DANIEL HOROWITZ
Attorney at Law
P.O. Box 1547
Lafayette, California 94549
(925) 283-1863
Attorney for the Estate of Michael Hassen and Reallaw APC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF MICHAEL HASSEN AND REALLAW APC | Case No.: |
| Plaintiffs, | |
| vs. | **CIVIL COMPLAINT FOR DAMAGES** |
| | COUNT 1: CIVIL RICO UNDER 1962 (C) |
| J.P. MORGAN CHASE BANK N.A., JOHN TORRES AND DOES 1-100. | COUNT 2: CIVIL RICO CONSPIRACY UNDER 1962 (D) |
| | COUNT 3: FRAUD |
| Defendants | JURY TRIAL DEMANDED |
| | Complaint Filed: |

## COMPLAINT

Plaintiffs, Estate of Michael Hassen and Reallaw APC, sue Defendants, J.P. Morgan Chase Bank N.A. ("Chase") and John Torres.

### NATURE OF THE ACTION

1.   This case arises directly out of a RICO enterprise that exploited multiple victims out of millions of dollars.

2.   Plaintiff Michael Hassen was one of those victims. His law firm, Reallaw APC was also one of those victims. Michael Hassen passed away in October of 2022. His Estate now brings this action on his behalf.

CASE NO.

3.   Non-party Benjamin Rafael pled guilty to conspiring to commit wire fraud while he was an employee of Wells Fargo.

4.   Non-party Benjamin McConley, one of the founders of the fraudulent enterprise, who worked and communicated directly with Benjamin Rafael and John Torres, also pled guilty to committing wire fraud.

5.   Benjamin McConley and his co-conspirator Jason Van Eman would not have been able to continue their fraudulent enterprise without the aid of Bejamin Rafael and John Torres.

6.   John Torres made fraudulent representations to Michael Hassen during the scope of his employment at J.P. Morgan.

7.   One of Michael Hassen's clients was also fraudulently exploited by J.P. Morgan and John Torres. That client has since sued Michael Hassen for malpractice and other torts.

8.   As a direct result of the actions of RICO Enterprise and as directly caused by the participation in that Enterprise by J.P. Morgan and Torres, Michael Hassen has suffered damages as set forth more fully herein.

## THE PARTIES

**Estate of Michael Hassen**

9.   Plaintiff, now deceased, was an individual residing in California as a well as an attorney duly licensed to practice in the State of California and with his office in Walnut Creek, California. He suffered injuries personally and professionally. His Estate now brings this action on his behalf. Hereinafter the individual Michael Hassen and his estate will be referred to as "Hassen".

**Reallaw APC**

CASE NO.

10. Reallaw APC is a professional corporation formed by Michael Hassen for his law practice. This APC was duly registered with the State of California and is presently valid and active. Hereinafter Reallaw APC will be referred to as "Reallaw".

**J.P. Morgan Chase Bank N.A.**

11. JPMorgan Chase & Co. is an American multinational financial services firm headquartered in New York City and incorporated in Delaware. This entity will hereinafter be referred to as "Chase".

**John Torres**

12. John Torres was an officer of Chase. He occupied to the role of Vice President. John Torres was, at all relevant times until August of 2018, an employee or agent of JPMorgan as a banker in California and acted within the scope of that role. Upon information and belief, Torres was fired on August 9, 2018.

**Does 1-100**

13. The true names of Does 1-100 are currently unknown to Plaintiffs. However, Does 1-100 are sued herein because each of them were in some manner responsible or legally liable for the actions, events, transactions, and occurrences alleged herein. Plaintiff will seek leave from the court to amend this complaint to identify the true names of such fictitiously named defendants whether individual, corporate, associate, or otherwise, once known.

## NON-PARTIES

**Benjamin McConley**

14. Benjamin McConley was one of the principals of the RICO enterprise.

**Jason Van Eman**

15. Jason Van Eman was one of the principals of the RICO enterprise.

CASE NO.

**Benjamin Rafael**

16. Benjamin Rafael was a banker at Wells Fargo who participated in the scheme.

**Weathervane Productions**

17. Plaintiffs are informed and believe Weathervane Productions is a Nevada Limited Liability Company which was conducting business in the County of Los Angeles owned by Jason Van Eman

**Forrest Capital Partners**

18. Plaintiffs are informed and believe Forrest Capital Partners (FCP) is a Florida Limited Liability Company which was conducting business in the County of Los Angeles California and is owned by Benjamin McConley.

**Wells Fargo Bank N.A.**

19. Wells Fargo & Company is an American multinational financial services company. Its banking subsidiary is Wells Fargo Bank, N.A., a national bank that designates its Sioux Falls, South Dakota as headquarters. These entities are hereinafter referred to as Wells Fargo Company and Wells Fargo Bank when individual distinctions are made. However, this complaint alleges that the conduct of Wells Fargo Bank is identical to and inseparable from those of Wells Fargo Company and therefore the conduct alleged herein is generically referred to as "Wells Fargo".

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 over the RICO counts and supplemental jurisdiction over the state law fraud counts.

21. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because John Torres, Wells Fargo Bank, J.P. Morgan are subject to personal

CASE NO.

jurisdiction in this judicial district and plaintiff is informed and believes that John Torres resides in this district.

## THE RICO ENTERPRISE

20. Benjamin McConley and Jason Van Eman held themselves out as film producers and financiers. In those roles, McConley and Van Eman offered to provide financing to investors and producers seeking funds to produce motion pictures, theater performances, and other projects.

21. McConley and Van Eman promised their victims that, in exchange for the victims' cash contribution, McConley would match the contribution and use the combined funds to secure financing from financial institutions.

22. In order to lure lenders, producers, and investors, McConley and Van Eman executed false and fraudulent "funding agreements," which guaranteed that the victims' cash contributions or loans would be "matched" dollar-for-dollar by McConley. McConley and Van Eman further assured the victims that their monies would be held in a secure bank account and would not be transferred without the victims' consent.

23. Van Eman and McConley worked with Wells Fargo Bank, Wells Fargo Vice President Benjamin Rafael, J.P. Morgan Chase and J.P. Morgan Chase Vice President John Torres and many others to create, continue, and cover up this unlawful enterprise.

24. The banks and their executives helped establish bank accounts which were created against banking laws and regulations and helped direct funds that the victims believed were targeted to safe accounts into fraudulent accounts created by the banks and bankers to benefit the enterprise.

25. At times, McConley and Van Eman promised that victims' contributions or loans would be secured by a financial guarantee called a "performance bond." McConley and Van Eman

CASE NO.

claimed they would pay for the performance bonds to be issued by a third-party insurance company. Other times the bankers would assure the victims and use the banking system to both deceive and directly defraud the victims.

26. Victims sent tens of millions of dollars to accounts controlled by the enterprise and investor funds were never "matched" as promised in the funding agreements. Neither McConley nor Van Eman applied for lines of credit on behalf of victims. Neither McConley nor Van Eman paid for or otherwise secured performance bonds on behalf of victims.

27. Instead of fulfilling their promises to victims, the enterprise stole the victims' money by transferring funds from the purportedly secure bank accounts to McConley and Van Eman's personal and corporate bank accounts, often within days of the victims' contributions or loans.

28. Benjamin Rafael, a Wells Fargo Bank employee, and John Torres, a J.P. Morgan Chase employee, falsely assured victims about the security of their funds. During the course of the scheme, these banking executives among others, falsely told victims that their contributions or loans had been "matched" and that McConley and Van Eman had applied for lines of credit at Wells Fargo Bank and J.P. Morgan Chase as promised in the funding agreements.

29. When victims demanded the return of their money, McConley and Van Eman usually refused to return the victims' funds as promised in the funding agreements, often blaming bank "compliance" issues. As a result, several victims filed civil lawsuits and other legal actions against McConley and Van Eman in Florida, California, and Texas. The banks were aware of these lawsuits but failed to warn other victims, failed to report the criminal conduct

CASE NO.

at their bank to law enforcement, and continued to support the criminal enterprise in various ways as set forth herein.

30. During the pendency of the lawsuits and legal actions, McConley and Van Eman continued to lure victims with false and fraudulent promises and documents. In order to resolve the various lawsuits and legal actions filed by earlier victims, and to pay attorneys' fees, the enterprise directed later victims' funds to the earlier victims and attorneys; all without the later victims' knowledge or authorization. In order to conceal from the public news of the lawsuits and legal actions, the enterprise engaged an "online reputation management" firm to "suppress" or hide negative information about them.

31. To promote the image of McConley and Van Eman as successful movie producers, these individuals used some of the stolen money to purchase luxury automobiles, personal watercraft, real estate, jewelry, home furnishings, designer clothes, hotel accommodations, and private and commercial air travel.

32. This enterprise began in 2012 and continued until July 2019 when Jason Van Eman and Benjamin Forrest McConley were federally indicted.

33. Michael Hassen was defrauded by Benjamin McConley, Jason Van Eman, Chase, and John Torres as both an individual and in his role as attorney for Dr. Vatche Cabayan.

34. Weathervane Productions was a seemingly successful movie producer/financier that used its successful projects to hide an overarching scheme of defrauding lenders and investors.

35. Ultimately Dr. Cabayan placed $ 1.6 million dollars and Michael Hassen placed $ 100,000.00 dollars into what J.P. Morgan Chase Vice President John Torres assured them was a blocked account accessible only to Jason Van Eman and the actual filmmaker, Warner Davis.

CASE NO.

This was not the case. The account belonged to the criminal enterprise and within hours the money was removed from J.P. Morgan Chase by the enterprise.

## THE SCHEME AS IT IMPACTED MICHAEL HASSEN

36. Warner Davis (Davis) was a legitimate film maker and Michael Hassen understood that he was raising funds as the first step in the financing of a film titled Tender.

37. Michael Hassen had previously provided Davis with informal advice on Davis's dealings with the owners of Weathervane Productions, Inc (WVP) and Forest Capital Partners, Inc. (FCP) on a film entitled Camp Cold Brook in the summer of 2017.

38. There were funding delays but the money was eventually provided and the film was made. Camp Cold Brook was successful. It can presently be viewed on Amazon Prime, Apple TV, Peacock and eleven other outlets. From these and other facts, Michael Hassen's belief and expectation that Weathervane and Forest Capital arrangement which is the subject of this lawsuit could legitimately fund a film was reasonable.

39. Additionally, Weathervane went on to fund successful films such as "The Tale" which premiered at Sundance Film Festival and later aired on HBO.

40. Further, prior to Michael Hassen and Dr. Cabayan's interaction with Weathervane/Forest Capital, they had released fourteen films (through 2016) and four more were released in 2017. In other words, as of 2017 at least 18 film makers, lenders, and investors had done business with Weathervane/Forest Capital and were met with success.

41. Michael Hassen had a client named Dr. Vatche Cabayan.

42. Michael Hassen discussed with his client putting in $1.6 million in funding for the film pursuant to a DFA with Warner Davis that was requested by McConley and Van Eman.

CASE NO.

43. Michael Hassen had multiple conversations with McConley, Van Eman, and John Torres discussing the structure of the deal regarding funding $1.7 million.

44. Dr. Cabayan agreed to put in $1.6 million requested by McConley and Van Eman to secure a line of credit from Chase.

45. Acting as his attorney, Hassen communicated directly with McConley, Van Eman, and John Torres.

46. Dr. Cabayan and Michael Hassen were not the only people involved with reviewing this deal. Dr. Cabayan had a personal banker at Bank of the West named Sol Gallardo who reviewed the transaction. Vick Ekmekjian, a trust officer with Atlantic Trust Company also reviewed the various documents and information passed on by Cabayan. Dr. Cabayan's personal friend and businessman Richard Najarian reviewed the proposed deal. Attorney Paul Tour-Sarkissian also reviewed the deal. None of these people flagged the deal as fraudulent. The reason all of the involved persons did not see the "fraud flag" was that John Torres used his position at Chase Bank to hide the fraud. The McConley Affidavit reveals the details for the first time (as far as plaintiffs or defendants to this action were aware.)

47. As presented, there were many protections put in place for this deal. Van Eman and McConley provided control to Hassen and Davis in that they could review and provide revisions to the film Term Sheet (which had an NDA) and Depositor Funding Agreement (DFA). The beneficial owner of the funds, Cabayan was to reach his own separate agreement with Davis on the terms of entrustment of the funds. No one else had access.

48. Dr. Cabayan put $ 1.6 million dollars of his money into this arrangement. Michael Hassen supplied $ 100,000.00.

**THE FRAUD**

CASE NO.

49. McConley, Van Eman, and Torres together and individually made fraudulent statements to Plaintiff in furtherance of the fraudulent purposes of the RICO enterprise.

50. Van Eman and McConley made representations to Plaintiff that the funds could be matched according to the DFA and Term Sheet.

51. Van Eman and McConley made representations that the funds were needed to secure a line of credit from Chase.

52. Torres made representations that the accounts of Van Eman and McConley were in good standing and free of holds.

53. Torres made representations that a locked account could be opened at Chase with Van Eman and Davis as signatories.

54. Van Eman made representations that a locked account could be opened at Chase with himself and Davis as signatories.

55. Van Eman knew that this was a fraud and that no such account would be created.

56. Benjamin McConley knew that this was a fraud and that no such account would be created.

57. John Torres knew that this was a fraud and that no such account would be created.

58. Hassen's due diligence efforts as an attorney were muddled due to the positive reputation of Van Eman and McConley in the film industry as well as the fact that other victims of the ponzi and RICO scheme had not yet been made public.

59. No agent of Chase ever informed Hassen that McConley and Van Eman were fraudsters.

60. Before Plaintiff himself and his client wired the money into the "secure" Chase account, he requested confirmation from Torres that the account was secure.

CASE NO.

61. Torres reassured Plaintiff that the account was secure.

62. On November 2nd, 2017 Warner Davis sent an email to Plaintiff forwarded from Benjamin McConley containing a letter from John Torres. (Exhibit 1)

63. That letter falsely stated that a "holding account" needed to be funded before the "master account" could be opened per the DFA.

64. That letter falsely stated that the wired funds would be allocated to the account once opened.

65. That letter falsely stated that "Forrest Capital Partner's accounts are in good standing and…..are free of any restrictions or holds".

66. That letter falsely stated that "In accordance with the provisions and intent of the aforesaid Funding Agreement…..CHASE BANK will be opening an additional account and issuing a line of credit in the amount of $3,400,000."

67. The $1.7 Million was never placed in a restricted account as agreed upon in the Term Sheet. That led to the losses and this lawsuit. Reallaw/Hassen as Defendants blame Chase and its Vice President John Torres for this failure. However, until counsel received the McConley Affidavit the details were not understood. This was not a bank error, it was an orchestrated fraud. The failures were not "failures". The failures were a success on the part of those conducting a deliberate fraud. John Torres and Chase Bank were instrumental in this process.

68. Van Eman made representations that a wire returning the money was in progress when it was not.

69. Van Eman made representations that the $1.7 million was safe in the "locked" account when it was not.

CASE NO.

70. Benjamin McConley made representations that the $1.7 million was safe in the "locked" account when it was not.

71. Van Eman made representations that the money could not be returned due issues by Chase.

72. Van Eman made representations that Chase was solely responsible for the delay of return of funds to Dr. Cayaban and Plaintiff.

73. Benjamin McConley made representations that Chase was solely responsible for the delay of return of funds to Dr. Cabayan and Plaintiff.

74. Torres made representations that the $1.7 million dollars would be returned via wire on April 12, 2018, even though he knew that the money was not available. (Exhibit 2)

75. The $1.7 Million defrauded by the RICO enterprise was never returned to Dr. Cabayan and Plaintiff.

76. On August 9, 2018, John Torres was fired from Chase for opening improper accounts and providing inaccurate information to victims like Plaintiff.

77. On July 25, 2019, the United States indicted McConley, Van Eman, and Benjamin Rafael.

78. Dr. Cabayan later sued Michael Hassen and his law practice, Reallaw APC, for malpractice and other torts.

79. Reallaw APC has suffered reputational damages and damages in the form of costs associated with defending against Dr. Cabayan's suit.

**THE CRITICAL ROLE OF THE BANKS AND THEIR VICE PRESIDENTS**

CASE NO.

80. To bolster their credibility, McConley and Van Eman would use Rafael and Torres (and possibly others unknown to Plaintiff) to back up their claims or support their statements that they had secured a line of credit or matched the victims' contributions.

81. Relying on these fraudulent statements, the victims provided their financial contributions.

82. But McConley and Van Eman did not, in fact, match their victims' contributions. Instead, within days, McConley and Van Eman transferred their victims' money to accounts under their or Rafael's control, and they then used the money to keep angry victims at bay and to spend lavishly on their lifestyle.

83. Thus, in reality, McConley, Van Eman, Wells Fargo's employee Rafael, and JPMorgan's employee Torres were lying to the victims when they assured them that the victims' contribution would be secure in an untouchable account, assured them that McConley and Van Eman had matched their contribution, assured them that McConley and Van Eman were wealthy businessmen, and assured them that McConley and Van Eman could not return the contributions because of compliance issues with the bank.

84. Both Wells Fargo and JPMorgan saw several red flags before McConley and Van Eman could open their accounts, but despite this McConley and Van Eman opened several accounts at those banks, after JPMorgan and Wells Fargo overrode the red flags.

85. Wells Fargo earned transaction fees whenever McConley, Van Eman, or Rafael wired millions in or out of Wells Fargo accounts as well as other monetary and non-monetary benefits.

86. JPMorgan too earned transaction fees whenever McConley, Van Eman, or Torres wired millions in or out of JPMorgan accounts as well as other monetary and non-monetary benefits.

87. McConley and Van Eman had been blocked from opening bank accounts. This key safety net alone would have prevented this fraudulent transaction from going forward. McConley's

bank accounts with Chase Bank were also blocked and/or closed as a result of being placed on the ChexSystem1 banned list.

88. In addition, McConley was banned from being a signer and/or owner on any account at Chase Bank due to Chase Global Security placing him on their banned list.

89. Both Wells Fargo and Chase allowed their banks to be used for illegal activities as the banks focused on profit and did not enforce state, federal law, or regulations designed to protect individuals.

90. To avoid these regulations and the bank's internal policies, the fraudsters needed inside help. Through an intermediary McConley met Chase' John Torres. Torres said he would "open an account and get around the system". Torres set up a straw man account in Torres' Brother in Law's name. Later the name was removed. (Exhibit 3)

91. Torres further explained how the account should be opened using the creation of a California company. Torres had McConley sign Torres' Brother in Law's name on the Chase signature card ... so that when McConley needed to sign the name for business relating to the account, the signature would be the same.

92. Torres then assisted in setting up a new account titled, FCP Master Holding Account, Inc. Torres ensured that the name of the business account at Chase mirror the name of a California corporation. "Torres even assisted in getting the California corporation, FCP Master Holding Account, Inc. set up with the California Secretary of State." (Exhibit 3)

93. The intricacy included setting up on line banking and ensuring that the "FCP Master Holding Account so that it would not link up with Gustavo's other Chase accounts." ( New Gmail accounts were set up.

CASE NO.

94. In 2019 Chase, John Torres and Ray Davido were sued in the USDC Central District of California CASE NO. CV 19-10337 (See Exhibit 4) The allegations related the same conduct that constitutes the gravamen of this lawsuit.

95. Chase invoked the (fraudulent) contract signed by the victims and fraudster Jason Van Eman to invoke the arbitration clause in that contract for the benefit of Chase.

96. While Chase did not admit liability, they claimed protection from the contract to which they were not direct parties, arguing that "Worldwide cannot avoid the Funding Agreement's binding arbitration provision by not suing the fraudsters who breached the Funding Agreement and allegedly stole its money. Worldwide expressly agreed to arbitrate "[a]ny dispute, claim or controversy arising out of or relating to this Agreement…". (Motion to Compel Arbitration, Exhibit 12, 2:1-4)

**OTHER FRAUD VICTIMS OF THE SCHEME**

97. Exhibits 5-8 of this complaint are lawsuits filed by individuals against the RICO defendants herein. Each of these lawsuits details both series of RICO predicate acts culminating in the accomplishment of the purpose of the scheme (to obtain money for the enterprise). These lawsuits detail the conduct of named RICO defendants in this action and of other (unnamed) RICO participants employed by the RICO enterprise. Plaintiff incorporates the allegations in those lawsuits in this complaint.

98. In summary the lawsuits allege as follows:

99. Exhibit 5 is a complaint filed by 818 Media Productions against Wells Fargo Bank N.A., Benjamin Rafael, Weathervane Productions, Jason Van Eman, Forest Capital Partners, and Benjamin McConley. The lawsuit alleges fraud, intentional deceit, negligent misrepresentation, Unfair business acts, breach of contract, and conversion.

CASE NO.

100. Exhibit 6 is a lawsuit filed by Adana Investing Inc against Forrest Capital Partners, Weathervane Productions Inc, Benjamin McConley, and Jason Van Eman. The lawsuit alleges that the Defendants fraudulently induced the Plaintiff to loan 15 million.

101. Exhibit 7 is a lawsuit filed by Baker Film Fund LLC against Weathervane Productions Inc, Forrest Capital Partners Inc., Wells Fargo Advisors LLC, Wells Fargo Bank, N.A., Jason Van Eman, Benjamin McConley, and Benjamin Rafael. The lawsuit alleges breach of contract, fraud, and negligent misrepresentation.

102. Exhibit 8 is a lawsuit filed by Brad Tuckman against Wells Fargo Bank N.A., JPMorgan Chase Bank N.A., and John Torres. The lawsuit alleges RICO, RICO conspiracy, fraud, and civil conspiracy to defraud among other torts. The lawsuit alleges that the Defendants fraudulently induced the Plaintiff to loan $1.85 million.

103.  Exhibit 9 is the Indictment filed against Van Eman, McConley and a third party not named in this lawsuit alleging violations of 18 USC 1349, 1343, 1956(h), 1957, 981(a)(I)(c) 982(a)(1). Van Eman plead guilty and the Judgment is incorporated herein as Exhibit 10 and McConley pled guilty plead guilty and the Judgment is incorporated herein as Exhibit 11.

104. Exhibit 3 is the sworn affidavit of Benjamin McConley detailing the operation of the enterprise. This document is incorporated herein by this reference.

105. As an example of how the criminal enterprise repeated its modus operandi, Just as Michael Hassen was scammed, so was Worldwide's legal counsel.

106. That victim's claim is reflected in Exhibit 4.

107. In that case, McConley requested John Torres to send an email to Mike Cherry, Worldwide's legal counsel, informing him that Torres was in possession of the contract for Bleed

CASE NO.

into One (a movie) and that FCP will have the confirmation letter that is required by the Funding Agreement and will deliver it upon receipt.

## TORRES PAYOFFS

108. These manipulations did not come "cheap". Torres was first with $10,000.00 in cash for his role in "getting around the system".

109. Over time, "In order to have John Torres serve as the inside banker and further the fraudulent scheme funds Torres was paid approximately $400,000.00 via wire transfers, cashier's checks, and regular checks." (Exhibit 3)

110. Other Chase employees were involved as well.

## ONLINE REPUTATION MANAGEMENT

111. To suppress and hide negative information about them, McConley and Van Eman engaged an "online reputation management" firm and paid that firm with money stolen from victims.

## BANK COMPLICITY

112. Benjamin Rafael was ultimately terminated from his employment with Wells Fargo Bank so that the enterprise could no longer use Rafael as the inside bank employee to assist in furthering the fraudulent film financing scheme.

113. However, to protect its reputation and the profits earned from the enterprise, Wells Fargo did not disclose to any regulatory or law enforcement agency the true nature of Rafael's criminal activities or those of the criminal enterprise.

114. As a result of the multiple civil lawsuits that were filed against the enterprise alleging various financial bad acts, sometime in the summer of 2017, the enterprise began to have most, if not all, of its bank accounts closed and/or terminated as a result of being placed on the

CASE NO.

ChexSystems banned list. In addition, during the summer of 2017 McConley's bank accounts with Chase Bank were also blocked and/or closed as a result of being placed on the ChexSystem banned list.

115. He also discovered during June 2017 that he was banned from being a signer and/or owner on any account at Chase Bank due to Chase Global Security placing him on their banned list.

116. However, Chase did not contact victims, law enforcement, or regulatory agencies to disclose the nature or extent of the crimes and Chase retained the profits earned from the criminal conduct.

117. From June 2017 through July 2018, John Torres was the banker at Chase Bank who assisted in opening accounts and misappropriating approximately $17,000,000.00 in lender and investor funds that were deposited at Chase Bank using John Torres as the Chase banker to legitimize the fraudulent financing scheme. "The lenders/investors/victims that John Torres assisted in defrauding were: (1) Worldwide Film Productions, LLC; **(2) Michael Hassan**; (3) Brad Tuckman; (4) Stuart Benjaim and (5) Josh Minyard." (Exhibit 3).

118. John Torres would have a conference call with the victims to legitimize the transaction; confirm that FCP and/or myself had the financial means to make any "match contribution"; that Chase would ensure that the victim's funds are secure and safe and could not be withdrawn unless done so in accordance with the funding agreement; and that the financing investment is legitimate. Torres also sent false emails, letters and other communications in furtherance of the fraud schemes perpetrated on the above-referenced victims. Some of the same false and fraudulent Chase letterhead documents that Torres created involving other fraud victims are attached hereto.

CASE NO.

## CHASE FURTHER COVER-UP

119. In a civil lawsuit presently in arbitration counsel for one of the parties attempted to subpoena documents from former Chase Vice President John Torres.

120. Mr. Torres was successfully served and his counsel, Joseph Vescera of Mayer Brown, contacted counsel to discuss the subpoena and requested documents.

121. During the meet and confer conference, counsel for Mr. Torres represented that Mr. Torres had no documents relating to the FCP account.

122. Mr. Vescera also represented that Mr. Torres had no recollection relating to this matter.

123. Mr. Vescera stated that he would ask Mr. Torres if he was willing to provide a declaration to that effect or sit for a short deposition. There was never any follow through.

124. At this point in time a subpoena was also issued to the bank for relevant records. Chase never provided any records indicating its knowledge of the criminal conduct of Mr. Torres.

## <u>FIRST CAUSE OF ACTION</u>
### [CIVIL RICO UNDER 1962(c)]
(By Plaintiffs Against All Defendants)

125. Plaintiffs incorporates and realleges paragraphs 1 – 124 here.

126. McConley, Van Eman, Wells Fargo, Rafael, Chase, and Torres all associated to create an enterprise with the common purpose of defrauding victims.

127. The enterprise's activity affected interstate commerce.

128. The enterprise's activity lasted a substantial period of time, from at least 2012 to at least 2019.

129. Chase and Torres were all associated with the enterprise.

130. Chase and Torres participated through a pattern of racketeering activity, namely wire fraud under 18 U.S.C § 1343.

CASE NO.

131. Plaintiffs suffered injury to business and property, which was proximately and actually caused by the pattern of racketeering.

132. **WHEREFORE**, Plaintiffs request that this court enters a judgement against Chase and Torres and award them compensatory damages, costs, treble damages, prejudgment interest, attorneys' fees, and all other just and equitable relief that this court deems appropriate.

<u>**SECOND CAUSE OF ACTION**</u>
**[CIVIL RICO CONSPIRACY UNDER 1962 (d)]**
(By Plaintiffs Against All Defendants)

133. Plaintiffs incorporate and realleges paragraphs 1 – 124 here.

134. McConley, Van Eman, Wells Fargo, Rafael, Chase, and Torres all associated to create an enterprise with the common purpose of defrauding victims.

135. The enterprise's activity affected interstate commerce.

136. The enterprise's activity lasted a substantial period of time, from at least 2012 to at least 2019.

137. McConley and Van Eman were employed by or associated with the enterprise.

138. McConley and Van Eman participated in, directly, in the conduct of the affairs of the enterprise.

139. Chase and Torres were associated with the enterprise.

140. McConley and Van Eman participated through a pattern of racketeering activity, namely wire fraud under 18 U.S.C § 1343.

141.  Chase and Torres conspired with McConley and Van Eman to violate 18 U.S.C. § 1962 (c).

142. Chase and Torres agreed to further and knowingly intend to further their conspiracy, which, if completed, satisfied all the elements of violating 18 U.S.C. § 1962 (c).

CIVIL COMPLAINT FOR DAMAGES
20

CASE NO.

143. Plaintiffs suffered injury to business and property, which was proximately and actually caused by the pattern of racketeering.

144. **WHEREFORE**, Plaintiffs request that this court enters a judgement against Chase and Torres and award them compensatory damages, costs, treble damages, prejudgment interest, attorneys' fees, and all other just and equitable relief that this court deems appropriate.

## THIRD CAUSE OF ACTION
### [FRAUD]
(By Plaintiffs Against All Defendants)

145. Plaintiffs incorporates and realleges paragraphs 1 – 124 here.

146. Chase and Torres each made statements of material fact to Plaintiffs

147. Chase and Torres each knew those statements to be false.

148. Chase and Torres made these misrepresentations to induce Plaintiff to deposit $100,000 of his own money and $1.6 million of his client's money.

149. Plaintiff and his client relied on these representations and wired $1.7 million into a Chase account which was stolen.

150. Plaintiff and his client were damaged by these representations.

151. **WHEREFORE**, Plaintiffs request that this court enters a judgement against Chase and Torres and award them compensatory damages, punitive damages, costs, prejudgment interest, and all other just and equitable relief that this court deems appropriate.

Dated this 18th day of August, 2023.
Respectfully Submitted,

_____
Daniel Horowitz
Attorney for the Estate of Michael Hassen
and Reallaw APC

CIVIL COMPLAINT FOR DAMAGES
21

CASE NO.

## **DEMAND FOR JURY TRIAL**

Please take notice that Plaintiffs Estate of Michael Hassen and Reallaw APC, demand a trial by jury.

Dated this 18th day of August, 2023.

_____

Daniel Horowitz
Attorney for the Estate of Michael Hassen
and Reallaw APC

CASE NO.