# Exhibit 12


**A High Tide For Prices of Private Docks**
REAL ESTATE | W1


**Bang-Up Job: Visiting China's Fireworks City**
MARKETPLACE | B1


**In Rare Boom, Cities Rush To Build Parks**
WEEKEND JOURNAL | W1

# THE WALL STREET JOURNAL.

DOWJONES    * * * * *    FRIDAY, JUNE 29, 2007 - VOL. CCXLIX NO. 151    * * * * $1.00

DJIA 13422.28 ▼ 5.45    NASD 2608.37 ▲ 0.1    NIKKEI 17932.27 ▲ 0.5    DJ STOXX 50 3922.48 ▲ 0.9    10-YR TREAS ▼ 11/32, yield 5.118    OIL $69.57 ▲ $0.60    GOLD $647.50 ▲ $5.60    EURO $1.3438    YEN 123.21

## What's News—

### Business and Finance

■ The Fed left short-term rates unchanged at 5.25% and softened its hawkish inflation stance a bit, while apparently ruling out any rate cuts soon. The move, which had been expected, had little impact on stocks. The Dow industrials eased 5.45 points to 13422.28. Treasurys fell. A2, C1, C8
■ Nymex crude-oil futures briefly topped $70 a barrel for the first time since September before settling at $69.57. C12
■ Richard Scrushy was sentenced to nearly seven years in prison for bribery. A judge denied the HealthSouth founder's bid to remain free pending appeal. A3
■ The U.S. net foreign debt rose about $300 billion last year, a less-than-expected sum given the current-account gap, helped by returns on overseas investments. A4
■ The Supreme Court decided to let manufacturers set and enforce minimum prices, ending a nearly 100-year-old ban. A2
■ Mortgage firms are offering deals to avoid foreclosures, but the effort may create clashes with mortgage-backed debt investors. C1
■ U.K. fund Caliber said it is shutting down because of souring investments in subprime mortgage-backed securities. C1
■ KB Home swung to a $148.7 million loss as revenue tumbled 36% amid a glut of homes for sale and slackening demand. C6
■ GM is selling Allison Transmission to private-equity firms Carlyle and Onex for $5.6 billion, its latest move to raise cash. A4
■ Delta Air Lines emerged as the leading contender to win the first new nonstop flights between the U.S. and China. A4
■ UAL is struggling with a dispirited staff, poor consumer ratings and mediocre service, 17 months after leaving Chapter 11. A10
■ The SEC is set to interview witnesses as it builds a case against a couple accused of improperly trading Dow Jones shares. A4
■ The FDA is blocking imports of Chinese farm-raised seafood after finding 25% had residues of illegal antibiotics and chemicals. B6
■ RIM's profit jumped 73%, helped by a new lineup of consumer devices. Rival Palm reported a 43% drop in earnings. B4
■ Apple CEO Jobs conceded AT&T's network will limit how fast iPhones surf the Web but said Wi-Fi use would boost speed. B4
■ Qualcomm rejected a patent-settlement proposal from rival Broadcom, the latest twist in a fight over cellphone chips. B5
■ Russia's Gazprom said earnings nearly doubled last year, helped by gas exports to Europe. Lukoil's first-quarter profit fell 23%. C6
■ A new Maine law requiring community-impact studies for big-box stores shows how the issue is gaining on the state level. A8

### World-Wide

■ Justices restricted the use of race to integrate public schools.
The Supreme Court's 5-4 decision is a stark indication of how the court is splitting along ideological lines and reflects deep disagreements over the Brown v. Board of Education ruling. Hundreds of schools will be required to rethink their race-based policies. Dissenting justices accused the majority of betraying the promise of racial equality, while conservatives hailed the decision. A1, A4
- *The court, 5-4, barred Texas from executing a mentally ill man, but it didn't address the larger issue of whether the inmate can be executed.*
■ The immigration bill collapsed as supporters fell 14 votes short. Within minutes after Senate vote to limit debate failed, Democrats discussed how to salvage pieces such as farm-labor provisions. Tech firms said they would press for legislation to increase the number of skilled workers. But backers may stand back and let problems worsen until public support builds, which may be after 2008 elections. A3
- *The food stamps Bush as a lame duck. In the House, the stalemate can be an excuse to avoid a fight.*
■ The White House moved toward a constitutional showdown, rejecting Senate subpoenas related to firings of U.S. attorneys. It may soon be embroiled in a similar executive-privilege standoff with subpoenas on Bush's warrantless surveillance program, even as it resumes a legislative push to update FISA law. A12
■ Pelosi endorsed the Senate's efforts to boost fuel standards, but uncertainty on House action reflects splits among Democrats. A7
■ The House rejected an effort to eliminate Cheney's office funds.
■ A Scottish panel ruled that a Libyan convicted in the 1988 Pan Am bombing should be given an appeal so new evidence can be weighed.
■ The EU banned all Indonesian airlines and some from Russia, Ukraine and Angola from flying into the bloc due to safety issues.
■ Biologists changed one species of bacteria into another, a step toward a new life form and a process with possible commercial uses. B1
- *Scientists have created embryonic stem cells by stimulating unfertilized eggs, but some disagree on the ethics of the procedure.*
■ Israeli President Katsav pleaded guilty to lesser sex crimes, a deal that avoids jail but forces him to resign. Peres succeeds him July 15.
■ Colombia accused FARC rebels of killing 11 lawmakers abducted in 2002. The guerrillas said they died in a rescue crossfire last week.
■ Russia successfully test-fired a sea-based ballistic missile, a weapon Moscow claims can penetrate prospective air defenses.
■ The U.S. reached pacts with Bogota and Seoul on free trade as Bush raced to meet a deadline before fast-track legislation expires.
■ Bush urged patience on Iraq in a speech at the Naval War College as an aide met with Republican war critics about a defense-policy bill.
■ Died: Kiichi Miyazawa, 87, premier of Japan 1991-93, in Tokyo.

---

## TABLE TALK

## A Shift in Dining Scene Nicks a Once-Hot Chain

*Applebee's Retained Bar-and-Grill Formula As Tastes Moved On*

By JANET ADAMY

On a visit to Marietta, Ga., last fall, TJ Palmer stopped into an Applebee's and ordered a bruschetta burger. "I didn't like it at all," she says.

After having visited the restaurant chain regularly for years, Ms. Palmer says, she rarely goes anymore. "It doesn't have anything that would make me want to come back."

Her assessment counts. Twenty-seven years ago, Ms. Palmer co-founded Applebee's.

It became one of the country's hottest restaurant companies. With its heaping portions of $8.49 oriental chicken salad and $10.99 riblet platters, Applebee's in the 1990s grew into the nation's largest sit-down restaurant chain, in part by blanketing suburbs and smaller cities that competitors overlooked. It was so popular that franchisees of other chains occasionally tore them down to build more Applebee's restaurants.

Yet today, Applebee's finds itself a



**Losing Ground**

| Change in sales at Applebee's U.S. restaurants open for at least 18 months: | 6% |
| --- | --- |
| | 4 |
| | 2 |
| | 0 |
| | -2 |
| | '04 '05 '06 |

Net Income, in millions:
| | $120 |
| --- | --- |
| | 80 |
| | 40 |
| | 0 |
| '02 '03 '04 '05 '06 |

Source: the company

company with falling profits, a lagging stock and restless investors agitating for change. Richard Breeden, head of an investment group that owns 5.25% of the company, has attacked Applebee's for giving bonuses to executives while the stock languished, and complained that directors didn't have a strategy to get things moving again. In February, trying to please its anxious investors, Applebee's announced it would consider selling itself.

What changed? Like other modestly priced restaurants, Applebee's is up against high gasoline prices that pinch the finances of some of its customers. But the chain's bigger problem is that it didn't change quickly enough while a raft of competitors copied it. In a business where fashions shift—fashions in food, in decor and in general restaurant ambience—Applebee's stayed too long with a formula that had worked for it in the past.

Attracting diners these days are

*Please turn to page A13*

---

## Court Limits How Districts Integrate Schools

*Race-Based Policy Ban Augurs Broad Changes; Clash Over Brown Case*

By JESS BRAVIN And DANIEL GOLDEN

WASHINGTON—In one of its most bitterly divided rulings of recent years, the Supreme Court sharply restricted how school districts can racially integrate their student bodies, reflecting deep disagreements over the meaning of the landmark *Brown v. Board of Education* decision.

Yesterday's ruling could bring sweeping change to hundreds of public-school districts, many of which must rethink the use of various race-based policies they have voluntarily adopted, including the busing of students from minority urban areas to predominantly white suburbs. Except for districts ordered by courts to remedy the ills of prior official segregation, the decision effectively outlaws assigning students to a school because of their race.

That means more districts are likely to seek diversity based on students' socioeconomic status. Some, such as Pinellas County, Fla., have already dropped any consideration of race. (See related article on page B1.)

The case is the starkest indication yet how the court is splitting along ideological lines under the stewardship of Chief Justice John Roberts, and the new court challenges three decades of liberal legal presumptions. It is also one of the angriest divisions in modern times as one of the nation's littmus-test social issues—the two sides reached almost diametrically opposed conclusions in their assessment of *Brown*, the 1954 ruling that decreed an

*Please turn to page A10*

---

## Bison Don't Roam, And It's a Problem For the Polish Herd

*Plan Is to Get Lazy Beasts To Travel Abroad and Breed; The EU Looks for Solution*

By EDWARD TAYLOR

BIAŁOWIEŻA, Poland—Krzysztof Niedziałkowski is trying to teach Europe's largest land mammal, the bison, to become more European.

To keep the animals from extinction, Mr. Niedziałkowski, coordinator of the European Bison Program, is trying to change the migration patterns of about 400 lowland bison (*Bison bonasus bonasus*) roaming the primeval forest in northeastern Poland. He wants to persuade Polish bison to breed with other wild herds of the same species in neighboring Lithuania and Slovakia.



Krzysztof Niedziałkowski

To do that, the bison, which can weigh nearly 2,000 pounds, need to stop gathering in one large herd and eventually must learn new migration routes now possible with the expansion of the European Union. In that town of one-story wood houses on the edge of Białowieża National Forest, Mr. Niedziałkowski runs a project to lay out trails of beets and hay—food to coax the bison to take their first small steps beyond the forest and eventually, he hopes, across borders.

"It's not working very well," says Wolfgang Fremuth, a zoologist at the Frankfurt Zoological Society, which is helping to finance the project. "Bison are very lazy and they haven't understood where to go. It may take a couple of years for them to learn."

The feeding stations of "steering meals" set up by the rangers often don't last long since there's a good chance that elk, deer and wild boar will eat the bison's buffet. Data gathered from 20 bison with radio collars show that, so far, not a single one has managed to follow a planned 37-mile migration route between neighboring forests in Poland, Mr. Niedziałkowski says.

But the EU, together with Mr. Niedziałkowski's employer, Poland's Mammal Research Institute, and the Frankfurt Zoological Society, have put up more than $4 million as part of a four-year program starting last year to expand the bison's habitat and to reach

*Please turn to page A12*

---

## NARRATIVE DISCORD

## Critiques of Iraq War Reveal Rifts Among Army Officers

*Colonel's Essay Draws Rebuttal From General; Captains Losing Faith*

By GREG JAFFE

Last December, Lt. Col. Paul Yingling attended a Purple Heart ceremony for soldiers injured in Iraq. As he watched the wounded troops collect their medals, the 41-year-old officer reflected on his two combat tours in Iraq.

He was frustrated at how slowly the Army had adjusted to the demands of guerrilla war, and ashamed he hadn't done more to push for change. By the end of the ceremony, he says, he could barely look the wounded troops in the eyes. Col. Yingling just had been chosen to lead a 540-soldier battalion. "I can't command like this," he recalls thinking.

He poured his thoughts into a blistering critique of the Army brass, "A Failure in Generalship," published last month in Armed Forces Journal, a nongovernment publication. "America's generals have been checked by a form of

Paul Yingling

war that they did not prepare for and do not understand," his piece argued. The essay echoed around the Army via email. The director of the Army's elite school for war planners scrapped his lesson plan for a day to discuss it. The commanding general at Fort Hood assembled about 200 captains in the chapel of that Texas base and delivered a speech intended to rebut it.

"I think [Col. Yingling] was speaking some truths that most of us talk about over beers," says Col. Matthew Moten, a history professor at West Point who also served in Iraq. "Very few of us have the courage or foolhardiness to put them in print."

The controversy over Col. Yingling's essay is part of a broader debate within the military over why the Army has struggled in Iraq, what it should look like going forward, and

*Please turn to page A12*

---

TODAY'S AGENDA: *A preview of newsworthy events*

**With Strong Job Market, Wallets Seem to Stay Open**

Personal income and spending are expected to get a lift from the tight job market. Meanwhile, the personal consumption expenditure index, an inflation indicator, is forecast to rise 0.5% for May, after a 0.3% rise in April. *Report at 8:30 a.m. EDT.*

**Fuel Costs and Real Estate May Dent Consumer Mood**

The mood of American consumers likely soured in June, thanks to higher gas prices, real-estate jitters and higher interest rates. The University of Michigan's June consumer-sentiment index is forecast to slide to 83.7 from May's 88.3. *Results at 10 a.m. EDT.*

Commerce department reports on construction spending, 10 a.m. EDT.

Follow the news all day at WSJ.com

CONTENTS
Corporate Focus..........A10    The Economy.............A2    Media & Marketing.......B5    Leisure....................W11
Deals & Deal Makers.....C3    Leading the News......A4    Pc, Inc. & Economics, A6,B    Technology & Health....B3
Earnings Digest............C3    Letters to the Editor...A13    Review & Outlook.......A14    Weather Watch........A12
                                            Heard on the Street.....C1    Stocks in the News......C4    Wire News.............B6

© Copyright 2007 Dow Jones & Company All Rights Reserved



The finest luxury crossover ever

# OPINION

## Putin's Soul

By David Satter

When President George W. Bush meets Vladimir Putin this weekend at his father's home in Kennebunkport, he will be trying to improve relations with a Russia that is becoming increasingly dangerous to the security interests of the West.

Mr. Bush is apparently counting on his "friendship" with Mr. Putin. But the relationship works in only one direction—to confuse and limit the policy options of the United States. Mr. Putin will become increasingly hostile not because he has tragically misinterpreted our intentions, but because he is the architect of a corrupt bureaucratic system in Russia that needs an anti-Western policy in order to survive.

### Russia's ex-KGB president runs a gangster state that pursues anti-Western policies in order to survive.

Russia wants to stop the U.S. from installing an anti-ballistic missile system in Eastern Europe on the grounds that it undermines the Russian deterrent. Mr. Putin offered instead to share the Russian early warning radar station in Azerbaijan to help the U.S. protect itself against Iran. But the offer made no sense. The radar is too close to Iran to be secure and cannot guide interceptors based in Poland.

At the same time, Russia continues to lend support to Iran. At a June 20 press conference in Tehran, Russian Foreign Minister Sergei Lavrov said that Iran was not a threat and that Russia would continue cooperation with the regime, including construction of the Bushehr nuclear plant scheduled to come on line in October.

Western officials have often been mystified by Russian actions that, by undermining Western security in the face of Islamic fanaticism, undermine Russia's security as well. But the Putin regime is concerned first of all with its own security. Russian interests are often not taken into account.

At first glance, the position of the Putin regime appears impregnable. Russia was the single largest beneficiary of the world commodities boom of the 2000s. GDP has grown by 6% to 7% a year, from $200 billion in 1999 to $920 billion in 2006 (in current dollars). Reserves now top $300 billion. Average salaries under Mr. Putin have doubled and his approval rating is above 70%.

Despite this, the Putin regime is actually quite fragile. It sits at the apex of an unjust social system and tolerates just enough liberty to make it extremely vulnerable to a serious investigation of its apparent crimes. Mr. Putin has systematically eliminated other centers of power. As a result, the bureaucracy rules alone—without interference from society but also without its support.

Under Mr. Putin, the handful of people who run Russia also own it. Government officials are on the board of Russia's largest state-run companies. First Deputy Premier Dmitri Medvedev is chairman of the board of Gazprom, Igor Sechin, deputy head of the Kremlin administration, is chairman of the Rosneft oil company, and Igor Shuvalov, an assistant to the president, is chairman of Russian Railroads. The capitalization of Gazprom is $236 billion, Rosneft $94 billion and Russian Railroads $50 billion. It is estimated that the people around Mr. Putin control companies that account for 80% of the capitalization of the Russian stock market.

The country is the scene of grossincome inequality. In 2006, the average income of the top 10% of the population in Moscow was 49 times greater than that of the bottom 10%. Despite the oil boom, 83% of the Russian population is poor.

Historically, income inequality has been dangerous for Russia and seldom has wealth been flouted in Russia the way it is now. The income gap also has grim consequences because of the government's failure to invest in social services. Those with money obtain high quality medical care. Those without it give up on their lives and wait to die, aware that decent medical care is out of reach. One result is that there are 60 deaths in Russia for every 100 births. Male life expectancy in Russia is now 58, lower than that of Bangladesh. Russia's murder rate is nearly five times that of the U.S.

Because the oil boom has guaranteed a gradual improvement in conditions and Russians were traumatized by the chaos of the Boris Yeltsin years, they have been accepting of conditions under Mr. Putin. But a collapse of the oil price would plunge Russia into recession and change the social and political situation overnight.

At the same time, the Russian leaders know that if the social situation in the country becomes unsettled, there are several terrorist acts and political assassinations that could be re-examined with far reaching consequences. Russia has been the scene of many crimes and unexplained deaths in the last eight years, but the best known were the 1999 apartment bombings, the hostage takings in Moscow and


George Bush and Vladimir Putin.

Beslan, the apparent poisoning of the investigative journalist Yuri Shchekochikhin, the murder of Duma deputy Sergei Yushenkov, and the recent murders of Anna Politkovskaya and Alexander Litvinenko.

The government has done virtually nothing to investigate these events (the refusal to extradite a suspect in the murder of Litvinenko was typical.) But private citizens and journalists have continued to turn up information. It has been reported, for example, that law enforcement was informed in advance about plans to take hostages in Moscow and Beslan but did nothing to disrupt them. There is also a videotape, which was not widely broadcast, of two of the persons who shadowed Politkovskaya before her murder.

Opposition political figures have taken an interest in these cases. Mikhail Kasyanov, the former prime minister who may run for president, has called for a new investigation of the apartment bombings and the hostage takings in Moscow and Beslan. Even supporters of the regime may use these crimes to eliminate their opponents. When Vladimir Ustinov was removed last year as prosecutor general, his opponents proposed reopening the investigation into the apparent poisoning of Shchekochikhin, who had investigated corruption in the FSB. This was a way of attacking their enemies in the FSB.

Under these circumstances, the anti-Western policies of the Putin regime, far from being a mystery, actually make perfect sense. By insisting on the right to give orders to countries it once dominated, such as Georgia and Ukraine, Russia guarantees a series of needless conflicts that can be used to distract the Russian population from massive corruption while playing to primitive nationalist instincts. A sign of the success of this policy is the mounting xenophobia in Russia and the tolerated attacks on dark-skinned foreigners in the streets. Anti-Western policies are also useful because they guarantee that Russia will absorb the West's attention. This can be depicted, with the help of state-controlled television, as a return to Russian greatness.

Finally, anti-Western policies set the stage for unrestrained demagoguery that can be used to undermine the ability of Russians to draw even the most basic moral distinctions. The most recent example was Mr. Putin's remarks to a delegation of teachers that no one should try to make Russia feel guilty about the Great Terror of 1937 because in other countries even worse things happened.

There will undoubtedly be an attempt in Kennebunkport to put a good face on U.S.-Russian relations. But this should not come through a self-censorship on the U.S. side that changes nothing in Russia's behavior and denies us the possibility of influencing it. In fact, the best President Bush can do is speak frankly to Mr. Putin about the obstructive and self-defeating character of his policies. By telling Mr. Putin the things he needs to hear, Mr. Bush may provoke a boorish response. But he will be behaving like a true friend.

*Mr. Satter is affiliated with the Hoover Institution, the Hudson Institute and Johns Hopkins. His most recent book is "Darkness at Dawn: the Rise of the Russian Criminal State" (Yale, 2003).*

## The Jesus Phone

By Paul Kedrosky

The Apple iPhone is set to be released today at 6 p.m., and I feel like I already have one. Apple's new "Jesus phone"—it combines Internet access, an iPod music player, and, oh yes, a phone—has been accompanied by a loud, relentless, and unavoidable drumbeat of hype.

According to one study, 58% of British and 64% of U.S. mobile phone users are aware of the iPhone, and 19 million Americans have pressed interest in buying one. That is remarkable stuff when you consider the iPhone's $499 price, not to mention that even the most successful so-called smart-phones are lucky to sell a million units.

Yikes! So, how has Apple done it? Some people argue it has cleverly drip-dripped product information to the market, tantalizing consumers and journalists alike, everyone hanging on to learn about the next nifty feature. A big, bright touch screen! A real Web browser! A finger-flickable interface! I gotta get one!

But this theory is wrong. Apple hasn't steadily dripped product information. As a matter of fact, the iPhone that Steve Jobs described and demonstrated back in January, when he first announced the product, is pretty much the same as what is being launched today. I am hard-pressed to think of a single material feature in the product that wasn't announced six months ago, right down to the nifty new way you can scroll through songs.

So if Apple hasn't teased and tantalized its way to iPhone ubiquity, as other theory goes, surely it has been the company's massive, multibillion-dollar marketing campaign that has done the deed. The trouble is, there is no such multibillion-dollar Apple campaign. Apple simply announced the product, and then did nothing. It has only been in the last month that there have been some television advertisements, and those were merely product demonstrations set to music. Granted, it was nice music, but it was also just an iPhone being put through its paces, hardly the recipe for hype.

### iPhone mania says a lot about how much people hate their current wireless options.

Some will say I'm missing the most important factor in Apple's marketing campaign: master showman, and Apple founder and CEO, Steve Jobs. He has been the one driving the promotion using his personal persuasiveness and charm. Fine. Show me his recent iPhone-pumping appearances on CNBC. None. Or on CNN. None. He has been conspicuous in his almost complete media absence. It must be a fairly postmodern style of promotion that has Mr. Jobs playing master showman largely by being invisible.

So if there hasn't really been much of an iPhone marketing campaign, at least in orthodox terms, and Apple demonstrably isn't suffering for iPhone attention, is it the Apple addicts out there that are responsible for the hype? Apple does have some of the most ardent fans of any modern company, many disposed to cult members than customers, but there simply aren't enough of them to explain the iPhone's cultural ubiquity.

If it's not the marketing campaign, nor the cult of Apple, nor the showmanship of the charismatic Steve Jobs, then how has the iPhone succeeded in getting millions of people interested in buying something so expensive that hasn't even been launched?

I'll tell you. First, people hate their cell phones. Other than making phone calls—a downright dreary bit of business—using phones for Internet, entertainment and pretty much anything else has been abysmal. Cell phones are best characterized as crippled, paternalistic devices best suited for people who think straitjackets are comfortable evening wear. People have horrible Web browsers, crummy screens, and obscure-to-the point-of-opacity interfaces. (After all, some of the iPhone's most-hyped features, like maps, are on traditional cell phones as well. You just can't find the feature.)

But in addition to hating their phones, people hate their cell phone carriers. Hate, hate, hate, hate. The major cellular providers—with their ham-handed "support" and fascist control of software that can run on phones directly—are right up there with the IRS in terms of inspiring your average mobile phone user's disgust and loathing.

To such consumers, Apple's iPhone seems like a cool drink of water. These people want to be liberated either from bad phones or from bad phone companies. They want to choose a device that does all the things they want to do—calling, being entertained, consuming information—not all the things their phone carriers want to do.

Ditto cell phone companies as well. You just can't find the feature.

Company thinks they should do (and then be charged $5 a month per feature for the privilege). They want phones that make it possible to do calls over wi-fi, to the point that cellular companies could potentially become irrelevant.

The massive upwelling of grassroots support for the iPhone shows that a revolution has been building for some time. Now it's here. Cell phone carriers are going to have to respond by cutting the length of contracts and eliminating exclusivity, and most important, by finally being willing to cede control to the market. If not, iPhones (or their successors) will finish them off.

*Mr. Kedrosky is a venture capitalist and CNBC analyst.*

## Scalia's Judicial Activism

By Richard A. Epstein

This past week, a sharply divided Supreme Court in *Hein v. Freedom From Religion Foundation* held that President Bush's faith-based initiatives could not be challenged in federal court as a prohibited state establishment of religion. *Hein* said nothing about the merits of the underlying challenge, but relied instead on the constitutional rule that denies taxpayers "standing" to sue.

Many liberals criticized the decision because it erodes the line between church and state. Many conservatives have hailed the decision for the opposite reason. I think the liberals have a point on the merits—but quite apart from the merits, conservatives who cheer *Hein* make a critical mistake. Any defender of limited government who believes in an original interpretation of the Constitution should reject, root-and-branch, the court's hostility to taxpayer standing.

"Standing" doctrine holds that only certain individuals are in position to challenge the constitutionality of various government actions. Today's basic rule allows challenges only from parties with a distinct "pocketbook interest," such as personal injury or contract loss. That rule blocks taxpayers from suing to stop action that they claim lies outside congressional or executive power.

The doctrine arose from two companion suits brought in 1923 against Andrew Mellon, then Secretary of the Treasury, to block the collection and expenditure of funds under the 1921 Maternity Act, which offered to cooperating states federal grants intended to reduce infant and maternal mortality. Any state could opt out of the grant—but its citizens could not opt out from the taxes needed to fund it. Massachusetts and Mrs. Frothingham sought to stop a program they claimed was exclusively of local concern under the 10th Amendment, which reserves powers not delegated to the federal government to the states. Justice Sutherland, writing for a unanimous court, ducked the substantive issue by denying standing to both plaintiffs.

Since then, the one major exception to the standing doctrine surfaced in 1968 in *Flast v. Cohen*, which did allow taxpayers an establishment clause challenge to the payment of federal funds to religious schools. *Hein* asked whether the *Flast* exception allowed taxpayers to challenge discretionary executive branch expenditures in support of faith-based initiatives. The upshot was a three-way split. Justice Alito, writing for the Chief Justice and Justice Kennedy, held the *Flast* exception did not. Justices Scalia and Thomas wanted to deny taxpayer standing across the board, overruling *Flast*. That unhappy coalition tossed the Foundation out of court. Justice Souter speaking for Justices Stevens, Ginsburg and Breyer argued that *Flast* governed.

### Taxpayers have every right to challenge unconstitutional government.

They all addressed the wrong question: The proper rule should allow all taxpayers free rein to challenge either Congress or the executive branch for overstepping their constitutional authority.

At stake is whether judicial review itself remains as a check on the political branches. Blocking taxpayer standing often leaves no one to challenge congressional or presidential actions as inconsistent with our basic constitutional design—allowing both branches to act in areas where they have no constitutional authority.

Many conservatives might react in horror: High-flying legal theory should never be invoked to manufacture new powers for the federal courts. But limits on taxpayer standing do not derive from any textual command. They rest on a serious misreading of the constitutional text, which contains no standing requirement at all.

Article III states that "the judicial power [of the federal courts] shall extend to all cases in Law and Equity." Thereafter follows a discrete list of various disputes over which that power shall be exercised: suits arising under the Constitution, it is not *Flast* that needs to be overturned, but *Frothingham v. Mellon*.

There are high stakes here in the ongoing debate between majoritarians and limited government libertarians. Majoritarians may think that our Constitution is simply a blueprint to organize democratic politics. But its elaborate system of separation of powers, checks and balances, and individual guarantees, reveals a far more complex structure.

These issues here and will replay themselves in areas from national security to environmental protection, where federal legislation and executive initiatives could raise serious constitutional questions. When they do, our commitment to limited government calls for a full and substantive analysis, not an artful dodge by unprincipled procedural tricks.

*Mr. Epstein is a professor of law at the University of Chicago and a senior fellow at the Hoover Institution.*

---

### THE WALL STREET JOURNAL.

Published since 1889 by DOW JONES & COMPANY

L. Gordon Crovitz, Publisher
DOW JONES & COMPANY
M. Peter McPherson, Chairman
Richard F. Zannino, Chief Executive Officer

Marcus W. Brauchli, Managing Editor

DEPUTY MANAGING EDITORS:
Daniel Hertzberg, Senior Deputy; John Bussey;
Edward Felsenthal; Alix M. Freedman
Paul E. Steiger, Editor at Large
Paul A. Gigot, Editor of the Editorial Page
Daniel Henninger, Melanie Kirkpatrick,
Deputy Editors, Editorial Page

OPERATING EXECUTIVES:
Todd H. Larsen, Chief Operating Officer
Gordon Crovitz, Publisher
Michael F. Rooney, Chief Revenue Officer

VICE PRESIDENTS:
Alexandra A. Flinn, Jr., Partners
Liberia Moderate, Circulation Marketing; Paul
Bascobert, Senior Vice President, Operations; Sally
Brophy, Brand & Research; William C. Dwyer, Law,
International; Jack S. Gelman, Technology; Matthew
A. Goldberg, Executive Development; Michael J.
Henry, Integrated Solutions; Kenneth Herts,
Finance; Larry L. Hoffman, Production; Jon
Housman, Classified Ventures; Stuart D. Karle,
Law; Ann Marie Mekenzie, International Advertising; Indira
Patel, Marketing Strategy; K. James Pensiero,
Corporate Communications; Richard M. Strauss,
Advertising & Public Relations, Sales Strategy;
Marketing, Lee Weinberg, Sales Strategy; Andrew T.
Yost, Strategy & Ops Communications

EDITORIAL AND CORPORATE HEADQUARTERS: 200 Liberty Street, New York, N.Y., 10281, Telephone (212) 416-2000
ONLINE: www.wsj.com
Subscription Services: Call 1-800 JOURNAL, http://www.services.wsj.com

This material may be protected by Copyright law (Title 17 U.S. Code)

# The Jesus Phone

By Paul Kedrosky

The Apple iPhone is set to be released today at 6 p.m., and I feel like I already have one. Apple's new "Jesus phone"—it combines Internet access, an iPod music player, and, oh yes, a phone—has been accompanied by a loud, relentless, and unavoidable drumbeat of hype.

According to one study, 58% of British and 64% of U.S. mobile phone users are aware of the iPhone, and 19 million Americans have expressed interest in buying one. That is remarkable stuff when you consider the iPhone's $499 price, not to mention that even the most successful so-called smartphones are lucky to sell a million units.

Yikes! So, how has Apple done it? Some people argue it has cleverly drip-dripped product information to the market, tantalizing consumers and journalists alike, everyone hanging on to learn about the next nifty feature. A big, bright touch screen! A real Web browser! A finger-flickable interface! 1 gotta get one!

But this theory is wrong. Apple hasn't steadily dripped product information. As a matter of fact, the iPhone that Steve Jobs described and demonstrated back in January, when he first announced the product, is pretty much the same as what is being launched today. I am hard-pressed to think of a single material feature in the product that wasn't announced six months ago, right down to the nifty new way you can scroll through songs.

So if Apple hasn't teased and tantalized its way to iPhone ubiquity, another theory goes, surely it has been the company's massive, multibillion-dollar marketing campaign that has done the deed. The trouble is, there is no such multibillion-dollar Apple campaign. Apple simply announced the product, and then did nothing. It has only been in the last month that there have been some television advertisements, and those were merely product demonstrations set to music. Granted, it was nice music, but it was also just an iPhone being put through its paces, hardly the recipe for hype.

Some will say I'm missing the most important factor in Apple's marketing campaign: master showman, and Apple founder and CEO, Steve Jobs.

He has been the one driving the promotion using his personal persuasiveness and charm. Fine. Show me his recent iPhone-pumping appearances on CNBC. None. Or on CNN. None. He has been conspicuous in his almost complete media absence. It must be a fairly postmodern style of promotion that has Mr. Jobs playing master showman largely by being invisible.

So if there hasn't really been much of an iPhone marketing campaign, at least in orthodox terms, and Apple demonstrably isn't suffering for iPhone attention, is it the Apple addicts out there that are responsible for the hype? Apple does have some of the most ardent fans of any modern company, more similar to cult members than customers, but there simply aren't enough of them to explain the iPhone's cultural ubiquity.

If it's not the marketing campaign, nor the cult of Apple, nor the showmanship of the charismatic Steve Jobs, then how has the iPhone succeeded in getting millions of people interested in buying something so expensive that hasn't even been launched?

I'll tell you. First, people hate their cell phones. Other than making phone calls—a downright dreary bit of business—using phones for Internet, entertainment and pretty much anything else has been abysmal. Cell phones are best characterized as crippled, paternalistic devices best suited for people who think straitjackets are comfortable evening

> *iPhone mania says a lot about how much people hate their current wireless options.*

wear. They have horrible Web browsers, crummy screens, and obscure-to-the-point-of-opacity interfaces. (After all, some of the iPhone's most hyped features, like maps, are on traditional cell phones as well. You just can't find the feature.)

But in addition to hating their phones, people hate their cell phone carriers. Hate, hate, hate, hate. The major cellular providers—with their ham-handed "support" and fascist control of software that can run on phones directly—are right up there with the IRS in terms of inspiring your average mobile phone user's disgust and loathing.

To such consumers, Apple's iPhone seems like a cool drink of water. These people want to be liberated either from bad phones or from bad phone companies. They want to choose a device that does all the things they want to do—calling, being entertained, consuming information—not all the things their phone company thinks they should do (and then be charged $5 a month per feature for the privilege). They want phones that make it possible to do calls over wi-fi, to the point that cellular companies could potentially become irrelevant.

The massive upwelling of grass-roots support for the iPhone shows that a revolution has been building for some time. Now it's here. Cell phone carriers are going to have to respond by cutting the length of contracts and eliminating exclusivity, and most important, by finally being responsive to their market. If not, iPhones (or their successors) will finish them off.

*Mr. Kedrosky is a venture capitalist and CNBC analyst.*

# Scalia's Judicial Activism

By Richard A. Epstein

This past week, a sharply divided Supreme Court in *Hein v. Freedom From Religion Foundation* held that President Bush's faith-based initiatives could not be challenged in federal court as a prohibited state establishment of religion. *Hein* said nothing about the merits of the underlying challenge, but relied instead on the constitutional rule that denies taxpayers "standing" to sue.

Many liberals criticized the decision because it erodes the line between church and state. Many conservatives have hailed the decision for the opposite reason. I think the liberals have a point on the merits—but quite apart from the merits, conservatives who cheer *Hein* make a critical mistake. Any defender of limited government who believes in an originalist interpretation of the Constitution should reject, root-and-branch, the court's hostility to taxpayer standing.

"Standing" doctrine holds that only certain individuals are in position to challenge the constitutionality of various government actions. Today's basic rule allows challenges only from parties with a distinct "pocketbook interest," such as personal injury or contract loss. That rule blocks taxpayers from suing to stop action that they claim lies outside congressional or executive power.

The doctrine arose from two companion suits brought in 1923 against Andrew Mellon, then Secretary of the Treasury, to block the collection and expenditure of funds under the 1921 Maternity Act, which offered to cooperating states federal grants intended to reduce infant and maternal mortality. Any state could opt out of the grant—but its citizens could not opt out from the taxes needed to fund it. Massachusetts and Mrs. Frothingham sought to stop a program they claimed was exclusively of local concern under the 10th Amendment, which reserves powers not delegated to the federal government to the states. Justice Sutherland, writing for a unanimous court, ducked the substantive issue by denying standing to both plaintiffs.

Since then, the one major exception to the standing doctrine surfaced in 1968 in *Flast v. Cohen*, which did allow taxpayers an establishment clause challenge to the payment of federal funds to religious schools. *Hein* asked whether the *Flast* exception allowed taxpayers to challenge discretionary executive branch expenditures in support of faith-based initiatives. The upshot was a three-way split. Justice Alito, writing for the Chief Justice and Justice Kennedy, held the *Flast* exception did not. Justices Scalia and Thomas wanted to deny taxpayer standing across the board, overruling *Flast*. That uneasy coalition tossed the Foundation out of court. Justice Souter speaking for Justices Stevens, Ginsburg and Breyer argued that *Flast* governed.

> *Taxpayers have every right to challenge unconstitutional government.*

They all addressed the wrong question: The proper rule should allow all taxpayers free rein to challenge either Congress or the executive branch for overstepping their constitutional authority.

At stake is whether judicial review itself remains as a check on the political branches. Blocking taxpayer standing often leaves no one to challenge congressional or presidential actions as inconsistent with our basic constitutional design—allowing both branches to act in areas where they have no constitutional authority.

Many conservatives might react in horror: High-flying legal theory should never be invoked to manufacture new powers for the federal courts. But limits on taxpayer standing do not derive from any textual command. They rest on a serious misreading of the constitutional text, which contains no standing requirement at all.

Article III states that "the judicial power [of the federal courts] shall extend to all cases in Law and Equity." Thereafter follows a discrete list of various disputes over which that power shall be exercised: suits arising under the Constitution and federal laws, suits to which the U.S. is a party, and the like. Nothing about this limits who counts as a proper plaintiff. It is therefore a supreme sleight-of-hand to assume that Article III justifies this self-imposed limit on judicial power.

Quite the opposite. The pocketbook or discrete-injury requirement of standing is rightly implied for cases "in law"—that is, the old common-law courts—where only damages could be awarded. But from well before even the federal constitution unified state and federal courts, courts could use their powers of equity to issue injunctions to stop the illegal actions of corporations, associations, or local governments at the instance of shareholders, members or taxpayers.

Justice Scalia therefore takes a blatantly anti-originalist position by reading into the Constitution a limitation found neither in its text nor its basic structure, nor in the general judicial practice running deep in our history. *Hein* does not involve a question, as he says, of "mental displeasure" on the part of members of the Freedom from Religion Foundation. The question is about the structural integrity of our government under the Constitution. It is not *Flast* that needs to be overturned, but *Frothingham v. Mellon*.

There are high stakes here in the ongoing debate between majoritarians and limited government libertarians. Majoritarians may think that our Constitution is simply a blueprint to organize democratic politics. But its elaborate system of separation of powers, checks and balances, and individual guarantees, reveals a far more complex structure.

These issues have and will replay themselves in areas from national security to environmental protection, where federal legislation and executive initiatives could raise serious constitutional questions. When they do, our commitment to limited government calls for a full and substantive analysis, not an artful dodge by unprincipled procedural tricks.

*Mr. Epstein is a professor of law at the University of Chicago and a senior fellow at the Hoover Institution.*

---

## THE WALL STREET JOURNAL.
*Published since 1889 by DOW JONES & COMPANY*

**L. Gordon Crovitz**, Publisher

**Marcus W. Brauchli**, Managing Editor

**DEPUTY MANAGING EDITORS:**
Daniel Hertzberg, *Senior Deputy*; John Bussey; Edward Felsenthal; Alix M. Freedman

**Paul E. Steiger**, *Editor at Large*

**Paul A. Gigot**, *Editor of the Editorial Page*
Daniel Henninger, Melanie Kirkpatrick, *Deputy Editors, Editorial Page*

**OPERATING EXECUTIVES:**
Todd H. Larsen, *Chief Operating Officer*
Ann Marks, *Chief Marketing Officer*
Michael F. Rooney, *Chief Revenue Officer*

**VICE PRESIDENTS:**
Liberta Abbondante, *Circulation Marketing*; Paul Bascobert, *Senior Vice President, Operations*; Sally Brophy, *Brand & Research*; William E. Casey, Jr., *International*; Jack S. Gelman, *Technology*; Matthew A. Goldberg, *Franchise Development*; Michael J. Henry, *Integrated Solutions*; Kenneth Herts, *Finance*; Larry L. Hoffman, *Production*; Jon Housman, *Classified Ventures*; Stuart D. Karle, *Legal*; Kelly Leach, *Strategy & Planning*; John J. McMenamin, *International Marketing*; Imtiaz Patel, *Marketing Strategy*; F. James Pensiero, *Special Projects*; Jennifer B. Stranzl, *Marketing & Public Relations*; David Wachtel, *Advertising Marketing*; Lee Weinberg, *Sales Strategy*; Andrew T. Yost, *Strategic & Group Circulation*

**DOW JONES & COMPANY**

M. Peter McPherson, *Chairman*
Richard F. Zannino, *Chief Executive Officer*

**EXECUTIVE VICE PRESIDENTS:**
L. Gordon Crovitz, *Consumer Media Group*
Clare Hart, *Enterprise Media Group*
William B. Plummer, *Chief Financial Officer*
Joseph A. Stern, *General Counsel*

**SENIOR VICE PRESIDENTS:**
Jorge L. Figueredo, *Human Resources*;
John N. Wilcox, *Local Media Group*

**OPERATING EXECUTIVES:**
Edwin A. Finn, Jr., *Barron's*
Neal Lipschutz, *Dow Jones Newswires*
*Managing Editor*
Michael A. Petronella, *Indexes*
Ann Sarnoff, *Ventures*
Scott D. Schulman, *Financial Information Services*

**VICE PRESIDENTS:**
Joseph J. Cantamessa, *Security*; Linda E. Dunbar, *Communications*; Paul J. Ingrassia, *News Strategy*

**ONLINE:**
Gordon McLeod, *President*
Bill Grueskin, *Managing Editor, WSJ.com*
Brian J. Quinn, *Vice President, Advertising*
Daniel J. Bernard, *General Manager, WSJ.com*

EDITORIAL AND CORPORATE HEADQUARTERS: 200 Liberty Street, New York, N.Y., 10281, Telephone (212) 416-2000.
Subscription Services: Call 1-800-JOURNAL, http://services.wsj.com  **DOWJONES**