UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No.   11-cv-01846-LHK<br><br>**DECLARATION OF COOPER C. WOODRING IN SUPPORT OF APPLE'S MOTION FOR A PRELIMINARY INJUNCTION** |

I, COOPER C. WOODRING, declare as follows:

**A.     Qualifications**

1.     I am an independent industrial designer and inventor. I have bachelor's and master's degrees in Industrial Design. I have worked as an industrial designer continuously since 1962—almost 50 years. I have received over 25 United States design and utility patents. (*See* Exhibit 1.) A selected set of my United States design patents is attached as Exhibits 2 and 3.

2.     The Industrial Designers Society of America ("IDSA") defines industrial design as:

> [T]he professional service of creating and developing concepts and specifications that optimize the function, value, and appearance of products and systems for the mutual benefit of both user and manufacturer. (*See* Exhibit 4.)

3.     I was elected President and Chairman of the IDSA and most recently served as its Executive Director. I testified before the United States Congress on The Industrial Design Innovation and Technology Act (H.R. 1790). I was appointed by President Ronald Reagan to head the United States Information Agency's Cultural Exchange Mission, "Design in America," behind the then-existing Iron Curtain. I recently addressed the Design Patent Examiners of the United States Patent and Trademark Office at its first ever "Design Day" on future issues and strategies for seeking patent protection for designs from the perspective of an industrial designer. (*See* Exhibit 5.)

4.     I received my profession's highest award, the IDSA Personal Recognition Award, which has been bestowed on only nine designers in history. A list of my honors, awards, articles, and speaking engagements appears in my curriculum vitae. (*See* Exhibit 6.)

5.     During my career, I have designed hundreds of consumer products. A majority of my career was spent with JCPenney Co. in New York City as Manager of New Product Development and Product Design. During my time with JCPenney, I designed consumer products in many categories, including sporting goods, toys, furniture, electronics, hardware, major appliances, and housewares. Attached as Exhibit 7 are examples of consumer electronics I designed during my career.

6. Based on my years of experience designing consumer products, including consumer electronics, and for all the reasons stated in this declaration, I believe that I am qualified to testify as one skilled in the art with respect to the designs at issue in this case. In addition, I believe that my experiences working with other designers of products of this type qualify me to testify on what would be understood by one skilled in the art of designing cellular phones and tablet computers such as the ones at issue here.

7. I also believe that, based on my firsthand experiences observing purchasers of consumer electronics, I am qualified to testify as to how an ordinary observer would perceive and evaluate cellular phone and tablet computer designs. For example, during my tenure at JCPenney, it was estimated that more than one million people a day shopped in our stores. Watching the many customers come through the store, I conducted research into how ordinary observers evaluate, compare, and purchase product designs, including consumer electronics. I studied and learned the habits and customs of these ordinary customers in the retail environment, including the length of time a typical customer spends making a purchase decision for consumer products. I also have experience seeing how consumers are influenced by market trends and styles. In short, I have had firsthand experience observing ordinary purchasers of consumer electronics. Furthermore, I have purchased consumer electronics and thus can speak from my own personal experiences. For all of these reasons, I believe that I am qualified to testify on issues related to how ordinary observers perceive ornamental designs for cellular phones and tablet computers, such as those at issue here.

8. In the past five years, I have worked as an expert witness in several lawsuits involving design patent and trade dress infringement. In particular, I have served as an expert for:

- Herman Miller against A. Studio in Case No. 1:04CV0781 (W.D. Mich.);
- Electrolux against Oreck Holdings in Civil Action No. 05-5696 (E.D. La.);
- Garmin against Tom Tom in Case No. 268408/KGZA 06-819 (The Netherlands District Court of The Hague, Civil Law Section);

- Wing Shing against Sunbeam (Mr. Coffee) in Case No. 06 Civ. 3522 (S.D.N.Y.);

- VTech Communications, Inc. against Motorola, Inc. in Case No. 07-cv-171-DF-CMC (E.D. Tex.);

- Wenger Corp. against Jim Melhart Piano & Organ Co., Inc. in Case No. M-05-359 (S.D. Tex.);

- Wenger Corp. against Stadium Chair Co. & Gil DeShazio in Case No. MO-5-CV-099 (W.D. Tex.);

- Nichia Corp. against Seoul Semiconductor Co., Ltd. in Case No. 06-cv-162-MMC (JCS) (N.D. Cal.);

- Yokohama Rubber Co., Ltd. against Stamford Tyres Intl. Pte Ltd. in Case No. SACV 07-0010 CJC (MLGx) (C.D. Cal.);

- Yokohama against Hangzhou Tire in Case No. SACV 06-0822 JVS (C.D. Cal.);

- Bodum against Four Others in Case No. 07C5303 ASE (N.D. Ill.);

- Dexas against Tung Yung in Case No. 6:07-CV-00334 LED (E.D. Tex.);

- Risenthel against Mad Bags in Case No. 1:09-CV-04971 (N.D. Ill.);

- B&R Plastics against Kikkerland Designs in Investigation No. 337-TA-693 (U.S. ITC);

- Cobra against Bulldog in Case No. 1:09-cv-00436-UA-PTS (M.D.N.C.);

- MMI against Baja Motorsports in Case No. 2:10-cv-00496-JAT (D. Ariz.); and

- Chrysler against Xingyue Group in Investigation No. 377-TA-722 (U.S. ITC).

9. I have been retained as an expert consultant in this case by Morrison & Foerster LLP, attorneys for Apple Inc. My hourly rate is $360. My compensation is in no way tied to the outcome of this case or any particular part of the case.

**B.     Scope of Declaration**

10. I have been asked by Apple's attorneys to compare the designs claimed in U.S. Design Patent No. D618,677 (the "'D677 patent"), D593,087 (the "'D087 patent"), and D504,889

1   (the "'D899 patent") against the designs of Samsung's Galaxy S 4G, Infuse 4G, and Galaxy Tab
2   10.1 products.

3   11.   My detailed analysis follows and makes reference to Exhibits 8-21, which contain
4   side by side comparisons of the patented designs and the Samsung products and, in some
5   instances, three-way comparisons of the patented designs, the Samsung products, and the prior art.

6   12.   In Exhibits 8-21, I have scaled the drawings and photographs such that the heights
7   of the phones and tablet computers correspond with one another.  Care has been taken not to
8   change the proportional relationship (i.e., aspect ratio) of the designs.  When conducting my
9   analysis, I compared an actual physical sample of the Samsung product to the drawing figures of
10  the patented designs.  The photographs in this declaration accurately represent the Samsung
11  products and record the visual comparison that I made.

12  **C.   Detailed Comparison of 'D677 Design against Samsung Galaxy S 4G and Infuse 4G.**
13

14  13.   The 'D677 patent is directed to the ornamental appearance of Apple's iPhone.
15  14.   Before conducting my comparison of the 'D677 patent against the Samsung
16  Galaxy S 4G and Infuse 4G products, I reviewed the file history of the 'D677 patent and analyzed
17  and became familiar with the prior art cited there, as well as U.S. Design Patent No. D498,754
18  and D563,929 (the "Samsung-identified references"), which I understand were identified by
19  Samsung's attorneys at a May 12, 2011 hearing in this case.

20  15.   In conducting my analysis, I compared the eight views of the 'D677 patent (FIGS.
21  1-8) with the corresponding views of the Samsung Galaxy S 4G and Infuse 4G phones.  In
22  Exhibit 8, each view of the patented 'D677 design is compared to the corresponding view of the
23  Galaxy S 4G.  In Exhibit 11, each view of the patented 'D677 design is compared to the
24  corresponding view of the Infuse 4G.

25  *1.   'D677 against the Galaxy S 4G*

26  16.   On visual inspection, it is apparent that all of the major design elements from the
27  patented 'D677 design are also found in the Galaxy S 4G design.  Just as in the patented design,
28  the Galaxy S 4G design has:

        a.      a flat, clear, black-colored, rectangular front surface with four evenly rounded corners;

        b.      an inset rectangular display screen centered on the front surface that leaves very narrow borders on either side of the display screen and substantial borders above and below the display screen; and

        c.      a rounded, horizontal speaker slot centered on the front surface above the display screen,

        d.      where the rectangular front surface is otherwise substantially free of ornamentation outside of an optional button area centrally located below the display.

(*See* Exhibit 8.)

17. To confirm my analysis, and to directly compare physical product against physical product, I have also included in Exhibit 9 a view-by-view comparison of the Apple iPhone 3GS, which embodies the patented 'D677 design, against the Samsung Galaxy S 4G. As can be seen from Exhibit 9, each major design feature listed in points (a)-(d) above exists in both the Apple iPhone 3GS and the Samsung Galaxy S 4G.

18. Moreover, I have conducted a "three way" analysis of the Galaxy S 4G design, the 'D677 design, and the prior art (i.e., the prior art cited in the 'D677 file history and the Samsung-identified references). In my analysis, the Galaxy S 4G design entirely overlaps with the patented 'D677 design, but is far afield from the designs of the prior art I considered. Put another way, both the 'D677 design and the Galaxy S 4G design depart conspicuously from the prior art designs in the same key features. This spectrum of designs is illustrated in Exhibit 10, which compares the Galaxy S 4G against the two Samsung-identified references on the one hand, and the patented 'D677 design on the other.

19. Some minor differences exist between the Galaxy S 4G design and the patented 'D677 design. In particular:

        a.      the Galaxy S 4G has slightly thinner black bands above and below the display screen;

        b.      the Galaxy S 4G has a slightly longer and thinner speaker slot;

        c.      the Galaxy S 4G has a small camera aperture in the upper right corner of the front surface;

    d. the Galaxy S 4G uses small graphical icons to denote touch sensitive areas under its display screen.

20. These minor differences, however, merely prevent the Galaxy S 4G from being an exact copy of the patented 'D677 design. They do not carry sufficient weight to alter the overall impression created by the Galaxy S 4G design, which incorporates every major design element from the 'D677 design.

21. In my opinion, the Galaxy S 4G design is substantially the same as the 'D677 design and embodies that patented design. It is similarly my opinion that an ordinary observer purchasing a cellular phone would also find the Galaxy S 4G design to be substantially the same as the patented 'D677 design.

### 2. *D677 against the Infuse 4G*

22. On visual inspection, it is apparent that all of the major design elements from the patented 'D677 design are also found in the Infuse 4G design. Just as in the patented design, the Infuse 4G design has:

    a. a flat, clear, black-colored, rectangular front surface with four evenly rounded corners;

    b. an inset rectangular display screen centered on the front surface that leaves very narrow borders on either side of the display screen and substantial borders above and below the display screen; and

    c. a rounded, horizontal speaker slot centered on the front surface above the display screen,

    d. where the rectangular front surface is otherwise substantially free of ornamentation outside of an optional button area centrally located below the display.

(*See* Exhibit 11.)

23. To confirm my analysis, and to directly compare physical product against physical product, I have also included in Exhibit 12 a view-by-view comparison of the Apple iPhone 4, which embodies the patented 'D677 design, against the Samsung Infuse 4G. As can be seen from Exhibit 12, each major design feature listed in points (a)-(d) above exists in both the Apple iPhone 4 and the Samsung Infuse 4G.

24.     Moreover, I have conducted a "three way" analysis of the Infuse 4G design, the 'D677 design, and the prior art (i.e., the prior art cited in the 'D677 file history and the Samsung-identified references).  In my analysis, the Infuse 4G design entirely overlaps with the patented 'D677 design, but is far afield from the designs of the prior art I considered.  Put another way, both the 'D677 design and the Infuse 4G design depart conspicuously from the prior art designs in the same key features.  This spectrum of designs is illustrated in Exhibit 13, which compares the Infuse 4G against the Samsung-identified references on the one hand, and the patented 'D677 design on the other.

25.     Some minor differences exist between the Infuse 4G design and the patented 'D677 design.  In particular:

   a.   the Infuse 4G has slightly thinner black bands above and below the display screen;

   b.   the Infuse 4G front surface has rounded corners with a slightly smaller radius of curvature;

   d.   the Infuse 4G has a slightly longer and thinner speaker slot;

   e.   the Infuse 4G uses small graphical icons to denote touch-sensitive areas located under its display screen.

26.     These minor differences, however, merely prevent the Infuse 4G from being an exact copy of the patented 'D677 design.  They do not carry sufficient weight to alter the overall impression created by the Infuse 4G design, which incorporates every major design element from the 'D677 design.

27.     In my opinion, the Infuse 4G design is substantially the same as the 'D677 design and embodies that patented design.  It is similarly my opinion that an ordinary observer purchasing a cellular phone would also find the Infuse 4G design to be substantially the same as the patented 'D677 design.

**D.     Comparison of 'D087 Design against Samsung Galaxy S 4G and Infuse 4G**

28.     The 'D087 patent is directed to the ornamental appearance of Apple's iPhone.

29. Before conducting my comparison of the 'D087 patent against the Samsung Galaxy S 4G and Infuse 4G products, I reviewed the file history of the 'D087 patent and analyzed and became familiar with the prior art cited there, as well as the Samsung-identified references.

30. In conducting my analysis, I compared the eight views of the sixth embodiment of the 'D087 patent (FIGS. 41-48) (the "patented 'D087 design") with the corresponding views of the Samsung Galaxy S 4G and Infuse 4G phones. In Exhibit 14, each view of the patented 'D087 design is compared to the corresponding view of the Galaxy S 4G. In Exhibit 17, each view of the patented 'D087 design is compared to the corresponding view of the Infuse 4G.

### 1. *'D087 design against the Galaxy S 4G*

31. On visual inspection, it is apparent that all of the major design elements from the patented 'D087 design are also found in the Galaxy S 4G design. Just as in the patented design, the Galaxy S 4G design has:

 a. a flat rectangular front surface with four evenly rounded corners;

 b. an inset rectangular display screen centered on the front surface that leaves very narrow borders on either side of the display screen and substantial borders above and below the display screen;

 c. a rounded, horizontal speaker slot centered on the front surface above the display screen,

 d. where the rectangular front surface is otherwise substantially free of ornamentation outside of an optional button area centrally located below the display; and

 e. a thin, continuous bezel surrounding the rectangular front surface that is substantially uniform in appearance and having an inwardly sloping profile.

(*See* Exhibit 14.)

32. To confirm my analysis, and to directly compare physical product against physical product, I have also included in Exhibit 15 a view-by-view comparison of the original Apple iPhone, which embodies the patented 'D087 design, against the Samsung Galaxy S 4G. As can be seen from Exhibit 15, each major design feature listed in points (a)-(e) above exists in both the Apple iPhone and the Samsung Galaxy S 4G.

33. Moreover, I have conducted a "three way" analysis of the Galaxy S 4G design, the patented 'D087 design, and the prior art (i.e., the prior art cited in the 'D087 patent file history and the Samsung-identified references). In my analysis, the Galaxy S 4G design entirely overlaps with the patented 'D087 design, but is far afield from the designs of the prior art I considered. Put another way, both the patented 'D087 design and the Galaxy S 4G design depart conspicuously from the prior art designs, and do so in the same key features. This spectrum of designs is illustrated in Exhibit 16, which compares the Galaxy S 4G against the Samsung-identified references on the one hand, and the patented 'D087 design on the other.

34. Some minor differences exist between the Galaxy S 4G design and the patented 'D087 design. In particular:

    a. the Galaxy S 4G has slightly thinner bands above and below the display screen;

    b. the Galaxy S 4G has a slightly longer and thinner speaker slot;

    c. the Galaxy S 4G has a small camera aperture in the upper right corner of the front surface;

    d. the Galaxy S 4G uses small graphical icons to denote touch sensitive areas under its display screen;

    e. in profile, the bezel of Galaxy S 4G is slightly thinner at the top edge and slightly thicker at the bottom edge.

35. These minor differences, however, merely prevent the Galaxy S 4G from being an exact copy of the patented 'D087 design. They do not carry sufficient weight to alter the overall impression created by the Galaxy S 4G design, which incorporates every major design element from the patented 'D087 design.

36. In my opinion, the Galaxy S 4G design is substantially the same as the patented 'D087 design and embodies that design. It is similarly my opinion that an ordinary observer purchasing a cellular phone would also find the Galaxy S 4G design to be substantially the same as the patented 'D087 design.

### 2. '*D087 design against the Infuse 4G*

37. On visual inspection, it is apparent that all of the major design elements from the patented 'D087 design are also found in the Infuse 4G design. Just as in the patented design, the Infuse 4G design has:

    a. a flat rectangular front surface with four evenly rounded corners;

    b. an inset rectangular display screen centered on the front surface that leaves very narrow borders on either side of the display screen and substantial borders above and below the display screen;

    c. a rounded, horizontal speaker slot centered on the front surface above the display screen,

    d. where the rectangular front surface is otherwise substantially free of ornamentation outside of an optional button area centrally located below the display; and

    e. a thin, continuous bezel surrounding the rectangular front surface that is substantially uniform in appearance and having an inwardly sloping profile.

(*See* Exhibit 17.)

38. To confirm my analysis, and to directly compare physical product against physical product, I have also included in Exhibit 18 a view-by-view comparison of the original Apple iPhone, which embodies the patented 'D087 design, against the Samsung Infuse 4G. As can be seen from Exhibit 18, each major design feature listed in points (a)-(e) above exists in both the Apple iPhone and the Samsung Infuse 4G.

39. Moreover, I have conducted a "three way" analysis of the Infuse 4G design, the patented 'D087 design, and the prior art (i.e., the prior art cited in the 'D087 patent file history and the Samsung-identified references). In my analysis, the Infuse 4G design entirely overlaps with the patented 'D087 design, but is far afield from the designs of the prior art that I considered. Put another way, both the patented 'D087 design and the Infuse 4G design depart conspicuously from the prior art designs, and do so in the same key features. This spectrum of designs is illustrated in Exhibit 19, which compares the Infuse 4G against the Samsung-identified references on the one hand, and the patented 'D087 design on the other.

40. Some minor differences exist between the Infuse 4G design and the patented 'D087 design. In particular:

    a. the Infuse 4G has slightly thinner bands above and below the display screen;

    b. the Infuse 4G has a slightly thinner bezel when viewed from the front;

    c. the Infuse 4G has rounded corners with a slightly smaller radius of curvature;

    d. the Infuse 4G has a slightly longer and thinner speaker slot;

    e. the Infuse 4G uses small graphical icons to denote touch-sensitive areas below its display screen.

41. These minor differences, however, merely prevent the Infuse 4G from being an exact copy of the patented 'D087 design. They do not carry sufficient weight to alter the overall impression created by the Infuse 4G design, which incorporates every major design element from the patented 'D087 design.

42. In my opinion, the Infuse 4G design is substantially the same as the patented 'D087 design and embodies that patented design. It is similarly my opinion that an ordinary observer purchasing a cellular phone would also find the Infuse 4G design to be substantially the same as the patented 'D087 design.

**E. Detailed Comparison of 'D889 Design against Samsung Galaxy Tab 10.1**

43. The 'D889 patent is directed to the ornamental appearance of an electronic device.

44. Before conducting my comparison of the 'D889 patent against the Samsung Galaxy Tab 10.1 product, I reviewed the file history of the 'D889 patent and analyzed and became familiar with the prior art cited there.

45. In conducting my analysis, I compared the nine views of the 'D889 patent (FIGS. 1-9) with the corresponding views of the Samsung Galaxy Tab 10.1. In Exhibit 20, each view of the patented 'D889 design is compared to the corresponding view of the Galaxy Tab 10.1.

46. On visual inspection, it is apparent that all of the major design elements from the patented 'D889 design are also found in the Galaxy Tab 10.1. Just as in the patented design, the Galaxy Tab 10.1 design has:

    a. an overall rectangular shape with four evenly rounded corners;

    b. a flat clear surface covering the front of the device that is without any ornamentation;

    c. a thin rim surrounding the front surface;

    c. a substantially flat back panel that rounds up near the edges to form the thin rim around the front surface; and

    d. a thin form factor.

47. I have also conducted a "three way" analysis of the Galaxy Tab 10.1, the 'D889 design, and the prior art cited in the 'D889 patent file history. In my analysis, the Galaxy Tab 10.1 design entirely overlaps with the patented 'D889 design, but is far afield from the designs of the prior art I considered. Put another way, both the 'D889 design and the Galaxy Tab 10.1 design depart conspicuously from the prior art designs in the same key features. This spectrum of designs is illustrated in Exhibit 21, which compares the Galaxy Tab 10.1 against two of the closest prior art references from the 'D889 patent file history on the one hand, and the patented 'D889 design on the other.

48. Some minor differences exist between the Galaxy Tab 10.1 and the patented 'D889 design. In particular:

    a. the Galaxy Tab 10.1, held in vertical or portrait view, has a slightly higher height-to-width ratio;

    b. the Galaxy Tab 10.1 is slightly more rounded in its edge profiles; and

    c. the Galaxy Tab 10.1 has a slightly thinner form factor.

49. These minor differences, however, merely prevent the Galaxy Tab 10.1 from being exact copy of the patented 'D889 design. They do not carry sufficient weight to alter the overall impression created by the Galaxy Tab 10.1 design, which incorporates every major design element from the 'D889 design.

50. In my opinion, the Galaxy Tab 10.1 design is substantially the same as the 'D889 design and embodies that patented design. It is similarly my opinion that an ordinary observer purchasing an electronic device would also find the Galaxy Tab 10.1 design to be substantially the same as the patented 'D889 design.

### F. My Article on the *Gorham* Spoons

51. I am the author of the article entitled *One Man's Crusade: How a Spoon Revolutionized Design Protection in America*, which was published in the Summer 2010 issue of Innovation magazine (attached as Exhibit 22). This article chronicles my efforts to locate a sample of LeRoy S. White's infringing spoon from the Supreme Court's landmark *Gorham v. White* decision, which set forth the "ordinary observer" test for design patent infringement. *See Gorham Co. v. White*, 81 U.S. 511 (U.S. 1872).

52. As discussed in the article, I was able to identify and obtain seven teaspoons of Mr. White's infringing design and conducted a side-by-side comparison of these samples against the figures of Mr. Gorham's design patent. This detailed analysis revealed differences between the two designs that I believe are discernible to the ordinary observer. In my opinion, the existence of discernible differences in Mr. White's spoon provides further context to the Supreme Court's *Gorham* decision, in which the White spoon design was found to be "substantially the same" as Mr. Gorham's patented spoon design under the ordinary observer test, despite these discernible differences.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: June 30, 2011

_____
COOPER C. WOODRING