# Exhibit 4-1



# United States Patent and Trademark Office
Performance and Accountability Report
Fiscal Year 2007



accountability



results

innovation



creativity





global

*Transforming for the Future Today*

## FINANCIAL HIGHLIGHTS

| (Dollars In Thousands) | % Change 2007 over 2006 | September 30, 2007 | September 30, 2006 |
|---|---|---|---|
| Fund Balance with Treasury | 0.1% | $ 1,402,663 | $ 1,401,771 |
| Property, Plant, and Equipment, Net | 24.3% | 204,577 | 164,538 |
| Other Assets | 30.3% | 18,221 | 13,987 |
| Total Assets | 2.9% | $ 1,625,461 | $ 1,580,296 |
| Deferred Revenue | 6.9% | $ 828,070 | $ 774,425 |
| Accounts Payable | (7.5)% | 96,602 | 104,390 |
| Accrued Payroll, Benefits, and Leave | 18.7% | 120,326 | 101,368 |
| Other Liabilities | 14.0% | 116,443 | 102,115 |
| Total Liabilities | 7.3% | $ 1,161,441 | $ 1,082,298 |
| Net Position | (6.8)% | 464,020 | 497,998 |
| Total Liabilities & Net Position Program | 2.9% | $ 1,625,461 | $ 1,580,296 |
| Total Program Cost | 16.9% | $ 1,769,658 | $ 1,514,169 |
| Total Earned Revenue | 8.9% | (1,735,706) | (1,594,437) |
| Net Cost/(Income) of Operations | (142.3)% | $ 33,952 | $ (80,268) |
| Budgetary Resources Available for Spending | 6.8% | $ 1,794,460 | $ 1,680,101 |
| Total Outlays/(Collections), Net | (105.5)% | $ 8,283 | $ (151,818) |
| Federal Personnel | 8.8% | 8,913 | 8,189 |
| Disbursements by Electronic Funds Transfer | — | 99% | 99% |
| On-Time Payments to Vendors | (1.0)% | 96% | 97% |

## PERFORMANCE HIGHLIGHTS

| Performance Measures | Target | Actual | Met/Not Met Score[1] |
|---|---|---|---|
| Patent Average First Action Pendency (months) | 23.7 | 25.3 | 🟠 |
| Patent Average Total Pendency (months) | 33.0 | 31.9 | 🟢 |
| Patent In-Process Examination Compliance Rate | 90.0% | 92.2% | 🟢 |
| Patent Allowance Compliance Rate | 96.0% | 96.5% | 🟢 |
| Patent Applications Filed Electronically | 40.0% | 49.3%[2] | 🟢 |
| Patent Applications Managed Electronically | 99.9% | 99.9% | 🟢 |
| Patent Efficiency | $4,253 | $3,961 | 🟢 |
| Trademark Average First Action Pendency (months) | 3.7 | 2.9 | 🟢 |
| Trademark Average Total Pendency (months) | 17.3 | 15.1 | 🟢 |
| Trademark First Action Compliance Rate | 95.5% | 95.9% | 🟢 |
| Trademark Final Action Compliance Rate | 96.0% | 97.4% | 🟢 |
| Trademark Applications Filed Electronically | 90.0% | 95.4% | 🟢 |
| Trademark Applications Managed Electronically | 99.0% | 99.9% | 🟢 |
| Trademark Efficiency | $685 | $660 | 🟢 |
| Instances which USPTO Experts Review IP Policies/Standards | 80 | 461 | 🟢 |
| IP Plans of Action, Mechanisms, & Support Programs in Developing Countries | 8 | 15 | 🟢 |
| Improving Worldwide IP Expertise for U.S. Government Interests | 10 | 17 | 🟢 |

[1] *We are using three ratings for "met" or "not met." Green is for actually meeting or exceeding the target. Yellow indicates that the target is at least 75% met. Red indicates that the target was not met by at least 75%.*

[2] *This is preliminary data and is expected to be final by December 2007 and will be reported in the fiscal year (FY) 2008 PAR.*

## TABLE OF CONTENTS

| | |
|---|---|
| **Message from the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office (USPTO)** | 3 |
| **Management's Discussion and Analysis** | 9 |
| Mission and Organization of the USPTO | 10 |
| Performance Goals and Results | 14 |
| USPTO Strategic Plan | 14 |
| Strategic Goal 1: Optimize Patent Quality and Timeliness | 16 |
| Strategic Goal 2: Optimize Trademark Quality and Timeliness | 20 |
| Strategic Goal 3: Improve Intellectual Property Protection and Enforcement Domestically and Abroad | 24 |
| Management Goal: Achieve Organizational Excellence | 29 |
| Management Challenges | 31 |
| What's Ahead? | 33 |
| Accompanying Information on USPTO Performance | 35 |
| The President's Management Agenda | 35 |
| Performance Audits and Evaluations | 39 |
| Management Assurances and Compliance with Laws and Regulations | 45 |
| Financial Highlights | 50 |
| **Financial Section** | 63 |
| Message from the Chief Financial Officer | 64 |
| Principal Financial Statements and Related Notes | 66 |
| Independent Auditors' Report | 93 |
| **Other Accompanying Information** | 101 |
| Management and Performance Challenges Identified by the Inspector General | 102 |
| The Nature of the Training Provided to USPTO Examiners | 104 |
| Fiscal Year 2007 USPTO Workload Tables | 108 |
| **Glossary of Acronyms and Abbreviation List** | 139 |

WEB ADDRESS FOR THE USPTO PERFORMANCE AND ACCOUNTABILITY REPORT

*http://www.uspto.gov/web/offices/com/annual/index.html*

### ABOUT THIS REPORT

*The USPTO Performance and Accountability Report for FY 2007 provides a comprehensive summary of program and financial results and is structured to help the President, the Congress, and the American public assess our performance relative to our mission and accountability for our financial resources.*

# Transforming for the Future Today – Fiscal Year 2007



***Inspiring Invention*** *— An innovative ad campaign to encourage young people to invent is launched at the National Press Club by U.S. Secretary of Commerce Carlos Gutierrez; Under Secretary of Commerce for Intellectual Property and USPTO Director Jon Dudas; National Inventors Hall of Fame inductee Dr. James West; and Ad Council Vice President Kathy Crosby. The three-year ad campaign features creative TV and radio spots, along with an engaging Web site, inventnow.org.*

# Message from the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office (USPTO)

The United States Patent and Trademark Office continued leading the world in intellectual property (IP) protection and policy in fiscal year (FY) 2007.  Beyond achieving another record-breaking year in performance, we took steps to **transform for the future today.**   In other words, we are building a foundation for gains that will be fully realized in the years ahead.

The USPTO granted patents and registered trademarks that will affect countless lives in the future.  We once again improved the quality and efficiency of our patent and trademark processes. Quality is our primary focus, and our quality results have been phenomenal.  To keep the momentum, we started down a path to future quality improvements by encouraging greater collaboration with our constituents.

In FY 2007, we reached out to encourage individual inventors and small and medium businesses to innovate and protect their IP.  We also worked to foster innovation among America's next generation.   We began a three-year partnership with the Ad Council to reach young people through a national ad campaign called, "Inspiring Invention."   Our radio and TV commercials are now playing throughout the country with the message, "Anything's possible.  Keep thinking."

The USPTO continued to move forward on improving IP rights and enforcement here and around the world.  For example, we hosted a "heads of office meeting" with the leaders of the world's five largest IP offices — China, Europe, Japan, Korea, and the United States — to discuss how we can better work together.  With the growth of China and Korea's offices over the past few years, the top five IP offices now handle more than three-fourths of the world's patent applications.  So, these IP leaders recognize that close cooperation among our offices is essential to ensuring high quality and maximizing efficiencies.

To define exactly how the USPTO will remain the world's leader in IP, we rolled out our *2007-2012 Strategic Plan*, with these major goals:



*World IP Leaders Meet — USPTO Director Jon Dudas hosts the leaders of the world's five largest intellectual property offices at a meeting to discuss shared issues and ways the offices can work together.*

**GOAL 1:**   *Optimize patent quality and timeliness*

**GOAL 2:**   *Optimize trademark quality and timeliness*

**GOAL 3:**   *Improve IP protection and enforcement domestically and abroad*

*And* **MANAGEMENT GOAL:**   *Achieve organizational excellence*

I am pleased to present the FY 2007 USPTO Performance and Accountability Report, which demonstrates that we are achieving the goals of our Strategic Plan – the basis for achieving even greater results in the future.

## GOAL 1: OPTIMIZE PATENT QUALITY AND TIMELINESS

Our Patent organization improved on a record-breaking FY 2006 performance, examining more applications at a high level of quality.

### Providing high quality

Last year, Patents achieved its highest examination compliance rate in a quarter of a century, at 96.5 percent.  This year, Patents matched that with 96.5 percent compliance again.

We recognize that this accomplishment is the result of several quality initiatives put into place four years ago. For example, we added a new quality review mid-way through the patent examination process. This gives patent examiners the chance to realize possible errors and learn from them before they make a final decision. This in-process review has reduced errors at a growing rate since it was implemented in 2005.

Beyond achieving higher compliance and in-process review rates, our patent examiners' decisions are also increasingly being affirmed by our Board of Patent Appeals and Interferences. This is the first time in recent history that the Board approved outright the majority of decisions.

We have revamped our patent examiner hiring process, developed a new, more intensive patent training academy, and started testing and certifying patent examiners at critical times throughout their careers.

This year, Patents hired and trained another 1,215 new patent examiners. We increased the number of patent examiners who can work from home to more than 1,000, and gave them better electronic tools. Both programs helped us retain more examiners. We also deepened partnerships with industry to keep our patent examiners' knowledge on the cutting edge.

### Improving e-systems

Patents moved closer to an end-to-end electronic system. E-filings have grown dramatically. Our e-filings were only 2.2 percent of total filings in FY 2005. E-filings reached 14.2 percent in FY 2006, and they jumped to 49.3 percent in FY 2007. In the final month of the year, this had risen to 68 percent. The USPTO also celebrated the one-millionth e-submission on our Patents Electronic Filing System-Web this year. We are exploring other ways to achieve greater e-filings.

### Exploring range of options to meet challenges

Last year, Patents launched an Accelerated Examination program offering patent protection in less than a year. In exchange, applicants provide concise information upfront and have a limited number of claims. In the first year, we dramatically reduced the time for patent examination. One patent examination went from filing to issuing in less than four months.



*Common Goal* — *USPTO Director Jon Dudas speaks to employees at the 11th annual USPTO Community Day. The theme was "Many Skills – One Remarkable Community," celebrating the diversity of our work force.*

Comments from our users indicate that Accelerated Examination is not only faster, but higher quality because of the close interaction between the USPTO and the applicant. We believe this is a significant lesson for the Agency and applicants.

To promote still greater collaboration, we participated in a peer-to-patent pilot that asked members of the public to review volunteered applications and submit prior art and comments. And our Patent Public Advisory Committee is reaching out to applicants to ask them what other types of examination options would be helpful.

### GOAL 2: OPTIMIZE TRADEMARK QUALITY AND TIMELINESS

Our Trademark organization continued to demonstrate excellence today and outstanding planning for tomorrow. For the second year in a row, Trademarks met or exceeded all of its performance goals.

### Improving efficiency

First-action pendency of trademark applications — the length of time between receipt of a trademark application and when our office makes a preliminary decision — was reduced to the lowest level in six years, ending the year at 2.9 months. Average total pendency of applications showed significant improvement, with trademark registration occurring within 15.1 months of filing.

### Improving quality

Quality of searching and examination of trademarks continued to improve — with quality rates exceeding 97 percent.  These advances were made through greater use of online tools, e-filing, workflow design, and training.

Trademarks continues to gain recognition for a leading telework program.  We celebrated the 10th anniversary of this program in June.  Eighty-five percent of eligible trademark examining attorneys now work from home nearly full time.  We are confident that this program helps us attract and retain the best and brightest work force, who continue to improve trademark quality.

### Providing e-management and e-tools

Trademarks is in the final stages of a long-term project to become fully electronic.  To this end, we have undertaken an assessment that includes documenting the entire Trademark process workflow.  We will use this assessment to complete our design requirements and implement an electronic workflow and file management system.  Again, we are achieving today, while transforming for tomorrow.

### GOAL 3:  IMPROVE IP PROTECTION AND ENFORCEMENT DOMESTICALLY AND ABROAD

During FY 2007, the USPTO continued to improve IP rights and enforcement in the United States and around the world.

### Protecting IP and curbing IP theft

As part of President Bush's Strategy Targeting Organized Piracy (STOP!) initiative, we worked with other U.S. Government agencies to fight piracy and counterfeiting.  For example, the USPTO managed the STOP! hotline that helps businesses leverage U.S. Government resources to protect their IP. We responded to 1,730 hotline calls this year.

We advocated for American businesses and led IP training for foreign officials through our IP experts stationed in American embassies in Brazil, China, Egypt, India, Russia, and Thailand.

Once again, the USPTO offered a public awareness campaign to educate small businesses and individual inventors about protecting their IP, providing more than 1,300 participants with important information in seminars throughout the country. We partnered with the U.S. Chamber of Commerce on many of these seminars, which provided even greater outreach.

### Working to unify international IP practice

In addition to hosting the meeting with the heads of the world's five largest IP offices, we made strides in implementing our USPTO-State IP Office of the People's Republic of China work plan of strategic cooperation.  And we signed memos of understanding with IP offices in Australia, Ethiopia, India, and the Philippines to cooperate on many issues.

We made great progress within the Trademark Trilateral on identifying classifications for goods and services.  We expect this to further reduce our trademark pendency, because applications, especially those filed from abroad, will be more focused.

### Giving domestic IP policy guidance

Patent modernization legislation has been the subject of several committee hearings and much debate in Congress this year. The proposed legislation is intended to improve patent quality, reduce patent litigation costs, and further the international harmonization of patent laws.  The USPTO supports these goals, and we are working closely with Congress to develop laws that are effective, fair, and balanced for all stakeholders.

Our Office of General Counsel also played a significant role in improving the quality and timeliness of domestic patent examination this year.  In the Supreme Court Case, *KSR International Co. v. Teleflex*, we worked closely with the U.S. Solicitor General to formulate the Government's *amicus* brief.  In this landmark decision, the Supreme Court largely adopted our position to give our patent examiners greater flexibility in determining whether a claimed invention is "obvious."

### Delivering IP education worldwide

Also this year, we completed our Global Intellectual Property Academy, a 20,000-square-foot training facility.  It has allowed us to expand our IP training for foreign judges, enforcement officials, and administrators.  In FY 2007, our academy trained more than 700 foreign officials on how to strengthen their IP rights and enforcement.

## MANAGEMENT GOAL:  ACHIEVE ORGANIZATIONAL EXCELLENCE

And finally, the USPTO made gains in achieving organizational excellence and set the course for future improvement.

### Working as partners for superior performance

Our business units are working more closely across organizational lines as true partners.  For example, our Office of Chief Administrative Officer led us in developing a ***Strategic Human Capital Plan*** to address the challenges identified in our overall ***Strategic Plan***.  Our ***Human Capital Plan*** is helping us identify, develop, and implement activities that make the USPTO an "employer of choice with a culture of high performance."

In many ways, we are already a leading government agency in offering programs to attract and retain highly qualified employees.  We continue to expand our workplace flexibilities and telework programs, which improve employee retention.  This year, we offered recruitment bonuses to attract top-notch scientists and engineers.  For the second year, we hosted a management conference off-site with more than 700 of our front-line supervisors to give them valuable training and time to share ideas with each other.

### Ensuring excellence in management processes

Our Office of Chief Financial Officer (OCFO) worked with our Office of Chief Information Officer (OCIO) to help us become more effective stewards of our financial resources using new e-tools.  These groups enhanced our systems to create an enterprise-wide approach to financial management.  Specifically, the OCFO focused on improving processes for collecting financial data, so that USPTO managers have the right information to make sound decisions quickly.

### Enhancing online access and information availability

Beyond helping the Patent and Trademark organizations achieve record e-filings, our OCIO also improved our information technology (IT) enterprise architecture to help us deliver higher quality products.  Moving forward, we will continue to improve the security, availability, and quality of our IT systems, while reducing their complexity and cost.

### FINANCIAL COMPLIANCE

We are confident that the USPTO's financial and performance data are complete, reliable, accurate, and consistent as we improve our ability to measure progress toward our performance goals.  For the 15th consecutive year, we earned an unqualified audit opinion on our annual financial statements.  For FY 2007 financial reporting, the independent auditors did not identify any material weaknesses, significant deficiencies, or instances of non-compliance with laws and regulations.

However, we are reporting one non-financial material weakness in IT security.  The OCIO is working diligently with the Office of the Inspector General and the Department of Commerce to improve our overall IT security program and certification packages to remove our material weakness for IT security.

During FY 2007, the USPTO lived up to our mission of fostering innovation and competitiveness.  Our vision of leading the world in IP protection and policy means continually improving our own operations and **transforming for the future today**.

Jon W. Dudas
Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office
November 6, 2007

# 2006
# CERTIFICATE OF EXCELLENCE







# Management's Discussion and Analysis



# Mission and Organization of the United States Patent and Trademark Office (USPTO)



## Mission

**T**he USPTO's mission is to foster innovation and competitiveness by:

- Providing high quality and timely examination of patent and trademark applications
- Guiding domestic and international intellectual property policy
- Delivering intellectual property information and education worldwide

Intellectual property (IP) includes inventions or creations embodied in the form of a patent, trademark, trade secret, or copyright. The strength and vitality of the U.S. economy depends on effective mechanisms for protecting new ideas and investments in innovation and creativity. The continued demand for patents and trademarks underscores the ingenuity of American inventors and entrepreneurs. In fulfilling the mandate of Article 1, Section 8 of the Constitution, "to promote the progress of science and the useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries," the USPTO is on the cutting edge of our nation's technological progress and achievement.

# Our Organization

The USPTO is an agency of the United States within the Department of Commerce (DOC). The Agency is led by the Under Secretary of Commerce for IP and Director of the USPTO who consults with the Patent Public Advisory Committee and the Trademark Public Advisory Committee.

The USPTO has two major business lines: Patents and Trademarks, as shown in the organization chart below. Headquartered in Alexandria, Virginia, the USPTO also has two storage facilities located in Virginia and Pennsylvania.





*Honoring Great Minds* — *Deputy Under Secretary Margaret Peterlin, along with National Inventors Hall of Fame Foundation (NIHFF) Board President James Poolie, congratulate Dr. Robert Metcalfe (left) on his 2007 induction into the National Inventors Hall of Fame. Dr. Metcalfe invented the Ethernet, the most widely used local area network. Working with the USPTO, the National Inventors Hall of Fame® honors people responsible for great technological advances that make human, social, and economic progress possible.*

The USPTO has evolved into a unique government agency. In 1991 – under the Omnibus Budget Reconciliation Act (OBRA) of 1990 – the USPTO became fully supported by user fees to fund its operations. In 1999, the American Inventors Protection Act established the USPTO as an agency with performance-based attributes; for example, a clear mission statement, measurable services and a performance measurement system, and predictable sources of funding.

The Patent organization examines inventor's patent applications. Patent examiners compare the claimed subject matter of an application to a large body of technological information to determine whether the claimed invention is new, useful, and non-obvious to someone knowledgeable in that subject matter. Patent examiners also provide answers on applications appealed to the Board of Patent Appeals and Interferences (BPAI), prepare initial memoranda for interference proceedings to determine priority of invention, and prepare search reports and international preliminary examination reports for international applications filed under the Patent Cooperation Treaty (PCT). The patent process also includes performing an administrative review of newly filed applications, publishing pending applications, issuing patents to successful applicants, and disseminating issued patents to the public.

The Trademark organization registers marks (trademarks, service marks, certification marks, collective membership marks) that meet the requirements of the Trademark Act of 1946, as amended, and provide notice to the public and businesses of the trademark rights claimed in the pending applications and existing registrations of others. The core process of the Trademark organization is the examination of applications for trademark registration. As part of that process, examining attorneys make determinations of registrability under the provisions of the Trademark Act, which includes searching the electronic databases for any pending or registered marks that are confusingly similar to the mark in a subject application, preparing letters informing applicants of the attorney's findings, approving applications to be published for opposition, and examining statements of use in applications filed under the Intent-to-Use provisions of the Trademark Act.

In registering trademarks, the USPTO assists businesses in protecting their investment, promotes quality goods and services, and safeguards consumers against confusion and deception in the marketplace. With notice readily available at *www.uspto.gov*, a business can make an informed decision when it wishes to adopt a new mark or expand the goods or services marketed under an existing mark. Federal registration provides enhanced protection for the owner's investment in the mark and in the goods and services sold under the registered mark.



*Giving Back* — *USPTO Office of Civil Rights employees Maria Hernandez and Darnella Boxley celebrate another successful Combined Federal Campaign. The USPTO raised more than $1.3 million for charities, reaching 113 percent of its goal. Eighty-seven percent of USPTO employees contributed.*

Domestically, the USPTO provides technical advice and information to executive branch agencies on IP matters and trade-related aspects of IP rights. Internationally, the USPTO works with foreign governments to establish regulatory and enforcement mechanisms that meet international obligations relating to the protection of IP.

## Our People

At the end of fiscal year (FY) 2007, the USPTO work force was composed of 8,913 Federal employees (including 5,477 patent examiners, and 404 trademark examining attorneys).



**USPTO STAFFING**

404
5,477
3,032

- Patent Examiners
- Trademark Examining Attorneys
- Remaining USPTO Staff

| Total | 8,913 |
|---|---|



***Different Backgrounds, One Vision*** — *USPTO employees and contractors Suzanne Lo, Jasmine Clark, Stuart Drewry, Fei Yeung-Lopez, and Socheata Chap march in the USPTO Community Day "Parade of Fashions from around the World." Community Day highlights the inclusiveness of the USPTO's work force and includes speeches, music, educational exhibits, and a car and motorcycle show.*



***Home away from Home*** — *The USPTO campus in Alexandria, Virginia, provides workspace for almost 9,000 employees. Meanwhile, more than 3,000 USPTO employees work from home at least one day a week, making the agency a telework leader within the Federal Government.*

# Performance Goals and Results

## USPTO Strategic Plan



In FY 2006, the USPTO launched a comprehensive strategic planning process by soliciting input from interested parties, including the Patent Public Advisory Committee, the Trademark Public Advisory Committee, members of the public, stakeholders, and employees. A draft plan was posted on the USPTO Web site, and a notice announcing its availability for review and comment was published in the *Federal Register*. The USPTO established e-mail boxes and held special forums for the public and employees to provide input. Finally, a draft of the plan was shared with Congress.

The end result was the ***2007-2012 Strategic Plan*** that was formally released in March of 2007. The ***2007-2012 Strategic Plan***, along with an annual performance plan and report that are integrated with the annual budget request, meet the requirements of the Government Performance and Results Act (GPRA). These documents can be found at *www.uspto.gov.*

In support of the DOC's strategic objective to "protect intellectual property and improve the patent and trademark systems," the USPTO established three strategic goals and a management goal to guide its policies and operations over the next five years. Together they accomplish the mission of fostering innovation and competitiveness. These goals and the related objectives, initiatives, and performance measures were established with a focus on four guiding principles:

- **QUALITY**—accurate and consistent results in examination
- **TIMELINESS**—processing applications without undue delay
- **COST-EFFECTIVENESS**—efficiency, accountability, and a focus on results
- **TRANSPARENCY**—impartiality, fairness, accessibility, availability, and a public-service mentality

The ***2007-2012 Strategic Plan*** is an ever-changing document with the USPTO continually reviewing, refining, and updating it to adjust to changing conditions, and to incorporate the best thinking of the IP community and beyond. The USPTO's budget and performance plan, submitted to the Congress each year, also documents key measurements and yearly milestones to justify the funding for the USPTO to achieve its strategic goals.

Information related to achieving the Agency's objectives for each of the goals is described in the following sections of this report. Detailed information about the performance measures for each of the three strategic goals, including data verification and validation, is included in "Accompanying Information on USPTO Performance" section of this report.

## 2007-2012 USPTO Strategic Plan

### Mission

To foster innovation and competitiveness by:
- Providing high quality and timely examination of patent and trademark applications
- Guiding domestic and international intellectual property policy
- Delivering intellectual property information and education worldwide

### Vision

USPTO:  Leading the World in Intellectual Property Protection and Policy

| Strategic Goal #1 | Strategic Goal #2 | Strategic Goal #3 | Management Goal |
|---|---|---|---|
| Optimize Patent Quality and Timeliness | Optimize Trademark Quality and Timeliness | Improve Intellectual Property Protection and Enforcement Domestically and Abroad | Achieve Organizational Excellence |
| **Objectives** | **Objectives** | **Objectives** | **Objectives** |
| ■ Provide high quality examination of patent applications<br><br>■ Improve and integrate existing electronic systems to promote full electronic patent application processing; implement better/more secure systems<br><br>■ Improve the quality and timeliness of patent examination by exploring a range of approaches to examining applications | ■ Achieve and maintain three-month first action pendency, and reduce disposal pendency excluding suspended and *inter partes* cases<br><br>■ Improve quality of examination by ensuring consistency and quality of searching and examination, and provide internal on-line tools<br><br>■ Provide electronic file management and workflow<br><br>■ Develop interactive on-line electronic filing capabilities and upgrade e-tools | ■ Support efforts and initiatives aimed at strengthening IP protection and curbing theft of IP<br><br>■ Continue efforts to develop unified standards for international IP practice<br><br>■ Provide policy guidance on domestic IP issues<br><br>■ Foster innovation and competitiveness by delivering IP information and education worldwide | ■ Function as true business partners across the organization to achieve superior enterprise performance and provide strategic leadership<br><br>■ Ensure operational excellence in enterprise-wide management processes<br><br>■ Dramatically simplify on-line access to, and availability of, USPTO information and data |

## Performance Measures by Goal

| Goal #1 Measures | Goal #2 Measures | Goal #3 Measures |
|---|---|---|
| ■ Patent allowance compliance rate<br><br>■ Patent in-process examination compliance rate<br><br>■ Patent average first action pendency<br><br>■ Patent average total pendency<br><br>■ Patent efficiency<br><br>■ Patent applications filed electronically<br><br>■ Patent applications managed electronically | ■ Trademark first action compliance rate<br><br>■ Trademark final action compliance rate<br><br>■ Trademark average first action pendency<br><br>■ Trademark average final action pendency<br><br>■ Trademark efficiency<br><br>■ Trademark applications filed electronically<br><br>■ Trademark applications managed electronically | ■ Number of instances in which USPTO experts review IP policies/standards<br><br>■ Improving worldwide IP expertise for U.S. Government interests<br><br>■ Plans of action, mechanisms, and support programs initiated or implemented in developing countries |

# Strategic Goal 1:  Optimize Patent Quality and Timeliness

**H**igh quality and timely examination of patent applications advances science and technology and creates the certainty innovators need in capital driven markets.  The Patent organization is working closely with the public and its stakeholders to find the best ways to ensure that the U.S. patent system continues to promote innovation and U.S. competitiveness in the global economy.  Proposed solutions will not be limited by existing laws, rules, processes or procedures.  The following are the priorities for achieving this goal and our accomplishments in FY 2007.

## PROVIDING HIGH QUALITY

The Patent organization built on its successes from FY 2006 and improved its record-breaking performance by examining more applications at an even higher level of quality. Hiring and training of large numbers of new examiners continued so the Patent organization could address growing patent pendency, which stood at 25.3 months from filing to first action and 31.9 months until issue or abandonment at the end of the fiscal year.  The Patent Training Academy was expanded to better train all newly hired examiners and



***Sharing Ideas*** — *Patent Examiners Dan McNally and DeMaris Wilson consult with one another.  Many examiners from different units now discuss common issues and help each other solve problems.*

additional resources were committed to make this initial training as effective as possible.

*Patent Pendency Performance – The two primary measures of Patent organization processing are average first action pendency (the time from filing to first action) and average total pendency (the time from filing until the application is issued as a patent or abandoned by the applicant).*





Enhanced reviews of allowed patent applications in selected technologies continued.  Appeals specialists were added to each Technology Center to assist with pre-appeal conferences and improve the quality of appeal briefs.  Processing of appeals was centralized to ensure compliance of both examiners and applicants with formal requirements for appeals.  Partnerships with industry were expanded, working with the nanotechnology, biotechnology, and business

Case 5:11-cv-01846-LHK   Document 167-4   Filed 08/22/11   Page 20 of 71

MANAGEMENT'S DISCUSSION AND ANALYSIS



*Case Review* — The USPTO Board of Patent Appeals and Interferences reviews patent decisions when requested by applicants meeting certain requirements. A panel of at least three members of the Board reviews each case. The Board increasingly affirmed patent examiners' decisions in FY 2007, in part as a result of numerous patent examination quality initiatives.

methods taxation areas to keep patent examiners' knowledge current. Through these efforts and other initiatives, the Patent organization reached an allowance compliance rate of 96.5 percent and an in-process compliance rate of 92.2 percent, while hiring and training 1,215 examiners.



*Working Smarter* — Primary Patent Examiner Jessica Ward uses dual-monitors, which help examiners work more efficiently by letting them compare information in multiple documents and applications more easily.

The Patent organization took the lead in creating detailed examination guidelines for implementing the Supreme Court's decision on obviousness in *KSR International Co. v. Teleflex, Inc.*, and trained the entire examining corps in applying these guidelines.

*Patent Quality Performance* – The Patent organization continues to improve the quality of its products and services using in-depth reviews of work in progress and enhanced end-process reviews.



**Measure: Patent In-Process Examination Compliance Rate**

| | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| Target | Baseline | 84.0% | 86.0% | 90.0% |
| Actual | 82.0% | 85.2% | 90.0% | 92.2% |

Target Met



**Measure: Patent Allowance Compliance Rate**

| | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| Target | 96.0% | 96.0% | 96.0% | 96.0% |
| Actual | 94.7% | 95.4% | 96.5% | 96.5% |

Target Met

## IMPROVING E-SYSTEMS

The Patent organization continued to transition to an end-to-end, text-based patent prosecution system, and increased the number of examiners able to work from home, while providing them with better electronic tools to perform their work. Electronic filings more than tripled from 14.2 percent in FY 2006 to 49.3 percent in FY 2007. Electronic management of patent applications continued at 99.9 percent in FY 2007. The USPTO continues to explore options that will move toward complete electronic filings.

The USPTO piloted an improved collaboration tool for work-at-home examiners, which allows them to submit their work for review and have it credited electronically. An additional 503 examiners joined the hoteling work-at-home program, and 2,314 examiners were given remote access to their workstations to improve their productivity. The Agency also

www.uspto.gov

17

Case 3:11-cv-01846-LHK   Document 167-4   Filed 08/22/11   Page 21 of 71

*E-Filing and E-Management of Patent Applications* — *Electronic filings more than tripled from 14.2 percent in FY 2006 to 49.3 percent in FY 2007. Electronic management of patent applications continued at 99.9 percent in FY 2007. The USPTO continues to explore options that will move toward complete electronic filings.*



**Measure:  Patent Applications Filed Electronically**

- Target
- Actual

*Target Met*

| Year | Target | Actual |
|------|--------|--------|
| 2004 | 2.0% | 1.5% |
| 2005 | 4.0% | 2.2% |
| 2006 | 10.0% | 14.2% |
| 2007 | 40.0% | 49.3% |



**Measure:  Patent Applications Managed Electronically**

- Target
- Actual

*Target Met*

| Year | Target | Actual |
|------|--------|--------|
| 2004 | 70.0% | 88.0% |
| 2005 | 90.0% | 96.7% |
| 2006 | 99.0% | 99.9% |
| 2007 | 99.0% | 99.0% |



*Class of 2007* — *Patent Training Academy instructor and Supervisory Patent Examiner Dennis Chow leads a class of new patent examiners through the discipline of patent examination.  The Academy was started in 2006 to effectively train the more than 1,200 patent examiners now hired annually. The ninth class of examiners graduated in September 2007.*

continued the development of a text based Patent File Wrapper (PFW) system, with a goal of replacing the current image based system.  The USPTO piloted a virtual art unit to evaluate remote management and training needs and a hoteling work-at-home program for patent technical support staff.

## EXPLORING RANGE OF OPTIONS TO MEET CHALLENGES

In an effort to continue increasing patent quality, the USPTO introduced the Accelerated Examination program.   These procedures require the applicant to perform a pre-examination search and provide the examiner with a comparison of the results of that search to the claimed invention. In exchange, the USPTO completes prosecution of the application within a year.  In the first year of the program, 24 patents were issued, one in four months from filing.

In order to focus on examination and improve the overall quality of patents, the USPTO published rules that will limit the number of claims in an application to a reasonable number, while giving applicants the option of filing an examination support document if they need more claims.  The USPTO also published rules that require applicants seeking to file repeated continuation applications to show the need for the additional applications.  Rules are also expected to be published requiring applicants to provide similar support information when they submit many prior art references in an application.

The USPTO collaborated in a peer-to-patent pilot that encourages the public to review volunteered published applications and submit prior art and commentary on what they believe to be the best prior art to consider during examination.  Through the Patent Public Advisory Committee, the USPTO is reaching out to the user community to determine what types of examination options should be provided as alternatives to the current system.

***Patent Efficiency*** *–The following metric measures the relative cost-effectiveness of the entire patent examination process over time, or the efficiency with which the organization applies its resources to production.*





***Helping the Next Generation*** *— Patent Commissioner John Doll and Deputy Patent Commissioner Peggy Focarino confer with William Dondero, patent examiner and mentor for the Hayfield Robotics Team, at a "For Inspiration and Recognition of Science and Technology," (or FIRST) regional competition. The USPTO works with FIRST and many other nonprofit organizations to encourage young people to become interested in math, science, and innovation.*

# Strategic Goal 2:  Optimize Trademark Quality and Timeliness

**T**he Trademark organization continues to demonstrate excellence and the qualities that allow the USPTO to make progress toward its vision to "lead the world in IP protection and policy."  For the second year in a row, the Trademark organization has met and exceeded all of its agency performance targets, advancing all of the objectives outlined in the USPTO's *2007-2012 Strategic Plan.*  FY 2007 accomplishments and future priorities are:

## IMPROVING EFFICIENCY

First action pendency — the length of time between receipt of a trademark application and when the USPTO makes a preliminary decision — was reduced to the lowest level in six years, ending the year at 2.9 months, demonstrating results a year ahead of schedule.  Average total pendency also showed significant improvement with registration occurring within 15.1 months from filing.

Pendency has improved as production has increased and become more consistent on a monthly basis, due to changes in performance plans and incentive awards.  Increased use of electronic forms, particularly Trademark Electronic Application System (TEAS) Plus filings, which represent about 30 percent of new application filings, have improved the efficiency of examination as well as contributing to an increase in applications approved for publication.



*Learning from Industry — Sun Microsystems Trademarks Director Tiki Dare moderates the 6th Annual International Trademark Association (INTA) Industry Group Training Seminar for USPTO trademark attorneys.  The seminar is jointly sponsored by INTA and the USPTO to bring trademark attorneys firsthand updates from various industries.*

The Trademark organization has made process changes to streamline the post examination process, and reduce costs and disposal pendency.  Specifically, the Trademark organization has decreased the time between approval for publication by the examining attorney, publication in the **Official Gazette**, and registration (by eliminating the second level of proofing and improving the post-publication amendment process).  This process change has had a direct

*Trademark Pendency Performance – The two primary measures of Trademark organization processing are average first action pendency (the time from filing to first action) and total average pendency (the time from filing until disposal).*





and positive impact on reducing disposal pendency to the lowest level in 14 years.

## IMPROVING QUALITY

Searching and examination quality continued to show improvement.  Nearly 96 percent of first actions and more than 97 percent of final actions meet statutory and compliance rates for quality of decision making and writing, the highest levels ever achieved.  Advances have also been made to enable more complete and accurate filings.  Specifically, the Trademark organization has greater use of online tools and has improved the workflow process to better manage and track performance, improve training, and increase the use of electronic filing, which contribute to better quality of application data and consistency in processing  All newly hired examiners now complete a seven-week training course on substantive and procedural examination, with an emphasis on the Trademark organization's examination curriculum.  The Trademark organization's quality results are a reflection of the cumulative effects of five years of emphasis on the same criteria for assessing examination quality.



***Celebrating Success*** — *Under Secretary Jon Dudas; Deputy Commissioner for Trademark Operations Debbie Cohn; and Commissioner  for Trademarks Lynne Beresford celebrate the 10th anniversary of the Trademark Work-at-Home program.  Ms. Cohn was surprised to receive inscribed statements from Congressmen Tom Davis, Jim Moran, and Frank Wolf, praising her work and the success of the telework program in the* **Congressional Record**.

The Trademark telework program, already recognized as a leader in the Federal Government, received the *2007 Work-Life Innovative Excellence Award* given by the Alliance for Work-Life Progress.  The award showcases forward thinking programs and policies that look beyond their own cultural, demographic, and organizational boundaries to demonstrate excellence in enhancing and promoting work-life effectiveness, while achieving organizational goals.

On June 4, 2007, the USPTO celebrated the 10-year anniversary of its trademark Work-at-Home program, which started out in 1997 as a small pilot with just 18 examining attorneys.  The Trademark organization has realized numerous benefits from saving space, to employee retention, to improved work life balance for employees.

The Trademark organization continues to improve on its successful telework program through the continued expansion of telework opportunities and by exploring the use of remote access and collaboration tools.  Eighty-five percent of eligible examining attorneys now work from home nearly full time, with 85 percent of all eligible Trademark employees working from home at least one day per week.  Forty-nine percent of all Trademark employees telework.

***Trademark Quality Performance*** – *The Trademark organization continues to improve the quality of its products and services using in-depth reviews of work in progress and enhanced end-process reviews.*



**Measure:  Trademark First Action Compliance Rate**

| | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| Target | 91.7% | 92.5% | 93.5% | 95.5% |
| Actual | 92.1% | 95.3% | 95.7% | 95.9% |

■ Target  ■ Actual  **Target Met**



**Measure:  Trademark Final Action Compliance Rate**

| | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| Target | 95.0% | 95.0% | 93.5% | 96.0% |
| Actual | 94.2% | 94.1% | 96.4% | 97.4% |

■ Target  ■ Actual  **Target Met**

## PROVIDING E-MANAGEMENT AND E-TOOLS

The Trademark organization is in the final stages of implementing a long term project to replace manual, paper-based processes with a fully electronic operation. In the past year, Trademarks implemented an electronic docketing system known as the First Action System for Trademarks (FAST) for the law office technical support staff. This was the first implementation to extend electronic workload management tools, which include the routing and assignment of new work, and monitoring of cases in process beyond the examining corps. This system significantly improves the processing and management of applications as well as providing access to online production reports to monitor the status of individual performance.

To ensure that the transition results in more productive, efficient, and cost-effective business processes and practices, the organization has also undertaken an assessment of its trademark process and the effect of incremental changes on its work force. The assessment process includes documenting or mapping the entire workflow to identify opportunities for further improvement, examining how best to organize and use staff, and developing more appropriate performance standards.

As part of this assessment process, the Trademark organization implemented several changes including realigning the law office support staff in order to create a greater focus on managing workload and quality throughout the examination process. The realignment recognizes the significant changes made over the past several years on how work is processed. It places a greater emphasis on monitoring and evaluating performance, incorporating quality controls, establishing consistent practices, and providing training. Changes have also been made in performance plans, production measures, and workflows, which now mostly rely on electronic processing and file records to support core examination activities.

Documentation from the process mapping will be used to complete the design requirements and complete implementation of the electronic workflow and file management system.

*E-Filing and E-Management of Applications – The percent of trademark applications filed electronically has steadily increased over the past four years to the current level of 95.4 percent. Electronic management of trademark applications continued at 99.9 percent in FY 2007.*



**Measure: Trademark Applications Filed Electronically**



**Measure: Trademark Applications Managed Electronically**

The Trademark organization reached a major milestone on November 29, 2006 – more than one million trademark applications have been filed since TEAS was first piloted nine years ago. The USPTO hosted a celebration in January honoring Donald Junck, a South Dakota entrepreneur who filed the one-millionth Web-based trademark application using TEAS. Other filers were also honored.

The Trademark organization released additional enhancements for TEAS forms in March to expand the acceptance of Portable Document Format (PDF) attachments to the initial application form. Changes were made to align forms with examiner guidance, ensure consistent ordering of identifications, and automatically update some fields in the post registration forms.



**One-millionth E-Filer** — *Donald Junck, of Sioux Falls, South Dakota, receives a plaque from USPTO Director Jon Dudas and Commissioner Lynne Beresford recognizing that Mr. Junck was the one-millionth electronic trademark filer. The Trademark e-filing system became available worldwide in 1998. More than 95 percent of all new U.S. trademark applications are now filed electronically.*

*Trademark Efficiency* – *This following metric measures the relative cost-effectiveness of the entire trademark examination process over time, or the efficiency with which the organization applies its resources to production.*



# Strategic Goal 3:  Improve Intellectual Property Protection and Enforcement Domestically and Abroad

The USPTO is an integral component of President Bush's strategy to encourage innovation and strengthen the nation's ability to compete in the global economy.  To this end, the USPTO advocates U.S. Government IP policy, works to develop unified standards for international IP, provides policy guidance on domestic IP issues, and fosters innovation.

## PROTECTING IP AND CURBING IP THEFT

During FY 2007, the USPTO continued to improve the enforcement of IP rights in the United States and around the world.  USPTO actions included taking the lead on several initiatives to strengthen IP protection and enforcement and to continue advocating improved IP protection and enforcement for American businesses.

As part of the Administration's Strategy Targeting Organized Piracy! (STOP!) initiative, the USPTO advanced work with other U.S. Government agencies to fight piracy and counterfeiting.  As part of STOP!, the USPTO continued managing a hotline that helps small and medium-sized businesses leverage U.S. Government resources to protect their IP.  The USPTO received 1,730 STOP! hotline calls in FY 2007.

The USPTO actively worked with the Office of the United States Trade Representative (USTR) on the IP chapter for several free trade agreements (FTAs) during FY 2007, most notably the IP chapter of the U.S.-Korea Free Trade Agreement, which was completed in April 2007.  This is the strongest IP chapter in any FTA to date and the most commercially significant FTA in more than 15 years.  Additionally, the USPTO



**FOREIGN POSTINGS OF IP EXPERTS**

officials participated in negotiations with USTR on the IP chapters of the U.S.-Malaysia FTA negotiations and the implementation of the U.S.-Central American FTA with the Dominican Republic. The USPTO also continued posting IP experts at American embassies in key locations around the world.

## WORKING TO UNIFY INTERNATIONAL IP PRACTICE

### Multilateral Efforts

The heads of the five largest IP Offices — China, Europe, Japan, Korea, and the United States met to discuss ways the Offices can cooperate to improve efficiency and quality and keep pace with the rising volume of global patent filings. In May 2007, the USPTO met with leaders from the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean IP Office (KIPO), and the State Intellectual Property Office (SIPO) of the People's Republic of China to discuss common patent administration issues such as work sharing, quality management practices, e-filing, and examiner training.  These offices are critical to the future of the global patent system and global economy.  Enhancing cooperation among them will lead to higher quality, greater productivity, and less redundancy.

The USPTO also made significant progress within the Trademark Trilateral (the USPTO, the JPO, and Europe's Office for Harmonization in the Internal Market) on the identification of classifications for goods and services.  The partners have now agreed to invite additional countries to participate in the project, on a limited basis.  This work should further reduce trademark pendency as applications, especially those filed from abroad, will be more focused for examination in the United States.

The USPTO, JPO, and EPO continued working together, within the Patent Trilateral (the cooperative effort that began in 1983 among the three offices), to find mechanisms to streamline processing and avoid redundancies among the offices and for applicants.  In FY 2007, the Patent Trilateral implemented electronic priority document exchange, allowing for direct office-to-office transmission of priority documents.

USPTO officials led discussions with the International Union for the Protection of New Varieties of Plants (UPOV) convention, which sets minimum standards for a *sui generis* form of IP protection system for plant varieties.  The convention promotes compliance for IP protection internationally with respect to the process of plant breeding and aims to encourage plant breeders to develop new varieties of plants. Five countries — the Dominican Republic, Morocco, Spain, the Ukraine, and Vietnam — joined the 1991 Act of the UPOV convention in FY 2007 bringing total membership to 64.

In the future, the USPTO will continue to seek enhanced cooperation and improved protection for intellectual property multilaterally. Working with Patent and Trademark Trilateral partners, as well as other IP offices such as Korea and China, the USPTO plans to intensify efforts to improve efficiency and quality in the examination process. The USPTO also will continue to promote improved IP protection internationally in several multilateral fora such as the UPOV and the World Intellectual Property Organization (WIPO).

### Bilateral Efforts

The USPTO also made great strides in implementing the USPTO-SIPO work plan of strategic cooperation.  Under the work plan, the USPTO implemented an examiner exchange program, initiated an automation experts' group meeting, and provided extensive training to SIPO examiners and managers.

The USPTO established broad cooperative agreements with other countries for increased technical cooperation between the offices.  Memoranda of understanding signed by USPTO in FY 2007.

- India's Department of Industrial Policy and Promotion, January 9, 2007, to cooperate in capacity building activities, human resource development, and public awareness programs.

- IP Australia (IPAU), January 18, 2007, to establish a second phase of a pilot project to determine the feasibility of having IPAU perform search and examination functions under the PCT for the USPTO.

- The IP office of the Republic of the Philippines, January 28, 2007, for increased technical cooperation between the two Offices.

- The Ethiopian IP Office, March 23, 2007, emphasizing the importance of bilateral relationships, and wherein the USPTO agreed to provide technical assistance to improve the administration of IP systems and develop professional skills.

While the main thrust of the USPTO bilateral efforts is at the operational level, involving training and technical assistance, the USPTO believes that these efforts should produce results



***Resident Expert*** — *USPTO IP attorney Tom Sydnor testifies before the U.S. House Oversight and Government Reform Committee about the effects of inadvertent filesharing.*

at the policy level in the form of improved IP protection in these countries by improving IP office administration, public awareness of IP, and enhanced cooperation at both the technical and policy levels.

## GIVING DOMESTIC IP POLICY GUIDANCE

Patent modernization legislation has been the subject of several committee hearings and considerable debate and discussion in the U.S. Congress. The legislative proposals are intended to improve patent quality, reduce patent litigation costs, and further international harmonization of patent laws. The USPTO supports these goals and is working with the Congress to develop a bill that effectively addresses the goals in a fair and balanced manner for all stakeholders in the patent community. The USPTO will continue consultations as this important legislation moves ahead in the legislative process.

The USPTO also provided policy guidance on various other patent, trademark, and IP bills during the year. The Agency responded to and consulted with Congressional staff on various diverse IP issues related to the protection and enforcement of Intellectual Property Rights (IPR), geographical indications, IP assistance to small businesses, and telework policies and practices for Federal agencies.

In March, the USPTO released a report, "Filesharing Programs and Technological Features to Induce Users to Share." This report found that five popular filesharing programs had features that could cause users to inadvertently share files and facilitate identity theft or breaches of security. After the report's

release, the USPTO, as a co-author, testified before the Congress on the results and the impact of inadvertent file sharing.

On July 17, the Director of the Office of International Relations testified before the Senate Committee on Foreign Relations to discuss three important IP treaties. The Director urged support for ratification of the Hague Agreement, the Patent Law Treaty, and the Singapore Treaty, each of which would streamline and simplify procedures for American innovators and businesses seeking to protect their IP abroad.

As in past years, the USPTO was heavily involved in shaping IP law and policy through domestic litigation.

### The Obviousness Test in Patent Law
#### *KSR International Co. v. Teleflex, Inc.*

Whether a claimed invention is obvious in view of the prior art is often the central question in deciding whether to grant a patent. The Office of General Counsel worked closely with the Solicitor General of the United States in formulating the Government's *amicus* brief for the Supreme Court case *KSR International. v. Teleflex, Inc.*, and the Supreme Court largely adopted. The unanimous *KSR* opinion gives patent examiners more flexibility when analyzing this fundamental issue, ensuring that allowed applications meet the statutory standard of nonobviousness. The Agency is leading the way to apply *KSR*, having prepared very detailed examination guidelines. Moreover, BPAI has issued several precedential opinions, outlining best practices for examining patent applications in light of *KSR*. Finally, implementation of *KSR* will positively affect the USPTO's role in maintaining a strong system of granting high quality, valid patents.

In addition to *KSR*, the USPTO advised the Solicitor General of the United States on several other IP matters before the Supreme Court. For example, the USPTO assisted in preparing the Government's *amicus* brief in *Microsoft v. AT&T Corp.*, which involved the limits of extraterritorial infringement under 35 U.S.C. § 271(f)(1). The Supreme Court essentially adopted the Government's position, finding that Microsoft was not liable for infringement under §271(f) for copies of software made overseas of a master copy that was supplied from the United States. Likewise, the Supreme Court's decision in *MedImmune, Inc. v Genentech, Inc.,* was consistent with the

Government's brief, holding that a patent licensee may be permitted, under certain circumstances, to challenge the patent's validity in court without having to breach the license.

The USPTO continued to defend its decisions before the U.S. Court of Appeals for the Federal Circuit, resulting in a number of recent precedential decisions that provide further guidance to both our examiners and applicants in improving the application process.

In *Hyatt v. Dudas,* the Federal Circuit upheld the USPTO's decision, in the case of an application with very large numbers of claims, to require the applicant to affirmatively specify the written description supporting those claims when the examiner is unable to locate such support on initial examination of the application.

In *Bender v. Dudas,* the Federal Circuit affirmed the USPTO's decision to disbar a patent attorney for his activities with an invention promotion company, in which they collectively misled hundreds of individual inventors through the patent application process.  Public confidence in not only the quality of patent grants, but also in the members of the  patent bar will always be a critical issue for the USPTO.

The USPTO successfully defended the Trademark Trial and Appeal Board's (TTAB) decision in *In re Elsevier,* denying registration of the mark "LAWYERS.COM" for an online legal information service.  The Federal Circuit determined that the mark was generic for legal information services.

Furthering the Agency's leadership in IP law, both the BPAI and the TTAB increased their issuance of precedential decisions, with the TTAB issuing over 60 such decisions, and the BPAI issuing landmark decisions providing early guidance on applying *KSR.*  In addition, this past year, both boards issued or proposed new rules designed to streamline case resolution and improve the efficiency of the decision-making process.

## DELIVERING IP EDUCATION WORLDWIDE

This year, the USPTO completed the Global Intellectual Property Academy (GIPA), a 20,000 square foot state-of-the-art facility equipped to efficiently deliver targeted programs and training for foreign IP and law enforcement officials.  With the establishment of this academy, the USPTO implemented a Foreign Examiners-in-Residence training program — the first of its kind in international cooperation and training at the USPTO.



***Thinking Globally*** — *The USPTO completed the Global Intellectual Property Academy (or GIPA), a 20,000 square-foot training facility for foreign IP officials. This work strengthens IP rights around the world.*

Selected examiners from the patent offices in Brazil, China, Egypt, India, Mexico, and the Philippines are now participating in this eight-month training program.  Overall, the USPTO conducted 77 GIPA programs in FY 2007, a 63 percent increase over programs offered last year.  Fifty-eight percent of the FY 2007 GIPA programs focused specifically on IPR enforcement-related topics, with a goal toward improving IPR enforcement regimes worldwide.  For example, programs dealt with border enforcement, IP rights for judges and prosecutors, effective practices in the regulation of optical media production and the implementation of anti-piracy efforts, copyright infringement in the digital environment, geographical indications, trademark examination, traditional knowledge, and genetic resources.

Also, as part of the STOP! initiative, the USPTO continued its intensive national public awareness campaign.  In FY 2007 the USPTO developed a critical partnership with the U.S. Chamber of Commerce enabling the USPTO to share duties of agenda-building, funding, and outreach.

The USPTO kicked off the year with a highly anticipated event for small and medium-sized businesses designed to aid them in protecting their IP in a global marketplace in Raleigh, North Carolina, and followed up with events in Detroit, Michigan; Burlington, Vermont; San Antonio, Texas; Portland, Oregon; Seattle, Washington; Denver, Colorado; and Los Angeles, California.  The USPTO also organized two China specific events throughout FY 2007, which took place in Philadelphia, Pennsylvania and Kansas City, Missouri.

*IP Protection*—*The measures of the USPTO's progress in protecting and enforcing IP focus on FTA negotiations and implementation, World Trade Organization (WTO) accessions, 301 reviews, trade policy reviews, technical assistance, expansion of foreign postings, work details of USPTO employees to other U.S. Government agencies, as well as development of specific plans for strategic cooperation; for example, the work plans with China, Egypt, India, Brazil, and Association of South East Asian Nations (ASEAN).*

*The significant variance in actual numbers of instances in which USPTO experts reviewed IP policies/standards compared to the target was due to the exceptionally large number of requests from the USTR to assist with trade policy reviews, activities associated with FTAs, and requests for technical assistance stemming from the successful GIPA program and an increased focus on China.*



Measure: Plans of action, mechanisms, and support programs initiated or implemented in developing countries



Measure: Number of instances in which USPTO experts review IP policies/standards



Measure: Improving worldwide IP expertise for U. S. Government interests

More than 1,300 small and medium-sized businesses attended our conferences. Large companies presented "Lessons Learned" and "Best Practices" to small business attendees and small businesses discussed the importance of IP protection. As a new outreach and educational tool, the USPTO also distributed more than 1,500 CD-ROM presentations on IP protection. Our commitment to reach out to small businesses will continue in FY 2008.

In FY 2007, USPTO began a partnership with the Ad Council to reach young people through a national ad campaign called "Inspiring Invention," which seeks to make inventing and developing new ideas part of American children's lives. Radio and TV commercials are now playing throughout the country with the message, "Anything's possible. Keep thinking."



*Spreading the Word* — *The USPTO displays information at the 2007 Summer NAMM (International Music Products Association) trade show, where USPTO attorneys gave lectures on protecting IP and preventing piracy and counterfeiting. The USPTO's work was part of the Bush Administration's "Strategy Targeting Organized Piracy!" initiative, (or STOP!), a joint effort of nine Federal agencies to crack down on IP theft.*

# Management Goal: Achieve Organizational Excellence

Fulfilling the USPTO's mission and goals requires strong leadership and collaborative management. While the three strategic goals focus on the core mission, the management goal focuses on the organizational excellence that is a prerequisite for achieving those goals. Collectively, the USPTO leadership is responsible for core management activities in three critical areas.

## WORKING AS PARTNERS FOR SUPERIOR PERFORMANCE

Employees are the USPTO's most valuable asset. So, USPTO leaders have singled out effective human capital management as a priority initiative to enhance employee development and to improve program performance throughout the USPTO. In FY 2007, the USPTO developed an enterprise-wide **Strategic Human Capital Plan** to address human capital challenges identified in the **2007-2012 Strategic Plan.**

The USPTO will use the **Strategic Human Capital Plan** to identify, develop, and implement activities that will enable it to become an "employer of choice with a culture of high performance." The **Strategic Human Capital Plan** identified four areas in which the Agency will focus its efforts: (1) talent management, (2) results-oriented performance culture, (3) leadership development and knowledge management, and (4) Office of Human Resources (OHR) transformation. Each of the USPTO business units is developing its own implementation plan to determine its approach to supporting enterprise-wide objectives. These are expected to be completed by January 2008.

The USPTO is working to continually improve the retention of qualified employees. In FY 2007, the USPTO hired 1,215 new patent examiners and 1,218 the prior year. To maintain this momentum, the USPTO implemented recruitment bonuses to attract and retain the most highly qualified candidates.



*Ideas in Action* — *The USPTO Madison Building displayed models or renderings of the 25 top inventions in the 2007 Modern Marvels Invent Now® Challenge. The Challenge was presented by the History Channel® and National Inventors Hall of Fame® Foundation and sponsored by the USPTO to recognize outstanding inventions and inventors.*

In addition, the Agency offers employees flexible work schedules and telework opportunities that raise morale, enhance work-life balance, and improve retention rates. For example, the USPTO expanded its telework and remote access programs by providing USPTO equipment and collaboration tools to employees to work-at-home so that they have the same capabilities and functionality as if they were working at the Alexandria campus.

For the USPTO to continue to be effective in today's increasingly electronic and telecommuting environment, there must be clear communication among all levels of employees. The USPTO has placed increased emphasis on internal communications in an effort to improve individual and organizational performance by strategically managing communication, information, and knowledge throughout the Agency. This is being done by improving enterprise-wide information sharing; nurturing an

open communication culture; enhancing leader-employee communication; and ensuring that our employees understand the Agency's mission, goals and objectives, and their role in achieving them.

### ENSURING EXCELLENCE IN MANAGEMENT PROCESSES

The Office of Chief Financial Officer (OCFO) is confident that the USPTO's financial and performance data are complete, reliable, accurate, and consistent, as we improve our ability to measure progress toward performance objectives. For the 15th consecutive year, the USPTO earned an unqualified audit opinion on our annual financial statements. For financial reporting during FY 2007, the independent auditors did not identify any material weaknesses, significant deficiencies, or instances of noncompliance. However, the USPTO is reporting one non-financial material weakness in information technology (IT) security.

The Office of Chief Information Officer (OCIO) is working diligently with the Office of the Inspector General (OIG) and the DOC to improve the USPTO's overall IT security program and the quality of the certification and accreditation (C&A) packages to remove the current material weakness identified for IT security.

The USPTO also made significant progress in tracking IT costs by project and category of expense through improved budget processes and controls. Through the efforts of the OCFO and the OCIO, USPTO managers can better understand the costs of providing IT products and services and thereby drive improved efficiency and cost reduction. In fulfilling responsibilities under 44 U.S.C. §3504(h), the USPTO uses a Capital Planning and Investment Control (CPIC) process to prioritize investments and determine funding levels for subsequent fiscal years. Projects are carefully managed throughout their life cycle. At key milestone dates, progress reviews are conducted to compare the project's status to planned benefit, cost, and schedule, along with technical efficiency and effectiveness measures. All major IT system investments are reported in the Office of Management and Budget's (OMB) Circular A-11, Exhibit 53, the USPTO's IT Investment Portfolio, for FY 2009.

### ENHANCING ONLINE ACCESS TO INFORMATION

Besides helping the Patent and Trademark organizations achieve record numbers of electronic filings of applications and related documents, the OCIO continued to make improvements in IT enterprise architecture, internal processes, and organizational alignment to improve our ability to be more responsive and better manage and deliver quality products at enhanced service levels. These initiatives also directly support efforts to improve overall efficiency; improve availability of and streamline access to USPTO information, data, and services; serve an increasingly geographically dispersed work force; implement faster, more secure information exchange; and, continue expansion and improvement of e-filing, e-processing, and other e-government efforts.

# Management Challenges

The USPTO will continue to lead the world in IP policy by optimizing patent and trademark quality and timeliness, and improving IP protection and enforcement domestically by addressing the following challenges:

## MAKE EFFICIENCY GAINS FOR THE FUTURE, WHILE KEEPING QUALITY HIGH

The Patent organization's biggest challenge is to address the growth of pendency and the backlog of patent applications waiting to be examined while maintaining high quality.  The Patent organization must address the dual challenges of rising workloads and a shift of applications from traditional arts to more complex technologies.  To address rising workloads, the Patent organization will continue to hire, train and retain additional examiners, and explore and implement process improvements.  Quality, which is a critical component of the USPTO's ***2007-2012 Strategic Plan,*** will be ensured throughout the patent examination process.

The Trademark organization's biggest challenge is to maintain first-action pendency between 2.5 and 3.5 months on a consistent basis, given the monthly fluctuation and unpredictability of projecting new filings.  If the Trademark organization can maintain first action pendency at that level, it can also ensure low disposal pendency as well.

## CONTINUE TO MOVE TO AN ELECTRONIC WORKPLACE

The Patent and Trademark organizations are moving rapidly to eliminate paper documents from their processes. Electronic communications are improving, encouraging more applicants to do business electronically in using Web-based systems.  Both Patent and Trademark organizations have made significant progress in support of the long-term goal to create an e-government operation. The Trademark organization now relies exclusively on data submitted or captured electronically to support examination, publish documents, and issue registrations.

The Trademark organization still has the challenge of completing an electronic docket and file management system for the operations that support core examination and post-registration to link all operations and processing.  A fully electronic



workflow will allow the Trademark organization to better manage the fluctuations in filings and be more efficient, as well as timely, in processing and responding.

This increased reliance on electronic systems presents other challenges to the USPTO in the event of an unplanned outage or disruption in processing. To address this need, the USPTO has embarked on an aggressive, phased business continuity/disaster recovery program. The current phase involves establishing a remote data bunker, which stores backups of mission critical data. Subsequent phases of the project will establish an alternate processing center, which will serve as the main processing site for some systems and the development and test site for other systems, and eventually allow for near-real time recovery of systems and data.

## STRENGTHEN GLOBAL INTELLECTUAL PROPERTY RIGHTS (IPR) SYSTEMS

An effective IPR system is important to trade because it provides confidence to businesses that rights will be respected and that profits will be returned to IPR holders. The tremendous ingenuity of American inventors, coupled with a strong IP system, encourages and rewards innovation and helps propel the economic and technological growth of our nation.

The challenges to maintaining an effective IPR system include deepening the dialogue on global IP policy, facilitating technical cooperation with foreign countries, surveying and exchanging information on the current status of IPR protection and administrative systems, and arriving at agreement on standards of enhanced IP enforcement. These standards of enhanced IP enforcement include increased criminal and civil protection, as well as tighter controls on circumventing technological protection. Reaching bilateral and multilateral agreements will require all sides to openly communicate and strive toward a more global convergence of patent and trademark standards.

## SUSTAIN A FUNDING STREAM

Permanent enactment of the fee changes made by the Consolidated Appropriations Act, 2005 is necessary to provide a stable and predictable funding stream for the Agency. In the United States, demands for products and services have created substantial workload challenges in the processing of patents and trademarks. Permanent enactment of these fee changes and continued implementation of strategic initiatives will address these challenges. Long-term funding stability is essential to the creation of a predictable environment for planning purposes.

Additionally, the USPTO seeks specific authority to eliminate, set, or otherwise adjust patent and trademark filing and processing fees subject to appropriate oversight and comment by the Patent Advisory Committee, Trademark Advisory Committee, stakeholders, and Congress.

## ACQUIRE MORE TALENT

The USPTO work is highly technical in nature and requires a highly educated, well credentialed work force. This presents the Agency with employment challenges as the Agency faces increased customer demand and the need to recruit in a highly competitive environment, particularly for patent examiners and IT specialists.

The USPTO also needs to focus on ways to manage the new generation of employees, in an increasing virtual workplace. Although the Agency has strong performance management processes in place, the USPTO faces the management challenge of keeping younger employees – many of whom are or will be working remotely — feeling engaged, motivated, and wanting to remain with the Agency. The USPTO needs to provide more and better training in supervision, management, and leadership, while keeping the work force current with all the latest technology.

The Agency also needs to address succession planning by identifying and developing future leaders. The significance of our mission, excellent benefits, and wide use of telework and other employment flexibilities make a good business case for marketing the USPTO as an employer of choice.

# What's Ahead?

## OPTIMIZE PATENT QUALITY AND TIMELINESS

As outlined in the ***2007-2012 Strategic Plan***, the Patent organization will continue to emphasize quality and timely examination.  Our intention is to implement several rule changes to provide examiners with the best information, to better focus on examinations, and to maximize the value of communication with applicants.  Working with its stakeholders, the USPTO will explore how it can share responsibility for patent quality with applicants.

To build and retain the high-quality examiner corps needed, the Patent organization will continue hiring 1,200 examiners per year in FY 2008 and into the future.  With the refinement of end-to-end electronic processing environment and the move toward e-filing of applications and related documents, the Patent organization will move closer to becoming a nationwide work force.  These actions will help to make the Agency even more responsive to the ever increasing demand for patents.

The Office of the General Counsel is also defending several cases pending before the Federal Circuit involving the scope of subject matter eligible for patent protection.  Because the boundaries of patent eligibility in certain areas remain ambiguous, we anticipate that the Federal Circuit will issue precedential opinions in these appeals in the next year.  These opinions will provide guidance to our patent examiners on evaluating the fundamental issue of what types of claimed inventions qualify for patent protection.

## OPTIMIZE TRADEMARK QUALITY AND TIMELINESS

The Trademark organization will build on its accomplishments and work toward meeting the objectives of the ***2007-2012 Strategic Plan***.  The Trademark organization will continue to work with its customers to ensure that the objectives remain aligned with their needs.

The Trademark organization will continue to assess the efficiency of its operations going forward, and incorporate process improvement in the incremental redesign of the electronic workflow and file management system.  The USPTO will also continue to use e-government as the primary means of doing business with applicants and registrants, and as a means of processing work within the Trademark organization.



First-action pendency has reached the long-term target range of 2.5 to 3.5 months. The Trademark organization must strike a proper balance between forecasting levels of new filings, existing inventories, and managing an appropriately sized staff to ensure sufficient resources are available to maintain this goal on a consistent basis. Completing the electronic workflow and file management system throughout the entire process will provide better automated tools and consistency for managing workloads and provide better services to its customers.

## IMPROVE INTELLECTUAL PROPERTY PROTECTION AND ENFORCEMENT DOMESTICALLY AND ABROAD

The USPTO will continue strong advocacy policies that ensure that IP rights, such as patents, trademarks, and copyrights, are recognized as essential tools for economic growth in both developed and developing economies. This is particularly important in light of misperceptions, such as the misperception that strong IP protection hinders development. The USPTO will continue to work with international partners to promote a strong and effective IP regime, that provides adequate and effective incentives for innovation and creativity, worldwide, including within organizations such as the WIPO, the WTO, and the United Nations Human Rights Commission.

The USPTO must continue to advocate pro-IP principles as endorsed by the "Group of Eight" (G8) countries — Canada, France, Germany, Italy, Japan, Russia, the United Kingdom and the United States — to assist all countries in adopting and effectively enforcing adequate levels of IP protection for the benefit of all citizens. This will be accomplished by advising other Federal agencies on domestic and international IP policy, and by continually expanding our IP training and technical assistance internationally.

The USPTO will continue to search for solutions to its workload, examination quality, and e-government challenges by taking the lead on cooperative initiatives with other IP offices throughout the world. This will result in progress in the areas of work-sharing, examination practice uniformity, and electronic access and compatibility. Finally, the Agency will continue to address policy and legal matters relating to all legislative proposals relating to IP and the USPTO, especially in the context of the continuing debate over proposed changes to the patent laws of the United States.

## ACHIEVE ORGANIZATIONAL EXCELLENCE

USPTO leaders will continue to work together with its business partners to: lead and support efforts to improve efficiency; develop and implement an effective, comprehensive communication plan; recruit and retain the best, brightest, and most talented staff with the necessary skill sets; improve internal monitoring and reporting of organizational goals and objectives (by implementing and expanding performance measures and service level agreements); streamline access to USPTO information, data, and services; implement faster, more secure information exchange; and continue expansion of e-filing, e-processing, and other e-government efforts. In FY 2008, the USPTO will also take steps to improve its ability to be more responsive and better manage and deliver quality products at enhanced service levels. This will be accomplished by reducing the cost and complexity of systems, establishing and enforcing more standards, and practicing continual process improvement.

In addition, the OCIO will continue to:

- Work with the OIG and the DOC to improve the overall IT security program and C&A package quality to remove the current material weakness for IT security.

- Improve the security, availability, and quality of IT systems and services while reducing their complexity and cost; support business area needs to accommodate the hiring and equipping of 1,200 patent examiners a year through 2012; work with the Trademark organization to provide internal online tools (regarding consistency and quality of searching and examination); provide electronic file management and workflow; develop interactive online electronic filing capabilities and upgrade e-tools; help move to fully electronic records and eliminate the need to collect and store paper records; and continue to improve overall data quality.

- Support the Office of Chief Administrative Officer to implement the Human Resources (HR) Line of Business in FY 2008, which will improve online HR services and capability, including access to employee information such as Official Personnel Files and an employee self-service feature (online view and update of employee information and benefits).

- Work with the OCFO to plan and support the implementation of the Financial Management Line of Business.

# Accompanying Information on USPTO Performance

## The President's Management Agenda (PMA)

The USPTO is committed to the objectives of the PMA, which is the strategy implemented by President Bush's Administration to improve the management and performance of the Federal Government. Departmental agencies are scored green, yellow or red on their status in achieving overall goals or long-term criteria, as well as their progress in implementing improvement plans.

### STRATEGIC MANAGEMENT OF HUMAN CAPITAL

The USPTO plays a vital role in enabling discoveries, inventions and creative ideas to be brought to the marketplace. To support this effort, it is essential to have a strong human capital management program that continues to attract, hire, train and maintain employees with technical knowledge and skills that increase in both range and depth.

| PROGRESS | UPCOMING EVENTS |
|---|---|
| ■ Released the *Strategic Human Capital Plan* on September 17, 2007. | ■ Develop business area plans by January 2008 for achieving the objectives of the *Strategic Human Capital Plan*. |
| ■ Recruited and hired 1,215 patent examiners in FY 2007. | |
| ■ Partnered with the Office of Personnel Management (OPM) to produce a Patent television recruitment ad featuring a USPTO patent examiner. To date, the ad has run in several cities in conjunction with job fairs hosted by the Agency. As a result of the ads, job fair attendance, by highly qualified candidates was high. | ■ Develop plans to hire an additional 1,200 patent examiners by holding recruitment events at colleges and universities, and bringing college and university representatives to USPTO for on-site briefings. |
| ■ Supported Telework – Of the USPTO's 8,913 employees, 88.9 percent are eligible to work at home. Of those eligible, 45.9 percent actually did work at home. | ■ Train recruiters and hiring coordinators on issues such as reviewing resumes and transcripts, conducting interviews, and ensuring adherence to merit system principles. |



## COMPETITIVE SOURCING

The USPTO is committed to achieving performance enhancements and cost-savings through competitive sourcing.

| PROGRESS | UPCOMING EVENTS |
| --- | --- |
| ■ Established a Competitive Sourcing Steering Committee (CSSC)<br><br>■ Directed the CSSC to conduct feasibility studies on all Federal Activities Inventory Reform (FAIR) Act activities containing 20 or more commercial jobs.  The feasibility studies will determine if sufficient "return" exists to justify the "investment" associated with conducting a competition. | ■ Once the feasibility studies are complete, for any study that establishes a favorable return on investment, the CSSC will authorize a full assessment on the scope of the study, applicable mission impacts, risks, estimated savings, and timeline.  After the full assessment, the CSSC will determine specific functions to be completed among public and private sources. |

## IMPROVED FINANCIAL PERFORMANCE

The USPTO is in compliance with all Federal accounting principles and standards and has encountered no instances of material weaknesses in internal controls or non-compliance with Federal accounting regulations.  The USPTO will continue to maintain and strengthen internal controls and improve the timeliness and usefulness of financial management information.

| PROGRESS | UPCOMING EVENTS |
| --- | --- |
| ■ Met all quarterly financial reporting requirements instituted by OMB.<br><br>■ Sustained the Agency's clean audit opinion, with FY 2007 marking the 15th consecutive unqualified audit opinion and the 11th consecutive year with no material weaknesses.<br><br>■ Maintained a certified and accredited, fully integrated financial management system and uses a data warehouse to manage both financial and operational data.  The data warehouse is used by managers for analyzing financial results and performance and by supervisory patent examiners for managing patent processing timeframes.<br><br>■ Operated a mature activity based cost (ABC) system that captures costs of core mission activities and both direct and indirect costs for the Agency.  Managers use data from the ABC system to analyze the cost of operations when making decisions regarding improving processes, setting fees, or developing budget requirements. | ■ The USPTO will continue its efforts to meet all reporting requirements, comply with all financial reporting rules, and earn an unqualified audit opinion with no material weaknesses. Financial systems will continue to be maintained at the highest standards and integrated into the daily operations. |

## EXPANDED E-GOVERNMENT

E-government is a critical factor in achieving the USPTO's three strategic goals. Specific e-government activities related to the strategic goals are included in those sections. The following describes enterprise-wide activities in support of this PMA initiative.

| PROGRESS | UPCOMING EVENTS |
|---|---|
| ■ Continued support of the Patent Electronic Filing System (EFS)-Web system (the electronic patent document filing system launched in FY 2006) which provides users with a simple, fast, and secure method for submitting initial and follow-on patent applications over the Internet. | ■ The USPTO will implement the HR Line of Business, which will improve online HR services and capabilities. |
| ■ Continued development of the new PFW system to pro-actively support the Patent organization as it faces the issues of increased filings, the need for remote access, and significant, fast paced changes in the examined technologies. | ■ The USPTO will continue planning for the Financial Line of Business. |
| ■ TEAS continued to provide customers with the ability to submit trademark applications and other trademark forms electronically over the Internet. | ■ The USPTO will continue to:  improve the security, availability, and quality of IT systems and services, while reducing their complexity and cost; support business area needs; provide internal on-line tools (re: consistency and quality of searching and exam); provide electronic file management and workflow; develop interactive on-line electronic filing capabilities; upgrade e-tools; help move to fully electronic records; eliminate the need to collect and store paper records; and continue to improve overall data quality. |
| ■ Continued to expand the BPAI and TTAB electronic processing systems. | |
| ■ Continued to enhance the electronic business center (available at the USPTO Web site *http://www.uspto.gov*.) which provides citizens with online services such as the ability to pay fees, obtain historical patent and trademark information, file applications, maintain patents and registered marks, view patent and trademark documents, and locate registered patent attorneys or agents. | |

## BUDGET AND PERFORMANCE INTEGRATION

Since FY 1999, the USPTO has developed an annual corporate plan that links the annual performance plan and budget request so that resource requirements for continuing programs and new initiatives are aligned with outputs and performance goals.

| PROGRESS | UPCOMING EVENTS |
|---|---|
| ■ Introduced the *2007-2012 Strategic Plan* in concert with the FY 2008 budget request.  This is a multi-year plan that provides USPTO employees, stakeholders, and the public, with a long-term vision of Agency goals, and planned outcomes.<br><br>■ Ensured that the annual performance plan is linked to the Agency's FY 2009 budget request and reflects the priorities and goals found in the *2007-2012 Strategic Plan*.  The annual budget request is a consequence of USPTO managers integrating their funding requirements to the *2007-2012 Strategic Plan*, and establishing measurable objectives and milestones for each goal.  The annual integrated budget/performance plan is the most effective and efficient way to establish accountability by making sure that performance measures are consistent with the views of the Administration and Congress.<br><br>■ Refined the Agency's performance goals for better integration of budgetary resources with both enterprise-wide strategic goals and individual unit performance targets.<br><br>■ Utilized the Program Assessment and Rating Tool (PART), and other assessment evaluations and modeling techniques to effectively enhance delivery of services and achieve improved program results.  The Agency routinely monitors program performance targets to ensure achievement of actual results vis-a-vis performance goals.  Organizational goals and crosscutting performance measures are also included in senior executive members' performance appraisal plans to ensure alignment with Agency mission, strategic goals, and objectives. | ■ Improve efficiency measures and their targets to provide more meaningful information for decision making.<br><br>■ Complete an internal assessment using PART to identify where improved program results can be achieved.<br><br>■ Continue PART training in anticipation of a PART review in FY 2008. |

# Performance Audits and Evaluations

The OIG completed one inspection report during FY 2007. The report, *Commercial Service Brazil Is Operating Well But Needs Management Attention In Some Areas*, focused on the management of the Commercial Service (CS) post in Brazil, including its programmatic, financial, and administrative operations. The OIG recommended that the USPTO work with the CS to clarify the responsibilities of the new IP attaché in Brazil; this included developing a work plan, and ensuring that adequate support staff and travel funds are made available to the attaché. In response, the USPTO created a Latin America Regional Team to support the operations of the CS Brazil attaché, developed an action plan for Latin America, authorized hiring budget and support staff, and approved a budget that included adequate travel funds.

In conjunction with the USPTO's continued material weakness in IT Security, the OIG completed two evaluations over Federal Information Security Management Act (FISMA) compliance during FY 2007 (*FY 2007 FISMA Assessment of Patent Search System – Primary Search and Retrieval* and *FY 2007 FISMA Assessment of Project Performance Corpora-tion General Support System*). These reports recognized that while the USPTO has made improvements with FISMA compliance, there are some weaknesses remaining. These evaluations were performed in support of the Management Goal: Achieve Organizational Excellence.

## PERFORMANCE DATA VERIFICATION AND VALIDATION

In accordance with GPRA requirements, the USPTO is committed to making certain the performance information it reports is complete, accurate, and consistent. The USPTO developed a strategy to validate and verify the quality, reliability, and credibility of USPTO performance results and has taken the following actions:

**ACCOUNTABILITY** – Responsibility for providing performance data lies with managers of USPTO programs who are held accountable for making certain that procedures are in place to ensure the accuracy of data and the performance measurement sources are complete and reliable.

**QUALITY CONTROL** – Automated systems and databases that collect, track, and store performance indicators are monitored and maintained by USPTO program managers, with systems support provided by the OCIO. Each system, such as Patent Application Location and Monitoring (PALM) or Trademark Reporting And Application Monitoring (TRAM), incorporates internal program edits to control the accuracy of supporting data. The edits, typically, evaluate data for reasonableness, consistency, and accuracy. Crosschecks between other internal automated systems also provide assurances of data reasonableness and consistency. In addition to internal monitoring of each system, experts outside of the business units routinely monitor the data-collection methodology. The OCFO is responsible for monitoring the Agency's performance, providing direction and support on data collection methodology and analysis, ensuring that data quality checks are in place, and reporting performance management data.

**FINANCIAL STATEMENT AUDIT** – During the FY 2007 financial statement audit, the USPTO conducted various tests and reviews of the primary accounting system and internal controls, as required by the Chief Financial Officers' Act. In their FY 2007 report, the auditors reported no material weaknesses in internal controls or material compliance violations. The auditors issued an unqualified opinion on the USPTO's FY 2007 financial statements. Additionally, as required by OMB Bulletin Number 07-04, the auditors reported that they had "noted no deficiencies involving the design of the internal control over the existence and completeness assertions related to key performance measures" reported in the Management's Discussion and Analysis section.

**DATA ACCURACY** – The USPTO conducts verification and validation of performance measures periodically to ensure quality, reliability, and credibility. At the beginning of each fiscal year, and at various points throughout the reporting or measurement period, sampling techniques and sample counts are reviewed and adjusted to ensure data are statistically reliable for making inferences about the population as a whole. Data analyses are also conducted to assist the business units in interpreting

program data, such as the identification of statistically significant trends and underlying factors that may be impacting a specific performance indicator. For examination quality measures, the review programs themselves are assessed in terms of reviewer variability, data entry errors, and various potential biases.

Following is specific information, including data verification and validation, for each performance measure:

## PERFORMANCE GOAL 1: OPTIMIZE PATENT QUALITY AND TIMELINESS

### Patent Quality

Quality improvement continues to drive many of the Patent organization's new initiatives. The Patent organization continues to improve the quality of its products and services using in-depth reviews of work in progress and enhanced end-process reviews to provide feedback to examiners on areas for improvement, targeted training, and safeguards to ensure competencies. The in-process compliance rate is the percentage of applications reviewed during prosecution prior to allowance, with no errors. Allowance compliance rate is the percentage of applications allowed by examiners with no errors after being reviewed.

| Measure: Patent Allowance Compliance Rate | | |
|---|---|---|
| | TARGET | ACTUAL |
| 2004 | 96.0% | 94.7% |
| 2005 | 96.0% | 95.4% |
| 2006 | 96.0% | 96.5% |
| 2007 | 96.0% | 96.5% |

**Target Met.** *The increase in the compliance rate indicates that the quality initiatives implemented in FY 2005 through FY 2007 have been effective.*

| Measure: Patent In-Process Examination Compliance Rate | | |
|---|---|---|
| | TARGET | ACTUAL |
| 2004 | Baseline | 82.0% |
| 2005 | 84.0% | 86.2% |
| 2006 | 86.0% | 90.0% |
| 2007 | 90.0% | 92.2% |

**Target Met.** *The improvement of the in-process compliance rate indicates that quality initiatives implemented in FY 2005 through FY 2007 are producing the desired results.*

Data Verification and Validation for Patent Allowance Compliance Rate and Patent In-Process Examination Compliance Rate

| | |
|---|---|
| **Data source:** | Office of Patent Quality Review Report |
| **Frequency:** | Daily input, monthly reporting |
| **Data Storage:** | Automated systems, reports |
| **Verification:** | Manual reports and analysis |
| **Data Limitations:** | None |

### Patent Pendency

The two primary measures of Patent organization processing time are: (1) average first action pendency, which measures the average time in months from filing until an examiner's initial determination is made of the patentability of an invention; and (2) average total pendency, which measures the average time in months from filing until the application is issued as a patent or abandoned by the applicant. The USPTO is implementing strategies to reduce patent pendency and the backlog of applications awaiting examination such as increased hiring, proposed rule changes, and process changes. However, even with continued access to the funding required to successfully execute these strategies, pendency will continue to rise for a period of time, but not to the extent it would have if these actions were not taken.

| Measure: Patent Average First Action Pendency | | |
|---|---|---|
| | TARGET (Months) | ACTUAL (Months) |
| 2004 | 20.2 | 20.2 |
| 2005 | 21.3 | 21.1 |
| 2006 | 22.0 | 22.6 |
| 2007 | 23.7 | 25.3 |

**Target Not Met.** *This target was not met because of the increasing dual challenges of rising workloads and a shift of applications from traditional arts to more complex technologies.*

| Measure: Patent Average Total Pendency | | |
|---|---|---|
| | TARGET (Months) | ACTUAL (Months) |
| 2004 | 29.8 | 27.6 |
| 2005 | 31.0 | 29.1 |
| 2006 | 31.3 | 31.1 |
| 2007 | 33.0 | 31.9 |

**Target Met.**

Data Verification and Validation for Patent Average First Action Pendency and Patent Average Total Pendency

| | |
|---|---|
| **Data source:** | PALM system |
| **Frequency:** | Daily input, monthly reporting |
| **Data Storage:** | PALM, automated systems, reports |
| **Verification:** | Accuracy of supporting data is controlled through internal program edits in the PALM system.  Final test for reasonableness is performed internally by patent examiners, supervisors, and program management analysts |
| **Data Limitations:** | None |

### Patent E-Filing and E-Management

The USPTO launched a Web-based tool (EFS-Web) in FY 2006, which allows applicants to submit patent applications in a PDF.  Acceptance of the new tool is reflected in the significant increase in applications filed electronically.

The USPTO also created a fully electronic patent application management process whereby all patent examiners, technical support staff, and adjunct users can access an electronic image of all patent applications.

| Measure:  Patent Applications Filed Electronically | | |
|---|---|---|
| | **TARGET** | **ACTUAL** |
| **2004** | 2.0% | 1.5% |
| **2005** | 4.0% | 2.2% |
| **2006** | 10.0% | 14.2% |
| **2007** | 40.0% | 49.3% |

*Target Met. This measure indicates USPTO's support of, and applicants' willingness to operate in, an e-government environment and identifies the percentage of applications filed electronically.*

| Measure:  Patent Applications Managed Electronically | | |
|---|---|---|
| | **TARGET** | **ACTUAL** |
| **2004** | 70.0% | 88.0% |
| **2005** | 90.0% | 96.7% |
| **2006** | 99.0% | 99.9% |
| **2007** | 99.9% | 99.9% |

*Target Met.*

Data Verification and Validation for Patent Applications Filed Electronically and Patent Applications Managed Electronically

| | |
|---|---|
| **Data source:** | PALM system |
| **Frequency:** | Daily input, weekly reporting |
| **Data Storage:** | PALM and automated systems |
| **Verification:** | Accuracy of supporting data is controlled through internal program edits in the PALM system and cross checks against other automated systems |
| **Data Limitations:** | None |

### Patent Efficiency

Measures the relative cost-effectiveness of the entire patent examination process over time, or the efficiency with which the organization applies its resources to production.

| Measure:  Patent Efficiency | | |
|---|---|---|
| | **TARGET** | **ACTUAL** |
| **2004** | $3,502 | $3,556 |
| **2005** | $4,122 | $3,877 |
| **2006** | $4,214 | $3,798 |
| **2007** | $4,253 | $3,961 |

*Target Met.*

| | |
|---|---|
| **Data source:** | PALM system |
| **Frequency:** | Daily input, quarterly reporting |
| **Data Storage:** | PALM, Data Warehouse, Activity Based Management (ABM) System |
| **Verification:** | Accuracy of supporting data is controlled through internal program edits in PALM, Momentum, ABM System.  Quality control review of data by ABC  System and Program Business Teams |
| **Data Limitations:** | None |

## PERFORMANCE GOAL 2:  OPTIMIZE TRADEMARK QUALITY AND TIMELINESS

### Trademark Quality

The Trademark organization measures for assessing examination quality include an evaluation for all issues that could be considered deficient in making a first and final action substantive refusal. Evaluations are conducted on a random sample of applications to review the quality of decision making of the examiner's first office action and final action refusal.

The "in-process review" standard for assessing excellent and deficient work creates a comprehensive, meaningful and rigorous review of what constitutes quality.

The results of an examiner's first action and final refusal are reviewed for the quality of the substantive basis for decision-making, search strategy, evidence and writing.  The measures consider elements for review and evaluation with training targeted to topics that warrant improvement.  Examiners are given feedback about excellent as well as deficient work to further improve quality.

| Measure:  Trademark Final Action Compliance Rate | | |
|---|---|---|
| | TARGET | ACTUAL |
| 2004 | 95.0% | 94.2% |
| 2005 | 95.0% | 94.1% |
| 2006 | 93.5% | 96.4% |
| 2007 | 96.0% | 97.4% |

*Target Met. Numerous training efforts focusing on quality have had a more than additive effect.  Also, quality improvements that first appeared in First Actions have now filtered to Final Actions.*

| Measure:  Trademark First Action Compliance Rate | | |
|---|---|---|
| | TARGET | ACTUAL |
| 2004 | 91.7% | 92.1% |
| 2005 | 92.5% | 95.3% |
| 2006 | 93.5% | 95.7% |
| 2007 | 95.5% | 95.9% |

*Target Met.*

Data Verification and Validation for Trademark Final Action Compliance Rate and Trademark First Action Compliance Rate

| | |
|---|---|
| Data source: | Office of Trademark Quality Review Report |
| Frequency: | Daily input, monthly reporting |
| Data Storage: | Automated systems, reports |
| Verification: | Manual reports and analysis |
| Data Limitations: | None |

### Trademark Pendency

Trademark first action pendency measures the average number of months from the date of application filing to the first office action.

Trademark average total pendency measures the average number of months, from the date of application filing to the date of disposal.  Disposal includes registration, abandonment or issuance of a notice of allowance, excluding applications, that are suspended and awaiting further action or involved in *inter partes* proceedings.

Disposal pendency, including suspended and *inter partes* cases, was 15.1 months.  Excluding applications that were suspended or delayed for *inter partes* proceedings; disposal pendency was 13.4 months.

| Measure:  Trademark Average First Action Pendency | | |
|---|---|---|
| | TARGET (Months) | ACTUAL (Months) |
| 2004 | 5.4 | 6.6 |
| 2005 | 6.4 | 6.3 |
| 2006 | 5.3 | 4.8 |
| 2007 | 3.7 | 2.9 |

*Target Met.*

| Measure:  Trademark Average Total Pendency | | |
|---|---|---|
| | TARGET (Months) | ACTUAL (Months) |
| 2004 | 21.6 | 19.5 |
| 2005 | 20.3 | 19.6 |
| 2006 | 18.8 | 18.0 |
| 2007 | 17.3 | 15.1 |

*Target Met.*

Data Verification and Validation for Trademark Average First Action Pendency and Trademark Average Total Pendency

| Data source: | TRAM system |
|---|---|
| Frequency: | Daily input, monthly reporting |
| Data Storage: | TRAM, automated systems, reports |
| Verification: | Accuracy of supporting data is controlled through internal program edits in the TRAM system.  Program management performs final test for reasonableness |
| Data Limitations: | None |

## Trademark E-Filing and E-Management

The number of trademark applications has progressed steadily over the years as a result of promotional events, increased number and type of applications, electronic filing, improved functionality and enhancements, and financial incentives, for example, lower fees.

The Trademark organization has created a fully electronic trademark application management process by capturing nearly 100 percent of the application inventory as an electronic file that includes text and image of the initial application and subsequent applicant and office correspondence.  Examining attorneys use the electronic record to process and examine applications, manage their dockets of pending work, and take action on applications.

| Measure:  Trademark Applications Filed Electronically | | |
|---|---|---|
| | TARGET | ACTUAL |
| 2004 | 65.0% | 73.0% |
| 2005 | 70.0% | 88.0% |
| 2006 | 80.0% | 93.8% |
| 2007 | 90.0% | 95.4% |
| *Target Met.* | | |

| Data source: | TRAM system |
|---|---|
| Frequency: | Daily input, monthly reporting |
| Data Storage: | TRAM and automated systems |
| Verification: | Accuracy of supporting data is controlled through internal program edits in the TRAM system and crosschecks against other automated systems |
| Data Limitations: | None |

| Measure:  Trademark Applications Managed Electronically | | |
|---|---|---|
| | TARGET | ACTUAL |
| 2004 | 80.0% | 98.0% |
| 2005 | 99.0% | 99.9% |
| 2006 | 99.0% | 99.9% |
| 2007 | 99.0% | 99.9% |
| *Target Met.* | | |

| Data source: | TRAM system and Trademark Image Capture and Retrieval System database reports |
|---|---|
| Frequency: | Daily input, monthly reporting |
| Data Storage: | TRAM and automated systems |
| Verification: | Accuracy of supporting data is controlled through internal program edits in the TRAM system and crosschecks against other automated systems |
| Data Limitations: | None |

## Trademark Efficiency

Measures the relative cost-effectiveness of the entire trademark examination process over time, or the efficiency with which the organization applies its resources to production.

| Measure:  Trademark Efficiency | | |
|---|---|---|
| | TARGET | ACTUAL |
| 2004 | $583 | $542 |
| 2005 | $701 | $677 |
| 2006 | $635 | $565 |
| 2007 | $685 | $660 |
| *Target Met.* | | |

| Data source: | TRAM system, Momentum, ABM system |
|---|---|
| Frequency: | Daily input, quarterly reporting |
| Data Storage: | TRAM, Data Warehouse, ABM system |
| Verification: | Accuracy of supporting data is controlled through internal program edits in TRAM, Momentum, ABM System.  Quality control review of data by ABC System and program organization teams |
| Data Limitations: | None |

## PERFORMANCE GOAL 3:  IMPROVE INTELLECTUAL PROPERTY PROTECTION AND ENFORCEMENT DOMESTICALLY AND ABROAD

The following measures demonstrate progress in protecting and enforcing IP. They focus on FTA negotiations and implementation, WTO accessions, 301 reviews, trade policy reviews, technical assistance, expansion of foreign postings, work details of USPTO employees to other U.S. Government agencies, as well as development of specific plans for strategic cooperation; for example, the work plans with China, Egypt, India, Brazil, and ASEAN.

| Measure:  Number of instances in which USPTO experts review IP policies/standards | | |
|---|---|---|
| | TARGET | ACTUAL |
| 2004 | N/A | 55 |
| 2005 | N/A | 61 |
| 2006 | N/A | 77 |
| 2007 | 80 | 461 |
| *Target Met.* | | |

| Measure:  Improving worldwide IP expertise for U. S. Government interests | | |
|---|---|---|
| | TARGET | ACTUAL |
| 2004 | N/A | 4 |
| 2005 | N/A | 4 |
| 2006 | N/A | 8 |
| 2007 | 10 | 17 |
| *Target Met.* | | |

| Measure:  Plans of action, mechanisms, and support programs initiated or implemented in developing countries | | |
|---|---|---|
| | TARGET | ACTUAL |
| 2004 | N/A | 1 |
| 2005 | N/A | 2 |
| 2006 | N/A | 6 |
| 2007 | 8 | 15 |
| *Target Met.* | | |

The significant variance in actual numbers of instances in which USPTO experts reviewed IP policies/standards compared to the target was due to the exceptionally large number of requests from the USTR to assist with trade policy reviews, activities associated with FTAs, and requests for technical assistance stemming from the successful GIPA program and an increased focus on China.

Data Verification and Validation for Number of instances in which USPTO experts review IP policies/standards; Improving worldwide IP expertise for U. S. Government interest; and plans of action, mechanisms, and support programs initiated or implemented in developing countries

| | |
|---|---|
| Data source: | External Affairs' reports and databases |
| Frequency: | Monthly input and reporting |
| Data Storage: | Reports |
| Verification: | Manual reports and analysis |
| Data Limitations: | None |

### COMMISSIONER'S PERFORMANCE FOR FY 2007

The American Inventors Protection Act (AIPA), Title VI, Subtitle G, the Patent and Trademark Office Efficiency Act, requires that an annual performance agreement be established between the Commissioner for Patents and the Secretary of Commerce, and the Commissioner for Trademarks and the Secretary of Commerce.  The Commissioners for Patents and Trademarks have FY 2007 performance agreements with the Secretary of Commerce, which outline the measurable organizational goals and objectives for which they are responsible.  They may be awarded a bonus, based upon an evaluation of their performance as defined in the agreement, of up to 50 percent of their base salary.  The results achieved in FY 2007 are documented in this report.  FY 2007 bonus information is currently not available.  For FY 2006, the Commissioner for Patents was awarded a bonus of 14.3 percent of base salary and the Commissioner for Trademarks a bonus of 14.9 percent.

# Management Assurances and Compliance with Laws and Regulations

This section provides information on the USPTO's compliance with the following legislative mandates:

- Federal Managers' Financial Integrity Act (FMFIA)
- Federal Financial Management Improvement Act (FFMIA)
- Federal Information Security Management Act
- Inspector General (IG) Act Amendments
- OMB Financial Management Indicators
- Prompt Payment Act
- Civil Monetary Penalty Act
- Debt Collection Improvement Act
- Biennial Review of Fees
- Improper Payments Information Act of 2002

## Management Assurances

### FEDERAL MANAGERS' FINANCIAL INTEGRITY ACT

The FMFIA requires federal agencies to provide an annual statement of assurance regarding management controls and financial systems. The USPTO management is responsible for establishing and maintaining effective internal control and financial management systems that meet the objectives of the FMFIA. The objectives of internal control, as defined by the Government Accountability Office (GAO), are to ensure:

- Effectiveness and efficiency of operations;
- Reliability of financial reporting; and
- Compliance with laws and regulations.



The statement of assurance is provided at right, which includes one Section 2 material weakness for IT security discussed in further detail in the Federal Information Security Management Act section below.  This statement was based on the review and consideration of a wide variety of evaluations, control assessments, internal analyses, reconciliations, reports, and other information, including the DOC OIG audits, and the independent public accountants' opinion on the USPTO's financial statements and their reports on internal control and compliance with laws and regulations.  In addition, USPTO is not identified on the GAO's High Risk List related to controls governing various areas.

## FEDERAL FINANCIAL MANAGEMENT IMPROVEMENT ACT

The FFMIA requires Federal agencies to report on agency substantial compliance with Federal financial management system requirements, Federal accounting standards, and the U.S. Standard General Ledger at the transaction level.  The USPTO complied substantially with the FFMIA for FY 2007.

# Other Compliance with Laws and Regulations

## FEDERAL INFORMATION SECURITY MANAGEMENT ACT

The USPTO continues to stay vigilant in reviewing administrative controls over information systems and is always seeking methods of improving our secure configuration.  All mission and business systems are fully certified and accredited, with full authority to operate.  In addition, during FY 2007, all ten contractor systems were certified and accredited, receiving full authority to operate.

During FY 2007, the USPTO made significant progress, including improved processes and documentation.  However, since some weaknesses remain, we are continuing to report the material weakness in IT Security, in recognition of the need for compliance with Government guidance on IT Security and to reconfirm its commitment to the protection of our Nation's intellectual capital information systems.

On the basis of the USPTO's comprehensive internal control program during FY 2007, the USPTO can provide reasonable assurance that its internal control over the effectiveness and efficiency of operations and compliance with applicable laws and regulations as of September 30, 2007, was operating effectively, except for the one material weakness identified.  Accordingly, I am pleased to certify with reasonable assurance, except for the one Federal Information Security Management Act material weakness regarding information technology security, that our agency's systems of internal control, taken as a whole, comply with Section 2 of the Federal Managers' Financial Integrity Act of 1982.  Our agency also is in substantial compliance with applicable Federal accounting standards and the U.S. Standard General Ledger at the transaction level and with Federal financial system requirements.  Accordingly, our agency fully complies with Section 4 of the Federal Managers' Financial Integrity Act of 1982, with no material non-conformances.

In addition, the USPTO conducted its assessment of the effectiveness of our agency's internal control over financial reporting, which includes safeguarding of assets and compliance with applicable laws and regulations, in accordance with OMB Circular A-123, Management's Responsibility for Internal Control.  Based on the results of this evaluation, the USPTO provides reasonable assurance that its internal control over financial reporting as of June 30, 2007 was operating effectively and no material weaknesses were found in the design or operation of the internal control over financial reporting.  In addition, no material weaknesses related to internal control over financial reporting were identified between July 1, 2007 and September 30, 2007.

Jon W. Dudas
Jon W. Dudas
*Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office*
*November 6, 2007*

While the USPTO IT Security Program has made significant strides within the past year, there remain several security areas that require improvement. Specific areas that have been improved upon during FY 2007 include the C&A process of contractor systems, continuous monitoring of IT systems, and improvement of C&A packages for Federal systems. In addition, upon issuance of the authority to operate for the Patent Automation Program, the OMB removed the USPTO from their Management Watch List.

During FY 2008, the USPTO will continue to improve upon the remaining weaknesses.

## INSPECTOR GENERAL ACT AMENDMENTS

The Inspector General Act, as amended, requires semi-annual reporting on IG audits and related activities, as well as any requisite agency follow-up. The report is required to provide information on the overall progress on audit follow-up and internal management controls, statistics on audit reports with disallowed costs, and statistics on audit reports with funds put to better use. The USPTO did not have audit reports with disallowed costs or funds put to better use.

The USPTO's follow-up actions on audit findings and recommendations are essential to improving the effectiveness and efficiency of our programs and operations. As of September 30, 2007, management had two recommendations outstanding from a report issued in FY 2004 (USPTO-BTD-16432-4-0001: "USPTO Needs Strong Office of Human Resources Management Capable of Addressing Current and Future Challenges"). No new reports had been issued during FY 2007. A summary of audit findings and recommendations follows.

| Status of IG Act Amendment Audit Recommendations as of September 30, 2007 | | | | |
|---|---|---|---|---|
| **Report for Fiscal Year** | **Status** | **Recommendation** | **Action Plan** | **Completion Date** |
| FY 2004 | Open | Ensure that the USPTO works with Commerce and OPM to officially obtain delegated examining authority. | USPTO's delegated examining authority is pending the results of the next OPM audit, which is scheduled for December 2007. Per OPM, some aspects of the USPTO delegated examining operations were improved; however, OPM provided some recommended and some required actions for the USPTO to take before delegated examining authority is granted. | Estimated February 2008 |
| FY 2004 | Open | Ensure that the USPTO develops OHR organizational descriptions, policies, and procedures, in accordance with the intent of Departmental Organization Order (DOO) 10-14. | The USPTO has developed policies on prohibited personnel practices and merit systems principles training to executives and supervisors. The Office of Human Resources (OHR) is working on the development of established high quality agency administrative orders (AAO), policies, and standard operating procedures. These documents cover all OHR functions and effectively establish a set of rules and procedures for providing OHR services. As of September 30, 2007, three AAOs and several policies have been completed. | Estimated December 2007 |

- *The estimated date of completion for the delegated examining authority was moved from last year pending an OPM decision on USPTO's request for delegated examining authority. OPM will not render a decision on the USPTO's delegated examining authority until the results of the next OPM audit, which is scheduled for December 2007.*

- *The estimated date of completion for the organizational policies was moved from last year to allow time for development and approval of all AAOs, policies, and standard operating procedures.*

| Financial Performance Measure | FY 2007 Target | FY 2007 Performance |
|---|---|---|
| Percentage of Timely Vendor Payments (MTS) | 98% | 96% |
| Percentage of Payroll by Electronic Transfer (OMB) | 90% | 99% |
| Percentage of Treasury Agency Locations Fully Reconciled (OMB) | 95% | 100% |
| Timely Reports to Central Agencies (OMB) | 95% | 100% |
| Audit Opinion on FY 2007 Financial Statements (OMB) | Unqualified | Unqualified |
| Material Weaknesses Reported by OIG (OMB) | None | None |
| Timely Posting of Inter-Agency Charges (USPTO) | 30 days | 34 days |
| Average Processing Time for Travel Payments (USPTO) | 8 days | 13 days |

## OMB FINANCIAL MANAGEMENT INDICATORS

The Office of Management and Budget (OMB) prescribes the use of quantitative indicators to monitor improvements in financial management. The USPTO tracks other financial performance measures as well. The table above shows the USPTO's performance during FY 2007 against performance targets established internally and by OMB and the government-wide Metric Tracking System (MTS).

## PROMPT PAYMENT ACT

The Prompt Payment Act requires Federal agencies to report on their efforts to make timely payments to vendors, including interest penalties for late payments. In FY 2007, the USPTO did not pay interest penalties on 98.0 percent of the 8,740 vendor invoices processed, representing payments of approximately $629.9 million. Of the 270 invoices that were not processed in a timely manner, the USPTO was required to pay interest penalties on 176 invoices, and was not required to pay interest penalties on 94 invoices, where the interest was calculated at less than $1. The USPTO paid only $30 in interest penalties for every million dollars disbursed in FY 2007. Virtually all recurring payments were processed by electronic funds transfer in accordance with the electronic funds transfer provisions of the Debt Collection Improvement Act of 1996.

## CIVIL MONETARY PENALTY ACT

There were no Civil Monetary Penalties assessed by the USPTO during FY 2007.

## DEBT COLLECTION IMPROVEMENT ACT

The Debt Collection Improvement Act prescribes standards for the administrative collection, compromise, suspension, and termination of Federal agency collection actions, and referral to the proper agency for litigation. Although the Act has no material effect on the USPTO since it operates with minimal delinquent debt, all debt more than 180 days old has been transferred to the U.S. Department of the Treasury for cross-servicing.

## BIENNIAL REVIEW OF FEES

The Chief Financial Officers Act of 1990 requires a biennial review of agency fees, rents, and other charges imposed for services and things of value it provides to specific beneficiaries as opposed to the American public in general. The objective of the review is to identify such activities and to begin charging fees, where permitted by law, and to periodically adjust existing fees to reflect current costs or market value so as to minimize general taxpayer subsidy of specialized services or things of value (such as rights or privileges) provided directly to identifiable non-Federal beneficiaries. The USPTO is a fully fee-funded agency without subsidy of general taxpayer revenue. For non-legislative fees, it uses ABC accounting to evaluate the costs of activities and determine if fees are set appropriately. When necessary, fees are adjusted to be consistent with the program and with the legislative requirement to recover full cost of the goods or services provided to the public.

| Improper Payment Reduction Outlook *(Dollars in millions)* | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 2006 | | | FY 2007 | | | FY 2008 | | FY 2009 | | FY 2010 | |
| Program | Outlays | Improper Payment Percent | Improper Payment Dollars | Outlays | Improper Payment Percent | Improper Payment Dollars | Estimated Outlays | Improper Payment Percent | Estimated Outlays | Improper Payment Percent | Estimated Outlays | Improper Payment Percent |
| Patent | $1,335 | 0.06% | $ 0.82 | $1,544 | 0.04% | $ 0.59 | $ 1,604 | 0.00% | $ 1,686 | 0.00% | $ 1,789 | 0.00% |
| Trademark | 179 | 0.06% | 0.11 | 255 | 0.04% | 0.09 | 250 | 0.00% | 263 | 0.00% | 279 | 0.00% |
| Total | $1,514 | 0.06% | $ 0.93 | $1,799 | 0.04% | $ 0.68 | $ 1,854 | 0.00% | $ 1,949 | 0.00% | $ 2,068 | 0.00% |

In September 2007, the USPTO implemented a patent fee increase commensurate with the last 12 months' increase in the Consumer Price Index. A large scale fee restructuring is underway, comparing fees to costs at the fee code level. This study is on-going and is expected to continue through FY 2008.

## IMPROPER PAYMENTS INFORMATION ACT OF 2002

During FY 2007, the USPTO did not have any erroneous payments that exceeded the ten million dollar threshold. While our erroneous payments were only 0.04 percent of total disbursements and primarily related to inaccurate banking information, we plan to further reduce this percentage through our use of the government-wide Central Contractor Registration database maintained by the Department of Defense, which requires all government contractors to maintain current contact and banking information. The USPTO identifies overpayments and erroneous payments by reviewing (1) credit memos and refund checks issued by vendors or customers and (2) undelivered electronic payments returned by financial institutions.

During FY 2005, the USPTO entered into an agreement with the DOC to use an existing contract for recovery audit services. The audit was limited to closed obligations greater than $0.1 million. Further excluded were grants, travel payments, purchase card transactions, inter-agency agreements, government bills of lading, and gift and bequest transactions.

| Summary of Recovery Audit Effort *(Dollars in millions)* | |
|---|---|
| **Amount subject to review** | $ 159.4 |
| *# of invoices* | 4,433 |
| **Actual amount reviewed** | $ 107.3 |
| *# of invoices* | 985 |
| **Amount selected for review and not reviewed** | $ 24.7 |
| *# of invoices* | 86 |

The audit was completed in FY 2006 and resulted in three invoices that were identified as recoverable improper payments, which are insignificant. The improper payments identified of $0.1 million were recovered during FY 2006. No additional actions were taken in FY 2007.



# Financial Highlights



**T**he following presents the USPTO's FY 2007 financial highlights for budgetary resources and requirements, along with results of operations. Details behind these highlights are included in the discussion of the USPTO's financial statements beginning on page 52.

## BUDGETARY RESOURCES AND REQUIREMENTS

The USPTO was provided appropriation authority to spend all estimated fee collections in FY 2007. When spending authority is less than fee collections, the additional fee collections are temporarily unavailable. During FY 2007, the USPTO collected an additional $12.2 million in fees that are unavailable for spending.

The table on the following page presents the source of funds made available to the USPTO, and the use of such funds.

| Source and Status of Funds *(Dollars in millions)* | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|
| **Source of Funds:** | | | | |
| Unobligated Beginning Balance | $    3.5 | $    2.3 | $    5.7 | $    5.7 |
| Recovery of Prior Year Obligations | 10.4 | 7.6 | 9.1 | 9.9 |
| Spending Authority from Offsetting Collections | 1,321.7 | 1,504.2 | 1,665.4 | 1,791.1 |
| Non-Expenditure Transfer | – | – | (0.1) | – |
| Net Increase in Unavailable Fees | (99.9) | – | – | (12.2) |
| Total Source of Funds | $ 1,235.7 | $ 1,514.1 | $ 1,680.1 | $ 1,794.5 |
| **Status of Funds:** | | | | |
| Obligations Incurred | $ 1,233.4 | $ 1,508.4 | $ 1,674.4 | $ 1,766.5 |
| Unobligated Balance, Available | 1.8 | 2.7 | 5.7 | 28.0 |
| Unobligated Balance, Unavailable | 0.5 | 3.0 | – | – |
| Total Status of Funds | $ 1,235.7 | $ 1,514.1 | $ 1,680.1 | $ 1,794.5 |

During FY 2007, total budgetary resources available for spending increased 6.8 percent over the amount available in the preceding year. This significant increase in budgetary resources available for use is depicted by the graph below.



**ANNUAL GROWTH IN BUDGETARY RESOURCES**
*(Dollars in Millions)*

In FY 2007, the USPTO was provided with use of all of its estimated fee collections. This allowed the USPTO continued flexibility towards meeting the goals of the ***2007-2012 Strategic Plan***, including transitioning to a fully electronic operating environment, improving the quality of its services and products, addressing patent and trademark pendency, and improving intellectual property protection and enforcement. The additional funding has enabled the USPTO to substantially increase the number of patent examiners to assist in addressing

the growing average complexity of patent applications and increasing workloads and to allocate additional resources towards protecting intellectual property in the United States and abroad. As a result, the USPTO was able to meet virtually all of the performance goals and continue reforms that assure intellectual property relevancy in a highly competitive, global marketplace.

## RESULTS OF OPERATIONS

The USPTO generated a net cost of $33.9 million in FY 2007, compared to net income in FY 2006 of $80.2 million, a decrease of $114.1 million. This significant variation is the result of a few factors, explained in more detail in the Statement of Net Cost discussion. The primary factor was increased costs in FY 2007 — costs for FY 2007 increased significantly from FY 2006 primarily due to increased staffing levels hired in late FY 2006 and throughout FY 2007.

Due to the increase in pendency, the amount of time an application is waiting before a patent is issued or trademark is registered, the USPTO has been recognizing a steadily increasing deferred revenue liability for fees received prior to the revenue being earned. From FY 2004 through FY 2007, unearned patent fees increased 53.5 percent. In FY 2007, for each month patent pendency to first action increased, deferred revenue increased approximately $30.3 million per pendency month, with a corresponding decrease in earned revenue. From FY 2004 through FY 2007, unearned trademark fees decreased 9.2 percent, a result of the increased staffing to address the backlog

and the decrease in pendency. In addition to the 1,215 patent examiners hired during FY 2007, the USPTO plans to continue hiring at least 1,200 new patent examiners each fiscal year through FY 2012, as well as implementing new operating practices, to reduce the backlog of unprocessed applications and reduce pendency.

## FINANCIAL STATEMENTS

The USPTO received an unqualified (clean) audit opinion from the independent public accounting firm of KPMG LLP on its FY 2007 financial statements, provided on pages 67 to 91. This is the 15th consecutive year that the USPTO received a clean opinion. Our unqualified audit opinion provides independent assurance to the public that the information presented in the USPTO financial statements is fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America. In addition for FY 2007, KPMG LLP reported no material weaknesses or significant deficiencies in the USPTO's internal control, and no instances of non-compliance with laws and regulations affecting the financial statements.

The USPTO financial management process ensures that management decision-making information is dependable, internal controls over financial reporting are effective, and that

compliance with laws and regulations is maintained. The preparation of these financial statements is a component of the USPTO's objective to continually improve the accuracy and usefulness of its financial management tools.

The following sections provide a discussion and analysis of the financial statements and related information.

## STATEMENT OF BUDGETARY RESOURCES

The following table displays the USPTO's total budgetary resources available for spending over the past four years, with the related percentage of change. The budgetary resources available for spending do not include amounts that were not available through September 30, 2007, but will become available for spending on October 1, 2007 once apportioned by the OMB.

As evident from the table below, total budgetary resources available for spending increased in FY 2007, a 6.8 percent increase over the prior fiscal year and a 45.3 percent increase over the past three fiscal years. The increase in available budgetary resources was used to fund the increased cost of additional human capital to address the growing average complexity of patent applications and the increase in patent and trademark filings.

| Resources | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|
| Budgetary Resources Available for Spending (dollars in millions) | $1,235.2 | $1,511.1 | $1,680.1 | $1,794.5 |
| Percentage Change | 3.5% | 22.3% | 11.2% | 6.8% |
| Patent Examiners | 3,681 | 4,177 | 4,779 | 5,477 |
| Percentage Change | 2.8% | 13.5% | 14.4% | 14.6% |
| Trademark Examining Attorneys | 286 | 357 | 413 | 404 |
| Percentage Change | 11.7% | 24.8% | 15.7% | (2.2)% |

| Filings | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---------|---------|---------|---------|---------|
| Patent Filings | 378,984 | 409,532 | 445,613 | 467,243[1] |
| *Percentage Change* | *6.6%* | *8.1%* | *8.8%* | *4.9%* |
| | | | | |
| Trademark Filings | 298,489 | 323,501 | 354,775 | 394,368 |
| *Percentage Change* | *11.7%* | *8.4%* | *9.7%* | *11.2%* |
| [1] *Preliminary data* | | | | |

The increase in available budgetary resources also allows the USPTO to apply additional funds towards the accomplishment of strategic goals and other initiatives that are associated with the performance goals contained in the **2007-2012 Strategic Plan** and the PMA.

The USPTO fee collections exceeded the estimated collections of $1,771.0 million during FY 2007; therefore, the USPTO was able to spend up to $1,771.0 million of fees collected during the year. The FY 2007 fee collections of $1,783.2 million increased 7.6 percent over FY 2006 collections of $1,657.6 million, all of which was appropriated. This increase in collections is due to an increase in patent and trademark application filings, as well as an increase in maintenance fees received.

As defined earlier, temporarily unavailable fee collections occur when the initial fee estimates are lower than actual collections. During FY 2007, the USPTO collected $12.2 million in fee collections that were designated as temporarily unavailable. As a result, the $516.5 million in temporarily unavailable fee collections at the end of FY 2004 increased to $528.7 million at the end of FY 2007.

The chart below illustrates amounts that Congress has appropriated to the USPTO over the past four fiscal years, as well as the cumulative unavailable fee collections.

In addition to these annual restrictions, collections of $233.5 million are unavailable in accordance with the OBRA of 1990, and deposited in a special fund receipt account at the U.S. Department of the Treasury.

### STATEMENT OF NET COST

The Statement of Net Cost presents the USPTO's results of operations by the following responsibility segments – Patent, Trademark, and Intellectual Property Protection. The following table presents the total USPTO's results of operations for the past four fiscal years. From FY 2004 through FY 2005, the USPTO's operations resulted in a net cost. In FY 2006, the USPTO generated a net income due to the increased mainte-nance fees received and revenue recognition of previously deferred revenue collected subsequent to the fee increase on December 8, 2004. During FY 2007, the USPTO's operations resulted in a net cost of $33.9 million.

| Net (Cost)/Income (Dollars in millions) | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|
| Earned Revenue | $1,239.0 | $1,372.8 | $1,594.4 | $1,735.7 |
| Program Cost | (1,289.2) | (1,424.0) | (1,514.2) | (1,769.6) |
| Net (Cost)/Income | $   (50.2) | $   (51.2) | $   80.2 | $   (33.9) |

The Statement of Net Cost compares fees earned to costs incurred during a specific period of time. It is not necessarily an indicator of net income or net cost over the life of a patent or trademark. Net income or net cost for the fiscal year is dependent upon the groups of work that have been completed over the various phases of the production life cycle. The net income calculation is based on fees earned during the fiscal year being reported, regardless of when those fees were collected. Maintenance fees also play a large part in whether a

| Temporary Unavailable Fee Collections (Dollars in millions) | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|
| Fiscal year fee collections | $ 1,321.0 | $ 1,497.2 | $ 1,657.6 | $ 1,783.2 |
| Fiscal year collections appropriated | (1,222.5) | (1,497.2) | (1,657.6) | (1,771.0) |
| Reductions - Rescissions | 77.0 | – | – | – |
| Fiscal year unavailable collections | $ 175.5 | $ – | $ – | $ 12.2 |
| Prior year collections unavailable | 341.0 | 516.5 | 516.5 | 516.5 |
| Cumulative temporarily unavailable fee collections | $   516.5 | $   516.5 | $   516.5 | $   528.7 |

total net income or net cost is recognized. Maintenance fees collected in FY 2007 are a reflection of patent issue levels 3.5, 7.5, and 11.5 years ago, rather than a reflection of patents issued in FY 2007. Therefore, maintenance fees can have a significant impact on matching costs and revenue.

While the backlog for patent applications continues to increase, increasing deferred revenue and decreasing earned revenue, during FY 2007, the Patent organization disposed of 8.9 percent more applications than were disposed of during FY 2006.

During FY 2007, even though the number of trademark applications increased 11.2 percent over the prior year, the Trademark organization was able to continue to reduce their backlog and register 2.9 percent more trademarks over FY 2006. While additional costs were incurred in reducing the backlog, the Trademark organization was able to recognize a significant increase in revenue earned.

## EARNED REVENUE

The USPTO's earned revenue is derived from the fees collected for patent and trademark products and services. Fee collections are recognized as earned revenue when the activities to complete the work associated with the fee are completed. The table below presents the earned revenue for the past four years.

Earned revenue totaled $1,735.7 million for FY 2007, an increase of $141.3 million, or 8.9 percent, over FY 2006 earned revenue of $1,594.4 million. Of revenue earned during FY 2007, $388.5 million related to fee collections that were deferred for revenue recognition in prior fiscal years, $544.7 million related to maintenance fees collected during FY 2007, which were considered earned immediately, $795.5 million related to work performed for fees collected during FY 2007, and $7.0 million were not fee-related.

For fees collected and earned during FY 2007, there was an increase of $79.1 million over these same fees earned during FY 2006. This increase can primarily be attributed to $14.4 million in fees considered earned immediately, $21.9 million in earned patent filing fees, $11.0 million in earned trademark application fees, $13.2 million in earned patent issue fees, $12.9 million in trademark post-registration fees, and $3.0 million in earned recording fees.

### *Patent*

Traditionally, the major components of earned revenue derived from patent operations are maintenance fees, initial application fees for filing, search and examination, and issue fees. These fees account for over 83 percent of total patent income. The following chart depicts the relationship among the most significant patent fee types.

**FY 2007 PATENT REVENUE BY FEE TYPE**

Maintenance
Filing, Search and Examination
Issue
Extensions
PCT
Services
Other
2.4%
2.4%
4.9%
7.0%
16.6%
36.2%
30.5%

| **Earned Revenue** *(Dollars in Millions)* | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|
| Patent | $ 1,092.5 | $ 1,197.8 | $ 1,384.2 | $ 1,507.0 |
| *Percentage Change in Patent Earned Revenue* | *8.8%* | *9.6%* | *15.6%* | *8.9%* |
| | | | | |
| Trademark | 146.5 | 175.0 | 210.2 | 228.7 |
| *Percentage Change in Trademark Earned Revenue* | *(7.2)%* | *19.5%* | *20.1%* | *8.8%* |
| | | | | |
| Total Earned Revenue | $ 1,239.0 | $ 1,372.8 | $ 1,594.4 | $ 1,735.7 |
| *Percentage Change in Earned Revenue* | *6.6%* | *10.8%* | *16.1%* | *8.9%* |

Patent maintenance fees are the largest source of earned revenue by fee type. During FY 2007, maintenance fees collected increased $51.1 million, or 10.4 percent, over FY 2006. As they are recognized immediately as earned revenue, any fluctuations in the rates of renewal have a significant impact on the total earned revenue of the USPTO. To some extent, renewals recoup costs incurred during the initial patent process. As shown below, the renewal rates for all three stages of maintenance fees have been increasing modestly over the last four years and the trend indicates that this growth pattern will continue.

| Patent Renewal Rates* | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|
| First Stage | 91.9% | 83.1% | 93.1% | 90.1% |
| Second Stage | 65.7% | 65.4% | 69.2% | 71.4% |
| Third Stage | 43.8% | 45.0% | 44.4% | 48.5% |

**\* Note:** *The First Stage refers to the end of the 3rd year after the initial patent is issued; the Second Stage refers to the end of the 7th year after the initial patent is issued; and the Third Stage refers to the end of the 11th year after the initial patent is issued. For example, in FY 2007, 90.1 percent of the patents issued three years ago were renewed, 71.4 percent of the patents issued seven years ago were renewed, and 48.5 percent of the patents issued 11 years ago were renewed.*

Application fee revenue earned upon filing increased from $96.9 million in FY 2006 to $98.0 million in FY 2007, with the number of applications increasing from 445,613 to 467,243 over the same period, increases of 1.1 percent and 4.9 percent, respectively. The FY 2008 President's Budget projects an increase of 8.0 percent in patent applications filed beginning in FY 2008 and extending through FY 2012, which will contribute to the continued growth in earned fee revenue.

Earned issue fee revenue increased from $202.5 million in FY 2006 to $249.9 million in FY 2007, with the number of patents issued increasing from 183,187 to 184,377 over the same period, increases of 23.4 percent and 0.6 percent, respectively. The FY 2008 President's Budget projects that patents issued will continue at the current levels through FY 2012.

## Trademark

Trademark fees are comprised of application filing, renewal services, and Trademark Trial and Appeal Board fees. Additional fees are charged for intent-to-use filed applications, as additional requirements must be met for registration. The following chart depicts the relationship among the most significant trademark fee types.



FY 2007 TRADEMARK REVENUE BY FEE TYPE

- Use-Based and Intent-to-Use Applications for Registration
- Other Intent-to-Use Fees
- Renewal Fees
- Services
- Trademark Trial and Appeal Board

59.2%  15.0%  9.8%  5.6%  10.4%

Earned revenue for trademark applications increased from $131.7 million in FY 2006 to $133.1 million in FY 2007, with the number of trademarks registered increasing from 188,899 to 194,327 over the same period, increases of 1.1 percent and 2.9 percent, respectively. The FY 2008 President's Budget projects that trademark applications filed will continue to increase, which will contribute to the continued growth in earned fee revenue.

Trademark registration can be a recurring source of revenue. To some extent, renewal fees recoup costs incurred during the initial examination process. As shown below, the renewal rates for trademarks have remained fairly stable over the last four years, indicating continued earned revenue from this source. Further, in the FY 2008 President's Budget, earned revenue from trademark renewals is expected to continue in the future.

| Trademark Renewal Rates | FY 2004 | FY 2005 | FY 2006 | FY 2007[1] |
|---|---|---|---|---|
| Renewals | 28.7% | 28.6% | 28.8% | 25.9% |

**Note:** *The renewals occur every 10th year for trademarks registered after November 15, 1989. For trademarks issued or renewed before November 15, 1989, renewal will occur after the 20th year and the renewal will be for a ten-year period. For example, in FY 2007, 25.9 percent of the trademarks granted 10 and 20 years ago were renewed.*

*[1] Preliminary data*

## PROGRAM COSTS

Program costs totaled $1,769.6 million for the year ended September 30, 2007, an increase of $255.4 million, or 16.9 percent, over FY 2006 program costs of $1,514.2 million. The USPTO's most significant program cost is personnel services and benefits, which traditionally comprise over half of USPTO's total program costs. Any significant change or fluctuation in staffing or pay rate directly impacts the change in total program costs from year to year. Total personnel services and benefits costs for the year ended September 30, 2007, were $1,059.7 million, an increase of $176.3 million, or 20.0 percent, over FY 2006 personnel services and benefits costs of $883.4 million. This change, 69.0 percent of the total increase in program costs, was a result of a 2.6 percent increase in the Federal pay scale, combined with a net increase of 724 personnel, from 8,189 at the end of FY 2006 to 8,913 at the end of FY 2007.

The USPTO directs maximum resources to the priority functions of patent and trademark examination, as well as IP protection and enforcement domestically and abroad. For FY 2007, costs directly attributable to the Patent, Trademark, and IP protection business areas represent 82.0 percent of total USPTO costs. The remaining costs, representing support costs, are allocated to the business areas using ABC accounting.

### Patent

Total costs for the Patent business unit increased $387.2 million, 33.8 percent, from FY 2004 through FY 2007. The following table presents the major components of Patent costs for the past four years.



**FY 2007 PROGRAM COSTS**

- Personnel Costs
- Rent, Communication, and Utilities
- Printing
- Contractual Services
- Other
- Depreciation
- Allocated Costs

14.1%   1.6%   4.0%   4.6%   2.3%   18.0%   55.4%



**PROGRAM COSTS (Dollars in Millions)**

- Patent Direct Costs
- Trademark Direct Costs
- IP Protection Direct Costs
- Allocated Costs

$955.9   $1,005.9   $1,085.7   $1,285.8
$219.0   $295.9   $272.4   $318.9
$114.3   $122.2   $131.1   $142.8
$25.0   $22.1

FY 2004   FY 2005   FY 2006   FY 2007

| Patent Costs *(Dollars in millions)* | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|
| Personnel Costs | $ 603.6 | $ 646.5 | $ 714.4 | $ 867.1 |
| Contractual Services | 150.4 | 156.1 | 181.5 | 223.6 |
| Printing and Reproduction | 71.8 | 68.9 | 71.9 | 70.0 |
| Rent, Communications, and Utilities | 76.3 | 82.6 | 69.3 | 71.1 |
| Depreciation, Amortization, or Loss on Asset Disposition | 32.5 | 26.1 | 24.8 | 32.3 |
| Other | 21.3 | 25.7 | 23.8 | 21.7 |
|    Direct Costs | 955.9 | 1,005.9 | 1,085.7 | 1,285.8 |
| Allocated Costs | 189.9 | 247.2 | 226.6 | 247.2 |
|    Total Patent Costs | $ 1,145.8 | 1,253.1 | $1,312.3 | $ 1,533.0 |
| *Percentage Change in Patent Costs* | *6.7%* | *9.4%* | *4.7%* | *16.8%* |

The Patent organization's most significant program costs relate to personnel services, and account for 68.1 percent of the increase in total cost of Patent operations during the past three years. Patent personnel costs for the year ended September 30, 2007, were $867.1 million, an increase of $152.7 million, or 21.4 percent, over FY 2006 personnel costs of $714.4 million. Rent, communications, and utilities, printing and reproduction, and contractual service costs represent 23.8 percent of the Patent program costs for FY 2007. Over the last three years, contractual costs increased in line with the overall increase in total Patent costs due to increases in the number of patents issued and increased spending on indexing and scanning documents for the electronic file wrapper, offset by minor decreases in printing and reproduction. In addition, rental costs decreased 6.8 percent over the past three years, with a decrease in costs of $5.2 million as the move to Alexandria has been completed.

Patent costs were spread over four main patent products: utility patents, design patents, plant patents, and PCT patents. Utility patents were further broken down into the technology of the utility patent. The cost percentages presented at right are based on direct and indirect costs allocated to patent operations and are a function of the volume of applications processed in each product area.

### Trademark

Total costs for the Trademark business unit increased $61.1 million, 42.6 percent, from FY 2004 through FY 2007. The following table shows the major components of Trademark costs for that period.



**FY 2007 PATENT COST BY PRODUCT**

- Utility-Transportation
- Utility-Mechanical
- Utility-Computer and Electronic Commerce
- Utility-Communications
- Utility-Biotechnology
- Utility-Chemical
- Utility-Physics
- Design
- Plant
- PCT
- Other

The Trademark organization's most significant program costs relate to personnel services, and account for 44.5 percent of the increase in total cost of Trademark operations during the past three years. Contractual services have increased $2.1 million over the past three years, which represents 3.4 percent of the increase in total Trademark costs over the past three years, primarily attributable to the increased costs associated with operating in a fully electronic environment.

The Intent-to-Use cost includes costs related to examining both the application and the additional intent to use disclosures. The overall cost percentages presented below are based on both

| Trademark Costs *(Dollars in millions)* | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|
| Personnel Costs | $ 72.6 | $ 80.0 | $ 88.8 | $ 99.8 |
| Contractual Services | 22.3 | 23.2 | 25.1 | 24.4 |
| Printing and Reproduction | 1.2 | 0.8 | 0.3 | 0.8 |
| Rent, Communications, and Utilities | 8.9 | 8.4 | 7.8 | 7.8 |
| Depreciation, Amortization, or Loss on Asset Disposition | 4.9 | 6.1 | 6.0 | 7.3 |
| Other | 4.4 | 3.7 | 3.1 | 2.7 |
| Direct Costs | 114.3 | 122.2 | 131.1 | 142.8 |
| Allocated Costs | 29.1 | 48.7 | 37.7 | 61.7 |
| Total Trademark Costs | $ 143.4 | $ 170.9 | $ 168.8 | $ 204.5 |
| *Percentage Change in Total Trademark Costs* | *8.6%* | *19.2%* | *(1.2)%* | *21.1%* |

direct costs and indirect costs allocated to trademark operations and are a function of the volume of applications processed in each product area.



**FY 2007 TRADEMARK COST BY PRODUCT**

- Intent-to-Use Marks
- Madrid Protocol
- Use-Based Marks
- Renewals
- Trademark Trial and Appeal Board
- Other Services

24.8% · 3.4% · 7.8% · 7.5% · 49.2% · 7.3%

### Intellectual Property Protection and Enforcement

The release of the **2007-2012 Strategic Plan** resulted in a new responsibility segment for FY 2007. Prior year costs were reclassified to conform to the current year presentation of this new responsibility segment. Total costs for IP Protection decreased $1.0 million, 3.0 percent, from FY 2006 through FY 2007. The table below shows the major components of IP Protection costs for that period.

The most significant program costs for IP Protection relate to personnel services, and account for 40.8 percent of the total cost for IP Protection operations during the past year. The next largest cost associated with the protection and enforcement of intellectual property domestically and abroad is travel. Travel costs have increased 118.8 percent over the past year, which is in line with the activities discussed on pages 24 to 28.

| Intellectual Property Protection and Enforcement Costs (Dollars in millions) | FY 2004[1] | FY 2005[1] | FY 2006 | FY 2007 |
|---|---|---|---|---|
| Personnel Costs | – | – | $ 13.6 | $ 13.1 |
| Contractual Services | – | – | 6.3 | 1.9 |
| Rent, Communications, and Utilities | – | – | 2.1 | 2.2 |
| Travel | – | – | 1.6 | 3.5 |
| Depreciation, Amortization, or Loss on Asset Disposition | – | – | 0.5 | 0.4 |
| Other | – | – | 0.9 | 1.0 |
| Direct Costs | – | – | 25.0 | 22.1 |
| Allocated Costs | – | – | 8.1 | 10.0 |
| Total IP Protection and Enforcement Costs | – | – | $ 33.1 | $ 32.1 |
| Percentage Change in Total IP Protection and Enforcement Costs | – | – | –% | (3.0)% |

[1] Intellectual Property Protection and Enforcement is a new goal this year. Costs prior to FY 2006 are not available.

| Composition of USPTO Assets *(Dollars in millions)* | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|
| Cash | $   11.9 | $   8.8 | $   6.8 | $   7.0 |
| Fund Balance with Treasury | 1,135.2 | 1,240.8 | 1,401.8 | 1,402.7 |
| Property, Plant, and Equipment, Net | 137.3 | 148.4 | 164.5 | 204.6 |
| Accounts Receivable and Prepayments | 12.9 | 11.1 | 7.2 | 11.2 |
| Total Assets | $  1,297.3 | 1,409.1 | $  1,580.3 | $  1,625.5 |
| *Percentage Change in Total Assets* | *12.7%* | *8.6%* | *12.1%* | *2.9%* |

## BALANCE SHEET AND STATEMENT OF CHANGES IN NET POSITION

At the end of FY 2007, the USPTO's consolidated Balance Sheet presents total assets of $1,625.5 million, total liabilities of $1,161.5 million, and a net position of $464.0 million.

Total assets increased 25.3 percent over the last three years, resulting largely from the increase in Fund Balance with Treasury and Property, Plant, and Equipment. The table above shows the changes in assets during this period.

Fund Balance with Treasury is the single largest asset on the Balance Sheet and represents 86.3 percent of total assets at the end of FY 2007. This asset is comprised of unpaid obligated funds of $512.1 million, temporarily unavailable fees of $528.7 million, unavailable special receipt funds under OBRA of $233.5 million, other funds held on deposit for customers of $100.4 million, and unobligated funds of $28.0 million.

The unavailable special receipt funds and the temporarily unavailable funds require Congressional appropriation before they will be available for USPTO's use. These funds, together with amounts obligated and held on deposit, represent 98.0 percent of the Fund Balance with Treasury.

The other major asset is property, plant, and equipment. The net balance of this asset has increased by $67.3 million during the past three years, with the acquisition values of property, plant, and equipment increasing by $170.3 million. Investments in IT software and software in development increased $72.2 million, in conjunction with enhancing the existing e-government capabilities in areas such as e-filing, application information retrieval, data and image capture, and Web-based search systems.

Total liabilities increased from $1,082.3 million at the end of FY 2006 to $1,161.5 million at the end of FY 2007, representing an increase of $79.2 million, or 7.3 percent. The table below shows the change in liabilities during the past four years.

The USPTO's deferred revenue is the largest liability on the Balance Sheet. The liability for deferred revenue is calculated by analyzing the process for completing each service provided. The percent incomplete based on the inventory of pending work is applied to fee collections to estimate the amount for deferred revenue liability.

At the end of FY 2007, deferred revenue liability was $828.1 million, representing an increase of $248.5 million, or 42.9 percent, over the past three years. The deferred revenue

| Composition of USPTO Liabilities *(Dollars in millions)* | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|
| Deferred Revenue | $   579.6 | $   706.7 | $   774.4 | $   828.1 |
| Accounts Payable | 77.3 | 101.8 | 104.4 | 96.6 |
| Accrued Payroll, Leave, and Benefits | 83.4 | 90.7 | 101.4 | 120.3 |
| Customer Deposit Accounts | 70.7 | 74.1 | 83.8 | 91.9 |
| Other Liabilities | 17.2 | 18.0 | 18.3 | 24.6 |
| Total Liabilities | $   828.2 | $   991.3 | $  1,082.3 | $  1,161.5 |
| *Percentage Change in Total Liabilities* | *10.7%* | *19.7%* | *9.2%* | *7.3%* |

liability includes unearned patent and trademark fees, as well as undeposited checks. The unearned patent fees represented 91.0 percent of this liability. The following graph depicts the composition of the deferred revenue liability, in addition to the increase in this liability during each of the past four years.

Deferred revenue at the USPTO is largely impacted by the change in patent and trademark filings, changes in the first action pendency rates, and changes in fee rates. In FY 2004,

the percentage increase in deferred revenue is consistent with the percentage increases in the first action pendency months. However, in FY 2005 and FY 2006, the percentage change in first action pendency months was less than the percentage change in deferred revenue as a result of the increased fees associated with the unearned patent and trademark application filings. Again in FY 2007, the percentage increase in deferred revenue is consistent with the percentage increases in the first action pendency months. The table below depicts the changes in the filings and pendencies during the past four years.

Deferred revenue associated with the patent process is expected to further increase. In the FY 2008 President's Budget, the number of patent applications filed from FY 2008 through FY 2012 is expected to increase approximately 8.0 percent each year, with first action pendency increasing to 28.9 months in FY 2012 and total pendency increasing to 38.6 months in FY 2012. The pendency increases will result in patent deferred revenue increases.

The deferred revenue associated with the trademark process continued to decrease in FY 2007. Trademark deferred revenue decreased by $4.9 million, or 6.5 percent, from FY 2006, with a total 9.2 percent decrease over the past three years. This was consistent with trademark first action pendency decreasing to 2.9 months and total trademark pendency decreasing to



| Filings and Pendencies | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|
| Patent Filings | 378,984 | 409,532 | 445,613 | 467,243[1] |
| Percentage Change in Patent Filings | 6.6% | 8.1% | 8.8% | 4.9% |
| Patent First Action Pendency (months) | 20.2 | 21.1 | 22.6 | 25.3 |
| Percentage Change in Patent First Action Pendency | 10.4% | 4.5% | 7.1% | 11.9% |
| Total Patent Pendency (months) | 27.6 | 29.1 | 31.1 | 31.9 |
| Percentage Change in Total Patent Pendency | 3.4% | 5.4% | 6.9% | 2.6% |
| Trademark Filings | 298,489 | 323,501 | 354,775 | 394,368 |
| Percentage Change in Trademark Filings | 11.7% | 8.4% | 9.7% | 11.2% |
| Trademark First Action Pendency (months) | 6.6 | 6.3 | 4.8 | 2.9 |
| Percentage Change in Trademark First Action Pendency | 22.2% | (4.5)% | (23.8)% | (39.6)% |
| Total Trademark Pendency (months) | 19.5 | 19.6 | 18.0 | 15.1 |
| Percentage Change in Total Trademark Pendency | (1.5)% | 0.5% | (8.2)% | (16.1)% |

[1] Preliminary data

15.1 months. Estimates included in the FY 2008 President's Budget project the pendencies to remain constant in the upcoming years.

The Statement of Changes in Net Position presents the changes in the financial position of the USPTO due to results of operations and unexpended appropriations. The movement in net position is the result of the net income or net cost for the year. The change in the net position during the past four years is presented in the following table.

| USPTO Net Position (Dollars in millions) | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|
| Net Position | $ 469.1 | $ 417.8 | $ 498.0 | $ 464.0 |
| Percentage Change in Net Position | 16.3% | (10.9)% | 19.2% | (6.8)% |

The decrease in net position from $498.0 million at the end of FY 2006 to $464.0 million at the end of FY 2007, or 6.8 percent, is attributable largely to the results of operations. The significant increase in net position during FY 2004 is attributable largely to the permanent rescission reversing to a temporarily unavailable reduction in budgetary resources for $75.6 million.

## LIMITATION ON FINANCIAL STATEMENTS

The USPTO has prepared its FY 2007 financial statements in accordance with the requirements of OMB Circular A-136, *Financial Reporting Requirements*, as amended, and guidance provided by the Department of Commerce. OMB Circular A-136 incorporates the concepts and standards contained in the Statements of Federal Financial Accounting Concepts (SFFAC) and the Statements of Federal Financial Accounting Standards (SFFAS) recommended by the Federal Accounting Standards Advisory Board (FASAB) and approved by the Secretary of the Treasury, the Director of the OMB, and the Comptroller General.

On October 19, 1999, the American Institute of Certified Public Accountants Council designated the FASAB as the accounting standards-setting body for Federal Government entities. Therefore, the SFFAS constitute accounting principles generally accepted in the United States (GAAP) for the Federal Government. These concepts and standards have been set by FASAB to help Federal agencies comply with the requirements of the *Chief*

*Financial Officers' Act of 1990*, as amended by the *Government Management Reform Act of 1994*. These two Acts demand financial accountability from Federal agencies and require the integration of accounting, financial management, and cost accounting systems.

The financial data in this report and the financial statements that follow have been prepared from the accounting records of the USPTO in conformity with GAAP. The USPTO's financial statements consist of the Balance Sheet, the Statement of Net Cost, the Statement of Changes in Net Position, the Statement of Budgetary Resources, and the Statement of Cash Flows. The financial statements were prepared pursuant to the requirements of 31 U.S.C. §3515 (b). The following limitations apply to the preparation of the financial statements:

- While the statements are prepared from books and records in accordance with the formats prescribed by the OMB, the statements are in addition to the financial reports used to monitor and control budgetary resources, which are prepared from the same books and records.

- The statements should be read with the realization that the USPTO is a component of the U.S. Government, a sovereign entity. One implication is that unfunded liabilities cannot be liquidated without legislation that provides resources to do so.

In addition, certain information contained in this financial discussion and analysis and in other parts of this Performance and Accountability Report may be deemed forward-looking statements regarding events and financial trends that may affect future operating results and financial position. Such statements may be identified by words such as "estimate," "project," "plan," "intend," "believe," "expect," "anticipate," or variations or negatives thereof or by similar or comparable words or phrases. Prospective statements are subject to risks and uncertainties that could cause actual results to differ materially from those expressed in the statements. Such risks and uncertainties include, but are not limited to, the following: changes in U.S. or international IP laws; changes in U.S. or global economic conditions; the availability, hiring, and retention of qualified staff employees; management of patent and trademark growth; Government regulations; disputes with labor organizations; and deployment of new technologies. The USPTO undertakes no obligation to publicly update these financial statements to reflect events or circumstances after the date hereof, or to reflect the occurrence of unanticipated events.

Case 3:11-cv-01846-LHK   Document 167-4   Filed 08/22/11   Page 65 of 71

## MANAGEMENT RESPONSIBILITIES

USPTO management is responsible for the fair presentation of information contained in the principal financial statements, in conformity with GAAP, the requirements of OMB Circular A-136, and guidance provided by the Department of Commerce. Management is also responsible for the fair presentation of the USPTO's performance measures in accordance with OMB requirements. The quality of the USPTO's internal control rests with management, as does the responsibility for identifying and complying with pertinent laws and regulations.

# Financial
# Section





# Message From the Chief Financial Officer

I n FY 2007, the USPTO continued to maintain its high standard of financial management and account-ability in reporting.  As a result of the dedicated efforts of the financial management staff throughout the USPTO, we have earned an unqualified opinion on our financial state-ments for the 15th consecutive year.  Along with the unquali-fied opinion, the auditors reported no material weak-nesses or reportable conditions in the design and operation of the USPTO's system of internal



*Our CFO* — *USPTO Chief Financial Officer Barry Hudson serves as the agency's principal financial adviser and manager of fiscal opera-tions.  The Office of Chief Financial Officer guided the agency in creating its new Strategic Plan for 2007-2012.*

control over financial reporting and the auditors reported no instances in which our financial system did not substantially comply with Federal financial systems requirements.  For the fifth consecutive year, the Association of Government Accountants awarded the USPTO the Certificate of Excellence in Accountability Reporting for our **FY 2006 Performance and Accountability Report**, clearly demonstrating our excellence in integrating performance and accountability reporting.

The most significant change in financial management this year was driven by the adoption of the new **2007-2012 Strategic Plan**.  For the first time, the strategic plan embodied a new management goal for the USPTO – Achieve Organizational Excellence.  While the strategic goals set the direction for the USPTO to achieve its core mission, this management goal focuses on organizational excellence, a necessary element for achieving the USPTO's strategic goals.  The OCFO supports the strategic direction of the USPTO by

carrying out the fundamental objectives of the enterprise-wide management goal. The OCFO accomplishes this through sound and cost-effective resource management and improving the transparency into executive management information to monitor the performance and financial accountability of the Agency.

An important foundation for organizational excellence is the continuous evaluation of processes to improve efficiency, effectiveness, and accountability. The OCFO is working to improve strategic sourcing of the goods and services necessary for accomplishing the strategic goals and to provide effective stewardship of patent and trademark fees by right-sizing our spending plans and maximizing or obtaining new funding flexibilities. We also continue to review financial management and related processes to identify areas for improved efficiency, financial and performance data integration, and internal controls to ensure unmatched reliability in financial activities.

During FY 2007, the OCFO changed the accounting classification structure to improve the timeliness, usefulness, and accuracy of financial management information for decision-making. This initiative called for a thorough review of the manner in which we capture and allocate cost information. The structure was simplified and stove-piped coding structures were eliminated, setting the stage for a more enterprise-wide approach to financial management. When complete, executives and program managers will have better insight into the cost of cross-cutting activities and the ability for a more succinct alignment of costs with operational activities.

As we look to the future, we will begin integrating strategic, financial, performance, and operational data in a manner to improve analysis of crucial information, bring the information to those who require it in a timely manner, and ensure the information is valuable, straight forward, and accurate. We look forward to continuing our organizational excellence by providing strategic leadership and being a true business partner in achieving the strategic goals of the organization.

Barry K. Hudson

Barry K. Hudson
Chief Financial Officer
November 6, 2007

# Principal Financial Statements and Related Notes





**Excellent Team Work** — *Members of the USPTO FY 2006 Performance and Accountability Report team display the Certificate of Excellence in Accountability Reporting Award from the Association of Government Accountants. 2006 PAR team members include* (SEATED) *Barry Hudson,* (STANDING) *Eleanor Meltzer, Jennifer Connelly, Britt Fucito, Candace Yu, Jeanette Kuendel, Jack Buie, Dennis Detar, Shana Willard, John Yandziak, Ali Emgushov, Mariam Hooks, and Judy Grundy.*

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CONSOLIDATED BALANCE SHEETS

## As of September 30, 2007 and 2006

| (Dollars in Thousands) | 2007 | | 2006 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Intragovernmental: | | | | |
| Fund Balance with Treasury (Note 2) | $ | 1,402,663 | $ | 1,401,771 |
| Advances and Prepayments | | 1,950 | | 1,607 |
| Total Intragovernmental | | 1,404,613 | | 1,403,378 |
| Cash | | 7,010 | | 6,790 |
| Accounts Receivable, Net | | 5,078 | | 2,882 |
| Advances and Prepayments | | 4,183 | | 2,708 |
| Property, Plant, and Equipment, Net (Note 4) | | 204,577 | | 164,538 |
| Total Assets | $ | 1,625,461 | $ | 1,580,296 |
| **LIABILITIES** | | | | |
| Intragovernmental: | | | | |
| Accounts Payable | $ | 5,674 | $ | 12,165 |
| Accrued Payroll and Benefits | | 6,846 | | 6,174 |
| Accrued Post-employment Compensation | | 1,826 | | 1,563 |
| Customer Deposit Accounts (Note 3) | | 4,779 | | 4,498 |
| Total Intragovernmental | | 19,125 | | 24,400 |
| Accounts Payable | | 90,928 | | 92,225 |
| Accrued Payroll and Benefits | | 61,707 | | 51,382 |
| Accrued Leave | | 51,773 | | 43,812 |
| Customer Deposit Accounts (Note 3) | | 87,090 | | 79,309 |
| Patent Cooperation Treaty Account (Note 3) | | 13,717 | | 8,746 |
| Madrid Protocol Account (Note 3) | | 450 | | 279 |
| Deferred Revenue (Note 6) | | 828,070 | | 774,425 |
| Actuarial Liability (Note 7) | | 7,929 | | 7,470 |
| Contingent Liability (Note 14) | | 652 | | 250 |
| Total Liabilities (Note 5) | $ | 1,161,441 | $ | 1,082,298 |
| **NET POSITION** | | | | |
| Unexpended Appropriations – Earmarked Funds (Note 10) | $ | — | $ | 26 |
| Cumulative Results of Operations – Earmarked Funds (Note 10) | | 464,020 | | 497,972 |
| Total Net Position | $ | 464,020 | $ | 497,998 |
| Total Liabilities and Net Position | $ | 1,625,461 | $ | 1,580,296 |

The accompanying notes are an integral part of these financial statements.

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CONSOLIDATED STATEMENTS OF NET COST

**For the years ended September 30, 2007 and 2006**

| (Dollars in Thousands) | | 2007 | | 2006 |
|---|---|---|---|---|
| **Strategic Goal 1: Optimize Patent**<br>**Quality and Timeliness** | | | | |
| Total Program Cost | $ | 1,533,051 | $ | 1,312,330 |
| Total Program Earned Revenue | | (1,506,994) | | (1,384,274) |
| Net Program Cost/(Income) | | 26,057 | | (71,944) |
| | | | | |
| **Strategic Goal 2: Optimize Trademark**<br>**Quality and Timeliness** | | | | |
| Total Program Cost | | 204,527 | | 168,751 |
| Total Program Earned Revenue | | (228,712) | | (210,163) |
| Net Program Income | | (24,185) | | (41,412) |
| | | | | |
| **Strategic Goal 3: Improve Intellectual Property Protection**<br>**and Enforcement Domestically and Abroad** | | | | |
| Total Program Cost | | 32,080 | | 33,088 |
| Net Cost/(Income) from Operations (Note 11) | $ | 33,952 | $ | (80,268) |
| **Total Entity** | | | | |
| Total Program Cost (Notes 12 and 13) | $ | 1,769,658 | $ | 1,514,169 |
| Total Earned Revenue | | (1,735,706) | | (1,594,437) |
| Net Cost/(Income) from Operations (Note 11) | $ | 33,952 | $ | (80,268) |

The accompanying notes are an integral part of these financial statements.