# EXHIBIT N

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 1

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                           --o0o--

4    APPLE INC., a California
     corporation,

5
                         Plaintiff,

6
                         Vs.                Case No. 11-CV-01846-LHK

7

     SAMSUNG ELECTRONICS CO., LTD.,

8    a Korean business entity;
     SAMSUNG ELECTRONICS AMERICA,

9    INC., a New York corporation;
     SAMSUNG TELECOMMUNICATIONS

10   AMERICA, LLC, a Delaware
     limited liability company,

11
                         Defendants.

12   _____/

13

14          VIDEOTAPED DEPOSITION OF COOPER WOODRING

15               Redwood Shores, California

16                Friday, August 5, 2011

17          (HIGHLY CONFIDENTIAL ATTORNEYS' EYES

18            ONLY PORTIONS BOUND SEPARATELY)

19   Reported By:  CAROL S. NYGARD, CSR No. 4018
                   Registered Merit Reporter

20

21

22

23

24

25

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 7

1              MS. WHEELER:  Cindy Wheeler, Apple.

2              VIDEOGRAPHER:  Will the Court Reporter please

3     swear in the witness.

4              (Thereupon the oath was administered to the

5              Witness by the Court Reporter.)

6                           EXAMINATION

7     BY MR. ZELLER:

8        Q.    Good morning.

9              Please tell us your full name.

10       A.    Cooper Coolidge Woodring.

11       Q.    And what is your current business address?

12       A.    131 Highland Avenue, Wakefield, Rhode Island

13    02789.

14       Q.    And where do you currently reside?

15       A.    At that same address.

16       Q.    Currently do you -- do you have a company or a

17    firm that you work with?

18       A.    No.

19       Q.    You're out on your own as a consultant?

20       A.    Yes.

21       Q.    When is it that you were first contacted by

22    anyone about potentially being engaged in connection

23    with a dispute with Samsung?

24       A.    I think it was early May of this year.

25       Q.    Who did you hear from?

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 27

1      THE WITNESS:  I'm sure there are, you know,

2  many variations on that that would allow the shape of a

3  touch screen to be proprietary to a particular maker.

4  BY MR. ZELLER:

5      Q.    Is the shape in the form of a rectangle of a

6  touch screen proprietary to Apple?

7      MR. MONACH:  Object to the form of the

8  question.  Incomplete hypothetical.

9      THE WITNESS:   Unto itself, probably not.

10  BY MR. ZELLER:

11      Q.    In connection with smartphones what's the most

12  common shape of display screens?

13      MR. MONACH:  Object to form.

14      THE WITNESS:  Probably some form of rectangle.

15  BY MR. ZELLER:

16      Q.    Is there anything about the rectangular shape,

17  the particular rectangular shape of the screens used on

18  the iPhones, that you believe is proprietary to Apple?

19      MR. MONACH:  Object to form.

20      THE WITNESS:  Well, again, it's hard to answer

21  that question.

22      If a -- if a rectangular display screen were

23  being claimed in a design patent in combination with

24  other visual elements, yes, it could be a part -- it

25  could be a part of the patent's claim.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page  28

1    BY MR. ZELLER:

2        Q.    I'm asking about the particular shape of the

3    rectangular display screen alone.

4              In your view is that particular shape of the

5    rectangular display screen alone as used in connection

6    with the iPhones proprietary to Apple?

7              MR. MONACH:  Objection to form.

8              THE WITNESS:  I would think not.

9    BY MR. ZELLER:

10       Q.    You, of course, know that touch screens have

11   been used in a rectangular form, a generally rectangular

12   shape, going back to at least the 1990s; right?

13             MR. MONACH:  Objection to form.

14             THE WITNESS:  I know they have been used for a

15   number of years.  I don't know the specific time frame.

16   BY MR. ZELLER:

17       Q.    You know that at least as early as 1997 that

18   cell phones used generally rectangular-shaped displays;

19   correct?

20             MR. MONACH:  Objection to form.

21             THE WITNESS:  Yes.

22   BY MR. ZELLER:

23       Q.    Generally speaking, in connection with the

24   design patents that -- that you reviewed, what was your

25   impression of them when you first reviewed them?

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 29

1          MR. MONACH:  Object to form.

2          THE WITNESS:   Help me understand what -- what

3   do you mean by what was my impression?

4          They -- they looked like rather conventional

5   design patents,

6   BY MR. ZELLER:

7      Q.    Well, let's focus on the 889 design patent.

8          Did you think that design that was depicted

9   there was a -- extremely simple design?

10          Did you think it was ornate?

11          What was your overall impression of it?

12      A.    The 087?

13      Q.    The 889 design patent, that's the Tab 1?

14      A.    Right.

15          I thought it was -- rather typical of

16   Apple-designed products.

17      Q.    And what do you mean by that?

18      A.    They tend to be -- what has been described by

19   other designers as "minimalist designs."

20      Q.    Another way of describing it to be defined by

21   simplicity?

22          MR. MONACH:  Object to form.

23   BY MR. ZELLER:

24      Q.    In its design.

25      A.    You could substitute that term, yes.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 30

1    Q.    And was that also true of the two other design

2  patents that you reviewed pertaining to the surface of

3  the -- of the phones?

4    A.    In general.

5         MR. MONACH:  Object to form.

6         THE WITNESS:  In general, yes.

7  BY MR. ZELLER:

8    Q.    And it's true that when a design is reduced to

9  a level of simplicity little things mean a lot?

10         MR. MONACH:  Object to form.

11         THE WITNESS:  They can.

12  BY MR. ZELLER:

13    Q.    You, yourself, have said that; true?

14    A.    I have.

15    Q.    Was it true when you said it?

16    A.    Yes, of course.

17    Q.    It's something you still believe today?

18         MR. MONACH:  Object to form.

19         THE WITNESS:   I -- I said that in a certain

20  context that may not apply to every situation.

21         In general it -- it's true that a -- small

22  nuances would be less noticeable on a highly-complex

23  design than they would on a -- a more simple design.

24  BY MR. ZELLER:

25    Q.    And in terms of designs for electronic

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page  31

1  devices, the design patents that bring us here today are

2  on the side of simplicity rather than complexity; right?

3          MR. MONACH:  Object to form.

4          THE WITNESS:  In general, yes.

5  BY MR. ZELLER:

6      Q.    Now, it's true that informed users of

7  electronic products pay more attention to differences of

8  necessary features; right?

9          MR. MONACH:  Object to form.

10         THE WITNESS:  Well, that's a -- a standard

11  that is -- utilized in the European community.

12         I don't know that it's a standard that is

13  appropriate here.

14  BY MR. ZELLER:

15     Q.    Well, you've said that you agree with that

16  standard; true?

17         MR. MONACH:  Object to the form.  Taking a

18  statement out of context.

19         He's not here to testify about a European

20  proceeding.

21         But, if you can answer the question in the

22  abstract as it's phrased, go ahead.

23         THE WITNESS:  I'm not going to argue with the

24  -- the European community design registration's legal

25  standards, no.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 120

1           THE WITNESS:  Not only am I not aware that it

2   is an advantage, I would disagree that it is an

3   advantage.

4           I would think having a one inch wide border on

5   either side would be detrimental.

6   BY MR. ZELLER:

7      Q.   And when you say "a one inch order size,"

8   you're referring to the actual product that we marked as

9   Exhibit 65; right?

10          MR. MONACH:  Object to the form of the

11  question.

12          THE WITNESS:  I wouldn't care if you applied

13  it to the product or the design shown in the patent.

14          Having an extremely wide border on either side

15  of the display screen, I would think, would be

16  detrimental, not advantageous.

17  BY MR. ZELLER:

18     Q.   In what way do you believe it is

19  disadvantageous and not advantageous?

20          MR. MONACH:  Object to the form of the

21  question.

22          Incomplete hypothetical.  Vague.

23          THE WITNESS:  Well, it would either reduce the

24  display down to about half inch in vertical width or it

25  would increase the size of the iPhone by a couple of

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 121

1  inches, neither one of which would seem to be

2  advantageous.

3  BY MR. ZELLER:

4      Q.    And you would agree with me that generally

5  speaking for iPhones -- or excuse me -- for smartphone

6  and computer tablet design, the same is true, when you

7  talk about what the size of those side borders are;

8  right?

9          MR. MONACH:  Object to form.

10          THE WITNESS:  I didn't understand your

11  question.

12          I -- with regard to iPhones and tablets what?

13  BY MR. ZELLER:

14      Q.    Well, you told me that you think that there

15  are certain disadvantages in having to have a wider

16  border around the display?

17      A.    Of having a too wide border, yes.

18      Q.    And you talked about that specifically in

19  context of the iPhone; right?

20      A.    Yes.

21      Q.    And so my question is now a more general one.

22          Is it true that you also believe that it would

23  be disadvantageous for smartphones in general and

24  tablets in general to have to have wider as opposed to

25  more narrow borders?

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 122

1            MR. MONACH:   Objection.   Vague.

2   BY MR. ZELLER:

3       Q.    For those same reasons that you discussed in

4   connection with the iPhone?

5       A.    Your -- your question is -- is so vague I

6   can't give you a definitive answer.

7            In other words, wider -- wider than what and

8   up to what width?

9            In other words, it's -- it's all conditional.

10  These are the choices designers make that makes products

11  successful.

12           It could be too narrow.   It could be too wide.

13      Q.    We're talking about a particular design

14  aspect.

15           We're talking about the borders around the

16  display screens; right?

17      A.    Of?

18      Q.    On smartphones.

19      A.    Okay.

20      Q.    Right?

21      A.    Okay.

22      Q.    You'll agree with me that it is a design

23  disadvantage to have to have borders around the display

24  screen of a smartphone that are so wide that it would

25  either mean that the screen -- the active display screen

Contains Highly Confidential - Attorneys' Eyes Only  Portions

1   area is reduced or the phone size has to be increased;

2   right?

3          MR. MONACH:  Objection.  Vague and incomplete

4   hypothetical in light of his prior testimony.

5          THE WITNESS:  In -- in general terms, yes, I

6   would agree with that.

7   BY MR. ZELLER:

8    Q.   And the same is true with respect to tablet

9   computer design; right?

10          MR. MONACH:  Same objection.

11          THE WITNESS:  Yes, but to a lesser degree,

12   because there's a little more freedom in a tablet

13   computer just because of its size and the fact that it's

14   probably not designed to go in a pocket and whatnot.

15   BY MR. ZELLER:

16    Q.   The scale of it is -- is larger when you're

17   working with a tablet computer than you are with a

18   smartphone, so at least the space that you have to work

19   with is larger in the tablet computer arena?

20    A.   The -- the matte, if you will, around --

21   between the frame and the display screen, yes, you'd

22   have a little more leeway there, be less constrained.

23    Q.   In your view is it important to compare the

24   products to the -- the designs and the design patents

25   using the same scale?

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 124

1    A.    I think it helps in the analysis, and I did

2    that in my exhibits.

3           If you -- if you look, the photographs of the

4    products and the patent drawings are as close to being

5    the same scale as we could achieve.

6    Q.    And why is it you think it's most helpful or

7    it does help in the analysis?

8    A.    Well, it's just more of an apples-to-apples

9    comparison -- excuse the pun.

10   Q.    And please tell me, why do you say that?

11          Why do you think it makes it more

12   apples-to-apples?

13          I'm just trying to understand that part of it.

14   A.    Design patents have no dimensions, so they

15   know no specific size.

16          So to scale the drawings in a design patent to

17   the same scale or size as an accused product simply

18   makes the comparison an easier one to make.

19   Q.    Directing your attention back to Exhibit 65,

20   do you know whether as of the time that that product was

21   designed and manufactured as to whether or not there was

22   a minimum-sized border on the side that had to be used?

23          MR. MONACH:  Objection.  Form.

24   BY MR. ZELLER:

25   Q.    On the phone?

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page  149

1    Q.    You've never worked in a carrier storefront?

2    A.    No.

3          I testified earlier that I hadn't.

4    Q.    You have no expertise at all with carrier

5  storefronts; right?

6    A.    I wouldn't agree with that.

7    Q.    Please tell me your expertise with carrier

8  storefronts?

9    A.    A carrier storefront is a retail operation,

10  and I wouldn't want to limit my testimony to say I don't

11  have any experience in retail operations in that in my

12  decades with J.C. Penney we were involved in -- in

13  designing stores, and storefronts, and interiors, and

14  point of purchase displays, and architecture.

15          So I wouldn't want to say I have no -- no

16  expertise in retail environment.

17    Q.    So please tell me your full basis for

18  believing that purchasers of smartphones through carrier

19  storefronts are the same types of purchasers who went to

20  J.C. Penney as of 1986 when you left?

21          MR. MONACH:  Object to the form of the

22  question.

23          THE WITNESS:  Consumers are consumers.

24          There's certain generalities that we can make

25  about them.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 150

1          In -- in the mid-eighties we had over a

2     million people a day going through J.C. Penney stores.

3          I'm sure some of those same people are -- are

4     buying smartphones in carrier storefronts today.

5          I'm not saying there's a direct correlation.

6          I'm just saying that they're not mutually

7     exclusive.

8     BY MR. ZELLER:

9        Q.    Do you believe that consumers have become more

10    sophisticated about technology since 1986?

11          MR. MONACH:  Objection.  Vague.

12          THE WITNESS:  That's a double-edged sword.

13          I could answer "yes," and give you reasons why

14    I believe that.

15          I could also answer that they've become less

16    sophisticated because of the advent of -- of products

17    like the iPhone that reduce our need for the

18    understanding of the -- of technology by providing a

19    simple easy to use product.

20          There's an argument on both sides of that

21    coin.

22       Q.    Well, I'm not asking for arguments.

23          Tell me, what empirical data do you have to

24    support that answer you just gave?

25       A.    Having designed products where we reduced

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 151

1   complexity against a background of more complex products

2   simplified the need for knowledge about technology on

3   the part of the consumer and resulted in a -- what often

4   became a, quote, "best seller" in that category of

5   consumer electronics at J.C. Penney, so there's a basis

6   -- a proven logical analytical basis for my statement.

7       Q.    If I -- if I'm hearing you correctly, simply

8   filing the design can increase the ease of -- of use of

9   technology for the consumer; is that right?

10      A.    Sure.

11      Q.    And is that something you generally believe is

12  true?

13      A.    I know it's true.

14      Q.    It makes the technology more accessible and

15  easier to use from the consumer perspective?

16          MR. MONACH:  Objection.  Vague and incomplete

17  hypothetical.

18          THE WITNESS:  All of those plus easier to

19  understand.

20  BY MR. ZELLER:

21      Q.    And you believe that those are all -- all have

22  been advanced by the iPhone design and the iPad design

23  that's embodied in these design patents; right?

24          MR. MONACH:  Object to form.

25          THE WITNESS:   I believe both of the products

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 152

1   you've just mentioned make the technology more

2   accessible and more transparent and easier to use, which

3   is partly conveyed through the ornamental design.

4   BY MR. ZELLER:

5       Q.    Well, whether you call the design "ornamental"

6   or not, just to be clear, what we're talking about is

7   when you say "both the products make the technology more

8   accessible and easier to use," you're talking about the

9   fact that by simplifying the design of the products

10  that's been achieved; right?

11          MR. MONACH:  Object to the form of the

12  question.

13          THE WITNESS:  Yeah, but we have to be careful

14  when we say "simplifying the design" what we're talking

15  about.

16          I'm not talking about simplifying the --

17  manufacture or something like that, which can also be

18  considered "design."

19          I'm talking about simplifying the ornamental

20  design or the types of design that are protectable by

21  design patent.

22  BY MR. ZELLER:

23      Q.    Right.

24          I think we're on the same page.

25          What you're saying is that by simplifying the

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 153

1  appearance of the design, one -- that helps advance the

2  accessibility of the -- of the technology and makes it

3  also easier to use from the consumer perspective?

4     A.   That's the goal and purpose, and, if it's done

5  properly, it accomplishes that.

6       If it's done improperly, as it was done, for

7  example, on BMW's iDrive, then it makes it so complex

8  nobody can figure it out and they won't even buy the

9  car, which is a good case, an example of attempting to

10  simplify it, but having to go through so many steps to

11  turn the radio on that it became ridiculous.

12    Q.   To make sure we're still on the same page,

13  because I think I understand what you're saying, because

14  when you say it was the goal and the purpose here, is it

15  true that from your perspective the -- the appearance of

16  the iPhone designs and the appearance of the iPad

17  designs makes the technology itself more accessible to

18  people and makes it easier for them to use?

19       MR. MONACH:  Object to the form of the

20  question.

21       THE WITNESS:  Yes,  again, with the caveat

22  being that it's the ornamental appearance that I'm

23  referring to that -- that allows this to happen.

24  BY MR. ZELLER:

25    Q.   Right.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 154

1          When you say "the ornamental appearance,"

2     again, we're talking about really your bailiwick here,

3     which is the -- the design of the product just simply

4     from an aesthetic point of view, and that it still has

5     -- it still reaches these goals and has this purpose you

6     mentioned of making the technology more accessible and

7     the technology easier to use?

8          A.    I would agree with that.

9          Q.    And you would also agree with me that the

10    three design patents that bring us here today, the 677

11    design patent, the 087 design patent, and the 889 design

12    patent, also have this kind of simplified design that

13    makes the technology easier for consumers to understand

14    and increases the ease of use; true?

15               MR. MONACH:  Object to form.

16               THE WITNESS:  Yes, that's true.

17    BY MR. ZELLER:

18         Q.    Now, as part of your -- your field of study

19    and design, do you look at ergonomics?

20               Is that something you -- you have a background

21    in?

22         A.    Sure.

23               All products are used by humans, and

24    ergonomics defines the interface between the product and

25    the user.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 155

1      Q.    Is there anything about the iPhone design that

2  you believe makes it easier to hold in the human hand?

3            MR. MONACH:  Object to the question as vague.

4            As compared to what?

5            THE WITNESS:  Easier than a brick?

6  BY MR. ZELLER:

7      Q.    Easier than other --

8            Well, let me ask this.

9            Are rectangular shapes something that -- that

10  are easy to hold for people?

11            MR. MONACH:  Object to form.

12  BY MR. ZELLER:

13      Q.    Is there ergonomic value to having a

14  rectangular shape to a phone?

15      A.    Easier than what shape?

16      Q.    I'm not even comparing it to anything.

17            Is it --

18            Is a rectangular shape something that you

19  believe is pleasant and easy for ordinary humans to hold

20  in their hand to use as a phone?

21            MR. MONACH:  Objection.  Vague and incomplete

22  hypothetical.

23            THE WITNESS:  No, no.  There's no hard rule

24  that this shape is better than that shape from an

25  ergonomic point of view.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 156

1             It's the goal of every designer designing

2    every cell phone that they want them to be comfortable

3    in their hand.

4             So ergonomics is always a consideration of the

5    designer, and yet we have a hundred different cell phone

6    designs all trying to achieve the same ergonomic goal.

7    BY MR. ZELLER:

8        Q.    I'm not asking you to compare.  I'm not asking

9    you for alternatives.

10            I'm asking you a very simple question.

11            Do you think that people find it comfortable

12   to hold a cell phone or a smartphone that is in the

13   shape of a rectangle?

14            MR. MONACH:  Objection.  Vague.

15            THE WITNESS:  Generally.

16   BY MR. ZELLER:

17       Q.    You agree with that generally; right?

18       A.    Uh-huh.

19       Q.    That's a "yes"?

20       A.    Generally.

21       Q.    That's a yes, generally; right?

22       A.    Yes.

23       Q.    And the same is true of using a rectangular

24   shape for a tablet computer; right?

25       A.    Again, it's -- it's hard to answer your

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 157

1    question specifically without comparison to other

2    shapes.

3              It's not an uncomfortable shape, but it may

4    not be more comfortable than some other shape.

5        Q.    Do you think that a rectangular shape for a

6    tablet computer is something -- a kind of shape that

7    people find easy and pleasant to hold -- as a product

8    shape?

9        A.    Easy and pleasant.

10             Maybe convenient.

11             I don't know if it's easy, or I don't know if

12   pleasant is sort of a personal attribute.

13             I don't know if people find it pleasant.

14       Q.    So you're more comfortable and you do agree

15   with the idea that -- and you do agree that having a

16   rectangular shape for a tablet computer is something

17   that people find more convenient to hold as -- as a

18   product shape?

19             MR. MONACH:  Objection.  Vague.

20             It's more convenient than what?

21             THE WITNESS:  They find it convenient.

22             I don't know that it's more convenient than

23   something else.

24   BY MR. ZELLER:

25       Q.    And why do you think it's a convenient shape

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 158

1    for tablet computers, just from a -- again, we're

2    talking now in the context of ergonomics.

3        A.    I don't think its convenience stems from

4    ergonomics.

5            I think it's convenient because throughout

6    history documents have been rectilinear in shape.

7            Whether they're magazines, or newspapers, or

8    any printed material is -- is usually in some form of

9    rectilinear shape.

10           So to -- have a hand-held device where you're

11   examining documents seems to be reasonable to mimic the

12   shape that history has predicated those documents.

13       Q.    In other words, just from a design

14   perspective, if you're going to design a product that

15   people are going to use to view documents and view other

16   things on one logical design choice would be put it in a

17   rectangular type form, something that people would be

18   used to holding and looking at?

19       A.    That would be one logical conclusion, yes.

20           (Thereupon the following portion of the

21           transcript has been designated "Highly

22           Confidential - Attorneys' Eyes Only" and

23           continues on page 149, line 1.)

24

25

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 159

1      Q.    Directing your attention back to Exhibit 14,

2    would you please turn to page number 10809.23.

3      A.    Okay.

4      Q.    And you'll see that there's some bar graphs on

5    here, and it's called "Reason for Purchase, Ownership,"

6    and then you'll see that there are various -- colored

7    bars in the upper righthand quadrant?

8      A.    Uh-huh.

9      Q.    Do you see that?

10           And you'll see that the heading for that, it's

11   the label, is actually underneath it, but it says

12   "Reason for Choice by OS Ownership Share in Q410."

13           Do you see that graph?

14     A.    That's the upper righthand graph?

15     Q.    Yes.

16     A.    Yes, I see that.

17     Q.    Now, you'll see that the bar or the stack

18   there that is second from the left is IOS?

19           Do you see that?

20     A.    Yes.

21     Q.    Now, again, I'll represent to you that "IOS"

22   stands for Apple's operating system.

23           And do you see where there's a blue figure of

24   "1 percent"?

25     A.    Yes.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page  211

1          MR.  ZELLER:  No, you can have a standing

2    objection.

3          MR.  MONACH:  I'll say "objection," but it

4    includes all the elements previously stated.

5          MR.  ZELLER:   Understood.  I appreciate that.

6          MR.  MONACH:  Okay.

7          MR.  ZELLER:  I'll absolutely agree that you

8    have a standing objection, as well that that's an

9    appropriate shorthand.

10          MR.  MONACH:   Okay.

11          THE  WITNESS:  If we assume that what I had

12    previously characterized in my declaration -- I called

13    them the "major design elements" that are listed on the

14    top of page 5, the A, B, C, D, if those major design

15    elements that conspicuously depart from the prior art

16    are considered not limited to those, but considered and

17    in combination, no, the -- the movement of that little

18    slot quarter of an inch one way or another is not -- not

19    going to make it a different design.

20    BY MR. ZELLER:

21       Q.   Let me --

22          In fact, maybe we can -- do this a little bit

23    more efficiently then by relying on your declaration.

24          Directing your attention to paragraph 16 of

25    your declaration, as you mention -- you lay out what you

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page  212

1    consider to be the four major design elements of the 677

2    design patent; right?

3        A.    Right.

4        Q.    And in your view all the elements that are

5    listed there in that paragraph under A through D are

6    present in the 6 -- in the design that we've marked as

7    Exhibit 67?

8        A.    Well, you've already testified we can't tell.

9    I can't tell if this is black, for example.

10       Q.    Well, okay.

11             Then setting aside the black portion of it, do

12   you agree that all the other --

13       A.    Well --

14       Q.    -- what you call "major design elements" that

15   listed here in A through D are present in the design we

16   marked as Exhibit 67?

17             MR. MONACH:  Objection.  Lack of foundation.

18   Vague.

19             Incomplete hypothetical in light of the

20   witness' prior testimony that he can't tell what this

21   is.

22             Go ahead.

23             THE WITNESS:  I -- it's an analysis I haven't

24   made previously, so let me attempt to answer your

25   question, and it appears --

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page  213

1          Although, again, I can't tell if it's flat, I
2     can't tell if it's clear, I can't tell if it's
3     black-colored.
4          I can tell that it's a rectangular front
5     surface with four evenly rounded corners.
6          I can't tell if it has an inset rectangular
7     display screen.
8          I can tell if it's centered on the front
9     surface, and that it leaves very narrow borders on
10    either side of the display screen and substantial
11    borders above and below the display screen.
12         I can tell that it has a rounded horizontal
13    speaker slot centered on the front surface above the
14    display screen, and I can tell that where the
15    rectangular front surface is otherwise substantially
16    free of ornamentation outside of an optional button area
17    centrally below the display.
18         So, if it has most of those major visual
19    characteristics, excusing the ones that we can't make a
20    determination about, then I would have to conclude that
21    it's substantially the same in the eyes of the ordinary
22    observer.
23    BY MR. ZELLER:
24    Q.   And just to make sure I heard everything that
25    you said here, the -- you agree that the major design

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 214

1    elements that you list in paragraph 16 in A through D

2    are all present in the design that we marked as Exhibit

3    67 except for the part where it says a flat clear black

4    color, those elements you're not sure about, but the

5    rest of them you do see there?

6         A.    No.  I didn't say that.

7               MR. MONACH:  Objection.  Mischaracterizes

8    prior testimony.

9    BY MR. ZELLER:

10        Q.    What are the other ones you can't tell then?

11              That's why I want to make sure I heard you

12   correctly.

13        A.    Apparently you didn't.

14              In B it's impossible to tell from this that it

15   has an inset rectangular display screen.

16        Q.    So you don't know whether it's inset or not,

17   you can see it's a rectangular display screen that's

18   centered on the front surface?

19        A.    It could be protruding.

20        Q.    So --

21              But the rest of it you do agree is present in

22   the design that's Exhibit 67 except for the inset part

23   in B?

24        A.    Yes.

25        Q.    So, again, just --

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page  227

1   insufficient evidence.

2          Calling for speculation given the lack of

3   foundation.

4          THE WITNESS:  Repeat the question just one

5   more time.

6          I just want to get it clear, and I --

7   BY MR. ZELLER:

8      Q.    I've been trying to find out if you think that

9   the design that's in Exhibit 67 is substantially the

10  same in the eyes of the ordinary observer and purchaser

11  to the 677 design patent; right?

12         MR. MONACH:  Objection.  Asked and answered.

13         MR. ZELLER:  You're following along so far?

14         MR. MONACH:  Objection.

15         You're asking that question -- it's been asked

16  and answered multiple times.

17         THE WITNESS:  I understood what you said.

18  BY MR. ZELLER:

19     Q.    So my question is, that -- and you've

20  testified so far that you're not certain as to whether

21  or not the 67 -- the Exhibit 67 design has a -- is flat,

22  clear, black-colored, and whether the rectangular

23  display screen is inset; right?

24     A.    Correct.

25     Q.    Is it true that if those four elements are not

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page  228

1   present in the design that we marked as Exhibit 67, it

2   would no longer be substantially the same as the 677

3   design patent to the ordinary observer?

4         MR. MONACH:  Objection.  Vague and ambiguous.

5   BY MR. ZELLER:

6   Q.    Or would it still be substantially the same?

7         MR. MONACH:  Objection.  Vague and ambiguous.

8         Incomplete hypothetical.  Misstates prior

9   testimony to the extent you said it would still be

10  substantially the same.

11        Calling for improper opinion testimony without

12  adequate factual basis being provided.

13        THE WITNESS:  May I repeat your question in my

14  answer to be sure that I have it straight?

15        MR. ZELLER:  Uh-huh.

16        THE WITNESS:  You're asking me if Exhibit

17  67 -- if the design depicted in Exhibit 67 would be

18  substantially the same as the 677 design if it were not

19  flat, not clear, not black-colored, and did not have an

20  inset rectangular display screen?

21  Q.    Right.

22        In other words, it still has a rectangular

23  display screen, but just not inset.

24  A.    And the answer is I don't know, and the reason

25  for the answer is, if it weren't flat, but it were --

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 229

1    almost flat, differing only by the thickness of a piece

2    of paper, I could say to an ordinary observer that's

3    flat.

4            If it weren't clear but translucent, pretty

5    close to clear, again, all of these subjective issues

6    come in to play here, because I don't know what the

7    design is you're asking me to compare to the 677.

8            Just not being flat is not good enough to make

9    an opinion on.

10           It's not black-colored?

11           Well, is it 90 percent black?

12           Not inset display screen?

13           If it protrudes an inch, I'd say it's a

14   different design.

15           If it's close, it could be close.

16           I just can't answer the question, and I'm

17   trying to explain to you the basis for my inability to

18   give you a definitive answer.

19   Q.    Isn't it true that as of the time that the 677

20   and the 087 design patents were conceived of that it was

21   obvious to a designer of ordinary skill that the surface

22   of an electronic device would be clear?

23           MR. MONACH:  Objection.  Incomplete

24   hypothetical.  Lacking foundation.

25           THE WITNESS:   Obviously, if you're going to

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page  230

1  read a display screen, it has to be clear, however, the

2  clear surface does not have to extend beyond the

3  display.

4        So if you're asking me is -- is the Apple

5  approach to covering its entire front surface of a

6  smartphone with a clear surface -- is that obvious to a

7  designer of ordinary skill in the art, I'd say, no, it's

8  highly nonobvious.

9  BY MR. ZELLER:

10    Q.    You are unaware of any prior art to the 677

11  and the 087 design patents that teach having a flat

12  clear surface extending over the front of the entire

13  face of an electronic device; is that true?

14    A.    I didn't say that.

15    Q.    Well, you are aware that --

16    A.    But let me --

17        MR. MONACH:   Let him finish.

18        THE WITNESS:  Let me finish the question.

19  BY MR. ZELLER:

20    Q.    You said you didn't know.  That's your answer.

21        MR. MONACH:  No, you interrupted.

22        Go ahead and finish your answer.

23        THE WITNESS:  No, I didn't say that.

24        What I did say, however, is that in

25  combination with these other major visual differences

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 305

1    I, CAROL S. NYGARD, a Certified Shorthand

2    Reporter of the State of California, duly authorized to

3    administer oaths, do hereby certify:

4        That the foregoing proceedings were taken

5    before me at the time and place herein set forth; that

6    any witnesses in the foregoing proceedings, prior to

7    testifying, were duly sworn; that a record of the

8    proceedings was made by me using machine shorthand which

9    was thereafter transcribed under my direction; that the

10   foregoing transcript is a true record of the testimony

11   given.

12       Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal Case,

14   before completion of the proceedings review of the

15   transcript was not requested.

16       I further certify I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney or party to this action.

19       IN WITNESS WHEREOF, I have this date

20   subscribed my name:

21       Dated: August 6th, 2011

22

23   _____

24   CAROL S. NYGARD, CSR #4018

25