# EXHIBIT 1

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3                        --oOo--
 4    APPLE INC., a California
      corporation,
 5
                      Plaintiff,
 6
                      Vs.              Case No. 11-CV-01846-LHK
 7
 8    SAMSUNG ELECTRONICS CO., LTD.,
      a Korean business entity;
      SAMSUNG ELECTRONICS AMERICA,
 9    INC., a New York corporation;
      SAMSUNG TELECOMMUNICATIONS
10    AMERICA, LLC, a Delaware
      limited liability company,
11
                      Defendants.
12    _____/
13
14         VIDEOTAPED DEPOSITION OF COOPER WOODRING
15               Redwood Shores, California
16                Friday, August 5, 2011
17         (HIGHLY CONFIDENTIAL ATTORNEYS' EYES
                ONLY PORTIONS BOUND SEPARATELY)
18
19    Reported By:  CAROL S. NYGARD, CSR No. 4018
                 Registered Merit Reporter
20
21
22
23
24
25
```

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 2

1                          August 5, 2011

2                             9:46 a.m.

3    Videotaped Deposition of COOPER

4    WOODRING, held at the offices of

5    Quinn Emanuel Urquhart & Sullivan,

6    LLP, 555 Twin Dolphin Drive, Redwood Shores,

7    California, before Carol S. Nygard,

8    A Certified Shorthand Reporter,

9    Registered Merit Reporter.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 3

```
 1                 A P P E A R A N C E S:
 2  FOR THE PLAINTIFF APPLE, INC.:
 3        MORRISON & FOERSTER
          BY:  ANDREW E. MONACH, ESQ.
 4             PATRICK J. ZHANG, ESQ.
          425 Market Street
 5        San Francisco, California   94105
 6
 7

          CYNDI WHEELER, Patent Counsel
 8        Apple
          1 Infinite Loop, MS 40-PAT
 9        Cupertino, California   95014
10
11

    FOR THE DEFENDANTS SAMSUNG:
12
          QUINN EMANUEL URQUHART & SULLIVAN
13        BY:  MICHAEL T. ZELLER, ESQ.
               TAMAR BUCHAKJIAN ESQ,
14        856 South Figueroa Street
          10th Floor
15        Los Angeles, CA   90017
16
17

18        QUINN EMANUEL URQUHART & SULLIVAN
          BY: MARGARET CARUSO, ESQ.
19             JOELLE PERRY, ESQ.
          555 Twin Dolphin Drive
20        5th Floor
          Redwood Shores, California   94065
21
22
23

          Also Present:
24
          JAKE KROHN, Videographer
25        NATE SUN
```

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 23

1      declaration?

2                MR. MONACH:  Objection.  Lack of foundation.

3                THE WITNESS:  I -- I've already testified I

4      don't know when it was started.

5      BY MR. ZELLER:

6          Q.    When did you first see a draft of any kind?

7          A.    Generally mid-June time frame.

8          Q.    How did you receive it?

9          A.    By E-mail.

10         Q.    From whom?

11         A.    Mr. Zhang.

12         Q.    You'll agree with me that it's often difficult

13     to compare a two-dimensional drawing to a

14     three-dimensional object?

15               MR. MONACH:  Objection form.

16     BY MR. ZELLER:

17         Q.    Correct?

18         A.    Difficult for who?

19         Q.    For anyone.

20               MR. MONACH:  Objection.  Form.

21               THE WITNESS:  It's probably difficult for a

22     layperson.

23               I don't think it's difficult for a designer or

24     one skilled in the art.

25     BY MR. ZELLER:

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 24

1    Q.    What's a "smartphone"?

2          MR. MONACH:  Object to form.

3          THE WITNESS:  A phone that does more than be a

4    telephone.

5    BY MR. ZELLER:

6    Q.    Are there any essential components, hardware

7    components, that you're aware of that a smartphone needs

8    to have?

9          MR. MONACH:  Object to form.  Calls for

10   opinion testimony outside his declaration.

11         You can -- you can answer if you understand

12   the question and have an answer.

13         THE WITNESS:  Smartphones generally require

14   means of inputting information and means of outputting

15   or receiving information.

16   BY MR. ZELLER:

17   Q.    What's your understanding of what the most

18   common means is of inputting and outputting information

19   for a smartphone?

20         MR. MONACH:  Object to form.

21         THE WITNESS:  Well, in what time frame?

22         Obviously, they've changed over a period of

23   time as technology changes.

24   BY MR. ZELLER:

25   Q.    Well, when were smartphones first available?

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 25

1          MR. MONACH:  Object to form.

2          THE WITNESS:  A number of years ago.

3   BY MR. ZELLER:

4      Q.    What year?

5      A.    I don't know.

6          MR. MONACH:  Object to form.

7   BY MR. ZELLER:

8      Q.    Who was the manufacturer of the first

9   smartphone?

10          MR. MONACH:  Object to form.

11          THE WITNESS:  I -- I'm not sure.

12          I don't know.

13   BY MR. ZELLER:

14      Q.    Do you know what the most common means is

15   today of inputting and outputting information in

16   smartphones?

17          MR. MONACH:  Object to form.

18          THE WITNESS:   Possibly a display screen.

19   BY MR. ZELLER:

20      Q.    You say "possibly."

21          Do you know?

22          MR. MONACH:  Object to form.

23          THE WITNESS:  I -- I wouldn't swear to it.  I

24   don't know for sure.

25   BY MR. ZELLER:

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 26

1    Q.    You'll agree with me that touch screens are
2  not proprietary just in terms of their overall shape to
3  Apple; correct?
4          MR. MONACH:  Object to form.
5          THE WITNESS:  Would you repeat the question,
6  please.
7  BY MR. ZELLER:
8    Q.    Touch screens are not proprietary in terms of
9  their overall shape to Apple; correct?
10         MR. MONACH:  Objection to form.
11         THE WITNESS:  I find the question sort of too
12  broad or impossible to answer.
13         A touch screen -- the shape of a touch screen
14  could be proprietary to Apple or to anyone else.
15  BY MR. ZELLER:
16   Q.    Please tell me the circumstances under which
17  in your view the shape of a touch screen would be
18  proprietary to a manufacturer.
19         MR. MONACH:  Object to form.
20         THE WITNESS:  Well, if a manufacturer had a
21  cell phone with a heart-shaped touch screen, it's
22  entirely possible that that could be proprietary.
23  BY MR. ZELLER:
24   Q.    Any other circumstances you can think of?
25         MR. MONACH:  Object to form.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 28

1  BY MR. ZELLER:

2      Q.    I'm asking about the particular shape of the

3  rectangular display screen alone.

4          In your view is that particular shape of the

5  rectangular display screen alone as used in connection

6  with the iPhones proprietary to Apple?

7          MR. MONACH:  Objection to form.

8          THE WITNESS:  I would think not.

9  BY MR. ZELLER:

10     Q.    You, of course, know that touch screens have

11 been used in a rectangular form, a generally rectangular

12 shape, going back to at least the 1990s; right?

13         MR. MONACH:  Objection to form.

14         THE WITNESS:  I know they have been used for a

15 number of years.  I don't know the specific time frame.

16 BY MR. ZELLER:

17     Q.    You know that at least as early as 1997 that

18 cell phones used generally rectangular-shaped displays;

19 correct?

20         MR. MONACH:  Objection to form.

21         THE WITNESS:  Yes.

22 BY MR. ZELLER:

23     Q.    Generally speaking, in connection with the

24 design patents that -- that you reviewed, what was your

25 impression of them when you first reviewed them?

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 29

1           MR. MONACH:   Object to form.

2           THE WITNESS:   Help me understand what -- what

3    do you mean by what was my impression?

4           They -- they looked like rather conventional

5    design patents,

6    BY MR. ZELLER:

7       Q.    Well, let's focus on the 889 design patent.

8           Did you think that design that was depicted

9    there was a -- extremely simple design?

10          Did you think it was ornate?

11          What was your overall impression of it?

12      A.    The 087?

13      Q.    The 889 design patent, that's the Tab 1?

14      A.    Right.

15          I thought it was -- rather typical of

16   Apple-designed products.

17      Q.    And what do you mean by that?

18      A.    They tend to be -- what has been described by

19   other designers as "minimalist designs."

20      Q.    Another way of describing it to be defined by

21   simplicity?

22          MR. MONACH:   Object to form.

23   BY MR. ZELLER:

24      Q.    In its design.

25      A.    You could substitute that term, yes.

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 30

1      Q.    And was that also true of the two other design

2   patents that you reviewed pertaining to the surface of

3   the -- of the phones?

4      A.    In general.

5         MR. MONACH:  Object to form.

6         THE WITNESS:  In general, yes.

7   BY MR. ZELLER:

8      Q.    And it's true that when a design is reduced to

9   a level of simplicity little things mean a lot?

10        MR. MONACH:  Object to form.

11        THE WITNESS:  They can.

12   BY MR. ZELLER:

13     Q.    You, yourself, have said that; true?

14     A.    I have.

15     Q.    Was it true when you said it?

16     A.    Yes, of course.

17     Q.    It's something you still believe today?

18        MR. MONACH:  Object to form.

19        THE WITNESS:   I -- I said that in a certain

20   context that may not apply to every situation.

21        In general it -- it's true that a -- small

22   nuances would be less noticeable on a highly-complex

23   design than they would on a -- a more simple design.

24   BY MR. ZELLER:

25     Q.    And in terms of designs for electronic

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 31

1    devices, the design patents that bring us here today are

2    on the side of simplicity rather than complexity; right?

3            MR. MONACH:  Object to form.

4            THE WITNESS:  In general, yes.

5    BY MR. ZELLER:

6        Q.    Now, it's true that informed users of

7    electronic products pay more attention to differences of

8    necessary features; right?

9            MR. MONACH:  Object to form.

10           THE WITNESS:  Well, that's a -- a standard

11   that is -- utilized in the European community.

12           I don't know that it's a standard that is

13   appropriate here.

14   BY MR. ZELLER:

15       Q.    Well, you've said that you agree with that

16   standard; true?

17           MR. MONACH:  Object to the form.  Taking a

18   statement out of context.

19           He's not here to testify about a European

20   proceeding.

21           But, if you can answer the question in the

22   abstract as it's phrased, go ahead.

23           THE WITNESS:  I'm not going to argue with the

24   -- the European community design registration's legal

25   standards, no.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 32

1    BY MR. ZELLER:

2        Q.    I didn't ask you if you were going to argue

3    with it.

4            You have said that you did agree with the

5    proposition that informed users pay more attention to

6    differences of necessary features; correct?

7            MR. MONACH:  Object to the form of the

8    question for the reasons previously stated.

9            To the extent that you're asking him about the

10   European proceeding, I object that it goes outside the

11   scope of discovery in this case.

12   BY MR. ZELLER:

13       Q.    It's a simple question.

14           You said it or you didn't.

15           MR. MONACH:  Same objection.

16           THE WITNESS:  I agree with it in the European

17   community.

18   BY MR. ZELLER:

19       Q.    In your view the informed user in Europe

20   perceives the design patents that bring us here today

21   differently than an informed user in the United States?

22           MR. MONACH:  Objection.  Lack of foundation

23   and goes beyond the scope of preliminary injunctive

24   discovery here.

25           THE WITNESS:  Well, our standards don't --

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 40

1    design.

2              MR. MONACH:   Object to form.   Lacking in

3    foundation in light of witness' prior testimony.

4              THE WITNESS:   If Apple created minimalist

5    design and there was no -- prior art, it would seem that

6    it would be entirely able to be protected legally.

7    BY MR. ZELLER:

8         Q.    In your view does the 889 design patent

9    protect or make proprietary to Apple the concept of

10   minimalism for tablet computers?

11             MR. MONACH:   Object to the form of the

12   question.

13             THE WITNESS:   No.

14             As I've already testified, design patents

15   don't protect concepts.   They protect designs.

16   BY MR. ZELLER:

17        Q.    In your view do the two -- what we're calling

18   "the phone design patents" that are the subject of your

19   declaration make proprietary to Apple the concept of

20   minimalism for phones?

21             MR. MONACH:   Object to the form of the

22   question.

23             THE WITNESS:   No, because, as I have already

24   testified, design patents don't protect concepts, they

25   protect designs.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 41

1  BY MR. ZELLER:

2      Q.    What is "4G"?

3            MR. MONACH:  Object to the form of the

4  question.  Lacking foundation.

5            THE WITNESS:  I don't know.

6  BY MR. ZELLER:

7      Q.    Does Apple have a 4G phone?

8      A.    I don't know.

9      Q.    Who are the carriers for the Samsung Galaxy S

10  4G?

11     A.    I don't know.

12           MR. MONACH:  Objection.  Lack of foundation.

13           THE WITNESS:  I don't know.

14  BY MR. ZELLER:

15     Q.    Who are the carriers for the Infuse 4G phone?

16           MR. MONACH:  Same objection.

17           THE WITNESS:  I don't know.

18  BY MR. ZELLER:

19     Q.    What channels are those Samsung phones sold

20  through?

21           MR. MONACH:  Same objection.

22           THE WITNESS:  I don't know.

23  BY MR. ZELLER:

24     Q.    What channels are the Galaxy Tab 10.1 sold

25  through?

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 42

1          MR. MONACH:   Same objection.

2          THE WITNESS:   I don't know.

3    BY MR. ZELLER:

4     Q.    Have you seen any of those accused products in

5    any store anywhere at any time?

6     A.    I don't recall having seen them, no.

7     Q.    You don't have any expertise in the

8    engineering of mobile phones or tablet computers;

9    correct?

10     A.    No, not specifically.

11     Q.    That's a correct statement, that you do not

12    have such expertise; correct?

13          MR. MONACH:   Object to form.

14          THE WITNESS:   What is "such expertise" again?

15          MR. ZELLER:   I didn't say "such expertise"?

16          MR. MONACH:   That's what the -- that's what

17    the transcript says.

18          MR. ZELLER:   Not the original question.

19    BY MR. ZELLER:

20     Q.    You are not an expert in the engineering of

21    mobile phones or tablet computers; correct?

22     A.    That's correct.

23     Q.    You're not an expert in the manufacture of

24    mobile phones or computer tablets; correct?

25     A.    That's correct.

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 45

1    element functional, yes.

2    BY MR. ZELLER:

3        Q.    I didn't use the word "functional."

4              I used the world "utilitarian."

5              Are you --

6        A.    Okay, utilitarian.

7        Q.    So you're an expert in that area; is that

8    true?

9              MR. MONACH:  Object to form.  Asked and

10   answered.

11             You can answer it again.

12             THE WITNESS:  From a design view, yes.

13   BY MR. ZELLER:

14       Q.    You don't say that anywhere in your

15   declaration; do you?

16             MR. MONACH:  Object to form.  Best Evidence

17   Rule.

18             THE WITNESS:  Let me think about that for a

19   minute.

20   BY MR. ZELLER:

21       Q.    Please point out to us where in your

22   declaration you offer yourself as an expert in the

23   functional or utilitarian aspects of mobile phones or

24   tablet computers, or, in fact, offer any opinion on what

25   is or is not functional or utilitarian.

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 46

1          MR. MONACH:  Object to the form of the

2    question to the extent it mischaracterizes his prior

3    testimony.

4          Object under the Best Evidence Rule that the

5    declaration is the best evidence of what it says, but if

6    you want the witness to go -- to sit here and go through

7    it on the record, he can do so.

8          THE WITNESS:  I think the two questions you

9    asked is what -- one, did I include that opinion in my

10   declaration and the answer to that is, no, I don't

11   believe I did, but the prior question was do I consider

12   myself an expert in that, and the answer to that is yes.

13   BY MR. ZELLER:

14     Q.    Why does your declaration contain no opinion

15   as to whether or not any elements or features of mobile

16   phones or tablet computers are utilitarian or

17   functional?

18         MR. MONACH:  Object to the form of the

19   question, and I don't know that this calls for

20   communications with counsel, but if -- if it calls for

21   communications with counsel other than facts and

22   assumptions, I'd instruct you not to reveal those facts

23   and assumptions.

24         THE WITNESS:  I don't think I gave an opinion

25   on that in my declaration because design patents are --

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 47

1    are primarily ornamental or they wouldn't have been

2    issued by the Patent Office, so I saw no reason to give

3    an opinion on that.

4    BY MR. ZELLER:

5        Q.    Well, focusing on the 889 design patent, when

6    you offered your opinions in the declaration in this

7    case, were you assuming that the elements or features

8    depicted in the design patent were primarily ornamental?

9        A.    Yes.

10       Q.    And is it also true -- same statement true

11   with respect to the two other design patents that are

12   the subject of your declaration, namely those involving

13   the surface of the -- the phones?

14       A.    Yes.

15       Q.    So is it true that with respect to utilitarian

16   or functionality --

17             Well, let me rephrase that.

18             Is it true that with respect to functionality

19   of -- any of the design patents that are at issue this

20   is something that you're simply assuming as opposed to

21   something you're offering an opinion on in this case?

22             MR. MONACH:  Object to the form of the

23   question to the extent it might be intended to cover

24   rebuttals or replies.

25             The witness has testified to the opinion he's

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 48

1    given and hasn't given his opening statement -- his

2    opening declaration and why, but certainly if someone

3    from your side comes and says a feature is functional we

4    reserve the right to respond to that.

5             MR. ZELLER:  And I reserve the right to

6    examine him today on any opinion he has or is going to

7    give on functionality.

8             The question is is --

9             MR. MONACH:  He may not know what the -- he

10   may not know what opinions he's going to give --

11            MR. ZELLER:  Then he's going to have --

12            MR. MONACH:  -- until he sees an opinion from

13   the other side, which he's reserved the right to respond

14   to.

15            MR. ZELLER:  That's, obviously, completely

16   improper.

17   BY MR. ZELLER:

18      Q.    So my question is, are you assuming that the

19   features of the design patents that you describe in your

20   declaration are not functional and primarily ornamental,

21   or are you offering an opinion on that?

22            MR. MONACH:  Object to the form of the

23   question.

24            It's ambiguous with respect to whether we're

25   talking about the declaration given or an opinion that

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 49

1    he might give in response to other opinions.

2            You can answer.

3            THE WITNESS:  I didn't assume that they were

4    primarily ornamental just because the Patent Office says

5    they are, but it is my opinion that they are ornamental.

6    BY MR. ZELLER:

7        Q.    And you had that opinion as of the time that

8    you signed this declaration on June 30th, 2011; is that

9    true?

10       A.    Yes.

11       Q.    So why isn't it in your declaration?

12            MR. MONACH:  Objection.  Asked and answered.

13            THE WITNESS:  I wasn't asked to give that

14   opinion.

15   BY MR. ZELLER:

16       Q.    Okay.  Well, please tell me the -- first of

17   all, the full basis of the investigation that you

18   undertook to determine whether or not any of the

19   elements or features of the design patents that you

20   discuss in your declaration are primarily functional or

21   primarily ornamental.

22            I want to know everyone you talked to, every

23   piece of literature you reviewed, all the works that you

24   did in advance of signing your declaration and as of the

25   time you formed that opinion.

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 50

1          MR. MONACH:  I'm going to instruct the witness

2     not to answer with respect to communications he had

3     other than communications revealing facts that he relied

4     on or assumptions that he relied on in giving his

5     declaration.

6          THE WITNESS:  It's pretty simple.

7          I examined the three design patents involved

8     and looked at the individual visual features of each and

9     determined that each was ornamental in that its

10    appearance was not dictated by function.

11    BY MR. ZELLER:

12       Q.   So you -- you looked at the designed patents.

13          That was the full extent of your basis for

14    your opinion that the elements or features of the design

15    patents that are discussed in your declaration are not

16    functional and instead are primarily ornamental;

17    correct?

18          MR. MONACH:  Object to form.

19          THE WITNESS:  That's correct.

20          I don't know how one could make that

21    determination unless they the visual features of the

22    design patent.

23    BY MR. ZELLER:

24       Q.   You didn't do anything beyond looking at the

25    design patents on their face for that inquiry; true?

Contains Highly Confidential - Attorneys' Eyes Only Portions

1       A.      Well, when you say I -- my analysis was

2   limited to looking at them, no, that wouldn't be true.

3               Obviously, when you look at them you have to

4   make some kind of an intelligent decision based on the

5   -- on having looked at them.

6       Q.      Well, did you ask anyone at Apple whether or

7   not any of the features that you describe or any of the

8   elements you describe for any of these design patents

9   were primarily functional or not?

10      A.      No.

11      Q.      Did you ask any of the named inventors?

12      A.      No.

13      Q.      Did you ask anyone to even speak to Apple or

14  any of the named inventors about that?

15              MR. MONACH:  I'm going to instruct the witness

16  again not to reveal any -- not saying they did happen or

17  didn't, but not to reveal any attorney/client

18  communications other than communications in which you

19  obtained facts or assumptions that you considered in

20  giving your declaration.

21              THE WITNESS:  No, the answer is no, I did not,

22  because I was able to make that determination on my own.

23  BY MR. ZELLER:

24      Q.      Did you review any Apple documents?

25              MR. MONACH:  I'll again instruct the witness

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 52

1    to limit his answer to any documents that you reviewed

2    that provided facts that you considered or assumptions

3    that you relied upon in forming your opinions.

4            THE WITNESS:  Well, I obviously examined the

5    Apple documents of these three design patents.

6    BY MR. ZELLER:

7        Q.    Did you review any internal Apple documents

8    pertaining to the engineering, design, manufacture, or

9    costing of any tablet computer or any mobile phone?

10           MR. MONACH:  Again, I'll instruct the witness

11    to answer only if you reviewed such documents and you

12    considered them in giving your opinion.

13           THE WITNESS:  Well, again, your question is

14    very broad, and it included the term "design," so did I

15    review any Apple documents, the internal, I think you

16    said, documents involving design?

17           Yes, I examined these three design patents.

18    BY MR. ZELLER:

19        Q.    What other documents?

20           MR. MONACH:  Same instruction.

21           THE WITNESS:  None others.

22    BY MR. ZELLER:

23        Q.    Please tell us from a functional point of

24    view, why is it that the most common shape of a display

25    screen used for smartphones is rectangular?

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 53

1          MR. MONACH:  Object to form.

2          THE WITNESS:  Probably because the

3   manufacturers of display screens make them in those

4   shape and have them in stock and available.

5   BY MR. ZELLER:

6      Q.    Do you know what an "aspect screen ratio" is?

7      A.    Sure.

8      Q.    What is it?

9      A.    It's a height-to-width ratio.

10     Q.    And what's the relationship between the aspect

11  screen ratio and the shape -- the most common shape for

12  display screens that are used for smartphones?

13         MR. MONACH:  Object to the form of the

14  question.

15         THE WITNESS:  I don't really know.

16  BY MR. ZELLER:

17     Q.    When you say "really," do you know at all?

18     A.    No.

19     Q.    Do you know what the relationship is between

20  the aspect screen ratio and the shape of display

21  sequences that are used for portable tablet computers?

22         MR. MONACH:  Object to the form of the

23  question.

24         THE WITNESS:  I doubt that they're limit --

25  that tablet computers are limited to one aspect ratio

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 56

1   particular aspect screen ratios?

2           MR. MONACH:  Object to the form of the

3   question.  It's vague and ambiguous.

4           THE WITNESS:  I don't know.

5   BY MR. ZELLER:

6      Q.    Do you consider yourself to be in a position

7   as an expert to offer any opinion about that in this

8   case?

9           MR. MONACH:  Same objection.

10          THE WITNESS:  What -- what is "about that"?

11  BY MR. ZELLER:

12     Q.    That being whether or not there are particular

13  rectangular shapes of display screens that are most

14  efficacious for certain aspect screen ratios for tablet

15  computers.

16          MR. MONACH:  Object to the form.  Question.

17          THE WITNESS:  I don't know.

18  BY MR. ZELLER:

19     Q.    You're not an expert in that area and you

20  can't offer an opinion on that; true?

21          MR. MONACH:  Object to the form of the

22  question.

23          THE WITNESS:  Yes, that's true.

24  BY MR. ZELLER:

25     Q.    Is it a coincidence that the iPad and the

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 57

1    iPad2 have a generally rectangular shape and the display

2    screen for those products is in a generally rectangular

3    shape?

4              MR. MONACH:  Object to the form of the

5    question.

6              THE WITNESS:   I -- I would have no way of

7    knowing if it was a coincidence.

8    BY MR. ZELLER:

9       Q.    Is it a coincidence that various versions of

10   the iPhone are in a generally rectangular shape and the

11   fact that their displays are in a generally rectangular

12   shape?

13             MR. MONACH:  Same objection to form.

14             THE WITNESS:  Again, I would have no way of

15   knowing if it was a coincidence.

16   BY MR. ZELLER:

17      Q.    You're generally aware that there are black

18   borders running along the tops and the sides of the iPad

19   and the iPad2; right?

20      A.    In some cases, yes.

21      Q.    Why are there those black borders there?

22             MR. MONACH:  Object to form.

23             THE WITNESS:  Because that's what the

24   designers wanted.

25   BY MR. ZELLER:

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 58

1      Q.    Does that black border do anything for the

2  display screen or for the product?

3            MR. MONACH:  Object to form.

4            THE WITNESS:  Help me understand, what do you

5  mean by does it -- does it do anything?

6  BY MR. ZELLER:

7      Q.    Does it perform any -- any function at all in

8  connection with the device that you know of?

9      A.    It hides what's below in -- in that it -- it's

10 not a transparent or translucent area.

11     Q.    And the same is true for the borders that

12 you've seen on the iPhones as well; right?

13           MR. MONACH:  Object to form.

14           THE WITNESS:  Generally, yes.

15 BY MR. ZELLER:

16     Q.    Do you know what the most common color is for

17 mobile phones?

18     A.    No.

19     Q.    Do you know what the most common color was for

20 mobile phones even prior to the time of the design

21 patents that bring us here today?

22     A.    I think I'd probably have an intelligent

23 guess, but I -- but your question is do I know, and the

24 answer to that is, no, I don't know.

25     Q.    You're not certain, but you have a -- you have

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 59

1      a belief?

2          A.      Yes.

3          Q.      And -- and what's that belief?

4          A.      Black.

5          Q.      Do you have an understanding as to why the

6      display screen of the iPad products and the iPhone

7      products are black when they're turned off?

8          A.      Well, when they're turned off, there's no --

9      no illumination, so they're black.

10         Q.      And when they're turned on they illuminate and

11     they're no longer black; right?

12             MR. MONACH:   Object to form.

13             THE WITNESS:   Partially or -- or, yes, that's

14     possible.

15     BY MR. ZELLER:

16         Q.      Are there alternative colors for display

17     screens when they're turned off other than black?

18         A.      I don't really know.

19             I suspect there are -- I suspect they can be

20     dark gray.

21         Q.      But you're not sure and you don't have an

22     expert opinion on that; right?

23         A.      No, I don't.

24         Q.      Can you think of any advantages from the user

25     perspective in having a display screen that goes black

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 60

1    when it's off?

2              MR. MONACH:  Objection vague.  Object to form.

3              THE WITNESS:  No, I can't think of any

4    advantage.

5    BY MR. ZELLER:

6        Q.    Well, wouldn't one advantage be that the user

7    knows that the device is actually powered off, it's

8    turned off?

9              MR. MONACH:  Object to form.

10   BY MR. ZELLER:

11       Q.    Isn't consuming power?

12             MR. MONACH:  Assumes facts not in evidence.

13             THE WITNESS:  I wouldn't agree with that, no.

14             I think the screen could -- could go black

15   while it was -- while the unit was still on.

16   BY MR. ZELLER:

17       Q.    So you still can't think of any advantage for

18   -- to a consumer to having a display screen that goes

19   black when it's off?

20             I mean, as we've been talking here you can't

21   think of anything?

22       A.    No.

23       Q.    Do you ever go to the movies?

24       A.    Sure.

25       Q.    Do you have a smartphone?

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 61

1     A.     Yes.

2     Q.     You've seen other people out in the world

3  having smartphones, too?

4     A.     I have.

5     Q.     Do you want to sit in a dark theater with

6  everyone's displays still lit up?

7            Do you think there's some advantage there in

8  having a display screen that goes dark, goes black?

9            MR. MONACH:   Object to the form of the

10 question.

11           THE WITNESS:   I think -- I think there's an

12 advantage to having a display screen able to go dark.

13           I don't agree with you that's necessarily

14 indicative of the fact that the machine has shut down or

15 is not consuming power.

16           MR. ZELLER:   I've moved on.

17           You told me you just don't see that, so I've

18 moved on to something else.

19           MR. MONACH:   Objection.

20           If that's a question, I object to form.

21           MR. ZELLER:   No.  I've asked a completely

22 separate question.

23           THE WITNESS:   Well, repeat the question then.

24 BY MR. ZELLER:

25     Q.     Do you think there are advantages to the user

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 62

1   in being able to make the device go off and look dark

2   and be black instead of emitting light such as in

3   darkened bedrooms at night, such as in movie theaters,

4   such as in cars at night?

5          You'll agree with me that's an advantage in

6   having a black -- or display screen that can go black;

7   right?

8       A.    Sure, I'd agree with that.

9       Q.    You do know that -- it took a while, but Apple

10  came out with a white iPhone; right?

11         MR. MONACH:  Object to form.

12         THE WITNESS:   I know they came out with one.

13  I don't know that it took a while.

14  BY MR. ZELLER:

15      Q.    So you don't know why there was -- it took a

16  while for Apple to launch a white iPhone?

17         MR. MONACH:  Object to form.

18         THE WITNESS:   I just said I don't know if it

19  took a while.

20  BY MR. ZELLER:

21      Q.    Do you know what "light bleed" is?

22         MR. MONACH:  Object to form.

23         THE WITNESS:   I don't know what your

24  interpretation of "light bleed" is.

25  BY MR. ZELLER:

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 63

1    Q.    Have you ever heard that term in connection

2  with electronic devices?

3    A.    No.

4    Q.    Do you have a sense of what it might mean?

5          MR. MONACH:  Object to form.

6          THE WITNESS:  Might mean that light is

7  bleeding.

8  BY MR. ZELLER:

9    Q.    Means light is coming out of the device when

10 you don't want it to?

11   A.    I guess it could mean that.

12   Q.    And you understand that manufacturers of

13 electronic devices consider that to be undesirable

14 because consumers think it's undesirable; right?

15         MR. MONACH:  Object to form.

16         THE WITNESS:  I'll take your word for it.

17 BY MR. ZELLER:

18   Q.    You don't have any reason to doubt that; do

19 you?

20   A.    I'll take your word for it.

21   Q.    Please tell me all the reasons you have to

22 doubt that statement.

23         MR. MONACH:  Object to the form.  It's

24 hopelessly vague.

25         THE WITNESS:  I just don't have an opinion

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 73

1      A.      I don't really know.

2              MR. MONACH:  Lack of foundation.

3              THE WITNESS:  I don't really know.

4              MR. MONACH:  It's vague and ambiguous.

5   BY MR. ZELLER:

6      Q.      In your view does the ordinary observer, the

7   ordinary purchaser, vary in any way depending on how

8   expensive the product is?

9      A.      Well, yes, of course, but what you're -- but

10  what you're saying is that expense is equated only to

11  the dollar price, and that's not how bright marketers or

12  designers understand expense.

13             Expense is related to the benefits.

14             And, so, if you get a smartphone that is $500

15  but provides extraordinary benefits, the average

16  consumer may consider this to be a bargain.

17     Q.      You understood my question that I asked you

18  when you gave that answer or was there something unclear

19  about my question to you?

20     A.      I thought I understood it and I thought I

21  answered it.

22     Q.      So it wasn't deliberately?

23             MR. MONACH:  Object to the form of the

24  question.

25             If you have a question, pose it.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 74

1          Don't try to browbeat or argue with the

2    witness because you don't like the answer.

3          MR. ZELLER:  I don't like it because it's not

4    responsive.

5          I'd ask you listen to my questions.

6          MR. MONACH:  Why don't you pose a question.

7    BY MR. ZELLER:

8    Q.    In your view --

9          Well, let's talk about your declaration.

10         When you offered your opinions about the

11   ordinary observer, the ordinary observer you're

12   referring to includes purchasers of smartphones; true?

13   A.    Sure.

14   Q.    Purchasers of -- of smartphones are more

15   likely to pay attention to differences in designs

16   between smartphones because they are costly products;

17   correct?

18         MR. MONACH:  Object to form.

19         THE WITNESS:  Ask the question again, please.

20   BY MR. ZELLER:

21   Q.    Isn't it true that purchasers of smartphones

22   are more likely to pay attention to differences in

23   designs between smartphones because they are products

24   that are on the more costly side rather than the less

25   costly side?

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 75

1           MR. MONACH:   Object to form.

2           THE WITNESS:   Generally I would agree with

3      that.

4      BY MR. ZELLER:

5           Q.    You also understand that purchasers of

6      smartphones buy those phones overwhelmingly through

7      carrier storefronts; correct?

8           MR. MONACH:   Objection.  Lack of foundation.

9           THE WITNESS:   I -- I couldn't agree with that.

10     BY MR. ZELLER:

11          Q.    Do you know --

12          A.    An Apple Store is not a carrier storefront.

13          Q.    Do you know where most iPhones are sold?

14          A.    Where they're sold?

15          Q.    Yes.

16          A.    Probably in China.

17          Q.    Sold?

18          A.    Sold.

19          Q.    Let me try it this way:  What types of stores

20     have the most volume in sales of iPhones?

21          MR. MONACH:   Objection.  Lack of foundation.

22     Outside the scope of his declaration.

23          THE WITNESS:   I don't know.

24          I mean -- I guess there's two choices, an

25     Apple Store or a carrier.

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 76

1    BY MR. ZELLER:

2        Q.    Well, you do understand, generally speaking,

3    that most purchasers of smartphones in the United States

4    enter in to a contract, a long-term contract with a

5    carrier; right?

6        A.    Yes.

7              MR. MONACH:   Objection.

8    BY MR. ZELLER:

9        Q.    You understand that those contracts are

10   typically at least a year, sometimes more than a year;

11   right?

12       A.    I understand that.

13       Q.    And you'll agree with me that that fact also

14   means that it is more likely that smartphone purchasers

15   pay more attention to differences in designs between

16   smartphones; right?

17             I mean that's another factor that weighs in

18   favor of purchasers giving more care; right?

19       A.    I wouldn't agree with that, no.

20       Q.    You don't think a multi-year commitment makes

21   people more careful?

22             MR. MONACH:   Object to form.

23             THE WITNESS:   I don't think -- which carrier

24   you pick or how long your contract is has anything to do

25   with the selection of the design of the phone.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page  77

1    BY MR. ZELLER:

2        Q.     Please tell me the full factual basis for your

3    opinion on that.

4        A.     Design decisions in terms of purchasing are --

5    are often made, as I said earlier, based on high

6    perceived value and high consumer acceptance related to

7    the -- the hardware, to the item, and I don't know that

8    that has any correlation between which carrier or how

9    long a contract would be.

10       Q.     Now you're saying you don't know.

11              Do you know whether or not the fact that

12   consumers are entering in to contracts with carriers

13   when they buy these cell phones, these smartphones,

14   makes the purchasers more careful or not?

15              MR. MONACH:   Object to form.

16   BY MR. ZELLER:

17       Q.     Do you know one way or the other?

18       A.     Makes them more careful.

19       Q.     In their purchasing.

20              MR. MONACH:   Objection.  Vague.

21              THE WITNESS:   It may make them more careful in

22   their purchasing.

23              I don't know that that has anything to do with

24   a design choice, however.

25   BY MR. ZELLER:

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 78

1      Q.    I'm not asking about design choice.   I'm

2  asking a pretty straightforward question.

3           Let me try it again.

4           Do you know one way or another whether

5  purchasers of smartphones are more careful in their

6  purchasing decisions in order -- in other words, in what

7  devices to because of the fact that they're entering in

8  to a contract with a carrier that is -- a year long and

9  potentially longer?

10          MR. MONACH:  Objection.  Vague.  Asked and

11  answered.

12          THE WITNESS: I don't know.

13  BY MR. ZELLER:

14      Q.    Do most smartphone purchasers in the context

15  of their potential acquisition of a smartphone interact

16  with representatives or salespeople of the carriers?

17          MR. MONACH:  Object to form.

18          THE WITNESS:  I don't know.

19  BY MR. ZELLER:

20      Q.    Does that have any effect on whether they pay

21  attention to differences in designs between smartphones

22  or not?

23          MR. MONACH:  Objection.  Vague.  Incomplete

24  hypothetical.

25          THE WITNESS: I don't know.

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 79

1    BY MR. ZELLER:

2        Q.    Do you know what percentage of purchasers of

3    iPhones even care about the design of the phone --

4            MR. MONACH:  Objection.

5    BY MR. ZELLER:

6        Q.    -- as a factor in their purchasing decision?

7            MR. MONACH:  Objection.  Vague.

8            THE WITNESS:  I suspect they all care about

9    the design.

10   BY MR. ZELLER:

11       Q.    Well, you say you suspect.

12           Do you know?

13       A.    I couldn't prove that they all know -- or that

14   they all care.

15       Q.    What percentage of iPhone purchasers purchase

16   the iPhone because of the design?

17           MR. MONACH:  Object to the form of the

18   question.

19           THE WITNESS:  I suspect it's a very high

20   percent.

21   BY MR. ZELLER:

22       Q.    What percentage?

23           MR. MONACH:  Object to form.

24           THE WITNESS:  Vast majority.

25   BY MR. ZELLER:

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 80

1    Q.    So what -- what percentage?

2          MR. MONACH:  Same objection.

3          THE WITNESS:  70, 80.

4    BY MR. ZELLER:

5    Q.    And you're offering an expert opinion on that?

6    A.    I didn't say it was an expert opinion.

7          You asked me a question, and I tried to give

8    you an honest answer.

9    Q.    Well, are you an expert --

10         Are you offering an expert opinion in this

11   case about what purchasers notice and care about in

12   connection with the design of the iPhone?

13         MR. MONACH:  The --

14         I'm going to object and instruct the witness

15   not to answer or speculate about what he might be --

16   opinions he might be asked to give in the future in

17   rebuttal.

18         The opinions he has given are set forth in his

19   declaration that was filed.

20         THE WITNESS:  I don't know.

21   BY MR. ZELLER:

22   Q.    Well, are you an expert on that?

23         MR. MONACH:  Object to the form of the

24   question.

25         THE WITNESS:  Explain "on that."

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 81

1    BY MR. ZELLER:

2        Q.    Are you an expert in to the reasons why

3    consumers buy iPhones?

4        A.    Not to the --

5            MR. MONOCH:  Object to the form.

6            Go ahead.

7            THE WITNESS:  Not specifically with regard to

8    why they buy iPhones.

9    BY MR. ZELLER:

10       Q.    Are you an expert as to why consumers buy iPad

11   products?

12       A.    Not specifically with regard to why they buy

13   iPad products.

14       Q.    Are you an expert in why consumers buy

15   smartphones?

16            MR. MONACH:  Object to form.

17            THE WITNESS:  No.

18   BY MR. ZELLER:

19       Q.    Now, earlier you offered a percentage of your

20   belief as to how many consumers buy the iPhone because

21   of the design.

22            Please tell me the full basis for that

23   percentage.

24       A.    It's my belief in general that a design is an

25   extremely powerful influence in purchases in general,

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 82

1  and in -- in a category like cell phones it's -- just a

2  terribly influential factor.

3      Q.    And that's an assumption that -- that you

4  bring to your opinions in this case; right?

5          MR. MONACH:   Object to the form of the

6  question.

7          THE WITNESS:   You can characterize it as "an

8  assumption" if you want.

9          I think it's based on decades of experience

10 working in the retail environment for a company like

11 J.C. Penney, where we did a lot of studies of how and

12 why people buy what they do based on the appearance of

13 products and importance of design.

14 BY MR. ZELLER:

15     Q.    In other words, that's a viewpoint that you've

16 developed over the years based upon your work in the

17 field, and that's something that's the kind of

18 information and view that you bring to this case when

19 you offer your opinion; right?

20     A.    I would agree with that.

21     Q.    Did you ever ask Apple for any of their

22 internal research as to why consumers purchase iPhones?

23     A.    No.

24     Q.    Is there a reason why you didn't ask?

25     A.    I thought it was self-evident why.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 83

1      Q.    And, by the way, are you an expert on the

2  reasons why consumers buy tablet computers?

3      A.    Not specifically on why they buy tablet

4  computers, no.

5      Q.    Do you have any knowledge or information as to

6  what it is that carriers believe is important in the

7  design of smartphones or tablet computers?

8            MR. MONACH:  Objection.  Vague.

9            THE WITNESS:  No.

10  BY MR. ZELLER:

11      Q.    Are you an expert in that area?

12      A.    No.

13      Q.    Before the break we were talking about screen

14  colors.

15            Do you recall that?

16      A.    I recall that.

17            MR. ZELLER:  What's the next number?

18            MS. BUCHAKJIAN:  63.

19            MR. ZELLER:  63?

20            Let's please mark as Exhibit 63 a Samsung 4G

21  phone.

22            (Exhibit 63 was marked for Identification.)

23            MR. MONACH:  For the record counsel --

24            Oh.  Sorry.

25            Are you representing that this is the phone

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 84

1    that's described in his declaration or are you using it

2    to be a category of phone that has a capability for 4G

3    communication?

4              MR. ZELLER:  It just says "4G" on the back.

5              MR. MONACH:  So our record is clear, what is

6    the name and model of this phone?

7              MR. ZELLER:  I'd like to ask my questions

8    independent of that.

9              That's fine.

10             I mean, I'll identify it, but it's marked for

11   the record, and I don't want --

12             I mean, we're talking about design here, and

13   I'm not going to start specifying things for him and

14   giving him other identifying information.

15             MR. MONACH:  Well, that's fine, but you've

16   made a statement on the record about what you've handed

17   him, and I think the record should be clear that it's

18   not one of the phones that is in his declaration.

19             MR. ZELLER:  Apparently you're desperate to

20   communicate that him.

21             MR. MONACH:  No, I want the record to be

22   clear.

23             MR. ZELLER:  It's really irrelevant to what

24   questions I'm going to ask him.

25             I have marked a phone.  I called it a "Samsung

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 107

1    purchasers of smartphones believe that dark metallic

2    gray is substantially the same color as black.

3              MR. MONACH:   Asked and answered.

4    BY MR. ZELLER:

5       Q.     What data, what facts, do you have to

6    substantiate that opinion?

7              Please tell me all of them.

8       A.     Well, as I said earlier, in decades of

9    experience with J.C. Penney and studying how ordinary

10   observers evaluate designs at the point of purchase,

11   they make broad generalizations, unlike an expert, and

12   my professional opinion is based upon those experiences

13   and consumer research data that an ordinary observer

14   would look at the front face of an iPhone and say "It's

15   black."

16      Q.     Anything else?

17      A.     I think that's enough.

18      Q.     I didn't ask if that's enough.

19             Do you have any other basis for your expert

20   opinion that you provided or do I have your complete

21   full basis?

22      A.     You have everything I can think of at the

23   moment.

24      Q.     Now, the experience that you just described

25   working with consumer products was at J.C. Penney;

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 108

1    right?

2         A.      That's correct.

3         Q.      Did J.C. Penney sell -- have any smartphones

4    that it sold when you were there?

5         A.      I left in 1986, so I don't think so.

6         Q.      Have you ever worked at any retailer or any

7    other vendor of smartphone products such that you were

8    in a position to observe consumer behavior insofar as it

9    related to the purchase or observation of smartphones or

10   tablet computers?

11        A.      I've never worked in a retail environment that

12   sold tablet computers or smartphones.

13        Q.      So it's true that the experience that you

14   cited as the basis for your opinion that consumers

15   believe that gray is black was based on experience that

16   had nothing to do with smartphones or tablet computers;

17   true?

18             MR. MONACH:  Object to the form of the

19   question as misstating the prior testimony.

20             THE WITNESS:  Well, first, I didn't say that

21   they thought gray was black, and, secondly, I think that

22   experience and knowledge that I gained is applicable

23   here as well as to other areas.

24   BY MR. ZELLER:

25        Q.      The experience that you cited for your opinion

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 109

1  that consumers believe that dark metallic gray is

2  substantially the same as black for smartphones and

3  tablet computers was based upon experience in a retail

4  environment that did not have in it smartphones or

5  tablet computers; correct?

6      A.    That's correct, but it doesn't mean that the

7  knowledge gained isn't transferrable from one form of

8  consumer electronics to another.

9      Q.    Well, what consumer electronics are you

10 referring to where it had a dark metallic gray color for

11 a display and consumers perceived it to be substantially

12 the same as the color black?

13     A.    I could cite television sets as an example

14 where at J.C. Penney we designed and had manufactured to

15 our design specifications and sold television sets that

16 probably are a very close analogy to this case where the

17 screen of a television set is not through my eyes

18 perfectly black, but would be considered so by an

19 ordinary observer.

20     Q.    What were the T.V. sets that you're referring

21 to that were sold when you were there?

22     A.    What were they?

23     Q.    Yeah.

24     A.    Well, they ranged from 9-inch to 25-inch.

25     Q.    They were -- they were cathode ray television

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 121

1    inches, neither one of which would seem to be

2    advantageous.

3    BY MR. ZELLER:

4        Q.    And you would agree with me that generally

5    speaking for iPhones -- or excuse me -- for smartphone

6    and computer tablet design, the same is true, when you

7    talk about what the size of those side borders are;

8    right?

9            MR. MONACH:  Object to form.

10            THE WITNESS:  I didn't understand your

11   question.

12            I -- with regard to iPhones and tablets what?

13   BY MR. ZELLER:

14       Q.    Well, you told me that you think that there

15   are certain disadvantages in having to have a wider

16   border around the display?

17       A.    Of having a too wide border, yes.

18       Q.    And you talked about that specifically in

19   context of the iPhone; right?

20       A.    Yes.

21       Q.    And so my question is now a more general one.

22            Is it true that you also believe that it would

23   be disadvantageous for smartphones in general and

24   tablets in general to have to have wider as opposed to

25   more narrow borders?

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 122

1          MR. MONACH:   Objection.   Vague.

2    BY MR. ZELLER:

3        Q.    For those same reasons that you discussed in

4    connection with the iPhone?

5        A.    Your -- your question is -- is so vague I

6    can't give you a definitive answer.

7              In other words, wider -- wider than what and

8    up to what width?

9              In other words, it's -- it's all conditional.

10   These are the choices designers make that makes products

11   successful.

12             It could be too narrow.   It could be too wide.

13       Q.    We're talking about a particular design

14   aspect.

15             We're talking about the borders around the

16   display screens; right?

17       A.    Of?

18       Q.    On smartphones.

19       A.    Okay.

20       Q.    Right?

21       A.    Okay.

22       Q.    You'll agree with me that it is a design

23   disadvantage to have to have borders around the display

24   screen of a smartphone that are so wide that it would

25   either mean that the screen -- the active display screen

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 123

1  area is reduced or the phone size has to be increased;

2  right?

3          MR. MONACH:   Objection.   Vague and incomplete

4  hypothetical in light of his prior testimony.

5          THE WITNESS:   In -- in general terms, yes, I

6  would agree with that.

7  BY MR. ZELLER:

8      Q.    And the same is true with respect to tablet

9  computer design; right?

10         MR. MONACH:   Same objection.

11         THE WITNESS:   Yes, but to a lesser degree,

12  because there's a little more freedom in a tablet

13  computer just because of its size and the fact that it's

14  probably not designed to go in a pocket and whatnot.

15  BY MR. ZELLER:

16     Q.    The scale of it is -- is larger when you're

17  working with a tablet computer than you are with a

18  smartphone, so at least the space that you have to work

19  with is larger in the tablet computer arena?

20     A.    The -- the matte, if you will, around --

21  between the frame and the display screen, yes, you'd

22  have a little more leeway there, be less constrained.

23     Q.    In your view is it important to compare the

24  products to the -- the designs and the design patents

25  using the same scale?

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 124

1    A.    I think it helps in the analysis, and I did
2    that in my exhibits.
3         If you -- if you look, the photographs of the
4    products and the patent drawings are as close to being
5    the same scale as we could achieve.
6    Q.    And why is it you think it's most helpful or
7    it does help in the analysis?
8    A.    Well, it's just more of an apples-to-apples
9    comparison -- excuse the pun.
10   Q.    And please tell me, why do you say that?
11        Why do you think it makes it more
12   apples-to-apples?
13        I'm just trying to understand that part of it.
14   A.    Design patents have no dimensions, so they
15   know no specific size.
16        So to scale the drawings in a design patent to
17   the same scale or size as an accused product simply
18   makes the comparison an easier one to make.
19   Q.    Directing your attention back to Exhibit 65,
20   do you know whether as of the time that that product was
21   designed and manufactured as to whether or not there was
22   a minimum-sized border on the side that had to be used?
23        MR. MONACH:   Objection.   Form.
24   BY MR. ZELLER:
25   Q.    On the phone?

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 121

1  inches, neither one of which would seem to be

2  advantageous.

3  BY MR. ZELLER:

4      Q.    And you would agree with me that generally

5  speaking for iPhones -- or excuse me -- for smartphone

6  and computer tablet design, the same is true, when you

7  talk about what the size of those side borders are;

8  right?

9            MR. MONACH:  Object to form.

10            THE WITNESS:  I didn't understand your

11  question.

12            I -- with regard to iPhones and tablets what?

13  BY MR. ZELLER:

14      Q.    Well, you told me that you think that there

15  are certain disadvantages in having to have a wider

16  border around the display?

17      A.    Of having a too wide border, yes.

18      Q.    And you talked about that specifically in

19  context of the iPhone; right?

20      A.    Yes.

21      Q.    And so my question is now a more general one.

22            Is it true that you also believe that it would

23  be disadvantageous for smartphones in general and

24  tablets in general to have to have wider as opposed to

25  more narrow borders?

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 122

1          MR. MONACH:   Objection.   Vague.

2    BY MR. ZELLER:

3        Q.    For those same reasons that you discussed in

4    connection with the iPhone?

5        A.    Your -- your question is -- is so vague I

6    can't give you a definitive answer.

7              In other words, wider -- wider than what and

8    up to what width?

9              In other words, it's -- it's all conditional.

10   These are the choices designers make that makes products

11   successful.

12             It could be too narrow.   It could be too wide.

13       Q.    We're talking about a particular design

14   aspect.

15             We're talking about the borders around the

16   display screens; right?

17       A.    Of?

18       Q.    On smartphones.

19       A.    Okay.

20       Q.    Right?

21       A.    Okay.

22       Q.    You'll agree with me that it is a design

23   disadvantage to have to have borders around the display

24   screen of a smartphone that are so wide that it would

25   either mean that the screen -- the active display screen

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 123

1    area is reduced or the phone size has to be increased;

2    right?

3              MR. MONACH:   Objection.   Vague and incomplete

4    hypothetical in light of his prior testimony.

5              THE WITNESS:   In -- in general terms, yes, I

6    would agree with that.

7    BY MR. ZELLER:

8       Q.    And the same is true with respect to tablet

9    computer design; right?

10             MR. MONACH:   Same objection.

11             THE WITNESS:   Yes, but to a lesser degree,

12   because there's a little more freedom in a tablet

13   computer just because of its size and the fact that it's

14   probably not designed to go in a pocket and whatnot.

15   BY MR. ZELLER:

16      Q.    The scale of it is -- is larger when you're

17   working with a tablet computer than you are with a

18   smartphone, so at least the space that you have to work

19   with is larger in the tablet computer arena?

20      A.    The -- the matte, if you will, around --

21   between the frame and the display screen, yes, you'd

22   have a little more leeway there, be less constrained.

23      Q.    In your view is it important to compare the

24   products to the -- the designs and the design patents

25   using the same scale?

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 124

1      A.    I think it helps in the analysis, and I did

2    that in my exhibits.

3           If you -- if you look, the photographs of the

4    products and the patent drawings are as close to being

5    the same scale as we could achieve.

6      Q.    And why is it you think it's most helpful or

7    it does help in the analysis?

8      A.    Well, it's just more of an apples-to-apples

9    comparison -- excuse the pun.

10     Q.    And please tell me, why do you say that?

11          Why do you think it makes it more

12   apples-to-apples?

13          I'm just trying to understand that part of it.

14     A.    Design patents have no dimensions, so they

15   know no specific size.

16          So to scale the drawings in a design patent to

17   the same scale or size as an accused product simply

18   makes the comparison an easier one to make.

19     Q.    Directing your attention back to Exhibit 65,

20   do you know whether as of the time that that product was

21   designed and manufactured as to whether or not there was

22   a minimum-sized border on the side that had to be used?

23          MR. MONACH:  Objection.  Form.

24   BY MR. ZELLER:

25     Q.    On the phone?

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 125

1      A.    No, I don't know if there was a minimum size.

2      Q.    You don't know what technical or commercial

3   constraints there were on the size of that side border

4   as of the time that this phone that was -- we've marked

5   as Exhibit 65 was designed or manufactured; is that

6   correct?

7           MR. MONACH:  Objection.  Vague.

8           THE WITNESS:  I don't agree with that, because

9   I don't even agree that it has to have a border at all

10  -- in the form of a matte between the display screen and

11  the edge of the cabinet.

12  BY MR. ZELLER:

13     Q.    You --

14           In your view, as of the time that this phone

15  we marked as Exhibit 65 was manufactured, that it was

16  technically commercially feasible to design,

17  manufacture, and sell a smartphone that had an

18  edge-to-edge active display area?

19           MR. MONACH:  Objection.  Form.

20           THE WITNESS:  If -- if you define

21  "edge-to-edge" like the display screen is being shown

22  here, it's going edge-to-edge, there is no mask, or

23  black mask, or frame between the edge of the product and

24  the display screen, then I think that's evidence or

25  proof that you don't have to have a black mask at all

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 153

1  appearance of the design, one -- that helps advance the

2  accessibility of the -- of the technology and makes it

3  also easier to use from the consumer perspective?

4      A.    That's the goal and purpose, and, if it's done

5  properly, it accomplishes that.

6          If it's done improperly, as it was done, for

7  example, on BMW's iDrive, then it makes it so complex

8  nobody can figure it out and they won't even buy the

9  car, which is a good case, an example of attempting to

10  simplify it, but having to go through so many steps to

11  turn the radio on that it became ridiculous.

12      Q.    To make sure we're still on the same page,

13  because I think I understand what you're saying, because

14  when you say it was the goal and the purpose here, is it

15  true that from your perspective the -- the appearance of

16  the iPhone designs and the appearance of the iPad

17  designs makes the technology itself more accessible to

18  people and makes it easier for them to use?

19          MR. MONACH:  Object to the form of the

20  question.

21          THE WITNESS:  Yes,  again, with the caveat

22  being that it's the ornamental appearance that I'm

23  referring to that -- that allows this to happen.

24  BY MR. ZELLER:

25      Q.    Right.

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 154

1          When you say "the ornamental appearance,"

2   again, we're talking about really your bailiwick here,

3   which is the -- the design of the product just simply

4   from an aesthetic point of view, and that it still has

5   -- it still reaches these goals and has this purpose you

6   mentioned of making the technology more accessible and

7   the technology easier to use?

8      A.    I would agree with that.

9      Q.    And you would also agree with me that the

10  three design patents that bring us here today, the 677

11  design patent, the 087 design patent, and the 889 design

12  patent, also have this kind of simplified design that

13  makes the technology easier for consumers to understand

14  and increases the ease of use; true?

15         MR. MONACH:  Object to form.

16         THE WITNESS:  Yes, that's true.

17  BY MR. ZELLER:

18     Q.    Now, as part of your -- your field of study

19  and design, do you look at ergonomics?

20         Is that something you -- you have a background

21  in?

22     A.    Sure.

23         All products are used by humans, and

24  ergonomics defines the interface between the product and

25  the user.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 155

1    Q.    Is there anything about the iPhone design that

2    you believe makes it easier to hold in the human hand?

3              MR. MONACH:  Object to the question as vague.

4              As compared to what?

5              THE WITNESS:  Easier than a brick?

6    BY MR. ZELLER:

7    Q.    Easier than other --

8              Well, let me ask this.

9              Are rectangular shapes something that -- that

10   are easy to hold for people?

11             MR. MONACH:  Object to form.

12   BY MR. ZELLER:

13   Q.    Is there ergonomic value to having a

14   rectangular shape to a phone?

15   A.    Easier than what shape?

16   Q.    I'm not even comparing it to anything.

17             Is it --

18             Is a rectangular shape something that you

19   believe is pleasant and easy for ordinary humans to hold

20   in their hand to use as a phone?

21             MR. MONACH:  Objection.  Vague and incomplete

22   hypothetical.

23             THE WITNESS:  No, no.  There's no hard rule

24   that this shape is better than that shape from an

25   ergonomic point of view.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 156

1          It's the goal of every designer designing

2    every cell phone that they want them to be comfortable

3    in their hand.

4          So ergonomics is always a consideration of the

5    designer, and yet we have a hundred different cell phone

6    designs all trying to achieve the same ergonomic goal.

7    BY MR. ZELLER:

8       Q.    I'm not asking you to compare.   I'm not asking

9    you for alternatives.

10          I'm asking you a very simple question.

11          Do you think that people find it comfortable

12    to hold a cell phone or a smartphone that is in the

13    shape of a rectangle?

14          MR. MONACH:   Objection.   Vague.

15          THE WITNESS:   Generally.

16    BY MR. ZELLER:

17       Q.    You agree with that generally; right?

18       A.    Uh-huh.

19       Q.    That's a "yes"?

20       A.    Generally.

21       Q.    That's a yes, generally; right?

22       A.    Yes.

23       Q.    And the same is true of using a rectangular

24    shape for a tablet computer; right?

25       A.    Again, it's -- it's hard to answer your

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 157

1  question specifically without comparison to other

2  shapes.

3          It's not an uncomfortable shape, but it may

4  not be more comfortable than some other shape.

5      Q.    Do you think that a rectangular shape for a

6  tablet computer is something -- a kind of shape that

7  people find easy and pleasant to hold -- as a product

8  shape?

9      A.    Easy and pleasant.

10          Maybe convenient.

11          I don't know if it's easy, or I don't know if

12  pleasant is sort of a personal attribute.

13          I don't know if people find it pleasant.

14      Q.    So you're more comfortable and you do agree

15  with the idea that -- and you do agree that having a

16  rectangular shape for a tablet computer is something

17  that people find more convenient to hold as -- as a

18  product shape?

19          MR. MONACH:  Objection.  Vague.

20          It's more convenient than what?

21          THE WITNESS:  They find it convenient.

22          I don't know that it's more convenient than

23  something else.

24  BY MR. ZELLER:

25      Q.    And why do you think it's a convenient shape

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 158

1    for tablet computers, just from a -- again, we're

2    talking now in the context of ergonomics.

3         A.    I don't think its convenience stems from

4    ergonomics.

5              I think it's convenient because throughout

6    history documents have been rectilinear in shape.

7              Whether they're magazines, or newspapers, or

8    any printed material is -- is usually in some form of

9    rectilinear shape.

10             So to -- have a hand-held device where you're

11   examining documents seems to be reasonable to mimic the

12   shape that history has predicated those documents.

13        Q.    In other words, just from a design

14   perspective, if you're going to design a product that

15   people are going to use to view documents and view other

16   things on one logical design choice would be put it in a

17   rectangular type form, something that people would be

18   used to holding and looking at?

19        A.    That would be one logical conclusion, yes.

20             (Thereupon the following portion of the

21             transcript has been designated "Highly

22             Confidential - Attorneys' Eyes Only" and

23             continues on page 149, line 1.)

24

25

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 169

1          I mean, there are -- components.

2          I mean, they have to have an energy source.

3    They have to have a battery.

4          I -- as to what's absolutely necessary, that's

5    probably about it.

6    BY MR. ZELLER:

7      Q.    Well, would you consider from a design

8    perspective a necessary feature of a smartphone to to be

9    a slot, or a hole, or some sort of aperture where sound

10   can come out?

11     A.    I think I said earlier there has to be a means

12   of inputting and outputting information.

13          That is a means of outputting information.

14          So I thought -- I think it's covered by that.

15          I certainly disagree with your

16   characterization that it has to be a slot.

17     Q.    But you agree with me that there needs to be a

18   speaker of some kind; right?

19     A.    It certainly would be a highly desirous

20   feature.

21          As to whether it's absolutely necessary, I --

22   I don't know.

23          (Discussion off the record)

24   BY MR. ZELLER:

25     Q.    Directing your attention to the iPhone that

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 170

1   we've marked as Exhibit 65, what would you say is the

2   shape of the speaker aperture that product?

3       A.    I've characterized it as a rounded horizontal

4   speaker slot.

5       Q.    And it's the same for what's depicted in the

6   087 design patent and the 677 design patent?

7       A.    Yes.

8       Q.    Why by your understanding is the speaker slot

9   in the 087 and the 677 design patents in that shape?

10      A.    I know of no reason why it need be in that

11  shape other than as an aesthetic choice on the part of

12  the designers.

13      Q.    To your knowledge was the first electronic

14  device with a speaker slot that was in the shape of this

15  slot that's depicted in the two design patents something

16  that was already known in the art as of the time that

17  the design patents were conceived of?

18      A.    I don't know the answer to that question.

19           I mean, there were hundreds of design patents

20  and products that had speakers on them.

21           It's conceivable that one of them might have

22  had a slot-shaped speaker opening.

23      Q.    You wouldn't be surprised to -- to find that

24  that was something already well-established in the art

25  as of the time that these designs patents were conceived

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 171

1  of; right?

2      A.     I'd be surprised if it was "well-established,"

3  as you called it.

4            I wouldn't be surprised if it existed.

5      Q.     Well, given then the full range of shapes that

6  you described as available to designers, why did Apple

7  designers choose to have this slot shape for the speaker

8  aperture?

9      A.     If you want to know why Apple designers

10 selected that ornamental shape, you'd have to ask them.

11           I really don't know why.  I've just not

12 discussed it with any of them.

13     Q.     Is the speaker slot hole as shown in the 087

14 and the 677 design patents positioned in some kind of

15 symmetrical way?

16     A.     It's symmetrical, yes.

17           It's centered left to right, if that's -- that

18 would constitute symmetrical, yes.

19     Q.     Is that how you view it?

20           Is that how you view the positioning of this

21 slot?

22     A.     I think that's an accurate description of its

23 location.

24     Q.     Do you have any understanding as to why that

25 speaker slot is in the upper fifth of the front of the

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 172

1    phone?

2        A.     Logically it would be in the upper portion

3    because that might correspond with your ear, but that

4    wouldn't mean that it needs to be centered left to right

5    or centered in the black mask area above the screen or

6    be of the shape or dimension that it is.

7        Q.     So then of all the design choices that were

8    available for the positioning of that speaker slot that

9    you just described, why is the speaker slot as depicted

10   in the 087 and the 677 design patent in the center?

11       A.     That's where the designers wanted it for

12   aesthetic reasons.

13       Q.     Any other reason?

14       A.     I can't think of any.

15       Q.     You just testified, I think, that when these

16   design patents were put in to fixed form, when they were

17   conceived of, the designers had quite a range of

18   possibilities as to where to put that speaker slot

19   relative to the two sides, right, and they put it in the

20   center; right?

21       A.     Yes.

22       Q.     By your understanding for cell phones,

23   electronic devices with speaker slots, as of the time

24   that these two design patents was conceived of, where

25   were the speaker slot positions?

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 173

1          MR. MONACH:  Object to the form of the

2     question -- if there is one.

3          THE WITNESS:  Well, when you say where were

4     the -- the prior art speaker slots located, I already

5     testified that there -- there may be a speaker slot in

6     the prior art.

7          Where they were located implies that there are

8     more than one or many of them, and I just don't know

9     that that's the case.

10    BY MR. ZELLER:

11        Q.    Well, in fact, on electronic devices as of the

12    time that these two design patents were conceived of and

13    first put in to some kind of written form, it was, in

14    fact, commonplace to have the speaker aperture

15    positioned centrally and in the upper fifth portion of

16    the device; right?

17        A.    I wouldn't disagree with that.

18        Q.    And it's true that one advantage in having a

19    speaker aperture that's in the form of a slot that runs

20    horizontally is that it certainly covers more area;

21    right?

22          MR. MONACH:  Object to the form of the

23    question.

24    BY MR. ZELLER:

25        Q.    Than say a pinhole?

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 177

1        THE WITNESS:  Yes, I believe they would be the

2    same design as demonstrated by the fact that the 087

3    patent, for example, both claims and disclaims the

4    button.

5        So, since a design patent can only claim one

6    design, they are -- it's one design, whether it has the

7    button or not.

8    BY MR. ZELLER:

9    Q.    In your view would an ordinary observer

10   consider the designs depicted in these two design

11   patents to be still substantially the same even if they

12   didn't have the center button and that speaker slot hole

13   was moved up closer to the top and then everything else

14   remained the same?

15       MR. MONACH:  Object to form.

16       THE WITNESS:  I believe they would, yes.  They

17   would consider them to be the same design -- or at least

18   substantially similar.

19   BY MR. ZELLER:

20   Q.    When you say "substantially similar," you're

21   saying substantially the same for purposes of design

22   patent analysis; right?

23   A.    Yes.

24       MR. ZELLER:  Let's please mark as Exhibit 66 a

25   multi-page document consisting of a copy of the

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 178

1    "Declaration of Cooper C. Woodring in Support of Apple's

2    Motion for a Preliminary Injunction."

3              (Exhibit 66 was marked for Identification.)

4    BY MR. ZELLER:

5        Q.    You recognize Exhibit 66 as your declaration?

6        A.    Yes, I do.

7        Q.    And, by the way, about how much time did you

8    personally spend on revising, drafting, writing, and

9    otherwise putting together the declaration we have in

10   front of you?

11       A.    I don't recall specifically, but probably

12   somewhere in the range of 20 or 30 hours.

13       Q.    And your declaration reflects that you're

14   being compensated at the rate of $360 an hour?

15       A.    Yes.

16       Q.    And that's still the case?

17       A.    Yes.

18       Q.    And does your compensation change depending on

19   whether you're testifying at a deposition, or at trial,

20   or doing other kind of work --

21       A.    No.

22       Q.    -- or does it just stay the same?

23       A.    Flat fee regardless of activity.

24       Q.    Directing your attention to paragraph 4 of

25   your declaration, which is Exhibit 66, do you see that

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 179

1    the -- you say that you have received the IDSA Personal

2    Recognition Award, which has been bestowed on only nine

3    designers in history?

4         Do you see that?

5    A.   Yes.

6    Q.   That's an incorrect statement; isn't it?

7    A.   No, it's not.

8         It had been bestowed on only nine designers in

9    history at the time that I received the award.

10        It has subsequently been granted to others.

11   Q.   You say here "which has been bestowed on only

12   nine designers in history."

13        It doesn't say only nine others had received

14   it before you; right?

15   A.   You might want to interpret "has" as "had."

16   Q.   How many people to date, in fact, have been

17   bestowed this recognition award in history?

18   A.   I think at the time I --

19        Well, I know at the time I received it there

20   had been only nine.  The Board of Directors had granted

21   the award only nine times previously.

22        I think they've gotten a little more liberal

23   with their recognition, which is well deserved, of

24   others, and it's probably been another nine or 10 since.

25   Q.   In fact, isn't it something like 27?

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 180

1      A.      In total?

2      Q.      Yes.

3      A.      If -- if you tell me that's the case, I

4    wouldn't disagree with it.

5      Q.      Directing your attention to paragraph 7, you

6    say here that -- in essence, that you do have experience

7    observing purchasers of consumer electronics; right?

8      A.      I did say that.

9      Q.      And that in your view qualifies you to testify

10   as an expert as to how an ordinary observer would

11   perceive and evaluate cellular phone and tablet computer

12   designs; correct?

13     A.      Yes.

14     Q.      And that's -- that's the basis of your -- your

15   expertise that you're claiming in this case; correct?

16             MR. MONACH:   Object to the form of the

17   question.

18             THE WITNESS:   Yes.

19   BY MR. ZELLER:

20     Q.      And then you say, "For example, during my

21   tenure at J.C. Penney it was estimated" and you talk

22   about your experience at J.C. Penney; right?

23     A.      I do.

24     Q.      And then you say you have personal experience,

25   firsthand experience, observing ordinary purchasers of

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 181

1    consumer electronics and that you purchased them

2    yourself and can speak from your own personal

3    experiences; right?

4         A.    Yes.

5         Q.    Now, other than what you did at J.C. Penney

6    and other than your own personal experiences, do you

7    have any other experience -- that -- in observing

8    purchasers of consumer electronics?

9         A.    Nothing more than -- having purchased them

10   myself and observing other people purchasing them

11   probably while I was purchasing them.

12         So, no, nothing more specific than what I've

13   stated here.

14         Q.    And just so it's clear then, the entirety of

15   what you're relying upon in order to base your

16   qualification -- your qualifications as an expert to

17   testify as to how an ordinary observer would perceive

18   and evaluate cellular phone and tablet computer designs

19   is based on your work at J.C. Penney, your own personal

20   experience in purchasing consumer electronics, and your

21   seeing others purchasing consumer electronics during the

22   course of the times when you've been purchasing them; is

23   that true?

24         A.    And -- and during times when I wasn't

25   purchasing them but maybe visited an Apple Store for a

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 182

1    -- to visit a Genius Bar or get an upgrade in software,

2    or whatever, yes.

3        Q.    And is that -- is it true that that's then the

4    totality of that experience that you're relying on for

5    that?

6        A.    Yes.

7        Q.    And I take it from your answer you have, in

8    fact, been in Apple Stores?

9        A.    Yes.

10        Q.    Is there a particular one you go to?

11        A.    Yes.

12        Q.    Which one?

13        A.    Providence Mall.

14        Q.    Not one of the ones in China, I take it?

15        A.    They're not really Apple Stores.

16        Q.    Just wanted to make sure they were authentic

17    ones.

18            And is it -- have you been to many Apple

19    Stores or is it really that one?

20        A.    I've been to several, but not many.

21        Q.    And most of your experience is that one in

22    Providence Mall?

23        A.    That's -- I've looked at others.

24            That's where I tend to do business, is with

25    that one.

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 183

1    Q.    In -- during your experiences there in the

2  Apple Store did you think that it was a store that was

3  similar to -- to J.C. Penney when you worked there?

4          MR. MONACH:  Object to form.

5          THE WITNESS:  Actually, no, I thought it was

6  quite different, and that's probably why J.C. Penney

7  just hired Ron Johnson from Apple as their new CEO.

8  BY MR. ZELLER:

9    Q.    You'll agree with me that the retail

10  environment there at J.C. Penney is not similar to the

11  retail environment of the Apple Store?

12    A.    I would agree with that.

13    Q.    Now, you've talked about how in your

14  declaration and a bit in your testimony here today about

15  your own personal experiences about purchasing consumer

16  electronics.

17          So you've purchased yourself cell phones?

18    A.    I have.

19    Q.    You, yourself, purchased smartphones?

20    A.    I have.

21    Q.    Which ones?

22    A.    I have a -- an Apple -- 32 gig whatever this

23  is.

24    Q.    3G?

25    A.    3G.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page  184

1           This is my second one.   First one went

2    overboard.

3           I purchased one for my daughter.

4           I've purchased -- iPads and -- a number of

5    computers.

6        Q.    Have you purchased any smartphones by

7    manufacturers other than Apple?

8        A.    No.

9        Q.    Have you purchased any tablet computers by

10   manufacturers other than Apple?

11       A.    No.

12       Q.    Do you have any knowledge or information about

13   -- the purchasers of smartphones other than Apple phones

14   in your own personal experience?

15          MR. MONACH:   Object to the form of the

16   question.

17          THE WITNESS:   Do I have any knowledge of them?

18          If they're in some way different than

19   purchasers of Apple smartphones, I -- I wouldn't be

20   aware of that.

21   BY MR. ZELLER:

22       Q.    Do you have any personal experience that gives

23   you knowledge or information about the purchasers of

24   tablet computers by manufacturers other than Apple?

25       A.    No, not specifically.

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 185

1      Q.   As we talked about before, when you were there

2   at J.C. Penney working in the -- what you're saying,

3   this retail environment of J.C. Penney, there were no

4   smartphones or tablet computers that were sold there;

5   right?

6           MR. MONACH:   Objection.   Asked and answered.

7           THE WITNESS:   That's correct.

8   BY MR. ZELLER:

9      Q.   What were the kinds of consumer electronic

10  products that were being sold at that time that you're

11  referring to here in your declaration?

12     A.   Well, I believe I included some -- an exhibit

13  showing some of the specific designs of them, but it

14  included some quite sophisticated audio equipment,

15  stereo equipment, telephones, radios, CB equipment,

16  television sets, VHS systems in that era.

17          That's about it -- consumer electronics.

18     Q.   And I take it those consumer electronics ran a

19  broad range of prices?

20     A.   Yes.

21     Q.   And I take it that those consumer products ran

22  a broad range of the amount of time and the care that

23  consumers put in to their purchasing decisions of those

24  various products; right?

25     A.   I wouldn't characterize it as "a broad range."

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 186

1           I'd say it was a --

2           Well, I guess it would be a broad range from

3      the cheapest radio to the most expensive stereo system.

4           Yes, it would be a fairly broad range.

5      Q.    Can you tell me how the length of time that

6      the typical consumers spent making the purchasing

7      decisions for these consumer electronic products that

8      you've described there at J.C. Penney compared to the

9      length of time that a typical consumer spends making a

10     purchasing decision for a smartphone?

11     A.    The consumer research that we did taught us

12     some broad generalities.

13          For example, we learned that about 70 percent

14     of all consumers who ever buy anything buy it at the

15     first store they go to.

16          So they make a preconceived notion that, you

17     know, pick, your example, if J.C. Penney has the kinds

18     of sheets or the sheet selection that I want to buy, so

19     they go to that one store, and they make a purchase, and

20     because they're predisposed to shop in that one retail

21     environment they've almost already made a decision, and

22     so the individual purchase decision once they get there

23     is far quicker than -- than we are typically aware of.

24          So a purchase decision at J.C. Penney on a --

25     clock radio for $25 may be two minutes, on an $800

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 187

1    television set it may be five minutes, but it's a lot

2    quicker than we think.

3        Q.     In general you do agree that consumers or

4    purchasers put more care in to a decision where they're

5    spending more money rather than less on something?

6        A.     In general, yes.

7               Let me revise that answer.

8               In general, yes, but there are obvious

9    exceptions, where -- where just the opposite would be

10   true.

11       Q.     Well, you don't have any reason to think

12   that --

13              Are you familiar with the term "impulse

14   purchase"?

15       A.     Of course.

16       Q.     You don't have any reason to think that

17   smartphones or tablet computers are what people would

18   consider to be impulse purchases; right?

19              MR. MONACH:  Object to form.

20              THE WITNESS:  Most people wouldn't.

21              A Saudi prince visiting the shopping mall in

22   Dubai may buy a dozen of them as an impulse purchase.

23              So there's always that kind of exception.

24   BY MR. ZELLER:

25       Q.     I take it you don't consider the Saudi prince

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 188

1   to be an ordinary purchaser of these kinds of goods

2   anyway?

3       A.    He's an extraordinary purchaser.

4       Q.    Do you have any reason to doubt that

5   specifically with respect to smartphones and tablet

6   computers that those products are, generally speaking,

7   in a price range where consumers spend and give more

8   attention to their purchasing decision than they do for

9   less expensive goods?

10          MR. MONACH:  Object to form.

11          THE WITNESS:  As a general rule, yes, I would

12   agree with that.

13          Again, there are exceptions that would drive

14   just the exact opposite opinion, however.

15   BY MR. ZELLER:

16      Q.    But as a general principle you agree with the

17   proposition that smartphones and tablet computers are in

18   a price range where consumers give more care to their

19   purchasing decision than they do or would for less

20   expensive products?

21          MR. MONACH:  Objection to the form.

22          THE WITNESS:  For the majority of the

23   population, I would agree with that.

24   BY MR. ZELLER:

25      Q.    Now, you'd mentioned, going back a little bit

Contains Highly Confidential - Attorneys' Eyes Only  Portions

1    here to your J.C. Penney experience, that some of the

2    information that you have about the retail environment

3    is based upon market research that you saw when you were

4    there?

5        A.    That I did while I was there.

6        Q.    Well, that you did, and you saw others, too?

7        A.    Yes.

8        Q.    Did you have other sources of information

9    about the habits and customs of the customers there at

10   J.C. Penney other than the market research?

11            Did you have other inputs?

12       A.    Sure.

13       Q.    What were those other ones?

14       A.    Well, personal experience.

15            As a designer, if I was asked to design a

16   sewing machine, which I was, the first thing I would do

17   is go out to the nearest store and sell sewing machines

18   for three days and learn a great deal about what

19   consumers do or don't like.

20            I then took sewing lessons to learn how to

21   sew.

22            And then I went to Japan and toured the

23   factory that manufactured our sewing machines for us,

24   and then came home and felt I was qualified to design a

25   sewing machine.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 190

1   But the most important of those three aspects

2   was attempting to determine what consumers' needs and

3   wants were at the point of purchase.

4   The others were sort of subservient to that.

5   Q.   Were there other sources of information that

6   you received when you were there at J.C. Penney

7   concerning the purchasing behavior of -- of customers

8   other than what you told me about so far?

9   A.   We -- we were a member of NRMA, National

10   Retail Merchants Association, and served on their Board

11   of Directors and whatnot, and they did broad base

12   consumer research that we were privileged to.

13   Some of it was very appropriate to our

14   customer, who tended to be -- an ordinary observer.

15   Others of it was more targeted to Tiffany or

16   Gucci and less applicable to our needs.

17   Q.   And is it true that you're relying upon this

18   -- these various sources of information that you

19   obtained when you were in J.C. Penney, including the

20   market research and the consumer research for your

21   opinions as to how you believe an ordinary observer

22   would perceive and evaluate the smartphone and tablet

23   computer designs that are at issue in this case?

24   A.   Yes.

25   Q.   And you would certainly agree with me that how

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 191

1    an ordinary observer would perceive and evaluate the

2    smartphone and tablet computer designs that are at issue

3    in this case would also be informed by consumer and

4    market research that Apple has done about reasons why

5    consumers purchase those products;?

6              MR. MONACH:   Objection to form.

7              THE WITNESS:   If I understood your question

8    accurately, I don't think consumers would have any clue

9    as to what Apples' consumer research showed.

10   BY MR. ZELLER:

11        Q.    No.  I'm not asking about consumers.

12              I'm asking about your -- your opinion here.

13              You told me that for purposes of your opinion

14   in this case, namely this conclusion about how an

15   ordinary observer would perceive and evaluate the

16   designs at issue, that you're relying at least in part

17   on the market research information that you received

18   while you were at J.C. Penney; right?

19        A.    Yes.

20        Q.    And you do understand that there are --

21   there's been market research done by Apple specifically

22   about the products that are at issue; right?

23        A.    Yes.

24              MR. MONACH:   Object --

25   BY MR. ZELLER:

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 192

1    Q.    In fact, we saw one example of that a little
2  earlier here today with the bar graph and other pages
3  that we talked about, which was Exhibit Number 14;
4  right?
5    A.    Yes.  Yes.
6    Q.    And you'll agree with me that that kind of
7  updated specific market research information about the
8  purchasing behavior of Apple's consumers is relevant to
9  determining how an ordinary observer would perceive and
10  evaluate the smartphone and tablet computer designs at
11  issue in this case; right?
12        MR. MONACH:  Object to the form.
13        THE WITNESS:  It's relevant, yes.
14  BY MR. ZELLER:
15    Q.    So please explain for me why you relied upon
16  consumer research, going back to this time period when
17  you were at J.C. Penney.
18        And I think you said you left in 1986?
19    A.    Yes.
20    Q.    For reaching your conclusions about how an
21  ordinary observer would perceive and evaluate the
22  designs at issue here, but you didn't consider or obtain
23  and weren't given Apple's market research that was
24  specifically directed to those products?
25        MR. MONACH:  Object to the form of the

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page  193

1    question.

2           THE  WITNESS:   Well,  as  I  stated  earlier,  I

3    think  there's  some  universal  truths,  if  you  can  call

4    that,  or  some  truisms  that  cut  across  time  frames  and

5    market  segments  that  I  relied  on  and  I  still  believe  are

6    true.

7           I  didn't  think  it  was  necessary  to  ask  Apple's

8    opinion.

9    BY  MR.  ZELLER:

10       Q.    It  certainly  occurred  to  you,  and  --  it  --

11   before  now  that  the  market  research  that  Apple  has  for

12   its  specific  products  that  are  at  issue  in  this  case

13   would  be  more  relevant,  and,  in  fact,  far  more  relevant

14   to  your  opinions  than  market  research  that  was  from  J.C.

15   Penney  in  the  1980s;  right?

16       A.    No,  I  wouldn't  agree  with  that  for  this

17   reason.

18          We're  trying  to  --  dissect,  or  classify,  or

19   segregate  this  --  this  ordinary  observer  which  --  which

20   I  think  we  all  agree  is  a  hypothetical  person.

21          There  is  no  such  real  person.

22          So  the  market  research,  specific  market

23   research  that  Apple  may  have,  may  or  may  not  even  apply

24   to  this  hypothetical  mythical  person.

25       Q.    Why  in  paragraph  7  of  your  declaration  did  you

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 194

1    cite and rely upon market research, other information

2    that you obtained about consumers from J.C. Penney, from

3    the 1986 and earlier time period as opposed to also

4    including updated information about the purchasing

5    behavior of consumers for smartphones and tablet

6    computer designs today?

7         A.    Well, I think I've answered that, but I'll try

8    again.

9              There are some universal truths that we

10   learned on a broad base that were true then and are true

11   now.

12             The more specific consumer research gets, like

13   why did you buy an Apple iPhone, because of design or

14   brand, the less reliable that consumer research becomes.

15             In fact, the -- the danger is that it becomes

16   erroneously wrong because the consumer interprets

17   questions often differently than they're asked, and

18   that's contrasted with the broader based more universal

19   kind of consumer research that we were doing at J.C.

20   Penney that I believe is sort of time honored.

21             It was -- it was true then, it's true now.

22             So, to the best of my ability, that's the

23   answer to your question.

24        Q.    Well, what specific empirical data do you have

25   to substantiate your assertion that market research and

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 196

1   were not given any market research specifically that

2   related to -- tablet computers or smartphones?

3          MR. MONACH:   Asked and answered.

4          To the extent it has a foundation, a portion

5   of the compound question, lacking in foundation.

6          THE WITNESS:   As an expert witness, I'm not an

7   advocate for Apple.

8          I -- I didn't want to know what they thought.

9   I didn't want to be influenced by their opinion.

10          I wanted to be an independent expert and give

11   my opinion.

12   BY MR. ZELLER:

13      Q.    So it was a -- it was a conscious decision on

14   your part to rely upon and cite consumer research from

15   J.C. Penney in the 1986 and prior time period that

16   didn't relate specifically to smartphones and tablet

17   computers and to deliberately shield yourself from

18   market research since that time that, in fact,

19   specifically relates to smartphones and tablet

20   computers; correct?

21      A.    Well, I don't think that accurately

22   characterizes my testimony, but I didn't --

23          I'll go this far with you.

24          I didn't think it was necessary for me to --

25   necessary or desirous for me to be my -- my opinion to

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 197

1    be influenced by Apple.

2        Q.    I'm not asking about in the abstract of it

3    being influenced by Apple.

4            I'm asking about specific market information.

5            You deliberately chose to rely upon the J.C.

6    Penney consumer information that you had from the 1980s

7    in lieu of getting up-to-date market research

8    information about smartphones and tablet computers;

9    right?

10       A.    For the reasons I've previously given, yes.

11       Q.    Do you have any knowledge or information as to

12   whether or not this market research that you're relying

13   upon for reaching an opinion about how ordinary

14   observers react to smartphone and tablet computer

15   designs bears any resemblance to the market research

16   that has been done, say, in the course of the last

17   decade about smartphones and tablet computers

18   specifically?

19       A.    I have no specific knowledge of any research

20   other than what I've seen today regarding smartphones

21   and tablet computers because neither existed in my --

22   during my watch at J.C. Penney.

23       Q.    But you have no --

24           You have no information and you don't know

25   whether or not the consumer research that you are

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 198

1    familiar with back in the J.C. Penney days is consistent

2    at all with the research that's been done in recent

3    years about the purchasing of smartphones and tablet

4    computers; right?

5              MR. MONACH:   Objection.   Vague.

6              THE WITNESS:   I -- I think I've already

7    answered that question in the sense that the -- the

8    research that we did was a -- of a broader base more

9    universal nature, and, therefore, tended to be more

10   accurate as opposed to the more specific detailed kind

11   of information that Apple has done here as to percent of

12   customers that bought their phone in a certain era

13   because of a specific reason for which we know the

14   consumers are unreliable.

15             So -- so I think that the research I'm relying

16   on is -- has good reason to be more accurate and

17   entirely appropriate.

18   BY MR. ZELLER:

19      Q.    Well, let's -- let's -- let's find out about

20   how this research was done.

21             Focusing your attention on the market research

22   that you're relying upon from J.C. Penney in the 1986

23   and earlier time period, what were the sample sizes of

24   the surveys that you're relying on?

25      A.    They varied from a mall intercept of half a

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 206

1    at all with your reliance upon market research from the

2    1986 and earlier time period from J.C. Penney in order

3    to reach your opinions in this case in lieu of any

4    market research undertaken in the course of the last

5    decade concerning smartphones and tablet computers;

6    right?

7              MR. MONACH:  Object to form.

8              THE WITNESS:  No, I don't find it unusual at

9    all in that all of this -- the whole consumer research

10   issue that we're discussing is all targeted toward what

11   a hypothetical ordinary observer might think.

12             So in that context I don't --

13             No, I don't think the it's unusual at all.

14             I think it's probably highly reliable.

15             MR. ZELLER:  Let's please mark as Exhibit 67 a

16   one-page document consisting of a design.

17             (Exhibit 67 was marked for Identification.)

18             MR. ZELLER:  Just so you know -- yeah, this is

19   the top part, the speaker hole.

20   BY MR. ZELLER:

21       Q.    Do you know what Exhibit 67 depicts?

22       A.    I could surmise it's a smartphone.

23       Q.    In your view is the design that's depicted

24   here on Exhibit 67 substantially the same as the design

25   that's depicted in Exhibit 6, which is the 087 design

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 207

1    patent?

2              MR. MONACH:  Object to the form of the

3    question.  Vague, and incomplete hypothetical.  Calling

4    for a legal conclusion without providing the required

5    information or adequate time.

6              But the witness can respond.

7              THE WITNESS:  Ask the question again.

8              Did I think it was what?

9    BY MR. ZELLER:

10        Q.    Do you believe that the design that's

11   reflected here on Exhibit 67 is substantially the same

12   from the perspective of the ordinary observer or

13   purchaser as the design that's depicted in the 087

14   design patent which is Exhibit 6?

15             MR. MONACH:  Same objection.

16             THE WITNESS:  Yes, it certainly is --

17   substantially the same in the eyes of the ordinary

18   observer of at least one embodiment of the 087.

19   BY MR. ZELLER:

20        Q.    And you would agree that it is also

21   substantially the same from the perspective of the

22   ordinary purchaser or observer as the design that's

23   depicted in Exhibit 7, which is the 677 design patent;

24   correct?

25             MR. MONACH:  Same objection.

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 208

1    THE WITNESS:  Probably.

2    I -- I can't answer that question

3 definitively, because the 677 claims the front surface

4 of an electronic device that is black, and the Exhibit

5 67 that you've shown me, there's no indication that the

6 front surface is black.

7 BY MR. ZELLER:

8    Q.    Well, let me rephrase it then.

9    Directing your attention to the design that's

10 reflected here in Exhibit 67, setting aside the color

11 limitation that's set forth in the 677 design patent, do

12 you believe that the ordinary observer or purchaser

13 would consider the overall design, again, saying aside

14 the color, of the design in Exhibit 67 to be

15 substantially the same as the design depicted in the 677

16 design patent?

17    MR. MONACH:  Object to the form of the

18 question.

19    Object for the reasons previously stated.

20    THE WITNESS:  Yeah, they're -- they're

21 substantially the same.

22 BY MR. ZELLER:

23    Q.    And specifically the -- the design that's

24 reflected here in Exhibit 67, you'll agree, has a -- has

25 a speaker slot that's smaller and more near the top than

TSG Reporting - Worldwide   877-702-9580

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 209

1   the design that's depicted in the 087 and the 677 design

2   patents; right?

3       A.    Yeah.   Yeah.   I'll answer yes, and I'll go

4   along with it.

5           If you want to be technical about it, it's a

6   slot.

7           There's nothing in a design patent that

8   teaches me that that's a speaker.

9       Q.    Well, if you know that this is a smartphone,

10  as you surmised when you saw it, that would at least

11  tend to suggest to you that that's a speaker slot;

12  right?

13      A.    It would do that.

14          It -- it just -- it's -- it doesn't prove that

15  it is, but we -- yes, we can assume that that is the

16  purpose.

17          The -- the 67 exhibit that you've given me

18  shows a -- you know, elonggated long end shape at the

19  top.

20          I don't know -- can't discern from this if

21  it's an opening, or a protrusion, or just an outline of

22  a racetrack.

23      Q.    Well, for purposes of the questioning I want

24  you to assume that the -- it's an electronic device.

25      A.    Okay.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 215

1    I wanted to make sure that I heard you
2  correctly and understood everything you said.
3    So all the elements, the major design elements
4  listed here in paragraph 16, are present in the design
5  we marked as Exhibit 67 except for the parts where it
6  says flat, clear, black colored, and inset, and as to
7  those you don't know?
8    MR. MONACH:  Object to the form of the
9  question.
10    To the extent -- if you're asking him to
11  testify, it's asked and answered.
12    If you're changing it each time you repeat it
13  over and over again, then it's mischaracterizing the
14  prior testimony.
15    Same standing objection to this line of
16  questions.
17    Go ahead.
18    THE WITNESS:  You're -- I think you're asking
19  me for an infringement analysis by -- by asking me
20  whether or not it is substantially the same in the eyes
21  of the ordinary observer.
22    That's a -- as I testified earlier this
23  morning, that's a lengthy, detailed, analytical
24  conclusion based on review of prosecution history and
25  file wrappers and prior art, and I'm not prepared to

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 216

1    give you a definitive answer to that here today.

2          I will say that it looks suspiciously similar.

3    BY MR. ZELLER:

4      Q.    I'm not asking for so-called infringement

5    analysis.  I'm asking something factual right now.

6          In paragraph 16 of your declaration you lay

7    out what you consider to be the major design elements of

8    the 677 design patent; right?

9      A.    Yes.

10     Q.    And I'm simply asking you whether you see in

11   this design that we marked as Exhibit 67 elements that

12   you've listed here in that design, and, if I understand

13   you correctly, you do see in Exhibit 67 all the major

14   design elements of the 677 design patent that you lay

15   out here except for the following:  Flat, clear,

16   black-colored and inset; right?

17         MR. MONACH:  Object to the form of the

18   question for the reasons previously stated.

19         Objection, asked and answered.

20         Object to the extent it misstates his prior

21   testimony.

22         THE WITNESS:  I believe that's correct.

23   BY MR. ZELLER:

24     Q.    Directing your attention to paragraph 31 of

25   your declaration, this is where you lay out in

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 217

1    subparagraphs A through E what you consider to be the

2    major design elements of the 087 design patent; is that

3    correct?

4         A.    Yes.

5         Q.    Are the elements that you list here in A as

6    the major design elements also present in the design we

7    marked as Exhibit 67?

8         A.    It would appear so.

9              MR. MONACH:   Hang on a second.

10             Same objection to this as with the previous

11   line of questioning about the 667, same objection to

12   lack of foundation in light of the witness' prior

13   testimony about what he can and can't glean from this.

14             Incomplete hypothetical.

15   BY MR. ZELLER:

16        Q.    You believe that those elements that are

17   described here in A are present in paragraph 31 -- are

18   present in the Exhibit 67 design; correct?

19             MR. MONACH:   Same objection.

20             THE WITNESS:   It would appear so, yes.

21   BY MR. ZELLER:

22        Q.    Focusing then on paragraph 31(b) of your

23   declaration --

24        A.    Let me go back to A for a minute.

25             I have -- there's no basis for determining

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 218

1    that it's flat

2         Q.    Okay.  Well, we'll exclude flat then.

3              So with respect to 31(b), the elements that

4    are listed here are present in the Ehibit 67 design with

5    the exception of potentially flat, because, as you say,

6    you can't tell from the design that you have in front of

7    you; right?

8         A.    Right.

9         Q.    Okay.  Then let's focus on paragraph B.

10             Other than the inset description, do you agree

11   that all the other elements that are listed here in

12   paragraph 31(b) of your declaration in describing the

13   087 design patent are present in this design we've

14   marked as Exhibit 67?

15             MR. MONACH:  Same objection.

16             THE WITNESS:  It would appear so, yes.

17   BY MR. ZELLER:

18        Q.    Are the design elements of the 087 design

19   patent listed in paragraph 31(c) of your declaration

20   present?

21             MR. MONACH:  Same objection.

22   BY MR. ZELLER:

23        Q.    In the Exhibit 67 design?

24        A.    Yes, to the extent that we could guess that

25   that racetrack shape opening is a slot, a slot implies

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 263

1    relying upon for your expert opinion as set forth in

2    your declaration as to what differences are minor or not

3    between the Samsung products and the -- the claimed

4    patented designs other than what you've told me about?

5         A.    Any other basis for my opinion?

6         Q.    Correct, for believing that consumers or that

7    the ordinary observers or purchasers would perceive

8    those differences to be minor.

9         A.    I will have to grant you this is somewhat of a

10   science -- somewhat of an art and not a science,

11   however, it is absolutely without question in my mind

12   that, say, the Galaxy S4 design has a slightly longer

13   and thinner speaker slot is a subtle nuance in a

14   difference in design compared with a -- a significant

15   feature of the front face being flat, and clear, and

16   black and whatnot.

17        Q.    I'm asking something different.

18              I'm trying to understand the bases for your

19   opinions about something.

20              You've offered an opinion in this case about

21   how ordinary observers, or consumers, or purchasers view

22   designs in this case; right?

23        A.    Yes.

24        Q.    And one aspect of that opinion that you've

25   offered is -- is that in your view ordinary purchasers

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 264

1   or ordinary observers would consider the differences

2   between the Samsung phones and the -- and the design

3   patents that are being claimed to be, quote, "minor

4   differences," end quote; right?

5       A.    Yes.

6       Q.    And so my question is, apart from the

7   qualifications you set forth in paragraph 7 of your

8   declaration and the qualifications we talked about

9   earlier here today in terms of your experience with

10  consumer market research, your work at J.C. Penney and

11  the like, and apart from the fact that you're a design

12  expert, do you have any other basis, factual basis, for

13  your opinion that the ordinary observer or the ordinary

14  purchaser would consider those differences to be, quote,

15  "minor differences," or do I have the complete bases

16  that you're relying on your opinion for that?

17      A.    The questions are getting longer and more

18  difficult to answer, but your question says -- asks me

19  is there anything I'm relying on other than being an

20  expert, and the answer is being an expert is enough.

21          That's why I'm an expert.

22          MR. ZELLER:  Should we take a break?

23          You need to talk to him.

24          I think -- if I'm not even going to get out of

25  him what the bases are for his opinion --

Contains Highly Confidential - Attorneys' Eyes Only  Portions

1       Take a break.  Take a break.

2       Why don't you talk to him.

3       MR. MONACH:  He's given the basis for his

4  opinions.  The problem is --

5       MR. ZELLER:  No.  He thinks -- he thinks

6  something is sufficient.

7       He's not answering my question.

8       MR. MONACH:  No.  The problem is you -- is you

9  restate --

10       MR. ZELLER:  Can we take a break?

11       MR. MONACH:  -- every question.

12       MR. ZELLER:  Because he claims to be losing

13  the thread of where we are.

14       We're going to take a break.

15       MR. MONACH:  We're not.

16       MR. ZELLER:  I'm not counting this time

17  against me.

18       MR. MONACH:  Five or six times.

19       MR. ZELLER:  You go talk to him, but clearly

20  I'm entitled to know what the bases are for when he says

21  something's minor or not.

22       Let's go off the record.

23       But I'm certainly not going to be wasting more

24  time on this since he obviously doesn't understand the

25  task of a record.

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 295

1    any case as an expert on consumer behavior in mobile

2    phone or tablet -- computer -- tablet computer markets;

3    correct?

4        A.    That's correct.

5        Q.    And you've never testified before this case as

6    an expert in the areas of smartphones or tablet computer

7    design; correct?

8        A.    That's correct.

9        Q.    And you've never testified as an expert before

10   this case on consumer behavior or perceptions as they

11   relate to smartphones or be tablet computer marekts;

12   correct?

13       A.    That's correct.

14       Q.    Does the Samsung Infuse 4G have a bezel?

15       A.    Can you produce one for me or show me one?

16             You know, as a test of my memory, I don't

17   recall.

18       Q.    I take it that prior to offering your opinion

19   in this case you actually examined the tangible physical

20   Infuse device to determine whether or not it had a

21   bezel; right?

22       A.    Yes, I did.

23       Q.    Directing your attention --

24             MR. MONACH:  That's it.  Time's up according

25   to the videographer.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 296

1          VIDEOGRAPHER:  Off the record?

2          MR. MONACH:   I just have a -- couple questions

3     for the witness.

4          MR. ZELLER:   That's, obviously, not proper at

5     all.

6          If he's going to stay here past seven hours,

7     you aren't going to interrupt me in the middle of my

8     questioning.

9          MR. MONACH:   You've had your seven hours.

10    You've done repetitive questioning.

11          You've asked him about lots of topics

12    unrelated to his declaration.

13          I'm allowed a very short -- which is all I

14    have to do -- redirect to clarify a question you asked

15    him about.

16                          EXAMINATION

17    BY MR. MONACH:

18     Q.    Mr. Woodring, in answering some questions by

19    counsel for Samsung, you testified that the design of

20    the iPad conveyed a sense of ease of use and access to

21    technology.

22          Later on, in a different framed question, you

23    agreed in substance that the designs increased ease of

24    use and accessibility of technology.

25          Do you recall that?

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 297

1      A.      Yes.

2      Q.      And, as a designer, when you use the term for

3  a -- an ornamental design ease of use what are you --

4  what do you mean by that?

5      A.      Ease of use from a -- from a designer's point

6  of view communicates through the ornamental appearance

7  or the aesthetic quality to the consumer.

8      Q.      Okay.

9      A.      If a -- to -- to an engineer, conversely, ease

10  of use might be related to the product's function.

11      Q.      Okay.

12      A.      But not --

13            Industrial designers don't -- don't design the

14  product's function.   They design the product's

15  appearance.

16      Q.      When you answered questions about -- along the

17  lines of conveying ease of use for design, were you

18  intending to offer an opinion about whether they

19  increased or had any effect on the actual functionality

20  of -- of a device?

21      A.      No.   The -- the -- one of the goals of an

22  industrial designer is to convey or communicate the ease

23  of use through the ornamental design, which may or may

24  not promise to actually deliver it.

25            I believe I cited the example of the BMW's

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 298

1    iDrive, which was designed to convey ease of use, but it

2    certainly didn't deliver it.

3       Q.    Okay.

4       A.    So attempting to communicate that through the

5    ornamental aspects of the design is no guarantee you're

6    going to get it.

7             MR. MONACH:   Okay.   Thank you.   That's it.

8             MR. ZELLER:   Well, let me ask one follow-up

9    question about what you've testified to.

10            It may be more than one, but I need to make

11   sure I understand something.

12                      FURTHER EXAMINATION

13   BY MR. ZELLER:

14      Q.    You said something to the fact that indusrial

15   designers design aesthetics?

16      A.    Yes.

17      Q.    What do you mean by that?

18      A.    They strive to make -- a product's appearance

19   appropriate, which may not always be beautiful.

20            A sledge hammer design may not seek to be

21   beautiful, but it certainly may seek to be appropriate.

22      Q.    It's true that it's commonplace for industrial

23   designers, when they receive an assignment from a

24   company to design a product, to get technical

25   specifications that they have to meet as part of this

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 305

1          I, CAROL S. NYGARD, a Certified Shorthand

2     Reporter of the State of California, duly authorized to

3     administer oaths, do hereby certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth; that

6     any witnesses in the foregoing proceedings, prior to

7     testifying, were duly sworn; that a record of the

8     proceedings was made by me using machine shorthand which

9     was thereafter transcribed under my direction; that the

10     foregoing transcript is a true record of the testimony

11     given.

12          Further, that if the foregoing pertains to the

13     original transcript of a deposition in a Federal Case,

14     before completion of the proceedings review of the

15     transcript was not requested.

16          I further certify I am neither financially

17     interested in the action nor a relative or employee of

18     any attorney or party to this action.

19          IN WITNESS WHEREOF, I have this date

20     subscribed my name:

21          Dated: August 6th, 2011

22

23     _____

24     CAROL S. NYGARD, CSR #4018

25