# EXHIBIT
# 6

S. Hrg. 100–104

# THE INDUSTRIAL INNOVATION AND TECHNOLOGY ACT

# HEARING

BEFORE THE

## SUBCOMMITTEE ON
## PATENTS, COPYRIGHTS AND TRADEMARKS

OF THE

## COMMITTEE ON THE JUDICIARY
## UNITED STATES SENATE

### ONE HUNDREDTH CONGRESS

FIRST SESSION

ON

## S. 791

A BILL TO AMEND THE COPYRIGHT LAW, TITLE 17 OF THE UNITED STATES CODE, TO PROVIDE FOR PROTECTION OF INDUSTRIAL DESIGNS OF USEFUL ARTICLES

―――――

MARCH 26, 1987

―――――

### Serial No. J-100-9

―――――

Printed for the use of the Committee on the Judiciary



U.S. GOVERNMENT PRINTING OFFICE

73-604                        WASHINGTON : 1987

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

S521-50

## COMMITTEE ON THE JUDICIARY

JOSEPH R. BIDEN, Jr., Delaware, *Chairman*

EDWARD M. KENNEDY, Massachusetts
ROBERT C. BYRD, West Virginia
HOWARD M. METZENBAUM, Ohio
DENNIS DeCONCINI, Arizona
PATRICK J LEAHY, Vermont
HOWELL HEFLIN, Alabama
PAUL SIMON, Illinois

STROM THURMOND, South Carolina
ORRIN G. HATCH, Utah
ALAN K. SIMPSON, Wyoming
CHARLES E. GRASSLEY, Iowa
ARLEN SPECTER, Pennsylvania
GORDON J. HUMPHREY, New Hampshire

Mark H. Gitenstein, *Chief Counsel*
Diana Huffman, *Staff Director*
Dennis W. Shedd, *Minority Chief Counsel*

---

### SUBCOMMITTEE ON PATENTS, COPYRIGHTS AND TRADEMARKS

Dennis DeConcini, Arizona, *Chairman*

EDWARD M. KENNEDY, Massachusetts
PATRICK J. LEAHY, Vermont
HOWELL HEFLIN, Alabama

ORRIN G. HATCH, Utah
ALAN K. SIMPSON, Wyoming
CHARLES E. GRASSLEY, Iowa

Edward H. Baxter, *Chief Counsel and Staff Director*

(II)

# CONTENTS

## STATEMENTS OF COMMITTEE MEMBERS

Page

DeConcini, Hon. Dennis, a U.S. Senator from the State of Arizona, chairman, Subcommittee on Patents, Copyrights and Trademarks ..................................... 1
Hatch, Hon. Orrin G., a U.S. Senator from the State of Utah ............................... 7

## PROPOSED LEGISLATION

S. 791, a bill to amend the copyright law, title 17 of the United States Code, to provide for protection of industrial designs of useful articles............................. 3

## CHRONOLOGICAL LIST OF WITNESSES

Rich, Hon. Giles S., U.S. Court of Appeals, Federal Circuit, Washington, DC .... 8
Woodring, Cooper C., President, Better Mousetraps, Inc., Plandome, NY, and Chairman of the Board, Industrial Designers Society of America ..................... 31
Thompson, William S., Patent Counsel, Caterpillar, Inc., Peoria, IL, representing the Industrial Design Coalition ............................................................... 39
Richardson, Joseph E., III, Richardson Brothers Co., Sheboygan Falls, WI, representing the American Furniture Manufacturing Association .................... 63
Newtson, Gary L., Chief Patent Counsel, Chrysler Motors Corp., Highland Park, MI, representing the Motor Vehicle Manufacturers Association ............ 69
Hiestand, Jean C., General Counsel, State Farm Mutual Automobile Insurance, Bloomington, IL, accompanied by James Fitzpatrick, Washington Counsel, State Farm Mutual Automobile Insurance .......................................... 87
Alegi, August P., Vice President and Deputy General Counsel, GEICO, representing the National Association of Independent Insurers ............................ 147
Romano, Malcolm J., Patent Counsel and Assistant Secretary, Lear Siegler, Inc., Santa Monica, CA ......................................................................................... 16C

## ALPHABETICAL LIST AND MATERIAL SUBMITTED

Alegi, August P.:
    Testimony ........................................................................................................ 147
    Prepared statement ........................................................................................ 152
    Letters to Senator DeConcini:
        April 13, 1987 ............................................................................................ 157
            Attachment: Claims Complaint............................................................ 158
        Response to 11 questions............................................................................ 159
        Response to an additional question from Senator Leahy .......................... 161
Hiestand, Jean C.:
    Testimony ........................................................................................................ 87
    Prepared statement ........................................................................................ 90
        Appendix A—"Cosmetic Replacement Parts and Auto Repair Practices," from Advisory, January 1987 ...................................................... 105
        Appendix B—Statement of Brian O'Neill, Insurance Institute for Highway Safety, before the Oregon Department of Commerce, November 24, 1986.................................................................................... 107
            Attachment: Summary Description, 49 CFR Part 571, Federal Motor Vehicle Safety Standards ......................................................... 111

IV

|  | Page |
|---|---|
| Hiestand, Jean C.—Continued | |
|   Prepared statement—Continued | |
|     Appendix C—Letters to: | |
|       Josephine M. Driscoll, CPIW, Insurance Commissioner, Department of Commerce, Insurance Division, Commerce Building, Salem, OR, from Brian O'Neill, President, Insurance Institute for Highway Safety, November 26, 1986 | 115 |
|       Senator DeConcini, from James F. Fitzpatrick, of Arnold & Porter, Washington, DC, April 9, 1987 | 116 |
|     Answers submitted by those opposing design protection for automobile crash parts | 118 |
|       Appendix A: Letter to Senator DeConcini, from Edward J. Muhl, President, NAIC, March 26, 1987 | 131 |
|     Answers to questions submitted by Senator DeConcini | 132 |
|     Attachment: After Market Parts Model Regulation | 141 |
|     Answers to questions submitted by Senator Leahy | 143 |
| Newtson, Gary L.: | |
|   Testimony | 69 |
|   Prepared statement | 73 |
|   Letter to Senator DeConcini, from William H. Crabtree, Vice President and General Counsel, MVMA, April 15, 1987 | 81 |
| Rich, Giles S.: | |
|   Testimony | 8 |
|   Prepared statement | 11 |
|     Attachment A: Copy of a 1963 statement to the House subcommittee | 15 |
|     Attachment B: Letter to Congressman Kastenmeier, April 20, 1976 | 23 |
|   Letter to members of the Coordinating Committee on Designs of the National Council of Patent Law Associations, November 12, 1958 | 27 |
| Richardson, Joseph E., III: | |
|   Testimony | 63 |
|   Prepared statement | 65 |
|   Questions and answers | 68 |
|   Letter to the Subcommittee on Patents, Copyrights and Trademarks, from Joseph G. Gerard, Vice President, American Furniture Manufacturers Association, March 27, 1987 | 69 |
| Romano, Malcolm J.: | |
|   Testimony | 162 |
|   Prepared statement | 163 |
| Thompson, William S.: | |
|   Testimony | 39 |
|   Prepared statement | 42 |
|   Statement before the Intellectual Property Working Group, Economic Policy Council, April 1, 1987 | 49 |
|   Responses to questions submitted by Senator DeConcini, April 13, 1987 | 54 |
|   Answers submitted by supporters of Industrial Design Protection, April 7, 1987 | 57 |
|   Overview of Economic Impact: Case studies/examples | 62 |
| Woodring, Cooper C.: | |
|   Testimony | 31 |
|   Prepared statement | 34 |

## APPENDIX

### ADDITIONAL STATEMENTS AND COMMENTS

| | Page |
|---|---|
| Statement concerning the Industrial Innovation and Technology Act, submitted by William T. Fryer III, Professor, University of Baltimore School of Law | 173 |
|   Enclosures: | |
|     Various newspaper and magazine articles | 177 |
|     H.R. 20, a bill to amend the copyright law, title 17 of the United States Code, to provide for protection of ornamental designs of useful articles, 97th Congress | 199 |
| Testimony of Ron Stone, Executive Director for Governmental Affairs of the National Marine Manufacturers Association, in support of S. 791 | 210 |
| Statement of Ralph Oman, Register of Copyrights and Assistant Librarian for Copyright Services | 213 |

V

| | Page |
|---|---|
| The Industrial Innovation and Technology Act of 1987 (S. 791): Comments on proposed amendments by the Motor & Equipment Manufacturers Association (MEMA) | 248 |
| Attachment: Proposed amendments to S. 791 | 250 |

CORRESPONDENCE

| | Page |
|---|---|
| Letters to Hon. Dennis DeConcini, chairman, Patents, Copyrights and Trademarks, from: | |
| HTS High Technology Solutions, March 20, 1987 | 251 |
| Enclosure: Letter from Congressman Hamilton Fish, February 25, 1987 | 254 |
| Varityper, March 20, 1987 | 256 |
| The Company, March 23, 1987 | 257 |
| Automotive Service Industry Association, March 24, 1987 | 258 |
| Esselte Letraset, March 24, 1987 | 261 |
| International Typeface Corporation, March 24, 1986 | 262 |
| National Association of Manufacturers, March 26, 1987 | 263 |
| The Murray Ohio Manufacturing Co., March 31, 1987 | 264 |
| Dresser Industries, Inc., March 31, 1987 | 265 |
| Mehler, Frantz, Conlon, Knapp, Phelan & Varnum, April 2, 1987 | 266 |
| DP, April 10, 1987 | 268 |
| Enclosure: Letter to Senator Charles Mathias, July 23, 1986 | 270 |
| Attachment: "Foreign inventors appear to have patent on ingenuity," from the Atlanta Constitution, July 17, 1986 | 272 |
| IPO, April 20, 1987 | 273 |

# THE INDUSTRIAL INNOVATION AND TECHNOLOGY ACT

---

### THURSDAY, MARCH 26, 1987

U.S. SENATE,
COMMITTEE ON THE JUDICIARY,
SUBCOMMITTEE ON PATENTS, COPYRIGHTS AND TRADEMARKS,
*Washington, DC.*

The Subcommittee on Patents, Copyrights and Trademarks met, pursuant to notice, at 2:07 p.m., in room 226, Dirksen Senate Office Building, Hon. Dennis DeConcini [chairman of the subcommittee] presiding.

Also present: Senators Hatch and Grassley.

Staff present: Ed Baxter, majority chief counsel and staff director; Tara McMahon, majority counsel; Cecilia A. Swensen, legislative aide; and Randy Rader, minority chief counsel.

### OPENING STATEMENT OF HON. DENNIS DeCONCINI, A U.S. SENATOR FROM THE STATE OF ARIZONA

Senator DeCONCINI. The subcommittee will come to order.

The subcommittee meets this afternoon to hear testimony on a bill introduced last week by Senator Hatch and myself on industrial design protection, Senate bill 791, the Industrial Innovation and Technology Act of 1987.

It is not novel legislation; in fact, we are pleased to have as our first witness today the Honorable Giles Rich, who was one of the original drafters of similar legislation proposed in the 1950's. Judge, we're very pleased you're here.

The climate has changed, however, over the years; and in 1987 the legislation has become a necessity, not only domestically, but internationally.

We see in the headlines every day evidence that the industrial competitiveness of the United States has been slipping, that America's innovativeness is on the decline. For the past 25 years we in America have seen our share of world trade take a nosedive. For 70 years this Nation was a creditor Nation, but those times seem to have gone. Over the past two decades we have seen our balance of trade go from a surplus of $5 billion in 1960 to an incredible deficit of $170 billion last year. This is the largest trade deficit of any country at any time in history.

What is our track record in the area of intellectual property? In 1985, 6 of the 10 corporations which received the largest number of U.S. patents were foreign controlled. Ten years ago, less than a third of the top ten corporations were foreign controlled. With

(1)

2

design patents, the statistics are even more revealing. The U.S. Patent Office issues about 3,000 design patents a year. Japan, by contrast, issues over 30,000 design registrations each year. Over 60,000 are issued in West Germany. Other industrial countries like ours, such as the United Kingdom and France, issue similar high numbers of design registrations.

I have no doubt that Americans are well equipped to do innovative work which equals or surpasses that of any trading partner. The best way to turn around U.S. competition is to make sure that we have a climate that will make it more profitable to compete. The best way to turn around American inventiveness is to make sure that we establish a climate that will make it more profitable to invest.

I know that American business is not looking for any special advantages, just a fair shot, a level field to play on. I believe that this legislation would extend to U.S. manufacturers and designers the same type of intellectual property protection that is offered by our major trading partners to their businesses. It would fill the void that exists within our current system. Commercial pirates of the marketplace can now take for their own profits, with minimal cost to themselves, the most successful and creative work of designers. This translates into a loss of American jobs and a disincentive to companies to invest in new product research and development. A limited 10-year period of protection under this bill would enable the owners of designs to prevent unauthorized imitation of their products, the so-called knock-offs which create unfair competition in the market.

The bill provides incentives to American manufacturers and designers to develop innovative and better designs themselves. For a limited time, owners will be able to protect their designs from others who would use them without having borne the cost of research and development. Design protection encourages fair competition and extend intellectual property protection to an area of creative innovation in which America is preeminent.

I look forward to hearing our witnesses today comment on the industrial design protections and on the specific legislation that is before us. I do welcome their suggestions on ways to make this legislation even better.

[S. 791, as printed in the Congressional Record of March 19, 1987, follows:]

you name it and you give its title and you pay a small fee. I've forgotten what it is now. I think it was $6 a few years ago.

In the Patent Office, you file an application and the patent must meet the requirements of novelty and utility. Well, it has to take its place in line until some skilled engineering school graduate examiner can get around to looking through all the prior art that he has available—classified, as you know, in the Patent Office—to see whether he can find anything like it or anything the same, and then make a judgment as to whether it is unobvious in view of the prior art that he has found. And this takes a while, and the chances are very high that his first "office action," so-called, will be a rejection, after which the applicant has another few months to respond—the statute says 6; the office cuts it down to 3—and then there will be another action. And the Patent Office has been struggling for years to cut down the time of examination, which has run very high at times, maybe 5 years. They have a goal of 18 months by 1988, I think it is, something like that, and that's why I said in my prepared statement that the average time might be about 2 years, by which time many designs have lost their fashion appeal and they're gone.

With a copyright-type of registration, it can be all over in a couple of weeks, perhaps.

Senator HATCH. Sure.

Now, you indicated that an exemption depends upon the facts. What are the facts, for instance, that would support an exemption in the garment industry?

Judge RICH. Well, I don't know of any facts to support it except that that group doesn't like it and thinks they're better off without it. It's sort of——

Senator HATCH. So it's a political judgment, then?

Judge RICH [continuing]. Pro and con; attitude changes through time. When I was promoting this legislation before I was a judge, the main opposition was coming from the automobile industry, the manufacturers. Now I see they're here to support the bill.

Personally, to get the thing rolling and to get something better for the great bulk of people who can use this design law, I would rather see an exemption or two to get on with it.

Senator HATCH. OK. Thank you.

Senator DeCONCINI. The Senator from Iowa?

Senator GRASSLEY. Judge Rich, I want your comments, please, on the 10-year term of protection, whether or not that's adequate, whether or not you think it ought to be shorter or lengthened.

Judge RICH. All time periods in protection are arbitrary. We started out with a 5-year term back in 1957, with a 5-year renewal. I'm inclined to think that it makes more sense to have a fixed term with no renewal, and I think 10 is a pretty good compromise. The patent term is 17; the copyright is life of the author plus 50 or 75 years. I think 10 is about right.

Senator GRASSLEY. OK, thank you.

Mr. Chairman, I have no further questions.

Senator DeCONCINI. Thank you, Senator Grassley.

Judge Rich, thank you very much.

Judge RICH. I brought another present for you.

31

Senator DeConcini. Good. I need presents. I don't want those fenders though.

Judge Rich. In the early days of this legislation, the Copyright Office was actively supporting it—and I might say that I have recalled five successive Copyright Registers who have backed this bill; they began with Arthur Fisher and include his successors, Abe Kamenstein, George Cary, Barbara Ringer, and David Ladd, and where the present Register stands I haven't found out yet—at that time Arthur Fisher said to me, "look, I shouldn't be pushing the legislation, and now that you're a judge, you shouldn't be pushing it; we ought to organize a committee." So we created, in New York City, the NCEDL, the National Committee for Effective Design Legislation, and we put in as executive director a man named Alan Latman, a great scholar who was at the time working for Arthur Fisher. Alan Latman became a professor at NYU Law School; he was the author of two successive books on copyrights. At the beginning of NCEDL he wrote a pamphlet, Protection for Designs, which gave all of the best arguments that we could think of at that time, and I have an extra copy. It came out in February 1959, and I'd like to leave it with you.

Senator DeConcini. Thank you. Thank you, Judge. We're going to have a historic library here if you'll just stay there a little bit longer.

Judge Rich. Well, I have two filing cabinets full that I would be glad to get rid of. [Laughter.]

Senator DeConcini. Thank you. Thank you, Judge Rich, very much; I appreciate your being here.

Judge Rich. Thank you.

Senator DeConcini. Our first panel is going to be Mr. Cooper Woodring, president, Better Mousetraps, Inc.; Mr. William Thompson, patent counsel, Caterpillar, Inc.; Mr. Joseph Richardson III, Richardson Brothers Co.; and Mr. Gary Newton, chief patent counsel, Chrysler Corp. If you would all come forward.

Gentlemen, your full statements will appear in the record, if you would like to summarize them for me.

Mr. Woodring, would you begin?

## STATEMENT OF COOPER C. WOODRING, PRESIDENT, BETTER MOUSETRAPS, INC., PLANDOME, NY, AND CHAIRMAN OF THE BOARD, INDUSTRIAL DESIGNERS SOCIETY OF AMERICA

Mr. Woodring. Thank you.

In 1871, Ralph Waldo Emerson said, "If a man maketh a better mousetrap, the world will beat a path to his door." For almost 100 years we have assumed that this meant that the world was eager to buy an improved product. Recently, we find that many are in fact beating a path to plagiarize the better idea.

For years, America has prided herself on the benefits of Yankee ingenuity. We have been enamored with the values of competition and innovation in American industry; yet we face a situation wherein original design in the United States is almost defenseless against copying. Japan, West Germany, Korea, and Taiwan have been diligent in providing protection for their original designs while still free to copy ours. The lack of low-cost, timely and easy

to obtain design protection is reducing the quality of American products, thereby making them less competitive in the world market.

On behalf of the Industrial Designers Society of America let me state up front that we strongly support passage of this legislation to provide protection of industrial designs; and I, as chairman of that organization, welcome the opportunity to testify before this subcommittee.

The Industrial Designers Society of America, IDSA, is the national nonprofit organization of professionals who design consumer products, equipment, instruments, furniture, and transportation.

To create innovate products and services which satisfy both clients and consumers, industrial designers work with manufacturers to specify appropriate and cost-effective materials and production processes. They apply human factors considerations to ensure comfort, safety and ease of use. They determine the appropriate form, color, and texture that will appeal to the targeted consumer segment.

There are approximately 6,000 industrial designers practicing in the United States today, both as consultants and within corporations. It is estimated that the average individual designer annually affects over $100 million of the U.S. gross national product, the highest impact of any design professional and 50 times the economic impact of the average architect.

The Gallup Organization completed a study in 1985 of how U.S. business uses industrial design and what it considers to be industrial design's major contribution. A startling highlight from the Gallup study is that senior business executives rate industrial design as 60 percent responsible for the success of any new product; 23 percent rated industrial design's contribution at 80 percent or more.

However, this should not be surprising when given the essence of the industrial designer's contribution, for it is the industrial designer who is responsible for the attributes of the product which you like best—the elegant VCR which you can operate without having to study a manual for 2 hours; the handsome office chair that doesn't cause a backache, and the antifreeze bottle which funnels the liquid into the radiator, not onto the engine.

The United States faces a serious problem wherein the appearance of new, innovative American products are being copied with impunity. This undermines industrial design innovation and rewards the purveyors of imitation goods. Its effect has been to hamper American competitiveness in the global marketplace, thereby reducing American jobs.

Currently, the appearance of useful objects—including most features integrally related to the product function—cannot be copyrighted in the United States, unlike other countries which provide protection for original industrial designs. Here, the only protection available for the design of a useful product is a design patent, which takes a minimum of 14 months before it affords protection. By then the copiers, usually offshore, have already done their damage and achieved their market share. The cost of prosecuting a design patent becomes economically unrealistic in most cases.

33

As technological advances diminish product life cycles, legislation that will improve and speed up the protection process is vital. If the design creativity and innovation of individuals who are 60 percent responsible for a new product's success and who on average each affect over $100 million of our GNP are important to the competitive health of American trade, shouldn't we provide effective protection for their intellectual property?

IDSA strongly urges passage of this industrial design protection legislation for two reasons.

One, the consumers will be protected. The design and product development process is a long and expensive one in which the product's appearance integrates technology, function, user considerations and consumer appeal. It is certainly debilitating both to the company and to the designer to see a ripoff that captures only the superficial appearance, but these ripoffs can also cheat consumers who think they are buying well-conceived products only to discover that they have purchased less functional and often unsafe merchandise.

No. 2, U.S. products will be more competitive. The current U.S. design patent process takes so long, and without a retroactive basis to receive payment, that it is currently estimated that Japan protects 10 times and West Germany 30 times as many industrial designs as does the United States. Each of those countries, by the way, has less industrial designers than does this country. By providing immediate protection when one shows a new design in public, this legislation will make it possible to prosecute infringers within a reasonable time.

All consumers, whether domestic or international, want to buy products which are well designed; that is, aesthetically pleasing, functional, safe, and easy to use. No one can be induced to buy what they consider to be a poorly designed product. Passage of this legislation will make it much more likely in the global marketplace that it will be an American product which is being bought.

We commend Senator DeConcini for his foresight in holding these hearings and pledge our cooperation to the subcommittee in any way which would further the goals and objectives of a fair and effective U.S. trade policy.

[The prepared statement of Mr. Woodring follows:]

34

Testimony of Cooper C. Woodring, FIDSA
Chairman of the Board
Industrial Designers Society of America
March 26, 1987


In 1871 Ralph Waldo Emerson said: "If a man make a
better mousetrap the world will beat a path to his
door." For most of the past 100 years we have assumed
this meant that the world was eager to buy an improved
product. In 1987 we find that many are in fact beating
a path to plagiarize it.

For years America has prided itself on the benefits of
Yankee ingenuity. We have been enamored of the values
of competition and innovation in American industry.
Yet, we face a situation wherein original design in the
United States is almost defenseless against copying.
Other countries such as Japan, West Germany, Korea and
Taiwan have been diligent in providing protection for
original designs. Here, the lack of low-cost, timely
and easy to obtain copyright protection is reducing the
quality of American products, thereby making them less
competitive in world markets.

On behalf of the officers and members of the Industrial
Designers Society of America (IDSA) let me state
upfront that we strongly support passage of legislation
to provide for protection of industrial designs, and
welcome the opportunity to testify before this
Subcommittee.

IDSA is the national nonprofit organization of
professionals who design products, equipment,
instruments, furniture and transportation.

First founded during the 1930s, IDSA currently
consists of 1900 professionals in 24 chapters
nationwide. The Society's major purposes are:

35

* To foster high standards of professional integrity;

* To create and make available a body of professional literature;

* To recognize outstanding design achievement;

* To assist in the development of quality educational programs in industrial design; and

* To encourage the development of innovative and responsible products.

IDSA establishes curriculum standards for baccalaureate degree programs in industrial design; sets ethical standards for professional practice; publishes a professional journal, monthly newsletter, annual directory and statistical profiles; and conducts conferences, awards programs and public information programs.

INDUSTRIAL DESIGN PROFESSION

To create innovative products and services which satisfy both clients and customers, industrial designers:

* Work with manufacturing to select appropriate, cost-efficient materials and production processes;

* Apply human factors considerations to ensure comfort, safety and ease of use; and

* Determine the appropriate form, color and texture that will appeal to the customer.

There are approximately 6250 industrial designers practicing throughout the United States today as

36

consultants and within corporations.  It is estimated
that the average industrial designer annually affects
over $100 million of the U.S. Gross National
Product--the highest impact of any design
professional.

**INDUSTRIAL DESIGN'S ROLE IN BUSINESS AND TRADE**

The Gallup Organization completed a study in 1985 of
how U.S. business uses industrial design and what it
considers to be industrial design's contribution.

A startling highlight from the Gallup study is that
**senior business executives rate industrial design as
60 percent responsible for the success of a product.**
Twenty-three percent (mostly from small, fast-growing
companies) rated industrial design's contribution at
80 percent or better.

However, this should not be surprising given the
essence of the industrial designer's contribution.
For it is the industrial designer who is responsible
for those features of a product which you like best:
the elegant VCR which you can operate without having
to study a manual for two days; the handsome office
chair which doesn't cause you a backache; and the
antifreeze bottle which funnels the liquid into the
radiator and not onto the engine.

**PROBLEM**

The United States faces a serious problem wherein the
appearance of new, innovative American products are
being copied with impunity.  This undermines
industrial design innovation and rewards the
purveyors of cheap, imitation goods.  Its effect has
been to hamper American competitiveness in the global
marketplace, thereby reducing American jobs.

Currently, the appearance of useful articles
(including most features integrally related to
product function) cannot be copyrighted in the United
States, unlike West Germany, Japan, Korea and others
which provide copyright protection for original
industrial designs. Here, the only protection
available for the design of a useful product is a
design patent, but a design patent takes a minimum of
14 months before it affords protection. By then, the
copiers (usually offshore) have already done their
damage and achieved their market share. The cost of
prosecuting a design patent becomes economically
unrealistic in most cases.

As technological advances diminish product life
cycles, legislation that will improve and speed up
the protection process is vital. If the design
creativity and innovation of individuals who are 60%
responsible for a product's success and who on
average affect over $100 million of our GNP are
important to the competitive health of American
trade, shouldn't we provide effective protection
against pirating?

**INDUSTRIAL DESIGN PROTECTION LEGISLATION**

The Industrial Designers Society of America (IDSA)
strongly urges passage of this industrial design
protection legislation for two main reasons.

1.   Consumers Will Be Protected

The design and product development process is a long
one in which the product's appearance integrates
technology, function, user considerations and appeal.
It is certainly debilitating to both a company and
its designers to see a rip-off that captures only the
superficiality of style. But, these rip-offs also
cheat consumers who think they are buying a

38

well-conceived design only to discover they have
purchas.d less functional and often unsafe merchandise.


2.  U.S. Products Will Be More Competitive

The current U.S. design patent process takes so long
(and without a retroactive basis to receive payment)
that it is currently estimated that Japan protects 10
times and West Germany 30 times as many industrial
designs as does the United States.  By providing
immediate protection when one shows a new design in
public, this legislation will make it possible to
prosecute infringements within a reasonable time.
This will encourage more companies to develop
well-designed products without the fear that their
investment in design will be undercut.

The low cost and ease of filing copyright protection
under the proposed legislation will also encourage
more small entrepreneurs to invest in original
design.  Better designed U.S. products mean more
successful American products, a reduction in the U.S.
trade deficit, and more jobs.

CONCLUSION

All consumers, whether domestic or international,
want to buy products which are well-designed, i.e.
aesthetically appealing, functional, safe and easy to
use.  No one can be induced to buy what they consider
to be a poorly designed product.  Passage of this
legislation will make it much more likely that in the
global marketplace it will be an American product
which is being bought.

We commend Senator DeConcini for his foresight in
holding these hearings, and pledge our cooperation to
the Subcommittee in any way which would further the
goals and objectives of an effective U.S. trade policy.

39

Senator DECONCINI. Thank you, Mr. Woodring.
Mr. Thompson?

## STATEMENT OF WILLIAM S. THOMPSON, PATENT COUNSEL, CAT-ERPILLAR, INC., PEORIA, IL, REPRESENTING THE INDUSTRIAL DESIGN COALITION

Mr. THOMPSON. Mr. Chairman, I am William Thompson, patent counsel of Caterpillar, Inc., and on behalf of my company and the Industrial Design Coalition, I am pleased to testify this afternoon in support of S. 791, the Industrial Innovation and Technology Act of 1987.

The Industrial Design Coalition is an ad hoc group of companies and trade associations spanning a wide range of consumer products and capital goods. This diverse group of over 30 companies and trade associations is concerned about the growth of competition of look-alike products and the lack of meaningful intellectual property protection to protect designs. It was formed in 1985 to seek congressional passage of industrial design legislation like S. 791.

Today, in this highly competitive economic environment, product designs are an important marketing tool. The industrial designer in his attempts to integrate form and function offers the consumer the choice of a product that not only looks attractive, but also functions properly to meet specific needs. This often requires the collective efforts of research, engineering, and marketing disciplines at considerable development cost. The end result—a useful article with a distinctive shape—often has a high commercial value and is worthy of protection from blatant copying.

Mr. Chairman, let me focus on Caterpillar, Inc., and our interest in this legislation.

Headquartered in Peoria, IL, Caterpillar, Inc., is a multinational company which designs, manufactures, and markets a wide array of earth-moving, construction, material handling and farm machinery, as well as diesel and turbine engines. The company employs 54,000 men and women around the world, 36,000 in the United States.

Aftermarket parts are a major segment of the worldwide construction industry sales and profits, representing between $10 billion and $15 billion annually. Replacement parts for machinery of the scale manufactured by Caterpillar are necessarily expensive. A large bulldozer which retails for $350,000 will consume about $250,000 in parts over its lifetime.

Since parts breakage or failure means expensive, nonproductive downtime for these commercial machines, Caterpillar has developed an extensive computerized network linking our 23 warehouses to assure around-the-clock availability of over 450,000 parts. Minimizing downtime allows our customers to operate their businesses at lower costs; in fact, this is so important that we deliver parts anywhere in the world within 48 hours.

The worldwide network of 23 warehouses enables us to maintain our leadership position in construction machinery, sales, and service.

In recent years, we have experienced a growing influx of look-alike parts, competing head-to-head with genuine Caterpillar parts.

40

This resemblance, we believe, is not accidental; it's a purposeful effort to confuse the customer or the repair shop about the parts' origin and leave the impression that the look-alike and the Caterpillar parts are indeed the same.

To illustrate what is happening in the parts business today, let me point to two examples. The first is a set of photographs that compare a Caterpillar bucket tip and corner guard adapter with a product manufactured by a competitor. The corner guard fits at this location [indicating] on a bucket on the vehicle. Let me point out that several designs could have been chosen, but Caterpillar has determined that this particular shape was the best in blending form and function. Notice that the competitor's design is the same as Caterpillar's, yet the manufacturing process is different. For the consumer, such differences will be keyed to product life and performance and to the integrity of the overall product.

In the case of the fuel injection nozzles, we have examples of both counterfeit and look-alike problems. First, a genuine Caterpillar nozzle; there is a distinctive indentation in the casing caused by the manufacturing process. Compare this with a smooth German competitor's nozzle, which can be successfully used in the same application. Again, several designs can be used without affecting function, and I might point out that we have no objection to the use of this different-looking nozzle.

Now let's look at an example of a counterfeit nozzle in a counterfeit package. No doubt the Caterpillar trademark was infringed, and we took successful legal action based on trademark law in this particular case.

Senator DeConcini. Where was that made?

Mr. Thompson. That was in Los Angeles.

Next, a differently designed fuel nozzle packaged in a white cardboard box; no problem so far. But when we open the box we find that the manufacturer has wrapped the nozzle in a counterfeit polybag, creating a trademark infringement actionable under current law.

The last example shows a nozzle identical to Caterpillar's, having the indentation, in a generic polybag; not having a trademark usage, but a factual statement. Under current intellectual property rights, the manufacturer is free to sell this nozzle even though it is an exact copy of the shape of the Caterpillar part.

Again, these parts look exactly the same, but their manufacturing processes are different. The competitor manufacturer intentionally added the outside indentation after the initial machining process in order to conform his nozzle shape to Caterpillar's.

It is not uncommon, as in the example used by the computer chip industry in successfully arguing for design protection for mask works, for a copyist to even duplicate errors.

Mr. Chairman, the coalition and Caterpillar believe that S. 791 is a balanced approach to addressing the problems of our current design patent system. The scope of legislation is correctly narrow, requiring copying of the design to be actionable. The requirement for filing a registration and the issuance of a design certificate is desirable to let the public know what is protected and what is not.

The sui generis form of copyright protection is much better suited to protecting industrial designs than our existing patent