# EXHIBIT
# 7

# DESIGN INNOVATION AND TECHNOLOGY ACT OF 1991

# HEARING

BEFORE THE

## SUBCOMMITTEE ON INTELLECTUAL PROPERTY AND JUDICIAL ADMINISTRATION

OF THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

### ONE HUNDRED SECOND CONGRESS

SECOND SESSION

ON

## H.R. 1790

DESIGN INNOVATION AND TECHNOLOGY ACT OF 1991

JANUARY 29, 1992

## Serial No. 102



Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE

64-784 CC          WASHINGTON : 1993

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-040719-2

H521-50.

## COMMITTEE ON THE JUDICIARY

### JACK BROOKS, Texas, *Chairman*

DON EDWARDS, California
JOHN CONYERS, JR., Michigan
ROMANO L. MAZZOLI, Kentucky
WILLIAM J. HUGHES, New Jersey
MIKE SYNAR, Oklahoma
PATRICIA SCHROEDER, Colorado
DAN GLICKMAN, Kansas
BARNEY FRANK, Massachusetts
CHARLES E. SCHUMER, New York
EDWARD F. FEIGHAN, Ohio
HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
HARLEY O. STAGGERS, JR., West Virginia
JOHN BRYANT, Texas
MEL LEVINE, California
GEORGE E. SANGMEISTER, Illinois
CRAIG A. WASHINGTON, Texas
PETER HOAGLAND, Nebraska
MICHAEL J. KOPETSKI, Oregon
JACK REED, Rhode Island

HAMILTON FISH, JR., New York
CARLOS J. MOORHEAD, California
HENRY J. HYDE, Illinois
F. JAMES SENSENBRENNER, JR., Wisconsin
BILL McCOLLUM, Florida
GEORGE W. GEKAS, Pennsylvania
HOWARD COBLE, North Carolina
LAMAR S. SMITH, Texas
CRAIG T. JAMES, Florida
TOM CAMPBELL, California
STEVEN SCHIFF, New Mexico
JIM RAMSTAD, Minnesota
GEORGE ALLEN, Virginia

JONATHAN R. YAROWSKY, *General Counsel*
ROBERT H. BRINK, *Deputy General Counsel*
ALAN F. COFFEY, JR., *Minority Chief Counsel*

---

### SUBCOMMITTEE ON INTELLECTUAL PROPERTY AND JUDICIAL ADMINISTRATION

### WILLIAM J. HUGHES, New Jersey, *Chairman*

JOHN CONYERS, JR., Michigan
MIKE SYNAR, Oklahoma
PATRICIA SCHROEDER, Colorado
DAN GLICKMAN, Kansas
BARNEY FRANK, Massachusetts
CHARLES E. SCHUMER, New York
RICK BOUCHER, Virginia
MEL LEVINE, California
GEORGE E. SANGMEISTER, Illinois

CARLOS J. MOORHEAD, California
HOWARD COBLE, North Carolina
HAMILTON FISH, JR., New York
F. JAMES SENSENBRENNER, JR., Wisconsin
CRAIG T. JAMES, Florida
TOM CAMPBELL, California

HAYDEN W. GREGORY, *Counsel*
ELIZABETH FINE, *Assistant Counsel*
EDWARD O'CONNELL, *Assistant Counsel*
LINDA C. HALL, *Editor*
PHYLLIS HENDERSON, *Staff Assistant*
VERONICA L. ELIGAN, *Staff Assistant*
THOMAS E. MOONEY, *Minority Counsel*
JOSEPH V. WOLFE, *Minority Counsel*

(II)

# CONTENTS

## HEARING DATE

| | Page |
|---|---|
| January 29, 1992 | 1 |

## TEXT OF BILL

| | |
|---|---|
| H.R. 1790 | 2 |

## OPENING STATEMENT

Hughes, Hon. William J., a Representative in Congress from the State of New Jersey, and chairman, Subcommittee on Intellectual Property and Judicial Administration ........................................................................... 1

## WITNESSES

Baroody, Michael, senior vice president, policy and communications, National Association of Manufacturers .......................................................... 69

Castle, Rita L., chairwoman, the Design Coalition, accompanied by Bruce Lehman, attorney, Swidler & Berlin ................................................... 50

Cunningham, William J., legislative representative, Department of Legislation, American Federation of Labor and Congress of Industrial Organizations ........................................................................................ 62

Jackson, Les, director of technical services, National Institute of Governmental Purchasing, Inc. ............................................................ 159

Kanjorski, Hon. Paul E., a Representative in Congress from the State of Pennsylvania ....................................................................................... 44

Parish, Rhonda J., assistant general counsel, Wal-Mart Stores, Inc., on behalf of the International Mass Retail Association ....................................... 136

Sharoff, Brian, president, Private Label Manufacturers Association, accompanied by Arthur M. Handler, counsel .................................... 166

Silbergeld, Mark, director, Washington office, Consumers Union, on behalf of Consumers Union and Consumer Federation of America ................. 112

Woodring, Cooper C., chair, Task Force on Design Legislation, Industrial Designers Society of America, on behalf of Better Mousetraps, Inc. ........ 79

## LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARING

Baroody, Michael, senior vice president, policy and communications, National Association of Manufacturers: Prepared statement .......................... 71

Castle, Rita L., chairwoman, the Design Coalition: Prepared statement .......... 53

Cunningham, William J., legislative representative, Department of Legislation, American Federation of Labor and Congress of Industrial Organizations: Prepared statement ..................................................... 64

Gephardt, Hon. Richard A., a Representative in Congress from the State of Missouri: Prepared statement ...................................................... 37

Jackson, Les, director of technical services, National Institute of Governmental Purchasing, Inc.: Prepared statement ......................... 161

Kanjorski, Hon. Paul E., a Representative in Congress from the State of Pennsylvania: Prepared statement ................................................. 47

Michel, Hon. Robert H., a Representative in Congress from the State of Illinois: Prepared statement .......................................................... 35

Parish, Rhonda J., assistant general counsel, Wal-Mart Stores, Inc., on behalf of the International Mass Retail Association: Prepared statement ............... 139

(III)

IV

|  | Page |
|---|---|
| Sharoff, Brian, president, Private Label Manufacturers Association: Prepared statement | 168 |
| Silbergeld, Mark, director, Washington office, Consumers Union, on behalf of Consumers Union and Consumer Federation of America: |  |
| Advertisement by Nissan, "Our New Pricing Policy is a Better Way to Make Ends Meet," Fuel Line magazine, January 1992, at 20 | 115 |
| Letter from John C. Datt, executive director, Washington office, American Farm Bureau Federation (with attachment), to Chairman William J. Hughes, January 23, 1992 | 116 |
| Prepared statement | 118 |
| PRNewsWire article re announcement of price reduction on General Motors collision parts, January 17, 1992 | 114 |
| Synar, Hon. Mike, a Representative in Congress from the State of Oklahoma: Prepared statement | 42 |
| Woodring, Cooper C., chair, Task Force on Design Legislation, Industrial Designers Society of America, on behalf of Better Mousetraps, Inc.: |  |
| Analysis of how design protection has enhanced innovation in foreign countries | 94 |
| Prepared statement | 81 |

APPENDIXES

| Appendix 1.—Statement of Hon. Hamilton Fish, Jr., a Representative in Congress from the State of New York | 193 |
|---|---|
| Appendix 2.—Statement of Bethlehem Steel Corp. | 195 |
| Appendix 3.—Statement of J.D. Stryker, manager, product development power tool, Material Handling Division, Ingersoll-Rand Co. | 196 |
| Appendix 4.—Press release issued by the Design Coalition, January 29, 1992 | 199 |
| Appendix 5.—Letter from Peter M.C. Choy, chairman, American Committee for Interoperable Systems (ACIS), to Chairman William J. Hughes, Subcommittee on Intellectual Property and Judicial Administration, June 26, 1992 | 201 |
| Appendix 6.—Summary and position on design protection, Coalition for Auto Repair Equality (CARE) | 204 |
| Appendix 7.—Article by Iain C. Baillie, Ladas & Parry, London, "A Frustration of Good Design," Opinion: [1991] 9 EIPR at 315 | 208 |
| Appendix 8.—Data base reports from the Insurance Information Institute, November 1991 | 212 |

# DESIGN INNOVATION AND TECHNOLOGY ACT OF 1991

## WEDNESDAY, JANUARY 29, 1992

HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON INTELLECTUAL PROPERTY AND
JUDICIAL ADMINISTRATION,
COMMITTEE ON THE JUDICIARY,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:10 a.m., in room 2237, Rayburn House Office Building, Hon. William J. Hughes (chairman of the subcommittee) presiding.

Present: Representatives William J. Hughes, John Conyers, Jr., Mike Synar, Patricia Schroeder, Dan Glickman, George E. Sangmeister, Carlos J. Moorhead, Howard Coble, and F. James Sensenbrenner, Jr.

Also present: Representative Michael J. Kopetski.

Staff present: Hayden Gregory, counsel; Elizabeth Fine, assistant counsel; Veronica Eligan, staff assistant; and Thomas E. Mooney, minority counsel.

## OPENING STATEMENT OF CHAIRMAN HUGHES

Mr. HUGHES. The Subcommittee on Intellectual Property and Judicial Administration will come to order. Good morning.

The Chair has received a request to cover this hearing, in whole or in part, by television broadcast, radio broadcast, or still photography, or by other similar methods. In accordance with committee rule 5(a), permission will be granted unless there is objection. Is there objection?

Hearing none, permission is granted.

This morning, this subcommittee will begin consideration of an important and complex issue, protection for industrial designs. H.R. 1790, the Design Innovation and Technology Act, was introduced last year by the distinguished majority leader, Mr. Gephardt of Missouri; and the ranking minority member of our subcommittee, Mr. Moorhead of California; and the minority leader, Mr. Michel. Cosponsors also include a number of members of this subcommittee. The bill would create freestanding intellectual property protections for industrial designs.

[The bill, H.R. 1790, follows:]

75

The only winners in this situation are the copiers.

Even if awarded a design patent, design protection is far from assured if subjected to litigation: approximately two-thirds of challenged design patents are invalidated by the courts. In addition, the long pendency period of design patent applications (currently 32 months) can render such protection meaningless in an era of increasingly short product life cycles.

## International Comparisons

Most of our international trade competitors clearly recognize the value of design and protect them much more effectively than does the United States. The copyright-like systems employed elsewhere work well: they protect innovative designs, they stimulate design competition and they do so with a minimum of disruption or litigation.

Although not directly addressed by H.R. 1790, there is another international consideration to U.S. design protection. The lack of clear and effective protection in the United States weakens our bargaining position in pushing for higher international standards of intellectual property protection in the GATT and other negotiations. That is, how can the United States credibly press for better standards of protection for intellectual property rights when it neglects to do so itself? While we need not be driven by these external factors, we should be aware of their impact.

The United States is virtually alone in the industrialized world in applying patent-type protection to designs rather than easier to obtain copyright-type protection. Needless to say, this puts U.S. designers and manufacturers at a serious disadvantage compared with their foreign counterparts.

5

76

**The Design Innovation and Technology Act**

NAM believes that H.R. 1790 would greatly improve our design protection system and will close a significant gap in our intellectual property protection regime, thereby contributing to overall U.S. competitiveness.

While I will not present a detailed review H.R. 1790, I would like to offer some comments on two specific issues. The first deals with the confusion surrounding what is and is not protectable. The language in §1001 of the bill clearly stipulates a design must be "original," must be embodied in a useful article and must make the article "attractive or distinctive in appearance to the purchasing or using public." These criteria greatly limit the eligibility of a design for protection under the proposed new Chapter 10. Further, §1032 makes it clear this protection is prospective only and has no impact on extant designs.

NAM believes the purpose of intellectual property protection is to stimulate and reward innovation and creativity, *not* to restrict that which is already in the public domain. Thus, in listing those designs not protectable, §1002 correctly excludes designs that are not original, are staple or commonplace, or are dictated solely by a utilitarian function of the article that embodies it.

In addition, protection would not be available for the design of "that portion of the article shape dictated by the mechanical interface, perimeter, or envelope restrictions necessary to permit the physical and functional substitution" of the article. In other words, replacement parts would be perfectly legal so long as they did not slavishly copy the original, distinctive and discretionary design portion of the original article.

The second specific issue I should like to comment on concerns §1029, the relation of

6

77

this new Chapter 10 to existing design patent law.  This section stipulates that issuance of a
design patent (or copyright registration) shall terminate any protection of the original design
under the new chapter.  NAM strongly opposes this section of the bill.  In fact, NAM's
Intellectual Property Task Force voted last July to condition our support of H.R. 1790 on this
section's removal.  We regard this language as unnecessary and too narrowing, particularly in
light of the high rate of design patent invalidation.  For example, a design owner would have
to give up the design protection under proposed Chapter 10 if the recipient of a design patent.
If that design patent were subsequently invalidated, the design owner would then be left without
any protection whatsoever.  We urge the subcommittee to remove this needless language from
the bill.

### Opposition to Effective Design Protection

Opponents of this and other forms of intellectual property protection often attempt to characterize
their positions as "pro-consumer" or "anti-monopolist."  The National Association of
Manufacturers strongly rejects these characterizations.  The substitution of pirated copies and
imitations for true *choices* is not in consumers'—or anyone's—long-term interests.  Further,
NAM believes that unauthorized appropriation of intellectual property should be treated the same
way as unauthorized appropriation of material property: as theft.

   We recognize that certain industry sectors have expressed concern over some of H.R.
1790's specific language.  NAM and other members of the Design Coalition have always
expressed our willingness to work with these parties to arrive at an equitable solution.  We
remain ready to do so.

7

78

**Conclusion**

The list of cosponsors of H.R. 1790 is indicative of the wide-ranging support this issue enjoys, as is the very composition of this panel of witnesses.  Design protection is an issue that is important to manufacturers, important to creativity and innovation, and important to U.S. competitiveness and jobs.  It is also a issue of basic fairness.  The National Association of Manufacturers urges you to enact this much needed improvement in U.S. intellectual property law.

Again, thank you for this opportunity to express our concerns on this issue.  I will be glad to answer any questions you might have.

Mr. CONYERS. Our final witness on panel one is a person I have always wanted to meet in my years in Congress, somebody that would come here on behalf of Better Mousetraps, Inc.

This is a high point in my career, sir, and I have waited a long time to meet you, and you are here at last before us. Let's hear from you.

## STATEMENT OF COOPER C. WOODRING, CHAIR, TASK FORCE ON DESIGN LEGISLATION, INDUSTRIAL DESIGNERS SOCIETY OF AMERICA, ON BEHALF OF BETTER MOUSETRAPS, INC.

Mr. WOODRING. Good morning, and thank you. Thank you for inviting a designer to testify on behalf of the Industrial Designers Society of America.

Business Week states the designer is the one who conceives what form the product should take. Without designers, neither engineers nor marketers can do their magic. It is the designer whose creations define a corporation to those who buy its product. Meeting consumers' needs is the prime criterion of industrial design. The design process begins by anticipating consumers' needs and wants and proceeds to researching the consumers' physical and behavioral patterns. This knowledge assures us that the design will be safe and easy to operate.

The designer also investigates manufacturing processes and materials capabilities to improve quality and cost efficiencies. The goal is to achieve a design of original form that is distinctive, attractive, and communicates the product's function. Quality, performance, and manufacturing processes are all predicated by the product's design process.

In contrast, when we view current patent laws as they are written, an engineer determined the product's function and an artisan decorated the results. Neither existing utility nor design patent laws protect today's industrial designs where the form and the function are inseparable. H.R. 1790 responds to today's reality. Every major industrialized nation in the world today, except the United States, acknowledges industrial design's contribution with laws to protect this national resource.

A society speaks most clearly through its laws. The United States is speaking clearly. Our message: It's OK to steal our designs. In fact, it is not even stealing; we have no laws to the contrary. This message must change if we want American business to invest in design research and development such that we can compete in Europe and the Pacific Rim.

What is worth stealing is worth protecting. We have laws to protect the theft of our films, our music, and our chips. We must include the design of American's manufactured goods if we wish to slow the importing of $150 billion a year worth of manufactured goods. These are the products of design, many preferred because of superior design and many created by world-class American designers. The brain drain goes on.

I represent thousands of professional designers who create original, distinctive designs. Their products, in and of themselves, would not be protected. What would be protected is limited to the appearance, but only if the design is discretionary, original, and

distinctive. Exempt from production are appearances that are commonplace.

Mr. Chairman, many have asked the question, what is an original design, and what is commonplace? I would like to answer them by submitting the design of two squeegees. The exempt design came from the local hardware store. The Cleret—this version [indicating squeegee]—exquisitely designed and manufactured in the United States, received our Industrial Design Excellence Award.

The Cleret's design is clearly discretionary, original, and distinctive. It makes obvious that there is more than one way to design a squeegee. Most importantly, this example demonstrates that the retailers' and consumers' choices will be expanded by design and at lower price points than the generic version.

Your consideration of H.R. 1790 should not be limited to the positive impact on our balance of trade where each $1 billion of trade deficit equates to approximately 20,000 more American jobs but should include the question of why this one society has singled out this one profession to be exempt from the kinds of incentives that are offered to all others and by all others.

Industrial designers may be exceptional, but we don't deserve to be made an exception. Allow me one personal example. My father served as FDR's Secretary of War. When he came into office, his department designed all war materiel itself. Competitive bidding meant low price and low quality. He changed the process to require the bidder to design to department specifications. Now the bidder had strong incentive not only to meet but to beat the specifications. The first contract awarded under his new process was for a general purpose vehicle, code named GP, nicknamed Jeep. Another was for the B–17, for which he coined the term "Flying Fortress." This one small change in the process caused rather ordinary people to make extraordinary contributions.

You now have a similar opportunity to redesign the process that you control to stimulate design innovation and technology in the United States, and at a time when we can certainly use it. I hope you will realize the need for change, for it is your process that predicates our results.

Thank you.

Mr. HUGHES [presiding]. Thank you very much, Mr. Woodring.

[The prepared statement of Mr. Woodring follows:]

81

PREPARED STATEMENT OF COOPER C. WOODRING, CHAIR, TASK FORCE
ON DESIGN LEGISLATION, INDUSTRIAL DESIGNERS SOCIETY OF
AMERICA, ON BEHALF OF BETTER MOUSETRAPS, INC.

Thank you for allowing an industrial designer to testify on this important
legislation. I'm proud to represent the Industrial Designers Society of America
(IDSA) at this hearing.

*Business Week*, in it's special issue on innovation, stated, "The designer is the
one who conceives what form the original product should take, the one who
renews an aging product line. Without designers, neither engineers nor
marketers can do their magic. So in the end, it is the . . . designer whose
creations define what a corporation is—what image it will have among the
people who buy its products. "

Today, industrial designers, manufacturers and ever more discerning
consumers are joined together in a global economic network.  Design has
become an international language, linking together the ideals and aspirations
of people the world over.

Successful products in today's consumer-driven market are designed to satisfy
the consumer's needs and wants. In fact, concern for benefiting the consumer is
a prime criterion of industrial design.

Anticipation of the consumer's needs and wants is where the product design
process begins.  Careful research spans the consumer's physical abilities and
requirements for comfort as well as the consumer's thinking processes and
behavioral patterns. This information helps to ensure that the design will be safe
and easy to operate.  It is this concern for the consumer that explains why good
design has become a prime purchasing criterion.

1

82

The design process goes on to investigate manufacturing processes and materials capabilities, seeking to identify opportunities for improved quality and cost efficiencies. Industrial designers have been known to break long-standing quality and safety gridlocks through design innovation that makes the most of new manufacturing technologies.

The design process also entails an exploration of possible configurations that embody the information produced by the research, an exploration that begins with sketches, is refined through three-dimensional models and ends in the detailed perfections for manufacture achieved through prototypes. The goal here is to achieve an appealing, appropriate, comfortable, easy to use and safe form, an original form that distinctively and attractively expresses the function.

As you can see, the design process is no mere styling exercise, but a thorough investigation into both opportunities and limitations. Investments in industrial design are significant. Their returns can be remarkable. The Ford Taurus comes to mind as a well-documented case study.

As the internal mechanisms and electronics of products have shrunk in bulk, these components have come to play a less significant role in determining a product's shape. Today, it is industrial designers—with their concern for the consumer's needs and wants—who play the determining role in a product's form and how that form supports the function. Quality, performance, manufacturing processes and materials are all predicated by the product's design process.

2

83

When one examines IDSA's annual awards for excellence in design, one sees this integration of function and appearance. The product's insides and outsides have been inseparably married such that the resultant integration could have been created only by an industrial designer—or, as we are more commonly called, a product designer. We create what consumers in other nations refer to as everyday art—art that infuses useful objects with practicality, safety, convenience, comfort and affordability in addition to a distinctive appearance attractive to the purchasing or using public.

Industrial design is the art form that more than any other embodies the spirit of the twentieth century. We articulate into one homogeneous whole what were once separate functions, conceived by separate individuals, and protected by separate laws.

Allow me to contrast this description of today's industrial designer with an example of how products evolved in the era when our current utility and design patent laws were written.

In 1851, Isaac Singer, a skilled mechanical engineer, invented an improved mechanism for a sewing machine. After building a working model and applying for utility patent protection, Mr. Singer collaborated with an artisan to have his machine decorated with ornamental art. A design patent was issued to the artisan for the climbing roses on the cast iron trellis and other ornamental aspects of the machine's decoration.

The point of this illustration is that the creation of the machine's mechanism and the creation of the machine's appearance required  different skills, executed

3

84

separately by different individuals—the engineer and the artist. That era's artifacts reflect this separatism of form and function. In contrast, the outward appearance of our era's products reveal the object's inner spirit.

Existing utility and design patent laws were conceived to protect each individual's contributions. Neither, however, will protect today's industrial designs where the form and the function are so integrated. HR 1790 will responds to today's reality, as it protects neither function nor decoration, but recognizes that it is the product's shape that communicates it's heart and soul.

Every major industrialized nation in the world today, except the United States, acknowledges industrial design's contribution to their global competitiveness with laws to protect this national resource, laws that prohibit others from stealing their designers' original creations.

A society speaks most clearly through it's laws.

The United States is speaking clearly and has done so for decades. Our message? It's okay to steal the original designs of our useful objects—that is, our industrial designs. In fact, it's not even stealing, because we have no laws to the contrary. Anyone who wishes to plagiarize that which we have invested in so heavily to create, may do so without penalty and with clear conscience.

This message must change and change now if we want our American business sector to invest in design research and development. On that investment may rest our ability to compete economically in the Pacific Rim and in Europe. Only with the incentive provided by HR1790 can we hope to improve American

4

85

quality and style in everything from furniture to telephones, appliances to eyeglasses, and boats to computers. We need your support to bring HR 1790 to a floor vote.

What's worth stealing is worth protecting.

America's law is that you can not copy the creative and original efforts of America's authors, artists, musicians, engineers, horticulturists, chip designers or software developers. It's time to include the designers of America's manufactured goods to slow the importing of 150 billion dollars a year worth of manufactured goods, many preferred because of their superior design.

Ironically, those imports' superior design are often the result of the best efforts of America's most talented designers. Virtually all US industrial design firms do work for foreign companies, work that is then imported into the US. Our competitors know the need to invest in industrial design and have an assured return on that investment through their nations' more up-to-date systems for protecting intellectual property.

America's leadership position in the family of nations was, at one time, attributed to its patent protection. In 1900, a Japanese Commissioner said, "We have looked about us to see what nations are the greatest, so that we can be like them. What is it that makes the United States such a great nation? We investigated and found that it was their patent system—their society's basic practice of giving incentives to those who create. "

5

86

American industrial designers are not asking for incentives. We are asking for the elimination of disincentives. Give us the right, as the bumper stickers say, to think globally and act locally.

More than a decade ago, Harvard Business School criticized US business for no longer being innovative. Harvard said, "The key to long-term success, even survival, in business is the same as it has always been: to invest, to lead and to create value where none before existed." We will lead and create the value where none before existed, if you will invest in industrial designs equal ability to compete with other nations.

I represent thousands of professional industrial designers who daily create original, distinctive and desirable designs for business and industrial products, consumer products, products for the disabled and elderly, furniture, medical and scientific products and transportation products. These products would not be protected by this proposed legislation in and of themselves . What would be protected is limited to the shape, the appearance, of these products, but only if the design is discretionary, original and distinctive,  and only for ten years. Exempt from protection are forms that are commonplace and staple, that lack new design content.

Mr. Chairman, a lot of people have questions about what is original design and what is commonplace.  I would like to answer them by calling your attention to these two products—both squeegees intended to clean glass.  I bought one at the local hardware store.  It has the traditional handle perpendicular to a black rubber blade.  The other—the Hanoo Cleret, designed and manufactured in the USA—received our Industrial Design Excellence Award, the pinnacle of

6

87

achievement for US product design.  (See the illustration appended to the end
of this testimony.)

I believe you can see why.  The round tubular handle is large enough to fit
comfortably in either hand, the left or the right.  There are two parallel  rubber
blades inserted into the length of that handle and extending beyond its length.
Those blades have a unique S-shaped curve made possible by the designer's
knowledge of  materials, in this case dual durometer plastic extrusions that are
hard at the handle but soft where they need to flex in order to perform their
cleaning function.

The Cleret's design is clearly distinctive, not commonplace.  It is discretionary.
Compared to the more traditional squeegee, the Cleret's design demonstrates
that there is more than one way to configure a squeegee.   And, as I deduce
from  their incredible sales success around the world, it is certainly attractive.  It
is all these things and extremely functional as well, with a design that is
comfortable to hold and use effectively.

Not only are the consumer's choices expanded by the Cleret, but the consumer
is offered a choice at a lower price than the traditional model!

Mark Twain , who invented suspenders in 1871, said a year earlier, "A country
without good patent laws, is like a crab - they can't travel forward—only
sideways and backways." America has an internationally inconsistent void in
our patent laws and we seem to be moving every way but forward.

7

88

Your consideration of HR 1790 should not be limited to the positive effect of this legislation on America's balance of trade, where each one billion dollars of trade deficit equates to approximately 20,000 American jobs; nor to the increased choices of original designs that would become available to retailers and consumers by the limiting of copycat designs. It should include the question of why this one society has singled out this one profession to be exempt from the incentive to innovate that is offered to all others, by all others. It works for them. It will work for us.

Industrial designers may be exceptional, but we don't deserve to be made an exception.

As our well-earned international reputation attests, we have the education, the ability and the sense of urgency to successfully compete with our foreign counterparts, but only you have the ability to turn us loose. Or as *Business Week* says, "Get set, America, for a journey that will shatter your preconceived notions: The designers of the '90s are poised and ready to let loose."

Allow me to end with a personal example. My father, a Kansas farmer who couldn't afford to finish high school, served as Secretary of War during FDR's second and third terms . When he came into office, the standard military procurement process was for the War Department to design all war materiel itself. Competitive bidding meant lowest price—usually accompanied by lowest quality.

Recognizing that the process predicated the results, he changed the process to require the competitive bidder to be responsible for the design as well as the

8

89

price. Now the military could simply issue performance specifications for its needs, wants and even wishes or dreams. The bidder now had strong incentive not only to meet, but to exceed the specifications, with a price commensurate with the performance.

The first contract awarded under his new process was to little known first-time bidder Willys-Overland Company for its innovative design of a General Purpose Vehicle. Code named GP, it was quickly nicknamed "Jeep." Another early beneficiary of his revolutionary bidding process was the Boeing Company for their B-17, for which he coined the name Flying Fortress.

I'm proud that he recognized how a small modification in the way a process works can cause rather ordinary people to make extraordinary contributions—and at a time when America needed it most.

You now have a similar opportunity to redesign the process you control to benefit design innovation and technology in America—and at a time when we can certainly use it.

I hope you will recognize the need for change in America's design protection process. Because the process predicates the results.

Thank you,

Cooper C. Woodring, FIDSA

9



91

Mr. HUGHES. I think you have given us a good sample of what would be covered and what would not be covered by the squeegee example. I wonder if you can carry that a little further and tell us some other things that would be covered by the present legislation and what would not be covered. Give us some other examples.

Mr. WOODRING. Well, industrial designers like myself design capital goods and equipment, and sporting goods, and electronics, furniture, automobiles, transportation products, and the bill is construed that if the design is original and discretionary it would be covered, and that is the same kind of incentive to stimulate the creative sector that is the time-honored method that we have used for all other creative sectors and that other parts of the world provide to their industrial designers. So if a product meets that criterion, it would be covered by this legislation. Those that currently exist or those that are commonplace or generic or of such simple form as to not constitute a noteworthy design would, of course, be exempt.

Mr. HUGHES. I appreciate that.

Do any other members of the panel have other examples such as the squeegee they would like to bring to our attention?

Ms. CASTLE. Mr. Chairman, let me hold up a pair of Oakley sunglasses. For those of you who are not familiar with Oakley, they are from Irvine, CA. They are a very high-tech manufacturer of sunglasses. This pair [indicating one pair], retails for over $100. This is the knock-off of the product [indicating second pair], which is virtually an identical copy.

Mr. HUGHES. What does that sell for?

Ms. CASTLE. I don't know what that sells for. I will find out and submit this information to you, Mr. Chairman.

[The information follows:]

The knock-off pair of sunglasses was manufactured in Taiwan and sells for $10 to $15 per pair.

Ms. CASTLE. $4 million is the annual research and development budget for Oakley to produce a line of sunglasses, of which this is just an example.

I want to clarify something that Mr. Woodring said a moment ago. Let's make sure that when we talk about the legislation we don't talk about products that are covered but that we talk about the design of the product that is covered. In this legislation, we are talking about discretionary designs. If a product, such as a pair of sunglasses or a coffeemaker or whatever, can be designed more than one way, this legislation not only doesn't preclude that from happening but indeed it encourages it. Today designers have very little financial encouragement to develop new designs of products, because the moment they do, very often they are ripped off in the marketplace within 6 months.

That squeegee that you have has been on the marketplace just a few months, and the manufacturers expect to see knock-offs within 6 to 8 months of its introduction.

If you look over here to Ingersoll-Rand's products [indicating exhibits], on the right-hand side you see the Ingersoll-Rand air wrench. This is a product that takes the lug nuts off your wheel when you have your tire changed, and to the right of that is the knock-off. You will notice that the product has been copied in every

sense, both the exterior and the interior parts. The only difference we can find in that entire display is that the logos representing the knock-off and the original are there, but everything else has been copied.

Mr. HUGHES. Where is the knock-off manufactured, the Astro?

Ms. CASTLE. I believe it is Taiwan.

Mr. HUGHES. Taiwan.

We have design patent laws in this country. I'm sympathetic to the need to take a close look at the inadequacies of our intellectual property laws to try to protect the creators of property of all kinds. Assuming corrective action is necessary to provide adequate protection for designs, why not work to improve the design patent laws instead of creating a whole new body of laws that will require years of implementation and, I might add, litigation before you will know if it serves its intended purpose?

Why don't we start with you, Ms. Castle.

Ms. CASTLE. Mr. Chairman, we have struggled with that question both within the coalition and with some of our corporate patent counsels who operate worldwide in the intellectual property arena. We would not be averse to taking a closer look at our design patent system and trying to correct it in certain areas—one, ornamentality; two, nonobviousness—which are clearly major hurdles when trying to protect the design of a product as opposed to the way it functions.

However, this legislation more nearly replicates the type of protection for designs which we see generally in non-U.S. countries, and that type of protection is more typically a copyright type of protection than a patent system, because we are talking about the expression of an article as opposed to the way it functions.

Mr. HUGHES. It doesn't fit neatly into either, does it, really?

Ms. CASTLE. It does not, and that is why we do not actually amend the copyright statute but rather form a separate, sui generis, form of protection.

Mr. HUGHES. And I recognize that there are some obvious advantages working through the copyright law, but it seems to me that we ought to at least take a look at what can be done to try to fix, if it is broken in some respects, where it needs review, the design patent law that is supposed to perform that function.

Ms. CASTLE. Mr. Chairman, I wouldn't disagree with you. I think if we go back and look at the original Willis bill that was introduced in the fifties, that approach was generated not by the private sector but by the American Bar Association and other practitioners. I believe the Copyright Office had a hand in it's drafting. They were the first ones to propose a sui generis form of copyright protection.

Mr. HUGHES. Mr. Cunningham, or Mr. Baroody, why does the legislation propose a 10-year term for design protection instead of five or perhaps 15?

Mr. CUNNINGHAM. I'll let Mike answer—I'm not sure.

Mr. HUGHES. Whoever would like to respond.

Bruce.

Mr. LEHMAN. Mr. Chairman, I am Bruce Lehman, I'm counsel to the coalition, and I have the answer to some of these technical questions.

93

The world standard generally is 15 years, and the original design legislation that Ms. Castle referred to, the Willis bill, which was the predecessor to this—this is about 40 years old, this particular piece of legislation, was drafted by a committee of the ABA some 40 years ago—I believe originally it had a 15-year term of protection, which would be like what you have in Germany and the Benelux countries and other countries.

But during the course of processing this legislation over the last several years, as a part of the good-faith attempt on the part of the proponents of the bill to suggest that they were not trying to seek any kind of overly extensive protection, the term was simply reduced to 10 years.

Mr. HUGHES. I see. So it was just basically a compromise position.

Mr. LEHMAN. But the world standard is generally at least 15 years. Some countries give you much longer protection.

Mr. HUGHES. All right.

For any member of the panel: How would the proposed legislation foster new innovation? Do foreign countries have a higher level of design protection than we have in this country and also have a higher level of design innovation?

Mr. WOODRING. I certainly think they do. I think our statistics in the Industrial Designer Society of America would show that a great number, if not a majority of our clients, are foreign. A great number of America's top industrial designers are heads of design for major foreign corporations, whether this be in the Pacific Rim or in Europe. The reason, I am assuming, is because there is a greater return on the design investment because of the protection offered to them which is not offered to us.

Mr. HUGHES. I wonder if you could submit for the record—and the record would remain open for that purpose—some analysis of basically the innovation in foreign countries, how design protection has enhanced innovation in those countries. If you have some data, that would be very helpful—an analysis of perhaps what we find in some of the other countries, what they have done to protect designs of all kinds and the impact it might have, if you have any.

Mr. WOODRING. Certainly to what extent we have data available, we would be happy to make that a matter of record.

Mr. HUGHES. That would be helpful, and the record will remain open for—is 14 days enough time?

Mr. WOODRING. Thank you.

[The information follows:]

94

Industrial Designers Society of America

1142-E Walker Road, Great Falls, Virginia 22066
703.759.0100          FAX: 703.759.7679



The inroads into US markets accomplished by our foreign competitors in the 1980s were achieved by products that benefit from the competitive edge conveyed by industrial design innovation. These products benefitted from industrial design innovation for two reasons: their countries and companies understood the market value of investing in it; and their companies were able to take advantage of effective design protection at home in order to ensure a return on their investment.

The first of these two reasons--a national and corporate grasp of industrial design's value--is an issue that the Industrial Designers Society of America is addressing through its relationship with Business Week and its various public relations programs. The second can only be addressed by the US Congress through the passage of HR 1790, "The Design Innovation and Technology Act of 1991."

We do not have figures on the effect of well-designed imports, but the current trade deficit is clear proof of their impact. There is other proof that demonstrates the critical role of more effective foreign design protection on those countries' international competition and level of perceived innovation.

• US industrial designers enjoy an excellent reputation on the international scene. Not only do US industrial designers head the key design function in many foreign companies, fully <u>30 percent of the consulting work done by US industrial design firms is done for foreign clients!</u> This figure was arrived at through a survey of small, medium and large US industrial design firms conducted by IDSA in February, 1992. Moreover, most of the firms reported that their work for foreign clients was <u>increasing</u>. This trend indicates that US industrial design innovation is sought after by foreign companies. One can, therefore, conclude that the higher level of innovation of foreign products is not a function of better talent, but of better investment and better intellectual property protection.

• That intellectual property protection for industrial design is more effective and accessible in other industrialized countries is borne out by the different in the number of patents issued. As Congressman Moorhead points out, in 1989 the US granted only 6,000 design patents while Japan granted 32,000 and Germany more than 85,000.



95

Industrial Designers Society of America

1142-E Walker Road, Great Falls, Virginia 22066
703.759.0100          FAX: 703.759.7879

• The International Trade Commission reported in 1988 that about $2 billion of
sales were lost in the United States because of US imports of infringing goods;
about $6 billion of US exports were lost because of inadequate intellectual
property protection; and about $3 billion in royalties and fees were lost.  The
biggest sales losses were reported by the scientific and photographic instruments,
computer and electronics industries--all industries whose products have a
significant industrial design component.  (See Table below.)

Table:
US Firms' Estimates of Worldwide Sales Losses Due to Weak
Intellectual Property Rights Protection, 1986

| Industry | Aggregate Estimated Loss by Responding Firms ($ millions) | Number of Responding Firms Reporting: No Loss | Loss | Total |
|---|---|---|---|---|
| Aerospace | 120 | 2 | 5 | 7 |
| Building materials | 739 | 0 | 6 | 6 |
| Chemicals | 1,334 | 3 | 18 | 21 |
| Computers and software | 4,130 | 6 | 25 | 31 |
| Electronics | 2,288 | 6 | 11 | 17 |
| Entertainment | 2,060 | 0 | 12 | 12 |
| Food and beverages | 86 | 2 | 8 | 10 |
| Forest products | 665 | 0 | 7 | 7 |
| Industrial and farm equipment | 622 | 1 | 9 | 10 |
| Metals and metal products | 292 | 1 | 6 | 7 |
| Motor vehicles and parts | 2,194 | 0 | 4 | 4 |
| Petroleum refining | 1,295 | 3 | 6 | 9 |
| Pharmaceuticals | 1,909 | 0 | 10 | 10 |
| Publishing and printing | 128 | 0 | 11 | 11 |
| Rubber products | 511 | 1 | 4 | 5 |
| Scientific and photographic instruments | 5,090 | 1 | 6 | 7 |
| Textiles and apparel | 251 | 0 | 11 | 11 |
| Other | 151 | 0 | 8 | 8 |
| Total | 23,845 | 26 | 167 | 193 |

Source:  International Trade Commission (1988).

96

Mr. HUGHES. The gentleman from California.

Mr. MOORHEAD. Thank you, Mr. Chairman. I thank also the members of the panel for coming here this morning and testifying before us.

H.R. 1790 clearly states that designs that aren't original or commonplace or ordinary or any design dictated by function or designs dictated by "must fit" dimensions are excluded from protection. In addition, the majority leader and I, in a letter to our chairman, recommended further language to even more clearly exempt aftermarket repair parts for passenger cars and pickup trucks. The after-market repair parts trade association was told over a year ago that H.R. 1790 was never intended to apply to that industry and would be so clarified at the subcommittee markup. Their response, under the acronym of CARE, was to mount a massive misinformation campaign against the bill on some members of this subcommittee. Are you aware of any member of the Design Coalition opposed to exempting the after-market repair parts industry? What is behind this unusual opposition?

Rita Castle.

Ms. CASTLE. Mr. Chairman, no, I am not. The Design Coalition fully supports the amendment excluding the internal repair parts for automobiles and light-duty trucks. As to why the opposition continues, I think that the rhetoric is partly due to a misunderstanding as to what that amendment does. There is a lot of disinformation and misinformation about the existence of the amendment in the first instance; and about its breadth and scope. I believe this concern is playing to a certain constituency that wants to perpetuate their opposition to the legislation. They are simply ignoring the facts.

Mr. MOORHEAD. Mr. Baroody, do you have a response to that?

Mr. BAROODY. It wouldn't differ substantially from what you have just heard.

We think that the exclusion is obviously quite acceptable and, further, that it only makes explicit what many correctly thought was implicit in the bill prior to the addition of the amendment.

Mr. MOORHEAD. A question for Bill Cunningham: Do you have any idea how many jobs are at stake across the board in the struggle?

Mr. CUNNINGHAM. Mr. Moorhead, when we testified last time I went back and asked the UAW and the IBEW to do that kind of analysis, and the kind of list that I got was what had closed, and they couldn't attribute it to after-parts. I mean most of these plants are producing parts for ongoing new cars, skins, and not for the after-market.

The only thing they did tell me was that the auto industry traditionally, when they are having tough times—and, unfortunately, they have had tough times for the last 4 years—use the after-parts market as a profit center to maintain employment. Unfortunately, the nonsale of U.S.-made autos in the last 3 years has come a cropper on that one, and we now get the announcement of significant down-sizing by GM.

I think it is important that Mr. Hughes know, and other members of this committee, that we do really believe that the bill should be looked at and amended to only provide this protection if

the products are manufactured in the United States. As I tried to point out before, it does our members little good and your constituents that overseas production of these parts for design protection would basically not help. I mean we are not in this business to help GM move to Mexico, and we are not in this business to see our members' jobs move overseas. Last time I sat with Mike Baroody was to argue against Fast Track for Mexico for that very same reason.

So the concern we have here is that this legislation is paralleling what our trading partners do, which is important, because our trading partners basically are working in a world trading system in which they have some comparative advantages both in their statutes and the way they trade, but they should also be looked at, and the Congress should look at things, in terms of impact and job creation in the United States, I am very concerned that this legislation is silent on this issue, and I wanted to bring it directly to your attention.

Mr. HUGHES. Would the gentleman yield to me?

Mr. MOORHEAD. Surely.

Mr. HUGHES. I would have some concern, however, about the argument of discrimination. We are endeavoring in GATT to negotiate an accommodation with other countries.

Mr. CUNNINGHAM. Mr. Chairman, when you were not here I mentioned that our review of the Dunkel draft, looking at the TRIPS section, which is the intellectual copyright section, basically exempts the less developed countries, which, under the Dunkel draft, they can self-certify themselves as LDC's to get out from under the TRIPS regimen.

So I think this committee should look at the international trade negotiations to find out how much protection in terms of intellectual design or patent is going to be provided by that, because the Dunkel draft predicates moving the decisionmaking locus for a lot of these congressionally mandated decisions to an MTO, which is a supranational trade organization.

I know many members who have said, "We want to move to a world trading system with rules and intellectual property rights protections and all the rest on an international level," are saying this is a good way to go. The problem is, the agreements that are coming down leave our trading partners in a position within their countries to use regulation, such as design protection, and we are basically focusing on a GATT agreement that leaves those statutes in place.

There is a problem here, I am not denying there is a problem in this issue, but you have to understand that in these agreements, although the words are mentioned, the relief for American produced products is probably not going to be there. If the Dunkel draft goes through we will be looking for relief as a country to an international organization that basically keeps in place design protections for every other countries, and the LDC's don't have to abide by it, which is where most of our exports are going.

Mr. HUGHES. Thank you.

I thank the gentleman from California.

Mr. MOORHEAD. To some extent, all patents and all copyrights create a monopoly. Of course, in an area where you could have al-

98

ternate products slightly different or somewhat different, that monopoly isn't really effective. The opponents to this legislation, many of them, would say that this legislation would create monopolies, as all patents would, and that that would raise the price of products to the consumer. We have to have a response to them. What is your response?—any member of the panel.

Ms. CASTLE. Mr. Chairman, I would go back again to making the distinction between a patent which is protecting the product and the way it functions and this legislation which is simply protecting the shape or the expression of the function; i.e., the design. This legislation gives protection only to discretionary designs. If, for example, an article has to look a certain way in order to perform a function, the design is not subject to protection.

So, again, the cries of monopoly and tying up the chain of commerce are just rhetoric. Frankly, I must call this hyperbole. They simply do not relate to the actual words on the page, as you well know, in H.R. 1790. We are not talking about tying up products, we are talking about protecting discretionary designs.

Mr. MOORHEAD. I know to some extent this question has been responded to in your testimony, but the major opposition to this bill has come from the insurance companies, who want to use copycat fenders and doors and grills in the case of accidents, and they say that it is going to dramatically raise the cost of insurance across the country, and of course, with insurance having gone up so much, that is a red flag for many people, and it is an emotional issue. How do we respond to that?

Mr. CUNNINGHAM. I would suggest, Mr. Moorhead, that this committee is looking at Mr. Brooks' McCarran-Ferguson repeal legislation, but you may want to look at how States set their rates for property casualty and the auto business to find out what role auto part replacements play in that ratemaking. It is my impression that that is an insignificant amount in the underlying rate structure.

The way that insurance companies are taxed—I happen to be the tax guy also—the way insurance companies are taxed, with reserves not being taxed is probably the most complicated in the Internal Revenue Code and in local State codes. It is my intuition that repair parts are an insignificant part of the rate structure and that this committee should be able to get information from State insurance commissioners to find out how parts are put in that structure. I think it is an insignificant amount. I think it is essentially a redherring, although, like most redherrings, it stinks and makes people upset.

Mr. MOORHEAD. This is a time when the United States is trying to encourage the nations of the world to bring their patent laws, their copyright laws, and trademark laws into line with each other. It has been something we have preached around the world. We have joined the Berne Convention to enforce uniform copyright laws. We have been working with the people in the Orient, our trading partners, which is so important to us, the trade with them, and many of them have come into line with their laws in that respect. Most of the industrialized nations protect design patents. What is a good argument, if any, to keep America behind the other countries of the world in this respect?

99

Mr. CUNNINGHAM. Let me point out one fact that happened within the last 3 weeks. We have opposed MFN for China, but the USTR has negotiated a 301 case with the Chinese to basically honor intellectual property rights. If we are left to have just the administration enforce those intellectual property rights' operation and the President determines, based on national security as opposed to trade reasons, they haven't done anything in this area or they have honored the agreement, what redress is there for an American corporation. Can they go in and say, "They are stealing my stuff still, and I have no redress," if USTR is told for national security reasons not to do it.

The other issue is that if you look—and I would suggest you do, and I don't foist myself off as a GATT expert and the GATT agreement is changing—but if you look at the GATT agreement, what it usually does is keep in place whatever design laws are in place in those developed countries, and for the LDC's, which are the bulk of our trading partners, they would be exempt from these design protection laws; they can basically do knock-offs and rip-offs if they are defined as LDC's, based on the Dunkel draft.

So I think this committee has to look very carefully at the assertion. I know that has been our Government's position, and that is what we wanted, but the real world is totally different in terms of behavior, and I think that is something we have to be careful of.

Mr. MOORHEAD. Any other response?

Mr. BAROODY. If I could just kind of comment briefly, in answer to your question again, I can't think of a reason, an argument, for not bringing intellectual property rights protection of the United States on a par with most of the rest of the world. That was your question, and no reason suggests itself to me for that.

In addition, though, if there weren't in the rest of the industrialized world such a high threshold of protection, that by itself would not be an argument against this bill either, because the bill, as I understand it, is fairly one dimensional. It is not designed to do everything, it is designed primarily to do one thing, which is to protect the rights essentially of design R&D to be used by those who produce it and to do so in the confidence that no one can knock it off, no one can steal, the fruits of that labor. That seems to me to be a good thing to do, no matter the international picture, and it is a better thing to do given the international picture.

Mr. MOORHEAD. I want to thank my chairman for his courtesy. My time has long since passed.

Thank you.

Mr. HUGHES. The gentleman from Kansas.

Mr. GLICKMAN. Thank you, Mr. Chairman.

As I said before, I was an original sponsor of this bill, and I pulled my name off. It doesn't mean I am against it, it means that I thought there were some concerns raised. I think you have one of these classic conflicts here, apart from the issue that—and I think it is a compelling issue—that we may be the only country in the world that doesn't provide the relief. But I personally don't think there is any way to dispute the fact that parts will cost more with this protection. But maybe the issue is, is that fair, being able to recoup the design investment? That probably is fair, to recoup

the design investment. But I think it is difficult to argue that parts won't cost more.

There is no question that knock-offs help keep the basic original parts, the OEM part prices, down. I have gone to my auto dealers at home. They say, "Yes, they will keep the prices down."

We do a lot of things to protect people's original works of art, investments, and therefore that keeps prices up, and that may be fair, but I guess my original concern is, could we not expect a doubling or tripling of OEM prices if the design protection were granted?

Now let's just be practical. Again, go to your auto dealers; talk to the people who are selling the parts, the people who are GM dealers, Ford dealers, Chrysler dealers, the service departments, and they will tell you that there is no question that some of these knock-offs do act as a kind of competitive pricing mechanism. It may not be right intellectually, but that may be a practical effect of this, and I think that is what has some folks concerned, and that may be what has the consumer groups concerned, you know, and the insurance people. Now this may be disinformation, too, but I suspect there is probably a little bit of truth in it.

Yes?

Mr. WOODRING. Since we are both Jayhawks, let me try to answer that one.

Mr. GLICKMAN. Let's see. Was your father the Governor, Harry Woodring?

Mr. WOODRING. Yes, sir. But let me try to answer your question.

Mr. GLICKMAN. OK. He was a very great man, also a Democrat. We in Kansas have to connect on that kind of stuff.

Mr. WOODRING. There is good reason to believe that Mr. Goodwrench's fender costs as much as it does because they don't enjoy the after-market success with it they should because of the theft of their intellectual property, were this a law.

Mr. GLICKMAN. So they don't sell as many because of that?

Mr. WOODRING. That is right, of course.

Now they have already paid for their tooling, they have already allocated the cost of the part, and they are producing very few of them in the after-market. Doesn't it stand to reason—and, grant you, I am a designer, not an economist—but doesn't it stand to reason that if they had the entire after-market and were simply producing more parts off the same tooling that has already been allocated that the cost of that part should come down?

Mr. GLICKMAN. No. That is a little bit like the argument that— my home town has seven MRI machines, the most of any place in the world per capita, and you would think, with seven MRI machines, that the time to go in and have your brain x rayed would cost less because there are more of them and they are used more. It costs more, not less. It doesn't work that way in some cases.

You may be right, but if you have a monopoly over the product, then you don't have genuine price competition. That is the issue. Just the fact that you are producing more—you will get the product down if, in fact, there is genuine price competition, if there is somebody else making another product that gets it down.

I understand your point, but I'm not sure I buy the argument that just quantity will produce a reduction in prices.