Exhibit C

Claim Number HC06 C00618

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
PATENTS COURT

BETWEEN:

TELEFONAKTIEBOLAGET LM ERICSSON
(a company incorporated in Sweden)

*Claimant*

- and -

(1) SAMSUNG ELECTRONICS UK LIMITED
(2) SAMSUNG ELECTRONICS CO. LIMITED

*Defendants*

---

RE-AMENDED DEFENCE AND
COUNTERCLAIM

---

**IMPORTANT NOTICE:** This Re-Amended Defence and Counterclaim contains information that is confidential to the parties and to which no third party should be given access (see Bristows' letter of 26 June 2006 addressed to the Chancery Registry). Statements of case served in these proceedings are also subject to an Order of the Court dated 2 October 2006 made pursuant to CPR 5.4C restricting the rights of third parties to inspect or obtain copies.

1.    The Claimant's enforcement of its intellectual property rights in these proceedings (in seeking injunctive relief, an order for delivery up and an account of profits), and/or its refusal to grant a licence to the Defendants in respect of its portfolio of patents (including the patents in suit) which are technically or commercially essential for the supply of mobile telephone handsets in the European Union save on the basis of unfair trading conditions is an abuse by it of a dominant position contrary to article 82 EC and/or section 18(1) of the Competition Act 1998 ("the Chapter II prohibition") (see Paragraphs 64 to 86 below); alternatively, the Claimant's exercise of its intellectual property rights in these proceedings falls within the prohibition in Article 81 EC and/or the section 2(1) of the Competition Act 1998 ("the Chapter I prohibition"), being the object, means or consequence of the agreement constituted by the rules of the European Telecommunications Standard Institute ("ETSI") which develops and promulgates technical industry standards based in part on the use of

20686233                                              1

technology covered by essential patents owned or controlled by its member undertakings (see Paragraphs 63Z to 63CC below).

1A.  The Claimant's enforcement of its intellectual property rights in these proceedings (in seeking injunctive relief, an order for delivery up and an account of profits) and/or its refusal to grant a licence to the Defendants on fair, reasonable and non-discriminatory terms is in breach of the contract which exists between the Claimant and the First Defendant as a result of their common membership of ETSI (see Paragraphs 63R to 63Y below).

2.  Further and/or in the alternative, the Claimant has waived its right to enforce the patents in suit ("the Patents") or any of them in these proceedings and/or is estopped from doing so, either by seeking injunctive relief or by seeking an order for delivery up or an account of profits (see Paragraphs 87 to 98 below).

3.  Further it is denied that the Defendants or either of them have infringed and/or threaten to infringe the Patents or any of them as alleged or at all.  In addition the Patents are, and at all times have been, invalid (see Paragraphs 99 to 103 below).

4.  Further and in the alternative, it is denied that the Claimant is entitled to the relief sought or any relief in respect of the Defendants' acts which are expressly or impliedly licensed (see Paragraphs 104 to 107 below).

4A.  Further, there are additional patents in respect of which the Claimant is the registered proprietor which are and have at all material times been invalid, and which should be revoked (see Paragraphs 110 to 112 below).

5.  Further, and in any event, should the Claimant be entitled to any relief, which is denied, the Court should in its discretion refuse to grant injunctive relief, an order for delivery up and an account of profits.  In the event that the Claimant does offer the Defendants a licence under its portfolio of essential patents (including the Patents) on fair, reasonable and non-discriminatory terms, which involves the payment of royalties by the Defendants, then the appropriate relief will be the grant of damages calculated on the basis of those royalties (see Paragraphs 108 to 109 below).

CONTRACT LAW, COMPETITION LAW AND WAIVER / ESTOPPEL DEFENCES

**Background**

6.   These non-patent law Defences (Paragraphs 7 to 98 below) proceed on the basis that the Claimant's patent portfolio must be assumed to include at least one essential patent which is at least partially valid and which would necessarily be infringed by the Defendants' supply of any mobile telephone handsets or telecommunications infrastructure equipment complying with the GSM / WCDMA industry standards.

**The Parties**

7.   The Claimant is a global supplier of telecommunications network equipment, including radio base stations and core network infrastructure, and services.   Its headquarters are located in Stockholm, Sweden.   The Claimant describes itself as a "world-leading provider of telecommunications equipment and related services to mobile and fixed network operators globally".   It states that over 1,000 networks in 140 countries use the Claimant's network equipment and 40 per cent of all mobile calls are made through the Claimant's systems.[1]

8.   The Claimant claims that it actively promotes open standards and systems.   It states that it has one of the industry's most comprehensive intellectual property portfolios containing over 20 000 patents.[2]

9.   Sony Ericsson Mobile Communications AB ("SonyEricsson") is a 50/50 joint venture between the Claimant and Sony Corporation.   SonyEricsson supplies mobile phones and other mobile communication devices globally.   Its mobile telephone handsets are sold throughout the European Union.

10.   The Second Defendant is a global supplier of consumer electronics equipment, including mobile telephone handsets, and is based in Korea. The First Defendant is a UK-based sales subsidiary of the Second Defendant.   Among other things, the First Defendant supplies mobile phone handsets in the UK and other countries in Europe,

---

[1]   http://www.ericsson.com/ericsson/corpinfo/

[2]   http://www.ericsson.com/ericsson/corpinfo/

including Ireland.   The Second Defendant also has sales subsidiaries located in Germany, France, Italy, Poland, Portugal, Sweden, the Netherlands, Spain and Austria.   The Defendants' mobile telephone handsets are sold throughout the European Union.

**The Industry**

11.   The first generation of mobile wireless networks, which are now superseded, used analogue technologies only.

12.   The most widely available networks in use throughout the world today are known as "second generation" networks.   These use digital technologies, which offer in particular much clearer sound quality.   They also allow the use of data services such as Short Message Services ("SMS"), which is a service for sending short text messages to mobile telephones.

13.   Over time, second generation networks have been upgraded to allow more sophisticated uses.   The upgraded networks (often called generation 2.5 or 2G+ networks) support higher data transfer rates than ordinary second generation mobile networks, and they offer additional functions such as allowing users to send and receive e-mail, and access the Internet.

14.   Third generation or 3G wireless telephone technology is a further generation of high-speed digital technology which allows yet more sophisticated and data-rich information transfer, including, for example, video telephony and music downloading.

15.   Introduction of third generation technology (which is still not complete in the European Union) entailed the creation of a new infrastructure and the grant of new licences to telecommunications operators.   At present, second and third generation technologies co-exist in the European Union.

16.   Both SonyEricsson and the Defendants supply mobile telephone handsets in the European Union with second generation and generation 2.5 or 2G+ functionality ("2G

handsets") and mobile telephone handsets with third generation functionality ("3G handsets").

**Industry Standards**

17.    In order to allow mobile telephone handsets to be connected to any mobile telephone network in the European Union (and globally) and to communicate with each other, international standards have been developed.

18.    GSM ("Global System for Mobile Communications") is a second generation digital mobile telephone standard.  GSM was initially developed in the early 1980s as a collaboration between EU heads of state (endorsed by the EC Commission) to enable mobile roaming between EU Member States.  The GSM standard was adopted in Europe in the early to mid 1990s and has subsequently been adopted in most countries in the world.  In June 2006, there were 690 GSM mobile operators in 213 countries / territories and over 2 billion users worldwide.[3]  In 2005, GSM handsets represented 77.4% of handsets used worldwide.[4]

19.    The GSM system can be divided into two broad constituents: (i) the mobile station or terminal, comprising the mobile telephone handset and SIM (Subscriber Identity Module) card; and (ii) the infrastructure, comprising the base station subsystem, which controls the radio link with the mobile station and the network subsystem, which performs the conveyance and switching of calls between the mobile users and other mobile and fixed network users.

20.    GSM is the exclusive industry standard used for 2G mobile telephone networks throughout the European Union.  All 2G+ (or 2.5G) networks (such as GPRS) in the European Union also conform to the GSM standard, with which they are compatible.

21.    So far as the Defendants are aware, all 3G handsets currently sold in the European Union incorporate GSM technology, enabling their users to make and receive calls on GSM networks.   If a 3G handset user travels to an area without 3G network

---

[3]    http://www.gsmworld.com/about/index.shtml; http://www.gsmworld.com/news/press_2006/press06_29.shtml

[4]    Strategy Analytics: Global handset sales forecast in January 2006

infrastructure coverage, the handset will automatically switch to GSM. All such "dual use" handsets therefore must also comply with the GSM standard.

22.  WCDMA (Wideband Code-Division Multiple-Access) is one of the main standards for the implementation of 3G mobile telephony.   Japanese operator NTT DoCoMo launched the world's first commercial WCDMA network in 2001. As of 2006, 108 3G networks based on the WCDMA standard are operating commercially in 49 countries.[5]  WCDMA is the only 3G mobile telephony standard currently adopted in the European Union.

23.  WCDMA technology is increasing in importance.  In 2005, industry analysis showed that 3G handsets accounted for 53% of mobile telephone market growth in Western Europe[6] and their sales are growing at a faster rate than sales of 2G handsets. It is estimated that, by 2010, global sales of 3G handsets will at least equal, and may have overtaken, global sales of 2G handsets.

24.  The telecommunications networks based on the WCDMA standard can be divided into the same two constituents (mobile station and infrastructure) as networks based on the GSM standard.

**Standard-setting and Administration**

25.  Within Europe, the European Telecommunications Standards Institute ("ETSI") is principally responsible for the telecommunications standardisation process. ETSI is a non profit making association under French law.  It was recognised as a European Standards Institute by the European Community in 1992 (see Commission Decision 92/400/EEC of 15 July 1992), and is currently recognised under Directive 98/34 EC of the European Parliament and Council.

26.  ETSI was directly responsible for the development of the GSM standard, and continues to administer it in Europe.  The WCDMA standardisation process is administered by 3GPP. ETSI is one of six telecommunications standards bodies that

---

[5]      http://www.umts-forum.org/servlet/dycon/ztumts/umts/Live/en/umts/Resources_Deployment_index

[6]      GSM Association statistics Q1 2006: 3GSM (W-CDMA) regional statistics (www.gsmworld.com)

together form the 3GPP (the others being ARIB, CCSA, ATIS, TTA and TTC). Individual members of 3GPP must also be a member of one of these bodies and operate according to the rules of the relevant body.

27.     Standards documents, for *inter alia* GSM and WCDMA, are updated and republished by ETSI every quarter.

28.     ETSI has 654 members from 59 countries inside and outside Europe, including most major manufacturers, network operators and telecommunications service providers. The Claimant and the First Defendant are both members of ETSI.

29.     According to the ETSI website, there are about 30 holders of patents who have declared to ETSI that they have patents essential to the GSM standard, representing about 3,200 patents (in respect of some patents, this will include a number of foreign counterparts – this varies depending on the filing and declaration practice of the patentee).

**The ETSI IPR Policy: rights and obligations of ETSI members and rights of third parties**

30.     ETSI members' rights and obligations and the rights of third parties are set out *inter alia* in ETSI's Intellectual Property Rights Policy ("IPR Policy"). The version of the IPR Policy currently in force is dated 23 November 2005. The relevant precepts and obligations of the IPR Policy referred to below are also contained in earlier versions of the ETSI IPR policy and have been in force at all material times.

31.     Clause 3 of the IPR Policy sets out ETSI's policy objectives as follows:

"Standards and technical specifications shall be based on solutions which best meet the technical objectives of the European telecommunications sector, as defined by the General Assembly. In order to further this objective, the ETSI IPR Policy seeks to reduce the risk to ETSI, Members and others applying ETSI standards and technical specifications, that investment in the preparation, adoption and application of standards could be wasted as a result of an essential IPR for a standard or technical specification being unavailable. In achieving this objective, the ETSI IPR policy seeks a balance between the needs of standardisation for public use in the field of telecommunications and the rights of the owners of IPRs.

IPR holders, whether members of ETSI and their affiliates or third parties, should be adequately and fairly rewarded for the use of their IPRs in the implementation of standards and technical specifications.

ETSI shall take reasonable measures to ensure, as far as possible, that its activities which relate to the preparation, adoption and application of standards and technical specifications enable standards and technical specifications to be available to potential users in accordance with the general principles of standardisation".

32.   Clause 15.6 of the IPR Policy states that:

" "Essential" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardisation, to make, sell, lease or otherwise dispose of, repair, use or operate equipment or methods which comply with a standard without infringing that IPR.  For the avoidance of doubt in exceptional cases where a standard can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered essential".

33.   Clause 4.1 of the IPR Policy provides for disclosure of IPRs as follows:

"… each Member shall use its reasonable endeavours, in particular during the development of a standard or technical specification where it participates, to inform ETSI of essential IPRs in a timely fashion.  In particular, a Member submitting a technical proposal for a standard or technical specification shall, on a bona fide basis, draw the attention of ETSI to any of that Member's IPR which might be essential if that proposal is adopted".

34.   Clause 6.1 of the IPR Policy provides for the availability of licences for essential IPR as follows:

"When an essential IPR relating to a particular standard or technical specification is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory terms and conditions under such IPR to at least the following extent:

- manufacture, including the right to make or have made customized components and sub-systems to the licensee's own design for use in manufacture;

- sell, lease or otherwise dispose of equipment so manufactured;

- repair, use or operate equipment; and

- use methods.

The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate".

35.   Clause 15.4 of the IPR Policy defines "equipment" as meaning "any system or device fully conforming to a standard", and Clause 15.5 defines "methods" as meaning "any method or operation fully conforming to a standard".

36.   The ETSI Guide on Intellectual Property Rights ("the IPR Guide") recognises that non-members of ETSI have certain rights under the IPR Policy even if they do not have obligations thereunder.  Paragraph 1.4 of the IPR Guide contains a table which "intends to give a clear overview of the most important rights and obligations of the Institute, the Members, the Secretariat and the rights of third parties as specified under the ETSI IPR Policy".  The table includes among third parties' rights, the right "to be granted licences on fair, reasonable and non-discriminatory terms and conditions in respect of a standard at least to manufacture, sell, lease, repair, use and operate (*clause 6.1*)".

**The Patent License Agreement made between the parties on [...Redated...]**

37.   On [...**Redacted**...], the Claimant and the Defendants entered into a "Patent License Agreement" ("the Patent License Agreement").  Each party agreed to [...**Redacted**...] licences under [...**Redacted**...], defined to mean [...**Redacted**...].  [...**Redacted**...] were defined to mean [...**Redacted**...].

37A.  The said grant accordingly extended not only to [...**Redacted**...] but also to other [...**Redacted**...].  Further, the said grant specifically extended to all [...**Redacted**...].

38.   At the time of the Patent License Agreement, the Defendants had only a limited number of patents relating to technology required to meet the GSM standard.

39.   By contrast, the Claimant held numerous patents, in particular relating to technology required to meet the GSM standard.  As far as the Defendants are aware from public sources, the Claimant was, and continues to be, the holder of the second largest number of declared essential patents under the GSM standard.  [...**Redacted**...].

40.     Under the Patent License Agreement, the Defendants agreed [...**Redacted**...].

41.     Clause [...**Redacted**...] of the Patent License Agreement stated *inter alia* that:

        [...**Redacted**...].

42.     Clause [...**Redacted**...] of the Patent License Agreement also stated that:

        [...**Redacted**...].

43.     By clause [...**Redacted**...] of the Patent License Agreement, the Defendants agreed to license their patents to the Claimant for [...**Redacted**...].

44.     The Patent License Agreement commenced on [...**Redacted**...] (the [...**Redacted**...]) and was to continue to the expiry date of [...**Redacted**...] (unless terminated by either party before that date).  By Clause [...**Redacted**...]:

        [...**Redacted**...].

45.     As indicated above, Clause [...**Redacted**...] of the Patent License Agreement [...**Redacted**...].

46.     At the time when the Patent License Agreement was entered into, both parties anticipated that the [...**Redacted**...] agreed between them would represent [...**Redacted**...].

47.     In the course of the negotiations for the Patent License Agreement, the parties referred to [...**Redacted**...].

48.     In fact, on the basis of [...**Redacted**...], the effective average royalty rate for the [...**Redacted**...] over the period [...**Redacted**...] was [...**Redacted**...].  If, in accordance with Clause [...**Redacted**...] of the Patent License Agreement, [...**Redacted**...], then the effective average royalty rate is [...**Redacted**...].

**Declaration of the Patents in Suit as Essential**

49.     In its Particulars of Infringement, the Claimant states at Paragraph 3(2):

"The Claimant believes and has declared the Patents to be essential in relation to the European Telecommunications Standards Institution's GSM standard".

50.     The Claimant declared each of the Patents to ETSI as essential in relation to the GSM standard on 22 February 2002.  The following statement appears on the Claimant's declaration for each Patent:

"The signatory and/or its affiliates hereby declare that they are prepared to grant irrevocable licences under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the standard, to the extent that the IPRs remain essential".

51.     Clause 6.1 of the ETSI IPR Policy refers to fair, reasonable and non-discriminatory ("FRAND") terms and conditions.

52.     Therefore, by the said declarations, the Claimant undertook to grant irrevocable licences under the Patents on FRAND terms and conditions.

53.     The declaration for each of the Patents was published on the ETSI website for the information of ETSI members and potential licensees, such as the Defendants.

53A.    The Claimant has declared (and continues from time to time to declare) a large number of other patents as essential, to ETSI and to other relevant industry standard-setting bodies (such as OMA).

**The negotiations between the parties in [...Redacted...]**

54.     Since [...**Redacted**...] (when the Patent License Agreement was entered into), the Defendants have expanded their portfolio of essential patents for the GSM standard and, to an even greater extent, for the WCDMA standard.

55.     By [...**Redacted**...], the Defendants estimated that their portfolio of WCDMA essential patents had increased both in absolute terms and relative to the portfolio of

essential WCDMA patents held by the Claimant.  According to information published on the ETSI website:

55.1    the Second Defendant is now one of about 20 undertakings holding up to 50 GSM declared essential patents, while the Claimant is one of about 7 undertakings holding 101 or more GSM declared essential patents;

55.2    the Second Defendant is now one of about 10 undertakings, along with the Claimant, holding 101 or more WCDMA declared essential patents.

56.     In  [...**Redacted...**], the Claimant and the Defendants entered into technical negotiations for a new patent licence agreement, with commercial negotiations commencing in [...**Redacted...**]. They failed to reach agreement.  The Claimant then, on 21 February 2006, initiated the present proceedings (together with patent infringement proceedings in the USA, Germany and the Netherlands) seeking *inter alia* injunctions to prevent the Defendants making use of the Patents.

57.     Before the Claimant initiated the present proceedings, its final position in negotiations with the Defendants [...**Redacted...**] was that the parties should enter into a [...**Redacted...**] year cross-licence [...**Redacted...**] (see Paragraphs 37 to 37A above), for [...**Redacted...**] having allegedly been calculated by the Claimant by reference to [...**Redacted...**].

58.     The Defendants did not accept the Claimant's offer on the basis that it did not appear to them fair or reasonable having regard to the level of the previously agreed licensing fee (under the Patent License Agreement), to the treatment by Ericsson (so far as discernable) of other comparable licensees including [...**Redacted...**], and to the increased value of the Defendants' own patent portfolio since the time of the Patent License Agreement.  Further, the Defendants were unable to assess whether the Demanded Royalty was non-discriminatory nor the principles upon which the calculation of the Demanded Royalty had been based.  The Claimant did not at any time during the negotiations between the parties in 2005 provide any adequate explanation of the steps that it had taken to ensure that the Demanded Royalty was

fair, reasonable and non-discriminatory nor did it adequately explain upon what principles the Demanded Royalty was based.

59.   The Defendants' final position in the negotiations with the Claimant before the commencement of these proceedings was that the parties enter into a [...**Redacted...**] year cross-licence [...**Redacted...**] for technology under [...**Redacted...**].

60.   In the light of the Claimant's declaration to the effect that it was prepared to license its declared essential patents on FRAND terms and conditions, the Defendants' solicitors wrote to the Claimant's solicitors on 5 June 2006, asking in particular for:

60.1   a full and clear explanation of the basis on which the Claimant values its own essential patents for licensing purposes, and calculates the royalties that are to be paid by each of its licensees, including an explanation of the basis on which the Claimant values any patents offered by way of cross-licence when setting royalty rates;

60.2   an explanation of the Claimant's understanding of, approach to, and implementation of FRAND terms and conditions, including at least:

60.2.1   a full and clear explanation of the Claimant's approach to the duty of non-discrimination, and how this is implemented by the Claimant in practice across licensees and potential licensees;

60.2.2   what steps the Claimant has taken (and continues to take) to ensure that its agreements and demands for royalties payable under licences in respect of patents declared as essential are fair and reasonable;

60.2.3   full details of any internal written assessment that the Claimant has actually carried out concerning the requirements of its undertaking to ETSI to license essential patents on FRAND terms and conditions; and

60.3   the basis for the Claimant's belief that the terms and conditions of its final pre-litigation offer to the Defendants in respect of the licensing of the Patents were FRAND with a copy of the Claimant's own contemporaneous written internal assessment of that issue; and

60.4 "confirmation that every other company currently engaged in any commercial activity in (respectively) the GSM and WCDMA markets has signed a licence with and is paying a licence fee to the Claimant or that a licence is currently under negotiation".

61. By letter dated 13 June 2006, the Claimant's solicitors replied as follows:

"Thank you for your letter of 5 June 2006.

As we are yet to receive either of your clients' Defences regarding this matter we do not feel it appropriate to provide a response to your requests for disclosure at this stage".

62. By letter dated 15 June 2006, the Defendants' solicitors wrote further explaining that the Defendants remained ready to enter into a cross licence with the Claimant as soon as it could be satisfied that the terms and conditions offered were fair, reasonable and non-discriminatory. The Defendants' solicitors stated that the information sought in its letter of 5 June 2006 was requested to assist them in making that assessment on a fair basis and asked the Claimant's solicitors to reconsider their refusal to supply the information requested.

63. As at the date of this Amended Defence, the Claimant's solicitors have still not provided the information requested by the Defendants (despite the request having been repeated by the Defendants' solicitors in letters dated 14 July, 21 July and 26 July 2006).

63A. On 20 July 2006, the Claimant served its Reply and Defence to Counterclaim. As at the date hereof, that document contains the most complete explanation that the Claimant has yet been prepared to give about the basis on which it has been willing to enter into a patent licence agreement with the Defendants. In Paragraph 25 of the Reply and Defence to Counterclaim, the Claimant has asserted simply that:

63A.1 It uses a system of "reference royalty rates" in relation to "the licensing of GSM products" [...Redacted...] and in relation to "the licensing of WCDMA products" [...Redacted...].

63A.2  It has applied a discount from those reference royalty rates in making its offer to the Defendants, in order to take account of "a number of factors". Those factors are said to have included (a) the Defendants' patent portfolio in each technology; (b) the parties' respective projected volumes of worldwide sales of each party's and Sony Ericsson's products; (c) the present and future business relationship between the parties; and (d) the benefits and risks [...**Redacted...**].

63B.   The Claimant's description of its approach is inadequate to justify, or even to enable the Defendants to understand, how it has arrived at the Demanded Royalty. Thus:

63C.   The basis for the reference royalty rates is opaque. For example, the Claimant does not show, or indicate, that it has taken into account the overall licensing situation for licensees generally, including the cost of obtaining all necessary licences from other relevant patent holders for all relevant technologies in the end products.

63D.   The Claimant has given no adequate explanation of the way in which it has applied a discount from those reference royalty rates in the present case, so as to arrive at the Demanded Royalty.

63E.   The Claimant does not purport to have taken into account, in setting the Demanded Royalty, the terms and conditions on which it has granted licences to other parties (including [...**Redacted...**]) who are in a comparable position to the Defendants *qua* licensees, with a view to ensuring that there is no discriminatory treatment of the Defendants and that the Defendants are not placed at a competitive disadvantage in relation to the supply of mobile handsets in the European Union.

**The Claimant's revised offer made on 7 August 2006**

63F.   On 28 July 2006, following a proposal made by the Claimant that it should collect the licensing terms previously offered to the Defendants into a single document, the Court directed that the Claimant should serve on the Defendants "a written statement setting out the terms on which it is prepared to enter into a cross-licence with the Defendants including the patents in suit".

63G.   On 7 August 2006, the Claimant served on the Defendants its proposed draft cross-licence ("the Revised Ericsson Offer").  The Defendants will refer to the full terms and conditions of the Revised Ericsson Offer at trial.  In summary, the Claimant proposed that the parties would grant each other [**...Redacted...**] licence of [**...Redacted...**].   [**...Redacted...**] were given a precise definition, to mean [**...Redacted...**].

63H.   Accordingly, unlike the 2001 Patent License Agreement between the parties, and out of line with the basis of the negotiations between the parties in [**...Redacted...**] relating to a successor agreement, the Revised Ericsson Offer makes no provision for the inclusion in a new cross-licence of [**...Redacted...**].

63I.   Under the Revised Ericsson Offer, the Defendants would be required to pay the Claimant a [**...Redacted...**] together with a [**...Redacted...**].

63J.   By its solicitors' letter of 18 August 2006, the Claimant declined to provide [**...Redacted...**] to be paid under the Revised Ericsson Offer, but stated that [**...Redacted...**] could be calculated by applying the [**...Redacted...**] to [**...Redacted...**] and [**...Redacted...**] (see letter from Claimant's solicitors of 18 August 2006).

63K.   The Defendants have not accepted the Revised Ericsson Offer.  As in the case of the Demanded Royalty (and *a fortiori* in view of the restriction in [**...Redacted...**]), the Revised Ericsson Offer does not appear to them fair, reasonable or non-discriminatory having regard to the level of the previously agreed licensing fee under the Patent License Agreement, to the treatment by Ericsson (so far as discernable) of other comparable licensees including [**...Redacted...**], and to the increased value of the Defendants' own patent portfolio since the time of the Patent License Agreement.

63L.   Further, the Defendants are similarly unable to assess the principles upon which the calculation of the Revised Ericsson Offer has been based.  The Claimant has failed to give any explanation as to how or why it says that the terms and conditions of the Revised Ericsson Offer are fair, reasonable and non-discriminatory over and above its assertion (which is denied) that "[t]his proposal reflects the last offer made by [the Claimant] in the pre-litigation negotiations" and that "[**...Redacted...**] (as pleaded in

our clients Reply and Defence to Counterclaim) and, in addition, were calculated to incentivise [the Defendants] to settle the dispute without recourse to litigation" (see the letter from the Claimant's solicitors of 7 August 2006).

**The Claimant's further increase in its licence demands in January 2007**

63M.   On 5 January 2007, the Claimants sought to limit the scope of the Revised Ericsson Offer even further.  By letter from Messrs Bird & Bird, the Claimant stated that the offer was intended [...**Redacted...**], and that, despite its wording, it was meant to cover [...**Redacted...**] in respect of the [...**Redacted...**].

63N.   Subsequently, on 15 January 2007, Bird & Bird on behalf of the Claimant served [...**Redacted...**].  These were:

63N.1   [...**Redacted...**]; and

63N.2   [...**Redacted...**].

63O.   [...**Redacted...**].

63P.   [...**Redacted...**].

63Q.   The Claimant has refused to inform the Defendants, pursuant to written requests made by their solicitors Messrs Bristows on [...**Redacted...**] and [...**Redacted...**], of the basis on which the Claimant asserts that its licence offers are FRAND.  The Claimant has even refused to explain why the [...**Redacted...**] is different from [...**Redacted...**]. Its position, in relation to explaining the basis of its offers in any way, was set out in a letter from Bird & Bird dated 18 January 2007:

> "We have made it clear that our client believes that the obligation to grant a FRAND licence does not in any way import an obligation to justify any such offer by giving reasoning and evidence in support."

**Breach of contract**

63R.   The Claimant and the First Defendant are both members of ETSI. The ETSI rules, including the ETSI IPR Policy, take effect as a multilateral agreement between its members, governed by French law ("the ETSI agreement").

63S.   The Claimant has expressly agreed and undertaken, in accordance with clause 6.1 of the ETSI IPR Policy, and its formal written undertakings made thereunder, to be prepared to grant irrevocable licences on fair, reasonable and non-discriminatory terms under all its patents declared as essential to ETSI (including the Patents). The Claimant has admitted that it is under a binding legal obligation to grant a licence under all such essential patents on fair, reasonable and non-discriminatory terms: see in particular paragraph 20 of the Claimant's Reply and Defence to Counterclaim.

63T.   Under French law, the content of the Claimant's obligation to be prepared to license on fair, reasonable and non-discriminatory terms must be interpreted in the light of the facts and circumstances surrounding the adoption of the said obligation in the ETSI IPR Policy. The relevant facts and circumstances include, in particular, the desire/need of the ETSI members concerned to comply with EC competition law, and to avoid the intervention of the European Commission if no competition law-compliant IPR policy could be adopted. In consequence, and in view of the potential applicability of the prohibitions in Articles 81 and 82 EC, the obligation to license standard-essential patents on "fair and reasonable", as well as on "non-discriminatory", terms includes an obligation to ensure that the terms of licensing do not infringe Articles 81 and/or 82 EC and in particular do not hinder effective competition between manufacturers and suppliers of mobile telephone handsets, and that the interests of final consumers of mobile handsets (in particular in not paying excessive prices) are not harmed.

63U.   The Claimant's licensing offers under its portfolio of essential patents (culminating in the Amended Revised Ericsson Offer) have not been on fair, reasonable and non-discriminatory terms. The Claimant is thereby in breach of its contractual obligations under the ETSI agreement. The Defendants refer to and rely on all of the facts and matters which are set out at Paragraphs 80 to 84A below.

*Breach of the obligation to negotiate in good faith / transparently*

63V.   Further, as a result of the Claimant's said declarations to ETSI, and in the light of the matters set out in Paragraphs 30 to 36 and 63T above relating to the objectives and principles of the ETSI IPR Policy to which the Claimant has subscribed, the Claimant is obliged under the French law of obligations to enter into good faith negotiations with the Defendants for the licensing on FRAND terms of the patents that it has declared as essential.

63W.   The obligation to negotiate in good faith for the grant of a licence on FRAND terms necessitates:

63W.1 that the Claimant should demand only terms and conditions that are FRAND, and which are based upon a cogent justification;

63W.2 the provision by the Claimant of a full and clear explanation of the basis on which it is asserted that any demanded terms and conditions are FRAND, namely each of (a) fair (b) reasonable and (c) non-discriminatory; and

63W.3 that the Claimant should answer in good faith any challenge made or questions raised by a potential licensee, such as the Defendants, concerning any demanded terms and conditions for the grant of a licence.

63X.   In breach of the said obligation of good faith, the Claimant has refused, and continues to refuse, to explain to the Defendants (in response to their solicitors' request) and to justify the principles, facts and matters on which it bases and purports to justify the Demanded Royalty and/or the royalty proposed under the Amended Revised Ericsson Offer.  The Defendants refer to and rely upon the matters set out at Paragraphs 63V to 63W above.

63Y.   Instead of negotiating in good faith, the Claimant has initiated these proceedings in order to exert pressure on the Defendant to agree to its unfair, unreasonable and discriminatory demands for a new patent licence agreement, or else be driven from the market for the supply of mobile telephone handsets.  The Claimant has thereby

wrongly terminated the negotiations between the parties in breach of its obligation to negotiate for the licensing of the Patents (and all patents declared to ETSI and other relevant industry standard setting bodies as essential) in good faith.

## Article 81 EC and/or section 2 of the Competition Act 1998

63Z.   Further or alternatively, the obligations referred to in Paragraphs 63S, 63T, 63V and 63W above are required by, as well as in order for the agreement between undertakings which is comprised by the ETSI rules ("the ETSI agreement") to be compatible with, Article 81 EC and/or the Chapter I prohibition:

63Z.1. The ETSI agreement is an agreement between undertakings which, actually or potentially, restricts competition on the market for the supply of mobile telephone handsets within at least the European Union (see further Paragraphs 67 to 69 below), and affects trade between member states (see further Paragraphs 85 to 86 below). In particular, the GSM standard adopted within ETSI requires to be implemented by all manufacturers and suppliers of mobile telephone handsets for use within (at least) the European Union. Similarly, the WCDMA standard requires to be implemented by all manufacturers and suppliers of 3G mobile telephone handsets. Against that background, the ETSI agreement operates, actually or potentially, to confer market power on its members who are owners of essential patents under the applicable technical specifications and standards, vis-à-vis mobile handset suppliers who need to take licences under such patents for their business purposes.

63Z.2. The ETSI agreement is made compatible with the requirements of Article 81 EC (including the conditions of Article 81(3) EC) only if and to the extent that, under the agreement, members owning essential patents are prepared to grant licences under those patents on FRAND terms, when requested to do so.

63Z.3 If, under the provisions of the ETSI agreement, members owning essential patents may refuse to license any party who is unwilling to accept without question a bare assertion that the terms proposed by the patent owner are allegedly FRAND, then the agreement will not provide a sufficient mechanism to ensure that licences on fair,

reasonable and non-discriminatory terms are actually granted so as to be compatible with Article 81 EC.

63AA. Paragraphs 63Z to 63Z.3 above are repeated with respect to the application of the Chapter I prohibition rather than Article 81 EC, save that references to effects on trade within the United Kingdom should be substituted for the references to effects on trade between member states.

63BB. The refusal by the Claimant to license the Defendants under its portfolio of essential patents on fair, reasonable and non-discriminatory terms, and/or the Claimant's refusal to justify in any way the basis of its licence offers, represents an exercise of intellectual property rights that itself falls within the prohibition in Article 81 EC and/or the Chapter I prohibition, being the object, means or consequence of the ETSI agreement.

63CC. In the premises, even if (which is denied) the Patents are valid and infringed, the Claimant may not obtain the relief that it seeks in these proceedings and will be limited to a remedy in damages equivalent to that which the Claimant can establish would be payable under a licence on fair, reasonable and non-discriminatory terms.

**Article 82 EC and/or section 18(1) of the Competition Act 1998**

64.    The Claimant's refusal to grant a licence to the Defendants in respect of its portfolio of technically and commercially essential patents (having the same scope as under the PLA) otherwise than by imposing unfair trading conditions is an abuse by it of a dominant position contrary to Article 82 EC and/or section 18(1) of the Competition Act 1998 ("the Chapter II prohibition"), and the Claimant is not entitled to the relief sought by it in these proceedings.

*Relevant markets*

65.    For the reasons set out in Paragraphs 17 to 21 above, any undertaking that wishes to manufacture or supply mobile telephone handsets for use in the European Union

today (whether 2G or 3G handsets) must ensure that the handsets incorporate technology that complies with the GSM industry standard.

66.   The Patents are declared to be essential for compliance with the GSM industry standard and (for the purposes of this competition law defence) are assumed to be so (see Paragraph 6 above).  Therefore, any undertaking that wishes to manufacture or to supply mobile telephone handsets for use in the European Union today cannot avoid utilising the technology which is the subject-matter of each of the Patents.  In other words, the relevant technology represents an indispensable input from the point of view of any such undertaking, since there are no actual or potential substitutes for it.

67.   In these circumstances, there is a relevant economic market for the supply, within (at least) the European Union, of the technology that is covered by each of the four Patents.

67A.  Further or alternatively, there is a relevant economic market for the supply within at least the European Union of technology required to be implemented for the supply of commercially saleable 2G and/or 2G and 3G mobile telephone handsets; alternatively, there is a relevant market for the supply of all the technology owned or controlled by the Claimant which is required to be implemented for the supply of commercially saleable 2G and/or 2G and 3G mobile telephone handsets.

67B.  By reason of its possession of a large portfolio of patents (including the Patents) that have been declared essential to the relevant industry standards (including the GSM and WCDMA standards, and the OMA specifications applicable to those standards), and/or which are in fact commercially essential from the point of view of mobile telephone handset suppliers, the Claimant occupies a dominant position in the economic market or markets referred to at Paragraphs 67 to 67A above ("the relevant technology markets").

68.   Further, and insofar as it is necessary to establish the same, there is also a relevant economic market for the supply of mobile telephone handsets for use within (at least) the European Union (being handsets that need to comply with the GSM industry standard, and in respect of which use of the technology covered by essential patents

under that standard is required).  The relevant technology markets are "upstream" markets in relation to the "downstream" market for the supply of mobile telephone handsets.

69.   The downstream handset market is limited to 2G handsets, on the basis that a hypothetical monopolist of such products within (at least) the European Union would be able to raise its prices by a small but significant amount (5-10 per cent.) for a significant time, without this strategy being rendered unprofitable as a result of consumers switching their purchases to other products, and in particular to the only other widely available commercial substitute product, namely 3G handsets. Alternatively, the downstream handset market comprises both 2G and 3G handsets.

*The Claimant's dominant position*

70.   The Claimant holds a dominant position in each of the relevant technology markets. Any undertaking that wishes to carry on business in the economic market for the supply of mobile telephone handsets for use in the European Union has no choice but to seek and obtain a licence under the Claimant's portfolio of essential patents (including the Patents).   If the Claimant were to choose to exploit any such undertaking by, for example, charging excessive and/or discriminatory prices, that undertaking could not respond by switching its purchases of the relevant technology to an alternative supplier, or by using some alternative technology.  The Claimant is therefore an unavoidable trading partner for any undertaking wishing to compete in the mobile handset market in the European Union.  It faces no competitors in the supply of the relevant technology, and it has the power to behave to an appreciable extent independently of its customers and, ultimately, consumers.

71.   The Claimant's position of dominance in relation to the relevant technology markets is strengthened by the fact that the Claimant does not itself carry on business in the supply of mobile telephone handsets for use in the European Union (although it has an interest in the SonyEricsson joint venture), and therefore the ability of potential licensees to counter any unreasonable demands by the Claimant as respects the terms of licensing of its portfolio of essential patents (including the Patents), by threatening

to withhold from the Claimant licences of their own essential patents relevant to the supply of handsets, is very limited.

72.    Similarly, the Defendants and other potential licensees under the Claimant's essential patent portfolio (including the Patents) are unable effectively to counter any unreasonable demands by the Claimant by threatening to withhold licences of their own declared essential or other patents relevant to the supply by the Claimant of telecommunications network equipment and services.    That is so because, among other matters:

72.1    the Claimant has a very powerful and well-established market position and installed base in the supply of network equipment and services: see Paragraph 7 above.   In particular, approximately forty per cent. of all mobile telephone calls are made through the Claimant's systems.   The businesses of other undertakings (such as the Defendants and customers of the Defendants) involved in the mobile telecommunications industry are, in varying degrees, reliant upon the continued effective provision of the Claimant's network equipment and services;

72.2    the market for the supply of network equipment and services is characterised by the conclusion of infrequent agreements with a small number of customers, whereas the handset market is characterised by the need for suppliers (such as the Defendants) to conclude agreements with a large number of customers on a regular and frequent basis.   Accordingly, the short-term commercial effects on the Claimant's network and equipment sales of any threat by the Defendants to withhold licences of their essential patents is different from, and in practice far less than, the effects on the Defendant's handset sales of a threat by the Claimant (as in these proceedings) to do likewise.

73.    Moreover, the Claimant's position of dominance, and the extent of its special responsibility not to allow its conduct to impair genuine undistorted competition, are strongly reinforced by the lack of transparency in the relevant technology markets, to which the Claimant, through its conduct, contributes.   As explained in the following paragraphs, that lack of transparency normally renders it impossible for any potential licensee to know whether the licensing terms being offered by the Claimant are fair,

reasonable and non-discriminatory, at least in the absence of co-operation from the Claimant itself.

74.   It is a common feature of licensing agreements for essential (and non-essential) patents for *inter alia* the GSM and WCDMA standards that they contain in practice a confidentiality or non-disclosure clause, under which the parties are obliged not to disclose to any third parties the terms of the agreement, including the royalty rates or licensing fees that are paid by the parties thereunder.

75.   In view of that feature of the industry, any potential licensee is normally entirely dependent upon the patent holder to explain fully the principles upon which it bases the terms and conditions that it desires to impose under any proposed patent licence, and to demonstrate that those terms and conditions are compatible with Article 82 EC, in that they are, in all relevant respects, fair and reasonable and non-discriminatory.

76.   In these circumstances, if, as in the present case, the holder of declared essential patents relating to the GSM industry standard refuses to explain the principles on which it bases the terms and conditions under any proposed patent licence, this precludes the possibility for a potential licensee to negotiate in order to ensure the application of fair trading conditions for the purposes of Article 82 EC, and thereby enables the patent holder to impose abusive trading conditions, including excessive and/or discriminatory pricing.

77.   The following are the best particulars that the Defendants can give of the abuse of dominance by the Claimant pending clarification of the basis for the Revised Ericsson Offer.

*Abuse*

*(1)   Refusal to license otherwise than by the imposition of unfair and/or discriminatory trading conditions*

77A.   As of [**...Redacted...**], the Revised Ericsson Offer effectively replaced the Claimant's final position in pre-litigation negotiations with the Defendants (as set out

in Paragraph 57 above).  As at [...**Redacted...**], the Revised Ericsson Offer was itself effectively amended when the Claimant issued terms for a [...**Redacted...**] (see paragraphs 63M to 63Q above).  The following paragraphs of this Re-Amended Defence therefore focus on the Revised Ericsson Offer, as amended by the subsequent offers in respect of [...**Redacted...**] ("the Amended Revised Ericsson Offer").

78.   As a result of exceptional circumstances, the Claimant's refusal to grant the Defendants a licence under its portfolio of essential patents (including the Patents) unless they agree to the Amended Revised Ericsson Offer is an abuse of a dominant position in breach of Article 82 EC and/or section 18(1) of the Competition Act 1998, for the following reasons:

78.1   The Claimant's essential patents (including the Patents) relate to "industry standards", and/or, without access on fair trading conditions to the technology covered by the portfolio, it is impossible for any undertaking sustainably to compete in the downstream economic market for mobile telephone handsets in the European Union;

78.2   The Claimant does not seek to rely on its intellectual property rights in these proceedings in order to reserve exclusively to itself the ability to manufacture and supply mobile telephone handsets: rather, its intention is to extract unfair and/or discriminatory licensing terms from the Defendants as the price for their continued presence in the market;

78.3   In recognition of the essential nature of the Patents and other patents within its portfolio, the Claimant has made express declarations to ETSI of its preparedness to enter into licences on FRAND terms. However, despite this, the Claimant has refused, and continues to refuse, adequately to explain to the Defendants (in response to their solicitors' requests) the principles on which it bases and purports to justify the Amended Revised Ericsson Offer.

78.4   The Defendants were, until recently, licensees of the Claimant, and they are existing and important competitors in the market for the supply of mobile telephone handsets in the European Union;

78.5    In the premises, if the Defendants cannot obtain a licence under the Claimant's portfolio of essential patents (including the Patents) on fair trading conditions, they will be unable economically to utilise the relevant technology and so to supply mobile telephone handsets that comply with the industry standards on a fair commercial basis; as a result, they will eventually be driven from the market for the supply of mobile telephone handsets in the European Union, in which they currently compete, thereby causing a significant loss in competition in the handset market to the detriment of consumers; further or alternatively, the result of having to pay excessive licence fees to the Claimant is likely to be reflected in increased prices of handsets to consumers;

78.6    For all the reasons set out in Paragraphs 80 to 84A below, the royalty proposed under the Amended Revised Ericsson Offer is an unreasonable, excessive and discriminatory price that cannot be objectively justified, and so the charging by the Claimant of the royalty proposed under the Amended Revised Ericsson Offer would be illegal as amounting to the imposition of an unfair selling price contrary to Article 82(a) and/or Article 82(c) EC, and/or contrary to s.18(2)(a) and/or (c) of the Competition Act 1998;

78.7    The Defendants aver insofar as necessary that they do not require a licence of the Claimant's patents merely in order to duplicate goods or services already being offered on the mobile handset market by the Claimant.  The Claimant is not in fact present on the mobile handset market (although the SonyEricsson joint venture company is), and in any event the Defendants' range of mobile telephone products is varied and innovative, and is different from the range of products that is offered by the SonyEricsson joint venture.

79.     There is no objective justification for the Claimant's constructive refusal to license its portfolio of essential patents (including the Patents) to the Defendants in the present case.

*(2)*   *Unfair / excessive pricing*

80.     Further or alternatively, the royalty proposed under the Amended Revised Ericsson Offer, if charged, would constitute an unfair selling price within the meaning of Article 82(a) EC and section 18(2)(a) of the Competition Act 1998, for the following reasons:

*Comparators*

80.1    The Demanded Royalty was unfair and/or excessive in that:

80.1.1  it was substantially in excess of any royalty or licence fee charged to the Defendants by any other holder of essential GSM and WCDMA patents under comparable cross-licence agreements without there being any objective justification for this difference; and

80.1.2  it exceeded the [...**Redacted**...] charged to the Defendants by [...**Redacted**...] under comparable cross-licence agreements [...**Redacted**...], without objective justification.

80.1.3  Since the Demanded Royalty was an unfair and excessive selling price when compared to the royalties and licence fees charged to the Defendants by other holders of [...**Redacted**...] under comparable cross-licence agreements, the Amended Revised Ericsson Offer is also an unfair and excessive selling price.

80.2    The Defendants refer to the following facts and matters in support of the allegations at Paragraph 80.1 above:

80.2.1  The confidential cross-licence agreements upon which the Defendants rely at Paragraph 80.1.1 above as relevant comparators (where differences between the agreements are not considered such as to remove their value as comparators), and which have been disclosed to the Claimant, including those made since [...**Redacted**...] with: [...**Redacted**...].

80.2.2 [...**Redacted...**] charged to the Defendants by [...**Redacted...**] under comparable cross-licence agreements is in the region of [...**Redacted...**] (including the royalties and licence fees (if any) payable to all the licensors listed in Paragraph 80.2.1 above and under the 2001 Patent License Agreement with Ericsson – see Paragraph 80.3 below), which falls to be compared with [...**Redacted...**] sought by the Claimant [...**Redacted...**] as the Demanded Royalty.

*The yardstick of the 2001 Patent License Agreement*

80.3 The [...**Redacted...**] agreed by the parties under the Patent License Agreement was the result of fair commercial negotiations between the parties. It was in line with the licence fees paid by the Defendants to other holders of [...**Redacted...**] under comparable cross-licence agreements. The licence fee under the Patent License Agreement provides a yardstick against which the fairness of the Demanded Royalty and the royalty proposed under the Amended Revised Ericsson Offer may be measured:

80.3.1 The Demanded Royalty represented a [...**Redacted...**] on the licence fee agreed by the parties under the Patent License Agreement. At [...**Redacted...**], the Demanded Royalty is more than [...**Redacted...**] agreed by the parties under the Patent License Agreement. Moreover, as noted above at Paragraph 45, only [...**Redacted...**] of the [...**Redacted...**] related to the period on and after the Effective Date of the Patent License Agreement [...**Redacted...**]. The Demanded Royalty is therefore more than [...**Redacted...**] under the Patent License Agreement;

80.3.2 There is no objective justification for the said increase;

80.3.3 On the contrary, as explained above, the Defendants' patent portfolio (which would be the subject of a cross-licence under the new agreement) has strengthened, particularly as regards patents essential to the WCDMA standard, since the Effective Date of the Patent License Agreement;

80.3.4 Moreover, since 2001, WCDMA technology has increased in importance. In 2005, industry analysis showed that 3G handsets accounted for 53% of mobile telephone

market growth in Western Europe[7] and their sales are growing at a faster rate than sales of 2G handsets. It is estimated that, by 2010, global sales of 3G handsets will at least equal, and may have overtaken, global sales of 2G handsets;

80.3.5 The value of essential patents for WCDMA technology has therefore also increased;

80.3.6 However, the Demanded Royalty failed to attribute any or any adequate value to the Defendants' patent portfolio which would be cross-licensed to the Claimant.

80.3.7 Since the Demanded Royalty was an unfair and excessive selling price when measured against the yardstick of the licence fee charged under the Patent License Agreement, the Amended Revised Ericsson Offer is also an unfair and excessive selling price.

*The need to take into account the cumulative royalties that have to be paid to licensors of declared essential patents*

80.4 The royalty proposed under the Revised Ericsson Offer fails to take into account the cumulative royalty costs required to be paid to patent holders by undertakings wishing to comply with the GSM standard (including associated 2.5G technologies such as GPRS), and the WCDMA standard. If undertakings carrying on business in the supply of mobile telephone handsets (and in particular undertakings without any essential patents of their own to cross-license) had to pay royalties to all relevant patent holders that were in line with the royalty proposed under the Amended Revised Ericsson Offer, the cumulative cost would be prohibitive and would therefore prevent, restrict or distort competition in the mobile handset market:

80.4.1 In a document entitled "Proposal for IPR Policy Reform" presented to the ETSI General Assembly meeting of 10-11 January 2006 at Munich by the Claimant, Motorola and Nokia, the authors referred to the problem of "royalty stacking" and of excessive cumulative royalties, and said:

---

[7]    GSM Association statistics Q1 2006: 3GSM (W-CDMA) regional statistics (www.gsmworld.com)

"... **each essential patent owner can develop its own idea of how FRAND should be applied in practice. This fragmented approach means that when there are many essential patents and essential patent owners the overall license cost, i.e. the "cumulative royalties", are more uncertain.**

Also the increasing tendency for multi-function, multi-technology products means that there are ever more patents covering the end product, giving rise to the phenomenon of so-called 'royalty stacking'.

**Overall, cumulative royalties are perceived to be uncertain and often too high, possibly even prohibitive".**

(emphasis added)

80.4.2  In that document, the Claimant, Motorola and Nokia proposed that the FRAND definition should be clarified by reference to a principle of "aggregated reasonable terms" which:

"means essential patent owners agree to grant licences on terms that are objectively commercially reasonable **taking into account the overall licensing situation including the cost of obtaining all necessary licences from other patent holders for all relevant technologies in the end product.**

"... **the proposed new definition in the IPR policy will enable and signal to judges in patent litigation that they can and should look at the overall cumulative royalty costs for a given standard and not just to assess whether the terms being offered by one particular licensor are fair and reasonable** *in vacuo*. **In other words the courts will be directed to take into account the cumulative royalty effect in standards where there are potentially many patent claims".**

(emphasis added)

80.4.3  The Claimant, Motorola and Nokia emphasised that their proposal:

"is not really changing the normal practice and behaviour of licensing in the field. What it does is to codify existing best practices."

80.4.4  In a statement dated 28-29 January 1998 made to ETSI's Special Mobile Group (in which the Defendants participated), which statement was subsequently posted on ETSI's website, the Claimant, together with Nokia, NTT DoCoMo, NEC, Fujitsu, Matsushita (Panasonic) and Mitsubishi Electric, declared  its willingness to grant licences to existing and future essential WCDMA patents on FRAND terms.  The Claimant and the other companies further stated:

"...WCDMA should become an open world standard accessible to all users and manufacturers. **For a rapid growth and a cost-effective solution for the next generation of mobile communication services, the total cost of the IPR needed for the standard must be addressed**.

"Building on the foundation of the IPR policies of ETSI and other standards bodies, an approach is needed to obtain clarity that IPR that is Essential to the WCDMA standard will be licensed to anyone wishing to obtain a license and that **the cumulative cost will be fair and reasonable**. ...

"There shall be no upfront payments. **The cumulative maximum cost should be set at a reasonable level.**

"These statements are made on the condition of reciprocity; parties not accepting this framework and requiring royalty rates that are not compatible with these aims shall not receive the benefit of the undertakings by the original signatories and parties later joining these principles."

(emphasis added)

80.4.5   In a press release dated 6 November 2002, the Claimant further announced that it had entered into a "mutual understanding" with NTT DoCoMo, Nokia and Siemens:

"to introduce licensing arrangements whereby essential patents for W-CDMA are licensed at rates that are proportional to the number of essential patents owned by each company. The intention is to set a benchmark for all patent holders of the W-CDMA technology to achieve fair and reasonable royalty rates.

"The companies together own the clear majority of the essential Intellectual Property Rights (IPR) relevant to the W-CDMA standard selected already by about 110 operators worldwide. **This arrangement would enable the cumulative royalty rate for W-CDMA to be at a modest single digit level. ...**

"**It is of the utmost importance for the mobile communication industry and in the interests of both licensors and licensees that the cumulative royalty cost of W-CDMA is maintained at a competitive level which encourages both greater growth and innovation in the industry**," says Lothar Pauly, board member of the Siemens Information and Communication Mobile Group. ...

"W-CDMA is the standard selected by most operators in the world for their future business, and with this initiative we believe that the cumulative royalty rate will be even lower for W-CDMA than GSM, which has enjoyed unrivalled success compared to any other standard in the world" says Torbjorn Nilsson, Senior Vice President Marketing & Strategic Business Development of Ericsson.

"This initiative is meaningful for promoting the W-CDMA services by keeping cumulative royalty rate below 5%", says Kota Kinoshita, Executive Vice President of NTT DoCoMo. ...".

(emphasis added)

80.4.6  A precise assessment of what would be a reasonable cumulative royalty rate in the market for the supply of mobile telephone handsets in the European Union will be a matter of expert evidence. However, the Claimant has itself estimated that the typical cumulative royalties payable by licensees supplying GSM-compliant products is 5-7 per cent. The Defendants will contend that this range represents an upper bound to a fair cumulative royalty rate for a licensee with no significant intellectual property to cross-license. For a licensee holding essential patents which it is prepared to cross-license, the Defendants will contend that the cumulative royalties should be still lower.

80.4.7  During the negotiations between the parties in [...**Redacted**...], the Claimant stated that its standard royalty rates in relation to the licensing of [...**Redacted**...] patents were [...**Redacted**...] in respect of [...**Redacted**...] and [...**Redacted**...] in respect of [...**Redacted**...].

80.4.8  As respects the licence fees demanded from the Defendants, the royalty proposed under the Revised Ericsson Offer is to be calculated by reference to a [...**Redacted**...] of the value of the Defendants' sales of 2G handsets based on the [...**Redacted**...] and [...**Redacted**...] of the value of the Defendants' sales of 3G handsets based on the [...**Redacted**...]: see Paragraph 631 above. Those figures, moreover, are stated to exclude licences under the Claimant's [...**Redacted**...]. Under the Revised Amended Ericsson Offer [...**Redacted**...], a licence including [...**Redacted**...] is to be calculated by reference to [...**Redacted**...] on sales of 2G handsets based on the [...**Redacted**...] and [...**Redacted**...] on sales of [...**Redacted**...]. If the Defendants had to pay royalties to all other holders of declared essential [...**Redacted**...] patents in line with the royalty proposed under the Amended Revised Ericsson Offer, the cumulative royalties would be unfair and unreasonable and amount to substantially in excess of [...**Redacted**...].

80.4.9   In particular, and by way of illustration, in the case of essential patents under the GSM standard, there are about 30 holders of declared essential patents by whom royalties could be sought.   About 7 of these (including the Claimant) hold 101 or more declared essential patents according to information published on the ETSI website.

*Failure to take account of the value of the Defendants' patent portfolio*

80.5   Further or alternatively, the royalty proposed under the Amended Revised Ericsson Offer is unfair and/or excessive by reason of the fact that it fails to take any or any adequate account of the value of the Defendants' patent portfolio which would be cross-licensed to the Claimant, in particular, those patents which the Defendants have declared as essential to ETSI under both the GSM standard and, more particularly, the WCDMA standard:

80.5.1   As indicated above, in 2005, the Defendants estimated that their portfolio of essential patents for GSM had increased since 2001, and that their portfolio of essential patents for WCDMA had increased both in absolute terms and relative to the portfolio of essential WCDMA patents held by the Claimant.

80.5.2   The Defendants continue to obtain further patents essential to the WCDMA standard and their position in this growing technology, relative to that of the Claimant, is improving all the time. According to information published on the ETSI website, the Second Defendant is now, together with the Claimant, one of about 10 undertakings holding 101 or more declared WCDMA essential patents.

80.5.3   The Claimant's failure to take any or any adequate account of the value of the Defendants' patent portfolio is evidenced by the fact that neither the Amended Revised Ericsson Offer nor the Demanded Royalty took into account the value of the Claimant's or SonyEricsson's projected sales of infrastructure equipment or mobile telephone handsets incorporating technology under the Defendants' relevant patents.

*Double payment*

80.6    Further or alternatively, the royalty proposed under the Revised Ericsson Offer is unfair and/or excessive in that it takes no account of the fact that about [...**Redacted...**] per cent of the Defendants' mobile telephone handsets contain [...**Redacted...**] manufactured under a licence between the Claimant and [...**Redacted...**] supplied to the Defendants by [...**Redacted...**], and more than [...**Redacted...**]% of the Defendants' 3G mobile telephone handsets (including all the products listed in Annex 2) contain [...**Redacted...**] manufactured under a licence between the Claimant and [...**Redacted...**]: see Paragraphs 104 to 107 below. The Defendants believe that part of the price paid by them for the aforementioned [...**Redacted...**] represents a royalty payment or other transfer of value to the Claimant (e.g. through the Claimant making correspondingly reduced royalty payments to [...**Redacted...**] or [...**Redacted...**], in respect of cross-licensed technology) to the Claimant for the use of its technology. As the royalty proposed under the Revised Ericsson Offer is based on a percentage of the actual sales price of the said handsets, it therefore involves a double payment to the Claimant for the use of the technology contained in the [...**Redacted...**].

*No reasonable relationship between the royalty rates proposed for GSM and for WCDMA essential patents*

80.7    The royalty proposed under the Amended Revised Ericsson Offer involves a royalty rate of [...**Redacted...**] for GSM patents and [...**Redacted...**] for WCDMA patents. These rates cannot be based on objective criteria because the cross-licence value of the Defendants' GSM patent portfolio (including essential patents) is significantly smaller than the cross-licence value of its WCDMA patent portfolio (including essential patents) so that if the royalty rates were calculated on the basis of objective criteria, the royalty rate charged to the Defendants for WCDMA essential patents would be expected to be lower than the rate charged to them for GSM essential patents, rather than (as is the case) *vice versa*.

*Failure to take into account that royalties charged should not be excessive by comparison with the Claimant's research and development costs*

80A.    In setting the royalties proposed under the Amended Revised Ericsson Offer, the Claimant failed to take into account that its total licensing income should not be excessive by comparison with the Claimant's costs of research and development, and should reflect no more than a fair return on the investment made. The Claimant's approach was simply to maximise the value of, and the returns from licensing, its intellectual property rights. In particular, the Claimant failed (adequately or at all) to take into account, in its approach to the setting of the reference royalty rates under the Amended Revised Ericsson Offer, the aggregate value that could be expected to be derived from licensing the patents concerned in comparison with the costs of research and development. Nor, when setting the royalty rates in the Amended Revised Ericsson Offer, did the Claimant take account of the very substantial licensing income that it would thereby receive from the Defendants, given the Defendants' very substantial worldwide sales of mobile telephone handsets. The assessment of what would be a fair return on the Claimant's research and development expenditure will be a matter for expert evidence at trial. The setting of excessive royalty rates by the Claimant could be expected ultimately to lead to excessive handset prices paid by consumers.

*Failure to take into account the inherent and/or pre-standard value of the patented inventions*

80B.    In setting the royalties proposed under the Revised Ericsson Offer, the Claimant failed to take into account that the rates charged in respect of technically essential patents should correspond to the inherent and/or pre-standard value of the patented inventions, and should not include that proportion of the value which is due to the effects of standardisation, or merely to interoperability.

*Failure to use an appropriate base for the charging of royalties in view of developments in the range of features offered by mobile telephone handsets*

80C.    The Claimant's various offers all base the royalty rate on the net selling prices of the Defendants' mobile telecommunications products, which are in significant part, and

increasingly, determined by extraneous features that do not relate to the licensed telecommunications technology, such as photo and video cameras, games, colour screens, mp3 players, and radio. The Claimants have not, or apparently not, taken into account that the royalty rates it now requires (which are understood to be based on standard reference rates) should be appropriately reduced to reflect those developments.

*Over-recovery under the Amended Revised Ericsson Offer*

80D.   The Claimant's combined offer made in [...**Redacted**...] was arrived at simply by adding [...**Redacted**...] to the royalty rates contained in the [...**Redacted**...] Revised Ericsson Offer. However, the latter offer was itself specifically intended to be a crystallisation of the Claimant's final offer to the Defendants in the negotiations for a successor cross-licence to the PLA (which expired in [...**Redacted**...]). Those negotiations between the parties were conducted on the basis that the parties would arrive at a cross-licence with a similar scope to the PLA, which extended to [...**Redacted**...]. There was never any suggestion that those negotiations, or the [...**Redacted**...] offer, excluded [...**Redacted**...] until the Claimant's solicitors' letter of 5 January 2007. Accordingly, even if (which is denied) the [...**Redacted**...] offer is on FRAND terms, it already implicitly includes a royalty element relating to the use of the technology covered by all [...**Redacted**...] incorporated in the handsets, so that the recovery of any additional sums by the Claimant would be unfair and unreasonable.

80E.   For the avoidance of doubt, the Defendants aver that an undertaking in the position of the Claimant must offer potential licensees in the position of the Defendants a single licence under (at least) all its relevant telecommunication standard-essential patents where it has accepted, or is otherwise under, obligations to be prepared to license all such patents on fair, reasonable and non-discriminatory terms. In the alternative, the terms on which one group of standard-essential patents is licensed (e.g. essential patents declared to ETSI) must still take account of the terms on which all other standard-essential patents (e.g., [...**Redacted**...]) are licensed to the same counterparties, if they are to be fair, reasonable and non-discriminatory terms.

*(3)*   ***Discriminatory pricing***

81.   The royalty proposed under the Amended Revised Ericsson Offer, if charged, would constitute the application of dissimilar conditions to equivalent transactions with other trading parties, placing the Defendants at a competitive disadvantage, in breach of Article 82(c) EC and/or sections 18(1) and (2)(c) of the Competition Act 1998.

82.   By its letters of 5 and 15 June 2006, the Defendants' solicitors asked the Claimant's solicitors *inter alia* for details of the royalty rates charged by the Claimant to other licensees for GSM/WCDMA patents that the Claimant has declared as essential, and for an explanation of the Claimant's approach to the duty of non-discrimination and how this is implemented by the Claimant in practice across licensees and potential licensees. However, by its letter in reply of 13 June 2006, the Claimant's solicitor has refused to provide that information (see Paragraphs 60 to 62 above).

83.   Based on the information available to the Defendants, and subject to further information and disclosure and/or inspection of disclosed documents, it appears that the royalty proposed under the Amended Revised Ericsson Offer [**...Redacted...**] the level of royalty charged by the Claimant to other similarly-positioned licensees, without there being any objective justification for the difference:

83.1   [**...Redacted...**]

83.2   [**...Redacted...**]

83.3   [**...Redacted...**]

83.4   [**...Redacted...**]

83.5   [**...Redacted...**]

83.6   [**...Redacted...**]

83A.   Moreover, the other terms proposed under the Amended Revised Ericsson Offer would constitute the application of dissimilar conditions to equivalent transactions

with other trading parties, placing the Defendants at a competitive disadvantage, in breach of Article 82(c) EC and/or sections 18(1) and (2)(c) of the Competition Act 1998 for the following reasons:

83A.1   Under the [...**Redacted**...] is granted a licence [...**Redacted**...].

83A.2   The basis upon which the royalty sum [...**Redacted**...] (and any further payments by the party [...**Redacted**...]) was calculated for the purposes of the [...**Redacted**...] is unclear.

83A.3   However, even if (which is not admitted) the royalty to be paid by [...**Redacted**...] to the Claimant pursuant to the [...**Redacted**...] was calculated by reference to the same royalty rates as those proposed by the Claimant to the Defendants under the Amended Revised Ericsson Offer, because [...**Redacted**...] pays royalties in respect of the Claimant's [...**Redacted**...] whereas the Amended Revised Ericsson Offer applies *only* to [...**Redacted**...], the Defendants are charged a higher price by the Claimant (overall and *pro rata* for the [...**Redacted**...]) for the ability to make and market mobile telephone handsets that are compliant with the GSM and WCDMA standards.

83A.4   Further, even if the royalty proposed by the Claimant to the Defendants under the Amended Revised Ericsson Offer has been reduced by the Claimant so as to reflect the exclusion of [...**Redacted**...] from the Amended Revised Ericsson Offer, which is not admitted, the exclusion of [...**Redacted**...] from the Amended Revised Ericsson Offer still leaves the Defendants facing an extra practical hurdle compared to [...**Redacted**...] (i.e. the need to obtain further patent licences in respect of [...**Redacted**...] at reasonable rates) before they can supply mobile telephone handsets that are compliant with the GSM and WCDMA standards.

83A.5   The aforementioned differences in treatment place the Defendants at a substantial competitive disadvantage vis-à-vis [...**Redacted**...] in the highly competitive downstream market for the supply of mobile telephone handsets for use within (at least) the European Union (being handsets that need to comply with the GSM and WCDMA industry standards).

83A.6  The same reasoning applies *mutatis mutandis* to the [**...Redacted...**] under which [**...Redacted...**] is granted a licence of the Claimant's [**...Redacted...**].

84.  If the Defendants were obliged to pay the royalty proposed under the Amended Revised Ericsson Offer, they would be placed at a competitive disadvantage as against other participants in the market for the supply of mobile telephone handsets in (at least) the European Union, who are charged a lower licence fee (or, in the case of Sony Ericsson, none at all) without any objective justification for the difference in treatment.

*(4)*    *Lack of transparency*

84A.  Further or alternatively, the Claimant's approach to the negotiations with the Defendants for a new patent licence agreement was, and is, abusive in itself, in that the Claimant has at all material times failed or refused to provide the Defendants with information sufficient to enable them reasonably to satisfy themselves that the terms and conditions being requested by the Claimant were fair, reasonable and non-discriminatory, and were based upon a cogent justification.

**Effect on trade between Member States**

85.  The abuses of dominance on the part of the Claimant, described at Paragraphs 77A to 84A above, may affect trade between Member States for the purposes of Article 82 EC:

85.1  Mobile telephone handsets are widely traded between European Union Member States;

85.2  Changes in the cost base of different suppliers relating to common elements of cost (such as the licence fees in respect of essential patents) are likely appreciably to influence the prices, quantities or specifications of mobile telephones, and therefore the conditions of competition between those suppliers on the market.

86.     Further or alternatively, the Claimant's abuses of dominance are likely to have an appreciable effect on trade within the United Kingdom for the purposes of the Chapter II prohibition, for the reasons set out in Paragraph 85.2 above.

**Waiver / estoppel**

87.     Further or in the alternative, the Claimant has waived its right to enforce the Patents or any of them in these proceedings and/ or is estopped from doing so, either by seeking injunctive relief or at all.

88.     By its declarations of essentiality to ETSI, the Claimant made a clear and unequivocal representation to ETSI Members and to all other third-party undertakings that sought to manufacture and supply mobile telephone handsets incorporating the relevant technology, including the Defendants, that it was prepared to grant them irrevocable licences under its portfolio of essential patents (including the Patents) on FRAND terms and conditions.

89.     In view of the purpose of making such declarations (see Clause 3 of the ETSI IPR Policy) and in view of the statements of the Claimant reproduced at Paragraphs 90 to 91 below, the said representation was intended to affect legal relations between the Claimant and *inter alia* the Defendants, and to be acted upon by the latter accordingly. Alternatively, for the said reasons, it was of such a nature that a reasonable person would have understood it to be so.

90.     In a document entitled "Proposal for IPR Policy Reform: Minimum Change Optimum Impact Approach (MCOI) – Frequently Asked Questions" presented to the ETSI General Assembly meeting of 22-23 March 2006 at Neuss by the Claimant, Motorola and Nokia, the authors confirmed that declarations whereby holders of patents essential to ETSI standards undertook to grant licences on FRAND terms were legally binding, as follows:

"It is proposed to introduce definitions of Aggregated Reasonable Terms and Proportionality [as] part of the undertaking to grant licences on FRAND terms which would be legally binding on ETSI Members. ...

It is proposed to continue to rely upon bilateral licensing and legal enforceability of the rules against anyone violating them …

A patent owner who is a member of ETSI will have to make a legally binding commitment to license essential patents on FRAND terms based upon the principles of aggregated reasonable terms and proportionality. Technically, that commitment is made to ETSI itself, which effectively extends to all ETSI members. We believe that the Courts would not be able to ignore such a commitment in any relevant litigation".

91.     The Claimant, Motorola and Nokia emphasised that their position on these matters:

"is not really changing the normal practice and behaviour of licensing in the field. What it does is to codify existing best practices".

92.     The Defendants acted upon the said representation to their detriment as follows:

92.1    Since the said representation, the Defendants have continued to manufacture and sell 2G and 3G handsets containing the relevant technology on the assumption that they would be able to obtain a licence under the Claimant's essential patent portfolio (including the Patents) on FRAND terms.

92.2    Since the said representation, the Defendants have developed and launched new versions of and upgrades to their 2G and 3G handsets containing the relevant technology on the assumption that they would be able to obtain a licence under the Claimant's essential patent portfolio (including the Patents) on FRAND terms.

92.3    Since the said representation, the Defendants have invested substantial sums of money in research and development into mobile telephony, including in particular WCDMA technology, with a view to including that technology in 2G and 3G handsets also containing the relevant technology on the assumption that they would be able to obtain a licence under the Claimant's portfolio of essential patents (including the Patents) on FRAND terms.

93.     The offer by the Claimant to grant a licence to the Defendants under its portfolio of essential patents (including the Patents) upon payment of the royalty proposed under the Amended Revised Ericsson Offer is not an offer to grant a licence on FRAND terms, as the royalty proposed under the Amended Revised Ericsson Offer is unfair,

unreasonable and discriminatory for the reasons set out in Paragraphs 80 to 84A above.

94.   The Claimant has never offered the Defendants a licence under the Claimant's portfolio of essential patents (including the Patents) on FRAND terms for any period after [...**Redacted...**].

95.   The Defendants hereby aver that, should such a licence be offered on such terms by the Claimant the Defendants will accept that offer.

96.   In the premises, it would be unconscionable for the Claimant now to resile from the said representation by enforcing the present claim for infringement of the Patents or any of them.

97.   Therefore, the Claimant has waived its right to enforce the present claim for infringement of the Patents or any of them and/ or is estopped from doing so.

98.   Further, and in any event, the Claimant has waived its right to seek injunctive relief for infringement of the Patents or any of them and/ or is estopped from doing so.

## PATENT AND LICENCE DEFENCES

99.   [...**Redacted...**].

100.   [...**Redacted...**].

101.   [...**Redacted...**].

102.   [...**Redacted...**].

103.   [...**Redacted...**].

**[...Redacted...] Licences**

104.    Further and in any event, the Defendants deny that the Claimant is entitled to the relief sought or any relief in respect of the Defendants' products in respect of which the Claimant complains which utilise [...**Redacted**...] supplied [...**Redacted**...] and or [...**Redacted**...].

105.    The Defendants understand that the [...**Redacted**...] are manufactured and distributed by [...**Redacted**...] under a licence between the Claimant and [...**Redacted**...].  The [...**Redacted**...] contain all means, or in the alternative, means relating to an essential element of the alleged invention of the Patents which is suitable for putting and intended to put the alleged invention of the Patents into effect.  Annex 1 hereto contains a list of the Defendants' products which utilise the [...**Redacted**...].

106.    The Defendants understand that the [...**Redacted**...] are manufactured and distributed by [...**Redacted**...] under a licence between the Claimant and [...**Redacted**...].  The [...**Redacted**...] contain all means, or in the alternative, means relating to an essential element of the alleged invention of the Patents which is suitable for putting and intended to put the alleged invention of the Patents into effect.  Annex 2 hereto contains a list of the Defendants' products which utilise the [...**Redacted**...].

107.    In the premises, the acts of which the Claimant complains in respect of such of the Defendants' products as utilise the [...**Redacted**...] or the [...**Redacted**...] are acts which are done with the consent of the proprietor of the Patents.

**Non-Entitlement to Injunctive Relief**

108.    In any event in its discretion the court should refuse to grant injunctive relief, but grant damages in lieu for the following reasons:

108.1   The Claimant, having committed itself to licensing the Patents upon fair, reasonable and non-discriminatory terms, has accepted that it can be compensated in monetary terms for any use of the Patents;

108.2   The effect of an injunction would be disproportionate, because it would go far beyond preventing use of the inventions said to be the subject of the Patents;

108.3   No alternative design is possible in respect of truly essential patents;

108.4   The lack of injunctive relief would not be injurious to the Claimant who would be adequately recompensed by monetary damages;

108.5   The imposition of an injunction would, in the circumstances, be oppressive.

109.    In the premises, should the Claimant be entitled to any relief, which is denied, the appropriate relief is the grant of a damages equivalent to a fair, reasonable and non-discriminatory royalty.

## PATENT COUNTERCLAIMS

110.    [...**Redacted**...].

111.    [...**Redacted**...].

112.    [...**Redacted**...].

## AND THE DEFENDANTS COUNTERCLAIM FOR:

(1)     A Declaration that the Claimant's refusal to license its portfolio of essential patents (including the Patents) to the Defendants otherwise than on the terms of the Amended Revised Ericsson Offer and/or that the Claimant has wrongfully refused to negotiate with the Defendants in good faith and on the basis of a full and cogent justification of its demands for the grant of a licence on terms that are fair, reasonable and non-discriminatory is an abuse of dominance contrary to Article 82 EC and/or the Chapter II prohibition, and is thereby unlawful;

(2)     A Declaration that the Claimant has unlawfully and in breach of contract refused to license the Defendants in respect of its portfolio of essential patents (including the Patents) on FRAND terms and/or that the Claimant has wrongfully refused to negotiate with the Defendants in good faith and on the

basis of a full and cogent justification of its demands for the grant of a licence on FRAND terms;

(3)     An Order that European Patents (UK) No. [...**Redacted...**] be revoked;

(4)     A Declaration that European Patents (UK) No. [...**Redacted...**] are not infringed by the Defendants' mobile handsets which utilise either the [...**Redacted...**] or the [...**Redacted...**];

(5)     Further or other relief;

(6)     Costs.

**JON TURNER QC**
**KASSIE SMITH**
**BRIAN NICHOLSON**

Served this 15th day of March 2007 by Bristows, Solicitors for the Defendants.

**Statement of Truth**

The Defendants believe that the facts stated in this Re-Amended Defence and Counterclaim are true.

I am duly authorised by the Defendants to sign this Statement of Truth.

Name ……………………………………………………………..

Position or Office Held ……………………………………….…

Date ……………………………………………………………….

# ANNEX 1

## List of the Defendants' handsets which utilise the [...Redacted...]

[...Redacted...]

## ANNEX 2

## List of the Defendants' handsets which utilise the [...Redacted...]

[...Redacted...]