# Exhibit G

**Phillip E. Areeda**
*Late Langdell Professor of Law*
Harvard University

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa College
  of Law

**Volume VII**
**Second Edition**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application



**ASPEN LAW & BUSINESS**
A Division of Aspen Publishers, Inc.
New York        Gaithersburg

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

— From a *Declaration of Principles* jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations

Copyright © 2003 by the President and Fellows of Harvard College

All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or any information storage and retrieval system, without permission in writing from the publisher. Requests for permission to make copies of any part of this work should be mailed to:

    Permissions
    Aspen Law & Business
    1185 Avenue of the Americas
    New York, NY 10036

Printed in the United States of America

Library of Congress Catalog Card No. 77-15710
ISBN 1-56706-602-X (Set)
0-7355-3365-2 (Vol. VII)

1 2 3 4 5 6 7 8 9 0

Visa accounted for approximately 47 percent of the dollar volume of general purpose credit card transactions, and MasterCard approximately 26 percent.[9] This gave the two defendant ventures a combined total of approximately 73 percent.[10] The court concluded that these shares, "whether measured jointly or separately,"[11] were sufficient to establish the market power requirement in a joint venture rule of reason case.

The government had challenged (1) a Visa bylaw preventing member banks from issuing any non-Visa general purpose cards but excepting MasterCard; and (2) a MasterCard rule doing the same thing but excepting Visa.[12] The record did not show that the two firms had agreed with each other to adopt the exclusionary rules. Nevertheless, the fact of common ownership dictated aggregation. Suppose, for example, that Ford, Mercury, and Lincoln, who are three wholly owned subsidiaries of Ford Motor Company, were accused of undertaking the same exclusionary practice. Further, the record does not show that they "agreed" to do so. Power would be assessed by aggregating the shares of the three. The conclusion flows not from the presence of any provable "agreement" among the wholly owned subsidiaries but rather from the fact of common ownership. In sum, *Copperweld* indicates that just as commonly owned subsidiaries are a single economic unit who cannot "agree" with each other, it also establishes that within such a unit such an agreement is unnecessary.

## ¶1477. Trade Associations and Concerted Rule Making

The term "trade association" or "professional association" refers to organizations whose members are typically the producers or sellers of a certain good or service, sometimes in a given region. For example, the California Dental Association is made up primarily of dentists, and the American Academy of Ophthalmology of ophthalmologists.[1] Some associations have a much broader membership. For example, the National Fire Protection Associa-

---

9. *Visa*, 163 F. Supp. 2d at 341.
10. Id. Of the balance, American Express accounted for approximately 20 percent and Discover approximately 6 percent. Ibid.
11. Id. at 342.
12. The decision is discussed further in the current Supplement at ¶2221.
¶1477 n.1. See *California Dental Assn. v. FTC (CDA)*, 526 U.S. 756, 759 (1999); *Schachar v. American Academy of Ophthalmology*, 870 F.2d 397, 400 (7th Cir.1989).

tion draws its members from "industry, labor, academia, insurers, organized medicine, firefighters, and government."[2]

Characteristically, these associations are not separately organized to earn a profit; however, a principal purpose of their existence is to further their particular industry, thus increasing the profits of individual members.[3] Also characteristically, the effective decision makers are individual profit-making firms or individuals. For example, the association's voting membership may be composed primarily if not exclusively by producers, and important decisions are made by vote of the membership.

Trade associations are routinely treated as continuing conspiracies or "combinations" of their members, as are bodies promulgating rules or standards for the competitive conduct of their members, such as the National Society of Professional Engineers.[4] This brings association rules having a competitive impact within the reach of §1 of the Sherman Act. Some joint ventures, mainly discussed in the next Paragraph, also promulgate rules governing the competitive behavior of their members. For example, the New York Stock Exchange is not only a "joint venture" of member brokers to create and operate a trading exchange, its rules and bylaws also govern members' relations inter se and with the public—at one time even setting the fees that member brokers charged their customers.[5] The key difference between these situations and the formation, or even merger, of firms is that each creator or member retains an independent market significance.

Just as the creation of an ordinary business corporation is an agreement, so also is the formation of a trade or professional association or standard-setting organization. Such collaboration is law-

---

2. *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 495 (1988).
3. E.g., *CDA*, note 1 (association organized as not for profit, but its purpose is to enhance profits of its members, thus placing it within jurisdiction of FTCA §5); see ¶261b (2d).
4. See *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978). Standard setting and rule making of such associations are treated in Subchapter 22C. See also *California Dental Assn. v. FTC*, 128 F.3d 720 (9th Cir. 1997), rev'd on other grounds, 526 U.S. 756 (1999) ("Professional associations are routinely treated as continuing conspiracies of their members," citing an earlier edition of this Paragraph; in this case, "CDA members are independent, profit-seeking dentists in competition with each other; by joining the CDA, they effectively agree to abide by the CDA's Code of Ethics."). In a finding that the Supreme Court did not disturb, the FTC had rejected the argument that the relationship between the CDA and its several thousand dentist members should be viewed as that between a parent and its subsidiaries. The "dentists do not shed their economic identities as competitors in the dental services market upon joining the association." *California Dental Assn.*, 5 Trade Reg. Rep. ¶24,007 (F.T.C. 1996).
5. E.g., *Silver v. New York Stock Exchange*, 373 U.S. 341 (1963), which was brought under Sherman Act §1. See ¶243d (2d).