1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HAROLD J. MCELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

WILLIAM F. LEE (*pro hac vice*)
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Attorneys for Plaintiff
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

APPLE INC., a California corporation,

Plaintiff,

v.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation; and SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,

Defendants.

Case No. 11-cv-01846-LHK

**DECLARATION OF PATRICK ZHANG IN
SUPPORT OF APPLE'S OPPOSITION TO
SAMSUNG'S MOTION TO EXCLUDE
ORDINARY OBSERVER OPINIONS OF
APPLE EXPERT COOPER WOODRING**

Date:        October 13, 2011
Time:        1:30 P.M.
Place:       Courtroom 8, 4th Floor
Judge:      Hon. Lucy H. Koh

**PUBLIC REDACTED VERSION
EXHIBITS B and C FILED UNDER SEAL**

I, PATRICK J. ZHANG, declare as follows:

1.      I am an attorney at the law firm of Morrison & Foerster LLP, counsel of record in this action for plaintiff Apple Inc. ("Apple").  I submit this declaration in support of Apple's Opposition to Samsung's Motion to Exclude Ordinary Observer Opinions of Apple Expert Cooper Woodring.  Unless otherwise indicated, I have personal knowledge of the matters set forth below.  If called as a witness I could and would testify competently as follows:

2.      Attached as Exhibit A is a true and correct copy of the Declaration of Cooper C. Woodring In Support of Apple's Motion for a Preliminary Injunction, filed July 1, 2011.

3.      Attached as Exhibit B is a true and correct copy of excerpts from the transcript of the deposition of Cooper C. Woodring taken on August 5, 2011.

4.      Attached as Exhibit C is a true and correct copy of excerpts from the transcript of the deposition of Chris Stringer taken on August 3, 2011

5.      Attached as Exhibit D is a true and correct copy of the *curriculum vitae* of Cooper C. Woodring, previously filed as exhibit 6 to his June 30, 2011 declaration In Support of Apple's Motion for Preliminary Injunction.

6.      Attached as Exhibit E is a true and correct copy of an article from www.patentadesign.com printed on September 6, 2011 and available at http://www.patentadesign.com/gallery/statue-of-liberty-design-patent.html, and a true and copy of U.S. Design Patent No. D11,023.

I declare under the penalty of perjury under the laws of the United States of America that the forgoing is true and correct and that this Declaration was executed this 13th day of September, 2011, at San Francisco, California.


By:      /s/ Patrick J. Zhang
                Patrick J. Zhang

1

2

**ATTESTATION OF E-FILED SIGNATURE**

3

    I, JASON R. BARTLETT, am the ECF User whose ID and password are being used to

4

file this Declaration.  In compliance with General Order 45, X.B., I hereby attest that Patrick J.

5

Zhang has concurred in this filing.

6

Dated:  September 13, 2011            By:  _____ /s/  Jason R. Bartlett _____

7

                                           Jason R. Bartlett

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>     Plaintiff,<br><br> v.<br><br>SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>     Defendants. | Case No. 11-cv-01846-LHK<br><br>**DECLARATION OF COOPER C. WOODRING IN SUPPORT OF APPLE'S MOTION FOR A PRELIMINARY INJUNCTION** |

I, COOPER C. WOODRING, declare as follows:

### A. Qualifications

1. I am an independent industrial designer and inventor. I have bachelor's and master's degrees in Industrial Design. I have worked as an industrial designer continuously since 1962—almost 50 years. I have received over 25 United States design and utility patents. (*See* Exhibit 1.) A selected set of my United States design patents is attached as Exhibits 2 and 3.

2. The Industrial Designers Society of America ("IDSA") defines industrial design as:

> [T]he professional service of creating and developing concepts and specifications that optimize the function, value, and appearance of products and systems for the mutual benefit of both user and manufacturer. (*See* Exhibit 4.)

3. I was elected President and Chairman of the IDSA and most recently served as its Executive Director. I testified before the United States Congress on The Industrial Design Innovation and Technology Act (H.R. 1790). I was appointed by President Ronald Reagan to head the United States Information Agency's Cultural Exchange Mission, "Design in America," behind the then-existing Iron Curtain. I recently addressed the Design Patent Examiners of the United States Patent and Trademark Office at its first ever "Design Day" on future issues and strategies for seeking patent protection for designs from the perspective of an industrial designer. (*See* Exhibit 5.)

4. I received my profession's highest award, the IDSA Personal Recognition Award, which has been bestowed on only nine designers in history. A list of my honors, awards, articles, and speaking engagements appears in my curriculum vitae. (*See* Exhibit 6.)

5. During my career, I have designed hundreds of consumer products. A majority of my career was spent with JCPenney Co. in New York City as Manager of New Product Development and Product Design. During my time with JCPenney, I designed consumer products in many categories, including sporting goods, toys, furniture, electronics, hardware, major appliances, and housewares. Attached as Exhibit 7 are examples of consumer electronics I designed during my career.

6.      Based on my years of experience designing consumer products, including consumer electronics, and for all the reasons stated in this declaration, I believe that I am qualified to testify as one skilled in the art with respect to the designs at issue in this case.  In addition, I believe that my experiences working with other designers of products of this type qualify me to testify on what would be understood by one skilled in the art of designing cellular phones and tablet computers such as the ones at issue here.

7.      I also believe that, based on my firsthand experiences observing purchasers of consumer electronics, I am qualified to testify as to how an ordinary observer would perceive and evaluate cellular phone and tablet computer designs.  For example, during my tenure at JCPenney, it was estimated that more than one million people a day shopped in our stores.  Watching the many customers come through the store, I conducted research into how ordinary observers evaluate, compare, and purchase product designs, including consumer electronics.  I studied and learned the habits and customs of these ordinary customers in the retail environment, including the length of time a typical customer spends making a purchase decision for consumer products.  I also have experience seeing how consumers are influenced by market trends and styles.  In short, I have had firsthand experience observing ordinary purchasers of consumer electronics.  Furthermore, I have purchased consumer electronics and thus can speak from my own personal experiences.  For all of these reasons, I believe that I am qualified to testify on issues related to how ordinary observers perceive ornamental designs for cellular phones and tablet computers, such as those at issue here.

8.      In the past five years, I have worked as an expert witness in several lawsuits involving design patent and trade dress infringement.  In particular, I have served as an expert for:

- Herman Miller against A. Studio in Case No. 1:04CV0781 (W.D. Mich.);

- Electrolux against Oreck Holdings in Civil Action No. 05-5696 (E.D. La.);

- Garmin against Tom Tom in Case No. 268408/KGZA 06-819 (The Netherlands District Court of The Hague, Civil Law Section);

- Wing Shing against Sunbeam (Mr. Coffee) in Case No. 06 Civ. 3522 (S.D.N.Y.);

- VTech Communications, Inc. against Motorola, Inc. in Case No. 07-cv-171-DF-CMC (E.D. Tex.);

- Wenger Corp. against Jim Melhart Piano & Organ Co., Inc. in Case No. M-05-359 (S.D. Tex.);

- Wenger Corp. against Stadium Chair Co. & Gil DeShazio in Case No. MO-5-CV-099 (W.D. Tex.);

- Nichia Corp. against Seoul Semiconductor Co., Ltd. in Case No. 06-cv-162-MMC (JCS) (N.D. Cal.);

- Yokohama Rubber Co., Ltd. against Stamford Tyres Intl. Pte Ltd. in Case No. SACV 07-0010 CJC (MLGx) (C.D. Cal.);

- Yokohama against Hangzhou Tire in Case No. SACV 06-0822 JVS (C.D. Cal.);

- Bodum against Four Others in Case No. 07C5303 ASE (N.D. Ill.);

- Dexas against Tung Yung in Case No. 6:07-CV-00334 LED (E.D. Tex.);

- Risenthel against Mad Bags in Case No. 1:09-CV-04971 (N.D. Ill.);

- B&R Plastics against Kikkerland Designs in Investigation No. 337-TA-693 (U.S. ITC);

- Cobra against Bulldog in Case No. 1:09-cv-00436-UA-PTS (M.D.N.C.);

- MMI against Baja Motorsports in Case No. 2:10-cv-00496-JAT (D. Ariz.); and

- Chrysler against Xingyue Group in Investigation No. 377-TA-722 (U.S. ITC).

9.     I have been retained as an expert consultant in this case by Morrison & Foerster LLP, attorneys for Apple Inc.  My hourly rate is $360.  My compensation is in no way tied to the outcome of this case or any particular part of the case.

**B.     Scope of Declaration**

10.     I have been asked by Apple's attorneys to compare the designs claimed in U.S. Design Patent No. D618,677 (the "'D677 patent"), D593,087 (the "'D087 patent"), and D504,889

(the "'D899 patent") against the designs of Samsung's Galaxy S 4G, Infuse 4G, and Galaxy Tab 10.1 products.

11.     My detailed analysis follows and makes reference to Exhibits 8-21, which contain side by side comparisons of the patented designs and the Samsung products and, in some instances, three-way comparisons of the patented designs, the Samsung products, and the prior art.

12.     In Exhibits 8-21, I have scaled the drawings and photographs such that the heights of the phones and tablet computers correspond with one another. Care has been taken not to change the proportional relationship (i.e., aspect ratio) of the designs. When conducting my analysis, I compared an actual physical sample of the Samsung product to the drawing figures of the patented designs. The photographs in this declaration accurately represent the Samsung products and record the visual comparison that I made.

**C.      Detailed Comparison of 'D677 Design against Samsung Galaxy S 4G and Infuse 4G.**

13.     The 'D677 patent is directed to the ornamental appearance of Apple's iPhone.

14.     Before conducting my comparison of the 'D677 patent against the Samsung Galaxy S 4G and Infuse 4G products, I reviewed the file history of the 'D677 patent and analyzed and became familiar with the prior art cited there, as well as U.S. Design Patent No. D498,754 and D563,929 (the "Samsung-identified references"), which I understand were identified by Samsung's attorneys at a May 12, 2011 hearing in this case.

15.     In conducting my analysis, I compared the eight views of the 'D677 patent (FIGS. 1-8) with the corresponding views of the Samsung Galaxy S 4G and Infuse 4G phones. In Exhibit 8, each view of the patented 'D677 design is compared to the corresponding view of the Galaxy S 4G. In Exhibit 11, each view of the patented 'D677 design is compared to the corresponding view of the Infuse 4G.

*1.      'D677 against the Galaxy S 4G*

16.     On visual inspection, it is apparent that all of the major design elements from the patented 'D677 design are also found in the Galaxy S 4G design. Just as in the patented design, the Galaxy S 4G design has:

a.  a flat, clear, black-colored, rectangular front surface with four evenly rounded corners;

b.  an inset rectangular display screen centered on the front surface that leaves very narrow borders on either side of the display screen and substantial borders above and below the display screen; and

c.  a rounded, horizontal speaker slot centered on the front surface above the display screen,

d.  where the rectangular front surface is otherwise substantially free of ornamentation outside of an optional button area centrally located below the display.

(*See* Exhibit 8.)

17.     To confirm my analysis, and to directly compare physical product against physical product, I have also included in Exhibit 9 a view-by-view comparison of the Apple iPhone 3GS, which embodies the patented 'D677 design, against the Samsung Galaxy S 4G. As can be seen from Exhibit 9, each major design feature listed in points (a)-(d) above exists in both the Apple iPhone 3GS and the Samsung Galaxy S 4G.

18.     Moreover, I have conducted a "three way" analysis of the Galaxy S 4G design, the 'D677 design, and the prior art (i.e., the prior art cited in the 'D677 file history and the Samsung-identified references). In my analysis, the Galaxy S 4G design entirely overlaps with the patented 'D677 design, but is far afield from the designs of the prior art I considered. Put another way, both the 'D677 design and the Galaxy S 4G design depart conspicuously from the prior art designs in the same key features. This spectrum of designs is illustrated in Exhibit 10, which compares the Galaxy S 4G against the two Samsung-identified references on the one hand, and the patented 'D677 design on the other.

19.     Some minor differences exist between the Galaxy S 4G design and the patented 'D677 design. In particular:

a.  the Galaxy S 4G has slightly thinner black bands above and below the display screen;

b.  the Galaxy S 4G has a slightly longer and thinner speaker slot;

c.  the Galaxy S 4G has a small camera aperture in the upper right corner of the front surface;

d.    the Galaxy S 4G uses small graphical icons to denote touch sensitive areas under its display screen.

20.    These minor differences, however, merely prevent the Galaxy S 4G from being an exact copy of the patented 'D677 design. They do not carry sufficient weight to alter the overall impression created by the Galaxy S 4G design, which incorporates every major design element from the 'D677 design.

21.    In my opinion, the Galaxy S 4G design is substantially the same as the 'D677 design and embodies that patented design. It is similarly my opinion that an ordinary observer purchasing a cellular phone would also find the Galaxy S 4G design to be substantially the same as the patented 'D677 design.

### 2. D677 against the Infuse 4G

22.    On visual inspection, it is apparent that all of the major design elements from the patented 'D677 design are also found in the Infuse 4G design. Just as in the patented design, the Infuse 4G design has:

a.    a flat, clear, black-colored, rectangular front surface with four evenly rounded corners;

b.    an inset rectangular display screen centered on the front surface that leaves very narrow borders on either side of the display screen and substantial borders above and below the display screen; and

c.    a rounded, horizontal speaker slot centered on the front surface above the display screen,

d.    where the rectangular front surface is otherwise substantially free of ornamentation outside of an optional button area centrally located below the display.

(*See* Exhibit 11.)

23.    To confirm my analysis, and to directly compare physical product against physical product, I have also included in Exhibit 12 a view-by-view comparison of the Apple iPhone 4, which embodies the patented 'D677 design, against the Samsung Infuse 4G. As can be seen from Exhibit 12, each major design feature listed in points (a)-(d) above exists in both the Apple iPhone 4 and the Samsung Infuse 4G.

24.     Moreover, I have conducted a "three way" analysis of the Infuse 4G design, the 'D677 design, and the prior art (i.e., the prior art cited in the 'D677 file history and the Samsung-identified references).  In my analysis, the Infuse 4G design entirely overlaps with the patented 'D677 design, but is far afield from the designs of the prior art I considered.  Put another way, both the 'D677 design and the Infuse 4G design depart conspicuously from the prior art designs in the same key features.  This spectrum of designs is illustrated in Exhibit 13, which compares the Infuse 4G against the Samsung-identified references on the one hand, and the patented 'D677 design on the other.

25.     Some minor differences exist between the Infuse 4G design and the patented 'D677 design.  In particular:

      a.    the Infuse 4G has slightly thinner black bands above and below the display screen;

      b.    the Infuse 4G front surface has rounded corners with a slightly smaller radius of curvature;

      d.    the Infuse 4G has a slightly longer and thinner speaker slot;

      e.    the Infuse 4G uses small graphical icons to denote touch-sensitive areas located under its display screen.

26.     These minor differences, however, merely prevent the Infuse 4G from being an exact copy of the patented 'D677 design.  They do not carry sufficient weight to alter the overall impression created by the Infuse 4G design, which incorporates every major design element from the 'D677 design.

27.     In my opinion, the Infuse 4G design is substantially the same as the 'D677 design and embodies that patented design.  It is similarly my opinion that an ordinary observer purchasing a cellular phone would also find the Infuse 4G design to be substantially the same as the patented 'D677 design.

**D.**     **Comparison of 'D087 Design against Samsung Galaxy S 4G and Infuse 4G**

28.     The 'D087 patent is directed to the ornamental appearance of Apple's iPhone.

29.     Before conducting my comparison of the 'D087 patent against the Samsung Galaxy S 4G and Infuse 4G products, I reviewed the file history of the 'D087 patent and analyzed and became familiar with the prior art cited there, as well as the Samsung-identified references.

30.     In conducting my analysis, I compared the eight views of the sixth embodiment of the 'D087 patent (FIGS. 41-48) (the "patented 'D087 design") with the corresponding views of the Samsung Galaxy S 4G and Infuse 4G phones.  In Exhibit 14, each view of the patented 'D087 design is compared to the corresponding view of the Galaxy S 4G.  In Exhibit 17, each view of the patented 'D087 design is compared to the corresponding view of the Infuse 4G.

### *1.     'D087 design against the Galaxy S 4G*

31.     On visual inspection, it is apparent that all of the major design elements from the patented 'D087 design are also found in the Galaxy S 4G design.  Just as in the patented design, the Galaxy S 4G design has:

a.      a flat rectangular front surface with four evenly rounded corners;

b.      an inset rectangular display screen centered on the front surface that leaves very narrow borders on either side of the display screen and substantial borders above and below the display screen;

c.      a rounded, horizontal speaker slot centered on the front surface above the display screen,

d.      where the rectangular front surface is otherwise substantially free of ornamentation outside of an optional button area centrally located below the display; and

e.      a thin, continuous bezel surrounding the rectangular front surface that is substantially uniform in appearance and having an inwardly sloping profile.

(*See* Exhibit 14.)

32.     To confirm my analysis, and to directly compare physical product against physical product, I have also included in Exhibit 15 a view-by-view comparison of the original Apple iPhone, which embodies the patented 'D087 design, against the Samsung Galaxy S 4G.  As can be seen from Exhibit 15, each major design feature listed in points (a)-(e) above exists in both the Apple iPhone and the Samsung Galaxy S 4G.

33.     Moreover, I have conducted a "three way" analysis of the Galaxy S 4G design, the patented 'D087 design, and the prior art (i.e., the prior art cited in the 'D087 patent file history and the Samsung-identified references). In my analysis, the Galaxy S 4G design entirely overlaps with the patented 'D087 design, but is far afield from the designs of the prior art I considered. Put another way, both the patented 'D087 design and the Galaxy S 4G design depart conspicuously from the prior art designs, and do so in the same key features. This spectrum of designs is illustrated in Exhibit 16, which compares the Galaxy S 4G against the Samsung-identified references on the one hand, and the patented 'D087 design on the other.

34.     Some minor differences exist between the Galaxy S 4G design and the patented 'D087 design. In particular:

    a.  the Galaxy S 4G has slightly thinner bands above and below the display screen;

    b.  the Galaxy S 4G has a slightly longer and thinner speaker slot;

    c.  the Galaxy S 4G has a small camera aperture in the upper right corner of the front surface;

    d.  the Galaxy S 4G uses small graphical icons to denote touch sensitive areas under its display screen;

    e.  in profile, the bezel of Galaxy S 4G is slightly thinner at the top edge and slightly thicker at the bottom edge.

35.     These minor differences, however, merely prevent the Galaxy S 4G from being an exact copy of the patented 'D087 design. They do not carry sufficient weight to alter the overall impression created by the Galaxy S 4G design, which incorporates every major design element from the patented 'D087 design.

36.     In my opinion, the Galaxy S 4G design is substantially the same as the patented 'D087 design and embodies that design. It is similarly my opinion that an ordinary observer purchasing a cellular phone would also find the Galaxy S 4G design to be substantially the same as the patented 'D087 design.

## 2. 'D087 design against the Infuse 4G

37.     On visual inspection, it is apparent that all of the major design elements from the patented 'D087 design are also found in the Infuse 4G design.  Just as in the patented design, the Infuse 4G design has:

         a.     a flat rectangular front surface with four evenly rounded corners;

         b.     an inset rectangular display screen centered on the front surface that leaves very narrow borders on either side of the display screen and substantial borders above and below the display screen;

         c.     a rounded, horizontal speaker slot centered on the front surface above the display screen,

         d.     where the rectangular front surface is otherwise substantially free of ornamentation outside of an optional button area centrally located below the display; and

         e.     a thin, continuous bezel surrounding the rectangular front surface that is substantially uniform in appearance and having an inwardly sloping profile.

(*See* Exhibit 17.)

38.     To confirm my analysis, and to directly compare physical product against physical product, I have also included in Exhibit 18 a view-by-view comparison of the original Apple iPhone, which embodies the patented 'D087 design, against the Samsung Infuse 4G.  As can be seen from Exhibit 18, each major design feature listed in points (a)-(e) above exists in both the Apple iPhone and the Samsung Infuse 4G.

39.     Moreover, I have conducted a "three way" analysis of the Infuse 4G design, the patented 'D087 design, and the prior art (i.e., the prior art cited in the 'D087 patent file history and the Samsung-identified references).  In my analysis, the Infuse 4G design entirely overlaps with the patented 'D087 design, but is far afield from the designs of the prior art that I considered. Put another way, both the patented 'D087 design and the Infuse 4G design depart conspicuously from the prior art designs, and do so in the same key features.  This spectrum of designs is illustrated in Exhibit 19, which compares the Infuse 4G against the Samsung-identified references on the one hand, and the patented 'D087 design on the other.

40.     Some minor differences exist between the Infuse 4G design and the patented 'D087 design.  In particular:

a.      the Infuse 4G has slightly thinner bands above and below the display screen;

b.      the Infuse 4G has a slightly thinner bezel when viewed from the front;

c.      the Infuse 4G has rounded corners with a slightly smaller radius of curvature;

d.      the Infuse 4G has a slightly longer and thinner speaker slot;

e.      the Infuse 4G uses small graphical icons to denote touch-sensitive areas below its display screen.

41.     These minor differences, however, merely prevent the Infuse 4G from being an exact copy of the patented 'D087 design.  They do not carry sufficient weight to alter the overall impression created by the Infuse 4G design, which incorporates every major design element from the patented 'D087 design.

42.     In my opinion, the Infuse 4G design is substantially the same as the patented 'D087 design and embodies that patented design.  It is similarly my opinion that an ordinary observer purchasing a cellular phone would also find the Infuse 4G design to be substantially the same as the patented 'D087 design.

**E.      Detailed Comparison of 'D889 Design against Samsung Galaxy Tab 10.1**

43.     The 'D889 patent is directed to the ornamental appearance of an electronic device.

44.     Before conducting my comparison of the 'D889 patent against the Samsung Galaxy Tab 10.1 product, I reviewed the file history of the 'D889 patent and analyzed and became familiar with the prior art cited there.

45.     In conducting my analysis, I compared the nine views of the 'D889 patent (FIGS. 1-9) with the corresponding views of the Samsung Galaxy Tab 10.1.  In Exhibit 20, each view of the patented 'D889 design is compared to the corresponding view of the Galaxy Tab 10.1.

46. On visual inspection, it is apparent that all of the major design elements from the patented 'D889 design are also found in the Galaxy Tab 10.1. Just as in the patented design, the Galaxy Tab 10.1 design has:

a. an overall rectangular shape with four evenly rounded corners;

b. a flat clear surface covering the front of the device that is without any ornamentation;

c. a thin rim surrounding the front surface;

c. a substantially flat back panel that rounds up near the edges to form the thin rim around the front surface; and

d. a thin form factor.

47. I have also conducted a "three way" analysis of the Galaxy Tab 10.1, the 'D889 design, and the prior art cited in the 'D889 patent file history. In my analysis, the Galaxy Tab 10.1 design entirely overlaps with the patented 'D889 design, but is far afield from the designs of the prior art I considered. Put another way, both the 'D889 design and the Galaxy Tab 10.1 design depart conspicuously from the prior art designs in the same key features. This spectrum of designs is illustrated in Exhibit 21, which compares the Galaxy Tab 10.1 against two of the closest prior art references from the 'D889 patent file history on the one hand, and the patented 'D889 design on the other.

48. Some minor differences exist between the Galaxy Tab 10.1 and the patented 'D889 design. In particular:

a. the Galaxy Tab 10.1, held in vertical or portrait view, has a slightly higher height-to-width ratio;

b. the Galaxy Tab 10.1 is slightly more rounded in its edge profiles; and

c. the Galaxy Tab 10.1 has a slightly thinner form factor.

49. These minor differences, however, merely prevent the Galaxy Tab 10.1 from being exact copy of the patented 'D889 design. They do not carry sufficient weight to alter the overall impression created by the Galaxy Tab 10.1 design, which incorporates every major design element from the 'D889 design.

50.     In my opinion, the Galaxy Tab 10.1 design is substantially the same as the 'D889 design and embodies that patented design.  It is similarly my opinion that an ordinary observer purchasing an electronic device would also find the Galaxy Tab 10.1 design to be substantially the same as the patented 'D889 design.

### F.     My Article on the *Gorham* Spoons

51.     I am the author of the article entitled *One Man's Crusade:  How a Spoon Revolutionized Design Protection in America*, which was published in the Summer 2010 issue of Innovation magazine (attached as Exhibit 22).  This article chronicles my efforts to locate a sample of LeRoy S. White's infringing spoon from the Supreme Court's landmark *Gorham v. White* decision, which set forth the "ordinary observer" test for design patent infringement.  *See Gorham Co. v. White*, 81 U.S. 511 (U.S. 1872).

52.     As discussed in the article, I was able to identify and obtain seven teaspoons of Mr. White's infringing design and conducted a side-by-side comparison of these samples against the figures of Mr. Gorham's design patent.  This detailed analysis revealed differences between the two designs that I believe are discernible to the ordinary observer.  In my opinion, the existence of discernible differences in Mr. White's spoon provides further context to the Supreme Court's *Gorham* decision, in which the White spoon design was found to be "substantially the same" as Mr. Gorham's patented spoon design under the ordinary observer test, despite these discernible differences.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: June 30, 2011

_____
COOPER C. WOODRING

# EXHIBIT B

FILED UNDER SEAL

# EXHIBIT C

FILED UNDER SEAL

Exhibit D

**Cooper  Coolidge  Woodring,  FIDSA®**

131 Highland Avenue, Wakefield, RI 02879.3416, USA
Phone: 401.284.0890, Cell: 401.527.2171, e mail: ccwodring@cox.net

**Education:**

| | |
|---|---|
| 1955-1960 | Bachelor of Fine Arts in Industrial Design, University of Kansas, Lawrence, Kansas |
| 1960-1962 | Master of Fine Arts in Design, Cranbrook Academy of Art, Bloomfield Hills, Michigan, |

**Employment:**

| | |
|---|---|
| 1962-1964 | F. Eugene Smith Associates, Bath, Ohio, Designer |
| 1963-1964 | Akron Art Institute, Ohio, Instructor in Industrial Design and Modelmaking |
| 1964-1969 | BFGoodrich Co., New York City, Designer for BFG Tire Co. and BFG Research Center |
| 1969-1971 | JCPenney Co., Inc., New York City, Product Designer |
| 1971-1974 | JCPenney Co., Inc., New York City, Senior Product Designer |
| 1974-1983 | JCPenney Co., Inc., New York City, Manager, Product Design |
| 1983-1986 | JCPenney Co., Inc., New York City, Manager, New Product Development and Design |
| 1986-1997 | Better Mousetraps, Inc., Plandome, New York, President |
| 1997- 2003 | Independent Consultant Industrial Designer and Expert Witness, Topeka, KS |
| 2003 - 2008 | Independent Consultant Industrial Designer and Expert Witness, Corpus Christi, TX |
| 2007 - 2008 | Executive Director, Industrial Designers Society of America (IDSA), Washington, DC |
| 2008 - Present | Independent Consultant Industrial Designer and Expert Witness, Wakefield, RI |

**Professional:**

| | |
|---|---|
| 1967 | Member: Industrial Designers Society of America (IDSA) |
| 1978 | Chairman, New York Chapter, IDSA |
| 1979 | Chairman, IDSA National Conference, Washington, D.C. |
| 1979 | Recipient: New York Chapter, IDSA Bronze Apple Award |
| 1982 | Recipient: Fellowship, IDSA  (Represents less than 2% of IDSA's membership) |
| 1984-1985 | Executive Vice President, IDSA |
| 1985-1986 | President, IDSA |

| 1986-1988 | Chairman, IDSA |
| 1989-1990 | Chairman, IDSA Government Affairs Committee |
| 1990-1995 | Chairman, IDSA Design Legislation Committee |
| 1992 | Recipient: IDSA's Personal Recognition Award |
| 1993 | Member, Kansas Association of Inventors |
| 1996 | Chairman, IDSA National Nominations Committee |
| 1999 | Appointment, Juror in IDSA 's Annual Design Awards Program, IDEA 2000 |
| 1999 | Founder & Co-Chair, IDSA's Design Protection Section (with Perry J. Saidman, IDSA) |
| 2001 | Founding Trustee, The Design Foundation, Inc. (IDSA's 501.c.3 charitable organization) |
| 2001 | United States Delegate to ICSID Conference, Seoul, Korea |
| 2003 | United States Delegate to ICSID Conference, Berlin, Germany |

**Awards, Honors & Other Activities:**

| 1976-1983 | Elected Trustee - Incorporated Village of Plandome, NY |
| 1979 | Citation for Distinguished Service and Achievement<br>Design Alumni Society, University of Kansas |
| 1979 | First Industrial Designer to Address "The Conference Board" |
| 1983-1985 | Elected Mayor - Incorporated Village of Plandome, NY |
| 1983-1991 | Part Owner - ID (Industrial Design) Magazine |
| 1985-1987 | Reelected Mayor - Incorporated Village of Plandome, NY |
| 1985 | Responsible for ICSID "WORLDESIGN", Washington, DC<br>(International Congress of Societies of Industrial Design)<br>"The World's Largest Gathering of Industrial Designers" |
| 1986 | Presidential Appointment to Head USIA's Cultural Exchange Mission<br>"Design in America", behind the Iron Curtain |
| 1986 | Inducted, Charter Member, JCPenney Inventor's Club |
| 1987 | Testified before U.S. Senate, Industrial Design Bill (S-791) |
| 1989-1994 | International Congress of the Societies of Industrial Design (ICSID)<br>Representative to the United Nations |

2

| 1992 | Testified before U. S. House of Representatives<br>Industrial Design Innovation & Technology Act (HR-1790) |
|------|---|
| 1992 | Gubernatorial Appointment: Kansas Historic Sites Board of Review<br>State and National Register of Historic Places |
| 1993 | Guest Educator - University of Kansas, Dept. of Design<br>Senior course in Industrial Design in Spring 1993 |
| 1993 | Elected to Board of Directors, Friends of Cedar Crest Association<br>Kansas Governor's Residence, Topeka |
| Feb. 1993 | Appointed, Heritage Trust Fund, Board of Review<br>Allocation of $600,000 Federal Funds to Kansas Historic Sites |
| 1994 | Elected to Board of Directors, Historic Topeka, Inc. |
| Feb. 1994 | Appointed, Heritage Trust Fund, Board of Review<br>Allocation of $650,000 Federal Funds to Kansas Historic Sites |
| 1994 | Elected to Board of Directors, Kansas State Historical Society |
| Feb. 1995 | Appointed, Heritage Trust Fund, Board of Review<br>Allocation of $650,000 Federal Funds to Kansas Historic Sites |
| 1995 | Elected to Board of Directors, Mulvane Art Center of Topeka, Inc. |
| April 1996 | Elected to University of Kansas, School of Fine Arts Board of Advisors |
| Fall 1997 | Elected, Board of Directors, Friends of the Free State Capitol<br>A preservation group to save the former Kansas State Capitol |
| Summer 1998 | Selection Committee, Kansas State Historical Society<br>Governor's Architectural Preservation Award |
| June 2000 | Elected President of Board of Directors, Mulvane Art Museum |
| June 2001 | Reelected President of Board of Directors, Mulvane Art Museum |
| Nov. 2001 | Elected, Vice President, Board of Directors, Kansas International Museum |
| Aug. 2005 | Appointed, Chairman of IDSA's Academy of Presidents |

**Speeches and Publications:**

| Sep./Oct.1976 | ID Magazine, Cover Article, "Design System Transforms Mass Retailer" |
|------|---|
| 1977 | Quotes, 75th Anniversary Edition, JCPenney News |
| 1981 | ID Magazine, "The Design Manager's Opinion" |
| 1982 | IDSA Journal, innovation, "Designing with Corporate Goals in Mind" |

| | |
|---|---|
| 1983 | Speaker, "Profits by Design", New York Chamber of Commerce and Industry |
| Fall 1983 | IDSA Journal, innovation, "The Client's Role in Great Design" |
| Apr. 19, 1984 | Quote, Philadelphia Daily News, "Read This - Quick!" |
| Aug. 8, 1984 | Interview, National Public Radio (1090) Seattle |
| July 11, 1984 | Speaker, Consumer Product Safety Commission (CPSC) Conference, Washington, DC |
| 1985 | Speaker, WORLDESIGN Conference, Washington, DC<br>"Driving Forces - What Shapes American Design" |
| 1985 | Article, New Product Development Newsletter<br>"The CW Formula for Successful New Products" |
| 1985 | Speaker/Panelist, International Design Conference/Aspen<br>"Everyday Art, Retailers v Museums" |
| Nov. 1985 | Speaker, 1st New Products Design Conference, New York<br>"The Best Kept American Business Secret" |
| Nov. 14, 1985 | Article, NY Times, Cover Home Section<br>"Made in America - How Does the US Fare in Design?" |
| 1985 | Jury's Introduction to Consumer Product Section, 5 Years of IDSA Design Excellence |
| Dec. 14, 1985 | Article, The Economist, "World Business" |
| 1985 | Editorial, IDSA Newsletter "Design Perspectives" |
| July 15, 1986 | Quote, Wall Street Journal, "Italian Designer of Sleek Autos Expands to US" |
| Sept. 10, 1986 | Keynote Speech, USIA Lecture Series "Design in America", Belgrade, Yugoslavia |
| Sept. 12, 1986 | Keynote Speech, USIA Lecture Series "Design in America", Zagreb, Yugoslavia |
| Dec. 2, 1986 | Keynote Speech, USIA Lecture Series "Design in America", Ljubljana, Yugoslavia |
| Dec. 5, 1986 | Keynote Speech, USIA Lecture Series "Design in America", Sarajevo, Yugoslavia |
| June 1986 | Feature Article, Technical Aesthetics, Soviet Publication<br>"Artists Do What They Want, Designers Want What They Do" |
| 1986 | Introduction Speech, The Whitney Museum of American Art<br>"High Styles - Twentieth Century American Design" |
| June 1987 | Full Page Interview, Housewares Executive Magazine |
| July 1987 | Article, High Technology, "Design With People in Mind" |
| Aug. 27, 1987 | Article, The London Financial Times, "The Sacrificial Enhancement Syndrome" |

1987            Testimony, US Senate, Committee on The Judiciary
                Subcommittee on Patents, Copyrights and Trademarks

Feb. 4, 1988    Article, NY Times, "US - Soviet Accord on Design"

1988            Speaker, Design Management Institute (DMI) Conference
                "Strategies for New Product Development"

1988            Article, DesignWeek, British Publication

Nov. 13, 1988   Quotes, NY Times, Ideas and Trends
                "A Bigger American Following for Industrial Design -
                A New Approach to Products From Cars to Copiers"

Fall 1989       Keynote Address, University of Baltimore Law School
                "A Designer's View of Current Design Protection"

Nov. 17, 1989   Quote, DesignWorld, Australian Publication, "Design in the Soviet Union"

1990            Speaker, IDSA Annual Conference, "The Profession After Design Legislation"

Jan. 29, 1992   Testimony, US House of Representatives
                Subcommittee on Intellectual Property and Judicial Administration
                The Industrial Design Innovation and Technology Act

May/June 1992   Quote, ID Magazine, "Should We Copyright Design ?"

May 20, 1992    Speaker, International Congress of the Societies of Industrial Design
                17th ICSID Conference, Ljubljana, Slovenia
                "Designing a New Nation for Global Competitiveness"

Aug. 20, 1992   Speaker, IDSA Worldesign Conference, San Francisco
                "If Ralph had said 'Design' instead of 'Build' a Better Mousetrap"

Oct. 14, 1992   Speaker, Rocky Mountain Chapter, IDSA, "Are Industrial Designs Intellectual Property?"

Nov. 9, 1992    Speaker, Topeka Chamber of Commerce, "How to Profit from Your Ideas"

Dec. 6, 1992    The Topeka Capital-Journal, Front Page Business Section, "Making Better Mousetraps"

Sept. 1993      Speaker, Kansas City Chapter, IDSA
                Do Industrial Designers Create Intellectual Property?

Nov. 1993       Article, The Design Management Institute (DMI) Journal
                "U.S. Policy & it's Effect on the Economic Value of Design"

May 16, 1994    Wall Street Journal - "Another Gizmo to Indulge Our Love of Garlic"
                Article about Better Mousetraps' GarlicEXPRESS

Jun. 11, 1994   The Topeka Capital-Journal, Front Page Business Section
                "Better Mousetraps Smells a Winner" -  Half Page Article

Nov./Dec. 1994 Article, Inventor's Digest Magazine - 5 Page Article, "The Economic Value of Design"

Sept. 1995  Speaker, International Congress of the Societies of Industrial Design
(ICSID) Taipei, Taiwan - "Design in the 21st Century"

Oct. 23, 1996  The National Conference on Industrial Design Protection
"Designer's View on What Should be Protected"
Sponsors: American Intellectual Property Law Association
and the Industrial Designers Society of America (IDSA)

Sept. 25, 1997 Design Management Institute (DMI) Annual Conference
"Design Patents: An Underutilized Competitive Weapon", Newport, RI

Spring 1998  Kansas Technology Enterprise Corporation (KTEC), Advanced Manufacturing Institute
Speaker at Annual Conference, "Design and Manufacturing"

Summer 1998  Juror for NorthWest Chapter, IDSA, Annual Awards Competition

October 1998  Speaker, International Congress of the Societies of Industrial Design (ICSID)
Pittsburgh, PA, "Design Patents in United States"

Dec. 1998  International Congress of the Societies of Industrial Design (ICSID) News
"Design Protection in the US"

May 13, 1999  Public Hearing, Testimony, United States Patent & Trademark Office (USPTO)
The Hague Agreement Concerning the International Registration of Industrial Designs

Aug. 25, 1999  United States Patent & Trademark Office (USPTO) Annual Open House
Keynote Speaker:  "The Importance of Design to Business & the US Economy"

March 2000  Juror for IDSA's Industrial Design Excellence Awards (IDEA) Program
Selections announced in the June 2, 2000 edition of BusinessWeek Magazine

March 2000  Speaker at IDSA's Midwest Regional Conference, St. Louis, MO
"On the Witness Stand for Design"

Sep. 23, 2000  Presentation at IDSA Annual Conference, New Orleans, LA
Mock Trial on Design Patent Infringement with Perry J. Saidman, IDSA

Jan. 14, 2001  Speaker, National Housewares Show, Chicago, IL
"On the Witness Stand for Design"

Jan. 15, 2001  Speaker, Chicago Chapter, IDSA
"On the Witness Stand for Design"

Apr. 07, 2001  Speaker, Southern District Conference, IDSA
"On the Witness Stand for Design"

Aug. 16, 2001  Presentation at IDSA Annual Conference, Boston, MA
"Top Ten Mistakes Designers & Patent Attorneys Make in Filing Design Patents"

| | |
|---|---|
| Nov. 2001 | Keynote Speaker, Fédération Internationale des Conseils en Propriété Industrielle Rome, Italy  (FICPI is the International Association of Intellectual Property Attorneys) |
| July 2002 | Presentation at IDSA Annual Conference, Monterey, CA "The Latest Skinny on Design Patents, Do's & Don't's" |
| Aug. 2003 | Presentation at IDSA Annual Conference, New York City "US Design Patents & The New Registration System in the European Community |
| Jan./Feb. 2004 | Silver Magazine, "The Trial of the Century: Gorham Verses White, 1871" |
| Sept. 8, 2005 | Keynote Speaker, International Trademark Association (INTA) 2005 Worldwide Forum on Marks & Designs, Vancouver, British Columbia, Canada in Cooperation with the World Intellectual Property Organization (WIPO) |
| Mar. 3, 2006 | Presenter, "Design Patents, The Currency of the Innovation Age" Innovation Imperative, The University of Cincinnati |
| Apr. 10, 2006 | Keynote Presenter, The First USPTO "Design Day", Washington, DC |
| May 2006 | Keynote Speaker, Fédération Internationale des Conseils en Propriété Industrielle Paris, France  (FICPI is the International Association of Intellectual Property Attorneys) |
| Oct. 2007 | Presenter, IDSA/ICSID WorldDesign Conference, San Francisco, CA "On the Witness Stand for Design" |
| June 2008 | Taught IDSA Continuing Education Seminar in Reston, VA with Perry J. Saidman, Esq. "How to Serve as an Expert Witness in Design Patent Litigation" |
| 1972-Present | Guest Lecturer, Industrial Design Department |

Auburn University
Carnege-Mellon University
Cranbrook Academy of Art
Dartmouth College
Georgia Institute of Technology
Harvard University
Illinois Institute of Technology
Massachusetts Institute of Technology
Pratt Institute
Rhode Island School of Design
Stanford University
The Art Center
University of Cincinnati
University of Kansas

Exhibit E



# Design Patent
EVERYTHING YOU NEED TO KNOW

home        about        contact        get a patent



search



Search

knowledge

Understanding Design Patents

Can I Patent Clothing Design?

patents

Apply for a Design Patent

Thoughts to Paper

Design Patent Application

electronics

Apple iPhone 3GS

Apple iPod Nano

Apple iPod Shuffle

RIM Blackberry Phone

Sony PlayStation

Microsoft Xbox

Nintendo Game Boy

Nintendo Wii Controller

cars

Bentley Continental

Lamborghini Murcielago

Maserati GranTurismo

Chrylser Crossfire Roadster

Volkswagen Beetle

clothing/accessories

Rolex Watch

## The Statue of Liberty Design Patent

In 1879, Frédéric Auguste Bartholdi was granted this design patent of his masterpiece which would become a national monument and a universal symbol of freedom and democracy. The design consists of a woman holding a torch and book which represent attributes of wisdom. The statue's stern face is rumored to have been modeled after Bartholdi's mother, and the statue's body modeled after his wife. The design patent allowed exclusive profits from small copies of the statue which proceeded to help build the full-size statue that stands tall on Liberty Island today. The 151-foot-tall statue was completed in 1886 and presented to the U.S. as a centennial commemoration of its Declaration of Independence. According to some sources, roughly ten years after the Statue of Liberty was received by the US, they donated $10,000,000 USD to a number of charities in France.

**Statue of Liberty Tickets**
Want to visit Statue of Liberty ?, Get Free Admission - Learn more
newyorkpass.com/statue-of-liberty

AdChoices ▷



Montblanc Ball Point Pen

Ugg Boots

True Religion Jeans

Chanel Watch

Oakley Sunglasses

Casio G-Shock Watch

Dolce & Gabbana Handbag

## food

Coca-Cola Bottle

Starbucks Chocolate

Kellogg's Eggo Waffles

Lay's Wavy Chips

Planters Mr. Peanut

## miscellaneous

Statue of Liberty

Google Homepage

Microsoft's Wingdings Font

Star Wars' Yoda

Batman

Copyright © 2010 Patent a Design. All Rights Reserved. Patent designs are owned by their respective inventors or assignees. Designed by Free CSS Templates.

D19-34.5        AU 2901        EX
FIP: 05/96      XR        D011023

# DESIGN.

## A. BARTHOLDI.
### Statue.

No. 11,023.        Patented Feb. 18, 1879.



Copyright by Moore & Perigon and Armour Bartholdi, Aug., 1876.

LIBERTY ENLIGHTENING THE WORLD.

# UNITED STATES PATENT OFFICE.

AUGUSTE BARTHOLDI, OF PARIS, FRANCE.

## DESIGN FOR A STATUE.

Specification forming part of Design No. **11,023,** dated February 18, 1879; application filed January 2, 1879.
[Term of patent 14 years.]

*To all whom it may concern:*

Be it known that I, AUGUSTE BARTHOLDI, of Paris, in the Republic of France, have originated and produced a Design of a Monumental Statue, representing "Liberty enlightening the world," being intended as a commemorative monument of the independence of the United States; and I hereby declare the following to be a full, clear, and exact description of the same, reference being had to the accompanying illustration, which I submit as part of this specification.

The statue is that of a female figure standing erect upon a pedestal or block, the body being thrown slightly over to the left, so as to gravitate upon the left leg, the whole figure being thus in equilibrium, and symmetrically arranged with respect to a perpendicular line or axis passing through the head and left foot. The right leg, with its lower limb thrown back, is bent, resting upon the bent toe, thus giving grace to the general attitude of the figure. The body is clothed in the classical drapery, being a stola, or mantle gathered in upon the left shoulder and thrown over the skirt or tunic or under-garment, which drops in voluminous folds upon the feet. The right arm is thrown up and stretched out, with a flamboyant torch grasped in the hand. The flame of the torch is thus held high up above the figure. The arm is nude; the drapery of the sleeve is dropping down upon the shoulder in voluminous folds. In the left arm, which is falling against the body, is held a tablet, upon which is inscribed "4th July, 1776." This tablet is made to rest against the side of the body, above the hip, and so as to occupy an inclined position with relation thereto, exhibiting the inscription. The left hand clasps the tablet so as to bring the four fingers onto the face thereof. The head, with its classical, yet severe and calm, features, is surmounted by a crown or diadem, from which radiate divergingly seven rays, tapering from the crown, and representing a halo. The feet are bare and sandal-strapped.

This design may be carried out in any manner known to the glyptic art in the form of a statue or statuette, or in alto-relievo or bass-relief, in metal, stone, terra-cotta, plaster-of-paris, or other plastic composition. It may also be carried out pictorially in print from engravings on metal, wood, or stone, or by photographing or otherwise.

What I claim as my invention is—

The herein-described design of a statue representing Liberty enlightening the world, the same consisting, essentially, of the draped female figure, with one arm upraised, bearing a torch, while the other holds an inscribed tablet, and having upon the head a diadem, substantially as set forth.

In testimony whereof I have signed this specification in the presence of two subscribing witnesses.

A. BARTHOLDI.

Witnesses:
 C. TERINIER,
 COTTIN.