DANIEL J. BERGESON, Bar No. 105439
dbergeson@be-law.com
MELINDA M. MORTON, Bar No. 209373
mmorton@be-law.com
BERGESON, LLP
303 Almaden Boulevard, Suite 500
San Jose, CA 95110-272
Telephone: (408) 291-6200
Facsimile: (408) 297-6000

Of Counsel:
MICHAEL E. JOFFRE
AARON M. PANNER
KELLOGG, HUBER, HANSEN, TODD,
 EVANS & FIGEL, PLLC
1615 M Street N.W., #400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999

Attorneys for Amicus Curiae
Cellco Partnership d/b/a Verizon Wireless

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 11-cv-01846-LHK<br><br>**BRIEF OF AMICUS CURIAE CELLCO PARTNERSHIP REGARDING APPLE'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date: October 13, 2011<br>Time: 1:30 pm<br>Courtroom 8, 4th Floor<br>Judge: Hon. Lucy H. Koh |

**TABLE OF CONTENTS**

I. Introduction ................................................................................................................. 1

II. Background: Verizon Wireless's Investments ........................................................... 3

III. Public Interest: Harm to Verizon Wireless and Consumers ...................................... 4

    a. An Injunction Would Harm Verizon Wireless and Consumers ............................... 5

    b. The Harm Would Be Increased Because 4G Device Technology Is At An Early Stage ......................................................................................................... 7

    c. The Harm From An Injunction Would Be Increased Due To Its Timing ................ 8

IV. Public Interest: Harm To Others ............................................................................... 8

    a. A Key U.S. Priority Is Access to Broadband Technologies .................................... 9

    b. Encouraging Use of High-Speed Wireless Networks Creates Jobs and Advances The U.S. Economy ........................................................................... 10

    c. A 4G Network Helps First-Responders and Promotes Life-Saving Technology ....................................................................................................... 11

V. Conclusion ................................................................................................................. 12

# TABLE OF AUTHORITIES

**CASES**

*Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61 (D.D.C. 2010) .................................................. 5

*Atari Corp. v. Sega of Am., Inc.*, 869 F. Supp. 783 (N.D. Cal. 1994) ............................................. 7

*Aventure Commc'ns Tech., L.L.C. v. Iowa Utilities Bd.*, 734 F. Supp. 2d 636
    (N.D. Iowa 2010) ........................................................................................................................ 5

*City of Harrisonville v. Dickey Clay Mfg. Co.*, 289 U.S. 334 (1933) ............................................. 6

*Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446 (Fed. Cir. 1988) ................................................. 5, 8

*eSpeed, Inc. v. Brokertec USA, L.L.C.*, No. CIV.A. 03-612-KAJ, 2004 WL 62490
    (D. Del. Jan. 14, 2004) ............................................................................................................... 5

*Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566 (Fed. Cir. 1993) ............................................. 4

*Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377 (Fed. Cir. 2000) ..................................... 5

*Lambert v. Holmberg*, 712 N.W.2d 268 (Neb. 2006) ..................................................................... 6

*Providence Products, LLC v. Implus Footcare, LLC*, No. 3:07CV504, 2008 WL 227281
    (W.D.N.C. Jan. 25, 2008) ........................................................................................................... 3

*Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 (Fed. Cir. 1995) ............................................ 5, 8

*Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266 (Fed. Cir. 1985) ................................................... 1

*Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921
    (D.C. Cir. 1958) .......................................................................................................................... 8

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ............................................................... 2, 4

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................ 1

**OTHER MATERIALS**

Everett M. Rogers, *Diffusion of Innovations* 288-90 (5th ed. 2003) .............................................. 7

Federal Trade Commission, *The Evolving IP Marketplace* (March 2011) ..................................... 4

Damien Geradin & Robert O'Donoghue, *The Concurrent Application of Competition Law
    and Regulation: The Case of Margin Squeeze Abuses in the Telecommunications
    Sector*, 1 J. Competition L. & Econ. 355 (2005) ....................................................................... 7

J. Covello et al., Goldman Sachs Equity Research, *LTE: Fueling the Mobile Super-Cycle;
    Implications Across TMT* (Feb. 9, 2011) ................................................................................... 7

Max Stul Oppenheimer, *The Time and Place for "Technology-Shifting" Rights*, 14 Marq.
    Intell. Prop. L. Rev. 269 (2010) ................................................................................................. 7

Robert J. Kauffman, Angsana A. Techatassananasoontorn, *Understanding Early Diffusion of Digital Wireless Phones*, 33 Telecommunications Policy 432 (2009)............................................ 7

*Amicus curiae* Cellco Partnership d/b/a Verizon Wireless is a national wireless carrier.[1] Verizon Wireless has invested billions of dollars in developing, deploying, and operating a broadband nationwide wireless network. That includes massive investments in a next-generation network whose greater speed allows many services and applications, such as video, to work far better than with current network technologies. Additionally, Verizon Wireless is an innovator in the field of wireless communication and has devoted considerable resources to developing and patenting new technology.

Verizon Wireless respectfully requests leave to file this brief to inform the Court of public interest considerations implicated by Apple's preliminary injunction motion on its utility patent.[2] The requested injunction of certain Samsung products will harm Verizon Wireless and U.S. consumers. It also has the possibility of slowing the deployment of next-generation networks – such as Verizon Wireless's – contrary to the stated goals of the U.S. government.[3]

## I.   Introduction

In order to grant the extraordinary remedy of a preliminary injunction, this Court must find that the requested relief will not do serious harm to the public interest. *See Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 1269 n.2 (Fed. Cir. 1985) (declaring "*each* [preliminary injunction factor must] be weighed and measured against others and against the relief demanded") (emphasis added). That standard is not met in this case.

---

[1] Amicus curiae and its undersigned counsel represent that they have authored this brief. No party or counsel for any party made any monetary contribution intended to fund the preparation or submission of this brief.

[2] Verizon Wireless takes no position on whether a preliminary injunction should be granted if the Court finds a likelihood of success on the infringement of Apple's design patents.

[3] Verizon Wireless takes no position on whether Apple is likely to succeed on the merits of its infringement claims. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Rather, it is solely concerned that an injunction may cripple the free flow of goods to Verizon Wireless, businesses and consumers. Verizon Wireless's advocacy in this matter is focused solely on minimizing the adverse impacts to persons who are not parties to this dispute.

1

*Apple, Inc. v. Samsung Elecs., et al.*, Case No. 11-cv-01846-LHK

An injunction would prohibit some of the newest, most advanced wireless devices sold today and impede the growth of Verizon Wireless's high-speed 4G network. The accused Samsung devices are among the few products that can access Verizon Wireless's next-generation high speed network and therefore are among the most sought-after devices by early-adopting consumers – a critical market segment in the industry. Verizon Wireless has invested and is investing billions in developing and deploying its next-generation Long Term Evolution ("LTE") 4G network; that investment depends on consumers having access to devices that can make use of that network. Samsung is one of only six manufacturers (including HP, HTC, LG, Motorola, and Pantech) that has developed and is offering a limited number of such devices today. Moreover, the motion to enjoin Samsung's devices comes at a critical moment: when Verizon Wireless is expanding its LTE network to paying customers and right before the holiday shopping season.

The proposed preliminary injunction would affect only Samsung devices that make use of wireless carriers' next-generation networks. But the utility patent at issue in the motion has *nothing* to do with the 4G network technology that makes the accused smartphones and tablet uniquely attractive to consumers. Instead, the patent covers the way documents can be viewed on the devices. There are nearly two dozen other devices accused in the current lawsuit that are not part of Apple's preliminary injunction motion. But those devices are mainly older devices that are not designed to make use of Verizon Wireless's and other carriers' next-generation networks. Thus, the proposed injunction would disproportionally affect the very devices that are most critical to adoption and expansion of Verizon Wireless's next-generation network.

While Verizon Wireless supports without reservation the protection of intellectual property rights, in this case these rights inherent in the utility patent can be fully vindicated through an award of monetary damages. In contrast, any factors favoring the proposed injunction are outweighed by the public interest in protecting a competitive marketplace, consumers, and Verizon Wireless who has invested heavily in a network of which the accused Samsung devices are an important part. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("[When] an injunction is asked which will adversely affect a public interest . . . the court may in the public

2

*Apple, Inc. v. Samsung Elecs., et al.*, Case No. 11-cv-01846-LHK

interest withhold relief until a final determination of the rights of the parties.") (internal quotation marks omitted). Imposing this irreversible harm on consumers and Verizon Wireless is particularly inappropriate at the preliminary injunction stage, when the infringement claims have not been fully adjudicated. *See Providence Products, LLC v. Implus Footcare, LLC*, No. 3:07CV504, 2008 WL 227281, at *3 (W.D.N.C. Jan. 25, 2008) ("Given the fact that it is too early to determine either party's likelihood of success on the merits, it would not be in the public's interest for the Court to grant such a drastic remedy as a preliminary injunction."). For these reasons, Verizon Wireless respectfully submits that the motion for a preliminary injunction should be denied.

## II.  Background: Verizon Wireless's Investments

Verizon Wireless has invested enormous effort and resources into building and marketing its 4G LTE network, which already covers more than 100 markets and which will cover more than two thirds of the U.S. population by mid-year 2012.[4] Since it was formed, Verizon Wireless has invested more than $65 billion – $6 billion on average every year – in its networks and services.[5] In 2008, Verizon Wireless paid $9.36 billion for a group of wireless spectrum licenses for use in launching its LTE network.[6] Verizon Wireless deployed its LTE network on December 5, 2010, in 39 major metropolitan areas covering more than 110 million people.[7] Verizon Wireless's LTE network is on track to cover over 175 markets and more than 185 million people by the end of 2011.[8] As a result of Verizon Wireless's extensive investments, customers using the LTE network have access to expected download speeds that are ten times the speed of Verizon Wireless's 3G network.[9]

---

[4] *See* http://network4g.verizonwireless.com/#/coverage.

[5] *See* http://aboutus.vzw.com/bestnetwork/network_facts.html.

[6] *See* http://news.vzw.com/news/2008/04/pr2008-04-04.html.

[7] *See* http://news.vzw.com/LTE/Overview.html.

[8] *See* J. Moorman, Standard & Poor's, op cit., at 2.

[9] *See* http://network4g.verizonwireless.com/#/comparison.

3
*Apple, Inc. v. Samsung Elecs., et al.*, Case No. 11-cv-01846-LHK

The success of Verizon Wireless's LTE network depends on consumers' purchasing and using smartphones and devices capable of interacting with Verizon Wireless's LTE infrastructure. Verizon Wireless's LTE network can interact only with devices specifically configured to work with that network.  And Verizon Wireless has been successful in selling and distributing such devices.  By the end of the first quarter of 2011, Verizon Wireless had over 500,000 LTE subscribers.[10]  During the second quarter of 2011 alone, Verizon Wireless sold 1.2 million LTE smartphones and Internet data devices.[11]

Verizon Wireless currently offers five models[12] of LTE smartphones.[13]  The Samsung DROID Charge, one of the smartphones at issue in the motion, is one of the marquee products offered by Verizon Wireless to showcase its LTE network.  Samsung's Galaxy Tab 10.1, which is also the subject of the motion, is the first LTE tablet sold by Verizon Wireless.

### III. Public Interest: Harm to Verizon Wireless and Consumers

"[A] preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted."  *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993).  When considering whether to issue an injunction, courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger*, 456 U.S. at 312; *see also* Federal Trade Commission, *The Evolving IP Marketplace*, at 232-33 (March 2011) ("courts have appropriately broadened the scope of the public interest concerns to include . . . other burdens that would be borne by the broader public").  Courts have denied a preliminary injunction on public interest grounds where the "economic injury" to third parties from the

---

[10] *See* http://www.sidecutreports.com/2011/04/21/verizon-hits-half-million-mark-for-lte-subscribers/.

[11] *See* http://www22.verizon.com/investor/investor-consump/groups/events/documents/investorrelation/event_ucm_4_trans.pdf.

[12] Verizon Wireless began offering the DROID Bionic on September 8, 2011, and the Pantech Breakout on September 22, 2011.

[13] *See* J. Covello et al., Goldman Sachs Equity Research, *LTE: Fueling the Mobile Super-Cycle; Implications Across TMT*, at 8 (Feb. 9, 2011).

4
*Apple, Inc. v. Samsung Elecs., et al.*, Case No. 11-cv-01846-LHK

injunction would be severe.  *See Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 70 (D.D.C. 2010); *Aventure Commc'ns Tech., L.L.C. v. Iowa Utilities Bd.*, 734 F. Supp. 2d 636, 667 (N.D. Iowa 2010).  Courts also have denied motions for a preliminary injunction when the injunction would have eliminated or reduced the market for an important technology.  *See*, *e.g.*, *eSpeed, Inc. v. Brokertec USA, L.L.C.*, No. CIV.A. 03-612-KAJ, 2004 WL 62490, at *3-4 (D. Del. Jan. 14, 2004) (denying patentee's motion for a preliminary injunction that would have enjoined defendant from providing consumers with its electronic trading system for government securities and would have effectively granted patentee a hegemony over electronic systems for government securities); *cf. Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995) (en banc) (recognizing that courts have denied injunctive relief in patent cases to protect the public interest).

In considering the public interest, courts should *not* focus on whether "there exists a public interest in protecting rights secured by valid patents," because *every* patent case concerns the protection of intellectual property rights.  *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988).  Instead, the focus is on "whether there exists some critical public interest that would be injured by the grant of preliminary relief."  *Id.*  Apple cannot meet its burden to show that there is "no potential injury to an important public interest."  *Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377, 1380 (Fed. Cir. 2000).

      **a.**     **An Injunction Would Harm Verizon Wireless and Consumers**

The harm from a preliminary injunction would be substantial to both consumers and Verizon Wireless.  Consumers cannot benefit from the billions of dollars that Verizon Wireless has invested in its next-generation network unless they can purchase and use 4G devices compatible with that network.  Verizon Wireless's calculus in determining to invest billions of dollars to deploy its LTE network was based on the expectation that the network would yield a return on investment and be supported through revenues from consumers who bought 4G devices.  But the Samsung devices targeted by the motion are among the very few 4G devices available today.

5

*Apple, Inc. v. Samsung Elecs., et al.*, Case No. 11-cv-01846-LHK

1   For example, Verizon Wireless markets five 4G handsets for use on its next-generation LTE network.  One of those is the Samsung DROID Charge, which is a target of the motion.  Thus, a preliminary injunction would severely decrease customers' options if they want to use Verizon Wireless's LTE network.  The preliminary injunction motion also targets the Samsung 4G Galaxy Tab 10.1, which is the first 4G tablet device available in the United States.  A preliminary injunction could force tablet computer customers to choose non-4G devices – and thus decrease the rate at which customers adopt LTE services.

Because of factors that have little to do with the patented technology, there will be few alternatives to the Samsung 4G devices in the near term.  It takes considerable time and effort to develop any 4G product – normally, much longer than a year.  Any requirement that Samsung redesign its products in light of an injunction may cause long delays before the redesigned 4G devices are available to consumers.  Such redesigned devices would need to be tested, including checking their performance, operation, and compatibility with Verizon Wireless's network and specifications.  Time and money already spent preparing education and training materials for store employees on the accused devices may be lost, and these materials may need to be recreated.  Verizon Wireless may need to re-tool marketing campaigns that are already running or about to run.  Accordingly, the harm imposed by an injunction would fall not just, or even mainly, on Samsung.  Rather, customers would see their access to 4G technology sharply restricted, and Verizon Wireless would be limited in its ability to promote its LTE network to consumers and thus restricted in its ability recoup its investments.

Where the costs to third parties are massive, courts have refused to impose injunctions in all areas of property law.  *See*, *e.g.*, *City of Harrisonville v. Dickey Clay Mfg. Co.*, 289 U.S. 334, 339 (1933) (reversing the grant of an injunction because it would have forced a city defendant either to abandon its $60,000 sewage disposal plant, leaving the residents "to the primitive methods theretofore employed," or to build an auxiliary plant for $25,000); *Lambert v. Holmberg*, 712 N.W.2d 268, 277 (Neb. 2006) (affirming denial of injunction to prevent connection to private sewerline where nominal impediment to the plaintiff's "exclusive rights to possession of their

sewerline . . . is outweighed by the public interest in efficient and safe disposal of sewage"). Here, too, the costs to Verizon Wireless and consumers from an injunction likewise counsels against a preliminary injunction.

### b.     The Harm Would Be Increased Because 4G Device Technology Is At An Early Stage

Because 4G devices are in an early stage of adoption, any decrease in the number of available devices may delay large numbers of consumers from adopting LTE technology. *Cf. Atari Corp. v. Sega of Am., Inc.*, 869 F. Supp. 783, 791 (N.D. Cal. 1994) (harm to a technology is increased when the technology is new). As economists and analysts have recognized, early adopters are "critical for the successful diffusion of digital wireless phones. According to the diffusion of innovation theory, this is because this group of adopters is often referred to as *opinion leaders*. They are likely to have a strong influence on those who adopt later."[14] If the early adopters are prevented from buying a Samsung device, they will be less likely to influence other, later users from subscribing to Verizon Wireless's LTE network.

The rate of technological changes in the wireless industry further exacerbates the harm from impeding early adopters' access to 4G devices. For example, analysts predict that consumers will replace 50% of their smartphones and 30% of their tablets within two years.[15] An injunction that limited the availability of 4G devices in the market could substantially reduce the number of customers who could or would purchase those devices. Such a loss in sales of 4G devices, in turn, undermines the business justification for continuing to expand Verizon Wireless's LTE network.

---

[14] Robert J. Kauffman, Angsana A. Techatassananasoontorn, *Understanding Early Diffusion of Digital Wireless Phones*, 33 Telecommunications Policy 432, 445 (2009); *see also* Everett M. Rogers, *Diffusion of Innovations* 288-90 (5th ed. 2003); Max Stul Oppenheimer, *The Time and Place for "Technology-Shifting" Rights*, 14 Marq. Intell. Prop. L. Rev. 269, 303 (2010); Damien Geradin & Robert O'Donoghue, *The Concurrent Application of Competition Law and Regulation: The Case of Margin Squeeze Abuses in the Telecommunications Sector*, 1 J. Competition L. & Econ. 355, 425 (2005).

[15] *See* J. Covello et al., Goldman Sachs Equity Research, *LTE: Fueling the Mobile Super-Cycle; Implications Across TMT*, at 38 (Feb. 9, 2011).

7
*Apple, Inc. v. Samsung Elecs., et al.*, Case No. 11-cv-01846-LHK

The resulting loss of capital, customer base, and goodwill to Verizon Wireless would be irreparable. *See Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) ("[r]elief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as the equitable judgment").

### c.   The Harm From An Injunction Would Be Increased Due To Its Timing

The harm from the proposed preliminary injunction would be increased if it issued during the holiday and year-end sales season. Holiday sales form a significant percentage of Verizon Wireless's yearly revenue. Verizon Wireless has been preparing for the holiday period for months.[16] Its build-up to this season has involved ordering smartphone and tablets, developing and launching new marketing campaigns, and training additional sales personnel.[17] The holiday season will begin in November, with holiday commercials starting the first week of that month.[18] If an injunction issued in the midst of the holiday season, after Verizon Wireless has begun its holiday sales campaigns, the time and money spent on those campaigns would be lost.

## IV.   Public Interest: Harm To Others

The harm from an injunction would go well beyond Verizon Wireless and consumers. It would hurt U.S. businesses, U.S. job growth, and access to emergency personnel. As the Federal Circuit has recognized, an "important public need" for a technology can override other factors and weigh against an injunction. *See Rite-Hite*, 56 F.3d at 1547 (listing cases where a court denied an injunction to ensure that the public had access to an important technology); *Hybritech*, 849 F.2d at 1458 (affirming district court's exclusion of medical test kits from a preliminary injunction to

---

[16]  Verizon Wireless was not made aware in advance that the accused devices suddenly might be become unavailable as a result of a preliminary injunction. Consequently, it has had little opportunity to prepare for a potential loss of the 4G devices during the holiday sales season.

[17]  *See* PREVIEW-Smartphones lift Apple, Samsung in Q4 phone bonanza (Jan. 17, 2011), *available at* http://www.reuters.com/article/2011/01/17/cellphones-idUSLDE70G07C20110117 ("The market for phones tends to jump 10-15 percent in the fourth quarter from the third quarter, as many consumers buy the latest gadgets for Christmas gifts.")

[18]  *See id.*; *see also* http://www.gadgetell.com/technologytell/article/verizon-begins-the-holiday-season-commercials-with-robotic-snowman-video/.

8
*Apple, Inc. v. Samsung Elecs., et al.*, Case No. 11-cv-01846-LHK

safeguard the public's interest in these diagnostic tests).  As explained below, the public's need to access high-speed wireless networks for business and safety weighs against an injunction.

### a. A Key U.S. Priority Is Access to Broadband Technologies

The current U.S. Administration, like previous Administrations, has made expansion of wireless broadband technology a key policy goal.  President Obama has stated that "High-speed wireless service is the next train station, the next off-ramp.  It's how we'll spark new innovation, new investments, and new jobs."[19]  This expansion is critical as only 65% of American households subscribe to high-speed broadband, as opposed to, for example, 90% of homes in South Korea.[20]  As part of the U.S. government's plan to introduce wireless broadband, it announced a $5 billion investment to support build out in rural areas.[21]

Analysts concur that high-speed networks will offer U.S. businesses a competitive advantage.  Juniper Research has estimated that "the first beneficiaries of LTE mobile broadband networks will be business users based in developed countries, led by the US and Japan amongst other countries."[22]  Specifically, wireless broadband networks make emerging technologies, such as cloud computing, more efficient, which leads to higher productivity.[23]

By decreasing the number of available 4G devices, fewer U.S. consumers and businesses may have access to such high-speed networks and this key policy goal is hindered.

---

[19] Obama Pushes Broadband Expansion Proposal, CNN (Feb. 10, 2011).

[20] *See id.*

[21] White House Press Release, *President Obama Details Plan To Win the Future Through Expanded Wireless Access* (Feb. 10, 2011), *available at* http://www.whitehouse.gov/the-press-office/2011/02/10/president-obama-details-plan-win-future-through-expanded-wireless-access.

[22] Juniper Research Press Release, *US & Japan Lead Race for High Speed Mobile Broadband as LTE Revenues to Exceed $200bn Globally by 2015* (Dec. 15, 2010), *available at* http://juniperresearch.com/viewpressrelease.php?pr=220.

[23] "[T]he mobile economy will rise to a whole new level as 4G mobile broadband comes on the scene . . .  The result will be an array of new applications, services, and business models that will create millions of U.S. jobs and power America's growth."  Robert Atkinson, ITIF, *The 4G Jobs Revolution*, National Journal, at 19 (July 9, 2011), *available at* http://www.itif.org/files/2011-innovation-crossroads.pdf.

### b. Encouraging Use of High-Speed Wireless Networks Creates Jobs and Advances The U.S. Economy

Investments in wireless broadband and associated applications provide hundreds of thousands of U.S. jobs.[24] Then-Director of the National Economic Council, Lawrence Summers, explained that

> [T]he substantial capital expenditures associated with developing 4G networks will generate significant job creation. Each dollar invested in wireless deployment is estimated to result in as much as $7 to $10 higher GDP. With major American wireless firms spending $10 billion and rising on these efforts, the benefits for job creation and job improvement are likely to be substantial.[25]

As analysts have pointed out, those high-speed wireless networks' "revenues will be driven by laptops, smartphones and other devices."[26]

A preliminary injunction is likely to slow consumer acceptance of LTE technology, which will affect investments in applications, as well as investments in infrastructure. Smartphones and tablets that operate on an Android platform – such as the Samsung devices at issue in the motion – drive a rapidly growing market for software applications and other support services. According to a recent survey, jobs for Android developers rose 20% in the second quarter of 2011.[27] This job growth is closely tied to the use of Android-based devices with access to high-speed networks, such as the Samsung DROID Charge and Galaxy Tab 10.1. Specifically, the Android Market –

---

[24] *See* Robert D. Atkinson, Daniel Castro & Stephen J. Ezell, ITIF, *The Digital Road to Recovery: A Stimulus Plan To Create Jobs, Boost Productivity and Revitalize America*, at 1-2, 5 (Jan. 2009), *available at* http://www.itif.org/files/roadtorecovery.pdf.

[25] Lawrence H. Summers, *Technological Opportunities, Job Creation, and Economic Growth*, Remarks at the New America Foundation on the President's Spectrum Initiative (June 28, 2010), *available at* http://www.whitehouse.gov/administration/eop/nec/speeches/technological-opportunities-job-creation-economic-growth.

[26] Juniper Research Press Release, *4G LTE Revenues Projected to Exceed $100bn Globally in 2014, Despite Uncertainty About New Data Plans, Says Juniper Research* (Nov. 2010), *available at* http://juniperresearch.com/viewpressrelease.php?pr=213.

[27] J. Paczkowski, *Smartphone Job Market Ripe With Opportunity, Unless You're a BlackBerry Developer*, AllThingsD.com (July 8, 2011), *available at* http://allthingsd.com/20110708/smartphone_job_market/.

10
*Apple, Inc. v. Samsung Elecs., et al.*, Case No. 11-cv-01846-LHK

aided by access to high-speed networks – will see its fastest growth in 2011, increasing revenue by nearly 300 percent.[28]  Removing Samsung's devices from the market would necessarily result in a lower demand for applications and fewer jobs for developers of new applications and other support providers.

Even a small change in investment could affect employment greatly.  That is because a large portion of investment results in increased expenditures on salaries.[29]  By some estimates, even a 2% decline of capital expenditures in broadband would reduce employment by 31,382.  At 10 percent reduction in expenditure would reduce employment by 156,911.[30]

### c.  A 4G Network Helps First-Responders and Promotes Life-Saving Technology

Finally, the U.S. government has emphasized the importance of wireless broadband networks in helping first responders and other public safety officials.  Speed and information are critical assets in an emergency and wireless broadband technology offers both.  Public safety officials' access to commercial broadband networks, however, is supported by commercial revenues from subscribers.  For example, nearly two dozen state and city public safety groups have expressed public interest in LTE networks.[31]  Many first responders – particularly in rural areas – who wish to use broadband wireless devices will need to use Verizon Wireless's next-

---

[28]  *See* iSuppli Press Release, *Revenue for Major Mobile App Stores to Rise 77.7 Percent in 2011* (May 3, 2011), *available at* http://www.isuppli.com/media-research/news/pages/revenue-for-major-mobile-app-stores-to-rise-77-7-percent-in-2011.aspx.

[29]  "[B]ecause broadband investments offer such a robust employment effects per investment…. [E]ven marginal declines in investments could have substantial effects on employment."  Robert D. Atkinson, The Information Technology & Innovation Foundation, *The Economic Impacts of Declining Investment in Broadband*, at 2 (Oct. 2009), *available at* http://www.itif.org/files/10.20.09.Broadband_Investment_and_Jobs.pdf.

[30]  *See id.*

[31]  *See FCC Grants Public-Safety Agencies Waivers to Build LTE Networks*, Fierce Broadband Wireless, *available at* http://www.fiercebroadbandwireless.com/story/fcc-grants-public-safety-agencies-waivers-build-lte-networks/2010-05-16.

1  generation network.  If the 4G devices are enjoined, there will be less revenue to continue

2  expansion of Verizon Wireless's LTE network, which is used by first responders.[32]

3  **V.     Conclusion**

4       A preliminary injunction would hinder Verizon Wireless in developing and deploying its

5  next generation high-speed LTE network, the job growth dependant on that network, and will

6  undercut key public policy goals, including expansion of American's access to broadband

7  networks and faster communication with emergency personnel.  These public interests depend on

8  the availability of 4G devices – including Samsung's accused devices.  Accordingly, the public

9  interest weighs against granting the motion for a preliminary injunction.

11  September 23, 2011                              /s Melinda M. Morton
                                                    Daniel J. Bergeson, Bar No. 105439
                                                    dbergeson@be-law.com
                                                    Melinda M. Morton, Bar No. 209373
                                                    mmorton@be-law.com
                                                    Bergeson, LLP
                                                    303 Almaden Boulevard, Suite 500
                                                    San Jose, CA 95110-2712
                                                    Telephone: (408) 291-6200
                                                    Facsimile: (408) 297-6000

Of Counsel:

Michael E. Joffre
Aaron M. Panner
KELLOGG, HUBER, HANSEN, TODD, EVANS &
FIGEL, PLLC
1615 M Street N.W., #400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999

*Attorneys for Cellco Partnership d/b/a Verizon Wireless*

---

[32] There is a strong demand for the use of next-generation networks by public safety officials.  It is estimated that there will be a $3-5 billion investment over the next four to five years in such uses.  *Motorola Solutions Inc. at Sanford C. Bernstein & Co. Strategic Decisions Conference – Final*, FD (Fair Disclosure) Wire, Transcript 060311a3980113.713 (June 3, 2011) (statement by Motorola Solutions, Inc. President & CEO Greg Brown).

12
*Apple, Inc. v. Samsung Elecs., et al.*, Case No. 11-cv-01846-LHK