# EXHIBIT A

14c O 194/11



**Issued on Sept. 09, 2011**

Klingberg
Court employee,
Clerk of the Court

# Regional Court at Düsseldorf

# Judgment

# IN THE NAME OF THE PEOPLE

In preliminary injunction proceedings

Apple Inc., legally represented by its Chief Executive Officer, Tim Cook, 1 Infinite Loop, Cupertino, CA 95014, United States,

- Petitioner -

Counsel of record:      Freshfields Bruckhaus Deringer, Attorneys at Law, Im Zollhafen 24, 50678 Cologne,

v.

1.      SAMSUNG Electronics GmbH, represented by its managing director, Lee Sun Woo, Am Kronberger Hang 6, 65824 Schwalbach,

2.      SAMSUNG Electronics Co., Ltd, legally represented by the Chairman of its Management Board, Lee Kun-hee, Maetan-dong, Yeongtong-gu, Suwon City, Gyeonggi-do, South Korea,

- Respondents –

Counsel of record:      Rospatt Osten Pross, Attorneys at Law, Kaiser-Friedrich-Ring 56, 40547 Düsseldorf,

Following the oral hearing of August 25, 2011, Civil Division 14c of the Regional Court at Düsseldorf, speaking through the Presiding Judge of the Regional Court, Brückner Hofmann, Regional Court Judge Dr. Heidkamp-Borchers, and Judge Kroll-Schlüter,

decided

that the preliminary injunction of August 9, 2011 shall be modified to read as follows:

I.

On penalty of an administrative fine of up to EUR 250,000.00 to be imposed by the Court for each instance of non-compliance—or confinement for contempt of court if the fine cannot be collected—or, alternatively, confinement for contempt of court for up six months or confinement for up to two years for repeated non-compliance (the latter to be enforced against the Respondents' legal representatives),

the Respondents,

i.e. Respondent 1) in commercial transactions within the European Union, and

Respondent 2) in commercial transactions within the Federal Republic of Germany,

are prohibited

from using any computer products, in particular, from manufacturing, offering for sale (including advertising), bringing to market, importing, exporting and/or possessing same for any of the above purposes, where such products have the following characteristics:

(i)     an overall rectangular shape with four evenly rounded corners;

(ii)    a flat clear surface covering the front of the device that is without any ornamentation;

(iii)   a rectangular boundary under the clear surface with even distances to all sides;

(iv)    a thin rim surrounding the front surface;

(v)     a back panel that is rounded at the corners and bent upward at the edges, and

(vi)    a thin profile

as illustrated below:

1)







and/or

2)







II.

The Petitioner's motion to extend the injunction against Respondent 2) in Section I beyond the territory of the Federal Republic of Germany to the territory of the European Community—except for the Netherlands—is dismissed.

III.

The Petitioner shall bear two-fifths, Respondent 1) shall bear one-half, and Respondent 2) shall bear one-tenth of the Petitioner's court costs and out-of-court expenses. Respondent 1) shall bear its own out-of-court expenses. Respondent 2) shall bear one-fifth of its out-of-court expenses, and the Petitioner shall bear four-fifths thereof.

IV.

This decision is provisionally enforceable. The Petitioner can prevent enforcement by Respondent 2) by posting security of 120% of the amount to be enforced in each case, unless Respondent 2) posts security in the same amount prior to enforcement.

**Facts**

The Parties are very successful manufacturers of consumer electronics, telecommunications, and computer devices. Respondent 1) is the German subsidiary of Respondent 2), which is the South Korean parent company. The Petitioner, which has its registered office in California, distributes, *inter alia*, a tablet PC whose first version, bearing the name of iPad, was launched in 2010. In March 2011, the Petitioner launched the successor to the iPad—the iPad 2— in Germany.

As early as May 24, 2004, the Petitioner had Design Patent No. 000181607-0001 for a handheld computer registered with the European office responsible for registering design patents using a priority application in the United States dated March 17, 2004; this design patent is illustrated below:

0001.1



The Respondents intend to distribute their new tablet PC, the "Galaxy Tab 10.1," as disclosed in the illustrations in the operative provisions of this decision, on the German market. Respondent 2) has already launched the Galaxy Tab 10.1 on the American market, but without the "Samsung" logo on the front.

On July 18, 2011, a report with photographs entitled "Out of Wraps: The Samsung Galaxy Tab 10.1," was published in CHIP magazine, stating that Samsung had now "officially introduced" the Galaxy Tab 10.1 and had provided the editors with a test model (Exhibit ASt 23). In the days that followed, additional reports about the Galaxy Tab 10.1 were published in other computer magazines, indicating that the respective editors had been provided with the tablet PC. A ZDNet article dated July 29, 2011 stated: "Almost two weeks ago, Samsung made the first pre-production samples of the new Galaxy Tab 10.1 available for testing. Pre-production means that production is set to begin […]." (Exhibit ASt 27). The Petitioner's counsel of record found out from an O2 shop that the product would be available to the general public from retail dealers as of August 11, 2011.

The Parties dispute whether the Petitioner was aware of the upcoming market launch and the design of the Galaxy Tab 10.1 prior to July 18, 2011.

In this regard, the Petitioner asserts it was unaware of the exact design of the anticipated product until the CHIP article was published on July 18, 2011. It was unclear whether the same version of the product that was intended for and already introduced by the Respondents to the American market would also be launched on the German market or whether the product would be modified. This lack of clarity still existed when a petition for a preliminary injunction was filed in the Netherlands on June 27, 2011. Ultimately, the Respondents' only change was to add the "Samsung" logo to the front of the tablet PC. This modification alone indicates that the tablet PC was not intended to have the same design in the various markets. This can also be concluded from the fact that, in legal proceedings in Australia relating to the Galaxy Tab 10.1, Samsung asserted that a variation of the US form was intended for the Australian market (Exhibit ASt 44). The Petitioner could not ascertain the design of the Galaxy Tab 10.1 intended for Germany and Europe with the requisite accuracy and certainty

from the pictures on Respondent 1)'s website. Moreover—as emphasized at the oral hearing—there were no pictures of the packaging, which was relevant to the Petitioner's unfair competition law claim.

The Petitioner believes that the Galaxy Tab 10.1 falls within the scope of protection of its legally valid Design Patent No. 000181607-0001 and that its rights under design patent law have thus been infringed. Alternatively, the Petitioner asserts claims under unfair competition law. It has submitted comprehensive briefs in this respect.

With regard to the question of the international jurisdiction of the adjudicating Court over Respondent 2)'s actions outside the territory of the Federal Republic of Germany, the Petitioner asserts that Respondent 1) is a mere sales office of Respondent 2) and serves as an extension of Respondent 2) to carry out its activities on the German market. Therefore, it believes that Respondent 1) must be regarded as an establishment of Respondent 2) as defined in Art. 82 No. 1 of the Community Design Regulation (hereinafter: CDR). Jurisdiction also follows from Art. 82 (2) of the CDR and Art. 82 (1) and Art. 79 (1) of the CDR in conjunction with Art. 6 No. 1 of the Brussels Convention.

In response to the petition dated August 4, 2011, the Court issued a preliminary injunction on August 9, 2011 prohibiting the Respondents from using the computer products pictured in the preliminary injunction in the European Union—with the exception that the injunction did not apply to Respondent 2) with respect to the Netherlands. The decision did not contain any information about features and only provided the first two pictures presented in the operative provisions of the judgment with respect to each of the two model variations. Reference is made to the decision for the details.

The Respondents filed an opposition to the preliminary injunction on August 10, 2011.

In its decision of August 16, 2011, the Court, at the motion of the Respondents, suspended enforcement of the preliminary injunction to the extent Respondent 2) was prohibited from engaging in actions outside the territory of the Federal Republic of Germany.

The Petitioner petitions the Court as follows:

to hold, as it has already held:

In Section I of the petition, the Petitioner described features (iii), (iv) and (v) as follows:

(iii)   beneath the clear surface, there are clear neutral borders on all sides of the displays with the same proportions above and below;

(iv)   a surface with a thin bezel surrounding the front face;

(v)   a back side that is rounded at the corners, forming a slim bezel around the front of the device;

and the Petitioner requested that the petition be supplemented by adding the following additional picture:



and that the Court also maintain the preliminary injunction in effect with respect to Respondent 2) to the extent that Respondent 2) is prohibited from taking the actions set forth in No. I of the operative provisions throughout the European Union.

The Respondents petition the Court as follows:

> To lift the preliminary injunction of August 9, 2011 and dismiss the Petitioner's petitions.

The Respondents argue that the Court has no international jurisdiction to prohibit Respondent 2) from use outside Germany.

Furthermore, the Respondents argue that the entire petition is lacking in particularity and thus impermissible.

In addition, they assert that there is a lack of urgency because the Petitioner has long been aware that the Respondents intend to launch their Galaxy Tab 10.1 on the

German market. In particular, pictures like those attached to Exhibit rop 44a have been available on the Respondents' German website since May 17, 2011. On June 6, 2011, they were replaced by the pictures submitted by the Respondents as Exhibit rop 3 with respect to their protective letter [*Schutzschrift*]. They were only the size of a postage stamp but clearly revealed the design.

Moreover, the Respondents argue that the asserted Registered Community Design [RCD] is invalid. On one hand, the presentation is so inconsistent that it results in invalidity. On the other hand, there is prior art showing a design corpus, which conflicts with design protection. This is evident from the Respondents' petition seeking a declaration of invalidity filed with the OHIM on August 9, 2011 (Exhibit rop 20). In particular, a product study by "Knight-Ridder" (Exhibits rop 11, 12, 12a, 13, 13a, 53 and 53a) and the "HP Compaq TC 1000" (Exhibits 14, 14a, 15, 16, 16a and 50) anticipated the asserted RCD; the Respondents make detailed statements with respect to this and also with respect to further prior art.

Finally, the asserted RCD was not infringed. The features described by the Petitioner as distinctive are primarily technical in nature. Due to the prior art and the technical aspects, the asserted RCD is protected only to a small extent. Moreover, the asserted RCD and the Galaxy Tab 10.1 give different overall impressions since the distinctive features of the asserted RCD are not present in the challenged form. In particular, the challenged design does not feature the bowl-shaped unibody form of the back side and the narrow sides but has three parts because it consists of the frame surface, frame part and back cover. The round-bodied frame, which extends on one side as a "throw-over" onto the back side, is particularly distinctive. Finally, the challenged design has a different aspect ratio than the asserted RCD. The product does not remind one of a bowl with a glass plate placed on it, but of a flat plate, similar to a flat bread-cutting board.

Moreover, claims under unfair competition law cannot be considered. In particular, there is no misrepresentation of origin or exploitation of reputation.

Reference is made to the briefs and their exhibits in the court files for further details of the factual situation and the status of the dispute.

**Opinion of the Court:**

The opposition cannot be sustained with respect to Respondent 1). With respect to Respondent 2), the interim injunction shall be limited to the territory of the Federal Republic of Germany, and the prohibition previously imposed—with effect throughout the entire EU except for the Netherlands—is set aside.

**I.**

The Court has international jurisdiction over the proceedings against Respondent 1, which is based in the Federal Republic of Germany, under Art. 82 (1) of the Community Design Regulation [CDR]. Under Art. 83 (1) of the CDR, this jurisdiction extends throughout the territory of the European Union.

Furthermore, under Art. 82 (5) of the CDR, the Court has international jurisdiction over the proceedings against Respondent 2), which is based in South Korea, only with regard to infringing acts committed or threatened in the Federal Republic of Germany (Art. 83 (2) of the CDR).

There is no further international jurisdiction, which would allow the Court to extend an interim injunction against Respondent 2) beyond the borders of the Federal Republic of Germany to include the entire territory of the European Union. To this extent, the interim injunction of August 9, 2011 must be set aside, and the petition seeking the issuance of such an injunction must be dismissed.

The adjudicating Court has no jurisdiction under Art. 82 (1) of the CDR. The Petitioner did not succeed in demonstrating and substantiating to the Court that Respondent 1) is an "establishment" of Respondent 2) within the meaning of Art. 82 (1) of the CDR.

The Court bases its decision on whether Respondent 1) qualifies as an "establishment" on the requirements developed by the European Court of Justice [ECJ] under Art. 5 No. 5 of the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters (hereinafter: the Brussels Convention) (Ruhl, Gemeinschaftsgeschmacksmuster, 2nd ed. 2010, Art. 82, Margin No. 9).  The starting point is the definition of "establishment" developed in the *Somafer* decision (ECJ 33/78 Somafer v. Saar-Fernglas AG ECR 1978, 2183), which also forms the basis for the *Schott*e decision (ECJ 218/86 SAR Schotte GmbH v. Parfums Rothschild SARL ECR 1987, 4905), under which "establishment" means "a place of business which holds itself out as the permanent branch office of a parent company, has a management structure, and has the necessary physical resources to transact business with third parties so that the latter, although knowing that there is a legal relationship with the foreign parent company, do not have to deal directly with the parent company but may transact business at the place of business that constitutes a branch office."


The fact that Respondent 1) is a legally independent subsidiary of Respondent 2) does not, in principle, preclude its qualification as an establishment. Thus, the ECJ, in assessing whether an independent company was an establishment in its *Schotte* decision (loc. cit.), deemed it sufficient that this was a company with the same name and the identical management as the parent company, which negotiated and did business on behalf of the parent company, and which the parent company used as a branch office (see ECJ in the Schotte decision, loc. cit.). In this context, the ECJ made clear that the internal operational structure alone was not decisive, but rather the manner in which the companies acted in business practice and presented themselves to third parties. Finally, the Düsseldorf Higher Regional Court (OLG) (judgment of May 26, 1995, Case No. 17 U 240/95), taking the aforementioned principles into account, also found that an establishment existed where the managements were not identical, but the independent branch office processed all transactions on behalf of the legal entity domiciled in the other Member State.

The Petitioner has not been able to demonstrate that the above requirements have been met. It is true that Respondent 1) is a mere distribution company. It also holds itself out as a place of business and a branch office of the parent company, Respondent 2), insofar as it acts under the same name in legal transactions and no clear differentiation is made between itself and its parent company on the Internet website. Thus, under the menu item for "Management," the Korean members of the Management Board are presented, and the information largely refers to the parent company and the corporate group as a whole. Moreover, in its presentation to the outside world, e.g. at a trade fair stand, it sometimes uses only the "Samsung" brand name, without indicating who is the party doing business. Nevertheless, the Petitioner could not demonstrate and substantiate that Respondent 1) negotiated and did business on behalf of the parent company. Rather, the Respondents demonstrated that Respondent 1) entered into agreements and issued invoices exclusively in its own name and that it always used its own name in correspondence. Against this background, third parties do not believe they are establishing a legal relationship with the parent company domiciled abroad—even as a possibility—but assume that their exclusive business contact will be Respondent 1).

It is true that, the foreign parent company—as the Petitioner stated and deemed inequitable—can influence whether an establishment exists within the meaning of the aforementioned legal provisions by adopting a particular internal company organization. However, this view fails to understand that a structure under which the domestic company acts and presents itself to the public in its own name creates a corresponding ostensible legal situation vis-à-vis third parties.

Therefore, in the present situation, where Respondent 1) acts and presents itself in its own name, no other interpretation is required, even considering the protective purpose of the statutory provision. It is not apparent why third parties should be able to sue the foreign parent company in Germany. The third party has the independent

subsidiary as a contact and contract partner. Its contact with the latter does not require recourse to the parent company.

Moreover, the protection of intellectual property rights, particularly with respect to Art. 82 of the CDR, requires no other interpretation. A plaintiff objecting to the infringement of an industrial property right in the European Union by a company based outside the EU is not denied legal protection throughout Europe from a court in a Member State. If the plaintiff itself is domiciled or has an establishment in a Member State, it may bring an action in that Member State. Otherwise, the courts where the Office for Harmonization in Alicante has its headquarters have EU-wide jurisdiction. The Petitioner did not substantiate that it has an establishment in Germany and, that, therefore, jurisdiction could be based on Art. 82 (2) of the CDR. There was no need for notification by the Court since the Petitioner could gather from the decision of August 16, 2011 that the Court had considerable doubts as to its international jurisdiction to issue an EU-wide prohibition against Respondent 2) and the Petitioner thus had to make comprehensive submissions on all conceivable jurisdictions—which it did.

Neither does the Court have jurisdiction on the basis of Art. 79 (1) of the CDR in conjunction with Art. 6 No. 1 of Council Regulation 44/2001 of December 22, 2000 on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters (hereinafter: Brussels I). It is questionable whether international jurisdiction over a defendant domiciled in a third country—Respondent 2) in this case—can be established under these provisions. This question is highly disputed in the relevant legal literature. It is true that some authors find it reasonable to apply Art. 6 of Brussels I by analogy (Kropholler, Europäisches Zivilprozessrecht, 8th ed. 2005, Art. 6 of Brussels I, Margin No. 7; Rauscher, Europäisches Zivilprozessrecht, 2nd ed. 2006, Art. 6 of the Brussels I Regulation, Margin No. 7 with further references). However, it can be countered that the wording of Art. 6 and Art. 4 (1) of Brussels I does not support an inference that Art. 6 No. 1 of Brussels I intends to create jurisdiction over a joined party not domiciled in a Member State (see Musielak-Stadler, ZPO, Art. 6 of Brussels I, Margin No. 3; Ruhl, loc. cit., Art. 79, Margin No.18).

Even if, contrary to the language therein, one considers the provisions of Art. 6 of Brussels I (in conjunction with Art. 79 (1) of the CDR) to be applicable to Respondent 2), which is domiciled in South Korea, it follows from the provisions of Art. 90 of the CDR on preliminary injunction proceedings that a court whose jurisdiction is based only on Art. 82 (5) of the CDR or Art. 79 (1) of the CDR in conjunction with Art. 6 of Brussels I may only order interim measures with effect for the territory of the state in which the court is located, but not with Community-wide effect. Under the language of Art. 90 (3) sentence 1 of the CDR, only courts whose jurisdiction is based on Art. 82 (1) through (4) of the CDR have jurisdiction with cross-border scope in interim injunction proceedings, which is not the case here (see Ruhl, loc. cit, Art. 90, Margin No. 17).

Otherwise, there are no concerns as to the jurisdiction of the adjudicating Court, and the parties made no such objections.

## II.

The interim injunction is also otherwise permissible. In particular, the injunction petition has sufficient particularity to the extent claims are asserted under design patent law.

The original petition, which was the subject of the interim injunction dated August 9, 2011, showed both variants of the challenged Galaxy Tab 10.1 (dark and white back) in two illustrations. At the end of the oral hearing, the Petitioner supplemented this petition by adding pictures of the side view and describing features in light of the decision of the Düsseldorf Higher Regional Court dated January 12, 2010, I-20 U 155/09, which had been submitted by its opponent.

With respect to the petition under unfair competition law—filed as an alternative motion, in case of dispute—the attached listing of features serves the purpose of describing the features that establish the product's individual character under unfair competition law (Federal Court of Justice (BGH), judgment of

July 12, 2001, I ZR 40/99 – *Laubhefter*; OLG Düsseldorf, judgment of January 12, 2010, I-20 U 155/09).

By contrast, a listing of features is not required for a petition under design patent law to have the requisite particularity, since the infringing embodiment as well as the design at issue are characterized by their overall impressions and, thus, by all their features—except for the features to be expressly disregarded according to the provisions of the Regulation (see Ruhl, loc. cit., Art. 88, Margin No. 19). Therefore, the listing of features, at most, serves to explain what is visible in the pictures.

The petition is not worded in so unclear a manner that the matter in dispute under design patent law and the content and scope of the prohibition requested are not sufficiently established. In this context, it is to be noted that the petition is open to interpretation—even a corrective one (Zöller/Greger, ZPO, 28th ed. 2010, Section 253, Margin No. 13 and before Section 128, Margin No. 25 with further references). The matter in dispute under design patent law is established by the illustrations, unless the scope of protection is expressly extended by additional language, such as "in all color combinations." The two variants can be perceived with sufficient clarity in the pictures. In particular, the addition of the first side view makes the design of the narrow sides more apparent than just the previous photos. This does not mean that the matter in dispute was modified, but only that it was specified. Moreover, the other side view is not inconsistent with the other photos, even though the Court did not include it in the operative provisions of the decision, in exercise of its discretionary power within the scope of its order under Section 938 of the Code of Civil Procedure (ZPO), because it does not contain any elements clarifying the scope of the prohibition. To the extent the Respondents object to the fact that shades of color have been made the subject of the petition, this is obviously an irrelevant play of light that occurred when the picture was taken. To the extent the picture with the white back was used to show the side view of both product variants, this is non-prejudicial for the representation of the side view.

The addition of the listing of features does not result in the petition lacking particularity. The features described do not detract from the unambiguousness of the pictures. Indeed, the Respondents' charge that the descriptions at times lack

precision and are even incorrect in feature (v), which relates to the back, must be admitted. This is obviously due to the fact that the Petitioner used the listing of the features of the design patent as a starting point although it was supposed to describe the challenged designs. The Court, too, failed to notice the obvious incorrectness of the wording of feature (v) caused when the Petitioner drafted its petition at the end of the oral hearing. However, the Court deems this to be non-prejudicial. This is because—as stated—the petition is established by the pictures and is subject to interpretation. Features (i) to (iv) and (vi) can be understood in conjunction with the pictures. Feature (v) is to be corrected for its obvious incorrectness in the second half-sentence, as was done in the operative provisions.

## III.

The prerequisites for issuing a preliminary injunction required under Sections 935 and 940 of the Code of Civil Procedure (ZPO) have been met. The Respondents announced that they would launch the challenged products on the German market, and have done so in the meantime.

The Petitioner's behavior after becoming aware of this did not indicate that it did not consider the matter very urgent. Applying a more flexible standard than the Düsseldorf Higher Regional Court, which assumed a regular time limit of two months (see OLG Düsseldorf, judgment of December 21, 2010, I-20 U 144/10 with further references), the Court assumes that the period of time between becoming aware of the infringing act and the identity of the infringer and filing the injunction petition may take four weeks without any need for justification. However, this time limit can definitely be extended to 8 weeks and, in exceptional cases, even beyond this period if the circumstances of a case appear to justify it, e.g. because further clarification of the facts, a warning letter, settlement negotiations, international correspondence involving translation work, or extensive research are necessary (e.g. LG Düsseldorf, judgment of June 28, 2011, 14c O 125/11).

The period begins running when the aggrieved party becomes aware of the design of the challenged product and the identity of the infringer. For this purpose, it is not necessary for the product to be available on the market. It is enough if sufficiently accurate illustrations are available that convey the overall impression in so complete a manner that the availability of the actual product at a later point in time cannot give rise to a different assessment (see Eichmann/von Falckenstein, Geschmacksmustergesetz, 4th ed. 2010, Section 42, Margin No. 51, on German design patent law). The urgency period can also start running if the lack of awareness of the infringement is only due to gross negligence (Eichmann/von Falckenstein, loc. cit, Section 42, Margin No. 51).

The urgency period did not expire prior to the filing of the petition in this dispute on August 4, 2011. Not until the article appeared in CHIP magazine on July 18, 2011 (ASt 23) was it established and did it become apparent to the relevant public, including the Petitioner, what the Galaxy Tab 10.1 offered in Germany would actually look like, since the editors had obtained the product and taken pictures of it, i.e. the product had arrived in Germany.

Before this, the Petitioner could not ascertain with the requisite certainty what the Respondents' product for the German market would look like.

According to the Respondents, the Galaxy Tab 10.1 was presented in the USA at the CTIA trade fair in Orlando, Florida, on 22 March 2011. It is undisputed that announcements were made after that date—including in various German computer magazines and by O2—that a tablet PC Galaxy Tab 10.1 was also to be launched on the German market (Exhibits rop 43-47). It was unclear, however, whether the US model would come to Germany with its design unchanged, especially since the US market launch was delayed until June 8, 2011.

The Petitioner could thus wait and see whether the Respondents would launch the device in its US versions or in variations thereof. This is true, in particular, because Samsung had defended itself in Australia by stating that a variation of the US model of the Galaxy Tab 10.1 would be launched there (ASt 44). In fact, the Respondents added the "Samsung" logo to the front of the Galaxy Tab 10.1 provided for Germany and only modified the design to this extent as compared to the Galaxy Tab 10.1 available on the US market. Prior to this, the Petitioner had no way of knowing that more far-reaching changes would not be made as compared to the US version, which would have an impact on the overall impression.

Even based on the injunction petition filed in the Netherlands on June 27, 2011, the Petitioner did not have knowledge of the design of the products to be launched in Germany. This is because the Petitioner stated in its petition that the Galaxy Tab 10.1 had not yet been introduced into the Netherlands and that it merely assumed the product would correspond to the US version. Therefore, the petition filed in the Netherlands was based on assumptions that could not cause the urgency period to commence running. The fact that the Petitioner took action in the Netherlands before the urgency period began running from a German perspective cannot be prejudicial to it, especially since it mentioned the uncertainties in its petition.

Moreover, the pictures of the Galaxy Tab 10.1 in the excerpt from Respondent 1)'s website dated August 8, 2011, which the Petitioner submitted (Exhibit ASt 43), were too unclear; in particular, the side view and the rear view were lacking.

Finally, the urgency period did begin to run when the illustrations of the challenged product shown in Exhibit rop 3 and submitted in the Petitioner's brief dated August 29, 2011, filed following the oral hearing, could actually be readily retrieved by the Petitioner in large format from Respondent 1)'s Internet website on June 6, 2011. In

this context, the Court attaches little importance to the disclaimer: "The pictures shown may differ from the original," to which the Petitioner makes reference, as such a disclaimer usually relates mainly to color deviations or similar inaccuracies due to image rendering and is regularly used with all product pictures as a precautionary measure. Rather, it is crucial that adequate certainty with respect to the infringing product could be not obtained from the website. This is so because, despite the express indication at the oral hearing of the importance of whether any pictures were provided in connection with the text to make it clear to the viewer of the website that the tablet PC shown there was the Galaxy Tab 10.1 ultimately earmarked for launch on the German market, the Respondents were unable to demonstrate and substantiate this.

Even if the Respondents' submission is correct, despite the fact that it was, in part, provided after the end of the oral hearing, these pictures alone did not engender any certainty in the Petitioner with respect to the anticipated product.

Thus, the website did not indicate that only the products available on the German market or about to be launched on the German market were being shown, as Mr. Stefan Laun stated at the oral hearing. This is because the pictures displayed on Respondent 1)'s website on and after May 17, 2011 indisputably showed the US version of the Galaxy Tab 10.1 (without the "Samsung" logo). Without any explanation, these pictures were, as the Respondents state, replaced by new pictures on June 6, 2011, which showed the product as it would later be introduced into the German market. It is not apparent how third parties could have known this. The Court finds that the Petitioner could rightly continue to assume that further changes might be implemented, apart from the addition of the logo to the front. It could wait until the product actually arrived in Germany and illustrations unambiguously showed how it looked. As has been stated, this happened only when the article appeared in CHIP magazine on July 18, 2011.

Finally, the Respondents also argued that there was no urgency with respect to Respondent 2) since, according to the Petitioner's legal view, Respondent 2) could also have been sued in the Netherlands with effect throughout the EU. The Court does not share this view. The Petitioner could wait until it knew with certainty which product would be distributed in Europe, particularly in Germany and the Netherlands. As stated, its attempt to obtain an injunction in the Netherlands on the basis of assumptions did not cause the urgency period to start running.


## IV.

The Petitioner also sufficiently substantiated a further claim to injunctive relief within the meaning of Sections 935, 940, 936, 916 et seq. of the Code of Civil Procedure (ZPO), so that the preliminary injunction granted by the Court on August 9, 2011 is upheld to the extent it is not restricted in its territorial scope with respect to Respondent 2).

The Petitioner is entitled to a prohibitive injunction against the Respondents under Art. 19 (1) and Art. 89 (1) (a) of the CDR.


1.

The Petitioner is the holder of Community Design No. 000181607-0001, which was applied for and registered on May 24, 2004—claiming priority based on a US registration of March 17, 2004—the legal validity of which is to be presumed by the Court under Art. 85 (1) of the CDR.


The Respondents' permissible defense, raised under Art. 90 (2) of the CDR, that the Community design is invalid has failed.

a.

The asserted RCD is not invalid due to inconsistency in the representation of the design under Art. 25 (1) (a) in conjunction with Art. 3 (a) of the CDR. An inconsistency only results in the invalidity of the design if, despite various possible interpretations of same, there is an inconsistency between the various views forming part of the application for registration of the design (Ruhl, loc. cit., Art. 3, Margin No. 150, with further references). This is so since the representation of a design is open to interpretation, and the question to be asked is what the applicant ostensibly intended (Ruhl, loc. cit., Art. 3, Margin No. 143; Art. 36, Margin No. 75).

In the Court's opinion, the illustrations of the design that were submitted show one and the same product, and not multiple products or views of different products, as is argued by the Respondents.

Figure 0001.1 shows the product from an oblique view. A rectangular surface with rounded corners is visible here, which is surrounded by a narrow frame. Since this is the first view of the product, we can identify it as the front side. The hatching, which is spread across the surface and extends right out to the edges, indicates a transparent surface that gives the effect of a glass plate. This impression is reinforced by the dotted rectangular shape, which lies like a frame below this surface and hence also lies beneath the hatching. Accordingly, this composition is also to be found in the illustration of the same side in the front view in figure 0001.3.

Figure 0001.2 also shows an oblique view of the product. Instead of the frame, a curving towards the sidewalls is identifiable here. In conjunction with figure 0001.1, it follows that this is the back side. However, this side exhibits a different type of hatching. This is not spread across the surface and does not convey a "glass" effect. At first glance, it may seem that this shows a mirror effect. However, the arrangement of the hatching would rather suggest that it signifies surface topography. This should make it clear that the surface is completely smooth, and thus flat. This interpretation is also consistent with figure 0001.4, since in the top view, the question as to surface topography does not arise, because this dimension is not visible in the top view.

Since this interpretation resolves any apparent inconsistency, it also appears to be correct for this reason as well.

Finally, no inconsistency results from the fact that figure 0001.7 shows a thicker sidewall than figures 0001.5 and 0001.6. Owing to the fact that figures 0001.5 and 0001.6 only differ from each other due to the additional small, circular dotted line on the right-hand side, it becomes clear in conjunction with figure 0001.2 that these are the side views of both the long sides. Figure 0001.7 ultimately shows an additional rectangular element in the center, which is illustrated by a dotted line. In conjunction with figure 0001.2, it becomes clear that this figure is the transverse (short) side. Since in figure 0001.7 it has the same length as the long sides, it is not difficult to identify that a different scale was opted for here, which would provide a logical explanation for the greater thickness. Therefore, the views are not inconsistent.

b.

The asserted RCD is also not invalid on grounds that it is barred by prior art.

The requirements for the asserted RCD to be legally valid under Art. 4(1) CDR are that it must be novel and have individual character. A design is considered novel if no identical design has been made available to the public before the priority date. Two designs are deemed to be identical if their features differ only in immaterial details, Art. 5 of the CDR. Furthermore, a design is considered to have individual character if the overall impression it produces on an informed observer differs from the overall impression produced on such observer by another design that is prior art, Art. 6 of the CDR. Here, an informed observer—as distinct from an average consumer or a targeted expert group—is defined as a potential customer who has certain knowledge and a certain design awareness (Hamburg Higher Regional Court (OLG), judgment of December 20, 2006, 5 U 135/05 – *Mobiltelefon*; Düsseldorf OLG, judgment of April 3, 2007, I-20 U 128/06 – *Aluminiumfelgen*, cited to juris, Margin No. 19).

Applying these principles, the RCD asserted by the Petitioner is novel and has individual character.

The asserted RCD has the following features:

1)  a rectangular shape with four equally rounded corners;

2)  a flat, transparent surface without any ornamentation, which is surrounded by a thin chassis edge;

3)  a dotted marking of a rectangular frame on the surface, whose width is equal on all sides;

4)  a flat back side which is curved upwards at the edges, whereby the straight sidewalls and the thin bezel are shaped around towards the front side (bowl shape);

5)  a thin profile;

6)  a small round element on one of its long sides, that is marked in dotted form; and

7)  a rectangular element on one of the transverse (short) sides that is marked in dotted form.

In the opinion of the Court, all the above mentioned features—features 6) and 7) being subject to the restrictions stated below—determine the protective scope of the asserted RCD, although they characterize the design with varying degrees of intensity and are themselves also subject to interpretation.

Thus, in the Court's opinion, the dotted frame mentioned in feature 3 also forms part of the subject matter to be protected. Indeed, it is to be conceded to the Respondents that under item 11.4 of the Examination Guidelines (reproduced in Ruhl, loc. cit., Appendix 3), dotted lines are used in a view to either represent elements for which no protection is claimed or to represent hidden lines. Thus, these are elements that do not belong to the view in which they appear. At the same time, the Examination Guidelines make it clear that it is "the applicant's responsibility to use dotted lines, boundaries and coloring in such a way as to make clear for which features protection is sought and for which it is not …" Thus, what is ultimately decisive is what the applicant ostensibly intended, whereby the Examination Guidelines provide the

starting point for the interpretation of such. As already stated, front views 0001.1 and 0001.3 show a transparent surface. Taking a reasonable approach, the dotted line placed beneath it, which is covered by the hatching, signifies that this is a border that does not constitute a separation at the surface, but is inside the product. It was thus obvious for it to be illustrated as a hidden line. Due to the transparency on the front side, under which it lies, it is visible in the views that display this side, but not in the other views. Hence, as a whole, it forms part of the scope of protection as an internal border that is only visible from the front side.

However, even if one were to see this differently—based on grounds of legal certainty—and to view the dotted line as an element for which no protection was sought, such an interpretation still does not preclude an infringement—as will be illustrated below.

In contrast, the elements listed in figures 6) and 7), which are illustrated in the form of a dotted line, are to be evaluated differently. Evidently, these are not internal borders, but openings in the surface. On a reasonable assessment, the applicant's depiction of these in dotted form can only be understood to mean that these elements were not to form part of the protection in their specific form (see EGC, judgment of June 14, 2011, T-68/10, Margin Nos. 63, 64). Nevertheless, they are of significance to the asserted RCD because they make it clear that such elements may appear on the sidewalls of the product. Moreover, it is instantly clear from the fact that only one element is shown in each case, that the sides are to be kept simple.

None of the features is required solely from a technical standpoint. Under Art. 8 (1) of the CDR, a Community design does not consist of features relating to the appearance of a product which are solely dictated by its technical function. This condition is not met when there is a feasible design alternative to features of a product, which enables the product to fulfill its technical function in at least the same manner (Ruhl, loc. cit., Art. 8, Margin No. 18; see also Düsseldorf OLG, *Aluminiumfelgen*, loc. cit., Margin No. 14). For each feature of the asserted RCD, design alternatives of this kind may be seen from the designs submitted by the

Parties—from both the design corpus and the market—that exhibit varying forms of chassis, rim and body (see also German Federal Court of Justice [BGH], judgment of April 22, 2010, I ZR 89/08 – *Limousinen*, cited to juris, Margin No. 45).

The design of the front side, in particular, is not required solely from a technical standpoint. Admittedly, it has been pointed out by both the Respondents and the Dutch Court, the Rechtbank's Gravenhage, in the proceedings with respect to the Galaxy Tab 10.1, which were conducted in the Netherlands, that a "glass" touch screen covering the entirety of the front side appears to be a logical choice (see the German translation of the decision of the Rechtbank's Gravenhage of August 24, 2011, Exhibit rop 49a). This also applies to the rounded corners. However, contrary to the Dutch Court, this Court also sees the omission of supplemental elements and the minimalization of elements as a design accomplishment. This is because such minimalization is not required from a technical standpoint. A wider, handier chassis rim—possibly only on the short sides or only on one of the long sides—a display that is embedded deeper into the product, as frequently exhibited by traditional PC screens, an inner frame whose borders have varying widths (in so far as this element is to be taken into account—as the Court does) or a more marked curving of the corners all provide examples of changes to the front side that do not have to result in disadvantages from a technical perspective.

The possibilities with respect to the design of a chassis edge that differs from the asserted RCD and that would fulfill the same technical function are clearly shown in the tablet PCs on the market that were submitted by the Petitioner (Exhibit ASt 18). Thus, the Folio 100 tablet PC by Toshiba has an inner display frame, a surrounding chassis frame and a surrounding silver "trim," which may increase shock resistance. The Iconia Tab from acer exhibits a surrounding chassis frame, which is somewhat wider on the long sides than on the short sides, while conversely, the inner display frame is narrower on the long sides than on the short sides. In relation to the Zii0 from creative, the chassis frame on the short sides and the upper long side is narrow and is only wider on the bottom long side. The display of the Archos $10_1$ has a surrounding frame, which is itself embedded into the chassis, so that there is a kind

of gripping surface on the shorter sides, which prevents the user from constantly touching the display and leaving fingerprints. Finally, the Eee Pad from Asus has a chassis frame which merely surrounds the display on the long sides with a narrow rim, while being somewhat wider on the short sides and having a grooved surface, providing both the impression of good grip and an optically interesting effect. All of these designs provide different solutions to the minimalist design of the asserted RCD that are on a par with it from a technical perspective or even provide advantages over it and are not to be merely deemed unnecessary supplemental elements.

In the opinion of the Court, a different assessment fails to recognize that there is not only one solution that fulfills the necessary technical requirements. It is rather the case that, due to the various different technical requirements of stability, input, production costs, producibility, weight, manageability, etc., it is possible to come up with designs that are very different from each other. The Community Design Regulation does not contain a requirement that a minimalist solution has to be preserved. The aim of the Community Design Regulation is rather to protect every design accomplishment in the course of creating a product design, which is distinct from prior known product designs in a manner relevant for the market (Ruhl, loc. cit., Art. 6, Margin No. 11).

The very combination of a front side that has a minimalist design with a smooth back side and a chassis that avoids both sharp corners and edges and protruding or decorative elements, is a design accomplishment and is—as demonstrated—not merely a technically necessary design. It characterizes the asserted RCD in a special way.

All in all, the product displayed in the illustrations of the asserted RCD submitted by the Petitioner exhibits a modern and elegant design that is aesthetically appealing to the user's senses and characterized by its simple contours, slim profile and consistent minimalism.

The asserted RCD is novel and has individual character because it generates a different overall impression than prior designs.

The embodiments in the science fiction films "2001: A Space Odyssey" and "The Tomorrow People" are too ambiguous to identify the precise design. The Respondents thus correctly refer to them as "initial designs." Thus, in the film sequences, it is not possible to see, in particular, whether the glass front side is only surrounded by a narrow chassis edge, whether the display is embedded deeper into the device than the surrounding frame, and precisely how the edges, sidewalls and back side are designed. An initial design idea may be gathered here, at least in hindsight, but not a design with a specific overall impression created by its various features.

The nearest prior art is to be found in the Tablet-Newspaper product study by Knight-Ridder, Inc. in 1995 and the HP Compaq TC 1000 from 2002. However, even the overall impression of these products clearly deviates from that of the asserted RCD and cannot be said to have anticipated it. To this extent, the question of whether the Tablet-Newspaper product study was already known to domestic expert groups can also remain unanswered.

Admittedly, the Tablet-Newspaper product study by Knight-Ridder, Inc. shows a rectangular front side with rounded corners and a display, as well as a slim profile. Its details, particularly the design of the sidewalls and the back side, are not precisely identifiable. However, the front side has a screen that is clearly embedded into the device. While this may be covered by a pane that is flush with the chassis surface, the actual picture is nevertheless placed much deeper than this surface. The surface of the chassis itself has a wide frame, which is much wider at its lower narrow side than at the other sides. Furthermore, the product also differs in relation to other details, as the Petitioner correctly stated. The lack of a glass front, which is only surrounded by a narrow chassis edge, is decisive for the overall impression. This design does not have the simplicity and pure elegance of the asserted RCD.

The HP Compaq TC 1000 also has a rectangular shape with rounded corners, a display on the front side and a flat design, even if the asserted RCD is much flatter than its HP Compaq counterpart. In the Court's view it is irrelevant that there is a keyboard, which can be attached to this device. As the Respondents made clear, it can be easily used as intended without the keyboard.

However, the design of the asserted RCD clearly differs from that of the HP Compaq TC 1000. In particular, the product from the design corpus lacks a narrow chassis frame that surrounds the front side. The HP Compaq TC 1000 comes across as being quite bulky. It is so markedly curved at the upper edge that this results in a wide bezel on the front side. In addition, the front side has several screen frames, each inserted into the other, which leads to a further difference from the asserted RCD, at least if one counts the frame illustrated by a dotted line as part of the scope of protection. Apart from that, there are also further serious differences that lead to a different overall impression. The HP Compaq TC 1000 is made up of several layers in the side view and its back side also has several parts with clearly visible grooves between the various cover panels. Therefore, the product does not come across as being minimalistic and simple. There are no smooth, non-separated sides, which give the asserted RCD a particular simplicity and clarity. This is also lacking in the citation, due to the multitude of connection ports that are located on the sides. All in all, the asserted RCD comes across as being much slimmer and more elegant than the HP Compaq TC 1000, which seems rather heavy and chunky in comparison, meaning that one cannot really imagine carrying it around in one's bag all the time.

There appears to be no other, more obvious designs of earlier priority. As is shown by a comparison of the relevant illustrations with the asserted RCD, the overall impression of the citations introduced in the invalidity proceedings differ much more

from the RCD asserted by the Petitioner than the two citations that have just been set forth above and were also the focus of the Respondents' submissions.

2.

The Petitioner has the exclusive right to use its RCD under Art. 19 (1) of the CDR. Under Art. 10 (1) of the CDR, the scope of this protection includes any design that does not produce a different overall impression on the informed user. In such context, a medium to wide scope of protection of the asserted RCD must be assumed.

When the petition for registration of the asserted RCD was filed, there were only a small number of other relevant designs, and the designer had a large degree of freedom of design. The design corpus submitted shows that, with the product study by Knight-Ridder, Inc. from 1995 and the HP Compaq TC 1000 from 2002, there were only two designs of an earlier priority date that already had some features of the asserted RCD but still produced a very different overall impression. All other designs were very different. Due to the small number of other relevant designs, the designer had a large degree of freedom of design to be taken into consideration under Art. 10 (2) of the CDR, which results in a wide scope of protection for the RCD, so that even large differences in the design of the challenged design may produce no different overall impression on the informed user (see Federal Court of Justice (BGH), judgment of May 19, 2010, I ZR 71/08 – "*Untersetzer,*" cited from juris, margin No. 17, with further references). However, in the view of the Court, how far the asserted RCD departs, to a greater or lesser degree, from the design corpus on which it is based, should be taken into account (this view is presumably also shared by the Federal Court of Justice (BGH), "*Untersetzer*," loc. cit.). The asserted RCD with its minimalistic design, simple lines, smooth surfaces and harmonious roundings represents a significant departure from the existing design corpus. Finally, the fact that this is the first time the RCD has been challenged, despite the highly competitive product environment, is an indication of a wide scope of protection.

The challenged Galaxy Tab 10.1 design infringes the asserted RCD because it produces the same overall impression as the RCD on the informed user and thus falls within the RCD's scope of protection.

The distinctive design elements of the asserted RCD are, with little differences, all present in the Respondents' challenged tablet PC. The design and the infringing embodiment are characterized by their simple, smooth surfaces without any fanciful aspects. This is a puristic, minimalistic design.

The top view and the oblique view are particularly decisive for the overall impression because these are the views to which the informed user will attach particular importance given that these views are mainly perceived during use. In these top and oblique views, it becomes apparent that the smooth reflecting surface of the display with its rounded corners is only surrounded by a narrow chassis edge. This is a significant departure from the prior design corpus. At the same time, when you hold the Galaxy Tab 10.1 in the hand or it is in front you, you perceive the flat profile and the comfortably rounded edges.

In the top view and also in the oblique view, the asserted RCD and the challenged design are almost completely identical. The slight rounding of the sidewall of the Galaxy Tab 10.1 which differs from the sidewall of the asserted RCD that is straight towards the top does not give rise to a different overall impression because what is decisive is the narrow edge surrounding the display, and the rounding of the sidewall of the Galaxy Tab 10.1 does not extend so far that a chassis edge that is significantly wider than that of the asserted RCD would be visible. The fact that the sidewalls seamlessly merge into the back wall of the asserted RCD, and, as a result, a bowl shape is created, whereas, in the challenged design, the sidewalls extend a little bit

over the lower edge but a cover in the form of a separate back wall is mounted there, is not visible for the informed user in the top view and the oblique view.

When also taking into account, the inside frame, which is equally wide on all sides, a further congruence arises, which adds to the overall impression that they are identical. If, contrary to the view of the Court, one did not take the frame into account due to the dotted line in the asserted RCD, what lies beneath the transparent surface of the asserted RCD remains open. In such a case, the inside frame of the challenged design may neither add to nor reduce the overall impression that the two are identical.

It is true that the informed user will also take the side and back views into account when determining his overall impression. It is further true, as claimed by the Respondents, that the back side allows for a particular variety of design since the design does not depend on the technical requirement of a smooth display that is as large as possible there. However, taking into account the side and back views, the challenged design does not produce an overall impression that is different from that of the asserted RCD.

The fact that the sidewall in the challenged design is completely rounded is of little relevance to the overall impression since, despite this fact, only a narrow bezel of the display is created and the rounding to the back side is precisely identical to the rounding of the asserted RCD, the sidewall of which also only has such a low height that it does not appear to be a larger, smooth and flat surface.

When taking into account the design of the sidewalls and the back wall, the overall impression is also mainly characterized by the smooth surfaces, the rounding between the sidewalls and the back wall, and the absence of numerous additional elements (connection ports). Between the back wall and the sidewalls there are no strong edges, wide grooves or shoulders in the challenged design either. The surface separation is mainly located in the rounding area of the lower edge and thus rather inconspicuous.

The back wall has a surface separation only with respect to the "throw-over" (term used by the Respondents to properly describe the fact that the frame forming the sidewalls protrudes into the back side). Consequently, the throw-over represents the most important difference between the asserted RCD and the infringing embodiment. It is due to the throw-over that the informed user perceives that the infringing embodiment consists of three parts, namely the glass surface, the frame part and the back cover. As a result, it is true that the design of the challenged design departs from the bowl shape of the asserted RCD in the view of the back wall. However, the overall impression is mainly determined by the impression of smooth, simple surfaces. In addition, the three parts and the throw-over do not structure the sidewalls and back side in such manner as was the case in the design corpus of the HP Compaq TC 1000. They are rather inconspicuous and are not so important that they would be able to produce an overall impression that the two are not identical.

Furthermore, the exact proportions are also not decisive for the overall impression. For example, it is not relevant whether the challenged embodiment is flatter than the asserted RCD. What is relevant is the thin profile that does not result from the measurements but from the overall picture considering the aspect ratio and the roundings so that it cannot be appropriately defined in more detail. Moreover, the different relationships between the length and width of the display, which is approximately 4:3 in the case of the asserted RCD, while the challenged design—with an aspect ratio of approximately 16:10—is longer and slimmer, does not give rise to a different overall impression. This is because the size relationship merely contributes to the overall impression, and only significant differences result in a different overall impression. There are simply no such differences in the present case. Rather, the proportions are similar.

Finally, the design of the connection ports in the challenged embodiment is not relevant to the overall impression. It is true that the informed user can infer from such design that this is not an Apple device. However, as stated above, these elements do

not fall within the scope of design protection. In addition, the design and exact number of the connection ports are of secondary importance because it is the overall shape and the puristic, minimalistic design that create the overall impression that the asserted RCD and the challenged tablet PC are identical.

As a legal consequence, the Petitioner is entitled to a Community-wide prohibitive injunction against Respondent 1). This follows from Art. 1 (3) sentences 1 and 2 of the CDR under which the Community design has a unitary character and has equal effect throughout the Community. An act of infringement committed in any Member State, as a rule, creates the risk that it will be committed on the entire territory of the European Union (Federal Court of Justice (BGH), "*Verlängerte Limousinen,*" loc. cit., margin No. 56).

It was not possible to issue a Europe-wide prohibition against the Respondent 2) under Art. 83 (2) of the CDR, since the Court, as already stated, only has international jurisdiction under Art. 82 (5) of the CDR.

In injunction proceedings, the Court may determine the detailed content of the preliminary injunction at its free discretion, although it is bound by the petition, which is, however, open to interpretation (Zöller/Greger, loc. cit. § 253, Margin No. 13 and before § 128, Margin No. 25) with respect to the intent and scope of the petition (Zöller/Vollkommer, loc. cit., § 938, margin No. 1, with further references).

Therefore, the Court, making use of its judicial discretion, has adapted the wording of the description of the features to clearly specify the Petitioner's prayer for relief, which has been sufficiently defined by the pictures. Furthermore, the Court did not include the second picture of the sidewall since the design of the sidewall is sufficiently defined by the first picture, and the briefs show that inclusion of the second picture of the sidewall may result in different interpretations of the color and contrast design and the play of light and shadow.

**V.**

The claims under unfair competition law were only asserted by the Petitioner in the alternative. Accordingly, there is no need to examine such claims due to the design infringement that has been found.

## VI.

The ancillary procedural decisions follow from Section 92 (1) (by analogy), Section 708 No. 6, and Section 711 of the German Code of Civil Procedure (ZPO).

The amount in dispute is € 2,000,000, of which € 1,000,000 is attributable to each Respondent, and the amount attributable to the Federal Republic of Germany included therein, was assessed at € 200,000 in the decision on costs.

Brückner-Hofmann          Dr. Heidkamp-Borchers          Kroll-Schlüter