# EXHIBIT J

```
 1        UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF CALIFORNIA
 2             SAN JOSE DIVISION

 3

 4

 5

 6
    APPLE INC., A CALIFORNIA    :
 7  CORPORATION,                :
                    PLAINTIFF,  :
 8
                               :
 9      VS.                    : CASE NO.
                               : 11-CV-01846-LHK
10  SAMSUNG ELECTRONICS, CO.,  :
    LTD., A KOREAN BUSINESS     :
11  ENTITY; SAMSUNG ELECTRONICS :
    AMERICA, INC., A NEW YORK    :
12  CORPORATION; SAMSUNG        :
    TELECOMMUNICATIONS AMERICA, :
13  LLC, A DELAWARE LIMITED     :
    LIABILITY COMPANY,          :
14                  DEFENDANTS

15

16

17

18

19

20      DEPOSITION OF ANDRIES VAN DAM, an Expert
    Witness in the above-entitled cause, taken on
21  behalf of the Plaintiff, before Barbara
    Warner, RPR, Notary Public in and for the
22  State of Rhode Island, at the offices of
    Allied Court Reporters, 115 Phenix Avenue,
23  Cranston, RI, on September 14, 2011
    at 9:30 A.M.

24

25  Job Number: 41901
```

```
 1
     APPEARANCES:
 2

 3   FOR THE PLAINTIFF APPLE INC.:
     MORRISON & FOERSTER
 4   BY:  RICHARD S.J. HUNG, ESQ.
     BY:  DEOK KEUN MATTHEW AHN, ESQ.
 5   425 MARKET STREET
     SAN FRANCISCO, CALIFORNIA 94105
 6

 7

 8

 9
     FOR THE DEFENDANTS SAMSUNG:
10   QUINN EMANUEL URQUHART OLIVER & HEDGES
     BY:  TODD M. BRIGGS, ESQ.
11   BY:  AARON KAUFMAN, ESQ.
     555 TWIN DOLPHIN DRIVE
12   REDWOOD SHORES, CALIFORNIA 94065

13

14

15
     ALSO PRESENT:
16   MIKE HENRIQUES, VIDEOGRAPHER

17

18

19

20

21

22

23

24

25
```

1       this paragraph you refer to a number of

2       materials, including the patent, the Bas

3       Ording patent, the prosecution file history,

4       the reexamination file history, and

5       references cited therein.  Do you see that?

6       A. Yes, I do.

7   Q.  When you refer to referring to the

8       prosecution history, how did you review it,

9       and by that, I mean what did you review?

10      A. I reviewed a file that had been sent to

11      me, which was the wrapper, in effect, the

12      complete fill history, and I went through

13      that.

14  Q.  Did you also review the reexam file history?

15      A. I did, in the same way.

16  Q.  There is a reference to the reference cited

17      therein, and that's the last clause of that

18      sentence in paragraph 19.

19      A. Yes, I see it.

20  Q.  I was slightly confused as to what that was

21      modifying.  Is that references cited therein

22      modifying the reexamination file history, the

23      prosecution file history, the patent, and/or

24      all three?

25      A. You are talking about a possible ambiguity

1      in the materials cited?

2   Q.  I apologize.  In paragraph 19, the last

3       clause says, And the references cited

4       therein, at line 25.

5       A. To be more precise, I did not go through

6       the references cited by the patent examiner.

7   Q.  I am handing you what has been previously

8       marked as Ording Exhibit 71.  This is what I

9       believe we both referred to as the Ording

10      patent, correct?

11      A. Yes.  This is the '381, which is the basis

12      of our discussion today.

13  Q.  If you look at the first two pages of the

14      Ording patent, you will see that there are

15      a -- it is a long list of U.S. patent

16      documents, and also foreign patent documents,

17      and other publications.  Do you see that?

18      A. I do.

19  Q.  The references that were cited by the

20      examiner, I am assuming that by that you are

21      referring to the references that have an

22      asterisk next to them, correct?

23      A. Sorry, I'm having a little trouble reading

24      this because the print is so small.  In the

25      file histories, I recall there are references

Page 60

1       are off the record.

2                   (OFF THE RECORD)

3                   THE VIDEOGRAPHER:  11:24 a.m., we

4       are back on the record.

5    Q.  Professor van Dam, we asked if you could

6       demonstrate beginning from the start screen

7       on 1950 LaunchTile your participation for

8       Claim 1 with respect to this device.

9    A. I am about to start doing that with the

10      caveat that because I suffer from familial

11      tremor, and especially in my dominant hand,

12      it will be a little shaky because there are

13      very few pixels on the screen.  It is very

14      sensitive to a single pixel deviation, so it

15      may take me several tries to show you what I

16      want to show you.

17                  In the overview screen, which is

18      the start screen for LaunchTile, we see an

19      array of 6 x 6 individual tiles.  And to come

20      in on those individual tiles, you can pick a

21      zone by pushing this blue chrome button that

22      lets you do that.  Then you can further zoom

23      into one of the four tiles comprising the

24      zone by tapping on it.

25                  I have now zoomed on the mail

1     file, and I can scroll this.  And you can see

2     it is a little laggy in its response.  What I

3     am doing now is to say that in the first

4     example, it is the mail file with all of the

5     headers and this constitutes the electric

6     document.

7  Q.  If I could interrupt you, if you could help

8     us by keeping it upright then the video

9     camera will be able to record it.

10    A. As you can see, the shaking will make that

11    hard, especially since I am now sitting in a

12    very awkward angle to it, which makes it hard

13    to manipulate.

14         So I am doing a scroll, and as you

15    can see, I have clearly reached the edge of

16    the document here because I have the solid

17    gray area, so I am establishing the document

18    does, in fact, have an edge and there is area

19    beyond the edge.

20         But for our example, we are going

21    to stop short of having completely scrolled

22    off.  And I am now going to say in this

23    particular start state, this is the first

24    portion of the document referred to in Claim

25    1.  And now I'm going to have the device

1    detect, and I'm going to scroll in the

2    vertical direction upwards, and here I have a

3    different portion, which is the second

4    portion.

5              And now I'm going to scroll a

6    little more and there's even less of the mail

7    file showing.  In fact, there is area below

8    Catherine Thompson, which is white and which

9    is differentiated from Catherine Thompson by

10   a very thin, single pixel lines of

11   demarcation.

12   Q.  Could you hold that up?  Thank you.

13   A. Now, when I let go, it snaps back.  The

14   movement is subtle and I don't know whether

15   you caught it.  Do you want me to repeat it?

16   Q.  Please.

17   A. Okay.  So I'm near the edge for my

18   starting position, the bottom edge of the

19   mail file.  I'm not going to scroll up like

20   so until I am just at Sarah Carlson, like so.

21   And now when I let go, it bounces back and I

22   see yet a different view of the mail file

23   where there is nothing showing beyond the

24   edge that I saw previously.

25              I have the bottom of the mail file

```
 1        in its entirety and it is different from

 2        first, second and third portions.

 3   Q.   What if we exceed the threshold?

 4        A. If we exceed the threshold, then we don't

 5        get the bounce-back effect.  There is no

 6        reversing of the direction or different

 7        direction, which is all the claim calls for,

 8        but bounce-back typically has this notion of

 9        the opposite direction.  You are simply going

10        to scroll the file so that most of it and

11        eventually all of it becomes this gray no

12        man's land.

13   Q.   In which case there is no snap-back, correct?

14        A. There is no snap-back in any of the prior

15        art, or I believe the patent itself and its

16        specification if you go beyond a certain

17        threshold.

18   Q.   Looking at the blue button with the blue

19        bar --

20        A. That's the chrome I was referring to

21        earlier.

22   Q.   That chrome is adjustable on the 1950,

23        correct?

24        A. It is.  Some of it is.  In particular, in

25        the E-mail application, I can move it up and
```

1          and in particular, I tried to be consistent

2          with how I saw Professor Balakrishnan and

3          Apple itself were interpreting the term,

4          using the term in their respective writings.

5     Q.   Putting aside any construction that you

6          understood or believed Apple to be applying,

7          or Dr. Balakrishnan to be applying, did you

8          personally adopt or arrive at any other

9          constructions besides those that you believed

10         Apple or Dr. Balakrishnan to be applying?

11         A. You mean besides the electronic document,

12         were there other terms used in '381?

13    Q.   Yes.

14         A. Sure.  There are plenty of terms that were

15         used.  I said it informally in the patent

16         without being rigorously defined.  For

17         example, even such a simple thing as

18         direction is not defined and one could spend

19         a lot of time talking about what is meant by

20         direction, and what does and does not

21         constitute the same direction.

22              There is a dependent claim which

23         talks about opposite direction, what is the

24         meaning of opposite.  Is it a mathematical

25         meaning, or a looser one.  That is an example

1       of a term that I didn't struggle with because

2       I took it in its common-sense meaning.

3    Q.  If you could help to understand the

4       common-sense meaning with respect to

5       direction, what did you understand the

6       common-sense meaning of direction to be?

7       A. In the case of my examples, clearly I

8       thought in terms of the predominantly

9       horizontal movement in the case of the zones

10      example, and a vertical direction in the case

11      of scrolling, as exemplified by the mail

12      application.

13   Q.  When you are thinking about the vertical

14      direction in the case of scrolling for the

15      mail application, did you understand that to

16      cover a predominantly vertical movement?

17      A. I did.

18   Q.  I don't want to fixate on this, because I

19      understand that you have a tremor.  I didn't

20      want to ask about the tremor.

21      A. You can, please.

22   Q.  Meaning if you were drawing a line from point

23      A to point B, whether on the table right now

24      with a permanent marker, or on a piece of

25      paper, do you believe that you could draw a

1     portions, but under the section panning

2     techniques and so on, there is talk about the

3     zoom space animates to a line, so there's a

4     lot of evidence in here about the fact that

5     there are alignment or snapping techniques

6     that are being used.  Particular sequence

7     with all of the elements that we go through

8     for Claim 1 is not that explicit in here.

9  Q.  When you prepared your declaration, you did

10     not rely on this reference as a anticipatory

11     reference, correct?

12     A. I didn't use the paper as a anticipatory

13     reference because I thought the code was a

14     much stronger antecedent.

15  Q.  As a person of skill in the art who is

16     opining on the anticipation of the '381

17     patent, do you agree that this reference,

18     Exhibit 134, the AppLens and LaunchTile tile

19     article, does not anticipate the claims of

20     the '381 patent?

21          MR. BRIGGS:  Object to the form.

22     Mischaracterizes prior testimony.

23     A. In each and every detail of the claim

24     language, it is not literally written out in

25     a step-by-step manner.  It doesn't talk about

1      portions in particular.  So one could find in

2      here enough information to say, is that a

3      particular instance of behavior described in

4      here, absolutely, but I think the combination

5      of the code and the behavior that the code

6      implements, plus the paper, makes for the

7      complete case.

8  Q.  I'm specifically excluding the code and the

9      behavior that the code implements.  I'm only

10     talking about the paper.  As you sit here

11     today, as a person who reviewed this

12     reference and has made, offered, opinions on

13     the '381 patent claims thereof are

14     anticipated by LaunchTile and XNav, do you

15     believe that this reference before you,

16     Exhibit 134, anticipates the claims of the

17     Bas Ording '381 patent?

18  A.  If you hand-simulate the entire panning

19     techniques paragraph, and you see that

20     there's always an attempt to snap to the

21     underlying grid, and you ask yourself the

22     question, what happens if we overscroll a

23     little, and we peak into the next zone after

24     having seen the gray border area, what would

25     happen, the answer unambiguously is it snaps

1       of overshooting.

2                   But LaunchTile also demonstrates

3       effectively the same behavior when you

4       undershoot.  I'm sorry to be verbose, but I

5       wanted to say that to a person of ordinary

6       skill in the art, i.e., somebody familiar

7       with interaction techniques the notion of

8       gravity grids, alignment to grid lines is

9       absolutely bread and butter.

10  Q.  Do you see each and every limitation of Claim

11      1 expressed expressly disclosed in this

12      reference?

13      A. No.  And the reason I don't is because

14      Claim 1 is very specific about these portions

15      and it makes distinctions about one being

16      smaller than the other and distinctions about

17      they cannot be the same.  And that language

18      is absent here.  But, again, if you take a

19      system like LaunchTile, and you have a

20      gravity grid, an alignment grid and you think

21      about what has to happen during alignment,

22      and you then calculate what pixels are going

23      to be visible, I think it is all totally

24      deducible.

25  Q.  That's what I am asking, that you exclude the

1       LaunchTile system as implemented, the

2       LaunchTile code, the XNav code, I'm simply

3       asking if you look at this document, you

4       would agree, with me, wouldn't you, that this

5       document, 134 before you, does not expressly

6       disclose each and every limitation as recited

7       in Claim 1 of the Bas Ording '381 patent?

8       A. Because that language include statements

9       about portions of the electronic document and

10      this does not use that terminology, this does

11      not explicitly disclose.  Explicitly, that is

12      my qualifier.

13                  MR. HUNG:  Why don't we go off the

14      record, because he needs to change the tape.

15                  THE WITNESS:  That's fine.

16                  THE VIDEOGRAPHER:  3:15 p.m., we

17      are going off the record.

18                  (OFF THE RECORD)

19                  THE VIDEOGRAPHER:  3:28 p.m., we

20      are back on the record.

21  Q.  Dr. van Dam, in reviewing the Bederson

22      declaration, attached to that declaration

23      were a couple of videos.  Do you recall

24      viewing those?

25      A. No, I do not.

1  Q.  So I take it that you don't have an opinion

2      as to whether the videos that were attached

3      to his declaration independently anticipate

4      the claims of the '381 patent or not?

5      A. Correct.

6  Q.  In the last exhibit that was before you,

7      Exhibit A, that was, there's a reference to a

8      CHI, C-H-I, conference in Portland, Oregon.

9      Do you see that on the very first page?

10     A. Yes.

11 Q.  Did you attend that conference?

12     A. I did not.

13 Q.  Have you ever heard of the phrase on rails?

14     A. I have.

15 Q.  In connection with graphical user interface?

16     A. Until I started working on this case, I

17     hadn't recalled the use of that term.

18 Q.  When you saw that phrase in connection with,

19     I take it, your review of literature for this

20     case, what did you understand that phrase to

21     mean?

22     A. Aligned.  Again, the standard vocabulary

23     of having an underlying grid of some kind and

24     forcing the object that you are manipulating

25     to be aligned.

1          reason to align an object to a grid is to

2          ensure that a user knows where they are in a

3          document?

4          A. It's one use of alignment.  Other use of

5          alignment would be to build a composite and

6          you want to obey certain layout principles.

7          For example, you would use a Swiss grid,

8          which is a standard design technique for

9          layout used in newspapers and magazines.  And

10         many of our ideas about user interfaces come

11         from the graphical design world.

12    Q.   Have you ever worked with technologies that

13         auto-center objects on a screen?

14                   MR. BRIGGS:  Objection.  Vague.

15         A. As I understand you without your having

16         define what you mean by object, I will impose

17         my own interpretation and say that in the

18         earliest Word and Document and Hypertext

19         processing systems that I helped design, and

20         that my students implemented, we had the

21         notion of centering objects, such as titles,

22         headings, paragraphs.  Those are all objects

23         within a hierarchical compound document.  So

24         I am answer in the affirmative.

25    Q.   Thank you.  Let's focus on documents now, and

1       documents as discussed in the '381 patent.

2       You would agree with me, wouldn't you, that

3       LaunchTile, when one is depicting the 2 x 2

4       zone, and when one moves off as to display a

5       portion other than the 2 x 2 zone, when you

6       release the 2 x 2 zone, it sends, correct?

7       A. Correct, by zone, and that design choice

8       is mentioned in here.

9   Q.  And, in fact, that is an express design

10      purpose for LaunchTile?

11      A. Correct.

12  Q.  And the functionality for the 2 x 2 zone, the

13      snap functional for 2 x 2 zone is auto center

14      on a zone?

15      A. Um-hum.

16  Q.  And we saw that same functionality not just

17      with the 2 x 2 zone example, your second

18      example in your declaration, but also with

19      the 2 x 4, correct?

20      A. The underlying alignment grid tries always

21      to make zones fit to that grid.

22  Q.  And, in fact, we see this with respect to the

23      overscrolling or overpanning situation in

24      LaunchTile or in XNav, correct?

25      A. Correct.

1       row within the highlight displayed on the

2       device, correct?

3                  MR. BRIGGS:  Objection.

4       Foundation.

5       A. Yeah, I don't think that that behavior

6       necessarily implies the existence, even of a

7       highlight.  You could simply say that a

8       useful feature for the reader of the mail

9       list is that you don't have half a row of

10      some header exhibited.  You always want to

11      exhibit whole rows.  You don't have to, but

12      it is aesthetically more pleasing.  I don't

13      like to see things cut off, and most people

14      don't.

15  Q.  Putting aside what you characterized as the

16      edge example in the E-mail list, I want to

17      exclude that.  When we saw the snap effect

18      occur with respect to the highlight, in which

19      a header row, upon release of the finger or

20      stylist device, then caused the header row to

21      snap or bounce into the highlight?

22      A. Um-hum.

23  Q.  A benefit of that functionality is to center

24      the header row within the highlight, correct?

25      A. I think that's a reasonable

```
 1        interpretation.  But I repeat myself, that
 2        functionality could exist independent of any
 3        highlighting.  You could remove the
 4        highlighting, and it still would be useful to
 5        show a list without any line being cut off in
 6        the middle.
 7   Q.   As we saw this morning, whenever the
 8        snap-back effect occurred in a list, in the
 9        E-mail list example, whether for XNav or
10        LaunchTile, it always caused the snap-back of
11        a header row into the highlight, correct?
12        A. We saw that, but I didn't focus on that,
13        and it's not mentioned in my declaration,
14        because I didn't do that analysis relative to
15        the selection bar.  I did it relative to the
16        edge to follow the patent claim language.
17   Q.   We discussed this morning that you did not
18        review the source code, or you don't have an
19        opinion on the source code as you sit here
20        today relating to a snap effect that may
21        occur with respect to the highlighted bar?
22        A. That's correct.
23                  MR. HUNG:  We don't need to
24        videotape this, although let's mark it as an
25        exhibit, just so we know it was marked.  I
```

1    marked as van Dam Exhibit 135 the Sony with

2    XNav product to which you and I discussed

3    this morning.  You can take that.

4              THE WITNESS:  Thank you.

5    (EXHIBIT 135 MARKED FOR IDENTIFICATION)

6  Q.  As I have handed it to you, you will see the

7    entire E-mail list is displayed on the page?

8    A. Um-hum.

9  Q.  With a white portion above the top E-mail?

10   A. Right.

11 Q.  And that the highlight bar has been

12   positioned at the very top of that page.  Do

13   you see that?

14   A. Okay.  If you tell me that is the

15   highlight bar, I will take your word for it.

16   It is not the border of that window.  It is

17   the highlight part, you say, so it is not

18   highlighting any subject header at this

19   point.

20 Q.  Correct.  When you scroll that list right

21   now, if you were to scroll the list, no

22   bounce effect occurs; isn't that right?

23   A. It just did.  No, not a bounce in the

24   opposite direction.  It did center the first

25   header that came into view under the

1      highlight bar.

2  Q.  So to make sure I can verbally characterize

3      what you just saw, to start, what you were

4      seeing on the screen was an E-mail list with

5      a white, a blank white portion above the top

6      list E-mail?

7  A.  Yes.

8  Q.  And a blue highlight at the very top of the

9      display, correct?

10 A.  All I can say is that I am seeing a blue

11     bar.  I would have to take your word for the

12     fact that it is, in fact, the highlight bar.

13 Q.  And when you made small adjustments in the

14     pixel range, 1, 2, 3 pixel range of the list,

15     it did not bounce?

16 A.  There was no snapping behavior.  I was

17     able to move the list, and then when I got

18     close to the bar, it sucked in the full

19     header, so it did the alignment that you

20     talked about.  But that's not a bounce-back.

21     That is the symmetric attraction for

22     undershoot.

23 Q.  The alignment in the example that you just

24     attempted, the action that you just

25     performed, the alignment was with respect to

1        the blue highlight and not with respect to

2        the edge of the E-mail list as depicted,

3        correct?

4        A. I can't testify to that.  I saw that it

5        certainly did align with the blue bar, and if

6        the blue bar aligns with the headers, then by

7        definition, the header aligns to the blue

8        bar.  That's tautological.  But I don't know

9        whether underlying the logic even cares about

10       the blue bar, or whether it's simply saying I

11       have the available display space.  It is

12       gridded.  It has row upon row and row, and

13       I'm aligning so that each other fits centered

14       in its row.

15              You could have that logic and

16       exactly the same behavior, but there is no

17       attempt in the code to align it with the blue

18       bar.  It's sort of confusing cause and

19       effect, and I can't tell them apart by

20       looking at the visual behavior.

21  Q.   Without looking at the code?

22       A. Without looking at the code, exactly.  It

23       is absolutely centering headers in a row of

24       the underlying grid.

25  Q.   I want to make sure that I am understanding

```
 1        there are any number of ways to do it.
 2   Q.   What about further down in the middle column
 3        where you see the phrase, New Day, New Rulers
 4        in Afghanistan; do you see that?
 5        A. Can you show me, it would be faster?
 6   Q.   At the very bottom of the page right here.
 7        A. Yes, those links.
 8   Q.   If one had positioned the A wall browser
 9        window in this figure, figure 10 of the Lira
10        PCT application, over that New Day, New
11        Rulers in Afghanistan text, how would one
12        know when they had moved the window beyond
13        the edge of the column?
14        A. One wouldn't know for sure, because it
15        depends on the layout for this column.  But
16        the fact that you have wrapping to the next
17        line might give you a clue that you were
18        about to go over the column boundary,
19        particularly if you saw a solid, gray area on
20        the right.
21   Q.   Assuming --
22        A. I'm sorry, but let me make a point that
23        applies to all of your questions.  There are
24        clues, but it is mostly in the motion as you
25        move around that you get a sense of where you
```

1        are, and the snapping behavior helps with

2        that.  The visual queues are just that, they

3        are queues.  There is no definitive Marching

4        ants, or something, demarcation in these

5        implementations that tells you that you are

6        about to go off the edge.  There is nothing

7        that prevents you from having that.  All of

8        these references are silent on that.

9    Q.  What was the checkerboard exhibit to your

10       right, what number was that?

11       A. That was 133.

12   Q.  For Exhibit 133, if we removed all of black

13       from that page and simply had a bright red

14       square --

15       A. You mean this red square?

16   Q.  Correct.  The entire page was covered with

17       the red square, there were no visual

18       indicators at all as to separate anything on

19       that page in that square, could there be

20       multiple documents on that page?

21       A. In that particular case, that's kind of a

22       reductural ad absurdum example, because it is

23       a solid field of red.  You could say,

24       absolutely.  You can have columns.  You can

25       have rows, so you could define, even on the

Page 232

1          follow-up, there is follow-up.  But I

2          appreciate your time, Dr. van Dam.  And we

3          are happy to close the deposition now.

4                    MR. BRIGGS:  Great.  Thanks.

5                    THE WITNESS:  Very good.  Thank

6          you.

7                    THE VIDEOGRAPHER:  It is 6 p.m.,

8          we are off the record.  This concludes the

9          videotaped deposition of Andries van Dam on

10         September 14, 2011.

11             (DEPOSITION CONCLUDED AT 6:00 P.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E
                I, Barbara Warner, a Notary Public in
 2      and for the State of Rhode Island, duly
        commissioned and qualified to administer
 3      oaths, do hereby certify that the foreging
        Deposition of Andries van Dam, a Witness in
 4      the above-entitled cause, was taken before me
        on behalf of the Plaintiff, at the offices of
 5      Allied Court Reporters, 115 Phenix Avenue,
        Cranston, Rhode Island on September 14, 2011
 6      at 9:30 A.M.; that previous to examination of
        said witness, who was of lawful age, he was
 7      first sworn by me and duly cautioned to
        testify to the truth, the whole truth, and
 8      nothing but the truth, and that he thereupon
        testified in the foregoing manner as set out
 9      in the aforesaid transcript.

10              I further testify that the foregoing
        Deposition was taken down by me in machine
11      shorthand and was later transcribed by
        computer, and that the foregoing Deposition
12      is a true and accurate record of the
        testimony of said witness.
13
                Pursuant to Rules 5(b) and 30(f) of the
14      Federal Rules of Civil Procedure, original
        transcripts shall not be filed in Court;
15      therefore, the original is delivered to and
        retained by Plaintiff's attorney, Richard
16      S.J. Hung, Esquire.

17              Correction and signature pages were sent
        to Plaintiff's Counsel, Todd M. Briggs.
18
                IN WITNESS WHEREOF, I have hereunto set
19      my hand and seal this 15th day of September,
        2011.
20

21

22

23

24      _____
        BARBARA WARNER, NOTARY PUBLIC/CERTIFIED
25      COURT REPORTER
```