1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

12

APPLE INC., a California corporation,

13

Plaintiff,

14

v.

15

SAMSUNG ELECTRONICS CO., LTD., A
Korean business entity; SAMSUNG
ELECTRONICS AMERICA, INC., a New York
corporation; SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC, a
Delaware limited liability company,

16

17

18

19

Defendants.

20

21

22

23

24

25

26

27

28

Case No.    11-cv-01846-LHK

**REPLY DECLARATION OF
PETER W. BRESSLER IN
SUPPORT OF APPLE'S MOTION
FOR A PRELIMINARY
INJUNCTION**

1    I, PETER W. BRESSLER, declare as follows:

2          1.       I am an independent industrial designer and inventor.  I have been asked by

3    counsel for Apple Inc. to provide a declaration addressing issues that I understand have been

4    raised by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung

5    Telecommunications America, LLC (collectively, "Samsung") in connection with Apple's

6    Motion for a Preliminary Injunction, including the nature of minimalist design and the

7    protectability of Apple's designs.  This declaration sets forth my professional opinion on these

8    issues as an expert in industrial design.

9          2.       I understand that discovery from Samsung to date is on-going.  I reserve the right

10   to supplement or amend this declaration based on any new information that is relevant to my

11   opinions.

12         3.       I have reviewed Apple's Amended Complaint, Apple's Motion for a Preliminary

13   Injunction, Samsung's Opposition to Apple's Motion for a Preliminary Injunction, Mr. Cooper

14   Woodring's June 30 2011 Declaration in Support of Apple's Motion for a Preliminary Injunction,

15   Mr. Woodring's August 5, 2011 deposition transcript, Mr. Itay Sherman's August 22, 2011

16   Declaration in Support of Samsung's Opposition to Apple's Motion for a Preliminary Injunction,

17   the non-confidential portions of Mr. Sherman's September 14, 2011 deposition transcript, Mr.

18   Roger Fidler's August 22, 2011 Declaration In Support of Samsung's Opposition to Apple's

19   Motion for a Preliminary Injunction, and Mr. Fidler's September 23, 2011 deposition transcript.

20         4.       It is my opinion that Mr. Sherman does not understand the nature of minimalist

21   design, such as the minimalist designs achieved in the iPhone and iPad.  Mr. Sherman's testimony

22   that there is only one possible minimalist design for a smartphone and only one possible

23   minimalist design for a tablet computer (Ex. 2 at 38:12-21; 43:6-44:6; 45:3-17.) reflects

24   Mr. Sherman's fundamental misunderstanding of what is possible in the field of industrial design,

25   as does Samsung's claim that Apple's designs are a result of the "natural evolution" of

26   smartphones and tablet computers.  (Opp. at 2:2-5.)  It is also my opinion that Mr. Sherman

27   improperly analyzed functionality issues in assessing Apple's designs, and that he improperly

28   analyzed the prior art to conclude that the Apple design patents are invalid.

5.      Accordingly, I disagree with Mr. Sherman's opinions, including those ultimate conclusions set forth in paragraph 184 of his declaration that:  (1) "the D'889, D'677, and D'087 patents are invalid in light of the prior art described [in Mr. Sherman's declaration]" and (2) "the designs claimed by the D'889, D'677, and D'087 patents are not protectable because they only encompass non-ornamental elements."

## I.      QUALIFICATIONS

6.      I am currently a product design consultant and an Adjunct Associate Professor in the Integrated Product Design Program at the University of Pennsylvania.

7.      My *curriculum vitae*, which includes a listing of papers, patents, and other materials which I have authored within the last ten (10) years, is attached as Exhibit 1.  My CV also includes a listing of the cases in which I have testified as an expert at trial or by deposition within the last four (4) years.  It also includes a history of the positions that have been held at the national level of the Industrial Designers Society of America (IDSA).  Also, it lists my education background, which includes a Bachelor of Fine Arts degree in Industrial Design from Rhode Island School of Design in 1968.

8.      In 2010, I received my profession's highest award, The IDSA Personal Recognition Award, which had been bestowed upon only 25 others in the history of the profession prior to my receipt of the award.

9.      I am the founder and currently the Board Chair at Bresslergroup, Inc., a design research, strategic product planning, industrial design, product development and engineering consulting firm.  As the founder of Bresslergroup, Inc., I have been involved with over 700 clients and over 3,000 product design and development projects.

10.      I have been awarded over 70 United States patents for physical products.  These patents are divided roughly equally between utility and design patents, a listing of which is provided in my CV.

11.      As an industrial designer, I have significant experience in the design of consumer electronics products, which has included my attendance at the Consumer Electronics Show in approximately 20 of the last 30 years.  Several related projects include industrial designs for

1   telephone handsets for IMM, cell phones for Motorola, video phones for Worldgate, audio

2   products for Polk Audio, tablet computers for Telepad, and digital tire gauges for MSI

3   International.

4       12.     As an industrial designer, I am trained in, and have experience with, understanding

5   how consumers see, recognize, understand objects and their use.  I have been trained to

6   understand the principals of how people see and react to visual stimulus.  I have spent

7   considerable time following the process of consumer testing and data analysis to determine both

8   functional and visual understanding and subsequent design and business choices.

9       13.     I have been asked to provide an expert declaration on behalf of Apple Inc. in the

10  above-captioned case.  I understand I submit this declaration in support of Apple's Motion for a

11  Preliminary Injunction.  I may testify at a hearing regarding the matters expressed in this

12  declaration and any supplemental declarations that I may prepare for this litigation.

13      14.     I bill my time at a rate during consultancy of $400.00 dollars per hour.  My

14  compensation is in no way contingent upon the outcome of the case.

15  **II.     LEGAL PRINCIPLES**

16      15.     I have not been asked to offer an opinion on the law; however, as an expert

17  assisting the Court in determining validity and functionality, I understand that I am obliged to

18  follow existing law.  I have therefore been asked to apply the following principles to my analysis

19  of validity and functionality.

20      16.     I have been instructed by Apple's counsel that an analysis of whether a design

21  patent is obvious requires one of ordinary skill in the art to identify a primary prior art reference

22  "the design characteristics of which are basically the same as the claimed design."  *Durling v.*

23  *Spectrum Furniture Co., Inc.*, 101 F.3d 100, 103 (Fed. Cir. 1996) (*quoting In re Rosen*, 673 F.2d

24  388, 391 (C.C.P.A. 1982)).  The designs of secondary references "may then properly be relied

25  upon for modification of such *basic design* when the references are 'so related that the appearance

26  of certain ornamental features in one . . . would have suggested application of those features to

27  another."  *In re Harvey*, 12 F.3d 1061, 1063 (Fed. Cir. 2003) (emphasis in original) (quotation

28  omitted).  "Once that piece of prior art has been constructed, obviousness, like anticipation,

1    requires application of the ordinary observer test, not the view of one skilled in the art." *Int'l*

2    *Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1240 (Fed. Cir. 2009). "[T]he

3    ordinary observer test, whether applied for infringement or invalidity, and the obviousness test,

4    applied for invalidity under Section 103, focus on the *overall designs*." *Id.* at 1240-41 (emphasis

5    in original). I understand that a piecemeal comparison of different design elements found in the

6    prior art is not permitted under *International Seaway*.

7          17.    I also understand that "in considering prior art references for purposes of

8    determining patentability of ornamental designs, the focus must be on appearances and not uses."

9    *In re Harvey*, 12 F.3d at 1064. Thus, if the prior art merely suggests "components of [the

10   patented] design, but not its overall appearance, an obviousness rejection is inappropriate." *Id.* at

11   1063.

12         18.    I understand that the following test is used to determine if a design is functional:

13   "In determining whether a design is primarily functional or primarily ornamental the claimed

14   design is viewed in its entirety, for the ultimate question is not the functional or decorative aspect

15   of each separate feature, but the overall appearance of the article, in determining whether the

16   claimed design is dictated by the utilitarian purpose of the article." *L.A. Gear, Inc. v. Thom McAn*

17   *Shoe Co.*, 988 Fed. 2d. 1117, 1123 (Fed. Cir. 1993).

18         19.    Moreover, I understand that when one is analyzing functionality, the issue is not

19   whether the device performs a function; it is whether the design of the device is dictated by

20   function. "[T]he design of a useful article is deemed to be functional when the appearance of the

21   claimed design is 'dictated by' the use or purpose of the article." *Id.* (citation omitted). "If the

22   particular design is essential to the use of the article, it can not be the subject of a design patent."

23   *Id.* If there are alternative designs that can achieve the same function, then the design is not

24   dictated by function. *Best Lock Corp. v. Ilco Unican*, 94 F.3d 1563, 1566 (Fed. Cir. 1996)

25         20.    I have been further instructed by Apple's counsel that in instances where elements

26   of a design patent are "purely functional," such elements should not be considered a part of the

27   patented design for purposes of comparison with an accused product. *Egyptian Goddess, Inc. v.*

28   *Swisa, Inc.*, 543 F.3d 665, 680 (Fed. Cir. 2008).

21.     This was illustrated in the case of *Richardson v. Stanley Works, Inc.*, where the Federal Circuit affirmed a claim construction for the design of a multi-purpose tool that discounted "elements that are driven purely by utility," such as the flat end of a hammer-head. 597 F.3d 1288, 1294 (Fed. Cir. 2010).  The claim construction approved by the Federal Circuit in *Richardson* was arrived at by the district court in view of the fact that "every piece of prior art identified by the parties" showed these functional elements to be rendered "in the exact same way" and in light of "the absence of alternative designs."  *Richardson v. Stanley Works, Inc.*, 610 F. Supp. 2d 1046, 1050 (D. Ariz. 2009).

22.     I have been instructed by Apple's counsel that elements of a design can serve a function without being dictated by function where alternate designs for the element are available. *L.A. Gear, Inc.*, 988 F.2d at 1123; *Richardson*, 610 F. Supp. 2d at 1050.

### III.     INDUSTRIAL DESIGN AND MINIMALISM

23.     Mr. Sherman testified there can be only one minimalist design for a touch screen smart phone and only one minimalist design for a tablet computer. (Ex. 2 at 38:12-21; 43:6-44:6; 45:3-17.)  I disagree with Mr. Sherman's testimony as it reflects a misunderstanding of what industrial design and minimalist design entail.

24.     The underlying premise of the industrial design process is that every function can have more than one visual embodiment or ornamental presentation that, to the consumer, differentiates that artifact from others that provide the same function.  In practice, the industrial designer's role is to create and design aesthetic embodiments of the functional choices made by a product design team.

25.     Minimalism, a term used in various forms of the arts including music, painting and sculpture, as well as architecture and product design, is an approach to the creative industrial design process, where the product embodiment is stripped down to its most fundamental components by using a bare minimum of elements.

26.     A noted proponent of minimalism was architect and designer Ludwig Mies van der Rohe, who adopted the motto *"less is more."*  This phrase described his aesthetic approach of organizing and arranging the numerous necessary components of a building to create a visual

impression of extreme simplicity.  Van der Rohe was head of the influential Bauhaus School in Germany for three years before it was disbanded in 1933.  His buildings achieved the maximum effect using the minimum of means with their simplicity of form, attention to detail and painstaking craftsmanship.

27.     A similar sentiment was embodied in industrial designer Dieter Rams' motto, "Less but better," which was adapted from van der Rohe.  Considered by many in the design community to be the greatest 20th century designer alive, Rams' philosophical design approach uses relatively simple, elegant forms.  The structure's beauty derives from using basic geometric shapes as a visual foundation, and using only a single shape or a small number of like shapes for complementary features to create design unity.  Perceived ornamentation is the result of using high quality materials, textures and finishes.

28.     As a designer who has endeavoured to ascribe to minimalist design principals for several decades, it is my opinion that the minimalist design approach strives to identify an overriding, strong and memorable minimal visual framework or system of forms that together communicate a unified statement to the potential user/consumer.  Once this overall visual image is established, it is then a designer's challenge to develop the detailed visual elements that communicate usability and quality while supporting, and not distracting from, the primary memorable aesthetic statement.  Like any other approach to industrial design, various minimalist designs may exist for a given product, including electronic devices like touchscreen smartphones or tablet computers.

29.     Thus, each design patent at issue reflects but one of many potential minimalist designs.

30.     With respect to the iPhone and the iPad products, Apple has created a powerful and memorable visual aesthetic based on their minimalist designs.  Particularly, these Apple products are based upon the simplest possible use of a visually uninterrupted and continuous surface of glass-like materials that creates a reflective surface covering the product face.

31.     Accordingly, Mr. Sherman's testimony that there can only be one minimalist design for a touch screen smart phone or a tablet computer is incorrect.

**IV.    VALIDITY.**

32.    Based on my understanding of the appropriate test of obviousness and my review of Mr. Sherman's declaration, Mr. Sherman obviousness analysis is not correct.

33.    First, Mr. Sherman does not purport to opine on whether an ordinary observer would find the prior art he constructs as substantially the same as the Apple designs.  I have reviewed his declaration and the non-confidential portions of his deposition transcript, and I do not find any instance where he opines on what the ordinary observer would perceive with respects to the designs at issue.

34.    Second, even if Mr. Sherman had included an opinion as to what an ordinary observer would perceive regarding the designs at issue, he does not recite any qualifications that would enable him to testify as to how an ordinary observer would perceive these designs. (Sherman Decl. ¶¶ 5-13.)  Rather, Mr. Sherman's opinion is purportedly based on his experience "in the telecommunication industry" and "mobile handsets technology and products."  (*Id.* ¶ 6.) This is not sufficient to establish expertise in consumer perceptions.

35.    In contrast, industrial designers are trained to understand how consumers respond to visual cues and aesthetics.  Thus, industrial designers regularly create and run consumer focus groups where we interview and observe potential users of the products, and identify their needs so that we can incorporate them into the design.  As a result, industrial designers have a deep knowledge of how consumers perceive and respond to designs.  My training in consumer research began in college – my thesis project involved learning to do user observational research.  This included objective observation and interview processes with users in a hospital environment. Subsequently, I was trained in 1972 in Synectics, a consumer group creativity process.  Since then, I have participated in well over one hundred and fifty consumer or user research projects employing focus groups, consumer preference studies, point of sale, observational, ethnographic, interview, mall intercept and product usability testing projects.

36.    Mr. Sherman testified that he has never studied marketing, industrial design, or minimalism.  (Ex. 2 20:7-15 and 47:11-15.)

37.     Third, it is my opinion that a designer of ordinary skill in the art is a designer who is experienced in the industrial design of consumer electronic devices.

38.     Mr. Sherman is not a designer of ordinary skill in the art because he is not an industrial designer and has no experience as an industrial designer.  He has taken no coursework in industrial design.  (Ex. 2 at 20:7-9)  Rather, it appears that he is an electrical engineer whose total exposure to industrial design was limited to his experience "consulting to the [Industrial Design team]" and "proposing ideas" when he was CTO of MODU.  (Ex. 2 at 6:4-16).

39.     Fourth, in his declaration and during his deposition, Mr. Sherman never identified a primary reference whose design would be viewed, by a designer skilled in the art, as basically the same as each of Apple's asserted design patents.  Likewise, for each of Apple's design patents, Mr. Sherman did not identify any secondary reference whose design could be used to modify the design of a primary reference to construct a piece of prior art that would be viewed, by an ordinary observer, as substantially similar to Apple's designs.  Similarly, Mr. Sherman did not identify any suggestion in the prior art for combining any of the references that he identified; instead, he relied on his opinion that it would be "natural" or "common."

**A.     The D504,889 Patent.**

40.     I have reviewed Mr. Sherman's analysis of the prior art to the D'889 Patent.

41.     Mr. Sherman does not identify a single reference that discloses all the elements of the claimed design of the D'889 Patent from the perspective of an ordinary observer.

42.     Moreover, Mr. Sherman does not identify a primary reference that is basically the same as the D'889 Patent from the perspective of an ordinary observer.  He also does not identify any secondary references whose design can be used to modify such primary reference. Mr. Sherman also does not identify any suggestion in the prior art for combining any primary reference with any secondary reference.  Finally, he does not identify any combination of references based on a primary reference and any secondary references that discloses all the elements of the claimed design of the D'889 Patent from the perspective of an ordinary observer.

43.     Rather, Mr. Sherman recites a laundry list of prior art references, reciting apparent similarities and differences between the prior art reference and the claimed design of the D'889

Patent.  He then concludes that all the elements of the claimed design of the D'889 appear

somewhere in the prior art.  Mr. Sherman's prior art analysis regarding the D'889 Patent is

incorrect, and does not follow the methodology described above.

44.     ***1981 Fidler Mock-up*** (Exs. 3 & 4) – I have reviewed the exhibits to the

Declaration of Roger Fidler dated August 16, 2011, as well as photographs provided by Apple's

counsel, which include the 1981 mock-up of a tablet that Roger Fidler created.  I note that the

1981 tablet appears to have an opaque white frame surrounding an inset display, with the frame

on the bottom extending more deeply into the inset display.  Thus, the entire front surface is not

clear, and there is an edge or line that appears adjacent to the inset display, contrary to Mr.

Sherman's claim that there is a "flat rectangular front surface."  (Sherman Decl. ¶ 24.)  Moreover,

the corners are not rounded, the edge profiles appear square, and there appear to be three layers to

the tablet when viewed from the side.  Mr. Fidler's 1981 mock-up of a tablet is neither basically

the same as nor substantially the same as the D'889 design.

45.     ***1994 Fidler Mock-up*** (Exs. 5 & 6) – The 1994 mock-up of a tablet that Roger

Fidler created has a raised plastic asymmetrical frame surrounding an inset display, an on/off

button in the upper left-hand corner, and an apparently arbitrary design created of a series of dots

in the upper right-hand corner.  Thus, I disagree with Mr. Sherman's description that the front

surface is clear and completely flat.  Also, the back surface has a raised door with several screws,

which undermines Mr. Sherman's description that there is a "smooth back surface with no

ornamentation."  Moreover, the corners are substantially rounded with a large radius.  There also

appears to be notches and ports on the sides and top of the mock-up, and two memory cards

sticking out of the top of the mock-up, thereby taking away from a simplistic design and contrary

to Mr. Sherman's claim that the 1994 mock-up had "minimal ornamentation."  (Sherman Decl.

¶ 25.)  Moreover, the edges of the design curve out from the front surface toward the back and

then curve back in to the back surface.   Mr. Fidler's 1994 mock-up of a tablet is neither basically

the same as nor substantially the same as the D'889 design.

46.     ***1997 Fidler Mock-up*** (Exs. 7 & 8) – I have reviewed photographs of Plexiglas

sheets and Plexiglas mock-ups that Mr. Fidler brought to his deposition.  The Plexiglas sheets are

nothing more than a blank piece of white Plexiglas that has been cut into a rectangular shape with slightly round corners.  Therefore, they are not substantially the same as the D'889 design.  With respect to the Plexiglas mock-ups, they have a thick raised frame surrounding the inset display and the front and back edges appear to have sharp 90 degree angles.  They do not have a rounded back edge profile as is seen in the D'889 patent.  Mr. Fidler's 1997 mock-up of a tablet is neither basically the same as nor substantially the same as the D'889 design.

47.    ***D337,569 Patent*** (Exs. 9 & 10) – The D'569 patent has a thick opaque frame that is stepped up surrounding a recessed display and substantially wider on the ends than on the top and bottom of the device.  Thus, the front surface is not clear or completely flat, so as to appear as an uninterrupted, continuous surface.  The design in the D'569 patent is also not "rectangular shaped" as Mr. Sherman claims.  (Sherman Decl. ¶ 26.)  Rather, the two ends are substantially rounded and thus this design is lozenge-shaped.  Nor does it have a "largely smooth and continuous back surface" (*id.*), as there appears to be a separate rectangular back panel, which is also stepped up from the frame.  Moreover, the edges of the design appear to be formed from three straight-edged layers with the front and back layers being recessed from the middle layer.  The D'569 design is neither basically the same as nor substantially the same as the D'889 design.

48.    ***D461,802 Patent*** (Exs. 11 & 12) – The D'802 Patent has a thick asymmetrical raised frame with an ornamental texture surrounded by a second frame.  The front surface is not completely flat, so as to appear as an uninterrupted continuous surface.  The shape of the design is not rectangular as there is a protrusion at one of the edges, presumably for a stylus holder.  The edge profile also curves gradually from the front surface and meets the back surface at a vertical angle to form a sharp edge around the back surface, which appears to be the complete opposite of the D'889 design, where the edge profile gradually curves from the back surface and meets the front surface at a vertical angle to form a sharp edge around the front surface.

49.    I have reproduced Figure 2 of the D'802 design, where the front surface is shown at the top of the figure and the back surface is shown at the bottom of the figure, below:

1

2

50.     Mr. Sherman, however, flips the edge profile in his declaration (see below) to



3

4

5   make the D'802's profile appear to be exactly the opposite of what it is, thereby making it appear

6   to be similar to the edge profile in the D'889 design.

7

8



D461,802, Fig. 2.

D'889, Fig. 5.

9

10

11

12

13

14   51.     The D'802 design is neither basically the same as nor substantially the same as the

15   D'889 design.

16   52.     *JP 0921403* (Exs. 13 & 14) – The design disclosed in JP 0921403 does not have a

17   clear and completely flat front surface, so as to appear uninterrupted and continuous.  The frame

18   is asymmetrical and has two buttons on the front.  One of the edges is partially jagged; another

19   edge appears squared; and another edge is completely rounded.  Moreover, two of the corners are

20   squared.  There is also a dominant split line in the middle of the edges.  The back surface is also

21   adorned with five circles, which appear to be fasteners.  Indeed, Mr. Sherman admits the

22   substantial differences between the design disclosed in JP 0921403 and the D'889 design.

23   (Sherman Decl. ¶ 29.)  The JP 0921403 is neither basically the same as nor substantially the same

24   as the D'889 design.

25   53.     *JP 0887388* (Exs. 15 & 16) – The design disclosed in JP 0887388 does not have a

26   clear and completely flat front surface so as to appear uninterrupted and continuous.  There

27   appears to be a prominent ornamental feature that is raised on the lower part of the frame.  The

28   back surface has a prominent raised rectangular feature, contrary to Mr. Sherman's claim that this

design has "a largely smooth and continuous back surface." (Sherman Decl. ¶ 29.) Moreover, the edges of the design curve out from the front surface toward the back, and then curve back in to the back surface. The JP 0887388 design is neither basically the same as nor substantially the same as the D'889 design.

54.     **JP 1142127** (Exs. 17 & 18) – The design disclosed in JP 1142127 does not have a clear and completely flat front surface, contrary to Mr. Sherman's claim that this design appears to have a "flat smooth surface from end to end on both the front and back." (Sherman Decl. ¶ 29.) For instance, the frame is covered with ornamental dots. Moreover, the frame appears to be stepped up from the edge of the front surface, leaving the appearance of a rim around the edge of the frame, as well as from the display inset. Moreover, there appears to be groove inset on the back surface and one of the sides. The JP 11421727 design is neither basically the same as nor substantially the same as the D'889 design.

55.     **HP Compaq TC1000** (Exs. 19 & 20) – I have reviewed the actual HP Compaq TC1000 device. The TC1000 has a frame around that edge that extends onto the front surface. There also appears to be silver and black perimeters surrounding the display screen. The edges and back surface also have a complicated arrangement of slots, ports, hatches, and buttons. The TC1000 also has a very thick form factor. The TC1000 is neither basically the same as nor substantially the same as the D'889 design.

56.     None of the prior art references that Mr. Sherman describes in his declaration is basically the same as or substantially the same as the design in the D'889 patent.

57.     Moreover, it would not have been obvious to a designer skilled in the art prior to the disclosure of the D'889 patent to create a flat, clear front surface that is uninterrupted and continuous on an electronic device. A raised frame surrounding an inset display would have been the most obvious front surface design for an electronic device. As demonstrated by the art relied on by Mr. Sherman, such a front surface with a raised frame surrounding an inset display, in contrast to an uninterrupted continuous glass surface, was common prior to the D'889 patent.

**B.      The D618,677 Patent**

58.     I have reviewed Mr. Sherman's analysis of the prior art to the D'677 Patent.

1    59.    Mr. Sherman does not identify a single reference that discloses all the elements of

2    the claimed design of the D'677 Patent from the perspective of an ordinary observer.

3    60.    Moreover, Mr. Sherman does not identify a primary reference that is basically the

4    same as the D'677 Patent from the perspective of an ordinary observer.  He also does not identify

5    any secondary references whose design can be used to modify such primary reference.

6    Mr. Sherman also does not identify any suggestion in the prior art for combining any primary

7    reference with any secondary reference.  Finally, he does not identify any combination of

8    references based on a primary reference and any secondary references that discloses all of the

9    elements of the claimed design of the D'677 Patent from the perspective of an ordinary observer.

10    61.    Rather, Mr. Sherman recites a laundry list of prior art references, reciting apparent

11    similarities and differences between the prior art references and the claimed design of the D'677

12    Patent.  He then concludes that all of the elements of the claimed design of the D'677 appear

13    somewhere in the prior art.  Mr. Sherman's prior art analysis regarding the D'677 Patent is

14    incorrect, and does not follow the methodology described above.

15    62.    *JP 1241638* (Exs. 21 & 22) – The design disclosed in the JP 1241638 reference

16    has a front surface that is not flat, but rather slopes toward the back of the device near the top and

17    bottom, which Mr. Sherman admits.  (Sherman Decl. ¶ 89.)  The bezel in the JP 1241638

18    reference is much thicker and does not have an inwardly sloping profile.  This is all apparent from

19    alternative figures of the JP 1241638, which Mr. Sherman failed to insert in his declaration

20    adjacent to the figure of the front view on page 19.  Moreover, the JP 1241638 does not have a

21    transparent front surface, with a black mask underneath to make an appearance of a black surface.

22    The JP 1241638 design is neither basically the same as nor substantially the same as the D'677

23    design.

24

25

26

27

28

63.     I disagree with Mr. Sherman's claim that "making the front cover transparent black would have been an obvious choice in January of 2006 because the display screens available at that time were only commercially available in shades of black.  Unless a designer wanted to make an unusual choice of creating a multiple colored unified face, using black for the unified front surface was not only an obvious choice; it was the natural default."  (Sherman Decl. ¶ 86.)  First, when display screens from 2006 were turned off, they actually display a shade of gray and not completely black.  Thus, if a designer would want to match the display screen to rest of the surface, a designer would choose a shade of gray for the front surface.  Second, black was not a "default" color for smart phones in 2006 as designers also chose many other colors instead of black.  For instance, Samsung's SCH i830, released in January 2006, was blue in color.  (See http://pdadb.net/index.php?m=specs&id=389&c=samsung_sch-i830__ip-830w)



64.     Many other smart phones in 2006, like ones from Nokia, Palm, and Motorola, as shown respectively below, respectively, were silver or chrome.  (See http://pdadb.net)

1
2
3
4
5
6
7
8
9
10

          

Nokia 9300/b            Palm Treo 700b            Motorola Q

11      65.    *LG Chocolate* (Ex. 23) – The LG Chocolate does not have a centered display

12  screen with balanced borders above and below the screen.  Rather the display screen is aligned

13  closer to the top of the design, rather than the center.  The side borders to the right and left of the

14  screen are also wider.  Moreover, the top and bottom edges are not straight.  There is also

15  substantial ornamentation in the form of a large metal button with a metallic-appearing rim and

16  red marking, which is surrounded by a number of smaller red buttons on the front surface below

17  the display screen.  The LG Chocolate is neither basically the same as nor substantially the same

18  as the D'677 design.

19      66.    *LG Prada* (Ex. 24) – The LG Prada has a wide frame surrounding all sides of the

20  display screen.  It also has a complex arrangement of three metal buttons protruding from the

21  front surface, which extends almost the width of the bottom of the device.  There does not appear

22  to be a bezel that surrounds the front surface.  The front surface is also not a continuous and

23  uninterrupted due to the prominent silver buttons and a wide frame.  There also appears to be a

24  black border surrounding the frame.  The LG Prada is neither basically the same as nor

25  substantially the same as the D'677 design.

26      67.    *JP 1280315* (Exs. 25 & 26) – The JP 1280315 design does not have a centered

27  display screen with balanced borders above and below the screen.  It also does not have a speaker

28

slot or a bezel surrounding the front surface.  Moreover, this design does not have a transparent front surface with a black mask underneath to form the appearance of a clear black surface.  The JP 1280315 design is neither basically the same as nor substantially the same as the D'677 design.

68.      *JP 1009317* (Exs. 27 & 28) – The JP 1009317 design does not have a bezel.  The borders above and below the display screen do not appear to be balanced and thus the frame appears to be asymmetric.  The top and bottom edges also curve from the center toward the sides.  There is no bezel, and the design does not have a continuous clear front surface with a black mask underneath to form the appearance of a transparent black surface.  The JP 1009317 design is neither basically the same as nor substantially the same as the D'677 design.

69.      *JP 1241383* (Exs. 29 & 30) – The JP 1241383 design appears to have an inset display screen surrounded by a large thick bezel.  Large lozenge and circle shaped buttons extend from the left side of the design and thus are visible from the front.  There is no speaker slot.  Also, this design does not have a continuous clear front surface with a black mask underneath to form the appearance of a transparent black surface.  The JP 1241383 design is neither basically the same as nor substantially the same as the D'677 design.

70.      *KR 30-0418547* (Exs. 31 & 32) – The KR 30-0418547 design has wide borders surrounding the display screen.  There appears to be a rimmed frame surrounding the front surface.  Also, this design does not appear to have a continuous clear front surface with a black mask underneath to form the appearance of a transparent black surface.  The KR 30-0418547 design is neither basically the same as nor substantially the same as the D'677 design.

71.      None of the prior art references that Mr. Sherman describes in his declaration is basically the same as or substantially the same as the design in the D'677 patent.

72.      Moreover, it would not have been obvious to a designer skilled in the art prior to the disclosure of the D'677 patent to create a flat, clear front surface with a black mask underneath to form the appearance of a transparent black surface on an electronic device.  A raised frame surrounding an inset display would have been the most obvious front surface design for an electronic device.  As demonstrated by the art relied on by Mr. Sherman, such a front

1 surface was common prior to the D'889 patent.  Moreover, such a raised frame or rim

2 surrounding an inset display on the front surface would provide protection to the display.

3 **C.     The D593,087 Patent**

4       73.     Mr. Sherman does not provide a separate analysis of the prior art to the D'087

5 Patent.  Rather, he relies on his analysis of the prior art to the D'677 Patent.  For the reasons

6 explained above with respect to the D'677 Patent, Mr. Sherman's prior art analysis is incorrect.

7 **IV.    FUNCTIONALITY**

8       74.     Based on my understanding of the appropriate test of functionality and my review

9 of Mr. Sherman's declaration, Mr. Sherman's conclusion that the "designs claimed by the D'889,

10 D'677, and D'087 patents are not protectable because they only encompass non-ornamental

11 elements" is incorrect.  (Sherman Decl. ¶ 184.)  Mr. Sherman incorrectly forms this conclusion

12 based on his opinion that certain broadly defined elements of the design patents *may perform*

13 *some function.*

14       75.     I understand that this piecemeal functionality analysis is incorrect:  "In

15 determining whether a design is primarily functional or primarily ornamental the claimed design

16 is viewed in its entirety, for the ultimate question is not the functional or decorative aspect of each

17 separate feature, but the overall appearance of the article, in determining whether the claimed

18 design is dictated by the utilitarian purpose of the article."  *L.A. Gear*, 988 F.2d at 1123.

19       76.     Moreover, I understand that when one is analyzing functionality, the issue is not

20 whether the device performs a function; it is whether the design of the device is dictated by

21 function.  "[T]he design of a useful article is deemed to be functional when the appearance of the

22 claimed design is 'dictated by' the use or purpose of the article."  *Id.*  "If the particular design is

23 essential to the use of the article, it can not be the subject of a design patent."  *Id.*  If there are

24 alternative designs that can achieve the same function, then the design is not dictated by function.

25 *Id.*; *Richardson*, 610 F. Supp. 2d at 1050.

26       **B.     The D'889 patent is not dictated by function**

27       77.     I have reviewed Mr. Sherman's "functionality" analysis of D'889 Patent.

28

78.     Mr. Sherman divides the D'889 Patent into a list of broadly defined elements and recites a possible function for each of those elements.  (Sherman Decl. ¶¶ 36-51.)  He then concludes that the D'889 Patent is "not protectable" because it "only encompass(es) non-ornamental elements."  (*Id.* ¶ 184.)  This type of analysis is incorrect, as explained above at ¶¶ 74-76.

79.     For the D'889 design, alternate tablet computer designs include forms that have:

- squared or chamfer corners instead of rounded corners (e.g., Exs. 33-37);
- a front surface that is not flat (e.g., Exs. 34; 38-39) or clear (e.g., Exs. 34-35; 38-42);
- a front surface with decorations (e.g., Exs. 32; 39; 42-43); or
- thick frames around the front surface (e.g., Exs. 34; 36; 38; 43).

80.     An alternative design that performs many of the same functions that Mr. Sherman recites in paragraphs 36-51 of his declaration can be derived from any combination of the above characteristics.  Accordingly, the functions that Mr. Sherman recites in paragraphs 36-51 of his declaration do not dictate the design of the D'889 patent.

81.     For example, Mr. Sherman identifies the "rounded corners" of the D'889 patent as "functional because they ensure comfortable, safe, and ease of use" and "also make the device more durable."  (Sherman Decl. ¶¶ 39-40.)  Mr. Sherman ignores the fact that other tablets can implement alternative designs to ensure comfort, safety, ease of use & durability.  For instance, a tablet may have chamfered corners and even a "protective ring" surrounding the tablet for durability and safety.  (See Ex. 35.)  Also, a tablet may have a "folded" design such that it is more comfortable to use. (See Ex. 44.)  These alternative designs help demonstrate that the rounded corners of the D'889 patent are not dictated by functionality.

82.     As another example, Mr. Sherman also identifies the "flat surface" of the D'889 patent as performing the function of "help[ing] keep the tablet surface clean and minimizes chance of dust or water encroachment."  (Sherman Decl. ¶ 43.)  Mr. Sherman fails to explain how a front surface that was not completely flat (i.e., a front surface that has a raised rim or frame or ornamentation) would impede the cleanliness of a tablet.  Indeed, many tablet designs – including

1    the many prior art designs identified by Mr. Sherman – do not have completely flat front surfaces.

2    (See e.g., Sherman Decl. Exs. C, D, & L)

3        83.    As another example, Mr. Sherman also identifies "a clear surface without

4    ornamentation" of the D'889 patent as performing the function of "allow[ing] unimpeded viewing

5    of the display screen."  (Sherman Decl. ¶ 44.)  Mr. Sherman ignores the fact that many tablet

6    designs do not have a "clear surface without ornamentation" but yet do not impede viewing of the

7    display screen.  For instance, many alternative designs cover the border surrounding the display

8    with an opaque – rather than clear – surface.  (See e.g., Exs. 34-35; 38-42.)

9        84.    The elements that Mr. Sherman identifies in his declaration are not dictated by

10   function because alternative designs are available that can perform the same functions described

11   by Mr. Sherman.

12       **C.    The D'677 patent is not dictated by function**

13       85.    I have reviewed Mr. Sherman's "functionality" analysis of D'677 patent.

14       86.    As with the D'889 patent, Mr. Sherman improperly divides the D'677 patent into a

15   list of broadly defined elements and recites a possible function for each of the elements.

16   (Sherman Decl. ¶¶ 107-125.)  He then concludes that the D'677 Patent is "not protectable"

17   because it "only encompass[es] non-ornamental elements."  (*Id.* ¶ 184.)  This type of analysis is

18   incorrect, as explained above at ¶¶ 74-76.

19       87.    For the D'677 design, there are numerous alternate smartphone designs, including

20   forms that have:

21       ●    rounded or other shapes, rather than a rectangular shape with four straight sides

22   (e.g., Exs. 45-47; 68)

23       ●    squared corners instead of rounded corners (e.g., Exs. 47-49);

24       ●    a front surface that is not flat (e.g., Exs. 50-52; 67), clear (e.g., Exs. 50-55), or

25   black (e.g., Exs. 50; 53; 56-57);

26       ●    a front surface with decorations (e.g., Exs. 46; 48; 57);

27       ●    an off-center display screen such that borders surrounding the screen are not

28   uniform (e.g., Exs. 58-60);

1      •     wide frames around the front surface (e.g., Exs. 54; 61-62); or

2      •     alternative bezel designs, or no bezel at all (e.g., Ex. 52; 60-61).

3      88.     An alternative design that performs many of the same functions that Mr. Sherman

4 recites in paragraphs 107-125 of his declaration can be derived from any combination of the

5 above characteristics.  Accordingly, the functions that Mr. Sherman recites in paragraphs 107-125

6 of his declaration do not dictate the design of the D'677 patent.

7      89.     Moreover, Mr. Sherman's element-by-element analysis in paragraphs 107-125 of

8 his declaration merely lists a variety of alleged functions performed by extremely broadly

9 described elements of Apple's design and conclusorily opines that each element is "functional."

10 This analysis is incorrect.

11      90.     For example, Mr. Sherman identifies "surface flatness" as addressing

12 "functionality concerns of ease of cleaning and limiting inadvertent transmissions from physical

13 keys."  (Sherman Decl. ¶ 107.)  Mr. Sherman, however, ignores the many smartphone designs

14 that do not have flat surfaces that would also be easy to clean and also limit inadvertent

15 transmissions from the physical keys.  (See e.g., Exs. 50-52; 67.)

16      91.     As another example, Mr. Sherman explains that "surface transparency" is

17 functional because "otherwise, the purpose of the display screen would be impaired."  (Sherman

18 Decl. ¶ 108.)  Mr. Sherman, however, fails to explain why the entire surface must be transparent

19 to perform the function of preventing impairment of the display screen.  For instance, a

20 smartphone that has a surface that is transparent only in the regions covering the display but is

21 otherwise opaque in other regions would still perform the same functionality that Mr. Sherman

22 describes.  Indeed, many smartphone designs include such opaque surfaces.  (See e.g., Exs. 50-

23 55.)

24      92.     As another example, Mr. Sherman identifies "blackness of surface" and purports to

25 identify a laundry list of functions for this element so that he can conclude that it "is a particularly

26 useful color for the surface of a phone."  (Sherman Decl. ¶ 109.)  Mr. Sherman ignores the fact

27 that many smartphones on the market before and after the introduction of the iPhone were not

28 black, and yet could still perform the same functions that Mr. Sherman describes.  Indeed, at least

one of Samsung's own smartphones in 2006 was blue and many other smartphones in 2006 were silver or chrome.  (*Supra* ¶¶ 74-76.)  Moreover, Mr. Sherman's claim that "blackness of surface" is functional is undermined by his acknowledgement of several aesthetic reasons why a smartphone may be black – i.e., it "does not send an overt message of flashiness or frivolity." (Sherman Decl. ¶ 109.)

93.     As another example, Mr. Sherman identifies a "centered display screen" with "narrow borders on the long sides of the screen" and "wider borders on the top and bottom of the front surface" as serving several functions.  (Sherman Decl. ¶¶ 114-118.)  Mr. Sherman, however, fails to explain how the myriad other designs that have 1) display screens that are off-center 2) thicker borders on the long sides of the screen, and/or 3) narrower borders on the top and bottom cannot perform the same functions that Mr. Sherman describes.  Indeed, display screen location and border size vary greatly in smartphone designs.  (See, e.g., Exs. 53-55.)

94.     As another example, Mr. Sherman identifies the "rounded horizontal speaker slot" as performing various functions.  (Sherman Decl. ¶ 119-123.)  At his deposition, Mr. Sherman testified that the "rounded horizontal" shape of the speaker slot is functional because it conforms to the shape of speaker component, which is also round and horizontal.  (Ex. 2 at 124:17-24.)  His opinion was based upon what he read in manufacturing specifications received from two manufacturers of two speaker elements, each of which made elongated rectangular speaker elements.  (Ex. 2 at 148:13-25; 154:12-155:1.)  Mr. Sherman ignores, however, that speaker components can be circular, not just rectangular.  Indeed, one of Samsung's own smartphones uses a circular component; it does not have a circular speaker slot that conforms to that circular component, demonstrating that it is not necessary for a speaker slot to conform to the shape of the underlying speaker component.  (Ex. 63.)  Moreover, many other smartphones designs have speaker slots that do not have a "rounded horizontal" shape, yet they still perform the same functions that Mr. Sherman describes.  (See e.g., Exs. 64-66.)

95.     As another example, Mr. Sherman also mentions that the D'677 patent being "substantially free of other ornamentation" as performing the functions of "enhanc[ing] the device's ease of use and the viewer's perception of the content of the display screen." (Sherman Decl. ¶ 124.) Mr. Sherman ignores the fact that many smartphone designs have a surface with ornamentation" and yet still appear to be easy to use. (See, e.g., Exs. 46, 48, 57.)

96.     The elements that Mr. Sherman identifies in his declaration are not dictated by function because alternative designs are available that can perform the same functions described by Mr. Sherman.

**D.      The D593,087 Patent**

97.     Mr. Sherman does not provide a separate analysis of functionality with respect to the D'087 Patent. Rather, he relies on his analysis of functionality with respect the D'677 Patent. For the reasons explained above with respect to the D'677 Patent, Mr. Sherman's analysis is incorrect.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:  September 30, 2011                    _____
                                                    PETER W. BRESSLER