1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Charles K. Verhoeven (Bar No. 170151)
2  charlesverhoeven@quinnemanuel.com
   50 California Street, 22nd Floor
3  San Francisco, California 94111
   Telephone: (415) 875-6600
4  Facsimile: (415) 875-6700

5    Kevin P.B. Johnson (Bar No. 177129
   kevinjohnson@quinnemanuel.com
6    Victoria F. Maroulis (Bar No. 202603)
   victoriamaroulis@quinnemanuel.com
7  555 Twin Dolphin Drive, 5th Floor
   Redwood Shores, California  94065-2139
8  Telephone:    (650) 801-5000
   Facsimile:    (650) 801-5100
9

10   Michael T. Zeller (Bar No. 196417)
   michaelzeller@quinnemanuel.com
11 865 S. Figueroa St., 10th Floor
   Los Angeles, California 90017
12 Telephone: (213) 443-3000
   Facsimile: (213) 443-3100

13

14 Attorneys for SAMSUNG ELECTRONICS CO.,
   LTD., SAMSUNG ELECTRONICS AMERICA,
15 INC. and SAMSUNG
   TELECOMMUNICATIONS AMERICA, LLC

16

17              UNITED STATES DISTRICT COURT

18        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

19

20 APPLE INC., a California corporation,          CASE NO. 11-cv-01846-LHK

21              Plaintiff,                        **DECLARATION OF PROFESSOR RÉMY**
                                                  **LIBCHABER IN SUPPORT OF**
22         vs.                                    **DEFENDANT SAMSUNG'S MOTION TO**
                                                  **DISMISS APPLE'S COUNTERCLAIMS**
23 SAMSUNG ELECTRONICS CO., LTD., a
   Korean business entity; SAMSUNG               **Date:    November 22, 2011**
24 ELECTRONICS AMERICA, INC., a New             **Time:    1:30 p.m.**
   York corporation; SAMSUNG                     **Place:   Courtroom 4, 5th Floor**
25 TELECOMMUNICATIONS AMERICA,                   **Judge:   Hon. Lucy H. Koh**
   LLC, a Delaware limited liability company,
26
                Defendant.
27

28

99999.77816/4453597.3

I, Professor Rémy Libchaber, do hereby declare and state as follows:

## INTRODUCTION

1.     My name is Rémy Libchaber.  Since 2001, I have been a Professor of Law at the Paris I University (Panthéon-Sorbonne).  Before my present appointment, I was a Professor of Law at Paris-XII University, and before that at Maine University, in Le Mans.  My address is 12, rue François Millet. 75016 Paris.

2.     I teach French contract law, both at undergraduate and at graduate levels.

3.     I have published widely in the field of French contract law.  I have also been an editor of a number of chronicles on contract law: from 1995 to 2000 in the *Revue Dalloz*; from 2001 to 2009 in the *Répertoire du Notariat Defrénois*; and since 2011 in the *Revue des contrats*.

4.     I submit my curriculum vitae as Exhibit A to this declaration.

5.     As set forth below, this declaration is based upon my expert knowledge of French contract law.

## MATERIALS REVIEWED

6.     In preparing this declaration I have reviewed the following documents:

       a.     ETSI IPR Policy, dated November 1997 ("ETSI IPR Policy")

       b.     Samsung's declarations to ETSI, dated December 14, 1998, September 19, 2003, May 15, 2006, August 7, 2006, and July 24, 2008 ("ETSI Declarations"), as set forth in Apple's allegations ((D.N. 381 Counterclaims ¶¶ 59, 63)

## SUBJECT MATTER OF THIS DECLARATION

7.     I have been asked by Defendant Samsung to prepare a report setting out my opinion as to the following questions under French contract law:

       a.     What are the general requirements for the formation of a contract?

       b.     What are the minimum terms that would need to be identified for there to be a contract for the license of a patent?  For instance, does the price need to be agreed?

       c.     Are there any special requirements under French law that apply to the formation or enforceability of a contract in respect of a license to use a patent (for instance, that the agreement be in writing)?  If so, what are these requirements?

1          d.       Do ETSI Declarations give rise to a contract for the license of a patent?

2          e.       If the ETSI Declarations do not give rise to a contract, then do they

3    nevertheless impose upon the patentee any legally enforceable obligation?

4          f.       Do the ETSI Declarations create an obligation on the part of Samsung to

5    negotiate with third parties in relation to granting a license to patents covered by the declaration?

6          g.       Would the application of the doctrine of *intuitus personae* affect (and, if so,

7    how) the obligations of the holder of essential patents who has made an ETSI declaration?

8                                            **OPINION**

9    **General Requirements for Formation of a Contract**

10         8.       Under French law, the contract is based on the meeting of concurring wills: not

11   only do both parties have to be willing to enter into the contract, they also have to be willing to do

12   so together, and their wills have to meet with respect to the same content.  This apparently simple

13   model raises numerous difficulties that can be explained as follows.

14         The Freedom of Contract Principle

15         9.       As the contract in French law is based on the exercise by the contracting parties of

16   will, the fundamental principle governing the formation of contracts is ***the freedom of contract***

17   ***principle***.

18         10.      This freedom of contract principle is reflected in a number of other (subsidiary)

19   principles: "As to the merit, freedom of contract is expressed through a threefold capacity: to

20   contract or not, to freely choose the other party, to freely determine the content of the contract."

21   (Fr. TERRÉ, Ph. SIMLER and Y. LEQUETTE, *Les obligations*, 10th ed., Dalloz 2009, No. 24, p. 31, in

22   the same direction: Ph. MALAURIE, L. AYNÈS and Ph. STOFFEL-MUNCK, *Les obligations*, 4th ed.,

23   Defrénois 2009, No. 455, p. 231 ; J. FLOUR, J.-L. AUBERT and E. SAVAUX, *Les obligations*. 1.

24   *L'acte juridique*, 14th ed., Sirey 2010, No. 123, p. 102).

25         11.      A person is free to contract, as long as he is legally capable; conversely, any person

26   is free to refuse to enter into a contract.  There is no mandatory agreement under French law, and a

27   party can always and at any time break off negotiations, insofar as it feels it is not interested

28   anymore.

-2-                                    Case No. 11-cv-01846-LHK
DECL. OF PROF. LIBCHABER IN SUPPORT OF SAMSUNG'S MOTION TO DISMISS APPLE'S
COUNTERCLAIMS

12.     Under the principle of freedom of contract, a party who terminates negotiations is not at fault unless the way the negotiations have been brought to an end is wrongful. If the termination is wrongful, the party at fault can be liable to pay damages under tort liability. However, a party will never be compelled by a Court to enter into a contract: one does not enter into contract without wanting to (Com. 26 November 2003, *Bull. IV*, No. 186, p. 206, *D.* 2004.869, comment DUPRÉ-DALLEMAGNE ; Civ. 3, 28 June 2006, *Bull. III*, No. 164, p. 136, *JCP* 2006.II.10130, comment DESHAYES).

The Consensualism Principle

13.     The freedom to enter into a contract obviously also has a positive side: the contract is naturally formed as soon as the parties' wills meet.  This is the ***consensualism principle***: the contract is usually formed simply by the meeting of the wills and without requiring the agreement to be manifested or acknowledged in some other way.

14.     An exception to this principle arises when the contract is said to be formal: additional formalities are then required for the contract to be considered to be formed.  For example, a written contract is sometimes required, not *ad probationem* but instead *ad validitatem*. Consent is set aside by formalism: the contract will not exist until the required formalities have been fulfilled.

15.     However, it remains that, "following classical analysis, at the heart of the contract is the agreement of the wills, which determines its content." (MALAURIE, AYNÈS and STOFFEL-MUNCK, *op. cit.*, No. 457, p. 233; having the same opinion: FLOUR, AUBERT and SAVAUX, *op. cit.*, No. 122, p. 101; TERRÉ, SIMLER and LEQUETTE, *op. cit.*, No. 91, p. 110).

16.     This consensualism principle usually determines the date of formation of the contract.  The contract is concluded not at the moment a writing is executed, but when the wills of the parties have met with respect to its essential elements.  It goes otherwise for formal contracts, however, which are only deemed to be concluded at the date of satisfaction of the required formalities.

The Exclusion of the Unilateral Commitment of the Will

17.     French law does not acknowledge, as a matter of principle, the unilateral commitment of the will.  For instance, a promise to reward a person, not accepted by that person, does not give rise to an obligation: there can be no specific performance.  The promise is only binding if the person accepts the promise, and acceptance changes a unilateral commitment into a contract.

18.     However, there is an exception to this rule: when a contractual offer has been made, the initiator is bound to keep this offer open for a reasonable time.  Though purely unilateral, this offer cannot be withdrawn — which is normally the case for unilateral commitments, which do not bind any debtor.

19.     In its elementary form, the contract binds two persons who are committed one to the other.  The element that justifies the binding force is the reciprocity of the commitments, the fact that each of the wills is bound to the other person's will.

20.     French law also acknowledges collective agreements, which involve the meeting of the wills of a greater number of persons.  In fact, the same underlying principle is at work: the wills to be bound are legally effective because each exercise of will is supported by each other exercise of will.

21.     This is precisely the reason why French contract law cannot recognize an individual will, by itself, as being the source of obligations.  If one sets aside some minor elements, civil law does not admit that a person can be held debtor because of his own declarations.  Whatever their seriousness, it is a principle that they can be withdrawn, which shows that they are not truly binding.

Types of Contract

22.     According to Article 1101 of the Civil Code, "the contract is an agreement by which one or several persons undertake, towards one or more other persons, to give, to do or not to do something."  It results that the contract is an agreement of wills producing obligations for the parties.

23.    It rarely happens that this meeting of wills produces asymmetric effects: that is, where the contract only produces obligations to be borne by only one party.  But such a contract is possible and it is called a *unilateral contract*: there is a meeting of wills when the contract is formed, but it only binds one of the parties to the other.  An example of such a contract is the contract of guarantee: it is formed following an agreement between the guarantor and the creditor; it only binds the guarantor and benefits the creditor.

24.    Still, it must be noted that a unilateral contract is not to be confused with a unilateral commitment.  A contract is always a process managed by two parties, who may agree on an obligation due by only one of them.  A unilateral commitment, however, involves only one party, who unilaterally declares itself debtor.

25.    In most cases, we are dealing with *bilateral contracts*, which create mutual obligations to be borne by both parties.  In a lease agreement, for example, the owner undertakes to make available a good to the tenant, and the latter undertakes to pay the rent.

26.    Whatever its type, the contract has a binding effect.  Pursuant to Article 1134, §1: "The agreements that are legally formed act as law for those who made them."  Between the parties, contractual obligations have the force of a law, which means that the legal system upholds them scrupulously.

The Formation of the Contract:  The Ideal Model

27.    The contract formation proceeds from the above observations: it involves an agreement of wills between the two parties, which must meet around a common subject.

28.    This means that these wills must exist with respect to each of the parties; they must be serious, meaning that each of them really wanted to bind itself; they must be concurring; and finally they must have been expressed, in any way whatsoever, so that one can tell that there is a meeting of wills.

29.    While these basic principles may seem simple, the question of the meeting of wills is particularly thorny in practice.  It is one thing to contend that the contract involves an agreement of the wills, it is another to be able to determine when and under what conditions this agreement has been reached.

30.     In this respect, French scholars propose an ideal model, constructed around a dialogue between the parties.  An offer to enter into a contract, which has to be firm and complete, is made by an offeror who takes the initiative to commence the negotiations.  Then the recipient replies to this offer, either by accepting it, which results in the contract; or by a counter-proposal, which is construed to be a new offer to contract, leading to a reversal of positions.  Indeed, the initial offeror, who became the recipient of the counter-proposal, has to say whether he will accept it, giving rise to the contract, or if he will respond by a counter-proposal.  And so on, until the meeting of the wills.

31.     This model is certainly educational, but does not describe what happens in actual negotiations, which are characterized by disorder, confusion and constant transactions.  If one wishes to propose a more realistic process, it is necessary to consider another model, closer to real life conditions.

<u>Contract Conclusion: The Realistic Model</u>

32.     The formation of the contract certainly does not result from an immediate agreement, a kind of "love at first sight" situation between the parties:  French law recognises the progressive nature of contractual negotiations.  The contract is formed by steps (a), which means that partial agreements or preliminary contracts, may be part of the overall process (b).

*The formation of the contract by steps*

33.     In theory, it is not necessary that the parties reach the end of their negotiations: a contract is formed once the essential elements have been accepted.  For each contract, the list of these essential elements is different, and it is always difficult to determine whether the contract was formed in this or that case.

34.     With respect to the common law of contracts, quitting the negotiations can thus raise true difficulties.  As said above, no one is ever forced to enter into a contract, and it is always possible to stop the negotiations before any contract is formed.  But as soon as the essential elements have been agreed, everything changes: the contract now does exist, at least in principle: consequently, quitting the negotiations constitutes a breach of contract.  The principle of freedom

1    to contract ceases to be relevant: it is the idea of *the binding force of the contract* that replaces it,

2    and compels the parties to go to the end of discussions for the contract to be in force.

3         35.    It is thus clear that a contract may exist even before the parties are aware of its

4    existence. As soon as the court can determine that the essential elements of the contract have been

5    agreed, a contract exists and the court can consequently declare that both the parties are bound to

6    perform it. Nevertheless, minor points may very well remain un-negotiated, though the contract is

7    in existence. In such a situation, if the parties are unable to finish the negotiation process, the

8    blanks will be completed by the law. More precisely, the missing stipulations may be found in the

9    regulations pertaining to the type of contract involved, or in the general regulation of contracts set

10   forth in the French Civil Code.

11        36.    However, when there is a pre-condition to a contract, either due to the meeting of

12   wills or by law, the contract cannot exist as long as this element is missing. The Supreme Court

13   thus considered that "the sale is perfect between the parties as soon as the thing and the price has

14   been determined and the absence of a definitive agreement on the secondary elements of the sale

15   cannot prevent the sale from being perfect, unless the parties have decided to postpone the

16   formation of the contract to the determination of these conditions." (Civ. 3, 14 January 1987, *D.*

17   1988,80, commentary J. Schmidt).

18        37.    Thus, when a writing is required *ad validitatem*, the contract will not be able to be

19   considered as formed before this writing exists, even if one could acknowledge a perfect

20   agreement on all objectively essential elements of the project. (TERRÉ, SIMLER et LEQUETTE, *op.*

21   *cit.,* No. 91, p. 110).

22        *The preliminary contracts phenomenon*

23        38.    The difficulty in forming the contract during complex negotiations explains the

24   existence of preliminary contracts: they are partial contracts, formed between the parties and

25   intended to give rise to the main contract. The use of the expression "agreement in principle" is

26   controversial and different scholars use it to mean different things. I therefore do not use that

27   expression in this report. Instead, I have focused in my report on the concepts and principles

28   governing the formation of contracts under French law.

-7-
Case No. 11-cv-01846-LHK

DECL. OF PROF. LIBCHABER IN SUPPORT OF SAMSUNG'S MOTION TO DISMISS APPLE'S
COUNTERCLAIMS

39.     A preliminary contract can be constituted by a promise of contract – which is itself a contract.  Under a promise of contract, all the terms of the final contract are already negotiated between the parties but the consent to the formation of the required contract cannot be given yet. By way of a reversal of the formation process, the contract has been negotiated before the parties are ready to contract.

40.     Sometimes, there can be a *unilateral promise*, in which case one party has definitely agreed to the formation of the contract, the terms of which have been determined, while the other has not yet decided to enter into the contract.  The promisor, already committed, offers to the promisee an option, allowing him, after a period of reflection, to form the contract or to abandon the project.

41.     Alongside this unilateral promise, French law knows of the *bilateral promise* of contract: the clauses of the contract have been negotiated, and the conditions are agreed upon by both parties; but in the common interest of the parties, the benefits of the contract are postponed, and may be subject to a renewal of contractual wills.

42.     As I have already stated, all promises, whether unilateral and bilateral, are true contracts. Consequently, they must be formed by both the parties exercising their will in anticipation of a definite contract, *i.e.*, the contract intended to be entered into by the parties. Therefore, a promise never merely consists of a unilateral declaration: it results from an agreement between two parties, who agree upon the existence of an offer, or an obligation.  In contrast, a unilateral commitment stems from a single party.

**Minimum Terms for a Patent License Contract**

43.     According to prevailing opinions, a patent license "is traditionally analysed as a type of lease" (Fr. COLLART-DUTILLEUL and Ph. DELEBECQUE, *Contrats civils et commerciaux*, 9th ed., Dalloz 2011, No. 360, p. 332 ; having the same opinion, see i.e. Y. REBOUL, *J.-Cl. Brevets*, Fasc. 4740: License de brevet. Formation du contrat. Conclusion du contrat, No. 67 and the numerous references cited; Ph. MALAURIE, L. AYNÈS and P.-Y. GAUTIER, *Les contrats spéciaux*, 4th ed., Defrénois 2009, No. 601, p. 331).

44.     The lease agreement, formerly called a *lease of things* (Articles 1713 to 1778 of the Civil code), is to be distinguished from an old parent, *the hiring of industry and services* (Articles 1779 to 1799-1) – today called a service contract.  The distinction is easy to draw:  in a service contract, "one of the parties undertakes to do something for the other" (Art. 1710), whereas in a lease of things it "undertakes to let the other party enjoy a thing for a certain period of time" (Art. 1709).

45.     Under French law, although intangible, the patent is considered to be a thing leased to the licensee – by making some cosmetic adaptations linked to the intangible nature of the thing (Collart-Dutilleul and Delebecque, *op. Cit.*, No. 360, p. 332).  The license agreement allows the licensee to use the thing, in return of royalties that are determined from the beginning.

46.     As a license is a type of lease of things, it is essential that the price be agreed in order for a contract to be formed.  "As the price with respect to sales contract, the rent is of the essence of the lease of things". (MALAURIE, AYNÈS and GAUTIER, *cit. op.*, No. 622, p. 342)."  As with a sale, the lease is by nature an onerous contract: there is no lease without a price and the use of the thing requires a consideration" (A. BÉNABENT, *Les contrats spéciaux, civils et commerciaux*, 9th ed., Montchrestien 2011, No. 519, p. 233).

47.     The same does not apply to *hiring of industry and services* which does not require a prior determination of the price. If the parties do not reach an agreement, the rent will be lawfully determined by the judge (COLLART-DUTILLEUL and DELEBECQUE, *op. cit.*, No. 734, p. 674 ; MALAURIE, AYNÈS and GAUTIER, *op. cit.*, No. 766, p. 442 ; BÉNABENT, *op. cit.*, No. 755, p. 355).

48.     According to most scholars, in the common law of lease, "the wills of the landlord and the tenant must agree on the subject of the contract, the rent and the duration.  This theoretical scheme of the meeting of the wills is enough to insure the validity of the contract." COLLART-DUTILLEUL and DELEBECQUE, *op. cit.*, No. 430, p. 379 ; MALAURIE, AYNÈS et GAUTIER, *op. cit.*, No. 647, p. 353 ; A. SÉRIAUX, *Contrats civils*, PUF 2001, No. 50, p. 143; TERRÉ, SIMLER and LEQUETTE, *op. cit.*, No. 109, p. 123; *contra*, C. AUBERT DE VINCELLES, *Rép. civil*, V° Bail, No. 70, p. 15).

DECL. OF PROF. LIBCHABER IN SUPPORT OF SAMSUNG'S MOTION TO DISMISS APPLE'S COUNTERCLAIMS

49.     Decisions are rare on this issue, but such decisions as do exist support the above view.   The Supreme Court (*Cour de cassation*) has ruled, pursuant to Article 1709 of the Civil Code, that "a promise of lease can only be considered as a lease if it contains an agreement of the parties on the price" (Civ. 3, 27 June 1973, *Bull. III*, No. 446, p.324; Civ. 3, 28 October 2009, *Bull.* III, No. 237; in the same direction: Civ. 3, 28 May 1997, *Bull. III*, No. 116, p. 77 ; Civ. 3, 20 May 1992, *Bull. III*, No. 152, p. 93 ; Civ. 3, 7 April 1976, *Bull. III*, No. 138, p. 111 ; Civ. 3, 23 January 1970, *Bull. III*, No. 63, p. 45).   These cases concerned regulated property leases for which the rent has to be fixed and there are no decisions from the *Cour de cassation* of which I am aware that directly concern common law leases.   However, the decisions cited above are published in *Bulletin des arrêts de la Cour de cassation* under the name: "Lease in general".   Only  cases which are considered by the *Cour de cassation* to be important are published in the *Bulletin des arrêts de la Cour de cassation*.   The fact that these cases are published under "Lease in general" shows that the editors of the *Bulletin* (who are judges of the *Cour de cassation*) consider the cases to be of general application to all types of lease (including common law leases).

50.     In addition, I have determined from my research that the weight of scholarly opinion is that a lease without a rent would in no way be accepted under French law to be a binding contract.   A lease is an onerous contract and agreement as to the rent is an essential term of the contract.

51.     This means that under the common law of lease, as long as the rent is not determined, the threshold for formation of a lease of things is not reached and there can be no binding contract.

**Special Requirements That Apply to the Formation or Enforceability of a Patent License**

52.     Regarding the formation of contracts, French law usually follows the principle of consensualism: the contract is formed when the will of the parties meet.   But French law also knows formal contracts, the formation of which is subject to certain formalities.

53.     Patent license agreements can only be formed in writing.   It is not a condition of proof, but only of form: in the absence of a writing, the contract does not exist in spite of the matching will of the parties.

54.     Pursuant to Article L. 613-8, § 5 of the Intellectual Property Code, "acts bearing a transfer or a license, referred to in the first two paragraphs, must be acknowledged in writing, under penalty of nullity." The patent license agreement is thus a formal contract under the law. If it is not in writing, it cannot have any existence or efficiency, even if the parties have agreed on its content.

55.     Article 1316-4 concerns the matter of proof, and states that: "The signature necessary to the execution of a legal transaction identifies the signatory. It makes clear the consent of the parties to the obligations which flow from that transaction."

56.     Consequently, at a minimum, the document must identify both the parties, state the object of the contract, and contain all the different stipulations that are necessary to express the precise content of their agreement.

57.     Above all, the document must be signed, in order to manifest the convergence of the will of both parties — which is a fundamental requirement for the formation of contracts.

58.     Traditionally — not taking into account the regulation of electronic contracts — the requirement of writing is satisfied by the existence of writing on paper stating the elements identified above. No particular form is required, however, as long as what is recorded in writing is sufficient to give rise to an enforceable contract.

59.     To provide an example, Samsung's declarations, which are in the form of an undertaking to grant licenses in certain circumstances, cannot be a writing recording a contract formed following a successful negotiation due to the fact that there is no third party's agreement on the document, and because of the absence of any precise clauses identifying the essential terms of the contract (such as the price).

60.     In addition, it is impossible to consider them even as constituting a promise of contracts. In itself, a promise is necessarily a contract, and the lack of a third party makes it impossible to consider the declaration as a promise.

61.     In the undersigned's opinion, the temptation to consider this unilateral declaration as constituting both a promise and a license contract has no basis under French law, which does not recognize so many uses for a single document.

DECL. OF PROF. LIBCHABER IN SUPPORT OF SAMSUNG'S MOTION TO DISMISS APPLE'S COUNTERCLAIMS

**The ETSI Declarations Do Not Give Rise to a Contract for a Patent License**

62.     Within the framework of the *ETSI Intellectual Property Rights Policy*, the patent application holders who disclose their standards essential patents are invited to declare whether they are ready to license them to the interested operators, on a fair, reasonable and non-discriminatory basis (Art. 6) – or if they refuse. (See Art. 8.)

63.     Samsung informed ETSI of the existence of a certain number of patents, which it declared were likely to be licensed, under the conditions set out under Article 6-1.

64.     The declarations, which are in similar terms, state: "the SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL." (D.N. 381 Counterclaims ¶ 63.)

65.     In my opinion, after Samsung had published these declarations, it could no longer refuse to enter into negotiations with a person who asked it for a patent license, subject to the doctrine of *intuitus personae* (see below).

66.     But the interested parties first had to request that Samsung grant a license and a negotiation had to be conducted in good faith with a view to forming a contract for license on fair and reasonable terms.

67.     As a consequence, the ETSI declarations only have a very limited scope: they contemplate the possibility of a grant of licenses on the patents if the parties agree on the essential terms (see further below).  Their legal effect was twofold: first, Samsung could not refuse to enter into negotiations to grant a license; secondly, it had to negotiate the conditions of the license agreement on a fair and reasonable basis.

68.     According to the principles of French contract law, it is difficult to see how there could be any additional legal consequence to these declarations.  No matter how the declarations made by Samsung within the framework of Article 6-1 are analysed, we do not see how they can be given a decisive contractual scope.  Samsung indicated that it was in principle open to granting licenses, subject to negotiations leading to meetings of will.  But that did not mean that Samsung

1  agreed to be bound by future contracts that would no longer depend on its agreement, for the

2  benefit of indeterminable contractors, and under undetermined stipulations.

3     69.    Moreover, the declaration cannot even be seen as a contractual offer: under the

4  principles of contact, it is inconceivable that the declaration could be so considered.

5     70.    In the French contractual theory, an offer must be specific enough for the contract

6  to be formed by a simple acceptance of the person to whom the offer is communicated.

7  Acceptance from the interested person should be sufficient for the contract to exist: "the offer is

8  the proposal for which it will be enough for the approached person to agree for the contract to be

9  concluded " (MALAURIE, AYNÈS and STOFFEL-MUNCK, *op. cit.*, No. 465, p. 238). "Legally

10  speaking, offers means something narrow.  The offer, also named *pollicitation*, is the firm

11  proposal to conclude, upon *specified conditions*, a contract so that its acceptance is sufficient for

12  its formation"( TERRÉ, SIMLER et LEQUETTE, *op. cit.*, No. 108, p. 121).

13     71.    It is therefore important that the offer should be both firm and precise.  In this case,

14  Samsung's statements were neither firm, in the French sense (a) nor precise (b), which removes

15  any possibility for them to amount to offers.

16  <u>Samsung's Statements Were Not Firm Offers</u>

17     72.    Samsung's statements were made in the context of the technical standard-setting

18  organization, ETSI.

19     73.    The expression "fair, reasonable and non-discriminatory basis" used in Article 6 of

20  the ETSI Policy is not defined.  The specific legal aspects of any license therefore appear to be a

21  matter for the private relations between parties, with which ETSI is not concerned.

22     74.    From this perspective, without denying the interest of ETSI to provide a useful

23  platform for the legal circulation of these standards, it is difficult to conclude that ETSI's policies

24  translate into contractually binding licenses.

25     75.    The statements under Article 6-1 are better understood as information given to the

26  market about the existence, the content and the availability of patents, than as formal commitments

27  designed to bind the holders.

28

-13-                    Case No. 11-cv-01846-LHK
DECL. OF PROF. LIBCHABER IN SUPPORT OF SAMSUNG'S MOTION TO DISMISS APPLE'S
COUNTERCLAIMS

76. Regardless of the role of ETSI, the existence of a contract requires detailed terms. Mentioning the possibility of a license agreement is not enough to make out a complete contract from Article 6-1. The content of the contract had not been established.

<u>Samsung's Statements Were Not Precise Offers</u>

77. The question of whether there were precise offers is a question of fact to be determined by a competent Court. However, there are still very serious reasons to doubt that the declarations were precise offers.

78. First, the declarations simply described in a minimal way the subject of the license – each patent the subject of a declaration of essential patents by Samsung – without any of the essential terms that could be reasonably expected to be stated in a precise offer. The subject of a license contract would need to be specified in greater detail and include all the conditions necessary to the use of the patent: the territorial extent of use, duration of the license, the total or partial nature of the license and so on.

79. In addition, the declarations are silent as to the amount of the royalties to be paid. As consideration for the grant of the right to use the patents, the royalties could not constitute a side issue, which would have been secondary in the mind of the parties.

80. The absence of any specification of the royalties to be paid indicates that the declarations were not precise offers. Given the legal nature of the license, the prior determination of the royalties was necessary to the formation of the contract. It follows that the determinations were insufficient to form a contract by mere consent of wills.

81. The patent license is a kind of lease of things. If one stops at this qualification – forgetting for a moment the determining fact that the license is a formal contract under French law – the price must be determined at the stage of the negotiations for the contract to be formed.

**The ETSI Declarations Oblige Samsung to _Negotiate_ with Potential Licensees in Good Faith**

82. The obligation of the patentee is a very simple one: the company is supposed to negotiate with those who would be interested in obtaining a license of the patent. By declaring that it was ready to license various patents, Samsung accepted an obligation to negotiate in good faith, in order to reach a FRAND agreement with whomever would be interested. Samsung is

DECL. OF PROF. LIBCHABER IN SUPPORT OF SAMSUNG'S MOTION TO DISMISS APPLE'S COUNTERCLAIMS

1  certainly not committed to accept a contract which would not seem to be appropriate: if a fair deal

2  could not be reached, Samsung could certainly refuse to form a contract.

3       83.     In my opinion, the obligation is purely restrictive in nature, rather than affirmative.

4  Samsung is not bound to affirmatively do something: there is no precise object to the obligation.

5  But it is prohibited from refusing to enter into negotiations with those who seek a license, as a

6  general position. In the French Civil Code, at Article 1101, this type of obligation is referred to as

7  an "obligation not to do something" (*obligation de ne pas faire*).

8       84.     Thus, if Samsung has some basis for believing that an agreement with a particular

9  third party would not be suitable, it may have grounds to refuse to begin the negotiations.  But

10  such reasons have to exist prior to any refusal, and be manifest (see further below).

11       85.     On the other hand, if Samsung has no reason to suspect the third party, negotiations

12  are compulsory in order to try to reach a mutual agreement.

13       <u>Legal Basis For the Obligation</u>

14       86.     Under French civil law, a unilateral commitment of wills is not considered to have

15  a binding force: no one is bound by his sole declaration.

16       87.     There is an exception. A unilateral commitment of wills may constitute an offer.

17  But, as discussed above, that is not the case here.

18       88.     It may be argued that the commitments under Article 6-1 have contractual force by

19  virtue of the mechanism of the stipulation for others.

20       89.     However, the stipulation in this case would work in a very unusual way, and not as

21  the Civil Code has provided for it under Article 1121. It would require a conclusion that, by a true

22  contractual agreement with Samsung, ETSI has imposed upon Samsung the obligation to grant a

23  license to whoever asks for one.

24       90.     This is far from obvious. First, because this makes the ETSI play a role of contracts

25  initiator which seems doubtful, given its lack of legal commitment (see n° 9, 1, above). In

26  addition, Article 6-1 cannot easily be reduced to an independent contractual stipulation, carrying a

27  commitment to others.

28

DECL. OF PROF. LIBCHABER IN SUPPORT OF SAMSUNG'S MOTION TO DISMISS APPLE'S
COUNTERCLAIMS

1      91.     It is said that "the promising party can require from the stipulating party that it

2  performs the commitments subscribed towards him" (MALAURIE, AYNÈS and STOFFEL-MUNCK,

3  *op. cit.*, No. 817, p. 429). If Samsung refuses to grant a license, can ETSI sue it in enforcement?

4  Would such a potential claim stand?   Nonetheless, it would be the necessary consequence of the

5  admission of its position to make stipulations for others.

6      92.     Moreover, the stipulation process makes a third party the creditor of the promisor

7  (MALAURIE, AYNÈS et STOFFEL-MUNCK, *op. cit.*, No. 807, p. 422 ; TERRÉ, SIMLER and LEQUETTE,

8  *op. cit.*, No. 511, p. 529). Indeed the French Supreme Court admitted in 1987 that a burden could

9  be associated to this claim (Civ.1, 8 December 1987, *Bull. I*, No. 343, p. 246, *D.* 1989, som. 233,

10  obs. J.-L. AUBERT, *RTDciv* 1988.532, obs. J. MESTRE). As stated by Article 1121, "One may

11  likewise stipulate for the benefit of a third party". But Samsung's declarations provide no benefit,

12  in the sense of *créance*. The concept of *créance* does not extend to the right to compel a

13  negotiation as that is not a right that is capable of specific performance. That is because the parties

14  have to enter into a bargaining process that cannot be supervised by the court. A third party may

15  become a licensee, not a creditor!

16      93.     In the present case, it is thus difficult to characterise Samsung's declarations as

17  giving rise to claims, eventually resulting in burdens: they shall be considered as contractual offers

18  – which is completely different.

19      94.     We would find ourselves in a feature non-admitted as such by law, though it has

20  been suggested by a commentator: the stipulation of contract for others (D. MARTIN, « La

21  stipulation de contrat pour autrui », *D.* 1994.145).  We may find it in group insurances, when an

22  employer subscribes an insurance agreement to the benefits of its employees, who only have to

23  subscribe to benefit from it. Besides, the fact that it is contested that this insurance is based on a

24  stipulation for others (MALAURIE, AYNÈS and STOFFEL-MUNCK, *op. cit.*, No. 816, p. 428 ; D.

25  MAZEAUD, commentary under Civ. 1, 22 May 2008, *RDC* 2008.1135).  But we can doubt that in

26  this context, ETSI would play an equivalent role to an employer: its interest in the formation of

27  licenses seems far less clear than in the group insurance example.

28

-16-                    Case No. 11-cv-01846-LHK

DECL. OF PROF. LIBCHABER IN SUPPORT OF SAMSUNG'S MOTION TO DISMISS APPLE'S
COUNTERCLAIMS

95.     French law is not very comfortable with such legal features, and it does not consider them to carry firm commitments.  It is evidenced by the fact that they can be withdrawn, at least before they have been accepted.

<u>ETSI Is Unclear As To Whom the Obligation Is Owed</u>

96.     It is difficult to identify the beneficiaries of the ETSI Declarations.  It is arguable that these declarations were primarily intended to benefit the members of ETSI. ETSI is an Association, formed under the French law of 1901, and there are numerous firms which took part in this Association.

97.     But based solely upon the text of the declaration, it is not clear that the offer is limited to the members of the Association.

98.     This is clearly a question of interpretation of the declaration.  What were the intentions of the patentee when it made the declaration?  Moreover, as the declaration was made based upon a model prepared by ETSI, what was the intention of the Association when preparing the wording of the declaration?

99.     Under French law, there is no definitive method for analysing intentions: the question of what a party intended is a question of fact to be determined by a competent Court.

<u>A Third Party Has No Obligation Until It Enters Negotiations</u>

100.    A third party who is interested in a license has no obligation.  Its only task is to enter into negotiations with the patentee, and try to reach an agreement.

101.    While negotiating, both the parties must act in good faith: this is a general requirement concerning contractual discussions.  But it is more an imprecise standard than a binding obligation, in a technical sense.

**Content of French Law's Obligation To Negotiate**

102.    As a general principle, there is no obligation to negotiate under French law.  As previously stated, the contract is based on will, and *the freedom of contract principle* is fundamental to French law.  This principle forbids the existence of any obligation to negotiate.

103.    But a party can bind itself, at least partially, to such an obligation, which, in my opinion, Samsung did by its declarations to ETSI.  But it is still quite difficult to give any

1  interpretation to such an obligation other than to express it as a restrictive covenant: as a general

2  rule, Samsung cannot refuse to negotiate with everyone.

3      Steps Required To Discharge Obligation To Negotiate

4      104.    Samsung could not refuse to enter into negotiations.  But given the doctrine of

5  *intuitus personae* (see below), the interested parties still had to be approved by Samsung, and

6  negotiations had to be conducted with said interested parties, with the purpose of arriving at a

7  meeting of the wills, which is a preliminary step to the formation of the contract – that could have

8  only occurred in writing.

9      105.    There are numerous reasons why, in my view, the existence of a negotiation phase

10  was unavoidable by Samsung.

11      106.    Under Article 6-1 of the ETSI Policy, the interested parties are described with the

12  circumlocution "*those who seek licenses*", and it is said that the patent holder must be "*prepared

13  to grant irrevocable licenses*". The fact that one speaks of *granting* a license to the one who *asks*

14  for it indeed implies the obligation to enter into a negotiation process.

15      107.    The declaration of Article 6-1 therefore forbids any refusal of principle to

16  negotiate. The negotiating phase must occur: not only because it is required by the legal

17  provisions, but because this negotiation complies with the spirit of French law. It is only through

18  such a process that the parties are likely to move from an interested or favourable position, to

19  concrete and detailed meetings of the wills.

20      An Obligation To Negotiate Does Not Require An Entity To Reach an Agreement or Form
    a Contract

21

22      108.    Nothing in the content of the Article 6-1 declaration authorizes the deduction that

23  Samsung is obliged to enter an agreement or form a contract.  Moreover, it would blatantly breach

24  the *freedom of contract* principle, which is a founding principle of French contract law.

25      109.    No one is ever forced to enter into a contract, and I cannot see why Samsung would

26  be from now on tied and bound, to the point where it has lost the right to refuse to contract. After

27  all, the parties may not reach an agreement on the clauses of the contract; and license agreements

28

DECL. OF PROF. LIBCHABER IN SUPPORT OF SAMSUNG'S MOTION TO DISMISS APPLE'S
COUNTERCLAIMS

1  being marked by the *intuitus personae*, personal considerations can very well come into play,

2  despite Samsung's commitment to contract on a fair basis (see further below).

3       110.    If Samsung refuses without good reason to negotiate with an interested party , he

4  could certainly challenge Samsung's liability.

5       111.    But no judge would consider the contract as formed, except by infringing upon the

6  freedom to contract principle according to which no one can be a party to a contract if he does not

7  so intend. "No contract can be formed without one and another party to have wanted it, moreover

8  against the will of one of the party (FLOUR, AUBERT et SAVAUX, *op. cit.*, No. 123, p. 102).

9  "Everyone has the right to refuse to sell the goods he owns or to employ someone he does not

10  want. The refusal to contract is a manifestation of freedom" (TERRÉ, SIMLER et LEQUETTE, *op.*

11  *cit.*, No. 24, p. 31).

12  <u>Circumstances In Which Samsung May Refuse to Grant a License to a Third Party With</u>

13  <u>Which It Is Negotiating</u>

14       112.    The declaration under Article 6-1 went beyond the mere availability of licenses,

15  since Samsung undertook to conduct negotiations pursuant to the FRAND principle (*fair,*

16  *reasonable and non-discriminatory terms and conditions*).

17       113.    Obviously, a failure of the negotiations remained possible, because FRAND is not

18  an objective concept: what may seem to result from contractual fairness and good faith for one

19  person may not necessarily be the same for another.

20       114.    No contractual stipulation can stem from the FRAND formula. It refers to an

21  attitude in the process of negotiating, but does not determine contractual stipulations such as the

22  determination of the royalties, the duration of the contract or the geographical scope.

23       115.    It is useless to give too much weight to these requirements: the FRAND conditions

24  have no more consequences than what we know in French law, with the notion of good faith. "Pre-

25  contractual period is placed under the double sign of freedom and good faith. . . . The parties shall

26  negotiate on a fair basis" (TERRÉ, SIMLER et LEQUETTE, *op. cit.*, No. 185, p. 190).

27       116.    The fact that there is an obligation to act in good faith has never overridden the

28  parties' right to negotiate on the basis that the conditions of the contract have been predetermined.

DECL. OF PROF. LIBCHABER IN SUPPORT OF SAMSUNG'S MOTION TO DISMISS APPLE'S
COUNTERCLAIMS

117.    Contractual fairness is a required behavior; there is no reason to consider that for all that, it leads to a unique and necessary result.  Obviously, there is not just a single possible price for a license, a single territory, a single duration, etc.

118.    It is thus quite clear that there are countless reasons that would permit and explain Samsung's refusal to grant a license.  Any problem that would prevent a perfect match between the parties' wills would prevent the formation of a contract.  Of course, in good faith, the parties must try to sort out their difficulties before considering that the contract is out of reach.

119.    Nevertheless, the parties can always fail to reach an agreement, and for very good reasons: conflicts can legitimately arise concerning the price, the patents included in the agreement, the territory concerned, the duration, the entitlement of the licensee to sub-license and so on.

**The Doctrine of _Intuitus Personae_**

120.    Under French law, it is considered that a contract is entered into _intuitu personae_ not only when a party has been specially chosen – one rarely enters into an agreement with anyone – but when this person has been chosen because it was able to perform the obligation of the contract.  There is such an _intuitus personae_ when the identity of the person played a key role in the formation of the contract – this implies consequences with respect to the legal regime of the contract.

121.    The doctrine of _intuitus personæ_ is quite difficult to define with precision.  Once stated that the consideration of the person is essential, there can be many nuances (Ph. LE TOURNEAU and D. KRAJESKI, _J.-Cl. Contrats-Distribution_, Fasc. 200: Contrat "intuitu personæ", N° 32 to 45; it must be emphasized that M. Krajeski has precisely dedicated his Doctorate Thesis to the notion of _intuitus personæ_).  Thus, it can be objective or subjective: it is objective when it is linked to special abilities of a contractor; but it can also correspond to some intimate feelings, such as a particular confidence.  As an example of this subjective _intuitus personæ,_ perfectly recognised under French law, a well-known author quotes Montaigne's feelings towards his friend La Boëtie, lying in a simple formula: _parce que c'était lui, parce que c'était moi_ (see MALAURIE, AYNÈS and STOFFEL-MUNCK, _op. cit._, No. 420, p. 203).

122.    In order to comprehend this notion, an author distinguishes contracts that are impersonal — *i.e.*, they can be formed with any counterparty, regardless of his personality — from those that are linked to special abilities or qualities, well fitted for the contract. For this second type of contract, "the intention to contract (the *animus negotii contrahendi*) is not sufficient: the *delectus personarum* (as the American lawyers say) is paramount, which is the intention to deal precisely with this person" (Ph. LE TOURNEAU and KRAJESKI, *op. cit.*, N° 2).

123.    A few contracts are known to be formed *intuitu personæ*, such as donations, skilled service contracts (implying the presence of a surgeon, an engineer or a barrister, for instance), and special agencies. (See LE TOURNEAU and KRAJESKI, *op. cit.*, N° 46 to 61, who give a list of those contracts, as long as a judge has recognised this particularity).

124.    The patent license is widely recognized as a contract entered into *intuitu personae*, which means that in the eyes of the patent holder, the person chosen to be granted a license is always decisive (LE TOURNEAU and KRAJESKI, *op. cit.*, N° 52; J. SCHMIDT-SZALEWSKI and J.-L. PIERRE, *Droit de la propriété industrielle*, 4th ed., Litec 2007, No. 274, p. 110 ; Fr. POLLAUD-DULIAN, La propriété industrielle, Economica 2010, No. 695, p. 366 ; J.-J. BURST, *J.-Cl. Brevets*, Fasc. 4740: License de brevet. Effets du contrat de license. Fin du contrat de license, No. 132).

125.    This feature leads to the fact that sub-licenses are often prohibited: the contracting party having been chosen in view of its personal qualities, it shall not grant the right to use the patents to another.

126.    But *intuitus personæ* can even take place in ordinary contracts, if a contractor has clearly specified that he wanted to deal solely with this person, and with no one else — because of the person's qualities, or the special confidence which links them, or any other particularity relevant to the object or the execution of the contract.  The consequence will be that the contract will not be transferable: it has to be performed by the person specially chosen, and it ceases to exist if this very person is no longer able to perform it.

DECL. OF PROF. LIBCHABER IN SUPPORT OF SAMSUNG'S MOTION TO DISMISS APPLE'S COUNTERCLAIMS

The Doctrine of *Intuitus Personae* May Permit The Holder of Essential Patents Who Has Made an ETSI Declaration To Refuse To Negotiate

127.   It has been stated that, as a general matter, a party like Samsung which has made an ETSI declaration cannot refuse to enter into negotiations with those who are interested in a license. But a blunt refusal could certainly be admitted if the firm had reasons to believe, from the very beginning, that an agreement was out of reach — either because Samsung knew the counterparty would refuse to enter into it, or because the third party would not be sufficiently reliable.

128.   It is debatable whether this is really a problem of *intuitus personæ* ("consideration of the person"), or rather a simple question of *freedom of contract*.  The answer depends upon both of these two considerations.

129.   There are two aspects to the license problem.  The first one is objective, or technical: whether the third party has the necessary skills to use the patent.  The second one is subjective, and consists of trust: whether this third party will be a reliable contractor, paying his royalties on time, not degrading the patent, trying to reach agreements if difficulties arise, etc.  A very well informed author has drawn a special link between *intuitus personæ* and trust: "the *intuitus personæ* expresses a particular trust between contractors."  And more precisely: "there are contracts in which a contractor *trusts* his partner in such a special way, that the consideration of the person is an essential element of the contract" (LE TOURNEAU and KRAJESKI, *op. cit.*, N° 16).

130.   If a party is objectively able to receive a license, Samsung must consider the possibility of negotiating when asked to.  But if, from a subjective point of view, Samsung is not sure that this party is reliable — or, even more, is sure that this party is not reliable — it can refuse all negotiations by explaining that reaching an agreement is impossible.  If confidence is lacking, a contract can very well be right away declared out of reach.

131.   If confronted with a dishonest contractor, Samsung has no reason to give him a chance, and thus risk being a victim for the second time.  The *freedom of contract* principle is clearly at stake: when there is a past history between two parties, there is simply no reason why this history could not be set forth — either to refuse the agreement, or to choose a contractor among other third parties.

**The Doctrine of *Intuitus Personae* May Permit The Holder of Essential Patents Who Has Made an ETSI Declaration *and* an Offer To License Its Patents To Refuse To Continue To Negotiate If the Offer Was Rejected**

132.    The answer would be the same if the patentee has made an offer to license its portfolio of essential patents on FRAND terms, but the third party has declined to accept that offer.  Nevertheless, the reason for the refusal would be different: it is no longer a question of lack of confidence, but simply a matter of legitimate refusal, after a first offer.  If a first offer under ETSI conditions has been turned down, Samsung has no reason to give a second chance to negotiate to this third party.

133.    In a professional world, there is simply no reason why the process of negotiations should be endless, with the same contractor asking for a new round of discussions after each and every failure.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 22 day of November, 2011, in Paris, France.

Rémy Libchaber

## Individual Note

**Name:** Libchaber

**First Names:** Rémy, Antoine

**Date and place of birth:** 20 July 1961, in Neuilly-sur-Seine

**Nationality:** French

**Social Security Number:** 1610775051256 52

**Marital status:** Married, three children.

**Personal address:** 12, rue François Millet. 75016 Paris. Tel: 01 46 47 48 37.

**University Titles:**

- Law Doctorate, and accreditation to supervise legal searches
- Degree in modern literature
- ESSEC Diploma (Superior School of Economic and Commercial Sciences)

**Function**

- Professor of law universities (*valedictorian* of the *Agrégation* Examination 1992-1993)

**Home institution:** Paris-I University (Panthéon-Sorbonne)

*Curriculum Vitae*

## EXTRA-LEGAL EDUCATION

- High School Education at Lycée Janson de Sailly.

- June 1978: Baccalaureate, Series C, (*cum laude*).

- 1978-1980: H.E.C. preparatory school at Lycée Janson de Sailly.

- 1980-1983: Education at E.S.S.E.C. (Superior School of Economic and Commercial Sciences), at Cergy-Pontoise. Graduated in June 1983.

- 1980-1984: Degree in modern literature at Paris X University (Nanterre), (*magna cum laude*).


## LEGAL EDUCATION

- 1983-1984: Bachelor of Law at Paris X University (Nanterre), (*cum laude*).

- 1984-1985: Degree in Private Law at Paris X University (Nanterre), (*cum laude*).

- 1985-1986: Postgraduate Diploma in International private law and International commercial law, at Paris I University (Panthéon-Sorbonne) and Paris XII (Sceaux), (*cum laude*).

- 1986-1991: Doctorate Thesis at Paris I University (Panthéon-Sorbonne), under the direction of Pr. Mayer: "*Recherches sur la monnaie en droit privé*".

- 12 March 1991: *Viva voce* and accreditation to supervise research; with honour and congratulations of the jury.

- Obtaining LEVY-ULLMANN price.


## TEACHING ACTIVITIES

- 1985-1986: Principal teacher of Commercial Action in Commercial Action BTS (Superior Technician Diploma), at Lycée Le Rebours (Paris 13th).

- 1986-1989: Research Allocator at Paris I University (Panthéon-Sorbonne).

- 1990-1991: Mid-Time Teacher at Paris I University (Panthéon-Sorbonne).

- 1991-1992: Full-Time Teacher at Paris I University (Panthéon-Sorbonne).

- 1992-1993: Lecturer at Cergy-Pontoise University.

- 1993-1997: Professor at Maine University; President of the private law chapter and Specialist committee.

- Since 2011: Professor at Paris I University (Panthéon-Sorbonne).

PROFESSIONAL COLLABORATION

- 1992-1999: associate at CRIDON of Paris (Help Centre for documentation and notary information).

- 2000-2006: *of-counsel* at *CMS/Bureau Francis Lefebvre*, Neuilly/Seine.

- Since 2007: consultant at *Willkie Farr & Gallagher LLP*, Paris.

## Publications

**Books**

- *Recherches sur la monnaie en droit privé*, Pref. P. MAYER, Bibl. dr. priv. 225, LGDJ 1992.

- Participation to *Avant-projet de réforme du droit des obligations et de la prescription*, dir. P. CATALA, La documentation française 2006, chap. V, « De l'extinction des obligations », p. 67 et 122.

- To be released at the end of 2011 : *Ordre juridique, discours, normes, pratiques. Essai sur les limites de la connaissance du droit*, LGDJ.

- In preparation : *Introduction au droit*, aux Précis Domat, Montchrestien.

**Articles**

1.    « L'usufruit des parts de SICAV de capitalisation et les droits du conjoint survivant », *Bull. du Cridon de Paris* 1994.91.

2.    « L'exception d'ordre public en droit international privé », *L'ordre public à la fin du XXe siècle*, Dalloz 1996, p. 65.

3.    « Réflexions sur les engagements perpétuels et la durée des sociétés », *Revue des sociétés* 1995.437.

4.    « Le portefeuille de valeurs mobilières : bien unique ou pluralité de biens ? », Actes du Colloque du 9 octobre 1995, *Répertoire Defrénois*, 1997. 65.

5.    « L'euro et la théorie juridique de la monnaie au cours de la phase transitoire », *Les aspects juridiques du passage à l'euro*, Actes du séminaire de l'Université jean Moulin - Lyon III, 12 avril 1996, p. 1.

6.    « L'usufruit des créances existe-t-il ? », *Revue trimestrielle de droit civil* 1997.615.

7.    « L'argent, entre matière et mémoire », *Archives de philosophie du droit* 1997.115.

8.    « Les créanciers du conjoint in bonis marié sous le régime de la communauté », in P. HOLL et R. LIBCHABER, *Communauté conjugale et procédure collective*, Les Éditions du Cridon 1998, p. 22.

9.    « Le droit de propriété, un modèle pour la réparation des troubles du voisinage », *Mélanges Chr. MOULY*, Litec 1998, t. 1, p. 421.

10.    « Les délais de grâce », in *L'apurement des dettes. Solution au surendettement*, sous la direction de Y. CHAPUT, Litec 1998, p. 329.

11.    « La société, contrat spécial », *Mélanges M. JEANTIN*, Dalloz 1999, p. 281.

12.    « Le juriste et ses objets. Trois exemples de construction en droit privé », *Revue Enquêtes* 1999, n° 7.

13.    « La propriété », Libertés et droits fondamentaux, from the 5th ed., Dalloz 1999, updated each year.

14.     « Demeure et mise en demeure en droit français », *Les sanctions de l'inexécution des obligations contractuelles*, dir. M. FONTAINE and G. VINEY, Bruylant and LGDJ 2001, p. 113.

15.     « Pour une redéfinition de la notion de donation indirecte », *Rép. Defrénois* 2000.1409.

16.     « Le dépôt d'actifs financiers », *Droit et Patrimoine*, May 2000, p. 89.

17.     « La transmission de biens entre partenaires : les trois interprétations de l'art. 515-5, al. 2, C. civ. », *Bull. Pat.* 2001.

18.     « Les articles 4 et 5 du Code civil, ou les devoirs contradictoires du juge civil », *Le titre préliminaire du Code civil*, Economica 2003, p. 143.

19.     « Les droits nouveaux du conjoint survivant. Commentaire de la loi du 3 décembre 2001 », *Bull. Pat.* 2002. and *Bull. fiscal.* 2002.

20.     « Pour un renouvellement de l'analyse des droits sociaux », *Mélanges Y. GUYON*, Dalloz 2003, p. 717.

21.     « La recodification du droit des biens », Le Code civil 1804-2004. *Livre du Bicentenaire*, Dalloz and Litec 2004, p. 297.

22.     « Une fiducie française, inutile et incertaine... », *Mélanges Ph. MALAURIE*, LGDJ 2005, p. 303.

23.     « Réflexions sur le "désordre juridique français" », *Mél. A. DECOCQ*, LITEC 2004, p. 405.

24.     « Réflexions sur les effets du contrat », *Mél. J.-L. AUBERT*, Dalloz 2005, p. 211.

25.     « La notion de mariage, civil », *Mél. Ph. JESTAZ*, Dalloz 2006, p. 325.

26.     « Le point sur l'interversion des prescriptions en cas de condamnation en justice », *Recueil Dalloz* 2006.254.

27.     « Hommage à Philippe Malaurie, à l'occasion de la remise d'un liber amicorum », *Rép. Defrénois 2006*, Actualités p. 25.

28.     « Droit des biens et droit savant : le double abandon du Code », in *Traditions savantes et codifications*, dir. Cl. OPHELE and Ph. REMY, Collection de la Faculté de droit et des sciences sociales de l'Université de Poitiers, LGDJ 2007

29.     « La pensée économique de Jean Carbonnier : la monnaie », in *Hommage à Jean Carbonnier*, Dalloz 2007,

30.     « La vaine recherche des sûretés personnelles nouvelles : l'insaisissable porte-fort de l'exécution », RJDA 2006.787.

31.     « Un procès de presse : quatre réactions », *Commentaire* 2007.553.

32.     « Les aspects civils de la fiducie, dans la loi du 19 février 2007 », *Rép. Defrénois* 2007.1094 et 1194.

33.     « Une cession temporaire d'usufruit ? », *Rép. Defrénois* 2008.1656.

34.     « Variations autour d'un mariage annulé », *Commentaire* 2008.787.

35.     « L'impossible rationalité de l'ordre juridique », *Mél. Oppetit*, p. 505.

36.     « Retours sur l'affaire Polanski », *Commentaire* 2009.999.

37      « Conflits de lois dans l'espace et dans le temps en matière de prescription extinctive », in *La prescription extinctive. Études de droit comparé*, (dir. P. JOURDAIN and P. WERY), Bruylant 2010, p. 805.

38.     « Feu la théorie du patrimoine », *Bull. Joly* 2010, p. 316.

39.     « Les paradoxes de la présomption d'innocence », *Commentaire* 2011.


**Case law Commentaries**

1.      Commentary under Com. 9 April 1991, *Revue des sociétés* 1991.746.

2.      Commentary under Com. 10 March 1992, *Revue des sociétés* 1992.732.

3.      Commentary under Com. 15 June 1993, *Revue des sociétés* 1994.730.

4.      Commentary under CJCE 14 September 1994, *Revue critique DIP* 1995.754.

5.      Commentary under Com. 4 July 1995, *Revue critique DIP* 1996.452.

6.      Commentary under AP, 18 June 1999, *D* 2000.248.

7.      Commentary under Civ. 3, 4 July 2001, D. 2001.151.

8.      Commentary under Civ. 1, 5 March 2002, , D. 2002.2555.

9.      Commentary under TGI Nanterre, 11 March 2002, *Rev. arb*. 2004.

10.     Commentary under Civ. 1, 30 June 2004, *Rev. arb*. 2005.645.

11.     Commentary under Paris, 30 June 2005, *Rev. arb*. 2006.687

12.     Commentary under Ch. mixte, 17 November 2006, and Civ. 1, 21 November 2006, *D*. 2007.842.

13.     Commentary under Civ. 1, 6 March 2007, *Revue critique DIP* 2007.784.

14.     Commentary under Civ. 3, 27 March 2008, *Bull. Joly 2008*, § 181, p. 852.

15.     Commentary under Com. 12 November 2008, *Bull. Joly 2009*, § 45, p. 234.

16.     Commentary under Civ. 3, 4 February 2009, *Bull. Joly 2009*, § 133, p. 667.

17.     Commentary under Com. 31 March 2009, *Bull. Joly 2009*, § 178, p. 873.

18.     Commentary under Com. 5 May 2009, *Bull. Joly 2009*, § 215, p. 234.

19.     Commentary under Com. 10 November 2009, *Revue des sociétés* 2010.99.

20.     Commentary under Civ. 1, 20 May 2010, *Bull. Joly* 2010, § 152, p. 727.

21.     Commentary under Civ. 1, 9 February 2011, *Bull. Joly* 2011, § 178, p. 1064.

22.    Commentary under CA Paris, 5 May 2011, *Bull. Joly* 2011.

## Quarterly Chronicle of Civil Law

• In *Recueil Dalloz*, from 1995 to 2000, with L. AYNES, D. MAZEAUD and Ph. DELEBECQUE.

• In *Répertoire du Notariat Defrénois*, from 2001 to 2009, with J.-L. AUBERT†, and E. SAVAUX.

• In *la Revue des Contrats*, since 2011 (Legal regime of contractual obligations), with D. MAZEAUD and Th. REVET.

## Biannual Chronicle of sources of law in internal law

• In *la Revue trimestrielle de droit civil*, from 1997 to 2004, with N. MOLFESSIS.

## Articles of Repertory

• « Effets de commerce et chèque en droit international privé », *Répertoire Dalloz de Droit international*, 1998.

• « Biens », *Répertoire Dalloz de Droit civil*, 1997 ; 2nd ed. 2002 ; 3rd ed. 2009.

• « Gage » and « Gage de somme d'argent », Lamy Droit des sûretés, 2002.

## Reports and Preface

• Preamble to Aude DENIZOT's thesis, *L'universalité de fait*, Fondation Varenne, LGDJ 2008.

• Report of: Frédéric DANOS, *Propriété, possession et opposabilité*, direction L. AYNES, Th. Paris I (Panthéon-Sorbonne) 2006, Rev. trim. dr. civ. 2007.

• Report of: Jean-Louis BERGEL, *Théorie générale du droit*, 4e éd., Dalloz 2003, Rev. trim. dr. civ. 2005.

• Report of: Mikhaïl XIFARAS, *La propriété*, Étude de philosophie du droit, coll. « Fondements de la politique », PUF 2004, Rev. trim. dr. civ. 2005.

• Report of: Madeleine CANTIN CUMYN, *L'administration du bien d'autrui*, Les Éditions Yvon Blais, Québec 2000, Rev. trim. dr. civ. 2001.

• Report of: Olivier BEAUD, *Le sang contaminé*, collection Béhémoth, P.U.F 1999, Rev. trim. dr. civ. 2000.

• Report of: Alain SERIAUX, LE DROIT : *une introduction*, Ellipses 1997, Rev. trim. dr. civ. 1998.

**GENERAL ORDER ATTESTATION**

I, Victoria Maroulis, am the ECF user whose ID and password are being used to file the foregoing document.  I hereby attest pursuant to General Order 45.X.B. that concurrence in the electronic filing of this document has been obtained from Rémy Libchaber.


_/s/ Victoria Maroulis_