HAROLD J. MCELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

WILLIAM F. LEE (*pro hac vice*)
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Attorneys for Plaintiff
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 11-cv-01846-LHK<br><br>**APPLE'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:      October 13, 2011<br>Time:      1:30 p.m.<br>Place:     Courtroom 8, 4th Floor<br>Judge:     Hon. Lucy H. Koh |

**PUBLIC REDACTED VERSION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................iii

LIST OF CITATION ABBREVIATIONS ...............................................................................vi

INTRODUCTION ......................................................................................................................1

I.    SAMSUNG'S PHONES INFRINGE THE D'087 AND D'677 DESIGN
      PATENTS. ........................................................................................................................2

II.   THE D'087 AND D'677 PATENTS ARE VALID. .......................................................4

      A.    The D'087 and D'677 Patents Are Not Anticipated. ...........................................4

      B.    The D'087 and D'677 Patents Are Not Obvious. ................................................6

      C.    The iPhone's Commercial Success. ......................................................................7

III.  SAMSUNG'S GALAXY TAB 10.1 INFRINGES THE D'889 PATENT. ....................8

IV.   THE D'889 PATENT IS VALID. ...................................................................................8

      A.    The Design Is Not Functional. .............................................................................8

      B.    The D'889 Patent Design Is Not Obvious. ...........................................................9

            1.    The HP Compaq TC1000 Portable Computer. .........................................9

            2.    Knight-Ridder Portable Digital Newspaper Mockups. ...........................10

      C.    The iPad's Unexpected Commercial Success. ....................................................10

V.    SAMSUNG INFRINGES THE '381 PATENT. ...........................................................11

VI.   THE '381 PATENT IS VALID. ...................................................................................12

      A.    LaunchTile Does Not Invalidate the '381 Patent. .............................................13

      B.    Lira Does Not Invalidate the '381 Patent. .........................................................16

      C.    Van den Hoven Does Not Invalidate the '381 Patent. .......................................17

      D.    Samsung Will Not Prove that the '381 Patent is Unenforceable. ......................17

VII.  A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT
      IRREPARABLE HARM. ...............................................................................................18

      A.    Samsung's Sale of Copycat Products Will Cause Irreparable Harm
            by Eroding the Distinctiveness of Apple's Protected Designs. ..........................18

      B.    Samsung's Sale of Copycat Products Will Cause Irreparable Harm ..................21

            1.    Samsung's sales will cause lost market share, lost profits on
                  current and future Apple products, and lost customer
                  goodwill. .................................................................................................21

            2.    Money cannot fully remedy the harm to Apple. .....................................23

            3.    Apple does not lack "capacity." ..............................................................25

      C.    Samsung Fails To Rebut Irreparable Harm. .......................................................25

            1.    Apple promptly sought a preliminary injunction against
                  Samsung's new round of infringing products. ........................................25

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

LIST OF CITATION ABBREVIATIONS .......................................................................... vi

INTRODUCTION ............................................................................................................... 1

I.      SAMSUNG'S PHONES INFRINGE THE D'087 AND D'677 DESIGN PATENTS. ............................................................................................................ 2

II.      THE D'087 AND D'677 PATENTS ARE VALID. ................................................ 4

     A.      The D'087 and D'677 Patents Are Not Anticipated. .................................. 4

     B.      The D'087 and D'677 Patents Are Not Obvious. ...................................... 6

     C.      The iPhone's Commercial Success. ........................................................... 7

III.      SAMSUNG'S GALAXY TAB 10.1 INFRINGES THE D'889 PATENT. ............. 8

IV.      THE D'889 PATENT IS VALID. ........................................................................... 8

     A.      The Design Is Not Functional. ................................................................... 8

     B.      The D'889 Patent Design Is Not Obvious. ................................................ 9

         1.      The HP Compaq TC1000 Portable Computer. ............................ 9

         2.      Knight-Ridder Portable Digital Newspaper Mockups. ............. 10

     C.      The iPad's Unexpected Commercial Success. ......................................... 10

V.      SAMSUNG INFRINGES THE '381 PATENT. ..................................................... 11

VI.      THE '381 PATENT IS VALID. ............................................................................ 12

     A.      LaunchTile Does Not Invalidate the '381 Patent. .................................. 13

     B.      Lira Does Not Invalidate the '381 Patent. .............................................. 16

     C.      Van den Hoven Does Not Invalidate the '381 Patent. ............................ 17

     D.      Samsung Will Not Prove that the '381 Patent is Unenforceable. ........... 17

VII.      A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM. .................................................................................... 18

     A.      Samsung's Sale of Copycat Products Will Cause Irreparable Harm by Eroding the Distinctiveness of Apple's Protected Designs. ........... 18

     B.      Samsung's Sale of Copycat Products Will Cause Irreparable Harm .............. 21

         1.      Samsung's sales will cause lost market share, lost profits on current and future Apple products, and lost customer goodwill. ..................................................................................... 21

         2.      Money cannot fully remedy the harm to Apple. ....................... 23

         3.      Apple does not lack "capacity." ................................................ 25

     C.      Samsung Fails To Rebut Irreparable Harm. ............................................ 25

         1.      Apple promptly sought a preliminary injunction against Samsung's new round of infringing products. ............................ 25

2.      Apple's focus on four recently released Samsung products
does not rebut its showing of irreparable harm. .......................................27

3.      Apple's limited licenses do not rebut its showing of
irreparable harm. ......................................................................................27

VIII.    THE BALANCE OF EQUITIES FAVORS APPLE. .....................................................28

IX.      THE PUBLIC INTEREST FAVORS INNOVATION, NOT COPYING. ....................29

CONCLUSION ............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acumed,*
    551 F.3d at 1328...................................................................................................... 28

*Astra-Zeneca LP v. Apotex, Inc.,*
    633 F.3d 1042 ........................................................................................................... 4

*Best Lock Corp. v. Ilco Unican,*
    94 F. 3d. 1563 (Fed. Cir. 1996) ............................................................................... 3

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
    489 U.S. 141 (1989) ................................................................................................ 3

*Broadcom Corp. v. Qualcomm, Inc.,*
    543 F.3d 683 (Fed. Cir. 2008) ............................................................................... 24

*Calmar, Inc. v. Emson Research, Inc.,*
    838 F. Supp. 453 (C.D. Cal. 1993).......................................................................... 26

*Contessa Food Prods. v. Conagra,*
    282 F.3d 1370 (Fed. Cir. 2002) ............................................................................... 5

*Crocs, Inc. v. ITC,*
    598 F.3d 1294 (Fed. Cir. 2010)............................................................................... 7

*Door-Master Corp. v. Yorktowne, Inc.,*
    256 F.3d 1308 (Fed. Cir. 2001)............................................................................... 5

*Durling v. Spectrum Furniture Co., Inc.,*
    101 F.3d 100 (Fed. Cir. 1996)................................................................................. 6

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,*
    49 F.3d 1551 (Fed. Cir. 1995) ............................................................................... 26

*In re Harvey,*
    12 F.3d 1061 (Fed. Cir. 1993) ................................................................................. 6

*In re Kollar,*
    286 F.3d 1326 (Fed. Cir. 2002) ............................................................................. 16

*Int'l Seaway Trading Corp. v. Walgreens Corp.,*
    589 F.3d 1223 (Fed. Cir. 2009)................................................................... 3, 4, 6, 8

*L.A. Gear v. Thom McAn,*
    988 F.2d 1117 (Fed. Cir. 1993)........................................................................... 3, 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Limostars, Inc. v. N.J. Car & Limo, Inc.*,
    2011 U.S. Dist. LEXIS 87771 (D. Ariz. Aug. 8, 2011) ........................................ 24

*Lisle Corp. v. AJ Mfg. Co.*,
    398 F.3d 1306 (Fed. Cir. 2005)........................................................................... 11

*Marche Design, LLC v. TwinPro Int'l Holdings, Ltd.*,
    No. 08-cv-2108, 2009 U.S. Dist. LEXIS 600 (D. Kan. Jan. 6, 2009)................... 20

*Maxim Integrated Prods., Inc. v. Quintana*,
    654 F. Supp. 2d 1024 (N.D. Cal. 2009) .............................................................. 20

*Motionless Keyboard Co. v. Microsoft Corp.*,
    486 F.3d 1376 (Fed. Cir. 2007)........................................................................... 13

*Novozymes A/S v. Danisco A/S*,
    No. 10-cv-251, 2010 WL 3783682 (W.D. Wis. Sept. 24, 2010) .......................... 26

*Plumtree Software, Inc. v. Datamize, LLC*,
    473 F.3d 1152 (Fed. Cir. 2006)........................................................................... 16

*Poly-America, L.P. v. GSE Lining Tech., Inc.*,
    383 F.3d 1303 (Fed. Cir. 2004)........................................................................... 16

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)............................................................................. 13

*Richardson v. Stanley Tools*,
    597 F.3d 1288 (Fed. Cir. 2010)............................................................................. 3

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001)............................................................................... 24

*Sun Hill Indus. v. Easter Unlimited*,
    48 F.3d 1193 (Fed. Cir. 1995)............................................................................... 3

*Telebrands Direct Response Corp.*,
    802 F. Supp. 1169 (D.N.J. 1992) .................................................................. 28, 30

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    99 U.S.P.Q.2d (BNA) 1065 (Fed. Cir. 2011)....................................................... 18

*Titan Tire Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009)........................................................................ 4, 10

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Containers USA, Inc.*,
    617 F.3d 1296 (Fed. Cir. 2010)........................................................................... 11

**STATUTES**

35 U.S.C.
   § 171 ................................................................................................................................. 6

**OTHER AUTHORITIES**

Fed. R.Evid.
   Rule 408 ............................................................................................................................ 27

1

**LIST OF CITATION ABBREVIATIONS**

2      "Balakrishnan Dec." refers to the Declaration of Ravin Balakrishnan, Ph.D. In Support of

3  Apple's Motion for a Preliminary Injunction, filed July 1, 2011 (D.N. 91).

4      "Balakrishnan Reply Dec." refers to the Reply Declaration of Ravin Balakrishnan, Ph.D.

5  In Support of Apple's Motion for a Preliminary Injunction, submitted with this Reply.

6      "Bartlett Dec." refers to the Declaration of Jason R. Bartlett In Support of Apple's Motion

7  for a Preliminary Injunction, filed July 1, 2011 (D.N. 88).

8      "Blevins Dec." refers to the Reply Declaration of Tony Blevins In Support of Apple's

9  Motion for a Preliminary Injunction, submitted with this Reply.

10      "Bressler Dec." refers to the Reply Declaration of Peter W. Bressler In Support of Apple's

11  Motion for a Preliminary Injunction, submitted with this Reply.

12      "Ho Dec." refers to the Declaration of Francis Ho In Support of Apple's Motion for a

13  Preliminary Injunction, submitted with this Reply.

14      "Lutton Dec." refers to the Declaration of Richard J. Lutton, Jr. In Support of Apple's

15  Motion for a Preliminary Injunction, dated June 30, 2011 (filed under seal July 21, 2011 (D.N.

16  128); redacted public version filed July 21, 2011 (D.N. 129)).

17      "Lutton Reply Dec." refers to the Reply Declaration of Richard J. Lutton, Jr. In Support of

18  Apple's Motion for a Preliminary Injunction, submitted with this Reply.

19      "Mot." refers to Apple's Motion for a Preliminary Injunction, filed July 1, 2011 (D.N. 86).

20      "Musika Dec." refers to the Reply Declaration of Terry Musika In Support of Apple's

21  Motion for a Preliminary Injunction, submitted with this Reply.

22      "Opp." refers to Samsung's Opposition to Apple's Motion for a Preliminary Injunction,

23  filed under seal October 13, 2011.

24      "Sherman Dec." refers to the Declaration of Itay Sherman in Support of Samsung's

25  Opposition to Apple's Motion for a Preliminary Injunction, filed August 22, 2011 (D.N. 172).

26      "Sood Dec." refers to the Reply Declaration of Sanjay Sood In Support of Apple's Motion

27  for a Preliminary Injunction, submitted with this Reply.

28

1         "Stringer Dec." refers to the Reply Declaration of Christopher Stringer In Support of

2   Apple's Motion for a Preliminary Injunction, submitted with this Reply.

3         "Twiggs Dec." refers to the Declaration of Sissie Twiggs In Support of Apple's Motion

4   for a Preliminary Injunction, filed July 1, 2011 (D.N. 89).

5         "Van Dam Dec." refers to the Declaration of Andries Van Dam, Ph.D., in Support of

6   Samsung's Opposition to Apple's Motion for a Preliminary Injunction, filed August 22, 2011

7   (D.N. 168).

8         "Wagner Dec." refers to the Declaration of Michael J. Wagner in Support of Samsung's

9   Opposition to Apple's Motion for a Preliminary Injunction, filed August 22, 2011 (D.N. 173).

10         "Woodring Dec." refers to the Declaration of Cooper C. Woodring In Support of Apple's

11   Motion for a Preliminary Injunction, filed July 1, 2011 (D.N. 90).

12         "Woodring Reply Dec." refers to the Reply Declaration of Cooper C. Woodring In

13   Support of Apple's Motion for a Preliminary Injunction, submitted with this Reply.

14         "Zhang Dec." refers to Declaration of Patrick Zhang in Support of Apple's Motion for a

15   Preliminary Injunction, filed July 1, 2011 (D.N. 87).

16         When citing to documents filed with this Court, page numbers are taken from the ECF

17   numbers at the top of the page.

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Samsung's opposition does nothing to undermine the factual and legal showing supporting Apple's motion.  Samsung does not and cannot deny that Apple's iPhone and iPad products are among the most successful and revolutionary consumer products ever introduced, and that the news media, the trade press, and the public have praised these products and attributed their success to their innovative and iconic designs.  Apple's obsession with creating an attractive minimalist style and bringing design cachet to mobile communications and mobile computing products is apparent not only to its customers, but to anyone who reads a newspaper or walks down a city street.[1]

No "ordinary observer" could help but be struck by the similarity between Samsung's accused products and the design patents at issue in this motion.  As we have shown, an entire world of observers has commented on Samsung's slavish copying and the resulting similarity of Samsung's products with Apple's designs.  Samsung's attempts to deconstruct the infringement analysis flies in the face of Federal Circuit authority.

Samsung's attempt to argue non-infringement of the '381 utility patent is similarly weak.  Any person reading the '381 patent would understand that movements of a finger on a touch screen in a "first direction" need not be made with a precision that no human digit could achieve, and that the area beyond the edge of an electronic document can be "displayed" as a solid black color.  This Court must recognize, as the world does, that Samsung has chosen to mimic the Apple look and feel, without regard for Apple's intellectual property rights, and that this mimicry extends to Apple's user interface inventions.

---

[1] Samsung's infringement is also apparent to foreign courts.  Apple has obtained preliminary injunctions against versions of the Samsung Galaxy S, S II, and Ace smartphones sold in the Netherlands (based upon a European patent related to the '381 patent), and against the version of the Galaxy Tab 10.1, 7.7, and 8.9 sold in Germany (based upon a foreign counterpart to the D'889 patent).  In Australia, Samsung agreed not to import, offer for sale, or sell the U.S. version of the Galaxy Tab 10.1 pending resolution of Apple's preliminary injunction application, and then during the preliminary injunction hearing further agreed to remove certain accused features before marketing the Australian Tab 10.1.  (Ho Dec. ¶¶ 2-6.)

1    Thus, as it is forced to, Samsung focuses on invalidity arguments, but here the sheer

2    number of issues Samsung raises demonstrates the underlying truth:  Apple's designs and its

3    patents were and are novel.  Samsung has no anticipating art, and it will not be able to establish

4    obviousness by clear and convincing evidence.

5    Finally, as we have shown, the injury that Apple faces if its rights are not enforced will

6    truly be irreparable.  Samsung's expert has conceded as much under cross-examination.

7    Injunctive relief is the only way that Apple's intellectual property can be protected, and

8    Samsung's unfair competition prevented.

9    **I.    SAMSUNG'S PHONES INFRINGE THE D'087 AND D'677 DESIGN PATENTS.**

10

11    The impact of Apple's iPhone design on Samsung's designs is evident from a comparison

12    of products released before the Apple design was filed, and those that came after.

13    Samsung Smartphones          Apple's D'087         Samsung Smartphones
     **BEFORE** Apple's D'087        (filed Jan. 2007)      **AFTER** Apple's D'087

14

15

16

17           

18

19

20

21

22

23    (Ho Dec. Ex. HH.)  Samsung attempts to divert the Court's attention from the overall look of its

24    products by focusing on minute differences, while disregarding all design elements that allegedly

25    perform some function.  (Opp. at 11.)  The law requires exactly the opposite:  "The Court should

26    compare the overall designs to see if an ordinary observer would conclude that they are

27    substantially the same . . . [T]he ordinary observer test, whether applied for infringement or

28    invalidity, and the obviousness test . . . focus on the *overall designs*."  *Int'l Seaway Trading*

1   *Corp. v. Walgreens Corp.*, 589 F.3d 1223, 1240-41 (Fed. Cir. 2009) (emphasis in original).[2]

2   When the overall designs are compared, there is no question that they are substantially similar.

3         In assessing infringement, the only elements to be excluded from the comparison of

4   overall designs are those that are "purely functional," *i.e.*, dictated by function.  *See e.g.*,

5   *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1294 (Fed. Cir. 2010) (excluding the flat face

6   of a hammer from infringement analysis because it was dictated by function).  "To qualify for

7   protection, a design must present an aesthetically pleasing appearance that is not dictated by

8   function alone."  *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 148 (1989); *see*

9   *also L.A. Gear*, 988 F.2d. at 1123 ("[T]he design … is deemed to be functional when the

10  appearance of the claimed design is 'dictated by' the use or purpose of the article.").

11        Samsung does not even mention, let alone attempt to meet the "dictated by function" test.

12  (Opp. at 9-11.)  To rebut Samsung's claim that the elements are "functional," Apple submits

13  numerous examples of alternative designs that perform each of the functions highlighted by

14  Samsung, as illustrated in the exhibits to the accompanying reply declarations of Cooper C.

15  Woodring and Peter W. Bressler.  These examples establish that no element of the Apple designs

16  is dictated by function.  *See Best Lock Corp. v. Ilco Unican,* 94 F. 3d. 1563, 1566 (Fed. Cir. 1996)

17  ("A design is not dictated solely by its function when alternative designs … are available.").

18  Smartphones can be rendered quite differently—as they have been in designs used or patented by

19  Samsung—and still perform the same functions, as shown below:

20

21

22

23

_____

24      [2] Samsung argues about the size of photos and products.  However, where a design patent
    does not claim the actual size of a product's design, an accused product cannot escape

25  infringement by being larger or smaller than the commercial embodiment of the patented design.
    *See Sun Hill Indus. v. Easter Unlimited*, 48 F.3d 1193, 1196-97 (Fed. Cir. 1995) (error to rely on

26  size in infringement analysis).  Likewise, Samsung's argument that labeling products with
    SAMSUNG or a carrier name or logo defeats Apple's infringement claim is unavailing.  (Opp.

27  at 13.)  *See L.A. Gear v. Thom McAn*, 988 F.2d 1117, 1126 (Fed. Cir. 1993) (design patent law
    does not allow "avoidance of infringement by labeling").

28



(Woodring Reply Dec. ¶¶ 38-54; Bressler Dec. ¶¶ 87-97.)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

        In sum, no element of Apple's iPhone design should be excluded from the infringement

comparison, because none is dictated by function.  When the overall designs are compared,

Samsung's products look substantially the same as Apple's designs.

## II.     THE D'087 AND D'677 PATENTS ARE VALID.

        To defeat Apple's motion, Samsung must "come forward with evidence of invalidity, just

as it would be [required to] at trial."  *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372,

1376-79 (Fed. Cir. 2009).  Apple "then has the burden of responding with contrary evidence,

which of course may include analysis and argument."  *Id.*  The Court determines if Samsung has

shown that it is likely to prevail on invalidity when the evidence is "view[ed] . . . in light of the

burdens and presumptions that will inhere at trial."  *Astra Zeneca LP v. Apotex, Inc.*, 633 F.3d

1042, 1050.  Samsung has not carried its burden.

### A.     The D'087 and D'677 Patents Are Not Anticipated.

        To establish that Apple's designs were anticipated, Samsung must demonstrate that a

single prior art reference is substantially the same as Apple's design.  *Int'l Seaway*, 589 F.3d at

1239-1240.  Samsung's only "evidence" on this point is a deposition statement by Apple's expert that the front of the JP 1241638 patent (the "Sharp design") is "substantially similar" to Apple's designs.  (Opp. at 8.)  However, whether the front of a reference is substantially similar is not the test when the designs include side views showing that the profile of the Sharp design is *not* substantially similar to the profile of the Apple designs.  *See Contessa Food Prods. v. Conagra*, 282 F.3d 1370, 1381-1382 (Fed. Cir. 2002) (all design views must be compared to determine substantial similarity); *Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1314 (Fed. Cir. 2001) (jury could find no anticipation due to differences in rear panels of prior art and claimed design, even if front panels "look very similar").

        Not only did Samsung hide all but one view of the Sharp design from Apple's expert at his deposition, its Opposition also failed to include the entirety of the Sharp design, which includes 14 figures.  Significant portions of the Sharp design omitted by Samsung are shown below:



| Samsung's Opposition | Additional Views of the Sharp JPN No. 1241638 | Apple's 'D087 and 'D677 Design Patents |
|---|---|---|

1   Side and perspective views of the Sharp design reveal that it (1) has a "cambered," not flat, front

2   surface; (2) has a thicker nonuniform "bezel" with a different profile; (3) has a smaller speaker

3   opening placed much higher up; and (4) lacks a translucent and black-colored front surface.

4   (Woodring Reply Dec. ¶¶ 102-109.; Bressler Dec. ¶ 62; Ho Dec. Ex. P (Woodring Dep. at 212:4-

5   213:3).)  The Sharp design differs from the Apple designs in several key respects.

6                **B.        The D'087 and D'677 Patents Are Not Obvious.**

7          To prove obviousness, Samsung must "find a single reference, 'a something in existence,

8   the design characteristics of which are *basically the same* as the claimed design.'"  *Durling v.*

9   *Spectrum Furniture Co., Inc.*, 101 F.3d 100, 103 (Fed. Cir. 1996); *see In re Harvey*, 12 F.3d 1061,

10  1063 (Fed. Cir. 1993) (where major modifications would be required, the prior reference "cannot

11  qualify as a basic design").  If a basic reference is identified, secondary references can then be

12  considered to construct a piece of "prior art" for purposes of comparison to the patented design.

13  "Once that piece of prior art has been constructed, obviousness, like anticipation, requires

14  application of the ordinary observer test" and a "focus on the *overall designs*."[3]  *Int'l Seaway*,

15  589 F.3d at 1240-1241 (emphasis in original).

16         Samsung does the opposite of the required analysis, merely pointing to a pool of alleged

17  prior art references that it claims encompasses various elements of the Apple designs.  (Opp. at 8-

18  9.)  All but three of Samsung's references clearly post-date the invention dates for the Apple

19  designs, and are thus not "prior" art.[4]  As explained below, none of the three other references

20

21         [3] Moreover, actual designs, not design concepts such as "rounded corners," "rectangular
22  shape," "rim," and "bezel," must be compared.  *Durling*, 101 F.3d at 104 ("As we have explained
    in the past, however, the focus in a design patent obviousness inquiry should be on visual
23  appearances rather than design concepts.").

           [4] The rules for priority are the same for design patents and utility patents.  35 U.S.C.
24  § 171.  Many of the designs cited by Samsung are not prior to the corroborated invention date for
    the two design patents (no later than April 20, 2006) and one is not even prior to the application
25  date (January 5, 2007). ████████████████████████  The LG Prada smartphone was announced in September 2006, and the
26  Samsung KR 30-2006-0050769 design patent application was filed in December 2006.
    Samsung's expert declaration is similarly rife with post-invention art, including Korean
27  registration KR 30-041857 (published in July 2006), the Softbank 825SH phone (released in
    2008), and JP 1280315 (issued September 2006).  (*See* Sherman Dec. ¶¶ 20-21, 24-25, 99.)
28

1   qualifies as a "basic reference" because none is "basically the same as" either of the Apple

2   designs.  (Woodring Reply Dec. ¶¶ 112-113, 118-121; Bressler Dec. ¶¶ 60, 71.)

3          *The LG Chocolate Phone*:  The LG Chocolate is not a basic reference for either of Apple's

4   designs.  It does not have a centered display screen with balanced borders above and below the

5   screen.  Its display screen is aligned closer to the top of the design, rather than the center.  The

6   side borders to the right and left of the screen are also wider.  Moreover, the top and bottom edges

7   are not straight.  There is also substantial ornamentation in the form of a large metal button with a

8   metallic-appearing rim and red marking, which is surrounded by a number of smaller red buttons

9   on the front surface below the display screen.  It also lacks a bezel like that of the D'087 design.

10   (*See* Woodring Reply Dec. ¶¶ 112-113; Bressler Dec. ¶ 65.)

11          *The JP 1241383 Reference*:  JP 1241383 also is not a basic reference for Apple's designs.

12   It appears to have an inset display screen surrounded by a large thick bezel.  Large lozenge- and

13   circle-shaped buttons extend from the left side of the design and thus are visible from the front.

14   There is no translucent black surface as claimed in Apple's D'677 design, and one of the three

15   major elements in the D'087 design is missing:  the distinctive speaker slot.  It also fails to

16   disclose the thin bezel of the D'087 patent.  (Woodring Reply Dec. ¶¶ 120-121; Bressler Dec.

17   ¶ 69.)

18          *The JP 1009317 Reference*:  Nor is the JP 1009317 design a basic reference for Apple's

19   designs.  It does not have a bezel as found in the D'087 patent.  The borders above and below the

20   display screen do not appear to be balanced and thus the frame appears to be asymmetric.  The

21   top and bottom edges also curve from the center toward the sides.  The design does not have a

22   continuous clear black front surface as claimed in the D'677 patent.  (Woodring Reply Dec.

23   ¶¶ 118-119; Bressler Dec. ¶ 68.)

24          In short, none of Samsung's references is an appropriate starting place for the obviousness

25   analysis because none is "basically the same" as either of the Apple designs.

26          **C.      The iPhone's Commercial Success.**

27          "Secondary considerations 'can be the most probative evidence of non-obviousness in the

28   record, and enables the . . . court to avert the trap of hindsight.'"  *Crocs, Inc. v. ITC*, 598 F.3d

1   1294, 1310-11 (Fed. Cir. 2010) (finding a design patent non-obvious partially due to the

2   commercial success of the product that embodied the design).  The incredible reaction to the

3   revolutionary and distinctive "look" of the iPhone confirms the novelty of Apple's patented

4   designs.  (*See* Zhang Dec. ¶¶ 32-37 & Exs. 27-32.)  Given the overwhelming evidence of the

5   commercial success of the iPhone and widespread acclaim for its design, Samsung cannot

6   demonstrate that Apple's designs were obvious.

7   **III.**     **SAMSUNG'S GALAXY TAB 10.1 INFRINGES THE D'889 PATENT.**

8         Just as a picture is worth a thousand words, the lack of pictures in Samsung's Opposition

9   speaks volumes.  Samsung's only comparative tablet illustration depicts *the back* of the D'889

10   patent, the iPad and iPad2, and the Galaxy Tab 10.1, where product names and logos appear.

11   (Opp. at 18.)  The "focus [is] on the *overall designs*," however, not on a single view of the

12   designs.  *Int'l Seaway*, 589 F.3d at 1240-41 (emphasis in original).  And logos are irrelevant.  *See*

13   *L.A. Gear,* 988 F.2d. at 1126.  Notwithstanding minor differences in thickness, screen aspect ratio,

14   and a silver accent at one rear edge of the Samsung product, the overall effect is that the designs

15   are substantially the same to an ordinary observer.  (Woodring Reply Dec. ¶ 8.)



24   (Ho Ex. II.)

25   **IV.**     **THE D'889 PATENT IS VALID.**

26       **A.**     **The Design Is Not Functional.**

27         Again, Samsung errs in its functionality analysis, creatively arguing that Apple's designs

28   are "so basic that [they are] primarily utilitarian" and the result of "natural evolution."  (Opp. at 1-

4, 16.)  Samsung ignores the myriad alternate designs that are available, as set forth in the

Woodring, Bressler, and Stringer declarations.  (Woodring Reply Dec. ¶ 41; Bressler Dec. ¶¶ 79-

84; Stringer Dec. ¶¶ 26-40.)  Samsung also fails to account for the nature of minimalist design,

which is explained further in the Bressler Declaration.  (Bressler Dec. ¶¶ 23-31.)  Samsung made

and sold a very different looking touchscreen tablet before the iPad 2 was released:

| Samsung Touchscreen Tablet **BEFORE** iPad 2 | Apple's iPad 2 (announced Mar. 2011) | Samsung Touchscreen Tablet **AFTER** iPad 2 |
|---|---|---|



(Ho Dec. Ex. HH.)

**B.     The D'889 Patent Design Is Not Obvious.**

Once again, Samsung fails to identify a basic reference to show that the design patent is

obvious.  Without a basic reference, the D'889 patent cannot be obvious, no matter how many

pieces of prior art Samsung puts forward.  *See* Part II(B), *supra*.  The prior art references that

Samsung discusses in any detail—the HP Compaq TC1000 Portable Computer and two Knight-

Ridder portable digital newspaper mockups—are significantly different from the D'889 patent

and cannot constitute a basic reference.

**1.     The HP Compaq TC1000 Portable Computer.**

The TC1000 has a thick three-layered frame around the edge that extends onto the front

surface.  The opaque silver frame around the front surface is noticeably wider from the front view.

In addition, two silver and black colored masks surround the display screen.  The front surface

1    also includes a number of graphical icons.  The edges and back surface of the TC1000 have a

2    complicated arrangement of slots, ports, hatches, and buttons, and it has a thicker form factor.

3    (Woodring Reply Dec. ¶ 95; Bressler Dec. ¶¶ 55.)

4              **2.      Knight-Ridder Portable Digital Newspaper Mockups.**

5              The 1981 mockup appears to have an asymmetrical wide opaque frame surrounding the

6    display.  Thus, the entire front surface is not clear.  Moreover, the mockup has square corners and

7    a different side profile.  The 1994 mockup has a raised plastic asymmetrical frame surrounding an

8    inset display.  The back surface has a raised door with four screws and the edges have several

9    notches and ports.  (Woodring Reply Dec. ¶¶ 86-87; Bressler Dec. ¶¶ 44-45.)[5]

10            None of these references is basically the same as Apple's design, and the other references

11   are even further afield.  (Woodring Reply Dec. ¶¶ 88-94; Bressler Dec. ¶¶ 47-54.)  Samsung's

12   conclusory assertion that a pool of references "disclose[s] all of the elements Apple claims in the

13   D'889 patent and render[s] it obvious" (Opp. at 15) fails to meet the *Titan Tire* test.

14            **C.      The iPad's Unexpected Commercial Success.**

15            As explained in Apple's opening papers, the iPad was an instant success with phenomenal

16   sales.  (Mot. at 30.)  Significantly, the critical acclaim upon arrival of the Apple iPad is in sharp

17   contrast with pre-launch skepticism by industry experts:

18                      Like a moth to a hot trend, Apple (AAPL) will fly into the netbook
                        flame and get burned. The company will unveil a 10-inch touch-
19                      screen tablet computer sometime this year, say analysts.  Not only
                        does Apple want to showcase its design prowess, the company
20                      desperately needs a new hit to revitalize its computer line-up. . . .
                        [B]eyond the core fan base, Apple will discover what other PC
21                      makers have known for a while:  Consumers find big tablets hard to
                        swallow.
22

23   _____

24        [5] Samsung's suggestion that Apple improperly failed to disclose the Knight-Ridder
     mockup to the Patent Office (Opp. at 14) is ludicrous.  Even if Samsung had demonstrated that
25   the mockup was material to patentability, there would still be no showing of intent.  The Knight-
     Ridder inventor Fidler testified that he worked with the two to four employees of a Colorado
26   "Apple media lab" in 1994-95 in connection with an unsuccessful attempt to provide newspaper
     content for the Apple Newton.  (Ho Dec. Ex. Y (Fidler Dep. 174:16-180:10; 187:22-197:19).)
27   Samsung offers no evidence that any of these unidentified Apple employees was involved in
     hardware design, had any memory of Fidler's mockup, or even worked for Apple when the D'889
     patent was filed ten years later.
28

(Ho Dec. Ex. AA.)  Others shared this skeptical view.  (Ho Dec. Exs. BB-DD.)  Many of the

design features that drove demand for the iPad are found in the iPad2, which embodies the D'889

patent.  (Ho Dec. Ex. O.)  Initial skepticism from industry experts is a powerful indicator of non-

obviousness.  *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Containers USA, Inc.*,

617 F.3d 1296, 1304 (Fed. Cir. 2010) (reversing summary judgment of obviousness because

district court failed to consider evidence of industry skepticism).[6]

## V.     SAMSUNG INFRINGES THE '381 PATENT.

Samsung's contrived non-infringement arguments on the '381 utility patent are easily

rejected.  Under the plain language of the patent claims, in light of the specification and common

sense, translating or moving a document in a "first direction" by scrolling on a touch screen does

not require that a human finger or stylus move in precisely straight lines without variation.  (Opp.

at 27.)  The patent specification is clear that it is directed to the field of "devices with touch-

screen displays" ('381 patent at 1:45-46), and aims to solve problems with prior devices by

providing a user interface based on "finger contacts and gestures on the touch-sensitive display."

(*Id.* at 2:49-50.)  Nothing in the patent specification suggests that the invention requires

superhuman precision in finger movements.  (*See* Balakrishnan Dec. ¶¶ 43-47.)

Patent law requires that claim interpretation be linked in a common-sense fashion to the

technology and techniques described in the specification.  *Lisle Corp. v. AJ Mfg. Co.*, 398 F.3d

1306, 1314 (Fed. Cir. 2005) (rejecting "a hyper-technical reading of the limitation that requires"

something the claimed tool is "incapable of performing" in favor of "a common-sense meaning of

that claim limitation").  Because the '381 patent is directed to detection of a moving finger or

handheld object on a touch screen, a person of ordinary skill would understand that the

movements detected are those that are typically made and are capable of being made by a human

---

[6] Samsung erroneously contends that the D'889 patent is indefinite and non-enabling (Opp. at 16 n.4).  Samsung relies solely on testimony from Chris Stringer, an industrial designer who is not a patent attorney, as to whether he could "explain" the legal significance of certain differences between patent figures.  Stringer's testimony does not establish the invalidity of the patent, and the design of the D'889 patent is readily apparent when all of the figures are considered.

1   finger or handheld stylus rather than those beyond the precision of human-controlled movement.

2   Samsung's overly narrow interpretation of the claims cannot be squared with the specification

3   and defies common sense.

4          Samsung's argument that the area beyond an edge of a document is not "displayed" if it is

5   shown to the user as a black expanse, is similarly unavailing and contradicted by its own expert.

6   Without any support from the claims or from the specification, Samsung redefines the claim term

7   "display" (in the sense of showing or revealing something to the viewer) as "active display" and

8   then further transforms "active display" to mean "illuminated pixel."  (Opp. at 26.)  Samsung then

9   asserts that the Tab 10.1's admitted showing of a black area beyond the edge of an electronic

10  document is not "displaying" because the black pixels are turned off.  Samsung's interpretation is

11  flatly inconsistent with the patent specification and claims.  The specification's key example of

12  this functionality is Figure 8C, in which "an area . . . beyond the bottom and right edges of the

13  [document] is displayed."  ('381 patent at 29:57-58.)  In the figure, the area beyond the edge of

14  the document is displayed as "black and thus is visually distinct from the white background of the

15  document."  ('381 patent at 29:61-62; *see also* Figure 8C.)  Any remaining doubt on this point is

16  resolved by the claims.  Claim 1 requires that "the area beyond the edge of a document" be

17  displayed, and dependent Claim 13 adds that "the area beyond the edge of the document is *black*,

18  gray, a solid color, or white."  Thus, there can be no question that the patent claims, properly

19  construed, encompass the display *in black* of the area beyond the edge of the document.  (*See*

20  Balakrishnan Dec. ¶¶ 48-52.)  Samsung's expert acknowledged that any other interpretation of

21  the claims would be contrary to their plain meaning.  (Ho Dec. Ex. S (Johnson Dep. 112:19-20;

22  125:13-21).)

23  **VI.     THE '381 PATENT IS VALID.**

24         Samsung's invalidity arguments on the '381 utility patent are not persuasive.  An accurate

25  analysis of the Apple conception and priority dates, and an accurate evaluation of the pertinent

26  prior art references, demonstrate that Samsung is not likely to prove by clear and convincing

27  evidence that the '381 patent is invalid.

28

1    Samsung cites three references:  (1) the LaunchTile program prototype (and the code for

2    its XNav twin); (2) the Lira WO '458 patent and its U.S. counterpart; and (3) the Van den Hoven

3    WO '702 publication.  None of these anticipates the '381 patent or renders it obvious.

4          **A.**    **LaunchTile Does Not Invalidate the '381 Patent.**

5    Samsung points to several pieces of evidence about the supposed "prior art" LaunchTile

6    system.  None of this evidence invalidates the '381 patent claims.  First, Samsung points to

7    videotapes of LaunchTile demonstrations in 2005.  (*See* Opp. at 20.)  As LaunchTile's inventor

8    Dr. Bederson acknowledged at his deposition, however, the videotapes do not display LaunchTile

9    performing the steps upon which Samsung now relies.  (Ho Dec. Ex. T (Bederson Dep. 198:6-

10   25).)  Samsung also relies on Bederson's testimony that he performed live demonstrations of

11   LaunchTile in 2005 (Opp. at 20), but Samsung has introduced no evidence of what was

12   demonstrated in 2005, and Bederson does not remember.  (*Id*. (Bederson Dep. 160:18-23) ("I

13   don't recall the specific details of what was or was not shown to any specific individual."))

14   Samsung points to source code for a related product, XNav, which Bederson sent to

15   Microsoft in 2005.  (Opp. at 20.)  The disclosure of source code, however, cannot constitute a

16   "public use" under section 102(b).  *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376,

17   1385 (Fed. Cir. 2007) (finding no public use where "disclosures visually displayed the keyboard

18   design without putting it into use" according to its "intended purpose").  Nor does the source code

19   qualify as a "printed publication" under section 102.  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d

20   860, 865-866 (Fed. Cir. 2010) (user manual not a publication unless it is accessible to public).

21   Recognizing the limits of the contemporaneous evidence, Samsung relies on two

22   demonstrations conducted *in 2011* by its retained expert:  one illustrating particular scenarios

23   using LaunchTile to navigate an email list, and another depicting the "zone view" of LaunchTile.

24   (Van Dam Dec. ¶¶ 48-69 & Ex. 2.)  Neither demonstration invalidates the '381 claims.

25   The '381 patent is directed to a particular problem:  how a user interface program

26   addresses the situation where a user scrolls to the edge of a document.  The prior art showed two

27   possible solutions:  (1) not permitting the user to "overscroll," i.e., scroll past the edge of an

28   electronic document; and (2) permitting the user to continue scrolling past the edge of the

1   document, without limitation.  (*See* Balakrishnan Dec. ¶¶ 14-23.)  Both methods could be

2   confusing to users.  The first method could lead a user to mistakenly conclude that the program

3   had crashed, as it would no longer respond to the scroll command.  The second method, which

4   Bederson referred to as "Desert Fog," could be disorienting to users as they scroll into empty

5   areas with no meaningful content.  (Ho Dec. Ex. T (Bederson Dep. 204:19-207:5) ("[s]ometimes

6   you can navigate to a place where there is no content.  If there is no content, then you're kind of

7   in a place that essentially—typically—represented with an empty screen.  And that was a concern

8   because that would make a user feel disoriented since there is nothing on the screen.").)

9          As the inventor of the '381 testified, and as use of Apple's iPhones and iPads and the

10   accused products demonstrates, an advantage of the patented method is that the user knows when

11   he has scrolled beyond the edge of the document and no more content can be displayed by

12   continuing to scroll further.  And then, on the user's moving his finger away from the screen, the

13   document scrolls back so that the content of the document, rather than the area beyond the edge

14   of the document, is displayed.  (Ho Dec. Ex. W (Ording Dep. 32:17-35:4; 39:16-40:17; 42:20-

15   46:17).)

16          LaunchTile does not practice the claimed invention; indeed, as explained below, (1) its

17   "zone view" application practices the prior art method of preventing the user from scrolling

18   beyond the edge of the document; and (2) its email application permits the user to scroll into a

19   "Desert Fog."  Thus, LaunchTile *teaches away* from the invention claimed in the '381 patent *by*

20   *practicing both of the prior art methods*.

21          *The Zone View of the LaunchTile "World"*:  Users who scroll through the electronic

22   document containing the "World" of LaunchTile are not permitted to "overscroll" beyond the

23   "edge" of the tiles to display an area beyond the array of tiles.  (Balakrishnan Dec. ¶ 22 & Fig. 5;

24   Balakrishnan Dec. Ex. A (Video); Ho Dec. Ex. T (Bederson Dep. 148:25-149:4).)  As a result, no

25   area can be displayed beyond the boundary edge of the array of tiles, and the array of tiles does

26   not translate back in the opposite direction after showing an area beyond the edge when the user's

27   finger is removed from the touch screen.  In other words, if the user keeps scrolling up, down, to

28   the left or to the right in LaunchTile, he will not see an area beyond the edge of the electronic

1    document that contains the 36 tiles, and will have no way of knowing whether he has reached the

2    edge of the array of tiles or if the touch screen is simply not responding.  (*Id.*)  The 6x6

3    LaunchTile view therefore does not practice the claimed invention; it practices the first prior art

4    method of simply precluding the user from scrolling past the end of an electronic document.

5         In its Opposition, Samsung has tried to define away this fundamental difference between

6    LaunchTile and the '381 patent by asserting that the *internal* grid lines *within* the "World" of

7    LaunchTile, like the internal lines that accentuate squares within a checkerboard, can be treated as

8    if they were the *external* boundary lines that define the *"edge"* of the electronic document.   (Opp.

9    at 22.)  Samsung's videos purporting to show the LaunchTile application involve zooming in and

10   viewing only the "internal" tiles of the 6x6 LaunchTile array, much like looking at a few internal

11   squares on a checkerboard through a magnifying glass.  Moving the magnifying glass over a few

12   of the internal squares can show different "portions" of those squares, but it does not show the

13   area beyond the "edge" of the checkerboard, let alone return the viewer to the checkerboard if he

14   crosses the edge.

15        *The Email "Application"*:  Using LaunchTile's email "application" (which is a mock-up,

16   not a real email program (Ho Dec. Ex. T (Bederson Dep. 216:16-217:8)), it is possible to scroll up

17   or down indefinitely beyond the list of emails to display a vast expanse of an area apparently

18   beyond the edge of the email list that is displayed in white.  (*See* Balakrishnan Dec. ¶¶ 22, 26 &

19   Fig. 6; Ho Dec. Ex. T (Bederson Dep. 84:20-86:21).)  Lifting one's finger from the screen does

20   *not* cause the screen to scroll back to stop displaying the white area and to show only the content

21   inside the edge of the electronic document.  Thus, the LaunchTile email program practices the

22   second "Desert Fog" prior art method.

23        Samsung's effort to demonstrate that the email application practices the patent requires a

24   sleight of hand:  while scrolling down the list it is possible to stop the list slightly out of

25   alignment, lift the stylus, and have the list auto-align with a moveable blue highlighted bar.

26   (Van Dam Dec. ¶ 61; Balakrishnan Dec. ¶¶ 18, 22, 25 & Fig. 1.)  The list moves back or forward

27   less than the width of a row.  This minimal auto-alignment behavior occurs whenever the rows

28   are out of alignment with the blue highlight bar, which doubles as an email selection tool.

1   (Balakrishnan Dec. ¶ 25; Ho Dec. Ex. T (Bederson Dep. 78:17-79:18).)  The translation of the list

2   in the second direction is not responding to "an edge of the electronic document being reached"

3   (as required by the claims).  Rather, its purpose is to make it easier for users to select a desired

4   email by auto-aligning the cursor to the highlight bar.  (Balakrishnan Dec. ¶¶ 22, 25 & Exs. B-C

5   (Videos).) Therefore, the LaunchTile application fails to anticipate the '381 patent claims and

6   does not make them obvious.[7]

7           In addition, Samsung has failed to establish that the LaunchTile device was actually used

8   in 2005 in the manner now depicted.  The most that the video demonstrations made in 2011 can

9   do is show that the LaunchTile device was *capable* of performing in the manner now described.

10  The recent demonstrations do not constitute evidence that LaunchTile *was* actually used in this

11  manner before the patent was filed.  *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303,

12  1306-1309 (Fed. Cir. 2004) (cautioning against the use of hindsight to establish prior use, where a

13  device is "capable of performing the claimed method" it was not "originally designed to do"); *see*

14  *also In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002) ("[A] process . . . consists of a series of

15  acts or steps . . . . It consists of doing something, and therefore has to be carried out or

16  performed.").  Samsung must establish that someone "actually performed all of the patented steps

17  before the critical date."  *Plumtree Software, Inc. v. Datamize*, *LLC*, 473 F.3d 1152, 1163 (Fed.

18  Cir. 2006).  Samsung has failed to make this showing.

19          **B.      Lira Does Not Invalidate the '381 Patent.**

20          The Lira WO '458 patent and its U.S. counterpart (U.S. Patent No. 7,872,640) disclose a

21  variation of the LaunchTile auto-alignment technique.  The Lira patents describe a method for

22  zooming in on documents such as web pages on a small screen, reconfiguring the web page into

23

24          [7] Contrary to Samsung's contention, Dr. Balakrishnan did not "agree[] that LaunchTile
    anticipated the claims." (Opp. at 23 n.9.)  Balakrishnan had not offered any testimony about
25  LaunchTile before his deposition, and made it clear he could not provide opinions about it
    without additional opportunity for review.  (*See, e.g.*, Ho Dec. Ex. V (Balakrishnan Dep. 279:23-
26  280:11) ("I cannot make that determination, just looking at this on the fly"); *id.* at 285:1-8 ("that
    might be an electronic document vis-à-vis the claims. It might not be. I would have to study that
27  in detail"); (*id.* at 330:4-7 ("Q: Doesn't that meet claim limitation seven? . . . I think I would have
    to study that in detail.").)

28

1   columns, and then zooming in and scrolling through and across those newly configured columns.

2   To allow ease of viewing, the screen will scroll forward to center on the next column, or back to

3   center on the previous column, depending upon whether the scrolling motion has moved beyond a

4   threshold amount.  For example, if the scrolling is more than half way to the next column it might

5   continue scrolling forward to center on the next column, and if it is less than half way it could

6   scroll back to center on the previous column.  (Balakrishnan Reply Dec. ¶¶ 20, 34-35 & Ex. D

7   (WO 03/081458 "Lira" at Fig. 14B & p. 15, ll. 18-31).)

8         The Lira patents do not address what happens when the user scrolls to an edge of an

9   electronic document.  Moreover, they do not disclose or suggest that an area beyond the edge of

10  the electronic document would be displayed.  (Balakrishnan Reply Dec. ¶¶ 22, 34-37.)  They do

11  not provide any solutions to the problem of the user not knowing when he has scrolled to the edge

12  of an electronic document and whether or not the touch screen device is working properly when

13  he has in fact scrolled to the edge and the screen stops responding.  As a result, these prior art

14  references do not disclose the claimed invention of the '381 patent.

15        **C.      Van den Hoven Does Not Invalidate the '381 Patent.**

16        Van den Hoven discloses scrolling through a set of images, such as thumbnails, in an up

17  or down direction, with the speed and direction being responsive to the user's input.  (*See*

18  Balakrishnan Reply Dec. Ex. E (WO01 029702 "Van Den Hoven" at Fig. 2).)  An image can then

19  be selected and dragged to a display area for viewing a larger image.  The patent says nothing

20  about displaying different portions of an electronic document, displaying or not displaying an

21  area beyond the edge of the document, or translating documents in a first direction and then in a

22  second direction to stop showing the area beyond the edge of the document.  (*Id.* ¶¶ 22, 38-42.)

23        **D.      Samsung Will Not Prove that the '381 Patent is Unenforceable.**

24        Samsung asserts in a footnote and in the Godici Declaration that Apple engaged in

25  inequitable conduct by failing to disclose the Van den Hoven reference during prosecution of

26  the '381 patent.  For the reasons discussed above and in the Balakrishnan Reply Declaration (*id.*

27  ¶¶ 38-42), the Van den Hoven reference is not material to patentability.  Van den Hoven is at

28  most cumulative to the Collins reference, which like Van den Hoven discloses automated reverse

1   scrolling and which was the subject of an Examiner Interview prior to allowance.  Samsung's

2   declarants Van Dam and Godici did not even read the Collins reference before smearing Apple's

3   attorneys with unfounded accusations of inequitable conduct.  (*See* Ho Dec. Ex. X (Van Dam Dep.

4   21:16-22:6); Ho Dec. Ex. U (Godici Dep. 63:10-16).)  Samsung has not even made a *prima facie*

5   case of inequitable conduct, let alone a persuasive one, under *Therasense, Inc. v. Becton,*

6   *Dickinson & Co.*, 99 U.S.P.Q.2d (BNA) 1065 (Fed. Cir. 2011).

7   **VII.    A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT**
       **IRREPARABLE HARM.**

8

9          Samsung's own evidence and the admissions of its expert confirm that Apple has shown

10  an urgent need to stop Samsung from selling copycat products that will cause irreparable harm to

11  Apple's distinctive designs, market share, and customer goodwill.

12          **A.    Samsung's Sale of Copycat Products Will Cause Irreparable Harm by**
               **Eroding the Distinctiveness of Apple's Protected Designs.**

13

14          Apple submitted evidence that the media praised the iPhone and iPad for their "amazing,"

15  "sleek," "beautiful," and "seriously different" designs, and criticized Samsung for "shockingly

16  similar" designs to those products.  (Mot. at 8, 22; Zhang Dec. Exs. 1-4, 27-32.)  That

17  uncontroverted evidence demonstrates the irreparable harm that Apple faces from Samsung's sale

18  of infringing products.  By flooding the market with look-alike products, Samsung threatens to

19  genericize Apple's distinctive designs, depriving Apple of a significant competitive advantage.

20          Samsung's own expert, economist Michael Wagner, confirmed the importance of Apple's

21  distinctive designs in driving demand.  Wagner admitted that design is "one of six drivers of

22  demand."  (Ho Dec. Ex. D (Wagner Dep. 28:14-29:22).)  He further admitted that Apple is

23  "known as a company that pays particular attention to design," and that "Apple's iPhone and iPad

24  products are distinctive."  (*Id.* at Dep. 37:5-8, 38:24-39:2).)  Indeed, Wagner repeatedly

25  acknowledged that Apple's highly valuable brand was built on the distinctiveness of its products.[8]

26  _____

27          [8] Samsung's expert admitted that "Apple's extensive marketing efforts have created one
    of the most valuable brands worldwide"; you need "a distinctive set of products" in order "to
    really have a large value to your brand"; Apple's reputation as "an innovator in the area of design
28                                                                          (Footnote continues on next page.)

1    Similarly, Wagner acknowledged that Apple uses advertisements that "clearly focus on design" or

2    "show off" the design as "a featured element," "associat[ing] the design with the Apple brand."

3    (*Id.* at 41:18-42:6, 46:7-10, 47:10-12, 40:24-41:1, 44:9-14, 45:11-46:2, 47:13-15).)

4              Contrary to its expert's crucial admissions, Samsung argues that few customers buy the

5    iPhone because of its distinctive design. ███████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████████████████

12   ████████████████████████████

13             Wagner tried without success to neutralize his admissions by asserting that design does

14   not "drive[] the majority" of smartphone purchases, citing a ████████████████████████

15   ████████████████████████████████████████████████████████████████████████

16   █████████████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████████   As

19   explained by Dr. Sanjay Sood—who, unlike economist Wagner, is an expert on the effect of

20   design on consumer decision making—design is important in making purchase decisions, but is

21   rarely identified as the *primary* reason; indeed, consumers often do not realize how important

22   product design is to their decision.  (Sood Dec. ¶¶ 2-5, 11-33.)

23             The ████████████████████████  the Nielsen survey cited by Samsung's expert, and

24   Sood's research all show that design is an important factor driving smartphone and tablet

25

26   (Footnote continued from previous page.)

27   helped to increase its sales"; and Apple "built up the value of its brand" by "advertising the
     products' distinctiveness"  (Ho Dec. Ex. D (Wagner Dep. at 39:12-15; 52:8-19, 72:18-24);
     Wagner Dec. ¶ 21; *see* Ho Exs. F-G (Wagner Dep. Exs. 169, 170).)

28

APPLE'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 11-cv-01846-LHK
sf-3051944

19

1   purchases.  (Ho Dec. Ex. A (SAMNDCA00521309, SAMNDCA00521318,

2   SAMNDCA00025031); Ho Dec. Ex. E (Wagner Dep. Ex. 162); Sood Dec. ¶¶ 13-33).)  ███

3   ██████████████████████████████████████████████████████████████

4   ██████████████████████████████████████████████████████████████

5   ████████████████████████████

6          The distinctive design of Apple's iPhone and iPad differentiate them from competing

7   products.  (*See* Sood Dec. ¶¶ 36-37; Ho Dec. Ex. D (Wagner Dep. 39:12-15, 72:25-73:2).)  ███

8   ██████████████████████████████████████ "product as hero" advertisements that, as

9   Samsung's expert admitted, "focus on" or "show off" the design and "associate the design with

10  the Apple brand."  (*See* Sood Dec.¶¶ 36-37; Ho Dec. Ex. D (Wagner Dep. 41:18-42:6, 46:7-10,

11  47:10-12; 40:24-41:1, 44:9-14, 45:11-46:2, 47:13-15); Mot. at 30-31; Twiggs Dec. ¶¶ 2-8, Exs. 1,

12  2, 4, 6, 11-18; Ho Dec. Ex. EE (Twiggs Dep. 199:4-207:5); Ho Exs. FF-GG (Twiggs Dep.

13  Exs. 45-46).)  Samsung's sales of its infringing products threaten to erode the distinctiveness of

14  Apple's designs, harm Apple's reputation as an innovator, and diminish the value of its brand and

15  related goodwill.  (Lutton Reply Dec. ¶ 28; Sood Dec. ¶¶ 35-41.)

16         Apple's brand is a valuable form of goodwill, as Samsung's expert agrees.  (Ho Dec.

17  Ex. D (Wagner Dep. 39:12-21); *see also* Musika Dec. ¶¶ 27-28.)  Samsung's infringement

18  impermissibly free-rides on Apple's distinctive patented designs.  As Wagner admitted, the owner

19  of a design patent embodied in its products "can advertise the design and have the confidence that

20  that advertisement will benefit them because they can exclude others from using the design"; but

21  "if a company is advertising a design and other companies are copying the same design," that

22  advertising may be "benefitting the company that . . . copied it."  (Ho Dec. Ex. D (Wagner Dep.

23  78:4-13, 79:23-80:5).)

24         Legally and factually, the harm to Apple's brand is irreparable and cannot be remedied by

25  money.  (Musika Dec. ¶¶ 27-28.)  *See Maxim Integrated Prods., Inc. v. Quintana*, 654 F. Supp.

26  2d 1024, 1035 (N.D. Cal. 2009) (irreparable harm found in loss of control over reputation, loss of

27  trade, and loss of goodwill); *Marche Design, LLC v. TwinPro Int'l Holdings, Ltd.*, No. 08-cv-

28  2108, 2009 U.S. Dist. LEXIS 600, at *8-9 (D. Kan. Jan. 6, 2009) (irreparable harm where

1     defendant's copying of the trade dress design of plaintiffs' audio speakers rendered plaintiffs

2     "unable to deliver on their promise of exclusivity to their clients").

3          **B.**      **Samsung's Sale of Copycat Products Will Cause Irreparable Harm**

4               **1.**      **Samsung's sales will cause lost market share, lost profits on**
                         **current and future Apple products, and lost customer goodwill.**

5

6        Samsung does not dispute that "Samsung's market share has grown" and that Samsung is

7     Apple's "avowed competitor" and aims to "aggressively challenge" Apple in the smartphone and

8     tablet markets. (*See* Mot. at 31-32 (citing D.N. 44 at 1, Bartlett Dec. Exs. 45-47, Opp. at 29.)

9        Samsung's witnesses confirm these facts. ███████████████████████

10 ████████████████████████████████████████████████

11 █████████████████████████████████████████████████████

12 ███████████████████████████████ Samsung's expert, Michael Wagner,

13     admitted that (1) Apple, Samsung, and HTC "are now scrapping for the top spot in the

14     smartphone market" (Ho Dec. Ex. D (Wagner Dep. 152:13-19)); (2) Samsung is "Apple's

15     principal competitor in the tablet market" (*id.* at 182:25-183:3); and (3) Samsung's Galaxy

16     smartphones and tablets are "key competitors" of Apple's iPhone and iPad products (*id.* at

17     126:10-14, 149:10-150:4). ████████████████████████

18 █████████████████████████████████████████████████████

19 ████████

20        Despite admitting its products compete, Samsung contends its sales do not take away any

21     sales or market share from Apple. (Opp. at 29-30.) This argument defies common sense, █

22 ██████████████████████████████████████████████

23 ██████████████████████████████████████████████████████

24 ███████████████████████████████████████████

25 ███████████████████████████████████████████

26

27

28

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████

5     Wagner also admitted that Samsung eroded Apple's share of the tablet market.  In the last

6 quarter of 2010, an earlier version of Samsung's Galaxy Tab took 17% of the global market,

7 contributing substantially to the reduction of Apple's share from 93% to 73%.  (Ho Ex. D

8 (Wagner Dep. 180:11-181:21; Ho Dec. Ex. N (Dep. Ex. 185).)  ██████████████████████

9 ████████████████████████████████████████████████

10 ████████████  ████████████████████

11     Wagner's deposition testimony, and Musika's analysis, refute Samsung's "no harm"

12 argument.  Wagner admitted that Apple "probably suffered some damages" and could "have even

13 stronger sales than what they've had were it not for Samsung products."  (Ho Dec. Ex. D

14 (Wagner Dep. at 100:23-101:13).)  He also admitted that because Apple had "a lesser share of the

15 market," it missed out on "more sales than [it was] getting before because the market is growing."

16 (*Id.* at 174:14-19.)  Wagner identified several types of harm:

> 1.  Apple's lost sales of its competing product (*id*. at 88:7-10);
>
> 2.  Apple's lost sales of tag-along or "convoyed" items, such as iTunes music and software applications ("apps") that are used by that product (*id*. at 63:14-64:14, 88:14-18).
>
> 3.  Apple's lost sales of other Apple products that complement the initial product.  For example, when Wagner bought his iPhone 4, he bought five additional iPhones for his wife and four children, so they "can communicate easier and use FaceTime," a video calling system that works only with Apple products such as the iPhone, iPad, and iMac (*id*. at 61:11-62:8, 46:21-48:17; 89:5-13).
>
> 4.  Apple's lost sales of future products, such as the iPhone 6 or 8 (*id*. at 91:7-12, 94:18- 95:4, 95:9-17).  "Apple has the highest loyalty of any brand," so customers who buy an Apple product will likely "stick with Apple over time" (*id*. at 60:4-10).

---

[9] ████████████████████████████████████████

[10] Wagner did not know Samsung's market share during this period, but admitted that the Android market share included Samsung's Galaxy Tab, and that "Samsung is Apple's principal competitor in the tablet market."  (Ho Dec. Ex. D (Wagner Dep. 179:12-21, 182:25-183:3).)

1   ████████████████████████████████████████████████████████

2        Samsung contends its sales do not harm Apple because Samsung customers are loyal to

3   smartphones and tablets that operate on the Android platform, rather than Apple's platform.  (Opp.

4   at 30 (if injunction issued, Samsung customers will likely "switch to another Android device").)

5   But as Wagner admitted, 60% of U.S. mobile phone users have phones with less-sophisticated or

6   no operating systems.  (Ho Dec. Ex. D (Wagner Dep. 59:6-17).) ███████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10  █████████████████████████████████████████████████████

11  ████████

12       Moreover, the 60% of mobile phone users who do not own smartphones are predicted to

13  convert to smartphones over the next 3-5 years.  (Ho Dec. Ex. D (Wagner Dep. 153:11-156:17) &

14  Ho Dec. Ex. L (Wagner Dep. Ex. 183).) █████████████████████████

15  ████████████████████████████████████████████████████████

16  █████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  Unless enjoined, Samsung's sales of infringing devices will cause lost sales of both current Apple

23  products and future products to customers who otherwise would have been loyal to Apple.

24          **2.**        **Money cannot fully remedy the harm to Apple.**

25       Samsung contends the harm due to Samsung's taking away of market share, sales, and

26  customers can be quantified and adequately remedied by damages based on the "sales figures" for

27  the challenged products or a "reasonable royalty."  (Opp. at 34; Wagner Dec. ¶ 100.) ████████

28  ████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████

3      Once again, Samsung's own expert defeats its position.  Wagner admitted Samsung's

4 sales may cause lost future sales of successor products to customers who would have been loyal

5 to Apple, as well as lost sales of tag-along items and other related items.  Wagner alleged he

6 could quantify this harm, but admitted it depends on unknown future events, including (1) "what

7 the market looks like two years from now when the two-year contract expires"; (2) whether Apple

8 is able to maintain customer loyalty at the same level, which is "unknown"; and (3) the outcome

9 of "the real competition" between the Apple and Android platforms.  (Ho Dec. Ex. D (Wagner

10 Dep. 91:20-22, 92:2-5; 95:24-96:1).) ███████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ███████████████████████████      *See Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 703-04

14 (Fed. Cir. 2008) (difficulty in estimating monetary damages reinforces inadequacy of remedy).

15      ██████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████  Wagner agreed that customer loyalty is a form of goodwill,

18 noting the "classic definition" of goodwill as "the expectation of future patronage."  (Ho Dec.

19 Ex. D (Wagner Depo. 210:12-15); *see also* Musika Dec. ¶¶ 27-28.)  "Evidence of threatened loss

20 of prospective customers or goodwill certainly supports a finding of the possibility of irreparable

21 harm."  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001);

22 *LimoStars, Inc. v. N.J. Car & Limo, Inc.*, 2011 U.S. Dist. LEXIS 87771, at *47 (D. Ariz. Aug. 8,

23 2011) (loss of "new customers who might otherwise have become repeat customers generating

24 revenue far into the future" is irreparable harm).

25      Samsung's sales also threaten harm to Apple's reputation, which is another harm that is

26 hard to quantify.  Samsung and Apple are "neck and neck" in global smartphone sales.  (Ho Dec.

27 Ex. D (Wagner Depo. 181:1-12).)  Apple's reputation would suffer if Samsung became the top

28 seller, as Wagner admits.  "Being number one in sales" enhances brand value.  (*Id.* 51:17-52:3.)

1  "[W]hen you're the leading seller in the world, it's easier to keep people focused on you for

2  further development of software apps than if you're not number one."  (*Id.* 196:2-8; *see* Lutton

3  Reply Dec. ¶¶ 26-27.) ███████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████████

6        **3.     Apple does not lack "capacity."**

7        Samsung argues its infringing sales cannot harm Apple because Apple lacks capacity to

8  meet demand, citing "supply constraints" for the iPhone 4 when it was first introduced in June

9  2010.  (Opp. at 32, citing Ex. MM at 26, 38, 50.) ███████████████████████████

10 ████████████████████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████████████

14 ███████████████████████████████████████████████

15     **C.     Samsung Fails To Rebut Irreparable Harm.**

16        **1.     Apple promptly sought a preliminary injunction against
               Samsung's new round of infringing products.**

17

18        Samsung's argument that Apple delayed in seeking a preliminary injunction is refuted by

19 the release dates of the products at issue:  June 8, 2011 (Galaxy Tab 10.1); May 14 and 15, 2011

20 (Droid Charge and Infuse 4G); and February 23, 2011 (Galaxy S 4G).  (Mot. at 33 n.9.)  The Tab

21 10.1, Charge, and Infuse *were not even on the market* when Apple filed this lawsuit on April 15,

22 2011, and the Galaxy S 4G had been on the market for *only two months*.  Upon filing this suit,

23 Apple promptly moved for expedited discovery to obtain samples of Samsung's unreleased

24 products.  (D.N. 10)  Apple filed this motion on July 1, just three weeks after the Tab 10.1 was

25 released on June 8.

26        Samsung cites no case finding that such a short "delay" negates irreparable harm.  Indeed,

27 the primary case on which Samsung relies stated a delay of *seventeen months* "may not have been

28 enough, standing alone, to demonstrate the absence of irreparable harm."  *High Tech Med.*

1   *Instrumentation, Inc. v. New Image Indus., Inc.,* 49 F.3d 1551, 1557 (Fed. Cir. 1995).  The court

2   ultimately found no irreparable harm due to a *combination of factors*, including "the absence of

3   any indication that money damages would be unavailable to remedy any loss," and plaintiff's

4   "inactivity in the market," meaning it did not "run the risk of losses of sales or goodwill."  *Id.* at

5   1556-57.  Similarly, *Novozymes A/S v. Danisco A/S,*  No. 10-cv-251, 2010 WL 3783682, *3 (W.D.

6   Wis. Sept. 24, 2010), does not support Samsung, as that case rested on plaintiffs' failure to show

7   a threat of *additional* harm, besides the harm *already incurred* in the two years before the patent

8   issued, when defendant's sales were "perfectly legal."  Both cases are inapposite in view of

9   Apple's showing of irreparable harm.

10        Samsung's argument that the "delay" period should be calculated from its release of older

11   products in 2010 is refuted by *Rexnord* and *Whistler*, both of which hold that delay begins from

12   the release of the products for which an injunction is sought.  (*See* Mot. at 33.)  Samsung relies on

13   *Calmar, Inc. v. Emson Research, Inc.,* 838 F. Supp. 453, 454-56 (C.D. Cal. 1993), which

14   mentioned continual sales of similar products, but that case did not identify the release date of the

15   product at issue, which may already have been on the market for a year or more.

16        In any event, acceptance of Samsung's unfounded argument that the delay period began

17   when its older products were released would not rebut Apple's showing of irreparable harm.

18   When Samsung released its first round of infringing products in July 2010, Apple immediately

19   objected and then tried to negotiate a resolution.  (Mot. at 33 n.10; Lutton Dec. ¶¶ 2-9; Lutton

20   Reply Dec. ¶¶ 6-22.)  Samsung admits "settlement negotiations can excuse reasonable delay in

21   seeking a preliminary injunction," █████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ███████████████████████████████████████████

25   ██████████████████████████████████████████████

26   ██████████████████████████████████████████████

27   ████████████████████████████████████████████████

28   █████████████████████████████████

1

2. **Apple's focus on four recently released Samsung products does not rebut its showing of irreparable harm.**

2

3   Samsung accuses Apple of "gamesmanship" by seeking a preliminary injunction against

4   four recently released Samsung products, and not other products.  (Opp. at 37.)  As Samsung  has

5   admitted, mobile devices "have a shelf life . . . like cabbage" of "six months to a year max."  (Ho

6   Dec. Ex. R (6/17/11 Hrg. Tr. at 32).)  ████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████ █ ████████████████████████

9   Apple's focus on Samsung's most recent models reflects that reality.

10          3.      **Apple's limited licenses do not rebut its showing of irreparable harm.**

11      ████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████

14      ██████████████████████████████████████████████████████████████████

15   ████████████████████████████████████ █ ██████████████████████████████████

16      ████████████████████████████████████████████████████████████

17   ████████████████████████████████████████

18      ████████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████████

23

24          [11] Apple's decision not to seek preliminary relief against Motorola, Nokia, and HTC does
25   not rebut irreparable harm.  Those cases, involving different defendants, products, and intellectual
     property—for example, no design patents are at issue—have no relevance except to confirm
26   Apple's vigorous enforcement of its intellectual property rights.

27          [12] Samsung refers to Exhibit "OO," but evidently intended to refer to Exhibit QQ.  Apple
     objects to evidence of Rule 408 settlement offers and submits rebuttal evidence only in the event
28   that the Court decides to consider such evidence.

Prior licenses are "but one factor for the district court to consider" in assessing irreparable harm. *Acumed*, 551 F.3d at 1328.  "Adding a new competitor to the market may create an irreparable harm that the prior licenses did not." *Id.* at 1329.

## VIII.   THE BALANCE OF EQUITIES FAVORS APPLE.

Samsung complains it would be harmed by a preliminary injunction, but "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against a continuing infringement destroys the business so elected." *Telebrands Direct Response Corp. v. Ovation Commc'ns, Inc.*, 802 F. Supp. 1169, 1179 (D.N.J. 1992) (quoting *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986).)  Samsung admits copying is relevant to a preliminary injunction, but asserts Apple has not shown "copying or willful

1    infringement."[13]  (Opp. at 39.)  Samsung's product designs are too similar to Apple's, however,

2    for this to be mere coincidence.  (*See* Mot. at 7-8.)  Samsung redesigned its Galaxy Tab 10.1 to

3    make it closer to the iPad 2 design, resulting in what one commentator called the "best design

4    compliment an Android tablet could hope for, often being mistaken by bypassers, including

5    Apple iPad users, for an iPad 2."[14]  While Samsung has refused to produce evidence of the

6    decision process that led to its look-alike designs, the snippets it produced are highly revealing.

7    ███████████████████████████████████████████████████████

8    █████████████████████████████████████████████████████████

9    ███████████████████████████████████████████

10      ███████████████████████████████████████████

11   █████████████████████████   (Lutton Reply Dec. ¶¶ 7, 9-12)  Samsung nevertheless

12   chose to release multiple new infringing products despite Apple's objections, and thus has no

13   basis to complain about the alleged "hardship" a preliminary injunction motion would impose.

14   Moreover, a preliminary injunction would be limited to certain Samsung products, and Samsung

15   could presumably remove the infringing "bounce-back" feature and modify its designs.

16   **IX.    THE PUBLIC INTEREST FAVORS INNOVATION, NOT COPYING.**

17         Samsung contends the "public interest" favors "competition" because Apple has not

18   shown "Samsung is infringing a valid patent."  (Opp. at 39.)  Apple has shown likely success,

19   however, and no public interest is served by *unlawful* competition.  On the contrary, the public

20   interest favors "rewarding inventors for their creative genius and protecting their intellectual

21

22   _____

23      [13] On September 28, 2011, Magistrate Judge Grewal ordered Samsung to produce all
     documents from Samsung's designers that reference the Apple products that Apple alleges
24   embody features claimed in the asserted patents.  (D.N. 267 at 3.)  The Order states that Samsung
     placed those documents at issue by arguing in its Opposition that Apple had offered no evidence
25   of deliberate copying.  (*Id*.)

26      [14] Ho Ex. D (Wagner Dep. 118:4-119:1, 121:20-122:7, 128:22-25) & Ho Dec. Ex. K
     (Wagner Dep. Ex. 177;) *see* Ho Dec. Ex. H (Wagner Dep. Ex. 173 (Galaxy Tab 10.1 "looks like
27   an iPad")); Ho Ex. I (Wagner Dep. Ex. 175 (Tab 10.1 takes "another page from the iPad 2's
     school of sexy tablet building")); Ho Dec. Ex. J (Wagner Dep. Ex. 176 (Tab 10.1 "looks very
     similar to the iPad 2").)

28

1   property rights from infringers," because "such protection encourages the innovation that leads to

2   new products."  *Telebrands*, 802 F. Supp. at 1179.

3        Samsung argues the interest in competition is "especially acute" because there are other

4   makers of Android devices.  (Opp. at 40.)  This argument shows why the public interest *favors* a

5   preliminary injunction.  An injunction against selling the accused Samsung devices will not

6   materially limit competition because consumers will be able to buy Android devices from

7   others.[15]  In contrast, unabated infringing sales will cause irreparable harm by sending a message

8   to the industry that it is "open season" on patented designs and features in which Apple has

9   invested hundreds of millions of dollars to develop and promote.

10  **CONCLUSION**

11       Apple has demonstrated likelihood of success on the merits, met every criteria for

12  injunctive relief, and has shown an urgent need to prevent further irreparable harm from

13  Samsung's continued sale of infringing products.  The requested injunction should issue.

14

15  Dated:  September 30, 2011          MORRISON & FOERSTER LLP

16

17                      By:    */s/ Michael A. Jacobs*
                            Michael A. Jacobs

18                            Attorneys for Plaintiff
                          APPLE INC.

19

20

21

22

23

24

25

26      [15] Samsung has made no showing of an acute public necessity for the infringing devices at
issue in this motion.  This case does not involve, for example, a pharmaceutical that would impact

27  public health if sales were enjoined.  Samsung does not and cannot dispute that other smartphones
and tablets, including those running on "4G" networks, are currently being sold in the U.S.

28

1

**ATTESTATION OF E-FILED SIGNATURE**

2        I, JASON R. BARTLETT, am the ECF User whose ID and password are being used to

3   file this Reply in support of Apple's Motion for a Preliminary Injunction.  In compliance with

4   General Order 45, X.B., I hereby attest that Michael A. Jacobs has concurred in this filing.

5   Dated:  September 30, 2011              By:  _____ */s/  Jason R. Bartlett*_____

6                                                    Jason R. Bartlett

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28