# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | Case No.   11-cv-01846-LHK |
| Plaintiff, | **REPLY DECLARATION OF SANJAY SOOD IN SUPPORT OF APPLE'S MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | Date: October 13, 2011<br>Time: 1:30 p.m.<br>Courtroom: 8, 4th Floor<br>Honorable Lucy H. Koh |
| Defendants. | |

**PUBLIC REDACTED VERSION**

**EXHIBITS D AND H FILED UNDER SEAL**

I, SANJAY SOOD, declare as follows:

1. I am an Associate Professor at the Anderson Graduate School of Management of the University of California, Los Angeles ("UCLA"). My teaching and research interests are marketing management, brand management, advertising, and consumer behavior. I have been asked by counsel for Apple Inc. to provide a declaration addressing issues that I understand have been raised by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung") in connection with Apple's Motion for a Preliminary Injunction, including the impact of design on consumer behavior. This declaration sets forth my professional opinion on these issues as an expert in marketing and branding.

## I. QUALIFICATIONS

2. I hold a Ph.D. in Marketing from Stanford University. I also received a Master of Business Administration degree from Northwestern University and a Bachelor of Science in Electrical Engineering from the University of Illinois at Urbana-Champaign.

3. Over the past thirteen years, I have taught marketing management, brand management, and entertainment marketing to students in graduate education and executive education programs at UCLA and Rice University. A copy of my curriculum vitae is attached hereto as Exhibit A.

4. I am an associate editor at both the *Journal of Marketing* and the *Journal of Consumer Psychology*. I am also on the editorial boards of the *Journal of Marketing Research* and the *Journal of Consumer Research*. I also have published numerous journal articles on consumer behavior, brand equity, and other marketing topics. A list of my honors, awards, articles, and speaking engagements appears in my curriculum vitae. (*See* Ex. A.)

5. My research focuses on marketing management, brand management, advertising, and consumer behavior. Specifically, I have studied the effects of branding strategies and product experience on brand evaluations, competitive anticipation in marketing decision making, and the effects of design on consumer behavior.

6. In the past five years, I have provided expert opinions concerning marketing and consumer behavior in the following cases:

- *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, Case No. 07-cv-03752-JSW (N.D. Cal.) (expert for Levi Strauss & Co. on trade dress recognition and likelihood of confusion);
- *Experian Information Solutions, Inc. v. LifeLock, Inc.*, 08-cv-00165-AG-MLG (C.D. Cal.) (expert for Experian Information Solutions, Inc. on consumer behavior); and
- *Erica Possin v. ConsumerInfo.com, Inc., d/b/a Freecreditreport.com*, SACV10-00156-JVS (C.D. Cal.) (expert for ConsumerInfo.com, Inc. on consumer perceptions of advertising).

7. I also have been professionally engaged by the following companies to provide corporate training and consultation regarding marketing and branding: Microsoft Corporation, MTV Network, The Walt Disney Company, Kaiser Permanente, Sony Corporation, Sanofi-Aventis, Novartis, Irish Medical Devices Association, State Farm, Lynx Grills, and National Promotions & Advertising, Inc.

8. I have been retained as an expert consultant in this case by Morrison & Foerster LLP, attorneys for Apple Inc. My hourly rate is $550. My compensation is in no way tied to the outcome of this case or any particular part of this case.

## II. SCOPE OF DECLARATION

9. I have been asked by Apple's attorneys to address several issues that I understand have been raised by Samsung in its opposition to Apple's Motion for a Preliminary Injunction. These issues include: (a) the general impact of design in consumer purchasing decisions; (b) the specific impact of design on consumer decisions to purchase Apple's iPhone and iPad products, as reflected in several smartphone consumer surveys cited by Michael Wagner or used by Samsung in its opposition; and (c) the impact of sales of competing products with substantially the same design on the brand image and marketing efforts of a company, such as Apple, that is known for its innovative and distinctive designs.

10. In preparing this declaration, I reviewed Apple's Amended Complaint; Samsung's Answer; Apple's Motion for a Preliminary Injunction, the declaration of Sissie Twiggs in Support of Apple's Motion for a Preliminary Injunction and exhibits to that declaration; the deposition transcript of Sissie Twiggs; the non-confidential portions of Samsung's Opposition to Apple's Motion for a Preliminary Injunction; the non-confidential portions of the Declaration of Michael J. Wagner in Support of Samsung's Opposition to Apple's Motion for a Preliminary Injunction and the non-confidential portions of the exhibits to that declaration; non-confidential Exhibit 162 to the deposition transcript of Michael J. Wagner; a market study called "ComTech United States Report Q410," dated February 11, 2011 (the "ComTech Report"); the iPhone Buyer Survey that covers the third quarter of Apple's 2011 fiscal year (the "iPhone Buyer Survey, FY11-Q3"); the iPhone Buyer Survey that covers the second quarter of Apple's fiscal year (the "iPhone Buyer Survey, FY11-Q2"); and the iPad Tracking Study that covers the second quarter of Apple's 2011 fiscal year (the "iPad Tracking Study, FY11-Q2").

11. As explained below, research on consumer behavior—including my own independent research—demonstrates that design plays an important role in consumers' purchasing decisions. Yet, consumers systematically underestimate the importance of design in response to direct surveys about their purchasing decisions. The surveys of smartphone customers that I have reviewed illustrate this phenomenon. Surveys that ask the importance of multiple different factors in choosing a smartphone consistently result in "design" being identified as an important factor. In contrast, when surveys ask the main reason for buying a product, consumers are unlikely to identify design as the most important factor. This does not necessarily mean that design is unimportant. Rather, it means that consumers may not realize the significance of design in their purchasing decisions, or may be unwilling to identify design as the single most important factor in their purchase decisions.

12. Because design is an important factor in consumer buying decisions, a company such as Apple that has distinctive and attractive product designs has a significant competitive advantage. My research shows that not only are consumers more likely to buy those specific products, they are likely to pay more for them. Moreover, other research suggests that if a

company has a consistent focus on design, it may acquire a reputation as an innovator in design that may increase the overall value of the brand and create a positive image that attracts more customers. If a second company sells competing products with substantially the same design, the first company can lose its competitive advantage with regard to its innovative product designs. This is because the availability of competing products with similar designs by the second company will make the first company's products look less distinctive, and they may harm the first company's reputation for uniquely appealing product designs.

### III. PRODUCT DESIGN PLAYS A SIGNIFICANT, BUT OFTEN UNDERREPORTED, ROLE IN CONSUMER PURCHASING DECISIONS

13. Since 2007, I have conducted approximately fifteen to twenty surveys as part of my research on the impact of design on consumer purchasing decisions. Typically these studies provide consumers with a choice between an attractive looking product and an average looking product. The products will have varying levels of functional feature information provided, with up to five other features, including price, shown in addition to design. I have examined a host of product categories, ranging from some that are more public in nature such as socially oriented products (*e.g.*, sunglasses, blue jeans, etc.) as well as categories that are more private in nature and less socially oriented (*e.g.*, tape dispensers, CD alarm clock radios, etc.). Based on the studies I have conducted and that are described above, I have determined that an attractive and distinctive design of a product is a critical driver of purchasing decisions in both public and private categories.

14. At the same time, my research reveals a systematic underweighting of design as a reason for choice when consumers are asked directly to rate the importance of design, as opposed to being asked indirectly by choosing between two specific products, one of which has a more aesthetically pleasing design than the other. I have conducted several studies that examine this contrast in the importance of design when asking the question directly or indirectly. For example, when asked directly (as in the case of a survey or questionnaire) about how much extra they would be willing to pay for a product with an attractive design, consumers replied that they would be willing to pay about a 30% price premium in categories such as sunglasses.

15. When asked indirectly through a choice task, however, the results differed significantly. Specifically, consumers were given the choice between a product with an attractive design and a product with an average design, presented side by side. Different sets of people were given different prices for the two products, with the average looking product priced at a "base" price and the attractively designed product priced at a premium, starting at a 12-15% premium over the base price and going up from there. The results revealed that consumers were very willing to pay large premiums for an attractively designed product. In fact, the percentage of people who chose the product with the attractive design did not decrease significantly until the price premium of that product reached more than three times the base price. This research demonstrates that consumers are willing to pay a substantial price premium—up to three times the original price—for a product with an attractive design, which is many multiples above the 30% price premium that they identify when asked directly about their willingness to pay more for a product with attractive design. Interestingly, we find a similar pattern of willingness to pay whether the category is more public (*e.g.*, sunglasses) or more private (*e.g.*, CD alarm clock radios) in nature.

16. My research also shows that consumers may be reluctant to identify 'design' as a reason for their purchase decision when responding to surveys. Similar to the price-premium research described above, we asked consumers two sets of questions that were designed to test directly and indirectly whether they felt that 'design' justified purchase decisions. Specifically, consumers were presented with the following scenario: "Person A and Person B are both shopping for a new blender. There are two options. One is more aesthetically pleasing while the other functions better (or is lower priced or better branded). Person A opts for the more aesthetically pleasing option. Person B opts for the better functioning product (or lower priced or better branded) option." Based on this scenario, consumers were asked, "Who is smarter?" None of the respondents said that Person A was smarter in any of the three scenarios (design vs. function, price, or brand). This research demonstrates that, although consumers weigh design heavily in their purchase decisions (as discussed above), consumers perceive that reporting that their decisions are being driven by design is not a rational or "smart" decision. As a result,

1  consumers may systematically underreport the impact of design in their decision making because
2  of the bias reflected above.

3        17.    In a separate study, we asked consumers questions that indirectly tested whether
4  they felt that design justified purchasing decisions. Specifically, consumers were given the
5  choice between an aesthetically appealing product and an average-looking product, similar to the
6  studies of willingness to pay described above. We used five product categories in this study: tape
7  dispensers, blenders, CD alarm clocks, desk lamps, and wall clocks. In contrast to the earlier
8  studies, for each of the products consumers were given four functional features (in addition to
9  design and price) as a basis for evaluations. For example, in tape dispensers the functional
10 features included whether or not the base was no-slip (feature A), whether or not the base was
11 weighted (feature B), if the dispenser could handle more than one size of tape (feature C), and
12 whether or not it was easy to load the dispenser with tape (feature D).

13       18.    All of these functional features were shown to the respondents, however the
14 features differed in terms of whether or not they favored the aesthetically pleasing option. For
15 half of the respondents, two of the features (*e.g.*, features A and B) favored the aesthetically
16 pleasing option (*e.g.*, this dispenser had a weighted base and a no-slip base) and the other two
17 features (*e.g.*, features C and D) favored the average-looking option (*e.g.*, this dispenser could
18 handle more than one tape size and was easy to load). This was reversed for the other half of
19 respondents so that the features that previously favored the average-looking option (*e.g.*, features
20 C and D) now favored the aesthetically pleasing option and the features that previously favored
21 the aesthetically pleasing option (*e.g.*, features A and B) now favored the average-looking option.
22 After choosing an option, consumers were asked to rate how important each feature was in their
23 decision.

24       19.    Across the product categories, each feature set (*e.g.*, features A and B or features C
25 and D) was weighted as being significantly more important whenever it was paired with the more
26 aesthetically pleasing product. In other words, when asked about the importance of certain
27 features in terms of being a basis for choice, consumers in this study consistently inflated the
28 importance of functional features that were paired with the more aesthetically pleasing products,

1  regardless of which feature set was paired with those products. This research demonstrates that
2  consumers may justify their choice of an aesthetically appealing product by overweighting
3  functional product features because they may be reluctant to articulate that design drove their
4  purchasing decisions.

5       20.    As stated above, based on my research, the distinctiveness of a product's design is
6  a critical driver of purchasing decisions. The experimental paradigm that we used in the studies
7  paired an aesthetically pleasing product with an average-looking product. Consumers' choices
8  made it clear that consumers are willing to pay substantially more for an aesthetically pleasing
9  product; yet, when asked directly, consumers would underweight the importance of design as a
10 basis for their choices. Instead, they overweighted the importance of functional features, such as
11 a tape dispenser with a no-slip base. This is consistent with research in the field of consumer
12 behavior that shows that when consumers are surveyed about their choices, they tend to give
13 reasons that are more easy to justify to themselves and others (*e.g.*, a tape dispenser with a no-slip
14 base) rather than reasons that are less rational and harder to justify (*e.g.*, an attractive looking tape
15 dispenser). Attached hereto as Exhibit B is a true and correct copy of a paper that discusses this
16 topic.[1] Thus, although consumers prefer distinctive, attractive designs, they nonetheless tend to
17 underweight the importance of design when directly asked about its importance, and they
18 correspondingly overweight other factors.

19 **IV.   SIGNIFICANCE OF DESIGN FOR SMARTPHONE BUYERS**

20      21.    I have reviewed several surveys concerning the importance of design to buyers of
21 smartphones such as the iPhone. The first survey is a June 2011 Nielsen survey described in an
22 article that Michael Wagner cites in his declaration, which I understand was marked as Exhibit
23 162 to Mr. Wagner's deposition. Attached as Exhibit C is the document that was submitted as
24 Exhibit 162 to Mr. Wagner's deposition. As Mr. Wagner states in his declaration, the Nielsen

---

[1] Eldar Shafir, Itamar Simonson & Amos Tversky, *Reason-Based Choice*, 49 COGNITION 11 (1993).

1   survey showed that "touchscreen capability" was ranked as the most important factor in a
2   smartphone, while "other important decision drivers included 'Internet access, apps, access to
3   email, design, ease of use and price.'" (Wagner Dec. ¶ 84.) Thus, design was identified as "one
4   of six drivers of demand." (*Id.*) Indeed, the article noted that it was a "tossup" as to which of
5   those six drivers of demand was most important. (Ex. C at 2.) The article concluded that
6   "smartphone users want a lot of different things out of their device, which means that smartphone
7   vendors will need to cover all their bases to be successful in the smartphone market." (*Id.*) The
8   summary of the survey results indicates that respondents were asked to identify the first, second,
9   and third most important reasons for buying a smartphone. (*Id.* at 5.)

10   22.   In the Nielsen survey, design was presented as one of twenty potential reasons for
11   choice. Similar to the discussion above, the identification of design may be underweighted as the
12   majority of the other reasons were easier to justify as a basis for choice. For example, features
13   such as "touchscreen capability" and "access to email" offer clear functional benefits that could
14   be more easily justified to others relative to design.

15   23.   While the Nielsen survey in fact indicates that design is an "important decision
16   driver" for smartphone buyers, as Mr. Wagner notes, consumers often undervalue the significance
17   of design to their buying decision, as discussed above. Because of this phenomenon, it is likely
18   that design was actually even more important to smartphone buyers than indicated by the Nielsen
19   survey, and may have been among the top several reasons for purchase.

20   24.   [redacted]

1  ███████████████████████████████████████████████████████

2  ███████████████████████████████████████████████

3  ███████████████████████████████████████████████████████

4  ███████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████

7  ██████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████

9  █████████████████████████████████████████████████████

10 ████████████████

11       25.   █████████████████████████████████████████████

12 ███████████████████████████████████████████████████████

13 ███████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ███████████████████████████████████████████████████████

16 ██████████████████████████████████████████████████████

17 ██████████████████████████████████████████████████████

18 ██████████████████████████████████████████████████████

19 ███████████████████████████████████████████████████████

20 ███████████████████████████████████████████████████████

21 ██████████████████████████████████████████████  Indeed, the

22 *New York Times* discussed the attractive design of Apple's iPad in a recent article on the market

23 for tablet computers: "Apple also has a lead in design that will be tough to surmount. People

24

25

26

27

28

1  want to own its products because they are so good-looking."  Attached hereto as Exhibit E is a
2  true and correct copy of a printout of "Amazon Has High Hopes for its iPad Competitor."[2]

3  26. ███████████████████████████████████████
4  ███████████████████████████████████████
5  ███████████████████████████████████████
6  ███████████████████████████████████████
7  ███████████████████████████████████████
8  ███████████████████████████████████████
9  ███████████████████████████████████████
10 ███████████████████████████████

11 27. ████████████████████████████████
12 ███████████████████████████████████████
13 ███████████████████████████████████████
14 ███████████████████████████████████████
15 ███████████████████████████████████████
16 ███████████████████████████████████
17 ████████████████████

18 28. ██████████████████████████████
19 ███████████████████████████████████████
20 ███████████████████████████████████████
21 ███████████████████████████████████████
22 ███████████████████████████████████████
23 ████████████████████

---

[2] David Stretifeld, *Amazon Has High Hopes for its iPad Competitor*, N.Y. TIMES, SEPT. 25, 2011.



1

2

3

4

5    33.

6

7

8

9

10

11

12

13

### V. THE SALE OF COMPETING PRODUCTS WITH SUBSTANTIALLY THE SAME DESIGN WILL ERODE THE DISTINCTIVENESS OF THE IPHONE AND IPAD DESIGNS

34.     I have been asked to comment on the statements of Michael Wagner concerning the impact on Apple of Samsung's sales of competing products with substantially the same design as the iPhone and iPad.  In particular, I have been asked to comment on Mr. Wagner's statements that Apple "fails to provide any linkage whatsoever between Samsung's sales and the erosion of the distinctiveness of Apple's designs" (Wagner Dec. ¶ 17) and that the Apple brand is so strong that the sales of Samsung's products cannot have any adverse effect on the distinctiveness of Apple's designs, or on the price-competitiveness of Apple's products.  (Wagner Dec. ¶¶ 24, 27.) Mr. Wagner's statements demonstrate that he does not understand the effects that can occur when a distinctive design is copied by others in the marketplace.

35.     I have seen copies of a selection of iPhone and iPad advertisements that were attached as exhibits to the Declaration of Sissie Twiggs submitted in support of Apple's Motion for a Preliminary Injunction, as well as iPhone and iPad advertisements that I have seen in the media in my everyday life.  Without question, Apple has featured its distinctive design in its

1  advertising. iPhone and iPad ads generally showcase the products in use on television or display
2  the products prominently in print. This common technique seen in many Apple ads is sometimes
3  referred to as the "product as hero" approach in advertising. That is, the approach is to show the
4  product itself as the star of the ad, rather than to use a spokesperson or to show a myriad of
5  product features as the star. Apple's advertising tends to focus on big, bold product shots, making
6  the attractive and distinctive product design central in the ad and clear to the viewer. Advertising
7  is a significant strength for Apple, as evidenced by the awards that Apple has received including
8  Advertising Age's first ever Marketer of the Decade Award in 2010. Attached hereto as Exhibit
9  F is a true and correct copy of a website printout discussing this award.[3]

10  36.  Apple has consistently used this "product as hero" technique across its product line
11  over the years. This common focus on the product combined with consistency across Apple
12  advertising would be expected to increase the distinctiveness of Apple's designs in the
13  marketplace. Research on branding shows that repeatedly using a consistent advertising message
14  increases the strength of that message in consumers' minds. Attached hereto as Exhibit G is a
15  true and correct copy of a paper titled "The Brand Report Card" that discusses this issue.[4] The
16  paper discusses the top ten traits that strong brands share, and one of the traits is that the brand
17  stays consistent over time. The paper describes the case of Michelob and how the inconsistency
18  in its advertising led to consumer confusion about the brand. On the other hand, Apple has been
19  very consistent with its advertising over the last five years. The iPhone and iPad ads typically
20  feature the product, making it easy to appreciate the design. In addition, the ads have a simple,
21  elegant look that has helped Apple strengthen its association with design in the minds of
22  consumers.

---

[3] Beth Snyder Bulik, "Marketer of the Decade: Apple," *available at* http://adage.com/article/special-report-marketer-of-the-year-2010/marketer-decade-apple/146492/.

[4] Kevin Lane Keller, *The Brand Report Card*, HARV. BUS. REV., Jan-Feb. 2000, at 3.

37. If other products that look like the iPhone or the iPad are released on the market, then the distinctiveness of the iPhone and iPad designs would begin to be eroded in the eyes of the customer. For example, as discussed above, consumers consistently prefer a product with an attractive design over a product with an average design, even if the average-looking product is functionally as good as or even better than the product with the attractive design. Having products with attractive and distinctive designs gives Apple a competitive advantage over other companies that do not have such products. If other companies are able to offer products with similar designs, however, Apple will lose this competitive advantage.

38. In addition, the sale of competing products with similar designs would erode the ability of the iPhone and iPad to command price premiums based on design. Research has pointed out that strong brands need to have a strong, favorable, and unique point of difference in the marketplace. If products with similar designs to the iPhone and iPad are available, then Apple's strong point of difference of design would be eroded, and eventually design could become a point of parity that is shared among several brands. Attached hereto as Exhibit I is a true and correct copy of a paper titled "Three Questions You Need to Ask About Your Brand," which discusses this topic.[5] In other words, Apple would no longer be able to use its distinctive design as a unique way to differentiate its products from competitors and price premiums related to design would likely erode. Indeed, to the extent that Apple's "product as hero" advertising increases demand for products with Apple's designs, Apple's advertising will actually benefit competitors that are selling products that look like Apple's.

39. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[5] Kevin Lane Keller, Brian Sternthal, and Alice Tybout, *Three Questions You Need to Ask About Your Brand*, HARV. BUS. REV., Sept. 2002, at 3.

1   █████████████████████████████████████████████████████

2   ████████████████████████████████

3       40.     Further, Apple's reputation as an innovator in design may be tarnished if other companies are selling products with similar designs. Apple has a well-established reputation of coming out with remarkable new products and designs that look very different from what has come before. If consumers can buy products with similar designs from other companies, Apple's design will no longer stand out from the crowd of competing products. Eventually design will no longer be a compelling strength for Apple. To the extent that similar designs exist, then design will become less important and other features such as function and/or price will become more important in the purchase decision.

4       41.     There are compelling anecdotal examples of this erosion of distinctiveness in the marketplace. For example, at one time, high-end kitchens were denoted by appliances with a sleek design featuring a distinctive stainless steel look. The uniqueness of the stainless steel design conveyed status, and consumers were willing to pay huge price premiums for these appliances. Now, however, such a design is no longer as distinctive as many manufacturers have copied the stainless steel look in the marketplace.

1    I declare under penalty of perjury that the foregoing is true and correct, and that this
2    declaration was executed on September 30, 2011 at Los Angeles, California.

_____
*Sanjay Sood* (signature)