UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>          Plaintiff,<br><br>    v.<br><br>SAMSUNG ELECTRONICS CO., LTD., A<br>Korean business entity; SAMSUNG<br>ELECTRONICS AMERICA, INC., a New York<br>corporation; SAMSUNG<br>TELECOMMUNICATIONS AMERICA, LLC, a<br>Delaware limited liability company,<br><br>          Defendants. | Case No.    11-cv-01846-LHK<br><br>**REPLY DECLARATION OF<br>COOPER C. WOODRING IN<br>SUPPORT OF APPLE'S MOTION<br>FOR A PRELIMINARY<br>INJUNCTION**<br><br>Date: October 13, 2011<br>Time: 1:30 p.m.<br>Courtroom: 8, 4th Floor<br>Honorable Lucy H. Koh |

**PUBLIC REDACTED VERSION**

**[EX. 1 FILED UNDER SEAL]**

I, COOPER C. WOODRING, declare as follows:

1.      I am an independent industrial designer and inventor.  My qualifications are set forth in my June 30, 2011 Declaration In Support of Apple's Motion for a Preliminary Injunction ("opening declaration").  In all, I have offered my expert opinion in over 60 U.S. district court or U.S. ITC litigations and have had my testimony admitted in over a dozen U.S. district court or U.S. ITC trials pertaining to design patent infringement.

2.      I have been asked by counsel for Apple Inc. to provide a declaration addressing issues that I understand have been raised by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung") in connection with Apple's Motion for a Preliminary Injunction, including the validity and protectability of Apple's design patents, as well as Samsung's claims that its products do not infringe Apple's design patents.

3.      I have reviewed Apple's Amended Complaint, Apple's Motion for Preliminary Injunction, Samsung's Opposition to Apple's Motion for Preliminary Injunction, Mr. Christopher Stringer's September 29, 2011 Reply Declaration in Support of Apple's Motion for Preliminary Injunction, Mr. Stringer's August 3, 2011 deposition transcript, Mr. Itay Sherman's August 22, 2011 Declaration In Support of Samsung's Opposition to Apple's Motion for a Preliminary Injunction, Mr. Sherman's September 14, 2011 deposition transcript, Mr. Roger Fidler's August 22, 2011 Declaration In Support of Samsung's Opposition to Apple's Motion for a Preliminary Injunction, and Mr. Fidler's September 22, 2011 deposition transcript.

**A.      Scope of Declaration and Summary of Opinions**

4.      I have analyzed Mr. Itay Sherman's declaration and deposition.  It is my opinion that the analysis and conclusions contained in Mr. Sherman's declaration are incorrect due to his failure to apply the correct legal standards for analyzing functionality, anticipation, obviousness, and infringement of a design patent.  In addition, I disagree with many of the factual assertions in Mr. Sherman's declaration.

5.      Accordingly, I disagree with the opinions set forth in Mr. Sherman's declaration, including those ultimate conclusions set forth in paragraph 184 of his declaration that:  (1) the

D'889, D'677, and D'087 patents (collectively, the "Apple designs or Apple patents") are invalid in light of the prior art described in Mr. Sherman's declaration; (2) the Apple designs are not protectable because they only encompass non-ornamental elements; (3) the Samsung Galaxy Tab 10.1 differs significantly from the D'889 design; and (4) the Samsung Galaxy S 4G and Samsung Infuse differ significantly from the D'677 and D'087 designs.

6.     Contrary to Mr. Sherman's opinion, I believe that each overall Apple design, as well as each visual element contained in each design, is primarily ornamental under the legal standard and is protectable intellectual property under U.S. design patent law.  As set forth in detail below, the myriad of alternate designs for a tablet computer and smartphone demonstrates that none of the Apple designs, or any visual elements thereof, was dictated solely by function. Rather, these designs were the result of aesthetic decisions made by Apple's industrial designers.

7.     Mr. Sherman's declaration confirms my view that the D'087, D'677, and D'889 designs are far afield from the prior art with respect to the features shared by the Apple designs and the accused Samsung products, as explained further in my opening declaration.  None of the prior art brought forward in Mr. Sherman's declaration causes me to question my original conclusion that the Apple designs are not anticipated or obvious.

8.     Mr. Sherman's declaration also does not alter my opinion, as set forth in my opening declaration, that the Samsung Tab 10.1 is substantially the same as the D'889 design, and that the ordinary observer would find the Galaxy Tab 10.1 design to be substantially the same as the D'889 design.

9.     Furthermore, Mr. Sherman's declaration does not alter my opinion, as set forth in my opening declaration, that the Samsung Galaxy S 4G design is substantially the same as the D'087 design and the D'677 design, and that an ordinary observer would find the Galaxy S 4G design to be substantially the same as the D'087 and D'677 designs.

10.     Likewise, Mr. Sherman's declaration does not alter my opinion, as set forth in my opening Declaration, that the Samsung Infuse 4G design is substantially the same as the D'087 design and the D'677 design, and that an ordinary observer would find the Infuse 4G design to be substantially the same as the D'087 and D'677 designs.

11.     Moreover, it is my opinion that Mr. Sherman is not a designer of ordinary skill in the art because he has no experience as an industrial designer and has taken no coursework in industrial design.  (*See* Ex. 1 at 20:7-9.) ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████ 6:4-16; ████████████████████

**B.     The Apple Designs Are Not Dictated by Function**

12.     Mr. Sherman's declaration makes a number of statements regarding alleged functions provided by the Apple designs and individual visual elements thereof.  (Sherman Decl. ¶¶ 35-51, 106-125, 173-174.)  Mr. Sherman's declaration also recites a number of conclusions about the "functionality" of Apple's designs and their individual visual elements, concluding in Mr. Sherman's statement that the Apple designs "are not protectable because they only encompass non-ornamental elements."  (*Id.* at ¶ 184.)

13.     Mr. Sherman's analysis and conclusions are incorrect, however, because he has erroneously concluded that if functions can be performed by visual elements of an article of manufacture, the design *must be primarily functional* and therefore unprotectable.  This is not the correct analysis.  Design patents are only issued for articles of manufacture, and all articles of manufacture serve some function.  Yet design patent laws were intended to protect the ornamental features of those articles.  Those designs are protectable so long as the designs themselves are not dictated solely by function.

14.     Mr. Sherman's declaration does not claim that any of Apple's designs, or any visual elements thereof, was dictated solely by the functions he enumerates for them.  If Mr. Sherman were to make such a claim, then it would mean that function dictates that it is

1    possible to have only one design for a smartphone — the Apple iPhone — and that function dictates

2    that it is possible to have only one design for a tablet computer — the D'889 design.

3           15.    As an industrial designer of numerous portable consumer electronics, I am of the

4    opinion that many different designs are possible for smartphones and tablet computers and that

5    function does not dictate the specific design embodied in the iPhone or disclosed in the D'889

6    patent.  As will be demonstrated below, my opinion is confirmed by the large number of alternate

7    designs available in the public domain.

8    ████  ████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10   ████████████████████████████████████████

11          17.    In sum, Apple's iconic designs were not dictated by their function.  There is more

12   than one way to design a working smartphone or tablet computer.  Therefore, Apple's designs are

13   protectable under the design patent laws.

14                 **1.     The overall Apple designs are protectable.**

15                      **a.     The legal standard for functionality.**

16          18.    I have been informed by Apple's counsel that "[t]o qualify for protection, a design

17   must present an aesthetically pleasing appearance that is not dictated by function alone." *Bonito*

18   *Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 148 (1989).

19          19.    "A design patent is directed to the appearance of an article of manufacture." *L.A.*

20   *Gear, Inc. v. Thom McAn Shoe Co*., 988 F.2d 1117, 1123 (Fed. Cir. 1993).  "An article of

21   manufacture necessarily serves a utilitarian purpose, and the design of a useful article is deemed

22   to be functional when the appearance of the claimed design is 'dictated by' the use or purpose of

23   the article." *Id*.  "If the particular design is essential to the use of the article, it can not be the

24   subject of a design patent." *Id*.

25          20.    I have been informed by Apple's counsel that "[i]n determining whether a design

26   is primarily functional or primarily ornamental the claimed design is viewed in its entirety, for the

27   ultimate question is not the functional or decorative aspect of each separate feature, but the

28

1   overall appearance of the article, in determining whether the claimed design is dictated by the

2   utilitarian purpose of the article." *L.A. Gear, Inc.*, 988 F.2d at 1123.

3        21.    I have been informed by Apple's counsel that "[a] design is not dictated solely by

4   its function when alternative designs for the article of manufacture are available." *Best Lock*

5   *Corp. v. ILCO Unican Corp.*, 94 F.3d 1563, 1566 (Fed. Cir. 1996).

6        22.    Mr. Sherman's declaration does not include the foregoing legal standard for

7   determining functionality.  (Sherman Decl. ¶ 20.)  Instead, Mr. Sherman's analysis rests on a

8   determination of whether each overall product design   a smartphone and a tablet computer

9   *performs a function*.  When he concludes that it does, he also concludes that it is "functional."  He

10  also goes on to determine that a number of specific, broadly-defined visual elements found in the

11  designs   "rounded corners," "flat surface," "rectangular shape," etc.   perform a function,

12  concludes that those individual elements are therefore "functional," and then equates their

13  "functionality" with the functionality of the overall design.  As discussed below Mr. Sherman's

14  analysis is incorrect.

**b.    The overall Apple designs are not dictated by function.**

16       23.    Mr. Sherman opines in his declaration that the overall Apple iPhone and D'889

17  tablet designs are "functional" because they allegedly serve some function, such as focusing the

18  user's attention on the display screen.  (Sherman Decl. ¶¶ 35, 106.)

19       24.    But Mr. Sherman does not claim or conclude in his declaration that the particular

20  designs for the Apple iPhone and D'889 tablet are dictated by their use or purpose as smartphones

21  or tablets, or that alternative designs for smartphones and tablets are not available.

22       25.    Indeed, a number of alternative designs are available for both smartphones and

23  tablets, including Samsung's own patented designs and commercialized products.  (Exs. 2-41.)



1

2

3

4

5

6 ██████████  (Ex. 1 at 43:6-45:17.)

7    28.    The issuance of Apple's design patents, the availability of alternate designs,

8 Mr. Stringer's declaration, and my own experience in designing portable electronics all confirm

9 my opinion that none of the overall Apple designs is dictated solely by their function.  Were it not

10 so, all touchscreen smartphones and tablet computers would be essentially identical to Apple's

11 designs, and there are many such alternatives, as shown in Exhibits 2-29.

12            **c.        Mr. Sherman's element-by-element analysis is incorrect.**

13    29.    By his conclusion that the Apple designs "are not protectable because they only

14 encompass non-ornamental elements," Mr. Sherman appears to assume that functionality of

15 individual, broadly-defined visual elements add up to functionality     and unprotectability   of the

16 overall design.

17    30.    Thus, Mr. Sherman's process of (a) broadly defining visual elements in the Apple

18 designs, (b) identifying some alleged function for each of those visual elements, (c) concluding

19 that therefore each broadly defined element is "functional" and "not protectable," and (d)

20 ultimately opining that "there is nothing left" to protect in the Apple patents because all

21 individual elements have been found functional and non-ornamental, is flawed on a number of

22 levels.  (Sherman Decl. ¶¶ 35-51, 106-125, 173-174, and 184; Ex. 1 at 169:14-178:16.)

23    31.    First, Mr. Sherman's element-by-element analysis is not sufficient to support his

24 ultimate conclusion that the overall Apple designs are "functional" and "not protectable" because

25 Mr. Sherman has not applied the correct legal standard for determining functionality of an overall

26 design   whether the *overall* design is "dictated by the utilitarian purpose of the article."

27    32.    Second, Mr. Sherman merely lists alleged functions performed by broadly

28 described visual elements of Apple's designs to conclude that each visual element is "functional."

He never opines that each of the elements is dictated by the ascribed functions, is essential to use

of a smartphone or tablet computer, or that the functions cannot be performed by alternates

designs.  Rather, Mr. Sherman concludes that an element is "functional" when it is the "most

obvious choice" for providing an alleged function.  (Ex. 1 at 180:8-24.)  This latter point will be

discussed in further detail below.

### 2.   The individual visual elements of Apple's designs are not dictated by function.

#### a.   The legal standard for determining functionality in the context of the infringement analysis.

33.   I have been informed by Apple's counsel that in instances where visual elements

of a design patent are "purely functional," such visual elements should not be considered a part of

the patented design for purposes of comparison with an accused product to determine

infringement.  *Egyptian Goddess, Inc. v. Swisa, Inc*., 543 F.3d 665, 680 (Fed. Cir. 2008).

34.   I have been informed, for example, that in the case of *Richardson v. Stanley*

*Works, Inc*., the Federal Circuit affirmed a claim construction for the design of a multi-purpose

tool that discounted "elements that are driven purely by utility," such as the flat end of a hammer-

head.  597 F.3d 1288, 1294 (Fed. Cir. 2010).  The claim construction approved by the Federal

Circuit in *Richardson* was arrived at by the district court in view of the fact that "every piece of

prior art identified by the parties" showed these functional elements to be rendered "in the exact

same way," and in light of "the absence of alternative designs."  *Richardson v. Stanley Works,*

*Inc*., 610 F. Supp. 2d 1046, 1050 (D. Ariz. 2009).

35.   As I have been informed, "[a]n article of manufacture necessarily serves a

utilitarian purpose, and the design of a useful article is deemed to be functional when the

appearance of the claimed design is 'dictated by' the use or purpose of the article."  *L.A. Gear,*

*Inc*., 988 F.2d at 1123.  "If the particular design is essential to the use of the article, it can not be

the subject of a design patent."  *Id.*

36.     I have been informed by Apple's counsel that elements of a design can serve a function without being dictated by function where alternate designs for the element are available. *L.A. Gear, Inc.*, 988 F.2d at 1123; *Richardson*, 610 F. Supp. 2d at 1050.

>        **b.      Many alternate forms are available for the visual elements of Apple's designs.**

37.     Mr. Sherman's declaration provides a list of alleged functions served by broadly defined visual elements or concepts of Apple's designs.  Mr. Sherman does not claim or conclude that the enumerated visual elements are essential to the use of tablet computers or smartphones. Nor does Mr. Sherman claim or conclude that the enumerated visual elements cannot be rendered in an alternate form to achieve the same function.  Therefore, Mr. Sherman's conclusion that certain individual elements of Apple's designs are "functional," and therefore not protectable, does not meet the legal standard for determining functionality, as set forth above.

38.     Indeed, Mr. Sherman has conceded that the enumerated functions can be achieved with designs rendered in alternative form.  For example, he states in his declaration that "the exact details [of the iPhone bezel] can be implemented through a range of choices."  (Sherman Decl. ¶ 174.)  Mr. Sherman also testified during his deposition that a raised frame could be used to replace the D'889 design's thin rim and █████████████████████████████████ █████████████ (Ex. 1 at ████████ 268:19-270:12.)

39.     The large number of alternate forms for the individual visual elements of Apple's designs demonstrate that any alleged utilitarian function provided by these elements is not essential to the use of a tablet computer or smartphone, and that any utilitarian function that is provided by these elements can be accomplished with an alternate design.  As shown in Exs. 2-41, designs in the public domain, including Samsung's own designs and prior art cited by Samsung, demonstrate the alternate choices available for each visual element of Apple's designs.

40.     For the iPhone design, alternative smartphone designs include:  front surfaces that are not black (Exs. 2-4) or clear (Exs. 4-6); front surfaces that are not rectangular (Exs.7-10), not flat (Exs. 11-13), and without rounded corners (Exs. 9, 14, 15); display screens that are more square than rectangular or not rectangular at all (Exs. 8, 16, 17); display screens that are not

centered on the front surface of the phone (Exs. 18-20, 37) and that have substantial lateral

borders (Exs. 21-22); speaker openings that are not horizontal slots with rounded ends (Exs. 12,

15, 23, 24, 37) and that are not centered above the display screen (Exs. 12, 25, 26); front surfaces

that contain substantial adornment (Exs. 9, 15, 19); and phones without bezels at all (Exs. 11, 13,

18) or very different looking bezels that are not thin, uniform, and with an inwardly sloping

profile (Ex. 21).

41.    For the D'889 tablet design, alternate tablet computer designs include:  overall

shapes that are not rectangular with four flat sides (Exs. 27-29) or that do not have four rounded

corners (Exs. 28, 30-32); front surfaces that are not completely flat or clear (Exs. 27, 28, 33, 34)

and that have substantial adornment (Exs. 28, 35); thick frames rather than a thin rim around the

front surface (Exs. 28, 34-36); and profiles that are not thin relative to the D'889 or that have a

cluttered appearance (Exs. 28, 33, 38).

43.    The availability of so many different design choices confirms my opinion that any

alleged function assigned to the individual Apple design elements called out by Mr. Sherman is

not essential to the use of a tablet computer or smartphone and could not have dictated the

particular design of these elements of the Apple iPhone and D'889 tablet design.  Further, it is my

opinion that any function provided by these elements is capable of being provided by alternate

designs.

44.    For example, Mr. Sherman states that a black surface provides a number of

functions, such as hiding the electronic components underneath.

As indicated above, a number

of white phones have been sold commercially, including by Samsung itself.  (Exs. 2-3.)

1          45.     Mr. Sherman also states that the entirely clear front surface on the iPhone and

2    D'889 tablet design serves some purpose, because the material over a display screen must be

3    clear and unimpeded.  (Sherman Decl. ¶¶ 44-46, 108.)  But Mr. Sherman offers no functional

4    benefit that explains why the remaining area around the display screen must also be clear, aside

5    from a statement that "it follows" from having a continuous flat surface on the front of the phone.

6    (*Id.*)  As demonstrated, numerous smartphones and tablets have been made with a clear surface

7    over the display screen and opaque material over the remainder of the front surface.  (Ex. 20.)

8          46.     As for the entirely flat front surface, Mr. Sherman explains that the function is to

9    conform with the flatness of the display screen, ease of cleaning, and "limiting inadvertent

10   transmission from [having] physical keys."  (Sherman Decl. ¶¶ 42-43, 107.)  But Mr. Sherman

11   does not explain why, if only a part of the front surface is taken up by the display screen, the

12   entire front surface must be flat.  His opinion that it would "conform with the flatness of the of

13   the display screen" addresses an aesthetic issue, not a functional issue.  Moreover, as

14   demonstrated, a number of designs have non-flat front surfaces with edges that slope downward,

15   including Samsung's own designs.  (Ex. 28.)  Such a curved surface would also be easy to clean

16   and could similarly not include physical keys, if that were a significant functionality concern.

17         47.     As for the bezel or rim around the front surface of the iPhone and the D'889 tablet

18   design, Mr. Sherman himself states that many different forms can be used to render these

19   elements, including the use of a frame surrounding the display screen.  (Sherman Decl. ¶ 174; Ex.

20   1 at 268:19-270:12.)  Any framing or protective function served by the thin rim or thin bezel can

21   be equally served by a differently designed rim or bezel, or by a wide frame.  In fact, the design

22   of the rim/bezel element cannot be dictated by function, as many devices do without a rim or

23   bezel altogether.  (Ex. 12.)

24         48.     Mr. Sherman indicates that a rectangular shape is dictated by the shape of the

25   display screen.  (Sherman Decl. ¶¶ 36-37.)  But Mr. Sherman does not explain why other shapes

26   could not be used to surround a rectangular screen.  (Ex. 7.)  Mr. Sherman also does not explain

27   why non-rectangular display screens (such as screens that are substantially square) cannot be

28   substituted.  (Ex. 16.)

49. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████ (Ex. 39 at 3; ████████████████) A number of other

options, such as rounding back of the edges or use of flat or blunted corners, are available for

meeting the functional concerns enumerated by Mr. Sherman (*i.e.*, risk of puncture, durability,

ease of manufacture). (Sherman Decl. ¶¶ 38-41.) But indeed, a number of designs have been

manufactured with sharp, 90 degree corners as viewed from the front. (Ex. 14, 39.)

50. Mr. Sherman explains that a front surface lacking adornment is functional because

the resultant design does not "distract from the display screen." (Sherman Decl. ¶¶ 44, 124.) I

disagree with Mr. Sherman that this is a utilitarian function, rather than aesthetic function.

Moreover, Mr. Sherman fails to explain why the loss of useful controls or indicators on the front

surface does not actually detract from the function of the design.

51. Mr. Sherman states that a thin design is functional because it facilitates "mobility

and portability." (Sherman Decl. ¶ 51.) But Mr. Sherman does not explain the attendant fragility

of a thin device, the advanced materials required to make a durable thin device, the heating

dissipation concerns for a thin device, or the added expense of manufacturing a thin device with

smaller components. Mr. Sherman also does not explain that ergonomically, given equal overall

weight, a thin device is not necessarily more comfortable to hold in the hand than a thicker device

that distributes the weight. In my experience as an industrial designer, these are all practical

downsides to making a device thinner. ████████████████████████████████████████

████████) Mr. Sherman, therefore, has only highlighted a few advantages of these design elements,

and has not considered all of the functional considerations attendant to them.

52. Mr. Sherman explains that a display screen centered on the front surface with

narrow lateral borders and thick top and bottom borders serves a number of functions. (Sherman

Decl. ¶¶ 113-118.) But it is clear that none of these functions dictated the specific design of

Apple's iPhone because there is a large variation in the screen location and size of lateral borders

in other smartphone designs. (Exs. 20, 21.)

53.     Mr. Sherman also explains that a speaker opening in the shape of a horizontal slot with rounded ends and centered in the space above the display screen is dictated by the function of the speaker opening and manufacturing concerns.  (Sherman Decl. ¶¶ 119-123.)  Mr. Sherman explained at his deposition that speaker openings must be stretched in the horizontal direction because speaker elements are shaped as rectangles and, to save vertical space, must be arranged horizontally.  (Ex. 1 at 123:6-126:5.)  Mr. Sherman also testified that the speaker slots needed to conform to the shape of the speaker elements.  However, speaker elements need not be rectangular, as evidenced by one such element for a Samsung phone.  (Ex. 40.)  With a circular speaker element, there is no reason why a speaker slot cannot be vertically oriented and still provide the same amount of open area for sound to pass through.  Mr. Sherman also testified that manufacturing specifications for speaker components only provided guidelines on the size of the speaker opening.  (Ex. 1 at 147:22-149:25.)  In fact, myriad different speaker opening shapes and locations are known, including those designed by Samsung itself.  (Exs. 19, 27, 34.)

54.     None of the claimed elements of Apple's design patents is dictated by function alone.  Accordingly, none of the elements needs to be excluded from the infringement analysis.

55.     Similarly, the elements of Samsung's designs cannot be explained by function alone.  Were it not so, Samsung would not be capable of making a smartphone phone differently from the Apple iPhone, or a tablet computer different than the D'889 design, when it has done so.  (Ex. 28.)  In fact, many different alternative forms are possible for Apple's designs and every element thereof, as demonstrated by the state of the art before Apple's iPhone and iPad products were released.  Samsung's choice of designs was not dictated by function.  The convergence of designs after the public release of Apple's designs cannot be explained by functional necessity.

**B.     The Accused Samsung Products Infringe the Apple Designs**

56.     In my opening declaration I stated my opinion that the accused Samsung products are substantially the same as the corresponding Apple designs, both in my eyes and in the eyes of an ordinary observer purchasing cellular phones or electronic devices.  Mr. Sherman's declaration does not alter my opinion.

**1.** **Mr. Sherman's opinion should not be accorded any weight because it does not follow the proper test for design patent infringement.**

57.     Mr. Sherman does not purport to opine on whether an ordinary observer would find Samsung's accused designs substantially the same as the Apple designs.  In fact, his declaration recites no qualifications that would enable him to testify as to the ordinary observer's perception of these designs.  Mr. Sherman also made it clear during his deposition that he is not so qualified because he has had no training in marketing, industrial design or surveys. ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

58.     In contrast, as I set forth in my opening declaration and during my deposition, for over fifteen years I studied ordinary observers while they compared and evaluated design decisions about consumer electronics.  (Ex. 41 at 81:19-82:13.)

59.     Mr. Sherman's only opinion on the differences between the Samsung products and Apple's designs is from the perspective of an alleged expert in cellular phone engineering and a person in the trade who has worked on cellular phones.  With that background, Mr. Sherman is naturally more discerning of minor differences in cellular phone designs than would be an ordinary observer.

60.     However, as I have been informed by Apple's counsel, it is the perception of the ordinary observer, and not the expert, that is the proper test for design patent infringement. *Egyptian Goddess*, 543 F.3d at 670.

61.     Therefore, Mr. Sherman's opinion that, in his view, the accused Samsung products "differ significantly" from the Apple designs does not alter the opinions I provided in my opening

declaration on whether the ordinary observer would find Samsung's designs substantially the same as Apple's designs.

62.     In my experience, the ordinary observer brings a different level of familiarity, visual acuity, and level of observation to a visual examination of products than those that are experts in the design of the product or belong to the trade.

**2.     Mr. Sherman's assumptions regarding functionality affected his opinion regarding the significance of differences in the Samsung products.**

63.     Although it is not entirely clear from Mr. Sherman's declaration, Mr. Sherman testified in his deposition that he ignored all of the design concepts of the Apple designs that he deemed functional using the erroneous analysis described above, before comparing a few remaining designs, such as the precise radius of curvature of the corners and the precise shape of the bezel, with the Samsung products, and then concluding that each of those specific designs "differed significantly" from the Apple designs.  (Ex. 1 at 322:12-324:14.)

64.     As previously discussed, Mr. Sherman's functionality analysis was performed without an understanding of the applicable legal standard and is incorrect.  None of the design elements of the Apple designs is dictated by function and none should be excluded from the infringement analysis.  Moreover, Mr. Sherman's decision to compare, one-by-one, each of the specific elements that he determined was non-functional to the Samsung products is also incorrect.  Even if there were specific design elements that needed to be excluded because they are dictated by function, Mr. Sherman should still have compared the remaining design as a whole to the accused products to determine if the remaining design was substantially similar to the accused products.  Mr. Sherman never compared the design as whole to the accused products.

65.     However, Mr. Sherman's functionality analysis explains why Mr. Sherman assigns so much weight to minor differences between the Samsung products and the Apple designs, i.e., because he eliminated via his functionality analysis all the major elements of Apple's designs that are similar to Samsung's designs, Mr. Sherman was left to compare only specific elements that differ slightly between the designs.  Left with those specific elements, and comparing them one-

by-one, it is not surprising that Mr. Sherman concluded that each of those elements differed because he was focusing only on elements that do differ slightly between Apple's designs and Samsung's products.

### 3. Mr. Sherman's analysis takes into account differences that cannot be used to escape design patent infringement under the law.

66.     Mr. Sherman's declaration states that a difference between the Samsung Infuse 4G and Galaxy S 4G products and the Apple D'087 and D'677 designs is the bigger size of the Samsung products.  (Sherman Decl. ¶¶ 137, 143.)

67.     However, I have been informed by Apple's counsel that the size of a product cannot be used to differentiate a design patent.  *Sun Hill Indus. v. Easter Unlimited*, 48 F.3d 1193, 1196-1197 (Fed. Cir. 1995).  Because there is no indication of size in the D'087 or D'677 designs, a much bigger clone of an iPhone cannot escape infringement due to its size.

68.     Mr. Sherman's declaration also makes reference to the logos that appear on the face of the Infuse 4G and Galaxy S 4G products as a difference with the Apple D'087 and D'677 designs.  (Sherman Decl. ¶¶ 164-169.)  I have been informed by Apple's counsel that the use of labeling or logos cannot be used to escape design patent infringement.  *L.A. Gear*, 988 Fed. 2d at 1126.

69.     Accordingly, Mr. Sherman should not have relied on these differences to differentiate the accused Samsung products from the Apple designs.

### C. Apple's Asserted Designs Are Valid In Light of Prior Art.

70.     Mr. Sherman opines in his declaration that the Apple designs are "invalid in light of the prior art described [in his declaration]."  (Sherman Decl. ¶ 184.)  I disagree with Mr. Sherman's opinion because it was formed without reference to the proper legal standard for determining anticipation or obviousness of a design patent.

### 1. Legal standard for determining anticipation and obviousness.

71.     I have been informed by Apple's counsel that the ordinary observer test used to determine design patent infringement is also used to determine whether a prior art design

1   anticipates a design patent.  *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233,

2   1240-41 (Fed. Cir. 2009).

3       72.     I have also been informed that "there must be a reference, a something in

4   existence, the design characteristics of which are basically the same as the claimed design in

5   order to support a holding of obviousness."  *In re Rosen*, 673 F.2d 388, 391 (C.C.P.A. 1982); *In*

6   *re Harvey*, 12 F.3d 1061, 1063 (Fed. Cir. 1993).  Such a reference is necessary whether the

7   holding is based on the basic reference alone or on the basic reference in view of modifications

8   suggested by secondary references.  *Id.*

9       73.     I have been informed that if "major modifications would be required to make [the

10  prior art design] look like the claimed designs, it cannot qualify as a basic [or primary] design."

11  *In re Harvey*, 12 F.3d at 1063.

12      74.     I have also been informed that in order for secondary references to be considered,

13  there must be some suggestion in the prior art to modify the basic design with features from the

14  secondary references.  *L.A. Gear*, 988 F.2d at 1124; *In re Rosen*, 673 F.2d at 391.  The teachings

15  of prior art designs may be combined only when the designs are "so related that the appearance of

16  certain ornamental features in one would suggest the application of those features to the other."

17  *In re Harvey*, 12 F.3d at 1063.  "[I]n considering prior art references for purposes of determining

18  patentability of ornamental designs, the focus must be on appearances and not uses."  *In re*

19  *Harvey*, 12 F.3d at 1064.

20      75.     I have been informed that "the ordinary observer test, whether applied for

21  infringement or invalidity, and the obviousness test, applied for invalidity under Section 103,

22  focus on the *overall designs*."  *Int'l Seaway Trading*, 589 F.3d at 1340-41 (emphasis in original).

23  If the prior art merely suggests "components of the [patented] design, but not its overall

24  appearance, an obviousness rejection is inappropriate."  *In re Harvey*, 12 F.3d at 1063.

25      76.     I have been informed that a proper obviousness analysis, like a proper

26  infringement analysis, requires a comparison of all of the available views of the prior art

27  reference to all of the views shown in the design patent.  *Contessa*, 282 F.3d at 1379.

28

77.     I understand that the Federal Circuit has held that it is error to construe a design too broadly for purposes of analyzing obviousness:  "[T]he district court's description merely represents the general concept of a sectional sofa with integrated end tables.  As we have explained in the past, however, the focus in a design patent obviousness inquiry should be on visual appearances rather than design concepts." *Durling v. Spectrum Furniture Co., Inc.*, 101 F.3d 100 (Fed. Cir. 1996); *In re Harvey*, 12 F.3d at 1064 ("[W]e hold that the Board should have focused on actual appearances, rather than "design concepts.").

### 2.     There is no basis for Mr. Sherman's invalidity opinion because he failed to apply the ordinary observer test.

78.     Mr. Sherman's opinion is disconnected from the proper legal standard for determining invalidity of a design patent, which requires the application of the ordinary observer test.  Not only did Mr. Sherman's testimony at his deposition make it clear that he is not qualified to opine on the perceptions of the ordinary observer (*see* supra at ¶ 57), in his declaration he makes no effort to use the ordinary observer test to compare the prior art with the Apple designs.  Mr. Sherman's invalidity opinion, therefore, is the result of unsound methodology.

### 3.     Mr. Sherman is not a designer of ordinary skill in the art.

79.     In my opinion, the designer of ordinary skill in the art is a person who is experienced in the industrial design of portable electronic devices, i.e., the design of the ornamental appearance of portable electronic devices.



81.     In my opinion, Mr. Sherman is not a designer of ordinary skill in the art in the field of portable electronic devices.  Given his lack of industrial design experience, Mr. Sherman is not qualified to opine on the aesthetic modifications an ordinary designer would have found to be

obvious, or whether an ordinary designer would have been motivated to combine features from different references.

### 4.   Mr. Sherman's invalidity opinion is not based upon the correct legal standard.

82.   Mr. Sherman's analysis of the prior art is disconnected from the legal standard for determining obviousness because Mr. Sherman does not identify a single primary reference that is basically the same as any of the Apple designs.  Mr. Sherman also does not identify any suggestion in the prior art for combining secondary references with a primary reference.  Instead, Mr. Sherman selects prior art that he claims discloses each of the broadly defined design concepts listed in his declaration (flat surface, rounded corners, etc.) — rather than the actual appearance of the Apple designs — and then asserts that the existence of an entire pool of such prior art renders the patents obvious.  In addition to Mr. Sherman's failure to identify a primary reference, I understand that such focus on broad design concepts, rather than a comparison of the actual visual appearance of the designs, is incorrect.  *In re Harvey*, 12 F.3d at 1064 ("[W]e hold that the Board should have focused on actual appearances, rather than "design concepts.").

83.   Mr. Sherman's only apparent criteria for including prior art in his pool is whether it includes a feature that fits within his broadly described design concepts.  Mr. Sherman also uses functional concerns — whether a design element performs the same alleged utilitarian function in the prior art and in the Apple designs as a reason for inclusion.  (*See, e.g.*, Sherman Decl. ¶ 104.)  Once he determines that the design elements perform functions similar to the counterpart elements in the Apple designs, Mr. Sherman claims that combining them would be "natural," "common," "expected," or "obvious."  Such focus on use as a suggestion for combining references is also incorrect.  (*See supra* at ¶74.)

#### a.   D'889 design.

84.   I have reviewed Mr. Sherman's analysis of the alleged prior art to the D'889 design.  Mr. Sherman does not claim that any single piece of prior art anticipates the D'889 design.  Mr. Sherman does not claim that any single piece of prior art is basically the same as the

1  D'889 design.  Mr. Sherman does not identify a specific combination of references or a specific

2  modification of a primary reference that results in the obviousness of the D'889 design.

3      85.    In my opinion, none of the prior art discussed by Mr. Sherman is basically the

4  same as or substantially similar to the D'889 design.  Major modifications would be required to

5  each of these references before arriving at the D'889 design.

6      86.    **1981 Fidler mock-up**.  I have reviewed Mr. Fidler's August 16, 2011 declaration.

7  As shown in Exs. B-D to Mr. Fidler's declaration and in the other photographs taken by counsel

8  at the inspection of this mock-up (Ex. 42), the 1981 Fidler mock-up is not basically the same as or

9  substantially similar to the D'889 design.  As illustrated in Ex. 43, among other differences, the

10  1981 mock-up had a wide, opaque frame around the display screen in the traditional "picture

11  frame" style, with a slightly wider frame along with bottom edge.  It did not have a thin rim

12  around an edge to edge piece of transparent cover glass, like the D'889 design.  Also, the 1981

13  mock-up did not have rounded corners or a back that curved up near the edges.

14      87.    **1994 Fidler mock-up**.  As shown in Exs. I, J, K to Mr. Fidler's declaration and in

15  the other photographs taken by counsel at the inspection of this tablet (Ex. 44), the 1994 Fidler

16  mock-up is not basically the same as or substantially similar to the D'889 design.  As illustrated

17  in Ex. 45, among other differences, the 1994 mock-up had a wide, raised frame around the

18  display screen in the traditional "picture frame" style, with a slighter wider frame along the

19  bottom edge.  It did not have a thin rim around an edge to edge piece of transparent cover glass,

20  like the D'889 design.

21      88.    **D337,569 patent**.  As shown in Exs. 46 and Ex. 47, the D'569 patent is not

22  basically the same as or substantially similar to the D'889 design.  Among other differences, the

23  D'569 design has a thick, raised, asymmetrical frame around its display screen that is wider at the

24  left and right sides.  The left and right ends of the device's body are also curved, not straight.  The

25  D'569 design also has a very different side profile featuring a central ring with "steps" above and

26  below.  It does not have a thin rim around an edge to edge piece of transparent cover glass, like

27  the D'889 design.

28

89.  **D461,802 patent**.  As shown in Exs. 48 and 49, the D'802 patent is not basically the same as or substantially similar to the D'889 design.  Among other differences, the D'802 patent has a thick frame around the central area covered by a "knitted" texture.  It also features a relatively wide edge that is rounded and slopes downward.  There is a protrusion near the top of the design that corresponds to a carved out slot.  It does not have a thin rim around an edge to edge piece of transparent cover glass, like the D'889 design.

90.  As illustrated below, Mr. Sherman has also flipped over the profile view of the D'802 reference in his declaration so that the back of the D'802 reference faces up in the figure below   and appears to be analogous to the front of the D'889 patent (which faces up in the figure below).  (Sherman Decl. ¶ 28.)



D461,802, Fig. 2.

D'889, Fig. 5.

91.  In fact, the profile is the exactly opposite.



92.  **JP 0921403**.  As shown in Exs. 50 and 51, the JP'403 patent is not basically the same as or substantially similar to the D'889 design.  Among other differences, the JP'403 design has a substantially wider frame around its display screen of non-equal width.  The frame does not have rounded corners on its two bottom edges.  The frame includes two prominent rectangular buttons.  A noticeable jagged edge exists on the right side of the device.  In profile, the JP'403 design does not round up near three of its edges.  It does not have a thin rim around an edge to edge piece of transparent cover glass, like the D'889 design.

93.  **JP 0887388**.  As shown in Exs. 52 and 53, the JP'388 patent is not basically the same as or substantially similar to the D'889 design.  Among other differences, the JP'388 design has a wide, raised frame around its display screen.  The frame is asymmetrical and is wider at the

1   bottom.  The frame also includes a prominent rectangular feature at the bottom.  The back of the

2   JP'388 design features a protruding rectangular feature that is prominent from the profile and

3   back views.  It does not have a thin rim around an edge to edge piece of transparent cover glass,

4   like the D'889 design.

5   94.   **JP 1142127**.  As shown in Exs. 54 and 55, the JP'127 patent is not basically the

6   same as or substantially similar to the D'889 design.  Among other differences, the JP'127 design

7   has a wide, opaque frame around its display screen that is adorned with prominent "speaker-hole"

8   patterns on the left and right.  It does not have a thin rim around an edge to edge piece of

9   transparent cover glass, like the D'889 design.

10   95.   **HP Compaq TC1000**.  As shown in Exs. 56 and 57, the TC1000 is not basically

11   the same as or substantially similar to the D'889 design.  Among other differences, the TC1000

12   has a thick frame that wraps around the sides and extends into the front surface.  There are also

13   two additional prominent masks surrounding the display on the front surface, whereas the D'889

14   design allows for only one optional frame on its front surface.  The TC1000 also includes two sets

15   of indicators that take away from the simplicity of the front surface.  As to sides and backs, in

16   addition to a thicker form factor, the TC1000 includes complicated arrangement of ports, hatches,

17   slots, and buttons on its sides and more ports and hatches on the back.

18   96.   Placed side by side, the designer of ordinary skill in the art would not find the

19   TC1000 to be basically the same as or substantially similar to the D'889 design.  Extensive

20   modifications of the TC1000 would be required    at least to the frame structure, to the masks

21   appearing on the front surface, and to the design of the sides and back to eliminate the vast

22   majority of buttons, ports, vents, and hatches and slots.

23   97.   Without a basic or primary reference as a starting point, Mr. Sherman's opinion

24   that "a designer of ordinary skill in designing mobile electronic devices in 2003 would have

25   found it obvious to create the D'889 tablet design" is without a foundation in proper legal

26   principles.  Mr. Sherman's statement that "[t]hese elements [of the D'889 design] are all

27   disclosed, many in combination with each other, in the prior art discussed above" is in direct

28

1  contradiction of the correct legal standard for obviousness, which does not allow an unstructured

2  "picking and choosing" of components from the prior art.

3        98.    Indeed, not all of the "design concepts" of the D'889 design, even as Mr. Sherman

4  broadly defines them, are disclosed by the prior art discussed by Mr. Sherman.  For example,

5  when asked to identify which prior art disclosed the distinctive thin rim surrounding the D'889

6  device's front surface, Mr. Sherman could only point to the JP'403 reference, which has a

7  substantially wide, asymmetrical frame and not a rim.  (Ex. 1 at 315:18-316:11.)

8        99.    Mr. Sherman's declaration does not alter my opinion from the opening declaration

9  that the D'889 design departs significantly from the prior art in the same features that are found in

10  the Samsung Tab 10.1.  It is my opinion, in consideration of Mr. Sherman's declaration, that the

11  D'889 design is not anticipated by or obvious in light of prior art.

12            **b.**     **D'677 and D'087 designs.**

13       100.    I have reviewed Mr. Sherman's analysis of the alleged prior art to the D'677 and

14  D'087 designs.  (Sherman Decl. ¶¶ 83-105, 172.)  Mr. Sherman does not claim that any single

15  piece of prior art anticipates the D'677 or D'087 designs.  Mr. Sherman does not identify any

16  single piece of prior art as the primary reference for purposes of obviousness analysis.  Rather,

17  Mr. Sherman has relied on bits and pieces from eight different references over a 20 year period

18  for his analysis.

19       101.    In my opinion, none of the prior art discussed by Mr. Sherman is basically the

20  same as or substantially similar to the D'677 design or the D'087 design.  Major modifications

21  would be required to each of these references before arriving at the claimed Apple designs.

22       102.    **JP 1241638**.  As shown in Exs. 58 and 59, the JP'638 patent is not basically the

23  same as or substantially similar to the D'677 design.  Among other differences, the JP'638 design

24  does not disclose a transparent, black-colored front surface .  Mr. Sherman's declaration does not

25  even mention the translucent nature of the D'677 design, but concentrates solely on the black

26  color.  The JP'638 design also does not disclose a flat front surface.  Instead, the JP'638 design

27  has a cambered front surface that slopes toward the back at the top and bottom portions.  The

28

speaker slot for the JP'638 design is also located much higher up than the D'677 design and is much smaller in appearance.

103.    Placed side by side, the designer of ordinary skill in the art would not find the JP'638 design to be basically the same as or substantially similar to the D'677 design.  Extensive modifications of the JP'638 design would be required    at least to make the entire front face flat, cover it with a translucent, black-colored front surface, and to alter the speaker slot location and design.

104.    As shown in Exs. 58-59, the JP'638 patent is not basically the same as or substantially similar to the D'087 design.  Among other differences, the JP'638 design does not disclose a flat front surface.  Instead, the JP'638 design has a cambered front surface that slopes toward the back at the top and bottom portions.  The bezel in the JP'638 design is thicker in profile and does not have a substantially uniform appearance because it is much thinner near the top and bottom portions.  From the top and bottom views, the bezel also has the appearance of notches, adding to its non-uniform appearance.  The JP'638 bezel also does not have an inwardly sloping profile.  The speaker slot for the JP'638 design is also located much higher up than the D'677 design and is much smaller in appearance.

105.    Placed side by side, the designer of ordinary skill in the art would not find the JP'638 design to be basically the same as or substantially similar to the D'087 design.  Extensive modifications of the JP'638 design would be required    at least to make the entire front face flat, change the bezel's thickness, uniformity, and profile shape, and alter the speaker slot location and design.

106.    During my deposition, I was shown a single front view of the JP'638 patent (Ex. 67 to my deposition, reattached here as Ex. 60), like the one featured on page 19 of Mr. Sherman's declaration.  Reducing the D'087 design to two-dimensions to match the single front view I had been shown, I testified that the two would appear substantially the same to the ordinary observer.  My testimony, however, pertained to that deposition exhibit only and has no bearing on my opinion as to the actual, overall JP'638 design.

107.    As I informed Samsung's attorney, it was not possible for me to perform a substantial similarity analysis on the overall designs without information on what the other views of the design shown in the deposition exhibit looked like.  (Ex. 41 at 224:20-225:9; 227:10-229:18.)  I was not permitted to see the other views of the JP'638 patent during my deposition.

108.    As it turns out, the other 13 views of the JP'638 design reveal substantial differences with the D'087 design.  As is well known, a legally proper comparison between prior art and the asserted design requires a comparison of the overall designs and between each available view of the prior art and the asserted design.

109.    I understand that Samsung has taken the position that only the front views are relevant to the analysis because the Apple designs are limited to the front surface.  This is not correct.  The D'087 and D'677 designs both have side views that claim the flat nature of the front surface and, in the D'087 design, the side profile of the bezel.  These additional figures are all a part of the claim for the D'677 and D'087 designs and cannot be ignored.  Just as the non-flat or sloped front surface of the JP'638 design cannot be ignored by looking at only the front view that is shown on page 19 of Mr. Sherman's declaration.  When the overall D'087 and D'677 designs are compared to the overall JP'638 design, it is clear that they are not basically the same as or substantially similar to the JP'638 design.

110.    Mr. Sherman also refers to the SoftBank 825SH phone as the "apparent commercial embodiment" of the JP'638 reference.  I have been informed by Apple's counsel that the SoftBank phone is not prior art to the D'677 or D'087 designs because it was not released until 2008, after the invention date of the Apple designs and after the Apple's iPhone had already been released.

111.    Also, the SoftBank phone has significant differences with the actual JP'638 design.  In particular, when compared with the JP'638 design, the front surface of the SoftBank phone is much flatter, the appearance of its bezel is reduced from the front view, and its speaker slot has a different, lower position.  As the SoftBank phone is different from the JP'638 design and is not prior art to the Apple designs, it does not factor into my analysis.

1    112.    **LG Chocolate**.  As shown in Ex. 61, the LG Chocolate is not basically the same

2  as or substantially similar to the D'677 design.  Among other differences, the LG Chocolate does

3  not have a centered display screen with balanced borders above and below the screen.  Rather the

4  display screen is aligned closer to the top of the design.  The side borders to the right and left of

5  the screen are also wider, and the top and bottom edges of the phone are not straight.  There is

6  also substantial ornamentation in the form of a large metal button surrounding by smaller red

7  buttons on the front face.

8    113.    As shown in Ex. 61, the LG Chocolate is not basically the same as or substantially

9  similar to the D'087 design.  Among other differences, the LG Chocolate does not have a

10  centered display screen with balanced borders above and below the screen.  Rather the display

11  screen is aligned closer to the top of the design.  The side borders to the right and left of the

12  screen are also wider, and the top and bottom edges of the phone are not straight.  There is also

13  substantial ornamentation in the form of a large metal button surrounding by smaller red buttons

14  on the front face.  The LG Chocolate also does not have a thin, uniform bezel surrounding the

15  front surface.

16    114.    **LG Prada**.  As shown in Ex. 62, the LG Prada is not basically the same as or

17  substantially similar to the D'677 design.  Among other differences, the LG Prada has thicker

18  borders to the left and right of the display screen that are noticeably different from the "big

19  screen" look of the D'677 design.  The Prada also has a complex arrangement of metal buttons

20  that extends almost the width of the bottom of the device and protrudes from the face of the

21  device.

22    115.    As shown in Ex. 62, the LG Prada is not basically the same as or substantially

23  similar to the D'087 design.  Among other differences, the LG Prada has thicker borders to the

24  left and right of the display screen that are noticeably different from the "big screen" look of the

25  D'677 design.  The Prada also has a complex arrangement of metal buttons that extends almost

26  the width of the bottom of the device and protrudes from the face of the device.  Also, the Prada

27  does not have a thin, uniform bezel surrounding the front surface.

28

116.    **JP 1280315**.  As shown in Exs. 63-64, the JP'315 patent is not basically the same as or substantially similar to the D'677 design.  Among other differences, the JP'315 design does not have a centered display screen with balanced borders above and below the screen.  It also does not disclose a translucent, black-colored front surface.  The JP'315 design also lacks a speaker slot.

117.    As shown in Exs. 63-64, the JP'315 patent is not basically the same as or substantially similar to the D'087 design.  Among other differences, the JP'315 design does not have a centered display screen with balanced borders above and below the screen.  The JP'315 design also lacks a speaker slot and a thin, uniform bezel surrounding the front surface.

118.    **JP 1009317**.  As shown in Exs. 65-66, the JP'317 patent is not basically the same as or substantially similar to the D'677 design.  Among other differences, the JP'317 design does not have a centered display screen with balanced borders above and below the screen.  It also does not disclose a translucent , black-colored front surface.  The overall shape of the JP'317 design is also not entirely rectangular, as it has rounded edges at the top and bottom of the phone.

119.    As shown in Exs. 65-66, the JP'317 patent is not basically the same as or substantially similar to the D'087 design.  Among other differences, the JP'317 design does not have a centered display screen with balanced borders above and below the screen. The overall shape of the JP'317 design is also not entirely rectangular, as it has rounded edges at the top and bottom of the phone.  The JP'317 design also lacks a thin, uniform bezel surrounding its front surface.

120.    **JP 1241383**.  As shown in Exs. 67-68, the JP'383 patent is not basically the same as or substantially similar to the D'677 design.  Among other differences, the JP'383 design does not disclose a translucent , black-colored front surface.  The borders above and below the screen are opaque.  The JP'383 design also does not disclose the distinctive speaker slot claimed in the Apple design at all.

121.    As shown in Exs. 67-68, the JP'383 patent is not basically the same as or substantially similar to the D'087 design.  Among other differences, the JP'383 design does not disclose the distinctive speaker slot claimed in the Apple design at all.  The JP'383 design also

1  does not disclose a thin bezel with a substantially uniform appearance and inwardly sloping

2  profile.  Although the front view of the JP'383 design appears to show a bezel, the bezel appears

3  to be much thicker in appearance both from the front and in perspective views.  Moreover, in the

4  profile views of the design, the shape and contours of the bezel are unclear.  In my view, there is a

5  substantial difference between any bezel disclosed in the JP'383 design and the thin, elegant bezel

6  claimed in the D'087 design.

7      122.  **KR 30-041857**.  As shown in Exs. 69-70, the KR'857 reference is not basically the

8  same as or substantially similar to the D'677 design.  Among other differences, the KR'857

9  design has much wider borders to the left and right of the display screen.  This design also does

10  not have a translucent, black-colored black front surface.

11      123.  As shown in Exs. 69-70, the KR'857 reference is not basically the same as or

12  substantially similar to the D'087 design.  Among other differences, the KR'857 design has wider

13  borders to the left and right of the display screen.  This design also lacks a bezel around the front

14  surface.  Rather, a band appears to wrap around the body the device, leaving some amount of the

15  front surface uncovered.  A three-line rim pattern appears at the edge of the front surface.

16      124.  **KR30-2006-0050769**.  As shown in Exs. 71-72, the KR'769 reference is not

17  basically the same as or substantially similar to the D'677 design.  Among other differences, the

18  KR'769 design does not include a translucent, black-colored front surface.  The KR'769 design

19  also has a much narrower front surface than the D'677 design.  Moreover, its display screen has

20  rounded corners.

21      125.  As shown in Exs. 71-72, the KR'769 reference is not basically the same as or

22  substantially similar to the D'087 design.  Among other differences, the KR'769 design has a

23  much narrower front surface than the D'677 design.  Its display screen has rounded corners.

24  Moreover, the bezel of the KR'769 design is drastically asymmetrical and much thicker on the

25  left side than on the right from the front view.  In profile, this asymmetry is revealed as a different

26  slope for left side of the bezel than the right.  Also, the bezel the is much thicker in profile than

27  the D'087 bezel.

28

126.   Mr. Sherman's declaration does not identify a single prior art reference that is basically the same as or substantially similar to the D'677 or D'087 designs.  Therefore, Mr. Sherman's obviousness opinion as to these two Apple designs is not based upon the proper analysis under the legal standard, which does not allow for unstructured selection of components from the prior art.  (*Compare* Sherman Decl. ¶ 105 with *supra* at ¶¶ 72-75.)

127.   Moreover, while Mr. Sherman lists a number of alleged motivations to combine elements of the prior art, his motivations are based on utilitarian considerations rather than aesthetic ones.  Such an approach is contrary to the proper legal standard.  (*See supra* at ¶ 74.)

128.   For example, Mr. Sherman lists the advancement in touch technology as a reason that entirely flat front surfaces were capable of being manufactured.  This is a functional reason, however, that does not explain why the ordinary design would be motivated to make a flat, clear surface for aesthetic reasons.  That is, even though the advancement in technology may explain the ability to make an entirely flat, translucent front surface on a cellular phone, that does not explain why the ordinary designer would have found a suggestion to do so, rather than persist with the traditional "raised frame around glass" look.

129.   Mr. Sherman's declaration does not alter my opinion from the opening declaration that the D'677 and D'087 designs depart significantly from the prior art in the same features that are found in the Samsung Galaxy S 4G and Infuse 4G phones.  It is my opinion, in consideration of Mr. Sherman's declaration, that neither the D'677 design nor the D'087 design is anticipated by or obvious in light of prior art.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:  September 30, 2011

Cooper C. Woodring