Exhibit T

Confidential Attorneys' Eyes Only
Outside Counsel

Page 1

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

                   SAN JOSE DIVISION

3

4    APPLE INC., a California      Case No.
     corporation,

5                                  11-cv-01846-LHK

          Plaintiff,

6

     v.

7

     SAMSUNG ELECTRONICS CO.,

8    LTD., a Korean business
     entity; SAMSUNG ELECTRONICS

9    AMERICA, INC., a New York
     corporation; SAMSUNG

10   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited

11   liability company,

12          Defendants.

13          C O N F I D E N T I A L

14     A T T O R N E Y S'   E Y E S   O N L Y

15        O U T S I D E   C O U N S E L

16        VIDEOTAPED DEPOSITION

17       BENJAMIN B. BEDERSON, Ph.D.

18            Washington, D.C.

19      Saturday, September 17, 2011

20              9:30 a.m.

21

22   Job No. 41965

23

24   Reporter:  Linda S. Kinkade, RDR, CRR, RMR, CSR

25   Videographer:  Conway Barker

Confidential Attorneys' Eyes Only
Outside Counsel

Page 2

```
 1

 2

 3

 4

 5         The following is the videotaped deposition

 6   of BENJAMIN B. BEDERSON, Ph.D. held at the offices

 7   of:

 8

 9

10         Morrison & Foerster

11         2000 Pennsylvania Avenue, N.W.

12         Washington, DC 20005

13

14

15

16         Taken pursuant to applicable Rules of Civil

17   Procedure, before Linda S. Kinkade, Registered

18   Diplomate Reporter, Certified Realtime Reporter,

19   Registered Professional Reporter, Registered Merit

20   Reporter, Certified Shorthand Reporter (CA), and

21   Notary Public, in and for the District of Columbia.

22

23

24

25
```

Confidential Attorneys' Eyes Only
Outside Counsel

1    APPEARANCES:

2

3        On Behalf of Plaintiff APPLE INC., a

4    California corporation:

5            MICHAEL A. JACOBS, ESQUIRE

6            DEOK KEUN AHN, ESQUIRE

7            Morrison & Foerster

8            425 Market Street

9            San Francisco, California 94105

10

11

12

13

14        On Behalf of Defendant SAMSUNG ELECTRONICS

15    CO.:

16            ERIC HUANG, ESQUIRE

17            AARON KAUFMAN, ESQUIRE

18            Quinn Emanuel Urquhart & Sullivan

19            51 Madison Avenue

20            22nd Floor

21            New York, New York 10010

22

23

24

25

Confidential Attorneys' Eyes Only
Outside Counsel

Page 78

BY MR. JACOBS:

    Q.  And is it the very same code that
executes that functionality in the following two
conditions:  Condition 1, the cursor highlight
bar is between email header images in the list;
condition 2, the email header is in the white
display space underneath the last -- below the
last of the email headers in the list?

        MR. HUANG:  Objection to the form of
the question.

        THE WITNESS:  You used the word email
header where I think you meant highlight cursor.

BY MR. JACOBS:

    Q.  I think I did, yes.  So let me ask it
again.  Maybe now that I have stated it orally I
can do it more clearly.

    There are two possibilities for the email
highlight cursor to be out of alignment with
email headers.  One possibility is it's in
between email headers; the other possibility is
it's after the last of the email headers.
Correct?

    A.  Yes.

    Q.  Is it the exact same code that causes
the email header to snap into alignment with the

Confidential Attorneys' Eyes Only
Outside Counsel

Page 79

1    email cursor bar in either of those two cases?

2            MR. HUANG:  Same objection.

3            THE WITNESS:  So there is only one

4    code sequence of flow that performs snapping,

5    and that same sequence is used wherever the

6    email list is positioned vertically, including

7    when the bottom-most email header is above the

8    bottom of the screen.

9    BY MR. JACOBS:

10           Q.  And the -- it is possible that, when

11   the user lifts -- in the case of the depiction

12   on page 6 of your declaration -- when the user

13   lifts his finger, that the blue cursor bar and

14   email header image are in alignment, correct?

15           MR. HUANG:  Objection to the form.

16           THE WITNESS:  So at the time the user

17   lifts off, it's possible that one of the email

18   headers is already completely aligned underneath

19   the highlight cursor -- highlight cursor.

20   BY MR. JACOBS:

21           Q.  That's my question.

22           A.  Yes, that's possible.

23           Q.  So I think you did this before, but if

24   you could just again point us to the code that

25   tests whether that condition has been met.

Confidential Attorneys' Eyes Only
Outside Counsel

Page 84

1    Do you see that?

2         A.  Yes, I do.

3         Q.  What's the reference to depending on

4    the degree of the over-pan?

5            MR. HUANG:  Objection, form.

6            THE WITNESS:  If in the example that's

7    described here with these images, for a concrete

8    example, if the user has dragged -- moves --

9    touches the screen, drags their finger up so

10   they are moving the email list up, and the

11   bottom-most email header is above the bottom of

12   the screen, if -- so this is the over-pan

13   position -- if they have over-panned to a degree

14   such that that bottom email header is partially

15   overlapping with the highlight cursor, then it

16   will snap back so that the bottom-most email

17   header is aligned with the bottom of the screen

18   in this situation.

19   BY MR. JACOBS:

20        Q.  And if -- so in order for the snap

21   back to occur, there must be some partial

22   overlap at the end -- when the user lifts his

23   finger?

24            MR. HUANG:  Objection to the form.

25            THE WITNESS:  If the -- it depends on

Confidential Attorneys' Eyes Only
Outside Counsel

Page 85

1    how much the bottom email header is above the

2    bottom of the screen.  So if it's -- that's why

3    I said, depending on the degree of the over-pan,

4    if the degree is such that there is some

5    overlap, then it will snap back.

6    BY MR. JACOBS:

7        Q.  And if the degree is such that there

8    is no overlap, what happens?

9        A.  I believe then it does not snap back.

10   Then I believe it just stays in that position.

11       Q.  And that's just a function of the

12   state of the code as -- let me start over again.

13       That is because the code in its -- in the

14   state in which you've provided it to us doesn't

15   have a case for no overlap or beyond overlap; is

16   that correct?

17       A.  Well, the code -- it does what it

18   does.  I mean, it does a very specific set of

19   features and interactions, as we talked about,

20   and that's what it does.  So --

21       Q.  Let me ask it this way.  Point us

22   where in the code the test is set forth in a way

23   that such that that constraint, that there must

24   be some overlap is present.

25       A.  So in Exhibit 212 --

Confidential Attorneys' Eyes Only
Outside Counsel

Page 86

1       Q.  Email.cs.

2       A.  -- Email.cs, pages 29 to 30, method

3    SnapObjectToHighlight, around the fifth line of

4    code it calls, GetIntersectingEmailItemBounds.

5    As we discussed earlier, this returns the

6    rectangle representing the bounds of the email

7    header that most overlaps the highlight cursor

8    implemented by that

9    GetIntersectingEmailItemBounds method.  If we're

10   in this condition where there is no email header

11   that overlaps -- sorry.  If we're in the

12   condition where the bounds of every email header

13   does not overlap the bounds of the highlight

14   cursor, then this method will return a

15   sourceRectangle whose value is empty.

16       The next line of code in

17   SnapObjectToHighlight says, if sourceRectangle is

18   not empty, then it calls SnapPositionToObject.  So

19   in the case we're talking about, sourceRectangle

20   would be empty and this SnapPositionToObject method

21   would not get called.

22       Q.  So I may not have been tracking your

23   description.  On the bottom of page 29, three --

24   well, four lines up from the bottom, if you

25   include the brace, there is if sourceRectangle

Confidential Attorneys' Eyes Only
Outside Counsel

Page 148

1  panning or attempting to pan the screen.

2      Q.  And how does it -- what happens when

3  there is no, in our case, where there is no Zone

4  to the right?

5      A.  I'm just going to look at this code

6  for a moment.  I'll figure this out in another

7  minute so that it will settle.

8      Q.  Not a problem.

9      A.  To be honest, I'm having a little

10  trouble understanding exactly how this code

11  works.  My interpretation of the code is not

12  consistent with how it behaved, so I'm likely

13  misunderstanding something here.

14      Q.  Let me come at the topic this way.  It

15  is the case, as we discussed, that you can't

16  cause the Zone to move to the left when the

17  right-most boundary of the Zone does not have

18  adjacent to it on the right another Zone,

19  correct?

20          MR. HUANG:  Objection to the form.

21          THE WITNESS:  I think -- let me

22  just --

23  BY MR. JACOBS:

24      Q.  Say it your way.

25      A.  There is a grid of 3x3 Zones that's

Confidential Attorneys' Eyes Only
Outside Counsel

Page 149

1    fixed in the code.  So if you were in the

2    right-most column, that is, any of the three

3    right Zones, and you try and drag to the left,

4    you will not be able to drag to the left.

5           Q.  Why?  Why did you design it that way?

6               MR. HUANG:  Objection to the form.

7               THE WITNESS:  I don't recall our

8    thinking in that specific design decision.

9    BY MR. JACOBS:

10          Q.  Was it a design decision?

11              MR. HUANG:  Objection to the form.

12              THE WITNESS:  Or possibly a lack of a

13   design decision.  I don't remember what our

14   thinking was for that particular interaction

15   detail.

16   BY MR. JACOBS:

17          Q.  The source code for LaunchTile, were

18   you able to locate that?

19          A.  No, I was not.

20          Q.  Any idea what happened to it?

21          A.  Well, I know that Amy Karlson was

22   primarily responsible for writing it.  I believe

23   she managed source code, and I don't think I

24   probably followed it in that much detail.  So

25   that's why I -- when I looked, I didn't have it,

Confidential Attorneys' Eyes Only
Outside Counsel

Page 160

1  well demonstrating it.  So that's what I recall.

2  BY MR. JACOBS:

3      Q.  Were you demonstrating the software in

4  a live basis in conformance with what was

5  demonstrated on the video?  Were you trying to

6  map what was on the video to your live

7  demonstration?

8          MR. HUANG:  Objection to the form.

9          THE WITNESS:  No.  The video was a

10 short, you know, narrow summary, and when we

11 gave live demos it was much more casual.  We

12 would typically hand the device over to whoever

13 we were showing it to, let them do whatever they

14 want, ask us any questions.  They had already

15 seen the video, so they typically would want to

16 go beyond that.

17 BY MR. JACOBS:

18     Q.  Do you recall anything specifically

19 being demonstrated in May 2005 that wasn't in

20 the video?

21     A.  I don't recall the specific details of

22 what was or was not shown to any specific

23 individual.

24     Q.  Let me show you an email that you

25 produced to us.

Confidential Attorneys' Eyes Only
Outside Counsel

Page 198

1          Then at time 1:15 seconds the user again

2     touched the screen, dragged down, let go, which

3     resulted in snapping forward to the Zone above.

4          And that's the end of the video.

5     BY MR. JACOBS:

6          Q.   In either of the videos did we see the

7     activity that's described in paragraph 14 of

8     your declaration?

9          A.   Neither video showed the activity

10    described in paragraph 14 of my declaration.

11         Q.   And that's what your declaration calls

12    the under-panning case, correct?

13         A.   I don't think -- paragraph 14 doesn't

14    use that term, but I believe this describes the

15    concept that was described earlier as

16    under-panning.

17         Q.   And to get back to the way the source

18    code works, that's the case where in the

19    three-stage interaction sequence where, after

20    landing on the screen, the finger is moved less

21    than 20% in the relevant direction -- sorry --

22    yes, less than one-sixth in the relevant

23    direction such that there is what the

24    declaration describes as a snapback.

25         A.   Correct.

Confidential Attorneys' Eyes Only
Outside Counsel

Page 204

1    LaunchTile is motivated by the idea that, if

2    there are some places that are convenient for

3    the interface to go to, then you should make the

4    interface naturally take you to those places and

5    not let you get stuck in inconvenient places.

6         Q.  So you published an article recently,

7    "The Promise of Zoomable User Interfaces."

8         Mark this as the next in order.

9         (Exhibit No. 222 marked for

10   identification.)

11   BY MR. JACOBS:

12        Q.  The Promise of Zoomable User

13   Interfaces by Benjamin B. Bederson, 2011, Taylor

14   & Francis.  What was this published in?

15        A.  This was published in a journal named

16   Behaviour & Information Technology.

17        Q.  In 2011?

18        A.  Yes.

19        Q.  On page 4 you have a discussion of

20   Desert Fog citing Jul and Furnas.  Desert Fog

21   labels a phenomena that you describe as allowing

22   users to fly through the space going absolutely

23   anywhere including deep into the spaces between

24   objects.  Do you see that?

25        A.  No, actually.  Sorry.  Where are you?

Confidential Attorneys' Eyes Only
Outside Counsel

Page 205

1          Q.   It's on the right-hand column of --

2     it's such a vivid image I thought it might just

3     jump from the page.   The right-hand column of

4     page 4, second paragraph.

5          A.   Yes, I see this.

6          Q.   So just to maybe start a little bit

7     earlier, different zoomable user interfaces have

8     also had various navigation mechanisms, which

9     are ways for users to move through the space.

10    Again, there is a trade-off between flexibility

11    and usability.   Some interfaces allow users to

12    fly through the space going absolutely anywhere,

13    including deep into the spaces between objects,

14    resulting in some researchers labeling this

15    phenomenon Desert Fog, Jul and Furnas.   Then you

16    say, very few other applications let a user

17    navigate beyond the actual content.

18         Can you explain the contrast you were

19    drawing there between ZUIs and other applications?

20              MR. HUANG:   Objection to the form.

21              THE WITNESS:   Sure.   So if we continue

22    reading this paragraph, it describes this idea

23    of not letting you navigate between the actual

24    content.   I believe it says, almost every

25    document browser and editor limits navigation to

Confidential Attorneys' Eyes Only
Outside Counsel

Page 206

1    the available content with the notable exception

2    of Microsoft Excel's scroll bar arrows, Apple

3    numbers, and Google -- I'm sorry -- with the

4    notable exception of Microsoft Excel's scroll

5    bar arrows.  Apple numbers and Google

6    spreadsheet, on the other hand, do limit

7    navigation.  On the other hand, some interfaces

8    allow you only to click on objects to zoom into

9    them and click on a zoom out button to zoom out,

10   making it impossible to get lost, but also

11   giving less control over exactly where you look.

12        So the point of this paragraph was to

13   describe that there are some applications that let

14   the user navigate in space possibly -- navigating

15   can be simple scrolling or it could be this kind of

16   zooming navigation, which is a little bit more

17   uncommon, or it could be 3-D navigation in a 3-D

18   world.

19        Sorry.  I was describing that sometimes you

20   can navigate to a place where there is no content.

21   If there is no content, then you're kind of in a

22   place that essentially -- typically -- represented

23   with an empty screen.  And that was a concern

24   because that would make a user feel disoriented

25   since there is nothing on the screen.

Confidential Attorneys' Eyes Only
Outside Counsel

Page 207

1      And I said that it was more common for
2 applications to stop a user from navigating to a
3 place where there was no content, although it
4 occurred, both in widespread applications like Excel
5 and in many ZUIs, in at least those.
6      Q.  So the basic contrast you were drawing
7 was between those ZUIs that are flexible but
8 haven't addressed this problem of getting lost
9 in Desert Fog, and most applications which do
10 constrain you to the space that's filled by
11 content.  Is that -- am I capturing the essence
12 of your paragraph correctly?
13      MR. HUANG:  Objection to the form of
14 the question.
15      THE WITNESS:  The paragraph said --
16 well, it didn't say "most."  It said there were
17 few applications that let you move to a place
18 where there is no content, although I did
19 describe some, and many constrained you to
20 navigating only within available, visible
21 content.
22 BY MR. JACOBS:
23      Q.  And that -- but you were describing
24 that, as of 2011, there remains this problem in
25 ZUIs of flying through the space going

Confidential Attorneys' Eyes Only
Outside Counsel

Page 216

1    underline the point, if one were to click on or

2    otherwise seek to get the underlying text of the

3    email on this device, the device does not have

4    the full email underneath the header, correct?

5          MR. HUANG:  Objection to the form of

6    the question.

7          THE WITNESS:  If you tap on one of

8    these email, I believe -- so, I guess, if you

9    press this button, it opens up a special kind of

10   menu, and, if you press the plus button, then it

11   will open up a representation of an email.

12   BY MR. JACOBS:

13        Q.  Is that the same email for every

14   header?

15        A.  Yes, it is.

16        Q.  So it's kind of a -- this is really a

17   prototype of what it could -- what this device

18   could do if you figured out how to get an email

19   client to create images for each header, store

20   them in the database, and link them to the

21   underlying message, correct?

22        A.  I think you just proposed a possible

23   architecture for implementing an email system.

24   So what I would say is this is a prototype that

25   demonstrates how email can work in this

Confidential Attorneys' Eyes Only
Outside Counsel

Page 217

1   environment.

2         Q.   With a prepopulated database of images

3   representing email headers and a single email

4   text, correct?

5             MR. HUANG:   Objection to the form.

6             THE WITNESS:   I would say with a

7   hard-coded set of email headers and a single

8   content of email.

9   BY MR. JACOBS:

10        Q.   Thank you.

11            MR. JACOBS:   Let's go off the record

12  again.

13            VIDEOGRAPHER:   Off the record at 4:43.

14        (Proceedings recessed.)

15            VIDEOGRAPHER:   Back on the record at

16  4:45.

17  BY MR. JACOBS:

18        Q.   So a couple other devices were given

19  to us by Quinn Emanuel, counsel for Samsung, and

20  I want to just check with you if you know

21  anything about the providence of those devices

22  and the appearance that one sees when one opens

23  them up.

24            So we have this iPAQ here that we

25  received, and we've taken a picture of the

Confidential Attorneys' Eyes Only
Outside Counsel

Page 223

1       A.   Correct.

2            MR. JACOBS:   I think we're done.

3     Thank you.

4            MR. HUANG:   Thank you.

5            THE WITNESS:   Thank you.

6            VIDEOGRAPHER:   This concludes the

7     deposition of Dr. Bederson.   Off the record at

8     4:57 and it consists of five tapes.

9            (Proceedings concluded.)

10

11     //

12            (Signature having not been waived, the

13     deposition of BENJAMIN B. BEDERSON, Ph.D.

14     concluded at 4:57 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Confidential Attorneys' Eyes Only
Outside Counsel

Page 224

CERTIFICATE OF SHORTHAND REPORTER

NOTARY PUBLIC

I, Linda S. Kinkade, RDR, CRR, RMR, CSR, the notarial officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically, to the best of my ability, and thereafter reduced to typewriting; and that I am neither counsel for or related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of September 2011.

_____

Linda S. Kinkade

NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA
My commission expires:  July 14, 2012