QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California  94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Cal. Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Cal. Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive 5th Floor
Redwood Shores, California  94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Michael T. Zeller (Cal. Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Samsung Electronics Co., Ltd.,
Samsung Electronics America, Inc., and Samsung
Telecommunications America LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | CASE NO. 11-cv-01846-LHK |
| Plaintiff, | **DECLARATION OF JEFFREY JOHNSON, PH.D., IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR A PRELIMINARY INJUNCTION** |
| vs. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | Date: October 13, 2011<br>Time: 1:30 p.m.<br>Courtroom 4, 5th Floor<br>Judge: Hon. Lucy H. Koh |
| Defendants. | PUBLIC REDACTED VERSION |

1        I, Jeffrey Johnson, hereby declare as follows:

2   **I.        BACKGROUND**

3        1.        I am currently the President and Principal Consultant at UI Wizards, Inc., where I

4   manage the company, perform product usability design, evaluation, testing and training for clients.

5        2.        I have more than 32 years of experience in the computer industry designing,

6   implementing, evaluating, and testing user interfaces, including touch-screen based user interfaces.

7   Previously, I held positions at Cromemco, Xerox, US West, Hewlett-Packard and Sun

8   Microsystems. I have authored numerous publications on user interface technology, including four

9   books in this field.

10       3.        I earned a B.A. in psychology from Yale University and a Ph.D. in psychology

11  with additional studies in computer science from Stanford University.

12       4.        My experience includes consulting with Samsung on the Blackjack II device, a

13  Samsung smartphone that was released in late 2007 or 2008.  My work involved exploring issues

14  to improve the user interface and user experience.

15       5.        I have also published multiple papers relating to touchscreens.  In 1995, I published

16  a paper entitled "A Comparison of User Interfaces for Panning on a Touch-Controlled Display" in

17  the proceedings of the Computer-Human Interaction (CHI) conference in 1995.  I also made a

18  presentation on the same subject at the CHI conference in 1995.  The study involved, among other

19  things, an investigation into the accuracy of panning.  In April 1994, I published another paper on

20  touchpad technology entitled "The Effect of Touch-Pad Size on Pointing Accuracy" as a

21  FirstPerson Technical Report FP-1994-2.  This study investigated the accuracy of certain

22  touchpads.  In August 1995, I published a paper entitled "A Comparison of Remote Pointing

23  Devices for Interactive TV Applications" as another FirstPerson Technical Report FP-1994-5.

24  This study also investigated the accuracy of certain touchpads.

25       6.        Attached as Exhibit 1 is my Curriculum Vitae which summarizes my background,

26  credentials, and includes a list of my publications.

27

28

7.     I have been asked by counsel for Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; and Samsung Telecommunications America, LLC (collectively "Samsung") to assess whether certain limitations of Apple's allegations of infringement of U.S. Patent No. 7,469,381 ("'381 Patent") that were asserted in conjunction with Apple's preliminary injunction against Samsung Galaxy S 4G, Samsung Infuse 4G, Samsung Droid Charge and Samsung Galaxy Tab 10.1 (collectively "Accused Devices") are met.

8.     Apple has moved in its Motion to preliminarily enjoin Samsung "from infringing three Apple design patents and one utility patent by selling four recently released products: the Infuse 4G, Galaxy S 4G, Droid Charge smartphones, and the Galaxy Tab 10.1 tablet computer."

9.     I am being compensated at my customary rate for my work on this case. I have received no other compensation for my work in this litigation. My compensation is in no way contingent upon the opinions I arrive at or the result of the litigation.

10.    In performing my analysis, I have reviewed Apple's amended complaint against Samsung, Apple's Motion For A Preliminary Injunction ("Motion"), and declarations and exhibits submitted in support of that Motion, the '381 Patent, the '381 Patent file history including references cited therein, a redacted transcript of Dr. Ravin Balakrishnan's deposition taken on August 16, 2011, the reexamination file history including references cited therein. I have also reviewed publicly available documents discussed in this declaration.

11.    In addition to my review of documents listed above, I have relied on my training and experience working in the area of touch screen-based and touchpad user interfaces to arrive at my opinion.

12.    My opinion is that Apple has not shown that the Accused Devices meet the "first direction" and the "displaying an area beyond the edge of the electronic document" limitations of the '381 Patent.

## II.    LEGAL STANDARDS

13.    I understand that assessment of infringement is a two-step process. First, the language of the patent claims must be construed by the Court. Second, the claims as construed are

1  applied to the accused product or process to determine whether the accused product or process

2  meets each and every limitation of the claim as construed by the Court.

3      14.     I understand that when interpreting the claims of a patent, the Court first looks at

4  the intrinsic evidence in the following order: the plain claim language, the specification, and the

5  prosecution history.  The specification and prosecution history often can inform the meaning of

6  the claim language by demonstrating how the inventor understood the invention and whether the

7  inventor limited the invention.  Extrinsic evidence can also be relevant in determining the meaning

8  of the claims.

9      15.     I understand that there are two types of infringement:  literal infringement and

10  infringement under the doctrine of equivalents ("DOE").  It is my understanding that to literally

11  infringe a claim, an accused product or process must literally meet every limitation of the claim.

12      16.     I understand that in order to succeed on a claim of infringement of a patent claim

13  the patentee is required to prove infringement of every single limitation of the patent claim. I

14  further understand that in order to succeed on a claim of infringement of a dependent claim, the

15  patentee is required to prove infringement of every single limitation of the claim, plus every single

16  limitation of the claim(s) on which the dependent claim depends.  For example, if claim 2 is

17  dependent on claim 1, in order to succeed on a claim of infringement of claim 2, the patentee must

18  prove infringement of every single element of both claim 2 and claim 1.

19      17.     Therefore, if the patentee fails to prove infringement on a single limitation of an

20  independent claim, then the patentee will not succeed on any claim of infringement of that

21  independent claim and all the claims that depend on that independent claim.

22      18.     I understand that there are two ways of evaluating whether a requirement is present

23  under the doctrine of equivalents.  One test for equivalency is the "function-way-result" test,

24  whereby the patentee may show an equivalent when the accused product or process performs

25  substantially the same function, in substantially the same way, to achieve substantially the same

26  result, as disclosed in the claim.  Equivalency may also be proven where the differences between

27  the invention as claimed and the accused product or process are insubstantial.

28

19.     I am further informed that the same term used multiple times within a single claim should be interpreted the same way.

**III.     APPLE'S ALLEGATIONS OF INFRINGEMENT**

20.     Apple has alleged that the Gallery and Contacts applications in the Galaxy S 4G, Infuse 4G and Droid Charge infringe claims 1-5, 7, 9-10, 13-14, 16, and 19-20 of the '381 Patent.

21.     Apple has further alleged that the Gallery and the Browser applications in the Galaxy Tab 10.1 infringe claims 1-5, 7, 9-10, 13-14, 16, and 19-20 of the '381 Patent.

**IV.     NON-INFRINGEMENT—"FIRST DIRECTION"**

22.     Claim 1 of the '381 Patent requires: "translating the electronic document displayed on the touch screen display in a <u>first direction</u> to display a second portion of the electronic document." (emphasis added.)

23.     Claim 1 of the '381 Patent also requires: "in response to an edge of the electronic document being reached while translating the electronic document in the <u>first direction</u>" (emphasis added.)

24.     While I understand claim construction has not yet happened in this case, one of ordinary skill in the art would understand  "direction" as used in the claims refers to a translation that is specified with the degree of accuracy which the device is capable.  This meaning of the term "direction" is consistent with and supported by the '381 Patent specification and file history. *See, e.g.,* '381 Patent at 15:16-19; 20:60-67; 24:10-15; 27:12-17; 29:21-40; Figs. 8A-8C.

25.     This meaning of "direction" appears to differ from Dr. Balakrishnan's interpretation of this term.  Figure 1 below diagrams various gestures that Dr. Balakrishnan was asked about and summarizes his testimony with respect to each.  In particular, while Dr. Balakrishnan did not provide a construction for "direction" during his deposition, he testified that a zig-zag motion or an arc motion consists of movements in only a single direction.  Balakrishnan Depo. Tr. at 103:8-17; 107:1-13; 108:22-110:8.  These motions include multiple components and would not consist of a single direction under my construction of "direction."  Furthermore, Dr. Balakrishnan's interpretation of "first direction" is inconsistent and incompatible with the use of

"direction" in the '381 Patent specification. *See, e.g.,* '381 Patent at 15:16-19; 20:60-67; 24:10-15; 27:12-17; 29:21-40.

| Example | Balakrishnan Testimony |
|---|---|
| <br>zig – zag | same "first direction"<br><br>Exhibit 3 (Balakrishnan Depo. Tr.) at 108:22-111:7. |
| <br>arc | same "first direction"<br><br>Exhibit 3 (Balakrishnan Depo. Tr.) at 103:8-17. |
| <br>up then down | NOT same "first direction"<br><br>Exhibit 3 (Balakrishnan Depo. Tr.) at 97:15-98:20. |
| <br>straight line | NOT humanly possible<br><br>Exhibit 3 (Balakrishnan Depo. Tr.) at 100:18-101:3. |

**Figure 1.** Balakrishnan testimony on "first direction"

26.     The term "first direction" as used in both instances in claim 1 refers to the same direction.  Therefore, in order to meet both "first direction" limitations, a document must be translated in the same direction when displaying the second portion of the electronic document as when reaching the edge of the document.

27.     I also note that the first instance of "first direction" appears as "<u>a</u> first direction" while the second instance of "first direction" appears as "<u>the</u> first direction."  Because the second instance refers to "<u>the</u>," it is referring to the first instance as an antecedent, further supporting the requirement that both "first direction"'s are referring to the same thing.

**A.     Gallery Application**

28.     In the Gallery application, a document is not necessarily translated and in general is not translated in the same direction when displaying a second portion of the electronic document as when reaching the edge of the document.

1       29.    Figures 2-4 illustrate a non-infringing use of the Gallery application on a Samsung

2  Galaxy S 4G.

3       30.    In Figure 2 below, I show an image prior to translation.

4       31.    In Figure 3 below, I show a user translating a document to show a second portion

5  (labeled "Direction A").

6       32.    In Figure 4 below, I show the user translating a document in a different direction

7  when reaching the edge of the document (labeled "Direction B").

8

9

10

11

12

13

14

15

16

17

18

19



20      **Figure 2. Image prior to**    **Figure 3. Image translated in**    **Figure 4. Image translated in**
    **translation.**    **"Direction A"**    **"Direction B"**

21

22       33.    Figures 5-7 illustrate a non-infringing use of the Gallery application on a Samsung

23  Galaxy Tab 10.1.

24       34.    In Figure 5 below, I show an image prior to translation.

25       35.    In Figure 6 below, I show a user translating a document to show a second portion

26  (labeled "Direction A").

27

28

36.    In Figure 7 below, I show the user translating a document in a different direction when reaching the edge of the document (labeled "Direction B").




Figure 5.  Image prior to translation.

Figure 6.  Image translated in "Direction A"

Figure 7.  Image translated in "Direction B"

37.    Unless the document is somehow constrained to translate in only a fixed linear direction, the two directions, Direction A and Direction B, illustrated in Figures 3 and 4 will almost certainly be different.  In the Gallery application there is no such constraint; the documents can translate freely in two dimensions.  I agree with Dr. Balakrishnan's statement that it is not humanly possible for a finger to move in exactly a straight line.  Balakrishnan Depo. Tr. 100:18-101:3.

38.    Because it is not humanly possible for a finger to move in exactly a straight line, and use of the Gallery application does not otherwise restrict a document to be translated in the same direction to show a second portion as when reaching the edge of the document, use of the Gallery application does not meet both "first direction" limitations of Claim 1.

39.    Claims 19 and 20 have the same requirements with respect to their usage of the term "first direction" as claim 1.  As a result, use of the Gallery also does not infringe the "first direction" limitations of claims 19 and 20.

1    **B.      Browser Application**

2        40.      As with the Gallery application, a document in the Browser application can be

3    translated in two dimensions, and therefore is not necessarily translated and in general is not

4    translated in the same direction when displaying a second portion of the electronic document as

5    when reaching the edge of the document.

6        41.      Figures 8-10 illustrate a non-infringing use of the Browser application on a

7    Samsung Galaxy Tab 10.1.

8        42.      In Figure 8 below, I show an image prior to translation.

9        43.      In Figure 9 below, I show a user translating a document to show a second portion

10   (labeled "Direction A").

11       44.      In Figure 10 below, I show the user translating a document in a different direction

12   when reaching the edge of the document (labeled "Direction B").

13

14

15   

16

17

18

19

20

21

22

23   **Figure 8.  Image prior to**          **Figure 9.  Image translated in**      **Figure 10.  Image translated**
     **translation.**                        **"Direction A"**                       **in "Direction B"**

24

25       45.      As explained above, it is not humanly possible for a finger to move in exactly a

26   straight line, and use of the Browser application does not otherwise restrict a document to be

27   translated in the same direction to show a second portion as when reaching the edge of the

28

1  document, use of the Gallery application does not meet both "first direction" limitations of claims

2  1, 19 and 20 for the same reasons the Gallery application does not meet the "first direction"

3  limitations of those claims.

4       46.     Furthermore, the accused Samsung devices do not meet the "first direction"

5  limitations under the doctrine of equivalents.  The Gallery and Browser applications both allow

6  the user to move a document in two dimensions and therefore, they do not behave in substantially

7  the same way nor do they achieve substantially the same function or result as what is claimed by

8  the "first direction" limitations.  The translation of the document in Gallery and Browser are not

9  constrained to a "first direction" and the way the edge of the document is reached affects the

10  behavior of these applications after the edge has been reached.  Moreover, the differences between

11  the Gallery and Browser applications and the claimed "first direction" limitations are not

12  insubstantial because the touchscreen is sensitive to two dimensional movement and the

13  translation of the document also occurs in two dimensions.

14

15  ## V.    NON-INFRINGEMENT – "DISPLAYING AN AREA BEYOND THE EDGE OF THE DOCUMENT"

16

17       47.     Claim 1 of the '381 Patent requires: "in response to an edge of the electronic

18  document being reached … displaying an area beyond the edge of the document." (emphasis

19  added.)

20       48.     Apple has not provided a construction of "displaying" in its motion nor has Dr.

21  Balakrishnan provided a construction in his declaration or deposition.   One of ordinary skill in the

22  art would understand "displaying an area" requires that some part of the area beyond the edge of

23  the document emits light or is illuminated.  Construing "displaying an area" to require emission of

24  light is consistent with the '381 Patent specification. *See, e.g.,* '381 Patent at 3:6; 3:45; 4:8; 4:19;

25  9:40; 10:2; 10:12; 10:23; 12:24; 15:32; 15:33; 18:31; 22:47.

26       49.     Furthermore, in addition to "displaying an area beyond the edge of the document"

27  "displaying" or "display" is used in multiple places in the claim: "displaying a first portion,"

28  "display a second portion," "displaying a third portion," "display a fourth portion."  In all of these

1  instances, "display" or "displaying" refers to an active display including emission of light or

2  illumination.  Because terms should be construed consistently within a claim, "displaying an area

3  beyond the edge of the document" should also require active display including emission of light.

4       50.     Applying this understanding, if a device is turned off, its screen is displaying

5  nothing.  More specifically, if an area of the screen is turned off, that area of the screen is not

6  displaying anything.  A black portion of the screen beyond the edge of a document does not meet

7  the limitation "displaying an area beyond the edge of the document" because there is no emission

8  of light in that area.

9       51.     The Samsung Galaxy S 4G, the Samsung Infuse 4G and the Samsung Droid Charge

10  (collective, "Accused Smartphone Devices") all use a display technology known as Super

11  AMOLED, which is a type of AMOLED technology.  Balakrishnan Decl. Exhs. 2-4, 6-8.

12  AMOLED stands for Active Matrix Organic Light-Emitting Diode and is a display technology

13  using light-emitting diodes as light sources so each pixel is emissive.  Each pixel emits light when

14  activated and is turned off when black is desired.

15       52.     One of the advantages of AMOLED technology is that it consumes significantly

16  less power than other flat panel display technologies.  The more black there is on the screen at any

17  given time, the less power the screen consumes at that time.  For example, an AMOLED display

18  showing white text on black background uses less than one-third the power of showing black text

19  on white background.   Exhibit 2 (Mian Dong; Choi, Y.-S.K; Lin Zhong (July 2009). "Power

20  modeling of graphical user interfaces on OLED displays". Design Automation Conference, 2009.

21  DAC '09. 46th ACM/IEEE (IEEE): 652-657) at 1.

22       53.     When showing black, the pixels of a Super AMOLED display consume no power.

23  They are in the same state as when the display and device are off.  *Id.* at Figure 3.

24       54.     To take advantage of the power-saving aspect of Super AMOLED technology, one

25  should maximize the use of black in a graphical user interface.  Using black for the area beyond

26  the edge of documents is consistent with this goal and I have confirmed that the accused Samsung

27  devices in fact use black background.

28

55.    Dr. Balakrishnan does not set forth a clear construction for the term "displaying" as used in this claim in his declaration or deposition testimony.  Balakrishnan Depo. Tr. at 111-136.  For example, in one portion of his testimony, Dr. Balakrishnan states: "My understanding is … I've got the edge of the document.  I've reached the edge, and I'm gonna show something, some – some amount of visuals beyond that edge.  Displaying an area."  Balakrishnan Depo. Tr. at 112:11-15.  Dr. Balakrishnan also testified that "When the screen is turned off, the screen portion is not displaying anything."  Balakrishnan Depo Tr. at 124:21-125:12.  This testimony seems to indicate "displaying" requires actively showing some amount of visuals.

56.    In another portion of his testimony, Dr. Balakrishnan states "the code would have to display… –    figure out what it's gonna display and what it's not gonna display, and if it is – if it tells the – the screen don't illuminate those – those particular pixels, that would be equivalent to saying display that area in black.  So it would be displaying an area beyond the edge of the document."   Exhibit 3 (Balakrishnan Depo. Tr.) at 130:4-11.  This seems to indicate that displaying an area in black (which is off for AMOLED displays, as discussed above) is displaying an area beyond the edge of the electronic document.

57.    As discussed above, for the Accused Smartphone Devices, Apple has alleged that the Gallery and Contacts applications infringes the '381 Patent.

58.    I have reviewed the Gallery applications on the Accused Smartphone Devices.  The area beyond the edge of the image appears black.  Furthermore, I have reviewed source code for the Gallery application                          Excerpts for the source code for the Gallery application are provided in Exhibit 3.  I have also reviewed the Contacts applications on the Accused Smartphone Devices.  The area beyond the edge of the list appears black.

59.    Because the black background is what appears in the Gallery and Contacts applications beyond the edge of the electronic document and black pixels in Super AMOLED technology are in the *off* state, these applications do not "display" anything beyond the edge of the electronic document.  Therefore, the Gallery and Contacts application does not meet the limitation

1  "in response to an edge of the electronic document being reached … displaying an area beyond the
2  edge of the document."

3      60.     This is in contrast to other devices I have observed such as Apple iPod Touch, in
4  which, for example, the Settings application clearly displays a non-black area beyond the edge of
5  an electronic document.

6      61.     Because all of the asserted claims require displaying an area beyond the edge of the
7  document and Gallery and Contacts applications in the Accused Smartphone Devices does not
8  meet this limitation, these devices do not infringe the asserted claims.

9      62.     Furthermore, the accused Samsung devices do not meet the "displaying an area
10  beyond the edge of the document" limitation under the doctrine of equivalents.  The Gallery and
11  Contacts applications both turn certain pixels off in order to conserve power and maximize the
12  efficiency of the use of the Super AMOLED screen.  Turning portions of the display off is
13  substantially different from actively displaying an area beyond the edge of the document.  The
14  Gallery and Contacts therefore do not behave in substantially the same way nor do they achieve
15  the substantially the same function or result as what is claimed by the "displaying an area beyond
16  the edge of the document" limitation.  Moreover, the differences between the Gallery and Contacts
17  applications and the claimed "displaying an area beyond the edge of the document" limitation are
18  not insubstantial because the consumption of power on a mobile device is a substantial
19  consideration that is of interest to users.

20

21      I declare under penalty of perjury under the laws of the United States of America
22  that the foregoing is true and correct.

23      Executed on August 22, 2011, at San Francisco, California.

24

25  _____

26

27

28

1

**GENERAL ORDER ATTESTATION**

2

I, Victoria Maroulis, am the ECF user whose ID and password are being used to file the

3

foregoing document.  I hereby attest pursuant to General Order 45.X.B. that concurrence in the

4

electronic filing of this document has been obtained from Jeffrey Johnson.

5

6
                                        _/s/ Victoria Maroulis_____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28