# EXHIBIT
# 1

Contains Highly Confidential - Attorneys' Eyes Only  Portions

1                    UNITED STATES DISTRICT COURT
2                   NORTHERN DISTRICT OF CALIFORNIA
3                            --oOo--
4    APPLE INC., a California
     corporation,
5
                       Plaintiff,
6
                  Vs.               Case No. 11-CV-01846-LHK
7
     SAMSUNG ELECTRONICS CO., LTD.,
8    a Korean business entity;
     SAMSUNG ELECTRONICS AMERICA,
9    INC., a New York corporation;
     SAMSUNG TELECOMMUNICATIONS
10   AMERICA, LLC, a Delaware
     limited liability company,
11
                       Defendants.
12   _____/
13
14        VIDEOTAPED DEPOSITION OF COOPER WOODRING
15              Redwood Shores, California
16               Friday, August 5, 2011
17        (HIGHLY CONFIDENTIAL ATTORNEYS' EYES
                ONLY PORTIONS BOUND SEPARATELY)
18
19   Reported By:  CAROL S. NYGARD, CSR No. 4018
                   Registered Merit Reporter
20
21
22
23
24
25

Contains Highly Confidential - Attorneys' Eyes Only  Portions

1                    August 5, 2011

2                      9:46 a.m.

3    Videotaped Deposition of COOPER

4    WOODRING, held at the offices of

5    Quinn Emanuel Urquhart & Sullivan,

6    LLP, 555 Twin Dolphin Drive, Redwood Shores,

7    California, before Carol S. Nygard,

8    A Certified Shorthand Reporter,

9    Registered Merit Reporter.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 3

1                      A P P E A R A N C E S:
2   FOR THE PLAINTIFF APPLE, INC.:
3        MORRISON & FOERSTER
         BY:  ANDREW E. MONACH, ESQ.
4             PATRICK J. ZHANG, ESQ.
         425 Market Street
5        San Francisco, California  94105
6
7
         CYNDI WHEELER, Patent Counsel
8        Apple
         1 Infinite Loop, MS 40-PAT
9        Cupertino, California  95014
10
11
    FOR THE DEFENDANTS SAMSUNG:
12
         QUINN EMANUEL URQUHART & SULLIVAN
13       BY:  MICHAEL T. ZELLER, ESQ.
              TAMAR BUCHAKJIAN ESQ,
14       856 South Figueroa Street
         10th Floor
15       Los Angeles, CA  90017
16
17
18       QUINN EMANUEL URQUHART & SULLIVAN
         BY: MARGARET CARUSO, ESQ.
19            JOELLE PERRY, ESQ.
         555 Twin Dolphin Drive
20       5th Floor
         Redwood Shores, California  94065
21
22
23
         Also Present:
24
         JAKE KROHN, Videographer
25       NATE SUN

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 45

1    element functional, yes.

2    BY MR. ZELLER:

3        Q.    I didn't use the word "functional."

4              I used the world "utilitarian."

5              Are you --

6        A.    Okay, utilitarian.

7        Q.    So you're an expert in that area; is that

8    true?

9              MR. MONACH:  Object to form.  Asked and

10   answered.

11             You can answer it again.

12             THE WITNESS:  From a design view, yes.

13   BY MR. ZELLER:

14       Q.    You don't say that anywhere in your

15   declaration; do you?

16             MR. MONACH:  Object to form.  Best Evidence

17   Rule.

18             THE WITNESS:  Let me think about that for a

19   minute.

20   BY MR. ZELLER:

21       Q.    Please point out to us where in your

22   declaration you offer yourself as an expert in the

23   functional or utilitarian aspects of mobile phones or

24   tablet computers, or, in fact, offer any opinion on what

25   is or is not functional or utilitarian.

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 46

1          MR. MONACH:  Object to the form of the

2    question to the extent it mischaracterizes his prior

3    testimony.

4          Object under the Best Evidence Rule that the

5    declaration is the best evidence of what it says, but if

6    you want the witness to go -- to sit here and go through

7    it on the record, he can do so.

8          THE WITNESS:  I think the two questions you

9    asked is what -- one, did I include that opinion in my

10   declaration and the answer to that is, no, I don't

11   believe I did, but the prior question was do I consider

12   myself an expert in that, and the answer to that is yes.

13   BY MR. ZELLER:

14        Q.   Why does your declaration contain no opinion

15   as to whether or not any elements or features of mobile

16   phones or tablet computers are utilitarian or

17   functional?

18          MR. MONACH:  Object to the form of the

19   question, and I don't know that this calls for

20   communications with counsel, but if -- if it calls for

21   communications with counsel other than facts and

22   assumptions, I'd instruct you not to reveal those facts

23   and assumptions.

24          THE WITNESS:  I don't think I gave an opinion

25   on that in my declaration because design patents are --

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 47

1   are primarily ornamental or they wouldn't have been

2   issued by the Patent Office, so I saw no reason to give

3   an opinion on that.

4   BY MR. ZELLER:

5       Q.    Well, focusing on the 889 design patent, when

6   you offered your opinions in the declaration in this

7   case, were you assuming that the elements or features

8   depicted in the design patent were primarily ornamental?

9       A.    Yes.

10      Q.    And is it also true -- same statement true

11  with respect to the two other design patents that are

12  the subject of your declaration, namely those involving

13  the surface of the -- the phones?

14      A.    Yes.

15      Q.    So is it true that with respect to utilitarian

16  or functionality --

17            Well, let me rephrase that.

18            Is it true that with respect to functionality

19  of -- any of the design patents that are at issue this

20  is something that you're simply assuming as opposed to

21  something you're offering an opinion on in this case?

22            MR. MONACH:   Object to the form of the

23  question to the extent it might be intended to cover

24  rebuttals or replies.

25            The witness has testified to the opinion he's

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 48

1  given and hasn't given his opening statement -- his

2  opening declaration and why, but certainly if someone

3  from your side comes and says a feature is functional we

4  reserve the right to respond to that.

5       MR. ZELLER:  And I reserve the right to

6  examine him today on any opinion he has or is going to

7  give on functionality.

8       The question is is --

9       MR. MONACH:  He may not know what the -- he

10 may not know what opinions he's going to give --

11      MR. ZELLER:  Then he's going to have --

12      MR. MONACH:  -- until he sees an opinion from

13 the other side, which he's reserved the right to respond

14 to.

15      MR. ZELLER:  That's, obviously, completely

16 improper.

17 BY MR. ZELLER:

18   Q.   So my question is, are you assuming that the

19 features of the design patents that you describe in your

20 declaration are not functional and primarily ornamental,

21 or are you offering an opinion on that?

22      MR. MONACH:  Object to the form of the

23 question.

24      It's ambiguous with respect to whether we're

25 talking about the declaration given or an opinion that

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 49

1    he might give in response to other opinions.

2           You can answer.

3           THE WITNESS:  I didn't assume that they were

4    primarily ornamental just because the Patent Office says

5    they are, but it is my opinion that they are ornamental.

6    BY MR. ZELLER:

7        Q.    And you had that opinion as of the time that

8    you signed this declaration on June 30th, 2011; is that

9    true?

10       A.    Yes.

11       Q.    So why isn't it in your declaration?

12           MR. MONACH:  Objection.  Asked and answered.

13           THE WITNESS:  I wasn't asked to give that

14    opinion.

15    BY MR. ZELLER:

16       Q.    Okay.  Well, please tell me the -- first of

17    all, the full basis of the investigation that you

18    undertook to determine whether or not any of the

19    elements or features of the design patents that you

20    discuss in your declaration are primarily functional or

21    primarily ornamental.

22           I want to know everyone you talked to, every

23    piece of literature you reviewed, all the works that you

24    did in advance of signing your declaration and as of the

25    time you formed that opinion.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 50

1          MR. MONACH:  I'm going to instruct the witness

2    not to answer with respect to communications he had

3    other than communications revealing facts that he relied

4    on or assumptions that he relied on in giving his

5    declaration.

6          THE WITNESS:  It's pretty simple.

7          I examined the three design patents involved

8    and looked at the individual visual features of each and

9    determined that each was ornamental in that its

10   appearance was not dictated by function.

11   BY MR. ZELLER:

12     Q.    So you -- you looked at the designed patents.

13          That was the full extent of your basis for

14   your opinion that the elements or features of the design

15   patents that are discussed in your declaration are not

16   functional and instead are primarily ornamental;

17   correct?

18          MR. MONACH:  Object to form.

19          THE WITNESS:  That's correct.

20          I don't know how one could make that

21   determination unless they the visual features of the

22   design patent.

23   BY MR. ZELLER:

24     Q.    You didn't do anything beyond looking at the

25   design patents on their face for that inquiry; true?

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 149

1    Q.    You've never worked in a carrier storefront?

2    A.    No.

3          I testified earlier that I hadn't.

4    Q.    You have no expertise at all with carrier

5    storefronts; right?

6    A.    I wouldn't agree with that.

7    Q.    Please tell me your expertise with carrier

8    storefronts?

9    A.    A carrier storefront is a retail operation,

10   and I wouldn't want to limit my testimony to say I don't

11   have any experience in retail operations in that in my

12   decades with J.C. Penney we were involved in -- in

13   designing stores, and storefronts, and interiors, and

14   point of purchase displays, and architecture.

15         So I wouldn't want to say I have no -- no

16   expertise in retail environment.

17   Q.    So please tell me your full basis for

18   believing that purchasers of smartphones through carrier

19   storefronts are the same types of purchasers who went to

20   J.C. Penney as of 1986 when you left?

21         MR. MONACH:   Object to the form of the

22   question.

23         THE WITNESS:   Consumers are consumers.

24         There's certain generalities that we can make

25   about them.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 150

1          In -- in the mid-eighties we had over a

2     million people a day going through J.C. Penney stores.

3          I'm sure some of those same people are -- are

4     buying smartphones in carrier storefronts today.

5          I'm not saying there's a direct correlation.

6          I'm just saying that they're not mutually

7     exclusive.

8     BY MR. ZELLER:

9          Q.    Do you believe that consumers have become more

10    sophisticated about technology since 1986?

11              MR. MONACH:   Objection.   Vague.

12              THE WITNESS:   That's a double-edged sword.

13          I could answer "yes," and give you reasons why

14    I believe that.

15          I could also answer that they've become less

16    sophisticated because of the advent of -- of products

17    like the iPhone that reduce our need for the

18    understanding of the -- of technology by providing a

19    simple easy to use product.

20          There's an argument on both sides of that

21    coin.

22          Q.    Well, I'm not asking for arguments.

23          Tell me, what empirical data do you have to

24    support that answer you just gave?

25          A.    Having designed products where we reduced

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 151

1    complexity against a background of more complex products

2    simplified the need for knowledge about technology on

3    the part of the consumer and resulted in a -- what often

4    became a, quote, "best seller" in that category of

5    consumer electronics at J.C. Penney, so there's a basis

6    -- a proven logical analytical basis for my statement.

7        Q.    If I -- if I'm hearing you correctly, simply

8    filing the design can increase the ease of -- of use of

9    technology for the consumer; is that right?

10       A.    Sure.

11       Q.    And is that something you generally believe is

12   true?

13       A.    I know it's true.

14       Q.    It makes the technology more accessible and

15   easier to use from the consumer perspective?

16            MR. MONACH:  Objection.  Vague and incomplete

17   hypothetical.

18            THE WITNESS:  All of those plus easier to

19   understand.

20   BY MR. ZELLER:

21       Q.    And you believe that those are all -- all have

22   been advanced by the iPhone design and the iPad design

23   that's embodied in these design patents; right?

24            MR. MONACH:  Object to form.

25            THE WITNESS:  I believe both of the products

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 152

1   you've just mentioned make the technology more

2   accessible and more transparent and easier to use, which

3   is partly conveyed through the ornamental design.

4   BY MR. ZELLER:

5       Q.    Well, whether you call the design "ornamental"

6   or not, just to be clear, what we're talking about is

7   when you say "both the products make the technology more

8   accessible and easier to use," you're talking about the

9   fact that by simplifying the design of the products

10  that's been achieved; right?

11          MR. MONACH:  Object to the form of the

12  question.

13          THE WITNESS:  Yeah, but we have to be careful

14  when we say "simplifying the design" what we're talking

15  about.

16          I'm not talking about simplifying the --

17  manufacture or something like that, which can also be

18  considered "design."

19          I'm talking about simplifying the ornamental

20  design or the types of design that are protectable by

21  design patent.

22  BY MR. ZELLER:

23      Q.    Right.

24          I think we're on the same page.

25          What you're saying is that by simplifying the

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 180

1    A.    In total?

2    Q.    Yes.

3    A.    If -- if you tell me that's the case, I

4    wouldn't disagree with it.

5    Q.    Directing your attention to paragraph 7, you

6    say here that -- in essence, that you do have experience

7    observing purchasers of consumer electronics; right?

8    A.    I did say that.

9    Q.    And that in your view qualifies you to testify

10   as an expert as to how an ordinary observer would

11   perceive and evaluate cellular phone and tablet computer

12   designs; correct?

13   A.    Yes.

14   Q.    And that's -- that's the basis of your -- your

15   expertise that you're claiming in this case; correct?

16       MR. MONACH:   Object to the form of the

17   question.

18       THE WITNESS:   Yes.

19   BY MR. ZELLER:

20   Q.    And then you say, "For example, during my

21   tenure at J.C. Penney it was estimated" and you talk

22   about your experience at J.C. Penney; right?

23   A.    I do.

24   Q.    And then you say you have personal experience,

25   firsthand experience, observing ordinary purchasers of

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 181

1    consumer electronics and that you purchased them

2    yourself and can speak from your own personal

3    experiences; right?

4         A.    Yes.

5         Q.    Now, other than what you did at J.C. Penney

6    and other than your own personal experiences, do you

7    have any other experience -- that -- in observing

8    purchasers of consumer electronics?

9         A.    Nothing more than -- having purchased them

10   myself and observing other people purchasing them

11   probably while I was purchasing them.

12             So, no, nothing more specific than what I've

13   stated here.

14        Q.    And just so it's clear then, the entirety of

15   what you're relying upon in order to base your

16   qualification -- your qualifications as an expert to

17   testify as to how an ordinary observer would perceive

18   and evaluate cellular phone and tablet computer designs

19   is based on your work at J.C. Penney, your own personal

20   experience in purchasing consumer electronics, and your

21   seeing others purchasing consumer electronics during the

22   course of the times when you've been purchasing them; is

23   that true?

24        A.    And -- and during times when I wasn't

25   purchasing them but maybe visited an Apple Store for a

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 182

1   -- to visit a Genius Bar or get an upgrade in software,

2   or whatever, yes.

3        Q.     And is that -- is it true that that's then the

4   totality of that experience that you're relying on for

5   that?

6        A.     Yes.

7        Q.     And I take it from your answer you have, in

8   fact, been in Apple Stores?

9        A.     Yes.

10       Q.     Is there a particular one you go to?

11       A.     Yes.

12       Q.     Which one?

13       A.     Providence Mall.

14       Q.     Not one of the ones in China, I take it?

15       A.     They're not really Apple Stores.

16       Q.     Just wanted to make sure they were authentic

17   ones.

18              And is it -- have you been to many Apple

19   Stores or is it really that one?

20       A.     I've been to several, but not many.

21       Q.     And most of your experience is that one in

22   Providence Mall?

23       A.     That's -- I've looked at others.

24              That's where I tend to do business, is with

25   that one.

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 183

1    Q.    In -- during your experiences there in the

2    Apple Store did you think that it was a store that was

3    similar to -- to J.C. Penney when you worked there?

4         MR. MONACH:   Object to form.

5         THE WITNESS:   Actually, no, I thought it was

6    quite different, and that's probably why J.C. Penney

7    just hired Ron Johnson from Apple as their new CEO.

8    BY MR. ZELLER:

9    Q.    You'll agree with me that the retail

10   environment there at J.C. Penney is not similar to the

11   retail environment of the Apple Store?

12   A.    I would agree with that.

13   Q.    Now, you've talked about how in your

14   declaration and a bit in your testimony here today about

15   your own personal experiences about purchasing consumer

16   electronics.

17        So you've purchased yourself cell phones?

18   A.    I have.

19   Q.    You, yourself, purchased smartphones?

20   A.    I have.

21   Q.    Which ones?

22   A.    I have a -- an Apple -- 32 gig whatever this

23   is.

24   Q.    3G?

25   A.    3G.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 184

1          This is my second one.  First one went

2     overboard.

3          I purchased one for my daughter.

4          I've purchased -- iPads and -- a number of

5     computers.

6     Q.    Have you purchased any smartphones by

7     manufacturers other than Apple?

8     A.    No.

9     Q.    Have you purchased any tablet computers by

10    manufacturers other than Apple?

11    A.    No.

12    Q.    Do you have any knowledge or information about

13    -- the purchasers of smartphones other than Apple phones

14    in your own personal experience?

15          MR. MONACH:  Object to the form of the

16    question.

17          THE WITNESS:  Do I have any knowledge of them?

18          If they're in some way different than

19    purchasers of Apple smartphones, I -- I wouldn't be

20    aware of that.

21    BY MR. ZELLER:

22    Q.    Do you have any personal experience that gives

23    you knowledge or information about the purchasers of

24    tablet computers by manufacturers other than Apple?

25    A.    No, not specifically.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 185

1    Q.    As we talked about before, when you were there

2  at J.C. Penney working in the -- what you're saying,

3  this retail environment of J.C. Penney, there were no

4  smartphones or tablet computers that were sold there;

5  right?

6              MR. MONACH:  Objection.  Asked and answered.

7              THE WITNESS:  That's correct.

8  BY MR. ZELLER:

9    Q.    What were the kinds of consumer electronic

10  products that were being sold at that time that you're

11  referring to here in your declaration?

12    A.    Well, I believe I included some -- an exhibit

13  showing some of the specific designs of them, but it

14  included some quite sophisticated audio equipment,

15  stereo equipment, telephones, radios, CB equipment,

16  television sets, VHS systems in that era.

17              That's about it -- consumer electronics.

18    Q.    And I take it those consumer electronics ran a

19  broad range of prices?

20    A.    Yes.

21    Q.    And I take it that those consumer products ran

22  a broad range of the amount of time and the care that

23  consumers put in to their purchasing decisions of those

24  various products; right?

25    A.    I wouldn't characterize it as "a broad range."

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 186

1        I'd say it was a --

2        Well, I guess it would be a broad range from

3    the cheapest radio to the most expensive stereo system.

4        Yes, it would be a fairly broad range.

5    Q.    Can you tell me how the length of time that

6    the typical consumers spent making the purchasing

7    decisions for these consumer electronic products that

8    you've described there at J.C. Penney compared to the

9    length of time that a typical consumer spends making a

10   purchasing decision for a smartphone?

11   A.    The consumer research that we did taught us

12   some broad generalities.

13       For example, we learned that about 70 percent

14   of all consumers who ever buy anything buy it at the

15   first store they go to.

16       So they make a preconceived notion that, you

17   know, pick, your example, if J.C. Penney has the kinds

18   of sheets or the sheet selection that I want to buy, so

19   they go to that one store, and they make a purchase, and

20   because they're predisposed to shop in that one retail

21   environment they've almost already made a decision, and

22   so the individual purchase decision once they get there

23   is far quicker than -- than we are typically aware of.

24       So a purchase decision at J.C. Penney on a --

25   clock radio for $25 may be two minutes, on an $800

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 187

1    television set it may be five minutes, but it's a lot

2    quicker than we think.

3         Q.    In general you do agree that consumers or

4    purchasers put more care in to a decision where they're

5    spending more money rather than less on something?

6         A.    In general, yes.

7               Let me revise that answer.

8               In general, yes, but there are obvious

9    exceptions, where -- where just the opposite would be

10   true.

11        Q.    Well, you don't have any reason to think

12   that --

13              Are you familiar with the term "impulse

14   purchase"?

15        A.    Of course.

16        Q.    You don't have any reason to think that

17   smartphones or tablet computers are what people would

18   consider to be impulse purchases; right?

19              MR. MONACH:  Object to form.

20              THE WITNESS:  Most people wouldn't.

21              A Saudi prince visiting the shopping mall in

22   Dubai may buy a dozen of them as an impulse purchase.

23              So there's always that kind of exception.

24   BY MR. ZELLER:

25        Q.    I take it you don't consider the Saudi prince

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 216

1    give you a definitive answer to that here today.

2         I will say that it looks suspiciously similar.

3    BY MR. ZELLER:

4    Q.    I'm not asking for so-called infringement

5    analysis.  I'm asking something factual right now.

6         In paragraph 16 of your declaration you lay

7    out what you consider to be the major design elements of

8    the 677 design patent; right?

9    A.    Yes.

10   Q.    And I'm simply asking you whether you see in

11   this design that we marked as Exhibit 67 elements that

12   you've listed here in that design, and, if I understand

13   you correctly, you do see in Exhibit 67 all the major

14   design elements of the 677 design patent that you lay

15   out here except for the following:  Flat, clear,

16   black-colored and inset; right?

17        MR. MONACH:  Object to the form of the

18   question for the reasons previously stated.

19        Objection, asked and answered.

20        Object to the extent it misstates his prior

21   testimony.

22        THE WITNESS:  I believe that's correct.

23   BY MR. ZELLER:

24   Q.    Directing your attention to paragraph 31 of

25   your declaration, this is where you lay out in

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 217

1    subparagraphs A through E what you consider to be the

2    major design elements of the 087 design patent; is that

3    correct?

4        A.   Yes.

5        Q.   Are the elements that you list here in A as

6    the major design elements also present in the design we

7    marked as Exhibit 67?

8        A.   It would appear so.

9             MR. MONACH:  Hang on a second.

10            Same objection to this as with the previous

11   line of questioning about the 667, same objection to

12   lack of foundation in light of the witness' prior

13   testimony about what he can and can't glean from this.

14            Incomplete hypothetical.

15   BY MR. ZELLER:

16       Q.   You believe that those elements that are

17   described here in A are present in paragraph 31 -- are

18   present in the Exhibit 67 design; correct?

19            MR. MONACH:  Same objection.

20            THE WITNESS:  It would appear so, yes.

21   BY MR. ZELLER:

22       Q.   Focusing then on paragraph 31(b) of your

23   declaration --

24       A.   Let me go back to A for a minute.

25            I have -- there's no basis for determining

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 218

1    that it's flat

2        Q.    Okay.  Well, we'll exclude flat then.

3            So with respect to 31(b), the elements that

4    are listed here are present in the Ehibit 67 design with

5    the exception of potentially flat, because, as you say,

6    you can't tell from the design that you have in front of

7    you; right?

8        A.    Right.

9        Q.    Okay.  Then let's focus on paragraph B.

10            Other than the inset description, do you agree

11   that all the other elements that are listed here in

12   paragraph 31(b) of your declaration in describing the

13   087 design patent are present in this design we've

14   marked as Exhibit 67?

15            MR. MONACH:  Same objection.

16            THE WITNESS:  It would appear so, yes.

17   BY MR. ZELLER:

18       Q.    Are the design elements of the 087 design

19   patent listed in paragraph 31(c) of your declaration

20   present?

21            MR. MONACH:  Same objection.

22   BY MR. ZELLER:

23       Q.    In the Exhibit 67 design?

24       A.    Yes, to the extent that we could guess that

25   that racetrack shape opening is a slot, a slot implies

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 219

1    that it's open.

2           That -- that -- we can't determine that.

3      Q.    If -- if what's reflected here in Exhibit 67

4    is, in fact, a speaker slot, then would you agree with

5    me that the elements listed in paragraph 31(c) are

6    present in Exhibit 67 based on that assumption?

7      A.    If that -- if the assumption is correct, then,

8    yes, then it would -- then it would -- yes, the answer

9    would be yes.

10     Q.    Focusing then on paragraph 31(d) and the

11   description of the major design elements of the 087

12   design patent, are the elements described here in that

13   subparagraph, D, present in the design that we marked as

14   Exhibit 67?

15          MR. MONACH:  Same standing objection.  Same

16   objection to lack of foundation and incomplete

17   hypothetical.

18          THE WITNESS:  It would appear so.

19   BY MR. ZELLER:

20     Q.    And then, focusing on paragraph 31(e), does

21   the portion of your description here where it says about

22   the design patent, the 087 design patent, "a thin

23   continuous bezel surrounding the rectangular front

24   surface that is substantially uniform in appearance,"

25   apply to what's depicted here in the design that we

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 220

1   marked as Exhibit 67?

2           MR. MONACH:  Same objection.  Incomplete

3   hypothetical.  Lack of foundation.

4           THE WITNESS:  It would appear so, yes.

5   BY MR. ZELLER:

6       Q.    And then the end of Subparagraph E says, "And

7   having an inwardly sloping profile."

8           When you're talking about the -- and you're

9   describing the 087 design patent?

10      A.    Yes.

11      Q.    And if you can please tell me, what do you

12  mean by that, "having an inwardly sloping profile"?

13      A.    Well, if you go to Figure 47 or 48 --

14  actually, 45, 6, 7 or 8, the -- the bezel portion in

15  those profile views slopes inwardly toward the -- center

16  of the product.

17      Q.    So you're talking about when you can see it in

18  the profile?

19      A.    Yes.

20      Q.    And it says -- kind of -- more kind of rounded

21  edge?

22          MR. MONACH:  Object to form.

23          THE WITNESS:  It's slightly rounded, yes, but

24  it generally slopes inwardly.

25  BY MR. ZELLER:

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 221

1    Q.    Maybe "rounded" wasn't quite the word.

2          It's curved rather than flat?

3    A.    It's not flat.

4    Q.    How do you know that the slots that are

5    depicted in the 677 and the 087 design patents are --

6    are speaker slots?

7    A.    Well, as I testified earlier, technically you

8    don't know that.

9          These patents don't teach you that there's a

10   -- that that's what the function is.

11         They only teach you what the shape is.

12         MR. MONACH:  Counsel, we've been going about

13   an hour-and-a-half, I think, and it's almost 5:00, so

14   are you getting close to a break time?

15         MR. ZELLER:  Sure.

16         Let me just ask a couple more questions as a

17   follow-up to this.

18         MR. MONACH:  Okay.  Thank you.

19   BY MR. ZELLER:

20   Q.    I think I understand what you're saying in

21   your answer, but you describe the design patents, the

22   087 and the 677 design patents, as having a rounded

23   horizontal speaker slot, and I'm trying to figure out

24   why you picked the word "speaker."

25   A.    As we said earlier, we can surmise by -- by

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 222

1    looking at the commercial embodiment that that's what

2    that is.

3          As a general rule I prefer to refer to the

4    visual elements of a design by their shape rather than

5    by their function, because, when we refer to it as a

6    "speaker slot," it begins to make it sound like it's

7    functional when, in fact, it's ornamental.

8      Q.    So maybe then I'll ask this.

9          So then with respect to this slot shape that's

10   depicted here in Exhibits 7 and -- Exhibit 6, which are

11   the two -- loosely we're calling "the phone surface

12   patents," you agree that the slot shape that's depicted

13   here in Exhibit 67, even though it's somewhat different

14   in size and somewhat different in position, is still

15   substantially the same as the slot shape and design

16   that's depicted here in the two design patents?

17          MR. MONACH:   Object to the form of the

18   question.

19          THE WITNESS:   I don't believe it would cause

20   it to be a different design.

21   BY MR. ZELLER:

22      Q.    And so we're clear then, because I want to

23   make sure we've divorced it from this notion of, you

24   know, what the function of it is as a speaker or

25   something else, so we'll just call it the -- "the slot"

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 223

1    here.

2           You'll agree with me that, notwithstanding the

3    differences that you can see here when comparing the

4    design in Exhibit 67 to the designs shown in Exhibits 6

5    and 7, that any of those variations or differences that

6    we've talked about in your view mean that an ordinary

7    observer would still believe that the design in Exhibit

8    67 is substantially the same as the designs depicted in

9    the 087 and the 677 design patents; right?

10          MR. MONACH:  Objection.  Misstates the prior

11   testimony.  Compound.  Vague and ambiguous.

12          Incomplete hypothetical.  Lack of foundation

13   given the witness' prior testimony about features that

14   could and couldn't be discerned from 67.

15          THE WITNESS:  We -- we have made so many

16   assumptions and -- and asked to excuse the fact that,

17   for example, in 677 it claims a black design, and we

18   can't tell if this is black, but if we ignore all of

19   those differences or potential differences, then, yes, I

20   would say it is substantially the same.

21          But -- but as a -- it's a hypothetical

22   comparison that we're -- that you're asking me to make,

23   because we're not comparing apples and apples.

24   BY MR. ZELLER:

25          Q.   Well, I think you're misunderstanding my

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 224

1   question.

2              Let me try and rephrase it.

3              Let's first focus on the 087 design patent.

4              And I understand you testified that there's

5   certain things about the 67 design patent or the design

6   there that you can't -- you can't necessarily tell, but

7   even assuming that those are different, I want you to

8   assume that those are still differences.

9              In terms of the overall design that's depicted

10  here in Exhibit 67 in your view is it substantially the

11  same as the 087 design in the eyes and from the

12  perspective of the ordinary observer or -- or purchaser?

13             MR. MONACH:  Vague and --

14             Hang on a second.

15             Vague and ambiguous.  Improper request for

16  opinion based on incomplete hypothetical, lacking

17  foundation, and calling for speculation in light of what

18  you told him and in light of the witness' prior

19  testimony.

20             THE WITNESS:  So my answer would have to be

21  it's impossible to make that determination because

22  you're asking me to ignore the fact that the 087 is

23  claiming a flat surface with an inset rectangular

24  display screen and things like that, and I've already

25  testified I can't tell those things about this Exhibit

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 225

1   67, so how can I possibly arrive at a conclusion that

2   the ordinary observer would think the designs are

3   substantially the same?

4           I simply can't ignore claimed elements of the

5   087 to -- to --

6           What you're doing is you're eliminating from

7   the 087 the differences between it and the Exhibit 67

8   and then asking me, well, isn't what's left over the

9   same?

10          Well, sure what's left over is the same, but

11  what's left over is not what's claimed.

12          MR. ZELLER:  You're, again, not following my

13  question.

14          THE WITNESS:  I'm trying.

15          MR. MONACH:  Counsel --

16          Counsel, please don't argue with the witness.

17          I mean, you said you had a couple more

18  follow-up questions.

19          MR. ZELLER:  I'm trying to understand his

20  answer, and he's not --

21          I think he's not answering my question.

22          MR. MONACH:  The answer is quite clear, even

23  though you don't like it.

24          MR. ZELLER:  It has nothing to do with like.

25  It has everything to do with the fact he's not answering

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 226

1    my question.

2    BY MR. ZELLER:

3        Q.    In your view, focusing on the 677 design

4    patent, --

5        A.    Now we're switching back to that one?

6        Q.    Let's talk about the 677 patent first --

7        A.    Okay.

8        Q.    -- since that was the one you picked up on now

9    and trying to argue about because -- that surface.

10            So let's -- let's focus on that one for a

11   moment.

12       A.    Okay.

13       Q.    Now, is it true that if a smartphone

14   manufacturer were to make a smartphone that had all the

15   elements you've listed here in -- from A to D in

16   paragraph 16 of your declaration, but it was different

17   in that it was -- didn't have a flat, clear, black

18   colored, and the display screen wasn't inset, that those

19   differences alone would be sufficient in your view to

20   differentiate that design from the 677 design patent in

21   the eyes of the ordinary observer and purchaser, "yes"

22   or "no"?

23            MR. MONACH:   Incomplete hypothetical.

24            Vague and ambiguous.   Improper request for

25   opinion testimony or legal conclusion based on

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 255

1    do have at hand as an expert to opine on the prior art,

2    what I'd like to know is, do you believe that it was

3    obvious to a designer of ordinary skill in the art back

4    in the time when the design patent, the 677 design

5    patent, was being conceived of, to take the design

6    depicted in Figure 41 and eliminate the bezel?

7              MR. MONACH:  Objection.  Incomplete

8    hypothetical and calling for a legal conclusion without

9    his having studied this issue.

10             Asked and answered multiple times.

11             THE WITNESS:  I would have to, you know, just

12   give you the same answer I did before.

13             It would have been obvious to design a cell

14   phone or a smartphone without a bezel.

15             It would not necessarily have been obvious to,

16   as you put it, "take the design," whatever that means,

17   of the 087, or copy it and eliminate the bezel.

18             That's -- that's not what designers do.

19        Q.   It's true that back in the time period when

20   the 677 design patent was being conceived of that it was

21   an obvious design choice to designers of ordinary skill

22   in the art to have smartphone designs that don't have a

23   bezel; right?

24        A.   Yes.

25             MR. MONACH:  Objection.  Asked and answered

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 256

1    about four or five times.

2            THE WITNESS:  Yeah, there were bezeled phones

3    and there were bezelless phones.

4    BY MR. ZELLER:

5        Q.    At one point you wrote or gave a presentation

6    that was called "Design Patents, an Underutilized

7    Competitive Weapon;" correct?

8        A.    Yes.

9        Q.    Was this something you -- you actually wrote?

10           Was it a speech of some kind?

11           Was it both?

12       A.    Let me just refresh my memory and look at my

13   C.V. and see, you know, where and when I did that, and

14   maybe it would refresh my memory.

15       Q.    What I'll do is direct your attention to

16   Exhibit 6 of your declaration, which we marked as

17   Exhibit 66.

18       A.    Okay.

19       Q.    And specifically page 6.

20       A.    Okay.

21       Q.    And you'll see that you refer to a design --

22   this is the third entry down.

23           It says "Design Management Institute, DMI

24   Annual Conference," and apparently this was in Newport

25   Rhode Island.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page  257

1          Do you see that?

2     A.    Yes.

3     Q.    And that's where this --

4          Whether it was a speech or article we'll find

5     out in here in a minute.

6          But where you delivered something called

7     "Design Patents:  An Underutilized Competitive Weapon;"

8     right?

9     A.    Yes.

10    Q.    And so was that a --

11         Was that something handed out in writing to

12    people?

13         Was it a speech?

14         Was it both?

15    A.    It was a presentation with a verbal and visual

16    -- elements.

17    Q.    And so there was some kind of written

18    materials that went with it?

19    A.    No, I didn't say that.

20         I said it was verbal and visual.

21         I spoke and showed --

22    Q.    There were no written materials at all that

23    went with it?

24    A.    I probably had notes or an outline at that

25    time.

Contains Highly Confidential - Attorneys' Eyes Only  Portions

Page 258

1    I certainly don't recall having it now.  That

2    was what, six -- 11, 14 years ago.

3        Q.    Well, did you give that talk on only one

4    occasion?

5        A.    I believe I did.

6        Q.    Was it --

7        A.    Design -- Design Management Institute is

8    different than a typical industrial designer

9    organization.

10        It's the -- it's the management of design, not

11   doing design, and so the -- that presentation was geared

12   more toward global issues of competitive weapons like

13   the South Korean Government, for example, funding and

14   sponsoring students to come study in the United States

15   and go home to South Korea and apply their services

16   there.

17       Q.    So we have a clear record on this, you believe

18   that you only gave this talk called "Design Patents:  An

19   Undertilized Competitive Weapon" on one occasion?

20       A.    That's my recollection.

21       Q.    Was the presentation taped in any kind of way?

22       A.    I don't generally --

23        It's on very, very rare occasion that I would

24   allow a presentation to be taped.

25        It -- it inhibits the free flow of

Contains Highly Confidential - Attorneys' Eyes Only Portions

Page 305

1        I, CAROL S. NYGARD, a Certified Shorthand

2    Reporter of the State of California, duly authorized to

3    administer oaths, do hereby certify:

4        That the foregoing proceedings were taken

5    before me at the time and place herein set forth; that

6    any witnesses in the foregoing proceedings, prior to

7    testifying, were duly sworn; that a record of the

8    proceedings was made by me using machine shorthand which

9    was thereafter transcribed under my direction; that the

10   foregoing transcript is a true record of the testimony

11   given.

12        Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal Case,

14   before completion of the proceedings review of the

15   transcript was not requested.

16        I further certify I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney or party to this action.

19        IN WITNESS WHEREOF, I have this date

20   subscribed my name:

21        Dated: August 6th, 2011

22

23        _____

24        CAROL S. NYGARD, CSR #4018

25