# EXHIBIT G

REDACTED VERSION

Confidential Attorneys' Eyes Only

Page 1

1                  UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                       SAN JOSE DIVISION

4    APPLE INC., a California

     corporation,

5

6            Plaintiff,

7    vs.                          Case No. 11-CV-01846-LHK

8    SAMSUNG ELECTRONICS CO., LTD.,

     a Korean business entity;

9    SAMSUNG ELECTRONICS AMERICA,

     INC., a New York corporation;

10   SAMSUNG TELECOMMUNICATIONS

     AMERICA, LLC, a Delaware

11   limited liability company,

12           Defendants.

     ------------------------------/

13

14

15                     CONFIDENTIAL

16                ATTORNEYS' EYES ONLY

17                  OUTSIDE COUNSEL

18    VIDEOTAPED DEPOSITION OF MICHAEL J. WAGNER, CPA

                  San Francisco, California

19               Wednesday, September 14, 2011

20

21

22

23           Reported by:

     LORRIE L. MARCHANT, CSR No. 10523, RPR, CRR, CCRR, CLR

24           JOB NO. 41962

25

Confidential Attorneys' Eyes Only

Page 2

1                    September 14, 2011

2                         9:33 a.m.

3

4          Videotaped Deposition of MICHAEL J.

5          WAGNER, held at the offices of

6          Morrison & Foerster, LLP, 425 Market

7          Street, 34th Floor, San Francisco,

8          California, before Lorrie L. Marchant,

9          a Certified Shorthand Reporter,

10         Registered Professional Reporter,

11         Certified Realtime Reporter,

12         California Certified Realtime Reporter

13         and Certified LiveNote Reporter.

14

15

16

17

18

19

20

21

22

23

24

25

Confidential Attorneys' Eyes Only

Page 3

1            A P P E A R A N C E S:
2
3    FOR THE PLAINTIFF APPLE INC.:
4         MORRISON & FOERSTER, LLP
          BY:  WESLEY OVERSON, ESQ.
5              GRANT L. KIM, ESQ.
          425 Market Street
6         San Francisco, California 94105-2482
          Phone:  (415)268-6538
7         Fax:  (415) 268-7522
          e-mail:  Woverson@mofo.com
8                  gkim@mofo.com
9
10   FOR THE DEFENDANTS SAMSUNG:
11        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          BY:  HEATHER BELVILLE, ESQ.
12        555 Twin Dolphin Drive, 5th Floor
          Redwood Shores, California 94065
13        Phone:  (650) 801-5000
          Fax:  (650) 801-5100
14        e-mail:  heatherbelville@quinnemanuel.com
15   and
16        BY:  CARL G. ANDERSON, Ph.D., ESQ.
          50 California Street, 22nd Floor
17        San Francisco, California 94111
          Phone:  (415) 875-6600
18        Fax:  (415) 875-6700
          e-mail:  carlanderson@equinnemanuel.com
19
20   ALSO PRESENT:
21        Sean McGrath, Videographer
22                      ---oOo---
23
24
25

Confidential Attorneys' Eyes Only

Page 30

1          MR. OVERSON:  We'll mark this as 162.

2          (Marked for identification purposes,

3          Exhibit 162.)

4          BY MR. OVERSON:

5     Q.   So I believe 162 is the document that you're

6     quoting on paragraph 84 of your report.

7     A.   It is.

8     Q.   Okay.  And if you look on the second page of

9     the article, which is entitled "Are touchscreens the

10    most important feature of smartphones?"  And it says,

11    It's from FierceWireless, the wireless industry's daily

12    monitor.  And the date is June 2nd, 2011.

13         But on page 2, there's a paragraph that has the

14    word "now" at the beginning.

15    A.   It does.  And I think that's the paragraph that

16    I quote for everything I have in paragraph 84.

17    Q.   Okay.  And the last sentence states, quote, I

18    think the conclusion to draw from this is that

19    smartphone users want a lot of different things out of

20    their device, which means that smartphone vendors will

21    need to cover all their bases to be successful in the

22    smartphone market.

23         You quoted that -- at least the end of that

24    sentence in your report; true?

25    A.   I did.

Confidential Attorneys' Eyes Only

Page 31

1    Q.   And you would agree with that statement?

2    A.   I wouldn't have put it in my declaration if

3    I -- I disagreed with it.  I do agree with it, yes.

4    Q.   So one of the bases that a smartphone vendor

5    has to cover to be successful is design; true?

6    A.   I think that's correct.

7    Q.   If a smartphone maker doesn't have a [sic]

8    attractive design, they will have a hard time competing

9    in the marketplace; true?

10         MR. ANDERSON:  Objection.  Incomplete

11   hypothetical.

12         THE WITNESS:  I'd need more information to know

13   to answer that question.

14         BY MR. OVERSON:

15   Q.   Well, just from your own paragraph, design is

16   one of the decision drivers on purchases for

17   smartphones; true?

18   A.   It is.

19   Q.   And a maker of smartphones will have to cover

20   that base, that base being the design, in order to be

21   competitive; true?

22   A.   If -- if they are off the scale on the other

23   features and those are the features that a consumer

24   buys, that consumer could probably care less about the

25   design.  But in some circumstances, someone -- another

Confidential Attorneys' Eyes Only

Page 32



1    consumer may put a higher emphasis on design.   In that

2    case, then they would need to have a good design.

Confidential Attorneys' Eyes Only

Page 33



Confidential Attorneys' Eyes Only

Page 34



Confidential Attorneys' Eyes Only

Page 82

1    author talks about the six drivers of the market?

2          MR. ANDERSON:  Objection.  Misrepresents the

3    document.

4          THE WITNESS:  Well, in the middle of the third

5    paragraph on the second page, it starts, With the second

6    most important characteristic of smartphones is a

7    toss-up among Internet access, apps, access to e-mail,

8    design, ease of use and price.

9          BY MR. OVERSON:

10    Q.    And then the first characteristic was the

11   touchscreen; right?

12    A.    Yes.

13    Q.    Yeah.  Okay.

14          So would you agree that Apple and Samsung are

15   competing in -- in all of those seven areas that we --

16   that this author discusses?

17    A.    Those and other areas, yes.

18    Q.    And if you assume that Samsung has copied

19   Apple's designs of the iPhone and the iPad, then the

20   design element of the competition has been taken out of

21   the -- it's been taken out of the competition; right?

22          MR. ANDERSON:  Objection.  Incomplete

23   hypothetical.  Assumes facts not in evidence.

24          THE WITNESS:  I don't know if I'd agree with

25   that statement, that it's taken out.

Confidential Attorneys' Eyes Only

Page 83

1          BY MR. OVERSON:

2      Q.   Well, if they're competing on these seven

3    characteristics of smartphones and they're copying the

4    design, which I think you have to assume for your study,

5    that means they're not competing on design anymore;

6    right?

7          MR. ANDERSON:  Same objection.  Also vague.

8          THE WITNESS:  Only if you ask me to assume that

9    the -- the design patents at issue in this case cover

10   100 percent of the design of a phone, then the answer

11   would be, yes.  But I didn't believe that was the case.

12         BY MR. OVERSON:

13     Q.   And you haven't looked at the design patents;

14   correct?

15     A.   I have not.

16     Q.   Okay.

17     A.   Just the way you've described them in your

18   pleadings.

19     Q.   Let's assume that -- that the overall design of

20   the phone is covered by those patents.  And so the

21   overall design of the phone is -- if -- if Samsung is

22   copying the overall design of the phone, then that

23   element of the competition is no longer there; true?

24         MR. ANDERSON:  Objection.  Vague.  Incomplete

25   hypothetical.  Assumes facts not in evidence.

Confidential Attorneys' Eyes Only

Page 84

1       THE WITNESS:  If you ask me to assume what you

2  said in your hypothetical, yes.

3       BY MR. OVERSON:

4    Q.   And that means that to win over customers,

5  Apple would have to beat Samsung in the other six areas;

6  right?

7       MR. ANDERSON:  Same objections.

8       THE WITNESS:  Falling on your previous

9  hypothetical by definition, yes.

10       BY MR. OVERSON:

11    Q.   And some customers will believe that design is

12  an important factor in their decision; right?

13       MR. ANDERSON:  Objection.  Lacks foundation.

14  Incomplete hypothetical.  Assumes facts not in evidence.

15       THE WITNESS:  Some will.  But based on the

16  evidence I've seen in this case, that some is very few.

17       BY MR. OVERSON:

18    Q.   Okay.  If -- if design is taken out of the

19  competition between Samsung and Apple, Apple will lose

20  some customers because they won't have the

21  differentiated design; correct?

22       MR. ANDERSON:  Same objections.

23       THE WITNESS:  That's a possibility, but not

24  necessarily.

25  ///

Confidential Attorneys' Eyes Only

Page 85

1          BY MR. OVERSON:

2      Q.   So what if a customer values design as one of

3   the main factors, but not the primary factor?  And let

4   me give you a hypothetical.  Maybe someone loves the

5   design of the phone, but wants to use an open source

6   Android system.  And those are both fact -- both

7   important factors.  Okay.

8          If you take the design element out of the

9   competition, then the customer would be more likely to

10  buy the Samsung phone; right?

11         MR. ANDERSON:  Objection.  Incomplete

12  hypothetical.  Vague.

13         THE WITNESS:  Well, by definition, based on

14  your hypothetical, he'll buy the Samsung because he

15  wants open source operating system.  So regardless of

16  the design, based on your criteria in your hypothetical,

17  he's going to buy Samsung.

18         BY MR. OVERSON:

19     Q.   Well, if Apple has the design that the customer

20  wants and Samsung does not, then he might buy the Apple

21  for the design; right?

22         MR. ANDERSON:  Objection.  Incomplete

23  hypothetical.  Vague.

24         THE WITNESS:  I hate to try to restate your

25  hypothetical, but if you're asking me there's two things

Confidential Attorneys' Eyes Only

Page 86

1    that are driving this customer to make a purchase

2    decision.  One is the design of the phone, and one is

3    they would like to have their phone have an open source

4    operating system.

5            And the only way they can get the design is if

6    the Apple phone was the only one offering that design.

7    And the only way they can get open source is Samsung or

8    one of Samsung's other competitors, I don't know what

9    that -- that -- that customer is going to do.  He's

10   going to have a quandary.  It may be a coin flip.

11           So maybe some they would lose and some they

12   wouldn't.  But they'd have to make, then, a decision

13   which is more important to them, the design or the open

14   source operating system.

15           BY MR. OVERSON:

16       Q.   But if the -- the Samsung phone has the same

17   design as the Apple phone, then they don't have the make

18   that decision that way; right?

19       A.   I agree with that question.

20       Q.   I want to make sure I understand your position.

21   I think I do.

22           But earlier you were saying that if design is

23   not the primary driver of the market, then Samsung

24   having the same design would not have an effect on

25   Apple's -- sales, was it?

Confidential Attorneys' Eyes Only

Page 87

1      A.    Yes.

2      Q.    So what if design is number two out of five

3  factors?  You're saying that means it doesn't have any

4  effect?

5            MR. ANDERSON:  Objection.  Incomplete

6  hypothetical.  Misstates witness testimony.

7            THE WITNESS:  No, I can't be that strong.

8            BY MR. OVERSON:

9      Q.    Okay.  What do you mean by "primary driver" of

10  the customer's decision, then?

11     A.    That it really is one of the features of the

12  phone that is going to sway the ultimate decision of

13  what phone to purchase.

14     Q.    Okay.  So it could be one of the features as

15  opposed to the primary feature?

16     A.    Yes.  I mean, often it's not a binary decision,

17  that there is just one feature, like in that survey that

18  we discussed earlier in my deposition, that you have to

19  just answer with one answer, with one feature, or one

20  function.  It's normally more complicated than that.

21  And then it's a balancing of them as to how the ultimate

22  decision is made.

23     Q.    Okay.  So if design is one of the main factors,

24  then -- then copying the Apple design, in fact, would be

25  hurting Apple; right?

Confidential Attorneys' Eyes Only

Page 98

1        But the game is also being played on the design

2    front; right?  That's one of the areas that these

3    companies compete in?

4        MR. ANDERSON:  Objection.  Vague.

5        THE WITNESS:  I agree with that.  Otherwise,

6    none of us would be sitting in this room.

7        BY MR. OVERSON:

8    Q.   And the loyalty of Apple's customers is, in

9    part, based on Apple's ability to continue to produce

10   distinctive designs; true?

11       MR. ANDERSON:  Objection.  Assumes facts not in

12   evidence.  Argumentative.

13       THE WITNESS:  To some extent, yes.

14       BY MR. OVERSON:

15   Q.   Okay.  In your declaration, at paragraph 20, at

16   the end of the paragraph, you're talking about consumers

17   who are paying hundreds of dollars for the iPad and the

18   iPhone.

19       And then in paragraph 22 you mention, on the

20   last line, that this type of consumer -- I think you

21   mean the more affluent and well-educated consumer,

22   coupled with a powerful brand like Apple is not likely a

23   recipe for product confusion, especially in a

24   marketplace that has long been characterized by a

25   diverse product offering.

Confidential Attorneys' Eyes Only

Page 184

1    Q.   It goes up to Q4, 2010.

2    A.   Correct.

3    Q.   So you don't have any more recent data than

4    that?

5    A.   I don't.  If I did you would have seen it in my

6    declaration.

7    Q.   Okay.  Can you turn to paragraph 52 of your

8    declaration, please.

9    A.   Yes.

10   Q.   In paragraph 52 you're talking about a Retrevo

11   study and state that, not every tablet consumer is in

12   the market for an iPad.  For that reason, it could very

13   well be the case that increases in market share earned

14   by other tablet manufacturers are simply sales to

15   consumer segment outside of that to which Apple sells.

16        So you're -- you're -- I think what you're

17   saying is some people may want, for example, a Android

18   operating system on their tablet; is that --

19   A.   That's one possibility, yes.

20   Q.   Okay.  Have you ever seen -- let me ask you

21   this:  What tablets have you looked at?

22   A.   Personally?

23   Q.   Yes.

24   A.   I've seen the iPad 2, and I've seen the Samsung

25   10.1.  I think those are the only two I've ever touched

Confidential Attorneys' Eyes Only

Page 185

1    myself.  But not in connection with my work on this

2    case.

3         Q.   Have you seen any tablet made by another

4    manufacturer?

5         A.   I believe I've seen some other ones --

6         Q.   Okay.

7         A.   -- like on an airplane.

8         Q.   And do you recall whether they looked more --

9    do they look different from what the Samsung Tablet 10.1

10   looks like?

11        A.   I'm not remembering it enough to answer your

12   question.

13        Q.   The Retrevo study, I see that on page 22 you

14   have a pie chart where 21 percent answered the question,

15   Are you planning to buy a tablet this year?  And, Yes,

16   an Android tablet.

17             And is that -- I mean, that -- those are people

18   who have seen the GALAXY Tab 10.1; right?

19             MR. ANDERSON:  Objection.  Lacks foundation.

20             THE WITNESS:  I have no idea what the

21   respondents to this survey know or don't know.  I have

22   not seen the survey questionnaire or how it was

23   conducted.

24             I do recall looking at the information where I

25   took this from that the results are statistically

Confidential Attorneys' Eyes Only

Page 186

1    significant.  But how the survey was designed and what

2    was asked, I don't know.

3            BY MR. OVERSON:

4        Q.    It could be that people are saying, Yes, an

5    Android tablet because they've seen the design of

6    Samsung's tablet and they liked it; right?

7        A.    That is possible.

8        Q.    Okay.  On paragraph 54 you talk about rare --

9    some -- one of the rare delays of Apple having to do

10   with the product -- having to do with the deliveries of

11   iPad 2s.

12           Are you with me?

13       A.    I am.

14       Q.    Okay.  Do you have any evidence that there are

15   any delays with iPad 2s today?

16       A.    I don't.

17       Q.    As far as you know, you can walk in the store

18   and buy one?

19       A.    I'm pretty sure you can, because I think people

20   are waiting for the iPad 3 at this point.  So I think

21   there's probably plenty of iPad 2s.

22       Q.    Do you have any information about when iPad 3

23   is coming out?

24       A.    I have seen rumors.

25       Q.    If you look at paragraph 57, you state that,

Confidential Attorneys' Eyes Only

Page 187

1    Further supporting the proposition that Apple would not

2    suffer irreparable harm if Samsung's products at issue

3    were found to infringe is that Apple did not appear to

4    suffer irreparable harm (or any demonstrable harm) when

5    previous versions of the Samsung's products at issue

6    were released into the market.  Since Samsung's products

7    were launched, sales of the corresponding iPhone and

8    iPad have continued to increase.

9         So you're not saying that because sales

10   increased there was no harm, are you?

11        A.   Asked and answered.  I am not.

12        Q.   You're not.

13        Okay.  I guess I don't understand, if that's

14   not your point, what is the point of this paragraph?

15        A.   Well --

16        Q.   I don't mean to be argumentative.  I'm just

17   trying to get -- I'm trying to understand, you're

18   pointing to the fact that sales are increasing, but it's

19   a growing market.  We've gone over that.  And Apple

20   could definitely be harmed by Samsung's infringing

21   products that we're assuming to infringe while still

22   increasing their sales; right?

23        A.   I agree with everything you said.

24        Q.   So is it that you're saying there could be

25   harm, but it's not irreparable?

Confidential Attorneys' Eyes Only

Page 245

1        MR. ANDERSON:  Yes, I do.

2        MR. OVERSON:  Okay.  Shall we do that first

3   before we talk about confidentiality?

4        MR. ANDERSON:  Okay.

5            EXAMINATION BY MR. ANDERSON

6        BY MR. ANDERSON:

7     Q.   Mr. Wagner, do you understand the word "design"

8   to encompass functional design?

9        THE WITNESS:  Among other things, yes.

10        MR. ANDERSON:  So you understand the word

11   "design" to include elements that are not merely

12   ornamental; is that correct?

13        THE WITNESS:  That's my understanding.

14        MR. ANDERSON:  No further questions.

15        MR. OVERSON:  Do you wish to change any of your

16   earlier answers today in light of your understanding of

17   "design"?

18        THE WITNESS:  I do not.

19        MR. OVERSON:  Okay.  I have no further

20   questions.

21        Okay.  There was an issue we talked about off

22   the record, and that is confidentiality.

23        For the Apple side we are designating the

24   transcript confidential to the extent -- because there

25   are some -- highly confidential, because there's some

Confidential Attorneys' Eyes Only

Page 248

1      And, likewise, we will redact out the Apple

2  confidential information, of which there was some in the

3  declaration and which there was some in other exhibits,

4  I noted, before we share a transcript.

5      MR. OVERSON:  Okay.  And we'll exchange -- when

6  we give it to our clients, we'll exchange with each

7  other so with know what we did.

8      MR. ANDERSON:  That's agreeable.

9      MR. OVERSON:  Okay.  Thank you.

10      THE VIDEOGRAPHER:  This marks the end of

11  Volume I, Disk 4, and concludes the deposition of

12  Michael Wagner.  The time is 5:43 p.m. and we are off

13  the record.

14      (Deposition concluded at 5:43 p.m.)

15                    ---oOo---

16

17

18                    _____

19                    MICHAEL J. WAGNER

20  Subscribed and sworn to

    before me this     day

21  of          2011.

22

23  _____

24

25

Confidential Attorneys' Eyes Only

Page 249

1                           CERTIFICATE

2

3       STATE OF CALIFORNIA )
                            :  ss
        COUNTY OF SONOMA    )

4

5          I, Lorrie L. Marchant, a Certified Shorthand

6       Reporter, a Registered Professional Reporter, a

7       Certified Realtime Reporter, and a Certified Realtime

8       Professional within and for the State of California, do

9       hereby certify:

10         That MICHAEL J. WAGNER, the witness whose

11      deposition is herein set forth, was duly sworn/affirmed

12      by me and that such deposition is a true record of the

13      testimony given by such witness.

14         I further certify that I am not related to any of

15      the parties to this action by blood or marriage and that

16      I am in no way interested in the outcome of this matter.

17         In witness whereof, I have hereunto set my hand

18      this 14th day of September, 2011.

19

20

21

22      ------------------------------------------------

        LORRIE L. MARCHANT, CSR, RPR, CRR, CLR, CCRR
23      CSR No. 10523

24

25