# Exhibit I

**ALLEN & OVERY**
Avocats à la Cour

Allen & Overy LLP

**STATEMENT FROM LAËTITIA BENARD, *AVOCAT A LA COUR*, PARTNER**

**OPINION UNDER FRENCH LAW ON THE ETSI IPR POLICY AND THE ETSI DECLARATIONS MADE BY SAMSUNG**

(1) I am an attorney at the Paris Bar, to which I was admitted in 2000. I am a partner at Allen & Overy since 2009. Since my admission to the Bar, I specialize in patent litigation. I have litigated a number of cases concerning patents essential to standards, especially in the field of telecommunications. I am the author of a number of publications concerning patent law.

(2) I have reviewed the Statement of Defence filed by Apple in preparation of the hearing of 26 September 2011, and especially points 3.1 to 3.12 thereof, as well as the declarations of Philippe Delebecque (the "Delebecque Declaration") and Laurent Aynès (the "Aynès Declaration") filed in support of this Statement of Defence. I have been asked by Mr. Bas Berghuis van Woortman to provide my comments on the contents of these documents, insofar as they contain the contention that, by effect of the ETSI IPR Policy and the declarations made by Samsung to the ETSI, Apple would be the beneficiary of a license agreement on the patents relied upon by Samsung in its claim against Apple.

(3) In preparing the present opinion, I have reviewed the exhibits to the Delebecque and Aynès Declarations, including (i) the ETSI Guide on Intellectual Property Rights, in its version adopted on 27 November 2008, (ii) the ETSI Intellectual Property Rights Policy of 8 April 2009, (iii) the ETSI Intellectual Property Rights Policy of 20 November 1997 (together the "ETSI IPR Policy"), (iv) the ETSI IPR Policy FAQ and (v) the 10 declaration forms made by Samsung to the ETSI regarding Samsung's Intellectual Property rights (the "ETSI Declarations"). I have also reviewed the following documents, which were not taken into account in the Delebecque and Aynès Declarations: (i) the letters sent by Samsung to Apple on 13 May 2011, 3 June 2011, 1st July 2011 and 20 July 2011, (ii) the letters sent by Apple to Samsung on 29 April 2011, 9 May 2011, 27 May 2011, 22 June 2011 and 18 July 2011 and (iii) Apple's pleadings filed on 21 July 2011 before the United States Northern District Court of California (available at http://dockets.justia.com/docket/california/candce/5:2011cv01846/239768/).

(4) As set out in greater detail below, it is my opinion that, under French law, there is no sound legal basis for Apple's contention that *"under French law such license declaration brings about a complete license agreement under FRAND conditions between Samsung and a third party at the moment that third party starts to apply the standard"*.

(5) Apple's reasoning, as it is set out notably in the Delebecque Declaration, comprises three steps:

- Samsung is contractually bound by the ETSI IPR Policy, whose Article 6-1, along with the ETSI Declarations made by Samsung, constitutes a stipulation for third parties to the benefit of all third parties implementing the standard (§ 25 of the Delebecque Declaration);

- This stipulation for third parties has the nature of a contractual patent license agreement and not of an obligation to negotiate in good faith (§ 27 of the Delebecque Declaration);

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is regulated by the Solicitors Regulation Authority of England and Wales. The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications. A list of the members of Allen & Overy LLP and of the non-members who are designated as partners is open to inspection at its registered office, One Bishops Square, London E1 6AD.

Allen & Overy LLP or an affiliated undertaking has an office in each of: Abu Dhabi, Amsterdam, Antwerp, Athens, Bangkok, Beijing, Belfast, Bratislava, Brussels, Bucharest (associated office), Budapest, Doha, Dubai, Düsseldorf, Frankfurt, Hamburg, Hong Kong, Jakarta (associated office), London, Luxembourg, Madrid, Mannheim, Milan, Moscow, Munich, New York, Paris, Perth, Prague, Riyadh (associated office), Rome, São Paulo, Shanghai, Singapore, Sydney, Tokyo, Warsaw and Washington, D.C.

**ALLEN & OVERY**
Avocats à la Cour

- It has been accepted by Apple by beginning to implement the relevant standard in its products (§ 35 of the Delebecque Declaration).

It is my opinion that all three steps of this reasoning are unsupported by French law and case-law.

## 1. SAMSUNG CAN ONLY BE BOUND BY AN OBLIGATION TO NEGOTIATE

(6) Before addressing the issue of the existence of a stipulation for third parties, the preliminary question is to determine whether Samsung can be bound by a contractual patent license agreement. Such is not the case: under the ETSI IPR Policy and the ETSI Declarations: Samsung could only be bound by an obligation to negotiate with Apple.

### 1.1 Reminder of the applicable legal framework

(7) In order to have a contract concluded under French law, it is necessary that an exchange of consents creating obligations exists; in other words, that the offer, precise and committing, made by one party meets the acceptance of another party under the same terms.

(8) Scholars thus classically teach that "*the offer must be precise and complete, that is to say that it must comprise all the elements of the contract to be concluded, such that its pure and simple acceptance suffices to its conclusion*" (Marty and Raynaud, *Civil Law (Les obligations)*, Volume 1, 2nd ed., Sirey, 1988, No. 109, p. 103). An offer to contract is thus defined as "*the expression of will having for subject-matter the proposal to conclude a contract under conditions which are precised by the offering party*" (C. Larroumet, *Civil Law (Les obligations). The contract*, 1st part, Volume III, 6th ed., Economica, 2007, No. 238, p. 215). An offer is "*the firm proposal to conclude, under determined conditions, a contract such that its acceptance suffices to its formation*" (F. Terré, Ph. Simler and Y. Lequette, *Civil Law (Les obligations)*, Dalloz, 10th ed., 2009, No. 108, p. 121 –italics in the original). Case-law also clearly holds so (see e.g. French Supreme Court, 26 June 1983, *RJDA* 1993, No. 1015 ; 6 March 1990, JCP 1990 II 21583, note B. Gross ; 3 June 2003, *RDC* 2004.633, obs. D. Mazeaud).

### 1.2 Confrontation of this legal framework with the facts of the case

(9) In the case at hand, assuming that Samsung made an "offer" either through its acceptance of the ETSI IPR Policy or through its ETSI Declarations, the latter does not present the essential features of a patent license agreement. It is true that, since French law accepts the concept of an offer to the public at large, the fact that this "offer" was not made to a specific person – by its nature, an ETSI Declaration is general and not directed specifically to Apple – does not matter. It is however essential that this "offer" constitutes a *firm* proposal to enter into a contract, under *determined conditions*, such that its acceptance suffices for the formation of the contract. Now, none of those two constituting elements is characterised in the present case.

(10) There is no firm proposal since Samsung indicates that itself or its affiliates "*hereby declares that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy*" (ETSI Declarations, emphasis added). Being prepared to grant licenses, expressly under conditions, is absolutely not a firm offer: it is a possibility, and not already an offer; it is conditional, and not firm.

(11) Samsung, in its various letters, indicates to be ready to grant a license to Apple under certain conditions (see the letters dated 1st July 2011 – 2nd paragraph – and 20 July 2011 – 3rd paragraph): "*Once Apple has executed an appropriate non-disclosure agreement, Samsung will provide the FRAND terms it is willing to offer to Apple*". But this never constitutes a firm offer. Indeed, "*the proposal which only tends to initiate negotiations does not fulfil the above condition*" and " *the firm*

**ALLEN & OVERY**
Avocats à la Cour

*character of an offer excludes as a principle the possibility to make any reserve*" (Marty and Raynaud, *Civil Law (Les obligations)*, Volume 1, 2nd ed., Sirey, 1988, No. 109, p. 103).

(12) <u>Neither are there determined conditions</u> since, even though there is a reference to the conditions of Clause 6.1 of the IPR Policy in the declaration made by Samsung, this cannot suffice.

(13) Indeed, none of the essential conditions for the conclusion of a patent license agreement, and notably the conditions of subject-matter (including the patents covered, the geographical scope and the duration) and of price are mentioned. Now, to qualify as an offer, Samsung's proposal should have comprised those determined conditions, which are essential to any license agreement. As legal scholars have highlighted, the necessary condition for a "*precise and complete*" offer is that "*the offer indicates* the essential clauses of the proposed contract" (Marty and Raynaud, *Civil Law (Les obligations)*, Volume 1, 2nd ed., Sirey, 1988, No. 109, p. 103 – italics in the original; similarly, F. Terré, Ph. Simler and Y. Lequette, *Civil Law (Les obligations)*, Dalloz, 10th ed., 2009, No. 109, p. 122). In practice, this is understood as meaning at least the subject-matter and the price, as case-law reminded it (French Supreme Court, 24 April 1929, *DH* 1929.283 ; 9 May 1961, *Bull. civ.* III, No. 197 ; 27 June 1973, *JCP* 1973 IV 308).

(14) Now, the exchanges of letters between Apple and Samsung demonstrate that the price is not set, or even determinable, and that the subject-matter is still undefined. In its letter dated 13 May 2011, Samsung asks Apple what patents they wish to obtain a license for. In its letters dated 27 May 2011, 22 June 2011 and 18 July 2011, Apple asks Samsung the rate it charges for such license.

(15) The ETSI declaration indicates that the declaring entity or its affiliates accept to be prepared to grant licenses of exploitation, and the aforementioned Clause 6.1 clearly indicates that it is necessary for the licenses to be "*fair, reasonable and non-discriminatory terms and conditions*"; the ETSI declaration further adds that "*the above undertaking is subject to the condition that those who seek licenses agree to reciprocate*". In the case at hand, Apple opened discussions with a view of being granted a license, as evidenced by the multiple letters exchanged with Samsung, but it clearly appears from reading and analysing these letters that no contract was actually concluded. Thus, Apple was still seeking to know the elements of the license ("*to inquire about the specific terms of a FRAND License from Samsung*") (Apple's letters dated 29 April 2011 and 9 May 2011) and Samsung responded that such request came as a surprise whereas it negotiated an agreement in good faith when Apple abruptly halted the negotiations and initiated a lawsuit against Samsung (Samsung's letter dated 13 May 2011).

(16) Apple reiterated its request for the rates of a license (Apple's letters dated 27 May 2011, 22 June 2011 and again 18 July 2011), which clearly evidences that the parties did not agree on the license, nor on any price or on a duration. Samsung answered by asking Apple explanations and details on the sought information, and the signature of a non-disclosure agreement (Samsung's letters dated 13 May 2011, 3 June 2011, 1st and 20 July 2011). These last letters are entitled in a very clear manner "*Apple's Request for a Patent License*", which shows that Apple had not been granted a license. Indeed, Apple refused to sign the non-disclosure agreement that was stipulated to be a negotiation condition by Samsung: "*Once Apple has executed an appropriate non-disclosure agreement, Samsung will provide the FRAND terms it is willing to offer to Apple*" (Samsung's letters dated 1st July 2011, 2nd paragraph; reiteration in the letter dated 20 July 2011, 3rd paragraph). Since the condition stipulated by Samsung was not fulfilled by Apple, no acceptance of an alleged "offer" could occur: the concordance between the acceptance and the offer is the "*very condition of a true consent*" (Mary and Raynaud, *Civil Law (Les obligations)*, Volume 1, 2nd ed., Sirey, 1988, No. 114, p. 112), which is itself the condition for the existence of the contract.

(17) Apple accepts that no agreement has occurred at least insofar as the price (royalty rate) of the license is concerned, but contends that the price would not constitute an essential element of a license contract, such that the absence of agreement on the said price would not constitute an obstacle to the

conclusion of the contract. It is interesting to note in this respect that, whilst Apple presents such an argumentation with respect of the price, it does not even attempt to define some other essential elements of the license agreement, such as the precise patents covered (the definition of this list was the subject of exchanges, without any agreement being reached), the geographical scope of the agreement or its duration.

(18) In any event, it is plainly false to contend that the price (royalty rate) would not constitute an essential element of a patent license agreement.

(19) This is firstly confirmed by textbooks on intellectual property. Thus, the *Jurisclasseur* on patent license agreements states that "*in order for a [patent license] contract to be valid with respect to the rules of civil law, the price must be determined or determinable*" (C. Guthmann, *Jurisclasseur Brevets*, "Contrats d'exploitation", fasc. 4723, No. 58).

(20) This conclusion is further confirmed by numerous classical textbooks on civil law. It is indeed commonly accepted that a patent license agreement is governed by the provisions of the Civil Code on the rental of things, i.e. Articles 1709 and 1713 sqq. of the Civil Code (see in this respect Azéma and Galloux, *Industrial property law*, 6th ed., Dalloz, 2006, No. 485: "*The main scholars, approved by case-law, teach that licenses have all the features of rental and agree to apply to them the provisions of Articles 1713 sqq. of the Civil Code*" and the references cited); the Aynès Declaration also acknowledges this fact, by indicating that "*a licensing agreement is similar to leases (Civil Code art. 1709)*" (p. 5). Now, as far as leases of things are concerned, it is unanimously accepted that the price of the lease constitutes an essential element of the contract, such that, in the absence of agreement on that element, no contract can exist (Bénabent, *Droit civil (Les contrats spéciaux civils et commerciaux)*, 8th ed., Montchrestien, 2008, No. 526; Terré, Simler and Lequette, *Droit civil (Les obligations)*, 9th ed., Dalloz, 2005, No. 287; Huet, *Traité de Droit Civil (Les principaux contrats spéciaux)*, 2nd ed., LGDJ, No. 21143; Puig, *Contrats spéciaux*, Dalloz, 2005, No. 614, Mainguy, *Contrats spéciaux*, 7th ed., Dalloz, 2010, No. 396). Of particular note in this respect is a textbook, authored by Professor Delebecque himself, confirming explicitly that, in contracts for the lease of things, the determination of the price is a condition to the existence of a valid agreement: "*the absence of stipulation of a rent – or of a serious rent – leads either to the nullity of the contract or to its requalification... Its amount must be determined or determinable, in accordance with general rules, or the lease would be void*" (Dutilleul and Delebecque, *Contrats civils et commerciaux*, Dalloz, 8th ed., 2007, Nos. 458-459, emphasis added). One could also refer to a very recent precedent of the Rennes Court of Appeals, which held that "*whilst it is not required to sign a lease contract in writing, it remains that the party relying on such lease must demonstrate the agreement of the parties on the premises that constitute the subject-matter of the lease, on the duration of this lease and on the amount of the rent*" (CA Rennes, 1st ch. B, 16 June 2011, Docket No. 10/07780). It clearly results from the foregoing that, in leases of things – by the legal regime of which patent licenses are governed, subject to explicit derogations – the determination of the price constitutes an essential element of the contract, in the absence of which no such contract can exist. This element, which was not taken into account in the Delebecque and Aynès Declarations, fundamentally undermines Apple's contentions.

(21) It is also noteworthy that, in support of their respective allegation that "*in a license contract, it is not necessary for the parties to have agreed on the price for the agreement to have been concluded*" (Delebecque Declaration, § 34) and that "*in leases, as a general rule, it is not necessary for the parties to have agreed on the price for the agreement to be formed*" (Aynès Declaration, p. 5), both the Delebecque and Aynès Declarations refer to a single source, namely a statement in a textbook by Schmidt-Szalewski and Pierre. Now, the only support in this textbook for the statement relied upon in the Delebecque and Aynès Declarations is a decision from the French Supreme Court (Cass. com., 9 November 1987, *Bull. civ. IV*, No. 237), which however **did not** concern a lease of things but, to the contrary, an obligation to perform certain services (as rightfully indicated in the Delebecque and Aynès Declarations, the price is not an essential condition in a contract concerning an obligation to

4

perform services – a lease of work under the French Civil Code). As underscored in one of the commentaries of the Supreme Court case at stake, "*the Supreme Court does not qualify the contract; it says that it comprises an 'obligation to do'. That is the essential element: the condition of determination of the price does not interest contracts pertaining to human activity, whose 'price' cannot be known in advance, contrary to things*" (Note Malaurie, D. 1989, p. 35, emphasis added). It results from the foregoing that the only element on which the Delebecque and Aynès Declarations are based – the excerpt from textbook by Schmidt-Szalewski and Pierre – itself results from an erroneous analysis of the single underlying precedent, as highlighted by other comments of that decision.

### 1.3 Conclusion: absence of patent license agreement

(22) As accepted by the Delebecque and Aynès Declarations, the ETSI IPR Policy and the ETSI Declarations could only be of a nature (subject to additional conditions) to give rise to a patent license contract if they comprised the essential elements of such patent license. Now, it clearly appears from the above that neither the price – which constitutes such an essential element contrary to what the Delebecque and Aynès Declarations contend – nor the subject-matter (patents at stake, geographical scope and duration) are determined or determinable on the basis of the ETSI IPR Policy and the ETSI Declarations. As also accepted by the Delebecque and Aynès Declarations (Delebecque Declaration, § 28), in the absence of determination of these essential conditions, no patent license contract can exist.

(23) Apple actually very clearly acknowledges the <u>absence of such contract</u> in its filings in the context of the lawsuit pending before the United States Northern District Court of California. Indeed, in pleadings filed on 21 July 2011, Apple underlines that "*Samsung has recently claimed that it is willing to quote Apple FRAND License terms, but it has not yet done so or given any indication what those terms will be*" (No. 72, p. 49), which clearly amounts to admitting that the agreement cannot exist, for lack of content and lack of agreement on the essential elements.

(24) As a result, the alleged patent license contract relied upon by Apple, or, in the alternative, the alleged offer from Samsung to enter into a patent license contract which Apple could simply accept, does not exist in the case at hand. Instead, the ETSI declaration made by Samsung can be interpreted in part as an invitation to negotiate with undetermined third parties since "*any proposal to enter into a contract which does not qualify as [an offer] because it is insufficiently precise or lacks firmness, should qualify as an invitation to negotiate or a call for tender*" (F. Terré, Ph. Simler and Y. Lequette, *Civil Law (Les obligations)*, Dalloz, 10th ed., 2009, No. 108, p. 121).

(25) Under French law, the obligation to participate in such negotiations is the only obligation that could be incumbent on Samsung pursuant to the ETSI IPR Policy and the ETSI Declarations. To the contrary, these documents cannot give rise to a patent license agreement, or even to an offer of patent license agreement.

### 2. THERE IS NO STIPULATION FOR THIRD PARTIES CONCERNING A PATENT LICENSE AGREEMENT

(26) The ETSI IPR Policy and the ETSI Declarations cannot constitute either a stipulation for third party, concerning a patent license agreement.

(27) Indeed, such a stipulation precisely requires the existence of a basic contract between the party which declares and the party which promises, to which a stipulation for a third party beneficiary is grafted, that third party beneficiary not being a party to the basic contract (see Article 1121 of the Civil Code; F. Terré, Ph. Simler and Y. Lequette, *Civil Law (Les obligations)*, Dalloz, 10th ed., 2009, No. 511, p. 329). In other words, a stipulation for third party could only exist if there was (inter alia)

**ALLEN & OVERY**
Avocats à la Cour

(27) a contract between Samsung and ETSI due to the ETSI IPR Policy and the ETSI Declarations, which would present the features of a patent license agreement.

(28) Now, as detailed above, the ETSI IPR Policy and ETSI Declarations do not comprise the essential features of a such a contract. In addition, these documents have neither the nature, nor the purpose of a patent license contract. This general solution is confirmed by custom and practice in the considered field. Neither custom nor practice reveal the existence of license agreements simply on the basis of the ETSI IPR Policy or ETSI declarations. Ruling otherwise would allow Apple, and all third parties, to benefit freely, since no fee is set or paid, from all the patents for which ETSI declarations have been made.

3. **IN ANY EVENT, APPLE'S IMPLEMENTATION OF THE STANDARD CANNOT AMOUNT TO A PATENT LICENSE AGREEMENT**

(29) The third prong of Apple's reasoning is as erroneous as the two others. Indeed, Apple contends that its acceptance of the license agreement would result from the mere implementation of the standard in its products.

(30) In this respect, it should be reminded that, under French law, patent license agreements (unlike general leases of things) must necessarily be in a written form, subject to nullity. Article L. 613-8 of the Intellectual Property Code indeed provides that the rights deriving from a patent application or a patent are assignable in whole or in part (§1), that they may be subject in whole or in part to the grant of an exclusive or non-exclusive license of exploitation (§2) and expressly specifies that *"the acts referred to in the first two paragraphs which comprise assignment or license shall be executed in writing, subject to nullity"* (§5).

(31) Apple's implementation of the standard in its products clearly does not amount to such a written agreement.

(32) In conclusion, the contract alleged by Apple does not exist substantially (lack of agreement), or formally (lack of written form).

Done in Paris,
On 12 September 2011

Laëtitia Bénard
Allen & Overy LLP