1  HAROLD J. MCELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
2  MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
3  RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
4  MORRISON & FOERSTER LLP
425 Market Street
5  San Francisco, California  94105-2482
Telephone:  (415) 268-7000
6  Facsimile:  (415) 268-7522

WILLIAM F. LEE (*pro hac vice*)
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Attorneys for Plaintiff and
Counterclaim-Defendant Apple Inc.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

APPLE INC., a California corporation,

        Plaintiff,

    vs.

SAMSUNG ELECTRONICS CO., LTD., a
Korean business entity, SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation, and SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,

        Defendants.

Civil Action No. 11-CV-01846-LHK

**DECLARATION OF PROFESSOR
NICOLAS MOLFESSIS IN SUPPORT OF
APPLE INC.'S OPPOSITION TO
SAMSUNG'S MOTION TO DISMISS
APPLE'S COUNTERCLAIMS**

Date:  April 5, 2012
Time:  1:30 p.m.
Place:  Courtroom 4, 5th Floor
Judge:  Hon. Lucy H. Koh

1

DECLARATION OF PROFESSOR NICOLAS
MOLFESSIS IN SUPPORT OF APPLE INC.'S
OPPOSITION TO SAMSUNG'S MOTION TO
DISMISS -- Case No. 11-cv-01846 (LHK)

SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,

Counterclaim-Plaintiffs,

v.

APPLE INC., a California corporation,

Counterclaim-Defendant.

I, Professor Nicolas Molfessis, do hereby declare and state as follows:

**INTRODUCTION**

1.      Since 1998, I have been a Professor of Law at the University Pantheon-Assas, where I teach French contract law.

2.      I am the author and co-author of numerous publications in the field of contract law.  I have also been a consultant in these fields for the past 15 years.

3.      I submit a copy of my curriculum vitae as Exhibit A to this declaration.

4.      As set forth below, this declaration is based upon my expert knowledge of French contract law.

**MATERIALS REVIEWED**

5.      In preparing this declaration I have reviewed the following documents:

a)      Apple's Amended Answer, Defenses, and Counterclaims in Reply to Samsung's Counterclaims ("ACR"), dated November 8, 2011 (a copy of which is annexed to this declaration as Exhibit B);

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

b)      The European Telecommunications Standards Institute (ETSI) Intellectual Property Rights (IPR) Policy, April 8, 2009 (the "ETSI IPR Policy"), submitted by Samsung with its Motion to Dismiss Apple's Counterclaims in Reply and cited in Apple's Counterclaims in Reply ¶¶ 50 -54 (a copy of which is annexed to this declaration as Exhibit C);[1]

c)      ETSI IPR Policy dated November, 1997;

d)      Declarations from Samsung to ETSI regarding Samsung IPR dated September 19, 2003, May 15, 2006, August 7, 2007, and July 24, 2008, cited in Apple's Counterclaims in Reply ¶ 63; and

e)      Opinion submitted by Professor Remy Libchaber in support of Samsung's Motion to Dismiss Apple's Counterclaims in Reply, dated November 22, 2011.

## SUBJECT MATTER OF THIS DECLARATION

6.      I have been asked by legal counsel for Apple to provide an independent legal opinion and to testify, as a Professor of French law, in disputes between Apple and Samsung.

7.      Specifically, I have been asked to respond to the following questions:

a)      Is the relationship between ETSI and its members governed by French contract law?

b)      What are the requirements under French law for the formation of a contract?

c)      What are the contractual obligations of an ETSI member under the ETSI IPR policy under French law?  In particular:

i)  What are the contractual obligations timely to disclose essential IPR?

---

[1] I refer herein to the 2009 version of the ETSI IPR Policy because that is the version cited in Apple's Amended Counterclaims in Reply.  I have also reviewed the 1997 version of the ETSI IPR Policy, and relying on that version, rather than the 2009 version, would have no effect and would result in the same conclusions.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

ii)  What are the contractual obligations of a member that has declared IPR essential by submitting an undertaking under Clause 6.1 of the IPR Policy?

iii)  Can a member who has submitted a Clause 6.1 undertaking thereafter seek an injunction against an implementer's use of the subject IPR?

d)        Does a FRAND undertaking pursuant to Clause 6.1 confer a license of the subject IPR to parties implementing the UMTS standard on their implementation?  In particular:

i)  Does such an undertaking incorporating ETSI Clause 6.1 provisions include sufficiently definite terms to constitute an enforceable license agreement?

ii)  Would such a license comply with French law requirements requiring a written license instrument?

iii)  Would such a license conflict with the doctrine of *intuitus personae* under French law?

e)        Does French law include a doctrine of promissory estoppel; and if so, how would such a doctrine apply in the case of a Clause 6.1 declarant?

In responding to these questions, I will first set out relevant French law principles, and thereafter explicate each of such principles in the specific context of the question presented.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

## OPINION

**I.      APPLICABLE PRINCIPLES OF FRENCH CONTRACT LAW**

**A.      Formation of a Contract**

8.      Under French law, the requirements for the formation of a contract are described in Article 1108 of the French Civil Code.[2]  Article 1108 states that to form a valid contract, the following four conditions must be fulfilled:

> i)      The consent of the parties regarding the contracted obligation;

> ii)     capacity of the parties to enter into the considered contract;

> iii)    a definite object that constitutes the subject matter of the contracted obligation; and

> iv)     a valid consideration for the obligation contracted.

9.      Under Article 6 of the French Civil code,[3] that a contract not offend public policy and morals is an additional requirement.

10.     Although all four of the conditions set forth in Article 1108 are prerequisites to a valid contract, the consent of the parties regarding the contracted obligation is by far the most important requirement.[4]

11.      Under Article 1108, there are no formal requirements regarding the form of consent. The formation of a contract is governed by the principle of consensualism; that is, unless the law expressly states otherwise, the contract is formed by the exchange of consent (*solo consensu*)

---

[2] Art. 1108 Civil Code: "Four requisites are essential for the validity of an agreement:  The consent of the party who binds himself; His capacity to contract; A definite object which forms the subject-matter of the undertaking; A lawful cause in the obligation."
[3] Art. 6 Civil Code: "Statutes relating to public policy and morals may not be derogated from by private agreements."
[4] Ph. Malinvaud et D. Fenouillet, Droit des obligations, Litec, 11ème éd., p. 90, n° 112.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

regardless of the form.[5]  The contract is finalized when the wills of the parties have been met, i.e., when an offer is accepted.

12.     Article 1985 of the French Civil Code, on agency agreements, and Article 778, on inheritance, for example, explicitly confirm that the acceptance of an offer can be implied and results from the performance of such an agreement or from some other act that implies the intent to accept.  These, however, are simply examples of the rule for all contracts.

13.     Moreover, "*the idea of acceptance by way of performance of the offered contract is acknowledged as a general principle.*"[6]  This has been illustrated by many court decisions[7] (e.g., for transportation agreements, it has been ruled that to catch a bus constitutes acceptance of the offered transportation contract).[8]

**B.     Essential Elements of a Contract in General**

14.     The determination of whether the parties have consented must focus on the essential elements of the considered contract.  The contract is formed when the parties have agreed on the "essential elements" for the formation of the contract.[9]

15.     However, one must draw the distinction between the "essential elements" required for the *formation* of the contract and the "essential elements" required for the *characterization* of the said contract.  Indeed, French scholars may refer to "essential elements" to describe the elements that characterize a type of contract and permit it to be distinguished from another type of contract.  However, those elements do not need to be determined at the time of the formation of

---

[5] M. Fabre-Magnan, Droit des obligations, I – Contrat et engagement unilatéral, Thémis, PUF, 2ème éd., p. 215.
[6] J.- L. Aubert, *op. cit.*, p. 282, n° 307.
[7] For sale contracts: Req, 18 octobre 1909, DP, 1910.1.207; for services contracts: Com. 25 juin 1991, Bull. Civ. IV, n° 234.
[8] Grenoble, 14 avril 1958, D. 1958, 414, note Rodière.Voir aussi, Cass. req., 7 mai 1935, S, 1935, 1, 206; T.G.I. Seine, 24 février 1962, D. 1962, Somm. III; Nancy, 1er mars 1950, JCP, 1950, II, 5892, note Hémard.
[9] Req., 1er décembre 1885, S., 1887, 1, 167; Civ. 1ère, 26 novembre 1962, D., 1963.61, RTD Civ. 1963, p. 364, obs. G. Cornu.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

the contract for the contract to be valid and binding.  The usage of the same expression to designate two very different issues must not provoke confusion.

16.     Indeed, under French law there exists a fundamental distinction between an element considered essential for the characterization of the contract and an element considered essential for its formation.  An element can be essential for the characterization of the contract without having to be determined for the formation of a valid and binding contract.  For instance, for a services contract, price is an essential element to characterize the contract as a services contract.  That is, for a contract to be characterized as a services contract, a price must be paid by the customer.  Otherwise, the contract will be recharacterized as a different type of contract.[10]  As I discuss below, however, price is not an essential element for the formation of a services contract.  The concept of essential elements originates in Roman law.  Roman law differentiated essential elements, natural elements, and accidental elements in a contract.[11]  Accidental elements are those resulting from specifications given by the parties that would otherwise not exist.

17.     An element is considered essential *for the formation of a contract* when an agreement between the parties on that particular element is required for the contract to be validly formed.

18.     Elements that are not essential elements for the formation of a contract are known as "secondary elements."  Although the law provides the default rule regarding which elements are required for the formation of a contract, the parties may decide to stipulate that an element that is regarded as secondary under French law is an essential element for purposes of their contract.[12]

19.     Different types of contracts have different required elements for formation under French law.  To illustrate this point, it is useful to contrast a sales contract and a lease agreement.  For a

---

[10] A. Bénabent, Les contrats spéciaux civils et commerciaux, Montchrestien, 7ᵉ éd., p. 346, n° 506.
[11] F. Terré, L'influence de la volonté individuelle sur les qualifications, LGDJ, 1955, préf. R. Le Balle, spéc. n°33, p. 35.
[12] Civ. 1ᵉʳᵉ, 14 janvier 1987, D., 1988.80, note J. Schmidt.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

sales contract to be formed, the parties must agree on the essential elements of (i) a definite item that will be delivered and (ii) an amount of money that will be paid.  On the other hand, for a lease contract to be formed, the parties must agree to the essential elements of (i) a definite item that will be leased and (ii) the fact that the leasee will pay *some* rent.  But the parties need not agree on the *amount* of the rent for the contract to be formed.  In this case, the amount of rent paid is a secondary element – unless the parties involved decide, on their own accord, that this secondary term is an essential requirement for their contract to be validly formed.

20.     Under French law, when the parties cannot agree on a secondary element, the courts will provide that element.  The absence of agreement on a secondary element does not prevent a contract from being formed.

21.     There are only a few essential elements that are required for the formation of a given type of contract.  To form a contract, the parties need only agree on the essential elements, i.e., those that cannot be supplemented after formation.

22.     The example of services contracts shows perfectly that an element can be essential to characterize the contract but does not have to be fixed at the time the contract is formed for the contract to be binding.  Indeed, services contracts can be formed even if the parties have not yet agreed on the price.  The price is an essential element in the characterization of services contracts, but it is not an essential element for its formation.  It can be fixed after formation and during the execution of the contract.

23.     On the other hand, for sale contracts, price is both an essential element for the characterization of the sale contracts and an essential element for the formation of a binding

contract.  Article 1591 of the Civil Code states that "The price of a sale must be determined and stated by the parties."[13]

### C.      Essential Elements for Formation of a Patent License Agreement

24.      For the formation of a contract for the license of a patent, the parties must reach agreement on the essential elements for that type of contract.

25.      A patent license is a *sui generis* contract.  Under French law, certain contracts are placed within a particular category of contract.  For example, commercial leases are part of a more general category:  the lease.  The significance of such a classification is that if a special rule applicable to commercial leases is not sufficient to resolve a particular issue; the general rule applicable to all leases may be applied.  A patent licenses does not belong to such a category.  It is a specific contract that is not a subdivision of an existing category.  Therefore, no rules beyond those applicable to patent licenses in particular should normally be applied.

26.      For a license agreement to be formed, the object of the license – i.e., the patents involved – must be determined.  In other words, the patent or patents must be identified.

27.      Under French law, as a general rule, a contract can be validly and definitively formed without the price being determined or determinable.  This was formally confirmed on December 1, 1995 in four *Cour de cassation* (the highest court in France) rulings[14] handed down by the *Assemblée Plénière* of the *Cour de cassation*.  (The *Assemblée Plénière* is an assembly of judges from all sections of the *Cour de cassation*, which meets only for cases of particular significance.)

28.      Although the general rule no longer requires the parties to determine the price at the time of the formation of the contract for the contract to be valid and binding, price is an essential

---

[13] Com., 24 mars 1965, D., 1965, 474; RTDCiv., 1965, 821, obs. G. Cornu; Req., 7 janvier 1925, GAJCiv., 11ᵉ éd., n°246.
[14] As. Plen., 1ᵉʳ décembre 1995, D. 1996, concl. Jéol, note L. Aynès; JCP 1996, II, 22565, concl. Jéol, note J. Ghestin.

element for formation with respect to certain categories of contracts:  in the 1st December 1995 rulings, the *Cour de cassation* described such cases as those where there are "*specific legal provisions.*"[15]

29.     However, **there is no such legal requirement for patent licenses, which, unlike sale agreements, do not require the parties to agree on price (i.e., royalties) before a binding agreement can be concluded**.  Indeed, licenses, as *sui generis* contracts (*see supra* at ¶ 25), are subject to several specific rules set out by the Intellectual Property Code, and not to the rules of any broader category of agreements.  None of these rules requires that price must be determined for a valid license agreement to be formed.  French scholars confirm that a license agreement can be entered into without the price being determined or determinable.[16]

30.     Moreover, this question has been recently submitted to a court of appeal.  In the case submitted to the court, an amendment to a license contract stated that the use of the patent will imply the payment of royalties.  Royalties were specified as a lump sum, but it was stated that if the licensee finally sold fewer of the items covered by the patent than expected, the parties should meet again to agree on a new royalty amount.  In other words, the amount of the royalties to be paid was not determined and was subject to a new agreement by the parties involved.  In order to avoid its obligations, the licensee claimed that the amendment was void because the amount of royalties, i.e. the price, was not determined at the time of the amendment.  The court of appeal rejected this argument.  In a direct reference to the jurisprudence of the *assemblée plénière* of 1995, the court of appeal judges held that the amendment was perfectly valid and the fact that price was undetermined did not void the contract:

---

[15] As. Plen., 1er décembre 1995, D. 1996, concl. Jéol, note L. Aynès; JCP 1996, II, 22565, concl. Jéol, note J. Ghestin.
[16] J. Schmidt-Szalewski and J-L. Pierre, *"Droit de la propriété industrielle,"* Litec, 4ème éd., n° 292.

DECLARATION OF PROFESSOR NICOLAS
MOLFESSIS IN SUPPORT OF APPLE INC.'S
OPPOSITION TO SAMSUNG'S MOTION TO
DISMISS -- Case No. 11-cv-01846 (LHK)

"Absence of the determination of the price does not void the contract.  However, if the parties abuse their right to determine the price, it will only give rise to indemnities or to allow revocation."[17]

31.     Therefore, even if the amount of royalties is an essential condition of a license for purposes of *characterizing* a license contract, the royalties need not be determined for a license agreement to be formed.

32.     Professor Libchaber contends that a patent license is a type of lease agreement.  I disagree with his view.  Even if one were (incorrectly) to conclude that a license agreement is a form of lease, and therefore the rules applicable to leases which are set out in Articles 1709 and 1713 *et seq.* of the French Civil Code were applicable, however, determination of the amount of the royalties would not be necessary for the contract to be formed and valid.

33.     There are several reasons for my conclusion that a lease agreement can be formed without any agreement between the parties on the rent amount:

      i)      *Firstly, reasons based on the French Civil Code*

34.     Article 1709, which defines leases on items, is drafted in terms that are similar to, but even less prescriptive than, Article 1710, which governs the services agreements ("*contrats d'entreprise*").  According to case law, the services agreements can be formed without any agreement between the parties regarding the price amount.  It therefore follows that the parties need not agree on price to form a valid lease agreement.  In addition, as the *Cour de Cassation* has concluded it implicitly results from Article 1716[18] on proof of verbal leases that an

---

[17] Lyon, 5 févr. 2009, D. 2010, p. 467, note J. Raynard.
[18] Art. 1716: "Where there is a controversy as to the price of a verbal lease which is being carried out, and there is no receipt, the owner shall be believed upon his oath, unless the tenant prefers to apply for an appraisal by experts; in which case, the costs of the appraisement shall be charged to him, if the appraisal exceeds the price which he has declared."

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

agreement on the rent amount is not a prerequisite for a lease to be validly formed.[19]  It is sufficient for the parties to agree that the lessee has an obligation to pay *some amount* of rent; they need not agree on the *specific amount* of the rent.

### ii)    Secondly, reasons based on precedents

35.    In addition, when lawmakers intend to require the amount of the price to be fixed as a prerequisite for the formation of a valid contract, they expressly provide for this (e.g., for housing rentals - "*baux d'habitation*").  These cases should be considered as exceptions. Accordingly, given that lawmakers have not required that the parties agree as to rent amount for the formation of a valid lease agreement, there is no such requirement.

36.    The *Cour de Cassation* has long recognized that in the absence of an agreement between the parties on the rent amount, it is up to the courts to fix such rent, and the absence of a rent amount does not affect the existence of a binding contract.[20]  Moreover, since the four rulings from the Full Court of the *Cour de Cassation* of December 1, 1995, any obligation to determine the price *ab initio* has become an exception to the general principle that the amount of the price of an agreement need not be set when the agreement is formed for the agreement to be validly formed.

37.    In addition, given that two of these four rulings were handed down on the basis of Article 1709, and given that, under French law, all exceptions must be narrowly interpreted, there is no doubt that leases of items are not one of these exceptions to the general principle.  Indeed, as P.Y. Gautier, a leading French contract scholar has written:  "*The general solution resulting from these* [1995] *rulings is undoubtedly designated to apply to leases.*"  This same principle has been

---

[19] Paris, 22 janvier 1991, JurisData, n° 1991-020352. See also: Cass. civ. 3ème, 3 octobre 1968, Bull. civ., III, n° 356; Versailles, 29 octobre 1999, JurisData n° 1999-104783. Voir aussi, Cass. civ. 3ème, 25 février 1971, Bull. civ. III, n° 135; 6 janvier 1993, pourvoi n° 91-13858.

[20] Req., 30 novembre 1891, D., 1893, I, 11.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

indirectly confirmed in a decision from the *Cour de Cassation* regarding safety boxes.  In that case, the *Cour de cassation* ruled that a bank had not acted abusively in determining a price when it raised the price of a safety box by 100%, because the other party was timely informed of that increase.[21]  By directly focusing on the question of abuse – not the question of contract formation – the *Cour de cassation* logically confirmed that the rent may be unilaterally altered by one party after the execution of the contract.  Put otherwise, if the court had believed that price was an essential element for the formation of the lease agreement, it would not have assessed whether the bank had acted abusively.

38.     Moreover, another case clearly demonstrates that the *Cour de cassation* does not consider price an essential element for formation of a lease agreement.[22]  In this case, the lessor was contending that a deed did not include the essential elements for a lease contract because the price for the lease had not been specified in the deed.  The *Cour de cassation* rejected this argument, finding that the essential elements for a lease formation were contained in the deed, notwithstanding that the deed did not set forth a price.  The court wrote:

> "The Court of appeal that has stated that the deed recounted that, by an act signed the same day, the seller had granted a lease of the locals for nine years, could have considered that <u>the deed has revealed essential elements of the lease</u>, and that this contract has a 'certain date.'"  (emphasis added)

In other words, in determining that a deed not mentioning the price had set forth the essential elements for the lease, the *Cour de cassation* necessarily determined that the price is not one of the essential elements for formation of a lease.  Moreover, that the *Cour de cassation*

---

[21] Cass. civ.1ère, 30 Juin 2004, Bull. Civ I, n° 190.
[22] Civ. 3ème, 15 mars 2000, Bull. civ. I, n° 55.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

made particular reference to the specific term "essential elements" in finding that the lease was sufficiently described, despite the lack of price specification, is highly significant.

*   *   *   *   *

39.      In conclusion, under French law, a specified royalty amount is not essential to the formation of a license.

**D.      Writing Requirement**

40.      Under French law, a distinction exists between a contract that must be entered into in writing – said to be "formal" – and a contract that is not subject to any writing requirement – said to be "consensual."

41.      Article L. 613-8 of the Intellectual Property Code states that "acts bearing a transfer or a license, referred to in the first two paragraphs, must be acknowledged in writing, under penalty of nullity."  The Article refers to a license concluded on a "gré à gré" basis; i.e. it refers only to the case where a contract of license is formed after an actual negotiation between two parties.

42.      Furthermore, the purpose of this formality is to protect the holder of the patent, which will realize the consequences of his commitment when he writes its consent.  In other words, what is important, and the purpose of the writing requirement, is that the owner of the patent expresses its consent in writing,[23] not that the licensee do so.

**E.      Doctrine of *Intuitus Personae***

43.      Under French law, a contract is said to be formed *intuitu personae* when it is entered into in consideration of the identity of the counterparty.  For those contracts, the identity of the parties is of fundamental importance.[24]

---

[23] F. Terré, Ph. Simler, Y. Lequette, Les obligations, Précis Dalloz, 10ème éd., p. 156, n° 143.
[24] Ph. Le Tourneau et D. Krajeski, J-CL, Contrats-Distribution, Fasc. 200: Contrat « intuitu personae », spéc. n° 13s.

DECLARATION OF PROFESSOR NICOLAS
MOLFESSIS IN SUPPORT OF APPLE INC.'S
OPPOSITION TO SAMSUNG'S MOTION TO
DISMISS -- Case No. 11-cv-01846 (LHK)

44.      It is usually determined that a contract is concluded *intuitu personae* when its execution necessitates the special ability of the promisee, or where there is a special trust between the parties.

45.      Although the definition is not controversial, the scope of the doctrine of *intuitu personae* is not definite.  Under French law, there is no list of contracts considered as formed *intuitu personae*.  It is up to the parties to decide to enter in a contract *intuitu personae* or not.  In the absence of will expressed by the parties, it is up to the judge to decide whether a contract has been formed *intuitu personae* or not. [25]

46.      Some contracts are invariably considered as *intuitu personae* contracts.  The first type of contract concerns the contracts dictated by feeling, such as donation.  The second type concerns contracts where a fiduciary relationship between the parties is necessary, such as agency.  The third type concerns the services contracts where the skills of the person are essential.[26]

47.      Absent these types of special circumstances where the context dictates that the contract can only be accepted by a particular party designated by the offeror, however, the contract is not subject to the doctrine of *intuitu personae*.

48.      The *intuitu personae* nature of a contract may have a huge influence on its formation and on its execution.  It is generally acknowledged that, when an offer is made at large, i.e. to an indefinite public, if the contract is not *intuitu personae*, the acceptance of any person interested will be sufficient to form the contract, whereas, if the contract is *intuitu personae*, the offeror

---

[25] Ph. Le Tourneau et D. Krajeski, J-CL, Contrats-Distribution, Fasc. 200: Contrat « intuitu personae », spéc. n° 47.
[26] Ph. Le Tourneau et D. Krajeski, J-CL, Contrats-Distribution, Fasc. 200: Contrat « intuitu personae », spéc. n° 50. The *intuitu personae* character of the contract can be assumed when the person is the subject matter of the contract (actor, professional athlete, etc.), or when the activity is mainly or wholly intellectual (traditionally lawyer, surgeon, architect).

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

1    remains free to elect, among the parties interested, to contract with only the party that seems

2    most appropriate.  Other consequences are generally attached to the *intuitu personae*.[27]

3    **F.       Association/Membership Contracts**

4    49.       Under French law, a contract is created between the association and its members, and

5    among the members of the associations.  Article 1 of the July 1st 1901 French Act on association

6/7  agreements, states:

> An association is an agreement in which two or more people
> permanently combine their knowledge or activities for a purpose
> other than sharing profits.  Its validity is governed by the general
> legal principles applying to contracts and obligations.

Applying this Article, the French *Cour de cassation* characterizes the relationship among the

association members as "contractual" in order to be able to apply the proper contractual rules.[28]

The French *Cour de cassation* also characterizes the relationship between the members, on the

one hand, and the association itself, on the other, as "contractual."[29]  Therefore, the relationship

is contractual among the members of the association, and is also contractual between the entity

and each member.  The association and its members can agree to the terms that will govern their

contractual relationship through writings, such as bylaws or rules of procedure, which become

binding on members once adopted by the association.

50.       Such an association is similar to French "*cooperatives*" and "*mutuelles*" (mutually

beneficial societies) or French "*systèmes d'échange locaux*" (local trading systems) where "each

company offers goods to the other and consumes goods from other companies in the system."[30]

---

[27] For example, it prevents the beneficiary of the contract from entering into a sub-contract, and it prevents the beneficiary from transferring its rights and obligations under the contract without the consent of the other party.
[28] Y. Chartier, L'association, contrat, dans la jurisprudence récente de la *Cour de cassation*, Mel. Y. Guyon, 2005, p. Pr196 s.
[29] Cass. Civ. 1ère, 6 mai 2010, Dr. sociétés, 2010, comm. 135, note H. Hovasse; Cass. civ. 1ère, 15 juillet 1999, Bull. Joly, § 261, note A. Couret.
[30] F. Grua, J-Cl Civil, Art. 1235 à 1270, Fasc. 12: Substituts de la monnaie, n° 76.

16

DECLARATION OF PROFESSOR NICOLAS
MOLFESSIS IN SUPPORT OF APPLE INC.'S
OPPOSITION TO SAMSUNG'S MOTION TO
DISMISS -- Case No. 11-cv-01846 (LHK)

51.     In all these examples, the purpose of joining a group is to pool material or intellectual resources together, so that one group member can make this available to the other members for fair and reasonable consideration.

**G.     Promissory Estoppel**

52.     Traditionally, French law did not recognize the concept of estoppel, except in specific fields such as public international law and international business law.[31]  However, the concept is now widely recognized by the *Cour de cassation* as a consequence of the French contract law principle of coherence which governs, along with the concept of good faith and loyalty, the construction of contracts under French law.

53.     The concept of estoppel is clearly established in matters of procedure:  a party cannot contradict itself to the detriment of another party.  The consecration of that principle was first implicit,[32] but the principle is now clearly affirmed by the *Cour de cassation*, which does not hesitate to dismiss claims on that ground.[33]  Moreover, in two recent cases, the *Cour de cassation* has referred to "the principle according to which no party may contradict itself to the detriment of another party" as a "general principle" of broad application.[34]  This formulation of principle suggests that the *Cour de cassation* will likely apply the principle not only for procedural matters, but also with regard to substantive issues – i.e., to hold that a party may not contradict a promise to the detriment of another in the course of business dealings.

54.      It bears noting that applying the doctrine of promissory estoppel to substantive matters is consistent with and accomplishes objectives similar to the application of the good faith

---

[31] E. Gaillard, L'interdiction de se contredire au détriment d'autrui comme principe général du droit du commerce international, Revue de l'arbitrage 1985, p. 241.
[32] Cass. ass. plén., 27 févr. 2009,, D. 2009, 723 obs. X. Delpech et 1245, note D. Houtcieff.
[33] Cass. civ. 2e, 9 sept. 2010, D. 2011, n° 145 note N. Dupont.
[34] Cass. com., 20 sept. 2011, JCP G.n°46, p.2246, obs. Houtcieff; Cass. 1re civ. 26 oct. 2011, pourvoi n° 10-17.708.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

requirement, which is very classical under French law.[35]  Indeed, French courts penalize parties that make a representation about the conclusion[36] or continuation[37] of a contract in bad faith and later refuse to conclude or continue the said contract, in contradiction of their previous representation.

## II.      FRENCH CONTRACT LAW PRINCIPLES SPECIFIC TO THE CIRCUMSTANCES OF THIS MATTER

55.      In this section, I set out the particular principles of French contract law noted above that are directly relevant to the specific circumstances alleged in Apple's Counterclaims in Reply, which I understand to be at issue here.

56.      Clause 12 of the ETSI IPR Policy expressly states that the ETSI IPR Policy is governed by French law.  (ACR ¶ 54)  Thus, the relationship between ETSI and its members with regard to the IPR Policy is governed by French law, and French law governs all the rights and obligations arising from the ETSI IPR Policy.

57.       ETSI has adopted an association form, more precisely a non-profit entity.  (ACR ¶ 39)  That means that all members of ETSI should be regarded as being contractually linked to each other and to the association.  Consequently, they have contractual obligations toward the association and toward each of its members.  (ACR ¶ 31)  Each decision made by ETSI is

---

[35] D. Houtcieff, Le principe de cohérence en matière contractuelle, PUAM, 2001. In the first case, the Cour de cassation inferred from that principle that the claimant was not entitled to use a new argument in appeal that he did not invoke before.  In the second case, the Cour de cassation has, on the ground of the principle according to which no party may contradict itself to the detriment of another party, dismissed a claim relying on incompatible procedural behaviour.

[36] Civ. 1ère, 7 avril 1998, pourvoi n° 95-20361: in that case, one party negotiated in bad faith during four years without any real intention to conclude the contract.

[37] Cass. com., 28 févr. 1995: D. 1995, somm. p. 64, obs. Ferrier; RTD com. 1995, p. 85, obs. Mestre. In that case, the party induced in bad faith the other party to consider that the contractual relations between the parties will be continued.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

binding on its members.  The French courts have made clear that all decisions made by the association are binding on its members, and not just the initial decision to create an association.[38]

58.     Pursuant to Clause 1 of the ETSI IPR Policy, "The General Assembly of ETSI has established the following Intellectual Property Rights POLICY."  That establishment of the ETSI IPR Policy is an association decision, which is binding on all ETSI members.  It creates contractual rights and obligations between ETSI and its members.  (ACR ¶ 50)

59.     The ETSI IPR Policy must therefore be construed as a contract that governs both the relationship among the members of ETSI and between ETSI and its members.

**Contractual Obligations of Members Under the ETSI IPR Policy**

**A.     Timely Disclosure**

60.     Pursuant to Clause 4 of the ETSI IPR Policy, the owner of a patent which might be essential has a duty to disclose the existence of that patent to ETSI.  (ACR ¶ 51)  Clause 4 states that:

> 4.1 Subject to Clause 4.2 below, each MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion.  In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

> 4.2 The obligations pursuant to Clause 4.1 above do however not imply any obligation on MEMBERS to conduct IPR searches.

> 4.3 The obligations pursuant to Clause 4.1 above are deemed to be fulfilled in respect of all existing and future members of a PATENT FAMILY if ETSI has been informed of a member of this PATENT FAMILY in a timely fashion.  Information on other

---

[38]  Cass. civ. 1ère, 10 juillet 1979, Bull. Civ. I, n° 202, Cass .civ. 1ère, 27 juin 2000, Rev. societés 2001, p. 105, note D. Randoux; Cass. civ. 3ème, 20 juin 2001, Rev. sociétés 2002, 321, note E. Alfandari.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

members of this PATENT FAMILY, if any, may be voluntarily provided.

Therefore, all ETSI members have an obligation to timely inform ETSI if they hold IPR that they know may be essential to a standard that ETSI is considering.  (ACR ¶ 51)  This obligation is binding on each member of ETSI:  by their membership in ETSI, all ETSI members have accepted that obligation.

**B.     Clause 6.1 FRAND Obligations for Those Submitting FRAND Undertaking**

61.     Pursuant to Clause 6.1 of the ETSI IPR Policy, if the owner of an essential patent has submitted an undertaking identifying IPR as essential and stating that it is prepared to grant licenses on FRAND terms, it is then bound by its commitment.   (ACR ¶ 52)

62.     Clause 6.1 of the ETSI IPR Policy states that:

"When an essential IPR relating to a particular Standard or Technical Specification is brought to the attention of ETSI, the Director General of ETSI shall immediately request the owner to give within three months an **undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions** under such IPR to at least the following extent:

-Manufacture, including the right to make or have made customized components and sub-systems to the licensee's own design for use in Manufacture;

-Sell, lease, or otherwise dispose of equipment so manufactured;

-Repair, use, or operate equipment; and

-Use Methods

The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate."

In becoming an ETSI member, each company is encouraged to make an IPR undertaking to grant licenses to patents that may be deemed essential to an ETSI standard under the conditions provided in the ETSI IPR Policy.  To that effect, Clause 2.1.1 of the ETSI IPR Policy

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

states:  *"Members are encouraged to make general IPR undertakings/licensing declarations that they will make licenses available for all their IPRs under FRAND terms and conditions related to a specific standardization area and then, as soon as feasible, provide (or refine) detailed disclosures.  This process reduces the risk of the standards making process being blocked due to IPR constraints."*  ETSI's aim is to facilitate the licensing of new technologies, so that fair and reasonable royalties are paid to patent owners, and to prevent any obstacle in the development of "standards."[39]  (ACR ¶¶ 24-28)

63.     Although Clause 8.1 of the ETSI IPR Rules contemplates that a member may refuse to make a commitment to license under Clause 6.1 in the first place, the ETSI IPR Rules do not contemplate that an ETSI member may refuse to license after having submitted an undertaking under Clause 6.1.  Thus, when an ETSI member has declared its IPR essential by submitting an undertaking under Clause 6.1 of the ETSI IPR Policy, the first consequence is that it is no longer permitted to take the position that it will not license, which Clause 8.1 permits before a ETSI member makes a FRAND declaration under Clause 6.1.  **It is evident that this is no intermediary situation – i.e., a situation where the holder of the patent may enter into a negotiation with a potential licensee, while retaining the power to accept or refuse to grant licenses at the end.**

64.     Therefore, the obligations under Clause 6.1 are binding on all FRAND declarants.  In this case, the undertaking is expressly irrevocable.  The declarant is obliged to grant a license to implementers of the standard that accept the offer reflected in the declaration.

65.     There are two mechanisms under French law that explain the binding force of the FRAND declaration:  The undertaking may be regarded as a "continuing offer" ("*offre*

---

[39] Clause 3 ETSI IPR Policy.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

21

1   *permanente*") such that an express or implied acceptance by an implementer of the relevant

2   standard is sufficient to create a binding license.  This type of situation is well known in French

3   law.  It has been defined as the following by J.-L. Aubert:  It deals with a person who has made a

4   definite offer to enter into certain contracts, in general a specific contract, which most of the time

5   is made to the public at large, but sometimes, to an individual.[40]  This mechanism is classically

6   illustrated in the transport contract:

7

8               The transporter is in a state of permanent offer resulting from the
              publication of its transport conditions, from billboards, or more
9               simply from the fact that the vehicles are at the disposal of people
              who require them. The transporter [does not retain the option to
10              select which specific potential passengers may accept the offer].
              The later accepts the offer by using the transporter' vehicles.[41]
11

12  The acceptance – either expressly or implicitly or by way of execution of the offer – by a party

13  wishing to implement the UMTS standard will be sufficient to form the contract.[42]

14  66.      The undertaking may also be regarded as a "*stipulation pour autrui*."  This mechanism,

15  outlined in Article 1121 of the French Civil code, permits a party to enter into a binding

16  obligation for the benefit of third parties.  This mechanism can be described as the following:  an

17  obligation in favor of a third party that is formed by an exchange of consent between two parties.

18  One such party commits itself - the promisor - and the other party receives the commitment - the

19  stipulator.  By this undertaking, the promisor (here, the declarant) commits to the stipulator

20  (here, ETSI) to grant a right to one or more beneficiaries.  The latter, which are the third parties

21  in this binding engagement, do not need to accept it for the contract to be formed.[43]  By the sole

22  commitment of the promisor, they are vested with an immediate and direct right against the

23

24

25

26  [40] J.-L. Aubert, Notions et rôle de l'offre et de l'acceptation dans la formation du contrat, LGDJ, 1970, p.20, n° 13.
[41] Nancy, 1er mars 1950, JCP, 1950, II, 5892, note J. Hémard.
27  [42] M. Fabre-Magan, Droit des obligations, 1 – Contrat et engagement unilatéral, Thémis, 2ème éd., p. 263.
[43] F. Terré, Ph. Simler, Y. Lequette, Les obligations, Précis Dalloz, 10ème éd., p. 541, n° 526.

28

DECLARATION OF PROFESSOR NICOLAS
MOLFESSIS IN SUPPORT OF APPLE INC.'S
OPPOSITION TO SAMSUNG'S MOTION TO
DISMISS -- Case No. 11-cv-01846 (LHK)

promisor:  "The beneficiary has a direct right against the promisor.  This right arises only by the meeting of the minds of the stipulator and the promisor.  Acceptance by the beneficiary is not a condition of the existence of that right against the promisor."[44]

67.      Under a *stipulation pour autrui*, the beneficiary will remain free to request or not the execution of the contracted obligation.  Even though it is not necessary to obtain the benefit of the stipulation, acceptance still has an effect:  it prevents the stipulator (here, ETSI) from revoking the stipulation *pour autrui*.[45]  Only the stipulator (here, ETSI)  – not the promisor (here, Samsung) – may revoke the offer to the beneficiary before acceptance.  The acceptance does not affect the relationship between the promisor and the beneficiary:  the beneficiary already has an enforceable right against the promisor, which has irrevocably committed.  In other words, the promisor may never withdraw its commitment.  It is definitively committed when it undertakes to the sipulator to grant a right to the beneficiary.

68.      Under such a stipulation, the contract is directly formed between the promisor and the beneficiary.  The promisor is irreversibly bound by the contract and the beneficiary is consequently entitled to sue the promisor to force him to execute the contract.[46]

69.      Although Article 1121 mentions explicitly only the stipulation of an obligation, the French courts have substantially expanded the scope of the mechanism.  They hold that the stipulation may involve not just a single obligation but a whole contract.[47]  The French doctrine evokes a *stipulation de contrat pour autrui*.  The difference is that the commitment of the promisor does not concern a sole obligation toward the beneficiary (for example, obligation to donate the insurance benefits to the beneficiary of the stipulation), but concerns the conclusion of

---

[44] F. Terré, Ph. Simler, Y. Lequette, Les obligations, Précis Dalloz, 10ème éd., p. 541, n° 526.
[45] F. Terré, Ph. Simler, Y. Lequette, Les obligations, Précis Dalloz, 10ème éd., p. 541, n° 528.
[46] F. Terré, Ph. Simler, Y. Lequette, Les obligations, Précis Dalloz, 10ème éd., p. 541, n° 526.
[47] Civ. 1ère, 22 mai 2008, D., 2008, p. 2447, note C. Goldie-Genicon.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

a contract:  by such a stipulation, the promisor accepts to enter into a contract with the beneficiary.

70.     That sort of "*stipulation de contrat pour autrui*" may perfectly take place when an entity is concerned.  The *Cour de cassation* has stated[48] that in the case of group insurance (assurance negotiated and concluded with the representative of a group), the right to conclude the contract is promised to each member of the group, who, in signing up for the insurance, directly enters into a contract with the insurance company.

71.     Therefore, an association like ETSI, may be the forum for the *stipulation pour autrui*. The ETSI member that has submitted an undertaking, under Clause 6.1 of the ETSI IPR Policy, (the promisor) is irrevocably bound by its promise toward ETSI (the stipulator) to grant licenses to ETSI members or other parties implementing the standards (beneficiaries).  It cannot revoke its promise.

*   *   *   *   *

72.     Under either mechanism recognized by the French law described above, the consequence is the same:  the undertaking pursuant to Clause 6.1 of the ETSI IPR Policy binds the party declaring essential IPR to an irrevocable commitment to license the declared-essential IPR to ETSI members or others that wish to implement the UMTS standard, and the license begins immediately upon implementation of the standard, even if the price has not been set.  As I explained above (*see supra* at ¶ 29), price is not an essential element for formation of a patent license.

---

[48] Civ. 1ère, 9 mars 1983, Bull. civ. I, n° 91; 7 juin 1989, Bull. civ. I, n° 233.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

**C.     The Clause 6.1 Undertaking is Not Merely an Agreement to Negotiate**

73.     I disagree with Professor Libchaber regarding the question of the legal consequences of an ETSI member making a FRAND commitment under Clause 6.1 of the ETSI IPR Policy.

74.     Under Professor Libchaber's view, the undertaking under Clause 6.1 of the ETSI IPR Policy must be construed as strictly an "*accord de principe,*" i.e., an invitation to negotiate to parties that are interested in implementing the UMTS standard.  Under this construction, the declarant is not bound until it has accepted a license offer from an interested party at the end of negotiations.  Until then, the declarant is free to refuse to give his consent and to grant a license. I note, however, that even under Professor Libchaber's view, a FRAND declarant has an obligation  to negotiate in good faith to try to reach agreement on a FRAND license:  "the obligation of the patentee is a very simple one:  the company is supposed to negotiate with those who would be interested in obtaining a license of the patent.  By declaring that it was ready to license various patents, Samsung accepted an obligation to negotiate in good faith, in order to reach a FRAND agreement with whomever would be interested."[49]

75.     As I explain below, under a correct construction of an undertaking pursuant to Clause 6.1 of the ETSI IPR Policy, as governed by French law, the FRAND undertaking constitutes a commitment that immediately binds the declarant.  The acceptance of the undertaking by the party seeking to implement the relevant standard (here the UMTS standard), either expressly or implicitly, will therefore give rise to a license and allow the implementer to practice the patents that the declarant has declared essential to the standard, without the need for any additional consent by the declarant.

---

[49] R. Libchaber's Affidavit, spec. n° 86.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

76.     The fundamental question is the following:  in submitting the undertaking under Clause 6.1, does an ETSI member only bind itself to enter into negotiations?  Or is it making an irrevocable contractual offer that creates a binding patent license on acceptance of the offer by a beneficiary of the promise through the beneficiary's action in implementing the standard to which the IPR has been declared essential?

77.     Many points lead me to conclude that a FRAND commitment under Clause 6.1 is a binding agreement upon acceptance by an implementer.

78.     First, the purpose of the ETSI Rules is to make licenses on FRAND terms and conditions available to all parties that wish to implement the relevant standard (Clause 3, *Policy Objectives*, ETSI IPR Policy; Clause 6, *"Availability of Licenses,"* ETSI IPR Policy).  (ACR ¶ 54)  Such an aim cannot be achieved if the declarant retains the ability to refuse to grant such a license on a declared-essential patent after having made an undertaking to do so under Clause 6.1 of the ETSI IPR Policy.

79.     Secondly, the binding nature of such an undertaking results from the wording of Clause 6.1.  The declaration is described as an *"undertaking in writing that [the declarant] is prepared to grant irrevocable licenses on FRAND terms and conditions under such IPR to at least the following extent."* (ACR ¶ 52)  *That is, the declarer is not prepared to negotiate, it is prepared to grant.*

80.     In addition, Clause 6.1 expressly allows for imposing a reciprocity provision:  *"the above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate."*  (ACR ¶ 52)  This is illuminating.  Under Clause 6.1, allowing the declarant to stipulate such a provision necessarily presumes that the declarant has entered into a binding offer for a license that becomes effective on implementation of the standard.  If the declarant did not

DECLARATION OF PROFESSOR NICOLAS
MOLFESSIS IN SUPPORT OF APPLE INC.'S
OPPOSITION TO SAMSUNG'S MOTION TO
DISMISS -- Case No. 11-cv-01846 (LHK)

make a binding offer for a license, this part of Clause 6.1 has no content:  the licensor could simply impose the reciprocity provision on any party that it would later agree to license – applying its prerogative to determine whether or not to license any particular party.  Under French law, conditional *negotiations* do not exist.[50]

81.     Consequently, Clause 6.1 of the ETSI Policy Rule may be construed only one way:  when the holder of an essential patent submits a FRAND undertaking, it becomes bound by Clause 6.1. The only condition put on the commitment is reciprocity from those accepting a license.

82.     Thirdly, under French law, a contract may be formed without any negotiation.  If the offer contains all the essential elements for the formation of the future contract, the contract will be formed immediately on acceptance by the offeree.[51]  As discussed in Paragraph 26 above, patents that are the objective of the agreement must be identified.  Here, that is clearly the case. In particular, by its letter dated December 14, 1998, Samsung committed, with respect to the UMTS standard, to "grant licenses to its IPRs on a fair reasonable, and non-discriminatory basis in accordance with the terms and conditions set forth in Clause 6.1 of the ETSI IPR Policy," thereby promising to license on FRAND terms *all* Samsung IPR declared essential to the UMTS standard.  (ACR ¶¶ 61-62)  Moreover, Samsung later made a series of additional FRAND commitments where it specified by patent number each of the individual declared-essential patents it has asserted in this case and re-committed to license those patents on FRAND terms. (ACR ¶ 63)

---

[50] F. Terré, Ph. Simler, Y. Lequette, Les obligations, Précis Dalloz, 10ème éd., p. 1204, n° 1219.
[51]   F. Terré, Ph. Simler, Y. Lequette, Les obligations, Précis Dalloz, 10ème éd., p. 134, n° 121.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

83.     Therefore, by submitting an undertaking, under Clause 6.1 of the ETSI IPR Policy, the ETSI member commits itself to a contractually binding obligation to grant licenses to parties that wish to implement the relevant standard.

**D.     The Clause 6.1 Undertaking Negates Any Injunction Remedy**

84.     An injunction to abstain from performing an act is based on the presumption that the party against which the injunction is sought has a contractual or legal obligation not to perform this act – in the present case, an obligation to abstain from infringing the patent.

85.     However, by submitting an undertaking under Clause 6.1, ETSI members waive their right to request an injunction to limit the beneficiary's right each time the conditions are fulfilled, i.e., each time the party implements the standards.

86.     This commitment is binding.  In order to request an injunction, the party declaring essential IPR would first have to revoke its obligation.  Revocation is a unilateral act of will by which a party intends to break an agreement validly finalized.

87.     According to Article 1134 line 2 of the French Civil Code, such a revocation by the declarant, acting alone, is forbidden.  (Also discussed above at Paragraphs 67-71 in the context of a *stipulation pur autrui*.)  This is the result of the binding power of contracts, which prevent the contractors from revoking their obligations without the consent of their counterparties. Indeed, under French law, when the ETSI member has committed to grant a licence to all implementers of an ETSI standard that incorporates it declared-essential IPR, it cannot prevent any beneficiary from practicing the IPR.

88.     Moreover, even (erroneously) assuming that the formation of a patent license would not be recognized under French law with respect to an implementer beginning to implement the relevant standard, Samsung would still have committed itself to grant a license on a FRAND

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

basis by submitting the undertaking.  Therefore, it would have, at the very least, a duty to negotiate in good faith, i.e. to offer Apple a license on FRAND terms.  Under French law, the appropriate remedy for a Samsung failure to make a FRAND offer would be an order to negotiate in good faith; Samsung could never be entitled to obtain an injunction to prohibit a standard implementer from practicing its declared-essential patents.

**E.      Consummation of License Agreement Between 6.1 Declarant and Implementer**

89.      At the time the Clause 6.1 undertaking is made, the commitment is irrevocably binding. The right to be granted licenses on FRAND terms and conditions belongs to all parties interested in implementing the relevant standard as soon as ETSI receives the IPR holder's commitment. The license has not yet been formed until acceptance by implementers, but the contractual obligation to offer FRAND licenses is irrevocably binding on the member that has made the undertaking.

90.      Whether the undertaking is considered as an offer at large or a promise to contract by the mechanism of "*stipulation pour autrui*," the result is the same:  the consent of the offeree is required before a license agreement can be formed.   In other words, because a contract involves rights and obligations for each party, its formation requires the agreement of both the parties involved.  Therefore, as long as the license gives birth to an obligation of payment of royalties, the acceptance of the offeree or beneficiary is all that is needed for the contract to be formed.

91.      The acceptance does not have to be formalized, however.  It can be given either expressly or implicitly, by implementing the standard.

92.      The undertaking constitutes an offer, under Clause 6.1, to grant the beneficiaries a patent license.  Therefore, the use of the patent by the beneficiary constitutes performance of such an

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

agreement which is, under French law, a valid form of acceptance of an offer, resulting in the formation of an irrevocable contract.

93.     As explained above, Article 1985 of the French Civil Code, on agency agreements, and Article 778, on inheritance, explicitly confirm that the acceptance of an offer can be implied and results from the performance of such an agreement or from some other act that implies the intent to accept.  These are only examples of the general rule that applies to all contracts under French law.  As a leading French contract scholar has written: "*the idea of acceptance by way of performance of the offered contract is acknowledged as a general principle.*"[52]

94.     Therefore acceptance of the license can be made by implementing the relevant standard (and therefore practicing the patent to the extent the patent is actually essential to the standard). Consequently, a bilateral license is irrevocably formed with such an acceptance.

\*   \*   \*   \*   \*

95.     In sum, it is clear that the commitment to grant a license on FRAND terms, and that the acceptance of that proposal may take the form of an implementation of the relevant standard by the beneficiary of that offer or *stipulation pour autrui*.

96.     The analysis must then focus on the question whether a patent license contract has been formed.

**F.      The License Contains Sufficient Terms**

97.     In this regard, for there to be a contract for the license of a patent, all the essential elements for the formation of a license agreement must be present.

98.     There is no doubt that the undertaking submitted, under Clause 6.1, does not contain all the secondary elements of a license and some have to be completed.  However, the relevant

---

[52]  J.- L. Aubert, *op. cit.*, ", p. 282,  n° 307.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

question under French law is whether such an undertaking contains all of the essential elements for formation of a patent license agreement in order for a binding contract to be formed upon acceptance by UMTS implementers.

99.     In his declaration, Professor Libchaber opines that the patent license agreement is a type of lease, and that for a lease contract, determination of the amount of royalties is a prerequisite for the contract to be formed:  "According to prevailing opinions, a patent license 'is traditionally analysed as a type of lease (...).'  As a license is a type of lease of things, it is essential that the price be agreed in order for a contract to be formed."[53]

100.    As I noted in Paragraphs 24 – 39 above, I disagree with his opinion.  There is no doubt that the object of the license has to be determined for a contract to be concluded.  This element does not raise any difficulty.  The object of the contract is sufficiently defined by reference to the ETSI IPR Policy.

101.    Indeed, the FRAND commitment under Clause 6.1, already stipulates the IPR covered, the entitlement of the IPR holder to receive consideration for the practice of its patents on FRAND terms and conditions, and the obligation of the implementer to pay the IPR holder such consideration.  Additionally, the FRAND undertaking stipulates the duration of the license (as long as the IPR remains essential).  As for the geographic scope, the reasoning is the same, i.e. if the parties have not determined the geographic scope of the license, it will be the same as the geographic scope of the underlying patent.

102.    On the other hand, the amount of royalties to be paid is not determined by the FRAND undertaking.  The legal question here is whether the royalty amount is a prerequisite to the

---

[53] Affidavit, n° 44 and 47.

DECLARATION OF PROFESSOR NICOLAS
MOLFESSIS IN SUPPORT OF APPLE INC.'S
OPPOSITION TO SAMSUNG'S MOTION TO
DISMISS -- Case No. 11-cv-01846 (LHK)

formation of a valid patent license.  If the royalty amount is not a prerequisite, this would mean that the ETSI member's undertaking does indeed constitute an offer of a patent license.

103.    As set out in preceding Paragraphs 24 – 39, for a contract of patent license, price is not an essential element that must be determined for the contract to be formed and binding.

104.    As I have noted  (*supra* at ¶ 25), a patent license is a sui generis contract, that is to say that it is not a subdivision of general type of contract, such as lease, but a specific and distinct contract.  Therefore, no specific rules other than license rules should be applied.  I disagree with Professor Libchaber's opinion that a license agreement is properly classified as a type of lease agreement.  Although some French scholars have made this argument, French law commentators who focus on patent contracts have observed that such a classification is not appropriate:  "the fact that there's some similar points between licenses of leases should not lead to apply to licenses rules that are not convenient."[54]

105.    However, even if a patent license were deemed a sort of lease (which it should not be), application of lease rules would still lead to the conclusion that a binding contract has been formed through a FRAND declaration and acceptance thereof.

106.    Since a patent license can be validly formed without any agreement between the parties on a specific amount, the absence of a precise definition of FRAND royalties does not affect the binding effect of this validly formed agreement.

107.    In the event the parties are not able to reach agreement on a royalty term, a court can provide this missing secondary element.  In this regard, it is notable that the ETSI IPR Policy is similar to the regulation provided for mandatory licenses (see, e.g., paragraph 5 of Article 20 of the European Council's proposed Regulation for EU patents), which authorizes price

---

[54] R. Joliet, LE contrat de licence de brevet en droit belge et français, RTD Com., 1982, p. 167 s., spec. p. 224.

DECLARATION OF PROFESSOR NICOLAS
MOLFESSIS IN SUPPORT OF APPLE INC.'S
OPPOSITION TO SAMSUNG'S MOTION TO
DISMISS -- Case No. 11-cv-01846 (LHK)

1   determination by a third party.  Besides, under French law, the courts have jurisdiction to fix the

2   royalty amount for mandatory licenses, when the royalty amount is absent in the agreement

3   between the parties.  This solution is not limited to the realm of mandatory licenses, but has also

4   been applied to patent pools,[55] and can plainly be applied as well in the context of licenses

5   entered into within the ETSI IPR Policy context.  Determination of an appropriate royalty

6   amount by the court is a viable alternative.

7

8   **G.      The License Satisfies the Writing Requirement**

9   108.      In his declaration, Professor Libchaber also opines that, pursuant to Article L. 613-8 of

10  the Intellectual Property Code, patent agreements can only be formed in writing.[56]

11  109.      As explained above (*supra* at ¶¶ 40-42), Article L. 613-8 of the Intellectual Property

12  Code states that "acts bearing a transfer or a license, referred to in the first two paragraphs, must

13  be acknowledged in writing, under penalty of nullity."  The Article, however, refers to a license

14  concluded on a "gré à gré" basis; i.e. it refers only to the case where a contract of license is

15  formed after a negotiation between two parties.  It is not applicable to licenses granted under the

16  ETSI mechanism, which is not a license falling under Article L. 613-8 of the Intellectual

17  Property Code.  Moreover, the purpose of this formality is to protect the holder of the patent,

18  which will realize the consequences of his commitment when he writes his consent.

19  110.      The requirement for written undertaking within the ETSI IPR Policy accomplishes this

20  very objective.  The holder of the patent has expressed its will in writing.  Accordingly, this

21  written undertaking is sufficient to bind the holder of the patent.

22

23

24

25

26

27  [55] Cass. com., 18 janvier 1971, Bull. civ. IV, n° 15.

28  [56] Affidavit, n° 53 s.

DECLARATION OF PROFESSOR NICOLAS
MOLFESSIS IN SUPPORT OF APPLE INC.'S
OPPOSITION TO SAMSUNG'S MOTION TO
DISMISS -- Case No. 11-cv-01846 (LHK)

33

111.    In addition, to avoid any doubt on that point, it is useful to recognize that the mechanism of Clause 6.1 is very similar to the systems of the European Patent Office and the French INPI (national trademark) institute.  The wording of Article 43 of the Convention of Luxembourg[57] is so similar to Clause 6.1 that it provides a very useful basis for analogy.  Article 43 provides: "Licenses of right ….Where the proprietor of a Community patent files a **written statement with the European Patent Office that he is prepared to allow any person to use the invention as a licensee in return for appropriate compensation, (…)."**

112.    The exigency is the same in both systems:  a written understanding.  And there is no doubt that as the Convention is applied in France, the patent owner's commitment is binding. Indeed, as soon as the patent owner makes its declaration, any person is entitled to use the patented technology as a licensee, without any more formal requirement:  "On the basis of the statement, **any person shall be entitled to use the invention as a licensee under the conditions laid down in the Implementing Regulations.  A license so obtained shall, for the purposes of this Convention, be treated as a contractual license."**[58]

113.    The ETSI system, which shares the same goal (i.e., to allow the use of essential technologies) as the Convention of Luxembourg and the French INPI, can clearly be construed by analogy with those systems in that the declarant, by virtue of its declaration, has authorized the use of its patents covered by such a declaration.

114.    Written or express acceptance is not required for an implementer of a standard to obtain the benefit of license under an ETSI FRAND commitment.  Neither the ETSI IPR Policy, nor the Clause 6.1 undertaking, require that acceptance to be express or written.

---

[57] This convention has not been ratified by all the members of the European Union.  The content of Article 43 has been reproduced in the European Council's proposed Regulation for EU patents.
[58] Art. 43 Convention de Luxembourg.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

115.    An acceptance based on the performance of the contract only is therefore perfectly acceptable and binding.  Consequently, the implementation of an ETSI standard must be interpreted as acceptance of the rights and obligations under the relevant IPRs.

**H.    The License is Consistent With *Intuitus Personae* Principles**

116.    Professor Libchaber opines that the principle of *intuitus personae* applies to Samsung's FRAND commitment.  I disagree with his conclusion.

117.    As explained above (*supra* at ¶ 48), the *intuitu personae* nature of a contract may have a huge influence on its formation and on its execution.  It is usually admitted that, when an offer is made at large, i.e. to an indefinite public, if the contract is not *intuitu personae*, the acceptance of any person interested will be sufficient to form the contract, whereas, if the contract is *intuitu personae*, the offeror remains free to elect, among the people interested, the proposition which seems the most appropriate.

118.    In the present situation, the question is:  could the doctrine of *intuitu personae* prevent the conclusion that a declaration made under Clause 6.1 is a real offer, acceptance of which by the party implementing the standards is sufficient to create a contract of license?

119.     French scholars conclude that intellectual property contracts, namely, publishing contracts, licensing contracts of patent, trademark or software, are typically *intuitu personae,* in particular in the case of exclusive licenses.  But the doctrine clearly has no application in the case of an ETSI FRAND declaration.

120.    On one hand, if the mechanism is construed as a stipulation for others, the doctrine of *intuitu personae* clearly has no relevance:  the promisor definitively gives its consent to the stipulant.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

121.     On the other hand, as already mentioned above, it is the parties' decision whether a contract is *intuitu personae* or not.  Given that they can add this character to a contract that, in essence, is not *intuitu personae*, they can also remove this character from a contract which is, most of the time, concluded on an *intuitu personae* basis.

122.     As set out below, there can be no doubt that the mechanism of Clause 6.1 is not based on the *intuitu personae* doctrine.

123.     Firstly, the goal of the ETSI IPR Policy is not compatible with the doctrine of *intuitu personae*.  The goal of the ETSI IPR Policy is to facilitate the licensing of new technologies, for fair and reasonable royalties to be paid to patent owners, in order to prevent any obstacle to the development of "standards."  (ACR ¶ 54)  The Policy is premised on ready granting of licenses to allow as many manufacturers as possible to implement the new technologies.  (ACR ¶¶ 50-54)

124.     This purpose is antithetical to the principle of an *intuitu personae* basis, which aims to select only the most qualified licensee and most of the time leads to the grant of an exclusive license.

125.     Secondly, Clause 6.1 expressly delimitates the limit of personal consideration of the grant of a license.  Indeed, the Clause 6.1 framework is very restrictive.  Clause 6.1 only authorizes the holder of essential patents to condition his agreement to the reciprocity of engagements.  That means that the ETSI prohibits any other condition or restriction to the grant of licenses.  (ACR ¶ 52)  *Intuitu personae* is clearly inapplicable to FRAND declarations under Clause 6.1 for this reason also.

126.     Thirdly, looking back at previous discussion, the goal of the doctrine of *intuitu personae* is to authorize a party to select the person who will enter into a contract on a personal and subjective basis that cannot be challenged.  In other words, it permits the party to *discriminate*

DECLARATION OF PROFESSOR NICOLAS
MOLFESSIS IN SUPPORT OF APPLE INC.'S
OPPOSITION TO SAMSUNG'S MOTION TO
DISMISS -- Case No. 11-cv-01846 (LHK)

between the people interested.  The essence of the undertaking under Clause 6.1, however, is that the declarant must be prepared to grant a license on a FRAND basis, i.e. on a fair, reasonable and *non-discriminatory* basis.  (ACR ¶ 54)  This is clearly not compatible with the application of the doctrine of *intuitu personae.*

127.    Therefore, FRAND declarations under Clause 6.1 are not subject to the doctrine of *intuitu personae*.  Thus, the obligation of the holder of IPR that has made a FRAND commitment cannot be affected by this doctrine.

**I.      Promissory Estoppel Requires a Clause 6.1 Declarant to Offer FRAND License Terms to Standards Implementers**

128.    Even if one were to conclude (incorrectly) that Samsung and Apple have not concluded a license agreement, Samsung would still be bound to grant a license on FRAND terms under the principle of promissory estoppel.  Samsung submitted undertakings stating that it was prepared to grant licenses on FRAND terms.  Its current conduct in refusing to offer FRAND license terms (ACR ¶¶ 76-80) contradicts its past commitment, on which Apple has relied to its detriment.  (ACR ¶ 69)  Such a contradiction gives rise to both an estoppel and a finding of bad faith.  Consequently, as a matter of French law, Samsung's conduct prevents it from seeking an injunction against Apple and renders it liable to Apple for having executed in bad faith its commitment under the ETSI IPR Policy.

DECLARATION OF PROFESSOR NICOLAS MOLFESSIS IN SUPPORT OF APPLE INC.'S OPPOSITION TO SAMSUNG'S MOTION TO DISMISS -- Case No. 11-cv-01846 (LHK)

37

1    I declare under penalty of perjury under the laws of the United States that the foregoing is

2  true and correct.

3    Executed this 20ᵗʰ day of December, 2011, in Paris, France.

4

5

6                                                   Nicolas Molfessis

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          DECLARATION OF PROFESSOR NICOLAS
                                          MOLFESSIS IN SUPPORT OF APPLE INC.'S
                                          OPPOSITION TO SAMSUNG'S MOTION TO
                            38            DISMISS -- Case No. 11-cv-01846 (LHK)