# EXHIBIT F

Confidential Attorneys' Eyes Only Outside Counsel

Page 1

1              UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3                  SAN JOSE DIVISION
4

5    APPLE INC., a California
     corporation,
6

                      Plaintiff,
7

     vs.                          CASE NO. 11-CV-01846-LHK
8

     SAMSUNG ELECTRONICS CO., LTD.,
9    A Korean business entity;
     SAMSUNG ELECTRONICS AMERICA,
10   INC., a New York corporation;
     SAMSUNG TELECOMMUNICATIONS
11   AMERICA, LLC, a Delaware
     limited liability company,
12

                      Defendants.
13   _____/
14

15            C O N F I D E N T I A L
16       A T T O R N E Y S'  E Y E S  O N L Y
17         O U T S I D E   C O U N S E L
18

19   VIDEOTAPED DEPOSITION OF RAVIN BALAKRISHNAN, Ph.D.
20            SAN FRANCISCO, CALIFORNIA
21           TUESDAY, AUGUST 16, 2011
22

23   BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR
24   CSR LICENSE NO. 9830
25   JOB NO. 41176

Confidential Attorneys' Eyes Only Outside Counsel

Page 2

1          TUESDAY, AUGUST 16, 2011

2                  9:10 a.m.

3

4

5

6    VIDEOTAPED DEPOSITION OF RAVIN BALAKRISHNAN,

7    Ph.D., taken at QUINN EMANUEL URQUHART &

8    SULLIVAN, 50 California Street, 22nd Floor,

9    San Francisco, California, pursuant to

10   Notice, before me, ANDREA M. IGNACIO HOWARD,

11   CLR, CCRR, RPR, CSR License No. 9830.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential Attorneys' Eyes Only Outside Counsel

Page 3

1    A P P E A R A N C E S:

2

3        FOR APPLE INC.:

4            MORRISON & FOERSTER

5            By:  ANDREW E. MONACH, Esq.

6                 DEOK KEUN AHN, Esq.

7            425 Market Street

8            San Francisco, California 94105

9

10

11

12       FOR SAMSUNG ELECTRONICS CO. LTD:

13           QUINN EMANUEL URQUHART & SULLIVAN

14           By:  KEVIN JOHNSON, Esq.

15                HENRY LIEN, Esq.

16                TODD BRIGGS, Esq.

17                MARK TUNG, Ph.D., Esq.

18           555 Twin Dolphin Drive

19           Redwood Shores, California 94065

20

21

22

23       ALSO PRESENT:  Alan Dias, Videographer

24

25

Confidential Attorneys' Eyes Only Outside Counsel

Page 4

1      SAN FRANCISCO, CALIFORNIA

2      TUESDAY, AUGUST 16, 2011

3           9:10 a.m.

4

5

6      THE VIDEOGRAPHER:  Good morning.

7      This is the beginning of Disk No. 1, of the

8  videotaped deposition of Dr. Balakrishnan, in the

9  matter of Apple versus Samsung, et al., in the United

10 States District Court, Northern District of

11 California, San Jose Division.

12      We are located today at 50 California Street,

13 in the City of San Francisco, California.

14      Today's August 16, 2011, and the time is

15 9:10 a.m.

16      My name is Alan Dias from TSG Reporting.

17 Here with me is Andrea Ignacio.

18      Counsel, would you please identify yourself

19 for the record.

20      MR. JOHNSON:  This is Kevin Johnson on behalf

21 of Samsung.

22      MR. MONACH:  Andrew Monach, representing

23 Apple and the witness.

24      MR. TUNG:  I'm Mark Tung, representing

25 Samsung.

Confidential Attorneys' Eyes Only Outside Counsel

Page 5

1        MR. LIEN:  Henry Lien, representing Samsung.

2        MR. BRIGGS:  Todd Briggs, representing

3   Samsung.

4        MR. AHN:  Matthew Ahn, of Morrison &

5   Foerster, on behalf of Apple.

6        THE VIDEOGRAPHER:  Will the court reporter

7   please swear in the witness.

8

9            RAVIN BALAKRISHNAN, Ph.D.,

10           having been sworn as a witness,

11        by the Certified Shorthand Reporter,

12               testified as follows:

13

14

15        THE VIDEOGRAPHER:  You may proceed.

16

17            EXAMINATION BY MR. JOHNSON

18        MR. JOHNSON:  Good morning, Mr. Balakrishnan.

19   Q    Have -- you've been deposed before?

20   A    Yes, I have.

21   Q    Okay.  About how many times?

22   A    About a half a dozen times, roughly.

23   Q    I'll try to ask coherent questions, and if

24   you -- hopefully you'll provide some answers, and

25   if -- to the extent that you don't understand any of

Confidential Attorneys' Eyes Only Outside Counsel

1  my questions, I'd appreciate it if you'd just let me

2  know, and I'll do my best to try and rephrase the

3  question; is that a deal?

4      A    Fair enough.

5          (Document marked Balakrishnan Exhibit 96

6           for identification.)

7          MR. JOHNSON:  Okay.  I'll show you what I've

8  marked as Exhibit 96, which is a Notice of Deposition

9  of Ravin Balakrishnan.

10     Q    Do you understand that you're appearing today

11 for deposition pursuant to an agreement between

12 Samsung and Apple and their counsel?

13     A    Yes.

14     Q    Okay.  You've done a fair amount of work for

15 Apple in the past; right?

16         MR. MONACH:  Object to form.

17         THE WITNESS:  I've done some amount of work

18 for Apple, yes.

19         MR. JOHNSON:  Okay.

20     Q    Well, you've -- you've -- you've testified on

21 behalf of Apple in other cases; right?

22     A    Yes.

23     Q    About how many other cases?

24     A    I testified in the Apple/Elan case at the

25 ITC; and more recently, I've been engaged in the Apple

Confidential Attorneys' Eyes Only Outside Counsel

1    and Motorola case, and in that one, the only testimony

2    I've given so far is a deposition about two weeks ago.

3    I'm not sure if that's called testimony.  It's not --

4    it wasn't in front of a judge.

5        Q   Okay.  The -- the Elan case, there were

6    actually -- there were two cases there; right?

7        A   There was an ITC case and a district of

8    California case, yes.

9        Q   Okay.  And were you retained to testify in

10   both of those cases?

11       A   I have been retained for both cases, but I've

12   only testified so far in the ITC case.

13       Q   Okay.

14       A   The original district of California case, I

15   think there was a Markman hearing before I was

16   engaged, and I was not involved in that.

17       Q   Generally, what is the technology involved in

18   the Elan cases?

19       A   In the Elan case, it's one patent that's

20   referred to as the '352 patent, I believe to Bassett

21   and others; and the technology there is on analyzing

22   data from a touch -- touch-sensitive input device to

23   determine a number of finger contacts.

24       Q   Does the technology overlap at all with

25   your tech- -- the technology in this case?

Confidential Attorneys' Eyes Only Outside Counsel

Page 8

1           MR. MONACH:  Object to form; vague.

2           THE WITNESS:  To the extent that, very

3    broadly speaking, they are both concerning touch input

4    devices, yes, but the real subject matter of the Elan

5    case was on this algorithm for analyzing the data

6    coming out of the touch, the touch device.  Whereas,

7    here, it's more of a user interface issue, at least

8    the three -- well, the current patent, right, we're

9    talking about today here.

10          MR. JOHNSON:  Q.  In the Elan case, Apple is

11   a defendant; right?

12      A   That is correct.

13      Q   And about how many hours have you billed in

14   the Elan case?

15      A   Probably about 2- to 300 hours, roughly.  I'd

16   have to look it up to get the exact number.

17      Q   You also mentioned --

18          MR. MONACH:  Excuse me just a second.

19   Just -- this may or may not be confidential, and so I

20   think, as a protective matter, we'll just designate

21   the entire transcript subject to redesignation as

22   attorney's eyes only, and we'll make dedesignations

23   within the time frame.

24          MR. JOHNSON:  So --

25          THE WITNESS:  A quick question, though.  I'm

Confidential Attorneys' Eyes Only Outside Counsel

1   not sure how much I'm allowed to divulge about the

2   Elan case.  I would like some advice --

3         MR. JOHNSON:  I'm -- I'm not gonna go into a

4   lot of detail.

5         THE WITNESS:  Okay.

6         MR. JOHNSON:  I -- I have some information

7   about it, but I just want to -- we'll take each

8   question --

9         THE WITNESS:  Fair enough.

10        MR. JOHNSON:  -- as it comes up.

11        But, Andy, going to your comment, you -- we

12  obviously are under some pretty tight time

13  constraints, and so, you know, we want to make -- and

14  I haven't even started asking really any substantive

15  questions yet, so I -- I think it's sort of improper

16  for you to -- to designate the whole transcript going

17  forward, but be it as it may, I mean, I just -- I --

18  you know, we need to get the dedesignations done

19  quickly, and we can talk about it during a break and

20  figure out how we can -- how we can get that done, but

21  I'll -- I'll keep moving.

22     Q   The Motorola cases, now, you've -- you've

23  been retained in more than one of those cases; right?

24     A   More than one of which cases?

25     Q   The Motorola cases.

Confidential Attorneys' Eyes Only Outside Counsel

Page 10

1    A   So far, I believe, I've only been retained in

2  the ITC case filed for Motorola.

3    Q   There -- there are two ITC cases; right?

4    A   This is the one where I'm working for Apple

5  as a -- I guess, the plaintiff.

6    Q   Okay.

7    A   So that's a 7 -- 750, I think.

8    Q   A 750 --

9    A   I got to check the number --

10   Q   Yeah, that --

11   A   -- but it's a plaintiff's case.

12   Q   -- I think -- I think that's right.

13       But you've also, as far as I can tell in the

14  record, the publicly available record, you've --

15  you've also been retained for the 745-case.

16       MR. MONACH:  Object to form.

17       THE WITNESS:  The retention letter may have

18  included both cases, but I haven't done any work for

19  the 745, as far as I can tell.

20       MR. JOHNSON:  Okay.

21   Q   What about in the Apple versus Motorola

22  Wisconsin cases?  Have you been involved in any of

23  those cases?

24   A   I have not done any work.  I believe, at the

25  initial conversations with the Apple counsel at Weil,

Confidential Attorneys' Eyes Only Outside Counsel

Page 11

1    you know, I think they -- they put out a variety of

2    patents for me to look at, and the Wisconsin case did

3    come up as a possibility, but I have not done any work

4    on it.

5        Q    Okay.

6        A    So I can't recall if the retention letter

7    included this whole umbrella of cases.  It might have.

8        Q    According to the publicly available

9    information, you've submitted protective orders

10   subscriptions for the 745 case in the ITC, the 750 ITC

11   case, and it appears, also, that the two Wisconsin

12   cases; but it sounds like the only work you've done,

13   at least thus far, most of the work has been on the

14   750 Apple offensive case; right?

15           MR. MONACH:  Object to form.

16           THE WITNESS:  Any substantive work, yes.

17           MR. JOHNSON:  Yeah.

18           THE WITNESS:  Beyond just maybe looking at

19   the initial patents for some of the other cases --

20           MR. JOHNSON:  Okay.

21           THE WITNESS:  -- but I haven't done any --

22   yeah, the 750-case is the only one I've done

23   significant work on.

24           MR. JOHNSON:  Q.  And how many hours have you

25   billed so far on the Motorola cases?

Confidential Attorneys' Eyes Only Outside Counsel

Page 12

1    A    I can roughly tell you the hours I've spent.

2  I haven't billed all of it because some of it happened

3  very recently here, and I haven't submitted my

4  invoices.  Probably in the order of 80 hours, roughly.

5    Q    What patents are you substantively involved

6  in with respect to the Motorola cases?

7         MR. MONACH:  Dr. Balakrishnan, we're not

8  involved -- my firm is not involved in the Motorola

9  case, and it may well be that work that -- work that

10 you've done that isn't publicly known, for example, by

11 filing something is confidential and is the work

12 product of the firm representing Apple in that case,

13 so I would caution you not to disclose anything that

14 is not -- has not been made public in that case.

15         It's irrelevant to this case, in our view.

16         THE WITNESS:  Okay.  I think your question

17 was what patents, and I believe that is, based on my

18 declaration which I believe, are public.  The two

19 patents I've primarily been working on is the --

20 what's called the '828 patent, and the other one is

21 the '430 patent.  The full number, I'd have to look it

22 up.

23         MR. JOHNSON:  Yeah.

24    Q    And, just generally, what do those patents

25 relate to?

Confidential Attorneys' Eyes Only Outside Counsel

Page 13

1    A    The '828 patent is about taking data from

2    a -- from a touch device and fitting the ellipses to

3    that data for -- in order to determine what types of

4    contact, whether it's fingers or thumbs or other kinds

5    of body parts.

6        The '430 patent is more to do with the

7    object-oriented located system for -- for operating

8    systems.

9    Q    And you've also testified -- or strike that.

10       You've also been involved in the -- in

11   another ITC case on behalf of Nintendo®; right?

12   A    That's correct.

13   Q    Did you testify in a hearing at that -- in

14   that ITC case?

15   A    Yes, I did.

16   Q    Just generally, what -- what did the patent

17   relate to or patents relate to in that case?

18   A    The -- there were several patents.  The one I

19   was working on was relating to a zooming user

20   interface for television programming.

21   Q    Okay.  I think you -- you said earlier that

22   you testified in about half a dozen hearings or

23   depositions.  Beyond the Elan, Motorola, and Nintendo®

24   cases, what -- what other cases did you testify in?

25   A    Those are the three cases I've been deposed

Confidential Attorneys' Eyes Only Outside Counsel

Page 14

1  in.  I've only testified in the Nintendo® -- when --

2  when -- when I say "deposed" -- or when I say

3  "testified," I mean in court --

4      Q    Right.

5      A    -- I've done the Nintendo® case and the

6  Apple/Elan case.  The Motorola cases, I've just been

7  deposed.

8      Q    Okay.  What were you retained to do in this

9  particular case?

10     A    In the Apple/Samsung case?

11     Q    Yes.

12     A    My initial retention is to look at the -- the

13  patent, this '351 patent.

14     Q    The '381?

15     A    Sorry, '381 patent.  So many numbers floating

16  around.

17          The '381 patent and consider infringement

18  analysis.  That is my current retention.

19     Q    When were you retained?

20     A    I think the initial conversations with

21  Mr. Ahn, Matthew Ahn here, was probably a couple of --

22  two or three months ago, roughly.  I'm not sure

23  exactly when the retention letter was signed.  It was

24  probably a few weeks after that.

25     Q    What specifically did you do after you were

Confidential Attorneys' Eyes Only Outside Counsel

Page 15

1  retained?

2       MR. MONACH:  Let me just caution you that in

3  describing what you did, don't disclose any

4  communications that you had with counsel, other than

5  any facts that you relied on for the opinions you're

6  giving in this case or any assumptions you were told

7  to make in giving your opinions, but you can answer

8  the question.

9       THE WITNESS:  So, if I recall, your question

10  is what did I do since being retained.

11       With regards to this case, obviously read the

12  patent in detail, looked at the -- what they call the

13  file history, prosecution history of the patent.

14       There was a reexamination of the patent to

15  the patent office, I believe initiated by Nokia, that

16  I looked at that document, and then I looked at the --

17  the four devices that Apple alleges -- the four

18  Samsung devices that Apple alleges infringes the '381

19  patent.

20       MR. JOHNSON:  Okay.

21   Q   Did you do anything else?

22   A   Well, I've then subsequently wrote -- wrote

23  the declaration, if that --

24   Q   Okay.  Is that it?  I'm just trying to get

25  the -- the comprehensive list.

Confidential Attorneys' Eyes Only Outside Counsel

Page 16

1    A    I mean, there was conversations with counsel

2    throughout this, trying to understand what -- what

3    they -- what Apple contended infringed from these

4    devices.

5    Q    Did -- did counsel for Apple tell you what

6    Apple contended infringed the '381 patent?

7        MR. MONACH:  I'm gonna object to the form of

8    the question, and I will instruct the witness not to

9    answer, except with respect to facts that you relied

10   on for preparing your declaration or assumptions that

11   you relied on for your declaration.

12       THE WITNESS:  So counsel for Apple informed

13   me that these four devices were being accused of

14   infringement, and the particular applications that

15   Apple alleged were infringing, they informed me of

16   that.

17       MR. JOHNSON:  Q.  And then you confirmed

18   there was infringement?

19   A    That is correct.  I looked at those

20   applications, looked at those devices.

21   Q    When is the first time you -- you -- you saw

22   the '381 patent?

23   A    Probably very shortly, a few days or even a

24   day or two, after my initial call with Mr. Ahn.  He --

25   I think the first thing he did was send me the patent.

Confidential Attorneys' Eyes Only Outside Counsel

Page 17

1      Q    So you haven't been retained by Apple on

2  the '381 patent in any of the other litigations or

3  licensing negotiations?

4      A    I've been retained by Apple for the -- I was

5  also retained for the Apple/Samsung case in the

6  Netherlands, which recently -- just last week had a --

7  had a preliminary injunction hearing, I believe is

8  what it's called.  Obviously, the patents there were

9  the -- were not the '381 patent, per se.  It was a

10  European -- a European patent that has some

11  similarities with the '381, but not -- not exactly the

12  same.

13      Q    Did you attend the hearing?

14      A    Yes, I did.

15      Q    Did you submit a declaration in connection

16  with that?

17      A    Yes, I did.

18      Q    When was that declaration submitted?

19          MR. MONACH:  Object to the form; lack of

20  foundation.

21          THE WITNESS:  I'm not sure when the lawyers

22  submitted it to the judge -- to the court, but I wrote

23  it probably about two or three weeks before the

24  hearing.

25          MR. JOHNSON:  Q.  As part of your -- your

Confidential Attorneys' Eyes Only Outside Counsel

Page 18

1  work on this matter, did you talk to the inventor of

2  the '381 patent?

3      A   No, I did not.

4      Q   Did you review his deposition transcript?

5      A   I briefly reviewed it in the last couple of

6  days.

7      Q   Why do you say "briefly"?

8      A   If I didn't, you know, cross-check every

9  little detail in there.  I read -- read the whole

10  thing.  There's a lot of details.

11      Q   Did you skim it?

12      A   Maybe a little bit more than a skim.

13      Q   What's a little bit more than a skim?

14      A   Well, I guess, what I'm saying is, you know,

15  sometimes I referred to other documents and so forth,

16  and I didn't go and look at those documents to

17  cross-check things.

18      Q   Okay.

19      A   So I read the doc -- read the transcript, but

20  I didn't do all the cross-checking who one, who read

21  it, very thoroughly might have done.

22      Q   Okay.  Did you look at any other deposition

23  transcripts?

24          MR. MONACH:  I'm gonna instruct the witness

25  not to -- well, not to answer, unless you've reviewed

Confidential Attorneys' Eyes Only Outside Counsel

Page 19

1    something that affects your opinions in this case.

2          THE WITNESS:  So, I guess, I -- I can't

3    answer the question.

4          MR. JOHNSON:  Q.  Why not?

5      A   As instructed by counsel, anything else I

6    might have reviewed, I don't believe had any impact on

7    this case.

8      Q   Did you review the deposition transcript of

9    Mr. Lutton?

10         MR. MONACH:  Same instruction.

11         THE WITNESS:  No, I have not.

12         MR. JOHNSON:  Q.  Did you talk to any of the

13   lawyers involved in the prosecution of the '381

14   patent?

15         MR. MONACH:  Object to form.

16         THE WITNESS:  When you say "the prosecution,"

17   the initial filing and running it through the patent

18   office?

19         MR. JOHNSON:  Q.  The back and forth between

20   the patent office and Apple.

21     A   No, I did not.

22     Q   Did you talk to anybody at Apple with respect

23   to your work on the '381 patent?

24         MR. MONACH:  You can answer that "yes" or

25   "no."

Confidential Attorneys' Eyes Only Outside Counsel

Page 20

1          THE WITNESS:  Yes, in that I, at the

2    Netherlands hearing, met or ran into a couple of the

3    Apple in-house counsel, and I think those -- friendly

4    discussion, "Oh, you're also working on that case,"

5    that kind of thing, but nothing substantive.

6          MR. JOHNSON:  Q.  Who -- who did you see in

7    the Netherlands from -- from Apple?

8      A    Jana Witt and another lady by the name of

9    Cindy Wheeler, I believe.

10     Q    What kind of phone do you have?  Do you have

11   a smartphone?

12     A    I do, yes.

13     Q    And what do you have?

14     A    I have a variety of them.  I -- I --

15     Q    You do now.

16     A    In my pocket right now is a Nokia phone, but

17   until about a week ago, I was carrying an Apple

18   iPhone.

19     Q    How come you got rid of it?

20     A    The Apple iPhone, I dropped it and it stopped

21   working, so I had to dig in my drawer for a temporary

22   replacement.

23     Q    And what about, have you -- have you had any

24   Android phones?

25     A    I personally have not carried an Android

Confidential Attorneys' Eyes Only Outside Counsel

Page  21

1   phone, but in my lab -- in my research lab at the

2   University of Toronto, we have a variety of Android

3   phones that we use for in different projects.

4        Q   Like, what?  Which ones?

5        A   I believe it's a -- probably some HTC ones.

6   There might be some Samsung ones, as well.

7        Q   Are you involved in any of Apple's work

8   against HTC?

9        A   No, I'm not.

10       Q   Okay.  When's the first time you saw a

11  Gal- -- a Samsung Galaxy phone?

12           MR. MONACH:  Object to form; vague.

13           THE WITNESS:  I can't answer that precisely.

14  It's --

15           MR. JOHNSON:  Q.  Approximately.

16           MR. MONACH:  Same objections.

17           THE WITNESS:  Some months ago, year -- maybe

18  almost a year ago.  We see a lot of -- I see a lot of

19  phones coming through my lab.

20           MR. JOHNSON:  Q.  How come?

21       A   How -- how come I see these phones?  Some of

22  my research involves user interfaces for mobile

23  devices, and depending on the project, some of my

24  graduate students will, you know, pick up a particular

25  model, and we happen to have them around a lot.

Confidential Attorneys' Eyes Only Outside Counsel

1    Q    And does your anal- -- does your lab analyze

2    the UI features of the various phones that are out

3    there?

4    A    We don't do that as an exercise, per se.

5    Sometimes if a student is working on a particular type

6    of interface element, he may or she may look at some

7    of the other work already done, you know, classic

8    literature of use, so to speak; but, you know, it's

9    not our job in the whole research lab to go out and

10   analyze everything on every phone.

11   Q    Okay.  I want to show you a Galaxy S phone

12   that's been marked as Exhibit 20.

13   A    Okay.

14   Q    And I'd like for you to look at the -- the

15   gallery and contacts features or applications, and

16   verify whether, for example -- starting with the

17   gallery, whether the gallery infringes the '381

18   patent.

19            MR. MONACH:  I'll object to the --

20            MR. JOHNSON:  And then -- sorry.

21            MR. MONACH:  Go ahead -- go ahead and finish.

22            MR. JOHNSON:  I just want -- and then I --

23   once you -- once you look at, and then I'd just like

24   for you to walk me through how it infringes, and we'll

25   just show it to the camera, since that's what we're

Confidential Attorneys' Eyes Only Outside Counsel

Page 23

1  here for is to record what happens, so...

2      MR. MONACH:  I'll -- I'll object to the form

3  of the question and the posing the hypothetical on a

4  phone that appears to be one that's not part of his

5  declaration.  So I object he hasn't been given

6  sufficient time or opportunity to form a -- an

7  opinion, but to the extent the witness is able, I'll

8  allow him to go question by question to go through

9  this exercise, if he can.

10      And, Dr. Balakrishnan, if for some reason you

11 can't or you need more -- need something, feel free to

12 speak up.

13      THE WITNESS:  So, I guess, to put in context

14 here, right, I'm not sure if this is exactly one of

15 the phones that I've looked at, or the one I looked at

16 was a Galaxy S 4G.  So if this is a new phone, I'm

17 doing this on the fly here.  So just to put that in

18 context, and if you just give me a minute to get

19 this -- if you don't mind, if we can get a copy of the

20 patent so I can make sure, as I'm walking through,

21 that I'm hitting all of the claims.

22      MR. MONACH:  I'll also object to the extent

23 that the question calls for an extended narrative.

24      MR. JOHNSON:  What exhibit was it before?

25      THE WITNESS:  Thank you.

Confidential Attorneys' Eyes Only Outside Counsel

Page 24

1          MR. JOHNSON:  You can take mine.

2          MR. MONACH:  If you -- if you've got an extra

3     one --

4          MR. JOHNSON:  Q.  I've placed before you what

5     we've previously marked as Exhibit 71, which is

6     the '381 patent.

7       A   Does she need to mark it?

8       Q   No.

9       A   Okay.

10         MR. JOHNSON:  You want another one?

11         MR. MONACH:  All right.

12         MR. JOHNSON:  Okay.

13      Q   And you...

14      A   I'm sorry.

15      Q   Okay.  So you've -- you've looked at the

16    gallery application and --

17      A   Yes, I just did.

18      Q   Okay.  So can you -- first of all, is it your

19    opinion that Exhibit 20 infringes Claim 1 of the '381

20    patent?

21      A   Based on what I'm looking at right now, in my

22    opinion -- in my quick overview of it, my opinion is,

23    yes, it does infringe Claim 1, yes.

24      Q   Okay.  Can you explain to us the basis for

25    your opinion?

Confidential Attorneys' Eyes Only Outside Counsel

Page 25

1    A    Sure.  So I'll just walk you through the --

2  the claims --

3    Q    Yeah.

4    A    -- and how it matches them.

5    Q    And just as you go through it, as you're

6  manipulating the images, you can just show it to the

7  camera so the camera can -- can focus on it.

8         THE WITNESS:  Do I stand up or --

9         MR. JOHNSON:  No, just -- just like that.

10  He'll --

11         THE WITNESS:  Oh, you can focus in on it?

12         MR. JOHNSON:  -- he'll do the work.

13         THE WITNESS:  Okay.

14         So just to start with this, the claim, the

15  preamble states a computer-implemented method.  This

16  is clearly a smartphone that is a mobile computer,

17  compromising a device of a touchscreen display.  It

18  clearly has a touchscreen display.  When I touch it,

19  it -- it reacts to my touches.

20         It -- I've got here a -- just a moment

21  here -- I've got here a -- it says "displaying a first

22  portion of an electronic document."  I've got here a

23  first portion of an electronic document.

24         Can you see that on the camera?

25         MR. JOHNSON:  It may -- it'd be helpful if

Confidential Attorneys' Eyes Only Outside Counsel

Page 26

1    you just sort of turn it.

2        A    This way?

3        Q    Yeah.

4        A    Okay.  It may be a little difficult.  It just

5    flipped around and did something.

6        Q    If you hold it --

7        A    Touch sensor.  So tell me how you want it,

8    and then I'll -- I'll keep it that way and --

9        Q    Hold it straight up like that, and then you

10   can --

11       A    All right.  I'm gonna try and manipulate it,

12   if I can.

13       Q    Okay.  So what -- so what are -- so what are

14   we --

15       A    Let me just do this again.

16       Q    Okay.  So you zoomed in on it first; right?

17            So is it fair to say that your opinion -- for

18   purposes of the gallery here, the -- the photograph

19   has to be zoomed in on it?

20            MR. MONACH:  Object to the form of the

21   question; incomplete hypothetical; inadequate

22   opportunity to examine the device; vague.

23            You can answer.

24            THE WITNESS:  In this particular example that

25   I'm gonna walk you through is an infringing example, I

Confidential Attorneys' Eyes Only Outside Counsel

Page  27

1    did zoom in.  But whether or not it has to be zoomed

2    in, I need to spend a bit more time making sure

3    whether it has to or not.  I have not done that right

4    now on this device.

5              MR. JOHNSON:  Okay.

6              THE WITNESS:  So, on this device, I went

7    through the -- the preamble.  It's clearly a

8    computer-implemented method.  It has a device with a

9    touchscreen display.  It is displaying right now a

10   first portion of an electronic document.  The

11   electronic document here happens to be a photograph or

12   an image, some kind of a picture of something.

13             MR. JOHNSON:  Q.  Is the electronic doc --

14   what -- what does an "electronic document" mean in the

15   context of this patent?

16             MR. MONACH:  Object to form to the extent

17   it's calling for a legal conclusion, but you can give

18   your views on that.

19             THE WITNESS:  In the context of this patent,

20   my understanding, having read the patent and the

21   claims, is the electronic document is some visual

22   representation on the screen that has a defined length

23   and a width, as an example, or defined set of

24   boundaries, because they may not have to be a

25   rectangular set of boundaries.

Confidential Attorneys' Eyes Only Outside Counsel

Page 28

1    MR. JOHNSON:  Q.  So can it -- it can be

2  anything with a defined length and width?

3    A   It could be any visually represented thing

4  with a defined boundary.  I'd rather use the word

5  "boundaries," because length and width may connote a

6  rectangular thing.  It may not be a rectangle,

7  necessarily.

8    Q   Okay.  So an electronic document is anything

9  that can be visually represented with a defined

10 boundary?

11   MR. MONACH:  Object to the form of the

12 question; object as calling for a legal conclusion.

13   THE WITNESS:  In the context of this patent

14 and the claims, reading the patent and the claims, I

15 would say that would be a -- my definition of an

16 electronic document would be something visually

17 representable on the screen that -- that has a defined

18 set of boundaries.

19   MR. JOHNSON:  Okay.

20   Q   How about the next limitation?

21   A   Okay.  So, as I said earlier, it's got a

22 first portion of an electronic document.  We already

23 went through that.

24   Q   And -- and -- I'm sorry.

25   A   I'm sorry.

Confidential Attorneys' Eyes Only Outside Counsel

Page 29

1    Q    What does "first portion" mean?

2        MR. MONACH:   I'm going to object to the form

3   of the question to the extent it calls for a legal

4   conclusion.

5        THE WITNESS:   In -- in this particular

6   example, I would say the first portion is the -- the

7   portion of the image that we see displayed on the

8   screen, which I don't know how to describe this --

9        MR. JOHNSON:   Can you zoom in more on the

10   screen, just so we see it better.   Yeah, okay.   That's

11   good.   Thanks.

12        THE WITNESS:   Everything, including the

13   yellow blob in the middle and the blue stuff around

14   it.

15        MR. JOHNSON:   Q.   So it's everything that's

16   shown on the screen is the first portion?

17    A    Well, obviously, not this word "Samsung" and

18   things like that.

19    Q    Yeah.

20    A    The actual display, maybe if I -- without

21   touching it, if I can sort of indicate, you see the

22   bottom boundary there --

23    Q    Okay.

24    A    -- the top boundary, right boundary, and left

25   boundary?

Confidential Attorneys' Eyes Only Outside Counsel

Page 30

1    Q    Okay.

2    A    Should I keep going?

3    Q    Yes.

4    A    Okay.

5         And then it says "After displaying the first

6    portion of an electronic document, detecting a

7    movement of an object on or near the touchscreen

8    display."

9         So, in this case, I'm -- I'm going to -- I'm

10   gonna deal with that and the next element of the

11   claim, because once I touch it, it's gonna -- it's

12   gonna move; but, essentially, I'm gonna put my finger

13   down, and I'm gonna move it, so it's gonna detect a

14   movement of an object.  The object, in this example

15   that I'm doing, would be my finger on the touch

16   display.  I'm gonna do that in a second.

17        And then, the next element says "In response

18   to detecting that movement, translating the electronic

19   document displayed on the touchscreen display in a

20   first direction to display a second portion of the

21   electronic document, wherein in the second portion is

22   different from the first portion."

23        So that's -- I'm gonna do those two elements

24   right now.  So I've got -- got my finger touching it.

25   So that's my object on or near the touchscreen

Confidential Attorneys' Eyes Only Outside Counsel

Page 31

1    display.  As I move and I pause for a second, it is

2    now displaying a second portion of that same document,

3    which is different from the first portion.  As you can

4    see, it's moved to the -- to the right.  The yellow

5    blob is now intersecting the right margin of the

6    screen.  So that's the second portion.

7          And then, if I go to the third -- I'm not

8    sure what the -- the next element of the claim, it

9    says "In response to an edge of the electronic

10   document being reached while translating the

11   electronic document in the first direction while the

12   object is still detected on or near the touchscreen

13   display, displaying an area beyond the edge of the

14   document and displaying a third portion of the

15   electronic document, wherein the third portion is

16   smaller than the first portion."

17         So, here, I still got my -- my finger or the

18   object on the -- on or near the touchscreen display,

19   and I'm gonna keep moving it in the same direction I

20   was moving earlier, and I reached an edge.  The edge

21   is now on the left-hand side.  You see the edge of the

22   document is -- is revealed, so in response to the edge

23   being reached while translating, which is what's

24   happened there, it displays an area beyond the edge of

25   the document, which is the, I guess, black or dark

Confidential Attorneys' Eyes Only Outside Counsel

Page  32

1   gray vertical rectangle beyond the edge of the

2   document there.

3           And then it displays a third portion.  So you

4   see the portion of the document being displayed.  To

5   the right of that edge is smaller than the -- the

6   first portion.  The first portion took up most, if not

7   all, of the screen.  In this case, the -- the third

8   portion is smaller.  It doesn't take up the whole

9   screen, and so that covers up to that portion of

10  the -- sorry.  I don't want to use the word "portion"

11  again, because that's my claim language.

12          That -- that elem- -- that element of the

13  claims, and the last element of the claims says "In

14  response to detecting the object is no longer on or

15  near the touchscreen display, translating the

16  electronic document in a second direction until the

17  area beyond the edge of the electronic document is no

18  longer displayed, to display a fourth portion of the

19  electronic document, wherein in the fourth portion is

20  different from the first portion."

21          So that last element there says when the

22  object, i.e., my finger, is no longer on, if I release

23  it, it's gonna translate in a different direction.

24  So, so far, it's been translating to the -- to the

25  right as I move.  Now, when I release, it's gonna

Confidential Attorneys' Eyes Only Outside Counsel

Page 33

1 translate in a different direction to the left, and it

2 is gonna display a fourth portion of that document,

3 and no longer show the area beyond the edge of the

4 display.

5 So if you -- it's still on the camera.  I let

6 it go.  You see it kind of moved back towards the --

7 so the edge the -- the area beyond the edge is no

8 longer seen, and now the -- this fourth portion is

9 clearly different, if we go back and look at what the

10 first portion was.  The fourth portion of the document

11 is clearly different from the first portion.

12 Q   Does Exhibit 20 infringe Claims 19 and 20 of

13 the -- of the patent, as well?

14 MR. MONACH:  Same objection to calling for an

15 opinion on the fly here at the deposition, but you can

16 answer.

17 THE WITNESS:  So just to put the

18 clarification in my upcoming answer here, I have not

19 had time to investigate this in great detail, this

20 particular device, but to the extent that I'm looking

21 at it right now on the fly, I would say that Claim 19,

22 which says "A device comprising a touchscreen display

23 of one or more processes programs with instructions,"

24 I would say that the very fact that I'm able to

25 manipulate it, manipulate the content, it is running

Confidential Attorneys' Eyes Only Outside Counsel

Page 34

1    on a smartphone mobile computer, it clearly must have

2    instructions in order to execute those -- those

3    movements and functions that I just demonstrated.

4           So that would cover 19, and Claim 20, when it

5    talks about a storage medium, that -- those

6    instructions, the program that we -- it was executing

7    while I'm manipulating this, would have to be stored

8    on some storage medium, and given that this doesn't

9    appear to be connected to anything else and the medium

10   must be -- wouldn't necessarily have to be inside

11   the -- the device itself, and I say that, again,

12   without having examined the device in great detail,

13   this particular device.

14          MR. JOHNSON:  Okay.

15     Q   So in your -- in your opinion, the gallery

16   application in -- of Exhibit 20 infringes Claims 1,

17   19, and 20; correct?

18          MR. MONACH:  Same objection.

19          THE WITNESS:  So, in my opinion, given the

20   short time I've looked at this right now, the time

21   I've had there, I would -- I would say, yes, it

22   infringes.

23          MR. JOHNSON:  Q.  Can you look at the

24   contacts application --

25     A   Sure.

Confidential Attorneys' Eyes Only Outside Counsel

Page 35

1    Q   -- and we'll go through this -- well, let me

2  ask you this:  Can you look at the contacts

3  application and tell me whether it's your opinion that

4  the contacts application of Exhibit 20 infringes the

5  claims of the '381 patent?

6         MR. MONACH:  Object to form; same objection

7  on asking him a hypothetical question to form an

8  opinion at the -- on the fly at the deposition.

9         THE WITNESS:  So, again, I'll preface -- if

10  you give me a minute, first of all, to -- to look at

11  this, but I also preface my upcoming answer by saying

12  that I haven't had a chance to examine this particular

13  phone on my own time, so I'm doing this, again, right

14  here at the deposition, so it's kind of an on-the-fly

15  opinion.

16         Okay.  I've looked at it.

17         MR. JOHNSON:  Q.  In your opinion, does the

18  contacts application of Exhibit 20 infringe the '381

19  patent?

20         MR. MONACH:  Same objection to the form;

21  asking for a legal conclusion with minimal time to

22  examine it, the device.

23         THE WITNESS:  So based on my brief

24  examination of this right now in the deposition, I

25  would say, yes, it does infringe Claim 1.

Confidential Attorneys' Eyes Only Outside Counsel

Page 36

1          MR. JOHNSON:   Okay.

2      Q   Can you walk us through the infringement?

3      A   Sure.

4          So let's see on this again.

5          Okay.  So what I have here is, again, the

6   Samsung Galaxy -- what appears to be the Samsung

7   Galaxy S smartphone mobile computer, and it has the

8   preamble, again, of Claim 1, a computer-implemented

9   method.  It's a mobile computer.  It has a computer

10  compromising a device with a touchscreen display and,

11  as you can see, it's a device that's got a touchscreen

12  display that reacts to my touches.

13         So now what I've got here is the -- the

14  so-called contacts application, and what it -- what

15  it's showing me on the screen is a -- displaying a

16  first portion of an electronic document.  So this

17  document here consists of a bunch of phones or, you

18  know, contact information of different people, I

19  guess, and their phone numbers and so forth.

20         So, right now, I've got the first portion of

21  that, which, you know, the top here, it's got Bob

22  White, and on the bottom, it's got somebody I just

23  entered, with -- with some random set of letters at

24  the bottom, starting with N.  So that's a displaying

25  the first portion of an electronic document element of

Confidential Attorneys' Eyes Only Outside Counsel

Page 37

1   the claim.

2       The second element is detecting a movement of

3   an object on or near the touchscreen display, and I'm

4   gonna do this in combination with the next element,

5   which says, "In response to detecting the movement,

6   translating the electronic document displayed on the

7   touchscreen display in a first direction to display a

8   second portion of the electronic document, wherein the

9   second portion is different from the first portion."

10      So I'm just gonna do this right now.  I'm

11  gonna put my finger down, and that finger would

12  correspond to the object in the claims, and it's gonna

13  detect -- the system's gonna detect the movement of

14  that object with my finger on -- on the touchscreen

15  display.  I'm gonna put it down.  Oops.  I'm sorry.  I

16  didn't intend it to activate the -- I'm just gonna go

17  back here.

18      So strike that little portion where it

19  activated.  If I put my finger down, it'll lightly

20  move.  It -- and I've now moved in one direction,

21  moved my finger in one direction, the document is

22  moved in one direction to display a second portion,

23  and the second portion here, you can see, has a -- the

24  last name at the bottom of the screen -- I don't know

25  if you can see that -- it's now Mary something or the

Confidential Attorneys' Eyes Only Outside Counsel

Page 38

1    other.

2        Q    Johnson?

3        A    Maybe Johnson.

4        Q    That's a nice name.

5        A    All right.  I'm sorry.  My finger is blocking

6    it.  I couldn't read it.

7        Q    That's my last name.

8        A    I didn't intend --

9        Q    No -- no relation to Mary, though.

10       A    I didn't intend to mangle the name.  I just

11   couldn't see it.

12            Clearly, the -- it's the second portion

13   that's different from that first portion we saw

14   earlier, and now, if I -- I'm gonna go on to the next

15   element of the claim, where it says "In response to an

16   edge of an electronic document being reached while

17   translating the electronic document in the first

18   direction, while the object is still detected on or

19   near the touchscreen display, displaying an area

20   beyond the edge of the document and displaying a third

21   portion of the electronic document, wherein the third

22   portion is smaller than the first portion."

23            So I'm gonna continue moving my object, which

24   is -- my finger, which is the object in the claims, in

25   the same first direction, and as you can see, I keep

Confidential Attorneys' Eyes Only Outside Counsel

Page 39

1  going here, it is gone to an area beyond the edge of

2  the document, which is on the top of that create

3  contact label there.

4       Q   Can you tilt it forward?  There you go.

5       A   I may lose my touch here, unfortunately.  I

6  may have to do this again.  I'm sorry.  I have to do

7  this again.

8       Q   Yeah, that's fine.

9       A   So I think I was somewhere here, when I was

10 at the second.

11      Q   Yeah.  If you -- just -- that's better.

12 Just -- it's picking up glare on the light.

13      A   Sure, I understand.  I also need to be able

14 to look at it, otherwise I can't --

15      Q   Okay.

16      A   Let's try this again.  I believe this is very

17 similar to the second portion of the document.  I had

18 my finger down.  It did that again.  Let me try this.

19 Okay.  Second -- all right.

20           I'm gonna move it down, okay.  You can see

21 now I'm on the third portion of the document where it

22 has an area beyond the edge of the document, the black

23 or gray area beyond the -- the heading labeled "create

24 contact" there.

25           So it's showing me the area beyond the edge

Confidential Attorneys' Eyes Only Outside Counsel

Page 40

1   of the document, and it's showing a third portion of

2   the electronic document, which, you know, ends at the

3   bottom, with Joe -- again, I can't read the last name

4   of that contact because my finger is obscuring it,

5   but, clearly, this third portion is different and

6   smaller than the first portion.  It has less

7   information.  It's smaller than the first portion I

8   showed earlier.

9          And, then, now, the last element of the claim

10  says, "In response to detecting that the object is no

11  longer on or near the touchscreen display, translating

12  the electronic document in a second direction until

13  the area beyond the edge of the electronic document is

14  no longer displayed to display a fourth portion of the

15  electronic document, wherein the fourth portion is

16  different from the first portion."

17         So -- oops, I accidentally just did that, but

18  I'll -- I'll do this again.  So I'm in the third

19  portion here.  I'm gonna release my finger, which

20  means the system detects that my object or the finger

21  is no longer on the touchscreen display, and it has

22  translated the -- the electronic document in a second

23  direction, in a different direction from the direction

24  it was going earlier, so that the area beyond the edge

25  of the electronic document is no longer displayed.

Confidential Attorneys' Eyes Only Outside Counsel

Page 41

1          So if you saw in the third -- in the segment

2     before this, there was a black area or gray area

3     beyond the word -- the header "create document," now

4     that's no longer there.  It's -- it's gone back up.

5          And the fourth portion now that -- what you

6     see here is clearly different from the -- the very

7     first portion that we started with, which had, if I

8     recall correctly, a -- the bottom contact was

9     something N, a name with N, something or the other on

10    it.

11         I think that should cover Claim 1.

12     Q    Okay.  And it's also your opinion that

13    Exhibit 20 in the contacts application infringes

14    Claims 19 and 20, as well?

15         MR. MONACH:  Same -- same objection

16    previously stated about asking him to form opinions on

17    the fly at the deposition, but you can answer.

18         THE WITNESS:  So, again, to the extent that

19    I've only had a very short time to look at this, so

20    this is my, kind of, off-the-cuff answer, is this

21    contacts application clearly is running on a computer

22    in the smartphone, and although I haven't had a chance

23    to look at the instructions of the code, per se, it

24    must be running some set of instructions in order for

25    this application, the contacts application, to perform

Confidential Attorneys' Eyes Only Outside Counsel

Page 42

1    the functions that I just showed, and as such, it

2    would infringe Claim 19.

3           And, similarly, for Claim 20, I, again,

4    haven't opened this up to look at the memory in there,

5    given the short time that I have here.  But, once

6    again, the -- the program that's running for this

7    contacts application has instructions, and like any

8    other computer program, it would have to be stored in

9    some kind of storage medium or memory that can then be

10   executed to perform these actions.  So I would say,

11   yes, it -- it does infringe Claim 20, as well.

12          MR. JOHNSON:  Q.  Based on your review of

13   Exhibit 20, do the contact features -- strike that.

14          Based on your review of Exhibit 20, does the

15   gallery and contact features operate the same way as

16   the Galaxy S 4G that you looked at for purposes of

17   infringement of the '381 patent?

18          MR. MONACH:  Object to the form of the

19   question.

20          THE WITNESS:  So I would have to say that in

21   order to answer that completely accurately, I'd have

22   to put both of the devices side by side and look very

23   carefully at whether they're exactly the same.

24          Just off the cuff here, going by what I've

25   just played with for the last, I don't know, five,

Confidential Attorneys' Eyes Only Outside Counsel

Page 43

1    ten minutes, and my memory of -- of what I looked at a

2    couple of weeks ago on the Galaxy S 4G device that

3    I -- I use, I would say the -- the essence or the --

4    maybe not the word "essence" -- the -- the basics of

5    the operation, with regards to the infringing of the

6    claims, it would be the same.  But whether the

7    specifics of the look and feel is exactly the same,

8    I'd have to spend quite a bit more time making sure

9    that that's true.

10           MR. JOHNSON:  Q.  And all -- what I'm really

11   trying to ask you is just whether the -- for only

12   purposes of alleged infringement of the '381 patent,

13   is whether these features operate basically the same

14   way.  I'm not interested in -- in subtle nuances or

15   specific differences between the contacts and gallery

16   applications between the two.  I'm just trying to

17   understand whether, for purposes of infringement, the

18   features operate the same way between Exhibit 20 and

19   the Galaxy S 4G, and I'm gonna -- I'm gonna hand you

20   what's been previously marked as Exhibit 21, a

21   Galaxy S 4G, and you can -- if you could take a look

22   at that and just tell me -- it was marked at another

23   deposition.

24           Just -- so that -- in your right hand,

25   Exhibit 21 is a Galaxy S 4G, and so if you could just

Confidential Attorneys' Eyes Only Outside Counsel

Page 44

1    take a look at the gallery application and take a look

2    at the -- the contacts application and just tell me

3    whether -- for purposes of alleged infringement of

4    the '381 patent, whether those two devices operate the

5    same way.

6            MR. MONACH:  Object to the form of the

7    question.

8            THE WITNESS:  First of all, I'll take your

9    representation that this is actually a Galaxy S 4G.

10   It's very hard to tell just from looking at the device

11   without the box it came in and so forth.  So assuming

12   that it is indeed the S 4G, I'm gonna quickly look at

13   the contact application here.

14           MR. JOHNSON:  Q.  Here's the box.

15     A    Assuming it came out of that, I'll take your

16   representation for that.

17     Q    You don't want to trust me.

18     A    So let me quickly make sure it's the same

19   thing.

20     Q    Yeah, it -- take my representation.  It's a

21   Galaxy S 4G.  It's a nice phone.

22     A    So just my -- based on my quick comparison

23   here very briefly, I would say that there are some

24   subtle differences.  If you want me to go through

25   that, the -- in terms of the basic functionality, in

Page 45

1  terms -- and in terms of infringing Claims 1, 19, and

2  20, I would say, for the contacts -- I haven't looked

3  at the gallery yet.  For the contacts -- contacts list

4  application, it does the same functionality, but there

5  are some, let's say, visual differences, potentially.

6          MR. JOHNSON:  Q.  Do those visual -- those

7  visual differences don't matter for purposes of

8  infringement, though; do they?

9          MR. MONACH:  Object to the form of the

10  question.

11          THE WITNESS:  For this particular

12  application, the contacts application and what I'm

13  seeing right now, the differences between these two, I

14  would say they would not matter --

15          MR. JOHNSON:  Right.

16          THE WITNESS:  -- because it works the same

17  way.

18          MR. JOHNSON:  Okay.

19      Q    How -- how about for the gallery application?

20      A    Okay.

21      Q    Does -- can you look at the gallery

22  application in the Galaxy S 4G and compare it to

23  Exhibit 20 and tell me whether the infringement --

24  alleged infringement is the same?

25          MR. MONACH:  Object to the form of the

Confidential Attorneys' Eyes Only Outside Counsel

Page 46

1   question.

2        THE WITNESS:  So based on my quick review

3   here, I would say, again, there's probably some

4   subtleties and differences, but the basic

5   functionality, with regards to Claim 1, appears to be

6   essentially the same.

7        (Phone marked Balakrishnan Exhibit 97

8         for identification.)

9        MR. JOHNSON:  Okay.  I'm gonna show you what

10  I've marked as Exhibit 97, which is another Samsung

11  Galaxy S phone, and ask you to take a look at the --

12  the gallery in the contacts applications on that -- on

13  that particular phone, and -- and tell me whether

14  those phones, what -- same question.

15       So does Exhibit 97, in the contacts and

16  gallery applications, operate the same way as the

17  Galaxy S 4G for purposes of alleged infringement of

18  the '381 patent?

19       MR. MONACH:  Counsel, can we get some better

20  identification of what -- what phone Exhibit 97 is?

21       MR. JOHNSON:  It's the -- the Samsung

22  Captivate.

23       MR. MONACH:  Okay.  Thank you.

24       Same objection as before.  Object to the

25  asking for a legal conclusion and an expert opinion on

Confidential Attorneys' Eyes Only Outside Counsel

Page 47

1  a phone the witness hasn't seen before at the

2  deposition.

3          THE WITNESS:  Okay.  So to the extent -- and

4  I'm only looking at this, again, for a very, very

5  short time.  I've not -- believe -- I don't believe

6  I've seen this phone in any detail before, and my

7  quick review of the Gal- -- I'm sorry -- the gallery

8  application on this phone, on Exhibit 97, I would say

9  for purposes of matching up with the elements of

10 Claim 1, it is doing essentially the same thing as the

11 other two phones I just looked at.

12         Again, there, I believe, are and could be

13 further subtle differences in the visuals and some of

14 the other behavior, but basic functionality appears to

15 be the same for the gallery application; and now I'll

16 look at the contacts application, if that's what you

17 want me to do.

18         MR. JOHNSON:  Yeah.

19    Q   Can you please look at the contacts

20 application and tell me whether that application

21 operates in the same way as the Galaxy S 4G for

22 purposes of alleged infringement of the '381 patent.

23         MR. MONACH:  Same objection.

24         THE WITNESS:  So having looked at this,

25 again, briefly, I would say, with the caveat that, you

Confidential Attorneys' Eyes Only Outside Counsel

Page 48

1  know, not having enough time to really study the

2  details of it, the basic functionality of the contacts

3  application of this phone on Exhibit 97 is -- has the

4  same essential functions that would infringe

5  Claim 1 -- of the elements of Claim 1 of the '381

6  patent.

7       MR. JOHNSON:  Q.  So it operates the same way

8  as the other two phones --

9       MR. MONACH:  Object to the form.

10      MR. JOHNSON:  Q.  -- for purposes of alleged

11 infringement of the '381 patent?

12      MR. MONACH:  Object to the form of the

13 question.

14      THE WITNESS:  I would say it -- it operates

15 in a manner that infringes every one of the claims.

16 The -- this -- there could be -- appear to be some

17 subtle differences in some of the operating elements

18 between these three phones for both these

19 applications, but for purposes of infringing the

20 claims, the -- the elements of the claims, the -- this

21 phone has all the elements, as well.

22      MR. JOHNSON:  Q.  And those subtle

23 differences don't matter for purposes of infringing

24 the claims in the '381 patent; right?

25      MR. MONACH:  Same objection.

Confidential Attorneys' Eyes Only Outside Counsel

Page 49

1      THE WITNESS:  So, again, to the extent that

2  I've only had a chance to very quickly look at this, I

3  would say the -- the subtle differences do not appear

4  to be crucial to the -- to the infringement analysis

5  with respect to the claim of the '381 patent.

6      (Phone marked Balakrishnan Exhibit 98

7       for identification.)

8      MR. JOHNSON:  Okay.  Let me show you

9  Exhibit 98, which is the Samsung Epic 4G.

10  Q   I'll ask you the same question, if you could

11  look at the -- the gallery and the contacts

12  applications and just tell me if that phone --

13  those -- strike that.

14      Could you please look at the gallery and

15  contact applications of Exhibit 98 and tell me whether

16  those applications operate in the same manner as the

17  Galaxy S 4G applications for purposes of infringement

18  of the '381 patent?

19      MR. MONACH:  Object to the form of the

20  question.  Object to asking the witness to offer a

21  legal conclusion and to form an expert opinion on a

22  phone he hasn't seen before it was handed to him at

23  the deposition.

24      THE WITNESS:  Okay.  I have -- so I've had a

25  chance to quickly look at this.  Again, I would say I

Confidential Attorneys' Eyes Only Outside Counsel

Page 50

1  have not seen this phone in any detail prior to this,

2  so this opinion here is a very quick opinion on the --

3  on the fly.

4       So given my few minutes of examining the

5  contacts list and the gallery application on this

6  phone, Exhibit No. 98 here, I would say both these

7  applications appear to have all the elements that

8  infringe Claim 1 of the '381 patent, based -- based,

9  again, on my very quick overview here.

10      There are subtleties that are -- that seem to

11  be different from the other three phones that I just

12  looked at, but the basic functions seem to be the

13  same.

14      MR. JOHNSON:  Q.  And so for purposes of

15  alleged infringement of the '381 patent, Exhibit 98,

16  in terms of the gallery and contacts applications,

17  operates the same way as the Galaxy S 4G; right?

18      MR. MONACH:  Same objection as previously

19  stated.

20      THE WITNESS:  So as I just said, given my

21  very quick overview of this device right here and my

22  on-the-fly opinion, I haven't studied this in detail,

23  the -- the gallery and the contacts list application

24  appear to have the functions that would infringe --

25  perform the same functions that infringe Claim 1 of

Confidential Attorneys' Eyes Only Outside Counsel

Page 51

1    the '381 patent.

2         MR. JOHNSON:  Q.  And the same is true for

3    Claims 19 and 20?

4         MR. MONACH:  Same objection.

5         You can answer.

6         THE WITNESS:  Again, I haven't, you know,

7    looked at this device in great detail, but to the

8    extent that this is a program running on a mobile

9    computer device, it must have instructions, so,

10   therefore, it would infringe Claim 19, and the --

11   those instructions would have to be stored in some

12   kind of a storage media on the device, and, therefore,

13   it would infringe Claim 20, again, based on my very

14   quick view of this right here.

15   Q    And 19 -- and 19?

16   A    I said that earlier, yes, 19.

17        (Phone marked Balakrishnan Exhibit 99

18         for identification.)

19        MR. JOHNSON:  I'm sorry.  You're right.

20        Okay.  The -- let me show you what I'm gonna

21   mark as Exhibit 99, which is the Samsung Fascinate

22   phone, and basically the same question.

23   Q    Can you please look at the -- the gallery and

24   contacts applications and tell me whether, for

25   purposes of infringement of the '381 patent, those

Confidential Attorneys' Eyes Only Outside Counsel

Page 52

1  applications operate in the same way as the Galaxy S

2  4G, and the other phones.

3           MR. MONACH:  Same objection as previously

4  stated.  Object to asking the witness to form a legal

5  conclusion, to form a new opinion on a -- on a

6  different device at the deposition; and vague and

7  lacking in foundation with respect to how this phone

8  may operate.

9           THE WITNESS:  Okay.  So based on, again, a

10  very, very quick overview of this device, which I have

11  not examined in detail before, very quickly looking at

12  the contacts list application and the gallery

13  application, I would say they both perform the -- the

14  steps of the -- of Claim 1 of the '381 patent.  Again,

15  based on my very brief exploration of this.

16           MR. JOHNSON:  Q.  What about Claims 19 and

17  20?

18           MR. MONACH:  Same objection.

19           THE WITNESS:  Again, I -- you know, given my

20  very quick look at this, I would say because it's

21  running computer programs that would have had to have

22  instructions, those instructions must be running on

23  this mobile device computer, and, therefore, Claim 19

24  would be infringed; and, similarly, those instructions

25  must be stored on a storage media that would be on

Confidential Attorneys' Eyes Only Outside Counsel

Page 53

1    this device; therefore, Claim 20 would be infringed,

2    as well.  Again, I'm saying this, given the very brief

3    opportunity to look at this device.

4          MR. JOHNSON:  Q.  Do the gallery and contacts

5    applications in Exhibit 99 operate the same way as the

6    Galaxy S 4G and other phones in front of you for

7    purposes of infringement of the '381 patent?

8          MR. MONACH:  Object to form; lack of

9    foundation; same objection as previously stated about

10   asking for opinion testimony about a phone he's just

11   seen for the first time.

12         THE WITNESS:  So, again, based on my very

13   quick overview of this device here, at the deposition,

14   and not having examined it in great detail, I would

15   say they have the same -- both the gallery and the

16   contacts list application on this phone, on

17   Exhibit 99, have the same basic functionality that

18   would infringe Claim 1 of the '381 patent, that is

19   the -- similar to the, kind of, basic functionality of

20   the other four phones that I have in front of me here.

21         MR. JOHNSON:  Okay.

22         THE WITNESS:  But there are -- you know,

23   there could be -- there are and could be nuances that

24   are different across the phones.

25         MR. JOHNSON:  Q.  But -- but those nuances,

Confidential Attorneys' Eyes Only Outside Counsel

Page 54

1   to the extent they exist, are not important for

2   purposes of infringement of the '381 patent --

3           MR. MONACH:  Same objection.

4           MR. JOHNSON:  Q.  -- in your opinion; right?

5           THE WITNESS:  For purposes of -- including

6   the claims that we're talking about, Claim 1, 19, and

7   20, I would say the -- they infringe the -- the device

8   I'm looking at right now, No. 99, is -- would infringe

9   and these differences between the phones, to the

10  extent that I've only looked at it very briefly, I

11  would say they -- they do not impact that infringement

12  analysis.

13           (Phone marked Balakrishnan Exhibit 100

14            for identification.)

15           MR. JOHNSON:  Okay.  Let me show you what

16  I've marked as Exhibit 100, which is a Galaxy Tab 7.

17  Q   Have you seen that before?

18  A   I believe I have looked at a similar device.

19  I can't say if it's exactly the same thing, but I

20  haven't had a chance to study this in detail either.

21  Q   What --

22  A   I'm sorry.

23  Q   Is it fair to say that you -- the first time

24  you looked at a similar device was after you were

25  retained in connection with this particular matter, or

Confidential Attorneys' Eyes Only Outside Counsel

Page 55

1   was it something outside of your retention in this

2   case?

3           MR. MONACH:  Object to form; vague.

4           THE WITNESS:  You mean a tablet device or the

5   Samsung --

6           MR. JOHNSON:  Samsung tablet.

7           THE WITNESS:  I would say it's before the

8   retention in this matter.  Again, like I said, my lab,

9   we get a variety of these devices in for a variety of

10  projects, and I believe I've seen the Samsung Tablet

11  or more than one tablet --

12          MR. JOHNSON:  When --

13          THE WITNESS:  -- in -- in the research

14  context.  Whether it's exactly this one or not, I

15  can't tell for sure, sitting here.

16          MR. JOHNSON:  Q.  When do you think you --

17  you first saw a Samsung Tablet, just approximately?

18      A   Yeah, I can't answer that definitively.  I'd

19  say at least a few months ago.

20      Q   Okay.

21      A   Earlier in the year.

22      Q   So can you look at the Exhibit 100 and tell

23  me, for example, if you pull up the gallery

24  application, does it infringe the '381 patent, in your

25  opinion?

Confidential Attorneys' Eyes Only Outside Counsel

Page 56

1      MR. MONACH:  Same objection as stated --

2  previously stated with respect to asking for an

3  opinion about the phones he hadn't reviewed

4  previously.

5      THE WITNESS:  So based on my, again, very

6  quick review of this device right here in this

7  deposition, and not having studied it in detail, I

8  would say that the -- that the features of the gallery

9  application on this device, Exhibit No. 100, appear to

10  infringe all elements of Claim 1 of the '381 patent.

11      MR. JOHNSON:  Q.  And 19 and 20?

12      MR. MONACH:  Same objection.

13      THE WITNESS:  Again, to the extent that I've

14  only looked at this very briefly, I would say, yes, it

15  would infringe 19 -- Claims 19 and 20.

16      MR. JOHNSON:  Q.  And does the gallery

17  application operate in the same way for purposes of

18  alleged infringement of the '381 patent as the Galaxy

19  Tab 10.1?

20      MR. MONACH:  Same objection as previously

21  stated.

22      THE WITNESS:  So given that I've only had a

23  very quick opportunity to look at this at this

24  deposition and haven't studied it in detail, I would

25  say that -- that the basic functionality, with respect

Confidential Attorneys' Eyes Only Outside Counsel

Page 57

1   to the elements of the claims of -- Claim 1 of

2   the '381 patent, appear to be the same as the -- those

3   found in the gallery application of these other five

4   phones, five phones that have just been placed in

5   front of me and looked at a few minutes ago.  Again, I

6   want to say I haven't studied this in great detail to

7   confirm with 100 percent certainty.

8            MR. JOHNSON:  Q.  But, as far as you're

9   concerned, the gallery feature operates the same basic

10  way as -- in Exhibit 100 as it does in the Galaxy

11  10.1, for purposes of alleged infringement of the '381

12  patent; right?

13           MR. MONACH:  Object to the form of the

14  question, since he hasn't been given an opportunity to

15  compare this with the 10.1 --

16           THE WITNESS:  So --

17           MR. MONACH:  -- side by side.

18           THE WITNESS:  So, I'm sorry, you said against

19  the Galaxy 10.1 tablet, yeah, I would like to look at

20  that in -- in detail before I make that determination.

21  Otherwise, I'd be going by memory.

22           MR. JOHNSON:  Q.  When's the last time you

23  looked at a Galaxy 10.1?

24     A    I might have looked at it yesterday, again,

25  in preparation for the depo, but I certainly looked at

Confidential Attorneys' Eyes Only Outside Counsel

Page 58

1   it about two or three weeks ago.

2          (Phone marked Balakrishnan Exhibit 101

3           for identification.)

4          MR. JOHNSON:  Exhibit 101 is a Galaxy 10.1,

5   so let me ask the question again.

6      Q    Looking at Exhibit 100, the Galaxy Tab 7, and

7   comparing the Galaxy 10.1 gallery function, can you

8   tell me whether those gallery applications operate the

9   same way for purposes of alleged infringement of

10  the '381 patent?

11         MR. MONACH:  Same objection; lack of

12  foundation; calling for a legal conclusion and a new

13  opinion on devices presented for the first time at the

14  deposition.

15         THE WITNESS:  So if you give me a minute to

16  refresh my memory on the 10.1 tablet here.

17         So based -- based on my quick comparison here

18  on -- on the fly, at this deposition, I would say

19  the -- of these two tablets, Exhibit 100 and

20  Exhibit 101, I would say that the base functionality

21  in the gallery application, with regards to elements

22  of Claim 1, appear to be very similar.

23         MR. JOHNSON:  Q.  Can you look at the

24  contacts application of the Tab 7 and tell me whether

25  the contacts application infringes any claims of

Confidential Attorneys' Eyes Only Outside Counsel

Page 59

1    the '381 patent?

2         MR. MONACH:  Same objection as previously

3    stated.

4         THE WITNESS:  So I would say this is the

5    first time I'm looking at this particular contacts

6    application, so you've got to give me a few minutes to

7    study this.

8         So, again, this is the first time I'm looking

9    at this particular style of contacts application,

10   which has a very different look and feel from the

11   other ones on the phones.  Given my very quick review

12   here, I would say this contacts application, in terms

13   of scrolling the -- the list of names within the

14   application, would meet the -- would infringe the

15   claims -- the element of the claims of -- of Claim 1

16   of the '381 patent.

17        MR. JOHNSON:  Q.  Would infringe?

18    A   It would infringe, yes.

19    Q   Can -- can you walk us through the alleged

20   infringement of the contacts application and using the

21   camera where possible --

22    A   Sure.

23    Q   -- to show the different limitations of the

24   claim?

25        MR. MONACH:  Same objection as previously

Confidential Attorneys' Eyes Only Outside Counsel

Page 60

1  stated, asking the witness to form a new infringement

2  opinion with a device presented to him for the first

3  time at the deposition.

4        THE WITNESS:  Do you know if there's a way to

5  lock the thing from not rotating, because -- anyway,

6  I'm gonna try, if it doesn't keep bouncing around.

7        How are we doing?

8        MR. JOHNSON:  If you could just tilt it

9  forward a little bit.  That's better.  Here, you

10  can --

11        THE WITNESS:  You good to go?  Okay.

12        To the extent that I'm -- you know, I want to

13  just caveat this by saying I'm doing this live on a

14  device I've just seen a few minutes ago, so I may make

15  some mistakes and maybe do it again.

16        So, first of all, let's walk through to

17  Claim 1.  It's a computer implemented method.  This is

18  clearly a mobile computer compromising a device with a

19  touchscreen display.  This is -- it just shut off.

20        Okay.  Let's try this again.

21        It's a device with a touchscreen display that

22  clearly reacts to my -- my touching the display, so it

23  has the preamble of the claim.  It says here, in the

24  first part of the claim, it says, "Displaying a first

25  portion of an electronic document," and in this

Confidential Attorneys' Eyes Only Outside Counsel

Page 61

1    contact application, I would say the electronic

2    document is this list of -- of items, list of names

3    that you see on the left-hand side of the -- of the

4    screen here.

5         MR. JOHNSON:  Q.  So it's -- it's the -- the

6    column of the names?  Can you -- can you just point to

7    what you're talking about?

8         A    Sure.

9         Q    You should touch the screen before.

10        A    Okay.  Let's try this again.

11        So the electronic document in this particular

12   instantiation would be the list of -- of names that

13   you see with these letter headings or letter dividers

14   in between the names.  It would be the -- so, you

15   know, what you see in, kind of, this box here,

16   starting -- it keeps going off to -- I'm sorry.  It

17   keeps shutting off.

18        MR. MONACH:  Sorry to interrupt here, but

19   while you're fiddling with that, I just have a

20   continuing objection to this series of questions.

21        THE WITNESS:  Okay.  All right.  Let's try

22   this again.  Hopefully, it doesn't go to sleep.

23        So it has -- you know, the list I just marked

24   out there, that would be the electronic --

25        MR. JOHNSON:  Q.  So an electronic document

Confidential Attorneys' Eyes Only Outside Counsel

Page 62

1  can be something that's smaller than what you see on

2  the screen, because it meets your definition of

3  visually represented on the screen with a defined --

4  defined set of boundaries?

5       MR. MONACH:  Objection; calling for a legal

6  conclusion.

7       THE WITNESS:  I would say an electronic

8  document doesn't have to fill the entire screen.

9       MR. JOHNSON:  Okay.

10       THE WITNESS:  Yes, and it's gone asleep

11  again, so let's try this one more time.  Okay.

12       All right.  So it is live.  So we've got the

13  electronic document.  Now, the next element of the

14  claim says "Detecting a movement of an object on or

15  near the touchscreen display," and I -- I'm gonna put

16  my finger down, which would correspond to the object

17  in the -- in the claims, and it detects a movement of

18  my object on or near the touchscreen display and

19  clearly reacts to that.

20       The next element says "In response to

21  detecting the movement, translating the electronic

22  document displayed on the touchscreen display in a

23  first direction to display a second portion of the

24  electronic document, wherein the second portion is

25  different from the first portion."

Confidential Attorneys' Eyes Only Outside Counsel

Page 63

1    So let's see if I can show this.  I've got my

2  finger on the screen, my object on the screen.  The

3  first portion is this part of the document that, let's

4  say, starts with Chris Thomas at the top, and at the

5  bottom it has the word "QWERTY," that I just entered.

6  I'm gonna -- I'm gonna move my -- move my finger, and

7  so in response to my -- my finger, it's gonna

8  translate the electronic document to display --

9  translate in a first direction, in one direction here,

10  to display a second portion, which is different from

11  the first portion.

12    So, now, the second portion now, as you see,

13  on the top, has Billy Smith, and the bottom has

14  Michael Myers on the -- on the list of the information

15  on the document.  So it's clearly different from that

16  first portion that we saw earlier that had different

17  names on the top and bottom.

18    Now -- now, I'm gonna keep going here to the

19  next element.  It says "In response to an edge of the

20  electronic document being reached while translating

21  the electronic document in the first direction, while

22  the object is still detected on or near the

23  touchscreen display, displaying an area beyond the

24  edge of a document and displaying a third portion of

25  the electronic document, wherein the third portion is

Confidential Attorneys' Eyes Only Outside Counsel

Page 64

1    smaller than the first portion."

2        So I'm gonna keep going here, moving in the

3    same direction as I was earlier, and you can see I've

4    reached the edge, which is at the top of the A, lists

5    Arnold -- Arnold Palmer there, and once I've reach the

6    edge, it displays a third portion.

7        First of all, it displays an area beyond the

8    edge of the document, that white space rectangle above

9    the A, that's the area beyond the edge of the

10   document, and then it displays the third portion of

11   the document that is smaller.

12       So, as you can see, this doc -- part of the

13   document here, the third portion, starts at the top

14   with that white space, and then the document itself

15   starts, which is the A, and then the Arnold Palmer,

16   and at the bottom, that is John Brown, that -- whoops,

17   I just lost it here.  Let me just get back to where I

18   was.  So it was something like that.

19       This third portion, it has fewer items on the

20   list.  It's smaller than -- than the first portion,

21   which I showed much earlier, which had probably at

22   least another item or two displayed on the screen;

23   and, finally, the last element is "In response to

24   detecting that the object is no longer on or near the

25   touchscreen display, translating the electronic

Confidential Attorneys' Eyes Only Outside Counsel

Page 65

1    document in a second direction until the area beyond

2    the edge of the electronic document is no longer

3    displayed, to display a fourth portion of the

4    electronic document, wherein the fourth portion is

5    different from the first portion."

6         So now I'm gonna release my finger, which

7    is -- corresponds to detecting that the object, i.e.,

8    my finger, is no longer on the touchscreen display.

9    It has translated the document in a second direction,

10   in a different direction from the way it was going in

11   the first three steps there, and the area beyond the

12   edge, where that white space that we saw in that

13   section there, is -- is no longer being displayed

14   above the A.  I just lost this.

15        So I just -- I just touched it to refresh the

16   screen.  Nothing to do with the claims.  And then it

17   has now displayed the fourth portion of the electronic

18   document, which is different from the first portion;

19   and we know that by seeing this fourth portion has

20   Arnold Palmer on the top and Kathy Lee at the bottom,

21   which, going by my memory here, the first portion had

22   a different set of names at the top and the bottom, so

23   it is clearly -- I think clearly meets the -- the

24   elements of this claim.

25        MR. JOHNSON:  Okay.

Confidential Attorneys' Eyes Only Outside Counsel

Page 66

1        THE WITNESS:  Just, you know, doing it on the

2   fly here at --

3        MR. JOHNSON:  All right.

4    Q   And -- and is it true that the -- the Droid

5   charge and the infused 4G operate in the same way in

6   the gallery and contacts applications for purposes of

7   alleged infringement of the '381 patent as the

8   Galaxy S 4G?

9        MR. MONACH:  Object to the form of the

10  question.

11       THE WITNESS:  So I'm going by memory here.  I

12  don't have the Droid charge and the -- you said the

13  infused 4G in front of me, I don't believe, but going

14  by memory at what I looked at, when I wrote my report,

15  the -- the basic operations in the gallery and the

16  contacts list application on those two phones would

17  meet the -- the claims of -- sorry -- the element of

18  the claims of Claim 1 of the '381 patent.

19       MR. JOHNSON:  Okay.  Why don't we take a

20  quick break?

21       THE WITNESS:  Sure.

22       MR. JOHNSON:  And we'll go off the record.

23       THE VIDEOGRAPHER:  This is the end of

24  Disk No. 1, Volume 1.

25       We are off the record at 10:45 a.m.

Confidential Attorneys' Eyes Only Outside Counsel

Page 67

1          (Recess taken.)

2          THE VIDEOGRAPHER:  This is the beginning of

3     Disk No. 2, Volume I.

4          We are back on record the at 11:02 a.m.

5          You may proceed.

6          MR. JOHNSON:  Q.  I'd like to show you the --

7     the Galaxy S 4G, which is Exhibit 21, and can you walk

8     us through the -- the alleged infringement with

9     respect to this particular phone of the '381 patent?

10     A   You --

11          MR. MONACH:  I'm sorry.  I thought you did

12     that before, but maybe not.

13          Go ahead.

14          THE WITNESS:  So I'll take your

15     representation.

16          MR. MONACH:  I'm getting -- I'm getting mixed

17     up.

18          MR. JOHNSON:  There is -- there is a blue

19     moon.

20          THE WITNESS:  I'll take your representation

21     that this actually is the Galaxy -- Galaxy S 4G.

22          MR. JOHNSON:  Q.  It doesn't look familiar to

23     you?

24     A   It looks very familiar, but it's very hard to

25     tell from just the -- the device itself that it's the

Confidential Attorneys' Eyes Only Outside Counsel

Page 68

1    4G or something else.

2           Assuming that it is, do you want me to walk

3    through -- walk through which application?  Does it

4    matter?

5        Q   Start with gallery.

6        A   Oh.

7        Q   So --

8        A   You want me to do it with the --

9        Q   Yeah, can we do it with a camera?  Sorry.

10       A   Hope this doesn't shut down halfway.

11       Q   So -- okay.  Just -- just to start, can

12   you -- can you go back to the -- the gallery of images

13   and just show how you -- how -- how you got to that

14   particular image?

15       A   So from here, you mean?

16       Q   Yes.

17       A   Okay.

18       Q   Okay.  So in the gallery of images; right?

19       A   Let's rotate back here.

20       Q   Right.

21       A   So do you want me to walk through the -- all

22   the claim elements, or how do you want me to do this?

23       Q   Yeah, let's walk through the claim elements.

24       A   Okay.  So I'm reading from Claim 1 here, what

25   it says in the preamble, "A completely implemented

Confidential Attorneys' Eyes Only Outside Counsel

Page 69

1  method compromising a device with a touchscreen

2  display."

3      So this Galaxy S 4G is a mobile computer.  It

4  has a touchscreen display, as you can see, when I

5  touch the screen, it reacts to that, so it clearly

6  meets the preamble.  Now, this is the gallery

7  application, and I'm gonna just simply select one of

8  these images, and I'm gonna zoom in a little bit here

9  a little bit more.  As you can see, it's still, you

10  know, reacting to my touch.

11    Q   Okay.  So -- so, by the way, before you --

12  you have to zoom in on an image on the Samsung accused

13  phones in order for the gallery application to

14  infringe; correct?

15      MR. MONACH:  Object to the form of the

16  question.

17      THE WITNESS:  So, right now, I did zoom in.

18  If I don't zoom in, I've already got the -- it doesn't

19  make sense to translate the document, because it

20  already sees the edge, so the -- the claim elements --

21  not all the claim elements would be met --

22      MR. JOHNSON:  Right.

23      THE WITNESS:  -- by -- if I -- if I did not

24  zoom in on that image.

25      MR. JOHNSON:  Okay.

Confidential Attorneys' Eyes Only Outside Counsel

Page 70

1    Q    So a non-zoomed in image in the gallery of

2    the accused phones doesn't infringe the '381 patent;

3    correct?

4         MR. MONACH:  Object.  Object to the form of

5    the question.

6         THE WITNESS:  So I have not done an

7    exhaustive search through all possible images that

8    could -- could belong in a gallery.  For example, it

9    may be that some images are so large that the gallery

10   doesn't scale it down.  I do not know that.  So for

11   the images that I've seen, the -- where the entire

12   image could be displayed in some aspect or ratio on

13   the -- on the screen, I have not determined that

14   the -- an unzoomed in image would infringe all the

15   elements of the claim --

16        MR. JOHNSON:  Okay.

17        THE WITNESS:  -- but -- but, again, I haven't

18   done an exhaustive search.

19        MR. JOHNSON:  Q.  But sitting here today,

20   you're not -- you're not aware of any non-zoomed image

21   that infringes the '381 patent in the accused Samsung

22   phones; right?

23        MR. MONACH:  Object to form; asked and

24   answered; incomplete hypothetical.

25        THE WITNESS:  So in the gallery application

Confidential Attorneys' Eyes Only Outside Counsel

Page 71

1   of this particular phone -- it's gone asleep again --

2   the -- if the image has not been zoomed in, for the

3   images I have looked at, I can't say for sure for all

4   possible images, I have not been able to determine

5   that it -- that it infringes all elements of the

6   claim.

7           MR. JOHNSON:  Okay.  Let -- let me just,

8   while we're going through this, to cut through and

9   improve the efficiency, I'm gonna mark, as

10  Exhibit 102, the -- the Droid Charge, and I'll mark,

11  as Exhibit 103, the Infuse 4G.  I'm gonna hand those

12  to you.

13          (Phones marked Balakrishnan Exhibits

14           102 - 103 for identification.)

15          MR. JOHNSON:  Okay.

16      Q   You said earlier that you had looked at the

17  Galaxy S 4G in preparation for, I think, your

18  declaration; right?

19      A   That's correct.

20      Q   Okay.  Have you looked in detail at the

21  Samsung Droid Charge and Infuse 4G products?

22      A   I've looked at the Infuse 4G and the Droid

23  Charge products into the same level or detail as the

24  Galaxy S 4G, in -- in -- in terms of the gallery

25  application and the contacts application.

Confidential Attorneys' Eyes Only Outside Counsel

Page 72

1    Q    Okay.  And the Galaxy 10.1, you've also

2   looked at in detail?

3         MR. MONACH:  Object to form.

4         THE WITNESS:  The Galaxy 10.1 Tablet that

5   I've looked at it, no, to the same level of detail.  I

6   wouldn't say I've explored the entire device --

7         MR. JOHNSON:  Right.

8         THE WITNESS:  -- in great detail, no.

9         MR. JOHNSON:  Q.  And you haven't opened any

10  of them up; right?

11    A    You -- you mean physically?

12    Q    Right.

13    A    No, I have not taken it apart.

14    Q    Okay.  And you'll understand, just for

15  purposes of our discussion, that when I say "Samsung

16  Accused Products," I'm referring to those four

17  products, namely Exhibits 101, 102, 103, and

18  Exhibit 21, namely the Droid Charge, the Infuse 4G,

19  the Galaxy S 4G, and the Galaxy Tab 10.1?

20    A    So the four devices that were in my

21  declaration, yes.  I'm assuming the exhibit numbers

22  are correct that you just rattled --

23    Q    Okay.

24    A    -- off.

25    Q    Okay.  So let's go back to the -- to the S

Confidential Attorneys' Eyes Only Outside Counsel

Page 73

1    4G.

2        A    Back to that gallery?

3        Q    Yeah.

4        A    Okay.

5        Q    Okay.  And -- and before you even zoom in on

6    that image, let's go back to the gallery itself.

7            So when you move the gallery from one side to

8    the other, I notice that it tilts.

9        A    I'm sorry.

10       Q    Just try and move among --

11       A    The gallery, like, not in a particular image?

12       Q    Yeah.  See how when you get to the edge, it

13   tilts?  You can hold that up and show it to the

14   camera.

15       A    You mean that -- that kind of tilting?

16       Q    That kind of tilting.

17       A    Yes.

18       Q    All right.

19           And if you go to the other direction, it

20   tilts in the other direction; right?

21       A    It appears to, yes.

22       Q    Right.

23           That doesn't infringe any claims of the '381

24   patent; right?

25           MR. MONACH:  Object to the form of the

Confidential Attorneys' Eyes Only Outside Counsel

Page 74

1  question; vague and ambiguous; calling for a legal

2  conclusion; incomplete hypothetical; and the witness

3  hasn't opined on this or examined this particular

4  feature before.

5      THE WITNESS:  I can't answer that question

6  without spending quite a bit of time considering,

7  looking at this in detail.  I have not studied this

8  particular feature --

9      MR. JOHNSON:  Q.  Why haven't you --

10  A    -- in any -- in any detail.

11  Q    Why haven't you studied that feature, if you

12  were asked to look at the phones to determine whether

13  they infringe?

14      MR. MONACH:  Object to the form of the

15  question.  I'll instruct the witness, again, that I'm

16  not saying this -- there was any such communication,

17  but I'll direct you not to reveal any communications

18  with counsel, other than communication of facts or

19  assumptions on which you relied in framing and coming

20  up with your declaration and your opinions.

21      THE WITNESS:  So when I was asked to work on

22  this case, I was told that Apple had alleged that

23  these four devices, what we're calling the Accused

24  Products, infringed the patent in Claim 1 and a few

25  other claims, and in particular the -- they identified

Confidential Attorneys' Eyes Only Outside Counsel

1  that they -- they believe the gallery and the contact

2  lists application were the ones that were infringing,

3  so I focused my efforts on -- on looking at those two

4  particular applications.  Oh, and the web browser for

5  the -- for the Galaxy 10.1 Tablet, as well.

6           So I -- I spent -- you know, I could -- you

7  would take quite a bit of time to look at every

8  application and all the different features to see if

9  everything infringed, and my understanding, for the

10  purposes of infringement, if you can show that one

11  aspect of the device or one application infringed,

12  that would be sufficient, so I did not take the time

13  to explore all -- all possible infringements and

14  areas --

15           MR. JOHNSON:  So you weren't --

16           THE WITNESS:  -- once I satisfied myself that

17  within the gallery, within an image, it infringed

18  Claim 1 and any other claims.

19           MR. JOHNSON:  Q.  So you weren't asked to

20  look at anything beyond the Galaxy -- strike that.

21           So you were not asked to look at anything

22  beyond the gallery and the contacts for purposes of

23  infringement of the accused phones; is that right?

24           MR. MONACH:  Object to the extent it

25  misstates his prior testimony about the Galaxy Tab.

Confidential Attorneys' Eyes Only Outside Counsel

Page 76

1     THE WITNESS:  For the phones, I was asked to

2  do the -- I was directed or advised that, you know,

3  they were -- Apple was alleging that it was the

4  gallery and the contacts list that was infringing.

5  For the Galaxy 10.1 Tablet, they also indicated that

6  the web browser was of interest.

7     MR. JOHNSON:  Q.  So you -- you were told

8  that Apple was alleging that these Accused Products

9  infringed the '381 patent before you actually did any

10  work to verify whether these products infringed

11  yourself or not?

12    A   I was -- I was told that that was Apple's

13  allegations, yes, before I looked at it in any detail,

14  yes.

15    Q   And you don't have an opinion as to whether

16  the Galaxy -- strike that -- the gallery that you were

17  just looking at that shows the tilt, you don't have

18  any opinion as to whether that infringes or not?

19    MR. MONACH:  Object to the form of the

20  question.

21    THE WITNESS:  I have not had a chance to

22  study that in detail, so I -- I cannot say today

23  whether there is -- whether it infringes or doesn't

24  infringe.  I would have to reserve that 'til I've had

25  a chance to look at it in some amount of detail.

Confidential Attorneys' Eyes Only Outside Counsel

Page 77

1          MR. JOHNSON:  Okay.

2     Q   Well, if you turn it back on, can you go back

3  to that gallery that we were just looking at with the

4  tilt, it doesn't display an area beyond the edge of a

5  document; does it?

6          MR. MONACH:  Object to the form of the

7  question; incomplete hypothetical; asking the witness

8  to form a new opinion on the fly; calls for a legal

9  conclusion.

10         THE WITNESS:  You're talking about in this

11  multi-image view?

12         MR. JOHNSON:  Right.

13         THE WITNESS:  I would have to study that in

14  detail to give you an answer.  If you want me to do

15  that, I can do that.  But I'm -- I can't just looking

16  at it right now.

17         MR. JOHNSON:  Okay.

18         THE WITNESS:  I have to match it up with

19  every element of the claim.

20         MR. JOHNSON:  Yeah.

21     Q   I'd like for you to look at it over the lunch

22  break, but let's keep going.

23     A   Fair enough.

24     Q   Okay.  So let's go to the gallery, the

25  particular gallery application with the zoomed in

Confidential Attorneys' Eyes Only Outside Counsel

Page 78

1    image that you believe infringes Claim 1 of the '381

2    patent, and you just show us how you got to that

3    again.  So you took the image --

4        A   I'm sorry.  It's flipping around.

5        Q   Yeah.

6        A   All right.

7        Q   So --

8        A   Can you see that?  Okay, so I'm in the

9    gallery.

10       Q   Right.

11       A   I'm gonna select an image just by tapping on

12   it.  The image takes up some of the screen.  I -- I

13   just zoomed in a little bit into that image, so it's

14   now magnified some -- by some amount.

15       Q   Okay.

16       A   And so now I've got the image with an

17   electronic document on the screen.

18       Q   Okay.  So is that displaying a first portion

19   of an electronic document?

20       A   In this current state, one could say -- it's

21   shutting off again, I'm gonna just touch it so it

22   comes back on.

23           Yes, in this case, it -- this would be, for

24   example, displaying a first portion of an electronic

25   document.

Confidential Attorneys' Eyes Only Outside Counsel

Page 79

1    Q    Okay.  And when the -- what -- what -- what's

2    the first portion?  Can you just -- can you point to

3    what the first portion is?

4        A    So I would say, in this case, the -- I'm just

5    gonna touch it again --

6        Q    That's fine.

7        A    -- because it's -- it's going on and off.

8            I don't know if you can see that, the first

9    portion would be what is displayed in the -- I'm just

10   gonna draw around here, where my pen is -- is showing

11   the -- that rectangular thing, where my pen went

12   around.

13       Q    Okay.  And what's the electronic document?

14       A    The electronic document would be the -- that

15   image that --

16       Q    The larger --

17       A    -- that we're -- that we're seeing a portion

18   of right now.

19       Q    So the -- the original image when you --

20           MR. MONACH:  Objection.

21           MR. JOHNSON:  Q.  -- when you clicked on it?

22           MR. MONACH:  Objection to the form.

23           THE WITNESS:  In this particular case, the

24   image that showed up, yes, when I -- when I clicked on

25   it, and it took up part of the screen.

Confidential Attorneys' Eyes Only Outside Counsel

Page 80

1        MR. JOHNSON:   Okay.

2    Q   What is -- what's the next limitation that's

3  met?

4    A   So it's displaying the first portion of an

5  electronic document.  The next one is detecting a

6  movement of an object on or near the touchscreen

7  display.  So, in this case, I'm gonna use my finger as

8  the object, and I'm gonna put it down, and -- and, as

9  you can see, it detects the movement of my finger,

10  i.e., the object on -- on the touchscreen display.

11        You want me to go on?

12    Q   Okay.

13        Yes.

14    A   The next portion -- next element of the claim

15  says "In response to detecting the movement,

16  translating the electronic document displayed on the

17  touchscreen display in a first direction to display a

18  second portion of the electronic document, wherein the

19  second portion is different from the first portion."

20        So now I've got my -- my finger down and the

21  system is detecting my movement, the movement of the

22  finger or the object, and it's gonna translate the

23  electronic document in a first direction.

24        So I'm going to do this again.  I just went

25  over it too much.  Okay.  So let's do this again.

Confidential Attorneys' Eyes Only Outside Counsel

Page 81

1      I've got my first portion.  I've got my

2  finger down.  It's detecting movement.  I'm going to

3  translate in a first direction to display a second

4  portion.

5      As you can see, the second portion of the --

6  of the electronic document has -- is different from

7  the first portion, more of that yellow -- I think it's

8  a yellow -- pencil-like thing next to the pink eraser

9  image.  More of the yellow portion is yellow.

10      The pencil is showing, so it's clearly a

11  different portion of the image than the first portion;

12  and then, if I continue moving in the same direction,

13  in -- the next element of the claims says "In response

14  to an edge of the electronic document being

15  reached" --

16    Q   Just -- just before you go to the next

17  element, let me ask you a question.

18      What does -- what does "in response to"

19   mean, as it's used in the claims of the '381 patent?

20      MR. MONACH:  Object to the form of the

21  question as calling for a legal conclusion.

22      You can give your understanding.

23      THE WITNESS:  So my understanding of it is

24  when an edge of an electronic document is reached, so

25  when the -- when the -- when the edge is reached and

Confidential Attorneys' Eyes Only Outside Counsel

Page 82

1   recognized that it will do something, and in this

2   case, the something is -- is gonna display an area

3   beyond the edge of the document and display a third

4   portion of the --

5           MR. JOHNSON:  Yeah.

6       Q   I was -- I was talking about the previous

7   element, and I'm actually just focusing on the words

8   "in response to."

9       A   So are you talking about the one where it

10  says "in response to detecting the movement"?

11      Q   Yes.

12      A   Okay.

13          MR. MONACH:  Same objection.

14          THE WITNESS:  So back up.

15          MR. JOHNSON:  Q.  So what does "in response

16  to" mean?

17      A   So in response -- in my understanding, there

18  is -- when it says "in response to detecting the

19  movement," it says -- basically, it means that when

20  the movement is detected, it's gonna do something.  In

21  this case, translate the document and so forth.

22      Q   So, in your words, does "in response to" mean

23  after "in response to"?

24          MR. MONACH:  Object to the form of the

25  question; asked and answered.

Confidential Attorneys' Eyes Only Outside Counsel

Page 83

1        MR. JOHNSON:  Q.  It has -- it has to be

2   after something happens; right?

3   A    In re- --

4        MR. MONACH:  Same objection.

5        Go ahead.

6        THE WITNESS:  I'm sorry.

7        MR. MONACH:  That's all right.

8        THE WITNESS:  I'm talking over him.

9        In -- it's in response to detecting the

10  movement, so it detects the movement and in response

11  to that -- in reaction to that, it -- it does

12  something.  So it's responding to an event, which, in

13  this case, is detection of movement.

14       MR. JOHNSON:  Q.  So in -- in -- in this

15  particular limitation, the translation of the

16  electronic document happens after the movement is

17  detected?

18       MR. MONACH:  Object to form.

19       THE WITNESS:  So, yes, in re- -- the

20  translation occurs in response to that detection of

21  the movement.  So the movement has to be detected, and

22  then the translation occurs.

23       MR. JOHNSON:  Okay.

24    Q   So "in response to" has this, at least,

25  temporal as -- aspect that deals with after something

1  happens, something else then occurs?

2          MR. MONACH:  Object to form.

3          MR. JOHNSON:  Q.  Do -- do you understand my

4  question?

5          MR. MONACH:  Object to form; asked and

6  answered.

7          THE WITNESS:  First, can I just release my

8  finger on this?

9          MR. JOHNSON:  Yeah.

10         THE WITNESS:  I'm sorry.  Could you repeat

11  that last portion?

12         MR. JOHNSON:  Q.  Does "in response to"

13  denote/connote some temporal aspect that deals with,

14  you know, for example, after the movement is

15  detected --

16         MR. MONACH:  Object to form.

17         MR. JOHNSON:  Q.  -- or -- or after the edge

18  of an electronic -- electronic document is reached?

19         MR. MONACH:  Object to form; asked and

20  answered.

21         THE WITNESS:  In the context of this claim

22  and this patent, it is -- you -- the response is after

23  the detection of the movement.  So the movement has to

24  be detected, and then the system responds by

25  translating the document.  So in terms of this claim

Confidential Attorneys' Eyes Only Outside Counsel

Page 85

1   and this patent and the way the patent work --

2   describes this, that response would have to be

3   subsequent in -- in time.

4        MR. JOHNSON:  Right.

5     Q   And the next element, when it says "in

6   response to an edge of the electronic document being

7   reached," the -- the edge of the electronic document

8   has to be reached before the subsequent action occurs;

9   right?

10        MR. MONACH:  Object to the form of the

11   question; calling for a legal conclusion; vague.

12        THE WITNESS:  So if you're saying the edge

13   has to be reached before the -- the next translating

14   step occurs, we're -- yes, in the context of this

15   claim, this patent, I would say, yes, the -- the --

16   you'd have -- you'd have to detect the edge, and then

17   that next portion of the translation would occur.

18        MR. JOHNSON:  And the last element says "In

19   response to," again, "detecting that the object is no

20   longer on or near the touchscreen display translating

21   the electronic document in a second direction."

22     Q   So, again, the translating the -- the

23   electronic document in a second direction occurs only

24   after the object is no longer on or near the

25   touchscreen display; right?

Confidential Attorneys' Eyes Only Outside Counsel

Page 86

1    MR. MONACH:  Same objection.

2    THE WITNESS:  For this claim in this patent,

3 in -- my understanding of it is the -- the object has

4 to be not on or near the touchscreen display anymore,

5 and then the -- that second direction translation

6 would occur.

7    MR. JOHNSON:  Okay.  Let's go back to the --

8 the -- the third element, I guess.

9    Q   "In response to detecting the movement,

10 translating the electronic document displayed on the

11 touchscreen display in a first direction to display a

12 second portion of the electronic document."

13    What's -- what's the first direction?

14    MR. MONACH:  Object to form; asked and

15 answered.

16    THE WITNESS:  My reading of the claims, as I

17 demonstrated earlier on the -- several of the phones,

18 as well, it says "a first direction," so a direction

19 that the -- that is picked to move to display that

20 second portion.

21    MR. JOHNSON:  Okay.

22    Q   Do you see the next element refers to "the

23 first direction"?

24    A   "The first direction that is different from

25 the" -- you're talking about when it -- when it says

Confidential Attorneys' Eyes Only Outside Counsel

Page 87

1    "after the edge is reached"?

2        Q    Yes.

3        A    Okay.

4        Q    So the first direction is used twice in the

5    claims; right?

6        A    It's used once, twice -- it appears to be

7    used twice, yes.

8        Q    And it means the same thing in both

9    instances; right?

10       MR. MONACH:  Object to the form of the

11   question to the extent it calls for a legal

12   conclusion; vague.

13       THE WITNESS:  I'm not sure what you mean by

14   "the same thing."  In the first -- I'm not sure which

15   element this is.  The first -- first instance of the

16   word -- of the phrase "first direction" in the claims,

17   it says "in a first direction."  So it's some first

18   direction.

19       And then, the second time it appears, it's in

20   the next claim element, it says "in the first

21   direction," and I would imagine it's referring it back

22   to the first direction previously determined.  So --

23       MR. JOHNSON:  Q.  So the -- the direction has

24   to be the same for both instances of -- the use first

25   direction in the claims; right?

Confidential Attorneys' Eyes Only Outside Counsel

Page 88

1      MR. MONACH:  Objection to the extent it's

2  calling for a legal conclusion.

3      THE WITNESS:  So the first -- yeah, the first

4  direction is a first direction, and the second one is

5  the same first direction as the previous one.

6      MR. JOHNSON:  Yeah, that's all my point is.

7  Q   It's the same direction for both of those

8  instances.

9      MR. MONACH:  Objection; form.

10     THE WITNESS:  The second -- the second first

11 direction is the same as the first first direction.

12     MR. JOHNSON:  Q.  Let's just circle on your

13 pens.

14 A   I'm sorry?

15 Q   Just circle both instances --

16 A   Yeah.

17 Q   -- first direction on your pen.

18 A   Yeah, okay.

19 Q   Okay.  So my -- I think you've already

20 answered this, but the direction that's referred to in

21 both of those, quote, "first directions," is the same;

22 right?

23     MR. MONACH:  Objection; form.  Objection to

24 the extent it calls for a legal conclusion; asked and

25 answered.

Confidential Attorneys' Eyes Only Outside Counsel

Page 89

1        THE WITNESS:  I think what I said was the
2   second first direction, the second so-called here on
3   the patent, is the same as the first one.
4        MR. JOHNSON:  Okay.
5   Q   So if you go back to the phone that you were
6   looking at, the -- the S 4G.
7   A   This is the one.  Yeah, I think it's the same
8   one.  Okay.
9   Q   Let me -- let me have it for a sec.
10       And if you -- you zoom in on the image, you
11  would agree that the photo pans according to the
12  movement of my finger; right?
13  A   It reacts to movement of my -- your -- your
14  finger.
15  Q   Okay.  And if I -- if I move my finger in a
16  circle, the image moves in a circle; right?
17  A   The image appears to follow the finger to
18  some extent, yes.
19  Q   And if I -- if I move it in an arc, it moves
20  in an arc; correct?
21  A    It's hard to say whether it's an arc or not,
22  but it is kind of tethered to your finger, yes.
23  It's -- it's moving relative to the movement of your
24  finger.
25  Q   So if I'm -- as I -- as you were showing me,

Confidential Attorneys' Eyes Only Outside Counsel

Page 90

1    if I zoom in on the image, and if I move the image,

2    then -- if I -- at 45 degrees, for example, you know,

3    you see my finger has moved 45 degrees?

4        A    Roughly.

5        Q    -- or approximately; right?

6        A    Sure.

7        Q    And then that's a first direction; right?

8            MR. MONACH:  Objection; form.

9            MR. JOHNSON:  Q.  I want you to assume that's

10   the first direction.

11       A    Okay.  Sure.

12       Q    Okay.  And then if I move the image down from

13   there at 45 degrees, right, have -- in both of those

14   actions, has my finger moved the same direction?

15           MR. MONACH:  Objection to the form of the

16   question; vague; calling for a legal conclusion.

17           THE WITNESS:  In the compound two-dimensional

18   case, it is moving in two dimensions.  It, in one

19   case, moved in some amount of the X, in some amount of

20   the Y.  In the other case you moved a different amount

21   of the X, a different amount of the Y, depending on

22   what your components of the direction are.  If you're

23   only interested in one axis, then maybe it was the

24   same.  I'd have -- I'd have to determine exactly what

25   your paths were.  But if you're talking about the

Confidential Attorneys' Eyes Only Outside Counsel

Page 91

1  two-dimensional movement, then it appears you took two

2  different vectors --

3          MR. JOHNSON:  Yeah.

4      Q   For purposes --

5      A   -- in these images.

6      Q   For purposes of the claims of the '381

7  patent, these are -- these are two different

8  directions; right?

9          MR. MONACH:  Objection; calling for a legal

10  conclusion.

11          THE WITNESS:  For purposes of the claims,

12  these -- the two-dimensional directions that you

13  took -- that you just showed appear to be different.

14          MR. JOHNSON:  Right.

15      Q   Just so, since you're the actor today, can --

16  can you -- can you --

17      A   I hope I'm not acting.

18      Q   -- show us on the screen -- or, at least,

19  you're -- you're the hand model.

20          Can -- if you could just put the -- show on

21  the screen the two -- the -- the -- just what I just

22  did.

23          So put -- put your finger on the screen on

24  the zoomed-in image, and if you move it up at

25  45 degrees --

Confidential Attorneys' Eyes Only Outside Counsel

Page 92

1      A    Like, up here?

2      Q    Yeah.

3      A    Okay.

4      Q    And then if you move it down 45 degrees,

5  right, those are not the same direction; right?

6          MR. MONACH:  Objection to the form of

7  questions for the reasons previously stated.

8          THE WITNESS:  So, as I said, in the

9  two-dimensional space, if I'm concerned with both the

10  X and Y axes, taking both components of movement, then

11  it would be different.  However, if I'm only

12  interested in one of the components, say, for example,

13  the X axis, I'd have to look at the data.  It may be

14  both moving in the same direction in the X axis, for

15  example.

16          MR. JOHNSON:  Q.  For purposes of the claims

17  of the '381 patent, they're not the same direction;

18  are they?

19          MR. MONACH:  Objection to the form of the

20  question; calling for a legal conclusion.

21          THE WITNESS:  So the claim doesn't say

22  whether the direction is two dimensional, three

23  dimensional, one dimensional, so it would be

24  determined -- would depend a little bit on whether you

25  want to constrain the direction to be only a

Confidential Attorneys' Eyes Only Outside Counsel

Page 93

1  particular axis.  If the claim is interpreted broadly

2  to mean any number of axes of movement, then it would

3  not be the same.  If it's interpreted more narrowly to

4  say I'm only interested in X axis movement, for

5  example, then it can be the same.

6          MR. JOHNSON:  Q.  Well, what's your

7  definition of "first direction," under the claims of

8  the '381 patent?

9      A   Reading it in terms of the plain language,

10  which is the way I've -- I've interpreted the claims

11  so far, I would take this to be -- could be more than

12  one -- one dimension.

13     Q   So under the definition -- under the

14  definition of "first direction" that you just gave for

15  the '381 patent, were those two finger movements the

16  same direction?

17     A   They would be the same direction, if you take

18  the two-dimensional components into account, yes.

19     Q   So they would be a first direction?

20     A   So, no, I'm sorry.  Can I go back?  I -- I

21  misstated that.

22          They would be -- they would not be the same

23  direction if I took the two-dimensional components

24  into account.  But if I only looked at one-dimensional

25  component of the movement, they might be the same.

Confidential Attorneys' Eyes Only Outside Counsel

Page 94

1   I'd have to look whether the X axis is the same thing.

2       Q   Is there -- do you think there's an ambiguity

3   in terms of what "first direction" means in the plain

4   language meaning of that term for the '381 patent?

5           MR. MONACH:  Object to the form of the

6   question; vague; incomplete hypothetical; calling for

7   a legal conclusion.

8           THE WITNESS:  From a plain reading of this

9   and just taking a high-level view of it, the -- it

10  would appear to encompass all -- all components of the

11  direction, dimensions of the direction, but I could

12  imagine somebody, you know, saying I only want it

13  constrained to X axis, for example.

14          MR. JOHNSON:  Yeah, I'm talking about a

15  person of ordinary skill in the art.

16      Q   What would a person of ordinary skill in the

17  art understand "first direction" to mean in the '381

18  patent?

19          MR. MONACH:  Object to the -- object to the

20  form of the question, but you can give your

21  understanding.

22          THE WITNESS:  So as I'm reading this, the

23  claims in conjunction with the patent, I would say it

24  includes the -- the -- the two-dimensional components.

25          MR. JOHNSON:  Okay.

Confidential Attorneys' Eyes Only Outside Counsel

Page 95

1    Q   So if I go back to the claim language, the

2  third element says "In response to detecting a

3  movement translating the electronic document displayed

4  on the touchscreen display in a first direction to

5  display a second portion of the electronic document,"

6  so can you show me what that is in the Galaxy S 4G?

7    A   So -- so displayed in the touchscreen in a

8  first direction.

9        So if I go -- so let me zoom this one again.

10  If I go this way, see that.  Let me do this again.  So

11  it's a first direction, for example.

12    Q   Okay.

13    A   And it displays a second portion of the

14  document.

15    Q   And then, the next element says "In response

16  to an edge of the electronic document being reached

17  while translating the electronic document in the first

18  direction."

19        So that means you have to reach the edge

20  using the same first direction?

21    A   That's right.

22        MR. MONACH:  Object to the form.

23        THE WITNESS:  I'm sorry.  I should have

24  waited.

25        MR. JOHNSON:  So --

Confidential Attorneys' Eyes Only Outside Counsel

Page 96

1        THE WITNESS:  Yeah, so I'm gonna continue in

2    the same direction; and I'm now -- not sure whether it

3    reaches the edge.  It all looks black there.  Let me

4    do this again.  So if I go first direction, keep

5    going, I've definitely reached the edge now.

6        MR. JOHNSON:  Okay.

7    Q   So if you do what I did before that had the

8    45-degree angle --

9    A   Right.

10   Q   -- right.  So move the image up, and then

11   move it down, and reach the edge.

12   A   Like that?

13   Q   Right.  Zoom in on it first for me, right.

14       First direction, up 45 degrees a little bit.

15   A   Yep.

16   Q   And then down.

17   A   Well, that's already gone past the edge.

18   Q   So go -- go --

19   A   Still without the edge being shown?  I'm

20   sorry.

21   Q   Yeah, let me -- let me -- let me -- what

22   I'm -- so if I start here, and I go up here, I haven't

23   reached the edge yet, but then I --

24   A   I don't believe so, yes.

25   Q   Start there, and then I reach the edge by

Confidential Attorneys' Eyes Only Outside Counsel

Page 97

1  going down.

2      A   I think there's some black dotted stuff

3  there, but I think you reached the edge --

4      Q   Right.

5      A   -- as it should.

6      Q   So that is not using the same first direction

7  to reach the edge; right?

8          MR. MONACH:  Same objection to the extent it

9  calls for a legal conclusion.

10         But you can give your understanding.

11         THE WITNESS:  To the extent that it's -- the

12 two-dimensional directions that we just discussed,

13 it's not the same two-dimensional directions.

14         MR. JOHNSON:  Okay.

15     Q   So can you just demonstrate for us the

16 example that I just gave?

17     A   So you want me to go --

18     Q   Zoom in, and move -- right.

19     A   I think I've already passed the edge, though.

20 Okay.

21     Q   So that's --

22     A   That's --

23     Q   So in response to detecting a movement,

24 translating electronic document displayed on a

25 touchscreen display in a first direction.

Confidential Attorneys' Eyes Only Outside Counsel

Page 98

1    A    So you want me to go up --

2    Q    Right.

3    A    -- to the 45 degrees.

4    Q    45 degrees.

5    A    Okay.

6    Q    And then, in response to an edge of the

7  document being reached while translating the document

8  in the first direction.  So if you move down at

9  45 degrees, and you come to an edge --

10   A    Right.

11   Q    -- that doesn't meet the claims of the '381

12  patent; right?

13       MR. MONACH:  Objection.

14       MR. JOHNSON:  Q.  -- because it's not the

15  same first direction that's used to get to the edge?

16       MR. MONACH:  Objection; form.  Objection;

17  calling for a legal conclusion.

18       THE WITNESS:  Given that it's a different

19  two-dimensional direction, it would not be the same

20  first direction, correct.

21       MR. JOHNSON:  Okay.  All right.

22   Q    So going back to the claim language, using

23  your example of a first direction, can you -- can you

24  explain to us the alleged infringement for the element

25  that says, "In response to an edge of the electronic

Confidential Attorneys' Eyes Only Outside Counsel

Page 99

1    document being reached while translating the

2    electronic document in the first direction"?

3        A    So same zoomed-in image, I'm going here.   I

4    moved in the first direction, and I continue moving in

5    that same direction, I see the edge, and then it

6    continues.

7            So it's detected the edge.  Movement is still

8    happening the same first direction and displays an

9    area beyond the edge, which is in black, past the --

10   past the edge of the document, and then displays a

11   third portion of the electronic document, which is

12   what you see in the screen, which is smaller than the

13   first portion that we saw earlier.

14       Q    Okay.  So when I -- when you moved to the

15   edge of the document by moving your finger over, I saw

16   the image move up a little bit.

17           MR. MONACH:  Object to the form of the

18   question.

19           MR. JOHNSON:  Q.  And so my question is:

20   When you move your finger across and the image moves

21   up or down, is that the same first direction?

22           MR. MONACH:  Object.

23           MR. JOHNSON:  Q.  Do you understand my

24   question?

25           MR. MONACH:  Object to the form of question;

Confidential Attorneys' Eyes Only Outside Counsel

Page 100

1  assuming facts not in evidence.  Object to the extent

2  it calls for a legal conclusion.

3          THE WITNESS:  So --

4          MR. JOHNSON:  Q.  So let me -- let me ask it

5  a different way.

6      A   Can I release this?

7      Q   Yeah, you can release that.  This is not --

8  this is not intended to be torture.

9          Is there -- is the only way to infringe this,

10  the claims of the '381 patent, for the -- for the

11  movement of the image and the object to be in a

12  perfectly straight line?

13          MR. MONACH:  Object to the form of the

14  question as calling for a legal conclusion; incomplete

15  hypothetical.

16          THE WITNESS:  No, I don't think it has to be

17  a perfectly straight line.

18          MR. JOHNSON:  Q.  You would agree that the

19  first movement that you took when you translated the

20  document to -- to display a second portion of an

21  electronic document, and then when you moved to the --

22  to the edge of the document, your -- your finger

23  didn't move exactly a straight line; right?

24          MR. MONACH:  Objection; form.  Objection;

25  vague.

Confidential Attorneys' Eyes Only Outside Counsel

Page 101

1          THE WITNESS:  To the extent that a -- a --
2     you know, was my finger exactly on a straight line, I
3     don't think that's humanly possible --
4          MR. JOHNSON:  Right.
5          THE WITNESS:  -- unless you constrain my
6     finger with some physical gadgetry that would hold it.
7     I don't think that you can do that --
8          MR. JOHNSON:  Q.  So my question is --
9          MR. MONACH:  Please don't interrupt him.
10         MR. JOHNSON:  Sorry about that.
11     Q    My question is:  Where do you draw the
12     boundaries around what constitutes the same first
13     direction?  How do you do that?
14          Because, as you just said, you can't have a
15     perfectly straight line, unless your finger is
16     physically constrained to something that -- that makes
17     that happen.  So what's -- what constitutes the
18     difference between moving in the same first direction
19     the way you did it, versus the way I did it with a
20     45-degree arc?
21          MR. MONACH:  Hang on.
22          Object to the form of the question.  Object
23     to the extent you're calling for a legal conclusion.
24          THE WITNESS:  So --
25          MR. JOHNSON:  Q.  So my question is:  A

Confidential Attorneys' Eyes Only Outside Counsel

1   person of ordinary skill in the art would not know how

2   to differentiate between drawing the perfectly

3   straight line with a finger in one direction -- in the

4   first direction, versus drawing approximately a

5   straight line.

6           MR. MONACH:  Is that a question?

7           Object to -- object to form.

8           THE WITNESS:  Are you talking from a -- so

9   I'm not sure I completely understand the question.

10          MR. JOHNSON:  I'm talking from a user

11  standpoint.

12      Q   Someone wants to try and avoid using this

13  particular claim by saying I'm not gonna use my object

14  to -- to -- to move, in this case, the photo in a

15  first direction.  How do I go about avoiding that?

16          MR. MONACH:  Object to the form of the

17  question as vague and calling for a legal conclusion.

18  Objection to the extent it calls for a narrative about

19  all the possible ways one might avoid infringing.

20          THE WITNESS:  So I think that's -- it would

21  have to be a first direction that the other one --

22  the -- the second first direction and the first first

23  direction in these claims would have to be the same

24  general direction as a user would perceive it to be.

25          I -- I don't think it has to be exactly on a

Confidential Attorneys' Eyes Only Outside Counsel

1   mathematical equivalent straight line, but, to me, if

2   you go, you know, obviously different directions, like

3   you did on the -- the two 45s in very different

4   two-dimensional directions, most users would be able

5   to say that's a -- you know, I've got to change

6   direction along the way.

7       MR. JOHNSON:  Okay.

8   Q   How about a slight arc?  Is that sufficient?

9       MR. MONACH:  Same objection; also vague.

10      THE WITNESS:  A slight arc.  So if you're

11  saying my direction is -- is the contours of the arc,

12  so one, kind of, doing this and continue along the

13  same -- I don't know how you continue in an arc.

14      Eventually you will loop back, but wait.  Let

15  me -- that would be -- you know, if your direction is

16  now a two-dimensional direction, yes, it would be the

17  same direction.

18      Or if I was on the 45 angle and continued in

19  this similar 45 and didn't make a sharp turn, then it

20  would be the same dir- -- same first direction.

21      MR. JOHNSON:  Q.  And what if I -- what if I

22  did an angle that was, you know, ten degrees in one

23  direction and ten degrees in the other direction?

24      I'm trying to understand where the metes and

25  bounds are, where the boundaries are for what

Confidential Attorneys' Eyes Only Outside Counsel

Page 104

1    infringes, versus what doesn't; and so at what point

2    is it the same first direction and at what point is it

3    not the same direction?  Because you said my -- my

4    example of going 45 degrees up and 45 degrees down is

5    not the same direction.

6           So, you know, going at ten degrees up and ten

7    degrees down, is that the same first direction?  I

8    mean, I can't draw a straight line with a ruler, so it

9    all looks pretty straight to me, but at what point do

10   you avoid the claim and at what point are you covered

11   by the claim?

12          MR. MONACH:  Object to the --

13          MR. JOHNSON:  So let -- let me ask it a

14   little bit more specifically.

15    Q   At -- tell me -- when -- when you said it has

16   to be the same general direction, what exactly do you

17   mean by that?

18          MR. MONACH:  Objection to the extent that

19   you're asking for a legal conclusion.  Objection to

20   the extent it's an incomplete hypothetical and you're

21   asking him to form a new opinion here at the

22   deposition.

23          But if you have a -- have you -- you can

24   answer.

25          THE WITNESS:  So I haven't, you know,

Confidential Attorneys' Eyes Only Outside Counsel

Page 105

1  explored this particular question in great detail

2  in -- in thinking about this, because, to me, reading

3  this, as one skilled in the art, it says first

4  direction and another first direction, it would be the

5  direction -- same general direction that a user would

6  generally consider to be a first direction of the same

7  direction; whereas, if it's something that -- you

8  know, I think a straight line from a mathematical

9  definition or a unfavoring first direction from a

10  mathematical -- a direction from a mathematical

11  definition, and then what one skilled in the art or

12  average user would say, yeah, that's in the same

13  direction.

14       So if you're asking me is there an exact

15  mathematical number at which it is no longer one, I

16  don't think I could give you that answer.

17       MR. JOHNSON:  Okay.

18   Q   What about -- let me -- can we have that

19  phone, please.  Thank you.

20       Can you try and get this for me?

21       Okay.  So you said this is not the same first

22  direction; right?

23   A   Can you do that again?

24   Q   That direction is not the same as that

25  direction --

Confidential Attorneys' Eyes Only Outside Counsel

1   MR. MONACH:  Objection to the form of the

2   question.

3   MR. JOHNSON:  Q.  -- right?

4   MR. MONACH:  Calling for a legal conclusion.

5   THE WITNESS:  If I was a -- as I said

6   earlier, if I'm considering the full two-dimensional

7   movement and not just the X axis component, then --

8   then it is two different directions that a user would

9   perceive it as.

10   MR. JOHNSON:  Q.  I'm -- all I'm asking is,

11   is it the same first direction for purposes of

12   the '381 patent and how the term "first direction" is

13   used in that?

14   MR. MONACH:  Objection; asked and answered.

15   Objection; calling for a legal conclusion and a new

16   opinion with an incomplete hypothetical.

17   THE WITNESS:  So to the extent that you --

18   you -- the movement you did was -- from my eyes, it's

19   exact -- it's a different two-dimensional direction.

20   MR. JOHNSON:  Okay.

21   THE WITNESS:  It is different.

22   MR. JOHNSON:  Okay.

23   Q   Is -- is this arc the same direction?  So if

24   I break it into two --

25   A   You didn't pause.

Confidential Attorneys' Eyes Only Outside Counsel

Page 107

1    Q    Let me do it again.

2         So that is the first step of the first

3    direction.  This is the second step.

4         Is that the same first direction?

5         MR. MONACH:  Same objection as to the

6    previous question.

7         THE WITNESS:  So, conceptually, if you're

8    moving in an arc, and assuming you went on the same

9    arc, and you didn't -- when you broke there, you --

10   you were still following the same arc, I would say it

11   is the same first direction.

12        MR. JOHNSON:  Q.  It is?

13   A    Yes.

14   Q    Okay.  So what if I changed -- what if I

15   break the arc?  So if I start this, this way with --

16   and that's the first step, and then I change the angle

17   of the arc, I either go up or I go down at a different

18   angle, so I break the arc?

19   A    So it's no longer --

20        MR. MONACH:  Same objection.

21        Go ahead.

22        THE WITNESS:  I'm sorry.

23        A -- if you're no longer on the same arc, you

24   have -- you have broken the arc, as you -- as you've

25   said, then it would not be the same direction.

Confidential Attorneys' Eyes Only Outside Counsel

1          MR. JOHNSON:  Okay.

2     Q    And if I move my finger -- you would agree

3  that in moving my finger -- and I can see the image

4  moving up and down -- I mean, generally speaking,

5  there are gonna be components within the movement of a

6  finger that have a vertical component to it, as well

7  as sort of the horizontal component; right?  So it's

8  moving up and down.

9          MR. MONACH:  Object to the form of the

10 question.

11         MR. JOHNSON:  Q.  So is that -- is that the

12 same direction, even though it's -- it's bouncing up

13 and down when I move it?

14         MR. MONACH:  Same objection.

15         THE WITNESS:  Well, I wouldn't say that's

16 bouncing up and down.  I saw it moving primarily to

17 the right.  I actually could not see it bounce, but

18 I'll take your word that it's moving maybe a little

19 bit up and down.  You could exaggerate it a little

20 bit, if you wanted it to, but -- but now you're

21 clearly moving it in a jaggy way, so that's --

22         MR. JOHNSON:  Q.  So is that the same first

23 direction?

24     A    Well, I'm seeing your hand move in a zigzag,

25 so, to me, that's -- I think it's a very contrived way

Confidential Attorneys' Eyes Only Outside Counsel

Page 109

1    of doing it.

2        Q   No, I'm trying to -- I'm -- I'm purposely

3    contriving it to -- to understand if that's the same

4    first direction.  So if I move it in a -- in a jagged

5    sort of way --

6            MR. MONACH:  Hang on a second.

7            MR. JOHNSON:  Q.  -- is that the first --

8    with -- let me start over.

9        Q   If I move my finger in a jagged way, like

10   this, does that meet the elements of the claim in

11   the '381 patent for first direction?

12           MR. MONACH:  Objection; calling for a legal

13   conclusion; vague; incomplete hypothetical.

14           THE WITNESS:  So I'm thinking here -- I

15   haven't considered this in detail before.  Now you're

16   showing me this for the first time, and I'm thinking

17   out loud here, to some extent.

18           Similar to the arc, where it's a

19   two-dimensional movement, but it follows a pattern,

20   it's following that arc, and I said that it would be a

21   first direction if you continue along the same arc.

22   In this case, you've got a rhythmic -- I think you did

23   a rhythmic jagged movement, where you kind of went up

24   and down, up and down, in a same kind of sawtooth.  I

25   would say that is the same direction, if you continue

Confidential Attorneys' Eyes Only Outside Counsel

Page 110

1   along the same rhythmic two dimension --

2   two-dimensional sawtooth or jaggy, whatever you want

3   to call it, which is different from the original --

4   sorry -- the earlier one where you did a big movement

5   in one direction and another big movement in a

6   different -- very different two-dimensional direction.

7   I would think one of ordinary skill in the art would

8   say that's a different two-dimensional direction.

9       MR. JOHNSON:  Okay.

10      Q   So, then, let me -- let me go back to that,

11  then, and ask you this:  If I -- if I do two saw

12  teeth, up, down, up, down, is that the same first

13  direction --

14      MR. MONACH:  Objection; vague and --

15      MR. JOHNSON:  Q.  -- because it's rhythmic?

16      MR. MONACH:  Objection; vague and ambiguous;

17  incomplete hypothetical; calling for a legal

18  conclusion and a new opinion at the deposition.

19      THE WITNESS:  Again, I haven't thought about

20  it in detail.  You know, I'm thinking about this for

21  the first time here.  I would say to the extent that

22  it's repetitive, and you're -- you're going in the

23  same direction, it would be the same first direction.

24      MR. JOHNSON:  Okay.

25      Q   So repetitive in the same direction,

Confidential Attorneys' Eyes Only Outside Counsel

1   rhythmic, generally the same direction, those all meet

2   the limitations of the '381 patent for first

3   direction, as far as you're concerned; right?

4        MR. MONACH:  Same objection.

5        THE WITNESS:  Again, thinking on the fly

6   here, you know, haven't -- haven't delved into this in

7   great detail, yes, I would say yes.

8        MR. JOHNSON:  Okay.

9   Q   So let's -- let's keep going through the --

10  the claim --

11  A   Sorry.  I can't remember where we were.

12  Q   -- limitations.

13      We were -- we were just about to do display

14  in an area beyond the edge of a document.

15  A   Okay.  So let's assume I've done some of the

16  earlier stuff, and I've now -- I've pulled this, and

17  I've gone in one direction in a -- in the same

18  direction, same first direction.  I've now -- I'm now

19  showing an area beyond the document.

20  Q   That's the black?

21  A   It is the black beyond the blackened dots

22  there.  It says, "Displays the area beyond the edge of

23  the document," and then it displays -- well, currently

24  displays a third portion of the electronic document,

25  which is what you see to the right of the -- the area

Confidential Attorneys' Eyes Only Outside Counsel

1  beyond the edge, and that is clearly smaller than the

2  first portion which took up more of the screen.

3      And then, now, that last element of the

4  claims --

5      Q   Okay.  Before you get there, what -- what is

6  "displaying an area beyond the edge of the document"

7  mean?

8      MR. MONACH:  Object to form.  Object to the

9  extent it calls for a legal conclusion.

10      You can give your understanding.

11      THE WITNESS:  My understanding is, in the

12  context of this patent and the claims, it's -- I've

13  got the edge of the document.  I've reached the edge,

14  and I'm gonna show something, some -- some amount of

15  visuals beyond that edge.  Displaying an area.

16      MR. JOHNSON:  Q.  What do you mean you're

17  going to show some amount of visuals beyond the edge?

18      A   So, for example, the black space, that black

19  area.  It could be a white area.  It could be some --

20  some visual that's not part of the document.

21      Q   So it could be anything that's visual, as

22  long as it's not part of the document?

23      MR. MONACH:  Object to the form of the

24  question.  Object to the extent it's vague and calls

25  for a legal conclusion.

Confidential Attorneys' Eyes Only Outside Counsel

1        THE WITNESS:  So as this claim reads, it

2   says, "Displaying an area beyond the edge of the

3   document."  It doesn't say the area has to have any

4   particular characteristics.  Yes, or any -- some area

5   beyond the edge is not part of the document.

6        MR. JOHNSON:  Q.  And what is -- what does

7   "displayed" mean?

8        A   Can I release the --

9        Q   Yeah.

10        MR. MONACH:  Same objection.

11        THE WITNESS:  Displaying, showing on the

12   screen.

13        MR. JOHNSON:  Okay.

14        Q   Now, you haven't looked at the -- the -- the

15   source code for any of the accused devices; right?

16        MR. MONACH:  Objection.  Object to form.

17        THE WITNESS:  I briefly looked at some of the

18   public Android source code.

19        MR. JOHNSON:  Okay.

20        Q   Have you -- so -- and, by the way, can you

21   tell us what specific Android source code you looked

22   at for purpose -- I'm talking about the -- for the

23   accused devices, as well?

24        MR. MONACH:  Well, objection; vague and

25   compound.

Confidential Attorneys' Eyes Only Outside Counsel

1    MR. JOHNSON:  Let me reask it, all right.

2    Q   So have you looked at any of the source codes

3    for these particularly accused devices?

4    MR. MONACH:  Objection; vague; may be lacking

5    in foundation.

6    THE REPORTER:  Excuse me.  Don't play with

7    the cord.

8    THE WITNESS:  Oh, I'm sorry.

9    I have looked at some of the source codes for

10   Android 2.3, 2.2, for example.

11   MR. JOHNSON:  Q.  The source code that you're

12   referring to is the publicly available Android source

13   code; right?

14   A   That is correct.

15   Q   Okay.  You haven't looked at any of the

16   proprietary source codes for any of the Samsung

17   Accused Products; right?

18   A   I have not looked at any -- anything that was

19   obviously marked proprietary, no.

20   Q   Okay.  And what -- what specific pieces of

21   the source code for Android 2.3 and 2.2 did you look

22   at?

23   A   Well, I can't remember the specifics.  I -- I

24   know in -- in Android 2.3, I believe, I looked --

25   looked for -- out of curiosity, really, just looked at

Confidential Attorneys' Eyes Only Outside Counsel

Page 115

1   some of the scrolling functionality.  That's -- you

2   know, that's some of the stuff I looked at.

3       Q    When did you look at that?

4       A    Maybe a month or two ago.  Maybe a month

5   ago --

6       Q    After you --

7       A    -- a month.

8       Q    After you were retained for this case?

9       A    That particular chunk of code, yes, it was

10  after I was retained.

11      Q    And -- and why did you look at it?

12      A    It was when I was --

13          MR. MONACH:  Actually, let me just caution

14  the -- caution the witness not to disclose any expert

15  and lawyer communications, except to the extent they

16  relate to facts or assumptions that you relied on,

17  but, otherwise, you're free to answer the question.

18          MR. JOHNSON:  Go ahead.

19          THE WITNESS:  So when I was looking at these

20  phones, I, you know, was curious because the code was

21  available.  Should -- you know, apparently was

22  available online publicly, so I -- you know, I was

23  just curious to see what they were doing there, so I

24  looked at that, but I realized very quickly that the

25  infringement -- I mean, I did not need to look at the

Confidential Attorneys' Eyes Only Outside Counsel

1  code to determine infringement, because it's pretty

2  obvious, just from looking at the applications

3  themselves, that I could determine infringement

4  without analyzing the code in any detail, so I did not

5  pursue the code analysis in any further detail.

6      MR. JOHNSON:  Did the aspect of the -- strike

7  that.

8    Q   Did the code that you looked at for Android

9  2.3 and 2.2 confirm in your mind infringement of

10 the '381 patent?

11     MR. MONACH:  Objection; vague.  Objection;

12 compound.

13     THE WITNESS:  So in Android 2.3, I saw

14 something called the -- I think it's called a scroller

15 class, over-scroller class.  That appeared to be doing

16 some of this moving-past-the-edge thing.  I did not

17 study it in great detail to match it up with the

18 claims.  I did not, you know, go searching very hard

19 for the same type of functionality in 2.2, because, at

20 that point, I realized I didn't need that to determine

21 infringement.

22     Well, I certainly did not sit there and say,

23 okay, all of this code matches up with the claims; and

24 the code, element by element, infringes, I did not do

25 that analysis yet.

Confidential Attorneys' Eyes Only Outside Counsel

Page 117

1       MR. JOHNSON:  Do Android versions 2.3 and 2.2

2   meet the elements of claim -- strike that.

3       Q   Do Android versions 2.3 and 2.2 meet the

4   elements of the -- of the claims of the '381 patent,

5   as far as you're concerned?

6       MR. MONACH:  Object to the form of the

7   question as vague and ambiguous; lacking in

8   foundation, in light of the prior testimony.  I object

9   to the extent it calls for a legal conclusion and a

10  new opinion on a new subject at the deposition.

11      THE WITNESS:  So, as I said, I have not

12  analyzed that code in detail to match them up with the

13  claims, but to the -- but I have looked at these four

14  devices and the gallery and contacts application, as

15  we've already discussed, and from the applications and

16  using the applications, I've matched up the

17  functionality with the claims.  And, as I said before,

18  these devices are running code in the -- in the

19  devices, and to the extent that that code is the same

20  code as Android 2.2 or 2.3, or whatever it is, then

21  it -- if it is the same code, then it would have to,

22  because the functionality running on the device is

23  infringing the claims, the code would have to infringe

24  the claims.

25      MR. JOHNSON:  But you don't know whether the

Confidential Attorneys' Eyes Only Outside Counsel

Page 118

1    claim -- well, strike that.

2        Q    You don't know whether the -- the accused

3    Samsung products actually implement the Android code

4    in the same way that you reviewed it; right?

5        A    So I don't know if the accused Samsung

6    products use exactly the same versions of code I

7    looked at, no, I cannot say that for sure, and the --

8    the products may have additional code beyond the --

9    the publicly available code that I'm not --

10       Q    And you just don't, because you haven't

11   looked at the code?

12       A    I have not looked at that code in detail

13   enough to make that determination.

14       Q    Right.

15           The Android software is obviously publicly

16   available; right?

17           MR. MONACH:  Object to form.

18           THE WITNESS:  The Android code and software

19   is pub- -- some versions of it are publicly available,

20   I believe, yes.

21           MR. JOHNSON:  You didn't look at any of

22   the -- well, strike that.

23       Q    Did you look at the -- let me ask you in two

24   ways:  You didn't look at any Samsung code to

25   determine if the elements that require "In response to

Confidential Attorneys' Eyes Only Outside Counsel

Page 119

1  detecting the movement translating the electronic

2  document displayed on the touchscreen display in a

3  first direction," or "in response to an edge of the

4  electronic document being reached while translating

5  the electronic document in the first direction while

6  the object is still being detected on or near the

7  touchscreen display," or "in response to detecting

8  that the object is no longer on or near the

9  touchscreen display translating the electronic

10  document in a second direction until the area beyond

11  the edge of electronic document is no longer displayed

12  to display a fourth portion," you didn't look to

13  determine whether any of the Samsung code meets those

14  limitations specifically; right?

15         MR. MONACH:  Object to the form of the

16  question.  He's already asked -- he's already been

17  asked and answered whether he looked at the code

18  that's loaded on these devices.

19         You can answer again.

20         THE WITNESS:  So I've not looked at the

21  particular code that might be loaded on these

22  devices --

23         MR. JOHNSON:  Q.  And did you look at --

24     A   -- to match them up with the claims, no.

25     Q   Did you look at the Android software

Confidential Attorneys' Eyes Only Outside Counsel

Page 120

1   specifically to determine if those three limitations

2   in the claims were met?

3           MR. MONACH:  Objection; asked and answered.

4           You can do it again.

5           THE WITNESS:  If you mean the Android

6   publicly available source code, I did not look at it

7   and match up -- I did not do the matching --

8           MR. JOHNSON:  Okay.

9           THE WITNESS:  -- of the -- of the code to the

10  claims.  I did not do that.

11          MR. JOHNSON:  All right.

12      Q   Let -- let's go back to the limitation that

13  says "displaying an area beyond the edge of a

14  document."

15          You obviously didn't look at any code to

16  determine whether or how the displaying of -- of any

17  of the documents occurs; right?

18          MR. MONACH:  Objection; vague.

19          THE WITNESS:  I did not -- I'm sorry.  You're

20  done?

21          MR. MONACH:  Yes.

22          THE WITNESS:  I -- I did not look at code

23  that -- specifically looking for how a particular

24  document or area beyond the document might have been

25  displayed.

Confidential Attorneys' Eyes Only Outside Counsel

Page 121

1           MR. JOHNSON:  Q.  And there -- there --

2     you're not aware of any instructions in any code,

3     whether it's Samsung code or Android code, to draw an

4     area beyond the edge of the document, as required in

5     Claim 1 of the '381 patent; right?

6           MR. MONACH:  Objection; vague.

7           THE WITNESS:  I have not seen the code,

8     per se, but there would have to be that code, because

9     the functionality, as I'm working -- as I've

10    demonstrated on all these devices, clearly displays an

11    area beyond the edge of the document, so that

12    functionality is there.  It's not magic.  There would

13    have to be some code somewhere on the device that's

14    making that happen.

15          MR. JOHNSON:  Q.  Well, actually, do you have

16    any experience with AMO LED displays?  You do; right?

17    AMO LED?

18     A   I'm sorry.  What do you mean by A --

19     Q   AMO LED.

20         Do you have experience with AMO LED displays?

21     A   In terms of using them?

22     Q   Using them, analyzing them, working with

23    them.

24     A   I haven't analyzed the hardware in any

25    fashion at all.

Confidential Attorneys' Eyes Only Outside Counsel

Page 122

1    Q    But I thought you said -- well, strike.

2         Do you know whether any of the Samsung

3    accused devices use AMO LED displays?

4    A    I do not know what particular hardware

5    display they're using.

6    Q    That's not of any importance to your

7    analysis?

8         MR. MONACH:  Object to the form of the

9    question.

10        THE WITNESS:  I don't believe for these

11   particular claims the type of display, or beyond the

12   fact that it's a touchscreen display, the type of

13   whether it's an LCD, LED, whatever underlying

14   technology, the claim simply says a touchscreen

15   display, that is able to detect movement.

16        MR. JOHNSON:  Q.  What is --

17   A    So, for those claims, I did not see the need

18   to consider what particular type of hardware

19   technology, beyond the fact that it's a touchscreen

20   display.

21   Q    What is an AMO LED display?

22        MR. MONACH:  Objection; lack of foundation.

23        THE WITNESS:  I -- I haven't thought about

24   that in conjunction with this case, and I haven't --

25   you know, haven't formed an opinion on that, so I'm

Confidential Attorneys' Eyes Only Outside Counsel

1    not going to answer it.

2        Q    Have you ever -- have you ever heard of the

3    term?

4        A    I believe I have.  It's not something that I

5    use regularly.

6        Q    Okay.  Have you ever heard of the term

7    "organic LED displays"?

8        A    I have heard the term, yes.

9        Q    Okay.  And what -- what is that?

10       A    It -- again, I haven't, for purposes of

11   preparation for this, I haven't thought about that in

12   detail to give you a clear answer, so I'm not -- I'm

13   not gonna give you an answer that's detailed.  I would

14   say that's a different form of -- of display --

15       Q    Okay.

16       A    -- than some of the others out there.

17       Q    So to -- to meet the elements of the claims

18   in the '381 patent that refer to display in an area

19   beyond the edge of the document, does the display need

20   to actively show something beyond the edge of the

21   document?

22            MR. MONACH:  Objection; vague.  Objection to

23   the extent it calls for a legal conclusion.

24            THE WITNESS:  I'm not sure what you mean by

25   "actively needs to show."  It says the -- the claim

Confidential Attorneys' Eyes Only Outside Counsel

Page 124

1  element says "displaying an area," so it would have to

2  display an area.  I'm not sure how it could happen

3  without --

4          MR. JOHNSON:  Okay.

5          THE WITNESS:  -- the device actually doing

6  it.

7          MR. JOHNSON:  Q.  Exhibit 21 that's in front

8  of you, the Galaxy S 4G, I think it's off right now,

9  right, so is -- is that display -- strike that.

10         Is that device displaying anything on the --

11 on the screen?

12         MR. MONACH:  Object to the form of the

13 question; vague.  Object to the extent it's asking for

14 a legal conclusion and a new opinion.

15         THE WITNESS:  I haven't thought about this

16 in -- in any detail.  Just thinking on the fly here,

17 the display doesn't appear to be powered on, and as a

18 result, the active part of the display doesn't appear

19 to be showing anything.

20         MR. JOHNSON:  All right.

21    Q   So when it's off, when it's not displaying

22 anything, it's not -- strike that.  It's not

23 displaying anything, so let me ask it a different way.

24         When the -- when the screen is turned off,

25 it's not displaying anything; right?

Confidential Attorneys' Eyes Only Outside Counsel

Page 125

1          MR. MONACH:  Same objection.

2          THE WITNESS:  When the screen is turned off,

3    the screen portion is not displaying anything.  Beyond

4    the screen, there are hard -- you know, hard is the --

5    I guess personally -- permanently or somewhat

6    permanently etched lettering that says "T-Mobile" and

7    "Samsung" on it.  You could argue that that's a

8    display on the phone, but it's not, you know --

9          MR. JOHNSON:  Q.  I'm talking about the

10   screen.

11      A   -- the -- the actual active part of the

12   screen, it's not displaying anything, no.

13      Q   Okay.  So if you go to -- back to your

14   example, where you were demonstrating infringement of

15   the photograph in the gallery.

16      A   Uh-huh.

17      Q   Can you go back to that for me.  Okay.

18          And if you go to the portion where you

19   believe that you're displaying an area beyond the edge

20   of the document --

21      A   Like once --

22      Q   That's the black --

23      A   Yeah.

24      Q   -- edge on the left-hand side of the screen.

25          You don't know how the Samsung products

Confidential Attorneys' Eyes Only Outside Counsel

1  actually operate and where that black boundary comes

2  from; do you?

3      A   Are you saying where the black boundary comes

4  from and whether it's sending instructions illuminate

5  or not illuminate those pixels?

6      Q   Right.

7      A   It would have to send the instructions to say

8  illuminate or not illuminate or illuminate with a

9  particular color.

10     Q   So what is it doing?  Is it telling you to

11 illuminate or not illuminate?  What does the code do

12 there?

13         MR. MONACH:  Objection; lack of foundation.

14         MR. JOHNSON:  Q.  And if you don't know, you

15 can say you don't know.

16     A   I -- I have not looked at the code that does

17 that, so I cannot answer that question.

18     Q   So if -- if the LED -- if there are LEDs that

19 are turned off in that leftmost edge there, right,

20 there -- it's not displaying an area beyond the edge

21 of the document; is it?

22         MR. MONACH:  Object to the form of the

23 question.  Object to the extent it calls for a legal

24 conclusion and a new opinion.

25         THE WITNESS:  So I haven't thought about this

Confidential Attorneys' Eyes Only Outside Counsel

Page 127

1    in detail until now.  Thinking on the fly, if those

2    LEDs are turned off because the code says turn it off,

3    then it is -- it is displaying an area beyond the

4    screen, because it's under instruction that it's

5    turned off.

6         Or if it says display black, which is another

7    possibility, then it's also displaying an area --

8         MR. JOHNSON:  Q.  What if it doesn't do

9    anything?  What if it's not doing anything, and all

10   you're doing is moving the image over?

11        MR. MONACH:  Object to the form of the

12   question as vague and ambiguous.

13        MR. JOHNSON:  Q.  That doesn't meet the --

14        MR. MONACH:  Object to the extent it calls

15   for a legal conclusion.

16        MR. JOHNSON:  Q.  That doesn't meet the

17   element of the claims; do it -- does it?

18        A   If you're saying the instructions don't say

19   display or don't -- anything like that?

20        Q   Correct.

21        A   I think it would have to say something,

22   because, typically, my understanding of how these

23   refreshes of screens work, it -- it -- you typically

24   refresh the whole screen, and if portions are not

25   refreshed, you explicitly say I'm not gonna refresh

Confidential Attorneys' Eyes Only Outside Counsel

1  those portions as refresh this other portion.  So

2  there would be instructions in there, given that the

3  screen is on.  I mean, if you can shut the whole thing

4  off, obviously, nothing happens.

5      MR. JOHNSON:  Q.  But you don't know how

6  these devices operate, right, with respect to this

7  particular element?

8      A   I have not looked at the code to determine

9  exactly how it operates internally.

10     Q   So my question is --

11     A   Can I erase --

12     Q   -- if these are LE- -- if these are LEDs that

13  are -- that are just off for whatever reason, you

14  don't -- do you have an opinion as to whether that

15  meets the limitation of displaying an area beyond the

16  edge of the document?

17     MR. MONACH:  Objection; vague; incomplete

18  hypothetical; calls for a legal conclusion; asked and

19  answered.

20     You can do it again.

21     THE WITNESS:  So as I said earlier, I haven't

22  thought about this in detail.  I'm thinking on the fly

23  here.

24     If those LEDs were turned off by -- by the

25  code, by instruction --

Confidential Attorneys' Eyes Only Outside Counsel

Page 129

1         MR. JOHNSON:  That's not my question.

2         MR. MONACH:  Let me answer.

3         Go ahead and answer -- go ahead and answer

4    the question as you understood it.

5         THE WITNESS:  So what I'm saying is, if

6    the -- if the LEDs are turned off, and the code calls

7    it to turn -- turn it off, they would be displaying an

8    area beyond the edge of the document.

9         MR. JOHNSON:  That's not my question.  Move

10   to strike.  Your lawyer will get an opportunity to ask

11   you questions at the end.

12     Q   My -- my question is:  Just like now, where

13   the screen is black, it's not -- that screen -- you

14   already said it's not displaying anything.

15        So my question is:  When the -- when the

16   photograph moves beyond the edge and there's a black

17   portion that appears beyond the edge, you don't know

18   whether that black portion meets the limitations of

19   the claims of the '381 patent because you haven't

20   looked at the code to determine whether it displays an

21   area beyond the edge of the document; right?

22        MR. MONACH:  Object to the form of the

23   question.  Object to the extent it calls for a legal

24   conclusion; asked and answered.

25        You can answer again.

Confidential Attorneys' Eyes Only Outside Counsel

Page 130

1        THE WITNESS:  As I said before, I've

2   already -- I haven't looked at this in detail.  I

3   haven't considered this issue in detail.  To me, as

4   the thing is moving, it is -- the code would have to

5   display -- figure out what it's gonna display and what

6   it's not gonna display, and if it is -- if it tells

7   the -- the screen don't illuminate those -- those

8   particular pixels, that would be equivalent to saying

9   display that area in black.

10        So it would be displaying an area beyond the

11  edge of the document.  If the code doesn't say it, if

12  it just leaves it, and the system on its own defaults

13  or something, then maybe it's not displaying.

14        MR. JOHNSON:  Okay.

15   Q   So if the -- if the default is to just leave

16  it, then it doesn't meet the elements of the claims of

17  the '381 patent; right?

18        MR. MONACH:  Object to the form of the

19  question; incomplete hypothetical; vague; calling for

20  a legal conclusion and a new opinion at the

21  deposition; asked and answered.

22        THE WITNESS:  So, as I said earlier, the --

23  the code would have to say display or don't display,

24  and it -- the system is not gonna just say, by

25  default, don't display, because previously there was

Confidential Attorneys' Eyes Only Outside Counsel

Page 131

1   something there.  So some instruction -- there's some

2   other content there, the earlier part of the image was

3   displayed on that portion of the screen.  So the code

4   would have to say, you know, turn that to black or

5   turn it off.  It's just not gonna just disappear off

6   the screen during the refresh.

7            There would have to be something in the code

8   that gave instructions to the screen to either display

9   black pixels or to turn off those pixels.  In both

10  cases, my testimony is that that would constitute

11  displaying an area.

12           MR. JOHNSON:  Q.  But you don't -- you don't

13  know what -- you don't know what is in the code or

14  what it -- what it says or how that display is

15  generated one way or the other; do you?

16      A   I have not looked -- as I said earlier, I

17  have not looked at the specifics of that code.

18      Q   So when you look at Claim 19, and it says

19  "instructions for displaying an area beyond an edge of

20  the electronic document," you don't know what those

21  instructions are; do you?

22           MR. MONACH:  Objection; vague.

23           THE WITNESS:  As I said earlier, I have not

24  looked at those particular instructions.

25           MR. JOHNSON:  Okay.

Confidential Attorneys' Eyes Only Outside Counsel

1        THE WITNESS:  And as I've testified, the fact

2    that the program is running and doing the

3    functionality, as in Claim 1, it would have to have

4    some instructions.

5        MR. JOHNSON:  Q.  But you would agree -- or

6    do you have an opinion -- do you have an opinion as --

7    you said you had an iPhone, right.  I mean, do you

8    have an opinion -- do you know whether the -- the

9    displays in an iPhone 4 are the same as the displays

10   that are in the Samsung accused devices?

11       MR. MONACH:  Objection; lack of foundation.

12       THE WITNESS:  I have not made that

13   determination.

14       MR. JOHNSON:  Okay.

15    Q   Is -- do you -- you would agree that an

16   organic LED screen operates differently from the

17   touchscreen in the iPhone 4; right?

18       MR. MONACH:  Objection; vague; lack of

19   foundation.

20       THE WITNESS:  I have not considered those

21   differences, so I cannot make a -- give an answer

22   either way on that one.

23       MR. JOHNSON:  Q.  You haven't formed an

24   opinion on that; right?

25    A   I have not formed an opinion.

Confidential Attorneys' Eyes Only Outside Counsel

1      Q    If you have code to draw on only half of the

2    screen and no instructions for the other half, is

3    there a display beyond the edge of a document?

4         MR. MONACH:  Objection; incomplete

5    hypothetical; vague; calling for a legal conclusion;

6    calling for a new opinion.

7         THE WITNESS:  So I haven't thought this issue

8    through.  Again, I'm thinking on the fly here.

9         So the code says only draw a portion of the

10   screen, and doesn't say anything about the other side.

11   The -- there would have to be something in the -- in

12   the machine, in the computer, that decides what to

13   draw on the other side, whether that is another chunk

14   of code or some -- some firmware that also happens to

15   be code that defaults to something.  It would have

16   to -- it would have to -- you would have to know to

17   display something on there, whether it's black, white,

18   or -- so if nothing is explicitly said, there would

19   still have to be something in the machine that -- some

20   code, somewhere, that determines what is displayed

21   there; and, therefore, if the screen is on, there

22   would be an area displayed beyond the edge of the

23   document.

24        MR. JOHNSON:  Q.  So under that explanation,

25   is there code when the device is turned off?

Confidential Attorneys' Eyes Only Outside Counsel

1    A    When the device is turned off, the code is

2  not running.

3         Now, I'm not sure, on this particular set of

4  devices, when -- when the screen is turned off,

5  whether the code is not running or not.  They -- there

6  might be.  The code may still be executing.  Just the

7  screen is powered off.

8    Q    When there -- when there's -- the black part

9  of the screen is shown beyond the edge of the

10  document, is there code that is running that says

11  "make this black"?

12         MR. MONACH:  Objection; lack of foundation.

13  Objection; vague.  Objection; asked and answered,

14  multiple times.

15         You can do it again.

16         MR. JOHNSON:  Q.  And you shouldn't

17  speculate.  I want -- I want to know what your -- what

18  your opinion is.

19    A    So, as I said, I haven't looked at the

20  particular code on -- on this device.  Just from --

21  generally, there would have to be some code that

22  decides what to illuminate on a -- on a display or not

23  illuminate on a display that is -- is powered off.

24         MR. MONACH:  Kevin, we've been going for

25  about an hour and 15 or 20 minutes, and we're due for

Confidential Attorneys' Eyes Only Outside Counsel

Page 135

1   a lunch break, so sometime soon we should probably

2   break, but if you have more questions on this, go

3   ahead; but it seems like we're getting into some

4   repetition.

5          MR. JOHNSON:  Q.  So going back to the -- the

6   language where I was asking you about in the claims it

7   says "in response to," the temporal aspects of those

8   claims, right, you don't know whether the area beyond

9   the edge of a document is drawn after the edge is

10  reached; do you?

11         MR. MONACH:  Object to the form of the

12  question; vague; calling for a legal conclusion; lack

13  of foundation.

14         THE WITNESS:  So in -- in using the devices,

15  the way I've demonstrated using these applications,

16  the -- before you hit the edge of the document, there

17  was something drawn there, which is that second

18  portion of the -- of the document, and then it reaches

19  the edge, and it moves beyond the edge, the third

20  portion would have to be drawn.  It's either -- it's

21  either drawn as black in that particular example I've

22  shown you, or drawn in that -- some code instructed

23  the system to say don't display anything.

24         So there would have to be some instructions.

25  I have not looked at those instructions, as I've

Confidential Attorneys' Eyes Only Outside Counsel

1  already said.

2      MR. JOHNSON:  Q.  So in your -- in your

3  opinion, when the code says "don't display anything,"

4  it really means "display something"?

5      MR. MONACH:  Objection; vague and ambiguous;

6  lacking in foundation; misstates the prior testimony.

7      THE WITNESS:  I think if the code says "turn

8  off the -- those pixels," that is another way of

9  saying display it in -- in the default, turned off

10  color, so it would be the same thing.

11      MR. JOHNSON:  Okay.  Just a couple of other

12  questions, and then we can break for lunch.

13      Q   Earlier when we were looking at the Accused

14  Products, you showed us that you had to zoom in on the

15  photo in order to infringe the claims of the '381

16  patent.  I want to understand what limitations are not

17  met when the photo is not zoomed in.

18      MR. MONACH:  Objection; misstates the prior

19  testimony; assumes facts not in evidence; vague, and

20  calling for a legal conclusion.

21      Go ahead.

22      THE WITNESS:  Finished?

23      I -- I don't want to give the answer right

24  off my cuff here.  I'd have to sit here and analyze

25  the situation when it's not zoomed in with respect to

Confidential Attorneys' Eyes Only Outside Counsel

Page 137

1  each of the elements of the claim, and I'm happy to do

2  that, if you want me to do that.

3       MR. JOHNSON:  Okay.  Yeah, why don't we take

4  the lunch break, and you can do it over the lunch

5  break.  I'd appreciate it.  It shouldn't take that

6  long.  Now is a good time to break.

7       Well, it's up to you, actually.  If you want

8  to break for lunch break, or you want to keep going?

9       THE WITNESS:  Yeah, we can do that and --

10      MR. MONACH:  Yeah, break for lunch.  I

11 don't -- I don't think it's proper to ask him to do a

12 homework assignment over the lunch break, but we'll

13 return, and if you have questions, you can pose them.

14      MR. JOHNSON:  Well, those are my questions.

15 I'd like for you to take a look at that over the lunch

16 break.

17      THE VIDEOGRAPHER:  This is the end of Disk

18 No. 2, Volume I.

19      We are off the record at 12:22 p.m.

20      (Lunch break taken at 12:22 p.m.)

21                  ---oOo---

22

23

24

25

Confidential Attorneys' Eyes Only Outside Counsel

Page 138

1      A F T E R N O O N   S E S S I O N

2                      1:38 p.m.

3

4

5

6          THE VIDEOGRAPHER:  This is the beginning of

7  Disk No. 3, Volume I.

8          We are back on the record at 1:38 p.m.

9          You may proceed.

10         MR. JOHNSON:  Q.  Before the lunch break, we

11  were discussing Samsung's S 4G, and I wanted to ask

12  you --

13      A   That's this one, 21, right?

14      Q   21, right.

15         So if you could look at that again, and, you

16  know, look at the gallery application, and tell me

17  what limitations are not met when the photo is not

18  zoomed in.

19         MR. MONACH:  Object to the form of the

20  question as being vague; calling for a legal

21  conclusion and asking witness to form new opinions on

22  the fly at the deposition.

23         THE WITNESS:  So just to be clear, I'm --

24  this is not something I've opined on in my -- in my

25  report.  So based on the few minutes I've looked at

Confidential Attorneys' Eyes Only Outside Counsel

Page 139

1   this here, and -- and not a detailed analysis, I --

2   for one particular image, for example, I'm looking at

3   that particular image, and you --

4        MR. JOHNSON:  Q.  Can you show it again, just

5   so --

6        A   Oh, sorry.

7        Q   Okay.  Thanks.

8        A   So that particular image, other images may

9   well behave differently.  I haven't done an exhaustive

10  determination of this.  For this particular image, in

11  the gallery application on this phone, it clearly has

12  the -- the preamble is met, the computer-implemented

13  method comprising a device with a touchscreen display.

14  That's clearly met, as we've discussed previously.  It

15  shut off again.  Just give me a second here.

16       Q   You got to change these settings so it

17  doesn't turn off.

18       A   So I've got the image here.  You can say

19  it's -- it meets the -- I would say it meets the --

20  the element of the claim that says displaying a first

21  portion of an electronic document, i.e., the -- the

22  image here; and then, the second element of the claim

23  would be detecting a movement of an object on or near

24  the touchscreen display.  In this case, I'm gonna put

25  my finger down, and the finger is the object in the

Confidential Attorneys' Eyes Only Outside Counsel

Page 140

1    claims, and clearly the -- the -- this computer

2    implemented method does detect the movement of my

3    finger.

4           And then, the next element of the claim says,

5    "In response to detecting the movement translating the

6    electronic document displayed on the touchscreen

7    display in a first direction to display a second

8    portion of the electronic document, wherein the second

9    portion is different from the first section."

10          So I'm gonna start again here and put my

11   finger down and move it in the first direction.  I've

12   now got a second portion.

13          The -- the right-hand side of the image went

14   off screen, so I've got a second portion that's

15   different from the first portion, and then I keep

16   translating it in response to an edge being detected,

17   while translating the electronic document in the first

18   direction.  While the object is still detected on or

19   near the touchscreen display, it displays an area

20   beyond the edge of the document, so I don't know if

21   you can see it here, but the -- there's a black region

22   displayed beyond -- beyond the edge of the document on

23   the right-hand side of my -- where my thumb is, and --

24   and there, at the same time, it displayed a third

25   portion of the electronic document, wherein the third

Confidential Attorneys' Eyes Only Outside Counsel

Page 141

1  portion, which is the -- the part which is not the

2  area beyond the edge is smaller than the first portion

3  we saw at the start of this.

4       And then -- so that's met, and, finally, in

5  response to detecting the object is no longer on or

6  near the touchscreen display, translating the

7  electronic document in a second direction until the

8  area beyond the edge of the electronic document is no

9  longer displayed to display a fourth portion of the

10  electronic document, wherein the fourth portion is

11  different from the first portion.

12       So this time, if I -- if I let go, in other

13  words, it detects that my object, i.e., the finger, is

14  no longer on or near the display, it has translated

15  the electronic document in a second direction, such

16  that the area beyond the edge is no longer displayed.

17  So that part is met, but the fourth portion is -- in

18  this particular example, in this particular image, is

19  not different from the first portion that we started

20  with at the start of this exercise.

21       So I would say that last part of that last

22  element of the claim where the fourth portion is

23  different from the first portion, that's not met in

24  this particular image example that I'm showing you,

25  I'm walking you through right now.

Confidential Attorneys' Eyes Only Outside Counsel

Page 142

1    Q    Okay.  What is the first Android phone that

2    you're aware of that has features that infringe

3    the '381 patent?

4         MR. MONACH:  Objection; vague and ambiguous;

5    lack of foundation; calling for a legal conclusion.

6         THE WITNESS:  Do you mean first Android phone

7    in general?

8         MR. JOHNSON:  Yes.

9         THE WITNESS:  Regardless of manufacturer?

10        MR. JOHNSON:  Yes.

11        THE WITNESS:  I don't think I can answer the

12   question.  I haven't thought about it in any detail at

13   all, until now.  I can't recall when -- when the first

14   time I saw this set -- this sort of feature on an

15   Android phone.

16        MR. JOHNSON:  Q.  So you don't -- you don't

17   know the answer, sitting here today; right?

18        A    I cannot give you a definitive answer either

19   way.

20        Q    We've talked a little bit about a person of

21   ordinary skill in the art.  Can you define for me who

22   a person of ordinary skill in the art is for the '381

23   patent.

24        MR. MONACH:  Object to the form of the

25   question, but you can give your personal view.

Confidential Attorneys' Eyes Only Outside Counsel

Page 143

1       THE WITNESS:  So I haven't made that

2   determination definitively yet as part of my work on

3   this case, so I, you know, haven't put it down in

4   writing yet, and I reserve the right to do that,

5   should the time arise.

6       Just sitting here today, off -- off the top

7   of my head, I would say -- to understand this patent

8   and make use of it, I would say a person would need to

9   have an undergraduate degree in computer science or

10  electrical engineering, or the equivalent of that, and

11  probably a couple of years of work experience or

12  equivalent.

13      MR. JOHNSON:  Q.  What kind of work

14  experience?

15      MR. MONACH:  Same objection.

16      THE WITNESS:  Again, I'm -- I'm thinking out

17  loud here.  I haven't thought about this in great

18  detail, but some experience in, at least,

19  understanding user interfaces and potentially having

20  either implemented some interfaces or look at other

21  implementations and knowing how to put them together.

22      MR. JOHNSON:  Okay.

23      Q   Now, degree -- an actual degree in computer

24  science or electrical engineering is not required for

25  a person of ordinary skill in the art; right?

Confidential Attorneys' Eyes Only Outside Counsel

Page 144

1        MR. MONACH:  Same -- same objection; asked

2    and answered.

3        THE WITNESS:  So as I said earlier, a -- I

4    would say you would need a degree in computer science,

5    electrical engineering, or the equivalent.

6        MR. JOHNSON:  Or the equivalent, okay.

7    Q    And what would the equivalent be?

8        MR. MONACH:  Object to the form.

9        MR. JOHNSON:  So, for example -- sorry.

10   Q    So, for example, could -- could a person who

11   has a degree in something else but has -- you know,

12   has computer science experience, having taken a

13   bunch -- you know, either taken courses in it or done

14   programming, could that person meet the definition of

15   a person of ordinary skill in the art for the '381

16   patent?

17       MR. MONACH:  Object to form.

18       THE WITNESS:  So to meet the equivalence

19   of -- when I said computer science degree or

20   electrical engineering or equivalent, to meet that

21   equivalence, I would think somebody would say, for

22   example, a degree in, let's say, mechanical

23   engineering, having taken substantial coursework in

24   computing, which does happen these days, that might

25   meet the -- the equivalence, or somebody with a human

1   factors degree, having taken sufficient computer

2   science courses, would meet that.  That would be an

3   equivalent degree, in my mind, for the purposes of

4   this, this patent.

5          MR. JOHNSON:  Q.  You said you read the

6   deposition transcript of the patentee, Mr. Ording.  In

7   your opinion, is Mr. Ording somebody of ordinary skill

8   in the art?

9          MR. MONACH:  I object to the form of the

10  question to the extent it calls for a legal conclusion

11  and a new opinion to be formed at the deposition; lack

12  of foundation, with respect to what he knows about

13  Mr. Ording, but you can answer.

14         MR. JOHNSON:  Q.  Or -- or does he have more

15  than ordinary skill in the art because he is the

16  inventor on the '381 patent?

17    A    So I don't know Mr. Ording's -- I don't

18  recall exactly the portions of his depositions that

19  spelled out, if it did spell out, his exact

20  qualifications.

21         My understanding, having seen him named on

22  this patent, and I believe a few other Apple patents,

23  and the fact that he works at Apple doing user

24  interface engineering, I would think that he, at the

25  very least, meets the ordinary skill definition or,

Confidential Attorneys' Eyes Only Outside Counsel

Page 146

1  more likely, he is -- he is more than ordinary skill

2  in the art.

3      Q    Looking back at the Exhibit 21 and the -- the

4  non-zoomed in image we were just talking about, when

5  the entire image is displayed, I think you -- you

6  testified that that was the first portion; right?

7      A    When the full image is on screen?

8      Q    Yeah, just show it to the -- so the camera

9  can see it.  That's the one I'm talking about.

10     A    In -- in this example?

11     Q    In that example, right.

12     A    That would be a -- I guess, a first portion.

13     Q    Right.

14     A    Okay.

15     Q    So -- so a first portion can be the entire

16 image; right?

17          MR. MONACH:  Object to the form of the

18 question as calling for a legal conclusion.

19          THE WITNESS:  Yes, I would say so.

20          MR. JOHNSON:  Okay.

21     Q    Can the first portion and the electronic

22 document, as described in the claims of the '381

23 patent, be the same thing?

24          MR. MONACH:  Same objection; incomplete

25 hypothetical.

Confidential Attorneys' Eyes Only Outside Counsel

Page 147

1    THE WITNESS:  I'm not sure I understand the

2   question.  I'm sorry.

3    MR. JOHNSON:  Q.  So -- so, in that example,

4   which has gone dark now, in that example, what's --

5   what's the electronic document?

6    MR. MONACH:  Objection; incomplete

7   hypothetical; lack of foundation; calling for a new

8   opinion at the deposition.

9    THE WITNESS:  So I haven't thought about this

10  in -- in great detail, but sitting here right now,

11  looking at this, I would say the electronic document

12  would be the -- this image that's shown on the screen,

13  with the boundaries being the -- the edges of that

14  image, as I've just, kind of, outlined here.

15   MR. JOHNSON:  All right.

16   Q   And -- and for an electronic document, you

17  can have --

18   A   Sorry.  I'll keep my finger on here so it

19  doesn't go away.

20   Q   Under your understanding of an electronic

21  document, an electronic document can have an internal

22  boundary; right?

23   MR. MONACH:  Object to the form of the

24  question as misstating the prior testimony and vague.

25  Object as calling for a legal conclusion and a new

Confidential Attorneys' Eyes Only Outside Counsel

Page 148

1   opinion.

2          THE WITNESS:  I don't think I talked about

3   internal boundary at all.

4          MR. JOHNSON:  Okay.

5     Q   Can an electronic document have an internal

6   boundary?

7          MR. MONACH:  Object.

8          MR. JOHNSON:  We talked about it in the

9   context of the contacts on the Tab 7 that had the --

10  the list of names.

11         MR. MONACH:  Object to the form of the

12  question as vague, misstating the prior testimony.

13         MR. JOHNSON:  Q.  So do you understand my

14  question?

15    A   I -- I'm not 100 percent sure, because the

16  word "internal boundary" I don't think, has come up

17  yet, and if I look at the con- -- if I go back to the

18  contacts list discussions, if I recall correctly this

19  morning, the only thing that when we talked about the

20  boundary of the contact list, I mean, there's the

21  application that has more decorations around it,

22  but -- so it -- you know, maybe you can be more

23  specific about what you mean by -- when you say

24  "internal boundary."

25    Q   Okay.  So if we -- you can put that one down

Confidential Attorneys' Eyes Only Outside Counsel

Page 149

1    and pick up the tab -- this is Tab 7.

2        A    Okay.

3        Q    And if you go to the contacts --

4        A    Yes, I'm at the contacts.

5        Q    -- location, right.

6            If you -- so my question is:  I think earlier

7    you said, use a pen, if you want to use a pen, can you

8    draw -- just can you just sort of show the camera what

9    the electronic document is in that context?

10           MR. MONACH:  Object to the form of the

11   question; calls for a legal conclusion, incomplete

12   hypothetical; asking for a new opinion.

13           THE WITNESS:  Okay.  Let me just refresh

14   myself on what this thing does here.

15           So I think I -- I believe I testified that

16   the electronic document -- this would be a portion of

17   the electronic document, because the entirety is not

18   shown.  It's will be this, this stuff that's displayed

19   in this rectangular column, and right now it's showing

20   me a partial --

21           MR. JOHNSON:  Yeah.

22           THE WITNESS:  -- amount.

23           MR. JOHNSON:  Q.  So there -- there are

24   pieces above the F and below the T?

25       A    There --

Confidential Attorneys' Eyes Only Outside Counsel

1        MR. MONACH:  Object to form.

2        MR. JOHNSON:  Q.  Or maybe not below it.

3    A    Yeah, there is stuff above the F and below

4    the T, yes.

5    Q    Okay.  So all I was asking was, you can have

6    an electronic document that has an internal boundary

7    within a screen; right?

8        MR. MONACH:  Object to the form of the

9    question as vague.  Objection; calls for a legal

10   conclusion.

11       THE WITNESS:  So I -- I'm not -- again, I'm

12   still not sure what you mean by "internal."  It --

13       MR. JOHNSON:  I'm --

14       THE WITNESS:  Are you saying that this is the

15   boundary of the electronic document?

16       MR. JOHNSON:  Yeah.

17   Q    I just meant that that's internal because

18   it's -- it's located within the middle of the screen?

19   A    So in that -- that boundary doesn't match the

20   edge of the screen --

21   Q    Exactly.

22   A    -- is what you're -- is that what you're

23   saying?

24   Q    Exactly.

25   A    Sure, the boundary of the document doesn't

Confidential Attorneys' Eyes Only Outside Counsel

1    have to align with the screen.

2        Q   So you can have -- you can have the edge of

3    the boundary be something other than the edge of the

4    screen?

5            MR. MONACH:  Objection; vague.

6            MR. JOHNSON:  I think we're saying the same

7    thing.  I'm just -- I'm really bad with trying to --

8        A   I want to make sure I say the right thing

9    with my understanding of what you're saying, too.

10       Q   So all I'm saying is, under your view of an

11   electronic document, an electronic document can have a

12   boundary that is internal to the screen or, you know,

13   doesn't have to be at the edge of the screen --

14           MR. MONACH:  Objection; form.

15           MR. JOHNSON:  Q.  -- right?

16           MR. MONACH:  Objection; calling for a legal

17   conclusion; asked and answered.

18           You can do it again.

19           THE WITNESS:  So as I answered earlier, and

20   my opinion is that the boundary of the electronic

21   document, in this case, this -- this edge is one

22   boundary of it, does not have to match the edge of the

23   screen, yes.

24           MR. JOHNSON:  Okay.

25       Q   So just, during the lunch, I had the guys

Page 152

1    just print up a sheet of paper with some squares on it

2    for me.  So if you imagine, sir, that the -- the

3    quadrants that are labeled 1 to 36 on here are the

4    entire -- that's this -- that's the screen of the

5    display.

6        A    So the whole -- the big rectangular is the

7    screen?

8        Q    Right.

9        A    Okay.

10       Q    So you can have an electronic document that

11   consists of smaller grids within the screen; right?

12           MR. MONACH:  Object to the form of the

13   question; calling for a legal conclusion; incomplete

14   hypothetical; asking for a new opinion.

15           THE WITNESS:  It would depend on what one

16   considers to be the electronic document.  It could be

17   one of these, let me call it sub rectangles that you

18   can label with numbers.  It could be some combination

19   of them.  It --

20           MR. JOHNSON:  Right.

21           THE WITNESS:  -- really depends on -- depends

22   on how, you know, you want to put the boundary around

23   it.

24           MR. JOHNSON:  Q.  So you could draw a

25   boundary, hypothetically, around squares 15, 16, 17,

Confidential Attorneys' Eyes Only Outside Counsel

Page 153

1   18, 21 and 22, 23 and 24?

2       A   Say -- sorry.  15, 16, 17, 18, 21?

3       Q   22, 23, and 24.

4       A   So kind of like this?

5       Q   Yeah, go ahead and draw it.

6           MR. MONACH:  Object to the -- object to the

7   form of the question as vague and ambiguous;

8   incomplete hypothetical.

9           MR. JOHNSON:  Q.  Make it a little more

10  noticeable for me.

11      A   We've got black lines around it.

12      Q   Yeah, okay.

13          So that could be an electronic document;

14  right?

15      A   Depend --

16          MR. MONACH:  Same objection.

17          THE WITNESS:  Sorry.  I jumped in there.

18          Depending on the context, depending on the

19  application, it could be.

20          MR. JOHNSON:  Okay.

21          THE WITNESS:  Or some other collection.

22          MR. JOHNSON:  Q.  It's not limited to that;

23  right?

24      A   I would not say it's limited.

25      Q   So it could be also a -- a six-by-six grid or

Confidential Attorneys' Eyes Only Outside Counsel

Page 154

1    a two-by-two grid?

2            MR. MONACH:  Same --

3            MR. JOHNSON:  Q.  -- or even a three-by-three

4    grid, I guess --

5            MR. MONACH:  Same objection.

6            MR. JOHNSON:  Q.  -- right?

7            MR. MONACH:  Vague and ambiguous; incomplete

8    hypothetical.

9            THE WITNESS:  Again, it would depend on the

10   def- -- you know, how -- whoever is being the

11   application, what they consider to be the document --

12   to be the extent of the document, yes.

13           MR. JOHNSON:  Q.  Under your view, though, it

14   could be those, those grids; right?

15           MR. MONACH:  Objection; same objection as

16   before.  Also, misstates the prior testimony.

17           THE WITNESS:  Depending on the context, it --

18   it could take on different forms.

19           MR. JOHNSON:  Okay.

20      Q   Does the grid need to be a rectangle?

21           MR. MONACH:  Same objection.

22           MR. JOHNSON:  Strike it.  Let me ask it

23   again.

24      Q   Does -- would the grid need to be a rectangle

25   in order for it to be an electronic document?

Confidential Attorneys' Eyes Only Outside Counsel

1    MR. MONACH:  Same objection.

2    THE WITNESS:  Well, I think the electronic

3 document doesn't have to be anything to do with the

4 grid.  It --

5    MR. JOHNSON:  Okay.

6    THE WITNESS:  -- it's any visual thing with

7 defined boundaries --

8    MR. JOHNSON:  So -- so it --

9    THE WITNESS:  -- by my definition of it.

10    MR. JOHNSON:  Q.  Could -- if you -- if you

11 drew lines around squares one, two, and eight, for

12 example --

13    A   One, two, and eight.  So this kind of, I

14 guess, inverted L?

15    Q   Yeah.

16    Could that be an electronic document?

17    MR. MONACH:  Objection; vague; incomplete

18 hypothetical; calling for a legal conclusion and a new

19 opinion.

20    THE WITNESS:  So to the extent that I haven't

21 considered this, this style of odd-shaped documents

22 prior to coming here today, just thinking on the fly

23 here, a -- based on my understanding of, you know,

24 boundaries, that wouldn't -- would satisfy the notion

25 of a boundary, again, depending on the context of the

Confidential Attorneys' Eyes Only Outside Counsel

Page 156

1  application and what a document means in that context.

2       MR. JOHNSON:  Q.  If -- going back to the

3  original two-by-four rectangle of 15, 16, 17, 18, 21,

4  22, 23, 24, if you look at that, is it fair to say

5  that this line right here is an edge of the electronic

6  document?

7    A   The line --

8       MR. MONACH:  Object.

9       Hang on a second.

10      THE WITNESS:  I'm sorry.

11      MR. MONACH:  Objection; vague and ambiguous;

12  incomplete hypothetical; calling for a legal

13  conclusion and a new opinion.

14      THE WITNESS:  So, again, I haven't considered

15  this prior to this, you putting this in front of me.

16      Thinking on the fly here, so you're saying

17  this line -- the vertical line between --

18      MR. JOHNSON:  Since the witness is pointing,

19  I just want to make sure you get what he's pointing

20  to.

21      Yeah.

22      THE WITNESS:  The vertical line between 14

23  and 15, and 20 and 21, here, this --

24    Q   That -- that's right, yeah.

25    A   -- line.

Confidential Attorneys' Eyes Only Outside Counsel

Page 157

1          Given this hypothetical scenario, where

2     you're saying the -- this two -- I'm sorry --

3     two-by-four grid of elements -- rectangle is an

4     electronic document in this hypothetical scenario,

5     that would be indeed, I guess, one boundary one

6     edge --

7          Q    Okay.

8          A    -- of that.

9          Q    So let's just label that "edge" for me, just

10    so I can keep track of it after the deposition.

11    Just --

12         A    What do you want me to call it?

13         Q    Just call it "edge," and then maybe put it

14    down at the bottom and draw an arrow down to the line,

15    or something.

16         A    Like this?

17         Q    Yeah.

18         A    Okay.

19         Q    Okay.  And then, is it fair to say that

20    the -- the -- the Blocks 14 and 20 are an area beyond

21    the edge --

22              MR. MONACH:  Same --

23              MR. JOHNSON:  Q.  -- of the electronic

24    document?

25              MR. MONACH:  Same objection.

Confidential Attorneys' Eyes Only Outside Counsel

Page 158

1    THE WITNESS:  So, again, considering this for

2  the first time here, I haven't thought this in detail,

3  if, in this hypothetical scenario, the document is

4  this two-by-four grid, labelled 15, 16, 17, 18, 21,

5  22, 23, 24, if that is the document, then anything

6  beyond that edge would be an area outside the document

7  beyond the edge of the document.

8    So given those hypotheticals, area 14 and 20

9  would be beyond the edge of the document, given that

10  scenario.

11    MR. JOHNSON:  Okay.

12   Q   So can you just label that "beyond the edge"?

13   A   How -- just label each one of these?

14   Q   Yeah, or just draw -- however you want.

15   A   Well, we're getting a lot of drawings on this

16  thing, so I don't know.  "Beyond."

17   Q   Speaking of which, let me just mark the --

18  the grid as Exhibit 104.

19   A   Put it on the bottom?

20   Q   Thanks.

21    (Phone marked Balakrishnan Exhibit 104

22     for identification.)

23    MR. JOHNSON:  Q.  Can you look at the Galaxy

24  Tab, which is Exhibit 101, and pull up for me the

25  contacts application.

Confidential Attorneys' Eyes Only Outside Counsel

1    A    Okay.

2    Q    And I noticed, in your declaration, you did

3  not include this particular application on -- as one

4  that infringes the '381 patent, so the question is:

5  Why?  Why not?

6         MR. MONACH:  Object to the form of the

7  question, and if -- if your answer would -- I'll

8  instruct the witness not to disclose any

9  communications with counsel, other than facts and

10  assumptions that he relied on in forming his opinion.

11         THE WITNESS:  So, at the time of writing the

12  report, I was, as I testified earlier, the -- the -- I

13  was -- I was told that Apple was alleging these four

14  devices and the particular applications, and they

15  were -- as far as I know, were not alleging the

16  contacts list on the Galaxy Tab 10.1, so I did not

17  analyze that in great detail.

18         So if you want me to go through this right

19  now, I'm happy to walk you through this and see which

20  portions of the claims I'm having -- which are not, if

21  you want me to do that.

22         MR. JOHNSON:  Q.  So you haven't -- you

23  haven't done that analysis before today?

24    A    I haven't done it in detail sufficiently,

25  just talk about it right off the cuff, without walking

Confidential Attorneys' Eyes Only Outside Counsel

1    through.

2        Q    Okay.  So when -- when Apple gave you the

3    roadmap to look at what was allegedly infringing,

4    contacts in the Galaxy tab wasn't included?

5            MR. MONACH:  Object to form.

6            THE WITNESS:  I -- yes, the -- the contacts

7    on the Galaxy Tab was not one of those I was -- it was

8    not one of those that I was told was being alleged to

9    infringe.

10           MR. JOHNSON:  Okay.

11       Q    So take a look at contacts in the Galaxy Tab

12   and -- and now that you have it, tell me --

13       A    Sorry.  It just keeps flipping.  If you give

14   me a second here.

15       Q    -- why it doesn't infringe.

16           MR. MONACH:  Object to the form of the

17   question.

18           THE WITNESS:  Okay, so I'm just gonna walk

19   through the claims here and try to match it up and

20   tell you where -- where it matches and where it

21   doesn't match, if that's okay.

22           So the Galaxy tab, as we've gone through it

23   before, has a complete computer-implemented method

24   that's in the preamble, compromising a device with a

25   touchscreen display.  So we've already established

Confidential Attorneys' Eyes Only Outside Counsel

Page 161

1   that the device has a touchscreen display.  It -- it

2   clearly displays a first portion of an electronic

3   document in this example right here that I've got.

4   I've got an electronic document, which is this

5   contacts list.

6          MR. JOHNSON:  Q.  Would you mind just showing

7   the camera.

8   A    So I'm walking through this, too, so --

9   Q    Yeah, that's fine.

10  A    -- I may have to go back and forth.

11  Q    Yeah, that's fine.

12  A    So you got it --

13  Q    So where -- where is the electronic document

14  there?

15  A    Okay.

16         MR. MONACH:  Hang on a second.

17         THE WITNESS:  Sorry.

18         MR. MONACH:  Object to the form of the

19  question; calling for a legal conclusion; asking for a

20  new opinion at the deposition; and vague and

21  ambiguous.

22         THE WITNESS:  So, again, I'm doing this on

23  the fly.  I haven't -- haven't thought about this in

24  great detail before.

25             So the electronic document here is this list

Confidential Attorneys' Eyes Only Outside Counsel

Page 162

1  of -- of contact information on, you know, Big Bird,

2  Genie, Playhouse, and so forth; and what's shown on

3  the display right now, the -- the electronic document

4  is -- well, it just stopped here.  It has -- starts

5  with the elements that, starting with a B, all the way

6  down to Tommy Bahama at the bottom, so that would be

7  the -- the first por- -- the portion of the electronic

8  document.

9         MR. JOHNSON:  Okay.

10        THE WITNESS:  Not the entirety.  Clearly

11 there's more stuff.

12        MR. JOHNSON:  Okay.

13        THE WITNESS:  There appears to be more stuff

14 on the two -- beyond the two edge -- boundaries.

15        MR. JOHNSON:  Okay.

16     Q   But the area to the right of the edge is not

17 part of the electronic document?

18        MR. MONACH:  Same objection.

19        THE WITNESS:  So --

20        MR. JOHNSON:  Q.  So this, this area right

21 over here, is not part of the electronic document?

22        MR. MONACH:  Same objection.

23        THE WITNESS:  So in this example

24 application -- in this application, looking at it just

25 right now at this deposition, I would say the

Confidential Attorneys' Eyes Only Outside Counsel

1  electronic document does not include the -- the area

2  right here.

3          MR. JOHNSON:  Okay.

4     Q    Okay.  How about the next limitation?

5     A    Okay.  So I think I already said first

6  portion of the electronic document.

7          The next limitation, detecting a movement of

8  an object on any other touchscreen display.  So,

9  again, I'm gonna put my finger down, which would be

10 the object, and it's on or near -- it clearly detects

11 movement of the object on or near the touchscreen

12 display.

13         In response to -- then, the next element

14 would be "In response to detecting the movement,

15 translating the electronic document displayed on the

16 touchscreen display in a first direction to display a

17 second portion of the electronic document, wherein the

18 secret portion is different from the first portion."

19         So let me go back to where I was here.  I

20 think it was something like that, with a B, I think it

21 had Tommy Bahama on the bottom there.  That's where I

22 was before.  So I'm gonna put my finger down, which is

23 the movement, and I'm gonna move it down a little bit,

24 and that would give me the -- translating the

25 electronic document in a first direction display a

Confidential Attorneys' Eyes Only Outside Counsel

Page 164

1   second portion, where the second portion is different.

2          So the second portion here now has an A on

3   the top part of the portion that's displayed on the

4   screen, and on the bottom, instead of Tommy Bahama on

5   the -- the first portion now has Missy, Missy

6   Buttersworth at the bottom, so that's a different

7   portion of the document.

8          So now we can go on.  So it says, in

9   response -- the next element says -- of the claim says

10  "In response to an edge of the electronic document

11  being reached, while translating the electronic

12  document in the first direction, so while the doc --

13  while the object is still detected on or near the

14  touchscreen display, displaying an area beyond the

15  edge of the document."

16         So I'm gonna continue moving, and now I see

17  that it stops.  The document there got the As in it

18  stops at the word "14 contacts" that is part of the

19  document.  It stops there.  It doesn't go -- it

20  doesn't seem to go beyond the edge, so it doesn't seem

21  to meet this thing of going beyond the edge and

22  displaying an area beyond the edge of that document.

23         And so that -- I don't know what the number

24  of this element is, but that -- that part of the claim

25  is not -- it doesn't appear to be met in this

Confidential Attorneys' Eyes Only Outside Counsel

Page 165

1  particular example that I'm walking through here live.

2       And then it says, "displaying a third portion

3  of the electronic document," so clearly it is

4  displaying a third portion in that there now that

5  bottom is now Jerry -- Jerry Mouse, which is different

6  from -- the second portion different from the first

7  portion, but it's not clear, in this example, that

8  this third portion is smaller than the first portion.

9  It appears that, at least in terms of the number of

10 pixels, the -- the portion is taking up relative to

11 the first portion is the same.

12       So the size issue there or the third portion

13 is smaller than the first portion.  It does not appear

14 to be met in this particular example, but I'm -- I'm

15 walking through live here.

16       And then, I already lifted my finger, but I'm

17 gonna redo this, and go to the third portion here, "In

18 response to detecting" -- the last element says "In

19 response to detecting that the object is no longer on

20 or near the touchscreen display, translating the

21 electronic document in a second direction until the

22 area beyond the edge of the electronic document is no

23 longer displayed to display a fourth portion of the

24 electronic document, wherein the fourth portion is

25 different from the first portion."

Confidential Attorneys' Eyes Only Outside Counsel

Page 166

1      So, if I release my finger, in this

2  particular example or this particular data that I'm

3  doing live here, it doesn't appear to translate the

4  document in a second direction until the edge --

5  sorry -- area beyond the edge of the electronic

6  document is no longer displayed, and so that portion

7  of the claim element doesn't appear to be met.

8      There is a fourth portion being shown, but --

9  and it is different from the first portion, but it

10  hasn't done that translation in a second direction of

11  the limitation of the claim, I guess, is the language.

12  Q   So, in your opinion, this particular

13  application of the contacts in the Galaxy 10.1 does

14  not infringe the '381 patent; right?

15      MR. MONACH:  Object to the form of the

16  question; calling for a legal conclusion; incomplete

17  hypothetical; asking for a new opinion at the

18  deposition.

19      THE WITNESS:  So my opinion, this particular

20  example of contacts, the contacts list on the Galaxy

21  Tab 10.1, with this particular data set that I'm

22  playing with right now live, as I walk through,

23  doesn't -- does not meet all of the limitations.

24      It meets some of the limitations, but not all

25  limitations of Claim 1, but I have to say that I have

Confidential Attorneys' Eyes Only Outside Counsel

Page 167

1  not exhaustively explored this.  It may be that a

2  different data set may result in different behavior.

3  I cannot make that determination right now, but for

4  the example data set I have right now that we just

5  saw, it does not meet all of the limitations.

6        MR. JOHNSON:   Okay.

7    Q   You see when you scroll down towards either

8  the top or the bottom, there's a little bit of a blue

9  glow that occurs?

10   A   Do you mind if I turn this back to take a

11  look?

12   Q   At the top or the bottom; do you see that?

13   A   Okay.  So I go up, but if I keep -- if I keep

14  pulling down, it's pretty hard to see.  It's very

15  subtle.  It's hard to tell exactly when that blue glow

16  starts, but it looks like if I roll and drag a lot,

17  then a glow does appear.  I'm finding it very

18  difficult to see exactly at what point it starts.  It

19  starts emanating from the top --

20   Q   Okay.

21   A   -- or the bottom, same thing, it looks like.

22   Q   Okay.  Earlier we were looking at the -- the

23  Galaxy S 4G and Exhibit 21, and we were looking at

24  the -- the -- the photo gallery, where all the photos

25  appeared in the grid, and I asked you to scroll over

Confidential Attorneys' Eyes Only Outside Counsel

Page 168

1  to the edge, and the grid tilted in one direction or

2  the other; do you remember that?

3      A   I remember the tilting.  I'm not sure which

4  phone exactly did that.  Could I just try that out,

5  even if we --

6      Q   Sure.

7          My question is whether you've reached an

8  opinion as to whether that infringes the claims of the

9  patent?

10         MR. MONACH:  Object to the extent it calls

11  for a legal conclusion; incomplete hypothetical, and

12  asks for a new opinion on the fly at the deposition.

13         THE WITNESS:  So I think I testified earlier

14  that I have not had a chance to -- to look at this in

15  any great detail at all, so -- and I -- if you want me

16  to do it right now, I'm happy to walk you through

17  this.  And I'm also not clear as to whether you're

18  asking me whether the -- just the tilting meets the

19  claims or --

20         MR. JOHNSON:  Q.  Well, let -- let me --

21      A   -- some combination.

22      Q   -- ask you myself.

23         The -- the tilt itself does not meet the

24  limitation of displaying an area beyond the edge of

25  the document; right?

Confidential Attorneys' Eyes Only Outside Counsel

1          MR. MONACH:  Objection to the form of the

2     question for the reasons previously stated.

3          THE WITNESS:  Well, I would have to study

4     this in detail before I give you a formed --

5     thoroughly informed answer on that, I haven't thought

6     about it and really explored this.  If you want an

7     on-the-fly answer, I'm happy to give you an on-the-fly

8     answer.

9          MR. JOHNSON:  Yeah, well, I'd like an answer

10    to the question, so --

11         THE WITNESS:  Okay.  So --

12         MR. MONACH:  Object to the form of the

13    question as calling for a legal conclusion and new

14    opinion at the deposition, and incomplete

15    hypothetical.

16         THE WITNESS:  So if the document happens to

17    be -- say, for example, if we consider this

18    application the document being, let's say, the

19    whole -- it's bouncing around right now for some

20    reason.  So it also reacts to the tilt sensors, so

21    tilting seems to be reacting to different things or

22    caused by different things.  It's hard to tell whether

23    it's just the finger that's causing that or not.

24         If -- if the document is the collection of

25    these -- these -- these images or, in this case, a --

Page 170

1  I guess, an inverted L kind of collection of six --

2  six items, and I've gone beyond -- let's say that's

3  the -- let's say that's the -- it's really hard to

4  keep this from tilting on its own.  Let's say that's

5  the -- the edge of the document, and I go beyond, and

6  then it tilts, that -- I don't see the -- the tilting

7  itself is not the -- the area beyond the edge, but the

8  area beyond the edge is this stuff that's displayed.

9        So the tilting causes more area beyond the

10  edge to be -- to be shown, but the act of tilting is

11  not the area beyond the edge.  I don't know if that

12  answers your question, but it gets close to that.

13        MR. JOHNSON:  Q.  Do you have an opinion on

14  what the appropriate conception date is for the

15  asserted claims in the '381 patent?

16        MR. MONACH:  Objection; vague and ambiguous;

17  lack of foundation; calls for a legal conclusion;

18  incomplete hypothetical.

19        THE WITNESS:  My understanding is the

20  application was filed on December 14th, and it goes

21  back to -- has these provisional applications that

22  seem to date back to January of 2007, as opposed to

23  the filing date, so it would be at least January 2007,

24  and I believe I was told from reading Mr. -- Mr. Bas

25  Ording's deposition, that they were -- there's a

Confidential Attorneys' Eyes Only Outside Counsel

1  possibility that he had shown this or conceived of

2  this application earlier than the 2005 range, an

3  internal code that he had written and maybe demoed in,

4  you know, a public or semipublic place.

5         I'm not sure where the demo occurred,

6  necessarily.

7         MR. JOHNSON:  You said you were told.

8    Q   Who were you told by?  Are you referring to a

9  conversation with counsel, or are you referring to

10  having read the transcript?

11        MR. MONACH:  Well, let me -- I'm gonna

12  instruct the witness not to disclose any communication

13  you had with counsel, unless it was something on which

14  you've based an opinion in your declaration, but if

15  you -- if you can answer it without -- if you can

16  answer counsel's question without disclosing any

17  communication with counsel that was not a fact you

18  relied on, then you're free to do so.

19        MR. JOHNSON:  Let me ask you:  Were you told

20  by counsel -- strike that.

21    Q   Did counsel give you the information about

22  what the appropriate conception, diligence,

23  introduction to practice dates are for the '381

24  patent?

25        MR. MONACH:  I'm gonna instruct the witness

Confidential Attorneys' Eyes Only Outside Counsel

1    not to answer, unless he relied on a fact that was

2    communicated by counsel in forming his opinion here.

3         THE WITNESS:  In forming my opinion for the

4    declaration, I did not rely on any such information.

5         MR. JOHNSON:  Did you rely on any

6    conception -- strike that.

7    Q    In your opinion, what is the appropriate

8    conception dates for -- if you have one -- for the

9    asserted claims of the '381 patent?

10        MR. MONACH:  Object to the question as asking

11   for a legal conclusion; may lack foundation; and is

12   posing an incomplete hypothetical for which there may

13   or may not be an adequate foundation.

14        THE WITNESS:  In my opinion, just reading

15   the -- this document and -- I would -- I would come up

16   with a January 7th, 2007, date.

17        MR. JOHNSON:  And is there -- do you have any

18   reason to believe -- strike that.

19   Q    Do you have an opinion as to whether the

20   conception date is earlier than January 7th, 2007, for

21   any of the asserted claims of the '381 patent?

22        MR. MONACH:  Same objection.

23        THE WITNESS:  So, as I said earlier, I -- I

24   understand, from Mr. Ording's deposition, that it may

25   be that it may date back to 2005, sometime in 2005.

Confidential Attorneys' Eyes Only Outside Counsel

Page 173

1        MR. JOHNSON:  Yeah, I'm asking for your

2    opinion.

3        Q   I mean, have you -- have you verified what

4    Mr. Ording said and tried to determine whether

5    that -- those dates were -- were accurate for -- you

6    know, for -- for purposes of the '381 patent?  And by

7    that, did you look at the testimony and compare what

8    he says he conceived with what the claims say they

9    cover?

10       A   So if you're asking me did I take his

11   testimony and match it up claim by -- element by

12   element of the claim; is that what you're asking me?

13       Q   Let's start there.

14       A   I did not do that.

15       Q   Okay.  So you don't have an opinion that --

16   whether the -- the 2005 conception date is accurate or

17   not; do you?

18       MR. MONACH:  Object to the form of the

19   question.

20       THE WITNESS:  I'm not able to tell whether

21   that is an accurate date or not --

22       MR. JOHNSON:  Okay.

23       THE WITNESS:  -- given the information I have

24   to date.

25       MR. JOHNSON:  Q.  And you haven't been asked

Confidential Attorneys' Eyes Only Outside Counsel

Page 174

1  to make or to render an opinion on that issue; right?

2         MR. MONACH:  I'll object to the form of the

3  question.

4         If -- and I'll instruct you not to answer

5  with respect to communications you may have had that

6  don't relate to facts and assumptions that you used in

7  forming your opinions today.  That doesn't -- the

8  witness has expressly reserved the right to respond to

9  arguments made or assertions made by Samsung in his

10  declaration.

11        THE WITNESS:  So I'm not sure I completely

12  followed the question or the objection there, so if I

13  could have that read back to me.

14        MR. JOHNSON:  Q.  Have you been asked to

15  render an opinion on whether the conception, reduction

16  to practice, and diligence dates in this case for

17  the '381 patent are accurate or not?

18        MR. MONACH:  And --

19        MR. JOHNSON:  That's all I'm asking.

20        MR. MONACH:  Same -- same instruction.  I'm

21  gonna instruct you not to answer about communications

22  you've had with counsel, specifically if they don't

23  relate to facts you relied on so far.

24        THE WITNESS:  I cannot answer that question.

25        MR. JOHNSON:  Q.  Why not?

Confidential Attorneys' Eyes Only Outside Counsel

Page 175

1    A    Because, as instructed by counsel, I -- I did

2  not rely on those facts to -- to form my opinion in

3  the -- in the -- in the declaration.

4    Q    So you're refusing to answer the question on

5  the basis of privilege because you didn't rely on

6  those facts?

7    A    I'm not sure what the legal term is, but if

8  what counsel just instructed is called privilege, I

9  would -- I would assume yes.

10   Q    Okay.  I'm just trying to understand where

11  you're drawing the boundary.  So you're not answering

12  the question because what -- basically, counsel told

13  you not to answer the question, because you didn't

14  rely on these facts in your -- forming your opinions?

15   A    That is correct, the --

16   Q    Okay.

17   A    -- 2005 date fact.

18   Q    Right.

19   A    Yes.

20   Q    Okay.  Did you look at any of the prototypes

21  or code that Mr. Ording generated for any of the

22  prototypes that he says relate to the technology in

23  the '381 patent?

24         MR. MONACH:  Same instruction.

25         THE WITNESS:  I did not look at that code.  I

Confidential Attorneys' Eyes Only Outside Counsel

Page 176

1  assume you mean the director code that Mr. Ording

2  produced at his deposition or discussed at his

3  deposition, I did not look at that code prior to

4  writing the declaration.

5         MR. JOHNSON:  Q.  Have you looked at it since

6  then?

7     A    Yes, I have, or portions of that code.

8     Q    Why?

9     A    In preparation for this dec- -- I'm sorry --

10 deposition today, and yesterday it was brought to my

11 attention, when I looked at the deposition transcript,

12 that some code was referred to and counsel produced

13 that code to me.

14    Q    Okay.  And do you have any opinions about

15 that code?

16        MR. MONACH:  Objection; vague and ambiguous.

17        THE WITNESS:  I have not had a chance to

18 study that code in any kind of detail to match it up

19 to the claims or do anything of that nature.

20        MR. JOHNSON:  Q.  Do you intend to do so?

21        MR. MONACH:  Objection; calls for

22 speculation.

23        THE WITNESS:  It might, if it's brought up

24 and --

25        MR. JOHNSON:  Q.  But you haven't --

Confidential Attorneys' Eyes Only Outside Counsel

1      A    -- in these -- in the proceedings after this

2    and, you know, if I -- if I see the need to respond to

3    that in rebuttal or whatever the case may be, I -- I

4    will certainly look at them.

5      Q   But you haven't been asked to do that so far;

6    right?

7          MR. MONACH:  Objection; vague.

8          THE WITNESS:  I have not been asked to study

9    that code in detail and provide a detailed opinion.

10         MR. JOHNSON:  Q.  Have you been asked to

11   study -- to look at the code in any detail and provide

12   any kind of an opinion about whether the code meets

13   the limitations of the '381 patent claims?

14         MR. MONACH:  Same instruction.  I'm gonna

15   instruct the witness not to disclose communications

16   with counsel about -- that's all.

17         You can answer that question.  You can answer

18   that question.

19         THE WITNESS:  I've not been instructed to

20   look at it in any detail to form a detailed opinion,

21   no.

22         MR. JOHNSON:  Q.  Why did you look at it

23   yesterday?

24      A   It -- the priority date issue came up, and it

25   was something that was relevant to that.  I haven't

Confidential Attorneys' Eyes Only Outside Counsel

Page 178

1    had a chance to study it in any detail.

2        Q    But you don't have an opinion as to what the

3    appropriate priority date is for the claims of

4    the '381 patent; right?

5            MR. MONACH:  Objection; asked and answered.

6            THE WITNESS:  As to whether it's that

7    2005-ish date, I -- I haven't been able to do a

8    detailed determination of that, so I cannot say either

9    way, yeah.

10           MR. JOHNSON:  Q.  Or, have you done any

11   re- -- did you review any of the professional

12   applications that are listed here on the front of

13   the '381 patent?

14       A    I looked at one of the professional

15   applications.

16       Q    Which one?

17       A    I can't recall exactly which one.  The

18   numbers skip -- skip my mind.

19       Q    Why did you look at it?

20       A    It was part of just understanding the -- the

21   providence of the patent, so to speak.

22       Q    Did it list other inventors besides

23   Mr. Ording?

24       A    It might have, yes.

25       Q    Were you curious as to why those other

Confidential Attorneys' Eyes Only Outside Counsel

Page 179

1   inventors were dropped?

2        MR. MONACH:  Objection; misstates -- assumes

3   facts not in evidence; vague and ambiguous; object to

4   form.

5        THE WITNESS:  I -- I'm not sure it's

6   something I immediately worried about.  It was -- it

7   did cross my mind.  I think -- I don't think I brought

8   it up to counsel or anything like that.  My assumption

9   was that, at some point -- you know, I'm not a lawyer,

10  so I don't understand all the legal differences

11  between provisional applications and the final thing

12  that issues.  I assumed, at some point, the -- you

13  know, the final version was the -- I guess the

14  penultimate -- I'm sorry.  Not penultimate -- the

15  ultimate correct things, so they dropped it, for

16  whatever reason.

17       I don't know why they dropped it, and I --

18  but I didn't see a need to ask that question.  I don't

19  think it pertained to the -- I didn't think it

20  pertained to the issue of do these devices infringe

21  those particular claims in this final patent.

22       MR. JOHNSON:  Q.  And -- and did you -- so

23  you didn't discuss the issue of why certain listed

24  inventors were dropped from the provisional

25  application with counsel?

Confidential Attorneys' Eyes Only Outside Counsel

1     MR. MONACH:  I'm gonna instruct the witness

2  not to disclose any communications you had that are

3  unrelated to the facts and assumptions of the opinions

4  you've offered.

5     THE WITNESS:  I -- I cannot answer that

6  question.

7     MR. JOHNSON:  Q.  Why not?

8     A   Because I don't think -- as instructed by

9  counsel, I don't think that affects any of my opinions

10  that I've given to date.

11     Q   But you did, at least, generally discuss the

12  issue with counsel.  Without telling me --

13     MR. MONACH:  Same instruction.

14     MR. JOHNSON:  So you're not letting him

15  answer that one?

16     MR. MONACH:  No.

17     MR. JOHNSON:  Q.  How do you know that the

18  January 7th, 2007, date is the -- at least in your

19  view, a correct priority date?

20     MR. MONACH:  Object to the form of the

21  question.  Objection; calls for a legal conclusion;

22  incomplete hypothetical.

23     MR. JOHNSON:  Q.  Did counsel tell you that?

24     THE WITNESS:  I don't know if you want me --

25     MR. MONACH:  Which question -- which question

Confidential Attorneys' Eyes Only Outside Counsel

Page 181

1  are you asking him?  The first one or the second one?

2        MR. JOHNSON:  Q.  Did counsel inform you to

3  use the January 7th, 2007, date as the priority date

4  for purposes of the '381 patent?

5        MR. MONACH:  I'll instruct the witness not to

6  answer if the answer would disclose communications

7  that are unrelated to anything he's -- facts he's

8  relied on for his opinions here.

9        THE WITNESS:  Based on what counsel just --

10  just said, I won't answer the question.  I cannot

11  answer the question.

12        MR. JOHNSON:  Q.  Did you analyze the

13  provisional application to determine -- whichever one

14  you looked at, to determine whether that application

15  disclosed each of the limitations in the claims of

16  the '381 patent that are being asserted against

17  Samsung?

18     A   I did not do a detailed analysis comparing

19  the claims and comparing the provisionals with the

20  final version.

21     Q   Are you aware that -- well, having read the

22  transcript of Mr. Ording, you are aware that he

23  testified that he had problems understanding certain

24  aspects of the claim language of the asserted claims

25  in the '381 patent; right?

Confidential Attorneys' Eyes Only Outside Counsel

Page 182

1      A   I would have to look at the transcript again
2  in detail to make sure that that's exactly what he
3  testified.  I read it.  I didn't read it in detail
4  enough to memorize the whole transcript, so --

5      Q   You -- you don't remember anything like that?

6      A   There may be -- there probably was something
7  to that effect.  I -- I don't remember the details of
8  the transcript.  So I'm happy to look at it now, if
9  you point me to the right portions.

10     Q   How do you know there was probably something
11  to that effect?

12     A   It sound -- now that you're bringing it up,
13  it sounded like something I had potentially seen in
14  the -- in the transcript, but I don't remember the
15  details of exactly what he said in the transcript.
16  It's a pretty long -- long transcript.

17     Q   You would agree, having studied the '381
18  patent, that the claims require that in response to
19  detecting that the object is no longer on or near the
20  touchscreen display, the electronic document is
21  translated in the second direction until the area
22  beyond the edge is no longer displayed; right?

23     A   I'm sorry.  Where are you seeing this?  Oh,
24  you're talking about the last limitation there?

25     Q   Right.

Confidential Attorneys' Eyes Only Outside Counsel

Page 183

1     A   So translating the electronic document a
2  second direction until the area -- yes, that clearly
3  is in the language of the claim.
4     Q   So if -- after the document snaps back,
5  there's still some area beyond the edge of the
6  document that's being displayed that wouldn't meet
7  these claim limitations; would it?
8         MR. MONACH:  Object to the form of the
9  question; calling for a legal conclusion; incomplete
10 hypothetical.
11        THE WITNESS:  So you used the term "snaps
12 back."  I'm not sure what you mean by that relative to
13 these claims.  The claim simply says "moving in a
14 second direction."
15        MR. JOHNSON:  Okay.
16    Q   So when -- so if after the document moves in
17 the second direction, there's still some area beyond
18 the edge of the document that's displayed.  That
19 wouldn't meet these claim limitations in the '381
20 patent; would it?
21        MR. MONACH:  Object to the form of the
22 question.  Objection; calling for a legal conclusion,
23 with an incomplete hypothetical.
24        THE WITNESS:  So I've not considered that in
25 detail.  This is the first time I'm thinking about it.

Confidential Attorneys' Eyes Only Outside Counsel

Page 184

1          Thinking on the fly here, I would say that

2    the earlier elements of the claim, so I don't know,

3    two levels up, where it says "displaying an area

4    beyond the edge of document" or "displaying an area,"

5    I would say that this last limitation that says "until

6    the area beyond the edge of the electronic document is

7    no longer displayed," that area this -- in this last

8    limitation, where it says "until the area," I would

9    imagine that area to be the same as the "an area" in

10   the -- in the limitation prior to that.

11          So if there is some other area beyond the

12   edge of the display -- sorry -- edge of the electronic

13   document that is unrelated to the area that got

14   displayed in this earlier limitation, that may still

15   be there and has nothing to do with this.

16          MR. JOHNSON:  So --

17          THE WITNESS:  Maybe I should number these

18   to --

19          MR. JOHNSON:  Q.  Yeah, that's fine.

20      A   If you want me to do that.

21      Q   Go ahead.  Sure.

22      A   So I don't know how you -- you call this

23   element one?

24      Q   However you want to do it is fine with me.

25      A   Okay.  I've just labeled these one to seven

Confidential Attorneys' Eyes Only Outside Counsel

Page 185

1    here, so we can --

2        Q    Okay.

3        A    -- clearly go back to it.

4        Q    So what I'm asking is -- is, in the example

5    of when we move beyond the edge of a document --

6        A    So I'm having trouble looking at this.  Okay.

7        Q    -- and this portion over here is displayed,

8    and when I remove my finger, if the document moves in

9    the second direction but still displays a portion of

10   the black area there, that doesn't meet the claim

11   limitations of the '381 patent; does it?

12           MR. MONACH:  Object to the form of the

13   question; incomplete hypothetical; calling for a legal

14   conclusion and a new opinion.

15           THE WITNESS:  So I haven't considered this in

16   detail before, and looking at what you just did there,

17   I'm assuming, if I saw correctly, it's a little hard

18   to see, when you started, you first showed the area

19   beyond the screen -- sorry -- beyond the document,

20   right.

21           So now I've got some area that has now been

22   revealed for the -- for, kind of, the first time

23   beyond -- beyond edge of the document, which I've

24   labeled as meeting element five on the -- on the

25   claims here.

Confidential Attorneys' Eyes Only Outside Counsel

1    When you come to element seven, when it says

2    "second direction until the area," I would imagine

3    it's the same -- the entirety of that area.

4    So if that entirety is not no longer

5    displayed, it would not meet the claim --

6    MR. JOHNSON:  So --

7    THE WITNESS:  -- so if there's some other

8    area beyond the edge of the screen that happened to be

9    there before or otherwise unrelated, that may not fall

10   within this -- this purview of the claims.

11   MR. JOHNSON:  Q.  So removing the negatives,

12   if -- if a part of that area is still displayed, like

13   in this situation, that wouldn't meet the claim

14   limitations of the '381 patent; would it?

15   MR. MONACH:  Objection; misstates the prior

16   testimony.  Objection; calling for a legal conclusion;

17   incomplete hypothetical; calling for a new opinion on

18   the fly.

19   THE WITNESS:  So, as I just testified, if the

20   first direction of movement resulted in meeting

21   element five, which is displaying an area beyond the

22   edge of the document, and then you come to element

23   seven, where it -- you translate in the second

24   direction, until the area beyond the edge of the --

25   area -- "the area" beyond the edge of the electronic

Confidential Attorneys' Eyes Only Outside Counsel

1  document is no longer displayed, so that "the area," I

2  would -- I would expect it to match up with the same

3  "an area" language of element five.

4       And if that entirety of that "an area" is --

5  is not -- hasn't gone away, then it would not meet,

6  but there could be some other areas that's beyond

7  the -- the edge of the document that is unrelated to

8  that, that "an area" that got displayed in element

9  five.  Then that -- that would not have an influence

10 on this in my reading.

11      MR. JOHNSON:  Q.  In the code that you

12 reviewed for -- for Mr. Ording's prototypes, do you

13 know whether when the image moves in a second

14 direction, whether there is still part of "an area" or

15 "the area" that remains?

16      MR. MONACH:  Objection; vague; compound;

17 lacking in foundation.

18      THE WITNESS:  So, as I said earlier, I only

19 looked at that code briefly.  I didn't study it in

20 great detail to match it up with the claims, so I

21 don't think I can say either way whether that occurred

22 or did not occur in that code.  I would have to study

23 it in much more detail.

24      May I ask, when you get a chance, at some

25 point, if I can take a break.

Confidential Attorneys' Eyes Only Outside Counsel

Page 188

1      MR. JOHNSON:  Yeah, why don't we do so right

2  now.

3      THE WITNESS:  Okay.  Thank you.

4      THE VIDEOGRAPHER:  We're off the record at

5  2:36 p.m.

6      (Recess taken.)

7      THE VIDEOGRAPHER:  We are back on the record

8  at 2:57 p.m.

9      You may proceed.

10     MR. JOHNSON:  I want to ask you about Claim 7

11  in the '381 patent.

12     Q   You see the reference to digital image in

13  that claim?

14     A   Yes.

15     Q   What is a digital image, as it's used in

16  the '381 patent?

17     MR. MONACH:  Object to the extent it calls

18  for a legal conclusion or goes beyond the witness's

19  opinions offered in his declaration, but you can give

20  your understanding.

21     THE WITNESS:  So I haven't gone a -- in my

22  declaration, I didn't give a specific definition of

23  that digital image, but the common usage of the term

24  would be to mean an image of the sort that we've been

25  playing with in the gallery application in many of

Page 189

1    these phones today.

2         MR. JOHNSON:  Q.  So is it something that's

3    displayed on the screen?

4         MR. MONACH:  Same objection.

5         THE WITNESS:  In -- in this case, because

6    it's an electronic document and the document is a --

7    is a digital image, it would be displayed on the

8    screen, in the context of these claims.

9         MR. JOHNSON:  Q.  Is it -- is it limited to a

10   JPEG or a TIFF, something like that?

11        MR. MONACH:  Same objection.

12        THE WITNESS:  I don't think it says anything

13   about the format of the digital image, so I would say

14   it's not limited to a JPEG or a TIFF, necessarily.

15   But it could be a JPEG or a TIFF.

16        MR. JOHNSON:  Q.  Your definition would be

17   broader than JPEG or TIFF?

18     A   My definition would include JPEG and a TIFF

19   and many other image formats that are out there.  It's

20   a pretty long list, I think.

21     Q   Okay.  So your understanding of "digital

22   image," as it's used in the claim of the '381 patent,

23   would be an image that's displayed on the screen?

24        MR. MONACH:  Objection; misstates prior

25   testimony; calls for a legal conclusion; incomplete

Confidential Attorneys' Eyes Only Outside Counsel

Page 190

1   hypothetical; goes beyond his opinions.

2         THE WITNESS:  My understanding of a digital

3   image, just thinking out loud here, it is an

4   electronic document.  As in the Claim 7, that because

5   it's an electronic document that's displayed on the

6   screen as for Claim 1 -- Claim 7 depends on Claim 1 --

7   it would be an image displayed on the screen.  But a

8   digital image in general doesn't have to be displayed.

9   In could be stored on a disk and not be displayed yet,

10  but in context of the claims, I would say it has to be

11  displayed.

12       Q   Okay.  I understand.

13         If you -- if you turn to Claim 16, there's a

14  reference to "elastically attached."

15         What does "elastically attached" mean?

16         MR. MONACH:  Same objection; calling for a

17  legal conclusion; asking him to formulate a new

18  opinion at the deposition.

19         THE WITNESS:  So I want to be clear, I have

20  not, in my declaration, given a -- any particular

21  definition of "elastically attached."  So just, again,

22  on the fly here, I would say that in the context of

23  these claims and in the context of the patent,

24  the '381 patent, "elastically attached" would connote

25  that the -- the edge of the document is moving in a

Confidential Attorneys' Eyes Only Outside Counsel

1   way that resembles as though -- in the physical world,

2   the analogy would be an elastic band connected from

3   the edge of the document to the edge of the screen, so

4   when you -- when you pull it beyond the stretch of --

5   you know, as the -- as the elastic band stretches,

6   when it pulls back, when it moves in the other

7   direction, it -- it has some -- some physical

8   characteristics of the movement, like -- like an

9   elastic band would in the physical world.

10          MR. JOHNSON:  Q.  So when the photograph

11  appears to snap or bounce back, that's elastically

12  attached, in your view?

13          MR. MONACH:  Object to the form of the

14  question as vague.  Object to the extent it calls for

15  a legal conclusion and is an incomplete hypothetical.

16          THE WITNESS:  So you used the terms "snap"

17  and "bounce back," and I'm not sure exactly what you

18  mean by those terms, but in terms of the claims, which

19  says the moving in a second direction, moving back,

20  that elastically attached means that movement is --

21  has -- if that movement is -- appears to be

22  elastically attached, that movement would have this --

23  would resemble the kind of movement you would expect

24  to see approximately in the physical world, if an

25  object were connected with an elastic band to some

Confidential Attorneys' Eyes Only Outside Counsel

Page 192

1    other object and were stretched and released.

2         MR. JOHNSON:  Q.  You're familiar with

3    BumpTop; right?

4         A    Yes.

5         Q    What is that?

6         A    BumpTop is -- assuming we're talking about

7    the same BumpTop -- the software package that myself

8    and a former student of mine created.

9         Is that the one you're talking about?

10        Q    Yes.

11        A    Yes, it was created maybe four or five years

12   ago as part of a master thesis, and then went on to be

13   commercialized as a startup, and it's a software

14   package that explores a new kind of user interface for

15   a desktop.

16        Q    Was that -- was that startup sold to anybody?

17        A    Yes, it was.

18        Q    Who was it sold to?

19        A    It was sold to Google.

20        Q    And what happened after it was sold to

21   Google?

22        MR. MONACH:  Object.

23        MR. JOHNSON:  Q.  Which technology, if you

24   know?

25        MR. MONACH:  Object to form; lack of

1    foundation.

2        THE WITNESS:  The technology was acquired by

3    Google.  After that, I have not been involved in

4    the -- in the -- in the subsequent actions at Google.

5    I have no relationship --

6        MR. JOHNSON:  When --

7        THE WITNESS:  -- with Google --

8        MR. JOHNSON:  Sorry.

9    Q   When was the company acquired by Google?

10   A   I'd have to check the exact date.  It would

11   have been sometime in 2010, kind of the April/May time

12   frame, 2010, but it was last year, yes.

13   Q   Is your grad student still involved?

14   A   My former grad student, he is, as far as I

15   know, as of last week, he was an employee of Google.

16   Q   Did you make any money off of the sale of

17   BumpTop to Google?

18       MR. MONACH:  Objection.

19       Yeah, un- -- unrelated to the preliminary

20   injunction motion or to any issue in this case,

21   under -- at least under California law, you may have

22   certain privacy rights about your financial matters

23   and what you received or didn't receive.

24       So I'll just advise you of that,

25   Dr. Balakrishnan, and you can decide whether you can

Confidential Attorneys' Eyes Only Outside Counsel

Page 194

1  answer and with what level of detail or not.

2       THE WITNESS:  So I'll answer that saying,

3  yes, I did make some money.

4       MR. JOHNSON:  Q.  Did -- and when -- when did

5  you start BumpTop?

6  A   The -- the research was started, oh, 2005 --

7  I'd say in the 2003, 2004 time period, and the paper

8  was published at the CHI Conference, the ACM SIG CHI

9  conference.  I think it was in 2005 or 2006.  I can't

10 remember the exact dates.  It's in my CV.

11 Q   Do you remember the title of the paper?

12 A   I don't know if it had the word "BumpTop" in

13 it.  Something to do with keeping it real, or physics

14 in relation to, or something along those lines.

15      (Document marked Balakrishnan Exhibit 105

16       for identification.)

17      MR. JOHNSON:  Q.  Marked, as Exhibit 105, a

18 copy of the article, I believe, and just confirm for

19 me, if you can, that that's the article.

20 A   It was in 2006.  Yes, it appears to be a copy

21 of the article, yes.

22 Q   So can you just tell me whether -- let me ask

23 it -- strike that.

24      Does -- does BumpTop contain the concept of

25 elastically attached?

Confidential Attorneys' Eyes Only Outside Counsel

Page 195

1        MR. MONACH:  Object to the form of the

2   question, and if to the extent you're trying to link

3   it to the claim construction in the '381, object that

4   it calls for a legal conclusion.

5        THE WITNESS:  So BumpTop has various

6   interface examples that embody kind of physical

7   simulations, and included in that is simulations where

8   there is accelerations, momentum, those kinds of

9   things associated with movements of the objects on

10  that prototype desktop, and some of that could have

11  been called -- could have been referred to as kind of

12  elastic-like movements.

13       I have not thought about whether that

14  directly corresponds to the claim language in the '381

15  patent.  In the more general sense, yes, there were

16  different physics simulations in -- in BumpTop.

17       MR. JOHNSON:  Q.  You don't have an opinion

18  as to whether the '381 patent is valid or not; do you?

19       MR. MONACH:  Object to the form of the

20  question.  The witness hasn't offered that opinion

21  yet, but we reserve the right to --

22       MR. JOHNSON:  To make your objection.

23       MR. MONACH:  -- have an offer in -- in

24  response to anything that Samsung may come forward

25  with, as stated in his declaration.

Confidential Attorneys' Eyes Only Outside Counsel

1       MR. JOHNSON:  Counsel, stop coaching the

2  witness.

3       MR. MONACH:  I'm not coaching the witness at

4  all.

5       MR. JOHNSON:  You can answer.

6       THE WITNESS:  So the question was, am I --

7       MR. JOHNSON:  Q.  You don't have an opinion

8  as to whether the '381 patent is valid or not; do you?

9       MR. MONACH:  Object to the form of the

10 question as vague and calling for a legal conclusion.

11      THE WITNESS:  So to the extent that I have

12 not seen anything from Samsung alleging invalidity of

13 this patent, as I said in my report, I obviously

14 reserve the right to respond if and when such an --

15 invalidity contentions are made, everything I've seen

16 so far would lead me to believe -- I don't see any

17 reason to believe that the '381 patent is not valid.

18      MR. JOHNSON:  Q.  So is your opinion, sitting

19 here today, that the '381 patent is valid?

20      MR. MONACH:  Same objection; vague;

21 incomplete hypothetical; calling for a legal

22 conclusion.

23      THE WITNESS:  Like I said, I have not seen

24 any invalidity contentions from Samsung, have not had

25 a chance to carefully consider any such potential

Confidential Attorneys' Eyes Only Outside Counsel

Page 197

1    invalidity contentions to determine invalidity, or

2    things along those lines.  Everything I've seen so far

3    with respect to the '381 patent leads me to believe

4    that it is valid.

5          MR. JOHNSON:  Q.  Why didn't you put anything

6    in your declaration about the validity of the patent?

7      A   My -- my assumption, as I said, and

8    everything I saw was -- did not indicate any

9    invalidity issues, and I was asked to -- to look at a

10   patent and determine if these particular devices that

11   Apple alleged infringed, actually infringed the

12   claims.

13         MR. JOHNSON:  Q.  So you weren't asked --

14     A   So I was asked -- asked to provide an

15   infringement opinion, and I was not asked to provide

16   a -- any kind of response to invalidity contentions.

17   If -- if such a -- if such invalidity contentions

18   arose later on, I'd be -- I'm sure I'd be asked to

19   provide my opinion, at that point, and I -- and I will

20   do that after studying the contentions and -- and the

21   patent.

22     Q   So you -- you haven't been asked to -- to

23   provide an opinion on validity so far; right?

24         MR. MONACH:  Asked and answered.

25         THE WITNESS:  I have not.  I've only been

Confidential Attorneys' Eyes Only Outside Counsel

1    asked to provide an opinion on infringement of these

2    particular devices relative to the patent.

3            MR. JOHNSON:  Q.  When you took on the

4    assignment of looking at the -- the Apple contentions

5    to see if Samsung infringed any of the '381 patent

6    claims, did you do any search for prior art?

7        A    I did not go out and do an exhaustive search

8    in any fashion.

9        Q    Why not?

10       A    Again, my -- I was asked to look at the

11   patent, and my reading of the patent did not

12   immediately trigger anything in my mind that, hey,

13   this stuff I've seen all before.  I did not get that

14   kind of a reaction reading the patent, and I was only

15   asked to look at infringement issues, so that's what I

16   focused on, and given that I didn't see an obvious

17   place where, you know, I thought that the patent, you

18   know, might -- might not be valid, it might have been

19   done before or portions of it have been done before, I

20   did not see the need to do it.

21       Q    I'd like to show you a -- a short video clip

22   that we found on the web with respect to BumpTop, and

23   we got here because your CV references a website

24   called BumpTop.com.

25            You're familiar with that; right?

Confidential Attorneys' Eyes Only Outside Counsel

Page 199

1      A    Of course.

2      Q    Okay.  So let me show you the video from

3  about 55 seconds to 59 seconds, somewhere in there,

4  and ask you, in your view, does this describe the

5  concept of elastically attached?

6           MR. MONACH:  Well, I'll object to the form of

7  the question as vague and ambiguous.  Object to the

8  extent it calls for a legal conclusion, if you're

9  linking it to the construction of terms in the '381

10  patent; incomplete hypothetical; and asking the

11  witness to form a new opinion during the deposition.

12           THE WITNESS:  So I -- I'm sorry.

13           MR. MONACH:  But you can go ahead and show

14  him the video, and if -- if he can answer, subject to

15  those objections, that's fine.

16           THE WITNESS:  So I'm having a bit of trouble

17  looking at it because this monitor is -- can you bring

18  it closer, please?

19           Great.  Thank you.

20           MR. TUNG:  This section here.  Those cards.

21           THE WITNESS:  Can you play that back again,

22  it's been a while since I've looked at this video.

23           MR. JOHNSON:  Q.  This looks familiar to you,

24  though; right?

25      A    Yes, of course.

Confidential Attorneys' Eyes Only Outside Counsel

Page 200

1          MR. TUNG:  This portion right here, these

2    cards.

3          MR. JOHNSON:  Q.  Do those cards moving back

4    and forth show the concept of elastically attached?

5      A   So those --

6          MR. MONACH:  Object.

7          THE WITNESS:  I'm sorry.

8          MR. MONACH:  Object to form.

9          THE WITNESS:  So those cards, if I recall

10   correctly, and just looking at the video from what we

11   did back then, they, I believe, had a spring damper

12   model connecting -- connecting the cards to one

13   another, and as they moved around, they behave like

14   springs connected to one another, which would be

15   analogous to being -- having an elastic band

16   connecting to each other.

17          Now, that's in that context, and the context

18   of the claims, if -- if -- it's, I guess, very

19   different in that, here -- where is that claim?  It's

20   talking about area of documents, some of which is

21   shown here is not displayed, and so forth.

22          The context is -- is, I would say, slightly

23   different, but in the broader concept, it is -- they

24   have, you know, equivalent of elastic bands between

25   the -- between the different cards in that -- in that

Confidential Attorneys' Eyes Only Outside Counsel

1    section of the video.

2         MR. JOHNSON:  Q.  Now, you understand that in

3    rendering an opinion as to whether a claim is

4    infringed, there's a two-step process; right?  The

5    first thing you have to do is look at the claims and

6    interpret the claims; correct?

7         MR. MONACH:  Objection to the extent it calls

8    for a legal conclusion, but you should -- you can give

9    your understanding.

10        THE WITNESS:  I would believe that's probably

11   a reasonable understanding I would have.

12        MR. JOHNSON:  Q.  And then the second step is

13   to apply the interpreted claims to the actual accused

14   device; right?

15        MR. MONACH:  Same objection.

16        THE WITNESS:  It's one way of characterizing

17   it, sure.

18        MR. JOHNSON:  Okay.

19     Q   And so did you undertake this to specifically

20   interpret the asserted claims of the '381 patent?

21        MR. MONACH:  Objection; vague.

22        THE WITNESS:  I'm not sure what your -- what

23   you're getting at here.  If -- if you mean did I try

24   to construe it in all possible ways and did you -- and

25   I read the claims, and based on the specification of

Confidential Attorneys' Eyes Only Outside Counsel

Page 202

1  the claims themselves, I -- and my understanding, as

2  one skilled in the art, I came to an understanding of

3  those claims.

4      MR. JOHNSON:  Q.  And so my -- my question

5  is:  Did you -- as you were reading the claims, did

6  you interpret the claims in light of the specification

7  in the prosecution history, what had happened, you

8  know, during the prosecution history?

9      A   I didn't look in detail at the prosecution

10  history or vis-à-vis the claims and interpreting, if

11  that's what you're asking me.

12      Q   Did you notice that the claims were changed

13  during -- over time during the prosecution of the '381

14  patent?

15      A   I think I noticed, at some point, that some

16  language had been modified.  I did not study that in

17  detail to determine the reasons for that modification.

18      Q   In fact, there were -- there were quite a few

19  modifications; right?  There was a series of language

20  added.  The whole idea, first portion, second portion,

21  third portion, fourth portion, was specifically added

22  to overcome certain prior art; right?

23      MR. MONACH:  Object to the form of the

24  question; assumes facts not in evidence.

25      THE WITNESS:  So I'm going by memory here,

Confidential Attorneys' Eyes Only Outside Counsel

Page 203

1    it's -- I haven't looked at the -- I haven't studied

2    the prior -- sorry -- the file history in detail in

3    matching up which parts exactly were changed.

4         If I recall correctly, there was -- there was

5    some addition of the first portion, second portion.

6    I'm not sure if all of that was added later or not.

7         MR. JOHNSON:  Q.  Did -- when you were

8    undertaking your -- your infringement analysis, did

9    you try to understand what each of the terms in the

10   patent claims meant?  Did you try to interpret those?

11        MR. MONACH:  Object to form.

12        THE WITNESS:  I tried to understand.  I,

13   obviously, had to understand the claims or each

14   element of the claims in order to determine whether

15   something was infringing, but in -- in reading

16   these -- these elements of the claim, same Claim 1, I

17   didn't particularly see anything that required -- that

18   was complicated enough that required a construction,

19   you know, for me to interpret it in a -- potentially

20   in more than any one way, so I wasn't stretching to --

21   to understand these.

22        MR. JOHNSON:  Q.  No, but you would -- you

23   would agree that there are terms in Claim 1 that are

24   ambiguous and subject to multiple interpretations;

25   right?

Confidential Attorneys' Eyes Only Outside Counsel

Page 204

1          MR. MONACH:  Object to form.

2          THE WITNESS:  I don't know that I'd agree to

3     that.  I think -- I think there are -- well, any word

4     one could argue is ambiguous, depending on context and

5     depending on how far you want to stretch the word

6     "ambiguous."

7          To me, reading is one -- as one skilled in

8     the art reading this thing, I did not find anything

9     particularly difficult to understand or, you know, a

10    term that I went, okay, what does that mean?  I did

11    not have --

12         MR. JOHNSON:  Q.  So you understand --

13         MR. MONACH:  Please don't -- please don't

14    interrupt him.  I don't think he finished.

15         MR. JOHNSON:  Q.  You understood --

16         MR. MONACH:  Did you finish?

17         THE WITNESS:  I -- I don't know if I

18    finished.

19         MR. MONACH:  All right.

20         THE WITNESS:  I got cut off in the middle.  I

21    think I got the gist of what I wanted to say out.

22         MR. JOHNSON:  Q.  Did you -- you're aware

23    that the '381 patent was asserted against Nokia;

24    right?

25     A    I believe so, yes.  Yes, it must have been,

Confidential Attorneys' Eyes Only Outside Counsel

Page 205

1   because Nokia requested that reexamination.

2       Q   Did you read the -- besides the reexamination

3   file history, did you read the case file in the Nokia

4   case for purposes of looking at what was said with

5   respect to the '381 patent?

6       A   The Nokia case file?  No, I don't think I

7   did.

8       Q   Did you look at any documents from the Nokia

9   case involving Apple that relate to the '381 patent?

10      A   The Nokia case.

11          Beyond the reexamination document, I don't

12  believe I have.

13      Q   Did you look at any invalidity contentions

14  that were submitted by Nokia in the case that Nokia

15  and Apple had concerning the '381 patent?

16      A    Not beyond what's in the reexamination

17  document.

18      Q   When I looked at your declaration in

19  connection with the motion for preliminary injunction,

20  I didn't see any reference to infringement under the

21  doctrine of equivalence.

22          You're not alleging that there's infringement

23  under the doctrine of equivalence; are you?

24          MR. MONACH:  Object to the form of the

25  question.  Object to the extent it calls for a legal

Page 206

1  conclusion or -- or additional opinion by the witness.

2       THE WITNESS:  So I -- in the declaration that

3  I've put forth so far, I -- I don't believe I've

4  alleged infringement by doctrine of equivalence yet.

5  That doesn't mean that such allegations may not be put

6  forth later on, if we deem it necessary, should --

7  should more information come to light.

8       MR. JOHNSON:  Q.  Looking at claims in

9  the '381 patent, do you believe those terms -- strike

10 that.

11      Looking at the claims of the '381 patent, do

12 you believe those claims use simple and elegant claim

13 terms?

14      MR. MONACH:  Object to the form of the

15 question.  It's vague and ambiguous.

16      THE WITNESS:  Well, I guess the term "simple

17 and elegant," it's a bit in the eye of the beholder,

18 but I would say these are relatively easy to

19 understand, the terms.

20      MR. JOHNSON:  Q.  So you think these claims

21 are easily understood --

22      MR. MONACH:  Please, please.  You're -- I

23 know he drops his voice, and that's his habit, so --

24      MR. JOHNSON:  I thought he was done.

25      MR. MONACH:  -- I don't think you're --

Confidential Attorneys' Eyes Only Outside Counsel

Page 207

1          MR. JOHNSON:  I thought he was done.

2          MR. MONACH:  -- I don't think you're doing it

3    on purpose, but it seems as though he's being cut off,

4    so if you could just wait, and if you could keep your

5    voice up, Dr. Balakrishnan, I think this will go

6    better.

7          THE WITNESS:  I'll try to do that.

8          I'm sorry.  I've lost my train of thought.

9          MR. JOHNSON:  So --

10         THE WITNESS:  If we could go back to the

11   question, and I'll try to give you an answer again.

12         MR. JOHNSON:  Q.  So you believe the -- the

13   terms -- strike that.

14         You believe the claim language of the '381

15   patent to be easily understood?

16         MR. MONACH:  Objection; vague; incomplete

17   hypothetical.

18         THE WITNESS:  I believe the claim, the

19   language in the claims are -- are comprehensible to

20   someone skilled in the art, yes.  I don't see any

21   particular difficulty.  I did not have any particular

22   difficulty --

23         MR. JOHNSON:  Q.  Well, you're an expert.

24    A   -- under -- understanding the -- the claim

25   language.

Confidential Attorneys' Eyes Only Outside Counsel

Page 208

1      Q    You're an expert.

2           My question is:  Do you believe the claim

3      language to be easily understood?

4           MR. MONACH:  Same objection; asked and

5      answered.

6           THE WITNESS:  So I think I just answered

7      that.  I said I did not have any difficulty.  It was

8      comprehensible, so I don't see it being difficult to

9      understand.

10          MR. JOHNSON:  Q.  And I'm saying you --

11     you're -- you're allegedly an expert in the field.

12          I'm asking:  Do you think a person of

13     ordinary skill to -- strike that.

14          To a person of ordinary skill in the art, do

15     you believe these claim -- the claim language to be

16     easily understood and straightforward?

17          MR. MONACH:  Objection; vague.

18          THE WITNESS:  So to one skilled in the art, I

19     believe that the language used in the claims are --

20     are easily understood, but I don't see any particular

21     difficulty for someone skilled in the art to

22     comprehend these claims.

23          MR. JOHNSON:  Q.  Do you need to read the

24     specification in order to understand the claim

25     language in the '381 patent?

Confidential Attorneys' Eyes Only Outside Counsel

1          MR. MONACH:  Objection; incomplete

2   hypothetical; vague; calls for speculation.

3          THE WITNESS:  So I would say that any patent,

4   I would always read the specification --

5   specification, the main body of the -- of the patent,

6   in conjunction with reading the claims.

7          I don't think one would read the claims in

8   isolation.  If all you gave me was the claims, I don't

9   think that's typically how patents are read.

10         MR. JOHNSON:  I'm talking about with respect

11  to the '381 patent.

12     Q   Do you need to read the specification in

13  order to understand the claim language of the '381

14  patent?

15         MR. MONACH:  Object to the form of the

16  question; asked and answered; calls for a legal

17  conclusion; vague; incomplete hypothetical.

18         THE WITNESS:  So in that, the claims, at

19  least, let's say, take Claim 1, as an example, reading

20  that, I -- I would -- as one skilled in the art or an

21  expert in the field, I would read the spec just to

22  make sure I wasn't missing something necessarily; but,

23  otherwise, I believe the claims actually speak for

24  themselves in this -- in this particular example.

25         MR. JOHNSON:  Q.  Did you read the

Confidential Attorneys' Eyes Only Outside Counsel

Page 210

1    specification of the '381 patent?

2        A    I have read the specification, yes.

3        Q    The whole thing?

4        A    Yes.

5        Q    All right.  And did you read the -- all of

6    the related applications that are discussed right up

7    there in the first few lines of Column 1?

8        A    You mean all these patent applications?

9        Q    Yeah.

10       A    No, I did not read all of them, no.

11       Q    You see line 40, it says, "All of these

12   applications are incorted -- incorporated by reference

13   herein in their entirety"?

14       A    Yes, I see that.

15       Q    Why didn't you read the patent applications

16   that are incorporated by reference in their entirety

17   in the '381 patent?

18       A    I didn't see the need to.  I read -- I read

19   the claims.  I could understand them.  The

20   specification in this document itself, without reading

21   those related applications or all of the related

22   applications, the specification itself did not

23   contradict my understanding of the claims, so I did

24   not see the need to -- to delve deeper, so to speak.

25       Q    You said that you've -- you've seen parts of

Confidential Attorneys' Eyes Only Outside Counsel

1    the prosecution history.  Have you read the whole

2    prosecution history of the '381 patent?

3        A    I would say I skimmed it.  I haven't read it

4    in -- you know, in detail, saying matching everything

5    up, if that's what you mean.

6        Q    Did you read all of the cited art?

7        A    I did not read all of the cited art.

8        Q    Why not?

9        A    For the same reason I did not see the need to

10   do that in order to understand the claims, in light of

11   the specification of the '381 patent, necessarily.

12       Q    So you didn't see reading the prosecution

13   history or the cited prior art as -- in forming the

14   scope of the claim terms that are used in the '381

15   patent?

16           MR. MONACH:  Objection; vague; incomplete

17   hypothetical; calling for a legal conclusion.

18           THE WITNESS:  If you mean by "scope," the --

19   whether it would be limited in particular ways, is

20   that what you mean?

21           MR. JOHNSON:  I just mean scope generally.

22       Q    I mean, you didn't -- you didn't read the

23   prosecution history or the cited prior art in order to

24   figure out how the claims were supposed to be

25   interpreted?

Confidential Attorneys' Eyes Only Outside Counsel

Page 212

1    A    I did not feel I needed to -- to read all the

2    cited prior art in order to understand the claims and

3    interpret in light of the specification that I read in

4    the '381 patent itself.

5        Q    How many pieces of cited prior art did you

6    read?

7        A    I don't recall, but I've -- I've certainly

8    looked at some of them.  I don't remember which ones

9    exactly.

10       Q    Did you -- did you read the four pieces of

11   prior art that were discussed in the reexamination

12   proceedings filed by Nokia?

13       A    I'm not sure if I've read all of them, but

14   I've read some of them.

15       Q    Which ones?

16       A    I read, for example, the Glimpse, the Glimpse

17   article in there.  I've read that one.  I browsed, I

18   think, something called Inside Out, or -- or something

19   to that effect.  Some Microsoft product, I browsed

20   that application -- sorry, not application --

21   document.  I can't remember what the other two were.

22   I'd have to look it up to see whether I actually

23   looked at it or not.

24       Q    There was a Zimmerman reference; do you

25   remember that?

Confidential Attorneys' Eyes Only Outside Counsel

Page 213

1    A    Yes, I do remember the Zimmerman reference.

2  I believe I have looked at that, at some point.

3    Q    When you say you looked at it, did you read

4  it?

5    A    When I say I looked at it, I read it, but

6  whether I read it at the level of detail of matching

7  up to every claim element and so forth, that, I did

8  not do.  And, again, I will reiterate that I was

9  looking at this in terms of infringement.  I wasn't

10 looking at the invalidity issues, at that point.

11   Q    How about the Robbins patent?  Did you look

12 at that?

13   A    Which Robbins patent is that?

14   Q    The one that was used in the reexam request

15 by Nokia.

16   A    Right, if you could tell me the full title,

17 because there's several of Robbins articles that are

18 floating around, I think.

19       MR. MONACH:  Objection.  Objection; vague and

20 ambiguous, in light of the witness's testimony.

21       MR. JOHNSON:  Q.  Do you remember the Robbins

22 artic- -- Robbins patent entitled "Advanced Navigation

23 Techniques for Portable Devices"?

24   A    Could I have a look at it, if you don't mind.

25       MR. JOHNSON:  I'll mark it as Exhibit 106.

Confidential Attorneys' Eyes Only Outside Counsel

Page 214

1          (Document marked Balakrishnan Exhibit 106

2           for identification.)

3          MR. MONACH:  Did you mark -- I'm sorry.  Did

4    you mark a 105?

5          THE WITNESS:  It was this BumpTop article.

6          MR. MONACH:  Okay.  Thank you.

7          THE WITNESS:  Yes, I have browsed this

8    article.

9          MR. JOHNSON:  Q.  Is there a distinction in

10   your mind between read it versus browsed it?

11     A   Well, I think if I was going to do a detailed

12   invalidity analysis, for example, I would read this

13   very, very carefully and, you know, understand

14   every -- to the extent possible, every nuance.

15          Browsing it, means, you know, I'm looking at

16   it very quickly just to get a sense of the article and

17   not trying to elicit every detail of it.

18     Q   Did you read it sufficiently to convince

19   yourself that it doesn't invalidate the '381 patent

20   claims?

21          MR. MONACH:  Object to the form of the

22   question; object to the extent it calls for a legal

23   conclusion, and ask the witness to formulate an

24   opinion on the spot here.

25          THE WITNESS:  So I was not looking at

Confidential Attorneys' Eyes Only Outside Counsel

Page  215

1   validity issues at the time I read this.  I -- I did

2   not have that as my primary objective, so I don't

3   think I could make that determination with any

4   certainty, unless somebody actually alleged particular

5   portions of this -- of this document called Contends,

6   that it invalidates the '381 patent, at which point

7   I'm happy to -- or I will study it in detail and

8   consider the different invalidity contentions and

9   respond appropriately.

10          At this time, and at the time for analysis of

11  my other colleague, I wasn't doing that level of

12  analysis.

13          MR. JOHNSON:  Q.  Well, at the time you

14  had -- you read it, though, Nokia had alleged that

15  that reference, as well as the three other references,

16  invalidated the '381 patent claims; right?

17          MR. MONACH:  Object to the form.

18          THE WITNESS:  At the time I looked at this,

19  the -- Nokia had made the allegation.  I believe they

20  may have already settled, at that point, and so

21  they -- my -- my understanding is that it goes away.

22  I'm not sure the legality of whether validity

23  contentions disappear after somebody settles, but...

24          MR. JOHNSON:  Q.  But when you looked at the

25  request of reexamination prosecution history, Nokia

Confidential Attorneys' Eyes Only Outside Counsel

Page 216

1    had requested that the '381 patent be reexamined

2    because it believed that these four references

3    invalidated the '381 patent; right?

4          MR. MONACH:  Object to the form of the

5    question.

6          THE WITNESS:  The reexamination request made

7    that allegation, yes, and -- and I also read that the

8    patent office had looked at it and -- and rejected

9    those claims.

10         MR. JOHNSON:  Q.  Well, did you look at these

11   references, these four references, sufficiently to

12   determine whether the patent office was correct or

13   not?

14      A   I did not do that level of analysis, no.

15      Q   Why not?

16      A   Because, at that point, I was engaged to do

17   infringement analysis.  The patent office had clearly

18   already said that it is -- they had determined the

19   patent was still valid, based on the reexamination.  I

20   had no reason to believe otherwise, and I wasn't

21   engaged to do a validity analysis.

22      Q   In your review of the prior art that you've

23   looked at, what do you think is the best prior art

24   against the '381 patent claims?

25         MR. MONACH:  Object to the form of the

Confidential Attorneys' Eyes Only Outside Counsel

1   question as asking for a legal conclusion; asking the

2   witness to provide opinion testimony where he hasn't

3   formulated an opinion on that subject yet.

4          THE WITNESS:  I think you would have to ask

5   me to speculate as to some things being valid.  What's

6   the closest validity -- sorry, closest prior art, and

7   I don't think I can do that right now without spending

8   a considerable amount of time considering these prior

9   art articles with invalidity or validity issues at the

10  forefront of my thinking.

11         MR. JOHNSON:  Q.  So you don't -- you don't

12  have an answer to my question?

13         MR. MONACH:  Objection; asked and answered.

14         THE WITNESS:  I think I just answered your

15  question.  I -- I --

16         MR. JOHNSON:  Q.  Let me ask it again.

17      A   I --

18      Q   What is the best prior art that you've seen

19  against the '381 patent?

20         MR. MONACH:  Same objection as previously

21  stated in response to that question, and I don't think

22  you're permitted to inquire about the witness's

23  tentative conclusions or -- or thoughts before he's

24  formulated an opinion or offered an opinion on a

25  topic.  It's asked and answered.

Page 218

1    You can answer it again.

2    THE WITNESS:  So, as I said before, I have

3    not studied these references with the view of

4    determining validity or invalidity.  That was not

5    something I've done in detail, and I cannot answer the

6    question as to which of these is the best or closest

7    prior art, because I haven't done that analysis yet,

8    and -- and when the time comes, if it comes, that I

9    have to do that analysis, I will do it and, at that

10   point, come up with an appropriate opinion.

11   MR. JOHNSON:  Q.  Did Nokia uncover the best

12   prior art against the '381 patent?

13   MR. MONACH:  Objection for the reasons

14   previously stated.  This is the same question asked

15   and answered and now has a lack of foundation and

16   calls for speculation.

17   THE WITNESS:  Again, as I said, I -- I have

18   not done any kind of invalidity or validity analysis.

19   I have not considered the prior art with respect to

20   the '381 patent in any detail, and it's impossible for

21   me to say whether Nokia found the -- the best or the

22   worst prior art.  They certainly found what they

23   contend to be some prior art.  I haven't done the

24   analysis to determine either way to say anything

25   definitive about this prior art or other prior art

Confidential Attorneys' Eyes Only Outside Counsel

Page 219

1    that may exist out there or may not exist.

2         MR. JOHNSON:  I'll show you what I've marked

3    as Exhibit 107, which is the Glimpse prior art that

4    was referenced in the reexamination prosecution

5    history.

6         (Document marked Balakrishnan Exhibit 107

7          for identification.)

8         MR. JOHNSON:  Q.  Have you read this, this

9    article?

10        A    Yes, I have.

11        Q    And this one you read carefully?

12        MR. MONACH:  Object to the form.

13        THE WITNESS:  This one I've read in some

14   detail, in -- in, actually, much more in detail way

15   back when it was written.  I'm familiar with the

16   article from back in 2005.

17        MR. JOHNSON:  Q.  How come you're familiar

18   with it back then?

19        A    It -- it's, first of all, an article that

20   appeared in a conference that I regularly attend, the

21   CHI Conference.  Clifton Foreigns was a former Ph.D.

22   student of mine, and I think, at that time, he was a

23   Ph.D. student of mine, and I know the other authors,

24   so it's a work in my field that I'm generally familiar

25   with.

Confidential Attorneys' Eyes Only Outside Counsel

Page 220

1    Q   Okay.  Do you believe this is the best prior

2  art against the '381 patent, or do you have an

3  opinion?

4        MR. MONACH:  Objection; same objections as

5  previously stated -- previously stated; asked and

6  answered, multiple times.

7        THE WITNESS:  So, as I said earlier, I have

8  not done any kind of analysis on validity or

9  invalidity.  I have not formed an opinion in that

10  regard.  This could be prior art that's relevant.  I

11  have not studied it in view of determining validity or

12  invalidity relative to the '381 patent, so I don't

13  think I can answer that definitively either way right

14  now, but I reserve the right down the road, if the

15  time comes, to actually do that.

16        MR. JOHNSON:  But you've reviewed it.  You're

17  familiar with the article.  You've obviously read the

18  '381 patent a bunch of times.

19    Q   Can you tell me what limitations from the

20  '381 patent claims are missing in this particular

21  reference?

22        MR. MONACH:  I'll object to the form of the

23  question; asking the witness to formulate an opinion

24  where he's said -- already testified multiple times he

25  hasn't done this work.  Object; it asks for a legal

Confidential Attorneys' Eyes Only Outside Counsel

Page 221

1  conclusion and is compound with respect to all of the

2  different limitations and elements.

3           But if you -- if you can, and -- and want to

4  do so and study it now and give some response, I'm not

5  going to instruct you not to do that.

6           THE WITNESS:  So this is a -- I would say a

7  several-pages long article that covers some ground.  I

8  have not done the comparison to every element of the

9  claims of the '381 patent, and it's not something I

10 want to do on the fly.

11          If -- I certainly don't want to do this live

12 in a deposition.  I would have to spend the time and

13 carefully consider the -- the -- the article and what

14 it -- what it discloses, relative to each of the

15 embodiments -- sorry -- each of the elements of the

16 claims, and I -- I don't -- I simply cannot do that

17 right now.

18          (Document marked Balakrishnan Exhibit 108

19           for identification.)

20          MR. JOHNSON:  Let me mark, as Exhibit 108,

21 the Zimmerman '387 patent.

22     Q   You've seen that before; right?

23          Have you read the Zimmerman article -- I'm

24 sorry -- the Zimmerman patent?

25     A   I have browsed through it, yes.

Confidential Attorneys' Eyes Only Outside Counsel

Page 222

1      Q    You've only browsed through it.

2           Why didn't you read it carefully?

3      A    I did not read it in great detail.  Again, as

4  I've stated before, I -- you know, my task on this --

5  on this case so far was focused on infringement, and I

6  did not look at invalidity or validity issues in any

7  great detail.

8      Q    Do you understand that you can only infringe

9  a valid patent?

10     A    I would assume that's --

11          MR. MONACH:  Objection.

12          THE WITNESS:  I'm sorry.

13          MR. MONACH:  Object to the form of the

14  question.

15          THE WITNESS:  I would assume that's the case.

16  If it's invalid -- how would you infringe something

17  that's invalid?

18          MR. JOHNSON:  Q.  So -- so why didn't you do

19  anything to look at the validity of the patent more

20  carefully?

21     A    Because, as far as I know, and the patent

22  was -- has not been determined to be invalid, and it

23  had been reexamined by the patent office, which

24  determined it was valid, in light of these references,

25  I wasn't asked to determine validity or invalidity.

Page 223

1  My job was to look at infringement contentions

2  relative to the patent.  I did not -- reading the

3  patent did not lead me to believe that anything was

4  particularly -- anything jumped out to say this --

5  this has got to be invalid.  So I did not see the need

6  to do that.

7          If and when I -- you know, I'm presented with

8  particular invalidity contentions and allegations, I

9  will certainly go back and -- and do the very careful

10  analysis to determine if those allegations have any

11  basis, and respond accordingly.

12    Q   But you didn't see the need to determine

13  whether what was done during the prosecution history

14  of the '381 patent or the reexamination prosecution

15  history was accurate or not?

16          MR. MONACH:  Object to the form of the

17  question.

18          THE WITNESS:  Again, to reiterate what I --

19  what I said, I -- my -- my task here was to determine

20  infringement relative to the devices alleged were

21  infringing the applications, that they alleged were

22  infringing relative to the '381 patent, and given that

23  the reexamination by the patent office did not lead to

24  a conclusion of invalidity, I did not see the need

25  to -- to look at invalidity or validity contentions in

Confidential Attorneys' Eyes Only Outside Counsel

Page 224

1   any great detail, at that time, and if -- if and when

2   the -- such contentions are raised in this case, I

3   will -- I will certainly look at it.

4           (Document marked Balakrishnan Exhibit 109

5            for identification.)

6           MR. JOHNSON:  Let me mark, as Exhibit 109,

7   the prosecution history of the -- the reexamination

8   prosecution history of the '381 patent, with

9   production pages SAMNDCA030 through '0350.

10          So we produced this, and we numbered it.  We

11  didn't see it produced by Apple.

12     Q   I think you said you've browsed this before;

13  right?

14     A   Give me a minute here to quickly look through

15  this.

16          Yes, I've browsed, well, at least, an

17  electronic version of this.  Paper version looks a lot

18  thicker than the pdf file.

19     Q   But you haven't read it carefully?

20          MR. MONACH:  Object to the form of question.

21          THE WITNESS:  I -- like I said before, I

22  haven't read it with the eye to determine validity or

23  invalidity, because that was not my task for this --

24  for this aspect of the declaration that I put forth.

25          MR. JOHNSON:  Okay.

Confidential Attorneys' Eyes Only Outside Counsel

Page 225

1    Q    If you -- if you turn to page '311.

2    A    And you mean by the Bates number here?

3    Q    Yeah.

4    A    Okay.

5    Q    The first combination of prior art references

6    that Nokia asserted was grounds for rejection was

7    Glimpse, plus Inside and Out; right?

8    A    That appears to be what is said in this --

9    this section of the document.

10   Q    Now, if I ask you to look at the claim charts

11   that are on pages 18, 19, et cetera, of this

12   particular document, and I ask you whether the prior

13   art discloses certain claim elements that are

14   described here, are you gonna be able to tell me if

15   they're accurate or not?

16   A    I don't think I can -- I'm sorry.

17        MR. MONACH:  Object to the -- object to the

18   form of the question as calling for speculation and --

19   and vague.

20        THE WITNESS:  If you're asking me can I,

21   based on each of these elements on the table in this

22   chart, whether whatever Nokia said here is accurate or

23   not, I don't think I can do that right now.  I haven't

24   spent the time, and I think it's gonna take a

25   considerable amount of time to very carefully look at

Confidential Attorneys' Eyes Only Outside Counsel

Page 226

1   each of these allegations and correspond it to the

2   article in question and to the claim in question and

3   make that determination.

4        I have not done that, and I certainly don't

5   think I can do that on the fly here.  It would take

6   certainly much more time than we have today.

7        MR. JOHNSON:  Do you know whether -- did

8   the -- strike that.

9   Q   Did the examiner find that Glimpse disclosed

10  pan and zoom navigation using the touch input?

11       MR. MONACH:  Objection; lack of foundation.

12       Under the best evidence rule, whatever the

13  examiner found is the best evidence of what he found.

14       THE WITNESS:  I'm not sure I completely

15  understood that objection.

16       MR. JOHNSON:  Yeah.

17       MR. MONACH:  It's basically saying the

18  document speaks for itself.  The examiner did or

19  didn't do something and whether you have an opinion on

20  it doesn't change that in the slightest.

21       MR. JOHNSON:  That's -- that's an objection I

22  haven't heard at a deposition in a patent case before,

23  but go ahead.

24       THE WITNESS:  Can I have the question read

25  back to me, if you don't mind.

Confidential Attorneys' Eyes Only Outside Counsel

Page 227

1    MR. JOHNSON:  Q.  Did the examiner find that

2    Glimpse disclosed pan and zoom navigation using touch

3    input?

4    MR. MONACH:  Objection; best evidence rule.

5    Objection; lack of foundation.

6    THE WITNESS:  I don't recall exactly what the

7    examiner found.  I know, in its entirety, the examiner

8    did not find that this prior art invalidated the

9    patent claims.

10   So the particular -- particular elements of

11   the claims and particular elements of the Glimpse

12   article that the examiner may or may not have found to

13   match up, but I'd have to study that in great detail

14   before I -- or at least in some detail before I

15   determine what he found or what he didn't find.

16   MR. JOHNSON:  Q.  Based on your familiarity

17   with the Glimpse work, can the user preview results of

18   a movement by using a light touch, and then when the

19   user lifts his finger, the movement can be undone?

20   MR. MONACH:  Object to the form of the

21   questions.

22   THE WITNESS:  Going by memory, I -- I would

23   have to study the article again carefully to match it

24   up with your particular question there, but going from

25   memory, the thrust of that article was to -- to enable

Confidential Attorneys' Eyes Only Outside Counsel

1  glimpsing or previewing some other part of the -- of

2  the document space or the space of multiple documents.

3  The specifics of it, I would have to study in detail

4  in any kind of validity or invalidity contention.

5          MR. JOHNSON:  Q.  Based on your familiarity,

6  did Glimpse describe going beyond the edge of an

7  electronic document?

8          MR. MONACH:  Object to the form of the

9  question.  Objection; best evidence rule.

10         THE WITNESS:  I would have to study the

11 article again in detail to see if it matches up with

12 the way the edge of an electronic document is used in

13 the claims of the '381 patent.

14         MR. JOHNSON:  Q.  So you don't know?

15         MR. MONACH:  Same objection.

16         THE WITNESS:  As I said, I can't answer that

17 question right off.  Well, from memory here, I

18 wouldn't be able to tell you either way.

19         MR. JOHNSON:  Q.  If I -- if I ask you about

20 whether the statements that are made in the request

21 for reexamination that appear on page '294 through

22 '344 --

23     A   This is the Bates numbering again?

24     Q   -- and whether those are accurate statements,

25 are you able to answer those questions?

Confidential Attorneys' Eyes Only Outside Counsel

Page 229

1       MR. MONACH:  Same objection; compound;

2  calling for a narrative; asking the witness to

3  evaluate a -- 50 pages of a document on the fly.

4       THE WITNESS:  If you're asking me that --

5  whether I can tell you right now that each one of

6  these are accurate or inaccurate, I absolutely cannot

7  do that.  I have not studied this at that level of

8  detail at all, as I've said multiple times today.  I

9  would have to do that studying, and it's gonna take

10  many, many hours.

11       MR. JOHNSON:  Q.  Did you do anything

12  specifically to determine whether the patent discloses

13  the best mode for performing the claimed inventions in

14  the '381 patent?

15       MR. MONACH:  Objection to the extent it calls

16  for a legal conclusion.  Objection; vague.

17       THE WITNESS:  I -- I would have to ask you

18  what your definition of "best mode" is.  I have a

19  vague understanding of it from past cases, but --

20       MR. JOHNSON:  Q.  What do you understand it

21  to be?

22     A   My understanding is that the best possible

23  way or the -- the way the inventor intended it to be

24  used should be disclosed.  That's a very lay

25  understanding.  I haven't considered the -- just the

Confidential Attorneys' Eyes Only Outside Counsel

Page 230

1    legal best mode argument.

2        Q    Using your understanding, have you done

3    anything specific to determine whether the '381 patent

4    claims meet the best mode requirements?

5        A    No, I haven't done any kind of best mode

6    analysis, if that's what you're asking me.

7        Q    You weren't asked by counsel to look at that;

8    right?

9        A    I was not.  I was not instructed or asked

10   to -- to look at any best mode analysis, as far as I

11   know.

12       Q    Were you asked to look at whether any of the

13   claims are indefinite?

14       A    I was not asked to make that determination.

15       Q    Were you asked to look at whether the -- any

16   of the claims are described in a way that they would

17   enable a person of ordinary skill in the art to make

18   and use the inventions that are described in the '381

19   patent?

20       A    Did you say would not or would?  I'm sorry.

21   I missed some portion there.

22            If you could have it just read back, the

23   question, please.

24            MR. JOHNSON:  Let's read it back.

25            (Whereupon, record read by the Reporter as

Confidential Attorneys' Eyes Only Outside Counsel

Page 231

1  follows:

2       "Question:  Were you asked to look at whether

3        the -- any of the claims are described in a

4        way that they would enable a person of

5        ordinary skill in the art to make and use

6        the inventions that are described in

7        the '381 patent?")

8       THE WITNESS:  I was not asked to make that

9  determination.

10       MR. JOHNSON:  Q.  Now, with respect to your

11  declaration that the statements that are made in your

12  declaration are made on personal knowledge; right?

13    A   What do you mean by "personal knowledge"?

14    Q   I mean, there -- it's knowledge that you --

15  you have, as opposed to -- as to something that you're

16  relying -- are you relying on anybody else for the

17  opinions that are expressed in your declaration?

18       MR. MONACH:  Objection; vague and compound.

19       THE WITNESS:  I'm not relying on anybody

20  else, except for portions like the legal -- the legal

21  principal section.  I was given that information to

22  follow.  That's not something I'm an expert on, for

23  example.

24       MR. JOHNSON:  All right.

25    Q   How many hours have you billed on this case

Confidential Attorneys' Eyes Only Outside Counsel

1    so far?

2        A    I don't -- I don't know how many hours I've

3    submitted invoices for yet, but I roughly have worked

4    maybe 30 to 50 hours on the case.  I haven't submitted

5    all my invoices yet.

6        Q    Okay.  Now, you've worked on several

7    different cases for Apple.

8            Have you ever disagreed with any of Apple's

9    positions in its cases?

10           MR. MONACH:  I'm gonna instruct the witness

11   not to answer based on Rule 26 and work product

12   privilege.  It also goes beyond the scope of the

13   preliminary injunction motion here.

14           THE WITNESS:  So I cannot answer that

15   question.

16           MR. JOHNSON:  Okay.  Let's take a break.

17           THE VIDEOGRAPHER:  This is the end of Disk

18   No. 3, Volume I.

19           We are off the record at 3:55 p.m.

20           (Recess taken.)

21           THE VIDEOGRAPHER:  This is the beginning of

22   Disk No. 4, Volume I.

23           We are back on the record at 4:08 p.m.

24           You may proceed.

25           MR. JOHNSON:  Q.  In reviewing the

Confidential Attorneys' Eyes Only Outside Counsel

Page 233

1   declaration that you submitted in this case, I noticed

2   that in the qualification sections you basically

3   copied a bunch of those paragraphs from other

4   declarations and other expert reports you've done in

5   other cases.

6       A    You're talking about my qualifications?

7       Q    Yes.

8       A    Yes, I think I started from a boilerplate.  I

9   may have updated some relevant sections.

10      Q    But it --

11      A    The gist of it, I think, is similar to the

12  recent declaration.

13      Q    Yeah, in a lot of instances it's a copy until

14  we get to the materials considered.

15           So the first question is:  Who wrote your

16  declaration in this case?

17      A    I wrote it in conjunction with the counsel at

18  MoFo.

19      Q    Did you write it in the Bay Area?  I mean,

20  when you say "in conjunction," what do you mean?

21      A    I wrote -- no, I did not come to the Bay

22  Area.  It was done wherever I was in the world through

23  electronic communication.

24      Q    Who did the first draft?

25           MR. MONACH:  Objection; vague.

Page 234

1    THE WITNESS:  The different sections, I

2  think, I wrote a lot of content sections, I drafted

3  myself, and then it went back and forth.

4    You know, some parts like legal principles,

5  that was from counsel that stuck it in there, and then

6  there was a lot of kind of formatting it and putting

7  it in the kind of style of these reports that counsel

8  did more of that kind of work as well.

9    MR. JOHNSON:  Okay.

10    Q    The -- the four Accused Devices you said that

11  you've looked at before, did -- did counsel for Apple

12  send those to you?

13    A    Yes, they did.

14    Q    Now, in your declaration, you say that the

15  Accused Devices are capable of operating -- well,

16  strike that.

17    You would agree that the four Accused Devices

18  are capable of operating in non-infringing modes;

19  right?

20    MR. MONACH:  Object to the form of the

21  question as vague and ambiguous.

22    THE WITNESS:  So you mean that the devices in

23  other uses don't infringe.  Yes, that's true.  They

24  infringe in the particular instances, for example,

25  that I elaborate in my report and more on today.

Confidential Attorneys' Eyes Only Outside Counsel

Page 235

1          MR. JOHNSON:  Q.  So for the four accused

2    phones, you've identified in the phones themselves the

3    gallery and contacts applications, and particularly

4    manipulation of those applications yields

5    infringement; right?

6        A    In the three phones?

7        Q    Right.

8        A    The gallery and the contacts were in two

9    applications that I determined did infringe the

10   claims.

11       Q    And you're not alleging that there are any

12   other applications that infringe the accused phones;

13   right?

14         MR. MONACH:  Object to form.

15         THE WITNESS:  I don't think we're infringing

16   the phone.  Infringing the claims.

17         MR. JOHNSON:  Thanks.

18       Q    You're not alleging that there are any other

19   applications that infringe the Accused Products?

20         MR. MONACH:  Object to form.

21         MR. JOHNSON:  Strike that.

22       Q    You're not alleging that there are any other

23   applications that infringe the '381 patent; right?

24         MR. MONACH:  Object to form.

25         THE WITNESS:  Based on what I've seen so far

Confidential Attorneys' Eyes Only Outside Counsel

1  on those three phones and what counsel directed me to

2  look at, I haven't looked -- I haven't done an

3  exhaustive review of all possible applications on

4  those phones.

5        So based on the applications I've seen so

6  far, in particular the gallery and the contacts list,

7  those are the two that I have determined to infringe

8  the claims of -- of the '381 patent on those phones.

9        MR. JOHNSON:  Q.  And in the -- in the Galaxy

10  Tab 10.1, it's only the particular manipulation of the

11  images in the gallery application, as well as in the

12  browser application that infringe the '381 patent, as

13  far as you're concerned; right?

14        MR. MONACH:  Object to form.

15        THE WITNESS:  In the Gal -- I'm sorry -- the

16  Galaxy, in the tablet 10.1 device, I have only

17  considered the -- the gallery application and the web

18  browser application in relation to the '381 patent and

19  determined those were infringing.

20        I have not studied any of the other

21  applications in detail to determine whether they

22  infringed or not.

23        MR. JOHNSON:  Q.  When is the last time you

24  reviewed your declaration?

25        A  I looked through it again last night.

Confidential Attorneys' Eyes Only Outside Counsel

Page  237

1      Q    Okay.  Is there anything in there that's

2  inaccurate?

3      A    I haven't spotted anything that I would --

4  you know, stuck out as being inaccurate; but if there

5  are typos or any inconsistencies potentially that were

6  brought to my attention, I would certainly look at

7  that and consider it, whether I made a mistake; but,

8  in general, I believe it is accurate.

9      Q    Are there any changes that you'd like to make

10  to it?

11      A    At this point, I don't -- I don't have

12  anything that jumps out now.  No one area that maybe

13  needs some updating would be my qualifications.

14  Something about number of papers published, that --

15  that total may have been -- may have increased since I

16  wrote this; but I don't think that substantively

17  changes anything with regards to my opinions of

18  infringement.

19           Just as an example of something that, you

20  know, might need a little bit of updating.

21      Q    Have you reviewed Apple's motion for

22  preliminary injunction?

23      A    In this case?

24      Q    Yes.

25      A    I don't recall having reviewed that.

Confidential Attorneys' Eyes Only Outside Counsel

Page 238

1    Q   It's a publicly available --

2    A   Might have.

3    Q   It's a publicly available document.  Why

4  haven't you reviewed it?

5    A   I don't know if it's publicly available or

6  not.  It's not something I go looking for in the

7  course of my day-to-day work.  It was not brought to

8  my attention --

9    Q   Your name --

10   A   -- that I needed to.

11   Q   Your name is all over it.

12   A   It is?

13   Q   You're not curious what it says?

14       MR. MONACH:  Object to the form of the

15  question.

16       THE WITNESS:  Well, this is the first time

17  I'm hearing that my name is all over it.  Maybe now

18  I'll be curious enough to look at it afterwards.

19       MR. JOHNSON:  Q.  But you haven't looked at

20  it so far; right?

21   A   As far as I know, no.

22   Q   In your opinion, did Apple invent

23  touchscreens?

24       MR. MONACH:  Objection; vague and ambiguous;

25  lack of foundation; calls for a formulation of a new

Confidential Attorneys' Eyes Only Outside Counsel

1  opinion at the deposition.

2      THE WITNESS:  I have not studied in detail or

3  made a determination of the history of touchscreens

4  and who invented what and when.  I know touchscreens

5  have been around for quite a while.

6      As to whether it was Apple that invented it

7  or somebody else invented it, I cannot say for sure

8  right now either way.

9      MR. JOHNSON:  Q.  They were in existence

10  before the '381 patent; right?

11   A   Oh, certainly, yes.  Before the 2005 or 2007

12  dates, yes.

13   Q   And what about momentum scrolling?  Did Apple

14  invent momentum scrolling?

15      MR. MONACH:  Objection; vague.  Objection;

16  lack of foundation and asking for a new opinion.

17      THE WITNESS:  First of all, I'm going to ask,

18  you know, if you have a particular definition for

19  momentum scrolling, it's not necessarily a standard

20  term in the art.

21      MR. JOHNSON:  Q.  Have you heard of that term

22  before?

23   A   Yes, I have, a momentum-based scrolling,

24  acceleration scrolling.

25   Q   Yeah.

Confidential Attorneys' Eyes Only Outside Counsel

Page 240

1          What do you understand that to mean?

2     A    One understanding I have is scrolling that

3  has, as the list moves or the items move when you

4  scroll, the content moves, the movement has -- the

5  speed of the movement is modulated with some physical

6  characteristics; i.e., momentum style equations or,

7  you know, acceleration characteristics.

8          (Document marked Balakrishanan Exhibit 110

9           for identification.)

10         MR. JOHNSON:  I'm going to mark as

11 Exhibit 110, your declaration in this case.

12    Q    Can you turn to page 22?

13    A    Just give me a second to, yes.

14    Q    The last sentence of paragraph 22 says "I

15 understand that other Samsung products contain similar

16 features and functions and therefore also infringe the

17 '381 patent."

18    A    Page 22?

19    Q    It's paragraph 22.

20    A    Okay.  Sorry.  I'm on the wrong...

21    Q    Do you see the statement "I understand that

22 other Samsung products contain similar features and

23 functions and therefore also infringe the '381

24 patent"?

25    A    That's correct.  Sorry.  I see that

Confidential Attorneys' Eyes Only Outside Counsel

Page 241

1    statement.

2        Q   Where did that -- where did your

3    understanding come from?

4        A   My understanding there is having played with

5    the four devices that were particularly alleged by

6    Apple, I -- I was looking around some of the web pages

7    and so forth and that I included in -- in the report

8    or the appendices to the report, I also, believe, saw

9    some other devices in the lab that had similar

10   features, which I assumed would similarly infringe.

11       Q   What other devices did you see?

12       A   I can't remember the exact model numbers, but

13   they were -- they were all phone, like Samsung phone

14   devices.

15       Q   Which other Samsung phones do you have in

16   your lab?

17       A   I -- I can't remember offhand which --

18   exactly which ones they are.

19       Q   Do you still have them?

20       A   The lab probably still has them somewhere

21   around, yeah.

22       Q   And you looked at those to see if they

23   infringe the '381 patent?

24       A   I didn't look at it in detail.  I looked at

25   it and said, "Oh, this also has a contacts list

Confidential Attorneys' Eyes Only Outside Counsel

Page  242

1    feature.  This also has a gallery feature," that kind

2    of thing.  It exhibited the same type of behavior much

3    like we did today with some of these other phones.

4         They were not the ones that were specifically

5    alleged to infringe in this document or by Apple.

6      Q   Well, counsel, we'd ask that they be made

7    available for us.

8         Are the infringement allegations that we've

9    been discussing so far with respect to the '381 patent

10   directed at the Android operating system?

11        MR. MONACH:  Object to the form of the

12   question; vague and ambiguous.

13        THE WITNESS:  The infringement allegations

14   that I've made -- sorry -- that I'm opining on in my

15   declaration on behalf of Apple's alleged allegations

16   of infringement, my analysis is based on the operation

17   of the devices as I've detailed in my report.  My

18   understanding is they run the Android operating system

19   on an eighth [sic], but whether or not there is

20   additional code beyond the Android operating system

21   that Samsung puts in there, I have not made that

22   determination yet.     So as to whether this is

23   targeted, these allegations are targeted towards

24   Android, I don't believe that it's necessarily true.

25        It might be, but as of this date, my focus

Confidential Attorneys' Eyes Only Outside Counsel

Page 243

1  has been on the -- on the operation of the device.

2  Not necessarily the underlying code.

3           THE REPORTER:  Don't play with the cord.

4           THE WITNESS:  Oh, I'm sorry.

5           THE REPORTER:  Thank you.

6           MR. JOHNSON:  Q.  I noticed a difference when

7  you turn to Claim 19 of -- in your declaration.

8           So if you look, for example, on, this time,

9  page 21, page 22 --

10      A   Uh-huh, yes.

11      Q   -- in discussing Elements 5, 6, 7, which

12  recite instructions, in -- in describing the alleged

13  infringement in the Samsung products, you -- you say,

14  for example, in paragraph 117, "Because the Infuse 4G

15  performs this element of Claim 19, it must have

16  instructions for displaying a black region beyond the

17  edge of the photograph in displaying a smaller third

18  portion of the photograph," et cetera.

19          You don't know for sure whether the Samsung

20  products have those specific instructions; do you?

21          MR. MONACH:  Object to the form of the

22  question.

23          THE WITNESS:  As I say in that paragraph, and

24  as I've testified earlier in today's deposition, I

25  have determined that the Infuse 4G and the other

Confidential Attorneys' Eyes Only Outside Counsel

Page  244

1    phones perform those elements in -- in the actual user

2    interface, and as such it's not magic.  It has to

3    happen through some computer code, and as such it must

4    have those instructions in the code somewhere.

5           MR. JOHNSON:  Q.  So are you saying the code

6    is not necessary to establish infringement of any of

7    the claims of the '381 patent?

8           MR. MONACH:  Objection; misstates the prior

9    testimony; objection.

10          MR. JOHNSON:  I'll ask it a different way.

11     Q   Is the source code necessary to establish

12   infringement of any of the claims of the '381 patent?

13          MR. MONACH:  Object; object to the form of

14   the question on establishing infringement as vague.

15          THE WITNESS:  Done?

16          So as far as the claims in question, not the

17   claims that Apple has alleged infringement on and that

18   I have opined on, I would say that operation of the

19   phones, the way I've demonstrated in my report and in

20   today's deposition, is sufficient for determining

21   infringement.

22          I do not believe I need to look at the code

23   per se to determine if any one of these elements are

24   infringed.  Because the operation makes very clear

25   that it infringes, and it has to be code that performs

Confidential Attorneys' Eyes Only Outside Counsel

Page 245

1   those operations.

2         MR. JOHNSON:  Q.  So by the same token, you

3   don't need to look at the source code for any

4   particular device that may invalidate the claims of

5   the '381 patent; right?

6         MR. MONACH:  Objection.

7         MR. JOHNSON:  Q.  As long as it performs

8   those same functions you described; right?

9         MR. MONACH:  Objection to the form of the

10  question as vague; calls for a legal conclusion;

11  incomplete hypothetical.

12        THE WITNESS:  The -- so you mean any

13  particular other device that Samsung may contend it

14  invalidates as a -- as some third-party device?

15        MR. JOHNSON:  Yes.

16        THE WITNESS:  Depending on the device,

17  depending on what I see or what is shown on the

18  operation of the device, if it is immediately clear

19  from operating the device that it does -- it meets

20  every element of the claims in question, I do not

21  believe we need to see the source code.

22        But if it is not, if I cannot make a

23  determination from just operating the device and

24  matching it up with the claim elements, then maybe the

25  code may reveal some additional information to -- to

Page 246

1   justify -- sorry -- to, I guess, justify the

2   invalidity contention.

3       Q   So sitting here today, you don't expect you

4   would need to look at the source code for a prior art

5   device that is alleged to infringe -- I'm sorry --

6   allege to invalidate the claims of the '381 patent, as

7   long as it performs the same limitation described in

8   the '381 patent claims; right?

9       MR. MONACH:  Objection; vague and ambiguous;

10  incomplete hypothetical; calling for a legal

11  conclusion and a new partial opinion on the fly.

12      MR. JOHNSON:  I'm just trying to understand.

13  Because you're saying you don't need the code for

14  infringement, and I want to understand.

15      Q   Do you need code for invalidity?

16      MR. MONACH:  Same objection; asked and

17  answered.

18      You can do it again?

19      THE WITNESS:  So as I said before, I did not

20  need the code in this particular instance or instances

21  to determine infringement, because in looking at the

22  operation of the phones and the -- and the tablet, the

23  four devices being accused here, the -- I was able to

24  match up the functionality in operating it to the --

25  each element of the claims; and there was no reason

Confidential Attorneys' Eyes Only Outside Counsel

Page  247

1   for me to go look at the code to -- to determine --

2   because -- to determine if they infringed, because the

3   operation was very clearly matching up with the

4   claims.

5           Similarly for the potential invalidity

6   contentions, if a particular device is contended or

7   alleged to invalidate elements of some aspect of the

8   claims, I -- I would look at those devices and see if

9   I can match up, just by operating it, match up to the

10  claims, and if they do indeed perform exactly the same

11  thing, I do not need to look at the code.

12          But if they do not, if it's not immediately

13  apparent from operating it, that it matches up with

14  every element of the claims, then I may need to look

15  at the source code.  So my answer is it depends on the

16  situation.

17          MR. JOHNSON:  Q.  And you understand that

18  Samsung believes it doesn't infringe the '381 patent;

19  right?

20          MR. MONACH:  Objection; assumes facts not in

21  evidence; calls for speculation.

22          THE WITNESS:  I don't know.  Samsung, as far

23  as I know, has not contended invalidity or -- nor

24  noninfringement.

25          MR. JOHNSON:  Q.  Because it --

Confidential Attorneys' Eyes Only Outside Counsel

Page 248

1        THE WITNESS:  I assume -- I would assume that

2    we are sitting here today, if we admitted

3    infringement, we wouldn't be sitting here today.

4        MR. JOHNSON:  Right.

5    A    I haven't seen any documentation to just say

6    "Here's why we don't infringe," or "Here's why it's

7    invalid."

8    Q    MR. JOHNSON:  Let me show you what we

9    previously marked as Exhibit 93, which is the

10   prosecution history of the '381 patent.

11       Do you need a copy?

12   A    So why was this previously marked?  I'm

13   sorry, and I don't have it.

14   Q    I don't know why you don't have it, but it

15   was in a deposition in this case.

16       MR. MONACH:  When you said it was previously

17   marked, I think he means it was marked in another

18   previous deposition.

19       THE WITNESS:  Oh, I see.

20       MR. MONACH:  Not earlier today.

21       THE WITNESS:  Fair enough.

22       MR. JOHNSON:  Q.  You've seen this or browsed

23   this before or skimmed it or read it.

24   A    I browsed this in electronic format, yes.  I

25   believe so, yes.

Confidential Attorneys' Eyes Only Outside Counsel

Page 249

1   Q   Okay.  Did Apple request that the prosecution

2   of this patent be expedited?

3        MR. MONACH:  Objection; lack of foundation.

4   Objection; best evidence rule.

5        If you know, you can answer.

6        THE WITNESS:  I believe I saw something.  I

7   can't remember whether it's in this prosecution

8   history or -- yeah, it might be in this document that

9   there was some request to that effect.

10       I did not pay much attention to it thinking

11  it was just a bunch more legalese.

12       MR. JOHNSON:  Okay.

13  Q   There was an initial request to accelerate

14  examination which was denied, and then there was a

15  supplemental request for examination that was filed by

16  Apple; does that sound right?

17       MR. MONACH:  Same objection.

18       THE WITNESS:  I couldn't say whether the --

19       MR. JOHNSON:  Q.  You don't know?

20   A   I'm not sure about the first being denied and

21  the second being allowed.  I believe I've seen

22  something with regards to acceleration.

23  Q   What's your understanding as to why Apple

24  requested accelerated examination?

25       MR. MONACH:  Objection; lack of foundation;

Confidential Attorneys' Eyes Only Outside Counsel

Page 250

1    calls for speculation.

2         THE WITNESS:  I haven't considered that in --

3    in any detail at all.

4         MR. JOHNSON:  Q.  You don't know?

5    A    I don't.  I don't know the answer.

6    Q    Okay.  If you turn to page APLNDC3975.

7    A    That's in this stack?

8    Q    Yeah.

9    A    '3975; is that the --

10   Q    Right.

11   A    Okay.

12   Q    Have you read this particular document

13   before?

14   A    I think I've very quickly skimmed, at least

15   the first page of this.  I did not look at the details

16   of this.  The charts go on forever.

17   Q    Did you determine whether the charts are

18   accurate or not?

19   A    I did not make any such determination.

20   Q    Have you reviewed the -- the Miller personal

21   job application environment document?

22   A    No, I have not.

23   Q    Have you reviewed something called Photo Mesa

24   as prior art?

25   A    I'm aware of Photo Mesa through my own

Page 251

1  research in my field.  I have not reviewed it in the

2  context of this litigation, per se.

3      Q   Did you look at it in the context of this

4  prosecution history?

5      A   No, I did not.

6      Q   Did you look at whether Photo Mesa

7  invalidates any claims of the '381 patent?

8      A   As I said, I have not looked at in context of

9  this litigation, so I have not made any determination

10 either way as to whether it invalidates or validates

11 the patent.

12     Q   Can you look at page '4028.  That's the

13 Miller article.

14         Have you seen that article before?

15     A   Just give me a second to...

16         I think I very briefly skimmed it in skimming

17 of this whole document, but I haven't read this in

18 any -- in any detail at all.

19     Q   Does this cited reference disclose a

20 touchscreen?

21     A   I cannot say that, having not reviewed it in

22 any detail.

23     Q   Does this cited reference disclose moving

24 beyond the edge of an electronic document?

25     A   I cannot answer that, not having reviewed it

Confidential Attorneys' Eyes Only Outside Counsel

Page 252

1    in any detail.

2         Q    Let's go to what Apple said about it.

3              Take a look at page 16 of actually

4    page '3990.

5         A    The Bates number?

6         Q    Yes.

7         A    '3990; okay.

8         Q    Okay.  I'm sorry.  Let me turn back to '3980.

9         A    Okay.

10        Q    You see the -- in this document it says "The

11   following references is deemed most closely related to

12   the subject matter of the claims," and then it lists

13   four references there?  Do you see that?

14        A    Yes, yes it does.

15        Q    I think you said you skimmed Zimmerman?

16        A    That is the Zimmerman article, the '381

17   patent.

18        Q    Right.

19             Have you reviewed the Kwatinetz patent?

20        A    I don't -- sorry.  I talked over you.

21        Q    That's okay.

22        A    No, I have not reviewed.

23        Q    My wife does it all the time.  Strike that.

24             MR. MONACH:  It's in there forever.  That's

25   going in front of the jury.

Page 253

1          MR. JOHNSON:  I meant I talk all over my wife

2     is what I meant to say.

3          Q   The -- have you reviewed the Kwatinetz

4     patent, the '566 patent?

5          A   I don't recall having reviewed that in any

6     detail.

7          Q   I'm just going to show it to you to see if

8     you recognize it.

9          A   Okay.

10          (Document marked Balakrishnan Exhibit 111

11           for identification.)

12          MR. JOHNSON:  Exhibit 111 is the '566 patent.

13          MR. MONACH:  Thanks.

14          MR. JOHNSON:  And Exhibit 112 is the

15     Pallakoff patent.

16          (Document marked Balakrishnan Exhibit 112

17           for identification.)

18          MR. JOHNSON:  Q.  Have you seen either of

19     those before?

20          A   I don't believe I've looked at either of

21     these patents before.

22          Q   So here Apple is saying these four references

23     are deemed and most closely related to the subject

24     matter of the claims, but you didn't take the time to

25     look at any of those in any detail?

Confidential Attorneys' Eyes Only Outside Counsel

Page 254

1          MR. MONACH:  Objection; objection to the form

2     of the question.

3          THE WITNESS:  I again was -- my task here was

4     to look at infringement relative to the -- the claims

5     of the patent, and I was not doing any kind of

6     detailed investigation as to validity or questions

7     related to validity/invalidity.

8          MR. JOHNSON:  Q.  Do you see a little bit

9     later on on page '3980, it says "The following charts

10    identify the limitations that are disclosed in whole

11    or in part by Zimmerman, Kwatinetz, Pallakoff, and

12    Miller; do you see that?

13    A    Yes, I see that sentence.

14    Q    And you understand that Apple was obligated,

15    as part of its request for accelerated prosecution, to

16    actually provide these claim charts in connection with

17    the request?

18         MR. MONACH:  Object to the form of the

19    question.

20         THE WITNESS:  I don't --

21         MR. MONACH:  Lacking foundation.

22         Go ahead.  Sorry.

23         THE WITNESS:  I don't know what the

24    obligation was.  I -- it appears that they did provide

25    these reports.

Confidential Attorneys' Eyes Only Outside Counsel

Page 255

1        MR. JOHNSON:  Okay.

2        THE WITNESS:  Whether they were obliged to do

3   it or not, it's outside of my knowledge.

4        MR. JOHNSON:  Okay.

5   Q   Well, take a look at the -- so if I ask you

6   about the claim charts related to Zimmerman,

7   Kwatinetz, and Pallakoff that appear on the subsequent

8   pages, and ask you whether those are accurate or not,

9   you're not going to know the answer; right?

10  A   I'm not gonna commit to an answer either way

11  here, because I have not done the due diligence in

12  detail to do that.

13  Q   You don't -- you don't know whether they're

14  accurate, whether the claim charts as far as

15  Zimmerman, Kwatinetz and Pallakoff are accurate;

16  right?

17  A   I have not made a determination as to whether

18  they're accurate or inaccurate.  They may be accurate.

19  They may not be.

20  Q   Okay.

21  A   I have to make that determination after I

22  review it in detail, if -- if I need to review it in

23  detail at some point.

24  Q   Okay.  Take a look at the claim charts that

25  start on page '3990 for the Miller reference.

Confidential Attorneys' Eyes Only Outside Counsel

Page 256

1    A    '90.  Okay.

2    Q    Okay.  Do you see that for Claim 1 the only

3 limitation that Apple believes is not disclosed in

4 Miller is the last limitation that says "After the

5 object is no longer detected on or near the

6 touchscreen display, translating the document in a

7 second direction until the area beyond the edge of the

8 document is no longer displayed"?

9    A    Are we looking at the same page?  I'm not

10 seeing that on '3990.

11         MR. MONACH:  Object to the form of the

12 question.

13         THE WITNESS:  I'm sorry.

14         MR. JOHNSON:  Start over.

15    Q    Claim 1 starts on '3990 and spills over onto

16 '3991.

17    A    I see; okay.

18    Q    And so if you look at the claim language on

19 the left-hand side of the column and the right side

20 discloses what's allegedly described in the Miller

21 reference; right?

22    A    That's what it appears, yes.

23    Q    You've seen claim charts like this before?

24         MR. MONACH:  Object to the form of the

25 question.

Confidential Attorneys' Eyes Only Outside Counsel

Page  257

1      THE WITNESS:  Yes, I've seen similar claim --

2   the -- the style of claim charts, yes.

3      MR. JOHNSON:  Right.

4   Q   So my point is, from Apple's standpoint, the

5   only limitation that Miller does not disclose is the

6   last limitation that reads "After the object is no

7   longer detected on or near the touchscreen display,

8   translating the document to the second direction until

9   the area beyond the edge of the document is no longer

10  displayed."

11     MR. MONACH:  Objection; plainly misstates the

12  document.  Objection to the best evidence rule; lack

13  of foundation.

14     THE WITNESS:  So before I can answer that,

15  I'll have to read this chart or at least this section

16  in the chart before I do that.  If you want me to do

17  that, I'll do that.

18     MR. JOHNSON:  Go ahead.

19     THE WITNESS:  I'll read.  So I would say just

20  from reading the portion of the chart on 3990, that

21  your statement that the only element not disclosed is

22  the last one, I think that's inaccurate.

23     If I read at the bottom of page '3990, the

24  claim language or the element of the claim saying

25  "Detecting a movement of an object on or near the

Confidential Attorneys' Eyes Only Outside Counsel

Page 258

1    touchscreen display, Apple's -- Apple's disclosure

2    with regard to Miller says the first part of that,

3    that section says -- page six states "The touch, mode,

4    look and feel that's targeted for use on touchscreen

5    display on consumer products, on such products,

6    typically a finger or stylus can be used for input";

7    but then it goes on to say "but Miller did not

8    disclose detecting a movement of an object on or near

9    the touchscreen display as required by this claim."

10          So at least in -- that's one instance where

11   there's something else that Apple has contended Miller

12   does not disclose, and then -- and then it goes on to

13   say what Miller discloses, which is these stationary

14   taps, and so that's one example where I think your --

15   your statement was incorrect with regards to this

16   chart.

17          I'm looking at the next page now.  If you

18   give me a minute to continue reading.  So again, on

19   the topmost row of the chart on page '3991, again,

20   another example where further contention by Apple that

21   Miller does not disclose an element of the claim.

22          The claim language here is "In response to

23   detecting the movement translating electronic document

24   displayed on the touchscreen display in the first

25   direction," and Apple agrees that pages nine to ten

Confidential Attorneys' Eyes Only Outside Counsel

Page 259

disclose touchscreen that use stationary taps on

scroll up and scroll down buttons to translate a

electronic list on the touchscreen.

But they go on to say "Miller does not

disclose translating an electronic document in

response to detecting a movement," and it goes on

further than that.

So that's another example where Apple appears

to -- or states clearly that Miller does not disclose

another element of the claim.

Q    Okay.

A    Should I go on?

Q    Is there any other part of Claim 1?

A    Well, I've got to continue reading here.

Q    That's fine.

A    So the next section there, Apple says --

describes a section of Miller at page nine that talks

about what happens when the scrolling list is at the

top, and there is a half space left blank, it doesn't

say anything about the edge of the document being

reached while translating electronic documents.

So I'm not sure there's actually a contention

that Miller completely discloses that element or not.

It explicitly -- explicitly says that it doesn't

disclose it but --

Confidential Attorneys' Eyes Only Outside Counsel

Page 260

1    Q    And do you --

2    A    -- it doesn't say otherwise either.

3    Q    Do you yourself know whether Miller discloses

4    those particular elements?

5         MR. MONACH:  Objection; vague.  Objection;

6    lack of foundation.

7         THE WITNESS:  As I stated earlier, I have not

8    studied Miller in any great detail, so I cannot make

9    that determination right now.

10        MR. JOHNSON:  Okay.

11        THE WITNESS:  My comments are just based on

12   this chart.

13        MR. JOHNSON:  Q.  So -- so looking at

14   page '4368 -- I'm sorry -- '4367 --

15   A    Okay.

16   Q    -- there's a reference to prior art documents

17   discussed in an interview, including Photo Mesa?

18   A    Give me a second to look at this.

19        Yes, it appears it says "prior art document

20   discussed."

21   Q    Right.

22   A    And --

23   Q    And on the subsequent pages there is -- there

24   are Figures 1, 2 and 3 along with the copyright page

25   on '4372 that look like they're screen shots in Photo

Confidential Attorneys' Eyes Only Outside Counsel

1  Mesa.

2       Do those look familiar to you?

3    A   I don't know.  These are pretty bad copies.

4  It's honestly really hard to tell whether it's Photo

5  Mesa or something else.

6       I mean, it appears the title here says Photo

7  Mesa screen shots, and I would assume that's what it

8  is.

9    Q   Okay.

10   A   I can't tell definitively if it is indeed

11 Photo Mesa.

12   Q   On page '4368, the -- there's a -- there's a

13 quote where the examiner says that "The examiner

14 explained, see attached explanation, how the prior art

15 found teaches the claimed subject matter.  The

16 applicant requested to propose amendments to the

17 claims in order to overcome cited art."

18      Do you have an opinion as to whether the

19 prior art that was found and explained on the attached

20 pages teaches the claimed subject matter at the time

21 that this document was prepared?

22      MR. MONACH:  Objection; lack of foundation.

23      THE WITNESS:  So --

24      MR. MONACH:  Objection; calls for a legal

25 conclusion about different claims that are in the '381

Page 262

1   as issued.  Objection; asking the witness to form an

2   opinion on the fly here at the deposition.

3          MR. JOHNSON:  Counsel, your -- your coaching

4   of the witness is completely improper.

5          MR. MONACH:  I'm not coaching the witness at

6   all.

7          MR. JOHNSON:  Completely improper.

8          You absolutely are, and the judge will make

9   her own determination.  It's completely improper.

10     Q    You can answer.

11     A    Okay.  I have not looked at these -- these

12  prior art pieces in detail with regards to validity of

13  the claims or amendments of the claims.  So at this

14  time, I would not be able to say either way whether

15  they teach us the subject matter or not.

16         Of course at some point in the future, should

17  invalidity or validity contentions come up, and I'm

18  given the opportunity to -- to make the appropriate

19  detailed study, I would, at that time, be able to

20  offer my opinion.

21     Q    Take a look at page '4380 through '4385.

22         Do you see that there were amendments made to

23  the claims in order to overcome prior art?

24         MR. MONACH:  Object to the form of the

25  question; assumes facts not in evidence; lacking in

Confidential Attorneys' Eyes Only Outside Counsel

Page  263

1   foundation.

2          THE WITNESS:  Where did you say you wanted to

3   end this?  Sorry.  The -- what page?

4          MR. JOHNSON:  '85.  '4385.

5          THE WITNESS:  I guess it appears just from a

6   quick read of this right now that -- that there were

7   various amendments done to Claims 1, 19 and 20, and

8   Claim 2 as well.

9          MR. JOHNSON:  Q.  Do you know -- do you have

10  an opinion as to whether the cited prior art, and I'm

11  asking for your opinion, discloses the limitations of

12  each of the asserted claims of the '381 patent?

13     A   As I've just --

14         MR. MONACH:  Objection.

15         THE WITNESS:  I'm sorry.  He was going to --

16         MR. MONACH:  Objection; lack of foundation;

17  calling for a legal conclusion; calling for a new

18  opinion; calling for speculation in light of the

19  witness's repeated testimony about what he's done and

20  not done.

21         THE WITNESS:  Can I?

22         MR. MONACH:  Go ahead.

23         THE WITNESS:  So as I've testified

24  previously, I have not studied these prior art

25  references in detail with respect to validity and

Confidential Attorneys' Eyes Only Outside Counsel

Page 264

1   invalidity, and as such, I cannot offer an opinion in

2   detail as to whether those references meet these

3   claims or not at this time.

4        But I -- in the future, if I have a chance

5   to -- the need to look at it, based on the invalidity

6   contentions, I will -- I will study it and offer my

7   opinion at that time.

8        MR. JOHNSON:  Okay.  Why don't we take a

9   quick break.

10       THE VIDEOGRAPHER:  We're off the record at

11  4:53 p.m.

12       (Recess taken.)

13       THE VIDEOGRAPHER:  We are back on the record

14  at 5:05 p.m.

15       You may proceed.

16       MR. JOHNSON:  I've marked, during the break,

17  as Exhibit 113, a copy of the BumpTop video that we

18  saw before.  I just -- just for purposes of keeping it

19  on the record.  Here's a copy.

20       THE WITNESS:  So just put it aside?

21       MR. JOHNSON:  Yeah.

22       And, Counsel, I should have asked you at the

23  beginning, but so Mr. Balakrishnan is -- is not a

24  30(b)(6) witness on any topics; is that right?

25       MR. MONACH:  Correct.

Confidential Attorneys' Eyes Only Outside Counsel

Page 265

1    I think there was correspondence back and
2  forth that infringement would be presented by experts,
3  but the experts were not considered to be 30(b)(6)
4  witnesses.
5    MR. JOHNSON:  Okay.  And without agreeing or
6  disagreeing or waiving anything, to the extent that --
7  that he prepares a subsequent declaration on
8  invalidity or with -- frankly, with respect to
9  anything, noninfringement or otherwise, or
10  infringement, I just want to put on the record that we
11  want to depose him again, if he puts another piece of
12  paper in on the preliminary injunction motion.
13    Q    So I also want to ask you a little bit more
14  about the CHI Conference that you mentioned.
15    Can you tell me what that is?
16    A    What the conference is?
17    Q    Yeah.
18    A    It's a -- I don't know.  It's a conference in
19  computer science, a lot of publications of research
20  results.  Unlike in a lot of other fields, where you
21  would go to a journal, a printed journal in computer
22  science, in many sub areas of computer science,
23  including user interfaces, computer graphics systems,
24  a primary venue of publication would be in a
25  conference proceeding.

Confidential Attorneys' Eyes Only Outside Counsel

Page 266

1     So you would submit a paper, it would be
2  reviewed by a panel of experts at the conference or
3  prior to the conference, and some number of papers
4  would be accepted, others would be rejected, and at
5  the conference itself, which can last, depending on
6  the conference, three to five days, these papers -- an
7  oral presentation of these papers are typically done,
8  and it's also like any other conference in any other
9  field, it's a -- I guess an opportunity for networking
10  for people in the field to talk to each other and
11  share each other's outcomes.
12     Q   How long have you attended the CHI
13  Conference?
14     A   Probably, my first one was -- I'm going by
15  rough memory here -- '94, '95 -- 1994, 1995 time
16  frame, and since then, I've probably been to probably
17  every one, maybe missing one or two here and there,
18  and it's -- it's a once-a-year conference, by the way.
19     Q   Is it always in the same places, or does it
20  move around?
21     A   It moves around.
22     Q   All right.
23         And about how many people attend these -- the
24  conference, rather?
25     A   It varies.  I think, at some point, it was

Confidential Attorneys' Eyes Only Outside Counsel

Page 267

1    maybe 3- or 4000.  The last I heard maybe 2,500.  It

2    varies, from year to year, depending on economy and

3    people's travel budgets and so forth.

4         Q    But somewhere between 2,000 and 3,000 people?

5         A    I'd say, just to give you a broader range,

6    maybe between 1,500 and 4,000 people.

7         Q    Okay.

8         A    And, obviously, it's grown over the years.

9    In '94 it was probably smaller.

10        Q    What time of year is it held?

11        A    Typically, in the, kind of, April/May, kind

12   of, time frame.  Papers are submitted in September and

13   reviewed by Christmas time --

14        Q    So they --

15        A    -- and then the conference itself is, kind

16   of, in the April/May time frame.

17        Q    So the papers are submitted typically six

18   months in advance of the conference, approximately?

19        A    Give -- give or take a month or two, yes.

20        Q    And the papers are, then, reviewed by peers?

21        A    It is peer reviewed, sent out to other

22   experts in the field, taking into account conflicts of

23   interest and so forth.

24        Q    Have you submitted papers for the CHI

25   Conference?

Confidential Attorneys' Eyes Only Outside Counsel

Page 268

1     A    Yes.

2     Q    And just tell me a little about the

3    submission of the papers.

4         When you submit the papers in September, are

5    those papers deemed to be public, or are they

6    available to the public?

7         MR. MONACH:  Object to form.

8         THE WITNESS:  My understanding is the

9    submission and the review process, until such time it

10   appears in -- at the conference, it's considered to be

11   confidential.  The review process is confidential.

12   It's not public disclosure, and reviewers are

13   instructed, I believe, in the lengthy length --

14   sorry -- lengthy instructions they get for reviewing

15   to maintain that confidentiality.

16        MR. JOHNSON:  Q.  But the whole idea in

17   submitting the paper is ultimately it gets published,

18   hopefully; right?

19        A    If it is accepted, yes.  I mean, the author's

20   obviously hoping to get accepted and published.

21        Q    What -- what percentage of the papers, if you

22   have any idea, are published, versus submitted?

23        A    So the acceptance rate, so to speak, varies

24   from year to year, and I think in the low, where it

25   was very hard to get papers in, acceptance rate was in

Confidential Attorneys' Eyes Only Outside Counsel

Page 269

1   15 to 18 percent range.  Then more recently, there

2   have been attempts to, kind of, broaden the appeal of

3   the conference a little bit and not reject as many

4   papers, so I think the acceptance rate more recently

5   is probably in the 25 percent range.

6           So, in other words, three-quarters of the

7   papers are being rejected, very roughly.

8       Q   Do the -- the people who are doing the -- the

9   peer review of the papers, are they -- do they sign

10  some sort of confidentiality agreement --

11          MR. MONACH:  Object to form.

12          MR. JOHNSON:  Q.  -- to keep the papers

13  confidential?

14      A   I don't -- I don't believe there's a signed

15  piece of paper, but I believe all the -- all this

16  reviewing happens in an online -- a closed online

17  portal that you submit the papers and reviewers are

18  assigned.  And I believe, in the reviewer agreement

19  there, you click a box saying I've read this and I

20  agree to be confidential, and that, I would assume --

21  I'm not a lawyer, but I would assume that constitutes

22  an equivalence of a signed confidentiality agreement.

23          It would be considered fairly -- I mean, a

24  rather serious matter, I think, if you divulge that

25  confident -- if you break that confidentiality and

Confidential Attorneys' Eyes Only Outside Counsel

Page 270

1   somebody found out, just as a matter of academic

2   honesty.

3       Q    If one of the peers who were reviewing the

4   article then subsequently disclosed without the

5   author's consent, so to speak; is that what you mean?

6       A    That's right.  I think that would be

7   seriously frowned upon in the field.  Whether or not

8   somebody would take legal -- legal action, I haven't

9   heard of that happening, but I could see that

10  happening, if it was --

11      Q    You --

12      A    -- important enough.

13      Q    Yeah.

14           Have you ever heard of that happening?

15      A    I have not heard of legal action being taken,

16  per se.

17      Q    Okay.  Did you -- are you familiar with a

18  gentleman by the name of Ben Peterson?

19      A    Yes, I know him.

20      Q    How do you know him?

21      A    I know him as a, I guess, colleague in the

22  broader research field.  We attend the same

23  conferences.  I've read some of his work.  I've

24  visited his lab probably four or five years ago to

25  give a talk, as is common in academia.  He's in the

Confidential Attorneys' Eyes Only Outside Counsel

Page 271

1  same field as I am.

2      Q   Where is his lab?

3      A   He's at the University of Maryland in -- I

4  guess, in Maryland.

5      Q   Do you remember a talk he gave in -- at

6  the -- the 2005 CHI Conference in Portland, Oregon?

7      A   Which talk or what talk?  I've heard him give

8  various talks over -- you know, but --

9      Q   What -- what do you think of his work?

10         MR. MONACH:  Objection; vague; overly broad.

11         THE WITNESS:  I think he's a -- he's a

12  reasonable and good researcher out there.  Certainly a

13  peer.

14         MR. JOHNSON:  Q.  Have you been impressed

15  with his work over the years?

16         MR. MONACH:  Objection; vague.

17         THE WITNESS:  I've been impressed with some

18  of the work, yes.

19         MR. JOHNSON:  Q.  What work have you been

20  impressed with?

21      A   Well, I think, way back, he did some work,

22  kind of Pad++ resuming interface work.  I think that

23  was very novel back in the day.  That's one thing that

24  comes to mind.

25      Q   What was Pi++?

Confidential Attorneys' Eyes Only Outside Counsel

Page  272

1      A    Sorry.  Pad++.

2      Q    Pad++.

3           What was Pad++?

4      A    Pad++, just very quick summary, is a -- what

5  is known as a zooming interface.  Basically instead of

6  just moving between content on a screen in the X/Y or

7  planer direction, it also allows you to move in the

8  three-dimensional direction, kind of zooming into

9  different spaces in depth or -- you could think about

10  it as data in -- kind of in a three-dimensional

11  room-like space, and you're flying around in that

12  space.

13           So, at that time, it was something, I

14  believe, considered to be somewhat novel.

15      Q    Do you consider Mr. Peterson to be a

16  well-respected colleague?

17           MR. MONACH:  Objection; vague.

18           THE WITNESS:  I would say Dr. Peterson is a

19  respected researcher in the field, yes.

20           MR. JOHNSON:  Q.  Would you consider

21  Dr. Peterson to be an expert in user interface

22  technology?

23           MR. MONACH:  Objection; vague; lack of

24  foundation.

25           THE WITNESS:  Well, yes, he is a researcher

Confidential Attorneys' Eyes Only Outside Counsel

Page 273

1  on user interfaces, yes.

2      MR. JOHNSON:  Q.  Do you remember a talk that

3  Dr. Peterson gave in the 2005 CHI Conference in

4  Portland, Oregon, that was titled "Appland and

5  LaunchTile"?

6    A   I don't remember attending the talk,

7  necessarily.  I might have attended it.  I attend a

8  lot of talks at these conference.  That one doesn't

9  necessarily stand out.

10    Q   Do you remember -- do you remember something

11  called LaunchTile?

12    A   I have -- I believe I've seen that work in my

13  -- in my travels or in my research career.

14    Q   And what is it?

15      MR. MONACH:  Objection; lack of foundation;

16  overly broad; calls for a narrative.

17      THE WITNESS:  As giving you a broad

18  description, like I did for the Pad++, that is simply

19  a way to navigate around a space of, kind of, tiled

20  content on a -- on a screen.

21      MR. JOHNSON:  Q.  Using a touchscreen?

22    A   I'm not sure.  I can't recall whether it

23  actually used a touchscreen or a pen or a mouse, or

24  maybe all of the above.  I'd have to look at the paper

25  again in detail.

Confidential Attorneys' Eyes Only Outside Counsel

Page  274

1    Q   Do you know, is -- is LaunchTile a zoomable

2  user interface?

3    A   Going purely from memory, I believe there was

4  some elements that -- that allows -- that allowed for

5  zooming to different levels to see more or less

6  content, but I'm going purely from memory.

7         (Phone marked Balakirshnan Exhibit 114

8          for identification.)

9    MR. JOHNSON:   Okay.  I actually want to mark,

10  as Exhibit 114, a device that we have that is an iPAQ

11  that is running LaunchTiles on it, and I want to ask

12  you a few questions about it.

13    A   Okay.

14    Q   So I'm gonna ask my colleague to come around

15  over by you, just so he can put the device over there

16  and he can operate it while I ask you questions about

17  it, since I don't have four hands.

18    A   Okay.

19    MR. MONACH:   I'll object to the -- to the

20  extent there was a question, I'll object to the

21  question or assertion as vague and assuming facts not

22  in evidence that the device is running LaunchTiles.

23    THE VIDEOGRAPHER:   Please stand there.  It

24  might be better, and hold it like that.

25    MR. JOHNSON:   Just put that on the back for

Confidential Attorneys' Eyes Only Outside Counsel

Page 275

1    me so we don't forget.

2          THE WITNESS:  So you're gonna hold it?  Okay.

3          MR. JOHNSON:  Q.  So you can -- you can take

4    a look at it and, frankly, play around with it, if you

5    want --

6       A   Okay.

7       Q   -- to familiarize yourself with it, just to

8    tell me if you recognize it as LaunchTile.

9          Have you ever played with LaunchTile before?

10      A   I played with it very briefly a long time

11   ago, and then I looked at it briefly again -- was it

12   last week -- last week in the Netherlands, when this

13   came up.

14      Q   And how did it come up in the Netherlands?

15      A   I believe a similar device -- I don't know,

16   maybe it's the same one, but it was either produced by

17   Samsung or somehow the -- the Apple lawyers had a copy

18   of it, and LaunchTiles was allegedly loaded on it, and

19   they -- they looked at some of the potential

20   functionalities.  I did not spend much time on it.

21      Q   Okay.  What was your impression of it?

22         MR. MONACH:  Objection; vague.

23         THE WITNESS:  It -- it does what it does.

24   It -- I don't know what you mean what my impression

25   is.

Confidential Attorneys' Eyes Only Outside Counsel

Page 276

1          MR. JOHNSON:  All right.

2      Q   Well, take a look at it and just see if that

3  looks like the LaunchTile that you remember.

4          MR. MONACH:  Objection; vague; lack of

5  foundation; lack of authentication.  I also object

6  this is beyond the scope of his declaration in the

7  pending PI motion.

8          THE WITNESS:  So it does appear to be the

9  launch -- you know, a version of the LaunchTile

10 application that I've seen in various forms in the

11 past.  I haven't verified that it is actually

12 LaunchTiles.

13         MR. JOHNSON:  Q.  When is the first time you

14 saw LaunchTiles?

15     A   LaunchTiles?

16         It was -- I'm going by a vague memory here,

17 it was probably either at the conference, the CHI

18 Conference of that year, in, I think, 2005.  I might

19 have gone to the talk, or I saw it -- or I saw a video

20 of it subsequently.  Typically when I go back to my

21 university after a conference, we -- we review some of

22 the papers --

23     Q   Are those --

24     A   -- so I might have seen the video of it

25 later.

Confidential Attorneys' Eyes Only Outside Counsel

Page 277

1    Q    Okay.

2    A    I can't remember when is the first time I

3  played with it.  Somebody, one of my students, may

4  have downloaded it, and I checked it out.

5    Q    Are the -- are the presentations made at the

6  CHI Conference videotaped?

7    A    The presentations of -- they're sometimes

8  videotaped.  I don't think they're necessarily all

9  videotaped.  I've seen them being videotaped on

10  occasion.

11    Q    Do you know whether Dr. Peterson's

12  presentation was videotaped?

13         MR. MONACH:  Object to the form.

14         THE WITNESS:  That particular presentation at

15  the conference?

16         MR. JOHNSON:  Yeah.

17         THE WITNESS:  I do not know either way.

18         MR. JOHNSON:  Q.  Do you know whether he made

19  the presentation or was it somebody else?  Do you

20  remember?

21    A    I can't tell, as I can't remember whether I

22  attended the presentation or not.

23    Q    Okay.  So if you can, let me ask you to hand

24  it back to -- to Henry, and I just want to ask you a

25  few questions about some of the -- some of the -- the

Confidential Attorneys' Eyes Only Outside Counsel

Page 278

1  features of LaunchTiles.

2      So -- well -- and you can -- yeah.  You can

3  just -- I just want to make sure we can see it, as the

4  glare from the light is pretty bad.

5      So there -- there -- there -- in the example

6  that we've -- we've pulled up in front of you, which

7  has a 2x2 grid, is the -- is the LaunchTiles example

8  that you see there that's running on the iPAQ device a

9  computer-implemented method?

10     I'm just -- I'm just gonna go through the

11 claims of the '381 patent.

12   A   Okay.  Let's keep it in front of me.

13   Q   I'm not trying to trick you or anything.  I

14 just wanna -- I just -- I'm gonna follow along, so if

15 you want to follow along, that's fine.

16     So the question is:  In the 2x2 grid that --

17 that we have in LaunchTiles in front of you, does the

18 -- running on the iPAQ device, does that perform on a

19 computer-implemented method?

20     MR. MONACH:  Object to the form of the

21 question.  I'll object to this whole line of

22 questioning as calling for a legal conclusion; asking

23 the witness to form an -- a new opinion on a topic he

24 has not opined upon at the deposition with incomplete

25 information or opportunity to examine the device of a

Confidential Attorneys' Eyes Only Outside Counsel

Page 279

1    product, but you can answer.

2         MR. JOHNSON:  You can have a running

3    objection on that, just to try and cut though this.

4         THE WITNESS:  So I haven't examined this in

5    any great detail, but just looking at this right now,

6    it's -- certainly is an application that's running on

7    a computer-implemented -- or a computer -- so it is a

8    computer-implemented method.

9         MR. JOHNSON:  Okay.

10    Q    And does LaunchTiles running on iPAQ, does

11   that meet the limitation of a device with a

12   touchscreen display?

13        MR. MONACH:  Same objection.

14        THE WITNESS:  It's not clear, to me, this is

15   a touchscreen display.  I tried touching it a minute

16   ago, like when I was playing with it, and it didn't

17   react to me, but the -- the pen seems to do the job.

18        Okay, so now it does react, so maybe I was

19   mistaken.  Given what he just did, it appears to react

20   to touches, so, sure, it would be a device with a

21   touchscreen display.

22        MR. JOHNSON:  Okay.

23    Q    So in the -- in the 2x2 grid that we see

24   there running on the iPAQ, does that meet the

25   limitation of displaying a first portion of an

Confidential Attorneys' Eyes Only Outside Counsel

Page 280

1   electronic document?

2         MR. MONACH:  Same objection; lack of

3   foundation; incomplete hypothetical.

4         THE WITNESS:  So I would have to study this

5   in detail before answering that question, because I

6   need to understand the context of the content being

7   shown on the -- on the display as to what constitutes

8   an electronic document there, whether it's all four

9   tiles is one document or a single tile is a document.

10  I cannot make that determination, just looking at this

11  on the fly.

12        MR. JOHNSON:  Q.  So if the -- in this

13  example, assume the 2x2 is an electronic document.

14     A   So you're representing to me that you want me

15  to consider --

16     Q   I want you to consider the 2x2 is an

17  electronic document?

18     A   So just to clarify it, does that mean the --

19  the whole thing is one document.  Is that what you're

20  saying to me?

21     Q   Right.  Right, the 2x2.

22         And so, then, when --

23     A   So that's your representation.  I'm not

24  necessarily agreeing with that.

25     Q   I'm just -- yeah, right.

Confidential Attorneys' Eyes Only Outside Counsel

Page 281

1    And so, then, displaying a first portion of

2    an electronic document would mean that we scroll

3    slightly to the left.

4    Would you agree, just as we saw in the

5    infringement case, that that's displaying a first

6    portion of an electronic document?

7    MR. MONACH:  Same objection.

8    THE WITNESS:  So, again, to say, you know, I

9    haven't studied this in detail, in your representation

10   the -- the four tiles, as a whole, would be the

11   entire -- would be the electronic document, it would

12   be a first portion.  I would note that as you're -- as

13   it's moving there, the -- the electronic document is

14   translated.  However, that blue thing in the middle is

15   not moving, so I don't know if you intended the blue

16   thing, the blue circle in the middle, to be part of

17   the electronic document or not, but that -- that's

18   certainly not moving.  That's remaining stationary,

19   and some other representation of a so-called

20   underneath is moving, so it doesn't exactly seem to

21   match up in my -- in my current very quick view of

22   this, relative to the claims.

23   MR. JOHNSON:  Q.  But scrolling to the left,

24   that displays a first portion of the electronic

25   document, which is the 2x2 grid; right?

Confidential Attorneys' Eyes Only Outside Counsel

Page 282

1          MR. MONACH:  Same objection.

2          THE WITNESS:  You mean, before you scrolled

3    or after you scrolled?

4          MR. JOHNSON:  Q.  I mean, after I've

5    scrolled.

6      A    So after you made that little movement?

7      Q    Right.

8      A    Okay.

9      Q    That displays a first portion of an

10   electronic document; doesn't it?

11         MR. MONACH:  Same objection and assumes facts

12   not in evidence.

13         THE WITNESS:  If you, as you represented

14   earlier, before he scrolled -- if you don't mind going

15   back to before you scrolled, I believe, if I

16   understand you correctly, you represented to me that

17   you wanted me to consider the -- this -- all this

18   content, the four tiles with whatever decorations were

19   around it, the entirety, to be an electronic document.

20         MR. JOHNSON:  That's correct.

21         THE WITNESS:  That's -- that's my

22   understanding --

23         MR. JOHNSON:  That's right.

24         THE WITNESS:  -- that you represented to me.

25   I don't necessarily agree with that, because I haven't

Confidential Attorneys' Eyes Only Outside Counsel

Page  283

1    studied this to determine what would constitute an

2    electronic document and what would not, but given that

3    assumption, the hypothetical assumption, if that's an

4    electronic document, and now you are -- I believe he

5    scrolled or --

6            MR. JOHNSON:  Scrolled it slightly to the

7    left.

8            THE WITNESS:  -- moved it, I would say that

9    parts of the electronic document have moved, but other

10   parts have not moved.  So the blue thing that you just

11   represented to me was part of the electronic document

12   hasn't moved, so that hasn't translated at all.

13           MR. JOHNSON:  Q.  Does it need to move in

14   order to meet the elements of the claim?

15           MR. MONACH:  Objection for the reasons

16   previously stated; vague and ambiguous.

17           THE WITNESS:  So I haven't studied this in

18   detail.  Just very quickly reading the claims, it says

19   in response to detecting the movement.  I'm reading

20   Claim Element 3 here, which I --

21           MR. JOHNSON:  Q.  Yeah, I'm not there yet.

22       A    Okay.  So where are you?

23       Q    Displaying a first portion of an electronic

24   document.

25       A    Okay.

Confidential Attorneys' Eyes Only Outside Counsel

Page 284

1    Q    All he's done is moved it slightly to the

2  left.

3    A    Okay.  I thought you said the first portion

4  was the -- the earlier, the electronic document before

5  he moved it.

6    Q    Let's -- let's start over --

7    A    Okay.

8    Q    -- okay?

9         I want you to assume for me that the

10  electronic document is the 2x2 grid, the four tiles.

11    A    All that content?

12    Q    Right.

13    A    Including the decorations?

14    Q    That's fine.

15    A    Okay.

16    Q    Yeah, okay.

17         By the way, does that meet your definition of

18  an electronic document, namely -- strike that.

19         Does that meet your definition of an

20  electronic document for the purposes of the '381

21  claim?

22         MR. MONACH:  Objection; calling for a legal

23  conclusion; in -- incomplete hypothetical; asking him

24  to make a new opinion without adequate information.

25         THE WITNESS:  Done?

Confidential Attorneys' Eyes Only Outside Counsel

1          So as I stated earlier, I haven't studied

2    this in detail enough in matching it up with the

3    claims, so your representation is you wanted me to

4    consider all four tiles as one doc -- in a -- in its

5    combination, as an entirety, as one document.

6          That might be an electronic document

7    vis-à-vis the claims.  It might not be.  I would have

8    to study that in detail --

9          MR. JOHNSON:  Well --

10         THE WITNESS:  -- relative to the context of

11   the application.  I have not done that detailed

12   analysis yet.  So it may be that only each -- each

13   tile is an electronic document in this application.  I

14   don't know.

15         MR. JOHNSON:  Q.  Well, it's visually

16   represented on screen with a defined set of

17   boundaries, right, those 2x2 tiles?

18         MR. MONACH:  Object to the form of the

19   question; assumes facts not in evidence; lack of

20   foundation.

21         THE WITNESS:  As I said, you -- you're

22   representing to me that you wanted me to consider

23   that.  So if you considered those four tiles as one

24   entirety with the defined boundaries, that could be

25   an --

Confidential Attorneys' Eyes Only Outside Counsel

Page 286

1          MR. JOHNSON:  Sir --

2          THE WITNESS:  -- electronic document in the

3    con- -- but I have not studied this application in

4    detail enough to determine what the contact of use of

5    this application is.  Maybe in this application it

6    might be considering each of these tiles as a separate

7    electronic document.  I do not know that.

8          MR. JOHNSON:  Q.  I'm asking you, does the

9    2x2 tiles that we see currently on the screen, does

10   that meet your definition of "electronic document," as

11   that term is used in the '381 patent?

12         MR. MONACH:  Objection; lack of foundation;

13   incomplete hypothetical; asking the witness to draw a

14   legal conclusion and a new opinion for the first time

15   at the deposition with inadequate information.

16         THE WITNESS:  And as I believe I already

17   answered, it depends on what the context of use is.

18         So if -- if, indeed, the application

19   considers those four things as one entity and is --

20   has defined boundaries, then that might meet the

21   electronic document definition, as used in the claims,

22   but it -- it might not.

23         It might -- it might be that each of those --

24   each of these tiles or quadrants might be a separate

25   electronic document.  I would have to study this in

Page 287

1   the context of use of this -- of these pieces of tiles

2   in this application to determine that with any

3   certainty.

4          MR. JOHNSON:  Q.  So you don't know right

5   now, sitting here?

6      A   I cannot give you a definitive answer.  It

7   could be an electronic document, depending on the

8   context of use.

9      Q   So when -- when he slides it slightly to the

10  left, does that display a first portion of an

11  electronic document if you assume that that 2x2 grid

12  is an electronic document?

13         MR. MONACH:  Same objection.

14         THE WITNESS:  So if we make that assumption

15  that that 2x2 grid in its entirety is an electronic

16  document and after he slid it, that could be a first

17  portion.

18         Now, I would still note that when he moved

19  it, the -- if the electronic document was the

20  entirety, including that blue circle in the middle,

21  when he moved it, the blue circle did not move --

22     Q   Are --

23     A   -- so not all -- let me finish, please.

24         The -- the blue circle did not move, so the

25  entirety of the document --

Confidential Attorneys' Eyes Only Outside Counsel

Page 288

1    Q   But that --

2    A   -- in that example.

3    Q   -- that's irrelevant for the claims; isn't

4  it?

5        MR. MONACH:  Objection; same objection as

6  previously stated; asking for a legal conclusion with

7  incomplete hypothetical.

8        THE WITNESS:  So I have not made that

9  determination.  I would have to study that.  I have

10 not considered the relevance of whether portions of

11 the document moved together or not, whether that is

12 relevant to the -- to the elements of the claim, so I

13 would reserve a detailed opinion on that until I've

14 had a chance to study --

15   Q   I'm asking you for your opinion now.

16       Can you tell me if the location of the blue

17 circle on this is relevant to any portions of the

18 claim limitations?

19       MR. MONACH:  Same objections as previously

20 stated.  Now it's been asked and answered.

21       THE WITNESS:  So, as I said, I -- I cannot

22 tell you right now, without studying this in detail,

23 whether that blue thing, blue circle in the middle,

24 whether that moves with the document or not.  Whether

25 that has relevance to this, I would have to study that

Confidential Attorneys' Eyes Only Outside Counsel

Page 289

1    in detail, and I cannot answer that off the cuff now.

2         MR. JOHNSON:  Q.  Does LaunchTiles, with this

3    2x2 grid operated on an iPAQ, detect a movement of an

4    object on or near the touchscreen display?

5         A   Yes, it does.

6         Q   Okay.

7         A   He -- he showed me with a finger it does

8    that, and the pen is doing that, as well.

9         Q   So the -- an object can be either a finger or

10   a pen or something else; right?

11        A   Yes, it -- it could be any -- some object,

12   but it has to be on a touchscreen display.

13        Q   The -- when he now scrolls back to the right,

14   does --

15        A   He's bouncing around a little bit.  So you

16   moved to the left, and then now you've come back to

17   this.

18        Q   Moved to the right, yeah.

19        A   All right.

20        Q   So does the 2x2 LaunchTiles grid operating on

21   the iPAQ describe the next limitation in the claims,

22   which is numbered as three?

23        A   So this one's saying in response to detecting

24   the movement translating electronic document displayed

25   in the touchscreen in the first direction to display

Confidential Attorneys' Eyes Only Outside Counsel

Page 290

1  the second portion?

2          MR. MONACH:  Same objection.

3          MR. JOHNSON:  Correct.

4          THE WITNESS:  So you want me to assume the

5  first portion was after he had moved to the left, and

6  now you move it back, and you're saying that's the

7  second portion of the document?

8          MR. JOHNSON:  Right.

9          THE WITNESS:  With -- with the same caveats I

10 said earlier about the blue thing moving and whether

11 that's part of the document or not, I'll repeat that

12 as part of my current answer, and, again, I haven't

13 had a chance to explore this in great detail, but

14 given those, the qualifications, I would say it

15 appears to be -- it could be meeting that claim --

16 claim element.

17         MR. JOHNSON:  Q.  And when the device

18 continues scrolling to the right, beyond the edge,

19 does it meet the fourth limitation of Claim 1 of

20 the '381 patent?

21         MR. MONACH:  Same objections as previously

22 stated, and now the question assumes facts not in

23 evidence, as well.

24         THE WITNESS:  And you mean the fourth

25 limitation that I've labeled here as four; right?

Confidential Attorneys' Eyes Only Outside Counsel

Page 291

1          MR. JOHNSON:  Right.  We're gonna mark your

2      copy of the patent as Exhibit 115.

3          THE WITNESS:  Sure.  I think it's already

4      110, though.

5          MR. JOHNSON:  Okay.  Even better.

6          THE WITNESS:  It's 110?

7          MR. JOHNSON:  No, it's actually --

8          THE WITNESS:  Oh, I'm sorry.  I'm sorry.  I

9      made a mistake.

10          MR. JOHNSON:  Let's mark, as Exhibit 115, a

11      copy of your patent with the limitations numbered.

12          (Document marked Balakrishnan Exhibit 115

13           for identification.)

14          THE WITNESS:  Okay.  So we'll just go with

15      what I've written down here, okay.

16          MR. JOHNSON:  Q.  So, again, the question is:

17      Does the movement that Mr. Lien just did meet the

18      fourth limitation of the claim?

19          MR. MONACH:  Same objection as previously

20      stated.

21          THE WITNESS:  Again, with the same

22      qualifications about the blue circle in the middle not

23      moving, and if that was part of the document, then it

24      doesn't move appropriately.  And, again, with the same

25      qualifications I made earlier, that I haven't had a

Page 292

1  chance to look at this in detail.  Just sitting here

2  right now, an off-the-cuff view of this, I would say

3  it appears to meet -- meet the fourth limitation.

4       MR. JOHNSON:  Okay.

5    Q   Does LaunchTiles in the 2x2 grid operating on

6  the iPAQ meet the fifth limitation of Claim 1?

7       MR. MONACH:  Same objection as previously

8  stated; assumes facts not in evidence, as well.

9       THE WITNESS:  Can you do that again, please?

10       Again, given -- well, something else

11  happened.  So, again, given the qualifications I did

12  earlier -- I said earlier about the circle in the

13  middle, the blue circle, and also the fact that I

14  haven't looked at this in any detail, in this quick

15  view of this -- of this application running here, I

16  would say it appears to meet the -- the fifth element.

17       MR. JOHNSON:  Q.  Does it meet the sixth

18  element of Claim 1 of the '381 patent?

19       MR. MONACH:  Same objection.

20       THE WITNESS:  Can you show me the first

21  portion again?

22       Okay.  Now the second portion.  Third

23  portion.

24       I would say, in addition to the

25  qualifications I've given earlier, that it doesn't

Confidential Attorneys' Eyes Only Outside Counsel

Page 293

1   necessarily meet this sixth element, because the third

2   portion here that he's showing me, it's bouncing

3   around a little bit, but the size of that appears to

4   be -- it could be the same as the first portion that

5   he showed me earlier, because the first portion was

6   translated off to the left-hand side with a border on

7   this side.  Now he's on this side, with a similar

8   border on the other side.  So it -- it may be the same

9   size, that third portion may be the same size as the

10  first portion.

11       MR. JOHNSON:  Q.  But he could -- he could do

12  it in a way where the third portion is smaller than

13  the first portion; right?

14       MR. MONACH:  Same objection.

15       MR. JOHNSON:  Q.  And meet that -- meets the

16  sixth claim limitation; right?

17     A   Well, maybe -- maybe he can show me that.

18     Q   Sure.

19     A   Show me your first portion.  Let's see your

20  first portion.  Okay.

21       Second portion.  Okay.  Third portion.  It's

22  very hard to tell.  It's bouncing around.  I'd have to

23  measure it.  It could be.  It -- it may not be.  It's

24  clearly smaller necessarily, because the other one is

25  also not full screen.  It moved off to the other

Confidential Attorneys' Eyes Only Outside Counsel

Page 294

1    side --

2          MR. JOHNSON:  And can you do --

3          THE WITNESS:  -- so there was --

4          MR. JOHNSON:  -- it again that's more

5    pronounced.

6      Q   So let's -- let's look at the first, second,

7    third portions again.

8      A   Okay.  That's your first portion.  So second

9    portion is in the center.

10         It appears, in this case, he's moved it a bit

11   more, and it --

12         MR. MONACH:  Same objection.

13         THE WITNESS:  -- it potentially could --

14   could infringe -- sorry -- it could not infringe --

15         MR. JOHNSON:  Meet the limitation.

16         THE WITNESS:  -- meet the limitation of

17   Claim 6, again with the qualifications that I -- I

18   just went through with the circle in the middle and

19   the fact that I haven't studied this in any great

20   detail.

21         MR. JOHNSON:  Q.  It would meet the sixth

22   limitation of Claim 1; right?

23         MR. MONACH:  Same objection; asked and

24   answered.

25         MR. JOHNSON:  Q.  You said Claim 6, and I

Confidential Attorneys' Eyes Only Outside Counsel

Page 295

1  think you misspoke.

2      A   I meant to say the sixth limitation.

3      Q   Okay.

4      A   I'm sorry.

5      Q   And when he lifts the stylus or his finger,

6  does it meet the seventh limitation of Claim 1?

7          MR. MONACH:  Same objection.

8          THE WITNESS:  In this case, it's back to the

9  original document, which was, and I would say, to go

10 back, when you -- when you displayed the first portion

11 of the electronic document, that already included a

12 movement, which the claims doesn't talk about.

13         So you already had a movement there.  Given

14 that, and given all the caveats -- sorry -- the

15 qualifications that I have made with regards to

16 this -- this demonstration, the circle not moving, the

17 fact that I have not looked at this in any great

18 detail, it -- it appears that it could meet that --

19 that -- that -- sorry -- element 7 of Claim 1, again,

20 with the qualification again that -- that the first

21 portion of this case already included a movement,

22 which this -- this claim doesn't appear to talk about.

23         MR. JOHNSON:  Q.  Well, the -- the first

24 portion in your infringement reads "also included the

25 zoom-in movement"; right?

Confidential Attorneys' Eyes Only Outside Counsel

Page 296

1        MR. MONACH:  Objection; misstates the prior

2   testimony.

3        THE WITNESS:  I didn't talk about zooming at

4   all.

5        MR. JOHNSON:  But it included it.  I know you

6   didn't talk about it.

7    Q   But it included it; right?

8        MR. MONACH:  Objection; misstates the prior

9   testimony; vague and ambiguous.

10       THE WITNESS:  No, the zoom happened, and then

11  I'm -- I've -- I've got the document up there --

12       MR. JOHNSON:  Well, I know the --

13       THE WITNESS:  -- and I'm not holding my

14  finger down in a zoomed mode waiting for that -- the

15  next movement to appear.  I've zoomed it in.  I could

16  leave the device.  Start it up again.  It's already

17  zoomed in, and then I start implementing the claims of

18  the patent.

19       MR. JOHNSON:  But that's my point.

20    Q   You've already zoomed in on it for the

21  infringement read; right?

22       MR. MONACH:  Objection; misstates the prior

23  testimony, with respect to various portions of his

24  prior testimony.

25       MR. JOHNSON:  I'm sure you have it.  It's on

Confidential Attorneys' Eyes Only Outside Counsel

Page 297

1    the videotape.

2          THE WITNESS:  In the gallery application, a

3    zooming occurred way before the elements of the claim

4    were started out.  In the contacts list application,

5    there was no zooming happening.

6          MR. JOHNSON:  Q.  Way -- way before?

7    Where -- where are we getting "way before" from?

8        A   Before I started going through the claims --

9        Q   Okay.  Does --

10       A   -- as I said before; whereas, here, he -- he

11   has to keep his finger on that, on the first portion.

12   In other words, it would bounce back into the center

13   of the screen.

14       Q   The fact that he kept his finger or the

15   stylus on the device, does that -- is that relevant to

16   any of the claim language we just looked at?  Same

17   objection as previously stated to the whole line of

18   questioning here.

19       A   I don't know.  It might be.  I haven't -- as

20   I said, multiple times with regard to this

21   application, I have not studied it in detail, and --

22   and I'm giving an off-the-cuff analysis here looking

23   at a live demo, and I have not had the opportunity to

24   opine on this in any detail.

25         MR. JOHNSON:  Yeah.

Confidential Attorneys' Eyes Only Outside Counsel

1      THE WITNESS:  So it might be; it might not

2  be.  I don't know.

3      MR. JOHNSON:  Q.  Take a look at Claim 1 and

4  tell me, in your opinion, does the fact that he kept

5  his finger or the stylus on the screen avoid any

6  limitation of Claim 1?

7      MR. MONACH:  Objection; calling for a legal

8  conclusion; incomplete hypothetical; asking the

9  witness to form a new opinion based on inadequate time

10  to study.

11      THE WITNESS:  So as I just testified earlier,

12  the fact that he keeps his finger on there may or may

13  not impact Claim 1.  I have not had the time to study

14  that in detail and to consider that.  That's something

15  I'm being told right now on the fly, and I don't think

16  I can make an informed enough decision or opinion on

17  it just on the fly here.  So I'm gonna have to reserve

18  my answer to be a fully qualified opinion after I've

19  had a chance to consider that issue --

20      MR. JOHNSON:  I'm --

21      THE WITNESS: -- relative to these claims.

22      MR. JOHNSON:  You've read this patent several

23  times.

24      Q   I'm asking you to take a look at Claim 1 and

25  tell me, does the fact that he kept his finger or the

Confidential Attorneys' Eyes Only Outside Counsel

Page 299

1  stylus on the screen avoid infringement or invalidity

2  of this claim, and if so, tell me what the language is

3  that you're relying on.

4         MR. MONACH:  Same objection; now it's more

5  vague and compound; asked and answered.

6         THE WITNESS:  So I -- I'm going to give you

7  the same answer I just gave.  This is a new -- a new

8  element that is being shown to me for the first time

9  here.  I haven't had time to study this, and I don't

10 think I can give you a detailed opinion on whether or

11 not it might infringe -- sorry -- it might -- not

12 infringe, it might meet the claim, it might not meet

13 the claim.  I have -- I need to have time to study

14 that, and I cannot do that on the fly.

15        MR. JOHNSON:  Take a look at Claim 2.

16 Q   Does the 2x2 grid in LaunchTile operating on

17 the iPAQ meet the limitation described in Claim 2?

18        MR. MONACH:  Same objection as previously

19 stated with the questions about 1; lacking in

20 foundation, given his prior testimony about Claim 1.

21        MR. JOHNSON:  Counsel, I really suggest you

22 just keep a running objection, but you're really

23 interfering with the examination, at this point.

24        THE WITNESS:  So with regards to Claim 2, I'm

25 looking at this again, my qualifications of -- of what

Confidential Attorneys' Eyes Only Outside Counsel

Page 300

1    is the electronic document here, from my earlier

2    answers, it's not clear that -- whether that blue

3    circle in the middle is part of the document or not,

4    or, again, I'm looking at this on the flight here,

5    haven't had the time to study it.

6         It is -- I haven't had time to determine if

7    the magnification changes, as he moves it around or

8    not.  It might be.  It might not be.

9         At, you know, first glance, it looks like it

10   hasn't changed, but I haven't had time to -- to study

11   this in detail, so I cannot give a definitive answer

12   as to whether the magnification of the electronic

13   document, to the extent that's even an electronic

14   document in this application, remains the same.

15        MR. JOHNSON:  Okay.  Does -- what's -- what's

16   the exhibit number on the back of that?

17        MR. LIEN:  114.

18        MR. JOHNSON:  Okay.

19   Q   Does Exhibit 114 meet the limitations of

20   Claim 3?

21        MR. MONACH:  Same objection as stated in

22   response to the previous question.

23        THE WITNESS:  To the extent that -- my

24   understanding is Claim 3 is a dependent claim on

25   Claim 1, so to the extent that Claim 1 is met, which

Confidential Attorneys' Eyes Only Outside Counsel

Page 301

1   I'm not agreeing whether it does or not, based on my

2   earlier testimony.  That said, the -- the portion of

3   the Claim 3, which says the movement of the objects on

4   a touchscreen display, that would be met, yes.

5          MR. JOHNSON:  Q.  And the limitation of

6   Claim 4 would also be met; right?

7      A   With regards to whether the object being a

8   finger, if you can do that again, just so I can see

9   it.

10         Yes, it appears that a finger would affect

11   that kind of movement.

12     Q   And does Exhibit 114 meet the limitations of

13   Claim 5?

14         MR. MONACH:  Same objection.

15         THE WITNESS:  When you say "Exhibit 114," you

16   mean the device with the application running on it?

17         MR. JOHNSON:  That's correct.

18         THE WITNESS:  Okay.

19         Again, given the -- the same qualifications

20   I've given with my earlier answers with regards to

21   whether it meets Claim 1, and Claim 5 is a dependent

22   claim in Claim 1.

23         Given those qualifications, which I'd like to

24   incorporate in this current answer, I would say, given

25   those qualifications, yes, his first direction is one

Confidential Attorneys' Eyes Only Outside Counsel

Page 302

1  of a vertical/horizontal or diagonal, so it would meet

2  -- would meet the limitations of Claim 5.

3          MR. JOHNSON:  Q.  Does it meet the

4  limitations of Claim 7?

5          MR. MONACH:  Same objection.

6          THE WITNESS:  I don't think I can answer that

7  without knowing what the content of that -- of

8  those -- of that document is.  It's not clear to me

9  whether that's a collection of lines of text, whether

10 it's an image, like you said JPEG or something along

11 those lines --

12         MR. JOHNSON:  Is --

13         THE WITNESS:  -- or a collection of images.

14 I cannot answer that without exploring the -- that

15 document in much greater detail.

16         MR. JOHNSON:  Q.  Is it -- is it a digital

17 image?

18         MR. MONACH:  Objection; same objection to the

19 reasons previously stated; asked and answered.

20         THE WITNESS:  So as I just said, I cannot

21 determine if it's a digital image.  It may be an

22 image.  It may be several images concatenated

23 together.  It may be some web pages.  It may be lines

24 of text.  I -- I cannot make that determination just

25 from a quick look at it.

Confidential Attorneys' Eyes Only Outside Counsel

Page 303

1      MR. JOHNSON:   Q.  So is a web page not an

2  electronic document?

3      MR. MONACH:  Same objection; vague and

4  ambiguous.

5      THE WITNESS:  So Claim 7 says the electronic

6  document is a digital image, so it's -- it's trying

7  to -- my understanding is it's trying to give a more

8  specific instance of what an electronic document is,

9  in that -- in that example, in that claim.

10     MR. JOHNSON:  Right.

11  Q   Using your -- what is the -- what is the -- I

12  already asked you this.  I mean, using your

13  definition -- strike that.

14     Using the definition of a person of ordinary

15  skill in the art would understand a digital image to

16  mean, does Exhibit 114 meet the limitations of

17  Claim 7?

18     MR. MONACH:  Same objections as previously

19  stated.

20     THE WITNESS:  And I think I've already

21  answered that.

22     I -- without knowing more information about

23  what that -- those four tiles are that you have

24  represented to be the electronic document, is that a

25  single image?  Is it multiple images?  Is it some

Confidential Attorneys' Eyes Only Outside Counsel

Page 304

1  text?

2      MR. JOHNSON:  Well, take a look --

3      THE WITNESS:  I can't tell from -- this could

4  be four images that are concatenated together to form

5  one document.

6      MR. JOHNSON:  Q.  So would that not meet the

7  limitation?  If it's a concatenated series of images,

8  does that avoid Claim 7?

9      MR. MONACH:  Same objection.

10     THE WITNESS:  I don't know.  I haven't

11  considered that scenario.  It says here the electronic

12  document is a digital image.  It doesn't talk about a

13  concatenated set of images.

14     MR. JOHNSON:  Okay.

15     THE WITNESS:  And so I would have to study

16  that scenario in detail before answering that

17  question.

18     MR. JOHNSON:  Q.  Does a concatenated series

19  of images satisfy the definition of a digital image as

20  it's used in the '381 patent?

21     MR. MONACH:  Same objection; asked and

22  answered.

23     THE WITNESS:  I would say, again, to my --

24  similar answer to what I just gave, it -- it would

25  depend on the application.  If the application

Confidential Attorneys' Eyes Only Outside Counsel

Page 305

1  considered that -- sorry -- I think you asked whether

2  it's a digital image.

3        I would say a concatenation would be a series

4  of a bunch of digital images combined together.  Now,

5  if that combination is treated by the application as a

6  single image, then maybe it is.  It would depend on

7  the context.  So I do not know enough about the

8  context of this application and how it's treating any

9  potential concatenation of images to answer that

10  question in -- in -- with any certainty, at this

11  point.

12        MR. JOHNSON:  I heard you earlier say that

13  the claim language of the '381 patent is simple and

14  straightforward.

15  Q   So are you telling me that looking at this

16  screen that we see here in Exhibit 114, and what we

17  see on it, you can't tell me whether that is a digital

18  image?

19        MR. MONACH:  Object to the form of the

20  question.

21        THE WITNESS:  That's not what I said.  I said

22  I can't tell that's one digital image or four digital

23  images concatenated together, so it has nothing to do

24  with whether the -- the language.  The claim is

25  straightforward.  The claim states "a digital image."

Confidential Attorneys' Eyes Only Outside Counsel

Page 306

1  It doesn't talk about concatenation of digital images

2  or combination of digital images, which this may or

3  may not be.  I'm not able to tell that on the

4  application.  Nothing to do with the language of the

5  patent.

6       MR. JOHNSON:  Q.  Does Exhibit 114 meet the

7  limitations of Claim 9?

8       MR. MONACH:  Same objection.

9       THE WITNESS:  To the extent that if you say

10 the whole of four images can constitute the electronic

11 document, I would say, given this particular set of

12 content there, there appears to be a list of -- if you

13 don't mind, phone list and an inbox, which has a list

14 of items there.

15      So that --

16      MR. JOHNSON:  Zoom in.

17      THE WITNESS:  -- the electronic document

18 includes a list of items, which is what Claim 9 says.

19 It doesn't necessarily mean the whole document is a

20 list.

21      MR. JOHNSON:  Q.  Does it meet the

22 limitations of Claim 10?

23      MR. MONACH:  Same objection.

24      THE WITNESS:  Based on what he showed me

25 earlier, and given the qualifications I've already

Confidential Attorneys' Eyes Only Outside Counsel

Page 307

1   made regarding Claim 1, I would say it meets Claim 10,

2   yes.

3         MR. JOHNSON:  Q.  Does it meet the

4   limitations of Claim 13?

5         MR. MONACH:  Same objection as stated with

6   respect to the other claims.

7         THE WITNESS:  From what I've seen so far, it

8   appears that it would not meet Claim 13, because what

9   I've seen of the area beyond the edge of the document,

10  as shown to me by your colleague here, is not one of

11  these colors.  It seems to be a compound set of

12  content there.

13        MR. JOHNSON:  Q.  So the edge of the document

14  is -- is not black, gray, a solid color, or white?

15     A  No, he's --

16        MR. MONACH:  Object to the form of the

17  question.

18        THE WITNESS:  -- he's showing me all of this

19  other content that has a bunch of other extra stuff

20  there, beyond the -- beyond the edge of the document.

21        MR. JOHNSON:  Q.  So the fact that part of

22  the edge of the document, beyond the edge of the

23  document includes black, gray, solid color, or white

24  that -- that doesn't meet that limitation?

25        MR. MONACH:  Object to the form of the

Confidential Attorneys' Eyes Only Outside Counsel

1   question for the reasons previously stated, and also

2   now misstates the evidence.

3          THE WITNESS:  I think he's showing me the --

4   the area beyond the edge includes some other stuff

5   that is not just black, gray, solid color, or white.

6   It has all kinds of other colors there.

7          MR. JOHNSON:  Q.  But the -- the area beyond

8   the edge includes a solid color.  In this case, light

9   blue --

10      A   Do you mind if I --

11      Q   -- right, in the e-mail example?

12          MR. MONACH:  Same objection.

13          THE WITNESS:  It --

14          MR. MONACH:  Assumes facts not in evidence.

15          THE WITNESS:  To me, I'm looking at the area

16  beyond the edge.  It's -- the interactive area is way

17  beyond.  It has a vertical bar there, but then there's

18  also more stuff beyond it.  So it's not -- the whole

19  area is not one of those four things, as in Claim 13.

20          MR. JOHNSON:  Q.  Does Exhibit 114 meet the

21  limitations in Claim 14?

22          MR. MONACH:  Same objection as previously

23  stated to this line of questioning.

24          THE WITNESS:  And that's an even trickier

25  one, because I'd have to look very carefully at the

1    content of this stuff that's bouncing around on the

2    edge there and -- to determine if that actually is.

3    So, for example, the bottom here -- whether -- whether

4    that content is actually different, I'd have to study

5    it carefully.  To the extent that it is different,

6    then I would say, yes, it meets it.  It would really

7    depend on what that content is.

8              MR. JOHNSON:  Q.  Does claim -- does

9    Exhibit 114 meet the limitations in Claim 16?

10             MR. MONACH:  Same objections.

11             THE WITNESS:  Can you do that first

12   direction, second direction, and lift it up again,

13   please.  If you don't mind, I'll look at it.  Whoops.

14             MR. LIEN:  Sorry.

15             THE WITNESS:  Or maybe I can play with it, if

16   you don't mind.  I'm having trouble looking at this

17   thing.  Yeah, okay.

18             Do that again.  It would appear to be, again,

19   with all the caveats of -- all of the qualifications

20   I've already made with regards to Claim 1, I would say

21   it appears to be, this particular example, there might

22   be an elastic connection there or elastic look to

23   that.

24             MR. JOHNSON:  Q.  Does Exhibit 114 meet the

25   claim limitations described in Claim 19 of the '381

Confidential Attorneys' Eyes Only Outside Counsel

Page 310

1   patent?

2        MR. MONACH:  Same objection as previously

3   stated.

4        THE WITNESS:  Again, the same qualifications

5   with regards to Claim 1 in whether this device meets

6   that or not.  To the extent that this is running a

7   computer program, like in the Samsung phones, it

8   clearly has one or more programs running, and then,

9   therefore, it would meet Claim 19, again given my

10  qualifications of Claim 1.

11       MR. JOHNSON:  Q.  And does Exhibit 114 meet

12  Claim 1?

13       MR. MONACH:  Same objection.

14       THE WITNESS:  And my, kind of, similar

15  answer, taking all my -- my qualifications with

16  regards to Claim 1, you would have to have some kind

17  of storage media, so it would meet Claim 20, with the

18  same set of qualifications for all of the different

19  elements.

20       MR. JOHNSON:  Okay.  Let me show you another

21  example --

22       THE WITNESS:  I also want to say, just for

23  the -- I'm sorry to interrupt you.

24       MR. JOHNSON:  He'll have the opportunity to

25  ask you a question.

Confidential Attorneys' Eyes Only Outside Counsel

Page 311

1        MR. MONACH:  You can finish -- you can finish

2   your answer.  Go ahead.

3        MR. JOHNSON:  There's -- there's no question.

4        MR. MONACH:  There -- there was a question.

5   The witness was still speaking, and he's allowed to

6   speak, and if you want to move to strike it, you can

7   move to strike it, but he can -- he's free to go

8   ahead.

9        THE WITNESS:  I'll pass.

10        MR. JOHNSON:  Okay.

11   Q   The -- the -- I'd like for you now to assume

12   that the electronic document consists of a grid that's

13   actually 2x4 tiles.

14   A   I'm not seeing that here.  I'm seeing 2x2.

15   Q   So that's the four right there.

16   A   Right.

17   Q   Do you see what I'm talking about?

18   A   So I'm seeing four, and earlier he zoomed out

19   to some much larger number of tiles.

20   Q   It's the -- it should be 2x4.

21   A   So two --

22   Q   So two --

23   A   Okay.

24   Q   It's back to -- it's back to the -- the grid,

25   2x4.

Confidential Attorneys' Eyes Only Outside Counsel

Page 312

1          So he's --

2      A   You're talking about this grid?

3      Q   Yeah.

4      A   Okay.

5      Q   So there are two pages, so to speak.  It's

6   two --

7      A   So this --

8      Q   -- in the vertical direction and four in the

9   horizontal direction; okay?

10     A   The -- the document consists of these eight

11  tiles --

12     Q   Correct.

13     A   -- is your representation.

14     Q   Right.

15     A   Okay.

16         MR. MONACH:  Objection; assumes facts not in

17  evidence in addition to --

18         MR. JOHNSON:  Q.  So I'd like for you to --

19         MR. MONACH:  -- what's been previously

20  stated.

21         MR. JOHNSON:  Q.  I'd like for you to assume

22  that's the electronic document, the 2x4 tiles, and I'm

23  gonna have him run through again the -- the claim

24  language and see whether you agree with it or not,

25  okay?

Confidential Attorneys' Eyes Only Outside Counsel

Page 313

1    So assuming the -- the -- the electronic

2 document is 2x4 tiles, and if we start on the left

3 portion, I want you to assume for me that that's a

4 first portion of the electronic document; understand?

5    A    So these four tiles of the eight tiles is the

6 first portion.

7    Q    Right.

8    A    Okay.

9         MR. MONACH:  Same objection as --

10         MR. JOHNSON:  Then if --

11         MR. MONACH:  -- previously stated, and

12 further objection, assumes facts not in evidence.

13         MR. JOHNSON:  So we display a first portion

14 of an electronic document.  He's detected a movement

15 of an object on or near the touchscreen display.

16    Q    Now, the next limitation, which is Claim 3 --

17 sorry -- limitation No. 3 in Claim 1, when he scrolls

18 left, does that meet the third limitation in Claim 1?

19         MR. MONACH:  Same objection.

20         THE WITNESS:  So when he scrolled left there,

21 I would say, given your assumption that you've asked

22 me to take, I have not determined whether that's an

23 electronic document or not.

24         Given that hypothetical, he is moving to the

25 left, I would again, as I said earlier in the earlier

Confidential Attorneys' Eyes Only Outside Counsel

Page 314

1  round of answers and questions, the blue circle there

2  that appears to be part of the document initially is

3  not moving, so the translation of the document seems

4  to be partial in this case or when the blue stuff is

5  not moving in a -- and a lighter blue happened to move

6  instead.

7           Given those difficulties or qualifications to

8  the movement there, I would say, apart from that,

9  it -- it does appear to display a second portion that

10 is different from the first portion.

11          MR. JOHNSON:  Q.  And when he scrolls left

12 beyond the edge, does it meet the fourth limitation?

13          MR. MONACH:  Same objection, and now it

14 assumes facts not in evidence.

15          THE WITNESS:  I have not seen the edge of a

16 document being reached while translating.  So you told

17 me the document was the eight -- eight-item grid.

18          MR. JOHNSON:  Right.

19          THE WITNESS:  I have not seen the edge being

20 reached.

21          MR. JOHNSON:  Q.  Now the edge is reached;

22 right?

23          THE WITNESS:  Can you --

24          MR. MONACH:  Same objection.

25          THE WITNESS:  Can you show me that again?

Confidential Attorneys' Eyes Only Outside Counsel

1      So you're talking about that edge is reached?

2  Which edge?  I've lost track of where we are on the

3  document.  They all look -- the tiles all look the

4  same.

5      MR. JOHNSON:  I was trying to keep him quiet,

6  so you weren't having two people ask you the

7  questions, but, okay.

8      MR. LIEN:  Reboot.

9      MR. JOHNSON:  Yeah.  Get the other one.  Let

10  me ask about the other one.

11      MR. LIEN:  It's good.

12      MR. JOHNSON:  Okay.  So let's -- let's go

13  back to what we were looking at.

14     Q   So assume for me that the -- the --

15     A   One of the problems I'm having here is you

16  tilt it over that way for the camera, and maybe we can

17  both sit in a different way so I can see this

18  properly.  Okay.  That's better for me.

19      MR. JOHNSON:  What if you go that way a

20  little bit, and then let him zoom in, and then --

21      MR. LIEN:  Okay.

22      THE WITNESS:  That's better, yes, thank you.

23      MR. JOHNSON:  Q.  You're the one that

24  matters.

25     A   But you need to get it on camera too; right?

Confidential Attorneys' Eyes Only Outside Counsel

Page 316

1    Okay.  So where are we now?  We -- is this
2  the first two tiles of the eight-tile document?
3    Q    Right.
4    A    So there's four more tiles, kind of, out
5  here.
6    Q    That's right.
7    A    That's your representation.  Okay, given your
8  representation --
9    Q    It's like we zoom --
10   A    -- now that's the first movement?
11   Q    Right.
12   A    Okay.
13        MR. MONACH:  Same objection.
14        THE WITNESS:  Okay.  Now --
15        MR. JOHNSON:  Q.  That's the second portion?
16   A    This is the second portion, okay.  And now
17  that's the edge that you're saying we reach?
18   Q    Right, that's the edge.
19   A    So that's the end of the eight tiles; right?
20   Q    That's right.
21   A    Okay.
22   Q    And now we're scrolling beyond the edge, and
23  then when he lifts the object, it bounces back.
24   A    Can I ask you to do that again please, right
25  from the start, if you don't mind.  Okay.  Right.

Confidential Attorneys' Eyes Only Outside Counsel

Page 317

1    Okay.  Yes.

2            MR. MONACH:  Same objections.

3            MR. JOHNSON:  So --

4            MR. MONACH:  Assumes facts not in evidence,

5    as well.

6            MR. JOHNSON:  Q.  Would you agree that

7    Exhibit 114 meets the limitations of Claim 1 of

8    the '381 patent?

9            MR. MONACH:  Same objection.

10           THE WITNESS:  All elements of the claim?

11           MR. JOHNSON:  Yeah, under the scenario that

12   we just showed you.

13           THE WITNESS:  So, again, back to my earlier

14   answers, first of all, I haven't had a chance to study

15   this, the representation you had of the eight -- eight

16   tiles being one document as a whole, that's your

17   representation.  Given that hypothetical, I would also

18   say, as I said earlier, the blue circle in the middle,

19   which you represented the whole thing was a document,

20   that does not appear to move when you -- when you

21   translate the document.

22           So, as a result, I would say, given those

23   qualifications, the -- the entirety of these claims

24   are not met.  But if you assume, if those things are

25   not present, if the blue thing wasn't there, and

Confidential Attorneys' Eyes Only Outside Counsel

Page 318

1  the -- or it moved along with it as a document, it --

2  it appears to meet the claims.

3        MR. JOHNSON:  Q.  Well, which limitation is

4  not met in Claim 1 because of the presence of the blue

5  dot?

6        MR. MONACH:  Same objection.

7        THE WITNESS:  So, for example, claim --

8  sorry -- element three of Claim 1, it says "In

9  response to detecting the movement translating the

10  electronic document."  If the blue dot is part of the

11  electronic document, as I believe I was made to

12  understand in the hypothetical, that would -- part of

13  the document would have to translate it as not -- it's

14  not moving, that blue dot remains stationary through

15  all the reactions -- sorry -- all the intersections

16  that your colleague just did.

17        So Claim 3 -- sorry -- element three of

18  Claim 1.  Element four, again, the -- it says, "While

19  translating the electronic document in the first

20  direction," also would not be met, if the blue thing

21  as part of the document is not being translated.

22        Again, element seven has the same problem,

23  translating the electronic document, the blue portion,

24  only a part of the document is moving.  The entire

25  thing is not moving.

Confidential Attorneys' Eyes Only Outside Counsel

Page 319

1          MR. JOHNSON:  Okay.

2     Q    And what if the electronic document is

3 defined as -- as what you see on the screen or the 2x4

4 tiles without the blue dot?

5          MR. MONACH:  Same objection.

6          MR. JOHNSON:  Q.  Does your analysis change?

7          MR. MONACH:  Same objection; vague and

8 ambiguous, as well.

9          THE WITNESS:  I would have to think carefully

10 about that.  I haven't considered that in detail.  So

11 on the fly here, it may or may not.  I -- I would have

12 to reserve that --

13          MR. JOHNSON:  Q.  You don't know?

14     A    -- that detailed analysis until I've had a

15 chance to look at that.

16     Q    Okay.  Okay.

17          If you could look at the subsequent claims

18 that we've looked at earlier, 2, 3, 4, 5, 7, 9, 10,

19 13, 14, 16, and just tell me whether those limitations

20 are met by the 2x4 grid, as the electronic document

21 with -- in Exhibit 114.

22          MR. MONACH:  Same objections.

23          THE WITNESS:  So with regard to Claim 2, let

24 me quickly look at this again, first portion, second

25 portion.  So Claim 2 was with regard to the

Page 320

1  magnification.  Again, similar to the same answer I

2  gave -- to the answer I gave earlier when you went

3  over to Claim 2, I would have to determine for sure

4  whether that was indeed of the same magnification, but

5  if it is, then it would be met.  Again, given all the

6  caveats that I -- sorry -- all of the qualifications

7  that I just made with regards to Claim 1 not being

8  met, and Claim 1 is incorporated in Claim 2.

9      Claim 3 is -- the movement is on the

10  touchscreen display, but since it's incorporated in

11  Claim 1, if Claim 1 has -- is not met, for the reasons

12  I just gave you, then it would not be met.  But if

13  Claim 1 is met, Claim 3 would be met.

14  Q   How about Claim 4?

15  A   Claim 4 --

16      MR. MONACH:  Same objection.

17      THE WITNESS:  -- is the same.  I have the

18  same answer as Claim 3, really.

19      If Claim 1 is met, which, as I've said

20  earlier, it may or may not be met, the object could be

21  a finger, and your colleague has demonstrated that.

22  So I think that would be met, if Claim 1 is met.

23      What is the next claim?  Five?

24      MR. JOHNSON:  Five.

25      THE WITNESS:  Again, as in my previous

Confidential Attorneys' Eyes Only Outside Counsel

1  answers, Claim 5 is dependent on Claim 1, and given

2  all of the qualifications I've made with regards to

3  whether Claim 1 is met, if Claim 1 is met, then

4  Claim 5 would be met as the first direction, is one of

5  these three vertical, horizontal, or diagonal

6  directions.

7          MR. JOHNSON:  Q.  How about Claim 7?

8      A   Claim 7, I'm gonna give the same answer I

9  gave earlier when you went over this.  It's not clear

10  to me that -- whether that electronic document

11  consisting of, as you, yourself, said, 2x4 grid

12  of -- of images is whether that concatenation of

13  imagines is a digital image or not, or whether that's

14  eight different images or something else.  So I can't

15  say for sure until I've studied this in more detail.

16      Q   How about Claim 9?

17          MR. MONACH:  Same objection.

18          THE WITNESS:  Claim 9, I would have to look

19  at that very quickly again, just to see.  So this is

20  still part of the eight -- eight items, okay.

21          Claim 9, given the qualifications with

22  regards to Claim 1, and as I've said, Claim 1 may or

23  may not be met, depending on some of the issues there

24  that I've already discussed, and since Claim 9 is

25  dependent on Claim 1, if Claim 1 is met, then, in this

Confidential Attorneys' Eyes Only Outside Counsel

Page 322

1   example, if that is indeed the electronic document, it

2   appears that it has, at least in some -- some parts of

3   that document, has a list of documents that would be

4   met.

5           MR. JOHNSON:  Q.  How about Claim 10?

6           MR. MONACH:  Same objection.

7           THE WITNESS:  Claim 10, again, I would say it

8   depends on Claim 1, as is clear there, and given all

9   the qualifications I've made with regards to whether

10  Claim 1 is met, would apply here, and if Claim 1 is

11  met, there -- the second direction of movement could

12  be -- I mean, it's possible that it's often the first

13  direction.

14          MR. JOHNSON:  Q.  So it would be met?

15          MR. MONACH:  Same objection.

16          THE WITNESS:  It would be met if Claim 1 is

17  met with all my qualifications I've already discussed.

18          MR. JOHNSON:  Q.  How about Claim 13?

19          MR. MONACH:  Same objection.

20          THE WITNESS:  Claim 13, again, back to my

21  answer to the same question earlier with regards to

22  the smaller electronic document, I would say it

23  probably is not met, because the area beyond the edge

24  is -- seems to be much more compound than simply a

25  black, gray, solid color, or white, and also it

1   comprehends Claim 1, so Claim 1, I would give it all
2   of the same qualifications I did earlier.
3           MR. JOHNSON:  Q.  So a compound color beyond
4   the edge of the document would not meet Claim 13?
5           MR. MONACH:  Same objection; vague.
6           THE WITNESS:  A compound set of visuals, like
7   I'm seeing there, I would say it does not meet
8   Claim 13, because here it says black, gray, a solid
9   color, which I would read to mean one color or not a
10  variety of different colors appearing at the same
11  time, or white.
12          MR. JOHNSON:  Okay.
13      Q   How about Claim 14?
14          MR. MONACH:  Same objection.
15          THE WITNESS:  To the extent that the area
16  beyond the edge is some other content that one
17  could -- could determine to be visually distinct, it
18  would be met if Claim 1 is met, which it's not clear,
19  given all of the qualifications I've already -- I've
20  already --
21          MR. JOHNSON:  Q.  How about --
22      A   -- discussed in this deposition.
23      Q   Sorry.
24          How about Claim 16?
25          MR. MONACH:  Same objection.

Confidential Attorneys' Eyes Only Outside Counsel

Page 324

1       THE WITNESS:  Can you do that for me again,

2   please.

3       So Claim 16, again, it depends on Claim 1.

4   So to the extent that Claim 1 is or isn't met would --

5   would impact Claim 16, but the portion of Claim 16

6   that talks about the elastically attached, that --

7   that appears to be demonstrated in this application.

8   As to whether the whole claim is met would depend on

9   Claim 1, as I've discussed.

10      MR. JOHNSON:  Q.  Are the limitations in

11  Claim 19 met by Exhibit 114 running LaunchTiles on the

12  iPAQ?

13      MR. MONACH:  Same objection.

14      THE WITNESS:  I haven't had a chance to study

15  this in great detail, but given that it -- given the

16  functionality I've seen here with the same set of

17  qualifications I've already done with Claim 1, where

18  the language is repeated, just the instructions and

19  the number of the -- the one or more programs stored

20  and executed, that would have to -- that would be met,

21  but the -- the other portions that correspond to a

22  language in Claim 1 may or may not be met, depending

23  on my -- depending on the qualifications I just talked

24  about.

25      MR. JOHNSON:  Q.  And how about Claim 20?

Confidential Attorneys' Eyes Only Outside Counsel

Page 325

1    Would that be met by Exhibit 114?

2          MR. MONACH:  Same objection.

3          THE WITNESS:  Claim 20, again, similar to my

4    answer for Claim 19, it has all the language of

5    Claim 1, and that would have the same qualifications

6    that I've already discussed, or the portion about the

7    instructions being stored in a computer storage

8    medium, I think that would have to -- that would be

9    present on that device.

10         MR. JOHNSON:  Okay.  We need to take a quick

11   break to change the videotape.

12         MR. AHN:  Could we get a total time, too?

13         Thanks.

14         THE VIDEOGRAPHER:  This is the end of Disk

15   No. 4, Volume I.

16         We are off the record at 6:15 p.m.

17         (Recess taken.)

18         THE VIDEOGRAPHER:  This is the beginning of

19   Disk No. 5, Volume I.

20         We are back on the record at 6:25 p.m.

21         You may proceed.

22         MR. JOHNSON:  Q.  So I'd like for you to go

23   to Exhibit 14, the LaunchTile application, and

24   particularly the e-mail application.  When you click

25   on that, you'll see a list of names right on the

Confidential Attorneys' Eyes Only Outside Counsel

Page 326

1  left-hand side, and I'd like for you to assume that

2  that's the electronic document similar to what we

3  looked at in the Samsung devices, and I'm gonna ask

4  you:  Based on what Henry is doing here with respect

5  to LaunchTiles -- just move it forward, so the glare's

6  not -- just tilt it.  Tilt it forward.

7          Does the e-mail application of LaunchTiles on

8  Exhibit 114 meet the limitations of Claim 1?

9          MR. MONACH:  Objection; calls for a legal

10  conclusion; asks the witness to come up with a new

11  opinion unrelated to his declaration at the

12  deposition; incomplete hypothetical; vague and

13  ambiguous.

14          MR. JOHNSON:  So I'll have -- Henry, if you

15  can go through the first portion, second portion,

16  third portion, fourth portion.

17          THE WITNESS:  So where are you now?  You seem

18  to just be moving.

19          MR. LIEN:  So this is third portion right

20  here.

21          THE WITNESS:  Can -- can you go back?

22          What do you mean by first portion, second

23  portion?

24          MR. LIEN:  Yeah, so first portion, second

25  portion, third portion, fourth portion.

Confidential Attorneys' Eyes Only Outside Counsel

Page 327

1    THE WITNESS:  Can you do that again, please?

2    MR. LIEN:  So first portion, second portion,

3  third portion, fourth portion.

4    THE WITNESS:  Some other thing happened.

5    MR. JOHNSON:  Do it once more.  Try and tilt

6  it forward, Henry, because the glare is --

7    MR. LIEN:  Okay.

8    MR. JOHNSON:  Yeah, there you go.  Much

9  better.

10    MR. LIEN:  So first portion, second portion,

11  third portion, fourth portion.

12    THE WITNESS:  Okay.  So to the extent that

13  I'm seeing this for the first time, I haven't seen

14  that application at all before, so I'm -- I'm giving

15  this opinion on the fly here, I haven't considered it,

16  and it's not a detailed thing I've considered, so I'm

17  looking here.  It appears to meet the

18  computer-implemented method preamble.

19    It appears, giving your representation, that

20  that's a list, and it displays the first portion.  It

21  meets the first element.  To the extent that it

22  detects a movement, it may meet the second element.

23    With the third element, it appears to meet

24  that.  The fourth element, I do not see that being

25  met, because I'm not seeing an edge of the electronic

1  document being met.

2      MR. JOHNSON:  Q.  Look at the -- look at the

3  bottom where there's spacing there.

4    A    So he's saying Kathryn Thompson is the last

5  one.

6      MR. JOHNSON:  Right.

7      THE WITNESS:  Can you keep moving up?  Can

8  you go down?

9      MR. LIEN:  Which way?

10      THE WITNESS:  Do you mind if I try this

11  myself, because I'm having trouble looking at this.

12      MR. JOHNSON:  That's fine.  Yeah.

13      THE WITNESS:  Okay.  First portion.

14      So I would say the -- in response to the edge

15  being -- so coming here -- in response to the edge of

16  the document being reached while translating the first

17  direction, it displays an area beyond the edge of

18  document, if the document is a list.  It displays a

19  third portion that's smaller, so that meets element

20  six, but when I release my -- release the pen and

21  my -- or my finger, I would assume the finger works

22  the same way, it doesn't appear to -- it does not

23  appear to translate in the second direction until the

24  area beyond the edge of the electronic document is no

25  longer displayed.

Confidential Attorneys' Eyes Only Outside Counsel

Page 329

1        So I'm not getting element seven in this.

2        MR. JOHNSON:  Q.  But -- so it -- it has

3   elements one through six, but you have an issue with

4   element seven not being present --

5        MR. MONACH:  Same objection.

6        MR. JOHNSON:  Q.  -- is that right?

7        MR. MONACH:  Same objection; misstates the

8   prior testimony.

9        MR. JOHNSON:  I'm -- I'm just trying to

10  understand.

11       THE WITNESS:  So based on my very quick

12  first-time view of this, haven't studied it in detail,

13  repeating all the things I just said about this, very

14  quickly here I'm not getting element seven.

15       MR. JOHNSON:  Okay.

16       THE WITNESS:  It appears to meet elements one

17  to six, but I'm not getting element seven.

18       MR. JOHNSON:  Q.  So I think you may be

19  scrolling too far beyond the list.  So if you go back

20  to the list, and you get to the bottom, and you scroll

21  up so it displays the portion beyond the edge, and

22  then you release it.

23     A   I'm not getting it.  I've got past Kathryn,

24  with just one pixel, and it's not --

25       MR. LIEN:  Can I?

Confidential Attorneys' Eyes Only Outside Counsel

1          MR. JOHNSON:  Tilt it, Henry.  Yep.

2      Q    See that?

3      A    Keep going.

4      Q    Doesn't that meet claim limitation seven?

5          MR. MONACH:  Same -- same objection.

6          THE WITNESS:  I think I would have to study

7    that in detail.  It's not clear to me that I -- it

8    definitely meets the edge -- reaches the edge.  When I

9    know that I reached the edge because I've gone -- I've

10   already explored that list further, but just looking

11   at that and maybe there's something beyond that, I

12   don't know.  It's only when it goes much further that

13   it clearly tells me that I've reached the edge.  So,

14   again, I would caveat this by saying I have to study

15   this in detail --

16         MR. MONACH:  Sorry.

17         THE WITNESS:  -- before making that

18   determination.

19         MR. MONACH:  Sorry.

20         Mr. Videographer, are we at seven hours?  Two

21   minutes?  Okay.

22         MR. JOHNSON:  Okay.

23     Q    Can you tell me if this meets the limitations

24   of Claims 19 and 20?

25         MR. MONACH:  Same objection.

Confidential Attorneys' Eyes Only Outside Counsel

1    THE WITNESS:  So to the extent that if it

2  meets the elements of Claim 1, which I've just

3  discussed it may not, if it didn't meet Claim 1, then

4  a lot of the language in Claim 19 is not met or the

5  portion that talks about one or more programs with

6  instructions in Claim 19, that, I think, would be met.

7    MR. JOHNSON:  Q.  And what about Claim 20?

8    MR. MONACH:  Same objection.

9    THE WITNESS:  Same kind of answer with

10  Claim 20.  To the extent that the elements of Claim 20

11  that regard -- relate to Claim 1, they may not be met,

12  as I've just discussed with Claim 1, but the portion

13  about a readable storage medium having stored their

14  instructions, which executed that portion, would be

15  met.

16    MR. JOHNSON:  Q.  Is the -- what we've seen

17  in Exhibit 114, LaunchTiles with the iPAQ, the best

18  piece of prior art you've seen for the '381 patent

19  claims?

20    MR. MONACH:  Object to the form of the

21  question.  Objection; asking the witness to form a

22  legal conclusion with an incomplete hypothetical;

23  asking him to come up with a new opinion on the fly.

24    THE WITNESS:  So I don't think I can answer

25  with any degree of certainty, as I've discussed

Confidential Attorneys' Eyes Only Outside Counsel

Page 332

1  repeatedly during this deposition, I have not studied

2  all of the prior art in any detail.  I have not done

3  an invalidity or validity analysis, so it is certainly

4  one piece of prior art that I'm seeing in detail

5  today.  Whether -- how that compares to other pieces

6  of prior art, I would have to do that analysis.

7        MR. JOHNSON:  Q.  Is that better than the

8  prior art that was cited during the reexamination?

9        MR. MONACH:  Same objection; assumes facts

10  not in evidence that it's prior art.

11        THE WITNESS:  I -- as I said earlier, I

12  haven't studied the -- the -- the prior art that was

13  cited during the reexam in detail to form a validity

14  or invalidity detailed opinion, so I cannot make that

15  comparison right now.

16        I would also say that it's not clear to me

17  that this -- this application shown to me today is

18  actual prior art.  I know the paper is prior art, the

19  CHI 2005 paper.  The application itself, I -- I don't

20  know whether that's prior art or whether it was

21  written subsequent to the date of the patent.

22        MR. JOHNSON:  Q.  Based on the --  the prior

23  art that you've looked at --

24        MR. MONACH:  We're at seven hours -- we're --

25  we're done.

Confidential Attorneys' Eyes Only Outside Counsel

Page 333

1      MR. JOHNSON:  Are you leaving at this point?

2      MR. MONACH:  We're -- you've had your seven

3 hours.  This -- this deposition is over.  You had lots

4 of time to ask him about his opinions.  You've spent

5 hours and hours doing it, seven hours, including

6 repetitive questioning.  We told you we're -- we've

7 told you in advance that these are seven-hour

8 depositions.  We haven't agreed to a longer time.

9      MR. JOHNSON:  So are you --

10      MR. MONACH:  The deposition is over.

11      MR. JOHNSON:  So you're not gonna let me ask

12 any more questions?

13      MR. MONACH:  Correct.

14      MR. JOHNSON:  Okay.  Well, we're gonna keep

15 the deposition open, and I can't think of any part of

16 the deposition that should be designated confidential.

17 You know, at the very outset, you designated this

18 confidential, and it's putting us at great prejudice

19 in doing so, and you know that, and so I ask that you

20 right now dedesignate the transcript confidential, and

21 if you want to take the time to designate portions of

22 it confidential between now and tomorrow morning,

23 that's fine, but, you know, our opposition is due, and

24 there shouldn't be hardly any part of this transcript

25 that's designated confidential.

Confidential Attorneys' Eyes Only Outside Counsel

1    MR. MONACH:  Well, I disagree that you're at

2  any prejudice.  The interim protective order says what

3  it says.  You chose to ask him about ITC proceedings

4  and other parties' proceedings, for example, and

5  there's no requirement on us to do it overnight.

6    I mean, you can use the transcript or not use

7  it, as you see fit.  I'm not saying we're going to

8  designate or dedesignate after your filing date or

9  before your filing date.  Take it under advisement.

10    MR. JOHNSON:  Well, when can I get the

11  transcript dedesignated from you?

12    MR. MONACH:  I don't know the answer to that

13  question.  I'm not gonna make a commitment to you on

14  the record here today.

15    MR. JOHNSON:  How about -- how about -- how

16  about within two days?

17    MR. MONACH:  I just told you I'm not gonna --

18  I'm not gonna negotiate about it or make a commitment

19  to you on the record here.

20    MR. JOHNSON:  Well, that's just completely

21  unacceptable, so we'll have to take it up as we see

22  fit.

23    Thank you.  The deposition is still open from

24  our standpoint, and we'll go from there.  Thank you.

25    MR. MONACH:  All right.  From our -- from our

Confidential Attorneys' Eyes Only Outside Counsel

Page 335

1    perspective, no surprise, I suspect, the deposition is

2    over.

3            THE VIDEOGRAPHER:  This is the end of today's

4    deposition.

5            We are off the record at 6:37 p.m.

6            The master disk will be held by TSG.

7            (WHEREUPON, the deposition ended at

8             6:37 p.m.)

9                        ---oOo---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential Attorneys' Eyes Only Outside Counsel

Page 336

J U R A T

1

2

3          I, RAVIN BALAKRISHNAN, Ph.D., do hereby

4   certify under penalty of perjury that, I have read the

5   foregoing transcript of my deposition taken on

6   August 16, 2011; that I have made such corrections as

7   appear noted herein in ink, initialed by me; that my

8   testimony as contained herein, as corrected, is true

9   and correct.

10

11          DATED this _____ day of _____, 2011,

12   at _____.

13

14

15

16

17

18          _____

19              SIGNATURE OF WITNESS

20

21

22

23

24

25

Confidential Attorneys' Eyes Only Outside Counsel

Page  337

1                    CERTIFICATE OF REPORTER

2

3

4

5         I, ANDREA M. IGNACIO HOWARD, hereby certify

6    that the witness in the foregoing deposition was by me

7    duly sworn to tell the truth, the whole truth, and

8    nothing but the truth in the within-entitled cause;

9

10        That said deposition was taken in shorthand

11   by me, a Certified Shorthand Reporter of the State of

12   California, and was thereafter transcribed into

13   typewriting, and that the foregoing transcript

14   constitutes a full, true and correct report of said

15   deposition and of the proceedings which took place;

16

17        That I am a disinterested person to the said

18   action.

19

20        IN WITNESS WHEREOF, I have hereunto set my

21   hand this 17th day of August, 2011.

22

23   _____

24   ANDREA M. IGNACIO HOWARD, RPR, CCRR, CLR, CSR No. 9830

25

Confidential Attorneys' Eyes Only Outside Counsel

Page 338

1                    I N D E X

2

3    DEPOSITION OF RAVIN BALAKRISHNAN, Ph.D.

4

5    EXAMINATION                                    PAGE

6              MR. JOHNSON                           5

7

8                 E X H I B I T S

9

10   EXHIBIT                                        PAGE

11   Exhibit 96   Notice of Deposition of Ravin      6

12               Balakrishanan, Ph.D.; 3 pgs.

13   Exhibit 97   Samsung Galaxy S 4G Phone         46

14   Exhibit 98   Samsung Epic 4G Phone             49

15   Exhibit 99   Samsung Fascinate Phone           51

16   Exhibit 100  Samsung Galaxy Tab 7              54

17   Exhibit 101  Samsung Galaxy 10.1               58

18   Exhibit 102  Samsung Droid Charge              71

19   Exhibit 103  Samsung Infuse 4G Phone           71

20   Exhibit 104  Grid; 1 pg.                      158

21   Exhibit 105  Keeping It Real: Pushing the     194

22               Desktop Metaphor with Physics,

23               Piles and the Pen; 10 pgs.

24   ///

25   ///

Confidential Attorneys' Eyes Only Outside Counsel

Page 339

1                   E X H I B I T S   (Continued.)

2

3    EXHIBIT                                            PAGE

4    Exhibit 106   Patent US 2005/0195154 A1           214

5                  Robbins, Bates Nos.

6                  SAMNDCA00000357 - '402; 46 pgs.

7    Exhibit 107   Glimpse: A Novel Input Model        214

8                  for Multi-Level Devices,

9                  Bates Nos. SAMNDCA00000351 -

10                 '56; 6 pgs.

11   Exhibit 108   Patent US 6,690,387 BS,             219

12                 Zimmerman, Bates Nos.

13                 SAMNDCA00000403 - '409; 7 pgs.

14   Exhibit 109   Patent US 7,469,381 C1 Ording,      221

15                 Bates Nos. SAMNDCA00000030 -

16                 '350; 21 pgs.

17   Exhibit 110   Declaration of Ravin                224

18                 Balakrishnan, Ph.D., in support

19                 of Apple's Motion for a

20                 preliminary injunction; 30 pgs.

21   Exhibit 111   Patent 5,495,566, Kwatinetz,        240

22                 Bates Nos. SAMNDCA00001481 -

23                 '99; 19 pgs.

24   ///

25   ///

Confidential Attorneys' Eyes Only Outside Counsel

Page 340

1          E X H I B I T S  (Continued.)

2

3   EXHIBIT                                         PAGE

4   Exhibit 112  Patent US 2005/0012723 A1,        253

5               Pallakoff, Bates Nos.

6               SAMNDCA00001500 - '53; 54 pgs.

7   Exhibit 113  Patent US 8,469,381 B2 Ording,    253

8               Bates Nos.

9               APLNDC000106555 - '713; 159 pgs.

10  Exhibit 114  iPAQ phone with LaunchTiles       274

11  Exhibit 115  Copy of Patent                    291

12                     ---oOo---

13

14   NOTE** ALL EXHIBITS RETAINED BY QUINN ATTORNEYS

15

16                     ---oOo---

17

18

19

20

21

22

23

24

25

Confidential Attorneys' Eyes Only Outside Counsel

Page 341

1   NAME OF CASE: Apple Inc v. Samsung Electronics Company Limited

2   DATE OF DEPOSITION: 8/16/2011

3   NAME OF WITNESS: Dr. Ravin Balakrishnan

4   Reason Codes:

5       1.  To clarify the record.

6       2.  To conform to the facts.

7       3.  To correct transcription errors.

8   Page _____ Line _____ Reason _____

9   From _____ to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25                      _____