| | |
|---|---|
| HAROLD J. MCELHINNY (CA SBN 66781)<br>hmcelhinny@mofo.com<br>MICHAEL A. JACOBS (CA SBN 111664)<br>mjacobs@mofo.com<br>RICHARD S.J. HUNG (CA SBN 197425)<br>rhung@mofo.com<br>MORRISON & FOERSTER LLP<br>425 Market Street<br>San Francisco, California 94105-2482<br>Telephone: (415) 268-7000<br>Facsimile: (415) 268-7522 | WILLIAM F. LEE<br>william.lee@wilmerhale.com<br>WILMER CUTLER PICKERING<br>HALE AND DORR LLP<br>60 State Street<br>Boston, MA 02109<br>Telephone: (617) 526-6000<br>Facsimile: (617) 526-5000<br><br>MARK D. SELWYN (SBN 244180)<br>mark.selwyn@wilmerhale.com<br>WILMER CUTLER PICKERING<br>HALE AND DORR LLP<br>950 Page Mill Road<br>Palo Alto, California 94304<br>Telephone: (650) 858-6000<br>Facsimile: (650) 858-6100 |

Attorneys for Plaintiff and
Counterclaim-Defendant APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company.,<br><br>    Defendants. | Case No.   11-cv-01846-LHK<br><br>**APPLE'S REPLY CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT L.R. 4-5**<br><br>Claim Construction<br>Hearing:  Jan 20, 2012<br>Time:      10:00 a.m.<br>Place:     Courtroom 4, 5th Floor<br>Judge:    Honorable Lucy H. Koh |

# **TABLE OF CONTENTS**

**Page**

I. THE '002 PATENT – "THE FIRST WINDOW REGION…ETC." .................................1
II. THE '381 PATENT – "AN EDGE OF THE ELECTRONIC DOCUMENT" ...................3
III. THE '607 PATENT – "GLASS MEMBER" ..................................................................5
IV. THE '828 PATENT........................................................................................................6
    A. "fitting an ellipse" ...........................................................................................6
    B. "pixel / pixel groups" ....................................................................................10
V. THE '915 PATENT – "SCROLLING A WINDOW ASSOCIATED WITH AN EVENT OBJECT" ......................................................................................................10
VI. THE '891 PATENT......................................................................................................12
    A. "Starting a timer"...........................................................................................12
    B. "the first window has been displayed independently…etc." ................................13
VII. CONCLUSION ...........................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbott Labs. v. Sandoz, Inc.*,
566 F.3d 1282 (Fed. Cir. 2009) ............................................................................................... 8

*Alloc, Inc. v. ITC*,
342 F.3d 1361 (Fed. Cir. 2003) ............................................................................................... 9

*Gentry Gallery, Inc. v. Berkline Corp.*,
134 F.3d 1473 (Fed. Cir. 1998) .......................................................................................... 9, 10

*Helmsderfer v. Bobrick Washroop Equip., Inc.*,
527 F.3d 1379 (Fed. Cir. 2008) ............................................................................................... 8

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
452 F.3d 1312 (Fed. Cir. 2006) ............................................................................................... 8

*ImageCUBE LLC v. Boeing Co.*,
No. 2010-1265, 2011 U.S. App. LEXIS 12413 (Fed. Cir. June 20, 2011) ............................. 8

*In re Convertible Rowing Exerciser Patent Litig.*,
721 F. Supp. 596 (D. Del. 1989) ........................................................................................... 11

*Int'l Visual Corp. v. Crown Metal Co.*,
991 F.2d 768 (Fed. Cir. 1993) ................................................................................................. 4

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
424 F.3d 1324 (Fed. Cir. 2005) ............................................................................................... 8

*Linear Tech. Corp. v. Int'l Trade Comm'n*,
566 F.3d 1049 (Fed. Cir. 2009) ............................................................................................... 2

*Pfizer v. Teva Pharm.*,
429 F.3d 1364 (Fed. Cir. 2005) ...................................................................................... 11, 12

*TransWeb, LLC v. 3M Innovative Props. Co.*,
10-cv-4413, 2011 U.S. Dist. LEXIS 132153 (D.N.J. Nov. 16, 2011) ..................................... 7

**OTHER AUTHORITIES**

Northern District of California Patent Local Rule 4-3(b) ....................................................... passim

Far from adhering to well-established canons of claim construction, Samsung's arguments lack factual and legal support.  The Court should adopt Apple's proposed constructions.

## I. THE '002 PATENT – "THE FIRST WINDOW REGION…ETC."

As Samsung concedes in its opposition ("Opp."), its proposed construction would limit the '002 patent claims to one embodiment.  In particular, Samsung would restrict the claims to an embodiment in which a "first window region" displaying status or control information "always" appears in front of application windows.  But the specification also discloses that the control strip may, at the user's option, be hidden.  (Apple's Opening Claim Construction Brief Pursuant To Patent L.R. 4-5 ("Apple Opening Br.") at 4-5.)  Under general principles of claim construction, the independent claims – which do not expressly require Samsung's "always" – should cover this embodiment as well.  *See Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1059-60 (Fed. Cir. 2009) (error to limit claims to "directly" monitoring current where patent "not only discloses monitoring current *directly* . . . but also *indirectly* by some other means") (emphasis in original).  Samsung has no persuasive answer to this argument.

Samsung also offers no justification for reading the term "window layer" out of the claim or for adding the limitation that "independent display areas are never obscured by any portion of any application windows that are generated or capable of being generated."  Samsung's principal argument relies on a misconstruction of a single snippet from the prosecution history relating to the Hansen reference.[1]  According to Samsung, "Apple emphasized that the first window region in the '002 patent ***always*** appears on top of application programming windows."  (Opp. at 3, emphasis original.)  Samsung mischaracterizes Apple's statement.  What Apple actually said in its response was that the claimed invention "allows the user to have an unobstructed view of the system/controller area" and that "[t]hus, the window *may be* always visible to the user."  (Briggs Declaration in Support of Samsung's Opposition ("Briggs Decl.") Ex. C, at APLNDC00028084)

---

[1] Apple objects to and moves to strike (1) the portions of Samsung's opposition (p. 4 and n.3) referring to "O.A., 11/7/2001" and "Response to O.A., 8/20/1996" cited in Samsung's opposition as "Ex. C," but not actually included as part of Exhibit C; and (2) Exhibit D (Hansen reference), because they were not identified in the Joint Claim Construction Statement ("JCCS") in accordance with Patent Local Rule 4-3(b).

1  (emphasis added). Apple's argument that the window "may be" always visible (rather than "must
2  be" always visible) provides no support for Samsung's proposed construction since the user
3  optionally "may" hide the control strip.

4  Regardless, the Examiner did not allow the claims based on this response. Apple
5  appealed to the Board of Patent Appeals, and its Appeal Brief further refutes Samsung's argument.
6  In its August 31, 2000 Appeal Brief, Apple did not argue that the first window must "always"
7  appear on top of application windows. Rather, Apple explained that, "*[i]n one embodiment*, the
8  control strip is implemented in a private window layer that appears in front of the windows of all
9  the application layers . . . This prevents other windows from obscuring it." (Reply Declaration of
10  Deok Keun Matthew Ahn ("Ahn Reply Decl.") Ex. R at APLNC0028966) (emphasis added).
11  Apple thus underscored that the control strip's appearance in front of all application windows was
12  an optional, non-mandatory feature.

13  Apple also presented other arguments to distinguish the Hansen combination. (*See id*. at
14  APLNDC00028972; 28976; 28983.) Apple's appeal – and not its argument to the Examiner – led
15  to claim allowance. And at no point did Apple unequivocally disclaim embodiments in which the
16  "first window region" does not "always" appear in front of application windows.

17  Samsung also has no plausible response to Apple's claim differentiation argument.
18  (Apple Opening Br. at 5.) Dependent claim 12, for example, explicitly requires that the first
19  window region "*always* appears in front of application windows." (Emphasis added.) Samsung's
20  contention that the limitations of dependent claims 12 and 13 were incorporated into the
21  independent claims via amendment is simply inaccurate. (Opp. at 5.) Although Apple did amend
22  the independent claims to require "[a] first window region and the plurality of independent
23  display areas implemented in a window layer that appears on top of application programming
24  windows that may be generated," these amendments did not incorporate the limitations of
25  dependent claims 12 and 13. Those claims required that the first window region "*always* appears
26  in front of application windows" (claim 12, formerly claim 23) or be implemented in a private
27  window layer "that appears in front of windows for *all* applications layers" (claim 13, formerly
28  claim 24) (emphases added). Via its amendments, Apple preserved the distinction between the

1  independent claims, in which the "first window" appears in a window layer on top, and the
2  dependent claims, in which the first window "always" appears on top of "all" application
3  programs.

4  Finally, in a footnote, Samsung alleges that the inventor agreed with its claim
5  construction. This is both factually incorrect and legally irrelevant. In the cited deposition
6  excerpt, the inventor was addressing not claim construction, but a commercial embodiment of the
7  invention. In particular, the inventor explained that the "Control Strip" that he developed for
8  Apple's PowerBook computers "floated" in front of the application windows. In this way, if an
9  application created a window, it would appear behind the Control Strip. (Briggs Decl. Ex. B at
10 126:11-127:22.) Whether an early commercial implementation of the '002 patent implemented
11 every claimed embodiment is irrelevant to the claim construction inquiry. *See Int'l Visual Corp.*
12 *v. Crown Metal Co.*, 991 F.2d 768, 771-72 (Fed. Cir. 1993) (error to construe claims in
13 comparison with patentee's commercial embodiment).

14 **II.   THE '381 PATENT – "AN EDGE OF THE ELECTRONIC DOCUMENT"**

15 Samsung is mistaken that "[t]he parties' dispute concerns whether any content can exist
16 beyond 'an edge of the electronic document.'" (Opp. at 6.) The parties' disagreement actually
17 centers on whether "an edge of the electronic document" can arbitrarily be defined, as Samsung
18 proposes, to mean internal boundaries between different types of content within an electronic
19 document. This is in contrast with Apple's approach, which focuses on the actual "edge of the
20 electronic document" as those words would be understood by a person of ordinary skill. The
21 specification leaves no doubt that Apple's approach is the correct one.

22 As Apple explained in its opening brief, the specification describes exemplary
23 circumstances under which an area beyond the edge of the electronic document is displayed. In
24 one embodiment, the system determines whether the following condition is satisfied: "Is an edge
25 of the electronic document reached"? ('381 patent at 27:25-29; Fig. 7.) If this condition is
26 satisfied, the system then "[d]isplay[s] an area beyond the edge of the document." (*Id.*) The
27 execution of this if-then statement is depicted in Figure 8C, where the display of the black area
28 beyond the edge of the electronic document is contingent on the system's detection of an external

edge (in green) of the electronic document, and not by detection of the internal borders separating different types of content within the electronic document.




Fig. 7                                                                         Fig. 8C

Conversely, if the condition of reaching the external "edge" is not satisfied in this embodiment, then the system does not display an area beyond the edge of the electronic document. (*Id*.) This is consistent with the purpose of the invention, which is to provide visual feedback when a user attempts to scroll beyond the confines of an electronic document. As a matter of common sense, and as Samsung's own expert Andries Van Dam recognized, there is no need for the system to provide this visual feedback when a user is not at an actual edge of the electronic document, but is merely scrolling within the electronic document. (Apple Opening Br. at 8 (quoting Dr. Van Dam's testimony that edge indicates boundary separating electronic document from area that is "further than [the electronic document] should go").)

Although Samsung contends that "images within [a] webpage," such as Block 5 or Block 7 in Figure 8C, have "internal edges," it is clear that these internal demarcations separating different boxes of content within an electronic document are not themselves the "edge[s] of the electronic document" within which they are contained. In Figure 8C, display of the areas beyond the internal lines surrounding Block 5 or Block 7 does not depend on detecting a document "edge." The system does not respond to crossing those internal demarcation lines by displaying a black area beyond the internal boundary, and then translating the image on the screen in the

1  opposite direction.  Not only are the areas beyond what Samsung calls "internal boundaries"
2  displayed without satisfaction of any conditions, they are meant to be constantly present on screen
3  so long as the content is displayed.  This is in contrast to the dark area beyond the actual "edge"
4  of the electronic document, which appears briefly when the edge is crossed and then disappears
5  when the user's finger is removed from the screen.

6  Because areas beyond the "internal boundaries" under Samsung's construction are already
7  displayed regardless of the satisfaction of any edge-related conditions, it is clear that an internal
8  line that simply distinguishes "other content" is not "an edge of the electronic document" as
9  contemplated by the '381 patent.  Samsung's construction fails to account for the electronic
10 document edge-specific functionality disclosed in the patent, and must be rejected.

11 Abandoning its extrinsic evidence in the Joint Claim Construction Statement, and unable
12 to reconcile its expert's agreement with Apple, Samsung instead heavily relies on an exhibit used
13 during Dr. Balakrishnan's deposition.  Yet any suggestion that this exhibit demonstrates
14 Dr. Balakrishnan's agreement with Samsung's construction would be false.  This is because
15 Samsung's counsel expressly ***instructed*** Dr. Balakrishnan to label lines on a grid as an "edge"
16 and as "beyond the edge," and Dr. Balakrishnan merely did as he was told.  (*See* Ahn Reply Decl.
17 Ex. S at 157:9-15, 158:12-14 ("Q. So let's just label that 'edge' for me . . ."; "Q. So can you just
18 label that 'beyond the edge'?").)

19 The Court therefore should reject Samsung's unsupported construction and give this clear,
20 non-technical claim term its plain and ordinary meaning.

21 **III.    THE '607 PATENT – "GLASS MEMBER"**

22 Samsung concedes, as it must, that the '607 specification states that "any suitable glass or
23 plastic material may be used for the glass members."  ('607 patent at 16:46-47.)  Nonetheless,
24 Samsung apparently suggests that a "glass member" cannot be plastic because the specification
25 uses the words "glass" and "plastic" separately.[2]  (Opp. at 8.)  Samsung fails to note, however,

26

---

27 [2] Apple objects to and moves to strike Exhibits I (Huppi Dep. Tr.) and J (Strickon Dep.
Tr.) because they were not identified in the JCCS in accordance with Patent Local Rule 4-3(b).
28

1  that the specification uses the term "glass member" consistently throughout the specification, and
2  never recites "plastic member" at all.  Far from "mak[ing] a distinction between glass and plastic"
3  (Opp. at 8), the specification's consistent use of "glass member" shows that the specification's
4  definition should control.

5        Samsung contends that the specification does not adequately define the term "glass
6  member" – supposedly because it does not "set out with 'reasonable clarity, deliberateness, and
7  precision" the term's meaning.  (Opp. at 10.)  It is difficult to conceive of a more precise
8  definition of "glass member" than "any suitable glass or plastic material," and other courts have
9  concluded that analogous specification language constitutes a definition.  *See*, *e.g.*, *TransWeb,*
10 *LLC v. 3M Innovative Props. Co.*, 10-cv-4413, 2011 U.S. Dist. LEXIS 132153, at *10-17 (D.N.J.
11 Nov. 16, 2011) (where specification provides that charging can be accomplished using variety of
12 techniques including "hydrocharging, i.e., contacting an article with water in a manner sufficient
13 to impart a charge to the article, followed by drying the article," "[t]he specification sufficiently
14 demonstrates a clear intent that the patentee wished to act as his own lexicographer in defining
15 'hydrocharging,' and it is that definition that controls").

16 **IV.   THE '828 PATENT**

17     **A.   "fitting an ellipse"**

18       Samsung concedes that, as of the '828 patent's filing, "there were many different ways to
19 do ellipse fitting."  (Opp. at 11.)  Thus, there is no dispute that Samsung's proposed construction
20 – "applying a unitary transformation of the group covariance matrix of second moments" – differs
21 markedly from the plain and ordinary meaning of mathematically fitting an ellipse.  Samsung
22 fails to offer a persuasive justification for its limiting construction.

23       Samsung contends that the '828 inventors acted as their own lexicographer.  (Opp. at 12-
24 13.)  Samsung points to a sentence in the specification stating that in one of the preferred
25 embodiments, "the ellipse fitting procedure requires a unitary transformation of the group
26 covariance matrix," and relies on that language in its proposed construction.  But such a statement
27 does not constitute a definition of the term "mathematically fitting an ellipse," which appears only
28

in the claims. Indeed, as Apple noted in its opening brief (and Samsung ignores), the statement on which Samsung relies contrasts with this patent's many explicit definitions that "clearly express" the inventors' intent to define terms. (*See* Apple Opening Br. at 15:24-16:15; *Helmsderfer v. Bobrick Washroop Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008).)[3] Moreover, the statement is surrounded by none of the "this invention" or similar phrasing that sometimes supports reading in a limitation from the claims. *See, e.g.*, *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1317-19 (Fed. Cir. 2006) (construing claim limitation as "fuel filters" where specification referred to fuel filters as "this invention" and "the present invention"). Rather, the cited portion is merely an element in the patent's description of the particular embodiment disclosed in that section of the specification. Limiting the claim language to this embodiment would be a classic claim construction error. *See Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("this court will not limit broader claim language to [a single embodiment] unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restrictions") (internal quotation marks omitted); *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) (limiting claim to disclosed embodiments inappropriate "even when a specification describes very specific embodiments of the invention or even describes only a single embodiment, unless the specification makes clear that the patentee . . . intends for the claims and the embodiments in the specification to be strictly coextensive") (internal quotation marks omitted).

In addition, as Apple demonstrated in its opening brief, "applying a unitary transformation of the group covariance matrix of second moments" does not, in fact, fit an ellipse. It is a first step that can be taken *before* fitting an ellipse – something that Samsung does not dispute. (Apple Opening Br. at 15:1-13.) Samsung therefore asks the Court to hold that the inventors defined the

---

[3] Samsung relies on *ImageCUBE LLC v. Boeing Co.*, No. 2010-1265, 2011 U.S. App. LEXIS 12413 (Fed. Cir. June 20, 2011), as support for its position that the '828 inventors acted as their own lexicographer. In *ImageCUBE,* however, the court construed the phrase "components A and B" without ever holding that the inventor had acted as his own lexicographer. While citing several portions of the specification to support its construction, the *ImageCUBE* court never stated that the word "requires" signifies an intent to define a claim term.

1   phrase "mathematically fitting an ellipse" to mean something ("applying a unitary transformation

2   of the group covariance matrix of second moments") that *does not fit an ellipse*.

3         Nor could Samsung show that the inventors disclaimed the ordinary meaning of

4   mathematically fitting an ellipse. As explained in Apple's opening brief, disclaimer requires a

5   "clear intention to limit the claim scope," which is not present here. (*Id*. at 14-15.) Samsung

6   does not contend otherwise, thus conceding by its silence that no disclaimer is present.

7         Samsung cites to the prosecution history where the claim term "fitting an ellipse" was

8   amended to "mathematically fitting an ellipse." (Opp. at 13.) The prosecuting attorney made no

9   argument, however, that would support the much narrower construction that Samsung offers.

10   Indeed, as Apple explained in its opening brief, nothing in the prosecution history involved

11   distinguishing "mathematically fitting an ellipse" from any other type of fitting an ellipse. Nor is

12   there anything in the prosecution history regarding the "unitary transformation of the group

13   covariance matrix" definition. (Apple Opening Br. at 17-18.) For this reason, this case is entirely

14   unlike *Alloc, Inc. v. ITC*, 342 F.3d 1361 (Fed. Cir. 2003), on which Samsung relies. In *Alloc,* the

15   court construed the patent claims as requiring "play" in the joint because "the [patent] applicant

16   emphasized the criticality of play during prosecution" of the patent family. *Id.* at 1373. Samsung

17   has shown no such prosecution disclaimer here.

18         Finally, Samsung argues that this Court should find, under *Gentry Gallery, Inc. v.*

19   *Berkline Corp.*, 134 F.3d 1473 (Fed. Cir. 1998), that the claims must be limited to the particular

20   preferred embodiment for ellipse fitting shown in column 26. (Opp. at 14.) Samsung suggests

21   that, under *Gentry Gallery*, the disclosure of a single embodiment obligates the Court to limit the

22   claims to that embodiment. (Opp. at 14:5-6 ("The Federal Circuit has held that when a patent

23   discloses only one embodiment, it is proper to limit the claims to this single embodiment").)

24   Samsung misreads *Gentry Gallery*. In the portion of the decision on which Samsung relies, the

25   Federal Circuit did not construe the claims narrowly. Instead, the court held that, in the unusual

26   circumstances present there, claims that were broader than the disclosure were invalid under

27   section 112. 134 F.3d at 1480 (reversing decision that claims "were not shown to be invalid").

28   Under *Gentry Gallery*, the proper course is for this Court to construe the claims per their ordinary

meaning and entertain any invalidity challenges in due course. Apple is confident that the claims of the '828 are fully supported by its specification under *Gentry Gallery* and progeny.

In any event, Samsung errs in suggesting that there is only one ellipse fitting embodiment shown in the '828 patent. As explained in Apple's opening brief, the second preferred embodiment performs ellipse fitting because it computes "total group proximity size $G_z$," one of the specifically identified parameters that can define an ellipse. (Apple Opening Br. at 16-17.) Samsung contends that '828 patent inventor Wayne Westerman testified before the ITC that the second embodiment "is not an embodiment of ellipse fitting at all" (Opp. at 14:21-22),[4] but in the cited testimony Dr. Westerman offered nothing even close to such an opinion. In a portion of his ITC testimony that Samsung ignores, Dr. Westerman testified – just as Apple contends here – that the second preferred embodiment was a "way of fitting the ellipse parameters:"

> Q. Okay. And let's go back to column 27 [where the second preferred embodiment is disclosed] and the method that's described there. Is that an example of mathematically fitting an ellipse?
>
> [objection of counsel]
>
> JUDGE ESSEX: Why don't you tell me what that discloses, Doctor?
>
> THE WITNESS: Yes, I believe it is an alternate way of fitting the ellipse parameters.

(Ahn Reply Decl. Ex. T at 339-40; *see also id*. at 288-353 (all of Dr. Westerman's ITC hearing testimony regarding ellipse fitting, provided for completeness).) Samsung also fails to address ITC testimony from Dr. Balakrishnan confirming that the second embodiment constitutes ellipse fitting. (Ahn Reply Decl. Ex. U at APLNDC0001229687-688 ("At column 27 lines 1 through 8, the '828 Patent specification further describes another embodiment . . . this embodiment still mathematically defines an ellipse").) As a result, limiting the claims as Samsung proposes would

---

[4] Apple objects to and moves to strike (1) the portions of Exhibit L referred to on page 13 of Samsung's opposition as "App. No. 11/677,958, 2/22/2007" and "O.A. 12/24/2009"; (2) Exhibit M (Westerman Dep. Tr.); (3) Exhibit N (Westerman ITC testimony); and (4) Exhibit O (ITC Staff brief),.as these were not specifically identified in the JCCS. Samsung's purported reservation of its right to cite to anything from that ITC investigation does not satisfy Patent Local Rule 4-3(b).

read out a preferred embodiment, which "is rarely, if ever, correct." *Pfizer v. Teva Pharm.*, 429 F.3d 1364, 1374 (Fed. Cir. 2005).[5]

### B. "pixel / pixel groups"

Samsung's brief acknowledges that the '828 patent describes how to generate a "proximity image [which] shows where the hand is touching or close to the touch-sensitive surface," and that "[t]he proximity image consists of *pixels*." (Opp. at 11 (emphasis added).) At no point does the specification use the term "pixel" to refer to anything other than a part of the proximity image. Samsung nonetheless suggests that the term should not be construed at all, apparently in an attempt to argue that the term encompasses (or even is limited to) a "picture element" in a TV or camera. Samsung offers no reason for the Court to deviate from the meaning of the term "pixel" in the '828 patent to refer to the portion of a proximity image that indicates the proximity data measured at one electrode.

### V. THE '915 PATENT – "SCROLLING A WINDOW ASSOCIATED WITH AN EVENT OBJECT"

Samsung's confusing proposed construction for "scrolling a window having a view . . ." is plainly wrong and violates several canons of claim construction. Samsung begins by noting that the '915 specification describes a "window" as a "display region" that "may be the entire display region or area of a display" and a "view" as content such as "web, text, or image content" that can be seen on the display. (Opp. at 17.) Following this non-controversial opening, Samsung

---

[5] Samsung emphasizes that in the ITC proceeding against Motorola, the ITC staff recommended that the ALJ reject Apple's proposed construction of "mathematically fitting an ellipse" and chastises Apple for not noting this in its opening brief. (Opp. at 15). Given that ITC <u>determinations</u> have limited, if any, precedential value, *see, e.g., In re Convertible Rowing Exerciser Patent Litig.*, 721 F. Supp. 596, 604 (D. Del. 1989), Samsung's reliance on the ITC staff's <u>brief</u> is misplaced. The ITC staff erred for the same reasons Samsung errs, by incorporating a limitation from one of the patent's preferred embodiments into the claim. Apple notes, moreover, that the ITC staff agreed with Apple's constructions of "glass member" in the '607 patent and of terms relating to "pixels" and "proximity images" in the '828 patent (the term "pixel group" was not in dispute, as all parties in that action acknowledged that "pixels" in the '828 patent related to proximity images). As noted above, Samsung's selective submission of a portion of the ITC staff's brief on only one term (Ex. O) should be stricken. If Ex. O is not stricken, the staff's positions on "glass member" and on terms relating to "pixels" and "proximity images" should be part of the record. (*See* Ahn Decl. Ex. V at APLNDC-X0000006667-6669; 6709-6710.)

1  conjures three paragraphs of non-sequiturs. In these paragraphs, Samsung contends – without
2  citing to any intrinsic or extrinsic evidence – that: (i) "scrolling a window having a view" in the
3  claims is limited to a "very specific type of scrolling" in which "a finger swipe to the right results
4  in the next-rightmost portion of the content to appear under the window"; and (ii) the claim
5  language allegedly "explicitly excludes" and "do[es] not cover the situation where a finger swipe
6  that is horizontal to the right results in the next-leftmost portion of the content to appear under the
7  window . . ." (Opp. at 18.)

8  Samsung's proposed construction contradicts the preferred embodiments in the patent,
9  which describe *exactly* the type of scrolling that Samsung contends is excluded by the claim
10 language. In particular, the specification describes the appearance of additional content opposite
11 the direction of a finger swipe, such that the content appears to be scrolling within a fixed
12 window. For example, Figures 4 through 6D of the '915 patent depict vertical scrolling in which
13 a swipe in the downward direction causes additional entries at the top of a list to appear.[6] It is an
14 elementary principle of claim construction that a construction that excludes a preferred
15 embodiment is rarely, if ever, correct. *Pfizer*, 429 F.3d at 1374.

16 The specification further contradicts Samsung's argument that scrolling "a window having
17 a view" must reveal additional content only in the direction of the scrolling gesture. The patent
18 describes "rubberbanding" and "bounce" scrolling in which scrolling directions and the display of
19 content reverses during a scrolling operation, as well as "locked scrolling" in which the direction
20 of the swipe does not precisely match the direction of a swipe gesture. (Apple Opening Br. at
21 21.) Although Samsung asserts in a footnote that it did not "intend to make any statement
22 concerning the minutiae of the directionality of a scroll" with respect to nearly horizontal finger
23 swipes (Opp. at n.11), Samsung does not explain how its proposed construction can be squared
24 with "locked scrolling," "rubberbanding," and "bounce" scrolling.

25

---

26

27  [6] Samsung's example employs a horizontal swipe, rather than a vertical swipe. Samsung asserts that a horizontal swipe to the right would cause content to the right to appear. Under Samsung's logic, a downward swipe thus should cause content at the bottom of a list to appear.
28

1   The '915 patent also explicitly states that, "while embodiment 400 illustrates movement 414 in a particular direction, in other embodiments movement of the displayed objects may be in response to movement 414 in one or more other directions." ('915 patent at 8:20-23.) Finally, as Apple noted in its opening brief, the specification further describes "scrolling" as "the act of sliding a directional (*e.g.*, horizontal or vertical) presentation of content, such as text, drawings, or images, across a screen or display window." ('915 patent at 1:39-41.) That description of scrolling includes sliding content to the right with a swipe to the right to cause additional content to appear in the left edge of the window. Samsung ignores all of the embodiments disclosed in the patent that contradict its proposed construction, and fails to cite a single line in the specification or in the prosecution history to support its position.

## VI.  THE '891 PATENT

### A.  "Starting a timer"

Samsung suggests that Imran Chaudhri, one of the inventors of the '891 patent, testified that having a timer that counts down to zero was the only possible way of implementing a timer.[7] (Opp. at 21.) Samsung's truncated quotation excludes Mr. Chaudhri's prefatory statement that he was "taking you back to my earlier example . . ." (Apple Opening Br. at 24:4-9.) The full context for Mr. Chaudhri's testimony demonstrates he was offering merely one example of a timer in action, and in any case his testimony is not definitive evidence of the proper construction of this claim limitation. *See E-Pass Techs., Inc.*, 343 F.3d at 1370 n.5 (inventor testimony of limited probative value).

Samsung also relies on the operation of the Apple iPhone's Clock application to support its construction. Samsung fails to explain, however, how the application's 'timer' and 'stopwatch' functions reveal the appropriate meaning of "starting a timer" in the '891 patent. If anything, the existence of both count-down *and* count-up functionality in the same time-keeping application suggests that both methodologies are consistent with "starting a timer."

---

[7] Apple objects to and moves to strike (1) Exhibits T (description of iPhone Clock application), U and V (infringement contentions); and (2) Chaudhri deposition citation 70:22-71:2, as they were not identified in the JCCS in accordance with Patent Local Rule 4-3(b).

1    Finally, Samsung's reliance on exemplary claim charts in Apple's infringement
2 contentions is misplaced.  As Apple explained in its opening brief, the '891 patent contemplates
3 embodiments where, for example, "a predetermined amount of time" is counted, or "a time period
4 [is] calculated on the fly."  ('891 patent at 9:35-39.)  Dependent claim 23 requires that a
5 "condition is met," and Apple's exemplary reference to a determination of "whether or not an
6 amount of time has passed" is just that – an example of how that condition is met.  In view of the
7 many disclosed ways in which time can be counted in the context of the patent, this extrinsic
8 evidence hardly suggests that the expiration of a timer can occur only when a timer reaches zero,
9 as opposed to, for example, finally reaching a time period that is calculated on the fly.

10   Samsung's passing mention of intrinsic evidence fails to provide any support for the
11 portion of its construction requiring that the timekeeping process "begin[] at a predetermined
12 value."  As Apple noted in its opening brief, the '891 patent contemplates, among other
13 embodiments, "a time period calculated on the fly."  (*Id.*)  Because "a time period calculated on
14 the fly" is not "predetermined," Samsung's construction directly contradicts the specification on
15 this point and should be rejected.

16   Samsung also maintains that the claim term "expired" somehow means "reaching zero."
17 Yet every single citation to the specification in this section of Samsung's brief merely repeats the
18 claim language that a timer has "expired," and does not provide any support for the contention
19 that the timer must count down.  Samsung's reliance on common usage, such as "a parking
20 meter" that "expires when it reaches zero" is similarly misplaced.  (Opp. at 20.)  Anyone who has
21 purchased anything with an expiration date is well aware that "expired" does not necessarily
22 imply counting down to zero.

23   The Court should reject Samsung's argument and give this claim language the ordinary
24 meaning confirmed by the specification.

25   **B.   "the first window has been displayed independently…etc."**
26   Samsung's lengthy construction of this term suffers from several defects.  Among other
27 things, it (1) redefines the well-understood term "cursor" by improperly limiting it to "a mouse
28 pointer or a similar icon"; (2) erroneously requires that the cursor be "controlled by a mouse,

APPLE'S REPLY CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT L.R. 4-5     13
CASE NO. 11-CV-01846-LHK
sf-3087815

1  track ball, or touch pad" where no such requirement is present in the claims; and (3) improperly
2  requires that a cursor be "visible on the screen," where the claim merely requires that the first
3  window be displayed at a location independent of a cursor if a cursor is present. Samsung also
4  proposes, without explanation, to substitute the "movement" of a cursor for its "position."

5        At the outset, Samsung fails to show why the term "cursor" should be limited to a "mouse
6  pointer or similar icon." Leaving aside the ambiguity of what qualifies as a "similar icon" (or
7  why a text caret is not "similar" to a mouse pointer), Samsung bases its entire argument on the
8  "Aoki" reference. Samsung goes so far as to argue that "Aoki makes it clear that a cursor" has a
9  particular meaning.[8] (Opp. at 22.) Of course, the claims of the '891 patent are to be construed
10 based on the '891 specification, not the specification of a different patent application.

11       Not only does Aoki fail to provide a definition of the term "cursor," Apple's discussion of
12 Aoki during prosecution did not somehow re-define the term "cursor" in the '891 patent. Apple
13 overcame Aoki by noting that Aoki's pop-up windows appeared in different locations depending
14 on where the stylus made contact with the screen. This is plainly depicted in Figure 13 of the
15 Aoki reference. (*See* Briggs Decl. Ex. W.) Restated, Aoki disclosed a *location-dependent*
16 window, as opposed to the '891 patent's window that is displayed *independently*. This was the
17 reason why Apple's amendment (to require that ". . . the first window has been *displayed*
18 *independently* from a position of a cursor on the screen") overcame the Examiner's objection.
19 (Briggs Decl. Ex. X at APLNDC00028844 (emphasis added).) Samsung's contention that "this
20 amendment would not have overcome the Examiner's rejection" if "the cursor was merely a
21 blinking caret" (Opp. at 23) misses the mark.

22       Samsung also fails to show that the cursor must be controlled by a mouse, trackball, or
23 touchpad. Indeed, Samsung neglects to mention that the Examiner of the '891 patent application
24 stated that the term "cursor control device" included "a mouse, a joystick, a ***keyboard***, a touch
25 pad, a trackball" (Briggs Decl. Ex. X at APLNDC00028805 (emphasis added)), and that Apple

26
27       [8] Apple objects to and moves to strike Ex. X (12/4/2009 Office Action), as it was not identified in the JCCS in accordance with Patent Local Rule 4-3(b).
28

did not disagree. Accordingly, the intrinsic evidence makes clear that a person of ordinary skill in the art at the time of the invention would have understood that a keyboard constitutes a cursor control device, and Samsung's attempt to exclude it (as well as other devices such as a joystick) from its proposed construction must be rejected.

In addition, the '891 specification identifies, as "user input devices," a long list of items including "*e.g.*, a keyboard, mouse, track ball, touch pad, touch screen, joy stick, button, or others." ('891 patent at 2:45-46; 7:9-10; Figs. 1 and 14.) In view of the specification and prosecution history, it is clear that these "user input devices" also can be cursor control devices. That the specification does not repeat this full list of devices when discussing "cursor control devices" is irrelevant, as the listed devices are examples. (*See* '891 patent at 2:16-17 ("*e.g.*, a mouse, a track ball, or a touch pad") (emphasis added).)

Finally, Samsung insists that the patented method requires the use of a "visible" cursor despite the fact that none of the illustrative figures in the patent (Figs. 7-11, 16-21) depicts a cursor. Samsung again relies on Apple's arguments concerning Aoki, but they do not compel Samsung's narrow construction. As noted above, Aoki disclosed a system in which the location of a stylus pointer on a screen dictated the position and content of pop-up windows displayed on the screen. Apple explained this to the Examiner, and further remarked that Aoki failed to disclose all of the limitations of claim 1 (including the step of "displaying the first window independently of the position of a cursor on the screen") for this reason. (Briggs Decl. Ex. X at APLNDC00028844.) Apple's remarks do not require a cursor that is always visible on the screen. Instead, they mean what they say: that the window's display must be independent of the position of a cursor on the screen, which claim 1 requires and Aoki lacks.

## VII. CONCLUSION

For the foregoing reasons, Apple requests that the Court adopt its proposed constructions and reject Samsung's unsupported definitions.

Dated: December 29, 2011          MORRISON & FOERSTER LLP

By: */s/ Michael A. Jacobs*
MICHAEL A. JACOBS
Attorneys for Plaintiff APPLE Inc.