1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Charles K. Verhoeven (Bar No. 170151)
2     charlesverhoeven@quinnemanuel.com
   50 California Street, 22nd Floor
3  San Francisco, California 94111
   Telephone:    (415) 875-6600
4  Facsimile:    (415) 875-6700

5  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Kevin P.B. Johnson (Bar No. 177129)
6     kevinjohnson@quinnemanuel.com
     Victoria F. Maroulis (Bar No. 202603)
7     victoriamaroulis@quinnemanuel.com
   555 Twin Dolphin Drive, 5th Floor
8  Redwood Shores, California  94065-2139
   Telephone:    (650) 801-5000
9  Facsimile:    (650) 801-5100

10 QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Michael T. Zeller (Bar No. 196417)
11    michaelzeller@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
12 Los Angeles, California 90017
   Telephone:    (213) 443-3000
13 Facsimile:    (213) 443-3100

14 Attorneys for SAMSUNG ELECTRONICS CO.,
   LTD., SAMSUNG ELECTRONICS AMERICA,
15 INC. and SAMSUNG
   TELECOMMUNICATIONS AMERICA, LLC

16

17              UNITED STATES DISTRICT COURT

18       NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

19

20 APPLE INC., a California corporation,        CASE NO. 11-cv-01846-LHK

21              Plaintiff,                      **DECLARATION OF TODD M. BRIGGS
                                                IN SUPPORT OF SAMSUNG'S OPENING
22       vs.                                    CLAIM CONSTRUCTION BRIEF**

23 SAMSUNG ELECTRONICS CO., LTD., a             **Date: January 20, 2012**
   Korean business entity; SAMSUNG             **Time: 10:00 am**
24 ELECTRONICS AMERICA, INC., a New            **Place: Courtroom 8, 4th Floor**
   York corporation; SAMSUNG                   **Judge: Hon. Lucy H. Koh**
25 TELECOMMUNICATIONS AMERICA,
   LLC, a Delaware limited liability company,   **SUBMITTED UNDER SEAL**

26

27              Defendant.

28

1    I, Todd M. Briggs, declare as follows:

2    1.    I am an associate with the law firm of Quinn Emanuel Urquhart & Sullivan LLP

3    and counsel for defendants and counter-claimants Samsung Electronics Co. Ltd., Samsung

4    Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively,

5    "Samsung").  I submit this declaration in support of Samsung's Opening Claim Construction

6    Brief.  I am personally familiar with and knowledgeable about the facts stated in this declaration

7    and if called upon could and would testify competently as to the statements made herein.

8    1.    Attached hereto as **Exhibit A** is a true and correct copy of certain excerpts from the

9    Deposition of Hun-Kee Kim, Rough Transcript, dated November 30, 2011.

10    2.    Attached hereto as **Exhibit B** is a true and correct copy of SAMNDCA0013600, an

11    online article from Yonhap News describing the selection of SMP technology by the 3GPP

12    standards setting body.  Also attached is a certified translation from Korean to English.

13    3.    Attached hereto as **Exhibit C** is a true and correct copy of "Samsung Electronics'

14    Asynchronous IMT-2000 Technology Adopted as International Standard Specification,"

15    September 20, 2002, an online news article from iNews24.com.  Also attached is a certified

16    translation from Korean to English.

17    4.    Attached hereto as **Exhibit D** is a true and correct copy of certain excerpts from the

18    Deposition of Richard D. Gitlin, dated December 6, 2011.

19    5.    Attached hereto as **Exhibit E** is a true and correct copy of certain excerpts of

20    Gitlin, Hayes and Weinstein, DATA COMMUNICATIONS PRINCIPLES, Kluwer Academic/Plenum

21    Publishers (1992).

22    6.    Attached hereto as **Exhibit F** is a true and correct copy of certain excerpts from the

23    Deposition of Tony Givargis, dated December 6, 2011.

24    I hereby declare under penalty of perjury under the laws of the United States that the

25    foregoing is true and correct.

26

27

28

1

DATED: December 8, 2011          QUINN EMANUEL URQUHART &
                                 SULLIVAN, LLP

2

3
                                 By  /s/ Todd M. Briggs

4
                                    Todd M. Briggs
                                    Attorneys for Defendants/Counter-Claimants

5                                   SAMSUNG ELECTRONICS CO., LTD.,
                                    SAMSUNG ELECTRONICS AMERICA, INC.

6                                   and SAMSUNG TELECOMMUNICATIONS
                                    AMERICA, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-                                    Case No. 11-cv-01846-LHK

DECLARATION OF TODD M. BRIGGS IN SUPPORT OF SAMSUNG'S OPENING CLAIM CONSTRUCTION
BRIEF

**General Order 45 Attestation**

I, Victoria F. Maroulis, am the ECF user whose ID and password are being used to file this Declaration.  In compliance with General Order 45(X)(B), I hereby attest that Melissa N. Chan has concurred in this filing.

*/s/ Victoria Maroulis*

-4-                                   Case No. 11-cv-01846-LHK

DECLARATION OF TODD M. BRIGGS IN SUPPORT OF SAMSUNG'S OPENING CLAIM CONSTRUCTION BRIEF

# Exhibit A

4495085_1_11-30-11 Kim, Hun Kee - ROUGH.TXT

```
 1                    UNCERTIFIED ROUGH DRAFT
 2                          This draft is unedited and
 3   uncertified and may contain untranslated
 4   stenographic symbols, an occasional reporter's note,
 5   a misspelled proper name, and or nonsensical word
 6   combinations.  All such entries will be corrected on
 7   the final certified transcript, which will be
 8   delivered to you in accordance with our standard
 9   delivery terms.  Because of the need to correct
10   entries prior to certification, this draft is only
11   for the purpose of augmenting counsel's notes and
12   not for use in any court proceeding or for
13   distribution to any other parties.
14
15
16
17
18
19
20
21
22
23
24
25
```

                                                      6

                         (415) 357-4300

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

```
 1            THE VIDEOGRAPHER:  ))))))Here begins
```

4495085_1_11-30-11 Kim, Hun Kee - ROUGH.TXT

5          MR. BRIGGS:  In-house counsel.

6          THE VIDEOGRAPHER:  So Corey Anderson of

7 Merrill Corporation.

8          The court reporter, will you please swear

9 in the witness?

10          Will you please swear in the interpreters

11 first?

12                    JEESOO JUNG

13 being called as an interpreter, was first duly sworn

14 to translate English to Korean and Korean to English

15 the testimony of the following witness:

16               SUE MI JONES

17 being called as a check interpreter, was first duly

18 sworn to translate English to Korean and Korean to

19 English the testimony of the following witness:

20          HUN KEE KIM, Ph.D.

21 having been first duly sworn through the

22 English-Korean interpreter, testified as follows:

23          THE VIDEOGRAPHER:  Please begin.

24

25

                                                     8

                    (415) 357-4300

          HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

1                    EXAMINATION

2          BY MR. KOLOVOS:

3     Q.   Good morning, Dr. Kim.

4     A.   Good morning.

5     Q.   We were introduced earlier.  But for the

6 record, my name is Peter Kolovos, I am counsel for

7 Apple.  And I am -- thank you for coming here to be

4495085_1_11-30-11 Kim, Hun Kee - ROUGH.TXT
17    A.   I don't quite recall.

18         CHECK INTERPRETER:  I cannot recall that

19  at all.

20         BY MR. KOLOVOS:

21    Q.   Just to be clear, and I don't want to

22  know, I don't want to know what you did a couple

23  months ago.

24         But in your answer you said you submitted

25  some relevant documents to the IP team a few months

                                                      54

                    (415) 357-4300

         HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

 1  ago.  Was that work that was done helping the IP

 2  team with respect to this litigation with Apple?

 3    A.   I don't know whether it is related, but I

 4  was asked to provide materials, if any, that are

 5  related to this by the IP team.

 6    Q.   Okay.  My question is about anything you

 7  did in 2000 or 2001, or for that matter 2002.  Do

 8  you remember providing any documents to the IP team

 9  in connection with the patent application for the

10  '792 patent other than a patent application?

11    A.   As to that, I don't quite recall because

12  it was such a long time ago.

13    Q.   Okay.

14    A.   I don't recall.

15    Q.   For any of your patent applications that

16  you have been involved in, have you ever provided

17  research articles to the IP team?

18    A.   I'm not quite sure because it was a long

19  time ago.  But technical documents involving SMP

                    Page 45

4495085_1_11-30-11 Kim, Hun Kee - ROUGH.TXT

20    that were submitted to the 3GPP was -- were

21    provided, and I think there were some articles

22    related to SMP technology after the technology was

23    adopted by the 3GPP.

24           So I think, you know, they have those kind

25    of articles and that kind of information.

                                                           55

                    (415) 357-4300

         HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

1            CHECK INTERPRETER:  I'm not quite sure

2    because it was a long time ago.  But some technical

3    documents involving SMP that was submitted to the

4    3GPP likely provided to IP team and also was after

5    our SMP technology was adopted by 3GPP standard,

6    there were several articles in Korean major

7    newspapers.

8            So I can only think that they probably

9    have them.

10           THE WITNESS:  But I'm not quite sure

11   whether they kept those -- that kind of information

12   for a specific purpose or not.  I'm not quite sure.

13           BY MR. KOLOVOS:

14   Q.   Well, do you recall providing 3GPP

15   technical documents about SMP to the IP team?

16           MR. BRIGGS:  Objection, vague.

17           THE WITNESS:  As I mentioned earlier, a

18   few months ago I was asked to provide relevant

19   documents, so I provided them.

20           BY MR. KOLOVOS:

21   Q.   And my question is whether you provided

22   them to the IP team in 2000, 2001, or 2002, at the

                    Page 46

# Exhibit B



2002.03.20 (수) |

My Yonhapnews
오디오 뉴스
English News
기사제보
기사검색

오늘
연합시론
인사/부음/동정
인물검색
회원가입
커뮤니티
여론조사
독자토론
유머펀치
날씨
권역별
도시별
등산
낚시
비즈센터
와와스톡
신용정보조회
biz 컨설팅
연합biz뉴스

home › 정보/과학›정보통신/IT

삼성전자 IMT-2000 비동기기술 국제표준 채택

(서울=연합뉴스) 김범수기자= 삼성전자는 최근 세계 정보통신기술협회(TTA)주관으로 신라호텔에서 열린 3GPP(3세대 프로젝트그룹)회의에서 자체개발한 IMT-2000비동기 접속방식인 `SMP'기술이 국제 표준기술로 채택됐다고 20일 밝혔다.

삼성전자의 SMP(Symbol Mapping based on Priority)는 잡음에 의한 오차를 최소화해 고속 데이터 전송을 구현하는 기술이다.

삼성전자는 'IMT-2000기술의 표준화 과정에서 퀄컴, 노키아 등과 함께 선두그룹에 속하게 됐다'며 '차세대 이동통신 사업선점에 유리한 고지를 확보하게 됐다'고 설명했다.

bumsoo@yna.co.kr (끝)

2002/03/20 11:00 송고      ◀이전화면   프린트서비스

과학 Frontpage
과학일반,정책
정보통신,IT
대덕밸리
환경

Inte

My Yonhapnews | 오디오뉴스 | English News | 기사제보 | 기사검색 | 오늘 | 연합시론 | 인사/부음/동정 | 인물검색

[커뮤니티] 여론조사 독자토론 유머펀치  [날씨] 권역별 도시별 등산 낚시 해상  [건강] 한방 다이어트  [레저] 마라톤 골프 볼링  [시네마] 영화계소식 개봉영화 비디오  [웹자키] 음악마당 시네마클릭 뮤직에세이 오렌지사워 핫트렉스 그패그방송  [유직뱅크] 싱싱가요 팡팡팝 가사찾기 뮤직비디오  [취업] 인크루트  [책] Book&Book 베스트셀러 추천도서  [이벤트] 행사캘린더 경품잔치 복권집합  [교육] 유학 TEPS  [도우미] 슈퍼서치 원클릭 링크모음  [운세] 오늘의운세 운세상담  [비즈센터] 와와스톡 신용정보조회 Biz뉴스 Biz컨설팅 모바일뉴스

연합속보 · 금융증권 · 경제 · 정치 · 국제 · 정보과학 · 사회 · 지방 · 스포츠 · 월드컵 · 연예 · 문화 · 의료 · 라이프 · 북한

Copyright(c) 2001 YONHAP NEWS AGENCY
저작권 규약 | 사진검색 | 출판물판매 | 광고문의 | 회사소개 | webmaster

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY       SAMNDCA00146000

CERTIFICATION   OF TRANSLATION


I   certify that the Korean to English translation of the Korean internet newspaper article entitled *SAMNDCA00146000* is an accurate and complete rendering of the contents of the source document to the best of my knowledge and ability.  I further certify that I am a qualified professional translator familiar with both languages with more than ten years of experience in Korean to English translation of various legal, technical or business documents including a number of legal evidentiary documents submitted to various courts in the United States.


Date: December 6, 2011


_____

Alex N. Jo, Translator

**Samsung Electronics'IMT-2000 Asynchronous Technology Adopted as International Standard**

(Seoul = Associated Press) Reported by Bum Soo Kim = Samsung Electronics announced on March 20 that its 'SMP' technology, which is an IMT-2000 asynchronous connectivity mode developed in-house, was adopted as the international standard technology at the 3GPP (3rd Generation Project Group) meeting recently held by the International Telecommunication Technology Association (TTA) at Shilla Hotel.

Samsung Electronics' SMP (Symbol Mapping based on Priority) is a technology that minimizes error caused by noise. Thus enabling implementation of high-speed data transmission.

Samsung Electronics said, "In the course of IMT-2000 standardization process, we have emerged as a leader group company along with some other companies such as Qualcomm and Nokia, which enables us to preemptively secure an advantageous position in the next generation mobile communications business."

bumsoo@yna.co.kr    (The End)

Sent on March 20, 2002 11:00

# Exhibit C



e하루의 시작!

조이뉴스24 창간 7주년을 축하합니다!

SK broadband

아이뉴스24 홈 | 오피니언 | 프리미엄 | 정보센터 | 엠톡

연예·스포츠 | 게임 | 포토·TV | 스페셜

| 뉴스 홈 | IT정책 | 컴퓨팅 | 통신·미디어 | 과학 | 글로벌 | 디지털기기 | 기업 | 자동차 | 금융 | 유통 | 경제일반 | 정치 | 사회 | 문화 | 생활 |

▶ 전체보기 | 로그인·회원가입·RSS   [ 대명리조트 파격 1200만원대 회원권 한정분양 ]   통합검색 박신혜 [검색]

Home > 뉴스 > 통신    블로그코스트

[TOP 뉴스] 구글 맵스, 이제 건물 내부까지 알려준다   [AD] 대명리조트 파격 분양!

## 삼성전자의 비동기 IMT-2000 기술, 국제표준 규격으로 채택

2002.03.20일자 15:32 입력

[단독] "1번 충전에 15일 사용" 태양광 스마트폰 배터리 개발

기사보기   댓글보기(0)   글자 + - [인쇄] [스크랩] T w f C x ⚡

삼성전자의 'SMP(Symbol Mapping based on Priority)'기술이 곧 국제통신연맹(ITU)의 국제 표준 규격으로 정식 채택될 예정이다.

삼성전자는 지난주 신라호텔에서 세계 20여개국 400여명의 정보통신 기술 관계자가 참석한 가운데 정보통신기술협회(TTA) 주관으로 열린 '3세대 프로젝트그룹(3GPP)'회의에서 삼성전자의 'SMP'기술이 국제 IMT-2000 비동기식 기술규격 표준으로 최종 채택돼 국제 표준기술이 됐다고 20일 발표했다.

이번에 국제 표준이 된 삼성전자의 'SMP'기술은 잡음에 의한 오차를 최소화함으로써 고속 데이터 전송이 가능한 기술로, IMT-2000 비동기 방식의 핵심기술이다. 이동통신 시스템과 단말기간의 통화 및 데이터 전송시 잡음을 줄임으로써 통신 품질을 향상시킬 뿐 아니라 더 많은 가입자들이 동시에 사용할 수 있다는 것이다.

삼성전자 관계자는 "삼성의 SMP기술은 신뢰도가 각기 다른 정보비트간의 상관관계를 분석해 정보비트는 신뢰도가 높은 위치에 배열시키고 잉여비트는 상대적으로 신뢰도가 낮은 위치에 배열시키는 방법으로 데이터 패킷의 전송 오류를 줄이는 기능을 한다"고 밝혔다.

한편, 삼성은 IMT-2000표준화 과정에서 다수의 표준을 확보함으로써 퀄컴, 노키아 등과 함께 선두그룹의 위치에 올랐다.

삼성전자는 "국제 표준으로 채택된 기술력을 바탕으로 차세대 이동통신 사업에 유리한 고지를 확보하게 됐을 뿐 아니라 상당한 기술 수입효과도 거둘 수 있을 것으로 기대한다"고 설명했다.

윤휘종기자 hwiparam@inews24.com

**주요기사**
· S&P, 골드만삭스 등 세계 금융사 신용등급 강등
· 정몽구 회장, 자동차업계 '아시아 최고 CEO' 등극
· LG전자 TV 총괄 권희용 본부장 사장 승진

· 비그알엑스 국내출시 10억원 매출 달성
· 30 초 만에 입냄새 없애는 방법
· 여자들이 싫어하는 0순위

**관련기사**
· 3Great Event! HP의 Best Solution!  [광고]
· 대명리조트 파격 1200만원대 회원권 한정분양  [광고]
· 이성을 유혹하는 치명적인 향수 등장  [광고]

와이즈클릭 [AD]
선착순 최신형 스마트폰 무료증정 이벤..
겨울신상 50% SALE! 무집배송!
마누라 흥분시키는 정력화의 달인
명품가방/시계 80% ↓ 주문폭주on
44사이즈의 로망..폭풍감량확인!!

전문몰할인   男性확대수술   명품패션가방~



가장 많이 본 뉴스

IT | 시사 | 문화 | 연예 | 스포츠 |

· '맥가이버 칼' 빅토리녹스, 가방다리다
· 문화부-구글, 손잡고 한류 열풍 '키운다'
· 한제임 팬사인회, '어신 있다' 꽉
· 스티븐 호킹, 손가락 두개로 우주
· [Food Story]농심 '쌀국수 짬뽕'
· [위기의 행복]사랑 복잡하된 독사
· iCJD 감염 사례 국내 첫 발견…
· 내년 6월부터 백신 등에 '국가출처'
· '잠 때문에 못 자?'…수면 강박과
· '때써녀블하게, 보온성은 기본!'

블로그코스트 ⓘ










CERTIFICATION   OF TRANSLATION


I   certify that the Korean to English translation of the Korean internet newspaper article entitled ***news-inews24-com*** is an accurate and complete rendering of the contents of the source document to the best of my knowledge and ability.  I further certify that I am a qualified professional translator familiar with both languages with more than ten years of experience in Korean to English translation of various legal, technical or business documents including a number of legal evidentiary documents submitted to various courts in the United States.


Date: December 6, 2011


_____

      Alex N. Jo, Translator

## Samsung Electronics' Asynchronous IMT-2000 Technology Adopted as International Standard Specification

Entered at15:32, September 20, 2002

**[Exclusive] Developed a solar power Smartphone battery that "lasts 15 days with 1-time charge"**

Soon, Samsung Electronics'SMP (Symbol Mapping based on Priority) technology is slated to be formally adopted as an international standard specification of the International Telecommunication Union (ITU).

The Telecommunications Technology Association (TTA) held a '3rd Generation Project Group (3GPP)' meeting at Shilla Hotel last week with about 400 attendees in the field of information communications technology from 20 or so countries. Samsung Electronics announced on March 20 that its own 'SMP' technology became an international standard technology after it was finally selected as a standard specification for the IMT-2000 asynchronous technology at the meeting.

Samsung Electronics''SMP' technology which just became the international standard is the technology that minimizes error caused by noise, thus enabling a high-speed data transmission. It is the core asynchronous technology in the IMT-2000. This technology improves communication quality by reducing noise during a telephone call between a mobile communications system and a user terminal as well as during data transmission, and also supports a greater number of concurrent users.

A person affiliated with Samsung Electronics says, "Samsung's SMP technology analyzes the correlation among the information bits with different degrees of reliability, thus arraying "information bits" in a position of higher reliability, and arraying "excess bits" in a position of lower reliability. This method plays a role of reducing data packet transmission error."

Meanwhile, with its numerous technologies adopted as standards in the course of IMT-2000 standardization, Samsung emerged as one of the leading [standards] companies along with some other companies such as Qualcomm and Nokia.

Samsung Electronics said, "We came to secure an advantageous position in the next generation mobile communications business based on our technological prowess selected as international standards. Also, we expect to gain considerable income associated with our technologies."

Reported by Hwi Jong Yoon hwiparam@inews24.com

# Exhibit D

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
2                       SAN JOSE DIVISION

3

    APPLE INC., a California
4   corporation,

5            Plaintiff,
                                      Case No.:
6   vs.                               11-cv-01846-LHK

7   SAMSUNG ELECTRONICS CO., LTD., a
    Korean business entity; SAMSUNG
8   ELECTRONICS AMERICA, INC., a
    New York corporation; SAMSUNG
9   TELECOMMUNICATIONS AMERICA, LLC,
    a Delaware limited liability
10  company,

11           Defendants.
    _____/
12

13

       VIDEOTAPED DEPOSITION OF RICHARD D. GITLIN, Sc.D.
14

          Taken on Behalf of the Defendants
15

16

       DATE TAKEN:        Tuesday, December 6, 2011
17

       TIME:              9:06 a.m. - 3:26 p.m.
18

       PLACE:             Embassy Suites Downtown Tampa
19                        513 South Florida Avenue
                          Tampa, Florida
20

21

22

23  Stenographically Reported by:
    Donna L. Peterson
24  Registered Diplomate Reporter
    Certified Realtime Reporter
25  JOB NO: 44339

1    APPEARANCES:

2

3    Counsel for Plaintiff:

4        PETER J. KOLOVOS, ESQUIRE
         WilmerHale
5        60 State Street
         Boston, Massachusetts   02109
6

7    Counsel for Defendants:

8        TODD M. BRIGGS, ESQUIRE
         Quinn Emanuel Urquhart & Sullivan
9        555 Twin Dolphin Drive
         Redwood Shores, California   94065
10

11   Also Present:

12       Thomas Hallahan, videographer

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     P R O C E E D I N G S

2            THE VIDEOGRAPHER:  Good morning, ladies and

3      gentlemen.  Today's date is Tuesday, December the

4      6th, 2011.  The time is approximately 9:06 a.m.  My

5      name is Thomas Hallahan; I'm the videographer.  The

6      court reporter is Donna Peterson.

7            We are present at the Embassy Suites, 513 South

8      Florida Avenue, Tampa, Florida.  We're here for

9      the purpose of taking the deposition of

10     Dr. Richard D. Gitlin.  The case is instituted in

11     the United States District Court, Northern District

12     of California, San Jose Division, case entitled

13     Apple Incorporated versus Samsung Electronics

14     Company, Limited, et al.

15           I will now ask the attorneys to introduce

16     themselves, starting with the noticing attorney.

17           MR. BRIGGS:  Todd Briggs from Quinn Emanuel for

18     Samsung.

19           MR. KOLOVOS:  Peter Kolovos of Wilmer Cutler

20     Pickler Hale and Dorr for Apple.

21           THE VIDEOGRAPHER:  Would the court please swear

22     in the witness.

23           RICHARD D. GITLIN, Sc.D., called as a witness

24     by the Defendants, having been first duly sworn,

25     testified as follows:

1            THE WITNESS:  Yes, I do.

2                       DIRECT EXAMINATION

3    BY MR. BRIGGS:

4        Q.    Good morning, Dr. Gitlin.

5        A.    Good morning.

6        Q.    Can you state your name for the record?

7        A.    Richard Gitlin.

8        Q.    And where do you live?

9        A.    Just down the road in here, Tampa, 415 Knights

10   Run Avenue, Tampa.

11       Q.    Okay.  How long have you lived in Tampa?

12       A.    We've -- this is my fourth academic year.  We

13   also have a residence in New Jersey.

14       Q.    How long did you live in New Jersey?

15       A.    About 40 years.

16       Q.    How many times have you been deposed?

17       A.    As an expert or including as a fact witness?

18       Q.    How about both.

19       A.    Somewhere between 15 and 20.

20       Q.    How many times as an expert witness?

21       A.    This is probably about my 10th, 12th time.

22       Q.    When was the most recent deposition you had?

23       A.    I think this lady was handling my most recent

24   one.  That was in the spring of this year.

25       Q.    Okay.  And what case was that for?

1  respect to that HSDPA patent in the InterDigital versus

2  Samsung case?

3      A.   Similarly, that validity -- both sides, and

4  infringement.

5      Q.   So you wrote a report stating that or opining

6  that Samsung infringed that HSDPA patent?

7      A.   Yes.

8      Q.   And you also wrote a report opining that that

9  HSDA (sic) patent was valid?

10     A.   Yes.  There were, I mean, there were reports,

11 plural.  They were -- they went back and forth in this,

12 with supplementary reports and -- in that case.  And

13 then the cases were -- you know, the first case was

14 part -- was -- everything I did in the first case was

15 part of the second case.  So by the end, I think I had

16 seven or eight reports that I was the author of.

17     Q.   Do you -- do you remember the number of the

18 patent in that case, that you were working on?

19     A.   I -- I don't want to guess.  No.

20     Q.   Okay.

21     A.   I'm sure you could find it out.

22     Q.   What did the technology in that case -- or in

23 that patent involve, at a little bit lower level?

24     A.   It dealt with the control channel for HSDPA.

25          I can tell you a little more if you --

1    Q.    Yeah.

2    A.    It dealt with a -- the patent dealt with a

3    mechanism for signaling on the channel in a -- with a

4    minimum use of bits.  It was a clever way of doing this.

5    In fact now, when I teach my wireless course, I use that

6    as an example of a clever way to achieve a function.

7    Q.    Now, is HSDPA part of any standards?

8    A.    Yes.

9    Q.    What -- what standard or standards?

10   A.    Well, it's in the 3GPP family.

11   Q.    Okay.  Do you know if InterDigital believed

12   that that patent was essential to the 3GPP standard?

13        MR. KOLOVOS:  Objection.

14   A.    I believe that the -- that that -- that would

15   be a fair statement, yes.

16   Q.    So do you know what it means for a patent to be

17   essential to a standard?

18   A.    I think I have a rough understanding, not a

19   legal understanding, but a rough engineering

20   understanding, an expert witness understanding.

21   Q.    What's -- what's your understanding, you know,

22   as an expert witness?

23   A.    That to -- that to build a piece of equipment

24   that's compliant with the standard, you necessarily

25   infringe the patent.

Page 13

1      Q.   Now, in your expert report in that case, did
2    you take that position that this patent was essential to
3    the 3GPP standard?
4      A.   Yes.
5      Q.   Have you ever done any work for Samsung?
6      A.   No.
7      Q.   Other than this case, have you ever done any
8    work for Apple?
9      A.   No.
10      Q.   So this is the first time you've been retained
11    by Apple?
12      A.   Yes.
13      Q.   Has Apple retained you only in its lawsuit
14    against Samsung, or are you also working in other cases
15    Apple has?
16      A.   As far as I know, this is what I'm doing for
17    Apple.
18      Q.   Have you ever done any work for HTC?
19      A.   No.
20      Q.   Okay.  Have you ever done any work for
21    Motorola?
22      A.   No.
23      Q.   Okay.  Have you ever done any work for Google?
24      A.   No.
25      Q.   And you're not currently retained by Apple to

1    input bits from some source.  And the 120 is the channel

2    encoder.  Here it's a -- understood to be a turbo coder,

3    or encoder.  And it produces S bits, which are

4    systematic bits, and P bits are the parity bits.  And

5    the S bits are the actual input to the channel encoder,

6    the output of the CRC generator.

7            And the parity bits are generated by the shift

8    registers inside the turbo encoder, shift registers and

9    other elements.  And the rate matcher is a -- is a

10   device which will either puncture or eliminate bits or

11   repeat bits to match the output rate to the available

12   transmission capacity.

13           Bless you.

14           The -- so an interleaver is a common device in

15   wireless systems because wireless -- most codes are

16   designed to provide very good performance in random

17   channel areas that are come -- that come randomly.

18   Wireless systems have a different property.  They have

19   bursty errors.  And they have bursty errors because when

20   you're moving and you are in a fade, when you have,

21   let's say, a low received signal level.  So you're more

22   likely to make errors in a bunch, in a burst.

23           And so an interleaver is a clever device that,

24   for example -- it could be done many ways, but similar

25   to what's described in the patent.  You read bits into

1    a -- you think of a matrix.  You read bits into a row,

2    and you read -- and you read them alpha transmission in

3    a column.  So, for example, if you had a burst where a

4    whole column was errored, then viewed from the -- and it

5    in the first column, then at the receiver viewed from

6    the viewpoint of each row, you just have one bit in

7    error, and the code will be able to correct that.

8    That's the simple -- that's the very simple explanation.

9    The interleavers in -- in the patent are much more

10   sophisticated than that.

11        And then the -- and so the -- the notion of the

12   interleaver is that from the viewpoint of the receiver,

13   which is not shown in Figure 1 -- this is a

14   transmitter -- is you -- you turn the phenomenon of a

15   physically bursty error mechanism in a wireless channel

16   to a -- as processed by the receiver, independent errors

17   spread out over a long time.  So the errors tend to be

18   interleaved over time.

19        And so -- and the bit stream at the output of

20   element 140 goes into a modulator.  And I would call

21   that a mapper, bit mapper.  So that's -- in the three

22   levels of modulation I described, this would be --

23   that's the first one.  And I think that's a nonstandard

24   use of the term.  I'd -- I would say most people would

25   call that a symbol mapper or a mapper, bit-to-symbol

1    mapping.

2         And then the -- as I said, the controller is

3    getting information as to the state of the channel and

4    will adjust the level of encoding, let's say rate

5    one-half, rate three-quarters, and/or the modulation of

6    the symbols that you use, let's say a 16 QAM signal

7    constellation or a 64 QAM signal constellation,

8    depending upon the quality of the transmission channel.

9         Q.   In -- in box 150, I -- I believe you just

10   testified that a bit stream enters that box, which is

11   labeled "Modulator."

12        A.   Uh-huh.

13        Q.   What is the output of the modulator?

14        A.   So -- so the -- as it says in paragraph 28, the

15   modulator can be either QPSK symbol, an 8PSK symbol, a

16   16 QAM symbol, or a 64 QAM symbol.

17        Q.   So is that output, is that digital data, is it

18   a bit stream, or is it an analog signal?  What is it?

19             MR. KOLOVOS:  Objection.

20        A.   Each -- for example, if you're using choice

21   three, 16 QAM, 4 bits come in.  The output is a number.

22   It can be an X and Y number.  You can think of it as a

23   vector in the X and Y plane.  You can think of it as a

24   two couple.  It will have discrete values.  The typical

25   scaling labels will be, you choose, plus or minus 1,

1   plus or minus 3.  That could be volts, millivolts,

2   microvolts, depending upon the transmitter power.

3           So you asked before:  Is that digital?  I say

4   it's discrete valued.  There is the 16 discrete points.

5   You said one of those 16 discrete points.

6       Q.   Now, are those values you were just talking

7   about, are those used to modulate or alter a carrier

8   wave?

9       A.   If you recall my three levels of modulation,

10   you -- what's not -- it's not shown -- the rest of the

11   system is not shown here.  But typically what you would

12   do, you would take the -- let's take 16 QAM.  You would

13   take two of the bits, feed it to -- let's call it the

14   inphase rail, and two of the bits to the quadrature

15   rail.  Then you would use pulse amplitude modulation, my

16   second level of modulation, and you would -- so in that

17   16 QAM case, you would -- you would amplitude modulate a

18   pulse with either a level a plus 1, minus 1, plus 3,

19   minus 3.  And you amplitude modulate a pulse, and this

20   pulse will define the bandwidth of the signal.

21   Typically these pulses belong to a family called raised

22   cosine.

23           And so now what you've done -- and you do the

24   similar mechanism for the quadrature channel, and you

25   design what people in the art would call a "baseband

1    bits are segmented at the input to the modulator at

2    the -- let's say, if we look at case 16 QAM into 4 bit,

3    you group 4 bits at a time, and that produces a symbol.

4    That goes then to the second level of modulation, the

5    third level of modulation.  And you -- you -- generally

6    this goes on for -- you know, you're sending lots of

7    bits.  You may -- it depends upon a particular system,

8    and you're sending lots of bits, lots of symbols.

9        Q.   Okay.  So you said that the output of the

10   mapper is a modulated pattern?

11       A.   Yeah.  That's -- that's Apple's construction.

12   It's consistent with what's used in the -- as it says

13   in -- on page 12, fifty -- paragraph 56, the independent

14   claims 1 and 6 each recite the mapping, the collected

15   bits from the first interleaver and second

16   interleaver -- that's referring out to, I guess, not

17   Figure 1, but it's the same idea -- onto one modulation

18   symbol.  That's what the patent describes it.

19       Q.   So what is -- I'm trying to get an idea of what

20   this modulated pattern is that you're talking about that

21   is output from the mapper.

22            Is -- is this modulated pattern, are these --

23   is this a bit stream?

24       A.   It's -- for 16 QAM, you would -- you could --

25   it -- now, it depends upon implementation, how you're

1    going to implement it.  But you -- you -- functionally

2    or symbolically, you could think of it in the XY plane

3    or IQ plane as a vector or a point.  And that represents

4    one of the 16 discrete constellation points associated

5    with 16 QAM constellation.  That's what the output is.

6    And then you separately divide it, as I said, to get the

7    level -- level 2 pulse amplitude modulation, which then

8    leads to level 3 RF modulation.

9        Q.   So in the case of 16 QAM, if you're looking at

10   the constellation, would -- would you call one of the

11   points in the constellation a modulated pattern?

12       A.   That's -- well, that's a symbol.  Yeah.  That's

13   what -- that's what Apple's construction is, and a --

14   using the language of the pattern -- of the patent.  So

15   you -- you typically, in a laboratory, would have that

16   displayed.  And you -- you would see various -- if you'd

17   slow down time, you would see discretely points, one of

18   those 16 points being illuminated.  And that's a

19   modulated pattern or a mapped pattern of bits.

20           So the symbol is a mapped pattern of bits.  You

21   map 4 bits into this XY two-topper or vector.  That's

22   what a symbol is.

23       Q.   Okay.  So when you use the term "pattern,"

24   that's referring to the pattern of bits that are input

25   into the mapper?

1          A.    Yes.

2          Q.    Okay.  That's where I was getting confused.  I

3    didn't -- I didn't understand what "pattern" meant in

4    "modulated pattern."

5                So you're referring to, you know, in the case

6    of 16 QAM, the 4 bits that are coming into the mapper,

7    that would be the pattern that's modulated?

8          A.    That would be the bit pattern, yeah.

9          Q.    And so if a bit stream were going into a

10   mapper, the first 4 bits would map to -- would be a

11   pattern that maps to one symbol, the second 4 bits would

12   be a pattern that maps to another symbol?

13         A.    Well, it could be a very same symbol point.

14   You got 16 points.  If it's the same quartet of bits, it

15   would map to the same point.

16         Q.    Okay.  Well, let's assume they're all unique.

17         A.    Right.  They can only be unique -- after --

18   after 16, you got to hit the same spot.

19         Q.    But -- well, let's take an example where the

20   bit stream is 12 bits and you have four unique quartets.

21         A.    That's --

22         Q.    Or three, three unique quartets.

23         A.    Okay.

24         Q.    So the first pattern would map to one symbol,

25   the second pattern would map to a second symbol?

1        A.    Yeah.

2        Q.    And the third pattern would map to a third

3    symbol?

4        A.    Yeah.

5        Q.    Now, why in -- in Figure 1 do you believe that

6    the output is -- well, strike that.

7              Why do you believe in Figure 1 that the

8    modulator does not include the pulse amplitude

9    modulation or the RF modulation?

10       A.    I was just looking at the abstract of the

11   patent, but I'll -- I'll define the reference in the --

12   in the spec.

13             Well, if I look in column 2, I'm looking sort

14   of, you know, starting at around 40 and ending at 53.

15   You got to get down to the bottom.  The -- "in order to

16   adaptively select one of the modulation techniques

17   according to the radio department."

18             I mean, there's no discussion of my second

19   level of modulation.  There's no, as far as I can tell,

20   there's no pulse shaping involved.  There's certainly no

21   discussion of carrier frequency.  But the -- certainly,

22   since this is part of HSDPA, there is a standard.  One

23   could assume that.

24             So, I mean, I just -- that's all -- that's all

25   that I see in the patent, and that's all that's -- are

1   modulator 280, in Figure 3, it outputs a modulated

2   pattern?

3       A.   One of 16 QAM points.

4       Q.   Now, is the output of the modulator, is that

5   4 bits, or what -- what is the output?

6       A.   It's -- it's a four -- it's a symbol that is

7   one of the 16 points in the QAM, in the XY plane.

8       Q.   But for it to appear like that, it has to go

9   through the pulse -- the PAM and the RF modulation,

10  correct?

11      A.   No.  You take -- you take 4 bits.  You put it

12  into a lookup table, and it gives you a complex number

13  or an I and Q number.  And you can just put that -- you

14  can discuss that -- you can represent that in the signal

15  constellation in the IQ plane or the XY plane as a

16  signal point.  It's understood.  There's no figure of 16

17  QAM here, but.

18      Q.   Okay.  So going back to what a modulated

19  pattern is, in the case of 16 QAM, you would -- you

20  would say that a modulating -- a modulated pattern is

21  one of the points in the constellation?

22      A.   One of the 16 points.

23      Q.   One of the 16 points in the constellation.

24      A.   And there are various ways to represent that,

25  as a two-topple XY pair, X coordinate and Y coordinate,

1    or as a vector.

2         Q.   So would you agree that you could also call

3    that same point a "modulated signal"?

4         A.   No.

5         Q.   Why not?

6         A.    Okay.  To me -- and I see that Dr. Wessel uses

7    that term -- a signal in general has a notion of

8    bandwidth associated with it.  That symbol coming out is

9    a number.  Numbers don't have bandwidth.

10             Now, as he points to my textbook, when you --

11   when you start out pedagogically and you're teaching

12   students about statistical decision theory, you

13   generally start with, are you sending signal one or

14   signal two.  So you're sending, let's say, 1 bit, one

15   symbol, one signal.  So in that pedagogical case, you

16   can interchange the terms.

17             But in -- understanding of those skilled in the

18   art, a particular symbol as I'm talking about is a

19   number.  It could be a complex number, I and Q.  It's

20   just a number.  It doesn't -- you can't associate

21   that -- people wouldn't call that "signal."

22             So what would people call a signal?  People

23   would call a signal, after you have a sequence of these

24   symbols -- oh, let's say -- let's say -- let's say you

25   wanted to send, in a real signal, just one -- in a real

1    system, I want to get one symbol from me to you.  So I

2    take that one symbol.  I pulse amplitude modulate it.

3    Now it has a bandwidth.  And I put it in an RF carrier

4    and you receive it.  So I've sent one symbol, but the

5    signal is that composite where I can say it has --

6    exists for time and has a bandwidth.

7              A symbol is just a number.  But in actuality,

8    you send a plurality of such symbols in time, and the

9    composite is called a signal.

10        Q.   So I think you said something in your last

11   answer.  I thought you said a symbol is just a number?

12        A.   Yes, I think that's what I said, a complex

13   number.

14        Q.   Okay.

15        A.   Or an I and Q number, X and Y.  That's --

16   that's how someone of ordinary skill would interpret

17   that.

18        Q.   And what would that number represent?

19        A.   Well, it just -- in the language of the patent

20   in the more generally, if a 16 QAM, it would -- it would

21   have an association with 4 bits.  You -- you tell me

22   what symbol point, and I could tell you which 4 bits

23   you're -- depends if you're the transmitter or the

24   receiver -- what you're transmitting or what you believe

25   you received.  There's a one-to-one mapping.

1      Q.   Now, you would agree that your textbook and

2  other sources refer to symbols as signals?

3      A.   Under -- as I -- as I said in my testimony

4  which I just gave, that -- I believe the only time that

5  I did that in my book would be in a pedagogical sense

6  when you're sending one symbol.  So therefore -- and

7  it's pedagogical to teach students about statistical

8  decision theory, hypothesis testing, maximum likelihood

9  detection.  So you're sending one signal, and there it's

10  sending one symbol, and the terms are loosely used.

11      But no one of ordinary -- no one of skill in

12  the art would say, "I give you a symbol, a 16 QAM

13  symbol, a 64 -- a 64 QAM symbol," and say that's a

14  signal.  What's its bandwidth?  How long does it last?

15  I don't know.

16      Q.   In your -- in your book or any other references

17  outside of the patent that you've seen, have you ever

18  seen a symbol referred to as a modulated pattern?

19          MR. KOLOVOS:  Objection.

20      A.   The -- certainly I don't think I used that in

21  my book.  I don't recall seeing any references.  But

22  this is consistent with, as I said, the unusual use of

23  the term for element 280 as a modulator.  I think most

24  people would call that a mapper.  And if you use the

25  word "mapper," so that -- that would be a map pattern.

1    I think in my book I have the -- I did take a look.  I

2    use the word "pattern" for bit pattern.  And I'm sure I

3    used the word "mapper."

4            And it would be clear -- I mean -- you know,

5    and also in these books -- mine is a graduate-level text

6    when I was a faculty member.  When I retired from

7    Bell Labs in 2001, I taught at Columbia University for a

8    couple years.  So this was a Ph.D. level course.  They

9    still use my book.  Now it's 20 years old.  But, I mean,

10   it -- this were is Ph.D. students.  You didn't -- it

11   wasn't necessary to define the term.  You defined it

12   used in the context.

13   Q.   Have you ever seen in any extrinsic source or

14   any source outside of the patent the output of a mapper

15   being referred to as a modulated pattern?

16   A.   Again, mapper.  Well, if you -- if you have a

17   mapper, you would say it's the -- it's the output of the

18   mapper, you know.  You have -- that's -- and most

19   standards have, you know, a signal or mapping table.

20   Q.   Okay.  So I guess, in summary, you haven't seen

21   any -- anything in the patent or anything in any other

22   sources that describe a symbol as a modulated pattern?

23           MR. KOLOVOS:  Objection; asked and answered.

24   A.   Well, I disagree.  I mean, as I said, if you

25   look at Figure 3, the input is an input bit pattern, it

1  goes to a modulator.  So in plane English, that would be

2  a modulated pattern at the output.

3       I think that the claim construction is

4  informative more for "symbol" because that's the way

5  it's used in the patent.  In fact, if you didn't do it

6  that way, you might be confused when you -- you could be

7  confused when you read that term, because I would say,

8  to turn it around like you were suggesting but which I

9  disagreed with, that modulator could have all three

10  levels of modulation, but clearly it only has the first

11  level, and it uses it in an unconventional way.  So I

12  think it's wise that Apple use the language of the -- of

13  the patent to clarify "symbol."

14  Q.    Let me ask it one more time.

15       You have not seen anything, either in the

16  patent or in any other sources, textbooks, treatises,

17  papers, that describe a symbol as a modulated pattern,

18  correct?

19       MR. KOLOVOS:  Same objection.

20  A.    I -- sitting here today, I can't recall the

21  hundreds of thousands of papers that I've read, you

22  know.  We can put it into Google search.  I -- I haven't

23  done that in Google Scholar.  So I can't -- you know,

24  I'm not going to agree with you to that statement

25  because, you know, my memory is not that good.

1    Q.   But sitting here today, you can't identify the
2    use of "symbol" in any of these -- in any source where
3    "symbol" is defined as a modulated pattern?
4         MR. KOLOVOS:  Same objection.
5    Q.   Correct?
6    A.   In any extrinsic?  You know, I -- I -- I -- I
7    think that's -- you know, you're entitled to ask the
8    question.  And I'd say I -- I -- I don't remember.  I
9    can't instantly search all the papers, hundreds, if not
10   thousands, of papers in my 40-year career that I've
11   read, things that I've written, you know.
12        It's just simply that the use of the word for
13   element 280 modulator is, to me, nonstandard in mapping.
14   So, you know, it's a symbol.  A bit mapper would be
15   pretty common as to what you're doing.  You're mapping
16   bits into a symbol.  That's what that element 280 is
17   doing in this special way in conformance with SMP.
18   Q.   Okay.  Let me -- let me try one more time.
19        Sitting here today, you cannot identify any
20   source, any paper, treatise, book, anything that defines
21   a symbol as a modulated pattern; isn't that correct?
22        MR. KOLOVOS:  Objection.
23   A.   I -- I haven't tried to.  So, you know, if that
24   was an exercise that I was asked to do, I would go about
25   searching.  But I haven't attempted that.  So I'm not

1    going to say it doesn't exist, but I haven't attempted

2    to do that.

3        Q.   But you would agree to me -- with me that

4    sitting here today you cannot identify any book,

5    treatise, paper, any source outside of the patent itself

6    that defines "symbol" as a modulated pattern?

7            MR. KOLOVOS:  Objection.

8        A.   I'd just repeat my answer.  I -- I haven't

9    attempted to do that.  So you're asking me to sort of

10   reach a negative conclusion when I haven't attempted to

11   do the work.

12       Q.   So my question isn't -- it's not have you

13   attempted to do it.  I'm just saying that sitting here

14   today you haven't identified in your declaration, and

15   you can't identify -- sitting here, you can't identify

16   any paper, book, treatise, any source that defines

17   "symbol" as a modulated pattern, right?

18           MR. KOLOVOS:  Objection.

19       A.   I haven't been asked to do it, so I haven't

20   done it.  I haven't attempted to do it.  I don't know

21   the answer to the question.

22       Q.   Okay.  The next section --

23           MR. KOLOVOS:  You want to break for lunch

24       before we get to the next section?

25           MR. BRIGGS:  Sure.

1      THE VIDEOGRAPHER:  We're going off the video

2    record.  It's 12:35 p.m.

3         (Luncheon recess from 12:25 p.m. to 1:31 p.m.)

4      THE VIDEOGRAPHER:  We're on the video record.

5    It's 1:31 p.m.

6    BY MR. BRIGGS:

7      Q.   Dr. Gitlin, Apple's construction of "symbol"

8    has an interpretation of a modulated pattern in -- well,

9    strike that.

10         Apple's construction requires a symbol to be in

11   a sequence of such patterns.  Do you see that?

12     A.   Yes.

13     Q.   Okay.  Now, would you agree with me that a

14   symbol does not necessarily need to be in a sequence of

15   symbols?

16     A.   Yes.  You can send one symbol.

17     Q.   Okay.  So in defining "symbol," why do you

18   think it's proper to require that the symbol appear in a

19   sequence of symbols?

20     A.   Well, I think it's -- it's informative because

21   in these type of wireless and communication systems you

22   generally send a sequence of symbols.

23     Q.   But are you saying that the claim is actually

24   limited to sending a sequence of symbols?

25         MR. KOLOVOS:  Objection.

1      A.    You mean claim 11?

2      Q.    Yeah, claim 11.

3      A.    Well, I mean, an apparatus for receiving data

4   in the communication system comprising.  So it would be

5   understood of someone in skill in the art that a

6   communication system, almost every system that I'm

7   familiar with, sends a sequence of symbols.

8      Q.    But other than your understanding of what

9   somebody with skill in the art would believe, is there

10  anything in the claim language that you can point to

11  that requires a sequence of symbols to be sent?

12     A.    Well, I think it -- for example, if you look --

13  it's understood from the spec.  So if you look at

14  Figure 5, for example.  So look at the 64 QAM case, they

15  show you five symbols.  And --

16     Q.    So that was Figure?

17     A.    5.

18     Q.    5.  So it shows five symbols under 64 QAM?

19     A.    Yeah.  And it -- yes.  And there's a reason for

20  it, yeah, as I'm sure you're familiar with in the text.

21  But it's illustrative that -- that you're going to --

22  generally -- in this case, it's to accommodate some

23  limitation in memory.  But you're -- you're going to

24  have -- I think even in Figure 4 it shows for 64 QAM two

25  symbols.  But I think it's understood by -- when you say

1    I call level-one modulation, and can only talk about

2    level-one, what it calls, demodulation.  So I'll call it

3    level-one mapping and level-one unmapping or demapping.

4        Q.   Okay.  So you're disagreeing with how the

5    patent uses the terms "signal" and "symbol" here?

6             MR. KOLOVOS:  Objection.

7        A.   I'd like to read the patent in the column 21.

8        Q.   Okay.

9        A.   Yeah, I'm disagreeing.  I mean, if I look at

10   Figure 17, it -- it clearly shows that there's a signal

11   sample coming in.  And it's the -- the --

12            It's not clear at that point if the signal, the

13   received signal sample, has been -- was -- has been

14   resolved to one of 16 QAM points.  You don't see that.

15   So there is some ambiguity.  But the demodulator is

16   simply going from one of 16 -- it's a demapper -- one of

17   16 points to a 4-bit pattern.  And then that 4-bit

18   pattern has then split the stuff that's going to the

19   systematic deinterleaver and the parity deinterleaver.

20       Q.   Okay.  So I -- I guess the answer to my

21   question is, yes, you do disagree with how the patent

22   describes the received signal as being a symbol?

23            MR. KOLOVOS:  I object to the form.

24       Mischaracterizes both his testimony and what the

25       patent says.

1    A.   So the -- at the receiver you -- you have a

2  series of wave forms or samples, and those are proper to

3  refer to that as "signal" or "signal samples."  It's

4  only, you know, when you're making a decision and

5  saying, "Which of the 16 constellation points or symbols

6  do you think has been transmitted," are you back into a

7  symbol.  So, you know, there is -- there is a -- it's

8  never the case --

9         You're -- you're taking a received signal

10 sample, and you're mapping it through -- through some

11 decision device into one of these 16 points.  Now you

12 have a decision as to what you think the received --

13 what the symbol -- what you think what symbol was

14 transmitted.  And you go through this demodulator which

15 is, I think, as I said, a poor choice of English, it

16 would be a demapper.

17    Q.   So can a symbol be transmitted?

18         MR. KOLOVOS:   Objection.

19    A.   A symbol going through the three steps of

20 modulation.  You -- you -- you generate a transmitted

21 signal by following these three steps.  You take a bit

22 pattern; you map it, in the language of the patent;

23 modulate it to a symbol.  You amplitude modulate PAM,

24 and then you RFO modulate it.  And that whole composite

25 is called a signal.

1          So yes, that's the way you transmit symbols

2      or --

3          Q.    Okay.  So symbols are transmitted wirelessly?

4          A.    Symbols are inside a -- if you look inside the

5      airplane, there are symbols.  If you look -- if you

6      look -- if you look at the airplane, it's a signal.  And

7      what goes on the air is referred to as a signal.

8          Q.    And the signal contains symbols, correct?

9          A.    Yes.

10         Q.    So symbols are transmitted in a signal, and

11     symbols are received in a signal?

12         A.    The receiver operation is more complicated.  So

13     you -- the patent doesn't describe any of the

14     operations, other than these what I'll call

15     demodulated -- it's called demodulating or

16     demultiplexing.

17              And it -- so you receive a signal and you --

18     you undo the modulation through carrier frequency.

19     There are some other parameters in there.  And for phase

20     acquisition, you undo the effects of the distortion of

21     channel, and now you're presented with a sequence of

22     numbers.  So I think people would say that those are the

23     received signal samples.

24              And if you looked at those on a plot where you

25     have the 16 possible points, you'd have a bunch of fuzz.

1       A.    I read it.

2       Q.    Okay.  So do you agree or disagree with that?

3       A.    I disagree.

4       Q.    Okay.  So why do you disagree?

5       A.    It's the same issue, that the -- so let me read

6    the word.

7            What Apple, the construction says, a modulator

8    that is a map pattern.  So that's taking a group of bits

9    and a pattern of bits and modulating it, using the

10   terminology of the patent.

11           So as I've said many times, in 16 QAM you take

12   4 bits, and you produce one of those 16 constellation

13   points.

14           So -- so the demodulator is acting in an

15   ordinary fashion to convert or -- this is -- you have

16   a -- at the --

17           The way demodulator is used here is a demapper.

18   You already decided, for whatever receiver mechanism you

19   had, that the input of the demodulator is one of

20   16 points.  So the demodulator is simply a demapper

21   into -- one of those 16 points into 4 bits.  And

22   that's -- you know.

23           And -- and Apple is not claiming that a symbol

24   is itself a pattern.  It's a modulated pattern.  So it's

25   taking the pattern and then modulating it to one of

1    16 points.  That's what a symbol is.

2        Q.   Let's -- let's turn to the next section of

3    Dr. Wessel's declaration.

4        A.    Where are you?

5        Q.   On subsection B, between paragraphs 25 and 26.

6             THE WITNESS:  I'm going to need to take a break

7        in a couple of minutes.  Is this a good place to

8        take it now?  I want to go to the bathroom.

9             MR. BRIGGS:  Yeah.

10            THE VIDEOGRAPHER:  We're going off the video

11       record.  It's 2:17 p.m.

12            (Recess from 2:17 p.m. until 2:28 p.m.)

13            THE VIDEOGRAPHER:  We're on the video record.

14       Its 2:28 p.m.

15   BY MR. BRIGGS:

16       Q.   Dr. Gitlin, can you turn back to page 5 of

17   Dr. Wessel's declaration.

18            So I wanted to ask you some more questions

19   about Samsung's alternative construction.  We just

20   talked about the first part that says a "modulated

21   signal," and you disagreed that that was correct.

22            Now I want to ask you if you disagree with the

23   remainder of that proposed construction, which states --

24       A.    How would you parse it?

25       Q.   Well, that part says that a symbol represents a

1   number of bits specified according to the modulation

2   technique.

3           I mean, would you agree that a symbol

4   represents a number of bits specified according to a

5   modulation technique?

6       A.   Yes.

7       Q.   Okay.  So your real issue with Samsung's

8   proposed construction is the portion that states "a

9   modulated signal"?

10      A.   Yes.

11      Q.   And you don't agree that it's a signal; you

12  believe it's a modulated pattern?

13      A.   Yes.  And that -- that language is what -- the

14  way the patent refers the use of the word "modulator."

15  I mean, as I said many times, I'm -- every time I'm

16  seeing that "modulator," I'm saying "mapper," because

17  that's the language that I'm familiar with, a bit

18  mapper.  You map bits into the signal -- to a symbol,

19  excuse me.

20      Q.   Yeah, we've got a lot of tongue twisters today.

21          MR. KOLOVOS:  And given that the whole dispute

22      seems to be is it "symbol" or is it "signal."

23          MR. BRIGGS:  Hopefully you've been watching

24      over us.

25          MR. KOLOVOS:  I've been trying to, trying to,

1        trying keep an eye on that.

2        Q.   Can you turn to page -- or paragraph 38 of

3    Dr. Wessel's declaration?

4        A.   Let me -- let me just -- this is in...

5        Q.   And you might want to refer back to

6    paragraph 74 of your declaration.

7        A.   There's where I'm going.

8             I have paragraph 74.  Let's make sure I got to

9    the end of it.  Yeah.  Okay.  38.  Let me -- it goes on

10   to the next page.

11            Okay.  I think I read them all.

12       Q.   Okay.  So why don't we start with paragraph 74

13   of your declaration.

14            You make a statement in the middle of this

15   paragraph that it would be -- you state, "It would be

16   incorrect to refer to the entire sequence as a single

17   symbol.  Accordingly, a construction for symbols such as

18   a signal representative data would be incorrect because

19   it would fail to distinguish between a single symbol and

20   a sequence of such symbols."

21            Okay.  So what is -- what is your concern that

22   you're expressing here in paragraph 74?

23            MR. KOLOVOS:  Objection.

24       A.   It's, as I recall, it's intended to distinguish

25   between a symbol and a signal.  I mean, it's that the --

# Exhibit E



Applications of Communications Theory
Series Editor: R. W. Lucky

# Data Communications Principles

Richard D. Gitlin

Jeremiah F. Hayes

Stephen B. Weinstein

one is presented with statistical data whose probability distribution depends on a discrete set of underlying parameters. Decision theory offers tools for processing the data to enable one to choose among these parameters in a statistically optimal fashion. Specifically, we shall be applying elements of the theory to the detection of signals in a digital communication system in which one of a finite set of symbols is transmitted over a channel.

The derivation of optimum decision rules begins with the definition of what is called the *observation space*. This is the raw data that are to be processed by the receiver. The dimensions of this space depend upon the particular application at hand, and the points in the space are the observed output of the channel. Consider the following simple one-dimensional example. A zero or a one is conveyed over a pair of wires by voltage levels of $+s$ or $-s$, respectively. A single observation of the voltage is made. We assume that this observation is disturbed by additive noise, giving

$$Y = X + N, \tag{2.1}$$

where $X = +s$ or $-s$. Assume that the noise voltage, $N$, is a zero mean Gaussian random variable.* The observation space in this case is the range of values assumed by the random variable $Y$.

Because of the random nature of the channel, different transmitted symbols may be mapped into the same point in the observation space. In general, all that distinguishes these different transmitted symbols at the channel output are different conditional probability distributions. In the example of (2.1), conditioned on the transmitted symbol, $Y$ is a Gaussian random variable with either mean $+s$ or mean $-s$. The essential task of detection theory is to decide among the conditional distributions based on the observed values of $Y$. In the above example this is done by partitioning the observation space into two nonoverlapping regions (Figure 2.2) which cover the whole space. More generally, when one of $L$ symbols is transmitted, the observation space is partitioned into $L$ regions. Each region is identified with a transmitted symbol; a channel output falling in a particular region leads to deciding that the corresponding symbol was transmitted.

The choice of the criterion for partitioning the space led to a great deal of controversy in the formative years of detection theory. Part of the difficulty was in the assignment of *a priori* probabilities to the parameters of the distributions. Fortunately, matters are considerably simplified in the communications context, since the *a priori* probabilities of the transmitted symbols are known. In communications systems, there is also a convenient criterion for partitioning the

---

\* The Gaussian random variable, which is defined in Appendix 2A, along with other probabilistic concepts, is often a remarkably robust assumption. Many physical processes can be modeled as Gaussian. In other cases where the noise is, strictly speaking, not Gaussian, it can sometimes be assumed Gaussian for the purposes of comparing alternative systems and techniques, considerably simplifying the mathematical analysis. Furthermore, the results obtained for a Gaussian channel often provide a lower bound on the performance of systems operating on a non-Gaussian channel.



Fig. 2.2    Decision regions for one-dimensional binary transmission example.

observation space. One attempts to minimize the probability of making an error in deciding upon the transmitted symbol.

The derivation of the optimal decision regions is simplified if we assume the binary case, i.e., two transmitted symbols. The results of this analysis form the basis of the general case. The derivation of the detection rule involved partitioning the observation space into two disjoint regions; $R_0$ and $R_1$, each region being identified with one or the other signal. A decision is made as to whether the output of the channel falls in $R_0$ or $R_1$, respectively. The problem is to find the partition which minimizes probability of error. We shall assume that the observation space is of dimension $M$, i.e., all of the variables of equation (2.1) are vectors rather than scalars. We shall see later how signal and noise wave forms can be represented by such vectors. We generalize from $\pm s$ of the example above by supposing that the symbols $s_0$ and $s_1$ are transmitted with probabilities $P_0$ and $P_1$, respectively. If the received sample falls in region $R_i$, the decision is made that $s_i$ ($i=0,1$) was transmitted. A detection error is made if $s_0$ is transmitted and the observed random variable $Y$ falls in the region $R_1$ or vice versa. The probability error given that $s_0$ is transmitted is denoted by

$$Pr[Error|s_0 \text{ Transmitted}] = Pr[\mathbf{Y} \in \mathbf{R}_1 |s_0 \text{ Transmitted}]$$

and, similarly,

$$Pr[Error|s_1 \text{ Transmitted}] = Pr[\mathbf{Y} \in \mathbf{R}_0 |s_1 \text{ Transmitted}].$$

From the law of total probability, we may write the probability of error as

$$Pr[Error] = Pr[Error, s_0 \text{ Transmitted}] + Pr[Error, s_1 \text{ Transmitted}]$$

$$= P_0 \, Pr[\mathbf{Y} \in \mathbf{R}_1 |s_0 \text{ Transmitted}] + P_1 \, Pr[\mathbf{Y} \in \mathbf{R}_0 |s_1 \text{ Transmitted}].$$

$$(2.2)$$

We now derive the rule for choosing $R_0$ and $R_1$ which minimizes the probability of error. In case of a continuous channel output, we have

$$Pr[Error] = P_0 \int_{R_1} f(\mathbf{y}|\mathbf{s}_0 \ Transmitted) \ d\mathbf{y} + P_1 \int_{R_0} f(\mathbf{y}|\mathbf{s}_1 \ Transmitted) \ d\mathbf{y} \ ,$$

$$(2.3)$$

where $f(\mathbf{y}|\mathbf{s}_i \ Transmitted)$, $i = 0,1$ is the probability density function of the channel output conditioned on the transmitted signal. Integration is over the multidimensional regions $\mathbf{R}_1$ and $\mathbf{R}_0$, respectively.

In the case of a discrete channel output, the probability of error may be written as:

$$Pr[Error] = P_0 \sum_{\mathbf{y}_j \in \mathbf{R}_1} Pr(\mathbf{Y}=\mathbf{y}_j|\mathbf{s}_0 \ Transmitted)$$

$$+ P_1 \sum_{\mathbf{y}_j \in \mathbf{R}_0} Pr(\mathbf{Y}=\mathbf{y}_j|\mathbf{s}_1 \ Transmitted) \ , \qquad (2.4)$$

where $\mathbf{y}_j$, $j = 1,2...,M$, are the points in the observation space and $Pr(\mathbf{Y}=\mathbf{y}_j|\mathbf{s}_i \ Transmitted)$, $i = 0,1$, are the appropriate conditional probabilities.

Since $\mathbf{R}_0$ and $\mathbf{R}_1$ partition the observation space, $\mathbf{R}_0 \cap \mathbf{R}_1 = \phi$ and $\mathbf{R}_0 \cup \mathbf{R}_1 = \Omega$, where $\phi$ denotes the null space and $\Omega$ denotes the whole space. Based on these relations, and the fact that

$$\int_{R_0} f(\mathbf{y}|\mathbf{s}_0 \ Transmitted) \ d\mathbf{y} + \int_{R_1} f(\mathbf{y}|\mathbf{s}_0 \ Transmitted) \ d\mathbf{y}$$

$$= \int_{\Omega} f(\mathbf{y}|\mathbf{s}_0 \ Transmitted) \ d\mathbf{y} = 1 \ ,$$

we may express (2.3) in the following form which makes the minimization problem straightforward:

$$Pr[Error] = P_0 \int_{\Omega} f(\mathbf{y}|\mathbf{s}_0 \ Transmitted) \ d\mathbf{y} + \int_{R_0} \{ -P_0 \ f(\mathbf{y}|\mathbf{s}_0 \ Transmitted)$$

$$+ P_1 \ f(\mathbf{y}|\mathbf{s}_1 \ Transmitted) \} \ d\mathbf{y}$$

$$= P_0 + \int_{R_0} \{ P_1 f(\mathbf{y}|\mathbf{s}_1 \ Transmitted) - P_0 \ f(\mathbf{y}|\mathbf{s}_0 \ Transmitted) \} \ d\mathbf{y}.$$

$$(2.5)$$

The only unknown quantity in (2.5) is the set of points which compose $\mathbf{R}_0$. Observe that $Pr[Error]$ can be minimized by placing in $\mathbf{R}_0$ only those points for which the integrand is negative. The proof that this leads to a minimum is by contradiction. Suppose that $\mathbf{R}_0$ contains a set of points for which the integrand is positive. The probability of error can be decreased simply by placing these points in $\mathbf{R}_1$. Points which are exactly equal to zero can be placed in either region without changing the probability of error.

Since they are the product of positive quantities, a probability and a probability density, the two terms in the integrand of (2.5) are positive and the integrand is negative at a point $y$ if

$$\frac{P_0 f(\mathbf{y}|s_0 \ Transmitted)}{P_1 f(\mathbf{y}|s_1 Transmitted)} = \frac{Pr(s_0 \ Transmitted|\mathbf{Y}=\mathbf{y})}{Pr(s_1 \ Transmitted|\mathbf{Y}=\mathbf{y})} > 1 \ . \quad (2.6a)$$

Thus the decision rule that minimizes the probability of error is "decide $s_0$ was transmitted if (2.6a) is true and $s_1$ otherwise."

The decision rule in (2.6a) chooses the signal which maximizes the *a posteriori probability* of the transmitted symbol, given the observation; accordingly, it is called the maximum *a posteriori* (MAP) detector. As we shall see when we treat source coding in Section 2.4.2, for efficient transmission the *a priori* probabilities should be equal, $P_0 = P_1$. In this case the rule is to declare that $s_0$ was transmitted if

$$f(\mathbf{y}|s_0 \ Transmitted) > f(\mathbf{y}|s_1 \ Transmitted) \ , \quad (2.6b)$$

otherwise, choose $s_1$ as the transmitted symbol.

EXAMPLE 1  We now apply the MAP detector to the one-dimensional Gaussian example that we considered in (2.1) above. Since the Gaussian noise has zero mean and mean square value $\sigma^2$, the probability density of $Y$ is

$$f(\mathbf{y}|s_i \ Transmitted) = \exp(-(y\pm s)^2/2\sigma^2)/\sqrt{2\pi\sigma^2} \ .$$

Applying (2.6), we have the decision rule "choose the transmitted signal as $s$ if

$$\exp(-(\mathbf{y}-\mathbf{s})^2/2\sigma^2) > \exp(-(\mathbf{y}+\mathbf{s})^2/2\sigma^2) ."$$

Taking logarithms of both sides, we have, after some manipulation, the threshold rule, which is *to choose* $+s$ as the transmitted signal if

$$\mathbf{y} > 0.$$

The decision space is shown in Figure 2.2, along with the conditional probability density functions. A similar development can be followed in the case of a discrete observation space. Again, the probability of error is minimized by choosing the maximum *a posteriori* estimate (MAP)

$$\frac{P_0 Pr(\mathbf{Y}=\mathbf{y}_j|s_0 \ Transmitted)}{P_1 Pr(\mathbf{Y}=\mathbf{y}_j|s_1 \ Transmitted)} = \frac{Pr(s_0 \ Transmitted|\mathbf{Y}=\mathbf{y}_j)}{Pr(s_1 \ Transmitted|\mathbf{Y}=\mathbf{y}_j)} \quad (2.7a)$$

In the case of equal *a priori* probabilities, it can be shown that the probability of error is minimized for each $\mathbf{y}_j$, $i = 1,2,...,M$, in the observation space by choosing $s_0$ as the transmitted signal if

$$Pr(\mathbf{Y} = \mathbf{y}_j|s_0 \ Transmitted) > Pr(\mathbf{Y} = \mathbf{y}_j|s_1 Transmitted). \quad (2.7b)$$

Otherwise, choose $s_1$ as the transmitted signal.

EXAMPLE 2   Consider the following example for the discrete case. Suppose that two signals are transmitted with equal probability over an optical fiber line. At the receiver, we assume that the optical detector emits electrons at a Poisson rate whose mean value depends upon the transmitted signal. For the two possible transmitted signals, $s_0$ and $s_1$, we denote these averages as $\lambda_0$ and $\lambda_1$ electrons per second, respectively. We decide which of the two signals was transmitted by counting the number of electrons emitted in a $t$ second interval. Let $Y_t$ denote the number of electrons emitted by the optical detector over the observation interval $(0,t)$; then the receiver decides in favor of $s_0$ over $s_1$ if the actual number of observed electrons, $n$, is such that

$$Pr(Y_t = n \mid s_0 \; Transmitted) \; > \; Pr(Y_t = n \mid s_1 \; Transmitted).$$

Since the number of emitted electrons is a Poisson* random variable, we have

$$Pr[Y_t = n \mid s_i \; Transmitted] \; = \; \exp(-\lambda_i t) \; (\lambda_i t)^n/n!, \; i = 0,1, \; n = 0,1,2,...$$

Since $Y_t$ conditioned on the transmitted signal is a Poisson random variable, we choose $s_0$ over $s_1$ as the average rate if

$$\exp(-\lambda_0 t) \; (\lambda_0 t)^n/n! \; > \; \exp(-\lambda_1 t) \; (\lambda_1 t)^n/n!$$

or

$$n \; > \; (\lambda_0 - \lambda_1)t/(\ln \lambda_0 - \ln \lambda_1).$$

The equation says to choose the decision rule that says to select $s_0$ if the number of electrons is greater than the threshold on the right-hand side.

There is a related approach to decision making which results in the same decision rule as (2.6b) when the *a priori* probabilities are identical. The technique is called *maximum likelihood*. Given the received signal $y$ one chooses the input which maximizes the likelihood $f(y \mid s_i \; Transmitted)$, $i = 0$ or 1. Maximum likelihood is appropriate when there is no way of determining the *a priori* probabilities $P_0$ and $P_1$. For example, in radar, where one attempts to detect the presence or absence of a reflected signal, the *a priori* probabilities generally have no meaning. In this case decisions are made on the basis of costs associated with each kind of error.

### 2.1.2  L-ARY TRANSMISSION

In many applications the channel can be utilized more efficiently by using $L$-ary transmission, where one of $L > 2$ symbols, $s_i$, $i = 0,1...,L-1$ is transmitted. It is almost always true that $L$ is a power of two, $L = 2^l$, so that

* See Appendix 2A for the definition of a Poisson random variable.

Theoretical Foundations of Digital Communications                    77



Fig. 2.3      Optimum decision boundaries: $L = 3$.

encoding a binary data stream is straightforward; each symbol conveys $\log_2 L$ bits.*

The results that we have obtained for the detection of binary signals apply directly to $L$-ary transmission. We imagine that the search for the most probable transmitted signal is conducted by comparisons of all possible pairs of transmitted signals. In the continuous case, the transmitted signal is chosen as $s_i$, where $i$ is the value of the index such that $P_i\, f(\mathbf{y}|\mathbf{s}_i\ Transmitted)$ is maximum over $i = 0,1,...,L-1$ and where $P_i$ is the probability that $s_i$ is transmitted. In the discrete case, for a channel output $i$, $s_i$ is chosen such that $P_i\, Pr(Y = \mathbf{y}_j|\mathbf{s}_i\ Transmitted)$ is maximum over $i = 0,1,...,L-1$. In the usual communications context, where all transmitted symbols are equally probable, the above decision rule is equivalent to maximum likelihood.

The partitioning of the two-dimensional observation space for the simple case of $L = 3$ is shown in Figure 2.3. Let the transmitted symbols be represented by points on the plane, $s_0 = (1,0)$, $s_1 = (-0.5, 0.866)$, and $s_2 = (-0.5, -0.866)$. (In Chapter 5, we shall see that these points might represent the phases of a sinusoidal carrier.) Let us assume that each of the two

---

\*   In speaking of transmitting in bits per second, we are using the expression in its commonly used sense; however, as we shall see in Section 2.4, there is a mathematically rigorous definition of the information-bearing content of a signal in bits.

Case 5:11-cv-01846-LHK   Document 589-1   Filed 01/06/12   Page 61 of 82

components of the signal point representing a symbol is disturbed independently by additive Gaussian noise with mean square value $\sigma^2$. We also assume that the signals are equally probable. Since the noise components are independent, the joint conditional densities are the product of the marginals. The conditional densities of the channel outputs are:

$$f(\mathbf{y}|s_0 \; Transmitted) = \exp(-((y_1 - 1)^2 + y_2)/2\sigma^2)/2\pi\sigma^2$$

$$f(\mathbf{y}|s_1 \; Transmitted) = \exp(-((y_1 + 0.5)^2/2 + (y_2 - 0.866)^2/2\sigma^2)/2\pi\sigma^2$$

$$f(\mathbf{y}|s_2 \; Transmitted) = \exp(-((y_1 + 0.5)^2/2 + (y_2 + 0.866)^2/2\sigma^2)/2\pi\sigma^2$$

The derivation now proceeds in the same fashion as that of the one-dimensional Gaussian example considered above. The signal $s_0$ is chosen over $s_1$ if

$$\| \mathbf{Y} - s_0 \|^2 \;\; < \;\; \| \mathbf{Y} - s_1 \|^2,$$

where $\|\cdot\|$ denotes the familiar Euclidean distance. It is interesting to note that the latter relationship describes a detector that chooses the transmitted signal that is *closest* to the received signal vector. The concept of a receiver which decides in favor of the signal that is at the *minimum distance* from the received signal is an important attribute of many of the receivers we will discuss later in this book. Returning to the above example, we find that after some manipulation, this leads to the criterion choose $s_0$ over $s_1$ transmitted if $\sqrt{3} \; y_1 \geq y_2$. The remaining regions are found the same way, with the result in the form of optimum decision regions shown in Figure 2.3. As we see from the figure, the boundaries of the decision regions are the perpendicular bisectors of the lines connecting the signal points.

### 2.1.3 PERFORMANCE—THE UNION BOUND

It is essential to describe the performance of these optimum detectors. In principle, the calculation of performance, i.e., the probability of making an error, is quite direct for the binary case. Having derived the optimum decision regions $R_0$ and $R_1$, one may evaluate (2.3) and (2.4) for the continuous and discrete cases, respectively. In this chapter we shall consider calculations of performance for two types of channels, the additive white Gaussian noise (AWGN) channel and the binary symmetric channel (BSC).

The calculation of performance is somewhat more complicated in the case of $L$-ary transmission, $L > 2$. From the law of total probability, we may write

$$Pr[Error] = 1 - Pr[Correct] = 1 - \sum_{i=0}^{L-1} P_i \; Pr[Correct|s_i \; Transmitted]$$

$$= 1 - \sum_{i=0}^{L-1} P_i \; Pr[\mathbf{Y} \in \mathbf{R}_i | s_i \; Transmitted]. \qquad (2.8)$$

The key to evaluating the probability of error is the calculation of the term

$$Pr[\mathbf{Y} \in \mathbf{R}_i | \mathbf{s}_i \; Transmitted] = \int_{\mathbf{R}_i} f(\mathbf{y} | \mathbf{s}_i \; Transmitted) \; dy \qquad (2.9a)$$

in the continuous case, and

$$Pr[\mathbf{Y} \in \mathbf{R}_i | \mathbf{s}_i \; Transmitted] = \sum_{\mathbf{y}_i \in \mathbf{R}_i} Pr(\mathbf{Y} = \mathbf{y}_i | \mathbf{s}_i \; Transmitted) \qquad (2.9b)$$

in the discrete case.

There are many situations in which the calculation of the quantities in (2.9a–b) is not straightforward. We shall see several examples later in the text. In these situations, we can obtain a useful upper bound on the error probability by applying the *union bound,* which is composed of errors involving only pairs of signals.

Suppose that the transmitted signal is $s_i$. Let $E_{ij}$ denote the event that the observed point is such that $s_j$ rather than $s_i$ would be chosen. For example, in Figure 2.3, the event $E_{12}$ would occur if the observation falls below the line A–B when $s_1$ is transmitted. The actual error event consists of the union of these events over all $j \neq i$, and we may write

$$Pr[Error | s_i \; Transmitted] = Pr[\bigcup_{i \neq j} E_{ij}]. \qquad (2.9c)$$

It is important to observe that the events $E_{ij}$ and $E_{ik}$; $i \neq j \neq k$ are not disjoint. This is obvious in the example in Figure 2.3 where $E_{12}$ and $E_{10}$ have considerable overlap since $E_{10}$ consists of points to the right of C–D. An application of the standard laws of probability to (2.9c) yields the *union bound*

$$Pr[Error | s_i \; Transmitted] \leq \sum_{i \neq j} Pr[E_{ij}]. \qquad (2.10)$$

The calculation of the pairwise errors in (2.10) is the same as we have considered for binary transmission. For example, for the case depicted on Figure 2.3, one would integrate the density conditioned on $s_1$ over the half plane below A–B and the half plane to the right of C–D if the transmitted signal were $s_1$ [see (2.3) and (2.4)].

## 2.2  THE ADDITIVE WHITE GAUSSIAN NOISE (AWGN) CHANNEL

### 2.2.1 THE MATCHED-FILTER RECEIVER

In physical channels the information symbols are translated into time-varying waveforms or pulses whose form is suitable for transmission over the



Fig. 2.4     The additive, linear noisy, communications channel.

channel. In a general sense, this process is called *modulation*.* We begin with
the binary case, where the waveforms $s'_0(t)$ and $s'_1(t)$ are transmitted for a zero
and a one, respectively. There are many practical examples of modulation tech-
niques. Perhaps the most basic, known as non-return to zero (NRZ), is the
encoding of a zero into a positive pulse and a one into its negative. In frequency
shift keying† (FSK), data bits are represented by bursts of carrier at different fre-
quencies. Over a short time interval we have $s'_i(t) = \sin(2\pi f_i t)$,
$i = 0,1; f_0 \neq f_1$.

The signal is transmitted over the channel, where it is subject to the impair-
ments discussed in Section 1.6 of Chapter 1. The model of the channel is de-
picted in Figure 2.4. The transmitted signal suffers delay and attenuation distor-
tion represented by the channel which has impulse response $h(t)$ and the
corresponding transfer function $H(f)$. In this chapter, we shall assume that $h(t)$
or, equivalently, $H(f)$ is known at the receiver. Random impairments are
presented by additive noise. We also assume that there is no intersymbol
interference, where energy from one symbol spills over into adjacent symbol
intervals. Under this assumption, we can consider the detection of a single sig-
nal in isolation.**

Under these assumptions, the output of the channel may be written

$$y(t) = s_i(t) + n(t), \ i = 0,1 \ , \tag{2.11}$$

where $s_i(t)$ is the convolution of the transmitted signal with the channel impulse
response, $s_i(t) = s'_i(t) * h(t)$, $i = 0,1$.‡ The detection problem is to decide
upon the transmitted signal, $s'_0(t)$ or $s'_1(t)$, based upon the output of the channel
as represented in (2.11). Since the impulse response of the channel is known at

---

\*    There are often two levels of modulation in digital communication systems: the first level maps
      customer information, e.g., a binary stream, into a discrete set of signals, and the second level
      translates the signals into a form which is suited to the transmission media, modulation into a
      passband channel.

†    See Section 5.6 for a discussion of FSK.

\*\*  In Chapter 4 intersymbol interference and the effect of channel shaping and of transmitter and
      receiver filtering are considered.

‡    The symbol * indicates convolution $s'_i(t) * h(t) = \int\limits_{-\infty}^{\infty} s'_i(\tau) h(t - \tau) d\tau = \int\limits_{-\infty}^{\infty} s'_i(t - \tau) h(\tau) d\tau$.

# Exhibit F

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4
    --------------------------------x
5   APPLE INC., a California        )
    corporation,                    )
6                                   )
                    Plaintiff,      )
7                                   )
            vs.                     )
8                                   )No. 11-CV-01846LHK
    SAMSUNG ELECTRONICS CO., LTD.,  )
9   a Korean entity; SAMSUNG        )
    ELECTRONICS AMERICA, INC., a    )
10  New York corporation; SAMSUNG   )
    TELECOMMUNICATIONS AMERICA, LLC,)
11  a Delaware limited liability    )
    Company,                        )
12                                  )
                    Defendants.  )
13  --------------------------------x

14

15

16

17     VIDEOTAPED DEPOSITION OF TONY GIVARGIS, PH.D.

18              Los Angeles, California

19            Tuesday, December 6, 2011

20

21      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

22

23  Reported by:

24  SUSAN A. SULLIVAN, CSR #3522, RPR, CRR

25  JOB NO. 44330

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 2

1                     Tuesday, December 6, 2011

2                     8:56 a.m.

3

4    VIDEOTAPED DEPOSITION OF TONY GIVARGIS,

5    PH.D., taken by Defendants, at the offices

6    of Quinn, Emanuel, Urquhart & Sullivan,

7    865 South Figueroa Street, Los Angeles,

8    California, before Susan A. Sullivan, CSR,

9    RPR, CRR, State of California.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 5

1        MR. SHAH:  Ali Shah, WilmerHale, for the witness

2    and representing Apple.

3        THE VIDEOGRAPHER:  Thank you.

4            And will the reporter now swear or affirm

5    the witness.

6

7    TONY GIVARGIS, PH.D.,

8        called as a witness, having been duly sworn by

9        the court reporter, was examined and testified

10       as follows:

11

12   EXAMINATION

13   BY MS. MAROULIS:

14       Q    Good morning, Mr. Givargis.  How are you

15   today?

16       A    Good, thank you.

17       Q    My name is Victoria Maroulis and I will be

18   asking you some questions today.

19            Have you ever been deposed before?

20       A    No.

21       Q    In that case let me briefly run you through

22   the rules of the deposition.

23            First of all, do you understand that you

24   are testifying today like you would be in a court of

25   law under oath even though we're sitting in a

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1    publisher that I recognized or they were -- if they

2    were references on the website, that they were

3    credible and they were published in a place that I

4    would consider reasonable.

5         Q    Did counsel for Apple instruct you where to

6    search, what types of publications to search for

7    extrinsic evidence?

8         MR. SHAH:  Object to the extent it calls for

9    privileged communication, but you can answer it.

10        THE WITNESS:  Not necessarily.  They told me --

11        MR. SHAH:  Again, just a caution on substance of

12   the communication.

13        Q    BY MS. MAROULIS:  Let me help you out.  I

14   don't want to ask you what you spoke with them

15   about, my question is whether you were the one who

16   selected the extrinsic evidence in your declaration

17   or it was provided by counsel.

18        A    Absolutely, yes, I understand.  I selected

19   all of those.

20        Q    In your search for a definition of "applet"

21   in extrinsic sources have you come across any

22   definitions that did not support your opinion?

23        A    Yes, I did.

24        Q    Can you give me examples of those?

25        A    One example of those was Microsoft's

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 30

1    control panel applet which is -- which was a very

2    sort of exceptional use of the term "applet," a very

3    limited in terms of how widely the term "applet" is

4    used and how Microsoft was using it in that context.

5    That was one example.

6         Q    Why do you consider Microsoft's use of the

7    term "applet" exceptional?

8         A    Yes.  Most applets are usually considered

9    to be Java applets and/or similar to Java, Java,

10   sort of Java-like applets in the sense that they are

11   interpreted, they are an application or an app

12   running within an application.

13            The Microsoft control panel applets are

14   executable codes, they're actually dynamically-

15   linked libraries that do not require interpretation,

16   they run directly on the processor.

17        Q    You said that most applets are Java

18   applets.  There are any applets that are not Java

19   ones?

20        A    Yes, a number of them.

21        Q    Can you list them, please?

22        A    Yes.  For example, there are Python

23   applets, there are AppleScript applets, there are

24   JavaScript applets, there are applets in the context

25   of Flash, the Flash programming environment.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 31

1      Q    So if a colleague came up to you and said

2   they're writing an applet you would not necessarily

3   know which one of those languages they were writing

4   it in?

5      A    I would automatically assume --

6   MR. SHAH:  Just give me a second.

7           Objection; vague.

8           You can answer if you understand the

9   question.

10    THE WITNESS:  Yes, I would -- I would assume

11  Java applets because those are the most common types

12  of applets.

13     Q    BY MS. MAROULIS:  But they're not

14  exclusive, correct?

15     A    Correct.

16     Q    Besides the reason you stated about why

17  Microsoft was exceptional in use of applets, is

18  there any other reason why you did not pick the

19  Microsoft definition for your declaration?

20    MR. SHAH:  Object to form.

21    THE WITNESS:  Yes.  I felt that that represented

22  a very small percentage of all of the applets that

23  or all of the kinds of applets and it would not be

24  the usual or the common understanding of the term

25  "applet."

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1        Q     BY MS. MAROULIS:  Do you agree that at

2   least some people in the programming community when

3   they hear the word "applet" can think of a Microsoft

4   control panel applet?

5        A     Some, yes.

6        Q     And do you agree that was the case in 2005

7   as well?

8        A     Yes.

9        Q     Besides coming across the Microsoft control

10  panel applet, did you see any other definition of

11  "applets" in your research that diverged from the

12  one you picked for your declaration?

13       MR. SHAH:  Objection; vague.

14       THE WITNESS:  No.

15       Q     BY MS. MAROULIS:  Did you see any

16  definition of AppleScript applets?

17       A     I first came to -- to see AppleScript

18  applets when I read Mr. Cole's declaration.

19       Q     And upon reading Mr. Cole's declaration did

20  it remind you that there were in fact AppleScript

21  applets back in 2005?

22       A     Yes, that is correct.

23       Q     And in your research did you come across

24  the Python applets?

25       A     I was aware of Python applets but I did not

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 33

1    necessarily come across a writing or a textbook.

2        Q    Is it correct that Python applets existed

3    in 2005?

4        A    Yes, that is correct.

5        Q    In your research did you come across Flash

6    program applets?

7        A    I was very well aware of Flash applets but

8    I did not find or obtain or look for documents

9    describing Flash applets.

10       Q    You are aware they existed in 2005 as well,

11   correct?

12       A    Yes.

13       Q    Are you familiar with Linux applets?

14       A    I am not.

15       Q    Let's turn to your declaration on Page 5.

16            What is the invention of the '711 patent?

17       MR. SHAH:  Objection; vague.

18       THE WITNESS:  I can summarize the '711 patent as

19   being a method or a teaching of how to accommodate

20   multitasking on a mobile device.

21       Q    BY MS. MAROULIS:  Is there any reference to

22   Java in this patent?

23       A    May I take a look?

24       Q    Absolutely.

25       A    No.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 34

1      Q    Is there any references in this patent to

2   system independent nature of applets?

3      A    You mean operating-system dependent or just

4   system?

5      Q    Yes.

6      A    No, there is not.

7      Q    If you recall, is there any reference to

8   Java in the context of applets in the prosecution

9   history?

10      MR. SHAH:  If you need to review any documents,

11   you can ask for them.

12      THE WITNESS:  Yes, I would appreciate it if I

13   had a copy of the prosecution history.

14      MS. MAROULIS:  I'm happy to mark the file

15   history.  It is rather sizeable.

16          Let's mark this as Exhibit 5.

17          (Givargis Exhibit 5, a document, Bates Nos.

18          SAMNDCA00007840 to SAMNDCA00008459, marked

19          for identification, as of this date.)

20      Q    BY MS. MAROULIS:  Sir, I'm placing before

21   you Exhibit 5.  Do you recognize it as the

22   prosecution history of the '711 patent?

23      A    I believe portions of it I have reviewed,

24   yes.

25      Q    You don't remember reviewing the whole

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 35

1    thing?

2         A    Not the entire thing, no.

3         Q    How did you decide what portions of that

4    file history to review?

5         A    The file history was provided to me by the

6    attorneys.

7         Q    The file history that you see before you is

8    double-sided, so do you remember giving me documents

9    that is this thick or thicker or was it a smaller

10   document?

11        A    I recall a smaller document.

12        MS. MAROULIS:  Counsel, I would appreciate

13   seeing the version of the file history that was

14   provided to the witness.

15        MR. SHAH:  I can represent that we provided the

16   certified file history.

17        MS. MAROULIS:  The entire file history?

18        MR. SHAH:  We did.

19        MS. MAROULIS.  Via PDF file, not via paper.

20        Q    BY MS. MAROULIS:  This is not a memory

21   test, but do you recall any references to Java in

22   the context of applets in the file history?

23        A    There was absolutely no reference to Java

24   in the file history that I reviewed.

25        Q    Was there any reference to applet being

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 36

1    operating-systems independent?

2         A    I do not recall any reference to operating-

3    system-independent applets in the file history that

4    I reviewed.

5         Q    Turning back to Exhibit 2 which is the

6    patent-in-suit, is it correct, sir, that there's

7    only one place where applets are mentioned in the

8    patent?

9         A    There is only one place in the

10   specification that refers to patents.

11        Q    Thank you.

12        A    And to applet.

13        Q    Thank you for correcting me.  I did mean

14   specification.

15             And is it correct, sir, that that place in

16   the specification is Column 3, Lines 8 through 14?

17        A    Yes, that is correct.

18        Q    This passage does not mention Java as well,

19   correct?

20        A    That is correct.

21        Q    And it does not mention operating-systems

22   independent.

23        A    That is correct, yes.

24        Q    Why do you cite this passage to support

25   your definition in your declaration?

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 37

1      A    Yes.  The important element of this passage

2   is the part that says at least one applet within an

3   application model -- module or in each of the

4   application modules, and that relationship of an

5   applet within an application module or in the

6   context of an application module is relevant to my

7   understanding and definition of applets being

8   interpreted by a host application module.

9      Q    Where do you see the word "within," sir?

10     A    There is no "within" in this, in this

11  particular text.

12     Q    Okay.

13     A    There's an association, yes.

14     Q    Can you explain how you read this last

15  sentence to support your definition.

16     A    "Application modules of the portable

17  terminal include at least one applet and each of the

18  application modules, that is each menu of the

19  portable terminal, independently performs multi-

20  tasking."

21          So as I interpret it, the applets run

22  within or execute within an application module or

23  execute in the context of an application module.

24     Q    Do you draw a distinction between

25  "application module" and "program"?

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 39

1   operating-system independent?

2      A     This passage does not make reference to

3   operating-system independent.  However, the

4   association between an applet and an application

5   module, together with the claim language and the

6   prosecution, the file history, does suggest to me

7   that the applet requires the application module as

8   a, sort of as a context, and that relationship is

9   what one would expect from Java applets or Java-like

10  applets, that interpreted.

11     Q     Setting aside the claim language and

12  prosecution history, is it correct that there's

13  nothing in this particular passage that indicates

14  operating-system independence?

15     A     Nothing in the passage mentions anything

16  about being operating-system independent, yes.

17     Q     Let's take a look at the claim language.

18  For example, Claim 1 in Column 7, do you see that?

19     A     Yes.

20     Q     The relevant limitation is "Generating a

21  music background play object, wherein the music

22  background play object includes an application

23  module including at least one applet."

24          Is there any mention of operating-system

25  independence here?

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 40

1      A     No.

2      Q     Is there anything in this claim that you

3  see that supports your notion of operating-system

4  independence?

5      A     What I see in this sentence, passage, is,

6  again, the association between an applet running or

7  an applet that is within an application module and

8  that association to me suggests a Java-like

9  interpreted environment.

10     Q     Did you review the testimony of the

11  inventor of this patent?

12     A     Yes.  I reviewed a subset of it.

13     Q     Did you see that the inventor who was

14  developing this technology was working with system-

15  dependent applets?

16     A     That is correct, yes.

17     Q     Which system-dependent applets was he

18  working with, to your understanding?

19     MR. SHAH:  If you need to see any documents to

20  refresh your recollection, you can ask.

21     THE WITNESS:  Yes.  I think this one I can

22  answer without the document, but it was a Qualcomm

23  chipset.

24     Q     BY MS. MAROULIS:  Do you disagree that the

25  technology he was working on is described by Claim

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 41

1  1?

2       MR. SHAH:  Object to the extent it calls for a

3  legal conclusion.

4       THE WITNESS:  I have not formed that position

5  yet.

6       Q   BY MS. MAROULIS:  Do you understand that he

7  was asked during deposition about the embodiments of

8  the patent?

9       MR. SHAH:  Same objection.

10       THE WITNESS:  Yes.  I'm not sure exactly what he

11  was asked.

12       Q   BY MS. MAROULIS:  If the technology that he

13  was working on embodies this claim would you agree

14  with me that the claim includes applets that are

15  also system dependent?

16       MR. SHAH:  Same objection.

17       THE WITNESS:  Based on -- I recognize that the

18  inventor was working with a system that was

19  OS-dependent, specifically the Qualcom chipset.

20  However, that use of the term "applet" within that

21  context was unusual or it was not consistent with

22  the common understanding of the term "applet" at the

23  time and the '711 patent does not make that

24  distinction clear.

25       Q   BY MS. MAROULIS:  If the '711 patent does

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 43

1    are off the record.

2            (Recess)

3        THE VIDEOGRAPHER:  The time is 9:59 a.m. and we

4    are back on the record.

5    BY MS. MAROULIS:

6        Q    Mr. Givargis, before the break we were

7    discussing the '711 patent.  Other than the

8    "specification," quote, we discussed and the coding

9    language, there's no other portion of the '711

10   patent that you are relying on in your declaration,

11   correct?

12       A    I believe so, yes.

13       MS. MAROULIS:  I would like to now switch to the

14   prosecution history which is Exhibit 5 and, for the

15   record, the document control numbers are

16   SAMNDCA00007840 through 8459.

17       Q    What is your understanding, sir, of what a

18   file history is?

19       A    Yes.  It has three components, some of it

20   are identifying information or titles of various

21   documents and so on.  Then it has another component

22   which is sort of the examiner's rejections and a

23   description of why those rejections are followed by

24   a response to the office action which comes from the

25   applicant in response to the rejections.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 44

1      Q    What particular portions of this document

2  are you relying on in your declaration?

3      MR. SHAH:  Look at your declaration if you need

4  to.

5      THE WITNESS:  Yes.  May I look at my

6  declaration?

7      Q    BY MS. MAROULIS:  Yes.

8      A    Yes.  I'm relying on the examiner's

9  suggestion that the phrase "a music background play

10 object" will be -- will be augmented with "the music

11 background play objects including an application

12 module includes at least one applet" to distinguish

13 it from the Kokubo patent."

14     Q    Are you reviewing to the interview with the

15 examiner on December 8, 2009?

16     A    Yes.

17     Q    If you would like you can turn to Pages

18 7871 through 7873 of this exhibit, of Exhibit 5.

19     A    Yes.

20     Q    Is this the record of the examiner's

21 interview that we have been talking about?

22     MR. SHAH:  Objection.  The document speaks for

23 itself.

24     THE WITNESS:  Yes, that's correct.

25     Q    BY MS. MAROULIS:  And is it correct that

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 45

1    the relevant passage you were relying on appears on

2    Page 7873 of Exhibit 5?

3         A     This appears to be a summary of the

4    interview that is consistent with the passage I have

5    been relying on, yes.

6         Q     Did you interview any participants of this

7    interview?

8         A     No, I did not.

9         Q     So the only record of this interview you

10   are relying on is this summary here, correct?

11        A     This summary and some of the additional

12   text, yes.

13        Q     And the --

14        A     Surrounding it.

15        Q     And the followup filings by the applicants.

16        A     Correct.

17        Q     Is there anything in this interview summary

18   that mentions Java?

19        A     No, there is not.

20        Q     And is there anything in this summary that

21   mentions applet being system independent?

22        MR. SHAH:  Objection.  The document speaks for

23   itself.

24        THE WITNESS:  No, there is not.

25        Q     BY MS. MAROULIS:  What in particular about