QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

  Kevin P.B. Johnson (Bar No. 177129)
  kevinjohnson@quinnemanuel.com
  Victoria F. Maroulis (Bar No. 202603)
  victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:   (650) 801-5000
Facsimile:   (650) 801-5100

  Michael T. Zeller (Bar No. 196417)
  michaelzeller@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS CO.,
LTD., SAMSUNG ELECTRONICS AMERICA,
INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendant. | CASE NO. 11-cv-01846-LHK<br><br>**DECLARATION OF PROFESSOR RÉMY LIBCHABER IN SUPPORT OF DEFENDANT SAMSUNG'S REPLY MEMORANDUM**<br><br>Date:   April 5, 2012<br>Time:   1:30 p.m.<br>Place:  Courtroom 4, 5th Floor<br>Judge:  Hon. Lucy H. Koh |

02198.51845/4540016.1

I, Professor Rémy Libchaber, do hereby declare and state as follows:

## INTRODUCTION

1. My name is Rémy Libchaber. Since 2001, I have been a Professor of Law at the Paris I University (Panthéon-Sorbonne). Before my present appointment, I was a Professor of Law at Paris-XII University, and before that at Maine University, in Le Mans. My address is 12, rue François Millet. 75016 Paris.

2. I teach French contract law, both at undergraduate and at graduate levels.

3. I have published widely in the field of French contract law. I have also been an editor of a number of chronicles on contract law: from 1995 to 2000 in the *Revue Dalloz*; from 2001 to 2009 in the *Répertoire du Notariat Defrénois*; and since 2011 in the *Revue des contrats*.

4. I submit my curriculum vitae as Exhibit A to this declaration.

5. As set forth below, this declaration is based upon my expert knowledge of French contract law.

## MATERIALS REVIEWED

6. In addition to the materials I identified in my November 22, 2011 declaration submitted in this action, I have reviewed the Declaration of Professor Nicolas Molfessis in Support of Apple Inc.'s Opposition to Samsung's Motion to Dismiss Apple's Counterclaims.

## SUBJECT MATTER OF THIS DECLARATION

7. I have been asked by Defendant Samsung to prepare a report setting out my opinion as to the following questions under French contract law:

   a. How French law categorizes and analyzes patent licensing agreements.

   b. Whether French law requires that license agreements be made in writing.

       c.      Whether a royalty term is required to create an enforceable license agreement.

       d.      The position of the English common law doctrine of promissory estoppel under French civil law.

## OPINION

8. Professor Molfessis' declaration in the dispute between Samsung and Apple does nothing to alter my prior analysis. In his declaration, Prof. Molfessis examines the facts preventing the formation of a license agreement in this case:

- The absence of acceptance by the alleged licensee.
- The absence of a written, signed license agreement, which is required for a patent license agreement under French law.
- The absence of a price term, a required element for the formation of a lease contract.
- The absence of other terms essential to the operation of the contract.

9. For each of these missing elements, Prof. Molfessis tries to show that French law remains open to the formation of a contract even when certain essential terms are lacking. Prof. Molfessis' efforts, however, are in vain, and do little to inform the Court of the position of French law concerning the present matter.

10. The fundamental question analyzed here is whether, under French law, a license agreement is formed when no negotiations are conducted, when there is no acceptance by the purported licensee, when there is no agreement on the essential elements of the contract such as the price and scope of the licenses, when there is no signed writing attesting to the agreement, and when no royalty payments are ever made. As a threshold matter, French law requires license agreements to be memorialized in writing, under penalty of nullity. While Prof. Molfessis may argue that the absence of a particular element can be overcome under specific circumstances, the question here is whether a contract can be formed even when all these essential elements are absent simultaneously.

11. Under French law, a contract is only formed by a meeting of wills. But how can a contract be formed when an offer from one party does not meet with acceptance? How can a license agreement be formed from an act of infringement,

where there was no demonstrated intention to be bound by a license agreement? Prof. Molfessis' view would lead to the conclusion that, if a real estate agency offers an apartment for rent on attractive terms, anyone can force the door and settle into the building illegally, all the while stating that a lease agreement has been *ipso facto* formed. This is most certainly not the position of French law.

12. Pursuant to Article L. 613-8, al. 5, of the French Intellectual Property Code, "assignment or license [agreements] shall be executed in writing, on penalty of nullity." Therefore, license agreements must be recorded in writing, a requirement provided *ad validitatem*; non-written license agreements are void and unenforceable. The patent license agreement is a solemn contract by operation of law. If not in writing, it is invalid, even where the parties intended to agree on its contents.

13. Had Samsung and Apple drafted a written license agreement—which was mandatory—there would be none of the present difficulties. Because the holder of the patent would have straight away been informed of the use that the licensee wanted to make of it, the parties would naturally have considered the necessary conditions of the agreement relative to the desired goals, most fundamentally the amount of royalties.

14. Notably, the primary reason for this rule was to avoid the unfortunate consequences of the old freedom of form. The difficulties of interpretation that arose under the freedom of form system is well documented. *See* P. Roubier, *Le droit de la propriété industrielle*, Recueil Sirey 1954, t. 2, No. 183, p. 262. The dispute here clearly confirms the wisdom of the requirement that a license agreement be in writing: in addition to its other merits, a written contract avoids many of the ambiguities and difficulties of interpretation, the foremost of which is the question of whether an agreement actually exists.

15. In fact, this is the primary flaw in Prof. Molfessis' reasoning: he deals separately with each of the technical difficulties, claiming to have resolved them individually, rather than considering the impossibility of a contract formed from

nothing. Following the logic of Prof. Molfessis, it appears that by the simple declaration in Article 6.1 of the ETSI IPR Policy, Samsung agreed to contract with anyone, under undetermined pecuniary terms, and that it was enough for any interested party to use Samsung's standards-essential patents, without prior notice or authorization, for a license agreement to be formed.

16. Assuming, for the sake of argument, that French law would allow formation of a contract without any meeting of the wills, one still needs to ask how Prof. Molfessis deduced Samsung's intentions, through the simple fact of its membership in ETSI. It makes little sense that Samsung, an internationally recognized technology company, would abdicate all contractual will by agreeing to contract with anyone under undefined conditions, and especially without any provision regarding royalties.

17. For a patent holder, the principal benefit of a patent is in the royalties that can be derived. A license agreement is always formed in consideration of the licensee: a patentee has no reason to engage with persons it does not wish to license. A potential licensee acting in good faith would not practice another's patents without notice, but, instead, would declare this use to the patentee, in order to settle the situation legally. Better yet, a potential licensee would notify the patent holder before practicing patents to which it clearly has no rights, in order to obtain a valid license agreement. Notably, the potential licensee would bring the desired conditions to the patentee's attention—e.g., location, timing, scope—according to which it desired to use the patent, to see whether mutual agreement could be reached regarding royalties. And in case of disagreement or silence by patentee, a potential licensee would immediately apply for relief to a judge to set the royalties, in order not to be liable for excessive damages for any delay. Further, a party acting in good faith would straight away make royalty payments as a protective measure, or would escrow these sums, to show the patentee that it does not intend to take advantage of intellectual property rights free of charge.

18.  Samsung's ETSI declarations do not specify the duration of any license. The declarations only provide that Samsung is prepared to grant licenses on FRAND terms so long as the patents are essential to a standard. See ETSI IPR Policy 6.1. However, if the patents are no longer essential, Samsung will no longer be prepared to grant a license on FRAND terms: the fact that Samsung is conditioning its willingness to offer a license on the patent being essential, does not function as a stipulation of duration, but as a condition of the formation of the contract. Should the patent cease to be essential, Samsung will no longer be prepared to license it. But this does not settle the question of the duration of the term, which is obviously very important to a patent license.

19.  Finally, Prof. Molfessis' belief that a contract can be formed from a unilateral declaration by the patentee, entirely standardized in its formulation, ignores the French conception of contract formation. Further, Prof. Molfessis does not search for any confirmation of his beliefs in the later conduct of the parties, which would likely provide some perspective on their true intentions.

20.  The following sections rebut the arguments of Prof. Molfessis.

**The requirement of writing**

21.  Under French law, it is fundamentally impossible to have a license agreement in the absence of a writing. The patent license agreement is a formal contract, which must be in writing in order to be valid. Where there is no writing, there cannot be any contract. In response to this clear rule, Prof. Molfessis raises several arguments, which are addressed below.

22.  First, Prof. Molfessis argues that Article L. 613-8 of the Intellectual Property Code refers only to a negotiated ("gré à gré") contract, which would not be the case with the ETSI declaration at issue here. But this argument lacks any legal foundation. Under French law, a "gré à gré" contract is a negotiated contract, as

opposed to a preformulated standard contract. Fr. Terré, Ph. Simler and Y. Lequette, *Les obligations*, 10th ed., Dalloz 2009, No. 73, p. 85. A "gré à gré" contract is subject to a "free discussion between the parties," whereas in a preformulated standard contract, the contractual partner is bound by the contractual model provided by the party in a dominant position, able to unilaterally impose all its stipulations.

23. Prof. Molfessis does not argue that a declaration pursuant to Article 6.1 of the ETSI IPR Policy is a preformulated standard contract. For it to be a preformulated standard contract, Samsung would have had to make a complete offer that any interested party could accept to form a contract. Clearly, in the absence of a price term, a judge would still need to intervene to determine the royalties. A preformulated standard contract must be complete and free of the need for any judicial intervention for its formation. The fact that the price still had to be determined shows that the conditions of the license were intended to be negotiated before a contract could be formed. Therefore, Samsung's ETSI declarations were made "gré à gré," contrary to Prof. Molfessis' categorical statements.

24. The *ETSI Guide on Intellectual Property Rights (IPRs)* of November 27, 2008, expressly mentions negotiations occurring between the parties: "*specific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI.*" ETSI IPR Guide. p. 59, No. 4.1, § 1. In the context of ETSI membership, it was obvious that a license agreement had to be the subject of negotiations to settle the detailed terms a patent license requires.

25. In a similarly cursory way, Prof. Molfessis states that a writing is only required of the patentee, who must be able to size up its undertaking. He relies in this respect on authors who discuss contract law in a general way, and certainly not patent licenses, which are not mentioned. This unilateral approach is far from the mainstream. One specialist states that "the requirement of a writing is only for the protection of the contractual partners." Y. Reboul, *J.-Cl. Brevets*, Fasc. 4740: Licence de brevet.

- 8 -

Formation du contrat. Conclusion du contrat, No. 40. But this requirement of a writing can still be justified in several other ways. A writing brings certainty to the agreement and allows for the publication of the contract, which is necessary for reasons of enforceability against third parties.

26.   Finally, Prof. Molfessis appears to argue that the ETSI system is similar to that of the Luxembourg Convention, which is not applicable under the law as it stands. It is surprising that Prof. Molfessis attempts to shed light on French law with a European Convention of material law, which necessarily derogates from common law. In any event, Article 43 of the Luxembourg Convention of 15 December 1989 should dispel any possible doubt on the meaning of ETSI IPR Policy Article 6.1.

27.   First, Prof. Molfessis' quote suggests that the expression "in return for appropriate compensation," in Article 43, is somehow equivalent to the requirement of a FRAND price found at Article 6.1. This is absolutely not the case. Under the Convention, the amount of the desired royalty must be specified in the written offer (see paragraph 4, which specifies this requirement). If the royalty is described as adequate, it is because a mechanism for correction is provided for by the instrument, at Article 43, ¶ 5, stating that "[o]n written request by one of the parties, a Revocation Division shall determine the appropriate compensation or review it if circumstances have arisen or become known which render the compensation determined obviously inappropriate."

28.   Besides, the conditions for the use of a patent by an interested party are subject to the provisions of the implementing regulation, whose rule 10 provides that:

- Whoever wishes to use the invention must inform the owner by registered letter. This communication takes effect one week after the letter has been sent;
- The communication must indicate the use that would be made of the patent, and the actual practice of the licensee shall not diverge from what he undertook;

- The licensee must inform the patent owner, at the end of each quarter, of the use of the invention and pay the corresponding royalty.

29.    The system of the Luxembourg Convention is very different from the ETSI system. Under the Luxembourg Convention, the royalty must be specified in a written offer, which shows the importance of fixing the royalty term for the license agreement. Before practicing any patent, the interested party must notify the patent holder and specify all the conditions of the use of the license – to which he then remains bound.

30.    By Article L. 613-8 of the Intellectual Property Code, the French legislature has required that patent licenses be formed by writing, under penalty of nullity. And the legislature did not provide for any exceptions to this general rule. There is therefore no reason to permit Apple to avoid this formal requirement of French law.

**Characterization of the patent license agreement**

31.    Prof. Molfessis argues that since the license agreement does not fall within any general category, it is a *sui generis* contract, which would exclude it from application of any legal rule whatsoever. (Molfessis opinion, No. 25, p.9.) This opinion is far from the general consensus, however, and the most widely recognized texts on license agreements take the opposite position. In the first book devoted to license agreements, Prof. Burst states that the "case law did state, together with the scholars, that the license agreement had all the characteristics of a lease agreement." J.-J. Burst, Breveté et licencié. Leurs rapports juridiques dans le contrat de license, Pref. D. Bastian, Litec 1970, No. 19, p. 20. And in the latest work about license agreements, a whole chapter is entitled, *The intellectual property rights license agreement, an atypical lease agreement.* A. Abello, La licence, instrument de régulation des droits de propriété intellectuelle, Pref. M. Vivant, LGDJ 2008, p. 131 *et seq.*

32. The same position is found in textbooks. One author writes: "<u>all the authors</u> teach that licenses have all the characteristics of leases and agree to apply the provisions of Article 1713 of the civil code." Reboul, op. cit., No. 67 (emphasis added) and the many references, doctrinal or case law, cited there; this assertion was already found in No. 27. Another author states that "in this definition [of a license] we find once again the characteristic elements of a lease contract; it is indeed this qualification that is adopted by the prevailing doctrine and case law." J. Schmidt-Szalewski and J.-L. Pierre, Droit de la propriété industrielle, 4th ed., Litec 2007, No. 273, p. 109. "[A]lthough it is the best instrument for the 'transfer of technologies,' a license agreement is subject to the legal regime of lease agreements (Civil code, Art. 1708 *et seq*.), completed by a few other ad hoc rules laid down in Article L.613-8 of the Intellectual Property Code." Schmidt-Szalewski and Pierre, op.cit., No. 274, p.110.

33. Yet another author states that: "the patent license, a bilateral contract, is treated like a lease agreement: the patentee grants to another, in whole or in part, the enjoyment of its right of exploitation in return for royalties, while retaining ownership of the patent. Therefore we transpose to the patent license agreement the rules set up by the civil code for the lease agreement (art. 1713 *et seq*.)." Pollaud-Dulian, La propriété industrielle, Economica, No. 694, p.366. Under the heading *The license agreement is a lease agreement*, another author writes that "the prevailing doctrine, endorsed by case law, teaches that licenses have all the characteristics of leases and agree to apply the provisions of Article 1713 *et seq*. of the civil code." J. Azéma and J.-Chr. Galloux, Droit de la propriété industrielle, 6th ed., Dalloz 2006, No. 285, p. 298.

34. Finally, synthesizing all intellectual property rights, another writers considers that "the license agreement, or licensing, adopts the legal form of a lease agreement, a lease, whose object is an intellectual property . . . The intellectual property code being silent on this matter, and in the absence of any specific provision, the general law of leases, set out in Articles 1708 *et seq*. of the civil code is applicable,

- 11 -

which constitutes the general law of licensing in intellectual property." N. Binctin, Droit de la propriété intellectuelle, LGDJ 2010, No. 877, p. 549.

35.  Against all of these analyses from renowned authors, Prof. Molfessis cites Mr. Joliet, who believes that a license agreement need not entirely follow the law of a lease agreement. In particular, because the object of the agreement is intangible, Mr. Joliet argues that a certain number of rules applicable to leases must be adapted, but makes no reference to the determination of a royalty, which is not at the center of his interests.

36.  In his article, Mr. Joliet concedes that his approach is quite unusual. He writes: "the vast majority of scholars and case law, both in France and Belgium, emphasize the positive aspects of the license agreement that this majority compares with a lease of things… It can be easily understood that case law and scholars have made this connection. The situation of the licensee is comparable to that of the lessee." R. Joliet, "Le contrat de licence de brevet en droit belge et français," RTD com 1982.167, and spec. p. 174. Mr. Juliet's unorthodox views have not convinced most representative authorities, discussed above, and has not been adopted.

37.  Confronted with such clear-cut and converging opinions, Prof. Molfessis would need to offer compelling arguments countering this analysis on the subject of fixation of the price. There are no such compelling arguments in Prof. Molfessis' opinion.

**The determination of royalties in a license agreement**

38.  In reality, the academic classification of a contract is much less important than the consequences that can be drawn from it: is the determination of royalties a precondition to the formation of a patent license contract? Here there is no uncertainty as to the threshold of formation of the license—the contract is solemn and not informal. It can, therefore, be formed only by the existence of writing. Only by

ignoring this decisive element does Prof. Molfessis reach the question of classification. There are, then, two possibilities:

- A license agreement is a type of lease contract, which can only be formed if the rental price is determined by the parties, or is at the very least determinable; or

- A license agreement does not constitute a lease, which means the question of the threshold of formation remains to be resolved If the royalty is an essential element of the license, the contract cannot be formed as long as the amount remains undetermined.

39. If, as I believe, a patent license falls within the general category of a lease, it seems that the royalties that constitute the rent to be paid must be fixed in advance, in accordance with the common law of leases. Under French law, special leases, not controlled by common law, but rather defined by statute, also require a set price prior to formation of the contract. The ambit of common law leases gradually declined following the appearance of special lease regimes, meaning that it is difficult to find precedent confirming or invalidating the requirement of a price term in the common law. It is nevertheless interesting to consult the treaty of civil law that constituted the least contestable presentation of French law in the 1950s, i.e., just before the increase in the number of special leases. It is stated therein that:

> The lease price must not only be serious, but certain, i.e., determined or at least determinable. Consequently, if the parties, having agreed in principle to enter into a lease, forget to fix the price or cannot agree on it, the alleged lease will be nullified absolutely for want of price. Thus, a contract that allows for the parties to later reach an amicable agreement on the price will be null if this agreement is never reached. If the lessee was already in possession of the asset, he would not pay any rent to the lessor, but would instead provide compensation for his occupation of the asset, representative of the harm suffered.

M. Planiol and G. Ripert, *Droit civil français*, ch. X, *Contrats civils*, LGDJ 1956, by Fr. Givord et A. Tunc, No. 470, p. 602.

40.     Prof. Molfessis' argument fails to contradict well-established legal authority that a lease is formed only when the parties agree on a price. He first claims authority from the Civil Code, a strict interpretation of which would rule out the predetermination of a rental price (No. 34). During development of the Civil Code of 1804, it was clearly maintained that "agreement on the asset that is leased and the price creates a rental." P. A. Fenet, *Travaux préparatoires du Code civil*, Ch. 14, p. 312. Throughout the 19th Century, the comparison of the lease of assets and of the sale is systematic: "Renting is very much analogous to selling. In both contracts we come across the same essential elements: *consensus, res, pretium*." G. Baudry-Lacantinerie, *Précis de droit civil*, Ch. 3, 7th ed. 1900, No. 658, p. 417. At same time, a widely renowned professor opened a learned essay on this point with the following words: "it is incontestable, despite the continuing silence in the Civil Code on this point under the title *lease*, that in a lease contract the price must be certain and determined; Articles 1591 and 1592 concerning the sale are to be applied by analogy to this contract." A. Boistel, note under Pau, 22 March 1898, DP 1900.2.97.

41.     Prof. Molfessis invokes numerous rulings, the interpretation of which is equally questionable. No. 35 *et seq*. One of them covers the proof of contracts, in particular, whether the mention of the existence of a lease in another notarised agreement suffices to make it enforceable against a subsequent purchaser, and it is very difficult to draw anything of value from this whatsoever. Civ. 3, 15 March 2000, *Bull. III*, No. 55. The other concerns the renting of a safety deposit box, but does nothing to support his position. Civ. 1, 30 June 2004, *Bull. I*, No. 190. In that case, the contract was formed, but the rent was stipulated to be determinable by the unilateral resolve of the banker. In accordance with the rulings of 1995, the Court has considered that this stipulation was sufficient—a solution that is unchallengeable since these rulings, in relation not to leases but to all the contractual relationships where the parties agreed on a stipulation of the rental price solely by one party. But in our situation, the patent

holder never accepted that the royalties would be determined by the sole will of the licensee, which prevents those rulings to be of any help. This is why Professor Molfessis' opinion regarding the absence of determination of the rent in the lease, based on the rulings of 1995, is highly questionable, to say the least.

42.     In no way do these decisions allow that in the lease of things, a contract could be formed even though the amount of the rent is left to the wisdom of judges. The determination of the rent is far too essential to the contract for the parties not to have their say in its determination.

43.     If, as Prof. Molfessis suggests, a license is not considered a type of lease, what is the correct approach to determine the price? I begin by contesting the doctrinal argument invoked by Prof. Molfessis. The authors he cites contend that a license could be formed without the royalties being determinable, but they base their position on an inapposite decision that does not concern a patent license, Com. 9 November 1987, *Bull. IV*, No. 237. Another author opines the opposite way, but does not cite case law from the Supreme Court. Pollaud-Dulian, *cit. op.*, No. 701, p. 369 ("the absence of price is punished by an absolute nullity").

44.     The question here is whether the determination of the royalty is an essential element of the contract, or not. The Supreme Court has not addressed this question directly. Prof. Molfessis nonetheless cites a decision of the Lyon Court of Appeals, which would have settled the difficulty in favor of the absence of a prior determination of the royalties. Lyon, 5 February 2009, *D.* 2010.467, note J. Raynard.

45.     That decision, however, was not decided by the French Supreme Court and is therefore without significant precedential authority. One learned commentator on the decision wrote that the

> decision constitutes, to the best of our knowledge, the first application of the case law of the Supreme Court *en banc* of 1 December 1995 to a patent license. This reference is inappropriate for two reasons. First, the cited Supreme Court case concerned framework contracts of supply and demand, not a patent license involving the lease of things for

> which the requirement of a fixed price should be preserved, in particular taking into account Article 1591 of the French Civil Code on the legal regulation of the price of leases . . . In that case, there was no agreement between the parties on the mechanism for fixing the price, as the sales threshold was not reached. Therefore, it was not a matter of acknowledging the power of one of the parties to set the price, but only of noting an absence of agreement on a price which should have condemned the possibility of an agreement.

Raynard, obs. under Lyon, 5 February 2009, supra.

46. The fundamental question here is whether it is necessary to fix the amount of royalties for a license agreement to be formed. This question hardly ever appears in the case law, simply due to the requirement of the law that license agreements be written, which inevitably leads the parties to expressly fix the amount of the royalties.

47. Nevertheless, under common law, informal contracts are formed as soon as there is an agreement on the essential elements. Therefore, the question which arises under common law is whether the royalties should be considered as an essential element of a license agreement. For the reasons described herein, it seems obvious that the answer must be in the affirmative, as it is for lease agreements.

48. Prof. Anne Laude, a recognized expert on the subject of contract formation, writes that "one principle can be derived from the entirety of the case law on the existence or not of a contractual legal commitment: the principle pursuant to which any performance of an agreement providing for the payment of a price is essential in order for the agreement to entail a legal commitment." A. Laude, *La reconnaissance par le juge de l'existence d'un contrat*, Pref. J. Mestre, PUAM 1992, No. 322, p. 204. Prof. Laude concludes that "other contracts, which are less similar to sales, consider the financial performance as an essential element. Therefore, in the same way as the price in sales, the rent is essential to a lease contract, irrespective of whether it is a lease of movable or unmovable things." Laude, *cit. op.*, No. 331, p. 211. This approach extends "to a wide variety of contracts. Such is the case for an exclusive patent

license." Laude, *op. cit.*, No. 332, p. 212. Prof. Laude's analysis is partially based on a judgment of the French Supreme Court, which is somewhat ambiguous. Civ. 3, 22 February 1967, *Bull. III*, No 87, p. 83.

49. Nevertheless, the analysis by Prof. Laude is well founded. The determination of a price is always, by its nature, an essential element for the formation of a contract. In cases where French law seems to make an exception—in the lease of work and, more generally, in the performance of services—it does so for the sake of realism. Since the amount of work cannot always be determined ex ante, the parties must have some flexibility. Moreover, in such matters a judge who may eventually be asked to estimate the amount of work can refer to market prices, thereby avoiding any personal estimation. Laude, *cit. op.*, No. 338 and *seq.*, p. 217.

50. In regards to patent licenses, I cannot see anything that would obviate the necessity for the parties to determine the price, as a condition for formation of a contract. Even if the contract was informal, which is not the case, the determination of the royalty would still be an essential element for its formation.

### Promissory Estoppel under French Law

51. French law does not recognize a formal doctrine of promissory estoppel. In his opinion, Prof. Molfessis mentions the French Supreme Court's acknowledgement of the concept of estoppel, which he gives a broad reading. Prof. Molfessis believes that promissory estoppel is a doctrine that the "*Cour de cassation* will likely apply not only for procedural matters, but also with regard to substantive issues." (Molfessis Opinion, § 52.)

52. Prof. Molfessis is incorrect. First, there is no reason to think that the concept of estoppel, specific to *English common law*, will apply in France. In a few decisions, the French Supreme Court has simply mentioned the prohibition against contradicting oneself to the detriment of others, which is far from being a broadly accepted principle. In 2009, the French Supreme Court, sitting *en banc*, recognised

only a very modest scope to the principle. AP, 27 February 2009, D. 2009.1245, note D. Houtcieff. Therefore, Prof. Molfessis has no basis for invoking the doctrine of *promissory estoppel*, particularly in view of the strong associations this term could have in the eyes of an American judge.

53.  Second, the French rule against contradicting oneself to the detriment of others applies only in procedural matters, since the contradiction can only lead to an inadmissibility, as opposed to allegations incompatible with the conduct of the party in the same case. However one should not rush to give it excessive scope: the principle of procedural non-contradiction must be harmonized with another fundamental principle, according to which all parties enjoy real freedom in presenting their theory of the case at trial. The rule expressed by the Court is therefore designed to prevent procedural excesses motivated by bad faith.

54.  Third, the idea that this principle would extend to the point of constituting a general principal of substantive law, which would force any person to have a coherent behaviour in the conduct of its business and the organization of its contracts, has no basis in the law as it stands. Article 1134 of the Civil Code, the heart of French contract law, states that "the agreements that are legally formed act as law for those who made them." This bedrock principle of French law has not been replaced by one of non-contradiction.

55.  The legal debate on the place of promissory estoppel in French law holds very little interest, since this weak principle of procedural non-contradiction in no way concern the situation here.

## Conclusion

56.  In sum, I steadfastly maintain that the declaration of Article 6.1 constitutes only an offer to negotiate the terms of a potential patent license, as it remains silent on all the modalities of use. The principle of contractual freedom

- 18 -

allowed the patentee to refuse to grant a license to such or such interested party, taking into account the FRAND requirements, which would have to be considered during the contractual negotiation. The absence of any declaration from a third party interested in the patents made it impossible that a license agreement was formed. Illegal use of the patents can in no way be analyzed as a tacit acceptance of the contract, but constitutes an act of infringement. Above all, in the absence of a writing, no license agreement could exist between the parties, according to French law.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 9th day of January, 2012, in Paris, France.

Rémy Libchaber

**GENERAL ORDER ATTESTATION**

I, Victoria Maroulis, am the ECF user whose ID and password are being used to file the foregoing document.  I hereby attest pursuant to General Order 45.X.B. that concurrence in the electronic filing of this document has been obtained from Rémy Libchaber.

                                  */s/ Victoria Maroulis*