Exhibit A

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Cal. Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Cal. Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Michael T. Zeller (Cal. Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 11-cv-01846-LHK<br><br>**SAMSUNG'S FIRST 30(b)(6) DEPOSITION NOTICE TO APPLE INC.** |

1   **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2          **PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 30,

3   Defendants and Counterclaimants Samsung Electronics Co., Ltd., Samsung Electronics America,

4   Inc., and Samsung Telecommunications America, LLC (collectively "Samsung") will take the

5   deposition upon oral examination of Apple Inc. ("Apple") pursuant to 30(b)(6) of the Federal

6   Rules of Civil Procedure.  The deposition will commence on a mutually agreeable date at the

7   offices of Quinn Emanuel Urquhart & Sullivan,  LLP, 555 Twin Dolphin Drive, Redwood Shores,

8   California, 94065 and will continue day-to-day until completed.  The deposition will be taken by a

9   notary public or other authorized officer and will be videotaped and recorded stenographically.

10  Pursuant to Rule 30(b)(6), Apple shall designate one or more officers, directors, managing agents

11  or other persons who consent to testify on its behalf concerning each of the topics set forth in

12  Exhibit A hereto.

13  DATED: December 14, 2011            QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP
14

15

16                                      By  */s/ Victoria F. Maroulis*
                                           _____
17                                         Charles K. Verhoeven
                                           Kevin P.B. Johnson
                                           Victoria F. Maroulis
18                                         Michael T. Zeller
                                           Attorneys for SAMSUNG ELECTRONICS CO.,
19                                         LTD., SAMSUNG ELECTRONICS AMERICA,
                                           INC., and SAMSUNG
20                                         TELECOMMUNICATIONS AMERICA, LLC

21

22

23

24

25

26

27

28

**EXHIBIT A**

**DEFINITIONS**

The Topics for deposition, as well as the Instructions provided below, are subject to and incorporate the following definitions:

1.     The terms "APPLE," "PLAINTIFF," "YOU," and "YOUR" shall refer to Apple, Inc., any predecessor or successor of Apple, Inc., and any past or present parent, division, subsidiary, affiliate, joint venture, associated organization, director, officer, agent, employee, consultant, staff member, or other representative of Apple, Inc., including counsel and patent agents, in any country.

2.     The term "DEFENDANTS" and "SAMSUNG" means Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC.

3.     "This Lawsuit" shall mean the action entitled *Apple, Inc. v. Samsung Electronics Co., Ltd.*, Case No. 11-cv-01846-LHK.

4.     The term "'604 PATENT" shall mean U.S. Patent No. 6,928,604 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

5.     The term "'410 PATENT" shall mean U.S. Patent No. 7,050,410 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

6.     The term "'792 PATENT" shall mean U.S. Patent No. 7,200,792 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

7.     The term "'867 PATENT" shall mean U.S. Patent No. 7,362,867 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

8.     The term "'001 PATENT" shall mean U.S. Patent No. 7,386,001 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

1   and all foreign counterpart applications and patents which claim the same subject matter.

2       9.      The term "'516 PATENT" shall mean U.S. Patent No. 7,447,516 and all parents,

3   progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

4   and all foreign counterpart applications and patents which claim the same subject matter.

5       10.     The term "'941 PATENT" shall mean U.S. Patent No. 7,675,941 and all parents,

6   progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

7   and all foreign counterpart applications and patents which claim the same subject matter.

8       11.     The term "'055 PATENT" shall mean U.S. Patent No. 7,069,055 and all parents,

9   progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

10  and all foreign counterpart applications and patents which claim the same subject matter.

11      12.     The term "'871 PATENT" shall mean U.S. Patent No. 7,079,871 and all parents,

12  progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

13  and all foreign counterpart applications and patents which claim the same subject matter.

14      13.     The term "'893 PATENT" shall mean U.S. Patent No. 7,456,893 and all parents,

15  progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

16  and all foreign counterpart applications and patents which claim the same subject matter.

17      14.     The term "'460 PATENT" shall mean U.S. Patent No. 7,577,460 and all parents,

18  progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

19  and all foreign counterpart applications and patents which claim the same subject matter.

20      15.     The term "'711 PATENT" shall mean U.S. Patent No. 7,698,711 and all parents,

21  progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

22  and all foreign counterpart applications and patents which claim the same subject matter.

23      16.     "SAMSUNG PATENTS-IN-SUIT" shall mean the '604 PATENT, the '410

24  PATENT, the '792 PATENT, the '867 PATENT, the '001 PATENT, the '516 PATENT, the '941

25  PATENT, the '055 PATENT, the '871 PATENT, the '893 PATENT, the '460 PATENT, and the

26  '711 PATENT.

27      17.     The term "'002 PATENT" shall mean U.S. Patent No. 6,493,002 and all parents,

28  progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

1   and all foreign counterpart applications and patents which claim the same subject matter.

2       18.     The term "'381 PATENT" shall mean U.S. Patent No. 7,469,381 and all parents,

3   progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

4   and all foreign counterpart applications and patents which claim the same subject matter.

5       19.     The term "'607 PATENT" shall mean U.S. Patent No. 7,663,607 and all parents,

6   progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

7   and all foreign counterpart applications and patents which claim the same subject matter.

8       20.     The term "'828 PATENT" shall mean U.S. Patent No. 7,812,828 and all parents,

9   progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

10  and all foreign counterpart applications and patents which claim the same subject matter.

11      21.     The term "'915 PATENT" shall mean U.S. Patent No. 7,844,915 and all parents,

12  progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

13  and all foreign counterpart applications and patents which claim the same subject matter.

14      22.     The term "'891 PATENT" shall mean U.S. Patent No. 7,853,891 and all parents,

15  progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

16  and all foreign counterpart applications and patents which claim the same subject matter.

17      23.     The term "'163 PATENT" shall mean U.S. Patent No. 7,864,163 and all parents,

18  progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

19  and all foreign counterpart applications and patents which claim the same subject matter.

20      24.     The term "'129 PATENT" shall mean U.S. Patent No. 7,920,129 and all parents,

21  progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof

22  and all foreign counterpart applications and patents which claim the same subject matter.

23      25.     "APPLE UTILITY PATENTS" shall mean the '002 PATENT, the '381 PATENT,

24  the '607 PATENT, the '828 PATENT, the '915 PATENT, the '891 PATENT, the '163 PATENT,

25  and the '129 PATENT.

26      26.     The term "D'790 PATENT" shall mean U.S. Design Patent No. D627,790 and all

27  parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues

28  thereof and all foreign counterpart applications, registrations, and patents which claim the same

subject matter.

27.     The term "D'334 PATENT" shall mean U.S. Design Patent No. D617,334 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications, registrations, and patents which claim the same subject matter.

28.     The term "D'305 PATENT" shall mean U.S. Design Patent No. D604,305 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications, registrations, and patents which claim the same subject matter.

29.     The term "D'087 PATENT" shall mean U.S. Design Patent No. D593,087 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications, registrations, and patents which claim the same subject matter.

30.     The term "D'677 PATENT" shall mean U.S. Design Patent No. D618,677 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications, registrations, and patents which claim the same subject matter.

31.     The term "D'270 PATENT" shall mean U.S. Design Patent No. D622,270 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications, registrations, and patents which claim the same subject matter.

32.     The term "D'889 PATENT" shall mean U.S. Design Patent No. D504,889 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications, registrations, and patents which claim the same subject matter.

33.     "APPLE DESIGN PATENTS" shall mean the D'790 PATENT, the D'334 PATENT, the D'305 PATENT, the D'087 PATENT, the D'677 PATENT, the D'270 PATENT, and the D'889 PATENT.

34.     "APPLE PATENTS-IN-SUIT" shall mean the APPLE UTILITY PATENTS and the APPLE DESIGN PATENTS.

35.     "PATENT FAMILY TREE" shall mean any U.S. or foreign patents or patent applications related to a patent, including all parent, divisional, continuation, continuation-part, reissue, reexmaination, extension, and foreign counterpart patents and applications thereof.

36.     "PRIOR ART" shall mean any reference, publication, patent, physical specimen, use, invention by another, sale, offer for sale, or other activities that are relevant to the validity of the APPLE PATENTS-IN-SUIT, including anything that is relevant to the patentability of any patent claim under 35 U.S.C. §§ 102 and 103.  Prior Art is not limited to references or other activities cited to the United States Patent and Trademark Office during prosecution of any patent.

37.     The term "APPLE TRADE DRESS" shall mean U.S. Registration Nos. 3,470,983; 3,457,218; 3,475,327; US Application Serial Nos. 77/921,838; 77/921,829; 77/921,869; 85/299,118; and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications, and registrations that claim the same subject matter; and the unregistered iPhone, iPhone 3G, iPhone 4, iPhone/iPhone 3G/iPhone 4, iPad, iPad 2, and packaging trade dress claimed by APPLE.

38.     The term "APPLE TRADEMARKS" shall mean U.S. Trademark Registration Nos. 3,886,196; 3,889,642; 3,886,200; 3,889,685; 3,886,169; 3,886,197; 2,935,038; U.S. Application Serial No. 85/041,463, and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications, and registrations that claim the same subject matter.

39.     "APPLE IP" shall mean the APPLE PATENTS-IN-SUIT, APPLE TRADE DRESS and APPLE TRADEMARKS.

40.     The term "APPLE ACCUSED PRODUCTS" shall mean electronic devices that allow for communications and data transfer over networks including establishing data connections, execution of user operations and audio play back of digital data that are manufactured, distributed, and/or sold by YOU or YOUR parent, subsidiary, or affiliate companies or on YOUR behalf, or on behalf of YOUR parent, subsidiary, or affiliate companies

1   anywhere in the world, at any time between April 15, 2005 through the pendency of This Lawsuit,

2   including each and every APPLE product that SAMSUNG has identified as infringing in any of its

3   complaints or infringement contentions served in this action.  The term shall include, without

4   limitation, the following devices:  the Apple iPhone, the Apple iPhone 3G, the Apple iPhone 3GS,

5   the Apple iPhone 4, the iPod Touch, the iPad, the iPad 3G, the iPad 2, the iPad 2 3G.  The term

6   "APPLE ACCUSED PRODUCTS" also includes all products APPLE alleges embody the APPLE

7   PATENTS-IN-SUIT.

8          41.     The term "SAMSUNG ACCUSED PRODUCTS" shall mean the products APPLE

9   alleges infringe, dilute, unfairly compete with, or otherwise violate APPLE's rights in any of the

10  APPLE PATENTS-IN-SUIT, APPLE TRADE DRESS, or APPLE TRADEMARKS, including,

11  without limitation, the Acclaim, Captivate, Continuum, Droid Charge, Exhibit 4G, Epic 4G,

12  Fascinate, Gem, Galaxy Ace, Galaxy Prevail, Galaxy S, Galaxy S i9000, Galaxy S 4G, Gravity,

13  Indulge, Infuse 4G, Intercept, Mesmerize, Nexus S, Nexus S 4G, Replenish, Showcase i500,

14  Showcase Galaxy S, Sidekick, Transform, and Vibrant phones, and Galaxy Tab and Galaxy Tab

15  10.1 tablet computers.

16         42.     The term "Software" shall include source code, hardware code, machine code,

17  assembly code, or code written in any programming language, and code that can be compiled or

18  acted upon by a processor, any listings or printouts thereof, and any release notes describing the

19  features or modifications of such code.

20         43.     The term "Executable Software" shall mean computer files containing encoded

21  instructions capable of being executed by a processing unit (e.g. central processing unit, micro-

22  controller), and any release notes describing the features or modifications of such files.  The term

23  shall include, without limitation, firmware and executable binary files.

24         44.     The term "Hardware" includes all constituent parts of a device including, but not

25  limited to, assemblies, subassemblies, modules, individual integrated circuits, chipset, chipsets,

26  software, hardware-based capabilities, and/or application specific integrated circuits.

27         45.     The term "Baseband Processor" shall mean a processor in a mobile

28  telecommunications device that is mainly used to process communication functions.

46.     The term "3GPP" shall mean the organization known as the 3rd Generation Partnership Project which specifies, develops, and promulgates technical specifications for wireless networks.

47.     The term "UMTS" shall mean the Universal Mobile Telecommunications System as developed and promulgated by 3GPP.

48.     The term "WCDMA" shall mean Wideband Code Division Multiple Access a member of the UMTS family of standards.

49.     The term "GSM" shall means the standard known as Global System for Mobile Communications.

50.     The terms "COMMUNICATION" or "COMMUNICATIONS" shall mean, without limitation, any transmittal, conveyance or exchange of a word, statement, fact, thing, idea, DOCUMENT, instruction, information, demand, question or other information by any medium, whether by written, oral or other means, including but not limited to electronic communications and electronic mail.

51.     The terms "DOCUMENT" and "DOCUMENTS" shall have the broadest meaning ascribed to them by Federal Rule of Civil Procedure 34 and Federal Rule of Evidence 1001.  The terms shall include within their meaning, by way of example and not limitation, any and all accounts, analyses, books, CDs, calendars, commercial paper, communications, correspondence, DVDs, e-mail, films, financial statements, floppy disks, hard disks, inter-office memoranda, invoices, ledgers, letters, licenses, logs, memoranda, microfilms, minutes, notes, notes of conversations, notes of meetings, notes of telephone calls, office communications, photographs, printouts, recordings of conversations (whether written or electronic), reports, schedules, storage tape, task lists, telegrams, telephone bills, videotapes or other video recordings, and any differing versions of the foregoing whether denominated formal, informal or otherwise, as well as copies of the foregoing which differ from the original in any way, including handwritten notations or other written or printed matter.  The foregoing specifically includes information stored electronically, whether in a computer database or otherwise, regardless of whether such DOCUMENTS are presently in DOCUMENTary form or not.  A draft or non-identical copy of a DOCUMENT is a

1   separate DOCUMENT within the meaning of this term.

2       52.     "Identify" when used in reference to:

3           (a)     An individual, means to state his or her full name, present or last known

4   residential and business addresses, present or last known position and business affiliation, and if

5   applicable, history of employment of that individual;

6           (b)     A firm, partnership, corporation, proprietorship, joint venture, association,

7   or other organization or entity, means to state its full name, present or last known address and

8   place of incorporation or formation and to identify each agent that acted for it with respect to the

9   matters relating to the request or answer;

10          (c)     A DOCUMENT, means to state the date, title, if any, subject matter, each

11  author, each addressee or recipient if practicable, and otherwise a general description of the

12  persons to whom the writing was distributed, the production number, and the type of

13  DOCUMENT, *i.e.*, publication, letter, memorandum, book, telegram, chart etc., or some other

14  means of identifying the DOCUMENT, and its present location and custodian;

15          (d)     A COMMUNICATION, means to state its date and place, the person(s)

16  who participated in it or who were present during any part of it or who have knowledge about it;

17          (e)     A date, means to state the date and set forth the basis for YOUR contention

18  that the date is responsive to the request; and

19          (f)     A product, service, or intellectual property, means to state all names and

20  numbers related to the product, service, or intellectual property, and the owner, manufacturer,

21  distributor, licensor, or dealer of the product, service, or intellectual property during the relevant

22  time period and currently.  For a product, provide all designations for the product, from the most

23  specific to the most general, including any model numbers or designations, version numbers or

24  designations, and internal numbers or designations.

25      53.     The term "person" or "persons" refers to any individual, corporation,

26  proprietorship, association, joint venture, company, partnership or other business or legal entity,

27  including governmental bodies and agencies.  The masculine includes the feminine and vice versa;

28  the singular includes the plural and vice versa.

54.    The terms "any," "all," "every," and "each" shall each mean and include the other as necessary to bring within the scope of these requests for production all responses that might otherwise be construed to be outside of their scope.

55.    The terms "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these requests for production all responses that might otherwise be construed to be outside of its scope.

56.    The term "thing" refers to any physical specimen or tangible item in YOUR possession, custody or control, including research and development samples, prototypes, productions samples and the like.

57.    The terms "referring to," "relating to," "concerning" or "regarding" shall mean containing, describing, discussing, embodying, commenting upon, identifying, incorporating, summarizing, constituting, comprising or are otherwise pertinent to the matter or any aspect thereof.

58.    The use of the singular form of any word includes the plural and vice versa, as necessary to bring within the scope of these requests for production all responses that might otherwise be construed to be outside of its scope.

59.    The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

### Topics

1.    YOUR organizational structure and personnel, including officers, employees, and outside contractors and their respective responsibilities, related to intellectual property product design, research and development, testing sourcing, procurement, marketing, sales and sales projections, pricing, distribution, accounting, finance, manufacturing, management and information systems and electronic data processing, legal and licensing, government regulation and government relations, corporate management, and corporate strategy.

2.    YOUR corporate structure, including the personnel and any third parties involved in: (a) the research, development, and design of the APPLE ACCUSED PRODUCTS; (b) the manufacture and/or assembly of the APPLE ACCUSED PRODUCTS; (c) the importation of the APPLE ACCUSED PRODUCTS; (d) the sale and/or offer for sale of the United States of the APPLE ACCUSED PRODUCTS; (e) the facilities where the APPLE ACCUSED PRODUCTS are or were designed and/or manufactured; and (f) Apple's role in the manufacture, importation, use, purchase, sale or offer for sale of the APPLE ACCUSED PRODUCTS.

3.      Any DOCUMENTS and/or information provided to or received from manufacturers, purchasers and/or suppliers of APPLE ACCUSED PRODUCTS or of components used in such devices relating to those products or components, including any technical specification, firmware source code listings and specifications, reference design hardware, firmware, source code, specifications, and design DOCUMENTS.

4.      Any and all subsidiaries, parent companies, sister companies, affiliates, entities in which APPLE owns an equity interest, and/or entities that own an equity interest in APPLE.

5.      APPLE's policies and procedures for evaluating third-party patents for purposes of determining whether any APPLE products might infringe those patents, including any evaluations undertaken before the release of the iPhone or iPad.

6.      Any efforts APPLE has undertaken to preserve, secure, and collect DOCUMENTS that may be relevant to This Lawsuit.

7.      APPLE's policies and practices with respect to the filing, storage, retention, and destruction of DOCUMENTS.

8.      Whether APPLE has any basis for believing or suspecting that any DOCUMENTS responsive to SAMSUNG's requests for production in This Lawsuit have been destroyed, erased, discarded, or hidden and, for any such DOCUMENTS:

         (a)      the approximate date the DOCUMENT was destroyed, erased, discarded or hidden;

         (b)      the individual or individuals who ordered, were responsible for, or were involved in any way in the DOCUMENTS being destroyed, erased, discarded or hidden;

         (c)      any logs, records or other DOCUMENTS referring to, requiring, or authorizing the destruction, erasure, discarding, or hiding of the DOCUMENTS; and

         (d)      any policy, instruction, practice, or standard procedure under or pursuant to which the destruction, erasure, discarding or hiding of the DOCUMENTS was carried out, including the dates and authors of any such policy, instruction, practice or standard procedure.

9.      Investigations, tests, studies, reviews, analyses, or opinions of counsel relating to the SAMSUNG PATENTS-IN-SUIT, including validity/invalidity, enforceability/unenforceability, infringement/non-infringement, or any financial valuation of the SAMSUNG PATENTS-IN-SUIT.

10.     Any consideration, analysis, study, examination, reverse engineering, or copying of any SAMSUNG products by APPLE or any person or entity acting on APPLE's behalf during the research, development, design, manufacture, assembly, or marketing of APPLE ACCUSED PRODUCTS.

11.     Attempts by APPLE to design around or develop independently the subject matter disclosed and claimed in the SAMSUNG PATENTS-IN-SUIT.

12.     The first awareness and/or first knowledge by APPLE of any contention that any APPLE ACCUSED PRODUCT infringes the SAMSUNG PATENTS-IN-SUIT, and APPLE's response and internal investigation into such contention.

13.     APPLE's practices of monitoring patents being issued by the U.S. Patent and Trademark Office, or other non-US patent office, including for the SAMSUNG PATENTS-IN-SUIT.

14. Any representations, warranties, indemnities, promises, or agreements in which APPLE agreed to indemnify, defend, or hold harmless a third party, in whole or in part, or in which a third party agreed to indemnify, defend, or hold APPLE harmless, in whole or in part, for alleged or actual infringement of the SAMSUNG PATENTS-IN-SUIT.

15. Any potential or actual claim made by APPLE against any of APPLE's suppliers of components for the APPLE ACCUSED PRODUCTS, including any claim by APPLE that APPLE's suppliers should indemnify and hold APPLE harmless with respect to any relief obtained by SAMSUNG in This Lawsuit.

16. Warranties or representations, whether express or implied, by any of APPLE's suppliers or APPLE's suppliers consultants, attorneys, agents, or advisors that the suppliers' components do not infringe the SAMSUNG PATENTS-IN-SUIT.

17. Any insurance coverage or potential insurance coverage for APPLE's defense in This Lawsuit, or for liability incurred by APPLE as a result of This Lawsuit.

18. Investigations of infringement, prior art, validity, or enforceability of the SAMSUNG PATENTS-IN-SUIT before, during, or after the design, development, testing, marketing, sale, or offering for sale of the APPLE ACCUSED PRODUCTS.

19. Any good faith belief that APPLE may have had, and any representation APPLE has made to another, that APPLE was free to sell the APPLE ACCUSED PRODUCTS because the SAMSUNG PATENTS-IN-SUIT were invalid, unenforceable, or not infringed.

20. Any advice of counsel APPLE intends to rely upon in support of APPLE's defenses in This Lawsuit, including the identity of any person who rendered opinions or statements to APPLE concerning the SAMSUNG PATENTS-IN-SUIT, the identity of the recipients of such opinions or statements, and any actions taken by APPLE in consideration of such opinions or statements.

21. Marketing and promotion relating to the APPLE ACCUSED PRODUCTS, including: (a) sales and marketing strategies and methods relating to the APPLE ACCUSED PRODUCTS; (b) development of sales and marketing materials relating to the APPLE ACCUSED PRODUCTS; and (c) content of sales and marketing materials relating to the APPLE ACCUSED PRODUCTS.

22. Industry, market, and competition analyses performed by APPLE or on APPLE's behalf for the APPLE ACCUSED PRODUCTS.

23. Business plans, strategies, forecasts, studies, or reports related to the APPLE ACCUSED PRODUCTS.

24. Sales, pricing, and revenue relating to the APPLE ACCUSED PRODUCTS, including actual and forecasted unit prices, sales, revenues, and profits.

25. Historical, current and projected market share of, and market demand for, the APPLE ACCUSED PRODUCTS.

26. Products or services marketed, purchased, sold, or offered for sale in conjunction with the sale, purchase, rental, lease or other distribution of the APPLE ACCUSED PRODUCTS.

27. APPLE's accounting procedures, including the accounting procedures related to the sale, licensing, and/or distribution of APPLE ACCUSED PRODUCTS.

28.     For each APPLE ACCUSED PRODUCT, the amount and value of sales from January 1, 2004 to the present.

29.     For each APPLE ACCUSED PRODUCT, the identity of all entities involved in moving that PRODUCT from its place of manufacture to its point of sale, the location and types of DOCUMENTS and things relating to such delivery, and the identity of each custodian of such DOCUMENTS and things.

30.     For each APPLE ACCUSED PRODUCT, the shipments of that Product from January 1, 2007 to the present.

31.     For each APPLE ACCUSED PRODUCT, revenue derived by APPLE from that Product.

32.     For each APPLE ACCUSED PRODUCT, any agreements with another entity concerning the manufacture of that Product.

33.     For each APPLE ACCUSED PRODUCT, any agreements with another entity concerning the distribution of that Product.

34.     For each APPLE ACCUSED PRODUCT, any agreements with another entity concerning the sale of that Product.

35.     For each APPLE ACCUSED PRODUCT, the market for that Product.

36.     For each APPLE ACCUSED PRODUCT, the demand for that Product.

37.     For each APPLE ACCUSED PRODUCT, the identity of all Products that APPLE views as competing in the market with that Product.

38.     APPLE's policies regarding entering into licensing agreements with others.

39.     Licensing by APPLE (as licensee, licensor or cross-license) of patents, trade secrets, intellectual property or other technical "know-how" relating to the APPLE ACCUSED PRODUCTS, including: (a) any corporate policies/procedures relating to said licensing; (b) any royalties or fees paid to APPLE relating to the use, manufacture, or sale of the APPLE ACCUSED PRODUCTS; and (c) any royalties or fees paid by APPLE in connection with the use, manufacture, or sale of the APPLE ACCUSED PRODUCTS.

40.     All facts supporting any contention that APPLE does not infringe the APPLE PATENTS-IN-SUIT.

41.     All facts supporting any affirmative defenses APPLE has alleged or will allege in This Lawsuit.

42.     All facts supporting any contention that the SAMSUNG PATENTS-IN-SUIT are invalid, including without limitation, the alleged prior art cited in APPLE's Invalidity Contentions.

43.     All facts supporting any contention that the SAMSUNG PATENTS-IN-SUIT are unenforceable.

44.     For each word or phrase of any of the asserted claims of the SAMSUNG PATENTS-IN-SUIT and APPLE PATENTS-IN-SUIT that APPLE contends requires construction, facts supporting APPLE's proposed construction, including any intrinsic or extrinsic evidence that APPLE contends supports such construction.

45.   For each APPLE ACCUSED PRODUCT, all model names or numbers, or other designations (such as internal names or code names), and all brand names.

46.   For each APPLE ACCUSED PRODUCT, APPLE's involvement in the design of Hardware, Software, or architecture, including Identification of every individual who participated in any such involvement and a complete account of the role each such Person played in the involvement.

47.   For each APPLE ACCUSED PRODUCT, APPLE's involvement in conceiving, designing, developing, engineering, manufacturing, or testing, including Identification of every individual who participated in any such involvement and a complete account of the role each such Person played in the involvement.

48.   The existence and nature of any device-specific differences in the structure, functionality, and operation of each APPLE ACCUSED PRODUCT.

49.   The operating system services provided by each APPLE ACCUSED PRODUCT.

50.   The design and development of each APPLE ACCUSED PRODUCT and the identities of the individuals involved in the design and development of each APPLE ACCUSED PRODUCT.

51.   All communications between APPLE and any entity concerning This Lawsuit.

52.   For each APPLE PATENT-IN-SUIT, APPLE's involvement in searching for, reviewing, or disclosing Prior Art to the US Patent and Trademark Office, including Identification of every individual who participated in any such involvement and a complete account of the role each such Person played in the involvement.

53.   The conception, reduction to practice, of the APPLE PATENTS-IN-SUIT.

54.   For each APPLE PATENT-IN-SUIT, any alleged diligence from conception to reduction to practice of the alleged invention(s) of the patent.

55.   The subject matter of the APPLE PATENTS-IN-SUIT.

56.   The problem allegedly solved by the APPLE PATENTS-IN-SUIT.

57.   Each way in which the claimed invention of each APPLE PATENTS-IN-SUIT allegedly differs from or improves upon the prior art.

58.   The prosecution of the APPLE PATENTS-IN-SUIT, including all U.S. family members and foreign counterparts, including without limitation the decision about which prior art references to disclose or not disclose to the patent office.

59.   For each APPLE PATENT-IN-SUIT, all known prior art to the patent and to any patent in the APPLE PATENT-IN-SUIT PATENT FAMILY TREE, including any prior art which APPLE or the Named Inventors first became aware after applying for the APPLE PATENTS-IN-SUIT.

60.   For each APPLE PATENT-IN-SUIT, the factual basis for any claim of non-obviousness, including without limitation, contentions of commercial success, long-felt but unresolved need, failure of others, licensing, industry or other recognition, or deliberate copying.

61.   For each APPLE PATENT-IN-SUIT, all facts and circumstances concerning first manufacture; first demonstration; first disclosure; first disclosure outside APPLE; first public disclosure outside APPLE; first written description; first publication; first prototype; first use in the United States; first public use in the United States; first offer for sale in the United States; first sale in the United States; and first importation into the United States.

62.   For each APPLE PATENT-IN-SUIT, all facts and circumstances concerning the decision to seek patent protection for the patent.

63.   For each APPLE PATENT-IN-SUIT, all facts and circumstances concerning the Identification and determination of the Named Inventors.

64.   For each APPLE PATENT-IN-SUIT, the alleged contribution of each Named Inventor to each claim of the patent.

65.   For each APPLE PATENT-IN-SUIT, any interest held by anyone in the patent, including the ownership, title, chain-of-title, transfer, or assignment of the patent, including without limitation any security interest in or lien against any patent.  This includes without limitation the actual or potential purchase or sale by APPLE, in whole or part, of the patent.

66.   For each APPLE PATENT-IN-SUIT, and each patent in the APPLE PATENT-IN-SUIT PATENT FAMILY TREE, all communications between APPLE and any Person concerning any alleged infringement, invalidity, or unenforceability of the patent.

67.   For each APPLE PATENT-IN-SUIT, the legal and factual bases for APPLE's position that SAMSUNG has infringed the patent.

68.   For each APPLE PATENT-IN-SUIT, the identity, including by model number, name, and any other identifying feature, of any SAMSUNG ACCUSED PRODUCT.

69.   Separately for each SAMSUNG ACCUSED PRODUCT, APPLE's first awareness of such product.

70.   For each APPLE PATENT-IN-SUIT, the time at which and the circumstances by which APPLE first became aware of SAMSUNG's alleged infringement of the patent.

71.   Separately for each APPLE PATENT-IN-SUIT, all facts and circumstances concerning any notice given to SAMSUNG of the patent and/or of SAMSUNG's alleged infringement of the patent.

72.   An Identification of all APPLE products or prototypes that practice each APPLE PATENT-IN-SUIT.

73.   Each Baseband Processor used in each APPLE ACCUSED PRODUCT.

74.   The facts supporting any contentions APPLE has made or may make that any of the APPLE ACCUSED PRODUCTS do not infringe any asserted claim of any of the SAMSUNG PATENTS-IN-SUIT, all bases for any such contentions, including all Software or source code APPLE contends supports such non-infringement contentions, and the specific definition APPLE used or applied to each claim term in determining that the APPLE ACCUSED PRODUCT does not infringe or is not capable of indirect infringement.

75.   The APPLE ACCUSED PRODUCTS' compliance with any 3GPP Technical Specification.

76.   The 3GPP Release(s) supported (including which versions and subversions of the 3GPP specification are supported within each Release) by the APPLE ACCUSED PRODUCTS.

77.   For each APPLE ACCUSED PRODUCT, its compliance with 3GPP Technical Specification 25.212 v.6.0.0.

78.   For each APPLE ACCUSED PRODUCT, with 3GPP Technical Specification 25.212 v.5.0.0.

79.   The version(s) of HSUPA supported by each APPLE ACCUSED PRODUCT.

80.   The version(s) of HSDPA supported by each APPLE ACCUSED PRODUCT.

81.   For each Baseband Processor used in APPLE ACCUSED PRODUCTS, ITS compliance with any 3GPP Technical Specification.

82.   The 3GPP Release(s) supported (including which versions and subversions of the 3GPP specification are supported within each Release) by the Baseband Processor used in each APPLE ACCUSED PRODUCT.

83.   For each Baseband Processor used in each APPLE ACCUSED PRODUCT, its compliance with 3GPP Technical Specification 25.212 v.6.0.0.

84.   For each Baseband Processor used in each APPLE ACCUSED PRODUCT, its compliance with 3GPP Technical Specification 25.212 v.5.0.0.

85.   The version(s) of HSUPA supported by each Baseband Processor used in each APPLE ACCUSED PRODUCT.

86.   The version(s) of HSDPA supported by each Baseband Processor used in each APPLE ACCUSED PRODUCT.

87.   The technical documents describing the structure, function, and/or operation of each Baseband Processor used in each APPLE ACCUSED PRODUCT.

88.   The source code or Software code used to operate or enable each Baseband Processor used in each APPLE ACCUSED PRODUCT.

89.   The Hardware description languages (HDL) code for each Baseband Processor used in each APPLE ACCUSED PRODUCT.

90.   The register programming manuals for each Baseband Processor used in each APPLE ACCUSED PRODUCT.

91.   The functions and algorithms performed by the Software or Hardware used to operate or enable each Baseband Processor used in each APPLE ACCUSED PRODUCT.

92.   The build instructions, including settings for any flags or options, associated with the Software used to operate or enable each Baseband Processor used in each APPLE ACCUSED PRODUCT.

93.   The firmware architecture for the Baseband Processor and/or Executable Code used in each APPLE ACCUSED PRODUCT.

94.   The training materials used to teach new employees about the firmware architecture for the Baseband Processor and/or Executable Code used in each APPLE ACCUSED PRODUCT.

95.   The facts and circumstances relating to each instance in which APPLE, its parents, subsidiaries, or affiliates, or someone acting on behalf of APPLE, its parents, subsidiaries, or affiliates, operated any APPLE ACCUSED DEVICES in the United States for the purpose of quality testing, standards compliance, or FCC certification, and for each such occurrence, information concerning how the APPLE ACCUSED DEVICE was operated.

96.   The Baseband Processor and the Executable Software incorporated or installed in each APPLE ACCUSED PRODUCT, including but not limited to information concerning (a) each Baseband Processor incorporated in the device; (b) the time period during which each Baseband Processor was incorporated in the device; (c) each version of Executable Software that was installed in the device; and (d) the time period during which each version of Executable Software was installed in the device.

97.   The evaluation and/or customization of each Baseband Processor and/or the Software that runs on it.

98.   The design, structure, development, and operation of the Software or source code (whether stored on the processor itself or elsewhere) used to operate or enable the function of each Baseband Processor and related documentation in APPLE's possession, custody, or control, including all technical data-sheets, register programming manuals, user manuals, and technical documents describing the functions and algorithms performed by the Software or Hardware components embedded within the Baseband Processor.

99.   The design, development and testing of each APPLE ACCUSED PRODUCT and the Baseband Processor, including related documents, and including the current status of any design, development, or testing of APPLE'S ACCUSED PRODUCTS.

100.  The design, development, or testing of each APPLE ACCUSED PRODUCT and the Baseband Processor used in each product, related to compliance with 3GPP Technical Specification 25.212 v.6.0.0.

101.  The design, development, or testing of each APPLE ACCUSED PRODUCT and the Baseband Processor used in each product, related to compliance with 3GPP Technical Specification 25.212 v.5.0.0.

102.  The testing of each APPLE ACCUSED PRODUCT, including by or with any third party, for certification of compliance with 3GPP standards and/or for compliance with a 3GPP carrier's network.

103.  Documents in APPLE's possession, custody, or control that reflect the intended or suggested use, operation, or features of APPLE'S ACCUSED PRODUCTS and Baseband Processors incorporated therein.

104.  The process by which Baseband Processors are selected for incorporation into APPLE ACCUSED PRODUCTS, including the persons involved and any documents reflecting the actual selection (including evaluation, customization, testing, and approval) of the Baseband Processors used in APPLE'S ACCUSED PRODUCTS.

105.    The design and operation of the Baseband Processors used in the APPLE ACCUSED PRODUCTS.

106.    The use, enablement, settings enabling the use of, or decisions to use any multiplexing, coding, or modulation functionality not explicitly specified or mandated by the 3GPP standards in each APPLE ACCUSED PRODUCT.

107.    The structure, layout, and function of the circuit board and/or bus within the APPLE ACCUSED PRODUCT that houses the Baseband Processor.

108.    The generation, storage or processing of scrambling codes in each of the APPLE ACCUSED PRODUCTS.

109.    The Identification, operation, design, manufacture, sourcing, and purchasing of any Hardware, operating system and/or Software, including documentation related thereto, in each of the APPLE ACCUSED PRODUCTS that relates to the generation, storage or processing of scrambling codes.

110.    All Software, including, but not limited to, source code, Hardware code, and firmware, including the design and operation, in each of the APPLE ACCUSED PRODUCTS that relates to the generation, storage or processing of scrambling codes.

111.    All communications with any third party, including suppliers and customers, including but not limited to instructions, standards, guidelines, specifications, training materials, and user guides, regarding the abilities of the APPLE ACCUSED PRODUCTS that relates to the generation, storage or processing of scrambling codes.

112.    Any licensing agreements, negotiations for licensing agreements, supply agreements, or negotiations for supply agreements regarding Hardware, Software, methods, processes, or apparatuses that relates to or enables the APPLE ACCUSED PRODUCTS  to generate, store or process scrambling codes.

113.    Separately for each SAMSUNG PATENT-IN-SUIT, APPLE's first awareness of such patent.

114.    For each APPLE ACCUSED PRODUCT, compliance with 3GPP Technical Specification 25.214 v.6.6.0.

115.    For each Baseband Processor used in each APPLE ACCUSED PRODUCT, compliance with 3GPP Technical Specification 25.214 v.6.6.0.

116.    The design, development, or testing of each APPLE ACCUSED PRODUCT and the Baseband Processor used in each product, related to compliance with 3GPP Technical Specification 25.214 v.6.6.0.

117.    For each APPLE ACCUSED PRODUCT, compliance with 3GPP Technical Specification 25.322 v.6.4.0.

118.    For each Baseband Processor used in each APPLE ACCUSED PRODUCT, compliance with 3GPP Technical Specification 25.322 v.6.4.0.

119.    The design, development, or testing of each APPLE ACCUSED PRODUCT and the Baseband Processor used in each product, related to compliance with 3GPP Technical Specification 25.322 v.6.4.0.

120.   The following functionalities and abilities of each of the APPLE ACCUSED PRODUCTS:

(a) providing the ability to select a plurality of cities in the world clock application;

(b) process of calculating the local time of the cities included in the world clock application;

(c) process of calculating the local time of where the APPLE ACCUSED PRODUCT  is currently located; and

(d) process by which the APPLE ACCUSED PRODUCTS receive any sync channel messages from any cellular networks.

121.   The Identification, operation, design, manufacture, sourcing, and purchasing of any Hardware, operating system and/or Software, including documentation related thereto, in each of the APPLE ACCUSED PRODUCTS that relates to:

(a) providing the ability to select a plurality of cities in the world clock application;

(b) process of calculating the local time of the cities included in the world clock application;

(c) process of calculating the local time of where the APPLE ACCUSED PRODUCT  is currently located; and

(d) process by which the APPLE ACCUSED PRODUCTS receive any sync channel messages from any cellular networks.

122.   All Software, including, but not limited to, source code, Hardware code, and firmware, including the design and operation, in each of the APPLE ACCUSED PRODUCTS that relates to:

(a)     providing the ability to select a plurality of cities in the world clock application;

(b)     process of calculating the local time of the cities included in the world clock application;

(c)     process of calculating the local time of where the APPLE ACCUSED PRODUCT is currently located; and

(d)     process by which the APPLE ACCUSED PRODUCTS receive any sync channel messages from any cellular networks.

123.   All communications with any third party, including suppliers and customers, including but not limited to instructions, standards, guidelines, specifications, training materials, and user guides, regarding the abilities of the APPLE ACCUSED PRODUCTS that relate to:

(a)     providing the ability to select a plurality of cities in the world clock application;

(b)     process of calculating the local time of the cities included in the world clock application;

(c)     process of calculating the local time of where the APPLE ACCUSED PRODUCT is currently located; and

(d)      process by which the APPLE ACCUSED PRODUCTS receive any sync channel messages from any cellular networks.

124.   Any licensing agreements, negotiations for licensing agreements, supply agreements, or negotiations for supply agreements regarding Hardware, Software, methods, processes, or apparatuses that relates to or enables the APPLE ACCUSED PRODUCTS to perform the following functions:

(a)      providing the ability to select a plurality of cities in the world clock application;

(b)      calculating the local time of the cities included in the world clock application;

(c)      calculating the local time of where the APPLE ACCUSED PRODUCT is currently located; and

(d)      process by which the APPLE ACCUSED PRODUCTS receive a sync channel messages from any cellular networks.

125.   All facts supporting YOUR contentions relating to the novelty, obviousness, or knowledge in the art, as of and prior to July 17, 1998, regarding:

(a)      providing the ability to select a plurality of cities in the world clock application;

(b)      process of calculating the local time of the cities included in the world clock application;

(c)      process of calculating the local time of where the APPLE ACCUSED PRODUCT is currently located; and

(d)      process by which the APPLE ACCUSED PRODUCTS receive any sync channel messages from any cellular networks.

126.   The following functionalities and abilities of each of the APPLE ACCUSED PRODUCTS:

(a)      generation of the notification bar and pull down menu;

(b)      dividing the display into two windows by double-clicking the home button;

(c)      displaying data relating to application in the most recently used applications bar, which is displayed by double-clicking the home button; and

(d)      dividing the display of the APPLE ACCUSED PRODUCTS into multiple windows.

127.   The Identification, operation, design, manufacture, sourcing, and purchasing of any Hardware, operating system and/or Software, including documentation related thereto, in each of the APPLE ACCUSED PRODUCTS that relates to:

(a)       generation of the notification bar and pull down menu;

(b)      dividing the display into two windows by double-clicking the home button;

(c)      displaying data relating to application in the most recently used applications bar, which is displayed by double-clicking the home button; and

(d)     dividing the display of the APPLE ACCUSED PRODUCTS into multiple windows.

128.    All Software, including, but not limited to, source code, Hardware code, and firmware, including the design and operation, in each of the APPLE ACCUSED PRODUCTS that relates to:

(a)     generation of the notification bar and pull down menu;

(b)     dividing the display into two windows by double-clicking the home button;

(c)     displaying data relating to application in the most recently used applications bar, which is displayed by double-clicking the home button; and

(d)     dividing the display of the APPLE ACCUSED PRODUCTS into multiple windows.

129.    All communications with any third party, including suppliers and customers, including but not limited to instructions, standards, guidelines, specifications, training materials, and user guides, regarding the abilities of the APPLE ACCUSED PRODUCTS that relate to:

(a)     generation of the notification bar and pull down menu;

(b)     dividing the display into two windows by double-clicking the home button;

(c)     displaying data relating to application in the most recently used applications bar, which is displayed by double-clicking the home button; and

(d)     dividing the display of the APPLE ACCUSED PRODUCTS into multiple windows.

130.    Any licensing agreements, negotiations for licensing agreements, supply agreements, or negotiations for supply agreements regarding Hardware, Software, methods, processes, or apparatuses that relates to or enables the APPLE ACCUSED PRODUCTS to perform the following functions:

(a)     generation of the notification bar and pull down menu;

(b)     dividing the display into two windows by double-clicking the home button;

(c)     displaying data relating to application in the most recently used applications bar, which is displayed by double-clicking the home button; and

(d)     dividing the display of the APPLE ACCUSED PRODUCTS into multiple windows.

131.    All facts supporting YOUR contentions relating to the novelty, obviousness, or knowledge in the art, as of and prior to January 21, 2002, regarding:

(a)     generation of notification on a mobile device;

(b)     dividing the display into two windows as a result of user input;

(c)     displaying data relating to application in the most recently used applications bar, which is displayed by double-clicking the home button; and

(d)      dividing the display of a mobile device into multiple windows.

132.    The Photos, Camera, and Mail apps on the APPLE ACCUSED PRODUCTS.

133.    Multitasking on the APPLE ACCUSED PRODUCTS, including multitasking using the Photos, Camera, and Mail apps on the APPLE ACCUSED PRODUCTS.

134.    The multitasking bar on the APPLE ACCUSED PRODUCTS.

135.    All mechanisms, including an understanding of all related source code, by which the APPLE ACCUSED PRODUCTS transmit images, messages and addresses by email.

136.    All Software, including an understanding of all related source code, concerning digital image processing on the APPLE ACCUSED PRODUCTS, including all Software concerning capture, storage, display, and transmission of digital images, messages and addresses.

137.    All Hardware concerning digital image processing on the APPLE ACCUSED PRODUCTS, including all Hardware concerning capture, storage, display, and transmission of digital images, messages and addresses.

138.    All mechanisms, including an understanding of all related source code, by which the APPLE ACCUSED PRODUCTS display image files, including the mechanism by which the APPLE ACCUSED PRODUCTS switch between the Camera and Photos apps.

139.    The design and development of Software concerning digital image processing on the APPLE ACCUSED PRODUCTS, including the design and development of all Software concerning capture, storage, display, and transmission of digital images, messages and addresses.

140.    The design and development of Hardware concerning digital image processing on the APPLE ACCUSED PRODUCTS, including the design and development of all Hardware concerning capture, storage, display, and transmission of digital images, messages and addresses.

141.    The following functionalities and abilities of each of the APPLE ACCUSED PRODUCTS:

(a)      playing of digital audio or digital audio data;

(b)      processing of digital audio or digital audio data;

(c)      multi-tasking while continuing to perform the playing of digital audio or digital audio data in the background; and

(d)      using Java to perform multi-tasking functions while playing digital audio or digital audio data in the background.

142.    The Identification, operation, design, manufacture, sourcing, and purchasing of any Hardware, operating system and/or Software, including documentation related thereto, in each of the APPLE ACCUSED PRODUCTS that relates to:

(a)      playing of digital audio or digital audio data;

(b)      processing of digital audio or digital audio data;

(c)   multi-tasking while continuing to perform the playing of digital audio or digital audio data in the background; and

(d)   using Java to perform multi-tasking functions while playing digital audio or digital audio data in the background.

143.   All Software, including, but not limited to, source code, Hardware code, and firmware, including the design and operation, in each of the APPLE ACCUSED PRODUCTS that relates to:

(a)   playing of digital audio or digital audio data;

(b)   processing of digital audio or digital audio data;

(c)   multi-tasking while continuing to perform the playing of digital audio or digital audio data in the background; and

(d)   using Java to perform multi-tasking functions while playing digital audio or digital audio data in the background.

144.   All communications with any third party, including suppliers and customers, including but not limited to instructions, standards, guidelines, specifications, training materials, and user guides, regarding the abilities of the APPLE ACCUSED PRODUCTS that relate to:

(a)   playing of digital audio or digital audio data;

(b)   processing of digital audio or digital audio data;

(c)   multi-tasking while continuing to perform the playing of digital audio or digital audio data in the background; and

(d)   using Java to perform multi-tasking functions while playing digital audio or digital audio data in the background.

145.   Any licensing agreements, negotiations for licensing agreements, supply agreements, or negotiations for supply agreements regarding Hardware, Software, methods, processes, or apparatuses that relates to or enables the APPLE ACCUSED PRODUCTS to perform the following functions:

(a)   playing of digital audio or digital audio data;

(b)   processing of digital audio or digital audio data;

(c)   multi-tasking while continuing to perform the playing of digital audio or digital audio data in the background; and

(d)   using Java to perform multi-tasking functions while playing digital audio or digital audio data in the background.

146.   All facts supporting YOUR contentions relating to the novelty, obviousness, or knowledge in the art, as of and prior to August 30, 2005, regarding:

(a)   playing of digital audio or digital audio data;

(b)   processing of digital audio or digital audio data;

(c)      multi-tasking while continuing to perform the playing of digital audio or digital audio data in the background; and

(d)      using Java to perform multi-tasking functions while playing digital audio or digital audio data in the background.

147.     For each SAMSUNG ACCUSED PRODUCT that APPLE alleges practices the '002 PATENT (hereafter "'002 ACCUSED PRODUCTS") and for the NeXTSTEP Operating System, versions 3.x, the following functionalities of each '002 ACCUSED PRODUCT and of the NeXTSTEP Operating System, versions 3.x:

(a)      cursor control device;

(b)      cursor;

(c)      operating environment;

(d)      programming modules;

(e)      application programs;

(f)      status and/or control functions;

(g)      first window region;

(h)      display area;

(i)      first window region is independently displayed and independently active;

(j)      each of the plurality of display areas is associated with one of the plurality of individual programming modules;

(k)      the first window region and the plurality of independent display areas implemented in a window layer that appears on top of application programming windows that may be generated;

(l)      indicia generation logic;

(m)      associated programming module is sensitive to user input;

(n)      message-based communication;

(o)      variably sized;

(p)      provide access to control information when selected;

(q)      displays an additional display element;

(r)      individually and variably sized;

(s)      always appears in front of application windows;

(t)      implemented in a private window layer that appears in front of windows;

(u)      indicia graphics generation logic; and

1          (v)     user sensitive graphics.

2    148.  The Identification, operation, design, manufacture, sourcing, and purchasing of any
           Hardware, operating system and/or Software, including documentation related thereto, in
3          each '002 ACCUSED PRODUCT and in the NeXTSTEP Operating System, versions 3.x
           that relates to:

4
           (a)     cursor control device;
5
           (b)     cursor;
6
           (c)     operating environment;
7
           (d)     programming modules;
8
           (e)     application programs;
9
           (f)     status and/or control functions;
10
           (g)     first window region;
11
           (h)     display area;
12
           (i)     first window region is independently displayed and independently active;
13
           (j)     each of the plurality of display areas is associated with one of the plurality of
14         individual programming modules;

15         (k)     the first window region and the plurality of independent display areas implemented
           in a window layer that appears on top of application programming windows that may be
16         generated;

17         (l)     indicia generation logic;

18         (m)     associated programming module is sensitive to user input;

19         (n)     message-based communication;

20         (o)     variably sized;

21         (p)     provide access to control information when selected;

22         (q)     displays an additional display element;

23         (r)     individually and variably sized;

24         (s)     always appears in front of application windows;

25         (t)     implemented in a private window layer that appears in front of windows;

26         (u)     indicia graphics generation logic; and

27         (v)     user sensitive graphics.

28

149.   All Software, including, but not limited to, source code, Hardware code and firmware, including the design and operation, in each '002 ACCUSED PRODUCT that enables each '002 ACCUSED PRODUCT to have the following features:

(a)    cursor control device;

(b)    cursor;

(c)    operating environment;

(d)    programming modules;

(e)    application programs;

(f)    status and/or control functions;

(g)    first window region;

(h)    display area;

(i)    first window region is independently displayed and independently active;

(j)    each of the plurality of display areas is associated with one of the plurality of individual programming modules;

(k)    the first window region and the plurality of independent display areas implemented in a window layer that appears on top of application programming windows that may be generated;

(l)    indicia generation logic;

(m)    associated programming module is sensitive to user input;

(n)    message-based communication;

(o)    variably sized;

(p)    provide access to control information when selected;

(q)    displays an additional display element;

(r)    individually and variably sized;

(s)    always appears in front of application windows;

(t)    implemented in a private window layer that appears in front of windows;

(u)    indicia graphics generation logic; and

(v)    user sensitive graphics.

150.   All Software, including, but not limited to, source code, Hardware code and firmware, including the design and operation, in the NeXTSTEP Operating System, versions 3.x, or that enables the NeXTSTEP Operating System, version 3.x to have the following features:

1      (a)     cursor control device;

2      (b)     cursor;

3      (c)     operating environment;

4      (d)     programming modules;

5      (e)     application programs;

6      (f)     status and/or control functions;

7      (g)     first window region;

8      (h)     display area;

9      (i)     first window region is independently displayed and independently active;

10      (j)     each of the plurality of display areas is associated with one of the plurality of individual programming modules;

11

12      (k)     the first window region and the plurality of independent display areas implemented in a window layer that appears on top of application programming windows that may be generated;

13

14      (l)     indicia generation logic;

15      (m)     associated programming module is sensitive to user input;

16      (n)     message-based communication;

17      (o)     variably sized;

18      (p)     provide access to control information when selected;

19      (q)     displays an additional display element;

20      (r)     individually and variably sized;

21      (s)     always appears in front of application windows;

22      (t)     implemented in a private window layer that appears in front of windows;

23      (u)     indicia graphics generation logic; and

24      (v)     user sensitive graphics.

151.    All communications with any third party, including suppliers, including but not limited to instructions, standards, guidelines, and specifications, regarding the functionalities of the '002 ACCUSED PRODUCT that relate to:

25      (a)     cursor control device;

26

27      (b)     cursor;

28

(c)     operating environment;

(d)     programming modules;

(e)     application programs;

(f)     status and/or control functions;

(g)     first window region;

(h)     display area;

(i)     first window region is independently displayed and independently active;

(j)     each of the plurality of display areas is associated with one of the plurality of individual programming modules;

(k)     the first window region and the plurality of independent display areas implemented in a window layer that appears on top of application programming windows that may be generated;

(l)     indicia generation logic;

(m)     associated programming module is sensitive to user input;

(n)     message-based communication;

(o)     variably sized;

(p)     provide access to control information when selected;

(q)     displays an additional display element;

(r)     individually and variably sized;

(s)     always appears in front of application windows;

(t)     implemented in a private window layer that appears in front of windows;

(u)     indicia graphics generation logic; and

(v)     user sensitive graphics.

152.   Any licensing agreements, negotiations for licensing agreements, supply agreements, or negotiations for supply agreements regarding Hardware, Software, methods, processes, or apparatuses that relate to or enable the '002 ACCUSED PRODUCTS to perform the following functions:

(a)     cursor control device;

(b)     cursor;

(c)     operating environment;

(d)     programming modules;

1   (e)   application programs;

2   (f)   status and/or control functions;

3   (g)   first window region;

4   (h)   display area;

5   (i)   first window region is independently displayed and independently active;

6   (j)   each of the plurality of display areas is associated with one of the plurality of
individual programming modules;

7
8   (k)   the first window region and the plurality of independent display areas implemented
in a window layer that appears on top of application programming windows that may be
generated;

9
10  (l)   indicia generation logic;

11  (m)   associated programming module is sensitive to user input;

12  (n)   message-based communication;

13  (o)   variably sized;

14  (p)   provide access to control information when selected;

15  (q)   displays an additional display element;

16  (r)   individually and variably sized;

17  (s)   always appears in front of application windows;

18  (t)   implemented in a private window layer that appears in front of windows;

19  (u)   indicia graphics generation logic; and

20  (v)   user sensitive graphics.

21  153.   APPLE's knowledge (including all '002 inventors and those involved in the prosecution of
the '002 patent) knowledge regarding NeXT Computer, Inc., including, but not limited to,
the NeXTSTEP Operating System.

22
23  154.   APPLE's (including all '002 inventors and those involved in the prosecution of the '002
patent) knowledge regarding the SuperClock application, created by Steven Christensen.

24  155.   For each SAMSUNG ACCUSED PRODUCT that APPLE alleges practices the '381
PATENT (hereafter "'381 ACCUSED PRODUCTS"), the following functionalities of
25          each '381 ACCUSED PRODUCT:

26  (a)   a touch screen display;

27  (b)    displaying a first portion of an electronic document;

28  (c)   detecting movement of an object on or near the touch screen display;

(d)      translating an electronic document displayed on a touch screen in a first direction;

(e)      reaching  the edge of the electronic document while translating the electronic document in a first direction;

(f)      displaying an area beyond the edge of the electronic document;

(g)      displaying a third portion of an electronic document that is smaller than the first portion; and

(h)      translating the document in a second direction until the area beyond the edge of the electronic document is no longer displayed.

156.   The Identification, operation, design, manufacture, sourcing, and purchasing of any Hardware, operating system and/or Software, including documentation related thereto, in each '381 ACCUSED PRODUCT that relates to:

(a)      a touch screen display;

(b)      displaying a first portion of an electronic document;

(c)      detecting movement of an object on or near the touch screen display;

(d)      translating an electronic document displayed on a touch screen in a first direction;

(e)      reaching  the edge of the electronic document while translating the electronic document in a first direction;

(f)      displaying an area beyond the edge of the electronic document;

(g)      displaying a third portion of an electronic document that is smaller than the first portion; and

(h)      translating the document in a second direction until the area beyond the edge of the electronic document is no longer displayed.

157.   All Software, including, but not limited to, source code, Hardware code and firmware, including the design and operation, in each '381 ACCUSED PRODUCT or that enables each '381 ACCUSED PRODUCT to have the following features:

(a)      a touch screen display;

(b)       displaying a first portion of an electronic document;

(c)      detecting movement of an object on or near the touch screen display;

(d)      translating an electronic document displayed on a touch screen in a first direction;

(e)      reaching  the edge of the electronic document while translating the electronic document in a first direction;

(f)      displaying an area beyond the edge of the electronic document;

(g)      displaying a third portion of an electronic document that is smaller than the first portion; and

(h)     translating the document in a second direction until the area beyond the edge of the electronic document is no longer displayed.

158.   All communications with any third party, including suppliers, including but not limited to instructions, standards, guidelines, and specifications, regarding the functionalities of the '381 ACCUSED PRODUCT that relate to:

(a)     a touch screen display;

(b)      displaying a first portion of an electronic document;

(c)     detecting movement of an object on or near the touch screen display;

(d)     translating an electronic document displayed on a touch screen in a first direction;

(e)     reaching  the edge of the electronic document while translating the electronic document in a first direction;

(f)     displaying an area beyond the edge of the electronic document;

(g)     displaying a third portion of an electronic document that is smaller than the first portion; and

(h)     translating the document in a second direction until the area beyond the edge of the electronic document is no longer displayed.

159.   Any licensing agreements, negotiations for licensing agreements, supply agreements, or negotiations for supply agreements regarding Hardware, Software, methods, processes, or apparatuses that relate to or enable the '381 ACCUSED PRODUCTS  to perform the following functions:

(a)     a touch screen display;

(b)      displaying a first portion of an electronic document;

(c)     detecting movement of an object on or near the touch screen display;

(d)     translating an electronic document displayed on a touch screen in a first direction;

(e)     reaching  the edge of the electronic document while translating the electronic document in a first direction;

(f)     displaying an area beyond the edge of the electronic document;

(g)     displaying a third portion of an electronic document that is smaller than the first portion; and

(h)     translating the document in a second direction until the area beyond the edge of the electronic document is no longer displayed.

160.   APPLE's knowledge (including that of all '381 PATENT inventors and those involved in the prosecution of the '381 PATENT) regarding the work of Ben Bederson *et al.*, including but not limited to LaunchTile and XNav, before January 4, 2011.

161.   APPLE's knowledge (including that of all '381 PATENT inventors and those involved in the prosecution of the '381 PATENT) regarding the work of Mitsubishi Electric Research Laboratories, including but not limited to DiamondTouch, before Dec. 23, 2008.

162.   For each SAMSUNG ACCUSED PRODUCT that APPLE alleges practices the '607 PATENT (hereafter "'607 ACCUSED PRODUCTS"), the following functionalities of each '607 ACCUSED PRODUCT:

(a)    transparent capacitive sensing medium configured to detect multiple touches or near touches at the same time and at distinct locations;

(b)    a first layer having a plurality of transparent first conductive lines that are electrically isolated from one another;

(c)    a second layer spatially separated form the first layer;

(d)    a plurality of transparent second conductive lines that are eclectically isolated from each other;

(e)    each second conductive line operatively coupled to capacitive monitoring circuitry;

(f)    capacitive monitoring circuitry configured to detect changes in charge coupling between the first conductive lines and the second conductive lines;

(g)    conductive lines on each of the layers are substantially parallel to one another;

(h)    conductive lines on different layers are substantially perpendicular to each other;

(i)    a first glass member disposed over the screen of the display;

(j)    a second glass member disposed over the first transparent conductive layer;

(k)    a first transparent conductive layer comprising a plurality of spaced apart parallel lines having the same pitch and linewidths;

(l)    a second transparent conductive layer disposed over the second glass member comprising a plurality of spaced apart parallel lines having the same pitch and linewidths;

(m)    a third glass member disposed over the second transparent conductive layer; and

(n)    one or more sensor integrated circuits operatively coupled to the lines.

163.   The Identification, operation, design, manufacture, sourcing, and purchasing of any Hardware, operating system and/or Software, including documentation related thereto, in each '607 ACCUSED PRODUCT that relates to:

(a)    transparent capacitive sensing medium configured to detect multiple touches or near touches at the same time and at distinct locations;

(b)    a first layer having a plurality of transparent first conductive lines that are electrically isolated from one another;

(c)    a second layer spatially separated form the first layer;

(d)      a plurality of transparent second conductive lines that are eclectically isolated from each other;

(e)      each second conductive line operatively coupled to capacitive monitoring circuitry;

(f)      capacitive monitoring circuitry configured to detect changes in charge coupling between the first conductive lines and the second conductive lines;

(g)      conductive lines on each of the layers are substantially parallel to one another;

(h)      conductive lines on different layers are substantially perpendicular to each other;

(i)      a first glass member disposed over the screen of the display;

(j)      a second glass member disposed over the first transparent conductive layer;

(k)      a first transparent conductive layer comprising a plurality of spaced apart parallel lines having the same pitch and linewidths;

(l)      a second transparent conductive layer disposed over the second glass member comprising a plurality of spaced apart parallel lines having the same pitch and linewidths;

(m)      a third glass member disposed over the second transparent conductive layer; and

(n)      one or more sensor integrated circuits operatively coupled to the lines.

164.      All Software, including, but not limited to, source code, Hardware code and firmware, including the design and operation, in each '607 ACCUSED PRODUCT or that enables each '607 ACCUSED PRODUCT to have the following features:

(a)      transparent capacitive sensing medium configured to detect multiple touches or near touches at the same time and at distinct locations;

(b)      a first layer having a plurality of transparent first conductive lines that are electrically isolated from one another;

(c)      a second layer spatially separated form the first layer;

(d)      a plurality of transparent second conductive lines that are eclectically isolated from each other;

(e)      each second conductive line operatively coupled to capacitive monitoring circuitry;

(f)      capacitive monitoring circuitry configured to detect changes in charge coupling between the first conductive lines and the second conductive lines;

(g)      conductive lines on each of the layers are substantially parallel to one another;

(h)      conductive lines on different layers are substantially perpendicular to each other;

(i)      a first glass member disposed over the screen of the display;

(j)      a second glass member disposed over the first transparent conductive layer;

(k)     a first transparent conductive layer comprising a plurality of spaced apart parallel lines having the same pitch and linewidths;

(l)     a second transparent conductive layer disposed over the second glass member comprising a plurality of spaced apart parallel lines having the same pitch and linewidths;

(m)     a third glass member disposed over the second transparent conductive layer; and

(n)     one or more sensor integrated circuits operatively coupled to the lines.

165.   All communications with any third party, including suppliers, including but not limited to instructions, standards, guidelines, and specifications, regarding the functionalities of the '607 ACCUSED PRODUCTS that relate to:

(a)     transparent capacitive sensing medium configured to detect multiple touches or near touches at the same time and at distinct locations;

(b)     a first layer having a plurality of transparent first conductive lines that are electrically isolated from one another;

(c)     a second layer spatially separated form the first layer;

(d)     a plurality of transparent second conductive lines that are eclectically isolated from each other;

(e)     each second conductive line operatively coupled to capacitive monitoring circuitry;

(f)     capacitive monitoring circuitry configured to detect changes in charge coupling between the first conductive lines and the second conductive lines;

(g)     conductive lines on each of the layers are substantially parallel to one another;

(h)     conductive lines on different layers are substantially perpendicular to each other;

(i)     a first glass member disposed over the screen of the display;

(j)     a second glass member disposed over the first transparent conductive layer;

(k)     a first transparent conductive layer comprising a plurality of spaced apart parallel lines having the same pitch and linewidths;

(l)     a second transparent conductive layer disposed over the second glass member comprising a plurality of spaced apart parallel lines having the same pitch and linewidths;

(m)     a third glass member disposed over the second transparent conductive layer; and

(n)     one or more sensor integrated circuits operatively coupled to the lines.

166.   Any licensing agreements, negotiations for licensing agreements, supply agreements, or negotiations for supply agreements regarding Hardware, Software, methods, processes, or apparatuses that relate to or enable the '607 ACCUSED PRODUCTS to perform the following functions:

(a)     transparent capacitive sensing medium configured to detect multiple touches or near touches at the same time and at distinct locations;

(b)      a first layer having a plurality of transparent first conductive lines that are electrically isolated from one another;

(c)      a second layer spatially separated form the first layer;

(d)      a plurality of transparent second conductive lines that are eclectically isolated from each other;

(e)      each second conductive line operatively coupled to capacitive monitoring circuitry;

(f)      capacitive monitoring circuitry configured to detect changes in charge coupling between the first conductive lines and the second conductive lines;

(g)      conductive lines on each of the layers are substantially parallel to one another;

(h)      conductive lines on different layers are substantially perpendicular to each other;

(i)      a first glass member disposed over the screen of the display;

(j)      a second glass member disposed over the first transparent conductive layer;

(k)      a first transparent conductive layer comprising a plurality of spaced apart parallel lines having the same pitch and linewidths;

(l)      a second transparent conductive layer disposed over the second glass member comprising a plurality of spaced apart parallel lines having the same pitch and linewidths;

(m)      a third glass member disposed over the second transparent conductive layer; and

(n)      one or more sensor integrated circuits operatively coupled to the lines.

167.   APPLE's knowledge (including that of all '607 PATENT inventors and those involved in the prosecution of the '607 PATENT) regarding the work of Jun Rekimoto, including but not limited to Smart Skin and/or Mr. Rekimoto's article, *SmartSkin: An Infrastructure for Freehand Manipulation on Interactive Surface*, CHI 2002, before May 6, 2004.

168.   APPLE's knowledge (including that of all '607 PATENT inventors and those involved in the prosecution of the '607 PATENT) of mutual capacitance and/or multi-touch touch panels or touchscreens prior to May 6, 2004.

169.   For each SAMSUNG ACCUSED PRODUCT that APPLE alleges practices the '828 PATENT (hereafter "'828 ACCUSED PRODUCTS"), the following functionalities of each '828 ACCUSED PRODUCT:

(a)      receiving at least one proximity image representing a scan of a plurality of electrodes of the touch-sensitive surface;

(b)      segmenting each proximity image into one or more pixel groups that indicate significant proximity, each pixel group representing proximity of a distinguishable hand part or other touch object on or near the touch-sensitive surface;

(c)      mathematically fitting an ellipse to at least one of the pixel groups;

(d)      transmitting one or more ellipse parameters as a control signal to an electronic or electromechanical device;

(e)     where the one or more ellipse parameters is selected from the group consisting of position, shape, size, orientation, eccentricity major radius, minor radius, and any combination thereof;

(f)     tracking a path of at least one of the one or more pixel groups through a time-sequenced series of proximity images;

(g)     fitting an ellipse to at least one of the one or more pixel groups in each of the time-sequences series of proximity images;

(h)     tracking a change in one or more ellipse parameters through the time-sequenced series of proximity images; and

(i)     fitting an ellipse to one or more pixel groups comprising of computing one or more eigenvalues and one or more eigenvectors of a covariance matrix associated with the pixel group.

170.    The Identification, operation, design, manufacture, sourcing, and purchasing of any Hardware, operating system and/or Software, including documentation related thereto, in each '828 ACCUSED PRODUCT that relates to:

(a)     receiving at least one proximity image representing a scan of a plurality of electrodes of the touch-sensitive surface;

(b)     segmenting each proximity image into one or more pixel groups that indicate significant proximity, each pixel group representing proximity of a distinguishable hand part or other touch object on or near the touch-sensitive surface;

(c)     mathematically fitting an ellipse to at least one of the pixel groups;

(d)     transmitting one or more ellipse parameters as a control signal to an electronic or electromechanical device;

(e)     where the one or more ellipse parameters is selected from the group consisting of position, shape, size, orientation, eccentricity major radius, minor radius, and any combination thereof;

(f)     tracking a path of at least one of the one or more pixel groups through a time-sequenced series of proximity images;

(g)     fitting an ellipse to at least one of the one or more pixel groups in each of the time-sequences series of proximity images;

(h)     tracking a change in one or more ellipse parameters through the time-sequenced series of proximity images; and

(i)     fitting an ellipse to one or more pixel groups comprising of computing one or more eigenvalues and one or more eigenvectors of a covariance matrix associated with the pixel group.

171.    All Software, including, but not limited to, source code, Hardware code and firmware, including the design and operation, in each '828 ACCUSED PRODUCT or that enables each '828 ACCUSED PRODUCT to have the following features:

(a)     receiving at least one proximity image representing a scan of a plurality of electrodes of the touch-sensitive surface;

(b)     segmenting each proximity image into one or more pixel groups that indicate significant proximity, each pixel group representing proximity of a distinguishable hand part or other touch object on or near the touch-sensitive surface;

(c)     mathematically fitting an ellipse to at least one of the pixel groups;

(d)     transmitting one or more ellipse parameters as a control signal to an electronic or electromechanical device;

(e)     where the one or more ellipse parameters is selected from the group consisting of position, shape, size, orientation, eccentricity major radius, minor radius, and any combination thereof;

(f)     tracking a path of at least one of the one or more pixel groups through a time-sequenced series of proximity images;

(g)     fitting an ellipse to at least one of the one or more pixel groups in each of the time-sequences series of proximity images;

(h)     tracking a change in one or more ellipse parameters through the time-sequenced series of proximity images; and

(i)     fitting an ellipse to one or more pixel groups comprising of computing one or more eigenvalues and one or more eigenvectors of a covariance matrix associated with the pixel group.

172.    All communications with any third party, including suppliers, including but not limited to instructions, standards, guidelines, and specifications, regarding the functionalities of the '891 ACCUSED PRODUCTS that relate to:

(a)     receiving at least one proximity image representing a scan of a plurality of electrodes of the touch-sensitive surface;

(b)     segmenting each proximity image into one or more pixel groups that indicate significant proximity, each pixel group representing proximity of a distinguishable hand part or other touch object on or near the touch-sensitive surface;

(c)     mathematically fitting an ellipse to at least one of the pixel groups;

(d)     transmitting one or more ellipse parameters as a control signal to an electronic or electromechanical device;

(e)     where the one or more ellipse parameters is selected from the group consisting of position, shape, size, orientation, eccentricity major radius, minor radius, and any combination thereof;

(f)     tracking a path of at least one of the one or more pixel groups through a time-sequenced series of proximity images;

(g)     fitting an ellipse to at least one of the one or more pixel groups in each of the time-sequences series of proximity images;

(h)     tracking a change in one or more ellipse parameters through the time-sequenced series of proximity images; and

(i)     fitting an ellipse to one or more pixel groups comprising of computing one or more eigenvalues and one or more eigenvectors of a covariance matrix associated with the pixel group.

173.    Any licensing agreements, negotiations for licensing agreements, supply agreements, or negotiations for supply agreements regarding Hardware, Software, methods, processes, or apparatuses that relate to or enable the '828 ACCUSED PRODUCTS  to perform the following functions:

(a)     receiving at least one proximity image representing a scan of a plurality of electrodes of the touch-sensitive surface;

(b)     segmenting each proximity image into one or more pixel groups that indicate significant proximity, each pixel group representing proximity of a distinguishable hand part or other touch object on or near the touch-sensitive surface;

(c)     mathematically fitting an ellipse to at least one of the pixel groups;

(d)     transmitting one or more ellipse parameters as a control signal to an electronic or electromechanical device;

(e)     where the one or more ellipse parameters is selected from the group consisting of position, shape, size, orientation, eccentricity major radius, minor radius, and any combination thereof;

(f)     tracking a path of at least one of the one or more pixel groups through a time-sequenced series of proximity images;

(g)     fitting an ellipse to at least one of the one or more pixel groups in each of the time-sequences series of proximity images;

(h)     tracking a change in one or more ellipse parameters through the time-sequenced series of proximity images; and

(i)     fitting an ellipse to one or more pixel groups comprising of computing one or more eigenvalues and one or more eigenvectors of a covariance matrix associated with the pixel group.

174.    For each SAMSUNG ACCUSED PRODUCT that Apple alleges practices the '915 PATENT (hereafter "'915 ACCUSED PRODUCTS"), the following functionalities of each '915 ACCUSED PRODUCT:

(a)     receiving as user input one or more input points applied to the touch-sensitive display that is integrated with the device;

(b)     creating an event object in response to the user input;

(c)     determining whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation;

(d)      issuing at least one scroll or gesture call based on invoking the scroll or gesture operation;

(e)      responding to at least one scroll call, if issued, by scrolling a window having a view associated with the event object;

(f)      responding to at least one gesture call, if issued, by scaling the view associated with the event object based on receiving the two or more input points in the form of the user input;

(g)      if applicable to the particular '915 ACCUSED PRODUCT, scrolling a window having a view associated with the event object based on an amount of a scroll with the scroll stopped at a predetermined position in relation to the user input;

(h)      if applicable to the particular '915 ACCUSED PRODUCT, rubberbanding a scrolling region displayed within the window;

(i)      if applicable to the particular '915 ACCUSED PRODUCT, attaching scroll indicators and/or scroll bars to the window;

(j)      if applicable to the particular '915 ACCUSED PRODUCT, determining whether the event object invokes a scroll or gesture operation is based on receiving a drag user input for a certain time period;

(k)      if applicable to the particular '915 ACCUSED PRODUCT, rotating a view associated with the event object based on receiving a plurality of input points; and

(l)      whether the particular '915 ACCUSED PRODUCT is any (one or more) of a data processing device, a portable device, a portable data processing device, a multi touch device, a multi touch portable device, a wireless device, and/or a cell phone.

175.    The Identification, operation, design, manufacture, sourcing, and purchasing of any Hardware, operating system and/or Software, including documentation related thereto, in each '915 ACCUSED PRODUCT that relates to:

(a)      receiving as user input one or more input points applied to the touch-sensitive display that is integrated with the device;

(b)      creating an event object in response to the user input;

(c)      determining whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation;

(d)      issuing at least one scroll or gesture call based on invoking the scroll or gesture operation;

(e)      responding to at least one scroll call, if issued, by scrolling a window having a view associated with the event object;

(f)      responding to at least one gesture call, if issued, by scaling the view associated with the event object based on receiving the two or more input points in the form of the user input;

(g)    if applicable to the particular '915 ACCUSED PRODUCT, scrolling a window having a view associated with the event object based on an amount of a scroll with the scroll stopped at a predetermined position in relation to the user input;

(h)    if applicable to the particular '915 ACCUSED PRODUCT, rubberbanding a scrolling region displayed within the window;

(i)    if applicable to the particular '915 ACCUSED PRODUCT, attaching scroll indicators and/or scroll bars to the window;

(j)    if applicable to the particular '915 ACCUSED PRODUCT, determining whether the event object invokes a scroll or gesture operation is based on receiving a drag user input for a certain time period;

(k)    if applicable to the particular '915 ACCUSED PRODUCT, rotating a view associated with the event object based on receiving a plurality of input points; and

(l)    whether the particular '915 ACCUSED PRODUCT is any (one or more) of a data processing device, a portable device, a portable data processing device, a multi touch device, a multi touch portable device, a wireless device, and/or a cell phone.

176.    All  Software, including, but not limited to, source code, Hardware code and firmware, including the design and operation, in each '915 ACCUSED PRODUCT or that enables each '915 ACCUSED PRODUCT to have the following features:

(a)    receiving as user input one or more input points applied to the touch-sensitive display that is integrated with the device;

(b)    creating an event object in response to the user input;

(c)    determining whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation;

(d)    issuing at least one scroll or gesture call based on invoking the scroll or gesture operation;

(e)    responding to at least one scroll call, if issued, by scrolling a window having a view associated with the event object ;

(f)    responding to at least one gesture call, if issued, by scaling the view associated with the event object based on receiving the two or more input points in the form of the user input;

(g)    if applicable to the particular '915 ACCUSED PRODUCT, scrolling a window having a view associated with the event object based on an amount of a scroll with the scroll stopped at a predetermined position in relation to the user input;

(h)    if applicable to the particular '915 ACCUSED PRODUCT, rubberbanding a scrolling region displayed within the window;

(i)    if applicable to the particular '915 ACCUSED PRODUCT, attaching scroll indicators and/or scroll bars to the window;

(j)   if applicable to the particular '915 ACCUSED PRODUCT, determining whether the event object invokes a scroll or gesture operation is based on receiving a drag user input for a certain time period;

(k)   if applicable to the particular '915 ACCUSED PRODUCT, rotating a view associated with the event object based on receiving a plurality of input points; and

(l)   whether the particular '915 ACCUSED PRODUCT is any (one or more) of a data processing device, a portable device, a portable data processing device, a multi touch device, a multi touch portable device, a wireless device, and/or a cell phone.

177.   Any licensing agreements, negotiations for licensing agreements, supply agreements, or negotiations for supply agreements regarding Hardware, Software, methods, processes, or apparatuses that relate to or enable the '915 ACCUSED PRODUCTS to perform the following features:

(a)   receiving as user input one or more input points applied to the touch-sensitive display that is integrated with the device;

(b)   creating an event object in response to the user input;

(c)   determining whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation;

(d)   issuing at least one scroll or gesture call based on invoking the scroll or gesture operation;

(e)   responding to at least one scroll call, if issued, by scrolling a window having a view associated with the event object;

(f)   responding to at least one gesture call, if issued, by scaling the view associated with the event object based on receiving the two or more input points in the form of the user input;

(g)   if applicable to the particular '915 ACCUSED PRODUCT, scrolling a window having a view associated with the event object based on an amount of a scroll with the scroll stopped at a predetermined position in relation to the user input;

(h)   if applicable to the particular '915 ACCUSED PRODUCT, rubberbanding a scrolling region displayed within the window;

(i)   if applicable to the particular '915 ACCUSED PRODUCT, attaching scroll indicators and/or scroll bars to the window;

(j)   if applicable to the particular '915 ACCUSED PRODUCT, determining whether the event object invokes a scroll or gesture operation is based on receiving a drag user input for a certain time period;

(k)   if applicable to the particular '915 ACCUSED PRODUCT, rotating a view associated with the event object based on receiving a plurality of input points; and

(l)      whether the particular '915 ACCUSED PRODUCT is any (one or more) of a data processing device, a portable device, a portable data processing device, a multi touch device, a multi touch portable device, a wireless device, and/or a cell phone.

178.    Apple's knowledge (including that of all '915 PATENT inventors and those involved in the prosecution of the '915 PATENT) regarding the work of Dan Rubine, including but not limited to Dr. Rubine's PhD Dissertation, entitled "The Automatic Recognition of Gestures," and papers published by Dr. Rubine through the CHI '92 conference publications and the USENIX Association entitled "Integrating Gesture Recognition and Direct Manipulation" and "Combining Gestures and Direct Manipulation."

179.    Apple's knowledge (including that of all '915 PATENT inventors and those involved in the prosecution of the '915 PATENT) regarding Mitsubishi Electric Research Laboratories, including but not limited to the MERL DiamondTouch system, and the MERL Technical Reports concerning the MERL DiamondTouch system.

180.    Apple's knowledge (including that of all '915 PATENT inventors and those involved in the prosecution of the '915 PATENT) regarding the work of Jeffrey Y. Han and/or Perceptive Pixel, Inc., including but not limited to the public demonstrations of Jeffrey Y. Han's work given at TED Conferences, publically available as of the date of these requests at http://www.ted.com/talks/jeff_han_demos_his_breakthrough_touchscreen.html.

181.    Any communications or attempts by an inventor or person involved in the prosecution of any of the APPLE UTILITY PATENTS to communicate with Jeffrey Y. Han.

182.    All communications or attempts by Apple, any Apple employee (at the time of the communication or attempt), or any person involved in the prosecution of any of the APPLE UTILITY PATENTS to communicate with Jeffrey Y. Han concerning the subject matter of any APPLE UTILITY PATENTS.

183.    Any communications or attempts by an inventor or person involved in the prosecution of any of the APPLE UTILITY PATENTS to communicate with Bill Buxton.

184.    All communications or attempts by Apple, any Apple employee (at the time of the communication or attempt), or any person involved in the prosecution of any of the APPLE UTILITY PATENTS to communicate with Bill Buxton concerning the subject matter of any APPLE UTILITY PATENTS.

185.    Apple's knowledge (including that of all '915 PATENT inventors and those involved in the prosecution of the '915 PATENT) regarding the Sony SmartSkin system.

186.    Apple's knowledge (including that of all '915 PATENT inventors and those involved in the prosecution of the '915 PATENT) regarding the work of Masanori Sugimoto and Keiichi Hiroki, including but not limited to the "HybridTouch" system described in their paper entitled "HybridTouch: an intuitive manipulation technique for PDAs using their front and rear surfaces."

187.    Apple's knowledge (including that of all '915 PATENT inventors and those involved in the prosecution of the '915 PATENT) regarding the subject matter of Japanese Patent Application Disclosure 2000-163031 to Nomura (inventor) and Seiko Epson Corporation (corporate applicant) filed November 25, 1998.

188.    For each SAMSUNG ACCUSED PRODUCT that APPLE alleges practices the '891 PATENT (hereafter "'891 ACCUSED PRODUCTS") and for Mac OS X, version 10.0, the

following functionalities of each '891 ACCUSED PRODUCT and of Mac OS X, version 10.0:

(a)     displaying a first window;

(b)     displaying a first window in response to receiving a first input from a user input device;

(c)     starting a timer;

(d)     closing the first window in response to a determination that the timer expired;

(e)     the first window does not close in response to any input from a user input device;

(f)     the first window has been displayed independently from a position of a cursor on the screen;

(g)     the first window is translucent;

(h)     fading out an image of the first window;

(i)     the first window does not respond to any input from a user input device;

(j)     restarting the timer;

(k)     closing the first window without user input; and

(l)     determining whether or not a condition is met.

189.   The Identification, operation, design, manufacture, sourcing, and purchasing of any Hardware, operating system and/or Software, including documentation related thereto, in each '891 ACCUSED PRODUCT and in Mac OS X, version 10.0 that relates to:

(a)     displaying a first window

(b)     displaying a first window in response to receiving a first input from a user input device;

(c)     starting a timer;

(d)     closing the first window in response to a determination that the timer expired;

(e)     the first window does not close in response to any input from a user input device;

(f)     the first window has been displayed independently from a position of a cursor on the screen;

(g)     the first window is translucent;

(h)     fading out an image of the first window;

(i)     the first window does not respond to any input from a user input device;

(j)     restarting the timer;

1      (k)      closing the first window without user input; and

2      (l)      determining whether or not a condition is met.

3    190.   All Software, including, but not limited to, source code, Hardware code and firmware, including the design and operation, in each '891 ACCUSED PRODUCT or that enables each '891 ACCUSED PRODUCT to have the following features:

4

5      (a)      displaying a first window;

6      (b)      displaying a first window in response to receiving a first input from a user input device;

7

8      (c)      starting a timer;

        (d)      closing the first window in response to a determination that the timer expired;

9

10      (e)      the first window does not close in response to any input from a user input device;

11      (f)      the first window has been displayed independently from a position of a cursor on the screen;

12      (g)      the first window is translucent;

13      (h)      fading out an image of the first window;

14      (i)      the first window does not respond to any input from a user input device;

15      (j)      restarting the timer;

16      (k)      closing the first window without user input; and

17      (l)      determining whether or not a condition is met.

18    191.   All Software, including, but not limited to, source code, Hardware code and firmware, including the design and operation, in Mac OS X, version 10.0 or that enables Mac OS X, version 10.0 to have the following features:

19

20      (a)      displaying a first window;

21      (b)      displaying a first window in response to receiving a first input from a user input device;

22

23      (c)      starting a timer;

        (d)      closing the first window in response to a determination that the timer expired;

24

25      (e)      the first window does not close in response to any input from a user input device;

26      (f)      the first window has been displayed independently from a position of a cursor on the screen;

27      (g)      the first window is translucent;

28      (h)      fading out an image of the first window;

1      (i)      the first window does not respond to any input from a user input device;

2      (j)      restarting the timer;

3      (k)     closing the first window without user input; and

4      (l)      determining whether or not a condition is met.

5   192.    All communications with any third party, including suppliers, including but not limited to instructions, standards, guidelines, and specifications, regarding the functionalities of the
6      '891 ACCUSED PRODUCTS that relate to:

7      (a)     displaying a first window;

8      (b)     displaying a first window in response to receiving a first input from a user input device;

9

10      (c)     starting a timer;

11      (d)     closing the first window in response to a determination that the timer expired;

12      (e)     the first window does not close in response to any input from a user input device;

13      (f)     the first window has been displayed independently from a position of a cursor on the screen;

14      (g)     the first window is translucent;

15      (h)     fading out an image of the first window;

16      (i)      the first window does not respond to any input from a user input device;

17      (j)      restarting the timer;

18      (k)     closing the first window without user input; and

19      (l)      determining whether or not a condition is met.

20   193.    Any licensing agreements, negotiations for licensing agreements, supply agreements, or negotiations for supply agreements regarding Hardware, Software, methods, processes, or
21      apparatuses that relate to or enable the '891 ACCUSED PRODUCTS and/or Mac OS X, version 10.0 to perform the following functions:

22

23      (a)     displaying a first window;

24      (b)     displaying a first window in response to receiving a first input from a user input device;

25      (c)     starting a timer;

26      (d)     closing the first window in response to a determination that the timer expired;

27      (e)     the first window does not close in response to any input from a user input device;

28

(f)     the first window has been displayed independently from a position of a cursor on the screen;

(g)     the first window is translucent;

(h)     fading out an image of the first window;

(i)     the first window does not respond to any input from a user input device;

(j)     restarting the timer;

(k)     closing the first window without user input; and

(l)     determining whether or not a condition is met.

194.    APPLE's knowledge (including that of all '891 PATENT inventors and those involved in the prosecution of the '891 patent) regarding the Mac OS X, version 10.0 operating system including, but not limited to, whether Mac OS X, version 10.0 practices the '891 PATENT.

195.    For each SAMSUNG ACCUSED PRODUCT that APPLE alleges practices the '163 PATENT (hereafter "'163 ACCUSED PRODUCTS"), the following functionalities of each '163 ACCUSED PRODUCT:

(a)     a touch screen display;

(b)     displaying documents and displaying documents with boxes of content;

(c)     detecting gestures on a touchscreen;

(d)     enlarging and translating a document;

(e)     substantially centering a box of content;

(f)     scaling a document; and

(g)     rotating a document between a landscape and portrait view.

196.    The Identification, operation, design, manufacture, sourcing, and purchasing of any Hardware, operating system and/or Software, including documentation related thereto, in each '163 ACCUSED PRODUCT that relates to:

(a)     a touch screen display;

(b)     displaying documents and displaying documents with boxes of content;

(c)     detecting gestures on a touchscreen;

(d)     enlarging and translating a document;

(e)     substantially centering a box of content;

(f)     scaling a document; and

(g)     rotating a document between a landscape and portrait view.

197.   All Software, including, but not limited to, source code, Hardware code and firmware, including the design and operation, in each '163 ACCUSED PRODUCT or that enables each '163 ACCUSED PRODUCT to have the following features:

(a)   a touch screen display;

(b)   displaying documents and displaying documents with boxes of content;

(c)   detecting gestures on a touchscreen;

(d)   enlarging and translating a document;

(e)   substantially centering a box of content;

(f)   scaling a document; and

(g)   rotating a document between a landscape and portrait view.

198.   All communications with any third party, including suppliers, including but not limited to instructions, standards, guidelines, and specifications, regarding the functionalities of the '163 ACCUSED PRODUCTS that relate to:

(a)   a touch screen display;

(b)   displaying documents and displaying documents with boxes of content;

(c)   detecting gestures on a touchscreen;

(d)   enlarging and translating a document;

(e)   substantially centering a box of content;

(f)   scaling a document; and

(g)   rotating a document between a landscape and portrait view.

199.   Any licensing agreements, negotiations for licensing agreements, supply agreements, or negotiations for supply agreements regarding Hardware, Software, methods, processes, or apparatuses that relate to or enable the '163 ACCUSED PRODUCTS to perform the following functions:

(a)   a touch screen display;

(b)   displaying documents and displaying documents with boxes of content;

(c)   detecting gestures on a touchscreen;

(d)   enlarging and translating a document;

(e)   substantially centering a box of content;

(f)   scaling a document; and

(g)   rotating a document between a landscape and portrait view.

SAMSUNG'S FIRST 30(b)(6) DEPOSITION NOTICE TO APPLE INC.

200.    APPLE's knowledge (including that of all '163 PATENT inventors and those involved in the prosecution of the '163 PATENT) regarding the work of Ben Bederson *et al.*, including but not limited to LaunchTile and XNav, before January 4, 2011.

201.    APPLE's knowledge of the publication US2005/0012723.

202.    For each SAMSUNG ACCUSED PRODUCT that APPLE alleges practices the '129 PATENT (hereafter "'129 ACCUSED PRODUCTS"), the following functionalities of each '129 ACCUSED PRODUCT:

(a)     a first set of traces and/or sense traces of conductive material along a first dimension;

(b)     a second set of traces and/or drive traces of conductive material spatially separated from the first set by a dielectric;

(c)     the first set of traces and/or sense traces having one or more widths including a maximum width;

(d)     a second set of traces and/or drive traces having one or more widths including a minimum width;

(e)     the width of the second set of traces and/or drive traces being substantially greater than the maximum width of the first set of traces at an intersection;

(f)     the second set of traces and/or drive traces to provide shielding for the first set of traces and/or sense traces;

(g)     the second set of traces and/or drive traces configured for shielding the first set of traces and/or sense traces from the modulated Vcom signal;

(h)     sensors formed at locations where the first set of traces and/or sense traces intersects with the second set of traces and/or drive traces;

(i)     an LCD emitting a modulated Vcom signal;

(j)     second set of traces and/or drive traces are widened to substantially electrically isolate the first set of traces and/or sense traces from an LCD;

(k)     computing system;

(l)     digital audio player;

(m)     a media player;

(n)     shielding a capacitive touch sensor panel from a source of capacitive coupling;

(o)     a first set of traces and/or sense traces further from the source of capacitive coupling than a second set of traces and/or drive traces;

(p)     the first set of traces and/or sense traces configured for sensing changes in mutual capacitance;

(q)     second set of traces and/or drive traces configured for being driven by low impedance driver outputs;

(r)     drive traces widened as compared to the sense traces to substantially cover the second layer except for a gape between adjacent drive traces;

(s)     touch processor;

(t)     a display and/or LCD;

(u)     a touch sensor panel adjacent to the display and coupled to the touch processor;

(v)     drive traces of a substantially constant width; and

(w)     a second set of traces and/or drive traces closer to the source of capacitive coupling than the first set of traces and/or sense traces.

203.    The Identification, operation, design, manufacture, sourcing, and purchasing of any Hardware, operating system and/or Software, including documentation related thereto, in each '129 ACCUSED PRODUCT that relates to:

(a)     first set of traces and/or sense traces of conductive material along a first dimension;

(b)     a second set of traces and/or drive traces of conductive material spatially separated from the first set by a dielectric;

(c)     the first set of traces and/or sense traces having one or more widths including a maximum width;

(d)     a second set of traces and/or drive traces having one or more widths including a minimum width;

(e)     the width of the second set of traces and/or drive traces being substantially greater than the maximum width of the first set of traces at an intersection;

(f)     the second set of traces and/or drive traces to provide shielding for the first set of traces and/or sense traces;

(g)     the second set of traces and/or drive traces configured for shielding the first set of traces and/or sense traces from the modulated Vcom signal;

(h)     sensors formed at locations where the first set of traces and/or sense traces intersects with the second set of traces and/or drive traces;

(i)     an LCD emitting a modulated Vcom signal;

(j)     second set of traces and/or drive traces are widened to substantially electrically isolate the first set of traces and/or sense traces from an LCD;

(k)     computing system;

(l)     digital audio player;

(m)     a media player;

(n)     shielding a capacitive touch sensor panel from a source of capacitive coupling;

(o)     a first set of traces and/or sense traces further from the source of capacitive coupling than a second set of traces and/or drive traces;

(p)     the first set of traces and/or sense traces configured for sensing changes in mutual capacitance;

(q)     second set of traces and/or drive traces configured for being driven by low impedance driver outputs;

(r)     drive traces widened as compared to the sense traces to substantially cover the second layer except for a gape between adjacent drive traces;

(s)     touch processor;

(t)     a display and/or LCD;

(u)     a touch sensor panel adjacent to the display and coupled to the touch processor;

(v)     drive traces of a substantially constant width; and

(w)     a second set of traces and/or drive traces closer to the source of capacitive coupling than the first set of traces and/or sense traces.

204.    All Software, including, but not limited to, source code, Hardware code and firmware, including the design and operation, in each '129 ACCUSED PRODUCT or that enables each '129 ACCUSED PRODUCT to have the following features:

(a)     first set of traces and/or sense traces of conductive material along a first dimension;

(b)     a second set of traces and/or drive traces of conductive material spatially separated from the first set by a dielectric;

(c)     the first set of traces and/or sense traces having one or more widths including a maximum width;

(d)     a second set of traces and/or drive traces having one or more widths including a minimum width;

(e)     the width of the second set of traces and/or drive traces being substantially greater than the maximum width of the first set of traces at an intersection;

(f)     the second set of traces and/or drive traces to provide shielding for the first set of traces and/or sense traces;

(g)     the second set of traces and/or drive traces configured for shielding the first set of traces and/or sense traces from the modulated Vcom signal;

(h)     sensors formed at locations where the first set of traces and/or sense traces intersects with the second set of traces and/or drive traces;

(i)     an LCD emitting a modulated Vcom signal;

(j)     second set of traces and/or drive traces are widened to substantially electrically isolate the first set of traces and/or sense traces from an LCD;

(k)     computing system;

(l)     digital audio player;

(m)    a media player;

(n)     shielding a capacitive touch sensor panel from a source of capacitive coupling;

(o)     a first set of traces and/or sense traces further from the source of capacitive coupling than a second set of traces and/or drive traces;

(p)     the first set of traces and/or sense traces configured for sensing changes in mutual capacitance;

(q)     second set of traces and/or drive traces configured for being driven by low impedance driver outputs;

(r)     drive traces widened as compared to the sense traces to substantially cover the second layer except for a gape between adjacent drive traces;

(s)     touch processor;

(t)     a display and/or LCD;

(u)     a touch sensor panel adjacent to the display and coupled to the touch processor;

(v)     drive traces of a substantially constant width; and

(w)     a second set of traces and/or drive traces closer to the source of capacitive coupling than the first set of traces and/or sense traces.

205.    All communications with any third party, including suppliers, including but not limited to instructions, standards, guidelines, and specifications, regarding the functionalities of the '129 ACCUSED PRODUCT that relate to:

(a)     first set of traces and/or sense traces of conductive material along a first dimension;

(b)     a second set of traces and/or drive traces of conductive material spatially separated from the first set by a dielectric;

(c)     the first set of traces and/or sense traces having one or more widths including a maximum width;

(d)     a second set of traces and/or drive traces having one or more widths including a minimum width;

(e)     the width of the second set of traces and/or drive traces being substantially greater than the maximum width of the first set of traces at an intersection;

(f)     the second set of traces and/or drive traces to provide shielding for the first set of traces and/or sense traces;

(g)     the second set of traces and/or drive traces configured for shielding the first set of traces and/or sense traces from the modulated Vcom signal;

(h)     sensors formed at locations where the first set of traces and/or sense traces intersects with the second set of traces and/or drive traces;

(i)     an LCD emitting a modulated Vcom signal;

(j)     second set of traces and/or drive traces are widened to substantially electrically isolate the first set of traces and/or sense traces from an LCD;

(k)     computing system;

(l)     digital audio player;

(m)    a media player;

(n)     shielding a capacitive touch sensor panel from a source of capacitive coupling;

(o)     a first set of traces and/or sense traces further from the source of capacitive coupling than a second set of traces and/or drive traces;

(p)     the first set of traces and/or sense traces configured for sensing changes in mutual capacitance;

(q)     second set of traces and/or drive traces configured for being driven by low impedance driver outputs;

(r)     drive traces widened as compared to the sense traces to substantially cover the second layer except for a gape between adjacent drive traces;

(s)     touch processor;

(t)     a display and/or LCD;

(u)     a touch sensor panel adjacent to the display and coupled to the touch processor;

(v)     drive traces of a substantially constant width; and

(w)    a second set of traces and/or drive traces closer to the source of capacitive coupling than the first set of traces and/or sense traces.

206.   Any licensing agreements, negotiations for licensing agreements, supply agreements, or negotiations for supply agreements regarding Hardware, Software, methods, processes, or apparatuses that relate to or enable the '129 ACCUSED PRODUCTS to perform the following functions:

(a)     first set of traces and/or sense traces of conductive material along a first dimension;

(b)     a second set of traces and/or drive traces of conductive material spatially separated from the first set by a dielectric;

(c)     the first set of traces and/or sense traces having one or more widths including a maximum width;

(d)     a second set of traces and/or drive traces having one or more widths including a minimum width;

  
(e)    the width of the second set of traces and/or drive traces being substantially greater than the maximum width of the first set of traces at an intersection;

(f)    the second set of traces and/or drive traces to provide shielding for the first set of traces and/or sense traces;

(g)    the second set of traces and/or drive traces configured for shielding the first set of traces and/or sense traces from the modulated Vcom signal;

(h)    sensors formed at locations where the first set of traces and/or sense traces intersects with the second set of traces and/or drive traces;

(i)    an LCD emitting a modulated Vcom signal;

(j)    second set of traces and/or drive traces are widened to substantially electrically isolate the first set of traces and/or sense traces from an LCD;

(k)    computing system;

(l)    digital audio player;

(m)    a media player;

(n)    shielding a capacitive touch sensor panel from a source of capacitive coupling;

(o)    a first set of traces and/or sense traces further from the source of capacitive coupling than a second set of traces and/or drive traces;

(p)    the first set of traces and/or sense traces configured for sensing changes in mutual capacitance;

(q)    second set of traces and/or drive traces configured for being driven by low impedance driver outputs;

(r)    drive traces widened as compared to the sense traces to substantially cover the second layer except for a gape between adjacent drive traces;

(s)    touch processor;

(t)    a display and/or LCD;

(u)    a touch sensor panel adjacent to the display and coupled to the touch processor;

(v)    drive traces of a substantially constant width; and

(w)    a second set of traces and/or drive traces closer to the source of capacitive coupling than the first set of traces and/or sense traces.

207.    APPLE's knowledge (including that of all '129 PATENT inventors and those involved in the prosecution of the '129 PATENT) regarding the work of Jun Rekimoto, including but not limited to Smart Skin and/or Mr. Rekimoto's article, *SmartSkin: An Infrastructure for Freehand Manipulation on Interactive Surface*, CHI 2002, before January 3, 2007.

208.    APPLE's knowledge, including but not limited to the knowledge of those involved in the prosecution of the '129 or '607 PATENTS, of WIPO Patent Application Publication

Number WO 2005/114369 prior to January 3, 2007, including the first instance and date of such knowledge.

209.   APPLE's knowledge (including that of all '607 PATENT inventors and those involved in the prosecution of the '607 PATENT) of mutual capacitance and/or multi-touch touch panels or touchscreens where one set of traces provided shielding for the other, prior to January 3, 2007.

210.   The conception and development of the designs reflected in the APPLE DESIGN PATENTS, all iPhone, iPad, and iPod Touch versions, and packaging of those products, including when and how those products and designs were conceived of and developed, all inspirations for them, all mock-ups and prototypes created during the course of their development, all alternative designs considered for those products and designs, and who contributed to the industrial design and user interface design of those products and designs, including any non-APPLE employees.

211.   Cost considerations or manufacturing constraints that affected or altered the designs of the APPLE DESIGN PATENTS, the industrial design of all iPhone, iPad, and iPod Touch products, and the user interfaces for those products.

212.   Function or performance benefits of the claimed features, elements, and combinations of elements of the designs of the APPLE DESIGN PATENTS, the industrial design of all iPhone, iPad, and iPod Touch products, and the user interfaces for those products.

213.   Any reference to or consideration of any SAMSUNG or third-party product by anyone at APPLE who made design decisions in connection with the designs of the APPLE DESIGN PATENTS, the industrial design of any iPhone, iPad, or iPod Touch products, or the user interfaces for those products before or during the design process of any of those products or designs.

214.   APPLE's efforts to develop phone and tablet devices, including the device depicted in Exhibit 1175, introduced during the November 8, 2011 deposition of Douglas Satzger, and communications and interactions between any APPLE employee and Roger Fidler or the New Media & Information Design Lab, including who initiated and worked on APPLE's phone and tablet projects, what was done to pursue them, and reasons for discontinuing any phone or tablet projects.

215.   The strength, fame, distinctiveness, and secondary meaning of APPLE's asserted trademark and trade dress rights.

216.   APPLE's advertising and marketing for all iPhone, iPad, and iPod Touch versions, including strategy, budget, channels, content, media, return-on-investment analysis, and analysis, studies, data and commentary relating to the effectiveness of, or consumer reaction to, that advertising and marketing.

217.   All facts supporting APPLE's belief that confusion has occurred or is likely to occur between any APPLE product and any SAMSUNG product at issue, including all instances of consumer confusion of which APPLE has knowledge in which a person confused any SAMSUNG ACCUSED PRODUCT with any version of the iPhone, iPad, or iPod Touch.

218.   All facts supporting APPLE's belief that dilution of APPLE's trade dress has occurred or is likely to occur as a result of any action by SAMSUNG.

219.   All market and consumer testing, surveys, or research APPLE has conducted, commissioned, or otherwise received concerning phones, tablets, and media players, including any version of the iPhone, iPad, or iPod Touch, or any SAMSUNG product.

220.   Evidence relating to SAMSUNG's alleged knowledge of and intent regarding the alleged infringement and dilution of APPLE's asserted intellectual property rights.

221.   Use of APPLE's asserted design, trade dress, and trademark rights by anyone other than APPLE, including APPLE's knowledge of such use and all actions taken regarding such use.

222.   APPLE's cooperation with authors, photographers, and publishers of books concerning APPLE or APPLE's designs, including: Walter Isaacson, Paul Kunkel, Rick English, Friedrich von Borries, Ina Grätz and Sabine Schulze.

223.   All injuries, including the scope of such injuries, APPLE believes it has suffered and will suffer as a result of SAMSUNG's accused actions.

224.   APPLE's annual, monthly, and weekly profits, revenues, costs and sales for all iPhone, iPad, and iPod Touch versions, including reasons for increases or decreases in profits, revenues, costs and sales of these products.

225.   APPLE's communications with SAMSUNG RELATING to any SAMSUNG ACCUSED PRODUCT.

226.   Cost to APPLE of all iPhone, iPad, and iPod Touch versions.

227.   Cost to consumers of all iPhone, iPad, and iPod Touch versions, including shipping and related costs, and the availability of discounts and coupons.

228.   Cost to distributors of all iPhone, iPad, and iPod Touch versions, including shipping and related costs, and the availability of discounts and coupons.

229.   APPLE's manufacturing, sales and distribution capacities from 2010 to the present for all iPhone, iPad, and iPod Touch versions, including without limitation, staffing levels and needs and operating budgets, on a monthly basis for each of the manufacturing, sales and distribution organizations involved in the sale of any products for which APPLE claims lost profits.

CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2011, I caused **SAMSUNG'S FIRST 30(b)(6)**

**NOTICE TO APPLE** to be electronically served on the following via email:

**ATTORNEYS FOR APPLE INC.**

HAROLD J. MCELHINNY
hmcelhinny@mofo.com
MICHAEL A. JACOBS
mjacobs@mofo.com
JENNIFER LEE TAYLOR
jtaylor@mofo.com
ALISON M. TUCHER
atucher@mofo.com
RICHARD S.J. HUNG
rhung@mofo.com
JASON R. BARTLETT
jasonbartlett@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

WILLIAM F. LEE
william.lee@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

I declare under penalty of perjury that the foregoing is true and correct.  Executed in San

Francisco, California, on December 14, 2011.

_/s/ Alex Binder_____