1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Charles K. Verhoeven (Bar No. 170151)
2     charlesverhoeven@quinnemanuel.com
   50 California Street, 22nd Floor
3  San Francisco, California 94111
   Telephone: (415) 875-6600
4  Facsimile: (415) 875-6700

5     Kevin P.B. Johnson (Bar No. 177129)
       kevinjohnson@quinnemanuel.com
6     Victoria F. Maroulis (Bar No. 202603)
       victoriamaroulis@quinnemanuel.com
7  555 Twin Dolphin Drive, 5th Floor
   Redwood Shores, California 94065-2139
8  Telephone:    (650) 801-5000
   Facsimile:    (650) 801-5100

9

10    Michael T. Zeller (Bar No. 196417)
       michaelzeller@quinnemanuel.com
11 865 S. Figueroa St., 10th Floor
   Los Angeles, California 90017
12 Telephone: (213) 443-3000
   Facsimile: (213) 443-3100

13

14 Attorneys for SAMSUNG ELECTRONICS CO.,
   LTD., SAMSUNG ELECTRONICS AMERICA,
15 INC. and SAMSUNG
   TELECOMMUNICATIONS AMERICA, LLC

16

17              UNITED STATES DISTRICT COURT

18       NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

19

20 APPLE INC., a California corporation,          CASE NO. 11-cv-01846-LHK

21              Plaintiff,                         **SAMSUNG'S RESPONSE TO APPLE'S
                                                  OPENING CLAIM CONSTRUCTION
22      vs.                                        BRIEF**

23 SAMSUNG ELECTRONICS CO., LTD., a              Claim Construction
   Korean business entity; SAMSUNG              Hearing:      January 20, 2012
24 ELECTRONICS AMERICA, INC., a New             Time:         10:00 a.m.
   York corporation; SAMSUNG                    Place:        Courtroom 4, 5th Floor
25 TELECOMMUNICATIONS AMERICA,                  Judge:        Honorable Lucy H. Koh
   LLC, a Delaware limited liability company,
26                                               SUBMITTED UNDER SEAL
                Defendant.
27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................... 1

II.     ARGUMENT ........................................................................................................... 1

    A.      U.S. Patent No. 6,493,002 ........................................................................... 1

        1.      "the first window region . . . implemented in a window layer that
            appears on top of application programming windows that may be
            generated" .......................................................................................... 1

            a.      The Plain Claim Language and Specification Support
                Samsung's Construction ........................................................... 2

            b.      Apple Disclaimed Any Broader Construction During
                Prosecution .............................................................................. 3

    B.      U.S. Patent No. 7,469,381 ........................................................................... 5

        1.      "an edge of the electronic document" ............................................... 5

    C.      U.S. Patent No. 7,663,607 ........................................................................... 7

        1.      "glass member" ................................................................................. 7

            a.      "Glass Member" Should Be Given Its Ordinary Meaning ................ 8

            b.      The '607 Patent Does Not Specially Define "Glass Member" ......... 9

    D.      U.S. Patent No. 7,812,828 ......................................................................... 11

        1.      "mathematically fit[ting] an ellipse to at least one of the [one or
            more] pixel groups" ........................................................................ 12

            a.      The '828 Inventors Acted As Their Own Lexicographer ................ 12

            b.      The '828 Patent Discloses Only One Embodiment ......................... 14

            c.      The ITC Staff Already Rejected Apple's Arguments .................... 15

        2.      "pixel group[s]/pixel[s]" ................................................................ 15

    E.      U.S. Patent No. 7,822,915 ......................................................................... 17

        1.      "scrolling a window having a view" ............................................... 17

    F.      U.S. Patent No. 7,853,891 ......................................................................... 19

        1.      "starting a timer" ............................................................................ 20

a. The Intrinsic Evidence Supports Samsung's Construction ............. 20

b. Extrinsic Evidence Supports Samsung's Construction ................... 21

2. "the first window has been displayed independent[ly] from a position of a cursor on the screen" ................................................. 22

a. A Cursor Is A Mouse Pointer Or A Similar Icon That Is Controlled By A Mouse, Track Ball, Or Touch Pad ..................... 22

b. The Cursor Must Be Visible On The Screen ................................... 25

III. CONCLUSION .............................................................................................. 25

1

# **TABLE OF AUTHORITIES**

2

**Page**

**Cases**

*ACTV, Inc. v. Walt Disney Co.*,
    346 F.3d 1082 (Fed. Cir. 2003) .......................................................................20

*Abbott Laboratoriess v. Andrx Pharms., Inc.*,
    473 F.3d 1196 (Fed. Cir. 2007) .......................................................................10

*Alloc, Inc. v. International Trade Commission*,
    342 F.3d 1361 (Fed. Cir. 2003) .......................................................................14

*AstraZeneca LP v. Apotex, Inc.*,
    633 F.3d 1042 (Fed. Cir. 2010) .......................................................................13

*Board of Regents of the University of Tex. System v. BENQ America Corp.*,
    533 F.3d 1362 (Fed. Cir. 2008) .......................................................................18

*Bell Atlantic Network Services v. Covad Communs. Group*,
    262 F.3d 1258 (Fed. Cir. 2001) ...............................................................9, 10, 16

*Elekta Instrument S.A. v. O.U.R. Sci. International*,
    214 F.3d 1302 (Fed. Cir. 2000) .................................................................5, 10

*ERBE Elektromedizin GmbH v. Canady Tech. LLC*,
    629 F.3d 1278 (Fed. Cir. 2010) ........................................................................5

*Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*,
    93 F.3d 1572 (Fed. Cir 1996) .......................................................................10

*Gentry Gallery, Inc. v. Berkline Corp.*,
    134 F.3d 1473 (Fed. Cir. 1998) .......................................................................14

*Hoganas AB v. Dresser Industrial, Inc.*,
    9 F.3d 948 (Fed. Cir. 1993) .......................................................................11

*IP Innovation L.L.C. v. Lexmark, International, Inc.*,
    424 F. Supp. 2d 1078 .......................................................................16

*ImageCUBE LLC v. Boeing Co.*,
    No. 2010-1265, 2011 WL 2438634 (Fed. Cir. Jun. 20, 2011) ....................................13

*Intel Corp. v. Broadcom Corp.*,
    172 F. Supp. 2d 515 (D. Del. 2001) .......................................................................16

*Johnson Worldwide Associates v. Zebco Corp.*,
    175 F.3d 985 (Fed. Cir. 1999) ........................................................................8

*Lantech, Inc. v. Keip Machine Co.*,
    32 F.3d 542 (Fed. Cir. 1994) ........................................................................3

*LG Display Co., Ltd. V. AU Optronics Corp.*,
    686 F. Supp. 2d 429 (D. Del. 2006) .......................................................................15

*N. America Container, Inc. v. Plastipack Packaging, Inc.*
  415 F.3d 1335 (Fed. Cir. 2005) ...................................................................................5

*PCTEL, Inc. v. Agere System, Inc.*
  No. C 03-2474, 2005 WL 2206683 (N.D. Cal. Sept. 8, 2005)...................................21

*In re Paulsen,*
  30 F.3d 1475 (Fed. Cir. 1994) .................................................................................10

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) .........................................................................4, 6, 8

*Quickie Manufacturing Corp. v. Libman Co.,*
  180 F. Supp. 2d 636 (D.N.J. 2002) ...........................................................................11

*Rheox, Inc. v. Entact, Inc.,*
  276 F.3d 1319 (Fed. Cir. 2002) ........................................................................4, 5, 13

*S3 Inc. v. NVIDIA Corp.,*
  259 F.3d 1364 (Fed. Cir. 2001) ................................................................................15

*Semiconductor Energy Laboratories Co., Ltd. v. Samsung Electric Co., Ltd.,*
  711 F. Supp. 2d 913 (W.D. Wisc. 2010) ...................................................................16

*Silicon Graphics, Inc. v. nVIDIA Corp.,*
  58 F. Supp. 2d 331 (D. Del. 1999) ...........................................................................16

*Sinorgchem Co. v. ITC,*
  511 F.3d 1132 (Fed. Cir. 2007) .................................................................................9

*Southwall Techs., Inc. v. Cardinal IG Co.,*
  54 F.3d 1570 (Fed. Cir. 1995) ..............................................................................4, 13

*SuperGuide Corp. v. DirecTV Enterprises, Inc.,*
  169 F. Supp. 2d 492 (W.D.N.C. 2001)......................................................................16

*TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc.,*
  529 F.3d 1364 (Fed. Cir. 2008) ..................................................................................4

*Tandon Corp. v. U.S. International Trade Com.,*
  831 F.2d 1017 (Fed. Cir. 1987) ................................................................................21

*Teleflex Inc. v. Ficosa N. America, Corp.,*
  299 F.3d 1313 (Fed. Cir. 2002) ................................................................................16

*TurboCare Division of Demag Delaval Turbomachinery Corp. v. General Electric Co.,*
  264 F.3d 1111 (Fed. Cir. 2001) ................................................................................23

*Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576
  (Fed. Cir. 1996) .........................................................................................9, 16, 20

## Statutes

35 U.S.C. § 112, ¶ 1 ...................................................................................................23

# I.      INTRODUCTION

Defendants and counterclaimants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively "Samsung") respectfully submit this response brief on eight disputed claim terms from Apple's '002, '381, '607, '828, '915 and '891 patents.  Apple's proposed constructions violate the most fundamental cannons of claim construction, consistently disregarding and contradicting the plain claim language, unmistakable disclaimers made during prosecution of its patents, and the teachings of the specifications.  Apple's attempts to enlarge the scope of its claims is an obvious attempt to capture technology found in Samsung's products that falls well outside the metes and bounds of Apple's patents.  In sharp contrast, Samsung's constructions clarify the plain claim language and bring to light the unmistakable disclaimers and disavowals Apple made during prosecution of its patents and the teachings of the patents' specifications.  Accordingly, Samsung respectfully requests that the Court adopt its constructions for the sound reasons articulated in this brief.

# II.     ARGUMENT

## A.      U.S. Patent No. 6,493,002

### 1.      "the first window region . . . implemented in a window layer that appears on top of application programming windows that may be generated"

| Claim Term | Samsung's Construction | Apple's Construction |
|---|---|---|
| "the first window region and the plurality of independent display areas are implemented in a window layer that appears on top of application programming windows that may be generated" (claims 1, 14, 25, 26, 39, 50) | The first window and the plurality of independent display areas are never obscured by any portion of any application windows that are generated or capable of being generated. | Plain and ordinary meaning. |

The fundamental dispute between the parties is whether the first window and the plurality of independent display areas appears "on top of" application windows always (as Samsung contends) or only sometimes (as Apple contends).  Samsung's construction is dictated not only by the plain language of the claims, but also by the prosecution history, where Apple clearly

1  disavowed alternative embodiments of the "first window" and "independent display areas" that are

2  not always on top.

<b>a.    The Plain Claim Language and Specification Support<br>Samsung's Construction</b>

5  The asserted claims of the '002 patent require that a "first window region and the plurality

of independent display areas are implemented in a window layer that appears on top of application

programming windows that may be generated." *See* '002 patent at claim 1 (Ex. A).[1]  This

limitation is illustrated in Figure 2A of the '002 patent, which shows the first window region

appearing on top of ***all*** application programming windows generated on the display.



*See also* '002 patent at 6:40-46 (describing a "private" window layer on top of "all" application

windows).

18  The plain claim language requires the "first window" to be "implemented in a window

layer that appears <u>on top</u> of application programming windows <u>that may be generated</u>."  This

confirms that the "first window" appears above both presently generated application windows and

any application windows capable of being generated in the future.  In other words, if any

application programming window is ever generated, the first window must appear on top of that

application programming window.  By contrast, while Apple claims to espouse a "plain meaning"

construction, Apple's construction would allow a "first window" that appears *below* an application

window, which would read the limitation "on top of" right out of the claim.  Apple's construction

---

[1]  Citations to "Ex. __" refer to the Declaration of Todd M. Briggs in Support of Samsung's
Response to Apple's Opening Claim Construction Brief and the exhibits thereto.

must therefore be rejected. *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546 (Fed. Cir. 1994) ("All limitations in a claim must be considered meaningful.").[2]

### b.    Apple Disclaimed Any Broader Construction During Prosecution

Apple's explicit disclaimers during prosecution confirm Samsung's construction.  During prosecution, Apple distinguished the '002 patent from U.S. Patent No. 5,659,693 ("Hansen"), a "dashboard" program that generates a panel similar to the '002 window.  Apple emphasized that the first window region in the '002 patent **always** appears on top of application programming windows.  By contrast, Hansen only made that optional:

> Furthermore, the present invention as claimed includes having a window region with its independent display areas in a window that appears on top of application window programs that may be generated.  **Therefore, by implication, those window areas that are generated after the generation of the window layer will still not appear on top of the control/status window in the present invention as claimed when they are active.  This allows the user to have an unobstructed view of the system/controller area regardless of the window that's selected as being active (even when the windows overlap each other).  Thus, the window may _always_ be visible to the user.**  The Examiner believes that this is clearly shown in <u>Hansen</u>, specifically referring to the dashboard interface.  However, **<u>Hansen</u> only allows the user an unobstructed view of the system if a button is selected (col. 4, lines 45-51)**.  Thus, Applicant believes that one familiar with the art would not look to <u>Hansen</u> to arrive at the present invention because **the present invention is directed at using individual programming modules that generate displays that are _always_ visible on a top layer.**

Response to O.A., 6/28/2000 at 2-3 (emphasis added) APLNDC00028083-84 (Ex. C).

---

[2]   The sole named inventor on the '002 patent also testified that the first window region appears on top of all application windows that may be generated.  *See* Christensen Dep. at 126:11-127:22 (testifying that the disputed claim limitation means that "... if an application creates a window it will appear behind the Control Strip window") (Ex. B); *Id.* at 31:1-10, Ex. 978 ▮REDACTED▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. B).

1    Here, Apple clearly describes the disputed claim limitation as the "present invention," not

2    just a particular embodiment.   Apple then explains that the "present invention as claimed"

3    specifies that the first window region **<u>always</u>** appears on top of the application windows.

4    When the PTO still denied Apple's patent application, Apple appealed.   In its Appeal

5    Brief, Apple reiterated its position that Hansen was distinguishable because the window layer in

6    Hansen was not always on top:

7    > However, <u>Hansen</u> only allows the user an unobstructed view of the
> system if a button is selected (<u>Hansen</u>, col. 4, lines 45-51).   For
8    > example, see Figure 18 of <u>Hansen</u>, the dashboard is obscured by a
> window.   Thus, <u>Hansen</u> does not teach or suggest "window layer
9    > appears on top of application programming windows that may be
> generated."
10

11    Appeal Brief, 8/31/2001 at 16, APLNDC00028118 (Ex. C); see also <u>Hansen</u> Fig. 18 (Ex. D).

12    Once again, Apple explicitly disclaimed any embodiment where the first window region did not

13    always appear on top of any application windows.   The PTO then issued a notice of allowance

14    based on the Appeal Brief.   *See* O.A., 11/7/2001, APLNDC00029029-35 (Ex. C).

15    Through its statements to the PTO, Apple unambiguously disclaimed any first window that

16    can be obscured by an application programming window.   Apple cannot now add back through

17    claim construction what it previously disclaimed.   *See, e.g., Southwall Techs., Inc. v. Cardinal IG*

18    *Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of

19    claim terms so as to exclude any interpretation that was disclaimed during prosecution."); *Rheox,*

20    *Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002) (same).

21    Apple relies on two parts of the specification that discuss an embodiment where the user

22    can hide the control strip by clicking a button.   *See* Apple Br. at 4 (citing '002 patent at 7:29-32

23    and 8:44-46).   However, these embodiments are not covered by the claims.   *See TIP Systems, LLC*

24    *v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("Our precedent is

25    replete with examples of subject matter that is included in the specification, but is not claimed.").

26    Apple fails to explain how a control strip that is "hidden" as described in those embodiments

27    could nevertheless be considered "on top of" the application programming windows.

28    Furthermore, to the extent these embodiments were covered by the claims, they were

1   unambiguously disclaimed during prosecution when distinguishing Hansen.  *Rheox,* 276 F.3d at

2   1327 (limiting claim term to exclude preferred embodiments based on disclaimer in the

3   prosecution history); *N. Am. Container, Inc. v. Plastipack Packaging, Inc.*, 415 F.3d 1335 (Fed.

4   Cir. 2005); *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302,  (Fed. Cir. 2000).

5        The prosecution history also shows that Apple's reliance on the doctrine of claim

6   differentiation is misplaced.  Apple incorporated the limitations found in claims 12 and 13 into

7   claim 1 during prosecution to avoid prior art, thus making the scope of claim 1 coextensive with

8   dependent claims 12 and 13.  The prosecution timeline confirms this.  Apple introduced dependent

9   claims 12 and 13 in 1996.[3]  Apple added the disputed limitation to claim 1 three years later, in a

10  November 1999 amendment.[4]  Given this factual situation, it is unsurprising that scope of the

11  independent claims converged with some dependent claims.  Furthermore, prosecution disclaimers

12  override the doctrine of claim differentiation.  *See ERBE Elektromedizin GmbH v. Canady Tech.*

13  *LLC*, 629 F.3d 1278, 1287 (Fed. Cir. 2010) (holding that prosecution disclaimer occurred despite

14  the doctrine of claim differentiation).  Thus, the statements Apple made to avoid Hansen nullify

15  Apple's claim differentiation argument.

16        **B.    U.S. Patent No. 7,469,381**

17        The '381 patent describes a user-interface feature for touch screen displays that visually

18  indicates to the user when he or she has moved an electronic document past its edge.  Importantly,

19  the technology of the '381 patent relates to the visual presentation of documents on "touch screen

20  <u>displays</u>" and is described as a <u>graphical</u> user interface.

21        **1.    "an edge of the electronic document"**

| Claim Term | Samsung's Construction | Apple's Construction |
|---|---|---|
| "an edge of the electronic document"[5] (claims 1, 11, 13, 14, 16-20) | A boundary of the electronic document that distinguishes it from another electronic | No construction needed. |

---

[3]   *See* Response to O.A., 8/20/1996 at claims 23 and 24, APLNDC00028585 (Ex. C).

[4]   *See* Response to O.A., 11/8/1999 at 6, APLNDC00028058 (Ex. C).

[5]   This term appears in various forms in different claims of the '381 patent, but these variations are minor and not relevant to the primary points of dispute between the parties.

| | document, other content, or a background area. | |
|---|---|---|

The parties' dispute concerns whether any content can exist beyond "an edge of the electronic document."[6]  Samsung contends that "an edge of the electronic document" can separate one electronic document from another electronic document, other content, or background area, while Apple asserts that "an edge of the electronic document" can only be an external or outer boundary, beyond which there can be no content whatsoever.  There is no intrinsic or extrinsic evidence that supports Apple's unduly limited construction.

Nothing in the claim language or the specification of the '381 patent precludes another electronic document or other content from appearing beyond the edge of an electronic document.  To the contrary, the claims of the '381 patent expressly contemplate other content appearing beyond an edge of an electronic document.  Claim 13, which is dependent on claim 1, adds the limitation "wherein the area beyond the edge of the document is black, gray, a solid color, or white."  '381 patent at 36:23-25 (Ex. E).  Under the doctrine of claim differentiation, claim 1 must encompass more than simply a solid color, or background, beyond the edge of the document.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314, 1323 (Fed. Cir. 2005).  For the scope of claim 1 to differ from the scope of claim 13, content must exist beyond the edge of the electronic document described in claim 1.  Additionally, the '381 specification expressly disclose embodiments that include content beyond the edge: "In some other embodiments, a wallpaper image such as a picture or pattern may be displayed in the area beyond the edge of the electronic document."  '381 patent at 27:36-39 (Ex. E).

---

[6] Apple appears to be disputing Samsung's construction of this term to distinguish the '381 patent from the LaunchTile and Lira prior art raised during the preliminary injunction proceedings.  While the Court found that LaunchTile and Lira references were not likely to anticipate the '381 patent in its preliminary injunction order, this conclusion was based on the interpretation of a claim term that the parties did not have an opportunity to address during the preliminary injunction proceedings.  Samsung believes that the Court's interpretation of this claim term is incorrect and respectfully submits that it will be able to demonstrate as much when given an opportunity to do so.  Consequently, Samsung believes that the meaning of "an edge of the electronic document" remains an important term for construction.

1    Nothing in the claims or specification prevents electronic documents from appearing

2  within the boundaries of other electronic documents.  For example, a webpage may include within

3  its boundaries numerous images.  The webpage and images are electronic documents according to

4  the '381 specification.  *See, e.g., id.* at claim 6, claim 7, col. 27:7-12.  In this example, the images

5  within the webpage form so-called "internal edges."  These "internal edges" formed by the images

6  within the webpage are edges of electronic documents and additional content (*e.g.*, other content

7  in a webpage) may exist beyond these "internal edges."  Consequently, Apple's arguments that an

8  internal edge cannot serve as the edge of an electronic document and that content cannot appear

9  beyond the edge of an electronic document find no support in the intrinsic evidence.

10    The construction of "an edge of the electronic document" must take into account the fact

11  that the '381 patent is focused on the visual display of an electronic document.  For example,

12  claim 1 alone uses (some form of) the word "display" ten times, the title of the '381 patent

13  indicates it applies to "a touch-screen display," and the background section describes that part of

14  the problem addressed is a "result of the small size of display screens on portable electronic

15  devices."  '381 patent at 2:14-15 (Ex. E).  Samsung's construction accounts for any of these

16  aesthetic choices of display by focusing on the visual separation, whether that visual separation is

17  between areas containing content, or between content and a background area.  On the other hand,

18  Apple's interpretation focuses on a distinction between "internal" and "external" boundaries,

19  which is not a part of the '381 patent specification or its claims.  Such a distinction is unsupported

20  and should not be read into the construction of "an edge of the electronic document."

21    Testimony from Apple's expert, Dr. Ravin Balakrishnan, confirms that Samsung's

22  construction is correct.  During his deposition, Dr. Balakrishnan indicated in a drawing that

23  internal boundaries were included within the meaning of "an edge of the electronic document" and

24  that content can exist beyond the edge of an electronic document.  Balakrishnan Dep. 157:19-

25  158:10, Ex. 104 (Ex. F) (showing Dr. Balakrishnan's handwritten identification of the "Edge" of

26  an electronic and an area "Beyond Edge" of the edge the electronic document).

27  **C.    U.S. Patent No. 7,663,607**

28      **1.    "glass member"**

| Claim Term | Samsung's Construction | Apple's Construction |
|---|---|---|
| "glass member" (claim 10) | Plain and ordinary meaning. | glass or plastic material |

The '607 patent relates to a transparent multilayer touch screen configured to detect multiple touches occurring at the same time on different locations of the touch screen.  The parties dispute the meaning of the term "glass member" which appears in claim 10.  The term "glass member" should be given its plain and ordinary meaning to exclude plastic materials.  Plastic is not glass.  This construction is consistent the specification, the understanding of a person of ordinary skill in the art, and the understanding of Apple's own inventors.

### a.    "Glass Member" Should Be Given Its Ordinary Meaning

Claim construction must begin with the plain language of the claim.  There is nothing ambiguous or technical about the term "glass member."  As the Federal Circuit has explained, "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.  "Glass member" is a paradigmatic example of claim language consisting of "commonly understood words" with a "widely accepted meaning."  It requires no specialized knowledge to recognize that a "glass member" is made of glass.  Apple cannot overcome this heavy presumption in favor of the claim term's ordinary meaning.  *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999).

The specification refutes Apple's position that "glass" includes plastic.  The specification is replete with phrases referencing glass and plastic *separately*, indicating that the patentees did not intend glass and plastic to be synonymous or encompass each other.  For example, the specification explains that conductive lines are patterned on a clear material "such as *glass or plastic*." '607 patent at 10:37-40 (Ex. H).  The specification similarly states that the cover sheet may be formed from any suitable clear material "such as *glass and plastic*."  *Id.* at 12:60-62.  The specification once again makes a distinction between glass and plastic when it states the lines are

1  formed "on *glass, film or plastic*." *Id.* at 14:60-62.  None of these references would make sense if

2  the meaning of "glass" included plastic.[7]

### b.    The '607 Patent Does Not Redefine "Glass Member"

4      Apple asserts that it acted as its "own lexicographer" and defined "glass member" in the

5  specification to include both glass *and plastic* members.  Apple Br. at 9.  Apple's assertion does

6  not withstand scrutiny.  To act as your own lexicographer, "the intrinsic evidence must 'clearly set

7  forth' or 'clearly redefine' a claim term so as to put one reasonably skilled in the art on notice that

8  the patentee intended to so redefine the claim term." *Bell Atl. Network Servs. v. Covad Communs.*

9  *Group*, 262 F.3d 1258, 1268 (Fed. Cir. 2001).  A patentee may only clearly redefine a claim term

10  either by including an "explicit statement of redefinition" or "by implication."  *Id.*  To redefine by

11  implication, the patentee must "use[] a claim term throughout the *entire* patent specification, in a

12  manner *consistent with only a single meaning*."  *Id.* at 1271 (emphasis added) (quoting *Vitronics*

13  *Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

14      The patentees fell woefully short in acting as their own lexicographer here.  Apple's only

15  support is a single sentence in Column 16, lines 46-47 that reads: "For example, any suitable glass

16  or plastic material may be used for the glass members."  Apple Br. at 9.  This isolated sentence is

17  far from an explicit redefinition of the term.

18      First, the sentence lacks any indication whatsoever that it contains a prescriptive definition.

19  *See Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (use of quotation marks or "is"

20

---

21      [7]  Apple's contention that its proposed construction is supposedly consistent with "common

22  usage" is misplaced.  Apple references a drinking glass, eyeglasses, and a magnifying glass – all

of which Apple alleges could be made of plastic.  Apple Br. at 9-10.  This position is nonsensical

23  and ignores controlling case law that requires a claim term to take on the ordinary and customary

meaning of those of ordinary skill *in the art* at the time of the invention.  *See Phillips*, 415 F.3d

24  1303, 1313, 1326.  What is "common usage" in the fields of tableware or optometry is irrelevant

to the transparent touchscreen analysis here.  Moreover, the use of "glass as a noun is a

25  categorically different from the use of "glass" as an adjective modifying a noun, as used in claim

10.  In addition, the deposition testimony of Apple's own inventors further supports Samsung's

26  construction.  Two named inventors of the '607 patent testified that plastic and glass are different

materials having different characteristics and benefits.  Huppi Dep. at 89:10-90:9, 91:2-13 (Ex. I);

27  Strickon Dep. at 166:5-167:6 (Ex. J).

28

indicates express redefinition); *Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1210 (Fed. Cir. 2007) (use of "means" indicates express redefinition).  To the contrary, the quoted sentence is couched in the permissive language "for example" and "may be used."  These caveats are inconsistent with the concept of an explicit, global definition.

Second, this single sentence is not set out with "reasonable clarity, deliberateness, and precision" to redefine the meaning of this otherwise unambiguous term by implication.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).  The term "glass member" is used twenty-eight times in the specification of the '607 patent.  For twenty-seven of these uses, there is no indication that "glass member" means anything but "glass."  Moreover, the numerous examples cited above of "glass" and "plastic" used separately in the same phrase to refer to different materials cannot support a redefinition by implication because the patentees failed to use the term in a consistent manner throughout the *entire* specification.  *Bell Atl.*, 262 F.3d at 1271.  A single sentence buried deep within twenty-two columns of text and nineteen figures, and not consistently applied in the remainder of the patent, completely fails to serve any meaningful notice function to a reasonable competitor, as required by a redefinition.  *Id.* at 1268; *Elekta Instrument S.A.*, 214 F.3d at 1307 (Fed. Cir. 2000).

Third, where the specification intended to encompass both glass and plastic, it used explicitly broader language.  Throughout the '607 patent, the specification alternatively states that the claimed "touch panel may be composed of" (1) a "clear material" (*Id.* at 10:37-40; 12:60-62); (2) an "optical[ly] transmissive member" (*Id.* at 10:37-40; 13:62-64); or (3) a "substrate" (*Id.* at 14:62-65).  Any one of these terms could have been used in claim 10 instead of "glass member" to encompass *both glass and plastic*, but none were.  The only reasonable conclusion is that the patentees selected the term "glass member" in claim 10 to specifically refer only to glass and not to plastic or other materials.

Finally, to the extent Apple's one sentence creates any ambiguity at all, that ambiguity must be resolved against Apple.  Patent claims, like contracts, must be construed narrowly when ambiguous and against the drafter.  *See, e.g., Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 93 F.3d 1572, 1581 (Fed. Cir 1996) ("to the extent that the claim is ambiguous, a narrow

1  reading which excludes the ambiguously covered subject matter must be adopted"); *Quickie Mfg.*

2  *Corp. v. Libman Co.*, 180 F. Supp. 2d 636, 645 (D.N.J. 2002) (noting the Federal Circuit's

3  "admonition" that patent claims must be construed against the drafter).  Had Apple, "who was

4  responsible for drafting and prosecuting the patent, intended something different, it could have

5  prevented this result through clearer drafting."  *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948,

6  951 (Fed. Cir. 1993).

7       **D.      U.S. Patent No. 7,812,828**

8           The '828 patent relates to detecting and distinguishing the different parts of a hand on a

9  touch-sensitive surface.  '828 patent at 12:66-13:3; 18:1-4 (Ex. K).  The '828 patent does this by

10 generating a "proximity image."  *Id.* at 18:4-7.  As illustrated below, the proximity image shows

11 where the hand is touching or close to the touch-sensitive surface.  *Id.*

12

13 

14

15

16

17

18

19

20 The proximity image consists of pixels.  *Id.* at 18:14; 25:63.  In the specification, the pixels have a

21 parallelogram shape.  *See id.* at 18:1-4; Figs. 13-15.  A proximity image may have groups of

22 pixels.  For example, in Figure 13 above, there is a group of pixels for the thumb, for each finger,

23 and for the palm of the hand.  *Id.* at 18:16-33.  The specification describes "segmenting" the

24 proximity image into these pixel groups and then "mathematically fitting an ellipse" to each pixel

25 group.  *Id.* at 25:62-26:65.

26           The '828 inventors did not invent proximity images, segmenting proximity images into

27 pixel groups, or fitting ellipses to pixel groups.  In fact, when the inventors filed their patent

28 application, there were many different ways to do ellipse fitting.  *See* Apple Br. at 12-13 (citing to

Samsung's invalidity contentions).[8]   What the inventors invented, if anything, was a particular method for mathematically fitting an ellipse to pixel groups.   This is why the '828 inventors wrote their patent application to *require* the particular approach described below:



'828 patent at 26:17-47 (Ex. K).

### 1.   "mathematically fit[ting] an ellipse to at least one of the [one or more] pixel groups"

| Claim Term | Samsung's Construction | Apple's  Construction |
|---|---|---|
| "Mathematically fit[ting] an ellipse to at least one of the [one or more] pixel groups" (claims 1, 10) | For at least one of the pixel groups, applying a unitary transformation of the group covariance matrix of second moments of proximity data for all pixels in that pixel group to fit an ellipse. | No construction necessary. |

### a.   The '828 Inventors Acted As Their Own Lexicographer

The '828 specification is unambiguous when it states that "[t]he ellipse fitting procedure <u>requires</u> a unitary transformation of the group covariance matrix $G_{eov}$ of second moments $Q_{xx}$, $Q_{xy}$,

---

[8] Apple makes the disingenuous argument that the wealth of prior art in Samsung's invalidity contentions is evidence that "mathematically fitting an ellipse" should be given a broad construction.  Apple Br. at 13.  To the contrary, Samsung's invalidity contentions explicitly state that they are based on Apple's overly broad constructions in its infringement contentions.  The only thing that Samsung's invalidity contentions prove is that the '828 patent is a narrow patent in a crowded field.

$G_{yy}$." *Id.* at 26:19-21 (emphasis added).  By using the word "requires," the Applicants acted as their own lexicographer.  *See, e.g., ImageCUBE LLC v. Boeing Co.,* No. 2010-1265, 2011 WL 2438634, at *3 (Fed. Cir. 2011) (use of "requires" in a specification meant that a particular alloy "must result" for infringement of asserted claims); *accord, AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1051-52 (Fed. Cir. 2010) ("[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs.").  The specification explicitly puts the public on notice that the claimed "ellipse fitting" means the mathematical equations in column 26.

If there is *any* doubt that the inventors limited their claims to these mathematical equations, the prosecution history puts this issue to rest.  When the inventors filed their application, they initially tried to claim "fitting an ellipse to at least one of the pixel groups."  App. No. 11/677,958, 2/22/2007 at 94, APLNDC00020371 (Ex. L).  The Examiner summarily rejected these claims as anticipated by U.S. Patent No. 5,925,352 ("Bisset"), and the Applicants never overcame this rejection.  *See* O.A, 12/24/2009 at 6-8, APLNDC00021629-31(Ex. L); *Id.* at 11, APLNDC00021634; *Id.* at 15, APLNDC00021638.  Instead the Applicants argued that the Examiner was rejecting the claims unfairly because he <u>was not</u> limiting the claims to the specification.  *See* Request for Corrected O.A., 2/24/2010 at 10-11, APLNDC00021689-90 (Ex. L).  In this same response, the Applicants amended all of the claims to require "*mathematically fitting an ellipse.*"  *Id*. at 11, APLNDC00021690.

In their Amendment, the Applicants made a deal with the Patent Office.  They amended their claims to require "mathematically fitting and ellipse."  This amendment "must be viewed" in light of the specification which "requires" a unitary transformation of the group covariance matrix.  Based upon this limitation, the PTO subsequently allowed the claims.  Apple cannot undo this deal.  *See, e.g., Southwall Techs., Inc.*, 54 F.3d at 576; *Rheox, Inc.*, 276 F.3d at 1325.  Samsung's proposed construction properly reflects the prosecution history and is true to the inventors' definition in the specification.  Apple, on the other hand, wants a do-over.

### b.  The '828 Patent Discloses Only One Embodiment

The '828 patent only discloses *one* way of mathematically fitting an ellipse.  Thus, when the Applicants amended the claims to require "mathematically fitting an ellipse" and urged the Examiner to limit this term to the specification, the Applicants meant the mathematical equations in column 26.  The Federal Circuit has held that when a patent discloses only one embodiment, it is proper to limit the claims to this single embodiment.  *See Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (limiting a claim to a single embodiment where "the original disclosure clearly identifies the console as the *only* possible location for the controls[,] provides only the most minor variation in the location of the controls [and] no similar variation beyond the console is even suggested."); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (holding that "the specification as a whole leads to the inescapable conclusion that the claimed invention must include [the limitation] in every embodiment").

To avoid this result, Apple spends a disproportionate amount of its opening brief arguing that the '828 patent discloses a second embodiment.  However, this so-called second embodiment has nothing to do with mathematically fitting an ellipse to a pixel group.  Instead, it relates to a situation in which a contact is so slight—for example, a fingernail touch—that there is not enough pixel information for mathematical ellipse-fitting to provide meaningful shape information.  In this situation, the shape of a contact is simply assumed (perhaps as a circle), and default parameters are used instead of certain fitted ellipse parameters like eccentricity.  Wayne Westerman, the '828 patent's primary inventor, testified during the Motorola Investigation and reaffirmed during his deposition that what Apple describes as a "second embodiment" is not an embodiment of ellipse-fitting at all, but instead describes a method where, for particular parameters below a certain threshold, the patent describes discarding the actual fitted ellipse parameters in favor of predefined values unrelated to ellipse-fitting.  Westerman Dep. at 43:11-16 (Ex. M); Inv. No. 337-TA-750 Hearing Transcript at 352:2-17, APLNDC-X0000006233 (Ex. N).  Assuming a default shape for a small contact with no consideration of the contact's actual shape is not "mathematically fitting an ellipse" and simply does not constitute a second embodiment of the patent.

### c.    The ITC Staff Already Rejected Apple's Arguments

Apple devotes more than forty percent of its opening brief to the '828 patent, yet Apple never mentions that it is currently asserting the '828 patent against Motorola at the International Trade Commission (ITC).[9]   More importantly, Apple never mentions that the ITC's Office of Unfair Import Investigations (OUII) has already rejected Apple's arguments.  In the Motorola Investigation, the OUII considered Motorola's and Apple's constructions of this term.[10]   When faced with these dueling constructions, the OUII agreed with Motorola/Samsung's construction.

> Staff agrees with Motorola's construction of these terms.  In the Staff's view, the applicants for the '828 Patent acted as their own lexicographers and defined the term "mathematically fit(ting) an ellipse to "require[]" the use of a particular mathematical formula described in the '828 Patent:

*See* Pre-Trial Statement and Brief of the Commission Investigative Staff at 9, APLNDC-X0000006670 (noting "The Staff [originally] proposed a construction similar to Apple's for this term during preliminary claim construction, but has determined at this time, with the benefit of exert (*sic*) testimony that Motorola's construction is the correct one.")  (Ex. O).

### 2.    "pixel group[s]/pixel[s]"

| Claim Term | Samsung's Construction | Apple's Construction |
|---|---|---|
| "Pixel group[s]/pixel[s]" (claims 1, 6, 9, 10, 16, 24, 31) | Plain and ordinary meaning. | Portion[s] of a proximity image that indicate[s] the proximity data measured at one or more electrodes. |

The term pixel does not need construction.  Anyone who has bought a TV or a camera knows what a pixel is.  To try to define it would only add unnecessary ambiguity.

Historically, the term "pixel" has been used as an abbreviation for "picture element."  *See S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1366 (Fed. Cir. 2001) ("A computer screen is divided into many horizontal rows, each of which contains a plurality of points called picture elements or "pixels."); *see also LG Display Co., Ltd. V. AU Optronics Corp.*, 686 F. Supp. 2d 429, 453 (D.

---

[9] *Certain Mobile Devices and Related Software* (Inv. No. 337-TA-750) ("the Motorola Investigation").

[10] Samsung's proposed construction is identical to Motorola's proposed construction in the Motorola Investigation.  *See* Pre-Trial Statement and Brief of the Commission Investigative Staff at 8, APLNDC-X0000006669 (Ex. O).

Del. 2006) ("Pixels or picture elements are included on a thin film transistor array."); *SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 169 F. Supp. 2d 492, 498 (W.D.N.C. 2001); *Semiconductor Energy Lab Co., Ltd. v. Samsung Elec. Co., Ltd.*, 711 F. Supp. 2d 913, 919 (W.D. Wisc. 2010).

The term "pixel" has also been defined to mean the smallest discernible part of an image. *Intel Corp. v. Broadcom Corp.*, 172 F. Supp. 2d 515, 521 (D. Del. 2001) (stating that "pixels [are] the smallest element of an image."); *IP Innovation L.L.C. v. Lexmark, Int'l., Inc.*, 424 F. Supp. 2d 1078, 1088 (construing "pixel to mean the smallest complete element of an image"); *Silicon Graphics, Inc. v. nVIDIA Corp.*, 58 F. Supp. 2d 331, 335 (D. Del. 1999) ("Pixels are the smallest unit of color that can appear on a computer screen.").

The '828 patent uses the term "pixel" consistent with this accepted meaning and as a result, if a construction is absolutely necessary, the term "pixel" should be construed to mean "the smallest discernable part of an image." For example, in Figure 13, the smallest discernable part of the image is the parallelogram shaped pixels. '828 patent at 18:14; 25:63 (Ex. K). There is no reason in the intrinsic record to depart from this widely-recognized definition.

Contrary to Apple's assertion, the '828 specification does not adopt a special definition of "pixel." Apple points to one sentence of the specification that states: "In the discussion that follows, the proximity data measured at one electrode during a particular scan cycle constitutes one 'pixel' of the proximity image . . . ." Apple Br. at 18 (quoting '828 patent at 18:13-15). This simply says that each electrode contributes one pixel to the overall proximity image. It does not define "pixel," contrary to its ordinary meaning, as something that can *only* be a portion of the proximity image. *See Teleflex Inc. v. Ficosa N. Am., Corp.*, 299 F.3d 1313, 1326–28 (Fed. Cir. 2002) (finding limitation to preferred embodiments or specific examples in the specification improper if the patentee did not demonstrate a clear intent to deviate from the claim terms' ordinary meaning in that way, or to otherwise disavow the claim scope); *see also Bell Atl.*, 262 F.3d at 1271 (finding that for a redefinition by implication, the patentee must "use[] a claim term throughout the entire patent specification, in a manner consistent with only a single meaning") (emphasis added) (*quoting Vitronics Corp.*, 90 F.3d at 1582).

**E.     U.S. Patent No. 7,822,915**

The '915 patent generally claims a method and apparatus for distinguishing between a "scroll or gesture operation."   The claims require that the system distinguish between "scroll operations" and "gesture operations" based on whether the particular operation utilizes a single input point, which denotes a "scroll operation," or multiple input points, which denotes a "gesture operation."   The claims also require "responding to at least one scroll call, if issued, by scrolling a window having a view . . . ."

**1.     "scrolling a window having a view"**

| Claim Term | Samsung's Construction | Apple's Construction |
|---|---|---|
| "scrolling a window having a view" (claims 1, 8) | Sliding a window in a direction corresponding to the direction of the user input over a view that is stationary relative to the window. | No construction necessary. |

The parties dispute the meaning of "scrolling a window having a view."   Samsung contends that this term requires construction because it describes a very specific type of scrolling which is only one of the many different types of scrolling and gesture operations disclosed in the '915 patent specification.   Apple, on the other hand, contends this term should be giving its plain and ordinary meaning, but provides no indication whatsoever of what the plain and ordinary meaning of this unique term may be.

The terms "window" and "view" are defined in the '915 patent.   Within the meaning of the patent, "[a] window is a display region which may not have a border and may be the entire display region or area of a display."   '915 patent at 5:25-29  (Ex. P).  A view is described as some content, such as "web, text, or image content," that can be seen on the display.   *Id.* at 5:29, 6:50, and 13:43-44.   The specification teaches that a window "may" contain one or more views.   *Id.* at 5:25-32.   However, according to the claims, the window in which the scrolling occurs <u>must</u> contain at least one view.   *Id.* at 23:32-36.

To scroll a window having a view, the content ("view") shown must be larger than the window itself.   Otherwise the window would be able to show the entire content ("view") at one

1    time, and scrolling would be completely unnecessary, if not impossible or meaningless.  *Bd. of*

2    *Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1370 (Fed. Cir. 2008) ("We

3    decline to adopt a construction that would effect [a] nonsensical result.").  Thus, a window may be

4    thought of as a small, see-through pane of glass sitting above a large piece of paper containing the

5    window's content ("view").  Scrolling the window is simply the act of moving the window pane

6    over the view in the direction of the scroll.

7         Samsung's construction clarifies the plain claim language.  Each of the independent

8    claims requires the step of "scrolling a window having a view."  The claims require that the

9    window be scrolled, <u>not</u> the view.  Because of this, a scroll will cause the content viewed through

10   the window to move in the direction of the scroll.[11]   For example, a finger swipe that is horizontal

11   to the right should cause the next-rightmost portion of the content to appear under the window.

12   Conversely, a finger swipe that is horizontal to the left will cause the next-leftmost portion of the

13   content to appear under the window.   This behavior is captured by Samsung's clarifying

14   construction:  "Sliding a window in a direction corresponding to the direction of the user input

15   over a view that is stationary relative to the window."  This scrolling behavior is exactly what one

16   would experience, for example, reading this brief on a Windows-based PC using Adobe Acrobat.

17        What the patent claim language – as well as Samsung's construction – explicitly excludes

18   is a scroll in the reversed direction.  That is, the claims do not cover the situation where a finger

19   swipe that is horizontal to the right results in the next-leftmost portion of the content to appear

20   under the window nor do they cover the situation where a finger swipe that is horizontal to the left

21   results in the next-rightmost portion of the content to appear under the window.  This scrolling

22   behavior would be described as "scrolling a view," which is the opposite of "scrolling a window

23   having a view."

---

[11] Contrary to Apple's claims, Samsung's construction does not intend to make any statement concerning the minutiae of the directionality of a scroll.  For example, Samsung's construction is intended to capture the situation where a substantially but not precisely horizontal finger swipe to the right results in the movement of the window to the precisely horizontally to the right – or equivalently, the appearance of the next-rightmost section of the content ("view") in the window.

Apple was well aware when it drafted its claims of different types of scrolling and gesture operations.  For example, claim 1 recites "scaling the view" in response to "at least one gesture call."  The specification also describes a technique for "scrolling a list."  '915 patent at 8:61-9:60.  In view of the other scrolling and gesture behaviors disclosed in the '915 specification, it is clear that Apple drafted its claims to cover specific types of scrolling and gesture operations.  Consequently, Samsung's proposed construction should be adopted by the Court.

### F.     U.S. Patent No. 7,853,891

The '891 patent is a simple patent that can be readily understood by examining Figure 16, which is an image taken from an Apple Macintosh ("Mac").



Fig. 16

When the Mac user presses a volume key, a volume window appears on the screen.  '891 patent at 9:9-13  (Ex. Q).  A second window indicating the contents of a folder labeled "ibook" is also visible on the screen.  *Id*. at 9:13-15.  As set forth in claim 1, the Mac starts a timer and closes the volume window when the timer expires.  *Id*. at 10:12-14.  Other claims, like claim 20, do not require a timer.  Instead, they just require that the volume window closes without user input.  *Id*. at 11:20.

When the '891 inventors filed their patent application, windows that closed automatically already existed.  In order to obtain their patent, they had to add the following limitation to all of the independent claims: "the first window has been displayed independent from a position of a

cursor on the screen."  Amendment, 3/4/2010 at 22, APLNDC00028844 (Ex. R).  The prior art cited by the Examiner used a stylus to move around the screen; there was no cursor.  *Id*.  Apple argued that their claims were different.  As shown in Figure 16, a Mac has a cursor that is controlled by a mouse.  While the cursor is not visible in Figure 16 due to the poor resolution, the volume window is displayed independently of the cursor.

### 1.    "starting a timer"

| Claim Term | Samsung's Construction | Apple's Construction |
|---|---|---|
| "starting a timer" (claims 1, 21, 26, 46, 51, 71) | Initiation of a timekeeping process that begins at a predetermined value and counts down until zero. | Initiating a time keeping process. |

### a.    The Intrinsic Evidence Supports Samsung's Construction

The term "starting a timer" appears in independent claims 1, 26, and 51 and dependent claims 21, 46, and 71.  In all of these claims, the claim also specifies that the timer "expires."  Anyone that has used a microwave oven or a parking meter knows that a timer counts down and that it expires when it reaches zero.  A stopwatch, on the other hand, counts up.  The stopwatch may reach a particular time or condition, but it never expires.

Samsung's construction of the claim term "timer" is consistent with the claim limitation "expire."  *See Vitronics Corp. v. Conceptronic. Inc.,* 90 F.3d at 1582 (claim construction begins with the claims themselves).  If the timer counts down to zero, it will ultimately expire.  Apple, on the other hand, has defined timer in a way that the claim no longer makes sense.  Apple's definition would cover any time keeping process, including stopwatches, even if they never "expire."  *ACTV, Inc. v. Walt Disney Co*., 346 F.3d 1082, 1088 (Fed. Cir. 2003) (claim terms must be construed to be consistent with the surrounding words of the claim).

There is nothing in the specification that alters these customary meanings of the claim terms "timer" and "expire."  Throughout the specification, "timer" is consistently used to mean something that counts down to zero.  '891 patent at Abstract; Figs. 12-14; 2:22-24, 28-37, 49-50; 5:65-6:1; 6:21-25; 7:11-20; 8:6-15, 23-25; and 9:47-49.

b.       **Extrinsic Evidence Supports Samsung's Construction**

The inventor's deposition, Apple's products, and Apple's infringement contentions all confirm that a timer is different from a stopwatch.  During his deposition, the first named inventor testified that "[a] timer, as I understand it, is – is something that counts down from a – from a starting value to zero, typically."  Chaudri Dep. at 70:14-16  (Ex. S).  When asked what it means when the patent describes "closing the first window [when the] timer expire[s]," Chaudri responded that "I take it to mean that it's gone to zero [and a] timer, like my understanding of timers, would end at that point."  *Id.* at 70:22-71:17.

Next, Apple's own products use the term "timer" to mean something that counts down to zero.  Under the iPhone's "Clock" program, there is both a "timer" and a "stopwatch."  *See* Ex. T.  Consistent with Samsung's construction, the timer counts down; the stopwatch counts up.  *Id.*  The timer expires; the stopwatch does not.  *Id.*

Finally, Apple's infringement contentions confirm that a timer counts down.  Claims 21 and 23 depend from independent claim 20.  Dependent claim 21 recites that the window is closed when the timer expires.  '891 patent at 11:23-26.  Dependent claim 23 recites that the window is closed when a condition is met.  *Id.* at 11:32-35.  Because these claims use different language, they are presumed to have different scope.  "[D]ifferent language used in separate claims is presumed to indicate that the claims have different meanings and scope."  *PCTEL, Inc. v. Agere Sys., Inc.* No. C 03-2474, 2005 WL 2206683 at *2 (N.D. Cal. Sept. 8, 2005) (citing *Tandon Corp. v. U.S. Int'l Trade Com.*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)).

Apple's infringement contentions for claim 21 state: "The Samsung device starts a timer, and closes the first window (Ringer volume window) in response to the expiration of the timer."  Ex. U at 15; Ex. T at 5.  Apple's contentions for claim 23 state: "The Samsung device determines whether or not an amount of time has passed, and closes the first window (Ringer volume window) in response to a determination that the amount of time has passed."  Ex. U at 16; Ex. V at 6.  Even Apple recognizes that a stopwatch, like the one claimed in claim 23, is different from a timer, like the one claimed in claim 21.  Apple's infringement contentions for claim 21 say nothing about measuring the amount of the time that has passed.

1

2

## 2.    "the first window has been displayed independent[ly] from a position of a cursor on the screen"

| Claim Term | Samsung's Construction | Apple's Construction |
|---|---|---|
| "the first window has been displayed independent[ly] from a position of a cursor on the screen" (claims 1, 20, 26, 45, 51, 70) | "There is a mouse pointer or a similar icon that is controlled by a mouse, track ball, or touch pad visible on the screen and the user's movement of the mouse pointer or similar icon does not affect the location of the first window." | No construction necessary. |

There are two disputes with respect to this term.  First, the parties dispute the meaning of the term cursor.  Second, the parties dispute whether the cursor must be visible on the display. This claim term, which appears in all of the independent claims, was added to overcome a prior art rejection based on U.S. Pub. No. 2003/0016253 ("Aoki").  In order to understand this claim term, it is necessary to understand Aoki, the Examiner's rejection, Apple's response, and Figs. 16-18 of the '891 patent.   Apple's position that no construction is necessary completely ignores this intrinsic evidence.

### a.    A Cursor Is A Mouse Pointer Or A Similar Icon That Is Controlled By A Mouse, Track Ball, Or Touch Pad

Apple argues that a cursor can be a blinking caret, like the one used in Microsoft Word for text editing.  *See* Apple Br. at 25.  This definition is entirely inconsistent with the way that cursor is used in the prosecution history and the '891 patent.

Aoki makes it clear that a cursor is something that can "hover" over a hyperlink target or an active area within a displayed image.  *See* Aoki at [0005] and [0006] (Ex. W).  A "cursor control device" is used to move the cursor around the screen.  *Id*.  Aoki never uses the term cursor to mean a blinking caret.

As shown in the figure below, the whole point of Aoki was to get rid of the cursor and to allow the user to use a stylus to select hyper link targets or active areas within a displayed image.

1
2
3
4
5
6
7



8   *Id.* at Fig. 13.  A pop-up window (shown as 115) helps guide the user towards the hyper link

9   targets or active areas.  *Id.* at [0082].  This pop-up window is presumably positioned near the tip of

10  the stylus.  *Id.*  Like in the '891 patent, the pop-up window closes when a timer expires.  *Id.*

11  Based upon this disclosure, the Examiner rejected all of the claims.  *See* O.A., 12/4/2009,

12  APLNDC00028801-12 (Ex. X).

13          In order to overcome Aoki, Applicants amended the claims to require a cursor (as opposed

14  to the stylus in Aoki) and that the pop-up window is "displayed independently from a position of

15  the cursor on the screen."  *See* Amendment, 3/4/2010 at 22, APLNDC00028844 (Ex. X).

16  Understanding the context of the amendment, it is readily apparent that a cursor is something that

17  can be moved around the screen to select a target.  If, as Apple suggests, the cursor was merely a

18  blinking caret, this amendment would not have overcome the Examiner's rejection.

19          Anytime the claims are amended, the amendment must be supported by the written

20  description.  *See TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264

21  F.3d 1111, 1118 (Fed. Cir. 2001) (noting that when an "applicant adds a claim or otherwise

22  amends his specification after the original filing date, ... the new claims or other added material

23  must find support in the original specification" to satisfy the written description requirement of 35

24  U.S.C. § 112, ¶ 1).  Turning to the '891 patent, there is no blinking caret for text editing in Figures

25  16-18 or anywhere else in the '891 patent for that matter.  The only cursor found in the '891 patent

26  is a mouse pointer or a similar icon that is controlled by a mouse, track ball, or touch pad.

27          Apple argues that the specification discloses a keyboard and, therefore, Samsung's

28  proposed construction must be wrong.  *See* Apple Br. at 25.  To the contrary, the fact that the '891

patent explicitly mentions a keyboard and then uniformly omits the keyboard when talking about the cursor is definitive proof that the keyboard has nothing to do with the cursor.

As shown by the chart below, the specification mentions input devices and cursor control devices. According to the specification, the keyboard is an input device; the keyboard is *not* a cursor control device. While certain devices (e.g., mouse, track ball, touch pad, etc.) can be either an input or a cursor control device, a keyboard is **only** an input device.

| Input Devices | Cursor Control Devices/Cursors |
|---|---|
| Col. 1:28: "user input devices (e.g., a keyboard and a mouse)" | Col. 2:16-17: "the user manipulates a cursor control device (e.g., a mouse, a track ball, or a touch pad)" |
| Col. 2:45-46: "displaying a first window in response to receiving a first input from a user input device (e.g., a keyboard, mouse, track ball, touch pad, touch screen, joy stick, button, or others)" | Col. 9:11-12: "or selecting an item from a system control menu with a cursor control device, such as a mouse or a touch pad" |
| Col. 8:29-31: "user input devices (e.g., a keyboard, mouse, track ball, touch pad, touch screen, joy stick, button, or other criteria)." | Col. 1:41-43: "title bar may be clicked (e.g., pressing a button of a mouse while the cursor is on the title bar)" |
| | Col. 1:56-60: "When the user pauses cursor 215 at a location of the task bar for a short period of time, flash help window 213 appears. If the user does not move the cursor for another short period of time while window 213 is displayed, flash window 213 disappears." |
| | Col. 1:60-62: "If the user moves cursor 215 slightly (e.g., using a mouse, a track ball, or a touch pad) and paused the cursor 215 again, flash help window may appear again." |
| | Col. 2:16-19: "the user manipulates a cursor control device (e.g., a mouse, a track ball, or a touch pad) to view or dismiss flash help window 213 in FIG. 3;" |
| | Col. 7:55-60: "[I]f a cursor related event (e.g., a click) is not accepted by the translucent window, the input is considered for the window that is just under the translucent window so that the user can interact with the window under the translucent window as if the translucent window does not exist." |

In Figure 16 and claim 1, the keyboard may be used to control the volume window. The keyboard does not, however, control the cursor and blinking carets for text editing are never mentioned at all. When asked what a cursor is, the inventor agreed with Samsung: "I can guess it means a mouse cursor." Chaudri Dep. at 81:17 (Ex. S).

1

### b.      The Cursor Must Be Visible On The Screen

2        Incredibly, Apple argues in its brief: "All the claims require is that if there is a cursor on

3   the screen, the display of the 'first window' is independent of the cursor's position."  Apple Br. at

4   25.  If this was the case, then in a cursor-less system, like Aoki, the window would always be

5   independent of the cursor.  Obviously this cannot be the case.  Otherwise Aoki would invalidate

6   the claims for the same reasons in the Examiner's rejection.  *See* Detailed O.A., 12/4/2009,

7   APLNDC00028802 (Ex. Q).  The only way that Applicants could overcome Aoki was to require a

8   cursor and then specify that the first window is "displayed independently from a position of a

9   cursor on the screen."  *See* Amendment, 3/4/2010 at 22, APLNDC00028844.  Apple's argument

10  demonstrates a complete disregard for the prosecution history.

11  ### III.      CONCLUSION

12        For the foregoing reasons, Samsung respectfully requests that the Court adopt its proposed

13  claim constructions set forth above.

14

15

16  DATED: December 22, 2011               Respectfully submitted,

17                                         QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP

18

19

20                                         By /s/ *Victoria F. Maroulis*
                                           _____
                                               Charles K. Verhoeven
21                                             Kevin P.B. Johnson
                                               Victoria F. Maroulis
22                                             Michael T. Zeller
                                               Attorneys for SAMSUNG ELECTRONICS CO.,
23                                             LTD., SAMSUNG ELECTRONICS AMERICA,
                                               INC. and SAMSUNG
24                                             TELECOMMUNICATIONS AMERICA, LLC

25

26

27

28