1

2                IN THE UNITED STATES DISTRICT COURT

3           FOR THE NORTHERN DISTRICT OF CALIFORNIA

4                      SAN JOSE DIVISION

5

   APPLE, INC.,                    )  CV-11-1846-LHK
6                                   )
                    PLAINTIFF,      )  SAN JOSE, CALIFORNIA
7                                   )
            VS.                     )
8                                   )  JANUARY 19, 2012
   SAMSUNG ELECTRONICS, CO.,        )
9  LTD., ET AL,                     )
                                    )  PAGES 1-276
10                  DEFENDANT.      )
   _____

11

12               TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE PAUL S. GREWAL
13              UNITED STATES DISTRICT JUDGE

14

15  A P P E A R A N C E S:

16  FOR THE PLAINTIFF:  MORRISON & FOERSTER, LLP
                        BY:  MICHAEL JACOBS
17                           JASON BARTLETT
                             HAROLD MCELHINNY
18                           MIA MAZZA
                        425 MARKET STREET, 34TH FL
19                      SAN FRANCISCO, CA 94105

20  FOR THE DEFENDANT:  QUINN EMANUEL
                        BY:  DIANE HUTNYAN
21                      865 S. FIGUEROA ST., 10TH FL
                        LOS ANGELES, CA 90017

22

23          (APPEARANCES CONTINUED ON THE NEXT PAGE)

24

25  OFFICIAL COURT REPORTER: SUMMER FISHER, CSR, CRR
                             CERTIFICATE NUMBER 13185

1

```
 1    FOR THE PLAINTIFF:  WILMER HALE
                          BY:  MARK SELWYN
 2                             CALVIN WALDEN
                          950 PAGE MILL ROAD
 3                        PALO ALTO, CA 94304

 4    FOR THE DEFENDANT:  QUINN EMANUEL
                          BY:  VICTORIA MAROULIS
 5                             RACHEL KASSABIAN
                               JOBY MARTIN
 6                             KEN SUH
                               SCOTT HALL
 7                        555 TWIN DOLPHIN DRIVE, 5TH FL
                          REDWOOD SHORES, CA 94065
 8

 9
      ALSO PRESENT:       CHRISTOPHER KELLY
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SAN JOSE, CALIFORNIA          JANUARY 19, 2012

2                   P R O C E E D I N G S

3              (WHEREUPON, COURT CONVENED AND THE

4    FOLLOWING PROCEEDINGS WERE HELD:)

5              THE COURT:  MR. RIVERA, WOULD YOU CALL

6    THE NEXT MATTER ON THIS MORNING'S CALENDAR.

7              THE CLERK:  YES, YOUR HONOR.

8              CALLING APPLE, INC. VERSUS SAMSUNG

9    ELECTRONICS.  CASE NUMBER CV-11-1846.

10             MATTER ON FOR APPLE AND SAMSUNG DISCOVERY

11   MOTIONS.

12             COUNSEL, PLEASE STATE YOUR APPEARANCES.

13             MR. JACOBS:  MICHAEL JACOBS FROM MORRISON

14   & FOERSTER, YOUR HONOR, FOR APPLE.

15             WITH ME FROM MORRISON & FOERSTER IS

16   JASON BARTLETT, HAROLD MCELHINNY AND MIA MAZZA AT

17   COUNSEL TABLE.

18             THE COURT:  GOOD MORNING, COUNSEL.

19             MR. WALDEN:  GOOD MORNING, YOUR HONOR.

20             FROM WILMER HALE, MARK SELWYN.  AND WITH

21   ME TODAY IS MY PARTNER CALVIN WALDEN ALSO OF WILMER

22   HALE.

23             THE COURT:  GOOD MORNING AS WELL.

24             MS. MAROULIS:  GOOD MORNING, YOUR HONOR.

25             VICTORIA MAROULIS, WITH QUINN EMANUEL,

```
1    COUNSEL FOR SAMSUNG.

2             AND WITH ME ARE MY PARTNERS

3    MS. RACHEL KASSABIAN, DIANE HUTNYAN, AND OUR

4    COLLEAGUES JOBY MARTIN, KEN SUH AND SCOTT HALL.

5             THE COURT:  MS. MAROULIS, WELCOME BACK.

6             GOOD MORNING TO YOUR TEAM, AND ALSO TO

7    YOUR TEAM AS WELL.

8             ALL RIGHT.  COUNSEL, I HAVE BEFORE ME IF

9    I'VE GOT THE COUNT RIGHT, NINE MOTIONS.

10             I WANT TO FIRST ASK COUNSEL A SIMPLE

11   QUESTION.  WHEN I GRANTED EACH PARTY THE RIGHT TO

12   PURSUE ITS MOTIONS ON AN EXPEDITED BASIS, I WAS NOT

13   TOLD WE WOULD BE TALKING ABOUT NINE SEPARATE

14   MOTIONS.

15             AND AS I THINK YOU ALL CAN APPRECIATE, AS

16   I THINK WE'VE DISCUSSED BEFORE, THIS TYPE OF

17   EXTRAORDINARY RELIEF IMPOSES BURDENS NOT ONLY ON

18   THE COURT, PUT THAT TO THE SIDE, BUT OTHER PARTIES

19   WHO HAVE CASES PENDING IN THIS COURT.  YOU ARE,

20   EFFECTIVELY, JUMPING THE LINE.

21             AND WHILE I'M EAGER TO JUMP IN AND HELP

22   YOU RESOLVE AS MANY OF THESE DISPUTES AS POSSIBLE,

23   I HAVE TO ASK THE QUESTION:  AT WHAT POINT HAS THAT

24   LINE BEEN CROSSED?  BECAUSE NINE MOTIONS ON AN

25   EXPEDITED BASIS IS SOMEWHAT UNUSUAL, I WILL PUT IT
```

1    THAT WAY.

2            DID THE PARTIES ADDRESS OR CONSIDER THIS

3    AT ALL IN THE MEET AND CONFER THAT TOOK PLACE

4    BEFORE THE MOTIONS WERE FILED?

5            MS. MAROULIS:  IF I MAY, YOUR HONOR.

6            WE HAVE HAD THE LEAD COUNSEL MEET AND

7    CONFER, AND DUE TO THE SCHEDULING ISSUES OF GETTING

8    TOGETHER MR. MCELHINNY AND MR. VERHOVEN, SOME OF

9    THE DISPUTES HAVE PENT UP AND STACKED UP.

10            SO PART OF THE REASON FOR THE MOTIONS IS

11    BECAUSE WE WERE NOT SUCCESSFUL IN SCHEDULING THE

12    COUNSEL MEET AND CONFER UNTIL RECENTLY.

13            THE COURT:  ALL RIGHT.

14            MR. MCELHINNY:  HAROLD MCELHINNY FOR

15    APPLE.

16            I THINK THERE ARE TWO THINGS GOING ON ONE

17    OF WHICH MR. JACOBS WILL ADDRESS ON THE MERITS.

18            ONE, I AGREE WITH MS. MAROULIS, THERE HAS

19    BEEN A PROBLEM GETTING COUNSEL TOGETHER TO MEET AND

20    CONFER.  SO WHEN WE WERE ABLE TO GET TOGETHER,

21    THERE WAS A CAR WASH SORT OF LINE OF MOTIONS THAT

22    HAD TO BE RESOLVED.

23            THE OTHER MAJOR ISSUE WHICH MR. JACOBS IS

24    GOING TO ADDRESS, I'M NOT, AS YOUR HONOR KNOWS WE

25    ARE WORKING ON AN EXPEDITED SCHEDULE SET BY

5

1    JUDGE KOH.

2              THE COURT:  AND REQUESTED BY APPLE.

3              MR. MCELHINNY:  AND REQUESTED BY APPLE,

4    THERE'S NO QUESTION ABOUT IT.  BUT IT'S GOT SHORT

5    DEADLINES IN ORDER TO GET DISCOVERY COMPLETED.

6              AND FRANKLY, THERE ARE A LOT OF ISSUES.

7    SO IT'S THE COMBINATION OF THE SCHEDULE, THE

8    INABILITY TO RESOLVE DISPUTES AND THE FACT THAT

9    LEAD COUNSEL WERE AVAILABLE HAD THERE BEEN THAT

10   MANY MOTIONS HADN'T BACKED UP BEHIND THAT.

11             MS. KASSABIAN:  YOUR HONOR,

12   MS. KASSABIAN, IF I MIGHT BRIEFLY ADDRESS YOUR

13   POINT.

14             SAMSUNG DID NOT WANT TO EXPEDITE THE

15   APPLE MOTIONS THAT WERE BEING THREATENED.

16   UNFORTUNATELY, EVERY TIME WE HAVE OPPOSED A MOTION

17   TO EXPEDITE, WE'VE LOST.

18             SO WE WERE JUST UNDER THE ASSUMPTION OR

19   PRESUMPTION THAT IF WE OPPOSED AGAIN IT WOULD BE A

20   WASTE OF TIME.  SO WE TRIED TO WORK OUT A SHORTENED

21   SCHEDULE THAT WE WOULD BE ABLE TO STIPULATE TO AND

22   THEN ONCE WE DID THAT, I AGREE WITH BOTH

23   MS. MAROULIS AND MR. MCELHINNY, THERE HAVE BEEN

24   ENOUGH ISSUED STACKED UP THAT IT WAS KIND OF A DOG

25   PILE EFFECT.

1          BUT I WILL SAY WE DON'T THINK APPLE'S

2     MOTIONS NEED TO BE HEARD ON A SHORTENED PERIOD OF

3     TIME, BUT IT WOULD NOT BE PRODUCTIVE TO OPPOSE THEM

4     GIVEN THE PRIOR ORDERS OF THE COURT.

5          THE COURT:  I'LL NOTE APPLE'S MOTIONS

6     AREN'T THE ONLY ONES BEFORE ME THIS MORNING.

7          MS. KASSABIAN:  THAT'S WHERE THE DOG PILE

8     EFFECT -- WE ARE EQUALLY AT FAULT.

9          THE COURT:  I ONLY NOTE ALL OF THIS TO

10    MAKE A PRETTY SIMPLE POINT.  MY TIME IS YOUR TIME.

11          I'M HERE TO DO WHAT I CAN TO RESOLVE

12    THESE DISPUTES AND I'M FRANKLY INTERESTED, AS A LOT

13    OF YOU KNOW, WITH THESE ISSUES, BUT THERE IS A COST

14    HERE IMPOSED ON THESE PARTIES, A SERIOUS COST.

15          I'M STRUCK BY THE IMPACT OF THIS TYPE OF

16    PRACTICE ON ALL OF THE CIVIL RIGHTS, SOCIAL

17    SECURITY AND OTHER PARTIES IN CASES THAT I HAVE

18    PENDING BEFORE ME.  AND I JUST THINK IT'S WORTHY OF

19    NOTING ON THE RECORD THAT THIS TYPE OF PILE ON OR

20    DOG PILE DOES HAVE COSTS THAT EXTEND BEYOND THE

21    PARTIES AND THE COURT AND IT'S UNFORTUNATE THAT

22    OTHER PEOPLE HAVE TO BEAR THOSE COSTS.

23          ALL RIGHT.  WELL, LET'S TURN TO THE

24    MATTERS AT HAND.

25          I WON'T PRETEND TO HAVE ANY TYPE OF

1    SCHEDULE OR FRAMEWORK FOR HOW WE ARE GOING TO

2    ALLOCATE TIME HERE.  I WOULD LIKE TO TAKE THESE UP

3    ONE AT A TIME, HEAR THE ARGUMENTS THEN MOVE ON TO

4    THE NEXT.

5            I WOULD LIKE TO BEGIN WITH THE PROTECTIVE

6    ORDER ISSUE.  AND I WILL START WITH APPLE AND ITS

7    MOTION FOR PROTECTIVE ORDER.  OBVIOUSLY SAMSUNG HAS

8    ITS POSITIONS TO BE HEARD AS WELL.

9            MR. JACOBS, WOULD YOU LIKE TO BEGIN WITH

10   THAT?

11           MR. JACOBS:  YOUR HONOR, THIS ONE I THINK

12   IS QUITE WELL BRIEFED SO I WILL BE BRIEF.

13           REALLY, WE WERE VERY CLOSE TO HAVING AN

14   AGREED UPON PROTECTIVE ORDER.  WE HAVE BEEN

15   OPERATING IN A WAY THAT LITIGANTS OFTEN DO UNDER

16   THE INTERIM PROTECTIVE ORDER, AND THEN IN THE

17   SHADOW OF WHAT WE THOUGHT WOULD BE THE ENTERED

18   PROTECTIVE ORDER AND THEN AT THE LAST MINUTE

19   SAMSUNG PROPOSED THIS NEW TIER, WE SEE NO REASON

20   FOR A NEW TIER.

21           WE SEE NO JUSTIFICATION FOR WHAT SAMSUNG

22   HAS PROFFERED FOR INTRODUCING THIS NEW TIER AT THIS

23   LATE STAGE.  WE SUSPECT AN ALTERNATIVE MOTIVE

24   RELATED TO THE SWIRL OF MOTIONS AROUND THIS DREXLER

25   AND MORE PAPER ON A SINGLE EXPERT HAS NEVER BEEN

1    FILED IN MY EXPERIENCE.

2           AND THAT IS BACKED UP BY E-MAILS WE GOT

3    FROM SAMSUNG SAYING IN LIGHT OF RECENT DEVELOPMENTS

4    WE NEED TO PROPOSE THIS NEW TIER OF CONFIDENTIAL

5    MATERIAL.

6           PERHAPS THE MOST IMPORTANT REASON WHY A

7    NEW TIER DOESN'T MAKE ANY SENSE HERE IS BECAUSE IT

8    DOESN'T ALLOW IN-HOUSE COUNSEL ACCESS.  SO WE ARE

9    ALL OPERATING NOW UNDER OUTSIDE COUNSEL ONLY

10   PROTECTIVE ORDERS.

11          AND BY THE WAY THAT'S TRUE IN THE ITC

12   WHERE WE ARE LITIGATING MANY OF THE ISSUES IN

13   PARALLEL WHERE WE DO WANT TO KEEP THE PROTECTIVE

14   ORDERS IN SYNC, SO WE DO WANT TO MANAGE THAT PART

15   OF DISCOVERY PROCESS EFFICIENTLY.

16          SO NO REASON FOR THIS NEW TIER, NO

17   SUBSTANTIAL JUSTIFICATION FOR IT.  IT'S LATE AND

18   THERE'S THE INCONSISTENCY PROBLEM.

19          THE COURT:  ALL RIGHT.

20          WELL, LET ME ASK YOU THIS, THE

21   IMPLICATIONS ON THE RELATED ITC ACTIONS DID STRIKE

22   ME AS SOMETHING WE OUGHT TO TALK ABOUT.

23          CAN YOU EXPLAIN TO ME EXACTLY HOW THE

24   PROTECTIVE ORDERS HAVE RELATED TO ONE ANOTHER OR

25   MORE IMPORTANTLY HOW THE DISCLOSURES MADE IN THE

1    ITC ACTION HAVE BEEN PRODUCED IN THIS CASE?

2              MR. JACOBS:  SO WE HAVE A CROSS USE

3    AGREEMENT ALLOWING MATERIAL USED IN -- AND JUMP UP

4    COLLEAGUES IF I DON'T SAY THIS RIGHT.

5              WE HAVE A CROSS USE AGREEMENT THAT ALLOWS

6    MATERIALS USED IN ONE ACTION TO BE USED IN ANOTHER.

7              WE HAVE PRODUCTIONS OCCURRING FROM THIRD

8    PARTIES IN THE ACTIONS THEY ARE DEPENDENT ON THE

9    PROTECTIVE ORDERS.

10             WE HAVE -- SO THAT'S ESSENTIALLY THE

11   NATURE OF THE AGREEMENT.

12             SO WHEN WE SAY WE PRODUCED X NUMBERS OF

13   DOCUMENTS, WE ACTUALLY REALLY PROBABLY NEED TO TAKE

14   A GLOBAL VIEW OF THIS TO BE COMPLETELY ACCURATE.

15             THE COURT:  I TAKE IT YOUR COUNTS INCLUDE

16   PRODUCTIONS IN THE RELATED CASES?

17             MR. JACOBS:  I THINK WE HAVE BEEN

18   SPECIFIC.  IF IT'S BEEN PRODUCED IN THE ND CAL

19   ACTION, WE SAY THIS IS OUR PRODUCTION IN THE ND CAL

20   ACTION.  IT'S GOT AN ND CAL BATES NUMBER ON IT,

21   IT'S BEEN PRODUCED IN RESPONSE AND DELIVERED BY THE

22   ND CAL TEAM TO THE ND CAL TEAM ON THE OTHER SIDE.

23             SO UNLESS WE SAY THE ITC, I THINK THE

24   COUNT IS ND CAL.

25             THE COURT:  ALL RIGHT.

```
 1              NOW IF THE COURT WERE TO ENTER A

 2     PROTECTIVE ORDER WITH THE SECOND TIER, COULD YOU

 3     ADDRESS OR DISCUSS THE IMPLICATIONS FOR RE

 4     DESIGNATION OR DE DESIGNATION OF PRODUCTION TODAY?

 5              MR. JACOBS:  WELL, HAVING OPERATED UNDER

 6     THE ASSUMPTION, IF YOU WILL, OR THE INTERIM

 7     PROTECTIVE ORDER PLUS ASSUMPTION THAT IT WOULD BE

 8     OUTSIDE COUNSEL, BOTH SIDES HAVE DONE THIS.  WE

 9     HAVE PROBABLY ALL ERRED ON THE SIDE OF CAUTION AND

10     DESIGNATION TRYING TO PUSH OUT DOCUMENTS QUICKLY

11     AND KNOWING WE CAN TURN TO DE DESIGNATION LATER.

12              WE HAVE, I THINK, BEEN IN THIS AREA VERY

13     RESPONSIVE TO SAMSUNG WHEN THEY HAVE ASKED TO DE

14     DESIGNATE ALL THE WAY DOWN TO NO DESIGNATION, FOR

15     EXAMPLE, ON DEPOSITION MATERIAL.

16              BUT TO NOW GET LAUNCHED INTO A PROCESS OF

17     OH, WE WANT THESE CONFIDENTIAL AND OUTSIDE COUNSEL

18     ONLY, AND HAVE TO FIGURE OUT WHAT THOSE LINES ARE

19     WITH EVERYTHING ELSE GOING ON IN A SHORT TIME

20     TABLE, THAT STRIKES US AS A LOT OF PROCESS FOR NOT

21     MUCH BENEFIT.

22              THE COURT:  WHAT WOULD THE IMPLICATION OF

23     THE SECOND TIER, AN ORDER ADOPTING A SECOND TIER BE

24     ON MY DECEMBER 22ND ORDER WITH RESPECT TO THE -- I

25     BELIEVE THE GENTLEMAN'S NAME WAS --
```

1            MR. JACOBS:  DREXLER?

2            THE COURT:  SHERMAN.

3            MR. JACOBS:  I'M SORRY, SHERMAN.

4            THE COURT:  COULD YOU SPEAK TO THAT

5     ISSUE.

6            MR. JACOBS:  I THINK LURKING IN THIS

7     CONFIDENTIAL CATEGORY IS THIS ARGUMENT THAT SAMSUNG

8     IS ADVANCING THAT THEY SHOULD NOT HAVE TO IDENTIFY

9     CONSULTANTS WHO WILL HAVE ACCESS TO CONFIDENTIAL

10    MATERIALS.

11            I IMAGINE WHAT THEY ARE CONTEMPLATING IS

12    THEY ARE GOING TO COME TO US AND SAY, YOU NEED TO

13    DE DESIGNATE THIS RANGE OF MATERIALS TO

14    CONFIDENTIAL, AND THEN THEY WILL SHOW THE

15    CONFIDENTIAL MATERIALS TO THESE UNNAMED,

16    UNDISCLOSED CONSULTANTS OR DISCLOSE IT TO SHERMAN.

17            AND THAT'S GOT US QUITE ANXIOUS BECAUSE

18    THE WHOLE POINT OF THE SHERMAN ISSUE WAS DIVIDING

19    THE LINE OF WHAT SHERMAN COULD SEE AND WHAT NOT.

20            THAT'S WHY THIS STRUCK US AS AN END RUN.

21            SO THAT'S -- YOU COULD IMAGINE A

22    CONFIDENTIAL TIER THAT HAD DESIGNATION OF EXPERTS.

23    YOU COULD SEPARATE THOSE TWO ISSUES.  SAMSUNG HAS

24    LUMPED THOSE TOGETHER AND CLAIMED WORK PRODUCT FOR

25    IDENTIFYING CONSULTANTS WHO WOULD HAVE ACCESS UNDER

                                                          12

1    THE PROTECTIVE ORDER.

2              THE COURT:  ALL RIGHT.

3              WELL, I GUESS THE NEXT QUESTION I HAD FOR

4    YOU, MR. JACOBS, WAS IT SEEMS TO ME THAT IN MANY OF

5    THESE COMPETITOR CASES, AND I THINK THAT'S A FAIR

6    CHARACTERIZATION OF THIS DISPUTE, MULTIPLE TIER

7    PROTECTIVE ORDERS ARE NOT EXACTLY UNUSUAL, OTHER

8    THAN THE FACT THAT THE INTERIM PROTECTIVE ORDER HAS

9    A SINGLE TIER; WHAT'S UNIQUE ABOUT THIS CASE?

10             MR. JACOBS:  IT'S A VERY CURRENT CASE.

11   WE ARE PRODUCING, THEY ARE PRODUCING, BOTH SIDES

12   ARE PRODUCING TO EACH OTHER DOCUMENTS THAT ARE

13   QUITE IMMEDIATE.

14             THIS IS A VERY FAST MOVING INDUSTRY AS WE

15   HAVE HEARD SEVERAL TIMES, YOU'VE HEARD SEVERAL

16   TIMES.  SO THE DOCUMENTS ARE OF A CERTAIN

17   IMMEDIACY.

18             THERE IS ALSO A TRUE HEAD-TO-HEAD NATURE

19   HERE.  I MEAN, THIS ISN'T JUST COMPETITORS, THESE

20   ARE COMPANIES THAT ARE NOW QUITE LOCKED IN A

21   RIVALRY.

22             SO YES, IT'S NOT UNCOMMON -- I WOULD SAY

23   IT'S NOT UNCOMMON TO HAVE A CONFIDENTIAL

24   CLASSIFICATION.  IT'S NOTABLE THAT IN THE ITC, THE

25   ITC ADOPTED AN OUTSIDE COUNSEL ONLY REGIME TO

1    EXPEDITE PRODUCT IN LIGHT OF THE ITC'S EXPEDITED

2    TRIAL PROCEDURES.

3              THE COURT:  IT'S WHAT THEY DO.

4              MR. JACOBS:  THAT'S WHAT THEY DO.

5              AND WE'RE ON AN EXPEDITED SCHEDULE HERE.

6    AND I THINK THE SAME LOGIC APPLIES.  WE NEED TO GET

7    THESE DOCUMENTS OUT, WE NEED TO GET THEM OUT

8    QUICKLY AND WE NEED TO GET THEM REVIEWED BY THE

9    PRODUCING REVIEWING PARTY, AND THE MOST EFFICIENT

10   WAY TO DO THAT IS UNDER A SINGLE TIER AND NOT HAVE

11   A LOT OF PROCESS.

12             THE COURT:  ALL RIGHT.  THANK YOU VERY

13   MUCH.

14             MS. MAROULIS?

15             MS. MAROULIS:  YOUR HONOR, MS. HUTNYAN

16   WHO HAS BEEN NEGOTIATING THE ORDER WILL ADDRESS

17   THESE ISSUES.

18             THE COURT:  COUNSEL.

19             MS. HUTNYAN:  GOOD MORNING, YOUR HONOR.

20             THE COURT:  GOOD MORNING.

21             MS. HUTNYAN:  I THOUGHT I WOULD TAKE EACH

22   OF THE ISSUES THAT MR. SELWYN RAISED IN TURN.

23             THE FIRST IS ISSUE IS THE NEW TIER.

24   THERE IS NO NEW TIER.  THE INTERIM PROTECTIVE ORDER

25   ACTUALLY HAS TWO TIERS THAT ARE ALMOST EXACTLY

14

1    ALIKE THE ONE SAMSUNG WANTS.

2              IT HAS A LOWER LEVEL CONFIDENTIAL TIER

3    THAT DOES NOT REQUIRE ANY DISCLOSURE, IT JUST

4    REQUIRES THE EXPERTS TO SIGN ON TO THE PROTECTIVE

5    ORDER.

6              AND IT HAS A HIGHER TIER WHICH IS

7    CONSISTENT WITH THE HIGHER LEVEL OF PROTECTION

8    NEEDED FOR THE DOCUMENTS AS THE DISCLOSURE

9    PROVISION DOES.

10             SO SAMSUNG'S PROPOSAL WOULD CHANGE THE

11   DEFINITIONS A LITTLE BIT.  IN PARTICULAR, IT WOULD

12   ALLOW US TO HAVE ALL OF OUR CONFIDENTIAL DOCUMENTS

13   PROTECTED FROM BEING DISCLOSED TO THE EMPLOYEES OR

14   THE IN-HOUSE COUNSEL OF THE COMPETITOR.

15             BUT OTHERWISE IT'S MUCH THE SAME AS THE

16   INTERIM PROTECTIVE ORDER THAT APPLE AGREED TO AND

17   HAS BEEN USING ALL ALONG IN THIS CASE.

18             THE COURT:  SO LET ME ASK YOU THIS, LET'S

19   START WITH THE STATUS QUO.

20             UNDER THE CURRENT INTERIM PROTECTIVE

21   ORDER, WALK ME THROUGH HOW GIVEN DOCUMENT

22   DESIGNATION WOULD AFFECT WHO AT APPLE COULD SEE

23   YOUR INFORMATION.

24             MS. HUTNYAN:  SO UNDER THE CURRENT ORDER,

25   PARAGRAPHS 2.2 AND 2.8 SET UP THE TWO TIERS.  THEY

1    DEFINE WHAT IS CONFIDENTIAL AND WHAT IS HIGHLY

2    CONFIDENTIAL, ATTORNEY'S EYES ONLY.

3            AND THEN PARAGRAPH 5 IS THE ONE THAT SAYS

4    PERSONS MUST DESIGNATE THESE THINGS IN GOOD FAITH.

5            PARAGRAPH 6.1 PROVIDES A PROCEDURE FOR

6    CHALLENGING CURRENT DESIGNATION.  SO IT WOULD BE

7    SIMILAR AND IT WOULD ALLOW FOR MEET AND CONFER

8    PROCESS.

9            PARAGRAPH 7.2 AND 7.3 ARE THE ONES THAT

10   SAY WHAT THOSE DESIGNATED DOCUMENTS, YOU KNOW, WHO

11   CAN SEE THOSE DESIGNATED DOCUMENTS.

12           AND SO 7.2, SINCE EXPERTS ARE KIND OF KEY

13   IN THIS EXERCISE, THAT WOULD BE 7.2(C), AND IT

14   SAYS, EXPERTS AS DEFINED IN THIS ORDER OF THE

15   RECEIVING PARTY TO WHOM DISCLOSURE IS REASONABLY

16   NECESSARY FOR THIS LITIGATION AND WHO HAVE SIGNED

17   THE ACKNOWLEDGEMENT AND AGREEMENT TO BE BOUND.

18           SO THAT'S ALL THAT'S REQUIRED OF THEM.

19           7.3 ON THE OTHER HAND, SUBSECTION C,

20   SAYS, EXPERTS OF THE RECEIVING PARTY ONE, TO WHOM

21   DISCLOSURE IS REASONABLY NECESSARY TO THIS

22   LITIGATION; TWO, WHO HAVE SIGNED AN ACKNOWLEDGEMENT

23   AND AGREEMENT TO BE BOUND, EXHIBIT A; AND THREE, AS

24   TO WHOM THE PROCEDURE SET FORTH IN PARAGRAPH 7.4

25   SUBSECTION (A)(2) BELOW HAVE BEEN FOLLOWED.

1            AND THAT'S THE DISCLOSURE REQUIREMENT.

2            THE COURT:  AND WHEN YOU SAY DISCLOSURE

3    REQUIREMENT, FORGIVE ME, CAN YOU ARTICULATE EXACTLY

4    WHAT YOU ARE REFERRING TO?

5            MS. HUTNYAN:  ABSOLUTELY.

6            SO 7.4(A)(2) SETS FORTH THAT UNLESS IT'S

7    OTHERWISE SHOWN BY THE COURT OR AGREED TO IN

8    WRITING BY THE OTHER PARTY, A PARTY THAT SEEKS TO

9    DISCLOSE TO AN EXPERT ANY INFORMATION OR ITEM --

10   AND I'M PARAPHRASING, I'M NOT QUOTING -- ANY

11   INFORMATION OR ITEM DESIGNATED AT THE HIGHER LEVEL,

12   MUST FIRST MAKE A WRITTEN REQUEST TO THE

13   DESIGNATING PARTY THAT IDENTIFIES THE GENERAL

14   CATEGORIES OF HIGHLY CONFIDENTIAL, ATTORNEY'S-EYES

15   ONLY INFORMATION THAT THE RECEIVING PARTY SEEKS

16   PERMISSION TO DISCLOSE TO THE EXPERT.

17           TWO, SETS FORTH THE FULL NAME OF THE

18   EXPERT AND THE CITY AND STATE OF HIS OR HER PRIMARY

19   RESIDENCE.

20           THREE, ATTACHES A COPY OF THE EXPERT'S

21   CURRENT RESUME.

22           FOUR, IDENTIFIES THE EXPERT'S CURRENT

23   EMPLOYERS.

24           FIVE, IDENTIFIES EACH PERSON OR ENTITY

25   FROM WHOM THE EXPERT HAS RECEIVED COMPENSATION OR

1  FUNDING FOR WORK IN HIS OR HER AREAS OF EXPERTISE,

2  OR TO WHOM THE EXPERT HAS PROVIDED PROFESSIONAL

3  SERVICES INCLUDING IN CONNECTION WITH THE

4  LITIGATION AT ANY TIME DURING THE PROCEEDING BY

5  PEERS.

6        AND SIX, IDENTIFIES BY NAME AND NUMBER OF

7  THE CASE, FILE DATE, LOCATION OF COURT, ANY

8  LITIGATION IN CONNECTION WITH WHICH THE EXPERT HAS

9  OFFERED EXPERT TESTIMONY, INCLUDING THROUGH

10  DECLARATION, REPORT OR TESTIMONY OR DEPOSITION AT

11  TRIAL FOR THE PRECEDING FIVE YEARS.

12        THE COURT:  ALL RIGHT.

13        SO LET'S TAKE AN EXAMPLE JUST SO I MAKE

14  SURE I UNDERSTAND PRECISELY HOW THIS WORKS IN

15  PRACTICE.

16        THE TWO TIERS, THE FIRST TIER IN THE

17  CURRENT INTERIM ORDER IS DESIGNATED CONFIDENTIAL;

18  IS THAT RIGHT?

19        MS. HUTNYAN:  THAT'S RIGHT.

20        THE COURT:  THE SECOND TIER IS AEO; AM I

21  RIGHT ABOUT THAT?

22        MS. HUTNYAN:  IT'S HIGHLY CONFIDENTIAL,

23  ATTORNEY'S EYES ONLY.

24        THE COURT:  LET'S USE THE AEO LABEL FOR

25  EFFICIENCY SAKE.

```
1              APPLE PRODUCES A DOCUMENT TO SAMSUNG

2    THAT'S LABELED AEO, ALL RIGHT.  SAMSUNG WISHES TO

3    SHARE THAT DOCUMENT WITH ONE OF ITS EXPERTS, OKAY.

4              UNDER THE PROVISIONS YOU'VE JUST

5    DESCRIBED TO ME, SAMSUNG WOULD BE REQUIRED FIRST TO

6    IDENTIFY TO APPLE WHO THIS EXPERT WAS; AM I RIGHT?

7              MS. HUTNYAN:  UNLESS THEY WANTED TO -- IF

8    IT WASN'T A DOCUMENT THAT SHOULD PROPERLY BE

9    DESIGNATED AT THAT HIGHER LEVEL, THEN WE COULD

10   INITIATE A PROCESS TO --

11             THE COURT:  RIGHT.

12             YOU COULD ALL FIGHT ABOUT THAT IN THE

13   DESIGNATIONS, IF IT'S REASONABLE.

14             MS. HUTNYAN:  YES.

15             THE COURT:  LET'S ASSUME THAT MERCIFULLY

16   IS NOT AN ISSUE IN THIS HYPOTHETICAL.

17             SO GOING BACK TO THE HYPOTHETICAL, YOU'VE

18   GOT AN AEO DOC FROM APPLE, YOU WANT TO SHOW IT TO

19   AN EXPERT.  BEFORE YOU DO THAT YOU HAVE TO TELL

20   APPLE WHO THE EXPERT IS WHAT THEIR RESUME LOOKS

21   LIKE, THEIR HISTORY AND SO ON AND SO FORTH.

22             APPLE THEN PRESUMABLY HAS A PERIOD OF

23   TIME IN WHICH TO OBJECT TO THAT DISCLOSURE.

24             AND ARE YOU ALSO REQUIRED IN THAT

25   HYPOTHETICAL OR SCENARIO TO IDENTIFY WHAT AEO
```

1    DOCUMENT YOU WISH TO SHARE?

2              MS. HUTNYAN:  IT IS THE CATEGORIES.

3              THE COURT:  BECAUSE THAT'S WHERE I'M --

4    I'M SORRY.

5              MS. HUTNYAN:  IT SAYS, IDENTIFIES THE

6    GENERAL CATEGORIES OF HIGHLY CONFIDENTIAL

7    ATTORNEY'S EYES ONLY INFORMATION THAT THE RECEIVING

8    PARTY SEEKS PERMISSION TO DISCLOSE TO THE EXPERT.

9              THE COURT:  SO THAT'S A LITTLE SQUISHY,

10   ISN'T IT?

11             SO YOU DON'T HAVE TO SAY I WANT TO SHOW

12   BATES NUMBER 24562, YOU SIMPLY NEED TO DESCRIBE THE

13   GENERAL CATEGORY WITHIN WHICH THAT DOCUMENT FALLS,

14   FOR EXAMPLE, FINANCIAL DATA, SOURCE CODE

15   SPECIFICATIONS OR WHATEVER IT MAY BE.

16             MS. HUTNYAN:  I THINK THAT'S A REASONABLE

17   INTERPRETATION, YES.

18             THE COURT:  SO IN THIS SCENARIO THEN, AS

19   LONG AS THE EXPERT TO WHOM YOU WANT TO MAKE THE

20   DISCLOSURE IS IDENTIFIED, DISCLOSED, NO OBJECTIONS

21   IS RAISED, YOU ARE FREE TO MAKE THE DISCLOSURE,

22   RIGHT?

23             MS. HUTNYAN:  IF THERE'S NO OBJECTION,

24   YES.

25             THE COURT:  OKAY.

```
1              IF THERE IS AN OBJECTION, YOU FIGHT ABOUT

2     IT.  IF YOU HAVE A PROBLEM, YOU FILE A MOTION AND I

3     GET TO DEAL WITH IT.  OKAY.

4              IF THE DOCUMENT YOU WISH TO SHARE WITH

5     YOUR EXPERT IS NOT AEO BUT RATHER SIMPLY

6     CONFIDENTIAL, UNDER YOUR HIERARCHY I TAKE IT THERE

7     IS NO OBLIGATION ON YOUR PART TO DISCLOSE THE

8     EXPERT OR TO PROVIDE APPLE WITH AN OPPORTUNITY TO

9     OBJECT; IS THAT FAIR?

10             MS. HUTNYAN:  THAT'S CORRECT.

11             THE COURT:  OKAY.  ALL RIGHT.

12             IF THAT'S HOW THINGS WORK UNDER THE

13    CURRENT ORDER, WHAT CHANGE DO YOU WANT?

14             MS. HUTNYAN:  THAT'S THE THING.  IT'S NOT

15    A CHANGE.  IT'S --

16             THE COURT:  WELL, WHAT DIFFERENCE DO I

17    MAKE?  THERE'S OBVIOUSLY SOME DELTA OR WE WOULDN'T

18    HAVE A DEBATE HERE.

19             MS. HUTNYAN:  PART OF IT IS THE REST OF

20    THE CORRECTIVE ORDER.

21             SAM AND I TALKED FOR WEEKS ABOUT HOW TO,

22    THE CROSS USE PROVISION AND THINGS, SO PART OF THAT

23    IS ENTERING THE REST OF THE ORDER.

24             BUT THE DIFFERENCE HERE IS THE

25    DEFINITIONS UNDER THE INTERIM PROTECTIVE ORDER, THE
```

1   CONFIDENTIAL INFORMATION IS JUST TANGIBLE THINGS

2   THAT QUALIFY FOR PROTECTION UNDER FEDERAL RULE OF

3   CIVIL PROCEDURE 26(C).

4            THE COURT:  YOU ARE BASICALLY

5   INCORPORATING BY REFERENCE A TRADE SECRET

6   DEFINITION UNDER RULE 26?

7            MS. HUTNYAN:  UMM, I THINK IT'S NOT

8   LIMITED TO TRADE SECRETS, IT'S THINGS THAT QUALIFY

9   FOR PROTECTION.  SO IT'S ARGUABLY THINGS THAT

10  AREN'T FULL OF TRADE SECRETS.

11           BUT 2.8 IS INFORMATION OR ITEMS THAT ARE

12  EXTREMELY SENSITIVE CONFIDENTIAL INFORMATION

13  DISCLOSURE OF WHICH TO ANOTHER PARTY OR NONPARTY

14  WOULD CREATE A SUBSTANTIAL RISK OF SERIOUS HARM

15  THAT COULD NOT BE AVOIDED BY LESS ASSERTIVE MEANS.

16           THE COURT:  THE CROWN JEWELS.

17           MS. HUTNYAN:  YES.

18           SO IT'S A LITTLE BIT DIFFERENT THAN THE

19  ONE WE ARE PROPOSING BOTH IN THE DEFINITION THAT WE

20  HAVE PROPOSED OF WHAT YOU QUALIFY.  OURS IS BROADER

21  TO ALLOW MORE THINGS TO BE AEO, BUT THEN --

22           THE COURT:  SO YOU WANT TO EXPAND THE

23  DEFINITION OF AEO TO BROADEN THE CATEGORY OF

24  DOCUMENTS THAT ARE SUBJECT TO THIS HIGHER

25  DISCLOSURE REQUIREMENT; IS THAT RIGHT?

1          MS. HUTNYAN:  A LITTLE BIT.  JUST TO

2     CREATE A SUBSTANTIAL RISK OF SERIOUS HARM.

3          I DON'T THINK THIS IS A HUGELY MEANINGFUL

4     DISTINCTION, JUST HAPPENS TO BE A SLIGHTLY

5     DIFFERENT FORMULATION THAT'S ARGUABLY BROADER.  BUT

6     I THINK WE MIRROR THE CONFIDENTIAL LEVEL EXACTLY.

7          BUT THE MAIN DIFFERENCE BETWEEN THE

8     INTERIM PROTECTIVE ORDER AT THIS POINT AND THE ONE

9     WE ARE PROPOSING IS THAT IN OURS WE WOULD NOT HAVE

10    IN-HOUSE COUNSEL OR EMPLOYEES OF THE COMPETITOR

11    ABLE TO SEE ANYTHING THAT WAS CONFIDENTIAL AT

12    EITHER LEVEL.

13          WHICH THAT'S ONE OF THE RATIONALS I THINK

14    THAT APPLE HAD IN, OR DESIGNATING THINGS, BECAUSE

15    THAT'S THE ONLY WAY TO PROTECT IT FROM OUR

16    EMPLOYEES SEEING THEIR STUFF.

17          THE COURT:  LET ME BACK UP FOR A MOMENT,

18    AND FORGIVE ME FOR NOT BEING ON TOP OF THIS AS

19    CAREFULLY AS I SHOULD BE.

20          MS. HUTNYAN:  OUR FAULT, YOUR HONOR.

21          THE COURT:  SO UNDER THE CURRENT

22    PROTECTIVE ORDER, AGAIN, I WANT TO UNDERSTAND THE

23    STATUS QUO AND UNDERSTAND THE DELTA BETWEEN THE

24    STATUS QUO.

25          UNDER THE CURRENT PROTECTIVE ORDER,

1    IN-HOUSE COUNSEL ARE AMONG THOSE -- ARE THEY AMONG

2    THOSE WHO ARE QUALIFIED TO SEE AEO DESIGNATED

3    MATERIAL?

4          MS. HUTNYAN:  NOT AEO.

5          THE COURT:  OKAY.

6          SO IF APPLE IS DESIGNATING DOCUMENTS AEO,

7    UNDER THE CURRENT PROTECTIVE ORDER NO IN-HOUSE

8    COUNSEL FOR SAMSUNG ARE ENTITLED TO SEE IT; IS THAT

9    FAIR?

10         MS. HUTNYAN:  LET ME JUST DOUBLE CHECK.

11         SO RIGHT.  HOUSE COUNSEL CAN SEE -- THIS

12    IS DIRECTORS AND EMPLOYEES CAN SEE CONFIDENTIAL BUT

13    NOT HIGHLY CONFIDENTIAL.

14         THE COURT:  OKAY.

15         SO IN THAT SENSE HOUSE COUNSEL, IN-HOUSE

16    COUNSEL ARE NO DIFFERENT THAN OTHER EMPLOYEES OF

17    THE COMPANY.

18         MS. HUTNYAN:  THAT'S RIGHT.

19         THE COURT:  THEY ARE ENTITLED TO SEE THE

20    CONFIDENTIAL INFORMATION, THEY ARE NOT ENTITLED TO

21    SEE THE AEO MATERIAL; HAVE I GOT THAT RIGHT?

22         MS. HUTNYAN:  I SEE.

23         IN HIGHLY CONFIDENTIAL, ACTUALLY IT

24    ALLOWS DESIGNATED HOUSE COUNSEL OF THE RECEIVING

25    PARTY WHO HAS NO INVOLVEMENT IN COMPETITIVE

1    DECISION MAKING, ET CETERA, SO THERE'S SOME CARVE

2    OUT FOR SOME IN-HOUSE COUNSEL.

3              THE COURT:  SO EVEN UNDER THE CURRENT

4    PROTECTIVE ORDER, IN-HOUSE COUNSEL HAVE ACCESS TO

5    AEO, ASSUMING OTHERWISE QUALIFIED?

6              MS. HUTNYAN:  YES.

7              THE COURT:  OKAY.  SO THAT'S THE CURRENT

8    SITUATION.

9              AS TO -- APART FROM CHANGING THE

10   DEFINITION OF AEO SLIGHTLY TO NOT SLIGHTLY, WHAT

11   CHANGE WITH RESPECT TO ACCESS FOR IN-HOUSE COUNSEL

12   ARE YOU PROPOSING?

13             MS. HUTNYAN:  SO IN-HOUSE COUNSEL WOULD

14   NOT BE ABLE TO SEE CONFIDENTIAL OR HIGHLY

15   CONFIDENTIAL TIER OF INFORMATION, THEY WOULD ONLY

16   BE ABLE --

17             THE COURT:  THAT WOULD OBVIOUSLY APPLY TO

18   SAMSUNG IN-HOUSE COUNSEL AS WELL AS TO APPLE.

19             MS. HUTNYAN:  YES, YOUR HONOR.

20             THE COURT:  SO YOU BASICALLY WANT TO,

21   FORGIVE ME FOR THIS CHARACTERIZATION, YOU WANT TO

22   PUT ADDITIONAL HANDCUFFS ON WHAT YOUR IN-HOUSE

23   CLIENTS CAN SEE?  YOU WISH TO FURTHER RESTRICT

24   THEIR ABILITY TO REVIEW MATERIAL?

25             YOU ARE SAYING THEY SHOULD NOT HAVE

1    ACCESS TO CONFIDENTIAL INFORMATION AT ALL.

2              MS. HUTNYAN:  WELL, THAT'S WHERE WE WOUND

3    UP.  I MEAN, I THINK THAT WASN'T THE INTENT OF

4    THIS.  I MEAN --

5              THE COURT:  THE EFFECT.

6              MS. HUTNYAN:  RIGHT.  THE EFFECT WOULD

7    BE -- THAT WASN'T THE INTENT.

8              THE INTENT IS TO HAVE -- TO NOT HAVE A

9    SITUATION WHERE WE HAVE ONE HUMONGOUS TIER OF STUFF

10   WHERE THE PARTIES CAN DESIGNATE EVERYTHING UNDER

11   THAT AND THEN THERE'S NO WAY TO DESIGNATE THAT ONE

12   OTHER THAN --

13             THE COURT:  RIGHT.

14             BUT UNDER THE SO CALLED SINGLE TIER

15   APPROACH THAT APPLE IS PROPOSING, AND AS I

16   UNDERSTOOD YOUR CHARACTERIZATION OF IT, IN-HOUSE

17   COUNSEL HAS ACCESS TO THAT INFORMATION IF THEY

18   OTHERWISE QUALIFY; IS THAT RIGHT?

19             MS. HUTNYAN:  I THOUGHT WE WERE TALKING

20   ABOUT THE INTERIM PROTECTIVE ORDER THE WHOLE TIME.

21   UNDER THEIR PROPOSAL, IN-HOUSE COUNSEL WOULD NOT BE

22   ABLE TO SEE ANYTHING.

23             THE COURT:  THANK YOU.  YOU ARE

24   ABSOLUTELY RIGHT.  I WAS MISCHARACTERIZING THE

25   PROPOSAL.

1          JUST, AGAIN, TO PUT A VERY FINE POINT ON

2     THIS BECAUSE YOU APPARENTLY HAVEN'T ALL BEEN ABLE

3     TO REACH AGREEMENT ON THIS AND I NEED TO MAKE A

4     DECISION.

5          YOUR PROPOSAL ON IN-HOUSE COUNSEL -- IS

6     THE ISSUE IN-HOUSE COUNSEL ACCESS IN PARTICULAR?

7     OR ARE THERE OTHER INDIVIDUALS FOR WHOM YOU HAVE A

8     DIFFERENCE OF OPINION WITH APPLE ABOUT THE ACCESS?

9          MS. HUTNYAN:  WELL, APPLE'S POSITION IS

10    THAT THERE SHOULDN'T BE A CONFIDENTIAL TIER.

11         AND SO THE DIFFERENCE IN TERMS OF WITH OUR

12    CONFIDENTIAL TIER OR THEIR LACK OF CONFIDENTIAL

13    TIER, THE DELTA BETWEEN THOSE TWO OPTIONS WOULD BE

14    MOCK JURORS, WHICH I DON'T THINK THAT'S THE ISSUE,

15    AND THEN THE EXPERTS.  BECAUSE IT WOULD EFFECTIVELY

16    CREATE THIS DISCLOSURE REQUIREMENT FOR ANY EXPERT

17    TO SEE ANYTHING THAT ISN'T PUBLIC IN THIS CASE.

18         THE IN-HOUSE COUNSEL, THAT SEEMS TO BE

19    KIND OF A NONISSUE.  BOTH OF US HAD AGREED WHEN WE

20    WERE DISCUSSING WHETHER IT SHOULD BE ONE OR TWO

21    TIERS, THERE'S NEVER A CONCERN OF WHETHER IN-HOUSE

22    COUNSEL OR EMPLOYEES COULD SEE IT.

23         I THINK THE PARTIES AGREE THAT

24    CONFIDENTIAL DOCUMENTS, INTERNAL DOCUMENTS TO THESE

25    COMPANIES, DON'T NEED TO BE SHOWN TO THE OTHER

27

1    SIDE'S IN-HOUSE PEOPLE OR THEIR EMPLOYEES.  I DON'T

2    THINK THAT'S WHERE THE ISSUE IS.

3             THE COURT:  ALL RIGHT.  I THINK I

4    UNDERSTAND THE DIFFERENCE NOW.

5             ALL RIGHT.  WELL, HAVING EXPLAINED TO ME

6    WHAT THE DIFFERENCES ARE BETWEEN THOSE TWO,

7    PROPOSALS, I WOULD LIKE YOUR VIEW ON EXACTLY WHY

8    APPLE'S SUGGESTION -- LOOK, ALL YOU NEED TO DO IS

9    MAKE THE DISCLOSURE TO THE EXPERTS AND THEY CAN

10   HAVE ACCESS TO THE SAME INFORMATION THEY WOULD

11   OTHERWISE HAVE ACCESS TO UNDER YOUR PROPOSAL.

12            WHY IS THAT A PROBLEM FOR YOU?  WHAT'S

13   THE BURDEN IN THAT?

14            MS. HUTNYAN:  OKAY.

15            SO I THINK THE EASIEST WAY TO ILLUSTRATE

16   THAT HERE FOR YOU IS TO SUGGEST THAT WHEN YOU GET A

17   CHANCE, AND I UNDERSTAND THE COURT HASN'T HAD THAT

18   OPPORTUNITY YET PERHAPS, BUT TO LOOK AT EXHIBITS B

19   THROUGH K OF MY DECLARATION.  THAT GAVE YOU A BUNCH

20   OF EXAMPLES THAT YOU CAN THUMB THROUGH.

21            YOU CAN SEE IT'S PUBLIC INFORMATION THAT

22   HAS BEEN DESIGNATED AEO THAT OUR EXPERTS CAN'T SEE

23   WITHOUT DISCLOSURE.  IT'S --

24            THE COURT:  BUT IF IT'S PUBLIC

25   INFORMATION, AND THE PROBLEM IN THAT SCENARIO IS

1    THE ACCURACY OF THE DESIGNATION, IT'S NOT THE

2    STRUCTURE OF THE ORDER.

3              MS. HUTNYAN:  RIGHT.

4              BUT IF PEOPLE ARE COMPLAINING ABOUT THERE

5    WOULD BE THIS BURDEN IN DE DESIGNATING AND THEY ARE

6    REFUSING TO DE DESIGNATE ANY MATERIALS, OBVIOUSLY

7    WE ARE GOING TO HAVE LITIGATION OVER THAT.

8              E-MAILS FROM 2003, 2006, THOSE CANNOT BE

9    AT A HIGHLY CONFIDENTIAL LEVEL THAT MERITS ALL THAT

10   ADDITIONAL PROTECTION.  IT JUST DOESN'T OUTWEIGH

11   THE BURDEN THAT A PARTY NORMALLY WOULD HAVE TO MEET

12   TO SHOW EXCEPTIONAL CIRCUMSTANCES ALLOWING THEM TO

13   INVADE OUR WORK PRODUCT.

14             THAT'S WHY THE INTERIM PROTECTIVE ORDER

15   IS SET UP THE WAY IT IS SO THAT THERE'S A LOWER

16   LEVEL AND EVERYBODY RECOGNIZES FOR THOSE ADDITIONAL

17   THINGS THEY DON'T GET THOSE PROTECTIONS, IT'S

18   REALLY FOR THE HIGHLY CONFIDENTIAL THINGS THEY

19   SHOULD HAVE THOSE PROTECTIONS.

20             THE COURT:  RIGHT.

21             I UNDERSTAND THE EFFECT AND THE ORDER IN

22   THE SCENARIO YOU DESCRIBED MAY BE DIFFERENT

23   DEPENDING ON WHICH ORDER IS ADOPTED, BUT IT SEEMS

24   TO ME IF THE CORE ISSUE IS THE QUALITY OF THE

25   ACCURACY OF THE DESIGNATIONS, YOU ARE GOING TO BE

1    DEBATING THAT EITHER WAY, RIGHT?

2              MS. HUTNYAN:  WELL, IF THE COURT WERE TO

3    TAKE APPLE'S PROPOSAL WHICH IS TO NOT HAVE A

4    CONFIDENTIAL TIER AT ALL, IT WOULD MAKE IT

5    DIFFICULT FOR US TO EVEN CHALLENGE THE DESIGNATION

6    BECAUSE WE WOULD HAVE TO ASK FOR A MODIFICATION OF

7    THE PROTECTIVE ORDER TO ADD A CONFIDENTIAL TIER OR

8    WE WOULD HAVE TO ASK FOR COMPLETE DE DESIGNATION OF

9    THE DOCUMENT WHEN THESE ARE INTERNAL DOCUMENTS THAT

10   SHOW, YOU KNOW, A FEW YEARS AGO WHAT THEY ARE

11   TALKING ABOUT WITH RESPECT TO THE DESIGN OR

12   FUNCTIONALITY OF A PRODUCT AND REALLY SHOULD BE A

13   CONFIDENTIAL TIER.

14             THE COURT:  ALL RIGHT.

15             ANY OTHER POINTS YOU WISH TO MAKE ON THIS

16   ISSUE?

17             MS. HUTNYAN:  I CAN ADDRESS SOME OF THE

18   OTHER POINTS THAT MR. SELWYN MADE, IF IT WOULD

19   PLEASE THE COURT.

20             THE COURT:  GO AHEAD.

21             MS. HUTNYAN:  AS FAR AS THE ULTERIOR

22   MOTIVE ON SHERMAN, I THINK THIS IS KIND OF AMUSING.

23             ABSOLUTELY IT'S ABOUT SHERMAN, IT'S ABOUT

24   EVERY EXPERT IT COULD AFFECT.  SHERMAN BECAME THE

25   POSTER CHILD FOR THE OVER DESIGNATION IS TRULY A

30

1      PROBLEM.  AND WE ALMOST FELL FOR NOT INCLUDING THAT

2      DESIGNATION, WE ALMOST AGREED TO SOMETHING BECAUSE

3      WE THOUGHT OH, WELL MAYBE THAT ISN'T A BIG DEAL,

4      AND IT TURNED OUT IT WAS A REALLY BIG DEAL.

5              SO THIS THING ABOUT THE THINLY VEILED

6      EFFORT TO HIDE SHERMAN, IT'S ABSOLUTELY ABOUT

7      SHERMAN.

8              THE COURT:  SO YOU ARE SEEKING -- WE ARE

9      GOING TO GET TO THAT IN A MOMENT.  YOU ARE SEEKING

10     RECONSIDERATION ON MY ORDER OF SHERMAN?

11             MS. HUTNYAN:  NO, IT'S A CLARIFICATION.

12             THE COURT:  WELL, CLARIFICATION VERSUS

13     RECONSIDERATION IS A FINE LINE.

14             WE ARE GOING GET TO THAT.  I DON'T WANT

15     TO JUMP AHEAD OF THINGS.  IT SEEMS TO ME YOU ALL

16     HAVE A PROBLEM WITH MY DECEMBER 22ND ORDER; IS THAT

17     FAIR?

18             MS. HUTNYAN:  WE THINK THERE'S

19     AMBIGUITIES IN IT, AND I'M NOT PREPARED TO ADDRESS

20     THAT IN ANY DETAIL.

21             MS. MAROULIS:  YOUR HONOR, I WILL ADDRESS

22     THAT ONE.

23             THE COURT:  ALL RIGHT.  WE WILL GET TO

24     THAT.

25             MS. HUTNYAN:  YES.

                                                      31

```
1              BUT I'M JUST SAYING, TO SUGGEST THAT WE

2     WERE HIDING SHERMAN IN OUR MOTION FOR ENTRY OF

3     PROTECTIVE ORDER OR THAT HE ISN'T -- YOU KNOW, WE

4     WERE KEEPING IT A SECRET THAT HE WAS RELEVANT TO

5     THIS.

6              NO, THAT'S THE BEST ILLUSTRATION THAT I

7     COULD POSSIBLY PULL OUT TO SHOW WHY YOU HAVE TO

8     HAVE INITIAL TIER, AND IT'S LIKE THE INTERIM

9     PROTECTIVE ORDER.

10             AND THEN I'M NOT SURE WHAT MR. SELWYN WAS

11    SAYING ABOUT THERE BEING A PROBLEM IN NOT ALLOWING

12    IN-HOUSE COUNSEL TO SEE DOCUMENTS THAT ARE

13    CONFIDENTIAL OR HIGHLY CONFIDENTIAL.

14             THIS IS THE FIRST I'VE EVER HEARD THAT

15    THERE WAS SUCH AN ISSUE.  AND AS THEY SAID, WE ARE

16    LOCKED IN RIVALRY.  AND WHEN YOU HAVE COMPETITORS

17    IN A LAWSUIT, YOU DO HAVE TWO TIERS.  AND I THINK

18    APPLE WOULD CONCEDE THEY DO NOT WANT IN-HOUSE

19    PEOPLE TO SEE THEIR CONFIDENTIAL LOWER LEVEL

20    CONFIDENTIAL MATERIALS, SO I DON'T ACTUALLY THINK

21    THAT'S AN ISSUE.

22             THE ITC AND THE IMPLICATION OF THE CROSS

23    USE AGREEMENT.  ALL THE CROSS USE AGREEMENT DOES IN

24    OUR CASE AND WHAT WE AGREED TO, THE PROVISION WE

25    HAD AGREED TO, IS THAT IT ALLOWS DOCUMENTS THAT ARE
```

1    PRODUCED IN THAT CASE TO AUTOMATICALLY BE DEEMED

2    PRODUCED IN THIS CASE.

3              SO IT CREATES A BODY OF DOCUMENTS THAT

4    SAYS VOILA, THESE ARE NOW PRODUCED.  SO IT'S JUST

5    LIKE ANY OTHER DOCUMENTS PRODUCED IN THIS CASE, IT

6    CAN BE REDESIGNATED.

7              AND THE WAY WE HAVE IT IN OUR PROPOSED

8    ORDER WOULD BE TO LET ALL OF THOSE COME IN BECAUSE

9    THEY ARE ALL DESIGNATED THE SAME WAY IN THE ITC,

10   AEO.  AND IF THERE IS SOME KIND OF PROBLEM, WE WILL

11   REDESIGNATE IT AS NECESSARY.

12             THE COURT:  WELL, HOW WOULD YOU HAVE THE

13   WHOLESALE OF RE DESIGNATION IF THEY ARE LABELED AEO

14   IN THE ITC PROCEEDING?

15             EFFECTIVELY, UNDER YOUR PROPOSAL THERE

16   WOULD BE A REQUIREMENT TO REASSESS THAT LABEL AS TO

17   EACH AND EVERY DOCUMENT, RIGHT.

18             MS. HUTNYAN:  WELL, I JUST DON'T THINK

19   THAT YOU NEED TO DO THAT.

20             I MEAN, FOR THE VAST QUANTITY OF

21   DOCUMENTS, AND WE ARE GOING TO SHOW YOU SOME

22   EXAMPLES OF WHAT'S BEEN PRODUCED IN THIS CASE.  FOR

23   PROBABLY HUNDREDS OF THOUSANDS OF PAGES, THERE'S NO

24   NEED TO BOTHER WITH THEM, FRANKLY.

25             SO THERE'S NO NEED TO MEET AND CONFER AND

1    DECIDE WHETHER THINGS BE DESIGNATED BECAUSE THEY

2    ARE USELESS DOCUMENTS.

3            THE COURT:  THAT'S AN INTERESTING

4    CONCESSION.

5            MS. HUTNYAN:  WELL, MINE.

6            I THINK THE REALITY IS YOU DO YOUR BEST,

7    NOT KNOWING ANYTHING, TO CREATE CATEGORIES THAT ARE

8    DEEMED RELEVANT.  AND WITHIN THE THINGS THAT ARE

9    PRODUCED PURSUANT TO THOSE THINGS, IF EVERYBODY IS

10   DOING IT IN GOOD FAITH THEN THINGS COME BACK THAT

11   AREN'T USEFUL TO YOUR CASE.

12           YOU COULD GET THOUSANDS OF DOCUMENTS THAT

13   YOU ARE NOT GOING TO USE AT TRIAL, YOU ARE NOT

14   GOING TO SHOW YOUR EXPERT.  YOU SIFT THROUGH AND

15   YOU FIND THE ONES YOU CARE ABOUT.

16           BUT THIS WHOLE BUGABOO ABOUT OH, WE NEED

17   TO REDESIGNATE EVERYTHING FOR THE SAKE OF RE

18   DESIGNATION.  THAT HASN'T HAPPENED WITH THE INTERIM

19   PROTECTIVE ORDER.

20           WE HAVE HAD THE TWO TIERS ALL ALONG.

21   THEY'VE BEEN OVER DESIGNATING LIKE CRAZY.  THEY

22   ADMITTED IN THEIR BRIEFING, THEY STATED VIRTUALLY

23   EVERY DOCUMENT IN THIS CASE IS AEO.  HAVE WE HAD

24   LITIGATION OF THAT?  NO.  IT'S JUST A HANDFUL OF

25   THINGS THAT WE NEED TO BE ABLE TO WORK WITH AND

34

1    THAT'S WHAT PROTECTIVE ORDERS ARE FOR TO STREAMLINE

2    LITIGATION TO ALLOW THE PARTIES TO SHOW PEOPLE WHAT

3    THEY NEED TO, TO MAKE THEIR CASE.

4           SO THE CROSS USE, IT'S SEAMLESS.  IT

5    COMES IN, IN THE AEO.  IF THERE'S SOMETHING MORE WE

6    NEED TO TALK ABOUT FROM THAT, AND IF WE'RE NOT OVER

7    DESIGNATING THEN YEAH, THERE'S THIS LOWER TIER.

8    WITHOUT A LOWER TIER THERE WILL BE NO TALKING.

9           THE COURT:  SO FIRST OF ALL, CAN YOU

10   EXPLAIN TO ME WHAT ITC DOCUMENTS ARE WE TALKING

11   ABOUT?  WHAT IS THE CASE OR WHAT ARE THE CASES THAT

12   YOU ARE REFERRING TO?  WHAT'S THE BODY?

13          MS. MAROULIS:  YOUR HONOR, THERE ARE TWO

14   PARALLEL ITC PROCEEDINGS WHERE EACH COMPANY

15   INITIATED INVESTIGATION AGAINST THE OTHER.

16          SO IN THIS CASE THE CLAIMS THAT GO BOTH

17   WAYS, AND ITC THEY ARE TWO SEPARATE PROCEEDINGS,

18   THEY HAVE THE 794 INVESTIGATIONS AND 796

19   INVESTIGATION.

20          THERE'S OVERRIDING SUBJECT MATTER, BUT

21   THE PATENTS ASSERTED ARE DIFFERENT, BOTH UTILITY

22   AND DESIGN.

23          THE COURT:  ALL RIGHT.

24          SO UNDER THE CROSS USE AGREEMENT THE

25   PARTIES HAVE ENTERED INTO IN THIS CASE, ALL THE

1    DOCUMENTS PRODUCED IN THE 794N OR THE 796 MATTERS

2    ARE DEEMED PRODUCED IN THIS CASE; IS THAT CORRECT?

3              MS. MAROULIS:  THAT'S CORRECT.

4              MS. HUTNYAN:  THEY WOULD BE.

5              THE COURT:  OKAY.

6              AND ARE EACH OF THE DOCUMENTS -- ARE THE

7    DOCUMENTS IN EACH OF THOSE CASES SUBJECT TO A

8    DESIGNATION OF AEO?  A SINGLE DESIGNATION OF AEO

9    FOR CONFIDENTIALITY PURPOSES?

10             MS. MAROULIS:  IT'S MY UNDERSTANDING THAT

11   THOSE ARE CONFIDENTIAL, AEO.  THERE ARE PUBLIC

12   DOCUMENTS PRODUCED AS WELL.

13             MR. JACOBS:  THE LABEL TO THE ITC IS CBI,

14   CONFIDENTIAL BUSINESS INFORMATION, AND IT'S

15   STANDARD ITC PROTECTIVE ORDER THAT THEN DESIGNATES

16   THOSE EFFECTIVELY AS OUTSIDE COUNSEL ONLY.

17             THE COURT:  SO AS TO THE OUTSIDE COUNSEL

18   ONLY DOCUMENTS THAT ARE PRODUCED IN THE ITC

19   ACTIONS, AND BY VIRTUE OF YOUR AGREEMENT PRODUCED

20   IN THIS CASE, IF APPLE FOR EXAMPLE, WISHED TO SHOW

21   CERTAIN OF THOSE DOCUMENTS TO THEIR OUTSIDE

22   EXPERTS, OKAY, AND LET'S ASSUME FOR THE MOMENT I

23   ADOPTED YOUR PREFERRED PROTECTIVE ORDER, HOW WOULD

24   THEY GO ABOUT DOING THAT?  THEY ARE CURRENTLY

25   LABELED CBI, CORRECT?  SO HOW WOULD THEY UNDERSTAND

1    WHETHER THEY HAD THE AUTHORITY TO DISCLOSE THAT

2    INFORMATION UNDER YOUR SCHEME?

3              MS. HUTNYAN:  SO UNDER OUR PROTECTIVE

4    ORDER IT EXPLICITLY SAYS THAT ITEMS COMING IN FROM

5    THOSE ACTIONS WITH THAT DESIGNATION ARE

6    AUTOMATICALLY AEO.

7              THE COURT:  RIGHT.  SO THEY WOULDN'T BE

8    ABLE TO SHOW THEM.

9              MS. HUTNYAN:  WELL, THEY WOULD HAVE TO

10   DISCLOSE, RIGHT.

11             THE COURT:  RIGHT.

12             SO UNLESS -- IT SEEMS TO ME WE ARE

13   GETTING RIGHT BACK WHERE WE STARTED FROM, RIGHT?

14             IF THEY WANT TO SHOW THOSE DOCUMENTS, AS

15   YOU SAY THEY ARE DEEMED AEO UNDER YOUR SCHEME, AND

16   SO THEY WOULD HAVE TO QUALIFY THEIR EXPERTS IN THE

17   SAME WAY THAT AN EXPERT WOULD HAVE TO BE QUALIFIED

18   THROUGH ANY AEO DISCLOSURE, RIGHT?

19             MS. HUTNYAN:  NO, YOUR HONOR, BECAUSE ALL

20   THEY HAVE TO DO IS SAY THIS ONE CLEARLY DOESN'T

21   MERIT THAT HIGHER LEVEL STATUS, WE HAVE A SECOND

22   TIER IN THIS CASE, YOU SHOULD DE DESIGNATE THAT,

23   SAMSUNG.  WE HAVE A TALK ABOUT IT AND WE SAY YES,

24   THAT'S A SIX-YEAR OLD DOCUMENT, DOESN'T NEED TO

25   STAY AT THE HIGHER LEVEL, LET THEM SEE IT.

1          OR NOT EVEN.  WE CAN JUST SAY, THIS

2     HASN'T HAPPENED A LOT IN THIS CASE.  WE COULD SAY

3     EVEN THOUGH IT'S AEO, LET THEM SEE IT, IT'S NOT AN

4     ISSUE.

5          THE FACT IS APPLE HAS OBJECTED TO 14 OF

6     14 OF OUR EXPERTS IN THE ITC.  THIS IS A WHOLE

7     MACHINE TRYING TO KEEP THE PARTIES FROM LITIGATING

8     THEIR CASE.  AND IT SHOULDN'T BE ABOUT THAT, THERE

9     HAS TO BE A CONFIDENTIAL TIER SO THERE'S AN

10    OPPORTUNITY TO RESOLVE THOSE KINDS OF ISSUES THAT

11    NEED TO BE RESOLVED.

12          THE COURT:  I UNDERSTAND YOUR POINT.

13          BUT WHAT I'M STRUGGLING TO UNDERSTAND IS

14    I'M JUST TRYING TO PUT MYSELF BACK IN THAT ROOM,

15    AND UNDERSTAND, YOU KNOW, IF I'M EITHER APPLE OR

16    SAMSUNG IN THIS SCENARIO AND I'VE GOT AN EXPERT AND

17    I'VE GOT THE SAMSUNG PROTECTIVE ORDER ISSUED BY

18    THIS COURT AND I'VE GOT DOCUMENTS I WANT TO SHOW AN

19    EXPERT THAT WERE PRODUCED IN THE ITC ACTION, IT

20    WOULD SEEM TO ME BEFORE I COULD DO THAT, UNDER YOUR

21    SCHEME I WOULD FIRST HAVE TO SECURE YOUR

22    PERMISSION, APPLE, OR YOU WOULD HAVE TO SECURE

23    APPLE'S PERMISSION IN THE REVERSE SITUATION.

24    PERMISSION WOULD HAVE TO BE SECURED BEFORE A SINGLE

25    ONE OF THOSE DOCUMENTS COULD ARE SHARED, RIGHT?

1            MS. HUTNYAN:  YES.  JUST UNDER THE

2      INTERIM PROTECTIVE ORDER THEY AGREED TO,

3      YOUR HONOR.

4            THE COURT:  ALL RIGHT.

5            ANYTHING FURTHER YOU WISH TO ADD?

6            MS. HUTNYAN:  NOT UNLESS THE COURT HAS

7      ANY MORE QUESTIONS.

8            THE COURT:  THANK YOU VERY MUCH.

9            MS. HUTNYAN:  THANK YOU.

10            THE COURT:  ANY BRIEF REBUTTAL?

11            MR. JACOBS:  SO I THINK WE DISTILLED IT.

12            THE ISSUE IS WHAT WE HAVE BEEN DOING OVER

13      THE LAST FIVE MONTHS WHICH IS OPERATING IN THE

14      SHADOW OF WHAT WE THOUGHT WOULD BE ENTERED WHICH

15      WOULD BE PARALLEL IN THE ITC IN THE DISTRICT COURT,

16      WOULD HAVE A SINGLE TIER, SO WE DESIGNATED WITH

17      THAT IN MIND.

18            AND THE ONLY PREJUDICE THAT SAMSUNG HAS

19      ARGUED IS THIS SUPPOSED INVASION OF WORK PRODUCT

20      FOR THIS INTERIM PROPOSED INTERMEDIATE CATEGORY.

21      BECAUSE IT DOES ALL DISTILL DOWN TO, SHOULD THEY BE

22      REQUIRED TO DISCLOSE THEIR EXPERTS AND GIVE US A

23      CHANCE TO VET THEM THE WAY WE DID ON JUST ONE WITH

24      YOU, YOUR HONOR.

25            SO YOU'VE SEEN THE BACK AND FORTH IN THIS

1    CASE.  WE ARE ALL SHAKING OUR HEADS ABOUT 14 IN THE

2    ITC, I DON'T KNOW WHAT THAT WAS A REFERENCE TO.

3            SO THAT HAS NOT BEEN A BIG BATTLEGROUND.

4    SO THIS STRIKES US AS A LAST MINUTE CHANGE OF HEART

5    BECAUSE SOMETHING DIDN'T GO SAMSUNG'S WAY THAT

6    WOULD ADD A LOT OF EXPENSE, COST AND SOME MORE

7    FIGHTING BEFORE YOUR HONOR ABOUT PROPER DESIGNATION

8    WHICH WE DO NOT THINK WOULD BE PRODUCTIVE,

9    ESPECIALLY ON THE SCHEDULE WE ARE ON.

10            THE COURT:  ALL RIGHT.  THANK YOU.

11            LET'S TURN TO THE NEXT ITEM, OR ONE OF

12    THE NEXT ITEMS.

13            I WOULD LIKE TO ADDRESS THE MOTION FOR

14    PROTECTIVE ORDER ON SAMSUNG'S 30(B)(6) DEPOSITION

15    NOTICE.

16            MR. JACOBS:  WHAT IS 30(B)(6) FOR?

17            30(B)(6) IS DESIGNED TO ADDRESS THE

18    SITUATION IN WHICH IT'S NOT CLEAR WHAT WITNESS YOU

19    SHOULD DEPOSE TO GET SOME CORPORATE LEVEL

20    INFORMATION.

21            A 30(B)(6) TO A HOSPITAL.  TELL US WHAT

22    HAPPENED IN THE OPERATING ROOM SO WE DON'T HAVE TO

23    TAKE A DEPOSITION OF A NURSE, A DOCTOR, AN

24    ATTENDANT.  THAT'S WHAT 30(B)(6) IS ALL ABOUT.

25            IN THIS CASE, YOUR HONOR, THERE HAVE

1     ALREADY BEEN 50 DEPOSITIONS ABOUT WITNESSES AND

2     THERE ARE SOME 50 PLUS MORE THAT HAVE BEEN NOTICED.

3             WE HAVE THE INVENTORS ON THE DESIGN

4     PATENT.  THERE HAS BEEN AMPLE TESTIMONY OF WHO IS

5     WHO AND WHO DID WHAT AT APPLE.

6             SO THERE'S NO INHERENT PROBLEM HERE OF A

7     CASE THAT DOESN'T WARRANT TAKING DEPOSITIONS, SO WE

8     NEED TO TARGET THE 30(B)(6) RIGHT TO GET TO THE

9     RIGHT PERSON EFFICIENTLY AND QUICKLY.

10            WE DO HAVE A 250 HOUR DEPOSITION LIMIT.

11    AND AT 100 DEPOSITIONS, THAT'S ABOUT TWO AND A HALF

12    HOURS A DEPOSITION.  SO --

13            THE COURT:  THAT'S 250 PER SIDE, RIGHT?

14            MR. JACOBS:  250 PER SIDE, AND THERE ARE

15    SOME EXCLUSIONS THAT IF I WERE TO GET VERY

16    GRANULAR, SOME OF THOSE 50 MAY BE SUBJECT TO THE

17    EXCLUSION, SO MY MATH MAY BE A LITTLE BIT OFF.

18            BUT WE HAVE AN HOUR'S LIMIT HERE.  AND WE

19    ARE CAREENING TOWARD THIS MARCH 8TH FACT DISCOVERY

20    CUTOFF.

21            SO WE GET THIS NOTICE AND IT'S IMPOSSIBLE

22    TO FIGURE OUT HOW TO PROCEED ON IT.  IN FACT, IN

23    RESPONSE TO OUR PROTESTS, SAMSUNG CAN'T REALLY

24    FIGURE OUT HOW TO PROCEED BECAUSE THEY IDENTIFY A

25    157 TOPICS THAT WE ARE SUPPOSED TO FIND WITNESSES

1    ON.

2              THAT WAS THE LAST STATE OF THE KIND OF

3    PROPOSALS BACK AND FORTH.

4              THE COURT:  SO JUST SO THAT I'M CLEAR ON

5    THAT POINT, I HAD READ THE NOTICE AS LISTING AS

6    MANY AS 229 TOPICS.  YOU HAVE SINCE NEGOTIATED OR

7    HAD DISCUSSIONS; IS THAT FAIR?

8              MR. JACOBS:  I THINK THAT WOULD OVERSTATE

9    IT.

10             WE SAID THIS IS IMPOSSIBLY OVERBROAD.

11   THEY SENT US A LETTER SAYING OKAY, ONLY WORK ON 157

12   OF THE TOPICS.  AND THEN THERE WERE SOME

13   DISCUSSIONS THAT THE LEAD COUNSEL MEET AND CONFER

14   AND OTHER DISCUSSIONS ABOUT THERE'S GOT TO BE A

15   BETTER WAY.

16             I WILL NOTE THIS, THE INSTINCT THAT WE

17   FELT WHEN WE GOT THEIR NOTICE WAS TO COPY IT INTO

18   OUR NOTICE AND SEND THEM THE SAME NOTICE, BUT WE

19   RESISTED BECAUSE WE REALLY WANT TO BE BEFORE YOU ON

20   THIS QUESTION OF, WHAT'S THE PROPER USE OF 30(B)(6)

21   IN A CASE LIKE THIS?

22             IF THERE WERE RIGHTFUL SOUGHT QUESTIONS

23   THAT THEY ARE HAVING TROUBLE FINDING THE RIGHT

24   WITNESS FOR, PROBABLY THEY COULD ASK US WHO IS THE

25   RIGHT WITNESS AND WE WOULD TELL THEM OR THEY COULD

1    SEND US A RIGHTFUL SOUGHT QUESTION ON THE 30(B)(6)

2    TOPIC AND WE'LL FIND A WITNESS ON THAT TOPIC.

3             IN A CASE OF THIS TYPE AND THIS KIND OF

4    EVIDENCE AND THESE DEPOSITIONS AND THESE KIND OF

5    TIME LIMITS, THAT'S THE RIGHT APPROACH.

6             WE NOTED IN A FOOTNOTE THAT JUDGE ALSUP

7    HAS THIS RULE BECAUSE HE DECIDED HE SHOULD ISSUE AN

8    ORDER THAT DEALT WITH THE PROPER USE OF 30(B)(6).

9             AND IT'S NOT JUST THAT THERE ARE TEN

10   TOPICS, A TEN TOPIC LIMIT IN HIS STANDING ORDER,

11   BUT IT'S VERY CRISP ABOUT WHAT A PROPER 30(B)(6)

12   TOPIC IS.  AND IT'S DESIGNED TO FIND VERY SPECIFIC

13   FACTUAL INFORMATION THAT A WITNESS COULD BE

14   EXPECTED TO HAVE OR READILY GATHER.  THAT'S WHAT

15   30(B)(6) IS FOR UNDER THAT STANDING ORDER.

16            THAT'S KIND OF A BEST PRACTICE, AND

17   CERTAINLY A PRACTICE THAT WOULD MAKE SENSE IN THIS

18   CASE WHERE AT LEAST AS WE ARE PRODUCING OUR

19   EVIDENCE TO SAMSUNG, THERE DOESN'T SEEM TO BE

20   ANY -- THERE'S BEEN NO CLAIM OF, WE DON'T FIND THE

21   RIGHT WITNESS, WE CAN'T GET THIS ANY OTHER WAY, YOU

22   HAVE TO PREPARE.

23            THAT'S THE LAST POINT.  THERE WAS

24   ACTUALLY SOME -- I DON'T KNOW IF YOU SAW THIS

25   ASPECT OF IT, JUDGE KOH ORDERED, BUT DURING THE

1      PRELIMINARY INJUNCTION PHASE WE DID SEND A 30(B)(6)

2      DEPO NOTICE TO SAMSUNG AND SAMSUNG SAID OH, TO

3      PREPARE ON THIS NOTICE WE WOULD HAVE TO INTERVIEW

4      600 EMPLOYEES, FIND OUT ALL THE INFORMATION THEY

5      HAD, AND THEY SOUGHT TO BAR THAT NOTICE ON THAT

6      BASIS.

7              AND JUDGE KOH ESSENTIALLY GRANTED THAT

8      PROTECTION AGAINST 30(B)(6) IN THAT CONTEXT.

9              SO AS WE LOOK AT THE HOURS LIMIT, THE

10     PROPER USE OF 30(B)(6), ALL WE COULD SEE IN

11     SAMSUNG'S NOTICE TO US WAS, GO OUT AND PREPARE A

12     LOT OF PEOPLE ON TESTIMONY THAT WE CAN'T POSSIBLY

13     BE ABLE TO ELICIT, BECAUSE HOW ARE THEY GOING TO

14     GET IT IN THE HOURS LIMIT TO START WITH?

15             AND THAT'S WHAT REALLY STRUCK US AS AN

16     ABUSE, HARASS, ALL THE NEGATIVE WORDS THAT GET US

17     INTO PROTECTION BEFORE FOR YOU.

18             SO THAT'S WHY WE SEEK PROTECTION FROM THE

19     NOTICE.  WE THINK THEY SHOULD GO BACK TO THE

20     BEGINNING AND START OVER.

21             THE COURT:  OKAY.

22             LET ME ASK YOU A QUESTION ABOUT THE

23     STRUCTURE, THE DISCOVERY LIMITS JUDGE KOH ORDERED

24     EARLIER IN THIS CASE.

25             WITH RESPECT TO 30(B)(6), IS IT FAIR TO

                                                          44

1    SAY THAT THE 250 HOURS WHEN IT APPLIES TO EACH SIDE

2    IS AGNOSTIC AS TO WHETHER THOSE HOURS ARE SPENT ON

3    30(B)(1) OR 30(B)(6) WITNESSES?

4            MR. JACOBS:  THAT'S OUR UNDERSTANDING OF

5    THE WAY IT WORKED, AND THERE'S NO DISAGREEMENT ON

6    THAT POINT.

7            THE COURT:  OKAY.

8            AND IS IT ALSO FAIR TO ASSUME THAT THE

9    REQUIREMENTS OF 30(B)(6) APPLY NOTWITHSTANDING THE

10   LIMITS THAT IF ONE SERVES A NOTICE, LET'S PUT ASIDE

11   THE SAMSUNG NOTICE FOR A MOMENT, LET'S SAY I HAVE

12   SIX TOPICS IN MY NOTICE I SERVE ON YOU.

13           AM I LIMITED, IF YOU PUT TOGETHER

14   30(B)(6) WITH JUDGE KOH'S ORDER, AM I LIMITED TO

15   SEVEN HOURS ON THOSE SIX TOPICS?

16           MR. JACOBS:  I DON'T BELIEVE THAT'S THE

17   WAY THE ORDER HAS BEEN INTERPRETED OR APPLIED, NO.

18           I'M GETTING AGREEMENT.

19           THE COURT:  ALL RIGHT.

20           IT SEEMS TO ME THAT'S A SIGNIFICANT

21   ISSUE, RIGHT?  BECAUSE IF I HAD UNDERSTOOD FROM

22   YOUR PAPERS THAT THE WAY THIS ALL WORKS UNDER

23   JUDGE KOH'S ORDER, WHATEVER THE NUMBER OF TOPICS

24   ONE DISCLOSES IN THE NOTICE, ONE IS LIMITED TO

25   SEVEN HOURS ON THOSE TOPICS ABSENT RELIEF FROM THE

```
 1        COURT OR SOMETHING.

 2               I THINK WHAT YOU ARE TELLING ME NOW IS

 3        THAT'S NOT CORRECT.

 4               MR. JACOBS:  I THINK THE SEVEN HOURS

 5        LIMIT IS EXTERNAL TO JUDGE KOH'S ORDER.

 6               MS. MAROULIS:  YOUR HONOR --

 7               MR. JACOBS:  THAT'S JUST THE DEFAULT.

 8               MS. MAROULIS:  THAT'S THE BASIC RULES OF

 9        CIVIL PROCEDURE FOR 30(B)(6).

10               MR. JACOBS:  BUT I THINK THE WAY THIS

11        WOULD WORK, AND THERE IS A CASE IN OUR PAPERS WHERE

12        WE NOTED THAT A COURT SAID, WELL, YOU CAN HAVE ALL

13        THE TOPICS YOU WANT BUT YOU ONLY GET SEVEN HOURS OF

14        TESTIMONY.

15               THE COURT:  THAT'S WHERE I'M GOING.

16               MR. JACOBS:  THE TROUBLE WITH THAT

17        DECISION IS I DON'T THINK IT HELPS US ON THE

18        PREPARATION FRONT.  WE WON'T KNOW WHAT QUESTIONS

19        THEY ARE GOING TO ASK.

20               NOW THE COURT SAID THERE THAT WAS KIND OF

21        INTERESTING IS, NO ONE WILL BE ABLE TO COMPLAIN,

22        BUT YOU THE SEEKING PARTY, BECAUSE YOUR NOTICE WAS

23        SO OVERBROAD, IF THE WITNESS ISN'T REALLY PREPARED.

24               BUT THEN WHAT'S THE POINT?  I MEAN, IF

25        THEY REALLY NEED SOME INFORMATION, WE DON'T -- WE
```

1    ARE NOT TRYING TO HIDE IT.  WE WILL GIVE THEM THE

2    GRANULAR INFORMATION THEY NEED.

3              SO IT WAS CLEVER, BUT MAYBE THAT DECISION

4    WAS SLIGHTLY TOO CLEVER.

5              THE COURT:  ALL RIGHT.

6              THANK YOU VERY MUCH.

7              MS. MAROULIS?

8              MS. MAROULIS:  YOUR HONOR, THIS ISSUE

9    SPANS TO DIFFERENT MOTIONS, APPLE'S MOTION FOR

10   PROTECTIVE ORDER AND A PORTION OF OUR MOTION TO

11   COMPEL.  BECAUSE WE DID PROPOUND THIS NOTICE THAT

12   WE RECEIVED NOT ONLY NO WITNESSES BUT NO MEANINGFUL

13   DISCUSSION PROCEEDED WITH RESPECT TO THIS NOTICE,

14   AND WE ARE ESSENTIALLY ASKED TO START OVER.

15             THE COURT:  SO ON THAT POINT,

16   MS. MAROULIS, SO I UNDERSTAND YOU ALL HAD A

17   DIFFERENCE OF OPINION ON THE PROPRIETY OF THIS

18   NOTICE OF TYPE OR STRUCTURE.

19             BUT WHEN YOU SERVE THE NOTICE WITH

20   HOWEVER YOU COUNT THE TOPICS, A LOT OF TOPICS, I

21   THINK WE CAN AGREE ON THAT.

22             MS. MAROULIS:  YES, YOUR HONOR.

23             THE COURT:  DID APPLE SAY TO YOU, HERE

24   ARE AT LEAST SEVEN, LET'S GO FORWARD WITH THOSE.

25             MS. MAROULIS:  NO, YOUR HONOR.

47

 1            THAT'S A MAJOR POINT OF OURS.  THEY NEVER

 2     SAID WE WILL GIVE YOU WITNESSES ON TOPICS 1, 2 AND

 3     26.

 4            FOR EXAMPLE, THERE ARE TOPICS AS SIMPLE

 5     AS, WHEN DID YOU GIVE SAMSUNG NOTICE OF ALLEGED

 6     INFRINGEMENT, OR WHEN DID YOU FIRST BECOME AWARE OF

 7     ALLEGED INFRINGEMENT?

 8            TOPICS THAT ARE REALLY NARROW AND DON'T

 9     HAVE ANY SUBPARTS.  THERE ARE TOPICS WITH SUBPARTS

10     AND WE'LL GET TO THAT IN A MOMENT, BECAUSE IN OUR

11     MIND WHAT WE ARE DOING IS WE ARE CREATING A NOTICE

12     THAT WOULD BE HELPFUL FOR SOMEONE TO PRESENT A

13     SERIES OF COMPETENT WITNESSES.

14            YOU CAN TAKE THIS VERY SAME NOTICE AND

15     REDUCE IT, TAKE OTHER SUBPARTS AND MAKE IT MORE

16     GENERAL, BUT THEN WE WILL GET INTO THE QUESTIONS OF

17     VAGUENESS AND OVERBREADTH.

18            WHAT WE ARE TRYING TO DO IS TO GIVE A

19     SPECIFIC LIST OF SUBJECTS ON WHICH WE NEED

20     TESTIMONY.

21            AND MR. JACOBS POSED AN INTERESTING

22     QUESTION WHICH IS, WHAT IS THE PURPOSE OF 30(B)(6)

23     NOTICE?

24            THE PURPOSE IS TO ELICIT TESTIMONY THAT

25     BINDS COMPANIES.  AND THE PURPOSE OF THAT IS TO

1    AVOID WHAT WE HAVE BEEN GETTING A LOT FROM APPLE IN

2    THE LAY DEPOSITIONS.  IN THE LAY DEPOSITIONS OF THE

3    INVENTORS THERE WAS A NUMBER OF DESIGN DEPOSITIONS

4    WHERE WE GOT ALMOST NOTHING BECAUSE THEY CLAIMED

5    EITHER IGNORANCE OR NO RECOLLECTION.

6             A 30(B)(6) WOULD DEFINITIVELY BIND APPLE

7    AS TO EACH OF THOSE NOTICES, WHETHER IT'S SIX

8    TOPICS OR 206 OR 226.

9             THE COURT:  LET'S SAY YOU ARE RIGHT ABOUT

10   THAT.

11             ARE ANY LIMITS APPROPRIATE AS TO THE

12   NUMBER OF TOPICS IN THE NOTICE?  A THOUSAND, 5000?

13   WHAT IS THE UPPER BOUNDARY?

14             MS. MAROULIS:  WE HAVE NOT FOUND A CASE

15   THAT SAID THERE WAS AN UPPER BOUNDARY.  SOME COURTS

16   HAVE --

17             THE COURT:  10,000?

18             I MEAN, AT SOME POINT THERE MUST BE SOME

19   RATIONAL BASIS, SOME RATIONAL LIMITATION ON WHAT

20   ONE CAN IDENTIFY.

21             MS. MAROULIS:  YOUR HONOR, WE SUBMIT -- I

22   DON'T KNOW WHAT THE UPPER BOUNDARY IS BUT HERE IN

23   THIS CASE 220 WAS APPROPRIATE.  BECAUSE WE HAVE 27

24   PATENTS.  WE HAVE DOZENS OF TRADE DRESS AND

25   TRADEMARK CLAIMS.  WE HAVE ANTI-TRUST CLAIMS.  WE

1    HAVE DEFENSES THAT BOTH SIDES RAISED THAT ARE THEIR

2    OWN UNIQUE AREAS OF LAW.

3           IT IS A BIG CASE, AND BECAUSE OF THAT WE

4    HAVE GIVEN EXTENSIVE NOTICE OF DEPOSITION AND WE

5    HAVE HAD EXTENSIVE DISCOVERY.

6           APPLE HAS NEVER MAINTAINED IN EITHER

7    DISCUSSION OR IN THEIR PAPERS THAT ANY OF THE

8    TOPICS ARE NOT RELEVANT.

9           EACH TOPIC, HOWEVER OPPRESSIVE THEY

10   CONSIDER IT, IS RELEVANT TO ONE OF THE PARTIES'

11   CLAIMED DEFENSES.  THEY ALL GOT GO TO THE PATENTS

12   ASSERTED, THE TRADEMARKS ASSERTED, THEY GO TO

13   DAMAGES, THEY GO TO DEFENSES.  THEY ARE ALL

14   RELEVANT.  AND WE MADE THEM DETAILED FOR THE

15   BENEFIT OF THE OTHER SIDE.

16          IF THEY DID NOT LIKE THAT THEY COULD HAVE

17   COME BACK TO US AND SAID, LET'S RENEGOTIATE IT, CAN

18   WE ABROGATE THE TOPICS, COULD WE DO SOMETHING

19   DIFFERENT?  THEY ALWAYS REFUSED TO DISCUSS THIS

20   PARTICULAR AREA.

21          TOWARD THE END OF THIS PROCESS WE CAME

22   BACK AND WE SAID OKAY, WE ARE GOING TO BARGAIN

23   AGAINST OURSELVES.  HERE'S A LIST OF TOPICS THAT IF

24   YOU GIVE US A WITNESS MAYBE WE WILL EITHER GO AWAY

25   WITH THE REST OR SOMEHOW NARROW IT DOWN.

 1          AND THERE WAS NO RESPONSE TO THAT.  THAT

 2   WAS THE JANUARY 3RD LETTER TO APPLE'S COUNSEL.

 3          THE POINT HERE IS THIS, MR. JACOBS IS

 4   CONCERNED ABOUT OUR HOURS REMAINING FOR

 5   DEPOSITIONS.  WE HAVE 140-SOME HOURS AND THAT IS

 6   PROBABLY UNDERCOUNTING IT BECAUSE ONCE WE TAKE OUT

 7   ALL THE SPEAKING OBJECTIONS BY APPLE COUNSEL, WE

 8   WILL HAVE WAY MORE TIME.

 9          BUT THE TRUTH OF THE MATTER IS IT'S UP TO

10   US HOW TO USE THAT TIME.  IF THEY DESIGNATE ONE

11   WITNESS OR 200 TOPICS, WE ARE GOING TO GET SEVEN

12   HOURS.  IF THEY DESIGNATE FIVE WITNESSES, WE ARE

13   GOING TO DEPOSE THESE FIVE WITNESSES FOR NO MORE

14   THAN UP TO SEVEN HOURS EACH.

15          THE COURT:  SO YOU ARE SUGGESTING THAT IN

16   FACT THE SEVEN-HOUR LIMIT WOULD APPLY TO THE TOPICS

17   COVERING THIS?

18          MS. MAROULIS:  THE SEVEN-HOUR LIMIT IS

19   PER PERSON.

20          WE SUBMIT THAT NO SINGLE PERSON CAN COVER

21   ALL THESE TWO HUNDRED TOPICS, BUT ULTIMATELY

22   THERE'S NO SPECIFIC LIMITS OUTSIDE THE FEDERAL

23   RULES OF CIVIL PROCEDURE THAT APPLY TO THIS CASE AS

24   TO 30(B)(6).

25          THE LIMITS, INCIDENTALLY BOTH SIDES ARE

1    BOUND BY THE LIMITS, AND APPLE PROPOUNDED NOTICES

2    AND WE PROPOUNDED OUR OWN.  WE ARE IN CHARGE OF HOW

3    WE ARE TO DECIDE THIS DEPOSITION TIME BUDGET.  THEY

4    ARE NOT TO DICTATE TO US WE SHOULDN'T USE THE TIME

5    BUDGET TO DEPOSE 30(B)(6) WITNESSES.

6              THE COURT:  WHEN YOU HAVE 229 LISTED

7    TOPICS THAT INCLUDE TEST, FOR EXAMPLE, ON ALL

8    COMMUNICATIONS OR ALL SOFTWARE REGARDING A SET OF

9    FEATURES, AS A PRACTICAL MATTER, HOW IS ONE TO

10   PREPARE FOR THAT?

11             I MEAN, SO FOR EXAMPLE, IF THE TOPIC --

12   I'M TAKING ONE OF THESE TOPICS, ALL TOPICS

13   REGARDING COMMUNICATIONS WITH THIRD PARTIES ABOUT

14   HOW CERTAIN FEATURES WORK ON THE ACCUSED PRODUCT.

15             WELL, CONSIDERING THE GLOBAL SALES FORCE

16   THAT EACH COMPANY HAS IN THIS CASE, CERTAINLY APPLE

17   HAS THAT, HOW AS A PRACTICAL MATTER IS ONE WITNESS

18   SUPPOSED TO CAPTURE ALL OF THAT INFORMATION AND

19   ADEQUATELY PREPARE, PROVIDE TESTIMONY ON BEHALF OF

20   THE PARTY?

21             MS. MAROULIS:  YOUR HONOR, THAT SHOULD

22   HAVE BEEN THE SUBJECT OF THE PARTY'S DISCUSSION.

23   THAT WAS NEVER THE GRANULAR ITEM OF THE DISCUSSION.

24             BUT TO TAKE THE EXAMPLE YOU TAKE WHICH IS

25   ALL COMMUNICATIONS, WE COULD CARVE OUT AS TO, FOR

1    EXAMPLE, DISCUSSIONS WITH SUPPLIERS, DISCUSSIONS

2    RELATED TO APPLE'S EXHAUSTION DEFENSES AS TO HOW

3    THEY GET CERTAIN FEATURES FROM, HOW IT WORKS, HOW

4    IT'S IMPLEMENTED.

5              IF THEY DON'T KNOW WHAT WE MEAN, THEY CAN

6    TALK TO US, BUT THAT'S NOT WHAT HAPPENED HERE.  THE

7    TOPIC WAS REJECTED, THIS NOTICE WAS REJECTED

8    WHOLESALE WITHOUT ANY MEANINGFUL DISCUSSION.

9              THE COURT:  I DON'T KNOW HOW YOU GO ABOUT

10   THAT, THOUGH.

11             I'M JUST THINKING ABOUT THIS.  LET'S JUST

12   STICK WITH THIS ONE EXAMPLE FOR A MOMENT.

13             HOW AM I, AS AN ATTORNEY FOR A GLOBAL

14   TECHNOLOGY FIRM WITH THOUSANDS OF EMPLOYEES WITH

15   POTENTIALLY RESPONSIVE INFORMATION, TO ADEQUATELY

16   MEET MY RESPONSIBILITIES AND HAVE MY WITNESS

17   COLLECT AND GATHER ALL THAT INFORMATION?  HOW WOULD

18   THAT POSSIBLY WORK?  AND IF YOU SCALE THAT ACROSS

19   229 TOPICS OF THAT NATURE, HOW COULD THIS WORK?

20             MS. MAROULIS:  FIRST OF ALL, YOUR HONOR,

21   SOME TOPICS ARE BROADER THAN OTHERS.  THERE'S A

22   NUMBER OF EXAMPLES I GAVE UP FRONT THAT ARE MUCH

23   NARROWER THAN THAT.

24             THE COURT:  BUT YOU HAVE ALL

25   COMMUNICATIONS REQUEST FOR, I BELIEVE, 112 TOPICS,

1    SO HOW WOULD THAT WORK?

2         MS. MAROULIS:  THE FEATURES AT ISSUE ARE

3    SPECIFIC USE FEATURES, THEY ARE NOT PRODUCTS AS A

4    WHOLE.

5         SO IF THERE WERE DISTRIBUTIONS IN, SAY,

6    LITIGATION CONTEXT OR THE SUPPLY CONTEXT THAT I

7    GAVE THE EXAMPLE, THAT WOULD BE A MORE DISCREET

8    UNIVERSE OF INFORMATION.

9         THE COURT:  HOW MANY SUPPLIERS ARE YOU

10   TALKING ABOUT?

11        MS. MAROULIS:  WE ARE TALKING ABOUT --

12   THE MAJOR ONES ARE INTEL AND QUALCOMM, IN THIS

13   CASE, THAT SUPPLY CHIPS, RIGHT.  SO THAT'S ONE OF

14   THE EXAMPLES.  AND APPLE MIGHT SAY THERE ARE MORE

15   BUT WE DON'T KNOW BECAUSE THEY HAVEN'T GIVEN US

16   DISCOVERY.

17        THE COURT:  BUT YOUR TOPIC -- I'M SORRY,

18   ISN'T LIMITED TO QUALCOMM OR INTEL.  AND THEY ARE

19   ALSO NOT LIMITED TO BASEBAND PROCESSORS, RIGHT?

20        SO CONCEIVABLY, IF ANY SALES PERSON IN

21   APPLE'S WORLDWIDE GLOBAL SALES FORCE HAD DISCUSSION

22   WITH A THIRD PARTY ABOUT HOW A PARTICULAR SOFTWARE

23   FEATURE OPERATED, THE 30(B)(6) WOULD BE RESPONSIBLE

24   FOR MEETING WITH THAT PERSON, GATHERING THAT

25   INFORMATION.

1          IT JUST SEEMS UTTERLY IMPRACTICAL AND

2     IT'S EQUALLY APPLICABLE TO THE SIMILAR REQUESTS TO

3     SAMSUNG, I WOULD ADD.

4          SO HOW WOULD ALL THIS WORK?

5          MS. MAROULIS:  WELL, YOUR HONOR, THE

6     PERSON CAN START WITH HIGH LEVEL INFORMATION

7     GATHERING IN THEIR ORGANIZATION, AND UPON RECEIVING

8     THE INFORMATION OF DOCUMENTS, TALK TO PEOPLE IN

9     CHARGE OF THE RELATIONSHIPS, FOR EXAMPLE, AND FIND

10    OUT IF THERE ARE SUCH DISCUSSIONS.  WE HAVE TO

11    ANSWER TO EQUALLY BROAD DISCOVERY REQUESTS AND

12    TOPICS.

13         SO IT'S THE NATURE OF WHITTLING DOWN THE

14    DISCOVERY TO THE BASE OF WHAT'S AT STAKE IN THE

15    CASE.

16         THE COURT:  IS IT ALSO ACCURATE THAT IN

17    RESPONSE TO A 30(B)(6) NOTICE YOU WERE SUCCESSFUL

18    IN SECURING RELIEF FROM JUDGE KOH ON A SIMILAR

19    DISPUTE?

20         MS. MAROULIS:  YOUR HONOR, THAT WAS A

21    VERY DIFFERENT SITUATION.

22         THE COURT:  APPLES AND ORANGES.  TELL ME

23    WHY.

24         MS. MAROULIS:  SO THIS WAS A PRELIMINARY

25    INJUNCTION BEFORE APPLE EVEN KNEW THEY SOUGHT

1    EXPEDITED DISCOVERY.  THAT WAS BEFORE THEY MOVED

2    FOR PRELIMINARY INJUNCTION.

3              AND ONE OF THE THINGS THEY WANTED WAS

4    THIS MASSIVE 30(B)(6) NOTICE.  AND JUDGE KOH SAID

5    THAT, AMONG OTHER THINGS, IT'S NOT APPROPRIATE TO

6    DO IT, SUCH DISCOVERY IN THE CONTEXT OF PRELIMINARY

7    INJUNCTION PROCEEDINGS.

8              AND WHAT HAPPENED IS SHE ISSUED AN ORDER

9    IN JULY THAT CONTROLLED THE DISCOVERY AND BASICALLY

10   SAID, YOU GUYS HAVE TWO MONTHS, YOU CAN ISSUE SOME

11   DISCOVERY RESPONSES, DISCOVERY REQUESTS, YOU CAN

12   TAKE SOME DEPOSITIONS BUT IT HAS TO BE NARROW.

13             AS IT IS, WE SUBMIT THAT APPLE TURNED IT

14   INTO A VERY BROAD FISHING EXPEDITION.  BUT AS TO

15   THAT PARTICULAR NOTICE, IT WASN'T APPROPRIATE AT

16   THAT TIME TO PROVIDE SUCH BROAD TESTIMONY.

17             ULTIMATELY, THEY DID SERVE A DIFFERENT

18   NOTICE AND WE DID PRESENT A WITNESS.  SO WE HAD A

19   30(B)(6) WITNESS IN THE PI PROCEEDINGS ON A TOPIC.

20   SO IT WAS A TOPIC LEGITIMATELY PROPOUNDED BY APPLE.

21             BUT WHEN JUDGE KOH RULED ON THAT ONE

22   ISSUE EARLIER, IT WAS IN THE CONTEXT OF THE

23   EXPEDITED DISCOVERY PROCEEDINGS BEFORE THE PI

24   HEARING IF I REMEMBER EVERYTHING CORRECTLY, TIME

25   WISE.

 1                    THE COURT:  ALL RIGHT.

 2                    IT'S MY UNDERSTANDING THERE'S SOME

 3     DISPUTE HERE WHETHER THIS PARTICULAR ARGUMENT OR

 4     ISSUE WAS EVEN THE SUBJECT OF THE MEET AND CONFER

 5     BETWEEN LEAD COUNSEL.

 6                    WAS THIS RAISED AND DISCUSSED ON

 7     JANUARY 5TH?

 8                    MS. MAROULIS:  THIS WAS DEFINITELY

 9     DISCUSSED ON JANUARY 5TH.  I WAS NOT PRESENT BUT I

10     UNDERSTAND IT WAS DISCUSSED, AND AT THAT POINT IN

11     TIME WE WERE ADVISED TO QUOTE "START OVER."  THAT

12     WAS THE EXTENT OF APPLE'S DESIRE TO NEGOTIATE.

13                    AND WE HAVE A CONCERN ABOUT THAT BECAUSE

14     IF THEY HAD QUESTIONS ABOUT SPECIFIC TOPICS IF THEY

15     WANTED TO EITHER CARVE OUT SOME TOPICS OR CHANGE

16     TOPICS OR DELETE SOME TOPICS, WE COULD HAVE

17     DISCUSSED THAT.  WE DIDN'T HAVE TO BE BEFORE YOU ON

18     THIS WHOLESALE 200 OR SO TOPICS.

19                    AND THEIR REFUSAL TO ENGAGE IN THIS

20     PROCESS IS PROBLEMATIC BECAUSE THAT'S SOMETHING THE

21     PARTIES REALLY SHOULD DECIDE AMONG THEMSELVES,

22     ESPECIALLY BECAUSE THERE'S NO QUESTION OF

23     RELEVANCE, IT'S JUST A QUESTION OF THEM CLAIMING

24     IT'S HARDER FOR THEM TO PREP PEOPLE.

25                    THE COURT:  HOW DOES THE 30(B)(6), YOU

                                                          57

1    SERVED SQUARE WITH THE INDIVIDUAL DEPOSITIONS THAT

2    ARE OUTSTANDING?

3            WHERE I'M GOING WITH THIS IS YOU ARE

4    SUBJECT TO AN HOURS CAP, I UNDERSTAND THERE ARE

5    EXCEPTIONS AND THERE REMAIN SOME DEBATES ABOUT HOW

6    YOU COUNT OUT -- I SUSPECT YOU ALSO HAD DEBATES

7    ABOUT WHETHER CERTAIN OBJECTIONS WERE APPROPRIATE,

8    YOU HAVE ALLUDED TO THAT ALREADY.

9            BUT AGAIN, HOW MANY INDIVIDUAL NOTICES

10   ARE YOU ALSO -- HAVE YOU ALSO SERVED?  AND WHAT I'M

11   TRYING TO FIGURE OUT HERE IS IF YOU ARE WERE ASKING

12   FOR TESTIMONY ON 229 LIST OF TOPICS IN A CORPORATE

13   CAPACITY AND YOU ARE ALSO SEEKING INDIVIDUAL

14   TESTIMONY ON WHATEVER -- AT SOME POINT YOU ARE

15   GOING TO EXHAUST YOUR BUDGET, RIGHT?

16           MS. MAROULIS:  YES, YOUR HONOR.

17           SO IF WE CAN GET THE WITNESS NOW ON THESE

18   TOPICS, WE MIGHT NOT NEED TO DEPOSE A LOT OF OTHER

19   INDIVIDUALS.

20           WE CURRENTLY HAVE 48 OR 49 NOTICES

21   OUTSTANDING.  WE RECEIVED DATES FOR MOST OF THEM

22   SINCE THE FILING OF THE MOTION.

23           WE WILL NOT BE ABLE TO DEPOSE EVERY

24   SINGLE ONE OF THOSE PERSONS.  BUT GIVEN THE FACT

25   THAT WE HAVE NOT GOTTEN THE 30(B)(6) DESIGNEE, WE

1    HAVE TO NOTICE ALL OF THEM BECAUSE WE DON'T KNOW

2    WHAT WE DON'T HAVE YET.

3              IF WE COULD GET A WITNESS ON THE TOPICS

4    WE PROVIDED THEN THERE MAY BE NO NEED FOR SOME OF

5    THE NOTICES AND WE WOULD ACTUALLY LIKE NOT TO TAKE

6    UP THE TIME OF INDIVIDUALS IF IT'S NOT NECESSARY.

7              THE COURT:  SO IS IT YOUR PROPOSAL THAT

8    YOU WOULD PROCEED ON THE 30(B)(6) NOTICE IF YOU

9    WERE AUTHORIZED TO DO SO AND ONLY PURSUE AT LEAST A

10   SUBSET OF THE INDIVIDUAL NOTICES, IF NECESSARY?

11             MS. MAROULIS:  YOUR HONOR, WE WILL STILL

12   PURSUE SOME INDIVIDUALS.

13             I CANNOT, STANDING HERE RIGHT NOW, SAY WE

14   WILL CANCEL 40-SOME DEPOSITIONS BECAUSE THERE ARE

15   DIFFERENT AREAS WHERE THOSE PEOPLE ARE COMPETENT.

16             BUT IF WE GET GOOD, COMPETENT TESTIMONY

17   ON THE TOPICS WE PROPOUNDED THEN THERE WILL NOT BE

18   A NEED FOR THE ENTIRE REST OF THE INDIVIDUALS TO BE

19   DEPOSED.  I JUST CANNOT TELL YOU WHICH ONES

20   SPECIFICALLY BECAUSE I DON'T KNOW WHICH TOPICS THEY

21   WILL PRESENT WITNESSES ON AND HOW PREPARED THEY

22   WILL BE.

23             THE COURT:  ALL RIGHT.

24             THANK YOU VERY MUCH.

25             ANY REBUTTAL?

59

1           MR. JACOBS:  JUST VERY BRIEFLY,

2    YOUR HONOR.

3           IN EXHIBIT C TO MS. MAZZA'S DECLARATION

4    WE STATED WHAT WE ASKED SAMSUNG TO DO.  WE SAID, AS

5    WE ALSO DISCUSSED DURING THE CALL, THIS IS

6    DECEMBER 27TH LETTER, THERE MAY BE LIMITED TOPICS

7    IN YOUR NOTICE THAT WOULD BE APPROPRIATE FOR A

8    30(B)(6) DEPOSITION IF STATED SEPARATELY OR

9    CLARIFIED.  APPLE WOULD BE WILLING TO PROVIDE

10   30(B)(6) TESTIMONY ON SUCH TOPICS PROVIDED THAT

11   SAMSUNG IS WILLING TO RECIPROCATE AND PROVIDE

12   CORPORATE TESTIMONY TO APPLE ON SIMILAR TOPICS.

13          SO TRY TO SET A LEVELLING PRINCIPLE.

14          DURING OUR CALL WE ASKED SAMSUNG TO GO

15   BACK AND REEXAMINE ITS NOTICE AND IDENTIFY A

16   NARROWED AND MORE FOCUSED SET OF TOPICS ON WHICH

17   SAMSUNG SEEKS TESTIMONY AND FOR WHICH IT WILL BE

18   WILLING TO PROVIDE RECIPROCAL TESTIMONY.  WE LOOK

19   FORWARD TO SAMSUNG'S IDENTIFICATION OF SUCH TOPICS.

20          ACTUALLY, THAT MAY BE EXHIBIT, I MAY HAVE

21   MISSTATED THAT, EXHIBIT B.

22          AND THEN EXHIBIT C IS A LETTER BACK FROM

23   SAMSUNG DATED DECEMBER 31ST THAT BASICALLY REJECTS

24   THAT PROPOSITION.

25          THEN EXHIBIT D IS ANOTHER LETTER FROM

1    SAMSUNG IDENTIFYING THE 150 PLUS TOPICS THAT THEY

2    WANTED US TO PROCEED ON WITHOUT ANY ACKNOWLEDGEMENT

3    OF RECIPROCITY.

4            THE COURT:  WHILE I HAVE YOU MR. JACOBS,

5    ON THIS ISSUE, SO GIVEN THAT HISTORY, AT ANY POINT

6    DID APPLE SAY, FOR EXAMPLE ON THE CORPORATE

7    STRUCTURE, YEAH, WE WILL GIVE YOU A WITNESS ON

8    THAT, HERE HE IS, HE'S AVAILABLE ON THIS DATE.

9            MR. JACOBS:  NO.

10           WE TOOK A LOOK AT THE NOTICE AND WE JUST

11   KIND OF THREW UP OUR HANDS, YOUR HONOR, HONESTLY.

12   WHAT COULD WE POSSIBLY DO WITH A NOTICE OF THIS

13   MANY TOPICS AND SUBTOPICS?

14           THE COURT:  WELL, ONE THING YOU COULD

15   POSSIBLY DO IS TO IDENTIFY DISCREET TOPICS WHICH

16   THERE'S LITTLE CONTROVERSY RIGHT.

17           MR. JACOBS:  THAT WOULD A POSSIBLE

18   AVENUE, YOUR HONOR.

19           I THINK OUR POINT WAS TO PUT 30(B)(6) IN

20   ITS PROPER POSITION BETWEEN THE COMPANIES

21   RECIPROCALLY, AND THAT SEEMED LIKE AN APPROPRIATE

22   WAY TO PROCEED

23           THE COURT:  HAS APPLE SERVED ITS OWN

24   30(B)(6) NOTICE?

25           MR. JACOBS:  WE HAVE SERVED SOME 30(B)(6)

1    NOTICES.  I DON'T KNOW THE DETAILS OF ALL OF THEM

2    BECAUSE THEY HAVE BEEN SERVED BY CO-COUNSEL AS

3    WELL.

4            THE COURT:  I'M CURIOUS IF YOU OR YOUR

5    CO-COUNSEL CAN TELL ME HOW MANY TOPICS DID YOU

6    INCLUDE?

7            MR. JACOBS:  I DON'T KNOW THE ANSWER TO

8    THAT.

9            THE COURT:  DOES ANYBODY?

10           MR. SELWYN:  I BELIEVE THERE WERE TWO

11   NOTICES, IF I RECALL.  MARK SELWYN.

12           THE FIRST NOTICE WHICH WAS RELATED TO

13   LICENSE ISSUES, I BELIEVE HAD ABOUT 20 TOPICS.

14           THE OTHER NOTICE THAT I RECALL IS ONE

15   DIRECTED TO TWO PATENTS ON WHICH SAMSUNG HAS NOT

16   OFFERED UP ANY INVENTOR TESTIMONY.

17           SO WE SAID IF THERE ARE NO INVENTORS TO

18   TESTIFY ABOUT THESE PATENTS, WELL, WE NEED TO SERVE

19   30(B)(6) NOTICES SO WE UNDERSTAND WHAT THE FACTUAL

20   LANDSCAPE OF THOSE TWO PATENTS ARE.

21           I BELIEVE THEY ARE ON THE ORDER OF 20 OR

22   SO TOPICS.  I MAY BE OFF BY A LITTLE BUT I THINK

23   THAT'S THE RIGHT MAGNITUDE

24           THE COURT:  ALL RIGHT.

25           SO JUST TO PROVIDE ME WITH SOME CONTEXT

1    HERE THEN.

2           ON SIMPLY THE ISSUES OF LICENSING AND

3    CONCEPTION OR REDUCTION TO PRACTICE AND SO FORTH,

4    THE TWO PATENTS, APPLE ITSELF SERVED NOTICES TO

5    INCLUDE AS MANY AS 40 TOPICS, GIVE OR TAKE?

6           MR. SELWYN:  YOUR HONOR, I'M ACTUALLY

7    LOOKING AT IT NOW.

8           WE SERVED A SECOND 30(B)(6) NOTICE ON

9    TOPICS RELATED TO TWO PATENTS ON WHICH THEY HAD NO

10   INVENTORS.  AND THE GOAL THERE WAS TO IDENTIFY ANY

11   INFORMATION RELATED TO THE CONCEPTION, REDUCTION TO

12   PRACTICE AND SO FORTH, THE VERY QUESTIONS WE WOULD

13   ASK INVENTORS IF THEY HAD IT.

14          WE ALSO SERVED 30(B)(6) NOTICES RELATED

15   TO -- PARDON ME -- THAT NOTICE HAS 15 TOPICS IN IT,

16   I'M LOOKING AT IT NOW.  PROBLEM TO BE SOLVED BY

17   THOSE PATENTS, CONCEPTION, REDUCTION TO PRACTICE,

18   DILIGENCE AND SO FORTH.

19          IT ALSO HAS A FEW TOPICS THAT ARE RELATED

20   TO PRIOR ART THAT I BELIEVE TO BE SEPARATE FROM

21   THOSE CONCEPTIONS REDUCTION TO PRACTICE.

22          THE OTHER 30(B)(6) NOTICE I'M REFERRING

23   TO ON THESE LICENSING ISSUES HAS ABOUT 20 TOPICS.

24          THE COURT:  SO IF I'M DOING MY MATH

25   RIGHT, 35 TOPICS ON A FRACTION OF THE ISSUES IN THE

1    CASE.  THAT WOULD SEEM TO SUGGEST IF YOU COMPARE

2    THAT AND SCALE IT TO WHAT SAMSUNG IS SERVING, YOU

3    ALL ARE KIND OF IN THE SAME BALLPARK HERE.

4         MR. JACOBS:  I THINK WE AREN'T RESTING ON

5    THE NUMBER OF TOPICS ALONE, WE ARE RESTING ON

6    OVERLAP, NATURE OF TOPICS, DIFFICULTY OF PREPARING

7    FOR TOPICS, HOW IT FITS INTO THE OVERALL LANDSCAPE

8    OF THE DEPOSITION AND OTHER DISCOVERY TO DATE.

9         I DON'T THINK YOU CAN ISOLATE ANY

10   PARTICULAR FACTOR, 229 IS A LOT OF TOPICS TO

11   GRAPPLE WITH ON A NOTICE AND EXPLAINS WHY WE SAID,

12   GO BACK, LET'S FOCUS, LET'S DO IT RECIPROCALLY.

13        MS. MAROULIS:  IF I MAY JUST, YOUR HONOR,

14   I AM TOLD BY MY TEAM THERE MIGHT BE FOUR SEPARATE

15   NOTICES SERVED.  I DON'T HAVE THEM HANDY, BUT

16   THERE'S BEEN SOME ADDITIONAL ONES SERVED RECENTLY.

17        THE COURT:  ALL RIGHT.

18        LET'S TURN TO ANOTHER ISSUE IN DISPUTE.

19        LET'S TURN TO THE APPLE MOTION TO COMPEL

20   DISCOVERY ON ITS AFFIRMATIVE DEFENSES.

21        MR. WALDEN:  GOOD MORNING, YOUR HONOR.

22        CALVIN WALDEN FROM WILMER HALE.

23        THE COURT:  GOOD MORNING.

24        MR. WALDEN:  SO THIS APPLE MOTION HAS

25   THREE PARTS.

1          THE FIRST PART IS TO COMPEL PRODUCTION OF

2     ADDITIONAL DOCUMENTS FROM THE INVENTOR FILES.

3          THE SECOND PART IS TO COMPEL ADDITIONAL

4     DOCUMENTS RELATED TO STANDARD SETTING ORGANIZATION,

5     SPECIFICALLY ETSI AND 3GPP.

6          AND THE FINAL PART IS TO COMPEL

7     ADDITIONAL DOCUMENTS RELATING TO LICENSES AND

8     LICENSE NEGOTIATIONS TO PATENTS THAT SAMSUNG HAS

9     DECLARED STANDARD ESSENTIAL.  AGAIN, TO ETSI AND

10    3GPP.

11         SO I WILL START WITH THE FIRST PART, THE

12    COLLECTION OR THE MOTION TO COMPEL ADDITIONAL

13    PRODUCTION FROM THE INVENTOR FILES.  THE INVENTORS,

14    OR THE SAMSUNG INVENTORS WHO WERE ORDERED TO BE

15    DEPOSED IN THIS CASE BEFORE DECEMBER 1ST AND THE

16    PRODUCTIONS WERE ROLLING BEFORE THOSE DEPOSITIONS,

17    AND WE HAVE HAD SOME PRODUCTION SINCE THOSE

18    DEPOSITIONS.

19         FROM THOSE DEPOSITIONS WE LEARNED A

20    COUPLE OF WHAT WE -- WELL, WE LEARNED ONE ESSENTIAL

21    FACT AND THEN FROM A TRANSPARENCY BY SAMSUNG WE

22    LEARNED THE SECOND FACT.

23         THE FIRST FACT WE LEARNED WAS THAT THE

24    SAMSUNG INVENTORS WERE TASKED TO COLLECT THEIR OWN

25    DOCUMENTS.  ESSENTIALLY, THEY WERE ASKED TO GO LOOK

1    IN THEIR OWN FILES AND COLLECT THE DOCUMENTS FOR

2    FORWARDING TO COUNSEL AND THEN PRODUCTION.

3           THE SECOND THING WE LEARNED WAS THAT THE

4    INVENTORS FROM THE DEPOSITIONS, THAT THE INVENTORS

5    ACTUALLY PERFORMED THE WORD SEARCHES OF THEIR OWN

6    FILES THAT WERE PROVIDED TO THEM BY COUNSEL.

7           AND WHAT WE LEARNED IS THAT THOSE

8    SEARCHES WERE PERFORMED, BOTH KIND OF THE MANUAL

9    SEARCHS AND THE ELECTRONIC WORD SEARCHES, WERE

10   PERFORMED IN A FAIRLY AD HOC, WHAT WE CONSIDER

11   HAPHAZARD AND UNGUIDED WAY BY THE INVENTORS.

12          AND NOT SURPRISINGLY, ULTIMATELY WE HAVE

13   PRODUCTION FROM SAMSUNG THAT HAS NO DOCUMENTS BEING

14   PRODUCED FROM 15 OF 32 NAMED INVENTORS AND ONLY A

15   HANDFUL FROM SOME OF THE OTHER INVENTORS.

16          ULTIMATELY, AS COMPARED TO APPLE'S

17   PRODUCTION FROM ITS OWN INVENTORS, WE ARE ON AN

18   ORDER AND MAGNITUDE DIFFERENT IN TERMS OF NUMBER OF

19   DOCUMENTS AND TOTAL PAGES.

20          THE COURT:  WELL, IF THEY PRODUCED ZERO,

21   THEN TEN IS AN ORDER OF MAGNITUDE.

22          MR. WALDEN:  THAT'S FAIR.

23          I'M TALKING ABOUT THE TOTAL NUMBER OF

24   DOCUMENTS FROM ALL THEIR INVENTORS AS COMPARED TO

25   OURS.

1          THE COLLECTION, AGAIN AS WE HAVE

2    DESCRIBED IN MORE DETAIL IN OUR BRIEF WITH CITES TO

3    MULTIPLE DEPOSITIONS, REALLY WAS TASKED TO THE

4    INVENTORS THEMSELVES TO GO OUT AND FIGURE OUT FROM

5    THEIR OWN FILES WHAT WAS RELEVANT, HOW TO, AND THEN

6    PULL THOSE DOCUMENTS AND FORWARD THEM TO COUNSEL.

7          THERE HAD BEEN -- THERE WERE SOME

8    FOLLOWUP WITH COUNSEL, USUALLY IT APPEARS BASED ON

9    WHEN THEY WERE MEETING TO PREPARE FOR THEIR

10   DEPOSITIONS.

11         A COUPLE OF TIMES WE GOT LATE PRODUCTIONS

12   THAT DID APPEAR TO BE AS A RESULT OF HAVING THE

13   INVENTORS MEET WITH COUNSEL, FIGURING OUT THAT

14   THEIR PRODUCTION WAS INSUFFICIENT AND THEN PULLING

15   ADDITIONAL DOCUMENTS AND PRODUCING THEM JUST RIGHT

16   BEFORE THEIR DEPOSITIONS.

17         THE SECOND THING WE LEARNED WAS AT THE

18   TIME AT THE END OF THE DEPOSITION PERIOD ON

19   DECEMBER 1ST, SAMSUNG PROVIDED WHAT WE CALL

20   TRANSPARENCY DISCLOSURES, AND WHICH WAS PER

21   JUDGE KOH'S EARLIER ORDER THAT THE PARTIES DESCRIBE

22   HOW SEARCH TERMS OR WHICH SEARCH TERMS WERE USED

23   FOR THE PARTICULAR WITNESSES.

24         AND FROM THOSE WE LEARNED THAT THERE WERE

25   WHAT WE CONSIDERED TO BE SERIOUS DEFICIENCIES WITH

1    THE SEARCH TERMS THAT THEY USED FOR THEIR

2    INVENTORS.

3            SPECIFICALLY, WE DIDN'T RECEIVE ANY

4    SEARCH TERMS THAT WERE UTILIZED FOR TWO PATENTS AND

5    THOSE WERE THE TWO PATENTS THAT MR. SELWYN JUST

6    MENTIONED.

7            THE COURT:  THE '035 AND THE '871.

8            MR. WALDEN:  YES, SIR.

9            SECOND, WE RECEIVED THEIR DISCLOSURES OF

10   SEARCH TERMS BUT WITH ONE EXCEPTION, THEY DID NOT

11   APPEAR TO USE KOREAN LANGUAGE EQUIVALENTS OF THE

12   ENGLISH LANGUAGE SEARCH TERMS THAT THEY TOLD US

13   THEY WERE USING, WHICH TO US WAS VERY PROBLEMATIC

14   BECAUSE THE INVENTORS ARE LOCATED IN KOREA.  THEIR

15   DEPOSITIONS WERE TAKEN THROUGH INTERPRETERS.

16           AND THE DOCUMENTS THAT WE HAVE RECEIVED

17   FROM THE PRODUCTION SHOWS THAT THERE'S A LOT OF

18   KOREAN LANGUAGE IN THE DOCUMENTS, SOMETIMES A MIX

19   OF ENGLISH AND KOREAN.

20           THEY DIDN'T USE WHAT WE CALL STANDARD

21   SETTING ORGANIZATION RELATED SEARCH TERMS FOR THEIR

22   INVENTORS, FOR EXAMPLE 3GPP OR ETSI OR OTHER TERMS

23   WITH THE LIMITERS.

24           AND THEN FINALLY ON A PATENT-BY-PATENT

25   BASIS WE IDENTIFIED WHAT WE CONSIDERED TO BE

1    SERIOUS DEFICIENCIES WITH THEIR SEARCHES AND

2    ULTIMATELY, NOT SURPRISINGLY, FOR 15 OF THEIR

3    INVENTORS THEIR SEARCHES APPEARED TO HAVE RESULTED

4    IN ZERO DOCUMENTS BEING PRODUCED.

5             SO WE HAVE HAD MET AND CONFERRED MULTIPLE

6    TIMES WITH SAMSUNG ABOUT THIS ISSUE, BOTH WITH

7    RESPECT TO WHAT WE CONSIDER TO BE THE DEFICIENCIES

8    IN THEIR COLLECTION AND WITH THE DEFICIENCIES IN

9    THE SEARCH TERMS THEY USED THAT WE HAD THE

10   INVENTORS SEARCH THEIR OWN FILES.

11            ULTIMATELY WE WERE NOT ABLE TO GET

12   AGREEMENT IN ANY FORM INCLUDING AT THE LEAD COUNSEL

13   MEET AND CONFER, SO WE ARE MOVING TO COMPEL.

14            AND WHAT WE ARE ESSENTIALLY ASKING FOR ON

15   THE INVENTOR SIDE IS SAMSUNG GO BACK TO ITS

16   INVENTORS AND ACTUALLY COLLECT DOCUMENTS IN A MORE

17   APPROPRIATE WAY, SCIENTIFIC WAY.  IF IT MEANS

18   COPYING HARD DRIVES FROM THE INVENTORS, THAT'S WHAT

19   THEY SHOULD DO.  IF IT MEANS SOMETHING ELSE, THAT'S

20   MORE THAN JUST SAYING INVENTORS, GO FIND YOUR

21   DOCUMENTS, THAT'S WHAT THEY SHOULD DO.

22            SECOND, WE BELIEVE THAT WHEN THEY RUN

23   SEARCH TERMS THEY SHOULD RUN ADDITIONAL SEARCH

24   TERMS ON THE INVENTOR DOCUMENTS, AND IN OUR

25   PROPOSED ORDER WE PROVIDED THE TERMS THAT WE HAD

1    PROPOSED.

2             I WILL SAY A QUICK POINT ABOUT THE TERMS

3    THAT WE PROPOSED.  SAMSUNG, IN ITS OPPOSITION,

4    CLAIMS THAT THE TERMS THAT WE PROPOSED WERE

5    OVERBROAD OR WAY TOO BROAD AND THEY PROVIDED

6    EXAMPLES, AN EXAMPLE AT LEAST, OF WHERE THEY SAY

7    WELL, WE RAN THE SEARCH AND IT GOT 30,000 HITS OR

8    SOMETHING WHICH THEY CLAIM IS TOO BROAD.

9             WE NEVER WERE INFORMED OF THAT PRIOR TO

10   THEIR OPPOSITION.  WE HAD TOLD THEM DECEMBER 13TH

11   WE SENT A LETTER SAYING WE WANT ADDITIONAL SEARCH

12   TERMS RUN.

13            WE WOULD HAVE NEGOTIATED.  IT NEVER

14   HAPPENED ONLY BECAUSE THEY JUST IGNORED OUR LETTER

15   UNTIL THE POINT OF, AT SOME POINT THEY SAID WELL,

16   YOUR TERMS ARE TOO BROAD.  THEY NEVER GAVE US

17   EXAMPLES, AND ULTIMATELY FOR THE FIRST TIME IN

18   THEIR OPPOSITION WE SEE THAT THEY SAY SOME OF THESE

19   TERMS ARE TOO BROAD.

20            THE COURT:  MR. WALDEN, LET'S TAKE A STEP

21   BACK FOR A MOMENT.

22            GIVE ME YOUR PERSPECTIVE OR VISION OF HOW

23   AN INVENTOR DOCUMENT COLLECTION OUGHT TO WORK.

24   WHAT STANDARDS ARE YOU URGING THIS COURT IMPOSE NOT

25   ONLY ON SAMSUNG BUT ON APPLE THAT IN YOUR MIND MEET

1    THE REQUIREMENTS OF RULE 34?

2              MR. WALDEN:  WE'RE NOT SAYING AN INVENTOR

3    SHOULD NOT BE INVOLVED IN COLLECTING FROM THEIR OWN

4    FILES.

5              THE COURT:  ONE MIGHT ARGUE THEY NEED TO

6    BE INVOLVED IN ORDER FOR IT TO BE MEANINGFUL.

7              MR. WALDEN:  ABSOLUTELY.  THAT'S TRUE.

8              THEY NEED TO BE INVOLVED AND IT NEEDS TO

9    BE A COMMUNICATION, A CONVERSATION THAT INVENTORS

10   HAVE WITH COUNSEL IN WHICH THERE'S AN

11   IDENTIFICATION OF POTENTIAL REPOSITORIES, EITHER

12   ELECTRONIC OR HARD COPY, WHETHER ON YOUR COMPUTER

13   OR LOCATED IN A CENTRAL SERVER, POTENTIAL

14   REPOSITORIES OF RESPONSIVE RELEVANT DOCUMENTS.

15             ONCE THOSE ARE FOUND, WE BELIEVE THAT THE

16   RIGHT THING TO DO IS FOR THE ATTORNEYS THEN, AND

17   THEN MAYBE IN CONJUNCTION WITH THE INVENTORS, TO GO

18   COLLECT THOSE FILES, NOT TO SAY TO THE INVENTORS

19   NOW GO FIND THE RELEVANT DOCUMENTS FROM THOSE

20   FILES, BUT INSTEAD TO GO COLLECT THE FILES AND THEN

21   BRING THEM BACK AND HAVE THEM IN A WAY THAT CAN BE

22   SEARCHED.  IF IT'S COPYING A HARD DRIVE, YOU COPY

23   THE HARD DRIVE.  YOU DOWNLOAD IT INTO A SERVICE IF

24   YOU WANT TO USE THAT OR YOU SEARCH THAT HARD DRIVE.

25             AGAIN, COUNSEL SHOULD BE SEARCHING THAT

1    HARD DRIVE.

2            WHAT YOU SHOULDN'T DO IS WHAT WE THINK

3    THEY'VE DONE WHICH IS TASK THE INVENTORS TO DO

4    THAT, ESPECIALLY IN A SITUATION WHERE WE HAVE

5    COUNTERCLAIMS FOR ANTI-TRUST VIOLATIONS, FOR

6    STANDARD SETTING ORGANIZATION VIOLATIONS, AND THESE

7    INVENTORS ARE INVOLVED IN THE STANDARDS

8    ORGANIZATIONS WHY THERE'S A SITUATION WHERE THEY

9    MIGHT FIND DOCUMENTS IN THEIR OWN FILES THAT ARE

10   NEGATIVE THAT REFLECT POORLY ON THEM OR INDIVIDUALS

11   OR EMPLOYEES OF SAMSUNG.

12            AND THEN WHAT ARE THEY SUPPOSED TO DO?

13   THEY MAY BE VERY WELL TEMPTED NOT TO FORWARD THOSE

14   DOCUMENTS.

15            AND WE HAVE CITED CASE LAW THAT SAYS YOU

16   SHOULDN'T TASK PERSONS WHO ARE NOT LAWYERS,

17   EMPLOYEES OF COMPANIES, TO GO FIGURE OUT WHAT'S

18   RELEVANT AND WHAT MATTERS FOR A CASE AND FORWARD

19   THAT TO THE ATTORNEYS.

20            SO WE THINK THERE SHOULD BE A

21   CONVERSATION DEFINITELY TO FIND THE RIGHT

22   REPOSITORIES AND THEN SOME WAY OF MORE

23   SCIENTIFICALLY OR FORENSICALLY COLLECTING THE

24   DOCUMENTS FROM THOSE REPOSITORIES, AND ESSENTIALLY

25   IN A BLIND MANNER YOU GO AND YOU COLLECT IT ALL AND

1    THEN YOU RUN YOUR SEARCHES TO FIGURE OUT WHAT MIGHT

2    BE THE RELEVANT UNIVERSE OF RESPONSIVE DOCUMENTS,

3    THEN YOU REVIEW THOSE DOCUMENTS FOR PRIVILEGE AND

4    OTHER ISSUES AND WHAT NOT AND THEN YOU PRODUCE.

5              THE COURT:  SO MR. KIM FROM SAMSUNG, I

6    APOLOGIZE, I BELIEVE IT WAS MR. KIM, UNDER PENALTY

7    OF PERJURY TELLS THIS COURT THAT TO THE EXTENT THE

8    INVENTORS SEARCHED THEIR OWN COMPUTERS, THEY WERE

9    ACTING AT THE DIRECTION OF COUNSEL.

10             IS IT YOUR VIEW THAT'S INSUFFICIENT AS A

11   MATTER OF LAW?

12             MR. WALDEN:  I THINK I DO, ONLY BECAUSE I

13   THINK IF YOU READ THE KIM DECLARATION, AND THEIR

14   BRIEF VERY CAREFULLY, YOU SEE TWO THINGS.

15   THEY SAY THEY WERE ACTS UNDER DIRECTION OF COUNSEL,

16   BUT THEY DO NOT DENY TWO IMPORTANT FACTS.  IT WAS

17   THE INVENTORS WHO SEARCHED THEIR OWN FILES.  AND

18   AGAIN, ON THE MANUAL LEVEL.

19             AND THEN AGAIN IT WAS THE INVENTORS WHO

20   PERFORMED THESE WORD SEARCHES OF THEIR OWN FILES.

21   AND NOT ONLY DID THEY USE -- WERE THEY TASKED TO

22   PERFORM THE WORD SEARCHES, THEY WERE APPARENTLY

23   GIVEN FREE REIN AS TO WHAT TYPE OF SEARCH TOOLS TO

24   USE.  SO SOME OF THEM WERE APPARENTLY USING A

25   MICROSOFT SEARCH ENGINE WHICH WE FEEL ISN'T VERY

1      ROBUST, IT'S NOT GOING TO FIND ATTACHMENTS OR EVEN

2      KNOW HOW TO DEAL WITH A PDF, FOR EXAMPLE.

3              SO WHAT THE KIM DECLARATION IS, I THINK,

4      IS A CAREFULLY WORDED DECLARATION.

5              THE COURT:  MOST OF THEM ARE.

6              MR. WALDEN:  THEY ARE.

7              BUT I BELIEVE WHAT REALLY COMES THROUGH

8      WITH THIS IS THAT THERE'S NO DENYING THE INVENTORS

9      ACTUALLY DID THE SEARCHES, MANUAL SEARCHES, AND THE

10     INVENTORS AGAIN PERFORMED THE WORD SEARCHES.

11             NOW THERE WERE SOME EXCEPTIONS THAT WE

12     FOUND OUT IN TESTIMONY WHERE THE INVENTORS JUST DID

13     SUCH A POOR JOB AT THEIR DEPOSITION -- I'M SORRY,

14     DURING THEIR PREPARATION, THEY JUST FORWARDED --

15     THEY FINALLY MADE A HARD COPY OFF THEIR HARD

16     COPIES.

17             WELL, OUR POINT IS THAT'S WHAT YOU SHOULD

18     HAVE DONE IN THE FIRST PLACE, SAMSUNG, YOU SHOULD

19     HAVE DONE THAT BEFORE YOU WERE MEETING WITH THE

20     WITNESS IN JUST A FEW DAYS BEFORE THE DEPOSITION.

21     YOU SHOULD HAVE COPIED OFF THESE HARD DRIVES A LONG

22     TIME BACK.

23             SO I'M NOT HERE TO CALL MR. KIM A

24     PERJURER OR ANYTHING LIKE THAT, BUT I THINK IT IS

25     VERY CLEAR IF YOU LOOK AT THAT DECLARATION THEY ARE

1    NOT DENYING THAT THE INVENTORS DID THEIR OWN

2    SEARCHES BOTH MANUALLY AND THE WORD SEARCHES.

3              THE COURT:  SO IF I UNDERSTAND YOUR

4    POINT, YOU ARE SUGGESTING THAT AT LEAST IN CASES OF

5    THIS NATURE, THE COURT SHOULD ADOPT OR IMPOSE A

6    STANDARD WHICH REQUIRES OUTSIDE COUNSEL TO

7    SPECIFICALLY CONDUCT THE MANUAL COLLECTION AS WELL

8    AS TO EXECUTE ANY SEARCH ON ELECTRONIC DATA WHICH

9    HAS BEEN GATHERED?  IS THAT THE STANDARD YOU ARE

10   SUGGESTING OR URGING APPLY?

11             MR. WALDEN:  I THINK -- I THINK IT COMES

12   CLOSE TO IT.

13             THE OUTSIDE COUNSEL, AND PERHAPS INSIDE

14   COUNSEL IF IN WORKING WITH OUTSIDE COUNSEL, IN

15   CONJUNCTION WITH OUTSIDE COUNSEL, I THINK THE

16   STANDARD SHOULD BE THAT COUNSEL SHOULD BE THE ONES

17   MAKING THE CUT BETWEEN WHAT'S RELEVANT AND NON

18   RELEVANT IN THE DOCUMENT COLLECTION RATHER THAN THE

19   INVENTORS.

20             THE COURT:  OKAY.

21             SO WITH RESPECT TO PAPER DOCUMENTS

22   PRESUMABLY THAT WOULD REQUIRE INSIDE OR OUTSIDE

23   COUNSEL TO ACTUALLY DO THE COLLECTION AND REVIEW,

24   RIGHT?

25             IF THEY ARE MAKING AN ASSESSMENT OF

1    RELEVANCE UNDER YOUR PROPOSAL, THAT WOULD REQUIRE

2    THOSE INDIVIDUALS ACTUALLY DO THE REVIEW.

3            WITH RESPECT TO THE ELECTRONIC DOCUMENTS

4    IT WOULD SEEM TO ME UNDER YOUR PROPOSAL, A

5    REQUIREMENT THAT OUTSIDE COUNSEL DRIVE THE

6    RELEVANCE DETERMINATION OR MAKE THE RELEVANCE

7    DETERMINATION COULD BE SATISFIED BY OUTSIDE OR

8    INSIDE COUNSEL SUPPLYING THE TERMS?

9            BUT I HEAR IN WHAT YOU ARE SAYING, A

10   PROBLEM OR A CONCERN THAT THAT MAY BE INSUFFICIENT

11   TO MEET THE TEST.

12           MR. WALDEN:  I AM.

13           GIVEN IN THIS SITUATION WHERE OKAY, SO

14   THEY SUPPLIED THE TERMS BUT THEN THE INVENTORS

15   THEMSELVES WERE THEN TASKED TO FIGURE OUT HOW TO

16   APPLY THOSE TERMS, HOW TO RETURN THE SEARCHES.

17           IF THEY SUPPLIED THE TERMS AND SAID, ALL

18   RIGHT, HERE'S A TRIED AND TRUE METHOD AND HERE'S A

19   LIST OF BULLET POINTS THAT YOU HAVE TO FOLLOW IN

20   ORDER TO SEARCH YOUR OWN FILES, AND YOU MUST

21   CONFIRM THAT YOU HAVE SEARCHED E-MAILS, YOU HAVE

22   SEARCHED ATTACHMENTS, THAT PDF'S THAT HAVEN'T BEEN

23   OCR'S WOULD BE SEARCHABLE IN SOME WAY, AND THEN

24   PERHAPS.

25           WE ARE NOT SAYING THE INVENTOR, THAT IT

1    HAS TO BE COUNSEL THAT GOES TO THE INVENTOR'S

2    COMPUTER AND TYPES IN THE TERMS.  BUT IT'S NOT

3    SUFFICIENT IN OUR VIEW TO SAY THAT THE INVENTORS

4    ARE GIVEN THE TERMS THEN ARE TASKED TO DO THE

5    SEARCHES THEMSELVES, AND THEN FURTHER ARE TASKED TO

6    SAY, OKAY FORWARD TO ME WHAT YOU THINK IS THE

7    PROPER DOCUMENTS BECAUSE WE DIDN'T GET -- AND

8    AGAIN, THE KIM DECLARATION DOESN'T SAY THIS, WE

9    DIDN'T GET ANY INDICATION THAT EVERY DOCUMENT, FOR

10   EXAMPLE THAT THE INVENTORS FOUND FROM THEIR

11   SEARCHES, WAS FORWARDED.  WE DON'T KNOW.

12           THE COURT:  DID YOU PUT THAT QUESTION TO

13   ANY OF THE INVENTORS DURING THE DEPOSITION?

14           MR. WALDEN:  THERE WERE QUESTIONS AT

15   LEAST TO MR. LI, AND HE'S I BELIEVE IN EXHIBIT D OF

16   THE EXHIBITS IN WHICH HE DID SAY HE FORWARDED

17   EVERYTHING THAT HE FOUND.

18           SO WE DIDN'T ASK ALL 32 INVENTORS.

19           THE COURT:  SO THE ONE INDIVIDUAL YOU DID

20   ASK SAID HE DID FORWARD THE MATERIALS AND YOU

21   DIDN'T ASK THE OTHERS IF IT'S REASONABLE TO

22   CONCLUDE THERE'S A PROBLEM IN THE FORWARDING

23   PROCESS.

24           MR. WALDEN:  HE SAID THAT HE SEARCHED

25   USING THE MICROSOFT SEARCH ENGINE AND THEN HE

1    FORWARDED WHAT HE FOUND.

2           SO AGAIN, WE ARE NOT HERE TO POINT

3    FINGERS AT ALL 32 INVENTORS SAYING THAT THEY

4    VIOLATED THEIR DUTY.  WHAT WE ARE SAYING IS THAT

5    THE STRUCTURE THAT WAS SET UP BY SAMSUNG FOR

6    COLLECTING DOCUMENTS, RELYING TOO HEAVILY ON THE

7    INVENTORS, IS JUST RIPE FOR PROBLEMS.

8           WE DIDN'T IDENTIFY A SITUATION WHERE WE

9    HAD A SMOKING GUN FROM A DEPOSITION WHERE THE

10   INVENTOR SAYS YEAH, I FOUND A REALLY BAD ONE, I

11   DIDN'T FORWARD IT.

12          WHAT WE DID FIND WAS TERMS THAT WE

13   PROPOSED IT WAS PRETTY AD HOC SPORADIC AND OFTEN

14   TIMES HAD TO BE CORRECTED IN ORDER TO PREPARE FOR

15   THE DEPOSITION.

16          THE COURT:  SO MR. WALDEN, IS YOUR

17   COMPLAINT OR CONCERN ABOUT THIS PROTOCOL OR LACK OF

18   PROTOCOL LIMITED TO INVENTOR CUSTODIANS OR IS IT

19   MORE GENERAL THAN THAT?  DOES IT APPLY TO OTHER

20   INDIVIDUALS AT SAMSUNG WITH RELEVANT INFORMATION?

21          MR. WALDEN:  IT WOULD APPLY BUT WE DON'T

22   HAVE TESTIMONY THAT THAT'S BEEN THE METHOD OF

23   COLLECTING.

24          AGAIN, WE HAD A SLEW OF INVENTOR

25   DEPOSITIONS THAT OCCURRED PURSUANT TO THE ORDER.

1          SO OUR MOTION IS SPECIFIC TO THE

2     INVENTORS, BUT IN GENERAL WE WOULD EXPECT THAT

3     DOCUMENTS COLLECTED FROM ANY WITNESS FILES WOULD BE

4     REFLECTED IN A MORE ROBUST MANNER.

5          THE COURT:  ALL RIGHT.

6          BEFORE WE TURN TO THE SECOND AND THIRD

7     ELEMENTS OF YOUR MOTION I WOULD LIKE TO HEAR FROM

8     SAMSUNG, THEN WE WILL PICK THESE UP ONE AT A TIME.

9          WHO WANTS TO SPEAK ON BEHALF HALF OF

10    SAMSUNG?

11         MS. MAROULIS:  MS. KASSABIAN.

12         MS. KASSABIAN:  GOOD MORNING, YOUR HONOR.

13    I THINK IT'S STILL MORNING.

14         SO I'M STILL WAITING TO HEAR SOMETHING

15    THAT PERSUADES ME THAT THERE WAS ANYTHING WRONG

16    WITH SAMSUNG'S INVENTOR COLLECTION.

17         AND I THINK YOUR HONOR'S QUESTIONS WERE

18    EXACTLY RIGHT ASKING MR. WALDEN TO EXPLAIN WHAT WE

19    WOULD ENVISION AS BEING THE IDEAL OR MODEL OR,

20    FRANKLY, REQUIRED WAY TO SEARCH CUSTODIAL

21    DOCUMENTS.

22         I THINK SAMSUNG DID EVERYTHING THAT ANY

23    PARTY TYPICALLY DOES IN THIS SITUATION.  THERE

24    WERE, AS DETAILED IN MS. ROSA KIM'S, DECLARATION

25    THERE WERE --

1          THE COURT:  IT IS MS. KIM?  I APOLOGIZE.

2          MS. KASSABIAN:  IT IS MS. KIM.

3          ALSO AS DETAILED IN MS. CHAN'S

4     DECLARATION, MY COLLEAGUE AT QUINN EMANUEL, BOTH

5     INSIDE AND OUTSIDE COUNSEL WAS HEAVILY INVOLVED

6     FROM MINUTE ONE IN THESE COLLECTIONS, INCLUDING ME

7     PERSONALLY AND MANY MEMBERS OF MY FIRM AND MANY

8     MEMBERS OF SAMSUNG'S IN-HOUSE COUNSEL TEAM.

9          THIS WAS A GLOBAL EFFORT.  IT WAS A TEAM

10    COLLABORATIVE EFFORT BOTH IN TERMS OF LOCATING

11    INVENTORS, VETTING AND COMING UP WITH SEARCH TERMS,

12    COMMUNICATING WITH THE INVENTORS -- AND I DON'T

13    WANT TO GO INTO, OBVIOUSLY WE ARE GETTING VERY

14    DANGEROUSLY CLOSE TO ISSUES OF PRIVILEGE, BUT I CAN

15    CERTAINLY TELL YOU WHAT WAS COLLECTED AND GENERALLY

16    DESCRIBE THAT COMMUNICATIONS WERE HAD.

17         BUT THERE WERE VERY THOROUGH

18    INVESTIGATIONS AS DETAILED IN THE TWO DECLARATIONS

19    WE SUBMITTED TO DETERMINE WHERE DOCUMENTS WOULD BE,

20    AND COUNSEL WAS INVOLVED IN EVERY STEP OF THAT

21    PROCESS.

22         IS IT INAPPROPRIATE TO ASK ENGINEERS TO

23    RUN SEARCHES ON THEIR LAPTOPS?  I THINK NOT.  I

24    THINK THEY ARE PROBABLY THE MOST SKILLED PERSON TO

25    DO SUCH A THING.  IS IT INAPPROPRIATE TO ASK AN

1    ENGINEER, A PHD WHO IS WORKING ON HIGHLY TECHNICAL

2    AND COMPLICATED SUBJECT MATTER, TO HELP COUNSEL

3    POINT COUNSEL TO WHERE THE RELEVANT DOCUMENTS WOULD

4    BE?  I THINK THAT'S REQUIRED.

5              I THINK THERE'S NO WAY AN ATTORNEY COULD

6    SIMPLY STUMBLE THROUGH ONE OF THESE LAPTOPS AND

7    FIGURE OUT WHICH SETS OF TECHNICAL DOCUMENTS ARE

8    RELEVANT.

9              I THINK YOU WOULD BE REMISS NOT TO

10   INVOLVE THE INVENTOR VERY HEAVILY IN THAT MANUAL

11   COLLECTION.

12             SO THAT'S EXACTLY WHAT WE DID.  THERE'S

13   AN ACCUSATION THAT COUNSEL WASN'T INVOLVED; THAT'S

14   UNTRUE.  AND WE SUBMITTED SWORN DECLARATIONS ABOUT

15   THAT.  THERE'S AN ACCUSATION THAT THE SEARCHES WERE

16   NOT SUPERVISED; THAT IS ALSO UNTRUE.

17             THE COURT:  WHEN YOU SAY SEARCHES WERE

18   SUPERVISED, IS IT ACCURATE, ARE WE ALL ON THE SAME

19   PAGE HERE AS TO HOW THESE SEARCHES WERE EXECUTED?

20             IS IT IN FACT TRUE THAT FOR EACH AND

21   EVERY ONE OF THESE INVENTORS WE ARE TALKING ABOUT

22   THE INVENTORS WERE RESPONSIBLE FOR TAKING THE TERM

23   AND USING THE MICROSOFT TOOL OR ANOTHER LIKE IT IN

24   ORDER TO EXECUTE THE SEARCH, IS THAT AN ACCURATE

25   STATEMENT OF WHAT HAPPENED?

1            MS. KASSABIAN:  YES.  THE INVENTORS DID

2     THE TYPING.

3            AND I HEARD MR. WALDEN SAY THAT'S NOT

4     WHAT CONCERNS HIM.  WHAT CONCERNS HIM IS THAT HE IS

5     THEN SUPPOSING OR SPECULATING THAT THESE INVENTORS

6     SOMEHOW HAD THE TIME AND THE INCLINATION TO SIT

7     DOWN AND REVIEW THE TENS OF HUNDREDS OF THOUSANDS

8     OF HITS THAT THESE SEARCH TERMS RETRIEVED AND

9     NEFARIOUSLY PULL OUT RELEVANT DOCUMENTS AND NOT

10    PASS THEM ON TO COUNSEL PURSUANT TO THE GUIDANCE

11    THEY WERE GIVEN BY COUNSEL.

12            AND THAT'S NOTHING BUT UTTER AND PURE

13    SPECULATION.  THAT IS NOT WHAT HAPPENED.  HE HAS NO

14    BASIS TO SAY THAT.  APPLE HAS NO BASIS TO SPECULATE

15    THAT.

16            IF THAT WERE TRUE, THEN, YOU KNOW, APPLE

17    WOULD HAVE TO THEN COME AND EXPLAIN TO US AND MAYBE

18    REDO ALL OF ITS ASCERTAINS BECAUSE, WHO KNOWS,

19    MAYBE THERE'S SOME APPLE INVENTOR WHO DIDN'T TURN

20    OVER A NOTEBOOK OR DIDN'T TURN OVER A FILE OR TOOK

21    A PAGE OF A PRINTOUT OUT BEFORE HANDING IT OVER TO

22    COUNSEL.

23            THAT'S NOT A BASIS TO ASK SAMSUNG TO

24    SPEND ANOTHER, I THINK THIS COLLECTION TOOK TWO

25    MONTHS, MANY, MANY WEEKS, TO ASK US HERE WE ARE IN

82

1    LATE JANUARY, TO GO BACK AND REDO ALL THAT HARD

2    WORK.

3              SAMSUNG PRODUCED 122,000 PAGES OF

4    INVENTOR DOCUMENTS.  I HEARD MR. WALDEN SAY THAT

5    APPLE'S INVENTOR DOCUMENT PRODUCTION WAS LARGER.  I

6    DON'T THINK THAT'S TRUE.  BUT IF MR. WALDEN CAN

7    PROVIDE A NUMBER, I GUESS WE CAN COMPARE.

8              I KNOW THAT APPLE'S ENTIRE PRODUCTION IS

9    250,000 PAGES NOT INCLUDING SEVERAL HUNDRED

10   THOUSAND PAGES OF GIBBERISH WE GOT FROM ONE

11   CUSTODIAN.

12             BUT IN ANY EVENT, TO PRODUCE 122,000

13   DOCUMENTS USING MANUAL COLLECTION EFFORTS AND

14   SEARCH TERMS, YOU CAN IMAGINE HOW MANY DOCUMENTS

15   WERE ACTUALLY COLLECTED IN A SHORT PERIOD OF TIME.

16             I DON'T HAVE THE EXACT NUMBER, BUT I

17   SUSPECT IT WAS IN THE NEIGHBORHOOD OF HALF A

18   MILLION, A MILLION SOMETHING, CERTAINLY MUCH LARGER

19   THAN THE ULTIMATE SET OF DOCUMENTS THAT WAS

20   PRODUCED BECAUSE, OF COURSE, THERE'S A REVIEW

21   PROCESS.

22             THE COURT:  I WANT TO FOCUS ON, IF I

23   MAY --

24             MS. KASSABIAN:  ABSOLUTELY, YOUR HONOR.

25             THE COURT:  -- ON WHAT FACTS WE CAN AGREE

1   UPON IN TERMS OF WHAT ACTUALLY HAPPENED.

2         THE LEGAL SIGNIFICANCE OF THOSE FACTS IS

3   I SUSPECT AN ISSUE FOR ME TO MAKE A CALL ON.

4         BUT YOU HAVE CONFIRMED THAT AS TO WHO

5   ACTUALLY EXECUTED THE SEARCH, IT WAS IN FACT THE

6   CASE THAT THE INVENTORS WERE RESPONSIBLE FOR

7   EXECUTING THE SEARCH IN EACH AND EVERY INSTANCE; IS

8   THAT FAIR?

9         MS. KASSABIAN:  ARE WE TALKING ABOUT THE

10  SEARCH TERMS OR THE MANUAL COLLECTION?

11        THE COURT:  THE SEARCH TERMS ON THE

12  ELECTRONIC DATA.

13        MS. KASSABIAN:  OKAY.

14        BECAUSE CERTAINLY THE PRIMARY COLLECTION

15  METHOD WAS TO ASK THE INVENTORS, TELL US WHERE

16  THESE DOCUMENTS ARE.

17        THE COURT:  RIGHT.  I'M PAST COLLECTION,

18  I'M TALKING ABOUT APPLYING SEARCH TERMS.

19        MS. KASSABIAN:  YES, ABSOLUTELY.

20        THEY PUNCHED IN THE TERMS --

21        THE COURT:  OKAY.

22        MS. KASSABIAN:  -- WITH GUIDANCE FROM

23  COUNSEL.  THERE WERE MEETINGS, THERE WERE

24  EXPLANATIONS AS TO HOW TO RETURN THE SEARCHES AND

25  THEN THERE WERE SEARCH TERMS GIVEN TO THEM, AND IT

84

1    WAS A COLLABORATIVE PROCESS.

2                THE COURT:  OKAY.

3                SO THEY RAN THE TERMS, THAT'S ALL I NEED

4    TO KNOW ON THAT ISSUE.

5                MS. KASSABIAN:  ABSOLUTELY.

6                THE COURT:  AS TO FORWARDING POSITIVE

7    HITS, WERE THE INVENTORS RESPONSIBLE FOR FORWARDING

8    THOSE?

9                MS. KASSABIAN:  THEY WERE RESPONSIBLE FOR

10   HANDING EVERYTHING OVER TO COUNSEL, ABSOLUTELY.  I

11   MEAN, THROUGH AN UPLOAD PROCESS.

12               I MEAN, WE ARE TALKING ABOUT COMPUTER

13   ENGINEERS HERE, THEY CAN HANDLE IT.

14               SO INSTRUCTIONS WERE GIVEN TO PASS THE

15   DOCUMENTS ON.  DID A LAWYER WALK OVER TO THE WORK

16   STATION AND, YOU KNOW, STICK IN A THUMB DRIVE AND

17   DO THE FILE TRANSFER THEMSELVES?  I DON'T FRANKLY

18   KNOW.  I'M NOT SURE IF THAT OCCASIONALLY HAPPENED.

19               I DO KNOW THAT THE INSTRUCTIONS WERE,

20   GIVE THE HITS TO COUNSEL.  AND THEN THE INVENTORS

21   WERE NOT GIVEN THE DISCRETION TO GO THROUGH THOSE

22   HITS AND DECIDE WHAT THEY THOUGHT WAS RELEVANT.

23   THAT'S WHAT THE MANUAL COLLECTION WAS FOR, RIGHT?

24               SO THE MANUAL COLLECTION WAS THE STAGE

25   WHERE THEY SAY TO THE WITNESS, DO YOU KEEP FOLDERS

1     AND FILES ON YOUR COMPUTER REGARDING THE '941

2     INVENTION?  YES, OF COURSE I DO.  OKAY.  GIVE US

3     THOSE.

4             THEN SEPARATELY, JUST TO MAKE SURE

5     EVERYTHING WAS CAUGHT, BECAUSE WE ALL OCCASIONALLY

6     SAVE A DOCUMENT IN THE WRONG PLACE, THAT'S WHEN THE

7     SEARCH TERMS CAME IN.

8             SO TO BE CLEAR, THE MANUAL COLLECTIONS I

9     THINK TYPICALLY ARE MORE ACCURATE AND MORE RELIABLE

10    WHEN YOU ARE DEALING WITH THESE TYPES OF TECHNICAL

11    DOCUMENTS.

12            BUT IN ANY EVENT, BELT AND SUSPENDERS WAS

13    APPLIED AND THAT WAS THE SEARCH TERM TECHNIQUE, AND

14    THOSE SEARCH TERMS WERE DISCLOSED AND THEY WERE,

15    LIKE I SAID, VERY CLEARLY VETTED.

16            IT WAS A COLLABORATIVE EFFORT BOTH IN

17    TERMS OF COUNSEL'S VIEW OF WHAT TERMS MIGHT HIT

18    RELEVANT DOCUMENTS AND THE INVENTOR'S VIEW OF WHAT

19    TERMS THEY TYPICALLY USED AND WHETHER THEY USED

20    THOSE TERMS IN KOREAN OR IN ENGLISH GIVEN THE FACT

21    THAT THE SSO COMMUNITY COMMUNICATES IN ENGLISH.

22    OFTEN TIMES WE FOUND THAT IT WAS ACTUALLY ENGLISH

23    TERMS BEING USED FOR SOME OF THE THESE TECHNICAL

24    TERMS.

25            THE COURT:  ALL RIGHT.

1          ON THE ISSUE OF THE TERMS THEMSELVES, IS

2     IT TRUE THE '055 AND '871 PATENTS WERE NOT INCLUDED

3     AMONG THE SEARCH TERMS?

4          MS. KASSABIAN:  THERE WAS NOTHING TO

5     SEARCH.  THOSE INVENTORS ARE FORMER EMPLOYEES AND

6     THEY HAVE NOT BEEN ABLE TO LOCATE THEM.  SO THERE

7     WAS NO DATA SET TO APPLY THE SEARCH TERMS TO.

8          THE COURT:  SO DID THE UNIVERSE OF TERMS

9     THAT WERE USED TO CALL, COLLECT THE MATERIAL AND TO

10    POTENTIALLY RESPONSIVE MATERIAL, WAS THAT UNIVERSE

11    DIFFERENT FROM ONE INVENTOR TO THE NEXT?

12         MS. KASSABIAN:  YOU MEAN THE SEARCH

13    TERMS?

14         THE COURT:  YEAH.

15         MS. KASSABIAN:  ABSOLUTELY, YEAH.

16    BECAUSE IT'S VERY DIFFERENT TECHNOLOGY.

17         SO THERE WERE SETS OF SEARCH TERMS

18    DEVELOPED, I MEAN, THIS WAS A VERY COMPLEX AND VERY

19    TIME CONSUMING PROCESS.

20         BUT YES, THERE WERE SEPARATE SEARCH TERMS

21    FOR EACH INVENTOR BECAUSE NATURALLY THERE WERE

22    DIFFERENT WORDS INVOLVED IN TERMS OF THE

23    TECHNOLOGY, THE PATENT, WHETHER THERE WAS SSO

24    INVOLVEMENT AND THAT TYPE OF THING.

25         THE COURT:  SO YOUR POINT IS THE '055 AND

1     '871 WERE CONSCIOUSLY DISREGARDED BECAUSE THOSE

2     INVENTORS ARE NO LONGER EMPLOYED BY THE COMPANY?

3              MS. KASSABIAN:  THERE WAS NO LAPTOP OR

4     COMPUTER TO SEARCH.

5              THE COURT:  ARE THEY CURRENTLY EMPLOYED?

6              MS. KASSABIAN:  WE DON'T KNOW WHERE THEY

7     ARE, WE'VE LOOKED.  I ASSUME APPLE HAS LOOKED TOO.

8              THE COURT:  I JUST WANT TO KNOW THE

9     FACTS.  IF YOU HAVE LOOKED THEN CAN YOU CONFIRM FOR

10    ME THEY ARE NO LONGER EMPLOYED BY SAMSUNG?

11             MS. KASSABIAN:  THEY ARE DEFINITELY

12    FORMER EMPLOYEES, BUT SAMSUNG WAS ABLE ON LOCATE

13    SOME FORMER EMPLOYEES AND RAN SEARCHES ON THEIR

14    COMPUTERS AND COLLECTED MANUAL DOCUMENTS.

15             BUT FOR '055 AND '871, NO ONE HAS BEEN

16    ABLE TO LOCATE THE INVENTORS.  SO IT ISN'T THAT

17    THOSE TERMS JUST WEREN'T CREATED, BUT THERE WAS

18    NOTHING TO RUN THEM AGAINST.

19             SO WHAT WE DID INSTEAD --

20             THE COURT:  AND THEIR ELECTRONIC DATA WAS

21    NOT FOUND AFTER A REASONABLE SEARCH?  THE HARD

22    DRIVES AREN'T SITTING AROUND IN A LOCKER SOMEWHERE?

23             MS. KASSABIAN:  RIGHT.  NO, NO.

24             I DON'T HAVE THE EXACT NUMBER OF YEARS

25    BUT I THINK IT WAS SOMETHING IN THE NEIGHBORHOOD OF

1    6 TO 10 YEARS AGO AS TO THE RELEVANT TIME PERIOD

2    FOR THESE PATENTS.

3              AND OF COURSE LIKE MOST TECH COMPANIES,

4    OVER A FEW YEARS PEOPLE GET NEW COMPUTERS.  WHEN

5    PEOPLE LEAVE THE COMPANY, OBVIOUSLY THERE ARE

6    PROCEDURES FOR RETAINING OR DISPOSING OF THE WORK

7    PRODUCT.

8              THIS WAS SO LONG AGO THAT THEIR LAPTOPS

9    WERE NOT STILL AROUND.  BUT IT'S NOT THAT NOTHING

10   WAS DONE ON THOSE PATENTS, THERE WERE MANUAL

11   SEARCHS OF CENTRAL SERVERS TO SEE IF ANYTHING COULD

12   BE LOCATED FOR THOSE TWO, AND SOME DOCUMENTS WERE

13   LOCATED AND SOME WERE PRODUCED.

14             THE COURT:  ALL RIGHT.

15             WERE THERE KOREAN SEARCH TERMS INCLUDED?

16             MS. KASSABIAN:  YES.

17             I'M CERTAIN OF ONE WHICH WE DISCLOSED

18   BECAUSE DURING THE PROCESS OF DEVELOPING THE SEARCH

19   TERMS, THAT DISCUSSION WAS HAD WITH EVERYONE.

20             AND, YOU KNOW, THE TRUTH OF THE MATTER IS

21   THAT A LOT OF THESE INDIVIDUALS WORK ACROSS BORDERS

22   INTERNATIONALLY WITH STANDARD SETTING

23   ORGANIZATIONS, WITH WORKING GROUPS, AND THOSE

24   BODIES TEND TO COMMUNICATE IN ENGLISH.

25             AND SO WHEN WE LEARNED THAT THERE WAS A

1    TERM THAT WAS TYPICALLY USED IN KOREAN, OF COURSE

2    WE RAN THAT TERM.  THESE ARE KOREAN SPEAKING

3    PEOPLE.  THERE WAS NO INTENTIONAL DECISION TO

4    EXCLUDE CERTAIN TERMS IN THE TRANSLATION TO HIDE

5    DOCUMENTS.

6              WE DIDN'T INCLUDE KOREAN SEARCH TERMS

7    WHERE WE LEARNED THROUGH THE MULTIPLE INTERVIEWS

8    WITH THESE PEOPLE THAT THEY DID NOT USE THOSE TERMS

9    IN ANY LANGUAGE BUT ENGLISH.

10             SO IT WAS A THOUGHTFUL PROCESS.  THIS WAS

11   NOT SLOPPY, THIS WAS NOT INTENTIONALLY NEFARIOUS,

12   IT WAS CAREFUL AND THOUGHTFUL.

13             THE COURT:  ALL RIGHT.

14             LET'S LOOK AT HOW CAREFUL AND THOUGHTFUL

15   IT REALLY WAS.

16             IF THE SEARCH TERMS -- WELL, LET ME ASK

17   YOU THIS, DID YOU COMPUTE OR RUN THE SEARCH TERMS

18   ON THE DATA SETS, LET'S FOCUS ON THE ELECTRONIC

19   DATA FOR THE MOMENT, BEFORE OR AFTER THOSE TERMS

20   WERE DISCLOSED TO APPLE?

21             MS. KASSABIAN:  THAT WAS ALL DONE BEFORE

22   BECAUSE THE PARTIES ONLY AGREED TO EXCHANGE SEARCH

23   TERMS AFTER YOUR HONOR'S SEPTEMBER, I THINK IT WAS

24   IN THE SEPTEMBER 28TH ORDER WHERE YOUR HONOR

25   INDICATED THAT THAT WOULD BE A GOOD IDEA.

1           AND SO WE STARTED THE MEET AND CONFER

2    PROCESS WITH APPLE, AND SAMSUNG PROPOSED THAT IT BE

3    DONE AT LEAST ON SOMEWHAT OF A REGULAR BASIS.  WE

4    SUGGESTED MONTHLY.

5           AND SO THERE WAS AN INITIAL EXCHANGE

6    CONSISTENT WITH YOUR HONOR'S ORDER ON OCTOBER 7TH

7    WHICH WAS THE PRODUCTION DATE FOR YOUR LAST ORDER.

8           AND THEN DURING DISCUSSIONS WITH APPLE IN

9    NOVEMBER, LATE OCTOBER AND INTO NOVEMBER, WE

10   SUGGESTED HEY, YOU KNOW, WE SHOULD KEEP EXCHANGING

11   BECAUSE THE PARTIES ARE CONTINUING TO DISCOVER NEW

12   CUSTODIANS AND RUN NEW SEARCHES, SO THESE ARE GOING

13   TO HAVE TO BE UPDATED.

14          SO WE EXCHANGED UPDATED SEARCH TERMS IN

15   LATE NOVEMBER, THE VERY END OF NOVEMBER, APPLE GAVE

16   US A SET I THINK IN MID NOVEMBER.  WE GAVE OURS IN

17   LATE NOVEMBER.

18          THE COURT:  AND WERE THESE SETS OF TERMS

19   EXCHANGED IN NOVEMBER BEFORE OR AFTER --

20          MS. KASSABIAN:  AFTER THE DEPOSITIONS --

21          THE COURT:  AFTER THE SEARCH HAD BEEN

22   CONDUCTED?

23          MS. KASSABIAN:  OH, YES, YES.  AND THAT'S

24   WHAT APPLE DID AS WELL.

25          THE PARTIES HAVE NOT, ALTHOUGH IT

1    CERTAINLY IS DONE IN SOME CASES, AND FRANKLY, YOU

2    KNOW, CAN BE A GOOD IDEA IF THE PARTIES ARE

3    SOMEWHAT COOPERATIVE WITH EACH OTHER.

4            THE COURT:  SO IF YOU ARE NOT COOPERATING

5    WE WILL JUST ALL THROW IT AT THE COURT?

6            MS. KASSABIAN:  WELL CERTAINLY IN SOME

7    CASES THE PARTIES EXCHANGED TERMS BEFOREHAND.

8            THE COURT:  WHY WOULDN'T THAT MAKE SENSE?

9            I DON'T UNDERSTAND THE RESISTANCE IN OUR

10   BUSINESS HERE, A TYPE OF TRANSPARENCY.  HOW COULD

11   THAT NOT BE A GOOD IDEA?

12           MS. KASSABIAN:  I DON'T KNOW IF ANYONE

13   AFFIRMATIVELY DECIDED NOT TO DO THAT.  I THINK THIS

14   CASE IS JUST BARRELING THROUGH SPACE AT LIGHT SPEED

15   AND APPLE'S INVENTORS WERE DEPOSED IN OCTOBER,

16   INCLUDING ON DATES BEFORE, RIGHT AROUND THE TIME

17   YOUR HONOR'S ORDER ISSUED, SO THEY HAD ALREADY DONE

18   THEIR SEARCHES AND STARTED --

19           THE COURT:  SO I CAN UNDERSTAND AND

20   PERHAPS FORGIVE A FAILURE TO DISCLOSE IN ADVANCE

21   BEFORE I MADE IT CLEAR OF MY VIEWS ON THE SUBJECT,

22   ALTHOUGH I DON'T THINK I HAVE A PARTICULARLY UNIQUE

23   PERSPECTIVE ON THIS, IT STRIKES ME AS COMMON SENSE.

24           BUT AFTER THAT DATE, WHY WOULDN'T YOU

25   MAKE THAT DISCLOSURE BEFORE YOU GO THROUGH THE

```
1    TROUBLE AND EXPENSE OF RUNNING THE SEARCH?

2            MS. KASSABIAN:  I THINK THAT'S SOMETHING

3    THE PARTIES SHOULD HAVE AGREED TO BUT IT DIDN'T

4    HAPPEN.

5            AS I UNDERSTAND IT APPLE RAN ALL OF ITS

6    SEARCHES BEFORE YOUR HONOR'S ORDER ISSUED.  SO WE

7    GOT THE TERMS AFTER THEY HAD BEEN RUN, AND WE

8    ACTUALLY HAD SOME BONES TO PICK WITH THEIR

9    SEARCHES, NOT ON TERMS, WE DIDN'T ARM SHARE OR

10   QUARTERBACK THEIR TERMS SO MUCH AS WE WERE

11   CONCERNED WITH THE DATES.  THERE WERE SOME DATE

12   ISSUES WITH THEIR INVENTOR SEARCHES AND WE DID HAVE

13   SOME MEET AND CONFER EFFORTS ON THAT.

14           THE COURT:  IS IT ACCURATE THAT NO

15   DOCUMENTS HAVE BEEN PRODUCED FROM THE FILES OF 15

16   OUT OF 32 INVENTORS?

17           MS. KASSABIAN:  YES, THAT'S RIGHT.

18           I BELIEVE THAT'S THE RIGHT NUMBER, BUT

19   IT'S ALL DETAILED IN THE KIM DECLARATION.  FOR

20   EVERY PERSON THAT THEY TOOK ISSUE WITH, YOU KNOW,

21   THERE IS A REASON OR AN EXPLANATION.

22           TYPICALLY, IT'S TIME AND AGE.  A LOT OF

23   THESE SAMSUNG PATENTS ARE OLD.  AND THE RELEVANT

24   TIME PERIOD FOR INVENTION, CONCEPTION, REDUCTION TO

25   PRACTICE, HAS LONG, LONG PASSED.  THESE FOLKS HAVE
```

1    MOVED ON, SOME TO OTHER COMPANIES, SOME ARE STILL

2    AT SAMSUNG BUT THEY'VE HAD SIX LAPTOPS BETWEEN THEN

3    AND NOW.  SOME INDIVIDUALS CHOOSE TO SAVE THEIR

4    DATA FOREVER AND TRANSFER FILES TO THEIR NEW

5    LAPTOPS AND SOME DON'T.

6            BUT EVERYONE WAS CHECKED AND IF THERE

7    WERE RELEVANT DOCUMENTS OR DOCUMENTS THAT HAD A HIT

8    ON THE SEARCH TERMS, THEY WERE PRODUCED.  THERE'S

9    NOTHING MORE THAT CAN BE DONE.  IT'S NOT THAT

10   PEOPLE WERE NOT CONSULTED OR THAT PEOPLE'S

11   DOCUMENTS WEREN'T SEARCHED, IT'S JUST THAT SOME

12   PEOPLE LITERALLY WITH THE PASSAGE OF TIME DID NOT

13   STILL HAVE ANY RELEVANT DOCUMENTS.

14           THE COURT:  ALL RIGHT.

15           DO YOU HAVE ANYTHING FURTHER YOU WISH TO

16   ADD ON THIS PARTICULAR ISSUE?

17           MS. KASSABIAN:  YES.

18           I GUESS I WOULD JUST MAKE A FEW POINTS.

19           I GUESS WHAT TROUBLES ME AND CONFUSES ME

20   ABOUT THIS ENTIRE MOTION IS THAT WE'VE CAREFULLY

21   AND THOROUGHLY DISCLOSED WHAT HAPPENED, HOW THESE

22   SEARCHES WERE CONDUCTED.  AND FROM WHAT I CAN TELL

23   IT'S EXACTLY THE WAY APPLE GATHERS ITS DOCUMENTS IN

24   TERMS OF INTERVIEWS, SEARCH TERMS, TERMS THAT ARE

25   VETTED AND THEN A SET IS DECIDED UPON.

1          AND I COULD UNDERSTAND THE MOTION, I

2     SUPPOSE IF THEY WERE ABLE TO POINT TO DOCUMENTS AND

3     SAY HEY, YOU KNOW WHAT, SPECIFIC DOCUMENTS, ACTUAL

4     THINGS ARE MISSING.

5          BUT THERE'S NOTHING LIKE THAT IN THEIR

6     MOTION.  THE ONLY TIME THEY GET CLOSE TO THAT

7     SUGGESTION IS ABOUT SSO DOCUMENTS.  THEY DON'T

8     REALLY ACCUSE THAT THE INVENTION, CONCEPTION,

9     REDUCTION TO PRACTICE TYPE OF DOCUMENTS ARE

10    MISSING.

11         THEY DON'T SAY THAT ANYWHERE IN THEIR

12    MOTION AND FOR GOOD REASON, BECAUSE OUR SEARCH

13    TERMS WOULD HAVE CAUGHT THOSE AND WE PRODUCED

14    122,000 PAGES OF THAT.

15         THE CLOSEST THEY GET IN THEIR MOTION IS

16    THEY SAY WELL, WE THINK SSO SEARCH TERMS SHOULD

17    HAVE BEEN USED.

18         AND I THINK THAT'S A RED HERRING FOR TWO

19    REASONS.

20         NUMBER ONE, SSO DOCUMENTS WERE CAUGHT.

21         AND IN THE EXHIBITS TO THESE MOTIONS YOU

22    WILL FIND A JANUARY 6TH, 2012, LETTER WHERE -- FROM

23    SAMSUNG -- WHERE WE LAID OUT BATES NUMBERS OF SSO

24    DOCUMENTS THAT WERE IN THESE INVENTORS'

25    COLLECTIONS.

1          BUT SECONDLY, IN A SEPARATE PART OF

2     MOTION THAT WE ARE GOING TO GET TO NEXT, SAMSUNG

3     HAS AGREED TO SUPPLEMENT ITS PRODUCTION OF SSO

4     RELATED DOCUMENTS.

5          SO TO THE EXTENT -- THE ONLY THING TO THE

6     EXTENT IT IDENTIFIED ANYTHING THAT'S MISSING, THAT

7     ARGUMENT IS ESSENTIALLY MOOT BECAUSE THE SSO

8     DOCUMENT ISSUE IS ALREADY COVERED IN SAMSUNG'S

9     AGREEMENT TO GO BACK AND MAKE SURE THAT IT HAS

10    COLLECTED AND PRODUCED ALL COMMUNICATIONS BETWEEN

11    THE INVENTORS OF THE -- THE INVENTORS WHO WERE

12    INVOLVED IN THE RELEVANT THREE SPECIFICATIONS THAT

13    ARE AT ISSUE IN THE COUNTERCLAIM AND THE SSO

14    ORGANIZATIONS.

15          SO THAT PART OF THE --

16          THE COURT:  SO YOU HAVE NO OBJECTION OR

17    YOU DO NOT OBJECT TO PRODUCING SSO RELATED

18    COMMUNICATIONS AND OTHER DOCUMENTS IN THE FILES OF

19    THE INVENTORS?

20          MS. KASSABIAN:  WE DON'T, YOUR HONOR.

21          AND IN THE SSO SECTION YOU WILL SEE --

22          THE COURT:  AND THOSE HAVEN'T BEEN

23    PRODUCED THUS FAR.

24          MS. KASSABIAN:  NO, THAT'S NOT CORRECT.

25    AS I EXPLAINED, WE DID PRODUCE --

1        THE COURT:  BUT YOU DIDN'T INCLUDE

2   SPECIFIC SSO RELATED TERMS IN YOUR SEARCH TERMS.

3        MS. KASSABIAN:  SOME TERMS WERE, BUT THE

4   PROBLEM IS THAT SOME OF THE THESE SSO TERMS, IF YOU

5   SEARCH 3GPP, IT'S INSANE.  IT WOULD BE WILDLY OVER

6   INCLUSIVE AND THAT'S NOT THE RIGHT WAY TO DO IT.

7        THERE ARE WAYS YOU CAN DO THAT, AND WE'VE

8   AGREED IN THE MOTION WITH RESPECT TO THE INVENTORS

9   OF THE SPECIFICATIONS, THE INVENTORS WHO HAVE

10  RELEVANT KNOWLEDGE AND INFORMATION REGARDING THE

11  THREE SPECIFICATIONS WHICH IS NOT ALL 32 OF THE

12  INVENTORS, IT'S A SUBSET WITH RESPECT TO THOSE

13  INVENTORS WHO HAD SSO INVOLVEMENT, WITH REGARD TO

14  THE THREE SPECIFICATIONS AT ISSUE, ABSOLUTELY WE'VE

15  AGREED ALREADY IN OUR BRIEF AND IN MEET AND CONFER

16  CORRESPONDENCE THAT SHOULD HAVE AVERTED THIS MOTION

17  TO SUPPLEMENT OUR PRODUCTION TO THE EXTENT ANY OF

18  THOSE COMMUNICATIONS ARE MISSING.

19        THE COURT:  ALL RIGHT.

20   THANK YOU VERY MUCH.

21        MS. KASSABIAN:  THANK YOU.

22        THE COURT:  MR. WALDEN, ANY BRIEF

23  REBUTTAL BEFORE WE TURN TO THE SSO ISSUE IN ERNEST?

24        MR. WALDEN:  CERTAINLY.

25        JUST TO ADDRESS A COUPLE OF POINTS FROM

97

1    MS. KASSABIAN.

2              IT'S NOT THE CASE THAT WE COLLECTED

3    DOCUMENTS AND THAT OUR COLLECTION HAS BEEN THE SAME

4    AND THAT WE RAN SEARCHES THE SAME.

5              LIKE I SAID EARLIER, WE THINK A GOOD

6    COLLECTION IS YOU FIND THE RIGHT DOCUMENTS, THEN

7    YOU -- THE RIGHT UNIVERSE OF DOCUMENTS, THEN YOU

8    COLLECT THOSE DOCUMENTS.  IF IT MEANS MAKING A COPY

9    OF A HARD DRIVE, THAT'S WHAT WE DID.  IF IT MEANS

10   MAKING COPIES OF HARD DOCUMENTS, THAT'S WHAT WE DID

11   AS WELL.

12             AND WE AGREE WITH YOU IN A SENSE THAT IT

13   IS A BIT PUTTING THE CART BEFORE THE HORSE TO RUN

14   YOUR SEARCHES, HAVE THE DEPOSITIONS, THEN DISCLOSE

15   THE SEARCH TERMS, BUT THAT HAS BEEN THE MODUS OF

16   THIS CASE.

17             IN THAT CASE WHERE WE DISCLOSED SEARCH

18   TERMS, AND THEY'VE HAD ISSUES WITH DATE

19   RESTRICTION, WE'VE COLLECTED THE DOCUMENT.  SO FOR

20   US TO GO BACK AND RERUN THE SEARCHES IS

21   STRAIGHTFORWARD.  WE'VE GOT THE DOCUMENTS, RERUN

22   THE SEARCH, REPRODUCE.

23             I THINK PART OF THE RESISTANCE HERE ON

24   THEIR BOTH RESISTING THE IDEA THAT THEY'VE

25   COLLECTED IMPROPERLY BUT ALSO THAT THEY WOULD NEED

1    TO RUN ADDITIONAL SEARCH TERMS, THEY DIDN'T DO IT

2    THAT WAY.  THEY LEFT IT UP ON THE INVENTOR, SO NOW

3    IF THEY HAVE TO RUN ADDITIONAL SEARCH TERMS, THEY

4    HAVE TO GUESS, GO BACK TO THE INVENTORS UNDER THEIR

5    WAY AND DO THAT.

6           SO FOR EXAMPLE MS. KASSABIAN SAYS HEY, WE

7    AGREED TO PRODUCE ADDITIONAL SSO DOCUMENTS.  THEY

8    HAVEN'T SAID THEY WOULD AGREE TO RUN ADDITIONAL

9    TERMS USING SSO TERMS.

10          SO WE ARE NOT EVEN SURE WHAT THAT MEANS.

11   WE WILL GO BACK TO THE INVENTORS AND ASK IF THEY

12   HAVE ADDITIONAL DOCUMENTS THAT ARE RELEVANT.

13          THE I WANTED TO ADDRESS REAL QUICKLY THE

14   ISSUE OF FOREIGN LANGUAGE.  AGAIN, WE GOT ONE TERM

15   THAT WE WERE TOLD THAT THEY RAN A KOREAN LANGUAGE

16   SEARCH EQUIVALENT FOR.  SO WE HAVEN'T BEEN INFORMED

17   OF ANY OTHER TERMS THAT EITHER THE INVENTORS OR ANY

18   ATTORNEYS RAN FOREIGN EQUIVALENCE FOR.

19          THE COURT:  IT'S JUST ONE TERM, RIGHT?

20          MR. WALDEN:  WELL, I GUESS THAT'S RIGHT,

21   ALTHOUGH THEIR BRIEF SAID THERE WERE OTHER

22   INSTANCES OR IMPLIED THERE WERE OTHER INSTANCES, SO

23   WE JUST HAVEN'T BEEN INFORMED OF THAT.

24          THE COURT:  SO IN THIS PROCESS YOU HAVE

25   ALL BEEN OPERATING UNDER INDEPENDENTLY, HAVE YOU

1    HAD THE OPPORTUNITY TO SAY TO SAMSUNG, HEY, HERE

2    ARE FIVE OTHER KOREAN LANGUAGE TERMS THAT WE THINK

3    WOULD BE APPROPRIATE TO RUN AND HAVE YOU SHARED

4    THOSE WITH THEM?

5            MR. WALDEN:  NO.

6            WHAT WE EXPLAINED IS THAT WE BELIEVE THAT

7    BECAUSE THESE INVENTORS FOR EXAMPLE WERE DEPOSED IN

8    KOREAN, OR THEIR COLLEAGUES ARE KOREAN, WE EXPECT

9    THAT THEY COMMUNICATE IN E-MAILS OR OTHERWISE, THAT

10   ESSENTIALLY YOU SHOULD TAKE WHATEVER TERMS THAT YOU

11   USE AND RUN THE ENGLISH LANGUAGE OF THAT AND THE

12   KOREAN LANGUAGE EQUIVALENT OF THAT.

13           WE WOULD OF COURSE BE WILLING TO DISCUSS

14   IF THERE ARE TERMS THAT ARE SPECIFIC TO SSO'S OR

15   WHATEVER THAT AREN'T -- THAT THERE IS NO FOREIGN

16   LANGUAGE, THERE IS NO KOREAN LANGUAGE EQUIVALENT.

17           BUT IN GENERAL, WHAT WE EXPECT IS WHY NOT

18   JUST RUN THE SEARCH USING BOTH?  RUN IT WITH THE

19   ENGLISH LANGUAGE VERSION OF THE TERM THAT MATTERS

20   AND THE KOREAN VERSION.

21           FINALLY, I JUST WANTED TO ADDRESS A

22   COUPLE OF THINGS.  THE NUMBER OF PAGES AND DOCS

23   THAT HAVE BEEN PRODUCED FROM THE INVENTORS.

24           WE UNDERSTAND, AND WE PUT IN OUR BRIEFS,

25   THAT BASED ON OUR REVIEW OF THEIR CUSTODIAL

1    INFORMATION, SAMSUNG HAS PRODUCED 2,354 DOCUMENTS

2    FROM ITS 32 INVENTORS.  AND AGAIN, 15 OF THOSE WE

3    GOT ZERO FROM.

4              AND IN CONTRAST, APPLE HAS PRODUCED

5    APPROXIMATELY 24,864 DOCUMENTS FROM ITS INVENTORS.

6    WE ARE OVER 1.2 MILLION PAGES WORTH.

7              SO WHEN I SAID IN ORDER OF MAGNITUDE,

8    IT'S PRETTY CLOSE.

9              THE COURT:  ALL RIGHT.

10             THANK YOU VERY MUCH.

11             DO YOU WISH TO RESPOND BRIEFLY ON THAT?

12             MS. KASSABIAN:  IF I MAY, YOUR HONOR.

13             I JUST HAVE TO -- I HAVE TO.

14             SO 600,000 PAGES OF APPLE'S PRODUCTION

15   LOOKS LIKE THIS.  IT'S JUST GIBBERISH AND IT MUST

16   BE INCLUDED IN THE COUNT.

17             THE BRIEFS SAY THEY PRODUCED

18   870,000 PAGES.  HE'S NOW JUST SAID 1.2 MILLION.  I

19   DON'T KNOW WHAT THE RIGHT NUMBER IS, BUT I DO KNOW

20   600,000 PAGES CAME FROM ONE INVENTOR THAT LOOKED

21   LIKE THIS AND APPEAR TO BE COMPLETE GIBBERISH.

22             AND I JUST WANT TO REALLY QUICKLY SAY

23   YOUR HONOR, AGAIN, WITH THE RISK OF, I DON'T

24   WANT -- THE ATTORNEY-CLIENT COMMUNICATION ISSUE IS

25   A DICEY ONE HERE, BUT I WANT TO BE CRYSTAL CLEAR

1      THAT DURING THE INTERVIEWS OF ALL OF THE INVENTORS,

2      THEY WERE QUESTIONED REGARDING SSO DOCUMENTS AND

3      ASKED TO TURN THEM OVER.  I JUST WANT TO MAKE THAT

4      CRYSTAL CLEAR.

5                AND OUR OBJECTION -

6                THE COURT:  BUT -- THAT MAY BE SUFFICIENT

7      AS TO THE PAPER DOCUMENTS, BUT IF THE SEARCH TERMS

8      DID NOT INCLUDE ANY SPECIFIC REFERENCES THAT WOULD

9      CAPTURE SSO'S --

10               MS. KASSABIAN:  BUT THEY WOULD,

11     YOUR HONOR.

12               THE COURT:  HOW?

13               MS. KASSABIAN:  BECAUSE THE TECHNOLOGY

14     THAT'S INVOLVED THAT'S BEING SUBMITTED TO THE SSO'S

15     ARE THE TERMS THAT WE USE.

16               SO THEY SAY RUN 3GPP, AND WE SAY THAT'S

17     WILDLY OVERBROAD.  OUR JANUARY 6TH LETTER, CONTRARY

18     TO MR. WALDEN'S REPRESENTATION, WE SENT A

19     MULTI-PAGE LETTER TAKING ISSUE WITH THE PRECISE

20     SEARCH TERMS THEY WERE PROPOSING.

21               SO THEY SAID USE 3GPP OR APPLY A LIMITER.

22     WELL GUESS WHAT LIMITER WE WOULD APPLY?  THE TERMS

23     THAT WE USED, BECAUSE THERE ARE MULTIPLE DIFFERENT

24     TECHNOLOGIES THAT SOME OF THESE PEOPLE MAY BE

25     INVOLVED IN OR THEY MAY JUST BE GENERIC BLASTS THAT

1    THEY ARE GETTING.

2         SO THE LIMITING TERMS WOULD BE THE

3    SPECIFIC TECHNOLOGICAL TERMS WE ARE TALKING ABOUT,

4    THAT'S THE TECHNOLOGY THAT'S BEING SUBMITTED TO SSO

5    IN DISCUSSIONS ABOUT THESE STANDARDS.

6         SO YES, IT ABSOLUTELY WOULD CATCH

7    STANDARDS DOCUMENTS.

8         AND ALSO, THERE ARE ELECTRONIC FILES.

9    SOME INVENTORS KEEP FOLDERS.  3GPP MEETINGS

10   FOLDERS.  THOSE WERE COLLECTED IF THEY EXISTED.

11   THAT WAS PART OF THE INTERVIEW AND THE MANUAL

12   COLLECTION PROCESS.

13        AND LASTLY, I JUST WANT TO SAY THERE'S A

14   HUGE BURDEN ISSUE AS WE MENTION IN OUR BRIEF.  WE

15   TOOK SOME OF THEIR TERMS AND RAN IT ON AN IMAGE

16   HARD DRIVE FOR TWO OF THE INVENTORS AND THEIR

17   TERMS, WITHOUT VETTING BECAUSE THIS IS JUST APPLE

18   SHOOTING IN THE DARK SAYING HERE'S WHAT WE THINK

19   YOU SHOULD RUN, THEIR TERMS RESULTED IN ONE OUT OF

20   EVERY THREE E-MAILS BEING HIT THAT THESE PEOPLE

21   HAVE EVER SENT IN THEIR ENTIRE LIVES, AT LEAST ON

22   THEIR EXISTING COMPUTERS.

23        THAT'S 200,000 DOCUMENTS WHICH IS MANY,

24   MANY, MANY MORE HUNDREDS OF THOUSANDS OF PAGES, OF

25   COURSE, BECAUSE MOST DOCUMENTS ARE MORE THAN A

1    SINGLE PAGE.

2              THAT'S JUST FOR TWO OUT OF THE 17 OR SO

3    INVENTORS WHO HAD, YOU KNOW, STILL HAD RETAINED

4    RELEVANT DOCUMENTS OVER THE YEARS.

5              SO WE ARE TALKING ABOUT A CRUSHING BURDEN

6    HERE WHERE I DO NOT THINK THE BENEFIT OF RUNNING

7    SOME OF THESE VERY GENERIC TERMS BASED ON

8    SPECULATION THAT SOMETHING MIGHT NOT HAVE BEEN

9    CAUGHT IS WARRANTED HERE.

10             THE COURT:  HOW ARE YOU ALL PRODUCING

11   YOUR DOCUMENTS ARE YOU TIF'G THESE OUT, PRODUCING

12   THEM ON HARD DRIVES?

13             MS. KASSABIAN:  I BELIEVE -- I'M NOT IN

14   CHARGE OF THAT, BUT MY UNDERSTANDING IS THEY ARE

15   TIF'D AND THERE ARE LOAD FILES.

16             THE COURT:  YOU ARE TIF'G EVERY PAGE YOU

17   ARE PRODUCING?

18             MS. KASSABIAN:  I BELIEVE SO.

19             I'M NOT THAT PERSON -- I MEAN, CERTAINLY

20   SOMETIMES DOCUMENTS ARE EXCHANGED NATIVELY WHETHER

21   IT'S A SPREAD SHEET, AND I THINK THE PARTIES HAVE

22   BEEN MORE OR LESS IN AGREEMENT ON THOSE SORTS OF

23   ISSUES, I DON'T THINK THERE'S A BIG DISPUTE ABOUT

24   FORMAT, BUT SOMETIMES THERE ARE REQUESTS.

25             THE COURT:  BUT CERTAINLY YOU CAN

1    APPRECIATE THE FORMAT IS MATERIAL TO THE QUESTION

2    OF BURDEN.

3            BECAUSE IF YOU ARE TIF'G OR PDF'G EVERY

4    SINGLE PAGE THAT'S PART OF YOUR PRODUCTION, AND THE

5    PRODUCTION COSTS ASSOCIATED ARE GREATER THAN THE

6    NATIVE PRODUCTION, RIGHT, AND IT STRIKES ME AS THE

7    BURDEN THAT YOU ARE ARGUING HERE IS LARGELY A COST

8    BURDEN.

9            MS. KASSABIAN:  NO, IT'S A REVIEW BURDEN.

10           IF WE -- AGAIN --

11           THE COURT:  YOU ARE DOING MANUAL REVIEW

12   OF ALL YOUR POSITIVE DOCUMENTS?

13           MS. KASSABIAN:  ABSOLUTELY.

14           ATTORNEYS ARE REVIEWING DOCUMENTS FOR

15   RELEVANCE.  WE ARE TALKING ABOUT ARCH COMPETITORS

16   HERE AND BOTH SIDES ARE DOING RELEVANCE REVIEWS

17   BEFORE THEY TURN DOCUMENTS OVER.

18           THE COURT:  SO ATTORNEYS ARE LOOKING AT

19   EVERY IMAGE BEFORE THEY ARE PRODUCED.

20           MS. KASSABIAN:  THAT'S MY UNDERSTANDING.

21           I AM NOT PERSONALLY SUPERVISING THAT, BUT

22   YES, THE DOCUMENTS ONCE THEY ARE COLLECTED THEY ARE

23   TURNED OVER TO COUNSEL, COUNSEL IS REVIEWING THEM.

24           AGAIN, THESE ARE VERY SENSITIVE DOCUMENTS

25   INVOLVING VERY IMPORTANT TECHNOLOGY.  AND NO, WE

1    ARE NOT JUST PICKING UP THE BOX AND SHIPPING IT OUT

2    WHEN IT COMES IN FROM THE CLIENT.  WE HAVE TO DO

3    PRIVILEGE REVIEWS.  SOME OF THAT CAN BE AUTOMATED

4    OF COURSE WITH ATTORNEY NAMES AND SUCH.

5             BUT OFTEN TIMES THERE ARE DISCUSSIONS

6    THAT ARE PRIVILEGED RIGHT ON THE FACE OF THE

7    DOCUMENT ESPECIALLY INVOLVING INVENTIONS THAT YOU

8    SIMPLY HAVE TO MANUALLY REVIEW IF YOU ARE DOING THE

9    JOB.

10            THE COURT:  OR IF YOU HAVE A BUDGET THAT

11   SUPPORTS IT.

12            MS. KASSABIAN:  WE ARE FORCED TO, I

13   THINK.  BUT YES, I BELIEVE THAT IS WHAT BOTH SIDES

14   ARE DOING, THEY ARE NOT TURNING THEM OVER PRE

15   REVIEW.

16            THE COURT:  ALL RIGHT.  THANK YOU.

17            LET'S TURN TO THE SECOND OF THE ISSUES IN

18   THIS MOTION.  WE'VE ALREADY TOUCHED UPON STANDARDS

19   ALREADY, BUT LET'S HEAR APPLE'S THOUGHTS.

20            MR. WALDEN:  YES, YOUR HONOR.

21            WE HAD MOVED TO COMPEL PRODUCTION FROM

22   SAMSUNG OF ITS PUBLIC AND NONPUBLIC DOCUMENTS

23   CONCERNING PARTICIPATION IN ETSI AND 3GPP.

24            I WILL GIVE YOU JUST A QUICK BACKGROUND

25   JUST BECAUSE I WANT TO SET UP, BECAUSE SAMSUNG HAS

1    COME OUR WAY A LITTLE BIT SINCE WE FILED THE

2    MOTION.

3            WE HAVE BEEN DISCUSSING THE ISSUE OF

4    STANDARD SETTING ORGANIZATION DOCUMENTS, I BELIEVE

5    SINCE OCTOBER.  WE HAVE BEEN FAIRLY CONSISTENT WITH

6    WHAT WE WANTED.  WE HAVE BEEN VERY CLEAR WE WANTED

7    PUBLIC AND NONPUBLIC DOCUMENTS CONCERNING SAMSUNG'S

8    PARTICIPATION IN THESE WIRELESS STANDARDS.

9            BEFORE WE FILED OUR MOTION TO COMPEL,

10   UNTIL THE DAY OF THAT WE FILED OUR MOTION TO

11   COMPEL, SAMSUNG HAD TOLD US THIS SHOULD BE PART OF

12   THE DISCUSSIONS ABOUT RECIPROCITY AGREEMENT.  THE

13   PARTIES HAD BEEN DISCUSSING PERHAPS WHETHER BOTH

14   SIDES WOULD HAVE AN OBLIGATION, AND WE COULD

15   CLARIFY WHAT THAT OBLIGATION WAS.

16           WE TOLD THEM ALWAYS THAT THE OBLIGATION,

17   WHATEVER WE CONSIDERED TO BE IMPORTANT FOR

18   RECIPROCITY NEEDS TO INCLUDE NONPUBLIC DOCUMENTS

19   RELATING TO YOUR PARTICIPATION STANDARDS, SAMSUNG.

20           WE WAITED FOR A LONG TIME AND THEN

21   ULTIMATELY WHAT WE GOT BY WAY OF A PROPOSAL FROM

22   SAMSUNG WAS ONLY THAT THEY WOULD PRODUCE PUBLIC

23   DOCUMENTS, PUBLIC DISCLOSURES, TO ETSI ONLY.

24           WE TOLD THEM IN THE LEAD COUNSEL MEET AND

25   CONFER THIS THAT WAS UNACCEPTABLE.

1          THE FIRST TIME WE GOT A COMMITMENT BY

2     SAMSUNG, TO MY KNOWLEDGE, THE FIRST TIME WAS

3     7:45 P.M. PACIFIC OF THE DAY WE FILED A MOTION.  WE

4     GOT A LETTER WHERE SAMSUNG OFFERED FOR THE FIRST

5     TIME TO PRODUCE SOME NONPUBLIC COMMUNICATIONS WITH

6     ETSI BUT LIMITED ONLY TO THE PATENTS IN SUIT AND TO

7     THREE SPECIFIC UMTS SPECIFICATIONS.

8          THE COURT:  ARE THESE SPECIFICATIONS THAT

9     ARE CLAIMED FOR WHICH THE PATENTS ARE DEEMED

10    ESSENTIAL OR CLAIMED ESSENTIAL?

11         MR. WALDEN:  THERE ARE THREE

12    SPECIFICATIONS FOR WHICH THE PATENTS WERE DEEMED

13    ESSENTIAL.

14         I SHOULD SAY THERE'S A FOURTH

15    SPECIFICATION THAT WE DON'T KNOW WHY THEY DIDN'T

16    INCLUDE, EXCEPT IN ANSWERING OUR COUNTERCLAIMS IT

17    WASN'T JUST LISTED BY NAME WHICH IS SPEC 25.3 22.

18    AND THAT'S RELATED TO THE '491 PATENT, SAMSUNG'S

19    '491 PATENT.

20         NONETHELESS, WE HAD TOLD THEM WE WEREN'T

21    LOOKING JUST FOR THE PATENTS IN SUIT OR JUST THE

22    SPECIFICATIONS THAT WERE -- THAT THESE PARTICULAR

23    PATENTS WERE DISCLOSED UNDER, BUT WE ARE LOOKING

24    MORE GENERALLY AT THE STANDARD, WHAT HAS BEEN YOUR

25    PRACTICE BEFORE THIS STANDARD.

1           THE COURT:  IS IT FAIR TO CHARACTERIZE

2   YOUR REQUEST AS ASKING FOR EVERY SAMSUNG DOCUMENT

3   RELATING TO ETSI AND 3GPP?

4           MR. WALDEN:  I THINK THAT'S --

5           THE COURT:  THAT'S KIND OF HOW I READ

6   THEM.

7           MR. WALDEN:  IT'S FAIR THERE WERE, AS WE

8   LOOKED AT IT IN LOOKING AT THEIR OPPOSITION, IF

9   GOES THAT BROAD.

10          THE REQUESTS THEMSELVES ARE DEFINED TO BE

11  WIRELESS STANDARDS, SO WE ARE LOOKING AT ONLY THOSE

12  IN ETSI AND 3GPP THAT ARE WIRELESS SO IS MORE

13  NARROW THAT WAY.

14          THE COURT:  SAMSUNG HAS BEEN INVOLVED IN

15  THOSE NEGOTIATIONS FOR YEARS, RIGHT?  SO WE ARE

16  TALKING ABOUT SUBSTANTIAL VOLUME OF MATERIALS,

17  RIGHT?

18          MR. WALDEN:  YEAH.

19          I THINK ONE WAY PERHAPS TO LOOK AT IT,

20  IT'S NOT AS BROAD AS SAMSUNG IS SAYING.

21          IF YOU LOOK AT THEIR CHART ON PAGE 13

22  THEY HAVE A GRAPH OF ETSI, 3GPP AND SOME COMPONENTS

23  OF BOTH OF THOSE.

24          ESSENTIALLY, THEY ARE SAYING OUR MOTION

25  IS ASKING FOR EVERYTHING IN THE BLACK CIRCLE ETSI

1    AND 3GPP, BUT THAT'S NOT THE CASE BECAUSE WE ARE

2    NOT LOOKING FOR NON WIRELESS STANDARDS, WE ARE NOT

3    LOOKING AT SPACE SHIPS OR REFRIGERATORS.

4            THE COURT:  SAMSUNG HAS A LOT OF STUFF, I

5    GET THAT.

6            MR. WALDEN:  SO THAT GETS RID OF A LOT OF

7    SAMSUNG'S COMPLAINT.

8            IF YOU LOOK WITHIN THE 3GPP BUBBLE, WE

9    CAN ACTUALLY AGREE NOT TO ASK FOR DOCUMENTS RELATED

10   TO LTE AND THE LTE ADVANCED BUBBLE THERE,

11   ESSENTIALLY BECAUSE WHAT WE ARE LOOKING AT IS THE

12   MTS STANDARD WHICH IS WCDMA/HSBA, AND ESSENTIALLY

13   THE PREDECESSOR STANDARDS FOR THOSE WHICH WOULD BE

14   THE EDGE, GSM AND GPRS.

15           SO WE ARE NOT LOOKING AT THE ENTIRE VENN

16   DIAGRAM THERE, WE ARE LOOKING AT SPECIFIC PORTIONS

17   WITHIN THAT.

18           IF YOU LOOK AT THIS AND SAY, WELL, REALLY

19   WHAT WE ARE ENTITLED TO IS 3 OUT OF 248

20   SPECIFICATIONS WHICH IS THE LOWER MOST BUBBLE ON

21   THEIR DIAGRAM.

22           FOR ONE, THEY ARE LEAVING OUT A

23   SPECIFICATION THAT'S CLEARLY RELEVANT TO ONE OF

24   THEIR PATENTS.  BUT MORE IMPORTANTLY, WE DON'T SEE

25   THAT IT SHOULD BE LIMITED THIS WAY BASED ON OUR

```
1    ANTI-TRUST AND OTHER COUNTERCLAIMS WHICH ARE

2    ESSENTIALLY -- WHICH ARE ESSENTIALLY ALLEGING THAT

3    SAMSUNG HAS A PRACTICE OF GETTING TECHNOLOGY INTO

4    STANDARDS, AND SPECIFICALLY THE 3GPP STANDARDS

5    HERE, THEN ONLY LATER DISCLOSING THE INTELLECTUAL

6    PROPERTY FOR THOSE AFTER THOSE TECHNOLOGIES HAVE

7    BEEN LOCKED IN.

8            SO IN OUR VIEW IT SHOULDN'T BE LIMITED TO

9    THE SPECIFIC SPECIFICATIONS THAT THESE PATENTS IN

10   SUIT HAVE BEEN SUBMITTED IN, BUT MORE GENERALLY

11   TOWARDS THE UMTS, EDGE, TSP AND GPRS.

12           SO --

13           THE COURT:  AND OF THE 248 SPECIFICATIONS

14   THAT SAMSUNG DESCRIBES IN ITS PAPERS WHICH -- WHAT

15   NUMBER OF THE SPECIFICATIONS WOULD FALL WITHIN THE

16   SCOPE OF YOUR CLAIM, ALL OF THEM?

17           MR. WALDEN:  YES, YES.

18           THE COURT:  OKAY.  SO 248 SPECIFICATIONS.

19           AND AS I READ YOUR REQUEST, IF SOMEONE AT

20   SAMSUNG WAS ASKING SOMEONE AT QUALCOMM TO GO TO

21   LUNCH AFTER THE SSO MEETING ON ONE OF THOSE

22   SPECIFICATIONS, THEY WOULD HAVE TO PRODUCE THAT,

23   RIGHT?

24           MR. WALDEN:  THAT WOULD BE A

25   COMMUNICATION RESPECTING THOSE, ALTHOUGH I THINK IN
```

1    GENERAL, YOU KNOW, WE HAVEN'T SEEN VERY MANY

2    PRODUCTION -- VERY MUCH PRODUCTION OF ANYTHING LIKE

3    THAT, SO WE ARE NOT EVEN SURE IF THAT TYPE OF

4    COMMUNICATION IS INVOLVED.

5            I WILL TELL YOU ONE OF THE THINGS THAT

6    CONCERNS US OF JUST SAYING OKAY, WE COULD LIMIT IT

7    TO THE PARTICULAR SPECIFICATIONS THAT SAMSUNG HAS

8    DECLARED ITS PATENTS ESSENTIAL TO.  WHAT ABOUT

9    COMMUNICATIONS REGARDING DISCLOSURE REQUIREMENTS IN

10   ETSI OR IN 3GPP OR SPECIFIC TO THE UMTS?

11           THAT'S NOT SPECIFIC TO A SPECIFICATION.

12   THAT'S MORE ABOUT HEY, WHAT ARE WE DOING HERE?

13   WHAT IS OUR GOAL WITH RESPECT TO GETTING IPR

14   ACCEPTED BY THE SPECIFICATION?

15           SO IF WE WERE TO TRY TO LIMIT JUST TO THE

16   SPECS THAT ARE CRITICAL TO THESE PARTICULAR PATENTS

17   IN SUIT, WE BELIEVE THAT'S GOING TO SEVERELY LIMIT

18   OUR ABILITY TO CONDUCT THE DISCOVERY ON OUR

19   COUNTERCLAIMS.  THAT'S MORE BROADLY DIRECTED

20   TOWARDS THEIR BEHAVIOR BEFORE THESE BODIES.

21           THE COURT:  AND ON A RULE 11 BASIS YOU

22   ARE ALLEGING THAT SAMSUNG HAS VIOLATED THE

23   ANTI-TRUST LAWS WITH RESPECT TO ITS ROLE, ITS

24   PARTICIPATION IN THESE SSO'S GENERALLY WITHOUT

25   REGARD TO A PARTICULAR SPECIFICATION?  IS THAT WHAT

1    YOUR CLAIM IS?

2              MR. WALDEN:  I THINK OUR ANTI-TRUST

3    COUNTERCLAIMS WHICH WERE VERY SIMILARLY PUT

4    TOGETHER, WE MAKE THE ASSERTION THEY HAVE VIOLATED

5    ANTI-TRUST GENERALLY IN FRONT OF THESE

6    ORGANIZATIONS.  WE PROVIDED THE SPECIFIC EXAMPLES,

7    CERTAIN SPECIFIC EXAMPLES TO SATISFY OUR

8    PARTICULARITY REQUIREMENTS.

9              SO IN THE END, WHAT SAMSUNG IN ITS

10   OPPOSITION DID, IN ADDITION TO SAYING THAT OUR

11   REQUESTS WERE OVERBROAD, THEY AGREED TO PRODUCE

12   MORE THAN THEY'VE EVER AGREED TO PRODUCE BEFORE.

13             THEY NOW SAY THAT THEY WILL DISCLOSE

14   THEIR GENERAL -- THEY SAY THEY WILL DISCLOSE

15   DOCUMENTS SHOWING THEIR GENERAL POLICIES OF THEIR

16   PRACTICES OF ETSI AND 3GPP.  THEY SAY THEY WILL

17   PRODUCE DOCUMENTS SHOWING DOCUMENTS RELATED TO SSO

18   ISSUES.

19             AGAIN, THESE ARE AGREEMENTS THAT WERE

20   MADE FOR THE FIRST TIME AFTER WE MOVED TO COMPEL IN

21   THEIR OPPOSITION, AND ULTIMATELY, THEY SAY THAT

22   THEY WILL DISCLOSE DOCUMENTS RELATED TO THE

23   DECISION TO DISCLOSE OR NOT DISCLOSE THE PATENTS IN

24   SUIT TO ETSI.

25             NOW WHILE THIS COMES HALFWAY -- IT COMES

1    A FAIRLY LONG WAY TOWARDS WHAT WE MOVED TO COMPEL,

2    IT'S STILL NOT SUFFICIENT.

3              FIRST, WHEN THEY SAY THEY WILL PRODUCE

4    DOCUMENTS SUFFICIENT, DOCUMENTS SHOWING ITS GENERAL

5    PRACTICES AND POLICIES BEFORE ETSI, WE READ THAT

6    MEANING SUFFICIENT TO SHOW.

7              AND WHAT WE WANT IS REALLY THEIR

8    DOCUMENTS A THOROUGH PRODUCTION OF THEIR DOCUMENTS

9    SHOWING THEIR UNDERSTANDING OF WHAT IT IS THEY ARE

10   SUPPOSED TO BE DOING.

11             THE COURT:  SO ARE YOU SPECIFICALLY

12   INTERESTED IN THEIR UNDERSTANDING OF THE DISCLOSURE

13   OBLIGATION?  IS THAT WHAT YOU ARE SEEKING?

14             MR. WALDEN:  STATEMENTS THAT WOULD

15   EVIDENCE THEIR UNDERSTANDING OF THEIR DISCLOSURE

16   OBLIGATIONS.  STATEMENTS THAT ARE INTERNAL OR

17   EXTERNAL OF WHAT THEY DESCRIBE, WHAT THEY BELIEVE

18   OTHER COMPANY'S DISCLOSURE OBLIGATIONS WOULD BE,

19   BUT CERTAINLY THAT WOULD BE INCLUDED, YES.

20             THE COURT:  BUT IS IT LIMITED TO THAT?

21             I'M JUST TRYING TO UNDERSTAND WHAT

22   BOUNDARIES MIGHT BE IMPOSED TO MANAGE THE BURDEN

23   AGAINST THE LEGITIMATE INTEREST YOU HAVE IN THESE

24   DOCUMENTS.

25             MR. WALDEN:  WE'VE ASKED FOR,

1      SPECIFICALLY, POLICIES AND PROCEDURES GENERALLY,

2      AND MORE SPECIFIC TO THE PATENTS IN SUIT.  BUT THAT

3      WOULD INCLUDE POSITIVE AND NEGATIVE AND NOT JUST

4      SUFFICIENT TO SHOW.

5                ULTIMATELY, THEY OFFERED COMMUNICATIONS

6      WITH ETSI BUT WE EXPLAINED WE BELIEVE THAT IT

7      SHOULD BE SPECIFIC MORE FOR THE UMTS, THE EDGE, THE

8      TSM AND THE GPRS.

9                AND AGAIN, WE DON'T BELIEVE IT SHOULD BE

10     LIMITED TO ANY PARTICULAR SPECIFICATIONS BUT

11     CERTAINLY NOT THE THREE THAT THEY SAY ARE

12     IDENTIFIED IN THE COMPLAINT.

13               THERE'S AT LEAST FOUR IDENTIFIED IN THE

14     COMPLAINT AND WE BELIEVE WE ARE ENTITLED TO MORE

15     GENERAL DISCOVERY ON THIS.

16               THE COURT:  ALL RIGHT.

17               ANYTHING FURTHER?

18               MR. WALDEN:  I THINK JUST, WELL, I WILL

19     LEAVE IT AT THAT.

20               THANK YOU.

21               THE COURT:  THANK YOU, MR. WALDEN.

22               MS. KASSABIAN?

23               MS. KASSABIAN:  YES, YOUR HONOR.

24               I WOULD LIKE TO HAND UP AN ANNOTATED

25     VERSION OF THE VENN DIAGRAM.

1          THE COURT:  DO YOU HAVE A COPY FOR

2     COUNSEL?

3          MS. KASSABIAN:  YES, I DO.

4          IN THE RUSH TO GET THINGS FILED ON OUR

5     SHORTENED TIME, THIS ANNOTATED VERSION WASN'T QUITE

6     READY SO I JUST THOUGHT IT MIGHT BE HELPFUL, SINCE

7     WE ARE TOSSING AROUND A LOT OF ACRONYMS.

8          THE COURT:  YOU ARE BRINGING BACK A LOT

9     OF FOND MEMORIES FOR ME.

10         I'M SORRY, GO AHEAD.

11         MS. KASSABIAN:  SO I GUESS I WILL START

12    WITH THE VENN DIAGRAM.

13         WHAT MR. WALDEN, WHAT I HEAR HIM SAYING

14    IS THAT, YOU KNOW, IF YOU PUT YOUR FINGERS OVER THE

15    TWO BLUE DOTS ON THE RIGHT, LTE ADVANCED AND LTE,

16    THEY WANT EVERYTHING ELSE.

17         AND AS YOU CAN SEE, THE WCDMA CALL OUT

18    OBVIOUSLY HAS MANY, MANY, MANY WORKING GROUPS AND

19    SUBPARTS AND ORGANIZATIONS WITHIN IT AS OF COURSE

20    WOULD EDGE AND GSM AND GPRS.

21         SO, YOU KNOW, WE DID NOT OBVIOUSLY

22    INCLUDE THAT HERE BECAUSE OUR POINT WAS THAT

23    THIS --

24         THE COURT:  THE PAGE IS ONLY SO BIG.

25         MS. KASSABIAN:  THERE'S ONLY SO MUCH YOU

1    CAN FIT ON AN 8X11 PIECE OF PAPER, BUT CERTAINLY

2    I'M SURE I COULD COME UP WITH ANOTHER FANCY CHART

3    FOR YOU TO SHOW THAT THAT IS NOT THAT FAR DIFFERENT

4    FROM ASKING FOR THE BIG BLACK CIRCLE WHICH IS WHAT

5    THEY ARE DOING.

6              AND I WOULD ALSO --

7              THE COURT:  WELL, CERTAINLY, I MEAN, WE

8    CAN DRAW THESE PICTURES HOWEVER WE WANT TO DRAW

9    THEM, BUT THE FACT OF THE MATTER IS THEY ARE

10   DISCLAIMING ANY INTEREST IN DSL, BROADBAND, CLOUD

11   COMPUTING AND THE LIKE, RIGHT?

12             MS. KASSABIAN:  SO IF THAT'S TRUE, AND

13   IT'S NOT WHAT THEIR PROPOSED ORDER SAYS, I

14   APPRECIATE THAT WHAT MR. WALDEN IS SAYING, MAYBE

15   THAT'S THE CURRENT --

16             COURT REPORTER:  I'M SORRY, CAN YOU TRY

17   TO SLOW DOWN A LITTLE BIT.

18             MS. KASSABIAN:  WELL, I'M JUST WORRIED WE

19   ARE GOING TO BE HERE ALL NIGHT.

20             THE COURT:  YOU ARE NOT THE ONLY ONE.

21             MS. KASSABIAN:  THE PROPOSED ORDER ASKED

22   FOR ALL DOCUMENTS RELATED TO SAMSUNG'S

23   PARTICIPATION AND ETSI OR 3GPP.

24             SO I GUESS IF YOU THROW AWAY THE PROPOSED

25   ORDER AND LISTEN TO MR. WALDEN, THEN YES, WE CAN

1    GET RID OF OUR AERONAUTICS, BROADBAND, SATELLITE

2    SYSTEMS, ET CETERA.

3              AND IT SOUNDS LIKE THEY ARE SAYING WE

4    WANT ALL OF 3GPP, ALL DOCUMENTS BETWEEN SAMSUNG AND

5    3GPP, AND THAT WOULD MEAN 12 YEARS WORTH OF

6    DOCUMENTS.

7              THE COURT:  THIS IS AN ANTI-TRUST CASE,

8    RIGHT?

9              I MEAN, IN MY EXPERIENCE IN ANTI-TRUST

10   LITIGATION, I SEEM TO RECALL THESE TYPES OF CLAIMS

11   DO CALL FOR FAIRLY BROAD DISCOVERY GIVEN THE NATURE

12   OF THE CLAIMS.

13             MS. KASSABIAN:  WELL, IT'S FISHING.

14       AND SAMSUNG HAS IDENTIFIED -- SORRY, APPLE,

15   HAS OFFERED SOME CASE LAW SUPPORTING ITS CLAIM FOR

16   STANDARDS DOCUMENTS.

17             I PRESUME THAT THEY OFFERED YOU THE BEST

18   CASES THEY COULD FIND.  AND THOSE CASES ARE NOT

19   GOOD FOR THEM.

20             THE LG CASE, WHICH IS ONE OF THE CASES

21   THEY FEATURE IN THIS ARGUMENT, IT ACTUALLY DECLINES

22   TO GIVE ANY SSO DOCUMENTS EXCEPT FOR ONES RELATED

23   TO THE SPECIFIC STANDARDS.

24             AND THIS WAS A CASE ABOUT DIGITAL VIDEO

25   TRANSMISSION STANDARD FOR CABLE TELEVISION WHICH

```
 1    HAS A FUN ACRONYM AND ALSO ITU-T RECOMMENDATION

 2    J.A3NXB.  THOSE WERE THE TWO SPECIFIC STANDARDS AT

 3    ISSUE IN THIS CASE, AND THE MOVANT WAS SEEKING A

 4    MUCH BROADER CATEGORY OF SSO DOCUMENTS.

 5            AND THE COURT SAID NO, LG HAS NOT

 6    ESTABLISHED HOW THESE STANDARD SETTING ACTIVITIES

 7    RELATE TO THEIR CLAIMS BECAUSE THERE ARE NO OTHER

 8    STANDARDS REFERENCED IN THEIR COMPLAINT.

 9            WELL, IN THIS CASE APPLE HAS REFERENCED

10    STANDARDS IN ITS COMPLAINT, ITS REFERENCED THREE

11    SPECIFICATIONS.  THREE SPECIFIC ONES WHICH WE ARE

12    FINE WITH GIVING DOCUMENTS ON THOSE THREE.

13            AND I SHOULD MENTION THE TOTAL NUMBER OF

14    SPECIFICATIONS WITHIN THE WORKING GROUPS AND THE

15    LIGHT BLUE BUBBLE AT THE BOTTOM IS NOT 248, 248 IS

16    THE NUMBER JUST WITHIN SERIES 25 WHICH IS THE

17    SERIES AT ISSUE HERE.

18            THE TOTAL NUMBER OF SPECIFICATIONS FOR

19    ALL OF THESE, JUST THESE TWO WORKING GROUPS, IS

20    2600.

21            I DIDN'T INCLUDE THAT NUMBER BECAUSE, I

22    MEAN, THERE'S MUCH MORE WE COULD HAVE INCLUDED BUT

23    I WANTED TO MAKE CLEAR IF YOUR HONOR WERE TO ORDER

24    THIS, YOU KNOW, JUST LIMITING IT TO S25, THAT WOULD

25    BE 200 DOCUMENTS REGARDING 248 SPECS.  IF
```

```
1      YOUR HONOR ORDERED EVERYTHING REGARDING WORKING

2      GROUP 1 AND 2, THAT'S 2600

3                 THE COURT:  AND DID SAMSUNG PARTICIPATE

4      IN EACH OF THE SPECIFICATIONS HERE WITHIN WORKING

5      GROUPS 1 AND 2?

6                 MS. KASSABIAN:  SAMSUNG HAD -- THERE ARE

7      MANY PEOPLE THAT PARTICIPATE IN THE WORKING GROUPS.

8                 AND IN THIS LIMITED SPACE OF TIME WE HAD,

9      I COULDN'T GET A COMPLETE LISTING OF EVERYTHING,

10     BUT I CAN GIVE YOU SOME GENERAL INFORMATION IN

11     TERMS OF ETSI, SSO TECHNOLOGY, SAMSUNG PARTICIPATES

12     IN BROADBAND WIRELESS, BROADCAST AND --

13                THE COURT:  SO THOSE ARE OFF THE TABLE,

14     SO LET'S TALK ABOUT IT.

15                MS. KASSABIAN:  THAT'S GOOD.

16                ACCORDING TO MR. WALDEN THEY ARE ON THE

17     TABLE.

18                THE COURT:  BUT HE JUST TOLD US THEY

19     WEREN'T, RIGHT?

20                MS. KASSABIAN:  WELL, HE SAID HE WANTS --

21     NO, I DON'T THINK SO.

22                THE COURT:  I THINK HE JUST SAID, DIDN'T

23     HE, THAT THINGS LIKE AERONAUTICAL AND BROADBAND

24     WERE OFF THE TABLE?

25                MS. KASSABIAN:  WELL, I GUESS IT DEPENDS
```

1    ON WHAT'S WITHIN 3GPP AND WHAT'S WITHIN ETSI MORE

2    GENERALLY.

3              SO IF WE NARROW IT DOWN TO JUST 3GPP,

4    LET'S TALK ABOUT THE SIX BUBBLES HERE.  HE SAID,

5    YOU KNOW, WE WANT GSM AND EDGE.  AND MY

6    UNDERSTANDING OF THOSE IS THAT THEY ARE.

7              SO THE RELEVANT SYSTEM HERE IS WCDMA, AND

8    THAT IS ALL THE PATENTS IN SUIT RELATED TO THIS

9    SPECIFIC TECHNOLOGY, IT'S A RADIO INTERFACE.

10             THESE OTHER BUBBLES ARE DIFFERENT.  SOME

11   OF THEM ARE PREDECESSOR AND SOME OF THEM ARE FUTURE

12   TECHNOLOGY.

13             THE COURT:  RIGHT.

14             DO YOU HAVE ANY INFORMATION ON SAMSUNG'S

15   PARTICIPATION IN THESE OTHER SPECIFICATION SERIES

16   OR WORKING GROUPS?  CAN I GET SOME SENSE OF --

17             MS. KASSABIAN:  YES.

18             MY GENERAL UNDERSTANDING IS THAT THEY DO

19   PARTICIPATE IN OTHER OF THE LTE, LTE ADVANCED

20   WCDMA, GSM.  I CAN PROBABLY PROVIDE YOU WITH A

21   SUPPLEMENTATION ON THAT.  I DON'T HAVE ALL THOSE

22   LEVELS OF DETAILS HERE BECAUSE, AGAIN, THE MOTION

23   ASKED FOR THE WHOLE ENCHILADA.  SO IN OUR LIMITED

24   SPACE WE KIND OF TALKED ABOUT THAT, BUT I AM FAIRLY

25   CERTAIN THAT SAMSUNG'S INVOLVEMENT, GIVEN THE

1    NUMBER OF ENGINEERS IT HAS, IS AT MANY LEVELS OF

2    THIS.

3              I WOULD BE HAPPY TO OFFER SOME ADDITIONAL

4    BRIEFING ON THAT, BUT I THINK MR. WALDEN'S COMMENTS

5    MADE ONE THING CLEAR, AND THAT IS MAYBE THE PARTIES

6    HAVE MORE TO TALK ABOUT HERE.

7              UNFORTUNATELY, DURING THE MEET AND CONFER

8    PROCESS WE TRIED TO GET APPLE TO NARROW THIS DOWN

9    TO SOMETHING OTHER THAN THE BLACK BUBBLE AND IT

10   DIDN'T HAPPEN.

11             THE REASON WHY FOR THE FIRST TIME SAMSUNG

12   AGREED TO THESE THREE SPECIFIC CATEGORIES IN THEIR

13   MOTION WAS BECAUSE THAT'S THE FIRST WE HEARD OF IT.

14   THAT WAS NOT AN OFFER THAT WAS MADE DURING MEET AND

15   CONFER.

16             DURING THE MEET AND CONFER APPLE SAID,

17   YOU KNOW, WE'VE THOUGHT ABOUT IT, WE'VE TRIED AND

18   WE DON'T THINK WE COULD NARROW IT DOWN FROM 3GPP.

19             THE COURT:  WELL, THE FIRST TIME YOU

20   HEARD ABOUT THESE THREE SPECIFICATIONS, I THOUGHT

21   WAS IN THE COMPLAINT.

22             MS. KASSABIAN:  NO.

23             REGARDING THE THREE CATEGORIES OF

24   DOCUMENTS, SORRY, I WAS REFERRING TO IN THEIR

25   MOTION.  THEY CALL OUT THREE SPECIFIC CATEGORIES.

1       THEY SAY DOCUMENTS SHOWING GENERAL POLICIES OR

2       PRACTICES REGARDING DISCLOSURE OF ESSENTIAL IPR TO

3       THESE STANDARD BODIES; DOCUMENTS SHOWING THE

4       STRUCTURE OF THE DEPARTMENTS OR TEAMS AT SAMSUNG

5       THAT WORK ON SSO ISSUES; AND DOCUMENTS RELATED TO

6       SAMSUNG'S DECISION TO DISCLOSE OR NOT TO DISCLOSE

7       THE PATENTS IN SUIT.

8              SO THIS WAS NEVER AN OFFER THAT WAS PUT

9       TO US.  IF IT WAS WE WOULD HAVE ACCEPTED IT.  WE

10      HAVE ACCEPTED IT NOW HAVING SEEN IT IN THE MOTION.

11             BUT BEFORE THE MOTION, DESPITE OUR BEST

12      EFFORTS, WE COULD NOT MAKE GO HEADWAY.  AND APPLE

13      WOULD NOT AGREE WHEN WE MADE SUGGESTIONS, BUT WE

14      WERE MET WITH, YOU KNOW, REFUSALS AND JUST, YOU

15      KNOW, INSISTENCE AND BASICALLY APPLE WANTED TO

16      MAINTAIN ITS POSITION THAT THEY WERE ENTITLED TO

17      ALL DOCUMENTS REGARDING THESE ORGANIZATIONS.

18             IT SOUNDS LIKE MR. WALDEN IS MAKING SOME

19      CONCESSIONS NOW.  WE CERTAINLY CAN MAKE SOME AS

20      WELL.

21             YOU KNOW, ONE THOUGHT I MIGHT HAVE HERE

22      GIVEN THE MANY UNKNOWNS IN THESE LAYERS OF THIS

23      ORGANIZATION IS MAYBE YOUR HONOR COULD ORDER THE

24      PARTIES TO SPEND A WEEK REALLY HAMMERING OUT AN

25      AGREEMENT, AND IF WE CAN'T --

1          THE COURT:  I THOUGHT THAT'S WHAT OUR

2    LOCAL RULES REQUIRE BEFORE YOU MEET AND CONFER.

3          MS. KASSABIAN:  I AGREE.  I COULD NOT

4    AGREE MORE.

5          AND WE TRIED, BUT APPLE NEVER CAME OFF

6    ITS POSITION THAT THEY WANTED THE WHOLE ENCHILADA.

7    WE MADE OFFERS, MY JANUARY 10TH LETTER IS EXHIBIT 1

8    TO THE CHAN DECLARATION IN OPPOSITION TO THIS

9    MOTION.  IT'S A SIX OR SEVEN PAGE LETTER THAT I

10   WORKED INCREDIBLY HARD TO NEGOTIATE WITH MY CLIENT,

11   WITH MY COLLEAGUES AND WITH APPLE, AND DESPITE THE

12   MAJOR CONCESSIONS IN THAT LETTER AGREEING TO

13   PRODUCE VAST CATEGORIES OF DOCUMENTS INCLUDING

14   THESE, APPLE FILED THIS MOTION ANY WAY.

15          THE COURT:  ALL RIGHT.

16          THANK YOU VERY MUCH.

17          ANY REBUTTAL, MR. WALDEN?

18          MR. WALDEN:  YES, BUT BRIEF.

19          FIRST, I WILL JUST REMIND THE COURT THAT

20   THE LETTER MS. KASSABIAN MENTIONED SHE WORKED VERY

21   HARD ON, AND I DON'T DOUBT THAT SHE WORKED VERY

22   HARD ON IT, CAME AT 7:45 P.M. ON THE DAY WE FILED

23   OUR MOTION WHEN THE PARTIES HAD AGREED THAT WE

24   WOULD BE FILING THE MOTIONS ON THAT DAY.

25          EVEN WHEN IT CAME THOUGH, IT WAS TOO

1     LITTLE TOO LATE.

2              THE CASE THAT MS. KASSABIAN CITES WHICH

3     IS CITED IN BOTH PARTY'S BRIEFS, LG ELECTRONICS V.

4     MOTOROLA WHICH IS 2010, WEST LAW 3075755, DID IN

5     FACT COMPEL PRODUCTION OF DOCUMENTS RELATED TO A

6     STANDARD.

7              THEY SAY IT'S VERY SPECIFIC STANDARDS,

8     SCTE07 AND ITU-TJ.83, BUT IT WASN'T SAYING LIMIT IT

9     TO PARTICULAR SPECIFICATIONS WITHIN THE STANDARD,

10    BUT IT GAVE THEM -- IT GRANTED THE MOTION TO COMPEL

11    ON THE STANDARD.

12             AND WHAT THE COURT JUST SAID IS THAT NO,

13    I'M NOT GOING TO LET YOU HAVE EVERYTHING ABOUT

14    STANDARD SETTING ORGANIZATIONS FROM THAT PARTY.

15             SO WHEN WE ARE LOOKING AT IN THE VENN

16    DIAGRAM, WE IN OUR COMPLAINT -- I'M SORRY, IN OUR

17    ANSWER AND COUNTERCLAIMS, HAVE ASSERTED THEY HAVE

18    VIOLATED THE ANTI-TRUST LAWS AND CALIFORNIA

19    BUSINESS LAWS AND OTHERS WITH RESPECT TO THE

20    STANDARD, THE UMTS STANDARD, NOT 3 OUT OF 248

21    SPECIFICATIONS, BUT THE STANDARD.

22             AND A LOT OF THAT IS DETAILED IN OUR

23    ANSWER AND COUNTERCLAIMS AND IT HAS A LOT TO DO

24    WITH SAMSUNG'S BEHAVIOR ACROSS THE STANDARD AND

25    WHETHER ITS BEHAVIOR IS CONSISTENT WITH INDUSTRY

1    PRACTICES.

2             AND AGAIN, SAMSUNG HAS TALKED ABOUT HOW

3    INDUSTRY PRACTICES HAVE BEEN AND WE THINK WE ARE

4    ENTITLED TO DISCOVERY ON WHETHER THOSE INDUSTRY

5    PRACTICES ARE REALLY BEING FOLLOWED BY SAMSUNG OR

6    NOT.

7             THE COURT:  DO YOU HAVE ANY IDEA, BECAUSE

8    I TAKE IT THIS IS ALL A MATTER OF PUBLIC RECORD,

9    HOW MANY OF THESE SPECIFICATIONS THAT ULTIMATELY

10   FALL IN THE SCOPE OF THE 3GPP RUBRIC, HOW MANY OF

11   THOSE SAMSUNG HAS PARTICIPATED IN?

12            MR. WALDEN:  I DON'T HAVE A SPECIFIC

13   NUMBER HERE.  WE DID LOOK WHEN WE GOT THEIR

14   OPPOSITION AND THEIR STATEMENT THAT THERE WAS

15   HUNDREDS OF INDIVIDUALS INVOLVED AND WERE INVOLVED

16   IN ALL OF THOSE.

17            WHEN WE NARROWED IT DOWN TO UMTS AND THE

18   BACKWARDS COMPATIBLE STANDARDS, EDGE, GSM AND GPRS,

19   IT DID SEEM LIKE IT WAS A MUCH SMALLER UNIVERSE,

20   BUT I'M NOT REALLY ABLE TO GIVE YOU A PARTICULAR

21   NUMBER.

22            AND WHEN WE GO TO THE MORE BACKWARDS

23   COMPATIBLE STANDARDS, THE EDGE, GSM, GPRS, IT DID

24   SEEM THAT --

25            COURT REPORTER:  I'M SORRY, YOU NEED TO

1    SLOW DOWN.  IT'S BEEN A LONG MORNING, AND THESE

2    ACRONYMS -- CAN YOU START THAT SENTENCE AGAIN,

3    PLEASE.

4              MR. WALDEN:  I'M SORRY.

5              WHEN WE GO TO THE BACKWARDS COMPATIBLE

6    STANDARDS, THE EDGE, GSM AND GPRS, IT DID APPEAR IN

7    OUR VIEW THAT THEIR INVOLVEMENT WAS MUCH LIGHTER.

8              SO UMTS, FAIRLY HEAVY INVOLVEMENT, BUT

9    AGAIN WE ARE STILL LIMITING IT TO UMTS.

10             THE COURT:  ALL RIGHT.

11             LET'S COVER TOPIC NUMBER THREE ON THIS

12   MOTION.

13             MR. WALDEN:  OKAY.

14             SO THIS IS A SOMEWHAT RELATED TOPIC IN

15   THAT WE ARE LOOKING -- WE HAVE MOVED TO COMPEL

16   LICENSES AND NEGOTIATIONS DOCUMENTS RELATING TO

17   SAMSUNG'S PATENTS THAT HAVE BEEN DECLARED ESSENTIAL

18   TO ETSI UNDER 3GPP.

19             HERE AGAIN WE HAD, I THINK A LONG BUT

20   UNFORTUNATELY NOT VERY FRUITFUL, MEET AND CONFER

21   PROCESS WHERE WE HAD PUT INTO RECIPROCITY AGREEMENT

22   OR DRAFT RECIPROCITY AGREEMENT ESSENTIALLY WHAT WE

23   MOVED TO COMPEL.  THAT WE WANT LICENSES FOR ALL

24   PATENTS IN SUIT, BUT FOR THE STANDARDS ESSENTIAL

25   PATENTS IN SUIT WE WANT NEGOTIATION DOCUMENTS AS

1    WELL.

2              AND WE BELIEVE WE SHOULD GET NEGOTIATION

3    DOCUMENTS FOR OTHER SAMSUNG PATENTS THAT HAVE BEEN

4    DECLARED ESSENTIAL TO ETSI UNDER 3GPP.

5              THE NEGOTIATIONS WERE UNFRUITFUL BECAUSE

6    ESSENTIALLY SAMSUNG TOOK EVERY PROPOSAL THAT WE

7    MADE AND SAID, HERE'S WHAT WE WILL GIVE YOU, PUBLIC

8    DISCLOSURES.  I'M SORRY, THE LICENSES -- I GOT A

9    LITTLE CONFUSED THERE, BUT THE LICENSES OWNED UNTIL

10   AGAIN, 7:45, THE DAY THAT WE MOVED.

11             THEY DID MOVE SOMEWHAT FURTHER BY

12   AGREEING THAT THEY WOULD GIVE NEGOTIATION DOCUMENTS

13   IF THOSE NEGOTIATION DOCUMENTS FOR THE PATENTS IN

14   SUIT DISCUSSED ROYALTY INFORMATION.

15             WE EXPLAINED IN OUR BRIEF THAT THAT STILL

16   WAS NOT SUFFICIENT AND THAT WE WERE LOOKING FOR

17   THOSE PATENTS THAT HAVE BEEN DECLARED STANDARDS

18   ESSENTIAL, WE'RE LOOKING FOR NEGOTIATIONS BECAUSE

19   WE WANT INFORMATION AS TO HOW SAMSUNG HAS

20   COMMUNICATED ITS FRAND OBLIGATIONS OR OTHER PARTIES

21   FRAND OBLIGATIONS, OR AN ORDER TO DETERMINE WHETHER

22   THOSE COMMUNICATIONS WOULD BE RELEVANT HERE, AND

23   THEY VERY LIKELY WOULD BE IN ORDER TO ASSERT OR TO

24   ASSESS WHAT A FRAND LICENSE WOULD MOUNT TO.

25             SO SAMSUNG HAS SAID IN OTHER CONTEXTS FOR

1    THESE PATENTS OR FOR OTHER PATENTS THAT HAVE BEEN

2    DECLARED ESSENTIAL TO ETSI OR 3GPP, WE BELIEVE A

3    FRAND OBLIGATION ENTAILS A, B, AND C, WE WOULD BE

4    ENTITLED TO DISCOVERY OF THAT INFORMATION SO THAT

5    OUR DAMAGES EXPERT COULD PUT TOGETHER A DAMAGES

6    FORMULATION.

7              AGAIN, THEY HAVE COME FURTHER IN THEIR

8    OPPOSITION BRIEF THAN THEY HAD EVEN ON THE DAY THAT

9    WE MOVED TO COMPEL BECAUSE NOW THEY ARE SAYING THEY

10   WILL PRODUCE ALL COMMUNICATIONS WITH THIRD PARTIES

11   NEGOTIATIONS OF TERMS OF THE LICENSES TO THE

12   PATENTS IN SUIT.

13             SO NOW THEY ARE NOT SAYING, I GUESS,

14   LIMITED ONLY TO ROYALTY BUT THEY WILL GIVE US ALL

15   NEGOTIATIONS, THEY ARE NOT SAYING WE HAD REALLY

16   MOVED ON PATENTS THAT HAD BEEN DECLARED ESSENTIAL,

17   BUT AGAIN, WE HAD MOVED ON NOT JUST THE PATENTS IN

18   SUIT THAT HAD BEEN DECLARED ESSENTIAL BUT OTHER

19   PATENTS AS WELL.

20             SO WE SEE THAT SAMSUNG IS KIND OF

21   HALFWAY, THAT OUR MOTION -- UNFORTUNATELY, IT TAKES

22   A MOTION BUT OUR MOTION HAS SHAKEN SOME FRUIT FROM

23   THE TREE, BUT WE DON'T BELIEVE WE HAVE GOTTEN

24   ALL OF IT.

25             THE COURT:  WHY ISN'T THAT FRUIT A

1    REASONABLE COMPROMISE HERE?

2            I UNDERSTAND THE RATIONAL OR THE

3    RELEVANCE OF THESE ADDITIONAL PATENTS OR

4    DISCUSSIONS ON FRAND TERMS FOR ADDITIONAL PATENTS,

5    I GET THAT.

6            BUT ALL OF THIS HAS TO BE A GIVE AND TAKE

7    OF A BALANCING ISSUE.

8            ONE OF THE PATENTS THAT ARE ACTUALLY AT

9    ISSUE HERE, THE MOST PERTINENT, THE MOST

10   SIGNIFICANT, WHY ISN'T THAT AN APPROPRIATE LINE FOR

11   ME TO DRAW?

12           MR. WALDEN:  WELL, WE WOULD NOT DISAGREE

13   THAT THE PATENTS IN SUIT ARE PROBABLY THE MOST

14   PERTINENT BUT THAT DOESN'T MEAN THAT OTHER PATENTS

15   AREN'T PERTINENT OR RELEVANT, AND THEREFORE WE ARE

16   ENTITLED TO DISCOVERY ON THEM.

17           THE COURT:  YOU ARE NOT ENTITLED TO

18   RELEVANT DOCUMENTS.  WE HAD THIS DISCUSSION OVER

19   AND OVER AGAIN.  RELEVANCE IS A FACTOR, BUT IT'S

20   NOT THE ONLY FACTOR, RIGHT?

21           SO I HAVE TO BALANCE, AND I HOPE YOU

22   WOULD ALL BALANCE IN NEGOTIATING THESE THINGS OUT,

23   THE BURDEN OF COLLECTING ALL THESE THINGS.

24           BUT WHAT I'M STRUGGLING WITH IS IF THE

25   MOST RELEVANT DOCUMENTS ARE SOMETHING SAMSUNG IS

1    WILLING TO PRODUCE, WHY IS THAT NOT AN APPROPRIATE

2    COMPROMISE HERE THAT ADEQUATELY PROTECTS EACH OF

3    YOUR INTERESTS?

4              MR. WALDEN:  WELL, UNFORTUNATELY BECAUSE

5    WE FEEL IF THAT WAS THE CUT THEN WE ARE GOING TO

6    ONLY GET DOCUMENTS THAT SPECIFICALLY REFERENCE THE

7    PATENTS IN SUIT.

8              SO WHAT ABOUT LICENSES TO A PORTFOLIO?

9    WHAT ABOUT LICENSES THAT, YES, WOULD BE FOR ALL OF

10   SAMSUNG'S ETSI PATENTS, BUT THAT DON'T NECESSARILY

11   SPECIFICALLY CALL OUT OUR PATENTS IN SUIT BY

12   NUMBER.

13             SO WE BELIEVE THAT THEY ARE RELEVANT, NOT

14   JUST -- WELL, WE BELIEVE THAT THEY ARE RELEVANT

15   BECAUSE STATEMENTS MADE ABOUT FRAND OBLIGATIONS OR

16   WHAT IS AN APPROPRIATE LICENSE TO A DECLARED

17   ESSENTIAL PATENT ARE RELEVANT TO OUR CASE WHETHER

18   OR NOT IT'S FOR THE PATENTS IN SUIT.

19             IF WE WERE TO LIMIT IT ONLY TO THE

20   PATENTS IN SUIT, THE CONCERN REALLY WOULD BE THAT

21   WE ARE NOT GOING GET MANY DOCUMENTS THAT EITHER

22   MORE GENERALLY DESCRIBE FRAND REQUIREMENTS OR ARE

23   TO LICENSES THAT WOULD BE FOR A PORTFOLIO OF

24   PATENTS.

25             SO FOR THAT REASON WE BELIEVE THE BETTER

1     LINE TO DRAW FOR RELEVANCE AND FOR WHAT WE BELIEVE

2     TO BE, I GUESS THE RIGHT LINE, WOULD BE ETSI AND

3     3GPP PATENTS ONLY, NOT ALL --

4              THE COURT:  ALL ETSI PATENTS.

5              MR. WALDEN:  WE CAN LIMIT IT AGAIN TO THE

6     SAME WAY DESCRIBED EARLIER, THE UMTS AND THE

7     BACKWARDS COMPATIBLE, BUT WE COULD LEAVE OFF LTE

8     AND ADVANCED.

9              THE COURT:  AND BROADBAND.

10             MR. WALDEN:  YES, EVERYTHING ELSE LIKE

11    THAT.

12             THE COURT:  MS. KASSABIAN, ARE YOU UP

13    AGAIN?

14             COURT REPORTER:  CAN WE TAKE A QUICK

15    BREAK BEFORE WE CONTINUE?

16             THE COURT:  YES.  WHY DON'T WE TAKE OUR

17    LUNCH BREAK NOW.

18             SO WE WILL RESUME -- I WOULD LIKE TO KEEP

19    THIS THING MOVING, SO LET'S GET BACK HERE AT, SAY,

20    1:15.

21             THE CLERK:  THE COURT IS IN RECESS.

22             (WHEREUPON A RECESS WAS TAKEN.)

23             THE COURT:  ALL RIGHT.

24             BEFORE WE BROKE, I BELIEVE WE WERE

25    ADDRESSING THE THIRD OF THE ISSUES RAISED IN

1    APPLE'S MOTION TO COMPEL.

2              MS. KASSABIAN:  YES.

3              THE COURT:  SO LET'S RETURN TO THAT

4    TOPIC.

5              MS. KASSABIAN:  YOUR HONOR, IF I MAY, I

6    WAS ABLE TO QUICKLY GET AN ANSWER TO YOUR HONOR'S

7    QUESTION ON WHETHER SAMSUNG IS INVOLVED, WHAT ELSE

8    BESIDES THE SPECS AT ISSUE IS SAMSUNG INVOLVED IN,

9    AND I WAS ABLE TO CONFIRM THAT FOR WCDMA ALONE

10   WHICH IS I GUESS THE THIRD MAJOR BUBBLE DOWN,

11   SAMSUNG HAS 514 DECLARED ESSENTIAL PATENTS AT THAT

12   LEVEL WHICH WOULD MEAN THAT IF APPLE WERE PERMITTED

13   TO HAVE ITS WAY AND ASK FOR ALL DOCUMENTS REGARDING

14   THOSE TECHNOLOGIES AND SAMSUNG'S INTERACTIONS WITH

15   SSO, THAT WOULD COVER 514 DECLARED INDIVIDUAL

16   PATENTS AND WOULD PRESUMABLY INCLUDE OTHER THINGS

17   THAT WEREN'T DECLARED ESSENTIAL IF THE "ALL

18   DOCUMENTS" MONIKER WERE ADOPTED.

19             THE COURT:  DO YOU HAVE ANY INFORMATION

20   REGARDING WHICH OF THE SPECIFIC WORKING GROUPS OR

21   SPECIFICATIONS THOSE 514 PATENTS APPLY?

22             MS. KASSABIAN:  THAT'S AT THE WCDMA

23   LEVEL.

24             SO WHAT I'M TOLD IS THAT SAMSUNG WORKS ON

25   ALL OF THESE NEXT LEVEL DOWN BUBBLES TSGCT, TSGSA,

1   TSGGERAN, AND TSG RAN.  THESE, AS I UNDERSTAND IT,

2   THESE ARE ALL COMPONENTS OF 3G.

3           SO IF YOU GO UP A BUBBLE AND YOU LOOK AT

4   GPRS, GSM EDGE, THOSE ARE 2G, OLD ANTIQUATED

5   TECHNOLOGIES THAT ARE NOT RELEVANT HERE.  AND THEN

6   LTE AND LTE ADVANCED ARE FUTURE TECHNOLOGIES.

7           AND THEN WCDMA IS 3G.  THIS CASE IS ABOUT

8   3G.  BUT THERE ARE MANY DIFFERENT ASPECTS OF THE

9   CELLULAR TECHNOLOGY HERE, AND IT'S ONLY THE RADIO

10  ACCESS NETWORK COMPONENT WHICH IS TSG RAN THAT IS

11  AT ISSUE HERE.

12          SO AS --

13          THE COURT:  WELL, THAT'S WHAT'S AT ISSUE

14  IN THE PATENT CASE.

15          THE CONCERN, RIGHT, OR THE CLAIM IS THAT

16  THERE ARE ANTI-COMPETITIVE BEHAVIORS WHICH TOUCH

17  UPON ALL OF THESE DIFFERENT ORGANIZATIONS, THAT'S

18  THE CLAIM.

19          MS. KASSABIAN:  RIGHT.

20          NUMBER ONE, YOU HAVE TO HAVE A BASIS FOR

21  THAT CLAIM.

22          THE COURT:  THAT'S A RULE 11 ISSUE.

23          MS. KASSABIAN:  BUT I THINK IT IMPLICATES

24  DISCOVERY IF YOU HOLD THEM TO THE CLAIMS THEY'VE

25  ARTICULATED SO FAR.

1          THEIR ARGUMENT THAT WELL, WE THINK THAT

2     YOU, THAT THERE WAS SOME MISCONDUCT REGARDING THREE

3     PARTICULAR SPECIFICATIONS WAY DOWN THE LINE OF

4     RELEVANCE HERE IN THE VENN DIAGRAM, TO SAY THAT WE

5     GET TO FIND OUT, TAKE DISCOVERY ON EVERY SINGLE

6     INTERACTION SAMSUNG HAS EVER HAD WITH ETSI TO SEE

7     IF THERE MIGHT BE ANY OTHER MISCONDUCT THAT WE ARE

8     NOT AWARE OF, THAT'S JUST A CLASSIC FISHING

9     EXPEDITION.

10          SO I WANTED TO LET THE COURT KNOW THAT I

11    WAS ABLE TO CONFIRM THAT EVEN AT THE WCDMA LEVEL WE

12    ARE TALKING ABOUT MANY DIFFERENT ASPECTS OF THE

13    CELLULAR TECHNOLOGY THAT HAS NOTHING TO DO WITH THE

14    RADIO ACCESS NETWORK BUBBLE THAT IS AT ISSUE IN

15    THIS CASE.

16          THE COURT:  ALL RIGHT.

17          MS. KASSABIAN:  SORRY FOR THAT

18    DIGRESSION.

19          I THINK LICENSING IS RELATED AND CAN BE

20    DISCUSSED MORE QUICKLY.

21          THE ONLY REAL PROBLEM I THINK THAT I

22    HEARD MR. WALDEN SAY BEFORE WE BROKE FOR LUNCH IS

23    THAT HE'S CONCERNED THAT PORTFOLIO LICENSES WOULD

24    NOT BE PRODUCED.

25          I'M NOT SURE WHERE HE GOT THAT CONCERN

1    BECAUSE CERTAINLY HE'S NEVER RAISED THAT WITH

2    SAMSUNG.  IF HE HAD DURING THE MEET AND CONFER I

3    CERTAINLY WOULD HAVE ASSURED HIM THAT WE WOULDN'T

4    TAKE SUCH A STRICT AND ARTIFICIAL READING OF THEIR

5    REQUEST.

6              THE COURT:  SO ARE THEY GOING TO BE

7    PRODUCED?

8              MS. KASSABIAN:  ABSOLUTELY.

9              IF A PORTFOLIO LICENSE INCLUDES THAT

10   TECHNOLOGY, THOSE PATENTS, EVEN IF IT DOESN'T LIST

11   THEM OUT BY NAME BUT REFER TO THEM AS A GROUP,

12   ABSOLUTELY THEY ARE INCLUDED.

13             AND WE ARE TEEING SOME OF THOSE UP RIGHT

14   NOW FOR PRODUCTION PURSUANT TO OUR VOLUNTARY

15   AGREEMENT AS DESCRIBED IN, AT PAGE 16 OF OUR

16   OPPOSITION BRIEF TO PRODUCE THE LICENSES TO SAMSUNG

17   PATENTS THAT ARE INCORPORATED IN THE UMTS

18   SPECIFICATIONS IDENTIFIED IN THEIR ANSWER.  AND

19   THERE WERE THREE, AS WE PREVIOUSLY DISCUSSED.

20             SO IF THERE'S A PORTFOLIO LICENSE THAT

21   INCLUDES THAT AND A BUNCH OF OTHER THINGS, THAT'S

22   GETTING PRODUCED.

23             SO IF THAT'S THE ONLY CONCERN THEN I

24   DON'T THINK THERE'S REALLY A DISPUTE HERE, AND WHAT

25   WE'VE AGREED TO PRODUCE SHOULD BE ENOUGH.

1          ON THE BROADER ISSUE, IT'S UNCLEAR TO ME

2     WHETHER APPLE IS STILL PRESSING ITS BROADER DEMAND

3     FOR LICENSES REGARDING ALL ETSI AND 3GPP PATENTS.

4     BUT THERE ARE MORE THAN 3500 SUCH PATENTS.

5          SO AGAIN, WE WOULD ARGUE THAT'S

6     OVERBROAD.

7          THE COURT:  HOW MANY LICENSES ARE THERE

8     IMPLICATED BY THOSE PATENTS?

9          MS. KASSABIAN:  I'M STILL TRYING TO GET

10    THAT INFORMATION.  YOU KNOW, WE'RE TALKING ABOUT A

11    VERY BIG UNIVERSE OF PATENTS AND TECHNOLOGIES, SO

12    I'M WORKING ON THE INFORMATION.  IF I HAD IT, I

13    DEFINITELY WOULD HAVE PUT IT IN THE BRIEF.

14         BUT WE DO THINK IT IS A FACT THAT

15    SAMSUNG, LIKE MANY TECHNOLOGY COMPANIES, DOES OFTEN

16    ENTER INTO PORTFOLIO LICENSES.

17         AND SO THIS MAY BE, YOU KNOW, A NONISSUE

18    ULTIMATELY IF THE PORTFOLIO LICENSES ARE ENOUGH AND

19    ARE THE ONLY LICENSES THAT INCLUDE OR IMPLICATE

20    PATENTS COVERING THE THREE SPECIFICATIONS AT ISSUE

21    HERE.

22         SO I MEAN, I THINK YOUR HONOR IS RIGHT,

23    THERE HAS TO BE A BALANCING HERE.  I THINK OUR

24    OFFER FAIRLY BALANCES THE INTEREST HERE.  APPLE CAN

25    RECEIVE THOSE DOCUMENTS.  IF THEY THINK THEY ARE

1    INSUFFICIENT, THEY CAN ASK US FOR MORE.  BUT I

2    THINK AT THIS POINT THAT'S ENOUGH.

3              THE COURT:  DO YOU HAVE ANY OBJECTION TO

4    PRODUCING THE DOCUMENTS CONCERNING THE UNDERLYING

5    NEGOTIATIONS AS TO THOSE LICENSES THAT YOU

6    DESCRIBED A MOMENT AGO?

7              MS. KASSABIAN:  NO.  WE'VE AGREED TO

8    PRODUCE ALL COMMUNICATIONS WITH THIRD PARTIES

9    NEGOTIATING THE TERMS OF LICENSES THAT INCLUDE THE

10   PATENTS IN SUIT.

11             THE COURT:  THAT ARE LIMITED TO THE

12   PATENTS IN SUIT.

13             MS. KASSABIAN:  YES.

14             THE COURT:  THAT'S WHAT YOU ARE TELLING

15   ME, RIGHT?

16             MS. KASSABIAN:  YES, BUT A LOT OF THESE

17   ARE PORTFOLIO LICENSES.

18             SO THE LICENSES MAY NOT SPECIFICALLY SAY

19   THIS PARTICULAR PATENT BUT REFERS TO A FAMILY OF

20   PATENTS.

21             THE COURT:  BUT THAT FAMILY HAS TO

22   INCLUDE ONE OF THE OTHER ASSERTED PATENTS.

23             MS. KASSABIAN:  ABSOLUTELY.  THAT'S

24   WHAT'S RELEVANT HERE, ABSOLUTELY.

25             AND OBVIOUSLY TO THE EXTENT THAT THEY ARE

1    PORTFOLIO LICENSES, THEY WOULD INCLUDE MANY OTHER

2    PATENTS MAYBE NOT BY NAME BUT BY FAMILY AS WELL.

3           SO I THINK THEY ARE GOING TO GET A LARGE

4    UNIVERSE OF INFORMATION.  IF THEY AT THAT POINT

5    FEEL IT'S INSUFFICIENT, THEY CAN TALK TO US ABOUT

6    IT.  BUT I DON'T SEE A MORE RELEVANT SET THAT WOULD

7    BE REASONABLE GIVEN THE BALANCING TEST THAT HAS TO

8    OCCUR.

9           THE COURT:  DO THE PARTIES AGREE -- OR

10   LET ME ASK YOU.  YOU ARE NOT THE PARTIES, YOU ARE

11   YOU.

12          DO YOU AGREE THAT I CAN APPROPRIATELY

13   DRAW THE BOUNDARIES AROUND DISCOVERY ON THIS ISSUE

14   BY LOOKING TO THE LG CASE?  IS THAT AN APPROPRIATE

15   PRECEDENT FOR ME TO APPLY IN ANSWERING THIS

16   QUESTION?

17          MS. KASSABIAN:  WELL, I THINK THAT

18   THERE'S SOME ISSUE.  GENERALLY, YES, BUT I THINK

19   THERE'S AN ISSUE OF SEMANTICS.

20          I'VE TRIED MY BEST TO FIGURE OUT WHAT THE

21   PROPER DEFINITION OF THE TERM "STANDARD" IS AND I

22   THINK DIFFERENT PEOPLE HAVE DIFFERENT DEFINITIONS.

23          I THINK THE ACTUAL -- THE COURT CALLS

24   THEM "STANDARDS" BUT THE COURT IDENTIFIES WHAT I

25   BELIEVE ARE SOMETHING MAYBE NARROWER THAN A

1    STANDARD AND CALLS THEM STANDARDS.

2             IT LOOKS TO BE LIKE IT'S A SERIES OR A

3    RELEASE OR A SPECIFICATION.

4             THE COURT:  OR A WORKING GROUP.  THERE

5    ARE MANY DIFFERENT WAYS OF LOOKING AT THIS.

6             MS. KASSABIAN:  ABSOLUTELY.  WE COULD

7    LOOK AT IT AS A WORKING GROUP LEVEL.  I THINK THAT

8    WOULD MAKE SENSE.

9             IT WOULD STILL BE OVER INCLUSIVE BECAUSE

10   IF YOU LOOKING AT VENN DIAGRAM, JUST AMONG WORKING

11   GROUPS 1 AND 2 THERE ARE 245 SPECIFICATIONS THAT

12   JUST HAVE NOTHING TO DO WITH THE CASE.

13            SO EVEN AT THAT LEVEL I THINK IT WOULD

14   PROBABLY INCLUDE TOO MUCH.  BUT THAT IS FAR, FAR,

15   FAR MORE REASONABLE THAN TALKING ABOUT, YOU KNOW,

16   THE 3GPP LEVEL, THE WCDMA LEVEL, ET CETERA, WHICH I

17   THINK WOULD INCLUDE THOUSANDS OF SPECIFICATIONS AND

18   MANY, MANY MORE WORKING GROUPS AND DIFFERENT PIECES

19   OF THE TECHNOLOGY LOGICAL PUZZLE THAN THE VERY

20   NARROW PIECE AT ISSUE IN THIS CASE REGARDING THE

21   RADIO ACCESS NETWORK.

22            THE COURT:  SO IF WE COULD IMAGINE, FOR A

23   MINUTE, AN ALTERNATIVE UNIVERSE IN WHICH THE

24   COUNTER COMPLAINT IDENTIFIED ANTI-COMPETITIVE

25   BEHAVIOR WITH RESPECT TO ALL OF THE SPECIFICATIONS,

1   WORKING GROUPS, WITHIN 3GPP, WOULD YOU AGREE UNDER

2   THOSE CIRCUMSTANCES THAT THE DISCOVERY THEY ARE

3   SEEKING IS APPROPRIATE?

4         MS. KASSABIAN:  IT WOULD DEPEND.

5         IF IT WAS A FRAUD CLAIM, OBVIOUSLY THEY

6   WOULD NEED TO SATISFY RULE 9 AT ALL OF THOSE

7   LEVELS.  BUT I THINK GIVEN THE SIZE OF SAMSUNG AND

8   THE BREADTH OF THE TECHNOLOGIES THAT SAMSUNG IS

9   INVOLVED IN, YOU KNOW, MAYBE YOU WOULD HAVE TO

10  NARROW IT IN SOME OTHER WAY.

11        YOU COULD NARROW IT BY PRODUCTS OR BY

12  WITNESSES, THERE'S MANY DIFFERENT WAYS YOU COULD DO

13  IT.

14        APPLE DIDN'T HELP US AT ALL HERE IN

15  PROPOSING ANY NARROWING.  SO WHAT WE ARE PROPOSING

16  IS THAT YOU GO DOWN TO THE SPECIFICATION LEVEL

17  THAT'S ACCUSED.

18        IF YOUR HONOR WANTS TO BROADEN IT A BIT

19  AND LET THEM EXPLORE, YOU KNOW, WHETHER THERE MIGHT

20  BE ANY RELEVANT EVIDENCE THAT'S COMPARABLE

21  REGARDING A DIFFERENT SPECIFICATION, IF THAT'S

22  WHERE YOU ARE HEADED YOUR HONOR, I WOULD SAY IT HAS

23  TO BE AT THIS WORKING GROUP LEVEL.  BECAUSE EVEN

24  THAT IS, WE ARE TALKING ABOUT LIKE I SAID, 245

25  SPECIFICATIONS, AND I'M NOT EVEN SURE HOW MANY

1    PATENTS EVEN AT THAT LEVEL.

2                SO IF THEY HAD PLEADED FRAUD OR -- SORRY,

3    FAILURE TO DISCLOSE INFORMATION REGARDING SAMSUNG'S

4    INTERACTION WITH 3GPP UNDER THE TSG CT WORKING

5    GROUP FOR EXAMPLE, THEN YES I WOULD AGREE THEY

6    WOULD BE ENTITLED TO SOME DOCUMENTS IN THAT BUBBLE

7    ALL.  ALL OF THEM, I DON'T THINK SO.  BUT SOME OF

8    THEM, ABSOLUTELY, BUT THAT'S JUST NOT PLEADED HERE.

9                SO THEY ARE SAYING WE THINK YOU DID

10   SOMETHING BAD IN THIS CORNER SO WE WANT THE ENTIRE

11   BUILDING'S WORTH OF DOCUMENTS.  AND THAT'S JUST,

12   IT'S JUST A CLASSIC FISHING EXPEDITION.

13               WE MIGHT FIND SOMETHING ELSE WRONG THAT

14   YOU DID, ALLEGEDLY.

15               AND I THINK YOU HAVE TO FOCUS ON THE

16   CLAIMS, AND IF THEY ARE NOT SATISFIED, THEN AGAIN,

17   COME BACK TO US AND LET'S TALK ABOUT THAT.

18               IF YOU DON'T THINK YOU HAVE ENOUGH

19   DOCUMENTS AFTER WE'VE PRODUCED THE RELEVANT

20   MATERIALS RELATED TO THE ALLEGATIONS HERE, THE

21   ALLEGED IMPROPER FAILURE TO DISCLOSE REGARDING

22   THREE PARTICULAR SPECIFICATIONS, THEN WE WILL TALK.

23               THE COURT:  SO WHEN ARE YOU GOING TO

24   PRODUCE THE DOCUMENTS YOU SAID YOU WERE GOING TO

25   PRODUCE?

1              MS. KASSABIAN:  SO MY JANUARY 10TH

2     LETTER, THE FAMOUS JANUARY 10TH LETTER, LAID OUT

3     SPECIFIC PRODUCTION DATES.

4              AND I REALLY WAS AS LEAN AS I COULD BE IN

5     PERSUADING OUR CLIENT TO EXPEDITE THESE AS MUCH AS

6     I COULD.

7              CALL ME NAIVE, BUT I REALLY THOUGHT WE

8     MIGHT BE ABLE TO AVOID THIS MOTION.  SO I ASKED FOR

9     THE VERY EARLIEST DATE THAT THEY COULD REASONABLY

10    AGREE AND THAT'S INCLUDED IN THE LETTER.  THIS IS

11    EXHIBIT 1 TO THE CHAN DECLARATION IN OPPOSITION TO

12    THE MOTION TO COMPEL.

13             AND FOR THE LICENSE DOCUMENTS, BASICALLY

14    EACH DOCUMENT HAS A DIFFERENT DATE BECAUSE OF THE

15    AMOUNT OF BURDEN INVOLVED AND THE VOLUME OF

16    DOCUMENTS.

17             SO I BELIEVE FOR THE LICENSING DOCUMENT,

18    AND THE SSO DOCUMENTS WE SAID FEBRUARY 10TH.  EACH

19    SET OF DOCUMENTS HAS A DIFFERENT DATE.  AND THEY

20    ARE DIFFERENT FOR A REASON.  THESE WERE THOUGHTFUL

21    DATES.

22             YOU KNOW, I PRESSED PEOPLE, I BEGGED

23    PEOPLE.  YOU KNOW, TRIPS ARE BEING TAKEN, DOCUMENTS

24    ARE BEING GATHERED AS WE SPEAK, BUT THIS IS A VERY

25    LARGE UNIVERSE OF MATERIALS.  EVEN OUR COMPROMISE

1    IS STILL GOING TO RESULT IN A VERY LARGE

2    PRODUCTION.

3              SO FEBRUARY 10TH IS THE DATE FOR THOSE

4    DOCUMENTS.  AND THAT, WE BELIEVE, IS PROBABLY ONE

5    OF THE BIGGER CATEGORIES.

6              SOME OF THE OTHER DATES WE OFFERED ARE IN

7    JANUARY, LATE JANUARY.  AND IT STILL WASN'T ENOUGH,

8    I GUESS, TO AVERT THE MOTION.  BUT SOME OF THE

9    DOCUMENTS WE THINK WE CAN GATHER MORE QUICKLY.  WE

10   OFFERED AS EARLY AS JANUARY 27TH, JANUARY 31ST,

11   SOME DATES IN EARLY FEBRUARY.

12             BUT THE SSO AND LICENSING DOCUMENTS, I

13   THINK IT'S A BIG BODY OF WORK SO FEBRUARY 10TH WAS

14   OUR BEST ESTIMATE.

15             THE COURT:  AND WHAT NUMBER OF WITNESSES

16   WHO HAVE BEEN NOTICED FOR DEPOSITION ARE IMPLICATED

17   BY THESE CATEGORIES, THE SSO AND THE LICENSES?

18             MS. KASSABIAN:  SO THE INVENTOR

19   DEPOSITIONS ARE DONE.  SO NONE OF THEM.  AS FAR AS

20   I KNOW, NONE OF THEM.

21             AND BOTH PARTIES HAVE PRODUCED INVENTOR

22   DOCUMENTS AFTER THE INVENTOR DEPOSITIONS.  I THINK

23   EACH PARTY NEEDS TO BE THOUGHTFUL AND LOOK THROUGH

24   THOSE DOCUMENTS AND DECIDE WHETHER ANY OF THEM ARE

25   SO MATERIAL THAT THEY WANT TO ASK FOR MORE

1      DEPOSITION TIME WITH THAT PARTICULAR INVENTOR.

2                 SO FAR I DON'T THINK THAT PROCESS HAS

3      HAPPENED.  YOU KNOW, THEY CERTAINLY, I UNDERSTAND

4      THEY RESERVE THEIR RIGHT TO DO THAT AND WE RESERVE

5      OUR RIGHT TO DO THAT GIVEN THAT MANY INVENTOR

6      DOCUMENTS HAVE COME FROM APPLE AFTER THE

7      DEPOSITIONS.

8                 BUT WE DID MAKE CLEAR IN OUR OFFER THAT,

9      AND I BELIEVE THIS IS IN THE JANUARY 10TH LETTER,

10     THAT THE PRODUCTION WOULD BE COMING ON THESE DATES

11     OR SOONER IF A DEPOSITION WAS IMPLICATED.

12                SO WE ARE NOT IN ANY WAY PLANNING TO BLOW

13     BY ANY DEPOSITIONS.  WE ARE EITHER GOING TO GET THE

14     DOCUMENTS THAT FALL UNDER THESE CATEGORIES RELATED

15     TO A PARTICULAR WITNESS PRODUCED EARLY SO THAT THEY

16     CAN BE REVIEWED FOR THAT DEPO, OR IF IT'S

17     PHYSICALLY IMPOSSIBLE THEN WE PROBABLY MOVE DEPO

18     DATES AROUND BECAUSE THAT WOULD OBVIOUSLY, I THINK,

19     BE THE MOST EFFICIENT WAY TO HANDLE IT.

20                THE COURT:  ALL RIGHT.

21                WITH THE MARCH 8TH DEADLINE YOU DON'T

22     HAVE A LOT OF TIME TO WORK WITH, RIGHT?

23                MS. KASSABIAN:  NO.

24                BUT HONESTLY, A MONTH IN THIS CASE,

25     THAT'S A FAIRLY LONG TIME.  WE GET A LOT DONE IN

1    ONE DAY.

2            IT'S NOT A LOT OF TIME BUT, YOU KNOW,

3    LIKE I SAID, THE PARTIES HAVE SPENT WEEKS TRYING TO

4    NARROW THIS DOWN, AND WE WEREN'T SUCCESSFUL SO HERE

5    WE ARE.

6            BUT I DO THINK EVEN WITH THAT DATE, AND

7    THEY'VE GOT A LARGE TEAM, THEY'VE GOT TWO

8    OUTSTANDING LAW FIRMS, I THINK HAVING THESE

9    DOCUMENTS A MONTH BEFORE THE CUTOFF GIVES THEM

10   PLENTY OF TIME TO TAKE DEPO'S.

11           THEY'VE ALREADY NOTICED, I THINK, 40

12   DEPOSITIONS, RIGHT AROUND 40.  AND WE JUST GOT A

13   FEW MORE NOTICES A FEW DAYS AGO.

14           SO, YOU KNOW, AS FAR AS I KNOW THEIR DEPO

15   CALENDAR IS FULL.  BUT CERTAINLY THEY HAVE THE

16   RIGHT TO WITHDRAW SOME NOTICES AND ISSUE OTHERS IF

17   THEY RECEIVE THESE DOCUMENTS AND FEEL THAT THEY

18   HAVE OTHER PEOPLE THEY WANT TO TALK.

19           THE COURT:  ALL RIGHT.

20           THANK YOU, MS. KASSABIAN.

21           MR. WALDEN, ANY REBUTTAL?

22           MR. WALDEN:  YES, YOUR HONOR.

23       AND AGAIN, I WILL TRY TO BE SHORT.  JUST A

24   QUICK RESPONSE.

25           THE INVENTORS ARE NOT THE ONLY RELEVANT

146

1    WITNESSES FOR THE SSO DOCS WHO ARE THE LICENSING

2    DOCS.

3              THE INVENTORS ARE INVOLVED IN STANDARD

4    SETTING ORGANIZATIONS, BUT AS WE PUT IN OUR BRIEF

5    THERE ARE A LOT OF NON INVENTORS INVOLVED.

6              WE'VE NOTICED I BELIEVE FOUR OR FIVE THAT

7    HAVE COME TO LIGHT IN SOME OF THEIR MORE RECENT

8    PRODUCTIONS AS NAMES THAT WE THOUGHT WERE MORE

9    RELEVANT.

10             BUT AGAIN, AS WE PUT IN OUR MOTION, PART

11   OF OUR PROBLEM IS THEY'VE BEEN SO DEFICIENT IN

12   THEIR SSO PRODUCTION, NON INVENTOR RELATED,

13   ESPECIALLY THAT WE'RE NOT EVEN QUITE SURE WHO TO

14   DEPOSE.

15             THE LETTER, JUST TO CLARIFY,

16   MS. KASSABIAN'S LETTER THEY SAID THEY WOULD PRODUCE

17   THE SSO DOCUMENTS BY FEBRUARY 10TH BUT THE LICENSE

18   DOCUMENTS BY JANUARY 31ST.

19             AND AGAIN, WE HAD MOVED TO COMPEL THEM BY

20   JANUARY 23RD BECAUSE WE SERVED THESE REQUESTS A

21   LONG TIME AGO.  IT SHOULDN'T BE THAT THEY ARE

22   COLLECTING THEM AND GETTING THEM READY FOR

23   PRODUCTION, THEY SHOULD HAVE BEEN PRODUCED A WHILE

24   BACK.

25             AND THEN FINALLY JUST TO ADDRESS THE ONE

1     POINT THAT MS. KASSABIAN MENTIONED BEFORE, I

2     BELIEVE IT WAS THE UMTS, SHE SAID SOMETHING ON THE

3     ORDER, IT WAS 500 PLUS.

4              THE COURT:  IT WAS 514.

5              MR. WALDEN:  514.

6              MS. KASSABIAN MAY BE ABLE TO CLARIFY

7     THAT, BUT IN OUR REVIEW IT WAS NOT THAT GREAT OF AN

8     AMOUNT IF YOU LOOK AT WHETHER THERE'S, SAY, FOREIGN

9     COUNTERPARTS TO A U.S. PATENT OR SOMETHING LIKE

10    THAT.

11             SO ALL OF THE SUDDEN YOU'VE GOT FOUR OR

12    FIVE -- LOOKS LIKE FOUR OR FIVE PATENTS BEING

13    DISCLOSED, BUT REALLY IT'S THE SAME PATENT BUT IN

14    MULTIPLE JURISDICTIONS.

15             SO AGAIN, I THINK YOU NARROW THAT DOWN.

16    WE HAVE BROAD, REAL SUBSTANTIVE ANTI-TRUST AND

17    OTHER TYPES OF COUNTERCLAIMS, WE BELIEVE WE ARE

18    ENTITLED TO DISCOVERY FOR THAT REASON.

19             THE COURT:  ALL RIGHT.

20             THANK YOU VERY MUCH.

21             LET'S TURN NEXT TO THE LAST OF THE APPLE

22    MOTIONS.  APPLE'S MOTION TO COMPEL PRODUCTION,

23    WHICH IS DOCKET NUMBER 613.

24             WHO'S UP, MR. JACOBS?

25             MR. JACOBS:  YES, SIR.

1           THE COURT:  OH, YOU'RE UP.  OKAY.

2           MR. JACOBS:  IT'S A LITTLE AMBIGUOUS.

3           WELL, WE ARE HERE ON THIS MOTION,

4    YOUR HONOR, OUT OF A VERY SERIOUS CONCERN THAT WAS

5    REINFORCED BY SAMSUNG'S MOTION FOR AN EXTENSION OF

6    TIME ON YOUR DECEMBER 22ND ORDER.

7           WHAT BECAME CLEAR IN SAMSUNG'S MOVING

8    PAPERS FOR THAT EXTENSION WAS THAT SAMSUNG HAS ONLY

9    NOW GOTTEN UNDER WAY IN A SERIOUS WAY TO GATHER,

10   COLLECT AND PRODUCE THE DOCUMENTS THAT ARE

11   APPROPRIATE FOR PRODUCTION IN THIS CASE, EVEN BY

12   SAMSUNG'S OWN ACKNOWLEDGEMENT OR BY COURT ORDER.

13          SO TO BE CLEAR, WHAT SAMSUNG WAS SEEKING

14   EXTENSION ON WAS NOT JUST DOCUMENTS WE HAD LONG

15   REQUESTED OR THE COURT ORDERED IN ITS DECEMBER

16   ORDER, BUT RATHER AS THE DECEMBER ORDER WAS WORDED,

17   DOCUMENTS THAT HAD BEEN ORDERED FOR PRODUCTION IN

18   SEPTEMBER.

19          SO WHAT HAS BECOME APPARENT TO US WITH

20   ALL -- WITH VERY DEEP CONCERN FOR THE BURDEN WE ARE

21   PLACING ON THE COURT, AND REALLY, WE TALK ABOUT

22   THIS ALL THE TIME, HOW CAN WE TEE THIS UP MORE

23   EFFICIENTLY?  IS THERE ANYTHING WE CAN DO?

24          WE HAVE REACHED THE CONCLUSION THAT WE

25   JUST HAVE TO GET TO THESE MOTIONS THROUGH THE MEET

1    AND CONFER PROCESS WHICH IS ITS OWN SET OF

2    WANDERING PATHS HERE AND THEN IN FRONT OF

3    YOUR HONOR AND GET ORDERS.  AND I HOPE WE DON'T

4    NEED THIS, BUT ORDERS ON ORDERS BECAUSE THAT'S WHAT

5    IT SEEMS WE NEED IN THIS CASE.

6              SO SAMSUNG'S PROTESTATION IS LOOK, WE'VE

7    AGREED TO ALL THIS PRODUCTION.  THAT AGREEMENT CAME

8    FOUR DAYS AFTER THE FIRST PROMISE OF A SUBSTANTIVE

9    RESPONSE TO THE LEAD COUNSEL MEET AND CONFER WITH

10   SEVERAL EXTENSIONS GRANTED.

11             AND THE AGREEMENT, AS I WILL ILLUSTRATE

12   IN A MOMENT, IS INCOMPLETE.

13             BUT WE HAVE ANOTHER REASON FOR WORRY

14   WHICH IS THAT THE DECEMBER ORDER ALSO HAD AN ORDER

15   ABOUT PRODUCTION IN ADVANCE OF DEPOSITIONS.

16             THE DECEMBER ORDER SAID PRIORITIZE

17   DEPOSITIONS, RELATED PRODUCTION, AND SAID THREE

18   DAYS IN ADVANCE.

19             WE HAD EARLIER AGREED TO FIVE DAYS IN

20   ADVANCE.  AND AT THE APPLE INVENTOR DEPOSITIONS WE

21   AIMED FOR AND ALMOST ALWAYS HIT THAT DEADLINE.

22   WERE THERE A FEW DOCUMENTS THAT WE UNCOVERED DURING

23   DEPOSITION PREPARATION AND MADE AVAILABLE?  YES.

24   BUT WHAT WE HAVE NOW IN OUR DEPOSITIONS FROM

25   SAMSUNG IS A QUITE SERIOUS PROBLEM WITH DOCUMENTS

1    BEING PRODUCED ON OR ABOUT THE DAY OF THE

2    DEPOSITION.

3            SO WE PREPARED A CHART FOR YOUR HONOR.

4    AND WE ARE NOT MOVING ON THIS ISSUE RIGHT NOW IN A

5    SPECIFIC SENSE BUT THIS ILLUSTRATES THE PROBLEM WE

6    ARE HAVING GETTING SAMSUNG, AND BY SAMSUNG I MEAN

7    THE COMPANY, THE PEOPLE AT THE COMPANY, TO PAY

8    ATTENTION TO THIS PROCESS.

9            MS. MAROULIS:  YOUR HONOR, THIS IS NOT

10   THE MOTION THAT'S BEEN NOTICED, SO WE OBJECT.

11           THE COURT:  I NOTE THAT.  AND I TAKE IT

12   THAT MR. JACOBS IS GOING TO TIE THIS TO THE MOTION

13   THAT IS BEFORE ME PRETTY QUICKLY.

14           MS. KASSABIAN:  BUT THIS IS WHAT THE

15   PARTIES ARE CURRENTLY MEETING AND CONFERRING ON.

16           MR. JACOBS:  THE TIE, AS I SAID

17   YOUR HONOR, SAMSUNG HAS NOT GOTTEN TO IT ON

18   PRODUCTION.  WE ARE GETTING DOCUMENTS AFTER

19   DEPOSITIONS HAVE STARTED.  WE'RE GETTING DOCUMENTS

20   SHORTLY BEFORE DEPOSITIONS HAVE STARTED.  THOSE ARE

21   DOCUMENTS IN KOREAN LANGUAGE.  AND THE POINT IS

22   SAMSUNG HAS STILL NOT GOTTEN TO IT.

23           SO THAT'S WHY WE HAVE WHAT IS FAIRLY

24   BROAD IN TERMS OF THE NUMBER OF TOPICS IT COVERS, A

25   FAIRLY BROAD MOTION BEFORE YOUR HONOR SEEKING AN

1      ORDER TO PRODUCE AND TO PRODUCE ESSENTIALLY

2      IMMEDIATELY.

3              LET'S GET DOWN -- I THINK HAVING SAID

4      THAT BY WAY OF INTRODUCTION, I WANT TO BE AS

5      HELPFUL TO THE COURT IN ACTUALLY ISSUING AN ORDER

6      AS WE CAN.

7              SO WHAT I DID THIS MORNING, AND IT'S A

8      LITTLE ROUGH AND IT MAY BE THAT WE'VE

9      MISINTERPRETED WHAT SAMSUNG IS OFFERING, BUT WE

10     MARKED UP OUR PROPOSED ORDER WITH WHAT WE

11     UNDERSTAND SAMSUNG'S COMMITMENTS TO BE.

12             THE PROPOSED ORDER ITSELF WAS DESIGNED TO

13     MAKE THIS PROCESS AS CLEAR AND CRISP AS POSSIBLE.

14     AND WHAT YOU WILL SEE IS THAT IN SOME CASES WE

15     DON'T HAVE A DATE.  IN SOME CASES WE HAVE A NO.

16             NO COULD BE MEAN TWO THINGS:  IT COULD

17     MEAN REFUSAL, OR NO COULD MEAN SILENCE.  THEN IN

18     SOME CASES WE HAVE KIND OF A REWRITE.

19             AND SO AGAIN IF WE MARCH THROUGH THESE --

20     AGAIN, I WANT TO DO THIS AS EFFICIENTLY AND FOR THE

21     COURT AS POSSIBLE.  WHAT YOU WILL SEE IS WE DON'T

22     HAVE AGREEMENT YET AND WE DON'T HAVE A DATE.

23             MS. KASSABIAN:  MR. JACOBS, WHERE DID THE

24     LANGUAGE COME FROM?

25             MR. JACOBS:  I HAVE BEEN ASKED A QUESTION

1    BY COUNSEL.

2              THIS IS OUR INTERPRETATION OF WHAT WE

3    HAVE GOTTEN FROM SAMSUNG.  AGAIN, IF WE

4    MISINTERPRET IT, I'M SURE THEY WILL POINT IT OUT TO

5    US, BUT THIS IS OUR INTERPRETATION OF WHAT WE HAVE

6    GOTTEN.

7              SO I THINK MAYBE A COUPLE ARE WORTH

8    FLAGGING FOR YOUR HONOR BECAUSE THEY REQUIRE MORE

9    THAN JUST A KIND OF YES, THESE ARE RELEVANT, YES

10   THEY SHOULD BE ORDERED TO BE PRODUCED.

11             ON THE ISSUE OF DESIGN AROUNDS, THIS IS

12   AN IMPORTANT ONE, IT COMES UP TO TWO WAYS.

13             ONE, IF THEY HAVE DESIGNED AROUND

14   ALREADY, WE WANT THE DOCUMENTATION ABOUT THAT

15   DESIGN AROUND.

16             TWO, IF THEY ARE GOING TO ARGUE THAT THEY

17   HAVE NON INFRINGING ALTERNATIVES, HYPOTHETICAL OR

18   IN THE WORKS, WE WANT THE DOCUMENTS ABOUT THAT.

19             WHAT THEY HAVE SIGNALLED TO US IS THIS IS

20   CLOAKED IN PRIVILEGE ON ALL COUNTS AND THAT THERE

21   ISN'T ANYTHING TO PRODUCE.  BUT THAT JUST CAN'T BE

22   RIGHT.

23             IN THE FIRST CASE, WHEN AN ENGINEER

24   ACTUALLY IMPLEMENTS A DESIGN AROUND, THE

25   IMPLEMENTATION OF THAT DESIGN AROUND IS NOT A

1     PRIVILEGED EVENT.

2              THE DIRECTION FROM A MANAGER TO AN

3     ENGINEER CREATES THE BLUE GLOW EFFECT, IS NOT A

4     PRIVILEGED EVENT.  IT MAY BE THERE WAS LEGAL ADVICE

5     IN REACHING THE DECISION TO IMPLEMENT THE DESIGN

6     AROUND, AND SOME DAY WE WILL GET TO PRIVILEGE LOGS,

7     BUT THAT CAN'T BE RIGHT.

8              AND THEN, OF COURSE, IF THEY'RE GOING TO

9     ARGUE NON INFRINGING ALTERNATIVES AND THAT THEY

10    HAVE SOMETHING IN THE WORKS AND IT WOULD HAVE BEEN

11    TRIVIAL TO DESIGN OF THE PATENTS, THAT SHOULD BE

12    DOCUMENTED.

13             THE ISSUE OF FINANCIAL DOCUMENTS IS A

14    KNOTTY ONE.  IT'S KNOTTY BECAUSE OUR BURDEN IN ONE

15    SENSE IS FAIRLY EASY, AND IN ANOTHER SENSE IT'S

16    FAIRLY CHALLENGING.

17             WE ARE ENTITLED, FOR DESIGN PATENT

18    INFRINGEMENT, TO SAMSUNG'S PROFITS.  BUT SAMSUNG IS

19    A GLOBAL COMPANY WITH LOTS OF OPPORTUNITY TO MOVE

20    REVENUES INTO A SUBSIDIARY IF IT'S TAX ADVANTAGED

21    OR NOT OR ALLOCATE COSTS IN PARTICULAR WAYS.

22             AND WE HAVE TO REVERSE ENGINEER THAT FROM

23    THE UNDERLYING DOCUMENTATION AND WE HAVE TO CREATE

24    A DAMAGES MODEL THAT CREATES AN APPROPRIATELY

25    ALLOCATED MODELLING OF SAMSUNG'S PROFITS.

1          IT'S NOT MERELY WHAT SAMSUNG REPORTS AS,

2     SAY, PROFITS FOR THE HANDSET DIVISION, BECAUSE SOME

3     PRODUCTS INFRINGE THE DESIGN PATENTS, WE ALLEGE,

4     AND SOME PRODUCTS DO NOT.  SO WE NEED TO GET DOWN

5     TO A FAIRLY GRANULAR LEVEL HERE.

6          NOW AGAIN, WE ARE NOT EXACTLY SURE WHAT

7     SAMSUNG HAS PROMISED TO DO BUT IT DOES HAVE TO BE

8     QUITE COMPLETE, IT DOES HAVE TO BE GLOBAL AND IT

9     DOES HAVE TO BE DOWN TO THE PRODUCT IN A

10    MONTH-BY-MONTH LEVEL.

11         THE COURT:  DOESN'T THE CHAN DECLARATION,

12    OR EXHIBIT 1 TO IT, LAY OUT THAT JANUARY 10TH

13    LETTER WHAT THEY'VE AGREED TO PRODUCE?

14         MR. JACOBS:  YES.

15         AND I THINK IT'S THE -- THE SHORT ANSWER

16    IS IT'S INCOMPLETE.

17         SO I DON'T THINK WE ARE TRULY GETTING --

18    AMONG THE THINGS THAT WE'VE SPOTTED, WE NEED TO GET

19    THIS FROM ALL THE ENTITIES THAT ARE INVOLVED IN THE

20    SALES.

21         SO WE NEED IT AT THE SUBSIDIARY AND AT

22    THE PARENT LEVEL.  WE NEED IT AT THE MONTH-BY-MONTH

23    LEVEL BECAUSE PRODUCTS ARE BEING ROLLED IN AND OUT.

24    WE NEED IT AT THE PRODUCT LEVEL BECAUSE IT'S A

25    PRODUCT-BY-PRODUCT ASSESSMENT.  WE NEED THE BUILD

1    OF MATERIALS, WE NEED THE GNA ALLOCATION.  WE NEED

2    A PRETTY COMPREHENSIVE VIEW OF THE INCOME AND COSTS

3    STRUCTURE OF SAMSUNG'S MOBILE PHONE GROUP DOWN TO

4    THOSE LEVELS OF GRANULARITY.

5                THE COURT:  YOU ARE ASKING FOR THE BILL

6    OF MATERIALS FOR EACH OF THE INDIVIDUAL UNITS THAT

7    INFRINGE?

8                MR. JACOBS:  OH, YES.  AND WE HAVE GIVEN

9    THAT ON THE APPLE'S SIDE, YOUR HONOR.

10               THE COURT:  HOW MANY BILLS OF MATERIAL

11   ARE THERE?

12               MR. JACOBS:  WELL, THERE ARE A NUMBER OF

13   ACCUSED PRODUCTS.  FOR THIS PURPOSE, I DON'T THINK

14   IS THAT HUGE.

15               SO THAT'S AN AREA THAT'S PROBABLY WORTH A

16   LITTLE FURTHER EXPLORATION.

17               THOSE ARE THE ONES I WANTED, THAT I

18   THOUGHT IMPORTANT TO HIGHLIGHT, YOUR HONOR.

19               WE'VE ACTUALLY, WE COVERED A LOT OF

20   TOPICS WITH THIS MOTION.  WE THINK IT'S IMPORTANT

21   THAT WE GET AN ORDER FROM YOUR HONOR ORDERING

22   SAMSUNG TO DO WHAT IN MANY CASES, NOW ON THE EVE OF

23   THE LAST MINUTE IT SAID IT WAS WILLING TO DO,

24   BECAUSE ONLY WITH AN ORDER DO WE REALLY GET THEIR

25   ATTENTION.

1          THE COURT:  MR. JACOBS, COULD YOU SHED

2     SOME FURTHER LIGHT ON WHAT, IN YOUR VIEW, HAS BEEN

3     SAMSUNG'S NONCOMPLIANCE WITH MY DECEMBER 22ND AND

4     SEPTEMBER 28TH ORDERS?

5          I WOULD LIKE TO JUST BETTER UNDERSTAND

6     FROM APPLE'S PERSPECTIVE WHAT I ORDERED AND WHAT

7     YOU BELIEVE SAMSUNG HAS FAILED TO DO.

8          MR. JACOBS:  WE GOT DOCUMENTS LATE AFTER

9     THE DECEMBER 31ST DATE.  WE HAVE NOT MOVED ON THAT.

10    BUT WE ARE LOOKING AT IT TO SEE IN WHAT WAY IT WAS

11    IMPACTFUL THAT WE GOT THEM LATE.

12          WE GOT DOCUMENTS PURSUANT TO THAT ORDER

13    THAT WE SHOULD HAVE GOTTEN IN ADVANCE OF THE

14    PRELIMINARY INJUNCTION.

15          THAT'S POTENTIALLY HIGHLY PREJUDICIAL.

16    BUT AGAIN, WE DON'T WANT TO -- WE HAD A LOT TO DO.

17    AND IF WE ARE GOING TO BRING A MOTION, IT'S GOING

18    TO BE A VERY WELL PLACED MOTION WITH A LOT OF

19    THOUGHT GIVEN TO WHAT THE POSSIBLE RELIEF COULD BE.

20          AND THEN AS I MENTIONED, BECAUSE OF IT'S

21    ALREADY WELL INTO THE DATES FOR WHICH ALL

22    PRODUCTION IS TO BE COMPLETE, THE FACT THAT SAMSUNG

23    IS HAVING TROUBLE MEETING ITS PRE DEPOSITION

24    OBLIGATIONS, WHICH THEMSELVES ARE STATED IN THE

25    ORDER -- I'M SORRY, I'M NOT BEING CLEAR.  THERE'S

1    THE THREE-DAY ORDER IN THE ORDER AND THEN THERE'S

2    THE ORDER TO PRODUCE CATEGORIES OF DOCUMENTS.

3         WE WOULD HAVE THOUGHT THAT THE SECOND

4    ORDER WOULD HAVE SUBSUMED THE FIRST IN LARGE PART

5    SO THAT WE WOULDN'T BE GETTING LARGE PRODUCTIONS

6    RIGHT ON THE EVE OF A DEPOSITION.  THAT WOULD

7    ENABLE US TO DO THE TRANSLATIONS WELL ENOUGH IN

8    ADVANCE THAT WE CAN ACTUALLY PREPARE FOR THE

9    DEPOSITIONS.

10        BUT INSTEAD, AND YES THIS WILL PERHAPS BE

11   THE SUBJECT OF A SEPARATE MOTION, WE ARE GETTING

12   THEM VERY CLOSE IN TIME TO THE DEPOSITIONS.

13        THE COURT:  JUST SO THAT I'M CLEAR, YOU

14   WOULD AGREE THAT AT THIS POINT I DO NOT HAVE A

15   MOTION BEFORE WE WHICH SPECIFICALLY ADDRESSES

16   NONCOMPLIANCE WITH MY EARLIER ORDERS?

17        MR. JACOBS:  THAT'S CORRECT.

18        THE COURT:  ALL RIGHT.  THANK YOU.

19        LET'S HEAR FROM SAMSUNG.

20        MS. KASSABIAN, ARE YOU UP?

21        MS. KASSABIAN:  I AM.  AND I THANK

22   MR. JACOBS FOR HIS BREVITY.  I WILL TRY TO BE AS

23   BRIEF.

24        SO I GUESS THE FIRST THING I WILL QUICKLY

25   TALK ABOUT IS THIS RECURRING AND INCORRECT

1    ACCUSATION THAT THERE HAS BEEN A VIOLATION OF

2    YOUR HONOR'S PRIOR ORDERS.

3            IT WAS MENTIONED IN THE BRIEF, IT WAS

4    MENTIONED JUST NOW BY MR. JACOBS SPECIFICALLY

5    REGARDING THE MERCY EXTENSION OF TIME THAT WE ASKED

6    FOR OVER THE CHRISTMAS HOLIDAY.

7            I WANT TO BE CRYSTAL CLEAR ABOUT THAT.

8    THE ORDER SAID ANY DOCUMENTS THAT SHOULD HAVE BEEN

9    PRODUCED PURSUANT TO THE SEPTEMBER 28TH ORDER MUST

10   BE PRODUCED BY DECEMBER 31ST OR THERE MAY BE

11   SANCTIONS.

12           WE -- ALL OF THE DOCUMENTS THAT WERE

13   ORDERED PRODUCED BY SEPTEMBER 28TH HAD ALREADY BEEN

14   PRODUCED PURSUANT TO THAT ORDER IN DECEMBER.  THE

15   POINT OF THAT REQUEST WAS TWO FOLD, THE EXTENSION

16   REQUEST.

17           ONE, IT WAS BECAUSE AFTER THE PRODUCTION

18   HAD BEEN MADE PURSUANT TO THE SEPTEMBER 28TH ORDER,

19   SAMSUNG DISCOVERED A FEW ADDITIONAL CUSTODIANS ON

20   SURVEYS.  AND SO DEPENDING ON HOW YOU READ THAT, IF

21   YOU'RE BEING VERY CONSERVATIVE, ONE COULD ARGUE

22   WELL, THOSE ARE SURVEY DOCUMENTS THAT FIT THE

23   DESCRIPTION OF THE ORDER SO YOU REALLY SHOULD GET

24   THOSE OUT BY --

25           THE COURT:  THAT'S NOT REALLY A CLOSE

1    CALL, IS IT?  IT'S NOT BEING CONSERVATIVE, THE

2    SURVEY SHOULD HAVE BEEN PRODUCED MONTHS BEFORE.

3         MS. KASSABIAN:  RIGHT.

4         BUT I'M SAYING THAT DESPITE OUR

5    INVESTIGATIONS WE FOUND NEW CUSTODIANS.

6         WE DIDN'T WITHHOLD ANYTHING, THERE WERE

7    JUST WITNESSES THAT CAME TO LIGHT MONTHS LATER.  WE

8    REALIZED THESE PEOPLE HAD TO DO SURVEYS, SO WE

9    GATHERED THEIR DOCUMENTS WHICH WERE MASSIVE AND WE

10   BELIEVED THAT THAT WAS GOING TO MAYBE TRICKLE ON

11   PAST DECEMBER 31ST.

12        SO IT WASN'T THAT THEY WERE WITHHELD, IT

13   WASN'T THAT GOOD FAITH INVESTIGATION HADN'T

14   HAPPENED, IT WAS THAT WHEN WE DISCOVERED A COUPLE

15   ADDITIONAL SURVEY CUSTODIANS, WE INTERPRETED YOUR

16   ORDER TO SAY THOSE DOCUMENTS SHOULD BE OUT BY

17   DECEMBER 31ST.

18        IT TURNS OUT WE WERE ABLE TO DO THAT, YOU

19   KNOW, WITH SOME LATE NIGHTS WE WERE ABLE TO GET

20   THOSE DOCUMENTS OUT BY THE DECEMBER 22ND ORDER

21   DEADLINE WHICH WAS NEW YEARS EVE.  SO THOSE DID GET

22   OUT, THERE WAS NO VIOLATION

23        THE COURT:  SO YOU ARE STANDING HERE

24   REPRESENTING TO ME THAT EVERY DOCUMENT SUBJECT TO

25   MY SEPTEMBER 28TH AND DECEMBER 22ND ORDERS WAS

1   PRODUCED ON OR BEFORE DECEMBER 31ST?

2           MS. KASSABIAN:  JUST THE PART OF THE

3   ORDER -- WELL, THERE'S DIFFERENT PARTS OF

4   YOUR HONOR'S ORDER.

5           THE COURT:  WELL, THAT'S A PRETTY

6   YES-OR-NO QUESTION.

7           MS. KASSABIAN:  SOME OF THE DEADLINES IN

8   YOUR ORDER WERE JANUARY 15TH, SO THOSE DOCUMENTS

9   WERE NOT PRODUCED BY DECEMBER 31ST, BUT THEY WERE

10  PRODUCED BY JANUARY 15TH.

11          AND I CAN SPECIFICALLY TELL YOU YOUR

12  DECEMBER 22ND ORDER HAS, I THINK, FOUR PARAGRAPHS.

13  THE FIRST PARAGRAPH REQUIRE THAT DOCUMENTS BE

14  PRODUCED BY DECEMBER 31ST, THEY WERE.  THAT WAS

15  SOURCE CODE AND RELATED TECHNICAL DOCUMENTS.

16          DESPITE APPLE'S CLAIMS OF URGENCY, THEY

17  DECLINED TO COME INSPECT THEM THAT DAY CLAIMING

18  THEY DIDN'T REALIZE THOSE DOCUMENTS WERE COMING ON

19  THAT DAY AND THEY WEREN'T PREPARED, WHICH WAS

20  SURPRISING TO US.

21          THE SECOND PARAGRAPH SAYS DESIGN HISTORY

22  DOCUMENTS, CAD FILES, SKETCHBOOKS, MODELS AND

23  MOCKUPS.

24          ALL THREE OF THOSE CATEGORIES WERE

25  PRODUCED AND MADE AVAILABLE FOR INSPECTION ON

1    DECEMBER 31ST.  APPLE DECLINED TO COME LOOK AT THEM

2    THAT DAY.

3              THE ONLY CATEGORY WHERE THERE WAS A

4    SPILLOVER ON NUMBER TWO, AND IT WAS WHY WE

5    REQUESTED RELIEF, WAS ON THE E-MAILS, DESIGN

6    HISTORY E-MAILS AMONG THE DOZENS OF SAMSUNG

7    EMPLOYEES THAT WERE INVOLVED.  THAT PRODUCTION

8    STARTED BEFORE DECEMBER 31ST AND THE VERY LAST PAGE

9    OF IT WAS OUT BY JANUARY 5TH.

10             PARAGRAPH 3 ASKED FOR E-MAILS CONCERNING

11   SAMSUNG'S ANALYSIS OF APPLE PRODUCTS, AND THE

12   DEADLINE FOR THAT WAS 12/31.  THAT DEADLINE WAS

13   MET.

14             THE LAST SENTENCE TALKS ABOUT OTHER TYPES

15   OF ADDITIONAL DOCUMENTS REGARDING PRODUCTS IN

16   PATENT CLAIMS NOT AT ISSUE IN THE PI PHASE, SETS A

17   DEADLINE OF JANUARY 15TH, THAT DEADLINE WAS MET.

18             PARAGRAPH 4, SURVEY AND MARKETING

19   DOCUMENTS.  ALL OF THOSE DOCUMENTS WERE PRODUCED.

20   AGAIN, THESE WERE NEW CUSTODIANS THAT WERE JUST

21   RECENTLY FOUND, NOT SOMETHING WE KNEW ABOUT AT THE

22   TIME OF THE PRODUCTION IN CONNECTION WITH THE

23   SEPTEMBER 28TH ORDER.

24             THOSE DOCUMENTS WERE PRODUCED

25   DECEMBER 31ST.  I'M TOLD THERE WAS SOME SORT OF A

1    FILE CORRUPTION ISSUE AND THE FILES WERE RE

2    UPLOADED FOR APPLE ON THE 1ST, BUT IN ANY EVENT

3    THEY WENT OUT.

4            SO I JUST WANT TO BE CRYSTAL CLEAR ABOUT

5    THAT, THESE RECURRING ALLEGATIONS THAT THERE HAD

6    BEEN VIOLATIONS OF COURT ORDERS ARE INCORRECT.

7            GOING BACK TO THE SUBSTANCE OF THE

8    MOTION, DESIGN AROUNDS, THERE'S REALLY NOTHING TO

9    TALK ABOUT HERE.

10           ON THE BLUE GLOW, WHICH IS THE ONLY ISSUE

11   THAT APPLE MET AND CONFERRED WITH US ABOUT, WE'VE

12   AGREED TO PRODUCE DOCUMENTS.  WE DIDN'T SAY

13   EVERYTHING WAS PRIVILEGED.  WE SAID IN THE PRIOR

14   LETTER THAT AT THIS POINT ALL THAT WE HAD FOUND

15   WOULD BE PRIVILEGED, BUT CERTAINLY ANYTHING THAT'S

16   NOT PRIVILEGED WE WILL PRODUCE.

17           WE HAVE AGREED TO THAT PRODUCTION.

18   THERE'S NOTHING TO ORDER, IT'S MOOT.

19           THE COURT:  HAVE YOU PRODUCED THEM?

20           MS. KASSABIAN:  I DON'T THINK SO, I THINK

21   WE OFFERED TO --

22           THE COURT:  WELL, THEN IT'S NOT MOOT.

23           MS. KASSABIAN:  I THINK WE OFFERED TO

24   PRODUCE THEM WHICH IS JANUARY 27TH WHICH IS NEXT

25   WEEK.

1          SO BY AGREEMENT I BELIEVE IT'S MOOT

2    BECAUSE THERE'S NOT A DISPUTE ABOUT THAT, BUT

3    OBVIOUSLY IF YOUR HONOR WANTS TO ORDER THAT, IT'S

4    OBVIOUSLY WITHIN YOUR DISCRETION.

5          ON THE OTHER DESIGN AROUNDS THERE'S NOT

6    BEEN A MEET AND CONFER ON THAT.  WE GOT A LETTER

7    TWO DAYS BEFORE THE LEAD COUNSEL MEET AND CONFER

8    SAYING OH, WE WANT EVERYTHING ELSE REGARDING ALL

9    OTHER DESIGN AROUNDS.

10         IN THEORY, THERE REALLY ISN'T A DISPUTE

11   THERE EITHER BUT THERE'S BEEN NO DISCUSSION WHAT

12   DESIGN AROUNDS THOSE MIGHT BE.  ARE THERE ANY

13   DESIGN AROUNDS IN RELEASED PRODUCTS THAT WOULD BE

14   SUBJECT TO PRODUCTION?  THERE'S BEEN NO DISCUSSION

15   ON THAT.

16         SO THAT'S SOMETHING WE'VE ASKED

17   YOUR HONOR TO TELL APPLE TO GO BACK TO THE DRAWING

18   BOARD AND DO ITS HOMEWORK AND TALK TO US ABOUT IT

19   BEFORE FILING A MOTION.

20         THE COURT:  WELL, YOU INDICATED THAT THE

21   ISSUE WAS RAISED TWO DAYS BEFORE THE LEAD COUNSEL

22   MEET AND CONFER.

23         MS. KASSABIAN:  I BELIEVE THAT'S RIGHT.

24         THE COURT:  AM I RIGHT ABOUT THAT?

25         MS. KASSABIAN:  I BELIEVE THAT'S RIGHT.

1          THE COURT:  SO IF IT WAS RAISED TWO DAYS

2     BEFORE WHY WASN'T IT DISCUSSED ON THE 5TH?

3          MS. KASSABIAN:  I THINK IT WAS DISCUSSED,

4     BUT THE LEAD COUNSEL MEET AND CONFER IS NOT THE

5     TIME HAVE YOUR FIRST CONVERSATION, THAT'S THE TIME

6     TO HAVE YOUR LAST CONVERSATION.  AND THAT'S

7     SOMETHING WE FEEL IS BEING ABUSED BY APPLE.

8          THERE ARE MANY PEOPLE ON OUR TEAM THAT

9     ARE MORE THAN COMPETENT, AND FRANKLY BETTER SUITED,

10    TO HARSH OUT DISCOVERY ISSUES THAN MR. MCELHINNY

11    AND CHARLIE VERHOEVEN.  THEY ARE VERY BUSY MEN WITH

12    A LOTS OF THINGS TO DO.

13          AND SO IT'S BEEN AN AMBUSH --

14          THE COURT:  WELL, EXCEPT THAT A DISTRICT

15    JUDGE IN THIS COURT, IN THIS CASE, ORDERED THEM TO

16    BE INVOLVED IN THIS PROCESS.

17          MS. KASSABIAN:  THAT'S ABSOLUTELY RIGHT,

18    BUT WE CAN --

19          THE COURT:  I DON'T MEAN TO GO OUT ON A

20    TANGENT HERE, BUT THERE SEEMS TO BE A

21    MISUNDERSTANDING HERE ABOUT HOW THIS MEET AND

22    CONFER IS SUPPOSED TO WORK.

23          I DON'T KNOW HOW MANY TIMES WE HAVE

24    TALKED ABOUT THIS NOW, BUT I TEND TO FOLLOW THE

25    ORDERS OF THE PRESIDING JUDGE, HAS GOTTEN ME IN A

1    GOOD PLACE SO FAR.

2              I DON'T UNDERSTAND WHY IT'S SO HARD.  I

3    UNDERSTAND THEY ARE BUSY MEN, I UNDERSTAND THEY

4    HAVE OTHER CASES, I KNOW THIS WORLD.  BUT YOU'VE

5    GOT AN ARTICLE III JUDGE WHO SAID TO LEAD COUNSEL

6    IN THIS CASE THAT THEY NEED TO DRIVE THIS PROCESS

7    AND SERVE AS AN EFFECTIVE SCREEN BEFORE THESE

8    MOTIONS ARE BROUGHT BEFORE THE COURT.

9              MS. KASSABIAN:  ABSOLUTELY.

10             THE COURT:  SO I DON'T TAKE WELL THE

11   SUGGESTION THAT BECAUSE THEY'RE BUSY, BECAUSE THEY

12   CAN ONLY GET INVOLVED AT THE VERY TAIL END THE

13   PROCESS THAT SOMEHOW THEIR PARTICIPATION OUGHT TO

14   BE EXCUSED IN ANY WAY.

15             THAT'S NOT WHAT SHE TOLD ALL OF US TO DO.

16             MS. KASSABIAN:  DEFINITELY NOT.

17             I BELIEVE THE ORDER SAYS BEFORE YOU FILE

18   THE MOTION, LEAD COUNSEL MUST MEET AND CONFER IN

19   PERSON.

20             THAT DOES NOT MEAN THAT YOU SEND YOUR

21   VERY FIRST LETTER TO LEAD COUNSEL.  THEY ARE NOT AT

22   THAT LEVEL OF THE PROCESS WHERE THEY CAN

23   EFFECTIVELY FIELD THESE HUNDREDS OF DISCOVERY

24   DISPUTES WE ARE DEALING WITH.  SO ONE PERSON CAN.

25             WE HAVE TEAMS OF PEOPLE ON BOTH SIDES WHO

1    DEAL WITH THIS.  SO IT'S AN AMBUSH TO SHOW UP AT

2    LEAD COUNSEL MEET AND CONFER WHEN WE, THE LOWER

3    LEVEL LAWYERS, HAVEN'T EVEN HAD A CHANCE TO DISCUSS

4    IT.

5            THAT'S ALL I MEANT, YOUR HONOR.  I'M NOT

6    SAYING THEY SHOULDN'T BE, INVOLVED THEY MUST BE

7    INVOLVED.  BUT IT'S NOT EFFICIENT AND IT SEEMS LIKE

8    IT'S A CHECK THE BOX, OKAY, LEAD COUNSEL HAS MET

9    AND CONFERRED, WE GET TO BOTHER JUDGE GREWAL ABOUT

10   THIS.

11           THAT'S NOT HOW IT SHOULD WORK.  THERE

12   SHOULD BE A MEANINGFUL DISCUSSION AND IF WE ARE

13   LEARNING ABOUT SOMETHING AT THE FIRST TIME LEAD

14   COUNSEL MEET AND CONFER, WE HAVE NO TIME TO CONSULT

15   WITH OUR CLIENT, NO TIME TO REACH AGREEMENT.

16           SO LET ME QUICKLY MOVE ON.  FINANCIAL

17   DOCUMENTS.

18           MR. JACOBS MENTIONED THREE THINGS.

19   SUBSIDIARY AND PARENT, HE SAID, I'M FINE WITH

20   SAMSUNG'S PROPOSAL BUT IT'S MISSING THREE THINGS.

21   HE SAID, WE WANT A BREAKDOWN BETWEEN SUBSIDIARIES

22   AND PARENTS.

23           I'M NOT SURE WHAT HE'S TALKING ABOUT.  I

24   DON'T THINK ANYONE HAS MADE THAT DISTINCTION.  WE

25   CERTAINLY HAVEN'T.  I DON'T RECALL SEEING APPLE

1      MEET AND CONFER LETTERS TALKING ABOUT THAT.

2                  BUT THERE CERTAINLY IS AN AGREEMENT AND

3      WE'VE MADE CLEAR OUR OFFER THAT FOR THE ACCUSED

4      DEFENDANTS WHICH WOULD INCLUDE STA WHICH IS A

5      SUBSIDIARY OF SCC, THAT ALL THOSE FINANCIAL

6      DOCUMENTS ARE GOING TO BE PRODUCED AND HAVE BEEN

7      AND WE HAVE AGREED TO PRODUCE THEM.

8                  SO I DON'T UNDERSTAND THAT POINT BUT I

9      DON'T THINK THAT IT MATTERS BECAUSE THERE'S NOT

10     BEEN A REFUSAL ON SAMSUNG'S PART TO PRODUCE

11     DOCUMENTS RELATING TO THE FINANCIAL CATEGORIES

12     INVOLVED FOR THE THREE NAMED DEFENDANTS.

13                 HE ALSO SAID, WE WANT INFORMATION AT THE

14     PRODUCT LEVEL AND SAMSUNG HASN'T OFFERED THAT, AND

15     THAT'S JUST COMPLETELY NOT TRUE.

16                 IN OUR BRIEF IT LISTS OUT THE EXACT

17     CATEGORIES THAT HAVE BEEN AGREED TO AND IT INCLUDES

18     AT THE PRODUCT LEVEL.

19                 SO I'M NOT SURE WHERE HE GOT THAT BUT

20     IT'S DEFINITELY NOT SOMETHING THAT WE REFUSED TO

21     PRODUCE.

22                 THE NEXT THING HE IDENTIFIED IS BILLS OF

23     MATERIALS.  I AGREE WITH YOU THAT I THINK THAT'S

24     OVERKILL BY A LARGE MARGIN WHEN THERE ARE SUMMARY

25     FINANCIAL DOCUMENTS AT COMPANIES THIS LARGE.  BUT

1    TO TRY TO STAVE OFF A MOTION, WE AGREED TO DO IT,

2    AND WE ARE GOING TO TRY TO GET TO THOSE AND LOOK

3    FOR THEM.

4          SO THAT'S TOO -- HE'S INCORRECT THAT THAT

5    WAS MISSING FROM OUR OFFER.  SO EVERYTHING HE'S

6    SAYING IS WRONG WITH OUR OFFER, I DON'T AGREE WITH.

7    AND I THINK THE OFFER SPEAKS FOR ITSELF WHICH IS IN

8    THE JANUARY 10TH LETTER AND ALSO LISTED AGAIN IN

9    OUR OPPOSITION BRIEF.

10         THE COURT:  DOES YOUR OFFER INCLUDE SALES

11   DATA, REVENUE DATA OUTSIDE THE UNITED STATES?

12         MS. KASSABIAN:  FOR THE PRODUCTS THAT ARE

13   SOLD OUTSIDE, YES, WE AGREED TO THAT AND STILL THIS

14   MOTION WAS FILED.

15         MOST OF THESE PRODUCTS AREN'T SOLD

16   ANYWHERE ELSE, BUT THINGS LIKE THE TAB ARE.  SO

17   YES, IF IT'S SOLD -- AGAIN, I DON'T KNOW WHY WE ARE

18   HERE ON THIS ISSUE.

19         THE COURT:  WELL, IF IT'S NOT SOLD

20   OUTSIDE THE U.S. THERE IS NO DATA.

21         MS. KASSABIAN:  THAT'S RIGHT.

22         SO WE CAN'T AGREE TO PRODUCE ANYTHING

23   THAT DOESN'T EXIST.  BUT FOR THE PRODUCTS SOLD

24   ABROAD, WE AGREED TO PRODUCE WORLDWIDE DATA FOR

25   THOSE PRODUCTS WHICH THE TAB IS AN EXAMPLE.

169

1          AND IF I COULD JUST QUICKLY TOUCH ON

2     THREE ISSUES THAT MR. JACOBS DIDN'T MENTION, I JUST

3     WANT TO MAKE SURE THAT YOUR HONOR UNDERSTANDS THE

4     BURDENS AND IRRELEVANCE.

5          TECHNICAL DOCUMENTS.  APPLE ASKED FOR,

6     YOU KNOW, ALL DOCUMENTS REGARDING ALL VERSIONS OF

7     THE OPERATING SYSTEMS, THE SOURCE CODE, THE

8     TECHNOLOGIES AT ISSUE.

9          NOT ONLY IS THAT WILDLY, WILDLY

10    BURDENSOME BECAUSE OF THE AMOUNT, THE NUMBER OF

11    VERSIONS AND UPDATES THAT HAPPENED, SOMETIMES IT'S

12    SEVERAL TIMES A DAY FOR THESE PRODUCTS.  IT'S JUST

13    CRUSHING THE VOLUME THAT WE ARE TALKING ABOUT.

14    SAMSUNG DOESN'T STORE IT ALL IN ONE TIDY PLACE WITH

15    LITTLE LABELS AND STICKERS ON IT, SO YOU WOULD HAVE

16    TO GATHER THIS FROM A NUMBER OF DIFFERENT SOURCES

17    INCLUDING DIFFERENT ENGINEERS.

18          BUT SETTING ASIDE THE BURDEN, IT'S

19    COMPLETELY IRRELEVANT BECAUSE IN RESPONSE TO OUR

20    FIFTH INTERROGATORY WHERE WE ASKED ABOUT

21    IDENTIFYING -- ASKED APPLE TO IDENTIFY THE PRODUCTS

22    THAT WE BELIEVE MAY BE INFRINGING, HERE'S WHAT THEY

23    SAID:

24          "APPLE BELIEVES THAT THE USE OR POSSIBLE

25    USE OF ITS PATENTED INVENTIONS, TRADE DRESS AND

                                                      170

1    TRADEMARKS OCCURRED FOR EACH PRODUCT LISTED ABOVE

2    NO LATER THAN THE DATE OF EACH PRODUCT'S RELEASE IN

3    THE UNITED STATES."

4              THAT'S WHAT WE HAVE GIVEN THEM.  THEY

5    HAVE COMPLETE, FULL BILLS FOR THE ENTIRE PRODUCTS

6    OF EVERY SINGLE PRODUCT AT ISSUE AS OF THE RELEASE

7    DATE.

8              THEY ARE SAYING YOUR PRODUCTS INFRINGE

9    FROM DAY ONE.  THEY'VE GOT THAT SOURCE CODE.  SO

10   ALL THESE SUBSEQUENT RELEASES AND UPDATES AND

11   MODIFICATIONS ARE COMPLETELY IRRELEVANT IN THEIR

12   INFRINGEMENT CASE BECAUSE THEY ARE SAYING THE WHOLE

13   SHOOTING MATCH INFRINGES, IT WAS INFRINGING FROM

14   THE MOMENT OF RELEASE.  AND THEY ALREADY HAVE THAT

15   VERSION, THEY HAVE THAT CODE.

16             SO FORCING US TO DO THE BUSY WORK OF

17   GATHERING EVERY LITTLE BUG THAT WAS FIXED OR EVERY

18   LITTLE CHANGE OR UPDATE THAT WAS MADE IS POINTLESS,

19   IT ADDS ZERO TO OUR CASE.

20             THE COURT:  IN YOUR MEET AND CONFER DID

21   SAMSUNG EVER OFFER TO STIPULATE THAT ITS

22   INFRINGEMENT OR NON INFRINGEMENT OF APPLE'S

23   ASSERTED PATENTS MUST STAND AND FALL AS OF THE DATE

24   OF THE RELEASE?

25             IN OTHER WORDS, COULD YOU TAKE THIS ISSUE

1      OFF THE TABLE AND JUST SAY LOOK, MAYBE WE WILL WIN,

2      MAYBE WE'LL LOSE, BUT WE WILL WIN OR LOSE BASED ON

3      THE PRODUCT RELEASE DATE.

4              MS. KASSABIAN:  THAT'S ABOVE MY PAY

5      GRADE.  THAT'S A TECHNICAL QUESTION I WOULDN'T FEEL

6      COMFORTABLE ANSWERING.  IT'S NOT SOMETHING --

7              THE COURT:  IT'S NOT TECHNICAL.  IT SEEMS

8      TO ME IT'S A STRATEGY IN THE DECISION, DID

9      MR. VERHOEVEN DISCUSS THIS AT ALL?

10             MS. MAROULIS:  YOUR HONOR, MAY I

11     INTERJECT?

12             FOR SOME OF THE PRODUCTS THAT WOULD NOT

13     BE POSSIBLE.  FOR EXAMPLE, ON THE DESIGN SIDE THERE

14     WERE SOME TABS THAT WERE NOT IN THE DESIGN LOGO.

15             THE COURT:  THERE MAY BE MATERIAL

16     DIFFERENCES FROM VERSION TO VERSION.

17             BUT IT SEEMS TO ME WHAT I'M HEARING FROM

18     MS. KASSABIAN IS A LOT OF THESE SUBSEQUENT RELEASES

19     ARE NOT MATERIALLY DIFFERENT FROM EARLIER RELEASES

20     AND YOU ARE SUFFERING FROM A BURDEN OF THIS.  WELL

21     WHY NOT JUST TAKE THAT ISSUE OFF THE TABLE?

22             MS. KASSABIAN:  I'M NOT SAYING THEY ARE

23     NOT MATERIALLY DIFFERENT, I'M SAYING THEY ARE

24     IRRELEVANT TO THE CASE.

25             THE COURT:  WHAT'S THE DIFFERENCE BETWEEN

1      MATERIALLY DIFFERENT AND THEN IRRELEVANT?

2              MS. KASSABIAN:  WELL, IF APPLE WERE TO

3      COME TO US AND SAY, YOU KNOW WHAT, WE'VE LOOKED AT

4      THE CODE YOU'VE PROVIDED AND WE DON'T THINK THE

5      FIRST RELEASE INFRINGES, BUT WE KNOW YOU EVENTUALLY

6      DID INFRINGE, SO GIVE US THE VERSION THAT STARTED

7      INFRINGING, THAT MIGHT BE RELEVANT.

8              BUT I HAVE NOT HEARD APPLE SAY TO US, WE

9      DON'T THINK THE FIRST VERSION IS INFRINGING.

10             THE COURT:  WELL THEY JUST TOLD YOU

11     PRECISELY THE OPPOSITE, RIGHT?  THAT'S WHAT YOU

12     READ TO ME IN THE INTERROGATORY RESPONSE.

13             MS. KASSABIAN:  YEAH, EXACTLY.

14             THE COURT:  SO WHY NOT SIMPLY SAY LOOK,

15     WE BELIEVE WE DON'T INFRINGE THESE PATENTS -- I

16     ASSUME THAT'S YOUR POSITION IN THIS CASE.  AND IN

17     ORDER TO AVOID THE BURDEN OF HAVING TO PRODUCE ALL

18     OF THIS CODE AND ALL OF THESE DOCUMENTS FOR EACH

19     SUBSEQUENT RELEASE, WE WILL STIPULATE THAT OUR

20     INFRINGEMENT AS TO THOSE SUBSEQUENT RELEASES WILL

21     STAND OR FALL BASED ON A JURY'S CONCLUSION OR THE

22     COURT'S CONCLUSION ON THE ORIGINAL RELEASE.

23             WHY NOT THINK ABOUT SOMETHING LIKE THAT?

24             MS. KASSABIAN:  YEAH, THAT'S SOMETHING

25     THAT'S VERY INTERESTING AND SOMETHING THAT SHOULD

1    BE THOUGHT ABOUT.

2              I WILL SAY JUST THINKING OFF THE TOP OF

3    MY HEAD ON MY FEET HERE WITHOUT HAVING TIME TO

4    ANALYZE A VERY IMPORTANT DECISION LIKE THAT, IT

5    WOULD SEEM ON THE DAMAGES FRONT THERE PROBABLY

6    WOULD BE SOME -- YOU KNOW, YOU WOULD HAVE TO

7    ANALYZE THAT TO SEE IF AT SOME POINT THAT

8    INFRINGEMENT, ALLEGED INFRINGEMENT, HAD STOPPED.

9              BUT I THINK YOUR HONOR IS MAKING A VERY

10   GOOD POINT WHICH IS, THAT'S SOMETHING THE PARTIES

11   SHOULD DISCUSS TO SEE IF THERE MIGHT BE SOME OTHER

12   VERSION THAT COULD BE RELEVANT IN ADDITION TO THE

13   FIRST VERSION OR NOT.

14             I DON'T THINK THAT DISCUSSION HAS TAKEN

15   PLACE BUT I'M HAPPY TO ENGAGE IN THAT WITH COUNSEL.

16             BUT ON THE TECHNICAL DOCUMENTS, THAT WAS

17   I THINK ANOTHER ONE OF THOSE CATEGORIES THAT WAS

18   KIND OF SPRUNG ON US WITH THESE VERY, VERY BROAD

19   SWEEPING, YOU KNOW, MULTI-RFP ARGUMENTS THROWN INTO

20   THEIR BRIEF WITHOUT SUFFICIENT TIME FOR THE PARTIES

21   TO HASH THAT OUT.

22             SO I WOULD BE HAPPY TO ENGAGE IN THAT

23   DISCUSSION WITH THEM.

24             THE COURT:  ALL RIGHT.

25             DO YOU HAVE ANY FURTHER POINTS YOU WISH

174

1      TO RAISE ON THIS ISSUE?

2                MS. KASSABIAN:  JUST ON DESIGN DOCUMENTS.

3                I MEAN, THIS IS PROBABLY THE OBVIOUS ONE

4      FROM THE BRIEFING, BUT WE STRONGLY URGE THE COURT

5      TO DENY APPLE'S MOTION FOR EVERY SINGLE DESIGN

6      DOCUMENT REGARDING EVERY SINGLE PHONE OR TABLET

7      PRODUCT THAT SAMSUNG HAS EVER MADE GOING BACK, I

8      BELIEVE 12 YEARS.

9                AND I WON'T ADDRESS THAT FURTHER UNLESS

10     YOUR HONOR IS SERIOUSLY CONSIDERING IT.

11               MR. JACOBS DIDN'T RAISE IT AND I'M HOPING

12     PERHAPS THEY ARE NOT PRESSING THAT ANYMORE, BUT

13     OBVIOUSLY WE THINK THAT IS WILDLY OVERBROAD AND

14     RESTS ON AN INFIRM RELEVANCE ARGUMENT AND WOULD

15     EFFECTIVELY SHUT DOWN THE INDUSTRIAL DESIGN PORTION

16     OF SAMSUNG IF EVERYONE HAD TO PRODUCE EVERY

17     DOCUMENT REGARDING EVERY PRODUCT THEY EVER WORKED

18     ON, RELEASED OR UNRELEASED, AT ISSUE IN THIS CASE

19     OR NOT AT ISSUE IN THIS CASE.

20               SO WE VERY, VERY STRONGLY OBJECT TO THAT

21     PORTION OF THEIR MOTION AND URGE THE COURT TO DENY

22     IT.

23               THE COURT:  ALL RIGHT.  THANK YOU.

24               MR. JACOBS, ARE YOU ASKING FOR EVERY

25     SINGLE DOCUMENT THAT EVERY SINGLE PERSON AT SAMSUNG

1    HAS WORKED ON IN THE LAST 11 YEARS?

2                MR. JACOBS:  NO.

3                BUT THERE IS A MODIFICATION THAT I MEANT

4    TO CONVEY WHEN I WAS FIRST UP HERE AND I JUST LOST

5    TRACK OF IT BECAUSE THERE WAS A POINT THAT SAMSUNG

6    MADE IN ITS BRIEF THAT WE THOUGHT WAS WELL TAKEN

7    WHICH IS THAT GOING BACK TO 2000 IS UNNECESSARY,

8    AND IN FACT GOING BACK TO NON -- SEEKING DOCUMENTS

9    FROM NON TOUCHSCREEN PRODUCTS IS UNNECESSARY.

10               SO WHAT WE WOULD MODIFY OUR PROPOSED

11   ORDER TO READ FOR PRODUCTS RELEASED IN 2005 OR

12   AFTER THAT ARE TOUCHSCREEN PRODUCTS.  AND THAT

13   WOULD SUBSTANTIALLY REDUCE THE SCOPE OF THE REQUEST

14   TO REALLY -- THAT'S WHAT THE CASE IS ABOUT.

15               THE COURT:  WHY DO YOU NEED EVERY

16   DOCUMENT OF EVERY PRODUCT SINCE '05.

17               MR. JACOBS:  I THINK EVERY PRODUCT --

18   THIS WORD IS ONE OF THE BUGABOOS HERE, "PRODUCT."

19               SAMSUNG HAS FAMILIES OF PRODUCTS.  AND AS

20   YOU MAY RECALL OUR DISCUSSION LAST TIME, WE HAVE

21   U.S. MODELS WE HAVE AUSTRALIAN MODELS, WE HAVE

22   GERMAN MODELS, AND WHEN SAMSUNG SAYS "PRODUCT" AND

23   WE SAY "PRODUCT" WE MAY MEAN SOMETHING DIFFERENT.

24               SO WHEN WE SAY "PRODUCT" WE MEAN THE

25   PRODUCT THAT SAMSUNG'S MOBILE PHONE GROUP HAS

                                                    176

1    RELEASED.

2           WE WANT TO SEE THE ONES -- THE DESIGN

3    DOCUMENTS FOR THOSE THAT WE REGARD AS INFRINGING.

4    AND BECAUSE THEY ARE CLAIMING THAT THIS IS ALL

5    FUNCTIONALLY DRIVEN, THE DESIGN DOCUMENTATION FOR

6    THOSE, EVEN THOUGH THAT WE CONTEND ARE NON

7    INFRINGING, BECAUSE WE ARE ASKING WITNESSES IN

8    DEPOSITIONS, DOES THIS PHONE WORK OKAY?  AND

9    THEY'RE SAYING YES, IN MANY CASES PROVING OUR POINT

10   THAT THERE'S A DOCUMENTARY BASIS.  AND WE HAVE A

11   LOT OF WITNESSES COMING UP AND THAT'S WHAT WE WANT

12   TO BE ABLE TO DO.

13          SO THAT'S THE -- IF SAMSUNG, HAVING

14   PLACED FUNCTIONALITY IN DISPUTE FOR THE DESIGN

15   PATENTS AND FOR TRADE DRESS, THAT IS DRIVING THAT

16   REQUEST.

17          THE COURT:  IT SURE STRIKES ME, THOUGH,

18   THAT IN ANY DESIGN PATENT CASE FUNCTIONALITY IS IN

19   DISPUTE, THAT'S A PRETTY COMMON ISSUE RAISED BY A

20   DEFENDANT.

21          SO IN JUST ABOUT EVERY CASE OF THIS

22   NATURE, IF I UNDERSTAND THE LOGIC OF YOUR ARGUMENT,

23   THE COURT IS OBLIGATED TO ORDER THE PRODUCTION OF

24   ALL DOCUMENTS FOR ALL PRODUCTS, INFRINGING OR NOT.

25          IS THAT THE LOGICAL CONCLUSION I SHOULD

1    REACH BASED ON WHAT YOU TOLD ME?

2          MR. JACOBS:  SO I MODIFIED IT TO

3    TOUCHSCREEN PRODUCTS BECAUSE THAT'S A UNIFYING

4    CONCEPT HERE.

5          I HAVEN'T BEEN ABLE TO COME UP WITH

6    ANOTHER NARROWING CATEGORY, BUT YES, ONCE WE'RE IN

7    THE TOUCHSCREEN WORLD WE ARE LOOKING AT SAMSUNG'S

8    INFRINGING AND EVEN PRODUCTS THAT WE WOULD REGARD

9    AS NON INFRINGING TO PROVE THAT THERE ARE A LOT OF

10   ALTERNATIVES WITH THEM.

11         AND OF COURSE SAMSUNG ITSELF HAS PRESSED

12   THIS FUNCTIONALITY POINT WITH VERY INTRUSIVE

13   DISCOVERY FROM APPLE.

14         AT ONE POINT WE TRIED TO PERSUADE

15   EVERYBODY INVOLVED THAT THIS DOESN'T NEED TO GO

16   QUITE SO DEEP, BUT SAMSUNG HAS GONE VERY DEEP INTO

17   APPLE ON THIS ISSUE OF FUNCTIONALITY BECAUSE

18   APPARENTLY SAMSUNG THINKS THAT YOU CAN ARGUE THIS

19   AT A VERY MICROSCOPIC LEVEL, VERY GRANULAR LEVEL.

20         THE COURT:  I WANT TO ASK YOU ABOUT THE

21   SAME TOPIC I DISCUSSED WITH MS. KASSABIAN WHICH IS,

22   WAS ANY THOUGHT, AT ANY POINT IN THIS PROCESS,

23   GIVEN TO THE NOTION OF CERTAIN PRODUCTS SERVING AS

24   PROXIES FOR QUESTION OF INFRINGEMENT OR OTHERWISE?

25         IT SEEMS TO ME ONE COULD CONSIDER THIS

1   UNIVERSE OF ACCUSED PRODUCTS AND RELEASES AS

2   ESSENTIALLY A POPULATION FROM WHICH YOU COULD DRAW

3   REPRESENTATIVE SAMPLES.

4           SO WAS ANY THOUGHT AT ALL GIVEN TO

5   MITIGATING THE BURDEN HERE IN THAT WAY?

6           MR. JACOBS:  I UNDERSTAND THAT A

7   STIPULATION -- SOMETHING ALONG THE LINES OF WHAT

8   YOU ASKED MS. KASSABIAN ABOUT WHICH WAS MORE ALONG

9   THE LINES OF STIPULATING TO AN ADDITION OF A

10  PRODUCT.

11          THE COURT:  I THINK THAT'S ONE SPECIES OF

12  THE BROADER CLASS.  BUT EITHER WAY, WAS ANY THOUGHT

13  GIVEN TO THAT?

14          MR. JACOBS:  YES.

15          I'M TOLD -- MR. MCELHINNY IS HERE BECAUSE

16  HE WAS AT THAT MEET AND CONFER AND I WOULD LIKE HIM

17  TO TALK A LITTLE BIT ABOUT THE MEET AND CONFER

18  PROCESS.  BUT I'M TOLD AT THE JANUARY 5TH MEETING

19  THERE WAS A STIPULATION ALONG THOSE LINES EXPLORED.

20  AND IT WAS NOT --

21          THE COURT:  MR. MCELHINNY, CAN YOU SHED

22  HAD SOME LIGHT ON THAT FOR ME?

23          MR. MCELHINNY:  YES, YOUR HONOR.

24          I WOULD LIKE TO TALK ABOUT THE MEET AND

25  CONFER PROCESS, BUT ON THAT POINT SPECIFICALLY I

1    WILL SAY TWO THINGS.

2              I'M NOT IN A POSITION TO SPEAK ABOUT THE

3    SAMSUNG'S STRATEGIES, BUT IN TERMS OF EXTERNAL

4    PEOPLE WHO ARE WATCHING THESE CASES, THEY HAVE

5    COMMENTED THAT ONE OF THE THINGS THAT SAMSUNG IS

6    USING THIS LITIGATION FOR PROPERLY IS TO EXPLORE

7    THE BOUNDARIES OF APPLE'S INTELLECTUAL PROPERTY.

8              AND SO NOT JUST IN THIS COUNTRY, BUT IN

9    OTHER COUNTRIES AS THE LITIGATION GOES ON THEY ARE

10   COMING OUT WITH NEW PRODUCTS THAT MOVE A LITTLE

11   BIT.

12             THEY ARE NOT ANNOUNCING THEM AS CHANGED

13   BECAUSE THAT DOESN'T HELP THEIR SALES POSITION, BUT

14   THEY ARE IN FACT MOVING, IN SOME WAYS TRYING TO

15   MOVE A LITTLE BIT TO DETERMINE WHETHER OR NOT THEY

16   WILL CROSS OVER THE LINE, WHETHER THEY CAN GET JUST

17   OUTSIDE THE LINE OF WHAT THE COURTS WILL ENFORCE.

18             SO I THINK, STRATEGICALLY, THE IDEA THAT

19   YOUR HONOR IS PROMOTING PROBABLY DOESN'T WORK WITH

20   WHAT THEY ARE TRYING DO.  I DON'T THINK THAT'S

21   THEIR INTEREST TO GET A BROAD RULING, THAT DOESN'T

22   PARTICULARLY HELP THEM DECIDE WHERE THE LINE GOES.

23             THE COURT:  WELL, UNLESS IT'S A BROAD

24   RULING THAT'S IN THEIR FAVOR.

25             MR. MCELHINNY:  WELL, NOW ARE MAKING ME

1    ARGUE THEIR POSITION.

2              MS. MAROULIS:  I MUST OBJECT TO THIS

3    ARGUMENT ABOUT THE MERITS OF THE CASE BECAUSE WE

4    DON'T THINK IT'S APPROPRIATE HERE.

5              THE COURT:  I WILL NOTE THE OBJECTION.  I

6    AM SUPPOSED TO GIVE SAMSUNG A FULL AND FAIR

7    OPPORTUNITY TO RESPOND.

8              WHERE I'M GOING WITH THIS IS YOU ALL PUT

9    DISCOVERY BEFORE ME AND I'M JUST EXPLORING THE

10   NOTION THAT IN CASES OF THIS NATURE IT STRIKES ME

11   AS REASONABLE TO AT LEAST CONSIDER WAYS IN WHICH

12   YOU COULD USE CERTAIN PRODUCTS OR CERTAIN FEATURES

13   WITHIN CERTAIN RELEASES OF PRODUCTS AS

14   REPRESENTATIVE OF THE BROADER CLASS.

15             AND IF YOU COULD AT LEAST NEGOTIATE AND

16   EXPLORE THAT OPTION, WE MIGHT BE ABLE TO AVOID A

17   LOT OF REDUNDANT AND UNNECESSARY DISCOVERY ON BOTH

18   SIDES.  SO I'M JUST CURIOUS IF THAT WAS AN ISSUE

19   EXPLORED HERE?

20             MR. MCELHINNY:  IT HAS BEEN.

21             THE SPECIFIC ANSWER TO YOUR QUESTION IS

22   IT HAS BEEN EXPLORED.  I THINK IT'S FAIR TO SAY IT

23   IS BEING EXPLORED BUT ONLY IN THE LIMITED IDEA

24   WHETHER OR NOT PRODUCTS THAT HAVE BEEN RELEASED

25   SINCE THE LITIGATION STARTED.

1          JUDGMENTS AGAINST THE INITIAL PRODUCTS

2     WOULD BE GOOD AGAINST THOSE AS WELL.

3          THAT'S THE ONE AREA BECAUSE BOTH SIDES

4     HAVE AN INTEREST IN THAT, BUT AT LEAST WE CAN

5     TALK --

6          THE COURT:  AND OBVIOUSLY THEY ARE IN

7     LOCATIONS FOR INJUNCTIONS AND THE LIKE --

8          MR. MCELHINNY:  TRUE.

9          I WOULD ALSO SAY THAT STARTING -- I'M

10    LOSING TRACK OF THE DAYS.  ON TUESDAY JUDGE KOH

11    STARTED A DIALOG WITH US I THINK ABOUT HOW WE

12    ACTUALLY PLAN TO TRY THIS CASE.

13         AND I THINK WHAT YOUR HONOR IS SUGGESTING

14    IS CERTAINLY GOING TO COME UP IN THE DIALOG ABOUT

15    HOW TO MAKE THE CASE, TO PUT IT IN A POSITION SO

16    THAT A JURY CAN UNDERSTAND AND DEAL WITH IT.

17         THE COURT:  ALL RIGHT.

18         MR. MCELHINNY:  I WANTED TO ADDRESS THE

19    MEET AND CONFER ISSUES SO THAT YOUR HONOR

20    UNDERSTANDS THEM.

21         FOR THE MEET AND CONFER THAT HAPPENED --

22    I NEED TO START WITH WHAT MR. JACOBS HAS TOLD YOU

23    BECAUSE THIS IS OUR VIEW.

24         OUR VIEW IS THAT MOST OF THE DISPUTES

25    THAT YOU ARE SEEING NOW INVOLVE DOCUMENT REQUESTS

1    THAT WERE SERVED AT THE VERY BEGINNING OF THE CASE,

2    DOCUMENTS THAT SHOULD HAVE BEEN PRODUCED A LONG

3    TIME -- AND WE ARE DEALING FROM A PERCEPTION THAT

4    ORDERS FROM YOU ARE THE BEGINNING POINT IN THE

5    PRODUCTION PROCESS.

6            FOR THE MEET AND CONFER THAT HAPPENED IN

7    THIS CASE -- UNFORTUNATELY, WHAT'S HAPPENING NOW IS

8    THE MEET AND CONFER PROCESS IS BECOMING A MINI

9    LITIGATION PROCESS AS WELL.

10           YOUR HONOR CAN -- IN A CASE WITH AN

11   EXPEDITED SCHEDULE YOU CAN SEE THE ADVANTAGES OF

12   CONTROLLING ACCESS TO THE COURT.

13           FOR THE MEET AND CONFER PROCESS THAT

14   HAPPENED ON THESE MOTIONS, I PREPARED FOR FIVE

15   HOURS THE DAY BEFORE THE MEET AND CONFER PROCESS.

16   AND LET ME BE CLEAR, I'M NOT AS BUSY AS I WOULD

17   LIKE TO BE, I AM A BUSY PERSON.  I DO NOT CONSIDER

18   MY TIME THAT GOES INTO A MEET AND CONFER PROCESS

19   MORE VALUABLE THAN THE COURTS TIME IN DEALING WITH

20   MOTIONS.  I DON'T HAVE THAT VIEW AND I DON'T THINK

21   ANYTHING THAT WE SAY IS DIRECTED IN THAT VIEW.

22           I PREPARED FIVE HOURS FOR THE MEET AND

23   CONFER PROCESS.  I WENT DOWN TO REDWOOD CITY TO

24   MEET WITH QUINN EMANUEL PEOPLE.  I BROUGHT THREE

25   LAWYERS WITH ME.  THEY HAD SIX LAWYERS WITH THEM,

1    AND WE TALKED FOR FOUR HOURS.

2              AND TO THE EXTENT THAT PEOPLE WERE

3    WILLING TO EXCHANGE, WE EXCHANGED IDEAS.

4              IT'S INTERESTING, JUST TO GIVE YOU AN

5    EXAMPLE ON THE FINANCIAL INFORMATION, THERE HAD

6    BEEN LETTERS EXCHANGED WHERE WE SAID WE NEED THIS

7    BECAUSE WE ARE SEEKING SAMSUNG'S PROFITS.

8              AND WHEN WE GOT TO THE MEET AND CONFER

9    THE QUESTION WAS, WELL, HOW CAN YOU GET OUR

10   PROFITS?  YOU GET A REASONABLE ROYALTY, YOU DON'T

11   GET OUR PROFITS.  AND I SAID, WELL, THERE'S A

12   STATUTE THAT SAYS.

13             AND MS. KASSABIAN'S RESPONSE WAS, WELL,

14   WHY DIDN'T YOU TELL US ABOUT THAT SECTION IN THE

15   MEET AND CONFER LETTERS?

16             YOU KNOW, IT WAS SORT OF A STRANGE THING,

17   BUT WE TALKED FOR FOUR AND A HALF HOURS AND AT THE

18   END OF IT WE JUST SAID, YOU KNOW, HERE'S THE ISSUE,

19   WE HAVE TO FILE A MOTION.  THE DOCUMENTS WERE DUE

20   40 DAYS AGO AND IF YOU ARE NOT GOING TO GET THEM WE

21   WILL HAVE TO GO IN FRONT OF THE COURT WITH THAT

22   ISSUE.

23             I ACTUALLY THINK THE MEET AND CONFER

24   PROCESS WORKED A LITTLE BIT BECAUSE WE DID GET SOME

25   OFFERS AFTER.  WE DID GET, YOU KNOW, MR. VERHOEVEN

1    AND I DISCUSSED SOME ISSUES AND YOU COULD SEE THERE

2    WERE SOME ISSUES THAT NEEDED TO BE EXPLORED FURTHER

3    ON EITHER SIDE AND THAT WERE.

4           THE THING WE HAVE SEEN SINCE THEN, WE

5    JUST HAD ANOTHER MEET AND CONFER BUT WE ARE NOW

6    GETTING TO A PROCESS WHERE -- WE ARE NOT ALLOWED TO

7    MEET AND CONFER WITH MR. VERHOEVEN UNTIL THE OTHER

8    LAWYERS AGREE THAT THE LETTER-WRITING PROCESS HAS

9    GONE FAR ENOUGH THAT AND HE'S NOT PREPARED IF WE

10   ONLY HAVE 48 HOURS NOTICE BEFORE WE GET THERE.

11          AND THE IDEA THAT FURTHER MEET AND CONFER

12   IS GOING TO MOVE THIS, I JUST HAVE TO TELL YOU,

13   PARTICIPATING IN IT, I'M NOT GOING TO FILE A MOTION

14   IN FRONT OF YOU UNLESS I THINK WE NEED AN ORDER TO

15   GET THE DOCUMENTS.

16          AND IF THERE'S A WAY TO RESOLVE IT BEFORE

17   THAT, THAT IS WHAT WE'RE LOOKING TO DO BECAUSE WE

18   ARE TRYING GET TO OUR DEADLINE.

19          AND I JUST WANTED TO GIVE YOU ASSURANCE

20   PERSONALLY AND TELL YOU THAT'S HOW YOU GOT THE

21   MOTIONS THAT YOU HAVE TODAY.

22          THE COURT:  ALL RIGHT.

23          MS. KASSABIAN, MS. MAROULIS, WHO WANTS TO

24   RESPOND?

25          MS. KASSABIAN:  I WILL JUST ADDRESS THE

1    MOTION SPECIFIC ISSUES QUICKLY, YOUR HONOR.

2            SO THE FIRST ISSUE WAS MR. JACOBS OFFERED

3    A COMPROMISE OF NON TOUCHSCREEN PRODUCTS RELEASED

4    SINCE 2005.  THAT WOULD STILL BE OVER 1,000

5    PRODUCTS.

6            AND I'M BALL PARKING THAT BASED ON THE

7    FACT THEY BELIEVE IT'S 2 OR 3,000 PRODUCTS GOING

8    BACK 12 YEARS.  AND I BELIEVE THAT THE NUMBER OF

9    MODELS THAT ARE RELEASED HAS GENERALLY BEEN

10   INCREASING OVER TIME.

11           THERE ARE 26 PRODUCTS AT ISSUE IN THIS

12   CASE AND WE HAVE PRODUCED 600,000 PAGES OF

13   DOCUMENTS AND COUNTING FOR 26 PRODUCTS AT ISSUE.

14           SO ONE CAN ONLY IMAGINE WHAT DISCOVERY

15   WOULD LOOK LIKE REGARDING 975 PRODUCTS.  IT WOULD

16   BE ABSURD.

17           BUT SETTING ASIDE THE BURDEN, I HAVE TO

18   TALK ABOUT THIS RELEVANCE ARGUMENT, IT'S JUST

19   WRONG.

20           AT PAGES 12 AND 13 OF APPLE'S MOVING

21   PAPERS THEY SAY, SAMSUNG HAS ARGUED THAT THE

22   DESIGNS THAT APPLE HAS ACCUSED OF INFRINGEMENT ARE

23   DICTATED BY FUNCTION.

24           THAT PART IS TRUE.  IT'S AFTER THE DASH

25   WHERE IT FALLS APART:

1           WHICH MEANS THAT THE SAME FUNCTION CANNOT

2    BE PERFORMED THROUGH ANY OTHER DESIGN.

3           THAT'S JUST AN INCORRECT STATEMENT OF THE

4    LAW.  FOR A DESIGN PATENT TO BE INVALID IT HAS TO

5    IMPACT THE USEFULNESS.

6           THE REVERSE IS NOT TRUE.  IT DOES NOT

7    MEAN THAT THAT FUNCTION CAN ONLY BE ACCOMPLISHED BY

8    ONE SINGLE DESIGN AND THAT THEREFORE THEY'RE

9    ENTITLED TO SEE ALL OF OUR OTHER DESIGNS TO SEE IF

10   THEY SERVE THAT SAME FUNCTION.

11          THERE'S NO CITE AT END OF THAT SENTENCE

12   BECAUSE IT'S JUST NOT THE LAW.

13          YOU KNOW, AS LONG AS THE PATENTED DESIGN

14   IS PRIMARILY FUNCTIONAL RATHER THAN ORNAMENTAL,

15   THEN THE PATENT IS INVALID.

16          IT IS NOT THE SAME THING TO SAY -- IT'S

17   SIMPLY AN INCORRECT STATEMENT OF LAW TO SAY THAT IF

18   A DIFFERENT DESIGN CAN ACCOMPLISH THAT SAME

19   FUNCTION, THAT THAT HAS SOME LEGAL IMPACT.  IT

20   DOESN'T.  IT'S COMPLETELY IRRELEVANT.  THERE'S NO

21   CITATION TO IT BECAUSE THAT'S NOT THE STANDARD FOR

22   DESIGN PATENT INFRINGEMENT.

23          THE NEXT THING THAT WAS MENTIONED WAS

24   THAT THEY ARE NOT ASKING FOR UNRELEASED PRODUCTS,

25   AND THAT'S INCORRECT.

```
 1              THEY ARE ASKING FOR RELEASED OR

 2    UNRELEASED PRODUCTS.  THEY ARE ALSO ASKING FOR

 3    EVERY ALTERNATIVE DESIGN EVER CONSIDERED BUT NOT

 4    IMPLEMENTED.

 5              SO WE ARE NOT JUST TALKING ABOUT 975 MORE

 6    PRODUCTS, WE ARE THEN ALSO TALKING ABOUT UNRELEASED

 7    PRODUCTS THAT FROM 2005 TO NOW AND ALTERNATIVE

 8    DESIGNS THAT WERE CONSIDERED, IT WOULD ABSOLUTELY,

 9    YOU KNOW, BRING THIS CASE TO A SCREECHING HALT IF

10    WE HAD TO PRODUCE DOCUMENTS ON THAT MAGNITUDE.

11              THE COURT:  REALLY?  SO IF I ISSUED AN

12    ORDER THAT THEY REQUEST, YOU ARE TELLING ME THIS

13    CASE WILL COME TO A GRINDING HALT?

14              MS. KASSABIAN:  I'M SAYING THE DESIGN

15    DEPARTMENT AT SAMSUNG, I DON'T KNOW WHAT WOULD

16    HAPPEN.

17              IT WOULD BE CATASTROPHIC TO SAY, HEY,

18    MCDONALD'S, I WANT EVERY DOCUMENT IN YOUR COMPANY

19    REGARDING HAMBURGERS.  THAT'S WHAT WE ARE TALKING

20    ABOUT.

21              SO SAYING TO SAMSUNG'S MOBILE DIVISION,

22    WE WANT EVERY DOCUMENT REGARDING EVERY PRODUCT

23    YOU'VE EVER RELEASED IN THE LAST SEVEN YEARS, EVEN

24    THOUGH WE HAVE NO RELEVANCE ARGUMENT FOR THAT, I

25    THINK DOES NOT MEET THE PROPORTIONALITY
```

1    REQUIREMENT, YOUR HONOR.

2              AND I BELIEVE WE HAVE SUBMITTED A

3    DECLARATION FROM MR. KAHNG ABOUT BURDEN.

4              THE COURT:  ALL RIGHT.  THANK YOU.

5              MS. KASSABIAN:  UNLESS YOU HAVE ANY OTHER

6    QUESTIONS.

7              THE COURT:  THANK YOU.

8              MR. JACOBS:  JUST ONE TECHNICAL

9    CORRECTION.

10             WHAT I SAID WAS WE DON'T NEED DOCUMENTS,

11   WE CAN EXCLUDE NON TOUCHSCREEN PRODUCTS.

12             WHAT WE ARE SEEKING IS THE DOCUMENTATION

13   ALONG THE LINES OF WHAT WAS ARTICULATED FOR

14   PRODUCTS THAT WERE RELEASED POST-2005 THAT ARE

15   TOUCHSCREEN PRODUCTS AND THE ALTERNATIVE DESIGNS

16   THAT WERE CONSIDERED FOR THEM.

17             AND ON THIS COUNTING ISSUE, I THINK WE

18   ARE BACK TO THE DEFINITION OF PRODUCT BECAUSE THE

19   PRODUCTS COME IN FAMILIES AND THAT'S A COMMON

20   SOURCE AND THEN OFFSPRING FOR DIFFERENT COUNTRIES.

21             THE COURT:  DO YOU NEED THE SOURCE OR THE

22   DOCUMENTATION FOR EACH OF THOSE OFFSPRING?

23             MR. JACOBS:  I HAVEN'T FIGURED OUT A WAY

24   TO SLICE IT MORE NARROWLY, YOUR HONOR.

25             IF SAMSUNG -- WE ARE RIGHT ON THE LAW.

1    JUDGE KOH'S ORDER DEALS WITH THIS QUESTION OF THE

2    STANDARD.  BUT SAMSUNG IS GOING TO ARGUE THAT THESE

3    FEATURES DON'T WORK AS WELL OR THEY ARE GOING TO

4    NOT BE AS FUNCTIONAL IN SOME ALTERNATIVE DESIGN

5    CONCEPT, AND WE NEED TO BE ABLE TO PROVE THAT

6    THAT'S JUST WRONG.

7              MS. KASSABIAN:  YOUR HONOR, THAT'S JUST

8    ABSOLUTELY -- I STILL HAVEN'T HEARD AN ARGUMENT FOR

9    RELEVANCE.

10             IF APPLE WANTS TO GO OUT AND PURCHASE

11   SOME PUBLICLY AVAILABLE PHONES MADE BY SAMSUNG OR

12   MADE BY SOMEBODY ELSE AND MAKE WHATEVER ARGUMENT

13   THEY ARE REFERRING TO NOW, THEY ARE FREE TO DO

14   THAT.

15             BUT THAT IS NOT THE SAME THING AS ASKING

16   THIS COMPANY SAMSUNG TO PRODUCE MILLIONS AND

17   MILLIONS AND MILLIONS OF PAGES OF DOCUMENTS FOR

18   SEVEN YEARS WORTH OF DESIGN WORK WHEN THERE'S

19   ABSOLUTELY NO RELEVANCE.  THERE'S ZERO RELEVANCE TO

20   HOW AN UNACCUSED PRODUCT WAS DESIGNED IN THIS CASE.

21             IT DOES NOT MATTER WHETHER SOME OTHER

22   PRODUCT MIGHT, A DESIGN FEATURE OF THAT PRODUCT

23   MIGHT BE FUNCTIONAL, THAT HAS NO BEARING ON WHETHER

24   APPLE'S DESIGN PATENTS ARE VALID.

25             THE COURT:  ALL RIGHT.  THANK YOU.

```
 1                LET'S TURN TO SAMSUNG'S MOTIONS.

 2                I THINK IT'S FAIR TO SAY THAT SAMSUNG'S

 3    MOTION FOR THE PROTECTIVE ORDER HAS BEEN ADEQUATELY

 4    EVALUATED IN THE CONTEXT OF APPLE'S RECIPROCAL

 5    MOTION.

 6                SO MS. MAROULIS, I WOULD LIKE TO START

 7    WITH YOUR MOTION TO COMPEL DOCUMENTS, WHICH IS 603.

 8                MS. MAROULIS:  YES, YOUR HONOR.

 9                OUR OMNIBUS MOTION TO COMPEL CONCERNS

10    BASICALLY --

11                THE COURT:  THAT'S A GREAT TERM, BY THE

12    WAY.

13                MS. MAROULIS:  SEVEN CATEGORIES OF

14    DOCUMENTS AND TWO TYPES OF DEPOSITION TESTIMONY.

15                I BELIEVE WE COVERED ONE OF THE

16    DEPOSITION SUBPARTS BEFORE, SO WE'LL JUST FOCUS ON

17    THE DOCUMENTS AND FACT WITNESSES.

18                SO BROADLY SPEAKING, WE SEEK SOURCE CODE

19    AND TECHNICAL DOCUMENTS, PRIOR ART DOCUMENTS,

20    DOCUMENTS RESPONSIVE TO SEARCH SAMSUNG, AND RELATED

21    TERMS LIKE ALIASES FOR THE TERM "SAMSUNG" USED

22    WITHIN APPLE, DESIGN HISTORY DOCUMENTS, ADDITIONAL

23    INVENTOR DESIGN DOCUMENTS, SURVEY DOCUMENTS AND

24    FINANCIAL DOCUMENTS.

25                AND IN SOME WAYS, YOUR HONOR, THIS MOTION
```

1    IS AN OUTLINE OF THE FAILED DISCUSSIONS BETWEEN THE

2    PARTIES IN THE NOVEMBER/DECEMBER TIME FRAME

3    REGARDING WHAT WE REFER TO AS RECIPROCITY RULES.

4           THIS IS A TWO WAY CASE.  BOTH SIDES ARE

5    ALLEGING INTELLECTUAL PROPERTY AGAINST EACH OTHER.

6    THEY ARE ACCUSING EACH OTHER OF INFRINGEMENT, SO

7    THERE'S SOME CATEGORIES OF DOCUMENTS THAT BOTH NEED

8    TO PRODUCE.

9           FOR EXAMPLE, SURVEYS, FINANCIAL

10   INFORMATION, PRIOR ART AND TECHNICAL DOCUMENTS

11   CERTAINLY FALL WITHIN THAT.

12          SO WHAT HAPPENED IS THAT WE KEPT

13   NEGOTIATING WITH APPLE IN GOOD FAITH, AND WE

14   ATTACHED TO SOME OF OUR MOTION PAPERS THE CHARTS

15   THAT WE HAVE BEEN GOING BACK AND FORTH ON IN THE

16   MEET AND CONFER PROCESS.  AND THEN APPLE DROPPED

17   THE NEGOTIATIONS AND FILED A MOTION THAT RESULTED

18   IN YOUR HONOR'S DECEMBER 22ND ORDER.

19          WE AT SAMSUNG HAVE TAKEN THE MEET AND

20   CONFER PROCESS VERY SERIOUSLY, KEPT GOING, TRIED TO

21   CONVINCE APPLE TO PRODUCE THE DOCUMENTS WE NEED

22   THAT WERE SUBJECT TO THIS RECIPROCITY NEGOTIATION,

23   BUT THAT HAS NOT MATERIALIZED.

24          AND WHILE I DON'T DOUBT THAT

25   MR. MCELHINNY SPENT FIVE HOURS PREPARING FOR THE

1    MEET AND CONFER, THE ULTIMATE MEET AND CONFERS WERE

2    NOT FRUITFUL.

3              AND SO WHAT WE WANT TO IS TO AVOID THE

4    UNFORTUNATE DOUBLE STANDARD THAT APPLE IS URGING ON

5    THIS COURT WHEREBY SAMSUNG IS FORCED TO PRODUCE

6    VERY BROAD CATEGORIES OF DOCUMENTS IMMEDIATELY AND

7    APPLE CAN PICK AND CHOOSE WHAT IT WANTS TO PRODUCE

8    AND DO IT ON A FAIRLY LEISURELY SCHEDULE WHEN AND

9    IF IT WANTS IT.

10             AND THERE ARE MANY EXAMPLES BUT I WILL

11   JUST CITE ONE TO YOUR HONOR.  AS RECENTLY AS LAST

12   WEEK WE LEARNED THAT THERE'S A THOUSAND PROTOTYPE

13   MODELS OF THE DESIGN PATENTS AT ISSUE THAT APPLE

14   FINALLY MADE AVAILABLE TO US.

15             THESE ARE THE VERY SAME PROTOTYPES THAT

16   SHOULD HAVE BEEN PRODUCED BEFORE THE MOTION FOR

17   PRELIMINARY INJUNCTION, BECAUSE FOR EXAMPLE SAMSUNG

18   OFFERED ITS PROTOTYPES AND MOCKUPS FOR INSPECTION

19   BEFORE THE HEARING ON THE PRODUCTS AT ISSUE.

20             NOW WE LEARN IN THE MIDDLE OF JANUARY

21   ABOUT THESE THOUSAND PRODUCTS.  I HAVE A TEAM OF

22   PEOPLE TRYING TO INSPECT THAT.  AND THIS IS JUST

23   ONE OF MANY EXAMPLES OF THINGS THAT HAVE NOT BEEN

24   PRODUCED BEFORE AND THINGS THAT NEED TO BE

25   PRODUCED.

1          SO GOING THROUGH THE VARIOUS ITEMS THAT

2    WE BRIEFED IN OUR MOTION, AND IF YOUR HONOR WANTS I

3    IS SKIP SOME AND FOCUS MORE ON OTHERS.

4          WITH RESPECT TO SOURCE CODE, SOME SOURCE

5    CODE HAS BEEN OFFERED FOR INSPECTION BUT IT'S NOT

6    COMPLETE, IT'S NOT THE TYPE WE WANT.

7          AND THE EXAMPLES WERE FROM THE MOTION,

8    ARE FOR EXAMPLE THE SOURCE CODE RELATING TO THE

9    BASEBAND PROCESSORS.

10         AND WHAT'S HAPPENING THERE IS THAT APPLE

11   HAS A VARIETY OF EXCUSES.

12         ONE IS THAT IT'S THIRD PARTIES THAT

13   PROVIDE THE SOURCE CODE AND NOT APPLE SO THEY DON'T

14   HAVE IT.  THEN IT TURNS OUT THAT THEY DO HAVE IT

15   BUT THEY HAVEN'T SECURED THE PERMISSION IN TIME,

16   FOR EXAMPLE, INTEL.

17         AND ALL THIS TIME WE ARE WITHOUT AN

18   INCREDIBLY IMPORTANT TOOL FOR PROVING OUR

19   INFRINGEMENT ALLEGATIONS.  IN FACT, SOMETHING THAT

20   THEY SHOULD HAVE PRODUCED BACK IN SEPTEMBER WHEN

21   THE INFRINGEMENT CONTENTIONS WERE DUE.

22         THE COURT:  SO PERHAPS YOU MIGHT EXPLAIN

23   TO ME INTEL'S OBJECTION.

24         SO YOU HAVE ASKED FOR SOURCE CODE

25   RELATING TO CERTAIN BASEBAND PROCESSORS.  IT'S

1    UNDISPUTED AT LEAST A PORTION OF THAT CODE IS

2    SUPPLIED TO APPLE BY INTEL; HAVE I GOT IT RIGHT SO

3    FAR?

4             MS. MAROULIS:  YES, YOUR HONOR.  WE ASKED

5    INTEL AND APPLE.

6             WE ASKED INTEL BECAUSE WE WANT TO SEE

7    WHAT THEY SUPPLY AND WE ASKED APPLE BECAUSE WE WANT

8    TO SEE IF THERE'S ANY IMPLEMENTATION THAT'S

9    DIFFERENT.

10            FOR EXAMPLE, YOUR HONOR KEEPS ASKING HOW

11   COME YOU DON'T STIPULATE TO THINGS, HOW COME YOU

12   DON'T SIMPLIFY THIS CASE?  WE TRIED.

13            WE PROPOUNDED A SERIES THAT SAID, PLEASE

14   ADMIT THIS PRODUCT IS IN COMPLIANCE, AND THEN WE

15   INCLUDED THE SPEC NUMBER, 25 DOT WHATEVER.

16            AND THE RESPONSE WAS THOSE WITHOUT

17   KNOWLEDGE WHETHER THEIR PHONES ARE COMPLIANT.  I

18   MEAN, THAT MIGHT BE SUBJECT TO A SEPARATE MOTION

19   ENTIRELY, BUT THAT'S THEIR RESPONSE.

20            CONFRONTED WITH THAT RESPONSE, WE NEED TO

21   SEE HOW THE SOURCE CODE IS LISTED.  ARE THEY

22   CHANGING IT?  WHAT ARE THEY DOING TO IT?  ARE THEY

23   TAKING IT WHOLESALE?  WE UNDERSTAND WE WILL

24   EVENTUALLY GET THIS FROM INTEL, BUT WE ALSO NEED TO

25   GET IT FROM APPLE.

1          THE COURT:  AND WHAT IS APPLE'S OBJECTION

2     BEEN SO FAR TO YOUR REQUEST?

3          MS. MAROULIS:  MY UNDERSTANDING IS IT'S A

4     VARIETY OF OBJECTIONS.

5          ONE IS THAT THIS IS INTEL'S CODE SO INTEL

6     SHOULD BE PRODUCING IT.  THE OTHER ONE IS THAT THEY

7     MAY PRODUCE IT LATER ON.

8          BUT WE HAVE NOT GOTTEN A SATISFACTORY

9     EXPLANATION OF WHY THIS EXTREMELY CRUCIAL PIECE HAS

10    NOT BEEN PRODUCED.

11         THE COURT:  THERE'S NO DISPUTE THAT THE

12    CODE IS RELEVANT, RIGHT?

13         MS. MAROULIS:  THERE SHOULDN'T BE.  I DO

14    NOT BELIEVE APPLE DISPUTES THAT.

15         THE COURT:  OKAY.  ALL RIGHT.

16         MS. MAROULIS:  I DO NOT HAVE INSIGHT AS

17    TO WHAT ARE THE GROUNDS FOR INTEL'S OBJECTION TO

18    APPLE.

19         THE COURT:  AND I APPRECIATE THAT.

20         I'M SIMPLY TRYING TO UNDERSTAND WHAT YOU

21    HAVE BEEN TOLD DURING THE MEET AND CONFER PROCESS

22    ABOUT THAT.  AND IT SOUNDS TO ME LIKE YOU ARE

23    SAYING YOU HAVE NOT BEEN PRESENTED WITH ANY

24    RELEVANCE OBJECTION TO THAT.

25         MS. MAROULIS:  EXACTLY, YOUR HONOR.

1           AND AGAIN, IF APPLE IS WISHING TO

2    STIPULATE OR TO ANSWER SOME OF THOSE THINGS, SOME

3    OF THE PRODUCTION BURDENS COULD BE ALLEVIATED, BUT

4    WE ARE FACED WITH THAT NOT HAPPENING.

5           THE NEXT CATEGORY, BROAD CATEGORY OF

6    DOCUMENTS WE WANT, IS PRIOR ART.  GETTING PRIOR ART

7    OUT OF APPLE HAS BEEN AN ODYSSEY.

8           WE KNOW THAT APPLE IS INVOLVED IN A

9    VARIETY OF INTELLECTUAL PROPERTY LITIGATION, AND WE

10   KNOW THAT THROUGH THESE LITIGATIONS AND PUBLIC

11   INFORMATION THAT THEY ARE NOTICED OF A LOT OF PRIOR

12   ART FOR THE SAME PATENTS OR THE RELATED PATENTS.

13          GETTING IT OUT OF THEM HAS BEEN ALMOST

14   IMPOSSIBLE.  SO AGAIN, BY WAY OF EXAMPLE, WE ARE

15   DESCRIBING THE NEXT PRODUCT, THE PRODUCT THAT WE

16   HAVE BEEN TRYING TO GET INFORMATION FROM THEM, BUT

17   THAT'S NOT THE ONLY ONE.  IT TOOK US A MOTION

18   BEFORE YOUR HONOR LAST TIME TO GET MOTOROLA

19   LITIGATION MATERIALS.

20          WE HAVE NOW GOTTEN THEM, FOR THE MOST

21   PART.  AND OF COURSE MAC OS IS A WHOLE SEPARATE

22   MOTION BEFORE US AND WE WILL RETURN TO THAT.

23          BUT THE BROAD LEVEL WE ARE SEEKING IS

24   THAT APPLE PRODUCE ANY PRIOR ART IN ITS POSSESSION

25   RELEVANT TO THE 12 ASSERTED PATENTS.

1          THERE'S SOME PRIOR ART THAT APPLE HAS.

2     WE CANNOT BE FORCED TO GUESS FROM EITHER PUBLIC

3     FILING OR IN CASES OF DESIGN PATENTS WE FOUND PRIOR

4     ART IN READING THE DESIGN BOOKS THAT ARE PUBLICLY

5     PUBLISHED.

6          THEY ARE IN LITIGATION, THEY ARE NOTICED

7     THAT THEY HAVE TO PRODUCE PRIOR ART AND THEY HAVE

8     TO DO THAT.

9          THE COURT:  IF I COULD ASK ABOUT THAT.

10         I APPRECIATE YOU DON'T HAVE PERFECT

11    INSIGHT INTO THE PRIOR ART AND OTHER ISSUES IN

12    DISPUTES IN OTHER CASES, BUT AS YOU POINTED OUT YOU

13    ARE AT LEAST ABLE TO GLEAN FROM CERTAIN INSTANCES

14    WHAT PRIOR ART.

15         HAVE YOU IDENTIFIED, OTHER THAN THE NEXT

16    STEP OS, HAVE YOU IDENTIFIED ANY SPECIFIC PRIOR ART

17    THAT YOU WOULD LIKE PRODUCED THAT THEY REFUSED TO

18    PRODUCE?

19         MS. MAROULIS:  RIGHT NOW WE IDENTIFIED

20    NEXT BEFORE WE IDENTIFIED THE MOTOROLA PRIOR ART,

21    BUT WE DON'T KNOW WHAT WE DON'T KNOW, RIGHT?

22         THERE'S SOME PRIOR ART THAT THEY ARE

23    SITTING ON POTENTIALLY THAT THEY HAVE NOT PRODUCED

24    AND THEY WILL NOT TELL US IF THEY PRODUCED IT AT

25    ALL.

1           THE COURT:  BUT FOR EXAMPLE, YOU HAVEN'T

2    REVIEWED OR ANALYZED OTHER CASES IN WHICH THIS

3    PRIOR ART HAS BEEN AT ISSUE AND IDENTIFIED ANY

4    OTHER SPECIFIC REFERENCES --

5           MS. MAROULIS:  YOUR HONOR --

6           THE COURT:  -- TO FOCUS THEIR EFFORT.

7           MS. MAROULIS:  I UNDERSTAND THERE WAS A

8    LETTER FROM MS. CHAN SENT TO APPLE, AND I'M TRYING

9    TO FIND THE EXHIBIT NUMBER FOR YOU SO I CAN SHOW

10   YOU THE LETTER.

11          THE NEXT CATEGORY IS THE CATEGORY THAT

12   RELATES TO SEARCHES RESPONSIVE TO THE TERM SAMSUNG

13   OR SOME VARIATION THEREOF.  FOR EXAMPLE, ALIASES

14   FROM THE INTERNAL SLANG OR CODE WORDS THAT ARE USED

15   WITHIN APPLE.  AND RELATED TO THAT WE HAVE ASKED

16   THEM TO RUN ANDROID OR DROID WHICH IS AN

17   ABBREVIATION OF THAT.  AND WE RECEIVED A VARIETY OF

18   RESPONSES TO THAT.

19          AGAIN, ONE WAS THAT IT'S BURDENSOME.

20   ANOTHER ONE WAS THAT THERE'S NO NEED FOR THEM TO

21   RUN "SAMSUNG" EVEN THOUGH THEY FORCED US TO RUN

22   "APPLE" BECAUSE THEY SAY, YOU COPIED OUR PRODUCTS

23   AND WE HAVEN'T COPIED YOURS.

24          WELL, THAT'S NOT REALLY A SERIOUS

25   CONVERSATION BECAUSE WE ALLEGE THAT THEY INFRINGED

```
 1      12 OF OUR PATENTS THAT THEY COPIED OUR TECHNOLOGY.

 2      AND I KNOW MR. MCELHINNY LIKES TO SPEAK BEFORE

 3      YOUR HONOR AND OTHER TRIBUNALS ABOUT THE COPYING,

 4      BUT THERE'S COPYING ON APPLE'S SIDE, IT'S COPYING

 5      OF THE TECHNOLOGY, THAT'S THE PATENT INFRINGEMENT

 6      SAMSUNG IS ALLEGING.

 7               THE TERM "SAMSUNG" CAN BE RELEVANT TO A

 8      WHOLE VARIETY OF POINTS FROM LACK OF

 9      DISTINCTIVENESS IN THE TRADEMARK AREA TO

10      COMPETITIVE ANALYSIS TO COPYING BY APPLE OF SAMSUNG

11      FEATURES AND OTHERS.

12               THEY CANNOT SERIOUSLY DISPUTE THAT'S NOT

13      RELEVANT.  SO FOR THAT REASON, THE REASONS OF

14      CLARITY, THEY SHOULD EXECUTE THOSE SEARCHES.

15               IT IS MY UNDERSTANDING THAT THEY AGREED

16      TO SEARCH SOME OF THE FILES FOR THE TERM "SAMSUNG"

17      BUT NOT ALL OF THEM, AND THEY HAVE NOT AGREED TO

18      SEARCH ANDROID AND DROID.

19               THE COURT:  SO AS I UNDERSTAND IT IN A

20      LETTER DATED JANUARY 5 THEY IDENTIFIED AT LEAST

21      SOME TERMS THAT THEY WOULD BE WILLING TO SEARCH FOR

22      IN ORDER TO MEET YOUR LEGITIMATE NEEDS.

23               WHAT'S WRONG WITH THEIR PROPOSAL?

24               MS. MAROULIS:  YOUR HONOR, MY

25      UNDERSTANDING IS IT'S NOT AS TO ALL THE CUSTODIANS
```

1    AND IT'S NOT ALL OF OUR TERMS.  ONE MOMENT.

2              AND YOUR HONOR, WHILE WE ARE LOOKING UP

3    YOUR OTHER QUESTION, I WANTED TO DIRECT YOU TO

4    DECLARATION EXHIBIT E WHICH LISTS THE SPECIFIC

5    SOURCE CODE THAT WE WANTED AND I THINK YOU WERE

6    ASKING --

7              THE COURT:  I WAS CURIOUS ABOUT THE

8    JANUARY 5TH PROPOSAL.

9              MS. MAROULIS:  YEAH.

10             SO THE LETTER THAT THEY ARE DIRECTING US

11   TO SAYS THAT THEY WILL AGREE TO RUN "SAMSUNG" AS TO

12   INVENTOR DOCUMENTS BUT NOT OTHERS AND THAT THEY ARE

13   REFUSING TO RUN ANDROID AND DROID.

14             AND WE BELIEVE --

15             THE COURT:  IS YOUR BIGGER BEEF WITH THE

16   SUFFICIENCY OF THE SEARCH TERMS OR WITH THE

17   UNIVERSE OF CUSTODIANS SUBJECT TO THE SEARCH?

18             MS. MAROULIS:  IT'S BOTH.

19             THE COURT:  I GET THAT.

20             YOU WANT EVERYTHING IN A DAY, BOTH SIDES

21   DO, BUT WHAT'S MORE IMPORTANT TO YOU?  TELL ME WHAT

22   YOU REALLY NEED.

23             MS. KASSABIAN:  IF I COULD JUST SPEAK TO

24   THIS BRIEFLY BECAUSE I WAS INVOLVED IN THE MEET AND

25   CONFER ON THIS ISSUE.

1          APPLE AGREED TO DO THIS.  APPLE DEMANDED

2     THAT SAMSUNG SEARCH FOR THE WORD "APPLE" AND ALL OF

3     THE DOCUMENTS OF EVERYONE WHO DESIGNED, DEVELOPED

4     OR MARKETED ANY OF THE PRODUCTS AT ISSUE.

5          SO DESIGNERS AND -- DESIGNERS TEND TO BE

6     THE INVENTORS, IF YOU WILL, AT LEAST ON APPLE'S

7     SIDE.  DEVELOPERS TEND TO BE ENGINEERS, AND

8     MARKETERS ARE MARKETERS.

9          WE AGREED TO DO THAT IN EXCHANGE FOR THEM

10    TO DO SAMSUNG.  THEY ARE NOW RENEGING.  THEY ARE

11    SAYING, WE HAVE DONE THAT.  THEY ARE NOW SAYING WE

12    WILL SEARCH FOR THE WORD SAMSUNG BUT NO ALIASES,

13    EVEN THOUGH A LOT OF PEOPLE CALL SAMSUNG SS AND

14    OTHER ALIASES.

15          THE COURT:  DID YOU INCLUDE ANY ALIASES

16    FOR APPLE IN YOUR SEARCH?

17          MS. KASSABIAN:  ABSOLUTELY.

18          THE COURT:  GIVE ME AN EXAMPLE OF ONE.

19          MS. KASSABIAN:  A COMPANY.  A4.

20          THERE WAS AN "A" WITH A CHINESE CHARACTER

21    WHICH IS SOMETIMES USED IN SAMSUNG BECAUSE THE

22    PRONUNCIATION OF A CHINESE CHARACTER SOUNDS LIKE 4

23    AND A4 WAS SOMETIMES USED.

24          WE DID USE ALIASES, SO THIS IS REALLY

25    FRUSTRATING BECAUSE WE SPENT WEEKS NEGOTIATING THIS

```
 1      IN NOVEMBER.  WE REACHED AN AGREEMENT.  WE HAVE

 2      LETTERS CONFIRMING THE AGREEMENT, INCLUDING LETTERS

 3      FROM APPLE.  AND THEN THEY APPARENTLY CHANGED THEIR

 4      MIND AND ARE ONLY SEARCHING IN THEIR INVENTORS, NOT

 5      IN THE ENGINEERS' DOCUMENTS, NOT IN THE MARKETERS,

 6      AND NO ALIASES.

 7              AND THEN, YOU KNOW, RELATED TO THAT IS

 8      THE ANDROID/DROID TERM WHICH THEY ARE REFUSING TO

 9      SEARCH IN ANY CUSTODIAN FILES.

10              WE DID THIS.  THIS WAS AN AGREEMENT AND

11      THEY ARE NOW BACKING OUT, AS I UNDERSTAND IT.

12              MS. MAROULIS:  BUT YOUR HONOR, TO ANSWER

13      YOUR ORIGINAL QUESTION, WHICH IS, WHAT'S MORE

14      IMPORTANT TO US IN THE BROADER SEARCH OF SAMSUNG

15      VERSUS ANDROID, I GUESS WE WOULD LIKE THE BROADER

16      SEARCH OF SAMSUNG BECAUSE THAT MIGHT BE A LITTLE

17      BIT MORE VALUABLE TO US, ULTIMATELY.

18              BUT THERE'S NO REASON WHY THEY SHOULD

19      REFUSE.  AND AS MS. KASSABIAN DESCRIBED, THERE WAS

20      AN AGREEMENT.

21              AND AS I BEGAN THIS MOTION BY EXPLAINING

22      THESE NEGOTIATIONS AND HOW WE, IN GOOD FAITH, WENT

23      FORWARD WITH A LOT OF PRODUCTION AND AGREEMENTS AND

24      OFFERS TO THE COURT, AND THAT HAS NOT BEEN

25      RECIPROCATED.
```

1          THE COURT:  JUST SO I UNDERSTAND YOUR

2     POINT, I'M SORRY TO INTERRUPT YOU, MS. MAROULIS,

3     AND ALSO MS. KASSABIAN'S POINT.

4          YOU BOTH ARE TELLING ME IF I CRANK

5     THROUGH THE MEET AND CONFER LETTERS WHICH ARE

6     ATTACHED AS EXHIBITS AND EVALUATE THE EXCHANGE OF

7     PROPOSALS IN THOSE LETTERS, I WILL FIND A HARD

8     EVIDENCE, IRREFUTABLE EVIDENCE OF AGREEMENT,

9     COMMITMENT ON BOTH SIDES TO THIS PROCESS AS YOU

10    DESCRIBED.

11         MS. MAROULIS:  YOUR HONOR, I THINK WE

12    WILL DO BETTER THAN THAT.  I WILL ASK MY COLLEAGUES

13    TO GIVE YOU SPECIFIC NUMBERS BECAUSE I DON'T THINK

14    IT'S FAIR FOR THE COURT TO HAVE TO LOOK FOR THAT.

15         THE COURT:  BUT I WILL FIND IT IS WHAT

16    YOU ARE SAYING?

17         MS. KASSABIAN:  YES.

18         MS. MAROULIS:  YES.

19         ALL RIGHT.

20         SO THE RELATED CATEGORY OF THINGS THAT

21    WERE ASKING FOR IS THE SEARCH TERMS THAT GOVERN THE

22    DESIGN DOCUMENTS.

23         AND THOSE SEARCH TERMS ARE ESSENTIALLY

24    LAID OUT BOTH IN OUR BRIEF, BUT IF HONOR WANTS THE

25    ORIGINAL CORRESPONDENCE, IT'S THE LETTER FROM

                                                      204

1    MS. HUTNYAN ADDRESSED TO MS. MIA MAZZA OF APPLE,

2    MORRISON & FOERSTER'S EXHIBIT Z TO THE HUTNYAN

3    DECLARATION IN SUPPORT OF OUR MOTION TO COMPEL.

4            THOSE SEARCH TERMS WERE CAREFULLY

5    SELECTED BY US TO ADDRESS SPECIFIC DESIGN ISSUES

6    AND APPLE AGREED TO SEARCH SOME OF THEM BUT NOT

7    OTHERS.  AND THEY HAVE NOT AGREED, FOR EXAMPLE, TO

8    SUCH BASIC SEARCH OF TABLET, EVEN THOUGH THE TABLET

9    IS -- THEY HAVE THE TABLET THAT THEY ARE CLAIMING

10   TO BE AN EMBODIMENT IN THIS CASE AND THEY ARE

11   ACCUSING OUR TABLET.  SO IT'S A VERY PERTINENT

12   SEARCH.

13           BUT EXHIBIT Z ITEMIZES ALL THE SEARCHES

14   AND ALSO WHAT IT DOES IS IT PUTS A CHART TOGETHER

15   OF WHAT WE ARE ASKING VERSUS WHAT APPLE IS WILLING

16   OR NOT WILLING TO DO.

17           SO YOUR HONOR CAN EVALUATE THAT WAY AS

18   WELL.

19           SO I'M GOING TO HAND UP A COPY TO

20   YOUR HONOR IN A MINUTE.  BUT TO ANSWER YOUR

21   PREVIOUS QUESTION, WHICH IS, WHERE'S THE AGREEMENT

22   REGARDING SEARCHING EACH OTHER'S FILES REGARDING

23   THE COMPANY TERMS?  IT'S A LETTER DATED DECEMBER 5,

24   2011 AND IT'S FROM MS. MAZZA TO MS. KASSABIAN.

25           I DON'T THINK YOUR HONOR WANTS US TO READ

1    IT IN THE RECORD, BUT IF YOU WANT THEN I WILL.

2              THE COURT:  IF I HAVE THE LETTER, THAT'S

3    FINE.

4              MS. MAROULIS:  VERY WELL.

5              ALL RIGHT.  SO MOVING ON, THE CATEGORIES

6    THAT WE DO WANT TO COVER AS WELL ARE DESIGN

7    DOCUMENTS AND FINANCIALS.

8              WITH THE DESIGN DOCUMENTS WE HAVE SEEN A

9    VERY DISTURBING PATTERN, WHICH IS WE HAD TO DEPOSE

10   BY SCHEDULE ALL OF THEIR DESIGN INVENTORS AND THEIR

11   KEY DESIGNERS IN OCTOBER OF THIS YEAR.

12             WE ARE GOING TO TALK ABOUT REVISITING ONE

13   OF THOSE DEPOSITIONS, BUT GENERALLY WE ARE GOING TO

14   HAVE A HARD TIME REOPENING THEM.  WE MIGHT NEED TO

15   TRY WITH RESPECT TO SOME OF THEM, BUT OUR TIME ON

16   THOSE IN SOME WAYS HAVE PASSED.

17             EVER SINCE THEN WE FOUND AN INCREDIBLE

18   AMOUNT OF DESIGN EVIDENCE THAT SHOULD HAVE BEEN

19   PRODUCED A LONG TIME AGO.

20             YOUR HONOR IS VERY FAMILIAR WITH THE '035

21   MOCKUP SITUATION WITH THE CAD FILES AND THE

22   INVENTOR BOOKS THAT WE DISCUSSED BEFORE.

23             IT JUST RECENTLY CAME TO OUR ATTENTION

24   THAT THERE WAS A WHOLE TROVE OF MODELS THAT THEY

25   HAD PRODUCED TO US FOR INSPECTION THIS WEEK.  BUT

1    THERE ARE STILL ADDITIONAL DOCUMENTS THAT WE NOW

2    KNOW THEY HAVE WHICH THEY ARE NOT PRODUCING.

3              JUST TO GIVE YOU A FEW EXAMPLES, THERE'S

4    SOMETHING CALLED MCO.

5              THE COURT:  THESE ARE MECHANICAL

6    OUTLINES?

7              MS. MAROULIS:  I'VE BEEN TRYING TO FIND

8    OUT WHAT "C" STANDS FOR, BUT I HAVEN'T BEEN ABLE

9    TO.  BUT IT'S A MECHANICAL OUTLINE OF THE PRODUCT

10   AND IT'S MORE DETAILED THAN A CAD FILE, BUT IT IS

11   THE ACTUAL PROTOTYPE.

12             AND IT SHOWS A VARIETY OF THE FEATURES OF

13   THE PRODUCT, FOR EXAMPLE FUNCTIONALITY IN THIS

14   CASE.  THE MCO SHOWS THE THICKNESS OF THE WALLS,

15   AND THERE ARE INVENTOR DOCUMENTS AND E-MAILS THAT

16   DISCUSS THICKNESS OF THE WALLS AND VARIOUS

17   MEASUREMENTS AND THAT IS RELEVANT AS WELL TO OUR

18   CASE.

19             SO APPLE'S POSITION IS THAT THEY SHOULD

20   NOT HAVE TO PRODUCE ANY NONWORKING PROTOTYPES OR

21   ANY PARTS OF THE PROTOTYPES.  AND WE DISAGREE WITH

22   THAT.

23             FIRST OF ALL, WE DON'T KNOW WHAT ELSE

24   THEY ARE HIDING OUT THERE BECAUSE THE DESIGN

25   DOCUMENTS AND THINGS HAVE BEEN DRIBBLING OUT ARE

1    VERY, VERY SLOWLY.

2              BUT SECONDLY, FOR THE DESIGN PATENTS THEY

3    DON'T NEED TO BE FUNCTIONAL.  THEY ARE CLAIMING FOR

4    SOME OF THEM THE OUTSIDE HARDWARE, THEY ARE

5    BASICALLY CLAIMING THE SHELL, THE FLAT SURFACE.

6              AND SO WHETHER THE PROTOTYPE IS

7    FUNCTIONAL OR NOT DOES NOT AFFECT ITS RELEVANCE OR

8    RESPONSIVENESS IN THIS CASE.

9              SO IN OUR MOTION WE ARE SEEKING COMPLETE

10   PRODUCTION OF INVENTOR NOTEBOOKS, CAD FILES, MCO'S

11   AND PROTOTYPES.  AND THE INVENTOR NOTEBOOKS, AGAIN,

12   I APOLOGIZE FOR BRINGING IT UP YET AGAIN FOR THE

13   THIRD OR FOURTH TIME, BUT THIS IS AN IMPORTANT

14   ISSUE FOR US AND IT HAS NOT BEEN ADDRESSED AND

15   THAT'S SUBJECT TO OUR --

16             THE COURT:  ARE THERE PARTICULAR CAD

17   FILES OR SKETCHBOOKS THAT HAVE NOT BEEN PRODUCED?

18             MS. MAROULIS:  YOUR HONOR, THE

19   SKETCHBOOKS, APPARENTLY THEY ARE DRAWING A LINE AT

20   2003.  AND WE DON'T BELIEVE IT'S THE CORRECT LINE

21   BECAUSE THEY RECENTLY FINALLY GAVE US THE

22   CONCEPTION REDUCTION TO PRACTICE DATE FOR THE

23   TABLET AND IT'S SEPTEMBER 2003.  SO WE BELIEVE IT

24   SHOULD BE BELOW OR BEFORE THAT, AND 2003 IS AN

25   ARBITRARY CUTOFF. AND THEY SHOULD SEARCH FOR

1    RELEVANCE NOT AN ARBITRARY CUTOFF IN TERMS OF THE

2    TIME.

3            ALSO IN TERMS OF THE INVENTOR NOTEBOOKS,

4    IT'S NOT SOMETHING THE OTHER SIDE ADDRESSED IN THE

5    PAPERS BUT WE RAISED IN OUR PAPERS THE NOTEBOOKS

6    WERE REDACTED VERY HEAVILY BY COUNSEL.

7            AND APPARENTLY WHAT ONE UNDERSTOOD TO

8    COME OUT OF THIS PROCESS WAS THE INVENTORS

9    THEMSELVES WERE NOT INVOLVED, OR THE COUNSEL MADE,

10    BASICALLY FROM OUR PERSPECTIVE, MADE ARBITRARY

11    DECISIONS TO WHAT IS RELEVANT AND WHAT IS NOT,

12    BECAUSE SOME OF THE SKETCHBOOKS IF YOUR HONOR HAS

13    SEEN THEM, ARE VERY DIFFICULT TO DECIPHER AS TO

14    WHAT DATE THEY ARE AND WHAT ACTUAL PRODUCT IT IS.

15    AND IT WOULD BE DIFFICULT TO DETERMINE WITHOUT

16    SIGNIFICANT CONSULTATION.

17            IT'S MY UNDERSTANDING THAT IN THE MEET

18    AND CONFER COUNSEL FOR APPLE BASICALLY REVEALED FOR

19    THE FIRST TIME THAT THEY WERE THE ONES WHO WERE

20    DOING THE REDACTIONS.

21            WITH RESPECT TO THE SURVEY DOCUMENTS,

22    AGAIN, THEY HAVE NOT PRODUCED MOST OF THE SURVEY

23    DOCUMENTS.  WE HAVE SOME SURVEYS BUT VERY FEW OF

24    THEM, AND THEY HAVE OFFERED BUT HAVE NOT REPUTED ON

25    THIS YET, TO PRODUCE ONLY --

1           THE COURT:  COUNSEL, I'M SORRY -- I DON'T

2    MEAN TO INTERRUPT BUT I WILL BECAUSE I WANT TO MAKE

3    SURE I UNDERSTAND YOUR PREVIOUS POINT COMPLETELY.

4           ON THE MECHANICAL OUTLINES, MY EXPOSURE

5    TO MECHANICAL DESIGN IS PRETTY LIMITED BUT I HAD

6    ALWAYS UNDERSTOOD THESE THINGS TO BASICALLY REVEAL

7    HOW THE INTERNAL OPERATIONS OF COMPONENTS ARE LAID

8    OUT, THAT THEY WEREN'T TERRIBLY RELEVANT OR

9    ILLUMINATING AS TO EXTERIOR DESIGN.

10          AM I MISUNDERSTANDING AS TO WHAT THESE

11   THINGS ARE?

12          MS. MAROULIS:  YOUR HONOR, I AM NEW TO

13   THIS AS WELL, BUT THE MECHANICAL OUTLINES WE HAVE

14   SEEN BASICALLY SHOW KIND OF SLICED PRODUCTS.  AND

15   IT'S TAKEN APART, SO YOU SEE THE CROSS SECTION OF

16   WHAT'S INSIDE AND WHAT'S OUTSIDE AND HOW THE INSIDE

17   AND OUTSIDE FUNCTION.

18          WHEN WE MAKE SOME OF OUR FUNCTIONALITY

19   ARGUMENTS, FOR EXAMPLE, WE SAY THAT THE SCREEN IS

20   BLOCKED TO PRIVATE COMPONENTS, OR THE SCREEN IS

21   LOCATED IN SUCH A WAY TO EFFECTIVELY MAXIMIZE THE

22   SCREEN.

23          SO THESE DOCUMENTS -- THESE ARGUMENTS ARE

24   VERY MUCH INTERWOVEN FOR US WITH HOW THIS MCO DOES

25   -- I THINK THERE'S A SAMPLE MCO IN ONE OF THE

1    PARTIES' PAPERS, SO THERE'S ACTUALLY A DRAWING OF

2    THAT.

3               THE COURT:  YOU ARE TURNING TO THE SURVEY

4    DOCUMENT?

5               MS. MAROULIS:  YES, YOUR HONOR, I'M

6    MINDFUL OF THE LATE HOUR, SO I'M TRYING TO BE

7    CONCISE.

8               SO WITH RESPECT TO SURVEYS IT'S OUR

9    UNDERSTANDING THAT THEY ARE OFFERING TO PRODUCE NOW

10   WHICH THEY HAVEN'T YET DONE, FINAL SURVEYS THAT

11   APPLE HAVE RUN AND SURVEYS THAT THEY RECEIVE OR BUY

12   IN THE ORDINARY COURSE OF BUSINESS.

13              THAT IS FAR FROM THE VERY BROAD SURVEY

14   REQUESTS AND REQUIREMENTS THAT WERE IMPOSED TO

15   SAMSUNG BOTH BY APPLE AND BY THIS COURT.

16              WE BELIEVE THAT ALL SURVEYS SHOULD BE

17   PRODUCED TO US WHETHER THEY ARE GENERATED BY APPLE

18   OR ARE IN APPLE'S POSSESSION BUT GENERATED BY

19   SOMEBODY ELSE.

20              THE COURT:  SO -- I'M SORRY, SO WHAT

21   EXACTLY BEYOND WHAT THEY COMMITTED TO PRODUCING DO

22   YOU REQUIRE?

23              MS. MAROULIS:  WE REQUIRE ALL SURVEYS IN

24   THEIR POSSESSION.

25              SO IF THEY RECEIVE A SURVEY FROM ANOTHER

1    COMPANY, IF THEY ACCESS IT THROUGH COMPETITIVE

2    INTELLIGENCE, WHATEVER THEY HAVE, I WANT ALL THEIR

3    SURVEYS.  EVEN IF THOUGH THEY OFFERED TO PRODUCE

4    SOME OF THE SURVEYS, THEY HAVEN'T DONE SO YET.

5              AND AS WE DISCUSSED EARLIER, YOUR HONOR

6    WAS ASKING CLEAR QUESTIONS.  AND JUST TO BE CLEAR,

7    THEY HAVE NOT PRODUCED IT.  THIS IS STILL AN OFFER,

8    AND THEY GAVE THEMSELVES A FAIRLY LUXURIOUS

9    SCHEDULE.  I THINK THE OFFER WAS MADE A FEW DAYS

10   AGO AND THEY HAVE UNTIL EARLY FEBRUARY TO DO THAT.

11             WITH RESPECT TO FINANCIAL DOCUMENTS, WE

12   ARE STILL LOOKING FOR, DESPITE SOME OFFERS IN THE

13   IN BETWEEN, FOR PROJECTIONS, BUSINESS PLANS AND

14   KIND OF A MORE BIG PICTURE FINANCIAL DOCUMENTS.

15             I UNDERSTAND WE ARE GOING TO BE GETTING

16   SALES DATA BROKEN OUT BY PRODUCTS.  IF THAT'S

17   INCORRECT, WE CERTAINLY NEED THAT, BUT IT'S MY

18   UNDERSTANDING THEY WON'T BE GETTING US THE SALES

19   DATA.  BUT WE HAVE NO INFORMATION OR COMMITMENT TO

20   PRODUCE ON EITHER PROFIT MARGINS, COST ALLOCATION

21   AND PROJECTIONS AND BUSINESS PLANS.

22             THE COURT:  SO WHEN YOU RAISED THAT ISSUE

23   IN THE MEET AND CONFER WHAT DID THEY TELL YOU?

24             MS. MAROULIS:  THEY TOLD US THEY WOULD

25   PROVIDE SALES DATA AND BILLS AND MATERIALS.

```
 1              THE COURT:  DID THEY EXPLAIN WHY BUSINESS
 2    PLANS, FOR EXAMPLE, WOULD NOT BE PRODUCED OR
 3    PROJECTIONS?
 4              MS. MAROULIS:  THEY DIDN'T BELIEVE THAT
 5    WAS CALLED FOR.
 6              WE DISAGREE.  RFP 55, I BELIEVE THAT VERY
 7    SQUARELY ADDRESSES THAT.
 8              THE COURT:  ALL RIGHT.
 9              MS. MAROULIS:  BUT FINANCIAL DOCUMENTS IS
10    CERTAINLY ANOTHER AREA WHERE IT SHOULD BE FAIRLY
11    RECIPROCAL.
12              WE WILL SKIP THE 30(B)(6) ARGUMENTS
13    BECAUSE WE TALKED LONG ABOUT THEM EXTENSIVELY.
14              IN ADDITION, WE ASKED FOR ADDITIONAL TIME
15    OF DEPOSITION WITH DESIGN WITNESSES, BUT MORE
16    SPECIFICALLY MR. JONATHAN IVE.  WE DEPOSED MR. IVE
17    ON DECEMBER 1ST.  IT WAS A LITTLE BIT LATER THAN
18    MOST OF THE INVENTORS FOR REASONS OF HIS PERSONAL
19    SCHEDULE COMMITMENTS.
20              WE WERE NOT ABLE TO EXHAUST A NUMBER OF
21    THINGS WITH MR. IVE, NOT THE LEAST OF WHICH WAS
22    INFORMATION WE RECEIVED IN JANUARY INCLUDING
23    VARIOUS PROTOTYPES.
24              THE COURT:  HOW MANY HOURS DID YOU SPEND
25    WITH HIM?
```

```
1                MS. MAROULIS:  SEVEN HOURS.

2                THE COURT:  SO THE BASIS FOR YOUR REQUEST

3     FOR MORE TIME ISN'T THAT YOU HAVEN'T YET EXHAUSTED

4     THE DEFAULT UNDER THE RULES BUT RATHER THAT

5     ADDITIONAL DOCUMENTS AND OTHER INFORMATION HAS BEEN

6     PRODUCED AFTERWARDS.

7                MS. MAROULIS:  THERE'S BEEN A LOT OF

8     INFORMATION PRODUCED SINCE THEN AND WE NEED TIME

9     WITH HIM.

10                AND THE REASON IT IS HIM AND NOT OTHERS

11    IS THAT WHEN WE ARE DEPOSING VARIOUS DESIGN

12    INVENTORS, MANY OF THEM PLED IGNORANCE TO THINGS

13    THAT WE THINK THEY SHOULD HAVE KNOWN.

14                THE COURT:  DID ANY OF THEM POINT TO

15    SPECIFICALLY MR. IVE.

16                MS. MAROULIS:  YES, YOUR HONOR.

17                I DON'T HAVE TRANSCRIPTS, BUT IF

18    YOUR HONOR WOULD NEED IT -- IT'S NOT SURPRISING

19    BECAUSE HE'S THE HEAD OF DESIGN.

20                SO APPLE ARGUES THAT HE'S SUBJECT TO

21    WHAT'S CALLED THE APEX RULES.  WE BELIEVE THAT THIS

22    IS NOT AN APEX DEPONENT EVEN THOUGH HE HAS A HIGH

23    RANK WITHIN APPLE.  HE HAS UNIQUE KNOWLEDGE, AND SO

24    FOR THAT REASON, EVEN THOUGH HE'S A VERY HIGHLY

25    RANKED INDIVIDUAL, THAT DOESN'T ABSOLVE HIM FROM
```

1    SITTING FOR DEPOSITION.

2              AND FINALLY, WE ALREADY COVERED THE TOPIC

3    OF THE SOURCE CODE, BUT IF YOUR HONOR WOULD INDULGE

4    ME A LITTLE BIT MORE.

5              IN THE LETTER FROM MS. HUTNYAN WHICH IS

6    EXHIBIT E TO HER DECLARATION, WE EXHAUSTED THE LIST

7    SPECIFIC SOURCE CODE THAT WE WANT ORDERED.

8              I ALREADY DISCUSSED THE BASEBAND PROCESS,

9    BUT TO THE EXTENT YOUR HONOR TAILORS THE ORDER,

10   CALLS OUT SPECIFICALLY WHICH SOURCE CODES THAT

11   NEEDS TO BE, THAT LETTER CONTAINS AN EXHAUSTIVE

12   LIST OF THE SOURCE CODE.

13             THE COURT:  ALL RIGHT.

14             THANK YOU VERY MUCH, MS. MAROULIS.

15             I NEED TO GIVE MY COURT REPORTER A BREAK,

16   SO LET'S TAKE TEN MINUTES.

17             WE WILL RESUME IN TEN MINUTES.

18             (WHEREUPON A RECESS WAS TAKEN.)

19             THE COURT:  PLEASE BE SEATED.

20             MS. MAROULIS:  YOUR HONOR, I NEGLECTED TO

21   MAKE A COUPLE OF POINTS THAT I CAN EITHER MAKE NOW

22   OR DURING REBUTTAL, WHICH I THINK IS UP TO THE

23   COURT.

24             THE COURT:  WELL, I BELIEVE WE HAVEN'T

25   TECHNICALLY PASSED THE GAVEL OR BATON OR WHATEVER

1    THE METAPHOR IS.

2              MS. MAROULIS:  THANK YOU, YOUR HONOR.

3              ONE OF THE ITEMS WE WERE DISCUSSING

4    BEFORE THE BREAK WAS SURVEYS, AND YOU ASKED WHAT

5    SPECIFICALLY APPLE OFFERED VERSUS WHAT WE STILL

6    WANT.

7              AND I CHARACTERIZE PARTLY WHAT THEY

8    OFFERED BUT THERE WAS ANOTHER LIMITATION THAT THEY

9    PLACED ON THEIR OFFERING WHICH IS I BELIEVE THAT

10   THEY SAID THEY WILL SEARCH FOR SURVEYS REGARDING

11   THEIR OWN PRODUCTS, APPLE IPHONES, IPADS AND SUCH.

12             WE WOULD LIKE THEM TO SEARCH FOR ALL

13   SURVEYS REFERENCING SAMSUNG OR SAMSUNG PRODUCTS

14   BECAUSE THAT IS WHAT WAS RECIPROCAL OF US AS WELL.

15   AND WE HAD TO CONDUCT A NUMBER OF SEARCHES AND

16   PRODUCE ALL THESE DOCUMENTS.

17             THE SECOND POINT IS, THIS IS WITH RESPECT

18   TO THE SURVEYS, SO THE SECOND POINT IS THAT WITH

19   RESPECT TO FINANCIALS, WE BELIEVE THAT THEIR OFFER

20   IS TO PRODUCE REVENUES FOR PRODUCT.

21             AND WE WANT TO MAKE SURE IT'S ACTUALLY

22   PER MODEL, MEANING WE ARE NOT GETTING AN ABROGATE

23   IPAD OR IPHONE BUCKET, BUT IT'S SEGREGATED BY

24   IPHONE 4 OR 3, HOWEVER THE ACCUSED PRODUCTS ARE.

25             THE COURT:  HAVE THEY EXPLAINED TO YOU

1    WHETHER THEY EVEN TRACKED THAT LEVEL OF

2    GRANULARITY?

3              MS. MAROULIS:  WE DON'T KNOW YET BECAUSE

4    WE HAVEN'T DEPOSED THEIR FINANCIAL WITNESSES.

5              THE COURT:  IN THE MEET AND CONFER

6    PROCESS, WHEN YOU EXPLAINED TO THEM, WE NEED TO

7    HAVE A PRODUCT LEVEL.  I'M SORRY, IT'S A PRODUCT OR

8    RELEASE LEVEL, WHAT DID THEY TELL YOU?

9              MS. MAROULIS:  I DON'T KNOW ABOUT THE

10   DETAILS FOR THAT ONE BUT THE CORRESPONDENCE SAYS

11   THAT IT WOULD BE BY PRODUCT.

12             SO PERHAPS MR. JACOBS WOULD ELUCIDATE ON

13   THAT.  IF IT'S BY MODEL, THEN WE DON'T HAVE A

14   DISPUTE TO THAT.

15             AND FINALLY, YOUR HONOR, WE ASKED AT THE

16   BREAK WHERE WE CAN FIND THE AGREEMENT AS TO

17   RECIPROCAL SEARCHING OF THE TERMS "SAMSUNG" AND

18   SUCH.  AND IT IS EXHIBIT V TO THE HUTNYAN

19   DECLARATION, AND I WILL READ THIS INTO THE RECORD.

20             THIS IS WHAT APPLE'S COUNSEL STATED:

21             "AS DISCUSSED DURING THE CALL AND IN

22   RECENT CORRESPONDENCE, APPLE IS RECIPROCATING.

23   APPLE AGREES TO SEARCH FOR SAMSUNG OR ANY SAMSUNG

24   PRODUCT AT ISSUE IN THIS CASE OR ANY ALIAS

25   THEREFORE.  AND WITH RESPECT TO DOCUMENTS IN THE

1      FILES OF ITS DESIGNERS AND ENGINEERS WHO WORKED ON

2      THE RELEVANT PRODUCTS, EMPLOYEES RESPONSIBLE FOR

3      MARKETING THESE PRODUCTS AND EMPLOYEES RESPONSIBLE

4      FOR DEVELOPING THE FEATURES AT ISSUE."

5              SO THEY WENT BACK ON THAT WORD AND NOW

6      ARE SEARCHING MUCH MORE NARROWER.

7              THE COURT:  IS IT FAIR TO SAY,

8      MS. MAROULIS, THAT YOUR REQUEST OF THIS COURT IS

9      COEXTENSIVE IN THE SCOPE OF WHAT'S IDENTIFIED IN

10     THAT LETTER?

11             IN OTHER WORDS, YOU ARE NOT LOOKING FOR

12     SOMETHING MORE THAN THAT COMMITMENT, YOU'RE SIMPLY

13     LOOKING FOR THE COMMITMENT ALONE?

14             MS. MAROULIS:  WE ARE LOOKING FOR THE

15     SAME COMMITMENT WE WERE HELD TO.

16             THE COURT:  WHICH IS WHAT THAT LETTER

17     SAYS?

18             IN OTHER WORDS, I JUST WANT TO UNDERSTAND

19     YOUR REQUEST.  IS YOUR REQUEST WHAT THEY AGREED TO

20     DO?

21             MS. MAROULIS:  YES, YOUR HONOR.

22             WITH RESPECT TO THE TERM "SAMSUNG," YES.

23     WE ARE ALSO SEEKING "ANDROID" AND "DROID" WHICH IS

24     A RELATED ISSUE AND WE SHOULD NOT HAVE TO CHOOSE

25     BETWEEN THE TWO.

```
 1                THE COURT:  ALL RIGHT.

 2                MS. MAROULIS:  THANK YOU, YOUR HONOR.

 3                THE COURT:  THANK YOU.

 4           MR. JACOBS?

 5           MR. JACOBS:  YES.

 6                I THINK TO START WITH THE SOURCE CODE

 7      ISSUE, YOUR HONOR, MR. SELWYN WILL START.

 8                THE COURT:  ALL RIGHT.

 9           MR. SELWYN.

10           MR. SELWYN:  GOOD AFTERNOON, YOUR HONOR.

11                THE COURT:  GOOD AFTERNOON.

12           MR. SELWYN:  LET ME TRY TO GIVE YOU THE

13      FACTS AS BEST I CAN ON THE SOURCE CODE ISSUE.

14         ON DECEMBER 6TH WHICH WAS TWO BUSINESS DAYS

15      AFTER SAMSUNG'S LETTER REQUEST, APPLE TOLD SAMSUNG

16      THAT IT WAS PREPARED TO PRODUCE APPLE SOURCE CODE

17      FOR ALL THE ACCUSED FUNCTIONALITY FOR ALL THE NON

18      WIRELESS PATENTS IN THE CASE.

19                YOU RECALL THAT THERE WAS A BUCKET OF

20      PATENTS THAT'S THE DECLARED ESSENTIAL, THEN THERE'S

21      A BUCKET OF PATENTS THAT'S THE NON DECLARED

22      ESSENTIAL OR THE IMPLEMENTATION PATENTS.

23                WE TOLD SAMSUNG ON DECEMBER 6TH THAT WE

24      WERE PREPARED, THEY COULD COME AND SEE ALL THE

25      APPLE HOMEGROWN SOURCE CODE FOR THOSE FIVE PATENTS.
```

1    AND TO BE TRANSPARENT, APPLE SPECIFIED THE

2    CATEGORIES OF SOURCE CODE THAT IT WAS MAKING

3    AVAILABLE, THAT'S EXHIBIT A TO MR. MASELLI'S

4    DECLARATION.

5              THOSE CATEGORIES RELATE TO THE FEATURES

6    THAT ARE ACCUSED OF INFRINGING 50 SAMSUNG PATENTS,

7    THINGS LIKE THE IPOD AND MUSIC APP SOURCE CODE THAT

8    RELATES TO PLAYING MUSIC, THE CLOCK APP SOURCE CODE

9    THAT RELATES TO THE WORLD CLOCK AND TIME

10   INFORMATION.

11             AND TO BE CLEAR, WE'RE NOT TALKING ABOUT

12   A TINY AMOUNT OF SOURCE CODE HERE.  WHAT APPLE MADE

13   AVAILABLE TO SAMSUNG ON DECEMBER 6TH AND WHAT HAS

14   REMAINED AVAILABLE TO SAMSUNG SINCE DECEMBER 6TH IS

15   A STAGGERING AMOUNT OF CODE, IT'S MORE THAN 75,000

16   FILES, IT'S MORE THAN TWO GIGABYTES.  IF YOU WERE

17   TO ACTUALLY PRINT ALL OF THIS CODE IT WOULD BE

18   SOMEWHERE BETWEEN 350 TO 500,000 PAGES.

19             THE FIRST TIME THAT SAMSUNG'S EXPERT

20   LOOKED AT THIS CODE WAS JANUARY 6TH, THE DAY AFTER

21   THE MEET AND CONFER THAT PRECEDED THIS MOTION.  SO

22   ONE MONTH AFTER IT WAS OFFERED.

23             SAMSUNG'S EXPERT HAS NOT LOOKED AT THAT

24   CODE ONCE SINCE.  SO TO DATE, SAMSUNG'S EXPERT HAS

25   LOOKED AT THE 5,000 FILES ONCE FOR THE GRAND TOTAL

1    OF 90 MINUTES.

2                AND TO DATE SAMSUNG HAS NOT, IN ANY

3    BRIEF, IN ANY CORRESPONDENCE ANYWHERE TO OUR

4    KNOWLEDGE, IDENTIFIED ANY SHORTCOMING, ANY OMISSION

5    IN THE CODE THAT APPLE MADE AVAILABLE FOR THE

6    ACCUSED FUNCTIONALITY OF THE BUCKET OF PATENTS THAT

7    RELATES TO THE NON WIRELESS FEATURES.

8                SO THAT'S ONE BUCKET.

9                TURNING TO THE BASEBAND CODE AT ISSUE,

10   WE'VE NEVER HAD ANY OBJECTION TO PRODUCING THE

11   INTEL BASEBAND CODE RELEVANT TO THE ACCUSED

12   FUNCTIONALITY.

13               WE SAY THAT EXPLICITLY IN OUR PATENT

14   LOCAL RULE 34(A) DISCLOSURE.  BUT THIS IS NOT APPLE

15   SOURCE CODE, IT'S INTEL SOURCE CODE.  AFTER INTEL

16   PROVIDES APPLE THE SOURCE CODE, APPLE DOESN'T MAKE

17   ANY CHANGES TO IT.  INTEL SOURCE CODE.

18               APPLE SOUGHT INTEL'S CONSENT TO PRODUCE

19   THE RELEVANT SOURCE CODE.  AND IN RESPONSE, INTEL

20   INDICATED THAT IT WOULD NOT CONSENT TO APPLE'S

21   PRODUCTION OF THE INTEL SOURCE CODE IN APPLE'S

22   POSSESSION.

23               BUT WHAT INTEL DID INDICATE WAS THAT

24   SAMSUNG HAD SUBPOENAED THE SAME CODE FROM INTEL AND

25   IN FACT HAD SUBPOENAED MUCH MORE CODE THAN APPLE

1    POSSESSES.  BECAUSE APPLE DOES NOT POSSESS THE SO

2    CALLED HDL CODE, THE HARDWARE DESCRIPTION LANGUAGE

3    CODE, WHICH IS PROBABLY MORE RELEVANT THAN THE CODE

4    THAT APPLE ACTUALLY HAS.

5            THE COURT:  I MAY BE RUNNING A LITTLE FAR

6    AFIELD HERE, BUT I TAKE IT THAT CODE IS DELIVERED

7    TO APPLE BUT NOT IN SOURCE FORM; IS THAT FAIR?

8    IT'S IN OBJECT FORM?

9            MR. SELWYN:  RIGHT.  IT'S BAKED IN SO

10   APPLE DOESN'T HAVE THAT.

11           SO INTEL INDICATED THAT IT WAS

12   NEGOTIATING WITH SAMSUNG OVER THE SUBPOENA.  IT

13   INDICATED IT WANTED TO PRODUCE THIS VERY SENSITIVE

14   INFORMATION IN A CONSOLIDATED FASHION AFTER ITS

15   PROTECTIVE ORDER CONCERNS WERE SATISFIED.

16           THAT SEEMED TO US TO BE AN ORDERLY,

17   SENSIBLE WAY TO PROCEED.

18           THE COURT:  WHEN DID THAT DIALOG WITH

19   INTEL TAKE PLACE?

20           MR. SELWYN:  IT BEGAN IN DECEMBER.

21           AND INTEL'S OUTSIDE COUNSEL

22   MR. CHRIS KELLY IS ACTUALLY SITTING HERE IN THE

23   FIRST ROW.

24           THE COURT:  I SAW MR. KELLY.

25           MR. SELWYN:  AND MR. KELLY IS PREPARED TO

1    ANSWER ANY QUESTIONS THAT YOUR HONOR MIGHT HAVE

2    REGARDING INTEL'S POSITION ON THIS.

3            BUT AGAIN, WE HAVE NO OBJECTION TO

4    PRODUCING THE RELEVANT SOURCE CODE.  AT THE SAME

5    TIME WE ARE SENSITIVE TO THE CONCERNS THAT IT IS

6    INTEL'S SOURCE CODE.  WE ARE SENSITIVE TO THE

7    CONCERNS AND NEED TO PRODUCE IT IN AN EFFICIENT

8    MANNER.

9            AND THE FACT IS THAT OUR SOURCE CODE IS

10   JUST A SUBSET OF THE SOURCE CODE THAT SAMSUNG

11   WANTS.

12           THE COURT:  SO JUST SO I UNDERSTAND

13   APPLE'S POSITION, MR. SELWYN, IF THE COURT WERE TO

14   ORDER APPLE TO PRODUCE THE INTEL SUPPLIED CODE,

15   APPLE WOULD HAVE NO OBJECTION?

16           MR. SELWYN:  WELL, YOUR HONOR, WE WOULD

17   FOLLOW ANY ORDER THE COURT WOULD ISSUE.

18           THE COURT:  WOULD YOU AGREE ALSO THAT MY

19   ORDER WOULD RELIEVE APPLE OF ANY OTHER CONTRACTURAL

20   RESTRICTIONS THAT MIGHT OTHERWISE APPLY TO ITS

21   PRODUCTION?

22           MR. SELWYN:  MY UNDERSTANDING IS THAT

23   APPLE WOULD BE REQUIRED TO FOLLOW ANY ORDER THAT

24   YOUR HONOR ISSUES.

25           I WILL SAY ON THE QUESTION THAT YOU POSED

1    TO SAMSUNG WHETHER ALL THAT SOURCE CODE IS

2    RELEVANT, I DON'T THINK IT IS.

3            YOU WILL RECALL THE PRESENTATION SAYING

4    THERE WERE THREE SPECIFICATIONS WITHIN THE STANDARD

5    THAT THE PATENTS RELATE TO.  THE SOURCE CODE THAT

6    WE ARE TALKING ABOUT RELATES TO THE FUNCTIONALITY

7    ON THE BASEBAND CHIP MUCH MORE BROADLY THAN THAT.

8    SO I WOULDN'T AGREE THAT ALL OF THAT SOURCE CODE IS

9    RELEVANT.

10           I DON'T DISAGREE, HOWEVER, THAT SOME OF

11   THE SOURCE CODE THAT IS IN APPLE'S POSSESSION, SOME

12   OF THE INTEL SOURCE CODE IS RELEVANT.  IT'S LIKELY

13   A SMALL SUBSET OF THE TOTAL AMOUNT OF RELEVANT

14   SOURCE CODE BECAUSE APPLE DOESN'T POSSESS THE HDL

15   CODE.

16           THE LAST POINT I WOULD MAKE, AND THIS IS

17   REALLY TO ADDRESS ONE OF THE SCHEMATIC POINTS

18   SAMSUNG TRIES TO MAKE IN ITS PAPERS WITHOUT THE

19   OVERALL PRODUCTION ON THE DEFENSIVE SIDE, APPLE HAS

20   TO DATE PRODUCED IN THE U.S. CASES -- AND NOW THIS

21   WOULD BE THE DOCUMENTS THAT ARE SUBJECT TO CROSS

22   USE, WHETHER THEY ARE PRODUCED.  IN THIS CASE, THE

23   ITC CASE, SUBJECT TO CROSS USE.

24           THE STATS NOW ARE THAT APPLE HAS PRODUCED

25   ON THE DEFENSIVE SIDE ALONE ABOUT 17 MILLION PAGES.

1       WE ESTIMATE THAT 13.9 MILLION PAGES OF THAT ARE

2       TECHNICAL DOCUMENTS.  AND THESE ARE FROM DOZENS OF

3       CUSTODIANS.

4               SO IT HAS BEEN A VERY SIGNIFICANT

5       PRODUCTION.  WE BELIEVE THE SOURCE CODE THAT HAS

6       BEEN MADE AVAILABLE WITH RESPECT TO THE

7       IMPLEMENTATION PATENTS IS COMPREHENSIVE.

8               WE HAVEN'T HEARD ANY SPECIFIC COMPLAINT

9       ABOUT THAT AND THAT'S NOT A SURPRISE BECAUSE IT'S

10      ONLY BEEN LOOKED AT FOR 90 MINUTES.

11              WHAT WE ENDEAVOR TO DO IS MAKE A

12      COMPREHENSIVE PRODUCTION OF THAT SOURCE CODE TIMELY

13      TO SAMSUNG.

14              THE COURT:  THANK YOU.

15              MR. JACOBS:  TO FINISH WITH THAT LAST

16      POINT, YOUR HONOR, ONE OF THE THINGS WE CHECKED AT

17      THE BREAK WAS THE STATUS OF THE PILE OF PAPER THAT

18      SAMSUNG'S COUNSEL SHOWED YOU AND IMPLIED THAT APPLE

19      WAS INCLUDING THAT IN ITS COUNTER PRODUCTION.

20              THAT PILE OF PAPER WAS IMMEDIATELY CLAWED

21      BACK WHEN IT WAS SENT TO SAMSUNG BECAUSE WE

22      REALIZED IT HAD BEEN PRODUCED IN A FORMAT THAT MADE

23      IT TAKE A LOT OF PAGES AND WASN'T REASONABLE, AND

24      IT'S NOT INCLUDED IN ANY OF OUR COUNTS.

25              SO ONE OF THE CHALLENGES WE HAVE IN

1    TRYING TO KEEP OURSELVES ON THE ISSUE HERE IS THAT

2    THERE ARE ALLEGATIONS RAISED FROM TIME TO TIME

3    ABOUT APPLE'S CONDUCT AND SAMSUNG'S PRESENTATION ON

4    THIS MOTION, FOR EXAMPLE WE HEARD A LOT OF, FOR THE

5    FIRST TIME THIS, FOR THE FIRST TIME THAT.

6              SO WITH RESPECT TO MODELS, FOR EXAMPLE,

7    THE COURT WAS TOLD FOR THE FIRST TIME WE FOUND OUT

8    APPLE HAS A THOUSAND MODELS.  MR. STRINGER'S

9    DEPOSITION WAS TAKEN IN THE SUMMER.  HE DISCUSSED

10   THE PROCESS OF CREATING CAD AND BUILDING MODELS

11   FROM CAD.

12             IN CONNECTION WITH THE '035 ISSUE,

13   SAMSUNG SAW THE CATALOG OF MODELS THAT WE PRODUCED

14   TO EXPLAIN TO THEM HOW WE FOUND THAT PARTICULAR

15   MODEL.

16             AND THERE WAS A LOT OF DISCUSSION ABOUT

17   THE MODELS THAT EXIST IN THE MODEL SHOP.  AND NOW

18   WE'VE PRODUCED, THE DETAILS WERE GIVEN TO YOU IN

19   OUR PAPERS COVERED UP UNDER CLOAKS AND TAKEN TO A

20   HOTEL ROOM, A THOUSAND MODELS.

21             AND WE HEARD -- FOR THE FIRST TIME WE

22   HEARD ABOUT A THOUSAND MODELS.  SO IT'S NOT A

23   RELIABLE ASSERTION.

24             SO WHEN SAMSUNG ASSERTS TO YOU THEY NEED

25   MORE TIME WITH JOHN IVE OF INDUSTRIAL DESIGN, WHO

1    IS ONE OF A HANDFUL OF THE MOST IMPORTANT PEOPLE IN

2    THE COMPANY IN THE WAKE OF THE CEO'S DEATH, AND

3    SAY, THAT'S NOT AN APEX DEFINITION, WE NEED MORE

4    TIME FOR AN UNSPECIFIED REASON.

5            WE WOULD ASK THE COURT TO BE VERY

6    DEMANDING, EXACTLY WHAT IS IT THAT YOU NEED TO

7    SPEND MORE TIME WITH MR. IVE ON?  WHAT IS THE

8    DOCUMENT YOU INTEND TO ASK HIM ABOUT?  WILL IT TAKE

9    MORE THAN HALF AN HOUR TO ASK HIM ABOUT THAT

10   DOCUMENT?  COULD YOU BUILD IT INTO THE ITC

11   DEPOSITION THAT WE PROPOSED FOR FEBRUARY 8TH OF

12   MR. IVE?

13           BUT TO GIVE SAMSUNG, OH, WE FOUND MORE

14   DOCUMENTS --

15           THE COURT:  IF I MIGHT STOP YOU THERE, I

16   APOLOGIZE.

17           SO MR. IVE IS GOING TO BE DEPOSED BY

18   SAMSUNG IN THE ITC PROCEEDING?

19           MR. JACOBS:  EXACTLY.

20           THE COURT:  AND ARE THE DEPOSITION

21   TRANSCRIPTS IN THOSE CASES ALSO PART OF THE USER

22   AGREEMENT WE WERE TALKING ABOUT THIS MORNING?

23           MS. MAROULIS:  NO, YOUR HONOR, THEY ARE

24   NOT.

25           MR. JACOBS:  YOU SEE WHERE I'M GOING.

```
 1            THE COURT:  I THINK I DO.

 2            WOULD APPLE HAVE ANY OBJECTION TO

 3    STIPULATING THAT THE IVE DEPOSITION IN THE ITC

 4    ACTION COULD BE USED IN THIS CASE FOR ALL INTENTS

 5    AND PURPOSES?

 6            IN OTHER WORDS, COULD WE CREATE A SPECIAL

 7    RULE FOR MR. IVE TO MINIMIZE AND MITIGATE THE

 8    BURDEN ON HIM WITH YET ANOTHER DEPOSITION?

 9            MR. JACOBS:  LET ME CHECK AT THE NEXT

10    BREAK AND REPORT BACK IN, IF I MIGHT, YOUR HONOR.

11    I THINK SOMETHING LIKE THAT MIGHT WORK.

12            MY POINT IS IF THEY'VE GOT A SPECIFIC

13    DOCUMENT THEY NEED TO ASK MR. IVE ABOUT THEN THEY

14    SHOULD HAVE BROUGHT IT TO YOU.  THEY SHOULD HAVE

15    SAID, WE WANT TO ASK ABOUT THIS LATE-PRODUCED

16    DOCUMENT AND WE WILL TACK IT ON TO THE END OF THE

17    ITC DEPOSITION THAT WE HAVE BEEN OFFERED FOR

18    FEBRUARY 8TH.

19            SO THAT'S THE KIND OF RIGOR WE THINK

20    SHOULD BE IMPOSED ON SAMSUNG PARTLY BECAUSE THE

21    KINDS OF CLAIMS THEY MAKE UPON INSPECTION TURN OUT

22    NOT TO BE VALID.

23            SO LET'S MARCH THROUGH THIS MOTION TO

24    COMPEL.  I THINK A LOT OF THIS IS MOOT, HAS BEEN

25    ADDRESSED.
```

1           I WOULD LIKE TO START WITH SOME OF THE

2    INDUSTRIAL DESIGN ISSUES.

3           SO THIS 2002 VERSUS 2003 ISSUE, SAMSUNG

4    DOESN'T CHALLENGE THIS, WE LAID OUT IN OUR PAPERS

5    HOW WE TOLD SAMSUNG EXACTLY WHAT WE WERE GOING TO

6    DO WHEN WE LAUNCHED ON THIS EFFORT

7           AND IT'S A COMPLICATED PROCESS TO GATHER

8    AND SCAN AND PRODUCE THE SKETCHBOOKS, SO WE TRY TO

9    DO IT SYSTEMATICALLY AND WE HAD IT DONE BY THE

10   DEADLINE.

11          WE TOLD SAMSUNG TWICE, ONCE ORALLY AND

12   ONCE IN WRITING, THAT WE WERE STARTING WITH 2003

13   AND WE DREW NO OBJECTION.  AND WE ARE DONE.  WE

14   THINK WE SHOULD BE DONE.  THE FACT THAT WE HAVE A

15   CONCEPTION DATE OF 2003, WHY DOES THAT MAKE 2002

16   RELEVANT?

17          THERE'S NOTHING -- AGAIN, NOTHING

18   SPECIFIC THEY POINTED TO.  AND THAT GOES FOR A LOT

19   OF THE CATEGORIES IN SAMSUNG'S MOTION.  THE MCO'S,

20   IT'S THIS VAGUE ALLEGATION THAT THE MCO'S MIGHT

21   HAVE SOMETHING THAT'S RESPONSIVE TO THIS THEORY

22   THAT IT'S FUNCTIONALITY DRIVEN, BUT NO SPECIFIC

23   SHOWING.

24          AND YOUR QUESTIONS WERE VERY WELL TAKEN,

25   THAT THE MCO'S DEAL WITH THE INTERNAL DESIGN OF THE

1    PHONES.  THE INDUSTRIAL DESIGN WE ARE TALKING

2    ABOUT, THE LEVEL WE ARE TALKING ABOUT IS THINGS

3    LIKE THE BEZEL, THE FRONT SHAPE, YOU KNOW THIS FROM

4    THE ORDER.

5            SO HOW CAN THE MCO'S BE THAT RELEVANT AS

6    WHEN MEASURED AGAINST THE BURDEN THAT WE SHOULD

7    HAVE TO GO PRODUCE ALL OF THOSE?

8            AND I HAVE TO NOTE FROM THE VERY

9    BEGINNING THEY'VE HAD A COMPLETE CAD PRODUCTION.

10   NOW THEY'VE GOT ALL THE SKETCHBOOKS AND THE OTHER

11   DOCUMENTS FROM THE INDUSTRIAL DESIGNERS.  THEY HAD

12   A VERY THOROUGH UNDERSTANDING OF HOW APPLE CAME TO

13   DESIGN THE PRODUCTS THAT ARE AT ISSUE IN THIS CASE.

14           ON NEXT 2 OS, WE HAVE GIVEN THEM

15   EVERYTHING WE CAN REASONABLY DO THAT'S RELEVANT

16   TO -- NEXT AS PRIOR ART.

17           THERE IS A VAGUE REQUEST FOR ALL

18   DOCUMENTS AND SOURCE CODE RELATING.  WE HAVE GIVEN

19   THEM WHAT WE CAN KIND FROM NEXT THAT IS RESPONSIVE

20   TO THEIR REQUEST.  THEY HAVE IT.

21           WE DON'T KNOW OF ANYTHING ELSE IN THE

22   PRIOR ART CATEGORY THAT WE HAVE NOT PRODUCED TO

23   THEM.  THEY HAVE NOT POINTED TO IT.  WE HAVE NOT

24   INTENTIONALLY WITHHELD ANY PRIOR ART.  WE HAVE

25   PRODUCED DOCUMENTS FROM OTHER LITIGATION.

1          SO IN THE ABSENCE OF SOME GREATER

2     SPECIFICITY, WE THINK THAT ONE IS DISTRESSED.

3          SIMILARLY, THAT IS SIMILARLY THE CASE

4     WITH TIGER.  I'M NOT SURE WHERE THEY ARE ON TIGER

5     NOW.  WE PRODUCED TIGER, MAC OS 10.4 TO THEM WITH

6     THE SCREEN SHOTS SHOWING THE DOC ICONS.  I THINK

7     THAT ONE IS DEALT WITH, BUT AGAIN THEY ARE ASKING

8     FOR ALL DOCUMENTS RELATING TO IT.  I DON'T KNOW

9     WHAT THEY REALLY NEED TO ADDRESS TIGER AS PRIOR

10    ART.

11         ON SURVEY DOCUMENTS, I DON'T THINK THERE

12    ARE ANY SAMSUNG SURVEYS BY APPLE, BUT WE ARE HAPPY

13    TO LOOK FOR SAMSUNG.  I DON'T THINK THAT WAS A

14    FOCUS OF THEIR MOTION OR SOMETHING THEY HAD RAISED

15    EARLIER AS A SPECIFIC TARGET.  WHAT HE SAID IS, WE

16    WILL PRODUCE SURVEY REPORTS, QUESTIONNAIRES AND RAW

17    SURVEY DATA FOR CUSTOMER SURVEY DATA CONDUCTED BY

18    APPLE RELATING TO THE IPHONE, IPOD TOUCH AND THE

19    IPAD.

20         NOW I WASN'T -- MS. MAROULIS WAS NOT

21    CLEAR ON THIS POINT.  SHE SAID "ALL SURVEYS."  I

22    PRESUME THAT WHAT WAS MEANT WAS ALL SURVEYS, AT

23    LEAST RELATED TO THESE PRODUCT CATEGORIES, LIMITED

24    BY THESE PRODUCT CATEGORIES RATHER THAN THE

25    MACINTOSH, TELEVISION --

1           THE COURT:  MAC, TV, WHATEVER.

2           MR. JACOBS:  EXACTLY.

3           AND THAT'S SIMILARLY THE CASE FOR MARKET

4    RESEARCH REPORTS.  SO FOR MARKET RESEARCH REPORTS

5    THAT IS -- WE HAVE NO PROBLEM PRODUCING THAT AND

6    WILL GET IT OUT FORTHWITH.

7           SAMSUNG.  SO LOOK, I DON'T THINK THEY

8    BRIEFED THAT THERE WAS AN AGREEMENT ON THIS AND I

9    HAVEN'T GONE BACK TO LOOK AT THE WHOLE CHAIN OF

10   CORRESPONDENCE.  YOU HAVE NOW HEARD THERE WAS THIS

11   EFFORT AT KIND OF A RECIPROCAL BASIS FOR PRODUCTION

12   THAT WAS UNDERTAKEN.

13          WE LAID OUT IN DETAIL WHAT THE PROBLEM

14   WAS WITH SAMSUNG AND DROID AS A SEARCH TERM.  PART

15   OF THE PROBLEM WITH "SAMSUNG" IS IT'S A BIG

16   SUPPLIER TO APPLE.  SO WHEN APPLE REFERS TO

17   SAMSUNG, IT MAY VERY WELL BE REFERRING IN THESE

18   DOCUMENTS TO SAMSUNG AS A COMPONENT SUPPLIER AND

19   THAT'S GOING TO PRODUCE A LOT OF DOCUMENTS.

20          THERE'S BEEN A LOT OF BACK AND FORTH ON

21   THIS.  FROM OUR VANTAGE POINT THERE HASN'T BEEN

22   REAL ENGAGEMENT.  WHEN WE GO BACK TO SAMSUNG AND

23   DETAIL -- ACTUALLY, I NEED TO DO THIS.  I NEED TO

24   GO BACK FOR A SECOND.

25          WE ARE ABLE TO DO SOMETHING SAMSUNG CAN'T

1    DO.  WE HAVE THE DOCUMENTS IN A COMPUTERIZED

2    DATABASE.  SO WHEN SAMSUNG PROPOSES SEARCH TERMS TO

3    US, WE CAN RETURN THOSE SEARCH TERMS AGAINST THE

4    DATABASE, REPORT HOW MANY HITS THERE WILL BE AND

5    THEN ASSESS THE BURDEN BECAUSE BOTH SIDES ARE DOING

6    ATTORNEY REVIEW BEFORE PRODUCTION.

7              WE ARE SCANNING FOR PRIVILEGE, WE ARE

8    SCANNING FOR UNANNOUNCED PRODUCTS.  IN THAT AREA

9    THERE'S A CERTAIN SYMMETRY BETWEEN THE PARTIES,

10   BOTH SIDES ARE DOING ATTORNEY REVIEW BEFORE

11   PRODUCTION.

12             THE PROBLEM IS THAT SAMSUNG DIDN'T DO

13   THAT ON THE INTAKE.  THEY HAD THEIR ENGINEERS

14   PULLING DOCUMENTS ONE BY ONE AND FORWARDING THEM TO

15   THE COLLECTION CENTRAL POINT.

16             SO WE CAN REPORT BACK TO THEM, THAT'S A

17   VERY IMPORTANT ADVANTAGE THAT WE HAVE.  WE CAN

18   REPORT BACK.  THIS WILL HAVE 5,000 HITS.  WHAT WE

19   HAVEN'T FOUND ON THE SAMSUNG SIDE IS A REAL

20   WILLINGNESS TO ENGAGE WHEN WE DO THAT.

21             SAY, WELL, WHAT IF YOU TRY IT THIS WAY?

22   WHAT IT IF YOU RUN THIS LIMITER?  BECAUSE WE CAN DO

23   THAT AND WE CAN DO IT FAIRLY READILY.  SO WE CAN

24   FIGURE OUT HOW TO ITERATE TO GET DOWN TO A

25   REASONABLE LEVEL OF PRODUCTION AND THAT'S WHAT WE

1    PROPOSED TO DO FOR THAT PART OF SAMSUNG THAT WE

2    STILL RESIST.

3              SO WE HAVE AGREED TWICE.  IN THE

4    JANUARY 5TH AND THE JANUARY 7TH LETTERS, WE AGREED

5    TO PRODUCE FOR SAMSUNG FOR SOME CATEGORIES OF

6    CUSTODIANS THAT WE THOUGHT OKAY, THAT'S GOING TO BE

7    A MANAGEABLE NUMBER, AND THEN AFTER THAT WE SAID WE

8    REALLY NEED TO FIGURE OUT HOW TO LIMIT IT FURTHER.

9              AND DROID AND ANDROID JUST PRODUCED --

10   DROID IS MOTOROLA, SO I DON'T KNOW WHERE DROID

11   COMES FROM.  ANDROID PRODUCED LOTS AND LOTS OF HITS

12   BECAUSE WE GOT ENGADGET AND ALL THESE OTHER

13   JOURNALS COMING INTO THE COMPANY.  THAT WAS

14   ILLUSTRATED IN MR. BARTLETT'S DECLARATION.  TRYING

15   TO EXPLAIN IN DETAIL WHY SOME OF THE SEARCH TERMS

16   DON'T WORK.

17             SO WE'VE COVERED A LOT OF THE TOPICS.

18             ON FINANCIAL DOCUMENTS THE GENERAL

19   PRINCIPLE IS WE HAVE A SYSTEM OF RECORD.  WE CAN

20   QUERY THE SYSTEM OF RECORD AND IT CAN PRODUCE

21   REPORTS TO A PRETTY FINE LEVEL OF GRANULARITY.  IF

22   THERE'S MORE GRANULARITY SAMSUNG NEEDS, WE WILL DO

23   IT.  WE WILL QUERY THE SYSTEM OF RECORD AND WE WILL

24   PROVIDE IT.  IF IT CAN PROVIDE IT ON A MODEL BASIS,

25   I JUST DON'T HAPPEN TO KNOW OFFHAND AS OPPOSED

234

1    TO --

2                    THE COURT:  YOU DON'T HAVE AN OBJECTION.

3                    MR. JACOBS:  I DON'T HAVE ANY OBJECTION,

4    EXACTLY.

5                    WE ARE IN A MODE WHERE WE CAN DO WHATEVER

6    NEEDS TO BE DONE.

7                    ON ALL MARKETING DOCUMENTS, WASN'T A

8    FOCUS OF SAMSUNG'S ARGUMENT BEFORE YOU -- WE HAVE

9    EITHER DONE OR WILL DO THE CATEGORIES THAT SAMSUNG

10   HAS IDENTIFIED.  ONCE AGAIN, THE PROBLEM IS WHEN

11   SAMSUNG SAYS "ALL DOCUMENTS RELATING TO."

12                   SO WE HAVE PRODUCED LITERALLY ONE VERSION

13   OF EVERY PRINTOUT THAT'S EVER BEEN RUN.  WE HAVE

14   PRODUCED LITERALLY A COPY OF EVERY TELEVISION ADD

15   THAT'S BEEN RUN FOR THESE PRODUCTS, A COPY OF EVERY

16   OUTDOOR ADVERTISEMENT.  WE WILL DO THE ADVERTISING

17   CAMPAIGN BINDERS, WE WILL DO THE MEDIA PLANS.  WE

18   WILL DO CLICK COUNTS FOR THE SEARCH ENGINE.  WE

19   WILL DO BULLET REPORTS AND WE HAVE ALREADY

20   DISCUSSED THE MARKET RESEARCH DATA.

21                   THE COURT:  WHEN WILL THAT PRODUCTION BE

22   COMPLETED?

23                   MR. JACOBS:  WHAT IS OUR LATEST ESTIMATE?

24                   MR. BARTLETT:  YOUR HONOR, I THINK ALL OF

25   THOSE DOCUMENT CATEGORIES SHOULD BE DONE BY

1    JANUARY 31ST.

2              MR. BARTLETT:  SORRY, THAT WAS

3    JASON BARTLETT SPEAKING FOR APPLE.

4              THE COURT:  THANK YOU, MR. BARTLETT.

5              ANYTHING FURTHER, MR. JACOBS?

6              MR. JACOBS:  I THINK -- YOUR HONOR, I

7    THINK I COVERED THE IMPORTANT POINTS.  I NEED TO

8    RETURN TO THE JOHN IVE ISSUE BECAUSE THE MAN IS

9    CRITICAL TO THE COMPANY AS IT MOVES ON TO THE NEXT

10   PAGE OF ITS LEADERSHIP AND ANY BURDEN THAT WOULD BE

11   IMPOSED ON HIM WITHOUT A REALLY, REALLY GOOD

12   SHOWING WOULD BE UNDUE.

13             THE COURT:  ALL RIGHT.  THANK YOU.

14             MS. MAROULIS, REBUTTAL?

15             MS. MAROULIS:  YES, YOUR HONOR.

16             I WILL TRY TO ADDRESS EACH ISSUE RAISED

17   BRIEFLY AND WE CAN THEN MOVE ON.

18             SO WITH RESPECT TO SOURCE CODE I

19   UNDERSTOOD APPLE'S COUNSEL TO CONCEDE THAT THEY

20   HAVE NOT PRODUCED ANY SOURCE CODE WITH RESPECT TO

21   THE STANDARDS PATENTS.

22             WE HAVE TWO BUCKETS OF PATENTS, THE

23   FEATURE PATENTS AND THE STANDARDS PATENTS.  AND

24   IT'S MY UNDERSTANDING FROM BOTH OUR DISCUSSIONS AND

25   FROM THEIR ARGUMENT TODAY THAT THEY ARE NOT

1    PRODUCING IT EVEN THOUGH THEY HAVE IT.

2              THAT IS NOT APPROPRIATE.  IF THEY HAVE

3    SOURCE CODE THEY NEED TO SECURE APPROPRIATE

4    PERMISSION AND THEY NEED TO PRODUCE IT.

5              AND TO THE EXTENT THE SOURCE CODE DIFFERS

6    FROM WHATEVER SOURCE CODE THEY RECEIVED FROM INTEL

7    OR QUALCOMM OR OTHER SUPPLIERS, THEY NEED TO SHARE

8    WITH US THE SOURCE CODE THAT IMPLEMENTS APPLE'S

9    PRODUCTS.

10             WITH RESPECT TO PRIOR ART, I ONLY

11   IDENTIFY THE TWO.  THE PROBLEM WE HAVE WHICH IS WE

12   KEEP FINDING OUT APPLE HAS THIS OTHER PRIOR ART AND

13   THEN WE ASKED THEM FOR THE DOCUMENTS AT THAT POINT.

14   SO TO AVOID THAT WE WOULD LIKE THEM TO SAY IF THEY

15   HAVE EXHAUSTED THEIR PRIOR ART AND THEY HAVE

16   PRODUCED THE PRIOR ART WE WILL ASK THEM TO CERTIFY

17   IN WRITING THAT THEY HAVE DONE SO.

18             MOVING ON TO OTHER TOPICS.  WE

19   DISCUSSED -- MR. JACOBS DISCUSSED AT GREAT LENGTH

20   THE SKETCHBOOK ISSUE.  YOUR HONOR'S ORDER OF

21   DECEMBER 22ND WAS NOT TIME LIMITED.  THERE IS NO

22   TIME CUTOFF BY WHICH THEY CAN REFUSE TO SEARCH FOR

23   BOOKS.

24             WE REITERATE OUR REQUEST THAT PRE 2003

25   BOOKS BE PRODUCED TO US IF THEY HAVE RELEVANT

1    INFORMATION.  IF THEY HAVE RELEVANT INFORMATION ON

2    SKETCHES, WE NEED THEM AND WE'RE ENTITLED TO THEM.

3              THE COURT:  YOUR POSITION IS THEY HAVE

4    BEEN ORDERED TO PRODUCE THOSE BOOKS.

5              MS. MAROULIS:  THEY HAVE BEEN ORDERED TO

6    PRODUCE THOSE BOOKS SEVERAL TIMES, HENCE OUR MOTION

7    TO ENFORCE THE ORDERS.

8              WITH RESPECT TO SPECIFIC DESIGN ITEMS

9    CALLED TIGER, IT'S A PARTICULAR TYPE OF PRIOR ART

10   WITH RESPECT TO ONE OF THEIR ICON DESIGN PATENTS.

11             THEY OFFERED TO PRODUCE THE PRIOR ART

12   ITSELF BUT WE ASKED FOR ADDITIONAL DOCUMENTS THAT

13   PLACE IT IN THE CONTEXT AND SHOW WHEN IT WAS

14   AVAILABLE AND WHEN IT WAS PREPARED.  WE ARE

15   ENTITLED TO THIS, THIS IS A VERY SPECIFIC AREA AND

16   IT'S NOT THAT BURDENSOME FOR THEM TO DO.

17             THE COURT:  WOULD YOU AGREE THAT ONLY THE

18   DOC ICON PORTION OF TIGER IS RELEVANT TO THIS

19   LITIGATION?

20             MS. MAROULIS:  THAT IS THE MOST RELEVANT

21   BUT WE MIGHT FIND OUT THINGS ABOUT WHEN IT WAS

22   OFFERED, HOW IT WAS OFFERED, WHAT APPLE KNEW ABOUT

23   IT AND WHETHER APPLE HAD OBLIGATIONS TO THE PATENT

24   OFFICE TO -- WELL, TECHNICALLY SPEAKING, THAT IS AN

25   APPROPRIATE COMPARISON.

1           THE COURT:  ALL RIGHT.

2           SO JUST SO I UNDERSTAND YOUR POSITION,

3    ARE THERE OTHER PORTIONS OF TIGER OTHER THAN THE

4    PORTIONS WHICH RELATE TO THE DOC ICON WHICH ARE

5    RELEVANT TO AN ISSUE IN THIS CASE?

6           MS. MAROULIS:  TO THE EXTENT THERE ARE

7    ANY OTHER ICON INFORMATION, NO, IT'S RELEVANT TO

8    ICON.

9           SO TO RECAP, WITH RESPECT TO THE DESIGN

10   DOCUMENTS, APPLE STOOD HERE BEFORE YOU AND

11   EXPLAINED TO YOU HOW EASY IT IS FOR THEM TO SEARCH

12   FOR DOCUMENTS.

13          WE HEARD IT FOR THE FIRST TIME TODAY.

14   AND IF IT'S SO EASY TO GET DOCUMENTS TO US THEN WHY

15   IS IT THAT WE ARE WAITING FOR MONTHS FOR THE SIMPLE

16   CATEGORIES OF DOCUMENTS THAT THEY SHOULD HAVE

17   PRODUCED LONG AGO?

18          SO THAT'S A THEME THAT RUNS THROUGH ALL

19   OF OUR REQUESTS WHICH IS, IF YOU HAVE THEM, PRODUCE

20   THEM.  DON'T MAKE US WAIT, DON'T MAKE US PLEA,

21   DON'T MAKE US FILE EXCESSIVE MOTIONS TO COMPEL.

22   IT'S NOT APPROPRIATE LITIGATION CONDUCT.

23          SO TO RECAP WITH THE SKETCHBOOKS, WE

24   BELIEVE THE ORDER TO COMPEL THEM WAS NOT TIME

25   LIMITED.  AND THE SKETCHBOOKS, TO THE EXTENT WHICH

1    THEY ARE REDACTED BY THE ATTORNEYS, MAY BE MISSING

2    RELEVANT INFORMATION BECAUSE THEY ARE DIFFICULT TO

3    READ AND ONLY A PROFESSIONAL WHO IS USED TO DEALING

4    WITH SKETCHBOOKS CAN FULLY APPRECIATE WHETHER A

5    PARTICULAR SKETCH RELATES TO A PARTICULAR MODEL

6    THAT IS AT ISSUE IN THIS CASE.

7              WITH RESPECT TO SURVEYS, AGAIN, I

8    UNDERSTOOD MR. JACOBS TO SAY THAT THEY WILL PRODUCE

9    SURVEYS TO THE EXTENT THEY RELATE TO APPLE-OWNED

10   PRODUCTS.  THEY ARE NOT OFFERING TO PRODUCE ANY

11   SURVEYS OR ANY SURVEY DOCUMENTS WHICH CAN INCLUDE

12   E-MAIL AND OTHER DOCUMENTS THAT HAVE HITS FOR

13   SAMSUNG OR SAMSUNG PRODUCTS.

14             AGAIN, THIS HAS TO BE RECIPROCAL.  WE

15   WERE SUBJECTED TO --

16             THE COURT:  SO YOUR REQUEST WAS DIRECTED,

17   I THOUGHT, TO SURVEYS?  WHAT DOCUMENTS BEYOND

18   SURVEYS?  WHEN YOU SAY E-MAIL, WHAT SPECIFICALLY

19   ARE YOU REFERRING TO?

20             MS. MAROULIS:  SURE.

21             E-MAIL DISCUSSING SURVEY RESULTS AMONG

22   THE MARKETING DEPARTMENT.

23             SO WHEN WE SAY "SURVEYS" IT'S A BIT OF A

24   SHORTHAND, WE REALLY MEAN DOCUMENTS.

25             THE COURT:  ALL DOCUMENTS REGARDING ANY

240

1    SURVEY RELATING TO OR CONCERNING.

2            MS. MAROULIS:  WELL, CORRESPONDENCE AMONG

3    THE PEOPLE WITHIN THE MARKETING DEPARTMENT OR THE

4    CONSUMER RESEARCH DEPARTMENT WOULD BE HIGHLY

5    RELEVANT BECAUSE THAT'S WHERE THEY WOULD INTERPRET

6    AND PERHAPS COMMENT ON SOME OF THESE SURVEYS.

7            WITH RESPECT TO SAMSUNG HITS, APPLE'S

8    COUNSEL EXPLAINED THAT BECAUSE OF THE CUSTOMER

9    SUPPLIER RELATIONSHIP THERE WOULD BE A LOT OF FALSE

10   HITS MEANING HITS THAT'S NOT RELEVANT TO THIS CASE.

11   WE OBVIOUSLY FACE THE SAME PROBLEM BECAUSE THE

12   RELATIONSHIP WAS TWO-WAY.

13           IN ADDITION TO THAT WE FACED ISSUES OF

14   GETTING HITS ON APPLE THAT WERE COMPLETELY

15   IRRELEVANT BECAUSE SOME OF THE MACHINES SEARCHED

16   WERE MACINTOSHES, AND GENERALLY THERE WAS A LOT OF

17   FALSE POSITIVES.  BUT THIS IS PART OF THE AGREEMENT

18   THAT WE THOUGHT WE MADE WITH THEM AND WE URGE THE

19   COURTS TO HELP US ENFORCE IT.

20           SO MS. KASSABIAN JUST POINTED ME TO THE

21   PORTION OF THE SEPTEMBER 28TH ORDER RELATING TO THE

22   SURVEY DOCUMENTS, IT'S PARAGRAPH 3 IF HONOR WANTS

23   TO REFER BACK TO THAT.

24           THE COURT:  ALL RIGHT.

25           ANYTHING FURTHER ON THIS ONE?

1           MS. MAROULIS:  WITH RESPECT TO

2    FINANCIALS, I UNDERSTOOD APPLE'S COUNSEL TO SAY

3    THAT IF THEY HAVE A SYSTEM OF RECORD, IT'S

4    APPARENTLY A DATABASE WE CAN RUN A VARIETY OF

5    QUERIES.

6           I UNDERSTAND THE COMMITMENT THAT WE WILL

7    OBTAIN FROM THEM MODEL-BY-MODEL SALES DATA BY

8    QUARTER AND GRANULARITY.  IT'S GOOD TO HEAR BUT WE

9    DON'T HAVE THAT AND WE NEED THAT BECAUSE THE

10   REPORTS ARE COMING UP QUITE SOON.

11          WHAT I DIDN'T HEAR HIM ADDRESS WAS

12   BUSINESS PLANS, PROJECTIONS AND KIND OF A BIG

13   PICTURE FINANCIALS.  AND THIS IS PART OF OUR FEES

14   WE MOVED ON THEM AND WE BELIEVE IT SHOULD BE

15   GRANTED AND I DIDN'T HEAR ANY ARGUMENTS TO THE

16   CONTRARY.

17          IN CONCLUSION, YOUR HONOR, AND MY TEAM

18   WILL LET ME KNOW IF I MISSED ANYTHING, WE ARE

19   SEEKING A RELIEF THAT IS MUCH NARROWER IN SCOPE

20   THAT WHAT APPLE HAS BEEN SEEKING IN THIS CASE.

21          WE BELIEVE THAT WE HAVE TAKEN A POSITION

22   WHERE WE FOCUS ON THE SPECIFIC THINGS THAT MATTER

23   AND WANT APPLE TO PRODUCE THEM.  AND IT'S BEEN A

24   REAL BATTLE GETTING THIS OUT OF THEM.

25          AND THIS MOTION TO COMPEL IS A RESULT OF

1    OUR MONTHS OF NEGOTIATIONS, DISCUSSIONS AND

2    ATTEMPTS TO AVOID THIS MOTION AND TO OBTAIN THESE

3    RESULTS WITHOUT RESULTING TO A COURT PROCESS.

4              BUT NOW WE ARE HERE AND WE ARE SEEKING

5    FROM YOUR HONOR THE RELIEF ON THE RFP'S AND THE

6    SPECIFIC RECIPROCITY AS TO BROAD CATEGORIES OF

7    DOCUMENTS THAT AFFECT BOTH PARTIES EQUALLY.

8              THE COURT:  ALL RIGHT.

9              LET'S TURN TO DOCKET NUMBER 605 WHICH

10   IS --

11             MR. KELLY:  YOUR HONOR, MAY I BE HEARD

12   BRIEFLY ON INTEL?

13             THE COURT:  YOU MAY, MR. KELLY.  PLEASE

14   STEP FORWARD.

15             MR. KELLY:  AND I WILL BE BRIEF.

16             SO THE COURT RAISED, IN PASSING, THE

17   QUESTION OF AN ORDER COMPELLING APPLE TO PRODUCE

18   INTEL CODE.

19             AND THERE'S TWO TYPES OF CODE WE ARE

20   TALKING ABOUT.  ONE IS HDL WHICH IS THE CODE USED

21   TO GENERATE THE SILICON.  AND THE OTHER TYPE OF

22   CODE, IT'S A DSP CODE THAT ENGINEERS REFER TO IT AS

23   FIRMWARE.

24             APPLE DOES NOT HAVE THE HDL WHICH IS THE

25   MOST RELEVANT TO THE MAJORITY OF THE ASSERTIONS

1    MADE BY SAMSUNG HERE.

2              I GUESS THERE MAY BE SOME FIRMWARE THAT

3    APPLE HAS, BUT WE WOULD ASK THE COURT TO ALLOW

4    INTEL RATHER THAN APPLE TO PRODUCE THE CODE.

5    SAMSUNG HAS SUBPOENAED INTEL FOR THIS CODE.  INTEL

6    HAS GATHERED A BUNCH OF IT AND WE ARE GATHERING THE

7    REST AND WILL SOON HAVE THE REST OF IT.

8              OBVIOUSLY WE'RE THE PARTY FOR WHOM THESE

9    ARE THE CROWN JEWELS, THESE ARE THE MOST IMPORTANT

10   DOCUMENTS FOR US, SO WE WOULD PREFER TO BE THE ONES

11   WHO ARE CARRYING OUT THE PROCESS OF SUPERVISING THE

12   ACCESS TO THE CODE AND SO FORTH UNDER THE STANDARD

13   PRIVILEGES FOR CODE REVIEW.

14             SO THAT'S AN INTEREST IN WHICH WE HAVE A

15   MUCH DEEPER AND MORE SIGNIFICANT INTEREST THAN

16   APPLE DOES.

17             THE COURT:  WELL, YOUR REQUEST RAISES AN

18   INTERESTING ISSUE OF MY AUTHORITY OR JURISDICTION

19   TO ORDER PRODUCTION ON A THIRD PARTY.

20             I DON'T HAVE A SUBPOENA BEFORE ME OR

21   MOTION TO COMPEL ON THE SUBPOENA, SO I'M CURIOUS

22   EXACTLY HOW TO DO THAT WITHOUT RUNNING AFOUL.

23             THE WITNESS:  YOU HAD RAISED IT SO I

24   WANTED TO AT LEAST FLAG THAT ISSUE FOR THE COURT.

25             THE COURT:  ALL RIGHT.  THANK YOU.

1           LET'S TURN TO DOCKET 605 WHICH IS

2   SAMSUNG'S MOTION TO ENFORCE THE ORDER.

3           MS. MAROULIS:  YES, YOUR HONOR.

4           I UNDERSTAND THAT YOU WOULD LIKE ME TO

5   KEEP IT SHORT, BUT THE MOTION TO ENFORCE IS AGAIN

6   AS A RESULT OF A FACT THAT WE SOUGHT AND OBTAINED

7   RELIEF ON A NUMBER OF ISSUES RELATED TO DESIGN

8   DOCUMENTS IN THIS CASE.

9           AND WE ARE VERY FRUSTRATED THAT WE HAVE

10  TO BE HERE YET AGAIN TO REVISIT THE VERY SAME

11  ISSUES THAT WE'VE DISCUSSED BEFORE AD NAUSEAM.

12          THERE'S SPECIFICALLY FOUR CATEGORIES OF

13  DOCUMENTS.  ONE IS THE DESIGNER OR INVENTOR

14  SKETCHBOOKS, AND IT'S LARGELY THE TWO ISSUES I

15  FLAGGED BEFORE WHICH IS THE DATE CUTOFF AND THE

16  REDACTION FOR RELEVANCE THAT IS CONDUCTED BY

17  ATTORNEYS WITHOUT INPUT OF THE PERSONNEL WHO COULD

18  ACTUALLY TELL WHAT'S WHAT.

19          THE SECOND ISSUE IS MCO'S WHICH IS THE

20  MECHANICAL OUTLINES, CADS, PROTOTYPES AND MODELS.

21  WHEN THIS MOTION WAS BEING FILED, WE STILL DID NOT

22  HAVE ACCESS TO THE MODELS THAT WE ARE NOW

23  INSPECTING.  SO SOME OF IT IS ADDRESSED WITH

24  RESPECT TO THE INSPECTION GOING ON NOW WITH THE

25  THOUSANDS OF MODELS WE HAVE SEEN.  HOWEVER, WE

1    STILL DO NOT HAVE THE CONFIRMED CAD FILES FOR THE

2    '035 MOCKUP WHICH IS SOMETHING WE EXTENSIVELY

3    DISCUSSED BEFORE.

4            AND OUR UNDERSTANDING IS THAT APPLE IS

5    REFUSING TO PRODUCE NONFUNCTION PROTOTYPES AND/OR

6    PARTS AND PORTIONS OF THE PROTOTYPES.

7            SO THIS MOTION IS SEEKING TO ENFORCE THE

8    COURT'S ORDER RELATING TO SKETCHBOOKS, PROTOTYPES

9    CAD DRAWINGS AND SUCH.

10           AND THE TWO OTHER ISSUES ARE FAIRLY

11   DISCREET, BUT AGAIN WE NEED TO BE HERE BECAUSE WE

12   THOUGHT THE COURT ORDERED THEM VERY EXPLICITLY AND

13   WE DON'T UNDERSTAND WHY IT'S STILL NOT HAPPENING.

14           ONE OF THEM IS DE DESIGNATION OF THE '035

15   TABLET PHOTOS.  TO REMIND YOUR HONOR, THIS WAS THE

16   MOCKUP THAT WAS PHOTOGRAPHED AND SUBMITTED TO THE

17   PATENT OFFICE AS PART OF THE PROSECUTION OF THE

18   TABLET PATENT.  AND THROUGH EXTENSIVE MOTION WE

19   OBTAINED ACCESS TO THIS MOCKUP AND WE HAVE BEEN

20   SEEKING TO USE THE PHOTOGRAPHS THAT WE TOOK THAT

21   ARE FAR MORE DETAILED THAN WHICH WERE SUBMITTED TO

22   THE PATENT OFFICE.

23           AND BASICALLY THEY DE DESIGNATED SOME OF

24   THEM BUT NOT OTHERS.  AND THE ONES THAT THEY DID

25   NOT DESIGNATE THEY STRIPPED OUT OUR RULERS SHOWING

1    SCALE AND THEY ARE NOT ALLOWING US TO USE SOME VERY

2    DETAILED PICTURES THAT IS EXACTLY WHAT WE NEED TO

3    SHOW OUR EXPERT AND OTHERWISE USE IN LITIGATION.

4            AND WE THOUGHT YOUR HONOR'S ORDER WAS

5    VERY SPECIFIC WHICH IS THEY HAD TO DE DESIGNATE

6    ANYTHING THAT IS NOT CONFIDENTIAL.  AND WE STILL

7    DON'T UNDERSTAND HOW POSSIBLY THEY CAN CLAIM

8    CONFIDENTIALITY OVER A MOCKUP THAT WAS

9    PHOTOGRAPHED, SUBMITTED TO THE PUBLIC U.S.

10   GOVERNMENT AND GETTING A PATENT BASED ON THAT, BUT

11   THAT'S ANOTHER PORTION OF THE MOTION.

12           THE COURT:  WELL, BUT IF IT TURNS OUT THE

13   SCALE INFORMATION WAS NOT DISCLOSED TO THE PUBLIC,

14   ARGUABLY ISN'T THAT A DETAIL WHICH REMAINS

15   PROPRIETARY TO APPLE?  SO WOULDN'T THAT BE

16   APPROPRIATELY REDACTED OR MAINTAINED AS

17   CONFIDENTIAL?

18           MS. MAROULIS:  YOUR HONOR, IN THE FILE

19   HISTORY ITSELF WAS A PHOTOGRAPH OF A MAN THAT WE

20   ACTUALLY DEPOSED WHILE HOLDING THIS.

21           SO WHILE HIS EXACT MEASUREMENTS DON'T

22   APPEAR IN THE FILE, IT'S A HUMAN FIGURE HOLDING THE

23   TAB AND THE SCALE IS REVEALED.  IT'S NOT REVEALED

24   AS TO THE INCH AND THE CENTIMETER, BUT IT'S

25   CERTAINLY REVEALED IN PROPORTION.

1          FOR EXAMPLE, IT'S SOMETHING THAT A GROWN

2    MAN IS HOLDING LIKE THIS AS OPPOSED TO A SIZE WHERE

3    IT'S BIGGER THAN THE COURTROOM OR TINY.  SO WE

4    DON'T BELIEVE IT'S AN APPROPRIATE CONCERN.

5          AND THEN FINALLY WITH RESPECT TO THE

6    PHOTOGRAPHS THAT WERE SHOWN TO THE PTO, WE HAVE

7    RECENTLY DEPOSED THE PERSON WHO HAD SOME RELATION

8    TO THE PROSECUTION FILES AND APPARENTLY ANOTHER

9    SEVERAL CD'S THAT ARE RELEVANT TO THE FILE HISTORY,

10   AND ALL WITH RESPECT TO THIS PORTION OF THE MOTION

11   IS TO PUT THE FINAL END ON THIS CHAPTER THAT

12   THEY'VE SEARCHED, THEY'VE COMPLIED AND THEY LOOKED

13   FOR THESE BETTER PHOTOS OF THIS MOCKUP SUBMITTED TO

14   THE PATENT OFFICE.

15          THE COURT:  SO ARE YOU SPECIFICALLY

16   ASKING FOR AN ORDER COMPELLING APPLE TO SEARCH

17   TRACY DURKIN'S FILES.

18          MS. MAROULIS:  WE WANT IT BROADER THAN

19   THAT.  WE WANT THEM TO SEARCH ALL FILES BECAUSE WE

20   NOW HAVE ANOTHER CD SURFACING UP.

21          WE HAVE A VERY LIMITED TIME UNTIL

22   DISCOVERY CLOSES IN THIS CASE, YOUR HONOR, WE ONLY

23   HAVE UNTIL MARCH 8TH AND WE JUST NEED TO END THIS

24   CHAPTER SOMEHOW.

25          AND THE REASON WE BROUGHT THIS MOTION TO

1     ENFORCE IS THAT THE NORMAL PROCESSES OF GETTING

2     DISCOVERY OUT OF AN ADVERSARY DID NOT WORK.  AND

3     WHAT SEEMS TO HAVE BEEN WORKING IS REPEATED COURT

4     ORDERS, AND WE RECEIVED A LOT MORE DESIGN

5     DOCUMENTATION.

6              AND THE THOUSAND MODELS, I CANNOT OVER

7     EMPHASIZE HOW IMPORTANT THIS IS GIVEN THAT THEY

8     PROBABLY SHOULD HAVE BEEN PRODUCED BEFORE THE

9     PRELIMINARY INJUNCTION HEARING AND WE HAVE NEVER

10    SEEN THEM UNTIL JUST NOW.

11             THERE WAS ONE OTHER THING THAT JUST CAME

12    UP.  I JUST REMEMBERED ONE POINT I WANTED TO MAKE

13    WITH RESPECT TO SKETCHBOOKS WHICH IS THEY DID NOT

14    GIVE US THE CONCEPTION REDACTION TO PRACTICE DATE

15    UNTIL LATE FALL UNTIL ALMOST END OF DECEMBER.

16             SO TO THE EXTENT YOU ARE WONDERING WHY

17    SOME OF THE ISSUES ARE COMING UP NOW AS TO THE

18    CUTOFF, THAT IS PART OF REASON.

19             THE COURT:  ALL RIGHT.  THANK YOU.

20             MR. JACOBS?

21             MR. JACOBS:  WE JUST HAVE TO GET REALLY

22    DOWN INTO THE FACTS, YOUR HONOR.

23             THE COURT:  AS OPPOSED TO WHAT WE HAVE

24    BEEN DOING FOR THE LAST SIX HOURS?

25             MR. JACOBS:  MS. MAROULIS PERSONALLY

1    NEGOTIATED THE SCOPE OF OUR PRELIMINARY INJUNCTION

2    DISCOVERY.

3              I SAT ACROSS FROM THE TABLE FROM HER AND

4    NEGOTIATED THAT WITH HER.  SO, PROBABLY SHOULD HAVE

5    PRODUCED DURING THE PRELIMINARY INJUNCTION.  WE

6    REACHED AN AGREEMENT ON THE SCOPE OF APPLE'S

7    PRODUCTION.  IT WAS THE CAD FILES AND THEN THERE

8    WAS THE CONFUSION AROUND SKETCHBOOKS, NOTEBOOKS,

9    AND ALL THAT AND THAT LEAD TO MOTION PRACTICE AND

10   THE LIKE.

11             BUT IN TERMS OF WHAT WAS DUE TO BE

12   PRODUCED DURING THE PRELIMINARY INJUNCTION, THAT

13   WAS SPECIFICALLY NEGOTIATED INSOFAR AS APPLE'S

14   INDUSTRIAL DESIGN PRODUCTION WAS CONCERNED.

15             MAYBE MOVING IN REVERSE ORDER JUST

16   BECAUSE OF RECENCY, THIS '035 ISSUE, THIS IS NOW

17   GOTTEN TRULY QUITE BAZAAR.

18             MS. DURKIN SAID SHE HAS NO REASON TO

19   THINK THAT THERE ARE IMAGES ON THAT CD AND SHE

20   ASKED.  SO NOW --

21             THE COURT:  SHE SAID THIS IN THE

22   DEPOSITION.

23             MR. JACOBS:  EXACTLY.

24             AND NOW ON THE BASIS THAT SHE HAD A CD,

25   SAMSUNG MOVES TO ENFORCE COMPLIANCE WITH AN ORDER

1    THAT WE SEARCH IN MORE UNSTATED PLACES FOR THESE

2    PHOTOGRAPHS.

3              THEY HAVE THE MODEL, THEY CAN TAKE ALL

4    THE PHOTOGRAPHS OF THE MODEL THEY WANT, SUBJECT TO

5    OUR CONFIDENTIAL ISSUE WHICH REMAINS OBVIOUSLY A

6    POINT OF CONTENTION.

7              BUT THIS IS JUST NOW -- AGAIN, TO WHAT

8    PURPOSE, WHY MORE PHOTOGRAPHS?  WHAT IS MISSING

9    ABOUT THE 035 MODEL?  WHAT PROOF DOES IT GO TO?

10   RECALL THE EXAMINER SAYS IN THE PROSECUTION OF THE

11   '035 OF THE '889, THESE PHOTOGRAPHS ARE NOT PART OF

12   THE SPECIFICATION.  SO EXACTLY WHERE THIS IS GOING

13   REMAINS QUITE MYSTERIOUS.

14             ON THE CONFIDENTIALITY, WELL OF COURSE

15   YOU ARE EXACTLY RIGHT.  THE RULERS PROVIDE EXACT

16   SIZE INFORMATION.  AGAIN, TO WHAT PURPOSE?  WHY DO

17   THEY NEED TO HAVE A PUBLIC DOCUMENT WITH EXACT SIZE

18   INFORMATION WHEN APPLE REGARDS THAT AS CONFIDENTIAL

19   INFORMATION?  WHAT IS THE SIGNIFICANCE OF THAT HOW

20   IT WILL AID THE PROGRESS OF THE CASE?  WHAT IS THE

21   RELEVANT TO?  THAT IT BE DE DESIGNATED BECAUSE IT

22   HAS A RULER NEXT TO IT.

23             WE ADEQUATELY DISCUSSED THE MCO'S.  WE

24   TALKED ABOUT THE MODELS, THE MODELS THEY'VE GOT ON

25   SKETCHBOOKS.  THE ORDER WAS ALL RELEVANT

1    SKETCHBOOKS.  WE BELIEVE WE HAVE PRODUCED ALL

2    RELEVANT SKETCHBOOKS.

3              SAMSUNG HAS TWO ISSUES.  2002, NOT 2003.

4    BASED ON OUR DISCUSSIONS WITH INDUSTRIAL DESIGN

5    PERSONNEL WE BELIEVE THAT 2003 REPRESENTS A

6    RELEVANT DELIMITER.  WE MADE A RELEVANCE CUT, WE

7    MADE IT AT 2003 BASED ON THE DISCUSSIONS AND THE

8    BEST INFORMATION WE HAD AVAILABLE TO US.

9              THERE'S BEEN NO INDICATION OTHER THAN

10   THEY THINK IT'S RELEVANT THAT WE IN ANY WAY

11   BREACHED AN ORDER OF ALL THINGS.  THE LAST THING WE

12   WOULD WANT TO DO IN THIS MATTER.

13             ON ATTORNEY REVIEW, THIS IS NOW TURNING

14   AN ISSUE ON ITS HEAD.  OF COURSE WE ARE CONCERNED

15   THAT ATTORNEYS WEREN'T INVOLVED ENOUGH IN SAMSUNG'S

16   PRODUCTION.  NOW THEY ARE COMPLAINING THAT

17   ATTORNEY'S WERE INVOLVED IN REVIEWING THESE

18   SKETCHBOOKS FOR RELEVANCE.  WE TRAINED UP THE TEAM,

19   WE TAUGHT THE TEAM ABOUT HOW TO DO THE SEARCHING.

20   IT'S HOW WE ARE BOTH PRODUCING DOCUMENTS, WE ARE

21   USING ATTORNEYS TO DO THE REVIEW.

22             AGAIN, OTHER THAN THE FACT THAT THERE'S A

23   LOT OF REDACTION BECAUSE THERE WERE A LOT OF

24   UNRELATED SKETCHES, UNREPORTED PROJECTS, SAMSUNG

25   HAS NO BASIS FOR ARGUING WE BREACHED THE ORDER BY

1    DOING THE REVIEW ON THAT BASIS.

2              I THINK CO WE'VE COVERED IT.  THE MAC OS

3    10 HAS NOW BEEN -- WE HAD A PROBLEM WITH THE FIRST

4    VERSION.  FOR SOME REASON IT DIDN'T BOOT UP

5    PROPERLY.  WE GOT A TECHNICIAN IN AND WE GOT A

6    VERSION THAT'S WORKING.  I THINK THAT ONE HAS BEEN

7    ENTIRELY ADDRESSED.  WE HEARD NO COMPLAINT SINCE

8    THEIR LAST REVIEW OF IT.

9              TWO THINGS I NEED TO BE SURE I CORRECT

10   BECAUSE I TRY AND EXPLAIN TO YOUR HONOR PRETTY

11   CLEARLY I THINK WHAT'S GOING ON IN DISCOVERY AND

12   THEN I HEAR A SOMEWHAT DIFFERENT CHARACTERIZATION

13   FROM SAMSUNG'S COUNSEL.

14             TO BE CLEAR, ON THE SYSTEM OF RECORD, IF

15   IT IS DOWN TO THE MODEL LEVEL, WE ARE HAPPY TO

16   QUERY IT TO GO DOWN TO THE MODEL LEVEL.  THAT IS

17   WHAT I HAVE REPRESENTED TO THE COURT, IT'S A

18   CONFIDENTIAL STATEMENT.

19             MS. MAROULIS:  DO YOU KNOW WHAT IT IS

20   OR --

21             MR. JACOBS:  I DO NOT KNOW FOR SURE.  BUT

22   I WOULDN'T MENTION IT IF I WASN'T A LITTLE

23   CONCERNED THAT IT MAY NOT BE IN THE SYSTEM OF

24   RECORD, SO I DO WANT TO BE SURE.

25             AND THOSE ARE THE IMPORTANT POINTS,

1    YOUR HONOR.

2              THE COURT:  ALL RIGHT.

3              THANK YOU, MR. JACOBS.

4              ANY REBUTTAL, MS. MAROULIS?

5              MS. MAROULIS:  YOUR HONOR, VERY BRIEFLY.

6              ONE IS IT'S TRUE I SAT ACROSS FROM

7    MR. JACOBS AND WE TALKED ABOUT THE SCOPE OF

8    DISCOVERY.  HOWEVER, I HAD ABSOLUTELY NO WAY OF

9    KNOWING WHAT TYPES OF DOCUMENTS THE DESIGN TEAM

10   HAS.

11             SO UNTIL WE FOUND OUT THROUGH DEPOSITION

12   TESTIMONY AND OTHERWISE ABOUT MOCKUPS AND MCO'S AND

13   SUCH INFORMATION, THERE WAS NO WAY FOR US TO EVEN

14   ASK FOR THAT.  WE KNEW WHAT CAD FILES ARE AND WE

15   ASKED FOR THOSE AND WE ASKED FOR OTHER HARD COPY

16   DOCUMENTS.

17             SECONDLY, WITH RESPECT TO MS. DURKIN, WE

18   WERE NOT VERY EXPLICIT IN OUR MOTIONS BECAUSE IT'S

19   SUBJECT TO THE ITC PROCEEDINGS, BUT BECAUSE

20   MR. JACOBS BROUGHT IT UP, BASICALLY THE WITNESS

21   ADMITTED NOT HAVING SEARCHED A NUMBER OF SOURCES

22   WHICH IN OUR MIND CAST DOUBT ON THIS EFFICIENCY OF

23   SEARCH.  WHETHER OR NOT THERE WAS ACTUALLY ANYTHING

24   ON THOSE CD'S OR NOT, THAT IS WHAT HAPPENED.

25             AND FINALLY WITH RESPECT TO THE

1     SKETCHBOOKS, LOOKING AT THOSE SKETCHBOOKS

2     THEMSELVES AND HAVING REVIEWED THEM, IT IS VERY

3     DIFFICULT TO TELL WITHOUT A TRAINED DESIGNER EYE

4     WHAT IS THIS CONCERN ABOUT.

5             SO THE IDEA IS THAT THEY TRAINED A TEAM

6     OF ATTORNEYS AND THEY MADE CUTS IS VERY CONCERNING

7     TO US.  BECAUSE MANY SKETCHES LOOK ALIKE, MANY

8     SKETCHES DON'T LOOK LIKE WHAT THE FINISHED PRODUCT

9     DOES AND IT'S A VERY SIGNIFICANT ISSUE.  SO SIMPLY

10    DELEGATING IT TO COUNSEL WITHOUT WITNESS'S INPUT

11    AND PARTICIPATION IS A PROBLEM.

12            THE COURT:  SO YOU WOULD ASK THAT I ORDER

13    THAT SOME NUMBER OF APPLE DESIGNERS PARTICIPATE IN

14    DOCUMENT REVIEW?

15            MS. MAROULIS:  YOUR HONOR, THERE'S A

16    POSSIBILITY WE CAN JUST GET UN REDACTED SKETCHES

17    OR --

18            THE COURT:  WELL, THAT WOULD CERTAINLY

19    RESOLVE THE ISSUE.

20            BUT TO THE EXTENT THERE ARE LEGITIMATE

21    INTERESTS THEY ARE PROTECTING, IS THAT WHAT YOU ARE

22    ASKING ME TO DO?

23            MS. MAROULIS:  MS. KASSABIAN INFORMS ME

24    THAT WE ACTUALLY TURNED OVER THE ENTIRE

25    SKETCHBOOKS.

1          MS. KASSABIAN:  SO YOUR HONOR, IT IS

2     IMPOSSIBLE LOOKING AT THESE.  SOMETIMES IT'S JUST A

3     SKETCH OF, LIKE, A CORNER OR A SIDE VIEW OR JUST

4     LINES OR A PICTURE OF SOMETHING THAT'S NOT A PHONE.

5     IT'S IMPOSSIBLE TO TELL WHAT IS DEPICTED IN MANY OF

6     THESE SKETCHES.

7          SO WHEN WE COULDN'T MAKE HEADS OR TAILS

8     OF IT --

9          THE COURT:  IF THAT'S TRUE, WHY DO YOU

10    WANT THEM AT ALL?

11         MS. KASSABIAN:  BECAUSE THEY COULD BE

12    DRAWING SOMETHING THAT RELATES TO SOME OF THE

13    FUNCTIONALITY.

14         THE COURT:  IT SEEMS TO ME THAT THEY ARE

15    RELEVANT FOR PURPOSES OF YOUR REQUEST.  THE

16    RELEVANCE OF THE INDIVIDUAL PORTION OF THE SKETCH

17    IS SOMETHING THAT MIGHT BE PROPERLY ASSESSED PRIOR

18    TO PRODUCTION.

19         MS. KASSABIAN:  THAT'S FOR AN EXPERT,

20    THOUGH, TO DETERMINE, AND LAWYERS ARE NOT EXPERTS.

21    SO YOU EITHER HAVE TO SIT DOWN WITH THE INVENTOR --

22         THE COURT:  SO DO YOU HAVE BASEBAND

23    DESIGNERS REVIEWING YOUR TECHNICAL DOCUMENTS BEFORE

24    YOU PRODUCE THEM TO THE OTHER SIDE?

25         MS. MAROULIS:  WELL, YOUR HONOR, THIS IS

1    WHY WE HAD OUR INVENTORS LOOK AT DOCUMENTS AS WELL.

2             THE COURT:  WERE THEY DOING -- SO TO BE

3    CLEAR, ARE YOUR INVENTORS INVOLVED IN THE FINAL

4    DETERMINATION OF THE RELEVANCE OF ANY DOCUMENT?  I

5    HAD UNDERSTOOD FROM OUR EARLIER DISCUSSION YOU HAD

6    LAWYERS PERFORMING IT.

7             MS. MAROULIS:  NO, YOUR HONOR.  THEY GAVE

8    US EVERYTHING THAT WAS --

9             MS. KASSABIAN:  RIGHT.  SO WE WERE

10   INCLUSIVE, IS WHAT I'M SAYING.

11            WHEN WE COULDN'T TELL, WE WERE INCLUSIVE.

12   AND IT SOUNDS LIKE IF APPLE'S LAWYERS COULDN'T

13   TELL, THEY EXCLUDED THINGS.  AND THAT MAKES US

14   NERVOUS BECAUSE FROM OUR --

15            THE COURT:  I CAN APPRECIATE IT MAKES YOU

16   NERVOUS.

17            I HAVE A CHALLENGE HERE OF DRAFTING AN

18   ORDER THAT COVERS GOD ONLY KNOWS HOW MANY ISSUES

19   HAVE BEEN PRESENTED TO THE COURT.

20            AND WHAT I'M STRUGGLING WITH IS

21   ARTICULATING A PROPER BOUNDARY THAT BALANCES

22   COMPETING INTEREST.

23            SO ONE'S NERVOUSNESS DOESN'T TERRIBLY

24   MOVE ME, BUT WHAT MOVES ME IS AN APPROPRIATE

25   BALANCE OF INTEREST.

1          AND IN THIS PARTICULAR CASE IF I

2     UNDERSTAND YOUR OBJECTION, WHAT YOU ARE SAYING IS

3     YOU DON'T BELIEVE LAWYERS SHOULD BE PERMITTED TO

4     PERFORM THE EXCLUSIVE DETERMINATION AS TO RELEVANCE

5     OF SKETCHBOOKS; IS THAT RIGHT?

6          MS. MAROULIS:  YES, YOUR HONOR, BECAUSE

7     THEY CAN MAKE MISTAKES AND THAT WOULD --

8          THE COURT:  OKAY.  I UNDERSTAND WHERE

9     YOU'RE AT.

10          BUT THAT WOULD SUGGEST, WOULDN'T IT NOT,

11     A VERY ONEROUS BURDEN UNDER RULE 34 AND 26, IF THIS

12     COURT WERE TO APPLY THAT PRINCIPLE MORE BROADLY IN

13     ALL CASES INVOLVING SPECIALIZED KNOWLEDGE, WOULDN'T

14     IT?

15          MS. MAROULIS:  IT SEEMS TO BE

16     PARTICULARLY SPECIALIZED.

17          I HAVE BEEN INVOLVED IN A LOT OF PATENT

18     CASES --

19          THE COURT:  AND ME TOO.

20          MS. MAROULIS:  -- AND THERE ARE A LOT OF

21     DOCUMENTS YOU CAN READ WITH AN ATTORNEY, THESE

22     SKETCHBOOKS AND CAD FILES SEEM PARTICULARLY VAGUE

23     AND INDIFFERENT.

24          AND IT'S OUR UNDERSTANDING THAT THEY HAVE

25     ALREADY SCANNED THOSE NOTEBOOKS, AND IF THAT'S

1    CORRECT THAT WOULD NOT BE AN ADDITIONAL BURDEN.

2             THE COURT:  THANK YOU.

3             LET'S TURN TO JUST -- I'M SORRY, ANYTHING

4    FURTHER TO BE PRESENTED BY EITHER SIDE?

5             MR. SELWYN:  YOUR HONOR, IF I COULD MAKE

6    ONE POINT OF CLARIFICATION.

7             THE COURT:  YOU MAY.

8             MR. SELWYN:  IN MS. MAROULIS'S REBUTTAL

9    ON THE SOURCE CODE ISSUE SHE MENTIONED IN PASSING,

10   QUALCOMM.  QUALCOMM IS THE SUPPLIER OF THE BASEBAND

11   CHIP FOR THE IPHONE 4S.  THAT IS NOT AN ACCUSED

12   PRODUCT IN THIS CASE.

13            THE PARTIES HAVE BEEN MEETING AND

14   CONFERRING ABOUT A POSSIBLE STIPULATION AS TO

15   ADDITIONAL PRODUCTS ON BOTH SIDES.  I THINK THAT

16   THAT MEET AND CONFER PROCESS IS PROBABLY BROKEN

17   DOWN AT THIS POINT SUCH THAT EITHER PARTY WOULD

18   HAVE TO MOVE TO AMEND ITS INFRINGEMENT CONTENTIONS

19   TO IDENTIFY NEW PRODUCTS.

20            BUT TO BE CLEAR, THE 4S IS NOT AN ACCUSED

21   PRODUCT.  THE 4S IS THE ONLY UMTS APPLE PRODUCT

22   WITH A QUALCOMM BASEBAND CHIP.  THERE'S BEEN NO

23   DISCUSSION IN ANY MEET AND CONFER ABOUT THE IPHONE

24   4S BASEBAND CODE.

25            THE COURT:  ALL RIGHT.

1          MS. MAROULIS, I WILL GIVE YOU THE LAST

2     WORD ON THAT ISSUE.

3          MS. MAROULIS:  YOUR HONOR, I DON'T

4     DISAGREE WITH THE CHARACTERIZATION REGARDING 4S.

5          I THINK THE QUESTION OF THE COURT WAS

6     MORE BROAD AS TO WHAT BASEBAND PROCESSES WE ARE

7     TALKING ABOUT.

8          WE DO HAVE DISCUSSIONS REGARDING ADDING

9     4S, AND I UNDERSTAND APPLE WANTS TO ADD A BUNCH OF

10    OTHER PRODUCTS, SO THIS MIGHT COME TO FRUITION

11    SOON.

12         SO THE ISSUE WILL BE THE SAME IN TERMS OF

13    QUALITATIVE ISSUES.  WE WILL NEED THOSE PIECES FROM

14    QUALCOMM ONCE WE GET THE PRODUCT ADDED TO THE CASE.

15         MR. JACOBS:  YOUR HONOR, JUST BRIEFLY.  I

16    PROMISED TO GET BACK TO YOU ON TWO THINGS.

17         ONE IS THE ITC DEPO ISSUE AND WE CAN'T

18    AGREE IN THE CASE OF JONY IVE BECAUSE THE UNIQUE

19    RULES IN THE ITC AND IN PARTICULAR THE DIFFERENCE

20    IN TIME LIMITS.

21         SO IN THE ITC THERE AREN'T ANY.

22         THE COURT:  JUST ON THAT ISSUE, I CAN

23    APPRECIATE AND CERTAINLY RESPECT THE ITC'S

24    REQUIREMENTS AS A PRACTICAL MATTER IF YOU ARE ALL

25    IN A ROOM WITH A COURT REPORTER AND A VIDEO PERSON

1     AND YOU'VE GOT THE WITNESS THERE, WOULD IT NOT BE A

2     REASONABLE APPROACH HERE TO SAY LOOK, IF SAMSUNG IS

3     ENTITLED TO 30 OR 60 OR 90 MORE MINUTES OF

4     DEPOSITION, LET'S DO IT ALL HERE, AND WE WILL END

5     ONE DEPOSITION AND START THE NEXT.

6          MR. JACOBS:  THAT WAS EXACTLY -- IN A

7     WAY, THAT'S THE DIRECTION I WAS GOING, I JUST DON'T

8     THINK THEY MADE THE SHOWING THAT THEY ARE ENTITLED

9     TO THAT.  BUT I HEAR -- OBVIOUSLY WE HEAR THE

10    POINT.

11          AND THEN I ALSO SAID I WOULD GET BACK ON

12    YOU ON THE AGREEMENT.  AND IF YOU READ IN THE REST

13    OF THE LETTER, IT'S QUALIFIED.

14          THERE'S A PARAGRAPH THAT WAS READ THEN

15    THERE'S ANOTHER PARAGRAPH THAT TALKS ABOUT THE

16    LIMITERS BEING APPLIED IF THE SEARCH TERM "SAMSUNG"

17    BRINGS UP TOO MANY HITS.

18          THE COURT:  ALL RIGHT.

19          WELL, I SUSPECT THE LETTER WILL TELL ME

20    WHAT I NEED TO KNOW ONE WAY OR THE OTHER.

21          LET'S TURN BRIEFLY TO THE MOTION TO

22    COMPEL REGARDING OS 10.0.

23          HAS THIS ISSUE BEEN MOOTED?  DO YOU ALL

24    HAVE A BUTTON FIGURED OUT YET?

25          MS. MAROULIS:  SO ONCE WE FILED THE

1       SECOND MOTION ON THIS ISSUE, UNFORTUNATELY APPLE

2       DID PRODUCE A SOFTWARE WITH A FUNCTIONING BUTTON SO

3       WE WERE ABLE IT TO GET IT TO WORK.

4                 THE COURT:  YOUR BUTTON WORKS.

5                 MS. MAROULIS:  IT'S -- UNFORTUNATELY, IT

6       TOOK TWO MOTIONS TO GET TO THAT POINT, HOWEVER.

7                 WHAT WE DON'T HAVE THAT WE'RE HOPING TO

8       GET FROM APPLE EITHER BY DOCUMENTS OR BY

9       STIPULATION IS DOCUMENTS SHOWING IT WAS IN PUBLIC

10      USE OR SOLD AT THE TIME, SO BASICALLY TYING THIS

11      PARTICULAR THING THAT THEY PRODUCED TO US FOR

12      INSPECTION.

13                THE COURT:  THERE'S NO WAY TO GO ON THE

14      INTERNET AND CONFIRM?

15                MS. MAROULIS:  WE DON'T WANT TO DISPUTE

16      WITH THEM AS TO WHAT THEY PRODUCED TO US, IT BEING

17      THE VERSION FROM THE INTERNET.

18                THE COURT:  SO ALL YOU WANT TO BE ABLE TO

19      PROVE IS WHATEVER THEY PRODUCED WAS MADE AVAILABLE

20      FOR SALE AS OF A CERTAIN DATE?

21                MS. MAROULIS:  THAT'S CORRECT,

22      YOUR HONOR, TO AVOID FUTURE DISPUTES.

23                MR. JACOBS:  WE ARE FINE WITH THAT,

24      YOUR HONOR.

25                THE COURT:  ALL RIGHT.  THAT'S EASY.

1              LET'S MOVE ON.

2              MS. MAROULIS:  SO MOTION TO CLARIFY, I

3    BELIEVE IS THE LAST REMAINING ONE ON THE CALENDAR.

4              THE COURT:  I BELIEVE IT IS AS WELL.

5              MS. MAROULIS:  CONTRARY TO WHAT APPLE

6    ASSERTED, IT'S NOT A MOTION FOR RECONSIDERATION.

7              LAST TIME WE WERE BEFORE YOUR HONOR WE

8    SOUGHT A BROAD RELIEF OF SHOWING MR. SHERMAN THE

9    DESIGN DOCUMENTS AND YOUR HONOR RULED THAT THERE

10   SHOULD BE BALANCE BETWEEN APPLE'S PROPRIETARY

11   INTEREST AND OUR INTEREST IN HAVING AN EXPERT WHO

12   HAS INDUSTRY EXPERIENCE.

13             THE COURT:  SO I THINK I GAVE YOU THREE

14   OUT OF FOUR.

15             MS. MAROULIS:  YOU TOOK THE FOUR

16   CATEGORIES THAT WERE OFFERED BY APPLE AT SOME POINT

17   AS AN ALTERNATIVE.  WE WANTED IT BROADER SO WE

18   DON'T HAVE TO DO WHAT WE'RE DOING NOW WHICH IS TO

19   ASK FOR SPECIFIC CATEGORIES.

20             SO THIS MOTION IS BORN OF TWO

21   NECESSITIES.  ONE, THE FACT THAT THEY HAVE NOW TOLD

22   US ABOUT OR GAVE US ACCESS TO INFORMATION AND TYPES

23   OF DOCUMENTS THAT WERE SIMPLY NOT AVAILABLE WHEN

24   THIS MOTION WAS BEING SOUGHT, FOR EXAMPLE THE

25   THOUSAND MODELS WE ARE TALKING ABOUT IN THE MCO'S.

1           BUT SECONDLY, THERE WERE SOME CATEGORIES

2     OF DOCUMENTS THAT WE HONESTLY THOUGHT WOULD BE

3     SUBSUMED WITHIN YOUR ORDER

4           THE COURT:  LIKE THE EXHIBITS, FOR

5     EXAMPLE.

6           MS. MAROULIS:  YEAH.

7           FOR EXAMPLE, YOUR HONOR ORDERED THAT HE

8     COULD HAVE ACCESS TO DEPOSITIONS AND THEY'RE TAKING

9     THE POSITION THAT THAT EXCLUDES EXHIBITS.  WE COULD

10    NOT HAVE POSSIBLY FOUR.  THAT'S WHAT YOUR ORDER

11    MEANT AND THAT'S WHY WE ARE SEEKING A MOTION TO

12    CLARIFY.

13          BECAUSE TO US, IF YOU'RE READING A

14    DEPOSITION YOU MUST BE ABLE TO READ THE EXHIBITS

15    OTHERWISE HALF THE POSITION IS COMPLETELY

16    INCOMPREHENSIBLE.

17          SIMILARLY, INVENTOR DECLARATIONS TO US

18    SEEMED LIKE AN EQUIVALENT OR SIMILAR ITEM TO A

19    DEPOSITION.  THERE ARE ALSO SWORN TESTIMONY, FOR

20    EXAMPLE BY PEOPLE LIKE CHRIS STRINGER WHO WAS WELL

21    DEPOSED AND GAVE A DECLARATION.

22          EXPERT DEPOSITIONS, WE DON'T SEE A

23    DISTINCTION BETWEEN EXPERT DEPOSITIONS AND DESIGN

24    WITNESS DEPOSITIONS.

25          THEN THE LAST THREE CATEGORIES WE COVER

1    IN OUR MOTION ARE SLIGHTLY DIFFERENT WHICH IS THEY

2    WERE NOT WITHIN THE COURT'S ORDER BUT BASED ON WHAT

3    WE LEARNED SUBSEQUENTLY AND THE TYPES OF DOCUMENTS

4    WE ENCOUNTERED SUBSEQUENTLY, WE WOULD LIKE TO BRING

5    IN UNDER THAT ORDER BECAUSE WE WERE NOT AWARE OF

6    THE EXISTENCE OF THESE PROTOTYPES AND MODELS AND

7    CERTAIN TYPES OF MCO'S.

8            THE COURT:  I APOLOGIZE, MS. MAROULIS,

9    WHEN DID YOU FIRST RECEIVE THESE ADDITIONAL

10   PROTOTYPES, BEFORE OR AFTER YOU FILED YOUR MOTION

11   WITH ME THAT LEAD TO THE ORDER?

12           MS. MAROULIS:  IT WAS AFTER, YES.

13           I DON'T KNOW THE EXACT DATE.  IF I NEED

14   THE EXACT DATE --

15           THE COURT:  IF YOU ARE TELLING ME IT'S

16   AFTER, I WILL ACCEPT YOUR REPRESENTATION SUBJECT TO

17   CHALLENGE, OF COURSE.

18           YOU ARE TELLING ME WHAT WE ARE TALKING

19   ABOUT HERE ARE MATERIALS, DOCUMENTS AND THE

20   LANGUAGE THAT CAME AFTER THE REQUEST?

21           MS. MAROULIS:  YES.  TWO TYPES OF THE

22   CATEGORIES.

23           ONE IS THE CATEGORY THAT WE THOUGHT WAS

24   PART OF YOUR ORDER BUT WE HAVE A FIGHT NOW.  AND

25   THE OTHER ONE IS THE THINGS WE LEARNED

1    SUBSEQUENTLY.

2              SO THAT'S REALLY IT.  IN THEIR MOTION

3    APPLE DOES NOT REALLY DISPUTE WHAT WE ARE SAYING,

4    ALL THEY ARE SAYING IS THAT THIS IS AN END RUN

5    AROUND THE REQUIREMENTS OF THE LOCAL RULES

6    REGARDING MOTION FOR RECONSIDERATION, BUT WE DON'T

7    BELIEVE IT'S A MOTION FOR RECONSIDERATION, IT DOES

8    NOT FIT INTO THOSE THREE CATEGORIES THAT ARE

9    REQUIRED.

10             SO IN A SENSE THERE IS NEW FACTS BECAUSE

11   THERE'S NEW DOCUMENTS, BUT WE BELIEVE IT'S PROPER

12   TO REVISIT THE ORDER WITH THE KNOWLEDGE THAT WE

13   HAVE NOW ABOUT THE SCOPE OF APPLE'S PRODUCTION AND

14   ABOUT WHAT PARTIES CONSIDERED TO BE OR NOT TO BE IN

15   THAT ORDER.

16             THE COURT:  ALL RIGHT.

17             THANK YOU VERY MUCH.

18             MR. JACOBS?

19             MR. JACOBS:  YES, YOUR HONOR.

20             WELL, WE THINK YOUR ORDER WAS CLEAR AND

21   WE THINK, FOR EXAMPLE, THE WORD "TRANSCRIPTS" WAS

22   CLEAR BECAUSE MANY OF THE DEPOSITIONS HAVE

23   QUESTIONS AND HAD EXHIBITS, MORE IMPORTANTLY, THAT

24   GO TO INTERNAL DESIGN.

25             WHAT WE UNDERSTOOD YOUR ORDER TO SAY IS,

1   I'M GOING TO FIGURE OUT ON THE BASIS OF THE

2   CATEGORIES THAT HAVE BEEN PRESENTED TO ME WHICH

3   CATEGORIES DON'T POSE THAT MUCH OF A RISK GIVEN

4   WHAT SHERMAN DOES AND WHICH CATEGORIES AT A

5   CATEGORICAL LEVEL POSE A GREATER RISK.

6          AND EVERY TIME YOU WORK IN CATEGORIES

7   SOMETIMES IT'S OVER INCLUSIVE AND SOMETIMES IT'S

8   UNDER INCLUSIVE.  THE CATEGORIES WERE TEED UP TO

9   YOU AND YOU CALLED THE CATEGORIES.

10         AND OUR VIEW IS THAT THEY ARE TRYING TO

11  CHANGE THE CATEGORIES AND CHANGE THE CALCULATION OF

12  RISK AND BENEFIT OVER INCLUSIVENESS AND UNDER

13  INCLUSIVENESS.

14         SO FOR EXAMPLE, ASKING FOR ALL EXHIBITS

15  ATTACHED TO DEPOSITION TRANSCRIPTS OF DESIGN

16  INVENTORS, IN OUR VIEW RAISES A SUBSTANTIAL RISK OF

17  EXPOSURE TO SHERMAN OF INFORMATION THAT FALLS ON

18  THE "DON'T SHOW" SIDE OF THE LINE YOUR HONOR DREW.

19  AND THAT'S BECAUSE A LOT OF THEM ARE INTERNAL

20  DOCUMENTS BECAUSE THOSE HAPPEN TO GET ASKED ABOUT

21  IN DEPOSITIONS.

22         AND THE SAME IS TRUE FOR PROTOTYPES.  I

23  DO WANT TO DISTINGUISH BETWEEN MODELS AND

24  PROTOTYPES HERE.  MODELS ARE WHAT INDUSTRIAL DESIGN

25  CREATES FROM CAD.  PROTOTYPES ARE ACTUAL ATTEMPTS

1    TO BUILD WORKING SYSTEMS.

2              SAMSUNG ASKS FOR ALL OF THOSE.  WE DID

3    SEE THAT DECLARATIONS FIT INTO THE CATEGORY OF

4    DEPOSITIONS AND SO WE OFFERED THAT, OKAY.  THEY CAN

5    SEE THE DECLARATIONS OF STRINGER, FOR EXAMPLE,

6    BECAUSE THAT'S AKIN TO A DEPOSITION OF STRINGER

7    THAT HE COULD SEE.

8              WE REMAIN VERY CONCERNED ABOUT SHERMAN.

9    WE REMAIN VERY CONCERNED ABOUT HIS ONGOING WORK.

10   SO WE'RE READING YOUR ORDER TO DEFINE SOME

11   CATEGORIES AND TO OPPOSE ANY EXPANSION OF THOSE

12   CATEGORIES.

13             THE COURT:  ARE YOU SUGGESTING THAT

14   EITHER SAMSUNG'S REQUEST OR MY ORDER WAS EXCLUSIVE

15   OF ANY ADDITIONAL CATEGORIES WHICH WERE REVEALED BY

16   THE SUBSEQUENT APPLE PRODUCTION?  I MEAN, THAT

17   SEEMS LIKE A PRETTY EXTREME POSITION TO ME.

18             MR. JACOBS:  I DON'T THINK WE NEED THAT.

19   I DON'T THINK IT'S TRUE.

20             THE FACT THAT WE HAVE LOTS OF MODELS,

21   AGAIN, THEY'VE KNOWN THAT SINCE THE SUMMER.  THE

22   FACT THAT WE HAD VARIOUS CATEGORIES OF INTERNAL

23   DESIGN DOCUMENTS THEY'VE KNOWN THAT FROM THE VERY

24   BEGINNING.

25             SO I THINK THERE'S A FACTUAL DISPUTE OF

1    WHETHER THEY KNEW OR SHOULD HAVE KNOWN EARLIER THAT

2    THIS MIGHT COME UP IN CONNECTION WITH SHERMAN, BUT

3    MORE IMPORTANTLY THEY GAVE YOU A CATEGORY THAT

4    INCLUDED THOSE INTERNAL DOCUMENTS BY CATEGORY AND

5    THAT WAS WHERE YOU DREW THE LINE.

6              SO WE THINK THAT'S THE ANSWER HERE, THE

7    CATEGORIES THAT WERE DEFINED BY YOUR ORDER.

8              AND AGAIN, WE REMAIN VERY CONCERNED.

9              THE COURT:  THANK YOU.

10             ANY REBUTTAL?

11             MS. MAROULIS:  YES, YOUR HONOR.

12             I THINK IT'S IMPORTANT TO NOTE FOR THE

13   RECORD THAT APPLE IS ALSO OBJECTING TO OUR OTHER

14   DESIGN EXPERT, MR. LUCENTE.

15             THE COURT:  HIS NAME IS LUCENTE?

16             MS. MAROULIS:  YES.  HE'S IN DESIGN, BUT

17   IN THE U.S. AREA.

18             AND IT'S STILL NOT RIPE FOR THE MOTION

19   BEFORE YOU.  WE ARE STILL CONFERING ABOUT IT.  BUT

20   WE SEE A VERY TROUBLING PATTERN OF APPLE BLOCKING

21   US FROM OUR EXPERTS EFFECTIVELY ASSISTING US IN

22   THIS CASE.

23             AND MS. HUTNYAN ALREADY MENTIONED THAT

24   THERE WERE OBJECTIONS TO EVERY SINGLE ONE OF OUR

25   EXPERTS IN THE ITC PROCEEDING.  THAT'S NOT BEFORE

1    YOU, IT'S JUST A DATA POINT.  BUT THIS PROCEEDING

2    SHOULD NOT BE USED TO DEPRIVE US OF EXPERT'S

3    ASSISTANCE.

4              THE COURT:  SO IS IT FAIR TO SAY,

5    MS. MAROULIS, THAT YOUR POSITION ON THIS RESTS ON

6    THE NOTION THAT YOU'RE ENTITLED TO KEEP FROM APPLE

7    WHAT NON TESTIFYING EXPERTS YOU ARE WORKING WITH?

8    IS THAT THE CRITICAL ISSUE HERE?

9              I SEE THIS AS RELATED TO THE EARLIER

10   PROTECTIVE ORDER YOU MADE.  IS THAT WHERE THIS

11   ISSUE IS COMING TO A HEAD?

12             MS. MAROULIS:  THERE ARE TWO SEPARATE

13   ISSUES, YOUR HONOR.

14             THE COURT:  WHY DON'T YOU BREAK THEM

15   APART FOR ME.

16             MS. MAROULIS:  THE ISSUE MS. HUTNYAN

17   ALREADY COVERED IS WE SHOULDN'T HAVE TO EXPOSE

18   IDENTITIES OF EXPERTS OF THINGS THAT ARE NOT

19   ENTIRELY CONFIDENTIAL, THEY ARE REMEDIAL

20   CONFIDENTIALITY.

21             THE ISSUE HERE IS THAT IN THE DESIGN AREA

22   FOR SOME REASON APPLE IS PARTICULARLY BEING

23   DIFFICULT IN NOT LETTING US ENGAGE EXPERTS WHO WILL

24   BE HELPFUL IN THIS CASE AND THAT'S WHY WE HAVE

25   SUCCESSIVE MOTION PRACTICE.

1          MR. JACOBS HAS SAID HE'S NEVER SEEN THIS

2     MUCH MOTION PRACTICE FROM ONE EXPERT.  I HAVEN'T

3     EITHER.  I DON'T UNDERSTAND WHY WE CAN'T SHOW OUR

4     EXPERTS, MR. SHERMAN AND MR. LUCENTE, SOME OF THE

5     TEN-YEAR OLD E-MAILS PASSING ON PUBLIC ARTICLES OR

6     DEPOSITION EXHIBITS TO DEPOSITIONS HE CAN READ.

7          SO TO THE EXTENT THAT WE NEED TO PARSE

8     APART DIFFERENT CATEGORIES OF DOCUMENTS, WE CAN NOT

9     HAVE A BROADER PERMISSION, WE ARE BEFORE YOUR HONOR

10    WITH SPECIFIC SIX OR SEVEN CATEGORIES THAT WE SEEK

11    FROM THE COURT THE RELIEF TO GET IN THIS CASE.

12          THE COURT:  I APPRECIATE YOUR COMMENTS.

13          I GUESS WHERE I WAS GOING WITH ALL OF

14    THIS IS AS I SEE IT THERE ARE TWO ISSUES HERE WHICH

15    RELATE TO ONE ANOTHER.

16          ONE IS THE SUBJECT MATTER OF THE

17    DOCUMENTS OR DEPOSITION TRANSCRIPTS AT ISSUE AND

18    WHETHER OR NOT THOSE LEGITIMATELY IMPLICATE APPLE'S

19    COMPETITIVE CONCERNS.

20          THE SECOND IS WHETHER THE DOCUMENTS ARE

21    TRULY THE SECRET SAUCE OR SUPER SECRET OR SUPER

22    CONFIDENTIAL HIGHER LEVEL OF CONFIDENTIALITY

23    SEEKING AN ORDER.

24          AND WITH RESPECT TO MR. SHERMAN, LET'S

25    FOCUS ON HIM, I SUSPECT I WILL GET A MOTION ON THE

271

1    OTHER GUY LATER ON.

2              MS. MAROULIS:  I HOPE NOT.  I HOPE WE CAN

3    ACHIEVE AGREEMENT ON THAT.

4              THE COURT:  I HOPE NOT TOO.

5              BUT IT SEEMS TO ME WITH RESPECT TO

6    MR. SHERMAN WHAT YOU ARE SAYING IS GIVEN THE

7    CURRENT STATE AFFAIRS OR THE CURRENT PROTECTIVE

8    ORDER AND ALL OF THAT, YOU SHOULD BE ENTITLED TO

9    SHARE WITH MR. SHERMAN THE ADDITIONAL CATEGORIES

10   YOU IDENTIFIED FOR ALL THE SAME REASONS OR FOR

11   SIMILAR REASONS TO THE CATEGORIES THAT WERE

12   PREVIOUSLY AUTHORIZED.

13             MS. MAROULIS:  YES, YOUR HONOR.

14             THE COURT:  IS THAT A SUMMARY OF THE

15   POSITION?

16             MS. MAROULIS:  THAT'S CORRECT.

17             THE COURT:  ALL RIGHT.

18             ANYTHING FURTHER?

19             MS. MAROULIS:  THANK YOU, YOUR HONOR.

20             I THINK YOU'VE HEARD A LOT FROM US TODAY.

21             MR. JACOBS:  YES, IF I MAY.

22             THE COURT:  APPARENTLY NOT QUITE.

23             MR. JACOBS:  NOT QUITE.  WE WOULD LIKE

24   SOME DIRECTION FROM YOU.

25             THE COURT:  ALL RIGHT.

```
1              MR. JACOBS:  WE INFERRED FROM THE
2    SCHEDULE JUDGE KOH ENTERED AND FROM YOUR HONOR'S
3    EARLIER GRANTS OF MOTIONS TO EXPEDITE THAT
4    YOUR HONOR WAS MORE THAN -- NOT JUST OPEN, BUT IN A
5    AWAY KIND OF SAYING LOOK, LET'S GET THESE TEED UP,
6    LET'S GET THEM DECIDED, LET'S NOT PUT THEM ON THE
7    ORDINARY TRACK BECAUSE IF WE DO THAT IT WILL BE A
8    MONTH AND A HALF OUT.
9              THE COURT:  THAT'S BEFORE I KNEW THERE
10   WERE NINE OF THEM IN THE CUE AND MORE TO COME.
11             MR. JACOBS:  THAT'S WHY I'M GOING.
12             WE REALLY WANT TO DO THIS IN A WAY THAT
13   RESPECTS THE LIMITED THROUGHPUT OF THIS
14   INSTITUTION, THAT WE -- THAT DOESN'T GET CROSSWISE
15   WITH YOU, BECAUSE WE ARE HIGHLY DEPENDENT ON YOU,
16   FRANKLY, TO GET THE DISCOVERY WE NEED.
17             BUT I DON'T WANT TO JUST READ SIGNALS
18   THAT YOUR HONOR MIGHT HAVE BEEN SENDING ABOUT NO, I
19   DON'T WANT ANY MORE EXPEDITED MOTIONS.
20             CAN YOU GIVE US ANY GUIDANCE ON HOW YOU
21   WANT US TO PROCEED OVER THE SIX NEXT SIX OR
22   SEVEN WEEKS?
23             THE COURT:  WELL, WE SHOULD SPEAK TO THE
24   SUBJECT, MS. MAROULIS, I DON'T WANT TO DEPRIVE YOU
25   OF AN EQUAL OPPORTUNITY.
```

1              MS. MAROULIS:  WE NEED TO DO WHAT WORKS

2    FOR THE COURT.

3              IN THE PAST WE AT SAMSUNG WERE NOT

4    SEEKING EXPEDITED RELIEF.  EVERY SINGLE MOTION

5    APPLE FILED WAS AN EXPEDITED -- EXCUSE ME.

6              SO TO AVOID HAVING TWO DIFFERENT TRACKS,

7    WHERE THEIR MOTIONS ARE HEARD WELL BEFORE OURS IN

8    THE SENSE WE HAD TO JOIN THE EXPEDITED SCHEDULE.

9              BUT IF THERE'S A PERIOD WHERE ALL OUR

10   MOTIONS ARE HEARD, I THINK WE CAN LIVE WITH THAT.

11             THE COURT:  WELL LET ME, TO ADDRESS THE

12   ISSUE YOU BOTH HAVE SPOKEN TO, LET ME JUST SAY

13   THIS.

14             I HAVE STRUGGLED IN THIS CASE LIKE NO

15   OTHER IN CONSTRUCTING A PROCEDURE THAT WOULD ALLOW

16   ME TO ADDRESS YOUR DISPUTES EFFICIENTLY AND

17   REASONABLY GIVEN MY OTHER DEMANDS.

18             AND I HAVE RESISTED THE APPROACH THAT A

19   NUMBER OF MY COLLEAGUES HAVE ADOPTED IN THIS

20   DISTRICT OF LETTER BRIEFING.  FRANKLY, MANY OF

21   THESE ISSUES REQUIRE MORE THAN A THREE-PAGE

22   SINGLE-SPACER, IN MY VIEW.

23             IF THAT TYPE OF APPROACH IN YOUR MIND

24   WOULD ALLOW YOU TO FRAME THE ISSUES AND GET THEM

25   TEED UP IN AN EFFICIENT WAY, I'M OPEN TO IT.

1          IF YOU CAN REACH AN AGREEMENT TO

2     SOMETHING LIKE MY COLLEAGUES DO, I'M CERTAINLY

3     WILLING TO CONSIDER IT.  BUT FRANKLY, I WAS

4     RELUCTANT TO GO DOWN THAT ROAD OUT OF RESPECT TO

5     YOU TO COMPLETELY AND ADEQUATELY PRESENT THIS TO

6     ME.

7          I CAN'T OFFER ANY MORE GUIDANCE.  IF YOU

8     HAVE SOMETHING IN MIND, I WILL HEAR YOU OUT.

9          I WILL SAY IN THE FUTURE IF YOU WANT

10    EXPEDITED RELIEF, I WOULD APPRECIATE YOU TELLING ME

11    EXACTLY WHAT YOU HAD IN MIND IN TERMS OF THE MOTION

12    PRACTICE THAT WOULD FOLLOW SO I'M NOT SURPRISED BY

13    THE VOLUME.  THAT WOULD CERTAINLY ASSIST ME.

14          MR. JACOBS:  THAT'S VERY HELPFUL,

15    YOUR HONOR, THANK YOU.

16          THE COURT:  IS THERE ANYTHING ELSE I CAN

17    DO FOR YOU THIS AFTERNOON?

18          IF NOT, I WILL WISH YOU ALL A GOOD DAY.

19          THANK YOU.

20          MS. MAROULIS:  THANK YOU, YOUR HONOR.

21          THE CLERK:  COURT IS ADJOURNED.

22          (WHEREUPON, THE PROCEEDINGS IN THIS

23    MATTER WERE CONCLUDED.)

24

25

1

2

3

4                          **CERTIFICATE OF REPORTER**

5

6

7

8            I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22            _____
              SUMMER A. FISHER, CSR, CRR
23            CERTIFICATE NUMBER 13185

24

25