1    HAROLD J. MCELHINNY (CA SBN 66781)
     hmcelhinny@mofo.com
2    MICHAEL A. JACOBS (CA SBN 111664)
     mjacobs@mofo.com
3    RICHARD S.J. HUNG (CA SBN 197425)
     rhung@mofo.com
4    MORRISON & FOERSTER LLP
     425 Market Street
5    San Francisco, California 94105-2482
     Telephone:  (415) 268-7000
6    Facsimile:  (415) 268-7522

WILLIAM F. LEE (*pro hac vice*)
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Attorneys for Plaintiff and
Counterclaim-Defendant Apple Inc.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>           Plaintiff,<br><br>     vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>           Defendants.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>           Counterclaim-Plaintiffs,<br><br>     v.<br><br>APPLE INC., a California corporation,<br><br>           Counterclaim-Defendant. | Civil Action No. 11-CV-01846-LHK<br><br><br>**APPLE INC.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br><br>**Date:  May 10, 2012**<br>**Time:  1:30 pm**<br>**Place:  Courtroom 4, 4th Floor**<br>**Judge:  Hon. Lucy H. Koh**<br><br><br>**ORAL ARGUMENT REQUESTED**<br><br><br>**PUBLIC REDACTED VERSION** |

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

II.     STATEMENT OF FACTS .........................................................................................4

        A.      Samsung's Breaches Of ETSI's Disclosure Policy ..........................................4

                1.      Failure To Timely Disclose The '001 Patent ................................................5

                2.      Failure To Timely Disclose The '867 Patent ................................................5

                3.      Failure To Timely Disclose The '410 Patent ................................................6

                4.      Failure To Timely Disclose The '604 Patent ................................................7

                5.      Failure To Timely Disclose The '941 Patent ................................................7

                6.      Failure To Timely Disclose The '792 Patent ................................................8

                7.      Failure To Timely Disclose The '516 Patent ................................................8

        B.      Samsung's Agreement With Intel ..................................................................9

                1.      Intel Agreement ............................................................................10

                2.      Intel's Chipset Sales to Apple ................................................................10

        C.      Samsung's FRAND Commitments For Its Declared-Essential Patents ...............11

III.    ARGUMENT ............................................................................................................12

        A.      Samsung's Failure To Timely Disclose Declared-Essential Patents Requires A
                Finding Of Breach And Unenforceability As To Those Patents ..........................12

                1.      Under ETSI's Rules, Samsung Was Obligated To Disclose Its IPR
                        Before 3GPP Adopted Its Proposals ........................................................13

                2.      Samsung Breached Its Disclosure Obligations ........................................155

        B.      Intel's Chipset Sales to Apple Have Exhausted Samsung's Declared-Essential
                Patents As Applied to The Intel Chipsets In Apple Products ..............................15

        C.      In Any Event, Samsung Could Never Be Entitled to Injunctive Relief On Its
                Declared-Essential Patents .........................................................................17

                1.      By Agreeing Freely to License Its Declared Essential Patents, Samsung
                        Established That Injunctive Relief Is Not Appropriate for Those Patents.18

                2.      Under French Law, Apple Is Currently Licensed To Samsung's
                        Declared-Essential Patents ......................................................................20

IV.     CONCLUSION .....................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

<u>Federal Cases</u>

*Adams v. Burke*,
  84 U.S. (17 Wall.) 453 (1873) ......................................................................... 16, 17

*Broadcom Corp. v. Qualcomm, Inc.*,
  501 F.3d 297 (3d Cir. 2007).................................................................................. 19

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)............................................................................................... 18

*Guardian Indus. Corp. v. United States*,
  477 F.3d 1368 (Fed. Cir. 2007)............................................................................. 20

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  609 F. Supp. 2d 951 (N.D. Cal. 2009) ............................................................. 19, 20

*Keeler v. Standard Folding-Bed Co.*,
  157 U.S. 659 (1895)............................................................................................... 16

*Openwave Systems, Inc. v.724 Solutions (US) Inc.*,
  No. C 09-3511 RS, 2010 WL 890249 (N.D.Cal. Mar. 8, 2010)............................ 13

*Pazcoguin v. Radcliffe*,
  292 F.3d 1209 (9th Cir. 2002) .............................................................................. 20

*Praxair, Inc., v. ATMI, Inc.*,
  479 F. Supp. 2d 440 (D. Del. 2007)....................................................................... 18

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
  553 U.S. 617 (2008)............................................................................................... 16

*Qualcomm Inc. v. Broadcom Corp.*,
  548 U.S. 3d 1004 (Fed. Cir. 2008).................................................................... 13, 14

*Richmark Corp. v. Timber Falling Consultants*,
  959 F.2d 1468 (9th Cir. 1992) .............................................................................. 20

*Tessera, Inc. v. Int'l Trade Comm'n*,
  646 F.3d 1357 (Fed. Cir. 2011) ............................................................................ 16

*Voda v. Cordis Corp.*,
  No. CIV-03-1512-L, 2006 WL 2570614 (W.D. Okla. Sept. 5, 2006)................... 18

<u>State Cases</u>

*Nedlloyd Lines B.V. v. Superior Court of San Mateo County*,
  3 Cal. 4th 459 (Cal. 1992)..................................................................................... 21

# TABLE OF AUTHORITIES

Federal Rules

Federal Rule of Civil Procedure 56 ................................................................................................ 1

Federal Rule of Civil Procedure 44.1 ........................................................................................... 20

1   TO DEFENDANTS SAMSUNG ELECTRONICS CO. LTD., SAMSUNG ELECTRONICS

2   AMERICA, INC., AND SAMSUNG TELECOMMUNICATIONS AMERICA, LLC AND

3   THEIR COUNSEL OF RECORD:

4         **PLEASE TAKE NOTICE THAT** at 1:30 pm on May 10, 2012, Plaintiff and

5   Counterclaim-Defendant Apple Inc. will move pursuant to Federal Rule of Civil Procedure 56

6   for partial summary judgment.  This motion is based on this Notice of Motion, the accompanying

7   Memorandum of Points and Authorities in support thereof, the Declaration of Joseph J. Mueller,

8   the Declaration of Saku Hieta, the exhibits accompanying those Declarations, the argument of

9   counsel, and any other matters properly before the Court.

10                    **MEMORANDUM OF POINTS AND AUTHORITIES**

11  **I.     INTRODUCTION**

12        This case arises from Samsung's shameless copying of Apple's iconic iPhone and iPad

13  and their designs and features.  Notwithstanding Samsung's role as one of Apple's key

14  suppliers—for which Samsung has received billions of dollars from Apple—Samsung has

15  embarked on a strategy of slavish imitation of Apple's products.  Apple brought this suit to stop

16  Samsung's copying and to hold Samsung accountable for stealing Apple's ideas.

17        Samsung retaliated with counterclaims that reflect Samsung's complete disregard for the

18  rules governing intellectual property.  Samsung asserts patents it claims are "essential" (i.e.,

19  necessary to practice) the UMTS telecommunications standard used widely in modern mobile

20  phones—but these patents are based on applications that Samsung deceptively hid from industry

21  working groups that developed the UMTS standard.  Samsung asserts these patents against Intel

22  chipsets incorporated in Apple's products—but these chipsets are covered by a Samsung license

23  to Intel, which Samsung fought for months to avoid producing and thereby expose its contents.

24   Samsung touts to the public the threat of an injunction against Apple—but Samsung could never

25  be entitled to that remedy for its declared-essential patents.  Samsung's abusive approach to

26  intellectual property has consequences, and now is the time for those consequences to be

27  enforced.

28

APPLE INC.'S NOTICE OF MOTION
AND MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 11-cv-01846 (LHK))

This motion is based on three sets of promises that Samsung made and then broke:  (1) promises to the European Telecommunications Standards Institute ("ETSI"), a collaborative industry organization that develops standards for mobile phones; (2) promises to Intel, which supplies to Apple the chipsets that Samsung accuses of infringing its allegedly "standard essential" patents; and (3) promises to companies like Apple that sell products implementing the UMTS standard that ETSI helped create.  These broken promises share a common theme: having agreed that it would use its allegedly standard-essential patents only in a transparent, restrained fashion—by timely disclosing them, not asserting them against certain components, and licensing them on FRAND terms—Samsung is now abusing those same patents in an attempt to retaliate against Apple.

*First*, Samsung promised ETSI that it would timely disclose any allegedly standard-essential intellectual property rights ("IPR")—including patents and patent applications—during the standards-setting process.  Yet, notwithstanding that Samsung's named inventors and other personnel aggressively promoted technologies for inclusion in UMTS, Samsung chose not to timely disclose IPR that Samsung now alleges cover these same technologies.  This failure requires a finding that Samsung has breached its disclosure obligations, rendering its untimely-disclosed patents unenforceable against standards implementers like Apple.[1]

*Second*, Samsung promised Intel that it would abide by a cross-license with Intel. Exercising authority that Samsung granted through the license, Intel has sold baseband processor (i.e., mobile telecommunications) chipsets to Apple, and those "authorized sales" exhausted Samsung's patent rights as to those Intel chipsets.  Because all of Samsung's declared-essential patent claims against Apple are aimed at functionality contained in the Intel chipsets, these claims fail as a matter of law.

*Third*, Samsung promised that it would license its allegedly standard-essential patents to

---

[1]      As explained in Apple's opposition to Samsung's motion to dismiss, Samsung also intentionally breached its FRAND obligations, and Samsung's twin intentional breaches of its FRAND and disclosure obligations has resulted in competitive harm.  That competitive harm is the subject of Apple's antitrust claims.

APPLE INC.'S NOTICE OF MOTION
AND MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 11-cv-01846 (LHK))

any company that practices the UMTS standard, in return for "fair, reasonable, and non-discriminatory" ("FRAND") royalties.  Under basic principles of injunctive relief, this promise forecloses Samsung from seeking an injunction—because the promise itself shows both that Samsung will not be irreparably harmed by others practicing the declared-essential patents, and that money would adequately compensate Samsung.  Moreover, under French law—which governs Samsung's FRAND undertaking to ETSI—Samsung's promise and Apple's acceptance through implementation of the UMTS standard resulted in a presently enforceable license, which also forecloses injunctive relief against Apple.

To be clear, Apple disputes that any of the declared-essential patents that Samsung has asserted against Apple is actually essential to the UMTS standard and actually embodied in the Intel chipsets incorporated into Apple products.  Apple also disputes that the patents are valid.

But solely for purposes of this motion, Apple assumes that Samsung's contentions are correct—because even if true, Samsung's claims fail as a matter of law.  Apple thus respectfully requests that the Court grant this motion as to Apple's defenses and counterclaims directed to Samsung's declared-essential patents, and also Apple's defenses and counterclaims directed to Samsung's breach of its contractual duty to abide by ETSI's disclosure policies.[2]  Granting this motion would serve to narrow this complex dispute—and to hold Samsung to the promises that it made.

---

[2]     Specifically, Apple seeks judgment in its favor on its First Defense (Non-Infringement) as to the '604, '410, '792, '867, '001, '516, and '941 patents; Fourth Defense (Authority to Practice and/or Unenforceability) as to those same patents; Fifth Defense (FRAND License); Sixth Defense (No Injunctive Relief) as to those same patents; First Counterclaim (Declaratory Judgment of Non-Infringement of the '604 Patent); Third Counterclaim (Declaratory Judgment of Non-Infringement of the '410 Patent); Ninth Counterclaim (Declaratory Judgment of Non-Infringement of the '792 Patent); Eleventh Counterclaim (Declaratory Judgment of Non-Infringement of the '867 Patent); Thirteenth Counterclaim (Declaratory Judgment of Non-Infringement of the '001 Patent); Fifteenth Counterclaim (Declaratory Judgment of Non-Infringement of the '516 Patent); Twenty-First Counterclaim (Declaratory Judgment of Non-Infringement of the '941 Patent); Twenty-Fifth Counterclaim (Breach of Contract - FRAND and Other Standard-Related Misconduct); and Twenty-Seventh Counterclaim (Declaratory Judgment that Apple is Licensed to Samsung's Declared-Essential Patents).

APPLE INC.'S NOTICE OF MOTION
AND MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 11-cv-01846 (LHK))

## II.   STATEMENT OF FACTS

The facts supporting this motion relate to (A) the ETSI disclosure rules and Samsung's failures to timely disclose its allegedly standard-essential patents, (B) Samsung's agreement with Intel, and (C) the ETSI FRAND policy and Samsung's FRAND declarations.  None of these facts is subject to genuine dispute.

### A.   Samsung's Breaches Of ETSI's Disclosure Policy

Samsung's declared-essential patent claims are directed to Apple's implementation of the UMTS telecommunications standard, the most widely used 3G telecommunications standard. UMTS was created by the 3rd Generation Partnership Project ("3GPP"), which included ETSI.

ETSI was established as a non-profit association under French law, headquartered in Sophia-Antipolis, France.  (Declaration of Joseph J. Mueller ("Mueller Decl.") Ex. 1 (Statutes of the European Telecommunications Standards Institute, Articles 1 and 4, adopted March 29-30, 1988).)  ETSI's Intellectual Property Rights Policy is designed to prevent the possibility—for ETSI, its members, and other implementers of ETSI standards—that "investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD being unavailable" or available only at exorbitant royalty rates.  (*Id.* Ex. 2, Clause 3.1.)

To help achieve this goal, ETSI requires that all members "***timely*** inform ETSI of ESSENTIAL IPRs."  (*Id.* Ex. 2, Clause 4.1 (emphasis added).)  For ETSI members that, like Samsung, make technical proposals for a standard, the IPR Policy is even more exacting:

> In particular, a MEMBER submitting a technical proposal for a STANDARD shall, on a bona fide basis, ***draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted***.

(*Id.* (emphasis added).)

During the development of the UMTS standard, Samsung participated in working groups and advocated for standardization of certain technologies—yet did not timely disclose patents that Samsung now alleges cover those same technologies, waiting until long ***after*** 3GPP accepted the proposals.  This failure was pervasive:  Samsung failed to timely disclose ***all*** the asserted

1    declared-essential patents, *i.e.*, U.S. Patent Nos. 7,386,001, 7,362,867, 7,050,410, 6,928,604,

2    7,675,941, 7,200,792, and 7,447,516.

3         There was a consistent pattern across each patent:  to begin, Samsung filed a patent

4    application; next, Samsung personnel—frequently including named inventors—participated in

5    working-group meetings at which the groups discussed standardizing certain technologies; in

6    most cases, Samsung itself made formal proposals; and finally, only long after the standard was

7    finalized, Samsung disclosed the IPR that Samsung now contends cover those technologies.

8              **1.      Failure To Timely Disclose The '001 Patent**

9         On June 25, 1999, Samsung filed a Korean patent application.  The asserted '001 Patent

10   claims priority to that application and lists Beongjo Kim and Min Goo Kim among the inventors.

11   (Mueller Decl. Ex. 4.)  Samsung has alleged that the '001 patent is essential to practicing

12   Specification 25.212 of UMTS, which was created by 3GPP Working Group 1.  (*Id.* Ex. 5.)

13        Samsung actively participated in that working group.  The group maintained an email list,

14   called a "reflector."  (*Id.* ¶ 4.)  Four days after Samsung filed its patent application, on June 29,

15   1999, Samsung's Beongjo Kim—a named inventor on the '001 patent—began emailing the

16   reflector and proposing ideas for addressing the missing multiplexing rules.  (*Id.* Ex. 6.)  On July

17   9, 1999, Mr. Kim emailed a formal Samsung proposal to the reflector.  (*Id.* Ex. 7.)  The working

18   group approved the proposal at its Sixth Meeting in Espoo, Finland from July 13 to 16, 2009.

19   (*Id.* Ex. 12, p. 8.)  In October 1999, 3GPP approved the next version of Specification 25.212.

20   (*Id.* Exs. 8, 9.)

21        Samsung did not disclose its IPR until ***nearly four years later***, on September 19, 2003.

22   (*Id.* Ex. 5.)

23              **2.      Failure To Timely Disclose The '867 Patent**

24        On July 7, 1999, Samsung filed a Korean patent application.  The asserted '867 Patent

25   claims priority to that application and lists Heewon Kang and Jaeyoel Kim as inventors.  (*Id.* Ex.

26   10.)  Samsung has alleged that the '867 patent is essential to Specification 25.213 of UMTS,

27   which was also created by Working Group 1.  (*Id.* Ex. 5.)

28        Again, Samsung actively participated in the working group.  The very next day after

1   Samsung filed its patent application, on July 8, 1999, '867 named inventor Jaeyoel Kim sent a

2   draft proposal regarding a "new assignment method for multiple scrambling code" to the email

3   reflector for the working group.  (*Id.* Ex. 11.)  That proposal was considered at the Sixth Meeting

4   of Working Group 1 in Espoo, Finland from July 13 to 16, 1999.  (*Id.* Ex. 12, p. 10.)  Both

5   named inventors—Mr. Kim and Mr. Kang—attended that meeting.  (*Id.* Ex. 12, pp. 14, 15.)  The

6   proposal was not adopted at that time, but the working group encouraged Samsung to seek

7   support for its proposals before the next meeting.  (*Id.* Ex. 12, p. 10.)  Mr. Kim sent emails to the

8   reflector in late July and early August, soliciting support for a modified Samsung proposal.  (*Id.*

9   Ex. 13.)  By August 26, 1999, Mr. Kim circulated a modified proposal to the reflector.  (*Id.* Ex.

10  14.)  Samsung's proposal, with some modifications, was adopted at the next working group

11  meeting held in Hannover, Germany from August 30 to September 3, 1999.  (*Id.* Ex. 14, Ex. 15,

12  p. 11.)  3GPP approved the next released version of Specification 25.213 at a meeting in October

13  1999.  (*Id.* Exs. 9, 16.)

14          Samsung did not disclose its IPR until ***nearly four years late***r, on September 19, 2003.

15  (*Id.* Ex. 5.)

16                          **3.       Failure To Timely Disclose The '410 Patent**

17          On July 8, 1999, Samsung filed a Korean patent application.  The asserted '410 patent

18  claims priority to that application and lists Min Goo Kim as an inventor.  (*Id.* Ex. 17.)  Samsung

19  alleges the '410 patent is essential to practicing Specification 25.212 of UMTS developed by

20  Working Group 1.  (*Id.* Ex. 5.)

21          The same day Samsung filed his patent application (i.e., July 8, 1999), '410 named

22  inventor Min Goo Kim emailed the working group's reflector email list, indicating that Samsung

23  intended to propose a "unified rate matching scheme" at the next meeting and attaching a draft

24  proposal.  (*Id.* Ex. 18.)  Two days later, Mr. Kim sent a final version of the proposal.  (*Id.* Ex.

25  19.)  Mr. Kim attended the Sixth Meeting of Working Group 1 in Espoo, Finland from July 13-

26  16, 1999.  (*Id.* Ex. 12, p. 15.)  The Seventh Meeting of Working Group 1, in Hannover,

27  Germany, began August 30, 1999; Mr. Kim again attended on behalf of Samsung.  (*Id.* Ex. 15, p.

28  20.)  At that meeting, Samsung and LGIC made a joint proposal that was approved by the

APPLE INC.'S NOTICE OF MOTION
AND MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 11-cv-01846 (LHK))

1   working group.  (*Id.* Ex. 20; Ex. 15, p. 10.)  3GPP approved the next version of Specification

2   25.212 in October 1999.  (*Id.* Exs. 8, 9.)

3        Samsung did not disclose its IPR until ***nearly four years later***, on September 19, 2003.

4   (*Id.* Ex. 5.)

5              **4.       Failure To Timely Disclose The '604 Patent**

6        On March 31, 1998, Samsung filed a Korean patent application.  The asserted '604 patent

7   claims priority to that application and lists Chang-Soo Park, Joong-Ho Jeong and Hyeon-Woo

8   Lee as inventors.  (*Id.* Ex. 21.)  Samsung has alleged that the '604 patent is essential to practicing

9   Specification 25.212 of UMTS developed by Working Group 1.  (*Id.* Ex. 5.)

10       From August 30 to September 3, 1999, inventors Hyeon-Woo Lee and Chang-soo Park

11   attended a Working Group 1 meeting in Hanover, Germany.  (*Id.* Ex. 15, pp. 20-21.)  At that

12   meeting, Ericsson made two proposals.  (*Id.* Exs. 22, 23.)  ████████████████████

13   ████████████████████████████  (*Id.* Ex. 24.)  The working group

14   adopted those proposals (*id.* Ex. 15, pp. 10, 12), and 3GPP approved the next version of

15   Specification 25.212 in October 1999.  (*Id.* Exs. 8, 9.)

16       Samsung did not disclose its IPR until ***nearly four years later***, on September 19, 2003.

17   (*Id.* Ex. 5.)

18              **5.       Failure To Timely Disclose The '941 Patent**

19       On May 4, 2005, Samsung filed a Korean patent application.  The asserted '941 patent

20   claims priority to that application and lists Gert-Jan van Lieshout, Soenghun Kim, and Himke

21   van der Velde as inventors.  (*Id.* Ex. 25.)  Samsung has alleged that the '941 patent is essential to

22   practicing Specification 25.322 of UMTS, which was developed by 3GPP Working Group 2.

23   (*Id.* Ex. 26.)

24       Only five days after Samsung filed its patent application, on May 9, 2005, Samsung

25   presented two related proposals at a Working Group 2 meeting; these proposals included the use

26   of a "pre-defined length indicator."  (*Id.* Ex. 27, p. 39.)  The working group discussed and agreed

27   to the Samsung proposal, subject to confirmation via email after the meeting.  (*Id.*)  Named '941

28   inventors Gert-Jan van Lieshout and Himke van der Velde attended that meeting.  (*Id.* Ex. 28, p.

APPLE INC.'S NOTICE OF MOTION
AND MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 11-cv-01846 (LHK))

3.)  Following that meeting, Samsung circulated the proposal for email agreement, and Samsung's proposal was approved.  (*Id.* Ex. 27, p. 39.)  3GPP approved the next version of the Specification 25.322 at a meeting held in June 2005.  (*Id.* Exs. 9, 29.)

Samsung did not disclose its IPR until ***over two years later***, in August, 2007.  (*Id.* Ex. 26.)

### 6.  Failure To Timely Disclose The '792 Patent

On December 21, 2001, Samsung filed a Korean patent application.  The asserted '792 patent claims priority to that application and lists Hunkee Kim, Jaeseung Yoon, Yong Suk Moon, Jun Sung Lee, Nohsun Kim, and Ginkyu Choi as inventors.  (*Id.* Ex. 30.)  Samsung alleges that the '792 patent is essential to practicing Specification 25.212 of UMTS developed by Working Group 1.  (*Id.* Ex. 31.)

In April 2001, Samsung made a proposal to 3GPP related to "symbol mapping."  (*Id.* Ex. 32.)  Named '792 inventor Hunkee Kim presented and advocated for that proposal at a working group meeting, which was also attended by two other Samsung named inventors (Mr. Choi and Mr. Moon).  (*Id.* Ex. 33, pp. 11, 15, 22.)  During the Twenty-Fourth Meeting of Working Group 1 held in Orlando, Florida on February 18-22, 2002, several proposals were consolidated into a final joint proposal by Samsung, Siemens, and Motorola.  (*Id.* Ex. 3, pp. 13, 24; Ex. 35.)  3GPP approved the next version of Specification 25.212 at a meeting held in June 2002.  (*Id.* Exs. 8, 9.)

Samsung did not disclose its IPR until ***over six years later***, on July 24, 2008.  (*Id.* Ex. 31.)

### 7.  Failure To Timely Disclose The '516 Patent

On June 9, 2004 Samsung filed a Korean patent application.  The asserted '516 Patent claims priority to that application and lists Youn-Hyoung Heo, Juho Lee, Joon-Young Cho, Youngbum Kim, and Yong-Jun Kwak as inventors.  (*Id.* Ex. 36.)  Samsung contends that the '516 Patent is essential to practice Specification 25.214 of UMTS developed by Working Group 1.  (*Id.* Ex. 37.)

Two months after the application, named inventor Juho Lee circulated, presented, and advocated for Samsung proposals at a Working Group 1 meeting.  (*Id.* Ex. 34, p. 23; Exs. 38,

39.)  Named inventors Youn Hyoung Heo and Yongjun Kwak also attended the meeting.  (*Id.* Ex. 34, pp. 38, 41.)  Over the course of the next three working group meetings, Samsung submitted additional proposals that Mr. Lee and Ms. Heo presented and advocated.  (*Id.* Ex. 40, p. 29; Ex. 41, p. 13; Ex. 42, pp. 19-20.)  Two other named inventors also attended some of those meetings.  (*Id.* Ex. 40, pp. 37-38; Ex. 41, pp. 35, 38; Ex. 42, pp. 38, 40.)  In May 2005, the working group adopted a proposal jointly offered by Samsung, NEC, Nokia, Panasonic, Philips and Qualcomm.  (*Id.* Ex. 42, pp. 19-20.)  Samsung's Mr. Lee sent the proposal to the reflector several days before the working group meeting and presented the proposal there.  (*Id.* Ex. 42, p. 20; Ex. 43.)  The working group adopted the proposal after the meeting, on May 20, 2005.  (*Id.* Ex. 44.)  3GPP adopted the next version of Specification 25.214 at a 3GPP meeting held in June 2005.  (*Id.* Exs. 9, 45.)

Samsung did not disclose its IPR until ***nearly a year later***, on May 16, 2006.  (*Id.* Ex. 37.)

**B.**     **Samsung's Agreement With Intel**

Samsung has entered into a cross-license agreement with Intel that allows Intel to sell baseband chipsets that embody Samsung patents—in return for consideration to Samsung, including Samsung gaining rights to use Intel patents.[3]  Intel is the supplier of the baseband

---

[3]     Samsung has also entered into a license agreement with another chip supplier, Qualcomm Incorporated.  Qualcomm supplies the baseband chipset used in the iPhone 4S.  That product is not presently accused in this case.  (Today, Samsung moved for leave to supplement its infringement contentions to accuse the iPhone 4S.  Apple will oppose this motion.)  In foreign litigation that Samsung has initiated against the iPhone 4S, the parties have litigated whether the Qualcomm-Samsung agreement bars Samsung's claims against the iPhone 4S.  In denying Samsung applications for preliminary injunctions, two courts—in France and Italy—have already concluded that the Qualcomm agreement likely bars Samsung's declared-essential patent claims in those proceedings.  (*See* Mueller Decl. Ex. 49 (*Samsung Electronics Ltd. v. S.A.R.L. Apple France*, Tribunal de Grande Instance, Paris, RG No. 11/58301, Dec. 8, 2011) at 16 ("the plausibility of the infringement alleged by the Samsung companies is not demonstrated since the Apple companies produce sufficiently serious contestations, with respect to the exhaustion of Samsung's rights in patents EP 269 and EP 516 declared essential"); Ex. 50 (*Samsung Electronics Co. v. Apple Inc.*, Court of Milan, General Record No. 45629-1/2011, Dec. 16, 2011) § 9.6 ("it appears fair to state that Apple is among the so called indirect purchasers of Qualcomm, to which Samsung's commitment to waive the exercise of a legal action must be extended").)  In those decisions, courts recognized the likelihood that they will determine that Samsung has no infringement claims against Apple based on Samsung's prior commitments to a chipset supplier—the very determination that Apple asks the Court to make here.

1    chipsets incorporated in the accused Apple products.  These chipsets contain the functionality

2    that Samsung accuses of infringing its asserted declared-essential patents.  (*Id.* Exs. 56-63.)

3                **1.    Intel Agreement**

4    ████████████████████████████████████████████████████████████

5    ████████████████████████  (*Id.* Ex. 46.)  ██████████████████████████

6    ██████████████████████████████  (*Id.* Ex. 48, p. 10.)

7    ████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████████

10   ████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████████

13   ██████████████████████████████████  (*Id.* Ex. 48 (emphases added).)  ████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████  (*Id.* Ex. 46, section 1.14.)

17         Samsung fought for months to avoid producing this agreement to Apple.  (Mueller Decl.,

18   Ex. 55.)

19                **2.    Intel's Chipset Sales to Apple**

20         In January 2011, Intel purchased Infineon's Wireless Solutions Business, which had been

21   selling to Apple ██████████████████████████  baseband chipsets.  (Hieta Decl. ¶ 4.)

22   These chipsets were and are used in the iPhone 3G, iPhone 3GS, iPhone 4, iPad 3G, and iPad 2

23   3G.  (*Id.* ¶ 3.)  Intel placed the purchased Infineon assets into a wholly-owned Intel subsidiary,

24   Intel Mobile Communications GmbH ("IMC").  (Mueller Ex. 64.)  Since its acquisition of

25   ⁴    The parties have been litigating the effect of the Intel Agreement in ongoing foreign

26   cases, but no foreign court has yet reached the merits of Apple's defenses based on the Intel
      Agreement. █████████████████████████████████████████████████████████

27   █████████████████████████████████████████████████

28

APPLE INC.'S NOTICE OF MOTION
AND MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 11-cv-01846 (LHK))

1    Infineon's Wireless Solutions Business, ███████████████████████████████████

2    █████████████████████████████████████████[5]  (Hieta Decl. ¶ 5.)

3         **C.**     **Samsung's FRAND Commitments For Its Declared-Essential Patents**

4         In addition to ETSI's IPR disclosure requirement, another ETSI policy to prevent patent

5    "hold up" is its provision asking members to license their essential patents on FRAND terms:

6         When an ESSENTIAL IPR relating to a particular STANDARD is brought to the
         attention of ETSI, the Director-General of ETSI shall immediately request the owner to
7         give within three months an undertaking in writing that it is prepared to ***grant irrevocable
         licences on fair, reasonable and non-discriminatory terms and conditions*** under such
8         IPR to at least the following extent:

9         • MANUFACTURE, including the right to make or have made customized components
10         and sub-systems to the licensee's own design for use in MANUFACTURE;

11         • sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;

12         • repair, use, or operate EQUIPMENT; and

13         • use METHODS.

14         The above undertaking may be made subject to the condition that those who seek licences
         agree to reciprocate.
15

16   (Mueller Decl. Ex. 2, Clause 6.1 (emphasis added).)  This provision, like all provisions in the

17   ETSI IPR Policy, "shall be governed by the laws of France."  (*Id.* Ex. 2, Clause 12.)

18         On December 14, 1998, Samsung submitted a declaration to ETSI committing to license

19   on FRAND terms all patents that it would later declare essential to the UMTS standard,

20   including those it asserts here.  (*Id.* Ex. 51.)  Samsung subsequently submitted four declarations

21   to ETSI specifically identifying each of the declared-essential patents asserted in this case.  On

22   September 19, 2003, Samsung submitted a declaration for (among others) the patent applications

23   that became the '410 patent, '604 patent, '001 patent, and '867 patent.  (*Id.* Ex. 5 (IPR

24   Information Statement and Licensing Declaration, Sept. 19, 2003), pp. 3, 12, 15.)  On May 16,

25   ───────────────────
     [5]     Attached as exhibits to the Hieta Declaration are invoices (with certain order information
26   redacted) memorializing sales of ████████████████████████████████████████████.
     Two of the invoices relate to sales of ████████████████ chips, and two relate to sales of ████████████
27   chips.  Those invoices are representative of all sales of ████████████████████ chips to Apple
     since Intel purchased Infineon's Wireless Business Division in January 2011.  (Hieta Decl. ¶ 6.)
28

2006, Samsung submitted a declaration for (among others) the patent application that became the '516 patent.  (*Id.* Ex. 37 (IPR Information Statement and Licensing Declaration, May 16, 2006) at 9.)  On August 7, 2007, Samsung submitted a declaration for the patent application that became the '941 patent.  (*Id.* Ex. 26 (IPR Information Statement and Licensing Declaration, August 7, 2007) at 4.)  Finally, on July 24, 2008, Samsung submitted a declaration for the '792 patent.  (*Id.* Ex. 31 (IPR Information Statement and Licensing Declaration, July 24, 2008) at 5.)

Each of these four declarations stated Samsung's belief that the declared patents (or patent applications) were essential; committed Samsung to "grant irrevocable licenses" on FRAND terms; and acknowledged that French law governed the declaration:

> The SIGNATORY has notified ETSI that it is the proprietor of the IPRs listed in [attached Annex] and has informed ETSI that it believes that the IPRs may be considered ESSENTIAL to the Standards listed above.
>
> The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared **to grant irrevocable licenses** under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.
>
> . . . .
>
> The construction, validity and performance of this DECLARATION shall be governed by the laws of France.

(*Id.* Exs. 5, 26, 31, 37 (emphasis added).)

## III.    ARGUMENT

For three sets of issues—(A) Samsung's untimely disclosure of its declared-essential patents, (B) Apple's defenses based on the Intel Agreement, and (C) the unavailability of injunctive relief for Samsung's declared-essential patents—no genuine issue of material fact exists and Apple is entitled to summary judgment.  For each, the record demonstrates that Samsung broke an earlier promise; and for each, this breach carries clear legal consequences.

### A.    <u>Samsung's Failure To Timely Disclose Declared-Essential Patents Requires A Finding Of Breach And Unenforceability As To Those Patents</u>

For each of its asserted declared-essential patents, the indisputable facts show that Samsung waived its right to assert the patents against UMTS standard implementers like Apple,

by failing to timely disclose them.  In each case, Samsung filed patent applications and then proceeded to attend the meetings at which the working groups evaluated technical proposals that Samsung now claims are covered by its patents—in all but one case actively advocating for its own proposals, and in the other case attending the presentation of a technical proposal that Samsung later claimed its patent covered.  Yet Samsung chose to stand silent while the working groups considered those proposals and 3GPP adopted them.  Samsung did not disclose its IPR until **_after_** the standard was frozen, in flagrant disregard of its disclosure obligations.

The remedy for such a breach of disclosure requirements is the unenforceability of the patents against standard implementers, as the Federal Circuit has held.  *See Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1026 (Fed. Cir. 2008) ("[W]e conclude that a district court may in appropriate circumstances ***order patents unenforceable as a result of silence in the face of an SSO disclosure duty*** . . . ." (emphasis added)); *see also Openwave Systems, Inc. v. 724 Solutions (US) Inc.*, No. C 09-3511 RS, 2010 WL 890249, at *2 (N.D. Cal. Mar. 8, 2010) ("Qualcom [sic] makes clear that under some circumstances breach of a duty to disclose to an SSO can render patents unenforceable under the doctrines of waiver or estoppel.").  Indeed, in 2006, Samsung itself joined an amicus brief stating, "when a patent owner subverts an SSO and misuses patent rights to hold-up a standard, ***the appropriate remedy is to bar the patent owner from enforcing its patent rights against the affected standard***."  (Mueller Decl. Ex. 65 (Brief of Amici Curiae Nvidia Corp., Micron Tech. Inc., Samsung Elecs. Corp., and Hynix Semiconductor, Inc. on the Issue of the Appropriate Remedy for Rambus's Violations of the FTC Act at 4, *In the Matter of Rambus, Inc.*, No. 9302 (Federal Trade Commission Sept. 15, 2006 (emphasis added)).)  Samsung must now face these same consequences for its breaches of ETSI's nondisclosure rules.

### 1.    Under ETSI's Rules, Samsung Was Obligated To Disclose Its IPR Before 3GPP Adopted Its Proposals

It is undisputed that as a participant in 3GPP and a member of ETSI, Samsung was bound

by the ETSI IPR Policy,[6] including Clause 4.1 defining the disclosure obligation:

> Each MEMBER shall use its reasonable endeavors to **timely inform** ETSI of ESSENTIAL IPRs[7] it becomes aware of.  In particular, a MEMBER submitting a technical proposal for a STANDARD shall, on a bona fide basis, **draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted**.

(Mueller Decl. Ex. 2 (emphases added).)  The language of the Policy is mandatory:  It requires that each member "shall" disclose essential IPR of which it is aware.  In addition, the Policy places a more specific obligation on those members, like Samsung, that make technical proposals: "In particular, a MEMBER submitting a technical proposal for a STANDARD shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which **might** be ESSENTIAL if that proposal is adopted."  (*Id.* (emphasis added).)  Thus, Samsung was required to disclose any of its IPR that even **might** be essential if its proposals were adopted, and it was required to do so **before** the standard was adopted.

In *Qualcomm*, the Federal Circuit held that less stringent language created a binding disclosure obligation.  *See Qualcomm*, 548 F.3d at 1012–15.  *Qualcomm* dealt with the IPR policy of the Joint Video Team ("JVT") SSO.  *Id.* at 1011–12.  The JVT IPR policy stated that "members/experts are **encouraged** to disclose as soon as possible IPR information (of their own or anyone else's) associated with any standardization proposal (of their own or anyone else's). Such information should be provided on a best effort basis."  *Id.* at 1012 n.2 (emphasis added).  Even without mandatory language—like that in the ETSI IPR Policy—the court concluded that "Qualcomm, as a participant in the JVT prior to the release of the H.264 standard, did have IPR disclosure obligations . . . , under the written polic[y] of . . . the JVT."  *Id.* at 1015.  Given the

---

[6]     The substance of the ETSI IPR Policy has not changed over the years, but there have been minor adjustments to the language.  Because Samsung's relevant activity began in 1999, for purposes of this summary judgment motion, Apple relies on and will use the language of the 1997 ETSI IPR Policy, which remained in effect and unchanged from 1997 through November 2005.  The IPR Policy quoted in Apple's Amended Counterclaims is from the ETSI IPR Policy adopted in November 2008 and in effect today.

[7]     Clause 15.7 of the ETSI IPR Policy defines IPR to include patents and patent applications.  (Mueller Decl. Ex. 2.)

more stringent language in the ETSI IPR Policy, this logic applies with even more force here.

### 2.    Samsung Breached Its Disclosure Obligations

It is indisputable that Samsung breached its disclosure obligations with respect to each of the asserted declared-essential patents.  As recited in Section II above, for each patent, Samsung filed a patent application; proceeded to participate in the standards working group's evaluation of technology that Samsung now claims is covered by its patents—in all but one case proposing (or jointly proposing) the technology that 3GPP adopted; and finally, only long after the standard was finalized, Samsung disclosed its IPR.

The chart below shows exactly how Samsung failed to meet its disclosure obligations. For each patent it shows: (1) the relevant priority date of the earliest related application, (2) the date Samsung (or another company) submitted a proposal related to technology that Samsung now claims its patents cover, (3) the date that proposal (in some cases, as modified) was frozen into the standard, and (4) the date on which Samsung first disclosed its IPR:

| Patent | Priority Date | First Samsung Proposal | Freeze Date | Disclosure Date |
|--------|---------------|------------------------|-------------|-----------------|
| '001 | 6/25/1999 | 7/9/1999 | 10/1999 | **9/19/2003** |
| '867 | 7/7/1999 | 7/8/1999 | 10/1999 | **9/19/2003** |
| '410 | 7/8/1999 | 7/10/1999 | 10/1999 | **9/19/2003** |
| '604 | 3/31/1998 | 8/30/1999 (Ericsson) | 10/1999 | **9/19/2003** |
| '941 | 5/4/2005 | 5/9/2005 | 6/2005 | **8/7/2007** |
| '792 | 12/21/2001 | 4/2001 | 6/2002 | **7/24/2008** |
| '516 | 6/9/2004 | 8/12/2004 | 6/2005 | **5/16/2006** |

Samsung had ample opportunity to timely disclose its IPR, yet chose not do so, breaching its commitments to ETSI.  The consequence is unenforceability of the untimely-disclosed patents.

### B.    Intel's Chipset Sales to Apple Have Exhausted Samsung's Declared-Essential Patents As Applied to The Intel Chipsets In Apple Products

Samsung's agreement with Intel provides a second insuperable obstacle to Samsung

1    enforcing its declared-essential claims.  The Supreme Court has held that "[t]he longstanding

2    doctrine of patent exhaustion provides that the initial *authorized sale* of a patented item

3    terminates all patent rights to that item."  *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S.

4    617, 625 (2008) (emphasis added).  "[T]he fundamental purpose of patent exhaustion [is] to

5    prohibit *post-sale* restrictions on the use of a patented article."  *Tessera, Inc. v. Int'l Trade*

6    *Comm'n*, 646 F.3d 1357, 1370 (Fed. Cir. 2011) (emphasis added) (citing and quoting *Bloomer v.*

7    *McQuewan*, 55 U.S. (14 How.) 539, 549 (1852)) ( "[W]hen the machine passes to the hands of

8    the purchaser, it is no longer within the limits of the [patent] monopoly.").  The doctrine's

9    protection against post-authorized-sale infringement claims is deeply entrenched in the law, with

10   multiple Supreme Court decisions dating back to the 1800s.  *See, e.g., Keeler v. Standard*

11   *Folding-Bed Co.*, 157 U.S. 659, 666 (1895) ("Upon the doctrine of these cases, we think it

12   follows that one who buys patented articles of manufacture from one authorized to sell them

13   becomes possessed of an absolute property in such articles, unrestricted in time or place.");

14   *Adams v. Burke,* 84 U.S. (17 Wall.) 453, 456 (1873) ("[I]n the essential nature of things, when

15   the patentee, or the person having his rights, sells a machine or instrument whose sole value is in

16   its use, he receives the consideration for its use and he parts with the right to restrict that use.").

17          Here, Intel made chipset sales to Apple—███████████  ████████████

18   ███████—with Samsung's explicit authorization.  ████████████████

19   ████████████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ███████████████████████.[8]  (Muller Decl. Ex. 48 (emphasis added).)  The

22   language could not be clearer, and the legal implications are equally clear:  because Samsung

23   authorized the Intel chipset sales, the sales "terminate[] all patent rights to th[ose] item[s]."

24   *Quanta*, 553 U.S. at 625.  Samsung received valuable cross-license rights from Intel as part of

25   the bargain it struck with Intel, and Samsung thus "receive[d] the consideration for its [patents']

26   ─────────────────────

     [8] █████████████████████████████████████████████████████

27   ████████████████████████████████████████

     (Mueller Decl. Ex. 46)

28

1   use" and "part[ed] with the right to restrict that use." *Adams*, 84 U.S. at 456.  It cannot now seek

2   further compensation from Apple by asserting patent rights that have been exhausted with

3   respect to the Intel chipsets.  *See, e.g., id.*  Nor should this come as any surprise to Samsung: the

4   doctrine of patent exhaustion long predates Samsung's agreement with Intel, and Samsung

5   licensed its patent rights against this well-established legal backdrop.

6        Patent exhaustion thus requires judgment in Apple's favor on Samsung's claims of

7   infringement of its asserted declared-essential patents—i.e., the '516, '941, '867, '792, '001,

8   '410, and '604 patents—as applied to the iPhone 3G, iPhone 3GS, iPhone 4, iPad 3G, and iPad 2

9   3G products containing an Intel baseband processor chipset.[9]  For those products, Samsung's

10  infringement claims are based on Apple's use of the Intel chipsets—and because Samsung has

11  exhausted its rights as against those chipsets, these infringement claims must fail.

12     **C.     In Any Event, Samsung Could Never Be Entitled to Injunctive Relief On Its
           Declared-Essential Patents**

13

14       Even if Samsung could overcome its breach of the ETSI disclosure requirements and the

15  Intel Agreement—and it cannot—Samsung would face yet another legal problem:  it could never

16  be entitled to injunctive relief on these patents.  By making its FRAND declarations, Samsung

17  committed to the world that any company could practice these patents in return for FRAND

18  royalties.[10]  That necessarily means Samsung could not be irreparably harmed by others

19  _____

20  [9]     As for sales of accused products not containing an Intel chip, at most Samsung would be
    entitled to historical damages (which Apple disputes).  Since Intel acquired Infineon's Wireless

21  Solutions Business in January 2011, Apple has purchased UMTS baseband chipsets for
    incorporation in the iPhone 3G, iPhone 3GS, iPhone 4 (UMTS version), iPad 3G, and iPad 2 3G

22  (UMTS version) exclusively from Intel.  Accordingly, granting Apple's motion for summary
    judgment will both terminate any liability for the declared-essential patents as applied to those

23  products containing an Intel UMTS baseband processor chipset and remove any possibility of an
    injunction against those products.

24  [10]    Apple disputes that Samsung has ever been willing to license on truly FRAND terms, and

25  contends that Samsung instead has sought exorbitant royalties and other license terms that far
    exceed FRAND, but the Court need not reach that issue now.  For present purposes, the key is

26  that Samsung made a binding commitment that any and all interested parties could practice its
    declared-essential patents, and that Samsung acknowledged that it would be adequately

27  compensated by monetary payments in return.

28

practicing the patents, and that money (i.e., FRAND royalties) would adequately compensate Samsung for any infringement.  Moreover, as a matter of French law—which governs the ETSI policy and the FRAND commitments made thereunder—Apple is presently licensed to Samsung's FRAND-committed patents, even if the parties have not agreed on FRAND royalties.

      **1.**       **By Agreeing Freely to License Its Declared Essential Patents, Samsung Established That Injunctive Relief Is Not Appropriate for Those Patents**

      Samsung's FRAND commitment means that an injunction for its declared-essential patents could never be appropriate as a matter of law.  The four-part equitable test for injunctions is:  (1) whether the plaintiff has suffered an irreparable injury; (2) whether money damages are inadequate to compensate for that injury; (3) whether the balance of hardships between the parties warrants equitable relief; and (4) whether the public interest would not be disserved by injunctive relief.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Where the record weighs heavily against the patentee on the first two factors (irreparable injury and inadequacy of money damages), those factors are sufficient to defeat injunctive relief.  *See, e.g.*, *Praxair, Inc., v. ATMI, Inc.*, 479 F. Supp. 2d 440, 443 (D. Del. 2007) ("Under *eBay*, a plaintiff must prove that it is entitled to its statutory right to exclude by demonstrating, *inter alia*, irreparable injury and the inadequacy of legal remedies."); *Voda v. Cordis Corp.*, No. CIV-03-1512-L, 2006 WL 2570614, at *5 (W.D. Okla. Sept. 5, 2006) ("As plaintiff has failed to demonstrate either irreparable injury or that monetary damages are inadequate, the court denies his request for a permanent injunction."), *aff'd* 536 F.3d 1311 (Fed. Cir. 2008).

      *First*, having promised that ***any*** company implementing the UMTS standard can use the Samsung declared-essential patents, Samsung cannot be heard to claim that it would be irreparably harmed by Apple practicing those patents.  ETSI has almost 700 members, located across the world.  These include all the major mobile handset manufacturers—including Samsung's direct competitors.  When Samsung committed that any party wishing to practice the UMTS standard may practice its patents to do so, Samsung necessarily acknowledged that it would not suffer irreparable harm if Apple—or any other company—did so.  As Judge Whyte of

APPLE INC.'S NOTICE OF MOTION
AND MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 11-cv-01846 (LHK))

1   the Northern District held in denying an injunction sought by Rambus Inc.: "Rambus's ***own***

2   ***licensing practices show that it enabled the competition it now seeks to limit.***  It has marketed

3   and licensed JEDEC-standard DRAMs and its own proprietary technology since it first claimed

4   coverage of JEDEC-standard DRAMs."  *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp.

5   2d 951, 986 (N.D. Cal. 2009) (emphasis added).  So too here.

6       ***Second***, in return Samsung asked for FRAND royalties—i.e., money.  Thus, this is the

7   paradigmatic situation where money is adequate compensation.  Samsung itself recognized this

8   in 2007 in a case against Ericsson, stating, "The Claimant, ***having committed itself to licensing***

9   ***the Patents upon fair, reasonable and non-discriminatory terms, has accepted that it can be***

10  ***compensated in monetary terms for any use of the Patents***."  (Mueller Decl. Ex. 53,

11  *Telefonaktiebolaget LM Ericsson v Samsung Electronics UK Ltd.*, HC06 C00618 (High Court of

12  Justice, Chancery Division, Patents) ¶¶ 108-109 (emphasis added).)  Because money is adequate

13  compensation, injunctive relief is unavailable.  As Judge Whyte found in *Rambus*, "[t]his

14  historical practice [of licensing] suggests that Rambus is primarily concerned with monetary

15  compensation for use of its patented technology, whether in its proprietary architectures or

16  otherwise."  *Hynix*, 609 F. Supp. 2d at 986.

17      ***Third***, the special nature of the FRAND licensing commitment underscores that

18  injunctive relief could never be appropriate here.  The purpose of the ETSI FRAND policy is to

19  prevent holders of standard-essential patents from exploiting the standardization process to

20  "hold up" standards implementers or make their IPR unavailable altogether.  *See*, *e.g.*, *Broadcom*

21  *Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 313 (3d Cir. 2007) ("To guard against anticompetitive

22  patent hold-up, most SDOs require firms supplying essential technologies for inclusion in a

23  prospective standard to commit to licensing their technologies on FRAND terms."); (Mueller

24  Decl. Ex. 2, Clause 3.1 (describing the purpose of the ETSI IPR Policy as preventing IPR from

25  becoming "unavailable").  But injunctive relief enables the patent holder to do just that.  If the

26  patent holder could obtain an injunction against an implementer, it would be able to either hold

27  up the implementer for exorbitant royalties or keep the implementer from practicing the standard

28  entirely—and either would be antithetical to the fundamental objectives of the FRAND policy.

APPLE INC.'S NOTICE OF MOTION
AND MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 11-cv-01846 (LHK))

*See Hynix*, 609 F. Supp. 2d at 966-68 (describing examples of hold up problem that "nicely illustrate the general principle that the court in equity should be mindful that an injunction can impose disproportionate costs on the infringer and the general public with no commensurate gain to the patentee").  This is even more hostile to the FRAND policy—and to competition and consumers—where, like here, the patentee's target is an innovative competitor whose products have broken new ground technically and commercially; enjoining such products using declared-essential products is precisely the opposite of the purpose of the FRAND policy.

### 2.  Under French Law, Apple Is Currently Licensed To Samsung's Declared-Essential Patents

Based on Samsung's FRAND declarations, Apple has a present license to Samsung's declared-essential patents under governing French law.  As Samsung has acknowledged, "it is appropriate for the Court to resolve disputes under French law at this stage."[11]  Samsung's Reply Memorandum in Support of Samsung's Motion to Dismiss Apple Counterclaims at 7, *Apple Inc. v. Samsung Elecs Co.*, No. 11-cv-01846-LHK (N.D. Cal. Jan. 9, 2012).  French law applies to the determination whether Apple is presently licensed because both the ETSI IPR Policy and Samsung's declarations for the declared-essential patents are governed by French law.  (*See* Mueller Decl. Exs. 5, 26, 31, 37 at 1 ("The construction, validity and performance of this DECLARATION shall be governed by the laws of France.") and Ex. 2, Clause 12 ("The POLICY shall be governed by the laws of France.").)  California has a "strong policy favoring enforcement" of choice-of-law provisions and will do so where "there is any . . . reasonable basis for the parties' choice of law" and the chosen state's law is not contrary to a fundamental policy

---

[11]    Determination of the scope of French law is a question of law.  *See* Fed. R. Civ. P 44.1 ("The court's determination [of foreign law] must be treated as a ruling on a question of law."); *Guardian Indus. Corp. v. United States*, 477 F.3d 1368, 1371 (Fed. Cir. 2007) ("The determination of foreign law is a question of law which we review *de novo*."); *Pazcoguin v. Radcliffe*, 292 F.3d 1209, 1216 (9th Cir. 2002) ("The determination of foreign law is a question of law."); *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992) ("Questions of foreign law, like all questions of law, are reviewed *de novo*.").

1    of California.[12]  *Nedlloyd Lines B.V. v. Superior Court of San Mateo County*, 3 Cal. 4th 459,

2    464-66 (Cal. 1992).  Here, the choice of French law to govern declarations made to ETSI, a

3    French organization, and contracts between ETSI and its members is plainly reasonable.[13]

4           A member that submits a FRAND declaration to ETSI pursuant to Clause 6.1 of the IPR

5    Policy, as Samsung did for the Declared-Essential Patents, irrevocably commits to grant a license

6    to the IPR identified in the declaration to any party that implements the standard.  (Mueller

7    Decl., Ex. 54, Molfessis Decl. ¶¶ 63-64.)  Under French law, such a commitment is contractually

8    binding on the maker as a "continuing offer" (or *offre permanente*) that remains open for

9    acceptance by those to whom the offer is made.  (Molfessis Decl. ¶ 65.)[14]  As Professor

10   Molfessis of the University of Paris explained in his Declaration in support of Apple's opposition

11   to Samsung's motion to dismiss, the validity of such contracts is well established under French

12   law, with the classical example the continuing offer made by a bus service that is accepted by a

13   rider boarding a bus.  (*See* Molfessis Decl. ¶ 65 (citing Nancy, 1er mars 1950, JCP, 1950, II,

14   5892, note J. Hémard; M. Fabre-Magan, Droit des obligations, 1 – Contrat et engagement

15   unilateral, Thémis, 2ème éd., p. 263).)

16          As a matter of French law, an implementer of the UMTS standard accepts a license when

17   it begins to implement the standard.  (Molfessis Decl. ¶¶ 65, 72, 75.)  To establish a valid patent

18   license on acceptance under French law, only the "object" of the license—*i.e.*, the patents to be

19   licensed—must be identified.  (Molfessis Decl. ¶ 26.)  By specifying the patents in the ETSI

20   _____

21   [12]    Further, "a valid choice-of-law clause, which provides that a specified body of law
     'governs' the 'agreement' between the parties, encompasses all causes of action arising from or

22   related to that agreement, regardless of how they are characterized . . . ."  *Nedlloyd Lines B.V. v.
     Superior Court of San Mateo County*, 3 Cal. 4th 459, 470 (Cal. 1992).

23   [13]    Samsung has itself previously acknowledged that the "ETSI rules, including the ETSI
     IPR Policy, take effect as a multilateral agreement between its members, governed by French

24   law."  (Mueller Decl. Ex. 53 (Samsung's Re-Amended Defence and Counterclaim of March 15,
     2007, *Telefonaktiebolaget LM Ericsson v. Samsung Electronics UK Ltd.*, HC-06 C00618 (High

25   Court of Justice, Chancery Division, Patents Court)) ¶ 63R.)

26   [14]    A FRAND declaration made pursuant to Clause 6.1 is also contractually binding under
     Article 1121 of the French Civil code as a *stipulation pour autri* creating third-party beneficiary

27   rights for implementers of the standard through the contract formed between the declarant and

28   ETSI.  (Molfessis Decl. ¶¶ 66-71.)

declarations pursuant to Clause 6.1, both the duration of the license and the geographic scope are established.  The duration is the length of the patent terms (given that the grant is "irrevocable") unless a patent ceases being essential before expiration.  (Molfessis Decl. ¶ 100; Mueller Decl., Exs. 5, 26, 31, 37 at 1 (IPR declarations).)  The geographic scope is the geographic scope of the patent itself.  (Molfessis Decl. ¶ 100.)

A license is consummated by an implementer whether or not the parties have agreed on certain terms, such as royalty.  French law recognizes that, as a general rule, a valid contract can be formed without price or royalty being determined.  Four 1995 rulings of France's highest court (the *Cour de cassation*) confirmed this rule and explained that price is only essential where there are "specific legal provisions" requiring it.  (Molfessis Decl. ¶¶ 27-28 (citing As. Plen., 1er décembre 1995, D. 1996, concl. Jéol, note L. Aynès; JCP 1996, II, 22565, concl. Jéol, note J. Ghestin).)  There is no legal requirement that patent licenses must include price (or royalty) for formation.  (Molfessis Decl. ¶¶ 25, 27-31.)  Indeed, Samsung's own French law expert in prior litigation, Professor Xavier Boucobza of the University of Paris XI, agreed that the four 1995 decisions of the *Cour de cassation* established that price is not a necessary element to form a valid license contract:

> The license contract -- I mean, ***the contract is concluded independently of the fixing of the price.***  And this, according to the decisions of the Supreme Court of the 1st of December 1995 . . . .
>
> In other words, ***the price is not a necessity in order to conclude a valid contract license. The license already exists, was concluded before the price is determined.***

(Mueller Decl., Ex. 52 (Hearing Transcript, *In the Matter of Certain 3G Wideband Code Division Multiple Access Mobile Handsets and Components Thereof*, Inv. No. 337-TA-601 (ITC July 11, 2008)) at 1718 (emphases added).)[15]

Moreover, a 2009 decision by a French court of appeal, relying on the 1995 decisions of

---

[15]    As explained in Apple's Memorandum of Points and Authorities in Opposition to Samsung's Motion to Dismiss Apple's Counterclaims (D.I. 520), at 17-19, there is no merit to Samsung's contentions that a valid license was not formed because of either the writing requirement of Art. 613-8 of the French Intellectual Property Code or the doctrine of *intuitus personae*, neither of which is applicable here.

the *Court de cassation*, confirmed just that.  The court held that a patent license contract was validly formed where it provided that the parties would later agree on a royalty depending on sales volume because "[a]bsence of the determination of the price does not void the contract." (Molfessis Decl. ¶ 30 (quoting Lyon, 5 févr. 2009, D. 2010, p. 467, note J. Raynard).)  We are aware of no French authority to the contrary.

Indeed, if the ETSI IPR Policy is to achieve its purpose of widespread adoption of standards and avoidance of the risk of IPR "being unavailable" (Mueller Decl. Ex. 2, Clause 3.1), it necessarily means that manufacturers must be able to implement the standard without first negotiating licenses with each holder of declared-essential IPR.  If implementers had to negotiate with every declared-essential patent holder before introducing new products, it could take years for new products to come to market.  Given the purpose of the ETSI IPR Policy to "seek[] a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs" (*id.*, Ex. 2 Clause 3.1), it makes perfect sense that implementers are licensed on implementation, with the appropriate royalty to be determined later through negotiations or, if necessary, by a court.[16]  Such a system encourages widespread implementation while also ensuring that IPR owners are compensated with FRAND royalties.

Finally, even if Apple did not already have a license to practice Samsung's declared-essential patent—though it does—when Samsung committed to license UMTS implementers on FRAND terms, Samsung waived any right to seek an injunction as a matter of French law. Through that commitment, Samsung at the very least obligated itself to negotiate a FRAND license in good faith, and seeking an injunction to keep a UMTS implementer from practicing declared-essential patents is inconsistent with that obligation.  (Molfessis Decl. ¶¶ 84-88.)

\* \* \*

For all these reasons, Samsung's FRAND commitments mean that Samsung cannot now seek an injunction on its allegedly standard-essential patents.  Holding Samsung to the

---

[16]     This could be done, for example, through a **contract** claim seeking payment of past FRAND royalties.  Samsung has never brought such a claim, instead suing for patent infringement and seeking an injunction.

consequences of its FRAND commitments is especially appropriate given that Samsung sat silent

for years while Apple invested billions of dollars in developing the iPhone and iPad and paid

Samsung billions for key components used in those products.  For Samsung now to claim it

needs an injunction against Apple's products—products for which Samsung supplies

components to this day—defies both Samsung's own prior promises and common sense.

## IV.   CONCLUSION

For the reasons set forth above, Apple respectfully requests judgment on its defenses and

counterclaims listed *supra* in note 1 and in the proposed Order submitted herewith.

Dated:  January 25, 2012

/s/ Mark D. Selwyn
Mark D. Selwyn (SBN 244180)
(mark.selwyn@wilmerhale.com)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

William F. Lee (admitted *pro hac vice*)
(william.lee@wilmerhale.com)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, Massachusetts  02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Harold J. McElhinny (SBN 66781)
(HMcElhinny@mofo.com)
Michael A. Jacobs (SBN 111664)
(MJacobs@mofo.com)
Richard S.J. Hung (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105
Telephone: ( 415) 268-7000
Facsimile:  (415) 268-7522

*Attorneys for Apple Inc.*

APPLE INC.'S NOTICE OF MOTION
AND MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 11-cv-01846 (LHK))

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on January 25, 2012 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.  Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

/s/ Mark. D Selwyn
Mark D. Selwyn

APPLE INC.'S NOTICE OF MOTION
AND MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 11-cv-01846 (LHK))