# Mueller Exhibit 50

**General Record No. 59734/2011**



**SPECIAL INDUSTRIAL AND INTELLECTUAL PROPERTY DIVISION**

In the civil action entered under **General Record No. 59734/2011** filed by:

**SAMSUNG ELECTRONICS CO. LTD and SAMSUNG ELECTRONICS ITALIA S.P.A.,** in the person of their current legal representatives, assisted by Prof. ADRIANO VANZETTI, Esq., as well as the attorneys GIULIO ENRICO SIRONI, Esq. and ANNA COLMANO, VIA DAVERIO, 6 - 20122 MILAN, electively domiciled at the law offices of said attorneys, pursuant to a power of attorney on file,

PLAINTIFFS

versus

**APPLE INC**, **APPLE ITALIA S.R.L., APPLE RETAIL ITALIA S.R.L., APPLE SALES INTERNATIONAL,** in the person of their current legal representatives, assisted by Prof. GIUSEPPE SENA, Esq. and by the attorneys PAOLA TARCHINI, Esq. and BARBARA LA TELLA, Esq. all corporations electively domiciled at CORSO VENEZIA, 2 -20121 MILAN, in care of the law offices of Attorneys Sena and Tarchini, pursuant to a power of attorney on file,

DEFENDANTS

The Judge MARINA ANNA TAVASSI,

canceling the reserves issued at the hearing of December 16, 2011,

issued the following

**ORDER**

Having examined the records and documents of the proceeding, having heard the oral discussions of the parties' defense attorneys at the hearings of October 26 and December 16, 2011, canceling the reserve issued at the hearing of December 16, 2011, the presiding judge's deputy notes the following:

**1.     Preliminary de facto statements – The plaintiffs' theses**

**1.1**     This proceeding was filed with a provisional petition *pretrial* by Samsung Electronics Co. Ltd and Samsung Electronics Italia S.p.A. against Apple Inc., Apple Italia S.r.l., Apple Retail Italia S.r.l. and Apple Sales International. The proceeding was coupled with a lower court judgment (General Record No. 45629/2011) underway among the same parties for infringement of patents owned by Samsung and charges of unfair competition di within the scope of which Samsung filed an additional application for interim relief (General Record No. 45629-1/2011).

**1.2.**     Said proceedings involve the same parties, are based on patents covering portions of the same telecommunication standard (the so-called 3G/UMTS standard) and have as their subject the same Apple product, that is, the new Smartphone model, called iPhone 4S, as well as this pretrial proceeding, another Apple product called *tablet computer.*

The plaintiffs (hereinafter, also the "Samsung Group" or "Samsung") stated to be world leaders in the production of electronic devices and in the development of cutting edge technologies, so that over time they assumed the ownership of a huge patent portfolio.

Subject of the petition in question is in particular European patent EP1188269 (hereinafter also "EP' 269"), granted on October 13, 2004, upon an application filed on July 6, 2000, claiming a Korean priority of July 6, 1999, validated in Italy on January 11, 2005, pertaining to telecommunication systems on mobile telephony networks.

**1.3**     It is opportune to frame the context of the patent upheld in this proceeding by Samsung, in order to better understand the observations and grievances formulated by the parties.

The reference market for the products in question (and/or that implement the devices) and the relevant technologies in the case in point are characterized by the joint presence of numerous manufacturers and diverse electronic devices. Such a market requires the creation of the so-called shared standards (that is, collections of technical specifications) in order to create an effective communication systems on mobile telephony networks. The suppliers of network infrastructures make available tools that allow communication on the basis of said standard regulations.

In Europe, the definition of communication standards is entrusted to ETSI -*European Telecommunications Standards Institute.*

To date, the architecture, that is, the whole of the infrastructures that comprise a telecommunication system is the 3G (Third Generation) standard, which allows not only to make telephone calls between users, but also to exchange files, e-mails and streaming of multimedia contents (*e.g.* videos, TV channels, etc.).

In Europe, the networks that follow the 3G standard are called UMTS, *Universal Mobile Telecommunications System.*

As for 3G networks, and in particular UMTS systems, definition of the technical specifications of the standard is carried out by the 3GPP *(Third Generation Partnership Project)* Group, an association of various agencies, which include ETSI, that deal with the standardization of communication systems in various parts of the world and that cooperate for the purpose of defining technical specifications applicable worldwide.

As mentioned above, such third generation networks ensure transmission of various types of information, each with specific performance requirements (the so-called "QoS - *quality of service"),* in particular with reference to acceptable error rates and the various quality tolerability thresholds. These errors, on the other hand, cannot be eliminated, as many causes come into play that cannot be weighted in advance (*i.e.* atmospheric perturbations, physical obstacles, interference with other signals, etc.). For this reason there are various appropriate channels for transmission of every type of information (*i.e.* voice, video) called "Transport Channels" (TrCH). For each transport channel there is a system for reducing the incidence of these causes of error: this system is called "channel coding," so that the real information to be transmitted is opportunely codified, in the sense that typically a redundant piece of information is added to it (that is additional information generated and specifically added to the "real" information by the channel coding system), so that the error is distributed between the real information and the redundant information, consequently weighing less on the real information. In addition to protecting "useful" information from error, channel coding also has the purpose of allowing those who receive it to recognize and correct any errors. The heterogeneousness of the data implies that their transmission can take place at variable temporal frequency or with an equally variable length of data blocks.

Because the recipient of said data must be able to recognize them, said recipient must be informed of the frequency or temporal rate or the length of the block.

For this purpose, it is part of the known technique to require an indicator called TFCI (*Transport Format Combination Indicator*) within the frame of transmitted data. The indicator also performs the function of keeping the receiver informed of date frequency/rate, so that the receiver may recognize what type of data they are. On an operating level, information is transmitted in the form of bits, that is, the numbers "1" and "0" opportunely grouped, according to the binary numeral system used to transmit data between electronic devices.

It is essential for the TFCI to be correctly transmitted and received, because receiving an incorrect TFCI would keep the receiver from correctly reading the frame. It is therefore necessary that reconstruction of the TFCI by the receiver be reliable even under unfavorable transmission conditions, in which bits are transmitted incompletely or incorrectly (a circumstance that tends to occur frequently in the case of the so-called extended TFCI).

Transport channels are then joined into a single data flow, by a procedure technically called "*multiplexing*," to be transmitted over a physical channel, that is, via radio. The possibility of having separate transport channels allows processing the various data on the basis of said performance requirements.

Among the technical specifications (TS) that refer to 3G networks and in particular to UMTS systems, number TS 25.212, v. 3.11.0, prepared by the 3GPP group is particularly important. These specifications essentially pertain to channel encoding used in third generation networks. Version 3.11.0 of September 2002 is binding for UMTS networks, because it belongs to the so-called "Release 99," the first pertaining specifically to UMTS networks, and it is the most recent for this release ("*release*" refers to all standards pertaining to a certain system). It describes how the data to be transmitted for each transport channel is processed before being 'mapped," that is, its "transfer" on a physical channel.

**1.4**     Based on the preliminary statements set forth thus far, the content of the patent which is the subject of this proceeding can therefore be examined. This patent is qualified by the plaintiff Samsung as a so-called standard-essential patent, that is, essential for the standard, in

the sense that it covers parts of said standard that must necessarily be implemented to be able to communicate information in accordance with the 3G/UMTS system.

The problem that patent EP '269 resolves is that of making possible the codification of "extended" TFCI of various lengths (for instance, 10, 12, 14, bits and so on),  improving error correction capability.

Claim 1 of EP '269 translates this concept into the following terms:

"*1.    Device for encoding Transport Format Combination Indicators TFCI for a communication system, comprising:*

*an orthogonal sequences generator  (810) to generate several basic biorthogonal sequences according to a first part of a bit of data;*

*a mask sequences  generator (820) to generate several basic mask sequences according to a second part of a bit of data, and an adder (860) to add basic biorthogonal sequences and basic mask sequences generated by the sequence generator and the mask sequences generator.*"

It is allegedly the introduction of the so-called mask sequences that make the patent innovative and introduces a more favorable technique compared to the known art.

**1.5**    It is evident that there often is a biunivocal relationship between standards and instructions protected by invention patents, given that the former presuppose the adoption and implementation of the best existing technology. This implies that: either it is impossible to adhere to a standard without implementing the instructions in the patent (that covers a certain function of the standard), and in that case we are dealing with "patent essential to the standard" (or *standard-essential*); or it is not technically possible to adhere to the standard without violating a patent: in fact, it is highly probable that, in order to carry out a function required by the standard, the patented technology is used. This occurs, for instance, when the standard defines various possible methods for carrying out a function, compatible with one another, in which the patented variant is moreover the optimal method for carrying out that function.

**1.6**.    The latter allegedly is, according to Samsung's reconstruction, the scenario that took place in the case in point.

The defendants' defense reported that on  October 4, 2011 Tim Cook (Apple) had presented the new iPhone 4S, also available for sale in Italy from October 28, 2011.

Although without examining the product, already on the basis of the technical specifications divulged on the occasion of its launch on the market, Samsung deemed it possible to maintain that the iPhone 4S constitutes an infringement of its patent EP '269, enforced herein. In fact the WCDMA/HSPA or HSPA+ standards according to which the iPhone 4S operates, as well as the LTE standard, are standards that belong in the UMTS family(and in particular in *release* 99).

**1.7**.    In view of these considerations, Samsung identified the presumption of sufficient legal basis for itself and the danger in delay in Apple's conduct; it therefore petitioned this Special Division to avert the risk that the launch on the market of the new iPhone 4S by Apple could cause it irreparable damage, also considering the rapid obsolescence of high technology products. In particular Samsung asked:

1)    to forbid Apple from manufacturing, importing, offering for sale, marketing and publicizing the iPhone 4S smartphones, and in general any activity pertaining to the products in question;

2)    to order Apple to withdraw from the market the products set forth in point 1);

3)    to order the seizure of the products set forth in point 1) found at the offices, warehouses and Apple local units as well as at third parties' that market them, authorizing a representative for the Samsung companies and their defense attorneys and expert witnesses to assist in seizure operations;

4)    to order the seizure or, as an alternative, the description of accounting records pertaining to Apple's activities in Italy in order to be able to identify the total volume of manufacturing and/or importing and sales of iPhone 4S smartphones, as well as identifying entities involved in the offense; authorizing a representative for the Samsung companies and their defense attorneys and the party's expert accounting witnesses to assist in seizure or description operations, and appointing an expert accountant to assist the Bailiff, with express authorization to make a copy of the seized or described documents;

5)    Set a penalty of EUR 20,000, or another amount deemed fair, owed by Apple for every day of delay in complying with the measure to be issued and for every unit of product manufactured, imported or sold in violation of said measure, and more generally for any violation of the measure, observed after its filing;

6)      to order the publication of the measure to be issued;

7)      to order Apple to publish on their websites the measure to be issued, giving opportune emphasis to the measure in question on the home pag*e* of said sites;

8)      to order Apple to refund the Samsung companies for expenses, fees and attorneys' fees for this proceeding and any other expenses that may be necessary in the future.

## 2.      The Apple companies' entry of appearance

**2.1**      Entering their appearance in the proceeding with a brief filed on October 20, 2011, the defendant companies' defense developed arguments in response to the plaintiffs' implications and requested denial of any claims proposed against said companies, proposing as objections a series of arguments involving the validity (alleged non validity on Apple's part) of the Samsung patent, its (denied) infringement by the iPhone 4S, in any case the abuse of a dominant position by Samsung for having refused Apple a license at FRAND conditions, the exhaustion of any of Samsung's rights pursuant to the agreement established with Qualcomm. According to Apple this proceeding is, the same as the various proceedings filed in many countries by Samsung, retaliation against Apple following prior legal actions that had this defendant in the role plaintiff (defendant in the first instance proceeding  No. 45629/11, General Record) regarding patents and design owned by Apple, in order to strengthen and/or acquire contractual power (see paragraph 55 of Apple's entry of appearance brief).

**2.2**      As for merit, Apple's defense in turn outlined the context of the dispute, noting that ETSI's policy on intellectual property rights was based on two fundamental requirements: the timely communication to the Institute of essential intellectual property rights and the commitment to grant licenses for said rights based on frand conditions ("*Fair, Reasonable And Non-Discriminatory*"). In some cases, according to Apple, it happened that a larger than necessary number of patents was declared essential to the standard, as Samsung allegedly did on several occasions; in fact, the defendant stated that the qualification of a given patent as essential is made by the owner of the patent, without any verification by ETSI regarding the truthfulness of the claim.

**2.3**       In order to verify the real nature and the purposes of Samsung's conduct in trying to enforce patent EP '269, Apple's defense then proceeded with a summary of the events that preceded the statement by Samsung of patent EP '269 can an essential patent for the use of the UMTS standard.

As supported documentally by Michael Walker's statement (doc. 10, cit, in particular section IV B),within a week from Samsung filing the Korean patent application in relation to which EP '269 claimed priority, the two inventors indicated in  EP '269 had taken part in a meeting where proposals regarding portions of standard of specification TS25.212, for which Samsung had declared the essentiality of the patent. The meeting, during which the relevant standard portion had been discussed, took place in August 1999; at the meeting Samsung had made several proposals and the two inventors had been listed as possible contact for one of said proposal. Apple pointed out that one of those proposals contained a table that appeared to be an exact copy of a portion of the Korean priority document. The meeting in which technical specification TS25.212 version 3.0.0. was finalized took place in  December 1999, but, despite the extremely active involvement of Samsung and of the inventors of the patent in question in determining specification TS 25.212 and the invitation made to the work group to include in the standard the technology now Samsung claimed as protected by EP '269, Samsung on that occasion allegedly conveniently "forgot" to reveal the existence and the allegedly essential nature of EP' '269 until December 2003, that is over four years later. According to Apple it would therefore be clear that by acting this way Samsung, consciously and maliciously had failed to meet the obligations provided by ETSI's IPR Policy and that said conscious and malicious violation had been committed in order to prepare weapons for future enforcement of the (self) declared essential patents, a conduct that could be included in the phenomenon generally known by the term of *"patent ambush."*

**2.4**       Although Samsung had knowingly delayed declaring patent EP '269 essential, in the end it had however made that communication in compliance with clause 6.1 of ETSI IPR Policy, so that it would have been obligated to issue an irrevocable license for EP '269 at fair, reasonable and non discriminatory conditions (see annex JJ to Walker's statement, doc. 10 cit. and a statement by

8

prof. Delebecque, Apple doc. 32 "*a declaration made to ETSI pursuant to article 6.1 of ETSI Policy on intellectual property rights produces legal effects toward another ETSI member or another party interested in implementing the relevant standard. A declaration made to ETSI constitutes an offer of an actual license which is accepted once one party begins to implement the relevant standard and not a simple commitment to begin negotiations for the purposes of a licensing agreement*" and furthermore "*When one party commits to ETSI to grant licenses in accordance with FRAND terms, it waives the right to apply for provisional relief against another party using the intellectual property rights covered by the FRAND commitment*").

**2.5**    Despite Apple having (and still has) doubts regarding the actual essentiality and validity of patent EP' 269 (as it is, according to Apple an extension beyond the content of the original description, therefore in violation of Article 138(1c) EPC and Article 76(1c) CPI, as well as having unclear content and being devoid of real inventiveness and novelty), Apple itself had taken action to open negotiations with Samsung to regulate exploitation of the patent in question.

In a letter of May 13, 2011 Samsung had answered to Apple (Apple doc. 15 ) stating that "*Samsung takes FRAND commitments seriously and is willing to grant to Apple a non exclusive license for any Samsung patent whatsoever pertaining to Wireless, 'UMTS and WCDMA devices, subject to FRAND commitments*" (including therefore EP' 269).

On May 17, 2011 Apple wrote to Samsung (Apple Doc. 16) providing the information requested by Samsung and confirming its intent to obtain information in a non confidential manner, pointing out that, had  Samsung really committed to issue licenses at non discriminatory conditions, it would have had to reveal to Apple information regarding the existence of licensing agreements between Samsung and the manufacturer of the UMTS WCDMA chips.

This point, according to Apple's defense, would be decisive because the alleged infringement of EP' 269 would pertain only to a chip contained in  Apple products. Said chip is not manufactured by Apple (but rather by Qualcomm); therefore, should the third party supplier entity have a license from Samsung, Apple products could not be deemed in any way to be infringing Samsung's rights, given that said rights would be exhausted by the consent to use

the patent issued by Samsung to the chip manufacturer.

Only after four months' negotiations (conducted slowly by Samsung, for an obvious dilatory purpose, according to Apple), Samsung had answered Apple stating that it was willing to offer to it a license for the patents for a 2.4% royalty for each connected product. This rate, in Apple's opinion, was exorbitant and absolutely not FRAND (refer to paragraph 31 of Apple's entry of appearance brief and the ruling of the Dutch judge, in Apple doc. 2). Also, the defendant's defense complained that the taxable basis to which the royalty should be applied did not appear fair, because it included the entire value of Apple end products and not only those affected by the technologies and instructions set forth in the patent subject to this legal action. The offer furthermore was declared valid by Samsung only for 10 business days (a circumstance that appeared to Apple to be openly in contrast with its FRAND obligation to grant irrevocable licenses).

**2.6**      From a procedural standpoint, Apple's defense noted how the request to issue provisional measures filed by Samsung in regard to patent EP' 269 in this proceeding did not satisfy the requirements established by procedural rules for their concession, that is the terms of presumption of sufficient legal basis, of danger in delay and balancing of interests (see on this point paragraphs 60 and following in Apple's entry of appearance brief).

In reference to legal basis Apple's defense noted that the Samsung companies' requests should not be admitted because the attempt to enforce the patent supplemented a hypothesis of abuse of its dominant position and was in any case to be sanctioned also based on the

"*exceptio doli generalis*," with said defense observing that the clear purpose of Samsung's action was to cause huge damage to Apple, rather than protect its right from an alleged violation.

**2.7**      As for the danger, Apple's defense observed how the plaintiffs had completely omitted to explain how the iPhone 4S constituted a violation of patent EP' 269 different from the one that would allegedly be imputable also to other  Apple products, long present on the market, so that a danger of irreparable damage was identified only now and in regard to the iPhone 4S.

Additionally, Samsung allegedly did not offer any proof of the statement according to which, if the alleged infringement had not been present, its market share could have expanded further.

At best, the only foreseeable damage for Samsung according to Apple would be that pertaining to the (lack of) payment of  royalties for use of the patent, as in fact the quantification of a royalty is the principal issue that remains pending between the parties, and therefore a damage of an exclusive financial nature. Samsung's wish to obtain a *frand* royalty for its patent portfolio, declared essential, would therefore not justify issuing provisional measures.

Also, Apple's defense has pointed out how Samsung is not actually and seriously running any concrete and current risk, as it is indubitable that Apple is solvent; Apple, in any case, has placed in trust a sum of money as guarantee for the royalties presumably owed to Samsung in the event its patents were to be deemed valid and infringed (Apple doc. 30).

**2.8**    Apple's defense also maintained that there is another factual element to be taken into consideration, that is, that the basebands chips supplied to the Apple companies and contained in the iPhone 4S are the subject of a license by Samsung pursuant to the licensing agreement entered into by Samsung with the United States corporation Qualcomm, so that all of Samsung's alleged rights would be subject to exhaustion pursuant to article 5 of the Industrial Property code. Samsung, therefore, would not be able to uphold its patent in order to prevent further circulation of products that include the invention which is the subject of said patent; moreover, Samsung allegedly always opposed Apple's reiterated requests for a formal discovery procedure or for the release of a copy of licensing agreements with Qualcomm, so that Apple had succeeded in obtaining the agreement in question pursuant to an order of the American judge. The criterion for establishing whether a specific product may benefit from the exhaustion principle is the consent of the assign to sell the product within the European Community or in a member State of the European Economic Space. Such consent determines the exhaustion of the right, so that the owner of the industrial property right may not enforce its own right against any entity that purchased that product from the owner of said right or from third parties that obtained said owner's consent.

Apple's defense points out that Samsung and Qualcomm had signed on November 4, 2009 a crossed licensing agreement ("Samsung-Qualcomm Agreement"), *that covers telecommunication patents (CDMA/WCDMA/OFDM)* " (Apple doc. 33) for a term of 15 years. Therefore, UMTS chips, that Samsung assumes being counterfeited by Apple, applied in the iPhone 4S, are supplied by Qualcomm to Apple, as confirmed in a statement made on October 11, 2011 by Saku Hieta, employed by Apple Inc. as senior manager (Apple doc. 32).

**2.9** Again based on the Samsung-Qualcomm agreements, the current defendants did not have the right to bring action against Apple for patent EP' 269, as the Samsung-Qualcomm agreements un express commitment not to take legal action against the purchasers of Qualcomm chips.

On this point Apple's defense noted how the letter sent on 21 April 21, 2011 by Samsung to Qualcomm would have no effect. The letter stated: "*pursuant to the agreement existing between Samsung and Qualcomm Inc ("Qualcomm") and its relevant modifications, Samsung hereby exercises its right to limit immediately the scope of any agreement between Samsung and Qualcomm and the latter's buyers to exclude the application pertaining to any product manufactured, used, sold or otherwise granted to Apple or its affiliates.*" According to  Apple, in fact, pursuant to the Samsung-Qualcomm agreement (clause 5.2) the license and commitments could be "suspended" only if Apple had sued to uphold patents based on use or inclusion by Samsung of Qualcomm components, whereas the case in point does not fall under this provision. The attempt made by Samsung to boycott a competitor, selectively "suspending" a license for a vital component, with the clear intent of causing the competitor damage that has no connection with the subject of the dispute is, according to Apple, a clear violation of article 2569 of the civil Code and of articles 2 and 3 of Law No. 287/90.

**2.10** As for the content of the patent in dispute, Apple in any case challenges its validity and in any case its infringement by the iPhone 4S. In particular, on this point it notes that the specific standard quoted by the plaintiffs allegedly refer to an encoding method and would not instead prescribe a special implementation of that method  or a particular encoding apparatus, so that all claims of the patent in question would be only apparatus and not methodology claims. Therefore, although

the iPhone 4S, challenged by the plaintiffs may be compliant with the above-mentioned standard, this would not imply that said provision automatically includes the device claimed by EP' 269, not that the alleged inventive aspects claimed in EP' 269 are reproduced in the

challenged product, nor that the challenged product falls within the scope of protection of the patent in question.

**2.11**     According to additional statements of Apple's defense, Samsung's conduct in this specific case would also be relevant for various anti-competition aspects.

Samsung, in fact, allegedly holds a dominant position in the telecommunication sector, moreover, according to Apple, a veritable monopoly for supplying the European market with the technology covered by the patents necessary for manufacturing and marketing a cellular telephone using the 3G technology through the UMTS standard.

Samsung's abuse allegedly derives from the fact that a refusal to grant a license at FRAND conditions in the presence of (alleged) patents included in the standard hinders technological development, damaging both to Samsung's competitors and to consumers.

Furthermore, on this point Apple cites European Community laws on the matter of competition (and, in particular, articles 101 and 102 of the Treaty on the Functioning of the European Union, TFUE), that prohibit the illegal use of a patent by its owner, when the owner is in a dominant market position. Many decisions dealt with this specific subject (*Rambus Inc.* -COMP / 3.8.6.36, provision of the Court of Justice of December 9, 2009).

Therefore, in compliance with the above-mentioned regulations (articles 101 and 102 TFUE) Samsung should be kept from distorting competition on the market and, in particular, through improper procedures, from excluding from the market its competitors, including Apple, that compete for the same market.

The above-mentioned prohibition would be opposable to Samsung both in the event the patent in question were to be deemed essential for the standard, as claimed by Samsung and challenged by Apple –and in the event (as held by Apple) that the patent were not be deemed essential to the standard. In particular, in the second case, the dominant position would be the result of the false representation of reality offered by Samsung, so that consumers and manufacturers are led to believe that Samsung has a right to control the technology.

Consequently, the apparent dominant position held by Samsung, even if it had been deemed not to exist, could supplement an abuse of the right in regard to the manner in which it is presented and received by the market.

Apple cites the consolidated European Community case law according to which the refusal by a company in a dominant position to grant access to an essential resource or to an infrastructure or to sell or purchase an essential product or service to a party from which it had been requested or that had made a request constitutes an n abuse of a dominant position.

In accordance with this , the so-called "*essential facility*" doctrine must be remembered, which imposes to companies or entities making widespread use of an asset that may not be easily duplicated for financial or legal reasons, and to make it available at fair conditions to those requesting it; otherwise, an abuse of the right would occur (see the *Ladbroke* ruli*ng* – Court of First Instance of the European Communities, June 12, 1997, case T-504/93).

Because of all considerations set forth, Apple's defense concluded for the rejection of the applications for provisional relief filed against it by the Samsung companies.

### 3.    Further procedural development

**3.1**    At the hearing of October 26, 2011 the plaintiffs' defense requested a deadline for filing response briefs, and the defendants, although not deeming necessary assigning deadlines for brief and the consequent deferment of the hearing, asked to be also allowed to file a rejoinder brief. The Presiding Judge's deputy granted the parties adequate periods of time, in accordance with the deadline of said requests, to allow their respective defense to be developed and postponed the proceeding to the hearing of December 16, 2011.

Within the assigned period of time the parties arranged to file their defensive briefs. Then at the hearing of December 16, 2011, the defense attorneys had an in depth verbal discussion of the main points of their defense theses. The Presiding Judge's deputy reserved to decide.

## 4  Samsung's brief

**4.1**     With the brief filed on November 15, 2011 Samsung's defense developed its defense responding to the arguments and exceptions on which Apple's defense was based in its entry of appearance brief.

In particular it reported that until the summer of 2010 dealings among the parties were channeled into a serene commercial relationship: Apple had purchased solid memories, temporary memories (DRAM) and some processors from Samsung. Later, Apple had started to sell in "deliberate infringement." In July/August 2010 Apple started to charge Samsung with violation of its patents and demand substantial license fees (5% on the smartphone, Samsung doc. 9). Various meeting had then followed, as documented by the statements of Seungho Ahn and Jaehawk Lee (doc. 9 and 10), to confirm which the plaintiffs' defense asked for the declarants to undergo summary examinations. During these negotiations Apple operated by underestimating Samsung patents and overestimating its own: it was asking 5% royalties for smartphones and tablets, not considering that without the Samsung patents said smartphones and tablets would have been unable to communicate.

The plaintiffs' defense also mentioned how on 2.23. 2011 Samsung wrote a cordial e-mail to Apple stating the full intent to continue negotiations (doc. 11).

Apple answered it by serving a summons for infringement in April 2011, in the United States. At the end of April 2011 Apple asked Samsung for a license on the latter's patents (documents 13/27) and Samsung stated its willingness.

With communications dated 4.29.11 and 5. 9.11 Apple asked Samsung for a *frand* license for the standard-essential patents for UMTS/WCDMA technology (Apple documents 13 and 14).

On 5. 13.11 Samsung answered stating that it was willing and asking Apple for certain essential elements for granting the license (territorial and temporal extent, cross licensing), as well as the commitment to sign a non-disclosure agreement, in accordance with ETSI *Guide on Intellectual Property Rights* (doc. 12), that in fact on paragraph 4.4 NDA require a *non-disclosure agreement.*

Between May 17 and July 1, 2011 (Apple documents 16/20) Apple declared that it was not willing to sign a non-disclosure agreement and at the same time it complained that it had not yet received Samsung's offer. The following July 14 (Apple doc. 21) Samsung notified Apple of its impropriety (according to statements made in the proceeding pending in Japan on the fact that Samsung had allegedly refused to grant the license at *frand* conditions). On July 18 2011 (Apple doc. 22i) finally Apple declared its acceptance to assume a non-disclosure agreement a.

Samsung then answered (with a letter of 7.20.11, Samsung doc. 13 ) stating its willingness to grant a *frand* license. Then, as Apple had signed the non disclosure agreement (as per Apple doc. 23), Samsung formulated (on 7.25. 11) its offer for all UMTS/WCDMA technology standards, asking for a 2.4% royalty.

On August 18, 2011 (defendant doc. 24) Apple answered imputing to Samsung all sorts of violations, indicating as FRAND a 0.275% royalty and asking for Samsung to reveal the licensing terms granted to other operators. Lastly on September 5, 2011 (Apple doc. 25) Apple declared that it wished to license only the Dutch portions of 4 patents with a 0.0000738% royalty. Samsung responded to the counterparty's proposal (letter of 9.15.11 and 9.19.11, defendant doc. 26 and 27), reiterating its wish to conclude on the basis of a license at *frand* conditions.

On October 31, 11 (Samsung doc. 14) Apple again alleged violations by Samsung and maintained that the offer of a 2.4% royalty was not to be deemed *frand*.

**4.2**     Again recalling ETSI's  *IPRs Policy* and in particular Annex 6 to *ETSI Rules of Procedure* (Apple doc. 7), Samsung's defense noted that two violations had been imputed to its client by the adversary company: first the untimely communication to ETSI of the standard-essential nature of patent EP 269 (par. 4.1. "*in a timely fashion*"); second the refusal to grant a so-called FRAND license, thus being accused of patent ambush. The adversary defense had also maintained that, based on French law (applicable to dealings between ETSI and its members), the license should be deemed already established and enforceable.

**4.2.1**   As to the first of said charges, Samsung produced (doc. 15) an opinion by Ansgar Bergmann, head of the ETSI team in charge of development and management of GSM and UMTS standardization.

In particular he observed that (under annex 6 of doc. 15) the average period of time for the communication of standards to ETSI was 4 years and six months (he cited two cases, Ericsson and Motorola), pointing out that a communication had taken place even after 9 years and 9 months (see annexes 4, 5 and 6 to the document in question), as Apple itself had been in a similar situation (doc. 15 paragraphs 13, 17-20 ).

The plaintiff's defense recalled the Dutch ruling of October 14 11 (doc. 2 Apple and Samsung doc. 19) at point 4.25.

The defense stated that on December 14, 1998 (doc. 20) Samsung had stated it was willing to grant licenses at *frand* conditions on its essential patents for UMTS/WCDMA technology.

**4.2.2.**   In reference to the second charge brought forth by the adversary (refusal to grant a so-called *frand* license), Samsung proclaimed its compliance, stating how, according to Bergmann (paragraphs 12-14) a "*general IPR declaration*" was sufficient (as stated in Samsung doc. 20).

Thus it had been deemed also by the above-mentioned Dutch ruling (Apple doc. 2 and Samsung doc. 19) at points 4.23 and 4.24.

For an in-depth analysis of the concept of *patent ambush,* the plaintiffs' defense referred to the US decision of 10.18. 11 (Samsung doc. 21) and the Rambus case of the European Commission (doc. 22). It reported that the Dutch decision had also excluded *patent ambush* by observing that Samsung had already committed, with its 1998 statement, to negotiate a *frand* license.

**4.3**   As for *frand* conditions and the 2.4% royalty requested (page 21 of the Samsung brief) the plaintiffs' defense stated that said royalty simply represented a basis to start a negotiation, regarding which Samsung's willingness appeared clear.

According to Apple (referring to Michael Walker's and Richard Donaldson's opinions, doc. 10 and 11, the latter based on the Fairfield report, subject to criticism by Samsung on page 24 and 29 of the brief dated 11.15.2011) with a 5% ceiling for aggregate royalties for all essential patents, Samsung would only have a right to a small fraction, or 0.273 % of this 5%,

to be calculated not on the final sales price of smartphone and tablets, but on the cost of the individual chip that implemented the patented technology.

Samsung's defense brought up the opinion of two top experts in the technology licensing sector, Erik Stasik and David Teece (Samsung document 23 and 24), who stated that there is no predetermined maximum ceiling for aggregated royalties. The 5% proposal had not been followed up (he brought up the Nokia proposal of 2006, that had later been rejected).

The 2.4% royalty requested by Samsung was not to be deemed exorbitant, considering that, for a patents portfolio for UMTS/WCDMA technology (involving over 3196 patents), the royalty ranged between 1 and 2.75% (doc. 23 paragraphs 19-22; annex 7 mentions 4%, annex 8 between 1 and 3%, etc. annex 9 and 10).

Samsung's defense added that the calculations proposed by Apple starting from the so-called patent counting standpoint and deriving from the Donaldson opinion were to be deemed unreliable: the Donaldson opinion, in fact was based on a sector study (the previously mentioned Fairfield Report) conducted, according to Samsung, with approximative methodology and with results not scientifically supported, and for this reason generally criticized and not followed by experts and in established procedure (doc. 23, par. 37-47, containing a detailed list of all methodological errors and logical leaps that allegedly vitiate the report in question). Consequently Apple's statements according to which, if a 2.4% royalty were to be applied to Samsung's patents portfolio, proportionally an aggregate 44% royalty would be obtained to license all the essential patents, is also allegedly incorrect and arbitrary, as it is derived from the errors set forth above. Samsung's defense also noted that the requested 2.4 percentage was not at all exorbitant. In fact, a correct calculation based on established market procedures showed that for a patent portfolio on  UMTS/WCDMA technology (3196 patents) with a value such as Samsung's, a value recognized by other major operators in the sector: doc. 23, annex 5 and 6, an initial *frand* offer on the entire portfolio was placed between 1% and 2.75% (doc. 23, paragraphs. 19-22). Specialized publications also confirmed that for essential patents on W-CDMA technology the royalty rate used by an individual owner reached 4% (doc. 23, annex 7) and that, for instance, InterDigital requested royalties ranging between 1 and 3% for its W-CDMA essential patent portfolio (doc. 23, annex 8). Also for the different LTE (4G) standard, for which the royalty amount could

have been deemed homogeneous compared to that of the W-CDMA standard, the royalty rate announced by each operator ranged between 0.8% to 3.25%, with an average of 2.1% (doc. 23 annex 9 and 10). Samsung's defense also pointed out that the European Commission, in a proceeding pursuant to article 102 TFUE, against an entity accused of *patent ambush,* had deemed satisfactory this entity's commitment to apply royalty rates that for certain products reached 2.65% (thus the European Commission's decision of December 9, 2009 in the *Rambus* case, Samsung doc. 25).

In conclusion, from Samsung's viewpoint the initial offer of 2.4% amply fell within a *frand* range and was not at all arbitrary (if anything, the 5% royalty requested by Apple for its non essential patents during the previously mentioned negotiations was arbitrary).

It is opportune to mention right away that, in response to the percentages indicated as *frand* for the sector by the opposing defense, the defendants' attorneys noted that this percentage referred to a patent portfolio and not to one patent only (see Stasic statements doc. 31 par. 22). According to Apple (page 30 lower portion of the brief of December 6,2011) Stasik's and Teece's statements were general and could not assume any evidentiary value.

The plaintiffs' defense also observed that it made no sense for Samsung to apply the same royalties paid by others, because in this case there could be different reasons (pages 27-28 Samsung brief). On the other hand, Apple could well have reduced said rate by offering to cross license other IP rights to which it was entitled.

**4.4**     Samsung's defense also developed the subject of the non existence of a license that could be deemed already established between Samsung and Apple based on French law (page 30/33, Samsung brief), quoting the opinions of French experts, produced as documents 26-28.

In this regard it should be stated that Apple, quoting excerpts of an opinion by Prof. Delebecque (Apple doc. 30), has maintained in this proceeding that the declaration made by Samsung to ETSI regarding its willingness to negotiate *frand* licenses should be interpreted, based on French law applicable to the dealings between ETSI and its associates, as an offer of license to all other associates, including Apple;

this way Apple, by beginning to implement the standard, would have accepted this offer, so that there would already be a valid licensing agreement between the parties.

According to Samsung's defense this thesis is certainly incorrect, and this would allegedly be confirmed by three opinions of experts on French law, Laëtitia Bénard, Prof. Georges Bonet and Prof. Rémy Libchaber, which said defense produced as documents 26-28.

The declaration of the standard, which Samsung gave in regard to EP '269, is limited to the following statement: "*the signatory and/or its affiliates hereby declare that they are prepared to grant irrevocable licences under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the* st*andard, to the extent that the IPRs remain essential*" (doc. 29). Therefore this would be, according to Samsung's defense, already on the basis of the literal meaning of the expressions used, not the offer of a license, but rather the expression of mere willingness, "*prepared to,*" to negotiate and grant such a license.

In this regard, article 4.1 of the above-mentioned ETSI Guide on IPRs (Samsung doc. 12 ) establishes that "*Specific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI*," thus unequivocally indicating that licenses are not established with ETSI for the mere fact of a declaration, but must later be the subject of commercial negotiations between the parties. And again, the plaintiff's defense notes, article 8.2 of ETSI Policy (see Apple doc. 7) requires a complex mechanism of procedures and remedies that are applied when an associate, after the inclusion in the standard of a technology it patented, refuses to grant a license at *frand* conditions. According to Samsung's defense a similar provision would not make sense if it were to be deemed that, for the sole fact of the declaration and implementation of the standard by the third party, a license has been established.

Samsung's defense finally reported that  ETSI's *IPRs Policy* was accompanied by some FAQ (doc. 30), of which No. 6 and No. 7 merit consideration; they are transcribed on page 31 of Samsung's brief in the following terms: "*Question 6: Does one have to take permission from ETSI for using the patents as listed by ETSI in the standards? Answer 6: It is necessary to obtain permission to use patents declared as essential to ETSI's standards. To this end, each standard user should seek directly a license from a patent holder.  In order to obtain the contact details of a patent holder, please make*

*your request to the ETSI Legal Service.*"; "*Question 7: Does the firm concerned have to pay some consideration to ETSI for utilizing the said patents or while buying the technology from another company? Answer 7: Any firm interested in obtaining patents declared essential to ETSI standards shall not pay any consideration to ETSI but to the patents holders. To this end, the concerned firm has to enter into negotiation with the companies holding patents in order to obtain licenses for the use of the patented technology included in, and essential for the implementation of an ETSI standard.*" The same defense therefore noted that it was clear also from these FAQ (*Frequently Asked Questions*) that a direct negotiation of the license between the parties was necessary, subsequent to the statement of willingness to do so.

As an additional argument in support of its thesis, Samsung pointed out that article 8.2 of *ETSI Policy* required a complex mechanism of procedures ans remedies should an associate refuse to grant a license at *frand* **condition**s.

The licensing agreement had also to be considered as an agreement *intuitu personae*, so that the identity of the licensee assumed a fundamental role, and the license could only come from a bilateral negotiation with an already identified potential licensee (doc. 28, section II.1.b and section III.1.b).

Samsung's offer also was found devoid of the essential elements for deeming the license already granted (*offre ferme, précise*), and it could not be considered an agreement in favor of a third party (*stipulation pour autrui*).

Lastly, it was to be deemed resolutive that, according to French law, the patent license agreement had to be established in writing under penalty of nullity (art. L 613-8 *Code de la Propriété Intellectuelle*)

**4.5**      Samsung's defense believes that the necessary conditions for an injunction do exist, bringing up precedents similar to this dispute in which an injunction had been issued. Thus in the German case on the Orange Bookstandard (judgment of 5.6.2009, documents 31, 32 and 32 bis, which state that the Court of Mannheim will continue to apply the principles of the Orange Book case), as well as in the Dutch case (decision of the District Court of The Hague of March 17, 2010 in the Philips / SK Kassetten case, as doc. 33; see also Mr. Bas Berghuis van Woortman's statement: doc. 34). In the above ruling the Court established that an essential patent may not be upheld against a third party only if there is a voluntary license or, otherwise, a license imposed based on antitrust laws on said patent,

specifying that the third party, before marketing the products and becoming responsible for infringement, must request a FRAND license and, in the event of refusal by the owner, apply to a judge so that it may be imposed to the owner to grant the license. Samsung's defense also points out that in any case, based on European Community antitrust law, a refusal to grant a license on a patent does not in itself constitute an abuse, and granting a license may be imposed only if absolutely exceptional circumstances occur; failing that, the action to protect patent rights is and must be allowed (in termini: EC Court, October 5, 1988, C-238/87, Volvo / Veng; EC Court, April 6, 1995, joined cases C-241/92 and C-242/92, Magill; EC Court, April 29, 2004, C-418/01, IMS; EC Court, September 17, 2007, T-201/04, Microsoft). Similar principles had already been stated by the European Commission in its communication of October 27, 1992 on "Intellectual Property Rights and Standardization," according to which: "*the freedom of the right holder to refuse to license is ... absolute, since his exclusive intellectual property rights cannot be subject to expropriation or compulsory licensing except in exceptional circumstances such as reasons of national security or over-riding public interest*" (doc. 35 par. 4.3.5; see also paragraphs 4.7.2, 5.1.10 and 5.1.11, as well as par. 5.1.15 in which the Commission expresses the concern that imposing licenses may have negative effects over the long term on investments and innovation in the industrial sectors that are subject to standardization).

Samsung's defense also notes the decision by the Court of Genoa of May 8, 2004 in the Philips/Italcard case (doc. 36), that had also granted an injunction to protect a standard – essential patent, after having discovered that the owner had not denied access to the patent by means of a license and the third party had started to use the patents without asking to be granted said license.

In addition to Eric Stasik's opinion (produced in doc. 23, paragraphs 31-33, that tells how requests for injunctions are absolutely routine, and indeed the only form of protection of the owner of the essential patent, when a third party implements the patent technology without requesting or in any case being willing to enter into a FRAND license), the European Commission Horizontal Guidelines on "*Horizontal cooperation agreements*" (doc. 37), section seven of which (paragraphs 257-335) deals with the subject of standardization and FRAND commitments, deserve to be mentioned by Samsung's defense in addition to the warning expressed by Apple that, consulted by the European Commission

(as other operators in the sector) in the preparation stage of the Guidelines, had expressed the opinion that the Guidelines should state that the existence of a FRAND commitment implied a waiver of the right to ask an injunction against a party implementing the standard (doc. 38, par. 11), a warning not accepted by the Commission, so that nowhere in the *Guidelines* is it stated that an injunction is precluded to the owner of an essential patent subject to FRAND obligations. Lastly, said ETSI's *IPR Policy* also states the need for protection of the patent owner's interest and does not in any way exclude the possibility of an injunction.

**4.6**      In response to the accusations raised by Apple in reference to the abuse of a dominant position, Samsung's defense denied the existence of a dominant position held by the owner of an essential patent, denying in this specific case having a patent monopoly on 3G/UMTS technology.

Samsung admitted that it holds a market share, but it pointed out how this is not sufficient to identify a dominant position and allow it to maintain a conduct independent from that of competitors in its dealings with suppliers and customers, in the terms analyzed by the case law of the Court of Justice  (EU Court, February 17, 2011, C-52/09, TeliaSonera; EU Court, October 14, 2010, C-280/08 P, Deutsche Telekom/Commission; EC Court, April 2, 2009, C-202/07 P, France Télécom / Commission; EC Court, February 13, 1979, case 85/76, Hoffmann-La Roche; State Council, March 10, 2006, No. 1271, in *Foro Amm. CDS*, 2006, 3, 941; State Council, March 15, 2000, No. 1348, in *Giur. ann. dir. ind.*, 2000, 1221 *et seq.*; Turin App., February 17, 1995, *ivi*, 1995, 884 *et seq.*).

Apple's choice to use 3G/UMTS standards, partially covered by Samsung patents, according to the latter's defense thesis was not an obligatory choice (as there are alternatives, such as EDGE or GPRS or Wi-Fi connection.

In any case no abuse could be identified in Samsung's conduct, as Samsung never refused to negotiate and having instead declared to be willing to grant a license at FRAND conditions.

**4.7**      In reference to the Samsung/Qualcomm Agreement and the arguments set forth by the opposing defense based on the principle of patent exhaustion, Samsung's defense points out how, according to Apple, Qualcomm produced certain chips that include the patented technology pursuant to agreement s with Samsung.  These are allegedly the chips contained

in the iPhone 4S. According to Apple's thesis, with the agreement in question Samsung allegedly committed not to attack Qualcomm's customers.

Samsung's defense notes that in regard to the facts reported by Apple there is allegedly on record only a statement of an Apple employee, who stated that the UMTS chip of the iPhone 4S was supplied by Qualcomm, and Apple had not produced the agreements with Qualcomm.

According to Samsung the agreements with Qualcomm allegedly establish something other than what is alleged by Apple. The so-called *covenant not to sue* allegedly does not apply to Apple, both because the latter is not qualifiable as a Qualcomm customer, and because these are not products covered by this provision *(covenant products).*

Furthermore, it allegedly was not Apple, but Foxconn that purchased the iPhone 4S *chip* and assembled the smatphones later sold to Apple (see the statement by Eric Koliander, Qualcomm Senior Director set forth in doc. 43).

As for the exhaustion principle claimed by the defendant, according to Samsung's defensive thesis, the principal requirement is allegedly lacking, that is, Samsung's consent to market within the European Economic Space (concepts expanded on pages 52-53 of Samsung's brief, which will be re-examined later).

**4.8**     In reference to the *exceptio doli generalis* opposed by Apple, Samsung stated that it is a hypothesis of an exceptional nature, based on necessary conditions not found in the case in point, and in particular wholly unrelated to the conduct maintained by Samsung.

**4.9**     Lastly Samsung reacted to Apple's inference of the lack of danger in delay and denies the exclusively financial nature of the damage suffered.

This point will be the subject of an express discussion below so it is deemed opportune at this time to summarize as much as possible the arguments used by Samsung and to examine them later.

**4.10**     In the final portion of the brief of  11. 15.2011 Samsung's defense upheld the validity of  patent '269 (see in particular page 63), maintaining its sufficient description, as well as the existence of the requirements of novelty and inventive activity (pages 71/74).

In order to verify the infringement, and in any case to verify the validity of the patent it insisted to admit an expert witness, also pursuant to article 132 and. 5 CPI.

From the aspect of preliminary investigation it requested gathering summary information asking for Seungho Ahn and Jeahawk Lee to be examined regarding the negotiations at Samsung's between Samsung and Apple mentioned above.

## 5    Apple's brief

**5.1**    With its brief Apple developed the defense's theses already expressed when entering its appearance and it responded in an analytical fashion to the plaintiff's arguments.

Regarding the *presumption of sufficient legal basis* of the applications for interim relief filed by the latter, it specifically stated its reasons in reference to the Samsung -Qualcomm agreement (see page 6/8 of Apple's brief) then revisiting the subject in greater depth (in paragraphs 87/137).

Apple then observed that Samsung had started from the assumption that patent '269 pertained to the standard and that the characteristic of the standard covered by the patent could be implemented exclusively according to the instructions in that paten. Instead, the defendants' defense notes that Samsung could not avoid the burden of proving the actual use by the iPhone 4S of the invention protected by EP '269. Reiterating the exception of nullity of the patent (supported by the technical opinion of the engineer Deambrogi and the annexes to said opinion, doc. 36 and relevant annexes) the defendants' defense observes how the evident uncertainty of the solution regarding the questions of  infringement and  nullity led  the plaintiffs to request expressly (see Samsung's answer on page 77 and 78) for the judge to appoint an expert, pursuant to article  132, 5th paragraph, C.P.I. within the scope of the procedure for interim relief: according to Apple's defense that request is in itself indicative of the obvious relevance of these questions and the difficulty of their solution. Apple's defense also notes how the "summary technical indications" to which article 132 of the CPI refers would appear insufficient for resolving all doubts regarding the validity of the patent, as well as its infringement, within the scope of an interim injunction.

**5.2**    It also appears to be a strong argument for the defense in question that, to date, the alleged infringement of the patents allegedly has not ben proven. In fact the application for interim relief, filed on October 5, 2011 pertains to the new iPhone 4S, which, presented to the press on October 4, 2011, was launched on the Italian market on October 28, 2011. On the date the application for interim relief was filed, the plaintiffs declared that they had not yet been able to examine the product, but that based on news released by the press and confirmed by technical specifications available on that date, it was reasonable to assume that

the iPhone 4S operated based on the UMTS standard. According to the reconstruction offered by the Samsung companies, certain characteristics of said standard are allegedly covered by EP' 269.

However, given the absence of direct evidence of the alleged infringement, according to Apple, the claim formulated by the Samsung companies was and would remain based on a syllogism of this type: "(i) EP' 269 covers certain aspects of the UMTS communication standard and, as such, it allegedly is an essential patent for the standard; (ii) the iPhone 4S uses the UMTS standard; (iii) the iPhone 4S cannot operate according to the UMTS standard without implementing the patent and, therefore, it can only infringe it." The defendants' defense states that such a construct, rather than representing a syllogism, is based on a sophism, certainly not sufficient to support a claim of infringement. And indeed, starting from the assumption that the patent covers the standard (and according to Apple even that assumption was not demonstrated at all), it is supposed that the characteristic of the standard covered by the patent can be implemented only and exclusively according to the latter's instructions, when even this aspect is still to be demonstrated. The Samsung companies should instead undertake to prove concretely and directly the use by the iPhone 4S of the invention protected by  EP' 269.

As the iPhone 4S is already on the market, Samsung could well have provided direct evidence of the alleged infringement. The request to appoint an expert witness tries to fill the onus of identifying evidence of infringement, which is incumbent exclusively upon the plaintiffs. Samsung wants to place the burden of proof of infringement on the expert witness (an attempt excluded by Court of Cassation case law, ruling of October 1, 2011, No. 20217; 4.6.2005, No. 7097; 8.16.2004, No. 15968).

**5.3**     As a conclusive argument for the lack of grounds of Samsung's application for interim relief, Apple's defense observes how the rights of the plaintiff companies deriving from patent EP '269 are allegedly exhausted in any case in reference to the iPhone 4S and this pursuant to the agreement entered into with Qualcomm, as the latter is the supplier for the defendants of the basic communication chips pertaining to the alleged infringement, in reference, among other things, to patent EP '269. The interpretation offered by Samsung of said agreement appears contrary to both United States

and domestic rules of contractual interpretation, as it is contrary to Italian and European Community laws on competition.

In Samsung's opinion, Samsung's attempt to give value to the modification within the text of the agreement from the explicit use of the word "license" to "commitment not to take legal action" would be devoid of grounds, given that the second expression would not have a meaning effectively different from the first, as there is no difference between a license and a commitment not to take legal action. In fact, with a commitment not to take legal action to protect its patents, Samsung would have done nothing but allowing Qualcomm to use them. It would follow that the rights deriving from it would be exhausted in regard to all products placed on the market by Qualcomm based on the "*commitment not to take legal action*" (equivalent, in the defendants' thesis, to a license). Apple's defense deems that interpreting the agreement in a different manner would be not only illogical, but also contrary to "*general procedures*" in the parties' specific industrial sector, as it is normal for components to be manufactured, sold, resold, subcontracted and often transferred several times before reaching their end user. Should the agreement be interpreted in the sense of not exhausting the rights on Samsung's patents, the latter would find itself in a position of discriminating against certain users of the components made by Qualcomm, selecting, at its own choice and discretion, whether to act in the proceeding on the basis of patent rights, thus engendering total uncertainty in the market. This interpretation, according to Apple's defense, would also be contrary to the fundamental principles of European community competition laws, that intend to create a single market within which circulation of goods and services is free of any impediment, including, among other things, the distorted use of industrial property rights in order to discriminate against individual markets and/or users, thus creating a barrier to free circulation within a unified market.

Apple's defense points out that, should Samsung's rights be deemed not exhausted and therefore the Qualcomm agreement were to be examined in detail in order to decide whether Samsung has an actionable right in regard to the defendants, it would be a matter of taking into consideration the complex evidentiary tangle brought forth by the parties both de facto and de jure, requiring for that purpose a complete and exhaustive preliminary investigation stage, possible exclusively within the scope of the first instance ruling.

**5.4**    In reference to the danger in delay the defendant assumes that granting a provisional measure should be carefully examined, not only from the aspect of the probability of Samsung's claims to be admitted in first instance *(*presumption of sufficient legal basis*)*, but also in view of the verification of the occurrence of an actual risk for the plaintiffs to suffer irreparable damage. Apple's defense points out that reading Samsung's rejoinder brief made it evident that Samsung showed to be willing (if not obligated) to grant a license for patent EP '269. On the other hand Apple, should the patent be judged valid and infringed and the relevant rights not exhausted pursuant to the Qualcomm agreement, stated that it was willing to sign a license for which it offered an opportune consideration. It therefore stated the possibility that the dispute was to be resolved in purely financial terms, by signing a license agreement (on condition that the validity and the infringement of Samsung's rights be preliminarily verified, as well as their not being exhausted). It also pointed out that the plaintiffs had confirmed their commitment to grant a license at *frand* conditions*, also in regard to the irrevocable commitment assumed by Samsung with ETSI and, more generally, based on antitrust principles regarding the doctrine of the so-called *"essential facilities."*

According to the defendants' defense, Samsung's commitment to grant a license for the patent in question, would exclude, essentially, the existence of a risk of damage of an irreparable nature and therefore it would exclude the possibility of granting a provisional measure. In fact, the requirement of urgency cannot be recognized in the event the damage deriving from the alleged infringement can be compensated with monetary relief.

**5.5**    Apple therefore accuses Samsung of trying to provide a distorted interpretation of the facts, especially regarding the relationship between Apple and Samsung.

It stated that, given that Samsung communicated patent '269 to ETSI as deemed essential (even if that characteristic is challenged by Apple), Apple would have an irrevocable right to obtain a license at *frand* conditions.

It reports that the Dutch Court, with its decision of October 2011, concluded that the terms of Samsung's proposal were not *frand.*

It reminds that in 2010 Samsung launched the first Smartphone and TAB model Galaxy devices and that said models were in infringement of various

non essential Apple patents and design rights, so that the latter had filed various infringement proceedings.

Apple points out that its patents are not essential (they pertain to non essential technologies and product design), so it may or may not have granted licenses and propose any royalty rate. Instead, Samsung should choose: either its patents are essential, as they represent indispensable standards for the UMTS technology, accessible, according to Samsung, only by using its patent, or that technology is secondary and replaceable by EDGE or GPRS (see paragraph 146, 186 of Apple's brief).

Apple also points out that Samsung opposes, without too many explanations, seeming rather to neglects the subject, Apple's arguments regarding the existence of an obligation to give immediate notice of an essential patent and it opposes computation criteria for identifying a *frand* royalty.

**5.6**     In reference to the danger in delay, Apple insists that Samsung was aware of the fact that Apple was marketing devices that allegedly infringed EP' 269 since 7.11.2008 (doc. 28). Nor could it be maintained that the damage had suddenly increased, as it should instead be noted how Samsung's market share had tripled in 2010 (page 37, Apple brief).

The iPhone 4S, as admitted by Samsung itself, works with the same WCDMA/HSP standard technology, as previously did the iPhone 4 (page 3 of Samsung's application for interim relief). Even if the 4S has many new functions and improvements, it uses the same UMTS standard already used by its predecessors (see pages 35-36, Apple brief).

**5.7**     Again in reference to the Qualcomm agreement, the defendant reiterates that the basic communication microprocessor contained in the iPhone 4S comes from Qualcomm; Apple procures the basic communication microprocessor for all iPhone 4S worldwide only and exclusively from Qualcomm (as already specified in the entry of appearance brief, from par. 98 onward) and as proved by documents 32 and 33, the photographs set forth on page 48 and 51 of the brief, Mr. Hieta's additional statement (possibly to be heard as witness) as doc. 47, Giorgio Potenza's report (set forth in doc. 48 and regarding which in par. 96), as well as the statement made by Dr. Koliander, senior sales manager at Qualcomm (doc 49).

**6.        Decision on the application for interim relief**

**6.1**        Having summarized in the above terms the parties' complex defensive theses, this judge deems that she has to provide an answer only to some of the many subjects being dealt with and specifically to examine and consider only those subjects that appear useful for the purposes of a decision in this interim stage.

It is known that an examination for the purpose of whether to grant the requested provisional measures must take into consideration the elements supporting the presumption of sufficient legal basis and *periculum in mora.*

**6.2**        In reference to the presumption of sufficient legal basis certain necessary condition of the action upheld by the plaintiffs remain uncertain, and specifically the existence of a validly protectable patent, its qualification as standard (even if on this last point this judge's opinion, although in view of the limited analyses of the provisional stage is oriented in a positive sense), its infringement by Apple, or at least the possibility that the use of Samsung's technology may be considered as interfering in regard to Samsung's right, that is, allowed on the basis of the exhaustion principle.

**7.        Relationship between ownership of a standard and competition**

**7.1**        Again in reference to the development of questions inherent in the existence of the necessary condition of the presumption of sufficient legal basis, both parties' defenses handled the subject of technological standards.

Recalling here the definition provided by the European Commission within the scope of the Guidelines on the application of article 81 of the Treaty (now 101 TFUE) to technology transfer agreements *(TT Guidelines,* 2004/C 101/02, point 6), it may be stated that intellectual property rights grant the owner of the property the exclusive right to exploit the revenue from the subject of that right and to prohibit unauthorized exploitation acts, as well as to grant to third parties said right of exploitation by mean of licenses. It follows that the exclusive right ends up for being broken down into two alternative options: maintaining the exclusive right of exploitation of the subject of the property, forbidding it to third parties, or authorizing third parties licensees to exploit it. In reference to the latter possibility, it can be pointed out that, from a financial standpoint, it is certainly not indifferent to maintain a right of exclusive use of the asset for the owner or to share it with third party entities on (or even contribute it exclusively to said entities),

And this even apart from payment of a compensatory consideration, because the presence of a license implies the assumption of specific obligations contractually defined to be borne by the parties and it represents a limitation of private autonomy, pursuant to article 1372, Civil Code.

On the other hand, for the purposes of technical development and for the protection of free competition on the market, the right to forbid to third parties access to one's technology has undergone increasing restrictions over time.

In fact it is by now an accepted principle that in technical sectors for which a certain level of dialog and comparison of information is required, with particular regard, for instance, to high technology products, the need may arise to ensure the interchangeability of said products and information useful to make it possible for said products to interface. The tool whereby said interchange can be ensured is specifically that of the license.

The system whereby compatibility is made possible is based on cooperation among the entities that own the sole patent rights: following a negotiation between the parties, a standard is thus defined, that allows companies in the sector to mutually benefit from their respective technologies, taking advantage of the information held by both, reducing its dispersion and opening the possibility of implementing new technologies and taking advantage of economies of scale through the reduction of research and development costs.

This Judge, agreeing with the definition of "standard" already adopted by the Court of Genoa in a 2004 interim proceeding, issued with an order dated May 8, 2004 (*Koniklijke Philips Electronics N.V. v. Computer Support Italcard S.r.l.*, Pres. Est. Marchesiello; that assumed the definition provided by the *European Manufacturer Association – ECMA,* so that it is to be deemed as standard: *"each document, established by consensus and approved by a recognized body, that provides, for common and repeated use, rules, guidelines of characteristics for activities or their results, aimed at the achievement of the optimum degree or order in a given context"*), notes that the presence on the market of devices joined by uniform characteristics based on a proprietary standard, protected by an industrial property right, is often the result of shared technologies and knowledge among various entities, that agree among themselves on the definition of a standard and the exploitation of said resources,

And thereby define the conditions of access to the market of the devices manufacturers that intend to use that standard.

The market, because of the presence of a proprietary standard, is characterized by access barriers of a substantial nature, also considering the fact that it is difficult, one the standard has been adopted, to win market shares with a product that does not adopt it, because costs to migrate from one system to another would be enormous *(switching costs)* and would have repercussions on the sale price.

The problem of trade-off (balancing) between effects of market closure and benefits for technological development has been the subject of evaluation in Europe. In compliance with the content of the above-mentioned Guidelines on applicability of article 81 of the Treaty (now 101 TFUE) horizontal cooperation agreements (in OJ-C 3, 1.6.2002), the Commission, in a case pertaining to a hypothesis of so-called *patent ambush* (European Commission, case COMP/C-3/38, 636, *Rambus*, par. 33), when evaluating and approving the commitments submitted by *Rambus*, stated that the presence of standards has a positive effect on the market, since it allows promoting common economic development, improvement of supply conditions and even the development of new markets; more specifically, the Commission made a reference to the potential of standards to increase the level of competition and to lower final and sales costs of products, bringing benefits to the economy as a whole, also increasing interchange among products, maintaining and increasing their quality level and the circulation of information. However, the awareness of the presence of potentially anti-competitive implications in developing an established procedure for negotiated standards led to the need to face the problem of regulating access to licenses by the companies that intend to make use of this type of technology.

An initial answer. Although at the Guidelines level and therefore of non binding nature, is the one provided by the Commission in its 2002 Guidelines  on horizontal cooperation in which, in order to evaluate the impact of standardization on competition in the sectors that are subject to that procedure, states that standards must be set on a non discriminatory basis and it is necessary to justify the choice of one standard over another, stressing the need and importance of a non discriminatory, open and transparent procedure thus minimizing the risk of anti-competition effects.

As a regulatory system of a public law nature is still lacking, the exercise of property rights within the scope of the rules of conduct established by the associations that administer *standards*, such as ETSI (*European Telecommunications Standards Institute*), which imposes to the owner of a patent that includes the standard, the obligation to grant licenses at fair and non discriminatory conditions to those requesting them (conditions c.d. *frand*).

At the basis of these considerations there is the principle according to which the exercise of a property right may not extend to the point of unjustly prejudicing competitors in the race for innovation, because in this case the incentive for cultural and scientific progress assigned to the discipline of patent protection would be nullified.

An exercise in violation of such conduct could shape, according to the traditional structure derived from the United States (see the decisions that first applied the so-called *misuse doctrine* of the first half of the last century, see the cases *Motion Picture v. Universal Film* of 1917 and *Morton Salt v. Suppinger* of 1942), an unfair conduct qualified as an "abuse of the right," both in the event an owner totally refuses to license its standard, and if said owner demands excessively onerous contractual conditions, provided that it can be demonstrated that there is an actual position of dominance on the market by the patentee.

One datum that remained constant in the evolution of North American case law and with the emergence of European case law with the Magill, IMS, Microsoft I and II decisions, is that of the difficulty in finding a definition of "injustice," that is, to define within what limits a conduct may be defined as a legitimate exercise of property rights or be shaped as an abuse to the detriment of competitors, and ultimately of end users, according to the European Union interpretation of the Magill doctrine.

A safe basis is the consideration according to which it is not possible to establish universal and valid limits for everybody: among the various theories proposed and supported by eminent scholars of antitrust law and interfering competition, it was observed that, in regard to the heterogeneousness of intellectual property functions and antitrust laws, it is impossible to resort to formal judicial arguments, as instead it is necessary to evaluate the acts of exercise of property rights with restrictive effects for the competition on the basis of the relationship between  the increase of compensation generated in favor of the owner and

owner and the social costs from a monopoly caused to the collectivity, in terms of allocative efficiency of resources.

However even this approach, proposed by an eminent American doctrine, based on economic analysis, requires the use and processing a series of information not easily available to the competition authorities or the courts and, especially, does not allow taking a position on the social desirability of the various acts of exercise of property rights, limiting to order them in accordance with a series of increasing harmfulness.

Therefore, in the absence of universally valid solutions and easily applicable axioms, all that is left is to apply the rule of logic case by case (the so-called *rule of reason*) to the case being examined, giving rise to a balancing of interests between protection of competition and legitimate exercise of patent rights.

In fact, many opinions were voiced in favor of a "case by case" approach to the problem of the refusal to negotiate of an owner of the property right and possible effects that said refusal may imply for the competition. This approach must be agreed with in the case in point, with special consideration for the characteristics of the market in which the parties operate, that of mobile telephony, characterized by great technological innovation, that according to some authors, presents *windfall gains,* that is, successes for the company in a monopoly position meant to last only over the short term, with a high erosion rate, especially considering that the presence of sizable profits in the sector would also allow the competition to resort more easily to the credit market, thus giving incentive to an actual competition based on merit.

**7.2**      In the case in point, although the qualification of standard for the Samsung patents is challenged by Apple, for the purposes of the examination required herein, the reasoning can be approached starting from the necessary requirement that said patents merit that qualification (reserving any more in depth analyses on this point to the subsequent proceeding of first instance). Samsung, deeming that it held so called standard essential patents had reported it to ETSI, an agency that handles standardization of communication systems in various parts of the world and cooperates in the definition of technical specifications applicable worldwide.

This judge does not deem it indispensable for the purposes that are significant in this case to approach the verification of whether said report was timely, as the existence of such a report

(even if allegedly late) the necessary requirement for the offer of a license and for Apple's claim to said license (at *frand* conditions).

In the case in point it must be considered, first of all, that Samsung made a public offer for the license of the patent portfolio in question, stating it was willing to grant licenses worldwide for all its patents essential to implement the standards of UMTS/WCDMA technology; secondly, that the plaintiff itself reported to ETSI its patent EP' 269 as standard essential for the UMTS-3G system, committing to license it at frand conditions *(fair, reasonable and non discriminatory)*.

The parties do not agree on whether Samsung's offer was *frand*; in particular Apple maintains that the amount is too high, whereas Samsung states that the various calculations performed by Apple are unacceptable because they are exceedingly small.

The subject of the adequacy of the consideration requested to grant a license for the standard technology constitutes a complex assessment on the merit that escapes the understanding of the judge of the interim measure: that aspect may be considered indirectly for the purposes of an evaluation of Apple's conduct for the requested injunction.

As noted above, an investigation on the adequacy of the consideration implies a complex assessment that, as will be explained later, presents implications that are ill suited to the summary cognizance peculiar to interim measures.

In fact, it should be remembered that a judgment on the merit will necessarily involve an in depth analysis that will allow the parties' attorneys to argue specifically on the subject. If, on the one hand, an owner's refusal to grant a license based on the insufficiency of the compensation offered has been deemed legitimate in the legal literature, on the other hand the subject of fair price implies and subtends anti-competition subjects that must be evaluated critically and in depth. For the purposes of adopting a provisional measure, the observation that there has been a request between the parties to obtain a license and that serious negotiations took place for the concession of said license, serves to distinguish the case in point from European and domestic legal precedents and is also a point of distinction for whether to grant the relief requested by the plaintiffs.

Regarding the conduct maintained during negotiations there are reciprocal charges of impropriety and reactive attitudes from both parties. It seems difficult to conduct a full investigation on this point during the preliminary stage (see the statements and evidentiary offers made in that regard by Samsung's defense, reproduced in detail in points 4.1 and 4.9 above; see charges made by Apple against Samsung in note 7 on page 11 of Apple's brief, with the addition that Apple observes that it had never been communicated the conditions granted to other licensees despite having agreed to  Samsung's request and signed a non disclosure agreement, page 32, Apple brief of December 6, 2011).

It is opportune to recall on this point a ruling by the Federal Supreme Court of the German Republic, dated May 6, 2009, that states, in a case wholly similar to the one in question, regarding the multinational Philips, that the owner of intellectual property that intends to obtain an injunction, despite the defendant possibly having the right (as a competitor) to obtain a license on the disputed patent, abuses its dominant position on the market in the event it acts in bad faith. This subjective element may be deemed to exist when two situations are present: stating in advance that the party that intends to obtain a license must have made an unconditional offer, first of all, the owner of the property right may not refuse without such a refusal giving rise to an unreasonably exclusive conduct toward the party that intends to obtain that property right on license or without violating the principle of non discrimination. Secondly the aspiring licensee must comply with the provisions for use of the property right and, even in the case it had already made use of the technology subject to protection, it must pay or offer suitable guarantee for payment of royalties.

Deeming that the plaintiff has a right to quantify autonomously the percentage of the royalties against Apple's request, in a e *frand* percentage that in any case constitutes the subject of negotiations and therefore not imposed unilaterally to the licensee, it must be observed how, also in the case in point, it is not possible for Apple to claim the *misuse defence* to block an injunction based on the owner 's refusal to reach a contractual commitment with the aspiring licensee in regard to the consideration, already assumed by the German Supreme Court, that the owner of the property right must be deemed completely free to determine the amount of the requested royalty, with the two-fold limit not to hinder intentionally the aspiring

licensee's activity or to discriminate against it compared to other licensees.

Based on factual evidence that emerged during the proceeding, Samsung's offer does not appear, even if from a summary acknowledgment, as having extrinsic characteristics of san abusive nature.

**7.3**      In reference to the requested injunction, the plaintiff cites and deems applicable to the case in point the 2004 decision by the Court of Genoa that, confirming interim relief at the complaint hearing, had ordered an injunction in Philips' favor, based on a two-fold consideration: that the plaintiff was actually obligated to license its own property right at frand conditions and that the defendant had not submitted to the plaintiff any request to obtain a license for the patents, having however introduced into the European Economic Space (SEE) products exploiting Philips' property right .

It is on the basis of these necessary conditions that the Special Division of the Court of Genoa (and in another proceeding for provisional relief between Rovi and Ical, also Milan Special Division, this same judge being the reporting judge) decided to grant an injunction and seizure of infringing devices.

Instead, the indicated necessary conditions do not seem to be occurring in the dispute in question: although both cases in point have in common the presence of a proprietary standard, in the Genoese case the defendant's activity had been put in place without any attempt to negotiate the terms of a license on the standardized patents and it had turned into an appropriation of the competitor's property right. In the current dispute, instead, the parties that already had contractual relationships, as the plaintiff reported, began negotiations for granting to Apple a license for the Samsung patents as early as July 2010, with said negotiations extending until October 31, 2011, with an exchange of correspondence between the parties on the subject of the terms and conditions of the license, with requests for reciprocal obligations of various kinds.

In the case in point it is therefore not possible to claim the application of an injunction as decided at the complaint hearing by the Genoese Special Division, as it must be considered that in this case the very requirement exists that had been judged missing by the Genoese judges, that is, the interested party's application to obtain a license.

On the other hand a simple application would not be sufficient to be shielded from all charges of infringement, but it would be necessary for the intent to obtain a license to be pursued by means of serious negotiations. Now in the case in point, the seriousness (although probably

not shared in the conclusions that were drawn form it) of Apple's offer may be identified in the computation of the royalty percentage that the technicians consulted by Apple worked out, as shown below.

**8.     The theory of the establishment of the license having already occurred**

Regarding the thesis presented by the defendants' attorneys, according to which the license was allegedly already established and only determining the royalty percentage was lacking, this judge shares the objections of Samsung's defense. Based on the provisions on contracts of our civil code, the expressed willingness to start negotiations may not be compared to a contractual offer; for a proper binding offer, in regard to which a simple acceptance is equivalent to establishing a contract, it is necessary for the subject of the agreement to be precisely determined in all its elements and, in particular, for the respective performance by the party to be defined (Cass., July 7, 2009, No. 15964; Cass., December 15, 1982, No. 6922). Under no circumstance, on the basis of Italian law may an offer of patent license be a document that, one the one hand, does not even indicate what patent would be licensed and what the territorial and temporal limits of the license are and, on the other hand is wholly silent regarding the counter performance requested from the licensee.

The offer presupposes an expression of intent by the offering party in the sense of assuming a binding commitment and for the hypothesis of acceptance by the counterparty, that in the declaration at the time made by Samsung is instead absent. Likewise, the plaintiff's statement according to which, on the basis of Italian law, the conduct of the infringing party that begins to exploit another's patent without asking for a license and without paying royalties could not be considered an automatic acceptance of a license agreement seems reasonable.

Also the decision issued on October 14, 2011 in the parallel Dutch proceeding (doc. 19) rejected Apple's thesis regarding the existence of a license. The Dutch judge in fact ascertained (points 4.12-4.16) that:

- article 4.1. of the ETSI Guide on IPRs demonstrated that additional negotiations between the parties are necessary, after the declaration of willingness to deal;

-  the declaration to ETSI does not appear to correspond to an offer according to French law (applicable to the Agency's regulations);

-it is not sufficiently demonstrated that there can be a licensing agreement based on French law before the parties have agreed upon the license payments;

- based on French law licenses must be concluded in writing.

On the other hand, in this judge's opinion, it must also be excluded that there already was a license, in consideration of the fact that Apple itself on no occasion during negotiations had used such an argument, and instead had determined to comply with Samsung's requests (see in particular on the non disclosure agreement) without ever bringing up the existence of a license agreement already entered into, so that only the amount of the royalty would have remained uncertain. On the other hand, the uncertainty regarding this last datum was not a negligible lack, since the price of the royalty was an element of fundamental importance, also in  relation to the nature of the agreement and potential of use of the asset that constituted its subject.

### 9.        The Samsung/Qualcomm agreement

**9.1**      Again in reference to the presumption of sufficient legal basis the objections formulated by Apple's defense in reference to the Samsung/Qualcomm agreement and in reference to the statement of having purchased the chips in question from Qualcomm must be considered.

In this sense, it must be considered that the agreement executed between Samsung and Qualcomm consists of three subsequent documents: the actual license agreement, signed by the above-mentioned entities in 1993 (Apple doc. 34), the modification which took place in 2004 (*Amendment 3.29.2004*, attached to doc. 34) and lastly an "additional 2009 modification" (*Amendment 1.1.2009*, additional annex to doc. 34). This agreement, to which California laws apply (the parties agree on this point), explains its effect on the entire worldwide territory ("*Territory means the entire world,*" so in the preliminary considerations of the *Agreement of 8. 31.1993*) and it is inherent, for what pertains to this proceeding, in the discipline of certain aspects of the construction of components manufactured by Qualcomm on behalf of Samsung, the owner of the property right.

As for the subject of the license granted, it must be deemed that the patent in question (EP '269) is to be understood as included in the whole of the contractual agreements established between Samsung and Qualcomm. Indeed, in the 2004 Amendment, clause 5.1 expressly

excluded only patents owned by Samsung and its subsidiaries acquired or developed after 12.31.2000. Observing that the patent EP '726 claims a Korean priority from 1999 and the application for European registration was filed on July 6, 2000, Apple therefore states that the patent indicated is included in the agreements in question.  This deduction was not effectively denied by Samsung's defense and, at the current stage of analyses, it appears absolutely acceptable to this judge.

**9.2**      It must also be considered that, based on the 2004 Amendment, clauses 5.1 and 5.2 were modified: those clauses established on Samsung's part a covenant not to sue Qualcomm, as well as certain additional entities (this point will be revisited later). It is therefore necessary to understand whether, also in view of the provisions of the 2009 Amendment, such a waiver of the exercise of a legal action applies to Apple.

According to Samsung, in the 2004 agreement as well as in the 2009 modification, the commitment not to sue, set forth in articles 5.1 and 5.2, is allegedly not applicable to Apple. And in fact, in article 5.1 (agreement 2004) the commitment had been assumed toward Qualcomm alone, toward its affiliates and its suppliers. Article 5.2 instead, again according to the provisions of the 2004 modification, required the commitment not to sue also toward Qualcomm's customers; this commitment however had precise subjective and objective limitations that, according to Samsung's defense, would apply to excluding Apple.

Regarding the subjective limitations, the definition of "Qualcomm Customer" required for the "customer" to be any third party that had purchased a component from Qualcomm and/or from one of its affiliates and had incorporated it in its own product *("means any entity that purchases Components from Qualcomm and/or its Affiliates and incorporates such Components into its Subscriber Units or Infrastructure Equipments - as such terms would be applied if such entity were a Party)."* So by not purchasing it directly from Qualcomm, nor, according to Samsung, itself incorporating the purchased components, Apple would consequently be excluded from the qualification of customer.

As for objective limits, again established by clause 5.2, Samsung specified that the products in question were only those pertaining to products *"an entity's Subscriber Units and Infrastructure Equipment purchased by such entity from*

*Qualcomm or its Affiliates.*" Therefore, in this case, the fact that Apple did not itself incorporate the components manufactured by Qualcomm is relevant.

In the 2009 version the definition of "Qualcomm customer" vas modified, including also those that purchased a component directly and/or indirectly from Qualcomm ("*means any Third Party that purchase or otherwise lawfully obtains, directly or indirectly, any Qualcomm Components and incorporates such Qualcomm Component into its Subscriber Units, Cards, Embedded Modules, Femtocells, OFDM Infrastructure Equipment and/or Infrastructure Equipment*"). However, according to Samsung, also on the basis of this modification Apple would not be a "Qualcomm customer" for the purposes of the so-called commitment not to sue. And in fact Samsung, to support that position, filed (as doc. No. 42) the opinion of an expert in California contract law, Hon. Armand Arabian; said expert pointed out how the interpretation of the clauses in question, according to California law, allowed stating that only an entity that purchased the components directly from Qualcomm and that personally incorporated the in its products could be included in the definition of "*Qualcomm Customer.*"

**9.3**      According to the defendants' lawyers, instead, Apple would fall among those toward which Samsung assumed the commitment not to sue. In view of the modification introduced in 2009, regarding the definition of "Qualcomm customer," the inclusion of the wording ("*means any Third Party that purchases or otherwise lawfully obtains, directly or indirectly, any QUALCOMM Component and incorporates such QUALCOMM Component into its Subscriber Units, Modem Cards, Embedded Modules, Femtocells, OFDM Infrastructure Equipment and/or Infrastructure Equipment*") implies that among the customers set forth in article 5.2 Apple itself is present. This conclusion by the defendant's attorneys was also supported by the opinion of an expert (Apple doc. No. 51). Said expert stated that the interpretation of the agreement between Samsung and Qualcomm, even following the principles expressed by the laws of the State of California, moreover similar to those of our civil code, led to the conclusion that it was necessary to investigate on the actual intent of the parties regarding the content of the agreement. And indeed the distinction between "granting a license" and "committing not to sue" to Qualcomm by Samsung

was purely artificial and in any case not capable of modifying the substance of the agreement, as said agreement in any case was based on giving consent to the manufacture and sale of the product incorporating the patent and selling it on a worldwide scale. According to said expert the essence of the Qualcomm agreement corresponded to Samsung's permission, granted to Qualcomm, to manufacture ans dell products that incorporated one or all the patents pertaining to mobile communication devices, thereby consenting to the placement on the market of said products. A similar consent, according to an argument that appears fully convincing to this judge (see below), clearly may not be revoked after the fact by the obligated entity (Samsung) or after the product was sold to a third party and is on the market. According to said expert, an interpretation that denies the enjoyment of this license to Qualcomm's end customers or limited enjoyment solely to Qualcomm's direct nominal purchasers, excluding companies such as Apple, that obtain the chipsets with preliminary agreements from intermediary companies, would not make sense from a commercial standpoint and would go against the obvious intent and intentions of the parties to the license.

**9.4**     In reference to the exhaustion principle opposed by the defendants' attorneys, Samsung challenges the assumption of exhaustion of the rights granted by its patent EP' 269, assuming that Samsung had never given any consent whatsoever to market the products incorporating the chip covered by said patent within the European Economic Space. The plaintiff's defense also assumes how the consent, according to European Community case law, shared by domestic case law, must be given in an express fashion. It points out how only exceptionally "in special cases" it can be an automatic consent and how such a consent may be inferred only if prior circumstances express with certainty the owner's intent to and similar evidence should be provided for each individual product (meant in reference to a specific temporal scope), meaning with such statement that if a consent was granted  this does not imply that it was valid forever, in the absence of a specific contractual commitment in that sense.

According to Samsung's defense, therefore, the chips imported before the letter of cancellation may be considered covered by said consent, whereas those imported subsequently would remain without consent.

On the contrary, in the opinion of the defendant's attorneys the very agreement with Qualcomm would demonstrate how Samsung granted its consent to distribute the product worldwide, therefore obtaining the exhaustion of the right for patent EP' 279 also in reference to the European Economic Space.

**9.5**     This judge deems that she has to rule, in line with European community and domestic case law indicated by the plaintiff's defense (EU Court of Justice, July 12 2011, C-324/09, L'Oréal/eBay; EU Court of Justice, June 3, 2010, C-127/09, Coty Prestige; EC Court of Justice, October 15, 2009, C-324/08, Makro Zelfbedieningsgroothandel; EC Court of Justice, April 23, 2009, C-59/08, Copad; EC Court of Justice, November 20, 2001, joined actions from C-414/99 to C-416/99, Zino Davidoff; EC Court of Justice, July 1, 1999, C-173/98, Sebago; EC Court of Justice, July 16, 1998, C-355/96, Silhouette; in Italian case law, see Court of Bologna, September 12, 2006, in *Foro padano*, 2007, I, 397 ss.; Court of Turin, July 18, 2006, in *Foro it.*, 2007, I, 621 ss.; Court of Rome, February 23, 2005, in *Giur. ann. dir. ind.*, 2006, 289 ss.; Court of Turin, January 16, 2004, in *Giur. it.*, 2004, 1448 ss.), in favor of stating the need of an express consent for marketing the product covered by patent and the exceptionality of an automatic consent, to be verified very closely in view of the parties' intent, as could be demonstrated by the conducts maintained by them.

She however believes that in the case in point  Samsung's consent was stated in express wording*,* at the time when, defining the territorial scope of the agreement with Qualcomm it had referenced the entire world  ("*Territory means the entire world*," in the introduction of the *Agreement 8. 31.1993*). The territorial extension does not appear to have undergone modifications with the subsequent *Amendments* (the argument is not even used by the plaintiff's defense), so that clause 5.1 (2009 *Amendment*) states that Samsung grants a worldwide license, personal and non exclusive.

This interpretation therefore must certainly be deemed to include the European Economic Space, which if anything should have been expressly excluded. Therefore, with the summary evaluation reserved to this proceeding, it seems that it should be concluded that marketing in Italy (which is certainly a member of said SEEs) of products including Qualcomm's chips took place with the consent of the owner of the patent right

(if it is true, as assumed thus far, that the patent is valid) and the revocation of such a consent did not take place according to contractual provisions. On the other hand, these provisions limit  the freedom of revocation at will of the consent, given that Samsung by signing clause 5.2 in the terms stated above imposed to itself a limitation of its option to revoke the consent given in various other cases.

Add to this that from Samsung's press release of 11.6.2009 (Apple doc. 33) it is learned of the existence of a cross licensing agreement with Qualcomm that covered and covers the components of the telecommunication sector for a period of 15 years; that agreement was not presented as limited to the American market, but it appeared to pertain to the whole world and therefore also to Europe. Therefore Samsung's technology was marketed in Europe with its consent, so that it appears that exhaustion took place within the European community that keeps Samsung to oppose further marketing. Nor can that consequence, pertaining to a generally recognized principle intended for the protection of the market and free competition, be voided by the opposing intent stated by the interested party. It would be too easy ans too convenient for the owner of an intellectual property right, regulated by said principle, to have the option f manifesting a contrary intent at any time, and this moreover after it had guaranteed for itself a similar possibility only in certain cases.

**9.6**      On the other hand, it must be believed, again in view of the summary acknowledge reserved to this initial hearing, that the chips placed in the iPhone 4S are the chips purchased by Apple from Qualcomm; and this in view of what was stated and attached by Apple's defense in its brief, in which it acknowledged the purchase of some units of iPhone 4S (Apple doc. 48, which documents the purchase of ten iPhone 4S, there being a unit on record and as said unit shows the chip in question, see attached photographs and in particular the 7th sheet). Once examined the content of a unit, Dr. Potenza, who purchase at Apple's behest throughout Italy the ten units examined (report also attached  under doc. 48) , stated that the microprocessor found within one of said devices, selected as a sample, was a chip bearing the Qualcomm trademark.

According to this judge, again for the purposes of the summary acknowledgment reserved to this stage, significant evidentiary elements can be identified that lead to believe that the

that the microprocessors within the iPhone 4S came from Qualcomm. On the other hand, this circumstance is not effectively challenged by Samsung's defense (not even at the hearing of 12.16.2011, subsequent to Apple's production), as the burden of proof of infringement is incumbent upon Samsung. Consequently it appears fair to state that Apple is among the so called indirect purchasers of Qualcomm, to which Samsung's commitment to waive the exercise of a legal action must be extended.

It is significant that even the evidence offered in the similar French proceeding concluded with an emergency order  dated December 8, 2011 (produced by the parties  parti of the hearing of last December 16), confirms that the chips found at that location in the  iPhone 4S came from Qualcomm. Based on this observation and pursuant to a reading of the contractual clause examined above with which this judge has substantially agreed, the French Judge deemed to reject Samsung's requests for interim relief.

**9.7**     According to Samsung's defense, with its letter of April 21, 2011 (Samsung doc. 44) revocation of the consent in question was allegedly legally exercised, as it represented the distinction between the period in which the circulation of the chips that are the subject of the license (or in any case of the free circulation commitment) had occurred with the consent of the owner of the  patent (period of exhaustion) and the period in which said consent had instead been nullified (non opposability of exhaustion).

Aside from the problem of whether it was possible to revoke a consent already given (regarding which serious doubts can be formulated, unless in the presence of particular conditions), the defendant's observation as set forth below appears plausible to this judge.

Indeed, in regard to the letter of April 21, 2011, the defendant's attorneys maintain that the exercise of the power to limit the scope of any commitment assumed by Samsung toward Qualcomm i and its customers in order to exclude any product manufactured for, used by sold to or otherwise transferred to Apple or any of its affiliates, would not be valid in the case in point. In fact, also considering the content of clause 5.2 following the 2004 modification (as this remained substantially in force even after 2009), Samsung would have had a right to suspend the effects of its agreement with Qualcomm only when a customer or a third party had filed an infringement action against Samsung  and when the assumed basis of the

45

infringement derived from the use or incorporation of said Qualcomm components in the products covered by the agreement.

It must instead be noted that in the case in point the action was initiated by Samsung against Apple, so that the case in point does not identify with the one considered of contractual provision (the opposite case, in which Samsung were a defendant for infringement). In fact, even considering other proceedings pending between the parties, that have Samsung as defendant, it must be noted how none of the proceedings filed by Apple against Samsung pertains to the inclusion or use of components that are the subject of agreements with Qualcomm.

Therefore it must be concluded that the hypothesis on which Samsung had conditioned its option to revoke its consent to free worldwide circulation of the microprocessors produced by Qualcomm and based on Samsung's patents had not materialized, with the consequence that the revocation set forth in the letter of April 21, 2011 might not be validly opposed.

Samsung's right on the patent upheld here does not therefore appear to be able to avoid the principle of exhaustion, including under European Community laws.

**10 Il   *Danger in delay***

**10.1**      In any case it must be considered that in order to grant the provisional measures requested by Samsung here, it is also necessary to evaluate the requirement of grave and irreparable damage to which the plaintiff would be exposed in the time necessary to have its claim verified in the proceeding of first instance.

For this purpose one cannot neglect the defendant's observation which maintains that the violation of EP' 269 was known to the defendant since July 9-11 2008, as allegedly proved by Apple's doc. 28, a circumstance that in the defendant's defense would show the lack of damage from the aspect of the request for a timely intervention.

The date of 2008 is that of the placement in the market of the iPhone 3G (which was launched in July 2008), whereas in 2010 the iPhone 4 entered the market. Its evolved version, iPhone 4S, allegedly makes use of the same telecommunication technology, incorporating the patent which is the subject of the application for an injunction.

Therefore there would not be enough room to accept the claim because the current nature of the damage is lacking: if the chip in patent EP '269 had actually been included in both the iPhone 3G, and in the first version of the iPhone 4, sand finally in the iPhone 4S, then the current nature of the damage would be nullified, because more than three years have elapsed (or in any case more than one year) since the damaging event occurred.

In reference to this approach by the defense, the judge must note how it cannot be stated with absolute certainty that Apple document No. 28 is qualified to prove that the model marketed by the American multinational offered to Samsung the possibility of knowing that di the technology protected by the plaintiff's property right had been already included in that model and that the latter had showed an initial tolerance to take action only at the time of the launch by Apple of the iPhone 4S with an application for interim relief that would therefore be devoid of the timeliness requirement.

In fact, the document consists of an excerpt from the Apple website dated  July 9, 2008 announcing the introduction of the new iPhone 3G model, which states that the new cell phone gives the user an even faster access to internet and e-mail, because of the quad-band GSM and tri-band HSPDA system for voice and data connection worldwide, supporting Wi-Fi, 3G and EDGE network systems among which it is able to make an automatic selection in order to ensure maximum download speed. From this reference to the networking system the possibility for Samsung to be informed of the exploitation of its patent by Apple should be inferred.

However, no matter how vague the reference made by Apple to Samsung technology, it appears sufficient to put in doubt the existence of damage that can be defined current and imminent, also considering the credibility of the defendants' observation  according to which Samsung's defense had in its complaint stated that model 4S was substantially an update of the prior Phone 4, to then state, in the response brief, that the product in question was instead a novelty and such as to illegally erode market shares and cause a loss of customers for Samsung through infringement of EP' 269.

The reaction time frame between the supposed cognizance of the alleged infringement and the plaintiffs' judicial reaction, which took several months, would deprive Samsung of the possibility of qualifying its damage as imminent and current.

On this point the Special P.I.I. Division of Bologna remarked that: "the danger in delay is missing, required to obtain the description, presentation of documents, seizure and an injunction against manufacturing machinery produced in infringement of a patent when years have elapsed from the first notice sent to the infringing party and a proceeding before the UEB to obtain the annulment of the patent is pending before the judges in the state of which the defendant is a resident" (Special P.I.I. Division of Bologna, July 15, 2008). The same opinion is shared by the Special Division of Rome, in the order issued on July 5, 2007, which states that "the requirement of danger in delay of interim protection is not identifiable when the plaintiff only makes a vague and general reference to an indemnifiable financial damage and moreover deriving from conducts existing for over two years prior to filing the petition." In any case, as a situation of doubt persists regarding the moment in which the plaintiff could have learned of the infringement of its patents, this judge deems such an investigation ill suited to be conducted in the interim stage, because it would go through a technical stage, as a logical antecedent necessary for verifying Samsung's awareness, in order to ascertain whether the technology of EP' 269 was already present at the time the iPhone 4 was launched on the market in its basic version or even at the time of the marketing launch of the iPhone 3G.

However, even apart from such an evaluation, which would exceedingly burden this proceeding, it is useful to note that examining the current status of the damage constitutes a *posterius* in respect to the identification of the nature of said damage, that must be by law qualified as grievous and irreparable.

**10.2**    For this last purpose it must be observed that the injunction for infringement pertains to product for which the parties already had negotiations underway, and that said negotiated had reached a standstill because of the lack of agreement on the conditions for the price of the license. The defendant's thesis, which showed how there is a possibility that the dispute can be defined in purely financial terms though a license must therefore be accepted. This leads to exclude that damage of an irreparable nature exists and that there is an urgency to grant an injunction and/or withdrawal from the market of the iPhone 4S. Assuming a prospective and probabilistic scenario, should the plaintiff's claim be deemed founded and it were ascertained that Apple actually included the

*chips* protected by Samsung's property right, the latter would have the right to damages for infringement in merely financial terms, that is, by means of a monetary consideration. An injunction, instead, is to assist damage irreparably by its nature, whereas the irreparability of the damage seems to have to be excluded when there is a possibility of obtaining a full financial indemnification for the violation of one's property rights.

On the question of whether financial damage can be defined as irreparable and therefore give a foundation to the measure requested by Samsung, lower court legal precedent appears at first divided. On the one hand, it is possible to refer to rulings that acknowledge the incompatibility between irreparability and financial indemnification such, as an example (among many Court of Milan, February 28. 1996, Court of Monza, December 6, 1997, Special P.I.I. Division of Catania, January 19 2006), the decision by the Court of Florence of March 27, 2003, which stated that "the "alleged" damage to the patent right seems to cause a mere financial damage, consisting in the failure to exploit the invention by granting it to companies operating in the sector, basically, a loss of revenue. The normal duration  of a proceeding is absolutely not suitable to produce damage that can rise to the extremes of gravity and irreparability. In fact, at the end of the lower court proceeding to be filed, and acknowledgement of the legitimacy of the complaint would be followed by the possibility of obtaining an indemnification easily and precisely quantifiable in monetary terms, able to eliminate completely the financial damage suffered." A more recent order of the Special Division of the Court of Catania stated, in the same spirit, that "in the case when the owner of the patent only grants the patent on license to third parties, drawing a license fee as consideration, that irreparability of the damage that accompanied the concept of *periculum in re ipsa*, cannot be realized*,* given that the owner of the right can only claim the failure to collect license payments."

Other rulings instead seem to identify in financial detriment a sufficient element to give substance to the irreparability of the damage (see in particular: Special P.I.I. Division of Naples, order of 4.20.2004, reiterated by the order of 10.24.2008). However, a closer reading of the above-mentioned provisions allows to identify as a common element the need expressed by the judge to protect with an injunction a particularly qualified financial damage, characterized, on the

basis of the circumstance of the actual case, by relevant entities subject to unforeseeable and uncontrollable developments, or a difficult proof of its extent in the subsequent proceeding on the merits.

As agreed upon by the courts of first instance, the need clearly emerges of carrying out, prior to any other additional evaluation, a balancing of the parties' interests in view of issuing a provision: the Special Division in Naples considers it a priority to perform, also in within the scope of monetary damage, a *"comparative evaluation of the parties' opposing interests."* This approach allows to put in proportion the requirement of *danger in delay,* placing it into the actual case and evaluating the effects of adopting the relief measure.

The rationale of this approach allows to proceed apart from aprioristic categories of a general and abstract nature and to evaluate in full the characteristic of instrumentality which is peculiar to the interim procedure.

**10.3**     Applying this principle to the case in point, first of all it is noted how an approach linked to an evaluation of the individual action in the case in question leads to highlighting, among other things, the circumstance that Apple seems to have deposited in trust a sum of money as guarantee of the royalties presumably owed to Samsung in the event its patents were to be deemed valid and infringed (doc. 30). It must then be acknowledged that Apple is certainly not risking insolvency (to use a euphemism, as Apple's own defense states, see as doc. 29: press release of the report pertaining to Apple's sales for the third quarter of 2011), a conviction strengthened by the enormous success obtained by the products recently launched on the market.

The presence of such a guarantee would allow Samsung to mitigate any damaging effects during the proceeding. Also the observation of the easily verifiable extended illegal conduct and its extent lead to believe that it is necessary to evaluate the request for interim relief in view of the circumstances of the actual fact. The valuation of the nature of the companies involved in this dispute also contributes to the decision: these are in fact worldwide technology leaders. If on the one hand it must be stated that the nature of telecommunication "giants" is not sufficient to ensure immunity from the damaging consequences of their conducts, it is however undeniable that the presence of factors such as high revenues, a high degree of solvency and solidity of these multinational groups, together with a strict burden of

accounting documentation to which they are subject, all elements that ensure a high level of the possibility to verify commitments assumed and revenue obtained on which to calculate any royalties that may be owed.

Having made these preliminary statements and deeming that an injunction is not indispensable for protecting the plaintiffs' reasons during the proceeding, this judge does not deem to be able to admit the request for an injunction, as in the case in point no damage can be identified such as to place at risk the financial stability of the company that suffered it.

**10.4**    On the other hand, the ides of total unassailability of the Apple Group companies, that would allegedly be immune from any interim measure because of their position of particular prestige in the market (summarized in the expression now widespread in the financial press *"too big to fail,"* so that the American multinational would be *"too big to be stopped"* is to be dismissed.

There is no privileged judicial status that may be claimed by Apple, whose contractual and commercial behavior was examined at this stage and will certainly examined by the judges of first instance.

It is however deemed possible to state that Samsung's rights will be able to find adequate protection in the first instance proceeding, whereas at this time they are not such as to allow the immediate assumption of an injunction, as this does not appear to be supported by the necessary requirements to meet a sufficient degree of danger in delay, in terms of irreparability, in addition to timeliness.

**11**    **Balancing of interests**

**11.1**    The conclusion adopted, furthermore, appears in line with the principle of balancing opposing interests and with the one, certainly not negligible, of the protection of consumers and operators of the downstream market.

Indeed, on the one hand the iPhone 4S has already been introduced on the Italian market. It is true that Samsung had filed an application for interim relief before it was marketed, but the plaintiff itself at the first hearing requested a postponement to a date following the scheduled launch of the product on the market. On the other hand, in balancing opposing interests and with the pressure of the consumer public by now waiting to receive the new models (requested in the number of one million units, according to Samsung), it does not seem more opportune to intervene with an injunction , as it can be said

that, because of the considerations already expressed, the feared damage seems to consists solely of a monetary damage: the failure to be paid for royalties. And indeed, it cannot be revoked in doubt [sic] that Samsung repeatedly formulated an offer to license its patent both in general terms by stating to ETSI its willingness to offer a license on the standard, and specifically with a letter dated July 20, 2011 (Samsung doc. 13), when it had communicated its willingness to grant a *frand* license, reiterating said willingness in more precise terms, after Apple had signed the non disclosure commitment (as per Apple doc. 23); in that stage (on 7.25.11), in fact, Samsung had formalized its offer for all UMTS/WCDMA technology standards, asking for a 2.4% royalty.

Samsung itself states that in order to avoid an illegal act Apple should have demonstrated that it asked to pay royalties. But such a request indubitably was made and expressed with a certain seriousness, as demonstrated by the development of negotiations, in which for instance Apple signaled its willingness and indubitably expressed a certain good will in signing a confidentiality commitment.

Therefore it will be a matter of ascertaining during a first instance proceeding what the percentage is for a *frand* royalty, whether Apple bore any responsibility for the failure of negotiations or if the collapse of said negotiations is to be attributed to a normal and legitimate lack of identification of a mutually satisfactory threshold for the percentage of royalties to be paid. The fact that illustrious experts were consulted on this point by both parties and were able to support their theses with technical and econometric arguments, demonstrates how both the opposing parties' positions are not in bad faith (even if, naturally each tries to get the maximum advantage from the operation, according to a market law which, unless proved otherwise, can be deemed completely legal). This observation allows to clear the field, at least at the current stage of investigations, from charges of *patent ambush* and abuse of dominant position. It is therefore indubitable that the valuation regarding a *frand* royalty must be entrusted to an expert witness. Likewise, a definitive verification regarding the validity of the patent in question and regarding the actual technology used in the new iPhone 4S compared to prior models (for the purposes of verifying whether the charge of infringement is founded) can only take place during a full proceeding, through a court-appointed expert witness. Rather, in logical terms, this verification will considered as an antecedent and prejudicial

for the court-appointed expert witness on the royalty rate, as it is quite obvious that no royalty will be owed to Samsung if the exhaustion of its patent at a worldwide level can be stated pursuant to its agreements with Qualcomm, as well as if the validity of the patent were to be denied or infringement excluded.

**11.2**    These issues of a prejudicial nature keep from giving immediate access, following the indications of Samsung's defense, to an expert witness to determine a fair royalty. Lacking an agreement in that sense between the parties and in the presence of the other issues of a prejudicial and absorbing nature mentioned above, it is not possible to agree with the presentation of Samsung's defense, that could have however opened the way for an agreed-upon solution to the dispute.

It is not sufficient to state that Apple presented the new model as an "absolute novelty" to contradict Apple's statement regarding the use of the UMTS functionality. The burden of proof of the danger in delay rests on Samsung and therefore also that of the timeliness of the application for interim relief: against the principle of evidence provided by Apple regarding the use of said technology, Samsung should have demonstrated that the UMTS functionality of the iPhone 4S was different from the one used by Apple and that only that latest technology represented an infringement of their own patents.

**11.3**    In order to impose the requested interim reliefs it is necessary to balance the effects that said provisions would have on the market and for the defendant companies compared to the benefits derived from it for the owner del right requesting provisional protection.

In the case in point an injunction blocking or delaying the marketing of the iPhone 4S on the Italian market, as well as the seizure of all units already in commerce would mean enormous and irreparable damage for Apple and Italian consumers. In fact, not only the alleged irreparable damage to Samsung must be kept in mind t, but also the damage Apple would suffer in the event distribution and marketing of the iPhone 4S were to be prohibited, which would end up in an irreparable loss of market share for Apple, also in consideration of the rapid obsolescence that notoriously characterizes the market of mobile telecommunication devices.

At the end of the proceeding of first instance, should the opposing theses of the defendants [sic] be admitted (regarding which an opinion, albeit partial, of possibly being founded), the iPhone 4S would no longer be a marketable product. This would be damage

of enormous relevance, and truly irreparable, also involving third parties that participate in

the manufacture, distribution and promotion of the iPhone 4S. Instead, the damage that the Samsung companies would suffer if the provisional measures were denied at this stage, would exclusively correspond, as already illustrated in the preceding paragraphs – to the amount of uncollected royalties, as long as the plaintiff's thesis on infringement were confirmed in the lower court proceeding. It is correct to state that Samsung's alleged damage translates into a mere right to credit, which may find adequate compensation at the end of the proceeding of first instance.

**11.4**     The plaintiffs' defense (page 62 of Samsung's response brief) stated that rejecting their claims "*on the one hand would see thwarted in great part the research investments at the basis of EP' 269 (which, at this point, would be exploited free of charge by Apple without having contributed in any way to this technology) and, on the other hand, would find its market share blocked and likely eroded by the infringement committed by the counterparty*."

It does not appear that this statement can be agreed with. Indeed, as far as investments in research for the patent in question, should it be proved that EP "269 is valid and infringed by Apple, the latter would be obligated to pay to damages to Samsung in the form of the same royalties that Samsung is already requesting now as counterpart for its obligation to grant a license. The desire to offer a license has already been stated by da Samsung in various venues. As to the alleged risk of erosion of the market share held, it has been stated in the proceeding (par. 78 of Apple's answering brief) that the Samsung Galaxy S, iPhone 4S' potential competitor, since it was launched on the market approximately 5 months ago, has enjoyed a worldwide success in sales defined "incredible," that apparently exceeded 30 million units (doc. 45). Considering said great worldwide success, the statement that Samsung cannot complain that its market share would be "blocked" or "likely eroded" by the sale of the IPhone 4S is to be agreed with.

It must therefore be concluded that the damage that the Samsung companies may potentially suffer in the event of a failure to admit the petitions for provisional measures would be not only minor compared to the damage to Apple, but, above all, easily remedied by remitting the lost exploitation rates.

Indeed, a delay or a suspension in the manufacturing of the final product may cause the company interested in the licensing of a patent essential to the standard serious and irreparable harm in terms of its competitions, whereas the counterposed interest (also worthy of protection, in the event the validity and infringement of the patent were confirmed) is only

that of obtaining an adequate increase in the monetary value of its patent.

## 12     Conclusions

In view of all considerations set forth, this judge deems that she cannot grant the requested provisional measures and that she must reject the petitions filed on behalf of the plaintiffs Samsung corporations.

The uncertainty of the many arguments set forth in the opposing defenses, the novelty and complexity of the subject lead to order the sharing of proceeding expenses among the parties.

**THEREFORE**

Deciding on the provisional pretrial requests made by Samsung Electronics Co. Ltd and Samsung Electronics Italia S.p.A. against Apple Inc., Apple Italia S.r.l., Apple Retail Italia S.r.l. and Apple Sales International,

she rejects said provisional petitions and orders the full sharing among the parties of trial expenses for this stage of the proceeding.

Thus decided in Milan, on January 5, 2012.


*The Presiding Judge*

*Marina A. Tavassi*

**General Record No. 45629-1/2011**



### COURT of MILAN

### SPECIAL INDUSTRIAL AND INTELLECTUAL PROPERTY DIVISION

In the ongoing preliminary proceeding entered under **General Record No. 45629-1/2011** filed by:

**SAMSUNG ELECTRONICS CO. LTD and SAMSUNG ELECTRONICS ITALIA S.P.A.,** in the person of their current legal representatives, assisted by Prof. ADRIANO VANZETTI, Esq., as well as the attorneys GIULIO ENRICO SIRONI, Esq. and ANNA COLMANO, VIA DAVERIO, 6 - 20122 MILAN, electively domiciled at the law offices of said attorneys, pursuant to a power of attorney on file,

PLAINTIFFS

versus

**APPLE INC**, **APPLE ITALIA S.R.L., APPLE RETAIL ITALIA S.R.L., APPLE SALES INTERNATIONAL,** in the person of their current legal representatives, assisted by Prof. GIUSEPPE SENA, Esq. and by the attorneys PAOLA TARCHINI, Esq., MARCO FRANCETTI, Esq. of the Milan Bar, as well as FABRIZIO JACOBACCI, Esq. and BARBARA LA TELLA, Esq. of the Turin Bar, all corporations being electively domiciled at CORSO VENEZIA, 2 -20121 MILAN, in care of the law offices of Attorneys Sena and Tarchini, pursuant to powers of attorney on file,

DEFENDANTS

The Judge MARINA ANNA TAVASSI,

canceling the reserves issued at the hearing of 12/16/2011,

issued the following

### ORDER

Having examined the records and documents of the proceeding, having heard the oral discussions of the parties' defense attorneys at the hearings of October 26 and December 16, 2011, canceling the reserve issued at the hearing of December 16, 2011,

the presiding judge's deputy notes the following:

**1.      Preliminary de facto statements – The plaintiffs' theses**

**1.1**      This proceeding was filed with a provisional pretrial petition within the scope of the proceeding of first instance (General Record No. 45629/2011) by Samsung Electronics Co. Ltd and Samsung Electronics Italia S.p.A. against Apple Inc., Apple Italia S.r.l., Apple Retail Italia S.r.l. and Apple Sales International. Another application for interim relief, the latter pretrial, was filed separately filed by the same plaintiffs to protect their patent EP' 269.

**1.2.**      Said proceedings involve the same parties, are based on patents covering portions of the same telecommunication standard (the so-called 3G/UMTS standard) and have as their subject the same Apple product, that is, the new smartphone model, called iPhone4S, as well as this pretrial proceeding, another Apple product called *tablet computer*.

The plaintiff/petitioner companies (hereinafter, also the "Samsung Group" or "Samsung") stated to be world leaders in the production of electronic devices and in the development of cutting edge technologies, so that over time they assumed the ownership of a huge patent portfolio.

This application for interim relief, filed in the course of another proceeding, in included within a broader judicial context, with the current plaintiff/petitioner and defendant/respondent parties involved in a series of proceedings in various countries, having their subject matters variously linked to intellectual property rights owned by Samsung and Apple, extended to the subject of antitrust by the defense strategies formulated by Apple in the pretrial proceedings.

**1.3**      In reference to the proceeding of first instance into which this preliminary proceeding is included, it can be deemed that Samsung, with a complaint dated June 22, 2011, appeared before this Special Division in order to protect itself against the violation and infringement of three patents it owns.

Specifically, Samsung acted to protect patents EP 1005726, EP 1720373, EP 1714404 (although the application for interim relief being examined today centers on the first of said patents). Based on ample technical and legal arguments, Samsung stated that the Apple products commercially called iPad (in all their successive versions over time) and iPhone (and in particular the models starting from iPhone 3G to iPhone 4), as they operate in accordance with 3G/UMTS standards,

were necessarily implementing the *standard essentials* owned by Samsung and consequently they allegedly illegally implement (in the absence of a consent ~~fron~~from the owner Samsung) the above patents.

Samsung therefore charged that manufacturing, offering for sale, marketing and publicizing of said products by Apple constituted infringement and unfair competition against Samsung.

Samsung therefore concluded asking this Special Division to ascertain and declare that manufacturing, offering for sale, marketing and publicizing by Apple and any other activity pertaining to devices operating according to the 3G/UMTS standard constitute an infringement of the patents in dispute as well actions of unfair competition and therefore requested that Apple be forbidden to continue such illegal conduct, ordering the latter to pay damages and return the revenue obtained on the occasions of the conducts charged, as well with an order to withdraw from the market, destruction of infringing products and materials pertaining to them, setting a penalty and order to publish the judgment to be rendered.

1.4     It is opportune to frame the context of the patent upheld in this proceeding by Samsung, in order to better understand the observations and grievances formulated in first instance by the parties.

The reference market for the products in question (and/or that implement the devices and/or the relevant technologies in the case in point) is characterized by the joint presence of numerous manufacturers and diverse electronic devices. Such a market requires the creation of the so-called shared standards (that is, collections of technical specifications) in order to create an effective communication systems on mobile telephony networks. The suppliers of network infrastructures make available tools that allow communication on the basis of said standard regulations.

In Europe, the definition of communication standards is entrusted to ETSI -*European Telecommunications Standards Institute.*

To date, the architecture, that is, the whole of the infrastructures that comprise a telecommunication system is the 3G (Third Generation) standard, which allows not only to make telephone calls between users, but also to exchange files, e-mails and streaming of multimedia contents *(e.g.* videos, TV channels, etc.).

In Europe, the networks that follow the 3G standard are called UMTS, *Universal Mobile Telecommunications System.*

As for 3G networks, and in particular UMTS systems, definition of the technical specifications of the standard is carried out by the 3GPP *(Third Generation Partnership Project)* Group, an association of various agencies, which include ETSI, that deal with the standardization of communication systems in various parts of the world and that cooperate for the purpose of defining technical specifications applicable worldwide.

As mentioned above, such third generation networks ensure transmission of various types of information , each with specific performance requirements (the so-called "QoS - *quality of service"),* in particular with reference to acceptable error rates and the various quality tolerability thresholds. These errors, on the other hand, cannot be eliminated, as many causes come into play that cannot be weighted in advance (*i.e.* atmospheric perturbations, physical obstacles, interference with other signals, etc.). For this reason there are various appropriate channels for transmission of every type of information (*i.e.* voice, video) called "transport channels" (TrCH). For each transport channel there is a system for reducing the incidence of these causes of error: this system is called "channel coding," so that the real information to be transmitted is opportunely codified, in the sense that typically a redundant piece of information is added to it (that is, additional information generated and specifically added to the "real" information by the channel coding system), so that the error is distributed between the real information and the redundant information, consequently weighing less on the real information. In addition to protecting "useful" information from error, channel coding also has the purpose of allowing those who receive it to recognize and correct any errors. The heterogeneousness of the data implies that their transmission can take place at variable temporal frequency or with an equally variable length of data blocks. Because the recipient of said data must be able to recognize them, said recipient must be informed of the frequency or temporal rate or the length of the block.

For this purpose, it is part of the known technique to require an indicator called TFCI (*Transport Format Combination Indicator*) within the frame of transmitted data. The indicator also performs the function of keeping the receiver informed of date frequency/rate, so that the receiver may recognize what type of data they are.

4

On an operating level, information is transmitted in the form of bits, that is, the numbers "1" and "0" opportunely grouped, according to the binary numeral system used to transmit data between electronic devices.

It is essential for the TFCI to be correctly transmitted and received, because receiving an incorrect TFCI would keep the receiver from correctly reading the frame. It is therefore necessary that reconstruction of the TFCI by the receiver be reliable even under unfavorable transmission conditions, in which bits are transmitted incompletely or incorrectly (a circumstance that tends to occur frequently in the case of the so-called extended TFCI).

Transport channels are then joined into a single data flow, by a procedure technically called "*multiplexing*," to be transmitted over a physical channel, that is, via radio. The possibility of having separate transport channels allows processing the various data on the basis of said performance requirements.

Among the technical specifications (TS) that refer to 3G networks and in particular to UMTS systems, number TS 25.212, v. 3.11.0, prepared by the 3GPP group is particularly important. These specifications essentially pertain to channel coding used in third generation networks. Version 3.11.0 of September 2002 is binding for UMTS networks, because it belongs to the so-called  "Release 99," the first pertaining specifically to UMTS networks, and it is the most recent for this release ("*release*" refers to all standards pertaining to a certain system). It describes how the data to be transmitted for each transport channel is processed before being 'mapped," that is, its "transfer" on a physical channel.

**1.5**      Based on the preliminary statements set forth thus far, the content of the patent which is the subject of this proceeding can therefore be examined. This patent is qualified by the plaintiff Samsung as a so-called standard-essential patent, that is, essential for the standard, in the sense that it covers parts of said standard that must necessarily be implemented to be able to communicate information in accordance with the 3G/UMTS system.

According to the plaintiff,the new Apple iPhone model, the iPhone 4S,is allegedly infringing certain patents owned by Samsung, and for what is pertaining to the case in point, patent EP 1005726 (EP' 726). Said patent pertains to a device for encoding/decoding turbo codes and provides an innovative solution for efficient turbo

encoding, both in terms of frame dimentions and in terms of tolerable delays.

The invention set forth in patent EP '726 starts from the assumption that the capability for error correction improves when increasing the length of the bit block (the so-called frame) input in the turbo encoder. However, the greater the length of the frame, the greater the efforts in terms of calculation and amount of memory in the decoder; this may lead to delays both by the encoder and the decoder, and this may not be in keeping with the requirements of maximum delay allowed by the so-called "quality of service" required for the type of information being transmitted (voice, video, SMS, file, etc.). Therefore, on the one hand, short frames tax the decoder less and do not pose the problem of delays but, on the other hand, turbo encoding is not very efficient for these short frames, given that as mentioined above said turbo encoder works better as the frame length increases.

Patent EP '726 provides an innovative solution for efficient turbo encoding both in terms of frame size and in terms of tolerable delays: according to the invention of EP '726 the service quality of incoming data is read by a processor and based on that, the turbo encoder decides whether to join several consecutive frames (that is, several bit blocks that are input consecutively) and encode a so-called super frame of greater length that can, specifically because of its greater length, be decoded more efficiently by the receiver.

The inventive idea described above is the subject of independent claim 14, that defines the procedure in these terms: "*14. Channel encoding procedure for amobile communication system, which ioncludes the stages that consist of: determining the number of consecutive input frames required for assembling a super frame, according to a turbo service quality parameter encoding the super frame data dimension units determined by the number of combined input frames of consecutive input frames.*" In brief, first the number of consecutive frames is determinedto be joined into a super frame based on the quality of service ("QoS") and then the super frame is turbo encoded. This way turbo encoding with optimal efficiency is obtained, on one hand ensuring thatthe frames are not so short as to make turbo encoding inefficient  and on the other hand making it so the frames are not so long as to cause decoding delays."

The instructions of the patent apply in particular to the TS 25.212 standard, in combination with the specifications TR 25.944 and TS 34.108, that must be complied with by the manufacturers of mobile devices to test and make sure of compatibility with the   con  lo UMTS standard, as this reproduces, according to Samsung, all the stages that are the subject of independent claim 14 of patent EP '726.

**1.6**.      Prior to the first appearance hearing and Apple's regular appearance before the court, Samsung filed an application for interim relief on October 5, 2011. The plaintiffs' defense reported that on October 4, 2011 Tim Cook (Apple) had presented the new iPhone 4S, and said product was placed on the market in Italy from October 28, 2011.

Although without having been able to examine the product, already on the basis of the technical specifications divulged on the occasion of its launch on the market, Samsung deemed it possible to maintain that the iPhone 4S constituted an infringement of its patent EP '726, enforced herein.

In view of the above-mentioned considerations, Samsung identified the presumption of sufficient legal basis for itself and the danger in delay in Apple's conduct and it therefore introduced this petition for interim relief within the scope of the proceeding of first instance already under way (in addition to the separate application for interim relief preliminarily filed at the same time before this Special Division, in order to avert the risk that the launch on the market of the new iPhone 4S by Apple could cause irreparable damage to the plaintiff/petitioner companies, also considering the rapid obsolescence of high technology products.

It therefore asked that, after ascertaining the violation of the patent and the consequent implications associated with the activity of unfair competition, pursuant to articles 126, 129, 130 and 131 C.P.I. and 700 and 614-*bis* of the Code of Civil Procedure it be decided:

to forbid Apple from manufacturing, importing, offering for sale, marketing and publicizing the smartphones called iPhone 4S, and in general any activity pertaining to the products in question;

to order Apple to withdraw from the market the products set forth in point 1);

to order the seizure of the products set forth in point 1) found at the offices, warehouses and Apple local units as well as at third parties' that market them, authorizing a representative of the Samsung companies and their defense attorneys and expert witnesses to assist in seizure; operations;

7

to order the seizure or, as an alternative, the description of accounting records pertaining to Apple's activities in Italy, among them the VAT records of purchases and sales, warehouse traffic records, customers and supplier invoices, packing lists and the inventory book, and any other document allowing to identify the total volume of manufacturing and/or importing and sales of the smartphones iPhone 4S, as well as identifying entities involved in the offense; authorizing a representative for the Samsung companies and their defense attorneys and the party's expert accounting witnesses to assist in seizure or description operations, and appointing an expert accountant to assist the Bailiff, with express authorization to make a copy of the seized or described documents;

Set a penalty of EUR 20,000, or another amount deemed fair, owed by Apple to the Samsung companies for every day of delay in complying with the measure to be issued and for every unit of product manufactured, imported or sold in violation of said measure, and more generally for any violation of the measure, observed after its filing;

to order the publication of the measure to be issued;

to order Apple to publish on their websites the measure to be issued, giving opportune emphasis to the measure in question on the home pag*e* of said sites;

to order Apple to refund the Samsung companies for expenses, fees and attorneys' fees for this proceeding and any other expenses that may be necessary in the future.

## 2.    The Apple companies' appearance in the proceeding for interim relief

**2.1**    Entering their appearance in the proceeding with a brief filed on October 20, 2011, the defendant companies' defense developed arguments in response to the plaintiffs' implications and requested denial of any claims proposed against said defendant companies, proposing as objections a series of arguments involving the validity (alleged non validity on Apple's part) of the Samsung patent, its (denied) infringement by the iPhone 4S, in any case the abuse of a dominant position by Samsung for having refused Apple a license at FRAND conditions, the exhaustion of any of Samsung's rights pursuant to the agreement established with Qualcomm. According to Apple this proceeding is, the same as the various proceedings filed in many countries by Samsung, retaliation against Apple following prior legal actions that had this defendant in the role plaintiff (defendant in the first instance proceeding No. 45629/11, General Record in which today's proceeding for interim relief is included)

regarding patents and design owned by Apple, in order to strengthen and/or acquire contractual power.

**2.2**     As for merit, Apple's defense in turn outlined the context of the dispute, noting that ETSI's policy on intellectual property rights was based on two fundamental requirements: the timely communication to the Institute of intellectual property rights deemed essential and the commitment to grant licenses for said rights based on FRAND conditions ("*Fair, Reasonable And Non-Discriminatory*"). In some cases, according to Apple, it happened that a larger than necessary number of patents was declared essential to the standard, as Samsung allegedly did on several occasions; in fact, the defendant stated that the qualification of a given patent as essential is made by the owner of the patent, without any verification by ETSI regarding the truthfulness of the claim.

Apple challenged the circumstance that the patent being disputed, although declared such by a Samsung, was actually essential for the standard, an essentiality moreover maliciously claimed by Samsung over four years after the declaration of the standard, in violation of ETSI policy, in order, according to Apple. To take advantage of the fact that, after standardization, the entities implementing the UMTS standard would have no alternatives to choose from and would be "blocked" by standardized technologies and could be led to accept exorbitant royalties and other unfair licensing conditions, which Samsung would have been unable to demand before standardization, thus becoming responsible for a conduct that could be categorized in the phenomenon of patent ambush.

Although Samsung had knowingly delayed its declaration of the essential patent EP '726, in the end it had given that communication in compliance with clause 6.1 of ETSI's IPR Policy, so that it would have been obligated to issue an irrevocable license for EO ;726 at fair, reasonable and non discriminatory conditions (*frand*).

Apple reported that it had officially contacted Samsung in order to know the specific terms of a *frand* license in reference to the patents in dispute. The goal of starting said negotiations was that of minimizing the scope of a dispute between the parties, although Apple had never acknowledged (and does not acknowledge to date) that the patents in question were valid (See Apple doc. 36, Technical opinion of Engineer Deambrogi and relevant annexes)

or infringed. The interference of the challenged product with the Italian portion of the European patent would be simply inferred based on a purely syllogistic theoretical method of reasoning, based (i) on a totally abstract consideration that the challenged product allegedly performed certain functions of basic band processing of communication signals, (ii) on the presumption that it should be compliant with an international standard, and (iii) on the fact that the provisions of that standard allegedly correspond exactly to the instructions of the patent in question (on this point see paragraph 132 of Apple's entry of appearance brief).

In particular, Apple's defense observes that since the alleged infringement of EP '726 pertained only to the chip contained in the Apple product and said chip was not manufactured by Apple (Apple doc. 32) if the third party supplier (i.e. Qualcomm) had a license from Samsung, Apple products could not be deemed in any way as infringing Samsung's rights since these would be exhausted pursuant to the consent to use the patent issued by the party entitled to the chip manufacturer.

After a few months of slow negotiations, Samsung declared that it could offer a *frand* license of the patent in question at a royalty rate off 2.4% to be calculated on the entire market value of any Apple product characterized by a type 3G function. Said proposal appeared clearly not *frand* to Apple (on this point see Apple doc. 12, page 9: *the value of the cumulative royalty that each developer of the WCDMA standard should pay for a license to all patents declared essential would have a value of 5%";* as well as doc 3, ruling of the District Court of The Hague, in a proceeding for interim relief dated August 24, 2011). In specific reference to the adversary application for interim relief, Apple's defense proposed the same arguments developed in the parallel preliminary proceeding for interim relief so that the request to issue provisional measures filed by Samsung in regard to EP '726 did not allegedly satisfy the requirements established by the procedural rules for their concession, that is, i) presumption of sufficient legal basis, ii) of danger in delay and iii) balancing of interests). It also observed how Samsung's requests could not be accepted because the attempt to enforce EP '726 and the conduct maintained by the plaintiff companies constituted an abuse of dominant position; lastly, said conduct should be sanctioned also pursuant to the principle of *exceptio doli generalis.*

10

**2.3**      In order to verify the real nature and the purposes of Samsung's conduct in trying to enforce patent EP '726, Apple's defense summarized the events that had preceded the statement by Samsung of patent EP '726 as an essential patent for the use of the UMTS standard.

As supported documentally by Michael Walker's statement (doc. 10, cit, in particular section IV B), within a week from Samsung filing the Korean patent application in relation to which EP '726 claimed priority, the two inventors indicated in the patent had taken part in a meeting where proposals regarding portions of standard of specification TS25.212, for which Samsung had declared the essentiality of the patent. The meeting, during which the relevant standard portion had been discussed, took place in August 1999; at the meeting Samsung had made several proposals and the two inventors had been listed as possible contact for one of said proposal. Apple pointed out that one of those proposals contained a table that appeared to be an exact copy of a portion of the Korean priority document. The meeting in which technical specification TS25.212 version 3.0.0. was finalized took place in  December 1999, but, despite the extremely active involvement of Samsung and of the inventors of the patent in question in determining specification TS 25.212 and the invitation made to the work group to include in the standard the technology now Samsung claimed as protected by EP '726, Samsung on that occasion allegedly conveniently "forgot" to reveal the existence and the allegedly essential nature of EP' 726 until September 2003, that is over four years later. According to Apple it would therefore be clear that by acting this way Samsung, consciously and maliciously had failed to meet the obligations provided by ETSI's IPR Policy and that said conscious and malicious violation had been implemented in order to prepare weapons for future enforcement of the (self) declared essential patents, a conduct that could be included in the phenomenon generally known by the term of *"patent ambush."*

**2.4**      Although Samsung had knowingly delayed declaring patent EP '726 essential, in the end it had however given that communication in compliance with clause 6.1 of ETSI IPR Policy, so that it would have been obligated to issue an irrevocable license for the patent in question at fair, reasonable and non discriminatory conditions (see annex JJ to Walker's

statement, doc. 10 cit. and a statement by  prof. Delebecque, Apple doc. 32 "*a declaration made to ETSI pursuant to article  6.1 of ETSI Policy on intellectual property rights produces legal effects toward another ETSI member or another party interested in implementing the relevant standard. A declaration made to ETSI constitutes an offer of an actual license which is accepted once one party begins to implement the relevant standard and not a simple commitment to begin negotiations for the purposes of a licensing agreement*" and furthermore "*When one party commits to ETSI to grant licenses in accordance with FRAND terms, it waives the right to apply for provisional relief against another party using the intellectual property rights covered by the FRAND commitment*").

**2.5**    Despite Apple having (and still has) doubts regarding the actual essentiality and validity of patent EP' 726 (as it is, according to Apple an extension beyond the content of the original description, therefore in violation of Article 138(1c) EPC and Article 76(1c) CPI, as well as having unclear content and being devoid of real inventiveness and novelty), Apple itself had taken action to open negotiations with Samsung to regulate exploitation of the patent in question.

In a letter of May 13, 2011 Samsung had answered to Apple (Apple doc. 15 ) stating that "*Samsung takes FRAND commitments seriously and is willing to grant to Apple a non exclusive license for any Samsung patent whatsoever pertaining to Wireless, 'UMTS and WCDMA devices, subject to FRAND commitments*" (including therefore EP' 726).

On May 17, 2011 Apple wrote to Samsung (Apple Doc. 16) providing the information requested by Samsung and confirming its intent to obtain information in a non confidential manner, pointing out that, had Samsung really committed to issue licenses at non discriminatory conditions, it would have had to reveal to Apple information regarding the existence of licensing agreements between Samsung and the manufacturer of the UMTS WCDMA chips.

This point, according to Apple's defense, would be decisive because the alleged infringement of EP'726 would pertain only to a chip contained in  Apple products. Said chip is not however manufactured by Apple (but rather by Qualcomm); therefore, should the third party supplier entity have a license from Samsung, Apple products could not be deemed in any way to be infringing Samsung's rights, given that said rights would be exhausted pursuant to the

consent to use the patent issued by Samsung to the chip manufacturer.

Only after four months' negotiations (conducted slowly by Samsung, for an obvious dilatory purpose, according to Apple), Samsung had answered Apple stating that it was willing to offer to it a license for the patents for a 2.4% royalty for each connected product. This rate, in Apple's opinion, was exorbitant and absolutely not FRAND (refer to paragraph 31 of Apple's entry of appearance brief and the ruling of the Dutch judge, in Apple doc. 2). Also, the defendant's defense complained that the taxable basis to which the royalty should be applied did not appear fair, because it included the entire value of Apple end products and not only those affected by the technologies and instructions set forth in the patent subject to this legal action. The offer furthermore was declared valid by Samsung only for 10 business days (a circumstance that appeared to Apple to be openly in contrast with its FRAND obligation to grant irrevocable licenses).

**2.6**      From a procedural standpoint, Apple's defense noted how the request to issue provisional measures filed by Samsung in regard to patent EP' 726 in this proceeding did not satisfy the requirements established by procedural rules for their concession, that is the terms of presumption of sufficient legal basis, of danger in delay and balancing of interests (see on this point paragraphs 60 and following in Apple's entry of appearance brief).

In reference to legal basis Apple's defense noted that the Samsung companies' requests should not be admitted because the attempt to enforce the patent supplemented a hypothesis of abuse of its dominant position and was in any case to be sanctioned also based on the

 "*exceptio doli generalis*," with said defense observing that the clear purpose of Samsung's action was to cause huge damage to Apple, rather than protect its right from an alleged violation.

**2.7**      As for the danger, Apple's defense observed how the plaintiffs had completely omitted to explain how the iPhone 4S constituted a violation of patent EP' 726 different from the one that would allegedly be imputable also to other Apple products, long present on the market, so that a danger of irreparable damage was identified only now and in regard to the iPhone 4S.

Additionally, Samsung allegedly did not offer any proof of the statement according to which, if the alleged infringement had not been present, its market share could have expanded further.

At best, the only foreseeable damage for Samsung according to Apple would be that pertaining to the (lack of) payment of  royalties for use of the patent, as in fact the quantification of a royalty is the principal issue that remains pending between the parties, and therefore a damage of an exclusive financial nature. Samsung's wish to obtain a *frand* royalty for its patent portfolio, declared essential, would therefore not justify issuing provisional measures.

Also, Apple's defense has pointed out how Samsung is not actually and seriously running any concrete and current risk, as it is indubitable that Apple is solvent; Apple, in any case, has placed in trust a sum of money as guarantee for the royalties presumably owed to Samsung in the event its patents were to be deemed valid and infringed (Apple doc. 30).

**2.8**     Apple's defense also maintained that there is another factual element to be taken into consideration, that is, that the basebands chips supplied to the Apple companies and contained in the iPhone 4S are the subject of a license by Samsung pursuant to the licensing agreement entered into by Samsung with the United States corporation Qualcomm, so that all of Samsung's alleged rights would be subject to exhaustion pursuant to article 5 of the Industrial Property code. Samsung, therefore, would not be able to uphold its patent in order to prevent further circulation of products that include the invention which is the subject of said patent; moreover, Samsung allegedly always opposed Apple's reiterated requests for a formal discovery procedure or for the release of a copy of licensing agreements with Qualcomm, so that Apple had succeeded in obtaining the agreement in question pursuant to an order of the American judge. The criterion for establishing whether a specific product may benefit from the exhaustion principle is the consent of the assign to sell the product within the European Community or in a member State of the European Economic Space. Such consent determines the exhaustion of the right, so that the owner of the industrial property right may not enforce its own right against any entity that purchased that product from the owner of said right or from third parties that obtained said owner's consent.

Apple's defense points out that Samsung and Qualcomm had signed on November 4, 2009 a crossed licensing agreement ("Samsung-Qualcomm Agreement"), *that covers telecommunication patents (CDMA/WCDMA/OFDM)* " (Apple doc. 33) for a term of 15 years. Therefore, UMTS chips, that Samsung assumes being counterfeited by Apple, applied in the iPhone 4S, are supplied by Qualcomm to Apple, as confirmed in a statement made on October 11, 2011 by Saku Hieta, employed by Apple Inc. as senior manager (Apple doc. 32).

**2.9**   Again based on the Samsung-Qualcomm agreements, the current defendants did not have the right to bring action against Apple for patent EP' 726, as the Samsung-Qualcomm agreements contained an express commitment not to take legal action against the purchasers of Qualcomm chips.

On this point Apple's defense noted how the letter sent on 21 April 21, 2011 by Samsung to Qualcomm would have no effect. The letter stated: "*pursuant to the agreement existing between Samsung and Qualcomm Inc ("Qualcomm") and its relevant modifications, Samsung hereby exercises its right to limit immediately the scope of any agreement between Samsung and Qualcomm and the latter's buyers to exclude the application pertaining to any product manufactured, used, sold or otherwise granted to Apple or its affiliates.*" According to  Apple, in fact, pursuant to the Samsung-Qualcomm agreement (clause 5.2) the license and commitments could be "suspended" only if Apple had sued to uphold patents based on use or inclusion by Samsung of Qualcomm components, whereas the case in point does not fall under this provision. The attempt made by Samsung to boycott a competitor, selectively "suspending" a license for a vital component, with the clear intent of causing the competitor damage that has no connection with the subject of the dispute is, according to Apple, a clear violation of article 2569 of the civil Code and of articles 2 and 3 of Law No. 287/90.

**2.10**   As for the content of the patent in dispute, Apple in any case challenges its validity and in any case its infringement by the iPhone 4S. In particular, on this point it notes that, as reported in the party's technical opinion (attached as doc. 36), the Italian portion of the patent in question does not meet the patentability requirements prescribed by law, so it must be deemed void, and even if some validity were to be acknowledged to it, it could not be

inferred from it in any way that the Smartphone device iPhone 4S operating in compliance with the UMTS 3G standard interfered with the restricted scope of protection that may be recognized to that patent

**2.11**    According to additional statements of Apple's defense, Samsung's conduct in this specific case would also be relevant for various anti-competition aspects.

Samsung, in fact, allegedly holds a dominant position in the telecommunication sector, moreover, according to Apple, a veritable monopoly for supplying the European market with the technology covered by the patents necessary for manufacturing and marketing a cellular telephone using the 3G technology through the UMTS standard.

Samsung's abuse allegedly derives from the fact that a refusal to grant a license at frand conditions in the presence of (alleged) patents included in the standard hinders technological development, damaging both to Samsung's competitors and to consumers.

Furthermore, on this point Apple cites European Community laws on the matter of competition (and, in particular, articles 101 and 102 of the Treaty on the Functioning of the European Union, TFUE), that prohibit the illegal use of a patent by its owner, when the owner is in a dominant market position. Many decisions dealt with this specific subject (*Rambus Inc.* -COMP / 3.8.6.36, provision of the Court of Justice of December 9, 2009).

Therefore, in compliance with the above-mentioned regulations (articles 101 and 102 TFUE) Samsung should be kept from distorting competition on the market and, in particular, through improper procedures, from excluding from the market its competitors, including Apple, that compete for the same market.

The above-mentioned prohibition would be opposable to Samsung both in the event the patent in question were to be deemed essential for the standard, as claimed by Samsung and challenged by Apple –and in the event (as held by Apple) that the patent were not be deemed essential to the standard. In particular, in the second case, the dominant position would be the result of the false representation of reality offered by Samsung, so that consumers and manufacturers are led to believe that Samsung has a right to control the technology. Consequently, the apparent dominant position held by Samsung, even if it had been deemed

not to exist, could supplement an abuse of the right in regard to the manner in which it is presented and received by the market.

Apple therefore cites the consolidated European Community case law according to which the refusal by a company in a dominant position to grant access to an essential resource or to an infrastructure or to sell or purchase an essential product or service to a party from which it had been requested or that had made a request constitutes an n abuse of a dominant position.

In accordance with this, the so-called "*essential facility*" doctrine must be remembered, which imposes to companies or entities making widespread use of an asset that may not be easily duplicated for financial or legal reasons, and to make it available at fair conditions to those requesting it; otherwise, an abuse of the right would occur (see the *Ladbroke* ruli*ng* – Court of First Instance of the European Communities, June 12, 1997, case T-504/93).

Because of all considerations set forth, Apple's defense concluded for the rejection of the applications for provisional relief filed against it by the Samsung companies.

**3.      Further procedural development**

**3.1**     At the hearing of October 26, 2011 the plaintiffs' defense requested a deadline for filing response briefs, and the defendants, although not deeming necessary assigning deadlines for brief and the consequent deferment of the hearing, asked to be also allowed to file a rejoinder brief. The Presiding Judge's deputy granted the parties adequate periods of time, in accordance with the deadline of said requests, to allow their respective defense to be developed and postponed the proceeding to the hearing of December 16, 2011.

Within the assigned period of time the parties arranged to file their defensive briefs. Then at the hearing of December 16, 2011, the parties' defense attorneys had an in depth verbal discussion of the main points of their defense theses. The Presiding Judge's deputy reserved to decide.

**4      Samsung's brief**

**4.1**     With the brief filed on November 15, 2011 Samsung's defense developed its defense responding to the arguments and exceptions on which Apple's defense was based in its entry of appearance brief.

In particular it reported that until the summer of 2010 dealings among the parties were channeled into a serene commercial relationship: Apple had purchased solid memories, temporary memories (DRAM) and some processors from Samsung. Later, Apple had started to sell in "deliberate infringement." In July/August 2010 Apple started to charge Samsung with violation of its patents and demand substantial license fees (5% on the smartphone, Samsung doc. 9). Various meeting had then followed, as documented by the statements of Seungho Ahn and Jaehawk Lee (doc. 9 and 10), to confirm which the plaintiffs' defense asked for the declarants to undergo summary examinations. During these negotiations Apple operated by underestimating Samsung patents and overestimating its own: it was asking 5% royalties for smartphones and tablets, not considering that without the Samsung patents said smartphones and tablets would have been unable to communicate.

The plaintiffs' defense also mentioned how on 2.23. 2011 Samsung wrote a cordial e-mail to Apple stating the full intent to continue negotiations (doc. 11).

Apple answered it by serving a summons for infringement in April 2011, in the United States. At the end of April 2011 Apple asked Samsung for a license on the latter's patents (documents 13/27) and Samsung stated its willingness.

With communications dated 4.29.11 and 5. 9.11 Apple asked Samsung for a *frand* license for the standard-essential patents for UMTS/WCDMA technology (Apple documents 13 and 14).

On 5. 13.11 Samsung answered stating that it was willing and asking Apple for certain essential elements for granting the license (territorial and temporal extent, cross licensing), as well as the commitment to sign a non-disclosure agreement, in accordance with ETSI *Guide on Intellectual Property Rights* (doc. 12), that in fact on paragraph 4.4 NDA require the so-called *non-disclosure agreement.*

Between May 17 and July 1, 2011 (Apple documents 16/20) Apple declared that it was not willing to sign a non-disclosure agreement and at the same time it complained that it had not yet received Samsung's offer. The following July 14 (Apple doc. 21) Samsung notified Apple of its impropriety (according to statements made in the proceeding pending in Japan on the

fact that Samsung had allegedly refused to grant the license at *frand* conditions). On July 18 2011 (Apple doc. 22) finally Apple declared its acceptance to assume a non-disclosure agreement.

Samsung then answered (with a letter of 7.20.11, Samsung doc. 13  stating its willingness to grant a *frand* license. Then, as Apple had signed the non disclosure agreement (as per Apple doc. 23), Samsung formulated (on 7.25. 11) its offer for all UMTS/WCDMA technology standards, asking for a 2.4% royalty.

On August 18, 2011 (defendant doc. 24) Apple answered imputing to Samsung all sorts of violations, indicating as frand a 0.275% royalty and asking for Samsung to reveal the licensing terms granted to other operators. Lastly on September 5, 2011 (Apple doc. 25) Apple declared that it wished to license only the Dutch portions of 4 patents with a 0.0000738% royalty. Samsung responded to the counterparty's proposal (letter of 9.15.11 and 9.19.11, defendant doc. 26 and 27), reiterating its wish to conclude on the basis of a license at *frand* conditions.

On October 31, 11 (Samsung doc. 14) Apple again alleged violations by Samsung and maintained that the offer of a 2.4% royalty was not to be deemed *frand*.

**4.2**     Again recalling ETSI's  *IPRs Policy* and in particular Annex 6 to *ETSI Rules of Procedure* (Apple doc. 7), Samsung's defense noted that two violations had been imputed to its client by the adversary company: first the untimely communication to ETSI of the standard-essential nature of patent EP '726 (par. 4.1. "*in a timely fashion*"); second the refusal to grant a so-called *frand* license, thus being accused of patent ambush. The adversary defense had also maintained that, based on French law (applicable to dealings between ETSI and its members), the license should be deemed already established and enforceable.

**4.2.1**    As to the first of said charges, Samsung produced (doc. 15) an opinion by Ansgar Bergmann, head of the ETSI team in charge of development and management of GSM and UMTS standardization.

In particular he observed that (under annex 6 of doc. 15) the average period of time for the communication of standards to ETSI was 4 years and six months (he cited two cases, Ericsson and Motorola), pointing out that a communication had taken place even after 9 years

and 9 months (see annexes 4, 5 and 6 to the document in question), as Apple itself had been in a similar situation (doc. 15 paragraphs 13, 17-20 ).

The plaintiff's defense recalled the Dutch ruling of October 14 11 (doc. 2 Apple and Samsung doc. 19) at point 4.25.

The defense stated that on December 14, 1998 (doc. 20) Samsung had stated it was willing to grant licenses at *frand* conditions on its essential patents for UMTS/WCDMA technology.

**4.2.2.**   In reference to the second charge brought forth by the adversary (refusal to grant a so-called *frand* license), Samsung proclaimed its compliance, stating how, according to Bergmann (paragraphs 12-14) a "*general IPR declaration*" was sufficient (as stated in Samsung doc. 20).

Thus it had been deemed also by the above-mentioned Dutch ruling (Apple doc. 2 and Samsung doc. 19) at points 4.23 and 4.24.

For an in-depth analysis of the concept of *patent ambush,* the plaintiffs' defense referred to the US decision of 10.18. 11 (Samsung doc. 21) and the Rambus case of the European Commission (doc. 22). It reported that the Dutch decision had also excluded *patent ambush* by observing that Samsung had already committed, with its 1998 statement, to negotiate a *frand* license.

**4.3**      As for *frand* conditions and the 2.4% royalty requested (page 21 of the Samsung brief) the plaintiffs' defense stated that said royalty simply represented a basis to start a negotiation, regarding which Samsung's willingness appeared clear.
According to Apple (referring to Michael Walker's and Richard Donaldson's opinions, doc. 10 and 11, the latter based on the Fairfield report, subject to criticism by Samsung on page 24 and 29 of the brief dated 11.15.2011) with a 5% ceiling for aggregate royalties for all essential patents, Samsung would only have a right to a small fraction, or 0.273 % of this 5%, to be calculated not on the final sales price of smartphone and tablets, but on the cost of the individual chip that implemented the patented technology.

Samsung's defense brought up the opinion of two top experts in the technology licensing sector, Erik Stasik and David Teece (Samsung document 23 and 24), who stated that there is no predetermined maximum ceiling for aggregated royalties. The 5% proposal had not been

followed up (he brought up the Nokia proposal of 2006, that had later been rejected).

The 2.4% royalty requested by Samsung was not to be deemed exorbitant, considering that, for a patents portfolio for UMTS/WCDMA technology (involving over 3196 patents), the royalty ranged between 1 and 2.75% (doc. 23 paragraphs 19-22; annex 7 mentions 4%, annex 8 between 1 and 3%, etc. annex 9 and 10).

Samsung's defense added that the calculations proposed by Apple starting from the so-called patent counting standpoint and deriving from the Donaldson opinion were to be deemed unreliable: the Donaldson opinion, in fact was based on a sector study (the previously mentioned Fairfield Report) conducted, according to Samsung, with approximative methodology and with results not scientifically supported, and for this reason generally criticized and not followed by experts and in established procedure (doc. 23, par. 37-47, containing a detailed list of all methodological errors and logical leaps that allegedly vitiate the report in question). Consequently Apple's statements according to which, if a 2.4% royalty were to be applied to Samsung's patents portfolio, proportionally an aggregate 44% royalty would be obtained to license all the essential patents, is also allegedly incorrect and arbitrary, as it is derived from the errors set forth above. Samsung's defense also noted that the requested 2.4 percentage was not at all exorbitant. In fact, a correct calculation based on established market procedures showed that for a patent portfolio on  UMTS/WCDMA technology (3196 patents) with a value such as Samsung's, a value recognized by other major operators in the sector: doc. 23, annex 5 and 6, an initial *frand* offer on the entire portfolio was placed between 1% and 2.75% (doc. 23, paragraphs. 19-22). Specialized publications also confirmed that for essential patents on W-CDMA technology the royalty rate used by an individual owner reached 4% (doc. 23, annex 7) and that, for instance, InterDigital requested royalties ranging between 1 and 3% for its W-CDMA essential patent portfolio (doc. 23, annex 8). Also for the different LTE (4G) standard, for which the royalty amount could have been deemed homogeneous compared to that of the W-CDMA standard, the royalty rate announced by each operator ranged between 0.8% to 3.25%, with an average of 2.1% (doc. 23 annex 9 and 10). Samsung's defense also pointed out that the European Commission, in a proceeding pursuant to article 102 TFUE, against an entity accused of *patent ambush,* had

deemed satisfactory this entity's commitment to apply royalty rates that for certain products reached 2.65% (thus the European Commission's decision of December 9, 2009 in the *Rambus* case, Samsung doc. 25).

In conclusion, from Samsung's viewpoint the initial offer of 2.4% amply fell within a *FRAND* range and was not at all arbitrary (if anything, the 5% royalty requested by Apple for its non essential patents during the previously mentioned negotiations was arbitrary).

It is opportune to mention right away that, in response to the percentages indicated as *FRAND* for the sector by the opposing defense, the defendants' attorneys noted that this percentage referred to a patent portfolio and not to one patent only (see Stasik statements doc. 31 par. 22). According to Apple (page 30 lower portion of the brief of December 6,2011) Stasik's and Teece's statements were general and could not assume any evidentiary value.

The plaintiffs' defense also observed that it made no sense for Samsung to apply the same royalties paid by others, because in this case there could be different reasons (pages 27-28 Samsung brief). On the other hand, Apple could well have reduced said rate by offering to cross license other IP rights to which it was entitled.

**4.4**    Samsung's defense also developed the subject of the non existence of a license that could be deemed already established between Samsung and Apple based on French law (page 30/33, Samsung brief), quoting the opinions of French experts, produced as documents 26-28.

In this regard it should be stated that Apple, quoting excerpts of an opinion by Prof. Delebecque (Apple doc. 30), has maintained in this proceeding that the declaration made by Samsung to ETSI regarding its willingness to negotiate *FRAND* licenses should be interpreted, based on French law applicable to the dealings between ETSI and its associates, as an offer of license to all other associates, including Apple; this way Apple, by beginning to implement the standard, would have accepted this offer, so that there would already be a valid licensing agreement between the parties.

According to Samsung's defense this thesis is certainly incorrect, and this would allegedly be confirmed by three opinions of experts on French law, Laëtitia Bénard, Prof. Georges Bonet and Prof. Rémy Libchaber, which said defense produced as documents 26-28.

22

The declaration of the standard, which Samsung gave in regard to EP '726, is limited to the following statement: "*the signatory and/or its affiliates hereby declare that they are prepared to grant irrevocable licences under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the s*tandard, *to the extent that the IPRs remain essential*" (doc. 29). Therefore this would be, according to Samsung's defense, already on the basis of the literal meaning of the expressions used, not the offer of a license, but rather the expression of mere willingness, "*prepared to,*" to negotiate and grant such a license.

In this regard, article 4.1 of the above-mentioned ETSI Guide on IPRs (Samsung doc. 12 ) establishes that "*Specific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI*," thus unequivocally indicating that licenses are not established with ETSI for the mere fact of a declaration, but must later be the subject of commercial negotiations between the parties. And again, the plaintiff's defense notes, article 8.2 of ETSI Policy (see Apple doc. 7) requires a complex mechanism of procedures and remedies that are applied when an associate, after the inclusion in the standard of a technology it patented, refuses to grant a license at *FRAND* conditions. According to Samsung's defense a similar provision would not make sense if it were to be deemed that, for the sole fact of the declaration and implementation of the standard by the third party, a license has been established.

Samsung's defense finally reported that  ETSI's *IPRs Policy* was accompanied by some FAQ (doc. 30), of which No. 6 and No. 7 merit consideration; they are transcribed on page 31 of Samsung's brief in the following terms: "*Question 6: Does one have to take permission from ETSI for using the patents as listed by ETSI in the standards? Answer 6: It is necessary to obtain permission to use patents declared as essential to ETSI's standards. To this end, each standard user should seek directly a license from a patent holder.  In order to obtain the contact details of a patent holder, please make your request to the ETSI Legal Service.*"; "*Question 7: Does the firm concerned have to pay some consideration to ETSI for utilizing the said patents or while buying the technology from another company? Answer 7: Any firm interested in obtaining patents declared essential to ETSI standards shall not pay any consideration to ETSI but to the patents holders. To this end, the concerned firm has to enter into negotiation with the companies holding patents in order to obtain licenses for the use of*

*the patented technology included in, and essential for the implementation of an ETSI standard*." The same defense therefore noted that it was clear also from these FAQ (*Frequently Asked Questions*) that a direct negotiation of the license between the parties was necessary, subsequent to the statement of willingness to do so.

As an additional argument in support of its thesis, Samsung pointed out that article 8.2 of *ETSI Policy* required a complex mechanism of procedures ans remedies should an associate refuse to grant a license at *FRAND* conditions.

The licensing agreement had also to be considered as an agreement *intuitu personae*, so that the identity of the licensee assumed a fundamental role, and the license could only come from a bilateral negotiation with an already identified potential licensee (doc. 28, section II.1.b and section III.1.b).

Samsung's offer also was found devoid of the essential elements for deeming the license already granted (*offre ferme, précise*), and it could not be considered an agreement in favor of a third party (*stipulation pour autrui*).

Lastly, it was to be deemed resolutive that, according to French law, the patent license agreement had to be established in writing under penalty of nullity (art. L 613-8 *Code de la Propriété Intellectuelle*)

**4.5**    Samsung's defense believes that the necessary conditions for an injunction do exist, bringing up precedents similar to this dispute in which an injunction had been issued. Thus in the German case on the Orange Bookstandard (judgment of 5.6.2009, documents 31, 32 and 32 bis, which state that the Court of Mannheim will continue to apply the principles of the Orange Book case), as well as in the Dutch case (decision of the District Court of The Hague of March 17, 2010 in the Philips / SK Kassetten case, as doc. 33; see also Mr. Bas Berghuis van Woortman's statement: doc. 34). In the above ruling the Court established that an essential patent may not be upheld against a third party only if there is a voluntary license or, otherwise, a license imposed based on antitrust laws on said patent, specifying that the third party, before marketing the products and becoming responsible for infringement, must request a FRAND license and, in the event of refusal by the owner, apply to a judge so that it may be imposed to the owner to grant the license. Samsung's defense also points out that in any case, based on European Community antitrust law, a refusal to grant a license on a patent does not in itself constitute an abuse, and granting a license may be imposed only if

24

absolutely exceptional circumstances occur; failing that, the action to protect patent rights is and must be allowed (in termini: EC Court, October 5, 1988, C-238/87, Volvo / Veng; EC Court, April 6, 1995, joined cases C-241/92 and C-242/92, Magill; EC Court, April 29, 2004, C-418/01, IMS; EC Court, September 17, 2007, T-201/04, Microsoft). Similar principles had already been stated by the European Commission in its communication of October 27, 1992 on "Intellectual Property Rights and Standardization," according to which: "*the freedom of the right holder to refuse to license is ... absolute, since his exclusive intellectual property rights cannot be subject to expropriation or compulsory licensing except in exceptional circumstances such as reasons of national security or over-riding public interest*" (doc. 35 par. 4.3.5; see also paragraphs 4.7.2, 5.1.10 and 5.1.11, as well as par. 5.1.15 in which the Commission expresses the concern that imposing licenses may have negative effects over the long term on investments and innovation in the industrial sectors that are subject to standardization).

Samsung's defense also notes the decision by the Court of Genoa of May 8, 2004 in the Philips/Italcard case (doc. 36), that had also granted an injunction to protect a standard – essential patent, after having discovered that the owner had not denied access to the patent by means of a license and the third party had started to use the patents without asking to be granted said license.

In addition to Eric Stasik's opinion (produced in doc. 23, paragraphs 31-33, that tells how requests for injunctions are absolutely routine, and indeed the only form of protection of the owner of the essential patent, when a third party implements the patent technology without requesting or in any case being willing to enter into a FRAND license), the European Commission Horizontal Guidelines on "*Horizontal cooperation agreements*" (doc. 37), section seven of which (paragraphs 257-335) deals with the subject of standardization and FRAND commitments, deserve to be mentioned by Samsung's defense in addition to the warning expressed by Apple that, consulted by the European Commission (as other operators in the sector) in the preparation stage of the Guidelines, had expressed the opinion that the Guidelines should state that the existence of a FRAND commitment implied a waiver of the right to ask an injunction against a party implementing the standard (doc. 38, par. 11), a

warning not accepted by the Commission, so that nowhere in the *Guidelines* is it stated that an injunction is precluded to the owner of an essential patent subject to FRAND obligations. Lastly, said ETSI's *IPR Policy* also states the need for protection of the patent owner's interest and does not in any way exclude the possibility of an injunction.

**4.6**    In response to the accusations raised by Apple in reference to the abuse of a dominant position, Samsung's defense denied the existence of a dominant position held by the owner of an essential patent, denying in this specific case having a patent monopoly on 3G/UMTS technology.

Samsung admitted that it holds a market share, but it pointed out how this is not sufficient to identify a dominant position and allow it to maintain a conduct independent from that of competitors in its dealings with suppliers and customers, in the terms analyzed by the case law of the Court of Justice  (EU Court, February 17, 2011, C-52/09, TeliaSonera; EU Court, October 14, 2010, C-280/08 P, Deutsche Telekom/Commission; EC Court, April 2, 2009, C-202/07 P, France Télécom / Commission; EC Court, February 13, 1979, case 85/76, Hoffmann-La Roche; State Council, March 10, 2006, No. 1271, in *Foro Amm. CDS*, 2006, 3, 941; State Council, March 15, 2000, No. 1348, in *Giur. ann. dir. ind.*, 2000, 1221 *et seq.*; Turin App., February 17, 1995, *ivi*, 1995, 884 *et seq.*).

Apple's choice to use 3G/UMTS standards, partially covered by Samsung patents, according to the latter's defense thesis was not an obligatory choice (as there are alternatives, such as EDGE or GPRS or Wi-Fi connection.

In any case no abuse could be identified in Samsung's conduct, as Samsung never refused to negotiate and having instead declared to be willing to grant a license at FRAND conditions.

**4.7**    In reference to the Samsung/Qualcomm Agreement and the arguments set forth by the opposing defense based on the principle of patent exhaustion, Samsung's defense points out how, according to Apple, Qualcomm produced certain chips that include the patented technology pursuant to agreement s with Samsung.  These are allegedly the chips contained in the iPhone 4S. According to Apple's thesis, with the agreement in question Samsung allegedly committed not to attack Qualcomm's customers.

Samsung's defense notes that in regard to the facts reported by Apple there is allegedly on record only a statement of an Apple employee, who stated that the UMTS chip of the iPhone

4S was supplied by Qualcomm, and Apple had not produced the agreements with Qualcomm.

According to Samsung the agreements with Qualcomm allegedly establish something other than what is alleged by Apple. The so-called *covenant not to sue* allegedly does not apply to Apple, both because the latter is not qualifiable as a Qualcomm customer, and because these are not products covered by this provision *(covenant products)*.

Furthermore, it allegedly was not Apple, but Foxconn that purchased the iPhone 4S *chip* and assembled the smatphones later sold to Apple (see the statement by Eric Koliander, Qualcomm Senior Director set forth in doc. 43).

As for the exhaustion principle claimed by the defendant, according to Samsung's defensive thesis, the principal requirement is allegedly lacking, that is, Samsung's consent to market within the European Economic Space (concepts expanded on pages 52-53 of Samsung's brief, which will be re-examined later).

**4.8**    In reference to the *exceptio doli generalis* opposed by Apple, Samsung stated that it is a hypothesis of an exceptional nature, based on necessary conditions not found in the case in point, and in particular wholly unrelated to the conduct maintained by Samsung.

**4.9**    Lastly Samsung reacted to Apple's inference of the lack of danger in delay and denies the exclusively financial nature of the damage suffered.

This point will be the subject of an express discussion below so it is deemed opportune at this time to summarize as much as possible the arguments used by Samsung and to examine them later.

**4.10**    In the final portion of the brief of 11. 15.2011 Samsung's defense upheld the validity of  patent '726 (see in particular page 63), maintaining its sufficient description, as well as the existence of the requirements of novelty and inventive activity (pages 71/74).

In order to verify the infringement, and in any case to verify the validity of the patent it insisted for the admission of an expert witness, also pursuant to article 132 and. 5 CPI.

From the aspect of preliminary investigation it requested gathering summary information asking for Seungho Ahn and Jeahawk Lee to be examined regarding the negotiations at Samsung's between Samsung and Apple mentioned above.

## 5       Apple's brief

**5.1**      With its brief Apple developed the defense's theses already expressed when entering its appearance and it responded in an analytical fashion to the plaintiff's arguments.

Regarding the presumption of sufficient legal basis of the applications for interim relief filed by the latter, it specifically stated its reasons in reference to the Samsung -Qualcomm agreement (see page 6/8 of Apple's brief) then revisiting the subject in greater depth (in paragraphs 87/137).

Apple then observed that Samsung had started from the assumption that patent '726 pertained to the standard and that the characteristic of the standard covered by the patent could be implemented exclusively according to the instructions in that paten. Instead, the defendants' defense notes that Samsung could not avoid the burden of proving the actual use by the iPhone 4S of the invention protected by EP '726. Reiterating the exception of nullity of the patent (supported by the technical opinion of the engineer Deambrogi and the annexes to said opinion, doc. 36 and relevant annexes) the defendants' defense observes how the evident uncertainty of the solution regarding the questions of  infringement and  nullity led  the plaintiffs to request expressly (see Samsung's answer on page 77 and 78) for the judge to appoint an expert, pursuant to article  132, 5th paragraph, C.P.I. within the scope of the procedure for interim relief: according to Apple's defense that request is in itself indicative of the obvious relevance of these questions and the difficulty of their solution. Apple's defense also notes how the "summary technical indications" to which article 132 of the CPI refers would appear insufficient for resolving all doubts regarding the validity of the patent, as well as its infringement, within the scope of an interim injunction.

**5.2**      It also appears to be a strong argument for the defense in question that, to date, the alleged infringement of the patents allegedly has not ben proven. In fact the application for interim relief, filed on October 5, 2011 pertains to the new iPhone 4S, which, presented to the press on October 4, 2011, was launched on the Italian market on October 28, 2011. On the date the application for interim relief was filed, the plaintiffs declared that they had not yet been able to examine the product, but that based on news released by the press and confirmed by the technical specifications available on that date, it was reasonable to assume that the iPhone 4S operated based on the UMTS standard. According to the reconstruction offered by the Samsung companies, certain characteristics of said standard are allegedly covered by EP' '726.

However, given the absence of direct evidence of the alleged infringement, according to Apple, the claim formulated by the Samsung companies was and would remain based on a syllogism of this type: "(i) EP' 726  covers certain aspects of the UMTS communication standard and, as such, it allegedly is an essential patent for the standard; (ii) the iPhone 4S uses the UMTS standard; (iii) the iPhone 4S cannot operate according to the UMTS standard without implementing the patent and, therefore, it can only infringe it." The defendants' defense states that such a construct, rather than representing a syllogism, is based on a sophism, certainly not sufficient to support a claim of infringement. And indeed, starting from the assumption that the patent covers the standard (and according to Apple even that assumption was not demonstrated at all), it is supposed that the characteristic of the standard covered by the patent can be implemented only and exclusively according to the latter's instructions, when even this aspect is still to be demonstrated. The Samsung companies should instead undertake to prove concretely and directly the use by the iPhone 4S of the invention protected by EP' 726.

As the iPhone 4S is already on the market, Samsung could well have provided direct evidence of the alleged infringement. The request to appoint an expert witness tries to fill the onus of identifying evidence of infringement, which is incumbent exclusively upon the plaintiffs. Samsung wants to place the burden of proof of infringement on the expert witness (an attempt excluded by Court of Cassation case law, ruling of October 1, 2011, No. 20217; 4.6.2005, No. 7097; 8.16.2004, No. 15968).

**5.3**      As a conclusive argument for the lack of grounds of Samsung's application for interim relief, Apple's defense observes how the rights of the plaintiff companies deriving from patent EP '269 are allegedly exhausted in any case in reference to the iPhone 4S and this pursuant to the agreement entered into with Qualcomm, as the latter is the supplier for the defendants of the basic communication chips pertaining to the alleged infringement, in reference, among other things, to patent EP '726. The interpretation offered by Samsung of said agreement appears contrary to both United States and domestic rules of contractual interpretation, as it is contrary to Italian and European Community laws on competition.

In Samsung's opinion, Samsung's attempt to give value to the modification within the text of the agreement from the explicit use of the word "license" to "commitment not to take legal action" would be devoid of grounds, given that the second expression would not have a

meaning effectively different from the first, as there is no difference between a license and a commitment not to take legal action. In fact, with a commitment not to take legal action to protect its patents, Samsung would have done nothing but allowing Qualcomm to use them. It would follow that the rights deriving from it would be exhausted in regard to all products placed on the market by Qualcomm based on the "*commitment not to take legal action*" (equivalent, in the defendants' thesis, to a license). Apple's defense deems that interpreting the agreement in a different manner would be not only illogical, but also contrary to "*general procedures*" in the parties' specific industrial sector, as it is normal for components to be manufactured, sold, resold, subcontracted and often transferred several times before reaching their end user. Should the agreement be interpreted in the sense of not exhausting the rights on Samsung's patents, the latter would find itself in a position of discriminating against certain users of the components made by Qualcomm, selecting, at its own choice and discretion, whether to act in the proceeding on the basis of patent rights, thus engendering total uncertainty in the market. This interpretation, according to Apple's defense, would also be contrary to the fundamental principles of European community competition laws, which is designed to create a single market within which circulation of goods and services is free of any impediment, including, among other things, the distorted use of industrial property rights in order to discriminate against individual markets and/or users, thus creating a barrier to free circulation within a unified market.

Apple's defense points out that, should Samsung's rights be deemed not exhausted and therefore the Qualcomm agreement were to be examined in detail in order to decide whether Samsung has an actionable right in regard to the defendants, it would be a matter of taking into consideration the complex evidentiary tangle brought forth by the parties both de facto and de jure, requiring for that purpose a complete and exhaustive preliminary investigation stage, possible exclusively within the scope of the first instance ruling.

**5.4**    In reference to the danger in delay the defendant assumes that granting a provisional measure should be carefully examined, not only from the aspect of the probability of Samsung's claims to be admitted in first instance *(*presumption of sufficient legal basis*)*, but also in view of the verification of the occurrence of an actual risk for the plaintiffs to suffer irreparable damage. Apple's defense points out that reading Samsung's rejoinder brief made

it evident that Samsung showed to be willing (if not obligated) to grant a license for patent EP '726. On the other hand Apple, should the patent be judged valid and infringed and the relevant rights not exhausted pursuant to the Qualcomm agreement, stated that it was willing to sign a license for which it offered an opportune consideration. It therefore stated the possibility that the dispute was to be resolved in purely financial terms, by signing a license agreement (on condition that the validity and the infringement of Samsung's rights be preliminarily verified, as well as their not being exhausted). It also pointed out that the plaintiffs had confirmed their commitment to grant a license at *frand* conditions, also in regard to the irrevocable commitment assumed by Samsung with ETSI and, more generally, based on antitrust principles regarding the doctrine of the so-called *"essential facilities."*

According to the defendants' defense, Samsung's commitment to grant a license for the patent in question, would exclude, essentially, the existence of a risk of damage of an irreparable nature and therefore it would exclude the possibility of granting a provisional measure. In fact, the requirement of urgency cannot be recognized in the event the damage deriving from the alleged infringement can be compensated with monetary relief.

**5.5**     Apple therefore accuses Samsung of trying to provide a distorted interpretation of the facts, especially regarding the relationship between Apple and Samsung.

It stated that, given that Samsung communicated patent '726 to ETSI as deemed essential (even if that characteristic is challenged by Apple), Apple would have an irrevocable right to obtain a license at *frand* conditions.

It reports that the Dutch Court, with its decision of October 2011, concluded that the terms of Samsung's proposal were not *frand*.

It reminds that in 2010 Samsung launched the first Smartphone and TAB model Galaxy devices and that said models were in infringement of various

non essential Apple patents and design rights, so that the latter had filed various infringement proceedings.

Apple points out that its patents are not essential (they pertain to non essential technologies and product design), so it may or may not have granted licenses and propose any royalty rate. Instead, Samsung should choose: either its patents are essential, as they represent

indispensable standards for the UMTS technology, accessible, according to Samsung, only by using its patent, or that technology is secondary and replaceable by EDGE or GPRS (see paragraph 146, 186 of Apple's brief).

Apple also points out that Samsung opposes, without too many explanations, seeming rather to neglects the subject, Apple's arguments regarding the existence of an obligation to give immediate notice of an essential patent and it opposes computation criteria for identifying a *frand* royalty.

**5.6**     In reference to the danger in delay, Apple insists that Samsung was aware of the fact that Apple was marketing devices that allegedly infringed EP' 269 since 7.11.2008 (doc. 28). Nor could it be maintained that the damage had suddenly increased, as it should instead be noted how Samsung's market share had tripled in 2010 (page 37, Apple brief).

The iPhone 4S, as admitted by Samsung itself, works with the same WCDMA/HSP standard technology*,* as previously did the iPhone 4 (page 3 of Samsung's application for interim relief). Even if the 4S has many new functions and improvements, it uses the same UMTS standard already used by its predecessors (see pages 35-36, Apple brief).

**5.7**     Again in reference to the Qualcomm agreement, the defendant reiterates that the basic communication microprocessor contained in the iPhone 4S comes from Qualcomm; Apple procures the basic communication microprocessor for all iPhone 4S worldwide only and exclusively from Qualcomm (as already specified in the entry of appearance brief, from par. 98 onward) and as proved by documents 32 and 33, the photographs set forth on page 48 and 51 of the brief, Mr. Hieta's additional statement (possibly to be heard as witness) as doc. 47, Giorgio Potenza's report (set forth in doc. 48 and regarding which in par. 96), as well as the statement made by Dr. Koliander, senior sales manager at Qualcomm (doc 49).

**6.**     **Decision on the application for interim relief**

**6.1**     Having summarized in the above terms the parties' complex defensive theses, this judge deems that she has to provide an answer only to some of the many subjects being dealt with and specifically to examine and consider only those subjects that appear useful for the purposes of a decision in this interim stage.

It is known that an examination for the purpose of whether to grant the requested provisional measures must take into consideration the elements supporting the presumption of sufficient legal basis and danger in delay.

**6.2**    In reference to the presumption of sufficient legal basis certain necessary condition of the action upheld by the plaintiffs remain uncertain, and specifically the existence of a validly protectable patent, its qualification as standard (even if on this last point this judge's opinion, although in view of the limited analyses of the provisional stage is oriented in a positive sense), its infringement by Apple, or at least the possibility that the use of Samsung's technology may be considered as interfering in regard to Samsung's right, that is, allowed on the basis of the exhaustion principle.

### 7.    Relationship between ownership of a standard and competition

**7.1**    Again in reference to the development of questions inherent in the existence of the necessary condition of the presumption of sufficient legal basis, both parties' defenses handled the subject of technological standards.

Recalling here the definition provided by the European Commission within the scope of the Guidelines on the application of article 81 of the Treaty (now 101 TFUE) to technology transfer agreements *(TT Guidelines,* 2004/C 101/02, point 6), it may be stated that intellectual property rights grant the owner of the property the exclusive right to exploit the revenue from the subject of the property right and to prohibit unauthorized exploitation acts, as well as to grant to third parties said right of exploitation by mean of licenses. It follows that the exclusive right ends up for being broken down into two alternative options: maintaining the exclusive right of exploitation of the subject of the property right, forbidding it to third parties, or authorizing third parties licensees to exploit it.

In reference to the latter possibility, it can be pointed out that, from a financial standpoint, it is certainly not indifferent to maintain a right of exclusive use of the asset for the owner or to share it with third party entities on (or even contribute it exclusively to said entities),

And this even apart from payment of a compensatory consideration, because the presence of a license implies the assumption of specific obligations contractually defined to be borne by the parties and it represents a limitation of private autonomy, pursuant to article 1372, Civil Code.

On the other hand, for the purposes of technical development and for the protection of free competition on the market, the right to forbid to third parties access to one's technology has undergone increasing restrictions over time.

In fact it is by now an accepted principle that in technical sectors for which a certain level of dialog and comparison of information is required, with particular regard, for instance, to high technology products, the need may arise to ensure the interchangeability of said products and information useful to make it possible for said products to interface. The tool whereby said interchange can be ensured is specifically that of the license.

The system whereby compatibility is made possible is based on cooperation among the entities that own the sole patent rights: following a negotiation between the parties, a standard is thus defined, that allows companies in the sector to mutually benefit from their respective technologies, taking advantage of the information held by both, reducing its dispersion and opening the possibility of implementing new technologies and taking advantage of economies of scale through the reduction of research and development costs.

This Judge, agreeing with the definition of "standard" already adopted by the Court of Genoa in a 2004 interim proceeding, issued with an order dated May 8, 2004 (*Koniklijke Philips Electronics N.V. v. Computer Support Italcard S.r.l.*, Pres. Est. Marchesiello; that assumed the definition provided by the *European Manufacturer Association – ECMA,* so that it is to be deemed as standard: *"each document, established by consensus and approved by a recognized body, that provides, for common and repeated use, rules, guidelines of characteristics for activities or their results, aimed at the achievement of the optimum degree or order in a given context"*), notes that the presence on the market of devices joined by uniform characteristics based on a proprietary standard, protected by an industrial property right, is often the result of shared technologies and knowledge among various entities, that agree among themselves on the definition of a standard and the exploitation of said resources, and thereby define the conditions of access to the market of the devices manufacturers that intend to use that standard.

The market, because of the presence of a proprietary standard, is characterized by access barriers of a substantial nature, also considering the fact that it is difficult, one the standard has been adopted, to win market shares with a product that does not adopt it, because costs to

migrate from one system to another would be enormous *(switching costs)* and would have repercussions on the sale price.

The problem of trade-off (balancing) between effects of market closure and benefits for technological development has been the subject of evaluation in Europe. In compliance with the content of the above-mentioned Guidelines on applicability of article 81 of the Treaty (now 101 TFUE) horizontal cooperation agreements (in OJ-C 3, 1.6.2002), the Commission, in a case pertaining to a hypothesis of so-called *patent ambush* (European Commission, case COMP/C-3/38, 636, *Rambus*, par. 33), when evaluating and approving the commitments submitted by *Rambus*, stated that the presence of standards has a positive effect on the market, since it allows promoting common economic development, improvement of supply conditions and even the development of new markets; more specifically, the Commission made a reference to the potential of standards to increase the level of competition and to lower final and sales costs of products, bringing benefits to the economy as a whole, also increasing interchange among products, maintaining and increasing their quality level and the circulation of information. However, the awareness of the presence of potentially anti-competitive implications in developing an established procedure for negotiated standards led to the need to face the problem of regulating access to licenses by the companies that intend to make use of this type of technology.

An initial answer, although at the Guidelines level and therefore of non binding nature, is the one provided by the Commission in its 2002 Guidelines  on horizontal cooperation in which, in order to evaluate the impact of standardization on competition in the sectors that are subject to that procedure, states that standards must be set on a non discriminatory basis and it is necessary to justify the choice of one standard over another, stressing the need and importance of a non discriminatory, open and transparent procedure thus minimizing the risk of anti-competition effects.

As a regulatory system of a public law nature is still lacking, the exercise of property rights within the scope of the rules of conduct established by the associations that administer *standards*, such as ETSI (*European Telecommunications Standards Institute*), which imposes to the owner of a patent that includes the standard, the obligation to grant licenses at fair and non discriminatory conditions to those requesting them (the so-called . *frand* conditions).

At the basis of these considerations there is the principle according to which the exercise of a property right may not extend to the point of unjustly prejudicing competitors in the race for innovation, because in this case the incentive for cultural and scientific progress assigned to the discipline of patent protection would be nullified.

An exercise in violation of such conduct could shape, according to the traditional structure derived from the United States (see the decisions that first applied the so-called *misuse doctrine* of the first half of the last century, see the cases *Motion Picture v. Universal Film* of 1917 and *Morton Salt v. Suppinger* of 1942), an unfair conduct qualified as an "abuse of the right," both in the event an owner totally refuses to license its standard, and if said owner demands excessively onerous contractual conditions, provided that it can be demonstrated that there is an actual position of dominance on the market by the patentee.

One datum that remained constant in the evolution of North American case law and with the emergence of European case law with the Magill, IMS, Microsoft I and II decisions, is that of the difficulty in finding a definition of "injustice," that is, to define within what limits a conduct may be defined as a legitimate exercise of property rights or be shaped as an abuse to the detriment of competitors, and ultimately of end users, according to the European Union interpretation of the Magill doctrine.

A safe basis is the consideration according to which it is not possible to establish universal and valid limits for everybody: among the various theories proposed and supported by eminent scholars of antitrust law and interfering competition, it was observed that, in regard to the heterogeneousness of intellectual property functions and antitrust laws, it is impossible to resort to formal judicial arguments, as instead it is necessary to evaluate the acts of exercise of property rights with restrictive effects for the competition on the basis of the relationship between  the increase of compensation generated in favor of the owner and

owner and the social costs from a monopoly caused to the collectivity, in terms of allocative efficiency of resources.

However even this approach, proposed by an eminent American doctrine, based on economic analysis, requires the use and processing a series of information not easily available to the competition authorities or the courts and, especially, does not allow taking a position on the

social desirability of the various acts of exercise of property rights, limiting to order them in accordance with a series of increasing harmfulness.

Therefore, in the absence of universally valid solutions and easily applicable axioms, all that is left is to apply the rule of logic case by case (the so-called *rule of reason*) to the case being examined, giving rise to a balancing of interests between protection of competition and legitimate exercise of patent rights.

In fact, many opinions were voiced in favor of a "case by case" approach to the problem of the refusal to negotiate of an owner of the property right and possible effects that said refusal may imply for the competition. This approach must be agreed with in the case in point, with special consideration for the characteristics of the market in which the parties operate, that of mobile telephony, characterized by great technological innovation, that according to some authors, presents *windfall gains,* that is, successes for the company in a monopoly position meant to last only over the short term, with a high erosion rate, especially considering that the presence of sizable profits in the sector would also allow the competition to resort more easily to the credit market, thus giving incentive to an actual competition based on merit.

**7.2**     In the case in point, although the qualification of standard for the Samsung patents is challenged by Apple, for the purposes of the examination required herein, the reasoning can be approached starting from the necessary requirement that said patents merit that qualification (reserving any more in depth analyses on this point to the subsequent proceeding of first instance). Samsung, deeming that it held so called standard essential patents had reported it to ETSI, an agency that handles standardization of communication systems in various parts of the world and cooperates in the definition of technical specifications applicable worldwide.

This judge does not deem it indispensable for the purposes that are significant in this case to approach the verification of whether said report was timely, as the existence of such a report (even if allegedly late) the necessary requirement for the offer of a license and for Apple's claim to said license (at *frand* conditions).

In the case in point it must be considered, first of all, that Samsung made a public offer for the license of the patent portfolio in question, stating it was willing to grant licenses worldwide for all its patents essential to implement the standards of UMTS/WCDMA

37

technology; secondly, that the plaintiff itself reported to ETSI its patent EP' 726 as standard essential for the UMTS-3G system, committing to license it at frand conditions *(fair, reasonable and non discriminatory)*.

The parties do not agree on whether Samsung's offer was *frand*; in particular Apple maintains that the amount is too high, whereas Samsung states that the various calculations performed by Apple are unacceptable because they are exceedingly small.

The subject of the adequacy of the consideration requested to grant a license for the standard technology constitutes a complex assessment on the merit that escapes the understanding of the judge of the interim measure: that aspect may be considered indirectly for the purposes of an evaluation of Apple's conduct for the requested injunction.

As noted above, an investigation on the adequacy of the consideration implies a complex assessment that, as will be explained later, presents implications that are ill suited to the summary cognizance peculiar to interim measures.

In fact, it should be remembered that a judgment on the merit will necessarily involve an in depth analysis that will allow the parties' attorneys to argue specifically on the subject. If, on the one hand, an owner's refusal to grant a license based on the insufficiency of the compensation offered has been deemed legitimate in the legal literature, on the other hand the subject of fair price implies and subtends anti-competition subjects that must be evaluated critically and in depth. For the purposes of adopting a provisional measure, the observation that there has been a request between the parties to obtain a license and that serious negotiations took place for the concession of said license, serves to distinguish the case in point from European and domestic legal precedents and is also a point of distinction for whether to grant the relief requested by the plaintiffs.

Regarding the conduct maintained during negotiations there are reciprocal charges of impropriety and reactive attitudes from both parties. It seems difficult to conduct a full investigation on this point during the preliminary stage (see the statements and evidentiary offers made in that regard by Samsung's defense, reproduced in detail in points 4.1 and 4.9 above; see charges made by Apple against Samsung in note 7 on page 11 of Apple's brief, with the addition that Apple has observes that it had never been communicated the conditions

granted to other licensees despite having agreed to  Samsung's request and signed a non disclosure agreement, page 32, Apple brief of December 6, 2011).

It is opportune to recall on this point a ruling by the Federal Supreme Court of the German Republic, dated May 6, 2009, that states, in a case wholly similar to the one in question, regarding the multinational Philips, that the owner of intellectual property that intends to obtain an injunction, despite the defendant possibly having the right (as a competitor) to obtain a license on the disputed patent, abuses its dominant position on the market in the event it acts in bad faith. This subjective element may be deemed to exist when two situations are present: stating in advance that the party that intends to obtain a license must have made an unconditional offer, first of all, the owner of the property right may not refuse without such a refusal giving rise to an unreasonably exclusive conduct toward the party that intends to obtain that property right on license or without violating the principle of non discrimination. Secondly the aspiring licensee must comply with the provisions for use of the property right and, even in the case it had already made use of the technology subject to protection, it must pay or offer suitable guarantee for payment of royalties.

Deeming that the plaintiff has a right to quantify autonomously the percentage of the royalties against Apple's request, in a e *frand* percentage that in any case constitutes the subject of negotiations and therefore not imposed unilaterally to the licensee, it must be observed how, also in the case in point, it is not possible for Apple to claim the *misuse defence* to block an injunction based on the owner 's refusal to reach a contractual commitment with the aspiring licensee in regard to the consideration, already assumed by the German Supreme Court, that the owner of the property right must be deemed completely free to determine the amount of the requested royalty, with the two-fold limit not to hinder intentionally the aspiring licensee's activity or to discriminate against it compared to other licensees.

Based on factual evidence that emerged during the proceeding, Samsung's offer does not appear, even if from a summary acknowledgment, as having extrinsic characteristics of san abusive nature.

**7.3**      In reference to the requested injunction, the plaintiff cites and deems applicable to the case in point the 2004 decision by the Special Division of Genoa that, confirming interim

relief at the complaint hearing, had ordered an injunction in Philips' favor, based on a two-fold consideration: that the plaintiff was actually obligated to license its own property right at frand conditions and that the defendant had not submitted to the plaintiff any request to obtain a license for the patents, having however introduced into the European Economic Space (SEE) products exploiting Philips' property right.

It is on the basis of these necessary conditions that the Special Division of the Court of Genoa (and in another proceeding for provisional relief between Rovi and Ical, also Milan Special Division, this same judge being the reporting judge) decided to grant an injunction and seizure of infringing devices.

Instead, the indicated necessary conditions do not seem to be occurring in the dispute in question: although both cases in point have in common the presence of a proprietary standard, in the Genoese case the defendant's activity had been put in place without any attempt to negotiate the terms of a license on the standardized patents and it had turned into an appropriation of the competitor's property right. In the current dispute, instead, the parties that already had contractual relationships, as the plaintiff reported, began negotiations for granting to Apple a license for the Samsung patents as early as July 2010, with said negotiations extending until October 31, 2011, with an exchange of correspondence between the parties on the subject of the terms and conditions of the license, with requests for reciprocal obligations of various kinds.

In the case in point it is therefore not possible to claim the application of an injunction as decided at the complaint hearing by the Genoese Special Division, as it must be considered that in this case the very requirement exists that had been judged missing by the Genoese judges, that is, the interested party's application to obtain a license.

On the other hand a simple application would not be sufficient to be shielded from all charges of infringement, but it would be necessary for the intent to obtain a license to be pursued by means of serious negotiations. Now in the case in point, the seriousness (although probably not shared in the conclusions that were drawn form it) of Apple's offer may be identified in the computation of the royalty percentage that the technicians consulted by Apple worked out, as shown below.

**8.      The theory of the establishment of the license having already occurred**

Regarding the thesis presented by the defendants' attorneys, according to which the license was allegedly already established and only determining the royalty percentage was lacking, this judge shares the objections of Samsung's defense. Based on the provisions on contracts of our civil code, the expressed willingness to start negotiations may not be compared to a contractual offer; for a proper binding offer, in regard to which a simple acceptance is equivalent to establishing a contract, it is necessary for the subject of the agreement to be precisely determined in all its elements and, in particular, for the respective performance by the party to be defined (Cass., July 7, 2009, No. 15964; Cass., December 15, 1982, No. 6922). Under no circumstance, on the basis of Italian law may an offer of patent license be a document that, one the one hand, does not even indicate what patent would be licensed and what the territorial and temporal limits of the license are and, on the other hand is wholly silent regarding the counter performance requested from the licensee.

The offer presupposes an expression of intent by the offering party in the sense of assuming a binding commitment and for the hypothesis of acceptance by the counterparty, that in the declaration at the time made by Samsung is instead absent. Likewise, the plaintiff's statement according to which, on the basis of Italian law, the conduct of the infringing party that begins to exploit another's patent without asking for a license and without paying royalties could not be considered an automatic acceptance of a license agreement seems reasonable.

Also the decision issued on October 14, 2011 in the parallel Dutch proceeding (doc. 19) rejected Apple's thesis regarding the existence of a license. The Dutch judge in fact ascertained (points 4.12-4.16) that:

- article 4.1. of the ETSI Guide on IPRs demonstrated that additional negotiations between the parties are necessary, after the declaration of willingness to deal;

-  the declaration to ETSI does not appear to correspond to an offer according to French law (applicable to the Agency's regulations);

-it is not sufficiently demonstrated that there can be a licensing agreement based on French law before the parties have agreed upon the license payments;

- based on French law licenses must be concluded in writing.

On the other hand, in this judge's opinion, it must also be excluded that there already was a license, in consideration of the fact that Apple itself on no occasion during negotiations had

used such an argument, and instead had determined to comply with Samsung's requests (see in particular on the non disclosure agreement) without ever bringing up the existence of a license agreement already entered into, so that only the amount of the royalty would have remained uncertain. On the other hand, the uncertainty regarding this last datum was not a negligible lack, since the price of the royalty was an element of fundamental importance, also in  relation to the nature of the agreement and potential of use of the asset that constituted its subject.

**9.     The Samsung/Qualcomm agreement**

**9.1**     Again in reference to the presumption of sufficient legal basis the objections formulated by Apple's defense in reference to the Samsung/Qualcomm agreement and in reference to the statement of having purchased the chips in question from Qualcomm must be considered.

In this sense, it must be considered that the agreement executed between Samsung and Qualcomm consists of three subsequent documents: the actual license agreement, signed by the above-mentioned entities in 1993 (Apple doc. 34), the modification which took place in 2004 (*Amendment 3.29.2004*, attached to doc. 34) and lastly an "additional 2009 modification" (*Amendment 1.1.2009*, additional annex to doc. 34). This agreement, to which California laws apply (the parties agree on this point), explains its effect on the entire worldwide territory ("*Territory means the entire world,*" so in the preliminary considerations of the *Agreement of 8. 31.1993*) and it is inherent, for what pertains to this proceeding, in the discipline of certain aspects of the construction of components manufactured by Qualcomm on behalf of Samsung, the owner of the property right.

As for the subject of the license granted, it must be deemed that the patent in question (EP '726) is to be understood as included in the whole of the contractual agreements established between Samsung and Qualcomm. Indeed, in the 2004 Amendment, clause 5.1 expressly excluded only patents owned by Samsung and its subsidiaries acquired or developed after 12.31.2000. Observing that the patent EP '726 claims a Korean priority from 1999 and the application for European registration was filed on July 6, 2000, Apple therefore states that the patent indicated is included in the agreements in question.  This deduction was not effectively denied by Samsung's defense and, at the current stage of analyses, it appears absolutely acceptable to this judge.

**9.2**      It must also be considered that, based on the 2004 Amendment, clauses 5.1 and 5.2 were modified: those clauses established on Samsung's part a covenant not to sue Qualcomm, as well as certain additional entities (this point will be revisited later). It is therefore necessary to understand whether, also in view of the provisions of the 2009 Amendment, such a waiver of the exercise of a legal action applies to Apple.

According to Samsung, in the 2004 agreement as well as in the 2009 modification, the commitment not to sue, set forth in articles 5.1 and 5.2, is allegedly not applicable to Apple. And in fact, in article 5.1 (agreement 2004) the commitment had been assumed toward Qualcomm alone, toward its affiliates and its suppliers. Article 5.2 instead, again according to the provisions of the 2004 modification, required the commitment not to sue also toward Qualcomm's customers; this commitment however had precise subjective and objective limitations that, according to Samsung's defense, would apply to excluding Apple.

Regarding the subjective limitations, the definition of "Qualcomm Customer" required for the "customer" to be any third party that had purchased a component from Qualcomm and/or from one of its affiliates and had incorporated it in its own product *("means any entity that purchases Components from Qualcomm and/or its Affiliates and incorporates such Components into its Subscriber Units or Infrastructure Equipments - as such terms would be applied if such entity were a Party)."* So by not purchasing it directly from Qualcomm, nor, according to Samsung, itself incorporating the purchased components, Apple would consequently be excluded from the qualification of customer.

As for objective limits, again established by clause 5.2, Samsung specified that the products in question were only those pertaining to products *"an entity's Subscriber Units and Infrastructure Equipment purchased by such entity from Qualcomm or its Affiliates*." Therefore, in this case, the fact that Apple did not itself incorporate the components manufactured by Qualcomm is relevant.

In the 2009 version the definition of "Qualcomm customer" vas modified, including also those that purchased a component directly and/or indirectly from Qualcomm ("*means any Third Party that purchase or otherwise lawfully obtains, directly or indirectly, any Qualcomm Components and incorporates such Qualcomm Component into its Subscriber*

*Units, Cards, Embedded Modules, Femtocells, OFDM Infrastructure Equipment and/or Infrastructure Equipment*"). However, according to Samsung, also on the basis of this modification Apple would not be a "Qualcomm customer" for the purposes of the so-called commitment not to sue. And in fact Samsung, to support that position, filed (as doc. No. 42) the opinion of an expert in California contract law, Hon. Armand Arabian; said expert pointed out how the interpretation of the clauses in question, according to California law, allowed stating that only an entity that purchased the components directly from Qualcomm and that personally incorporated the in its products could be included in the definition of "*Qualcomm Customer*."

**9.3**     According to the defendants' lawyers, instead, Apple would fall among those toward which Samsung assumed the commitment not to sue. In view of the modification introduced in 2009, regarding the definition of "Qualcomm customer," the inclusion of the wording ("*means any Third Party that purchases or otherwise lawfully obtains, directly or indirectly, any QUALCOMM Component and incorporates such QUALCOMM Component into its Subscriber Units, Modem Cards, Embedded Modules, Femtocells, OFDM Infrastructure Equipment and/or Infrastructure Equipment*") implies that among the customers set forth in article 5.2 Apple itself is present. This conclusion by the defendant's attorneys was also supported by the opinion of an expert (Apple doc. No. 51). Said expert stated that the interpretation of the agreement between Samsung and Qualcomm, even following the principles expressed by the laws of the State of California, moreover similar to those of our civil code, led to the conclusion that it was necessary to investigate on the actual intent of the parties regarding the content of the agreement. And indeed the distinction between "granting a license" and "committing not to sue" to Qualcomm by Samsung was purely artificial and in any case not capable of modifying the substance of the agreement, as said agreement in any case was based on giving consent to the manufacture and sale of the product incorporating the patent and selling it on a worldwide scale. According to said expert the essence of the Qualcomm Agreement corresponded to Samsung's permission, granted to Qualcomm, to manufacture and sell products that incorporated one or all the patents pertaining to mobile

communication devices, thereby consenting to the placement on the market of said products. A similar consent, according to an argument that appears fully convincing to this judge (see below), clearly may not be revoked after the fact by the obligated entity (Samsung) or after the product was sold to a third party and is on the market. According to said expert, an interpretation that denies the enjoyment of this license to Qualcomm's end customers or limited enjoyment solely to Qualcomm's direct nominal purchasers, excluding companies such as Apple, that obtain the chipsets with preliminary agreements from intermediary companies, would not make sense from a commercial standpoint and would go against the obvious intent and intentions of the parties to the license.

**9.4**    In reference to the exhaustion principle opposed by the defendants' attorneys, Samsung challenges the assumption of exhaustion of the rights granted by its patent EP' 269, assuming that Samsung had never given any consent whatsoever to market the products incorporating the chip covered by said patent within the European Economic Space. The plaintiff's defense also assumes how the consent, according to European Community case law, shared by domestic case law, must be given in an express fashion. It points out how only exceptionally "in special cases" it can be an automatic consent and how such a consent may be inferred only if prior circumstances express with certainty the owner's intent to and similar evidence should be provided for each individual product (meant in reference to a specific temporal scope), meaning with such statement that if a consent was granted  this does not imply that it was valid forever, in the absence of a specific contractual commitment in that sense.

According to Samsung's defense, therefore, the chips imported before the letter of cancellation may be considered covered by said consent, whereas those imported subsequently would remain without consent.

On the contrary, in the opinion of the defendant's attorneys the very agreement with Qualcomm would demonstrate how Samsung granted its consent to distribute the product worldwide, therefore obtaining the exhaustion of the right for patent EP' 279 also in reference to the European Economic Space.

**9.5**     This judge deems that she has to rule, in line with European community and domestic case law indicated by the plaintiff's defense (EU Court of Justice, July 12 2011, C-324/09, L'Oréal/eBay; EU Court of Justice, June 3, 2010, C-127/09, Coty Prestige; EC Court of Justice, October 15, 2009, C-324/08, Makro Zelfbedieningsgroothandel; EC Court of Justice, April 23, 2009, C-59/08, Copad; EC Court of Justice, November 20, 2001, joined actions from C-414/99 to C-416/99, Zino Davidoff; EC Court of Justice, July 1, 1999, C-173/98, Sebago; EC Court of Justice, July 16, 1998, C-355/96, Silhouette; in Italian case law, see Court of Bologna, September 12, 2006, in *Foro padano*, 2007, I, 397 ss.; Court of Turin, July 18, 2006, in *Foro it.*, 2007, I, 621 ss.; Court of Rome, February 23, 2005, in *Giur. ann. dir. ind.*, 2006, 289 ss.; Court of Turin, January 16, 2004, in *Giur. it.*, 2004, 1448 ss.), in favor of stating the need of an express consent for marketing the product covered by patent and the exceptionality of an automatic consent, to be verified very closely in view of the parties' intent, as could be demonstrated by the conducts maintained by them.

She however believes that in the case in point  Samsung's consent was stated in express wording, at the time when, defining the territorial scope of the agreement with Qualcomm it had referenced the entire world  ("*Territory means the entire world*," in the introduction of the *Agreement 8. 31.1993*). The territorial extension does not appear to have undergone modifications with the subsequent *Amendments* (the argument is not even used by the plaintiff's defense), so that clause 5.1 (2009 *Amendment*) states that Samsung grants a worldwide license, personal and non exclusive.

This interpretation therefore must certainly be deemed to include the European Economic Space, which if anything should have been expressly excluded. Therefore, with the summary evaluation reserved to this proceeding, it seems that it should be concluded that marketing in Italy (which is certainly a member of said SEEs) of products including Qualcomm's chips took place with the consent of the owner of the patent right (if it is true, as assumed thus far, that the patent is valid) and the revocation of such a consent did not take place according to contractual provisions. On the other hand, these provisions limit the freedom of revocation at will of the consent, given that Samsung by signing clause 5.2 in the terms stated above

imposed to itself a limitation of its option to revoke the consent given in various other cases.

Add to this that from Samsung's press release of 11.6.2009 (Apple doc. 33) it is learned of the existence of a cross licensing agreement with Qualcomm that covered and covers the components of the telecommunication sector for a period of 15 years; that agreement was not presented as limited to the American market, but it appeared to pertain to the whole world and therefore also to Europe. Therefore Samsung's technology was marketed in Europe with its consent, so that it appears that exhaustion took place within the European community that keeps Samsung to oppose further marketing. Nor can that consequence, pertaining to a generally recognized principle intended for the protection of the market and free competition, be voided by the opposing intent stated by the interested party. It would be too easy ans too convenient for the owner of an intellectual property right, regulated by said principle, to have the option f manifesting a contrary intent at any time, and this moreover after it had guaranteed for itself a similar possibility only in certain cases.

**9.6**     On the other hand, it must be believed, again in view of the summary acknowledge reserved to this initial hearing, that the chips placed in the iPhone 4S are the chips purchased by Apple from Qualcomm; and this in view of what was stated and attached by Apple's defense in its brief, in which it acknowledged the purchase of some units of iPhone 4S (Apple doc. 48, which documents the purchase of ten iPhone 4S, there being a unit on record and as said unit shows the chip in question, see attached photographs and in particular the 7th sheet). Once examined the content of a unit, Dr. Potenza, who purchase at Apple's behest throughout Italy the ten units examined (report also attached  under doc. 48) , stated that the microprocessor found within one of said devices, selected as a sample, was a chip bearing the Qualcomm trademark.

According to this judge, again for the purposes of the summary acknowledgment reserved to this stage, significant evidentiary elements can be identified that lead to believe that the that the microprocessors within the iPhone 4S came from Qualcomm. On the other hand, this circumstance is not effectively challenged by Samsung's defense (not even at the hearing of 12.16.2011, subsequent to Apple's production), as the burden of proof of infringement is incumbent upon Samsung. Consequently it appears fair to state that Apple is among the so

called indirect purchasers of Qualcomm, to which Samsung's commitment to waive the exercise of a legal action must be extended.

It is significant that even the evidence offered in the similar French proceeding concluded with an emergency order  dated December 8, 2011 (produced by the parties  parti of the hearing of last December 16), confirms that the chips found at that location in the  iPhone 4S came from Qualcomm. Based on this observation and pursuant to a reading of the contractual clause examined above with which this judge has substantially agreed, the French Judge deemed to reject Samsung's requests for interim relief.

**9.7**    According to Samsung's defense, with its letter of April 21, 2011 (Samsung doc. 44) revocation of the consent in question was allegedly legally exercised, as it represented the distinction between the period in which the circulation of the chips that are the subject of the license (or in any case of the free circulation commitment) had occurred with the consent of the owner of the  patent (period of exhaustion) and the period in which said consent had instead been nullified (non opposability of exhaustion).

Aside from the problem of whether it was possible to revoke a consent already given (regarding which serious doubts can be formulated, unless in the presence of particular conditions), the defendant's observation as set forth below appears plausible to this judge.

Indeed, in regard to the letter of April 21, 2011, the defendant's attorneys maintain that the exercise of the power to limit the scope of any commitment assumed by Samsung toward Qualcomm i and its customers in order to exclude any product manufactured for, used by sold to or otherwise transferred to Apple or any of its affiliates, would not be valid in the case in point. In fact, also considering the content of clause 5.2 following the 2004 modification (as this remained substantially in force even after 2009), Samsung would have had a right to suspend the effects of its agreement with Qualcomm only when a customer or a third party had filed an infringement action against Samsung and when the assumed basis of the infringement had derived from the use or incorporation of said Qualcomm components in the products covered by the agreement.

It must instead be noted that in the case in point the action was initiated by Samsung against Apple, so that the case in point does not identify with the one considered of contractual provision (the opposite case, in which Samsung were a defendant for infringement). In fact,

even considering other proceedings pending between the parties, that have Samsung as defendant, it must be noted how none of the proceedings filed by Apple against Samsung pertains to the inclusion or use of components that are the subject of agreements with Qualcomm.

Therefore it must be concluded that the hypothesis on which Samsung had conditioned its option to revoke its consent to free worldwide circulation of the microprocessors produced by Qualcomm and based on Samsung's patents had not materialized, with the consequence that the revocation set forth in the letter of  April 21, 2011 might not be validly opposed.

Samsung's right on the patent upheld here does not therefore appear to be able to avoid the principle of exhaustion, including under European Community laws.

**10 Il**   *Danger in delay*

**10.1**     In any case it must be considered that in order to grant the provisional measures requested by Samsung here, it is also necessary to evaluate the requirement of grave and irreparable damage to which the plaintiff would be exposed in the time necessary to have its claim verified in the proceeding of first instance.

For this purpose one cannot neglect the defendant's observation which maintains that the violation of EP' 726 was known to the defendant since July 9-11 2008, as allegedly proved by Apple's doc. 28, a circumstance that in the defendant's defense would show the lack of damage from the aspect of the request for a timely intervention.

The date of 2008 is that of the placement in the market of the iPhone 3G (which was launched in July 2008), whereas in 2010 the iPhone 4 entered the market. Its evolved version, iPhone 4S, allegedly makes use of the same telecommunication technology, incorporating the patent which is the subject of the application for an injunction.

Therefore there would not be enough room to accept the claim because the current nature of the damage is lacking: if the chip in patent EP '726 had actually been included in both the iPhone 3G, and in the first version of the iPhone 4, and finally in the iPhone 4S, then the current nature of the damage would be nullified, because more than three years have elapsed (or in any case more than one year) since the damaging event occurred.

In reference to this approach by the defense, the judge must note how it cannot be stated with absolute certainty that Apple document No. 28 is qualified to prove that the model marketed

by the American multinational offered to Samsung the possibility of knowing that di the technology protected by the plaintiff's property right had been already included in that model and that the latter had showed an initial tolerance to take action only at the time of the launch by Apple of the iPhone 4S with an application for interim relief that would therefore be devoid of the timeliness requirement.

In fact, the document consists of an excerpt from the Apple website dated  July 9, 2008 announcing the introduction of the new iPhone 3G model, which states that the new cell phone gives the user an even faster access to internet and e-mail, because of the quad-band GSM and tri-band HSPDA system for voice and data connection worldwide, supporting Wi-Fi, 3G and EDGE network systems among which it is able to make an automatic selection in order to ensure maximum download speed. From this reference to the networking system the possibility for Samsung to be informed of the exploitation of its patent by Apple should be inferred.

However, no matter how vague the reference made by Apple to Samsung technology, it appears sufficient to put in doubt the existence of damage that can be defined current and imminent, also considering the credibility of the defendants' observation  according to which Samsung's defense had in its complaint stated that model 4S was substantially an update of the prior Phone 4, to then state, in the response brief, that the product in question was instead a novelty and such as to illegally erode market shares and cause a loss of customers for Samsung through infringement of EP' 726.

The reaction time frame between the supposed cognizance of the alleged infringement and the plaintiffs' judicial reaction, which took several months, would deprive Samsung of the possibility of qualifying its damage as imminent and current.

On this point the Special P.I.I. Division of Bologna remarked that: "the danger in delay is missing, required to obtain the description, presentation of documents, seizure and an injunction against manufacturing machinery produced in infringement of a patent when years have elapsed from the first notice sent to the infringing party and a proceeding before the UEB to obtain the annulment of the patent is pending before the judges in the state of which the defendant is a resident" (Special P.I.I. Division of Bologna, July 15, 2008). The same

opinion is shared by the Special Division of Rome, in the order issued on July 5, 2007, which states that "the requirement of danger in delay of interim protection is not identifiable when the plaintiff only makes a vague and general reference to an indemnifiable financial damage and moreover deriving from conducts existing for over two years prior to filing the petition." In any case, as a situation of doubt persists regarding the moment in which the plaintiff could have learned of the infringement of its patents, this judge deems such an investigation ill suited to be conducted in the interim stage, because it would go through a technical stage, as a logical antecedent necessary for verifying Samsung's awareness, in order to ascertain whether the technology of EP' 726 was already present at the time the iPhone 4 was launched on the market in its basic version or even at the time of the marketing launch of the iPhone 3G.

However, even apart from such an evaluation, which would exceedingly burden this proceeding, it is useful to note that examining the current status of the damage constitutes a *posterius* in respect to the identification of the nature of said damage, that must be by law qualified as grievous and irreparable.

**10.2**    For this last purpose it must be observed that the injunction for infringement pertains to product for which the parties already had negotiations underway, and that said negotiated had reached a standstill because of the lack of agreement on the conditions for the price of the license. The defendant's thesis, which showed how there is a possibility that the dispute can be defined in purely financial terms though a license must therefore be accepted. This leads to exclude that damage of an irreparable nature exists and that there is an urgency to grant an injunction and/or withdrawal from the market of the iPhone 4S. Assuming a prospective and probabilistic scenario, should the plaintiff's claim be deemed founded and it were ascertained that Apple actually included the chips protected by Samsung's property right, the latter would have the right to damages for infringement in merely financial terms, that is, by means of a monetary consideration. An injunction, instead, is to assist damage irreparably by its nature, whereas the irreparability of the damage seems to have to be excluded when there is a possibility of obtaining a full financial indemnification for the violation of one's property rights.

On the question of whether financial damage can be defined as irreparable and therefore give a foundation to the measure requested by Samsung, lower court legal precedent appears at first divided. On the one hand, it is possible to refer to rulings that acknowledge the incompatibility between irreparability and financial indemnification such, as an example (among many Court of Milan, February 28. 1996, Court of Monza, December 6, 1997, Special P.I.I. Division of Catania, January 19 2006), the decision by the Court of Florence of March 27, 2003, which stated that "the "alleged" damage to the patent right seems to cause a mere financial damage, consisting in the failure to exploit the invention by granting it to companies operating in the sector, basically, a loss of revenue. The normal duration  of a proceeding is absolutely not suitable to produce damage that can rise to the extremes of gravity and irreparability. In fact, at the end of the lower court proceeding to be filed, and acknowledgement of the legitimacy of the complaint would be followed by the possibility of obtaining an indemnification easily and precisely quantifiable in monetary terms, able to eliminate completely the financial damage suffered." A more recent order of the Special Division of the Court of Catania stated, in the same spirit, that "in the case when the owner of the patent only grants the patent on license to third parties, drawing a license fee as consideration, that irreparability of the damage that accompanied the concept of *periculum in re ipsa*, cannot be realized*,* given that the owner of the right can only claim the failure to collect license payments."

Other rulings instead seem to identify in financial detriment a sufficient element to give substance to the irreparability of the damage (see in particular: Special P.I.I. Division of Naples, order of 4.20.2004, reiterated by the order of 10.24.2008). However, a closer reading of the above-mentioned provisions allows to identify as a common element the need expressed by the judge to protect with an injunction a particularly qualified financial damage, characterized, on the basis of the circumstance of the actual case, of relevant importance and subject to unforeseeable and uncontrollable developments, or a difficult proof of its extent in the subsequent proceeding on the merits.

As agreed upon by the courts of first instance, the need clearly emerges of carrying out, prior to any other additional evaluation, a balancing of the parties' interests in view of issuing a

provision: the Special Division in Naples considers it a priority to perform, also in within the scope of monetary damage, a *"comparative evaluation of the parties' opposing interests."* This approach allows to put in proportion the requirement of *danger in delay,* placing it into the actual case and evaluating the effects of adopting the relief measure.

The rationale of this approach allows to proceed apart from aprioristic categories of a general and abstract nature and to evaluate in full the characteristic of instrumentality which is peculiar to the interim procedure.

**10.3**    Applying this principle to the case in point, first of all it is noted how an approach linked to an evaluation of the individual action in the case in question leads to highlighting, among other things, the circumstance that Apple seems to have deposited in trust a sum of money as guarantee of the royalties presumably owed to Samsung in the event its patents were to be deemed valid and infringed (doc. 30). It must then be acknowledged that Apple is certainly not risking insolvency (to use a euphemism, as Apple's own defense states, see as doc. 29: press release of the report pertaining to Apple's sales for the third quarter of 2011), a conviction strengthened by the enormous success obtained by the products recently launched on the market.

The presence of such a guarantee would allow Samsung to mitigate any damaging effects during the proceeding. Also the observation of the easily verifiable extended illegal conduct and its extent lead to believe that it is necessary to evaluate the request for interim relief in view of the circumstances of the actual fact. The valuation of the nature of the companies involved in this dispute also contributes to the decision: these are in fact worldwide technology leaders. If on the one hand it must be stated that the nature of telecommunication "giants" is not sufficient to ensure immunity from the damaging consequences of their conducts, it is however undeniable that the presence of factors such as high revenues, a high degree of solvency and solidity of these multinational groups, together with a strict burden of accounting documentation to which they are subject, all elements that ensure a high level of the possibility to verify commitments assumed and revenue obtained on which to calculate any royalties that may be owed.

Having made these preliminary statements and deeming that an injunction is not indispensable for protecting the plaintiffs' reasons during the proceeding, this judge does not

deem to be able to admit the request for an injunction, as in the case in point no damage can be identified such as to place at risk the financial stability of the company that suffered it.

**10.4**    On the other hand, the ides of total unassailability of the Apple Group companies, that would allegedly be immune from any interim measure because of their position of particular prestige in the market (summarized in the expression now widespread in the financial press *"too big to fail,"* so that the American multinational would be *"too big to be stopped"* is to be dismissed.

There is no privileged judicial status that may be claimed by Apple, whose contractual and commercial behavior was examined at this stage and will certainly examined by the judges of first instance.

It is however deemed possible to state that Samsung's rights will be able to find adequate protection in the first instance proceeding, whereas at this time they are not such as to allow the immediate assumption of an injunction, as this does not appear to be supported by the necessary requirements to meet a sufficient degree of danger in delay, in terms of irreparability, in addition to timeliness.

**11    Balancing of interests**

**11.1**    The conclusion adopted, furthermore, appears in line with the principle of balancing opposing interests and with the one, certainly not negligible, of the protection of consumers and operators of the downstream market.

Indeed, on the one hand the iPhone 4S has already been introduced on the Italian market. It is true that Samsung had filed an application for interim relief before it was marketed, but the plaintiff itself at the first hearing requested a postponement to a date following the scheduled launch of the product on the market. On the other hand, in balancing opposing interests and with the pressure of the consumer public by now waiting to receive the new models (requested in the number of one million units, according to Samsung), it does not seem more opportune to intervene with an injunction , as it can be said that, because of the considerations already expressed, the feared damage seems to consists solely of a monetary damage: the failure to be paid for royalties. And indeed, it cannot be revoked in doubt [sic] that Samsung repeatedly formulated an offer to license its patent both in general terms by stating its willingness to offer a license on the standard communicated to ETSI, and

specifically with a letter dated July 20, 2011 (Samsung doc. 13), when it had communicated its willingness to grant a *frand* license, reiterating said willingness in more precise terms, after Apple had signed the non disclosure commitment (as per Apple doc. 23); in that stage (on 7.25.11), in fact, Samsung had formalized its offer for all UMTS/WCDMA technology standards, asking for a 2.4% royalty.

Samsung itself states that in order to avoid an illegal act Apple should have demonstrated that it asked to pay royalties. But such a request indubitably was made and expressed with a certain seriousness, as demonstrated by the development of negotiations, in which for instance Apple signaled its willingness and indubitably expressed a certain good will in signing a confidentiality commitment.

Therefore it will be a matter of ascertaining during a first instance proceeding what the percentage is for a *frand* royalty, whether Apple bore any responsibility for the failure of negotiations or if the collapse of said negotiations is to be attributed to a normal and legitimate lack of identification of a mutually satisfactory threshold for the percentage of royalties to be paid. The fact that illustrious experts were consulted on this point by both parties and were able to support their theses with technical and econometric arguments, demonstrates how both the opposing parties' positions are not in bad faith (even if, naturally each tries to get the maximum advantage from the operation, according to a market law which, unless proved otherwise, can be deemed completely legal). This observation allows to clear the field, at least at the current stage of investigations, from charges of *patent ambush* and abuse of dominant position. It is therefore indubitable that the valuation regarding a *frand* royalty must be entrusted to an expert witness. Likewise, a definitive verification regarding the validity of the patent in question and regarding the actual technology used in the new iPhone 4S compared to prior models (for the purposes of verifying whether the charge of infringement is founded) can only take place during a full proceeding, through a court-appointed expert witness. Rather, in logical terms, this verification will considered as an antecedent and prejudicial for the court-appointed expert witness on the royalty rate, as it is quite obvious that no royalty will be owed to Samsung if the exhaustion of its patent at a worldwide level can be stated pursuant to its agreements with Qualcomm, as well as if the validity of the patent were to be denied or infringement excluded.

55

**11.2**     These issues of a prejudicial nature keep from giving immediate access, following the indications of Samsung's defense, to an expert witness to determine a fair royalty. Lacking an agreement in that sense between the parties and in the presence of the other issues of a prejudicial and absorbing nature mentioned above, it is not possible to agree with the presentation of Samsung's defense, that could have however opened the way for an agreed-upon solution to the dispute.

It is not sufficient to state that Apple presented the new model as an "absolute novelty" to contradict Apple's statement regarding the use of the UMTS functionality. The burden of proof of the danger in delay rests on Samsung and therefore also that of the timeliness of the application for interim relief: against the principle of evidence provided by Apple regarding the use of said technology, Samsung should have demonstrated that the UMTS functionality of the iPhone 4S was different from the one used by Apple and that only that latest technology represented an infringement of their own patents.

**11.3**     In order to impose the requested interim reliefs it is necessary to balance the effects that said provisions would have on the market and for the defendant companies compared to the benefits derived from it for the owner del right requesting provisional protection.

In the case in point an injunction blocking or delaying the marketing of the iPhone 4S on the Italian market, as well as the seizure of all units already in commerce would mean enormous and irreparable damage for Apple and Italian consumers. In fact, not only the alleged irreparable damage to Samsung must be kept in mind t, but also the damage Apple would suffer in the event distribution and marketing of the iPhone 4S were to be prohibited, which would end up in an irreparable loss of market share for Apple, also in consideration of the rapid obsolescence that notoriously characterizes the market of mobile telecommunication devices.

At the end of the proceeding of first instance, should the opposing theses of the defendants [sic] be admitted (regarding which an opinion, albeit partial, of possibly being founded), the iPhone 4S would no longer be a marketable product. This would be damage of enormous relevance, and truly irreparable, also involving third parties that participate in the manufacture, distribution and promotion of the iPhone 4S. Instead, the damage that the Samsung companies would suffer if the provisional measures were denied at this stage, would exclusively correspond, as already illustrated in the preceding paragraphs – to the

amount of uncollected royalties, as long as the plaintiff's thesis on infringement were confirmed in the lower court proceeding. It is correct to state that Samsung's alleged damage translates into a mere right to credit, which may find adequate compensation at the end of the proceeding of first instance.

**11.4**     The plaintiffs' defense (page 62 of Samsung's response brief) stated that rejecting their claims "*on the one hand would see thwarted in great part the research investments at the basis of EP' 726 (which, at this point, would be exploited free of charge by Apple without having contributed in any way to this technology) and, on the other hand, would find its market share blocked and likely eroded by the infringement committed by the counterparty*."

It does not appear that this statement can be agreed with. Indeed, as far as investments in research for the patent in question, should it be proved that EP '726 is valid and infringed by Apple, the latter would be obligated to pay to damages to Samsung in the form of the same royalties that Samsung is already requesting now as counterpart for its obligation to grant a license. The desire to offer a license has already been stated by da Samsung in various venues. As to the alleged risk of erosion of the market share held, it has been stated in the proceeding (par. 78 of Apple's answering brief) that the Samsung Galaxy S, iPhone 4S' potential competitor, since it was launched on the market approximately 5 months ago, has enjoyed a worldwide success in sales defined "incredible," that apparently exceeded 30 million units (doc. 45). Considering said great worldwide success, the statement that Samsung cannot complain that its market share would be "blocked" or "likely eroded" by the sale of the IPhone 4S is to be agreed with.

It must therefore be concluded that the damage that the Samsung companies may potentially suffer in the event of a failure to admit the petitions for provisional measures would be not only minor compared to the damage to Apple, but, above all, easily remedied by remitting the lost exploitation rates.

Indeed, a delay or a suspension in the manufacturing of the final product may cause the company interested in the licensing of a patent essential to the standard serious and irreparable harm in terms of its competitions, whereas the counterposed interest (also worthy

of protection, in the event the validity and infringement of the patent were confirmed) is only that of obtaining an adequate increase in the monetary value of its patent.

## 12   Conclusions

In view of all considerations set forth, this judge deems that she cannot grant the requested provisional measures and that she must reject the petitions filed on behalf of the plaintiffs Samsung corporations.

Settling assignment of expenses for this preliminary proceeding is remanded to the outcome of the proceeding of first instance.

<strong>THEREFORE</strong>

Deciding on the provisional pretrial requests made during the proceeding by Samsung Electronics Co. Ltd and Samsung Electronics Italia S.p.A. against Apple Inc., Apple Italia S.r.l., Apple Retail Italia S.r.l. and Apple Sales International,

she rejects said provisional petitions and reserves to rule on the expenses of this stage at the outcome of the proceeding of first instance.

Thus decided in Milan, on January 5, 2012.

<em>The Presiding Judge</em>

<em>Marina A. Tavassi</em>

450 7th Ave
6th Floor
New York, NY 10123
Tel 212.643.8800
Fax 212.643.0005
www.morningtrans.com

**County of New York**
**State of New York**

Date: January 11, 2012

To whom it may concern:

This is to certify that the attached translation from Italian into English is an accurate representation of the documents received by this office.

The documents are designated as:
- Apple – Samsung EP 269

David Druckman, Project Manager in this company, certifies that Laura Archiapatti, who translated these documents, is fluent in Italian and standard North American English and qualified to translate.  David Druckman attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of David Druckman

Accurate Translation Services 24/7

450 7th Ave
6th Floor
New York, NY 10123
Tel 212.643.8800
Fax 212.643.0005
www.morningtrans.com

**County of New York**
**State of New York**

Date: January 11, 2012

To whom it may concern:

This is to certify that the attached translation from Italian into English is an accurate representation of the documents received by this office.

The documents are designated as:
- Apple – Samsung EP 726

David Druckman, Project Manager in this company, certifies that Laura Archiapatti, who translated these documents, is fluent in Italian and standard North American English and qualified to translate.  David Druckman attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of David Druckman

Accurate Translation Services 24/7