# Exhibit A

1   HAROLD J. MCELHINNY (CA SBN 66781)      WILLIAM F. LEE
    hmcelhinny@mofo.com                      william.lee@wilmerhale.com
2   MICHAEL A. JACOBS (CA SBN 111664)        WILMER CUTLER PICKERING
    mjacobs@mofo.com                         HALE AND DORR LLP
3   JENNIFER LEE TAYLOR (CA SBN 161368)      60 State Street
    jtaylor@mofo.com                         Boston, MA 02109
4   ALISON M. TUCHER (CA SBN 171363)         Telephone: (617) 526-6000
    atucher@mofo.com                         Facsimile: (617) 526-5000
5   RICHARD S.J. HUNG (CA SBN 197425)
    rhung@mofo.com
6   JASON R. BARTLETT (CA SBN 214530)        MARK D. SELWYN (SBN 244180)
    jasonbartlett@mofo.com                   mark.selwyn@wilmerhale.com
7   MORRISON & FOERSTER LLP                  WILMER CUTLER PICKERING
    425 Market Street                        HALE AND DORR LLP
8   San Francisco, California  94105-2482    950 Page Mill Road
    Telephone:  (415) 268-7000               Palo Alto, California 94304
9   Facsimile:  (415) 268-7522               Telephone: (650) 858-6000
                                             Facsimile (650) 858-6100

10

11  Attorneys for Plaintiff and
    Counterclaim-Defendant APPLE INC.
12

13

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                    SAN JOSE DIVISION

17  APPLE INC., a California corporation,        Case No. 11-cv-01846-LHK (PSG)

18              Plaintiff,                       **APPLE'S [PROPOSED]
                                                 STATEMENT OF RECENT
19         v.                                    DECISIONS IN SUPPORT OF ITS
                                                 CLAIM CONSTRUCTION
20  SAMSUNG ELECTRONICS CO., LTD., a             POSITIONS**
    Korean corporation; SAMSUNG ELECTRONICS
21  AMERICA, INC., a New York corporation; and
    SAMSUNG TELECOMMUNICATIONS
22  AMERICA, LLC, a Delaware limited liability
    company,
23
                Defendants.
24

25

26

27

28

1    Pursuant to Civil Local Rule 7-3(d), and Apple's Request for Leave to File Statement

2    of Recent Decisions in Support of Its Claim Construction Positions, Apple submits the

3    following relevant decisions:

4        1.    *Falana v. Kent State Univ.*, Case No. 2011-1198, slip op. at 9 (Fed. Cir.

5    Jan. 23, 2012) (holding that district court properly construed disputed claim to not require an

6    additional feature because: (1) "the claims, not the written description . . . define the scope of

7    the patent right," (2) the disputed claims "do not contain express limitations" concerning the

8    additional feature, and (3) there was "no suggestion in the intrinsic record" that the applicant

9    "intended the claims to have the limited scope") (internal citations omitted).  *See*

10   **Attachment 1**.

11       2.    *Dealertrack, Inc. v. Huber*, Case No. 2009-1566, -1588, slip. op. at 12 (Fed.

12   Cir. Jan. 20, 2012) (holding that district court erred by construing "communications medium"

13   to exclude Internet technology where specification never mentioned Internet, explaining that

14   (1) the Federal Circuit had "expressly rejected the contention that if a patent describes only a

15   single embodiment, the claims of the patent must be construed as being limited to that

16   embodiment" and (2) the disclosure of "multiple examples" does not mean that "non-

17   enumerated examples should be excluded") (internal citations omitted).  *See* **Attachment 2**.

18
     Dated: January 27, 2012                    MORRISON & FOERSTER LLP
19

20                                              By:    */s/ Michael Jacobs*
21                                                     Michael Jacobs

22                                                     Attorneys for Plaintiff
                                                       APPLE INC.
23

24

25

26

27

28

# Attachment 1

# United States Court of Appeals for the Federal Circuit

———————————————

**OLUSEGUN FALANA,**
*Plaintiff-Appellee,*

**v.**

**KENT STATE UNIVERSITY**
**AND ALEXANDER J. SEED,**
*Defendants-Appellants.*

———————————————

2011-1198

———————————————

Appeal from the United States District Court for the Northern District of Ohio in case no. 08-CV-0720, Senior Judge David D. Dowd, Jr.

———————————————

Decided: January 23, 2012

———————————————

BRUCE H. WILSON, of Akron, Ohio, argued for plaintiff-appellee.

R. ERIC GAUM, Hahn Loeser & Parks, LLP, of Cleveland, Ohio, argued for defendants-appellants. With him on the brief were STEVEN J. MINTZ and SCOTT M. OLDHAM.

———————————————

Before LINN, PROST, and REYNA, *Circuit Judges*.

LINN, *Circuit Judge*.

Dr. Olusegun Falana ("Falana") filed a complaint with the U.S. District Court for the Northern District of Ohio against Kent State University ("Kent State") and the inventors listed on the face of U.S. Patent No. 6,830,789 ("the '789 Patent") seeking correction of inventorship under 35 U.S.C. § 256. Falana alleged that he was an omitted co-inventor of the '789 Patent. Following a bench trial, the district court agreed with Falana and ordered the United States Patent and Trademark Office ("USPTO") to issue a certificate of correction adding Falana as a named inventor on the '789 Patent. The district court, without the benefit of briefing, also found the case to be exceptional under 35 U.S.C. § 285 and awarded attorney fees to Falana. Findings of Fact, Conclusions of Law, and Order, *Falana v. Kent State Univ.*, No. 08-cv-720 (N.D. Ohio Dec. 15, 2010) ("*Opinion*"). Kent State appeals. For the reasons explained below, this court affirms the district court's judgment as to inventorship and does not address the district court's exceptional case determination and attorney fees award, which are not properly before us.

## I. BACKGROUND

Kent Displays, Inc. ("KDI") is a privately owned corporation that was established in 1993 as a spin-off technology company from Kent State. KDI designs and manufactures liquid crystal displays ("LCDs") used in electronic devices, such as cell phones, digital cameras, and e-books. In 1997, KDI started a research program to develop chiral additives. Chiral additives are chemical compounds that can be used to improve the performance characteristics of LCDs, such as the display's color, contrast, and brightness. One of the goals of the project was to develop a proprietary chiral additive so that KDI could

obtain its own patents and avoid having to obtain licenses to other patents in the field.

Dr. Joseph Doane ("Doane"), Chief Science Officer of KDI, hired Dr. Alexander Seed ("Seed"), an Associate Professor at Kent State, to work on this project for KDI. Seed was hired to synthesize and develop chiral additives for KDI. Doane and Seed sought to develop a temperature independent, high helical twisting power chiral additive. Temperature independence is an important characteristic for portable LCDs, which must be operable over a wide range of temperatures.

Due to other constraints on his time, Seed quickly found that he was personally unable to pursue the laboratory research required by the KDI project. In September 1997, Seed placed an advertisement in a trade magazine seeking a post-doctoral researcher to synthesize chiral organic molecules for the KDI research project. Seed selected Falana, who had received his Ph.D. in chemistry from Brandeis University, to start the advertised position on January 1, 1998. Both Seed and Falana were listed as "Co-Research Institution Investigators" on grant applications filed with the National Science Foundation.

Seed expected Falana to work independently and to have ideas of his own while working on the KDI project. Seed, Falana, and Doane were physically located in Kent, Ohio and regularly interacted with each other during the course of the project. Falana synthesized numerous compounds while working on the KDI project. In doing so, Falana synthesized compounds "of his own accord" and those suggested by Seed. These compounds were then tested by Dr. Asad Khan ("Khan") at KDI to determine their helical twisting power, solubility in a commercial liquid host material, and performance over a range of temperatures. In due course, Khan reported the outcomes of these tests to Seed, Falana, and Doane and the out-

comes were used to direct future experiments.  Dr. Seed described the interaction between Seed, Falana, and Doane as "very much a team process."

In March 1999, while conducting research for the KDI project, Falana developed a synthesis protocol ("Synthesis Protocol") for making a novel class, or "genus," of chemical compounds: naphthyl substituted TADDOLs.  Naphthyl substituted TADDOLs differ from the general class of TADDOLs in that they include a substituted naphthyl aryl group, rather than a phenyl, substituted phenyl, or naphthyl aryl group.  Using this protocol, Falana synthesized a compound within this genus that was designated "Compound 7."  Compound 7 was an "SS" enantiomer. "SS" and "RR" enantiomers are chemical compounds with molecular structures having mirror-image relationships to one another; RR and SS enantiomers are identical except for the direction of the molecule's helical twist.  Falana's Synthesis Protocol could be used, and was used, to synthesize both RR and SS enantiomers.  After testing, Compound 7 was found to exhibit substantial temperature independence between -20 and +30 degrees Celsius, but did not exhibit temperature independence outside of that range.  Thus, for purposes of the research project, Compound 7 was a "great improvement" and represented "significant progress," but did not completely satisfy the goals of the project.

In April 1999, Doane authored a letter to the Immigration and Naturalization Service in support of Falana's immigration status.  In this letter, Doane described Falana as "the sole organic chemist responsible for the synthesis of the chiral materials" and stated that "his outstanding performance led to a patent we are currently preparing and a proposal we have submitted to [the National Science Foundation]."  In September 1999, Falana resigned from KDI and Kent State to take another position.

In early 2000, Seed synthesized a compound designated Compound 9.  Like Compound 7, Compound 9 was a naphthyl substituted TADDOL synthesized using Falana's Synthesis Protocol.  Unlike Compound 7, however, Compound 9 was an RR enantiomer.  Additionally, Compound 9 exhibited substantial temperature independence between -20 and +70 degrees Celsius and, therefore, satisfied the goals of the project.

On June 9, 2000, KDI and Kent State filed the provisional application that led to the '789 Patent.  The inventors listed on the face of the '789 Patent include Doane, Khan, and Seed.  Afterwards, Doane, Khan, Seed, and Falana jointly authored a publication entitled "High Twisting Power Chiral Materials for Cholesteric Displays" which describes the research project and includes a discussion of the Synthesis Protocol, Compound 7, and Compound 9.  The '789 Patent issued on December 14, 2001.  Claim 1 of the '789 Patent recites:

1.  An optically active compound of the formula:



where the $R_2$ and $R_3$ groups are a lower alkyl group or an aryl or biaryl unit while the $R_1$ groups independently each are a hydroxyl, alkoxyl, aryloxy, or arylalkoxy group, the R groups each represent a group as follows:

$A_1$—[—Z—]$_q$—$A_2$—

where $A_1$ is an aromatic group, an acyclic aliphatic group, or an alicyclic group, and $A_1$ can be a substituted or unsubstituted, Z is a group selected from —O—, —OCO—, or —S—, and the coefficient q is 0 or 1 or Z is $(CH_2)_nO$ where the coefficient n is 0 to 5 and the coefficient q is 1, and $A_2$ is a bivalent radical of a naphthalene group, and the cyclic structure of $A_2$, or $A_1$ if it is cyclic, can be heterocyclic.

The patent specification discloses the Synthesis Protocol developed by Falana as the protocol utilized to synthesize the claimed class of chiral compounds.

After the '789 Patent issued, Falana learned that he was not listed as an inventor and asked Doane why he was not included. After receiving an unsatisfactory response from Doane, Falana filed the present § 256 action against Kent State, KDI, Seed, Doane, and Khan to correct the inventorship of the '789 Patent. On June 23, 2008, Doane and Khan filed signed statements with the court that "[they] have no disagreement with the addition of Olusegun Falana as a named co-inventor of the ['789 Patent]" and that "this statement may be filed with the USPTO to request correction of inventorship of [the '789 Patent] to add Olusegun Falana as a co-inventor." At trial, Doane and Khan explained that they signed the statement not because they thought, as scientists, that Dr. Falana actually had been a joint inventor, but instead because they wanted out of the lawsuit. Accordingly, Doane, Khan, and KDI moved to dismiss themselves from the case, and the district court granted their motion. Thus, the only remaining defendants were Kent State and Seed (collectively, "the Defendants").

The Defendants urged the district court to construe each claim of the '789 Patent to require an RR enantiomer that provides a substantially temperature independent

helical twisting power ("HTP"), wherein "substantially temperature independent HTP" is further defined as having a maximum change in peak reflection of 30 mm or less across a temperature range of +10°C to +50°C. *Opinion* at 34. The district court noted that, while the patent contains thirty claims, the parties only focused on claims 1 and 25. *Id.* While the district court construed claims 1 and 25 to require an RR enantiomer, the district court refused to read limitations into claims 1 and 25 concerning a substantially temperature independent HTP. *Id.* at 35-36.

After a bench trial, the district court concluded that Falana contributed to the conception of the claimed invention by, *inter alia*, the development of the Synthesis Protocol. *Opinion* at 37. Additionally, and without briefing from either party, the district court ruled the case to be exceptional and awarded attorney fees. *Opinion* at 40-44. The district court's determination that the case was exceptional was premised upon findings that the Defendants engaged in inequitable conduct, that the defense was objectively baseless, and that the "testimony of defendants' witnesses was not credible and of questionable veracity." *Opinion* at 41-42. The court then awarded attorney fees, but did not determine the amount. *Id.* at 44. The Defendants timely appealed and this court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

On appeal, the Defendants contend that the district court erred in its claim construction. They also contend that the district court abused its discretion in excluding certain exhibits. Additionally, the Defendants argue that the district court erred in concluding that Falana was an omitted joint-inventor on the '789 Patent. Finally, the Defendants argue that the district court erred in finding

the case exceptional and awarding attorney fees to Fa-
lana.  Each issue is addressed in turn.

### A.  Claim Construction

A district court's claim construction is reviewed de
novo.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448,
1454-56 (Fed. Cir. 1998) (en banc).

The Defendants argue on appeal that the district
court erred by not limiting the claims to an optically
active compound "having a substantially temperature
independent [HTP]."  According to the Defendants, "the
district court held that because the claims did not include
terms regarding temperature independent [HTP], the
claims did not include the limitation."  Quoting this
court's decision in *Alloc, Inc. v. International Trade Com-
mission*, 342 F.3d 1361, 1370 (Fed. Cir. 2003), the Defen-
dants assert that when "the specification makes clear at
various points that the claimed invention is narrower
than the claim language might imply, it is entirely per-
missible and proper to limit the claims."  The Defendants
contend that the specification describes the inventive
compounds as possessing a HTP that is substantially
independent of temperature and that, without this limita-
tion, the claimed compounds "would be commercially
worthless."

Falana responds that the plain language of the claims
nowhere suggests a limitation regarding temperature
independent HTP, let alone a temperature independent
HTP across the specific range of +10°C to +50°C.  Further,
Falana references portions of the specification which
suggest that HTP relative to temperature is simply a
modifiable characteristic of the inventive class of com-
pounds.    Finally, Falana contends that, although the
preferred embodiment may exhibit a temperature inde-
pendent HTP, the only reasonable conclusion is that the

patentee meant to claim the entire class of compounds covered by the plain language of the claims.

This court agrees with Falana. "[I]t is the *claims*, not the written description, which define the scope of the patent right." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("[A] court may not import limitations from the written description into the claims."). The claims here do not contain express limitations concerning a HTP that is substantially independent of temperature. Moreover, this court has "cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification." *See Teleflex, Inc. v. Focosa N. Am. Corp.*, 299 F.3d 1313, 1327-28 (Fed. Cir. 2002). Here, there is no suggestion in the intrinsic record that the applicant intended the claims to have the limited scope suggested by the Defendants. "Absent such clear statements of scope, we are constrained to follow the language of the claims, rather than that of the written description." *Id.* at 1328.

*Alloc*, relied upon by the Defendants, is distinguishable. In *Alloc*, this court concluded that, despite the plain language of the claims, each claim contained a limitation of "play" because the specification as a whole "[led] to the inescapable conclusion that the claimed invention must include play in every embodiment." *Alloc*, 342 F.3d at 1370. Unlike in *Alloc*, where the specification defined the invention as requiring "play" and the applicant emphasized the criticality of "play" during prosecution and distinguished the prior art on that basis, the specification here suggests that the temperature dependence of the HTP is a modifiable characteristic of the claimed compounds and the prosecution history is silent. *See, e.g.*, '789 Patent col.3 ll.52-57 ("In some cases it would be desirable if the temperature dependence of the cholesteric display could be *tailored* by the addition of a second additive . . . ." (emphasis added)); *id.* col.4 ll.18-21 ("The

$R$, $R_1$, $R_2$, and $R_3$ substitutions on the molecule of general formula I *control* the temperature dependence of the twisting power in the nematic host mixture . . . ." (emphasis added)); *cf. Alloc*, 342 F.3d at 1370-73.

For these reasons, this court concludes that the district court did not err in construing the language of the claims.

## B. Exclusion of Evidence

The admission of evidence is a procedural question that is controlled by regional circuit law. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003). In the Sixth Circuit, a district court's decision to admit or exclude evidence is reviewed for abuse of discretion. *United States v. Geisen*, 612 F.3d 471, 495 (6th Cir. 2010). A district court abuses its discretion in this regard when it bases its decision on errors of law or clearly erroneous factual determinations. *Id.* Moreover,

> even if the lower court's decision amounts to an abuse of discretion, it will not be disturbed on appeal if it did not result in a substantial injustice, as no error in the admission or exclusion of evidence is ground for reversal or granting a new trial unless refusal to take such action appears to the court to be inconsistent with substantial justice.

*Zamlen v. City of Cleveland*, 906 F.2d 209, 216 (6th Cir. 1990) (quotation omitted).

Here, the district court sustained Falana's objection to the admission of the Defendants' exhibits CCCC and DDDD. Exhibit CCCC was a United Kingdom patent application ("U.K. Patent") filed in 1991 by Seed and others. Exhibit DDDD was a scientific article published in 2000 by Dr. Seed and others. The Defendants offered

these documents to allegedly show that the Synthesis
Protocol was in the prior art and was in fact known to
Seed prior to his work with Falana.  Despite not admit-
ting these exhibits into evidence, the district court did
permit Seed to comment on them, explain how they
represented his earlier work, and note that the U.K.
Patent disclosed the method for preparing the first re-
agent material used by Seed in preparing Compound 9.

The Defendants argue that the district court errone-
ously excluded exhibits CCCC and DDDD and that had
this evidence been considered, it would have shown that
Falana's Synthesis Protocol was already known in the
art.  Appellant's Br. 31-39.  Falana responds that the Defen-
dants have failed to establish that the district court
abused its discretion in excluding these exhibits.  More-
over, Falana contends that Seed never testified that these
exhibits mentioned TADDOLs let alone the complete
Synthesis Protocol developed by Falana.  Appellee's Br.
24.  Thus, Falana asserts that even if the district court
abused its discretion, any error was harmless.  *Id.* at 26-
27.

This court finds no basis to upset the district court's
evidentiary ruling.  Although the district court may have
erred in excluding these exhibits without providing any
explanation, any such error in this case was harmless.
The Defendants sought to admit these exhibits not to
demonstrate that the entire Synthesis Protocol was
known in the art, but only to show that certain portions
of the Synthesis Protocol were known.  The district court did
permit Seed the opportunity to explain the portions of the
Synthesis Protocol that were known in the art and thus
these exhibits would have been cumulative of his testi-
mony.  Accordingly, this court is unable to conclude that
the error in the exclusion of exhibits CCCC and DDDD
resulted in substantial injustice.  *Zamlen*, 906 F.2d at
216.

### C.  Joint Inventorship

"Inventorship is a question of law that we review without deference." *Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1303 (Fed. Cir. 2010).  "We review the [district court's] underlying findings of fact for clear error."  *Id.* "Because the issuance of a patent creates a presumption that the named inventors are the true and only inventors, the burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence."  *Bd. of Educ. v. Am. BioSci., Inc.*, 333 F.3d 1330, 1337 (Fed. Cir. 2003) (citations ommited).

"A joint invention is the product of a collaboration between two or more persons working together to solve the problem addressed."  *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227 (Fed. Cir. 1994).  People may be joint inventors even though they do not physically work on the invention together or at the same time, and even though each does not make the same type or amount of contribution.  35 U.S.C. § 116.

"Thus, the critical question for joint conception is who conceived, as that term is used in the patent law, the subject matter of the claims at issue."  *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). "A contribution to one claim is enough."  *Id.*  "The statute does not set forth the minimum quality or quantity of contribution required for joint inventorship."  *Burroughs*, 40 F.3d at 1227.  Each joint inventor, however, "must contribute in some significant manner to the conception of the invention."  *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997).  Conception of a chemical compound "requires knowledge of both the specific chemical structure of the compound and an operative method of making it."  *Id.*

The district court issued extensive findings of fact and concluded that Falana's contribution of the Synthesis Protocol was sufficient contribution to the conception of the claimed invention as to render him a joint inventor on the patent.

The Defendants do not challenge any of the district court's findings of fact, but instead, only challenge the district court's legal determination that Falana was a joint inventor. Specifically, the Defendants contend that even if Falana contributed the Synthesis Protocol method, that contribution is insufficient to make him a co-inventor of the claims of the '789 Patent, which are all directed to chemical compositions and not methods. The Defendants also contend that Falana synthesized Compound 7, not Compound 9, and that Compound 7 does not fall within the scope of the claims.

Falana responds that he was the one who developed the Synthesis Protocol, which made it possible to make a previously-unknown genus of compounds, to wit, naphthyl substituted TADDOLs. This was the method used by Falana to synthesize Compound 7, the method used by Seed to synthesize Compound 9, and the only method disclosed in the '789 Patent for making the claimed compounds. Finally, Falana contends that because he contributed the method of making the novel class of compounds claimed in the '789 Patent, his contribution to conception was sufficient to make him a joint inventor.

The question before this court is whether a putative inventor who envisioned the structure of a novel chemical compound and contributed to the method of making that compound is a joint inventor of a claim covering that compound.

 The Defendants assert that *American BioScience* compels the answer "no" to the question before us. The

14                          FALANA v. KENT STATE UNIV

Defendants contend that *American Bioscience* held that a
putative inventor's contribution of a method for making
chemical compounds is legally irrelevant to whether he is
a joint inventor on a patent that "does not claim any
method of making those compounds." Appellant's Br. 28
(quoting *Am. BioSci.*, 333 F.3d at 1341). This reading of
*American Bioscience* is erroneous and the facts of this
case are manifestly distinct. *See Fina*, 123 F.3d at 1473
("The determination of whether a person is a joint inven-
tor is fact specific and no bright-line standard will suffice
in every case.").

In *American Bioscience*, the court was faced with
choosing between two competing groups of inventors. *Am.
BioSci.*, 333 F.3d at 1340; *see also Vanderbilt University*,
601 F.3d at 1306. The passage quoted by the Defendants
concerns whether Nadizadeh, a putative co-inventor and
scientist for FSU, was a joint inventor on the patent when
Tao, named co-inventor and a scientist for ABI, allegedly
used Nadizadeh's "secret" method to make the claimed
compounds. *Am. BioSci.*, 333 F.3d at 1341. There was no
indication, however, that Nadizadeh's secret method
actually made any of the claimed compounds and thus he
did not directly contribute to the conception of any of the
*claimed* compounds. *Id.* Even if Nadizadeh developed a
method of making similar compounds, it was of no conse-
quence because neither that method *nor those similar
compounds* themselves were *claimed* in the patent. *Id.* at
1342. Indeed, "Nadizadeh neither made the *claimed*
compounds nor attempted to make them, and he did not
have a firm and definite idea of the *claimed* combination
as a whole." *Id.* (emphasis added). Thus, the court con-
cluded that simply "teaching skills or general methods
that somehow facilitate a later invention, *without more*,
does not render one a co[-]inventor." *Id.* (emphasis
added).

*American Bioscience* did not hold that a putative inventor's contribution of the method for making a novel genus of claimed compounds is irrelevant on the question of inventorship of the patent. As explained above, the conception of a chemical compound necessarily requires knowledge of a method for making that compound. *Fina*, 123 F.3d at 1473. In some circumstances, the method of making a compound will require nothing more than the use of ordinary skill in the art. In those circumstances, the contribution of that method would simply be "[t]he basic exercise of the normal skill expected of one skilled in the art" and would not normally be a sufficient contribution to amount to an act of joint inventorship. *Id.* (citing *Sewall v. Walters*, 21 F.3d 441, 416 (Fed. Cir. 1994)); *cf. Oka v. Youssefyeh*, 849 F.2d 581, 583 (Fed. Cir. 1988) (stating in the interference context that "[w]hen . . . a method of making a compound with conventional techniques is a matter of routine knowledge among those skilled in the art, a compound has been deemed to have been conceived when it was described, and the question of whether the conceiver was in possession of a method of making it is simply not raised").

Where the method requires more than the exercise of ordinary skill, however, the discovery of that method is as much a contribution to the compound as the discovery of the compound itself. This case is simply the application of the well-known principle that conception of a compound requires knowledge of both the chemical structure of the compound and an operative method of making it. Accordingly, this court holds that a putative inventor who envisioned the structure of a novel genus of chemical compounds and contributes the method of making that genus contributes to the conception of that genus. This holding does not mean that such an inventor necessarily has a right to claim inventorship of all species within that genus which are discovered in the future. Once the method of making the novel genus of compounds becomes

public knowledge, it is then assimilated into the store-house of knowledge that comprises ordinary skill in the art. Additionally, joint inventorship arises only "when collaboration or concerted effort occurs—that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004).

Here, the district court concluded that Falana's contribution was greater than the exercise of ordinary skill. The district court made such a determination based on the documentary evidence before the court and the testimony of the named inventors themselves. **[JA36-37]** The district court was not persuaded by Seed's testimony that Falana's Synthesis Protocol was nothing more than the basic exercise of ordinary skill because it was simply "old chemistry." Instead, the district court "conclude[d] that the named inventors' post-lawsuit characterization of the meaning and accuracy of the contemporaneous physical evidence against Falana's joint inventorship [was] not credible." *Opinion* at 37 n.22. The district court found that Falana developed the Synthesis Protocol to synthesize Compound 7, an SS enantiomer. The district court also found that, contrary to Seed's testimony, Falana did not develop the Synthesis Protocol by simply following the teachings of others. *Opinion* at 37. Compound 7 is a species within the genus of naphthyl substituted TAD-DOLs—a previously unknown genus of chemical compounds. KDI regarded Compound 7, within that genus, as a "great improvement" because it represented "significant progress." Once Falana left the team, the team continued researching specific compounds within this novel genus. Using Falana's Synthesis Protocol, Seed synthesized Compound 9, an RR enantiomer within that genus. Compound 9 was similar to Compound 7, but exhibited greater temperature independence than that of Compound 7.

Although the Defendants argue that Falana did not contribute to the conception of Compound 9 because Compound 9 was first synthesized after Falana left the team, this argument is inapposite.  The claims of the '789 Patent are not limited to Compound 9.  Instead, they claim a subset of the entire genus of naphthyl substituted TADDOLS—those which are RR enantiomers.  Falana contributed to the conception of this genus by providing the team of which he was a part with the method for making these novel compounds.  Falana's lack of contribution to the discovery of Compound 9 itself does not negate his contribution of the method used by the other inventors to make the genus of compounds covered by the claims at issue.

The district court did not err in concluding that Falana's contribution of the method used by the team of which he was a part for making the claimed compounds was enough of a contribution to conception to pass the threshold required for joint inventorship.  We therefore affirm the district court's determination.

## D.  Exceptional Case

The district court found this case to be exceptional on three grounds: "[1] that defendants engaged in inequitable conduct, [2] that they took an untenable position in defending this case, and [3] that their continued defense of this case in the face of testimony that lacked credibility and veracity was frivolous and bordered on bad faith."  *Opinion* at 42.  The district court then awarded unquantified attorney fees against the Defendants, leaving the amount to be determined in further proceedings, which have yet to be conducted.  Order, *Falana v. Kent State Univ.*, No. 08-cv-720 (N.D. Ohio June 2, 2011), ECF No. 107 ("[T]he Court will defer ruling on plaintiff's application for attorney fees and costs until such time as the

Federal Circuit renders its decision in the pending appeal.").

Falana argues that the district court's exceptional case determination is not final because the amount of the attorney fee award is yet unresolved and is therefore not reviewable on appeal. Appellee's Br. 27 (citing *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1345 (Fed. Cir. 2001)). The Defendants respond that this court has jurisdiction to review the district court's exceptional case finding and that *Special Devices* is limited to the situation where the sole issue on appeal is the award of an unquantified amount of attorney fees.

"By its express terms, § 1295(a)(1) requires that the decision of the district court be 'final.'" *Special Devices*, 269 F.3d at 1343. A decision to award attorney fees under 35 U.S.C. § 285 is not final and appealable before the award has been quantified. *Id.* This rule "prevents piecemeal appeals involving 35 U.S.C. § 285—a first appeal to contest the exceptional finding *per se*, and a second appeal to contest the amount of the attorney fees." *Id.*

Here, the district court issued one order—concluding: (1) that Falana was a joint inventor on the patent; (2) that the case was exceptional; and (3) that an award of attorney fees was justified. The district court's decision on the merits, i.e. its decision on joint inventorship, is final and reviewable by this court. *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 202-03 (1988) ("[A] decision on the merits is a 'final decision' . . . whether or not there remains for adjudication a request for attorney's fees attributable to the case."). But the district court's exceptional case determination is a separately appealable judgment which itself must be final. *See White v. N. H. Dep't of Emp't Sec.*, 455 U.S. 445, 452 (1982) ("Unlike other judicial relief, . . . attorney's fees . . . are not com-

pensation for the injury giving rise to an action.  Their award is uniquely separable from the cause of action to be proved at trial."); *McCarter v. Ret. Plan for Dist. Managers*, 540 F.3d 649, 652 (7th Cir. 2008) ("[T]he upshot of *White's* approach is that decisions on the merits and decisions about attorneys' fees are treated as separate final decisions, which must be covered by separate notices of appeal—each filed after the subject has independently become 'final.'").  The district court's decision finding the case exceptional and awarding attorney fees that remain as of yet unquantified is not final and thus, not appealable.  *Special Devices*, 269 F.3d at 1345 ("[A] decision to award unquantified attorney fees in an exceptional case under 35 U.S.C. § 285 is not final.").  A non-final decision does not become final simply because it is issued in the same order as a final decision.

The Defendants urge this court to exercise pendent appellate jurisdiction over their appeal of this issue.  Under this theory, a court of appeals, with jurisdiction over one ruling can review related rulings that are not themselves appealable.  The Defendants argue that this court should, in the interest of judicial economy, exercise such jurisdiction in this case.  Appellant's Reply Br. 21-25.

The Supreme Court, in *Swint v. County Chambers Commission*, 514 U.S. 35 (1995), "threw cold water on pendent appellate jurisdiction."  *McCarter*, 540 F.3d at 653.  In *Swint*, the Court concluded that pendent appellate jurisdiction was incompatible with 28 U.S.C. § 1291, which limits appeals to "final decisions," and unnecessary because Congress has authorized the judiciary to prescribe rules to provide for interlocutory appeals.  *Swint*, 514 U.S. at 48.[1]  Although the Court did not completely

---

[1] While the decision in *Swint* was decided in the context of pendent *party* jurisdiction, the rationale is equally

rule out all possibility of pendent appellate jurisdiction, it did make clear that only the most extraordinary circumstances could justify the use of pendent appellate jurisdiction. *See id.* at 50-51 ("We need not definitively or preemptively settle here whether or when it may be proper for a court of appeals, with jurisdiction over one ruling, to review, conjunctively, related rulings that are not themselves independently appealable."). These extraordinary circumstances may be present when the nonappealable decision is "inextricably intertwined" with the appealable decision or when review of the nonappealable decision is "necessary to ensure meaningful review" of the appealable decision. *Id.* at 51; *Gilda Marx, Inc. v. Wildwood Exercise, Inc.*, 85 F.3d 675 (D.C. Cir. 1996) (refusing, post-*Swint*, "to create a blanket rule absolutely barring pendent appellate jurisdiction over non-final attorney's fee liability orders" but noting that "as a general matter," the review of such orders "will be rare exceptions"). *Swint* held that the Eleventh Circuit erred in invoking pendent appellate jurisdiction because "judicial economy" is no warrant for disregarding the statutory final-decision rule. *Swint*, 514 U.S. at 43-44, 51.

The Defendants do not, nor from the record could they, argue that the exceptional case determination and award of attorney fees are inextricably intertwined with the determination on the merits or that the exceptional case determination and award of attorney fees must be reviewed in order to properly review the decision on the merits. Were this court to conclude otherwise, every appeal of a non-final award of attorney fees would necessarily be subject to pendent appellate jurisdiction. *See Gilda Marx*, 85 F.3d at 679 ("Early review of attorney's fees liability is not likely to terminate the case or obviate

---

as persuasive to pendent jurisdiction generally. Additionally, the finality requirement of § 1291 is identical to that in § 1295.

further proceedings either here or in the district court."). Even if it was clear in a particular case that a district court erred, and thus early review would obviate further proceedings, such conclusion as to this court's jurisdiction could not be based upon a post-hoc analysis of the correctness of the district court's decision. That result would be contrary to our precedent and that of our sister circuits. *See Special Devices*, 269 F.3d at 1345; *see, e.g.*, *McCarter*, 540 F.3d at 654 (stating, before overruling Seventh Circuit precedent in conflict with *Swint*, "as far as we can see, no decision outside this circuit has invoked pendent appellate jurisdiction since *Swint* to entertain an appeal from an un-quantified award of attorneys' fees").

*Majorette Toys Inc. v. Darda, Inc.*, 798 F.2d 1390 (Fed. Cir. 1986) is also distinguishable from this case. The appeal in *Majorette Toys* was based on 28 U.S.C. § 1292. In that appeal, the Appellants raised issues of validity, infringement, and attorney fees. Although the attorney fees had not been quantified, this court concluded that § 1292(c)(2), which permits interlocutory appeals from a judgment of patent infringement that is final "except for an accounting," permitted the court to exercise jurisdiction over the appeal even if the award of attorney fees had not yet been ascertained. *Majorette Toys*, 798 F.2d at 1391 ("If an appeal in a patent case can come to this Court under § 1292(c)(2) after validity and infringement are determined but prior to determining damages, it makes no sense not to allow an appeal after validity, infringement, *and* damages are ascertained, and an award of attorney fees granted, even though the exact amount of attorney fees (and costs) has not been precisely ascertained."). First, *Majorette Toys* pre-dates the Supreme Court's decision in *Swint*. Second, because this is not an appeal from a judgment of patent infringement, the interlocutory provision of § 1292(c)(2) does not apply. *See Special Devices*, 269 F.3d at 1343 n.2. Instead, § 1295, with its finality requirement, provides the court's

jurisdiction over this appeal.  Finally, *Majorette Toys* was decided in the context of a motion to dismiss an appeal as non-final simply because the amount of attorney fees and costs were not finally determined.  The Supreme Court, a few years later, instructed that an otherwise final judgment on the merits does not lose finality simply because an award of attorney fees has not been quantified. *Budinich*, 486 U.S. at 202.  To the extent this court in *Majorette Toys* suggested it could review the unquantified fee award, such a suggestion was gratuitous to the resolution of the motion to dismiss the appeal.

Because the district court's exceptional case finding and award of attorney fees are not yet final, they are not properly before us and will not be addressed, except to note for the benefit of the district court the persuasive arguments raised by the Defendants in this appeal.

### III. CONCLUSION

The district court's determination that Falana is a joint inventor of the '789 Patent is affirmed.

**AFFIRMED**

### COSTS

Costs are awarded to Falana.

# Attachment 2

# United States Court of Appeals
# for the Federal Circuit

_____

**DEALERTRACK, INC.,**
*Plaintiff-Appellant,*

**v.**

**DAVID L. HUBER** AND **FINANCE EXPRESS, LLC,**
*Defendants-Appellees,*

AND

**JOHN DOE DEALERS,**
*Defendant,*

AND

**ROUTEONE, LLC,**
*Defendant-Cross Appellant.*

_____

2009-1566, -1588

_____

Appeal from the United States District Court for the Central District of California in consolidated case no. 06-CV-2335, Judge Andrew J. Guilford.

_____

Decided: January 20, 2012

_____

HENRY C. DINGER, Goodwin Procter, LLP, of Boston, Massachusetts, argued for the plaintiff-appellant.  With

him on the brief were ROBERT D. CARROLL; and FORREST A. HAINLINE, of San Francisco, California.

    LAWRENCE M. HADLEY, McKool Smith Hennigan, P.C., of Los Angeles, California, argued for the defendants-appellees.   With him on the brief were RODERICK G. DORMAN, BRIAN L. YATES and MIEKE K. MALMBERG.

    LAURENCE S. ROGERS, Ropes & Gray, LLP, of New York, New York, argued for defendant-cross appellant. With him on the brief were JESSE J. JENNER, CHING-LEE FUKUDA and BRIAN P. BIDDINGER.

———————————

    Before LINN, PLAGER, and DYK, *Circuit Judges*.

    Opinion for the court filed by *Circuit Judge* LINN.

    Opinion concurring in part and dissenting in part filed by *Circuit Judge* PLAGER.

LINN, *Circuit Judge*.

    Dealertrack, Inc. ("Dealertrack") appeals the grant of summary judgment of noninfringement of claims 7-9, 12, 14, 16, and 17 of U.S. Patent No. 6,587,841 ("'841 Patent") and the grant of summary judgment of invalidity of claims 1, 3, and 4 of U.S. Patent No. 7,181,427 ("'427 Patent") for failure to claim patentable subject matter under 35 U.S.C. § 101.   *Dealertrack, Inc. v. Huber*, No. CV-06-2335 (C.D. Cal. Sept. 27, 2008) ("*Claim Construction*"); *Dealertrack, Inc. v. Huber*, 657 F. Supp. 2d 1152 (C.D. Cal. July 7, 2009) ("*Invalidity*").   RouteOne, LLC ("RouteOne") cross-appeals the district court's denial of summary judgment of invalidity of claims 14, 16, and 17 of the '841 Patent for indefiniteness.   For the reasons set forth below, we affirm-in-part, vacate-in-part, reverse-in-part, and remand.

BACKGROUND

I.  The Patents in Suit

Dealertrack is the owner of the '841 and '427 Patents, directed to a computer-aided method and system, respectively, for processing credit applications over electronic networks.  The '841 Patent claims priority to and incorporates by reference U.S. Patent No. 5,878,403 ("'403 Patent") and uses the following incorporation language: "This is a division of application Ser. No. 08/526,776, filed Sep. 12, 1995, hereby incorporated by reference.  Now U.S. Pat. No. 5,878,403."  '841 Patent col.1 ll.5-7.  The '427 Patent also claims priority to the '403 Patent, of which it is a continuion-in-part.

Prior to Dealertrack's invention, car dealers, in seeking car loans on behalf of their customers, would apply to funding sources (i.e. banks) by: filling out application forms particular to each bank; faxing or transmitting the application to the respective banks; waiting for bank personnel to enter the application information into their internal computer systems; and eventually receiving responses from each bank.  Dealertrack proposed to automate the process through the use of a "central processor," which receives credit application data from dealers, processes the data to conform to the individual application forms of different banks, forwards the completed applications to banks selected by the dealer, receives answers from the banks, and forwards those answers back to the dealer.  Figure 1A of the '841 Patent, below, displays a preferred embodiment of the system:

4                                                    DEALERTRACK v. HUBER



'841 Patent, fig. 1A.  An important feature of the inven-
tion was to allow the dealer to fill out a single application,
to control which banks would receive the application, and
to control the order and timing in which the applications
were sent to the banks.

## II.  District Court Proceedings

Dealertrack sued appellees David L. Huber and
Finance Express, LLC ("Finance Express") for infringe-
ment of the '841, '427, and '403 Patents by their FEX
system, and sued appellee RouteOne for infringement by
its Credit Aggregation System ("CAS") and its Messenger
system.  The validity of the '403 Patent and infringement
of any of the patents by RouteOne's Messenger system are
not in dispute on appeal.  All of the accused products offer
automobile dealers loan management services that pass
all communications between dealers and lenders through
the Internet.

Appellees Finance Express, John Doe Dealers, and RouteOne (collectively, "Appellees") filed four summary judgment motions[1]: (1) non-infringement of all asserted claims of the '841 Patent based on the absence of a "communications medium," as construed by the district court, in the accused devices and based on several other proposed claim constructions; (2) invalidity of claims 14, 16, and 17 of the '841 Patent for indefiniteness under 35 U.S.C. § 112, ¶¶ 2, 6 for failure to disclose adequate structure corresponding to the purported means-plus-function "tracking" limitation; (3) invalidity of all asserted claims of the '427 Patent for failure to claim patent-eligible subject matter under 35 U.S.C. § 101; (4) invalidity of all asserted claims of the '427 Patent for failure to claim priority to the '403 Patent.

The district court agreed with Appellees' proposed claim construction of the phrase "communications medium" in the '841 Patent as "a 'network for transferring data,' not including the internet." *Claim Construction*, at 19. Because "communications medium" was a limitation in all claims of the '841 Patent, and because it was undisputed that the accused products transferred data only over the Internet, the district court granted summary judgment of non-infringement of all asserted claims of the '841 Patent. The district court denied summary judgment of invalidity for failure to disclose adequate structure for the "tracking" limitation of the claims of the '841 Patent because the district court determined that "tracking" was not part of the function of the central processing means limitation. The district court granted summary judgment of invalidity of all claims of the '427 Patent for failure to claim patent-eligible subject matter under § 101. The

---

[1]    Because the procedural history specific to each of the Appellees substantially mirrors that of RouteOne, we do not separately describe the motions and dispositions filed by each of them.

district court denied summary judgment of invalidity of the '427 Patent for failure to claim priority to the '403 Patent. These rulings are all at issue on appeal—directly, as alternative grounds of affirmance, or in the cross-appeal.

Dealertrack timely appealed, and RouteOne properly cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

I. The '841 Patent

Independent claim 7 of the '841 Patent reads as follows, with the contested limitations highlighted in **bold**:

> 7. A computer based method of operating a credit application and **routing** system, the system including a central processor coupled to a **communications medium** for communicating with remote application entry and display devices, remote credit bureau terminal devices, and remote funding source terminal devices, the method comprising:
>
> selectively receiving credit application data from a remote application entry and display device;
>
> selectively obtaining credit report data from at least one remote credit bureau terminal device;
>
> **selectively forwarding** the credit application data, and credit report data if

appropriate, to at least one remote
funding source terminal device; and

forwarding funding decision data from
the at least one remote funding source
terminal device to the respective re-
mote application entry and display de-
vice, wherein the step of selectively
forwarding the credit application data
and credit report data to at least one
remote funding source terminal device
comprises:

sending at least a portion of the credit
application data, and the credit report
data if appropriate, to more than one of
said at least one remote funding source
terminal devices substantially at the
same time.

'841 Patent col.32 l.55 – col.33 l.10.  Dependent claim 8
adds "[the method of claim 7] further comprising the step
of enabling reviewing, analysis and editing of the credit
application data at the remote application entry and
display device prior to the step of selectively forwarding
the credit application data."  *Id.* col.33 ll.11-15.  Depend-
ent claim 9 adds, "wherein said remote application entry
and display device is located at a vehicle dealer."  *Id.*
col.33 ll.16-18.  These claims are not argued separately.

Independent claim 14 of the '841 Patent reads as
follows, with the limitations relevant to this appeal high-
lighted in **bold**:

14.  A credit application and **routing**
system, comprising:

a communications medium;

**central processing means**, operably coupled to said communications medium, for executing a computer program which implements and controls credit application processing and **routing**;

at least one credit application input terminal device, operably coupled to said communications medium, for keyboard entry of at least credit application information, for visual display of at least funding decision information, and for sending and receiving to and from said central processing means over said communications medium; and

at least one funding source terminal device, operably coupled to said communications medium, for receiving at least a portion of a credit application over said communications medium from said at least one credit application input terminal device through said central processing means, and for sending a funding decision to said at least one credit application input terminal device through said central processing means over said communications medium,

wherein said central processing means computer program which implements and controls credit application processing and **routing**, further provides for **tracking pending credit applications.**

'841 Patent col.34 l.48 – col.35 l.6.  Independent claim 12 is the same as claim 14 except for the wherein clause, which reads "wherein there are a plurality of funding source terminal devices connected to said communications medium, and wherein a credit application is sent to more than one of said plurality of funding source terminal devices over said communications medium through said central processing means."  *Id.* col.34 ll.14-19.  Independent claim 16 is identical to claim 14, but adds "at least one credit bureau terminal device, operably coupled to said communications medium, for receiving at least a portion of a credit application from said at least one credit application input terminal device through said central processing means over said communications medium, and for sending credit information to said at least one credit application input terminal device over said communications medium through said central processing means."  *Id.* col.35 ll.35-43.  Claim 17 depends on claim 16, and adds "wherein said central processing means computer program which implements and controls credit application processing and routing, further provides outcome results including approval, decline, conditional approval or a message."  *Id.* col.35 ll.49-53.

## A.  Standard of Review

Claim construction is a question of law which this court reviews de novo.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1451 (Fed. Cir. 1998) (en banc).  "Where . . . the parties do not dispute any relevant facts regarding the accused product[ and] disagree [only] over which of two possible meanings of [the claim at issue] is the proper one, the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment."  *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996).

This court reviews the grant or denial of summary judgment under the laws of the regional circuit.  *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1349 (Fed. Cir. 2005).  The Ninth Circuit reviews grants or denials of summary judgment de novo, asking "whether there are any genuine issues of material fact" while "[v]iewing the evidence in the light most favorable to the nonmoving party."  *Burke v. County of Alameda*, 586 F.3d 725, 730-31 (9th Cir. 2009).

### B.  "Communications Medium"

There is no dispute that if the district court's claim construction of "communications medium" stands, Appellees are entitled to summary judgment of noninfringement.

The district court construed "communications medium" as "a 'network for transferring data,' not including the internet."  *Claim Construction*, at 19.  The district court grounded its construction on two bases.  First, the specification included the following statement in its "Detailed description of the preferred embodiment(s)" section: "Although illustrated as a wide area network [in FIG. 1], it should be appreciated that the communications medium could take a variety of other forms, for example, a local area network, a satellite communications network, a commercial value added network (VAN) ordinary telephone lines, or private leased lines."  '841 Patent col.17 l.67 – col.18 l.5.  The district court noted that though "it is improper for a court to limit a patent to its preferred embodiment, it is reasonable to assume that when a patent supplies a long list of examples like here, the list is exhaustive."  *Claim Construction*, at 18 (internal citations omitted).  Second, the district court rejected Dealertrack's arguments that (1) references in the specification to "TCP/IP" and "CompuServe" implicitly refer to the Internet as a communication medium; (2) the ordinary mean-

ing of communications medium included the Internet; and (3) the prosecution history shows the Internet was implicitly considered a "communications medium" by the examiner and the patentee.

Dealertrack argues that in 1995 ordinary artisans would have understood that the Internet was a communications medium as the phrase was used in the '841 Patent because: (1) the specification explicitly says that "[t]he communications medium used need only provide fast reliable data communication between its users," '817 Patent col.18 ll.8-9, and is not further limited anywhere; (2) it is undisputed that the Internet is—and was in 1995—a network for transferring data; (3) the '841 Patent is a divisional of the '403 Patent, which includes the Internet as an example of a "communications medium" and is incorporated by reference into the '841 Patent; (4) the Internet is a wide area network, which is expressly cited as an example of a communications medium; and (5) during prosecution, (a) the examiner manifested an understanding that the Internet was a particular "communications medium" by making rejections over Internet-based prior art, and (b) applicant distinguished such prior art on grounds unrelated to the Internet.  Dealertrack argues in the alternative that even if the Internet was not understood as a "communications medium" by ordinary artisans in 1995, it can be captured within the claim scope as after-arising technology.

Appellees counter that: (1) the specification requires that the communications medium be both reliable and secure, and the Internet was neither of these as of 1995; (2) the patentee disclaimed the Internet by capitulating to the examiner's requirement that "Internet" be removed from the specification as "new matter" after applicants attempted to insert it during prosecution; and (3) the incorporation by reference of the '403 Patent is inapposite because the Internet was improperly included in the '403

Patent's specification during prosecution, and anyway the '841 Patent, by its terms, only incorporates by reference the application that gave rise to the '403 Patent as originally filed.   As to Dealertrack's alternative argument, Appellees argue that the Internet may not be captured as after-arising technology because it was in existence as of the priority date of the '841 Patent.

We agree with Dealertrack that the district court improperly carved-out the Internet from its construction of "communications medium."  In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), this court "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  *Id.* at 1323.   The disclosure of multiple examples does not necessarily mean that such list is exhaustive or that non-enumerated examples should be excluded.  As we noted in *Phillips*, "[m]uch of the time, upon reading the specification in [] context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive."  *Id.*  Here, the context makes clear that the examples were not meant to be definitive of the scope of "communications medium."  The section in which the list of examples is found is entitled "Detailed description of the preferred embodiment(s)." '841 Patent col.17.   The first paragraph of the section says: "It should be kept in mind that the following described embodiment(s) is only presented by way of example and should not be construed as limiting the inventive concept to any particular physical configuration."  *Id.* col.17 ll.56-59.  While in some circumstances this may be taken as rote language, the additional context of the list cannot:

> "Although illustrated as a wide area network, it should be appreciated that the communications medium could take a variety of other forms, *for example*, a local area network, a satellite communications network, a commercial value added network (VAN) ordinary telephone lines, or private leased lines. . . .   The communications medium used *need only* provide fast reliable data communication between its users."

*Id.* col.17 l.67 – col.18 l.9 (emphases added).  The specification thus gives a basic definition of a communications medium as anything that "need only" provide "fast reliable data communication between its users." *Id.*  The list itself is explicitly prefaced with a description that the enumerated articles are "example[s]."  The natural reading of this paragraph, and the only reading that does not violate this court's repeated prohibition against importing limitations from the specification, is of a non-exhaustive list that, if anything, broadens the definition of "communications medium."

Both parties agree that a "communications medium" is a "network for transferring data" and only disagree about the Internet carve-out.  There is undisputed evidence in the record, not challenged on appeal, that in 1995 the Internet was a network for transferring data.  More specifically, Dealertrack proffered expert testimony that in 1995 the Internet was the world's largest wide area network, an enumerated species of a communications medium in the specification.  To specifically exclude the Internet would thus require a waiver of claim scope that is "both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003) (internal citations and parentheticals omitted).  There was no such waiver here.  The only part of the record that bears on

this is a post-allowance examiner's amendment deleting the phrase "the InterNet" from the list of examples in the specification and cancelling the claims specifically directed to the Internet.  The examiner did not provide reasons for the amendment, and there is no evidence that the applicant made any statements supporting patentability on the basis of the removal of that phrase from the specification.  This alone is insufficient to create a waiver.

Moreover, Dealertrack points out that during prosecution of the parent '403 Patent, the examiner allowed the applicant to include "the internet" as an example of a "communication medium."   Dealertrack thus contends that because the '403 Patent is expressly incorporated by reference into the '817 Patent, the specification expressly includes the Internet as an example of a communications medium.  Appellees counter that only the text as filed of the application that gave rise to the '403 Patent was incorporated by reference, not the text as later amended.  Appellees also contend that regardless of any incorporation by reference, the examiner's inclusion of the Internet into the specification of the '403 Patent was new matter and should not have been allowed in that patent.

We agree with Dealertrack.  The '817 patent incorporates the '403 Patent using the following language: "This is a division of application Ser. No. 08/526,776 ("'776 Application"), filed Sep. 12, 1995, hereby incorporated by reference.   Now U.S. Pat. No. 5,878,403."  '817 patent col.1 ll.5-7.  When the divisional application that gave rise to the '817 Patent was filed, the '776 Application already included the Internet as an example of a communications medium, as did the '403 Patent as issued.  To suggest that the inclusion of the filing date of the '776 Application in the incorporation language was intended to limit the same to the text of that application as filed instead of as issued is unwarranted and certainly not compelled.  There is no reason to conclude that the reference to the filing

date was anything other than applicant's compliance with the formal requirement to "[c]learly identify" the patent being incorporated by reference.  37 C.F.R. § 1.57(b)(2).[2]

We also reject Appellees' argument based on new matter.   Appellees have argued neither a lack of written description for failure to have possession of the Internet as of the priority date, nor the ineffectiveness of the incorporation by reference.  Therefore, we conclude that the inclusion of the Internet as an example of a "communications medium" is properly incorporated by reference into the '817 Patent and acts "as if it were explicitly contained therein."   *See Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378 (Fed. Cir. 2007).

Appellees' argument that the Internet does not fit the definition of a communications medium because the Internet was not reliable and secure is also inapposite.  Appellees' only support for the unreliability of the Internet is a statement by its expert, Derek M. Kato, that "achieving appropriate levels and qualities of service through the Internet for the credit application and routing system of the '403 Patent would have been problematic."   This ambivalent statement allegedly relating to reliability is insufficient to show that ordinary artisans would have considered "communications medium" to exclude the Internet.  As for security, that aspect of the Internet is addressed merely as an object of the invention, and there is no indication in the patent that the security of the data transferring network was understood by

---

[2]     We need not decide here whether what is incorporated is the text of the parent application as of the filing date of the divisional application, or the text of the parent as issued, because reference to the Internet as a communications medium was contained in the parent at both of these stages.

16                           DEALERTRACK v. HUBER

ordinary artisans to be a limit on what constituted a "communications medium."

Thus, this court concludes that the proper construction of "communications medium" is a "network for transferring data, including the Internet" and that the district court erred in granting summary judgment of non-infringement based on a construction that carved out the Internet.

### C. Alternative Grounds for Affirmance of Summary Judgment of Non-Infringement

In the district court, Appellees had moved for summary judgment of non-infringement on the basis of three other proposed claim constructions: "routing," "selective forwarding," and "central processing means." The district court rejected Appellees' claim constructions, and so, these claim constructions did not form the basis of the district court's grant of summary judgment of non-infringement of the '841 Patent.

Appellees argue here that they are entitled to summary judgment of non-infringement of all claims of the '841 Patent on the alternative grounds that the accused products lacked these three elements when properly construed.

### 1. "Routing"

| Claim Term | District Court's Construction | Appellees' Proposed Construction |
|---|---|---|
| "Routing" | "Sending or forwarding by a particular route" | "Sequencing (order) and timing" |

All asserted claims of the '841 Patent contain the "routing" limitation in the preamble, and certain claims contain it as a recitation in the body of those claims.

Appellees argue that "routing" necessarily includes the ability to select "sequencing (order) and timing," and that the district court erred by construing the phrase as "sending or forwarding by a particular route."  Appellees argue that because users of the accused device can only select one or more funding sources and not the order and sequencing by which the program sends applications, there can be no infringement of a claim requiring "routing."

Appellees specifically argue that the patent twice defines "routing" as "sequencing (order) and timing" in describing the preferred embodiment:

> As already mentioned, the present invention provides flexibility in funding source selection, and *routing, i.e., sequencing and timing*.  Dealer selected defaults for source and routing are provided at installation, but can be overridden on a case-by-case basis.
>
> In block **146**, a funding source (or sources) is selected to send the credit application, along with credit bureau information, if applicable.  If multiple sources are to receive the credit application, *then the timing and order of sending is also selected, that is, the routing of the credit application*.  Routing selections include one funding source at a time in sequence until a positive decision is returned or until a set time has elapsed (conditional), or all funding sources at once (shotgunning), for example.

'841 Patent col.22 ll.46-59 (italicized emphases added). Relying on *Abbott Labs. v. Novopharm Ltd.*, 323 F.3d

1324, 1327, 1330 (Fed. Cir. 2003), Appellees argue that the "i.e." and "that is" phrases are used to define what "routing" means in the context of the patent.

Dealertrack responds that (1) the specification repeatedly allows sending the application to a single funding source (including in the above-cited passage), and that in such a situation there is no user-defined choice of timing or order; (2) the invention performs "routing" even when shot-gunning is selected (which sends to all at the same time), for which the order of the funding sources selected is irrelevant; (3) the specification discusses routing as incorporating a source selection component, noting, for example, a "routing means for selectively forwarding the credit application data to remote funding sources," '841 Patent col.15 ll.39-43; and (4) in the context of the patent as a whole, *see Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1373-74 (Fed. Cir. 2005), the "i.e." phrase was not used definitionally.

This court agrees with Dealertrack.  In the context of the patent, "routing" is used as a generic term to indicate the sending of applications by a particular route.  The patent contemplates that a user may "route" the application data by selecting the sequencing, timing, or both that the invention will use in sending data to several funding sources.  *See id.* col.13 ll.30-40 ("As already noted, a dealer is able to select a plurality of funding sources to which the credit application will be sent, and if more than one funding sources is selected, various options are available.  For example, the dealer may optionally send to all at once (shot-gunning), send to each in turn if the previous funding source has declined the application, send to each if the previous funding source has not responded in 'N' (a selectable number of) minutes, send to each in turn if the previous funding source has declined or conditioned the application, or any combination of the last three ways."); *id.* col.22 ll.53-55 (noting that "if multiple sources

are to receive the credit application," then the routing
that takes place is "the timing and order of sending" the
applications); *id.* col.28 ll.28-32 ("If more than one funding
source is requested, the present invention can route the
application to the next funding source either manually or
automatically, after a predetermined time delay or a [sic]
application rejected response, for example."). *See also id.*
col.32 ll.24-37 ("**5.** A credit application and routing sys-
tem . . . further comprising . . . routing means for selec-
tively forwarding the credit application data to remote
funding sources . . . wherein the routing means comprises
. . . means for sending at least a portion of a credit appli-
cation to more than one of said remote funding sources
substantially at the same time.").

The patent also contemplates that a user may select
only a single funding source. *See, e.g.*, '841 Patent, Ab-
stract ("The computer program includes routines . . . for
selectively forwarding a received credit application to at
least one funding source."); *id.* col.5 ll.1-5 ("It is an object
of the invention to provide a dealer with on-line and off-
line entering of application data, for transfer to one or
more funding sources sequentially and automatically.");
*id.* col.13 ll.10-12 ("Once the dealer selects one or more
funding sources, the present invention prompts the dealer
for any additional information."); *id.* col.16 ll.23-30 ("Ac-
cording to another embodiment, there is provided a com-
puter program having . . . means for selectively
forwarding a received credit application to at least one
funding source."); *id.* col.26 ll.2-5 ("'Funding Selection,'
represents the operations related to funding sources and
the operations related to sending a credit application to
one or more sources."). The patent also categorizes this
selection as "routing." *Id.* Abstract ("A credit application
and routing system includes a central processor having
and executing a program . . . for selectively forwarding a
received credit application to at least one funding
source."); *id.* col.7 ll.54-55 ("It is an object of the present

invention to route an application to one or more banks as
directed by the user, or alternatively, a dealer can indi-
cate which bank or banks to send the application to."); *id.*
col.15 ll.24-30 ("In order to implement the above advanta-
geous features, there is provided according to one
embodiment a credit application and routing system
comprising a central processor having a program and
operation to . . . selectively forward the credit application
data to at least one remote funding source terminal
device."). Where only a single funding source is selected,
there is no user selection of timing or sequencing as there
is when multiple funding sources are selected. Moreover,
when shot-gunning is selected, there is no user selection
of the order in which the applications are sent, yet the
patent categorizes this too as "routing." Thus, the phrase
"routing," in the context of this patent, is not limited to
the particular species of routing occurring when the user
selects multiple funding sources.

The only way that the "i.e." in this patent could be
read definitionally is if it excluded from the claim scope
the embodiments discussed throughout the claim where
only a single funding source is selected. This "is rarely, if
ever, correct." *Pfizer*, 429 F.3d at 1374. Moreover, the
most natural reading of the "i.e." here is as citing exam-
ples, which, as discussed by the district court, is the way
it was used throughout the specification in other contexts.
*See Claim Construction*, at 6 (citing '403 Patent col.10
ll.41-44) ("'I.e.' as used in this patent . . . . appears to
supply examples. For instance, the patent refers to
'selecting the funding sources for a type of credit applica-
tion, i.e., finance versus lease, 'A' quality versus 'B & C'
quality.'").

This is precisely the type of contextual analysis we
required in *Pfizer*, in determining whether the patentee's
use of "i.e." was definitional. 429 F.3d at 1373-74 (requir-
ing consideration of written description as a whole and

concluding that "i.e." as used in the specification was not definitional because of inconsistent usage in the specification).  "It is necessary to consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the patent internally consistent." *Id.* at 1373 (citing *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001)).  Here, internal consistency can only be achieved by reading "i.e." as exemplary.  Under that reading, "sequencing (order) and timing" is a species of routing, achieved when the user selects more than one funding source, and the general construction of routing incorporates both that species and the species of routing involving the sending of application data to a single funding source and shot-gunning to all sources at once.  The district court's construction of "routing" as "sending or forwarding by a particular route" adequately maintains consistency in the patent in a way that a definitional reading of "i.e." would not.

For the reasons set forth above, we find no fault in the district court's construction of "routing."

2.  "Selectively Forwarding"

| Claim Term | District Court's Construction | Appellees' Proposed Construction |
|---|---|---|
| "Selectively Forwarding" | "Forwarding to particular (i.e. 'selected') destination(s)" and in claim 7, "[t]he 'selection' described involves choosing the remote funding source terminal devices." | "Forwarding using a selected sequence (order) and timing" |

Appellees next argue that the district court erred in its construction of "selectively forwarding." The basis for Appellees' argument is that FIGs. 3T, 2C-1, and 2C-2, in claims 7-9 of the '841 patent, show a preferred embodiment having three possible "[r]outing selections" for sending a credit application to multiple lenders, including: (1) sending the application to "one funding source at a time in sequence until a positive decision is returned"; (2) sending the credit application to a first lender, and then sending the application to a second lender after "a set time has elapsed"; or (3) sending the credit application to "all funding sources at once (shotgunning)." '841 Patent col. 22 ll. 46-65. RouteOne contends that the "selectively forwarding" claim limitation should be construed such that the claims require a user to *select* one *of multiple* such routing schemes, excluding methods and systems that permit only *one* routing selection scheme (such as only the "shotgunning" method). We disagree.

As discussed in connection with the "routing" construction above, the patent contemplates a user's ability to apply to only a single funding source, in which instance neither the timing nor the sequence is relevant. As a general rule, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1342 (Fed. Cir. 2010), *cert. denied on other grounds*, --- S. Ct. ---, 2011 WL 2437054 (June 20, 2011). There is no such indication in the intrinsic record here and, thus, no basis to overturn the district court's construction of this claim term.

Moreover, the language of the claims using the term "selectively forwarding" clearly indicates that the patentee intended some claims to cover embodiments that implement only one of the disclosed routing schemes, as

opposed to limiting every claim to the preferred embodiment that offers all three. For example, claim 1 of the '841 Patent is directed to the first routing scheme described above, as it recites "means for sending at least a portion of a credit application to more than one of said remote funding sources *sequentially until a funding source returns a positive funding decision . . . .*" '841 Patent col.31 ll.51-65 (emphasis added). Similarly, claim 3 is directed to the second routing scheme, reciting "means for sending at least a portion of a credit application to a first one of said remote funding sources, and then, *after a predetermined time delay*, sequentially sending to each other remote funding source in turn . . . ." *Id.* col.32 ll.3-17 (emphasis added). Finally, claim 7 is directed toward the "shotgunning" approach, as it recites the step of "selectively forwarding the credit application data . . . to more than one . . . funding source terminal devices *substantially at the same time.*" *Id.* col.33 ll.8-10 (emphasis added). Claim 5 recites an embodiment including all three schemes. *See id.* col.32 ll.25-50.

By specifically and separately claiming each of the disclosed routing schemes in different claims, and by using the term "selectively forwarding" in those claims, the patentee made clear that he intended at least some of the claims to cover embodiments that implement only one of the routing schemes. We therefore decline to construe the "selectively forwarding" limitation as requiring that a user select between multiple different routing schemes.

### 3. "Central Processing Means"

| Claim Term | District Court's Construction | Appellees' Proposed Construction |
|---|---|---|
| "Central Process-ing Means" | "A mainframe, super-mini or minicomputer system and a database." | "A main-frame, super-mini, or minicomputer system, with an operating system and a computer program on a computer readable storage medium for executing the specific algorithms disclosed in FIGs. 2, 2B, 2C-1, 2C-2, and 2D." |

Claims 12, 14, 16, and 17 contain the limitation, "central processing means, operably coupled to said communications medium, for executing a computer program which implements and controls credit application processing and routing." *E.g.*, '841 Patent col.33 ll.61-64. Both parties agree that the claim is written in means-plus-function terms and thus invokes section 112, paragraph 6. Both parties also agree that the function of the limitation is to "execute a computer program which implements and controls credit application processing and routing."

The parties dispute the associated structure. Specifically, Appellees argue that the structure necessarily includes the algorithms disclosed in the specification in FIGs. 2, 2B, 2C-1, 2C-2, and 2D under *WMS Gaming v. International Game Technology*, 184 F.3d 1339 (Fed. Cir. 1999), and *Aristocrat Technologies. Austl. PTY Ltd. v. International Game Technology*, 521 F.3d 1328 (Fed. Cir. 2008). Appellants argue that the district court properly

determined that the structure was "[a] mainframe, super-mini or minicomputer system and a database," because including the algorithm within the structure would require that a computer with a computer program that implements and controls credit application processing and routing would have to be the structure that "execut[es]" that same program.

In *Aristocrat*, this court stated:

> For a patentee to claim a means for performing a particular function and then to disclose only a general purpose computer as the structure designed to perform that function amounts to pure functional claiming. Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to "the corresponding structure, material, or acts" that perform the function, as required by section 112 paragraph 6.

*Aristocrat*, 521 F.3d at 1333. Therefore, "in a means-plus-function claim 'in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the [corresponding] structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.'" *Id.* (quoting *WMS Gaming*, 184 F.3d at 1349).

While Appellees' argument has a purely semantic appeal, we do not believe the inclusion of the phrase "for executing a computer program which," takes the claim out of the *Aristocrat* and *WMS Gaming* rule.

First, section 112, paragraph 6 incorporates a deliberate quid pro quo: the patentee is allowed to claim a limitation in broad functional language, "provided that the specification indicates what structure constitutes the means for performing the claimed function." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 n.1 (Fed. Cir. 2007). The indicated structure must limit the claim so as not to allow pure functional claiming. Here, the "mainframe, super-mini or minicomputer system, and a database" structure as construed by the district court places no limits on the functional language of the claim. Without specifying a program, a computer alone "does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112 paragraph 6." *Aristocrat*, 521 F.3d at 1333.

Second, the claim here recites that the program "implement[s] and control[s] credit application processing and routing." The claim would not be saved from pure functional claiming, and thus indefiniteness, without reference to the algorithms set forth in the specification, which are necessary to the performance of those recited functions.

A general purpose computer can perform the claimed function of "executing a computer program which implements and controls credit application processing and routing" only if the program it executes is capable of performing those functions. That the true functional requirements of the limitation are nested within the generic function of executing a program does not change this fact; though the computer itself may execute a computer program, it may not execute *that* computer program without the algorithms.

Finally, claims 14, 16, and 17 demonstrate the patentee's understanding that the phrase "executing a com-

puter program which" does not change the basic means-plus-function calculus. Those claims contain the following limitation: "wherein said central processing means computer program which implements and controls credit application processing and routing . . . ." '841 Patent col.35 ll.3-5. Thus, the patent itself equates "central processing means computer program" with "central processing means *for executing* a computer program."

Dealertrack's argument that a program cannot be included in the structure that executes the program is inapposite. In light of the above, the claims here are no different than the claims at issue in *WMS Gaming* and *Aristocrat*.

We therefore conclude that the appropriate structure must include the algorithms disclosed in the specification that "implement[] and control[] credit application processing and routing." Dealertrack argues that even if the structure includes the algorithms in the specification, the accused product need not contain equivalent structure to *all* the algorithms disclosed in Figures 2, 2B, 2C-1, 2C-2, and 2D, but only equivalent structure to *at least one* of the "distinct and alternative structures for performing the claimed function," *Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1345 (Fed. Cir. 2002), disclosed in the specification. For example, Dealertrack argues that the accused may infringe if it sends credit application data simultaneously to all banks, even if it cannot send the data sequentially or with a predetermined time delay, as disclosed in Figure 2C-2.

This court agrees. In *Creo*, the written description contained four algorithms, corresponding to four different offset corrections in a printing process. *Id.* We noted that "the written description may disclose distinct and alternative structures for performing the claimed function" and that the performance of any one of which (or their equiva-

lents) would fall within the scope of the claims, where "[n]othing in the patent requires a single structural embodiment corresponding to the 'means for offsetting' in original claim 1 to be capable of performing all four of the algorithms disclosed." *Id.* The same reasoning applies here. The routing algorithms disclosed in the written description here "implement[] and control[] credit application processing and routing," and constitute alternative structures for purposes of construction of the means-plus-function element.

Because we modify the district court's claim constructions of "communications medium" and "central processing means," we vacate the district court's summary judgment of non-infringement and remand to the district court to determine infringement in the first instance applying these constructions.

### D.  Cross-Appeal: Invalidity for Indefiniteness

Claims 14, 16, and 17 add the following limitation: "wherein said central processing means computer program which implements and controls credit application processing and routing, further provides for tracking pending credit applications." '841 Patent col.35 ll.3-6.

In its cross-appeal, RouteOne argues that this limitation must be added to the function of the central processing means limitation, and that, because there is no structure disclosed in the specification for tracking pending credit applications, the claims are indefinite. Dealertrack responds that this case is substantially similar to *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332 (Fed. Cir. 2002), where we held that the limitation "corona means cooperating with [the attenuator] and positioned for electrostatically charging the filaments" did not include "positioned for electrostati-

cally charging the filaments" within the function of the "corona means."

In our view, it is clear that claims 14, 16, and 17 recite an additional function for the "central processing means" to perform—i.e., the function of "further provid[ing] for tracking pending credit applications." As discussed above, the appropriate structure for the "central processing means" limitation must include the algorithms disclosed in the specification that "implement[] and control[]" the recited functions that the "central processing means" is required to perform. However, the '841 Patent's specification discloses no algorithm pursuant to which the "central processing means" could perform the claimed function of "tracking." The "central processing means" term is therefore indefinite, as used in claims 14, 16, and 17, for failure to recite sufficient structure to perform its claimed functions. *See Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009); *Aristocrat*, 521 F.3d at 1333; *WMS Gaming*, 184 F.3d at 1349. The district court therefore legally erred in denying the motion for summary judgment of invalidity for indefiniteness.

## II.  Invalidity of the '427 Patent

Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."[3]

---

[3]  With all due respect, the dissent's effort to define a more efficient judicial process, as laudable a goal as that may be, faces several obstacles. First, the Supreme Court characterizes patent eligibility under § 101 as a "threshold test." *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010) ("*Bilski II*") ("The § 101 patent-eligibility inquiry is only a

35 U.S.C. § 101.  The Supreme Court has set forth three broad categories of subject matter ineligible for patent protection: "laws of nature, physical phenomena, and abstract ideas." *Bilski II*, 130 S. Ct. at 3225 (2010).  It therefore generally follows that any invention within the broad statutory categories of § 101 that is made by man, not directed to a law of nature or physical phenomenon, and not so manifestly abstract as to preempt a fundamental concept or idea *is* patent eligible.  *See Diamond v.*

---

threshold test.").  Second, the "defenses provided in the statute," § 282, include not only the "conditions of patentability" in §§ 102 and 103, but also those in § 101.  *See Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 661 (Fed. Cir. 2008) ("It has long been understood that the Patent Act sets out the conditions for patentability in three sections: sections 101, 102, and 103." (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966))).  *See also Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 212 (1998) ("The title of a statute . . . cannot limit the plain meaning of the text. For interpretive purposes, it is of use only when it sheds light on some ambiguous word or phrase." (quoting *Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-529 (1947))).  Finally, the motion for summary judgment alluded to by the dissent was filed by Dealertrack, not Appellees, and sought summary judgment of nonobviousness.  *See* Plaintiff Dealertrack's Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment of Failure to Prove Invalidity of the Patents-In-Suit Based on Coinlink, *Dealertrack, Inc. v. Huber*, No. 06-cv-2335 (C.D. Cal. May 18, 2009), ECF No. 703.  In opposition, Appellees argued to the district court that summary judgment of obviousness was improper and that the issue should go to trial.  Thus, the resolution of Dealertrack's motion would not have decided the case absent a *sua sponte* determination of obviousness as a matter of law.

*Chakrabarty*, 447 U.S. 303, 309 (1980) ("Congress intended statutory subject matter to 'include anything under the sun that is made by man.'" (internal citation omitted)); *Research Corp. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010). The vast number of claims pass this coarse eligibility filter. Their patentability is properly measured against other provisions of Title 35.

Turning to the claims at issue here, claim 1 of the '427 Patent reads:

> 1. A computer aided method of managing a credit application, the method comprising the steps of:
>
> [A] receiving credit application data from a remote application entry and display device;
>
> [B] selectively forwarding the credit application data to remote funding source terminal devices;
>
> [C] forwarding funding decision data from at least one of the remote funding source terminal devices to the remote application entry and display device;
>
> [D] wherein the selectively forwarding the credit application data step further comprises:
>
> [D1] sending at least a portion of a credit application to more than one of said remote funding sources substantially at the same time;
>
> [D2] sending at least a portion of a credit application to more than one of

said remote funding sources sequen-
tially until a finding [*sic,* funding]
source returns a positive funding deci-
sion;

[D3] sending at least a portion of a
credit application to a first one of said
remote funding sources, and then, after
a predetermined time, sending to at
least one other remote funding source,
until one of the finding [*sic,* funding]
sources returns a positive funding deci-
sion or until all funding sources have
been exhausted; or,

[D4] sending the credit application
from a first remote funding source to a
second remote finding [*sic,* funding]
source if the first funding source de-
clines to approve the credit application.

'427 Patent col.20 l.54 – col.21 l.14. The patent eligibility
of dependent claims 3 and 4 is not separately argued on
appeal and, therefore, will not be separately addressed.
The district court determined that "computer aided
method" in the preamble was limiting, but did not further
define the phrase. The district court then construed
"remote application entry and display device" as "any
device, e.g., personal computer or dumb terminal, remote
from the central processor, for application entry and
display." *Id.* at 27. Similarly, "terminal device" was
construed as "any device, e.g., personal computer or dumb
terminal, located at a logical or physical terminus of the
system." *Id.* at 20. Appellant has not appealed these
constructions.

Applying this court's then definitive machine-or-
transformation test, the district court determined that
claims 1, 3, and 4 of the '427 Patent did not constitute

patent-eligible subject matter.  Because Dealertrack did
not argue that the claims effected a transformation, the
court applied only the machine prong of the test.  Relying
on a number of decisions by the Board of Patent Appeals
and Interferences and the decision in *Cybersource Corp. v.
Retail Decisions, Inc.*, 2009 U.S. Dist. LEXIS 26056 (N.D.
Cal. Mar. 26, 2009), *affirmed* No. 2009-1358 (Fed. Cir.
Aug. 16, 2011), the district court determined that because
the computer implicated was not "specially programmed"
and "nothing more than a general purpose computer that
has been programmed in some unspecified manner," it
could not constitute the "particular machine" required to
confer patent eligibility under the machine prong of *In re
Bilski*, 545 F.3d 943 (Fed. Cir. 2008) (en banc) ("*Bilski I*").
*See Cybersource*, 2009 U.S. Dist. LEXIS 26056; *Ex parte
Nawathe*, No. 2007-3360, 2009 WL 327520 (BPAI Feb. 9,
2009); *Ex parte Gutta*, No. 2008-3000, 2009 WL 112393
(BPAI Jan. 15, 2009); *Ex Parte Cornea-Hasegan*, 89
U.S.P.Q.2d (BNA) 1557 (BPAI Jan. 13, 2009).

On appeal, Dealertrack argues that (1) the claims
here are unlike those in *Gottschalk v. Benson*, 409 U.S. 63
(1972) ("*Benson*"), *Parker v. Flook*, 437 U.S. 584 (1978)
("*Flook*"), and *Bilski II,* 130 S. Ct. 3218, where the claims
were held patent ineligible, because those cases involved
claims reducible to a mathematical formula, and there is
no mathematical formula implicated in the claims of the
'427 Patent; (2) the claims here are not abstract because
they provide "a concrete, practical solution to a long-felt
problem in the automotive finance industry" that "greatly
increased the efficiency of processing automotive credit
applications" and was "rapidly adopted in the industry,"
Appellant Br. at 47; (3) to be patent eligible, claims need
not be tied to a "special purpose" computer, i.e. a pro-
grammed computer, but rather it is sufficient that they be
tied to a "general purpose" computer, which they are here:
the central processor, remote application entry and dis-
play devices, and funding source terminal devices; and (4)

even if a general purpose computer may not constitute the "machine" for § 101 purposes, the claims describe how to program the computer by reference to the flow charts in the specification, and the steps set forth in the claims constitute the programming of the general purpose computer, making it a special purpose computer sufficient to meet the machine prong.

Appellees counter that (1) the claims "preempt all manner of sending information back and forth, at specified time intervals or in sequence, from a dealer to a lender or from a lender to another lender," and thus are claims to an abstract idea, Huber Br. at 28; (2) the field of use restriction to auto dealers does not save the claim from abstraction because the restriction is just like that in *Flook*; (3) the claims here are unlike those in *Diamond v. Diehr*, 450 U.S. 175 (1981) ("*Diehr*") because no transformation took place here; (4) the claims are not tied to a particular machine because "computer aided" only requires performance with the "aid" of a computer for any single step, e.g., as a display device; (5) even if the claims require the computer to perform all the steps, the claim only requires a general purpose computer, which is not a "particular machine"; and (6) the claims do not require a specific algorithm because if they did, the claims would be indefinite for failure to disclose sufficient structure.

"Whether a patent claim is drawn to patent-eligible subject matter is an issue of law that is reviewed de novo." *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1331 (Fed. Cir. 2010). In *Research Corp.*, we recently admonished that for abstractness to invalidate a claim it must "exhibit itself so manifestly as to override the broad statutory categories of eligible subject matter and the statutory context that directs primary attention on the patentability criteria of the rest of the Patent Act." 627 F.3d at 868. This is in recognition of the clear congressional mandate that a very broad swath of inventions

be eligible for patent protection. *Bilski II*, 130 S. Ct. at 3225 (citing *Chakrabarty*, 447 U.S. at 308); *Prometheus Labs. v. Mayo Collaborative Servs.*, 628 F.3d 1347, 1353 (Fed. Cir. 2010); *Research Corp.*, 627 F.3d at 867. In this case, however, we are compelled to conclude that the claims are invalid as being directed to an abstract idea preemptive of a fundamental concept or idea that would foreclose innovation in this area.

Dealertrack's claimed process in its simplest form includes three steps: receiving data from one source (step A), selectively forwarding the data (step B, performed according to step D), and forwarding reply data to the first source (step C). The claim "explain[s] the basic concept" of processing information through a clearinghouse, just as claim 1 in *Bilski II* "explain[ed] the basic concept of hedging." *See Bilski II*, 130 S. Ct. at 3231. The steps that constitute the method here do not "impose meaningful limits on the claim's scope." *Bilski I*, 545 F.3d at 961-62 (citing *Benson*, 409 U.S. at 71-72). Neither Dealertrack nor any other entity is entitled to wholly preempt the clearinghouse concept.

Dealertrack's primary argument is that the "computer-aided" limitation in the preamble sufficiently limits the claims to an application of the idea. We disagree.

Although the district court construed "computer aided" as a limitation, the '427 Patent "does not specify how the computer hardware and database are specially programmed to perform the steps claimed in the patent." *See Invalidity* at 6-7. The claims are silent as to how a computer aids the method, the extent to which a computer aids the method, or the significance of a computer to the performance of the method. The undefined phrase "computer aided" is no less abstract than the idea of a clearinghouse itself. Because the computer here "can be programmed to perform very different tasks in very

different ways," *Aristocrat*, 521 F.3d at 1333, it does not "play a significant part in permitting the claimed method to be performed." *Cybersource*, slip op. at 19 (citing *SiRF Tech.*, 601 F.3d at 1333). Simply adding a "computer aided" limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible. *See SiRF*, 601 F.3d at 1333 ("In order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations.").

The claims here do not require a specific application, nor are they tied to a particular machine. The computer here does no more than the computer in *Benson* to limit the scope of the claim. The process in *Benson* covered the use of binary-coded decimal ("BCD") to pure binary conversion in "the operation of a train[, or the] verification of drivers' licenses[, or the] researching [of] the law books for precedent . . . performed through any existing machinery or future-devised machinery." 409 U.S. at 68. Similarly, here, the claims cover a clearinghouse process using any existing or future-devised machinery.

Nor are the claims here analogous to those in *Ultramercial, LLC v. Hulu, LLC*, No. 2010-1544 (Fed. Cir. Sept. 15, 2011). Unlike in *Ultramercial*, where this court found that the patent claimed a practical application with concrete steps requiring an extensive computer interface, *id.* slip op. at 11, the claims here recite only that the method is "computer aided" without specifying any level of involvement or detail. The fact that certain algorithms are disclosed in the specification does not change the outcome. In considering patent eligibility under § 101, one must focus on the claims. This is because a claim may "preempt" only that which the claims encompass, not

what is disclosed but left unclaimed.  Here, the claims of the '427 Patent were construed not to be limited to any particular algorithm.  Dealertrack has not appealed the district court's construction.

Lastly, Dealertrack argues that the claim is patent eligible because it covers the use of a clearinghouse only in the car loan application process, and not all uses thereof.  Although directed to a particular use, it nonetheless covers a broad idea.  In *Bilski II*, the Supreme Court explained that the dependent claims were not patent eligible though they "limit[ed] an abstract idea to one field of use or add[ed] token postsolution components."  130 S. Ct. at 3231.  *See also Diehr*, 450 U.S. at 192 n.14 ("A mathematical formula does not suddenly become patentable subject matter simply by having the applicant acquiesce to limiting the reach of the patent for the formula to a particular technological use.").

The restriction here is precisely the kind of limitation held to be insufficient to confer patent eligibility in *Bilski II*.  The notion of using a clearinghouse generally and using a clearinghouse specifically to apply for car loans, like the relationship between hedging and hedging in the energy market in *Bilski II*, is of no consequence without more.  *See Diehr*, 450 U.S. at 191 (noting that the principle that a mathematical formula "is not accorded the protection of our patent laws . . . cannot be circumvented by attempting to limit the *use* of the formula to a particular technological environment" (emphasis added)).

For the foregoing reasons, we affirm the determination of the district court that claims 1, 3, and 4 of the '427 Patent are patent ineligible abstract ideas under § 101.

Because of our disposition of this issue, we need not address Appellees' alternative grounds for affirmance concerning the '427 Patent.

CONCLUSION

For the foregoing reasons, we affirm the district court's construction of "routing" and "selectively forwarding," modify the district court's constructions of "communications medium" and "central processing means," reverse the district court's denial of summary judgment on indefiniteness, and vacate and remand the district court's summary judgment of non-infringement of the asserted claims of the '841 Patent. We affirm the district court's summary judgment of invalidity of claims 1, 3, and 4 of the '427 Patent as claiming patent ineligible subject matter under § 101.

**AFFIRMED-IN-PART, VACATED-IN-PART, REVERSED-IN-PART, AND REMANDED**

COSTS

Each party shall bear its own costs.

# United States Court of Appeals
# for the Federal Circuit

_____

**DEALERTRACK, INC.,**
*Plaintiff-Appellant,*

**v.**

**DAVID L. HUBER AND FINANCE EXPRESS, LLC,**
*Defendants-Appellees,*

**AND**

**JOHN DOE DEALERS,**
*Defendant,*

**AND**

**ROUTEONE, LLC,**
*Defendant-Cross Appellant.*

_____

2009-1566, -1588

_____

Appeal from the United States District Court for the Central District of California in consolidated case no. 06-CV-2335, Judge Andrew J. Guilford.

_____

PLAGER, *Circuit Judge*, concurring-in-part and dissenting-in-part.

I join the court's opinion and conclusions regarding the several issues addressing infringement of the '841 patent.

However, as a matter of efficient judicial process I object to and dissent from that part of the opinion regarding the '427 patent and its validity under §101, the section of the Patent Act that describes what is patentable subject matter. I believe that this court should exercise its inherent power to control the processes of litigation, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991), and insist that litigants, and trial courts, initially address patent invalidity issues in infringement suits in terms of the defenses provided in the statute[1]: "conditions of patentability," specifically §§102 and 103, and in addition §§112 and 251, and not foray into the jurisprudential morass of §101 unless absolutely necessary.

At issue before the trial court was the validity of a patent (the '427 patent) which the patentee was attempting to enforce against an alleged infringer. The trial court had before it several summary judgment motions, including one addressing §103 (obviousness), as well as one addressing §101. The trial court chose to decide the case under §101, rather than on the §103 issue. In my view that was an error that this court can and should correct.

I respectfully dissent from the panel's failure to insist that this case be heard and decided pursuant to the Patent Act's requirements and the efficient administration of justice. I would vacate the trial court's judgment regarding §101 and remand for a determination of validity under the conditions of patentability raised by the parties, in this case specifically the §103 issue.

---

[1] 35 U.S.C. §282.