# EXHIBIT 1

HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 1

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                     SAN JOSE DIVISION

4

5    APPLE, INC., a California

6    corporation,

7              Plaintiff,

8    vs.      NO. 11-CV-01846-LHK

9    SAMSUNG ELECTRONICS CO., LTD.,

10   a Korean business entity;

11   SAMSUNG ELECTRONICS AMERICA,

12   INC., a New York corporation;

13   SAMSUNG TELECOMMUNICATIONS

14   AMERICA, LLC, a Delaware

15   limited liability company,

16              Defendants.

17   _____

18       HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

19          DEPOSITION OF STEVEN CHRISTENSEN

20          Taken on behalf of the Defendants

21                 October 26, 2011

22

23

24

25   Job Number: 42864

HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 6

1       STEVEN CHRISTENSEN,
2       having been first duly sworn,
3       was examined and testified as follows:
4                    EXAMINATION
5  BY MR. BRIGGS:
6       Q.  Good morning.
7       A.  Good morning.
8       Q.  Can you state your name for the record.
9       A.  Steven Christensen.
10      Q.  Where do you live, Mr. Christensen?
11      A.  Ashland, Oregon.
12      Q.  Where is Ashland?
13      A.  About ten miles south of here.
14      Q.  Where do you work?
15      A.  I work for a small startup company that I
16  am a cofounder.  It is called Folium & Partners.
17      Q.  Do you work for Apple Computer?
18      A.  No.
19      Q.  Are you a consultant for Apple Computer?
20      A.  No.
21      Q.  Now, you have worked for Apple in the past,
22  correct?
23      A.  Yes.
24      Q.  And when was that?
25      A.  1982 through 1996.

HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 168

1    Super Clock?
2        A.   Yes.
3        Q.   Did you do that while you were at Apple?
4        A.   Yes.
5        Q.   Was this an Apple project, or was this one
6    of your own projects?
7        A.   No.  It was on my own time.
8        Q.   And how did you -- did you distribute Super
9    Clock in any way?
10       A.   Yes.  It was distributed on online services
11   at the time.  This was preinternet, so, port
12   services, systems like Compuserve.  Eventually others
13   would distribute it on floppy disk or CD-ROMs later
14   when they became available.
15       Q.   Did you have any idea how many people used
16   or downloaded Super Clock?
17       A.   No.  But a large number.
18       Q.   Would you say thousands?
19       A.   Millions.
20       Q.   Millions?
21       A.   It was very popular.
22       Q.   And did you receive any money for
23   distributing Super Clock?
24       A.   No.  It was free.
25       Q.   It was free.

HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 169

1   And when did you start distributing Super
2   Clock?
3   A.   Well, I think around 1988.
4   Q.   And was there a time when you stopped
5   distributing it or you stopped supporting it?
6   A.   1993.
7   Q.   Did you stop distributing it in 1993?
8   A.   Yes.
9   Q.   And so by definition you stopped supporting
10  it then, too?
11  A.   Yes.
12  Q.   And why was that?
13  A.   Apple had asked if they could incorporate
14  it in system 7 something, 7.5 maybe, and I felt that
15  that would probably be a good thing to do.  I didn't
16  want to keep supporting it.  So I gave them the
17  source.
18  Q.   And then somebody else at Apple
19  incorporated it into the --
20  A.   They actually asked that I incorporate it.
21  Q.   And you did that?
22  A.   Yes.
23  Q.   So let me ask you about a system in, let's
24  say, 1988 that incorporated Super Clock.
25       I guess that would be a McIntosh computer?

Case 5:11-cv-01846-LHK   Document 817-1   Filed 03/16/12   Page 6 of 13

HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 170

1    A.   Yes.
2    Q.   And what would the operating system on a
3  computer like that be called?
4    A.   I think at the time it was probably
5  somewhere around system 6.03, 6.04, that would be
6  6.03.
7    Q.   So one of these systems, one of these
8  computers that was using Super Clock, that computer
9  would have a processor in it, correct?
10   A.   Yes.
11   Q.   And it would also have a data display
12 screen, correct?
13        MR. KRAMER:  Objection.  Calls for a legal
14 conclusion.
15        THE WITNESS:  Yes.
16 BY MR. BRIGGS:
17   Q.   It would have a monitor on it, right?
18        And that computer would also have a
19 cursor-controlled device, correct?
20        MR. KRAMER:  Objection.  Calls for legal
21 conclusion, lacks foundation.
22        THE WITNESS:  It would have a mouse and
23 cursor, yes.
24 BY MR. BRIGGS:
25   Q.   And you could use the cursor to -- excuse

HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 183

1  A.  Yes.
2  Q.  Do you know how many lines of code the
3  Super Clock source code consists of?
4  A.  At this point I have no idea.
5  Q.  Do you have any ballpark estimates?
6      Is it large?
7  A.  It is not terribly large.
8  Q.  If we requested a copy of the Super Clock
9  source code, if Samsung did, could you provide it?
10     MR. KRAMER:  I think he was going to
11 consult with his counsel before responding to
12 anything like that.
13     THE WITNESS:  About that, yes.  I will
14 consult with my counsel first.
15     MR. BRIGGS:  It is a good bit of coaching
16 there.
17     MR. KRAMER:  It is not coaching.  I am
18 interrupting giving me client a legal instruction
19 relating to legal issues.
20 BY MR. BRIGGS:
21 Q.  Have you always made the Super Clock source
22 code -- has it always been confidential?
23 A.  Yes.
24 Q.  Have you ever released a copy to anybody?
25 A.  Other than Apple?  No.

HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 184

1    MR. BRIGGS:  So just to follow up, we would
2  like to get the source code for Super Clock.
3    MR. KRAMER:  I will talk to my client, and
4  we will take it under advisement.
5    MR. BRIGGS:  Okay.
6    Q.  When you applied for the patent application
7  that would become the 002 patent, did you understand
8  you were under an obligation to turn over any prior
9  art that you are aware of?
10   A.  I don't know if I was aware of that at the
11 time.
12   Q.  So you don't remember any attorneys ever
13 telling you that you were under an obligation to
14 disclose any prior art you were aware of to the
15 patent office?
16   A.  I don't recall that.
17   Q.  Did you become aware of that obligation any
18 time when you were involved with the 002 patent
19 prosecution?
20   A.  Not that I recall.
21   Q.  Do you know if the patent examiner had a
22 copy of the Super Clock source code when the 002
23 patent was examined?
24   A.  No, I don't.
25   Q.  In fact, he couldn't have because you have

HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 185

1  never given it to anybody other than Apple, correct?
2       A.   Unless it came indirectly through Apple
3  with the version they had, yes.
4       Q.   Do you remember providing any description
5  of Super Clock to the patent office when you applied
6  for your patent?
7       A.   No.
8       Q.   Do you know why you didn't?
9       A.   Probably didn't know that I needed to.
10      Q.   Would you agree with me that the Super
11 Clock functionality is similar to the Control Strip
12 functionality?
13           MR. KRAMER:  Objection.  Vague and
14 ambiguous.
15           THE WITNESS:  I don't really think I can,
16 no.
17 BY MR. BRIGGS:
18      Q.   Why not?
19      A.   Because it is completely different
20 behaviors, completely different implementation, and
21 in terms of one piece about maybe that both pieces of
22 information float above other windows, the fact that
23 Super Clock doesn't have anything to do with Super
24 Clock.  It has something to do with the menu bar.
25      Q.   I didn't catch that last part.

HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 190

1  patent.
2      Q.  Do you have any views on the patent system
3  in general?  I mean some people don't like patents.
4  Some people don't like software patents.
5          Do you have any views like that?
6      A.  I don't really have an opinion.  They just
7  are.
8      Q.  Do you think they are a good thing or bad
9  thing?
10     A.  I think patents are fine.
11     Q.  Do you have any other patents?
12     A.  I had done a second patent filing for
13 another company a few years later.  I found out
14 recently that the company allowed it to lapse a few
15 years ago.
16     Q.  Did that patent relate to windows or
17 control strips or anything like what we have been
18 discussing today?
19     A.  No.
20     Q.  Do you know -- did you ever receive any
21 awards for the 002 patent?
22     A.  No.
23     Q.  Any -- did you receive any kind of
24 recognition for the 002 patent?
25     A.  I think the filing happened after I left

HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 191

1  Apple.  So, no.  Or the issuance was after I left
2  Apple.
3      Q.  Do you know if the Control Strip led to
4  success of any, commercial success, of any Apple
5  products or anything like that?
6          MR. KRAMER:  Objection.  Lack of
7  foundation, calls for speculation.
8          THE WITNESS:  I have no idea if it improved
9  any product's success.
10 BY MR. BRIGGS:
11     Q.  Did you ever see any reports on -- from
12 consumers saying they liked or didn't like Control
13 Strip?
14     A.  I don't remember.  There were probably
15 reviews in magazines at the time, but I don't
16 remember now.

REDACTED

HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 192

REDACT

4    Q.   Do you still own -- or do you own Apple
5    stock?
6    A.   No.
7    Q.   And today do you develop software for Apple
8    products?
9    A.   I develop software for IOS devices, which
10   is I-Phone and I-Pad, and my company in general also
11   develops for windows phone seven.
12   Q.   At a high level what do you develop for IOS
13   and windows?
14   A.   At a high level.  Applications.
15   Q.   Applications?
16   A.   Yes.
17   Q.   Are there any specific applications?
18   A.   They are related to publishing and audio
19   books, not one single title.
20           MR. BRIGGS:  Can we take a break, and then
21   I think I can wrap it up in another half hour at the
22   most.
23           THE VIDEOGRAPHER:  The time is 3:19, and we
24   are off the record.
25           (Recess taken)

HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 196

1                        CERTIFICATE

2

3      I, Michele J. Lucas, do hereby certify that pursuant

4  to the Rules of Civil Procedure, the witness named herein

5  appeared before me at the time and place set forth in the

6  caption herein; that at the said time and place, I reported

7  in stenotype all testimony adduced and other oral

8  proceedings had in the foregoing matter; and that the

9  foregoing transcript pages constitute a full, true and

10 correct record of such testimony adduced and oral proceeding

11 had and of the whole thereof.

12

13     IN WITNESS HEREOF, I have hereunto set my hand this

14 27th day of October, 2011.

15

16

17

18

19 _____

20 /Signed                    August, 2013

21 Michele J. Lucas          Commission Expiration

22

23

24

25