QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California  94065-2139
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Michael T. Zeller (Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS CO.,
LTD., SAMSUNG ELECTRONICS AMERICA,
INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>                    Plaintiff,<br><br>          vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>                    Defendant. | CASE NO. 11-cv-01846-LHK<br><br>**SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:   May 10, 2012<br>Time:   1:30 p.m.<br>Place:  Courtroom 4, 4th Floor<br>Judge:  Hon. Lucy H. Koh |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

    A.    Samsung's Standard-Essential Patents ......................................................... 2

    B.    The ETSI IPR Policy and Its Application ..................................................... 3

        1.    ETSI's Policy Objectives ..................................................... 3

        2.    FRAND Licensing ................................................................. 3

        3.    The Role of Bilateral Negotiations ..................................... 4

    C.    Samsung's Commitments to ETSI ............................................................... 5

    D.    The Accused Products .................................................................................. 5

    E.    Apple's Rejection of Samsung's Offer to License on FRAND Terms ....................... 6

    F.    Samsung's Agreement with Intel .................................................................. 7

    G.    The Supply Chain for Apple's Baseband Chips ........................................... 7

ARGUMENT ....................................................................................................................... 8

I.    APPLE'S MOTION SEEKS AN ADVISORY OPINION CONCERNING
DISPUTED ISSUES OF FACT ................................................................................ 8

II.    SAMSUNG HAS NOT WAIVED THE RIGHT TO ENFORCE ITS STANDARD-
ESSENTIAL PATENTS .......................................................................................... 9

    A.    The Timing of Samsung's Disclosure Is Irrelevant Because the Patents Are
Available for License on FRAND Terms ..................................................... 10

    B.    What Constitutes "Timely" Disclosure Is a Disputed Issue of Fact ....................... 10

    C.    Whether Samsung Used "Reasonable Endeavours" to "Timely" Disclose Its
Patents Is a Disputed Issue of Fact .............................................................. 12

    D.    Holding Samsung's Declared-Essential Patents Unenforceable Would Be
Inequitable ................................................................................................... 15

III.    SAMSUNG IS ENTITLED TO SEEK INJUNCTIVE RELIEF ....................................... 16

    A.    Genuine Issues of Material Fact Preclude Summary Judgment on Whether
Injunctive Relief Is Appropriate ................................................................. 16

        1.    A Willingness to License Does Not Preclude Injunctive Relief ................. 16

        2.    Commitment to FRAND Does Not Preclude Injunctive Relief ................. 17

B.    Apple Is Not Licensed to the Patents-in-Suit .................................................. 18

1.    The ETSI Rules Are Inconsistent with Apple's Argument That a
FRAND Undertaking Automatically Creates a License ............................ 19

2.    A FRAND Undertaking Does Not Automatically Create a License
Under French Law........................................................................ 20

(a)    ETSI Declarations Are Not Sufficiently Definite to
Constitute an Offer That Apple Could Have Accepted.................. 20

(b)    Apple Did Not Accept Any Offer Made by Samsung.................... 21

(c)    Apple Has Failed to Demonstrate That Any License Was
Formalized as a Writing ................................................. 22

(d)    Samsung's Declarations Were Not *Intuitu Personae* and
Therefore Do Not Constitute a License............................. 23

IV.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY
JUDGMENT ON APPLE'S EXHAUSTION DEFENSE ................................... 23

A.    The Sale of IMC Chips Did Not Exhaust Samsung's Patent Rights Because
It Did Not Occur in the United States .............................................. 23

B.    Apple Has Failed to Show that Intel Extended Its Rights Under the Intel
Agreement to IMC ................................................................ 25

CONCLUSION ......................................................................... 26

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*Acumed LLC v. Stryker Corp.*,
   551 F.3d 1323 (Fed. Cir. 2008) ..............................................................................................16

*Broadcom Corp. v. Qualcomm Inc.*,
   543 F.3d 683 (Fed. Cir. 2008) ................................................................................................16

*Commonwealth Scientific & Indus. Research Org. v. Buffalo Tech. Inc.*,
   492 F. Supp. 2d 600 (E.D. Tex. 2007) ...................................................................................17

*Cornell Research Found., Inc. v. Hewlett-Packard Co.*,
   No. 5:01-CV-1974, 2007 WL 4349135 (N.D.N.Y. Jan. 31, 2007) ...........................................23

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ........................................................................................................15, 16

*Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*,
   394 F.3d 1368 (Fed. Cir. 2005) .........................................................................................22, 23

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   645 F.3d 1336 (Fed. Cir. 2011) ...............................................................................................9

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   609 F. Supp. 2d 951 (N.D. Cal. 2009) ...................................................................................16

*In re Certain Semiconductor Chips*,
   Inv. No. 337-TA-753, Initial Determination (Mar. 2, 2012) ...................................................18

*In re Certain Semiconductor Chips*,
   Inv. No. 337-TA-753, Order 55 (Oct. 6, 2011) .......................................................................18

*In re Dumont*,
   581 F.3d 1104 (9th Cir. 2009) ..................................................................................................8

*Intel Corp. v. Broadcom Corp.*,
   173 F. Supp. 2d 201 (D. Del. 2001) ..................................................................................24, 25

*Jazz Photo Corp. v. International Trade Comm'n*,
   264 F.3d 1094 (Fed. Cir. 2001) ...............................................................................................23

*Minebea Co., Ltd. v. Papst*,
   374 F. Supp. 2d 202 (D.D.C. 2005) .......................................................................................23

*Minebea Co., Ltd. v. Papst*,
   444 F. Supp. 2d 68 (D.D.C. 2006) .........................................................................................23

*Murphy v. Hosanna Youth Facilities, Inc.*,
   683 F. Supp. 2d 1304 (N.D. Ga. 2010) ..................................................................................21

*Muskrat v. United States*,
  219 U.S. 346 (1911) ..........................................................................................................8

*Netscape Commc'ns Corp. v. ValueClick, Inc.*,
  684 F. Supp. 2d 699 (E.D. Va. 2010).........................................................................10, 12

*Nokia Corp. v. Apple Inc.*,
  C.A. No. 09-791-GMS, 2011 WL 2160904 (D. Del. June 1, 2011) .........................................18

*Pritchard v. Norton*,
  106 U.S. 124 (1882) .........................................................................................................21

*Qualcomm Inc. v. Broadcom Corp.*,
  548 F.3d 1004 (Fed. Cir. 2008).............................................................................9, 10, 12, 15

*Symbol Techs., Inc. v. Proxim Inc.*,
  No. Civ. 01-801-SLR, 2004 WL 1770290 (D. Del. July 28, 2004) .........................................10

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
  No. 04 C 5312, 2008 WL 4531371 (N.D. Ill. May 22, 2008)..................................................17

## **Statutes**

Fed. R. Civ. P. 56(f) ..........................................................................................................24

Local Rule 7-3(a) ..............................................................................................................14

## PRELIMINARY STATEMENT

It is telling that Apple relies so aggressively on rhetoric rather than facts that it begins its Motion for Partial Summary Judgment by accusing Samsung of copying features of Apple products, which has nothing to do with the substance of the motion.   Apple's motion actually concerns *Apple's* copying of features invented and patented by *Samsung*, and Apple's attempt to benefit from those innovations without paying Samsung a dime.   Apple's motion includes three arguments why it should get this free pass, all presented as if they are purely legal issues based on undisputed facts.   Far from it—Apple mischaracterizes the legal standards in a way that simply covers up the myriad disputed material facts necessary to resolving these issues.

Apple's argument that Samsung cannot enforce its essential patents because it did not "timely" disclose them fails because there are disputed issues of fact regarding what "timely" means and whether Samsung's disclosure was "timely."   The ETSI IPR Policy deliberately leaves "timely" undefined.   In practice, most ETSI members do exactly what Samsung did: commit to FRAND licensing for *all* of its essential patents, and then disclose specific patents after the relevant technical specifications are known.   The Court cannot determine whether this is "timely" or "untimely" without assessing the meaning of the ETSI IPR Policy and how it is understood by ETSI members—both fact questions.   Apple also makes no effort to prove when Samsung was actually aware that any particular patent read on any ETSI technical specification.

Apple's argument that Samsung gave up the right to an injunction because it agreed to FRAND licensing fails because Apple addresses none of the fact issues that the Court must balance under *eBay* to rule on an injunction.   Apple argues the Court should apply a *per se* rule that willingness to license precludes injunctive relief; but the Supreme Court condemned that *per se* approach as error in *eBay*.   The Court cannot assess the *eBay* factors without a full trial on the merits.   Apple's argument that Samsung's FRAND undertaking creates an automatic patent license under French law similarly ignores disputed fact issues—such as whether Samsung's FRAND declaration contains sufficient details regarding the duration, scope, and royalty rate of the alleged license; and whether Apple accepted a license despite refusing to acknowledge Samsung's patent rights or pay royalties.

1    Apple's argument that Samsung's patent rights are exhausted by Intel's sale of baseband

2    chips ignores the critical fact issue of where the sale took place.   Only sales within the United

3    States exhaust rights in a United States patent.   Apple does not even attempt to prove a sale in the

4    United States, and evidence shows that the sales actually take place in Asia.   There is at least a

5    dispute of fact on this issue.   Similarly, there is a fact issue regarding whether the sales were

6    authorized under Intel's license agreement.   That license did not automatically grant rights to the

7    subsidiaries that make and sell the chips; subsidiaries were licensed only if Intel affirmatively

8    extended the license to them.   Apple has not shown that Intel ever extended rights to the

9    subsidiaries in question; at most, Apple has merely raised another fact dispute.   Apple cannot

10   avoid these or the other fact issues with mere rhetoric—it will have to try these issues to a jury.

11   **STATEMENT OF FACTS**

12       **A.**    **Samsung's Standard-Essential Patents**

13       Samsung has been a pioneer in the mobile device industry since its inception and has

14   played a leading role in the development of mobile device technology.   Many of Samsung's

15   innovations have been incorporated into mobile device standards, which define protocols for

16   transmitting information wirelessly that are used by the entire industry to ensure that devices made

17   by different manufacturers can operate together within a wireless network.   Samsung has been a

18   leader in developing the ideas and protocols needed to increase the efficiency, reliability, and

19   functionality of standards-based wireless networks and the features available in these networks.

20       In contrast to Samsung, Apple was a late entrant to the mobile communication device

21   market with its release of the iPhone in mid 2007.   In entering this market, Apple stood on the

22   shoulders of companies like Samsung and others that have invested billions of dollars in R&D

23   expenditures in building the industry standards.   But Apple made its mobile devices compliant

24   with these standards without securing licenses to the patented inventions that make those standards

25   possible.   In doing so, Apple necessarily infringed and continues to infringe hundreds of

26   Samsung's standard-essential patents worldwide.

27

28

1

    **B.**    <u>The ETSI IPR Policy and Its Application</u>

2

      **1.**    <u>ETSI's Policy Objectives</u>

3

    The European Telecommunications Standards Institute ("ETSI") is a standard setting

4

organization that was founded in 1988.   ETSI has promulgated over 4,900 standards for

5

information and communications technologies, including fixed, mobile, radio, converged,

6

broadcast and internet technologies, including the UMTS standard.   (Declaration of David Hecht,

7

filed concurrently ("Hecht Decl."), Ex. A.)

8

    ETSI was created to build a unified telecommunications market in Europe.   (Declaration

9

of Karl Heinz Rosenbrock, filed concurrently ("Rosenbrock Decl."), ¶ 18.)   ETSI's objective is

10

that "STANDARDS shall be based on solutions which best meet the technical objectives of the

11

European telecommunications sector."   (Hecht Decl., Ex. B1, Article 3.1.)   In furtherance of this

12

objective, ETSI's Intellectual Property Rights Policy ("ETSI IPR Policy") "seeks a balance

13

between the needs of standardization for public use in the field of telecommunications and the

14

rights of the owners of IPRs."   (*Id.*)   The ETSI IPR Policy seeks to reduce the risk that

15

investment in an industry standard could be wasted if IPR essential to that standard was not

16

available for license, while also recognizing that "IPR holders . . . should be adequately and fairly

17

rewarded for the use of their IPRs in the implementation of STANDARDS."   (*Id.*, Article 3.2.)

18

      **2.**    <u>FRAND Licensing</u>

19

    ETSI balances these interests by seeking assurances that essential patents will be available

20

for license on "fair, reasonable, and non-discriminatory" ("FRAND") terms.   Section 4.1 of the

21

ETSI IPR policy provides for disclosure of essential IPR:

22

      Each MEMBER shall use its reasonable endeavours to timely inform ETSI of
      ESSENTIAL IPRs it becomes aware of.   In particular, a MEMBER submitting a

23

      technical proposal for a STANDARD shall, on a bona fide basis, draw the attention
      of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that

24

      proposal is adopted.

25

(Hecht Decl., Ex. B1, Article 4.1.)   ETSI does not define what constitutes "timely" disclosure.

26

ETSI does, however, specify that the purpose of requesting timely disclosure is to ensure that

27

essential patents are available for license on FRAND terms:

28

The main problems for ETSI as a standards body which may arise from "late disclosures" include:

- Licenses for Patents which have been disclosed late and are not available at all, or,

- Licenses for Patents which have been disclosed late and which are available, but not on Fair, Reasonable and Non-Discriminatory (FRAND) terms, i.e. the company is unwilling to make a "FRAND" undertaking/licensing declaration.

(Hecht Decl., Ex. C1, Article 2.)

When an ETSI member discloses essential IPR, ETSI then requests that the IPR holder agree to license that IPR on FRAND terms to those using the relevant ETSI standard:

When an ESSENTIAL IPR relating to a particular STANDARD is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory terms and conditions . . . .

(Hecht Decl., Ex. B1, Article 6.1.)   ETSI also encourages members to make a general FRAND undertaking for all essential IPRs in advance, before those IPRs are even identified; this further reduces the risk that essential IPRs are not available.   (Hecht Decl., Ex. C1, Article 2.1.1.)

### 3.    The Role of Bilateral Negotiations

While ETSI encourages its members to license essential IPR on FRAND terms, ETSI does not involve itself with specific licensing terms.   (Hecht Decl., Ex. C1, Article 4.1 ("Specific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI.").)   Instead, ETSI encourages parties to agree on FRAND terms through bilateral negotiation.   ETSI's IPR Policy FAQ, available on the ETSI web site, states:

It is necessary to obtain permission to use patents declared as essential to ETSI's STANDARDS.   To this end, each STANDARD user should seek directly a license from a patent holder.

(Hecht Decl., Ex. D, Answer 6; *see also id.*, Answers 4 and 7.)

The ETSI IPR Policy also does not restrict the remedies available to IPR owners if license negotiations are unsuccessful.   In particular, ETSI does not have any rule prohibiting injunctive relief for essential patents.   (Rosenbrock Decl., ¶¶ 41–45.)   While some members have suggested limiting the remedies available to essential IPR owners, ETSI has consistently rejected these

SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1    suggestions.   (Rosenbrock Decl., ¶ 42.)   Instead, ETSI leaves the issue of remedies in the hands

2    of the national legal systems of its members.   (Hecht Decl., Ex. C1, Article 4.2.)

3          **C.      Samsung's Commitments to ETSI**

4          As a member of ETSI since 1996, Samsung has contributed extensively to the

5    development of ETSI standards, including UMTS.   Samsung has also repeatedly reaffirmed its

6    commitment to the ETSI IPR Policy and FRAND licensing in particular.   On December 14, 1998,

7    Samsung made a general FRAND undertaking, committing to license any and all essential UMTS

8    patents on FRAND terms.   The undertaking states that Samsung "is prepared to grant licenses to

9    its essential IPRs on a fair, reasonable, and non-discriminatory basis in accordance with the terms

10   and conditions set forth in Clause 6.1 of the ETSI IPR Policy."   (Hecht Decl., Ex. E.)

11         Samsung has also identified specific patents that may be essential to the UMTS standard or

12   other standards.   On September 29, 2003, Samsung submitted to ETSI an IPR Information

13   Statement and Licensing Declaration listing, among other IPR, patent applications to which

14   the '001 (application no. 603,062), '867 (patent application no. 611,518), '410 (Korean patent

15   application no. P19990027407), and '604 (application no. 282,851) patents claim priority.[1]

16   (Hecht Decl., Ex. F1.)   Samsung submitted similar declarations for the '516 patent (application no.

17   148,181) on May 16, 2006; for the '941 patent (application no. 417,219) on August 7, 2007; and

18   the '792 patent on July 24, 2008.   (Hecht Decl., Exs. F2-F4.)

19         Through these declarations, Samsung disclosed that the '001, '867, '410, '604, '516, '941,

20   and '792 patents "are, or are likely to become, Essential IPRs in relation to" the UMTS standard.

21   (Hecht Decl., Exs. F1-F4.)   Each IPR information statement also included a commitment that

22   Samsung was "prepared to grant irrevocable licenses" to those patents on FRAND terms, to the

23   extent they were essential to the UMTS standard.   (Hecht Decl., Exs. F1-F4.)

24         **D.      The Accused Products**

25         Apple released the iPhone 3G in July 2008.   (Hecht Decl., Ex. G, Apple's Responses to

26   Samsung's Fourth and Fifth Sets of Requests for Admissions ("Response to RFA"), No. 1909.)

27   _____

28         [1]   Under ETSI rules, disclosure of one patent in a patent family is sufficient notice of all
     current and future members of the entire patent family.   (Hecht Decl., Ex. B2, Article 4.3.)

1    Apple released other Accused Products in June 2009 (iPhone 3GS), April 2010 (iPad 3G), June

2    2010 (iPhone 4), and March 2011 (iPad 2 3G).   (Hecht Decl., Ex. G, Response to RFA Nos. 1910,

3    1911, 1915, 1917.)   By the time of those product releases, Samsung had long since identified the

4    standards patents-in-suit as patents that may be essential to the UMTS standard.   However, Apple

5    made no effort to negotiate a license for Samsung's declared-essential UMTS patents before

6    releasing any of these products.

7              **E.       Apple's Rejection of Samsung's Offer to License on FRAND Terms**

8              In July 2010, Apple accused Samsung of infringing certain patents relating to mobile

9    devices.   ████████████████████████████████████   In the parties' meetings to discuss

10   these allegations, Samsung informed Apple that Apple's products infringed several patents in

11   Samsung's portfolio.   (Hecht Decl., Ex. H.)   Samsung informed Apple that it was prepared to

12   grant licenses to these patents.   ████████████████████████████████████████

13   ██████████████████████████████████

14             On April 15, 2011, Apple filed the present action against Samsung, firing the first salvo

15   against Samsung in its ongoing war against rival manufacturers of smart phones and tablets.

16   (ECF No. 1.)   Apple has now filed numerous suits against Samsung in jurisdictions worldwide.

17             On April 27, 2011, Samsung filed suit against Apple alleging infringement of a number of

18   Samsung patents, including patents declared essential to the UMTS standard.   (Hecht Decl.,

19   Ex. I.)   Shortly thereafter, Apple for the first time requested FRAND license terms from

20   Samsung.   (Hecht Decl., Ex. J1.)   On July 25, 2011, after the parties signed a non-disclosure

21   agreement, Samsung provided Apple with proposed FRAND license terms for Samsung's

22   essential UMTS patents.   (Hecht Decl., Ex. J4.)   Apple rejected the offer on August 18, 2011.

23   (Hecht Decl., Ex. J5.)   Apple did not make any counterproposal.   (*Id.*)   In subsequent

24   correspondence, Samsung repeatedly reaffirmed its commitment to FRAND and urged Apple to

25   make a counterproposal and continue negotiations; however, Apple has steadfastly refused to

26   engage in meaningful FRAND license negotiations.   (Hecht Decl., Exs. J6-J11.)

27

28

**F.     <u>Samsung's Agreement with Intel</u>**



**G.     <u>The Supply Chain for Apple's Baseband Chips</u>**

SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT



10        **ARGUMENT**

11   I.   **APPLE'S MOTION SEEKS AN ADVISORY OPINION CONCERNING DISPUTED
12        ISSUES OF FACT**

13        Two of the three grounds of Apple's motion are procedurally improper because they seek

14   an advisory opinion based on hypothetical facts.   "[I]t is a rule of long standing that federal courts

15   may not issue advisory opinions."   *In re Dumont*, 581 F.3d 1104, 1112 n.14 (9th Cir. 2009)

16   (citing *Muskrat v. United States*, 219 U.S. 346, 352–60 (1911)).

17        Apple seeks partial summary judgment that Samsung's declared-essential patents are

18   unenforceable because Samsung allegedly failed to disclose them to ETSI in a timely manner.

19   (Motion at 12–15.)   Apple also seeks partial summary judgment that Samsung is not entitled to

20   injunctive relief on those patents based on its FRAND commitment to ETSI.   (Motion at 17–24.)

21   Both arguments, however, depend on a disputed issue of fact:   whether Samsung's patents are, in

22   fact, essential to the UMTS standard.   ETSI's rule requiring disclosure of patents applies only to

23   *essential* patents:   "Each MEMBER shall use its reasonable endeavours to timely inform ETSI of

24   *ESSENTIAL* IPRs it becomes aware of."   (Hecht Decl., Ex. B1, Article 4.1 (emphasis added).)

25   Similarly, Samsung's FRAND commitment, by its terms, applies only to the extent the patents in

26   question are *essential*:   "The SIGNATORY and/or its AFFILIATES hereby declare that they are

27   prepared to grant irrevocable licenses under the IPRs . . . *to the extent that the IPRs remain*

28   *ESSENTIAL*."   (Hecht Decl., Ex. F1-F4 (emphasis added).)   If the patents-in-suit are not essential,

1    then Samsung had no duty to disclose them to ETSI and Samsung has no obligation to license

2    them, and those portions of Apple's motion would be moot.

3          Apple argues the patents are *not* essential.   (Motion at 3.)   In fact, Apple refuses to admit

4    or deny whether its products embody the patents-in-suit; whether the UMTS standard embodies

5    the patents-in-suit; or even whether its products comply with the UMTS standard.   (Hecht Decl.,

6    Ex. G, Response to RFA Nos. 1853–73.)   Samsung contends the standards patents-in-suit are all

7    infringed and essential.   All of these are fact issues for trial.   If Apple is correct that the patents

8    are not essential, then those portions of Apple's motion are purely hypothetical.   A ruling would

9    not dispose of any issues in the case; the Court cannot determine whether Samsung can enforce its

10   patents, or whether Samsung is entitled to an injunction, until the jury determines whether the

11   patents are essential.   The jury in this case could find that Samsung's patents are valid, and

12   infringed, but not essential to the UMTS standard.   In that case, the issues raised by Apple's

13   motion never need be decided.   The proper course is therefore to postpone resolution of these

14   issues until the jury has determined infringement, validity, and essentiality.

15   **II.      SAMSUNG HAS NOT WAIVED THE RIGHT TO ENFORCE ITS STANDARD-
             ESSENTIAL PATENTS**
16

17         Apple argues that Samsung impliedly waived the right to enforce its declared-essential

18   patents by failing to disclose those patents to ETSI in a "timely" manner.   (Motion at 12–13.)   To

19   support a finding of implied waiver in the standard-setting context, Apple "must show by clear

20   and convincing evidence that '[the patentee's] conduct was so inconsistent with an intent to

21   enforce its rights as to induce a reasonable belief that such right has been relinquished.'"   *Hynix*

22   *Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1348 (Fed. Cir. 2011) (quoting *Qualcomm Inc.*

23   *v. Broadcom Corp.*, 548 F.3d 1004, 1020 (Fed. Cir. 2008)).   Apple must show that there is no

24   dispute of material fact that (1) Samsung had a duty of disclosure to ETSI, and (2) Samsung

25   breached that duty.   *See id.*   Apple cannot meet its burden because determining either the scope

26   of Samsung's duty to disclose or whether Samsung satisfied that duty requires resolution of

27   disputed factual issues that is inappropriate at summary judgment.

28

1    **A.    The Timing of Samsung's Disclosure Is Irrelevant Because the Patents Are**
2    **Available for License on FRAND Terms**

3        Whether Samsung complied with the ETSI IPR Policy is a disputed issue of fact.   The

4    ETSI IPR Policy requires only that members use "reasonable endeavors to timely inform ETSI of

5    ESSENTIAL IPRs it becomes aware of."   (Hecht Decl., Ex. B1, Article 4.1.)   The policy does

6    not define what "timely" means.   However, ETSI does explicitly define the purpose of the

7    disclosure requirement:   to ensure that essential IPRs are available for license on FRAND terms.

8    (Hecht Decl., Ex. C1, Article 2.)   So long as FRAND licenses are available, there is no risk that

9    investment in developing the standard or standard-compliant products will be wasted.   Thus, a

10   commitment to license essential IPR on FRAND terms "is sufficient when selecting technologies

11   for ETSI standards and technical specifications."   (Hecht Decl., Ex. C2, Article 4.1.)

12       Samsung committed to license all of its declared-essential UMTS patents on FRAND

13   terms—including the patents in suit—on December 14, 1998, long before the UMTS standard was

14   finalized.   (Hecht Decl., Ex. E.)   ETSI encourages precisely this type of general FRAND

15   commitment as a means of preventing patent hold-up.   (Hecht Decl., Ex. C1, Article 2.1.1.)

16   Samsung has also repeatedly reaffirmed its commitment to FRAND licensing and tried to

17   negotiate a FRAND license with Apple specifically.   Apple's motion does *not* challenge the

18   adequacy of Samsung's FRAND license offer.   Because Samsung has made all of its declared-

19   essential patents available for license on FRAND terms, Samsung has fully satisfied the objectives

20   of the ETSI IPR Policy.   The timing of when particular patents were identified that are subject to

21   that obligation is simply irrelevant.   *Cf. Symbol Techs., Inc. v. Proxim Inc.*, No. Civ. 01-801-SLR,

22   2004 WL 1770290 at *8 (D. Del. July 28, 2004) (finding evidence did not support a finding that

23   plaintiff breached a duty to disclose specific patents where "members could either disclose their

24   specific patents or pledge to license on a reasonable and nondiscriminatory basis, the latter being

25   the course selected by Symbol and several other significant technology holders").

26   **B.    What Constitutes "Timely" Disclosure Is a Disputed Issue of Fact**

27       Apple argues that the ETSI IPR Policy imposed a duty on Samsung to disclose the patents-

28   in-suit to ETSI before the relevant standard was frozen.   (Motion at 13.)   However, the ETSI IPR

1   Policy contains no such requirement.   Determining the scope of Samsung's obligation to disclose

2   requires resolution of disputed factual issues.

3   "The existence of a disclosure duty is a legal question with factual underpinnings."

4   *Qualcomm*, 548 F.3d at 1012.   One such factual underpinning is the meaning of the relevant IPR

5   policy.   *See id.*   To determine the scope of any duty to disclose under the ETSI IPR Policy, the

6   Court must consider both the language of the policy and the actual practice of ETSI members.

7   *See id.*; *Netscape Commc'ns Corp. v. ValueClick, Inc.*, 684 F. Supp. 2d 699, 723 (E.D. Va. 2010).

8   As noted above, the ETSI IPR Policy requires only that a member makes "reasonable

9   endeavours" to "timely" inform ETSI of essential IPR that "it becomes aware of."   (Hecht Decl.,

10  Ex. B1, Article 4.1.)   ETSI does not define any of these terms.   The ETSI IPR Policy simply does

11  not identify precisely when disclosure must be made.

12  The actual practice of ETSI members, however, reveals that it is not only common to

13  disclose essential patents after a standard is frozen, it is actually the norm.   Virtually all patents

14  that have been declared essential to the UMTS standard were declared *after* the relevant technical

15  specification was frozen.   (Hecht Decl., Ex. N.)   Apple itself has declared numerous patents

16  essential to the UMTS standard after the fact, but asserts that those disclosures were still timely.

17  (Hecht Decl., Exs. O1-O2; Hecht Decl., Ex. G, Response to RFA Nos. 1764, 1767, 1773, 1777.)

18  This practice also makes sense.   Because ETSI technical specifications are subject to

19  change up until the final, complete version of a standard is published, it can be difficult to predict

20  whether a particular patent will be essential or not.   This is doubly true of patent applications, the

21  claims of which can change during prosecution.   Furthermore, because it is a common practice to

22  make general FRAND commitments for all essential patents, as ETSI recommends (Rosenbrock

23  Decl., ¶ 33), there is much less urgency in identifying particular patents.

24  Apple argues that disclosure must be made before the standard is adopted because the

25  ETSI IPR Policy specifies that a member submitting a technical proposal "shall, on a bona fide

26  basis, draw the attention of ETSI to any of that MEMBER's IPR which ***might*** be ESSENTIAL if

27  that proposal is adopted."   (Motion at 14 (quoting ETSI IPR Policy, Article 4.1) (emphasis in

28  original).)   As discussed above, Apple's interpretation is contrary to the actual practice of ETSI

members, and therefore cannot be correct.[2]   The word "might" in the sentence Apple quotes says nothing about *when* disclosure should be made; it refers to the uncertainty in determining whether a particular patent is or is not essential.[3]   Temporally, the sentence Apple quotes is still subject to the general obligation (appearing immediately before that sentence) that a member "timely" disclose essential IPR that "it becomes aware of."   (Hecht Decl., Ex. B1, Article 4.1.)

Apple also argues that the ETSI IPR Policy is more stringent than the policy the Federal Circuit found binding in *Qualcomm*.   (Motion at 14.)   Apple's argument is factually incorrect and also misses the point of the Federal Circuit's analysis.   In *Qualcomm*, the Federal Circuit found that that the IPR policy in that case (for an organization called JVT, not ETSI) required members to exercise "best efforts" to disclose relevant patents, both because the written policy *expressly required* "best efforts," and because Broadcom had proven by clear and convincing evidence that members of the organization believed there was a duty to disclose.[4]   *See Qualcomm*, 548 F.3d at 1014–16.   That is a far stronger showing—notably, after a full trial—than Apple has made here.   Moreover, the Federal Circuit's analysis emphasizes that determining whether there is a duty to disclose requires a factual analysis of both the language of the specific IPR policy at issue and the understanding of the members subject to it.   *See Qualcomm*, 548 F.3d at 1012; *see also Netscape*, 684 F. Supp. 2d at 723 (finding that summary judgment was inappropriate where facts regarding the scope of the disclosure obligation were in dispute).   Apple does not even attempt that fact analysis here, and pointing to the result in *Qualcomm*—a case addressing a different standard-setting organization with a different policy and different members—cannot take the place of that analysis.

### C.  Whether Samsung Used "Reasonable Endeavours" to "Timely" Disclose Its Patents Is a Disputed Issue of Fact

---

[2]   Tellingly, Apple submits absolutely no evidence regarding the actual practice of ETSI members in support of its motion.

[3]   This uncertainty is also reflected in ETSI's IPR Information Statement and Licensing Declaration, which includes a declaration that the signatory "believes that the IPRs *may be considered ESSENTIAL* to the Standards listed."   (Hecht Decl., Ex. C1 at Annex 2 (emphasis added).)

[4]   The court found that Qualcomm had breached this duty because, by its own admission, it had made *no effort* to disclose the patents in suit.   *See Qualcomm*, 548 F.3d at 1014.

1    Just as Apple has failed to prove the scope of Samsung's duty to disclose, it has also failed

2    to show Samsung breached that duty even as Apple describes it.   Apple's only evidence on this

3    point is a chart listing, for each patent, (i) the priority date of the patent; (ii) the date Samsung

4    made a technical proposal to ETSI; (iii) what Apple calls the "freeze date" of the relevant

5    technical specification; and (iv) the date Samsung disclosed the patent or a related patent to ETSI.

6    (Motion at 15.)   However, Apple offers no facts to actually link these dates together in any way

7    that is relevant under the ETSI IPR policy.   There is a complete failure of proof on this point.

8    First, the ETSI IPR Policy requires only "reasonable endeavours to timely inform ETSI" of

9    essential patents.   (Hecht Decl., Ex. B1, Article 4.1.)   Apple argues only that Samsung's

10   disclosure was not "timely"; it does not even attempt to show that Samsung failed to use

11   "reasonable endeavours."   Whether Samsung's endeavours were reasonable is a question of fact.

12   Indeed, Apple admits that it has disclosed essential patents long after the relevant standard was

13   frozen, but contends that its disclosures were timely "under the relevant facts and circumstances."

14   (Hecht Decl., Ex. G, Response to RFA Nos. 1764, 1767, 1773, 1777.)   If timeliness depends on

15   the relevant fact and circumstances, summary judgment is impossible.

16   Second, the ETSI IPR Policy requires disclosure only of IPR that the member "*becomes

17   aware of*."   (Hecht Decl., Ex. B1, Article 4.1 (emphasis added).)   Merely showing that a patent

18   existed is not enough; to show that disclosure was "untimely," Apple would have to show *when*

19   Samsung became aware that a patent or patent application might be essential to the UMTS

20   standard.   Apple does not even attempt this showing.   Apple apparently wishes the Court to infer

21   that because some of the named inventors of the patents-in-suit also attended ETSI working group

22   meetings and made technical proposals, they must have known that their patents were essential.

23   Wishing does not satisfy Apple's burden on summary judgment.   Even knowledge of both the

24   pending patent application claims and the technical specification would not be enough.

25   Determining whether one reads on the other requires both a technical and a legal analysis.

26   ████████████████████████████████████████████████████

27   ██████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████

SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1   ████████████████████████   Without evidence that particular inventors knew both the

2   scope of Samsung's pending patent applications and that those applications covered technology in

3   development at ETSI, the Court cannot determine when there was a duty to disclose.

4   Third, Apple has failed to show that any of the technical proposals it points to actually

5   relate to Samsung's current patent claims.   For three of the seven patents at issue—the '001, '941,

6   and '516 patents—Apple does not even include the referenced proposals in its moving papers.   It

7   simply says there was a proposal and assumes, without proof, that the proposal related to a

8   particular patent-in-suit.   (Motion at 5–9; Mueller Exs. 7, 27, 43.)   For the other four patents,

9   Apple attaches a proposal, but does not connect the language of that proposal with either the

10  claims of the relevant patent application, or the relevant patent-in-suit, or the technology

11  ultimately adopted in the UMTS standard.   (Motion at 5–9; Mueller Exs. 14, 20, 22–23, 35.)

12  Apple has not connected any of the dots that would show when a duty to disclose was triggered.

13  Fourth, while Apple places great importance on the dates the relevant technical

14  specifications were frozen, Apple makes no effort to prove what those dates actually were.   For

15  each technical specification, Apple simply references a bare list of "freeze dates" from ETSI's

16  web site,[5] picks one date from that list, and asserts without analysis that it was the deadline for

17  Samsung to disclose its patents—without even attempting to show what technology was actually

18  frozen on those dates.   (Motion at 5–9.)   Again, Apple simply puts unconnected dots on a page

19  and calls it a picture.

20  Fifth, Apple fails to address the fact that most of the patents-in-suit *did not even exist* on

21  the dates Apple identifies as "freeze dates."   With one exception and one ambiguous case,[6] the

22  applications for those patents were filed months after the dates Apple claims were the deadlines

23  _____
    [5]   Apple has not authenticated any of these lists, or any of the other exhibits to the Mueller

24  Declaration, much less established hearsay exceptions that would permit the Court to consider the
    contents for their truth.   Pursuant to Local Rule 7-3(a), Samsung objects to each of the exhibits to

25  the Declaration of Joseph J. Mueller based on Federal Rules of Evidence 901 (lack of
    authentication) and 802 (hearsay).

26  [6]   The sole exception is the '604 patent, the application for which was filed in March 1999,
    approximately seven months before Apple's arbitrary "freeze date" for that technology of October

27  1999.   (Hecht Decl., Ex. Q1; Motion at 7.)   The ambiguous case is the '516 patent; that
    application was filed on June 9, 2005, and Apple identifies "June 2005" as the relevant "freeze

28  date."   (Hecht Decl., Ex. Q6; Motion at 9.)

1  for disclosure.   (Motion at 5–9; Hecht Decl., Exs. Q1-Q7.)   Glossing over this flaw, Apple

2  asserts that related foreign patent applications were on file before the dates it arbitrarily chose as

3  "freeze dates."   Apparently, Apple is inviting the Court to conclude that failure to "timely"

4  disclose one patent application waives all rights to enforce any related patent, regardless of

5  whether the latter patent was timely disclosed.   Apple cites no legal authority for this proposition,

6  which would be grossly unjust without, at a minimum, showing that the claim scope of the patents

7  in question was identical.   Apple does not attempt this comparison.

8           **D.    Holding Samsung's Declared-Essential Patents Unenforceable Would Be Inequitable**

9

10          Apple's motion suggests that any breach of the ETSI IPR disclosure rules automatically

11  leads to a remedy of unenforceability.   It does not.   Implied waiver is an equitable defense.   As

12  the Federal Circuit made clear in *Qualcomm*, "the remedy for waiver in the SSO context should

13  not be automatic, but should be fashioned to give a fair, just, and equitable response reflective of

14  the offending conduct."   548 F.3d at 1026.   The Court must consider, among other factors, "the

15  extent of the materiality of the withheld information and the circumstances of nondisclosure."   *Id.*

16          Here, there is a genuine dispute of material fact regarding whether holding Samsung's

17  patents unenforceable would be equitable under all the circumstances.   The alleged breach of

18  ETSI's IPR Policy was at most a technical one that caused no harm to Apple.   Samsung made a

19  general FRAND commitment for all its UMTS essential patents long before any of the relevant

20  technical specifications were frozen.   This commitment eliminated the risk of patent hold-up, and

21  removed any obstacle to including Samsung's patented technology in the UMTS standard.

22  Samsung later provided specific disclosures to ETSI of each of the standards patents at issue in

23  this case.   With only one exception, Samsung disclosed every one of those patents before Apple

24  released any of the Accused Products.[7]   This is not a case, as in *Qualcomm*, where a party

25  deliberately concealed its patents from a standard-setting organization in order to extort royalties

26  to which it would not be entitled under the relevant IPR policy.   Samsung has only ever sought

27          [7]    The sole exception was the '792 patent, which Samsung disclosed to ETSI in July 2008,
28  one month after Apple released the iPhone 3G but nearly a year before Apple released any of the
    other Accused Products.

1   the FRAND compensation to which the ETSI IPR Policy says it is entitled.   (Hecht Decl., Ex. B2,

2   Article 3.2.)   To allow Apple to infringe Samsung's declared-essential patents without paying any

3   compensation at all would itself be contrary to the objectives of ETSI IPR Policy and would give

4   Apple an unjustified windfall.

5   **III.      SAMSUNG IS ENTITLED TO SEEK INJUNCTIVE RELIEF**

6          **A.      Genuine Issues of Material Fact Preclude Summary Judgment on Whether Injunctive Relief Is Appropriate**

7

8                 **1.      A Willingness to License Does Not Preclude Injunctive Relief**

9          Apple argues that Samsung necessarily gave up the right to injunctive relief by committing

10  to FRAND licensing.   Apple contends that a willingness to license, as a matter of law, precludes

11  any finding of irreparable harm or the inadequacy of money damages, two of the four *eBay*

12  factors.   (Motion at 18–20.)   *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

13         Apple's legal argument is frivolous—*eBay* itself rejected the exact same argument.   The

14  *eBay* Court refused to apply any categorical rule for or against injunctive relief based on a

15  willingness to license:

16             [The District Court] concluded that a "plaintiff's willingness to license its patents"
               and "its lack of commercial activity in practicing the patents" would be sufficient to
17             establish that the patent holder would not suffer irreparable harm if an injunction
               did not issue.   But traditional equitable principles do not permit such broad
18             classifications. . . . Such patent holders may be able to satisfy the traditional four-
               factor test, and we see no basis for categorically denying them the opportunity to do
19             so.

20  *eBay*, 547 U.S. at 393 (citation omitted).   Following *eBay*, the Federal Circuit has similarly

21  rejected arguments that willingness to license precludes injunctions.   *See Acumed LLC v. Stryker*

22  *Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) ("A plaintiff's past willingness to license its patent is

23  not sufficient per se to establish lack of irreparable harm if a new infringer were licensed.");

24  *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 703–04 (Fed. Cir. 2008) (affirming permanent

25  injunction, where plaintiff had previously licensed the patents-in-suit).   While willingness to

26  license may be a factor in the *eBay* analysis, it is only one of the many factors the Court must

27  consider.   *See Acumed*, 551 F.3d at 1328.   The Court cannot decide Samsung's request for

28  injunctive relief without a full hearing and factual determinations on *all* of the *eBay* factors.

1       *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951 (N.D. Cal. 2009), the sole

2  case Apple cites on this issue, illustrates this approach.   While the *Hynix* court did find Rambus's

3  willingness to license its patents was *a factor* weighing against an injunction, *id.* at 985–86, it did

4  so only in the context of weighing *all* of the *eBay* factors after a full trial on the merits, *id.* at 980–

5  86.   *Hynix* thus directly contradicts the *per se* approach Apple advocates here.

6            **2.**      **Commitment to FRAND Does Not Preclude Injunctive Relief**

7       Apple also argues that FRAND licensing is unique because "[t]he purpose of the ETSI

8  FRAND policy is to prevent holders of standard-essential patents from exploiting the

9  standardization process to 'hold up' standards implementers or make their IPR unavailable

10  altogether."   (Motion at 19.)   Apple is wrong for several reasons.

11       First, as discussed above, Apple argues the patents-in-suit are not essential at all, in which

12  case FRAND would not even apply.   Apple cannot argue from one side of its mouth that it need

13  not pay a FRAND royalty because the patents are not essential, and yet argue from the other side

14  of its mouth that Samsung cannot get an injunction because the patents are essential and subject to

15  a FRAND royalty.

16       Second, ETSI's FRAND policy does not exist solely to prevent "hold up" of standards; its

17  purpose is fundamentally to *balance* the interests of IPR owners and standard users.   (Hecht

18  Decl., Ex. B1, Article 3.1; Rosenbrock Decl., ¶¶ 23–30.)   Part of this balance is to ensure patent

19  owners are "adequately and fairly rewarded for the use of their IPRs."   (*Id.*, Article 3.2.)   A rule

20  prohibiting injunctions would upset this balance and allow standard users to infringe essential

21  patents with impunity.   Without the possibility of injunction, a standard user would be no worse

22  off after litigation than it would have been signing a license to begin with; this gives the standard

23  user every incentive to refuse a license and force litigation.   Moreover, a compulsory license

24  following litigation would not contain all of the same protections as a license agreement concluded

25  through bilateral negotiations.   *See Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2008

26  WL 4531371 at *4 (N.D. Ill. May 22, 2008).

27       Third, if ETSI had intended to preclude injunctive relief, its IPR Policy would say so.

28  Nothing in the ETSI IPR Policy requires members to forego their right to an injunction.   In fact,

1  during the development of the ETSI IPR Policy, ETSI rejected a provision that would have barred

2  members from seeking injunctive relief on essential IPR.   (Rosenbrock Decl., ¶ 42.)

3       Fourth, actual practice shows that ETSI's members believe injunctive relief is available for

4  patents subject to a FRAND undertaking.   Numerous ETSI members, including Qualcomm,

5  Nokia, Motorola, Ericsson, and InterDigital have sought injunctive relief on essential patents.

6  (██████████████████████████████████████████████████████

7  ███████████   Hecht Decl., Ex. G, Response to RFA Nos. 1782, 1784-1786.)   This experience

8  shows that ETSI members do not interpret the ETSI IPR Policy, or the FRAND undertaking in

9  particular, as inconsistent with the right to seek injunctions.

10      Finally, federal district courts have consistently rejected the argument that FRAND

11 obligations preclude injunctive relief.   The Eastern District of Texas granted a permanent

12 injunction where one party undisputedly agreed to offer RAND licenses to companies

13 implementing the IEEE's 802.11a standard.   *See Commonwealth Scientific & Indus. Research*

14 *Org. v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 602-03 (E.D. Tex. 2007).   Just last year, the

15 District of Delaware denied a motion to dismiss a counterclaim seeking injunctive relief in a case

16 with alleged FRAND obligations.   *See Nokia Corp. v. Apple Inc.*, C.A. No. 09-791-GMS, 2011

17 WL 2160904 at *2 (D. Del. June 1, 2011).   The International Trade Commission—a forum where

18 the only form of relief is a type of injunction (an exclusion order)—has consistently held that a

19 FRAND obligation does not preclude relief.   *See In re Certain Semiconductor Chips*, Inv. No.

20 337-TA-753, Initial Determination (Mar. 2, 2012) and Order 55 (Oct. 6, 2011) at 3.   The

21 European Commission has also stated that an ETSI member who has given a FRAND declaration

22 may obtain an injunction.[8]   (Hecht Decl., Ex. R, ¶¶ 106, 126.)

23      **B.    Apple Is Not Licensed to the Patents-in-Suit**

24      Even though Apple has rejected Samsung's proposed license terms for its declared-

25 essential UMTS patents, and has refused to pay Samsung anything for the use of those patents,

26 Apple nevertheless argues that it has a license to those same patents.   Apple's argument is

---

27    [8]    In addition, Samsung's FRAND commitment for the '941 and '792 patents were expressly
28 conditioned on reciprocity from those who seek licenses.   (Hecht Decl., Exs. F3-F4.)   Apple does
   not even attempt to show it satisfied this condition.

1    inconsistent with common sense, with the plain language of ETSI's rules and guidelines, and with

2    French law, which governs those rules.

            **1.**      **The ETSI Rules Are Inconsistent with Apple's Argument That a FRAND Undertaking Automatically Creates a License**

3

4

5        Apple argues that Samsung's FRAND undertakings to ETSI automatically create a license

6    to Samsung's declared-essential patents.   (Motion at 20.)   The ETSI rules themselves plainly

7    contradict this position.   Article 6.1 of the ETSI IPR Policy, which is the provision addressing

8    FRAND undertakings, does not say the undertaking is a license.   It says that the IPR owner "is

9    *prepared to grant* irrevocable licenses."   (Hecht Decl., Ex. B1, Article 6.1.)   "Prepared to grant"

10   means that the patent owner is *willing* to grant a license, not that one already exists.   This is

11   consistent with the language of the FRAND declaration itself, which states that the signatory is

12   "*prepared to grant* irrevocable licenses."   (Hecht Decl., Ex. C1 at Annex 2 (emphasis added).)

13   The willingness to grant a license is also conditional:   it applies only "to the extent that the IPRs

14   remain ESSENTIAL."   (*Id.*)   Article 6.1 also provides that "[t]he above undertaking may be

15   made subject to the condition that those who seek licenses agree to reciprocate."   (Hecht Decl.,

16   Ex. B1, Article 6.1.)   For Apple to transmute a willingness to grant a license, subject to certain

17   conditions, into an existing and irrevocable license is inconsistent with the plain language of the

18   policy on which it relies.

19        Other ETSI policy documents similarly reveal the fallacy of Apple's argument.   ETSI's

20   IPR Policy FAQ and Guide on IPRs repeatedly advise standard users to seek and obtain a license

21   from essential patent holders:

22       •     "[E]ach STANDARD user should seek directly a license from a patent
              holder."   (Hecht Decl., Ex. D, Answer 6.)

23

24       •     "[T]he concerned firm has to enter into negotiation with the companies
              holding patents in order to obtain licenses for the use of the patented
              technology included in, and essential for the implementation of an ETSI

25            STANDARD."   (*Id.*, Answer 7.)

26       •     "It is the responsibility of each STANDARD user to contact directly the
              patent owner.   ETSI is not in a position to provide guidelines for

27            commercial negotiations."(*Id.*, Answer 4.)

28

1          •      "Specific licensing terms and negotiations are commercial issues between
                  the companies and shall not be addressed within ETSI."   (Hecht Decl.,
2                 Ex. C1, Article 4.1.)

3    These directives would make no sense if, as Apple claims, a license already existed the moment

4    the IPR owner made a FRAND declaration.

5                        **2.     A FRAND Undertaking Does Not Automatically Create a License
                                  Under French Law**

6

7          Apple argues that, notwithstanding the plain language of the ETSI rules, a FRAND

8    undertaking creates a "continuing offer" under French law that becomes a binding license when a

9    standard user begins to implement the standard.   (Motion at 21.)   As set forth in the previously-

10   filed declarations of Professor Rèmy Libchaber (ECF No. 405-4 ("Libchaber Decl."); ECF

11   No. 594-1 ("Libchaber Reply Decl.")), Apple's arguments are based on a mischaracterization of

12   French law.   An ETSI FRAND declaration does not contain sufficient terms to create a binding

13   contract under French law.   There is at least a genuine dispute of fact on this issue.

14                       **(a)     ETSI Declarations Are Not Sufficiently Definite to Constitute an
                                   Offer That Apple Could Have Accepted**

15

16         Under French law, "an offer must be specific enough for the contract to be formed by a

17   simple acceptance of the person to whom the offer is communicated."   (Libchaber Decl., ¶ 70.)

18   Samsung's ETSI declarations contain virtually none of the terms necessary to create a patent

19   license.   The declarations provide only the numbers of the patents or patent applications that "are,

20   or are likely to become," essential and an identification of the standards to which they relate.

21   (Hecht Decl., Exs. F1-F4.)   The declarations do not disclose the duration of the license, the

22   geographic scope of the license, or the applicable royalty rate; as a matter of French law, they lack

23   the requisite precision to constitute an offer.   (Libchaber Decl., ¶¶ 77–81.)

24         Apple concedes that neither the ETSI policy nor the ETSI declarations specify a royalty

25   rate.   Apple contends, however, that the price term need not be specified in order to form a

26   contract.   (Motion at 22.)   Apple's assessment of French law is incorrect.   French law treats

27   patent licenses as a type of lease.   (Libchaber Decl., ¶¶ 43–51.)   The *Cour de cassation*, the

28   highest French Court, has held that "a promise of lease can only be considered as a lease if it

1  contains an agreement of the parties on the price."   (Libchaber Decl., ¶ 49.)   The two cases cited

2  by Prof. Molfessis are not to the contrary.   In the first case, the *Cour de cassation* "ruled that a

3  bank had not acted abusively in determining a price when it raised the price of a safety box by

4  100%, because the other party was timely informed of that increase."   (Molfessis Decl., ¶ 37.)

5  However, in that case, the question was whether the contract would be renewed on different terms,

6  not whether the contract lacked a price term.   The price for the safety box was known with

7  specificity.   (Libchaber Reply Decl., ¶ 41.)   Prof. Molfessis also cites another *Cour de cassation*

8  case in which the Court concluded that the reference to a lease in a notarized document was

9  sufficient to bind the signer to the terms of the referenced lease.   (Molfessis Decl., ¶ 38.)   The

10  Court's decision about the sufficiency of this reference to the lease is not a ruling on whether price

11  constitutes an essential element for the formation of a lease.[9]   (Libchaber Reply Decl., ¶ 41.)

12                    **(b)      Apple Did Not Accept Any Offer Made by Samsung**

13          Apple's contention that it agreed to Samsung's alleged "offer" by practicing the UMTS

14  standard is also incorrect.   Under French law, formation of a contract requires a clear acceptance

15  of the offer by the promisee.[10]   (Libchaber Reply Decl., ¶¶ 10–11.)   This principle is consistent

16  with the ETSI rules, which direct companies to seek licenses through bilateral negotiations.

17  Indeed, this is precisely the route that Apple took in approaching Samsung for FRAND terms.

18  Apple effectively concedes that it never accepted Samsung's proposed license terms.   Nor has

19  Apple paid any royalties to Samsung for its use of Samsung's declared-essential patents.   On

20  these facts, it is preposterous to say that Apple "accepted" Samsung's license offer.

21

22

---

23          [9]      Apple's citation to the testimony of Prof. Boucobza is likewise inapposite.   Contrary to
Prof. Molfessis' opinion, Prof. Boucobza concluded that the ETSI declaration itself did not
24  constitute a license.   (Mueller Decl., Ex. 52 at 1716.)   Prof. Boucobza distinguishes between
"framework agreements," such as the ETSI IPR Policy binding all ETSI members, and
25  "implementing contracts," which are actual license agreements established between individual
ETSI members.   (*Id.* at 1661.)   While Prof. Boucobza testified that "[t]he *framework* [ETSI]
26  agreement is still valid" even without a price term (*Id.* at 1661–62 (emphasis added)), that is not
relevant to the existence of an actual license agreement.
27
          [10]      The case law Prof. Molfessis cites pertains to unrelated situations, such as the implied
28  acceptance of a transportation contract by a rider boarding a bus.   (Molfessis Decl., ¶ 13.)

1    In any event, whether Apple accepted a licensing offer cannot be decided on summary

2  judgment.   Whether a party has accepted an offer is an issue of fact.[11]  *See Murphy v. Hosanna*

3  *Youth Facilities, Inc.*, 683 F. Supp. 2d 1304, 1313 (N.D. Ga. 2010).   Here, Apple does not

4  concede that the patents-in-suit are essential to the UMTS standard, or that Apple is using them in

5  its products.   (Motion at 3.)   Accordingly, there is a question of fact as to whether, by practicing

6  the UMTS standard, Apple accepted a license to Samsung's declared-essential patents.

7                    **(c)      Apple Has Failed to Demonstrate That Any License Was**
                             **Formalized as a Writing**
8

9        Samsung's ETSI declarations also fail to satisfy the requirement under French law that

10  enforceable contracts must be in writing.   Prof. Molfessis concedes that, under French law, "acts

11  bearing a transfer or a license . . . must be acknowledged in writing, under penalty of nullity."

12  (Molfessis Decl., ¶ 109.)   He nevertheless contends that the provision is inapplicable because this

13  particular article of the French civil code applies only where the contract is negotiated ("gré à

14  gré"), as opposed to a contract of adhesion offered on a "take it or leave it" basis.   Prof. Molfessis

15  provides no legal support for his contention that the ETSI declarations are adhesion contracts.

16  Nor does he ever opine that Samsung's ETSI declarations are preformulated boilerplate contracts,

17  the formation of which requires no judicial intervention.   (Libchaber Reply Decl., ¶¶ 22–23.)   To

18  the contrary, Prof. Molfessis concedes that judicial intervention would be necessary because the

19  declarations do not include a price term.   (Molfessis Decl., ¶ 107.)   Characterizing the ETSI

20  declarations as adhesion contracts also contradicts ETSI's own directives that FRAND terms

21  should be decided through bilateral negotiations.

22        Prof. Molfessis' assertion that Samsung's declarations satisfy the writing requirement,

23  despite the absence of any corresponding writing by Apple, must also be rejected.   Prof.

24  Molfessis' contention that only Samsung's assent to a patent license is necessary is unsupported

25  by the commentary he cites, which does not reference patent licenses at all.   (Libchaber Reply

26

27      [11]    While the question whether Apple implicitly accepted the contract is a matter of French
law, the procedural issue whether acceptance is an issue of fact or law is a question of federal law.
28  *Pritchard v. Norton*, 106 U.S. 124, 129-30 (1882).

1  Decl., ¶ 25.)   French law requires that both parties assent to a patent license in writing to avoid

2  the very issue in dispute here—whether or not an agreement exists at all.   (*Id.*)

3              **(d)     Samsung's Declarations Were Not *Intuitu Personae* and**
                **Therefore Do Not Constitute a License**

4

5          Finally, the ETSI declarations do not constitute binding agreements under French law

6  because they are not *intuitu personae*—that is, specifically directed at a particular person with

7  whom the contract will be formed.   (Libchaber Decl., ¶¶ 120–33.)   This requirement is consistent

8  with ETSI IPR guidelines, which state that licenses are to be negotiated on a bilateral basis.   The

9  ETSI IPR Policy also supports this conclusion, as it contemplates individualized license

10  agreements by providing that members may grant licenses "subject to the condition that those who

11  seek licenses agree to reciprocate."   (Hecht Decl., Ex. B1, Article 6.1.)   In other words, an ETSI

12  IPR member may customize a license offer, distinguishing between a party that owns other patents

13  and one that does not.

14  **IV.     GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT**
        **ON APPLE'S EXHAUSTION DEFENSE**

15

16      **A.     The Sale of IMC Chips Did Not Exhaust Samsung's Patent Rights Because It**
            **Did Not Occur in the United States**

17          As the party invoking the affirmative defense of exhaustion, Apple bears the burden of

18  proving each element of the defense by a preponderance of the evidence.   *See Fuji Photo Film*

19  *Co., Ltd. v. Jazz Photo Corp.*, 394 F.3d 1368, 1373 (Fed. Cir. 2005).   Among other elements,

20  Apple must establish there is no genuine issue of material fact that the sales giving rise to

21  exhaustion occurred *within the United States*.   *See Jazz Photo Corp. v. International Trade*

22  *Comm'n*, 264 F.3d 1094, 1105 (Fed. Cir. 2001); *see also Fuji Photo*, 394 F.3d at 1376 ("In *Jazz*,

23  therefore, this court expressly limited first sales under the exhaustion doctrine to those occurring

24  within the United States.").   "[F]oreign sales can never occur under a United States patent

25  because the United States patent system does not provide for extraterritorial effect."   *Fuji Photo*,

26  394 F.3d at 1376.   Thus, "[t]he patentee's authorization of an international first sale does not

27  affect exhaustion of that patentee's rights in the United States."   *Id.*

28

1    "The location of a sale offered in support of a patent exhaustion defense presents an issue

2    of fact."   *Cornell Research Found., Inc. v. Hewlett-Packard Co.*, No. 5:01-CV-1974, 2007 WL

3    4349135 at *51 (N.D.N.Y. Jan. 31, 2007); *Minebea Co., Ltd. v. Papst*, 374 F. Supp. 2d 202, 218

4    (D.D.C. 2005).   Whether a sale took place in the United States is a multi-factor analysis that

5    requires consideration of "where the relevant negotiations took place, the location where payment

6    was made and, notably, the geographical point at which delivery was taken."   *Cornell*, 2007 WL

7    4349135 at *50.   The location of delivery is the most important factor, as there cannot be a sale

8    within the United States for purposes of exhaustion where delivery is made outside the United

9    States.   *See Minebea Co., Ltd. v. Papst*, 444 F. Supp. 2d 68, 146 (D.D.C. 2006); *Cornell*, 2007

10   WL 4349135 at *51.   This is true even if invoicing or other sales activity happened inside the

11   United States.   *See id.*

12       Apple not only fails to address this essential element of its exhaustion defense, but also

13   fails to disclose evidence that Apple itself introduced in a foreign litigation that proves this

14   element is not met.   █████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████

16   █████████████████████████████   Because these sales do not occur in the

17   United States, they cannot exhaust United States patent rights.

18       ███████████████████████████████████████████████

19   ███████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ██████████████████████████████████████████████████████████

24   ████████████████   In response to requests for admission in this case, Apple said it could not

25   admit or deny whether there is ever any physical delivery of baseband chips in the United States

26   because "a response requires information that is outside Apple's possession, custody and control."

27   (RFAs 1961–68.)   Duplicity aside, if Apple professes not to know whether there is any physical

28

1    delivery of baseband chips in the United States, it cannot possibly meet its burden of proving a

2    sale in the United States.[12]

3    **B.    Apple Has Failed to Show that Intel Extended Its Rights Under the Intel
           Agreement to IMC**

4

5         Apple's exhaustion argument also fails because the Intel Agreement did not automatically

6    authorize sales of chips by Intel subsidiaries; ████████████████████████████████████

7    █████████████████████████████████████████████████████████████████████████████

8    ███████████████████████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████████████████████

10   ██████████████████████████████████████████████████████████████████████████████

11       ████████████████████████████████████████████████████████████████████████

12   ███████████████████████████████████████    *See Intel Corp. v. Broadcom Corp.,* 173 F.

13   Supp. 2d 201, 222 (D. Del. 2001).   In *Intel*, the court construed an agreement that gave Motorola

14   "the right to extend the release and grants of Sections 2 and 3, respectively, to any MOTOROLA

15   SUBSIDIARY."   *Id.* at 219.   The court held that provision gave Motorola "the right to extend"

16   the Intel patent licenses to its subsidiary, but "Motorola must affirmatively exercise this right." *Id.*

17   at 221–22.   In the absence of any evidence showing that Motorola affirmatively exercised the

18   right to extend the licenses to its subsidiary GI, the court granted summary judgment in favor of

19   Intel, holding that sales to GI were not covered under the licenses.   *Id.* at 222–23.

20        Here, as in *Intel*, the Agreement provides Intel with the right to extend the licenses, but that

21   right is not self-executing.   Only after Intel affirmatively extends the right to a particular

22   subsidiary would the subsidiary be authorized under the license.   Apple has not presented any

23   _____

   [12]    Apple's motion should also be denied because Apple has not submitted competent
24   evidence that Apple actually buys the baseband chips used in the accused products from Intel.
     Apple relies exclusively on the conclusory declaration of Saku Hieta, which attaches four heavily
25   redacted invoices.   Apple refused to make Mr. Hieta available for deposition, despite a timely
     deposition notice by Samsung, making it impossible for Samsung to test the facts asserted by
26   Apple.   Apple also refused to produce other witnesses likely to have knowledge of this issue, such
     as Apple in-house counsel (and former Intel in-house counsel) Bruce Sewell.   (Hecht Decl.,
27   Ex. S1-S2.)   The Court should therefore give no weight to Mr. Hieta's conclusory declaration.   In
     the alternative, pursuant to Federal Rule of Civil Procedure 56(f), the Court should delay ruling
28   until Samsung has the opportunity to depose Mr. Hieta and Mr. Sewell.

1   evidence that Intel extended such rights to any of its subsidiaries, including IMC or IAI.   Indeed,

2   Intel could not have extended such rights to IMC because Intel did not acquire IMC until after the

3   Agreement expired..[13]   (Hecht Decl., Ex. K3, § 1.)

4                                     **<u>CONCLUSION</u>**

5         For the foregoing reasons, Apple has failed to show that there is no genuine dispute of

6   material fact and that it is entitled to judgment as a matter of law on these issues.   Apple's motion

7   for partial summary judgment should therefore be denied in its entirety.

8   DATED: April 2, 2012                   Respectfully submitted,

9
                                          QUINN EMANUEL URQUHART & SULLIVAN, LLP
10

11                                        By:     */s/ Victoria Maroulis*
                                                Charles K. Verhoeven
12                                              Kevin P.B. Johnson
                                                Victoria F. Maroulis
13                                              Michael T. Zeller

14                                        Attorneys for SAMSUNG ELECTRONICS CO., LTD.,
15                                        SAMSUNG ELECTRONICS AMERICA, INC. and
                                          SAMSUNG TELECOMMUNICATIONS AMERICA,
16                                        LLC

17

18

19

20

21

22

23

24

25

26

27   ───────────────────────
        [13]    By its terms, certain provisions of the Agreement survived termination, but Intel's right to
28   extend the license to subsidiaries was not among those provisions.   (Hecht Decl., Ex. K3, § 6.4.)