# EXHIBIT R

EN

*Case No COMP/M.6381 - GOOGLE/ MOTOROLA MOBILITY*

Only the English text is available and authentic.

# REGULATION (EC) No 139/2004
# MERGER PROCEDURE

Article 6(1)(b) NON-OPPOSITION
Date: 13/02/2012

*In electronic form on the EUR-Lex website under document number 32012M6381*

Office for Publications of the European Union
L-2985 Luxembourg

 **EUROPEAN COMMISSION**

Brussels, 13/02/2012

C(2012) 1068

| |
|---|
| In the published version of this decision, some information has been omitted pursuant to Article 17(2) of Council Regulation (EC) No 139/2004 concerning non-disclosure of business secrets and other confidential information. The omissions are shown thus […]. Where possible the information omitted has been replaced by ranges of figures or a general description. |

| |
|---|
| MERGER PROCEDURE ARTICLE 6(1)(b) DECISION |

| |
|---|
| PUBLIC VERSION |

**To the notifying party:**

Dear Sir/Madam,

**Subject:      Case No COMP/M.6381 – Google/Motorola Mobility
Commission decision pursuant to Article 6(1)(b) of Council Regulation
No 139/2004**

1.  On 25 November 2011, the European Commission received notification of a proposed concentration pursuant to Article 4 of Council Regulation No 139/2004[1] by which Google Inc. ("Google", USA), acquires, within the meaning of Article 3(1)(b) of the Merger Regulation, sole control over Motorola Mobility Holdings, Inc. ("Motorola Mobility", USA)[2] by way of purchase of shares.[3]  **Google** is designated hereinafter as the "notifying party" whereas Google and Motorola Mobility are referred to as the "parties to the proposed transaction".

2.  On 9 December 2011, the Commission adopted two decisions pursuant to Article 11(3) of the Merger Regulation in order to obtain from Google documents which the Commission considered necessary for its assessment of the case. This led to a suspension of the time limits referred to in Article 10 of the Merger Regulation from 6 December 2011 until 17 January 2012 included.

---

[1]   OJ L 24, 29.1.2004, p. 1 ("the Merger Regulation"). With effect from 1 December 2009, the Treaty on the Functioning of the European Union ("TFEU") has introduced certain changes, such as the replacement of "Community" by "Union" and "common market" by "internal market". The terminology of the TFEU will be used throughout this decision.

[2]   Motorola Mobility Holdings, Inc. was formerly known as the Mobile Devices and Home Division of Motorola, Inc.  It was spun-off as a separate legal entity in January 2011. Motorola, Inc. is not a party to the current transaction and is not referred to hereinafter.

[3]   Publication in the Official Journal of the European Union No C356, 06.12.2011 p.18.

## I. THE PARTIES

3. **Google** is a provider of internet search and online advertising services. It also provides a number of additional online services and software products. Google's revenue is mostly derived from online advertising services and, to a certain extent, from mobile online advertising services. Google also develops and makes available to original equipment manufacturers ("OEMs") of smart mobile devices an open source mobile operating system ("OS") called Android.  Google is the leading member of the Open Handset Alliance ("OHA").[4]

4. **Motorola Mobility** is a supplier of mobile devices (including smart mobile devices), TV set-top boxes (STBs), end-to-end video solutions and cable broadband access solutions.

## II. FACTS

5. Pursuant to the *Agreement and Plan of Merger* signed on 15 August 2011, Google will acquire the whole of Motorola Mobility by way of purchase of shares via its fully owned subsidiary RB98 Inc., a Delaware corporation. The transaction will result in the acquisition of sole control by Google over Motorola Mobility and thus constitutes a concentration pursuant to Article 3(1)(b) of the Merger Regulation.

6. As part of the transaction, Google will acquire Motorola Mobility's patent portfolio. Google submits that it would acquire approximately [7 000 - 8 000] patents ([6 000 -7 000] US and [500 - 1 000] EU patents) from Motorola Mobility.[5] Google explains that, consistently with its business activities, Motorola Mobility's patent portfolio focuses mainly on wireless communication hardware and to some extent high-definition television ("HDTV").

7. Motorola Mobility has a number of patents that it has declared to be standard essential patents ("SEPs").[6]  In particular, Motorola Mobility has a significant portfolio of cellular SEPs including patents relating to LTE, 3G and 2G as well as WCDMA-UMTS, GSM-GPRS, CDMA, WiFi, WiMAX, MPEG-4 Visual, HDTV, Battery etc.[7] ("Motorola Mobility's SEPs"). These patents read on wireless standards, smartphones, video, HDTV and batteries.[8]

---

[4]   The OHA is an alliance of "84 mobile and technology companies who have come together to accelerate innovation in mobile and offer consumers a richer, less expensive, and better mobile experience", see http://www.openhandsetalliance.com. Google founded the OHA in November 2007 as an alliance of mobile technology companies (including mobile operators, device manufacturers, semiconductor manufacturers, and software developers) that have committed to contributing to Android.

[5]   Table 6.66, paragraph 362 of the Form CO.

[6]   Listed in Annex 6.21 of the Form CO.

[7]   Internal document Google […].

[8]   Presentation by Google […].

8.  On 8 February 2012, Google sent a letter to various standard setting organisations ("SSOs") regarding its intended acquisition of Motorola Mobility's SEPs ("Google's SSO letter"). Google has also published this letter on its website.[9]

9.  The main points of this letter, which Google describes as "legally binding" and "irrevocable",[10] are as follows:

   a.  Google states that it will honour Motorola Mobility's pre-existing commitment to license its SEPs on fair, reasonable and non-discriminatory ("FRAND") terms;

   b.  Google recognises that Motorola Mobility has been prepared to grant licences for its SEPs at a maximum per-unit royalty of 2.25% of the net selling price for the relevant end-product, subject to offsets for any cross-licences or other consideration.[11] Google states that it will continue to honour this rate in the future;

   c.  Google states that it will negotiate in good faith with potential licensees for a reasonable period provided that, during that period, neither party shall (i) initiate legal proceedings against the other party's SEPs, and (ii) seek injunctive relief based on its SEPs;

   d.  Finally, Google contends that in relation to Motorola Mobility's SEPs, a potential licensee will have the opportunity to prevent an injunction from being sought, even after good faith negotiations have failed, provided that a potential licensee: (a) makes an offer to license Motorola Mobility's SEPs, subject to certain conditions, and (b) provides securities with regard to the royalty payments.

10. Google's commitments expressed in this letter will be subject to reciprocity, i.e. the counter-party having made a similar commitment in respect of its own SEPs reading on the same standard as Motorola Mobility's SEPs.

### III. EU DIMENSION

11. The parties to the proposed transaction have a combined aggregate world-wide turnover of more than EUR 5 000 million[12] (EUR 20 941 million for Google and EUR 8 644 million for Motorola Mobility). Each has an EU-wide turnover in excess of EUR 250

---

9   Google sent the letter to the following SSOs: the Advanced Television Systems Committee ("ATSC"); the Consumer Electronics Association ("CEA"); the Institute of Electrical and Electronics Engineers ("IEEE"); the European Telecommunications Standards Institute ("ETSI"); the International Electrotechnical Commission ("IEC"); the International Organization for Standardization ("ISO"); the International Telecommunication Union ("ITU"); the Joint Electron Devices Engineering Council ("JEDEC"); the Near Field Communication ("NFC") Forum; the Open Mobile Alliance ("OMA"); the Society of Motion Picture and Television Engineers; TechAmerica; the Telecommunications Industry Association ("TIA"); and the Wi-Fi Alliance. The letter is published on Google's website at:
    http://www.google.com/press/motorola/patents/

10  See Google's submission of 3 February 2012.

11  As noted below, nothing in this decision should be taken as supporting the position that Motorola Mobility's 2.25% rate is, or is not, a FRAND rate.

12  Turnover for 2010 calculated in accordance with Article 5 of the Merger Regulation.

million (EUR […] million for Google and EUR […] million for Motorola Mobility) and neither achieves more than two-thirds of its aggregate EU-wide turnover within one and the same Member State. The notified operation therefore has an EU dimension.

## IV. MARKET DEFINITION

12. The notifying party submits that the transaction will bring together two complementary businesses and does not give rise to any horizontally or vertically affected markets.

13. As explained above, Google primarily provides online services (including its Google Search service) and releases the open source Android OS. Motorola Mobility is in particular active in the supply of mobile devices[13] and TV STBs.

14. While the parties' activities horizontally overlap to a limited extent in the market for conditional access systems,[14] their combined market share is significantly less than 15% ([5-10]% worldwide and [0-5]% in the EEA based on the party's estimates). As a result, the transaction does not give rise to any horizontally affected markets.

15. Nevertheless, given the vertical relationships between Google as the supplier of the open source Android OS and online services on the one hand and Motorola Mobility as a supplier of mobile devices and holder of important Intellectual Property Rights for mobile devices on the other hand, the Commission has analysed the possible effects on competition resulting from these vertical relationships.

### 1. *Operating Systems*

*Relevant product market*

16. The Commission has not previously analysed the possible market for mobile OSs. However, the Commission has previously defined a market for OSs for PCs as follows: "Operating systems are system software products that control the basic functions of a computer and enable the user to make use of such a computer and run application software on it."[15] According to the Commission, while sometimes used interchangeably, "the term platform software (or platform) does not only refer to OSs, but to any software product that exposes an API for use by applications."[16]

---

13  Basic phones are used primarily for calls and text messaging. Feature phones are wireless phones with limited Internet browsing and application capabilities. Smartphones are wireless phones with advanced Internet browsing and application capabilities. Media tablet devices (or tablets) offer enhanced multimedia and functionality to the end user. For the purposes of this decision, smart mobile devices include smartphones and tablet devices.

14  See Case COMP/M.5121 - *News Corp/Premiere*, Commission decision of 25 June 2008, paragraph 44, where the Commission defined a market for conditional access systems. These are products that enable content providers, such as pay-TV operators, to charge their subscribers for access to content such as pay-TV channels, pay-per-view events and digital TV services over managed network infrastructures (e.g., Cable TV or IPTV networks).

15  Case COMP/C-3/37.792 – *Microsoft*, Commission decision of 24 March 2004, paragraph 37.

16  Case COMP/C-3/37.792 – *Microsoft*, Commission decision of 24 March 2004, paragraph 39.

17. Smart mobile devices, like PCs, need an OS to run on. Such an OS, designed to support the functioning of the mobile device and the corresponding applications, is the mobile OS.

18. Google releases the source code for the Android mobile OS for free under an open source licence.[17]  While not explicitly distinguishing between the Android OS and the Android platform, Google submits that it is active in the provision of mobile software platforms through its participation in OHA. According to Google, Motorola Mobility is not active in this area.

19. Google submits that there is a single product market for mobile software platforms for smartphones and mobile software platforms for tablets, arguing that there are no significant supply-side constraints that prevent a mobile software platform running on a smartphone from running on a tablet, as both types of devices provide similar capabilities and use very similar hardware configurations.

20. In addition, Google submits that the product market should include software platforms, such as iOS[18] and BlackBerry OS, which are not available for licensing by third-party OEMs (sometimes called "non-licensable" mobile software platforms). Google argues that, although from a demand-side perspective, OEMs currently running licensable or open source mobile software platforms are not able to switch to iOS or BlackBerry OS (since those software platforms only run on the hardware produced respectively by Apple or RIM), the competitive behaviour of licensable and open source mobile software platform suppliers is constrained by the software platforms of integrated companies, such as Apple, RIM, and Samsung,[19] and users can substitute between devices using licensable and non-licensable mobile software platforms. In addition, OEMs can also switch between mobile OSs and start producing mobile devices for a competing mobile OS.

21. Modern mobile software platforms typically provide a graphical user interface ("GUI"), many application programming interfaces[20] ("APIs"), and other ancillary functions that are required for the operation of a smart mobile device and enable new combinations of functions to offer richer usability and innovations.

22. Within each mobile software platform, consumer communications services are used in connection with the mobile OS which is installed on a device. The mobile OS is a key part of the mobile software platform. An OS is "system software" which controls the basic functions of an electronic device (mainly PCs, smartphones and tablets) and enables the user to make use of such an electronic device and run application software

---

17  This is the Apache 2.0 licence which allows anyone to take the source code and amend it, build upon it and commercialise it, without having to release into the open the changes made to the source code.

18  Apple Inc.'s mobile OS.

19  Samsung also operates its own proprietary mobile OS Bada, in addition to Android and Windows Phone OSs.

20  An API is a particular set of rules and specifications that a software program follows in order to access and make use of the services and resources provided by another software program that also implements that API.

on it.[21]  Applications written for a given mobile OS will typically run on any mobile device using the same mobile OS, regardless of the manufacturer. The figure below shows the functions of the mobile OS:



23. Like the OS on a PC platform, modern smart mobile device OSs combine the features of a personal computer OS with touchscreen, cellular, Bluetooth, WiFi, GPS mobile navigation, camera, video camera, speech recognition, voice recorder, music player, near field communication, personal digital assistant (PDA), and other features. While some of the features of a smart mobile device are not dependent upon a technical interface with the mobile OS, others will require a more substantial technical interface with that OS. Moreover, certain performance characteristics such as speed and memory size will be at least partially influenced by the quality of the mobile OS. Therefore the mobile OS is a central part of a smart mobile device. This was confirmed by the Commission's market investigation.

24. In view of the fact that the mobile OS is a central part of any smart mobile device, the Commission focused its analysis in the present case on the market for the provision of OSs for smart mobile devices. Through the Android mobile OS, Google is active in this market.

25. The source code for the Android mobile OS is released by Google for free under an open source licence. The OEMs take the latest version of the Android source code and build their smart mobile phone devices around the OS. They will need to ensure that all features specific to their smart mobile devices are compatible with the Android source code as released by Google, otherwise none of the applications built by Google or third-party developers will run on their devices (thus making them less attractive for consumers). The OEMs are in principle free to change the Android-based mobile OS software but they risk losing access to Google applications if the applications are no longer compatible with the changed mobile OS software.

26. The Commission notes that the majority of respondents to the market investigation considered that OSs for PCs and OSs for smart mobile devices belong to separate product markets given that both use different hardware and have different performance capacities.

---

21   See Case COMP/C-3/37.792 – *Microsoft*, Commission decision of 24 March 2004, paragraph 37 and Case COMP/M.6281 – *Microsoft/ Skype*, Commission decision of 7 October 2011, paragraph 38.

This is consistent with the Commission's position in the *Microsoft* case[22] where the Commission held that OSs for client PCs and OSs for other client appliances (such as PDAs and smart mobile devices) were not part of the same product market, given the lack of demand-side substitutability.

27. In addition, the majority of respondents were in favour of a separation of the mobile OSs for smart mobile devices from mobile OSs for other mobile devices, such as basic and feature phones. This was based on the fact that mobile OSs for smart mobile devices, unlike basic phones, are designed to support computer-like features. The ability to install and use applications is another characteristic which distinguishes smart from basic mobile devices.

28. Moreover, the majority of respondents considered that mobile OSs for smartphones and tablets should belong to the same market since they have very similar functionality and there appears to be significant convergence between the two types of devices.

29. In view of the above the Commission is of the view that: (a) mobile OSs are distinct from PC OSs (this is consistent with the Commission's position in the *Microsoft* decision) ;[23] (b) mobile OSs for smart mobile devices are distinct from mobile OSs for basic mobile phone devices due to their different performance capacities and abilities; and (c) mobile OSs for smartphones and tablets are part of the same market due to their similar functionalities.

30. However, the exact scope of the product market definition, and specifically, whether mobile OSs for smartphones and tablets belong to the same product market, can be left open, as the transaction does not raise competition concerns under any alternative product market definition.

*Relevant geographic market*

31. In the *Microsoft* decision,[24] the Commission held that:

"The relevant geographic market for client PC operating systems, work group server operating systems and media players is world-wide. The objective conditions for competition are essentially the same across the world. PCs and servers are manufactured by a large number of companies that operate on a world-wide scale such as IBM, Compaq, or Dell. In order to sell computers with the operating system (and a media player) already installed, such manufacturers obtain the necessary licences from the software manufacturers. Generally, a single world-wide licence agreement is entered into between the computer manufacturer and the software manufacturer. The computers are then sold on a world-wide scale. Neither import restrictions, transport costs or technical requirements constitute significant limitations. Language-specific demand characteristics regarding the relevant software exist but, in so far as the supply-side is concerned, do not constitute an obstacle for swift supply on a global basis in accordance with language-related preferences. The entire world can therefore be regarded as the relevant geographic market."

---

22  Case COMP/C-3/37.792 – *Microsoft*, Commission decision of 24 March 2004, paragraphs 324-330.

23  Case COMP/C-3/37.792 – *Microsoft*, Commission decision of 24 March 2004, paragraphs 324-330.

24  Case COMP/C-3/37.792 – *Microsoft*, Commission decision of 24 March 2004, paragraph 427.

32. The notifying party submits that this assessment remains valid and applies to mobile software platforms. The geographic scope of the market should therefore be considered to be worldwide.

33. The market investigation supports the existence of worldwide markets for mobile OSs. Notably, the market investigation showed that manufacturers of smart mobile devices approach mobile OS providers with a view to concluding global agreements for the use of a mobile OS.

34. In light of Commission's decision in the *Microsoft* case referred to above, and the fact that OSs agreements are concluded on a global basis, the Commission considers that the relevant geographic market for mobile OS is at least EEA-wide, or even worldwide, in scope.

35. However, for the purpose of the present case, the exact scope of the relevant geographic market can be left open, as the transaction does not raise competition concerns under any alternative geographic market definition.

*Conclusion*

36. The relevant markets are the markets for mobile OSs (whether further differentiated according to mobile OSs for smartphones and for tablets respectively) on an EEA-wide or worldwide basis.

## 2. *Mobile devices*

*Relevant product market*

37. In a previous decision,[25] the Commission indicated that "[t]he boundaries between smartphones and other mobile handsets are […] blurred" and therefore it would not be necessary to define separate product markets for smart phones and other mobile phones. The relevant product market in that case encompassed "all mobile phones."

38. The notifying party submits that there is a single product market for the supply of all mobile devices, whether basic or more advanced (i.e., including smartphones and tablets). The notifying party advances the following arguments to support its position. First, with respect to demand side substitutability, users are able to switch between mobile devices, substitute across price bands and consider a wide range of product parameters. Similarly, mobile network operators ("MNOs") which act as distributors of mobile devices can substitute between types of mobile devices. Second, as for supply-side substitutability, similar components are used in the production of all mobile devices, outsourcing of manufacturing is common practice, all mobile devices have to comply with cellular network standards and the mobile OS is not a constraint on the manufacturing of mobile devices.

39. The notifying party further submits that it is not necessary to distinguish between business and personal users because the borders between the business/enterprise and consumer

---

25   Case COMP/ M.4942 – *Nokia/Navteq*, Commission decision of 2 July 2008, paragraphs 137 and 139.

segments have been blurred in recent years, as indicated, for example, by the entry of companies like RIM (BlackBerry) into the consumer segment.

40. The majority of respondents to the market investigation considered that smartphones, tablets and low end phones (basic and feature phones) should each constitute a separate product market. They are sold through different channels: smartphones and low end phones are sold mostly through MNOs while tablets are sold through other retailers. Furthermore, customers view tablets more like computing devices. In addition, due to the differences in screen size, the usage of smartphones and tablets is different.

41. The Commission has strong indications that, for the purpose of the present case, smart mobile devices are not part of the same product market as other mobile devices (basic and feature phones). Those products clearly have different functionalities and are distributed through different sales channels. With regard to tablets and smartphones, the market investigation was less conclusive although a difference in functionalities and size was observed.

42. However, for the purpose of the present case, the exact product market definition for mobile devices can be left open as the transaction does not raise competition concerns under any alternative product market definition.

*Relevant geographic market*

43. In line with a previous Commission decision,[26] the notifying party submits that the geographic scope of the market for mobile devices is global, or at least EEA-wide.

44. Furthermore, while there are some regional distinctions between cellular standards, these standards are increasingly interchangeable and many devices can operate on more than one cellular standard. In addition, all major OEMs produce phones on all the main standards and can easily switch production capacity between phones supporting different standards. As a result of this supply-side substitutability, the notifying party claims that markets should not be segmented according to cellular standards.

45. The market investigation supports the overall position of the notifying party. The great majority of respondents are of the view that OEMs compete on a worldwide or at least on an EEA-wide basis for their mobile devices. While there are also "world devices" that can be used in any geographic area, mobile devices appear to be often configured differently depending on the region in which they are ultimately sold (US, Japan, China, EU). The existence of a harmonized regulatory regime in Europe and of a number of mobile operators that operate in several countries (for instance Vodafone, Orange, Telefonica, T-mobile), supports the argument that there is a mobile devices market that is at least EEA-wide.

46. In line with its previous decisions,[27] and as supported by the results of the market investigation, the Commission notes a number of factors supporting a worldwide, or at

---

26  Case COMP/ M.4942 – *Nokia/Navteq*, Commission decision of 2 July 2008, paragraph 140.

27  Case COMP/M.4942 – *Nokia/Navteq*, Commission decision of 2 July 2008, paragraph 140, and Case COMP/M.5094, *Nokia/Trolltech*, Commission decision of 4 June 2008, paragraph 20, making reference to Case COMP/M.3911 *BenQ/Siemens Mobile*, Commission decision of 7 September 2005

least EEA-wide, market. These include the fact that manufacturers distribute essentially the same products to all of their customers regardless of their geographic location; the fact that prices are similar for the same products offered globally; the fact that transport costs are low; and the fact that products are manufactured globally and shipped to customers throughout the world.

47. However, for the purpose of the present case, the exact geographic market definition can be left open as the transaction does not raise competition concerns under any alternative geographic market definition considered, i.e. EEA-wide or worldwide.

*Conclusion*

48. For the purpose of the present case, the relevant markets are the markets for smart mobile devices (whether further differentiated according to smartphones and tablets respectively) on an EEA-wide or worldwide basis.

### 3. SEPs as inputs for smart mobile devices

49. Thousands of different patents may read on a smart mobile device.  These patents may include both SEPs and non-SEPs and are generally held by various market players. As one market participant explains "as many as hundreds of thousands of patents read on a typical mobile device (and in some instances thousands of SEPs read on implementations of individual standards)".[28]

50. It is clear that smart mobile devices (operating on a mobile software platform) must, in order to operate effectively, comply with various standards that have been developed for mobile communications.

51. SEPs are patents which are, or have been declared, essential to the implementation of a standard in a SSO[29] and which cannot be designed around.

52. The ETSI IPR Policy defines SEPs as follows: " "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL".[30]

---

28  Q1 – Questionnaire to Competitors, question 44.1.

29  The SSOs identified by Google as the most relevant to mobile devices are as follows: the European Telecommunications Standards Institute ("ETSI"), the Institute of Electrical and Electronics Engineers ("IEEE"), the 3rd Generation Partnership Project ("3GPP"), 3GPP2, the Bluetooth Special Interest Group ("SIG"), the International Telecommunication Union ("ITU"), the Open Mobile Alliance ("OMA"), the Telecommunications Industry Association ("TIA"), the USB Implementers Forum, and the Wi-Fi Alliance.

30  http://www.etsi.org/WebSite/document/Legal/ETSI_IPR-Policy.pdf.

53. A company wishing to produce goods complying with a certain standard cannot do so without either a licence to the technology incorporated in that standard or by infringing the patents covering that technology. Prior to the adoption of a standard, multiple technologies may have competed. However, once a standard has been adopted and widely implemented by the industry and in the absence of competing standards, firms that use these technologies may be severely limited in their ability to use another technology. The very purpose of choosing a standard is that the industry coordinates on a specific technological solution at the expense of alternative technologies. Inter-technology competition that existed before is therefore impeded and any alternative technologies or technical solutions that may have had the same functionalities as the one chosen as the standard technology may have a significantly reduced value. In other words, once the standard is set, and in the absence of a competing standard, technology competition is largely eliminated.

54. The specificity of SEPs is that they have to be implemented in order to comply with a standard and thus cannot be designed around, i.e. there is by definition no alternative or substitute for each such patent. Therefore, each SEP constitutes a separate relevant technology market on its own.

55. FRAND commitments essentially oblige SEP owners: (i) to make the patent in question available to all interested third parties; (ii) not to discriminate between different licensees; and (iii) to offer a licence to the patent on fair and reasonable terms. SEP holders do, however, have the right to conduct negotiations with interested parties concerning the exact terms and conditions of the licence, including the exact level of royalties and the right to enforce such agreements by means of litigation.

56. SSOs have policies and procedures in place intended to facilitate the standardisation of the selected technology, based on technical performances and other relevant elements. SSOs typically provide in their governing rules that their members should reveal all relevant IPR in advance of adoption of a standard, or to commit to license any IPR relevant to the standard on "(fair,) reasonable, and non-discriminatory terms" (F/RAND) terms.

57. The Commission Guidelines on the applicability of Article 101 of the Treaty on the Functioning of the European Union to horizontal co-operation agreements[31] (the "Horizontal Cooperation Guidelines") recognise the market power which may be obtained by participants to the creation of a standard.[32] The Horizontal Cooperation Guidelines therefore seek to specifically limit that market power by stating that, in order for a standard-setting agreement to fall outside Article 101(1) TFEU, the SSOs IPR policy should ensure that each entity which contributes technology to a standard must limit their freedom to exercise their "ownership" of a piece of that standard by committing to license the relevant technology to anyone wishing to use the standard on FRAND terms.

---

31   OJ C 11¸ 14.1.2011, p.1

32   The Horizontal Cooperation Guidelines state in paragraph 269 that: "(…) by virtue of its IPR, a participant holding IPR essential for implementing the standard, could, in the specific context of standard-setting, also acquire control over the use of a standard. When the standard constitutes a barrier to entry, the company could thereby control the product or service market to which the standard relates. This in turn could allow companies to behave in anti-competitive ways, for example by 'holding-up' users after the adoption of the standard either by refusing to license the necessary IPR or by extracting excess rents by way of excessive ($^2$) royalty fees thereby preventing effective access to the standard".

58. Patents that are not part of a standard are referred to as "differentiating patents", "implementation patents", or simply non-SEPs. It must be emphasized that FRAND commitments do not apply to non-SEPs.

59. As regards non-SEPs, the commercial importance of these patents varies. Such patents are not part of a formal technical standard, the nature of many such patents may be incremental, and it is often easier to design around a patent falling in this category. Non-SEPs may relate to features used to differentiate competitors' products on the market, thus creating dimensions on which firms aggressively compete. This being said, non-SEPs could also potentially be the basis for foreclosure of rivals and possible abusive conduct. For example, in exceptional circumstances, notably where a technology has become an indispensable input for competitors, a refusal to grant access to that technology may be abusive.[33] However, this has to be assessed with regard to the specific factual circumstances in each individual case.

60. The majority of replies to the market investigation support the assessment that while both SEPs and non-SEPs are used in smart mobile devices, SEPs are always necessary and cannot be avoided if access is to be obtained to the standard at issue. In contrast, non-SEPs, although they may bring additional value to the mobile OS, are not by definition technically essential for access to a standard and can be worked around.

61. The Commission considers that each SEP can be considered as a separate market in itself as it is necessary to comply with a standard and thus cannot be designed around, i.e. there is by definition no alternative or substitute for each such patent. The relevant market in this case is thus the (at least) EEA-wide market for the licensing of each of the relevant SEPs that Google will acquire from Motorola Mobility following the transaction.

## V.   COMPETITIVE ANALYSIS

62. In order for smart mobile devices to work, they must, amongst others, contain three key elements: (i) technology that allows the device to operate over mobile networks; (ii) a mobile OS; and (iii) the remaining device hardware. Google currently controls the Android mobile OS.[34] As a result of the transaction, Google will acquire Motorola Mobility's mobile device hardware business as well as Motorola Mobility's patent portfolio which contains technologies that are key inputs in the manufacture of smart mobile devices in terms of mobile technology. Thus, subsequent to the transaction, Google will have access to all three key elements needed to make smart mobile devices work.

63. The transaction gives rise to two important vertical relationships,[35] namely (i) the mobile OS as a key input into smart mobile devices; and (ii) SEPs as key inputs into the smart

---

33   Case 238/87 *Volvo* [1988] ECR 6211, paragraph 9; Joined Cases C-241/91 P and C-242/91 P *RTE and ITP v Commission ('Magill')* [1995] ECR I-743, paragraph 50; Case C-418/01 *IMS Health v. NDC Health* [2004] ECR I-5039, paragraph 35.

34   See paragraphs 64 to 72 below.

35   The only horizontal overlap in the parties' activities in conditional access systems defined in footnote 14 above does not give rise to affected markets. Therefore, the decision does not analyse the effects of the transaction in this particular market.

mobile device industry. It also gives rise to certain conglomerate relationships between smart mobile devices and related IP rights on the one hand and Google's mobile online services on the other hand. All these aspects were analysed in detail during the Commission's investigation and are examined below.

## V.1   VERTICAL RELATIONSHIPS

### 1.   ATTRIBUTION OF ANDROID'S MARKET SHARE TO GOOGLE

64.  Google claims that the code for the Android mobile OS is released under an open source licence and anyone is free to use, distribute or further develop it. Moreover, it states that the use, distribution, and further development of Android mobile devices do not require Google's approval.[36] As a result, Google claims that it does not control Android and therefore Android's market share ([40-50]% of smart mobile devices in the EEA currently run on Android) should not be attributed to Google but to each of the various OEMs building Android based phones.

65. The Commission notes that a smart mobile device (i.e. a smartphone or tablet), which needs a mobile OS, is far more likely to be commercially successful if, in addition to design and functionality, it has a mobile OS that allows consumers to access various applications and services (for example, search, maps, e-mail, multimedia services, games, etc.). Furthermore, the commercial attractiveness of a mobile OS also depends strongly on the surrounding ecosystem specific to it. As regards Android, the ecosystem is built by Google (Google proprietary services and applications), third-party developers (who mainly distribute their Android applications via the Android Marketplace[37]), OEMs (who can also develop specific add-ons) and chipset manufacturers (who may develop specific functions of the chips to better support the Android mobile OS).

66. The Commission does not accept Google's view that Android's market share cannot be attributed to it for all the following reasons combined. First, Google owns the IPR to the Android mobile OS. Second, Google is responsible for releasing each new version of the Android mobile OS. Third, Google effectively has to approve each smartphone or tablet running on Android which is built as an Android device and has to approve the implementation of its applications on devices that ship with Google applications pre-installed.

67. Fourth, for the reasons set out in paragraph 25 above, even though the source code for the Android mobile OS is released by Google for free under an open source licence, Android OEMs still remain highly dependent on Google.

68. Fifth, a Google internal document shows that Google exerts control over Android. In this presentation […], Google addresses the issue of control over the Android mobile OS and entire Android ecosystem ("[…]"). Google's internal analysis in this document describes the whole mechanism that ensures its control over Android through cumulatively […].

---

36   Paragraph 121 of the Form CO.

37   Access to the Android Marketplace is controlled by Google.

69. It should be noted that the great majority of respondents to the market investigation have confirmed the view that the Android ecosystem is controlled by Google and that all of the market share corresponding to Android mobile devices should be attributed to Google on the OS level.

70. As one market participant explains, an OEM must go through the following process in order to comply with Google's Android compatibility assessment and get a smart mobile device approved as an "Android device":

"- Google publishes a CDD (Compatibility Definition Document) that describes the product features that must be supported.

- Google publishes a CTS (Compatibility Test Suite) a software suite that will test the compatibility of a device.

- The OEM develops its product based on the CDD and its ideas of what the product should be.

- The OEM run the CTS on the product. This automatically generates a test report. If the test passes, we proceed to the next step. If not, we need to solve the failing tests.

- The CTS test report is sent to Google.

- Products samples are given to Google.

- Google performs manual tests of the device with a set of about 50 applications (including the Google applications) and based on the results decides to certify the device.

- Subsequent versions of the firmware of the device need to pass the CTS. (test report sent to Google)."

71. Another market participant explains that: "Prior to the approval process […] must comply to both AFA and MADA.[38] […]".

72. For all the above reasons, the Commission concludes that Google controls Android and all of the market share corresponding to Android should be attributed to Google.

*2.*     ***MOBILE OSs AS KEY INPUTS INTO SMART MOBILE DEVICES***

73. Google's Android mobile OS is an input into Android mobile devices (smartphones and tablets) and is therefore vertically related to Motorola Mobility's mobile device business.

74. Motorola Mobility's market shares in smartphones at EEA and global level in 2010 were [0-5]% and [0-5]% respectively by volume. Motorola Mobility launched its tablet product in the second quarter of 2011.  Consequently, its share of the tablet segment in 2010 was 0%.

75. As regards mobile OSs, Android has become the leading mobile OS for smart mobile devices in the EEA.

---

38   Mobile Application Distribution Agreement.

76. The following tables show Android's and its competitors' mobile OSs market shares for 2010-2011 and forecasts for 2012-2015 by volume at various levels. In addition, an internal Google document[39] quotes a Canalys study that attributes to Android a [40-50]% market share at mid-2011.

| Operating System | Operating System share by volume (EEA, %) | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012* | 2013* | 2014* | 2015* |
| Android | [20-30] | [30-40] | [40-50] | [40-50] | [40-50] | [40-50] |
| Bada | [0-5] | [0-5] | [0-5] | [0-5] | [0-5] | [0-5] |
| Blackberry OS/QNX | [10-20] | [10-20] | [5-10] | [5-10] | [5-10] | [5-10] |
| iOS | [20-30] | [20-30] | [20-30] | [20-30] | [20-30] | [20-30] |
| Windows Phone | [0-5] | [5-10] | [10-20] | [10-20] | [10-20] | [10-20] |
| Symbian OS | [30-40] | [10-20] | [0-5] | [0-5] | [0-5] | [0-5] |

Source: table 6.51, Form CO, * projections

| Operating System | Licensable Operating System share by volume (%) | | | | | |
|---|---|---|---|---|---|---|
| | Worldwide | | | EEA | | |
| | 2010 | 2012* | 2015* | 2010 | 2012* | 2015* |
| Android | [30-40] | [70-80] | [70-80] | [30-40] | [70-80] | [70-80] |
| Symbian | [50-60] | [5-10] | [0-5] | [30-70] | [5-10] | [0-5] |
| Windows Phone | [5-10] | [10-20] | [20-30] | [5-10] | [10-20] | [20-30] |

Source: tables 6.56 and 6.57, Form CO, * projections

77. Post transaction, Google will become a vertically integrated producer of smart mobile devices. Therefore, it has to be assessed whether the proposed transaction would give it the ability and incentive to significantly impede effective competition by foreclosing or degrading access of other OEMs to the Android mobile OS and hence the ecosystem.

78. In assessing the likelihood of an anticompetitive input foreclosure scenario, the Commission has examined (i) whether the merged entity would post-merger have the ability to substantially foreclose access to input; (ii) whether the merged entity would have the incentive to do so; and (iii) whether a foreclosure strategy would give rise to a significant impediment to effective competition downstream.[40]

79. As recognised by the Non-Horizontal Merger Guidelines, in order to be able to foreclose competitors, the vertically integrated firm resulting from the merger must have a significant degree of market power (which does not necessarily amount to dominance) in the upstream market.[41] In particular, the Non-Horizontal Merger Guidelines note that the merged entity would have the ability to foreclose downstream competitors only if, by reducing access to its own upstream products or services, it could negatively affect the overall availability of inputs for the downstream market in terms of price or quality.[42]

80. Google stated that it has no incentive to start favouring Motorola Mobility given Motorola Mobility's minute share in the EEA ([0-5]%). Google has pointed out that its

---

39   Internal document Google […].

40   See Guidelines on the assessment of non-horizontal mergers under the Council Regulation on the control of concentrations between undertakings ("Non-Horizontal Merger Guidelines"), OJ C 265, 18.10.2008, p. 11, paragraph 32.

41   See Non-Horizontal Merger Guidelines, paragraph 35.

42   See Non-Horizontal Merger Guidelines, paragraph 36.

revenue comes largely from online and mobile advertising. Therefore, restricting access to the Android ecosystem would most likely cause Google a significant loss in the advertising revenue associated with Google search and other applications and services (all Android partners pre-install these Google products on their smart mobile devices). Given Motorola Mobility's very low market share, the revenue loss for Google from restricting access to Android is most likely to be far greater than the potential gain from Motorola Mobility smart mobile device sales.

## A. Input foreclosure

### (i)      Ability

81. Third parties have suggested that following the transaction, Google would have the ability to favour Motorola Mobility in such a way and to such an extent that competition on the market for the sale of smart mobile devices would be significantly impeded. Google could do this by using various methods, including the following:

   a. Google chooses a lead device manufacturer for each new version of Android. Android OEMs regularly submit updates on their product development cycle and roadmaps to Google, in the hope of being chosen as lead manufacturer. Google's decision is based on the handset performances, i.e. best chip and best device. By inter alia systematically favouring Motorola Mobility handsets, irrespective of performance, Google could significantly impede competition from competing OEMs;

   b. Google could interfere with the approval process for OEMs (see paragraph 71 above). For instance, it could leak information received from other OEMs during the approval process to Motorola Mobility. Google could also delay the approval process for the launch of competing OEM devices;

   c. Google could hinder innovation through its anti-fragmentation policy. Under Google's AFA, OEMs promise not to build mobile devices based on Android that do not meet the compatibility requirements as established by Google. Failure to comply makes an OEM unable to install Google proprietary applications and services or any applications from the Android Marketplace onto its devices (the Android Marketplace is the primary source from which consumers can download applications). Similarly, […]. Google could use these processes to considerably weaken the position of OEMs other than Motorola Mobility;

   d. It may also be that Google could degrade the versions of Android offered to third party OEMs.

82. The notifying party submits that a mobile platform is only one element among many that determines the quality of a smart mobile device and that OEMs compete with one another over a variety of dimensions. Furthermore it quotes a study according to which "mobile software platform does not represent a particularly important differentiating factor between mobile devices".

83. The Commission notes that, as suggested by the industry, the mobile OS is nonetheless a crucial element for the commercial and technical success of a smart mobile device. This important role of the mobile OS for smart mobile devices has been largely confirmed by the market investigation. A majority of respondents consider that, from a consumer

perspective, the mobile OS is one of the five most important features of a smart mobile device, alongside with applications and content. Even more telling, from a supplier perspective, the mobile OS plays a crucial role in the success of a smart mobile device because the most important other features of smart mobile devices that are appealing to consumers are dependant on (or must be compatible with) the mobile OS.

84. Regarding Google's ability to foreclose Android partners to the latest versions of Android mobile OS, the majority of respondents to the market investigation indicated that Google would be able to favour Motorola Mobility post-transaction over other Android OEMs.

85. However, the Commission considers that none of the "methods" described in paragraph 81 which Google could use in order to favour one specific OEM are merger specific. These possibilities already existed prior to the acquisition of Motorola Mobility. In other words, the ability of Google to favour one or another Android partner will not change as a result of the merger.

*(ii)    Incentives*

86. Google specified that the rationale for the transaction does not reside in the acquisition of Motorola Mobility's mobile device hardware business but rather in the acquisition of Motorola Mobility's patent portfolio. According to Google, this patent portfolio would enable Google to better protect the Android ecosystem from vexatious patent litigation. Google stated that it is in its commercial interest to maintain Android available to all OEMs.[43] Google has also argued that the transaction has been widely welcomed by industry participants.[44]

87. Most respondents to the market investigation indicated that Google would have no incentives to favour Motorola Mobility post-transaction over other Android OEMs because such behaviour would compromise Google's relationship with the other Android OEMs. The Commission notes that some of these OEMs are currently considerably more important market players than Motorola Mobility and already constitute a significant source of Google's mobile advertising revenue and therefore have a notable impact on its business results. These OEMs will, according to the projections, continue to bring even higher revenue in the future. Google internal documents also demonstrate that […].

88. The Commission notes, first of all, that Google's core business is online search and advertising. As submitted by Google, the vast majority of its revenues come from advertising. For instance, in 2010, Google derived approximately 96% of its revenue from online advertising.

89. As illustrated by the table below (internal document presenting Google's forecast revenue from Android for 2011-2015), Android's foreseen gross margin is […] million US dollars for last year and is expected to become substantially higher in the next years.

---

43   Paragraph 21 of the Form CO.

44   Paragraph 14 of the Form CO.



Source: Google […]

90. Motorola Mobility's total net revenue for 2010 was USD 11.46 billion. Mobile devices accounted for 68% of the company's combined net revenues, or USD 7.8 billion.[45] Google's internal documents indicate that Motorola Mobility's smartphone device business yielded […] margins, as illustrated by the table below.



Source: Google

91. Motorola Mobility's mobile device business incurred an operating loss of 76 million US dollars in 2010 and 1.2 billion in 2009.[46]

92. It follows from all of the above that Google would have strong incentives to favour the higher-margin and apparently flourishing Android business, instead of the lower-margin (even […] margin) hardware unit from Motorola Mobility.

93. Moreover, any constant favouring of Motorola Mobility would risk jeopardising Google's mobile search and advertising revenues. In particular, favouring Motorola Mobility would probably alienate other OEMs and entice them to turn to alternatives. As noted by one of

---

45   Annex 5.3.2 of the Form CO: Motorola Mobility 2010 Annual Report.

46   Annex 5.3.2 of the Form CO.

Google's internal documents, "[…]".[47] For this reason, the Commission considers it highly likely that Google will continue to ensure that Android is distributed as widely as possible in order to maximise the adoption of Google's mobile search and advertising services and thereby Google's mobile search and advertising revenues.

94. The Commission therefore considers that Google is unlikely to have the incentives to restrict third party OEMs access to Android as it is doubtful that Google could, in the short to medium term, capture more profits by favouring Motorola Mobility's smart mobile devices rather than through having a large base for its search and advertising services.

*(iii)    Effects on competition*

95. The Commission is of the view that even if Google were to prevent Motorola Mobility's competitors from accessing Android or were to degrade the versions of Android offered to competing OEMs, a significant impediment to effective competition is unlikely to arise.

96. It appears from the market investigation that other existing mobile OSs currently under development would provide roughly equivalent features or characteristics to those of Android.

97. Moreover, although the majority of replies by OEMs qualified Android as a "must have" or "key" input in the production and market success of the smart mobile devices that they produce, in the event that Google decided to degrade the quality of the Android versions made available to them as compared to the versions made available to Motorola Mobility, roughly half of the OEMs currently using Android and replying to the market investigation would consider also manufacturing smart mobile devices using another mobile OS. In addition, a small number indicated that they could develop their own mobile OS. Only a small minority indicated that they would have no alternative to Android in such a case.

98. Furthermore, given that significant harm to effective competition requires that the foreclosed firms play a sufficiently important role in the downstream market,[48] any real foreclosure effect would likely only affect smaller players in the downstream market. OEMs such as Apple and RIM (which use their own proprietary mobile OSs) and Nokia[49] would not be affected at all. Moreover, of the [40-50]% of the market that use Android, certain OEMs are unlikely to be significantly affected as, according to data submitted by Google, in the first half of 2011, Samsung, HTC, Sony Ericsson[50] and LG,[51] which represented [80-90]% of the EEA Android ecosystem, also had smart mobile devices running on another mobile OS in addition to Android. However, Sony Ericsson announced that it would move all its smart mobile devices to Android in 2012.

---

47   Internal document Google  […].

48   See Non-Horizontal Merger Guidelines, paragraph 48.

49   Public sources indicate that Nokia has decided to switch from Symbian to Windows Phone.

50   Sony Ericsson accounted for [10-20]% of all Android devices sold in the EEA in the first half of 2011. [5-10]% of Sony Ericsson devices ran on another OS than Android in that time period. Source: Table 6.35, page 95 of Form CO.

51   [5-10]% of LG devices sold in the EEA ran on an OS other than Android in the first half of 2011. Source: Table 6.35, page 95 of Form CO.

Subsequent to this move by Sony Ericsson, OEMs accounting for around [60-70]% of the EEA Android devices would currently have an additional mobile OS to Android to run their devices on.[52]

99. For all the above reasons, the Commission therefore considers that Google is unlikely to have the incentive to foreclose OEMs from access to Android post-merger as even if it did attempt to foreclose Motorola Mobility's competitors from accessing Android, competing OEMs would have alternatives to which they could turn.

## B. Customer foreclosure

100.   The Commission has also examined whether, post-transaction, Google would be in a position to foreclose access to Motorola Mobility's smart mobile devices to competing mobile OS suppliers.

101.   However, Motorola Mobility is already exclusively using Android on its smart mobile devices. Therefore the proposed transaction would not change the present structure of the market as a result of this vertical link.

102.   In addition, as explained above (see footnote 52), OEMs using Android do not all use exclusively Android on their smart mobile devices. OEMs accounting for around [60-70]% of the Android EEA smart devices market also have smart mobile devices that operate on a mobile OS other than Android. Therefore there is a very significant customer base which remains open to competing mobile OS suppliers. Similarly, Motorola Mobility's market share at both EEA ([0-5]%) and global ([0-5]%) level is limited. Were Google to foreclose access to competing mobile OSs on Motorola Mobility's smart mobile devices, Android competitors would still have a sufficient number of alternative OEMs as potential users of their mobile OSs.

103.   Therefore, significant competition concerns with regard to customer foreclosure are unlikely to arise.

## C. Conclusion

104.   For these reasons the Commission considers that the proposed transaction does not raise serious doubts as to its compatibility with the internal market regarding the mobile OSs used as key inputs into smart mobile devices.

---

[52]   According to Google's submissions, Samsung, which accounts for a third of the Android devices sold in the EEA, has [30-40]% of its smart mobile devices running on mobile OSs other than Android. Samsung also operates on Windows phone, on its own proprietary mobile OS (Bada) and on Symbian. HTC, which accounts for [20-30]% of the Android devices sold in the EEA, also runs on Windows Phone and another mobile OS. Therefore, according to data supplied by Google, OEMs only representing a maximum of [30-40]% of the EEA Android ecosystem (maximum [10-20]% of the EEA smart mobile devices market) currently run all their devices on Android.

*3.*     ***THE TRANSFER OF MOTOROLA MOBILITY'S SEPS TO GOOGLE***

*(i)      Introduction*

105.    FRAND commitments given in the context of standardisation are designed to ensure that essential IPR protected technology incorporated in a standard is accessible to the users of that standard on fair, reasonable and non-discriminatory terms and conditions. In particular, FRAND commitments can prevent IPR holders from making the implementation of a standard difficult by refusing to license or by requesting unfair or unreasonable fees (in other words excessive fees[53]) after the industry has been locked-in to the standard or by charging discriminatory royalty fees.[54]

106.    As explained in paragraph 53 above, any company manufacturing products incorporating a certain standard must either obtain the appropriate licences covering the technology included in that standard or risk infringing the IP rights of the patent holders reading on the standardised technology. In the event licensing discussions fail, the SEP holder may ultimately take its counterparty to court and seek an injunction.[55]

107.    Depending on the circumstances, it may be that the threat of injunction, the seeking of an injunction or indeed the actual enforcement of an injunction granted against a good faith potential licensee, may significantly impede effective competition by, for example, forcing the potential licensee into agreeing to potentially onerous licensing terms which it would otherwise not have agreed to. These onerous terms may include, for example, a higher royalty than would otherwise have been agreed. Another concern would be that the SEP holder may force a holder of non-SEPs[56] to cross-license those non-SEPs to it in return for a licence of the SEPs.[57] To the extent that injunctions are actually enforced, this

---

[53]   See Case 27/76 *United Brands v Commission* [1978] ECR 207, paragraph 250.

[54]   Horizontal Cooperation Guidelines, paragraph 287.

[55]   The Commission has previously, in a case different from the one at hand, taken a narrow view on when the initiation of legal proceedings by a dominant company may constitute an abuse  (See Case T-111/96 *ITT Promedia v Commission* [1998] ECR II-2937). Moreover, in that case, the General Court emphasised that, as access to the Court is a fundamental right and a general principle ensuring the rule of law, it is only in wholly exceptional circumstances that the fact that legal proceedings are brought is capable of constituting an abuse of an dominant position within the meaning of Article 102 TFEU (paragraph 60). More recently, the Court of Justice addressed the issue of whether EU law, including fundamental rights, precluded the grant of an injunction made by a national court against an internet service provider ("ISP") which required certain onerous action to be taken by that ISP. In that case, the ECJ acknowledged that the fundamental right to property, which includes the rights linked to intellectual property, is not absolutely protected but must be balanced against the protection of other fundamental rights such as the freedom to conduct business. (See Case C-70/10 *Scarlet Extended*, judgment of 24 November 2011, paragraphs 41 to 46).

[56]   Non-SEPs are not subject to FRAND-commitments.

[57]   The Commission notes that a SEP holder is generally considered as entitled to condition a cross-licence from the counter-party to that counter-party's SEPs reading on the same standard. For instance, ETSI's IPR Policy provides that "The above undertaking [FRAND commitment] may be made subject to the condition that those who seek licenses agreed to reciprocate" See paragraph 6.1 of Annex 6 (ETSI IPR Policy) of the ETSI Rules of Procedure, 8 April 2009. See Google's memorandum of 26 January 2012 on how Google

furthermore may have a direct negative effect on consumers if products are excluded from the market. Even if exclusion of competing products from the market through injunctions were to be temporary (i.e. there would be a delay only in access to the relevant products until the counter-party of the SEP holder agreed to the commercial terms demanded), in a fast-moving market such as the smart mobile device market,[58] serious harm could potentially be caused by it.

108.   In the present case, certain third parties have raised concerns about the merged entity seeking or enforcing injunctions against good faith competitors based on SEPs in order to impose more onerous licensing terms, in particular, in respect of cross-licences. These third parties argue that innovation and choice in the smart mobile devices industry could be seriously harmed by such behaviour and the market share of smart mobile devices running on Google's Android OSs would increase. According to those third parties, this would create or strengthen Google's alleged dominant position on the mobile operating system market and would in turn lead to a strengthening of Google's alleged dominant position in mobile search and advertising given that every Android device *de facto* has Google search set as default.

109.   In this context, the Commission has investigated whether Google would have the ability and incentive to use Motorola Mobility's SEPs in a way which would cause the Commission to have serious doubts as to the merger's compatibility with the internal market. More specifically, the Commission considered whether Google would be in a position to cause a significant impediment to effective competition, in particular by having recourse to injunctions against good faith licensees, with the aim of :

(i)     Raising the royalty levels (both rate and base) of Motorola Mobility's SEPs;

(ii)    Forcing potential licensees into cross-licences on  terms which they would otherwise not have agreed to; and/or

(iii)   Excluding competitors from the market.

110.   It should be noted that Google is acquiring not only Motorola Mobility's SEPs but the whole patent portfolio of Motorola Mobility which includes both SEPs and non-SEPs (see paragraphs 6 and 7 above). Given the size of Motorola Mobility's overall patent portfolio compared to the size of the overall patent portfolios of other market participants, including Google's major competitors, the mere size of the acquired overall patent portfolio of Motorola Mobility does not give rise to any particular competition-related concern. Google's overall patent portfolio will remain smaller than that of other market participants in the IT industry such as Microsoft, Oracle, HP and Sony.[59] In this context it is also worth

---

intends to implement the FRAND promises encumbering Motorola's SEPs post-transaction, paragraph 2.1. See also e.g. paragraphs 337 and 372 of the Form CO.

58   Smart mobile devices (similar to other high-technology products) are subject to rapid development cycles with new products often being launched at short intervals. This is well illustrated by the Google lead device process described in paragraphs 125-132 of the Form CO. See also e.g. an article from The Vista dated 16 February 2011 which suggests the average shelf life for smartphones in February 20011 to be around 6-9 months compared to the 3-5 years in 2005-2007 (see "Android OS changes smartphone life cycle", http://www.theusdvista.com/business/android-os-changes-smartphone-life-cycle-1.2000033).

59   According to information provided by the parties in the Form CO, the parties' combined patent portfolios will represent under […]% of [*relevant technology areas in which the parties have patents*].

noting that the market investigation did not reveal any concerns relating to either the non-SEP part of, or the sheer size, of Motorola Mobility's overall patent portfolio.

*(ii)    Ability*

111.    Google currently has no declared SEPs. The acquisition of Motorola Mobility's SEPs for which there is no substitute will give Google market power with regard to the standardised technology.

112.    Google has argued that going forward, it will be constrained by the FRAND commitment which has been given by Motorola Mobility. In addition, on 8 February 2012, Google sent a letter to various SSOs declaring that it is "irrevocably" bound by Motorola Mobility's FRAND commitment (see paragraphs 8 to 10 above).

113.    As explained above (see paragraphs 57 and 105), the concept of FRAND has been developed in an attempt to limit the ability of SEP holders to abuse their market power and to provide effective access to the standard for all interested third parties. That said, in the Commission's view, a FRAND commitment cannot be considered as a guarantee that a SEP holder will not abuse its market power. Although a FRAND commitment may influence a company's incentives to significantly impede effective competition, it remains true that the company would still have some ability to do so.[60] However, that ability would ultimately be constrained to an extent by the fact that FRAND is an obligation upon which *inter alia* courts, arbitral tribunals or competition authorities may rule.  In particular, courts are the ultimate decision-makers on whether injunctions should be granted and any SEP holder needs to convince a court before it can obtain an injunction. That said, despite the limitations imposed by courts and other bodies, it is likely that a SEP holder retains some ability to use its SEPs to significantly impede effective competition.  For example, a SEP holder can certainly threaten to seek or seek injunctions at any time. Moreover, depending on the national court in question, an injunction may be granted without a detailed examination of whether FRAND and Article 102 TFEU have been respected, leaving the SEP holder free to enforce the injunction. Thus the Commission considers that Google would have some ability to use its SEPs to significantly impede effective competition post-merger.

114.    In addition, Google's ability to use Motorola Mobility's SEPs to significantly impede effective competition would appear to be seriously limited in respect of a number of market participants who already have a licence or cross-licence to Motorola Mobility's SEPs. Companies such as […], […], […], […], […], […], […], […], […], and […] all have cross-licences with Motorola Mobility.[61] Google will clearly be limited by contract law if it were to attempt to interfere with the terms of those licences.[62]

---

60    In general, it should be noted that the market investigation indicated that a clear majority of the market participants take the view that FRAND works to some extent and only a minority of market participants state that FRAND does not work at all.

61    See paragraph 363 of the Form CO. Annex 6.17 of the Form CO lists more than […] companies as existing licensees.

62    Google has in fact stated that all existing cross-licences will remain valid. See for example, paragraphs 363 and 373 of the Form CO.

115.    The ability to foreclose smart mobile devices using competing OS (or indeed products in other markets) affects only those third-parties that currently do not have a licence from Motorola Mobility, which include Apple and Microsoft. […] also does not currently have a licence from Motorola Mobility.  However, […] is not active in the smart mobile device sector and there is no indication on the file that it is a potential competitor in this sector.  As for Apple and Microsoft, they are active in this sector and Motorola Mobility has already sought injunctions against Apple and Microsoft on the basis of its SEPs prior to the merger.

116.    In conclusion, the Commission considers that Google is likely to have some ability post-transaction, in particular through seeking and enforcing injunctions, to significantly impede effective competition, including by potentially extracting onerous licensing terms from good faith potential licensees to which they would otherwise not have agreed, be it in respect of royalty levels or other licence terms (for example, the scope of the end products to which the licence must apply) or cross-licences. Although Google is likely to be constrained to some extent by the power of *inter alia* courts and arbitral tribunals which can rule on whether any such behaviour by Google is compatible with FRAND and, in particular, in the case of courts, reject attempts by Google to obtain such injunctions, Google would retain some ability to seek or threaten to seek injunctions. In any case, any ability Google might have only applies to companies who do not have an existing licence to Motorola Mobility's SEPs, in particular, Apple and Microsoft. And, as for those two companies, there is an issue of merger specificity because Motorola Mobility has already sought pre-merger injunctions against them (see further paragraph 154 below).

*(iii)    Incentives*

*1.    Royalty levels*

117.    It needs to be underlined at the outset that Motorola Mobility has a long-standing practice of charging 2.25% rate of the net selling price[63] of the relevant end product for the use of its SEPs. Motorola Mobility has publicly stated that this is its FRAND rate. The Commission considers that there could only be a merger specific concern with respect to royalty levels if, post-transaction, Google were to start seeking royalties above 2.25%. However, given the evidence on the file, the Commission considers this would be unlikely for the following reasons.

118.    First, the documents on the file show clearly that Google's rationale for the transaction is to create "patent balance" in the smart mobile device industry and to preserve the ability of Android OEMs to compete and innovate free from the costs and uncertainties of litigation and litigation threats.[64] Google has indicated that its priority is *[Google's*

---

63    The net selling price is the price of the handset, tablet or other end-consumer device from the OEM to the customer or carrier, before application of any discounts or subsidies such as those provided by mobile operators to end consumers. The value of any SEPs or non-SEPs cross-licensed will be reflected in a reduced cash payment. Google gives as an example the cross-licence with […], whereby Motorola Mobility agreed to a […]% royalty rate to reflect the value of the […] patents which were cross-licensed.

64    See, for example, paragraphs 322 and 382 of the Form CO. In paragraph 382, Google states that cross-licences would preserve "the freedom of Google and Android OEMs to compete on the merits unencumbered by the costs, doubts, and uncertainty of patent threats" and that it is seeking "broader protection for the Android eco-system as opposed to cash payments". […].

*strategy to reach settlements with competitors]* to achieve "patent peace".[65] It should be noted that the internal Google documents reviewed by the Commission do not suggest that Google would have overriding incentives to extract a higher royalty level than the maximum level currently charged by Motorola Mobility.

119.    Second, the Commission considers that Google would gain little from extracting large licence fees from its competitors whilst at the same time leaving its Android OS open to attack.[66]

120.    Third, the Commission considers that Google would be bound by Motorola Mobility's FRAND commitment with respect to its SEPs and considers that this would constrain Google's incentives to raise the royalty level.[67] In the Form CO, Google represented that it would be bound by the FRAND commitments given by Motorola Mobility.[68] This is in line with the view that a purchaser company acquiring a SEP portfolio from a vendor company should be bound by a FRAND commitment previously given by that vendor company.[69]

121.    In addition, in its letter of 8 February 2012 to the SSOs, which, in its own words, is "irrevocable", Google repeated that it would be bound by Motorola Mobility's FRAND commitment and that it would honour Motorola Mobility's current maximum rate of 2.25% of the net selling price of the relevant end product (see paragraph 9 above).[70] The Commission considers that, in light of this letter, Google would be unlikely to increase that

---

65    See for example, paragraphs 351, 353, 379, 380-382 of the Form CO.

66    See footnote 65 above.

67    This is distinct from the Commission's position, explained above in paragraph 113, that the FRAND commitment would not necessarily limit a company's ability to significantly impede effective competition. A company may obviously have the ability to do something, without having the incentive to do it.

68    In fact, in the Form CO Google submitted that the exercise of SEPs is constrained by FRAND commitments, and declares that it will fully abide by Motorola Mobility's FRAND obligations as follows:
- First, a FRAND commitment requires the patent owner to make the SEP in question available to all interested third parties.  However, according to Google, injunctive relief may nevertheless also be available for SEPs under certain circumstances, for instance, if the licensee is unwilling to comply with FRAND terms, or if the licensee itself controls SEPs that it is unwilling to license on FRAND terms.
 -Second, a FRAND commitment precludes the right-holder from discriminating between different licensees.
- Third, a FRAND commitment requires the right-holder to offer a licence to the patent on fair and reasonable terms.
- Fourth, a FRAND commitment prevents the right-holder from conditioning the granting of a license on the acceptance of additional unrelated obligations. Conditions going beyond reciprocity for SEPs, such as requiring a cross-license for patents unrelated to the standard or other extraneous conditions are irreconcilable with a FRAND commitment. The right-holder can offer broader contractual arrangements, such as global cross-licenses, but interested licensees must remain free to opt only for a more limited license covering SEPs against payment of the FRAND royalty.
- Fifth, FRAND commitments are transferred with the patents in question and therefore bind any acquirer of the patents.

69    See, by analogy, the Horizontal Cooperation Guidelines, paragraph 285. See also the Commission's press release of 10 December 2009 with respect to IPCom's public FRAND declaration (Memo/09/549).

70    The exact scope by which Google would be constrained by its SSO letter is examined in further detail at paragraphs 134 and 135 below.

rate and therefore breach Motorola Mobility's FRAND obligation, as reaffirmed to the SSOs.

122.   Furthermore, since it is Motorola Mobility's current practice to apply its FRAND royalty rate on the whole end product (rather than a component), Google would be constrained in its incentives to expand the base on which the royalty is calculated.

123.   All of the above is without prejudice to any subsequent finding (e.g. by a court, competition authority or arbitral tribunal) that the maximum royalty level charged by Motorola Mobility is not compliant with FRAND, whether because of the rate or the base to which it is applied.[71]

124.   In conclusion, the Commission considers that Motorola Mobility's current maximum per-unit royalty level is non-merger specific and Google's incentives to raise that level are limited.

*2. Cross-licences*

125.   The Commission notes that cross-licences are, in general, not anti-competitive.[72] Moreover, cross-licensing is a widespread and accepted practice in the mobile telecommunications industry. Therefore, the fact that Google may have incentives to engage in cross-licensing based on Motorola Mobility's SEPs is not a competition concern in itself.

126.   Furthermore, the seeking or enforcement of injunctions on the basis of SEPs is also not, of itself, anti-competitive. In particular, and depending on the circumstances, it may be legitimate for the holder of SEPs to seek an injunction against a potential licensee which is not willing to negotiate in good faith on FRAND terms.

127.   Thus, the Commission's focus in the present assessment is whether Google would have the incentive to use Motorola Mobility's SEPs to significantly impede effective competition by forcibly extracting cross-licences which would otherwise not have been entered into, in particular by using the threat of injunctions or by actually seeking injunctions against good faith licensees (see paragraph 107 above).

128.   Overall, the Commission considers that Google is unlikely to have overriding incentives to behave in such a manner. The Commission relies on four main elements to reach this finding: (i) Google's internal documents made available to the Commission in the course of the investigation seem to corroborate Google's submissions that the aim of the transaction is to protect the Android ecosystem rather than impede competition; (ii) any incentive that Google would have to use Motorola Mobility's SEPs to significantly impede effective competition is diminished because of the Commission's enforcement policy under Articles 101 and 102 TFEU with respect to FRAND commitments and, in particular, the

---

[71]   Any such examination is beyond the scope of the present decision because the 2.25% rate and base are not merger specific.

[72]   With respect to the general pro-competitive benefits of licensing, see paragraph 17 of the Commission Guidelines on the application of Article 81 of the EC Treaty to technology transfer agreements Official Journal C 101, 27.04.2004, p. 2-42.

use of injunctions by holders of SEPs;[73] (iii) similarly, Google has sent a public and what it calls an "irrevocable" and "legally binding" letter to SSOs committing to engage in FRAND licensing and good faith negotiations with licensees, and explaining exactly the scope of what Google considers its obligations to be with respect to the licensing of SEPs;[74] and (iv) Google will have to take into account the threat of counter-suits for patent infringement from companies like Microsoft and Apple prior to engaging in behaviour that could significantly impede effective competition. These factors are examined in turn below.

129.    First, as noted in paragraph 118 above, Google's stated rationale for the transaction is to protect its commercial position and to enable Android OEMs to compete and innovate free from the costs and uncertainties of litigation. This position, as set out notably in the Form CO, is also largely supported by Google internal documents which the Commission has obtained during the merger procedure.[75]

130.    The documents on file show that Google would have an incentive to try to use the SEPs it is acquiring in the present transaction in order to obtain cross-licences from companies such as Apple and Microsoft.

131.    It is clear that such cross-licences negotiated by Google would likely be different in scope to a cross-licence negotiated by Motorola. In particular, Google has an incentive to obtain cross-licences which would benefit all Android OEMs. Google states its wish to negotiate such cross-licences clearly in the Form CO. However, that would not, of itself, significantly impede effective competition. Moreover, nothing in Google's internal documents suggest that Google would not comply with the FRAND commitment as made by Motorola Mobility and encumbering Motorola Mobility's SEPs.

132.    Second, the Commission considers that any incentive that Google would have to use Motorola Mobility's SEPs to significantly impede effective competition is diminished because of the Commission's policy with respect to FRAND commitments, in particular its competition concerns with respect to the use of injunctions by holders of SEPs under Article 102 TFEU.[76] The Commission's concerns in general about anti-competitive use of SEPs, were recently set out in the Horizontal Cooperation Guidelines of 11 January 2011 including with respect to potential abuses under Article 102 TFEU.[77] In addition, the Commission's vigilance with respect to the potential anti-competitive use of injunctions is

---

[73]    See, generally, Case C-13/03 *Commission v. Tetra Laval* [2005] ECR I-1113, paragraph 74. See also Case T-210/01 *General Electric v. Commission* [2005] ECR II-5575, paragraph 73.

[74]    The Commission notes that the SSO letter is assessed in this case as a fact. It does not constitute formal remedies in line with the Commission notice on remedies acceptable under the Council Regulation (EC) No 139/2004 and under Commission Regulation (EC) No 802/2004 (OJ C 267, 22.10.2008, p. 1) (the "Remedies Notice").

[75]    See footnote 64 above. The Commission notes that it has used Article 11(3) of the Merger Regulation to obtain certain important documents from Google in this regard (see paragraph 2 above).

[76]    See footnote 60 above.

[77]    See, e.g., paragraphs 264-269.

demonstrated by the recent initiation of proceedings against Samsung.[78] Given this context, the Commission considers that Google's incentives to use the threat of injunctions to forcibly extract cross-licences from good faith licensees are most likely be constrained by the prospect of an investigation based on Article 102 TFEU.[79]

133.    Third, and in a similar vein, Google's incentives to use Motorola Mobility's SEPS in a way which would significantly impede effective competition are further constrained by the FRAND obligation which Google is assuming with respect to Motorola Mobility's SEPs. As noted in paragraphs 120 and 121 above, Google represented in the Form CO that it would assume Motorola Mobility's FRAND commitments and has also publicly declared that it considers itself irrevocably bound by that FRAND obligation in its letter of 8 February 2012 to the SSOs.

134.    As a general point, Google has submitted to the Commission that its letter of 8 February 2012 to the SSOs has "binding legal effects" on Google.[80] Specifically, Google argues that the letter will have binding legal effects under a number of legal concepts that apply under the national laws of the Member States. These legal concepts can be broadly categorised into: (i) contractual principles;[81] and (ii) general equity/estoppel and good faith principles.

135.    Without prejudice to the question of whether or not the SSO letter is binding and irrevocable,[82] the Commission considers that Google's incentives to significantly impede effective competition, including by forcing licensees to grant cross-licences under the threat of injunctions, is limited by that letter. In particular, given that the letter itself states that it is "irrevocable", and that it has been sent to various SSOs and posted on Google's website, the Commission considers it unlikely that Google would subsequently renounce that letter. Moreover, it is difficult to see how a court hearing a patent action brought by Google on the basis of Motorola Mobility's SEPs would allow Google to backtrack from the principles that it has publicly enunciated in the letter. Thus, Google will know that it could harm itself – and damage any argument made before a court or competition authority that it is acting in good faith – if it reneges on the letter in the future.

136.   Next, as for the actual content of the letter, and its bearing on licensing negotiations for Motorola Mobility's SEPs, the first provision of relevance is Google's statement that it will

---

[78]   In that case, the Commission will investigate the allegation that Samsung has failed to honour its FRAND commitment in licensing negotiations, including by seeking injunctive relief before the courts of certain Member States in relation to some of its UMTS SEPs.  The Commission has publicised this initiation of proceedings. See Commission press release of 31 January 2012, IP/12/89.

[79]   See also Case C-13/03 *Commission v. Tetra Laval* [2005] ECR I-1113, paragraph 74. See also Case T-210/01 *General Electric v. Commission* [2005] ECR II-5575, paragraph 73.

[80]   See Google's submission of 3 February 2012 as to the binding legal effect on Google of its public letters to the SSOs.

[81]   In this respect, Google submits that: (a) the letter qualifies as a binding contract between the recipient SSOs and Google to the benefit of third parties; and (b) the letter should be treated as an irrevocable offer to contract that third parties can accept with binding effect for Google.

[82]   The Commission does not need to take a position on this for the purposes of the present proceeding.

honour Motorola Mobility's FRAND commitment and that it will negotiate in good faith with potential licensees for a reasonable period (paragraph 3 of the SSO letter).

137.    The second provision of relevance is Google's declaration that, when it makes a FRAND offer for the acquired SEPs, it will continue Motorola Mobility's practice of making a cash-only offer option available, subject to the licensee's grant of a FRAND licence to its own SEPs for the same standards as Google's products (paragraph 5 of the SSO letter).[83] The risk of Google insisting on onerous cross-licensing deals (including by requiring potential licensees to license their non-SEPs to Google) is reduced by Google's statement that it will continue to make cash-only offers to potential licensees.

138.    That said, the Commission also considered potential scenarios where Google could, despite the cash-only offer, use Motorola Mobility's SEPs to extract cross-licences which it would otherwise not have been able to conclude. Such a scenario can arise, for example, if the cash-only option is not a "true" FRAND offer. For instance, disagreements can arise in respect of the royalty rate, the base to which the royalty is applied (for example, should the royalty be applied to the end product or the price of the component in the product into which the relevant technology is incorporated), or the scope of the licence (i.e. to which products the licence is needed).

139.    However, even if the 2.25% rate charged by Motorola Mobility based on the net selling price of the end product were contrary to FRAND (and the Commission does not take a position on that issue in the present decision), this would not be a merger-specific problem because Motorola Mobility has applied that FRAND policy prior to the merger.[84]

140.    In any case, the problem of a SEP holder not making a "true" FRAND offer can be prevented if a potential licensee has the opportunity to have the terms of the cash-only option licence assessed by an independent third party (whether a court or arbitrator) without the threat of immediately being excluded from the market. Once an independent third party has assured that a licence compliant with FRAND obligations is indeed available, a potential licensee is no longer forced to accept a cross-licence on terms which it would not have otherwise accepted in order not to risk an injunction. Without such a possibility, FRAND negotiations may be distorted to the detriment of potential licensees and ultimately consumers who might be faced with less choice and innovation.

141.    In its letter to the SSO, Google clearly declares that any potential licensee will be able to contest the royalty level it offers for Motorola Mobility's SEPs without Google seeking injunctions (or seeking to enforce injunctions granted) on certain conditions.[85]  Paragraphs 8 and 9 of Google's letter to the SSOs are set out below:

---

83   With respect to this kind of grant-back for other SEPs on the same standard, and as noted in footnote 58 above, the Commission considers that this is not incompatible with FRAND.

84   Some third parties have complained that Motorola's SEP royalty rates are excessive and discriminatory. However, this is clearly not a merger specific issue.

85   In other words, even if there would be a merger-specific problem with respect to Google failing to provide a "true" FRAND option, the SSO letter would still constrain Google's incentives in this regard.

"8. Further, without prejudice to applicable laws, including those further limiting injunctive relief, Google will not apply for injunctive relief against a willing licensee based on the acquired MMI Essential IPR in litigation commenced after the date of this letter or based on acquired MMI Essential IPR introduced in existing litigation after the date of this letter. A counterparty qualifies as such a willing licensee if that counterparty:

(a) has made, during the period described in Paragraph 7, (i) a binding and unconditional commitment to license all acquired MMI Essential IPR for the standards at issue on FRAND terms offered by Google subject only to judicial review of the royalty level (including base and rate) or (ii) a binding and unconditional commitment to license all acquired MMI Essential IPR for the standards at issue on terms that Google cannot reasonably and fairly reject without prejudice to additional opportunities to make commitments under applicable law or subsequent judicial review in the context of a request for injunctive relief; and

(b) provides an account of sales to Google or an independent auditor, as appropriate, and, on a monthly basis, pays into an escrow account (or other account managed pursuant to an agreement with an independent trusted third party) a royalty for the acquired MMI Essential IPR of 2.25% of the net selling price for the relevant end product implementing a standard covered by the acquired MMI Essential IPR.

9. Paragraph 8 is subject to the condition that the counterparty agrees to a reciprocal process for limiting its ability to seek injunctive relief for alleged infringement by Google's products of its own standard essential patents reading on the same standards."

142.    By means of this letter, Google essentially confirms that any potential licensee has the opportunity to prevent an injunction from being sought, even after good faith negotiations have failed, if that potential licensee: (a) makes an offer to license Motorola Mobility's SEPs that is binding and unconditional within 30 days from Google's final offer, subject to the court determining whether the royalty level is FRAND; and (b) provides securities with regard to the royalty payments whilst the court is adjudicating on the FRAND nature of the royalty level.  According to Google's letter, royalty level includes both the rate (the maximum rate being 2.25%) as well as the base (i.e. whether the royalty should be paid on the price of the end product or the price of the component which incorporates the relevant standard).

143.    This is subject to reciprocity, i.e. the counter-party having made a similar commitment in respect of its own SEPs reading on the same standard as Motorola Mobility's SEPs.

144.    Whilst Google's interpretation of FRAND as outlined in its letter to the SSOs is not necessarily in line with the way the Commission considers FRAND should be interpreted in accordance with Article 102 TFEU (and should therefore not deemed to be approved by the Commission by means of this decision), it gives potential licensees a certain degree of protection and ability to contest the FRAND nature of royalty level before competent courts. It is notable that Google's interpretation of FRAND is largely in line with the current case-law of the German civil courts.

145.    The Commission also notes that the obligations incumbent on Google as clarified in the letter to the SSOs are without prejudice to applicable laws. Applicable laws include

Article 102 TFEU, as well as any national competition legislation or national procedural law that further limit the possibility of a SEP holder to seek or enforce injunctions.

146.   The market investigation has confirmed the view that, in practice, market participants often settle patent litigation. It cannot therefore be excluded that despite the ability of parties to contest FRAND terms before courts and arbitral tribunals (subject to certain conditions and depending on the procedural rules of the Member State in question), Google would be able to negotiate a cross-licence to the non-standard essential technology of a competitor by means of a settlement in the litigation process. However, if a potential licensee is able to meet the conditions to prevent an injunction (either the conditions as set out in Google's letter to the SSOs or the conditions set out in any applicable law), any such settlement would be a commercial choice for that licensee and not brought about through the threat by Google of otherwise unavoidable injunctions.

147.   Overall, Google's incentives to forcibly extract cross-licences will be reduced because Google will be aware that if it breaches FRAND commitments, by either refusing to offer a cash-only option or by making that offer on non-FRAND terms, it could be in breach of Motorola Mobility's FRAND obligations and in any event potentially subject to proceedings under Article 102 TFEU and/or court proceedings.

148.   Fourth, were Google to seek an injunction against, for example, Apple or Microsoft, Google knows that these companies could immediately counter-sue Android OEMs for injunctions on the basis of their patent portfolios (or possibly sue Google directly for other Google products that might need Apple or Microsoft patents). Google claims that the effects on its incentives would be the same regardless of whether it is being countersued on the basis of SEPs or non-SEPs. Without calling into question the potential difference between the market power conferred by SEPs versus that conferred by non-SEPs, the Commission is of the view that in practice, although not necessarily a complete constraint on Google's incentives to significantly impede effective competition, Google will have to take into account the large complex patent portfolios (which often lack transparency) held by its competitors and the probabilities of success of any counter-suits by these competitors in its commercial considerations, together with the ability to design around any invoked non-SEPs and the cost of litigation.[86]

149.   In conclusion, Google's incentives to threaten, seek and/or enforce injunctions against good-faith prospective licensees in order to force cross-licences for technology that the counter party would not otherwise wish to license, are limited.

---

86  Contrary to Google's arguments, the fact that patents are often sold as portfolios or that license negotiations take place on a portfolio basis does not detract from the market power conferred by SEPs. The same applies to the argument that the size of the counter-parties' portfolios is a countervailing factor since the larger the portfolio, the greater the chance that particular patents could read against one's products and be the subject of successful litigation (the presence of SEPs therefore not being decisive, rather, the presence of patents in general that read on competitors' products). It suffices to stress that market power can be conferred by a single SEP.

### 3.   Exclusion from the market

150.   None of Google's internal documents provide evidence that Google would seek injunctions against its competitors with the aim of ultimately excluding them from the market, as opposed to increasing its negotiating power to extract cross-licences.[87]

151.   The reasons set out in relation to cross-licences apply *mutatis mutandis* to Google's incentives to exclude third party products from the markets.

### (iv)   Effects on competition

152.   Without prejudice as to whether Motorola Mobility has used, or is using, its SEPs in an anti-competitive manner (a matter which cannot be determined in the context of this merger review), the Commission must assess what change the transaction would bring to the state of competition in order to establish whether it would give rise to a serious impediment to effective competition.[88]

153.   First, Motorola Mobility's FRAND rate, and the base on which it is charged, is not merger specific. Moreover, as noted above, Google is unlikely to have the incentive to increase the rate post-transaction (see paragraph 124 above). Therefore the Commission considers that there are unlikely to be negative merger specific effects on competition based on the royalty Google would charge for Motorola Mobility's SEPs post-transaction.

154.   Second, the Commission emphasises that Motorola Mobility already has the ability and incentive to seek injunctions and prevent competitors from accessing the market. In fact, Motorola Mobility has already done so in a number of jurisdictions against both Apple and Microsoft (including Germany in the EEA).

155.   In this context it must be noted that those proceedings were instigated by Motorola Mobility prior to this transaction taking place.[89] The Commission has no evidence to demonstrate that Google has determined (or indeed made worse) Motorola Mobility's conduct in existing litigation. Even if there were evidence in the Commission's file that Google was somehow directing the on-going litigation proceedings in Germany initiated by Motorola Mobility (*quod non*), it remains the case that those proceedings concern highly complex commercial disputes regarding various SEPs and numerous issues. Moreover, the litigation proceedings in Germany have been evolving rapidly on a continual basis over recent weeks and are likely to continue to do so going forward. In

---

87   Google has stated that its intention is not to seek injunctions but *[Google's strategy to reach settlements with competitors]* while also showing that its incentives are different from those of Motorola, who *[Motorola's strategy to maximize revenues]* (see […]).

88   See, e.g., Case T-342/07 *Ryanair holdings plc v Commission*, judgment of 6 July 2010, paragraphs 26-27.

89   For instance, according to Apple, Motorola Mobility has insisted that Apple cross-licenses its full non-SEP portfolio in exchange for Motorola Mobility's SEPs. Apple also argues that its refusal to accede to this demand led Motorola Mobility to sue Apple in an attempt to exclude Apple's products from the market. On the terms of Apple's own argument, Motorola Mobility's allegedly anti-competitive behaviour in this regard well precedes the merger at issue in the present decision. See, for instance, the e-mail of 2 February 2012 from Apple to the Commission.

addition, the Commission observes that certain findings have been made both in Motorola Mobility's and Apple's favour by German courts. Against that backdrop, the Commission cannot be expected to take a position, in the context of this, or indeed any merger proceeding, as to the merits of the respective position of the parties to the litigation proceedings, in particular whether or not they can be said to be acting in good faith.

156.    [*In the context of Motorola Mobility's negotiations with Apple in late 2011 concerning a potential cross-licensing settlement, the parties discussed the scope of any potential settlement in the event that the Google/Motorola Mobility transaction is closed.*] From the information available to the Commission, this option envisaged a cross-licence possibly to the benefit of all Android OEMs but also with mutual carve-outs. This kind of cross-licence would be different in scope from that which might have been concluded by Motorola Mobility prior to the transaction. However, nothing about these negotiations changes the Commission's assessment as contained in the previous paragraph. In this context, it should be noted that Google does have the right under the Agreement and Plan of Merger to consent to any final settlement reached by Motorola Mobility in pending litigation.[90] The aim of this provision is to preserve the value of the business that Google is acquiring in the transaction. There is no evidence on the Commission's file that Google has withheld its consent to any proposals submitted to it by Motorola Mobility under this provision. Indeed, in the context of the German litigation, Google has given specific consent for Motorola Mobility to accept […*an offer*…], provided that Motorola Mobility considers it commercially acceptable. It appears from the internal documents which the Commission has obtained during the merger procedure that Google has not tied any such consent to a cross-licence for the benefit of Android.

157.    As a subsidiary point, the Commission notes that in its 8 February 2012 letter to SSOs, Google has also stated that it will provide its consent to the actions Motorola Mobility may wish to make prior to the closing of the proposed merger only provided that those actions are in line with the principles set out in that letter.[91]

158.    It must also be noted that the only two pending litigation proceedings initiated by Motorola Mobility in the EEA are taking place in Germany. The German case-law sets out certain criteria for a competition law defence in the context of infringement proceedings with regard to SEPs (the so-called Orange Book criteria).[92] For the purposes of this

---

90   Agreement and Plan of Merger, Section 5.01(v).

91   Paragraph 11 of the letter states that: "Further, if Google's consent is required in connection with seeking or enforcement of injunctions for alleged infringement of the acquired MMI Essential IPR in pending proceedings between the date of this letter and closing, Google will provide its consent only if the conditions (i) and (ii) in Paragraph 10 are not satisfied, to the extent permissible under the Merger Agreement and applicable laws." Paragraph 10 states in relevant part that: "…Google commits to apply the principle described in Paragraphs 8 and 9 with respect to a counterparty (i) against whom MMI has a pending request for injunctive relief on the basis of infringement of the MMI Essential IPR as of the closing of this acquisition, and (ii) who has not previously had a reasonable opportunity either to license all the MMI Essential IPR for the standards at issue on FRAND terms offered by MMI or make a binding and unconditional commitment to license all MMI Essential IPR for the standards at issue on terms that MMI could not reasonably and fairly reject, without prejudice to additional opportunities to make commitments under applicable laws."

92   See Judgment of the Bundesgerichtshof of 6 May 2009 – Case KZR 39/06 – Orange Book Standard ("Orange Book" is the informal name for Philips and Sony's de facto Recordable CD Standard).

decision it can be left open whether Article 102 TFEU further restricts the possibility of the holder of SEPs in seeking and enforcing injunctions.

159.    Third, cross-licences in general are not necessarily anti-competitive (see paragraph 125 above). Moreover, while any cross-licences concluded by Google may be different in scope to those concluded by Motorola Mobility, at least in terms of beneficiaries of the licence, such a different cross-licence is not, however, necessarily anti-competitive.

*(v)     Conclusion*

160.    For all the above reasons, the Commission concludes that the proposed transaction does not raise serious doubts as to its compatibility with the internal market with respect to Google's acquisition of Motorola Mobility's IP rights, including Motorola Mobility's SEPs.

## V.2 CONGLOMERATE RELATIONSHIPS

*(i)     Introduction*

161.    In addition to the vertical relationships examined above, the Commission considers it appropriate to examine the conglomerate relationship between, on the one hand, Motorola Mobility's smart mobile devices and IP rights and, on the other hand, Google's mobile online services.

162.    Although some products of Google and Motorola Mobility are not vertically linked, they are still related. While Motorola Mobility supplies IP related to mobile communication and devices to OEMs, Google is a provider of various mobile online services, in particular the Google internet search engine and Google's mobile online advertising and advertising intermediation services, which are amongst the most prominent of Google's mobile services. Other Google mobile services include Google Maps, Gmail and YouTube.

163.    Motorola Mobility and Google are therefore active on markets that are, to some extent, related. Motorola Mobility's products and some of Google's products can be considered complementary or to belong to a range of products that is generally consumed by the same set of customers for the same end use, namely consumers that use smartphones or tablets.[93]

164.    A number of market participants have raised the prospect that the acquisition of Motorola Mobility's SEPs would provide Google with a tool to engage in exclusionary conduct, thereby strengthening its market power in mobile search and search advertising.

165.    Specifically, market participants argue that Google would, post-merger, have the ability and incentives to use Motorola Mobility's SEPs to foreclose competitors on various mobile services referred to above in paragraph 162 and thereby strengthen its market power in these mobile services markets by: (i) making access for OEMs to Motorola

---

[93]   See the Non-Horizontal Merger Guidelines, in particular section V., Conglomerate Mergers, page 21 ff.

Mobility's SEPs conditional upon installing Google's mobile services and potentially also upon setting them as default; or (ii) by offering favourable terms on which the OEMs can license Motorola Mobility's SEPs in return for installing Google's mobile services. This latter method could be implemented by either licensing Motorola Mobility's SEPs for free or by agreeing to compensate for Motorola Mobility's SEP licence fee via other means (e.g. advertising revenue share) on the condition that the licensee installs Google's mobile services.

166.   The Commission considers that for the purpose of this assessment, a distinction needs to be made between OEMs that already have a valid licence to Motorola Mobility's SEPs and those who do not have a valid licence. Second, a distinction also needs to be made between OEMs that supply Android based smart mobile devices and OEMs that supply competing non-Android smart mobile devices.

*(ii)   Ability*

167.   Google argues that it does not have the ability to foreclose competitors from mobile search and search advertising markets. Google states that it could not rely on Motorola Mobility's SEPs to impose search distribution deals on OEMs.

168.   The Commission considers that this is indeed the case in respect of the large number of OEMs with whom Motorola Mobility already has cross-licences that extend beyond a licence to its SEPs. Such licences therefore prevent Google from invoking Motorola Mobility's patents (including patents that are not standard essential) vis-à-vis licensed OEMs. For example, […], […], […] and […] already have cross-licences with Motorola Mobility.[94] These four companies alone account for [40-50]% of the EEA market of smartphones and tablets.[95]

169.   The Commission considers that, to the extent that there are OEMs with whom Motorola Mobility has not entered into cross-licensing agreements, Google would have the ability to contractually tie or bundle the licence for Motorola Mobility's SEPs with the use of Google's mobile services. However, as explained below, the Commission considers that Google already has the ability to impose its mobile services on OEMs.

170.   Google's ability to tie/bundle Motorola Mobility's SEPs and Google mobile services towards Android OEMs (who do not already have licences for Motorola Mobility's SEPs) already exists in practice pre-merger through a web of agreements.[96] For example, according to Google, OEMs implementing Android that wish to pre-install Google mobile services must enter into the Android MADA with Google and Google search

---

94   Paragraphs 23 and 363 of the Form CO. In addition, According to Annex 6.17 of the Form CO, more than […] OEMs have cross-license agreements with Motorola, including […], […], […], […],[…]and […].

95   Table 6.47, in Form CO, citing as source Canalys; shares of sales by volume for 2011 (Q1-Q3).

96   These agreements are: MADA, Mobile Services Distribution Agreements (MSDA), Co-marketing agreements between Google and OEMs and/or MNOs, and Android AFA.

must be set as the default Internet search service and a minimum suite of core Google mobile services must be pre-installed on the device.[97] This shows that Google already has the ability to tie/bundle Google's mobile online services to Android. The merger will not change this situation.

171.    Further, IP licences often tend to be for the lifetime of the IP (or at the very least for long periods of time) whereas service distribution agreements are limited in time. For example, Google's MADA is generally concluded for a period of […] years.[98] SEPs can therefore only be invoked to a limited extent in discussions on MADA.

172.    As for Google's ability to favour those OEMs who install Google mobile services by using lower licence fees or no licence fees, Google is already in a position to entice OEMs through advertising revenue share agreements to favour Google services.

173.    In conclusion, Google's merger-specific ability to impose Google services on OEMs and MNOs stemming from the proposed transaction is limited.

*(iii)    Incentives*

174.    Given that Google already has powerful tools to ensure that its services are installed on a large number of products, its incentives to use the licensing of FRAND-encumbered SEPs in the process can be questioned.

175.    Furthermore, given that FRAND commitments oblige a SEP holder to treat all licensees in a non-discriminatory way, Google's incentives to charge discriminatory royalty rates for SEPs, by favouring OEMs that pre-install Google's mobile online services and/or set them as default (for instance granting the licence free of charge) vis-à-vis OEMs who wish to use competing services, would be constrained by its FRAND commitments.

176.    In conclusion, Google is unlikely to have significant merger-specific incentives to use the acquired Motorola Mobility IP to foreclose competitors from mobile services markets.

*(iv)    Effects on competition*

177.    All Android OEMs already appear to pre-install Google search and other core Google services on their Android compatible smart mobile devices. In this sense, the fact that a number of Android OEMs do not have licences with Motorola Mobility makes no difference to Android-compatible smart mobile devices. Those who do have licences appear to be free to use non-Google services on their smart mobile devices running on competing OSs. The transaction changes nothing in this respect.

178.    As far as non-Android smart mobile devices are concerned, […][99] already has Google Search set as default search provider. In addition […][100] and […] already have licences to Motorola Mobility's SEPs, therefore Google could not leverage its position in SEPs to

---

97   See paragraph 471 of the Form CO and e.g. Article […] of MADA.

98   Google's revenue share agreements with OEMs are generally also concluded for a period of […] years.

99    See paragraph 471 of the Form CO.

100   […].

drive [...] to install Google search (instead of [...] on [...]) and [...] to make Google search its default service. Nokia currently operates on Symbian (to be phased out and replaced with Windows Phone) and Windows Phone. RIM operates on Blackberry OS. The market share of the devices operating on OSs other than Android, iOS, Blackberry OS or Symbian/Windows Phone OS is marginal.[101] Therefore, were the alleged conduct to materialise, it is unlikely to lead to merger-specific competition concerns in the markets for mobile online services, such as mobile internet search and online search advertising. This is especially the case given that Google already has a very high market share in mobile internet search.[102]

179.    The Commission's view is broadly confirmed by the majority of the respondents to the market investigation who gave their opinion on the potential effects of the merger on various mobile services.[103]

180.    Finally, even if Google were to tie/bundle the licensing of Motorola Mobility's SEPs to the distribution of its mobile services, end-users can still download competing services onto their smart mobile devices, change the default setting and access most competing services through the web browser of a device, which means that the effect of any coercion of OEMs may be mitigated by end-user choices.

*(v) Conclusion*

181.    The Commission finds that Google's proposed acquisition of Motorola Mobility does not raise serious doubts as to its compatibility with the internal market on the basis of conglomerate effects.

## VI. CONCLUSION

182.    For the above reasons, the European Commission has decided not to oppose the notified operation and to declare it compatible with the internal market and with the EEA Agreement. This decision is adopted in application of Article 6(1)(b) of the Merger Regulation.

*For the Commission*
*(signed)*

*Joaquín ALMUNIA*
*Vice-President*

---

101  According to Gartner, it varies between 3.9% in 2011 and 3.3% in 2015.

102  In this context, it should, however, be noted that based on a number of estimates, Google already has a market share of above 90% in mobile searches engines:
http://gs.statcounter.com/#mobile_search_engine-ww-monthly-201101-201201,
http://netmarketshare.com/search-engine-market-share.aspx?qprid=4&qpcustomd=1.
Gartner estimates that in 2010, Google had around 70% of the global mobile ad market.

103  In this respect, some respondents indicated that the proposed transaction would have no effect on the mobile search market since Google is already the dominant search provider on most of the existing OSs. Furthermore, one MNO indicated that the impact on mobile online search and advertising would be minimal since the transaction does not change the overall Android market.