UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

APPLE INC., a California corporation,

Plaintiff,

vs.

SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,

Defendants.

CASE NO. 11-cv-01846-LHK

**DECLARATION OF KARL HEINZ ROSENBROCK IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1. My name is Karl Heinz Rosenbrock. I have been retained as an expert in this case by Complainants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC (collectively, "Samsung"). I expect to testify to the matters set forth in this declaration, if asked about them by the Court or the parties' attorneys.

## I. BACKGROUND AND QUALIFICATIONS

2. I am currently a consulting partner for Hillebrand & Partners Consulting Engineers GmbH, a position I have held since October 2006. I provide consultancy services for clients from the mobile telecommunications industry. I frequently advise on ETSI-related matters.

3. My involvement in the telecommunications industry began in 1969 when I became the Deputy Head of section in the Telecommunications Centre (*Fernmeldetechnisches Zentralamt* – 'FTZ') of the (West) German Federal Post Office where I was responsible for international telephone switching. It was in this position that I first became involved in standardization.



4. I became Head of the same section in the FTZ in 1972. From this time onwards I was very active in standardization work in the International Telecommunications Union and the Conférence des administrations Européennes des Postes et des Télécommunications ('CEPT').

5. Beginning in 1980, for eight years I was the Project Manager of the Federal Ministry of Post and Telecommunications (*Bundesministerium für Post und Telekommunikation* – 'BMPT') in Bonn where I was responsible for the digitalization of the telephone network of the Federal Republic and the introduction of an Integrated Services Digital Network (ISDN) across Germany.

6. My involvement in telecoms standardization was furthered in early 1990 when I became Head of the Standardization Department at the BMPT in Bonn.

7. In July 1990 I was elected Director[1] of ETSI and started in this role on 01. November 1990. The Director-General of ETSI heads the ETSI Secretariat which supports all of ETSI's entities and activities. Furthermore, the Director-General of ETSI is also its legal representative. The ETSI Secretariat's main objective is to maintain ETSI's role as a world-class telecommunications standards-making organization, in addition to serving ETSI members for the best of their interests and the interests of ETSI.

8. Throughout my role as Director-General I had extensive involvement in standardization in general and the development of the ETSI IPR Policy and ETSI Guide on IPRs.

9. My involvement in standardization within ETSI included being the Chair of the ETSI UMTS Globalization Group which held 13 meetings in 1998 in order to prepare for the creation of the Third Generation Partnership Project (3GPP). Furthermore, I led the ETSI delegation during the negotiations with the overseas 3GPP partners. Since the 3GPP creation in December 1989 I acted as Chair and alternating Vice-Chair of the Project Coordination Group of 3GPP until 2006.

10. During my time at ETSI I oversaw the genesis, implementation and further development of the IPR Policy and Guide. I participated in the majority of the meetings of the ETSI Special Committee on IPRs (the IPRC) and also consultation meetings between the European Commission and ETSI prior to the establishment of the ETSI IPR Policy. I chaired the

---

1 The position of Director was renamed Director-General in 1995 with identical functions and responsibilities. All references that follow in this declaration to "Director-General" should be read to include "Director."

ETSI General Assembly Ad Hoc Group on IPR implementation, which held six meetings in 2003 to review the operation of the Policy and eventually resulted in the creation of the ETSI Guide on IPRs.

11. Upon my retirement from ETSI on 30 June 2006, I was made a life-long honorary Director-General. I still participate in ETSI's General Assembly meetings and the meetings of the IPR Special Committee as a delegate of Hillebrand & Partners and out of personal interest in the further development of ETSI, particularly in respect of IPR related matters.

12. A copy of my curriculum vitae is attached to this declaration as **Exhibit 1**.

## II. MATERIALS REVIEWED

13. The materials I have reviewed in forming my opinions in this declaration are cited throughout the declaration.

14. I have also been provided with, and have read carefully, a copy of the expert report of Dr. Michael Walker, submitted by Apple.

## III. QUESTIONS CONSIDERED

### A. What is the Purpose and Objective of European Standardization in General, and of ETSI in Particular?

15. I understand that Apple contends that ETSI's purpose is to ensure that its standards can be implemented and adopted as widely as possible. I have reviewed an expert report of Dr. Michael Walker, which he submits on behalf of Apple, that expresses the same opinion. I cannot agree with this assessment as it does not go to the bottom of ETSI's original purpose and objectives.

16. In my experience ETSI acts in accordance with its purpose and objectives as set out in its governing documents (see paragraph [17] below). Apple's and Dr. Walker's interpretation of ETSI's purpose and objectives is not supported by ETSI's governing documents and does not in my opinion address the fundamental purpose and objectives contained in those documents.

17. The Statutes of the European Telecommunications Standards Institute (the "ETSI Statutes") currently in force dated January 2012, and attached as **Exhibit 2**, describe ETSI's purpose, legal status and overall structure. These have been materially the same since ETSI's creation. Articles 2 and 3 provide as follows:



"*Article 2: Purpose*

*The objective of the Institute is to produce and perform the maintenance of the technical standards and other deliverables which are required by its members. As a recognized European Standards organization, an important task shall be to produce and perform the maintenance of the technical standards which are necessary to achieve a large unified European market for telecommunications, ICT, other electronic communications networks and services and related areas.*

*At the international level, the Institute shall aim to contribute to world-wide standardization in the fields described above.*

*The objective of the Institute may be achieved by any means. The Institute may carry out any action relating directly or indirectly, wholly or in part, to its objective or which may develop or facilitate the achievement of its objective.*

*Article 3: Scope of activities*

*The principal role of the Institute shall be technical pre-standardization and standardization in Information and Communication Technology (ICT) at the European level including in the following fields:*

• *Telecommunications, ICT, and other electronic communications networks and services*

• *Areas common to telecommunications, ICT, and other electronic communications networks and services, and information technology in co-ordination with CEN and CENELEC*

• *Areas common to telecommunications, ICT, and other electronic communications networks and services, and broadcasting (especially audio-visual and multi-media matters) in co-ordination with CEN, CENELEC and the EBU.*

*At the global level, the Institute shall contribute to world-wide standardization in the fields described above to produce and perform the maintenance of the technical standards and other deliverables which are required by its members.*

*In addition, the Institute shall be open to co-operation with other organizations when appropriate.*

*The activities of the Institute shall contribute to the production and the promotion of new harmonized world-wide standards and furthermore shall build upon world-wide standards, existing or in preparation."* (All emphasis added.)

18. Neither of Articles 2 or 3 of the ETSI Statutes states that the purpose of ETSI is to ensure widespread adoption of standards or to facilitate implementation by as many companies





as possible. Rather Article 2 states that ETSI's objective is the production and maintenance of technical standards and other deliverables as required by ETSI members. Article 2 refers to the importance of producing technical standards needed to achieve a large unified European telecommunications market. Its focus is on the removal of technical barriers. This reflects the underlying purpose of the creation of ETSI, namely achieving a single unified European telecommunications market in support of the European Community's 1992 "Single Market" project. This is made quite explicit by the reference in Article 2 to ETSI's special status as a "recognised European Standards Organization."

19. The same analysis applies to Article 3, which states that the principal role of ETSI shall be technical pre-standardization and standardization at the European level in the fields identified.

20. As I recall from the period prior to the establishment of ETSI, the position described above reflected the contemporaneous position of the European Commission. For example, the Commission Green Paper on the Development of the Common Market for Telecommunication Services and Equipment (the "Telecommunications Green Paper"), published in 1987 (see **Exhibit 3)**, was clear that the role of European standardization should be to strengthen the European Single Market and create greater competition in the European telecommunications sector prior to the 1992 deadline for completion of the Single Market.[2] The Commission explained that ETSI's role was to reinforce the rapid development of standards at the European and national level.[3]

21. The Commission later repeated its position as to the role of European standardization in even clearer terms in the Commission Green Paper on the Development of European Standardization (the "Standardization Green Paper"), published in 1990 (see **Exhibit 6**). The Commission stated that European standards are one of the means by which the full benefits of the Single Market can be obtained. It also added that European standards are, in addition to being a means of eliminating regulatory barriers, essential to an open, competitive

---

2 See **Exhibit 4** – Commission Communication – Summary Report accompanying the Telecommunications Green Paper, page 2.

3 See **Exhibit 5** – Commission Communication accompanying the Telecommunications Green Paper, page 5.

market.[4] ETSI's goal was to pursue the removal of technical and regulatory barriers and to create an open market in the telecommunications sector, in order to contribute to the creation of the Single Market by the end of 1992.[5]

22. These underlying documents, which are important to understanding ETSI's purpose and objectives, refer to a market integration purpose justifying the creation of ETSI as a formal European standardization body, as reflected in Article 2 of the ETSI Statutes. They do not support the contention that ETSI's purpose was to the widespread use of the standard.

B. **What is the nature and purpose of the FRAND commitment requested by ETSI from its members?**

23. The giving of a FRAND commitment is not obligatory. ETSI asks its members who have IPR which is essential to an ETSI standard to agree irrevocably to be prepared to make that IPR available to those who seek licences and who agree to reciprocate. This commitment, once given, is intended to achieve ETSI's policy objectives, as set out in its Statutes and as further reflected in its IPR Policy.

24. The Policy Objectives of Annex 6 to the ETSI Rules of Procedure, which contains the ETSI IPR Policy,[6] are set out in Article 3 which provides (and has provided at all material times):

***"3 Policy Objectives***

*3.1 It is ETSI's objective to create STANDARDS and TECHNICAL SPECIFICATIONS that are based on solutions which best meet the technical objectives of the European telecommunications sector, as defined by the General Assembly. In order to further this objective the ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS and TECHNICAL SPECIFICATIONS, that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable. In achieving this objective, the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.*

---

4 See **Exhibit 6**, pages 8 and 10.

5 See **Exhibit 3**, page 189.

6 See **Exhibit 7** – current version dated 8 April 2009. All following references to the ETSI IPR Policy in this declaration are to this version unless otherwise stated.

*3.2 IPR holders whether members of ETSI and their AFFILIATES or third parties, should be adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS and TECHNICAL SPECIFICATIONS.*

*3.3 ETSI shall take reasonable measures to ensure, as far as possible, that its activities which relate to the preparation, adoption and application of STANDARDS and TECHNICAL SPECIFICATIONS, enable STANDARDS and TECHNICAL SPECIFICATIONS to be available to potential users in accordance with the general principles of standardization.*"

25. Article 3.1 of the ETSI IPR Policy sets out the policy means to achieve ETSI's objective of ensuring:

(a) that investment in preparation and adoption of standards should not be wasted as a result of essential IPR not being available; and

(b) that there should be a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.

26. Article 3.1 is, in my experience, fundamental to understanding ETSI's IPR policy and practice.

27. Article 3.2 amplifies this provision by stating that IPR holders should be adequately and fairly rewarded for the use of their IPRs in the implementation of standards. To my recollection, this objective was essential in the development of the ETSI IPR Policy and was always regarded by ETSI as a very important policy objective. It was a constant factor throughout the discussions in which I participated and of which I was aware in my role as ETSI Director-General.

28. For example, there were early discussions in which a cumulative cap proposal was considered (but then later dropped) but, even in that context, express wording was proposed to ensure that any maximum cumulative royalty rate should be "*consistent with providing a fair reward for IPR based on R and D necessary for creating the technology underlying the ETS [European Telecommunications Standards].*"[7] Further, during early ETSI discussions on the meaning of fair and reasonable, there was "*a general consensus that it should be fair and reasonable to both licensee and licensor.*"[8]

---

7 See **Exhibit 8** – ETSI/GA 9 (90)9, page 4.

8 See **Exhibit 9** – ETSI/GA/20(94)2, Annex XX, page 4 – meeting minutes of the Third Plenary Meeting of the IPR Special Committee.

29. Article 3.3 provides that ETSI shall take reasonable measures to ensure that standards are available to potential users in accordance with the general principles of standardization. One aspect of this objective is transparency. The concept of transparency means enabling all of those who are involved with the ETSI standards to access information about ETSI's work and its standards. This is reflected on the ETSI website which discusses "ETSI's open approach to business."[9] A further important issue which ETSI always had to take into account in ensuring "standards are available to potential users" is the principle of "time to market." ETSI is concerned that its standards should be adopted in a timely fashion without undue delay, to avoid the standards being "out of date" in comparison to other global telecommunication markets. In my experience as Director-General of ETSI, this was an important policy objective particularly in the context of ensuring the success of ETSI as a European standardization body and the success of European standards in the global telecommunications market.[10]

30. All three paragraphs of Article 3 reflect the overall objective of ensuring efficient technical standardization while maintaining a balance with respect for the rights of IP owners. In my opinion, maintaining this balance has been fundamental throughout the evolution of the ETSI IPR policy. It is my view that the way in which the FRAND commitment operates within ETSI must be understood in that context.

31. The FRAND commitment that ETSI requests from its members and other owners of IPR is set out in Article 6.1 of the ETSI IPR Policy. It provides[11] that:

"***6 Availability of Licences***

*6.1 When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall*

---

9 See http://www.etsi.org/WebSite/AboutETSI/Introduction/VisionMission.aspx

10 The importance of this principle is illustrated in **Exhibit 10** – Communication from the European Commission 27 October 1992 on Intellectual Property Rights and Standardization COM (92) 445 final, clauses 2.1.13 and 2.1.14.

11 Article 6.1 of the ETSI IPR Policy has remained largely unchanged since the adoption of the Interim ETSI IPR Policy in 1994 apart from the addition of its final sentence "*[i]n the event a MEMBER assigns or transfers ownership of an ESSENTIAL IPR that it disclosed to ETSI, the MEMBER shall exercise reasonable efforts to notify the assignee or transferee of any undertaking it has made to ETSI pursuant to Clause 6 with regard to that ESSENTIAL IPR*." This was introduced only recently in 2009.

*immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory terms and conditions under such IPR to at least the following extent:*

- *MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;*
- *sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;*
- *repair, use, or operate EQUIPMENT; and*
- *use METHODS.*

*The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.*

*In the event a MEMBER assigns or transfers ownership of an ESSENTIAL IPR that it disclosed to ETSI, the MEMBER shall exercise reasonable efforts to notify the assignee or transferee of any undertaking it has made to ETSI pursuant to Clause 6 with regard to that ESSENTIAL IPR."*

32. It was recognized very early during efforts to standardize mobile telecommunications within Europe that IP was already common and likely to become ubiquitous within the relevant technical areas which are complex, with problems which require considerable technical ingenuity, innovation and investment to resolve. From the early days of ETSI it was accepted that, if ETSI's standardization projects were to succeed, a way of dealing with the tension between private property rights and public standardization would be critical.[12] ETSI explored many possible ways of achieving this balance before settling on the current system. It took ETSI more than five years to agree on the current system. The Special IPR committee tasked with the creation of the ETSI IPR Policy comprised up to 50 lawyers which at times resulted in difficulties in obtaining a consensus.

33. Article 6.1 of the ETSI IPR Policy achieves ETSI's stated objective of balancing the needs of standardization and the rights of the owners of IPRs. It provides that, if essential IPR is brought to the attention of ETSI, ETSI may request the IPR owner to give an irrevocable undertaking that it is prepared to grant irrevocable licenses on FRAND terms. It also provides that such an undertaking may be made subject to the condition that those who seek licenses agree to reciprocate. In my experience one of the notable features of the operation of the ETSI policy in practice is that ETSI members do not normally wait to be asked to give a FRAND undertaking

---

12 See, for example, **Exhibit 11** – ETSI TA 10(91) 17, page 6.

PE 01/04.

in respect of specific essential IPR. Instead they give prospective general FRAND declarations, indicating their willingness to respect the FRAND commitment for any of their IPR that may become essential for a given standardization project or area. This practice has also been encouraged by ETSI.[13]

34. The ETSI IPR Policy does not define what is fair, reasonable and non-discriminatory. Since 1994 ETSI has consistently maintained the position that the terms on which licences are to be granted by ETSI members to those who wish to take advantage of a FRAND licence is a matter for commercial negotiation between the parties.

35. In my opinion, an awareness of ETSI's rejection of a more interventionist approach for its IPR policy is important in understanding both the scope and the limitations of the current regime. Prior to the adoption of the Interim ETSI IPR Policy, in 1994, there were a number of discussions within ETSI about the meaning of FRAND and the extent to which ETSI should define or determine which royalties and other license terms were FRAND. This debate was renewed again in 2003 within the IPR Review Committee (on the operation of the ETSI IPR Policy). No changes to the definition of FRAND resulted from these meetings.[14] Eventually, having concluded that it was not possible to define FRAND, the IPR Review Committee suggested a set of FRAND "bad practice" examples.[15] However, consensus could not be reached on this approach, and it was rejected at the 42nd General Assembly Meeting.[16] It was the same case three years later when the new GA Ad Hoc Group (on the review of ETSI's IPR Policy) concluded that it was not possible to explicitly define FRAND.[17]

---

13 See, for example, **Exhibit 12** – ETSI/GAIPR02(03)14 rev.1, page 2.

14 See, for example, **Exhibit 13** – ETSI/GA IPR02(03)05, in which it is recorded that FRAND is based on a "*meeting of minds*" (page 1) between two licensing parties taking into account the meaning and intent of the words "*fair, reasonable and non-discriminatory*"; participants were in agreement that it was "*impractical to think about monitoring/calculating values for FRAND*"; and that it was "*impossible for ETSI to have any view on what FRAND conditions.*" (page 3).

15 See **Exhibit 14** – ETSI/GA#42(03)20 rev.1 – Report of the GA Ad Hoc Group on ETSI's IPR Policy operation.

16 See **Exhibit 14** – ETSI/GA#42(03)20 rev.1 – Report of the GA Ad Hoc Group on ETSI's IPR Policy operation.

17 See **Exhibit 15** – ETSI GA IPR02(06)02 – which records the meeting minutes of the Second Ad Hoc IPR Group meeting in which there were lengthy discussions on better defining FRAND. No consensus could be reached. Strong proponents of re-defining

36. Accordingly, the ETSI IPR Policy now makes it clear that the terms on which licences are available is a matter for bi-lateral negotiation between companies negotiating licences: Section 4.1 of the ETSI Guide on IPRs (see **Exhibit 16**)[18] states, "*[s]pecific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI. Technical Bodies are not the appropriate place to discuss IPR issues.*"

37. This position also reflects the view of the European Commission, given for example, in its Communication "IPRs and Standardization" COM(92) 445 final published on 27 October 1992 (see **Exhibit 10**), where the Commission states:

> "*It is not feasible or appropriate to be more specific as to what constitutes 'fairness' or 'reasonableness' since these are subjective factors determined by <u>the circumstances of the negotiation.</u>" (Clause 4.3.3)*

38. In my opinion and applying the principles set out in paragraphs [36] and [37], a royalty rate that is fair, reasonable and non-discriminatory under ETSI's IPR policy may only be determined on a case-by-case basis.

39. Since 1994, ETSI's formal position has been that the public interest in effective standardization is secured if those who own essential IPRs make a FRAND commitment as set out in Article 6.1 of the ETSI IPR Policy, and that the private rights of IP owners are secured by allowing them to negotiate terms and conditions with licensees which enable them to be adequately and fairly rewarded.

40. It is true that during the initial discussions about the ETSI IPR Policy, a more interventionist approach to the scope and contents of FRAND licences, and to the consequences of signing a general ETSI IPR Undertaking, was envisaged (see paragraph [35] above). However, an important group within ETSI never accepted such an approach, resulting in it being abandoned in 1994, as no consensus could be reached.

C. **<u>Does Article 6.1 of the ETSI IPR Policy (or the IPR Policy more generally) mean that ETSI members that give a FRAND commitment cannot enforce their ETSI essential patents?</u>**

---

FRAND (e.g. RIM) were met with equally strong opposition from members who believed that redefinition was unnecessary (e.g. Intel).

[18] Current version dated 27 November 2008. All following references to the ETSI Guide on IPRs in this declaration are to this version unless otherwise stated.

41. There is nothing from a plain reading of Article 6.1 of the ETSI IPR Policy and/or the ETSI Guide on IPRs that can be interpreted to mean that Article 6.1 is or was intended to stop ETSI members from preventing infringement of their ETSI essential patents.

42. Further I am not aware of any background discussions within ETSI in which it was agreed that ETSI Members are stopped from seeking a court order to prevent infringement of their ETSI essential patents. Early drafts of the ETSI IPR Policy included a provision that limited an essential patent holder's ability to seek injunctive relief for its essential patents,[19] but this proposal was dropped from the Interim ETSI IPR Policy that was adopted in 1994 and, as far as I know, has never been reconsidered within ETSI.

43. Further, if the FRAND obligation were to be interpreted in this way, in my view it would amount to a compulsory licensing regime. Any suggestion that the IPR Policy might result in a form of compulsory licensing was completely rejected when the original Undertaking (see paragraph [40] above) was abandoned in 1994, as explained below.

44. One of the foremost objections to the initial Interim ETSI IPR Policy and Undertaking that had been adopted by ETSI in March 1993, was that it amounted to a compulsory licensing regime. ETSI's adoption of that preliminary version of the ETSI IPR policy against the objections of several members (Digital, IBM, AT&T, Philips and Motorola) may have encouraged the complaint made by CBEMA.[20] The end result of this dispute was that ETSI eventually abandoned the "licensing by default" system which had formed part of the original 1993 regime and adopted the more liberal approach reflected in the current IPR Policy. Consequently, Article 6.1 of the ETSI IPR Policy is not a provision under which essential IPR holders are obliged to license their IPR under all circumstances.

45. In the absence of any express statement within the ETSI IPR Policy or any discussions within ETSI over the last 15 or more years resulting in a statement that injunctive relief is precluded by a FRAND commitment, my understanding is that this is intended to be a matter for national courts to consider under the usual national procedure that applies for the national patent in question.

---

19 See **Exhibits 8 and 17** – ETSI/GA 9 (90)9 (clause 2.9 of the ETSI IPR Undertaking) and ETSI/TA12(91)3 (clauses 12 and 13 of the ETSI IPR Undertaking).

20 See **Exhibit 18** for a copy of a letter from the Commission to ETSI notifying the complaint – dated 1 July 1993.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct to the best of my knowledge.

Executed this 1st day of April, 2012, in DIEBURG.

Signature Karl Heinz Rosenbrock