# EXHIBIT 4

TOWARDS A DYNAMIC EUROPEAN ECONOMY

**SUMMARY REPORT**

concerning the

GREEN PAPER

ON THE DEVELOPMENT OF THE COMMON MARKET

FOR TELECOMMUNICATIONS SERVICES AND EQUIPMENT

(Communication from the Commission)

Confidential Business Information,
Subject to Protective Order

S-ITC-003390347

## TABLE OF CONTENTS

I.   INTRODUCTION..................................................... 3

II.  ACHIEVEMENTS OF COMMUNITY TELECOMMUNICATIONS POLICY
     TO DATE......................................................... 4

III  CURRENT ADJUSTMENT OF INSTITUTIONAL AND
     REGULATORY CONDITIONS........................................... 7

IV   CONVERGENT TRENDS IN THE CURRENT DEBATE IN THE COMMUNITY
     ON STRUCTURAL ADJUSTMENT IN
     TELECOMMUNICATIONS.............................................. 10

V    POINTS TO BE CONSIDERED FOR A COMMON APPROACH.............. 12

VI   PROPOSED COMMUNITY POSITIONS............................... 16

VII  LINES OF ACTION TO HELP IMPLEMENTATION
     OF THESE POSITIONS............................................. 19

Confidential Business Information,
Subject to Protective Order

I. INTRODUCTION

The strengthening of European telecommunications has become one of the major conditions for promoting a harmonious development of economic activities and a competitive market throughout the Community and for achieving the completion of the Community-wide market for goods and services by 1992.

The current wave of technical innovation resulting from the convergence of telecommunications and computer technology has now led to reviews in all Member States, and elsewhere, of the future organisation of the telecommunications sector and its necessary regulatory adjustment.  The Commission considers it timely to aim at achieving maximum synergy between current developments and debates in the Member States, drawing fully on the potential offered by them to meet the objectives of the Treaty.

This report is intended to launch a debate and to attract comment from a broad spectrum of opinion : the Council ; the European Parliament and the Economic and Social Committee ; the Telecommunications Administrations and Recognized Private Operating Agencies, hereinafter referred to as the "Telecommunications Administrations" ; the European telecommunications, data processing and services industry ; the users who must be the main beneficiaries of the new opportunities ; and the trade unions and other organisations who represent the social interests in this area.

Ensuring that the varying national situations are fully taken into account in a European approach requires a wide-ranging debate over the whole of the Community.

Confidential Business Information,
Subject to Protective Order

The Paper advances proposals for common positions and lines of action, in order to ease the current transition.

The overriding aim is to develop the conditions for the market to provide European users with a greater variety of telecommunications services, of better quality and at lower cost, affording Europe the full internal and external benefits of a strong telecommunications sector.

Confidential Business Information,
Subject to Protective Order

S-ITC-003390350

4

II. ACHIEVEMENTS OF COMMUNITY TELECOMMUNICATIONS POLICY TO DATE

A technically advanced, Europe-wide and low-cost telecommuni-
cations network will provide an essential infrastructure for
improving the competitiveness of the European economy, achieving
the Internal Market and strengthening Community cohesion - which
constitute priority Community goals reaffirmed in the Single
European Act. Telecommunications have a great influence not only
on services in general, such as financial services, transport and
tourism, but also on trade in goods and on European industrial
co-operation.

The emerging new telecommunications services - and notably
so-called value-added and information services - will have a major
impact on the future tradeability of services in general and on
the location of economic activities.

By the end of the century up to seven per cent of the Gross
Domestic Product of the Community will result from
telecommunications, as against over two per cent today.  The
combined world equipment and services market for
telecommunications and information technology already represents
more than ECU 500 billion.  It is estimated that, via information
technology, more than 60% of Community employment may depend on
telecommunications by the end of the century.

Confidential Business Information,
Subject to Protective Order

Since 1984, the Community has made substantial progress in this field, by implementing a policy aimed at :

- promoting the creation of an advanced European telecommunications infrastructure ;

- contributing to the creation of a Community-wide market for services and equipment ;

- contributing to the competitiveness of European industry and service providers.

In following these objectives, the Commission has, within the last two years, made proposals and achieved <u>rapid agreement by Council</u> along five main lines :

- co-ordination regarding future development of telecommunications in the Community and common infrastructure projects. This concerns in particular the principal future stages of network development  -  the Integrated Services Digital Network (ISDN), digital mobile communications, and the introduction of future broadband communications ;

- creation of a Community-wide market for terminals and equipment.  This concerns in particular the promotion of Europe-wide open standards, in order to give equal opportunity to all market participants ;

- the launch of a programme of pre-competitive and "pre-normative" R&D covering the technologies required for integrated broadband communications (the RACE programme) ;

Confidential Business Information,
Subject to Protective Order

- promoting the introduction and development of advanced
  services and networks in the less-favoured peripheral regions
  of the Community ;

- building up common European positions with regard to
  international discussions in this area.

During 1986 alone, Council achieved agreement, on proposal by the
Commission, on six major measures which will become fully
effective during 1987.  Fig. 1 gives an overview of decisions
taken and of proposals currently before Council.

In parallel, the Commission has taken up a number of cases,
related to the opening of telecommunications markets, under the
Treaty's competition rules.

Confidential Business Information,
Subject to Protective Order

## COUNCIL DECISIONS TAKEN IN THE FIELD OF TELECOMMUNICATIONS

### SINCE 1984

COUNCIL RECOMMENDATION OF 12 NOVEMBER 1984 concerning the implementation of a common approach in the field of telecommunications (84/549/EEC)

COUNCIL RECOMMENDATION OF 12 NOVEMBER 1984 concerning the first phase of opening up access to public telecommunications contracts (84/550/EEC)

COUNCIL DECISION OF 25 JULY 1985 on a definition phase for an R&D programme in advanced communications technologies for Europe (RACE) (85/372/EEC)

COUNCIL RESOLUTION OF 9 JUNE 1986 on the use of videoconference and videophone techniques for intergovernmental applications (86/C 160/01)

COUNCIL DIRECTIVE OF 24 JULY 1986 on the initial stage of the mutual recognition of type approval for telecommunications terminal equipment (86/361/EEC)

COUNCIL REGULATION OF 27 OCTOBER 1986 instituting a Community programme for the development of certain less-favoured regions of the Community by improving access to advanced telecommunications services (STAR programme) (86/3300/EEC)

COUNCIL DIRECTIVE OF 3 NOVEMBER 1986 on the adoption of common technical specifications of the MAC/packet family of standards for direct satellite television broadcasting (86/529/EEC)

COUNCIL DECISION OF 22 DECEMBER 1986 on standardisation in the field of information technology and telecommunications (87/95/EEC)

COUNCIL RECOMMENDATION OF 22 DECEMBER 1986 on the co-ordinated introduction of the Integrated Services Digital Network (ISDN) in the European Community (86/659/EEC)

Confidential Business Information,
Subject to Protective Order

III CURRENT ADJUSTMENT OF INSTITUTIONAL AND REGULATORY CONDITIONS

To complement the progress achieved to date, it now seems timely
to initiate a common thinking process regarding the <u>fundamental
adjustment of the institutional and regulatory conditions</u> which
the telecommunications sector now faces.  This world-wide
transformation is due to the profound technical change which is
currently taking place : the progressive merger of
telecommunications and computing technology, and the growing
integration of spoken, written and audio-visual communication..

Telecommunications has taken 140 years to develop from a single
service to a dozen services in the early eighties. The new
technological capabilities will now lead to considerable <u>growth
and multiplication of services and applications</u> within a single
decade. [<u>Fig. 2</u>]

Mastering this transformation requires certain readjustments in
the organisation of the sector in all Member States.  The form of
these adjustments must take into account the particular position
of European countries and the requirements of the establishment of
a unified market.

As set out in this Green Paper, the Community must make sure
that :

-   the necessary European scale and dimension are introduced into
    the current phase of transformation ;

-   no new barriers are created within the Community during the
    adjustment of regulatory conditions ;

Confidential Business Information,
Subject to Protective Order

PROPOSALS CURRENTLY BEFORE COUNCIL

PROPOSAL FOR A COUNCIL REGULATION OF 29 OCTOBER 1986 on a Community
action in the field of telecommunications technologies (RACE)

PROPOSAL FOR A COUNCIL REGULATION OF 1 DECEMBER 1986 introducing
the preparatory phase of a Community programme on trade electronic
data interchange systems (TEDIS)

PROPOSAL FOR A COUNCIL RECOMMENDATION OF 9 FEBRUARY 1987 on the
co-ordinated introduction of public pan-European digital mobile
communications in the European Community and PROPOSAL FOR A COUNCIL
DIRECTIVE on the frequency bands to be made available for the
co-ordinated introduction of public pan-European digital mobile
communications in the European Community (*).

(*)  approved by Council on 11th June 1987

Confidential Business Information,
Subject to Protective Order

Confidential Business Information, Subject to Protective Order

S-ITC-003390357



**TELECOMMUNICATIONS: PROSPECTS FOR THE YEAR 2000**

Fig. 2    Source: Consortium British Telconsult/Consultel/Detecon/Nepostel/Sofrecom et al.

- existing barriers are removed in the course of this
  adjustment.

The search for common positions in the complex field of future
regulation of the telecommunications sector must take into account
a number of major requirements, if it is to contribute to
strengthening the European economy :

- firstly, differing regulatory traditions in the sector.
  Careful analysis of current reviews and debates in the Member
  States must identify those areas on which common positions can
  be reached. It is on those areas that efforts towards
  developing consensus should be concentrated, in order to
  increase convergence over time in the Community ;

- secondly, opportunities and obligations deriving from the
  Treaty, in particular regarding : the free movement of
  goods ; the freedom to provide services ; competition rules ;
  the common commercial policy ;

- thirdly, the external relations of the Community, in
  particular regarding its major trading partners  - the EFTA
  countries, the United States and Japan, the Third World.  The
  opportunities and obligations deriving for the Community from
  the GATT agreement and the new GATT round must be taken into
  account.  The impact on the Community's industrial and trading
  position must be kept clearly in mind ;

Confidential Business Information,
Subject to Protective Order

- fourthly, the evolution of social perceptions in the Member States regarding the new technologies. This concerns the social consequences of the new technologies and associated regulatory policies, the conditions for the integration of these technologies into both private and work life, and measures to facilitate the transition by generating new employment opportunities and protecting legitimate interests.

The convergence of telecommunications, data processing and audio-visual technologies is outdating traditional boundary lines between the telecommunications network and the terminals sector, and between services traditionally provided under monopoly and those provided in a competitive environment. Satellites are now able to provide services within and between countries, at a world level.

There are now many service functions and features that can be performed either by the public network or by a private network or the terminal equipment attached to the network. All countries are confronted by two options :

- either to try to maintain the current regulatory framework, which would imply imposing additional and permanent restrictions and regulations on the use of data processing equipment connected to the network ;

- or to define the telecommunications regulatory framework more narrowly and to give more room for competition.

The worldwide trend points towards the latter.

Confidential Business Information,
Subject to Protective Order

IV   CONVERGENT TRENDS IN THE CURRENT DEBATE IN THE COMMUNITY ON
     STRUCTURAL ADJUSTMENT IN TELECOMMUNICATIONS


In the Community, the situation is in flux.  The United Kingdom
has substantially modified the organisation of its
telecommunications sector and issued recently a new general
licence for value-added and data services.  France has seen
substantial changes of legislation in the telecommunications
audio-visual field and will introduce major new proposals for its
future telecommunications policy in 1987.  Reviews or changes are
underway in Germany, the Netherlands, Belgium, Italy, Spain,
Portugal, and other Member States.  For its part, the European
Conference of Postal and Telecommunications Administrations (CEPT)
is reviewing its organisation, in response to, and in close
interaction with, the development of Community telecommunications
policy, and in close co-operation with the Commission.


Analysis of the regulatory situation and of current trends of
adjustment in the Member States shows that there are convergent
trends in current thinking.  There is therefore the genuine
possibility of finding agreement for broad common regulatory aims
for the telecommunications sector in the Community.


There seems to be agreement on the following basic orientations :

-   New services and terminal equipment require market conditions
    which favour innovation, experimentation, and a high degree of
    flexibility.

Confidential Business Information,
Subject to Protective Order

- the current and future integrity of the basic network
  infrastructure must be maintained or created.  This implies in
  particular a continuing strong role for Telecommunications
  Administrations in the provision of network infrastructure,
  and strong emphasis on Europe-wide standards in this area.  It
  also implies safeguarding the financial viability of
  Telecommunications Administrations in order to ensure the
  build-up of the new generations of telecommunications
  infrastructure and the necessary level of investment.

- securing a wide range of choice for the consumer requires that
  Telecommunications Administrations be able to provide,
  alongside other suppliers, those services which are opened to
  competition even if this may involve complex problems of
  regulation.

- employment growth requires a growth-oriented policy,
  particularly in the future conglomerate sector of telecommuni-
  cations / information technologies within which jobs will
  shift from traditional activities to new opportunities.  An
  intense dialogue with the social partners will be necessary,
  in order to ensure a smooth transition.

Confidential Business Information,
Subject to Protective Order

S-ITC-003390361

V    POINTS TO BE CONSIDERED FOR A COMMON APPROACH


<u>The following points to be considered</u> for a solution are discussed
in more detail in the Green Paper :

- Given their importance and wide ramifications, regulatory
  changes in telecommunications can only be introduced
  progressively.  Time must be allowed for present structures,
  which have grown up historically over a long period, to adjust
  to the new environment.  The major objective must be the
  completion of the Internal Market by 1992.

- Regulatory changes in telecommunications must take account of
  the views of all parties concerned, in particular private and
  business users, Telecommunications Administrations, the
  Administrations' work force, competing enterprises and the
  telecommunications and data-processing industry ;

- There is consensus in the Community that competition in the
  telecommunications services and terminal equipment sectors
  must be substantially expanded, in order to react to
  technological, economic and world market trends ;

- There is also consensus that the role of the Telecommunica-
  tions Administrations in the provision of network infra-
  structure must be essentially safeguarded, in order to allow
  them to fulfil their public service mandate ;

- A stable "natural" boundary line between a "reserved services"
  sector and a "competitive services" sector (including in
  particular "value-added services") is not possible. Due to
  technological development  – the trend towards integration  –
  any definition (and reservation) of a service can only be

Confidential Business Information,
Subject to Protective Order

temporary and must be subject to review if it is not to impede the overall development of telecommunications services. There is however in practice consensus between the Member States that voice telephone service is a basic service. Currently, this service is reserved in all Member States for provision by the Telecommunications Administrations. At present, this service corresponds to 85% - 90% of telecommunications revenues.

- As one counterpart of a more open market environment, the time it takes for the establishment and common application of international standards must be substantially reduced, in order to maintain future network integrity and to promote the availability and interoperability of efficient Europe-wide and worldwide services.

- Telecommunications Adminstrations generally are  -  and should be  -  allowed to participate in the newly emerging competitive services and terminal equipment market. This requires that in the future regulatory responsibility must be separated from operational responsibility. Regulation concerns in particular licensing, control of conformity testing and obligatory interface specifications, frequency administration, and general surveillance including tariff principles ;

- Entry of the Telecommunications Administrations but also of the computer and data-processing multi-national companies into a competitive telecommunications sector implies the danger of abuse of a dominant position. Control measures with regard to both types of dominant market participants will have to be strengthened ;

Confidential Business Information,
Subject to Protective Order

- Action at Community level must be taken towards narrowing the differences between Member States regarding the provision of network facilities to the newly emerging competitive services and terminal equipment sector. Otherwise a Community market for services will not develop rapidly. This has implications both for technical regulations and network termination points and for usage conditions and tariff principles ;

- The long-term convergence of telecommunications with audio-visual technologies must be taken into account, in addition to the current convergence between the telecommunications and data-processing sectors.  This affects in particular policies concerned with satellite communications and cable-TV networks.

  Where cable-TV network infrastructure and satellite communications are also used for two-way communications, close surveillance with regard to their relationship and interfacing with the overall telecommunications network will be needed, in order to ensure the long-term overall integrity of the telecommunications infrastructure.

- Two-way satellite communications and the regulation of up-links will need case-by-case consideration.  Closely monitored competition should be a possibility in those cases where unacceptable interference with other satellite or radio communications systems is not to be expected and where the revenue base and financial viability of the general network infrastructure provider is not put into question.  In the case of very small satellite antennae (VSAT or "microterminals") suitable for data exchange only, this situation should normally be assumed automatically.

Confidential Business Information,
Subject to Protective Order

- Given the trend in satellite communications towards point to multi-point 'broadcasting' applications for closed user groups, the regulatory regime for receive only earth stations (ROES) for satellite communications should be assimilated to the regime for telecommunications terminals and TV receive-only satellite antennae and fully opened to competition.

- With the growing importance of services, the Community will face in its external relations a growing number of tele-communications-related issues.  Consensus must be achieved in time for the preparation of the new GATT round which will include telecommunications services.

Consensus must be further developed at Community level regarding telecommunications issues and the Community's overall framework of external relations, in particular with the EFTA countries and CEPT, with the United States and Japan and with the international organisations in this field, such as the International Telecommunications Union (ITU).

Confidential Business Information,
Subject to Protective Order

VI  PROPOSED COMMUNITY POSITIONS

With these points in mind, in the Green Paper proposals for
positions are developed, which are set out in Fig. 3.

The proposals concentrate on those issues which must be resolved
at Community level for all Member States.  They leave out
questions which are important but fall to the national level, such
as which status for Telecommunications Administrations is best
suited to facing the developing competitive market environment,
and related questions of finance, organisation, and employment
relations.

The proposals foresee the continuation of those aspects of the
current regimes where there is compatibility with the Treaty.
Within the framework of the current adjustment and according to
their economic appreciation and perception, Member States may, of
course, choose their own position with regard to these aspects,
such as a more liberal regime regarding the whole or parts of the
network infrastructure. As regards required change at the
Community level, the proposals in Fig. 3 insist on three essential
modifications :

–   PHASED COMPLETE OPENING OF THE TERMINAL EQUIPMENT MARKET TO
    COMPETITION

    In the long run this must include all terminals including the
    subscriber's first telephone set, given the trend towards
    integration of functions and the Integrated Services Digital
    Network.

Confidential Business Information,
Subject to Protective Order

Figure 3

PROPOSED POSITIONS

The general objective of the positions set out is the development in the Community of a strong telecommunications infrastructure and of efficient services : providing the European user with a broad variety of telecommunications services on the most favourable terms, ensuring coherence of development between Member States, and creating an open competitive environment, taking full account of the dynamic technological developments underway.

A)   Acceptance of continued exclusive provision or special rights for the Telecommunications Administrations regarding provision and operation of the network infrastructure.  Where a Member State chooses a more liberal regime, either for the whole or parts of the network, the short and long term integrity of the general network infrastructure should be safeguarded.

Closely monitored competitive offering of two-way satellite communications systems will need further analysis. It should be allowed on a case-by-case basis, where this is necessary to develop Europe-wide services and where impact on the financial viability of the main provider(s) is not substantial .

Common understanding and definition regarding infrastructure provision should be worked out under E) below.

B)   Acceptance of continued exclusive provision or special rights for the Telecommunications Administrations regarding provision of a limited number of basic services, where exclusive provision is considered essential at this stage for safeguarding public service goals.

Exclusive provision must be narrowly construed and be subject to review within given time intervals, taking account of technological development and particularly the evolution towards a digital infrastructure. "Reserved services" may not be defined so as to extend a Telecommunications Administration service monopoly in a way inconsistent with the Treaty. Currently, given general understanding in the Community, voice telephone service seems to be the only obvious candidate.

C)   Free (unrestricted) provision of all other services ("competitive services", including in particular "value-added services") within Member States and between Member States (in competition with the Telecommunications Administrations) for own use, shared use, or provision to third parties, subject to the conditions for use of the network infrastructure to be defined under E).

"Competitive services" would comprise all services except basic services explicitly reserved for the Telecommunications Administrations (see B).

Confidential Business Information,
Subject to Protective Order

D)   Strict requirements regarding standards for the network infrastructure and
services provided by the Telecommunications Administrations or service
providers of comparable importance, in order to maintain or create
Community-wide interoperability.  These requirements must build in particular
on Directives 83/189/EEC and 86/361/EEC, Decision 87/95/EEC and
Recommendation 86/659/EEC.

Member States and the Community should ensure and promote provision by the
Telecommunications Administrations of efficient Europe-wide and worldwide
communications, in particular regarding those services (be they reserved or
competitive) recommended for Community-wide provision, such as according to
Recommendation 86/659/EEC.

E)   Clear definition by Community Directive of general requirements imposed by
Telecommunications Administrations on providers of competitive services for
use of the network, including definitions regarding network infrastructure
provision.

This must include clear interconnect and access obligations by
Telecommunications Administrations for trans-frontier service providers in
order to prevent Treaty infringements.

Consensus must be achieved on standards, frequencies, and tariff principles,
in order to agree on the general conditions imposed for service provision on
the competitive sector. Details of this Directive on Open Network Provision
(O N P) should be prepared in consultation with the Member States, the
Telecommunications Administrations and the other parties concerned, in the
framework of the Senior Officials Group on Telecommunications (SOG-T).

F)   Free (unrestricted) provision of terminal equipment within Member States and
between Member States (in competition with Telecommunications
Administrations), subject to type approval as compatible with Treaty
obligations and existing Directives.  Provision of the first (conventional)
telephone set could be excluded from unrestricted provision on a temporary
basis.

Receive Only Earth Stations (ROES) for satellite down-links should be
assimilated with terminal equipment and be subject to type approval only ;

G)   Separation of regulatory and operational activities of Telecommunications
Administrations.  Regulatory activities concern in particular licensing,
control of type approval and interface specifications, allocation of
frequencies, and general surveillance of network usage conditions ;

Confidential Business Information,
Subject to Protective Order

Fig. 3 (cont'ed)

H)   Strict continuous review of operational (commercial) activities of
Telecommunications Administrations according to Articles 85, 86 and 90, EEC
Treaty. This applies in particular to practices of cross-subsidisation of
activities in the competitive services sector and of activities in
manufacturing ;

I)   Strict continuous review of all private providers in the newly opened sectors
according to Articles 85 and 86, in order to avoid the abuse of dominant
positions ;

J)   Full application of the Community's common commercial policy to
telecommunications.  Notification by Telecommunications Administrations under
Regulation 17/62 of all arrangements between them or with Third Countries
which may affect competition within the Community.  Provision of information
to the extent required for the Community, in order to build up a consistent
Community position for GATT negotiations and relations with Third Countries.

Confidential Business Information,
Subject to Protective Order

In the short term, transitional solutions will have to be found, taking into account that at the present stage the large majority of Member States wish to maintain their monopoly covering the first (conventional) telephone set.

- ACCEPTANCE BY THE TELECOMMUNICATIONS ADMINISTRATIONS OF CLEAR OBLIGATIONS TO INTERCONNECT WITH AND PROVIDE ACCESS TO TRANS-FRONTIER SERVICE PROVIDERS

Generally, the network must be opened, under fair competitive conditions, to service providers from other Member States. This is a pre-condition for implementation of the Internal Market for the Community's future service economy.

Insofar as Member States continue, for the time being, to reserve certain basic services for exclusive provision by their Telecommunications Administrations, reserved services must be construed narrowly and not interfere with service provision from other Member States, in accordance with Treaty rules.

- CLEAR SEPARATION OF REGULATORY AND OPERATIONAL FUNCTIONS OF TELECOMMUNICATIONS ADMINISTRATIONS,

in those Member States where this still has not been carried out. In a more competitive environment, the Telecommunications Administrations cannot continue to be both regulator and market participant, i.e. referee and player. Regulatory functions concern in particular licensing, control of type approval and binding specifications, frequency allocation, and surveillance of usage conditions.

Confidential Business Information,
Subject to Protective Order

The need for this separation is confirmed by the trends and debates in all Member States which are envisaging more competition for the sector.

The Telecommunications Administrations should be market participants in the competitive sectors, in an improved competitive environment, in order to ensure full service to the whole spectrum of users and industry.

Substantial differences will continue to exist between Member States but must be accommodated. This concerns the <u>different status of the network operators (public/private)</u> but also the policy regarding provision of leased lines and resale of capacity. All Member States agree currently on the necessity of securing the financial viability of their Administrations, either by excluding pure resale of voice (telephone) on leased lines or by tariff schemes which make resale of voice to third parties unattractive, such as usage-based tariffs. Both methods will have to be accommodated in the Community.  However, both methods must be limited to a legitimate level of protection of financial viability and must not represent the abuse of a dominant position.  Current charges for leased lines both at the national and Community level show in some cases wide and unexplained divergences.

The proposals aim at progressively introducing full Community-wide competition to the terminal equipment market, and as far as possible and justified at this stage to telecommunications services.  In pursuing the implementation of these proposals, and the lifting of existing restrictions, the Commission will take full account of the fact that the competition rules of the Treaty apply to Telecommunications Administrations, in particular  to the extent that they engage in commercial activities.

Confidential Business Information,
Subject to Protective Order

VII LINES OF ACTION TO HELP IMPLEMENTATION OF THESE POSITIONS

In order to create the environment for reaching the objectives set out, the Commission proposes a number of actions :

- to smooth the transition towards a more competitive Community-wide market ;

- to promote a strong European presence in both the services and industrial field ;

- to prepare the Community for its discussions of future trading relations in this field with its outside partners, in particular in the framework of GATT.

It is envisaged:

- to accelerate the implementation of existing action lines ;

- to initiate a number of new action lines needed to complement and facilitate the transition.

Confidential Business Information,
Subject to Protective Order

VII.1    ACCELERATION OF EXISTING ACTION LINES

As regards the acceleration of implementation of the action lines defined by Council in December 1984 for the Community's tele-communications policy, the Commission foresees :

- ACCELERATED ADOPTION OF THE PROPOSALS FOR ENSURING THE LONG TERM CONVERGENCE AND INTEGRITY OF THE NETWORK INFRASTRUCTURE IN THE COMMUNITY

  A pan-European telecommunications infrastructure with full interoperability is the only basis on which a Community-wide open competitive terminal equipment and services market can thrive. Intensified industrial cooperation within the Community must ensure that European industry will fully benefit from the opening of this market.

  This concerns in particular :

  . rapid adoption of the RACE MAIN programme which is fundamental to longer term network development in the Community and for Community-wide standards for the future Integrated Broadband Communications, and promotion of related projects for the progressive Community-wide introduction of broadband communications ;

  . rapid adoption of the proposals for the introduction of digital mobile communications ;

  . full application of Recommendation 86/659/EEC on the co-ordinated introduction of the Integrated Services Digital Network (ISDN) ;

Confidential Business Information,
Subject to Protective Order

. rapid application of the STAR programme for advancing infrastructure in the regions, with the aim of increasing economic cohesion during the current transition.

- RAPID EXTENSION OF DIRECTIVE 86/361/EEC TO INCLUDE FULL MUTUAL RECOGNITION OF TYPE APPROVAL FOR TERMINAL EQUIPMENT

According to the current Directive 86/361/EEC on the mutual recognition of testing required for type approval, proposals for full mutual recognition of type approval must be submitted by July 1989 at the latest.  The Commission proposes to accelerate this measure which is vital for the development of a competitive, Community-wide terminal market.

- REPLACING RECOMMENDATION 84/550/EEC ON THE FIRST PHASE OF OPENING UP ACCESS TO PUBLIC TELECOMMUNICATIONS CONTRACTS BY A DIRECTIVE

on the opening of procurement contracts applying to public and private Telecommunications Administrations to which the Member States confer exclusive or special rights.

The future participation of Telecommunications Administrations in the competitive markets requires more transparency in their purchasing behaviour.

Confidential Business Information,
Subject to Protective Order

VII.2   INITIATION OF NEW ACTION LINES

As regards new action lines needed to facilitate the transition towards a more competitive, Community-wide environment, <u>the Commission believes that the following are necessary</u> :

I   <u>SUBSTANTIAL REINFORCEMENT OF THE DEVELOPMENT OF STANDARDS AND SPECIFICATIONS IN THE COMMUNITY / CREATION OF A EUROPEAN TELECOMMUNICATIONS STANDARDS INSTITUTE</u>

based on the current co-operation of the Telecommunications Administrations within CEPT and with CEN-CENELEC.  A substantial reinforcement of resources applied to standardisation is a necessary requirement for a truly open competitive market.

Jointly financed, the institute, based on a small core team of permanent staff and independently managed according to best business practice, should draw flexibly on experts from both the Telecommunications Administrations and industry, in order substantially to accelerate the elaboration of standards and technical specifications, indispensable for an open competitive market environment and the development of Europe-wide services.

This action would build on and complement the Community's current policy on telecommunications and information technology standards.

Confidential Business Information,
Subject to Protective Order

II   COMMON DEFINITION OF AN AGREED SET OF CONDITIONS FOR OPEN
NETWORK PROVISION ("O N P") TO SERVICE PROVIDERS AND USERS

Working out in common the principles of the provision of the
network to competitive service providers is a necessary
requirement for a Community-wide competitive market for
terminal equipment and for competitive services, including in
particular value-added services, if a long period of
case-to-case decisions is to be avoided.

This concerns in particular the definition of clear
Europe-wide network termination points, usage conditions and
tariff principles and availability of frequencies where
relevant.

The work should be carried out by the Commission in close
collaboration with the Senior Officials Group on
Telecommunications (SOG-T), based on hearings with all parties
concerned.  Subsequently, the Commission would submit a
corresponding Directive on ONP to Council.

Confidential Business Information,
Subject to Protective Order

## III  COMMON DEVELOPMENT OF EUROPE-WIDE SERVICES

Future intra-Community communications will depend on achieving three objectives :

- Europe-wide compatibility and inter-operability of those services provided by the Telecommunications Administrations. In addition to efficient telephony and telex, new services such as teletex, videotex, packet-switched and circuit-switched data services, mobile communications and the future ISDN, as defined in Recommendation 86/659/EEC should be available universally at the European level.  This could concern joint Community-wide service provision, network planning, and tariff principles ;

- Rapid development of intra-Community provision of value-added services.  It is proposed to set into motion at the Community level a number of measures aimed at promoting the emergence of European value-added services, building on current efforts such as the TEDIS initiative.

- Rapid development of the Community's policy on the information market, to promote Europe-wide information services, in particular fully mobilising the potential of private initiatives.

Confidential Business Information,
Subject to Protective Order

IV   COMMON DEFINITION OF A COHERENT EUROPEAN POSITION REGARDING
     THE FUTURE DEVELOPMENT OF SATELLITE COMMUNICATIONS IN THE
     COMMUNITY

The international satellite communications sector is currently
going through rapid changes.  In the light of the positions
described in Fig. 3, based on prevailing technological trends,
common positions will in particular be required regarding :

.   development of the earth station market in Europe, in
    particular with regard to common standards ;

.   future development of satellite links (space segment), in
    particular the relationships between EUTELSAT, national,
    and private systems, and the full use of the technological
    potential of the European Space Agency ;

.   development of international satellite communications, in
    particular with regard to INTELSAT and INMARSAT.

V   COMMON DEFINITION OF A COHERENT CONCEPT ON TELECOMMUNICATIONS
    SERVICES AND EQUIPMENT WITH REGARD TO THE COMMUNITY'S
    RELATIONS WITH THIRD COUNTRIES

An intensification of co-ordination with regard to Third
Countries and the position on the international regulatory
environment is urgently needed.

This concerns in particular the preparation of the new GATT
ROUND and future relations with international organisations
such as the International Telecommunications Union.

Confidential Business Information,
Subject to Protective Order

It concerns further the evolving relationship in this field with the EFTA countries, with the United States and Japan and with the Third World.

## VI   COMMON ANALYSIS OF SOCIAL IMPACT AND CONDITIONS FOR A SMOOTH TRANSITION

In the long term, the most important factor for the future evolution of the telecommunications and information technology sector and its regulatory environment, both at the national and the Community level, will be the degree of social consensus which can be achieved regarding the new technologies.

Common discussions and positions will be needed regarding the best ways to master the shift in job qualifications required by the change in technology and to expand employment in new service provision.

An essential condition for achieving a true Common Market in this area will therefore be the development of a Europe-wide consensus in the analysis of the social consequences of the new technologies and the associated regulatory evolution and policies.  Analysis of the conditions for acceptability of new services and activities, and the impact on work life and employment will be a permanent task.

Confidential Business Information,
Subject to Protective Order

This must include continuous in-depth research of evolving user requirements for the new services, taking fully into account broader trends in economic activity, in the transformation of life-styles and in the social concerns of the European citizen.

A vital contribution which can be made at Community level towards evolving this consensus should be the launching of joint analysis and study, in order to lay a better factual basis of knowledge, increase the perception of developments in the other Member States, prepare informed debate and facilitate discussions and negotiations between the social partners.

Confidential Business Information,
Subject to Protective Order