# EXHIBIT 8

European Telecommunications Standards Institute

ETSI

9th General Assembly
Nice, 20-21 November 1990

ETSI/GA 9 (90) 9

| | |
|---|---|
| Date: | 16 November 1990 |
| Source: | IPRC Chairman |
| Title: | Intellectual Property Policy and Prodecures |
| Document for: | Information and Discussion |

Note from the ETSI Secretariat:

The attached document, which is a contribution from Mr. R. Nicholson, IPRC Chairman, is an amended version of the document submitted to the 7th Technical Assembly under the reference TA 7 (90) 31.

D/524/90/DG/skw

Confidential Business Information,
Subject to Protective Order

S-ITC-003390461

 

c/o Mr R Nicholson   ETSI IPRC Chairman
4 Pine Grove   Bishops Stortford   Herts   CM23 5NP
Tel: 0279 655305   Fax: 0279 506540

## FAX MESSAGE

To:  Prof Gagliardi
     Director

15 November 1990

SUBJECT:  9TH GENERAL ASSEMBLEY
          IP POLICY AND PROCEDURES

Please find enclosed a copy of the subject document for submission to GA9 as my contribution.

It is my opinion that apart from the following matters, this paper would be generally acceptable to the majority of the IPRC:-

a.   It is considered that the arbitration provisions should be deleted because disputes between members are a matter for the members.  It was concluded that essentiality is a matter for ETSI and not an arbitrator.  Thus any disputes concerning essentiality should be settled by ETSI and the members concerned.  Since decisions are only binding on the parties to the arbitration, different decisions may therefore arise concerning the essentiality of the same IPR.

b.   The manufacturers are concerned that operators will use their purchasing power to obtain licences in respect of non-essential IPR and have suggested the inclusion of a clause to prevent this (ie clause 6.10 of the IPR Undertaking).  The operators on the other hand feel that ETSI should only concern itself with essential statutory IPRs because the principle provisions of the agreement only relate to such IPRs and are of the opinion that clause 6.10 should be limited to essential statutory IPRs.

c.   The extent to which the licences can be extended to allow the operator to use outside the territory equipment manufactured under licence in the territory, is still a contentious issue.  The operators have stated that a viable off-set for this would be the freedom for manufacturers to manufacture components, sub-systems or the like outside the territory.

d.   The territorial extent of, and the consideration for, the licences are still areas of dispute.

With kind personal regards

Yours sincerely

RON NICHOLSON
IPRC CHAIRMAN

EUROPEAN TELECOMMUNICATIONS STANDARDS INSTITUTE
INSTITUT EUROPEEN DES NORMES DE TELECOMMUNICATION
EUROPAISCHES INSTITUT FÜR TELEKOMMUNIKATIONSSTANDARDS
Postal address : ETSI B.P. 152 - F - 06561 Valbonne Cedex FRANCE
Office address : Route des Lucioles Sophia-Antipolis, Valbonne FRANCE

Tel. : + 33 92 94 42 00
Telefax : + 33 93 65 47 16
+ 33 93 66 28 17
Télex : 470 040 F
SIRET n° 348 623 562 00017

Confidential Business Information,
Subject to Protective Order

Amended Version 2                                         Amended 15.11.90

4302s

# EUROPEAN TELECOMMUNICATIONS STANDARDS INSTITUTE (ETSI)

# INTELLECTUAL PROPERTY POLICY

# AND

# PROCEDURES

- 1 -

Confidential Business Information,
Subject to Protective Order

S-ITC-003390463

4302s

## 1.   INTRODUCTION

1.1   The General Assembly has recognised that the generation of European Telecommunications Standards (ETSs) may give rise to intellectual property problems and has, therefore, established an Intellectual Property Rights Committee (IPRC) to advise ETSI and its members.

1.2   The IPRC has formulated an Intellectual Property Policy (IPP) for the benefit of ETSI members and responsibility for the operation of this policy is vested in the IPRC.

1.3   The IPRC shall be responsible for recommending changes to the policy pursuant to change in the legal and commercial environment for ratification by the General Assembly.

## 2.   POLICY OBJECTIVES

In pursuance of Article 2 and 3 of the ETSI Statutes, the main policy objectives of ETSI in relation to IPRs are to ensure that:

2.1   intellectual property rights (IPRs) do not unreasonably hinder the manufacture, sale, supply or use of systems, equipment or services in compliance with ETSs;

2.2   ETSs shall be based on solutions which meet the stated technical objectives but a draft ETS shall not be adopted if it is subject to any IPRs for which licences are considered by ETSI to be needed but are not available, on fair, reasonable, and non-discriminatory terms and which licences in their totality are non-prohibitive;

2.3   the investment made by ETSI members and their affiliates in research and development, utilised in the establishment of ETSs, shall be adequately and fairly rewarded.

2.4   all ETSI members have real access to telecommunications markets, equivalent to that of indigenous commercial enterprises, in all countries adopting and implementing ETSs.

## 3.   IPR UNDERTAKINGS

3.1   As a condition of being, or continuing to be, a member of ETSI, all members must provide an IPR undertaking in the form shown in Appendix "A" including its Annexes which is an integral part of this Policy.  This IPR undertaking is intended to ensure that IPRs are not employed unreasonably to prevent the adoption of an ETS by ETSI, and that ETSI members can cooperate freely and without risk in achieving ETSI's stated objectives and in the development of common ETSs.

3.2   The IPR undertaking referred to in paragraph 3.1 above shall, on signature, apply to all ETSI standards and supersede any previous undertaking given to ETSI relating to standards for which ETSI is responsible.

- 2 -

Confidential Business Information,
Subject to Protective Order

3.3   Members of ETSI shall sign the Undertaking referred to in paragraph 3.1 above within 6 months of a request in writing from ETSI so to do.

4.   CONFIDENTIALITY

The proceedings of a Technical Committee (TC) or Sub-Committee (STC) or any part thereof shall be regarded as non-confidential except as expressly provided below and all information submitted to a (TC) or (STC) shall be treated as if in the public domain and shall be available for public inspection unless it is identified in writing by the originator as confidential at the date of submission. Proceedings of a TC or STC which relate to confidential information disclosed to the STC or TC shall if minuted to that effect be regarded as confidential themselves.

5.   OWNERSHIP OF IPRs

5.1   Subject to paragraph 5.2 below, ETSI shall not seek to own IPRs other than those generated by its employees or by secondees to ETSI from non-commercial organisations, such as universities.

5.2   The ownership of the copyright subsisting in standards documentation and reports created by TCs or STCs shall vest in ETSI but due acknowledgement shall be given to copyrights owned by third parties that are identifiable in ETSI copyrighted works.

5.3   Subject to paragraph 5.4 below, enforcement of IPRs owned by ETSI shall be at the discretion of the IPRC and subject to the approval of the General Assembly.

5.4   Except as provided in paragraph 5.2 above IPRs owned by ETSI shall be made available, as of right and free of charge, to ETSI members by way of a licence.

5.5   ETSI shall, subject to any obligation of confidentiality, permit its MEMBERS and their affiliates to reproduce its technical reports and standards specifications whether in draft or final form for their own internal use.

5.6   ETSI shall, subject to any obligation of confidentiality, distribute unofficial ETSI documents only to MEMBERS and their affiliates, observers, and counsellors.

5.7   ETSI may conclude agreements with governmental bodies, public telecommunications operators, industrial associations, telecommunications users associations, and national or regional standards bodies pursuant to which ETSs, draft ETSs, I-ETSs, and ETSI technical reports may be supplied to such bodies under conditions of confidence or otherwise.

- 3 -

Confidential Business Information,
Subject to Protective Order

6.  LICENSING PROVISIONS FOR STANDARDS RELATED LICENCES

   In accordance with paragraph 2.1 of the Policy, licences granted pursuant
   to the IPR Undertaking shall be on fair, reasonable and
   non-discriminatory terms.

   It is recommended that licences granted pursuant to the IPR Undertakings
   should be in the form annexed to the Undertaking set out in Appendix "A"
   attached hereto.

   Licensors of essential intellectual property rights, who are signatories
   of the Undertaking referred to in paragraph 3.1, shall in setting royalty
   rates take into account that the maximum cumulative royalty due in
   respect of essential IPRs for a particular product or method shall not
   exceed a predetermined level set by ETSI in accordance with its Rules of
   Procedure, above which level the cumulative royalty is deemed to be
   prohibitive, that is to say to have the effect of preventing licensees
   from commercialising such product or method. ETSI shall determine the
   level of the maximum cumulative royalty applicable to such ETS, taking
   into account normally accepted maximum royalty rates for the type of
   equipment and/or methods in the field of the ETS and consistent with
   providing a fair reward for IPR based on R and D necessary for creating
   the technology underlying the ETS.

7.  PROCEDURES

   7.1  In order to facilitate the provision of advice on IPR matters to
        the TCs and/or the STCs, the IPRC will have a Sub-Committee for
        each of the TCs and each of these Sub-Committees will:

        (a)  be chaired by a member of the IPRC who will be responsible
             for liaising with the Chairman of the TC to which his
             Sub-Committee has been assigned.

        (b)  have a modus operandi determined by the IPRC which will
             ratify and have final responsibility for any actions taken
             and/or advice given by the Sub-Committees.

        (c)  make a list of essential IPRs which might obstruct ETSs, and
             will pass copies of such list on a confidential basis to all
             ETSI members.

   7.2  ETSI members who disclose information to TCs or STCs shall bear the
        sole responsibility for taking appropriate measures for securing
        the IPRs they desire in relation to such information prior to
        disclosure.

   7.3  Any document submitted to a TC or STC containing information which
        the originator regards as confidential shall be clearly marked as
        such and any oral statement made to a TC or STC which is regarded
        as confidential must be identified before disclosure in
        non-confidential terms and recorded in the minutes in such terms.

   7.4  ETSI members who are procurers and vendors of equipment specified
        by reference to an ETS shall equitably share their risks associated
        with infringement of essential IPRs which are unidentified prior to
        the date on which a procurement contract price is binding on the
        vendor.

- 4 -

Confidential Business Information,
Subject to Protective Order

7.5   ETSI shall, to the extent that it is able, ensure its members can obtain licences on fair, reasonable and non-discriminatory terms pursuant to essential IPRs, in particular third party essential IPRs. If a member of ETSI is unable to obtain a licence on fair, reasonable and non-discriminatory terms pursuant to an IPR which is essential to a standard, ETSI shall take immediate steps to modify the standard so that such IPR is no longer essential or shall withdraw the standard.

8.   SETTLEMENT OF DISPUTES

8.1   In the event of a dispute or difference between the SIGNATORY, and a signatory of an equivalent undertaking mutatis mutandis arising out of or in connection with the UNDERTAKING, its interpretation, or application, the parties to the dispute shall first use their best endeavours to settle the dispute or difference amicably within a period of 3 months after one party has announced in writing to the other that there exists a dispute or difference.

8.2   All disputes or differences which cannot be settled as provided for in clause 8.1 above shall be finally settled by ad hoc arbitration by three arbitrators. One arbitrator shall be appointed by each party to the dispute, and the third arbitrator, who shall act as Chairman, shall be appointed by the two first appointed arbitrators. If the two first appointed arbitrators fail to agree upon the third arbitrator within 6 weeks of the appointment of the second of the first two arbitrators, the third arbitrator shall be appointed by the Director of ETSI. The Chairman of the arbitration panel shall have proven experience in the issues in dispute.

8.3   The arbitrators shall follow the rules of conciliation and arbitration of the International Chamber of Commerce in its edition current at the time of arbitration without involving the International Chamber of Commerce in administrative matters.

8.4   If there be more than one party on one, or on both sides, all parties being on one side shall act jointly and unanimously as a single party for the appointment of arbitrators and any other activities in the course of arbitration.

8.5   The arbitrators shall use their best efforts to give their final judgement not later than six months from the date on which the third arbitrator has been appointed.

8.6   Unless otherwise agreed, arbitrators shall have their meetings and hearings in Sophia-Antipolis, France.

8.7   The award of the arbitrators shall be final and binding upon the disputing parties.

8.8   Issues of IPR infringement and validity shall not be decided by the arbitrators, however decisions relating to the ESSENTIALITY of an IPR may be made, as between the parties, by arbitration and shall be made available by the parties to ETSI for distribution to all members together with the reasons for the arbitrator's decision.

- 5 -

Confidential Business Information,
Subject to Protective Order

8.9   If and as long as the SIGNATORY is not permitted by law to be a party to arbitration and a dispute arises out of this Policy which involves the SIGNATORY, then such dispute shall be submitted to the jurisdiction of a competent court.

8.10  The costs of arbitration shall be borne by the parties thereto and apportioned as the arbitrators shall direct.

## 9.   LAW AND REGULATION

This policy shall always be operated in a manner which complies with the law and regulation of the countries in which ETSI members are resident, and where appropriate with the law and regulation of the European Economic Community or the European Free Trade Association.

## 10.  PENALTIES

Any breach of this policy by an ETSI member shall be deemed to be a breach, by that member, of the ETSI Statutes.

- 6 -

Confidential Business Information,
Subject to Protective Order

43028

APPENDIX A

## ETSI IPR UNDERTAKING

This undertaking is given this ....... day of .......... by .........
(hereinafter referred to as the SIGNATORY) whose registered office is situate
at .............., to the EUROPEAN TELECOMMUNICATIONS STANDARDS INSTITUTE
whose registered office is situate at Route des Lucioles Sophia-Antipolis,
Valbonne, France (hereinafter referred to as ETSI).

**WHEREAS**

1.  The SIGNATORY is a member of ETSI, and fully committed to the objectives
    of ETSI.

2.  The objectives of ETSI are set out in Articles 2 and 3 of the Statutes of
    ETSI.

3.  The SIGNATORY is prepared to grant certain licences which are necessary
    to further the objectives of ETSI.

The SIGNATORY therefore undertakes as follows:-

1.  ## DEFINITIONS

    The words and phrases set out below shall have the following meanings
    ascribed to them for the purposes of the UNDERTAKING:-

    1.1  "THE UNDERTAKING" shall mean this undertaking including any
         amendments and modifications thereof.

    1.2  "STATUTORY IPR" shall mean any intellectual property right
         created by statute law including applications therefor other
         than trademarks.  For the avoidance of doubt rights relating
         to get-up, confidential information, trade secrets or the
         like are excluded from the definition of STATUTORY IPR.

    1.3  REGISTERED (STATUTORY) IPRs shall mean STATUTORY IPRs
         recorded in an official register including patents,
         registered designs and utility models and shall include
         applications therefor.

    1.4  "STANDARD" shall mean any standard including options
         contained therein or amended versions and shall include
         European Telecommunications Standards (ETS), interim ETSs,
         Normes Europeenes des Telecommunication (NETs) and drafts
         thereof, the technical specifications of which are available
         to all members of ETSI and are agreed and promulgated by
         ETSI.  The date on which a STANDARD is considered to be
         adopted by ETSI for the purposes of this UNDERTAKING shall be
         the date on which the technical specification of that
         STANDARD was available to all ETSI members.

- 7 -

Confidential Business Information,
Subject to Protective Order

1.5   "TERRITORY" shall mean any and all countries:
- whose national administration for telecommunications is, at the date of a request by a USER pursuant to clause 2.1 below, a member of ETSI, or

- in which an officially recognised national standardization body has formally adopted the STANDARD and in the opinion of ETSI the STANDARD has been implemented in that country, or

- in which, in the opinion of ETSI, a major telecommunications network operator has, or is about to, procure, on a substantial scale, equipment to a specification compliant with that STANDARD.

1.6   "USE" shall mean MANUFACTURE, sell, lease, or otherwise dispose in the TERRITORY of EQUIPMENT so MANUFACTURED and repair, use, or operate MANUFACTURED EQUIPMENT anywhere or use or operate METHODS in the TERRITORY.

1.7   "USER" means any competent legal entity and AFFILIATES thereof who is a member of ETSI, or who has given an undertaking to ETSI of identical effect, mutatis mutandis to the UNDERTAKING, for so long as its undertaking is in force.

1.8   "EQUIPMENT and METHODS" shall mean any system, device, method or operation fully conforming to a STANDARD.

1.9   "ESSENTIAL" as applied to STATUTORY IPR means that it is not possible on technical grounds to make, use, lease, sell, operate or dispose of EQUIPMENT or METHODS which comply with a STANDARD without infringing that STATUTORY IPR.  For the avoidance of doubt where a STANDARD can only be implemented by technical solutions, all of which are infringements of STATUTORY IPRs, all such STATUTORY IPRs shall be considered ESSENTIAL.

1.10  "AFFILIATE" of a first legal entity means: any other legal entity
- directly or indirectly owning or controlling the first legal entity or
- under the same direct or indirect ownership or control as the first legal entity, or

- 8 -

Confidential Business Information,
Subject to Protective Order

- directly or indirectly owned or controlled by the first legal entity,

for so long as such ownership or control lasts.
Ownership or control shall exist through the direct or indirect:

- ownership of more than 50% of the nominal value of the issued equity share capital or of more than 50% of the shares entitling the holders to vote for the election of directors or persons performing similar functions, or
- right by any other means to elect or appoint directors, or persons who together can exercise such control.

A state, a division of a state or other public entity operating under public law, or any legal entity, linked to the first legal entity solely through a state or any division of a state or other public entity operating under public law, shall be deemed to fall outside the definition of an AFFILIATE.

1.11 "MANUFACTURE", shall mean production of EQUIPMENT in the TERRITORY in accordance with Regulation (EEC) No 802/68 and 1318/71 as amended from time to time - "On the common definition of the concept of the origin of goods".

1.12 "INFORMATION" shall mean all information disclosed directly or indirectly to the SIGNATORY or any of its AFFILIATES in connection with work carried out under the auspices of ETSI by any member of ETSI participating in standardisation work, or by ETSI itself which that member or ETSI has indicated in writing to be confidential.

2.    LICENCE OPTION

2.1    The SIGNATORY hereby undertakes on behalf of itself and its AFFILIATES on request by any USER to grant non-exclusive licences to that USER under and in accordance with any ESSENTIAL STATUTORY IPR which it or its AFFILIATES own (including, subject to clause 5 below, jointly owned STATUTORY IPRs) or control other than STATUTORY IPRs which it has notified to ETSI pursuant to Clause 3.1 below in accordance with the terms and conditions of the UNDERTAKING. Such licences shall be in the form set forth in Annex 1 attached hereto unless either the USER or SIGNATORY objects.

2.2    Where the total royalties payable for EQUIPMENT and METHODS in respect of ESSENTIAL STATUTORY IPR relating to a particular STANDARD exceed the maximum cumulative royalty set by ETSI in accordance with paragraph 6 of the Policy, the SIGNATORY, if it is the owner of a relevant ESSENTIAL STATUTORY IPR, hereby undertakes on behalf of itself and its AFFILIATES, on the request of ETSI, to enter multi-lateral negotiations with other owners of ESSENTIAL IPRs relating to that STANDARD, and ETSI, to agree reductions in royalty rates on all licences granted or to be granted in respect of such ESSENTIAL STATUTORY IPRs.

2.3    The obligation set forth in clause 2.1 above shall only apply to STATUTORY IPRs created during or prior to any period in

- 9 -

Confidential Business Information,
Subject to Protective Order

which a USER is bound by all the terms and conditions of an undertaking to ETSI, identical, mutatis mutandis, to the UNDERTAKING. For the purpose of this paragraph and clause 8.3.2, the date of creation of a REGISTERED STATUTORY IPR shall be the date on which the first application for said REGISTERED STATUTORY IPR was made anywhere in the world, and the date of creation of all other STATUTORY IPRs shall be the date on which the intellectual property to which said STATUTORY IPRs relate came into existence.

2.4   The obligations set forth in Clause 2.1 shall cease when an ESSENTIAL STATUTORY IPR ceases to be ESSENTIAL by virtue of a change in the technical specification of a STANDARD or by virtue of a change in the scope of protection of such ESSENTIAL STATUTORY IPR, provided that a USER shall be granted a licence pursuant to clause 2.1 to the extent necessary to enable him to meet all commitments existing to third parties prior to the date of change in the STANDARD. All licences in respect of an ESSENTIAL STATUTORY IPR granted prior to the date on which that ESSENTIAL STATUTORY IPR ceases to be ESSENTIAL shall continue to the extent that the licensee's prior commitments or serious preparations to use, or actual use would be unreasonably prejudiced by termination.

2.5   Where a legal entity has, pursuant to clause 3.1 indicated that it is not prepared to licence a particular ESSENTIAL STATUTORY IPR for a particular STANDARD which has been adopted by ETSI prior to the date of signature of the UNDERTAKING the SIGNATORY'S obligations pursuant to clause 2.1 above to grant licences to that legal entity and its AFFILIATES for that particular STANDARD shall be suspended until such time as that legal entity irrevocably withdraws its right to refuse licences, for that particular STANDARD in respect of all ESSENTIAL STATUTORY IPRs which it or its AFFILIATES own or control.

2.6   Licences granted pursuant to clause 2.1 above shall be non-exclusive, on fair, reasonable and non-discriminatory terms, shall permit USE of EQUIPMENT and METHODS in the TERRITORY, shall be of a technical scope limited to that necessary to enable the USER to comply with the STANDARD, and shall conform with ETSI's published policy on intellectual property rights.

2.7   The licences granted pursuant to clause 2.1 above may be limited to ESSENTIAL STATUTORY IPRs granted in the TERRITORY provided said licences permit, in respect of all ESSENTIAL STATUTORY IPRs, MANUFACTURED EQUIPMENT to be used but not sold or otherwise disposed of, anywhere, and devices, sub-systems, materials or the like for use in MANUFACTURE to be made or procured anywhere.

2.8   The SIGNATORY on behalf of itself and its AFFILIATES hereby undertakes not to seek an injunction in respect of any ESSENTIAL STATUTORY IPR in respect of:

- offers for sale of EQUIPMENT and METHODS or parts thereof to a customer in any country by a USER, or

- 10 -

Confidential Business Information,
Subject to Protective Order

- the supply of EQUIPMENT and METHODS or parts thereof by a USER to a customer in any country and the use thereof by the customer in any country where it can be demonstrated by objective evidence that it is used only for a trial or pilot system directly associated with seeking the adoption of a STANDARD in that country.

2.9   The SIGNATORY hereby undertakes on behalf of itself and its AFFILIATES to pursue to a conclusion all licence negotiations, both as licensor and licensee, arising from a request made for licences pursuant to clause 2.1 above in good faith and without undue delay and to refrain from taking legal action against any person who has requested a licence pursuant to the UNDERTAKING in respect of any STATUTORY IPR which is or has been acknowledged by the SIGNATORY as ESSENTIAL STATUTORY IPR available for licence pursuant to clause 2.1 above for infringement of that ESSENTIAL STATUTORY IPR, providing that person pursues negotiations relating to said licence in good faith and without undue delay, pending resolution of the terms of such licence.

2.10  Where a dispute between a SIGNATORY and USER relating to licensing terms and conditions, other than the level of royalty, is referred, pursuant to clause 13, to arbitration, the arbitrators shall, in the absence of reasons to the contrary, take into consideration the licensing terms and conditions of the Model Licence Agreement set forth in Annex 1.

2.11  Where a legal entity is not an AFFILIATE of any one member of ETSI, but control of that legal entity can be exercised by two or more members of ETSI or their AFFILIATES including the SIGNATORY or his AFFILIATES acting in concert, the SIGNATORY undertakes on behalf of itself and its AFFILIATES to use all reasonable endeavours to ensure said legal entity signs an undertaking equivalent to the UNDERTAKING.

3.   DISCLOSURE OF STATUTORY INTELLECTUAL PROPERTY RIGHTS

3.1   Where the SIGNATORY or any of its AFFILIATES is not prepared to grant licences for a particular STANDARD in respect of any particular STATUTORY IPRs which it or any of its AFFILIATES owns or controls, the SIGNATORY on behalf of itself and its AFFILIATES undertakes to notify ETSI of the identity, defined in a clear and unique manner, of such STATUTORY IPRs and the STANDARD proposal to which they apply in accordance with procedures laid down by ETSI. Where the SIGNATORY or any of its AFFILIATES wish to declare any of their STATUTORY IPRs unavailable for licence in respect of a particular STANDARD adopted prior to the date of signature of the UNDERTAKING he undertakes on behalf of himself and his AFFILIATES to make the declaration within 3 months of the said date of signature.

3.2   The SIGNATORY undertakes on behalf of itself and its AFFILIATES to make use of clause 3.1 above only in exceptional cases.

- 11 -

Confidential Business Information,
Subject to Protective Order

3.3 Where a SIGNATORY fails to notify ETSI in compliance with the procedures referred to in clause 3.1 above of the identity of a STATUTORY IPR, the SIGNATORY hereby undertakes on behalf of itself and its AFFILIATES to grant licences pursuant to that STATUTORY IPR in accordance with Clause 2 above.

3.4 The SIGNATORY on behalf of itself and its AFFILIATES undertakes not to withhold wilfully from ETSI the identity of any STATUTORY IPR which it or its AFFILIATES own or control, which could result in a STANDARD being specified in a manner which would cause said STATUTORY IPR to be ESSENTIAL.

3.5 The SIGNATORY on behalf of itself and its AFFILIATES undertakes, when requested by ETSI, to notify ETSI of the maximum royalty rate or the nature of alternative consideration acceptable to offset all or part of said maximum royalty rate it will demand for the grant of licences in respect of a particular proposed STANDARD pursuant to any STATUTORY IPRs identified in the request, within 90 days of receipt of the request.

4. SOFTWARE AND MASK WORKS

4.1 For the purpose of this clause 4, software shall be deemed to include computer programs, interfaces, communication protocols, codes, data, data formats, instruction sets or the like.

4.2 The SIGNATORY and its AFFILIATES shall not be obliged by this clause 4 to make any disclosure of INFORMATION, software or mask works and the licences granted pursuant to clauses 2 and 4.3 shall only extend to that which has been proposed to ETSI by the owner of the rights in the software or mask work for standardisation purposes.

4.3 Where a SIGNATORY has made a non-confidential proposal of software to ETSI or ETSI members in the course of ETSI standardisation work, and that software has been incorporated in a STANDARD so that copyright in that software becomes or is deemed to be an ESSENTIAL STATUTORY IPR, the SIGNATORY on behalf of itself and its AFFILIATES undertakes on request by any USER to grant non-exclusive licences to that USER to enable him to comply with the STANDARD pursuant to any copyright which constitutes an ESSENTIAL STATUTORY IPR which it or its AFFILIATES own (including, subject to clause 5 below, jointly owned STATUTORY IPRs) or control on fair, reasonable, non-prohibitive, and non-discriminatory terms to copy, adapt, and translate the software, grant sub-licences to end users of the software, sell, use or lease EQUIPMENT incorporating the software or make such other use of the software as may be necessary to enable the USER to comply with the STANDARD.

- 12 -

Confidential Business Information,
Subject to Protective Order

5.   JOINT INTELLECTUAL PROPERTY RIGHTS

The SIGNATORY hereby undertakes on behalf of itself and its
AFFILIATES to use all reasonable efforts to ensure that all
STATUTORY IPRs, which are or may become ESSENTIAL, which it or its
AFFILIATES jointly own with third parties, are available for the
grant of licences pursuant to clause 2 above.

6.   MISCELLANEOUS PROVISIONS

6.1  The SIGNATORY and its AFFILIATES shall be relieved of their
     obligation to grant any licence under STATUTORY IPRs to the
     extent that they can show that they are not contractually
     free to grant such licences pursuant to a contract pre-dating
     the UNDERTAKING provided that the SIGNATORY and its
     AFFILIATES have made a bona fide attempt to identify and
     notify ETSI of all such prior contracts at the time of
     executing the UNDERTAKING.

6.2  Nothing in the UNDERTAKING is to be construed as requiring
     the commission of any act contrary to law and wherever there
     is any conflict between any provision of the UNDERTAKING and
     any material statute, law or ordinance the latter shall
     prevail, but in any such event the provisions of the
     UNDERTAKING affected shall be curtailed and limited only to
     the extent necessary to bring them within the legal
     requirements, and such provisions, so curtailed and limited
     together with all other provisions of the UNDERTAKING shall
     continue in full force and effect in accordance with the
     terms hereof.

6.3  If the SIGNATORY or any of its AFFILIATES acquires ownership
     or control of STATUTORY IPRs after the date of execution of
     the UNDERTAKING which due to contractual commitments
     pre-dating such acquisition are not available for licensing
     pursuant to the UNDERTAKING, the SIGNATORY shall identify and
     notify ETSI of such STATUTORY IPRs without undue delay.

6.4  Where a legal entity becomes a new AFFILIATE of the SIGNATORY
     after the date of execution of the UNDERTAKING, the SIGNATORY
     shall use its best endeavours to ensure that the new
     AFFILIATE is bound by the terms and conditions of the
     UNDERTAKING.  Where a SIGNATORY is unable to bind a new
     AFFILIATE to the terms and conditions of the UNDERTAKING, it
     shall immediately disclose its inability to ETSI together
     with full details of the reason for its failure, and shall
     submit to whatever penalty is provided by the ETSI statutes
     which, in the worst case, shall be resignation from ETSI.  An
     AFFILIATE who is not bound by an undertaking equivalent to
     the UNDERTAKING shall not be entitled to enjoy any rights
     granted by equivalent undertakings signed by members of ETSI
     and others.

- 13 -

Confidential Business Information,
Subject to Protective Order

6.5 The SIGNATORY on behalf of itself and its AFFILIATES hereby grants and undertakes to grant, ETSI, non-exclusive licences free of any financial consideration, pursuant to any literary or artistic copyright which the SIGNATORY owns or controls in non-confidential documents which the SIGNATORY supplies to ETSI or any committee of ETSI, permitting ETSI to reproduce, translate, adapt, edit or publish all or part of such documents in ETSI technical reports or standards specifications.

6.6 Any licence granted pursuant to 6.5 shall authorise ETSI to grant sub-licences to third parties on terms and conditions determined at the discretion of ETSI. In particular such sub-licences may be royalty bearing or free, and may authorise the grant of further sub-licences. The SIGNATORY shall have no claim on any financial return obtained by ETSI from the grant of such sub-licences.

6.7 The SIGNATORY on behalf of itself and its AFFILIATES hereby undertakes, when requested so to do by ETSI, to assign any copyright it may own in a complete work which comprises an ETSI technical report, ETS, or I-ETS as published by ETSI. The SIGNATORY and its AFFILIATES shall not be required to assign any copyright they may own in a work incorporated in an ETSI technical report, ETS, or I-ETS, unless it comprises the entire work.

6.8 ETSI shall respect author's rights in documents supplied to ETSI or its working committees by the SIGNATORY, and shall indemnify and hold harmless the SIGNATORY in respect of any action relating to author's rights arising from any use by ETSI or its sub-licensees of documents supplied by the SIGNATORY to ETSI.

6.9 The SIGNATORY on behalf of itself and its AFFILIATES undertakes to apply the rules set forth in Annex 3 to the UNDERTAKING relating to joint liability of the purchaser and vendor of EQUIPMENT specified by reference to a STANDARD for infringement of certain ESSENTIAL IPRs.

6.10 The SIGNATORY undertakes on behalf of itself and its AFFILIATES that in a contract relating to EQUIPMENT and METHODS with another party who is a member of ETSI or a signatory to an undertaking equivalent to this UNDERTAKING or an AFFILIATE of either, it will not include a term requiring IPRs to be licensed in any other way than in accordance with this UNDERTAKING.

6.11 Nothing in the UNDERTAKING shall be interpreted as in any way limiting or restricting the freedom of the SIGNATORY to assign or re-assign his employees participating in ETSI work.

7. CONFIDENTIALITY

7.1 The SIGNATORY hereby undertakes on behalf of itself and its AFFILIATES to keep confidential all INFORMATION for a period of two years from the date of disclosure or until the SIGNATORY is released from any obligation of confidentiality

- 14 -

Confidential Business Information,
Subject to Protective Order

S-ITC-003390476

in respect of the INFORMATION by a written communication issued by the discloser thereof or by ETSI, after having obtained the consent of the discloser of the INFORMATION, whichever be the earlier.

7.2   The SIGNATORY shall:

7.2.1 use the INFORMATION only for purposes associated with furthering the objectives of ETSI, (hereinafter referred to as the PERMITTED PURPOSE);

7.2.2 not disclose the INFORMATION or permit it to be disclosed to any person (other than an employee of the SIGNATORY or its AFFILIATES who needs to know it in connection with the PERMITTED PURPOSE) without the express written consent of ETSI.

7.2.3 not incorporate any of the INFORMATION in an application for a patent without the express written consent of ETSI;

7.2.4 ensure that all employees of the SIGNATORY or of its AFFILIATES in receipt of INFORMATION have either signed a confirmation form as set out in Annex 2 or are otherwise bound by a contractual obligation of confidentiality to the SIGNATORY.

7.3   The obligations imposed by 7.1 and 7.2 above shall not apply to:

(a)   INFORMATION in the public domain otherwise than in breach of the UNDERTAKING;

(b)   INFORMATION which the SIGNATORY can show to have been already in its possession prior to any disclosure to which the UNDERTAKING relates and which came into their possession from a source unrelated to ETSI or a member thereof;

(c)   INFORMATION which the SIGNATORY can show that he developed or discovered independently and without reference to any information disclosed to them under or in connection with the UNDERTAKING;

(d)   INFORMATION obtained from a third party (including an ETSI member) who is free to divulge it without imposing an obligation of confidentiality;

(e)   INFORMATION required to be divulged by order of a court or other competent tribunal;

7.4   Any breach of the requirements of this clause 7 discovered by the SIGNATORY shall immediately be notified to the Chairman of ETSI's IPRC and to the discloser of the INFORMATION.

- 15 -

Confidential Business Information,
Subject to Protective Order

8.   TERMINATION

8.1   The UNDERTAKING may be terminated by the SIGNATORY by giving
ETSI 24 months written notice of its intention to terminate
the UNDERTAKING.

8.2   The SIGNATORY may not terminate the UNDERTAKING unless he
simultaneously gives 12 months notice in writing of
termination of his membership of ETSI.  The date of
termination for the purposes of clause 8 shall be the date on
which the SIGNATORY ceases to be a member of ETSI.

8.3   The effects of terminating the UNDERTAKING are:-

8.3.1 All licences granted by or to the SIGNATORY pursuant to
the UNDERTAKING shall continue in full force and effect.

8.3.2 The obligations of the terminating SIGNATORY to grant
licences pursuant to the UNDERTAKING shall:
- in the case of STATUTORY IPRs identified to or by
ETSI as ESSENTIAL, prior to the date on which the
SIGNATORY ceases to be a member of ETSI, survive
termination until such time as said STATUTORY IPRs
expire.
- in the case of other STATUTORY IPRs created before
termination of the UNDERTAKING, and identified as
ESSENTIAL within a period of 2 years from the date
on which the SIGNATORY ceases to be a member of
ETSI, survive termination of the UNDERTAKING until
such time as said STATUTORY IPRs expire.
Creation shall have the same meaning as in clause
2.3 above.

8.4   Where an AFFILIATE of a SIGNATORY who is not a member of
ETSI in its own right ceases to be an AFFILIATE, the
SIGNATORY shall cease, upon the date of cessation, to have
any liability whatsoever in respect of that legal entity's
compliance or otherwise with the UNDERTAKING.  Any legal
entity ceasing to be an AFFILIATE of the SIGNATORY shall be
deemed to have given ETSI 24 months' written notice of its
intention to terminate the UNDERTAKING pursuant to clause 8.1
above.

9.   WAIVER OF DEFAULT

No waiver by ETSI of any default of the SIGNATORY shall be held to be a
waiver of any other or subsequent defaults.  The failure of ETSI at any
time to enforce any of the provisions of the UNDERTAKING, or to exercise
any right hereunder provided, shall not be construed as a waiver of that
provision or prevent subsequent exercise of that right.

- 16 -

Confidential Business Information,
Subject to Protective Order

10.  NOTICES

All communications provided for hereunder shall be in writing and shall
be delivered or mailed by registered mail to the applicable party at the
addresses indicated below:-

Notices shall be sent to the SIGNATORY at:

.................

.................

.................

Notices shall be sent to the ETSI at:

European Telecommunications Standards Institute
Route des Lucioles
Sophia - Antipolis
Valbonne
FRANCE

All such communications shall be effective when delivered.

11.  HEADINGS

The headings hereof are included for convenience of reference only and
shall not be deemed to be a part of the UNDERTAKING.

12.  CONSTRUCTION

The construction, validity and performance of the UNDERTAKING shall be
governed in all respect by the laws of France.

13.  ARBITRATION

13.1  In the event of a dispute or difference between the
      SIGNATORY, and a signatory of an equivalent undertaking
      mutatis mutandis arising out of or in connection with the
      UNDERTAKING, its interpretation, or application, the parties
      to the dispute shall first use their best endeavours to
      settle the dispute or difference amicably within a period of
      3 months after one party has announced in writing to the
      other that there exists a dispute or difference.

13.2  All disputes or differences which cannot be settled as
      provided for in clause 13.1 above shall be finally settled by
      ad hoc arbitration by three arbitrators.  One arbitrator
      shall be appointed by each party to the dispute, and the

- 17 -

Confidential Business Information,
Subject to Protective Order

third arbitrator, who shall act as Chairman, shall be appointed by the two first appointed arbitrators.  If the two first appointed arbitrators fail to agree upon the third arbitrator within 6 weeks of the appointment of the second of the first two, the third arbitrator shall be appointed by the Director of ETSI.  The Chairman of the arbitration panel shall have proven experience in the issues in dispute.

13.3  The arbitrators shall follow the rules of conciliation and arbitration of the International Chamber of Commerce in its edition current at the time of arbitration without involving the International Chamber of Commerce in administrative matters.

13.4  If there be more than one party on one, or on both sides, all parties being on one side shall act jointly and unanimously as a single party for the appointment of arbitrators and any other activities in the course of arbitration.

13.5  The arbitrators shall use their best efforts to give their final judgement not later than six months from the date on which the third arbitrator has been appointed.

13.6  Unless otherwise agreed, arbitrators shall have their meetings and hearings in Sophia-Antipolis.

13.7  The award of the arbitrators shall be final and binding upon the disputing parties.

13.8  Issues of IPR infringement and validity shall not be decided by the Arbitrators, however decisions relating to the ESSENTIALITY of an IPR may be made, as between the parties, by arbitration and shall be made available by the parties to ETSI for distribution to all members, together with the reasons for the arbitrator's decision.

13.9  If and as long as the SIGNATORY is not permitted by law to be a party to arbitration and a dispute arises out of the UNDERTAKING which involves the SIGNATORY, then such dispute shall be submitted to the jurisdiction of a competent court.

13.10  The costs of arbitration shall be borne by the parties thereto and apportioned as the arbitrators shall direct.

14.  RETROACTIVE EFFECT

14.1  The UNDERTAKING shall supersede and replace all previous undertakings given to ETSI by the SIGNATORY which relate to ESSENTIAL STATUTORY IPRs.  All such prior undertakings shall be regarded as null and void by ETSI and its members. However, where the terms and conditions of licences granted

- 18 -

Confidential Business Information,
Subject to Protective Order

or offered pursuant to such earlier undertaking would be more
favourable as a whole than the terms and conditions of a
licence granted pursuant to the UNDERTAKING, the SIGNATORY
undertakes on behalf of itself and its AFFILIATES if so
requested to grant licences in respect of ESSENTIAL STATUTORY
IPRs on the terms and conditions specified in said earlier
undertaking.

## 15.   COMPLIANCE WITH ETSI POLICY

The SIGNATORY on behalf of itself and its AFFILIATES accepts that its
AFFILIATES are subject to the Statutes of ETSI as though they were
members of ETSI and undertakes that it and its AFFILIATES will comply
with ETSI's IPR policy and any ruling made by ETSI pursuant to that
policy or ETSI's Statutes.

For and on behalf of ..............................

By ..............................

Position .........................

For and on behalf of ..............................

By ..............................

Position .........................

- 19 -

Confidential Business Information,
Subject to Protective Order

4302s

ANNEX 1 TO APPENDIX A

MODEL LICENCE AGREEMENT

LICENCE AGREEMENT made in ...... this ..... day of ...... between ...... whose registered office is situate at ........ (hereinafter referred to as "the LICENSOR" and ....... whose registered office is situate at ........ (hereinafter referred to as "the LICENSEE").

WHEREAS

1.    The LICENSOR has given an undertaking to ETSI dated ..... to grant licences in respect of ESSENTIAL STATUTORY IPRs owned or controlled by the LICENSOR, and

2.    The LICENSOR is the proprietor of certain ESSENTIAL STATUTORY IPRs listed in Annex 1 attached hereto.

3.    The LICENSEE has given an undertaking to ETSI dated .............. on terms equivalent, mutatis mutandis, to the undertaking given to ETSI by the LICENSOR.

4.    The LICENSEE wishes to obtain licences from the LICENSOR to USE LICENSED PRODUCTS and PROCESSES, and the LICENSOR is prepared to grant such licences to the LICENSEE upon the terms and conditions hereinafter set forth.

THE PARTIES HERETO AGREE AS FOLLOWS:-

1.    DEFINITIONS

For the purposes of the AGREEMENT, unless the context clearly or necessarily indicates otherwise, the following words and phrases shall have the meanings set forth below:-

    1.1   "AGREEMENT" shall mean this licence agreement.

    1.2   "LICENSED PRODUCTS and PROCESSES" shall mean any system, device, method or operation fully conforming to the STANDARD and which is, in the case of LICENSED PRODUCT MANUFACTURED in the TERRITORY.

    1.3   "ETSI" shall mean the EUROPEAN TELECOMMUNICATIONS STANDARDS INSTITUTE.

    1.4   The "STANDARD" shall mean the standard including its optional versions for ......

- 20 -

Confidential Business Information,
Subject to Protective Order

1.5  "STATUTORY IPR" shall mean any intellectual property right created by statute law other than trademarks.  For the avoidance of doubt rights relating to get up, confidential information, trade secrets or the like are excluded from the definition of STATUTORY IPR.

1.6  LICENSED IPRs shall mean the ESSENTIAL STATUTORY IPRS listed in Annex A. (Annex A should list patents and the claims thereof which are licensed together with all other STATUTORY IPRs licensed. Where a STATUTORY IPR is not licensed as a whole a clear unambiguous definition of the extent of the licence must be provided.)

1.7  "PENDING" as applied to an IPR means that an application has been made for the grant of that IPR, the application has neither been granted nor refused, and on grant of the IPR the proprietor thereof is entitled to payment by virtue of law or regulation for any acts performed by another within the scope of protection of the IPR during the period it was PENDING.

1.8  "ESSENTIAL" as applied to STATUTORY IPR means that it is not possible on technical grounds to make, use, sell, lease, operate or dispose of LICENSED PRODUCTS or PROCESSES which comply with the STANDARD without infringing that STATUTORY IPR.  For the avoidance of doubt where a STANDARD can only be implemented by technical solutions, all of which are infringements of STATUTORY IPRs, all such STATUTORY IPRs shall be considered ESSENTIAL.

1.9  "AFFILIATE" of a PARTY means: any legal entity

  – directly or indirectly owning or controlling the PARTY,
  – under the same direct or indirect ownership or control as the PARTY, or
  – directly or indirectly owned or controlled by the PARTY
  for so long as such ownership or control lasts.
  Ownership or control shall exist through the direct or indirect:
  – ownership of more than 50% of the nominal value of the issued equity share capital or of more than 50% of the shares entitling the holders to vote for the election of directors or persons performing similar functions, or
  – right by any other means to elect or appoint directors, or persons who together can exercise such control.

  A state, any division of a state, or other public entity operating under public law, or any legal entity linked to a PARTY solely through a state or any division of a state or other public entity operating under public law shall be deemed to fall outside the definition of an AFFILIATE.

1.10  "NET SALES VALUE" shall mean the gross sales value of LICENSED PRODUCTS less the total of any value added taxes, freight, packaging and insurance charges shown separately upon an invoice, if charges for packing, insurance and freight are not shown separately, a sum equal to 1.5% of the total amount invoiced less sales and/or value added tax may be deducted.

1.11  "SALE" (or "SOLD") shall mean sale or disposal and shall include lease.

- 21 -

Confidential Business Information,
Subject to Protective Order

1.12  "THE TERRITORY" shall mean any and all countries:
- whose national administration for telecommunications is, at the date of USE a member of ETSI, or
- in which an officially recognised national standardization body has formally adopted and, in the opinion of ETSI, the STANDARD has been implemented in that country or
- in which in the opinion of ETSI, a major telecommunications network operator, has or is about to procure equipment on a substantial scale conforming to a specification compliant with the STANDARD.

1.13  "USE" shall mean MANUFACTURE, sell, lease or otherwise dispose in the TERRITORY of LICENSED PRODUCTS and repair, use or operate LICENSED PRODUCTS anywhere or use or operate LICENSED PROCESSES in the TERRITORY.

1.14  "MANUFACTURE" shall mean production of LICENSED PRODUCTS in the TERRITORY in accordance with Regulation (EEC) No 802/68 and 1318/71 as amended from time to time - "On the common definition of the concept of the origin of goods."

## 2.  COMMENCEMENT DATE

The AGREEMENT shall come into effect on the date first before mentioned and unless terminated in accordance with the provisions hereof shall continue in force and effect, until expiration of the last STATUTORY IPR licensed hereunder.

## 3.  LICENCE GRANT

3.1  The LICENSOR hereby grants to the LICENSEE a non exclusive licence pursuant to LICENSED IPRs to:-

3.1.1  USE LICENSED PRODUCTS and PROCESSES.

3.1.2  Manufacture or procure anywhere devices, sub-systems materials or the like solely for use in MANUFACTURE.

## 4.  ROYALTY PAYMENTS

4.1  The LICENSEE shall pay to the LICENSOR a royalty of ....% of the NET SALE VALUE of the LICENSED PRODUCTS manufactured or sold by him.

(- Alternative modes of payment may be agreed.)

- 22 -

Confidential Business Information,
Subject to Protective Order

S-ITC-003390484

4.2   Royalties shall accrue to the LICENSOR on the date on which a LICENSED PRODUCT is dispatched to a customer. Royalties due in respect of transactions which do not involve sale shall be based on the NET SALES VALUE for an arm's length sales transaction.

4.3   Royalties shall be paid only once per LICENSED PRODUCT, and only if a LICENSED IPR is in force at the date on which the royalty accrues in a COUNTRY in which the LICENSEE MANUFACTURES, sells, uses, leases or otherwise disposes of a LICENSED PRODUCT. In respect of any PENDING LICENSED IPR, the royalty shall become due with retroactive effect from the date, on which under the applicable law, the applicant has a right to payment provided that the LICENSED IPR is granted.

4.4   The LICENSEE shall submit to the LICENSOR on or before ...... and ..... respectively in each year during the term of the AGREEMENT, a statement of all royalty bearing activity made by the LICENSEE during the six month period commencing eight months prior to the date on which the statement for royalty bearing activity is due. A "nil" statement shall be made when appropriate. The LICENSEE shall pay all sums due hereunder at the same time as submission of the statement. The LICENSEE shall pay, together with the first statement, any amounts due for infringements which accrued before the effective date of the AGREEMENT, and shall pay, together with the statement following the date of grant of a PENDING LICENSED IPR, any amounts due up to the date of grant.

4.5   The LICENSEE agrees to keep true and accurate books of account with regard to all royalty bearing activity. The LICENSOR shall have the right from time to time to cause the LICENSEE'S relevant records to be inspected and audited by a professional accountant appointed by the LICENSOR and acceptable to the LICENSEE. For the above purposes the LICENSEE shall allow access to its premises to the appointed accountant and disclose the relevant accounts and records. If the auditing shows an error in payments made of at least 5%, to the disadvantage of the LICENSOR, the LICENSEE shall bear the costs of the audit. All unpaid royalties and audit fees due shall be paid immediately.

4.6   In addition to payments made pursuant to clause 4.1 above, the LICENSEE shall pay to the LICENSOR any value added tax or equivalent tax which the LICENSOR is liable to pay referable to the payments referred to in clause 4.1.

4.7   The LICENSEE shall be entitled to deduct any income tax which he is required to withhold at source from the sums payable hereunder, provided that he shall do all things necessary to enable the LICENSOR to claim exemption therefrom under any treaty for the avoidance of double taxation.

5.   MISCELLANEOUS PROVISIONS

5.1   The LICENSOR shall not be liable to indemnify the LICENSEE against any loss sustained by him as a result of any claim made or action brought by any third party for infringement of any intellectual property right by reason of USE of LICENSED PRODUCTS.

- 23 -

Confidential Business Information,
Subject to Protective Order

5.2   The rights and obligations of either PARTY to the agreement may be assigned or sub-licensed to any AFFILIATE of that PARTY at any time during the period of the AGREEMENT, provided that the assignee or sub-licensee undertakes to be bound by the terms and conditions of the AGREEMENT as though he was the assignor or sub-licensor, mutatis mutandis, and to indemnify the other PARTY to the AGREEMENT against any loss or damage resulting from the assignment or sub-licence, subject to the prior agreement of the other PARTY, which agreement shall not be unreasonably withheld.

5.3   For the avoidance of doubt, and subject to clause 5.2 above, the licences herein granted do not include the right to grant sub-licences or the right to have LICENSED PRODUCTS made.

5.4   Except as provided for in clause 5.2 above, the LICENSEE shall not assign, transfer, mortgage, charge (except for any floating charge on company assets) or part with, any of his rights, duties or obligations under the AGREEMENT.

5.5   Where the LICENSEE sells LICENSED PRODUCTS in a country whose law requires goods subject to IPRs to bear a mark identifying the IPRs or whose laws impose any penalty or disadvantage on the proprietor of IPRs when goods do not bear such a mark, the LICENSEE shall use his reasonable endeavours to appropriately mark LICENSED PRODUCTS in accordance with the law of the country in which they are sold.

5.6   The LICENSOR does not warrant that any of the LICENSED IPRs are valid and does not undertake to maintain any of them.

5.7   The LICENSOR does not guarantee the success of production by the LICENSEE nor the quality and functionality of LICENSED PRODUCTS made by the LICENSEE, nor does it make any warranty of merchantability of LICENSED PRODUCTS.  The liability for technical defects, including product liability, shall rest exclusively with the LICENSEE.

5.8   To the extent permitted by the applicable law specified in clause 12 of this AGREEMENT, the liability of the LICENSOR shall be determined solely by the terms of the AGREEMENT.  The LICENSOR does not accept liability for damage suffered by third parties and consequential damage.

5.9   The LICENSEE undertakes, on behalf of itself and its AFFILIATES, during the period in which the LICENSEE is bound by an undertaking to ETSI, and to the extent that the LICENSEE is obliged to do so pursuant to such undertaking, to grant licences to the LICENSOR and its AFFILIATES in respect of ESSENTIAL STATUTORY IPRs.

6.   TERMINATION

6.1   The agreement may only be terminated by the LICENSOR on written notice to the LICENSEE if the LICENSEE materially breaches any of the terms of the AGREEMENT and such breach is not remedied within a period of 60 days after notification thereof, such notification stating the intention to terminate if such breach is not remedied.

- 24 -

Confidential Business Information,
Subject to Protective Order

6.2   The AGREEMENT may be terminated by the LICENSEE by giving the LICENSOR 12 month's written notice of his intention to terminate the AGREEMENT.

6.3   The AGREEMENT shall expire if not terminated earlier on the date of expiration of the last LICENSED IPR to expire.

6.4   Upon termination of the AGREEMENT pursuant to clause 6.1 and 6.2 all rights granted and obligations imposed by the AGREEMENT are terminated save that the LICENSEE remains obliged to pay any sums due pursuant to clause 4.

7.   SUPERVENING ILLEGALITY

Nothing in the AGREEMENT is to be construed as requiring the commission of any act contrary to law and wherever there is any conflict between any provision of the AGREEMENT and any material statute, law or ordinance the latter shall prevail, but in any such event the provisions of the AGREEMENT affected shall be curtailed and limited only to the extent necessary to bring them within the legal requirements, and such provisions, so curtailed and limited, together with all other provisions of the AGREEMENT shall continue in full force and effect in accordance with the terms hereof.

8.   WAIVER OF DEFAULT

No waiver by either PARTY of any default of the other PARTY shall be held to be a waiver of any other or subsequent defaults. The failure of either PARTY at any time to enforce any of the provisions of the AGREEMENT, or to exercise any right hereunder provided, shall not be construed as a waiver of that provision or prevent subsequent exercise of that right.

9.   NOTICES

All communications provided for hereunder shall be in writing and shall be delivered or mailed by registered (air) mail to the applicable PARTY at the addresses indicated below:-

Notices shall be sent to the LICENSOR at:

    .................
    .................
    .................

Notices shall be sent to the LICENSEE at:

    ..............
    ..............
    ..............

All such communications shall be effective when delivered.

- 25 -

Confidential Business Information,
Subject to Protective Order

10. **AMENDMENT**

10.1   The AGREEMENT constitutes the entire agreement between the PARTIES and shall not be modified or amended except by an instrument in writing of subsequent date hereto duly executed by both of the PARTIES.

10.2   Annex 1 shall from time to time be amended subject to the agreement of both PARTIES to the amendment and any other consequential amendment of the AGREEMENT.   Notwithstanding clause 10.1, the LICENSEE may unilaterally delete any LICENSED IPR from Annex 1 from the date of receipt by the LICENSOR of notification in writing of the LICENSEE'S decision to unilaterally delete such LICENSED IPR.

10.3   At the LICENSEE'S request the LICENSOR agrees to renegotiate the royalty rates or their equivalent, if any  specified in clause 4.1 above in the event that the LICENSEE is required to make payments, in respect of ESSENTIAL IPR whose existence was unknown to the Licensor or Licensee at the date first before mentioned  for USE of the same LICENSED PRODUCTS OR PROCESSES in the same country, if necessary in order to comply with paragraph 6 of ETSI's IPR policy.  However, nothing in this paragraph shall require the LICENSOR to refund payments already effected.

11. **HEADINGS**

The headings hereof are included for convenience of reference only and shall not be deemed to be a part of the AGREEMENT.

12. **CONSTRUCTION**

The construction, validity and performance of the AGREEMENT shall be governed in all respect by the laws of .........

13. **SETTLEMENT OF DISPUTES**

13.1   In the event of a dispute or difference between PARTIES to the AGREEMENT the PARTIES shall first use their best endeavours to settle the dispute or difference amicably within a period of 3 months after one party has announced in writing to the other that there exists a dispute or difference.

13.2   All disputes or differences which cannot be settled as provided for in clause 13.1 above shall be finally settled by ad hoc arbitration by three arbitrators.  One arbitrator shall be appointed by each party to the dispute, and the third arbitrator, who shall act as Chairman, shall be appointed by the two first appointed arbitrators.  If the two first appointed arbitrators fail to agree upon the third arbitrator within 6 weeks of the appointment of the second of the first two arbitrators, the third arbitrator shall be appointed by the Director of ETSI.  The Chairman of the arbitration panel shall have proven experience in the issues in dispute.

- 26 -

Confidential Business Information,
Subject to Protective Order

13.3 The arbitrators shall follow the rules of concilliation and arbitration of the International Chamber of Commerce in its edition current at the time of arbitration without involving the International Chamber of Commerce in administrative matters.

13.4 If there be more than one party on one, or on both sides, all parties being on one side shall act jointly and unanimously as a single party for the appointment of arbitrators and any other activities in the course of arbitration.

13.5 The arbitrators shall use their best efforts to give their final judgement not later than six months from the date on which the third arbitrator has been appointed.

13.6 Unless otherwise agreed, arbitrators shall have their meetings and hearings in Sophia-Antipolis, France.

13.7 The award of the arbitrators shall be final and binding upon the disputing parties.

13.8 Issues of IPR infringement and validity shall not be decided by the arbitrators, however decisions relating to the ESSENTIALITY of an IPR may be made, as between the parties, by arbitation and shall be made available by the parties to ETSI for distribution to all members, together with the reasons for the arbitrator's decision.

13.9 If and as long as one of the PARTIES is not permitted by law to be a party to arbitration and a dispute arises out of the AGREEMENT, then such dispute shall be submitted to the jurisdiction of a competent court.

13.10 The costs of arbitration shall be borne by the parties thereto and apportioned as the arbitrators shall direct.

For and on behalf of ............................

By ..............................

Position ..........................

For and on behalf of ..............................

By ................................

Position ..........................

- 27 -

Confidential Business Information,
Subject to Protective Order

## ANNEX 2 TO APPENDIX A

EMPLOYEES CONFIRMATION FORM

1.   .....................(the EMPLOYER) has signed an UNDERTAKING.  The terms
     of the UNDERTAKING relating to confidentiality are annexed to this form.

2.   In accordance with the above-mentioned UNDERTAKING the EMPLOYER is
     obliged to ensure that all its employees involved in ETSI work have
     signed a CONFIRMATION FORM in order to confirm that the employee has been
     informed of the obligations in the UNDERTAKING relating to
     confidentiality.

3.   I confirm that I am an employee of .the EMPLOYER and that I have read and
understood the annexed terms of the  UNDERTAKING.

Date .........................

Signed by .....................

– 28 –

Confidential Business Information,
Subject to Protective Order

S-ITC-003390490

ANNEX 3 TO APPENDIX A

JOINT LIABILITY FOR INFRINGEMENT OF ESSENTIAL STATUTORY IPRs

1.    The rules set out in this Annex for sharing the risks associated with infringement of ESSENTIAL STATUTORY IPRs shall only apply to infringement of ESSENTIAL STATUTORY IPRs which were not identified as ESSENTIAL or potentially ESSENTIAL on an official ETSI list available to all MEMBERS immediately prior to the date on which the STANDARD to which the ESSENTIAL STATUTORY IPRs relate is available to all members of ETSI as set out in clause 1.4 of the UNDERTAKING, or is available to both parties of a relevant procurement contract at least fourteen days  prior to the date on which the procurement contract price was binding on the vendor, whichever list was last available.*

2.    Members shall include terms and conditions which give effect to the rules set out in this Annex in all contracts for procurement of EQUIPMENT and METHODS or part thereof (hereinafter referred to as GOODS) which are specified in the contract, by reference to a STANDARD .

3.    The liabilities, incurred through infringement of ESSENTIAL STATUTORY IPRs, that are to be equitably shared are limited to:-

    a)    the price of GOODS delivered and/or GOODS in stock and the cost incurred of GOODS in the course of manufacture directly attributable to a relevant procurement contract subject to discounting for re-usable parts and components;

    b)    damages awarded by a court of law or arbitration and payments associated with the settlement of infringement of such ESSENTIAL STATUTORY IPR together with the associated legal . costs which are clearly identified with the supply of GOODS to which the contract relates;

    c)    sums payable for any licences pursuant to such ESSENTIAL STATUTORY IPR which can be objectively verified as relating solely to GOODS supplied under a relevant procurement contract.

    d)    the cost of modifying GOODS to avoid infringement of ESSENTIAL STATUTORY IPRs.

For the avoidance of doubt liabilities directly related to the infringement of ESSENTIAL STATUTORY IPRs which arise from use of GOODS by the purchaser where:

    -    the use is either explicitly set out in the relevant procurement contract or in absence thereof the use is that use for which the GOODS were designed, and

    -    the infringement arises solely by virtue of use of the GOODS as supplied under the relevant procurement contract;

shall be equitably shared by the parties to a relevant procurement contract.

*(Explanatory note: procurement contracts are sometimes placed before a standard specification referred to in the contract is published.)

Confidential Business Information,
Subject to Protective Order

4.   For the avoidance of doubt indirect losses, consequential losses and losses other than those referred to in paragraph 3 above shall not be shared but shall lie where they fall.

5.   For the purposes of this Annex the price of GOODS delivered shall be the contract price discounted by 10% for each full calendar year between the date of delivery of the GOODS and the date on which the purchaser first ceased using the GOODS because of infringement of an ESSENTIAL STATUTORY IPR by the GOODS or use of the GOODS.

6.   For the purposes of this Annex GOODS, or use of GOODS, shall be deemed to infringe an ESSENTIAL STATUTORY IPR either:

- by agreement of the parties to a relevant procurement contract, or

- by virtue of a decision by a court of law competent to determine issues of IPR infringement.

7.   Upon discovery that GOODS supplied or to be supplied under a relevant procurement contract may infringe an ESSENTIAL STATUTORY IPR, the parties shall meet and use their reasonable endeavours to agree upon a course of action which minimises the total losses of all parties to the procurement contract.

In considering the course of action to be followed the parties shall give favourable consideration to courses of action which include modification of the GOODS by the supplier so that:

- the GOODS no longer infringe ESSENTIAL STATUTORY IPRs. and

- the GOODS as modified are capable of performing their specified function or the function for which they were designed;

even if such modification results in the GOODS as modified no longer complying with the relevant STANDARD or, should it prove impractical to modify the GOODS, repurchase of the GOODS by the supplier at the price specified in Clause 5 of this Annex. The repurchase price less any sums recovered by resale of the GOODS or reuse of the parts thereof shall be added to the costs to be shared by the parties.

8.   Where it can be demonstrated that licences are not available on fair and reasonable terms in respect of an ESSENTIAL STATUTORY IPR which is infringed by the supply or use of GOODS pursuant to a procurement contract, failure to supply or accept GOODS shall not be deemed a breach of that contract. However, the parties may in accordance with paragraph 5 above where this is agreed modify GOODS to avoid infringement.

9.   For the avoidance of doubt any licence which requires payment of a royalty based on the extent of use of GOODS shall be deemed to be on unfair and unreasonable terms.

Confidential Business Information,
Subject to Protective Order

10. The contribution by one party (including repurchasing costs) whether by way of payment to the other party or by contribution to the cost of modification of GOODS pursuant to equitable sharing of liabilities payable as a result of infringement of ESSENTIAL STATUTORY IPR shall not exceed the price to be paid for GOODS in the original contract for supply of those GOODS.

11. Subject to paragraph 10 above equitable sharing of liabilities set out in Clauses 3a-3c above shall be sharing in equal parts between the parties to a relevant procurement contract.

12. Nothing in this Annex shall be taken as requiring the SIGNATORY or its AFFILIATES to refer any dispute relating to a procurement contract to arbitration.

Confidential Business Information,
Subject to Protective Order