# EXHIBIT 9

ETSI/GA20(94)2

# ANNEX XX

### Final Texts from 3rd Plenary meeting
### 4 Pages

Confidential Business Information,
Subject to Protective Order

S-ITC-003390494

ETSI Special Committee on IPR                    24 June, 1994
                                                 SAUNTEHUS

**Final text - 180 days**

The parts between brackets, [ ], are not agreed upon.

All committee members agree that

1.   A complete and stable draft of a standard available to
     all ETSI members is necessary before a member can
     effectively identify IPRs and evaluate whether or not to
     withhold a licence for such IPRs.

2.   A TC-approved draft, when typed, reproduced and
     distributed to all ETSI members can form a stable draft
     sufficient to perform an IPR evaluation.  Efforts should
     be undertaken to attempt to achieve such a stable draft
     at an earlier time.

3.   Unless an IPR holder has participated in the elaboration
     of a TC-approved draft standard, IPR holders shall have
     180 days from the time of distribution of an approved
     draft standard by the TC to provide notice to ETSI of the
     withholding of Essential IPRs.  If an IPR holder is such
     a participant and has received the TC approved draft of
     the standard, then the IPR holder has 90 days from the
     time of distribution of the approved draft by the TC.
     Any essential IPRs not withheld by the end of this 180-
     day (90-day) period shall be available for license by
     other ETSI members on terms and conditions consistent
     with the Undertaking. ETSI should, before implementation
     of the notice procedure, review its practices to have the
     definition of "Participation" reflect actual involvement
     in the elaboration of draft standards.  A review should
     be conducted after one year after the new notice
     procedure begins to review its effects.

4.   A member whose written technical proposal is approved by
     the TC substantially as proposed has waived its right to
     withhold his essential IPR contained in that technical
     proposal.

     [IPR searches, to the extent they are to be performed,
     shall be carried out [by IPR holders or on their behalf]
     [by ETSI or on its behalf].


Note 1:  Preferably the period of withholding should be completed
         before the start of public enquiry.

[Note 2:  Once a standard is approved, the right of use for any IPR
          related to the implementation of that standard may be
          refused only if the IPR owner can prove that the IPR is
          not Essential for the implementation of the standard.
          In case the previous paragraph is not finally agreed
          upon, the inclusion of the term "Essential" contained
          above is also not agreed upon.]


C:\FNL\24D.3rd

Confidential Business Information,
Subject to Protective Order                              S-ITC-003390495

Special Committee on IPR                          21 June 1994

### PROCESS FOR NEGOTIATION OF A COMMON SOLUTION

The Chairmanship intends to build on the success of the use
of working groups at the first two plenary meetings by
having, at least initially, a number of small working
groups.  The use of small groups should ensure that all
members have an opportunity to see that their own concerns,
as well as the Common Objectives established at the last
plenary meeting, are covered.

The process that will be followed in this meeting is as
follows:

   1. In each group the members will negotiate towards
   establishing a draft Common Solution on each of the 4
   issues.

   2. As the work progresses the groups will be combined
   and/or reformed to bring together the various draft
   Common Solutions emerging.

   3. In plenary session, the committee will review and
   integrate the drafts into a final text for a Common
   Overall Solution for the 4 issues.


WORKING PROCEDURE FOR GROUPS

1. Each group will work separately, and publicise its
progress through Plenary or other Sessions in the Plenary
room.  A group may report on its progress to the
Chairmanship at any time, or at the request of the
Chairmanship.

2. Each group will be self governing - the Chairmanship is
available to resolve disputes that cannot be settled
internally.  During the process the Chairmanship will
monitor progress being achieved in the groups and the
Chairmanship will be available for consultation, advice and
assistance to groups, as well as individual members,
whenever needed.

3. Merger, creation, or disbanding of groups will be with
the agreement of the Chairmanship.

4. The Chairmanship will be available each day between
08.00 and 22.00 to assist in the work of groups as
mediator, or to meet with members in private bilateral
consultations or multilateral meetings.

5. New Documents should only be introduced into the
committee through the Chairmanship.


SAUPROC.V2

Confidential Business Information,
Subject to Protective Order

2

III   <u>Most Favoured Licensee Provision</u>

    [A Clause 3.1 4th indent should be deleted.]

    Note 1:   A minority insisted to keep this clause.

    Note 2:   An alternative proposal was made to delete the present clause (which obliges the licensor to notification) and to address this question within the context of non discrimination.

IV   <u>Clauses 6.2/6.3 of the Undertaking</u>

    [A   ETSI-members holding essential IPRs should be entitled to royalties for past use.]

    B   Clause 6.2 should be maintained.

    [C   Clause 6.3 should be deleted.]

    Note 1:   A minority felt that principle A was not acceptable and that clause 6.3 should be maintained.

V   <u>Maximum royalty provision - clause 6.5 of the Undertaking</u>

    [A   Clause 6.5 should be deleted.]

    Note 1:   A minority is against such deletion

VI   <u>Clause 3.4 of the Undertaking</u>

    [A   Maintain present clause, but add at the end: Any such license granted upon settlement may be subject, however, to a reservation permitting the licensor to recover any additional compensation in excess of compensation due for the period of use prior to the settlement date.]

    Note 1:   A minority is against such addition.

C:\FNL\24M.3rd

Confidential Business Information,
Subject to Protective Order

S-ITC-003390497

the Work Programme to the end of Public Enquiry. The group underlined that there is a difference between members who participate in the technical work in TCs and STCs.

Mr. Hénault asked whether WG A had considered all IPRs in general, or made a distinction for essential IPRs.

Mr. Peters answered that it is to the IPR holder to consider if his IPR is essential or not.

Mr. Viklund asked whether WG A had considered during their discussions the question of Accelerated Unified Approval Procedure and stressed that the members should be aware that there could be an accelerated procedure.

Mr. Pellon answered that the WG A had not been into details at this stage.

The Chairman thanked Mr. Pellon for his presentation and gave the floor to the spokesman of Group B.

Mr. Hendon, spokesman of Group B, presented the results from his group. They considered two principles:

-   In the case a member is participating in the standardization work in an STC, he shall have a period of 60 days to state withholding of specific essential IPR from the date when the stable draft is STC/TC approved.

-   In the case a member is not participating in the standardization work, he shall have a period of 90 days to state withholding of specific essential IPR from the date when ETSI distributes the stable draft to Members requesting to receive such distribution.

WG B left for discussion whether a draft is stable at the point of STC approval or TC approval.

Mr. Hendon informed the Chairmanship that WG B had started working on the issue of "monetary compensation", that they had agreed on the main points but that they had not finished their work.

Mr. Ruikka said that all companies are not interested in all the work of all technical committees and did not want to receive all huge piles of documents.

The Chairman thanked Mr.Hendon for his presentation.

Mr. Becker, spokesman of Group C, presented the result of his group.

He reported that discussions arose in the group regarding the terms "licensor" and "licensee". Then, he read a statement on behalf of STET and ITALTEL that the rest of the group accepted to note, although they did not agree with the content: *"STET and ITALTEL do not agree with any solutions (on any issue) that implies acquiescence in the position that licences are needed by any member of ETSI for use of essential IPRs owned by other members of ETSI. Rather STET and ITALTEL would use language referring to terms and conditions governing the use of IPRs that are essential for practicing ETSI standards. The terms "licence", "licensor" and "licensee" are used for simplicity of reference only."*

He reported that the group agreed that a complete and stable draft available to all ETSI members was necessary to identify essential IPRs.

They agreed that the starting point to perform an IPR evaluation was identified as stage 7 (STC approval).

The next point of agreement was that 180 days from the time a stable draft is available should be provided to provide notice to ETSI if a Member wants to withhold his IPRs or not.

If substantial changes are made between STC approval and TC approval, then another period of 180 days should be given.

WG C could not reach agreement on the nature of the evaluation and there were two fundamental differences: - if an IPR is not specifically withheld after the 180 day period, then it shall be available for licensing by default; - a good faith effort shall be undertaken by the IPR owner without incurring an obligation to license if IPR is not discovered during the 180 days period.

The group could not reach an agreement on the nature of the notice to be given to ETSI: - notice need only be given on essential IPRS; - notice of all withheld IPRs need to be notified to ETSI.

Confidential Business Information,
Subject to Protective Order

Mr. Becker concluded that every Member should be informed about the work of STCs, to be able to carry a search. Substantial changes to the draft must be notified to all ETSI Members.

In the light of what Mr. Becker reported for WG C, Mr. Hendon reported that the principle of licensing by default was also agreed in WG B.

The Chairman thanked Mr. Becker for his presentation.

Mr. Loyau, spokesman for Group D, presented the results of his group through transparencies.

The group started with the principle that ETSI Members are willing to grant licences.

-   When an STC is starting to work on a work item, ETSI has to inform about the scope, the table of contents and the key elements.

-   During the period between the start of work and the draft is received by ETSI, ETSI has to pre-notify when important milestones are achieved in order to focus on certain searches.

-   When the STC has approved a document (with a presentation of search oriented information), ETSI notifies to all ETSI Members with copy of the document.

-   All Members have 60 days to notify before start of PE of withholding of essential IPRs.

-   After the start of PE, and if no information on withholding, IPRs are deemed to be licensed.

The Chairman thanked Mr.Loyau for his presentation, but asked for clarification, why only the milestones STC approval and Public Enquiry were mentioned, while there was no mention of TC approval in the presentation.

Mr.Loyau answered that they did not take too much care about TC approval, because, usually, no substantial modifications are made.

Mr.Hendon stated that people had to recognize that all Members had to give concessions and had clear ideas about what they could give away and what things they were not prepared to give away.

Mr.Loyau said that the target of the Committee was to come up with a proposal to the GA and that nobody was bound to vote in favour. The ultimate answer would be the vote at the GA.

The Chairman thanked the four groups for their good work and reminded the meeting that the work would start the day after at 9.00 hours.

Wednesday 22 June 1994

The plenary session reconvened at 9.00 hours.

The Chairman thanked the Committee members for the excellent work carried out and stated that the results achieved exceeded the Chairmanship's expectations.

On the basis of the experience gained, the Chairmanship wondered whether some adjustments on the procedure were appropriate.

The Chairman stated that the aim was the establishment of a common solution by the end of Thursday to enable the Committee to elaborate a more detailed common solution on Friday. Thus, he advised members to dedicate Thursday on the integration of the results of the work of the four groups who should then finalize their work by the end of the day. The 4 groups should produce a paper reflecting the results achieved and the 4 group documents will serve to start the integration process.

In order to facilitate the integration process, the Chairman asked members to produce the results in a common form. He then asked the Vice Chairman to present the Chairmanship's conclusion regarding a common format for solutions.

Confidential Business Information,
Subject to Protective Order

ETSI/GA20(94)2

# ANNEX XVIII

Minutes of 3rd Plenary meeting
+ List of Participants
23 Pages

Confidential Business Information,
Subject to Protective Order

Third Plenary Meeting of the IPR Special Committee
Sauntehus, 21 - 24 June 1994

<u>Mr. J. Abild Andersen</u>, Chairman of the IPR Special Committee, opened the session and bid the participants welcome to Sauntehus. He gave some historical background about the place and its good reputation: it is the place where the former Prime Minister, Mr. Poul Schlüter, used to hold meetings with his Cabinet, inter alia, to prepare his opening speech to the Parliament. He made reference to the fact that Mr. Schlüter's Cabinet – even though it was a minority government – was in office for ten years. Thus, Sauntehus has proved to be a good place for obtaining a compromise.

He thanked the members who had submitted contributions to the Chairmanship to allow the drafting of the consolidated document which was sent by fax to the Committee members. The Chairman stated that he highly appreciated the efforts carried out and that he had great expectations for the work to be carried out in order to reach a compromise on the 4 issues of the mandate.

Regarding the schedule for next week, the Chairman said that the meeting originally planned for two days will be reduced to a one day meeting for the drafting of the report, i.e. 29 June, as all discussions on substance were supposed to be finalized this week. He reminded the members of the Committee that they should respect the boundary lines, i.e. to only deal with the 4 issues mentioned in the mandate and to respect that only a pragmatic approach by members would enable the Committee to reach a common solution before the deadline of the end of the week.

The Chairman went through the Agenda and reminded the meeting that the day had come when discussions on SOLUTIONS should take place.

<u>Mr. R. Buttrick</u>, Vice Chairman of the IPR Special Committee, also welcomed the participants and presented a paper on the "process for negotiation of a common solution". He explained the three stages of the process: each group to establish a draft common solution on each of the 4 issues; the groups to be combined or reformed in order to bring together the various draft common solutions; the committee then to review in plenary session the drafts into a final text for a common overall solution for the 4 issues.

He reminded the meeting that the Chairmanship would be available from 8.00 to 22.00 to assist the work of the groups.

<u>Mr. Panfili</u> stated that the aim of the Committee was to create consensus, i.e. the same feeling on the matter discussed. He said that his impression was that no step forward had been accomplished through the work of the Committee and felt that the splitting into 4 different groups was a loss of time.

<u>The Chairman</u> explained that the Chairmanship had chosen to present the working papers as 4 separate papers and advised members to start with the first 3 items, i.e. "180 Days", "Monetary Compensation" and "Arbitration", leaving the issue of "Standards Application Area" for the last part of the discussions.

<u>Mr. Viklund</u> read the definition of "consensus", according to the ISO Guide 2, Para. 1.7:

*"General agreement, characterized by the absence of sustained opposition to substantial issues by any important part of the concerned interests and by a process that involves seeking to take into account the views of all parties concerned and to reconcile any conflicting arguments. Note: Consensus need not imply unanimity."*

<u>Dr. Boros</u> replied that unanimity without consensus does not exist.

The plenary meeting then split into working groups to prepare a draft solution in each group.

After dinner, the working groups reconvened at 20.00 hours for a one-hour session.

At 21.00 hours, the Committee members came back into a plenary session. The purpose was to give information from each of the 4 groups to the other 3 groups regarding the issues.

## "180 DAYS" ISSUE

<u>Mr. Pellon, spokesman of Group A</u>, presented through a diagram the results of the discussions in WG A regarding a proposed solution. The group identified the different stages of the standards elaboration process, from the creation of a work item in

Confidential Business Information,
Subject to Protective Order

The Vice Chairman asked the groups to produce their ideas in the similar format used by WG B the day before, i.e. establishing first statements or principles agreed within the group by consensus, then writing a series of notes on divergence of opinion.

Mr. Dunkel said that the paper of Group B had not been distributed.

Mr. Hendon, spokesman of WG B said that it had been agreed within Group B not to distribute their paper.

Mr. Hénault said that just the model of the presentation would be enough.

The Vice Chairman undertook to prepare a model for use by the groups.

The Chairman presented the revised draft Agenda. The modification of the time schedule aimed at taking into account the fact that information on the progress made in each group should be available to the other groups; and that we had to limit the number of plenary sessions to help the work of the working groups.

Mr. Hasse stated that the time allocated for the working groups was too limited and proposed not to split the two group sessions.

Mr. Hendon agreed with Mr. Hasse and proposed a one-hour plenary session before lunch after the two-hours group session.

This was agreed and a new revised Agenda would be issued. The meeting adjourned and reconvened at 11.00 hours.

## "MONETARY COMPENSATION" ISSUE

Mr. Peters presented the results from Group A on monetary compensation.

He started with the principle that both monetary and non-monetary compensation should be allowed. According to some members the non-monetary compensation should apply to related IPRs only, notably improvement patents. other members showed great flexibility and proposed no limitation at all regarding non-monetary compensation, provided that it was fair and reasonable.

- Regarding "fair and reasonable", there was a general consensus that it should be fair and reasonable both to licensee and licensor.
- Regarding "non-discriminatory" terms and conditions, non-discriminatory does not mean identical treatment.
- Regarding the most-favoured clause: it was proposed to keep it as it is in the Undertaking.
- Regarding Clause 6.3: it was proposed to change it into the MDB proposed text.
- Regarding Clause 6.4: there was a general consensus to maintain the present text and add the second paragraph of MFC.
- Regarding Clause 6.5: there was a general consensus to delete it.

Mr. Peters reported that it was too early to report on the issue of "Arbitration".

The Chairman thanked Mr. Peters for his report.

Mr. Hendon presented the results from Group B on monetary compensation.

He stated that the group had reached a good level of agreement. On the main issue, it was stated as a principle that licences may include both monetary and non-monetary compensation, and that non-monetary compensation should be restricted to patent licences only and to the same or related technical field. Inability to give non-monetary compensation should not lead to a refusal of licence. Both monetary and non-monetary compensation must be fair, reasonable and non-discriminatory. Non-discriminatory does not necessarily imply identical terms.

Regarding "past infringement", the group found it sufficient to state the principle of Clause 6.2 and proposed to delete Clause 6.3.

Mr. Hendon underlined the fact that each country has its own national laws regarding contractual matters and that it is not the role of the Undertaking to amend national laws.

Confidential Business Information,
Subject to Protective Order

page 5

Regarding "maximum royalty", the group considered that Clause 6.5 should be deleted since its role could be fullfilled by good faith negotiations, or perhaps by a new clause: "As soon as ETSI becomes aware that the total royalty level may become burdensome (e.g. where there are multiple potentially essential IPRs), ETSI shall take the initiative to convene a meeting to consider possibilities to reduce the burden (by establishing appropriate licensing terms with the essential IPR holders or by amendment or withdrawal of the Standard)."

Regarding "fair and reasonable terms": if there is a dispute, that should be addressed through the dispute resolution mechanisms.

Regarding "most favoured licensee", the group believed that the requirement of most favoured licensee is related to both "fair and reasonable" and "non-discriminatory" aspects, and should be left at the statement of principle.

The Chairman thanked Mr. Hendon for his report.

Mr. Loyau presented the results from Group D on monetary compensation.

The group had more or less reached an agreement on:

-       The licence has to be non-exclusive, fair, reasonable, non-discriminatory (not necessarily identical) for licensor as well as licensee.
-       The licence can be against monetary or non-monetary compensation.
-       In case of non-monetary compensation, it has to be related to the area covered by the IPR.
-       Unless otherwise agreed by licensor and licensee.

·       One member of the group wanted no limitation in case of non-monetary compensation.

·       The group agreed on 6.2 but reached no agreement on 6.3.

-       The group agreed on the proposed text in MEC (re Clause 6.5)
-       The group agreed on the proposed texts of MFB or MFC (re Clause 3.4)

The Chairman thanked Mr. Loyau for his report.

Mr. Becker presented the results from Group C and apologized for the delay in producing a paper.

He first reported small amendments to the paper produced the day before on the "180 Days" issue: the group reconsidered the starting point from TC approval (instead of STC approval) and indicated a period of 180 days from this starting point. However, there is a point of flexibility to agree on a period of 90 days from this starting point, depending on the results of the whole package.

Regarding monetary/non-monetary compensation, principles were agreed upon:

-       Both monetary and (if requested) non-monetary compensation must be allowed.
-       Compensation must be fair, reasonable and non-discriminatory.
-       Any non-monetary compensation shall be limited to licences of patents. Non-monetary compensation should be limited to grantbacks of licences under patents which are improvements to the essential licensed patent.

The group was faced with points of disagreement:

-       Is "essential" required in the grantback provision? (50/50)
-       What should be the time of notice of required compensation? The majority was for the availability before TC approval. A minority said that there should be no specified time.
-       Regarding payment for past use of IPRs, the majority was for no compensation for past infringement.
-       Regarding "fair, reasonable and non-discriminatory", there were two opinions expressed: upon proof by an IPR owner to an ETSI "compensation committee"; upon negotiation between licensor and licensee.
-       In case of non-monetary compensation, the question was raised about the need to have a "compensation committee".
-       Regarding the most-favoured licensee provision, the majority of the group was in favour.

Confidential Business Information,
Subject to Protective Order

Mr. Nasrullah expressed his confusion about the presentation on what was actually agreed upon in Group C.

Mr. Hénault answered that there were clear agreements on WHAT was fair, reasonable etc. There was still some divergence of opinion on HOW to assess if it is fair, reasonable etc. but that there was no real contradictions.

The Chairman thanked all Committee members He invited the groups to reconvene after lunch at 13.30 hours and informed that the plenary will reconvene at 16.30 hours.

## "ARBITRATION" ISSUE

The Chairman invited the spokesmen of the four groups to present the results from each group.

Dr. Huber presented the results from Group A on "Arbitration".

The group agreed on the principles that Arbitration should be based on ICC rules, using the ICC Court of Arbitration; that Arbitration should final and binding; that French substantive law should apply to Arbitration; that disputes on Essentiality should not be decided by Arbitration. He reported that the majority of the group thought Arbitration should be mandatory whereas the minority felt that arbitration should only take place if the disputing parties so agreed.

Mr. Loyau said that French courts will only be able to deal with Essentiality as a subsidiary question in an infringement case.

Mr. Hasse asked which national court will be used? a court of the country where the patent is valid?

Mr. Hendon presented the results from Group B on "Arbitration".

The group had discussed a three-step compromise approach.

- Parties should use all necessary efforts to resolve their disputes through bilateral discussions. He said that, although this was to state the obvious, the group wanted to put an emphasis on this first phase.
- In case negotiations failed to succeed, the parties should carry out arbitration under ICC rules.
- This award is binding unless one of the parties refers the dispute to the French courts within 30 days after the award.

The group issued three notes:

- Each party should appoint an arbitrator and the third arbitrator (chairman) could be agreed by the first two ones or appointed by the ICC. The Chairman should have qualifications and experience.
- Disputes related to essentiality, infringement, and validity should be within the jurisdiction of the courts.
- It should be left to the parties to determine when the negotiations should be considered as having failed.

Mr. Becker presented the results from Group C on "Arbitration".

The group stated principles similar to Groups A and B:

- Parties should be encouraged to settle disputes through bilateral negotiations.
- When the parties cannot settle the disputes, they should seek settlement through non-binding mediation.
- ETSI should have no role in negotiations, mediation or arbitration, unless the parties so agree or unless ETSI itself is a party in the dispute.
- If parties cannot agree on negotiation, mediation, arbitration, the matter should be settled in court.
- Arbitration proceedings should be conducted in accordance with the ICC rules.
- Questions of infringement, validity and essentiality could only be decided by a court of competent jurisdiction.

The group could not agree on:

- whether questions of essentiality should be determined by a single court of competent jurisdiction or whether any court of competent jurisdiction can decide on questions of essentiality.
- whether, if a single court should decide questions of essentiality, that court should be the court where ETSI is located.
- whether the IPR owner must demonstrate non-essentiality in any court proceeding of an IPR after the publication of the standard.

Confidential Business Information,
Subject to Protective Order

They could not agree that disputes between ETSI Members and ETSI can be put to Arbitration provided that it is ruled by application of the ETSI Statutes and RoP.

Dr. Boros said that this problem rose the most difficult discussions in the group if arbitration should apply to disputes between Members against Members and ETSI Members against ETSI. He continued by saying that it would be more appropriate to modify the Statutes and the RoP to avoid the signing of the Undertaking.

The Chairman replied to Dr. Boros that the question of signature of the Undertaking will be dealt with at a later stage.

Mr. Loyau presented the results from Group D on "Arbitration".

The group agreed in general to keep the present text as it is. They had similar views as the other groups, i.e. the parties should try first an amicable procedure; if the parties agree on arbitration, the arbitration should be final and binding; the third arbitrator should be appointed by the ICC if the two first arbitrators fail to appoint the third one.

He reported that WIPO (World Intellectual Property Organization) had proposed to set up an international tribunal, which might be considered as a future solution. He also reported that one member wanted essentiality out of the scope of arbitration.

## "STANDARDS APPLICATION AREA" ISSUE

Mr. Pellon presented the results from Group A on "SAA".

The group reached no agreement on any principle which could form a basis for a solution.

The unresolved issues were noted:

- The fundamental objection relates to the willingness to address the licensing of ETSI standards outside CEPT countries. This unwillingness to apply the ETSI IPR rules does not automatically mean that licences related to ETSI standards will not be made available outside CEPT countries.
- It was proposed that each standardization body approving an ETSI standard might decide not to apply the ETSI IPR rules in its territory. One member considered this as self-evident.
- Some members are unwilling to have affiliates outside CEPT bound by the Undertaking when they have no vote in the acceptance of those obligations.

Mr. Hendon presented the results from Group B on "SAA".

The group was unable to reach a consensus.

He reported the two approaches which received the widest support.

- The first approach was to remove the concept of SAA entirely and have world-wide commitment. This would mean that licences would extend to both exports from Europe to any country for products manufactured according to an ETSI standard and to imports from anywhere for use in Europe.
- The second approach was to modify the structure of SAA, and adopt the main principle stated in the SG proposal, i.e. "let local standardization body IPR rules apply, unless they fall short of actual availability of licences on fair, reasonable and non-discriminatory terms, but provide that if such availability is in an actual case not achieved for a given standard (corresponding to an ETSI Standard), then ETSI rules would apply between SIGNATORIES (and their AFFILIATES) for licensing of Essential IPR for that standard."

Mr. Ask asked the group whether they had discussed the issue of who has the burden of proof regarding this availability. It was answered that the group did not discuss this issue.

A discussion ensued regarding the need to have licence agreements for each standard in each country, depending on the rules of the NSO.

Mr. Becker presented the results from Group C on "SAA".

The group agreed on the principle that SAA should include CEPT countries, with rights to manufacture outside CEPT countries for import and use in CEPT countries.

Confidential Business Information,
Subject to Protective Order

The group discussed the proposals contained in SF and SG of the Chairmanship consolidated document and agreed on some support for SG.

Mr. Loyau presented the results from Group D on "SAA".

The group considered the principle contained in SF as acceptable as a starting point, but had concerns on how to solve the problem of reciprocity and world-wide manufacturing. The only alternative would be to have world-wide licensing.

The Chairman thanked all four groups and considered that now the four groups were able to deliver four papers on each issue to the secretariat in order to produce a consolidated paper showing the areas of agreement and the areas of disagreement for all groups on each issue.

The plenary meeting adjourned at 18.00 hours.

## Thursday 23 June 1994

## Preparation of "Integrated" drafts

The Chairman welcomed the Committee members and thanked them for the good work carried out. The task of each group now would be to work on an "integrated" draft document for each issue, taking into account the drafts of all four groups.

The consolidated "superdrafts" on the two issues of "180 Days" and "Arbitration" should be submitted to the Chairmanship before lunch.

Regarding the issues of "SAA" and "Monetary Compensation", the Chairmanship proposed to establish two small ad hoc groups to work on these specific issues on the basis of a set of terms of reference. The ad hoc groups should submit their work to the Chairmanship as soon as possible. This was agreed.

The ad hoc group on "SAA" was chaired by Mr. Hendon (DTI), assisted by Messrs. Pellon (Motorola), Dunkel (IBM), Peters (Philips), and Hasse (Siemens).

The ad hoc group on "Monetary Compensation" was chaired by Mr. Ruikka (Nokia), assisted by Christine Maury-Panis (Thomson) and Dr. Huber (Bosch).

The plenary adjourned for members to work in the working groups and ad hoc groups.

The plenary reconvened after lunch at 13.30 hours.

Back in the plenary, the Chairman welcomed the new participants in the Committee: Mr. Bonnier (France Telecom) and Mr. Montfort (French P&T), and asked the chairmen of the two ad hoc groups to present the results of their work.

Mr. Hendon presented the results of the work of the ad hoc group on "SAA".

He stated that each member of the group reserved the positions of their companies, but had tried to reconcile the opinions which were fundamentally different. However, the group had tried to find a compromise. Mr. Hendon presented four elements of a possible compromise:

- The Signatory should undertake to grant licences inside CEPT in accordance with the Undertaking, and licences should allow importation of equipment manufactured inside or outside CEPT.
- The Signatory should affirm his intention to enable ETSI standards to be adopted outside CEPT.
- The Signatory should undertake, following such adoption, to enter negotiations in good faith and use reasonable endeavours to achieve agreement on licensing outside CEPT, on fair, reasonable and on-discriminatory terms, with any ETSI Member who seeks such a licence, which licences will allow the import of equipment manufactured inside or outside CEPT.
- Once a standard is adopted by a standards body in a non-CEPT country, the principles of the previous paragraph should continue to be applied within the rules of that standards body when licensing in that territory.

Confidential Business Information,
Subject to Protective Order

Mr. Nasrullah made the remark that when looking at the objective of ETSI in the Statutes and RoP, we find the basic principle of SAA, i.e. "the large unified European telecommunications market".

Dr. Boros asked what was the difference between the text of the Undertaking and the text proposed by the ad hoc group.

Mr. Hendon answered that, whereas the Undertaking stipulated a firm obligation, the text proposed by the ad hoc group merely contained an undertaking to enter into negotiations in good faith. The concept of SAA was deleted and it was a question of normal bilateral negotiations.

Mr. Ruikka presented the results of the ad hoc group on "Monetary Compensation".

He reported that it was really a tough task to find any area acceptable to all parties. The group stated that:

- Parties are free to conclude license agreements on any basis found mutually acceptable and shall use all necessary efforts on voluntary basis and in accordance with their commercial practices.
- All compensation must be fair, reasonable and non-discriminatory.
- Unless otherwise agreed by the parties, non-monetary compensation shall be restricted to grant-backs of IPRs for the same or closely related standard; and/or restricted to know-how for the same or closely related standard.
- Inability to give non-monetary compensation shall not lead to a refusal of licence.
- Parties shall not commence infringement action unless and until negotiations and arbitration proceedings have been carried through on the aspect of whether monetary and non-monetary compensation sought meets the requirements set forth above.

He then expressed concerns of the ad hoc group that:

- the limitation to patents and know-how might be too restrictive in the light of normal business practices;
- the dispute resolution mechanism might cause significant delays in the licensing process;
- non-monetary compensation beyond IPR in the same Standard should only be possible on the basis of voluntary agreement between the parties.

He concluded that these submitted proposals would be hard to "sell" but invited the Committee members to "buy" as much as possible.

Mr. Penfili said that he was ready to "buy" a lot of things but found some contradictions in the paper: regarding the words "parties are free to conclude license agreements", he said that there was no freedom but a must to give patents.

A discussion ensued about the meaning of the term "know-how" and Mr. Ruikka answered that the group had not gone too much in depth regarding this issue, and that the wording would need to be carefully considered.

The Chairman invited the members to reassume the work of creating "integrated" drafts in the working groups on the basis of the documents which had been distributed at the beginning of the morning session regarding the 3 issues: 180 Days, Arbitration, and Monetary Compensation. The Chairmanship accepted Mr. Hendon's proposal that, regarding the issue of SAA, the goups used the document issued by the ad hoc group on SAA.

The plenary reconvened at 18.00 hours.

Results regarding the "Standards Application Area" issue on the basis of the ad hoc group paper

Mr. Peters presented the results from Group A. The group had failed to come to an agreement. They could only agree on the first sentence of point 1, i.e. "In signing the Undertaking, the Signatory undertakes to grant licences inside CEPT in accordance with the Undertaking."

The group could not agree on points 2 and 3 of the ad hoc group paper.

Mr. Hendon presented the results from Group B. The group managed to accept the text proposed by the ad hoc group, with small changes. They did not agree whether "adoption" included the notion of a substantial purchase by a major public telecommunications operator. Furthermore, it was also unclear to the group how to deal with associate members.

Confidential Business Information,
Subject to Protective Order

Mr. Becker presented the results from Group C. The group did not reach an agreement except on the first sentence of point 1 (like Group A). Some members gave some support to sentence two of point 1. Point 2 was not agreed, and points 3 and 4 received very small support. The point of view had been raised in the group that it was not the purpose of a European standardization body to try to regulate the US market.

Mrs. Maury-Panis presented the results from Group D.

The group considered the elements of the ad hoc group paper on SAA as a basis of compromise provided that their concerns were addressed on a satisfactory basis:

- How does the grant of licences apply to associate members?
- How do we address the question of manufacture for companies having manufacturing facilities outside CEPT?
- Clarification is needed for the sentence "licences should allow the importation of equipment manufactured outside CEPT".
- The words "adopted by a standards body in a non-CEPT country" have to be clarified, i.e. an NSO or what?

Mr. Bonnier said that he was not in favour of the document presented by the ad hoc group on SAA. He said that Members should have an obligation to license, and not just an obligation to negotiate.

## "INTEGRATED" DRAFTS

### Results on "180 Days" issue

Mr. Peters presented the "integrated" draft from Group A. He started by correcting a drafting error: instead of *"Two solutions are proposed"*, read *"The following solution is proposed"*. The group could agree on a number of principles based on the following categorization of members:

- A member who votes in favour of a draft standard in an STC has waived his right to withhold his essential IPR for that draft standard.
- A member whose written technical proposal is accepted by the STC has waived his right to withhold his essential IPR contained in that technical proposal.
- Upon distribution of the approved draft STC standard, members who have objected to an approved STC draft standard can withhold their IPRs related to that standard, provided notice is given to ETSI prior to the closure of the Public Enquiry.

Mr. Ruikka presented the "integrated" draft from Group B. The group has basically retained the ideas put forward in the previous papers, i.e.

- Licensing by default is retained
- 90 days from STC approval.

Mr. Becker presented the "integrated" draft from Group C. The group considered that Members who participate in the technical work should have stronger obligations than Members who have not participated in TCs and STCs. They proposed that if an ETSI Member proposes a written technical solution to an STC and does not include a legend to the effect that "not all IPR clearances have been obtained for the subject matter of this proposal", then this member may not withhold licences to any IPRs that are essential to the standard finally adopted corresponding to the proposal substantially as submitted. On the other hand, if a legend is included, some time for withholding should be allowed.

Mr. Hénault stated that the reason for the legend was that technical working parties are not always aware of the exact IPR situation in their companies. Members therefore needed a safeguard.

Mr. Becker, on behalf of group C, also drew the attention of the Committee to the possibility of delaying the Public Enquiry process as a consequence of using 180 days after TC approval for withdrawal of IPRs.

Mr. Viklund presented the "integrated" draft from Group D.

The group had worked on the basis of the paper submitted on 21 June and made some amendments. They proposed to delete point B of the revised paper and change the period of 60 days to 90 days for notification before start of Public Enquiry of withholding of essential IPRs.

Confidential Business Information,
Subject to Protective Order

<u>Mr. Panfili</u> stated that the situation was becoming more difficult than expected, and that STET and ITALTEL would issue a declaration, as they were not prepared to give up important positions on legal points.

<u>Mr. Viklund</u> said that ETSI should inform everybody on equal terms and that no distinction should be made between Members participating in the technical work and those who do not.

The plenary reconvened at 21.30 hours.

Results on "Arbitration" issue

<u>Mr. Peters presented the "integrated" draft from Group A</u>. The group had used the same paper as the previous one submitted on 22 June and had added two elements. They adopted point 1 of the integrated draft of Group B, i.e. *"Parties must honour the principle of using all necessary efforts to resolve their disputes through bilateral discussions. Members are encouraged to use mediation, expert advice and conciliation methods as means to achieve mutual agreement."*

They could not agree on the question of mandatory vs. non-mandatory arbitration.

<u>Mr. Ruikka presented the "integrated" draft from Group B</u>. The group used the same paper as the previous one submitted on 22 June.

<u>Mr. Becker presented the "integrated" draft from Group C</u>. The group agreed with the proposals from the other groups:

- 1st step: negotiations
- 2nd step: non-binding mediation
- 3rd step: matter settled in court
- no role of ETSI in negotiations, mediation, or arbitration
- ICC rules, unless otherwise agreed by the parties
- questions of infringement, validity and essentiality by a court of competent jurisdiction

The areas not agreed upon remained the same as the ones expressed previously.

<u>Mr. Viklund presented the "integrated" draft from Group D</u>. The group had used the integrated draft from Group B on which they had generally agreed. They changed the words *"refer the dispute to the French courts"* into *"refer the dispute to a competent court"* and added a new note that WIPO had proposed to set up a tribunal, which might be considered as a future system

Results on "Monetary Compensation" issue

<u>Mr. Peters reported for Group A</u> that they had used the paper from the ad hoc group as a basis, starting with the statement that parties are free to conclude licence agreements whatever the Undertaking is, and that they agreed to delete Clause 6.5 and add some provision to Clause 3.4 regarding damages and recovery from infringement prior to the signing of the license agreement.

<u>Mr. Ruikka reported for Group B</u> that paragraph A was what remained from  the previous proposal. There was some reluctance regarding "know-how" permitted as non-monetary compensation. They proposed a new Clause 6.5, and regarding 3.4, their position was similar to Group A.

<u>Mr. Becker reported for Group C</u> that the new proposal was based on the ad hoc group paper. The group could not accept point 1 of the ad hoc group paper, but agreed on points 2, 4 and 5, and partly on point 3. Some points of non-agreement still remained.

<u>Mrs. Maury-Panis reported for Group D</u> that the group concentrated on the ad hoc group paper and that some members were reluctant regarding know-how as non-monetary compensation.

<u>The Chairman</u> thanked the four groups and suggested a new process to better achieve consensus from all four groups on each issue: each group should invite another group to negotiate and submit a proposal merging the results.

He said that members might probably be discouraged after the results on SAA. He underlined that he would not like to see so many efforts spent in vain. He therefore urged the members to try at least to establish a common solution on the other 3

Confidential Business Information,
Subject to Protective Order

issues, starting with the issue of Arbitration.

Mr. Hendon made a general comment that everybody should think what would be a solution they could just accept on SAA, and then carry on with their work on the other 3 issues on the basis of the assumption that this solution on the SAA issue had been achieved.

Dr. Boros said that he was afraid that the members could not reach any solution if they continued to work in groups and he would have preferred working in plenary, analyzing all the points of agreements and the reasons for disagreements.

Mr. Becker asked for clarification about the process. Should the members only try to get consensus on the points already agreed in each group and exclude the points of non-agreement?

Dr. Boros wanted to know exactly the reasons behind all members' opinion/position and was ready to hear convincing arguments explaining why he was wrong.

Mr. Hendon responded that the Committee members were not in the position of being persuaded that they were wrong, but would have to see what they were prepared to give away. He said that it was not so much a matter of understanding but rather a matter of making concessions.

Mr. Hasse found it reasonable to narrow the positions and proceed stepwise. He then invited Group D to join Group B.

Mr. Nasrullah proposed the Committee to take the opposite position, i.e. assuming that a compromise could be reached on the 3 issues; the group should devote time to reach consensus or compromise on the issue of SAA.

The Chairmanship invited members to make an attempt for a common solution on Arbitration.

The plenary session reconvened at 2.00 in the morning (of 24 June).

"Joint super draft" on "Arbitration" issue:

Mr. Viklund presented the "joint super draft" submitted by Groups B, C, and D, and reported that after very long discussions, Groups A, B, C, and D accepted the compromise in a good spirit of co-operation, but with strong objections from some members. They agreed on the "joint super draft" with the deletion of paragraph 5 (*"An IPR owner who refuses a licence on grounds that this IPR is not Essential for the Standard in question, has the burden of proof that it is not "Essential". "*) and deletion of Note 3 (*"WIPO has proposed to set up an international tribunal. May be considered as a future system. "*).

Mr. Blommé underlined that, whilst his group accepted the proposed "joint super draft", he thought that this was not an efficient procedure. He also raised a concern about the enforceability of awards granted under the suggested text and suggested that ETSI should conduct a further investigation on the matter.

Mr. Peters stated that Mr. Blommé might be right regarding the issue of enforceability of arbitration decisions.

Mr. Panfili declared that he was strongly opposed to the deletion of paragraph 5 of the proposed "joint super draft" from Groups B, C, and D, as for him the burden of proof on essentiality was a very important element.

The Chairman concluded that the Committee members agreed on the proposal but that there would be made a general comment to the ETSI GA, before adoption on this issue, that an examination would be carried out as far as the legal issues are concerned, i.e. the workability and enforceability of the dispute resolutions procedure described in the "joint super draft" as well as the importance of the placing of the burden of proof.

The Chairmanship thanked the members and invited them to meet again at 9.00 in plenary.

Friday 24 June 1994

The plenary reconvened at 9.00.

Mr. Hendon made a presentation of the present situation regarding the issue of SAA. As the proposal submitted by the ad hoc group had not been agreed, there has been an attempt to try to elaborate a new proposal based on a code of conduct. This was presented by Mr. Hendon to the Committee members but it was rejected.

Confidential Business Information,
Subject to Protective Order

As Mr. Hendon did not find the present text of the Undertaking as a good compromise, he proposed to ease the discussions on the three other issues, to put on hold the proposal of the ad hoc group on SAA, and invited members to come up with proposals on the issue of SAA (in parallel with the work on the three other issues). He invited members to come forward with proposals which would form a bridge between the present text of the Policy and Undertaking and the situation where there was nothing. Then Mr. Hendon would inform the chairmanship on the progress regarding this issue.

The Chairman thanked Mr. Hendon for his constructive proposals and asked each Committee member whether they could support Mr. Hendon's attempt regarding SAA.

There was a large support in favour.

Dr. Boros, who had abstained, said that it would be more fruitful if the members who were against the formulation of the Undertaking could explain why they were against.

The Chairman invited the Committee members to work in working group with the issue of "180 Days" in order to produce a "joint super draft". He proposed that the 4 spokesmen of the groups had an initial discussion on the merging approach regarding this issue.

The plenary reconvened at 12.00 hours.

"Joint super draft" on "180 Days" issue:

Mr. Becker was the rapporteur from Groups A, B, and C and said that they had invited Group D to listen. Groups A, B, and C had come to an agreement on most issues related to the issue of "180 Days", i.e. they agreed on the starting point, on the principle of licensing by default, on the period, introducing a distinction between members who participate in the technical work and members who do not; they also agree that those members who had submitted written contributions should waive their rights to withhold. The question on who had to have the burden of patent search was put on hold (should it be the IPR owners? or the task of ETSI?).

The Chairman asked Group D if they could accept the agreement reached by Groups A, B, and C.

Some members of Group D (Mrs. Maury-Panis and Mr. Viklund) agreed with the summary. Some members (Mr. Nasrullah and Mr. Bonnier) found it too complicated and burdensome to introduce a differentiation between members participating in the technical work and members who do not. They would have preferred a more simple system, but accepted the results achieved.

Mr. Ask informed the Committee that the problem of participation and non-participation could be dealt with by the ETSI Secretariat, without major problems.

Dr. Panfili underlined that with the super draft on the "180 days" issue substantial changes had been introduced in the present Undertaking and that the new proposal for withholding now related to Essential IPRs only. He stated that STET and Italtel in the meanwhile were not in agreement that the withholding mechanism referred only to Essential IPR's, unless - in case of dispute - the IPR owner proves that the IPR which he intends to withhold is non-Essential. They were still expressing their opposition, while recognizing that some members had demonstrated the willingness to make steps towards STET's and Italtel's positions.

The Chairman concluded that he considered that there had been an agreement on the majority of the issues related to the "180 Days" issue.

He proposed that the groups carried on with the integration process on the "Monetary Compensation" issue as soon as possible after lunch and invited the members to come back in plenary at 16.00 hours.

He asked whether Mr. Hendon could give information on the SAA issue.

Mr. Hendon said that a text, to be put as an alternative to the ad hoc group paper, was being elaborated, and reminded the members that he would respect the confidence of the proposals submitted by them if they so wished.

The plenary reconvened after lunch.

Confidential Business Information,
Subject to Protective Order

"Joint super draft" on "Monetary Compensation" issue:

Mr. Peters was the rapporteur on this issue. Groups A and D have started from the integrated super draft submitted by Group A on 23 June. Groups B and C joined the meeting.

- The majority agreed that paragraph A could be deleted as it was superfluous.
- The group accepted paragraph B with the deletion of the first work "All" and the deletion of the parenthesis, then making a second clause to that paragraph.
- The group found no agreement on paragraph C
- Regarding paragraph C (b), the group proposed to delete "know-how in the form of"
- Regarding Note 1, the group proposed to replace "know-how" with "technical information".
- Regarding the most favoured licensee provision, the majority favoured deletion
- Regarding Clauses 6.2/6.3, the majority was in favour of maintaining Clause 6.2 as it is and delete 6.3.

The group was in the middle of the discussions on maximum royalty provision.

The Chairman invited the members to finalize the issue of "Monetary Compensation" before 18.00 hours, and informed the Committee that the Chairmanship would submit all the final texts by fax as soon as possible in order to have them circulated to Committe members to allow comments on these submitted texts by fax by Wednesday 29 June, or at the next meeting.

Mr. Hendon stated that nothing could be reported so far regarding the SAA issue.

At 18.30 hours, the Chairmanship joined the working groups in their discussions and invited the members to try to finalize their report on the "Monetary Compensation" issue before dinner and submit a revised draft to be typed at the secretariat and presented in plenary at 20.00 hours.

The plenary reconvened after dinner at 20.00 hours.

In addition to Messrs. Loyau and Pragsten, who had left on Thursday, some members had to leave before the end of the meeting and were then absent from the discussions: Messrs. Becker, Blommé, Hasse, Huber, Montfort, Nasrullah, Ruikka and Viklund.

Mr. Ryan, advisor for AT&T, presented the final text from Groups A, B, and C, on the "180 Days" issue.

- Point 1 was agreed
- Point 2 was agreed
- Small changes were proposed to point 3: replace "development" by "elaboration"; change "the drafts of the standard" into "the TC approved draft"; "actual awareness of the content of draft standards" into "actual involvement in the elaboration of draft standards".
- Point 4 was agreed
- Regarding the text in square brackets (meaning that it was not agreed upon) replace "by IPR holders (or ETSI)" by "[by IPR holders] [by or for ETSI]".
- The last paragraph in square brackets was strongly supported by STET and ITALTEL, but not agreed upon by the groups.

The Chairman asked Mr. Ask for some clarification regarding the distribution of technical documents from the ETSI Secretariat to the ETSI Members.

Mr. Ask responded that a distinction had to be made between the draft standards sent for Public Enquiry (sent to all ETSI Members via Collective Letters) and the interim documents sent to members participating in the work of the TCs/STCs in question. The TC approved draft standards are not automatically sent out to all Members.

Mr. Hendon said that the present practice was not to send out to all members STC/TC approved documents and that the procedure should be changed so that all Members could receive them.

Dr. Boros stated that he would declare his decision and position only at the end, in the name of ITALTEL and STET, for all four issues.

Mr. Madadi made a declaration regarding the issue of IPR search. He proposed that the people who actually benefit from this

Confidential Business Information,
Subject to Protective Order

search should not put the burden of the search on administrations.

Mr. Ask drew the attention to Clause 14 of the Undertaking which states that there is no obligation on Signatories to carry out patent search. Therefore, one should be careful in using the term "IPR searches ... are to be performed" since this is in contradiction with the said Clause 14. The minutes should reflect this possibility of misunderstanding.

The Chairman concluded that consensus had been achieved on "180 Days" issue, noting the reservation of STET and Italtel concerning the final note which remains unaccepted.

**Mr. Peters presented the "joint super draft" from all groups on the "Monetary Compensat ion" issue.**

- Regarding point I.A: agreement was reached.
- Regarding point I.B.(a): it was proposed to replace "IPRs" by "patent" and add a note that a minority was against this statement.

Mr. Hénault pointed out that the proposal made by group C to limit non-monetary compensation to grantbacks for improvement patents should be considered in addition to the points made under I-B.

The Chairman responded by saying that Group C proposal would figure in the minutes.

After discussions, it was decided to put the whole point I.B in square brackets as it seemed that agreement could not be reached, and as some members reserved their position depending on the whole package.

- Regarding point IV: it was also decided to put it in square brackets and add a note that a minority was against this statement.
- Regarding point VI: no agreement was reached.

The Chairman proposed to leave the "Monetary Compensation" issue with the agreed changes.

Regarding the issue of "Standards Application Area":

The Chairman invited two "super groups", A + C and B + D, to consider the two papers available, i.e. the paper submitted by the ad hoc group on this issue and the other document proposed by two members who had worked on this issue, and decide which would form the best basis for bridging between the present text of the Policy and Undertaking and the situation where there would be nothing.

Dr. Boros stated that he had not had too much time to study carefully the two papers but made a general statement that the two documents do not treat the principle of reciprocity.

The plenary reconvened at 22.30 hours.

Mr. Peters presented the results from the "super group A + C" (Dr. Boros (STET), Messrs. Hénault (AT&T), Madadi (Fujitsu), Panfili (Italtel), Pellon (Motorola) and Peters (Philips)).

The members worked on the basis of the two papers: the one submitted by the ad hoc group, and the one submitted by AT&T and Motorola.

STET and Italtel did not agree on any of the two documents, as they did not consider them as a good basis for further elaboration. Fujitsu was in favour of the ad hoc group paper because AT&T and Motorola's paper was not found sufficiently binding. Philips also supported the ad hoc group paper.

Mr. Hendon presented the results from the "super group" B + D (Mrs. Maury-Panis (Thomson), Messrs. Bonnier (France Telecom), Dunkel (IBM), Hendon (DTI) and van Voorst (Royal PTT Netherlands)).

IPRSC/3-002/msm
Page \18

Confidential Business Information,
Subject to Protective Order

S-ITC-003390513

The members considered the ad hoc group paper as a good basis for a compromise. Regarding item 2, they proposed to add the wording contained in the AT&T and Motorola's paper: *For the avoidance of doubt...reasons*

Mr. Dunkel continued Mr. Hendons comments by stressing that the ad hoc paper raised a number of issues which would have to be resolved in the further elaboration of this issue.

Mr. Hendon reported that the other paper did not receive much support as it was too general and non-committing.

Mr. van Voorst expressed general support for the ad hoc group paper.

Mr. Bonnier also expressed general support for the ad hoc group paper as a way to find a compromise and expressed some concerns regarding point 3 as there was only commitment for negotiation.

The Chairman concluded that a majority (Group (B+D) members and the members of group (A+C) identified as in favour by Mr. Peters) found the ad hoc paper to be the more appropriate basis to find a compromise but that some issues needed to be elaborated further.

Mr. Pellon made a declaration on fundamental objection to the ad hoc group paper. He presented the AT&T and Motorola's paper as an attempt to describe the type of behaviour which could be supported. He wanted members to understand that an attempt to use the ad hoc group paper as the direction for further elaboration could not be supported by Motorola because it specified certain behaviour outside CEPT.Furthermore, he presented the statement that: *If an ETSI standard, as finally approved by ETSI, is adopted as a standard by the ITU, the Signatory agrees to make available licences in accordance with the IPR practices of the ITU.*

Mr Peters said that this declaration did not take the issue further forward because ITU IPR rules would themselves require an IPR holder to make a declaration under ITU practice before the ITU could adopt a standard

Mr. Hénault said that his position was that he wanted to be fair to ETSI, fair to other standards bodies, fair to ITU, fair to his customers and that he had demonstrated a lot of flexibility by accepting licensing by default, going to French courts, etc. He stated that he would make all efforts that ETSI standards should be promoted in ITU.

The Chairman thanked the groups for their results and said that it would not be helpful to pursue further discussion of substance at this stage. He reminded the members that no discussions of substance should take place at next meeting.

Dr. Boros made a statement that the success of work is conditioned to a good and correct knowledge of the juridical nature of ETSI. STET and Italtel consider that the problems discussed by the Special Committee may find the right solutions only if due consideration is given to the existing rights and obligations of the ETSI members. To this end STET and Italtel have distributed to the Committee members a document dated June 6, 1994, which has not been however discussed by the Committee. The document outlines that, by becoming ETSI member, each member puts at the disposal of all the other members, for mutual use, and without paying additional payments, all its knowledges, patented and not patented, for the elaboration and implementation of the ETSI standards. STET and Italtel however declared their agreement to find a rule which allow the ETSI member to preclude, subject to certain terms and conditions, the use of some of their knowledges and to receive an additional compensation, without however modifying and/or prejudice the juridical nature of ETSI, as an association under french law of 1901.

Dr. Boros, in continuation, has indicated the problems in relation to which STET and Italtel were forced to express opposition to the proposed solutions to maintain the juridical nature of ETSI and declared that he will send to the Chairman a document which responds in writing this statement, which certainly - he declared - was not perfect considering his difficulties with the English language. Dr. Boros has also requested that such written documents be an integral part of this meeting minutes. Dr. Boros underlined that it is necessary to regulate in the Statutes and Rule of Procedure the issue of arbitration for disputes between ETSI and its members.

The Chairman has taken note of the above statement done by Dr. Boros, and the written document is enclosed as an annex to these minutes.

Confidential Business Information,
Subject to Protective Order

Dr. Boros congratulated the Chairman and his collaborators for the very efficient organization of the work carried out. He said that for the first time, during discussions in ETSI on IPR, there has been a genuine discussion.

The Chairman thanked Dr. Boros for his kind words and said that he will take account of the statement that Dr. Boros would send by fax.

Regarding the issue of "Monetary Compensation", the Chairman thanked his Vice Chairman for the efforts carried out in an attempt to deal with the texts in square brackets and gave him the floor.

The Vice Chairman expressed the Chairmanship's concerns on the preparation of the report to the GA Chairman on the overall situation and presented a paper on the Chairmanship's impression on the final position in the discussion of monetary compensation principle I(B), and noted members comments on the paper..

Mr. Peters proposed to delete point 4 on page 2 of the Chairmanship's impression paper. This was agreed.

The Chairman expressed his gratitude to the Committee members for the excellent work carried out. Although the members had not been able to reach common solutions on all four issues to widen consensus, he found that the Committee had achieved remarkable results in a number of areas.

He said that he had had a very positive experience during the Committee work and thanked the Vice Chairman for his remarkable contribution. He also expressed thanks to the secretariat which provided great support.

Mr. Hendon, in the name of all Committee members, present and absent, expressed congratulations on the way this work had been carried out. He underlined the incredible commitment of the Chairman and the Vice Chairman and their companies. He thanked National Telecom Agency for its impeccable hospitality allowing the members to work in a very special environment. He particularly thanked the secretariat for the excellent support provided, and concluded that it was really a very pleasant experience.

The Chairman thanked everybody, and closed the meeting.

Confidential Business Information,
Subject to Protective Order

S-ITC-003390515