# EXHIBIT 10

BRISTOWS COOKE & CARPMAEL
10 LINCOLN'S INNS FIELDS
LONDON WC2A 3BP
SOLICITORS

# COMMISSION OF THE EUROPEAN COMMUNITIES

COM(92) 445 final

Brussels, 27 October 1992

## COMMUNICATION FROM THE COMMISSION

## INTELLECTUAL PROPERTY RIGHTS AND STANDARDIZATION

COM DOCS
1992

Confidential Business Information,
Subject to Protective Order

S-ITC-003390518

# TABLE OF CONTENTS

1. Introduction

2. Principles of standardization

    (2.1) types of standards and objectives of standardization
    (2.2) principles used in national and international standards bodies
    (2.3) use of standards by public authorities

3. Principles of intellectual property protection

    (3.1) general principles
    (3.2) patents
    (3.3) copyright
    (3.4) semi-conductor products and other intellectual property rights
    (3.5) effects of intellectual property rights

4. The standard making process

    (4.1) standards incorporating no protected material
    (4.2) de facto standards
    (4.3) standards created to include an intellectual property right: agreement and refusal to licence
    (4.4) late or non-disclosure of rights
    (4.5) liability for non-disclosure
    (4.6) identification of right holders - inclusion of protected intellectual property rights
    (4.7) availability of licences
    (4.8) industry - specific solutions

5. Other policy considerations

    (5.1) competition aspects
    (5.2) availability of licences to third country entities - trade policy aspects

6. Conclusions

    (6.1) codes of practice/guidelines/undertakings
    (6.2) general principles
    (6.3) Community action

Confidential Business Information,
Subject to Protective Order

- 1 -

## 1.0.    INTRODUCTION

1.1.1.   Standardization and the protection of intellectual property serve different objectives but have to co-exist in the same industrial and commercial environment. Standardization aims at diffusing technology in the public interest, while intellectual property rights aim to secure private property protection. The standardization process cannot take place effectively if no clear solutions exist to resolve potential conflicts between the objectives of standardization and the principles of intellectual property rights. At the same time, the incentive to develop new products and processes on which to base future standardization will be lost if the standard-making process is carried out without due regard for intellectual property rights.

1.1.2.   In December 1991 the Commission published its follow up to the Green Paper on standards (COM(91) 521) in which it was stated, in paragraph (xi) (other issues 71), that the Commission would welcome the development by standards bodies of clear conditions for the inclusion of intellectual property rights in standards, based on practice in the international standardization organizations. It was further indicated that "in view of the importance and complexity of the issue for intellectual property rights, standardization, competition and trade policies", the Commission intended to produce a separate communication on the subject.

1.1.3.   Given the voluntary nature of standard-making, the Commission is not seeking to regulate standard-making directly by legislative proposals, if certain principles are not respected by standards bodies the Community will not be able to use their standards and even less, to make them mandatory. Certain types of behaviour on the part either of standards bodies, or on the part of holders of intellectual property rights could bring them into conflict with the provisions of the Treaty, of Community or national legislation, or of international conventions.

1.1.4.   Therefore in this Communication the Commission sets out a number of principles which it believes should form the basis of any internal rules which standards bodies may wish to elaborate. Standards bodies remain free to structure their membership rules and their internal organizational procedures as they wish. The results of their activity, must, however correspond to the standardization needs of the Community and must be made in conformity with the laws of the Community and its international obligations.

Confidential Business Information,
Subject to Protective Order

- 2 -

## 2.0.    PRINCIPLES AND OBJECTIVES  OF STANDARDIZATION

## 2.1.    TYPES OF STANDARDS

2.1.1.    A standard is a technical specification relating to a product or an operation which is recognized by a large number of manufacturers and users. Council Directive 83/189[1] lays down the following definition in its Article 1 (2) "standard shall mean a technical specification approved by a recognized standardizing body for repeated and continuous application compliance with which is in principle not compulsory".

It may be the result of a formal consensus-building procedure managed by a recognized standardization body in order to permit a large number of manufacturers to adopt identical solutions. Alternatively, the standard may arise spontaneously by the degree of penetration of the market of a particular technical solution (a so-called "de facto" or "proprietary" standard).

2.1.2.    Standards may be developed for a wide variety of purposes, ranging from terminology and testing to detailed technical specifications for products, processes and services. They may be limited to ensuring compatibility of products or systems at their points of interconnection, or may extend to detailed specifications in respect of the design, dimensions and materials of the products themselves. In general terms, the Community along with other Parties to the Agreement on Technical Barriers to Trade of the GATT ("TBTA") is committed to specifying technical regulations and standards in terms of performance rather than design or descriptive characteristics.

OBJECTIVES OF STANDARDIZATION

2.1.3.    In the majority of industries, the objective of the manufacturer whose product becomes a "de facto" standard may not be, at the outset of the commercialization of the technology, to see it become an industry standard. The objective of most manufacturers remains to achieve high levels of market penetration and to be competitive in those markets in relation to other manufacturers.

In certain industries, where a high degree of standardization is taking place, manufacturers must now, however, be aware of the possibility that some of their new technology may eventually form the basis of an industry standard.

---

(1)   83/189/EEC: Council Directive of 28 March 1983 laying down a procedure for the provision of information in the field of technical standards and regulations. OJ N° L 109, 26/04/83 p. 08

Confidential Business Information,
Subject to Protective Order

- 3 -

2.1.4.  If a new product has elements protected by intellectual
property legislation, as is most likely to be the case,
the manufacturer will exercise those intellectual
property rights vigorously, as a means of securing and
maintaining his lead and his profitability in a given
territory. In many high technology industries, the
highest costs are incurred in the research and
development phase when the intellectual input in terms of
man-hours of work is at its greatest, the manufacturing
phase being a relatively low-cost operation. The economic
value of the intellectual property rights in such a
product will therefore constitute an important factor in
price calculations and figures prominently as a company
asset.

2.1.5.  Once a certain level of penetration of the relevant
market for his product has been achieved, the
manufacturer will 'de facto' have set the industry
standard for that product and it will be difficult, if
not impossible, for others whose products must
interoperate with his, to avoid working to the standard
which he has set. This will be particularly the case
where interworking or networking is involved, as in the
computer, energy distribution, telecommunications and
transport industries.

2.1.6.  Once a certain level of market penetration has been
achieved, the manufacturer whose product has become a de
facto standard may accept that de facto standardization
can be advantageously converted into a formal standard
so that the dominance of his technology is embodied in a
more permanent form. His objective will then be to
secure the best terms from the conversion of his de facto
standard into a formal standard.

2.1.7.  These terms may include royalty payments for the use of
his intellectual property and the grant of licences on a
territorial basis for the exploitation of these
intellectual property rights. These rights include the
right to control manufacture and the right to control
distribution, including importation.

2.1.8.  A longer term benefit will probably accrue to the
manufacturer who voluntarily licences his technology to
become a standard since his market share will eventually
grow significantly in respect of the rights for which he
receives royalty payments even if he is no longer the
sole manufacturer of the product itself, and even if the
royalty rate which he receives is less than that which he
would have obtained from a licensee on the open market.

2.1.9.  He will also be able to satisfy a second longer term
objective which is to see the technology developed by his
company established as a worldwide standard with
resulting beneficial publicity.

Confidential Business Information,
Subject to Protective Order

- 4 -

2.1.10. On the other hand, a standard may arise by a process of definition and approval by a recognized national or international standardization body.

2.1.11. The underlying objective of formal standardization is to generate the economic benefits for society that will result from a more rational organization of supply and demand and greater competition in the market place. Standardization tends to reduce costs for the supplier and purchaser of goods and services and to increase transparency of the market. Once the requirements of the market are reflected in a standard, all interested suppliers are put in a position to meet market needs on a competitive basis. At the same time, purchasers are given common assurances with respect to the performance of the product or service against agreed criteria of quality, interoperability, and so on. The importance of standardization as "an instrument of economic and industrial integration within the European market" has recently been explicitly recognized by the Council in its Resolution on the role of European Standardization in the European Economy of 18 June 1992.[2]

2.1.12. These economic objectives can, of course, only be realized insofar as standards are made known and available to the widest possible number of interested parties on fair and reasonable terms. Consequently, a standard is by definition a publicly-available document[3] and the technical specification which is not available to all potential users is not a standard.

2.1.13. Benefits to purchasers and users accrue from the existence of a recognized standard guaranteeing not only interoperability but also a certain level of quality, safety and conformity to certain technical norms. A European standard can find itself in competition with standards set by other major trading partners such as the American or Far Eastern markets.

2.1.14. The objectives of standardization can only be met if the technology chosen is good, up-to-date and readily available. The standardization process is, however, by its consensus-driven nature, a lengthy one, and when substantial delays in adopting a standard occur, the technology on which the standard is based may already be out of date. On the other hand, the most innovative technology may not be the most appropriate for adoption as a standard because it is not yet stable and sufficiently tested in the market place.

---

(2) OJ n° 173 of 9.7.92, p.1

(3) See ISO/IEC Guide 2, "General terms and their definitions concerning standardization and related activities".

Confidential Business Information,
Subject to Protective Order

S-ITC-003390523

2..1.15   Once chosen as a standard, a particular technical
solution tends to perpetuate itself for a period longer
than that which it might have enjoyed on the open market
in a free competitive situation and therefore the process
of standardization may itself retard technological
innovation in some areas.

2.1.16   It is also the case that too much standardization in a
given area at a particular moment in time may create
difficulties as that technology changes. Replacing a
substantial standardized "platform" such as a main-frame
computer operating system with a new and more advanced
standardized "platform" may prove more costly and more
difficult than the addition of new layers of system
software on to existing products.

2.1.17   A variety of approaches to the issue of standardization
are therefore required if the most appropriate form of
standardization for a particular industry is to be
achieved.

2.2.   PRINCIPLES USED IN NATIONAL AND INTERNATIONAL STANDARDS
BODIES

2.2.1.   The three European standards-making bodies recognized by
the Community at a European level are CEN, CENELEC and
ETSI. CEN (European Committee for Standardization) and
CENELEC (European Committee for Electro-Technical
Standardization) create standards for EC and EFTA
countries. Their membership is composed of national
standards bodies and national electrotechnical committees
respectively. ETSI (European Telecommunications Standards
Institute) created in 1988 following the recommendation
made in the Commission's Green Paper on Standards, groups
together administrations, network operators, users,
manufacturers research institutions and private service
providers and has the task of drafting European
Telecommunications Standards.

2.2.2.   At the international level, ISO, IEC and CCITT
(International Telegraph and Telephone Consultative
Committee) are the standard-making organizations. ISO
(International Organization for Standardization) draws
its membership from national standards organizations.
The IEC (International Electrotechnical Commission) has a
similar but smaller membership in the field of
electronics and electrical engineering.

2.2.3.   The principles applied to intellectual property by
ISO/IEC and by CEN/CENELEC are relatively simple.
Subparagraphs b) and c) of Annex A of the ISO document
(Reference to patented items IEC/ISO Directives - Part 2
Methodology for the development of international
standards) are applied by all four bodies. They read as
follows:

Confidential Business Information,
Subject to Protective Order

- 6 -

b)    "If the proposal is accepted on technical grounds, the originator shall ask any known patent holder for a statement that he would be willing to negotiate licences under patent and like rights with applicants throughout the world on reasonable terms and conditions. A record of the patent holder's statement shall be placed in the files of the ISO Central Secretariat or the IEC Central Office, as appropriate, and shall be referred to in the relevant International Standard. If the patent holder does not provide such a statement, the Technical Committee shall not proceed with the inclusion of the patented item unless the respective Council gives permission

c)    Should it be revealed after publication of the International Standard that licences under a patent and like rights cannot be obtained under reasonable terms and conditions, the International Standard shall be referred back to the Technical Committee for further consideration."

2.2.4.    CCITT in its Annex 5 Statement on CCITT patent policy elaborated in June 1988 made the following observations. "Over the years the CCITT has developed a "code of practice" regarding patents... The rules of this "code of practice" are rather simple and straight forward... the detailed arrangements being left to the parties involved, as these arrangements might differ from case to case".

2.2.5.    ETSI has drafted a Policy and Undertaking on Intellectual Property Rights which sets out more detailed procedural rules and which starts from two premises which differ from those applicable in ISO/IEC/CEN or CENELEC. The first premise is that membership of ETSI is conditional on signature of the Undertaking whereby an Intellectual property right (IPR) holder agrees to licence his IPRs according to certain limitations as to royalties. The second premise is that ETSI standards are available in a specific geographical area as a consequence of the definition of territory contained within the draft Undertaking. Certain conditions are specific to signatories of the Undertaking. This Policy and Undertaking has not yet been approved by the ETSI membership.

Confidential Business Information,
Subject to Protective Order

- 7 -

## 2.3.    THE USE OF STANDARDS BY PUBLIC AUTHORITIES

2.3.1.  Because standards represent a voluntary consensus concerning the technical characteristics of goods and services, they are commonly used by public authorities within the framework of regulation. This may take the form of a direct reference in legislation which makes a given standard mandatory or, as is normally the case in the Community, of conferring a "presumption of conformity" to legislation on any product which complies with the standard. Directives based on reference to standards have been adopted in a number of important industries, including mechanical engineering, construction, medical devices, telecommunications, gas appliances and measuring instruments.

2.3.2.  Similarly, public authorities often use standards in their procurement. Within the Community, for instance, the public procurement Directives[4] now all require purchasing entities to define technical specifications in their contract documents by reference to European standards where these exist, in order to ensure that nationally-determined specifications are not used to restrict access to procurement markets.

2.3.3.  Whenever public authorities incorporate standards into legislation and thereby confer upon them a more binding character than their normal voluntary status, they must satisfy themselves that:

- the standards in question have been developed in accordance with the normal procedures of standardization (i.e. that they represent a consensus based on the views of all interested parties); and

- the standards in question are available for use by all interested parties to whom the legislation applies.

- International agreements subscribed to within the framework of the GATT (i.e. the TBTA and to a lesser extent the Agreement on Government procurement) extend these rights of non-discrminatory treatment to certain other GATT contracting parties.

2.3.4.  However, providing that the procedures set out below are followed, even in the exceptional circumstances where a standard becomes 'non-voluntary', problems can be resolved in relation to intellectual property rights.

_____
(4)   Directives 71/305/EEC, 77/62/EEC, 90/531/EEC

Confidential Business Information,
Subject to Protective Order

S-ITC-003390526

- 8 -

2.3.5.   If the technological solution which is to be made
         mandatory is based on proprietary rights, these rights
         must be the subject of negotiation before the standard is
         agreed and the technology is made mandatory.
         If the negotiations fail to produce an agreement from the
         rightholder,   the   rights   cannot   subsequently   be
         expropriated unless there are over-riding public interest
         or public safety considerations to be taken into account
         and no other technical solution could be devised.

2.3.6.   Therefore the question of the use of standards by public
         authorities does not hinge on the question of whether any
         intellectual   property   rights   which   may   underlie   the
         standard   can   be   incorporated   ex   post   facto   into   a
         mandatory standard, since such rights must in all cases
         be   acquired   by   negotiation   and   not   by   legislative
         expropriation.

Confidential Business Information,
Subject to Protective Order

## 3.0.   PRINCIPLES OF INTELLECTUAL PROPERTY PROTECTION

### 3.1.   GENERAL PRINCIPLES

3.1.1.   Intellectual property rights include patents, trademarks, copyright, design rights, semi-conductor topography rights, trade secrets. Works of the intellect are created as the result of a given volume of man-hours of labour and a return on the financial investment in that labour cost will be secured only if the creator of the work can control how his work is to be exploited and where.

General principles are applicable to all forms of intellectual property protection. They include the following :

-   others may only use or copy the intellectual creation with his permission and, if the right holder so wishes, he may be paid for that permission;
-   in order to ensure a wider distribution and use of works of the intellect in society as a whole, limits are set on the scope and duration of the intellectual property protection;
-   the abusive exercise of intellectual property rights by individuals or companies occupying a dominant position is subject to the application of competition rules, and in particular Article 85 and 86 of the Treaty. Agreements between companies regulating the exercise of intellectual property rights may be subject to the prohibition of Article 85 of the Treaty.

### 3.2.   PATENTS

3.2.1.   Specific characteristics apply to each type of intellectual property right. So in the case of patent rights, the object of the right is a new creative technical solution to a problem. The "invention" must demonstrate <u>novelty</u> and be capable of an industrial application.

Confidential Business Information,
Subject to Protective Order

S-ITC-003390528

3.2.2.  The patent right will only be granted if application formalities are completed in which the inventive step is described in detail. There may be a period during which a patent application is subject to examination prior to the grant of a patent. For this limited period of time the patent application is not fully disclosed to the public, although the existence of an application may be known. Once a patent has been granted, the disclosure to the public is compensated for by the temporary monopoly which the patent right gives over the exploitation of the patented invention.

3.2.3.  That monopoly right can be exercised exclusively by the patent holder if he chooses to commercialise his invention himself. If in certain circumstances he fails to work his patent himself or if he chooses to license others to do so, he may nevertheless be remunerated by others for the right to be a licensee of his patent.

The right is not subject to any general exceptions in respect of use by potentially competing third parties but is limited in time so that society may benefit freely from technical progress once the rightholder has had the opportunity to recover his original investment in research.

3.2.4.  Patents are granted on a territorial basis, that is to say, that they are valid for the country in which they are issued, or in the case of a patent issued by the EPO (European Patent Office) they may be valid for up to 17 countries, i.e. those of the Community plus Austria, Switzerland, Sweden, Monaco and Lichtenstein. Rights acquired under patent law exhaust only on expiry of the term of protection in the territory for which they are granted, or, on the non-payment of any renewal fees.

3.3.    COPYRIGHT

3.3.1.  Copyright, by contrast, protects not novelty but originality. This originality is assessed in relation to the expression used by the creator and protection by copyright cannot apply to solutions, principles, ideas, or methods as such. There is no monopoly in the patent sense under copyright protection since any second maker is free to find his own way to express an idea which he has taken from the work of another. Even in technical fields such as computer programs it is exceptional for there to be only one possible way to express an idea.

Confidential Business Information,
Subject to Protective Order

– 11 –

3.3.2.  In cases where idea and expression are inseparable, there is generally held to be no copyright in that expression. The only monopoly under copyright law is therefore the right of the author to prohibit the unauthorized exploitation of the expression used in a work, for example to prevent the copying of lines of text from a book or lines of code of a computer program.

3.3.3.  A work is protected under copyright law as soon as it is created. Within the Community and according to international copyright conventions there is no need to complete registration or examination formalities. However, in some countries, registration formalities do exist.

3.3.4.  The absence of any requirement in the Community to register a copyright means that only litigation can prove conclusively whether a valid copyright exists in relation to a particular work. The protection exists regardless of whether the work has been commercially exploited by its creator or not. Copyright is not therefore a compensation to the author for disclosure as with patent protection, and the essence of the copyright cannot be reduced to a mere right to remuneration.

3.3.5.  Copyright protection is relatively long, at least 50 years following the death of the author according to the relevant international conventions, and is a territorial right. A work created or published in the Community, can be licensed for exploitation only within the Community, the right to exploit the work in, for example, the US, being the object of a separate negotiation by the rightholder.

3.3.6.  A limited number of exceptions to the exclusive copyright rights are provided for in the legislation of the Member States and by the relevant international conventions so that certain acts may be legitimately performed by users.

3.4.  SEMI-CONDUCTOR PRODUCTS AND OTHER INTELLECTUAL PROPERTY RIGHTS

3.4.1.  The protection given in the Community to the topographies of semi-conductor products ("chips") should also be mentioned[5]. This protection is a sui generis regime, limited to chips produced within the Community, although protection can be extended, on the basis of reciprocity, to chips produced in third countries.

---

(5)  Directive 81/54/EC

Confidential Business Information,
Subject to Protective Order

S-ITC-003390530

- 12 -

The protection is limited in time (10 years) and is restricted in scope by exceptions permitting reproduction of a topography for the purpose of private study and the developing of other topographies, i.e. a form of 'reverse engineering' exception.

3.4.2.   Design rights have not yet been harmonized throughout the Community and a variety of regimes protecting both functional and non-functional designs exist. Some regimes foresee a registration system.

3.4.3.   Other forms of intellectual property such as trademarks, trade secrets, unfair competition do not appear at the present time to cause any specific problems in relation to the issue of standards and are therefore excluded from the scope of this Communication.

3.5.      EFFECTS OF AN INTELLECTUAL PROPERTY RIGHT

3.5.1.   Some clarification is necessary as to what acts are permitted or prohibited, in respect of intellectual property rights.  In the case of a product or process incorporating a patented invention, the part of the product or process so protected cannot be copied without authorization, even by observing the ideas and principles on which it is based, nor can instructions in written form, such as a specification or patent description, be used for the purpose of producing a similar or identical result.

3.5.2.   In the case of a product covered by copyright, the part of the product so protected may not be copied without authorization but if it is accessible to the human senses, as in the case of a three-dimensional object or other works in a humanly perceivable form, it may be studied, and the ideas and principles derived from that study may be used to create a similar or identical functionality, providing that the expression of the copyrighted work is not reproduced.

3.5.3.   A special exception to the normal rules of copyright and which is of relevance in the telecommunications standards area has been introduced in Directive 91/250 EC on the legal protection of computer programs to enable interoperable programs to be created by means of deriving and re-using information from existing programs. A study of a computer program in machine-readable form may not yield all the information required in order to create an interoperable program.

Confidential Business Information,
Subject to Protective Order

S-ITC-003390531

Acts which would constitute technical violations of copyright rights such as reproducing or translating the program may need to be carried out. The Directive does not exclude the possibility that payment may be made to the rightholder for such information as a consequence of negotiation between the rightholder and the person requiring information. The exception does not allow for the copying of protectable expression.

3.5.4.   As regards the specification for a standard which is produced in text form, copyright rules will apply to the expression of the specification. This does not prevent users of the specification from implementing the specification. No part of the product or process which is subject to intellectual property rights should be described in the specification, unless the rightholder has agreed to the use of his intellectual property rights in that standard.

3.5.5.   Once authorization has been given by the owner of an intellectual property right for the product or process covered by the right to be used as the basis of a standard, authorization to describe the standard in a technical specification must also have been given, either explicitly or implicitly.

3.5.6.   Ownership of the copyright, if any, in the written form of the specification will depend on whether the specification has been provided by the owner of rights in a de facto standard, or has been provided by a standards body following agreement between the parties concerned as to the ownership of the authors' rights in the text.

3.5.7.   If the specification of the standard is drawn up with sufficient accuracy, it should contain all the information necessary to ensure a satisfactory implementation of the standard. It should not therefore normally be necessary to look beyond the specification for additional information unless this can be done without violating the intellectual property rights in the product or process so described.

Confidential Business Information,
Subject to Protective Order

- 14 -

## 4.0.   THE STANDARD—MAKING PROCESS

### 4.1.   STANDARDS INCORPORATING NO PROTECTED MATERIAL

4.1.1.   It is the case in most standardization work that either
no intellectual property rights exist or are created, or
that there is express consent to free use of the
intellectual property or waiver of any rights arising or
acquired. It is also possible that intellectual property
rights arise but are owned and exercised jointly by all
members of the grouping, or according to contractual
arrangements between the parties.

4.1.2.   In these instances the question of the existence,
ownership and exercise of intellectual property rights is
normally resolved ab initio, and no further problems
should arise. It should be stressed that, wherever
possible, standards should be devised which avoid taking
over proprietary technology on which intellectual
property rights already exist.

### 4.2.   'DE FACTO' STANDARDS

4.2.1.   The opposite situation exists where the product or
process developed by one manufacturer becomes, by virtue
of its success on the market, the de facto standard. For
example, in the video cassette/recorder field, the
overwhelming success of the VHS "standard" is a well-
known case. In these situations the products or process
will almost certainly embody intellectual property
rights.

4.2.2.   These rights may have been known to others in the
industry if patents are involved since patent
applications are a matter of public record once the 18
months period from first filing date is up, at least as
far as the Community is concerned, and it is unlikely
that a de facto standardization can have occurred in a
period less than 18 months.
The manufacturer may even have concluded licences with
third parties in respect of those rights to permit
manufacture in certain markets.

4.2.3.   If copyright is involved the situation is more ambiguous,
as far as those countries are concerned which impose no
registration formalities on the copyright holder, as is
the case in all the Member States. In these
circumstances copyright may exist and expire at the end
of its due term without its validity ever being tested.

Confidential Business Information,
Subject to Protective Order

4.2.4.   Nevertheless it should always be possible for the potential owner of a copyright to identify the subject matter over which he intends to claim a prior right. A presumption of ownership will thus be created which will be rebuttable if he is found not to be the owner or if the subject matter is held not to be protectable.

4.2.5.   If the owner of the intellectual property right is made aware that a standard-making body wishes to base a standard on his technology, he is put on notice that a violation of his intellectual property rights might occur.

4.2.6.   It is therefore of relevance to any subsequent negotiations or litigation to establish by what means the rightholder could be expected to know that a violation of his rights might be proposed.

In the event that the rightholder participates himself in the standard making body it may be assumed that he receives constructive notice by the announcement that a standard is due to be established using the technology in question. In other words, an announcement by the standards body must create a presumption that the rightholder has been put on notice as to the potential use of his rights.

4.2.7.   However where the de facto standard concerns a technology created by a manufacturer not belonging to the standards body, the manufacturer cannot be said to be presumptively put on notice. This situation will be dealt with in paragraph 4.6 below.

4.2.8.   Adoption of official standards based on de facto standard solutions has many advantages. De facto standards are by their nature well-tried and tested solutions, stable and technically satisfactory. They have market acceptance and are probably well-documented.

4.2.9.   Therefore in spite of the difficulties which the existence of proprietary intellectual property rights could potentially create, it is unavoidable that de facto standards will present themselves in many instances as natural candidates for adaptation into recognized standards.

No cases have been drawn to the attention of the Commission as yet where the owner of intellectual property rights in a technology refused to licence his rights to enable an already agreed standard to be subsequently implemented.

Confidential Business Information,
Subject to Protective Order

4.2.10. Particular attention has to be paid however to the procedures by which this process occurs in order to ensure that the interests of rightholders and standards users are respected. These procedures are dealt with in the following sections.

4.3.     STANDARDS CREATED TO INCLUDE AN IPR : AGREEMENT AND REFUSAL TO LICENCE.

4.3.1.   If there are proprietary intellectual property rights underlying the technology on which a standard is to be based and that fact is known to the standard makers, then the agreement of the rightholder must be sought if the work on the standard is to continue. It is obvious that such an agreement should be sought at the earliest possible opportunity so that, in the event of a refusal to licence, alternative solutions may be explored. A time-limit within which permission must be given or refused can also assist in speeding up the standard-making process.

4.3.2.   Once the limit has passed and no agreement has been reached between the parties as to the use of an intellectual property right, work on that solution must be halted and an alternative technology considered. It would be inadvisable for a standard-making body to continue work on a standard if permission has not been sought or has not been granted in respect of intellectual property rights.

4.3.3.   If agreement is reached between the rightholder and the standard-making body, the terms for licences must be fair, reasonable and non-discriminatory. It is not feasible or appropriate to be more specific as to what constitutes "fairness" or "reasonableness" since these are subjective factors determined by the circumstances surrounding the negotiation. If the rightholder is to be satisfied that his investment in research and development can be adequately recovered, he would expect the royalty rate to relate in some way to the normal freely-negotiated commercial rate, allowing for the greatly increased market for his technology which standardization will bring.

4.3.4.   The terms which the rightholder offers for the use of his rights should be flexible enough to include the possibility, if the parties so agree, of cross-licensing arrangements. Cases of disputes arising in relation to the terms and conditions offered by the rightholder could be resolved if necessary by arbitration.

Confidential Business Information,
Subject to Protective Order

In the event of an appeal against an arbitration decision both parties may have recourse to the use of Article 86 EC.

4.3.5. The freedom of the rightholder to refuse to licence is, at the present time, absolute, since his exclusive intellectual property rights cannot be subject to expropriation or compulsory licensing except in exceptional circumstances such as reasons of national security or over-riding public interest.

4.3.6. However a refusal to licence by the rightholder implies as a consequence that an alternative technical solution will probably be adopted and will then challenge the rightholder's potential or de facto dominance in the market. It is normally therefore not in the rightholder's interest to decline to licence his patent or his copyright unless the terms offered by the potential users fall well short of his commercial expectations.

4.3.7. This factor has to be borne in mind in relationship to the "fairness" or "reasonableness" of the remuneration which the rightholder seeks to obtain and balanced against the enhanced market opportunities which standardization on his technology might bring.

4.4.    LATE OR NON-DISCLOSURE OF RIGHTS

4.4.1. A potential source of difficulties can be identified where proprietary rights are not disclosed at all or are disclosed late in the standard-making process. In theory, an IPR holder (having been put on notice by a standard-making body that his rights were potentially to be used in the creation of a standard,) would be acting in bad faith if he claimed those rights only once the standard had been adopted, thereby forcing competitors to agree to licence royalties higher than those which might have been offered at an earlier stage, or blocking the implementation of the standard completely.

4.4.2. As has been indicated in paragraph 4.2.9. above, no such event has yet been notified to the Commission. However, bad faith could easily be demonstrated where a presumption of knowledge on the part of the rightholder can be established.

Confidential Business Information,
Subject to Protective Order

- 18 -

It is therefore for standards-making bodies to establish procedures whereby late disclosure or non-disclosure of rights is penalized once actual or presumed knowledge can be established. The degree to which late disclosure inconveniences the standard-making body can be regulated by means of the time-limit imposed on rightholders to declare an interest once a standard has been announced.

4.4.3.  If there are deliberate acts of bad faith on the part of the rightholder a court might take these into consideration in evaluating the extent of any damages for copyright or patent violation under civil or criminal law.

4.5.  LIABILITY FOR NON-DISCLOSURE

4.5.1.  The question arises as to the extent to which the rightholder can and should be held liable for a failure to disclose an interest. If publication of future standard-making activities takes place in an efficient manner, the responsability for conducting a search of patents and copyrights held by a manufacturer taking part in the standard-making process must rest with that manufacturer. The rightholder may be unaware of the fact that he is in possession of a patent in a given area, or that the subject matter in question might be covered by a copyright. The task of identifying relevant rights will of course be more onerous for manufacturers with substantial IPR portfolios and this factor should be taken into consideration by the standard-making body, perhaps by allocating a longer time-limit for the identification of rights by manufacturers who can demonstrate the magnitude of the search procedure to be carried out in their particular case.

4.5.2.  If on the other hand, the standard-making body accepts the responsability for conducting a search of possible patents in a given area, then the liability for disclosure must no longer rest with the individual rightholder, alone. He can no longer be automatically presumed to have acted in bad faith by failing to disclose his rights.

Confidential Business Information,
Subject to Protective Order

1.6.       IDENTIFICATION OF RIGHT HOLDERS

1.6.1.   If a standard-making body bases its work on a technical solution which is not the property of any of those participating in its work, and makes no effort to identify and obtain authorization from the proprietary rights holder, then the normal application of intellectual property law implies that an infringement of rights has occurred if no reasonable effort has been made to trace the rightholder. Seeking authorization ex post facto will not legitimize the infringement of rights. Therefore the standard-making body has to ensure that all reasonable efforts have been made to identify rights and to negotiate with the rightholder before the subject matter of the rights is incorporated into the standard even if this means that searches have to be carried out as to the existence of patents.

.6.2.   Outside the standard-making environment, a manufacturer wishing to launch a new product should ensure that in so doing he will not violate existing patents or copyrights. The standard making body has a duty to take all reasonable precautions to the same end.

.7.       AVAILABILITY OF LICENCES

.7.1.   A further question which standard-making bodies must address is the extent to which proprietary rights should be licensed for use. The normal practice is for standard-making bodies to make standards available to all users regardless of whether they take part in the standard-making process. Terms and conditions applied to participants and non-participants should not significantly discriminate against the latter. A fortiori where the standard-making body acts in an official or quasi-official standard-making capacity and where its standards are recognized and even made compulsory by virtue of legislation, access to the standard must be available to all without a pre-condition of membership of any organization. Similarly, any treatment of non-members which would impose financial or other burdens on them which act as a direct incentive to become a member of a standard-making organization should be avoided. Different conditions might be applied to different users in relation to their contributions to the standard-making process and the benefits and disadvantages which the parties can demonstrate with regard to their particular circumstances.

7.2.   The rightholder must in all cases retain the initial right to grant or refuse licences on whatever exclusivity or territorial basis he wishes, subject to the application of Articles 30 - 36, 59, 66 and 85, 86 of the Treaty.

Confidential Business Information,
Subject to Protective Order

If membership of an industrial grouping or of a standard-making body is conditional upon agreement to a reciprocity arrangement between members and non-members it is for the rightholder to decide whether those arrangements are acceptable to him before joining the grouping or standards body.

4.7.3.    It should be borne in mind by industry groupings and standards bodies that intellectual property rights are exclusive rights which are usually exercised territorially. A rightholder can choose whom he licences to reproduce, publish, manufacture or distribute copies of his work and may grant exclusive licences for one specific market, the Member States of the Community being understood, of course, for such purposes as one single market. The Community has taken, within the GATT Uruguay Round negotiations, a strong line against the international exhaustion of intellectual property rights.

It has to be recognized at the same time that the standard-making process entails an acceptance by the rightholder of the fact that he is no longer acting in a totally free and geographically limited market once he has agreed to give licences as of right on fair and reasonable conditions to all users of a standard. The international obligations of the Community in this respect are dealt with in section 5.0 below.

4.8.    INDUSTRY SPECIFIC SOLUTIONS

4.8.1.    It may be the case that in certain industries the use of technical standards is more developed than in others. The reasons may be historic, for example the initial overwhelming success worldwide of a particular product, making it attractive for other manufacturers to adopt similar solutions. The reasons may also be purely technical, for example the need to ensure compatibility of international air traffic control and landing guidance systems. They may also be commercial, for example pressure from consumers for hi-fi products of different manufacturers to be combined into "sound systems".

4.8.2.    As a general rule, the more mature a market, the greater the likelihood that non-proprietary standard solutions will be adopted, at least as far as interfaces between products of different manufacturers are concerned. Mature markets may lead to a corresponding decrease in the market dominance of the de facto standard since the early market lead of a single manufacturer may well be overtaken by competitors offering similar but improved product ranges.

Confidential Business Information,
Subject to Protective Order

It is also often the case that manufacturers of established product types prefer to concentrate on improvements to quality or refinements of style or performance, leaving the standardized aspects of the product unchanged.

4.8.3.   The so-called 'black box' standardization described in 2.1.2. above, (which is limited to ensuring compatibility at the points of connection) and which can be observed for example in the case of consumer electronics, has many benefits to consumers and manufacturers. It multiplies choices available on the market but makes few demands on the intellectual property rights of these manufacturers already occupying a place in the market.

4.8.4.   In the other areas of standardization, the process is driven not by reasons of interoperability or market acceptance, but by reasons of quality, safety or conformity to certain technical norms. In these instances a result to be achieved has to be determined, but a variety of technical means to achieve that result may still be available.

4.8.5.   Intellectual property rights may therefore be less in conflict with the objectives of standardization in these circumstances , since the standard is likely to be based on results rather than methods. As a general principle, and for the reasons set out above, standardization based on results to be achieved rather than on a specific design or process technology, is to be preferred.

4.8.6.   In the telecommunications area an argument has been made by some that the advances in technology are so rapid and the degree of involvement of intellectual property rights so great that existing ISO/IEC rules are inadequate. This is felt to be especially the case in telecommunications where exact specifications must be respected if public networks are to function in an interoperable and efficient manner.

4.8.7.   It is not possible to say that in any specific industry, be it pressure vessels, mechanical engineering, aerospace engineering, or telecommunications, standardization and intellectual property rights co-exist with greater or lesser difficulty. Examples may be found, within one and the same industry, of standardization carried out for a variety of historic, technical, commercial and safety reasons. As a market for a particular product or process evolves, the motives which lead to standardization may also evolve.

Confidential Business Information,
Subject to Protective Order

4.8.8.   The Importance of the role of governments In determining
         the precise rules which affect the running of standards-
         making  bodies  should  be  noted.  Governments  have  a
         number of roles to play In this area In that they are the
         procuring entity and the user of standards, the authority
         responsible  for  setting  the  boundaries  for  standard-
         making  activities  and  at  the  same  time  encouraging
         research and development In both the private and public
         sectors,   and   the   regulator   of   competition   policy.
         Therefore  the  Involvement  of  the  legislator  In  the
         standard-making process and In the mandating of standards
         In specific areas becomes a tool of Industry policy.

4.8.9.   If  a  standard  to  which  reference  Is  made  In  a  legally
         binding Instrument, such as a Community Directive, Is not
         specific but Is rather a general reference to unspecified
         standards In a given field such as those referred to In
         Article  13  of  Directive  90/531/EEC[6],  then  questions
         may arise as to the role of the private standard making
         bodies. If this Is the case, a fortiori, It strengthens
         the need for uniform rules to apply to standard-making In
         those areas where legally binding Instruments are likely
         to make reference to such standards or In areas where the
         use of certain standards made by such quasi- private or
         private bodies will be mandatory.

4.8.10.  It  also  re-Inforces  the  underlying  principle  that  the
         rightholder must remain, at all stages of the process,
         free  to  contract  with  the  user  of  his  Intellectual
         property  rights,  since  a  standard-making  body  which
         assumed  the  role  of  administrator  of  such  rights  on
         behalf  of  Its  membership  In  an  area  where  use  of
         standards  became  mandatory  through  legislative  action,
         would de facto acquire a monopoly power In relation to
         those manufacturers and users who remained outside the
         standard-making body.

4.8.11.  In  the  view  of  the  Commission,  no  particular  Industries
         should  be  singled  out  as  requiring  specific  solutions.
         Such a policy, even If effective In the short term, could
         not  guarantee  an  appropriate  solution  In  the  long  term
         when  the  Imperatives  which  drive  the  moves  towards
         standardization  In  that  particular  Industry  may  have
         changed.

---

(6)   Article 13 (2) : The technical specifications shall be
      defined  by  reference  to  European  specifications  where
      these exist.
      Article  13  (3)  :  In  the  absence  of  European
      specifications, the technical specifications should as
      far  as  possible  be  defined  by  references  to  other
      standards having currency within the Community.

Confidential Business Information,
Subject to Protective Order

- 23 -

4.8.12. If special rules for the co-existence of intellectual
property rights and standardization were developed on an
industry specific basis, any resulting lessening of
intellectual property rights could lead to a shift in
production by manufacturers away from that industry, and
could disadvantage, rather than stimulate, European
production.

Confidential Business Information,
Subject to Protective Order

– 24 –

5.0.  OTHER POLICY CONSIDERATIONS

5.1.  COMPETITION

5.1.1.  An important consideration in the successful management of standardization involving intellectual property rights must also be the application of the competition rules of the Treaty and specifically the application of Articles 85 and 86. The issues which arise may be divided into two categories : those which relate to the constitution and operation of the standard-making body under Article 86 and those which relate to a refusal to grant licences to use an IPR or to the offer of terms and conditions for such licences under Article 86.

5.1.2.  Standards-making bodies must be mindful of the requirements of Article 85 regarding in particular the fixing of royalty rates or other trading conditions in respect of standards which they make available, and, additionally must avoid creating opportunities for exchange of competitively sensitive information or for restrictive practices relating to quantities, prices, customer and territory sharing.

5.1.3.  Restrictive agreements falling under Article 85(1) may nevertheless be exempted by the Commission under Article 85(3) where their benefits significantly outweigh the anticompetitive detriments. Standard-making bodies may therefore seek to notify the Commission of agreements which fall within the ambit of Article 85 with a view to negative clearance or an individual exemption under Article 85(3). Benefits derived from an exempted agreement must not fall only on the parties themselves but must also be shared by other market participants and consumers.

5.1.4.  The exercise of an intellectual property right falls within Article 85[7] if such is the "object, means or consequence of an agreement"

5.1.5.  Article 86 is also of relevance, whether to the standard-making body itself together with its members as undertakings likely to be in a collective dominant position within the common market or in a dominant position in their national markets or to the individual undertaking, member or non member, holding an intellectual property right.

---

[7]  (Art. 222 case 24/67 Parke Davis [1968] E.C.R. 55; cases 15 + 16/74 Centrafarm 55 [1774] E.C.R. 1147, 1183).

Confidential Business Information,
Subject to Protective Order                    S-ITC-003390543

5.1.6.   Abuse of a dominant position by a standard-making body and its members could manifest itself by the activities of imposing unfair purchasing prices (i.e. royalty rates to rightholders) or selling prices, (rates including royalties for the use of standards) or other unfair trading conditions. Paragraphs (b)(c) and (d) of Article 86 might also cover abuse of a dominant position by a standard-making body.

5.1.7.   The same test will apply to the individual undertaking, owner of an intellectual property right which the standard-making body wishes to use as the basis for a standard. However, whereas the definition of product market and the establishment of dominance in the relevant market are factors on which a considerable jurisprudence now exists at Community level, there have been as yet no decision of the application of Article 86 in the standards field.

The finding of dominance depends heavily on the definition of the relevant product market. Obviously, the narrower the relevant product market is the greater the likelihood of dominance being established. The concept of the relevant product market implies that there can be effective competition between the products which form part of it and this presupposes that there is a sufficient degree of interchangeability between all products forming part of the same market in so far as specific use of such products is concerned. This must be assessed inter alia in the light of the structure of demand and supply for each product and can lead to holding an undertaking dominant in the market for its own products.(8)

5.1.8.   The question is the extent to which a refusal by a rightholder to allow his technology to become the basis for a standard would be anticompetitive. In order to demonstrate abuse of a dominant position it would be necessary to establish that the relevant market was the technological solution in question and that the owner of rights in that technology occupied a position of dominance in relation to that market.

---

(8)   Hugin/Commission Judgment of 31 May 1979 in Case 22/78 (1979) ECR 1869; BBC/Commission (Magill) Judgment of 10 July 1991 in Case T-70/89 of the Court of First Instance; Hilti/Commission Judgment of 12 December 1991 in Case T-30/89 of the Court of First Instance.

Confidential Business Information,
Subject to Protective Order

- 26 -

5.1.9    If the criteria for establishing relevant market and dominance were met the next step would be to evaluate the behaviour of the rightholder in refusing to allow his technology to become the basis for a standard.

5.1.10.  Until now, the Court of Justice has always maintained that a mere refusal to licence an IPR, absent other instances of abusive behaviour, will not be actionable under Article 86[9].

Intellectual property rights are by their nature exclusive property rights, and except in very limited and specific circumstances, as laid down in national legislation or international conventions, do not have to be made available to others by means of compulsory licences unless it can be demonstrated that the exercise of the right involves certain abusive conduct.

5.1.11.  Therefore Article 86 cannot permit the expropriation of rights for the purposes of using the technology as the basis of a standard where no other circumstances establish abuse of a dominant position, and taking into account particularly whether there are other viable technologies available.

The problem should therefore be addressed before the technology on which to base the standard has been definitively selected. If the standard in question had been adopted, implemented, and made mandatory by a Community instrument, refusal to licence the technology necessary to use the standard would, a fortiori, create difficulties.

5.1.12.  A main objective of Article 86 is to ensure that dominant companies do not create conditions of trading in which they are able to stifle or eliminate competition.

If no standard exists, the IPR holder cannot be dominant in respect of the standard. If competition exists on the market for the product whose technology the standard-makers seek to use, the standard-maker is merely prevented from exercising a particular choice as regards the solution which he wishes to adopt to a specific problem.

---

(9)  Volvo Veng [1988] ECR Ground 8

Confidential Business Information,
Subject to Protective Order

- 27 -

5.1.13. The situation where the standard-maker is not able to choose an alternative technology must be examined. The circumstances in which this is the case will be unusual. Nevertheless, for technical or for financial reasons the standard-maker could attempt to demonstrate the absolute necessity of licences being available for the use of a particular technology. It could also be claimed that alternative technologies produced inferior results. In the case of technical necessity, objective evaluation of the scope of the patent in question should reveal whether the patent is so broad as to render all other substitute technologies not viable. It is relatively rare for a patent to cover such a broad innovative area that alternative means to achieve the same result cannot be found.

5.1.14. As to financial necessity, excessive pricing of its technology by the dominant company could be indicative of abusive behaviour but this factor is not of relevance in a case of mere refusal to licence. It should be noted however that excessive prices asked for by a dominant company could amount to a <u>de facto</u> refusal to license.

5.1.15. If it were demonstrable that no other viable technology existed, it would fall to be resolved whether the standard-making body, or potential users of the standard, would be placed at a competitive disadvantage vis-à-vis the owner of the intellectual property right by the fact that no standard could be made in that area, or that the standard adopted was less efficient than the proprietary technology. Although it could be argued that consumers would benefit in the short term if intellectual property rights were compulsively licensed to serve as the basis of standards, in the long-term, investment in research and development in the standardized industrial sectors would dry up within the Community. Non-Community entities with extensive research activities would be encouraged to keep their technology out of Community markets, while low-cost manufacturing centres outside the Community would benefit from cheap licences to use Community technology.

5.1.16. Therefore, any application of Article 86 in the field of public standardization must be balanced against the policy objective of maintaining the Community's strength in research and development.

Confidential Business Information,
Subject to Protective Order

- 28 -

5.2.    EXTERNAL RELATIONS ASPECTS
        AVAILABILITY   OF   LICENCES   FOR   PRODUCTS   FROM   THIRD
        COUNTRIES

5.2.1.  From a policy point of view the Community is committed to
        the widest possible geographical availability and use of
        standards   in   the   interest   of   economies   of   scale   and
        enhanced international trade.

5.2.2.  Under the Agreement on Technical Barriers to Trade (TBTA)
        concluded under the auspices of the General Agreement on
        Tariffs   and   Trade   (GATT)   in   1979   the   Community   has
        accepted several obligations vis à vis the other parties
        to the TBTA (practically all industrialised countries and
        a   number   of   developing   countries)   in   relation   to   the
        preparation,   adoption   and   application   of   technical
        regulations and standards.

        The level of compulsion varies according to whether the
        standard or technical regulation is prepared, adopted or
        applied by a central government body (Art. 2 TBTA) or a
        non-government body (Art. 4 TBTA).

5.2.3.  Under   Art.2   TBTA   the   Community   has   to   ensure   that
        standards are not prepared, adopted or applied with a
        view to creating obstacles to international trade and
        that products imported from the territory of any party to
        the TBTA shall be accorded treatment no less favourable
        than that accorded to like products of national origin
        and to like products originating in any other country.

        Under Art.4 TBTA the Community, as regards standards by
        non-governmental   bodies,   has   to   take   such   reasonable
        measures as may be available to achieve the objectives
        pointed out in Art.2 TBTA.

5.2.4.  Standards which are given a mandatory status by Community
        legislation by requiring that contracting authorities in
        public   procurement   Directives[10]   refer   to   European
        standards must be available to entities in the Community
        at fair, reasonable and non-discriminatory terms.

5.2.5.  Standards which provide a presumption of conformity to
        the essential requirements of Community 'New Approach'
        Directives[11]   must   be   available   to   entities   in   the
        Community at fair, reasonable and non-discriminatory
        terms.

---

(10) Directives 71/305/EEC [OJ N° L185 16.8.1979, p.5],
     77/62/EEC [OJ N° L13, 15.1.1977], 90/531/EEC [OJ N°L
     297, 29.10.1990, p. 1]
(11) Directives 87/404/EEC [OJ N° L 220, 08.08.1987,p.48],
     88/378/EEC [OJ N° L 187, 16.07.1988, p.1],
     89/106/EEC [OJ N° L 40, 11.02.1989, p. 12], 89/336/EEC
     [OJ N° L 139, 23.05.1989, p.19],
     89/392/EEC [OJ N° L 183, 29.06.1989, p. 29], 89/689/EEC
     [OJ N° L 399, 30.12.1989, p.18],
     90/384/EEC [OJ N° L 189, 20.07.1990, p.1], 90/385/EEC
     [OJ N° L 189, 20.07.1990, p. 17],
     90/396/EEC [OJ N° L 196, 26.07.1990, p.15], 91/263/EEC
     [OJ N° L 128, 23.05.1991, p.1]

Confidential Business Information,
Subject to Protective Order

- 29 -

5.2.6. For the standards described in 5.2.4. and 5.2.5. above, national treatment (Art.2) requires that products originating in a Party to the TBTA be treated in the same manner. If these standards contain intellectual property rights, this means that the Community must ensure that the importer from a country party to the TBTA can obtain licences from the IPR holder for importation, marketing, sale and use in the Community on fair, reasonable and non-discriminatory terms. For other standards the level of compulsion to reach this result is limited to the adoption of reasonable measures.

From a policy point of view it would be desirable to make sure if licences for IPRs which are required for manufacture for export to the Community are available on fair, reasonable and non-discriminatory terms in order not to create obstacles to international trade.

5.2.7. This issue does not raise any conflict with intellectual property rights incorporated into a standard provided that the holder of such rights has consented to their inclusion. It would become of direct relevance if the rightholder subsequently refused to grant licences for the manufacture of products in the Community or importation of products originating in a TBTA signatory country or if the existence of the rightholder was only revealed once the standard had been made mandatory.

5.2.8. In both the above situations, a number of solutions exist. The standard could be withdrawn or modified. Alternatively in exceptional circumstances the Community instrument itself might have to be modified and the standard made non-mandatory. However, it is essential for standard-making bodies to recognize the need to identify any intellectual property rights before adopting a technical solution and for the rightholder to understand and accept the terms and conditions under which his rights will subsequently be licensed, both in respect of manufacturing and importation licences.

Confidential Business Information,
Subject to Protective Order

6.0.    CONCLUSIONS

6.1.    CODES OF PRACTICE / GUIDELINES / "UNDERTAKINGS"

6.1.1.  If, in spite of the apparent lack of evidence of systematic difficulties arising at present in the majority of standard-making bodies, there are concerns that further codification of procedures for the treatment of intellectual property rights in the standards field is required, then consideration should be given to the nature of such codified procedures.

6.1.2.  As stated in paragraph 5.2.5. above, the possibility that a European standard may be made mandatory or given a particular status through Community legal instruments places a burden of responsability on the Community and the standard-making body to ensure that democratic and pro-competitive processes exist for the drafting of standard.

6.1.3.  Therefore, the standard-making process should remain voluntary and should respect existing national and Community legislation, and international obligations. If changes to Community legislation or obligations are required in order to achieve the legitimate objectives of standardization, such changes should be effected by all relevant means including proposals to the Council by the Commission for legislative action. If existing provisions of the Treaty, or of Community legislation are to be given effect in the standard making area in ways which are different from the effect normally given in other areas, such extensions or interpretations should conveyed with the industries concerned in a fully transparent manner.

6.1.4.  As indicated in paragraph 1.1.4, if standard-making bodies choose to elaborate codes of practice or undertakings for signature by participants in the standard making process, care should be taken to distinguish those private procedural obligations arising from membership of a standard-making body and the obligations under public law which the body or its members may incur.

6.1.5.  The Commission has examined a number of the codes or guidelines applied by international and national standards-making bodies. Given the voluntary nature of the standard-making process, the common characteristics of most such codes or guidelines are that they are non-binding and remain general in their approach. However, at least one standard-making body has attempted to create a binding and detailed Undertaking which sets out the mechanisms for regulating the making of standards.

Confidential Business Information,
Subject to Protective Order

6.1.6.   It can be argued that the complexity of the relationship between standard-making and exclusive intellectual property rights requires a set of rules which foresees all possible eventualities. It can equally be argued that without constraints on the membership of the standard-making body, the potentially conflicting interests of those taking part in the process cannot be reconciled.

6.1.7.   On the other hand, proponents of the general and voluntary approach favoured until now by most international standardization bodies argue that unnecessary detail in such guidelines renders the process more complex than it need be, and argue that no evidence of a need to depart from the voluntary approach has been produced.

6.1.8.   It is not for the Commission to favour one approach rather than another, providing the requirements set out in paragraph 6.2.1. below are met.
To the extent that standards-making bodies are private and voluntary organisations, they are free, within the limits imposed by Articles 85 and 86 of the Treaty, to organize their activites in the way which seems to them to be most appropriate. However, in imposing constraints on members, standards bodies should take into consideration the need to encourage the voluntary contribution by industry of its best technology toward the standard-making process. The Commission has therefore a preference for a system based on tried and proven principles, but which balances in a transparent and equitable way the interests of those concerned.

Confidential Business Information,
Subject to Protective Order

S-ITC-003390550

## 6.2.    GENERAL PRINCIPLES

6.2.1.    The Commission suggests that rights and obligations arise for both standards makers and intellectual property right holders. The principles on which standardization takes place should therefore recognize that partnership as follows :

European standard-making bodies should ensure that:

1.    all persons wishing to use European standards must be given access to those standards;

2.    standards are available for use on fair, reasonable and non-discriminatory terms, regardless of whether the users participate in the work of the standard-making body or not, but taking into account the circumstances of the use;

3.    users are able to use the above standards to manufacture in conformity with the standards in the Community, and to import into the Community goods legitimately manufactured in third countries in conformity with the standards;

4.    best efforts are made to identify holders of any intellectual property rights
      - by conducting searches
      - by publication of adequate information and where appropriate by holding public enquiries,
      before adopting a standard, work on a particular solution only continuing if all known intellectual property rights can be licensed for use in the standard;

5.    fair conditions are provided to the holders of intellectual property rights, especially with regard to the time limits for identifying IPRs and agreeing to their use, and in respect of arbitration mechanisms as to royalty rates;

Intellectual property right holders should:

6.    use best efforts to identify in a timely manner any IPR which they hold which is relevant to a standard which is being developed and to confirm or refuse permission for its incorporation in that standard promptly;

Confidential Business Information,
Subject to Protective Order

7.    offer   fair,   reasonable   and   non-discriminatory
      monetary or non-monetary terms for the licence to
      use any IPR;

8.    regard agreement to the incorporation of an IPR in
      a standard as irrevocable unless the exceptional
      circumstances justify withdrawal of licences once
      the standard is adopted.

## 6.3.    COMMUNITY ACTION

6.3.1.  The   Commission   may   find   itself   obliged   to   consider
        whether  Articles  30-36,  59,  66,  85 and 86 of the Treaty
        are applicable in certain cases.  Arbitration procedures
        set up by standard bodies, whilst useful in resolving
        disputes in certain areas, cannot be regarded as final
        and  binding  upon  all  parties  if  questions  arise  which
        fall  to  be  decided  by  application  of  provisions  of  the
        Treaty.

6.3.2.  As   indicated   earlier   in   this   Communication,   the
        Commission must ensure that where compliance with a
        standard  or  part  of  a  standard  is  referred  to  in
        Community  legislation,  either  as  a  mandatory  requirement
        or  as  one  which  confers  a  particular  status  under
        Community  law,  the  contents  of  that  standard  are  made
        available to all interested parties on a fair, reasonable
        and non-discriminatory basis. This obligation derives
        from both Community and international law.

6.3.3.  Where   the   Commission   has   reason   to   believe   that   a
        standard or part of it is not being made available on
        these terms it will have to take steps to withhold or to
        withdraw recognition under Community law of the standard.
        This could be done in respect of individual standards on
        an ad hoc basis, for instance, by the publication of
        notices in the Official Journal.

        However, if a European standardization body consistently
        failed   to   ensure   non-discriminatory   access   to   its
        standards, the status of the standardization body itself
        under Community law would have to be reviewed.

Confidential Business Information,
Subject to Protective Order