# EXHIBIT 13

**ETSI GA ahg on IPR#2
Sophia Antipolis,
3 – 4 March 2003**

**ETSI GA/IPR02(03)05**
23 February 2003
Page 1 of 6

**Source:**  **Tom Sanchez, Willy Verbestel**

**Title:**  **FRAND – Fair, reasonable, and non-discriminatory) (Issue 04)**

**Agenda item:  3.4**

**Document for:**

| Decision | |
|---|---|
| Discussion | **X** |
| Information | |

# 1  Introduction and Scope

This document summarises for this issue:

- The historic background
- The responses to the IPR questionnaire see Annex 1
- The 1st IPR ad hoc group meeting comments and discussion
- Comments subsequently posted from Members
- A possible topics for discussion

# 2  Historic Background

"Fair, reasonable, and non-discriminatory licensing terms and conditions":

The words are very plain.  The plain language is the starting point to determine what it means, as well as industry practice that has set a "de facto" determination of the words.

In general, the concept and fair and reasonable and non-discriminatory license obligations reflect legal mechanisms well established in the courts of many countries to settle patents disputes.  If one were to read the important "Georgia-Pacific" case cited in United States law as a method to determine a "reasonable royalty", it can readily be seen to be a test that closely parallels the concept of "fair, reasonable, and non-discriminatory" license obligations.

It is known that many GSM license agreements were entered into by companies based on a "meeting of the minds" between the companies regarding the meaning and intent of the words, "fair, reasonable, and non-discriminatory".  To argue the contrary is to argue that companies would enter into "unfair and unreasonable" terms and conditions that were not commercially viable.

In order to ensure the timely and very successful deployments of GSM, there were patent issues that needed to be resolved in order for GSM to be an economically viable implementation.  RIM cited the paper by Bekkers, Verspagen, and Smits, as a broad source of information with the understanding that the paper was not accurate in the details regarding the license agreements and some other misunderstandings of policy.  But the paper does cite actions such as the one brought by Dancall that questioned the meaning of "fair and reasonable" terms and conditions and other important points that it makes are correct.

As per Bekkers, in the pre-deployment stage of GSM, some companies would not give royalty-free licenses, this cast a doubt over deployment because other companies who did not have patent portfolios to trade were concerned that the price of the IPR (patents) would be too high. To wit, that the prices would Not be fair and reasonable.  See the Bekkers paper. It is also a matter of record, that ETSI did become involved at this early stage to actually evaluate one company's patents and to make

**Confidential Business Information,
Subject to Protective Order**

an expert evaluation of the legal status of the patents in order to determine if the claimed portfolio had valid patents.

This is an issue that had to be resolved in order for the successful deployment of GSM.

**"FAIR AND REASONABLE"**

"Fair and reasonable" as pointed out is a different question from the question of what is discriminatory. If a company wants to charge a 25% percent royalty of the price of every handset to every company in the industry for the same royalty price everywhere, it is arguably not being "discriminatory" but the price is so high as to be "unfair and unreasonable."

**"NONDISCRIMINATORY"**

In contrast, it was pointed out in the record of the meeting, that if a company (licensor) is attempting to charge two different companies (potential licensees) two different rates where one monetary consideration rate (actual payment of Euros) is 2 times as high to one potential licensee versus the other, and the two potential licensees are in the same patent (possible cross-license consideration to trade) and business position with respect to the licensor, then there is an argument that this is "discriminatory." There was a show of hands regarding this issue in the meeting.

There are now public records in court trials that give a good overview of what typical numbers are for patent licenses and the terms and conditions in the licenses that enabled GSM to grow into the most successful telecom standard in the world.  It must be kept in mind that many of the older licenses were entered into at a time, when all companies in the industry made a lot of profit.  Profit is a strong consideration in coming to agreement of what is "fair and reasonable." There are court records that indicate that as the margins of profit available to manufacturers were eroded, this required renegotiation.  Simply put, a royalty of 2 percent to an IPR holder when a particular company's profit is 35% year to year, may possibly be fair and reasonable if the cumulative is not too great, but a 2 percent royalty when there are no profit margins year to year, may constitute an "unfair and unreasonable" license demand, especially if the number of IPR holders is increased tenfold.

It is safe to say that by 1994, when GSM was becoming widely deployed, most major manufacturers had obtained the necessary licenses to "feel safe" that their companies would be free of claims by valid patent holders.  See Bekkers, and general industry knowledge.  This included obtaining licenses from non-industry participants where the licenses were not cross-licenses, but rather were what are sometimes described as one-way licenses, money flows one-way and there only monetary consideration.  Through regulatory and industry pressure, both direct and indirect, the royalty burden was equitably measured so the industry could prosper and the technology base grew.

An important critical factor to consider is that the market conditions that determine what is "fair and reasonable" have changed.

**Cumulative royalty charges**:

When GSM was deployed, there were at best a handful of companies that claimed patents or had the strength in their patent portfolios to enforce the patents.  As is understood, any company can claim a patent or several patents, but if there is enough prior art to invalidate the claims, the market price of the patents will go down.  The patent asserter will either have to reduce the price or risk a legal battle that will invalidate the patents. The Bekkers paper mentions the Interdigital case, whereby a potential major patent holder with potential very broad claims on "tdma" technologies, including GSM, had many important patent claims invalidated in a court action culminating in 1995 in the United States.  The public court record is quite extensive and the gist of the invalidating art were many papers regarding tdma technologies from the NTT radio labs that predated the patent claims by many years.

Other claimed patent asserters on the ETSI essential declaration list of ten years ago have lost legal battles regarding the merits of their patents.

Whereas the whole list of "claimed" ETSI essential patents for GSM were only a couple of dozen pages long ten years ago, that same list is now (year 2000) several hundred pages long, if not over a thousand pages long in 2003.  This means the number of asserters has arguably increased by more than an order of magnitude.

**Confidential Business Information,
Subject to Protective Order**

Prosperous companies that had to pay large running royalties for being in the GSM business without patents to diminish liability in 1992 GSM license agreements then correctly implemented programs to patent hundreds of new applications per year in a scramble to diminish the large amounts of money they paid for essential and commercial licenses.  These licenses are necessary to deploy equipment. Again this is a matter of public record.

One member in the first ad hoc meeting gave us a good number when he mentioned that his company files well over 1000 new patent applications every year.  This is not an unusual number.

As is well understood by everyone attending standards meetings, many of these patented technologies are brought to the standards meetings for inclusion in the standards.

**Other companies** attempt to use the standards not to diminish their royalty/product costs or to be viable market participants, but rather to be simply patent royalty collectors.  The scenario is obvious, if a company with such an intention can get one very good patent into the specification, and it were to go into every GSM handset sold in the world, at one Euro a unit, it becomes a hugely profitable company from the one patent.

## 3      First ad hoc meeting comments and discussion

"Intellectual property rights and standardization: the case of GSM" by Rudi Bekkers, Bart Verspagen, and Jan Smits.  Noted that RIM does not believe the document is correct in all aspects, but is a starting reference point for Members looking for issues regarding ETSI IPR policy and competition issues.

- **Phillips** - definition of reasonable depends on value of patent, market conditions, etc. These would be a restrictive modification to the policy so must be ruled out-of-scope

- **Ibbotson** - would be surprised if anybody buys a license just because it's on the list.  Article 6.2 refers to a search for a potential missing IPR and not for the investigation of the essentiality of a declared IPR.

- **Sanchez** - Fail and Reasonable are different issues to Non-Discriminatory, maybe need to break it into pieces

- **Lafuente** - need to have a checking mechanism to see that people are respecting the policy.

- **Adams** - impossible for ETSI to have any view on what FRAND conditions.

- **Ibbotson** - those words are there to prevent the TBs discussing the terms.  FRAND term is identical in ITU policy, Japan SDO, US SDO, even EC uses it in the FP6 conditions, and this is the standard way to express it.  It is completely impractical to think about monitoring / calculating values for FRAND.

- **Lafuente**, look for additional guidance, there is a need for a mechanism to check implementation. IPRs are supposed to be notified in the standard but in some areas e.g. GSM, operators don't want it. Need clear rules as it causes problems for SMEs, as they do not know the market conditions.

- **Sanchez** - in GSM everyone knows what the figures are but they are not published.  There are some recent cases in the US where companies have been forced to publish details so some comparisons are available.  In SMG2, there were some notes about rates. Within the industry there is knowledge as to what is a fair rate.  Non-discriminatory means you have to offer the same rate to equal players, the result of all this.  Result of this informal agreement was the success of GSM. ex. *If a company licenses a licensee on an essential IPR portfolio for a specific rate X, then the next licensee who is in the same IPR position as the first licensee cannot be charged a rate 2 times that would be discriminatory.*

- **Wimmer** - problem is dilute resolution not the terms.  FRAND is a standard principle throughout all SDOs.

- **Hernández** - ETSI could create a consultative IPR committee, to advise on FRAND conditions, enable exchange of views but with no formal powers. Intention would be to help achieve out of court settlements

**Confidential Business Information,
Subject to Protective Order**

- Proposal from **Hernández** by email during meeting:

  - Recommend the GA to create an ''IPR Advisory Committee'' composed of elected individuals from the different kinds of Membership (big, manufacturers, SMEs, operators, administrations…).

  - This special committee will be contacted by Members who have problems with the application of the IPR policy and they will try to help on a confidential basis.

  - The aim is to reduce to the minimum the ''going to court'' option

- **Adams** - there are known guidelines in the 3G communities with limits like ''no more than 10% total royalties or it will kill the market''.  Some industry in UK has arbitration but expensive to set-up.  Be careful it could be time consuming and expensive so not justifiable.

- **Breidthardt** - this is not an ETSI issue and there is a risk of article 81/82 problems.  ETSI could provide some examples of non-FRAND as a good practice / bad practice reference guide.

- **Director-General** - there seems to be wishes to provide some method to assist in FRAND advice to SMEs but also note some people against.

## 4       Comments posted since first Ad Hoc meeting

There were no comments subsequently received to date from members.

## 5       Possible Topics for discussion at second meeting

a)   **Is it possible to research documents well enough to determine past agreements that form a guideline as to what is "fair and reasonable."**

b)   **Is there conduct that can be agreed upon to be clearly a violation of "non-discriminatory" requirement?**

c)   **Non-discriminatory:** A question put for discussion: can a company which is a signatory to ETSI and has agreed to license on "fair, reasonable, and non-discriminatory" terms and conditions charge more than two times the monetary royalty rate in Europe to ETSI members for its IPR than it charges in another part of the world for the same technology?

Can a IPR holder charge several times the amount of monetary consideration to one licensee than to another with only the argument that there is some named "valuable" non-monetary consideration?

Where the royalty rate in question is several times the royalty rate charged by any big IPR holder in past ETSI standards such as GSM? Is this discriminatory and should the EU use its jurisdictional mandate to solve this problem like the governments of other countries have solved this problem? By capping the single IPR holder royalty?  Should the EU use its jurisdictional powers to ensure its consumers have the same cost effective products that other countries have for their consumers by ensuring the EU royalty rate is as favourable as that available in other countries?

Confidential Business Information,
Subject to Protective Order

**ETSI GA ahg on IPR#2**
**Sophia Antipolis,**
**3 – 4 March 2003**

**ETSI GA/IPR02(03)05**
23 February 2003
Page 5 of 6

### Annex 1 – Responses to IPR Questionnaire on FRAND

| QUESTION 6: What are the specific issues that you would like the Technical Body Chairman Guide on IPRs to identify? | |
|---|---|
| **COMPANY** | **ANSWERS** |
| INCOM | Many discussions related to licencing conditions of these IPR demand a significant degree of confidentiality, usually in the form of a NDA.<br>I feel that this is directly opposed to the ETSI principal of 'fair, reasonable and non-discriminatory. No-one will ever really know what is non-discriminatory if all licencing information is subject to NDA. Of course we can have the use of NDAs where there are specific cross-licencing and technology exchanges involved in the resulting negotiation but the basic 'reference value' of the IPR in question should not be limited by NDA. |
| Frequentis | There is no definition of "fair", "reasonable" and "non- discriminatory". The understanding of what is "fair" and "reasonable" can only be done by observing in what is happening on the marketplace. IPR holders can block entrants to the market by making every license negotiation subject to a Non-Disclosure Agreement (therefore it is not possible to judge if the terms are  "fair", "reasonable" and "non- discriminatory") and demanding outrageous licence deposit and royalties.<br>That the concept of licensing terms as 'fair, reasonable and non-discriminatory' requires evaluation by consensus and therefore, public knowledge of the perceived value. The current policy does not permit ETSI to request such information.<br>FREQUENTIS  proposes that ETSI members holding IPRs should be obliged to set up a joint administrative body with the view of administering all licences regarding the standard in question. This body shall then grant a joint licence for all IPRs regarding the standard in question to companies on public available "fair, reasonable and non-discriminatory terms and conditions". The IPR holders shall agree amongst themselves how to distribute the royalties paid to the administrative body. |
| Fylde Microsystems Ltd | The logical understanding of what constitutes 'fair and reasonable' is comparative and can only be made by reference to what is happening in the marketplace.  In fact the Chairman's guide to the ETSI IPR policy states "the holder of an Essential patent should never be asked to disclose the commercial terms under which licenses for the Essential patent may be made available." This invites IPR holder to circumvent their licencing commitment  and block entrants to the market by making every negotiation subject to a Non-Disclosure Agreement and demanding outrageous licence deposit and royalties.<br>There is no mechanism within the IPR policy for mediation<br>That the concept of licencing terms as 'fair, reasonable and non-discriminatory' requires evaluation by consensus and therefore, public knowledge of the perceived value. Current policy does not permit ETSI to request such information. |
| Microelectronica Española | ETSI IPR Policy Objectives state that STANDARDS or TECHNICAL SPECIFICATIONS shall be based on solutions that best meet the technical objectives of the European telecommunication sector. In the achievement of these objectives the Policy takes into consideration some rights – and not well detailed obligations - of the owner of IPR that may potentially become essential to implement an STANDARD or TECHNICAL SPECIFICATION but is not offering to ETSI members appropriate mechanisms to guarantee a fair play on IPR related issues.<br>There is not a mechanism to guarantee that terms and conditions for licenses under an essential or potentially essential IPR fulfil the ETSI IPR Policy, it is are "fair, reasonable and not discriminatory", as those terms and conditions are normally protected by an NDA. ETSI criteria about if proposed terms and conditions for a claimed essential IPR fulfil the ETSI IPR Policy may be the best criteria ETSI members may have on this matter. If ETSI is not able to guarantee the compliance with its policy who will guarantee it? If compliance with the policy can't be checked how can ETSI members be protected against anticompetitive actions derived from non-compliance of the ETSI IPR Policy? |
| Mitsubishi Electric Corporation Ltd | Fair, reasonable and non-discriminatory terms<br>Cases are observed in which being fair and being reasonable do not go together but goes against each other.  Where a patent holder undertakes to grant licenses at 2(two) % to any licensee, it might be fair. However, if there are 5(five) such holders, the cumulative royalty would be 10% which could not be regarded as reasonable if such royalty is applied to a consumer product. Furthermore, if such five patent holders assert each other the same terms and condition, no such patent holder has to pay any royalty. It is presumed that this is what is happened to GSM in Europe. In such situation, it is difficult to think that licensees who are forced to pay high and not-so-reasonable cumulative royalties and others who enjoy zero or very low royalties are treated in a non-discriminatory manner.<br>There is no way to prove that compensation is reasonable and non-discriminatory if it is mixed with values not monetary and not clearly explainable. |

**Confidential Business Information,**
**Subject to Protective Order**

| | |
|---|---|
| Niros Telecommunication A/S | The understanding of what constitutes 'fair and reasonable' is comparative and can only be made by reference to what is happening in the marketplace. In fact the Chairman's guide to the ETSI IPR policy states "the holder of an Essential patent should never be asked to disclose the commercial terms under which licenses for the Essential patent may be made available." This invites IPR holder to circumvent their licencing commitment and to block entrants to the market by making every negotiation subject to a Non-Disclosure Agreement and demanding outrageous licence deposit and royalties. It is Niros's opinion that this is what is actually taking place in relation to the TETRA standard by one IPR holder. Niros proposes that ETSI members holding IPRs - irrespective of whether or not they are participants in should be obliged to set up a joint administrative body with the view of administering all licences regarding the standard in question. This body shall then grant a joint licence for all IPRs regarding the standard in question to SMEs on "fair, reasonable and non-discriminatory terms and conditions". The IPR holders shall agree amongst themselves how to distribute the royalties paid to the administrative body.<br>That the concept of licencing terms as 'fair, reasonable and non-discriminatory' requires evaluation by consensus and therefore, public knowledge of the perceived value.The current policy does not permit ETSI to request such information. |
| ROHILL/ TETRA SME workgroup | The understanding of what constitutes 'fair and reasonable' is comparative and can only be made by reference to what is happening in the marketplace. In fact the Chairman's guide to the ETSI IPR policy states "the holder of an Essential patent should never be asked to disclose the commercial terms under which licenses for the Essential patent may be made available." This invites IPR holder to circumvent their licencing commitment and to block entrants to the market by making every negotiation subject to a Non-Disclosure Agreement and demanding outrageous licence deposit and royalties. It is Rohill's opinion that this is what is actually taking place in relation to the TETRA standard by one IPR holder. Rohill] proposes that ETSI members holding IPRs - irrespective of whether or not they are participants in should be obliged to set up a joint administrative body with the view of administering all licences regarding the standard in question. This body shall then grant a joint licence for all IPRs regarding the standard in question to SMEs on "fair, reasonable and non-discriminatory terms and conditions". The IPR holders shall agree amongst themselves how to distribute the royalties paid to the administrative body.<br>That the concept of licencing terms as 'fair, reasonable and non-discriminatory' requires evaluation by consensus and therefore, public knowledge of the perceived value.The current policy does not permit ETSI to request such information. |
| Sepura Ltd | There are no definitions of "fair, reasonable and non-discriminatory". Clarification of "fair, reasonable and non-discriminatory" and benchmarks against which the same can be measured. |
| Teltronic | That the concept of licencing terms as 'fair, reasonable and non-discriminatory' requires evaluation by consensus and therefore, public knowledge of the perceived value.The current policy does not permit ETSI to request such information.<br>The understanding of what constitutes 'fair and reasonable' is comparative and can only be made by reference to what is happening in the marketplace. In fact the Chairman's guide to the ETSI IPR policy states "the holder of an Essential patent should never be asked to disclose the commercial terms under which licenses for the Essential patent may be made available." This invites IPR holder to circumvent their licencing commitment and to block entrants to the market by making every negotiation subject to a Non-Disclosure Agreement and demanding outrageous licence deposit and royalties. It is TELTRONIC's opinion that this is what is actually taking place in relation to the TETRA standard by one IPR holder.<br>TELTRONIC proposes that ETSI members holding IPRs - irrespective of whether or not they are participants in should be obliged to set up a joint administrative body with the view of administering all licences regarding the standard in question. This body shall then grant a joint licence for all IPRs regarding the standard in question to SMEs on "fair, reasonable and non-discriminatory terms and conditions". The IPR holders shall agree amongst themselves how to distribute the royalties paid to the administrative body. |
| Damm Cellular Systems A/S | That the concept of licensing terms as 'fair, reasonable and non-discriminatory' requires evaluation by consensus and therefore, public knowledge of the perceived value. The current policy does not permit ETSI to request such information. |

**Confidential Business Information,
Subject to Protective Order**