# EXHIBIT 14



**ETSI/GA#42(03)20 rev.1**
Karl Heinz Rosenbrock/Julian Pritchard
Submission date: 14 August 2003
page 1 of 27

---

## ETSI 42nd General Assembly meeting
## Nice, 25-26 November 2003

**Source:**     **IPR ad hoc group Chairman**

**Title:**       **Report of the GA ad hoc group on ETSI's IPR Policy operation**
                 *[with Annex A deleted by GA#42]*

**Agenda item:** **5**

**Document for:**

| | | |
|---|---|---|
| Decision | **X** | |
| Discussion | | |
| Information | | |

| Late submission | |
|---|---|

## 1    Decision/action requested

*The General Assembly is invited:*
- *to discuss and endorse this Report of the ad hoc group on ETSI's IPR Policy operation, in general,*
- *to approve the Recommendations contained in this Report,*
- *to action the ETSI Secretariat to propose and elaborate appropriate measures for the implementation of the Recommendations taking into consideration the proposals included in this report and to discuss them on the ad hoc group email exploder,*
- *to decide on how to deal with Annex A [Annex A was deleted by GA#42],*
- *to action the ETSI Board to oversee and ensure the implementation of the Recommendations.*

## 2    References

ETSI/GA40(02)13      Creation of a GA ad hoc group on ETSI's IPR Policy (See Annex D).

## 3    Introduction

The ETSI General Assembly #40 adopted the terms of reference for the ad hoc group on the ETSI's IPR Policy operation.

This ad hoc group held six meetings;

    Meeting #1, on 23-24 January 2003 (Sophia Antipolis) with 36 participants;
    Meeting #2, on 3-4 March 2003 (Sophia Antipolis) with 41 participants;
    Meeting #3, on 19-20 May 2003 (Sophia Antipolis) with 39 participants.
    Meeting #4, on 18-19 June 2003 (Sophia Antipolis) with 24 participants.
    Meeting #5, on 26 September (Mainz) with 22 participants.
    Meeting #6, on 29 October (Audioconference) with 21 participants.

All meeting were paperless and included facilities for remote participation by audioconference. All the documents and notes of meetings can be found on the ETSI server at:

Confidential Business Information,
Subject to Protective Order

http://docbox.etsi.org/GA/ga_ad_hocs/IPR/.

Significant email exchanges took place between the meetings, it should be noted that 84 participants are registered on the e-mail exploder list.

During the first meeting, the Terms of Reference were analysed in depth and it was clarified that it was not within the mandate of the ad hoc group to modify the ETSI IPR Policy.

Subsequently, all proposals related to the implementation of the ETSI IPR Policy were identified and discussed and allocated within a structure of thirteen "issues" and Issue Managers were appointed with the objective to clearly define the issues and to prepare appropriate answers/recommendations on how to overcome the issues.

| Issue Number | Issue | Issue manager |
|---|---|---|
| Issue#01 | Timely disclosure of essential IPRs | John Phillips (Nortel Network Europe) |
| Issue#02 | Late IPR Information Statement and Licensing Declaration | Peter Adams (BT Group plc) |
| Issue#03 | Challenges to declaration of essentiality | Albin Schaetzle (Alcatel SEL AG) |
| Issue#04 | How to handle FRAND Information | Tom Sanchez (RIM) |
| Issue#05 | Geographical scope of Licensing | Richard Buttrick (PHILIPS Consumer Electronics) |
| Issue#06 | Normative referencing | Kurt Wimmer (Microsoft Europe) |
| Issue#07 | Dispute resolution | Azucena Hernández (TELEFONICA de España S.A.) |
| Issue#08 | Non-disclosure agreements | Alberto Perez Lafuente (Microelectronica Espanola SA) |
| Issue#09 | Members' compliance with the undertaking | Michael Breidthardt (IBM Europe) |
| Issue#10 | ETSI Secretariat assistance in IPR matters | Hans van der Veer (Lucent Technologies B.V.) |
| Issue#11 | Others | Stephane Tronchon (ETSI Secretariat) |
| Issue#12 | Out of Scope | Stephane Tronchon (ETSI Secretariat) |
| Issue#13 | Monitoring of volume of declarations to the ETSI IPR Database | Tim Frain (NOKIA Corporation) |

Since the second meeting all issue managers submitted their contributions which were discussed in detail. These contributions have been developed and refined by the Issue Managers with the objective to reach final conclusions on each one. The discussions within the ad hoc group have been very difficult, complex and thus time consuming and have not resulted in a clear consensus in all cases.

It has been agreed that the ad hoc group email exploder will be kept active after the group has formally terminated its work to provide a "sounding-board" during the implementation of the Recommendations.

Confidential Business Information,
Subject to Protective Order

## 4      The results

A brief introduction of each issue and the agreed Recommendations from the ad hoc group can be found below.   Where it has been possible to already identify a possible implementation this is indicated, for information.

### 4.1      Timely disclosure of essential IPRs

It seems obvious, that if essential IPRs in an ETSI Standard are not disclosed in a timely, manner there might be severe consequences. But, more surprisingly, there are also difficulties in making timely disclosures. These issues are summarised below.

A lack of timely disclosure (or the lack of an available undertaking) would delay commencement and hence delay completion of negotiations on the detail of licenses, which may delay market entry. If this occurs, the resulting delay in the implementation of a product may place a company in a difficult situation. This happens even if licenses are ultimately available on ETSI IPR policy terms. In particular, there is uncertainty over the outcome of negotiations over the details of the licenses which has to be resolved before a product can be launched.

> NOTE:      The term "undertaking" appears in the ETSI IPR Policy to mean "declaration". In order to help those non-legal experts in their reading of the Recommendations contained in this report, the term is identified as "undertaking/declaration" from now on.

The main task of a Technical Body is the search for the best technical solution and that the existence of essential IPRs is not a barrier.  Non-disclosure of essential IPR in a specific technical solution is not a problem for the Technical Body unless, ultimately, licenses are not available under FRAND conditions (see section 4.4). If this happens, then a standard could become blocked by the non-availability of IPR licenses on terms that meet ETSI's IPR policy. The committee would then be asked to re-write the standard.

Furthermore, ETSI also needs to deal with timely disclosure in the context of a publicly available specification or other document offered to ETSI for publication.

The concept "timely" is already documented, in terms of points where disclosures could or should be made:

- On formal submission of a technical solution,
- On completion of the first stable draft of the Standard,
- On working group approval of a draft Standard,
- On Technical Body approval of a draft Standard.

It was agreed that a formal definition "timely" would be a change to the policy, so the aim of the recommendations here is to refine the advice to Members and to promote the achievement of "timely disclosure" rather than to define the concept.

---

**Recommendation 1** (addressing the definition of timely)
The IPR ad hoc group **noted** that there should be no further definition of "timely" since this would constitute a "change to the policy".

However, the IPR ad hoc group **recommends** that ETSI Members should implement mechanisms to improve timeliness and deal as far as possible with the uncertainties. Such mechanisms could include guidance on best practice to ensure timeliness.

---

Confidential Business Information,
Subject to Protective Order

**Proposed implementation:**
It is proposed to extend the text included in Section 3.1.3 of the TB Chairman's Guide on IPR as follows:

> *A formal call for disclosure of essential or potentially essential IPRs shall be made by the Chairman at the beginning of each meeting. A shorter call should be made:*
>
> - *On formal submission of a technical solution*
> - *On completion of the first stable draft of the Standard;*
> - *On working group approval of a draft Standard*
> - *On TB approval of a draft Standard*
>
> *The Technical Body chairmen should note and should make their attendees aware that disclosure of essential or potentially essential IPRs should be made at the earliest possible stage within the above list.*

---

**Recommendation 2** (addressing the improvement of timeliness of essential IPR disclosures)
The IPR ad hoc group **recommends** that, in order to set down the basis for early disclosure by ETSI Members of their alleged-essential IPRs, ETSI Members having IPR portfolios should improve their internal IPR co-ordination processes to ensure, as far as possible, that their standards body attendees are aware of any alleged-essential IPR the company may have (related to the on-going work on a particular ETSI Standard or Technical Specification), that they understand their obligations, and that they know how to discharge them.

---

**Proposed implementation:**
It is proposed to add a new section 5 – to be called "Role of ETSI Members in respect of IPRs"- in the TB Chairman's Guide on IPR a statement recommending all Members having IPR portfolios to improve their internal IPR co-ordination processes and ensure as far as possible that their standards body attendees are aware of any alleged-essential IPR the company may have (related to on-going work on a particular ETSI Standard or Technical Specification), that they understand their obligations, and know how to discharge them.  It has also been agreed to add a statement that Technical Bodies are not the appropriate place to discuss IPR issues.

Members' IPR processes are very diverse. Proposing mechanisms which make broad improvements to the timeliness of IPR disclosures is not simple. However, the suggested mechanism is:

- To have a written IPR standards procedure document, which should be based on the Member's existing standards and IPR working methods, which;

    (i)    explains the Member's disclosure obligations, and
    (ii)   puts forward procedures for standards body attendees to help the Member discharge its obligations; and,

- To arrange periodically to bring the IPR standards procedure document to the attention of the Member's known standards body attendees.

---

**Recommendation 3** (addressing the improvement of timeliness of essential IPR disclosures)
The IPR ad hoc group **recommends** a review of the ETSI Seminar material on Members' obligations under the IPR policy with respect to Recommendation 2. This will help to ensure that new standards body attendees understand their obligations, and know how to discharge them.

---

**Proposed implementation:**
Review of the ETSI Seminar documentation.

Confidential Business Information,
Subject to Protective Order

**Recommendation 4** (addressing the improvement of timeliness of essential IPR disclosures)
The IPR ad hoc group **recommends** that the TB Chairman's Guide on IPR should encourage Members to use general IPR undertakings/declarations and then provide or refine detailed IPR disclosures as more information becomes available.

**Proposed implementation:**
It is proposed to integrate this recommendation in a new section 5 of the TB Chairman's Guide to be called "Role of ETSI Members in respect of IPRs"- and also to extend the existing section 3.1.3 of the TB Chairman's Guide on IPRs as follows:

*As a specific example, the guide on the implementation of the IPR policy should invite Members who may have essential IPRs to adopt the following procedures:*

- *At the approval of a new Work Item Members should be encouraged to provide a general undertaking/declaration under the existing IPR policy relating to any products meeting the standards which emerge from that work item.*

- *Subsequently, on an ongoing basis, Members providing a general undertaking/declaration relating to a specific Work Item should be reminded of the need to provide or refine detailed IPR disclosures.*

*Note that through the use of Technical Body IPR calls to implement bullet 2 above, the stages of;*

*(i) completion of the first stable draft of the standard;*
*(ii) working group approval of a draft standard; and,*
*(iii) approval of the draft standard by the Technical Body will be specifically addressed.*

*Members may also be invited to make general undertakings/declarations against standards emerging from specific Technical Bodies but these undertakings/declarations may have to be renewed whenever the Technical Body Terms of Reference change. General undertakings/declarations could also be encouraged against specific products or work areas.*

*Reference to the above possibilities should be put in place within the call for IPRs at Technical Body meetings.*

**Recommendation 5** (addressing the improvement of timeliness of essential IPR disclosures)
The IPR ad hoc group **recommends** that ETSI should co-operate with other SDOs on improving the timeliness of disclosures relating to essential or potentially essential IPRs.

**Proposed implementation:**
The Secretariat should inform the partners SDOs about the results of the IPR ad hoc group Recommendations during the next Global Standards Collaboration meeting (Seoul, May 2004).

**Recommendation 6** (dealing with the uncertainty of timeliness)
The IPR ad hoc group **recommends** that the TB Chairman's Guide on IPR should include a note that those Members developing products based on standards where there may be essential IPRs, but there is uncertainty, have mechanisms they can use to minimize their risk. As a non-exclusive example, a Member might wish to put in place financial contingency, based on their assessment of "reasonable" (a separate issue in this discussion) against the possibility that further/additional license fees might become payable.

**Proposed implementation:**
It is proposed to integrate the above note in a new section 5 of the TB Chairman's Guide on IPR to be called "Role of ETSI Members in respect of IPRs"- as extra information.

Confidential Business Information,
Subject to Protective Order

## 4.2    Late IPR Information Statement and Licensing Undertaking/Declaration

Generally, there is only a problem with late IPR declarations if the patent is not available at all for licensing, or is not available on "Fair, Reasonable and Non-Discriminatory (FRAND)" terms.

Mechanisms for making late declarations to ETSI need to be clarified (Note: At present declarations – late or otherwise – can be made to the ETSI Secretariat at any time). Time limits (3 / 6 months) also need to be considered.

ETSI Members dissatisfied with the consequences of other people's late IPR declarations can and should have the right to appeal to the GA – e.g. to have the contents of the relevant standard / specification changed.

There is a need to work closely with other SDOs to look more carefully at the procedures (if any) for identifying and declaring any relevant essential IPRs when their text is being referenced / copied into ETSI standards and specifications.

---

**Recommendation 7** (Identifying where ETSI has a problem arising from "late disclosures" in IPRs)

The IPR ad hoc group **recommends** that the Chairman's (or Delegate's) Guide on IPR should include a note that:

"...the main problems for ETSI as a standards body which arise from "late disclosures" include:

- Licenses for the Patents disclosed late and are not available at all, or;
- Licenses for the Patents disclosed late are available, but are not on Fair, Reasonable and Non-Discriminatory (FRAND) terms, i.e. the company is unwilling to make a 'FRAND' undertaking/declaration.

If the above problems cannot be satisfactorily resolved, then ETSI has to change the standard, which in some extreme cases could even include the need to start again with the development of that standard....".

---

NOTE 1:    The IPR ad hoc group noted that definitions for "Timeliness" or "Timely" cannot be agreed in this IPR group because such definitions would constitute a "change to the policy" and so no recommendation concerning this issue can be made.

NOTE 2:    The IPR ad hoc group noted the following description of Intentional Delay:

"Intentional Delay" has arisen when it can be demonstrated that an ETSI Member has deliberately withheld IPR disclosures significantly beyond what would be expected from normal considerations of "Timeliness". This description of 'Intentional Delay' should be interpreted in a way that is consistent with the current ETSI IPR policy. In complying with the requirements of timeliness under section 4.1 of the IPR Policy, Members are recommended to make IPR disclosures at the earliest possible time following their becoming aware of IPRs which may be essential.

NOTE 3:    The IPR ad hoc group also noted that "Intentional Delay", where proven, should be treated as a breach of the IPR policy (Article 14) and can be sanctioned by the General Assembly.

Confidential Business Information,
Subject to Protective Order

**Proposed implementation:**
It is proposed to integrate the above Recommendation and notes as a third paragraph in Section 1 "What is the status and the purpose of this guide?" of the TB Chairman's Guide on IPRs.

## 4.3    Challenges to Undertaking/Declaration of Essentiality

A thorough analysis of Articles 4.1, 6.1 and 7.1 of the ETSI IPR Policy was undertaken by the issue manager and it was concluded that the IPR policy defines rather clearly the Members' obligation to declare essential IPRs and ETSI's obligation to publish such undertakings/declarations.

There is room for improved implementation. Any discussion on the essentiality of a particular IPR may be solved between the discussing parties (a potential licensor and a potential licensee). If a proof is needed a court has to be asked by the parties.   The IPR ad hoc group **noted** that the IPR policy neither requests nor indicates any obligation to ETSI to prove the essentiality of an IPR or to have an opinion on that question.   Therefore, no Recommendation concerning the issue of essentiality is required.

---

**Recommendation 8** (Recommendation concerning for potential change for the update procedure of the ETSI IPR online database)

The IPR ad hoc group **recommends** that, in addition to the entry of new disclosures and undertakings/declarations, existing data in the ETSI IPR Database should only be updated based on information received from IPR holders or as the result of a GA decision, in particular with respect to the following cases:

- Completion of an existing data entry, e.g. the publication number, identification of standard.

- Updating of legal information, such as change of legal status of an IPR (e.g. grant, dropped, revoked or expired), change of ownership of the IPR.

- Addition of information concerning studies performed on the essentiality of an IPR:  Members are obliged to disclose IPRs, which might be essential and ETSI is obliged to make these disclosures available to Members. This disclosure reflects, of course, only an opinion of the Member and some facts on the IPRs, but the Member is responsible for the content. Any further opinion should be added only with the agreement of the Member or to implement a GA decision.

- Removal of IPR disclosures at the request of the IPR holder: Members are obliged to declare IPRs which they believe to be essential.  A license undertaking/declaration for these IPRs is also published.  ETSI is obliged to publish this undertaking/declaration.  Any such removal shall be tracked in the IPR database.

- Removal of IPR disclosures in exceptional circumstances: Removals not requested by the IPR holder shall only be performed following a decision taken by the General Assembly.  Any such removal shall be tracked in the IPR database.

---

**Proposed implementation:**
It is proposed to integrate the above recommendations concerning the update procedure of the ETSI IPR online database in Section 4 "Role of the ETSI Secretariat" of the TB Chairman's Guide on IPRs.

---

**Recommendation 9** (concerning the update of Standard or Technical Specification)
The IPR ad hoc group **recommends** that Published Standards or Technical Specifications should not be redrafted because a change on the essentiality of an IPR arises unless the required undertaking/declaration has not been provided within the three month period foreseen under section

---

**Confidential Business Information,**
**Subject to Protective Order**

6.1 of the IPR Policy, or has been refused. Any IPR changes should be entered into the ETSI IPR Database, showing the date of the entry.

**Proposed implementation:**
It is proposed to integrate the above recommendation in section 4 ("Role of the ETSI Secretariat") of the TB Chairman's Guide on IPRs.

---

**Recommendation 10** (dealing with the updating and completion of information statements)
The IPR ad hoc group **recommends** the following guideline concerning the updating and completion of information statements in-line with the revised form [in Annex C]:

"...*Members are not obliged to inform ETSI of any updates to their essential IPRs. But, Members should be encouraged to update and complete their information statements in-line with the revised form. A minimum of information should be requested, which allows to verify the essentiality or the potential essentiality of an IPR...*".

---

**Proposed implementation:**
It is proposed to add the above recommendation and the first 2 bullets of Recommendation 8 in the Appendix A "IPR Information Statement and Licensing undertaking/declaration" of the above recommendation of the TB Chairman's Guide on IPRs.

## 4.4   How to handle FRAND (Fair, Reasonable And Non-Discriminatory) information

The ETSI IPR Policy does not define FRAND (Fair, Reasonable And Non-Discriminatory).

In general, the concepts of fair, reasonable and non-discriminatory license obligations reflect legal mechanisms well established in the courts of many countries to settle patent disputes.

The ad hoc group was unable to define FRAND conditions.

**"FAIR AND REASONABLE"**
"Fair and reasonable" is a different question from the question of what is discriminatory.  If a company wants to charge a 25% percent royalty of the price of every handset to every company in the industry for the same royalty price everywhere, it is arguably not being "discriminatory" but the price is so high as to be "unfair and unreasonable."

**"NON-DISCRIMINATORY"**
In contrast, if a company (licensor) is attempting to charge two different companies (potential licensees) two different rates where one monetary consideration rate (actual payment of Euros) is 2 times as high to one potential licensee versus the other, and the two potential licensees are in the same patent (possible cross-license consideration to trade) and business position with respect to the licensor, then there is an argument that this is "discriminatory."

Given the fact that a court of law seems to be the only authority which can ultimately decide whether, or not, terms are Fair, Reasonable And Non-Discriminatory, a brainstorming session was held during meeting #4 to gather input on how to handle this issue.  The results were further developed into a discussion paper during meeting #5.  However, the issue is complex with diverging views.

In view of the lack of a definition of FRAND conditions, attempts were made to define them indirectly, i.e. by means of giving examples of so-called "bad practices" (see Annex A).

Among the Members represented within the IPR ad hoc group two different schools of thinking appeared:

**Confidential Business Information,
Subject to Protective Order**

- one group (basically SMEs) favoured the attempt to indirectly define FRAND conditions by giving several examples of bad practices as an orientation for the ETSI membership.
- the other group (basically holders of big IPR portfolios) saw no sense in such attempts as each case is different and the decision on FRAND conditions is, finally, a matter for the courts of law. ETSI should not engage itself in any judgement. Furthermore, the fear of any potential misuse of these examples of bad practice was expressed.

Therefore, no consensus has been achieved within the ad hoc group and it was, furthermore, proposed to use the text of Annex A as input for a best/worst practice guide but, finally, no consensus on this proposal was achieved.

When presenting this paper in its version #4 to the ETSI Board for information/feedback, the usefulness of Annex A was seriously questioned.

The General Assembly is now invited to decide what to do with Annex A:

- to keep it for information only.
- to modify it and then use it in a guide or in FAQ (Frequently Asked Questions) text, or,
- to delete it *[Annex A was deleted by GA#43]*.

## 4.5    Geographical Scope of Licensing

The following key issues were identified:

- During creation of the IPR Policy the territorial scope of licensing was a divisive issue and the Policy was therefore silent on the issue.

- Currently, the large majority of opinion so far received, strongly favours requiring undertakings/declarations from patent holders which obligate global licensing of all patents.

- Currently, a minority of opinion favours allowing patent holders flexibility in making undertakings/declarations.

- There are strong views from SME's that global markets are necessary to make ETSI Standards viable.

---

**Recommendation 11** (dealing with Geographical scope of Licensing)
The IPR ad hoc group **recommends** that ETSI should issue a policy statement encouraging ETSI Members to give licensing undertakings/declarations on a world-wide basis. This would be a non-binding statement expressing the expectations of ETSI.

---

**Proposed implementation:**
No implementation proposal has been discussed in the group. It is left to further discussion on the ad hoc group email exploder and, finally, to the Board to consider.

---

**Recommendation 12** (dealing with Geographical scope of Licensing)
The IPR ad hoc group **recommends** that if licensing on a world-wide basis is not possible then ETSI should require that those making an IPR undertaking/declaration indicate which territories are covered by the undertaking/declaration.

---

**Proposed implementation:**
No implementation proposal has been discussed in the group. It is left to further discussion on the ad hoc group email exploder and, finally, to the Board to consider.

Confidential Business Information,
Subject to Protective Order

### 4.6    Normative Referencing

Normative referencing, if left unsupervised, could result in negative consequences for the ETSI standardization process.  Yet, it is recognised that properly structured normative references can provide an efficient technique for referencing important and sometimes lengthy documents, and that ETSI's Drafting Rules provide that certain types of normative references are permissible.

The starting point is the ETSI drafting guide, which requires that "all documents shall be publicly available in the English language during the approval phases and at the time of publication of the ETSI deliverable, via the originating body or the ETSI secretariat . . . If public availability cannot be guaranteed after publication has occurred, the originating body of the document shall be requested to provide ETSI with the right to make available the text".  The guide also provides that the ETSI Secretariat "shall establish and maintain a list of the referenced documents and the relevant external bodies, for document tracking and cross-referencing purposes, and keep the necessary liaison with the originating body".  The guide further provides that an ETSI deliverable "shall not be submitted to an approval procedure" until normatively referenced documents are publicly available.  As pointed out in the prior document, many European and international SDOs condition the permissibility of normative references on the publicly available character of the material referenced.  Clearly, then, the question of when a normatively referenced document is "publicly available" is a crucial one.

Another important consideration is the scope of the licensing conditions that would be applied to any downstream IPRs that are contained in normatively referenced documents.  If the normatively referenced document is controlled by an SDO without a FRAND IPR policy that is comparable in substance to the ETSI IPR policy or by a private third party that has not made an explicit and binding commitment to license the normatively referenced material on terms comparable to those required by the ETSI IPR policy, there may be no assurance that any IPRs contained in the normatively referenced document would actually be available to ETSI implementers on terms at least as favourable as those in ETSI's IPR policy.  The ETSI drafting guide states that it is preferable to reference documents held by the European Commission and recognised standards bodies, presumably because they are less likely to contain IPR that would not be available for licensing to implementers on at least FRAND terms.  Accordingly, another key determinant of whether a normative reference would be permissible could be the nature of the IPR policy that governs the entity controlling access to the referenced material.  If that body is an SDO with a policy of requiring licensing on terms at least as favourable as ETSI's IPR policy, there may be few concerns about referencing a document controlled by the SDO.  On the other hand, if the document is controlled by a private party that can block full access to the IPRs contained in the document or condition access to the documents on private contractual agreements with implementers, normative referencing may be seen as impermissible.

In addition, test suites present a particularly important issue because of their importance to implementation and success of an ETSI deliverable.  If compliance with a specification that includes normatively referenced material is determined by the use of a test suite, participation in the process for development of that test suite must be available to all Members under ETSI's policies.  The use of a referenced document in a specification should not make the process of test suite development less accessible to participants than would otherwise be the case under ETSI's general development procedures.

It also is important to ensure the continuing validity of an ETSI deliverable by focusing on the stability and maintenance of documents that are normatively referenced.  This means that only documents that are stable versions of the process from which they originate (that is, not drafts) should be referenced, and that the process for making revisions to those documents once they have been referenced should be clear and explicit.  Expectations concerning any downstream impact that revisions to referenced documents may have on ETSI deliverables and test suites also should be made clear at the outset.

Confidential Business Information,
Subject to Protective Order

**Recommendation 13** (Normative Referencing)
The IPR ad hoc group **recommends** the adoption of a policy on Normative Referencing within ETSI deliverables to ensure the correct handling of downstream/third-party IPR issues.

The proposed policy statement can be found in Annex B of this document.

**Proposed implementation:**
It is proposed to integrate the policy statement into the ETSI Drafting Rules (SR 001 262).

## 4.7   Dispute resolution

A long discussion on Dispute Resolution took place including the proposal to create a "Consultative IPR Committee" within ETSI to investigate, review and advise on the handling of disputes between IPR holders.

It was concluded that:

- It is difficult to identify the composition and scope of such a Consultative Committee.
- It is unclear whether the IPR holders will ever make use of any kind of Consultative IPR Committee within ETSI.
- The potential disputes between Members related to IPR issues can only be solved in a court of law.

**Recommendation 14** (Dispute Resolution)
The IPR ad hoc group **recommends** that ETSI Members should attempt to resolve any dispute related to the application of the IPR policy bilaterally in a friendly manner.

Should this fail the Members concerned are invited to inform the ETSI GA in case a friendly mediation can be offered by other ETSI Members and/or the ETSI Secretariat.

However it was **noted** that once an IPR (patent) has been granted, in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes.

**Proposed implementation:**
It is proposed to integrate the above note concerning the use of dispute resolution in a new Section 7 (to be named "Miscellaneous") TB Chairman's Guide on IPRs.

## 4.8   Non-Disclosure Agreements (NDAs)

A number of group members were particularly concerned over the potential misuse of Non-Disclosure Agreements (NDAs), even to the extent of wanting to forbid the use of such agreements with respect to IPR licensing. This was rejected by other members and it was eventually agreed that NDAs can be beneficial and protect both Licensee and Licensor when used properly.

**Recommendation 15** (Non-Disclosure Agreements)
The IPR ad hoc group did not produce a recommendation on this issue, however, it was **noted** that the sentence in section 3.1.3 of the TB Chairman's Guide on IPR "...*The holder of an Essential patent should never be asked to disclose the commercial terms under which licenses for the Essential IPR may be made available...*" is only applicable within the context of the work of the Technical Body.

**Proposed implementation:**
It is proposed to integrate the above note by modifying the wording of the sentence of section 3.1.3 of the TB Chairman's Guide on IPRs as follows:

Confidential Business Information,
Subject to Protective Order

*'the holder of an Essential IPR, in the context of the work of the Technical Body, should never be asked to disclose the commercial terms, under which licenses for the Essential patent may be made available".*

---

**Recommendation 16** (Non-Disclosure Agreements)
The IPR ad hoc group did not produce a recommendation on the potential misuse of NDAs. However, it **agreed** the following NOTE concerning the usage of NDAs in IPR negotiations:

> *The ETSI IPR Group recognises that NDAs may be used to protect the commercial interests of both potential licensor and potential licensee during an Essential IPR licensing negotiation, and this general practice is not challenged. Nevertheless, ETSI expects its Members (as well as non-ETSI Members) to engage in an impartial and honest Essential IPR licensing negotiation process for FRAND terms and conditions.*

---

**Proposed implementation:**
It is proposed to integrate the above note concerning the use of NDAs in a new Section (to be named "Non-Disclosure Agreements") in the TB Chairman's Guide on IPRs.

## 4.9    Non-response to request for undertaking/declaration

Two cases were identified which non-compliance with the ETSI IPR Policy can be observed.

**Non-response by an ETSI Member**
According to Clause 6.1. an ETSI Member is obliged to respond within 3 months to a request from the ETSI Director-General for an undertaking/declaration to grant licenses. The response, however, can be the requested Licensing undertaking/declaration (Clause 6.1.) or a statement to refuse to give licenses (Clause 8.1). A non-response within this time-frame could be considered a violation of the ETSI IPR policy. According to clause 14 of the IPR rules any violation of the IPR policy is a breach of the Membership obligations which should be brought to the attention of the GA. The GA can then decide further steps. If the GA considers this as a 'substantial breach' of the Membership obligations, the maximum penalty could be the expulsion of the Member according to Art. 8. of the ETSI Statutes.

Art. 8.1 of the current ETSI IPR rules deals with the case that a Member is **refusing** to grant licenses. In this case the work on the standard needs to stop. There is, however, no explicit mentioning of the case that the Member does not reply to the request for an undertaking/declaration and what needs to be done in such a situation (Note: Also the case that the standard has already been published is not contained in the current rules).

Art. 8.2 of the ETSI IPR rules has been defined for the 'non-availability of licenses from third parties'. Although there is a difference in the headings of the articles dealing with Members (Art 8.1 'Member's Refusal to License') and Non-Members (Art 8.2. 'Non-availability of licences from third parties'), IPR #4 confirmed that this difference was not intended by the authors of the current ETSI IPR policy. Therefore, the steps defined in Art. 8.2 could also be used for the case, where an ETSI Member does not respond to the request for an undertaking/declaration. Following this principle, the risk is that work is unnecessarily stopped or a standard needs to be withdrawn potentially just because of a (unknown) delay in the response. However, there will be no late surprise for a refusal to grant licenses. Two sub-cases need to be distinguished:
a)  The Standard has already been published: the ETSI IPR policy does not contain rules for this, but the procedures laid out in Clause 8.1 and/or 8.2 could be followed in order to solve the problem. If no viable alternative technical solution is available the standard should be withdrawn following the normal processes defined for specific document types in the ETSI Technical Working Procedures.
b)  The Standard has not yet been published: Clause 8.1 contains rules that could be followed, although such a non-response is not the same as a refusal to grant licenses for which they were originally defined. The implementation guidelines should be enhanced to cover also this case by using the Art 8.1. process.

Confidential Business Information,
Subject to Protective Order

---

**Recommendation 17** (Non-response by an ETSI Member)
The IPR ad hoc group **recommends** that the following text should be included in the TB Chairman's Guide on IPR to cover the case where there has been no response from an ETSI Member to a request for undertaking/declaration within the three months specified in clause 6.1 of the IPR Policy:

- *where a standard has not yet been published and an undertaking/declaration has not been received or is not sufficiently defined, the steps listed in Article 8.1 of the IPR Policy should be applied, e.g. the TB should not pursue development of the standard based on the non-available technology and should look for alternative solutions.*

- *where a standard has already been published and an undertaking/declaration has not been received or is not sufficiently defined, the steps listed in Article 8.2 of the IPR Policy should be applied, e.g. contact the Member concerned, bring to the attention of the GA, etc. If these steps do not solve the issue of non-availability of licenses, the process of withdrawal of the standard should be initiated.*

---

**Proposed implementation:**
It is proposed to integrate the above recommendation in Section 5 "Role of the ETSI Secretariat in respect of IPRs" of the TB Chairman's Guide on IPRs.

**Non-Response by a non-Member:**
The difference to the previous chapter is that non-ETSI-Members have neither an obligation to respond to a request for an undertaking/declaration nor to grant licenses on FRAND conditions. One could, therefore, assume that non-availability of licenses  (on FRAND condition) happens already when a non-ETSI Member does not respond to such a request for an undertaking/declaration. Although Clause 8.2.iii) through v.) of the IPR rules sufficiently describe the steps for such a case, it is proposed - depending on the status of the document concerned - to add some implementation guidelines to distinguish between the case, where the standard has already been published or is still under development in the Technical Committee.

---

**Recommendation 18** (Non-response by a non-Member)
The IPR ad hoc group **recommends** that the following text should be included in the TB Chairman's Guide on IPR to cover the case where there has been no response from a Non-Member to a request for undertaking/declaration within the three months specified in clause 6.1 of the IPR Policy:

- *where a standard has not yet been published and an undertaking/declaration has not been received or is not sufficiently defined, the TB should not pursue development of the standard until a solution for the non-availability of the licenses has been found, as per in Article 8.1 of the IPR Policy.*

- *where a standard has already been published and an undertaking/declaration has not been received or is not sufficiently defined, the steps listed in Article 8.2 of the IPR Policy should be applied, e.g. contact the Member concerned, bring to the attention of the GA, etc. If these steps do not solve the issue of non-availability of licenses, the process of withdrawal of the standard should be initiated.*

---

**Proposed implementation:**
It is proposed to integrate the above recommendation in Section 5 "Role of the ETSI Secretariat in respect of IPRs" of the TB Chairman's Guide on IPRs.

Confidential Business Information,
Subject to Protective Order

## 4.10   ETSI Secretariat Assistance in IPR Matters

No Recommendation for improvement was considered necessary concerning the level of service and support by the ETSI Secretariat to the management of the Technical Bodies and the Secretariat assistance in IPR matters to the ETSI Members.   However, it was noted that the ETSI Director-General should be encouraged to bring any [substantial] IPR problem to the ETSI Board and/or General Assembly for further discussion.

---

**Recommendation 19** (ETSI Secretariat assistance in IPR matters)
The IPR ad hoc group **recommends** that the ETSI Director-General should bring any [substantial] IPR problem to the ETSI Board and/or General Assembly for further discussion.

---

**Proposed implementation:**
It is proposed to integrate the above information in a new Section 7 (to be named "Miscellaneous") of the TB Chairman's Guide on IPRs.

## 4.11   Other issues

The following related issues were discussed by the group:

### 4.11.1   Co-operation Agreements

---

**Recommendation 20** (Co-operation Agreements - clause 5, IPR)
The IPR ad hoc group **recommends** that the following wording should replace the existing text of clause 5 (IPR) of the template text of co-operation agreements between ETSI and External Organisations.

*Upon the entry into force of this Agreement, each Party shall provide the other Party with a written copy of its policy and procedures with respect to claimed intellectual property rights ("IPR Policy"), including but not limited to patents, in the development, approval and use of **ETSI** and **XXX** deliverables, respectively, and shall promptly notify the other Party of any changes to such policy. In any case in which a technical specification of one party is adopted by another party, the development and use of such technical specification will be made subject to the IPR policy of the adopting party.*

---

**Proposed implementation:**
It is proposed that the modification above is included in the Co-operation Agreement template.

---

**Recommendation 21** (Co-operation Agreements - clause 4, Normative Referencing)
The IPR ad hoc group **recommends** that the following wording should replace the existing text of clause 4 (Normative Referencing) of the template text of co-operation agreements between ETSI and External Organisations.

*ETSI and the XXX may agree in particular cases to incorporate text and graphics from the other party in a published document. The source of such material shall be acknowledged, and, for purposes of this agreement and all other purposes, its copyright, trade secret, patent and other intellectual and industrial property rights shall rest with the originating party. For the purpose of such incorporation, the originating party grants the relevant Technical Body/Group a royalty free copyright license to use such material. All referenced material must be publicly available. Any information or other material incorporated by one party shall include all notices and other legends requested by the originating party, including, without limitation, notices and legends related to the inclusion of patented information with the exchanged information..*

---

Confidential Business Information,
Subject to Protective Order

**Proposed implementation:**
It is proposed that the modification above is included in the Co-operation Agreement template.

#### 4.11.2   Frequently Asked Questions (FAQs)

| |
|---|
| **Recommendation 22** (FAQs) |
| The IPR ad hoc group **recommends** the use of a set of FAQs (Frequently Asked Questions) to deal with the issues which have been discussed in the group. |

**Proposed implementation:**
It is proposed to integrate the above information in a new Section 7 (to be called "Miscellaneous") or to create a new section FAQs in the TB Chairman's Guide on IPRs, or on the Portal, as appropriate.

#### 4.11.3   Wider target audience for the TB Chairman's Guide on IPRs

| |
|---|
| **Recommendation 23** (Wider target audience for the guide) |
| The IPR ad hoc group **recommends** that the targeted audience of the ETSI TB Chairman's Guide on IPRs should be widened to the whole membership of ETSI. |

**Proposed implementation:**
It is proposed that ETSI Board should decide on a suitable presentation widening the guide to become applicable to the whole membership and not just TB Chairmen.

### 4.12   Out of Scope issues

The GA is invited to note the following issues which were discussed, but upon which no consensus was reached.  Furthermore, they were ruled out-of-scope:

- The requirement that ETSI Members should grant licenses on a royalty free basis when it is proven that the IPR information statement and licensing undertaking/declaration were intentionally delayed.
- The proposal to recognise the value of technical contributions from ETSI Members that have freely given their expertise and technology to develop the Standards or Technical Specifications when negotiating related IPR licenses.

Any Member interested in one of these issues is free to submit appropriate contributions to the General Assembly.

### 4.13   Monitoring of volume of Undertaking/Declarations to the ETSI IPR Database

It is recommended that ETSI clarifies what minimum information is required as part of the disclosure of essential IPRs and seeks to adopt a more uniform and consistent approach to what information needs to be provided, in order to improve the value not only of individual disclosures, but also of the overall information content of the ETSI online IPR database.

#### 4.13.1   Patent families

The IPR Information Statement form should be revised to make it clear that patent family information is optional, but that if the declarer wishes to disclose more than one patent from the same family all patent family members should be grouped together on a single data entry line, rather than listed separately as individual entries.   The form should also state expressly that the completeness, accuracy and essentiality of any patent family information that is provided voluntarily cannot be guaranteed.

Confidential Business Information,
Subject to Protective Order

> **Recommendation 24** (Patent families)
> The IPR ad hoc group **recommends** the revision of the IPR Information Statement to allow identification of patent families.

**Proposed implementation:**
It is proposed to update Appendix A of TB Chairman's Guide on IPRs and also the IPR forms available from the ETSI web pages on IPRs at www.etsi.org/ipr/ in line with Annex C of this report.

### 4.13.2    Mapping of Projects

The standard IPR Information Statement currently has a column for "Project". First of all it needs to be clear that this column is for identifying the standard or technical specification. It is important to encourage all IPR owners to use the right standard name and in a consistent manner. To illustrate the problem, WCDMA patents have been declared with many standards and technical specifications names including UMTS, GPRS, AMR etc. The form should also be revised to identify not only the particular standard or technical specification, but also the applicable part of the standard or technical specification (i.e. section number). The field for Patent Title can be deleted as this does not add any real value. Drop-down menus in the electronic version of the form would be helpful for selecting the right standard or technical specification and section, and for ensuring that the information about the applicable standard or technical specification is provided in a uniform manner, so that everyone identifies a standard in the same way. The discloser would be expected to provide the best information about the standard or technical specification at the time of making the disclosure. There would be no obligation on the discloser to update this information later.

> **Recommendation 25** (Projects)
> The IPR ad hoc group **recommends** the revision of the IPR Information Statement to allow better mapping of the undertaking/declaration with a particular ETSI Standard or Technical Specification and part of it.

**Proposed implementation:**
It is proposed to update Appendix A of TB Chairman's Guide on IPRs and also the IPR forms available from the ETSI web pages on IPRs at www.etsi.org/ipr/ in line with Annex C of this report.

### 4.13.3    Absence of information

> **Recommendation 26** (Absence of information)
> The IPR ad hoc group **recommends** the follow-up procedure given below in the case of an absence of information:
>
> If the IPR owner fails to volunteer the information about the applicable standard or technical specification at the outset, ETSI Secretariat could – as a matter of standard practice – write to the declarer or IPR owner (if different) with an invitation to provide this information, which can then be included in the database. If the IPR owner declines or fails to provide this information within a set time (say 6 months), ETSI could add a note to the undertaking/declaration explaining the action ETSI has taken and indicating the outcome.

**Proposed implementation:**
It is proposed that the Secretariat should include this recommendation into their internal IPR database procedures (QMS documentation).

Confidential Business Information,
Subject to Protective Order

### 4.13.4   Updating of existing disclosures

**Recommendation 27** (Updating of existing disclosures)
The IPR ad hoc group **recommends** the follow-up procedure given below to create an incentive for Members to update their existing disclosures:

In order to improve the information value of the current entries in the ETSI online database it is proposed that the ETSI Secretariat write (a standard letter) to everyone who has disclosed patents inviting them to update their existing disclosures to identify the standard or technical specification in accordance with the new practice.

**Proposed implementation:**
It is proposed that the Secretariat should include this recommendation into their internal IPR database procedures (QMS documentation).

### 4.13.5   Best practice guide

The ETSI website should be updated to include specific guidelines on what information is needed to complete the updated version of Annex 2 of the IPR Information Statement, and including a sample data entry line for illustrative purposes.  It should also be indicated that if the discloser fails to provide information not indicated as optional, ETSI Secretariat will write to the discloser asking for the missing information, and that if the discloser fails to provide that information a note will be added to the database to that effect. The information requirement and follow-up procedure should also be explained in a "Best practice guide".

**Recommendation 28** (Best practice guidelines)
The IPR ad hoc group **recommends** the establishment of best practice guidelines to assist Members in filling the Annex 2 of the IPR information statement and licensing undertaking/declaration forms.

**Proposed implementation:**
It is proposed that the ETSI Secretariat should draft the best practice guidelines for approval by the Board. The Board will be responsible for its maintenance. These guidelines will be made available in the ETSI Portal.

### 4.13.6   Caveat

**Recommendation 29** (Caveat)
The IPR ad hoc group **noted** that the ETSI online IPR database already includes, as a preamble to any search, a caveat about the information contained in the database.  Specifically it warns that ETSI cannot confirm or deny that patents/applications are in fact, essential.

It is **recommended** that an additional caveat is included in that preamble (as a new third paragraph), as follows:

*"Potential Licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision".*

**Proposed implementation:**
To be implemented in the database application by the Secretariat.

**Confidential Business Information,
Subject to Protective Order**

### 4.13.7 Terminology

**Recommendation 30** (Terminology)
The IPR ad hoc group **recommends** the modification of the terminology for the ETSI IPR information statement and licensing undertaking/declaration forms to be aligned with the terminology of the ETSI IPR Policy.

**Proposed implementation:**
It is proposed to update Appendix A of TB Chairman's Guide on IPRs and also the IPR forms available from the ETSI web pages on IPRs at www.etsi.org/ipr/.

## 5 Future Work

Following the approval of the Recommendations by the General Assembly, it is intended that:

- the ETSI Secretariat will propose and elaborate appropriate measures for the implementation of the Recommendations,
- the proposals for implementation will be discussed on the ad hoc group email exploder,
- the ETSI Board will oversee and ensure the appropriate implementation of the Recommendations,
- and finally, the ETSI Secretariat will inform other SDOs, via GSC, about the outcome of the IPR ad hoc group.

Confidential Business Information,
Subject to Protective Order

## Annex A (informative)      Some background on the FRAND discussions

The major divergences among the participants in the IPR ad hoc group happened when the issue of analysing FRAND was discussed and resulted in two extremely opposite views.

The IPR ad hoc group participants consider that the various ETSI Members may feel closer to one view or the other, or even to some intermediate view depending upon their own type of business activity, and the situation in which they find themselves at any particular point in time.

No consensus was achieved on this issue and it was decided that the group would simply provide an information on the two extreme views and opinions expressed on them by individual members of the ad hoc group.

The two opposing views can be summarised as:

- FRAND cannot be analysed within ETSI as it is a legal concept outside the ETSI scope and only subject to treatment by courts of law.
- FRAND can be analysed within ETSI and examples of bad practice can be described in order to help ETSI Members comply with the ETSI IPR policy.

DISCLAIMER:  The views expressed in sections A.1 and A.2 have been provided by individual ad hoc group members and have not been validated by ETSI (as an Institute).  The Institute is not in a position to comment on these views nor will it provide any interpretations of the examples.

### A.1    FRAND analysis is out of the scope of ETSI

The current Directives and IPR Policy under which ETSI operates, appropriately address the issue of FRAND terms, and that any additional guidelines to address this issue would not be in the best interest of ETSI, or its Members. It is also believed that such a document would, in fact, constitute a substantial change to the existing ETSI IPR Policy, and is therefore out of scope for this committee.

Furthermore;

1) The determination of acceptable licensing terms and conditions is what constitutes the essence of the business negotiations between an IPR holder and a potential licensee. The scope of these negotiations takes many factors into account, including the business circumstances under which a potential licensee operates (whether small or large).

Any attempts to identify terms or conditions which are or are not acceptable, either in general or under specific business circumstances, would constitute involvement on the part of ETSI in these licensing negotiations, and would therefore directly conflict with the unanimous agreement that ETSI should not be involved in such negotiations.

2) There already exists a substantial body of competition law, patent statues and court decisions which address the issue of what constitutes FRAND terms. ETSI is not an appropriate body to issue guidelines, which seek to interpret and paraphrase this body of law.

If ETSI were to attempt to make such a determination, either generally or under specific circumstances, this could result in a conflict with the existing body of case law, applicable to such licensing negotiations. If this were to occur, such determinations are likely to be considered irrelevant by the courts, and could, in the worst case, potentially lead to legal action against ETSI or its Members. It is therefore in the best interest of ETSI and its Members, from a legal perspective, to refrain from making such determinations.

Confidential Business Information,
Subject to Protective Order

3) Lastly, disputes regarding whether specific terms or conditions are FRAND, if they cannot be resolved between the licensee and licensor, are better left to the appropriate courts, competition authorities, etc., and are not the purview of a standards development organization such as ETSI to resolve.

## A.2   Analysis of FRAND bad practices

The following lists of examples represents the views of the individual members which supplied the examples and do not constitute any consensus view of the Ad-hoc Group.  The provision of these lists does not imply that the examples have any valid legal status as bad practice, under any European statute or competition law, with respect to the FRAND obligations of the ETSI IPR Policy.

### A.2.1   On the interpretation of the term 'non-discriminatory'

The following list is not an exhaustive enumeration of bad practices with respect to the FRAND obligations of the ETSI IPR Policy that relate to the 'non-discriminatory' requirement, but only sets out examples of clearly bad behaviour:

A. The first interpretation of the term "non-discriminatory" is the plain language.  The plain language would indicate that licensees that are exactly the same in terms of business relationships and patent strength with respect to the licensor should receive the same treatment.  Records indicate that legitimate licensors abide by this "plain language" interpretation and generally put licensees on an even footing where licensees are similarly situated with respect to the licensor.

Note by example that means that if there are two licensees, Licensee A and Licensee B, who take a license from an essential patent holder, Licensor E, then the terms and conditions to the two licensees (who are exactly the same with respect to the Licensor E) should be the same terms and conditions, especially with respect to monetary payments.

Therefore an ETSI Member owning patents that are incorporated into an ETSI Standard should license to other interested Members at rates that are comparable (fair and reasonable) vis-a-vis other similarly situated licensees.

**Other examples of discriminatory behaviour:**

Example 1:

Licensor E claiming essential patents does not assert their patents against major equipment makers, "Makers" who ship tens of billions of dollars of GSM equipment for ten years.  And proof of such non-assertion is clearly available.  "New Entrant" into the market is in exactly the same position with respect to patents as Makers, and New Entrant has patents asserted against it by Licensor E.  In effect Licensor E gave free pass to major equipment Makers for no royalty dollars and now wants to charge New Entrant after ten years of not asserting.  And Licensor E is clearly asking for more royalty dollars than any major established licensor with hundreds of good patents.

Example 2:

Licensor EE that licensed its essential patent portfolio for nominal fee of less than 50 thousand pounds to major equipment Makers now wants running royalty worth millions from New Entrant.  Again, proof is clearly available in license agreements between Licensor EE and major equipment Makers.  That New Entrant is in the same patent position with respect to Licensor EE as Makers.

Example 3:

Licensor EEE was allowed to "buy-down" its monetary royalty to a figure that was less than 1 percent at a time when margins in the business were greater than 30 percent for all manufacturers, at a time when Licensor EEE had no patents nor any real business trade-off,

Confidential Business Information,
Subject to Protective Order

at a time when Licensor EEE was only a licensee in the industry. Now that Licensor EEE holds essential patents, it will not allow similar buy down by new entrants, or Licensor asks for large number or unlimited number of patent grant backs from New Entrants. Actions that were not considered reasonable by licensor when they were in position of New Entrant, with no patents.

Example 4:

Licensor EEEE sends inventors to working group meetings. The inventors are the patent holders and also the meeting attendees to the working groups and to the plenary meetings. The inventors take language from their patents and have it inserted into the GSM specification, word for word as written in the patent. When the call for IPRs is made, there is no action by the patent holders who are the inventors who are also the standards attendees for the Licensor EEEE. Licensor EEEE asserts only against New Entrants.

Example 5:

A major IPR holder licenses the essential patent portfolio in a substantial part of the world for several percent less than he is willing to license to European manufacturers for European products. The net effect is that the manufacturers in the territories with the much less expensive license can manufacture products with margins that allow them to prosper and survive. The European manufacturers are practically unable to compete in the markets with the lower royalty rates because of "practical" barriers to entry.

**A.2.2    On the Interpretation of the Term "Unfair"**

B.**The conscious extraction of royalties for invalid IPRs.** It is suggested that any attempt on behalf of an ETSI Member to extract royalties for a patent, where the Member is aware of the fact that the patent has expired or has been declared invalid by a competent court or patent office, would not be considered 'fair' nor 'reasonable'. Similarly, where the licensor knows that the pertinent patent is about to become invalid (either by the lapse of time or by a court decision), setting the time frame of the licensing agreement in a manner that will exceed the validity period of the patent may also be suspected as 'unfair' or 'unreasonable'.

C.**'Fairness' & SMEs.** Further to the above recognition of the fact that enterprises are differently situated, and to Board decision #D-B44/10 and the 2nd draft of the ETSI Strategy 2004 document which acknowledged the particularities of SMEs, it is suggested that the characteristics of SMEs may render them significantly different from larger enterprises. One pertinent sense of such a difference may be that licensees who are SMEs are often unable to retain their livelihood where the only accepted method of payment proposed by a licensor is a high flat rate up-front. It is therefore suggested that in instances where a licensee can demonstrate, within the restrictions of the NDA, that a requested flat licence fee (that is presented to it without any alternative method of payment) would drive it out of the market, such a licensing practice may be considered to be 'unfair'. The term "SME" in this context should take on the EC definition of this term, which is available at http://europa.eu.int/comm/enterprise/enterprise_policy/sme_definition/index_en.htm.

D.**Tying.** Licensing arrangements that condition conclusion of a licensing agreement upon the licensee's consent to contract and pay not only for ESSENTIAL IPRs (as defined in the IPR policy) but also for patents that are not essential for the pertinent standard, may be suspected to be 'unfair'. Any interpretation of this issue should be read in conjunction with the ETSI guide to European Competition Law.

E.**Discriminatory Pricing.** A global pricing scheme under which licenses are offered in a substantial part of the world for royalties that are lower than those charged from European manufacturers may be considered non FRAND. This matter shall be considered in conjunction with the EC competition regime, and in particular EC Treaty Art. 82 (c) that deals with the behaviour pattern of "applying dissimilar conditions to equivalent transactions with other trading parties"). In this context, it may be that ownership of a patent that is essential for the implementation of an ETSI standard can bestow a dominant position upon such IPR holder.

Confidential Business Information,
Subject to Protective Order

F. **Free use of the licensee's IPRs.** A clause in the licensing agreement which prevents the licensee from claiming or protecting its own IPRs against the licensor (which, in effect, creates a free compulsory licence that allows the licensor to utilize the licensee's IPR free of charge) may be considered unfair or discriminatory. An 'unfairness' case may especially arise where the essentiality of the patent for the implementation of the standard in effect coerces the licensee to agree to such a term in order to remain in the market. Discrimination issues may arise especially where the licensor indeed considered IPRs of other licensees as a full or partial method of consideration (e.g. in a cross-licensing context), but refuses to do so in this case in which it demands free use of such IPRs.

A.2.3 Practices which may be regarded as "unreasonable"

G. **Method of royalties.** Under specific circumstances where running royalties have been employed by the licensor over a significant period of time as its standard method of charging royalty for the use of an essential IPR for ETSI standards, applying a change to such a licensing practice by way of charging a new market entrant/SME a large up-front royalty fee may be considered a discriminatory practice.

Such specific circumstances may include contexts in which the licensor continues with the old licensing scheme with other enterprises and such a shift cannot be justified by valid business justifications.

H. **"Grantback" clauses.** Under certain circumstances, "grantback" clauses may be regarded as unreasonable or unfair. A grantback clause is an arrangement under which a licensee agrees to extend to the licensor of intellectual property the right to use the licensee's improvements to the licensed technology. Grantbacks differ from cross licenses in the sense that they are forward-looking, awarding the licensor right to future ideas that have not been thought of yet. Grantbacks may considered unfair because they extort an unreasonable price from licensees, who, in order to be able to obtain a licence that will allow them to use the standard and survive in the market, must give away all their future innovation.

The specific contexts under which "grantbacks" may be considered to be 'unreasonable' include scenarios in which the licensee is obliged to award the licensor future innovation that is not directly related to the licensed IPRs; and scenarios under which the licensor does not agree to any alternative methods of payment that would not include a "grantback" clause.

Confidential Business Information,
Subject to Protective Order

**Annex B (normative)        Normative References policy statement [IPR06(03)04]**

**Guidance for Including References to Documents of Other Organisations
in ETSI Deliverables**

## B.1    Scope

This document specifies rules for including references to documents of non-ETSI organisations in ETSI deliverables.   These rules are intended to ensure that implementers and evaluators of deliverables standardized by ETSI, and other interested parties, have access to all materials needed to implement those deliverables.   These rules are meant to apply not only to documents that are created within internal ETSI procedures but also to any deliverables that are developed elsewhere but are sent to ETSI to be standardized.

Two categories of references are possible.   "Normative references" are references to documents to which conformance is necessary to claim compliance to the ETSI deliverable containing the reference. "Informative references" are references to documents that may be useful in implementing an ETSI deliverable or add to the reader's understanding but which are not required for conformance to the ETSI deliverable.   These rules are pointed toward normative references because they are functionally a part of the ETSI deliverable itself.   It is best practice to follow these principles for informative references as well, but more flexibility is permitted for informative references because these documents are not strictly necessary for the implementation of an ETSI deliverable.

## B.2    Documents that may be referenced

In considering whether a normative reference to a document should be included in an ETSI deliverable, preference should be given to standards and specifications issued by recognised standards development organizations and to the directives of the European Commission.   Normative referencing of documents under the possession of other organisations is allowed where the use of such normative references has been justified by the technical body in charge of development of the ETSI deliverable containing the reference.   Where an objection to the use of a normative reference has been raised within Technical Body discussion, this shall be noted in the minutes or some other record that will be available to ETSI Members.   A normative reference to such a document is permissible only if the referenced document is Publicly Available, as defined in Section 3 below, during the approval phases and at the time of publication of the ETSI deliverable. If Public Availability cannot be ensured after publication of the ETSI deliverable has occurred, the originating body of the document shall be requested to provide ETSI with the right to make available the text.   If normative references in an ETSI deliverable are not Publicly Available during the drafting stage, the deliverable shall not be submitted to an approval procedure until the reference is publicly available or the text shall be made available to be held by ETSI.

## B.3    Public availability

All normatively referenced documents shall be Publicly Available to implementers, evaluators and other interested parties for as long as the ETSI deliverable that references them is an active document.   A document is Publicly Available when it may be obtained from the source organization by any person (with or without payment) simply by quoting the reference number given in the ETSI deliverable to the source organization or typical supplier.   Public Availability requires that a referenced document is available in the English language from a publicly accessible source, preferably via the Internet or other means of electronic access, without contractual limitations relating to its evaluation (other than limitations reasonably intended to restrict duplication and redistribution) and without substantive contractual limits on implementation of the referenced material or the ETSI deliverable as a condition of obtaining access to the referenced material.   This section, however, does not imply any

Confidential Business Information,
Subject to Protective Order

obligation on the technical body, or the ETSI Secretariat, to investigate the public availability of each normative reference used in an ETSI deliverable at the time that reference is made. Public Availability also requires that implementers, evaluators and other interested parties may not be required to prove qualifications to gain access to the referenced material. In particular, entities entitled to evaluate and implement ETSI deliverables shall not be required to be members of any other organization to gain access to a normatively referenced document.

## B.4    Intellectual property rights

ETSI promotes a policy that any essential intellectual property rights (IPRs) contained in normatively referenced documents be available for use in ETSI deliverables on licensing and disclosure terms that do not materially differ from the terms defined in the ETSI IPR Policy. This normative reference policy, however, does not imply any obligation on the Technical Body, ETSI members or Technical Body members to investigate or ensure the availability of any essential normatively referenced IPRs, under any specific licensing and disclosure terms, at the time a Normative Reference is provided, explicitly or implicitly, within an ETSI deliverable.

## B.5    Stability and maintenance

Normative references may be "specific" or "non-specific". A "specific" reference is a reference to the particular revision or version of the normatively referenced document. Specific references are favoured because they lead to permanence and stability in ETSI deliverables. Normative references generally should be limited to documents that are finally approved by the organizations responsible for issuing them.

A "non-specific" reference is a reference to a deliverable of another organization that will apply to all future revisions and versions of the originally referenced document. Non-specific references require additional procedures to ensure that any revisions made necessary to the ETSI deliverable by virtue of revisions made to the normatively referenced materials are considered by the appropriate technical body in charge of the ETSI deliverable.

If a normative reference is non-specific, the technical body in charge of the ETSI deliverable should establish a process for gaining access to all future revisions and versions of the normatively referenced material. In addition, the technical body should establish a work plan for ensuring that any such new revisions and versions of the normatively referenced material do not require a substantive amendment to the ETSI deliverable referencing that document or, alternatively, for ensuring that any such needed amendments are made and approved appropriately. Any future versions incorporated by reference should meet with the requirements for Public Availability and Intellectual Property as set forth above.

## B.6    Test suites

If conformance with a specification that includes normative references requires the use of a test suite, the test suite for the normatively referenced part should also be made Publicly Available. Any such test suite should be usable by potential implementers on terms at least as favourable as those contained in the ETSI IPR Policy.

Confidential Business Information,
Subject to Protective Order

*ETSI/GA#42(03)20*

page 25 of 27

## Annex C (normative)    ETSI IPR Information Statement

### Current version:

| Project (e.g. GSM, DECT...) | Company | Patent title | Country of registration | ETSI Standard No. (e.g. TS XXX XXX V0.0.0) | Application No. | Patent No. | Countries applicable |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |

### Proposed New version – and sample data entry line:

| ETSI Standard, Technical Specification or Work Item | | | Patent Proprietor | Patent/ application No. | Patent Subject/ Title | Country | OPTIONAL INFORMATION: Other patents/applications in same family* to which the Undertaking applies | |
|---|---|---|---|---|---|---|---|---|
| Project or Standard name | Work Item OR Standard No. | Section | Version | | | | | Patent/application No. | country |
| UMTS | TS 125 215 | 6.1.1.2 | v.3.5.0 | Nokia | 1131972 | Scheduling of slotted-mode related measurements | EPO | 1274000 | Australia |
| | | | | | | | | 99813100.8 | China P.R. |
| | | | | | | | | 108270 | Finland |
| | | | | | | | | 11-318161 | Japan |
| | | | | | | | | 6532226 | USA |
| | | | | | | | | | |
| | | | | | | | | | |

*Patent family information is provided voluntarily. The completeness and accuracy of any patent family information that is provided cannot be guaranteed.*

Confidential Business Information,
Subject to Protective Order

**Annex D (informative)      Terms of Reference of the GA ad-hoc on ETSI's IPR Policy operation [ETSI/GA40(02)13]**

**1      General**

There is a need, to review the ETSI IPR policy with a view to addressing and rectifying  any uncertainties on the operation of  this policy and on any legal rules and obligations on the membership in order to avoid an incorrect implementation of the ETSI IPR policy and in order to avoid anti-competitive actions.

This review shall consider the situation of all ETSI member categories and their respective IPR portfolio as well as amended definitions and interpretations of dedicated terms used in the ETSI Intellectual Property Rights Policy (Annex 6 of the ETSI Directives). Operational aspects in addition to the existing ETSI IPR operation might be considered by the ad-hoc activity if necessary.

**2      Scope**

The ETSI GA ad hoc group's primary role is "to review the ETSI IPR policy to ensure the IPR policy is applied in ETSI in a fair, reasonable, and non-discriminatory manner and in a way that is not anti-competitive".

For that purpose, the ad-hoc group shall consider the existing ETSI IPR policy and its underlying principles (Annex 6 of the ETSI Directives) as the stable basis to work from.

Definitions, interpretations and improvements of the above are to be made in order:

- to achieve a consensus view on the operation of the IPR policy;
- to achieve a consensus view on a non-discriminatory and not anti-competitive implementation of the IPR policy;
- to achieve a consensus view on any required additional operational provisions to ETSI's IPR policy.

**3      Duties**

**3.1           Understanding the scope and limits of the present ETSI IPR Policy.**

- Understand the spirit and core principles of the ETSI IPR Policy.
- Clarify issues arising out of the interpretation of the ETSI IPR Policy.
- Identify certain Members Practices during the ETSI Standard Making Process and set up a graduated checklist of compliance with the ETSI IPR Policy.

**3.2           Review the present ETSI Chairman's guide on IPRs.**

- Identify Members questions under the present Chairman's guide on IPRs.
- Clarify issues arising out of the interpretation of the ETSI Chairman's guide on IPRs.

**3.3           List and review the current actions taken by the ETSI Secretariat**

- relating to the implementation of the ETSI IPR Policy.

**3.4           Take note of the present ETSI Online IPR Database**

- Make proposal for improvements should the needs arise.

**3.5           Take note of the present ETSI Chairman's guide on European Competition Law**

- Understand the articulation between the ETSI Standard Making Process and the potential anti-competitive risks associated with it.

Confidential Business Information,
Subject to Protective Order

*ETSI/GA#42(03)20 rev.1*

page 27 of 27

4        Membership of the ad-hoc group/Chairmanship

The Membership of the GA ad hoc group is to be taken from;

- Any ETSI Member, in particular Members' Legal/IPR Dep. Representatives,
- ETSI Board members,
- The ETSI Secretariat,
- The ETSI Councillors,
- Experts qualifying for legal and IPR related contributions invited by the Chairman.

It is suggested, that the ad-hoc group shall be chaired by the Director-General or by a GA Head of Delegation with assistance provided by the ETSI Legal Adviser.

5        Meetings/Reporting

The group shall meet as many times as it considers appropriate and shall make use of all electronic meeting facilities to the extent possible.

The group shall provide an interim report to the March 2003 GA (GA#41) and a final report to the November 2003 GA (GA#42). In addition, the group shall provide the ETSI Board with regular progress reports.

Confidential Business Information,
Subject to Protective Order