# EXHIBIT 17

**European Telecommunications Standards Institute**

**ETSI**

**12th Technical Assembly**                          **ETSI/TA 12 (91) 3**
**Nice, 26 November 1991**

| | |
|---|---|
| **Date:** | October 1991 |
| **Source:** | ETSI Director |
| **Title:** | Intellectual Property Policy and procedures |
| **Agenda item:** | 2 |
| **Document for:** | Discussion and Decision |

**D/504/91/KHR/jg**

Confidential Business Information,
Subject to Protective Order

Final Draft incorporating results of the TA June 1991

14.10.91

JAC04653

EUROPEAN TELECOMMUNICATIONS
STANDARDS INSTITUTE
(ETSI)

INTELLECTUAL PROPERTY POLICY

AND

PROCEDURES

Confidential Business Information,
Subject to Protective Order

JAC04653

## EUROPEAN TELECOMMUNICATIONS STANDARDS INSTITUTE (ETSI)

## INTELLECTUAL PROPERTY POLICY AND PROCEDURES

### INDEX

| SECTION HEADING | PAGE NUMBER |
|---|---|

**Intellectual Property Policy**

**Part I – Objectives, Licensing and IPRs**

| | |
|---|---|
| Introduction | i |
| Policy Objectives | i |
| IPR Undertakings | i |
| Confidentiality | i |
| Ownership of IPRs | ii |
| Licensing Provisions for Standards Related Licences | ii |
| Reproduction of Standards Documentation | ii |
| Law and Regulations | ii |
| Policy Decisions | ii |
| Violation of Policy | ii |
| ~~Terminology~~ *Definitions* | iii |
| Duration | iii |
| Development of Policy | iii |

**Part II – Procedures and Procurement**

| | |
|---|---|
| Total Royalty Rates | iv |
| Procedures *for Searching and related matters* | iv |
| Risk Sharing | iv |
| Categorisation of Standards | iv |

**ETSI IPR Undertaking**

| | |
|---|---|
| Appendix A | 1 |

**Appendix A – Part I – Principle Licensing, Provisions and Disclosure of IPRs**

| | |
|---|---|
| Definitions | 2 |
| Licence Grant | 2 |
| Scope of Licences | 2 |
| Right to Withhold Licences | 3 |
| Reciprocity of Grant | 3 |
| Disclosure of IPRs and Licensing Terms | 4 |

Confidential Business Information,
Subject to Protective Order

SECTION HEADING                                              PAGE NUMBER


Appendix A – Part II – Standards Documentation

     Assignment of Literary Copyright                        5
     Licences Under Literary Copyright                       5
     Author's Rights                                         5

Appendix A - Part III – Miscellaneous and Legal Provisions

     Licensing and Procurement                               6
     Employees                                               6
     Conduct of Negotiations                                 6
     Injunctions                                             6
     Warranties                                              6
     Joint Ventures, Acquisitions and Divestiture of Affiliates   6–7
     Jointly Owned IPRs                                      7
     Confidentiality                                         7–8
     Commencement and Termination                            8
     Arbitration                                             8–9
     Retroactive Effect                                      9
     Compliance with Policy                                  9
     Legal Conflict                                          9
     Waiver of Default                                       10
     Headings                                                10
     Notices                                                 10
     Construction                                            10

Appendix A – Part IV – Special Provisions

     Renegotiation of Royalty Rates                          11
     Technology Transfer                                     11
     Indemnity in Procurement Contracts for IPR Infringement   11–13


Annex I - DEFINITIONS                                        i–ii

Annex II - EMPLOYEES CONFIRMATION FORM                       i

*Affiliates*

JAC04653

## EXPLANATORY NOTE

The Policy and Undertaking have been extensively revised to reflect the conclusions reached and decisions made at the June Technical Assembly, and to increase its user–friendliness. Both the Policy and Undertaking have been divided into parts, to aid comprehension.

Part II of the Policy and Part IV of the Undertaking contain provisions on which major disagreement between the majority of ETSI members exists. It is thought that genuine agreement on these provisions cannot be achieved in the short term. However, it is hoped that a substantial majority of ETSI's members will be able to agree an interim policy and undertaking which excludes Part II of the Policy and Part IV of the Undertaking. To this end automatic termination provisions have been incorporated in the Policy (paragraph 12) and the Undertaking (clause 18.2). To ensure a long term solution the Policy contains a commitment to work towards resolution of the key areas of disagreement which now exist.

Part I of the Undertaking contains provisions which relate to licensing and disclosure of IPRs and should be of interest to everyone.

Part II contains provisions which relate to standards documentation and is primarily of interest to the ETSI Secretariat.

Part III contains provisions which will be of primary interest to lawyers, and patent attorneys. It includes clauses which normally appear in documents of this type, sometimes referred to as "boiler plate". Some clauses are however of commercial significance.

Karl Heinz Rosenbrock
Director of ETSI
20th August 1991

Confidential Business Information,
Subject to Protective Order

JAC04653

<u>INTELLECTUAL PROPERTY POLICY</u>

<u>OF THE</u>

<u>EUROPEAN TELECOMMUNICATIONS STANDARDS INSTITUTE</u>

**PART I - OBJECTIVES, LICENSING AND IPRs**

Confidential Business Information,
Subject to Protective Order

JAC04653

## 1.  INTRODUCTION

The General Assembly has recognised that the generation of European Telecommunications Standards (ETSs) may give rise to intellectual property problems and has, therefore, established an Intellectual Property Policy (the POLICY) and an Intellectual Property Rights Committee (IPRC) to advise ETSI and its members in respect thereof.

## 2.  POLICY OBJECTIVES

Pursuant to Article 2 and 3 of the ETSI Statutes, the main policy objectives of ETSI in relation to IPRs are to ensure that:

2.1   ETSs shall be based on solutions which meet technical objectives stated by the TA but a draft ETS shall not be adopted if it is subject to any IPRs for which licences are considered by ETSI to be needed but are not available on terms which are fair, reasonable, and non–discriminatory and which in their totality are non–prohibitive;

2.2   the investment made by ETSI members and their AFFILIATES in research and development, utilised in the establishment of ETSs, shall be adequately and fairly rewarded.

2.3   all ETSI members have real access to telecommunications markets, equivalent to that of indigenous commercial and industrial enterprises, in all countries adopting and implementing STANDARDS.

## 3.  IPR UNDERTAKINGS

3.1   Each applicant for membership of ETSI must provide an IPR UNDERTAKING. Existing members shall sign the UNDERTAKING within 6 months from receipt of a written request from ETSI to sign.

3.2   The IPR UNDERTAKING referred to in paragraph 3.1 above shall, on signature, be binding in respect of all ETSI STANDARDS.

## 4.  CONFIDENTIALITY

The proceedings of a COMMITTEE shall be regarded as non–confidential except as expressly provided below and all information submitted to a COMMITTEE shall be treated as if in the public domain and shall be available for public inspection unless:

–   the information is in written or other tangible form; and

–   the information is identified in writing, when submitted, as confidential; and

–   the information is first submitted to, and accepted by, the Chairman of the TC or STC as confidential.

Confidential information incorporated in a STANDARD shall be regarded as non–confidential by ETSI and its members, from the date on which the STANDARD is published.

– i –

Confidential Business Information,
Subject to Protective Order

5.  OWNERSHIP OF IPRs

    5.1    The ownership of the copyright in STANDARDS documentation and reports created by ETSI or any of its COMMITTEES shall vest in ETSI but due acknowledgement shall be given to copyrights owned by third parties that are identifiable in ETSI copyrighted works.

    5.2    In respect of IPRs other than copyright in STANDARDS documentation and reports, ETSI shall only seek ownership of IPRs generated either by its employees or by secondees to ETSI from organisations who are not members of ETSI.  ETSI members and their AFFILIATES shall be allowed to use such IPRs free of charge.

    5.3    ETSI shall, on request by a non–member who has signed an undertaking equivalent to that set out in Appendix A, grant licences to that non–member on fair and reasonable terms and conditions in respect of any IPRs, other than those referred to in paragraph 5.1 above, owned by ETSI.

6.  LICENSING PROVISIONS FOR STANDARDS RELATED LICENCES

    6.1    In respect of ESSENTIAL IPRs, particularly third party ESSENTIAL IPRs, licences should be available to all members of ETSI on fair, reasonable and non–discriminatory terms and conditions.  If a member of ETSI is unable to obtain a licence on fair, reasonable and non–discriminatory terms and conditions in respect of an IPR which is ESSENTIAL to a STANDARD, immediate steps shall be taken to modify the STANDARD so that such IPR is no longer ESSENTIAL or to withdraw the STANDARD. 

    6.2    ETSI will make available on request a standard model licence which has been approved by the IPRC.

7.  REPRODUCTION OF STANDARDS DOCUMENTATION

Members of ETSI (including their AFFILIATES) may make copies of STANDARDS documentation published by ETSI for their own use free of charge but may not distribute such copies to others.

8.  LAW AND REGULATION

The POLICY shall be governed by the laws of France.  However, no member of ETSI shall be obliged by the POLICY to act against the laws or regulations of its country or against supranational laws or regulations applicable to its country.

9.  POLICY DECISIONS

Without prejudice to ETSI's statutes and rules of procedures, no decisions shall be taken by ETSI in relation to the POLICY and its implementation unless supported by a 71% majority of the weighted individual votes cast by members.

10.  VIOLATION OF POLICY

    10.1    Any violation of the POLICY by an ETSI member shall be deemed to be a breach, by that member, of its obligations to ETSI.  The ETSI General Assembly shall have the authority to decide the action to be taken, if any, against the ETSI member in breach, in accordance with the ETSI Statutes.

    10.2    Where a member of ETSI or any other person is proven to be in breach of his UNDERTAKING to ETSI other members of ETSI shall be relieved of any obligations they may have to that member or that other person pursuant to their UNDERTAKINGS to ETSI.

– ii –

Confidential Business Information,
Subject to Protective Order

S-ITC-003390838

11.  **DEFINITIONS**

Terms in the POLICY which are written in capital letters shall have the meaning set forth in THE UNDERTAKING in Appendix A.

12.  **DURATION**

The POLICY, as an interim policy, shall:

      –   come into effect on the 1st day of January 1992;

      –   continue in effect until the 31st day of December 1994 or the date of adoption of a permanent policy by ETSI, whichever is the earlier, and

      –   cease to have effect thereafter.

13.  **DEVELOPMENT OF POLICY**

ETSI and its members shall use their best efforts to agree a permanent intellectual property policy and undertaking to come into effect at the latest on the 1st day of January 1995. The permanent intellectual property policy and undertaking will incorporate the provisions of the POLICY and UNDERTAKING amended as agreed by ETSI and its members and shall address the following issues:

      –   searching of IPRs, particularly patents, to discover ESSENTIAL IPRs;

      –   sharing certain liabilities for infringement of ESSENTIAL IPRs;

      –   royalty rates payable for ESSENTIAL IPRs.

For the avoidance of doubt, if a permanent policy and undertaking is not adopted by ETSI prior to the 31st day of December 1994, the Policy shall cease to have effect.

– iii –

Confidential Business Information,
Subject to Protective Order

INTELLECTUAL PROPERTY POLICY

OF THE

EUROPEAN TELECOMMUNICATIONS STANDARDS INSTITUTE

PART II - PROCEDURES AND PROCUREMENT

Confidential Business Information,
Subject to Protective Order

14    TOTAL ROYALTY RATES

Licensors of ESSENTIAL IPRs who are SIGNATORIES of the UNDERTAKING referred to in paragraph 3.1, shall in setting royalty rates take into account that the total royalty due in respect of ESSENTIAL IPRs for a particular product or method shall not exceed a level which in itself unreasonably hinders licensees from participating in markets for such products or methods.

15.   PROCEDURES FOR SEARCHING AND RELATED MATTERS

ETSI shall establish procedures for discovering to the extent reasonably possible the existence and identity of potentially ESSENTIAL IPRs and the licensing terms in respect of which such IPRs will be available for ETSI standardisation. The costs associated with these procedures will be borne by ETSI and financed through contributions of its members.

16.   **RISK SHARING**

Members of ETSI who are procurers and vendors of equipment specified by reference to an ETS shall equitably share certain of their risks associated with infringement of ESSENTIAL IPRs.

17.   CATEGORISATION OF STANDARDS

On adoption of a work program by ETSI the Technical Assembly shall decide whether parts of that work program relate to a STANDARD for which an IPR investigation is to be performed by ETSI. Such a STANDARD shall be categorised as a TYPE-B STANDARD. All STANDARDS for which no IPR investigation is to be performed shall be categorised as TYPE-A STANDARDS. Clauses 15 and 16 of the POLICY shall only apply to TYPE-B STANDARDS.

Confidential Business Information,
Subject to Protective Order                    S-ITC-003390841

04653

## APPENDIX A

### ETSI IPR UNDERTAKING

This undertaking is given this ....... day of .......... by ......... (hereinafter referred to as the SIGNATORY) whose registered office is at .............., to the EUROPEAN TELECOMMUNICATIONS STANDARDS INSTITUTE whose registered office is at Route des Lucioles, Sophia–Antipolis, Valbonne, France (hereinafter referred to as ETSI).

WHEREAS

1.     The SIGNATORY is fully committed to the objectives of  ETSI.

2.     The objectives of ETSI are set ont in Articles 2 and 3 of the Statutes of ETSI.

3.     The SIGNATORY is prepared to grant certain licences and accept certain obligations which are necessary to further the objectives of ETSI.

The SIGNATORY therefore undertakes as follows:–

– 1 –

Confidential Business Information,
Subject to Protective Order

EUROPEAN TELECOMMUNICATIONS STANDARDS INSTITUTE  IPR UNDERTAKING

APPENDIX A

PART I - PRINCIPLE LICENSING PROVISIONS AND DISCLOSURE OF IPRs

Confidential Business Information,
Subject to Protective Order

1.   DEFINITIONS

Terms in the UNDERTAKING which are written in capital letters shall have the meaning set forth in Annex I attached.

2.   LICENCE GRANT

Subject to clauses 4 and 5, the SIGNATORY hereby undertakes on request by any PARTY to grant licences in accordance with the terms and conditions of the UNDERTAKING to that PARTY under any ESSENTIAL IPR which it owns (including, subject to clause 16 below, jointly owned IPRs) or controls.

3.   SCOPE OF LICENCES



3.1   Licences granted pursuant to clause 2 above shall:

–   be for monetary consideration only unless agreed otherwise by both Licensee and Licensor;

–   be granted for the full life of the licensed IPRs;



–   be non–exclusive, on fair, reasonable and non–discriminatory terms and conditions;

–   permit MANUFACTURE; sale, lease or other disposal in the TERRITORY of MANUFACTURED EQUIPMENT; repair, use or operation of MANUFACTURED EQUIPMENT anywhere; and use of METHODS in the TERRITORY;

–   be of a technical scope which enables the Licensee to comply with the STANDARD;

–   conform with the POLICY.

–   except as explicitly provided for by the UNDERTAKING, only be terminated by the Licensor for breach of the licence agreement by the Licensee.

–   permit the licensee to terminate the licence at any time.

3.2   If, as a result of a submission by the SIGNATORY:

–   a copyright owned by the SIGNATORY for software becomes an ESSENTIAL IPR, the licences granted pursuant to clause 2 shall permit copying, adaptation, translation and sub–licensing to end users to the extent required for compliance with the STANDARD;

–   a right in a mask work, unregistered design right, or a copyright (not related to software) owned by the SIGNATORY becomes an ESSENTIAL IPR the licences granted pursuant to clause 2 shall permit such use of the ESSENTIAL IPR as is required for complying with the STANDARD.

3.3   Licences granted pursuant to clause 2 shall permit the licensee to :

–   use MANUFACTURED EQUIPMENT anywhere;

–   make or have made anywhere customised components and sub–systems to the licensee's own design, for use in MANUFACTURE.

This clause 3.3 does not require the SIGNATORY to grant licences permitting sale or disposal outside the TERRITORY.

– 2 –

Confidential Business Information,
Subject to Protective Order

3.4   If a licence is granted pursuant to Clause 2 or in settlement of an action for infringement of an ESSENTIAL IPR, the SIGNATORY undertakes to make the licence effective from the date on which the licensed IPR became ESSENTIAL even if that date is earlier than the date on which the licence was signed.

4.   **RIGHT TO WITHHOLD LICENCES**

4.1   The SIGNATORY is entitled to refuse the grant of licences for a STANDARD in respect of an IPR which it owns or controls on condition that the SIGNATORY has notified ETSI of:
   –   the identity, in an unambiguous manner, of that IPR, and
   –   the STANDARD to which that IPR relates

within 90 days of approval by ETSI's Technical Assembly of the first work program directed to the creation of that STANDARD.

Where a work program for a STANDARD is approved by ETSI's Technical Assembly before signature of the UNDERTAKING by the SIGNATORY any notification of IPRs as unavailable for licence must be made before signature of the UNDERTAKING.

4.2   The SIGNATORY undertakes to make use of clause 4.1 above only in exceptional cases and never in the case of an IPR which the SIGNATORY has prior to signature of the UNDERTAKING undertaken to ETSI to license in respect of that particular STANDARD.

4.3   The SIGNATORY shall be relieved of its obligation to grant any licence under IPRs to the extent that it can show that it is not contractually free to grant such licences pursuant to a contract pre–dating the UNDERTAKING provided that the SIGNATORY has made a bona fide attempt to identify and notify ETSI of all such prior contracts at the time of executing the UNDERTAKING.

5.   **RECIPROCITY OF GRANT**

5.1   If a PARTY refuses to grant licences to the SIGNATORY under any IPRs owned or controlled by that PARTY which are ESSENTIAL to:

   –   a STANDARD, or
   –   a standard formally proposed by a recognised standards organisation (including ETSI, CCITT and  CCIR) which has an equivalent purpose to that of a STANDARD

then the SIGNATORY shall be relieved of its obligations:

   –   to grant, or not to terminate licences

to that PARTY under its IPRs relating to the STANDARD.

5.2   The SIGNATORY's obligation pursuant to clause 2 above to  grant licences to a PARTY shall be void if and for so long as that PARTY is in breach of an Undertaking given by him to ETSI pursuant to the POLICY or has not signed such Undertaking.

5.3   The SIGNATORY may terminate, on 90 days notice, any licence  granted pursuant to clause 2 above to a PARTY if that PARTY is in breach of an Undertaking given by him to ETSI pursuant to the POLICY provided that such licence shall be reinstated at the request of the PARTY if said breach is rectified within the notice period.

– 3 –

Confidential Business Information,
Subject to Protective Order

6.   **DISCLOSURE OF IPRs AND LICENSING TERMS**

6.1   The SIGNATORY undertakes to use its reasonable endeavours to disclose to ETSI, before a STANDARD goes to public enquiry, the identity of potentially ESSENTIAL IPRs which it owns or controls and:

  – which come into existence, or
  – for which application was first made

during the work program for that STANDARD.

The SIGNATORY undertakes not to seek payment from any PARTY for any infringement of an IPR to which this clause relates:

  – made by that PARTY in relation to EQUIPMENT or METHODS, and
  – committed before that IPR was identified to ETSI by the SIGNATORY as potentially ESSENTIAL.

6.2   The SIGNATORY undertakes in good faith to disclose to ETSI, without undue delay, the identity of potentially ESSENTIAL IPRs of which it is aware, at any time, and in particular, ESSENTIAL IPRs which it owns or controls and which relate to a technical contribution made by the SIGNATORY to a COMMITTEE.

6.3   If the SIGNATORY acquires ownership or control of IPRs after the date of execution of the UNDERTAKING which, due to contractual commitments pre–dating such acquisition, are not available for licensing pursuant to the UNDERTAKING, the SIGNATORY shall identify and notify ETSI of such IPRs without undue delay.

6.4   The SIGNATORY undertakes, when requested by ETSI, to notify ETSI of the maximum royalty rate it will demand for the grant of licences in respect of a particular proposed STANDARD pursuant to any IPRs identified in the request, within 90 days of receipt of the request.

– 4 –

Confidential Business Information,
Subject to Protective Order

S-ITC-003390846

EUROPEAN TELECOMMUNICATIONS STANDARDS INSTITUTE  IPR UNDERTAKING

APPENDIX A

PART II - STANDARDS DOCUMENTATION

Confidential Business Information,
Subject to Protective Order

7.    ASSIGNMENT OF LITERARY COPYRIGHT

The SIGNATORY undertakes, when requested to do so by ETSI, to assign any copyright it may own in a complete work which comprises an ETSI technical report, ETS, or I–ETS as published by ETSI. The SIGNATORY shall not be required to assign any copyright they may own in a work incorporated in an ETSI technical report, ETS, or I–ETS, unless it comprises the entire work.

8.    LICENCES UNDER LITERARY COPYRIGHT

8.1    The SIGNATORY grants and undertakes to grant, ETSI, non–exclusive licences free of any financial consideration, pursuant to any literary or artistic copyright which the SIGNATORY owns or controls in non–confidential documents which the SIGNATORY supplies to ETSI or any COMMITTEE, permitting ETSI to reproduce, translate, adapt, edit or publish all or part of such documents in ETSI technical reports or standards specifications.

8.2    Any licence granted pursuant to 8.1 shall authorise ETSI to grant sub–licences to third parties on terms and conditions determined at the discretion of ETSI. In particular such sub–licences may be royalty bearing or free, and may authorise the grant of further sub–licences. The SIGNATORY shall have no claim on any financial return obtained by ETSI from the grant of such sub–licences.

9.    AUTHOR'S RIGHTS

ETSI shall respect author's rights, of which they have been made aware, in documents supplied to ETSI or COMMITTEES by the SIGNATORY, and shall indemnify and hold harmless the SIGNATORY in respect of any action relating to author's rights arising from any use by ETSI or its sub–licensees of documents supplied by the SIGNATORY to ETSI.

– 5 –

Confidential Business Information,
Subject to Protective Order                    S-ITC-003390848

EUROPEAN TELECOMMUNICATIONS STANDARDS INSTITUTE  IPR UNDERTAKING

APPENDIX A

PART III – MISCELLANEOUS AND LEGAL PROVISIONS

Confidential Business Information,
Subject to Protective Order

10.  LICENSING AND PROCUREMENT

The SIGNATORY undertakes that, in a procurement contract relating to EQUIPMENT and METHODS with a PARTY, it will not impose obligations on that PARTY to license IPRs:

–   for supply to persons other than the SIGNATORY, or
–   for manufacture outside the TERRITORY

11.  **EMPLOYEES**

Nothing in the UNDERTAKING shall limit or restrict the SIGNATORY'S freedom to assign or re-assign his employees participating in ETSI work.

12.  CONDUCT OF NEGOTIATIONS

12.1  When requested by a PARTY to grant licences, pursuant to clause 2 above in respect of an ESSENTIAL IPR, the SIGNATORY undertakes:

–   to pursue all licence negotiations to a conclusion in good faith and without undue delay;
–   to refrain from taking legal action for infringement of the IPR against the PARTY during negotiations

provided that the PARTY also pursues the negotiations in good faith and without undue delay.

12.2  The SIGNATORY undertakes, when seeking a licence from a PARTY under an ESSENTIAL IPR, to pursue all licence negotiations in good faith and without undue delay.

13.  **INJUNCTIONS**

The SIGNATORY hereby undertakes not to seek an injunction against a PARTY in respect of any ESSENTIAL IPR in respect of:

–   offers for sale of EQUIPMENT and METHODS or parts  thereof to a customer in any country by a PARTY, or
–   the supply of EQUIPMENT and METHODS or parts thereof by a PARTY to a customer in any country and the use  thereof by the customer in any country,

provided objective evidence is produced to show that the EQUIPMENT and METHODS is being offered or supplied for purposes associated with seeking the adoption of a STANDARD in that country.

14.  **WARRANTIES**

Nothing in the UNDERTAKING shall oblige the SIGNATORY to perform any IPR search or investigation and the SIGNATORY shall not be deemed to give any warranty or make any representation with respect to, or have any liability for the accuracy or completeness of any information disclosed in good faith, or any good faith ommission pursuant to clauses 6.1 and 6.2 above.

15.  JOINT VENTURES, ACQUISITIONS AND DIVESTITURE OF AFFILIATES

15.1  Where a legal entity is not an AFFILIATE of any one member of ETSI, but control of that legal entity can be exercised by two or more members of ETSI or their AFFILIATES, including the SIGNATORY, acting in concert, the SIGNATORY undertakes to use all reasonable endeavours to ensure that the said legal entity signs an undertaking equivalent to the UNDERTAKING.

– 6 –

Confidential Business Information,
Subject to Protective Order

15.2   Where a legal entity becomes a new AFFILIATE of the SIGNATORY after the date of signature of the UNDERTAKING, the SIGNATORY shall use its best endeavour to ensure that the new AFFILIATE is bound by the terms and conditions of the UNDERTAKING. Where a SIGNATORY is unable to bind a new AFFILIATE to the terms and conditions of the UNDERTAKING, it shall immediately disclose this to ETSI together with full details of the reason for its failure, and shall submit to whatever sanction is provided by the ETSI statutes. Such an AFFILIATE shall not be entitled to enjoy any rights granted to the SIGNATORY by equivalent undertakings signed by PARTIES.

15.3   Where an AFFILIATE of a SIGNATORY who is not a member of ETSI in its own right ceases to be an AFFILIATE, the SIGNATORY shall cease, upon the date of cessation, to have any liability whatsoever in respect of that legal entity's compliance or otherwise with the UNDERTAKING. Any legal entity ceasing to be an AFFILIATE of the SIGNATORY shall be deemed to have given ETSI 24 months' written notice of its intention to terminate the UNDERTAKING pursuant to clause 18.3 below.

16.   **JOINTLY OWNED IPRs**

The SIGNATORY undertakes to use its reasonable endeavours to ensure that all IPRs, which are or may become ESSENTIAL, which it jointly owns with third parties, are available for the grant of licences pursuant to clause 2 above.

17.   **CONFIDENTIALITY**

17.1   The SIGNATORY undertakes to keep confidential all CONFIDENTIAL INFORMATION for a period of two years from the date of disclosure to the SIGNATORY or until the SIGNATORY is released from any obligation of confidentiality in respect of the CONFIDENTIAL INFORMATION by a written communication issued by the discloser thereof or by ETSI, after having obtained the consent of the discloser of the CONFIDENTIAL INFORMATION, whichever be the earlier.

17.2   The SIGNATORY shall, during the period of confidentiality:

17.2.1   use the CONFIDENTIAL INFORMATION only for purposes associated with furthering the objectives of ETSI.

17.2.2   ensure that all of its employees who have access to the CONFIDENTIAL INFORMATION have either signed a confirmation form as set out in Annex II or are otherwise bound by a contractual obligation of confidentiality to the SIGNATORY.

17.3   The obligations imposed by 17.1 and 17.2 above shall not apply to:

(a)   information in the public domain otherwise than in breach of the UNDERTAKING;

(b)   CONFIDENTIAL INFORMATION which the SIGNATORY can show to have been in its possession prior to any disclosure to which the UNDERTAKING relates and which came into its possession from a source unrelated to ETSI or a member thereof;

(c)   CONFIDENTIAL INFORMATION which the SIGNATORY can show that it developed or discovered independently and without reference to any information disclosed to it under or in connection with the UNDERTAKING;

(d)   information obtained from a third party (including an ETSI member) who is free to divulge it without imposing an obligation of confidentiality;

– 7 –

Confidential Business Information,
Subject to Protective Order

(e)   CONFIDENTIAL INFORMATION required to be divulged by order of a court or other competent authority;

17.4   Any breach of the requirements of this clause 17 discovered by the SIGNATORY shall immediately be notified to the Chairman of ETSI's IPRC and to the discloser of the CONFIDENTIAL INFORMATION.

17.5   The SIGNATORY waives any right of confidentiality it may have in CONFIDENTIAL INFORMATION which it discloses to a COMMITTEE:

–   if the CONFIDENTIAL INFORMATION is disclosed to a COMMITTEE without having first been submitted to the Chairman of the relevant TC or STC, or

–   when a STANDARD incorporating the CONFIDENTIAL INFORMATION is published.

## 18.   COMMENCEMENT AND TERMINATION

18.1   The UNDERTAKING shall come into effect on the date it is signed by the SIGNATORY.

18.2   The UNDERTAKING shall terminate on the 31st day of December 1994 unless previously terminated by the SIGNATORY pursuant to clause 18.3 below.

18.3   The UNDERTAKING may be terminated earlier by the SIGNATORY giving ETSI 24 months written notice.

18.4   The SIGNATORY, if a member of ETSI, may not terminate the UNDERTAKING unless it simultaneously gives 12 months notice in writing of termination of its membership of ETSI.

18.5   After termination of the UNDERTAKING all licences granted by or to the SIGNATORY pursuant to the UNDERTAKING shall continue in full force and effect.

18.6   The obligation to grant licences pursuant to the UNDERTAKING shall survive termination in the case of IPRs:

–   created before, and

–   identified to or by ETSI as ESSENTIAL up to 30 months after

termination of the UNDERTAKING, until such time as said IPRs expire.

## 19.   ARBITRATION

19.1   The SIGNATORY undertakes, on request by ETSI, to submit disputes on ESSENTIALITY which arise pursuant to the POLICY, to arbitration in accordance with clause 19.2 and accept the result of such arbitration as binding.

19.2   In the event of a dispute between the SIGNATORY and another PARTY in connection with the UNDERTAKING, the parties to the dispute shall first use their best endeavour to settle the dispute or difference amicably within a period of 3 months after one party has announced in writing to the other that there exists a dispute.

– 8 –

Confidential Business Information,
Subject to Protective Order

19.3  All disputes which cannot be settled as provided for in clause 19.2 above shall be finally settled by ad hoc arbitration by three arbitrators. One arbitrator shall be appointed by each party to the dispute, and the third arbitrator, who shall act as Chairman, shall be appointed by the two first appointed arbitrators. In the event of one of the parties failing to appoint an arbitrator within 6 weeks, of the appointment to the first arbitrator, or if the two first appointed arbitrators fail to agree upon the third arbitrator within 6 weeks of the appointment of the second of the first two, the second and/or third arbitrator shall be appointed by the Director of ETSI. The Chairman of the arbitration panel shall have proven experience in the issues in dispute.

19.4  The arbitrators shall follow the rules of conciliation and arbitration of the International Chamber of Commerce in its edition current at the time of arbitration without involving the International Chamber of Commerce in administrative matters.

19.5  If there be more than one party on one, or on both sides, all parties being on one side shall act jointly and unanimously as a single party for the appointment of an arbitrator and any other activities in the course of arbitration.

19.6  The arbitrators shall use their best efforts to give their final judgement not later than six months from the date on which the third arbitrator has been appointed.

19.7  Unless otherwise agreed between the disputing parties, arbitrators shall have their meetings and hearings in Sophia–Antipolis.

19.8  The decision of the arbitrators shall be final and binding upon the disputing parties.

19.9  Issues of IPR infringement and validity shall not be decided by the arbitrators.

19.10  If the SIGNATORY is not permitted by its national law to be a party to an arbitration and a dispute arises out of the UNDERTAKING or the POLICY which involves the SIGNATORY, then such dispute shall be submitted to the jurisdiction of a competent court of the State of the SIGNATORY.

19.11  The costs of arbitration shall be borne by the parties thereto  and apportioned as the arbitrators shall direct.

20.  **RETROACTIVE EFFECT**

The UNDERTAKING shall supersede and replace all previous undertakings given to ETSI by the SIGNATORY which relate to ESSENTIAL IPRs. All such prior undertakings shall be regarded as null and void by ETSI and its members. However, where the terms and conditions of licences granted or offered pursuant to such earlier undertaking would be more favourable as a whole than the terms and conditions of a licence granted pursuant to the UNDERTAKING, the SIGNATORY undertakes if so requested to grant licences in respect of ESSENTIAL IPRs on the terms and conditions specified in said earlier undertaking.

21.  **AFFILIATES' COMPLIANCE WITH POLICY**

The SIGNATORY undertakes that its AFFILIATES will comply with the POLICY and any ruling made by ETSI pursuant to the POLICY.

22.  **LEGAL CONFLICT**

Neither the SIGNATORY nor ETSI shall be required to perform an illegal act by the UNDERTAKING. If any part of the UNDERTAKING conflicts with law or regulation, the UNDERTAKING shall be amended to the minimum extent necessary to make it comply with that law or regulation. The amended undertaking shall continue to bind ETSI and the SIGNATORY.

– 9 –

**Confidential Business Information,**
**Subject to Protective Order**

23.   <u>WAIVER OF DEFAULT</u>

    23.1   If either ETSI or the SIGNATORY overlooks a default by the other, it shall not be regarded as permission to default subsequently.

    23.2   If either ETSI or the SIGNATORY does not enforce any of the rights granted to it by the UNDERTAKING, it shall not be prevented from exercising those rights at a later date.

24.   <u>HEADINGS</u>

The headings hereof are included for convenience of reference only and shall not be deemed to be a part of the UNDERTAKING.

25.   <u>NOTICES</u>

All communications provided for hereunder shall be in writing and shall be delivered or mailed by registered mail to the applicable party at the addresses indicated below:–

    Notices to the SIGNATORY shall be addressed to:

    ..............................................

    ..............................................

    ..............................................

    Notices to ETSI shall be addressed to:

    The Director
    European Telecommunications Standards Institute
    Route des Lucioles
    Sophia – Antipolis
    Valbonne, F06561
    FRANCE

    All such communications shall be effective when delivered.

26.   <u>CONSTRUCTION</u>

The construction, validity and performance of the UNDERTAKING shall be governed by the laws of France.

– 10 –

Confidential Business Information,
Subject to Protective Order

EUROPEAN TELECOMMUNICATIONS STANDARDS INSTITUTE  IPR UNDERTAKING

APPENDIX A

PART IV - SPECIAL PROVISIONS

Confidential Business Information,
Subject to Protective Order

27.   **RENEGOTIATION OF ROYALTY RATES**

The SIGNATORY undertakes, when requested by ETSI, to enter good faith negotiations on licensing royalty rates for ESSENTIAL IPR.  ETSI shall only initiate such negotiations if the total licensing royalties for particular EQUIPMENT and METHODS are excessive taking into account all commercial and technical issues.   Only ETSI and owners of ESSENTIAL IPRs relevant to the particular EQUIPMENT and METHODS shall take part in such negotiation.

28.   **TECHNOLOGY TRANSFER**

If a PARTY who is a licensee under an ESSENTIAL IPR owned by the SIGNATORY, transfers its technology to a third party and that technology cannot be used without infringing the ESSENTIAL IPR or a corresponding IPR owned by the SIGNATORY, the SIGNATORY undertakes to grant that third party a licence under the ESSENTIAL IPRs and corresponding IPRs to use that technology on terms and conditions equivalent to those under which the PARTY is licensed under the ESSENTIAL IPR.

29.   **INDEMNITY IN PROCUREMENT CONTRACTS FOR IPR INFRINGEMENT**

29.1   The SIGNATORY undertakes to apply the rules set forth in this clause 29 relating to joint liability of the purchaser and   vendor of EQUIPMENT or METHODS specified by reference to a  STANDARD for infringement of certain ESSENTIAL IPRs.

29.2   The SIGNATORY if it procures GOODS for the purpose of operation in the TERRITORY which are specified in the contract by reference to a B–TYPE STANDARD shall include terms and conditions which give effect to the rules set out in this clause 29 in all contracts for procurement placed prior to a date 21 months after that STANDARD is placed on public enquiry. This does not necessarily apply to commercial arrangements between one manufacturer and another manufacturer or between one operator and another operator.

29.3   Only the following liabilities, incurred through infringement of ESSENTIAL IPRs, are to be equitably shared:–

29.3.1   the price of GOODS delivered and/or GOODS in stock and the cost incurred of GOODS in the course of manufacture directly attributable to a relevant procurement contract subject to discounting for re–usable parts and components;

29.3.2   damages awarded by a court of law or arbitration and payments associated with the settlement of infringement of such ESSENTIAL IPR together with the associated legal costs which are clearly identified with the supply of GOODS to which the contract relates;

29.3.3   sums payable for any licences pursuant to such ESSENTIAL IPR which can be objectively verified as relating solely to GOODS supplied under a relevant procurement contract.

29.3.4   the price of repurchase of the GOODS by the supplier less any sums  recovered by resale of the GOODS or reuse of the parts thereof.

29.3.5   the cost of modifying GOODS to avoid infringement of ESSENTIAL  IPRs.

For the avoidance of doubt liabilities directly related to the infringement of  ESSENTIAL IPRs which arise from use of GOODS by the purchaser where:

– 11 –

Confidential Business Information,
Subject to Protective Order

S–ITC–003390856

— the use is either explicitly set out in the relevant procurement contract or in absence thereof the use is that use for which the GOODS were designed, and

— the infringement arises solely by virtue of use of the GOODS as supplied under the relevant procurement contract;

shall be equitably shared by the parties to a relevant procurement contract.

29.4 For the avoidance of doubt indirect losses, consequential losses and losses other than those referred to in clause 29.3 above shall not be shared but shall lie where they fall.

29.5 For the purposes of this clause 29 the price of GOODS delivered shall be the contract price discounted by 10% for each full calendar year between the date of delivery of the GOODS and the date on which the purchaser first ceased using the GOODS because of infringement of an ESSENTIAL IPR by the GOODS or use of the GOODS.

29.6 For the purposes of this clause 29 GOODS, or use of GOODS, will be deemed to infringe an ESSENTIAL IPR either:

— by agreement of the parties to a relevant procurement contract, or

— by virtue of a decision enforceable on one of the parties by a court of law competent to determine issues of IPR infringement.

29.7 If the GOODS supplied or to be supplied under a relevant procurement contract may infringe an ESSENTIAL IPR, the parties shall meet and use their reasonable endeavour to agree upon a course of action which minimises the total losses of all parties to the procurement contract.

In considering the course of action to be followed the parties shall give favourable consideration to courses of action which include modification of the GOODS by the supplier so that:

— the GOODS no longer infringe ESSENTIAL IPRs, and

— the GOODS as modified are capable of performing their specified function or the function for which they were designed;

even if such modification results in the GOODS as modified no longer complying with the relevant STANDARD or, should it prove impractical to modify the GOODS, repurchase of the GOODS by the supplier at the price specified in clause 29.5.

29.8 Where it can be demonstrated that licences are not available on fair and reasonable terms in respect of an ESSENTIAL IPR which is infringed by the supply or use of GOODS pursuant to a procurement contract, failure to supply or accept GOODS shall not be deemed a breach of that contract. However, the parties may in accordance with paragraph 29.7 above where this is agreed modify GOODS to avoid infringement. Provisions for termination by a party pursuant to this paragraph may be included in procurement contracts.

29.9 Where delays in the delivery of GOODS are caused by infringement of ESSENTIAL IPRs, penalty clauses for late delivery in procurement contracts shall be without effect.

29.10 For the avoidance of doubt any licence which requires payment of a royalty based on the extent of use of GOODS shall be deemed to be on unfair and unreasonable terms.

— 12 —

Confidential Business Information,
Subject to Protective Order

29.11 The contribution by one party whether by way of payment to the other party or by contribution to the cost of modification of GOODS pursuant to equitable sharing of liabilities payable as a result of infringement of ESSENTIAL IPR shall not exceed the price to be paid for GOODS in the original contract for supply of those GOODS.

29.12 Subject to paragraph 29.11 above equitable sharing of liabilities set out in Clauses 29.3.1 – 29.3.2 above shall be sharing in equal parts between the parties to a relevant procurement contract.

29.13 Where a supplier sells modified equipment to third parties in countries in which the unmodified equipment would infringe an ESSENTIAL IPR a purchaser who has contributed to the cost of modification shall be entitled to a fair and reasonable royalty on the sale.

29.14 Where a supplier modifies equipment to avoid an ESSENTIAL IPR and thereby (as compared to the unmodified form but disregarding questions of IPR infringement) increases its utility to the purchaser he shall be entitled to a fair and reasonable payment for the enhanced sales value of the equipment.

29.15 The royalty a purchaser shall be entitled to by virtue of sub-paragraph 29.3.2 shall be based upon that portion of the sales value of the modified equipment attributable to the modification.

29.16 The total royalty payment a purchaser shall be entitled to by virtue of sub-paragraph 29.3.2 and the payment a supplier shall be entitled to under sub-paragraph 29.3.3 shall not exceed the contribution (as set in clause 29.11) made by that party to the cost of modification of the goods.

29.17 Nothing in this clause shall prevent this SIGNATORY, when procuring GOODS, offering to include terms and conditions in a procurement contract which provide for sharing more favourable to the supplier than in equal parts, provided that the offer of such terms and conditions is made to all suppliers seeking to enter such contract.

29.18 Nothing in this Annex shall be taken as requiring the SIGNATORY or its AFFILIATES to refer any dispute relating to a procurement contract to arbitration.

29.19 A Member of ETSI shall not collude with one or more other members or any other party to increase the royalties and damages payable to said other members in respect of infringement of ESSENTIAL IPRs owned by said member and/or said other members or any other party.

29.20 When it has been objectively demonstrated that at the time of entering into the contract one party to the contract had wilfully withheld information on the basis of which there could be reasonable grounds to consider an IPR to be ESSENTIAL, the other party to the contract shall be relieved of his obligations to share liability according to clauses 29.1 – 29.19 in respect of that IPR. The existence of a patent right published at the time of entering into the contract shall not in itself constitute evidence of wilful withholding of information.

A party supplying information pursuant to this paragraph shall bear no liability for the accuracy of that information. Information supplied pursuant to this paragraph shall be confidential as between the parties.

30. Licences granted pursuant to clause 2 shall permit the licensee to make, or procure anywhere, standard components and materials for use in MANUFACTURE by the licensee.

– 13 –

Confidential Business Information,
Subject to Protective Order

For and on behalf of European Telecommunications Standards Institute

By:        ......................................................................................

Name:      ......................................................................................

Position:  Director of the European Standards Institute

Date:      ......................................................................................


Witnessed: ......................................................................................

Name:      ......................................................................................

Address:   ......................................................................................

           ......................................................................................


For and on behalf of .........................................................................

By:        ......................................................................................

Name:      ......................................................................................

Position:  ......................................................................................

Date:      ......................................................................................


Witnessed: ......................................................................................

Name:      ......................................................................................

Address:   ......................................................................................

Date:      ......................................................................................

Confidential Business Information,
Subject to Protective Order

ANNEX I

DEFINITIONS

1.  "AFFILIATE" of a first legal entity means: any other legal entity
    –    directly or indirectly owning or controlling the   first legal entity or
    –    under the same direct or indirect ownership or control as the first legal entity, or
    –    directly or indirectly owned or controlled by the  first legal entity,
    for so long as such ownership or control lasts.
    Ownership or control shall exist through the direct or indirect:
    –    ownership of more than 50% of the nominal value of the issued equity share capital or of
         more than 50% of the shares entitling the holders to vote for the election of directors or
         persons performing similar functions, or
    –    right by any other means to elect or appoint directors, or persons who collectively can
         exercise such control.

    A state, a division of a state or other public entity operating under public law, or any legal entity,
    linked to the first legal entity solely through a state or any division of a state or other public entity
    operating under public law, shall be deemed to fall outside the definition of an AFFILIATE.

2.  "COMMITTEE" shall mean any working party or committee of ETSI and shall include Technical
    Committees, Sub–Technical Committees, Project Teams and rapporteur groups.

3.  "CONFIDENTIAL INFORMATION" shall mean all information deemed to be confidential
    pursuant to clause 4 of the POLICY disclosed directly or indirectly to the SIGNATORY or any
    of its AFFILIATES together with information on IPRs and licensing distributed by ETSI pursuant
    to the POLICY.

4.  "EQUIPMENT and METHODS" shall mean any system, device, method or operation fully
    conforming to a STANDARD.

5.  "ESSENTIAL" as applied to IPR means that it is not possible on technical but not commercial
    grounds, taking into account normal technical practice and the state of the art generally available
    at the time of standardisation, to make, sell, lease, otherwise dispose of, repair, use or operate
    EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR.  For
    the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by
    technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered
    ESSENTIAL.

6.  "GOODS" shall mean EQUIPMENT, parts thereof and METHODS.

7.  "IPR" shall mean any intellectual property right conferred by statute law including applications
    therefor other than trademarks.  For the avoidance of doubt rights relating to get–up, confidential
    information, trade secrets or the like are excluded from the definition of IPR.

8.  "MANUFACTURE", shall mean production of EQUIPMENT in the TERRITORY in accordance
    with the principles of Regulation (EEC) No 802/68 and 1318/71 as amended from time to time
    – "On the common definition of the concept of the origin of goods".

– i –

Confidential Business Information,
Subject to Protective Order

9.   "PARTY" means any competent legal entity who is a member of ETSI, or who has given an undertaking to ETSI of identical effect, to the UNDERTAKING, for so long as its undertaking is in force. References to a PARTY in the UNDERTAKING shall wherever the context permits be interpreted as references to that PARTY and its AFFILIATES.

10.  "POLICY" shall mean ETSI's Intellectual Property Policy.

11.  References to the SIGNATORY in the UNDERTAKING shall wherever the context permits be interpreted as references to the SIGNATORY and its AFFILIATES.

12.  "STANDARD" shall mean any standard adopted by ETSI including options contained therein or amended versions and shall include European Telecommunications Standards (ETS), interim ETSs (I-ETS), Normes Europeenes des Telecommunications (NETs), Common Technical Regulation (CTR) and drafts thereof, the technical specifications of which are available to all members of ETSI. The date on which a STANDARD is considered to be adopted by ETSI for the purposes of this UNDERTAKING shall be the date on which the technical  specification of that STANDARD was available to all ETSI members.

13.  "TERRITORY" shall mean any and all countries:
     –   whose national administration for telecommunications is, at the date of a request by a PARTY pursuant to clause 2.1 of the UNDERTAKING, a member of ETSI, or

     –   in which an officially recognised national standardization body has formally adopted the STANDARD and ETSI has declared that the STANDARD has been implemented in that country, or

     –   in which ETSI has declared that a major telecommunications network operator has, or is about to, procure, on a substantial scale, equipment to a specification compliant with that STANDARD;

     provided that a country shall not be regarded as falling within the definition of TERRITORY if the CEC declares that:

     –   it does not give real access to its telecommunications markets to all commercial enterprises resident in the TERRITORY on a comparable basis to the access available to indigenous commercial enterprises, and

     –   conditions do not exist in that country for fair competition.

14.  "UNDERTAKING" shall mean this undertaking.

– ii –

Confidential Business Information,
Subject to Protective Order                                   S-ITC-003390861

## ANNEX II

EMPLOYEES CONFIRMATION FORM

1.  ....................(the EMPLOYER) has signed an UNDERTAKING.   The terms of the UNDERTAKING relating to confidentiality are annexed to this form.

2.  In accordance with the above-mentioned UNDERTAKING the EMPLOYER is obliged to ensure that all its employees involved in ETSI work have signed a CONFIRMATION FORM in order to confirm that the employee has been informed of the obligations in the UNDERTAKING relating to confidentiality.

3.  I confirm that I am an employee of .the EMPLOYER and that I have read and understood the annexed terms of the  UNDERTAKING.

Date ......................................................................

Signed by ..............................................................

– i –

Confidential Business Information,
Subject to Protective Order