# Exhibit 20

### III. Special Contracts

By M. Gérard Cornu

*Professor at the Faculty of Law and Economic Sciences
of the University of Poitiers*

#### a) Sale

*1. Determining the price*

In order to have a sale, if the price must be determined and designated by the parties (art. 1591 Civil Code), it is not required that the amount be worked out, upon exchanging consents. At that time, the price can still be uncertain, in its *quantum* (amount), provided that it can be determined, as it appears from the general provision of article 1129, paragraph 2 of the civil code. However, according to a constant interpretation, the price is determinable, in the sense of this text, since its subsequent determination must take place "on the basis of the clauses of the contract, through a relation with elements which no longer depend on the wish or desire of one of the parties" (Wording taken by the Chamber of Requests of Aubry and Rau, January 7. 1925, D.H. 25. 57 and renewal, since, except for a few variants: Req. March 11, 1935, D.P. 36.I. 48, S. 35. I.133; Req. 22 of December 22, 1936, S. 37, I. 101; Aubry andt Rau, 6th ed. By Esmein, § 349, text and note (34-2); *adde*: Baudry-Lacantinerie and Saignat, I. XIX, numbers 132 et al; Planiol, Ripert and Hamel, t. X, No. 36). All at once, the manner for calculating the price must be determined, from the beginning among the contracting parties and in this equation, the unknown must be independent from their later wish or desire. Once chosen, the process for evaluation must play out like an objective mechanism (except for the valid recourse to arbitration by a third party: art. 1592, Civil Code).

Such conditions are met – and the sale is complete – when for instance, the price of a promise to sell must be determined according to the official index of the cost of living on the day that it is implemented (Poitiers, Nov. 17, 1943, D. A. 44, 28; see in the same sense, Req. of Dec. 22, 1936, prec.; Lyon, October 6, 1958, D. 58.758, note J.C.), or when the amount to be paid must be obtained from a simple arithmetic calculation (that of the area in the sale per m2 of a lot designated in its adjacent plots of land, Req. July 4, 1848, D. P. 48. 5. 364; see Req. of March 11, 1935, préc.)

On the other hand, the price is not adequately determined, when it cannot be calculated without a new appreciation by the parties. This explains why the Court of Cassation has censured the decree that had been issued for an agreement on price, which determination of the latter remained conditional in the future, "by the acceptance by the buyer of the preferential rate which would be granted by the seller and which would be established in good faith between them according to clearly specified conditions". Under such conditions, the price could not be determined objectively but remained up in the air by a later understanding between the parties (*Com. March 24, 1965, Gaz. Pal. 65. 2. 22, D. 65. 474*).

Anyway, when things appear very simple, some discording decisions bring out the necessary nuances.

Reasoning first of all in connection with this case, when setting the price is given up to the *unilateral wish or desire* of one of the parties, cancellation of the sale goes into full effect on the grounds that the pleasure of a single party cannot make the law of the contract (from where one finds the nullity of the obligation under the potestative condition, art. 1174 civil code). There is no sale if the price is at the seller's discretion (Pau, July 9, 1888, D. P. 89. 2. 62; Com. February 11, 1957, *Bull. Cass*. 1957, III, No. 49, p. 42; Com. October 23, 1962, *Bull. Cass*. 1962, III, No. 420, p. 364). Conversely, the combination is leonine, if the buyer is the sole decision-maker of the price (Com. May 5, 1959, D. 59. 575; Trib. Corr. St.-Sever, March 23, 1900, D.P. 1903, 5. 779).

Here or there however, opposing decisions meet: a validated promise to sell, even though its price depends to a large extent, of the wish or desire of the beneficiary: Com. November 4, 1952, *Gaz. Pal*. 53. I. 84, Rev. 53. 341, Carbonnier observation); a sale considered complete and perfect, even though

the amount was left up to the Seller's decision (Douai, March 15, 1886, D.88. 2. 37). One will say, undoubtedly at least for the first decree, that setting the price was not discretionary on the part of the buyer (the purchase price of the goodwill depended on the prices that it was using for its own products). It is mainly notable that in both cases, the judges had estimated as normal the prices used by the buyer and the one asked by the seller, as if the courts assumed a type of moderating power, based on a control of the price and the respective good faith of the parties (such a power is only designed for an isolated operation or a closed operation, not on a staggering of projected operations). Coming back to our assumption, if one assumes now that setting the price depends no longer on a single contracting party but as in this case, on *implementing a new agreement* between them, nullity is also firm in its principle. In the absence of an agreement for the price, (art. 1583 civil code), the complete and perfect sale is missing a component which the judge cannot provide, especially when the time arrives, he would have to reduce a divergence of appreciation between the parties (Com. February 28, 1962, *Bull. Cass*. 1962, III, No. 136, p. 110: see Civ. January 28, 63, *Bull. Cass*. 1963, I, p. 54). A price to be discussed is not a *pretium certum*.

Here again, however, a decision gives a supporting note, by keeping as determinable a negotiated price within an agreed maximum (Req. February 14, 1927, D. 28. I. 80). However, the existence of a legal or conventional ceiling does not suffice in general, to save the operation (See Com February 11, 57 and Octob 23 62, préc.). But in 1927, it involved appreciating the responsibility of a power supplier who alleging the uncertainty of the price, had cut power to the consumer (a plant). Here again, there is a nuance: it is within the contentious matter of the abusive break that courts can exercise a certain moderating power as stated above, because there may be fault in breaking up advanced negotiations under certain circumstances, (for instance, an engagement would be an example !). On the other hand, the judge is powerless for an action being implemented, if he cannot complete an incomplete agreement with by an element of his own. In this case, the buyer was asking for damages for breaking an agreement which in reality was an exclusive sales agreement, but the details are missing to know whether in the field, circumstances would have justified damages (see J. Guyenot, Etudes juridique et économique des conventions d'exclusivité de vente / Legal and economic studies of exclusive sales agreements, Dr. soc. 1965, p. 78 et al, see on the other hand, the topic example which in terms of a promise to sell gives a degree of the *First Civil Section*, *May 11, 1965, D. 65. 629*).

### b)  Lease Agreement

2. *Grounds and conditions for a tacit renewal*

*The First Civil Section* points out that "it is based on a presumption of wish or desire of the parties" (*March 31, 1965, Gaz. Pal. August 28-31, D. 65. 472*). This voluntary basis is almost a redundancy, for a renewal which by definition, is a new leasing contract. Historically, it was for the owners above all a reassuring postulate always active by its consequences in their favor (since then, they have witnessed other disillusions).

At the base – and as if the individual wish had eclipsed the law – a specification is missing though: it is that the Civil Code establishes the presumption of tacit renewal according to given facts: the continuation, by the tenant, of its enjoyment after the expiration of the written lease agreement, and on the part of the lessor, the absence of opposition (art. 1738, 1739, 1759, Civil Code). There would certainly not be any motive to keep this legal presumption – fully interpretive – as undeniable (it is *juris tantum*; see already Pothier, Louage / Renting, No. 343). But one could have believed that to prevent the tacit renewal from taking place, the text forced the lessor to send to the lessee, not a formal notice with a customary deadline, but at least a reminder (arg. Art. 1739 Civil Code).
One knows that the requirement of a formal protest has not been retained: since the 19th century, it had been allowed that in the absence of a notice-reminder of art.. 1739, it was up to the judges to appreciate sovereignly which, in the conduct of the lessor, contradicted a presumed consent to renew the lease (Baudry-Lacantinerie and Wahl, Louage / Renting, I, No. 1416; Planiol, Ripert, Givord and Tune, t.X, No. 627l Req. February 9, 1875, D.P. 76, I, 27; in this case however, there would have been a formal refusal of renewal on the part of the lessor; Civil Court of Grenoble, Nov. 5, 1952,

J.C.P. 1953, 7352, Givord note). Another shift – which was in fact the reversal of presumption – took place when a decree seemed to allow that the tacit renewal assumed for the lessor, more than an abstention, more than a passive attitude: a positive manifestation of wish or will, an active adherence to renewal ( Com. February 1, 49, *Rev.* 50. 72, Carbonnier obs.).

One hesitates to situate this decree or decision in this last line. To object to the renewal, it sufficed that the lessee leave without response and without reaction a request to increase the rent, coming from the lessor. By law, must one understand, with the Court of Appeals that the "tacit renewal assumes the establishment of an agreement between the parties about the terms and conditions of the lease" (which is evident, in the case of an original lease) or, according to the rather ambiguous wording of the supreme Court "that in the absence of the lessor's wish or will, the tacit renewal could not take place"? In any event, there must be a certain benevolence to appreciate, in fact, either a disagreement in price, or a wish or desire of non-renewal, a request for a rent increase made three years before the expiration of the lease, and never reiterated (the lease had been granted for 9 years in 1940: see for a patent disagreement: Paris, April 11, 1946, D. 46. 228).

However, this case teemed with virtual developments. One could not seriously reproach a lessor for having continued to collect the rents after its vain complaint, and even until 1953 (4 years after the expiration of the written lease). Collection of the rents, at least after written notice does not imply in itself, consent to a new lease (Soc. January 6, 1949, J.C.P. 49. 5041; Aubry and Ray, by Esmein, *op. cit*. § 369, note 22-2). On the other hand, something had to be derived from the fact that from 1953 to 1959, the rent had not be paid nor demanded. Assuming that the first renewal had been accomplished, how could the second one have taken place in 1958 while such disinterest seemed exclusive, *on both sides*, of any wish or will to renew: for one, an act of simple tolerance, for the other, de facto occupancy, without any legal claim (something like an intervention in title, but in the sense of an abandonment, see art. 2258 Civil code, the theory of possession is not far away) ?

Leaving aside searches of intention – appeasing but deceiving – one could have found support in other arguments. Because the tacit renewal does not have a voluntary foundation. It is also based on customs, that of terms and conditions among other and on the difficulty of finding a farm or a house, after Saint Martin or Saint John (it is the loss of an opportunity in the game of supply and demand; see Aubry and Ray, by Esmein, *op. cit*., § 369, note 19-5; Carbonnier, obs. préc.). But, if it had been a bare lot, and for this type of opportunity, there is no customary term.

### c) Ordinary Lease

3.  *Application of the express termination clause due to non-payment of the rent, when its amount is contested*

In the leases submitted to its authority, the law of September 1, 1948 has tempered the rigor of the express termination clause, by instituting a grace period which the interim relief judge can grant under the conditions of art. 1244 of the Civil Code (art. 80, paragraph 3, I. September 1, 1948, comp. for the common law; Civ. July 2, 1860, D. 1860, I. 284; Req. of June 7, 1926, January 30, 1928, D.P. 28. I. 63). It is also required that the tenant request such measure within one month from its notification by the lessor (*eod. loc*.). Deferred, not defused, the mechanism of the termination conditions keeps its bite with a delay. Once the one- month period has passed, without complaint or settlement by the tenant, the termination is implemented outright and irrevocably. Whether approached by any of the parties, the judge no longer has the faculty of appreciation nor the power to grant a delay. Once the accomplishment of the condition (art. 1183 civil code) is observed, he must declare the produced effect (termination is a fact) and draw the consequence (order expulsion, subject to considering the urgency, if he renders a summary judgment).

The opposite practice of grace periods, following a late objection, had already been condemned (Civ,. July 29, 1952, D.52, 744, S. 53, I. 100). *La Chambre Sociale (March 25, 1965, Gaz. Pal. 65. 2. 43)* approves today the Court of Aix for having following the hard line which is indeed within the logic of commissoria lex, as designed at present, in terms of lease or sale (V. Givrod and Tune, No. 595 and Hamel, No. 165, t. X, Planiol and Ripert; see Com. February 22, 1965, *Gaz. Pal*. October 2-5, 65).

It is true that the Supreme Court itself shows benevolence when the rent amount is the object of a serious objection, to excuse a tenant, and in his lateness of paying in full and when overlooking a deadline request. For this type of dispute, a decree had to grant that the application of the termination clauses remains subordinate to the good faith requirements, in accordance with art. 1134 of the Civil Code (Com. January 7, 1963, *Bull. Cass*. 1963, III, page 14; *adde* Soc. January 16, 1953, D. 53, Somm. Page 63; see Soc. February 13, 1964, *Bull. Cass*. 1964, IV. 107). Upon expiration of the term, it appears that the courts assume, by exception, in this case, the last resource of a "relief" from termination, in favor of the tenant who is not responsible for the delay.

At first sight, the tenant in this case would appear to have merited such an indulgence. He had maintained that the rent was unlawful, according to the words even of the expert designated by the judge. When looking closer though, the *relaxatio legis* introduced by the cited decisions, is based on a deeper analysis of the respective conduct of the parties: the courts only refuse effect for the termination clause when they notice in the objection to the rent amount, exonerating elements for the tenant, such as: an error on the part of the lessor (for instance, demand a higher amount from the tenant without giving the opportunity to check it; see in this case the judicial termination: Civ. 1st, October 21, 64, *Gaz. Pal*. 64, 2, 456) and for the tenant, the certain wish or desire to comply with its obligation (a wish or desire, translated through a record, by offers, or even better, by a partial settlement; V. Com. January 7, 63 and Soc. January 16, 53, préc.). However, in this case, the tenant had committed the serious error of not paying twelve rent periods.

Instead of insisting on this decisive fact, the decree states more generally that an agreed rent must be considered as being lawful and remains due as long as a final court decision did not declare it unlawful. In itself, the formula is beyond reproach. In practice, it can mean that the sole issue of a claim is not sufficient to block the termination clause. But the play of the latter must not be unrelenting by the sole reason that the judge of the main issue has not yet decided on the objection regarding the rent amount, as long as in this objection, as we have seen, the lessor can have its responsibility and the tenant its good intention and desire (especially since the interim relief judge cannot settle this serious objection himself nor take it as a reason to suspend the termination condition: Paris, December 16, 1961, *Gaz. Pal*. 62. 2 . 66).

Even if confined like this, will one object that a relaxation of the severity takes place in the general policy of rigidness which the express termination clause traditionally requires ? On the other hand, isn't it excessive that by generalizing these clauses, the courts are in the process of losing all powers which articles 1184 and 1244 of the Civil Code grant them and this at the very moment when the progressive liberation of rents might make them desirable ? Without abandoning in principle the Roman automatism of the express termination condition, for the menacing design of the old jurisprudence (Pothier, *Du contrat de vente*, No. 459; Jur. Gén. V° Louage, No. 335), it is undoubtedly salutary to acknowledge a certain power of appreciation to the judge within the limits explained.

### d) Employment Contract

4. *Notwithstanding the collective agreement, application to the employee of more favorable provisions of the individual agreement.*

Under the condition of preserving social benefits which he enjoyed as a member of the guild, a foreman had accepted in the same company, a lower job. The *Chambre sociale* annuls the decree which had decided after his dismissal, compensations due to the employee had to be calculated, taking into account his actual functions, by reference to the jobs nomenclature defined by the collective labor agreement applicable to the business (*January 25, 1965, Gaz. Pal. 1965, I. 388*).

Indeed, it is a principle that the individual agreement has the upper hand over the collective agreement, to the extent that it is more beneficial to the employee. Technically speaking, the divisibility of the clauses of the collective agreement enables the employee to accumulate advantages

from both sources (provided that they do not deal with the same right). Politically, it is the vocation of the collective agreement of being an instrument of social progress rather than of leveling, a floor or base, not a ceiling: when it guarantees the employee a minimum of protection, it does not prohibit the employer to grant additional benefits. Formally sanctioned by the Labor Code (art. 31 *e, in fine*, book 1), this principle has already been the object of some applications (Soc. November 29, 1945, D. 46 . 188; see March 23, 1953, *Dr. soc*. 1953, page 408; and Soc. November 15, 1957, *Bull*. 57, IV, No. 1060, page 757; V. Brun and Galland, III, 74 and update 1962, page 128; Rivero and J. Savatier, page 245). If they appear rare, it is undoubtedly because in terms of social promotion, collective agreements are taking the lead and individual contracts are rather lagging behind.

Would it be necessary to bring into doubt (with the workers of the first hour) the right of the employer of reserving the benefit of these more favorable provisions to this or that employee of the company ? It appears that the pressure of dissatisfaction reduces, in fact the problem of tolerance of some individual situations and that in any event, the right to complain would only belong to disadvantaged employees without freedom, for the master to come back on his word.

What remains is to ask oneself is why the wording turned to by the Supreme Court is not art. 31 e of the Labor Code but rather art. 1134 of the Civil Code. There was indeed a violation of the given word and the promise of the employer appeared from its correspondence, rather than from a labor contract stipulation. This might be a reason to find the ground for a common law decision. Unless the special provision of the Labor Code has been treated by preterition as a pure and simple application of the principle of autonomy stated in article 1134 of the Civil code ?

For the time being, no one will exaggerate here the preeminence of individual wish or desire, because it is above all the preeminence of the most favorable provision which is established by the Labor Code, at each degree of hierarchy of the standards between the law and the collective agreement (art. 31 a, paragraph 2, book 1); between the national agreement and the regional or local agreements (art. 31, paragraph 2); between all the prior ones and the establishment agreements (art. 31, paragraph 3). From a lower standard, improvements can arise freely, as being foreign to the imperative nature of the higher standard. Then, one remembers that on the other hand, the transient social law, tempering the immediate effect of the new collective agreements for the contracts in effect, watches over maintaining the advantages acquired, with success, once and for all (V. Camerlynck, La clause de maintien des avantages acquis dans les conventions collectives /The clause of maintaining benefits acquired in collective agreements, *Dr. Soc*. 1959. I. 406; see about the difficulties following the denunciation or non-renewal of a collective agreement: M. Despax, *Dr. Soc*. 1965, page 387)). And one must admire, under the arrangement of these two mechanisms, this right certain of its path, which can always move forward but is hard to turn back, for which anything that is possible is good, and one sees immediately where the symbol is – open progress – and where is the security, irreversible progress.

### e) Company

5. *Non-Invocability against the company, a corporation, of a decision taken unanimously by its founders.*

After having put in place a company governed by the law of June 28, 1938, for the creation of a real estate entity, the founders agree to amend, to their benefit, the articles of association. They eliminate the clause which ensures equal rights to all shares, in particular with respect to the attribution of lots, and they adopt a mode of distribution which favors their own group of stock at the expense of another group distributed among the public.

To cancel such a decision, it would have sufficed to refer to the bylaws which subordinated their amendments to a proposal by the manager and to the agreement by all partners. However, the founders had excluded from their deliberation not only the manager but also new partners, holders of stock acquired before such moment. The *Court of Paris* has retained this ground of nullity (*February 1, 1965, Gaz. Pal. 1965, I, 206, D. 65, 564, A. Dalsace note*) and it was right to consider overall as

partners, beneficiaries of reciprocal promises to sell (see Paris, March 11, 1964, J.C.P. 65, 14169, M.F.P. note).

However, other reasons confer to its decree a more general scope: the amending act (under private deed) is declared *incontestable* for the sellers of stocks as well as for the company itself (at least until the day – considerably later – when a certain date had been reached, by its filing among the original documents of a notary).

Consequently, article 1328 of the Civil Code forms the king pin of the argumentation and the latter finds in it, without contradiction, a legal ground. Indeed, since civil companies, at least those that do not take on a commercial form, are not subjected to any legal publicity (not for their creation, nor for the subsequent decisions by the partners), common law fills in by vocation the gaps of special law. Opposability to third parties only is for the records which have reached a certain date under the terms of article 1328 of the Civil Code (without forgetting, on their part, the rules of property announcements). To introduce art. 1328, the Court has even taken the detour of art. 1834 of the Civil Code – duplicate of art. 1341 of the Civil Code in terms of companies – which requires written evidence "about whatever might have been alleged before, at that time of and since " the corporate deed(see confirmed judgment: T.G.I. Seine, January 16, 1963, *Gaz. Pal*. 63. 2. 79).

The principle being admitted, application of art. 1328 assumed however that the company would be treated as a third party, regarding the litigious act. For that purpose, the Court of Paris has first reaffirmed the corporate entity of the civil company, a reminder never unnoticed for a principle more than fifty years in existence (Req. February 23, 1891, D. 91, I. 337; March 2, 1892, D. 93. I 169; Civ. November 22, 1911, D. 1913. I. 83). Nor was it sufficient to recognize the company as an entity distinct from its members. It had to be shown that it had remained foreign to the act, that it had not been represented in it. Absence of some partners from the meeting of the founders could be an argument in this sense. It is remarkable that other facts have been decisive: the absence of the manager who by himself, represents the company and the lack of mentioning the deliberation in the register containing the minutes of the meeting, which prevented that "it was brought to the attention of the company". Beyond that, these elements of an organic and formal nature, adopt a general value it seems, as principles of order in civil companies, and this is not a negligible point of view for a type of company which neither the law, nor the agreement often, consider as a complete organization.

At the time when the development of civil companies amplifies or takes hold in the most varied of areas (real estate, agricultural, professional civil companies), the commented decision represents a sound alarm which points out the need of subjecting civil companies to an adequate publicity. This wish to the legislator must in any event be accompanied by a salute to the courts. Because it is precisely in their mission of mobilizing the common law resources and those of reasoning, when regulations are missing and when one might think that, even after the institution of a legal publicity, their vigilance will not be superfluous, to unmask fraud and to introduce what is required of a judicial police force in the fuzziness which civil companies enjoy. Even when they will no longer be, for the law, the poor parents of commercial companies, the civil companies will remain undoubtedly the cherished offspring of jurisprudence.

### f)   Life annuity

6. *Burden of the judicial pension increase, in case of a sub-transfer by the payer of an annuity, for the building acquired as counterpart*

In the chase of measures of revalorization and the increase of the cost of living, the law of February 23, 1963 (adding an article 2 *bis* to that of March 25, 1949) perfects the means for reducing the discrepancy. For a period, it provides the recipient of an annuity, the faculty of showing in court that the building transferred or alienated as counterpart for the pension has earned, as a result of new economic circumstances, a value increase that is higher than the legal valuation and permits the judge to grant him – up to a certain ceiling – an increase that exceeds the legal lump sum (V.Y. Bechade, J.C.P. 1963, I. 1800).

Is the payer of the annuity allowance required to bear the full burden, when he has resold the building ? That is a point that the law, being detailed after all, does not decide. Between "successive payers of an annuity allowance", it distributes the weight of the increase according to the profit of each in the increased value of the building (art. 2, paragraph 3 and art. 2 *bis, in fine*). But in itself, the sub-transfer or sub-sale of the building does not impact the pension service (it does not bring novation by changing the payer, nor does it add a payer to the other). The sub-buyer only becomes payer by virtue of a special stipulation to which the recipient must give his consent. French law does not allow the sale of debt, without the approval of the creditor / recipient (Planiol, Ripert and Radouant, I, VII, Nos. 1106, 1141 et al; Carbonnier, Théorie des obligations / Theory of obligations No. 210; Civ. March 12, 1946, D. 46, 268), nor *a fortiori* against his wish.

In a case where the recipient had given a formal refusal, it is rightly so that the *Court of Paris* (*February 16, 1965, Gaz. Pal. 1965. I. 386*) has proclaimed the right of the latter to object to a substitution of the payer (a prerogative that is even less contestable than the fact that the person of the payer has greater importance in a contract with successive implementation). Obviously, from that resulted that the sub-buyer, foreign to the debt, could not even partially support an increase of the arrears.

So then, did the whole increase of the allowance be assigned to the sole payer ? The Court of Paris thought so, by deciding that the increased value of the building, in the hands of the sub-buyer, should be taken into account.

After all, there were some reasons for measuring the burden of the payer to its benefit, by only considering the increased value of the property "in his hands". The wording appears in article 2 *bis* of the law of March 25, 1949 and article 2 keeps at least an analogous value, as application of the saying *Ubi onus, ibi emolumentum* (to the point even of leaving the loss, if any, for the recipient).

In any event, it remained to be shown that a payer of a pension allowance must in this quality, assume the full burden of all subsequent pension increases. One must admit for legal increases that their lump sum feature makes them indivisible. But a judicial review has more exact measures (comp. R. Savatier, La loi of March 25, 1949, J.C.P. 40. I. 767, Nos 9 and 10). To give it up, one must have a stronger reason than that of Ubi onus … Justice. It becomes necessary to assume that the credit of the pensioner is not only revisable, like a maintenance allowance, but that it includes a right to integral revalorization, opposable to the payer of the annuity in all its developments and for any event. The chances for revalorization are in other words assimilated to the guarantees of solvency: the payer of the annuity must not diminish them in any way by his / its own doing (even without error).

Considering the interests rather than the rights, the Court of Paris remembered that the judge had to take into account the "social and family interests present" to set the increased rates (art. 2 *bis,* paragraph 2, l. March 25, 1949). It pointed out that if the original payer had kept the annuity burden, the sale price had been established consequently and would have permitted it, as reinvestment, to acquire another property and the added value would have gone to him / it. One could ask oneself whether such considerations enter in the cannons of the law and if, the measures of revalorization were done to redistribute the property added value (which translate beyond the increase of the cost of living, the price of certain lots). But it would be a somber thought and it is always ungracious to argue against the recipient of the annuity, by reasoning about a decision which undoubtedly was based on fairness.

Gérard Cornu