# Exhibit 25

**Recueil Dalloz 1996 p. 13**

Non-determination of price in long-term contracts: from nullity to contractual responsibility (a radical shift by the Supreme Court of Appeal)

**Laurent Aynès**

NOTE

By these four rulings handed down on the same day, the Supreme Court of Appeal in a plenary session firmly anihilated more than twenty years of questionable jurisprudence, which had led distribution law to a dead end. Prepared by two precursor rulings of the First Civil Chamber (1), this event was expected (2). It erases the past (I), marks the present (II), and prepares the future (III).

I. - *Past*. - The state of positive law just prior to the Plenary Session rulings has been widely commented upon, sometimes with approval (3) but most often with criticism (4). It is described in the conclusions of chief general counsel M. Jeol, reported above. Reduced to its essence, the praetorian construction inaugurated in the 1970s is based on two affirmations:

- *Firstly*, the price must be set at the time when the contract is entered into. If this cannot be done, because it is variable, the parties must agree on a price-setting method that does not make it dependent on the will of one of the parties. For instance, when it is subject to the workings of an economic index or if the parties resort to an expert who will act as a mutual agent (civ. c., art. 1592). However, any reference to the creditor's future rate or a market price that only the creditor can declare makes the price undeterminable.

The rule does not only apply to sales pursuant to civ. c. art. 1591; it relates to all contracts generating an obligation to pay either directly (5) or by means of implementation contracts which they prepare. In which case it is based on civ. c. art. 1129, which comes under general contract theory.

Only obligations to pay in exchange for an activity escape this requirement, such as in contracts for services and agency contracts: the parties may have left determination of the price to an agreement coming after signature of the contract; if they are unable to reach an agreement, the courts give themselves the right to arbitrate the price (6).

The meaning of this jurisprudence is clear: what hounds the courts is not the non-determination of the price in itself, because cancelled contracts generally include an agreed process. Consequently, the judge does not have to choose between two evils: to find that the contract is lacking an essential component, preventing if from governing the parties, or to take the place of the parties and, in their stead, fill a void in the contract. In reality, what the courts do not accept is the price determination process, the fact that it is set unilaterally.

- *Secondly*, non-determination of the price, understood in this sense, is sanctioned by the contract being null and void. This is an absolute, automatic, and abstract nullity which does not take into account the

actual implementation of the contract and, in one stroke of the pen, obliterates all contractual relations which the parties have had, often over a long period of time (7).

This massive jurisprudence has not modified practice to much degree, because it imposes a requirement that is impossible to meet and claims to counter a danger that does not truly exist. As often observed by trial judges, nullity due to non-determination of the price is a pretext invoked after the contract has ended in order to escape subsisting obligations having nothing to do with the price, which is accepted without difficulty during contract performance (8). The admirable principles invoked—fairness, utility, bilateral essence of the contract (9)—are made to serve the defense of special interests.

Sensitive to these criticisms, the First Civil Chamber turns the page on 29 November 1994 (10): the reference to the supplier rate makes the price determinable; an end is put to litigation relating to the issue of nullity. All that remains is that of the execution of the contract if it turns out that the supplier abuses the exclusivity from which it benefits in increasing its rate in order to gain illegitimate profits from it, which would run counter to the duty to execute the agreement in good faith. The solution, though clear (11), brings up various questions: some only see in it a poorly reasoned traditional ruling (12); others, a reluctance to sanction (13).

These four rulings of the plenary Assembly confirm and clarify the solution adopted in 1994 by the First Civil Chamber.

II. - Today. - The clear message that the first attorney general is pressing the Court of Appeal to initiate lies (1) in what it decides and (2) in what it does not decide.

1. Handed down in relation to different cases, these four rulings adopt three complimentary solutions, outlined in order of increasing importance.

a) The first is inherent to framework distribution agreements (14). The price of the implementation agreements, for which the agreement provides the subsequent conclusion, can be undetermined in this agreement without affecting the validity thereof. The process of fixing future prices will be litigated in relation to contractual performance, which is to say liability (indemnification) or termination (for failure to perform). The framework agreement can be mute on future prices, or it can expressly provide for the fixation thereof by the supplier. It is valid without the judge having to verify that the price of the implementation agreements can be freely negotiated and agreed upon by the parties.

These rulings therefore restore the originality of the framework agreement (15). The present case clearly involves rental/maintenance agreements for a telephone installation. Articles 1709 and 1710 civ. c., relevant to rental of objects and labor, are referred to. And yet these two texts do not contain any particular requirement with respect to price. The stipulation of a price is merely an element of the definition of these contracts, as for the majority of contracts in return for payment. By combining these texts with articles 1134 and 1135 civ. c., the Court of Appeal gives the solution a general scope: when implementation agreements must include a price, it is not necessary that the framework agreement take the method for the determination thereof away from the power of one of the parties. The practice of distribution agreements (concession, franchising, supply...) is thus rid of a threat: the supply at the

rate of the supplier can be exclusive. Possible abuse in the fixing of prices is now governed by the rules on contractual liability.

b) The second solution (16) relates to the method used to set prices, consisting of referring to the supplier's future price list. The Court of Appeal rules that this process "does not affect the validity of the agreement." In other words, the reference to the future rate practiced by one of the parties is a process that is inherently lawful. The Court of Appeal could have been content to apply the previous solution: the franchise agreement is in fact a framework agreement. The ruling therefore goes further, it seems: a party can be granted the right to set the price later. If it abuses this right, the sanction will consist of the termination of the contract or the indemnification of the debtor of the price. The ruling therefore does justice to a would-be "bilateral essence" of the contract, which actually confuses unilateral and arbitrary. Nothing stands in the way of the parties agreeing to entrust one of them with the future setting of the price. The rules of contractual liability are sufficient to protect this trust.

c) More radically still, the third solution (17) should set aside once and for all the issue of nullity for non-determination: article 1129 civ. c. is not applicable to the determination of the price. This can have two meanings: article 1129 relates to all kinds of items except for sums of money (18). More radically, it is to the "determination of the price" that it does not apply: by even admitting that the price is an item in terms of article 1129, this text does not require that it be determined or determinable, failing which, the obligation is null and void. And yet, article 1129 has been the basis since 1978 for the majority of decisions to void. The turnaround is complete.

2. On the other hand, these four rulings neither sanction the setting of prices by the judiciary nor the advent of the "fair price."

*a)* The Supreme Court of Appeal first rejects the false alternative presented by some (19) between nullity due to non-determination of the price and court-ordered determination of the price. The parties may validly agree to leave the determination of future prices to one of the parties. The implementation of this conventional method can be checked by the courts.

This check comes under the traditional rules of contractual responsibility. The debtor of the price, claiming to be a victim, must therefore establish that the supplier has committed a wrongful act consisting of a abuse of the right to set the price granted in the contract. The judge's role is to evaluate the wrongful act, the loss, and the link of causality between them, and, when the victim takes termination action, to make sure the requirements of civ. c. art. 1184 are met. The discovery of an ideal price meeting the requirements of contractual fairness is only one stage in assessing the supplier's conduct.

The judge's office in our matters therefore differs profoundly from what it is in contracts for service or agency contracts: if the parties have not previously determined the price, the price should be agreed on between them once the work is done, since neither one has the right to set it. If they do not reach an agreement, there is no other way than to have the judge do it. The judge then focuses on the value of the work without any special consideration for the parties' behavior (20).

This distinction between checking and setting a price by the court naturally reflects back on the role of the Supreme Court of Appeal: in matters of responsibility or termination, this court assesses the process followed by the trial judge (characterization of the wrongdoing, the loss, the link of causality, etc.), while the determination of a price, by its very nature, escapes legal control.

The distinction between these two roles of the judge in matters of price, moreover, is common in positive law. When a contract governs the parties without one party being entitled to determine the price, the judge is charged with setting it if there is no agreement: for example, in matters of expropriation (21) or rent of a residential lease (22). If, however, one of the parties is entitled to impose the price, the judge only exercises a right to check, making it possible to thwart unfair contractual performance (23).

*b)* Nor is the purpose of the judicial check to impose a return to a "*fair price*" or an "objective" price, any deviation from such a price necessarily constituting bad faith on the part of the supplier. The question has been debated before the Supreme Court of Appeal and decided fairly: it is the "*abuse in price setting*," and not the excessive price, which is condemned (24). The supplier is free to set the price. Even when a market price exists, which is not always the case, and the judge is able to discover it, nothing allows one to think that the parties intended to refer to it. Such an approach flies in the face of the concrete assessment which civil responsibility involves. The market price is one element among many which make it possible to determine the supplier's responsibility (25). In general, when the judge checks the exercising of a unilateral right to set the price, the judge does not strive to discover the objective value of the item but rather the fairness of the contractual process (26). There may be multiple legitimate reasons for deviating from the so-called "objective" price.

It is therefore henceforth accepted that the setting of a future price may be assigned contractually to one of the parties. This sign of confidence (27) is the source of an obligation of fairness which is consistent with a spirit of collaboration in long-term contracts (28); flexibility in contractual responsibility, in conjunction with a development of the duty to carry out the contract in good faith, makes it possible to sanction the it effectively.

III. - *Future*. - the future will tell what use the courts will make of the checking power given to them by the Supreme Court of Appeal. For the time being, we can attempt to delimit its scope of application.

The new rule obviously applies to master contracts, whether it includes a supply obligation, be it exclusive or non-exclusive, or an obligation to resort to the supplier for the provision of a future object (rental) or work (service).

However, since it is deemed that the contract may leave future price setting to one of the parties without the validity thereof being affected, the new principle, it seems, aims to govern all contracts. Only a legal provision obligating the parties to set the price at the time of conclusion of the contract and subjecting future revisions thereof to mandatory requirements could keep it in check (for example, rental agreement for a dwelling, employment agreement or insurance contract)(29). But while the law does not obligate the parties to set the price and does not limit their freedom with respect to

subsequent changes, nothing prohibits them from relying on one of them [to set the price].  This is so in a loan agreement with interest and even in a sales contract.

In the case of a loan with interest, article 1907, al. 2, civ. c., together with the provisions of article L. 313-2 consumer code, obligate the parties to set the rate of conventional interest in writing. But nothing prohibits them from freely agreeing upon a change to this rate. Therefore, the ousting of article 1129 civ. c., on which the previous jurisprudence for prohibiting reference to the basic rate of the lender had been based, should lead to the abandonment of the old solution: subject to the fulfillment of the formal rules, the reference to the future basic bank rate has become lawful; but the abusive application thereof will entail contractual liability on the part of the lender(30).

With regard to sales, there is a special text, article 1591 civ. c., according to which "the sales price must be determined and designated by the parties." The first requirement must be understood in light of the reported rulings: the price is determined – determinable in any case – when the parties agree in a definitive manner to the method for setting thereof. The second rule obligates the parties to indicate what the agreed-upon price is. This requirement is also satisfied when they indicate the method that will be used to set the price(31). If all of the elements of the sale exist at that time, there is no reason to entrust one of the parties with the later setting of the price. On the other hand, this type of determination may be of interest when the price setting is subject to future elements as of yet unknown at the time of the conclusion of the sale (variable price as a function of the profitability of the item, market price, sale of a future item...). In these cases, the threat of nullity could very well be dismissed in favor of an action based on contractual liability or on resolution for non-performance(32).

The Court of Appeal now prefers specific control of the performance to the abstract and ill-adapted method of nullity. These rulings, handed down in plenary Assembly, mark a decisive turning point in the relationships between the court and the contract: today, the function of the court focuses on how the creditor uses the rights given to him by the contract. It is the law which states the conditions for assessing whether it has been properly executed. It is the court's role to assess whether it has been executed in accordance with contractual good faith.

**Keywords:**

CONTRACT AND OBLIGATIONS * Object * Price * Non-determination of price * Future service * Exclusive supply

**(1)** Cass. 1re civ., 29 nov. 1994, Bull. civ. I, no. 348 ; D. 1995, Jur. p. 122, note Aynès ; RTD civ. 1995, p. 358, note J. Mestre ; JCP 1995.II, n° 22371, note J. Ghestin ; Contrats, conc., consom. 1995, no. February, no. 24, note L. Leveneur.

**(2)** L. Aynès, Non-determination of price in distribution agreements: how to resolve the impasse?, D. 1993, Chron. p. 25 ; L. Vogel, Plea in favor of a turnaround: against the obligation of price determination in distribution agreements, D. 1995, Chron., p. 155.

**(3)** J. Ghestin, Reflections on the area and the basis of nullity for non-determination of price, D. 1993, Chron. p. 251, reproduced in Treatise on Civil Law, The Formation of the Contract, 3rd ed., no. 712 s.; J. Ghestin and M. Billiau, Price in long-term contracts, LGDJ, 1990, no. 31. However, this author also approves of the opposite solution: previous note, JCP 1995, II, no. 22371.

**(4)** Collart-Dutilleul and Delebecque, Civil and Commercial Contracts, 2nd ed., no. 147 ; Malaurie and Aynès, Special Contracts, 9th ed., no. 837 ; M.-A. Frison-Roche, The choice of cancellation as a sanction for the non-determination of price, Petites affiches 1993, no. 147 ; M. Béhar-Touchais, The structure of the distribution framework agreement and the non-determination of price in implementation agreements, JCP 1994, I, no. 3800 ; L. Vogel, previous page; L. Aynès, previous page and viewable in Cass. com., 5 Nov. 1991, D. 1992, Abstract p. 266.

**(5)** Example: the loaning of money for interest.

**(6)** See lastly; Cass. 1re civ., Nov. 24, 1993, *Bull. civ.* I, n° 339; *RTD civ.* 1994, p. 631, note P.-Y, Gautier; *Contracts, conc., consom.* 1994, February iissue, no. 20, note L. Leveneur.

**(7)** See lastly, Cass. com., Apr. 5, 1994, *Bull. civ.* IV, no. 147; Nov. 8, 1994, *ibid.* IV, no. 331,

**(8)** See for example, about variable interest rates, T. com. Nanterre, Oct. 27, 1995, *Barclays Bank versus SA Disimex*, not published.

**(9)** J. Ghestin, note and *Treatise supra*.

**(10)** See *supra*, note 1.

**(11)** L. Aynès, note D. 1995, *Jur.* P. 122.

**(12)** L. Leveneur, prev. cit. note

**(13)** J. Mestre, prev. cit. obs., *RTD civ.* 1995, p. 358.

**(14)** Ruling nos. 393 and 395, respectively *Cofratel* (1st cause) and *Cie Atlantique de téléphone* (3rd cause).

**(15)** It had been undermined by the Commercial Chamber's rulings of 1991; See in particular Cass. com., Nov. 5, 1991, prev. cit. ; M. Béhar-Touchais, op. cit., *JCP* 1994, I, no. 3800.

**(16)** Ruling no. 396, *Vassali versus Gagnaire* (4th cause).

**(17)** Ruling no. 394, *Sté Le Montparnasse versus GST Alcatel (2nd* cause).

**(18)** In this matter, M. Jeol, concl. above; Y. Loussouarn, note JCP 1979, II, no. 19034; M.-A. Frison-Roche, Non-determination of price, *RTD civ.* 1992, p. 277 ; *Contra* J. Ghestin, *Treatise*, supra, no. 718.

**(19)** J. Ghestin, *op. cit.*

**(20)** See in particular Cass. 1st civ., Nov. 24, 1993, supra

**(21)** C. expr., art. L. 13-14.

**(22)** L. Jul. 6, 1989, art. 17, *d* and *c*.

**(23)** See note Cass. 3rd civ., Jul. 5, 1995, 3 rulings, *JCP* 1995, II, no. 22528, concl. Weber, note Djigo: notice for the sale of rented housing constitutes an offer to sell to the renter at the price set by the lessor (L. Jul. 6, 1989, art. 15, II). The judge may consider this price by applying the general theory of fraud.

**(24)** See in particular the arguments developed by Me Marc Lévis during his oral pleadings, which opposed any reference to this concept, leading only to rescission due to gross undervalue.

**(25)** M. Jeol, concl. reported above.

**(26)** Comp. Cass. 3rd civ., Jul. 5, 1995, supra

**(27)** On the role of confidence as basis for the compulsory force of a contract, See not. : J. Carbonnier, *Contemporary evolution of contracts*, Journées Savatier, PUF, 1986, p. 34-35: R. Desgorces, *Good faith in contract law*, thesis, Paris II, p. 113 s.; T. S. Attiah, The evolution of English law: from agreement to "reliance" and exclusion of responsibility due to defect in the sale of goods, in D. Tallon and D. Harris, *Contracts today: French-English comparisons*, LGDJ, 1987.

**(28)** On the obligation to collaborate in distribution networks, See L. Amiel-Cosme, Distribution networks, thesis, Paris I, LGDJ, 1995, foreword Y. Guyon, no. 152 f.

**(29)** M. Jeol, concl. reported above.

**(30)** In this sense, **)** M. Jeol, concl. reported above.

**(31)** Mr. Marc Lévis has shown, in his pleadings, that according to the Roman tradition a sale for which no price was determined was merely flawed and could be salvaged by the later addition of the missing element.

**(32)** The First Civil Chamber has already opened the way for the new solution, by replacing the requirement for arbitrarity by the one for unilateral price setting.  Cass. 1st civ., June 28, 1988, Bull. Civ. I, no. 212; D. 1989, Jur., p. 121, note P. Malaurie; RTD civ. 1989, p. 343, note P. Rémy.  See also, Cass. com., Nov. 4, 1952, Bull. Civ. III, no. 337;  RTD civ. 1953, p. 341, note J. Carbonnier, in which the courts carried out verifications similar to those now authorized by the Supreme Court.