# Exhibit 41

Document 1 of 1

JurisClasseur Civil Code > App. Art. 1235 through 1270

Rating: 03, 2011

Up-to-date as of: January 10, 2011

# Section 12: CURRENCY. - Substitutes for currency. - Payment by means of debt.  Book money.  Electronic money.  Payment by means of foodstuffs or merchandise.  Local exchange systems (LES)

**François Grua**

**Professor in the Faculty of Law of Tours**

**Updated by Nicolas Cayrol**

**Professor at the Université Paris 8, Vincennes - St Denis**

**Director of the François Grua Judicial Studies Institute**

## Key points

- 1. -
  Monetary debts constitute a lower quality means of payment than currency itself (See n° 4).
- 2. -
  Book money consists of debt on bankers, but its transfer at end of payment does not constitute a transfer of debt (See n° 38).
- 3. -
  Electronic money is a private initiative with a view to establishing electronic units as a means of payment (See n° 51).
- 4. -
  Payments in foodstuffs occasionally serve to circumvent the rules on currency payments (See n° 67).

## Analytic summery

### I. - Payment by means of a receivable

**A. -  Power to discharge**

    **1° Right of the creditor to refuse payment by means of a debt**

    **2° Absence of the extinctive effect of the transfer of a debt**

      a) Survival of collateral and guarantees related to the debt to be extinguished

      b) Survival of recourse related to the debt to be extinguished

      c) Survival of exceptions

      d) Recovery of overpayment

    **3° Abnormal payment method**

**B. - Impact of the use of a debt on the system of the obligation to be settled**

**II. - Payments by transfer. Book money**

**III. - Electronic money**

**A. - Practice**

**B. - Nature**

**C. - System**

**D. – Innovation of electronic units**

**IV. - Payment by means of foodstuffs or merchandise**

**V. – Local exchange systems (LES)**

**Bibliography**

**I. - Payment by means of a debt for a sum of money**

**1. -** Despite its seemingly magic qualities, fiduciary currency as an instrument of payment is affected by a congenital weakness: it lends itself poorly to being moved. On the one hand, its volume makes large, remote payment inconvenient. On the other, it can be stolen. Hence, many payments have always been made by means of a debt transfer of a sum of money. Instead of remitting the currency to his creditor, the debtor has his debt assigned to a third party. As an intangible asset, a debt is not disadvantaged by volume or the risk of theft. Only the ownership reported for this debt may be misappropriated. And should this occur, it is generally easy to prevent payment by requesting the debtor of the transferred debt to stop payment.

**2.** - Practice has made two great improvements on this very ancient technique. The first was the creation of marketable securities, in particular commercial papers such as bills of exchange and the check. Incorporating a debt into a written format made debts more like currency by transforming them into tangible assets, which gave them the advantages without the disadvantages. The second improvement was affiliating almost all economic agents with a bank. This allowed debt loans pledged as payment between these agents as debts between a few banks, the largest share thus being extinguished by offsetting without movement of funds. These advances facilitated lowering "social cost of payment" and markedly changed the use and acceptance of payment instruments by businesses in France *(V. D. Bounie, J.-P. Buthion et A. François, Une analyse des facteurs de l'acceptation et de l'usage des instruments de paiement par les commerces en France : Rev. éco. fin. janv. 2010, n° 96, p. 187).*

**3.** - However, the ensuing developments tended to show that debts of sums of money and currency cannot be easily conflated. Payments require different rules depending on whether they are made by means of currency or by means of a currency debt.

**A. -  Power to discharge**

**4. -  Inferiority of debts on currency -** A debt on a sum of money never brings to the person to whom the debt is transferred payoff equal to the money itself. It is a less good store of value since it disappears through lapse and offsetting. The recipient of the debt does not have full and immediate control of it as with currency. It is subject to disputes, which could be unfounded. The debt is more difficult to reuse as it cannot be divided, and not all creditors will be paid off by it. Its collection is exposed to the risk that the debtor does not settle with the actual creditor. It should be noted that the precautions that may be required of said debtor shall never give the creditor total security. For all these reasons, debts of sums of money are payment instruments of a lower quality than cash *(Comp. R. Libchaber, Recherches sur la monnaie en droit privé, préf. Mayer : LGDJ 1992, n° 80 : "... nothing prevents a debt from playing the role of currency...").*

In addition, they are not provided with a power to discharge equal to that of currency. On the one hand, payment by means of a debt may not in principle be imposed by the debtor. On the other, the transfer of a debt is not sufficient in principle to extinguish a debt.

### 1°  Right of the creditor to refuse payment by means of a debt

**5. - Principle -** In principle, a debtor cannot impose upon his creditor a payment by means of a debt. This impossibility can be deduced from Article 1243 of the French Civil Code:  *"The creditor may not be forced to receive anything other than what he is owed, regardless of whether the thing offered is of either equal or greater value."*  The object of a debt of a sum of money is a certain amount of currency—i.e. something tangible; therefore, the debtor may not replace this currency with a debt, which is something intangible.

**6. - Application to the check -** Based on this, in particular, the creditor may not be forced to accept payment by check *(Cass. req., 3 mars 1930 : DP 1930, 1, p. 210 ; S. 1931, 1, p. 249, note P. Esmein. - Cass. req., 12 mars 1930 : DH 1930, p. 241. - Cass. req., 13 févr. 1934 : Gaz. Pal. 1934, 1, jurispr. p. 742. - Rép. min. just. n° 2471 : JOAN 16 sept. 1978, p. 5156)*. The check is not equivalent to a currency used as legal tender *(See. Cass. com., 19 juill. 1954 : D. 1954, jurispr. p. 629 ; JCP G 1954, IV, 133. - CE, 12 févr. 1960 : S. 1960, jurispr. p. 131, concl. Kahn ; D. 1960, jurispr. p. 263, note J. L'Huillier. - Comp. Cons. prud'h. Mulhouse, 11 mai 1959 : JCP G 1959, II, 11289, note F.D.)*.

Therefore, merchants can validly refuse payment by checks over small amounts *(Rép. min. just. : JOAN Q, 4 mars 1972, p. 519 ; JCP G 1972, IV, 172. - Rép. min. Economie : JOAN Q, 18 juin 1984, p. 2821, et 23 févr. 1987, p. 1012 ; JCP N 1984, prat. 9082, et 87, prat. 190-4)*.

**7. - Legal exceptions -** Occasionally, the law requires use of checks, transfers or payment cards for payments *(C. monét. fin., art. L. 112-6. - Cf. M. Cabrillac, Règlements par chèques : JCl. Banque-Crédit-Bourse, Fasc. 350)*.

This is the case for payments of more than €3,000 when the debtor has his **tax home** in France or when this involves his **business activity**. However, this threshold increases to €15,000 if the debtor does not have his tax home in France, and if this does not involve his business activity *(C. monét. fin., art. D. 112-3)*. This is also the case, pursuant to Article L. 3241-1, § 3, for the French Labor Code, which refers to Article L. 112-10 of the French Monetary and Financial Code, according to which the payment of **wages** "*beyond the monthly amount determined by decree*" (an amount set at €1,500 in *article 1er du décret n° 85-1073 du 7 octobre 1985, rédac. D. n° 2001-96 du 2 février 20011),* and the payment of all grain deliveries by cooperative producers, regardless of their size *(C. monét. fin, art. L. 112-8)*.

Similarly, the lawmaker requires professionals who belong to a **certified management center** to accept as payment checks made out to them *(CGI, art. L. 1649 quater E bis. - L. fin. n° 78-1239, 29 déc. 1978, art. 86)*.

**8.** - **Agreement** - An exception must also be made for the parties' conflicting intentions. It has been conceived that the creditor be required to accept payment by means of a debt, in particular by check. Such an agreement should be given effect *(TGI Paris, 24 nov. 1961 : Gaz. Pal. 1962, 1, jurispr. p. 140 ; RTD com. 1962, p. 278, obs. Becqué et Cabrillac)*. The agreement may be tacit, but not assumed since the principle remains that the creditor is entitled to refuse this means of payment.

In these cases, creditors may not refuse the means of payment used by the debtor (See *Cass. com., 19 juill. 1954 : D. 1954, jurispr. p. 629)*. But a cash payment made into the creditor's account is not tantamount to a payment by check or by transfer with respect to the legislation that requires this payment method *(Cass. com., 24 janv. 1977 : Bull. civ. 1977, IV, n° 18 ; D. 1977, inf. rap. p. 191 ; RTD com. 1977, p. 339, obs. M. Cabrillac et B. Teyssié)*.

**9.** - **Fees or reduction for the use of a given payment instrument** - In the French Monetary and Financial Code, the agreements on payment methods, and especially those on the "*fees or reduction for use of a given payment instrument*" are the subject of three provisions based on order n° 2009-866 of July 15, 2009. The first rendered null and void the clauses in which service payment providers prohibited their customers from applying fees, or offering a reduction for the use of a given payment instrument *(C. monét. fin., art. L. 112-11)*.  As regards price changes for use of a given payment instrument, the operative principle is that of freedom.  The second requires the payment beneficiary to inform the payer before starting the reduction

payment transaction that he is ready to agree to the use of a given payment instrument *(C. monét. fin., art. L. 112-12, al. 1er)*. The third provision prohibits applying specific fees for the use of a given payment instrument, except "*under the conditions specified by decree made after an opinion issued by the competition authorities in light of the need to encourage competition, and promote the use of efficient payment methods*" *(C. monét. fin., art. L. 112-12, al. 2)*.

**2°  Absence of the extinctive effect of the transfer of a debt**

**10. -  Principle -** In positive law it is established that only the transfer of debt of a sum of money is not tantamount to payment.  The debt to be paid is only extinguished when the debt remitted as payment is paid off in currency.  It has been stated in case-law regarding the transfer of debt that *(Cass. com., 23 juin 1992 : Bull. civ. 1992, IV, n° 245)*: "... the transfer of a debt shall itself not prevail over the extinguishment of the transferor's debt itself owed to the transferee…".

**11. -** It does not matter that failure to cash [a check] is due to an event of **force majeure** (About a payment made by check, *CA Paris, 1er févr. 1927 : JCP 1927, 250. - CA Paris, 19 janv. 1948 : JCP 1948, II, 4195, note H. Cabrillac ; Banque 1948, p. 651, obs. X. Marin ; RTD com. 1948, p. 896, obs. Houin*).

**12. - Remittance of a bill of exchange** - This rule is in line with that required in exchange law in accordance with the issuance of a bill of exchange, which does not prompt novation of the preexisting obligation because novation is not presumed *(Cass. civ., 8 mai 1850 : D. 1850, jurispr. p. 158. - Cass. civ., 28 avr. 1900 : D. 1901, jurispr. p. 17, note Thaller. - Cf. G. Ripert et R. Roblot, Traité élémentaire de droit commercial, t. 2 par Ph. Delebecque et M. Germain : LGDJ, 16e éd. 2000, n° 1928. - M. Cabrillac, La lettre de change dans la jurisprudence : Librairies Techniques, 1974, n° 56)*.

**13. - Remittance of a check** - Similarly, as stated in Article L. 131-67 of the French Monetary and Financial Code: "*remittance by check, accepted by the creditor, does not prevail over novation,*" and as a result *"the original debt remains with all the guarantees that are related to it until the aforementioned check is paid.*"  In other words, remittance of a check is only tantamount to payment on condition it is cashed *(Cass. 3e civ., 1er juill. 2009, n° 07-19.446 : JurisData n° 2009-048933 ; Gaz. Pal. 14 oct. 2009, p. 12. - Cass. 1re civ., 4 avr. 2001, n° 99-14.927 : JurisData n° 2001-009015 ; Bull. civ. 2001, I, n° 102)*. As regards remittance of a check, the lawmaker referred to past case-law *(Cass. civ., 17 déc. 1924 : S. 1925, jurispr. p. 19, rapp. Colin. - Cass. civ., 16 déc. 1931 : D. 1932, 1, p. 38 ; Gaz. Pal. 1932, 1, p. 310. - Cass. req., 21 mars 1932 : DP 1933, jurispr. p. 65 ; S. 1932, jurispr. p. 278. -* See also *Cass. 1re civ., 3 déc. 1991 : Bull. civ. 1991, I, n° 338. - Chr. Gavalda, la présomption de paiement résultant de la remise d'un chèque au créancier : D. 1973, chron. p. 129)*.

**14. -** Even when the law requires the creditor accept a check as payment, the remittance of a check is not sufficient to extinguish the debt *(Cass. com., 10 juin 1963 : Gaz. Pal. 1963, 2, p. 343 ; Rép. Commaille 1964, p. 231, obs. M. Vasseur ; RTD com. 1964, p. 123, obs. Becqué et Cabrillac. - Contra CA Paris, 26 janv. 1925 : S. 1925, 2, p. 97, note Chavegrin* : the remittance of a check constitutes a final payment equivalent to a cash payment.  *- CA Lyon, 28 oct. 1933 : S. 1934, 2, p. 213)*.

**15. - Legal basis** - One can imagine explaining these solutions by the possibility that debt in payment is not paid by the assigned or drawee debtor.  How can an extinguishing effect be lent to the transfer of a debt that may never be settled or bring any payoff to the recipient *(See N. Catala, La nature juridique du paiement, préf. J. Carbonnier : LGDJ 1961, n° 77)*? However, the argument is not convincing.  First, to refuse this extinguishing effect, positive law does not make a distinction based on whether the payment of the remitted debt is certain (this is sometimes the case for a certified check or treasury bills).  Thereafter, if its only a matter of protecting the transferee from the possibility of non-payment by the transferor, it would be sufficient to say that the remittance of the debt is tantamount to the payment of the debt that it is supposed to settle, subject to the condition subsequent of that of this debt (See *Valéry, Des chèques en droit français : LGDJ 1936, n° 346*, for whom the remittance would constitute a conditional payment). Lastly, the transferor's non-payment is not necessarily tantamount to the non-satisfaction of the transferee creditor because in all forms of debt transfer, the transferee receives a guarantee from the transferor.

**16. -** It appears as though the absence of the extinguishing effect is based on the intellectual requirement of the need to match the object of the obligation with that of its payment: the debt of a sum of money is in principle extinguished only by the remittance of this sum, as stated in Article 1243 of the French Civil Code

(Art. referred to in *Cass. com., 23 juin 1992, préc. n° 10*). In this respect, payment by means of a debt appears as a transfer in lieu of payment, a *datio pro solvendo*.

This facilitates deducting that the remittance of debt is clearly tantamount to payment when the object of the obligation to be extinguished is this debt. Thus, a loan of securities can be reimbursed in principle by the remittance of these securities.

The absence of the extinguishing effect is also based on this idea stated above *(See supra n° 4)* that remittance of debt to the payee provides a lesser degree of payoff than that of remittance of currency, even if the payment were assured.

**17. - Scope -** This idea also limits the scope of the rule because sometimes the creditor is paid off with this payment method despite its imperfections. In this case, remittance of the debt is clearly tantamount to payment (within this meaning, *Cass. com., 23 juin 1992, préc. n° 10*). Therefore, this changes from *datio pro solvendo* to *datio pro soluto*. Accordingly, in exchange law, supposing that the issuance of a bill of exchange prompts novation when it stems from circumstances in which stakeholders have agreed to conclude the core relationship, substituting it for the exchange obligation (*G. Ripert et R. Roblot, ibid*. - See also, regarding payments by Dailly forms, *D. Schmidt, La cession de créances professionnelles au regard des articles 107 et 108 de la loi du 25 janvier 1985 : RD bancaire 1987, p. 83*). The extinguishing nature of the remittance of the debt sometimes results specifically from the parties' agreement when the transferee is responsible for collections. This is the key to the factoring system *(See JCl. Banque-Crédit-Bourse, Fasc. 580)*.

**18.** - The sole fact remains that the use of a debt as means of payment does not create the presumption the parties have agreed that this debt remittance is tantamount to payment.

**19.** - Payments by means of a security can be thought of in principle as payment by remittance of something tangible when the debt that they contain is supposed to be incorporated into them. This leads one to think that only the remittance of a security is tantamount to payment, like the remittance of any merchandise. The fact that this solution was never accepted as regards commercial papers demonstrates that the fiction of the incorporation of the debt into the security has not been pushed to an extreme. The right to payment is only seen in debts, not in commercial papers.

On the other hand, if payment is made by means of company shares, which also contain a debt, it seems difficult not to acknowledge that their remittance alone is tantamount to payment, given that the collection is postponed *sine die*.

**20.** - The principle of the survival of the obligation to be extinguished has several practical implications. Many of them have arisen about bills of exchange, but they are not part of the common law of payment by means of a debt and may be extended to other means of debt transfer: Articles 1689 to 1701 of the French Civil Code, transfer by Dailly form, etc. These implications are as follows.

  a) **Survival of collateral and guarantees related to the debt to be extinguished**

  **21. -** The transferee creditor continues to benefit from the collateral and guarantees related to the debt of its transferor debtor, of which they are accessory as long as the debt is not cashed. The same holds true for the right of the seller. It is therefore an error to release a registered security before collecting a check intended to settle a guaranteed debt *(CA Lyon, 25 févr. 1982 : D. 1983, inf. rap. p. 43, obs. M. Cabrillac)*.

  b) **Survival of recourse related to the debt to be extinguished**

  **22. - Rule -** The transferee creditor has two types of recourse available to him. On the one hand, in his capacity as transferee, he has recourse related to the debt he receives. But on the other, since his debt on the transferor survives, he maintains the recourse related to them. These two procedural methods must be clearly distinguished as the rules of jurisdiction or admissibility that concern them are not necessarily identical (on their combination, See *infra n° 36*).

  **23.** - **Applications** - When the assigned or drawee debtor does not pay the transferee or bearer by the due date and for some reason, the guarantee of the transferor or drawer is not in question, the transferee

continues to be able to act against the latter based on his debt, which still has not yet been extinguished (See therefore *Cass. com., 23 juin 1992, préc. n° 10, à propos d'une cession de créance des art. 1689 et s., C. civ.)*. In other words, when a debt is transferred which is to extinguish a preexisting debt, the guarantee that stipulates the law of exchange of the transferor is not particularly useful (See, *C. monét. fin., art. L. 313-24, al. 2*). The transferor remains in any event exposed to the recourse to payment of his original debt.

**24.** - When the debt transfer is void or if the transferred debt is time-barred, the transferee creditor continues to be able to act against his transferor debtor as long as the debt of said transferor debtor is not itself time-barred.

**25.** - When a check in national currency is remitted for payment of a debt of foreign currency just before devaluation of the national currency, the original debt is not completely extinguished and the creditor maintains a recourse against his debtor to recover what he is missing *(CA Paris, 19 janv. 1948 : JCP G 1948, II, 4195, note M. Cabrillac. - CA Chambéry, 28 mai 1956 : JCP G 1956, IV, 150 ; Rev. crit. DIP 1957, p. 462, obs. Y. Loussouarn. - Cass. civ., 17 nov. 1957 : JCP G 1957, IV, 182)*.

**26.** - If the debt instrument sent as payment by the debtor is stolen or drawn on by a third party, this debtor is not released (regarding postal money orders See *CA Lyon, 16 mars 1954 : D. 1955, jurispr. p. 141. - T. com. Seine, 9 févr. 1912 : Gaz. Pal. 1912, 1, jurispr. p. 451. - Cass. com., 30 mars 1925 : DP 1927, 1, p. 168*. - Regarding checks, *Cass. com., 30 janv. 1979 : JCP G 1979, IV, 112 ; RTD com. 1979, p. 782, obs. M. Cabrillac et J.-L. Rives-Lange. - Cass. com., 3 avr. 1990 : RTD com. 1990, p. 614, obs. M. Cabrillac et B. Teyssié)*.

### c)  Survival of exceptions

**27. -** The creditor retains the benefit of the non-performance exception until the remittance of payment is paid.  The seller can therefore refuse delivery until the cashing of the check he received *(CA Paris, 4 avr. 1960 : D. 1960, jurispr. p. 410*. - See also regarding leases, *CA Paris, 25 févr. 1956 : JCP G 1956, IV, 65. - JCl. Banque-Crédit-Bourse, Fasc. 350)*. But he does not have the right to retain when he agreed to be paid by a bill of exchange *(Cass. com., 8 juill. 1997 : D. 1997, act. jurispr., p. 1041 ; JCP G 1998, I, 103, obs. Ph. Delebecque ; RTD com. 1997, p. 654, obs. M. Cabrillac)*.

### d)  Recovery of overpayment

**28. -** When the debt transferred as payment is void and the assigned debtor paid it regardless to the transferee, said assigned debtor has paid both the overpayment and what is owed. He first pays the overpayment, even though he was really not its debtor.  But he also pays what is owed to the transferee as said transferee was really the debtor of the transferor, since his payment also extinguished said debt.  Under these conditions, can we still acknowledge an action for recovery of the assigned debtor against the transferee?  In practice, the question arises in particular for the banker who pays a check issued by his customer despite a lack of sufficient provisions.  In principle, its response is affirmative.  The assigned or drawee debtor or the beneficiary first extinguishes his own debt, that he believes to be valid, and as he believes he was obligated.  If he were mistaken, we cannot see how one can object to the validity of his action for recovery of the debt of the transferor or drawer towards the transferee or beneficiary given that he is an outsider in this relationship (along the same lines see, *M. Cabrillac, Le chèque et le virement : Litec, 5e éd. 1980, n° 242. - Contra M. Vasseur et X. Marin, Le chèque : Sirey 1969, n° 239)*.

**29.** - Civil law doctrine does not provide a clear answer in this circumstance.  This is also true of case-law because in disputes the problem shifts towards conditions of the error or the debtor's absence of fault *(See JCl. Civil Code, Art. 1376 à 1381 ou Notarial Répertoire, V° Quasi-contrats, fasc. 40)*.

### 3°  Abnormal payment method

**30. -** In reorganization or court-ordered liquidation proceedings, Article L. 632-1, 4° of the French Commercial Code holds that payments made during the suspicious period subsequent to payment methods not "*generally accepted in business relations*" are void.  In principle, this expression covers payments made by means of a debt transfer or assignment of receivables *(Cass. com., 4 mai 1960 : Bull. civ. 1960, III, n° 163. - Cass. com., 15 janv. 1975 : D. 1975, jurispr. p. 259. - Cass. com., 19 févr. 1979 : Bull. civ. 1979,*

*IV, n° 66. - Cass. com., 5 nov. 1980 : Bull. civ. 1980, IV, n° 368 ; D. 1981, jurispr. p. 134, note Jeantin. - Cass. com., 6 mai 1982 : Bull. civ. 1982, IV, n° 162. - Cass. com., 6 mai 1982 : Bull. civ. 1982, IV, n° 162 ; D. 1982, inf. rap., p. 513, obs. F. Derrida. - Cass. com., 18 juin 1985 : Bull. civ. 1985, IV, n° 195. - Cass. com., 28 oct. 1986 : D. 1987, somm. p. 52, obs. J. Honorat. - CA Paris, 28 mars 1989 : Gaz. Pal. 1990, 1, somm. p. 186. - Cass. com., 14 déc. 1993 : Bull. civ. 1993, IV, n° 472 ; D. 1994, somm. p. 178, obs. J. Honorat ; JCP E 1994, II, 546, note Y. Guyon. - Cf. F. Jeantin, La cession de créance en période suspecte : D. 1980, chron. p. 309. - D. Schmidt, La cession de créances professionnelles au regard des articles 107 et 108 de la loi du 25 janvier 1985 : RD bancaire et bourse 987, p. 83).*

**31.** - However, this method of payment may be valid if it is generally accepted in business relations of the industry in question *(Cass. com., 30 mars 1993 : Bull. civ. 1993, IV, n° 130 ; JCP E 1993, II, 453, note Y. Guyon ; JCP E 1993, I, 277, 10, obs. Ph. Pétel ; D. 1993, somm. p. 320, obs. J. Honorat. - CA Rouen, 11 oct. 1994 : RJDA 1995, n° 357).*

In addition, Article L. L. 632-1, 4° makes an exception for payments of commercial papers or Dailly forms.

**B. - Impact of use of a debt on the system of the obligation to be settled**

**32. -** Since the creditor agrees with his debtor to be paid by means of a debt, he accepts certain payment methods that can depart from direct payment rules by means of a sum of money *(See F. Grua, L'obligation et son paiement, Mélanges Yves Guyon : Dalloz, 2003)*. Thus, said creditor may have to bear the cost of collection from the assigned or drawee debtor, whereas the debt to be extinguished is payable at the payee's address.

**33. - Payment date -** Similarly, the late payment of the debtor to be paid should be appreciated with respect to the remittance of the debt, though not in terms of the cashing of said debt. Thus, the payment of taxes by check does not expose the taxpayer to late payment penalties if the check is remitted on time (See in particular, *Instr. DGI 13 juin 1973 : BODGI 12A-5-73*). This was also ruled on in insurance contracts, when the beginning of coverage was subordinate to payment of the premium, it was depositing the check, not its cashing that should be taken into consideration (*Cass. civ., 2 déc. 1968 : JCP G 1969, II, 15775, concl. Lindon, note A. Besson ; RTD com. 1969, p. 550, obs. M. Cabrillac et B. Teyssié*. - See also, *Cass. com., 27 févr. 1968 : Bull. civ. 1968, IV, n° 84*, about a termination clause of a lease agreement. - On late payment penalties for the payment of employer contributions for social security, *Cass. soc., 17 mai 1972 : D. 1973, jurispr. p. 129, note Ch. Gavalda ; RTD com. 1972, p. 970, obs. M. Cabrillac et J.-L. Rives-Lange. - Cass. soc., 11 janv. 1973 : Bull. civ. 1973, V, n° 18. - Cass. crim., 22 mars 1973 : Gaz. Pal. 1973, 1, p. 483*. - Regarding a URSSAF payment by means of a recovered bill of exchange, *Cass. com., 30 mai 1985 : Bull. civ. 1985, IV, n° 172 ; D. 1986, inf. rap. p. 329, obs. M. Vasseur ; RTD com. 1986, p. 121, obs. M. Cabrillac et B. Teyssié. - CE, 25 nov. 1968 : JCP G 1970, II, 16337, note M. Cozian ; RTD com. 1969, p. 632, obs. R. Houin. - Contra CE, 4 avr. 1906 : DP 1907, 3, p. 124* : the debtor is only released when the postal money order that he sent is cashed by the creditor. - *Cass. req., 13 févr. 1934, préc. - CA Dijon, 14 avr. 1943 : JCP 1944, II, 2568, note Besson. - CA Paris, 4 nov. 1953 : JCP G 1953, II, 7881, note H. Cabrillac*).

As regards late payment penalties, when the check is sent by regular mail, case-law stipulates the date in which the check reaches its destination and not that of is sending (as regards social security contributions *Cass. soc., 17 mars 1972 : Bull. civ. 1972, V, n° 364. - Cass. soc., 11 janv. 1973 : JCP G 1973, IV, 76. - Cass. soc., 9 nov. 1976 : DS 1976, inf. rap. p. 331 ; RTD com. 1976, p. 762, obs. M. Cabrillac et J.-L. Rives-Lange. - Cass. soc., 20 juill. 1977 : JCP G 1977, IV, 249. - Cass. soc., 26 oct. 1978 : D 1979, inf. rap. p. 273*. - For payment of a commercial rent, *Cass. soc., 4 juill. 1983 : Bull. civ. 1983, V, n° 386. - CA Versailles, 21 févr. 1983 : Quot. jur. 14 janv. 1984*).

**34.** - **Change of the obligation to be extinguished** - Payment by means of a debt sometimes changes the very obligation to be extinguished. This is the case when the due date of the remitted debt is different from that of the debt to be extinguished. It should then be acknowledged that the parties have agreed to changes in said obligation *(See Cass. com., 8 juill. 1997, préc. n° 27)*. Or even if the amount of the remitted debt is different from that of the debt to be extinguished, in principle the parties have changed the object of said debt. The absence of novation (*See supra supra n° 12*) and the survival of the original obligation then becomes problematic.

**35. - Extinguishment of the transferor's debt -** This dependency of the obligation to be extinguished with respect to the debt serving as payment also appears at the time of settlement. It should be acknowledged that the payment of the debt provided as payment does not only extinguish this debt, but also the original debt of the

transferee on the transferor.

**36. - Priority of recourse -** Lastly, payment by means of a debt affects the recourse related to the debt to be extinguished. This debt undoubtedly survives until the debt provided as payment is paid *(See supra n° 10 à 29)*, but the recourse that it leaves open cannot in principle be exercised immediately, for the creditor, by accepting to be paid by means of a debt, also accepted that his payment is made in accordance with the rules inherent in the collection of this debt. Thereafter, it is only in the event of failure of recourse relating to this debt that it is admissible to act on the debt holder of the debt to be extinguished. The latter are pending as long as the former endure (See also, as regards bills of exchange, *R. Roblot, Effets de commerce : Sirey 1971*).

**37. -** When the debt used for payment has been transferred without a guarantee, it should be acknowledged that the transferee creditor waives all recourse against the transferor debtor, not only to that to which is attached to the transferred debt, but also that to the debt to be extinguished is attached. This allows said transferee creditor to take action against his initial debtor when the transferred debt is not paid.

## II. - Payments by transfers. Book money

**38. - Fiduciary currency and book money –** It is well known that bankers do not retain in their safes all amounts deposited by their customers. Bankers lend a large part of their sums because they can count on the assumption that all depositors will not want their money returned simultaneously. Yet, these loans engender in turn deposits, which facilitate new loans and so on. The result is that this amount of the available balance on all bank balance sheets in a country is infinitely higher than the cash in circulation. This is why it is said that two types of currency coexist. One is fiduciary currency, cash, materialized by coins and bills. The other is materialized by entries in bank accounting books; for this reason it is called book money.

**39.** - Legally, these two types of currency are assets of different categories. Coins and bills are tangible assets, whereas book money, which corresponds to the debts on bankers, belongs to the intangible asset category. Each of these assets is transmitted in its own way. Traditionally, cash circulates from hand to hand, whereas book money circulates by transfer.

**40. - Theory of book money -** French legal theory seems to agree that the transfer is a form of debt transfer (See *N. Catala, La nature juridique du payement, Préf. Carbonnier : LGDJ 1961, n° 76 et 82*. – See in particular, *J.-L. Rives-Lange, La monnaie scripturale [contribution à une étude juridique], Études de droit commercial à la mémoire de Henry Cabrillac : Litec 1968, p. 403. - P. Didier, Monnaie de compte et compte bancaire, Études offertes à Jacques Flour : Defrénois, 1979, p. 139. - R. Libchaber, Recherches sur la monnaie en droit privé, préf. Mayer : LGDJ 1992, n° 90 s.*). Book money actually moves a portion of the available balance from an account, which is a debt of the principal on his banker. A payment by transfer is therefore a payment by means of a debt.

But this legal analysis does not seem to correspond to the economic reality of things, which places book money in the same category as fiduciary currency. If the transfer must be treated as a debt transfer, book money will never be a satisfying monetary instrument: owing to the formalities of Article 1690, proof the date of consent, the principle of enforceability of exceptions, application of the right to transfer in lieu of payment, the transfer will never be a payment method that is as simple and safe as cash distribution. Under these conditions, it would be necessary to see in the available account balances a genuine currency and the in the transfer the equivalent of a cash distribution. It should therefore be taken into consideration that fictitiously debts representing these balances are incorporated into entries, as if they were incorporated in accordance with the theory of commercial papers, such that the transfer of entries take the place of delivery *(J.-L. Rives-Lange, art. préc.)*.

Thus, book money should be thought of as a monetized debt.

**41.** - This explanation clearly reflects the development of positive law, which constantly compares the transfer system to that of remittance of cash. Case-law has ceased to see in the transfer an assignment of a claim or of a debt. Said case-law acknowledges that the beneficiary profits from the unenforceability of exceptions, in this way the principal cannot cancel the transfer due to a defect affecting his dealings with the beneficiary *(Cass. com., 22 juill. 1986 : D. 1987, somm. p. 299, obs. M. Vasseur)*. It also acknowledges that a transfer facilitates making a gift by hand *(Cass. com., 12 juill. 1966 : D. 1966, jurispr. p. 614, note J. Mazeaud. - Cass. civ., 9 févr. 1977 : D. 1977, inf. rap. p. 501, obs. M. Vasseur)*, whereas the assignment of a claim does not allow for this, for lack of possible delivery of an intangible asset.

In addition, case-law acknowledges that the date of payment by transfer is when the sum is entered into the beneficiary's account (along these lines *Cass. com., 29 nov. 1954 : Bull. civ. 1954, III, n° 278. - Cass. soc., 9 avr. 1992 : Bull. civ. 1992, V, n° 272. - Cass. 1re civ., 23 juin 1993 : Bull. civ. 1993, I, n° 229 ; D. 1994, jurispr. p. 27, note D. Martin ; Defrénois 1994, p. 344, obs. Ph. Delebecque ; RTD com. 1993, p. 694, obs. M. Cabrillac et B. Teyssié*), in which more specifically, the date the beneficiary's banker receives these funds *(Cass. com., 3 févr. 2009, n° 06-21.184 : JurisData n° 2009-046858 ; Contrats, conc. consom. 2009, comm. 95, obs. L. Leveneur ; JCP G 2009, II, 10045, note Barbiéri)*.

Lastly, the law on the invalidity of the suspicious period no longer treats transfer payments as transfers in lieu of payment – i.e. abnormal methods of payment.

**42.** - **Critique** - However, the usual analysis of book money and the transfer appears to raise three objections *(See F. Grua, Les contrats de base de la pratique bancaire : Litec 2001, n° 129)*.

The first is that available account balances are not always considered currency, far from it.  Positive law often continues to consider them as debts.  Thus, whomever demands return of a bank deposit is not exercising a right to assert a claim on the currency, but rather a claim on a debt *(See JCl. Civil Code, App. art. 1235 à 1270, fasc. 14 ou Notarial Répertoire, V° Monnaie de paiement, fasc. 14)*. Similarly, attachment of balances are treated and organized as attachment of debts *(See JCl. Voies d'exécution, Fasc. 680 ou Banque-Crédit-Bourse, Fasc. 260)*.

**43.** - The second critique is that these debts should be considered as currencies that are available account balances. As a result remitting such a debt, like currency, is tantamount to payment, irrespective of the methods of this remittance.  Book money would therefore be a very important exception to the principle that the remittance of a debt as payment insufficient to extinguish a debt *(See supra n° 10 to 29)*. It would depart from Article 1243 of the French Civil Code.  It would go against the intention of the creditor who receives this debt and does not generally intend to be paid off with a debt.  One could imagine the case of a creditor who receives a transfer into an account of which there is debit balance and who should be contented with the satisfaction of having reduced his overdraft.  Justifying this fiction is convenient, but will not hold water.  In any event, it does not serve any purpose to bring up the critique whereby currency would be incorporated into entries, like the debt as commercial paper, since both positive law has never acknowledged this, despite this incorporation the remittance of commercial payment is tantamount to payment *(See supra n° 19)*.

**44.** - The third critique is that it appears needlessly complicated to present the transfer as the assignment of a claim, which would be fictitiously classed as a currency transfer.  In truth, the transfer was never from the onset a debt transfer.  This is a method of remittance of currency, not by a fictitious effect, but by the reality of things.

**45. - True nature of book money -** A transfer is not a transfer or assignment of debt for it would assume the intention to come to an agreement between the principal and the beneficiary.  Yet, the transfer is issued based on a basic order given to the banker, and does not require the beneficiary's consent.  This consent is certainly necessary for the validity of the payment by transfer, insofar as a debtor cannot in principle impose this method of payment on his creditor.  But it is not a condition of validity of the transfer itself.  In addition, when the transfer occurs between two accounts opened for the principal, no debt transfer is conceivable.

**46. - Indication of payment -** This is a method of currency remittance as its true legal form is not the debt transfer as stated in Article 1689 of the French Civil Code, but the indication of payment as stipulated in Article 1277 § 2 and in Article 1937 as regards deposits, whereby a creditor informs his debtor about the recipient who is going to receive the payment on his behalf.  Such is the intention demonstrated by the principal of a transfer: demanding recovery of the amounts deposited by their remittance, not to him, but to an indicated third party, rather than withdrawing the funds himself to remit to the a third party, who would remit them himself to his bank.  The transfer does not transfer recovered debt of the principal on his banker, it extinguishes it.

Applied to the transfer, the indication of payment system is sufficient to dictate all the solutions of current positive law recalled above *(See F. Grua, Sur les ordres de paiement en général : D. 1996, chron. p. 172)*.

**47. - Provision of currency -** The reason which probably led one to believe that the beneficiary was receiving in reality a debt, is that the transfer is made without the physical movement of cash.  It can be said that to be paid, the creditor must receive something, and since this is not cash, this can only be the recovered debt of the principal on his banker.  But this reasoning does not have a solid basis in the right to payment.  No legislation ever required the validity of a payment in money; that the cash physically changed hands.  Paying off the

creditor generally does not require the physical possession of this cash since cash has the particular characteristic of being of value not in and of itself but only by its capacity to be reused. The creditor is therefore shown to be deemed paid when he receives the **power to dispose** of them as he pleases, even if he does not actually see them. This is the idea on which the practice of the transfer is built. The beneficiary is paid off by the method of payment because he does not demonstrate the need to put the money in his safe. He loses the option of reusing by transfer, but gains many others: reuse by checks, transfer, cards, etc. That physical cash is not moved therefore does not prevent that cash is the actual instrument of payment. They will pay off the creditor, which is much better than an alleged debt.

**48.** - This is indeed the true innovation of the transfer: not debt transfer fictitiously treated as a remittance of cash, but a **cash payment handed over to a third party**. Under these conditions, book money cannot be a legal notion. It does not correspond to any asset distinct from cash that would have the virtue of extinguishing debts. In law, it is not the currency that is cashless, but the banking technique of providing cash.

**49. - Transfer system -** Whether the transfer is thought of as a cash payment or a payment by means of a debt, which would also be in currency, the practical consequences do not seem to be very significant. We arrive at the same results. However, the solutions are different as regards the recourse of the beneficiary creditor of the transfer. If the transfer contains a debt transfer, its beneficiary receives a claim on the principal's banker and direct recourse against said banker to be paid. We cannot see why the monetization of the debt would make them disappear. If, on the contrary, the transfer is but a cash payment, the beneficiary will not receive any claim on this banker. This is how it is put forward in French legal theory *(G. Ripert et R. Roblot, op. cit., n° 2305. - J.-L. Rives-Lange, art. préc. - JCl. Banque-Crédit-Bourse, Fasc. 390)*.

**50.** - In addition, when a sum is transferred from a balance which does not exist in reality, the transfer is nonexistent because it does not have an object. Thereafter, if the sum is entered into the beneficiary's account, the banker of the principal has paid someone who was not his creditor and therefore appears to have, in theory, made an overpayment *(See supra n° 28)*. On the other hand, if the transfer is but a means of making cash available, which tends only to extinguish the principal's debt to the beneficiary, it can no longer be said that the banker paid the overpayment. He did not pay the void debt that beneficiary would have had on him, but only the valid debt that the beneficiary had on the principal. Therefore, the banker did not have recourse against the principal, without there being a need to put forward a principle of the beneficiary's unenforceability of exceptions affecting the relations of the banker with his principal *(Comp. JCl. Banque-Crédit-Bourse, Fasc. préc.)*.

## III. - Electronic currency

### A. - Practice

**51. - Original meaning -** Information Technology has given rise to new payment methods, such as: payment cards, universal payment orders, recovered bills of exchange and automatic withdrawals. From the aforementioned terms, a convenient umbrella term, "electronic currency," has come into use (which seems to derive its origin from a report submitted by Mrs. Gautras on behalf of the Economic and Social Council, Official Journal of the French Republic, publisher).

However, at the origin, this term is misleading. Electronics has not yet produced any currency. A basic improvement in cashless techniques, electronic currency was only a means of carrying out transactions, which until then relied on book entries *(M. Vasseur, La monnaie électronique, Aspects juridiques : JCP G 1985, I, 3206. - F. Terré, Ph. Simler et Y. Lequette, Droit civil, Les obligations : Précis Dalloz, 6e éd. 1996, n° 1245. - M. Cabrillac, Monétique et droit du paiement, Mélanges de Juglart : LGDJ 1986, p. 83. - P. Ancel, La monnaie électronique : régime juridique, Droit et monnaie : Litec 1988, p. 303)*.

This innovation was without legal consequences. The use of electronic processing did not in principle change the payment order system. In particular, the rule remained that only the execution of the order, and not its issuance that could release the debtor *(Ch. Marty, P. Raynaud et Ph. Jestaz, Droit civil, les obligations, t. 2, Le régime : Sirey 1989, n° 207)*.

**52.** - **New electronic currency** – Electronic currency has been taking shape and may soon be worthy of the name of currency since the practice has developed monetary electronic media, reserves of monetary units that only exist in an electronic format.

A consortium made up of a dozen or so banks, the SNCF, the RATP and France Télécom, called Billétique Monétique Service, has promoted these new techniques. Some of the experiments limited to certain cities (Monéo) should come into more widespread use *(V. H. Sitruk, Monnaie électronique, monnaie fiduciaire et monnaie scripturale. Quelles substitutions ? Quelles Stratégies ? : Rev. éco. fin. mars 2008, n° 91, p. 37)*.

Electronic monetary media now exists in two versions.

**53.** - **Electronic purses** - There is, on the one had, the "electronic purse" (*porte monnaie électronique* or PME), which is similar to smart cards and its variations. Or this may be a totally independent card, without connection to a bank account, recharged at terminal provided for this purpose for an amount paid by means of an ordinary bank card. Or the card is linked to the bearers' bank account, its use translates into a debit of the account. Or it is an ordinary bank card that is used as an electronic purse.

In all these cases, the user pays his debts by using his card with an affiliated professional. This card is put into an electronic terminal, which asks the user to press the submit button (without typing a PIN number). The electronic units are then immediately transferred to the user's card to the electronic account of the banking professional. If he so desires, the banking professional asks the issuer of the PME to convert the units received into fiduciary currency or book money.

**54.** - **Virtual purses** - There is, on the other hand, the virtual purse ("porte-monnaie virtuel" or (PMV)) found on computer hard drives. The user of an electronic purse thus has a reserve of purchasing power that can be used remotely.

**55.** - **Innovation** - These processes are not entirely new. Pre-paid cards have already been used in the system, these cards allow paying issuers for purchases of goods and services. Thus, the cards are sold for use in telephone booths or with cell phones. The true innovation with respect to the electronic purse is to allow making all types of payments to persons who did not issue this media.

**B. -  Nature**

**56. -  French legal theory -** Electronic currency poses the same question to the legal professional as all the processes used as substitutes for coins and bills: is this a real currency or a currency debt?

Both arguments have been upheld. For some the PMEs or PMVs would only be new technical instruments serving to give payment orders to his bank to the benefit of a third party. Like checks or payment cards, irrespective of whether an innovative process, they allow the user to request that his bank transfer a portion of the available balance from his account to the account of a third party beneficiary. This third party beneficiary will therefore not be paid until the funds arrive in his account. Consequently, what is called "electronic currency" remains in reality electronically processed book money (along these lines, *S. Lanskoy, La nature juridique de la monnaie électronique : Bull. Banque Fr. oct. 1999, n° 70, p. 53. - Comp. T. Bonneau, Droit bancaire : Montchrestien, 8e éd. 2009, n° 429, et réf. cit.*).

On the contrary, for others electronic units would constitute a genuine currency. The asset would be incorporated into the electronic media, as in coins and bills. According to this view, electronic currency would be a new monetary currency *(M. Cabrillac, art. préc., p. 87. - M. Espagnon, Le paiement d'une somme d'argent sur internet : JCP G 1999, I, 131. - C. Lucas de Leyssac et X. Lacaze, Le paiement en ligne : JCP G 2001, I, 302)*.

The idea is sometimes argued that these two views are incompatible for a debt instrument may constitute a genuine currency *(G. Blanluet, La monnaie électronique. Définition. Nature juridique : RD bancaire et fin. 2001, p. 131. - R. Libchaber, op. cit., n° 92)*. However, as demonstrated above monetary debts were payment instruments legally imperfect and inferior to currency itself *(See supra n° 4)*.

**57. -  French law -** The lawmaker has not taken a clear position on the nature of the electronic units. The decision dated January 10, 2003 (ratifying regulation *n° 2003-13 of the French Banking and Regulation Committee: Journal Officiel 1er Février 2003 ; RTD civ. 2003, p. 361, comm. Rochfeld)*, which starts by describing currency as: "Electronic currency is made up of units of value called electronic currency units." But it is also immediately considered to be a debt: each unit "constitutes a debt instrument incorporated into an electronic instrument and accepted as means of payment, by third parties as well as by the issuer."

**58. - European legislation -** European authorities have proposed several definitions of electronic currency. They also demonstrate a certain hesitation about the nature of electronic currency, which they describe as: "units of value…stored electronically" *(A97/489/CE, art. 2 c of recommendation n° 97/489/CE of the Commission of July 30, 1997 on the transactions made by means of electronic payment instruments: Official Journal of the European Community dated August 2, 1997)*; "monetary value stored electronically…, accepted as a means of payment… electronic substitutes for coins and bank notes," "digital variation of cash" *(proposal of dir. n° 98/C 317/06, submitted by Commission on Sept 21, 1998: JOCE n° C 317/7, 15 oct. 1998* ; *"monetary value representing a claim on the issuer, which is (i) stored on electronic media, (ii) issued against the remittance of funds for an amount not less than the monetary value issued and (iii) accepted as a means of payment by companies other than the issuer"* (*dir. 2000/46/CE, on the access to business of electronic currency firms and its exercise as well as the prudential supervision of these firms: Journal Officiel des communautés européennes 27 Octobre 2000. –* See also, *RD bancaire et fin. 2000, p. 247, comm. J. Stoufflet).*

The directive 2009/110/CE of the European Parliament and the Council dated September 16, 2009, amended directives 2005/60/CE and 2006/48/CE, and repealed directive 2000/46/CE, which held that "*the definition of electronic currency should include both electronic currency using a payment system in which the holder of the electronic currency in his possession that which is stored remotely on a server and managed by the holder of electronic money through a specific account of electronic currency*" *(recital 8)*. Accordingly, electronic currency was defined as follows in this directive: "*a monetary value which is stored in an electronic format, including magnetic formats, representing a debt on the issuer, which is issued against the remittance of funds for the purposes of payment transactions*" *(art. 2)*. Under Article 11, Member States must ensure that "*issuers of electronic currency reimburse, on the request of the holder of electronic currency, at any time its face value, the monetary value of the electronic currency held*."

**C. - System**

**59. - Time of payment -** The time of an electronic currency payment is made seems to be contingent upon how we think about this transaction. If the electronic units are really currency, the payment is made as of their transmission. If they are debts, the time of payment is when they are cashed; in other words, when they are converted into fiduciary currency or book money, as the payment by means of a debt is not immediate *(See supra n° 10 to 29)*.

However, the parties to a payment by means of a debt can agree by waiver that the payment will be made exclusively by the remittance of the debt and not by cashing *(See supra n° 17)*. The time of payment by means of electronic units therefore seems to depend on the intention of the parties who use them, rather than on the legal status lent to these new instruments.

**60. - The payee's recourse -** Does the creditor who receives electronic units still have recourse against the debtor when, for some reason, he did not obtain their conversion from the issuer?  The response is negative if he received the currency.  This response is in principle affirmative if he received a debt.  However, once again the question especially seems to be a matter of the parties' intention.  Even if the electronic units are debts, nothing prevents agreeing that exclusively transmission shall release the debtor.  And this intention should be assumed as it seems necessary for the smooth functioning of the system.

As a general rule, the right of payment is not in principle a matter of public policy, and the parties adapt it as they see fit.  The use of electronic units is primarily a way of organizing payment.  Therefore, first, the parties' intention can be inferred from the payment system by electronic units.  The legal nature of the instrument is secondary.  It is more the payment system used that sheds light on the nature of the instrument rather then the nature of the instrument that determines the payment system.

**61. - System of transmission of electronic units -** Even if electronic units constitute currency and not debts, their transmission during payment can be binding on third parties, though it does not necessarily mean transfer to the issuer as per Article 1690 of the French Civil Code.

But even if electronic units are debts, their transmission still seems to evade the requirements of Article 1690 for reasons already explained with regard to the transfer *(See supra n° 46 to 50)*.

**62. - Monetary law -** Whether currency, electronic units seem to circumvent the rules governing fiduciary currency.   The Banque de France's monopoly of issue *(C. monét. fin., art. L. 141-5)* does not concern electronic

units as they are not the equivalent of bills used as legal tender.  For the same reason, criminal law provisions on counterfeiting money are not applicable to them.

On the other hand, the electronic purse is an instrument of payment within the meaning of Article L. 133-4 of the French Monetary and Financial Code.  Its counterfeiting and falsification are criminally sanctioned pursuant to Article L. 163-4 of the same Code.

**63. -  Banking law -** Electronic units fall within the definition of the means of payment provided by Article L. 311-3 of the French Financial and Monetary Code. Their provision to customers and management is therefore in principle reserved to credit institutions since the order of  n° 2009-866 July 15, 2009 on payment institutions.

For the tax authorities, the marketing of electronic currency in the form of cards, tickets and prepaid vouchers facilitates online purchases and is not subject to VAT *(lettre du 20 mai 2009 de la Direction des affaires fiscales - V. Comm. com. élect. 2010, comm. 11, par P. Néau-Leduc)*.

### D. -  Innovation of electronic units

**64. -  Comparison with fiduciary currency -** The comparison of electronic units to coins and bills shows more differences than similarities:

- like with coins and bills, electronic units are immediately reusable by their recipients;
- unlike coins and bills, electronic units are not legal tender.  A debtor cannot impose them as payment on his creditor.  They only circulate amongst people who have agreed to this.  The system is built on a contractual basis;
- coins and bills are free monetary instruments.  They are not purchased.  On the contrary PMEs or PMVs have a cost (between 7 and 12 EUR for PMEs);
- coins and bills come from the government and are governed by law.  On the contrary, the PMEs and PMVs come from private initiative and are freely governed by a contract between the parties.

**65. -  Comparison with debt securities -** As electronic units are convertible into legal currency, they can be seen as a debt security for legal currency.  From this perspective, the security offers at least four innovations. First, the debt is incorporated not into a document, but into a magnetic media.  Thereafter, the security is divvied up since we can have its contents in fractions.  Furthermore, the recipient of a debt security as payment normally does not have the insurance to reuse it for his own payments, as no one is required to accept this payment method.  On the contrary, electronic units come with a certain guarantee to be reused.  Last, the holder of the units does not usually claim what is owed to him in cash from the debtor; in other words, the issuer, since the units he holds are made to be reused.

But the participants definitely do not intend to hold electronic units for currency debts.  For the proper functioning of the system, it seems necessary that the creditors are paid off with these and that their remittance is sufficient to immediately extinguish the debt.  By agreement, electronic units must have, as regards payments, the same power to discharge as legal currency.  Receiving legal currency or these units must be legally equivalent.  We do not get this result with debts, which are only rights, whereas the creditor expects the thing for which he is entitled *(See supra n° 4)*. Consequently, electronic units must be treated not as a right to a thing, but as the thing itself.

**66.** - Like with a payment by means of a debt, payment by means of electronic units can be thought of as transfer in lieu of payment: the debtor remits something other than what is owed and which can only be legal currency.  But this transfer in lieu of payment, *datio pro soluto*, immediately releases the debtor.  The creditor is immediately paid off as if by a remittance of legal currency since he receives the availability of instruments reusable for his own payments.

## IV. -  Payment by means of foodstuffs or merchandise

**67. - Payment in kind -** Rather than this debt stipulated payable in currency, the parties can arrange it so they are paid by the delivery of food stuff or merchandise. This is a very ancient practice and continues in farming leases (farming clause in kind). This is also found in food leases.

A variation is to leave the creditor an option to be paid in food stuffs or in currency.

The advantage of these clauses is to remove the receivable from the effects of monetary depreciation. In this regard, they are similar to indexing clauses, in particular those that index debt on the price of a foodstuff. However, they are different insofar as they use foodstuffs as an instrument of payment, not only to determine the object of the obligation.

**68. - Validity -** The validity of this type of payment never seems to have been contested *(See Lalou : DP 1924, p. 2 et 18, et 1926, p. 2 et 70. - R. Demogue : Journ. not. 1923, p. 101. - M. Planiol : Rev. crit. 1926, p. 123. - H. Capitant : DH 1926, p. 4 ; DP 1926, 2, p. 57, et 1928, 1, p. 25)*. Although this may sometimes seem to be a means of circumventing monetary nominalism, this principle is after all not public policy *(See JCl. Civil Code, App. art. 1235 à 1270, fasc. 20 ou Notarial Répertoire, V° Monnaie de paiement, fasc. 20)*.

The law maker acknowledged this validity in farming leases *(See C. rur., art. L. 411-12)*. This has also been recognized in case-law in other areas: compensation allocated through testamentary parental partition *inter vivos (T. civ. Soissons, 10 janv. 1951 : Gaz. Pal. 1951, 1, jurispr. p. 308 ; D. 1951, somm. p. 60)*, life annuity *(CA Agen, 23 nov. 1951 : JCP G 1952, II, 6690, note C. Fardel)*. It also acknowledged the validity of a payment option clause in currency or in foodstuffs *(Cass. req., 18 févr., 18 mars et 1er août 1929 : DH 1929, p. 441 ; S. 1930, 1, p. 1 et 97)*.

It was ruled that the parties did not violate any rule of law by freely agreeing to reimburse in securities of a set kind a loan in pounds sterling *(Cass. 1re civ., 22 févr. 1956 : Bull. civ. 1956, I, n° 90)*.

**69. - Limit -** The only limit on this validity appears to be fraudulent evasion of the law. Therefore, the validity of the payment clause in foodstuffs seems problematic, since the object of this clause is to circumvent the indexing regulation or legal obligations to pay by check or transfer *(See supra n° 5 to 9)*. Similarly, a payment by means of foreign securities intended to circumvent the principle that payments in France must be made in French francs (on this principle, See *JCl. Civil Code, App. art. 1235 à 1270, fasc. 30 ou Notarial Répertoire, V° Monnaie de paiement, fasc. 30)*.

**70. - Force majeure -** The debtor of the foodstuffs promised is unable to deliver them. This was the case between 1940 and 1945, due to the economic laws on supplying or distribution of raw materials and industrial products *(See Les fermages en nature et la réglementation du rationnement : JCP N 1942, I, 266. - Le ravitaillement et les fermages en nature : JCP G 1943, I, 309. - Becqué : JCP G 1942, II, 2048)*. The majority of foodstuffs that served farming was rationed or had fixed quotas.

Case law refused to pronounce the rescission of these contracts for failure to perform, performance being made impossible by a regulation constituting force majeure. It suspended this execution and replaced the payment in kind by a cash payment throughout the term of the duration of the impossibility, the translation being done on the day of payment *(CA Agen, 23 déc. 1942 : JCP G 1943, II, 2150. – On appeal, Cass. civ., 6 janv. 1952 : D. 1953, somm. p. 44. - Along the same lines L. 4 sept. 1943, art. 2. - Ord. 17 nov. 1945, art. 22, al. 3, mod. L. 13 avr. 1946 et 31 déc. 1948)*.

## V. - Local exchange systems (LES)

**71. -** Local exchange systems consist of an organization, in the form of associations based on the Law of 1901, of a system of exchanges between cooperative shareholders divided into markets. LESs grew out of American and in particular Canadian experiments. They appeared in several countries, including France, after 1994. In 1997, there were estimated to be 248 French LESs with more than 25,000 members *(Cf. T. Aubert-Monpeyssen, La prestation de services dans le cadre des systèmes d'échanges locaux [SEL] : activité socialement utile ou travail illégal ? : JCP E 1999, I, 802)*.

These exchange systems are intended to fall outside the scope of the law, but the public authorities chose to give them favorable consideration (*Rép. min. Mariani n° 10085 : JOAN Q, 29 déc. 1997, p. 4893. - Rép. min. Abiven, n° 9015 : JOAN Q, 6 avr. 1998, p. 1967. - Rép. min. Aubert, n° 94 : JOAN Q, 6 juill. 1998, p. 3751*. - See also, refusing to view undeclared work as a service provision, *CA Toulouse, 17 sept. 1998 : JCP E 1999, I, 807*. -

*Supiot, Les mésaventure de la solidarité civile : Dr. soc. 1999, p. 64. - G. Raymond, Questions posées par les systèmes économiques locaux : Contrats, conc. consom. 1996, chron. 8).*

**72. - Organization -** Each cooperative shareholder [company] offers goods and services and consumes goods from other cooperative shareholders [companies] in the system.  No service is paid for with money.  This system works on credit that serves to pay for the service received by any cooperative shareholder.  This credit is not evaluated as official currency, but as a unit in which is called "seed" in France.

The association keeps the books of individuals in seeds.  Imbalances are never paid off in official currency.  Whoever is in deficit does not owe money:  he pays off his debt by providing goods or services.  Similarly, someone who is in surplus is only entitled to seek the goods and services of others.

**73. -  Comparison of "seeds" with currency -** Unlike the official currency, "seeds" are not materialized by any instrument.  They were only designed for counting, not for paying.  Therefore, they do not constitute a currency competing with the official currency, the circulation of which would fall under the scope of Article R. 642-2 of the French Penal Code.

Seeds are, nevertheless, similar to currency in that they also grant their holder with undifferentiated purchasing power: as the holder of currency, the creditor of "seeds" can use his credit to procure any good or service from another cooperative shareholder.  From this standpoint, they replace the official currency and serve as an instrument of payment (along these lines, *R. Libchaber : RTD civ. 1998, p. 801. - J.-M. Bruguière, Qu'est-ce que la monnaie ? : JCP E 2001, I, 1905, n° 12*).  The person who receives "seeds" in return for a service considers his debt on the purchaser as extinguished.  In theory, he is paid off by receiving "seeds," rather than by with official currency, which is prohibited.  This confers upon the "seeds" a property which is comparable the legal tender of the official currency.

## Bibliography

**P. Ancel**
*La monnaie électronique, régime juridique, in Droit et monnaie* : Litec 1988, p. 303

**G. Blanluet**
*La monnaie électronique. Définition. Nature juridique* : RD bancaire et fin. 2001, p. 131

**D. Bounie , J.-P. Buthion et A. François**
*Une analyse des facteurs de l'acceptation et de l'usage des instruments de paiement par les commerces en France* : Rev. éco. fin. janv. 2010, n° 96, p. 187

**J.-M. Bruguière**
*Qu'est-ce que la monnaie ?* : JCP E 2001, I, 1905

**M. Cabrillac**
*Le chèque et le virement* : Litec, 5e éd. 1980
*Monétique et droit du paiement, Études réunies en l'honneur de Michel de Juglart, Aspects du droit privé à la fin du XXe siècle* : LGDJ 1986, p. 83

**N. Catala**
*La nature juridique du payement, préf. Carbonnier* : LGDJ 1961

**P. Didier**
*Monnaie de compte et compte bancaire, Études offertes à Jacques Flour, Répertoire du Notariat* : Defrénois 1979, p. 139

**M. Espagnon**
*Le paiement d'une somme d'argent sur internet* : JCP G 1999, I, 131

**C. Gavalda et J. Stoufflet**
*Droit bancaire* : Litec, 7e éd. 2008, par J. Stoufflet

**F. Grua**
*Sur les ordres de paiement en général* : D. 1996, chron. p. 172
*L'obligation et son paiement, Mélanges Yves Guyon* : Dalloz, 2003

**L. Grynbaum**
*Le prote-monnaie électronique, un instrument de paiement indiscret* : RD bancaire et fin. 2003, n° 3, p. 183

**M. Jeantin**
*La cession de créance en période suspecte* : D. 1980, chron. p. 309

**S. Lanskoy**
*La nature juridique de la monnaie électronique* : Bull. Banque Fr., oct. 1999, n° 70, p. 45

**R. Libchaber**
*Recherches sur la monnaie en droit privé, préf. Mayer* : LGDJ, 1992

**C. Lucas de Layssac Lacaze**
*Le paiement en ligne* : JCP G 2001, I, 302

**J.-P. Marty , P. Raynaud et Ph. Jestaz**
*Les obligations, t. 2, Le régime* : Sirey, 1989

**R. Renaudin**
*Porte-monnaie électronique et monétique* : thèse dactyl. Paris I, 1996

**J.-L. Rives-Lange**
*La monnaie scripturale, Contribution à une étude juridique, Études de droit commercial à la mémoire de Henry Cabrillac* : Litec 1968, p. 403

**R. Roblot**
*Les effets de commerce* : Sirey 1971

**L. Schwerer**
*De la circulation électronique des monnaies scripturales à la monnaie électronique universelle* : RJ com. 2001, p. 59

**H. Sitruk**
*Monnaie électronique, monnaie fiduciaire et monnaie scripturale. Quelles substitutions ? Quelles Stratégies ?* : Rev. éco. fin. mars 2008, n° 91, p. 37

**M. Vasseur**
*La monnaie électronique, Aspect juridiques* : JCP G 1985, I, 3206, 24

**E. Wéry**
*Paiements et monnaie électroniques. Droits européens, français et belge* : Larcier 2007

© LexisNexis SA