# Exhibit 42



www.Trans-Lex.org - Please cite as www.trans-lex.org/123000

**Document-ID: 123000**

**Title:  Gaillard, Emmanuel, L'interdiction de se contredire au Détriment d'Autrui comme Principe Général du Droit du Commerce International, Rev D'Arb. 1985, at 241 et seq.**

Table of Content:
L'interdiction de se contredire au Détriment d'Autrui comme Principe Général du Droit du Commerce International (the principle of estoppel in certain recent arbitration judgments)
I. – THE SOURCES OF THE PROHIBITION TO CONTRADICT ONESELF TO THE DETRIMENT OF OTHERS
II. – THE SYSTEM OF THE PROHIBITION TO CONTRADICT ONESELF TO THE DETRIMENT OF OTHERS

**Referring Principles:**
Referring Principle:   No. I.1.2 – Prohibition of inconsistent behavior

**Content:**
_____


**Page:  241**
_____

# THE PROHIBITION TO CONTRADICT ONESELF TO THE DETRIMENT OF OTHERS AS A GENERAL PRINCIPLE OF THE LAW OF INTERNATIONAL TRADE (the principle of estoppel in certain recent arbitration judgments)

**By Emmanuel Gaillard**

1. *The prohibition to contradict oneself to the detriment of others* has recently gained acceptance as a new general principle of International Trade Law by means of certain arbitral awards.[1]

Therein lies a phenomenon that deserves continued focus insofar as if the rule does benefit from solid foundations in comparative law and international public law; it has not been received as such in all judicial systems[2] and is generally not mentioned among the general principles that make up the *lex mercatoria* whose nature and mere existence are now so resolutely controversial.[3]

Independently of the interest that the appearance of a new rule of law may still arouse as regards the method, most particularly in a context as heated as that of the *lex mercatoria,…*


**Page:  242**
_____

… it is without doubt that the rule bringing about *the prohibition to contradict oneself to the detriment of others* is liable to have a major practical impact in International Trade Law.  It is indeed rare that parties do not have, whether rightly or wrongly, certain inconsistencies that can be blamed on one another in major international trade litigation.  Furthermore, would we have enough attention so as to not forget the condition of prejudice brought about against others, without which no contradiction would be able to be sanctioned[4] and to not lose sight of the paradoxical nature of the doctrine of estoppel, an Anglo-American form of principle, which has always held that it be applied solely in a very discrete manner, so as to not give rise to long doctrinal motivations, apart from in the cases where they were to be rejected.  It would nonetheless be



excessive to prematurely conclude as much, as has sometimes occurred, wrongly in our belief, as regards International Public Law, that the principle would definitively not have any real practical interest.[5]

The first arbitral awards that refer to or have applied this principle in the context of International Trade Law do not escape this paradox.

2. The award rendered under the auspices of the I.C.S.I.D. on September 25, 1983 by Messieurs Goldman, Chairman, Rubin and Foighel, in the case of *Amco Asia vs. the Republic of Indonesia*, under the rule of the estoppel, more clearly expresses the desire to solely recognize the feature of general principle of International Trade Law in the instance in which the conditions for its application were not fulfilled.

The litigation relating to an investment in a hotel in Indonesia pitted three plaintiffs – a first foreign investor, Amco Asia, a subsidiary established under the local laws by means of the rte channel by which the investment had been undertaken, P-T. Amco, and a second foreign investor, Pan American, to which a portion of the shares of the subsidiary established under the local laws had further been transferred – against the Republic of Indonesia, the defendant, which had been accused of having seized the hotel which was the object of the investment…

**Page:  243**
_____

…by means of military action and to have illegitimately withdrawn the initial investment authorization.  The Republic of Indonesia had, among other means that specifically concerned the conditions of the jurisdiction of the I.C.S.I.D.,[6] asserted that the arbitral tribunal did not have jurisdiction to hear any instances relating to the breach of any lease contracts that had intervened between the subsidiary established under the local law, P.T. Amco, and the lessor, P.T. Wisma, insofar as the latter was not a contracting State and that litigation between private parties did not fall under the jurisdiction of the Center.  Fearing that the plaintiffs would reply that P.T. Wisma was in reality nothing more than the expression of the State, which would have been sufficient to ruin this means, the Republic of Indonesia took care to add that the plaintiffs were estopped to claim that which they called the "alter ego theory", most notably by reason of the contrasting position which P.T. Amco had itself taken before the Indonesian jurisdiction in a parallel instance which opposed it to P.T. Wisma, as well as before the I.C.S.I.D. itself up until a certain date.

In truth, this precaution did not have any effect on the issue of the litigation, insofar as the arbitral tribunal had simply judged that it had the jurisdiction to hear a request that was not in effect a "lease claim", but rather a claim for indemnification following the expropriation by the State of a foreign investment; this notwithstanding that P.T. Wisma did have a distinct juridical personality to that of the State.  It was thus that neither the argument of the "alter ego" nor that of the estoppel, which is meant to prevent such a situation, has any pertinence.

It is however lucky that the arbitral tribunal did nonetheless take the trouble to examine the estoppel argument that was raised, which it does raise, at this time, to the rank of "general principle that is applicable to international trade relations in which individuals are implied."

Thus the famous formula of the Vice-Chairman Alfaro,[7] which is recalled by the tribunal, can henceforth be…

**Page:  244**
_____

…read in the terms of private lawyers, as implying that *nobody may be permitted to take advantage of their own contradictions to the detriment of others.*

The tribunal adds a few definitions of estoppel drawn from English tradition and underlines certain elements of its judicial system prior to declaring that it has no hesitation to conclude that in the case at hand, the argument of the estoppel does not draw upon the question of jurisdiction but rather upon the admissibility or "the non-admissibility of certain evidence or certain allegations and that the elements of this doctrine, which is to say the benefit that has been drawn by the party that has been submitted to the estoppel and/or the



prejudice suffered by the other, are not to be found in the present case, which would necessarily exclude any bad faith of the plaintiffs."[8]

3. In a completely different manner, the judgment that was rendered on September 2, 1983 by the tribunal for Iranian-American disputes, made up of Messieurs Mangard, Chairman, Mosk and Sani, in the case of *Woodward-Clyde Consultants vs. Iran and IEAO,* applies analogous principles as regards evidence.

So as to resist the request for payment of fees of a counsel, the Iranian Atomic Energy Organization (IEAO) invoked the right which was recognized by the contract to withhold the amount of the social security contributions charged to the account of the counsel; up until such time that the same cannot justify that he be paid these monies by the competent authorities through the presentation of a receipt delivered by these authorities.

To be able to make a judgment as to the payment of the social security contributions, the tribunal was faced with two contradictory documents which were issued both one and the other by the Iranian social security organism, with on the one part a receipt presented by the counsel, and on the other part a further payment request which corresponded to the same years and which made no mention either of payment, nor receipt, produced by the IEAO.

Deeming that these documents, whose authenticity is not put into doubt, contained "totally contradictory and irreconcilable affirmations" from the same social security organism, the tribunal has granted the request for payment of the counsel, notably justifying its judgment by the application of the "general rule of evidence according to which contradictory affirmations…"

**Page: 245**
_____

…of an interested party must be interpreted against this party."[9]

This apparently modest judgment thereby effectively sanctions a contradictory behavior and presents the not negligible interest to issue a "general" principle which is no other than the application, in the right of evidence, of the idea, in the broadest sense, that nothing that is in contradiction is admissible to the detriment of others.

4.  It is not surprising that it is under the aegis of the I.C.S.I.D. and of the tribunal for Iranian-American disputes,[10] that in the case of a dispute of State contracts, the rule, which is tradition in International Public Law, has been extended to International Trade Law.  However nothing in the sources (I) or in the system (II) of this new principle allows one to think that it should be considered as specific to State Contract Law and that it cannot on the contrary be applied in a general manner to any international trade relationship.

## I. - THE SOURCES OF THE PROHIBITION TO CONTRADICT ONESELF TO THE DETRIMENT OF OTHERS

5. In its research for the foundations of the prohibition to contradict oneself to the detriment of others, the *Amco* judgment is highly significant of the manner of the creation of general law principles, where it highlights both the sources of inspiration or real sources (A), as well as the support of judicial technique, or if one were to prefer, the formal source (B).

A) Its sources do appear clearly, the *Amco* judgment invokes both the conclusions of Comparative Law as well as the precedents of International Public Law.

**Page: 246**
_____

  1) It is clear that *Comparative Law*, which becomes an applied science in the law of international trade arbitration, plays a major role here.



6. The *Amco* judgment insists upon the Anglo-American notion of estoppel, which was presented by the counsel of the defendant, however the principal of *prohibition to contradict oneself* does benefit from a far more extensive support in Comparative Law.

As is recalled by the *Amco* judgment, the *estoppel by representation*, the sole form of estoppel that is admissible as the foundation of the discovery of a general principle as opposed to the highly technical estoppel by *res judicata* which corresponds to the authority of a judged item of continental laws, designates a blocking mechanism which works in much the same manner as a stonewalling action.  This is the prohibition made against a person who, by means of their declarations, their actions or their attitude, which is to say by the "representation" that it might have presented of a given situation, has led another person to modify their position to their detriment or to the benefit of the first party, to deliver justice for a fact that is contrary to this initial "representation".  The rule relies upon a requirement of good faith which prohibits one from profiting from one's own personal contradictions or, according to the renowned formula given by another judgment, to "blow both hot and cold, and to affirm on one side and to deny on the other."[11]

This is one of the numerous correcting mechanisms by which *Equity* jurisdictions have relaxed the initial rigor and formality of English law by having good faith and equity considerations prevail, however it is necessary to recognize that the constraints of respect of precedence have quickly incorporated this principle of equity in a body of rules which are themselves passably binding.[12]  However that which allows one to foresee drawing a general principle from this has less to do with the generalized reception in *Common Law* rights and more to do with the correspondences that find the rule in judicial systems that are based upon quite different inspiration.

**Page:  247**
_____

The *Amco* judgment remains very discrete and merely notes that the fundamental requirement of good faith from which the doctrine of estoppel derives is found in all judicial systems as well as in International Law.[13]  It would without doubt be possible to go even further to observe that numerous other systems have developed, on the basis of good faith or other just as general foundations, technical constructions that are related to the Anglo-American estoppel.

7. In fact, the temptation is strong, when one poses the questions as to whether estoppel is liable to reach the level of a general principle, to find more or less direct equivalents to this notion of Common Law in all judicial systems[14].

However, if one would like to avoid that the accumulation of disparate analogies might necessarily lead to the conclusion that, by reduction to the smallest common denominator, the new general principle that is thus discovered is all the more deceiving,[15] it is necessary to recognize that the Anglo-American estoppel does find two very different comparison points in the "continental" law systems.

The doctrine of estoppel does in fact rely upon two poles which are the contradiction (inconsistency) in the position of the party that is submitted to the estoppel and faith given to the author of the initial representation by the one who invokes the estoppel (reliance).  It is thus, that depending on whether one insists upon one or the other of these aspects, one is found in the position to privilege the analogy with the theory of appearance or with the "*non concedit venue contra factum proprium* principle" of the Swiss and German laws.

8. The rapprochement of the estoppel and the theory of appearance, which is known in a number of continental law systems, have become classical.[16]

It is true that the parallel with French law, so as to reason on the basis of this example, was more clear-cut when the same placed the accent on the sanctioning of the attitude of the person who creates…

**Page:  248**
_____



… or consciously allows an apparent situation to be created rather than on the necessity to strengthen an acquired situation on the basis of faith in a legitimate belief.[17] In effect, according to English law, the "representation" must have been made in a knowing manner, which is to say that they were aware that they could incite another person to act or, at very least, result from a negligent conduct.[18] The fact remains that, by differing means, prohibition to establish the existence of a state of the facts that is contrary to the initial "representation" before the courts or maintenance of acquired rights in view of the apparent situation, the theories of estoppel and of appearance do frequently achieve results that are analogous in their concrete applications.[19]

9. However other judicial systems, such as Swiss or German law have developed, in parallel to the theory of appearance which they are also familiar with, a rule that is even more directly comparable to the Anglo-American doctrine of estoppel: the *non concedit venire contra factum proprium* principle, for which there is no equivalent in French law.[20]

**Page: 249**
_____

German jurisprudence, of which we know of the importance it assigns to the principle of good faith, by interpretation of the very general directive of Article 242 of the German Civil Code, does in fact draw direct consequences from the obligation to not contradict oneself to the detriment of others. The rule is now well-established in German law that nothing is admitted to prevail over the existence of facts that are contrary to their preceding allegations: *non concedit venire contra factum proprium*. It knows various applications, which range from the prohibition made to the heir who has aided the deceased to pass a contract to further invoke the incapacity of the defunct to contest the act,[21] to the justification of the acceptance of the risks by the one who participates in a dangerous sport,[21 bis] passing through the sanction of the confusion of assets in the Law of Companies[22].

In matters of arbitration, in cases where it was subsequently brought before state courts, it has led the Federal Court to judge that the party who has relied upon the jurisdiction of the State Courts to deny the jurisdiction of arbitrators was not able to contrarily expect that only arbitrators had jurisdiction.[23] Inversely, it has been judged that the one who contests the jurisdiction of the state courts, on the basis of the existence of an arbitration clause, may not argue for the incompetence of the arbitral tribunal.[24]

The rule prohibiting the *venire contra factum proprium* has likewise been enshrined in Swiss law which ties it into the requirements for good faith, to the "principle of confidence", as well as to the theory of the abuse of rights. It is thus that a famous ruling of the Federal Tribunal in 1963 held that "the position taken" by one party "in flagrant contradiction with their previous position", upon which another party could have relied so as to "come to a good faith conclusion" as regards the existence of a right, "constitutes a *venire contra factum proprium* which must be classified as a legal abuse…

**Page: 250**
_____

…in the sense of article 2 line 2 of the Civil Code." A pretense to the contrary that is subsequently brought before the courts does not therefore merit the protection of the Judge.[25]

10. More immediate still than that which can be seen by the analysis of French and Italian laws, the Swiss and German jurisprudence tend to support the idea that the principle by which "nobody is permitted to benefit from their own contradictions" to the detriment of others, which constitutes the justification itself of the estoppel doctrine,[26] is very much a general principle insofar as it is received, under one form or another, in numerous contemporary law systems.

Beyond the impossible ideal of universal acceptance of the rule, it is indeed the existence of a sufficiently wide-ranging foundation which in our view must be sought out in the use of Comparative Law in the discovery of "general principles" of International Trade Law.[27]

2) The *Amco* judgment also draws upon International Public Law, where estoppel has long appeared as a general principle.[28]



11. Its most powerful and most famous formulation in the jurisprudence of the International Court of Justice does without doubt remain…

**Page: 251**

_____

…that of the Vice-Chairman Alfaro who dedicated the entirety of his personal opinion in the case of the *Préah Vihéar Temple.*[29] However the brilliance of the establishment of the estoppel doctrine in the opinion of Mr. Alfaro must not lead to the minimization of the interest of the decision itself. Quite to the contrary, it is significant that the Court, without using the term, had applied the principle of estoppel or of the *venire contra factum proprium* rule in their sanctioning of the contradictory position of Thailand. In the litigation that brought about the definition of the border with Cambodia, the same had disputed the border line that resulted from the documentation established through the application of a convention concluded in 1908 between France, prior to the accession of Cambodia upon independence, and Siam, to which Thailand succeeded. The Court had in fact deemed that "even if there did exist a doubt as to the acceptance by Siam in 1908 of the documentation", Thailand, due to their previous position, "is now precluded from asserting" that they had not accepted the document that stemmed from the treaty from which they had drawn benefits for 50 years; France, and by the intermediary of the same, Cambodia, having placed its faith in the acceptance thereof. It is pointed out by the Court that Thailand, "may not today contest that they were never a consenting party to the ruling, while at the same time continuing to benefit from and enjoy the ruling."[30]

We do however find the paradox in international jurisprudence which would have that the rulings just as willingly affirm the existence of a general principle stemming from estoppel or from the maxim *venire contra factum proprium* that the conditions for its application are not met. Therefore, for example, in the case of the *Andean border,*[31] the tribunal affirms that "it seems clear (…) that there exists a principle in International Law, which is furthermore a principle of Substantive Law and not a simple technical evidence rule, according to which a State which is party to an international lawsuit is held by their previous position and actions when they are in contradiction with their pretenses in this lawsuit", this prior to stating that in the case in point, the…

**Page: 252**

_____

…contradiction was not sufficiently distinguishable so as to be able to base the argument of estoppel that was drawn. Inversely, when they do effectively sanction the contradictory position of a State, the courts prefer to be more discrete as regards the theoretical justifications of their decision. Therefore in the case of the *Minquiers and of the Echéhous*, the International Court of Justice rejects the thesis of the French government whereby the disputed islands and rocks were not liable to appropriation on the basis of the fact that the French government had itself claimed sovereignty over these islands in the past but is careful not to touch upon the theory of estoppel.[32] However, it would be to make oneself a very dogmatic conception, to be able to deduce that the estoppel doctrine would not have found any veritable applications in International Public Law, which does in fact sanction the prohibition of benefiting from ones' own actions to the detriment of others.[33]

B) Having thus revealed the sources of its inspiration, the *Amco* judgment goes one additional step further in the elaboration of the new principle, by *formally attaching it* to the fundamental requirement for good faith which one finds in all legal systems; this whether dealing with national or international law."[34]

12. By placing itself at such a degree of generality, the *Amco* judgment gives the new principle the uncontested assize that an overly detailed analysis of Comparative Law might have risked denying,[35] and underlines that which today makes all the interest as well as also all the difficulty of the method of the general principles of law.

By articulating the principles in this manner, it illustrates in the clearest manner the movement towards the *specialization of the principles of international law…*



www.Trans-Lex.org - Please cite as www.trans-lex.org/123000

**Page:  253**

_____

…which will without doubt be particularly precious to those who believe in the progressive elaboration of a *system* of transnational rules.

While retaining a sufficient degree of abstraction so as to be worthy of the qualification of a general principle, the rule according to which *nobody is permitted to profit from their own contradictions to the detriment of others,* is nothing more, as is suggested by the *Amco* judgment, than one of the corollaries of the more general principle of good faith for which we would find numerous other special applications (interpretation of good faith and its own corollaries, good faith execution…).  In turn, the principle appears to require specialization by giving birth to various rules that are applicable in this or another specific hypothesis.  Therefore, "the general evidence rule according to which the contradictory affirmations of a party are interpreted against this party", which the Irano-American dispute tribunal applied in the case of *Woodward Clyde Consultants,*[36] may be understood as a special application of the prohibition to contradict oneself to the detriment of others.  The Anglo-American doctrine of estoppel is at times considered as a particular application of this principle which is equally presented under the banner of the maxim "*allegans contraria non est audientus.*"[37]

If it constitutes a non-negligible element to be admitted to the file regarding the nature of *lex mercatoria*, such an articulation of rules that are at varying degrees of generality, a characteristic of the existence of a judicial system also constitutes one of the major difficulties of the use of the "general principles" by the arbitrators.

The core of the question is in fact to know to what degree of abstraction one should interrupt at, in the search for these principles.  As is revealed by the *Amco* judgment, the theory of estoppel as properly described, is proprietary to the Anglo-American law systems and could "not be considered in all its details as having a universal applicability."[38]  Even more concretely yet, it is not at all established that the Germanic concept of *venire contra…*

**Page:  254**

_____

*…factum proprium* and the English doctrine of estoppel, which incontestably partake of the same philosophy, do indeed cover the exact same cases.  Should one therefore only retain the principle, and sanction any contradiction, or, only seize upon those that would be sanctioned in most systems in which the "general principle" is induced, something which would result in rigorously opposite results, by means of a cumulative form of application, and therefore in a more restrictive manner?  One point appears to be certain: to assume that it prevails over the German formula, which is more in keeping with the continental tradition, the use of the term estoppel should not lead to the systematic favoring of the English or American concept in the event that these laws do not have any particular relevance to govern the case at hand.

If they commit to the path of recognition of the prohibition to contradict oneself to the detriment of others as a general principle, it will be incumbent upon the arbitrators, within the logic of the comparative analysis which is at the base of the principle, to disentangle the essential points from those accessory points, something that will without doubt not be the easiest task.

The *Amco* judgment contributes in part by taking a side on certain points of the system of the new legal general principle.

## II. - THE SYSTEM OF THE PROHIBITION TO CONTRADICT ONESELF TO THE DETRIMENT OF OTHERS

13. The *Amco* judgment usefully details the foundation of the rule and the conditions for its application, however it does generate certain questions regarding the scope which can be recognized to it, in particular in the context of the Convention of Washington of March 18, 1965 which created the I.C.S.I.D...



www.Trans-Lex.org - Please cite as www.trans-lex.org/123000

14. By expressly tying the principle of estoppel to the "requirements of good faith," the *Amco* judgment openly takes a side in the controversy which, at least as regards International Public Law, opposes the authors in relation to the *foundation* of the rule. Certain people do in effect give it a conventional or "quasi-conventional" basis, according to which the estoppel would be based upon an implicit agreement of the author of the "representation" and the one who modifies his/her position upon viewing the initial "representation."[39]…

**Page: 255**

_____

…whereas others, who are more numerous, see therein an application of the principle of good faith.[40] On this point, the judgment can only be approved without reserve, with the "quasi-conventional" thesis presenting the double inconvenience of dangerously deforming the concepts of Contract Law and gutting the estoppel doctrine of any interest, insofar as the existence of a convention of the parties, in the event that it has been established, is in itself self-sufficient.

15. As regards the *conditions of its application*, it is not without doubt that the principle assumes a veritable contradiction which was far from being apparent in the *Amco* case where it was solely reproached of the plaintiffs that they had not *sustained* the theory of the *alter ego* prior to a certain date.

However the Arbitral Tribunal usefully details the requirement for contradiction to which it adds the condition, which is manifestly inspired by the English doctrine as well as by International Public Law, of an "advantage extracted by the party who is submitted to the estoppel and/or the prejudice suffered by the other," the absence of which "necessarily excludes any bad faith" of the party who witnesses their contradictory position being reproached. Whereas we can deplore, as regards the formulation, the shift that has thus been chosen between the objective requirement of prejudice and the subjective notion of good faith, the reminder of which is not dictated here, the condition in itself is worthwhile. It would be, in effect, particularly dangerous that any contradiction be able to fall under the same estoppel chopping block and would be shocking that a litigant be able to avail themselves of the contradiction so as to in turn bring about a legal effect, when he/she has not at all suffered.

In other terms, the game of principle assumes not only a contradiction but also a contradiction which, in one way or another, has *effectively* brought about or brings about a prejudice to another.

16. The Arbitral Tribunal furthermore raises, so as to reject the pretenses of Indonesia, that the "estoppel argument that has been drawn upon does not deal with the question of jurisdiction but rather with the admissibility…

**Page: 256**

_____

…or inadmissibility of certain evidence or of certain allegations."[41] On this point the judgment does generate certain reserves.

According to the concept of Indonesia, the estoppel was meant to most notably cause an obstacle to the establishment on the part of the plaintiffs that P.T. Wisma and the State were but one and the same. However this was but one single element of a much more generalized argumentation according to which the Center would not have jurisdiction to hear such a dispute which, in reality, would only have been concerned with the execution of the lease agreement that had been concluded between two private persons, P.T. Amco and P.T. Wisma. The thesis, which was based upon the idea that all disputes between individuals were excluded from the jurisdiction of the Center, could only be successful in the case in which P.T. Wisma was not considered as the *alter ego* of Indonesia. As we have already seen, it was to be able to answer this



possible objection that Indonesia invoked the estoppel in opposition to the fact that the plaintiffs might be able to return to this point.[42] In judging that the claim did not concern the execution of the lease but rather the seizure of the hotel which was ascribable to the State,[43] the Arbitral Tribunal had irrevocably condemned the argumentation of Indonesia. As such, neither the question of the identity of P.T. Wisma or of the State, nor by means of consequence, that of the estoppel, which had been charged against them, had any merit to be asked. By gratuitously observing that the estoppel deals with the admissibility of the evidence and not with the jurisdiction, is it not that the Arbitral Tribunal intended to indicate that this doctrine could never play any role in the jurisdiction stage? In truth, this delicate question calls for a guarded response.

Taking a position that is at the extreme opposite of that which has been held by the *Amco* judgment; various authors have foreseen the taking into consideration of the concept in the discussion of the jurisdiction of the I.C.S.I.D.

Thereby, it has, for example, been suggested that the Host State would be inadmissible in sustaining that a company having its headquarters in a Contracting State would in reality depend upon a non-contracting State by application of the criteria of oversight, inasmuch as it would have previously accepted to give it the recognition of citizenship…

**Page:  257**
_____

…of the Contracting State.[44] Likewise according to certain authors, the Host State after having accepted to address a legal person:  based upon both local and foreign law, as a result of the oversight exercised upon it by foreign interests would be inadmissible to further claim that this oversight is insufficient to justify jurisdiction of the Center.[45]

One has also invoked the principle of good faith, which is more wide-ranging than that of estoppel, in support of the idea that a State which has knowingly dealt with a company undergoing the process of foundation would be inadmissible to preclude the jurisdiction of the Center on the basis of the lack of incorporation of the investor in a Contracting State at the time of conclusion of the Arbitration Convention.[46]

However one immediately perceives the dangers that the wide-ranging introduction of estoppel could represent in the judgment of the jurisdiction of the Center, insofar as, in this perspective, it is possible for all the conditions posed by the Convention of Washington to be reduced to the sole existence of consent of the parties.  To take only one example, it is clear that the Convention has taken care to add an objective condition of foreign control to that of consent for a local legal person to be able to be treated as a foreigner for the purpose of the Convention[47], one would not be able to admit that the notion of estoppel might lead the control of the jurisdiction of the Center in such a case to purely subjective considerations.

Nonetheless, it is permissible to believe that this reserve must itself only come into play insofar as its raison d'être and that even in the jurisdiction stage, the estoppel or the *non concedit venire contra factum proprium* principle is susceptible to be found to apply, as is the case in German jurisprudence[48], inasmuch as the same would not affect the goals that are pursued by the international legislator.  Therefore,…

**Page:  258**
_____

…in the case in point, if the jurisdiction of the Center did indeed depend upon the point of knowing whether P.T. Wisma was the *alter ego* of Indonesia, as has been foreseen by the plaintiff, one would have difficulty in understanding the reasons for which the *inadmissibility* to prove this point would not have been taken into consideration in the debate regarding the *jurisdiction*, it being naturally presumed that the conditions regarding contradiction and prejudice have already been established elsewhere.  Without doubt, the sanction that is specific to the estoppel is inadmissibility, as is recalled by in the *Amco* judgment, however the impossibility to prove one of the elements of fact which control the decision relating to the jurisdiction can, in turn, have an impact on the jurisdiction.

It would appear that in a manner no different than that in the *Holiday Inns* judgment, where it would appear that it did not need to make any pronouncement on this point brought up by the parties,[49] the *Amco*



www.Trans-Lex.org - Please cite as www.trans-lex.org/123000

judgment does not bring any decisive clarity on this delicate question.  It will fall to the arbitral jurisprudence of the future to settle this difficulty which we solely had the ambition to highlight.

\*\*\*

17. Without prejudging the details, it is hereafter permitted to count the rule according to which *nothing is admitted to prevail over one's own contradictions to the detriment of others* among the list of general principles that are applicable to International Trade Arbitration.

Let us bet that it will live a great career.  To be able to judge the extent, care must be given, as is the case in International Public Law,[50] of any statistical approach, insofar as the function of the great corrective mechanisms that draw upon equity, such as fraud, the abuse of the law or enrichment without cause… is that of only seizing on those most flagrant situations, with the effect of morality that has been obtained greatly exceeds the case of the types where they are effectively applied.

**Footnotes:**

[1] Compare the extracts of the judgments that have been reproduced below, Appendices I and II [AMCO Asia Corporation et al. vs. Republic of Indonesia   and   Iran-USA Claims Tribunal, Woodward-Clyde Consultants vs. Iran] p-259-272.

[2] Compare below, No. 7 and subsequent.

[3] Thus, for example, the rule is not cited among the general principles either by B- Goldman, "La Lex Mercatoria dans le contrats et l'arbitrage internationaux: réalités et perspectives", Clunet, 1979.475 or by A Kassis in his work that is nonetheless very complete, Théorie générale des usages du commerce, droit comparé, contrats et arbitrage internationaux, lex mercatoria, L.G.D.J., 1984.

[4] Compare below, No. 15.

[5] Compare the disappointing observations of the preface which Mr. Virally has devoted to the thesis of A. Martin, L'estoppel en droit international public, précédé d'un aperçu de la théorie de l'estoppel en droit anglais, Pédone, 1979, in contrast with the expansionistic ambitions of the author.

[6] For the whole of the matter, see our observations, Chronique d'arbitrage I.C.S.I.D., still to appear, Clunet, 1986.

[7] "A state should not be authorized to take advantage of its own contradictions to the detriment of another State",  individual opinion of the Vice-Chairman Alfaro in the "case of the Préah Vihéar temple", Cambodia vs. Thailand, C.I.J., Collection, 1962, p. 6 et seq.; also see the observations of J.P. Cot, A.F.D.I., 1962, 217 et seq., specially 243-246.

[8] See the extracts that have been reproduced below, Appendix I, Nos. 47-48.

[9] See below, Appendix II.

[10] The doctrine of estoppel has been invoked on multiple occasions before the Tribunal, most frequently with less luck; see for example the judgment rendered on July 13, 1964 in the case No. 100 (142-100-3) by Messieurs Mangard, Chairman, Moin and Mosk, Yearbook Commercial Arbitration, Volume X, 1985, 292; judgment rendered on December 27, 183 in the case No. 245 (99-245-2) by Messieurs Riphagen, Shafeiei and Aldrich, Yearbook Commercial Arbitration, Volume X, 1985, 316.

[11] Court of the Exchequer, Cave vs. Mills (1862), Hurlstone and Norma, P. 927.

[12] As regards the details of the English concept of the estoppel, beyond the classic work of Spencer Bower and Turner, The Law Relating to Estoppel by Representation, 3rd Edition, Butterworth, 1977; in particular see in French language, R. David, Les Contrats en Droit Anglais, L.G.D.J. 1973, No. 303 et seq., J. Dargent, Une Théorie Originale du Droit Anglais en Matière de Preuve: la Doctrine de l'Estoppel, Thesis Grenoble, 1943; A. Martin op. cit., P 7-62.

[13] Judgment No. 47.

[14] In this sense, in particular see Martin, aforementioned thesis.

[15] Compare Martin, op. cit., p. 332-336.

[16] In particular see M.-N Jobard-Bachellier, L'apparence en Droit International Privé, Essai sur le Rôle des Représentations Individuelles en Droit Privé, L.G.D.J, 1984, No. 551 et seq.

[17] For conclusions that are similar for comparisons with Italian law in which the theory of appearance does not require anything more than the appearance does not result from the false attitude of the one who is at the basis thereof, see F. Mosconi, "La dottrina dell'estoppel in diritto internazionale". Diritto Internazionale, 1962.388, in particular p. 397-399.  The comparison undertaken by the author of estoppel



and of the concept of "preclusion" which would prohibit a subject from accomplishing certain acts that are not compatible with their preceding behavior is more deceiving, insofar as it relies on the analysis of special rules, which in large part are of a procedural nature, op. cit., p. 395-396.  For correspondence of the concept of estoppel in Spanish law, see in particular José Puig Brutau, Estudios de Derecho Comparado, La Doctrina de los Actos Proprios, Barcelona, 1951, in particular p. 97 et seq.

[18] In particular see Spencer Bower and Turner, op. cit., paragraph 99; Dargent, op. cit., p. 127, in French law, the turning point leading to the foundation that was drawn upon by the "legitimate growth" results, as is known, from the renowned Banque Canadienne judgment rendered by the Plenary Assembly of the Court of Cassation of December 13, 1962, D., 1963.277, note j Calais-Auloy, J.C.P., 1963.II. 13105, obs, P. Esmein, rev. rim. Dr. civ., 1963.527, obs. Cornu; Rev. trim. Dr. com., 1963.333, obs. Houin. As regards this evolution see also Sourioux, "La Croyance Légitime", J.C.P., 1982.I.3058.

[19] Compare M.-N. Jobard-Bachellier, op. cit., Nos. 556 et seq.

[20] Even if one were not to be surprised that the excellent work dedicated by Messieurs Roland and Boyer to the Latin phrases and adages of contemporary French law, Lyon, 1978, does not make mention of it, notwithstanding that we are dealing with a classic of German judicial thought.

[21] Palandt, Commentary of the German Civil Code, §242.

[21 bis] Ibid.

[22] The German jurisprudence thereby decides that the one who does not respect themselves the separation of assets is not allowed to further invoke this rule against company creditors through the application of the principle of "venire contra factum proprium"; see for example M. Lutter, "La Responsabilité Civile dans le Groupe de Sociétés", Rev. Soc., 1981.704.

[23] Law of May 20, 1968, German Supreme Court, 50, 191.

[24] Court of Appeals of Düsseldorf, January 13, 1978, O.L.G.Z., 78, 375.

[25] Forces Hydrauliques de Saint-Gall and Appenzell S.A. vs. Township of Linthal. May 17, 1963, RO 89.II.287, French translation in Journal des Tribunaux, 1964.334.

[26] In this case, see for example, the conclusions of the Advocate General Karl Roemer, C.J.C.E., Collection, vol. VI, 1960, p. 1049.

[27] As well as, without doubt, that the absence of manifest incompatibility with the fundamental principles of the judicial systems which ignore the rule as such.  In this regard, the prohibition to contradict oneself to the detriment of others does appear to us to satisfy this requirement, at least inasmuch as one can tell from the example of French law, where, under the form that it has been given by the German and Swiss law, the rule of venire contra factum proprium would easily find a solid hold.

[28] In particular, among copious literature, see Bin Cheng, General Principles of Law as applied by International Courts and Tribunals, London, 1953, p. 141 et seq.,; G. Schwarzenberger, The Fundamental Principles of International Law, course at the Academy of the Hague, course collection, 1955, Vol. 87.1, p. 303; D.W. Bowett, "Estoppel Before International Tribunal and its Relations to Acquiescence", 33 B.Y.I.L. 176 (1957); Mosconi, op. cit., p. 388 et seq.; and the detailed analysis of the jurisprudence by Martin, aforementioned thesis.

[29] See above, Note 7.

[30] C.I.J., Collection, p. 32.

[31] Arbitral judgment rendered on December 9, 1966, R.S.A.N.U., Vol. XVI, p. 111 et seq., and the observations of J.P. Cot, A.F.D.I., 1968, p. 246-248.

[32] Collection, 1953, p. 47 et seq., in particular p. 58-59, also see, barely more explicit, the arbitral judgment rendered in 1902 in the case of the Salvador Commercial Company or the "El Triunfo" case, R.S.A.N.U., Vol. I, p. 369 et seq., in particular p. 473, or the decision rendered March 29, 1958 by the Arbitral Commission relating to the goods, rights and interests in Germany in the case Purfürst vs. Vitous, cited by Martin, op. cit., p. 81; compare the more clear judgment of the Administrative Tribunal of the United Nations of October 16, 1974, Witmer vs. the Secretary General of the United Nations Organization, A.F.D.I., 1974, p. 389, obs. T:S:

[33] Compare above, note 5.

[34] See judgment, No. 47.

[35] See above, Nos. 7 et seq.

[36] See below, Appendix II.

[37] In this sense, B. Cheng, Op. cit., p. 141; compare P. Lalive, "The first World Bank Arbitration (Holiday Inns vs. Morocco). Some Legal Problems", 51, B.Y.I.L. 123 (1980), in particular p. 145, note 4.



[38] Judgment, No. 47.

[39] In this sense, in particular consult Dargent, op. cit., p. 229 et seq., and with certain reluctance, Martin, op. cit., Nos. 108 et seq.

[40] See for example Virally, aforementioned preface, p. XI; Cheng, op. cit., p. 143; Schwarzenberger, op. cit., p. 302; Bowett, op. cit., p. 176; Mosconi, op. cit., p. 398.

[41] Amco judgment, No. 48.

[42] See the presentation of the evidence of Indonesia, judgment, No. 4.

[43] Judgment, Nos. 35-40.

[44] Buffenstein, "Foreign Investment Arbitration and Joint Venture", 5 North Carolina, J. Int'l L., 191 (1980), in particular p. 205.

[45] Buffenstein, op. cit., p. 205.

[46] P. Lalive, "The First World Bank Arbitration", aforementioned article, p. 145.

[47] See Article 25-2 (b) closing notes of the Convention of Washington.

[48] See above, No. 9.

[49] See Lalive, op. cit., p. 146.

[50] See above, note 5.