# Exhibit 57

**Recueil Dalloz 2008 Pg. 2447**

**Group Insurance tested against Legislation on Unreasonable Clauses**

**Charlotte Goldie-Genicon, Senior Lecturer at the University of Paris II (Panthéon-Assas)**

**Essentials**
The First Civil Chamber sheds new light, in a Judgment of May 22, 2008, on the nature of the relationship between the insurer and the member in the case of a group insurance contract, at the same time that it calls for a fundamental reflection on a stipulation on behalf of third parties and on the effectiveness of consumer protections. The Court of Cassation, recognizing that there is a direct contractual bond of a bilateral nature between the member and the insurer that is subject to the provisions of Article L. 132-1 of the Consumer Code, appears to accommodate the existence of an original figure of stipulation: the contract stipulation on behalf of third parties.

1 - There are marriages whose wealth comes from the obstacles they were able to overcome. Such is the case that joins group insurance to the legislation on unreasonable clauses, which just celebrated a Judgment of the First Civil Chamber of the Court of Cassation of May 22, 2008 (1).

The facts of the case were favorable for such a meeting. On the occasion of the granting of credits extended by the Cetelem Company, a borrower subscribed to the group insurance contract entered into by the credit company to cover in particular the risk of permanent and total disability. After being declared unfit for work and placed in early retirement, the borrower summonsed the insurer to reimburse the balance of credits, citing before the trial court the unreasonableness of a clause in the group insurance contract which the insurer relied on against him to deny coverage. The Court of Appeal of Nimes, in a Judgment of October 18, 2005, rejected the application on the ground that the provisions of Article L. 132-1 of the Consumer Code were inapplicable, since the clause was in a contract that was not between the borrower and the insurance company, but between the latter and the Cetelem Company, which the borrower had been content to subscribe to. The First Civil Chamber of the Court of Cassation was then referred the following issue: can the subscriber to a group insurance contract invoke the unreasonableness of a clause in this contract against the insurer? The Court decided that "subscribing to the group insurance contract, although a consequence of a stipulation on behalf of third parties, nevertheless creates between the member and the insurer, who approves him, a direct contractual relationship of a bilateral nature, whose terms, as such, fall under the provisions" of Article L. 132-1 of the Consumer Code (2).

The First Civil Chamber thus lifts - in part - the veil over the mysterious nature of group insurance, about which it can be said that it has created confusion among lawyers for many years. And in so doing, the Court has contributed to renewing the face of the stipulation on behalf of third parties upon which it based its argument. It must, indeed, be kept in mind that the application of the legislation on unreasonable clauses in group insurance closely depends on the legal nature that we attribute to the latter. Thus, it is taught that if we analyze group insurance as a stipulation on behalf of third parties subscribed for the benefit of the member, Article L. 132-1

should not be expected to apply, since the insurance contract is concluded between two professionals, whereas if one departs from the model of a stipulation on behalf of third parties to recognize the existence of an insurance contract between the insurer and each of the members, it would be possible for Article L. 132-1 to apply since the contract in this case can be concluded between a professional and a consumer. The Judgment issued by the First Civil Chamber of the Court of Cassation is in this respect, paradoxical: it acknowledges that group insurance is built, at least in part, on the model of the stipulation on behalf of third parties, but admits, at the same time, that the consumer protection legislation could be applied. It is this apparent contradiction that needs to be dissipated. One cannot help being struck by the contrast between the assurance that the Court of Cassation demonstrated in affirming the application of Article L. 132-1 and the uncertainties that affect the legal analysis that it holds concerning group insurance. If the legal analysis of group insurance appears to be hesitant (I) it, however, firmly applies Article L. 132-1 of the Consumer Code to the relationship between insurer and member (II).

### I - A hesitant Legal Analysis of Group Insurance

2 - The Judgment of May 22, 2008 is an ambiguous contribution to the controversy that undermines the doctrine concerning the legal nature of group insurance. If the First Civil Chamber relies on the existence of a stipulation on behalf of third parties, which is the consequence of the insured subscribing to the group insurance contract (A), it also acknowledges the existence of a direct contractual relationship of a bilateral nature between the insurer and the member, thus seeming to take a step towards acknowledging the original figure: the contract stipulation on behalf of third parties (B).

A - Subscribing to the group insurance contract, which is the consequence of a stipulation on behalf of third parties

3 - Group insurance is defined, since Law No. 89-1014 of December 31, 1989 (3), in Article L. 141-1 of the Insurance Code as a "contract entered into by a legal entity or the head of a firm in view of the enrollment of a group of people that meet the conditions specified in the contract, to cover the risks that depend on the duration of human life, risks affecting the physical integrity of the person or related to maternity, risk of work disability, risk of disability or unemployment," each member to "have a similar relationship with the underwriter." This unitary definition of group insurance, however, masks a more anomalous reality. Indeed, there is not just one type of group insurance, but several possible kinds of group insurance whose legal analysis is likely to vary, some having mandatory enrollment (enrollment is therefore a necessary consequence of belonging to the group), others having optional enrollment (4).

The Judgment of May 22, 2008 specifically involved a special kind of group insurance whose enrollment is optional, borrowers group insurance, often underwritten by a credit institution with an insurer to insure its future borrowers-members against risk of death, illness, disability or unemployment (5). The credit institution occupies a special place because it combines the qualities of the underwriter of the group insurance contract and the beneficiary of the insurance, as the borrower-member generally designates it to receive the insurance indemnity ensuring repayment of the loan balance in the contingency (6). As for the insurer, it most often reserves the right to select the risks by refusing to accept certain members who so apply, due to the excessive risk they represent.

4 - Two main analyses (7) of group insurance are opposed in doctrine: a "unitary"

concept (8) and a "fragmented" concept (9). According to the first, which is the oldest, group insurance is akin to omnibus insurance (10) and would be built on the model of the stipulation on behalf of third parties. A single insurance contract would be concluded between the insurer-promisor and the member-stipulator, each insured having the capacity of third party beneficiary of a stipulation subscribed for his benefit that he accepts by enrolling in the group insurance contract. The first provision, which is designed to cover the risks referred to in the group insurance contract, is coupled with a second stipulation in favor of the credit institution, whose purpose this time is the payment of the insurance compensation (11).

This classic concept of group insurance has some weaknesses, however, the main one (12) relating to the existence of an obligation incumbent on of each of the members-insured. We must indeed keep in mind that with borrowers group insurance, the member must, in principle, make payment of the insurance premiums. He is not therefore offered a direct right without compensation by group insurance, as pointed out by the Court of Cassation itself, but a contractual relationship of a bilateral nature. Moreover, the use of the stipulation on behalf of third parties, under this type of assumption, is controversial. The Court of Cassation has indeed recognized that the stipulation on behalf of third parties did not preclude "in the case of acceptance by the beneficiary, that he is bound by certain obligations" (13), apparently accommodating what is known as the stipulation on behalf of third parties with an obligation, but some authors have argued that it could not then be a real stipulation on behalf of third parties (14). The Court of Cassation, indeed, subordinates the birth of the obligation to the beneficiary's acceptance, and the birth of the beneficiary's right is inseparable from the creation of the obligation which it is the counterpart to, and it is this acceptance that makes the beneficiary both the creditor and the debtor of the promisor. There would therefore be more deviation from the relative effect of contracts and any qualifying of the stipulation on behalf of third parties would be incorrect.

It would be even more questionable in the case of borrowers group insurance, that enrollment is not sufficient to create the bond between insurer and member, since the insurer's approval is necessary to the birth of the coverage. Isn't the insurer's right to refuse to contract with a member who presents an undue risk incompatible with the acknowledgment of a stipulation on behalf of third parties (15)? The promisor who undertakes under the terms of a stipulation on behalf of third parties is indeed required to carry out his obligation towards the beneficiary. It is hard to see where there is a commitment by an insurer which may choose, or not, to offer its guarantee to the insured who approach it.

5 - The "fragmented concept" of group insurance defended by the modern doctrine, , on the contrary, attempts to acknowledge the existence of as many individual contracts as there are members. There wouldn't be just a single insurance contract containing a multitude of stipulations on behalf of third parties, but a multitude of insurance contracts between the insurer and each member-insured. More specifically, in the event that the insurer has reserved the right to select the risks, the insured's enrollment in the group contract would act as a contract offer from the insurer and the insurer's approval would be acceptance of this offer, permanently sealing the contract that was formed (16). The members would not therefore be beneficiaries of a stipulation on behalf of third parties but would indeed be parties to an insurance contract. As for the contract binding the insurer to the credit institution-underwriter, it would avoid being qualified as an insurance contract. It would involve one variety of a framework contract whose purpose is to define the conditions of coverage

offered to members, and would therefore create the contours of future individual insurance contracts entered into with each of them. For one author, Mr. Bourdon, this framework contract is close to referencing contracts that are concluded in matters of distribution between central purchasing and suppliers (17).

6 - Faced with the doctrine's hesitation, the laws relating to group insurance cause more trouble than certainties. Article L. 141-6 of the Insurance Code presumes in particular the subscriber deemed representative of the insurer, thus joining with the fragmented concept of group insurance: if the underwriter is the insurer's agent during each enrollment, then an insurance contract is concluded between the insurer and each member, and the subscriber only intervenes as a representative to the act. But this legal presumption of a mandate, besides that it is open to criticism (18), is of no help in the present case since Article L. 141-6 itself excludes borrowers group insurance from the scope of application.

7 - The case law offers no surer guidance than the laws on the subject. If the Court of Cassation admits without hesitation that the credit institution is the beneficiary of a stipulation on behalf of third parties entered into by the insured (19), it is much less firm concerning the latter's situation and vacillates between the unitary concept and the fragmented concept of group insurance. Some judgments thus expressly make reference to a stipulation on behalf of third parties entered into in favor of the insured (20), while others admit the existence of a contract between insurer and member (21). The place given to the split analysis of group insurance, however, tends to grow within the jurisprudence.

A reading of the Judgment of May 22, 2008 leaves one perplexed in this regard. The Court of Cassation seems therein to hesitate between the unitary analysis and the fragmented analysis of group insurance. It acknowledges, on the one hand, enrollment in the group insurance contract as being the result of a stipulation on behalf of third parties, thereby confirming the positive response it intends to provide to the stipulation on behalf of third parties with obligation: the stipulation on behalf of third parties may be the cause of an obligation incumbent on the member-beneficiary, regardless of whether that obligation is a primary obligation - the obligation to pay premiums - and not a mere incidental obligation. But the Court held, on the other hand, that enrollment creates a direct contractual relationship of a bilateral nature between member and insurer. Isn't this an implicit sacrifice to the fragmented concept of group insurance? Isn't it somewhat clumsy to argue that the stipulation on behalf of third parties is the source of a contractual relationship between insurer-promisor and insured-beneficiary? The Court of Cassation itself moreover seems to be aware of this difficulty: isn't the negative turn it employs (22) a sign that this direct contractual relationship is not a normal consequence attached to the stipulation on behalf of third parties (23)? There is, in fact, no awkwardness or contradiction. The stipulation on behalf of third parties is perfectly compatible with the recognition of a contract between member and insurer, provided one wants to admit the existence of an original figure of stipulation: the contract stipulation on behalf of third parties.

B - Is enrollment in the group insurance contract the result of a contract stipulation on behalf of third parties?
8 - The solution given in the Judgment of May 22, 2008 is not new, since the Court of Cassation has had occasion to assert, in a Judgment dated June 7, 1989, that "adherence to the group insurance contract, although a consequence of a stipulation on behalf of third parties, nevertheless creates a direct contractual relationship

between the member and the insurer" (24). The perseverance shown by the Court of Cassation in this matter is not trivial. It demonstrates that, for the Court, there is no inconsistency in claiming that the provision may result in a direct contractual relationship and the negative formulation that it uses tends to emphasize the only apparent nature of this contradiction: the insured's enrollment, even if it is the consequence of a stipulation on behalf of third parties can well be the cause of a contract between member and insurer.

9 - As was remarkably shown by one author, Mr. Martin (25), there is indeed, next to the traditional forms of stipulation on behalf of third parties, an original figure of stipulation: the contract stipulation on behalf of third parties. The promisor does not promise to perform a service in favor of the beneficiary, but to enter a contract with predetermined conditions with the beneficiary, if the latter so requests by accepting the stipulation (26). The contract stipulation on behalf of third parties would thus be close to a form of unilateral promise to contract, as the promisor already gives its consent to the entering of a contract preconstituted towards the third party beneficiary (27), who would benefit from a right of option exercised through the power he has to accept or reject the stipulation subscribed to his advantage (28). The stipulation on behalf of third parties would therefore not be in any way incompatible with the creation of individual contracts in the promisor-beneficiaries relationship and therefore not inconsistent with the existence of an obligation incumbent on the beneficiary. This obligation would be simply the consequence of the contract arising out of the acceptance by the beneficiary of the stipulation made in his favor (29). The major advantage of this type of stipulation is the possibility for the "beneficiaries to access, via the stipulator's bargaining power, contract terms that they would not have received in isolation by individual and separate discussions with the supplier or service provider concerned" (30).

This attractive construction must be somewhat amended in the case of borrowers group insurance. It must be remembered that in this type of contract, the insurer usually reserves the right to approve or not the members who contact it. It has not therefore already committed to providing its coverage to all the members who so request. The stipulation on behalf of third parties then has a somewhat more modest purpose: the promisor undertakes to offer the member the coverage conditions it has negotiated with the credit institution, in the event that it accepts the member (31). Only if it has waived the right to select the risks will the real purpose of the stipulation on behalf of third parties be the entering of an insurance contract. In other words, either "the insurer has already committed to accommodate all the seekers for the insurance" (32) and the direct right that the latter receive is "a right of option to benefit, or not, from a promise of insurance" (33), or that "the insurer has, more conventionally, reserved the right to individual select risks" (34) and the members are empowered against it with the "right to have access to specifically negotiated terms to their attention" (35). There will therefore, in the latter case, once the insurer's approval is obtained, be a juxtaposition of the group contract, bearing the stipulation on behalf of third parties, and an individual insurance contract whose terms are largely derived from those laid down in the source contract.

10 - The stipulation would thus, in certain circumstances, constitute a "conventional method of forming contracts on behalf of third parties" (36), which the First Civil Chamber of the Court of Cassation clearly recognized in a Judgment of March 9, 1983 (37) The Court of Cassation thereby indeed approves the reasoning of the trial court stating that "the stipulation on behalf of third parties (...) only conferred to the member the power to conclude with the insurer a separate contract whose purpose

(…) is a direct and reciprocal commitment of the parties." The ""enrollment application" was [therefore] not an acceptance, but an insurance proposal determining the purpose and conditions of the agreement to come (…)." The analysis of group insurance adopted by the Court of Cassation in its annual report for 1986 also shows, in an underlying way, this figure of the contract stipulation on behalf of third parties. In the words of the Court, group insurance is based "originally on a stipulation on behalf of third parties, *by which the promisor (the insurer) undertakes to the underwriter to offer insurance to members in accordance with the conditions established by them.* But as of the enrollment in this proposal, a direct contractual relationship is established between the member and the insurer" (38).

11 - It remains that the wording of the Judgment of May 22, 2008 is not entirely clear. The Court of Cassation appears to have *"remained halfway down the road leading to the fragmented analysis of insurance"* (39): it does not explicitly recognize the existence of a contract between member and insurer, as it could have done in other rulings (40), but only that of a direct contractual relationship of a bilateral nature. Does this mean that there is, in its view, no real contract between member and insurer, but only a relationship whose contractual nature results from the fact that it arises from the contract between insurer and underwriter (41)? Yet it is difficult to see what would be the consistency of such a contractual relationship unless it is that of a contract between insurer and member (42). The Court also itself emphasized, in its terms, the two key moments in the formation of this contract: the enrollment by which the member proposes to the insurer to contract under the conditions defined in the group contract, and the approval by which the insurer accepts this offer. Thus, there is indeed an exchange of consent and the birth of an insurance contract between insurer and member, which confirms the aforementioned Judgment of March 9, 1983 and the *Annual Report for 1986* described above.

The solution posed in the Judgment of May 22, 2008 deserves to be corrected on one point: it is not enrollment that creates a direct relationship between member and insurer, but the latter's approval. As the insurer has reserved the right to select the risks, the coverage offered by it and the obligation to pay premiums, which is the counterpart, can arise only from the consent given by the insurer in this approval.

12 - Recognition of a stipulation on behalf of third parties along with the insurance contracts concluded between insurer and members is not in any way heresy, as we have seen. One last point must, however, be considered: what is the purpose of this stipulation on behalf of third parties? After all, if we assume that an individual contract is formed between member and insurer, this contract is sufficient to explain that the latter is bound towards each member to insure the risk under the contract: the members-insured are simply parties to the insurance contract and may, as such, require the provision of the service that was promised to them. There is no need for it to use the mechanism of the stipulation on behalf of third parties. This is, in reality, only a truncated view of group insurance that obscures some of the insurer's commitments.

It should be understood, in fact, that the insurer is bound as of the conclusion of the original contract to the credit agency and only the mechanism of the stipulation on behalf of third parties helps to explain this requirement (43). The insurer's commitment is, as we have seen, "less aggressive" (44) when he has reserved the right to accept the members who present themselves to him. This does not mean that it is non-existent. The insurer is bound by the coverage conditions in the contract-support agreement with the credit institution and has only one alternative:

concluding the insurance contract under those conditions, by approving the insured, or not entering into it. It cannot offer a participant less favorable conditions than those set in the original contract, and these conditions may involve the type of pricing, as well as the coverage period, the nature of the insurable risks, or the nature and extent of the benefits paid... Group insurance in effect allows the insurer to achieve economies of scale, it authorizes granting members a reduction in the amount of the premium that would be about 30% (45). Each member could therefore, as a third party beneficiary, require the insurer-promisor to give him access to the predetermined coverage conditions in the group contract.

The recognition of a stipulation on behalf of third parties has another advantage: it allows to explain that the lender does not completely remove itself from the group insurance scene after the conclusion of the initial contract. It may in fact require that the insurer-promisor carry out towards policyholders the stipulation subscribed to their advantage (46), which was indeed acknowledged in a Judgment of the Court of Cassation of June 7, 1989 (47). The underwriter can thus get the insurer to offer to any approved member the coverage conditions specified in the contract-support.

The qualification of the stipulation on behalf of third parties also carries another consequence: the right of the stipulating credit institution to revoke the stipulation created for the benefit of the borrowers-members, as long as they have not accepted the stipulation by enrolling in the group contract. Three successive periods thus succeed one another: before enrollment, the credit institution may withdraw the right that members have available to them to access the terms negotiated on their behalf; once a borrower has enrolled, this right is confirmed and becomes irrevocable with regards to him: the member "benefits from an analysis of his risk on the basis agreed to at the date of application, since [the insurer] can no longer, in principle, change these conditions" (48); once approval is obtained, the insurance contract is finally concluded, which results in the birth of the coverage. The insurer can no longer change in the future the coverage offered to the insured (49), unless there is a special provision authorizing it (50) or it has included in the contract a clause allowing the revision under certain conditions (51).

It must finally be noted, in conclusion, that the juxtaposition of a stipulation on behalf of third parties and individual insurance contracts can avoid some of the disadvantages attached to the unitary concept of group insurance. Thus, the insurer cannot enforce against the insured the compensation between the claim that this insured holds against it for the payment of the insurance benefits and the claim it holds against another insured who has not paid his insurance premiums (52). It also cannot cancel all the individual insurance policies in the event of a disaster striking one of the members, since there is not a single insurance policy but a multitude of insurance contracts that are independent of one another (53).

The analysis of group insurance used in the Judgment of May 22, 2008 remains hesitant, as we have seen. The Court of Cassation, however, has been much firmer when it comes to affirming the application of Article L. 132-1 of the Consumer Code.

## II - A Firm Application of Article L. 132-1 of the Consumer Code to the Member-Insurer Relationship

13 - The debate concerning the legal nature of group insurance is far from sterile (54). By basing itself on the structure of group insurance that has emerged, the First Civil Chamber of the Court of Cassation is able to support the extension of Article L.

132-1 of the Consumer Code to group insurance (A). The reasoning it employs, including the reference to a direct contractual relationship of a bilateral nature, raises questions about its possible influence on assumptions other than group insurance (B).

A - The extension of Article L. 132-1 of the Consumer Code to group insurance
14 - The issue of the application of Article L. 132-1 of the Consumer Code is not new and the First Civil Chamber of the Court of Cassation has already had to deal with it. It has indeed admitted, in a Judgment of February 26, 2002 (55), that a group insurance contract could be covered by the legislation on unreasonable clauses. But it has made this application in such an underground manner, without ruling on the specific structure of group insurance. The Judgment of May 22, 2008 confirms the extension of Article L. 132-1 to group insurance. It does it this time in an open manner and brings to the solution the theoretical justification that it was lacking. Indeed, the Court clearly based itself on the legal analysis that it draws from the relationships resulting from group insurance as the foundation for its decision.

It should be remembered, in this regard, that the application of the legislation on unreasonable clauses closely depends on the legal nature that is assigned to group insurance. It has been argued that, if we analyzed group insurance as a stipulation on behalf of third parties taken out in favor of the member, Article L. 132-1 should not be applicable (56). The scope of this article in effect is "contracts *entered into* between professionals and non-professionals or consumers" (57). However, in the unitary concept of group insurance, the insurance contract is concluded between the insurer and the underwriter, who both qualify as professionals. Added to this is that the member then does not have the capacity of a party to the contract that contains the clause (58): The stipulation on behalf of third parties, in the unitary concept, does not make him a contracting party and he cannot, as a third party, take action to secure the elimination of such a clause (59).

If we admit, on the contrary, that each member is a party to an individual insurance contract whose terms are derived from the original contract between insurer and underwriter, Article L. 132-1 can be applied, provided of course that the member is a consumer. The contract is indeed entered into between a professional (the insurer) and a consumer and the member is a party, and not a third party, to the contract. He may therefore indeed claim the protection of the law on unreasonable clauses, provided that the insurance he has taken out does not cove r an occupational hazard (60).

The Judgment of May 22, 2008 may, therefore, be surprising at first: it admits the existence of a stipulation on behalf of third parties in favor of the member, but disciplines the trial court for refusing to apply Article L. 132-1. This paradox is due in reality, as we have seen, to the possibility of admitting the coexistence of a stipulation on behalf of third parties - which is then a stipulation of a contract on behalf of third parties - and of the fragmented concept of group insurance. Once it is recognized that the stipulation can lead to a contract between insurer and member, there is no obstacle to admit the application of the legislation on unreasonable clauses to insurer-member relationships.

15 - This application, if it is legally sound, is also timely. One could certainly argue that the coverage conditions written into the group contract were originally negotiated between contracting parties of equal strength: the insurer and the underwriter. We are in the situation that is opposite to that sometimes encountered

in case law (61) where the contract was concluded between two consumers, but negotiated with a professional agent for one of the two consumers, a situation where some authors seek the application of the legislation on unreasonable clauses because of the weakness of the unrepresented consumer (62). Here the contract was concluded between a professional and a consumer but negotiated by two professionals. Couldn't it therefore be argued that the underwriter was able to defend the interests of its members and that they therefore do not deserve the protection of Article L. 132-1? This analysis is not convincing. Negotiating for one's self is not the same, first of all, as negotiating on behalf of a third party and it is not certain that the lender will use the same care in protecting the interests of its borrowers that it would have used to defend its own interests. It should be remembered, moreover, that the member, as of the moment when he commits himself, has no power to negotiate. The term used to designate his acceptance is, in this respect, revealing: he adheres to the contents of a pre-constituted contract, some of whose clauses will indeed often be beyond him. The member therefore deserves to benefit from the protection of the law on unreasonable clauses. One last argument can finally be put forward: the application of Article L. 132-1 of the Consumer Code to group insurance is not contrary to the insurer's forecasts. The latter is aware, when it negotiates the group contract, of the type of population and type of risks that will be covered by the insurance it offers. It knows perfectly well in advance that its coverage is for consumers who may, as such, avail themselves of the legislation on unreasonable clauses. The situation therefore differs from that encountered in the chains of transferring contracts in which the consumer, the final beneficiary of the action for contractual liability that passed along the chain, can have a clause in the original contract enforced against him without power to invoke its abusive nature (63). Compliance with the original debtor's forecasts then calls for the non-application of Article L. 132-1 if the contract originally entered into bound together two professionals.

16 - The relativity of the penalty for the unreasonableness of the clause calls for particular attention: the disputed clause shall be deemed unwritten in the single contract binding the insurer to the member who has invoked Article L. 132-1: it is indeed, in the words of the Court of Cassation, the provisions of the bilateral contractual relationship established between insurer and which are member of this text. The clause shall remain, however, in the group contract uniting the insurer to the lender, as well as in all contracts between the insurer and the other members, until they have been brought before the judge (64). This means that the disputed clause will remain in future insurance contracts concluded by the new members. The consumer associations, however, could act on the basis of Article L. 421-6 of the Consumer Code, to demand the removal of this clause from the group contract, when the latter will seek to cover non-occupational risks: the group contract can then indeed be analyzed as containing a model contract offered to or intended for consumers, within the meaning of that Article. Thus we see that an individual insurance contract has some autonomy compared to a group contract: it will not always be the perfect tracing for the predetermined stipulations in the latter, since certain clauses in the contract originally provided in the group contract can be eliminated because they are abusive, or even because they have not been brought to the member's attention at the moment he expressed his consent to the contract by enrolling (65). Similarly, the requirement attached to an individual insurance contract is separate from that governing a group contract: the biennial requirement, specific to an insurance contract, will only, in fact, be applied to the insurer-member relationship, as a group contract cannot be classified as an insurance contract.

The application of Article L. 132-1 to a group insurance contract is fully justified as long as one wants to admit the existence of a contract concluded between insurer and member. However, we have seen that the wording used by the Court of Cassation was ambiguous and that it did not explicitly recognize the existence of such a contract. We can therefore ask whether the Judgment of May 22, 2008 has a broader scope.

B - The influence of Article L. 132-1 of the Consumer Code outside of group insurance

17 - We can, first of all, examine the potential impact of the Judgment of May 22, 2008 on the stipulations on behalf of third parties that prosper outside of group insurance. Can we grant the third party beneficiary the right to invoke the unreasonableness of a clause that the promisor enforces against him? Everything depends on the type of stipulation proposed. If the provision in question can be regarded as a contract stipulation on behalf of third parties, because the promisor has undertaken with a third party to enter into a contract whose conditions are predetermined - or to consider this third party's application on the basis of these conditions - there is no obstacle to accepting the application of Article L. 132-1, when the third party beneficiary has the status of consumer: the contract arising from the acceptance of the stipulation will then indeed be concluded between a professional and a consumer, and the third party beneficiary shall be a party to that contract. The solution resulting from the Judgment of May 22, 2008 is thus potentially applicable to all the provisions on behalf of third parties with the responsibility incumbent on the third party beneficiary.

If, on the other hand, the stipulation merely seeks to enforce a provision to the benefit of a third party, it is no longer possible to apply the legislation on unreasonable clauses. Under such an assumption, in effect, the obligation that is the possible counterpart of the right offered to the third party beneficiary remains the stipulator's responsibility - otherwise, the stipulation would be a contract stipulation on behalf of third parties. There is, in the words of the Court of Cassation, no direct contractual relationship of a bilateral nature between promisor and third-party beneficiary, but a simple direct right to the latter's benefit. Moreover, this bilateral nature is necessary for the application of Article L. 132-1, as the unreasonableness of a clause requires the characterization of a "significant imbalance between the parties' rights and obligations." Added to this is that the third party beneficiary is not then a party to the contract between promisor and stipulator and cannot, as such, demand the elimination of one of this contract's clauses. This has, for example, led the Court of Appeal of Grenoble, in a Judgment of February 26, 2004 (66), to deny the benefit of the provisions relating to unreasonable clauses to an officer who benefited, for his second home, from a remote monitoring contract concluded by the company to his benefit.

18 - It is, secondly, the wording used by the Court of Cassation that raises doubt. We have seen that the Court expressly did not recognize the existence of a contract between the insurer and the member, but only a direct contractual relationship of a bilateral nature. Two interpretations of the Judgment are then possible: either the contractual relationship of a bilateral nature is just another way to describe the existence of a contract between insurer and member and the Judgment of May 22, 2008 would be limited to strictly enforcing the terms of Article L. 132-1, paragraph 1, of the Consumer Code (the contract has indeed been concluded between a professional and a consumer), or the Court did not intend to recognize the conclusion

of a contract between insurer and member and the Judgment of May 22, 2008 would then be detached from the terms of Article L. 132-1 of the Consumer Code. For this text to be applied, it would be sufficient that a contractual relationship of a bilateral nature exist between a professional and a consumer, without that they have directly entered into a contract. The solution would then extend beyond the scope of group insurance to apply to other situations where the professional and the consumer have not given their consent directly but are united by a contractual bond of a bilateral nature. One would think, for example, of the case of the assignment of a contract in which the assignor would have the capacity of a professional and the assignee that of a consumer; the assignee could claim against the assignor the unreasonableness of a clause, even if the assignor's consent cannot be analyzed as generating a new contract (67). Transportation contracts could also be affected by this solution. We know that Article L. 132-8 of the Commercial Code, as amended by the Act of February 6, 1998, raised the recipient to the rank of a party to a transportation contract (68) in the land transportation of freight (69). The contract was only however initially concluded between the shipper and the carrier, and the consignee was, subsequently incorporated into this contract when he joined it. The recipient, if he has the capacity of consumer, could then take advantage of the abusive nature of certain clauses against the carrier, since a direct contractual relationship of a bilateral nature binds him to the latter.

The union, which has now been consummated, between group insurance and the legislation on unreasonable clauses has not been without obstacles. It continues to cause problems. But it carries in its womb, as we have seen, fruitful questions concerning the mechanism of the stipulation on behalf of third parties. May it continue to feed the debate among lawyers for a long time.

**Key Words:**
**CONSUMER** * Unfair Clause * Group Insurance * Member * Insurer * Direct Contractual Relationship

**(1)** D. 2008. Jur. 1954, Note D. R. Martin; JCP G 2008. II. 10133, Note A. Seriaux, and I. 179, No. 8, Obs. P. Grosser.

**(2)** It then moves to another area, automatically belonging to a violation of Art. L. 133-2 Cons. C. by the trial court: the clause that the insurer claimed to enforce against the member was ambiguous and the appellate court should, in accordance with the requirements of Art. L. 133-2, have chosen the meaning most favorable to the insured-consumer.

**(3)** V. L. Mayaux, *in* J. Bigot, P. Baillot, J. Kullmann and L. Mayaux, Treaty on Insurance Law, V. 4, Personal Insurance, LGDJ, 2007, No. 771 f., Pg. 619 f.; Y. Lambert-Faivre and L. Leveneur, Insurance Law, Dalloz, 12th Ed., 2005, No. 917 fol., Pg. 776 s.

**(4)** In this sense, J. Kullmann, Basic Legal Rights in Group Insurance, RGDA 1998. 524 s.

**(5)** See on this point, J. Kullmann, *in* Personal Insurance, *op. cit.*, No. 938 fol., Pg. 777 s.

**(6)** See on this point, L. Mayaux, Personal Insurance, *op. cit.*, No. 785, Pg. 628 fol.

**(7)** Another analysis was proposed by some authors: group insurance should be treated as an insurance contract with bilateral effect concluded between the insurer and the underwriter on the head of the members-insured (D. Veaux, J.-Cl. Civil Law, Appendices, Insurance, Issue. 18, No. 10, C. J. Berr and H. Groutel, note under Civ. 1st, Dec. 15, 1978, D. 1979. Jur. 402, P. Malaurie, L. Aynès and P. Stoffel-Munck, Bonds, Defrénois, 3rd Ed., 2007, No. 816, Pg. 431). *Contra*, J. Francois, Legal Transactions conferring Three Party Status (stipulation on behalf of third parties and delegation of claim), Thesis, Paris II, 1994, No. 174, Pg. 130.

**(8)** L. Mayaux, Personal Insurance, *op. cit.*, No. 819, Pg. 655.

**(9)** *Ibid.*, No. 824, Pg. 660.

**(10)** In this sense, Picard and Besson, General Treaty of Marine Insurance, t. IV, LGDJ, 1945, No. 38.

**(11)** L. Mayaux, Personal Insurance, *op. cit.*, No. 823, Pg. 658 s.

**(12)** For other criticisms raised against the qualification of stipulation on behalf of third parties, See L. Mayaux, Personal Insurance, *op. cit.*, No. 823, Pg. 658 s.

**(13)** Civ. 1st, Dec. 8, 1987, Bull. Civ. I, No. 343, RTD Civ. 1988. 532, Obs. J. Mestre, D. 1989. Somm. 233, obs. J.-L. Aubert, G. Venandet, The Stipulation on Behalf of Third Parties with Obligation accepted by the Third Party Beneficiary, JCP 1989. I. 3391. Already, in the same direction, Civ. 1st, November 21, 1978, D. 1980. Jur. 309, Note C. Carreau; JCP 1980. II. 19315, note P. Rodière; Defrénois 1979. 1176, obs. J.-L. Aubert. *Contra* previously Civ. 3rd, April 10, 1973, D. 1974. Jur. 21, Note C. Larroumet.

**(14)** See not. J. Ghestin, C. Jamin and M. Billiau, Civil Law Treaty, The Effects of a Contract, LGDJ, 3rd Ed., 2001, No. 974, Pg. 1050 f.; C. Larroumet, The Obligations, The Contract, 2nd Part, Effects, Economica, 6th Ed., 2007, No. 807 *bis*, Pg. 982 f.

**(15)** In this sense, F. Boucard, Legal Analysis of Group Insurance in Credit Matters, RGDA 2002. 644 ff., spec. 647.

**(16)** In this sense, V. Bourdon, Distribution of Insurance by Associations, Contribution to the Study of Group Insurance, LGDJ, 2002, No. 470, Pg. 233.

**(17)** V. Bourdon, prev. thesis, No. 498 f., Pg. 246 s.

**(18)** In this critique, See V. Bourdon, prev. thesis, No. 371 f., Pg. 184 f. He stressed in particular that the underwriter will combine the capacity of the insurer's contractual partner and the insurer's agent.

**(19)** Civ. 1st, November 14, 1995, D. 1996. Jur. 436, Note M. Billiau; Defrénois 1996. 750, Obs. P. Delebecque; RTD Civ. 1997. 122, Obs. J. Mestre; RGDA 1996. 410, Note J. Kullmann, March 31, 1998, 1998 RGDA. 700, Note J. Kullmann; H. Groutel, The Borrower and the Starting Point of the Biennial Requirement: A New Foundation, RCA 1998. Chron. 12, G. Courtieu, About Insurance related to a Loan: Stipulation on Behalf of Third Parties or Assignment of Claim?, JCP 1998. Chron. 28, P. Sargos, Setting the Starting Point of Limitation Periods in Insurance, JCP 1998. I.

130, Civ. 1st, March 27, 2001, RGDA 2001. 355, Note J. Kullmann, March 5, 2002, RGDA 2002. 442, Note J. Kullmann.

**(20)** See not., Civ. 1st, Dec. 5 1978, D. 1979. Jur. 401, Note C. J. Berr and H. Groutel; June 7, 1989, 1989, Defrénois. 1989. 1057, Obs. J.-L. Aubert; H. Groutel, The End of the Hostages, RCA 1989. Chron. 27. *Adde* Civ. 1st, Jan 20, 1993, RGAT 1993. 336, Note J. Kullmann.

**(21)** Civ. 1st Civ., March 9, 1983, RGAT 1983. 526, Nov. 13, 1996, 1997 RGDA. 221, Note L. Mayaux, RCA 1997. 109, Note G. Courtieu, November 25, 1997, Bull. Civ. I, No. 324; RGDA 1997. 1066, Note J. Kullmann, who sees the credit institution as "a third party in relation to an insurance contract binding the insurer to the insured member" Civ. 1st Civ., March 2, 2004, RGDA 2004. 347, Note L. Mayaux. *Adde* Civ. 2nd, March 18, 2004, RGDA 2004. 486. See also the cases that have equated the credit institution to a third party on the question of the starting point of the biennial limitation, when the cause of the insured's action against the insurer was the appeal by a third party: Civ. 1st, Nov. 4, 1992, RGAT 1992. 837, Note J. Bigot; RCA 1992. Chron. 3, H. Groutel, May 26, 1993, RCA 1993. 281, Obs. S. Bertolaso; May 9, 1996, RGDA 1996. 615, Note J. Kullmann, and November 25, 1997, prev.

**(22)** "(…) enrollment in the group insurance contract, *although* the consequence of a stipulation on behalf of third parties, *nevertheless* creates, between the member and the insurer, who approves him, a direct contractual relationship of a bilateral nature (…)."

**(23)** In this sense, V. Bourdon, prev. thesis, Note 79, Pg. 205. *Adde* H. Groutel, RCA 1989. chron. 27, Pg. 3.

**(24)** Civ. 1st, June 7, 1989, prev., *Adde*, Civ. 1st, Nov. 29, 1988, RGAT 1989. 400, Note J.-L. Aubert.

**(25)** D. R. Martin, The Stipulation of a Contract on Behalf of Third Parties, D. 1994. Chron. 145. *Adde*, from the same author, Change of Contracting Party, D. 2001. Chron.. 3144; and prev. Note, D. 2008. Jur. 1954.

**(26)** D. R. Martin, prev. chron., D. 1994. 145.

**(27)** D. R. Martin, *ibid*.

**(28)** D. R. Martin, *ibid.*, Pg. 146.

**(29)** D. R. Martin, *ibid.*, Pg. 147.

**(30)** D. R. Martin, *ibid.*, Pg. 145.

**(31)** In this sense, J. Kullmann, prev. Note, RGDA 1997. 1066, prev. Art., RGDA 1998. 526.

**(32)** V. Bourdon, prev. thesis, No. 407, Pg. 202.

**(33)** *Ibid.* Professor M. Picard had already foreseen this particular nature of group insurance (*in* The Stipulation on behalf of Third Parties and its Main Applications, Proceedings of the Association H. Capitant, V. II, 1952, Pg. 277). *Contra*, M.

Tchendjou, Contemporary Applications of the Stipulation on behalf of Third Parties, Thesis, Paris I, 1995, No. 432 s., Pg. 408 s.

**(34)** V. Bourdon, prev. thesis, No. 407, Pg. 202.

**(35)** *Ibid.*

**(36)** V. Bourdon, prev. thesis, No. 399, Pg. 199.

**(37)** RGAT 1983. 526.

**(38)** Report C. Cass. for 1986, RGAT 1987. 630 (emphasis added).

**(39)** L. Mayaux, Personal Insurance, *op. cit.*, No. 888, Pg. 717.

**(40)** See the cases cited *supra,* Note 21.

**(41)** In this sense: J.-L. Aubert, prev. obs., Defrénois 1989. 1057.

**(42)** In this sense, H. Groutel, The End of the Hostages, RCA 1989. chron. 27, Pg. 3, L. Mayaux, Personal Insurance, *op. cit.*, No. 888, Pg. 717, D. R. Martin, prev. note D. 2008. Jur. 1954.

**(43)** This is the reason why some authors prefer the qualification of the contract stipulation on behalf of third parties to that of double brokerage concerning referencing contracts in distribution (M. Behar-Touchais and G. Virassamy, Treaty of Contracts, Distribution Contracts, LGDJ, 1999, No. 1451, Pg. 795 f.): it alone can explain that suppliers are already committed with regards to members concerning the purchasing terms negotiated by central purchasing.

**(44)** V. Bourdon, prev. thesis, No. 407, Pg. 202.

**(45)** J. Kullmann, News of Group Insurance for Borrowers, LPA, June 17, 1998. 45, spec. Pg. 49.

**(46)** It is well known, in fact, that the stipulator can bring against the promisor an action to carry out the stipulation on behalf of third parties in respect of the beneficiary. See not. Civ. 1st, July 12. 1956, D. 1956. Jur. 749, Note Radou.

**(47)** Prev.

**(48)** See Bourdon, prev. thesis, No. 421, Pg. 208. In contrast, if the insurer has waived selecting the risks, enrollment gives birth to the insurance contract and to the related coverage.

**(49)** In this sense, Civ. 1st, December 15, 1978, prev.

**(50)** This is true of Art. L. C. 141-4 Insur. C.: Indeed, this law makes subsequent amendments to the group contract binding on members without their consent. Specifically, the member has a choice: remain in the group while suffering the amendment or leave the group by renouncing his enrollment. The text does not apply, however, to group insurance whose purpose is to guarantee repayment of loans that are governed by special laws.

**(51)** This would involve a clause by which the member would agree, in advance, that subsequent amendments to the group contract agreed to between insurer and underwriter are applicable to him. See on this issue, V. Bourdon, prev. thesis, No. 431 f., Pg. 213 f.

**(52)** In this sense, Civ. 1st, June 7, 1989, prev.

**(53)** Contrary to what the Court of Cassation held (Civ. 1st, Jan. 20, 1993, prev., which admits that the occurence of a loss with respect to one member authorizes the termination of the group contract in its entirety).

**(54)** In this sense, L. Mayaux, Personal Insurance, *op. cit.*, No. 817, Pg. 654.

**(55)** Bull. Civ. I, No. 71; Defrénois 2002. 771, Obs. E. Saval; RGDA 2002. 351, Note J. Kullmann; RTD civ. 2003. 90, Obs. J. Mestre and B. Fages; D. 2002. AJ. 1346.

**(56)** See on this issue, J. Kullmann, Unreasonable Clauses and Insurance Contracts, RGAT 1996. 33; Personal Insurance, *op. cit.*, No. 955, Pg. 786 f.; M. Bruschi, The Elimination of Unreasonable Clauses in Insurance Contracts, *in* Liability and Insurance, Studies offered to Hubert Groutel, Litec, 2006, Pg. 73; L. Mayaux, Personal Insurance, *op. cit.*, No. 809, Pg. 645 f.

**(57)** Emphasis added.

**(58)** In this sense, J. Ghestin, C. Jamin and M. Billiau, The Effects of the Agreement, *op. cit.*, No. 719, Pg. 760 f.

**(59)** In this sense, C. Larroumet, Three Person Legal Transactions, Thesis, Bordeaux, 1968, Nos. 161 and 171. Rappr. E. Gaudemet, General Theory of Obligations, Sirey, 1965, Pg. 254.

**(60)** This has probably led a ruling by the Court of Cassation of May 15, 2008 (Civ. 2nd, No. 07-14430) to refuse to apply the legislation on unreasonable clauses to borrowers group insurance contracts.

**(61)** See not. Civ. 1st, May 4, 1999, Defrénois 1999. 1004, Obs. D. Mazeaud; Contracts, conc., Consum. 1999, No. 124, Note L. Leveneur, and No. 134, Note G. Raymond; D. 2000. Summ. 48, Obs. J.-P. Pizzio; JCP 1999. II. 10205, Note G. Paisant, and E 1999. II. 1827, Note C. Jamin, RTD Civ. 2000. 107, Obs. J. Mestre and B. Fages, who declared inadmissible an action by consumer associations for the removal of certain clauses from the act, because the contract was not concluded between a professional and a consumer.

**(62)** Contrary to what the Court of Cassation decided in the judgment mentioned above, See not. D. Mazeaud, prev. Note; G. Paisant, prev. Note, J.-P. Pizzio, Obs. prev., J. Calais-Auloy, F. Steinmetz, Consumer Law, Dalloz, 7th Ed., 2006, No. 178-1.

**(63)** Rappr. Civ. 1st, June 7, 1995, JCP 1995. I. 3893, Obs. G. Viney, Contracts, Conc., Consumers. 1995, No. 159, Obs. L. Leveneur; D. 1996. Jur. 395, Note D. Mazeaud, and Summ. 14, Obs. O. Tournafond; RDI 1996. 74, Obs. P. Malinvaud and B. Boubli; RTD Com. 1996. 74, Obs. B. Bouloc, who decides that the manufacturer of

the thing sold has the right to enforce against the sub-purchaser exercising a contractual action every defense that he is entitled to enforce against his own co-contracting party. The ruling does not directly address the application of the legislation on unreasonable clauses to chains of contracts, but it can be inferred that the sub-purchaser-consumer should not be able to take advantage of the unreasonableness of a clause against the manufacturer-professional, since the latter's co-contracting party was himself a professional.

**(64)** The clause could also exist in contracts in which the member has the status of professional. But it is unlikely that some group members are consumers and others are professionals. Members, in group insurance, must indeed be bound to the underwriter by a relationship of the same nature.

**(65)** In this sense, Civ. 2nd, March 18, 2004, prev.

**(66)** Com. Ch., Juris-Data No. 2004-251959. The Court of Appeal decides that the officer, who only had the capacity of third party to the contract, could not invoke the provisions of Art. L. 132-1 Consum. C. because these are reserved solely for the contracting consumer, the only legal entity that entered into the contract who is entitled to claim the application of this law.

**(67)** In this discussion, See not. F. Terré, P. Simler, Y. Lequette, The Obligations, Dalloz, 9th Ed., 2005, No. 1310 s., Pg. 1247 f.; J. Ghestin, C. Jamin and M. Billiau, The Effects of the Agreement, *op. cit.*, No. 1053, Pg. 1138 f.; P. Malaurie, L. Aynès and P. Stoffel-Munck, The Obligations, *op. cit.*, No. 917 f., Pg. 487 f.; J. Carbonnier, Civil Law, V. 4, The Obligations, PUF, 22nd Ed., 2000, No. 324, Pg. 573 f.; M. Fabre-Magnan, The Obligations, PUF, 2004, No. 181, Pg. 480 f.

**(68)** Art. L. C. 132-8 Com. C.: "The waybill forms a contract between the shipper, the carrier and the recipient or between the consignor, consignee, forwarder and the carrier." See not. on this point P. Delebecque, Article L. 132-8 (former Article 101) of the Commercial Code, Studies offered to B. Mercadal, Francis Lefebvre, 2002, Pg. 443; from the same author, The Recipient of the Goods: Third Party to the Transportation Contract?, Dalloz Business 1995 189, concerning the situation of the recipient before the Law of Feb. 6. 1998; F. Collart Dutilleul, P. Delebecque, Civil and Commercial Contracts, Dalloz, 8th Ed., 2007, No. 774, Pg. 698; C. Paulin, Transportation Law, Litec, 2005, No. 435, Pg. 225.

**(69)** Art. L. 132-8 Com. C. is specifically limited to domestic land transportation and to international road transportation. These provisions should be extended to air transportation in accordance with Art. L. C. 321-1 Aviat. C. (P. Delebecque, Article L. 132-8 (former Article 101) of the Commercial Code, Prev. Art., Pg. 446).