# Exhibit 1

PRIVATE LAW                                    **PRECIS**

Civil Law

# Obligations

François Terré

Philippe Simler

Yves Lequette

10th Edition

**DALLOZ**



Civil Law

# Obligations

10th Edition

2009

## François Terré

Emeritus professor at Panthéon-Assas University (Paris II)
Member of the Institute

## Philippe Simler

Emeritus professor at the University of Strasbourg
Honorary Dean of the Faculty of Law,
Political Sciences and Management of Strasbourg

## Yves Lequette

Professor at Panthéon-Assas University (Paris II)

**DALLOZ**



## A. The Theory of the Autonomy of the Will

20   ***Description*** ◊ Coming directly from the individualist philosophy (1°) and the economic liberalism (2°) which were in vogue at the end of the 18th century, it organises the legal regime of contracts around a few important principles (3°).

21   ***1• The Individualist Philosophy*** ◊ The enlightenment philosophy professes that each human being is fundamentally *free*. How is it then possible – as life in society seems to postulate – that individuals can be subject to other individuals, and that, for example, some can be creditors while others are debtors? The answer is simple: by making the *will* the essential source of these situations. To say that a human being is bound only because he wants to be bound and in the way he wants to be bound, is to respect his freedom. From that, two propositions: an individual cannot be subject to obligations he did not willingly subject himself to, because these obligations could be dictatorial; an individual must respect all obligations to which he has freely given his consent.

   That is to say, in this conception, contracts become the source of law *par excellence*. The will being able to create itself its own law, contracts draw their binding power from the meeting of the minds. Thus, after the end of the 19th century, the expression "autonomy of the will" was used to describe this analysis, indicating, as its etymology[1] clearly shows, that individuals can create their own law through their will.

   To reach the end of its analysis, the legal philosophy at the time made the contract into an instrument that explains the whole legal system. Society is born of a contract, the social contract. Agreements are, according to Rousseau, "the basis of all authority among human beings". And we try to explain most of the legal situations using contracts, or at least the will: the legal matrimonial regime is not the result of a legal provision, but of an implied agreement between the spouses who chose to be subject to it by deciding not to use a marriage contract; the legal inheritance regime only expresses what the implied of the deceased would have been; the nationality is the product of a contract between the citizen and the State…

22   ***2• The Economic Liberalism*** ◊ Contracts are the source of law *par excellence*, not only because it respects the freedom of individuals, but also because it makes possible…

---

[1] Autonomy is derived from "autonomous", which comes from the Greek word *autonomos* – prefix *auto*, substantive *nomos*, the latter corresponding to the Latin word *lex*, in French "Law" – the right to govern oneself with one's own law.



…to establish the fairest and the most socially useful relationships. We can see here the theories of economic liberalism.

Firstly, the free play of individual wills can only carry out *justice*. Considered as a pure will guided by an unerring reason[1], each contracting party is the best judge and thus the best legislator for its own interests. Consequently, we can assume that these interests are perfectly respected by the agreements it willingly entered into. If a mandatory obligation can be unfair, an accepted obligation cannot be one. The opposition of interests underlying the contract is, as it happens, the best guaranty that the obligations which result from it respect a certain balance as they fulfil the needs of each party. Otherwise, the disadvantaged party would not have given its consent. To take up the phrase of Fouillée that is always quoted: "Who says contractual says fair"[1].

Secondly, the free play of individual wills ensures *economic balance* and *general prosperity*. The law of supply and demand allowing the adjustment of the production to the needs, it is necessary to let the economic automatisms work their wonders, the famous "invisible hand" of the market. More generally, everyone's pursuit of their own interest can only lead to the satisfaction of the general interest, perceived as the sum of all the individual interests.

23  **3• The Legal Consequences** ◊ Applied to the contracts legal regime, the autonomy of the will theory leads to the proclamation of three tightly linked principles.

- In essence, the parties are free to choose to or not to enter into a contract; it is *the contractual freedom* (a).

- But, if they decide to be bound, they must meet their commitments; it is *the binding character of contracts* (b).

- Finally, the only persons who are bound are the ones who intended to be bound; it is the *relative effect of contracts* (c).

24  **a) The Contractual Freedom** ◊ There is a double dimension, the form and the content. The *content* is expressed through a triple ability: to be able to choose to or not to enter into a contract, to be able to freely choose the co-contracting party, to be able to freely determine the content of the contract.

There is no legal obligation to enter into a contract. No one is forced to enter into a relationship with their peers and everyone has the right to refuse to sell the assets that belong to them or to hire someone they do not want to. To refuse to enter into a contract is a manifestation of freedom.

It is up to the contracting parties, following a free discussion, to define what they commit themselves to.

---

[1] As D. Terré-Fornacciari justifiably points out (L'autonomie de la volonté, *Rev. sc. morales et politiques* 1995.255, sp. p. 264): "In accordance with Enlightenment, it is because the source of the will is to be found within the reason that it can create law".
[1] Concerning the real scope of the expression, see C. Jamin, Quelle nouvelle crise du contrat, in *La nouvelle crise du contrat*, 2003, p. 12, note 19.



Of course, provisions regulating the content of such-and-such standard contractual operation may exist. But presumed replaceable by the will of the parties, they apply only when the parties do not decide otherwise and are supposed to express the implied will of the parties. The parties' freedom of contract is hindered by only one hurdle: the rules that are imperative. Yet these remain rare, the legislator cannot restrain the will of the parties as it is necessary to preserve the freedom of third parties.

As for the *form*, contractual freedom implies consensualism[i]. The exchange of consents is enough to enter into the contact. No matter the form in which it occurs. The will would not be sovereign if its potency was subordinate to the respect of certain forms.

25   ***b) The Binding Character of Contracts*** ◊ Nothing forces the parties to enter into a contract.  But they must respect their commitments as soon as they have done so. What they have agreed upon binds them without the need to be supported by any rule. The meeting of the minds creates obligations by itself.

As a result, if any of the parties tried to release itself by its own will, it would become liable. Only mutual consent can release what it bound. And the parties must of course faithfully perform the obligations arising from the contract.

An agreement is binding for the parties but also for the *judge*. It binds him. He must respect it and make sure it is enforced. As the "Minister of the will of the parties", the judge must act as a respectful servant of the contract. If he is asked to interpret it, he will seek what the common intention of the parties was. If he is asked to modify or review it, he will refuse it, and will do so even if an unforeseeable change in the economic, social or political context has altered the economic balance of the contract.

26   ***c) The relative effect of contracts*** ◊ Because contracts rely upon the will of the parties, they have no effect towards third parties: a contract between the contracting parties cannot bind a third party, nor can it give rise to a claim for the benefit of a third party.

It explains the postulate upon which relies on the theory of the autonomy of the will theory, as it happens, very well. The will of some should not hinder the freedom of others. If every human being is the best judge of his own interests, he is not the best judge of the best interests of others.

### B. The Civil Code and the Theory of the Autonomy of the Will

27   ***The Position of the Civil Code*** ◊ When compared to the contractual model included in the Civil Code, this construction only partially takes it into account.



Because the drafters of the Civil Code did not fully agree with the postulate upon which is based the theory of the autonomy of the will (1°), the consequences which are normally deduced from this theory find themselves attenuated (2°).

**1° A Partial Adherence to the Postulate of the Theory of the Autonomy of the Will** – If we follow the theory of the autonomy of the will to its most extreme developments, contracts are sufficient to themselves. A contract does not need the help of any rule to bind the parties. The will of the parties draws its binging power from itself. And yet even a quick reading of section 1134 of the Civil Code shows that its drafters did not intend to endorse this conception. They assert the binding effect of contracts using a very high comparison – "agreements (…) take the place of the law for those who have made them" -, but they immediately specify that it is only true provided that these agreements are "lawfully entered into". That is to say that contract draws its binding effect not from itself, but from an external rule.  The power attributed to individual wills is not original, but *derived.*

 How could it be otherwise?

 According to the theory of the autonomy of the will, the obligation finds its ground in the will or more precisely in its power to bind itself. A debtor is bound because he wanted it. But then, how to explain that he will still be bound even if his will changes? Should it not be the "will that is alive, the current will", that should prevail over the "will that is dead, the past will"?[1] If the will is so potent, why can it not undo what it did? To that, we answer that the wills of the contracting parties met.  But in doing so, we are only shifting the problem. Why would the acceptance crystallise into an obligation the wills which are essentially free and mobile? As well tuned as it might be, the common intention of the parties cannot be sufficient to itself. It only proposes a program that would not bind the parties if it was not determined and ratified by some external authority as at the date of the contract. Otherwise, nothing would prevent each of the contracting parties to follow its own interest if its will happens to vary. *The binding effect does not come from the promise, but from the value that the law gives to this promise*. This value comes from an external rule, which alone holds the means necessary to ensure the performance of that promise. Thus, a contract is binding only if it is supported by a legal system which will, if necessary, lend to the creditor a piece of this power of which it has the monopoly. As we can see, the binding effect of contracts is not a reality that would exist and would impose itself independently of any legal system. Without the support of the latter, the contract is purely a moral commitment, which is not nothing, but not sufficient to force an unfaithful promisor.

---

[i]Translator's note: under French law, the principle of consensualism is a principle in accordance of which a legal transaction is not subjected to any specific form for its validity, the consent having alone the power of creating obligations.

---

[1] G. Rouhette, *Contribution à l'étude critique de la notion de contrat,* thesis Paris, 1965, n° 113, p. 407; V. Heuzé. *La réglementation française des contrats internationaux,* thesis Paris I, ed. 1990, n° 131, p. 71; read with *above*, n° 5.



Exhibit 2

# CIVIL LAW

Philippe MALAURIE - Laurent AYNÈS

# OBLIGATIONS

Philippe MALAURIE
Laurent AYNÈS
Philippe STOFFEL-MUNCK

4th edition

# ALLEN & OVERY
# LIBRARY

**DEFRÉNOIS**

lextenso éditions



# OBLIGATIONS



# TITLE II

# FORMATION OF THE CONTRACT

**455. Four Requisites.** – Section 1108 provides that " Four requisites are essential for the validity of an agreement: the consent of the party who binds himself; his capacity to contract; a definite object which forms the subject matter of the undertaking; a lawful cause in the obligation". It invites four comments.

> 1° It does not impose any form, which implicitly endorses the principle of consensualism.[1i]
>
> 2° It mentions ("a lawful cause") the principle of contractual freedom: anything that is not prohibited is permitted. As Cambacérès was saying when he presented his second draft Code to the Convention (Session of 23 Fructidor II): "*The right to enter into a contract which is only the power to choose the means of one's happiness;*"[2] this principle is of constitutional importance[3] and this is sometimes recalled by the courts[4]; the freedom of contract is mainly the knowledge of its limits: abuse of right[5], public order and good character.

Contractual freedom and consensualism are both in relation to the autonomy of the will principle, which is a philosophical principle according to which the human will constitutes itself its own law[6]. This link is complex; the autonomy of the will principle reached its peak at the end of the 18th century, whereas consensualism is far anterior to it; also, the contemporary decline of the autonomy of the will principle has not had a significant impact on the contractual freedom.

> 3° The four requisites provided for in Section 1108 are distinct; a close relationship exists between them.
>
> 4° The irregularity or absence of one of the requisites of the contract is sanctioned by the absolute or relative nullity of this contract.

**456. Plan.** – The capacity is not explained here[7]. Consent (Sub-Title I), form of the contract (Sub-title II), subject matter and cause of contractual obligations (Sub-Title III), public order and good character (Sub-Title IV) and the theory of nullity, sanction of the rules of the formation of contracts (Sub-title V), will be successively examined.

---

[1] *Below* n° 536.

[2] FENET, *Recueil complet des travaux préparatoires du Code civil*, 1828, t.I, p. 107.

[3] The Constitutional Court first stated that the contractual freedom was not a constitutional principle: Cons. Court., 3 August 1994, *JCP* G, 1995.II.22404, n. Y. Brousolle; *RTD civ.*, 1996.151, [illegible], J. Mestre: "*no rule of constitutional value ensures the principle of contractual freedom*"; then decided the opposite: 10 June 1998, *JO*, 14 June; *RTD civ.*, 1998.796, obs. N. Molfessis: "*the legislator cannot interfere with the overall economy of agreements or contracts legally entered into, in such a way that it obviously ignores the freedom arising from Section 4 of the Declaration of Human and Citizen's Rights of 1789.*"

[4] [illegible], French High Court. Com., 7 Apr. 1998, *Bull. civ*.IV, n° 126; *RTD civ.*, 1999.79, obs. J. Mestre: "*the vendor has the right to deal with the co-contracting party of his choosing, he is not required to justify his decision or to communicate the criteria upon which he based his choice*".

[5] *Above* n° 122.

[6] *Below* n°ˢ 748-750.

[7] *Les personnes*, coll. Droit Civil.

NATIONAL ACCREDITATION AUTHORITY FOR TRANSLATORS AND INTERPRETERS
NAATI No. 57513
VERONIQUE MORGAN-SMITH
TRANSLATOR
ENGLISH <-> FRENCH

---

[i] Translator's note: under French law, the principle of consensualism is a principle in accordance of which a legal transaction is not subject to any specific form for its validity, the consent having alone the power of creating obligations.



Exhibit 3

[Logo - SIREY ]
UNIVERSITY

Jacques FLOUR
Jean-Luc AUBERT
Éric SAVAUX

CIVIL LAW

# Obligations

## 1. Legal document

[Logo]

14th Edition



*[handwritten – l/530.465-1]*

Jacques Flour
Jean-Luc Aubert
Éric Savaux

*[stamp – BIBLIOTHEQUE INTERUNIVERSITAIRE CUJAS]*

# Obligations

## 1.  Legal document

Contracts – Formation – Effects
Unilateral Contracts
Collective Contracts

*[handwritten – KA.14 FLO yellow]*

Fourteenth Edition by

**Eric SAVAUX**

Aggregate of the Faculties of law.
Professor of the Faculty of Law and Social Sciences of the University of Poitiers

2010

**[Logo – SIREY]**



## Chapter 1

### Consent

**122. The Concept of Consent. –** Consent necessary for the formation of contracts is constituted by an *agreement between two wills*. At least two, since a contract may involve several persons; but the tradition is to think with the simplest hypothesis: that where there are only two contractors.[1] But we must specify: an agreement which aims *to create obligations* (or, more generally, if we identify, as is often the case, contract and agreement[2]: which aim to create legal relations).

Indeed, the meetings of the minds which do not intend to create legal relations exist. A father who promises a holiday trip to his son provided that the latter passes his examination (example of Pothier… already the cult of diplomas) does not intend to bind himself; if he breaks his promise, he will not be liable. Likewise, the one who, after having invited a friend to dinner, cancels; or, inversely, the guest who does not turn up. These agreements create, it is said, relationships of *complacency or courtesy*, and not obligations in the legal sense of the word.[3] But the limits are sometimes blurry.[4]

Without the consent being thus characterised, no contract can be formed. In terms of importance, this condition is above any other: *to contract is firstly to want.*[5] Thus the first principle that has to be laid out is the principle of contractual freedom.[6]

---

[1] Literally, section 1108 only requires the consent of the debtor (*the party who binds itself*). But the word would then be improper: *cum sentire,* to want with. And the idea is mostly inexact. In a unilateral contract, the creditor must have demonstrated his agreement with the debtor: a gift, for example, is perfect only if it is accepted by the beneficiary (s. 932). All the draft reforms require "the consent of the contracting parties".

[2] *Above*, n° 80.

[3] PERREAU, "Courtoisie, complaisance et usages non obligatoires", *RTD civ.* 1914, 503.

[4] Deciding that so long as the author of a commitment, even a moral commitment, has expressed his unequivocal and intended will to bind himself, this commitment is binding and its breach would require him to repair the damage that arises from it, See. Com. 23 Jan. 2007, *Bull. Civ.* IV, n° 12, *D.* 2007. 442, obs. DELPECH, *RTD civ. 2007*. 340, obs. MESTRE and FAGES, *Defrénois* 2007, Art. 38624, n° 48, obs. SAVAUX.

[5] In the absence of consent, no contract can be formed if the person against whom it is raised does not understand the language in which it was drafted by a third party (Paris, 30 Nov. 2006, *JCP* 2007. II. 10069, note KENFACK).

[6] It is not by chance that this principle can be found in several contract systems (foreign laws, scholarly codifications…) and the guiding principles of European contract law (*Projet de cadre commun de référence. Principes contractuels communs,* Société de législation comparée, 2008, p. 25 et seq.). It is the first principle of the guiding principles enunciated by the *projet gouvernemental de réforme du droit des contrats* (s. 15) and the first rule of the general rules of the *projet de l'Académie des sciences morales et politiques* (s. 3).

Concerning the draft common framework of reference, See. ALPA, "Autonomie des parties et liberté contractuelle aujourd'hui", *RDC* 2009. 826 ; LIMMER, "Cadre commun de référence et liberté contractuelle", *ibid.* 860.



The Conditions of the Formation of Contracts

**123. The Principle of contractual freedom. –** The assertion of this freedom gives rise to two major consequences.

Firstly, everyone is free *to decide to not enter into a contract*. No contract can be formed if both parties did not want it, and even less against the will of one of them. It was thus decided that the landlord to whom a person offers to buy a piece of land that is of no use to him, and for a price that is considerably higher than its actual value, can refuse to enter into a sale agreement: in doing so he does not become liable.[1]

Secondly, and if the parties have decided to enter into a contract, each party *is free to choose their co-contracting party*: this freedom takes a particular shape for contracts that are entered into *intuitu personae*[2] – by consideration of the other party – that is to say those where the personality of the individual with whom we deal with is of particular importance.

To this double rule, the law of the 19th century would add few exceptions, because it was liberal and individualistic. But we know that, under the pressure of the economic needs as well as of the political and social doctrines, liberalism had to yield to a growing interventionism throughout the 20th century. Contracts, which were only a technique, among others, of organisation of economic and social relationships, could not get away from this evolution. Also, this principle, under these two aspects, includes today several exceptions.

**124. Mandatory or Forced Contracts. –** It is at the end of the first half of this century that the doctrine[3] begins to talk about these concepts, which should not be confused with the concept of adhesion contract[4i], which has been known for a long time. The feature of this type of contract is a constraint coming from *one of the parties* who, being in a position of strength compared to the other, can impose to the latter the conditions of their respective commitments. On the contrary, in mandatory or forced contracts, the constraint arises from *the law*, which is an exception to the freedom of contract. Such contracts thus appear as one of the manifestations of the state interventionism which constitute one of the important features of the evolution of law during the 20th century.[5]

These exceptions sometimes affect the freedom of not entering into a contract, sometimes the freedom of choosing the co-contracting party, and finally sometimes both of these freedoms. But

---

[1] Claim. 24 Nov. 1924, S. 1925. 1. 217, note BRETHE DE LA GRESSAYE. We can notice that in this case, the principle of freedom of contract was reinforced by the absolute nature of the property right. Concerning an application in the context of a membership with an association: Civ. 3rd, 12 June 2003, *Bull. civ.* III, n° 125, *D.* 2003. 1695, obs. ROUQUET, *JCP* 2003. II. 10190, note AUQUE, *RTD civ.* 2004. 280, obs. MESTRE and FAGES.
[2] *Below*, n° 201.
[3] JOSSERAND, "Le contrat forcé et le contrat légal", *DH* 1940. Chron. 5; DURAND. "La contrainte légale dans la formation du rapport contractuel", *RTD civ.* 1944. 73; MOREL, "Le contrat imposé", in *Études Ripert*, vol. II, p. 116. See also BARRET, "Variations autour du refus de contracter", in *Mélanges offerts a J.-L. Aubert*, 2005, p. 3; J. HONORAT, "Rôle effectif et rôle concevable des 'quasi-contrats' en droit actuel". *RTD civ.* 1969, 653.
[4] Concerning the adhesion contract, see *above*, n° 93, and *below*, n° 177 et seq.
[5] *Above*, n° 72 and 74.



NAATI No. 57513
VERONIQUE MORGAN-SMITH
TRANSLATOR
ENGLISH <-> FRENCH
NATIONAL ACCREDITATION AUTHORITY FOR TRANSLATORS AND INTERPRETERS ©

classifying them like this is not sufficient to accurately measure their scope. It is necessary to consider the type of penalty that, in each case, is triggered by the non-observance of the law.[6]

---

[i] Translator's note: essentially, an adhesion contract is a take it or leave it arrangement between two parties, one is considered much stronger than the other.

---

[6] See AUBERT, *Notions et rôles de l'offre et de l'acceptation dans la formation du contrat*, LGDJ, 1970, pref. FLOUR, n[os] 334 et seq. Read with HONORAT, *op. cit.,* spec. n[o] 28, p. 679. Taking the notion of quasi-contract in a different sense from its definition in the traditional classification of the sources of obligations (*above*, n[os] 54, 58 and 59), this author uses this notion to qualify the legal relationships that, while they seem to be of contractual nature, have been imposed by the legislator. *[Incomplete sentence]*



# Exhibit 4a

The: 09/11/2011

**French High Court**

**Commercial Division**

**Public Hearing of 26 November 2003**

**No of appeal: 00-10243-10949**

Published to the bulletin

**Dismissal**

**Mr. Tricot, president**

Mr. Petit, associate judge

Mr. Lafortune, deputy prosecutor

SCP Gatineau, Mr. Luc-Thaler, SCP Piwnica et Molinié, solicitor(s)

**FRENCH REPUBLIC**

**ON BEHALF OF THE FRENCH PEOPLE**

ON BEHALF OF THE FRENCH PEOPLE

THE COMMERCIAL, FINANCIAL AND ECONOMIC DIVISION OF THE FRENCH HIGH COURT made the following decision:

Formally acknowledges that the jointly interested parties X... and Mr. And Mrs Y... withdrew from their appeal n° B 00-10.949 against the company Stuck, the company Les Complices et Mr. Z...;

Combines the appeals n° J 00-10.243 made by the company Alain Manoukian and n° B 00-10.949 made by the jointly interested parties X..., Mr. and Mrs. Y..., which appeal the same decision.

Considering that, according to the appealed decision (Paris, 29 October 1999) the company Alain Manoukian commenced negotiations in relation to the sale of shares with the jointly interested parties X... and Y... (the jointly interested parties X...), shareholders of the company Stuck in relation to the sale of issued shares of this company; that the negotiations undertaken in spring 1997 lead, after several meetings and various exchanges of letters, to the preparation of a draft agreement on 24 September 1997 providing, in particular, for several conditions precedent which should be completed by 10 October of the same year, date subsequently postponed to 31 October; that, on 16 October 1997, after further discussions, the company Alain Manoukian agreed on the amendments requested



by the vendors and proposed to postpone the due date for completion of the conditions precedent to 15 November 1997; that the jointly interested parties X... did not make any observations and a new draft sale agreement was sent to them on 13 November 1997; that on 24 November, the company Alain Manoukian learnt that on 10 November, the jointly interested parties X...had agreed to promise to sell the shares of the company Stuck to the company Les complices; that the company Alain Manoukian made a claim requesting that the jointly interested parties be ordered to pay compensation for the loss resulting from the wrongful termination of negotiations.

On the sole ground of the appeal made by the jointly interested parties X..., taken in two parts:

Considering that the jointly interested parties X...appeal the decision which ordered them to pay the amount of 400,000 Francs in damages while, in accordance with the ground:

1/ that the contractual freedom includes that of terminating negotiations, this freedom is only limited by an abuse of the termination right which is a fault if the trust of the partner is deceived; that the court of appeal, which did not find any elements which are the responsibility of the vendor and characterise such behaviour contrary to the contractual good faith, deprived its decision of any legal ground with respect to sections 1382 and 1383 of the French civil code;

2/ considering that the one which takes the initiative of the negotiations by preparing an offer of acquisition of all the shares of the company subject to several conditions precedent to be completed within a timeframe and which does not undertake any diligence to complete these conditions, should not, after the due date, be able to attribute the fault of terminating the negotiations to its partner so that by deciding so, the court of appeal is in breach of sections 1382 and 1383 of the French civil code;

However, considering that after noting on one hand that the parties agreed on a draft agreement smoothing out most of the difficulties and that the company Alain Manoukian had the right to think that the jointly interested parties still wanted to sell their shares and, on the other hand, that the shareholders of the company Stuck had, at the same time, led similar negotiations with the company Les complices and entered into an agreement with the latter, which was only notified to the company Alain Manoukian fourteen days after its execution while letting him believe that only the absence of the chartered accountant delayed the execution of the agreement, the court of appeal held that the jointly interested parties X...had then unilaterally and in bad faith terminated the negotiations from which they never seemed to withdraw and that the company Alain Manoukian undertook normally; that with respect to these findings and assessments, the court of appeal has legally justified its decision;

Considering, on the other hand, that the court of appeal having noted, on a ground which was not argued, that the parties had both agreed to postpone the completion date of the conditions precedent, the ground that the termination of negotiations would have been after that date is inoperative;



As a result, the ground may not be accepted in any of its parts.

On the first ground of the appeal made by the company Alain Manoukian:

Considering that the company Alain Manoukian appeals the decision which limited the damages ordered against the jointly interested parties X... to 400,000 Francs, while, according to the ground, the one which suddenly terminates the negotiations relating to the sale of shares of the company operating a business must indemnify the victim of this termination for the loss of a chance that the latter had to obtain profits that it would expect to result from the operation of the business if the contract was entered into; no matter that the parties did not agreed on a final and binding agreement; that, in this instance, the court of appeal found that the jointly interested parties X... are liable in tort to the company Alain Manoukian for terminating unilaterally, suddenly and in bad faith the negotiations which were held between them in relation to the sale of shares of the company Stuck which operates a business in the shopping centre Belle Epine; that, by however estimating that the loss suffered by the company Alain Manoukian could not, due to the sole absence of a final and binding agreement, correspond to the loss of a chance that this company has to obtain profits that it would expect to result from the operation of the business and by limiting the compensation for the loss suffered by the company Alain Manoukian to the costs incurred by the negotiation and preliminary studies that it had undertaken, the court of appeal is in breach of section 1382 of the French civil code;

However, considering that the circumstances which constitute a fault made in the exercise of the right of unilateral termination of pre-contractual negotiations are not the cause of the loss of a chance of making profits that would be expected from the execution of the contract;

Considering that the court of appeal rightly decided that, in the absence of a final and binding agreement, the loss suffered by the company Alain Manoukian only includes the costs incurred by the negotiation and preliminary studies which it had initiated and not the profits that it could have expected to result from the operation of business if the contract had been entered into nor even the loss of a chance to obtain profits; that the ground has no merits.

And on the second ground of the same appeal:

Considering that the company Alain Manoukian also appeals the decision which exonerates the company Les complices while, according to the ground, the simple fact that the purchaser warrants in advance the vendor any indemnity in case of termination of negotiations in which the latter could have previously undertaken with a third party is a fault for which the purchaser must compensate the victim of the termination of negotiations if such warranty induces the vendor for the benefit of the purchaser to suddenly terminate the negotiations - even if they were close to coming to an agreement - without any risk for the former; that, in this instance, the court of appeal found that, in accordance with the sale share agreement between the jointly interested parties X... and the company Les complices, the latter agrees to warrant the vendors any indemnity that they would eventually have to pay to a third

party for a wrongful termination of negotiations; that however, by considering that the company Les complices, which the judges of merits found that it had benefited from the unfair conduct of the jointly interested parties X... towards the company Alain Manoukian, the victim of the sudden termination of negotiations that it undertook with the jointly interested parties X..., notwithstanding that it cannot be demonstrated that the company Les complices had been aware of the progress of these negotiations, the court of appeal was in breach of section 1382 of the French civil code;

However, considering that the simple fact of entering, even knowingly, into a contract with a party which had commenced negotiations with a third party does not itself constitute a fault for which the author could be liable, except if this is motivated by the intention to harm or accompanied by deceptive conduct;

Considering that having noted that the warranty clause included in the promise to sell is not sufficient to establish that the company Les complices had used unfair practices to obtain the sale of issued shares of the company Stuck, not even if it was aware of the exact progress of the negotiations pursued by the company Alain Manoukian and the vendors and the lack of loyalty of the latter towards the former, the court of appeal rightly decided that this company could not be liable to the company Alain Manoukian, notwithstanding that in fact, it benefited from the unfair practices of the jointly interested parties X...; that the grounds has no merits;

**BASED ON THESE GROUNDS:**

DISMISSES the appeals;

Lets each party pay its own costs;

In view of section 700 of the new Code of civil procedure, dismisses the claims;

So made and judged by the commercial, financial and economic division of the French High Court and pronounced by the president in its public hearing of November two thousand and three.

**Publication**: Bull. 2003, IV, N° 186 p. 206

**Appealed decision**: Court of appeal of Paris of 29 October 1999



**Titles and summaries:** 1° LIABILITY IN TORT OR QUASI-DELICT[1] - Damage – Certain loss – Loss of a chance – Pre-contractual negotiations – Profits expected from the execution of the contract (non).

1° The circumstances which constitute a fault made in the exercise of the right of unilateral termination of precontractual negotiations are not the cause of the loss of a chance of making profits that would be expected from the execution of the contract. The court of appeal rightly decided that, in the absence of a final and binding agreement, the loss suffered by the company Alain Manoukian having initiated negotiations with the shareholders of the other company with a view to acquire the issued shares of this latter only includes the costs incurred by the negotiation and preliminary studies which it had initiated and not the profits that it could have expected to result from the operation of business if the contract had been entered into nor even the loss of a chance to obtain profits.

1° LIABILITY IN TORT OR QUASI-DELICT - Damage – Certain loss – Loss of a chance – Pre-contractual negotiations – Costs of negotiation and studies. 2° LIABILITY IN TORT OR QUASI-DELICT - Fault –Pre-contractual negotiations – Third party – Intention to harm – Necessity.

2° The simple fact of entering, even knowingly, into a contract with a party which had commenced negotiations with a third party does not itself constitute a fault for which the author could be liable, except if this is motivated by the intention to harm or accompanied by deceptive conduct. Henceforth, having noted that the warranty clause included in the promise of the sale of shares of a company for the benefit of another company, in which the latter warrants in advance the vendor any indemnity that would be due for a wrongful termination of negotiations previously initiated by a third party, is not sufficient to establish that this company had used unfair practices to obtain the aforementioned sale in lieu of the company with which the vendor was having ongoing negotiations or even that it was aware of the exact progress of these negotiations or the lack of loyalty of the vendor towards this company, the court of appeal rightly decided that the company, which is the beneficiary of the promise, could not be liable to this latter, notwithstanding that in fact, it benefited from the faulty behaviour of the vendor.

---

[1] Under French law, a quasi-delict is an act whereby a person, without malice, but by fault, negligence or imprudence not legally excusable, causes injury to another person.

# Exhibit 4b

## CONTRACT – LIABILITY – WARRANTY
## New precisions about the regime applicable to the unilateral termination of negotiations

---

**Summary of the decision**

   *The circumstances which constitute a fault made in the exercise of the right of unilateral termination of precontractual negotiations are not the cause of the loss of a chance of making profits that would be expected from the execution of the contract;*

   *The simple fact of entering, even knowingly, into a contract with a party which had commenced negotiations with a third party does not itself constitute a fault for which the author could be liable, except if this is motivated by the intention to harm or accompanied by deceptive conduct.*

---

**French High Court, com.
26 Nov. 2003**

   THE COURT - Considering that, according to the appealed decision (Paris, 29 October 1999) the company Alain Manoukian commenced negotiations in relation to the sale of shares with the jointly interested parties X... and Y... (the jointly interested parties X...), shareholders of the company Stuck in relation to the sale of issued shares of this company; that the negotiations undertaken in spring 1997 lead, after several meetings and various exchanges of letters, to the preparation of a draft agreement providing, in particular, for several conditions precedent which should be completed by 10 October of the same year, date subsequently postponed to 31 October; that, on 16 October 1997, after further discussions, the company Alain Manoukian agreed on the amendments requested by the vendors and proposed to postpone the due date for completion of the conditions precedent to 15 November 1997; that the jointly interested parties X... did not make any observations and a new draft sale agreement was sent to them on 13 November 1997; that on 24 November, the company Alain Manoukian learnt that on 10 November, the jointly interested parties X...had agreed to promise to sell the shares of the company Stuck to the company Les complices; that the company Alain Manoukian made a claim requesting that the jointly interested parties be ordered to pay compensation for the loss resulting from the wrongful termination of negotiations.

   On the sole ground of the appeal made by the jointly interested parties X..., taken in two parts: - Considering that the jointly interested parties X...appeal the decision which ordered them to pay the amount of 400,000 Francs in damages while, in accordance with the ground, -1/ that the contractual freedom includes that of terminating negotiations, this freedom is only limited by an abuse of the termination right which is a fault if the trust of the partner is deceived; that the court of appeal, which did not find any elements which are the responsibility of the vendor and characterise such behaviour contrary to the contractual good faith, deprived its decision of any legal ground with respect to sections 1382 and 1383 of the French civil code; 2- considering that the one which takes the initiative of the negotiations by preparing an offer of acquisition of all the shares of the company subject to several conditions precedent to be completed within a timeframe and which does not undertake any diligence to complete these conditions, should not, after the due dates, be able to attribute the fault of terminating the negotiations to its partner so that by deciding so, the court of appeal is in breach of sections 1382 and 1383 of the French civil code;

   However, considering that after noting on one hand that the parties agreed on a draft agreement smoothing out most of the difficulties and that the company Alain Manoukian had the right to think that the jointly interested parties still wanted to sell their shares and, on the other hand, that the shareholders of the company Stuck had, at the same time, led similar negotiations with the latter, which was only notified to the company Alain Manoukian fourteen days after its execution while letting him believe that only the absence of the chartered accountant delayed the execution of the agreement, the court of appeal held that the jointly interested parties X...had then unilaterally and in bad faith terminated the negotiations from which they never seemed to withdraw and that the company Alain Manoukian undertook normally; that with

respect to these findings and assessments, the court of appeal has legally justified its decision;

   Considering, on the other hand, that the court of appeal having noted, on a ground which was not argued, that the parties had both agreed to postpone the completion date of the conditions precedent, the ground that the termination of negotiations would have been after that date is inoperative; as a result, the ground may not be accepted in any of its parts.

   On the first ground of the appeal made by the company Alain Manoukian: - Considering that the company Alain Manoukian appeals the decision which limited the damages ordered against the jointly interested parties X... to 400,000 Francs, while, according to the ground, the one which suddenly terminates the negotiations relating to the sale of shares of the company operating a business must indemnify the victim of this termination for the loss of a chance that the latter had to obtain profits that it would expect to result from the operation of the business if the contract was entered into; no matter that the parties did not agreed on a final and binding agreement; that, in this instance, the court of appeal found that the jointly interested parties X... are liable in tort to the company Alain Manoukian for terminating unilaterally, suddenly and in bad faith the negotiations which were held between them in relation to the sale of shares of the company Stuck which operates a business in the shopping centre Belle Epine; that, by however estimating that the loss suffered by the company Alain Manoukian could not, due to the sole absence of a final and binding agreement, correspond to the loss of a chance that this company has to obtain profits that it would expect to result from the operation of the business and by limiting the compensation for the loss suffered by the company Alain Manoukian to the costs incurred by the negotiation and preliminary studies that it had undertaken, the court of appeal is in breach of section 1382 of the French civil code;

   However, considering that the circumstances which constitute a fault made in the exercise of the right of unilateral termination of precontractual negotiations are not the cause of the loss of a chance of making profits that would be expected from the execution of the contract; - Considering that the court of appeal rightly decided that, in the absence of a final and binding agreement, the loss suffered by the company Alain Manoukian only includes the costs incurred by the negotiation and preliminary studies which it had initiated and not the profits that it could have expected to result from the operation of business if the contract had been entered into nor even the loss of a chance to obtain profits; that the ground has no merits.

   And on the second ground of the same appeal: - Considering that the company Alain Manoukian also appeals the decision which exonerates the company Les complices while, according to the ground, the simple fact that the purchaser warrants in advance the vendor any indemnity in case of termination of negotiations in which the latter could have previously undertaken with a third party is a fault for which the purchaser must compensate the victim of the termination of negotiations if such warranty induces the vendor for the benefit of the purchaser to suddenly terminate the negotiations - even if they were close to coming to an agreement - without any risk for the former; that, in this instance, the court of appeal found that, in accordance with the sale share agreement between the jointly interested parties X... and the company Les complices, the latter agrees to warrant the vendors any indemnity that they would eventually have to pay to a third party for a wrongful termination of negotiations; that however, by considering



NAATI No. 57513
VERONIQUE MORGAN-SMITH
TRANSLATOR
ENGLISH <-> FRENCH
NATIONAL ACCREDITATION AUTHORITY FOR TRANSLATORS AND INTERPRETERS

**CASE LAW**
*Commentaries*

that the company Les complices, which the judges of merits found that it had benefited from the unfair conduct of the jointly interested parties X... towards the company Alain Manoukian, the victim of the sudden termination of negotiations that it undertook with the jointly interested parties X..., notwithstanding that it cannot be demonstrated that the company Les complices had been aware of the progress of these negotiations, the court of appeal was in breach of section 1382 of the French civil code;

However, considering that the simple fact of entering, even knowingly, into a contract with a party which had commenced negotiations with a third party does not itself constitute a fault for which the author could be liable, except if this is motivated by the intention to harm or accompanied by deceptive conduct; - Considering that having noted that the warranty clause included in the promise to sell is not sufficient to establish that the company Les complices had used unfair practices to obtain the sale of issued shares of the company Stuck, not even if it was aware of the exact progress of the negotiations pursued by the company Alain Manoukian and the vendors and the lack of loyalty of the latter towards the former, the court of appeal rightly decided that this company could not be liable to the company Alain Manoukian, notwithstanding that in fact, it benefited from the unfair practices of the jointly interested parties X...; that the grounds has no merits;

---

Based on these grounds, dismissed [...]

---

00-10.243 (no 1662 FS-P) – *Plaintiff*: Alain Manoukian (Cie) – *Defendant*: Wajsfisz – *Composition of court*: MM. Tricot, Pres. – Petit, A. judge – Lafortune, Dep. Pros. – SCP Gatineau, Mr. Luc-Thaler, SCP Piwnica et Molinié, sol. – Decision appealed: Paris Court of Appeal (25th civ. div. B) 29 Oct. 1999 (Dismissed)
**Key words:** CIVIL LIABILITY* Personal liability * Fault *Contractual negotiation * Negotiations * Termination * Loss of a chance * Third parties * Intention to harm * Deceptive conduct

---

**Note of Anne-Sophie Dupre- Dallemagne**
*Doctor in law*

After having accepted, in its previous decisions[1], the principle of the liability in tort of the author of the wrongful termination of negotiations, in its decision of 26 November 2003, the French High Court refines the regime applicable to it by specifying the scope of the compensable damage. In addition, it specifies the circumstances in which the third party which enters into a contact while being aware of such negotiations is liable.

In this instance, the company Alain Manoukian had commenced negotiations with the jointly interested parties X.., shareholders of the company Stuck in order to sell the issued shares of the company, negotiations which had led to the preparation of a draft agreement including several conditions precedent to be completed by 10 October 1997, date postponed to 31 October, then to 15 November of the same year. On 13 November 1997, the company Alain Mahoukian had addressed a new draft sale agreement to the jointly interested parties X.... However, on 24 November 1997, it learnt that on 10 November 1997, the latter had agreed to promise to sell the shares of the company Stuck to the company Les complices. It therefore requests that the vendor and the purchaser be ordered to pay compensation for the loss suffered due to the wrongful termination of negotiations.

The Court of appeal of Paris upheld the claims of the company Manoukian but only by ordering the vendor, with the exception of the purchaser, to pay damages to the aforementioned company. The double appeal is not only by the vendor but also by the victim of the wrongful termination of negotiations. The vendor

reproaches the court of appeal for not characterising the fault considered as being the fact of deceiving the trust of its partner. In addition, it underlines that no fault can be held against the one which terminates the negotiations after the expiration of the specified completion timeframe. As far as it is concerned, the unfortunate partner reproaches the judges of merits for limiting the damages for the loss suffered to the costs incurred by the negotiations and preliminary studies undertaken while it should also be compensated for the loss of a chance that it had to obtain profits expected to result from the operation of the business. It finally reproaches the court of appeal for exonerating the vendor; the simple fact that the purchaser warrants in advance the vendor any indemnity in case of termination of negotiation is a fault for which it must compensate the victim of termination.

These 2 appeals were dismissed. The French High Court endorses the decision of the judges of merits to accept the existence of a fault in the termination of negotiations, the termination having happened during the specified completion timeframe. It limits the compensation for the loss suffered to the costs incurred by the negotiation and preliminary studies undertaken by and refuses to see "*the cause of loss of a chance of making profits that would be expected from the execution of the contract*" in the circumstances of the termination. Finally, it specifies that "*the simple fact of entering, even knowingly, into a contract with a party which had commenced negotiations with a third party does not itself constitute a fault (...) except if this is motivated by the intention to harm or accompanied by deceptive conduct*".

The subject matter of negotiations is regulated by the principle of freedom: that of commencing the negotiations and terminating them[2]. Far from denying, in the decision, this principle stated by the jointly interested parties X... in their grounds of appeal, the French High Court reaffirms that it determines the impact of the wrongful termination (I) and specify the conditions to which a third party is liable (II).

**I– Liability of the author of the termination**

According to some authors[3], in the view of the wrongful termination of negotiations, the author of the termination should be ordered to specific performance. It could be forced to resume negotiations or even enter into the negotiated contract.

---

[1] HC*. com., 20 March 1972, Bull. civ. IV, n° 93; JCP 1973, II, 17543, note J. Schmidt-Szalewski; RTD civ. 1972, p. 779, obs. G. Durry; HC. com. 7 Jan. 1997, D. 1998, Jur. p. 45, note P. Chauvel; HC. com., 22 Feb. 1994, Bull. civ. IV, n° 79; RTD civ. 1994, p. 849, obs. J. Mestre; HC. 1ʳᵉ civ., 6 Jan. 1998, Dalloz Affaires 1998, p. 242; JCP 1998, II, 10066, note B. Fages. – Jud. CJCE, 17 Sep. 2002 which recognises the liability in tort, decision quoted by P. Delebecque, and F.-J. Pansler, *Droit des obligations, Contrat et quasi-contrat*, 3ʳᵈ ed. Litec, 2003, n° 79, p. 54; these authors would rather hold the contractual liability. In the same sense, See R. von Jhering, *Oeuvres choisies*, v. II, trans. Meulenaere, 1893, p.23.

[2] F. Terré, Ph. Simler and Y. Lequette, *Droit civil, Les obligations*, Dalloz, 8th ed., 2002, n° 185, p. 182. – *Adde*, Ph. Le Tourneau and L. Cadiet, *Droit de la responsabilité et des contrats*, Dalloz Action, 2002-2003, n° 837, p. 247: See the quoted bibliography.  And, H. Muir-Watt, "Les pourparlers : de la confiance trompée à la relation de confiance ", *in Les concepts contractuels français à l'heure des principes du droit européen des contrats*, Dalloz, 2003, p. 53.

[3] See in this sense, J.-M. Mousseron, La durée de la formation du contrat , *Mélanges A. Jauffret*, Aix-Marseille, 1974, p. 509, spec, n° 93: "*If there is (...) only a delay in the negotiations and that it is still interested, the interested party may (...) ask the judge to order the enforcement of the obligation to negotiate by the other party (...).*"

NAATI No. 575/13 VERONIQUE MORGAN-SMITH TRANSLATOR ENGLISH <-> FRENCH NATIONAL ACCREDITATION AUTHORITY FOR TRANSLATORS AND INTERPRETERS

However, the efficiency of such a constraint is limited by the freedom inherent to the negotiations. Therefore, it is not possible to force the author of the termination either to renegotiate or enter into the contract. The only solution for the victim is to punish the wrongful partner in order to obtain compensation by the payment of damages for the loss suffered. In its decision, the French High Court took care of defining the wrongful termination (A) and specifying the nature of the compensable loss (B).

## A – Requirement for compensation of the termination of negotiations

In order to define the termination of negotiations, the decision insists on the "unilateral" character of this termination which is now part of recent case law[4]. If, with respect to contracts, the unilateral termination must remain an exceptional solution on which strict limits are imposed, it is a principle with respect to negotiations: one of the parties must decide to not follow up on the negotiations which were undertaken. Insisting on the unilateral character of the termination gives the French High Court the opportunity to justify the liability of its author even if a bilateral termination, a type of pre-contractual *mutuus dissensus*, is not necessarily exclusive of any compensation. However, if the unilaterality of the termination remains in principle, it is advisable to examine the conditions in which the author will be liable.

The liability of the author of the termination is subject to the proof of a fault. The French High Court controls the concept of fault. It is advisable to note that, contrary to the court of appeal, the High Court does not hold the sudden character of the termination of negotiations. It notes that the judges of merits "*held that the jointly interested parties X had terminated unilaterally and in bad faith the negotiations from which they never seemed to withdraw (...).*" Whether or not the termination is sudden[5], this character is not, in this instance, the defining criterion of the wrongful termination: such termination is a termination done in bad faith.

To the extent that good faith is the key of the negotiation of a contract, any acts of bad faith must be punished. In this instance, the judges noted that "*the parties had agreed on a draft agreement*" while, in parallel, "*the shareholders of the company Stuck had, at the same time, undertaken negotiations (...) and entered into an agreement with the latter of which they had notified the company Alain Manoukian*" rather late and let him "*believe that that only the absence of the chartered accountant delayed the execution of the agreement*". Therefore, the good faith is now extended to the precontractual phase and punishes "*the lack of loyalty in the refusal to enter into a contract*".[6]

It is not the freedom of each of the parties to negotiate with a third party that is here challenged but the fact of letting your partner believe that entering into the contract is still possible while the same contract has already been entered into. "*The faults of hypocrisy and incoherence reproachable to the negotiator: (... the fact of) letting your partner believe in a favourable end of the transaction and deceive his expectations*"[7] characterise the wrongful termination.

The principle of freedom in terminating the negotiations found its limit in the obligation to negotiate in good faith, obligation which governs personal and commercial relationships even in the absence of pre-existing contractual relationship. The wrongful termination, a genuine fault in tort, leads to determine the nature of the compensable loss.

## B- The nature of the compensable loss

The author of the termination is liable if three conditions are met: the existence of a fault, a loss and a chain of causation between both of them. With respect to the compensable loss, the authors distinguish between the loss suffered and the loss of a profit. In this decision, the French High Court shows its will to define more precisely the compensable loss.

On one hand, the judges of the French High Court approve the decision of the judges of merits to indemnify the company Alain Manoukian for all the costs incurred by the negotiations and preliminary studies undertaken. Numerous decisions point in that direction: the judges already indemnified the victim of the termination of negotiations for trips[8], fitting of offices[9] or studies undertaken[10]. In accordance with the case law, in this instance, the judges therefore granted the Company Alain Manoukian the compensation of "*the costs incurred by the negotiation and preliminary studies that it had initiated.*" In other words, "*the negotiator must be put back in the situation that would have been his if he had not commenced the negotiations with the author of the wrongful termination*"[11].

On the other hand, the judges of merits, approved by those of the French High Court, resolved that the loss should not correspond to the profits that the company Alain Manoukian could have expected from the operation of the business if the contract had been entered into, nor even from the loss of a chance of making these profits. In accordance with the authors, the definition of lost gain covers three cases: an injury to reputation which could be detrimental when entered into future contracts, the loss of a chance of entering into a contract with a third party[12] and the loss of profits expected from the execution of the contract. The first two cases must be excluded as the company Alain Manoukian did not claim an injury to its reputation nor a loss of a chance of entering into a contract with a third party.[13]

Concerning the last case, the victim claims the loss of a chance that it had "*to obtain profits that it could expect from the operation of the business*". The judges of merits followed by those of the French High Court dismissed this claim on the grounds that "*the circumstances which constitute a fault made in the exercise of the right of unilateral termination of precontractual negotiations are not the cause of loss of a chance of making profits that would be expected from the execution of the contract*"[14].

---

[4] For a summary on this issue, See "Le pouvoir de rompre unilatéralement le contrat". *Colloque de l'école doctorale de Paris I et du DEA de droit des contrats et des biens*, 26 Jan 2004.

[5] See, in this sense, HC. com., 20 March 1972, above.

[6] P. Stoffel-Munck, *L'abus dans les contrats, essai d'une théorie*, pref. R. Bout, th. LGDJ, 2000, spec, n° 121, p. 101. – HC. 1st civ., 14 June 2000, Contracts, conc. Consom. Nov. 2000, n° 157, p. 10.

[7] P. Stoffel-Munck. L'abus dans les contrats, essai d'une théorie, *op. cit.*, *Ibid*.

[8] HC. com. 20 March 1972, above.

[9] HC. 3rd civ., 3 Oct. 1972, Bull. civ. III, n° 491.

[10] HC. com., 7 Jan. 1997, D. 1998, Jur. p. 45, note P. Chauvel.

[11] D. Mazeaud, La genèse des contrats: un régime de liberté surveillée, Dr. et patrimoine, Jul.-August 1996, p. 44, spec. n° 21, p. 49.

[12] On the concept of loss of a chance, See I. Vacarie, La perte d'une chance, RRJ, 1987-3, p. 90.

[13] HC. 2nd civ., 27 Feb. 1985, Bull. civ. II, n° 52; HC. com., 3 May 1979, Bull. civ. IV, n° 137.

[14] P. Chauvel, Rupture des pourparlers et responsabilité délictuelle, Dr. et patrimoine, 1996, p. 46: the loss of a chance is *"a certain and autonomous loss, we must admit that the chain of causation to be held is distinct to the one which will link the fault to the existing head of damage, including the costs incurred"*.

**CASE LAW**
*Commentaries*

It is therefore advisable to distinguish the circumstances that give right to compensation for the loss suffered by the wrongful termination to those which show a progress of the negotiations and authorise compensation with respect to the chance of making profits. In other words, the cause of the damage relating to the loss of a chance of making profits does not lie in the circumstances of the termination but in the existence of a "*final and binding agreement*". The French High Court therefore seems to want to establish a principle for some of the courts of merits by admitting the compensation for the loss of a chance of entering into a contract provided that the negotiations have sufficiently progressed[15]. The judges of the Court of Appeal of Paris have, indeed, previously granted compensation for the "*loss of a chance of entering into the proposed contract and making profits from it*"[16]. In this instance, the transposition of this solution should be possible all the more so that the compensation was granted in a similar case where a third party makes it impossible to enter into a contract.

In this instance, does the French High Court show its will to limit the concept of lost gain in its decision? Or more certainly, does it specify the scope of the compensable loss with respect to the progress of the negotiations? The reference to the existence of "*a binding and final agreement*" made by the French High Court points in that direction. There is, therefore, a distinction between "*non-contractual forms of negotiations*" and the circumstances in which "*the negotiations are contractual*"[17] Consequently, there are various phases in the formation of contract: the negotiations precede the precontractual agreements, which lead to the final contract. The loss of a chance of making profits which could be expected from the execution of the contract will only be indemnified if the agreement is "*binding and final*"[18]. At *contrario* during the negotiation period, the loss could not be indemnified but for a genuine loss of chance.

Finally, if "*the execution of the contract (is) too hypothetical, the victim cannot rely on it*", the judges assess "*whether or not the execution of contract is likely when it was rendered impossible due to a third party*"[19]. In this instance, "*the absence of a binding and final agreement*" excluded compensation for profits that the victim could have expected from the execution of the contract. By definition, the contract has not been entered into yet and the principle remains that of the freedom of termination of negotiations. In other words, it does not, without any doubt, "*give binding force to a contract which does not have it*"[20]. It does not provide a way of getting around the absence of a contractual obligation by giving compensation to the victim equivalent to a contract, which has not been entered into[21]. In conclusion, the degree of progress of the negotiations must be taken into account[22]; a loss of a chance must be a genuine loss of a chance.

**II- Liability of a third party**

If the liability of the author of the damage is usually accepted, the complicity of a third party is not excluded if some conditions are met (A). To this effect, it is advisable to assess the scope of a clause in which a third party warrants the payment of any indemnity of termination (B).

**A – The conditions of liability of a third party**

The author of the termination is usually punished. However, it is also possible to question in what conditions a third party, involved at the time of the termination, may also be liable for it. In this instance, the company Alain Manoukian reproached the judges of merits for not having held the liability of the third party. In response, the French High Court provides that "*the simple fact of entering, even knowingly, into a contract with a party which had commenced negotiations with a third party does not itself constitute a fault for which the author could be liable (...)*". Contrary to the situation where the contract has been entered into and is enforceable against third parties, the principle being that they must not be unaware of an established legal situation, the negotiations implement the principle of freedom of changing partner. The parties to the negotiations have therefore no right to demand that a third party complies with the agreement, which, by definition, has not been entered into yet[23]. If a third party is liable only due to its knowledge of the negotiations, there would not be any distinction between the negotiation period and the final agreement.

The French High Court however sets aside the situation in which there is "*an intention to harm or (...) deceptive conduct*" which would sanction the abuse of right to enter into a contract and more largely the freedom of competition. It remains that proving this intention to harm or deceptive conduct is difficult, which perhaps explains that the French High Court does not want to follow this path, even in the presence of a clause according to which the third party warrants the compensation relating to a wrongful termination.

**B- The scope of the warranty clause of payment of indemnities for termination**

If the contract entered into between the author of the termination and a third party includes a clause according to terms of which the purchaser warrants in advance the vendor any indemnity in case of termination of negotiations previously initiated with a partner, it is fair to wonder whether this clause is not sufficient to establish that the purchaser used unfair practices or that it had an accurate knowledge of the progress of the negotiations previously undertaken. For the first time, the French High Court makes a decision on this issue and holds a negative answer: no matter that the purchaser "*did in fact benefit from the unfair practices*" of the vendors.

[15] CA Paris, 16 Dec. 1998, Bull. Joly, 1998, para. 98; CA Rennes, 29 Apr. 1992, Bull. Joly, 1993, p. 463; para. 132, note J.-J. Daigre; CA Paris, 10 Jan. 1990, Dr. sociétés, 1991, Comm. n° 32; CA Paris, 25 May 1991, Dr. sociétés, 1991, Comm. n° 428; HC. com., 6 June 1990, Bull. Joly, 1990, p. 78, para. 226. –P. Stoffel-Munck, L'abus dans les contrats, essai d'une théorie, *op. cit*., n° 312, p. 250: "*it is one thing to compensate the disappointed hope and the loss of a chance of entering into a contract during the negotiation period, but it is another thing to consider that the termination leads to a lost gain*".
[16] CA Paris, 16 Dec. 1998, above.
[17] P. Delebecque and F.-J. Pansler, *Droit des obligations, Contrat et quasi-contrat, op. cit.*, n° 79, p. 54 and n° 82, p. 58.
[18] What do you mean by "*final and binding agreement*"? Certainly, this is the case of a contract but also the pre-contractual agreements such as the promise to sell.
[19] Obs. J. Mestre, RTD civ. 1988, p. 108.
[20] P. Malaurie, L. Aynès and P. Stoffel-Munck, *Les obligatoires*, Defrénois, 2004, n° 464, p. 218 - In the same sense: CA Rennes, 8 Jul. 1929, DH 1929, Jur. p. 548.
[21] The compensation of the loss of a chance is rarely granted, See, for instance, CA Versailles, 8 March 1985, Juris-data, n° 04-1111, which refuses to admit the chain of causation between the criticised pre-contractual fault and the loss resulting from the loss of a chance of performance of a show in another town; HC. 2nd civ. 12 June 1987, RTD civ. 1988, p.107, obs. Mestre, which decides that the hypothetical of deals is sufficient to exclude the loss of a chance of entering into them by the company.
[22] G. Viney, *Introduction à la responsabilité*, LGDJ, 2nd ed., 1995 n° 197-1.

[23] See P. Malaurie, L. Aynès and P. Stoffel-Munck, *Les obligations, op. cit.*, n° 793, p. 376 or A. Seriaux, *Droit des obligations*, PUF, 1998, n° 57, p. 234 and the quoted references.

In other words, if the third party benefits from unfair practices without being the investigator, it will not be liable. The principle of freedom of termination of the negotiations, like that of free competition, are protected: the existence of a clause warranting the payment of any indemnity of termination is not sufficient for the third party to be co-liable. The French High Court, following the judges of merits in this matter, refuses to admit that this clause characterises the existence of unfair practices.

Concerning the issue of legality of this clause, it was not raised and the French High Court indirectly recognised it by admitting its effects. But it is advisable to question the legal nature of this clause. It is not a clause of limitation or exclusion of liability, clause which is in principle null in tort as it is contrary to the public order, nullity aiming to protect the potential victims. This clause arranges for compensation and must be reconciled with the prohibition of "*releasing itself of the consequences of its proven faults*"[24].

In reality, the relevant clause does not focus on the amount of compensation due such as a clause of limitation or exclusion of liability, but on the determination of the person liable to pay it: it implements a genuine warranty of compensation.

It is possible to doubt the validity of this clause, a type of warranty resulting from the obligation to negotiate in good faith, mechanism which would apply whatever the nature of the fault made. But, by leaving the pre-contractual environment, the validity of this clause may be explained by the principle of contractual freedom, principle in application of which the parties (the author of the termination and a third party) may arrange for the payment of an indemnity due by the author of the termination by transferring the charge to a third party. The victim, indemnified in full, remained a third party to this agreement in the application of the principle of privity of contracts. However, if in law, the principle must be respected because the author remains liable for the wrongful termination and the damage is compensated, it remains that, by a contractual mechanism, it will indirectly be released from the consequences of its fault: admittedly liable for the debt, it is the beneficiary of a contractual action on the ground of which it may obtain that the third party which became liable by the application of the clause contributes to the payment of its compensation debt. ∎

* HC means French High Court

---

[24] F. Terré, Ph. Simler and Y. Lequette, *Droit civil, Les obligations, op. cit.*, n° 737, p. 708.

NAATI No. 57513
VERONIQUE MORGAN-SMITH
TRANSLATOR
ENGLISH <-> FRENCH
NATIONAL ACCREDITATION AUTHORITY FOR TRANSLATORS AND INTERPRETERS

Exhibit 5

The: 09/11/2011

**French High Court**

**Civil Division 3**

**Public Hearing of 28 June 2006**

**N° of appeal: 04-20040**

Published to the bulletin

**Partial Dismissal**

**Mr. Weber, president**

Mrs. Nesi, associate judge

Mr. Cedras, deputy prosecutor

SCP Bachelier et Potier de la Varde, SCP Richards, solicitor(s)

## FRENCH REPUBLIC

## ON BEHALF OF THE FRENCH PEOPLE

ON BEHALF OF THE FRENCH PEOPLE

THE FRENCH HIGH COURT, THIRD CIIVL DIVISION, made the following decision:

Considering that, in accordance with the appealed decision (Noumea, 29 July 2004), the company Antineas undertook the negotiations with the real estate investment company[1] Longson (SCI) and the jointly interested parties X... Y... for the sale of the land intended for the construction of a building; that a draft sale "agreement" not being able to be signed and the company Antineas having sold the asset to a third party, SCI and Mr. Phiet X.... Y.... issued a statement of claim for payment of damages for a wrongful termination of negotiations.

On the second ground:

In view of section 1382 of the French civil code;

● Considering that to order the company Antineas to pay damages to SCI, the decision holds that the court has sufficient elements to assess its loss of a chance relating to a shortfall in earnings resulting from the termination of the proposed real estate plan;

---

[1] Note of the translator:  under French law, a real estate investment company is an unlimited liability company restricted to real estate.

● That, by deciding so, while a fault made in the exercise of the right of unilateral termination of precontractual negotiations is not the cause of the loss of a chance of making profits that could have been expected from the execution of the contract, the court of appeal is in breach of the aforementioned section;

**BASED ON THESE GROUNDS:**

DISMISSES AND OVERRULES the decision between the parties made by the court of appeal of Noumea on 29 July 2004 by only ordering the company Antineas to pay SCI Longson the amount of six million Pacific Francs; consequently, puts the cause and the parties back into the situation where they were before the aforementioned decision and, to rightly do so, refers them to the court of appeal of Noumea which will be constituted differently.

Orders SCI Longson and the jointly interested parties X... Y...together to pay costs;

In view of section 700 of the new Code of civil procedure,

Orders SCI Longson and the jointly interested parties X... Y... to pay the company Gastaud in its official capacity the amount of €2,000;

States that this decision will be forwarded, at the initiative of the Chief Prosecutor of the French High Court, to be recorded either in the margin or following the partially dismissed decision.

So made and judged by the third civil division of the French High Court and pronounced by the president in its public hearing of twenty-eight June two thousand and six.

**Publication**: Bull. 2006, III, n° 164, p. 136

**Appealed decision**: Court of appeal of Noumea of 29 July 2004

**Titles and summaries:** LIABILITY IN TORT OR QUASI-DELICT[2] - Damage – Certain loss – Loss of a chance – Pre-contractual negotiations – Profits expected from the execution of contract (non)

A fault made in the exercise of the right of unilateral termination of pre-contractual negotiations is not the cause of the loss of a chance of making profits expected from the execution of the contract.

---

[2]  Under French law, a quasi-delict is an act whereby a person, without malice, but by fault, negligence or imprudence not legally excusable, causes injury to another person.

**Section applied:**

1382, French Civil Code



Exhibit 6

# CIVIL LAW

Philippe MALAURIE - Laurent AYNÈS

# OBLIGATIONS

Philippe MALAURIE
Laurent AYNÈS
Philippe STOFFEL-MUNCK

4th edition

## ALLEN & OVERY
## LIBRARY

**DEFRÉNOIS**

lextenso éditions



# OBLIGATIONS



## SUB-TITLE I

## MEETING OF THE MINDS

**457. Formation and Performance.** – According to the traditional analysis, the heart of a contract is the meeting of the minds, which determines its content. On the contrary, for the authors who are not voluntarists[i], it is the performance which is its essence, the agreement being formed by its performance and it therefore becomes fully binding only when it has commenced to be performed.

The parties can agree to make the formation of the contract conditional upon its performance or, even in a contract that is inherently consensual such as a sale agreement, they can agree to make the inception of the contract conditional upon the completion of a formality[1], which brings it closer to a formal contract, or upon the delivery of a thing, which brings it closer to a real contract[ii].

The meetings of the minds can occur in many different ways, sometimes without preliminary negotiation (ex.: purchase in a shop at a fixed price), sometimes after negotiations. Although there are two ways to reach an agreement (Chapter I), under French law the meeting of the minds is a single notion consisting of the common consent of both parties, but which can be vitiated (Chapter II).

**N[os] 458-459, reserved.**

---

[i] Translator's note: the voluntarists are known as "*volontaristes*" and are legal theorists for whom the will of the parties is paramount.
[ii] Translator's note: contracts are divided into those which are formed by the mere consent of the parties such as a sale, and those in which it is necessary that there should be something more than mere consent, such as the loan of money, deposit or pledge, which, from their nature, require the delivery of the thing; whence they are called real.

---

[1] Ex.: provide that where the sale of a real property (consensual contract) will be entered into only when the agreement drawn up by a notary is signed by the parties: *above*, n° 445.

Exhibit 7

[Logo - SIREY ]
UNIVERSITY

Jacques FLOUR
Jean-Luc AUBERT
Éric SAVAUX

CIVIL LAW

# Obligations

## 1. Legal document

[Logo]

14th Edition



*[handwritten – l/530.465-1]*

Jacques Flour
Jean-Luc Aubert
Éric Savaux

*[stamp –
BIBLIOTHEQUE
INTERUNIVERSITAIRE
CUJAS]*

# Obligations

## 1.  Legal document

Contracts – Formation – Effects
Unilateral Contracts
Collective Contracts

*[handwritten – KA.14 FLO yellow]*

Fourteenth Edition by

**Eric SAVAUX**

Aggregate of the Faculties of law.
Professor of the Faculty of Law and Social Sciences of the University of Poitiers

2010

**[Logo – SIREY]**



# Chapter 1

## Consent

**122. The Concept of Consent. –** Consent necessary for the formation of contracts is constituted by an *agreement between two wills*. At least two, since a contract may involve several persons; but the tradition is to think with the simplest hypothesis: that where there are only two contractors.[1] But we must specify: an agreement which aims *to create obligations* (or, more generally, if we identify, as is often the case, contract and agreement[2]: which aim to create legal relations).

Indeed, the meetings of the minds which do not intend to create legal relations exist. A father who promises a holiday trip to his son provided that the latter passes his examination (example of Pothier… already the cult of diplomas) does not intend to bind himself; if he breaks his promise, he will not be liable. Likewise, the one who, after having invited a friend to dinner, cancels; or, inversely, the guest who does not turn up. These agreements create, it is said, relationships of *complacency or courtesy*, and not obligations in the legal sense of the word.[3] But the limits are sometimes blurry.[4]

Without the consent being thus characterised, no contract can be formed. In terms of importance, this condition is above any other: *to contract is firstly to want.*[5] Thus the first principle that has to be laid out is the principle of contractual freedom.[6]

---

[1] Literally, section 1108 only requires the consent of the debtor (*the party who binds itself*). But the word would then be improper: *cum sentire,* to want with. And the idea is mostly inexact. In a unilateral contract, the creditor must have demonstrated his agreement with the debtor: a gift, for example, is perfect only if it is accepted by the beneficiary (s. 932). All the draft reforms require "the consent of the contracting parties".

[2] *Above*, n° 80.

[3] PERREAU, "Courtoisie, complaisance et usages non obligatoires", *RTD civ*. 1914, 503.

[4] Deciding that so long as the author of a commitment, even a moral commitment, has expressed his unequivocal and intended will to bind himself, this commitment is binding and its breach would require him to repair the damage that arises from it, See. Com. 23 Jan. 2007, *Bull. Civ.* IV, n° 12, *D*. 2007. 442, obs. DELPECH, *RTD civ. 2007*. 340, obs. MESTRE and FAGES, *Defrénois* 2007, Art. 38624, n° 48, obs. SAVAUX.

[5] In the absence of consent, no contract can be formed if the person against whom it is raised does not understand the language in which it was drafted by a third party (Paris, 30 Nov. 2006, *JCP* 2007. II. 10069, note KENFACK).

[6] It is not by chance that this principle can be found in several contract systems (foreign laws, scholarly codifications…) and the guiding principles of European contract law (*Projet de cadre commun de référence. Principes contractuels communs,* Société de législation comparée, 2008, p. 25 et seq.). It is the first principle of the guiding principles enunciated by the *projet gouvernemental de réforme du droit des contrats* (s. 15) and the first rule of the general rules of the *projet de l'Académie des sciences morales et politiques* (s. 3).

Concerning the draft common framework of reference, See. ALPA, "Autonomie des parties et liberté contractuelle aujourd'hui", *RDC* 2009. 826 ; LIMMER, "Cadre commun de référence et liberté contractuelle", *ibid.* 860.



**123. The Principle of contractual freedom. –** The assertion of this freedom gives rise to two major consequences.

Firstly, everyone is free *to decide to not enter into a contract*. No contract can be formed if both parties did not want it, and even less against the will of one of them. It was thus decided that the landlord to whom a person offers to buy a piece of land that is of no use to him, and for a price that is considerably higher than its actual value, can refuse to enter into a sale agreement: in doing so he does not become liable.[1]

Secondly, and if the parties have decided to enter into a contract, each party *is free to choose their co-contracting party*: this freedom takes a particular shape for contracts that are entered into *intuitu personae*[2] – by consideration of the other party – that is to say those where the personality of the individual with whom we deal with is of particular importance.

To this double rule, the law of the 19th century would add few exceptions, because it was liberal and individualistic. But we know that, under the pressure of the economic needs as well as of the political and social doctrines, liberalism had to yield to a growing interventionism throughout the 20th century. Contracts, which were only a technique, among others, of organisation of economic and social relationships, could not get away from this evolution. Also, this principle, under these two aspects, includes today several exceptions.

**124. Mandatory or Forced Contracts. –** It is at the end of the first half of this century that the doctrine[3] begins to talk about these concepts, which should not be confused with the concept of adhesion contract[4][i], which has been known for a long time. The feature of this type of contract is a constraint coming from *one of the parties* who, being in a position of strength compared to the other, can impose to the latter the conditions of their respective commitments. On the contrary, in mandatory or forced contracts, the constraint arises from *the law*, which is an exception to the freedom of contract. Such contracts thus appear as one of the manifestations of the state interventionism which constitute one of the important features of the evolution of law during the 20th century.[5]

These exceptions sometimes affect the freedom of not entering into a contract, sometimes the freedom of choosing the co-contracting party, and finally sometimes both of these freedoms. But

---

[1] Claim. 24 Nov. 1924, S. 1925. 1. 217, note BRETHE DE LA GRESSAYE. We can notice that in this case, the principle of freedom of contract was reinforced by the absolute nature of the property right. Concerning an application in the context of a membership with an association: Civ. 3rd, 12 June 2003, *Bull, civ.* III, n° 125, *D.* 2003. 1695, obs. ROUQUET, *JCP* 2003. II. 10190, note AUQUE, *RTD civ.* 2004. 280, obs. MESTRE and FAGES.
[2] *Below*, n° 201.
[3] JOSSERAND, "Le contrat forcé et le contrat légal", *DH* 1940. Chron. 5; DURAND. "La contrainte légale dans la formation du rapport contractuel", *RTD civ.* 1944. 73; MOREL, "Le contrat imposé", in *Études Ripert*, vol. II, p. 116. See also BARRET, "Variations autour du refus de contracter", in *Mélanges offerts a J.-L. Aubert*, 2005, p. 3; J. HONORAT, "Rôle effectif et rôle concevable des 'quasi-contrats' en droit actuel". *RTD civ.* 1969, 653.
[4] Concerning the adhesion contract, see *above*, n° 93, and *below*, n° 177 et seq.
[5] *Above*, n[os] 72 and 74.



classifying them like this is not sufficient to accurately measure their scope. It is necessary to consider the type of penalty that, in each case, is triggered by the non-observance of the law.[6]

---

[i] Translator's note: essentially, an adhesion contract is a take it or leave it arrangement between two parties, one is considered much stronger than the other.

---

[6] See AUBERT, *Notions et rôles de l'offre et de l'acceptation dans la formation du contrat*, LGDJ, 1970, pref. FLOUR, n$^{os}$ 334 et seq. Read with HONORAT, *op. cit.,* spec. n$^{o}$ 28, p. 679. Taking the notion of quasi-contract in a different sense from its definition in the traditional classification of the sources of obligations (*above*, n$^{os}$ 54, 58 and 59), this author uses this notion to qualify the legal relationships that, while they seem to be of contractual nature, have been imposed by the legislator.  *[Incomplete sentence]*



# Exhibit 8

PRIVATE LAW                                    **PRECIS**

Civil Law

# Obligations

François Terré

Philippe Simler

Yves Lequette

10th Edition

**DALLOZ**



Civil Law

# Obligations

10th Edition

2009

**François Terré**

Emeritus professor at Panthéon-Assas University (Paris II)
Member of the Institute

**Philippe Simler**

Emeritus professor at the University of Strasbourg
Honorary Dean of the Faculty of Law,
Political Sciences and Management of Strasbourg

**Yves Lequette**

Professor at Panthéon-Assas University (Paris II)

**DALLOZ**



# CHAPTER 2
# THE MEETING OF THE MINDS

90. ***Presentation*** ◊ Dealing with consent in sections 1109 to 1118, the Civil Code only considers it through the defects that may affect it. In other words, the legislator, in 1804, only preoccupied himself with the characteristics of consent that each of the parties must have in order to protect them against themselves. Without doubt, because the answer to these questions seemed obvious, the legislator did not feel the need neither to define the concept of consent itself, nor to specify the forms in which it must be expressed. Things must however be done differently in a work that aims to study positive law in the most extensive manner possible. Thus, we will successively examine: the existence of consent (Section 1), then the protection of consent (Section 2).

## SECTION 1. **THE EXISTENCE OF CONSENT**

91. ***The Meaning of the Word Consent*** ◊ In the contractual sphere, the term "consent" has a double meaning.

Firstly, it refers to the manifestation of the will of each of the parties, the acceptance that it gives to the conditions of the proposed contract. It is this meaning that is used when we talk about the "exchange of consents" or when we say that a person has "given their consent".

If we take its etymological meaning (*cum sentire*), the word consent also means *the agreement*, the combination of two wills: the will of the debtor who binds himself, and the will of the creditor to whom he owes an obligation. According to a thesis of Germanic inspiration, a contract is a simple juxtaposition of two unilateral declarations of will, each of them being binding by itself[1]. But in the French conception, contracts do not arise from the juxtaposition of two…

---

[1] Worms, *De la volonté unilatérale considérée comme source d'obligations*, thesis Paris 1891, p. 93 *in fine* "which appears paramount to us in a contract, is not the meeting and exchange of the wills, it is each of the wills considered individually. Because each of them has its own effect, and each of them is sufficient to bind its author". Concerning the relationship between this thesis and the ideas of Siegel, Austrian author who gave the first scientific expression of the unilateral contract theory in 1873, see. A. Rieg, *Le rôle de la volonté dans l'acte juridique en droit civil français et allemand*, thesis Strasbourg, ed. 1961, n° 430 et seq. p. 430. Concerning an analysis close to Worms', see. C. Grimaldi, *Quasi-engagement et engagement en droit privé*, thesis Paris II, ed. 2007. Concerning a new analysis in relation to the relationship between will and consent, see. M.-A. Frison-Roche, Remarques sur la distinction de la volonté et du consentement en droit des contrats, *RTD* civ. 1995, p. 573, RJ com. Nov, 1995, p. 151 et seq.

declarations, each of them being bound by themselves, but of the meeting of the minds, which gives rise to a new will, that is the will to realise a common transaction which is the subject matter of the contract. It is the node of the wills, the flow of trust that flows between the parties that forms the contract[1].

We will examine the existence of consent taking into account both of its meanings: on one hand as a manifestation of the will of each of the parties (Sub-section 1), and on the other hand as a meeting of the minds (Sub-section 2).

SUB-SECTION 1. **Consent as a Manifestation of the Will.**

92.   *Division* ◊ In order for a contract to be formed, it is necessary that each of the parties *consented* to it (Paragraph 1) and that they had the required *aptitude* (Paragraph 2).

Paragraph 1. **The Definition of the Concept of Consent**

93.   *Internal Will, Declared Will* ◊ To contract is to want.

Firstly, consent is fundamentally, a *mental* process, an internal step. After having discussed with himself, weighed the pros and cons, each party will decide to, or not to, bind himself. The light of intelligence comes to enlighten the energy of the decision. In brief, the consent is a *volition preceded by a reflection*. That is to say it requires the aptitude to understand, that is the intelligence, and the aptitude to decide, that is the will.

But, being a psychological phenomenon, consent will give rise to a contract only if it is *expressed*, so that the other party is able to be aware of it. We will see that no matter how consent is expressed - with words, in writing, gesture, electronic pulses -, it must be expressed. If it is not expressed, no meeting of the minds is conceivable. That is to say consent is both something that is a thought – which is the internal will – and something that is expressed – which is the declared will.

This duality does not raise any difficulty if the internal will and the declared perfectly match. On the other hand, a question arises when, the thought having been awkwardly expressed, a discrepancy, a distortion is created between the two. For example, a person makes a clerical error and indicates that they are selling an object for a price of 100 euros when they intended to sell it for 1000 euros. Which one will then prevail over the other: the internal will or the declared will? Which one of the two wills is to be used as the ground of the contract?

The individualistic conception, dominated by the theory of the autonomy of the will, teaches that the internal will must, in this case, prevail over the other.

---

[1] Concerning this agreement, see G. Rouhette, *Contribution à l'étude critique de la notion de contrat*, 1965, nᵒ 98 et seq.



Exhibit 9

# CIVIL CODE

Translated by Georges ROUHETTE, Professor of Law, with the assistance of Dr Anne ROUHETTE-BERTON, Assistant Professor of English.

## PRELIMINARY TITLE
## OF THE PUBLICATION, OPERATION AND APPLICATION OF STATUTES    Articles 1 to 6
## IN GENERAL

**Art. 1**
*(Ord. no 2004-164 of 20 Feb. 2004)*
Statutes and, when they are published in the Journal Officiel de la République Française, administrative acts shall come into force on the date specified in them or, in the absence thereof, on the day after their publication. However, the commencement of those of their provisions whose enforcement requires implementing measures is postponed to the date of commencement of said measures.
In case of emergency, statutes whose decree of promulgation so prescribes and administrative acts as to which the Government so orders by a special provision shall come into force as soon as they are published.
The provisions of this Article shall not apply to acts of individual application.

**Art. 2**
Legislation provides only for the future; it has no retrospective operation.

**Art. 3**
Statutes relating to public policy and safety are binding on all those  living on the territory.
Immovables are governed by French law even when owned by aliens.
Statutes relating to the status and capacity of persons govern French persons, even those residing in  foreign countries.

**Art. 4**
A judge who refuses to give judgment on the pretext of legislation being silent, obscure or insufficient, may be prosecuted for being guilty of a denial of justice.

**Art. 5**
Judges are forbidden to decide cases submitted to them by way of general and regulatory provisions.

**Art. 6**
Statutes relating to public policy and morals may not be derogated from by private agreements.

## BOOK I
## OF PERSONS                                    Articles 7 to 515-8

### TITLE I
### OF CIVIL RIGHTS                          Articles 7 to 16-13

#### CHAPTER I
#### [Of the Enjoyment of Civil Rights]            Articles 7 to 15

**Art. 7**
*(Act of 26 June 1889)*
The exercise of civil rights is unrelated to the exercise of political rights which are acquired and kept in accordance with constitutional and electoral statutes.

**Art. 8**
*(Act of 26 June 1889)*
Every French person enjoys civil rights.

**Art. 9**
*(Act no 70-643 of 17 July 1970)*
Everyone has the right to respect for his private life.
Without prejudice to compensation for injury suffered, the court may prescribe any measures, such as sequestration, seizure and others, appropriate to prevent or put an end to an invasion of personal privacy; in case of emergency those measures may be provided for by interim order.

**Art. 9-1**
*(Act no 93-2 of 4 Jan. 1993)*
Everyone has the right to respect of the presumption of innocence.
(Act no 2000-516 of 15 June 2000) Where, before any sentence, a person is publicly shown as being guilty of facts under inquiries or preliminary investigation, the court, even by interim order and without prejudice to compensation for

CIVIL CODE

injury suffered, may prescribe any measures, such as the insertion of a rectification or the circulation of a communiqué, in order to put an end to the infringement of the presumption of innocence, at the expenses of the natural or juridical person liable for that infringement.

**Art. 10**

*(Act no 72-626 of 5 July 1972)*

Everyone  is bound to collaborate with the court so that truth may come out.

He who, without legitimate reason, eludes that obligation when it has been legally prescribed to him, may be compelled to comply with it, if need be on pain of periodic penalty payment or of a civil fine, without prejudice to damages.

**Art. 11**

An alien enjoys in France the same civil rights as those that are or will be granted to French persons by the treaties of the  nation to which that alien belongs.

**Art. 12**

[repealed]

**Art. 13**

[repealed]

**Art. 14**

An alien, even if not residing in France, may be cited before French courts for the performance of obligations contracted by him in France with a French person; he may be called before the courts of France  for obligations contracted by him in a foreign country towards French persons.

**Art. 15**

French persons may be called before a court of France for obligations contracted by them in a foreign country, even with an alien.

CHAPTER II

Of the Respect of the Human Body                                              Articles 16 to 16-9

**Art. 16**

Legislation ensures the primacy of the person, prohibits any infringement of the latter's dignity and safeguards the respect of the human being from the outset of life.

**Art. 16-1**

Everyone has the right to respect for his body.

The human body is inviolable.

The human body, its elements and its products may not form the subject of a patrimonial right.

**Art. 16-2**

The court may prescribe any measures appropriate to prevent or put an end to an unlawful invasion of the human body or to unlawful dealings relating to its elements or products.

**Art. 16-3**

There may be no invasion of the integrity of the human body except in case of medical necessity for the person or exceptionally in the therapeutic interest of others (Act no 2004-800 of 6 Aug. 2004).

The consent of the person concerned must be obtained previously except when his state necessitates a therapeutic intervention to which he is not able to assent.

**Art. 16-4**

Nobody may invade the integrity of mankind.

Any eugenic practice which aims at organizing the selection of persons is forbidden.

Any intervention having the purpose of causing the birth of a child genetically identical to another person alive or dead is forbidden (Act no 2004-800 of 6 Aug. 2004).

Without prejudice to researches aiming at preventing and treating genetic diseases, there may be no alteration of the genetic characters with a view to changing the descent of a person.

**Art. 16-5**

Agreements that have the effect of bestowing a patrimonial value to the human body, its elements or products are void.

**Art. 16-6**

No remuneration may be granted to a person who consents to an experimentation on himself, to the taking of elements off his body or to the collection of products thereof.

**Art. 16-7**

All agreements relating to procreation or gestation on account of a third party are  void.

**Art. 16-8**

No information enabling the identification of both the person that donates an element or a product of his body and

CIVIL CODE

the person that receives it may be disclosed. The donor may not be acquainted with the identity of the receiver and the receiver may not be acquainted with that of the donor.

In case of therapeutic necessity, only the physicians of the donor and receiver may have access to the information enabling the identification of the two persons concerned.

**Art. 16-9**

The provisions in this chapter are mandatory.

CHAPTER III

Of the Examination of the Genetic Particulars of a Person and of the Identification of    Articles 16-10 to 16-13
a Person owing to his Genetic Prints

**Art. 16-10**

*(Act no 2004-800 of 6 Aug. 2004)*

An examination of the genetic particulars of a person may be undertaken only for medical purposes or in the interest of scientific research.

The express consent of the person must be obtained in writing before the carrying out of the examination, after he has been duly informed of its nature and purpose. The consent shall specify the purpose of the examination. It may be revoked without form at any time.

**Art. 16-11**

The identification of a person owing to his genetic prints may only be searched for within the framework of inquiries or investigations pending judicial proceedings or for medical purposes or in the interest of scientific research.

In civil matters, that identification may be sought only in implementation of proof proceedings directed by the court seized of an action aiming either at establishing or at contesting a parental bond, or for getting or discontinuing subsidies. The consent of the person must be obtained previously and expressly. Save an express consent given by the person during his lifetime, no identification owing to genetic prints may be effected after his death (Act no 2004-800 of 6 Aug. 2004).

Where the identification is made for medical purposes or in the interest of scientific research, the express consent of the person must be obtained in writing before the carrying out of the identification, after he has been duly informed of its nature and purpose. The consent shall specify the purpose of the identification. It may be revoked without form at any time (Act no 2004-800 of 6 Aug. 2004).

**Art. 16-12**

Only persons whom have been authorized in such a way as prescribed by a decree in Conseil d'Etat are entitled to undertake identifications owing to genetic prints. In the framework of judicial proceedings, those persons must besides be registered in a list of judicial experts.

**Art. 16-13**

*(Act no 2002-303 of 4 March 2002)*

No one may be discriminated against  on the basis of his genetic features.

**TITLE I bis**
**OF FRENCH NATIONALITY**                                                   Articles 17 to 33-2

CHAPTER I
General provisions                                                          Articles 17 to 17-12

**Art. 17**

*(Act no 73-42 of 9 Jan. 1973)*

French nationality is granted, acquired or lost according to the provisions laid down in this Title, subject to any treaties and other international commitments of France which may apply.

**Art. 17-1**

*(Act no 73-42 of 9 Jan. 1973)*

New statutes related to the granting of nationality by birth shall apply to persons who are minors at the time of their entry into force, without prejudice to the vested rights of third parties and without their being allowed to challenge  the validity of transactions previously concluded  on ground of nationality.

The provisions of the preceding paragraph shall apply for purposes of interpretation to the statutes related to nationality by birth that have come into force after the promulgation of Title I of this Code.

**Art. 17-2**

*(Act no 73-42 of 9 Jan. 1973)*

Acquisition and loss of French nationality are governed by the law that is in force at the time of the act or fact to which legislation attributes those effects.

The provisions of the preceding paragraph shall govern for purposes of interpretation the commencement of the Nationality Acts that were in force before  19 October 1945.

**Art. 17-3**

*(Act no 93-933 of 22 July 1993)*

CIVIL CODE

Applications in view to acquiring, losing French nationality or being reinstated in that nationality, as well as declarations of nationality, may, in the way provided for by law, be made without authorization from the age of sixteen.

A minor under sixteen must be represented by the person or persons who exercise parental authority over him.

(Act no 95-125 of 8 Feb. 1995) A minor between sixteen and eighteen who is prevented from expressing his intention by an impairing of his mental or bodily faculties must be likewise represented. The impediment shall be established by the judge of guardianships of his own motion, on application of a member of the family of the minor or of the Government procurator's office, upon presentation of a certificate issued by a specialist selected on a list drawn out by the Government procurator.

(Act no 95-125 of 8 Feb. 1995) Where the minor mentioned in the preceding paragraph is placed under guardianship, he is represented by the guardian authorized to this end by the family council.

**Art. 17-4**

(Act no 2003-1119 of 26 Nov. 2003).- Falling within the terms of this Title, the phrase"in France" means the metropolitan territory, overseas départements and territories as well as New Caledonia and the French Southern and Antartic Lands.

**Art. 17-5**

*(Act no 93-933 of 22 July 1993)*

In this Title, majority and minority shall be understood according to the meaning they have in French law.

**Art. 17-6**

*(Act no 73-42 of 9 Jan. 1973)*

In order to determine the French territory at any time, account shall be taken of modifications resulting from enactments of the French Government under the Constitution and statutes, as well as under international treaties previously concluded.

**Art. 17-7**

*(Act no 73-42 of 9 Jan. 1973)*

In the absence of conventional stipulations, the effects upon French nationality of annexations and cessions of territories are governed by the following provisions.

**Art. 17-8**

*(Act no 73-42 of 9 Jan. 1973)*

Nationals of the ceding State domiciled in the annexed territories on the day of the transfer of sovereignty acquire French nationality, unless they actually establish  their domiciles outside those territories. Under the same reservation, French nationals domiciled in the ceded territories on the day of the transfer of sovereignty lose that nationality.

**Art. 17-9**

*(Act no 73-42 of 9 Jan. 1973)*

The effects upon French nationality of the accession to independence of former overseas départements or territories of the Republic are determined in Chapter VII of this Title.

**Art. 17-10**

*(Act no 73-42 of 9 Jan. 1973)*

The provisions of Article 17-8 shall apply for purposes of interpretation to changes of nationality following upon annexations and cessions of territories resulting from treaties concluded before 19 October 1945.

However, aliens who had their domiciles in territories retroceded by France under the Treaty of Paris of 30 May 1814 and who transferred their domiciles in France later than this Treaty, were not allowed to acquire  French nationality on this ground unless they complied with the provisions of the Act of 14 October 1814. French persons who were born outside the retroceded territories and have kept their domiciles on those territories have not lost French nationality under the terms of the aforementioned Treaty.

**Art. 17-11**

*(Ord. no 45-2441 of 19 Oct. 1945)*

Provided that there is no infringement of the interpretation given to former agreements, a change of nationality may not, in any case, follow from an international convention, unless the convention so provides expressly.

**Art. 17-12 (Act n° 73-42 of 9 Jan. 1973)**

Where, under the terms of an international convention, a change of nationality is subject to the performing of an act of option, that act shall be determined as to its form by the law of the contracting country in which it is performed.

**Art. 17-12**

*(Act no 73-42 of 9 Jan. 1973)*

Where, under the terms of an international convention, a change of nationality is subject to the performing of an act of option, that act shall be determined as to its form by the law of the contracting country in which it is performed.

CHAPTER II

Of French Nationality by Birth                                        Articles 18 to 20-5

SECTION I

CIVIL CODE

Of French Persons by Parentage                                          Articles 18 to 18-1

**Art. 18**
*(Ord. no 2005-759 of 4 July 2005)*
Is French a child one parent of whom at least is French.

**Art. 18-1**
*(Act no 93-933 of 22 July 1993)*
If however only one of the parents is French, the child who was not born in France has the power to repudiate the status of French within six months preceding and twelve months following his majority.
(Act no 73-42 of 9 Jan. 1973) That power is lost if the alien or stateless parent acquires French nationality during the minority of the child.

SECTION II
Of French Persons by Birth in France                                    Articles 19 to 19-4

**Art. 19**
*(Act no 73-42 of 9 Jan. 1973)*
Is French a child born in France of unknown parents.
He shall however be deemed to have never been French if, during his minority, his parentage is established as regards an alien and if, under the national law of his parent, he has the nationality of the latter.

**Art. 19-1**
*(Act no 73-42 of 9 Jan. 1973)*
Is French:
1° A child born in France of stateless parents;
2° A child born in France of alien parents and to whom the transmission of the nationality of either parent is not by any means allowed by foreign Nationality Acts.(Act no 2003-1119 of 26 Nov. 2003).
(Act no 98-170 of 16 March 1998) He shall however be deemed to have never been French if, during his minority, the foreign nationality acquired or possessed by one of his parents happens to pass to him.

**Art. 19-2**
*(Act no 73-42 of 9 Jan. 1973)*
Shall be presumed born in France a child whose record of birth was drawn up in accordance with Article 58 of this Code.

**Art. 19-3**
*(Ord. no 2005-759 of 4 July 2005)*
Is French a child born in France where one at least of his parents was himself or herself born there.

**Art. 19-4**
*(Act no 73-42 of 9 Jan. 1973)*
Where  however only one parent was born in France, a child who is French under the terms of Article 19-3 has the power to repudiate this status within six months preceding and twelve months following  his majority.
That power is lost where one of the parents acquires French nationality during the minority of the child.

SECTION III
Common provisions                                                       Articles 20 to 20-5

**Art. 20**
*(Act no 73-42 of 9 Jan. 1973)*
A child who is French under this Chapter shall be deemed to have been French as from his birth, even where the statutory requirements for the granting of French nationality were fulfilled only at a later date.
(Act no 76-1179 of 22 Dec. 1976) The nationality of a child who was the subject of a plenary adoption is determined according to the distinctions set out in Articles 18 and 18-1, 19-1, 19-3 and 19-4 above.
(Act no 73-42 of 9 Jan. 1973) The establishing of the status of French later than birth may not however affect the validity of transactions previously concluded by the party concerned nor the rights previously acquired by third parties on the ground of the apparent nationality of the child.

**Art. 20-1**
*(Act no 73-42 of 9 Jan. 1973)*
The parentage of a child has effect on his nationality only where it is established during his minority.

**Art. 20-2**
*(Act no 93-993 of 22 July 1993)*
A French person who has the power to repudiate French nationality where this Title so provides may exercise that power by way of a declaration uttered in accordance with Articles 26 and  following.
He may divest himself of that power from the age of sixteen in the same way.

**Art. 20-3**
*(Act no 73-42 of 9 Jan. 1973)*

CIVIL CODE

In the circumstances referred to in the preceding Article, nobody may repudiate French nationality unless he proves that he has by birth the nationality of a foreign country.

**Art. 20-4**
*(Act no 98-170 of 16 March 1998)*

A French person who enlists in French forces loses the power to repudiate.

**Art. 20-5**
*(Act no 73-42 of 9 Jan. 1973)*

The provisions of Articles 19-3 and 19-4 shall not apply to children born in France of diplomatic agents or of regular consuls of foreign nationalities.

(Act no 93-993 of 22 July 1993) Those children have however the power to acquire voluntarily French nationality as provided for"in Article  21-11 below." ( Act no 98-170 of 16 March 1998)

| | |
|---|---|
| CHAPTER III | |
| Of the Acquisition of French Nationality | Articles 21 to 22-3 |
| SECTION I | |
| Of the Modes of Acquiring French Nationality | Articles 21 to 21-27 |
| Paragraph 1 | |
| Of the Acquisition of French Nationality by Reason of Parentage | Article 21 |

**Art. 21**
*(Act no 73-4 of, 9 Jan. 1973)*

As of right, ordinary adoption has no effect on the nationality of an adopted child.

| | |
|---|---|
| Paragraph 2 | |
| Of the Acquisition of French Nationality by Reason of Marriage | Articles 21-1 to 21-6 |

**Art. 21-1**
*(Act no 73-4 of, 9 Jan. 1973)*

As of right, marriage has no effect on nationality.

**Art. 21-2**
*(Act no 2003-1119 of 26 Nov. 2003)*

An alien or stateless person who marries and whose spouse is of French nationality may, after a period of two years from the marriage, acquire French nationality by way of declaration provided that, at the time of the declaration, the community of living both affective and physical has not come to an end and the French spouse has kept his or her nationality. The foreign spouse must also prove a sufficient knowledge of the French language, according to his or her condition.

The duration of the community of living shall be raised to three years where the alien, at the time of the declaration, does not prove that he has resided in France uninterruptedly for at least one year from the marriage.

The declaration shall be made as provided for in Articles 26 and following. Notwithstanding the provisions of Article 26-1, it shall be registered by the Minister in charge of naturalisations.

**Art. 21-3**
*(Act no 73-42 of 9 Jan. 1973)*

Subject to the provisions of Articles 21-4 and 26-3, the party concerned acquires French nationality at the date when the declaration is uttered.

**Art. 21-4**
*(Act no 93-993 of  22 July 1993)*

By a decree in Conseil d'Etat, the Government may, on grounds of indignity or lack of assimilation other than linguistic (Act no 2003-1119 of 26 Nov. 2003), oppose the acquisition of French nationality by the foreign spouse within a period of one year after the date of the acknowledgment of receipt provided for in Article 26, paragraph 2, or, where the registration was refused, after the day when the judgment which admits the lawfulness of the declaration has entered into force.

(Act no 73-42 of 9 Jan. 1973) If there is an opposition by the Government, the party concerned shall be deemed to have never acquired French nationality.

However, the validity of transactions concluded between the declaration and the decree that challenges it may not be objected to on the ground that the maker was not allowed to acquire French nationality.

**Art. 21-5**
*(Act no 73-42 of 9 Jan. 1973)*

Where a marriage  is declared to be void by a judgment of a French court, or of a foreign court whose authority is acknowledged in France, the declaration laid down in Article 21-2 may not lapse with regard to the spouse who married in good faith.

**Art. 21-6**

CIVIL CODE
*(Act no 73-42 of 9 Jan. 1973)*
The annulment of a marriage may not have any effect on the nationality of the children born thereof.

Paragraph 3
Of the Acquisition of French Nationality by Reason of Birth and Residence   Articles 21-7 to 21-11

in France

**Art. 21-7**
*(Act no 98-170 of 16 March 1998)*
Every child born in France of foreign parents acquires French nationality on his coming of age where, at that time, he has his residence in France and has had his usual residence in France for a continuous or discontinuous period of at least five years, from the age of eleven.
The tribunaux d'instance, local authorities, public bodies and services and especially educational establishments are obliged to inform the public, and in particular those persons to whom paragraph 1 applies, of the provisions in force in matters of nationality. The requirements as to that information shall be prescribed by a decree in Conseil d'Etat.

**Art. 21-8**
*(Act no 98-170 of 16 March 1998)*
The party concerned has the power to declare, in the way laid down in Article 26 and subject to his proving that he has the nationality of a foreign State, that he disclaims the status of French within six months before or twelve months after his majority.
In this event, he shall be deemed to have never been French.

**Art. 21-9**
*(Act no 98-170 of 16 March 1998)*
Any person who fulfils the requirements laid down in Article 21-7 in order to acquire French nationality loses the power to disclaim it where he enlists in French forces.
Any minor born in France of foreign parents who is regularly recruited as a volunteer acquires French nationality at the date of his recruitment.

**Art. 21-10**
*(Act no 98-170 of 16 March 1998)*
The provisions of Articles 21-7 to 21-9 may not apply to children born in France of diplomatic agents and of regular consuls of foreign nationality. Those children have however the power to acquire voluntarily French nationality as provided for in Article 21-11 below.

**Art. 21-11**
*(Act no 98-170 of 16 March 1998)*
A minor child born in France of foreign parents may from the age of sixteen claim French nationality by declaration, in the way laid down in Articles 26 and following where, at the time of his declaration, he has in France his residence and has had his usual residence in France for a continuous or discontinuous period of at least five years, from the age of eleven.
Under the same terms, French nationality may be claimed, on behalf of the minor child born in France of foreign parents, from the age of thirteen and with his personal consent, in which event the requirement of usual residence in France should be fulfilled from the age of eight.

Paragraph 4
Of the Acquisition of French Nationality by Reason of a Declaration of          Articles 21-12 to 21-14

Nationality

**Art. 21-12**
*(Act no 73-42 of 9 Jan. 1973)*
A child who was the subject of an ordinary adoption by a person of French nationality may, up to his majority, declare, in the way provided for in Articles 26 and following, that he claims the status of French, if he resides in France at the time of his declaration.
"However, the obligation of residing is dispensed with where the child was adopted by a person of French nationality who does not have  his usual residence  in France" (Act no 98-170, 16 March 1998).
May, in the same way, claim French nationality:
1° A child, who, for at least five years, has been sheltered and brought up by a person of French nationality or who, for at least three years, has been entrusted to the Children's aid service (Act no 2003-1119 of 26 Nov. 2003).;
2° A child sheltered in France and brought up in conditions that allowed him to receive, during five years at least, a French education"from either a public body, or a private body offering the features determined by a decree in Conseil d'Etat" (Act no 93-933 of 22 July 1993).

**Art. 21-13**
*(Act no 73-42 of 9 Jan. 1973)*
May claim French nationality"by declaration uttered as provided for in Articles 26 and following" (Act no 93-933 of 22 July 1993), persons who have enjoyed in a constant way the apparent status of French for the ten years prior to the

CIVIL CODE

declaration.

Where the validity of the transactions concluded before the declaration was made conditional on the entitlement of French nationality, that validity may not be objected to on the sole ground that the declarant had not that nationality.

**Art. 21-14**

*(Act no 93-933 of 22 July 1993)*

Persons who have lost French nationality under Article 23-6 or against whom was raised the peremptory exception laid down by Article 30-3 may claim French nationality by declaration uttered as provided for in Articles 26 and following.

They must have kept or acquired patent cultural, professional, economic or family bonds with France, or actually performed military services in a unit of the French army or fought in French or allied armies in time of war.

The surviving spouses of the persons who actually performed military services in a unit of the French army or fought in French or allied armies in time of war may likewise benefit from the provisions of this Article, paragraph 1.

Paragraph 5
Of the Acquisition of French Nationality by a Decision of the Government     Articles 21-14-1 to 21-25-1

**Art. 21-14-1**

*(Act no 99-1141 of 29 Dec. 1999)*

French nationality may be conferred by decree, on a proposal from the Minister of Defence, to an alien recruited in French armies who was wounded on duty during or on the occasion of an operational action and who makes a request herefor.

Where the party concerned is dead, the same procedure is open to his minor children who, at the day of the death, fulfilled the requirement of residence laid down in Article 22-1, subject to the conditions laid down in paragraph 1.

**Art. 21-14-2**

*(Act no 2004-809 of 13 August 2004)*

The representative of the state in the département and, in Paris, the chief commissioner of the police, shall notify the mayor, in his capacity of officer of civil status, the address of the foreign nationals naturalized by decree who reside in the commune.

A ceremony of reception into French citizenship may be organized by the mayor for the sake of the latter.

**Art. 21-15**

*(Act no 73-42 of 9 Jan. 1973)*

"Except in the circumstances referred to in Article 21-14-1" (Act no 99-1141 of 29 Dec. 1999), the acquisition of French nationality by a decision of the Government results from a naturalisation granted by decree at the request of the alien.

**Art. 21-16**

*(Ord. no 45-2441 of 19 Oct. 1945)*

Nobody may be naturalised unless he has his residence in France at the time of the signature of the decree of naturalisation.

**Art. 21-17**

*(Act no 93-933 of 22 July 1993)*

Subject to the exceptions laid down in Articles 21-18, 21-19 and 21-20, naturalisation may be granted only to an alien who proves an usual residence in France for five years before the submission of the request.

**Art. 21-18**

*(Act no 73-42 of 9 Jan. 1973)*

The probationary period referred to in Article 21-17 shall be reduced to two years:

1° As regards the alien who has successfully completed two years of university education in view of getting a diploma conferred by a French university or establishment of higher education;

2° As regards the alien who gave or can give significant services to France owing to his competences and talents.

**Art. 21-19**

*(Act no 73-42 of 9 Jan. 1973)*

May be naturalised without the requirement of a probationary period:

"1° A minor child who remained an alien although one of his parents acquired French nationality;

2° The  spouse and child of age of a person who acquires or acquired French nationality" (Act no 93-933 of 22 July 1993);

3° [repealed]

4° An alien who actually performed military services in a unit of the French army or who, in time of war, enlisted voluntarily in French or allied armies;

5° A national or former national of territories and States on which France exercised sovereignty, or a protectorate, a mandate or a trusteeship;

6° An alien who gave exceptional services to France or one whose naturalisation is of exceptional interest for France. In this event, the decree of naturalisation may be granted only after taking Conseil d'Etat's opinion and on the basis of a reasoned report from the competent Minister;

CIVIL CODE

7° (Act 98-170 of 16 March 1998) An alien who obtained the status of refugee in accordance with the Act no 52-893 of 25 July 1952 establishing a French Office for the protection of refugees and stateless persons.

**Art. 21-20**

*(Act no 93-933 of 22 July 1993)*

May be naturalised without any requirement as to a probationary period a person who belongs to the French cultural and linguistic unit, where he is a national of territories or States whose official language or one of the official languages is French, either if French is his mother tongue or if he proves school attendance of at least five years at an institution teaching in French.

**Art. 21-21**

*(Act no 93-933 of 22 July 1993)*

French nationality may be conferred by naturalisation on a proposal from the Minister of Foreign Affairs to any French-speaking alien who makes the request thereof and who contributes by his eminent deeds to the influence of France and to the prosperity of its international economic relations.

**Art. 21-22**

*(Act no 93-933 of 22 July 1993)*

With the exception of a minor who may avail himself of the privilege of Article 21-19, paragraph 2 (1°), nobody may be naturalised unless he has reached the age of eighteen.

**Art. 21-23**

*(Act no 73-42 of  9 Jan. 1973)*

Nobody may be naturalised where he is not of good character or has incurred one of the sentences referred to in Article 21-27 of this Code.

However, sentences delivered abroad may be overlooked; in this event the decree that pronounces naturalisation may be enacted only after assent of the Conseil d'Etat.

**Art. 21-24**

*(Ord. no 45-2441 of 19 Oct. 1945)*

Nobody may be naturalised unless he proves his assimilation into the French community, and specially owing to a sufficient knowledge of the French language, according to his condition and of the rights and duties conferred by French nationality" (Act no 2003-1119 of 26 Nov. 2003).

**Art. 21-24-1**

*(Act no 2003-1119 of 26 Nov. 2003)*

The requirement of knowledge of the French language shall not apply to political refugees and stateless persons who have resided in France regularly and usually for at least fifteen years and who are over seventy.

**Art. 21-25**

*(Ord. no 45-2441 of 19 Oct. 1945)*

The way of carrying out the checking of assimilation and state of health of an alien awaiting his naturalisation shall be prescribed by decree in Conseil d'Etat.

**Art. 21-25-1**

*(Act no 98-170 of 16 March 1998)*

The reply of the Government to a request for acquisition of French nationality by naturalisation must be made at the latest within eighteen months after the date when the acknowledgement of receipt that establishes the delivery of all the documents needed for the completion of a comprehensive file is issued to the applicant.

That period may be extended only once for three months by a reasoned decision.

Paragraph 6
Provisions Common to some Modes of Acquiring French Nationality         Articles 21-26 to 21-27

**Art. 21-26**

*(Act no 73-42 of 9 Jan. 1973)*

Is equivalent to a residence in France where that residence is a requirement for the acquiring of French nationality:

1° The  residing abroad of an alien who exercises a private or public professional activity on behalf of the French state or of a body whose activity is of special interest for French economy or culture;

2° A residing in those countries in customs union with France which are named by a decree;

3° (Act 98-170 of 16 March 1998) A presence outside France, in time of peace as in time of war, in a regular unit of the French army or for the duties laid down in Book II of the Code of National Service;

4° (Act 98-170 of 16 March 1998) A residing outside France as a volunteer for national service.

The equivalence as to residence which benefits one spouse shall be extended to the other where they actually live together.

**Art. 21-27**

*(Act no 93-933 of 22 July 1993; Act 98-170 of 16 March 1998) )*

Nobody may acquire French nationality or be reinstated in that nationality where he has been sentenced either for ordinary or serious offences that constitute a damage to the fundamental interests of the nation or an act of terrorism or,

CIVIL CODE

whatever the offence concerned may be, to a penalty of six months' imprisonment or more without suspension.

(Act no 93-1417 of 30 Dec. 1993) It shall be likewise for the person who has been subject either to an exclusion order not expressly revoked or repealed or to a banishment of the French territory not fully enforced.

(Act 93-1027 of 24 August 1993) It shall be likewise for the person whose residence in France is irregular with respect to the statutes and conventions concerning the residence of aliens in France.

(Act no 98-170 of 16 March 1998) The provisions of this Article shall not apply to a minor child who may acquire French nationality under Articles 21-7, 21-11, 21-12 and 22-1,nor to a condemned person who has benefited from a rehabilitation by operation of law or by a judicial rehabilitation in accordance with Article 133-12 of the Penal Code, or the entry of whose sentence has been excluded from the certificate no 2 of the police record, in accordance with Articles 775-1 and 775-2 of the Code of Criminal Procedure" (Act no 2003-1119 of 26 Nov. 2003).

SECTION II
Of the Effects of Acquiring French Nationality                           Articles 22 to 22-3

**Art. 22**
*(Act no 83-1046 of 8 Dec. 1983)*
A person who has acquired French nationality enjoys all the rights and is bound to all the duties attached to the status of French, from the day of that acquisition.

**Art. 22-1**
*(Ord. no 2005-759 of 4 July 2005)*
A minor child one of the parents of whom acquires French nationality, becomes French as of right where he has the same usual residence as that parent, or resides in turn with that parent in the event of separation or divorce.

(Act no 98-170 of 16 March 1998; Act no 99-1141 of 29 Dec. 1999) The provisions of this Article shall not apply to the child of a person who acquires French nationality by a decision of the French government or by declaration of nationality unless his name  is mentioned in the decree or the declaration.

**Art. 22-2**
*(Act no 73-42 of 9 Jan. 1973)*
The provisions of the preceding Article shall not apply to a married child.

**Art. 22-3**
*(Act no 93-933 of 22 July 1993)*
However, a child who is French under Article 22-1 and who was not born in France has the power to repudiate that status within six months preceding and twelve months following his coming of age.
He must exercise that power by declaration uttered as provided for in Articles 26 and following.
He may divest himself of that power from the age of sixteen in the same way.

CHAPTER IV
Of Loss and Forfeiture of, and of Reinstatement in French Nationality          Articles 23 to 25-1

SECTION I
Of Loss of French Nationality                                         Articles 23 to 23-9

**Art. 23**
*(Act no 73-42 of 9 Jan. 1973)*
An adult of French nationality residing usually abroad, who acquires voluntarily a foreign nationality, loses French nationality only where he so declares expressly, in the way provided for in Articles 26 and following of this Title.

**Art. 23-1**
*(Act no 73-42 of 9 Jan. 1973)*
The declaration in view to losing French nationality may be subscribed from the filing of the request for acquiring the foreign nationality and, at the latest, within a period of one year after the date of that acquiring.

**Art. 23-2**
*(Act no 98-170 of 16 March 1998)*
French persons who are under the age of thirty-five years may not subscribe the declaration provided for in Articles 23 and 23-1 above unless they have complied with the duties under Book II of the Code of National Service.

**Art. 23-3**
*(Act no 98-170 of 16 March 1998)*
Loses French nationality a French person who exercises the power to repudiate that status in the circumstances referred to in Articles 18-1, 19-4 and 22-3.

**Art. 23-4**
*(Act no 73-42 of 9 Jan. 1973)*
Loses French nationality a French person, even being a minor, who, having a foreign nationality, is, on his request, authorized by the French Government to lose the status of French.
That authorization shall be granted by decree.

**Art. 23-5**

CIVIL CODE
*(Act no 73-42 of 9 Jan. 1973)*
    In the event of a marriage with an alien, the French spouse may repudiate French nationality in accordance with Articles 26 and following, if he or she has acquired the foreign nationality of her or his spouse and the usual residence of the couple is established abroad.
    (Act no 98-170 of 16 March 1998) However, French persons who are under the age of thirty-five may not exercise that power of repudiation unless they have complied with the duties under Book II of the Code of National Service.

**Art. 23-6**
*(Act no 73-42 of 9 Jan. 1973)*
    The loss of French nationality may be recorded by judgment where the party concerned, French by parentage, has not the apparent status thereof and never had his usual residence in France, if the ancestors from whom he held French nationality have not had themselves the apparent status of French or residence in France for half a century.
    The judgment shall determine the date when French nationality was lost. It may decide that that nationality was lost by the predecessors of the party concerned and that the latter never was French.

**Art. 23-7**
*(Act no 73-42 of 9 Jan. 1973)*
    A French person who actually behaves as a national of a foreign country may, where he has the nationality of that country, be declared to have lost French nationality by decree with assent of the Conseil d'Etat.

**Art. 23-8**
*(Act no 73-42 of 9 Jan. 1973)*
    Loses French nationality a French person who, filling an employment in a foreign army or public service or in an international organization of which France is not a member, or more generally providing his assistance to it, did not relinquish his employment or stop his assistance notwithstanding the order of the Government.
    The party concerned shall be declared, by decree in Conseil d'Etat, to have lost French nationality unless, within the period prescribed by the order and which may not be shorter than fifteen days or longer than two months, he stops his occupation.
    Where the opinion of the Conseil d'Etat is adverse, the measure provided for in the preceding paragraph may be adopted only by a decree in Council of Ministers.

**Art. 23-9**
*(Act no 73-42 of 9 Jan. 1973)*
    Loss of French nationality takes effect:
    1° Where Article 23 so provides from the date of acquisition of the foreign nationality;
    2° Where Articles 23-3 and 23-5 so provide from the date of the declaration;
    3° Where Articles 23-4, 23-7 and 23-8 so provide from the date of the decree;
    4° Where Article 23-6 so provides from the day named in the judgment.

            SECTION II
            Of Reinstatement in French Nationality                               Articles 24 to 24-3

**Art. 24**
*(Act no 73-42 of 9 Jan. 1973)*
    Reinstatement in French nationality of persons who prove to have had the status of French shall result from a decree or a declaration in accordance with the distinctions provided for in the Articles below.

**Art. 24-1**
*(Act no 73-42 of 9 Jan. 1973)*
    Reinstatement by decree may be obtained at any age and without any requirement as to a probationary period. As to other issues, it shall be subject to the requirements and rules of naturalisation.

**Art. 24-2**
*(Act no 73-42 of 9 Jan. 1973)*
    Persons who"have lost French nationality" (Act. no 98-170 of 16 March 1998) by reason of a marriage with an alien or acquisition of a foreign nationality by an individual decision may, subject to the provisions"of Article 21-27" (Act no 93-933 of 22 July 1993), be reinstated by a declaration subscribed  in France or abroad as provided for in Articles 26 and following.
    They must have kept or acquired patent bonds with France, especially of cultural, professional, economic or family nature.

**Art. 24-3**
*(Act no 93-933 of 22 July 1993)*
    Reinstatement by decree or declaration is effective with regard to children under eighteen, subject to the conditions under Articles 22-1 and 22-2 of this Title.

            SECTION III
            Of Forfeiture of French Nationality                                  Articles 25 to 25-1

**Art. 25**

CIVIL CODE
*(Act no 73-42 of 9 Jan. 1973)*

An individual who acquired the status of French may be declared by decree adopted after assent of the Conseil d'Etat to have forfeited French nationality,"save where forfeiture has the effect of making him stateless" (Act no 98-170 of 16 March 1998):

1° Where he is sentenced for an act characterized as"ordinary or serious offence which constitutes an injury to the fundamental interests of the Nation" (Act no 93-933 of 22 July 1993)"or for an ordinary or serious offence which constitutes an act of terrorism" (Act no 96-647 of 22 July 1996);

2° Where he is sentenced for an act characterized as"ordinary or serious offence provided for and punished by Chapter II of Title III of Book IV of the Penal Code" (Act no 93-933 of 22 July 1993);

3° Where he is sentenced for evading the duties under the Code of National Service;

4° Where he committed acts incompatible with the status of French and detrimental to the interests of France for the benefit of a foreign State;

5 ° [repealed].

**Art. 25-1**
*(Ord. no 2005-759 of 4 July 2005)*

Forfeiture shall be incurred only where the facts of which the person concerned is accused and that are referred to in Article 25 occurred before the acquiring of French nationality or within ten years as from the date of that acquiring.

It may be pronounced only within ten years as from the perpetration of those facts.

Where the facts of which the person concerned is accused are referred to in Article 25, 1°, the periods referred to in the two preceding paragraphs shall be extended to fifteen years.

CHAPTER V
Of Acts related to Acquisition or Loss of French Nationality                    Articles 26 to 28-1

SECTION I
Of Declarations of Nationality                                                Articles 26 to 26-5

**Art. 26**
*(Act no 93-933 of 22 July 1993; Act 98-170 of 16 March 1998)*

Declarations of nationality shall be received by the juge d'instance or by consuls in the form prescribed by decree in Conseil d'Etat.

An acknowledgment of receipt must be issued after the filing of the documents necessary for proving their admissibility.

**Art. 26-1**
*(Act no 93-933 of 22 July 1993)*

A declaration of nationality must, on pain of nullity, be registered either by the juge d'instance as regards declarations subscribed in France, or by the Minister of Justice as regards declarations subscribed abroad.

**Art. 26-2**
*(Act no 93-933 of 22 July 1993)*

The seats and territorial jurisdiction of the tribunaux d'instance which are empowered to receive and register declarations of French nationality shall be established by decree.

**Art. 26-3**
*(Act no 93-933 of 22 July 1933; Act no 98-170 of 16 March 1998)*

The Minister or the judge shall refuse to register declarations which do not comply with the statutory requirements.

His reasoned decision shall be notified to the declarant, who may challenge it before the tribunal de grande instance within six months. The claim may be brought personally by a minor from the age of sixteen.

The decision of refusal to register must be taken within six months at the latest after the date when the acknowledgment of receipt which establishes the filing of all the documents necessary for proving the admissibility of the declaration is issued to the declarant.

The period shall be extended to one year as regards declarations subscribed under Article 21-2.

**Art. 26-4**
*(Act no 93-933 of 22 July 1993; Act no 98-170 of 16 March 1998)*

Within one year following the date when it was made, registration may be challenged by the Government procurator's office*, where the statutory requirements are not met.

In the absence of a refusal to register within the statutory period, a copy of the declaration shall be given to the declarant bearing the mention of the registration.

The registration may still be opposed by the Government procurator's office in the event of lie or fraud within two years after their being detected. The stopping of the community of living between spouses within twelve months after registration of the declaration under Article 21-2 shall constitute a presumption of fraud.

**Art. 26-5**
*(Act no 93-933 of 22 July 1993)*

Subject to the provisions of Article 23-9, paragraph 2 (1°), declarations of nationality, from the moment that they have been registered, take effect as from the date when they are subscribed.

CIVIL CODE

SECTION II
Of Administrative Decisions                                                Articles 27 to 27-3

**Art. 27**
*(Act no 93-933 of 22 July 1993)*
A decision declaring inadmissible, or adjourning or refusing a request for naturalisation or reinstatement by decree, as well as an authorization to lose French nationality must set out its reasons.

**Art. 27-1**
*(Act no 73-42 of 9 Jan. 1973)*
A decree deciding naturalisation or reinstatement, authorization to lose French nationality, loss or forfeiture of that nationality shall be adopted and published in forms prescribed by decree. It may not have any retrospective operation.

**Art. 27-2**
*(Act no 73-42 of 9 Jan. 1973)*
A decree deciding naturalisation or reinstatement may be withdrawn with assent of the Conseil d'Etat within one year after its publication in the Journal Officiel where the person making the request does not comply with the statutory requirements; where the decision was obtained by lie or fraud, the decree may be withdrawn within two years the detection of fraud.

**Art. 27-3**
*(Act no 73-42 of 9 Jan. 1973)*
A decree deciding loss on one of the grounds provided for in Articles 23-7 and 23-8 or forfeiture of French nationality shall be adopted after the person concerned has been heard or summoned to bring forward his comments.

SECTION III
Of Mentions on the Registers of Civil Registry                            Articles 28 to 28-1

**Art. 28**
*(Act no 78-731 of 12 July 1978)*
A mention of administrative acts and declarations causing acquisition or loss of French nationality or reinstatement therein shall be made in the margin of the record of birth.
(Act no 98-170 of 16 March 1998) A mention of a first issue of a certificate of French nationality and of adjudicatory decisions of a court relating to that nationality shall likewise be made.

**Art. 28-1**
*(Act no 98-170 of 16 March 1998)*
Mentions relating to nationality provided for in the preceding Article shall be made on copies of records of birth or instruments drawn up as substitutes for them.
Those mentions shall also be made on certificates of birth or on a livret de famille at the request of the parties concerned. However, the mentions of loss, disclaimer, forfeiture of, opposition to the acquisition of French nationality, withdrawal of the decree of naturalisation or reinstatement, or of the judicial decision which has established the alien status, shall be made as of right on certificates of birth and on a livret de famille where a person who previously acquired or was judicially adjudged that nationality, or obtained a certificate of French nationality, has requested their being mentioned on those documents.

CHAPTER VI
Of Disputes in Matters of Nationality                                     Articles 29 to 31-3

SECTION I
Of the Jurisdiction of Judicial Courts and the Proceedings therein        Articles 29 to 29-5

**Art. 29**
*(Act no 73-42 of 9 Jan. 1973)*
The civil courts of general jurisdiction shall exercise exclusive jurisdiction over disputes relating to French or foreign nationality of natural persons.
Issues of nationality shall be preliminary before any other administrative or judicial court except criminal courts with a criminal jury.

**Art. 29-1**
*(Act 93-933 of 22 July 1993)*
The seats and territorial jurisdiction of the tribunaux de grande instance which are empowered to try controversies relating to French or foreign nationality of natural persons are established by decree.

**Art. 29-2**
*(Act no 73-42 of 9 Jan. 1973)*
The procedure to be followed in matters of nationality and in particular the communication to the Government procurator's office of summons, pleadings and methods of review, is established by the Code of Civil Procedure.

**Art. 29-3**

CIVIL CODE

*(Act no 73-42 of 9 Jan. 1973)*
Everyone is entitled to bring an action for the determination of his having or not the status of French.
The Government procurator's office is likewise entitled with respect to any person. It shall be a necessary defendant in all declaratory actions on nationality. It must be joined to the action whenever an issue of nationality is raised as an interlocutory matter before a court empowered to try it.

**Art. 29-4**
*(Act no 73-42 of 9 Jan. 1973)*
The Government procurator's office shall have to sue where it is requested by a public service or a third party who raised the plea of national status before a court which stayed judgment under Article 29. The third party plaintiff shall be joined to the action.

**Art. 29-5**
*(Act no 73-42 of 9 Jan. 1973)*
Judgments handed down in matters of French nationality by a court of general jurisdiction have effect even against persons who were not parties nor represented.
However, a party concerned is competent to attack them by means of a third party application for rehearing provided that he joins the Government procurator's office to the action.

SECTION II
Of the Proof of Nationality before Judicial Courts                                        Articles 30 to 30-4

**Art. 30**
*(Act no 73-42 of 9 Jan. 1973)*
The burden of proof in matters of French nationality lies on the person whose nationality is in dispute.
However, this burden lies on him who challenges the status of French of a person who holds a certificate of French nationality issued as provided for in Articles 31 and following.

**Art. 30-1**
*(Ord. no 45-2441 of 19 Oct. 1945)*
Where French nationality is granted or acquired in another way than declaration, naturalisation, reinstatement or annexation of territories, proof of it may be made only by establishing the existence of all the statutory requirements.

**Art. 30-2**
*(Act no 61-1408 of 22 Dec. 1961)*
However, where French nationality may flow only from parentage, it shall be deemed established, saving proof to the contrary, if the person concerned and the parent who was likely to transmit it to him have in a constant way enjoyed the apparent status of French.
(Act no 93-933 of 22 July 1993) French nationality of persons born in Mayotte, of age on 1 January 1994, shall be alternatively deemed established if those persons have in a constant way enjoyed the apparent status of French.

**Art. 30-3**
*(Act no 61-1408 of 22 Dec. 1961)*
Where a person usually resides or resided in a foreign country, in which the ancestors from whom he holds nationality by parentage have settled for more than half a century, that person shall not be allowed to prove that he has French nationality by parentage if himself or the parent who was likely to transmit it to him have not enjoyed the apparent status of French.
In that event, the court shall have to record the loss of French nationality under Article 23-6.

**Art. 30-4**
*(Act no 73-42 of 9 Jan. 1973)*
Apart from loss or forfeiture of French nationality, proof of the alien status of a person may only be established by evidencing that the party concerned does not fulfil any of the statutory requirements for having the status of French.

SECTION III
Of Certificates of French Nationality                                        Articles 31 to 31-3

**Art. 31**
*(Act no 95-125 of 8 Feb. 1995)*
The chief clerk of a tribunal d'instance shall alone have the capacity to issue a certificate of French nationality to a person who establishes that he has that nationality.

**Art. 31-1**
*(Act no 93-933 of 22 July 1993)*
The seats and territorial jurisdiction of the tribunaux d'instance which are empowered to issue certificates of nationality shall be established by decree.

**Art. 31-2**
*(Act no 73-42 of 9 Jan. 1973)*
A certificate of nationality shall point out with reference to Chapters II, III, IV and VII of this Title the statutory

CIVIL CODE

provision under which the party concerned has the status of French as well as the documents which allowed its being drawn up. It shall prevail until evidence contrary to it.

(Act no 95-125 of 8 Feb. 1995) For the issuing of a certificate of nationality, the chief clerk of a tribunal d'instance may, failing other elements, presume that the records of civil status drawn up abroad and presented to him produce the effects that French law would have attributed to them.

**Art. 31-3**
*(Act no 95-125 of 8 Feb. 1995)*

Where the chief clerk of a tribunal d'instance refuses to issue a certificate of nationality, the party concerned may refer the matter to the Minister of Justice who shall decide whether there is a case for the performance of that issuing.

CHAPTER VII

Of the Effects on French Nationality of Transfers of Sovereignty relating to Certain        Articles 32 to 32-5
Territories

**Art. 32**
*(Act no 73-42 of 9 Jan. 1973)*

French persons natives of the territory of the French Republic, as it was constituted on the 28 July 1960, and who were domiciled on the day of its accession to independence on the territory of a State that had previously the status of an overseas territory of the French Republic, have kept French nationality.

It shall be the same as to the spouses, widows and widowers and descendants of the said persons.

**Art. 32-1**
*(Act no 73-42 of 9 Jan. 1973)*

French persons of civil status of general law who were domiciled in Algeria on the date of the official announcement of the results of the poll for self- determination keep French nationality whatever their situation with respect to Algerian nationality may be.

**Art. 32-2**
*(Act no 73-42 of 9 Jan. 1973)*

The French nationality of persons of civil status of general law who were born in Algeria before the 22 July 1962 shall be deemed established, on the terms of Article 30-2, where those persons have enjoyed in a constant way the apparent status of French.

**Art. 32-3**
*(Act no 73-42 of 9 Jan. 1973)*

Every French person who, at the date of its independence, was domiciled on the territory of a State that had previously the status of overseas département or territory of the Republic keeps his nationality as of right where no other nationality was granted to him by the law of that State.

Likewise, the children of persons who benefit from the provisions of the preceding paragraph, minors under eighteen at the date of the accession to independence of the territory where their parents were domiciled, keep French nationality as of right.

**Art. 32-4**
*(Act no 73-42 of 9 Jan. 1973)*

Former members of the Parliament of the Republic, of the Assembly of the French Union and of the Economic Council who have lost French nationality and acquired a foreign nationality under a general provision may be reinstated in French nationality by a mere declaration where they have established their domiciles in France.

The same power is granted to their spouse, widower or widow and their children.

**Art. 32-5**
*(Act no 93-933 of 22 July 1993)*

The declaration of reinstatement provided for in the preceding article may be subscribed by the parties concerned, in accordance with Article 26 and following, from the moment they have reached the age of eighteen; it may not be made through an agent. It has effect with regard to minor children on the terms of Articles 22-1 and 22-2.

CHAPTER VIII

Special Provisions regarding Overseas Territories                                Articles 33 to 33-2

**Art. 33**
*(Act no 73-42 of 9 Jan. 1973)*

For the implementation of this Code [Title] in overseas territories:
1° The words"tribunal de grande instance" shall each time be replaced by the words"tribunal de première instance";
2° [repealed].

**Art. 33-1**
*(Act no 93-933 of 22 July 1993)*

Notwithstanding Article 26, the declaration shall be received by the president of the tribunal de première instance or by the judge in charge of the section on detachment.

CIVIL CODE

**Art. 33-2**

*(Act no 93-933 of 22 July 1993)*

Notwithstanding Article 31, the president of the tribunal de première instance or the judge in charge of the section on detachment has alone the capacity to issue a certificate of French nationality to a person who establishes that he has that nationality.

**TITLE II**

**OF RECORDS OF CIVIL STATUS**                                          **Articles 34 to 101**

CHAPTER I

General provisions                                                     Articles 34 to 54

**Art. 34**

*(Act of 22 Oct. 1922)*

Records of civil status shall state the year, day and time when they were received, the first names and name of the officer of civil status, the first names, names, occupations and domiciles of all persons named therein.

The dates and places of birth:

a) Of the father and mother in the records of birth and of acknowledgement;

b) Of the child in the records of acknowledgement;

c) Of the spouses in the records of marriage; and

d) Of the deceased in the records of death,

shall be indicated when known. Otherwise the age of those persons shall be designated by their number of years as must be, in all cases, the ages of the declarants. As to the witnesses, only their status of adult shall be indicated.

**Art. 35**

Officers of civil status may insert nothing in the records they receive, by way of a note or of whatever wording, beyond what must be declared by the declarants.

**Art. 36**

Where the parties concerned are not obliged to appear in person, they may be represented by an agent with a special and authentic power.

**Art. 37**

*(Act of 7 Dec. 1897)*

Witnesses appearing in connection with records of civil status shall be at least of eighteen years of age, relatives or not, without distinction of sex; they shall be selected by the parties concerned.

[repealed]

**Art. 38**

*(Ord. no 58-779 of 23 august 1958)*

The officer of civil status shall read the records to the appearing parties or their agents, and to the witnesses; he shall invite them to take direct cognisance of them before signing them.

It shall be mentioned on the records that these formalities have been complied with.

**Art. 39**

Those records shall be signed by the officer of civil status, the appearing parties and witnesses; or mention shall be made of the cause preventing the appearing parties or witnesses from signing.

**Art. 40**

[repealed]

**Art. 41**

[repealed]

**Art. 42**

[repealed]

**Art. 43**

[repealed]

**Art. 44**

[repealed]

**Art. 45**

[repealed]

**Art. 46**

Where no registers have existed or where they have been lost, proof of them may be received by documents as well as by witnesses; and in that event, marriages, births and deaths may be proved by books and papers emanating from deceased fathers and mothers as well as by witnesses.

**Art. 47**

CIVIL CODE
*(Act no 2003-1119 of 26 Nov. 2003)*
Faith must be given to records of civil status of French persons and aliens made in a foreign country and drawn up in the forms in use in that country, unless other records or documents possessed, external data or elements drawn from the record itself establish that the record is irregular, forged or that the facts declared therein do not square with truth.

In case of doubt, the service before which a request for the drawing up, registration or issuing of a record or of a document is brought, shall delay the request and give notice to the person concerned that he may, within two months, refer the matter to the Government procurator in Nantes in order that the authenticity of the record be checked.

Where he considers groundless the request for checking made to him, the Government procurator shall give notice of it to the person concerned and the service within one month.

Where he shares the doubts of the service, the Government procurator in Nantes shall initiate any useful investigation, especially by referring the matter to the proper consular authorities, within a period which may not exceed six months, renewable one month for the requirements of the inquiry. He shall inform the person concerned and the service as soon as possible of the results of the inquiry.

Upon presentation of the results of the investigations carried out, the Government procurator may refer the matter to the tribunal de grande instance in Nantes in order that it give judgment about the validity of the record after having ordered, where appropriate, any examination proceedings it deems advisable.

**Art. 48**
*(Act no 93-22 of 8 Jan. 1993)*
A record of civil status of French persons in a foreign State  is valid where it was received, in accordance with French law, by diplomatic or consular agents.

(Act of 8 June 1893) A duplicate of the registers of civil status held by these agents shall be sent at the end of each year to the Ministry of Foreign Affairs which shall keep them and may deliver certificates from them.

**Art. 49**
*(Act of 17 Aug. 1897; Act of 10 March 1932)*
Whenever the mention of a record relating to civil status must be made in the margin of a record already drawn up or registered, it shall be made by the officer of his own motion.

The officer of civil status who has drawn up or registered the record that occasions the mention shall effect that mention within three days on the registers he keeps and, if the duplicate of the register on which the mention is to be effected is at the court registrar's office, he shall send a notice to the Government procurator of his arrondissements.

Where the record in the margin of which the mention is to be effected was drawn up or registered in another commune, the notice shall be sent, within three days, to the officer of civil status of that commune and the latter shall notify at once the Government procurator of his arrondissements  if the duplicate of the register is at the court registrar's office.

(Act no 93-22 of 8 Jan. 1993) Where the record in the margin of which a mention is to be effected was drawn up or registered abroad, the officer of civil status who drew up or registered the record that occasions the mention shall give notice of it, within three days, to the Minister of Foreign Affairs.

**Art. 50**
*(Act no 46-2154 of 7 Oct. 1946; Act no 56-780 of 4 Aug. 1956)*
An infringement of the preceding Articles on the part of the officials therein named shall be prosecuted before the tribunal de grande instance and punished with a fine of "3 € to 30 €" (Ord. no 2000-916 of 19 Sept. 2000)

**Art. 51**
A custodian of registers shall be civilly liable for the alterations that occur in them, subject to his remedy, if there is occasion, against the authors of those alterations.

**Art. 52**
An alteration, a forgery in records of civil status, an inscription of those records on a loose leaf and otherwise than on the registers designed for that purpose, shall give rise to damages to the parties, without prejudice to penalties provided for in the Penal Code.

**Art. 53**
The Government procurator at the tribunal de grande instance shall verify the state of the registers when they are deposited at the court registrar's office; he shall draw up a memorandum of verification, denounce minor and ordinary offences committed by officers of civil status and call for their being sentenced to fines.

**Art. 54**
Whenever a tribunal de grande instance has jurisdiction over records of civil status, the parties concerned may attack the judgment.

CHAPTER II
Of Records of Birth                                                            Articles 55 to 62-1

SECTION I
Of Declarations of Birth                                                   Articles 55 to 59

**Art. 55**

CIVIL CODE
*(Act of 20 Nov. 1919)*
Declarations of birth shall be made within three days of the delivery, to the local officer of civil status.

Where a birth has not been declared within the statutory period, the officer of civil status may only record it in his registers under a judgment rendered by the court of the arrondissements  in which the child was born, and a summary mention shall be made in the margin at the date of the birth. Where the place of birth is unknown, the court having jurisdiction shall be the one of the residence of the applicant.

*(Act no 93-22 of 8 Jan. 1993)* In foreign countries, declarations to diplomatic or consular agents must be made within fifteen days of the delivery. That period may however be extended by decree in some consular districts.

**Art. 56**
The birth of a child shall be declared by the father, or, in absence of the father, by the doctors of medicine or surgery, midwives, health officials or other persons present at the delivery; and, where the mother has given birth outside her domicile, by the person at whose place she has given birth.

*(Act of 7 Feb. 1924)* Records of birth shall be drawn up at once.

**Article 57**
*(Ord. no 2005-759 of 4 July 2005)*
A record of birth shall indicate the day, the time and the place of birth, the sex of the child, the first names given to him, the family name, followed if there is occasion by the mention of the joint declaration of the parents as regards the choice effected, and the first names, names, ages, occupations and domiciles of the father and mother and, if there is occasion, those of the applicant. If the father and mother of the child or one of them are not indicated to the officer of civil status, nothing thereon shall be mentioned on the registers.

The first names of the child are chosen by his father and mother. A woman who asked to keep her identity secret at the time of the delivery may make known the first names she desires to be given to the child. Otherwise, or where his parents are unknown, the officer of civil status shall choose three first names the last of which takes the place of a family name to the child. Any first name entered on the record may be chosen as the usual first name.

Where these first names or one of them, alone or combined with the other first names or the name appears to him to be contrary to the welfare of the child or to the rights of third persons to the protection of their family names, the officer of civil status shall give notice thereof to the government procurator* without delay. The latter may refer the matter to the family causes judge*.

Where the judge considers that the first name is not consonant with the welfare of the child or interferes with the rights of third persons to the protection of their family names, he shall order its removal from the registers of civil status. Where appropriate, he shall give the child another first name which he himself chooses in the absence of a new choice by the parents that be consonant with the interests aforesaid. A mention of the judgment shall be entered in the margin of the records of civil status of the child.

**Article 57-1**
*(Ord. no 2005-759 of 4 July 2005)*
Where the officer of civil status of the place of birth of a child makes mention of the acknowledgement of the aforesaid child in the margin of the record of birth of the latter, he shall inform the other parent thereof by registered letter with advice of delivery.

Where this parent may not be informed, the officer of civil status shall inform the government procurator thereof, and the latter shall have all the necessary steps taken.

**Art. 58**
*(Ord. no 58-779 of 23 Aug. 1958)*
A person who may have found a new-born child is required to make declaration of it to the officer of civil status of the place of discovery. Where he does not consent to take charge of the child, he shall hand him, with the clothing and other effects found with him, to the officer of civil status.

A detailed memorandum shall be drawn up which, besides the indications provided for by Article 34 of this Code, shall state the date, time, place and circumstances of the discovery, the apparent age and the sex of the child, any peculiarities which may contribute to his identification as well as the authority or person to whom he is entrusted. That memorandum shall be entered as of its date on the registers of civil status.

Following and separately from this memorandum, the officer of civil status shall draw up a record that shall take the place of a record of birth. Besides the indications provided for by Article 34, that record shall state the sex of the child as well as the first names and name that are given to him; it shall fix a date of birth that may tally with his apparent age and designate as place of birth the commune where the child was discovered.

Similar records shall be drawn up, on declaration of the Children's aid services, for children placed under their guardianship and deprived of a known record of birth or for whom the secret as to birth has been claimed.

Copies and certificates of the memorandum of discovery or of the interim record of birth shall be  issued on the terms and in accordance with the distinctions under Article 57 of this Code.

Where the record of birth of the child is found or the birth is judicially declared, the memorandum of discovery and the interim record of birth shall be nullified at the request of the Government procurator or of the parties concerned.

**Art. 59**
*(Act of 7 Feb. 1924)*
In case of birth during a sea voyage, a record shall be drawn up within  three days of the delivery, upon declaration

CIVIL CODE

of the father if he is on board.

(Act of 8 June 1893) Where the birth takes place during a break in port, a record shall be drawn up under the same terms if there is an impossibility to communicate with the shore or, if in a foreign country, there is no French diplomatic or consular agent vested with the functions of an officer of civil status.

That record shall be drawn up, to wit: on vessels of the State, by the officer of the Navy commissariat or, in his absence, by the captain or one who fulfils his functions; and on other ships by the captain, master or skipper, or one who fulfils his functions.

Mention shall be made of the circumstances among the ones above provided in which the record was drawn up.

The record shall be entered at the end of the list of the crew.

SECTION II

Of Changes of First Names and Name                                          Articles 60 to 61-4

**Art. 60**

A person who establishes a lawful interest may apply for a change of his first name. The application is brought before the family causes judge on request of the party concerned or, where the latter is a person under a disability, on request of his statutory representative. An adjunction or suppression of first names may be likewise decided.

Where the child is over thirteen his personal consent is required.

**Art. 61**

A person who establishes a lawful interest may apply for a change of his name.

The application for a change of name may be made for the purpose of preventing the extinguishment of the name borne by an ancestor or a collateral of the applicant up to the fourth degree.

The change of name shall be authorized by decree.

**Art. 61-1**

A person concerned may challenge before the Conseil d'Etat the decree establishing a change of name within two months after its publication in the Journal Officiel.

A decree establishing a change of name takes effect, where there is no challenge, at the end of the period within which the challenge is admissible or, where there is a challenge, after its dismissal.

**Art. 61-2**

A change of name extends as of right to the children of the beneficiary where they are under thirteen.

**Art. 61-3**

A change of name of a child over thirteen requires his personal consent where this change does not result from the establishing or modifying of a parental bond..

However, the establishing or modifying of a parental bond implies the change of adult children's"family name" (Act no 2002-304 of 4 March 2002) only subject to their consent.

**Art. 61-4**

Mentions of the judgments of changes of first names and name shall be entered in the margin of the records of civil status of the party concerned and, where appropriate, of those of his or her spouse and his or her children.

The provisions of Articles 100 and 101 shall apply to modifications of first names and name.

SECTION III

Of Record of Acknowledgement of an Illegitimate Child                      Articles 62 to 62-1

**Art. 62**

A record of acknowledgement of an illegitimate child shall indicate the first names, name, date of birth or, failing which, age, place of birth and domicile of the maker of the acknowledgement

It shall indicate the date and place of birth, the sex and first names of the child or, failing which, all appropriate information concerning the birth, subject to the provisions of Article 341-1.

A record of acknowledgement shall be entered at its date on the registers of civil status.

Only the mentions provided for in the first paragraph may be entered in the margin of the record of birth, if there is one.

In the circumstances referred to in Article 59, the declaration of acknowledgement may be received by the instrumentary officers named in that Article and in the forms therein indicated.

(Act no 2002-305 of 4 March 2002)  When  a record of acknowledgement is established, Articles 371-1 and 371-2 must be read to his or her maker.

**Art. 62-1**

*(Act no 2002-93 of 22 Jan. 2002)*

Where the registration of a paternal acknowledgement proves impossible because of secret as to her identity put forward by the mother, the father may give notice of it to the Government procurator. The latter shall undertake the search of the date and place of establishment of the child's record of birth.

CHAPTER III

Of Records of Marriage                                                      Articles 63 to 76

CIVIL CODE

**Art. 63**

(Act of 8 April 1927)Before the celebration of a marriage, an officer of civil status shall give  public notice of it by way of a bill stuck up on the door of the town hall. That notice shall state the first names, names, occupations, domiciles and residences of the future spouses, as well as the place where the marriage is to be celebrated.

Irrespective of the application of the provisions of Article 170, an officer of civil status may proceed to the public notice provided for in paragraph 1, or, in case of an exemption from public notice, to the celebration of the marriage, only after:

- the handing over by each of the future spouses of a medical certificate dating from less than two months, that attests that the person concerned was examined for purposes of marriage, to the exclusion of any other indication;

- hearing the future spouses jointly, except in case of impossibility or where it appears, upon examination of the file, that said hearing is not necessary with respect to Article 146 nor to Article 180. If he deems it necessary, the officer of civil status may also require a separate talk with one or the other of the future spouses. "He may assign the execution of the common hearing or of the separate talks to one or several established officials in charge of the department of civil status of the commune. Where one of the future spouses resides in a foreign country, the officer of civil status may request a French diplomatic or consular agent  on duty in that country to  hear him or her" (Act no 2006-399 of 4 April 2006 ).

(Act no 2003-1119 of 26 Nov. 2003; Ord. no 2000-916 of 19 Sept. 2000) An officer of civil status who does not comply with the prescriptions of the preceding paragraphs shall be prosecuted before the tribunal de grande instance and punished by a fine of 3 € to 30 €.

**Art. 64**

*(Act of 8 April 1927)*

The bill provided for in the preceding Article shall remain stuck up at the door of the town hall for ten days.

The marriage may not be celebrated before the tenth day after and exclusive of that of notice.

Where the bill-sticking is interrupted before the expiration of that period, a mention of it shall be made on the bill that has ceased to be stuck up at the door of the town hall.

**Art. 65**

*(Act of 21 June 1907)*

Where the marriage has not been celebrated within one year after the expiry of the period of notice, it may no longer be celebrated until a new public notice has been given in the form provided above.

Art 66

Instruments of formal objection to the marriage must be signed on the original and a copy by the opposing parties or their agents with special and authentic powers; they must be served, with a copy of the power, on the persons or at the domiciles of the parties and on the officer of civil status, who shall stamp the original.

**Art. 67**

*(Act of 8 April 1927)*

The officer of civil status shall make, without delay, a summary mention of the formal objections in the register of marriages; he shall also make, in the margin of the entry of those formal objections, a mention of judgments or instruments of withdrawals of which office copies have been delivered to him.

**Art. 68**

*(Act. no 46-2154 of 7 Oct. 1946)*

In the event of a formal objection, the officer of civil status may not celebrate the marriage before a withdrawal has been delivered to him, under pain of a fine of "4,5 €" (Ord. no 2000-916 of 19 Sept. 2000) and subject to all damages.

**Art. 69**

*(Act of 9 Aug. 1919)*

Where public notice has been given in several communes, the officer of civil status of each commune shall forward without delay to the one who is to celebrate the marriage a certificate stating that there is no formal objection.

**Art. 70**

*(Act of 2 Feb. 1933)*

The office copy of the record of birth delivered by each one of the future spouses to the officer of civil status who is to celebrate their marriage shall comply with Article 57, last paragraph, of the Civil Code with, if there is occasion, indication of the married status of his father and mother or, where the future spouse is a minor, indication of the acknowledgement of which he or she was the subject.

(Act of 11 July 1929) That instrument must not have been issued more than three months before where it was issued in France, and more than six months before  where it was issued in a colony or a consulate.

**Art. 71**

*(Act of 11 July 1929)*

A future spouse who would be unable to obtain that instrument may replace it by producing an affidavit issued by the judge of the tribunal d'instance of the place of his birth or of his domicile.

An affidavit shall contain a declaration made by three witnesses, of either sex, relatives or not, of the first names, name, occupation and domicile of the future spouse or of those of his father and mother, when known; the place and, as far as possible, the period of his birth and the causes that prevent the intrument from being produced. The witnesses

CIVIL CODE

shall sign the affidavit with the judge of the arrondissement; and if any of them cannot or does not know how to sign, mention shall be made of it.

**Art. 72**
*(Act no 72-3 of 3 Jan. 1972)*
Neither an affidavit nor a refusal to issue it may be subject to review.

**Art. 73**
*(Act of 9 Aug. 1919)*
An authentic instrument of consent of the father and mother, or grandfathers and grandmothers or, failing them, of the family council shall contain the first names, names, occupation and domiciles of the future spouses and of all those who concurred in the instrument, as well as their degree of consanguinity.

(Act of 28 Feb. 1922) Except in the case provided for in Article 159 of the Civil Code, that instrument of consent shall be drawn up either by a notaire or by the officer of civil status of the domicile or residence of the ascendant and, abroad, by French diplomatic or consular agents. Where it is drawn up by an officer of civil status, it must be legalized only when it is to be produced before foreign authorities, save as otherwise provided in international conventions.

**Art. 74**
*(Act of 21 June 1907)*
A marriage must be celebrated in the commune where one of the spouses has his or her domicile or residence established by a continuous habitation of at least one month at the date of the public notice provided for by law.

**Art. 75**
*(Act no 66-359 of 9 June 1966)*
On the day specified by the parties, after the period of public notice, the officer of civil status, at the town hall, in the presence of two witnesses at least or four at the most, relative or not of the parties, shall read Articles 212, 213 (paragraphs 1 and 2), 214 (paragraph 1) and 315 (paragraph 1) of this Code to the future spouses."Article 371-1 must also be read" (Act no 2002-305 of 4 March 2002).

(Act of 9 Aug. 1919) However, in case of serious impediment, the Government procurator of the place of marriage may require the officer of civil status to betake himself to the domicile or residence of one of the parties to celebrate the marriage. In case of imminent danger of death of one of the future spouses, the officer of civil status may betake himself there before any requirement or authorization of the Government procurator, to whom he shall then notify as soon as possible of the necessity of that celebration outside the town hall.

Mention shall be made of this in the record of marriage.

The officer of civil status shall ask the future spouses and, if they are minors, their ascendants present at the celebration and authorizing the marriage, to declare whether an ante-nuptial agreement has been made and, in the affirmative, the date of that contract and the name and place of residence of the notaire who received it.

(Act of 2 Feb. 1933) Where the documents produced by one of the future spouses do not accord with one another as to the first names or the spelling of the names, he shall ask the one whom they concern and, if the latter is a minor, his closest ascendants present at the celebration, to declare that the variance results from an omission or a mistake.

He shall receive from each party, one after the other, the declaration that they wish to take each other as husband and wife; he shall pronounce, in the name of the law, that they are united by marriage, and he shall draw up a record of it at once.

**Art. 76**
*(Act of 4 Feb. 1928)*
A record of marriage shall state:
1° The first names, names, occupations, ages, dates and places of birth, domiciles and residences of the spouses;
2° The first names, names, occupations and domiciles of the fathers and mothers;
3° The consent of the fathers and mothers, grandfathers and grandmothers and that of the family council where, they are required;
4° The first names and name of the previous spouse of each spouse;
5° [repealed]
6° The declaration of the contracting parties that they take each other for spouse, and the pronouncement of their being united by the officer of civil status;
7° The first names, names, occupations, domiciles of the witnesses and their capacity as adults;
8° (Act of 10 July 1850) The declaration, made upon the question prescribed by the preceding Article, that an ante-nuptial agreement was made or not and, as far as possible, the date of the agreement if any, as well as the name and place of residence of the notaire who received it; the whole on pain against the officer of civil status of the fine specified in Article 50;

Where the declaration was omitted or erroneous, the correction of the record, as to the omission or mistake, may be requested by the Government procurator, without prejudice to the rights of the parties concerned, under Article 99.

9° (Act no 97-987 of 28 Oct. 1997) If there is occasion, the declaration that an instrument of choice of the applicable law was made in accordance with The Hague Convention of 14 March 1978 on the law applicable to matrimonial regimes, as well as the date and place of signature of that instrument and, where appropriate, the name and capacity of the person who drew it.

(Ord. no 59-71 of 7 Jan. 1959) In the margin of the record of birth of each spouse, mention shall be made of the

CIVIL CODE

celebration of the marriage and of the name of the spouse.

CHAPTER IV
Of Records of Death                                                    Articles 77 to 92

**Art. 77**
[repealed]

**Art. 78**
*(Act of 7 Feb. 1924)*
A record of death must be drawn up by the officer of civil status of the commune where the death took place, upon the declaration of a relative of the deceased or of a person possessing the most reliable and complete information that is possible as to the civil status of the deceased.

**Art. 79**
*(Act of 7 Feb. 1924)*
A record of death shall state:
1° The day, time and place of the death;
2° The first names, name, date and place of birth, occupation and domicile of the deceased person;
3° The first names, names, professions and domiciles of his father and mother;
4° The first names and name of the other spouse, where the deceased person was married, widowed or divorced;
5° The first names, name, age, occupation and domicile of the declarant and, if there is occasion, his degree of consanguinity to the deceased person.
All of which in so far as may be known.
(Ord. of 29 March 1945) Mention of the death must be made in the margin of the record of birth of the deceased person.

**Art. 79-1**
*(Act no 93-22 of 8 Jan. 1993)*
Where a child is dead before his birth was declared to the civil registry, the officer of civil status shall draw up a record of birth and a record of death upon exhibition of a medical certificate stating that the child was born alive and viable and specifying the days and times of his birth and death.
In the absence of the medical certificate provided for in the preceding paragraph, the officer of civil status shall draw up a record of a lifeless child. That record shall be entered at its date in the registers of death and shall state the day, time, and place of the delivery, the first names and names, dates and places of birth, occupations and domiciles of the father and mother and, if there is occasion, those of the declarant. The record drawn up shall be without prejudice to knowing whether the child has lived or not; any party concerned may refer the matter  to the judgment of the tribunal de grande instance.

**Art. 80**
*(Act of 20 Nov. 1919)*
Where the death occurred elsewhere than in the commune where the deceased  was domiciled, the officer of civil status shall, within the shortest possible time, send to the officer of civil status of the deceased's last domicile, an office copy of that record which shall be immediately entered in the registers."This provision shall not apply to cities divided into arrondissements , when the death occurred in an arrondissement other than the one where the deceased was domiciled" (Ord. no 58-779 of 23 Aug. 1958).
"In case of death in hospitals or health units, naval or civil hospitals or other public bodies" (Act no 93-22 of 8 Jan. 1993), the directors, managers or heads of those hospitals or bodies shall give notice of it to the officer of civil status or to the person who fulfils his duties, within twenty-four hours.
The latter shall call there to ascertain the death and draw up a record of it, in accordance with the preceding Article, upon the declarations made to him and according to the information obtained by him.
There shall be kept in said hospitals, units and bodies, a register in which those declarations and information shall be entered.

**Art. 81**
Where there are marks or indications of violent death, or other circumstances which give rise  to suspicion thereof, the burial may not take place until a police officer has, with the assistance of a doctor in medicine or surgery, drawn up a memorandum of the condition of the corpse and of the circumstances relating to it, as well as of the information he could collect as to the first names, name, age, occupation, place of birth and domicile of the deceased person.

**Art. 82**
The police officer shall forward at once, to the officer of civil status of the place where the person died, all the information stated in his memorandum, according to which the record of death shall be drawn up.
The officer of civil status shall send an office copy of it to the officer of the domicile of the deceased person, if it is known: that office copy shall be entered in the registers.

**Art. 83**
[repealed by implication by Act no 81-908 of 9 Oct. 1981, which has abolished the death penalty]

**Art. 84**

CIVIL CODE

In case of death in a prison or centre of confinement or detention, a notice of it shall be given at once by the keepers or warders to the officer of civil status who shall betake himself thereto as provided for in Article 80 and shall draw up the record of death.

**Art. 85**

In all cases of violent death or death in prisons and centres of confinement [repealed by implication], those circumstances shall not be mentioned in the registers and the records of death shall simply be drawn up in the form prescribed by Article 79.

**Art. 86**
*(Act of 7 Feb. 1924)*

In case of death during a sea voyage and under the circumstances provided for in Article 59, a record must be drawn up within twenty-four hours by the instrumentary officers named in that Article and in the forms therein indicated.

[repealed]
[repealed]

**Art. 87**
*(Ord. no 58-779 of 23 Aug. 1958)*

Where the body of a deceased person is found and can be identified, a record of death shall be drawn up by the officer of civil status of the presumed place of death, whatever the time elapsed between the death and the discovery of the body may be.

` Where the deceased cannot be identified, the record of death shall include the most complete description of him; in the event of later identification, the record shall be rectified in the way provided for in Article 99 of this Code.

**Art. 88**
*(Ord. no 58-779 of 23 Aug. 1958)*

May be judicially declared, on application of the Government procurator or the parties concerned, the death of a French person who has disappeared in or outside France, in circumstances likely to imperil his life, where his body could not be found.

On the same terms, may be judicially declared the death of an alien or stateless person who disappeared either on a territory under the authority of France or aboard a French ship or aircraft, or even abroad where he had his domicile or usual residence in France.

The procedure of judicial declaration of death shall likewise apply where the death is certain but the body could not be found.

**Art. 89**
*(Ord. no 58-779 of 23 Aug. 1958)*

The application must be lodged at the tribunal de grande instance of the place of death or disappearance where it occurred on a territory under the authority of France, otherwise at the court of the domicile or last residence of the deceased or disappeared person or, failing which, at the court of the port of registry of the aircraft or the ship that carried him. In default of any other, the tribunal de grande instance of Paris shall have jurisdiction.

Where several persons disappeared in the course of the same event, a joint application may be lodged at the court of the place of the disappearance, at that of the port of registry or, failing them, at the  tribunal de grande instance of Paris.

**Art. 90**
*(Ord. no 58-779 of 23 Aug. 1958)*

Where it is not made by the Government procurator, the application must be forwarded through the latter to the court. The case shall be investigated and adjudged in chambers. The assistance of a counsel is not required and all proceedings as well as the office copies and certificates thereof, shall be exempt of stamp duties and registered gratis.

Where the court is of opinion that the death is not adequately proved, it may order any step in view to further information and request in particular an administrative enquiry on the circumstances of the disappearance.

Where the death is declared, its date shall be fixed by taking into account the presumptions drawn from the circumstances of the case and, failing them, on the day of the disappearance. That date may never be undetermined.

**Art. 91**
*(Ord. no 58-779 of 23 Aug. 1958)*

The operative part of a declaratory judgment of death must be recorded on the registers of civil status of the actual or presumed place of death and, where appropriate, on those of the last domicile of the deceased.

Mention of the recording shall be made in the margin of the registers at the date of the death. In case of a joint judgment, individual certificates shall be forwarded to the officers of civil status of the last domiciles of the persons who have disappeared, for purpose of their being entered.

Declaratory judgments of death shall take the place of records of death and are enforceable against third parties who may only have them rectified in accordance with Article 99 of this Code.

**Art. 92**
*(Ord. no 58-779 of 23 Aug. 1958)*

Where the person whose death was judicially declared reappears after a declaratory judgment, the Government procurator or any party concerned may apply for the annulment of the judgment in the forms provided for in Articles 89

CIVIL CODE

and following.

(Act no 77-1447 of 28 Dec. 1977) The provisions of Articles 130, 131 and 132 shall apply where required.

Mention of the annulment of the declaratory judgment shall be made in the margin of its recording.

CHAPTER V

Of Records of Civil Status concerning Soldiers and Mariners in some Special       Articles 93 to 97
Circumstances

**Art. 93**

*(Ord. no 58-779 of 23 Aug. 1958)*

Records of civil status concerning soldiers and mariners of the State  shall be drawn up as specified in the preceding Chapters.

However, outside France and in case of war, expedition, operation for the keeping of order and  pacification or quartering of French troops in foreign territories, for occupation or under intergovernmental agreements, those records may be received likewise by military officers of civil status, named by an order of the Minister of the Armed Forces. Those officers of civil status are also competent with regard to non-military persons where the provisions of the preceding Chapters cannot be applied.

In metropolitan France, the officers of civil status referred to above may receive records concerning soldiers and non-military persons in the parts of the territory where, by reason of mobilization or siege, the municipal civil registry is no longer regularly ensured.

Declarations of birth in the armed forces shall be made within ten days following the delivery.

Records of death may be drawn up in the armed forces notwithstanding Article 77 above [deleted] although the officer of civil status could not betake himself to the deceased person and, notwithstanding Article 78, they may be drawn up only on the attestation of two declarants.

Art 94 [deleted]

**Art. 95**

*(Act no 57-1232 of 28 Nov. 1957)*

Where Article 93, paragraphs 2 and 3, so provides, records of civil status shall be drawn up on a special register, the keeping and preservation of which shall be regulated by a joint order of the Minister of National Defence and Armed Forces and the Minister of Ex-Servicemen and Victims of War.

**Art. 96**

*(Act no 57-1232 of 28 Nov. 1957)*

Where a marriage is celebrated in one of the cases provided for in Article 93, paragraphs 2 and 3, public notice shall be given, to the extent that circumstances so permit, at the place of the last domicile of the future husband; they shall also be made in the unit to which the party concerned belongs, in the way provided for in an order of the Minister of National Defence and Armed Forces.

**Art. 97**

*(Act no 57-1232 of 28 Nov. 1957)*

Records of death received by military authorities in all cases provided for in Article 93 above, or by civilian authorities as regards members of the armed forces, civilians participating in their action, in duty covered by orders, or persons employed in the armies' train, may be subject to administrative rectification in the way provided for in a decree, within periods and in territories where the military authority is entitled, by said Article 93, to receive those records should the occasion arise.

CHAPTER VI

Of the Civil Status of Persons Born Abroad Who Acquire or Recover French       Articles 98 to 98-4
Nationality

**Art. 98**

A record taking the place of a record of birth shall be drawn up for any person born abroad who acquires or recovers French nationality unless the record drawn up at his birth was already entered on a register kept by a French authority.

That record shall state the name, first names and sex of the party concerned and indicate the place and date of his birth, his parentage, his residence at the date of his acquiring French nationality.

**Art. 98-1**

A record taking the place of a record of marriage shall likewise be drawn up where the person who acquires or recovers French nationality got previously married abroad, unless the celebration of the marriage was already taken note of by a record entered on a register kept by a French authority.

The record shall state:

- the date and place of the celebration;

- indication of the performing authority;

- the names, first names, dates and places of birth of each one of the spouses;

- the parentage of the spouses; and

- if there is occasion, the name, capacity and residence of the authority who received the ante-nuptial agreement.

CIVIL CODE

**Art. 98-2**

One and the same record may be drawn up containing the statements as to birth and marriage, unless birth and marriage were already taken note of by records entered on a register kept by a French authority.

It shall be used as both a record of birth and a record of marriage.

**Art. 98-3**

The records referred to in Articles 98 to 98-2 shall state besides:
- the date on which they were drawn up;
- the name and signature of the officer of civil status;
- the mentions entered in the margin of the record of which they take the place;
- indication of instruments and judgments relating to the nationality of the person.

Mention shall be made later in the margin:
- of the indications required for each category of record by the law in force.

**Art. 98-4**

The persons for whom records were drawn up under Articles 98 to 98-2 lose the power of requiring the entry of their record of birth or marriage received by a foreign authority.

In the case of conflict between the statements in a foreign record of civil status or a record of French consular civil status and those in a record drawn up under said Articles, the latter shall prevail until a judgment of rectification.

CHAPTER VII

Of the Rectification of Records of Civil Status                                    Articles 99 to 101

**Art. 99**

*(Ord. no 58-779 of 23 Aug. 1958; D. no 81-500 of 12 May 1981)*

A rectification of records of civil status shall be ordered by the president of the court.

The rectification of judgments which are declaratory of or supply for records of civil status shall be ordered by the president of the court.

The application for rectification may be lodged by any party concerned or by the Government procurator ; the latter shall act of his own motion where the mistake or omission bears on an essential indication of the record or of the judgment which takes its place.

The Government procurator who has territorial jurisdiction may undertake administrative rectification of merely clerical mistakes and omissions in the record of civil status: for this purpose he shall give all necessary instructions directly to the depositaries of registers.

**Art. 99-1**

*(Act no 78-731 of 12 July 1978)*

Persons entitled to perform the duties of an officer of civil status in order to draw up the records referred to in Articles 98 to 98-2 may undertake administrative rectification of merely clerical mistakes and omissions contained in those records"or in the mentions inserted in the margins, save those that are entered after the making of the records" (Act no 93-22 of 8 Jan. 1993).

**Art. 100**

*(0rd. no 58-779 of 23 Aug. 1958)*

A judicial or administrative rectification of a record or judgment relating to civil status has effect vis-à-vis any party.

**Art. 101**

*(0rd. no 58-779 of 23 Aug. 1958; D. no 81-500 of 12 May 1981)*

An office copy of the record may be issued only with the rectifications ordered, on pain of the fine prescribed by Article 50 of the Civil Code and subject to all damages against the depositaries of registers.

**TITLE III**
 **OF DOMICILE**                                                      **Articles 102 to 111**

**Art. 102**

*(Ord. no 58-923 of 7 Oct. 1958)*

The domicile of a French person, as to the exercise of his civil rights, is at the place where he has his main establishment.

Boatmen and other persons living on a boat of inland navigation registered in France, who do not have the domicile provided for by the preceding paragraph or a statutory domicile, must elect a domicile in one of the communes the names of which appear on a list established by an order of the Minister of Justice, the Minister of the Interior and  the Minister of Public Works, Transport and Tourism. However, wage-earning boatmen and persons living on board with them may domicile themselves in another commune provided that the concern that operates the boat has its headquarters or an establishment there; in this event, the domicile is fixed in the offices of the concern; failing an election by them, those boatmen and persons have their domiciles at the headquarters of the concern which operates the boat and, where those headquarters are abroad, at the chartering office in Paris.

[deleted]

**Art. 103**

CIVIL CODE

A change of domicile takes place in consequence of an actual residence in another place, in addition to the intention to fix one's main establishment there.

**Art. 104**

Proof of that intention shall result from an express declaration made both to the municipality of the place which one leaves and to that of the place where the domicile is transferred.

**Art. 105**

Failing an express declaration, proof of intention shall depend on circumstances.

**Art. 106**

A citizen called  to a temporary or revocable public office keeps the domicile he had previously, unless he has manifested an intention to the contrary.

**Art. 107**

Acceptance of an office conferred for life involves an immediate transfer of the domicile of the officer to the place where he is to fulfil his duties.

**Art. 108**

*(Act no 75-617 of 11 July 1975)*

A husband and a wife may have distinct domiciles without conflicting thereby with the rules concerning the community of living.

A notice served upon one spouse, even judicially separated, in matters of status and capacity of persons, must also be served upon his or her spouse, under pain of invalidity.

**Art. 108-1**

*(Act no 75-617 of 11 July 1975)*

Separate residence of the spouses, during proceedings for divorce or judicial separation, involves as of right separate domiciles.

**Art. 108-2**

*(Act no 75-617 of 11 July 1975)*

A minor when not emancipated is domiciled at his father and mother's home.

Where the father and mother have separate domiciles, he is domiciled at the home of the parent with whom he resides.

**Art. 108-3**

*(Act no 75-617 of 11 July 1975)*

An adult in guardianship shall be domiciled at his guardian's home.

**Art. 109**

Adults who usually serve or work at someone else's place, have the same domicile as the person they serve or at whose place they work where they live in the same house.

**Art. 110**

[deleted]

**Art. 111**

Where an instrument contains, on the part of the parties or of one of them, an election of domicile for the implementation of that instrument in a place other than that of the actual domicile; the services of notices, complaints and proceedings related to that instrument may be done at the elected domicile"and, subject to the provisions of Article 48 of the new Code of Civil Procedure, before the judge of that domicile" (D. no 75-1122 of 5 Dec. 1975).

### TITLE IV
### OF ABSENTEES

Articles 112 to 133 to 143

#### CHAPTER I
#### Of Presumption of Absence

Articles 112 to 121

**Art. 112**

Where  a person has ceased to appear at the place of his domicile or residence and has not been heard from, the judge of guardianships may, on the application of the parties concerned or of the Government procurator, establish that there is presumption of absence.

**Art. 113**

The judge may designate one or several relations by blood or marriage or, where appropriate, any other persons to represent the person presumed absentee in the exercise of his rights or in any act which would be his concern, as well as to administer all or part of his property ; the representation of the presumed absentee and the administration of his property shall then be subject to the rules which apply to statutory administration under judicial supervision such as it is provided for minors and, in addition, under the following amendments.

CIVIL CODE

**Art. 114**

Without prejudice to specific jurisdiction conferred upon other courts, for the same purposes, the judge shall fix, where appropriate, according to the extent of the property, the sums that should be allocated yearly to the maintenance of the family or the household expenses.

He shall determine how to provide for the settling of children.

He shall also specify how the expenses of administration as well as, if necessary, the fees that may be granted to the person responsible for the representation of the presumed absentee and the administration of his property should be settled.

**Art. 115**

The judge may, at any time and even of his own motion, put an end to the task of the person thus designed; he may also replace him.

**Art. 116**

Where a presumed absentee is called to a partition, Article 838, paragraph 1, of the Civil Code shall apply.

However, the judge of guardianships may authorize a partition, even partial, and designate a notaire to undertake it, in the presence of the representative of the presumed absentee or of his substitute designated as provided for in Article 115, where the original representative is himself concerned in the partition. The statement of liquidation is subject to the approval of the tribunal de grande instance.

**Art. 117**

The Government procurator's office shall be specially responsible for watching over the interests of presumed absentees; it shall be heard on all claims which concern them; it may of its own motion request the implementation or amendment of the measures provided for in this Title.

**Art. 118**

Where a presumed absentee reappears or is heard from, on his application, the judge shall put an end to the measures taken for representing him and administering his property; he shall then recover the property managed or acquired on his behalf during the period of absence.

**Art. 119**

Rights acquired without fraud on the basis of the presumption of absence, may not be called in question again where the death of the absentee is established or judicially declared, whatever the date fixed for the death may be.

**Art. 120**

The preceding provisions concerning the representation of presumed absentees and the administration of their property shall also apply to persons who, because of remoteness, are not, against their wish, in a position to express their intention.

**Art. 121**

These same provisions shall not apply to presumed absentees or to persons named in Article 120 where they left a power of attorney adequate for the purpose of representing them or administering their property.

It shall be the same where a spouse may provide sufficiently for the interests concerned through application of the matrimonial regime and particularly as a result of an order obtained under Articles 217 and 219, 1426 and 1429.

CHAPTER II

Of Declaration of Absence                                                                    Articles 122 to 133 to 143

**Art. 122**

When ten years have elapsed since the judgment that established the presumption of absence, either in the manner prescribed in Article 112, or on the occasion of one of the judicial proceedings provided for in Articles 217 and 219, 1426 and 1429, absence may be declared by the tribunal de grande instance, on the application of any person concerned or of the Government procurator's office.

It shall be the same where, failing that establishment, the person will have ceased to appear at the place of his domicile or residence, without having been heard from for more than twenty years.

**Art. 123**

Extracts of the application seeking declaration of absence, after being stamped by the Government procurator's office, shall be published in two newspapers circulating in the département or, where appropriate, in the country of the domicile or last residence of the person who remains unheard froim.

The court to which the application is referred may in addition order any other measure giving notice thereof in any place where it deems it proper.

Those measures must be carried out by the party who lodges the application.

**Art. 124**

As soon as the extracts have been published, the application must be forwarded, via the Government procurator, to the court which shall decide according to the exhibits and documents filed and in consideration of the conditions of the disappearance as well as of the circumstances that can explain the lack of news.

The court may order any complementary measure of investigation and prescribe, if there is occasion, that an

CIVIL CODE

examination of witnesses be made adversarily with the Government procurator, where the latter is not an applicant, in any place which it deems proper, and particularly in the arrondissement of the domicile, or those of the last residences, where they are different.

**Art. 125**

An originating motion may be lodged as early as the year preceding the expiry of the period provided for in Article 122, paragraphs 1 and 2. A declaratory judgment of absence shall be handed down at least one year after the publication of the extracts of that petition. It shall establish that the person presumed absentee has not reappeared during the periods referred to in Article 122.

**Art. 126**

A motion seeking declaration of absence shall be deemed void where the absentee reappears or the date of his death happens to be declared, before the handing down of the judgment.

**Art. 127**

Where a declaratory judgment of absence is handed down, extracts thereof shall be published in accordance with the detailed rules provided for in Article 123, within the period fixed by the court. The judgment shall be deemed void where it is not published within that period.

Where the judgment becomes res judicata, its operative part shall be recorded on request of the Government procurator on the registers of death of the place of domicile of the absentee or of his last residence. Mention of that recording shall be made in the margin of the registers at the date of the judgment declaring the absence; it shall also be made in the margin of the record of birth of the person declared absentee.

Following registration, the judgment is enforceable vis-à-vis third parties who may only obtain rectification in accordance with Article 99.

**Art. 128**

A declaratory judgment of absence involves, from the recording, all the effects that an established death of the absentee would have had.

The measures taken for the administration of the property of the absentee in accordance with Chapter I of this Title come to an end, save as otherwise decided by the court or, failing which, by the judge who ordered them.

The spouse of the absentee may marry again.

**Art. 129**

Where an absentee reappears or his existence is proved after the declaratory judgment of absence, annulment of that judgment may be sought, on application of the Government procurator or of any party concerned.

However, where a party concerned wishes to be represented, he may do so only through a counsel regularly entitled to practise.

The operative part of the judgment of annulment shall be published forthwith in accordance with the detailed rules provided for in Article 123. Mention of the judgment shall be made, from the time of its publication, in the margin of the declaratory judgment of absence and on any register which refers to it.

**Art. 130**

An absentee whose existence is judicially established recovers his property and that he should have received during his absence in the condition in which it may be, the proceeds of that which has been transferred or the property acquired by way of investment out of the capital or incomes fallen due to him.

**Art. 131**

A party concerned who has induced a declaration of absence by fraud is liable to restore to the absentee whose existence has been judicially established the incomes of the property which he would have enjoyed and to remit him the legal interests from the day of receipt, without prejudice, where appropriate, to complementary damages.

Where fraud falls on the spouse of the person declared absentee, the latter is entitled to contest the liquidation of the matrimonial regime to which the declaratory judgment of absence has put an end.

**Art. 132**

Marriage of an absentee remains dissolved, even where a declaratory judgment of absence is annulled.

**Art. 133 to 143**

[repealed]

**TITLE V**

**OF MARRIAGE**                                                                                    **Articles 144 to 227**

CHAPTER I

Of the Qualifications and Conditions Required for Contracting a Marriage            Articles 144 to 164

**Art. 144**

*(Act no 2006-399 of 4 April 2006)*

A male and a female may not contract marriage before they have completed their eighteenth year.

**Art. 145**

*(Act no 70-1266 of 23 Dec. 1970)*

CIVIL CODE

Nevertheless, the Government procurator of the place where a marriage is to be celebrated may grant dispensations as to age for serious reasons.

**Art. 146**

There is no marriage where there is no consent.

**Art. 146-1**

*(Act no 93-1027 of 24 Aug. 1993)*

The marriage of a French person, even where contracted in a foreign country, requires his being present.

**Art. 147**

No one may contract a second marriage before the dissolution of the first.

**Art. 148**

*(Act of 17 July 1927)*

Minors may not contract marriage without the consent of their father and mother; in case of disagreement between the father and mother, that division implies consent.

[repealed]
[repealed]

**Art. 149**

*(Act of 7 Feb. 1924)*

Where one of the two is dead or is unable to express his or her intention, the consent of the other suffices.

It is not necessary to produce the records of death of the father or mother of one of the future spouses where the spouse or the father and mother of the deceased certify the death under oath.

Where the present residence of the father or mother is unknown, and where he or she has not been heard from for one year, the marriage may be celebrated if the child and the parent who consents make declaration of this under oath.

All of which shall be mentioned on the record of marriage.

A false oath taken in the cases specified in this Article and the following Articles of this Chapter shall be punished by the penalties enacted by Article 363 [ Article 434-13] of the Penal Code.

**Art. 150**

*(Act of 17 July 1927)*

Where the father and mother are dead or are unable to express their intention, the grandfathers and grandmothers take their place; where there is disagreement between a grandfather and a grandmother in the same lineage, or where there is disagreement between the two lineages, that division implies consent.

*(Act of 7 Feb. 1924)* Where the present residence of the father and mother is unknown and where they have not been heard from for one year, the marriage may be celebrated if the grandfathers and grandmothers, together with the child himself, make declaration of this under oath. It shall be likewise where, if one or several grandfathers or grandmothers give their consent to the marriage, the present residence of the other grandfathers or grandmothers is unknown and they have not been heard from for one year.

**Art. 151**

*(Act of 2 Feb. 1933)*

The production of an office copy, reduced to the operative part, of the judgment that declared the absence or ordered an examination of witnesses as to the absence of the father and mother, grandfathers or grandmothers of one of the future spouses, is equivalent to the production of their records of death in the cases specified in Articles 149, 150, 158 and 159 of this Code.

**Art. 152**

[repealed]

**Art. 153**

[repealed by implication]

**Art. 154**

*(Act of 2 Feb. 1933)*

The disagreement between the father and mother, between the grandfather and grandmother of the same lineage, or between ancestors of the two lineages may be established by a notaire, requested by the future spouse and acting without the intervention of a second notaire or of witnesses, who will give notice of the planned union to the one or those of the father, mother or ancestors whose consent has not yet been gained.

The instrument containing the notice shall state the first names, names, occupations, domiciles and residences of the future spouses, of their fathers and mothers or, where appropriate, of their grandparents, as well as the  place where the marriage is to be celebrated.

It shall also state a declaration that this notice is given for purpose of gaining the consent not yet granted and that, failing which, the celebration of the marriage shall be proceeded with.

**Art. 155**

*(Act of 4 Feb. 1934)*

The disagreement of the ascendants may also be established, either by a letter bearing an authenticated signature

CIVIL CODE

and addressed to the officer of civil status who is to celebrate the marriage, or by an instrument drawn up in the form provided for by Article 73, paragraph 2.

The instruments listed in this Article and the preceding Article shall be stamped and registered gratis.

**Art. 156**

*(Act of 21 June 1907)*

An officer of civil status who celebrates marriages contracted by sons or daughters who have not reached the full age of eighteen years, without the consent of the fathers and mothers, that of the grandfathers or grandmothers and that of the family council, when it is required, being mentioned in the record of marriage, shall be sentenced to the fine specified in Article 192 of the Civil Code, at the suit of the parties concerned or of the Government procurator of the tribunal de grande instance of the arrondissement  where the marriage was celebrated.

**Art. 157**

*(Act of 4 Feb. 1934)*

An officer of civil status who has not required proof of the notice prescribed by Article 154 shall be sentenced to the fine provided for in the preceding Article.

**Art. 158**

[repealed by Ord. no 2005-759 of 4 July 2005 which shall come into force on 1 July 2006]

**Art. 159**

*(Act no 64-1230 of 14 Dec. 1964)*

Where there are no father, or mother, or grandfathers, or grandmothers, or where all are unable to express their intention, minors under eighteen years may not contract marriage without the consent of the family council.

[repealed by Ord. no 2005-759 of 4 July 2005 which shall come into force on 1 July 2006

**Art. 160**

*(Act no 64-1230 of 14 Dec. 1964)*

Where the present residence of those of the ascendants of a minor under eighteen of whom the death is not established is unknown and where the ascendants have not been heard from for one year, the minor shall make a declaration of it under oath before the judge of guardianships of his residence, with the assistance of his clerk, in his chambers, and the judge of guardianships shall place it on record.

The judge of guardianships shall give notice of that oath to the family council which shall rule on the application for authorization to marry. However, the minor may give the oath directly in the presence of the members of the family council.

**Art. 161**

*(Ord. no 2005-759 of 4 July 2005)*

In direct lineage, marriage is prohibited between all ascendants and descendants and the relatives by marriage in the same lineage.

**Art. 162**

*(Ord. no 2005-759 of 4 July 2005)*

Marriage is further prohibited between uncle and niece, aunt and nephew.

**Art. 163**

*(Act no 72-3 of 3 Jan. 1972)*

Marriage is further prohibited between uncle and niece, aunt and nephew, whether the relationship be legitimate or illegitimate.

**Art. 164**

*(Act of 10 March 1938)*

Nevertheless, the President of the Republic may for serious reasons remove the prohibitions entered:

1° in Article 161 as to marriages between relatives by marriage in direct lineage where the person who created the relationship is dead;

2° [repealed]

3° in Article 163 as to marriages between uncle and niece, aunt and nephew.

CHAPTER II

Of the Formalities Relating to the Celebration of Marriage                              Articles 165 to 171

**Art. 165**

*(Act of 21 June 1907)*

Marriage shall be celebrated publicly before the officer of civil status of the commune where one of the spouses has his domicile or his residence at the date of the public notice provided for by Article 63 and, in the event of dispensation of public notice, at the date of the dispensation provided for by Article 169 below.

**Art. 166**

*(Ord. no 58-779 of 23 Aug. 1958)*

The public notice required by Article 63 shall be made at the town hall of the place of celebration and at that of the place where each one of the future spouses has his domicile or, in the absence of domicile, his residence.

CIVIL CODE

**Art. 167 and 168**

[repealed]

**Art. 169**

*(Act of 8 April 1927)*

The Government procurator of the arrondissement  in which the marriage is to be celebrated may, for serious reasons, dispense with public notice and with any period or only with the bill-sticking of the notice.

(Ord. no 45-2720 of 2 Nov. 1945) He may also, in exceptional cases, dispense the future spouses, or one of them only, with the handing over of the medical certificate required by Article 63, paragraph 2.

The medical certificate may not be demanded to any of the future spouses in case of imminent danger of death of one of them, as provided for in Article 75, paragraph 3, of this Code.

**Art. 170**

*(Act of 21 June 1907)*

A marriage contracted in a foreign country between French persons and between a French person and an alien is valid where it is celebrated in the forms in use in that country, provided it was preceded by the public notice prescribed by Article 63, in the Title Of Records of Civil Status, and the French person did not commit a breach of the provisions contained in the preceding Chapter.

(Act of 29 Nov. 1901) It shall be likewise as regards a marriage contracted in a foreign country between a Frenchman and an alien (Act no 2003-1119 of 26 Nov. 2003), where it was celebrated by diplomatic agents or by consuls of France, in accordance with French legislation.

Nevertheless, diplomatic agents or consuls may only proceed to the celebration of the marriage between a Frenchman and an alien woman in the countries designated by decrees of the President of the Republic.

(Act no 2003-1119 of 26 Nov. 2003) Except in case of impossibility or where it appears, upon examination of the file, that said hearing is not necessary with respect to Article 146 "nor Article 180" (Act no 2006-399 of 4 April 2006), diplomatic or consular agents shall, for the implementation of paragraphs 1 and 2 of this Article, proceed to hearing jointly the future spouses or spouses, according to the circumstances, either at the time of the request for public notice under Article 63, or at the time of the issuing of the certificate of marriage, or in case of a request for registration of the marriage by a French national. Diplomatic or consular agents may, if necessary, require to have a talk with either one of the spouses or future spouses. "They may assign the execution of the common hearing or of the separate talks to one or several established officials in charge of civil status. Where one of the spouses or future spouses resides in a country different from that of the celebration, they may request the officer of civil status who has authority ratione loci to hear him or her" (Act no 2006-399 of 4 April 2006 ). They may also demand that the spouses or future spouses be present on the occasion of each one of the above mentioned formalities.

**Art. 170-1**

*(Act no 93-1027 of 24 Aug. 1993)*

Where there is serious circumstantial evidence giving rise to the presumption that a marriage celebrated abroad incurs annulment under "Articles 180, 184 or 191" (Act no 2006-399 of 4 April 2006), the diplomatic or consular agent in charge of the registration of the record shall immediately inform the Government procurator's office and defer the registration.

The Government procurator shall rule upon the registration. Where he claims annulment of the marriage, he shall order that the registration be limited to the only purpose of referring the matter to the court; until the judgement of the latter, an office copy of the registered record may be issued only to judicial authorities or with the authorization of the Government procurator

Where the Government procurator did not come to a decision within a period of six months after the reference, the diplomatic or consular agent shall register the record..

**Art. 171**

*(Act no 59-1583 of 31 Dec. 1959)*

The President of the Republic may, for grave reasons, authorize the celebration of the marriage where one of the future spouses is dead after the completion of the official formalities indicating unequivocally his or her consent.

In this case, the effects of the marriage  date back to the day preceding that of the death of the spouse.

However, this marriage may not involve any right of intestate succession to the benefit of the survivor and no matrimonial regime is considered to have existed between the spouses

CHAPTER III

Of Formal Objections to Marriage                                              Articles 172 to 179

**Art. 172**

The right to interpose an objection to the celebration of a marriage belongs to the person united by marriage with one of the two contracting parties.

**Art. 173**

*(Act of 9 Aug. 1919)*

The father, the mother and, in the absence of the father and the mother, the grandfathers and grandmothers may interpose an objection to the marriage of their children and descendants, even of full age.

After a judicial withdrawal of an objection to a marriage interposed by an ascendant, no new objection interposed by

CIVIL CODE

an ascendant is admissible and may delay the celebration.

**Art. 174**

In the absence of any ascendant, the brother or sister, the uncle or aunt, a cousin-german, of full age, may interpose an objection only in the following two instances :

1° (Act of 2 Feb. 1933) Where the consent of the family council, required by Article 159, was not gained;

2° Where the objection is based upon the state of insanity of the future spouse; that objection, the withdrawal of which may be unconditionally decided by the court, may be accepted only on condition for the objecting party to induce a guardianship of adults and gain a decision thereupon within the period fixed by judgment.

**Art. 175**

In the two cases provided for by the preceding Article, the guardian or curator may not, during the continuance of the guardianship or curatorship, interpose an objection, unless he is so authorized by the family council, which he may convene.

**Art. 175-1**

*(Act no 93-1027 of 24 Aug. 1993)*

The Government procurator may interpose an objection in the cases in which he might apply for annulment of a marriage.

**Art. 175-2**

*(Act no 2003-1119 of 26 Nov. 2003)*

Where there is serious circumstantial evidence giving rise, possibly after holding the hearings provided for in Article 63, to the presumption that the contemplated marriage may be annulled under Article 146 "or Article 180" (Act no 2006-399 of 4 April 2006), the officer of civil status may refer the matter to the Government procurator. He shall inform of it the persons concerned. [Provisions declared not to conform to the Constitution by decision of the Conseil constitutionnel no 2003-484 of 20 Nov. 2003]

The Government procurator shall, within fifteen days after the matter has been brought before him, either let the marriage proceed, or interpose an objection to it, or decide that the celebration must be stayed, pending the inquiry he initiates. He shall make his reasoned decision known to the officer of civil status and to the persons concerned. [Provisions declared not to conform to the Constitution by decision of the Conseil constitutionnel no 2003-484 of 20 Nov. 2003]

The duration of the stay decided by the Government procurator may not exceed one month renewable once by a specially reasoned decision.

After expiry of the stay, the Government procurator shall make known to the officer of civil status by a reasoned decision whether he allows the celebration of the marriage or objects to it.

Either of the future spouses, even minor, may challenge the decision to stay or its renewal before the president of the tribunal de grande instance who shall give judgment within ten days. The judgment of the president of the tribunal de grande instance may be referred to the court of appeal* which shall decide within the same period.

**Art. 176**

*(Act of 8 April 1927)*

An instrument of objection shall state the capacity in which the party objecting is entitled to do so; it shall contain an election of domicile at the place where the marriage is to be celebrated ; it shall also contain the reasons of the objection and reproduce the text of law on which the objection is based; the whole on pain of nullity and of disqualification of the ministerial officer who has signed the instrument containing the objection.

(Act of 15 March 1933) After one full year, the instrument of opposition ceases to be effective. It may be renewed, except in the case referred to in Article 173, paragraph 2, above.

**Art. 177**

*(Act of 15 March 1933)*

The tribunal de grande instance shall decide within ten days on an application for withdrawal filed by the future spouses, even minors.

**Art. 178**

*(Act of 15 March 1933)*

If there is an appeal it shall be disposed of within ten days, and, where the judgment under appeal has granted the withdrawal of the objection, the court shall decide even of its own motion.

**Art. 179**

Where an objection is set aside, the parties objecting may be ordered to pay damages, with the exception however of the ascendants.

(Act of 20 June 1896) An application for retrial does not lie against a default judgment which sets aside an objection to marriage.

CHAPTER IV

Of Applications for the Annulment of a Marriage                    Articles 180 to 202

**Art. 180**

(Act no 2006-399 of 4 April 2006) A marriage contracted without the free consent of the two spouses, or of one of

CIVIL CODE

them, may be attacked only by the spouses, or by the one whose consent was not free, or by the Government procurator*. The use of  coercion on the spouses or one of them, even resulting from reverential fear towards an ascendant, constitutes a case of annulment of the marriage.

(Act no 75-617 of 11 July 1975) Where there was a mistake as to the person, or as to essential capacities of the person, the other spouse may apply for annulment of the marriage.

**Art. 181**
*(Act no 2006-399 of 4 April 2006)*
In the case of the preceding Article, the application for annulment may no longer be admissible after a period of five years as from the marriage or since the spouse acquired his or her full freedom or the mistake was discovered by him or her.

**Art. 182**
A marriage contracted without the consent of the father and mother, of the ascendants or of the family council, where this consent was necessary, may be attacked only by those whose consent was required, or by the one of the spouses who needed that consent.

**Art. 183**
An application for annulment may no longer be instituted by the spouses or the parents whose consent was required, whenever the marriage was expressly or tacitly approved by those whose consent was necessary, or where five years has elapsed without claim on their part since they have had knowledge of the marriage. Nor may it be instituted by the spouse where five years has elapsed without claim on his or her part, since he or she has reached the competent age to consent to the marriage by himself or herself.

**Art. 184**
*(Act of 19 Feb. 1933)*
A marriage contracted in violation of the provisions contained in Articles 144, 146,"146-1," (Act no 93-1027 of 24 Aug. 1993) 147, 161, 162 and 163 may be attacked either by the spouses themselves, or by all those who have an interest therein, or by the Government procurator.

**Art. 185**
However, a marriage contracted by spouses who did not yet have the required age, or of whom one of the two had not reached  that age, may no longer be attacked :
1° where six months have elapsed since that spouse or the spouses have reached the competent age;
2° where the wife, who did not have that age, has conceived before six months elapsed.

**Art. 186**
The father, the mother, the ascendants and the family when they have consented to the marriage contracted in the circumstances referred to in the preceding Article, may not be admitted to apply for its annulment.

**Art. 187**
In all cases in which an application for annulment may be instituted, in accordance with Article 184, by all those who have an interest therein, it may not be instituted by collateral relatives, or by the children born of another marriage, in the lifetime of the spouses, unless they have a vested and present interest.

**Art. 188**
A spouse to whose detriment a second marriage was contracted, may apply for its annulment even during the lifetime of the spouse who was bound to him or her.

**Art. 189**
Where the new spouses raise the invalidity of the first marriage, the validity or invalidity of that marriage must be judged beforehand.

**Art. 190**
In all cases to which Article 184 applies and under the modifications contained in Article 185, the Government procurator may and shall apply for annulment of the marriage, during the lifetime of the spouses, and have them ordered to separate.

**Art. 190-1**
[repealed]

**Art. 191**
A marriage which was not publicly contracted and which was not celebrated before the competent public officer, may be attacked by the spouses themselves, by the father and mother, by the ascendants and by all those having a vested and present interest, as well as by the Government procurator.

**Art. 192**
*(Act of 21 June 1907)*
Where a marriage was not preceded by the public notice required or where the dispensations allowed by law were not gained, or where the intervals prescribed between the public notice and the celebration were not observed, the Government procurator shall have the public officer fined an amount not exceeding"30 francs" (4,5 € ) (Act no 46-2154

CIVIL CODE

of 7 Oct. 1946) and shall have the contracting parties, or those under whose authority they acted, fined in proportion to their wealth.

**Art. 193**

The penalties stated in the preceding Article are incurred by the persons therein named for any infringement of the rules prescribed by Article 165, even if those infringements are not held to be sufficient to involve annulment of the marriage.

**Art. 194**

No one may claim the quality of spouse and the civil effects of marriage unless he or she produces a record of celebration entered on the register of civil status; except in the cases provided for by Article 46, in the Title Of Records of Civil Status.

**Art. 195**

Apparent status may not exempt the alleged spouses who respectively avail themselves of it from producing the record of celebration of the marriage before the officer of civil status.

**Art. 196**

Where there is an apparent status and the record of celebration of the marriage before the officer of civil status is produced, the spouses have respectively no standing to sue for the annulment of that record.

Art.197

Where, however, in the case of Articles 194 and 195, there are children born of two persons who have openly lived as husband and wife and who are both dead, the legitimacy of the children may not be contested on the sole pretext of failure to produce the record of celebration, whenever legitimacy is proved by an apparent status which is not contradicted by the record of birth.

**Art. 198**

Where the proof of the lawful celebration of a marriage is established by the outcome of a criminal procedure, the entry of the judgment on the registers of civil status secures for the marriage, from the day of its celebration, all civil effects, both as regards the spouses and the children born of that marriage.

**Art. 199**

Where the spouses or one of them have died without having discovered fraud, a criminal action may be brought by all those who have an interest in having the marriage declared valid, and by the Government procurator.

**Art. 200**

Where a public officer is dead when fraud is discovered, a civil action may be instituted against his heirs, by the Government procurator, in the presence of the interested parties and upon their accusation.

**Art. 201**

*(Act no 72-3 of 3 Jan. 1972)*

A marriage which has been declared  void produces, nevertheless, its effects with regard to the spouses, where it was contracted in good faith.

Where good faith exists only on the part of one spouse, the marriage produces its effects only in favour of that spouse.

**Art. 202**

*(Act no 72-3 of 3 Jan. 1972)*

It also produces its effects with regard to the children, even though none of the spouses was in good faith.

(Act no 93-22 of 8 Jan. 1993) The judge shall rule on the exercise of parental authority as in matters of divorce.

CHAPTER V

Of the Obligations Arising from Marriage                                             Articles 203 to 211

**Art. 203**

The spouses contract together, by the sole fact of marriage, the obligation of feeding, supporting and educating their children.

**Art. 204**

A child has no claim against his father and mother for a settlement in view of marriage or otherwise.

**Art. 205**

*(Act no 72-3 of 3 Jan. 1972)*

Children owe maintenance to their father and mother or other ascendants who are in need.

**Art. 206**

*(Act of 9 Aug. 1919)*

Sons- and daughters-in-law owe likewise and under the same circumstances, maintenance to their father- and mother-in-law, but this obligation ceases where the spouse owing to whom the affinity existed and the children born of his or her union with the other spouse are dead.

**Art. 207**

CIVIL CODE
*(Act no 72-3 of 3 Jan. 1972)*
The obligations resulting from these provisions are reciprocal.
Nevertheless, where the creditor has failed seriously to fulfil his obligations towards the debtor, the judge may discharge the latter from all or part of the maintenance obligations.

**Art. 207-1**
[repealed]

**Art. 208**
*(Act no 73-2 of 3 Jan. 1972)*
Maintenance shall be granted only in proportion to the needs of the one who claims it, and to the wealth of the one who owes it.
The judge may, even of his own motion and according to the circumstances of the case, couple the periodical payments with a revision clause permitted by the law in force.

**Art. 209**
Where the one who provides or the one who receives maintenance is placed again in such a condition that the one can no longer give it, or the other is no longer in need of it, a discharge or reduction of it may be applied for.

**Art. 210**
Where the person who must provide maintenance establishes that he cannot make periodical payments, the"family causes judge"(Act no 93-22 of 8 Jan. 1993) may, with full knowledge of the facts, order that he shall receive in his home, feed and maintain the one to whom he owes maintenance.

**Art. 211**
The"family causes judge" (Act no 93-22 of 8 Jan. 1993) may also decide whether the father or mother who will offer to receive, feed and maintain in his or her home the child to which he or she owes maintenance should  in that case be exempted from periodical payments.

CHAPTER VI
Of the Respective Rights and Duties of the Spouses                    Articles 212 to 226

**Art. 212**
*(Act no 2006-399 of 4 April 2006)*
Spouses owe each other respect, fidelity, support and assistance.

**Art. 213**
*(Act no 70-459 of 4 June 1970)*
Spouses are responsible together for the material and moral guidance of the family. They shall provide for the education of the children and shall prepare their future.

**Art. 214**
*(Act no 65-570 of 13 July 1965)*
Where an ante-nuptial agreement does not regulate the contributions of the spouses to the marriage expenses, they shall contribute to them in proportion to their respective means.
[repealed]
[repealed]
Where one of the spouses does not fulfil his or her obligations, he or she may be compelled by the other to do so in the manner provided for in the Code of Civil Procedure.

**Art. 215**
*(Act no 70-459 of  4 June 1970)*
Spouses mutually oblige themselves to a community of living.
(Act no 75-617 of 11 July 1975) The residence of the family is at the place which they choose by common consent.
(Act no 65-570 of 13 July 1965) The spouses may not, separately, dispose of the rights whereby the lodging of the family is ensured, or of the pieces of furniture with which it is garnished. The one of the two who did not give his or her consent to the transaction may claim the annulment of it: the action for annulment is open to him or her within the year after the day when he or she had knowledge of the transaction, without possibility of its ever being instituted more than one year after the matrimonial regime was dissolved.

**Art. 216**
*(Act no 65-570 of 13 July 1965)*
Each spouse has full legal capacity; but his or her rights and powers may be restricted as a consequence of the matrimonial regime and of the provisions of this Chapter.

**Art. 217**
*(Act no 65-570 of 13 July 1965)*
A spouse may be authorized by a court to enter alone into a transaction for which the assistance or the consent of the other spouse would be necessary, where the latter is not able to express his or her intention or where his or her refusal is not justified by the interest of the family.
The transaction entered into under the terms of a judicial authorization is effective against the spouse whose

CIVIL CODE

assistance or consent was lacking, without any personal obligation incumbent on him or her resulting from it

**Art. 218**

*(Act no 65-570 of 13 July 1965)*

A spouse may give the other a written authorization to represent him or her in the exercise of the powers that the matrimonial regime confers to him or her.

*(Act no 85-1372 of 23 Dec. 1985)* He or she may, in all cases, freely revoke that authorization.

**Art. 219**

*(Act no 65-570 of 13 July 1965)*

Where one of the spouses is unable to express his or her intention, the other may be judicially entitled to represent him or her, in a general manner or for some particular transactions, in the exercise of the powers resulting from the matrimonial regime, the terms and extent of that representation being fixed by the judge.

Failing a legal power, power of attorney or judicial entitlement, the transactions entered into by a spouse in representation of the other are effective with regard to the latter according to the rules of management of another's business.

**Art. 220**

*(Act no 65-570 of 13 July 1965)*

Each one of the spouses has the power to make alone contracts which relate to the support of the household or the education of children: any debt thus contracted by the one binds the other jointly and severally.

Nevertheless, joint and several obligations do not arise as regards expenditures that are manifestly excessive with reference to the way of living of the household, to the usefulness or uselessness of the transaction, to the good or bad faith of the contracting third party.

*(Act no 85-1372 of 23 Dec. 1985)* They do not arise either, where they were not concluded with the consent of the two spouses, as regards instalment purchases or loans unless those relate to reasonable sums needed for the wants of everyday life.

**Art. 220-1**

*(Act no 65-570 of 13 July 1965)*

Where one of the spouses fails seriously in his or her duties and thus imperils the interests of the family, the"family causes judge" (Act no 93-22 of 8 Jan. 1993) may prescribe any urgent measure which those interests require.

He may in particular forbid that spouse to make, without the consent of the other, grants of his or her own property and of that of the community, movable or immovable. He may also forbid the displacing of movables, subject to the specifying of those which he attributes to the personal use of the one or the other of the spouses.

*(Act no 2004-439  of 26 May 2004 )* Where the violence practiced by one spouse endangers his or her spouse, one or several children, the judge may rule on the separate residence of the spouses, specifying which of the spouses shall continue to dwell in the conjugal lodging. Save particular circumstances, the enjoyment of this lodging must be attributed to the spouse who is not the author of the violence. The judge shall give judgment, if necessary, on the details of exercise of parental authority and on the contribution to the marriage expenses. The measures taken lapse where, upon expiry of a period of four months from their being handed down, no petition for divorce or judicial separation has been lodged.

The duration of the other measures taken under this Article must be determined by the judge and may not exceed three years, including a possible extension.

**Art. 220-2**

*(Act no 65-570 of 13 July 1965)*

Where an injunction prohibits the making of grants of property the conveyance of which is subject to registration, it must be registered at the suit of the applicant spouse. That registration ceases to be effective upon the expiry of the period determined by the injunction, subject for the party concerned to obtain in the interval a varying order, xhich shall be given notice of in the same manner.

Where an injunction prohibits the granting of movables, or the displacing them, it shall be served by the applicant on his or her spouse and involves the effect of rendering the latter a responsible custodian of the movables in the same manner as a person whose property is seized. Where served on a third party, the latter shall be deemed in bad faith.

**Art. 220-3**

*(Act no 65-570 of 13 July 1965)*

May be annulled, on claim of the applicant spouse, all transactions entered into in violation of the injunction, where they were made with a third party in bad faith, or even with regard to a property the conveyance of which is subject to registration, where they are simply subsequent to the registration provided for by the preceding Article.

An action for annulment may be brought by the applicant spouse within two years after the day when he or she had knowledge of the transaction, without possibility of its ever being instituted, where that transaction is subject to registration, more than two years after its registration.

**Art. 221**

*(Act no 65-570 of 13 July 1965)*

Each one of the spouses may open, without the consent of the other, a deposit account and a securities account in his or her personal name.

CIVIL CODE

(Act 85-1372 of 23 Dec. 1985) With regard to the depositary, the depositor is always considered, even after dissolution of the marriage, to have free disposal of the funds and of the securities on deposit.

**Art. 222**

*(Act no 65-570 of 13 July 1965)*

Where one of the spouses appears alone to do an act of administration or enjoyment or a grant on a movable which he or she holds individually, he or she is considered, with regard to the third party in good faith, to have the power to do that act alone.

This provision shall not apply to pieces of furniture referred to in Article 215, paragraph 3, or to movable tangible property the nature of which gives rise to a presumption of ownership of the other spouse in accordance with Article 1404.

**Art. 223**

*(Act 85-1372 of 23 Dec. 1985)*

Each spouse may freely follow a trade, collect his or her earnings and salaries and dispose of them after discharging marriage expenses.

**Art. 224**

[repealed]

**Art. 225**

*(Act 85-1372 of 23 Dec. 1985)*

Each of the spouses shall administer, bind and transfer alone his or her personal property.

**Art. 226**

*(Act no 65-570 of 13 July 1965)*

The provisions of this Chapter, on all questions where they do not save the application of ante-nuptial agreements, apply by the sole effect of marriage, whatever the matrimonial regime of the spouses may be.

CHAPTER VII

Of the Dissolution of Marriage                                                          Article 227

**Art. 227**

A marriage is dissolved:

1° By the death of one of the spouses;

2° By divorce lawfully pronounced;

3° [repealed]

**TITLE VI**

**OF DIVORCE**                                                                    **Articles 230 to 228**

**Art. 228**

(Act no 75-617 of 11 July 1975).-The tribunal de grande instance exercising civil jurisdiction has exclusive jurisdiction to rule on divorce and its consequences.

(Act no 93-22 of 8 Jan. 1993) One judge of this court shall be assigned to family causes. [deleted]

This judge has jurisdiction to decree a divorce, whatever the ground for it may be. He may transfer a case as it stands for hearings before a division of the court. That transfer is as of right when requested by a party .

(Act no 2004-439 of 26 May 2004) He also has exclusive jurisdiction, after divorce has been granted, whatever the ground for it may be, to rule on the details of the exercise of parental authority, on the modification of the contribution to the support and education of the children and to decide to entrust the children to a third person as well as on revision of the compensatory allowance or its terms of payment (Act no 75-617 of 11 July 1975). He shall then rule informally and may be seized by the parties concerned even by a mere petition.

CHAPTER I

Of Cases for Divorce                                                              Articles 230 to 229

**Art. 229**

Divorce may be decreed in cases either:

- of mutual consent; or

- of acceptance of the principle of the breakdown of the marriage; or

- of irretrievable impairing of the marriage tie; or

- of fault.

SECTION I

Of Divorce by Mutual Consent                                                    Articles 230 to 232

**Art. 230**

A petition for divorce may be presented jointly by the spouses where they agree on the breakdown of the marriage and its effects by submitting to the approval of the judge an agreement which regulates the consequences of the divorce.

CIVIL CODE

**Art. 231**

[repealed]

**Art. 232**

The judge shall approve the agreement and decree a divorce where he has acquired the belief that the intention of each spouse is real and that their consent is free and well informed.

He may refuse approval and not decree a divorce where he finds that the agreement insufficiently protects the interests of the children or of one of the spouses.

SECTION II

Of Divorce Accepted                                                                 Articles 233 to 235 and 236

**Art. 233**

A petition for divorce may be presented by either spouse or by both where they accept the principle of the breakdown of the marriage without consideration of the facts from which it originates.

This acceptance may not be withdrawn, even through an appeal.

**Art. 234**

Where he has acquired the belief that each spouse has given freely his or her consent, the judge shall decree divorce and rule upon its consequences.

**Art. 235 and 236**

[repealed]

SECTION III

Of Divorce for Irretrievable Impairing of the Marriage Tie                       Articles 237 to 239, 240 and 241

**Art. 237**

A petition for divorce may be presented by a spouse where the marriage tie is irretrievably impaired.

**Art. 238**

An irretrievable impairing of the marriage tie shall result from the ending of the community of life between the spouses, where they have been living apart for two years before the summons.

Notwithstanding the preceding provisions, divorce shall be decreed for irretrievable impairing of the marriage tie in the circumstances referred to in Article 246, paragraph 2, where the petition presented on this ground is lodged as a reconvention.

**Art. 239, 240 and 241**

[repealed]

SECTION IV

Of Divorce for Fault                                                               Articles 242 to 246

**Art. 242**

A petition for divorce may be presented by a spouse where facts which constitute a serious or renewed violation of the duties and obligations of marriage are ascribable to the other spouse and render unbearable the continuance of community life.

**Art. 243**

[repealed]

**Art. 244**

*(Act no 75-617 of 11 July 1975)*

A reconciliation of the spouses which occurred after the alleged facts prevents their being invoked as a ground for divorce.

The judge shall then declare the petition inadmissible. A new petition may however be lodged by reason of facts occurred or discovered after the reconciliation, the former facts being then recallable in support of that new petition.

Temporary continuance or renewal of community life must not be considered as a reconciliation where they result only from necessity or from an attempt at conciliation or from the needs of the education of the children.

**Art. 245**

*(Act no 75-617 of 11 July 1975)*

The faults of the spouse who initiated the divorce do not prevent from considering his or her application; they may, however, deprive the facts which the other spouse is reproached with of the seriousness that would make them a ground for divorce.

Those faults may be also invoked by the other spouse in support of a counter-petition in divorce. Where both applications are granted, divorce is decreed with the blame lying with both spouses.

Even failing a counter-petition, divorce may be decreed with the blame lying with the two spouses where wrongs ascribable to both appear in the hearings.

CIVIL CODE

**Art. 245-1**

*(Act no 75-617 of 11 July 1975; Act no 2004-439 of 26 May 2004 )*

At the request of the spouses, the judge may restrict himself to establishing in the grounds of the judgment that there are facts constituting a cause for divorce, without having to state the wrongs and complaints of the parties.

**Art. 246**

Where a petition on the ground of irretrievable impairing of the marriage tie and a petition on the ground of fault are presented concurrently, the judge shall rule first on the petition on the ground of fault.

Where he dismisses the latter, the judge shall rule on the petition for divorce on the ground of irretrievable impairing of the marriage tie.

SECTION V

Of Amendments of the Grounds of an Application for Divorce          Articles 247 to 247-2

**Art. 247**

Spouses may, at any stage of the case, request the judge to establish their understanding in view of having their divorce granted on the ground of mutual consent by submitting to him an agreement which regulates the consequences of the divorce.

**Art. 247-1**

Where a petition for divorce has been filed on the ground of irretrievable impairing of the marriage tie or of fault, spouses may also, at any stage of the case, request the judge to establish their understanding in view of having divorce granted on the ground of acceptance of the principle of the breakdown of the marriage.

**Art. 247-2**

Where, in the course of proceedings initiated on the ground of irretrievable impairing of the marriage tie, the respondent presents as a reconvention a petition on the ground of fault, the petitioner may invoke the faults of the other spouse in order to amend the ground of his or her petition.

CHAPTER II

Of Divorce Proceedings          Articles 248 to 259-3

SECTION I

General Provisions          Articles 248 to 249-4

**Art. 248**

*(Act no 75-617 of 11 July 1975)*

Hearings on the ground, on the consequences of divorce and on provisional measures may not be public.

**Art. 249**

Where a petition for divorce must be brought in the name of an adult in guardianship, it shall be lodged by the guardian with the authorization of the family council if it has been established or of the judge of guardianships. It shall be brought after advice from the attending physician and, as far as possible, after the person concerned has been heard by the family council or the judge, according to the circumstances.

(Act no 75-617 of 11 July 1975) An adult in curatorship shall bring the action himself with the assistance of the curator.

**Art. 249-1**

*(Act no 75-617 of 11 July 1975)*

Where the spouse against whom a petition is filed is in guardianship, the action must be brought against the guardian; where he or she is in curatorship, he or she is the defendant, with the assistance of the curator.

**Art. 249-2**

*(Act no 75-617 of 11 July 1975)*

A special guardian or curator must be appointed where the guardianship or curatorship was entrusted to the spouse of the person under a disability.

**Art. 249-3**

*(Act no 75-617 of 11 July 1975)*

Where one of the spouses is placed under judicial supervision, a petition for divorce may be tried only after organization of a guardianship or curatorship. (Act no 2004-439 of 26 May 2004). The judge however may prescribe the provisional measures provided for in Articles 254 and 255 and the emergency measures provided for in Article 257.

**Art. 249-4**

*(Act no 75-617 of 11 July 1975)*

Where one of the spouses is placed under one of the protective systems provided for in Article 490 below, no petition for divorce by mutual consent "or for acceptance of the principle of  the breakdown of the marriage" (Act no 2004-439 of 26 May 2004) may be lodged.

SECTION II

Of Proceedings Relating to Divorce by Mutual Consent          Articles 250 to 250-3

CIVIL CODE

**Art. 250**

An application for divorce may be filed either by the respective counsels of the parties or by one counsel chosen by common consent.

The judge shall consider the application with each one of the spouses, then shall call them together. He shall then call the counsel or counsels.

**Art. 250-1**

Where the conditions laid down in Article 232 are met, the judge shall approve the agreement which regulates the consequences of the divorce and shall grant divorce through the same decree.

**Art. 250-2**

Where he refuses approval of the agreement, the judge may nevertheless approve the provisional measures which the parties agree to take until the date when the judgment granting divorce becomes res judicata, provided that they are consonant with the welfare of the child or children.

A new agreement may then be submitted by the spouses within six months at the most.

**Art. 250-3**

Failing submission of a new agreement within the period prescribed by Article 250-2 or where the judge refuses approval once again, the application lapses.

SECTION III
Of Proceedings Relating to other Cases for Divorce                          Articles 251 to 259-3

Paragraph 1
Of Originating Petition                                                      Article 251

**Art. 251**

A spouse who makes an application for divorce shall file, through a counsel, a petition with the judge, without stating the grounds for divorce.

Paragraph 2
Of Conciliation                                                              Articles 252 to 253

**Art. 252**

An attempt at conciliation is compulsory before judicial proceedings. It may be renewed during the proceedings.

The judge shall seek to conciliate the spouses both as to the principle of the divorce and to its consequences.

**Art. 252-1**

Where the judge seeks to conciliate the spouses, he must personally have an interview with each of them separately before bringing them together in his presence.

The counsels shall then be called to attend the intervieqw and take part in it.

In the case where the spouse who did not file the petition does not appear at the hearing or is not able to express his or her intention, the judge shall have an interview with the other spouse and urge him or her to consideration.

**Art. 252-2**

An attempt at conciliation may be suspended and resumed without any formality, with the arranging of times for consideration for the spouses within a limit of eight days.

Where a longer period is deemed advisable, the judge may decide to suspend the proceedings and resort to a new attempt at conciliation within six months at most. He may take the requisite provisional measures if there is occasion.

**Art. 252-3**

Where the judge ascertains that the petitioner maintains his or her claim, he shall try to induce the spouses to regulate amicably the consequences of the divorce.

He shall require them to submit at the trial a draft settlement of the effects of divorce. For this purpose, he may take the provisional measures provided for in Article 255.

**Art. 252-4**

Anything that was said or written on the occasion of an attempt at conciliation, whatever the form under which it occurred may be, may not be invoked in favour of or against a spouse or a third party in the further proceedings.

**Art. 253**

Spouses may accept the principle of the breakdown of the marriage and the dissolution of the marriage under Article 233 only where each of them is assisted by a counsel.

Paragraph 3
Of Provisional Measures                                                      Articles 254 to 257

**Art. 254**

At the time of the hearing provided for in Article 252, the judge shall prescribe, having regard to the possible agreements of the spouses, the measures which are required in order to ensure their living and that of the children until the date on which the judgment becomes res judicata.

CIVIL CODE

**Art. 255**

The judge may in particular:

1° Propose a measure of mediation to the spouses and, after gaining their consent, appoint a family mediator in order to go through with it;

2° Enjoin the spouses to meet a family mediator who will inform them of the purpose and progress of the mediation;

3° Rule on the details of the separate residence of the spouses;

4° Allocate to one of them the enjoyment of the lodging and furniture of the household, or divide that enjoyment between them, specifying whether it is gratuitous or not and, if necessary, ascertaining the agreement of the spouses on the amount of a compensation for dwelling;

5° Order the delivery of clothes and personal belongings;

6° Prescribe periodical payments and allowance for costs to be paid by one spouse to the other, designate the spouse or spouses who shall be responsible for the provisional performance of all or part of the obligations;

7° Grant to one of the spouses advance payments as to his or her part in the community property, where circumstances so dictate;

8° Rule on the ascription of the enjoyment or management of the common or joint property, other than that referred to in paragraph 4, subject to the rights of each spouse in the liquidation of the matrimonial regime;

9° Appoint any qualified professional on purpose to draw up an estimative inventory or make proposals as to the settlement of the pecuniary interests of the spouses;

10° Appoint a notaire on purpose to prepare a draft of liquidation of the matrimonial regime and of composition of the lots to be distributed.

**Art. 256**

Provisional measures concerning children must be settled in accordance with the provisions of  Chapter I of Title IX of this Book.

**Art. 257**

*(Act no 75-617 of 11 July 1975)*

As soon as the originating petition has been lodged, the judge may take emergency measures.

He may, on this ground, authorize the petitioning spouse to reside apart, if occasion be with his or her minor children.

He may also, as a safeguard of the rights of a spouse, order any protective measures such as the affixing of seals on community property. Nevertheless the provisions of Article 220-1 and the other safeguards provided for by the matrimonial regime remain applicable.

Paragraph 4
Of Instituting Divorce Proceedings                    Articles 257-1 to 258

**Art. 257-1**

After the ordonnance de non-conciliation, a spouse may institute proceedings or bring a counter-claim for acceptance of the principle of the breakdown of the marriage, for irretrievable impairing of the marriage tie or for fault.

Where, however, at the conciliation hearing, the spouses have declared that they accepted the principle of the breakdown of the marriage and the dissolution of the latter under Article 233, proceedings may be instituted only on this same ground.

**Art. 257-2**

Under pain of inadmissibility, the originating summons shall include a proposal for settlement of the pecuniary and patrimonial interests of the spouses.

**Art. 258**

*(Act no 75-617 of 11 July 1975)*

Where he definitively dismisses an application for divorce, the judge may rule on the contributions to the marriage expenses, the residence of the family and"the details of the exercise of parental authority" (Act no 87-570 of 22 Jul. 1987).

Paragraph 5
Of Evidence                                      Articles 259 to 259-3

**Art. 259**

Facts invoked as grounds for divorce or as a defence against a petition may be established by any evidence, including admissions. However, descendants may never be heard on the grievances invoked by the spouses.

**Art.  259-1**

A spouse may not produce at the hearing a mean of proof which he or she obtained by duress or fraud.

**Art. 259-2**

*(Act no 75-617 of 11 July 1975)*

The certificates drawn up on request of a party are set aside from the hearing where there was forcible entry into the domicile or unlawful invasion of privacy.

**Art. 259-3**

CIVIL CODE

The spouses must communicate to each other and communicate to the judge as well as to experts and other persons designated by him under Article 255, 9° and 10°, any appropriate information and documents for fixing allowances and payments and liquidating the matrimonial regime.

The judge may cause any proper inquiry to be instigated with debtors or all those who hold assets on behalf of the spouses with no possible raising of professional secrecy.

CHAPTER III
Of the Consequences of Divorce                                              Articles 260 to 287 to 295

SECTION I
Of the Date at which Divorce takes Effect                                    Articles 260 to 262-2

**Art. 260**
*(Act no 75-617 of 11 July 1975)*
A judgment granting divorce dissolves the marriage at the date at which it acquires force of res judicata.

**Art. 261 to 261-2**
[repealed]

**Art. 262**
*(Act no 75-617 of 11 July 1975)*
A divorce judgment is effective against third parties, as regards the property of the spouses, from the day when the formalities of mention in the margin, prescribed by the rules which apply to civil status, have been performed.

**Art. 262-1**
A divorce judgment takes effect in the relations between spouses, as regards their property:
- where it is handed down by mutual consent, as from the date of the agreement which settles all the consequences of the divorce, unless the agreement otherwise provides;
- where it is handed down for acceptance of the principle of the breakdown of the marriage, for irretrievable impairing of the marriage tie or for fault, as from the date of the ordonnance de non-conciliation.

At the request of a spouse, the judge may backdate the effects of the judgment to the date when they ceased to live together and collaborate. That request may be brought only on the occasion of the application for divorce. The enjoyment of the conjugal lodging by one single spouse keeps a gratuitous character until the ordonnance de non-conciliation, save judicial decision to the contrary.

**Art. 262-2**
*(Act no 75-617 of 11 July 1975)*
Any obligation contracted by one of the spouses on the responsibility of the community, any transfer of community property made by one of them within the limit of his or her power, after the originating petition, shall be declared void where there is evidence that there was fraud on the rights of the other spouse.

SECTION II
Of the Consequences of Divorce for the Spouses                               Articles 263 to 276-2

Paragraph 1
General Provisions                                                           Articles 263 to 265-2

**Art. 263**
*(Act no 75-617 of 11 July 1975)*
Where divorced spouses wish to contract another union between themselves, a new celebration of marriage is required.

**Art. 264**
Following divorce, each of the spouses loses the use of his or her spouse's name.
However, a spouse may keep the use of the other's name, either with his or her consent, or with the authorization of the judge, where he or she proves that a particular interest lies therein for him or her or for the children.

**Art. 264-1**
[repealed]

**Art. 265**
Divorce does not affect the matrimonial advantages which take effect during the marriage nor the gifts of existing property whatever their form may be.
Divorce involves by operation of law revocation of the matrimonial advantages which take effect only at the dissolution of the matrimonial regime or at the death of one spouse and of the transfers mortis causa, granted by one spouse to the other by an ante-nuptial agreement or during the marriage, unless the spouse who granted them otherwise decides. This decision must be established by the judge at the time when he decrees divorce and shall render irrevocable the upheld advantage or transfer.

**Art. 265-1**

CIVIL CODE

Divorce does not affect the rights which either spouse gets from the law or from contracts entered into with third persons.

**Art. 265-2**

During divorce proceedings, spouses may enter into any agreements for the liquidation and partition of their matrimonial regime.

Where liquidation bears on property subject to land registration, the agreement must be drawn up through a notarial instrument.

Paragraph 2
Of the Consequences Specific to Divorces Other than by Mutual Consent    Articles 266 to 268-1 and 269

**Art. 266**

Without prejudice to the application of Article 270, damages may be awarded to one spouse in compensation for consequences of a particular seriousness which he or she suffers because of the dissolution of the marriage either when he or she was defendant in a divorce granted for irretrievable impairing of the marriage tie and he or she had not brought an application for divorce, or where divorce is granted against his or her spouse and the blame lies wholly with the latter.

This claim may be brought only on occasion of an application for divorce.

**Art. 267**

Failing a settlement agreed upon by the spouses, the judge, when he decrees divorce, shall order the liquidation and partition of their patrimonial interests.

He shall rule on the claims for maintenance of undivided ownership or preferential allotment.

He may also grant to one spouse or both an advance on his share of community or undivided property.

Where the draft of liquidation of the matrimonial regime drawn up by the notaire appointed under Article 255, 10°, contains sufficient information, the judge, upon request of either spouse, shall rule on the enduring disagreements between them.

**Art. 267-1**

Where the formalities of liquidation and partition are not completed within one year after the judgment granting divorce has become res judicata, the notaire shall forward to the court a report of difficulties recapitulating the respective declarations of the parties.

Upon examination of this report, the court may grant an additional period of six months at the most.

Where, upon expiry of that period, the formalities are still uncompleted, the notaire shall inform the court thereof. If the changes occurred make it necessary, he shall draw up a new report.

The court shall rule on the disputes which are still extant between the parties and shall refer them to the notaire for him to draw up the statement of liquidation.

**Art. 268**

During  the proceedings, the spouses may submit to the approval of the judge agreements settling all or part of the consequences of the divorce.

After checking that the interests of each spouse and the welfare of the children are preserved, the judge shall approve the agreements when he decrees divorce.

**Art. 268-1 and 269**

[repealed]

Paragraph 3
Of Compensatory Benefits                                        Articles 270 to 276-2

**Art. 270**

Divorce puts an end to the duty of support between spouses.

One of the spouses may be compelled to pay the other a benefit intended to compensate, as far as possible, for the disparity that the breakdown of the marriage creates in the respective ways of living. This benefit shall be in the nature of a lump sum. It shall take the form of a capital the amount of which must be fixed by the judge.

However, the judge may refuse to grant such a benefit where equity so demands, either taking into account the criteria set out in Article 271, or where the blame lies wholly upon the spouse who requests the advantage of this benefit, considering the particular circumstances of the breakdown.

**Art. 271**

A compensatory benefit must be fixed according to the needs of the spouse to whom it is paid and to the means of the other, account being taken of the situation at the time of divorce and of its evolution in a foreseeable future.

For this purpose, the judge shall have regard in particular to:

- the duration of the marriage;
- the ages and states of health of the spouses;
- their professional qualifications and occupations;
- the consequences of the professional choices made by one spouse during the community life for educating the

CIVIL CODE

children and the time which must still be devoted to this education, or for favouring his or her spouse's career to the detriment of his or her own;

- the estimated or foreseeable assets of the spouses, both in capital and income, after liquidation of the matrimonial regime;

- their existing and foreseeable rights;

- their respective situations as to retirement pensions.

**Art. 272**

In the context of the fixing of a compensatory benefit, by the judge or by the parties, or on the occasion of an application for revision, the parties shall provide the judge with declarations stating on their honour the accuracy of their means, incomes, assets and ways of living.

(Act no 2005-102 of 11 Feb. 2005) When determining the needs and means, the judge may not have regard to the sums paid on the ground of compensation for industrial injuries and to the sums paid on the ground of the right to compensation of a disability.

**Art. 273**

[repealed]

**Art. 274**

The judge shall settle the details according to which a compensatory benefit in capital must be implemented among the following forms:

1° Payment of a sum of money, the divorce judgment being made subject to the establishing of the guarantees provided for in Article 277;

2° Allocation of property for ownership or of a right of use, dwelling or usufruct, temporary or for life, the judgment operating a forced transfer in favour of the creditor. However, the consent of the debtor spouse is required to allocate the ownership of property which he or she received by succession or gift.

**Art. 275**

Where a debtor is not able to pay the capital under the terms of Article 274, the judge shall fix the modes of payment of the capital, within the limit of eight years, in the form of payments made at fixed intervals index-linked in accordance with the rules applicable to periodical payments.

A debtor may request a revision of those modes of payment in case of a considerable change in his or her situation. By way of exception the judge may then, by a special judgment setting out the grounds on which it is based, authorize the payment of the capital on a total period of more than eight years.

[repealed]

A debtor may at any time redeem the balance of the index-linked capital.

After liquidation of the matrimonial regime, the creditor of a compensatory benefit may refer to the judge a claim for payment of the balance of the index-linked capital.

**Art. 275-1**

The modes of payment provided for in Article 275, paragraph 1, are not exclusive of the payment of part of the capital in the forms provided for in Article 274.

**Art. 276**

By way of exception, where the age or state of health of the creditor does not allow him or her to supply to his or her needs, the judge may, by a special judgment setting out the grounds on which it is based, fix the compensatory benefit in the form of a life annuity. He shall have regard to the factors laid down in Article 271.

The amount of the annuity may be reduced, where circumstances so demand, by the allocation of a fraction in capital among the forms provided for in Article 274.

**Art. 276-1**

(Act no 75-617 of 11 July 1975; Act no 2000-596 of 30 June 2000).- An annuity must be linked to an index; the index must be determined as in periodical payments matters.

The amount of an annuity before index-linking must be fixed in a uniform fashion for its entire duration or may vary by successive periods following the likely evolution of needs and means.

**Art. 276-3**

A compensatory benefit fixed in the form of an annuity may be revised, postponed or suppressed in case of an important change in the means or needs of either party.

Revision may not lead to increase the annuity up to an amount superior to the one initially fixed by the judge.

**Art. 276-4**

The debtor of a compensatory benefit in the form of an annuity may at any time refer to the judge an application for replacing all or part of the annuity by a capital. The replacement must be effected according to terms established by décret en Conseil d'Etat.

The creditor of a compensatory benefit may submit the same application where he or she establishes that a modification in the situation of the debtor allows that replacement, in particular at the time of liquidation of the matrimonial regime.

The details of implementation provided for in Articles 274, 275 and 275-1 shall apply. The refusal of the judge to

CIVIL CODE

substitute a capital to all or part of the annuity must be specially reasoned.

### Art. 277

*(Act no 2000-596 of 30 June 2000)*

Irrespective of a statutory or judicial mortgage, the judge may order the debtor spouse to establish a pledge, to give security or to enter into a contract that guarantees the payment of the annuity or capital.

### Art. 278

In case of divorce by mutual consent, the spouses shall fix the amount and terms of the compensatory benefit in the agreement which they submit to the judge for approval. They may lay down that the payment of the benefit will come to an end from the occurrence of a specific event. The benefit may be in the form of an annuity granted for a limited period.

The judge, however, shall refuse to approve the agreement where it fixes unfairly the rights and obligations of the spouses.

### Art. 279

An approved agreement is enforceable at law as is a judicial decision.

It may be modified only by a new agreement between spouses, likewise submitted to approval .

Spouses have nevertheless the power to provide in their agreement that each of them may, in case of an important change in the means or needs of either party, request the judge to revise the compensatory benefit. The provisions of Article 275, paragraphs 2 and 3, and of Articles 276-3 and 276-4 shall also apply, depending on whether the compensatory benefit takes the form of a capital or of a temporary or life annuity.

Save as otherwise provided in the agreement, Articles 280 to 280-2 shall apply.

### Art. 279-1

Where, pursuant to Article 268, the spouses submit for approval by the judge an agreement relating to a compensatory benefit, the provisions of Articles 278 and 279 shall apply.

### Art. 280

On the death of a debtor spouse, payment of a compensatory benefit, whatever its form may be, must be set apart from the succession. Payment must be borne by all the heirs, who may not be liable for it personally, within the limit of the assets of the succession, and in case they are insufficient, by all the specific legatees, in proportion to their emoluments, subject to the provisions of Article 927.

Where a compensatory benefit was fixed under the form of a capital to be paid on the terms set out in Article 275, the balance of this index-linked capital falls immediately due.

Where it was fixed under the form of an annuity, a capital falling immediately due must be substituted. Substitution must be effected under terms fixed by décret en Conseil d'Etat.

### Art. 280-1

Notwithstanding Article 280, the heirs may decide together to maintain the forms and arrangements for payment of the compensatory benefit which was incumbent on the debtor spouse, by obliging themselves personally to the payment of that debt. Under pain of nullity, the agreement must be established by a notarial instrument. It is enforceable against third persons from the time when notice of it is given to the creditor spouse where the latter did not intervene in the instrument.

Where the arrangements for payment of a compensatory benefit have been maintained, the claims provided for in Article 275, paragraph 2, and in Articles 276-3 and 276-4, depending on whether the compensatory benefit takes the form of a capital or of a temporary or life annuity, pertain to the debtor's heirs. The latter may also at any time discharge their debt of the balance of the index-linked capital, where the compensatory benefit takes the form referred to in Article 275, paragraph 1.

### Art. 280-2

Survivor's pensions possibly paid in the deceased spouse's right must be deducted as of right from the amount of the compensatory benefit, where, at the time of the death, it took the form of an annuity. Where the heirs avail themselves of the power referred to in Article 280-1, and unless otherwise decided by the judge, a deduction of the same amount must still be granted where the creditor loses his or her right or suffers a change in his or her right to a survivor's pension.

### Art. 281

The transfers and surrenders provided for in this Subsection must be deemed dependent on the matrimonial regime, whatever their terms of payment may be. They must not be placed on the same footing as gifts.

### Art. 282 to 285

[repealed]

### Art. 285-1

If the premises serving as lodging for the family are the separate or personal property of one spouse, the judge may grant it on lease to the other spouse who exercises alone or in common parental authority over one or several of their children where the latter have their usual residence in these lodgings and their welfare so requires.

The judge shall fix the duration of the lease and may renew it until the coming of age of the youngest child.

The judge may terminate the lease where new circumstances so justify.

CIVIL CODE
**Art. 276-2**
[removed; cf. Art. 280-2]

Paragraph 4
Of Lodging

SECTION III
Of the Consequences of Divorce for the Children                Articles 286 to 287 to
295

**Art. 286**
*(Act no 2002-305 of 4 March 2002)*
The consequences of divorce for the children shall be settled in accordance with the provisions of Chapter I of Title IX of this Book.

**Art. 287 to 295**
[repealed]

CHAPTER IV
Of Judicial Separation                Articles 296 to 309

SECTION I
Of Cases and Proceedings for Judicial Separation                Articles 296 to 298

**Art. 296**
Judicial separation may be granted on application of one of the spouses in the same cases and subject to the same conditions as divorce.

**Art. 297**
*(Act no 2004-439 of 26 May 2004)*
A spouse against whom a petition for divorce is filed may make a counterclaim for judicial separation. However, where the principal claim for divorce is based on irretrievable impairing of the marriage tie, the counterclaim may be only for divorce. A spouse against whom a petition for judicial separation is filed may make a counterclaim for divorce.
[repealed]

**Art. 297-1**
*(Act no 2004-439 of 26 May 2004)*
Where a petition for divorce and a petition for judicial separation are filed concurrently, the judge shall consider first the petition  for divorce. He shall decree divorce where its conditions are met. Failing which, he shall rule on the petition for judicial separation.
However, where these petitions are based on fault, the judge shall consider them simultaneously and, if he entertains them, he shall decree divorce with respect to the two spouses with the blame lying with both spouses.

**Art. 298**
*(Act no 2004-439 of 26 May 2004)*
In addition, the rules contained in Article 228 and in Chapter II above shall apply to the proceedings for judicial separation.

SECTION II
Of the Consequences of Judicial Separation                Articles 299 to 304

**Art. 299**
Judicial separation does not dissolve marriage but it puts an end to the duty of cohabitation.

**Art. 300**
*(Act no 2004-439 of 26 May 2004)*
Each separated spouse keeps the use of the other's name. Nevertheless, they may be forbidden to do so by the judgment of separation or a further judgment, the respective interests of the spouses being taken into account.

**Art. 301**
*(Act no 2004-439 of 26 May 2004)*
In case of death of one of the judicially separated spouses, the other spouse shall keep the rights which the law grants to a surviving spouse. Where judicial separation is granted by mutual consent, the spouses may include in their agreement a renunciation of the rights of succession conferred upon them by Articles 756 to 757-3 and 764 to 766.

**Art. 302**
Judicial separation always involves separation of property.
Concerning property, the date at which judicial separation takes effect is determined as provided for in Articles 262 to 262-2.

**Art. 303**

CIVIL CODE

Judicial separation leaves subsisting the duty of support; the judgment which grants it or a further judgment shall fix the periodical payments owed to the spouse in need.

Those payments shall be allotted irrespective of wrongs. The debtor spouse may nevertheless invoke, if there is occasion, the provisions of Article 207, paragraph 2.

(Act no 2004-439 of 26 May 2004) They shall be subject to the rules of maintenance obligations.

Nevertheless, where the consistency of the property of the debtor spouse so permits, the payments must be replaced, in whole or part, by the establishment of a capital, in accordance with the rules of Articles 274 to 275-1, 277 and 281. Where this capital becomes inadequate to cover the needs of the creditor, the latter may request a complement under the form of periodical payments.

**Art. 304**

Subject to the provisions of this Section, the consequences of judicial separation shall obey the same rules as the consequences of divorce stated in Chapter III above.

SECTION III
Of the End of Judicial Separation                                        Articles 305 to 309

**Art. 305**

Voluntary resumption of community life puts an end to judicial separation.

In order to be effective against third parties, it must either be established by a notarial instrument, or be the subject of a declaration to an officer of civil status. Mention of it shall be made in the margin of the record of marriage"of the spouses, as well as in the margins of their records of birth" (Act no 85-1372 of 13 Dec. 1985).

Separation of property subsists unless the spouses adopt a new matrimonial regime as provided for in Article 1397.

**Art. 306**

On request of one of the spouses, a judgment of judicial separation shall be converted as of right into a judgment of divorce where judicial separation has lasted two years (Act no 2004-439 of 26 May 2004).

**Art. 307**

(Act no 2004-439 of 26 May 2004). In all cases of judicial separation, the latter may be converted into divorce by mutual consent.

Where judicial separation was granted on mutual consent, it may be converted into divorce only by a new joint petition.

**Art. 308**

Because of a conversion, the cause for judicial separation becomes the cause for divorce; the allocation of wrongs is not changed.

The judge shall fix the consequences of divorce. The benefits and payments between spouses shall be determined according to the rules appropriate for divorce.

**Art. 309**

Divorce and judicial separation are governed by French law :
- where both spouses are of French nationality;
- where both spouses have their domicile on French territory;
- where no foreign law considers it should govern whereas French courts have jurisdiction over a divorce or judicial separation case.

**TITLE VII**

**OF PARENT AND CHILD  (I) (Act no 72-3 of 3 Jan. 1972; shall continue in force until   Articles 311\* to 342-8\***
**30 June 2006)**

CHAPTER I
Provisions Common to Legitimate and Illegitimate Children          Articles 311\* to 311-23\*

SECTION I
Of Presumptions Relating to Parentage                            Articles 311\* to 311-3\*

**Art. 311\***

Legislation presumes that a child was conceived during the period that extends from the three-hundredth to the one-hundred and eightieth day, inclusive, before the date of birth.

Conception is presumed to have taken place at any time during that period, depending of what the welfare of the child requires.

Contrary evidence may be adduced to rebut those presumptions.

**Art. 311-1\***

Apparent status shall result from a sufficient collection of facts showing a bond of parentage and relationship between an individual and the family to which he is said to belong.

Apparent status must be continuous.

**Art. 311-2\***

CIVIL CODE

The main ones of those facts shall be:

That the individual has always borne the name of those from whom he is said to descend;

That the latter have treated him as their child, and that he has treated them as his father and mother;

That they have, in that capacity, provided for his education, support and settling;

That he is so recognized in society and by the family;

That public authorities consider him as such.

**Art. 311-3***

Subject to the conditions provided for in Articles 71 and 72 of this Code he parents or the child may apply to the judge of guardianships for an affidavit proving until proof to the contrary the apparent status, without prejudice to any other evidence to which they may resort to establish its existence in court, should it be contested.

(Act no 93-22 of 8 Jan. 1993) The parental bonds established by an apparent status recorded in an affidavit shall be mentioned in the margin of the record of birth of the child.

SECTION II

Of Actions Relating to Parentage                                        Articles 311-4* to
                                                                        311-13*

**Art. 311-4***

No action is admissible as to the parentage of a child who was not born viable.

**Art. 311-5***

The tribunal de grande instance exercising civil jurisdiction shall have exclusive jurisdiction to have cognisance of actions regarding parentage.

**Art. 311-6***

In case of an offence interfering with the parentage of an individual, a criminal action may be ruled upon only after the judgment on the question of parentage has become res judicata.

**Art. 311-7***

Whenever they are not confined by statute within shorter periods, actions regarding parentage are time-barred after thirty years from the day when the individual was deprived of the status that he claims, or began to enjoin the status that is contested against him.

**Art. 311-8***

An action who belonged to an individual as to his parentage may be brought by his heirs only when he died as a minor or within five years after his coming of age or his emancipation.

His heirs may also pursue an action which he had already initiated, unless there was a withdrawal or non-suit.

**Art. 311-9***

An action regarding parentage may not be the subject of a waiver.

**Art. 311-10***

Judgments handed down in matters of parentage are enforceable even against persons who were not parties thereto; but the latter are entitled to file third party applications for rehearing.

Judges may of their own motion require that all the parties concerned against whom they consider judgment should be given be joined in the action.

**Art. 311-11***

Likewise, where in one of the actions granted by Articles 340 and 342 below, a defence [repealed] is raised, based on the fact that the mother had, during the legal period of conception, intercourse with a third party, the judge may order that the latter be joined in the action.

**Art. 311-12***

The courts shall rule on conflicts of parentages for which legislation did not lay down other guidelines by establishing the most probable parentage through any evidence.

Failing adequate means of conviction, they shall have regard to the apparent status.

**Art. 311-13***

In the case where they are constrained to dismiss the claim of a party who actually educated a minor child, the courts may nevertheless, account being taken of the welfare of the child, grant to that party a right of access.

SECTION III

Of the Conflict of Laws Relating to Parentage                          Articles 311-14* to
                                                                        311-18*

**Art. 311-14***

Parentage is governed by the personal law of the mother on the day of birth of the child; where the mother is unknown, by the child's personal law.

**Art. 311-15***

CIVIL CODE

However, where a legitimate child and his father and mother, or an illegitimate child and one of his father and mother have in France their usual common or separate residence, the apparent status has all the consequences it produces according to French law, even when the other elements of the parentage may depend upon a foreign law.

**Art. 311-16\***

Marriage involves legitimation where, on the day when the union is celebrated, that consequence is admitted either by the law governing the effects of marriage, or by the personal law of one of the spouses, or by the child's personal law.

Legitimation on the authority of the court is governed, at the choice of the petitioner, either by the personal law of the latter, or by the child's personal law.

**Art. 311-17\***

A voluntary acknowledgement of paternity or maternity is valid where it was made in accordance with either the personal law of his doer, or the child's personal law.

**Art. 311-18\***

An action for purposes of subsidies is governed, at the choice of the child, by the law of its usual residence or the law of the usual residence of the debtor.

SECTION IV
Of Medically Assisted Procreation                                    Articles 311-19\* to
311-20\*

**Art. 311-19\***
*(Act no 94-653 of 29 July 1994)*

In case of a medically assisted procreation with a third party donor, no parental bonds may be established between the donor and the child born out of the procreation.

No action in tort may lie against a donor.

**Art. 311-20\***
*(Act no 94-653 of 29 July 1994)*

Spouses or unmarried partners who, in order to procreate, resort to a medical assistance requiring the intervention of a third party donor, must, subject to conditions that ensure secrecy, give first their consents to a judge or a notaire who shall inform them of the consequences of their act as regards parentage.

Consent given to a medically assisted procreation prohibits any action for challenging parentage or claiming a status unless it is argued that the child was not born out of the medically assisted procreation or that the consent was deprived of effect.

Consent is deprived of effect in case of death, of the filing of a petition for divorce or judicial separation or of discontinuance of community life, occurred before the realisation of the medically assisted procreation. It is also deprived of effect where the male or the female revokes it in writing and before the realisation of the medically assisted procreation, in the hands of the physician in charge of the implementation of that assistance.

He who, after consenting to medical assistance to procreation, does not acknowledge the child born out of it renders himself liable vis-à-vis the mother and child

Furthermore, may be judicially declared the paternity outside of marriage of him who, after consenting to a medical assistance to procreation, does not acknowledge the child born out of it. The action shall comply with the provisions of Article 340-2 to 340-6.

SECTION V
Of the Rules of Devolution of  Family Name                          Articles 311-21\* to
311-23\*

**Art. 311-21\***
*(Act no 2002-304 of 4 March 2002)*
*(Act no 2003-516 of 18 June 2003)*

Where the parentage of a child has been established with regard to his two parents at the latest on the day of declaration of his birth or afterwards but simultaneously, the parents shall choose the family name which devolves upon him: either the father's name, or the mother's name, or both names coupled in the order they choose within the limit of one family name for each of them. Failing a joint declaration to the officer of civil status mentioning the choice of the name of the child, the latter shall take the name of the parent with regard to whom his parentage has first been established and the father's name where his parentage has been established simultaneously with regard to both.

Where a child of whom one parent at least is French is born abroad, parents who have not availed themselves of the power to choose the name in the way provided for in the preceding paragraph may make such a declaration at the time of the registration of the record, at the latest within three years of the birth of the child.

A name devolving on a first child has effect as to the other common children.

Where the parents or one of them bear a double family name, they may, by a joint written declaration, transmit only one name to their children.

**Art. 311-22\***
*(Act no 2002-304 of 4 March 2002)*

CIVIL CODE
*(Act no 2003-516 of 18 June 2003)*
The provisions of Article 311-21 shall apply to the child who becomes French in compliance with Article 22-1, in the way provided for by a decree in Conseil d'État.

**Art. 311-23\***
*(Act no 2002-304 of 4 March 2002)*
*(Act no 2003-516 of 18 June 2003)*
The power to choose provided for in Articles 311-21 and 334-2 may be exercised only once.

CHAPTER II
Of Legitimate Children                                              Articles 312\* to 330\*

SECTION I
Of the Presumption of Paternity                                  Articles 312\* to 318-2\*

**Art. 312\***
A child conceived in wedlock has the husband as his father.
However, the latter may disavow the child in court, where he proves facts fitted to demonstrate that he cannot be the father.

**Art. 313\***
In case of judgment or even of petition, either for divorce or for judicial separation, the presumption of paternity shall not apply to a child born more than three hundred days after the order authorizing the spouses to live apart, and less than one hundred and eighty days following either the final dismissal of the petition or a reconciliation.
The presumption of paternity regains however its full force, by operation of law, where the child has the apparent status of a legitimate child with regard to the spouses.

**Art. 313-1\***
The presumption of paternity shall be set aside where a child, recorded without indication of the husband's name, has an apparent status only with regard to the mother.

**Art. 313-2\***
Where  the presumption of paternity is set aside in the circumstances provided for in the preceding Articles, the parentage of a child is established with regard to the mother as if there was a disavowal admitted in court.
Each one of the spouses may request that the effects of the presumption of paternity be  reinstated by proving that, during the statutory period of conception, a de facto relationship took place, that renders probable the paternity of the husband."The action may be brought by the child within two years after his coming of age" (Act no 93-22 of 8 Jan. 1993).

**Art. 314\***
A child born before the one-hundred and eightieth day of marriage is legitimate and shall be deemed to have been so as from his conception.
The husband, however, may disavow him as provided for in Article 312.
He may even disavow him on the sole proof of the date of the delivery, unless he knew of the pregnancy before the marriage, or behave like the father after the birth.

**Art. 315\***
The presumption of paternity shall not apply to a child born more than three hundred days after the dissolution of the marriage or, in case of declared absence of the husband, to the one who was born more than three hundred days after the disappearance.

**Art. 316\***
A husband must institute an action in disavowal within six months of the birth, where he is on the spot.
Where he was not on the spot, within six months from his return.
And within six months following the discovery of the fraud, where the birth of the child was concealed from him.

**Art. 316-1\***
Where the husband is dead before having instituted the action, but still being within the prescribed period for doing so, his heirs are entitled to contest the legitimacy of the child.
Their action ceases nevertheless to be admissible where six months have elapsed from the time when the child has taken possession of property claimed to be paternal, or from the time when the child has disturbed them in their own possession.

**Art. 316-2\***
An extra-judicial instrument containing a disavowal on the part of the husband or a contestation of legitimacy on the part of the heirs, is void where it is not followed by an action at law within the period of six months.

**Art. 317\***
*(Act no 93-22 of 8 Jan. 1993)*
An action in disavowal shall be directed, in the presence of the mother, against an ad hoc administrator designated on behalf of the child by the judge of guardianships in the way provided for in Article 389-3.

CIVIL CODE

**Art. 318\***

Even where there is no disavowal, the mother may contest the paternity of the husband, but only for the purpose of legitimation, when she remarried with the true father of the child after dissolution of the marriage.

**Art. 318-1\***

On pain of dismissal, an action, directed against the husband or his heirs, must be joined with an application for legitimation"brought before the tribunal de grande instance" (Act no 93-22 of 8 Jan. 1993).

It must be lodged by the mother and her new spouse within six months of their marriage and before the child has reached the age of seven years.

**Art. 318-2\***

Judgment is given on the two petitions by one and the same ruling
which  may entertain the contestation of legitimacy only where legitimation is admitted.

SECTION II
Of Proofs of Legitimacy                                                                Articles 319\* to 328\*

**Art. 319\***

Parentage of legitimate children is proved by records of birth entered in the registers of civil status.

**Art. 320\***

Failing this instrument, apparent status of a legitimate child is sufficient.

**Art. 321\***

There is apparent status of a legitimate child where it binds the child indivisibly to his father and mother.

**Art. 322\***

No one may claim a status contrary to that which is given to him by his record of birth and an apparent status consistent with that record.

And reciprocally, no one may contest the status of a person who has an apparent status consistent with his record of birth.

**Art. 322-1\***

If however it is alleged that there was a setting up of a supposititious child, or a substitution, even unintentional, either before, or after the drafting of the birth record, proof of it is admissible and may be made by any means.

**Art. 323\***

Failing record and apparent status, or where the child was entered, either under false names or without indication of the mother's name, proof of the parentage"may be judicially made only where there exist presumptions or circumstantial evidence serious enough to allow its being admissible." (Act no 93-22 of 8 Jan. 1993).
[repealed]

**Art. 324 \***

[repealed]

**Art. 325\***

Contrary proof may be made by any appropriate means to establish that the claimant is not the child of the mother whom he claims to have or even, maternity being proved, that it is not the child of the mother's husband.

Where the husband was not joined in the case for the claiming of status, he may contest his paternity within a period of six months after the day when he knew of the judgment which entertained the petition of the child having become res judicata.

**Art. 326\***

Without waiting for a claim of status to be instituted by the child, the husband may, by any means, contest his paternity within a period of six months after the day when he knew of the birth.

**Art. 327\***

After the death of the husband, his heirs are likewise entitled to contest his paternity, either as a precautionary step where the husband was still in the prescribed period for doing so, or in defence to a claim of status.

**Art. 328\***

The spouses, separately or jointly, may, by bringing in proof as provided for in Article 323 above, claim a child as their own; but if the latter already has an established parentage, they must first demonstrate its inaccuracy, supposing that the case is one of those in which the law authorizes that demonstration.

SECTION III
Of Legitimation                                                                          Articles 331\* to 330\*

**Art. 329\***

*(Act no 93-22 of 8 Jan. 1993)*
Legitimation may benefit all illegitimate children provided that their parentage has been lawfully established.

**Art. 330\***

CIVIL CODE

Legitimation takes place either by marriage of the parents, or on the authority of the court.

Paragraph 1
Of Legitimation by Marriage                                    Articles 331* to 332-1*

**Art. 331***

All children born out of wedlock,"even deceased" (Act no 93-22 of 8 Jan. 1993), are legitimated by operation of law by the subsequent marriage of their parents.

Where their parentage was not already established, those children must be the subject of an acknowledgement at the moment of celebration of the marriage. In that event, the officer of civil status who performs the celebration shall take note of the acknowledgement and of the legitimation in a separate record.

**Art. 331-1***

Where the parentage of an illegitimate child was established with regard to his father and mother or one of them only after their marriage, legitimation may take place only by virtue of a judgment.

That judgment shall state that the child has, since the celebration of the marriage, enjoyed the apparent status of their common child.

**Art. 331-2***

Any legitimation shall be mentioned in the margin of the record of birth of the legitimated child.

That mention may be required by any party concerned. In the case of Article 331, the officer of civil status shall provide for it himself, where he had knowledge of the existence of the children.

(Act no 93-22 of 8 Jan. 1993) The mention of the legitimation on the record of birth of an adult child is of no effect on his"family name" (Act no 2002-304 of 4 March 2002) where the record does not contain in addition mention of the consent of the party concerned to the modification of his"family name" (Act no 2002-304 of 4 March 2002).

**Art. 332 ***

[repealed]

**Art. 332-1***

Legitimation confers on a legitimated child the rights and duties of a legitimate child.

By means of a joint declaration produced at the time of the celebration of the marriage or ascertained by the court, the parents are entitled to the option provided for in Article 311-21, if parentage has been established in the way provided for in Article 334-1 and if they did not avail themselves of the power given by Article 334-2 (Act no 2002-304 of 4 March 2002; Act no 2003-516 of 18 June 2003)."Legitimation however may not have the effect of modifying the"family name" (Act no 2002-304 of 4 March 2002; Act no 2003-516 of 18 June 2003) of an adult child without his consent" (Act no 93-22 of 8 Jan. 1993).

It takes effect from the date of the marriage.

Paragraph 2
Of Legitimation on the Authority of the Court              Articles 333* to 333-6*

**Art. 333***

Where it appears that a marriage is impossible between the two parents, the benefit of legitimation may yet be conferred on the child on the authority of the court provided that he has, with regard to the parent who so requests, the apparent status of an illegitimate child.

**Art. 333-1***

A petition for purposes of legitimation must be initiated by one of the two parents or by both jointly before the tribunal de grande instance.

**Art. 333-2***

Where one of the parents was, at the time of conception, in bonds of a wedlock which is not dissolved, his or her petition is admissible only with the consent of her or his spouse.

**Art. 333-3***

The court shall verify whether the statutory conditions are fulfilled and, after receiving or inducing, if there is occasion, the comments of the child himself, of the other parent where he or she is not a party to the petition, as well as that of the spouse of the petitioner, it shall pronounce the legitimation, if it considers it is justified.

**Art. 333-4***

A legitimation on the authority of the court takes effect at the date of the judgment which pronounces it finally.

Where it took place on petition of one of the parents, it does not have any effect with regard to the other; it does not involve change of the"family" (Act no 2002-304 of 4 March 2002) name of the child, unless the court otherwise decides.

**Art. 333-5***

Where legitimation on the authority of the court was pronounced with regard to both parents,"the family name of the child is determined under the rules laid down by Articles 311-21 and 311-23" (Act no 2002-304 of 4 March 2002); where he is a minor" the court shall rule on the terms of exercise of parental authority" (Act no 87-750 of 22 July 1987) as in matters of divorce.

CIVIL CODE

**Art. 333-6***

The provisions of Article 331-2 and of the first two paragraphs of Article 332-1 shall apply to legitimation on the authority of the court (Act no 2002-304 of 4 March 2002).

CHAPTER III
Of Illegitimate Children                                                      Articles 334* to 342-8*

SECTION I
Of the Effects of Illegitimacy and of the Modes of Establishing Illegitimate          Articles 334* to 334-10*
Kinship in General

**Art. 334***

[repealed]
[deleted]

**Art. 334-1***

An illegitimate child acquires the name of the parent with regard to whom his parentage has been established in the first place. [repealed]

**Art. 334-2***

"Where the name of an illegitimate child was not transmitted in the way provided for in Article 311-21, his parents may, by means of a joint declaration made before the officer of civil status, choose during his minority whether they will substitute to it the family name of the parent with regard to whom parentage was established in the second place, or couple their two names, in the order they choose, within the limit of one family name for each of them. Mention of the change of name shall appear in the margin of the record of birth." (Act no 2002-304 of 4 March 2002; Act no 2003-516 of 18 June 2003).

Where the child is over"thirteen" (Act no 93-22 of 8 Jan. 1993) years old, his personal consent is required.

**Art. 334-3***

(Act no 93-22 of 8 Jan. 1993) "In the other cases, the change of name of an illegitimate child must be requested to the family causes judge. However, the tribunal de grande instance seized of a request for the change of status of an illegitimate child may in one and the same judgment rule on it and on the application for the change of name of the child that was brought before it".

An action be instituted during the minority of the child and within two years following either its coming of age, or a modification brought about in his status.

**Art. 334-4***

The substitution of name extends as of right to the minor children of the party concerned. It extends to adult children only with their consent.

**Art. 334-5***

"Failing established maternity or paternity, the father's wife or the mother's husband according to the circumstances may confer by substitution her or his family name to the child by a declaration made jointly with the other spouse, subject to the conditions set out in Article 334-2. Subject to the same conditions, the coupled names of both spouses may also be conferred on the child in the order they have chosen and within the limit of one name for each of them" ( Act no 2002-304 of 4 March 2002).

The child may however request to take back the name which he bore before, through a petition submitted to the"family causes judge" (Act no 93-22 of 8 Jan. 1993), within two years following his coming of age.

**Art. 334-6***

The rules for attributing a name provided for in the preceding Articles shall not prejudice the effects of an apparent status.

**Art. 334-7 ***

[repealed]

**Art. 334-8***

*(Act no 82-536 of 25 June 1982)*
Illegitimate parentage is lawfully established by voluntary acknowledgement.
Illegitimate parentage may also be lawfully established by an apparent status or by the effect of a judgment.

**Art. 334-9***

An acknowledgement is void, a paternity or maternity action is not admissible, where the child has a legitimate prentage already established by an apparent status.

**Art. 334-10***

Where there exists between the father and mother of the illegitimate child one of the impediments to marriage provided for by Articles 161 and 162 above by reason of kinship, if parentage is already established with regard to the one, it is forbidden to establish parentage with regard to the other.

SECTION II

CIVIL CODE
Of the Acknowledgement of Illegitimate Children                                   Articles 335* to 339*

**Art. 335***
*(Act no 93-22 of 8 Jan. 1993)*
Acknowledgment of an illegitimate child may be made in the record of birth, by an instrument received by the officer of civil status or by any other authentic instrument.
The instrument shall contain the statements provided for in Article 62.
(Act no 96-604 of 5 July 1996) It shall also contain a mention that the maker of the acknowledgement was informed of the divisible character of the bond of illegitimate kinship.

**Art. 336***
An acknowledgement of the father without indication of the mother and admission on her part, has effect only with regard to the father.

**Art. 337***
A record of birth designating the mother is deemed to be an acknowledgment, where it is corroborated by an apparent status.

**Art. 338***
So long as it is not contested in court, an acknowledgement renders inadmissible the establishing of another parentage which contradicts it.

**Art. 339***
An acknowledgement may be contested by all persons having an interest therein, including his maker.
An action may also be instituted by the Government procurator's office where circumstantial evidence based on the instruments themselves renders improbable the declared paternity or maternity."It may likewise be instituted where acknowledgement was made for evading the rules which govern adoption" (Act no 96-604 of 5 July 1996).
Where there exists an apparent status which is consistent with the acknowledgement and has lasted at least ten years after it, no contestation is any longer admissible, unless on the part of the other parent, of the child himself or of those who claim to be the true parents.

SECTION III
Of Paternity or Maternity Suits                                               Articles 340* to 341-1*

**Art. 340***
*(Act no 93-22 of 8 Jan. 1993)*
Paternity out of wedlock may be judicially declared.
Proof of it may be made only where there exist serious presumptions or circumstantial evidence.

**Art. 340-1***
[repealed]

**Art. 340-2***
The action belongs only to the child.
During the minority of the child, the mother, albeit a minor, is alone entitled to institute it.
Where the mother did not acknowledge the child, where she is dead or unable to express her intention, the action shall be instituted as provided for in Article 464, paragraph 3, of this Code.

**Art. 340-3***
*(Act no 93-22 of 8 Jan. 1993)*
An action to establish paternity must be brought against the  alleged father or against his heirs; in the absence of heirs or where they have renounced the succession, against the State, the renouncing heirs being nevertheless joined in the action in order to maintain their rights.

**Art. 340-4***
An action must be instituted within two years after the child's birth, on pain of lapse.
(Act no 93-22 of 8 Jan. 1993) Where however the alleged father and the mother have lived, during the statutory period of conception, in a state of concubinage involving, in the absence of community life, an enduring or continuous relationship, the action may be instituted until the expiry of a period of two years following the ending of the concubinage. Where the alleged father contributed to the support, the education or the settling of the child in the capacity of a father, the action may be instituted until the expiry of a period of two years following the ending of that contribution.
Where an action was not instituted during the minority of the child, the latter may institute it during two years after his coming of age.

**Art. 340-5***
Where it entertains the action, the court may, on petition of the mother, order the father to reimburse her for all or part of her maternity and support expenses during the three months preceding and the three months following the birth, without prejudice to damages she may claim under Articles 1382 and 1383.

**Art. 340-6***

CIVIL CODE

The court shall rule, if there is occasion, on the attribution of name and on parental authority, under Articles 334-3 and"372" (Act no 2002-305 of 4 March 2002).

**Art. 340-7\***

When dismissing the petition, the judges may, however, allow subsidies to the child, if the relationship between the mother and the defendant was proved in the way provided for in Articles 342 and following.

**Art. 341\***

*(Act no 93-22 of 8 Jan. 1993)*

Maternity suits are allowed subject to Article 341-1.

The child who brings the action must prove that he is the one to whom the alleged mother has given birth.

(Act no 93-22 of 8 Jan. 1993) Proof of it may be made only where there exist serious presumptions or circumstantial evidence.

**Art. 341-1\***

*(Act no 93-22 of 8 Jan. 1993)*

After a child's birth, his mother may request that the secrecy as to her admittance and identity be preserved.

SECTION IV

Of the Action for Purpose of Subsidies                                         Articles 342\* to 342-8\*

**Art. 342\***

An illegitimate child whose paternal parentage is not lawfully established may claim subsidies to the one who had a relationship with his mother during the statutory period of conception.

(Act no 77-1456 of 29 Dec. 1977) An action may be instituted during the whole minority of the child; the latter may still institute it within two years following his coming of age where it was not done during his minority.

An action is admissible even where the father or mother were, at the time of the conception, in the bonds of a wedlock with another person, or if there existed between them an impediment to marriage governed by Articles 161 to 164 of this Code.

**Art. 342-1\***

An action for purpose of subsidies may also be instituted by the child of a married woman, where his record of legitimate child is not corroborated by an apparent status.

Art.342-2

Subsidies shall be settled, in the form of periodical payments, according to the needs of the child, the means of the debtor and his family situation.

Periodical payments may be owed beyond the coming of age of the child, where he is still in need, unless that circumstance is imputable to his fault.

**Art. 342-3\***

Where there is occasion to apply Article 311-11 above, the judge, failing other factors for decision, has the discretion to impose on the defendants an indemnity intended to ensure the support and education of the child, where faults are established against them or commitments were previously entered into by them.

That indemnity shall be collected by the Children's aid service, a public-interest organization or a judicial agent bound to professional secrecy, who will pay it over to the statutory representative of the child. The terms of this collecting and of this paying over shall be fixed by decree.

The provisions governing subsidies shall apply to that indemnity as to other issues.

**Art. 342-4\***

*(Act no 93-22 of 8 Jan. 1993)*

A defendant may defeat a claim by proving by any means that he cannot be the father of the child.

**Art. 342-5\***

The responsibility of subsidies shall be transmitted to the succession of the debtor under the rules of Article"767" (Act no 2001-1135 of 3 Dec. 2001).

**Art. 342-6\***

Articles 340-2, 340-3 and 340-5 above shall apply to an action for purpose of subsidies.

**Art. 342-7\***

A judgment which awards subsidies creates between the debtor and the beneficiary, as well as, if there is occasion, between each of them and the parents or the spouse of the other, the impediments to marriage regulated by Articles 161 to 164 of this Code.

**Art. 342-8\***

Res judicata on an action for purpose of subsidies gives rise to no bar to proceedings against a subsequent paternity suit.

The award of subsidies ceases to have effect where the paternal parentage of the child happens to be established subsequently with regard to someone else than the debtor.

   **TITLE VII**

CIVIL CODE

**OF PARENT AND CHILD (I) (Ord. no 2005-759 of 4 July 2005; shall come into force      Articles 311 to 310 on 1 July 2006)**

### Article 310
*(Act no 2002-305 of 4 March 2002)*
All children whose parentage is lawfully established have the same rights and the same duties in their relations with their father and mother. They enter into the family of each of them.

CHAPTER I
General Provisions                                                                                Articles 311 to 310-2

### Article 310-1
Subject to the conditions under Chapter II of this Title, parentage is lawfully established by operation of law, by voluntary acknowledgement or by possession of status recorded in an affidavit.
It may also established by judgment subject to the conditions provided for in Chapter III of this Title.

### Article 310-2
Where there exists between the father and mother of the child one of the prohibitions to marriage due to lineage laid down by Articles 161 and 162, if parentage is already established with respect to one of them, it is prohibited to establish parentage with respect to the other by any means whatever.

SECTION I
Of Proofs and Presumptions                                                          Articles 311 to 311-3 to 311-13

### Article 311
*(Act no 72-3 of 3 Jan. 1972)*
Legislation presumes that a child was conceived during the period that extends from the three-hundredth to the one-hundred and eightieth day, inclusive, before the date of birth.
Conception is presumed to have taken place at any time during that period, depending on what the welfare of the child requires.
Contrary evidence may be adduced to rebut those presumptions.

### Article 311-1
Apparent status shall result from a sufficient collection of facts showing a bond of parentage and relationship between a person and the family to which he is said to belong.
The main ones of those facts shall be:
1° That the person has been treated by the one or ones from whom he is said to descend as their child, and that he has treated them as his parent or parents;
2° That they have, in that capacity, provided for his education, support or settling;
3° That the person is recognized  as their child in society and by the family;
4° That public authorities consider him as such;
5° That he bears the name of those from whom he is said to descend.

### Article 311-2
Apparent status must be continuous, peaceful, public and unequivocal.

### Article 310-3
Parentage is proved by the record of birth of the child, by the instrument of acknowledgement or by the act of notoriety recording the possession of status.
Where a claim is instituted under Chapter III of this Title, parentage is proved and contested by any means, subject to the admissibility of the claim.

### Articles 311-3 to 311-13]
[repealed or renumbered]

SECTION II
Of the Conflict of Laws Relating to Parentage                                Articles 311-14 to 311-18

### Article 311-14
*(Act no 72-3 of 3 Jan. 1972)*
Parentage is governed by the personal law of the mother on the day of the child's birth; where the mother is unknown, by the child's personal law.

### Article 311-15
However, where a child and his father and mother or any one of them have their usual common or separate residence in France, the apparent status has all the consequences it produces according to French law, even when the other elements of the parentage may depend upon a foreign law.

CIVIL CODE

**Article 311-16**
[repealed]

**Article 311-17**
*(Act no 72-3 of 3 Jan. 1972)*
A voluntary acknowledgement of paternity or maternity is valid where it was made in accordance with either the personal law of his or her doer, or the child's personal law.

**Article 311-18**
*(Act no 72-3 of 3 Jan. 1972)*
A claim for purposes of subsidies is governed, at the choice of the child, by the law of its usual residence or the law of the usual residence of the debtor.

SECTION III
Of Medical Assistance to Procreation                                    Articles 311-19 to 311-20

**Article 311-19**
*(Act no 94-653 of 29 July 1994)*
In case of a medically assisted procreation with a third party donor, no parental bonds may be established between the donor and the child born of the procreation.
No claim in tort may lie against a donor.

**Article 311-20**
*(Act no 94-653 of 29 July 1994)*
Spouses or unmarried partners who, in order to procreate, resort to a medical assistance requiring the intervention of a third party donor, must, subject to conditions that ensure secrecy, give first their consents to a judge or a notaire who shall inform them of the consequences of their act as regards parentage.
Consent given to a medically assisted procreation prohibits any action "for claiming or challenging parentage" (Ord. no 2005-759 of 4 July 2005) unless it is argued that the child was not born of the medically assisted procreation or that the consent was deprived of effect.
Consent is deprived of effect in case of death, of the filing of a petition for divorce or judicial separation or of discontinuance of community life, occurred before the carrying out of the medically assisted procreation. It is also deprived of effect where the male or the female revokes it in writing and before the carrying out of the medically assisted procreation, in the hands of the physician in charge of the implementation of that assistance.
He who, after consenting to medical assistance to procreation, does not acknowledge the child born of it renders himself liable vis-à-vis the mother and child
(Ord. no 2005-759 of 4 July 2005) Furthermore, his paternity is judicially declared. The action shall comply with the provisions of Articles 328 and 331.

SECTION IV
Of the Rules of Devolution of Family Name                               Articles 311-21 to 311-24

**Article 311-21**
*(Act no 2002-304 of 4 March 2002; Act no 2003-516 of 18 June 2003)*
Where the parentage of a child has been established with respect to his two parents at the latest on the day of declaration of his birth or afterwards but simultaneously, the parents shall choose the family name which devolves upon him: either the father's name, or the mother's name, or both names coupled in the order they choose within the limit of one family name for each of them. Failing a joint declaration to the officer of civil status mentioning the name chosen for the child, the latter shall take the name of the parent with respect to whom his parentage has first been established and the father's name where his parentage has been established simultaneously with respect to both.
When a child one parent of whom at least is French is born abroad, parents who have not availed themselves of the power to choose the name in the way provided for in the preceding paragraph may make such a declaration at the time of the registration of the record, at the latest within three years of the child's birth.
(Ord. no 2005-759 of 4 July 2005) Where this Article or Article 311-23, paragraph 2, have been applied to a common child, the name previously devolved or chosen goes for the other common children.
Where the parents or one of them bear a double family name, they may, by a joint written declaration, transmit only one name to their children.

**Article 311-22**
*(Act no 2002-304 of 4 March 2002; Act no 2003-516 of 18 June 2003)*
The provisions of Article 311-21 shall apply to the child who becomes French in compliance with Article 22-1, in the way provided for by a decree in Conseil d'Etat.

**Article 311-23**
Where parentage is established only with respect to one parent on the date of the declaration of birth, the child shall take that parent's name.

CIVIL CODE

When establishing the second bond of parentage and during the minority of the child, the parents may, by a joint declaration before the officer of civil status, choose either to substitute to him the family name of the parent with respect to whom parentage has been established in the second place, either to couple their two names, in the order they choose, within the limit of one family name for each of them. The change of name shall be mentioned in the margin of the record of birth.

However, when Article 311-21 or the second paragraph of this Article has already been applied with respect to another common child, the declaration of change of name may have no other effect than giving the name previously devolved or chosen.

If the child is over thirteen years of age, his personal consent is required.

**Article 311-24**

The power to choose provided for in Articles 311-21 and 311-23 may be exercised only once.

CHAPTER II
Of the Establishment of Parentage                                        Articles 311-25 to 317

SECTION I
Of the Establishment of Parentage by Operation of Law            Articles 311-25 to 315

Paragraph 1
Of the Designation of  the Mother in the Record of Birth            Article 311-25

**Article 311-25**

Parentage is established, with respect to the mother, by the designation of the latter in the record of birth.

Paragraph 2
Of the Presumption of Paternity                                        Articles 312 to 315

**Article 312**

A child conceived or born in wedlock has the husband as his father.

**Article 313**

In case of petition for divorce or for judicial separation, the presumption of paternity shall not apply to a child born more than three hundred days after the date of  either the approval of the agreement which regulates the whole consequences of the divorce or of the provisional measures taken under Article 250-2, or of the ordonnance de non-conciliation, and  less than one hundred and eighty days following either the final dismissal of the petition or a reconciliation.

The presumption of paternity regains however its full force, as of right, where the child has the apparent status of a legitimate child with regard to each spouses and where paternity is not established with respect to a third person.

**Article 314**

The presumption of paternity shall be set aside where the record of birth of the child does not indicate the husband as the father and the child has no apparent status with respect to him..

**Article 315**

Where  the presumption of paternity is set aside in the circumstances provided for in Articles 313 and 314, its effects may be reinstated in court in the way provided for in Article 329.

SECTION II
Of the Establishment of Parentage by Acknowledgement            Article 316

**Article 316**

Where parentage is not established in the way provided for in Section I of this Chapter, it may be so by an acknowledgement of paternity or maternity, made before or after the birth.

An acknowledgement establishes parentage only with respect to his or her author.

It may be made in the record of birth, by instrument received by the officer of civil status or by any other authentic instrument.

The instrument shall contain the statements set out in Article 62 and the mention that the author of the acknowledgement has been informed of the divisible character of the parental bond so established.

SECTION III
Of the Establishment of Parentage by Apparent Status            Article 317

**Article 317**

Each parent or the child may request the judge to issue, in the way provided for in Articles 71 and 72, an affidavit which will be proof of the apparent status until evidence contrary to it.

Where the alleged parent is deceased before the declaration of birth of the child, the affidavit may be issued if a sufficient collection of facts within the meaning of Article 311-1 is proved.

The issue of an affidavit may be requested only within a period of five years as from the ending of the alleged apparent status.

CIVIL CODE

The parentage established by an apparent status recorded in an affidavit shall be mentioned in the margin of the child's record of birth.

CHAPTER III
Of Claims Relating to Parentage                                    Articles 318 to 338 to 341-1

SECTION I
General Provisions                                                 Articles 318 to 324

**Article 318**
*(Act no 72-3 of 3 Jan. 1972)*
No action is admissible as to the parentage of a child who was not born viable.

**Article 318-1**
*(Act no 72-3 of 3 Jan. 1972)*
The tribunal de grande instance  exercising civil jurisdiction shall have exclusive jurisdiction to have cognisance of actions regarding parentage.

**Article 319**
In case of an offence interfering with the parentage of a person, a criminal action may be ruled upon only after the judgment on the question of parentage has become res judicata.

**Article 320**
As long as it has not been contested in court, a lawfully established parentage is a bar to establishing another parentage which would contradict it.

**Article 321**
Whenever they are not confined by statute within another period, claims regarding parentage are time-barred after ten years as from the day when the person was deprived of the status that he claims, or began to enjoy the status that is contested against him. With respect to the child, that period is suspended during his minority.

**Article 322**
A claim may be brought by the heirs of a person deceased before the expiry of the period of time which was fixed to the latter to sue.
His heirs may also pursue a claim he has already initiated, unless there was a withdrawal or non-suit.

**Article 323**
*(Act no 72-3 of 3 Jan. 1972)*
A claim regarding parentage may not be the subject of a waiver.

**Article 324**
Judgments handed down in matters of parentage are enforceable against persons who were not parties thereto. The latter are entitled to file third party applications for rehearing  within the period of time specified in Article 321 if they were entitled to institute the claim.
(Act no 72-3 of 3 Jan. 1972) Judges may of their own motion require that all the parties concerned against whom they consider judgment should be given be joined in the claim.

SECTION II
Of Claims for Purpose of Establishing Parentage                    Articles 325 to 331

**Article 325**
Failing record and apparent status, maternity suit is allowed subject to the application of Article 326.
The claim is reserved to the child who is bound to prove that he is the one to whom the alleged mother has given birth.

**Article 326**
*(Act no 93-22 of 8 Jan. 1993)*
After a child's birth, his mother may request that the secrecy as to her admittance and identity be preserved.

**Article 327**
Paternity out of wedlock may be judicially declared.
The claim for purpose of establishing paternity is reserved to the child.

**Article 328**
The parent, even under age, with respect to whom parentage is established, is alone entitled to institute a maternity or paternity suit during the child's minority.
Where no parental bond is established, or where that parent is dead or unable to express his or her intention, the claim is instituted as provided for in Article 464, paragraph 3.
The claim is brought against the alleged parent or his or her heirs. In the absence of heirs or where they have renounced succession, it is brought against the State. The renouncing heirs shall be joined in the proceedings in order

CIVIL CODE

to maintain their rights.

**Article 329**

Where the presumption of paternity has been set aside under Articles 313 or 314, each one of the spouses may, during the minority of the child, request that its effects be reinstated by proving that the husband is the father. The claim may be brought by the child within ten years after his coming of age.

**Article 330**

An apparent status may be established on request of any person having an interest thereto within the period of time specified in Article 321.

**Article 331**

Where a claim is brought under this Section, the court shall rule, if there is occasion, on the exercise of parental authority, the contribution to the support and education of the child and the attribution of the name.

SECTION III

Of Claims for Contesting Parentage                                     Articles 332 to 338 to 341-1

**Article 332**

Maternity may be contested by proving that the mother did not give birth to the child.

Paternity may be contested by proving that the husband or the author of the acknowledgement is not the father.

**Article 333**

Where the apparent status is consistent with the record, the claim may be brought only by the child, one of his father and mother or the person who alleges to be the true parent. The claim is time-barred after five years as from the day when the apparent status came to an end.

No one may contest a parentage where the apparent status consistent with the record has lasted at least five years as from the birth or the acknowledgement, if the latter was made later on.

**Article 334**

Failing an apparent status consistent with the record, a claim for contesting parentage may be brought by any person who has an interest thereto within the period of time specified in Article 321.

**Article 335**

A parentage established by an apparent status recorded in an affidavit may be contested by any person who has an interest thereto by adducing contrary proof, within a period of time of five years as from the issuing of the instrument.

**Article 336**

A lawfully established parentage may be contested by the government procurator where circumstantial evidence drawn from the instruments themselves renders it unlikely or in case of fraud upon legislation.

**Article 337**

Where it entertains a claim for contesting parentage, a court may, for the welfare of the child, fix the details of the relations between the latter and the person who was bringing him up.

**Articles 338 to 341-1**

[repealed or renumbered]

CHAPTER IV

Of Claim for Purpose of Subsidies                                     Articles 342 to 342-8

**Article 342**

*(Act no 72-3 of 3 Jan. 1972)*

A [...] child whose paternal parentage is not lawfully established may claim subsidies to him who had intercourse with his mother during the statutory period of conception.

*(Act no 77-1456 of 29 Dec. 1977)* A claim may be instituted during the whole minority of the child; the latter may still institute it within two years following his coming of age where it was not done during his minority.

A claim is admissible even where the father or mother were, at the time of the conception, in the bonds of a wedlock with another person, or if there existed between them an impediment to marriage governed by Articles 161 to 164 of this Code.

**Article 342-1**

[repealed]

**Article 342-2**

*(Act no 72-3 of 3 Jan. 1972)*

Subsidies shall be settled, in the form of periodical payments, according to the needs of the child, the means of the debtor and his family situation.

Periodical payments may be owed beyond the coming of age of the child, where he is still in need, unless that circumstance is imputable to his fault.

CIVIL CODE

**Article 342-3**

[repealed]

**Article 342-4**

*(Act no 93-22 of 8 Jan. 1993)*

A defendant may defeat a claim by proving by any means that he cannot be the father of the child.

**Article 342-5**

*(Act no 72-3 of 3 Jan. 1972)*

The responsibility of subsidies shall be transmitted to the succession of the debtor under the rules of Article "767" (Act no 2001-1135 of 3 Dec. 2001).

**Article 342-6**

*(Act no 77-1456 of 29 Dec. 1977)*

"Articles 327, paragraph 2, and 328" (Ord. no 2005-759 of 4 July 2005) above shall apply to a claim for purpose of subsidies.

**Article 342-7**

*(Act no 72-3 of 3 Jan. 1972)*

A judgment which awards subsidies creates between the debtor and the beneficiary, as well as, if there is occasion, between each of them and the parents or the spouse of the other, the impediments to marriage regulated by Articles 161 to 164 of this Code.

**Article 342-8**

*(Act no 72-3 of 3 Jan. 1972)*

Res judicata on a claim for purpose of subsidies gives rise to no bar to proceedings against a subsequent paternity suit.

The award of subsidies ceases to have effect where the paternal parentage of the child happens to be established subsequently with regard to someone else than the debtor.

**TITLE VIII**
**OF ADOPTION**                                                          **Articles 343 to 370-5**

CHAPTER I
Of Plenary Adoption                                                      Articles 343 to 359

SECTION I
Of the Requisites for Plenary Adoption                                   Articles 343 to 350

**Art. 343**

*(Act no 96-604 of 5 July 1996)*

Adoption may be petitioned by two spouses not judicially separated , married for more than two years or who are both older than twenty-eight years.

**Art. 343-1**

Adoption may be also petitioned by a person over"twenty-eight years of age" (Act no 96-604 of 5 July 1996).

Where the adopter is married and not judicially separated, his or her spouse's consent is required unless this spouse is unable to express his or her intention.

**Art. 343-2**

*(Act no 76-1179 of 22 Dec. 1976)*

The requirement as to age provided for in the preceding Article is not imposed in the case of adoption of the spouse's child.

**Art. 344**

The adopters must be fifteen years older than the children whom they propose to adopt. Where the latter are their spouse's children the required difference of age is only ten years.

(Act no 76-1179 of 22 Dec. 1976) The court may, however, if there are good reasons, make an adoption order where the difference in ages is smaller than that provided for by the preceding paragraph.

**Art. 345**

Adoption is allowed only in favour of children under fifteen, who have been received in the home of the adopter or adopters for at least six months.

Where however the child is older than fifteen and has been received before having reached that age by persons who did not fulfil the statutory requirements for adopting or where he was the subject of an ordinary adoption before reaching that age, plenary adoption may be applied for if the conditions for it are fulfilled,"during the minority of the child and within two years following his coming of age" (Act no 96-604 of 5 July 1996).

Where it is older than"thirteen" (Act no 76-1179 of 22 Dec. 1976), an adopted must personaly consent to his plenary adoption.

**Art. 345-1**

CIVIL CODE
*(Act no 96-604 of 5 July 1996)*
Plenary adoption of the spouse's child is allowed:
1° Where the child has a lawfully established parentage only with regard to that spouse;
2° Where the parent other than the spouse has been totally deprived of parental authority;
3° Where the parent other than the spouse is dead and has left no ascendant of the first degree or where the latter obviously took no further interest in the child.

## Art. 346

No one may be adopted by several persons unless by two spouses.
(Act no 76-1179 of 22 Dec. 1976) However, a new adoption may be ordered either after the death of the adopter or the two adopters, or after the death of one of the two adopters if the request is made by the new spouse of the survivor.

## Art. 347

May be adopted:
1° Children to the adoption of whom the father and mother or the family council have validly consented;
2° Wards of the State;
3° Children declared abandoned in the way provided for in Article 350.

## Art. 348

Where the parentage of a child is established with regard to his father and mother, the latter must both consent to the adoption.
Where one of them is dead or unable to express his or her consent or has lost his or her rights of parental authority, the consent of the other suffices.

## Art. 348-1

Where the parentage of a child is established only with regard to one of his parents, that one shall give the consent to adoption.

## Art. 348-2

Where the father and mother of the child are dead, unable to express their intention or deprived of their rights of parental authority, consent shall be given by the family council, after advice of the person who actually takes care of the child.
It shall be likewise where the parentage of the child is not established.

## Art. 248-3

Consent to the adoption shall be given"before the clerk in chief" (Act no 95-424 of 8 Feb. 1995) of the tribunal d'instance of the domicile or residence of the person who consents, or before a French or foreign notaire, or before French diplomatic or consular agents. It may also be received by the Children's aid service where the child was entrusted to them.
Consent to adoption may be withdrawn within"two months" (Act no 96-604 of 5 July 1996). Withdrawal must be made by registered letter with request for advice of delivery addressed to the person or service that received the consent to adoption. The handing over of the child to his parents on even verbal request shall also be treated as proof of the withdrawal.
Where, on the expiry of the period of"two months" (Act no 96-604 of 5 July 1996), consent was not withdrawn, the parents may still request restitution of the child, provided that he has not been placed for purpose of adoption. Where the person who received him refuses to give him back, the parents may refer the matter to the court which, taking into account the welfare of the child, shall determine whether there is occasion to order his restitution. By effect of restitution, a consent to adoption lapses.

## Art. 348-4

*(Act no 96-604 of 5 July 1996)*
Where the father and mother or the family council consent to the adoption of a child by entrusting him to the Children's aid service or to a body authorized for adoption, the choice of the adopter is left to the guardian with the agreement of the family council of the wards of the State or of the family council of the guardianship organized on the initiative of the body authorized for adoption.

## Art. 348-5

Except where there exists a bond of relationship by blood or by marriage up to the sixth degree inclusive between the adopter and the adoptee, the consent to adoption of children under two years old is valid only if the child was actually entrusted to the Children's aid service"or to a body authorized for adoption" (Act no 96-604 of 5 July 1996).

## Art. 348-6

The court may make an adoption order where it considers abusive the refusal of consent raised by the [...] parents or by one of them only, when they took no further interest in the child at the risk of endangering his health or morality.
It shall be likewise in case of abusive refusal of consent by the family council.

## Art. 349

As regards the wards of State whose parents did not consent to an adoption, consent shall be given by the family council of those wards.

CIVIL CODE

**Art. 350**

*(Act no 96-604 of 5 July 1996)*

A child received by a private person, a body or a Children's aid service, whose parents obviously took no further interest to him during the year preceding the institution of a petition for declaration of abandonment, shall be declared abandoned by the tribunal de grande instance, [...] and without prejudice to the provisions of paragraph 4. A petition for declaration of abandonment is required to be transmitted by the private person, the body or the Children's aid service who have received the child on the expiry of a period of one year where the parents obviously took no further interest to it.

(Act no 76-1179 of 22 Dec. 1976) Are deemed to have obviously taken no further interest to their child parents who have not entertained with him relations necessary to maintain bonds of affection.

A mere withdrawal of consent to adoption, a request for news or a wish expressed but not carried out to take the child back may not be a token of interest sufficient to constitute the ground of a dismissal as of right of a petition for declaration of abandonment."Those steps may not interrupt the period set out in paragraph 1"(Act no 93-22 of 8 Jan. 1993).

Abandonment may not be declared where, during the period set out in paragraph 1 of this Article, a member of the family petitioned to assume care of the child and where that petition is declared to be consonant with the welfare of the child.

Where it declares that the child is abandoned, the court shall, by the same order, delegate the rights of parental authority over the child to the Children's aid service, to the body or to the private person"who received the child or to whom the latter was entrusted" (Act no 93-22 of 8 Jan. 1993).

A third party application for revocation of the order is admissible only in case of deception, fraud or mistake as to the identity of the child.

SECTION II

Of the Placing for Purpose of Plenary Adoption and of the Judgment of Plenary   Articles 351 to 354

Adoption

**Art. 351**

Placing for the purpose of adoption must be made by actual entrusting to the prospective adopters of a child for whom a valid and final consent to adoption was given, of a ward of State or of a child declared abandoned by judicial decision.

Where the parentage of the child is not established, there may be no placing for purpose of adoption during a period of"two months" (Act no 96-604 of 5 July 1996) after the receiving of the child.

Placing may not take place where the parents of the child have petitioned for the restitution of the child so long as there is no decision on the conclusiveness of that petition at the request of the most diligent party.

**Art. 352**

Placing for the purpose of adoption is a bar to a restitution of the child to his family of origin. It defeats any declaration of parentage and any acknowledgement.

Where a placing for the purpose of adoption comes to an end or where the court refuses to order adoption, the effects of placing are retroactively set aside.

**Art. 353**

An adoption order may be made at the request of the adopter by the tribunal de grande instance which shall verify"within six months after reference to the court" (Act no 93-22 of 8 Jan. 1993), whether the statutory requirements are fulfilled and adoption is consonant with the welfare of the child.

(Act no 76-1179 of 22 Dec. 1976) In case the adopter has descendants, the court shall verify in addition whether the adoption is not likely to imperil family life.

Where the adopter dies after having properly received the child for purpose of his adoption, a petition may be filed on his or her behalf by the surviving spouse or by one of the adopter's heirs.

(Act no 96-604 of 5 July 1996) Where the child dies after being properly received for purpose of its adoption, the petition may nevertheless be filed. The judgment has effect on the day preceding the death and involves only modification of the civil status of the child.

An adoption order shall not state its reasons.

**Art. 353-1**

*(Act no 96-604 of 5 July 1996)*

In case of adoption of a ward of State", of a child entrusted to a body authorized for adoption" (Act no 2002-93 of 22 Jan. 2002), or of an alien child who is not the child of the adopter's spouse, the court shall verify before making an adoption order that the petitioner or petitioners gained an authorization to adopt or were dispensed with it.

Where an authorization was refused or was not issued within the statutory period, the court may make an adoption order if it considers that the petitioners have the capacity to receive the child and that the adoption is consonant with his welfare.

**Art. 353-2**

A third party application for revocation of the adoption order is admissible only in case of  deception or fraud imputable to the adopters.

CIVIL CODE

**Art. 354**

Within fifteen days of the date on which it came into force of res judicata, an order pronouncing plenary adoption shall be registered on the registers of civil status of the place of birth of the adoptee, on request of the Government procurator.

(Act no 96-604 of 5 July 1996) Where the adoptee was born in a foreign country, the order shall be registered on the registers of the central service of civil status of the Ministry of Foreign Affairs.

The registration shall state the day, hour and place of birth, the sex of the child as well as his"family name and" (Act no 2002-304 of 4 March 2002) first names such as they result from the adoption order, the first names, names, date and place of birth, occupation and domicile of the adopter or adopters. It may not contain any indication as to the actual parentage of the child.

The registration takes the place of a record of birth for the adoptee.

"The original record of birth kept by a French officer of civil status and, where appropriate," (Act no 96-604 of 5 July 1996) the record of birth established under Article 58 shall, on the initiative of the Government procurator, be stamped"adoption" and treated as void.

SECTION III
Of the Effects of Plenary Adoption                                         Articles 355 to 359

**Art. 355**

Adoption produces its effects from the day of the filing of the petition for adoption.

**Art. 356**

Adoption confers on the child a parentage which substitutes for his original parentage: the adoptee ceases to belong to his blood family, subject to the prohibitions of marriage referred to in Articles 161 to 164.

(Act no 76-1179 of 22 Dec. 1976) However, an adoption of the spouse's child still leaves extant his original parentage with regard to that spouse and his or her family. It produces, furthermore, the effects of an adoption by two spouses.

**Art. 357**

Adoption confers on the child the name of the adopter.

"In case of adoption by two spouses, the name conferred on a child is determined under the rules laid down in Article 311-21" (Act no 2002-304 of 4 March 2002).

On request of the adopter or adopters, the court may modify the first names of the child.

"Where the adopter is a married woman or a married man, the court may, in the adoption order, decide, on request of the adopter, that the name of the spouse will be conferred on the adoptee, subject to the consent of the spouse. The court may also, on request of the adopter and subject to the consent of the spouse, confer on the child the coupled names of the spouses in the order they choose and within the limit of one family name for each of them.

"Where the husband or the wife of the adopter is dead or unable to express his or her intention, the court shall in its discretion make a determination after consulting the heirs of the deceased or the closest persons entitled to inherit from him or her."(Act no 2002-304 of 4 March 2002)

**Art. 357-1**

*(Act no 2002-304 of 4 March 2002)*

The provisions of Article 311-21 shall apply to a child who was the subject of an adoption lawfully ordered abroad and having in France the effects of a plenary adoption.

The adopters shall exercise the option available under that Article at the time of the request for registration of an adoption order by declaration sent to the Government procurator of the place where that registration is to be made.

Where the adopters request an order for enforcement of a foreign adoption order, they shall join a declaration of option to their request. Mention of that declaration shall be made in the decision.

Mention of the name chosen shall be made at the suit of the Government procurator, in the child's record of birth.

**Art. 358**

An adoptee has, in the family of the adopter, the same rights and obligations as a child"whose parentage is established under Title VII of this Book" (Act no 2002-305 of 4 March 2002).

**Art. 359**

Adoption is irrevocable.

CHAPTER II
Of Ordinary Adoption                                                     Articles 360 to 369

SECTION I
Of Requisites and Judgment                                               Articles 360 to 362

**Art. 360**

Ordinary adoption is allowed irrespective of the age of the adoptee.

(Act no 96-604 of 5 July 1996) Where there are serious reasons justifying it, an ordinary adoption of a child who was the subject of a plenary adoption is allowed.

Where the adoptee is over"thirteen" (Act no 93-22 of 8 Jan. 1993), he must personally consent to the adoption.

CIVIL CODE

**Art. 361**

(Act no 76-1179 of 22 Dec. 1976).- The provisions of Articles 343 to 344, 346 to 350, 353, 353-1, 353-2, 355, and" of the last two paragraphs or Article 357" (Act no 2002-304 of 4 March 2002), shall apply to ordinary adoption.

**Art. 362**

Within fifteen days of the date on which it becomes res judicata, the order that pronounces an ordinary adoption must be mentioned or registered on the registers of civil status on request of the Government procurator.

SECTION II

Of the Effects of Ordinary Adoption                                        Articles 363 to 369

**Art. 363**

(Act no 93-22 of 8 Jan. 1993).- Ordinary adoption confers the name of the adopter on the adoptee by adding it to the name of the latter.

"Where the adoptee and the adopter, or one of them, bear a double family name, the name conferred on the adoptee results from the addition of the adopter's name to his own name, within the limit of one name for each of them. The choice belongs to the adopter, who must obtain the consent of the adoptee where the latter is older than thirteen. In case of disagreement or failing a choice, the name conferred on the adoptee results from the adjunction of the first of the adopter to the first name of the adoptee.

"In case of an adoption by two spouses, the name coupled with that of the adoptee shall be, on request of the adopters, either that of the husband, or that of the wife, within the limit of one  name for each of them, and, failing an agreement, the first of the husband's names. Where the adoptee bears a double family name, the choice of the name which is preserved belongs to the adopters, who must obtain the consent of the adoptee where he is older than thirteen. In case of disagreement or failing a choice, the name conferred on the adoptee results from the adjunction of the adopter's first name to the adoptee's first name.

The court, however, may at the request of the adopter, decide that the adoptee will bear only the name of the adopter."In case of an adoption by two spouses, the family name substituted to that of the adoptee may, at the choice of the adopters, be either that of the husband, or that of the wife, or the coupled names of the spouses in the order they choose and within the limit of one name for each of them" (Act no 2002-304 of 4 March 2002). That request may also be filed after the adoption. Where the adoptee is older than thirteen, his personal consent to that substitution of a"family name" (Act no 2002-304 of 4 March 2002) is required.

**Art. 363-1**

*(Act no 2002-304 of 4 March 2002)*

The provisions of Article 363 shall apply to a child who has been the subject of an adoption lawfully ordered abroad and which has in France the effects of an ordinary adoption, where the record of birth is kept by a French authority.

The adopters must exercise the option available under that Article by a declaration sent to the Government procurator of the place where the record of birth is kept on the occasion of a request for updating the latter.

Mention of the name chosen is entered on the record of birth of the child, at the suit of the Government procurator.

**Art. 364**

An adoptee remains in his family of origin and preserves all his rights therein, in particular his rights of succession.

The prohibitions to marriage provided for in Articles 161 to 164 of this Code apply between the adoptee and his family of origin.

**Art. 365**

An adopter is, with regard to the adoptee, alone invested of all the rights of parental authority, including that of consenting to the marriage of the adoptee, unless she or he is the spouse of the father or of the mother of the adoptee; in that event, the adopter has parental authority concurrently with his or her spouse,"who retains alone the exercise of it, subject to a joint declaration with the adopter before the chief clerk of the tribunal de grande instance for the purpose of an exercise in common of that authority" (Act no 2002-305 of 4 March 2002).

The rights of parental authority are exercised  by the adopter or adopters on the"terms provided for by Chapter I of Title IX of this Book" (Act no 2002-305 of 4 March 2002).

The rules of statutory administration and of guardianship of"minors" (Act no 2002-305 of 4 March 2002) shall apply to an adoptee.

**Art. 366**

The bond of kinship resulting from adoption extend to the [repealed] children of the adoptee.

Marriage is prohibited :

1° Between the adopter, the adoptee and his descendants;

2° Between the adoptee and the adopter's spouse; reciprocally, between the adopter and the adoptee's spouse;

3° Between the adoptee children of the same individual;

4° Between the adoptee and the adopter's children.

Nevertheless, the prohibitions to marriage provided for in 3° and 4° above may be lifted by dispensation of the President of the Republic, where there are serious reasons.

(Act no 76-1179 of 22 Dec. 1976) The prohibition to marriage provided for in 2° above may be lifted in the same conditions where the person who created the kinship is deceased.

**Art. 367**

CIVIL CODE

An adoptee owes maintenance to the adopter where he is in need and, reciprocally, an adopter owes maintenance to the adoptee.

The obligation of maintenance continues to exist between the adoptee and his father and mother. However, the father and mother of the adoptee are bound to provide maintenance to him only where he cannot obtain it from the adopter.

**Art. 368**

*(Act no 2002-305 of 4 March 2002)*

An adoptee and his descendants have, in the family of the adopter, the rights to succession provided for in Book III, Title I, Chapter III.

(Act no 96-604 of 5 July 1996) The adoptee and his descendants do not have, however, the status of compulsory heirs with regard to the ascendants of the adopter.

**Art. 368-1**

Where an adoptee dies without descendants, property given by the adopter or received through succession from him shall return to the adopter or his descendants, where it still exists in kind at the time of the death of the adoptee, on condition to contribute to debts and subject to the vested rights of third parties. Property received gratuitously by the adoptee from his father and mother shall return likewise to the latter or to their descendants.

The surplus of property of an adoptee shall be divided in halves between the family of origin and the adopter's family, without prejudice to the rights of the spouse on the whole of the succession.

**Art. 369**

The effects of an adoption continue notwithstanding the subsequent establishment of a parental bo,d.

CHAPTER III

Of the Conflict of Laws relating to Adoption and of the Effects in France of Adoptions   Articles 370 to 370-5

Ordered Abroad

**Art. 370**

*(Act no 96-604 of 5 July 1996)*

Where serious reasons so justify, adoption may be revoked , on request of the adopter or the adoptee, or, where the latter is a minor, of that of the Government procurator's office.

A request for revocation made by the adopter is admissible only where the adoptee is over fifteen.

Where the adoptee is a minor, the father and mother by blood or, failing them, a member of the family of origin up to the degree of cousin-german may also request revocation.

**Art. 370-1**

An order which revokes an adoption shall state its reasons

Its operative part shall be mentioned in the margin of the record of birth or of the registration of the adoption order, in the way provided for in Article 362.

**Art. 370-2**

Revocation causes all effects of adoption to cease for the future.

**Art. 370-3**

The requirements for adoption are governed by the national law of the adopter or, in case of adoption by two spouses, by the law which governs the effects of their union. Adoption however may not be ordered where it is prohibited by the national laws of both spouses.

Adoption of a foreign minor may not be ordered where his personal law prohibits that institution, unless the minor was born and resides usually in France.

Whatever the applicable law may be, adoption requires the consent of the statutory representative of the child. Consent must be free, obtained without any compensation, subsequent to the birth of the child and informed as to the consequences of adoption, specially where it is given for the purpose of a plenary adoption, as to the entire and irrevocable character of the breaking off of the pre-existing parental bond.

**Art. 370-4**

The effects of an adoption ordered in France are those of French law.

**Art. 370-5**

An adoption lawfully ordered in a foreign country produces in France the effects of a plenary adoption where it breaks off completely and irrevocably the pre-existing parental bond. Failing which, it produces the effects of an ordinary adoption. It may be converted into a plenary adoption where the required consents were given expressly and advisedly.

**TITLE IX**

**OF PARENT AND CHILD  (II : OF PARENTAL AUTHORITY)**                    **Articles 372 to 387**

CHAPTER I

Of Parental Authority with regard to the Person of a Child                    Articles 372 to 371-5

**Art. 371**

CIVIL CODE

A child, at any age, owes honour and respect to his father and mother.

**Art. 371-1**

*(Act no 2002-305 of 4 March 2002)*

Parental authority is a set of rights and duties whose finality is the welfare of the child.

It is vested in the father and mother until the majority or emancipation of the child in order to protect him in his security, health and morality, to ensure his education and allow his development, showing regard to his person.

Parents shall make a child a party to judgments relating to him, according to his age and degree of maturity.

**Art. 371-2**

*(Act no 2002-305 of 4 March 2002)*

Each one of the parents shall contribute to the education and support of the children in proportion to his or her means, to those of the other parent and to the needs of the child.

That obligation does not come to an end as of right where the child is of age.

**Art. 371-3**

A child may not, without the permission of the father and mother, leave the family home and he may be removed from it only in cases of necessity as determined by statute.

**Art. 371-4**

*(Act no 2002-305 of 4 March 2002)*

A child has the right to have personal relations with his grandparents. Only serious reasons may constitute a bar to that right.

Where the welfare of the child so requires, the family causes judge shall fix the details of the relations between a child and a third person, relative or not.

**Art. 371-5**

*(Act no 96-1238 of 30 Dec. 1996)*

A child may not be separated from its brothers and sisters, unless this is not possible or where his welfare dictates a different solution. If there is occasion, the judge shall rule on the relations between the brothers and sisters.

SECTION I

Of the Exercise of Parental Authority                          Articles 372 to 374-2

Paragraph 1

General Principles                                              Articles 372 to 372-1

and Art. 372-1

**Art. 372**

*(Act no 2002-305 of 4 March 2002)*

The father and mother shall exercise in common parental authority.

Where, however, parentage is established with regard to one of them more than one year after the birth of a child whose parentage is already established with regard to the other, the latter alone remains vested with the exercise of parental authority. It shall be likewise where parentage is judicially declared with regard to the second parent of the child.

Parental authority may however be exercised in common in case of joint declaration of the father and mother before the chief clerk of the tribunal de grande instance or upon judgment

of the family causes judge.

**Art. 372-1 and Art. 372-1-1**

[repealed]

**Art. 372-2**

Where one of the"parents" (Act no 93-22 of 8 Jan. 1993) performs alone an usual act of parental authority concerning the person of the child, he or she shall be considered to be acting with the consent of the other with regard to third parties in good faith,.

**Art. 373**

*(Act no 2002-305 of 4 March 2002)*

Shall be deprived of the exercise of parental authority the father or mother who is unable to express his or her intention, by reason of a disability, absence or any other cause.

**Art. 373-1**

*(Act no 2002-305 of 4 March 2002)*

Where one of the father and mother dies or is deprived of the exercise of parental authority, the other shall exercise that authority alone.

**Art. 372-1 and Art. 372-1-1**

[repealed]

**Art. 372-1 and Art. 372-1-1**

CIVIL CODE
[repealed]

**Art. 372-1 and Art. 372-1-1**
[repealed]

Paragraph 2
Of the Exercise of Parental Authority by Separated Parents        Articles 373-2 to
373-2-5

**Art. 373-2**
Separation of the parents has no influence on the rules of devolution of the exercise of parental authority.
Each of the father and mother shall maintain personal relations with the child and respect the bonds of the latter with the other parent.
Any change of residence of one of the parents, where it modifies the terms of exercise of parental authority, shall be the subject of a notice to the other parent, previously and in due time. In case of disagreement between them, the most diligent parent shall refer the matter to the family causes judge who shall rule according to what the welfare of the child requires. The judge shall apportion removal expenses and adapt accordingly the amount of the contribution to the support and education of the child.

**Art. 373-2-1**
Where the welfare of the child so requires, the judge may commit exercise of parental authority to one of the parents.
The exercise of the right of access and lodging may be refused to the other parent only for serious reasons.
That parent shall keep the right and duty to supervise the support and education of the child. He or she must have notice of the important choices relating to the life of the child. He or she shall comply with the obligation that devolves upon him or her under Article 371-2.

**Art. 373-2-2**
In case of a separation between the parents, or between the latter and the child, a contribution to his support and education shall take the form of periodical payments to be paid, according to the circumstances, by one of the parents to the other, or to the person to whom the child is entrusted.
The terms and guaranties of those periodical payments shall be fixed by the approved agreement referred to in Article 373-2-7 or, failing which, by the judge.
Those payments may in whole or in part take the form of a direct taking charge of costs incurred on behalf of a child.
They may in whole or in part be effected under the form of a right of use and dwelling.

**Art. 373-2-3**
Where the consistence of the debtor's property so permits, periodical payments may be replaced, in whole or in part, under the terms and guarantees provided for by the approved agreement or by the judge, by the payment of a sum of money in the hands of an accredited body responsible for granting in counterpart to the child an index-linked annuity, a surrender of property in usufruct or an allocation of property yielding income.

**Art. 373-2-4**
Ascription of additional means, in particular under the form of periodical payments, may, if there is occasion, be requested later on.

**Art. 373-2-5**
A parent who has primarily the responsibility of an adult child who cannot meet his own needs may ask the other parent to pay a contribution to his support and education. The judge may decide or the parents agree that this contribution be paid in whole or in part into the hands of the child.

Paragraph 3
Of the Intervention of the Family Causes Judge        Articles 373-2-6 to
373-2-13

**Art. 373-2-6**
A judge of the tribunal de grande instance in charge of family causes shall settle issues brought before him in the framework of this Chapter in watching in particular over the safeguarding of the welfare of minor children.
The judge may order measures that allow to protect continuity and effectiveness of the keeping of the bonds of the child with each of his parents.
He may in particular order an entry on the passports of the parents to prohibit the child's departure from the territory without the authorization of the two parents.

**Art. 373-2-7**
Parents may seize the family causes judge to have approved the agreement through which they organize the terms of exercise of parental authority and establish their contributions to the support and education of the child.
The judge shall approve the agreement unless he observes that it does not sufficiently protect the welfare of the child or that the consent of the parents was not freely given.

CIVIL CODE

**Art. 373-2-8**

The judge may also be seized by one of the parents or the Government procurator, who may himself be seized by a third person, relative or not, for the purpose of ruling upon the terms of exercise  of parental authority and the contribution to the support and education of the child.

**Art. 373-2-9**

In compliance with the two preceding Articles, the residence of a child may be fixed alternately at the domicile of each of the parents or at the domicile of one of them.

On request of one of the parents or in case of disagreement between them about the mode of residence of the child, the judge may order provisionally an alternate residence of which he shall determine the duration. On the expiry of it, the judge shall rule finally on the residence of the child alternately at the domicile of each of the parents or at the domicile of one of them.

**Art. 373-2-10**

In case of disagreement, the judge shall endeavour to conciliate the parties.

For the purpose of making easier the search by the parents of a consensual exercise of parental authority, the judge may offer them a measure of mediation and, after gaining their agreement, designate a family mediator who will initiate it.

He may call upon them to meet a family mediator who will acquaint them with the subject and progress of such a measure.

**Art. 373-2-11**

Where he rules on the terms of exercise of parental authority, the judge shall take into consideration in particular:
1° The practice previously followed by the parents or the agreements they entered into earlier;
2° Feelings expressed by a minor child in the way provided for in Article 388-1;
3° The capacity of each parent to assume his or her duties and to respect the rights of the other;
4° The result of court-ordered appraisals possibly carried out, taking into account in particular the age of the child;
5° Information collected in possible social enquiries and counter-enquiries provided for in Article 373-2-12.

**Art. 373-2-12**

Before any decision fixing the terms of exercise of parental authority and of the right of access, or entrusting the children to a third person, the judge may assign the task of undertaking a social enquiry to any qualified person. This is for the purpose of collecting information on the situation of the family and on the conditions in which the children live and are educated.

Where one of the parents contests the conclusions of a social inquiry, a counter-inquiry may be ordered on his or her request.

A social inquiry may not be used in a trial of a cause for divorce.

**Art. 373-2-13**

The provisions of an approved agreement as well as the  judgments relating to the exercise of parental authority may be varied or completed at any time by the judge, on request of the parents or of a parent or of the Government procurator, who himself may be seized by a third person, relative or not.

Paragraph 4
Of the Intervention of Third Persons                                    Articles 373-3 to 374-2

**Art. 373-3**

*(Act no 87-570 of 22 July 1987)*

"Separation of the parents" (Act no 2002-305 of 4 March 2002) is not a bar to the devolution provided for by Article 373-1, even where the parent who remains able to exercise parental authority was deprived of the exercise of some attributes of that authority by the effects of a judgment delivered against him or her.

(Act no 2002-305 of 4 March 2002) The judge may, by way of exception and where the welfare of the child so requires, in particular when one of the parents is deprived of the exercise or parental authority, decide to entrust the child to a third person, chosen preferably within his relatives. He shall be seized and shall rule under Articles 373-2-8 and 373-2-11.

In exceptional circumstances, the"family causes judge" (Act no 93-22 of 8 Jan. 1993) who decides on the terms of exercise of parental authority after"a separation of the parents" (Act no 2002-305 of 4 March 2002) may decide, even in the lifetime of the parents, that in case of death of the parent who exercises parental authority, the child may not be placed in the custody of the survivor. He may, in that event, designate the person to whom the child shall temporarily be entrusted.

[deleted]

**Art. 373-4**

*(Act no 87-570 of 22 July 1987)*

Where the child was entrusted to a third party, parental authority shall continue to be exercised by the father and mother; however, the person to whom the child was entrusted shall perform all the usual acts regarding his supervision and education.

The"family causes judge" (Act no 93-22 of 8 Jan. 1993), where he temporarily entrusts the child to a third person, may decide that the latter shall require the establishment of a guardianship.

CIVIL CODE

**Art. 374**

*(Act no 93-22 of 8 Jan. 1993)*

Where the parentage of an illegitimate child is established only with regard to one of his parents, the latter shall exercise parental authority alone.

Where his parentage is established with regard to both parents under terms different from those provided for in Article 372, parental authority shall be exercised by the mother. It shall however be exercised in common by both parents where they make a joint declaration thereof before the"clerk in chief of the tribunal de grande instance" (Act no 95-125 of 8 Feb. 1995).

In all cases the family causes judge may, on request of the father, the mother or the Government procuror's office, modify the terms of exercise of parental authority with regard to an illegitimate child. He may decide that it will be exercised either by one of the two parents, or in common by both parents; in that case, he shall designate the parent at whose home the child will have his usual residence.

The family causes judge may grant a right of supervision to the parent who does not have the exercise of parental authority. He may refuse him or her a right of access and lodging only for serious reasons.

In case of exercise in common of parental authority, the parent at whose home the children do not usually reside shall contribute to their support and education in proportion to the respective means of the parents.

**Art. 374-1**

*(Act no 93-22 of 8 Jan. 1993)*

The court which decides on the establishing of a [...] parentage may decide to entrust the child temporarily to a third person who will be in charge of requiring the organization of a guardianship.

**Art. 374-2**

In all cases provided for in this Title, a guardianship may be established even where there is no property to be administered.

It shall be then organized in accordance with the provisions of Title X.

SECTION II

Of Educational Assistance                                                  Articles 375 to 375-9

**Art. 375**

Where the health, security or morality of a not emancipated minor are imperilled, or where the conditions of his education are seriously endangered, measures of educational assistance may be judicially ordered on request of the father and mother jointly, or of one of them,"of the person or body to whom the child was entrusted" (Act no 87-570 of 22 July 1987) or of the guardian, of the minor himself or of the Government procuror's office. Exceptionally, the judge may be seized of his own motion.

They may be ordered at the same time with regard to several children dependent on a same parental authority.

(Act no 86-17 of 6 Jan. 1986) The decision shall fix the duration of the measure without exceeding two years, where it relates to an educational measure implemented by a service or body. A measure may be renewed by a judgment setting out the grounds on which it is based.

**Art. 375-1**

The juvenile judge shall have jurisdiction, subject to appeal, in all matters relating to educational assistance.

He shall always endeavour to secure the adhesion of the family to the measure contemplated.

**Art. 375-2**

Whenever possible, a minor must be kept in his present circle. In that case, the judge shall designate, either a qualified person, or a service of observation, education or rehabilitation in the free community, with the mission of bringing aid and counsel to the family in order to overcome the material or moral difficulties which it is encountering. That person or service shall be responsible for following the development of the child and making a periodical report of it to the judge.

The judge may also make the keeping of the child in his circle conditional on specific obligations, such as that of regularly attending a medical or educational institution, ordinary or specialized, or of exercising a professional activity.

**Art. 375-3**

Where it is necessary to withdraw the child from his present circle, the judge may decide to entrust him:

1°"To the other parent" (Act no 2002-305 of 4 March 2002) ;

2° To another member of the family or to a trustworthy third person;

3° To a medical or educational, ordinary or specialized, service or institution;

4°"To a départemental Children's aid service" (Act no 89-487 of 10 July 1989).

However, where a petition for divorce was filed or a divorce order handed down between the father and mother, those measures may be taken only if a new circumstance likely to endanger the minor is revealed after the decision"which rules on the terms of exercise of parental authority or entrusts the child to a third person" (Act no 87-570 of 22 July 1987) . They may not be a bar to the power of the"family causes judge" (Act no 93-22 of 8 Jan. 1993) to decide,"under Article 373-3" (Act no 2002-305 of 4 March 2002), to whom the child is to be entrusted. The same rules shall apply to judicial separation.

**Art. 375-4**

*(Act no 87-570 of 22 July 1987)*

CIVIL CODE

In the circumstances specified in 1°, 2° and 3° of the preceding Article, the judge may assign either to a qualified person, or to a service of observation, education or rehabilitation in the free community, the mission of bringing aid and counsel to the person or the service to whom the child was entrusted, as well as to the family, and of following the development of the child.

In all cases, the judge may join the handing over of the child with the same terms as under Article 375-2, paragraph 2. He may also decide that periodical report shall be made to him as to the situation of the child.

**Art. 375-5**

Provisionally, but subject to appeal, the judge may, pending suit, either order the provisory handing over of the child to a rest or observation centre, or take one of the measures provided for in Articles 375-3 and 375-4.

In case of emergency, the Government procurator of the place where the child was found, shall have the same power, with the responsibility of referring the matter within eight days to the competent judge who shall maintain, vary or revoke the measure.

**Art. 375-6**

Decisions taken in matters of educational assistance may, at any time, be varied or revoked by the judge who took them, either of his own motion, or on request of the father and mother jointly or of one of them,"of the person or service to whom the child was entrusted" (Act no 87-570 of 22 July 1987) or of the guardian, the child himself or the Government procurator's office.

**Art. 375-7**

The father and mother whose child gave occasion for a measure of educational assistance keep their parental authority over him and exercise all the attributes of it that are not incompatible with the implementation of the measure. They may not emancipate the child without authorization of the juvenile judge, while the measure of educational assistance is being implemented

Where it was necessary to place the child outside the parents' home, the latter keep a right of correspondence and a right of access. The judge shall fix the terms thereof and may even, if the welfare of the child so requires, decide that the exercise of these rights or of one of them shall be temporarily suspended."The judge may indicate that the locamlity of placement of the child shall be chosen so as to make easier, as far as possible, the exercise of the right of access for the parent or parents" (Act no 98-657 of 29 July 1998).

**Art. 375-8**

The expenses of support and education of the child who was the subject of a measure of educational assistance continue to devolve upon its father and mother as well as upon his ascendants from whom maintenance may be claimed, except for the power of the judge to discharge them of it in whole or in part.

**Art. 375-9**

(Act no 2002-303 of 4 March 2002).- The judgment which, under Article 375-3, paragraph 3, entrusts the minor to an institution which receives persons admitted by reason of mental diseases, shall be handed down after detailed medical advice from a physician not belonging to the institution, for a duration which may not exceed fifteen days.

The provision may be renewed, after medical assent given by  a psychiatrist of the receiving institution, for a duration of one month, renewable.

SECTION III

Of the Delegation of Parental Authority                                            Articles 376 to 377-3

**Art. 376**

No relinquishment or transfer relating to parental authority may be effective, unless under a judgment in the cases specified below.

**Art. 376-1**

A"family causes judge" (Act no 93-22 of 8 Jan. 1993) may, where he is called to rule upon"the terms of exercise of parental authority or upon the education of a minor child or where he decides to entrust a child to a third person" (Act no 87-570 of 22  July 1987), take into consideration the covenants which the father and mother may have freely concluded between them on this subject, unless one of them adduces serious reasons which allow him or her to revoke his or her consent.

**Art. 377**

*(Act no 2002-305 of 4 March 2002)*

The father and mother, jointly or separately, may, where circumstances so require, seize a judge for the purpose of having delegated all or part of the exercise of their parental authority to a third person, member of the family, trustworthy near relation, institution approved for receiving children or départemental Children's aid service.

In case of plain disinterest or where the parents are unable to exercise all or part of parental authority, the individual, the body or the départemental Children's aid service who received the child may also seize the judge for purpose of having delegated to them parental authority wholly or partially. In all cases referred to in this Article, both parents shall be called in the case. Where the child concerned is the subject of a measure of educational assistance, delegation may occur only after opinion of the juvenile judge.

**Art. 377-1**

*(Act no 2002-305 of 4 March 2002)*

CIVIL CODE

Delegation, total or partial, of parental authority results from the judgment handed down by the family causes judge.

However, a judgment of delegation may provide, for the needs of education of a child, that the father and mother, or one of them, shall share all or part of the exercise of parental authority with the third person delegatee. That division shall require consent of the parent or parents in so far as they exercise parental authority. The presumption in Article 372-2 shall apply with regard to transactions performed by the delegator or delegators and the delegatee.

The judge may be seized of the difficulties that a shared exercise of parental authority may produce by the parents, one of them, the delegatee or the Government procurator. He shall rule in accordance with the provisions of Article 373-2-11.

**Art. 377-2**

In all cases, delegation may come to an end or be removed by a new judgment, where new circumstances are adduced.

In the case where the father and mother are granted the return of the child, the"family causes judge" (Act no 93-22 of 8 Jan. 1993) shall place on them, unless they are necessitous, reimbursement of all or part of the expenses of support.

[deleted]

**Art. 377-3**

The right to consent to the adoption of a minor may never be delegated.

SECTION IV

Of the Total or Partial Withdrawal of Parental Authority                    Articles 378 to 381

**Art. 378**

By express provision of a criminal judgment, parental authority may be"totally withdrawn" (Act no 96-604 of 5 July 1996) from the father and mother who are sentenced either as perpetrators, co-perpetrators or accomplices of a serious or ordinary offence committed on the person of their child, or as co-perpetrators or accomplices of a serious or ordinary offence committed by their child,.

That"withdrawal" (Act no 96-604 of 5 July 1996) may be applied to ascendants other than the father and mother as regards that part of parental authority which they may have over their descendants.

**Art. 378-1**

The father and mother who"apart from any criminal sentence, either by maltreatment, or by usual and excessive consumption of alcoholic beverages or drug addiction, or by a notorious misconduct or criminal activities" or by lack of care or want of guidance, obviously endanger the security, health or morality of the child,"may be totally withdrawn parental authority" (Act no 96-604 of 5 July 1996).

The father and mother who, for more than two years, have intentionally abstained from exercising the rights and fulfilling the duties they retained under Article 375-7, may likewise"be totally withdrawn parental authority" (Act no 96-604 of 5 July 1996).

An action"for total withdrawal of parental authority" (Act no 96-604 of 5 July 1996) shall be brought before the tribunal de grande instance, either by the Government procurator's office, or by a member of the family or by the child's guardian.

**Art. 379**

*(Act no 96-604 of 5 July 1996)*

A total withdrawal of parental authority ordered under one of the two preceding Articles affects by operation of law all the attributes, patrimonial as well as personal, connected with parental authority; in the absence of other determination, it extends to all minor children already born at the time of the judgment. It involves, for the child, dispensation from maintenance obligation, in derogation from Articles 205 to 207, unless otherwise provided by the judgment of withdrawal.

**Art. 379-1**

*(Act no 96-604 of 5 July 1996)*

Instead of a total withdrawal, the judgment may be confined to ordering a partial withdrawal of parental authority, limited to the attributes it specifies. It may also decide that a total or partial withdrawal of parental authority will be effective only with regard to certain children already born.

**Art. 380**

When it orders"a total or partial withdrawal of parental authority or" (Act no 96-604 of 5 July 1996) of the right of custody, the court seized shall, where the other parent is dead or has lost the exercise of parental authority, either"designate a third person to whom the child will be temporarily entrusted" (Act no 87-570 of 22 July 1987) with the responsibility of requesting the organization of a guardianship, or entrust the child to the Children's aid service.

It may take the same measures where parental authority has devolved on one of the parents through the effect"of a total withdrawal of parental authority ordered" (Act no 96-604 of 5 July 1996) against the other.

**Art. 381**

The father and mother who have been the subject"of a total withdrawal of parental authority" (Act no 96-604 of 5 July 1996) or of a withdrawal of rights for one of the grounds provided for in Articles 378 and 378-1, may, by way of a petition, gain from the  tribunal de grande instance, by proving new circumstances, the restitution to them, in whole or in

CIVIL CODE

part, of the rights of which they were deprived.

An application for restitution may be filed only one year at the earliest after the judgment ordering"the total or partial withdrawal of parental authority" (Act no 96-604 of 5 July 1996) became irrevocable; in case of dismissal, it may be renewed only after a new period of one year. No application is admissible where, before the filing of the petition, the child has been placed for the purpose of adoption.

Where restitution is granted, the Government procurator's office shall, if there is occasion, apply for measures of educational assistance.

CHAPTER II

Of Parental Authority with regard to the Property of a Child                    Articles 382 to 387

**Art. 382**

The father and mother have, subject to the distinctions that follow, the administration and enjoyment of the property of their child.

**Art. 383**

*(Act no 85-1372 of 23 Dec. 1985)*

Statutory administration shall be exercised jointly by the father and mother where they exercise in common parental authority and, in the other cases, under judicial supervision, either by the father or by the mother, according to the provisions of the preceding Chapter.

Statutory enjoyment is attached to statutory administration: it belongs either to the two parents jointly, or to the one of the father and mother who is responsible for the administration.

**Art. 384**

The right of enjoyment comes to an end :

1° As soon as the child has completed"sixteen years" (Act no 74-631 of 5 July 1974), or even earlier when he contracts marriage;

2° Through the causes which put an end to parental authority, or even, more particularly, through those which put an end to statutory administration;

3° Through the causes which involve extinction of any usufruct.

**Art. 385**

The charges of such enjoyment are:

1° Those to which usufructuaries are liable in general;

2° The feeding, supporting and educating the child, according to his wealth;

3° Debts which burden a succession received by the child to the extent that they must be discharged out of the income.

**Art. 386**

That enjoyment may not take place for the benefit of a surviving spouse who omits to make an inventory, authentic or under private signature, of property owed to a minor.

**Art. 387**

Statutory enjoyment does not extend to property acquired by a child through his work, or to that which is donated or bequeathed to him under the express condition that the father and mother may not have enjoyment of them.

**TITLE X**

**OF MINORITY, OF GUARDIANSHIP AND OF EMANCIPATION**          **Articles 388 to 487**

CHAPTER I

Of Minority                                                    Articles 388 to 388-2

**Art. 388**

*(Act no 74-631 of 5 July 1974)*

A minor is an individual of either sex who has not yet reached the full age of eighteen years.

**Art. 388-1**

*(Act no 93-22 of 8 Jan. 1993)*

In all proceedings relating to him, a minor capable of discernment may, without prejudice to the provisions as to his intervention or consent, be heard by the judge or the person appointed by the judge for that purpose. Where a minor so requests, his hearing may be denied only by a judgment setting out specially the grounds on which it is based.

. He may be heard alone, with a counsel or a person of his choice. Where that choice does not appear to be consonant with the welfare of the child, the judge may appoint another person.

The hearing of a minor does not confer on him the status of a party to the proceedings.

**Art. 388-2**

*(Act no 93-22 of 8 Jan. 1993)*

Where, in a lawsuit, the interests of a minor appear to be in conflict with those of his statutory representatives, the judge of guardianships in the manner provided for in Article 389-3, or, failing which, the judge who is seized of the case shall appoint an ad hoc administrator who has the responsibility to represent him.

CIVIL CODE

CHAPTER II

Of Guardianship                                                                            Articles 389 to 475

SECTION I

Of the Cases Where either Statutory Administration or Guardianship Takes        Articles 389 to 392
Place

**Art. 389**

*(Act no 85-1372 of 23 Dec. 1985)*

Where parental authority is exercised in common by the twol parents, they are statutory administrators. In the other cases, statutory administration belongs to the parent who exercises parental authority.

**Art. 389-1**

*(Act no 85-1372 of 23 Dec. 1985)*

Statutory administration is outright where the two parents exercise parental authority in common.

**Art. 389-2**

*(Act no 85-1372 of 23 Dec. 1985)*

Statutory administration is placed under supervision of the judge of guardianships where one or the other of the two parents is dead or is"deprived of the exercise of parental authority" (Act no 2002-305 of 4 March 2002); it shall be likewise"in case of unilateral exercise of parental authority" (Act no 2002-305 of 4 March 2002).

**Art. 389-3**

A statutory administrator acts as an agent for the minor in all civil transactions, except cases where the law or usage authorizes minors to act for themselves.

Where his interests are in conflict with those of the minor, he must have an administrator ad hoc appointed by the judge of guardianships."In the absence of any suit of the statutory administrator, the judge may undertake that appointment on request of the Government procurator's office, of the minor himself or of his own motion" (Act no 93-22 of 8 Jan. 1993).

Property donated or bequeathed to a minor under the condition that it shall be administered by a third person is not subject to statutory administration. That third person administrator has the powers conferred on him by the gift or will; failing which, those of an administrator under judicial supervision.

**Art. 389-4**

*(Act no 75-617 of 11 July 1975)*

In outright statutory administration, each of the"parents" (Act no 85-1327 of 23 Dec. 1985) is deemed, with regard to third parties, to have received from the other the power to do alone the transactions for which a guardian would not need any authorization.

**Art. 389-5**

*(Act no 85-1372 of 23 Dec. 1985)*

In outright statutory administration, the parents perform together the transactions that a guardian could do only with the authorization of the family council.

Failing agreement between the parents, a transaction must be authorized by the judge of guardianships.

Even by mutual agreement, the parents may neither sell amicably, nor contribute to a partnership an immovable or a business concern belonging to the minor, nor contract loans on his behalf, nor waive a right for him without the authorization of the judge of guardianships. The same authorization is required for an amicable partition and the statement of liquidation shall be approved in the way provided for in Article 466.

Where a transaction causes loss to the minor, the parents are liable for it jointly and severally.

**Art. 389-6**

*(Act no 75-617 of 11 July 1975)*

In statutory administration under judicial supervision, an administrator must provide himself with an authorization from the judge of guardianships in order to perform the transactions that a guardian may do only with an authorization.

He may do the other transactions alone.

**Art. 389-7**

*(Act no 70-459 of 4 July 1970)*

As to other issues, the rules of guardianship shall apply to statutory administration, with the adjustments resulting from the latter's being deprived of family council and supervisory guardian, and without prejudicing, on the other part, to the rights that the father and mother hold under Title Of Parental Authority in particular as regards the education of the child and the usufruct of his property.

**Art. 390**

A guardianship must be opened where the father and mother are both dead or are"deprived of the exercise of parental authority" (Act no 2002-305 of 4 March 2002).

(Ord. no 2005-759 of 4 July 2005) It must also be opened with respect to a child who has neither a father nor a mother.

There is no derogation to specific statutes governing the Children's aid service.

CIVIL CODE

**Art. 391**

In the case of statutory administration under judicial supervision, the judge of guardianships may at any time, either of his own motion, or at the request of relatives by blood or marriage or of the Government procurator's office, decide to open guardianship, after hearing or summoning the statutory administrator, except in emergency. The latter may not, from the application and until final judgment, except in cases of emergency, enter into any transaction that would require the authorization of the family council were a guardianship opened.

The judge of guardianships may also decide, but only for serious reasons, to open a guardianship in the case of an outright statutory administration.

In both cases, where a guardianship is opened, the judge of guardianships shall convene the family council which may either name the statutory administrator as guardian, or designate another guardian.

**Art. 392**

Where a [...] child happens to be acknowledged by one of his parents after the opening of a guardianship, the judge of guardianships may, on request of that parent, decide to substitute statutory administration to guardianship under Article 389-2.

SECTION II

Of the Organization of a Guardianship                                    Articles 393 to 448

Paragraph 1

Of the Judge of Guardianships                                             Articles 393 to 396

**Art. 393**

The office of judge of guardianships is exercised by a judge of the tribunal d'instance in whose territorial jurisdiction the minor has his domicile.

**Art. 394**

Where the minor's domicile is transferred to another place, the guardian shall forthwith give notice of it to the judge of guardianships previously seized. The latter shall forward the file of the guardianship to the judge of guardianships of the new domicile. Mention of that forwarding shall be kept in the court office of the arrondissement.

**Art. 395**

A judge of guardianships shall exercise a general supervision over statutory administrations and guardianships of his jurisdiction.

He may convene statutory administrators, guardians and other organs of guardianship, require clarifications from, make observations to, and grant injunctions against them.

He may sentence to the fine provided for in the Code of Civil Procedure those who, without lawful excuse, did not comply with his injunctions.

**Art. 396**

The proceedings before a judge of guardianships shall be regulated by the Code of Civil Procedure.

Paragraph 2

Of Guardians                                                             Articles 340 to 406

**Art. 340**

*(Act n° 93-22 of 8 Jan. 1993)*

Paternity out of wedlock may be judicially declared.

Proof of it may be made only where there exist serious presumptions or circumstantial evidence.

**Art. 340-1**

[repealed]

**Art. 340-2**

The action belongs only to the child.

During the minority of the child, the mother, albeit a minor, is alone entitled to institute it.

Where the mother did not acknowledge the child, where she is dead or unable to express her intention, the action shall be instituted as provided for in Article 464, paragraph 3, of this Code.

**Art. 340-3**

*(Act n° 93-22 of 8 Jan. 1993)*

An action to establish paternity must be brought against the  alleged father or against his heirs; in the absence of heirs or where they have renounced the succession, against the State, the renouncing heirs being nevertheless joined in the action in order to maintain their rights.

**Art. 340-4**

An action must be instituted within two years after the child's birth, on pain of lapse.

(Act n° 93-22 of 8 Jan. 1993) Where however the alleged father and the mother have lived, during the statutory period of conception, in a state of concubinage involving, in the absence of community life, an enduring or continuous relationship, the action may be instituted until the expiry of a period of two years following the ending of the concubinage. Where the alleged father contributed to the support, the education or the settling of the child in the

CIVIL CODE

capacity of a father, the action may be instituted until the expiry of a period of two years following the ending of that contribution.

Where an action was not instituted during the minority of the child, the latter may institute it during two years after his coming of age.

**Art. 340-5**

Where it entertains the action, the court may, on petition of the mother, order the father to reimburse her for all or part of her maternity and support expenses during the three months preceding and the three months following the birth, without prejudice to damages she may claim under Articles 1382 and 1383.

**Art. 340-6**

The court shall rule, if there is occasion, on the attribution of name and on parental authority, under Articles 334-3 and"372" (Act n° 2002-305 of 4 March 2002).

**Art. 340-7**

When dismissing the petition, the judges may, however, allow subsidies to the child, if the relationship between the mother and the defendant was proved in the way provided for in Articles 342 and following.

**Art. 341**

*(Act n° 93-22 of 8 Jan. 1993)*

Maternity suits are allowed subject to Article 341-1.

The child who brings the action must prove that he is the one to whom the alleged mother has given birth.

(Act n° 93-22 of 8 Jan. 1993) Proof of it may be made only where there exist serious presumptions or circumstantial evidence.

**Art. 341-1**

*(Act n° 93-22 of 8 Jan. 1993)*

After a child's birth, his mother may request that the secrecy as to her admittance and identity be preserved.

**Art. 397**

The individual right to select a guardian, relative or not, belongs only to the last dying of the father and mother, where he or she has kept, on the day of death, the exercise of statutory administration or guardianship.

**Art. 398**

That appointment may be made  only in the form of a will or of a special declaration before a notaire.

**Art. 399 and 400**

[repealed]

**Art. 401**

A guardian selected by the father or mother may not be compelled to accept guardianship, unless he is furthermore within the class of the persons to whom, failing that special selection, the family council might have assign the duty thereof.

**Art. 402**

Where no guardian was selected by the last dying of the father and mother, guardianship of a [deleted, Act no 2002-305 of 4 March 2002] child is conferred on the one of the ascendants who is of the closest degree.

**Art. 403**

In case of concurrence between ascendants of the same degree, the family council shall designate the one among them who will be guardian.

**Art. 404**

Where there is neither testamentary guardian nor ascendant guardian, or where the one who was designated in that capacity happens to cease his office, a guardian shall be given to the minor by the family council.

**Art. 405**

That council shall be convened by the judge of guardianships, either of his own motion or on submission therefor made to him by relatives by blood or marriage of the father and mother, creditors or other parties concerned or the Government procurator's office. Any person may complain to the judge against the fact that will give occasion to the appointment of a guardian.

**Art. 406**

A guardian shall be designated for the duration of a guardianship.

The family council may however provide for his replacement in the course of the guardianship where serious circumstances so require, without prejudice to cases of excuse, incapacity or removal.

Paragraph 3

Of the Family Council                                                         Articles 407 to 416

**Art. 407**

A family council is composed of four to six members, including the supervisory guardian, but not the guardian or the judge of guardianships.

CIVIL CODE

They shall be designated by the judge for the duration of the guardianship. The judge may, however, without prejudice to Articles 428 and following, provide of his own motion for the replacement of one or several members in the course of guardianship in order to respond to changes which may occur in the condition of the parties.

**Art. 408**

The judge of guardianships shall select the members of the family council among the relatives by blood or marriage of the father and mother of the minor, in appraising all the circumstances of the case: nearness of degree, place of residence, ages and abilities of the parties concerned.

He must avoid, as far as possible, leaving one of the two lines without representation. But he shall have regard, above all, to the usual relations which the father and mother had with the various relatives by blood or marriage, as well as to the interest that those relatives have shown or appear to be able to show to the person of the child.

**Art. 409**

The judge of guardianships may also call upon, to form part of the family council, friends, neighbours or any other persons whom he considers able to take interest in the child.

**Art. 410**

A family council is convened by the judge of guardianships. It shall be so where convening is required either by two of its members, or by the guardian or supervisory guardian, or by the minor himself provided he is of the full age of"sixteen years" (Act no 74-631 of 5 July 1974).

(Act no 98-381 of 14 May 1998) A family council shall also be convened on the request of a minor under sixteen and capable of discernment, unless otherwise decided with particular reasons by the judge.

**Art. 411**

Notice convening a meeting  must be served at least eight days before the meeting.

(Act no 98-281 of 14 May 1998) Previously to that meeting, the judge shall hold a hearing of the minor capable of discernment in the way provided for in Article 388-1.

**Art. 412**

Members of the family council are obliged to attend meetings in person. Each one, however, may be represented by a relative by blood or marriage of the father and mother of the minor, where that relative is not already, in his own name, a member of the family council. A husband may represent his wife or reciprocally.

Members of the family council who, without a lawful excuse, are neither present nor validly represented, shall incur the fine provided for by the Code of Civil Procedure.

**Art. 413**

Where the judge of guardianships considers that a judgment may be handed down without the holding of a meeting being necessary, he shall notify to each one of the members of the council the text of the decision to be taken with appropriate clarifications.

Each of the members shall cast his vote by letter missive within the period fixed to him by the judge; failing which, he shall incur the fine provided for by the Code of Civil Procedure.

**Art. 414**

A family council may deliberate only where at least half of its members are present or represented. Where that number is not attained, the judge may, either adjourn the meeting or, in case of emergency, take the decision himself.

**Art. 415**

A family council is presided over by the judge of guardianships, who is entitled to vote with a casting vote in case of a parity of votes.

The guardian must attend the meetings; he is heard but does not vote, nor does the supervisory guardian where he represents the guardian.

(Act no 98-381 of 14 May 1998) A minor capable of discernment may, where the judge does not consider it contrary to his welfare, attend meetings in an advisory capacity. A minor over the full age of sixteen must be called where the meeting was convened on his requisition.

In no case may his consent to a transaction discharge the guardian and the other organs of guardianship from their liabilities.

**Art. 416**

Resolutions of a family council are void where they were obtained by fraud or deception, or where substantive formalities were omitted.

Invalidity is remedied by a new resolution equivalent to a confirmation under Article 1338.

An action for annulment may be brought by the guardian, the supervisory guardian, members of the family council or by the Government procurator's office, within two years following the resolution, as well as by the ward become of age or emancipated, within two years following his coming of age or his emancipation. Prescription does not run where there was deception or fraud, until the fact is discovered.

Transactions performed under a nullified resolution are themselves voidable in the same manner. The period, however, runs from the transaction and not from the resolution.

Paragraph 4
Of the Other Organs of Guardianship                                            Articles 417 to 426

CIVIL CODE

**Art. 417**

The family council, having regard to the abilities of the persons concerned and the composition of the patrimony to be administered, may decide that the guardianship will be divided between a guardian to the person and a guardian to the property, or that the management of particular property will be entrusted to a deputy guardian.

Guardians so appointed shall be independent, and not liable to each other, in their respective functions, unless otherwise ordered by the family council.

**Art. 418**

Guardianship is a personal office.

It does not extend to a guardian's spouse. Where, however, that spouse intrudes into the management of the ward's patrimony, he or she becomes jointly and severally liable with the guardian for all management subsequent to the intrusion.

**Art. 419**

Guardianship does not extend to a guardian's heirs. The latter are liable only for the management of their predecessor; and, where they are adults, they are bound to continue it until the appointment of a new guardian.

**Art. 420**

In every guardianship, there shall be a supervisory guardian, appointed by the family council among its members.

The functions of a supervisory guardian consist in the supervision of the management of the guardian and in representing a minor where his interests conflict with those of the guardian.

Where he observes some mismanagement, he must, on pain of incurring personal liability, immediately inform the judge of guardianships of it.

**Art. 421**

Where a guardian intrudes into the management before the appointment of a supervisory guardian, he may be dismissed from the guardianship, if there was fraud on his part, without prejudice to compensation due to the minor.

**Art. 422**

[repealed]

**Art. 423**

Where a guardian is a relative by blood or marriage of the minor only in one line, the supervisory guardian shall be taken, as far as possible, from the other line.

**Art. 424**

A supervisory guardian does not replace as of right a guardian who died or became under a disability, or who disclaims the guardianship; but he then shall, on pain of damages that may result from it to the minor, seek the appointment of a new guardian.

**Art. 425**

The office of a supervisory guardian comes to an end at the same time as that of the guardian.

**Art. 426**

A guardian may not seek the dismissal of a supervisory guardian or vote in the family councils that are convened for that purpose.

Paragraph 5

Of the Duties of a Guardian                                                                      Articles 427 to 448

**Art. 427**

Guardianship, a protection due to a child, is a public office.

**Art. 428**

Save the father and mother in the case of Article 391, persons to whom age, illness, remoteness, exceptionally absorbing professional or family activities or a previous guardianship render that new office particularly heavy, may be dispensed from guardianship.

**Art. 429**

Save the father and mother, may be discharged from guardianship persons who cannot continue to perform it because of one of the causes provided for by the preceding Article, where it occurred since the appointment.

**Art. 430 and 431**

[repealed]

**Art. 432**

One who was not a relative by blood or marriage of the father and mother of a minor may not be compelled to accept a guardianship.

**Art. 433**

*(Act no 89-487 of 10 July 1989)*

Where a guardianship remains vacant, the judge of guardianships shall remit it to the State if it concerns an adult, and to the Children's aid service if it concerns a minor.

CIVIL CODE

**Art. 434**

Excuses that dispense or discharge from a guardianship may be extended to a supervisory guardian and even to members of the family council, but only according to the seriousness of the cause.

**Art. 435 and 436**

[repealed]

**Art. 437**

A family council shall rule on the excuses of the guardian and the supervisory guardian; the judge of guardianships on the excuses offered by members of the family council.

**Art. 438**

Where an appointed guardian is present in person at the resolution which remits guardianship to him, he shall immediately, and on pain of having all subsequent claims declared non-admissible, offer his excuses on which the family council shall deliberate.

**Art. 439**

Where he was not present in person, he shall, within eight days of notice of appointment being served upon him, have the family council convened to deliberate on his excuses.

**Art. 440**

Where his excuses are rejected, he may make application to the tribunal de grande instance to have them accepted; but he is bound to administer temporarily pending suit.

**Art. 441**

The various duties of guardianship may be assumed by any person, without distinction of sex, but with reservation of the causes of incapacity, exclusion, dismissal or challenge expressed below.

**Art. 442**

Are incapable of the various duties of guardianship:

1° Minors, save the father or mother;

2° Adults under guardianship, insane persons and adults under curatorship.

**Art. 443**

Are excluded or dismissed by operation of law from the various duties of guardianship:

1° Those who were sentenced to an afflictive or infamous punishment or to whom exercise of the duties of guardianship was forbidden under Article 42 [131-26] of the Penal Code.

They may, however, be admitted to the guardianship of their own children, upon assent of the family council.

2° Those who have been deprived of parental authority.

**Art. 444**

May be excluded or dismissed from the various duties of guardianship people of notorious misconduct and those whose improbity, usual negligence or inability for business has been established.

**Art. 445**

Those who have, or whose father and mother have with the minor a controversy calling into question the status of the latter or a significant part of his property must resign and may be challenged as to the various duties of guardianship.

**Art. 446**

Where a member of the family council is subject to exclusion, dismissal or challenge, the judge of guardianships shall decide himself, either of his own motion, or on demand of the guardian, of the supervisory guardian or of the Government procurator's office.

**Art. 447**

Where a cause for exclusion, dismissal or challenge relates to a guardian or a supervisory guardian, the family council shall decide. It shall be convened by the judge of guardianships, either of his own motion, or on demand made by the persons mentioned in Article 410 or by the Government procurator's office.

**Art. 448**

A guardian or supervisory guardian may be excluded, dismissed or challenged only after being heard or summoned. Where he accepts the resolution, mention shall be made thereof and a new guardian or supervisory guardian shall take office at once.

Where he does not accept, he may make an application to vacate under the rules of the Code of Civil Procedure; but the judge of guardianships may, if he considers that there is an emergency, prescribe forthwith interim measures for the welfare of the minor.

SECTION III

Of the Functioning of a Guardianship                                                    Articles 449 to 468

**Art. 449**

A family council shall regulate the general conditions of support and education of the child, having regard to the intention which the father and mother may have expressed on this subject.

CIVIL CODE

**Art. 450**

A guardian shall take care of the person of the minor and shall represent him in all civil transactions, save the cases where the law or usage authorizes minors to act for themselves.

He shall administer his property like a prudent administrator and be liable for the damages that would result from his mismanagement.

He may not buy the minor's property or take it on lease for rent or farm lease, unless the family council has authorized the supervisory guardian to make a lease with him, or accept the assignment of any right or claim against his ward.

**Art. 451**

A guardian shall administer and act in that capacity from the day of his appointment, where it was made in his presence; otherwise, from the day when notice of it was served upon him.

Within the ten days which follow, he shall require the lifting of seals, if they were affixed, and shall at once have an inventory of the minor's property made, in the presence of the supervisory guardian. An office copy of that inventory shall be sent to the judge of guardianships.

Failing an inventory within the prescribed period, the supervisory guardian shall refer the matter to the judge of guardianships for the purpose of its being made, on pain of being jointly and severally liable with the guardian for all orders rendered in favour of the ward. Default of inventory shall authorize the ward to make proof of the value and composition of his property by any means, even common repute.

Where a minor owes something to the guardian, the latter shall so declare in the inventory, on pain of forfeiture, on the demand that the public officer is required to make to him, and  mention of which shall be made in the memorandum.

**Art. 452**

Within the three months which follow the initiating of a guardianship, a guardian shall convert into registered securities or deposit all the bearer securities belonging to the minor into an account opened in the name of the minor and mentioning the minority, with a depositary accredited by the Government to receive funds and securities of wards, unless he is authorized to sell them as provided for in Articles 457 and 468.

He shall similarly, and under the same reservation, convert into registered securities or deposit with an accredited depositary the bearer securities that the minor receives afterwards, in whatever manner, within the same period of three months after the entry into possession.

He may not withdraw the bearer securities deposited as provided for in the preceding paragraphs, or convert registered securities into bearer securities, unless conversion is made through a depositary accredited by the Government

The family council may, if necessary, fix a longer period for the performance of such operations.

**Art. 453**

A guardian may give a receipt for funds which he receives for the account of the ward only with the counter-signature of the supervisory guardian

Those funds shall be deposited by him into an account opened in the name of the minor and mentioning the minority, with a depositary accredited by the Government to receive funds and securities of wards.

Deposit is to be made within the period of one month after the receiving of funds; where that period elapses, the guardian is, as of right, debtor for the interests.

**Art. 454**

On the initiating of a guardianship, the family council shall determine at a roof estimate, and according to the importance of the property managed, the sum annually available  for the support and education of the ward, the expenses of administration of his property, as well as possibly the allowance that may be granted to the guardian.

The same resolution shall specify whether the guardian is authorized to put on the account the salaries of particulars administrators or agents for whose assistance he may ask, under his own responsibility.

The family council may also authorize the guardian to make a contract for the management of the marketable securities of the ward. The resolution shall designate the contracting third party having regard to his solvency and professional experience, and specify the terms of the contract. Notwithstanding any stipulation to the contrary, the contract may, at any time, be terminated in the name of the ward.

**Art. 455**

A family council shall determine the sum at which shall begin for the guardian the responsibility to reinvest the liquid capital of the minor, as well as the surplus of the income. That reinvestment shall be made within a period of six months, save extension by the family council. Where that period elapses, the guardian is as of right accountable for the interests.

The nature of the property that may be acquired in reinvestment shall be determined by the family council, either in advance, or on the occasion of each transaction.

In any case, third parties shall not be guarantors of the reinvestment.

**Art. 456**

As a representative of a minor, a guardian shall perform all acts of administration alone.

He may thus transfer, for value, movables of current use and property having character of profits.

Leases agreed to  by a guardian do not confer on the lessee, against a minor become of age, any right to renewal or any right to remain on the premises at the expiry of the lease, notwithstanding any statutory provision to the contrary. Those provisions, however, shall not apply to leases granted before the instituting of the guardianship and renewed by

CIVIL CODE

the guardian.

Transactions which, for the management of the marketable securities of the ward, must be deemed acts of administration entering into the responsibilities and powers, either of statutory administrators and guardians, or of accredited depositaries, shall be determined by decree in Conseil d'Etat.

**Art. 457**

A guardian may not, without being thereto authorized by the family council, make transfers in the name of the minor.

Without that authorization, he may not, in particular, borrow for the ward, or dispose of or encumber with real rights immovables, business concerns, marketable securities and other incorporeal rights, or movables which are precious or constitute an important part of the ward's patrimony.

**Art. 458**

In giving its authorization, a family council may prescribe all steps it considers appropriate, in particular as to the reinvestment of the funds.

**Art. 459**

A sale of immovables and business concerns that belong to a minor shall be done publicly by auction, in the presence of the supervisory guardian, subject to the conditions laid down by Articles 953 and following of the Code of Civil Procedure [Articles 1271 and following of the new Code of Civil Procedure].

A family council may, however, authorize an amicable sale, either by public auction with an opening bid it shall fix, or by private agreement, at prices and terms it shall determine. In case of amicable auction, an outbidding may always be made, as provided for in the Code of Civil Procedure.

A contribution to a partnership of an immovable or business concern may take place by private agreement  It must be authorized by the family council on the report of an expert whom the judge of guardianships shall designate.

Marketable securities registered on an official list shall be sold through the agency of a stockbroker [a broker-dealer].

Other marketable securities shall be sold by auction through the agency of a stockbroker [a broker-dealer] or a notaire designated in the resolution which authorizes the sale. The family council may, however, on the report of an expert designated by the judge of guardianships, authorize the sale of it by private agreement at prices and under terms it shall determine.

**Art. 460**

The authorization required by Article 457 for the transfer of property of a minor shall not apply where a judgment has ordered a sale by auction on request of a co-owner of the property held undivided.

**Art. 461**

A guardian may accept a succession accruing to a minor only under benefit of inventory. The family council may, however, by a special resolution, authorize him to accept it unconditionally where the assets manifestly exceed the liabilities.

A guardian may not repudiate a succession accruing to a minor without an authorization of the family council.

**Art. 462**

In case the succession repudiated in the name of a minor has not been accepted by any one else, it may be retaken, either by the guardian authorized for that purpose by a new resolution of the family council, or by the minor when he has come of age; but in the condition in which it is at the time it is retaken and without any possibility of review of the sales and other transactions lawfully performed during the vacancy.

**Art. 463**

A guardian may accept without authorization gifts and specific legacies accruing to the ward, unless they are encumbered with charges.

**Art. 464**

A guardian may, without authorization, lodge a claim relating to patrimonial rights of the minor. He may likewise abandon the proceedings. The family council may enjoin him to initiate an action, to abandon it, or to make offers for the purpose of abandonment, on pain of being liable.

A guardian may defend alone an action brought against the minor, but he may acquiesce in it only with the authorization of the family council.

An authorization of the family council is always required for actions relating to non-patrimonial rights.

**Art. 465**

A guardian may not, without an authorization of the family council, file an application for partition in the name of the minor; but he may, without that authorization, reply to an application for partition brought against the minor or join in a collective petition for the purpose of partition, lodged by all the parties concerned under Article 822.

**Art. 466**

In order to produce with regard to a minor the same full effect as it would do between adults, a partition must be made in court, in accordance with the provisions of Articles 815 and following.

The family council may, however, authorize an amicable partition, even partial. In that case, it shall designate a notaire to proceed thereto. The statement of liquidation, to which shall be attached the resolution of the family council, must be submitted to the approval of the tribunal de grande instance.

CIVIL CODE

Any other partition shall be considered as only provisional.

**Art. 467**

A guardian may compromise in the name of the minor only after having the family council approve the terms of the compromise.

**Art. 468**

In all cases where the authorization of the family council is required for the validity of an act of the guardian, it may be substituted by that of the judge of guardianships, where the act to be made involves property the capital value of which does not exceed a sum that is fixed by decree1.

The judge of guardianships may also, on request of a guardian, authorize a sale of marketable securities instead and in place of the family council where it appears to him that there would be danger in delay, but on condition that a report be made as soon as possible to the family council which will decide on the reinvestment.

1 D. no 65-961 of 5 Nov. 1965 : 1000 000 F (15 300 €)

SECTION IV

Of the Accounts of Guardianship and of Liabilities                                        Articles 469 to 475

**Art. 469**

Every guardian is accountable for his management when it comes to an end.

**Art. 470**

Before the end of a guardianship, a guardian is bound to deliver each year to the supervisory guardian an account of management. That account shall be written and delivered without cost, on unstamped paper.

(Act no 95-125 of 8 Feb. 1995) The supervisory guardian shall transmit the account with his comments to the clerk in chief of the tribunal d'instance who may ask him any information. In case of difficulty, the clerk in chief shall report to the judge of guardianships who may convene the family council, without prejudice to the power of the judge to get communication of the account and supervise it at any time.

Where a minor reaches the full age of"sixteen years" (Act no 74-631 of 5 July 1974), the judge of guardianships may decide that the account shall be communicated to him.

**Art. 471**

Within the three months following the end of a guardianship, a final account shall be rendered, either to the minor himself, having become of age or emancipated, or to his heirs. The guardian shall advance the costs of it; they shall be charged to the ward.

A guardian must be allowed therein all expenses sufficiently warranted and made for a useful purpose.

Where a guardian happens to cease his functions before the end of the guardianship, he shall render a recapitulatory account of his management to the new guardian who may accept it only with the authorization of the family council, upon the comments of the supervisory guardian.

**Art. 472**

A minor come of age or emancipated may approve an account of guardianship only one month after the guardian gave it to him, against a receipt, with supporting documents. An approval given before the end of the period is void.

Also void is any agreement entered into between the ward, become of age or emancipated, and him who was his guardian where it has the effect of releasing the latter, in whole or in part, from his obligation to render account.

Where an account gives rise to controversies, they shall be prosecuted and adjudged as provided for in the Title Of Accounting of the Code of Civil Procedure.

**Art. 473**

Approval of an account does not prejudice actions for compensation that may belong to a ward against a guardian or other organs of the guardianship.

The State is alone liable with regard to the ward, save its action of recourse if there is occasion, for damage resulting from whatever fault committed in the functioning of the guardianship, either by the judge of guardianships or his clerk,"or by the clerk in chief of the arrondissement" (Act no 95-125 of 8 Feb. 1995), or by the public administrator in charge of a vacant guardianship under Article 433.

An action for damages by the ward against the State shall be brought in all cases before the tribunal de grande instance.

**Art. 474**

The sum to which the balance due by the guardian may amount bears interest by operation of law from the approval of the account and, at the latest, three months after the end of the guardianship.

Interests on what may be due to the guardian by the minor run only from the day of demand for payment which followed the approval of the account.

**Art. 475**

Any action by the minor against a guardian, organs of the guardianship or the State relating to guardianship matters is time-barred after five years, counting from majority, even where there has been emancipation.

CHAPTER III

Of Emancipation                                                                 Articles 476 to 487

CIVIL CODE

**Art. 476**

*(Act no 74-631 of 5 July 1974)*

A minor is emancipated as a matter of right by marriage.

**Art. 477**

*(Act no 74-631 of 5 July 1974)*

A minor, even unmarried, may be emancipated when he has reached the full age of sixteen years.

"After the minor has been heard" (Act no 93-22 of 8 Jan. 1993), that emancipation shall be pronounced, if there are proper reasons, by the judge of guardianships, on request of the father and mother or of one of them.

Where the request is filed by only one parent, the judge shall decide after hearing the other, unless the latter is unable to express his or her intention.

**Art. 478**

*(Act no 74-631 of 5 July 1974)*

A minor left without father and mother may in the same manner be emancipated on request of the family council.

**Art. 479**

Where, in the case of the preceding Article, the guardian having taken no step, a member of the family council is of opinion that the minor can be emancipated, he may require the judge of guardianships to convene the council in order to consider the matter. The minor himself may request that convening.

**Art. 480**

The account of the administration or guardianship, as the case may be, is rendered to an emancipated minor in the way provided for in Article 471.

**Art. 481**

An emancipated minor is capable, like an adult, of all transactions of civil life.

He must however, in order to marry or give himself in adoption, comply with the same rules as if he was not emancipated.

**Art. 482**

An emancipated minor ceases to be under the authority of his father and mother.

The latter are not liable as of right, in their sole capacity as father or mother, for damage that he may cause to others after his emancipation.

**Art. 483 to 486**

[repealed]

**Art. 487**

*(Act no 74-631 of 5 July 1974)*

An emancipated minor may not be a merchant.

**TITLE XI**

**OF MAJORITY AND  OF ADULTS WHO ARE PROTECTED BY THE LAW**          **Articles 488 to 515**

CHAPTER I

General Provisions                                                       Articles 488 to 490-3

**Art. 488**

*(Act no 74-631 of 5 July 1974)*

Majority is fixed at the full age of eighteen years; at that age one is capable of all the transactions of civil life.

Nevertheless, an adult whom an impairing of his personal faculties places in the impossibility of providing alone for his interests  is protected by the law, either on the occasion of a specific transaction, or in a continuous manner.

May be likewise protected an adult who, because of his prodigality, insobriety or idleness, is in danger to fall into need or compromises the fulfilment of his family obligations.

**Art. 489**

In order to enter into a valid transaction, it is necessary to be of sound mind. But it is for those who seek annulment on that ground to prove the existence of a mental disorder at the time of the transaction.

During the lifetime of an individual, an action for annulment may be brought only by him, or by his guardian or curator, where one of them was appointed for him afterwards. It is time-barred after the period provided for in Article 1304.

**Art. 489-1**

After his death, transactions entered into by an individual, other than a gift inter vivos or a will, may be contested on the ground provided for in the preceding Article only in the cases listed below:

1° Where a transaction in itself discloses proof of a mental disorder;

2° Where it was entered into in a time when the individual was placed under judicial supervision;

3° Where a petition was initiated before the death in order to have a guardianship or curatorship opened.

**Art. 489-2**

CIVIL CODE

A person who has caused damage to another when he was under the influence of a mental disorder is nonetheless liable to compensation.

**Art. 490**

Where mental faculties are disordered by an illness, an infirmity or feebleness due to age, the interests of the person are safeguarded by one of the systems of protection provided for in the following Chapters.

The same systems of protection apply to the impairing of bodily faculties if it prevents the expression of intention.

An impairing of mental or bodily faculties must be medically established.

**Art. 490-1**

The methods of medical treatment, in particular as to the choice between hospitalisation and care at home, are independent of the system of protection relating to civil interests.

Reciprocally, the system relating to civil interests is independent of the medical treatment.

Nevertheless, judgments by which the judge of guardianships organizes the protection of civil interests must be preceded by an advice of the attending physician.

**Art. 490-2**

Whatever the system of protection applicable may be, the lodging of the protected person and the furniture with which it is equipped must be kept at his disposal as long as it is possible.

Power of administration, as regards that property, allows only agreements for precarious enjoyment, which shall cease from the return of the protected person, despite any provision or stipulation to the contrary.

Where it becomes necessary or it is in the interest of the protected person to dispose of rights relating to lodging or to transfer the furniture, the transaction must be approved by the judge of guardianships, after advice of the attending physician, without prejudice to the other formalities which the nature of the property may require. Souvenirs and other objects of a personal character must always be excepted from transfer and kept at the disposal of the protected person, where appropriate, thanks to the institution of treatment.

**Art. 490-3**

The Government procurator of the place of treatment and the judge of guardianships may visit or cause to be visited adults protected by law, whatever the system of protection applicable to them may be.

CHAPTER II
Of Adults under Judicial Supervision                                      Articles 491 to 491-6

**Art. 491**

An adult who, for one of the causes provided for in Article 490, needs to be protected in the transactions of civil life, may be placed under judicial supervision.

**Art. 491-1**

Judicial supervision results from a declaration made to the Government procurator in the way provided for by the Code of Public Health.

A judge of guardianships, to whom proceedings in guardianship or curatorship have been referred, may place the person whom it should be advisable to protect under judicial supervision, pending suit, by an interim order transmitted to the Government procurator.

**Art. 491-2**

An adult placed under judicial supervision keeps the exercise of his rights.

However, the transactions he entered into and the undertakings he contracted may be rescinded for ordinary loss or abated in case of excess, even though they may not be annulled under Article 489.

Courts shall take into consideration, on this subject, the wealth of the protected person, the good or bad faith of those who dealt with him, the usefulness or uselessness of the transaction.                An action for rescission or abatement may be brought, during the lifetime of the person, by all those who would have standing to petition for the opening of a guardianship and, after his death, by his heirs. It is time-barred after the period provided for in Article 1304.

**Art. 491-3**

Where a person has appointed an agent for the purpose of administering his property, either before, or after being placed under judicial supervision, that agency must be fulfilled.

However, where a power of attorney expressly mentions that it was given on account of the period of supervision, it may, during that period, be revoked by the principal only with the authorization of the judge of guardianships.

In all cases, the judge, either of his own motion, or on request of one of the parties who would have standing to request the opening of a guardianship, may order the revocation of the agency.

He may also, even of his own motion, order that"the accounts be submitted to the clerk in chief of the tribunal d'instance for approval, without prejudice to the power of the judge to exercise himself that supervision" (Act no 95-125 of 8 Feb. 1995).

**Art. 491-4**

In the absence of an agency, the rules of management of another's business shall be followed.

However, those who would have standing to request the opening of a guardianship are under the obligation to do the acts of preservation necessitated by the management of the patrimony of the protected person where they had knowledge of their urgency as well as of the declaration for purpose of supervision. The same obligation falls under the

CIVIL CODE

same conditions on the director of the treating institution or, possibly, on the one who shelters at his home the person under supervision.

An obligation to do acts of preservation involves, with regard to third parties, the corresponding power.

**Art. 491-5**

Where  there is occasion to act outside the cases defined in the preceding Article, any party concerned may give notice thereof to the judge of guardianships.

The judge may, either appoint a special agent for the purpose of doing a specific transaction or a series of transactions of the same nature, within the limits of what a guardian might do without the authorization of the family council, or decide of his own motion to open a guardianship or a curatorship, or direct the party concerned to instigate himself the opening where he is one of those having standing to request it

**Art. 491-6**

Judicial supervision comes to an end with a new declaration certifying that the previous situation has come to an end, by lapse of the declaration under the periods of the Code of Civil Procedure or by its cancellation upon decision of the Government procurator.

It comes also to an end with the opening of a guardianship or of a curatorship from the day when the new system of protection takes effect.

CHAPTER III

Of Adults in Guardianship                                                            Articles 492 to 507

**Art. 492**

A guardianship shall be opened where an adult, for one of the causes provided for in Article 490, needs to be represented in a continuous manner in the transactions of civil life.

**Art. 493**

The opening of a guardianship shall be ordered by the judge of guardianships on request of the person whom there is occasion to protect, of his or her spouse, unless community of living has ceased between them, of his or her ascendants or descendants, brothers and sisters, of the curator or of the Government procurator; it may also opened by the judge of his own motion.

Other relatives by blood or marriage, or friends, may only make known to the judge the cause that could justify the opening of a guardianship. It shall be likewise with the attending physician and the director of the institution.

The persons referred to in the two preceding paragraphs may, even where they did not intervene into the case, appeal to the tribunal de grande instance against a judgment which opened a guardianship.

**Art. 493-1**

The judge may order the opening of a guardianship only where the impairing of mental or bodily faculties of the sick person was ascertained by a specialist chosen from a list established by the Government procurator.

The opening of a guardianship shall be ordered in the way provided for in the Code of Civil Procedure.

**Art. 493-2**

Judgments opening, modifying or withdrawing a guardianship may be enforced against third parties only two months after mention of them was made in the margin of the record of birth of the protected person, as provided for in the Code of Civil Procedure.

Even failing that mention, they are nevertheless enforceable against third parties who had personal knowledge of them.

**Art. 494**

A guardianship may be opened for an emancipated minor as for an adult.

As regards a non-emancipated minor, a petition may even be initiated and adjudged during the last year of minority; but guardianship shall take effect only from the day when he comes of age.

**Art. 495**

Shall apply also to guardianships of adults the rules prescribed by Sections 2, 3 and 4 of Chapter II of Title X of this Book for guardianships of minors, save, however, those which relate to the education of the child and, in addition, under the following amendments.

**Art. 496**

A spouse is the guardian of the other spouse, unless community of living has ceased between them or the judge is of opinion that another reason prevents his or her being entrusted with guardianship. All other guardians are dative.

A guardianship of an adult may be conferred on a juridical person.

**Art. 496-1**

Nobody, except the spouse, descendants and juridical persons may be compelled to hold guardianship of an adult beyond five years. On the expiry of that period, the guardian may request and shall gain his replacement.

**Art. 496-2**

An attending physician may not be a guardian or a supervisory guardian of his patient. But the judge of guardianships may always call on him to participate in the family council in an advisory capacity.

A guardianship may not be conferred on a treating institution, or on any person holding therein a gainful occupation

CIVIL CODE

unless they are one of those who had standing to request the opening of a guardianship. An executive employee of the institution may however be designated as manager of the guardianship in the circumstances referred to in Article 499.

**Art. 497**

Where there is"a relative by blood or by marriage" (Act no 96-452 of 28 May 1996) qualified for managing the property, the judge of guardianships may decide that he shall manage it as a statutory administrator, without a supervisory guardian or a family council, in accordance with the rules that apply, as regards the property of a minor, to statutory administration under judicial supervision.

**Art. 498**

There is no occasion to open a guardianship which would devolve on a spouse where the interests of a protected person can be provided for adequately in accordance with the matrimonial regime and in particular with the rules of Articles 217 and 219, 1426 and 1429.

**Art. 499**

Where, in consideration of the composition of the property to be managed, the judge of guardianships considers it useless to establish a complete guardianship, he may limit himself to designate as manager of the guardianship, without supervisory guardian or family council, either an executive employee belonging to the administrative staff of the treating institution, or a special administrator, chosen in the way provided for in a decree in Conseil d'Etat.

**Art. 500**

A manager of a guardianship shall collect the incomes of the protected person and apply them to the support and treatment of the latter and discharge of the maintenance obligations for which he may be liable. Where there is an excess, he shall deposit it into an account which he must open with an accredited depositary. Each year, he shall render account of his management directly to the"clerk in chief of the arrondissement, without prejudice to the power of the judge to request at any time from the clerk in chief communication of the account of management and direct transmittal of the accounting" (Act no 95-125 of 8 Feb. 1995).

Where other acts become necessary, he shall refer the matter to the judge who may either authorize him to do them, or decide to establish the guardianship completely.

**Art. 501**

When opening a guardianship or in a subsequent judgment, the judge, upon opinion of the attending physician, may list some transactions that the person in guardianship will have the capacity to enter into himself, either alone, or with the assistance of the guardian or of the person standing in his stead.

**Art. 502**

All transactions entered into by a protected person after the judgment of opening of a guardianship are void as of right, subject to the provisions of Article 493-2.

**Art. 503**

Prior transactions may be annulled where the cause which determined the opening of the guardianship existed notoriously at the time when they were made.

**Art. 504**

A will made after the opening of a guardianship is void as of right.

A will previously made remains valid, unless it is proved that, since the opening of the guardianship, the reason which determined the testator to so dispose has disappeared.

**Art. 505**

With authorization of the family council, gifts may be made in the name of an adult in guardianship, but only in favour of his descendants and by way of advancement, or in favour of the spouse.

**Art. 506**

Even in the cases of articles 497 and 499, marriage of an adult in guardianship is allowed only with the consent of a family council specially convened in order to consider the matter. The council may decide only after hearing the future spouses.

There is no occasion for a meeting of the family council where the father and mother both give  their consent to the marriage.

In all cases, the opinion of the attending physician is required.

**Art. 506-1**

*(Act no 99-944 of 15 Nov. 1999)*

Adults in guardianship may not enter into a civil covenant of solidarity.

Where, during a civil covenant of solidarity, one of the partners is placed under guardianship, the guardian authorized by the family council or, failing which, the judge of guardianships may put an end to the covenant  in the way provided for in Article 515-7, paragraph 1 or 2.

Where the initiative to cancel the covenant is taken by the other partner, the notice mentioned in the same Article, paragraph 2 and 3, shall be served on the guardian.

**Art. 507**

Guardianship comes to an end with the causes that determined it; nevertheless removal of it may be ordered only in

CIVIL CODE

complying with the formalities prescribed for attaining its opening and a person in guardianship may resume the exercise of his rights only after a judgment of removal.

The methods of review provided for by Article 493, paragraph 3, may be resorted to only against judgments that refuse to give removal of a guardianship.

CHAPTER IV

Of Adults in Curatorship                                                                                      Articles 508 to 515

**Art. 508**

Where an adult, for one of the causes provided for in Article 490, without being unable to act for himself, has need of being advised or supervised in transactions of civil life, he may be placed under a system of curatorship.

**Art. 508-1**

An adult to whom Article 488, paragraph 3, refers may also be placed under a system of curatorship.

**Art. 509**

Curatorship is opened and comes to an end in the same way as a guardianship of adults.

It is subject to the same requirements as to notice.

**Art. 509-1**

In a curatorship there is no other organ than the curator.

A spouse is curator for the other spouse unless community of living has ceased between them or the judge is of opinion that another reason prevents his or her being entrusted with curatorship. All other curators must be appointed by the judge of guardianships.

**Art. 509-2**

The provisions relating to the duties of a guardian shall apply to the office of a curator, under the amendments which guardianship of adults involves.

**Art. 510**

An adult in curatorship may not, without the assistance of his curator, enter into any transaction which, under the system of guardianship of adults, requires an authorization of the family council. Nor may he, without that assistance, receive capital or make investment of it.

Where a curator refuses his assistance to a transaction, a person in curatorship may request a suppletory authorization from the judge of guardianships.

**Art. 510-1**

Where an adult in curatorship has entered alone into a transaction for which the assistance of a curator was required, himself or the curator may seek the annulment of it.

An action for annulment is time-barred after the period provided for in Article 1304, or even, before expiry of that period, in consequence of the approval that the curator may have given to the transaction.

**Art. 510-2**

Any service made on an adult in curatorship may be also made on the curator, on pain of invalidity.

**Art. 510-3**

In cases where the assistance of a curator was not required by statute, transactions into which an adult in curatorship may have entered alone remain nevertheless subject to actions for rescission or abatement regulated by Article 491-2, as though they were entered into by a person under judicial supervision.

**Art. 511**

When opening a curatorship or in a subsequent judgment, the judge, upon opinion of the attending physician, may list some transactions that the person in curatorship will have the capacity to enter into alone, in derogation from Article 510, or, inversely, add other transactions to those for which that Article requires the assistance of a curator.

**Art. 512**

When appointing a curator, the judge may order that he alone shall receive the incomes of the person in curatorship, settle expenses with regard to third parties, and deposit the excess, if any, into an account opened with an accredited depositary.

A curator appointed with that task shall render an account of his management each year to the"clerk in chief of the arrondissement, without prejudice to the power of the judge to request at any time from the clerk in chief communication of the account of management and direct transmittal of the accounting" (Act no 95-125 of 8 Feb. 1995)..

**Art. 513**

A person in curatorship may freely make his will, except for application of Article 901, if there is occasion.

He may make a gift only with the assistance of his curator.

**Art. 514**

As regards marriage of an adult in curatorship, the consent of the curator is required; failing which, that of the judge of guardianships.

**Art. 515**

CIVIL CODE
[repealed]

## TITLE XII
### OF CIVIL COVENANTS OF SOLIDARITY AND OF CONCUBINAGE          Articles 515-1 to 515-8

#### CHAPTER I
Of Civil Covenants of Solidarity                                    Articles 515-1 to 515-7

**Art. 515-1**

A civil covenant of solidarity is a contract entered into by two natural persons of age, of different sexes or of a same sex, to organize their common life.

**Art. 515-2**

On pain of nullity, there may not be a civil covenant of solidarity:

1° Between ascendants and descendants in direct line, between relatives by marriage in direct line and between collaterals until the third degree inclusive;

2° Between two persons of whom one at least is bound by the bonds of marriage;

3° Between two persons of whom one at least is already bound by a civil covenant of solidarity.

**Art. 515-3**

Two persons who enter into a civil covenant of solidarity shall make a joint declaration of it at the court office of the tribunal d'instance under the jurisdiction of which they fix their common residence.

On pain of dismissal, they shall file with the clerk the agreement concluded between them in duplicate original and add the documents of civil status which allow to establish the validity of the transaction with respect to Article 515-2, as well as a certificate of the court office of the tribunal d'instance of their places of birth or, in case of birth abroad, of the court office of the tribunal de grande instance of Paris, attesting that they are not already bound by a civil covenant of solidarity.

After the filing of the set of documents, the clerk shall enter that declaration into a register.

The clerk shall countersign and date the two originals of the agreement and give them back to each partner.

He shall have a mention of the declaration entered into a register held in the court office of the tribunal d'instance of the place of birth of each partner or, in case of birth abroad, in the court office of the tribunal de grande instance of Paris.

An entry in the register of the place of residence shall attribute an undisputable date to the civil covenant of solidarity and render it effective against third parties.

Any amendment to the covenant shall be the subject of a joint declaration entered at the court office that received the initial transaction, to which shall be added, on pain of dismissal and in duplicate original, the instrument amending the agreement. The formalities provided for in paragraph 4 shall apply.

Abroad, the entry of a joint declaration of a covenant binding two partners of whom one at least is of French nationality, the formalities provided for in paragraphs 2 and 4 and those required in case of an amendment of the covenant shall be the responsibility of French diplomatic and consular agents.

**Art. 515-4**

Partners bound by a civil covenant of solidarity shall provide mutual material and moral aid to each other. The terms of that aid shall be fixed by the covenant.

Partners shall be jointly and severally liable with regard to third parties for debts incurred by one of them for the needs of everyday life and for expenses relating to the common lodging.

**Art. 515-5**

Partners to a civil covenant of solidarity shall lay down, in the agreement referred to in Article 515-3, paragraph 2, whether they wish to submit to the system of undivided ownership the furniture they would acquire for value after the conclusion of the covenant. Failing which, that furniture shall be deemed undivided in halves. It shall be likewise where the date of acquisition of that property may not be established.

The other property of which partners become owners for value after the conclusion of the covenant shall be deemed undivided in halves where the instrument of acquisition or of subscription does not otherwise provide.

**Art. 515-6**

The provisions of Article 832 shall apply between partners to a civil covenant of solidarity in case of dissolution of it, save those relating to all or part of an agricultural holding, as well as to an undivided share or to partnership shares of that holding.

**Art. 515-7**

Where  partners decide by mutual agreement to put an end to a civil covenant of solidarity, they shall file a joint written declaration with the court office of the tribunal d'instance under the jurisdiction of which one of them at least has his residence. The clerk shall enter that declaration into a register and shall ensure its preservation.

Where one of the partners decides to put an end to a civil covenant of solidarity, he or she shall serve notice of his or her decision on the other and shall send a copy of that notice to the court office of the tribunal d'instance which received the initial instrument.

Where one of the partners puts an end to a civil covenant of solidarity by marrying, he or she shall notify his or her decision to the other by service and shall send copies of the latter and of his or her record of birth on which mention of the marriage has been made, to the court office of the tribunal d'instance which received the initial instrument.

CIVIL CODE

Where a civil covenant of solidarity comes to an end by the death of at least one of the partners, the survivor or any party concerned shall send a copy of the record of death to the court office of the  tribunal d'instance which received the initial instrument.

A clerk who receives a declaration or instruments provided for in the preceding paragraphs shall enter or have entered mention of the end of the covenant into the margin of the initial instrument. He shall also have registration of that mention written into the margin of the register provided for in Article 515-3, paragraph 5.

Abroad, receiving, recording and preserving a declaration or instruments referred to in the first four paragraphs shall be the responsibility of French diplomatic or consular agents, who shall also undertake or have undertaken mentions provided for in the preceding paragraph.

A civil covenant of solidarity shall come to an end, according to the circumstances:

1° As soon as a mention is made in the margin of the initial instrument of the joint declaration provided for in the first paragraph;

2° Three months after service delivered under paragraph 2, provided that a copy of it was brought to the knowledge of the clerk of the court designated in that paragraph;

3° On the date of the marriage or of the death of one of the partners.

Partners shall undertake themselves the liquidation of the rights and obligations resulting on their behalf from the civil covenant of solidarity. Failing an agreement, the judge shall rule on the patrimonial consequences of the breach, without prejudice to damage possibly suffered.

> CHAPTER II
> Of Concubinage                                                                Article 515-8

**Art. 515-8**

Concubinage is an union in fact, characterized by a life in common offering a character of stability and continuity, between two persons, of different sexes or of the same sex, who live in couple.

# BOOK II
# OF PROPERTY AND OF THE VARIOUS MODIFICATIONS OF OWNERSHIP  Articles 517 to 639

> ## TITLE I
> ## OF THE VARIOUS KINDS OF PROPERTY                                    Articles 517 to 516

**Art. 516**

All property is movable or immovable.

> CHAPTER I
> Of Immovables                                                          Articles 517 to 526

**Art. 517**

Property is immovable, either by its nature or by its destination or by the object to which it applies.

**Art. 518**

Lands and buildings are immovables by their nature.

**Art. 519**

Windmills or watermills, fixed on pillars and forming part of a building, are also immovables by their nature.

**Art. 520**

Harvests standing by roots and the fruit of trees not yet gathered are also immovables.

As soon as crops are cut and the fruit separated, even though not removed, they are movables.

Where only a part of a harvest is cut, this part alone is movable.

**Art. 521**

The normal cutting of underwood or of timber periodically cut becomes movable only as the cutting down of trees proceeds.

**Art. 522**

Animals which the owner of a tenement delivers to a farmer or share cropper for farming, whether they are appraised or not, shall be deemed immovables so long as they remain attached to the tenement under the terms of the agreement.

Animals leased to other than farmers or share croppers are movables.

**Art. 523**

Pipes used to bring water into a house or other immovable are immovables and form part of the  tenement to which they are attached.

**Art. 524**

"Animals and things that the owner of a tenement placed thereon for the use and working of the tenement are immovable by destination" (Act no 99-5 of 6 Jan. 1999).

Thus,

Animals attached to farming;

CIVIL CODE

Farming implements;
Seeds given to farmers or share croppers;
Pigeons in pigeon-houses;
Warren rabbits;
Beehives;
Fishes of waters not referred to in Article L. 231-3 of the Rural Code and of stretches of water referred to in Articles L. 431-6 and L. 431-7 of the Environmental Code;
Wine pressers, boilers, stills, vats and barrels;
Implements necessary for working ironworks, paper-mills and other factories;
Straw and manure,
are immovables by destination where they have been placed by the owner for the use and working of the tenement.
All movables which the owner has attached to the tenement perpetually are also immovables by destination.

**Art. 525**

An owner shall be deemed to have attached movables perpetually to his tenement, where they are fastened with plaster or mortar or cement, or where they cannot be removed without being broken or damaged, or without breaking or damaging the part of the tenement to which they are affixed.

The mirrors of an apartment shall be deemed perpetually placed where the flooring to which they have been fastened is part of the panelling.

It shall be the same as to pictures and other ornaments.

As regards statues, they are immovables where they are placed in a recess designed expressly to receive them, even though they can be removed without breakage or damage.

**Art. 526**

The usufruct of immovable things;
Servitudes or land services;
Actions for the purpose of recovering an immovable,
are immovables by the object to which they apply.

CHAPTER II
Of Movables                                                                                   Articles 527 to 536

**Art. 527**

Property is movable by its nature or by prescription of law.

**Art. 528**

*(Act no 99-5 of 6 Jan. 1999)*

Animals and things which can move from one place to another, whether they move by themselves, or whether they can move only as the result of an extraneous power, are movables by their nature.

**Art. 529**

Obligations and actions having as their object sums due or movable effects, shares or interests in financial, commercial or industrial concerns, even where immovables depending on these enterprises belong to the concerns, are movables by prescription of law. Those shares or interests shall be deemed movables with regard to each shareholder only, as long as the concern lasts.

Perpetual or life annuities, either from the State or private individuals, are also movables by prescription of law.

**Art. 530**

Any annuity established in perpetuity for the price of sale of an immovable, or as condition to a conveyance, for value or gratuitous, of an immovable tenement, is essentially redeemable.

A creditor may nevertheless regulate the terms and conditions of the redemption.

He may also stipulate that the annuity may be redeemed only after a certain time, which may never exceed thirty years: any stipulation to the contrary is void.

**Art. 531**

Boats, ferry-boats, ships, floating mills and baths, and generally all works which are not fastened to pillars and do not form part of a house, are movables: a seizure of some of these things may however, owing to their importance, be subject to certain special proceedings, as explained in the Code of Civil Procedure.

**Art. 532**

Materials coming from the demolition of a building, those gathered for erecting a new one, are movables until they are used by a worker in building operations.

**Art. 533**

The word movable, used alone in provisions of law or of man, without any other addition or designation, does not include ready money, precious stones, credits, books, medals, instruments of sciences, arts and professions, clothing, horses, carriages, weapons, grain, wine, hay and other commodities; neither does it include what is involved in a business.

**Art. 534**

CIVIL CODE

The words furnishing movables include only movables intended for use and ornamentation of apartments, such as tapestries, beds, seats, mirrors, clocks, tables, china and other articles of such kind.

Pictures and statues that form part of the furniture of an apartment are also included therein, but not collections of pictures which may be in galleries or special rooms.

It shall be likewise of china: only that which is part of the decoration of an apartment is included under the denomination of furnishing movables.

**Art. 535**

The expression movable property, that of furniture or movable effects include generally every thing which is deemed to be a movable according to the rules above set forth.

**Art. 536**

A sale or gift of a house, with all that is found therein, does nor include ready money, or credits and other rights whose instruments of title may have been deposited in the house; all other movable effects are included.

CHAPTER III

Of Property in its Relations with Those Who Own it                                       Articles 537 to 543

**Art. 537**

Private individuals have the free disposal of property which belongs to them, subject to the modifications established by legislation.

Property which does not belong to private individuals is administered and may be transferred only in the forms and according to the rules which are peculiar to it.

**Art. 538**

Ways, roads and streets of which the State is in charge, navigable or floatable rivers and streams, beaches, foreshore, ports, harbours, anchorages and generally all parts of French territory which are not capable of private ownership are deemed to be dependencies of the Public Domain.

**Art. 539**

(Act no 2004-809 of 13 August 2004).- The property of persons who die without heirs or whose successions are abandoned belong to the Public Domain.

**Art. 540**

The gates, walls, ditches and battlements of fortified places and fortresses, are also part of the Public Domain.

**Art. 541**

It shall be likewise with lands, fortifications and battlements of places which are no longer fortified places: they belong to the State, unless they have been lawfully transferred, or ownership has been acquired by prescription against it.

**Art. 542**

Common property is that to whose ownership or revenue the inhabitants or one or several communes have a vested right.

**Art. 543**

One may have a right of ownership, or a mere right of enjoyment, or only land services to be claimed on property.

**TITLE II**
**OF OWNERSHIP**                                                            **Articles 547 to 546**

**Art. 544**

Ownership is the right to enjoy and dispose of things in the most absolute manner, provided they are not used in a way prohibited by statutes or regulations.

**Art. 545**

No one may be compelled to yield his ownership, unless for public purposes and for a fair and previous indemnity.

**Art. 546**

Ownership of a thing, either movable or immovable, gives a right to everything it produces and to what is accessorily united to it, either naturally or artificially.

That right is called right of accession.

CHAPTER I

Of the Right of Accession to What is Produced by a Thing                        Articles 547 to 550

**Art. 547**

Natural or cultural fruit of the land;

Revenues;

Increase in stock,

belong to the owner by right of accession.

**Art. 548**

CIVIL CODE

*(Act no 60-464 of 17 May 1960)*

Fruit produced by a thing belong to the owner only on condition that he repays the costs of ploughing, works and seeds incurred by third parties and whose value must be assessed at the date of repayment.

**Art. 549**

*(Act no 60-464 of 17 May 1960)*

A mere possessor makes fruits his own only where he possesses in good faith. If not, he is bound to restore the products with the thing to the owner who claims it; where the said products are not found in kind, their value must be appraised at the date of repayment.

**Art. 550**

A possessor is in good faith where he possesses as owner, under an instrument of transfer of whose defects he does not know.

He ceases to be in good faith from the time those defects are known to him.

CHAPTER II

Of the Right of Accession to What Unites or Incorporates Itself with a Thing          Articles 551 to 577

**Art. 551**

Everything which unites and incorporates itself with a thing belongs to the owner, according to the rules hereafter laid down.

**Art. 552**

Ownership of the ground involves ownership of what is above and below it.

An owner may make above all the plantings and constructions which he deems proper, unless otherwise provided for in the Title Of Servitudes or Land Services.

He may make below all constructions and excavations which he deems proper and draw from these excavations all the products which they can give, subject to the limitations resulting from statutes and regulations relating to mines and from police statutes and regulations.

**Art. 553**

All constructions, plantings and works on or inside a piece of land are presumed made by the owner, at his expenses and belonging to him, unless the contrary is proved; without prejudice to the ownership, either of an underground gallery under a building of another, or of any other part of the building, which a third party may have acquired or may acquire by prescription

**Art. 554**

*(Act no 60-464 of 17 May 1960)*

An owner of the ground who made constructions, plantings and works with materials which did not belong to him, shall pay the value of them, appraised at the date of payment; he may also be ordered to pay damages, if there is occasion: but the owner of the materials may not remove them.

**Art. 555**

*(Act no 60-464 of 17 May 1960)*

Where plantings, constructions or works were made by a third party and with materials belonging to the latter, the owner of the tenement has the right, subject to the provisions of paragraph 4, either to keep the ownership of them, or to compel the third party to remove them.

Where the owner of the tenement requires to have the constructions, plantings or works suppressed, it shall be done at the expense of the third party, and without any compensation for him; the third party may furthermore be ordered to pay damages for loss which the owner of the tenement may have suffered.

Where the owner of the tenement prefers to keep ownership of the constructions, plantings or works, he must, at his choice, repay the third party either a sum equal to that by which the tenement has increased in value, or the cost of the materials and the price of the labour appraised at the date of repayment, account being taken of the condition in which the said plantings, constructions or works are.

Where the plantings, constructions or works were made by an evinced third party who would not have been liable to restoring the fruits owing to his good faith, the owner may not insist on the suppression of the said works, constructions and plantations, but he has the choice to repay the third party either of the  sums referred to in the preceding paragraph.

**Art. 556**

Deposits and accretions which gather successively and imperceptibly in tenements on the bank of a river or stream are called  alluvion.

Alluvion benefits to the riparian owner, whether it be a question of a river or of a stream navigable, floatable or not; on condition, in the first case, that he leaves a footpath or towing-path, in accordance with regulations.

**Art. 557**

The same rule shall apply to sandbanks formed by running water which withdraws insensibly from one of its banks and proceeds onto the other: the owner of the uncovered bank profits from the alluvion, without the riparian owner of the opposite side being allowed to claim the land which he has lost.

That right does not arise with regard to foreshore.

CIVIL CODE

**Art. 558**

Alluvion does not arise with regard to lakes and ponds, whose owner always keeps the land covered by the water when it reaches the level of the outlet of the pond, even where the volume of water decreases.

Reciprocally, the owner of a pond does not acquire any right to the riparian lands which its water happens to cover during extraordinary floods.

**Art. 559**

Where a river or stream, navigable or not, removes by a sudden drift a considerable and recognizable part of a riparian field and carries it towards a lower field or to the opposite bank, the owner of the part removed may claim his property; but he is compelled to file his claim within one year: after that period, it will no longer be admissible, unless the owner of the field to which the part removed has been joined has not yet taken possession of it.

**Art. 560**

Islands, islets, deposits which gather in the beds of rivers or of navigable or floatable streams belong to the State, unless there is an instrument of title or prescription to the contrary.

**Art. 561**

Islands and deposits which gather in streams not navigable nor floatable belong to the riparian owners on the side where the island gathered: where the island has not gathered on one side, it belongs to riparian owners of both sides, beginning from a line supposedly drawn in the middle of the river.

**Art. 562**

Where a stream or river, in forming a new arm, cuts off and surrounds a field of a riparian owner and makes an island of it, that owner keeps the ownership of his field, although the island gathered in a river or a stream navigable or floatable.

**Art. 563**

*(Act of 8 April 1898)*

Where a river or a stream navigable or floatable forms a new course by abandoning its former bed, the riparian owners may acquire ownership of that former bed, each one in his own right until a line supposedly drawn in the middle of the stream. The price of the former bed must be fixed by experts appointed by the president of the court of the location of the land, on request of the préfet of the département.

Where the riparian owners fail to declare, within three months of the notice served upon them by the préfet, their intention to purchase at the prices fixed by the experts, the conveyance of the ancient bed must be made under the rules which govern alienation of the domain of the State.

The proceeds of the sale shall be distributed as a compensation to the owners of the tenements filled by the new course in proportion to the value of the ground taken from each of them.

**Art. 564**

Pigeons, rabbits, fishes which go to another pigeon-house, warren or stretch of water referred to in Articles L. 431-6 and L. 431-7] of the Environmental Code, belong to the owner of these things, provided that they were not attracted by fraud or guile.

**Art. 565**

Where the right of accession applies to two movable things belonging to two different masters, it depends entirely on the principles of natural equity.

The following rules will serve as examples to the judge to make up his mind, in unforeseen situations, according to the circumstances of the case.

**Art. 566**

*(Act no 60-464 of 17 May 1960)*

Where two things belonging to different masters, which have been so joined as to form one whole, are nevertheless separable, so that one may subsist without the other, the whole belongs to the master of the thing which forms the main part, subject to the obligation of paying to the other the value, appraised at the date of payment, of the thing which has been jopined.

**Art. 567**

The part to which the other has been joined only for the use, ornamentation or completion of the first is deemed the main part.

**Art. 568**

Where, however, the thing joined is of much more value than the main thing and where it was used without the knowledge of the owner, the latter may request that the thing joined be separated in order to be returned to him, even where there may result some deterioration of the thing to which it has been joined.

**Art. 569**

Where of two things joined to form one whole, one cannot be considered as the accessory of the other, that one is deemed the main which has the greater value, or the greater volume where the values are approximately equal.

**Art. 570**

*(Act no 60-464 of 17 May 1960)*

CIVIL CODE

Where a craftsman or any person whatever has used material which did not belong to him to make a thing of a new kind, whether the material can resume its original form or not, he who was the owner of it has the right to claim the thing made out of it by repaying the price of the labour appraised at the date of repayment.

**Art. 571**

*(Act no 60-464 of 17 May 1960)*

Where however the labour was so important that it greatly exceeds the value of the material used, the service will then be deemed the main part and the workman has the right to keep the thing wrought, by repaying the owner the value of the material, appraised at the date of repayment.

**Art. 572**

*(Act no 60-464 of 17 May 1960)*

Where a person has partly used material which belonged to him and partly material which did not belong to him to make a thing of a new kind, without either of the two materials being entirely destroyed, but in such a way that they cannot be separated without inconvenience, the thing is common to the two owners, as to one, on account of the material which belonged to him, and as to the other, on account both of the material which belonged to him and of the price of his labour. The price of the labour must be appraised at the date of the auction sale provided for in Article 575.

**Art. 573**

Where a thing has been formed by a mingling of several materials belonging to different owners, of which none however can be considered as the main material, if the materials can be separated, he without whose knowledge the materials have been mingled may request that they be separated.

Where the materials can no longer be separated without inconvenience, they acquire ownership of them in common, in proportion to the quantity, the quality and the value of the materials belonging to each of them.

**Art. 574**

*(Act no 60-464 of 17 May 1960)*

Where the material belonging to one of the owners was far superior to the other in quantity and price, then the owner of the material superior in value may request the thing resulting from the mingling, by repaying the other the value of his material, appraised at the date of repayment.

**Art. 575**

Where a thing remains in common between the owners of the materials from which it has been made, it must be sold by auction for their common benefit.

**Art. 576**

*(Act no 60-464 of 17 May 1960)*

In all cases where the owner whose material was used without his knowledge to make a thing of a different kind may claim ownership of that thing, he has the choice of requesting restitution of his material in the same kind, quantity, weight, measure and good quality, or its value appraised at the date of restitution.

**Art. 577**

Those who have made use of materials belonging to others, and without their knowledge, may also be ordered to pay damages, if there is occasion, without prejudice to criminal prosecution, if need be.

### TITLE III
#### OF USUFRUCT, OF USE AND OF HABITATION                    Articles 582 to 636

CHAPTER I
Of Usufruct                                                   Articles 582 to 581

**Art. 578**

Usufruct is the right to enjoy things of which another has ownership in the same manner as the owner himself, but on condition that their substance be preserved.

**Art. 579**

Usufruct is established by law or by a person's wish.

**Art. 580**

Usufruct may be established outright, or at a certain date, or conditionally.

**Art. 581**

It may be established on any kind of movable and immovable property.

SECTION I
Of the Rights of a Usufructuary                              Articles 582 to 599

**Art. 582**

A usufructuary has the right to enjoy all kinds of fruits, either natural or cultural, or revenues, which the thing of which he has the usufruct can produce.

**Art. 583**

CIVIL CODE

Natural fruits are those which are the spontaneous product of the earth. The produce and increase of animals are also natural fruits.

Cultural fruits of a tenement are those which are obtained by cultivation.

**Art. 584**

Revenues are rents of houses, interests on sums due, arrears of annuities.

Prices of farming leases are also included in the class of revenues.

**Art. 585**

Natural and cultural fruits, hanging from branches or roots when a usufruct begins, belong to the usufructuary.

Those which are in the same condition when the usufruct comes to an end, belong to the owner, without compensation on either side for ploughing and seeds, but also without prejudice to the portion of the fruits which may be acquired by a tenant paying rent in kind who may be there at the beginning or at the termination of the usufruct.

**Art. 586**

Revenues are deemed to be acquired day by day, and belong to the usufructuary in proportion to the duration of his usufruct. This rule shall apply to proceeds of farming leases, as well as to rents of houses and other revenues.

**Art. 587**

*(Act no 60-464 of 17 May 1960)*

Where a usufruct includes things which cannot be used without being consumed, such as money, grain, liquors, a usufructuary has the right to use them, but with the responsibility of returning, at the end of the usufruct, either things of the same quantity and quality or their value appraised at the time of restitution.

**Art. 588**

A usufruct of a life annuity also gives the usufructuary, during the duration of his usufruct, the right to collect arrearages of it, without being liable to any restitution.

**Art. 589**

Where a usufruct includes things which, without being consumed at once, deteriorate gradually, such as clothes or furnishing movables, the usufructuary has the right to make use of them for the use to which they are intended and is only bound to return them at the end of the usufruct in the condition in which they are, not deteriorated through his intentional wrong or fault.

**Art. 590**

Where a usufruct includes underwood, a usufructuary is bound to respect the order and quota of cuttings, in accordance with the parcelling or the uniform usage of the owners; without however compensation in favour of the usufructuary or of his heirs, for ordinary cuttings, either of coppice, or of staddles, or of forest trees that were not done during his enjoyment.

Trees which can be removed from a tree nursery without damaging it, form part of a usufruct only on condition for the usufructuary of complying with the usages of the place in replacing them.

**Art. 591**

A usufructuary also benefits, always by observing the periods and usages of the former owners, by the parts of woods of timber trees in which periodical cuttings are made, whether those cuttings are made periodically over a certain extent of land, or whether they are made of a certain quantity of trees taken indiscriminately over the whole surface of the property.

**Art. 592**

In all other cases, a usufructuary may not interfere with woods of timber trees: he may only use the trees which have been uprooted or broken by accident to make the repairs which he is bound to make; he may even for that purpose have trees cut down, if necessary, provided the necessity of so doing is ascertained with the owner.

**Art. 593**

He may take vine props in the woods; he may also take annual or periodical products from the trees; all of which being done according to the usage of the country or the custom of the owners.

**Art. 594**

Fruit trees which die, even those which are uprooted or broken by accident, belong to the usufructuary, subject to the condition of replacing them by others.

**Art. 595**

*(Act no 65-570 of 13 July 1965)*

A usufructuary may enjoy by himself, give on lease to another, even sell or transfer his right gratuitously.

Leases that a usufructuary made alone for a period exceeding nine years are, in case of termination of the usufruct, binding with regard to the bare-owner only for the time remaining to run, either of the first period of nine years where the parties are still in it, or of the second period, and so on in order that the lessee has only the right to conclude the enjoyment of the period of nine years in which he is.

Leases of nine years or under which an usufructuary alone makes or renews more than three years before termination of a current lease where it relates to rural property, or more than two years before the same time where it relates to houses, are without effect, unless their performance began before termination of the usufruct.

CIVIL CODE

A usufructuary may not, without the assistance of the bare-owner, give on lease a rural tenement or an immovable intended for commercial, industrial or craft use. Failing assent of the bare-owner, a usufructuary may be authorized by a court to do that transaction alone.

**Art. 596**

A usufructuary enjoys the increase resulting from alluvion to the thing of which he has the usufruct.

**Art. 597**

He enjoys the rights of servitude, of way and generally all rights which an owner may enjoy, and he enjoys them in the same way as the owner himself.

**Art. 598**

He also enjoys, in the same way as the owner, mines and quarries which are being worked when the usufruct begins; where, however, a working which may not be carried on without a concession is concerned, a usufructuary may enjoy it only after gaining permission from the President of the Republic.

He has no right to mines and quarries not yet opened, or to peat bogs whose working has not yet begun, or to a treasure-trove which may be discovered during the duration of the usufruct.

**Art. 599**

An owner may not, by his acts or in any manner whatsoever, injure the rights of a usufructuary.

On his part, a usufructuary may not, on termination of the usufruct, claim any compensation for the improvements which he asserts to have made, even though the value of the thing has been increased thereby.

He or his heirs may however remove mirrors, pictures and other ornaments which he may have set up, but provided he restores the premises to their former condition.

SECTION II

Of the Obligations of a Usufructuary                                     Articles 600 to 616

**Art. 600**

A usufructuary takes things in the condition in which they are; but he may enter into enjoyment only after having an inventory of the movables and a statement as to the immovables subject to the usufruct drawn up, the owner being present or he having been duly summoned.

**Art. 601**

He shall give security to enjoy as a prudent administrator, unless he is dispensed with by the instrument creating the usufruct; however, the father and mother who have the legal usufruct of their children's property, a seller or donor who reserved  the usufruct, are not obliged to give security.

**Art. 602**

Where a usufructuary does not find a security, the immovables shall be given on lease or sequestered;
Sums included in the usufruct shall be invested;
Commodities shall be sold and the proceeds arising out of it shall be likewise invested;
The interest on those sums and the proceeds of leases shall belong in that case to the usufructuary.

**Art. 603**

Failing a security on the part of a usufructuary, an owner may demand that movables which fall into decay through use be sold, and the proceeds invested like that of commodities; the usufructuary shall then enjoy the interest during his usufruct: however, a usufructuary may request, and the judges may order, according to the circumstances, that a part of the movables necessary for his use be left to him, on his own mere guarantee given on oath, and subject to the condition of presenting them again on termination of the usufruct.

**Art. 604**

Delay in giving security does not deprive a usufructuary of the fruits to which he may be entitled: they are owed to him from the time when the usufruct began.

**Art. 605**

A usufructuary is only bound to repairs of maintenance.

Major repairs remain the responsibility of the owner, unless they were occasioned by the lack of repairs of maintenance since the beginning of the usufruct; in which case the usufructuary is also liable for them.

**Art. 606**

Major repairs are those to main walls and vaults, the restoring of beams and of entire coverings;
That of dams, breast walls and enclosing walls also in entirety.
All other repairs are of maintenance.

**Art. 607**

Neither an owner nor a usufructuary are bound to rebuild what has fallen from decay or has been destroyed by a fortuitous event.

**Art. 608**

A usufructuary is liable during his enjoyment for all the annual charges upon the property, such as taxes and others which, according to usage, are deemed to be charges on the fruits.

CIVIL CODE
**Art. 609**

As to charges that may be imposed upon the ownership for the duration of the usufruct, an owner and a usufructuary contribute to them as follows:

The owner is bound to pay them and the usufructuary must account to him for interest;

Where they are advanced by the usufructuary, he may claim the capital at the end of the usufruct.

**Art. 610**

A legacy, made by a testator, of a life annuity or of periodical payments, must be paid wholly by the universal legatee of the usufruct, and by a legatee by universal title of the usufruct in proportion to his enjoyment, without any claiming back on their part.

**Art. 611**

A specific usufructuary is not liable for debts for which the tenement is mortgaged: where he is compelled to pay them, he has a remedy against the owner, subject to what is provided for in Article 1020 in the Title Of Gifts Inter Vivos and of Wills.

**Art. 612**

A usufructuary, either universal, or by universal title, shall contribute with the owner to the payment of debts as follows:

The value of the tenement subject to usufruct shall be appraised; the contribution to the debts shall be then fixed, in accordance with that value.

Where a usufructuary wishes to advance the sum for which the tenement is liable, the capital shall be restored to him at the end of the usufruct, without any interest.

Where a usufructuary does not wish to make that advance, the owner has the choice either to pay that sum, in which case the usufructuary shall account to him for interest during the duration of the usufruct, or to have a portion of the property subject to the usufruct sold to the extent of the amount due.

**Art. 613**

A usufructuary is obliged to pay only the costs of the suits relating to enjoyment and of the other orders to which those suits may give rise.

**Art. 614**

Where during the duration of an usufruct a third party commits any encroachment upon the tenement, or interferes in any other way with the rights of the owner, the usufructuary is bound to notify the latter thereof; failing which, he is liable for all loss which may result from it to the owner, as he would be for dilapidations committed by himself.

**Art. 615**

Where an usufruct is established only over an animal which happens to die without the fault of the usufructuary, the latter is not bound to return another one, or to pay an appraisal of it.

**Art. 616**

*(Act no 60-464 of 17 May 1960)*

Where a herd upon which a usufruct was established perishes entirely by accident or disease and without the fault of the usufructuary, the latter is bound to account to the owner only for the skins, or of their value appraised at the date of restitution.

Where the herd does not perish entirely, the usufructuary is bound to replace the heads of the animals that have perished, to the extent of the increase in stock.

SECTION III

Of the Manner in which a Usufruct Comes to an End                                   Articles 617 to 624

**Art. 617**

A usufruct is extinguished:

By the natural [repealed by implication] death of the usufructuary;

By the expiry of the time for which it was granted;

By the consolidation or vesting in the same person of the two capacities of usufructuary and of owner;

By non-user of the right during thirty years;

By the total loss of the thing upon which the usufruct was established.

**Art. 618**

Usufruct may also cease through abuse which a usufructuary makes of his enjoyment, either by committing dilapidations upon the tenement, or by allowing it to decay for want of maintenance.

Creditors of a usufructuary may intervene in controversies, for the preservation of their rights; they may offer to repair the dilapidations committed and to give guarantees for the future.

Judges may, according to the seriousness of the circumstances, order either the absolute extinguishment of the usufruct, or the re-entry of the owner into the enjoyment of the thing subject thereto, provided that he pays annually to the usufructuary, or to his assigns, a fixed sum, up to the time when the usufruct should have ceased.

**Art. 619**

A usufruct which is not granted to private individuals may last only thirty years.

CIVIL CODE

**Art. 620**

A usufruct granted until a third party reaches a fixed age lasts until that time, even though the third party dies before the fixed age.

**Art. 621**

The sale of a thing subject to usufruct involves no change in the right of the usufructuary; he continues to enjoy his usufruct unless he has formally waived it.

**Art. 622**

Creditors of a usufructuary may have a waiver annulled, where it was prejudicial to them.

**Art. 623**

Where a part only of a thing subject to usufruct is destroyed, usufruct is preserved on what remains.

**Art. 624**

Where a usufruct is established only on a building, and that building is destroyed by fire or other accident, or collapses from decay, the usufructuary may not have the right to enjoy the ground or the materials.

Where the usufruct was established on an area of which the building was a part, the usufructuary enjoys the ground and the materials.

CHAPTER II

Of Use and of Habitation                                                     Articles 625 to 636

**Art. 625**

Rights of use and habitation are established and lost in the same manner as usufruct.

**Art. 626**

They may not be enjoyed unless security has been previously given, and statements and inventories made, as in the case of usufruct.

**Art. 627**

A user and a person having a right of habitation shall enjoy like prudent administrators.

**Art. 628**

Rights of use and of habitation are regulated by the instruments which have established them and are more or less extensive, depending upon their provisions.

**Art. 629**

Where an instrument does not make clear the extent of these rights, they shall be regulated as follows.

**Art. 630**

A person who has the use of the fruits of a tenement may only demand what is necessary for his needs and those of his family.

He may demand them even for the needs of children arrived since the granting of the use.

**Art. 631**

A user may neither transfer nor lease his right to another person.

**Art. 632**

He who has a right of habitation in a house, may live there with his family, even though he was not married at the time when that right was granted to him.

**Art. 633**

A right of habitation is restricted to what is necessary for the habitation of the person to whom that right is granted, and of his family.

**Art. 634**

A right of habitation may not be transferred or leased.

**Art. 635**

Where an user takes all the fruits of a tenement, or occupies the whole of a house, he is subjected to the expenses of cultivation, repairs of maintenance and payment of taxes, like a usufructuary.

Where he takes only a part of the fruits or occupies only a part of a house, he shall contribute in proportion to what he enjoys.

**Art. 636**

Use of woods and forests is regulated by a specific legislation.

TITLE IV

OF SERVITUDES OR LAND SERVICES                                      Articles 640 to 639

**Art. 637**

A servitude is a charge imposed on an immovable for the use and utility of another immovable belonging to another owner.

CIVIL CODE

**Art. 638**

A servitude may not establish any pre-eminence of an immovable over the other.

**Art. 639**

It results either from the natural location of the premises, or from obligations imposed by statute, or from agreements between owners.

CHAPTER I

Of the Servitudes Originating from the Situation of the Premises                    Articles 640 to 648

**Art. 640**

Lower tenements are subjected to those which are higher, to receive waters which flow naturally from them without the hand of man having contributed thereto.

A lower owner may not raise dams which prevent that flow.

An upper owner may not do anything that worsens the servitude of the lower tenement.

**Art. 641**

*(Act of 8 April 1898)*

An owner has the right to use and dispose of rainwater which falls on his tenement.

Where the use of those waters or the course given to them worsens the natural servitude of flow established by Article 640, a compensation is due to the owner of the lower tenement.

The same provision shall apply to spring waters originating on a tenement.

Where, by borings or subterranean works, an owner causes waters to rise from his tenement, the owners of lower tenements must receive them; but they are entitled to compensation in case of loss resulting from their flow.

Houses, courts, gardens, parks and enclosures adjoining dwellings may not be subjected to any worsening of the servitude of flow in the cases provided for in the preceding paragraphs.

Controversies which the establishment and exercise of the servitudes provided for by these paragraphs may give rise to, and the settlement, if any, of the compensations due to the owners of lower tenements, must be brought, subject to review, before the judge of the tribunal d'instance of the canton who, in his  judgment must reconcile the interests of agriculture and industry with the respect due to ownership.

If there is occasion for an appraisement, one expert only may be appointed

**Art. 642**

*(Act of 8 April 1898)*

A person who has a spring on his tenement may always use the water on his wishes, within the limits and for the needs of his property.

An owner of a spring may no longer use it to the detriment of the owners of the lower tenements who, for more than thirty years, have made and completed, on the tenement where the water springs, apparent and permanent works intended to use the waters and facilitating their passage within their property.

Nor may he use them so as to deprive the inhabitants of a commune, village or hamlet, of the water which is necessary to them; but where the inhabitants have not acquired or prescribed the use, the owner may claim a compensation which shall be fixed by experts.

**Art. 643**

*(Act of 8 April 1898)*

Where, as soon as they leave the tenement where they spout out, spring waters form a watercourse presenting the nature of public and running waters, the owner may not divert them from their natural course, to the detriment of lower users.

**Art. 644**

A person whose property borders running water other than that which is declared a dependency of the Public Domain by Article 538 in the Title Of Different Kinds of Property, may use it as it flows for irrigating his property.

A person through whose property that water flows may even use it over the interval it runs through it, provided he returns it to its ordinary course when it leaves his tenements.

**Art. 645**

Where a controversy arises between owners to whom those waters may be useful, the courts, in their decisions, must reconcile the interests of agriculture with the respect due to ownership; and, in all cases, the special and local regulations on the course and use of waters must be complied with.

**Art. 646**

Any owner may compel his neighbour to a setting of boundaries of their contiguous tenements. Setting boundaries shall be done at common expense.

**Art. 647**

An owner may enclose his property, subject to the exception laid down in Article 682.

**Art. 648**

An owner who wishes to be enclosed loses his right to commonage and free pasture, in proportion to the land that he so withdraws.

CIVIL CODE

CHAPTER II

Of the Servitudes Established by Statute                                                    Articles 653 to 652

**Art. 649**

Servitudes established by statute are for the purpose of public or communal utility, or of the utility of private individuals.

**Art. 650**

Those established for public or communal utility have as their subjects towing-paths along navigable or floatable streams, the making or repairing of roads and of other public or municipal works.

All that relates to that kind of servitudes is prescribed by statutes or specific regulations.

**Art. 651**

The law subjects owners to various obligations towards each other, independent of any agreement.

**Art. 652**

Part of those obligations are regulated by statutes on rural police;

The others relate to party walls and common ditches, to cases in which an outer wall is necessary, to views over the property of a neighbour, to eaves and to right of way.

SECTION I

Of Party Wall and Common Ditch                                                    Articles 653 to 673

**Art. 653**

In cities and in the country, any wall serving as separation between buildings up to the point of disjunction, or between courtyards and gardens, and even between enclosures in fields, is deemed to be a party wall, unless there is an instrument of title or an indication to the contrary.

**Art. 654**

There is an indication of a non-party wall where the top of a wall is straight and perpendicular from its facing on one side and shows an inclined plane on the other;

Even where there is on one side only either a coping or stone fillets and corbels which were placed there in building the wall.

In such cases, a wall is deemed to belong exclusively to the owner on whose side the eaves or stone corbels and fillets are.

**Art. 655**

Repairing and reconstruction of a party wall must be borne by all those who have a right to it, and in proportion to the right of each.

**Art. 656**

However, any co-owner of a party wall may excuse himself from contributing to repairing and reconstructing by waiving the right in common, provided the party wall does not support a building which belongs to him.

**Art. 657**

A co-owner may build against a party wall, and place there beams or joists through the whole thickness of the wall, more or less fifty-four millimetres, without prejudice to a neighbour's right to have the beam shortened with a chisel down to half of the wall, where he himself wishes to lay beams in the same place, or to back a chimney against it.

**Art. 658**

*(Act no 60-464 of 17 May 1960)*

A co-owner may have a party wall raised; but he must pay alone the expense of the raising and of the repairs of maintenance above the height of the common enclosure; he must also pay alone the costs of maintenance of the common part of the wall due to the raising and repay to the neighbouring owner all the expenses made necessary for the latter by the raising.

**Art. 659**

Where a party wall is not in a condition to support a raising, the person wishing to raise it must have it entirely rebuilt at his own expense, and the thickness in excess must be taken on his side.

**Art. 660**

*(Act no 60-464 of 17 May 1960)*

A neighbour who did not contribute to a raising may acquire rights in common on it by paying one-half of the expense it has cost and the value of one-half of the ground supplied for the additional thickness, if there is any. The expense that the raising has cost must be appraised at the date of acquisition, account being taken of the condition in which the raised part of the wall is.

**Art. 661**

*(Act no 60-464 of 17 May 1960)*

An owner adjoining a wall may make it a party wall in whole or in part by repaying to the master of the wall half the expense which it has cost, or half the expense which the part of the wall which he wishes to make a party wall has cost

CIVIL CODE

and half the value of the ground on which the wall was built. The expense which the wall has cost must be appraised at the date of acquisition of rights in common on it, account being taken of the condition in which it is.

**Art. 662**

A neighbour may not make a recess in a party wall or apply or build up a work on it without the consent of the other, or, on his refusal, without having had experts determine the necessary steps in order that the new work be not detrimental to the other's rights.

**Art. 663**

In cities and suburbs, everyone may compel his neighbour to contribute to the constructions and repairs of an enclosure separating their houses, court-yards and gardens situated in those cities and suburbs: the height of the enclosure shall be fixed according to specific regulations or uniform and recognized usages and, failing usages and regulations, a dividing wall between neighbours, which will be constructed or restored in the future, shall be at least thirty-two decimetres high, including the coping, in cities of fifty thousand souls and more, and twenty-six decimetres in the others.

**Art. 664**

[repealed]

**Art. 665**

Where a party wall or a house is rebuilt, active and passive servitudes continue with regard to the new wall or the new house, without, however, their being allowed to become more burdensome, and provided rebuilding is made before prescription is acquired.

**Art. 666**
*(Act of 20 Aug. 1881)*

Every enclosure separating tenements is deemed to be held in common, unless there is only one property actually enclosed, or there is an instrument of title, prescription or indication to the contrary.

As regards ditches, there is an indication that they are not held in common where the embankment or spoil of earth is found on only one side of the ditch.

A ditch is deemed to belong exclusively to the one on whose side the spoil is situated.

**Art. 667**
*(Act of 20 Aug. 1881)*

A common enclosure must be maintained at common expense; but a neighbour may elude that obligation by waiving ownership in common.

That power ceases where the ditch serves usually for the flowing of waters.

**Art. 668**
*(Act of 20 Aug. 1881)*

A neighbour whose property adjoins a ditch or a hedge not held in common may not compel the owner of that ditch or hedge to convey rights in common to him.

A co-owner of a common hedge may destroy it up to the limit of his property, provided he builds a wall upon that limit.

The same rule shall apply to the co-owner of a common ditch which is used only as an enclosure.

**Art. 669**
*(Act of 20 Aug. 1881)*

So long as a hedge is held in common, its products belong to the owners in halves.

**Art. 670**
*(Act of 20 Aug. 1881)*

Trees situated in a common hedge are held in common as the hedge is. Trees planted on the dividing line of two tenements are also deemed to be held in common. Where they die or are cut or uprooted, those trees are divided in halves. Fruits are gathered at joint expense and divided also in halves, either when they fall naturally, or when the fall was caused, or when they were picked.

Each owner has the right to require that the trees held in common be uprooted.

**Art. 671**
*(Act of 20 Aug. 1881)*

It is permitted to have trees, shrubs or bushes near the limit of a neighbouring property only at the distance allowed by the specific regulations presently in force or by uniform and recognized usages, and failing regulations and usages, at the distance of two metres from the dividing line of the two tenements as regards plantations whose height exceeds two metres, and at the distance of half a metre as regards other plantation.

Trees, bushes and shrubs of all kinds may be planted in espaliers on each side of a dividing wall, without having to keep to any distance, but they may not pass the crest of the wall.

Where a wall is not a party wall, the owner alone has the right to lean espaliers against it.

**Art. 672**
*(Act of 20 Aug. 1881)*

CIVIL CODE

A neighbour may require that trees, shrubs and bushes planted at a distance less than the statutory distance, be uprooted or reduced to the height fixed in the preceding Article, unless there is an instrument of title, an adjustment made by the owner, or thirty-year prescription.

Where the trees die, or where they are cut or uprooted, a neighbour may replace them only by keeping to the statutory distances.

**Art. 673**

*(Act of 20 Aug. 1881; Act of 12 Feb. 1921)*

One over whose property branches of a neighbour's trees, bushes and shrubs jut out may compel the latter to cut them. Fruits which have fallen naturally from these branches belong to him.

Where roots, brambles and brushwood jut out on his property, he has the right to cut them himself up to the limit of the dividing line.

The right to cut roots, brambles and brushwood or to have branches of trees, bushes or shrubs cut may not be lost by prescription.

SECTION II

Of the Distance and Intermediate Works Required for Certain Constructions         Article 674

**Art. 674**

He who has a well or a cesspool dug near a wall, whether it is a party wall or not,

He who wishes to build a chimney or a fire-place, a forge, an oven or a furnace,

Set a stable against it,

Or place against that wall a store of salt or a heap of corrosive materials;

Is obliged to leave the distance prescribed by regulations and specific usages relating to those things, or to do the works prescribed by the same regulations and usages in order to avoid injuring a neighbour.

SECTION III

Of the Views over the Property of One's Neighbour                       Articles 675 to 680

**Art. 675**

One of the neighbours may not, without the consent of the other, cut in a party wall any window or opening, in any manner whatever, even in fixed fanlights.

**Art. 676**

The owner of a wall which is not a party wall, adjoining the property of another person, may cut openings or windows in it, in leaded iron and fixed fanlights.

Those windows must be provided with an iron lattice whose meshes shall have an aperture of one decimetre (about three inches, eight lines) at the most, and with a frame of fixed fanlights.

**Art. 677**

Those windows or openings may only be made at twenty six decimetres (eight feet) above the floor or ground of the room which one wishes to give light to, where it is on the ground floor, and at nineteen decimetres (six feet) above the floor of the upper stories.

**Art. 678**

*(Act no 67-1253 of 30 Dec. 1967)*

One may not have straight views or bow windows, or balconies or similar projections over the neighbour's property, whether enclosed or not, if there is not a distance of nineteen decimetres between the wall where they are cut and the said property, unless the tenement or the part of the tenement over which the view bears is already burdened, for the benefit of the tenement which profits by it, with a servitude of way which prevents the erecting of constructions.

**Art. 679**

*(Act no 67-1253 of 30 Dec. 1967)*

One may not, subject to the same reservation, have side or oblique views on the same property, unless there is a distance of six decimetres.

**Art. 680**

The distance mentioned in the two preceding Articles counts from the outer facing of the wall in which the opening is cut, and, where there are balconies or other similar projections, from their exterior line up to the dividing line of the two tenements.

SECTION IV

Of Eaves                                                         Article 681

**Art. 681**

An owner must make his roofs in such a way that rainwater falls on his land or on the public highway; he may not have it pour on his neighbour's tenement.

SECTION V

Of Right of Way                                                 Articles 682 to 685-1

CIVIL CODE

**Art. 682**
*(Act no 67-1253 of 30 Dec. 1967)*

An owner whose tenements are enclaved and who has no way out to the public highway, or only one which is insufficient either for an agricultural, industrial or commercial working of his property, or for carrying out operations of building or development, is entitled to claim on his neighbours' tenements a way sufficient for the complete servicing of his own tenements, provided he pays a compensation in proportion to the damage he may cause.

**Art. 683**
*(Act of 20 Aug. 1881)*

The way must be taken regularly on the side where the route from the enclaved tenement to the public highway is shortest

It must however be fixed at the least damageable place for the person over whose tenement it is allowed.

**Art. 684**
*(Act of 20 Aug. 1881)*

Where a tenement is enclosed because of its dividing in consequence of a sale, an exchange, a partition or any other contract, a way may be requested only on the lands which were the subject of those transactions.

However, in the case where a sufficient way cannot be made over the divided tenements, Article 682 shall apply.

**Art. 685**
*(Act of 20 Aug. 1881)*

The location and manner of a servitude of way for enclavement are established by a continuous usage for thirty years.

An action for compensation in the case provided for in Article 682 is subject to be time-barred, and the way may be continued, although an action for compensation is no longer admissible.

**Art. 685-1**
*(Act no 71-494 of 25 June 1971)*

In case of discontinuance of the enclavement and whatever be the way in which the location and manner of the servitude were determined, the owner of the servient tenement may, at any time, invoke the extinguishment of the servitude where the service of the dominant tenement is ensured under the conditions of Article 682.

Failing amicable agreement, that disappearance must be ascertained by a judicial decision.

CHAPTER III
Of the Servitudes Established by the Act of Man                    Articles 686 to 710

SECTION I
Of the Various Kinds of Servitudes Which May be Established over Property    Articles 686 to 689

**Art. 686**

Owners are permitted to establish over their property, or in favour of their property, such servitudes as they deem proper, provided however that the services established are laid neither on a person nor in favour of a person, but only on a tenement and for a tenement, and provided that those servitudes moreover are not in any way contrary to public policy.

The use and extent of the servitudes thus established are regulated by the instrument which creates them; failing an instrument, by the following rules.

**Art. 687**

Servitudes are established either for the use of buildings, or for that of tenements.

Those of the first kind are called urban, whether the buildings to which they are due are located in a city or in the country.

Those of the second kind are named rural.

**Art. 688**

Servitudes are either continuous or discontinuous.

Continuous servitudes are those whose usage is or may be unceasing without need of a present act of man: such are water-pipes, sewers, views and others of that kind.

Discontinuous servitudes are those which need a present act of man in order to be exercised: such are rights of way, drawing water, pasturing and others similar.

**Art. 689**

Servitudes are apparent or non-apparent.

Apparent servitudes are those which show themselves by outer works, such as a door, a window, an aqueduct.

Non-apparent servitudes are those which do not have an outer sign of their existence, such as for instance a prohibition to build on a tenement, or to build only up to a fixed height.

SECTION II
How Servitudes are Established                    Articles 690 to 696

**Art. 690**

CIVIL CODE

Continuous and apparent servitudes are acquired by an instrument of title or by possession of thirty years.

**Art. 691**

Continuous non-apparent servitudes and discontinuous servitudes, whether apparent or not, may be established only by an instrument of title.

Possession, even immemorial, is not sufficient to establish them, without, however, one being allowed to challenge today servitudes of that kind already acquired by possession in localities where they were allowed to be acquired in that way.

**Art. 692**

Adjustment made by the owner is equivalent to an instrument of title as to continuous and apparent servitudes.

**Art. 693**

There is an adjustment made by the owner only where it is proved that the two tenements at present divided belonged to the same owner and that it was through him that things were put in the condition which gives rise to the servitude.

**Art. 694**

Where an owner of two tenements between which an apparent sign of servitude exists, disposes of one property and the contract does not contain any agreement relating to the servitude, the latter continues to exist actively or passively in favour of the tenement conveyed or upon the tenement conveyed.

**Art. 695**

An instrument creating a servitude, with regard to those which may not be acquired by prescription, may be replaced only by an instrument recognizing the servitude, emanating from the owner of the tenement subjected to the servitude.

**Art. 696**

Where a person establishes a servitude, he is deemed to grant all that is necessary to use it.

For instance, a servitude to draw water from another's fountain necessarily involves a right of way.

SECTION III

Of the Rights of the Owner of a Tenement to Which a Servitude is Due          Articles 697 to 702

**Art. 697**

A person to whom a servitude is due, has the right to make all works necessary to use and maintain it.

**Art. 698**

Those works shall be at his expense, and not at that of the owner of the tenement subjected to the servitude, unless the instrument creating the servitude provides for the contrary.

**Art. 699**

Even in the case where the owner of a tenement subjected to a servitude is compelled under the instrument to make the works necessary for the use or preservation of a servitude at his own expense, he may always exempt himself from the burden by waiving the servient tenement to the owner of the tenement to which the servitude is due.

**Art. 700**

Where a property for which a servitude was established happens to be divided, the servitude remains due for each portion, without however the condition of the servient tenement becoming more burdensome.

Thus, for instance, in case of a right of way, all the co-owners are obliged to use it at the same place.

**Art. 701**

The owner of a tenement which owes a servitude may do nothing tending to diminish its use or to make it more inconvenient.

Thus, he may not change the condition of the premises or remove the exercise of the servitude to a place different from the one where it was originally assigned.

But however, where that original assigning has become more onerous to the owner of the servient tenement, or where it prevents him from making advantageous repairs on it, he may offer to the owner of the other tenement a place as convenient for the exercise of his rights, and the latter may not refuse it.

**Art. 702**

On his part, he who has a right of servitude may only use it in accordance with his instrument of title, without being allowed to make, either on the tenement which owes the servitude, or on the tenement to which it is due, any change which would render the condition of the former more burdensome.

SECTION IV

How Servitudes are Extinguished          Articles 703 to 710

**Art. 703**

Servitudes cease when things are in such a condition that they can no longer be used.

**Art. 704**

CIVIL CODE

They revive where things are restored in such a manner that they can be used; unless time has already elapsed, sufficient to give rise to the presumption that the servitude is extinguished, as stated in Article 707.

**Art. 705**

A servitude is extinguished when the tenement to which it is owed, and the one which owes it, are united in the same hands.

**Art. 706**

A servitude is extinguished by non-user during thirty years.

**Art. 707**

The thirty years begin to run, according to the different kinds of servitudes, either from the day when one ceased to enjoy them, with respect to discontinuous servitudes, or from the day when an act contrary to the servitude has been performed, with respect to continuous servitudes.

**Art. 708**

The manner of a servitude may be time-barred like the servitude itself and in the same way.

**Art. 709**

Where a property in favour of which a servitude is established belongs to several persons in undivided ownership, enjoyment by one prevents prescription against all of them.

**Art. 710**

Where, among co-owners, there is one against whom prescription could not run, such as a minor, he keeps the rights of all the others.

## BOOK III
## OF THE VARIOUS WAYS HOW OWNERSHIP IS ACQUIRED

**Articles 711 to 2283**

### General Provisions

**Articles 711 to 718 and 719**

**Art. 711**

Ownership of property is acquired and transmitted by succession, by gift inter vivos or will, and by the effect of obligations.

**Art. 712**

Ownership is also acquired by accession or incorporation, and by prescription.

**Art. 713**

(Act no 2004-809 of 13 August 2004).- The property which has no master belongs to the commune on whose territory it is situated. However, ownership is transferred by operation of law to the Public Domain where the commune waives the exercise of its rights.

**Art. 714**

There are things which belong to nobody and whose usage is common to all.
Public order statutes regulate the manner of enjoying them.

**Art. 715**

The right to hunt or fish is also regulated by specific statutes.

**Art. 716**

Ownership of a treasure trove belongs to him who discovers it on his own tenement; where a treasure trove is discovered on another's tenement, one half of it belongs to him who discovered it, and the other half to the owner of the tenement.

A treasure trove is any hidden or buried thing of which nobody can prove ownership and which is discovered by a mere chance.

**Art. 717**

Rights to flotsam, to effects cast up by the sea, of whatever nature they may be, to plants and herbages which grow on the seashore, are also regulated by specific statutes.

It shall be the same as to lost things whose master does not appear.

**Art. 718 and 719**

[repealed]

### TITLE I
### OF SUCCESSIONS

**Articles 720 to 892**

CHAPTER I

CIVIL CODE

Of the Opening of Successions, the Universal Title* and the Vesting of Heirs in      Articles 720 to 724-1
Possession

**Art. 720**
Successions are opened by death, at the latest domicile of the deceased.

**Art. 721**
Successions devolve according to legislation where the deceased did not dispose of his property by gratuitous transfers.
They may devolve through gratuitous transfers insofar as the latter are consistent with inheritable reserve.

**Art. 722**
Agreements having the purpose of creating or disclaiming rights upon all or part of a succession not yet opened or of a property being part of it are effective only where authorized by legislation.

**Art. 723**
Universal successors and successors by universal title are liable for an indefinite obligation to the debts of a succession.

**Art. 724**
Heirs designated by legislation are vested by operation of law in possession of the property, rights and actions of the deceased ;
Universal legatees and donees are vested in possession in the conditions provided for in Title II of this Book.
Failing them, succession is acquired by the State who needs a court order to take possession.

**Art. 724-1**
The provisions of this Title, in particular those which relate to option, undivided ownership and partition shall apply, as may be thought proper, to universal legatees or donees, or legatees or donees by universal title, save as otherwise provided by a specific rule.

CHAPTER II
Of the Qualifications Required for Inheriting - Of Proof of Heirship      Articles 725 to 730-5

SECTION I
Of the Qualifications Required for Inheriting      Articles 725 to 729-1

**Art. 725**
In order to inherit, one must exist at the time of the opening of the succession or, having been conceived, be born viable.
A person whose absence is presumed under Article 112 may inherit.

**Art. 725-1**
Where two persons, one of whom was entitled to the other's succession, die in the same event, the order of deaths shall be established by any means.
Where that order may not be determined, the succession of each of them devolves without the other being called to it.
Where, however, one of the co-deceased leaves descendants, the latter may represent their predecessor in title, when representation is allowed.

**Art. 726**
Are unworthy of inheriting and, as such, must be excluded from succession :
1° One who is sentenced, as perpetrator or accomplice, to a serious penalty for having intentionally given or attempted to give death to the deceased;
2° One who is sentenced, as perpetrator or accomplice, to a serious penalty for having intentionally struck blows at or committed violence or assault that provoked the deceased's death without intention of causing it.

**Art. 727**
May be declared unworthy of inheriting :
1° One who is sentenced, as perpetrator or accomplice, to a correctional penalty for having intentionally given or attempted to give death to the deceased;
2° One who is sentenced, as perpetrator or accomplice, to a correctional penalty for having intentionally committed violence  that provoked the deceased's death without intention of causing it;
3° One who is sentenced for false testimony borne against the deceased  in criminal proceedings;
4° One who is sentenced for abstaining intentionally from preventing either a serious or an ordinary offence against the physical integrity of the deceased, wherefrom death resulted, whereas he could do so without any danger as to him or third persons ;
5° One who is sentenced for a slanderous criminal charge against the deceased where, relating to the acts denounced, a serious penalty was incurred ;
May also be declared unworthy of inheriting those who have committed acts referred to in 1° and 2° above and with regard to whom, by reason of their death, the public right of action could not be exercised or was extinguished.

CIVIL CODE

**Art. 727-1**

A declaration of unworthiness provided for in Article 727 shall be pronounced after the opening of the succession by the tribunal de grande instance on application of another heir. An application must be brought within six months of the death where the sentence or conviction precedes the death, or within six months of that judgment where it follows the death.

In the absence of heirs, a request may be filed by the Government procurator's office.

**Art. 728**

Is not excluded from succession a person entitled to inherit subject to a cause of unworthiness provided for in Articles 726 and 727, where the deceased, after the facts and the knowledge he had thereof, has stated by an express declaration of intention in the form of a will, that he intends to maintain him in his rights to succession or made a gratuitous transfer, universal or by universal title, in his favour.

**Art. 729**

An heir who is excluded from a succession on account of unworthiness is obliged to return all incomes and revenues which he enjoyed since the opening of the succession.

**Art. 729-1**

Children of an unworthy person may not be excluded on account of their parent's fault, whether they come to the succession on their own behalf or through representation; but an unworthy person may not, in any case, claim over the property of that succession the enjoyment that the law grants to the fathers and mothers over the property of their children.

SECTION II

Of Proof of Heirship                                                                 Articles 730 to 730-5

**Art. 730**

Proof of heirship may be made by any means.

No changes are made in the provisions or uniform usages relating to the issuing of certificates of ownership or inheritance by judicial or administrative authorities.

**Art. 730-1**

Proof of heirship may result from an affidavit drawn up by a notaire on request of one or several assigns.

Failing an ante-nuptial agreement or last will and testament of the predecessor in title of the person who requires it, an affidavit may also be drawn up by the clerk in chief of the tribunal d'instance of the place of opening of the succession.

An affidavit shall refer to the record of death of the person whose succession is opened and shall mention the supporting documents which may have been filed, such as records of civil status, and, possibly, documents relating to the existence of gratuitous transfers mortis causa which may affect the devolution of the succession.

It shall contain the assertion, signed by the assign or assigns makers of the request, that they are entitled, alone or with others whom they specify, to come into all or part of the succession of the deceased.

Any person whose statements seem to be useful may be called to the affidavit.

**Art. 730-2**

An assertion contained in an affidavit does not involve, per se, acceptance of the succession.

**Art. 730-3**

Faith must be given to an affidavit so established, until evidence contrary to it.

A person who avails himself of it is presumed to have rights of succession in the percentage herein stated.

**Art. 730-4**

The heirs designated in an affidavit or their common agent are deemed, with regard to third persons possessing property of the succession, to have free disposal of that property and, where funds are concerned, free disposal of them in the percentage stated in the affidavit.

**Art. 730-5**

A person who, knowingly and in bad faith, avails himself of an inaccurate affidavit, incurs the penalties of concealment provided for in Article 792, without prejudice for damages.

CHAPTER III

Of Heirs                                                                               Articles 734 to 732

**Art. 731**

Succession devolves by law to the relatives and spouse entitled to inherit on the following terms.

**Art. 732**

A surviving spouse non-divorced, against whom there does not exist an order of judicial separation having force of res judicata   is a spouse entitled to inherit.

SECTION I

Of the Rights of Relatives in the Absence of a Spouse Entitled to Inherit        Articles 734 to 733

CIVIL CODE

**Art. 733**

(Ord no 2005-759 of 4 July 2005).- Legislation does not discriminate according to the manners of establishing parentage in order to determinates the relatives called to inherit.

(Act no 2001-1135 of 3 Dec. 2001) Rights resulting from adoption are regulated in the Title Of Adoption.

Paragraph 1
Of Orders of Heirs                                                                  Articles 734 to 740

**Art. 734**

In the absence of a spouse entitled to inherit, relatives are called to succeed as follows:
1° Children and their descendants;
2° The father and mother; brothers and sisters and the descendants of the latter;
3° Ascendants other than the father and mother;
4° Collaterals other than brothers and sisters and the descendants of the latter.
Each of these four categories constitutes an order of heirs which excludes the following.

**Art. 735**

Children or their descendants succeed to their father and mother or other ascendants, without distinction of sex or primogeniture, even where born of different marriages.

**Art. 736**

Where a deceased leaves neither descendants, nor brother or sister, or descendants of the latter, his father and mother inherit from him, each one taking one half.

**Art. 737**

Where the father and mother have died before the deceased and the latter leaves no descendants, the brothers and sisters of the deceased or their descendants inherit from him, excluding the other relatives, ascendants or collaterals.

**Art. 738**

Where the father and mother outlive the deceased and the latter has no descendants, but brothers and sisters or descendants of the latter, one-quarter of the succession devolves to each one of the father and mother, and the remaining half to the brothers and sisters or to their descendants.

Where only one of the father and mother survives, one-quarter of the succession devolves to the latter, and three-quarters to the brothers and sisters or to their descendants.

**Art. 739**

Failing heirs of the first two orders, succession devolves to ascendants other than the father and mother.

**Art. 740**

Failing heirs of the first three orders, succession devolves to collateral relatives of the deceased other than brothers and sisters and the descendants of the latter.

Paragraph 2
Of Degrees                                                                          Articles 741 to 745

**Art. 741**

The proximity of relationship is established by the number of generations; each generation is called a degree.

**Art. 742**

The sequence of degrees forms the line; the sequence of degrees between persons descending one from the other is called the direct line; the sequence of degrees between persons who do not descend one from the other, but who descend from a common ancestor, is called the collateral line.

Descending direct line is separated from ascending direct line.

**Art. 743**

In the direct line, as many degrees are counted as there are generations between the persons: thus, a son is, with regard to his father, in the first degree, a grandson in the second; and reciprocally the father and grandfather with regard to sons and grandsons.

In the collateral line, degrees are counted by generations from one of the relatives to and exclusive of the common ancestor, and from the latter to the other relative.

Thus, two brothers are relatives in the second degree; uncle and nephew are in the third degree; first cousins in the fourth degree; and so on.

**Art. 744**

In each order, the heir who is in the nearest degree excludes an heir in a later degree.

In the same degree, heirs inherit in equal shares and by heads.

The whole, subject to what will be laid down hereafter as to division by branches and representation.

**Art. 745**

Collateral relatives may not inherit beyond the sixth degree.

Paragraph 3

CIVIL CODE

Of Division by Branches, Paternal and Maternal                    Articles 746 to 750

**Art. 746**

Parenthood is divided into two branches, depending on whether it proceeds from the father or the mother.

**Art. 747**

Where succession devolves to ascendants, it is divided in halves between those of the paternal branch and those of the maternal branch.

**Art. 748**

In each branch, the ascendant who is in the nearest degree inherits, to the exclusion of all others.

The ascendants in the same degree inherit by heads.

Failing an ascendant in a branch, the ascendants of the other branch shall take the whole succession.

**Art. 749**

Where succession devolves to collaterals other than brothers and sisters and their descendants, it is divided in halves between those of the paternal branch and those of the maternal branch.

**Art. 750**

In each branch, the collateral who is in the nearest degree inherits, to the exclusion of all others.

The collaterals in the same degree inherit by heads.

Failing a collateral in a branch, the collaterals of the other branch shall take the whole succession.

Paragraph 4
Of Representation                    Articles 751 to 755

**Art. 751**

Representation is a fiction of the law which causes the representative to enter into the rights of the person represented.

**Art. 752**

Representation takes place without limitation in the descending direct line.

It is admitted in all cases, whether the children of the deceased compete with the descendants of a predeceased child, or whether all the children of the deceased having died before him, the descendants of said children are in equal or unequal degrees between them.

**Art. 752-1**

Representation does not take place in favour of ascendants; in each of the two lines, the nearest always excludes the remotest.

**Art. 752-2**

In the collateral line, representation is admitted in favour of children and descendants of brothers or sisters of the deceased, whether they come to the succession concurrently with uncles and aunts, or whether, all the brothers and sisters of the deceased having died before him, the succession devolves on their descendants in equal or unequal degree.

**Art. 753**

In all cases in which representation is admitted, partition shall be made by stocks, as if the represented person came to the succession; if there is occasion, it shall be made by subdivision of stock. Within a stock or subdivision of stock, partition shall be made by heads.

**Art. 754**

One represents predeceased persons, one does not represent those who have renounced.

One may represent a person to whose succession one has renounced.

**Art. 755**

Representation is admitted in favour of the children and descendants of an unworthy heir, although the latter is alive on the opening of the succession.

Children of an unworthy heir conceived before the opening of a succession of which the unworthy heir was excluded shall return to the succession of the latter the property they have inherited in his stead, where they come in competition with other children conceived after the opening of the first succession.

Collation shall be made under the provisions of Section 2 of Chapter VI of this Title.

SECTION II
Of the Rights of a Spouse Entitled to Inherit                    Articles 756 to 767

Paragraph 1
Of the Nature of the Rights, of their Amount and Exercise                    Articles 756 to 758-5

**Art. 756**

A spouse entitled to inherit is called to a succession either alone, or in competition with the relatives of a deceased.

CIVIL CODE

**Art. 757**

Where a predeceased spouse leaves children or descendants, the surviving spouse shall take, at his or her option, either the usufruct of the whole of the existing property or the ownership of the quarter where all the children are born from both spouses and the ownership of the quarter in the presence of one or several children who are not born from both spouses.

**Art. 757-1**

Where, in the absence of children or descendants, a deceased leaves his father and mother, the surviving spouse shall take one half of the property. The other half devolves for one quarter to the father and for one quarter to the mother.

Where the father or the mother is predeceased, the share which he would have taken devolves to the surviving spouse.

**Art. 757-2**

In the absence of children or descendants of the deceased or of his father and mother, the surviving spouse shall take the whole succession.

**Art. 757-3**

Notwithstanding Article 757-2, in case of predecease of the father and mother and in absence of descendants, the property that the deceased received from them by succession or gift and that is found in kind in the succession devolves for one half to the brothers and sisters of the deceased or to their descendants, themselves descending from the predeceased parent or parents from whom the devolution originates.

**Art. 758**

Where a surviving spouse takes the whole or the three quarters of the property, the ascendants of the deceased, other than the father and mother, who are in need are entitled to a maintenance obligation against the succession of the predeceased.

The period within which it may be claimed is of one year after the death or the moment from which the heirs cease to perform the payments they made before to the ascendants. In case of undivided ownership the period shall be extended until the completion of the partition.

Periodical payments shall be obtained from the succession. They shall be borne by all the heirs and, in case of insufficiency, by all the specific legatees, in proportion to what they received.

If, however, the deceased expressly declared that such legacy should be paid in preference to the other, Article 927 shall apply.

**Art. 758-1**

Where a surviving spouse has an option between ownership or usufruct, his or her rights may not be assigned so long as he or she did not exercise the option.

**Art. 758-2**

The option of a spouse between usufruct and ownership may be proved by any means.

**Art. 758-3**

Any heir may request in writing a spouse to exercise his or her option. Where he or she fails to come to a decision in writing within three months, the spouse shall be deemed to have chosen the usufruct.

**Art. 758-4**

Where he or she dies without having come to a decision, the spouse shall be deemed to have chosen the usufruct.

**Art. 758-5**

The calculation of the right in full ownership of a spouse provided for in Articles 757 and 757-1 must be effected on an aggregate formed of all the property existing at the death of his or her spouse to which shall be united fictitiously that which he or she has disposed with, by an act inter vivos or testamentary, in favour of persons entitled to inherit, by way of advancement.

The spouse may exercise his or her right only on property which the predeceased has not disposed with by act inter vivos or testamentary, and without prejudicing reserved rights or rights to collation.

Paragraph 2
Of the Conversion of a Usufruct                                          Articles 759 to 762

**Art. 759**

Any usufruct belonging to a spouse upon the property of the predeceased, whether it results from legislation, from a will or from a gift of future property, gives rise to a power of conversion into a life annuity, on request of one of the heirs bare-owners or of the spouse himself or herself entitled to inherit.

**Art. 759-1**

A power of conversion may not be renounced . Coheirs may not be deprived of it by the intention of the predeceased.

**Art. 760**

Failing an agreement between the parties, an application for conversion shall be referred to the judge. It may be

CIVIL CODE

instituted until final partition.

Where he entertains the application for conversion, the judge shall determine the amount of the annuity, the guarantees which the debtor heirs shall give, as well as the appropriate kind of index-linking to maintain the initial equivalence of the annuity to the usufruct.

The judge, however, may not order against the intention of the spouse the conversion of the usufruct bearing on the lodging which he or she occupies as his or her main residence, as well as on the furniture with which it is fitted.

**Art. 761**

Through an agreement between the heirs and the spouse, it may be proceeded to a conversion of the usufruct of the spouse into a capital.

**Art. 762**

The conversion of an usufruct is part of the performing of a partition. It does not produce a retroactive effect, save stipulations of the parties to the contrary.

Paragraph 3
Of the Temporary Rights to Lodging and of Rights for Life to Lodging          Articles 763 to 766

**Art. 763**

Where, at the time of the death, a spouse entitled to inherit actually occupies, as his or her main habitation, a lodging belonging to the spouses or fully depending upon the succession, he or she has by operation of law, during one year, the gratuitous enjoyment of that lodging, as well as of the furniture, included in the succession, with which it is fitted.

Where his or her habitation was secured through a lease , the rents thereof shall be repaid to him or her during the year, as the payments proceed.

The rights provided for in this Article shall be deemed direct effects of the marriage and not rights of inheritance; This Article is mandatory.

**Art. 764**

Save intention to the contrary expressed by the deceased in the way provided for in Article 971, a spouse entitled to inherit who actually occupied, at the time of the death, as his or her main habitation, a lodging belonging to the spouses or fully depending upon the succession, has on this lodging, until his or her death, a right of habitation and a right of use on the furniture, included in the succession, with which it is fitted.

Those rights of habitation and of use are exercised subject to the conditions provided for in Articles 627, 631, 634, and 635.

The spouse, the other heirs, or one of them may insist on an inventory of the movables and a statement of the immovable subjected to the rights of use and of habitation being drawn up.

Notwithstanding Articles 631 and 634, where it results from the situation of the spouse that the lodging subject to the right of habitation is no longer adapted to his or her needs, the spouse or his or her representative may lease it for an use other than commercial or rural in order to provide necessary means for new conditions of dwelling.

**Art. 765**

The value of the rights of habitation and use shall be appropriated to the value of the rights of succession taken by the spouse.

Where the value of the rights of habitation and use is lesser than that of the rights of succession, the spouse may take the remainder on the existing property.

Where the value of the rights of habitation and use is higher than that of his or her rights of succession, the spouse is not bound to compensate the succession on account of the excess.

**Art. 765-1**

A spouse has one year after the death in order to evidence his or her intention to benefit from those rights of habitation and use.

**Art. 765-2**

Where the lodging was the subject of a lease, a spouse entitled to inherit who, at the time of the death, actually occupied the premises as his or her main habitation benefits by the right of use upon the furniture, included in the succession, with which it is fitted.

**Art. 766**

A spouse entitled to inherit and the heirs may, by agreement, convert the rights of habitation and use into a life annuity or a capital.

Where a minor or a protected adult are among the parties to an agreement, the latter must be authorized by the judge of guardianships.

Paragraph 4
Of the Right to Maintenance                                    Article 767

**Art. 767**

The succession of a predeceased spouse owes maintenance to a spouse entitled to inherit who is in need. The period within which to claim it is one year after the death or the time where the heirs cease to perform the payments they

CIVIL CODE

made before to the spouse. In case of undivided ownership the period shall be extended until the completion of the partition.

Periodical payments shall be obtained from the succession. They shall be borne by all the heirs and, in case of insufficiency, by all the specific legatees, in proportion to what they received.

If, however, the deceased expressly declared that such legacy should be paid in preference to the other, Article 927 shall apply.

CHAPTER IV
Of the Rights of the State                                                                       Articles 768 to 773

**Art. 768**
*(Ord. no 58-1307 of 23 Dec. 1958)*
In absence of heirs, a succession is acquired by the State .

**Art. 769**
*(Ord. no 58-1307 of 23 Dec. 1958)*
The administration of Domains which claims a right to a succession is bound to have seals affixed and to cause an inventory to be made in the forms prescribed  for the acceptance of successions under benefit of inventory.

**Art. 770**
*(Ord. no 58-1307 of 23 Dec. 1958)*
It must petition to obtain from the tribunal de grande instance in whose territorial jurisdiction the succession was opened, a court order to take possession.

It is dispensed from using the services of a counsel; the court shall rule on the petition three months and forty days after a notice and bill in the usual forms, and after having heard the Government procurator.

Where, the vacancy having been duly declared, the administration of Domains has been appointed curator, it may, before filing its petition, proceed by itself to the formalities of notice provided for in the preceding paragraph.

In all cases, bill-sticking shall be proved by a copy of the bill signed by the director of Domains and bearing a certificate of the mayor of the place of opening of the succession.

**Art. 771**
[repealed]

**Art. 772**
*(Ord. no 58-1307 of 23 Dec. 1958)*
The administration of Domains which does not fulfil the formalities prescribed for it may be ordered to pay damages to the heirs, if any should appear.

**Art. 773**
[repealed]

CHAPTER V
Of the Acceptance and Repudiation of Successions                                 Articles 774 to 814

SECTION I
Of Acceptance                                                                                   Articles 774 to 783

**Art. 774**
A succession may be accepted outright or subject to benefit of inventory.

**Art. 775**
No one is obliged to accept a succession which devolves upon him.

**Art. 776**
*(Act of 18 Feb. 1938)*
Successions devolving on minors and on adults in guardianship may be lawfully accepted only in accordance with the provisions of the Title Of Minority, of Guardianship and of Emancipation.

**Art. 777**
The effects of acceptance go back to the day of the opening of the succession.

**Art. 778**
Acceptance may be express or by conduct: it is express where one assumes the title or capacity of heir in an authentic or private instrument; it is by conduct where the heir does an act which necessarily implies his intention of accepting and which he would be entitled to do only in his capacity as heir.

**Art. 779**
Acts of mere preservation, supervision and interim administration are not acts of acceptance of a succession, unless the title or capacity of heir has been assumed therein.

**Art. 780**
A gift, sale or assignment of his rights of inheritance made by one of the co-heirs, either to a stranger, or to all his

CIVIL CODE

co-heirs, or to some of them, involves on his part acceptance of the succession.

It shall be the same :

1° as to the renunciation, even gratuitous, which one of the heirs makes in favour of one or several of his co-heirs;

2° as to the renunciation which he makes in favour of all his co-heirs without distinction, where he receives the price of his renunciation.

**Art. 781**

Where a person to whom a succession has devolved dies without having repudiated it or without having accepted it expressly or by conduct, his heirs may accept or repudiate it on his behalf.

**Art. 782**

Where those heirs do not agree as to accepting or repudiating the succession, it must be accepted under benefit of inventory.

**Art. 783**

An adult may attack an acceptance, express or by conduct, which he made of a succession, only in the case where that acceptance was the result of a deception committed upon him: he may never claim on the ground that he suffered loss, except only in the case where the succession is absorbed or reduced more than one-half through the discovery of a will unknown at the time of the acceptance.

SECTION II

Of the Renunciation of Successions                                         Articles 784 to 792

**Art. 784**

Renunciation of a succession may not be presumed; it may only be made at the court office of the tribunal de grande instance in the arrondissement of which the succession was opened, on a special register kept for that purpose.

**Art. 785**

An heir who renounces shall be deemed to have never been an heir.

**Art. 786**

The share of a renouncing heir accrues to his co-heirs; where he is alone, it devolves upon the next degree.

**Art. 787**

One may never take by representation of an heir who renounced: where the person renouncing is the only heir in his degree, or where all the co-heirs renounce, children come in their own right and inherit by heads.

**Art. 788**

Creditors of one who renounces to the detriment of their rights may be authorized by the court to accept the succession on behalf of their debtor, in his place and stead.

In that case, the renunciation is avoided only in favour of the creditors and to the extent only of their claims: it is not so in favour of the heir who renounced.

**Art. 789**

The power to accept or repudiate a succession is extinguished by the length of time required for the longest prescription of immovable rights.

**Art. 790**

So long as prescription of the right to accept is not effective against the heirs who renounced, they have the power to still accept the succession, where it has not already been accepted by other heirs; without prejudice, however, to the rights which third parties may have acquired to property of the succession, either by prescription, or by transactions lawfully entered into with the curator of the vacant succession.

**Art. 791**

One may not, even by an ante-nuptial agreement, renounce the succession of a living person or transfer contingent rights which one may have to that succession.

**Art. 792**

Heirs who have misappropriated or concealed items of property of a succession, are deprived of the power to renounce it: they remain outright heirs, notwithstanding their renunciation, without being allowed to claim any share in the things misappropriated or concealed.

SECTION III

Of the Benefit of Inventory, of its Effects and of the Obligations of a Beneficiary    Articles 793 to 810

Heir

**Art. 793**

The declaration of an heir, that he intends to assume that capacity only under benefit of inventory, must be made at the court office of the tribunal de grande instance in the arrondissement of which the succession was opened: it must be entered on the register designed for receiving acts of renunciation.

**Art. 794**

CIVIL CODE

That declaration is effective only where it is preceded or followed by a true and exact inventory of the property of the succession, in the manner prescribed by the legislation on procedure, and within the periods which shall be hereafter specified.

**Art. 795**

An heir has three months for making the inventory, from the day of the opening of the succession.

He has in addition, for deliberating on his acceptance or renunciation, a period of forty days, which shall commence to run from the day of expiry of the three months given for the inventory, or from the day of the closing of the inventory if it was finished before the three months.

**Art. 796**

Where, however, there exist in the succession articles liable to waste away or costly to keep, an heir may, in his capacity of being entitled to inherit, and without there being an acceptance on his part thereby presumed, have himself authorized by the court to proceed to a sale of those articles.

That sale must be done by a public officer, after the bills and notice regulated by legislation on procedure.

**Art. 797**

While the periods for making an inventory and deliberating are elapsing, an heir may not be compelled to assume a capacity and no judgment may be obtained against him: where he renounces when the periods have elapsed or before, the expenses which he has lawfully incurred up to that time are the responsibility of the succession.

**Art. 798**

After the expiry of the above-mentioned periods, an heir, in case of proceedings brought against him, may require a new period which the court to which the matter was referred may grant or refuse according to the circumstances.

**Art. 799**

The costs of the proceedings, in the case of the preceding Article, are the responsibility of the succession, where the heir proves either that he had no knowledge of the death, or that the periods were insufficient, either because of the location of the property, or because of the controversies which have arisen : where he does not make that proof, the costs are his personal responsibility.

**Art. 800**

Nevertheless, after the expiry of the periods granted by Article 795, and even of those given by the judge under Article 798, an heir keeps the power to still make an inventory and to stand as heir beneficiary, where he has not acted as heir or where there does not exist against him a judgment having become res judicata  which condemns him in the capacity of outright heir.

**Art. 801**

An heir who has been guilty of concealment or who has omitted, knowingly and in bad faith, to include articles of the succession in the inventory, is deprived of the benefit of inventory.

**Art. 802**

The effect of the benefit of inventory is to give an heir the advantage:

1° To be obliged to pay the debts of the succession only to the extent of the value of the property which he receives, and even to be allowed to discharge himself from paying the debts by abandoning all the property of the succession to the creditors and legatees;

2° Not to mingle his personal property with that of the succession, and to keep against it the right to ask for payment of his claims.

**Art. 803**

A beneficiary heir is responsible for administering the property of the succession, and must account for his administration to creditors and legatees.

He may be constrained as to his personal property only after having been given notice to present his account, and having failed to comply with that obligation.

After an auditing of the account, he may be constrained as to his personal property only to the extent of the balance of which he is debtor.

**Art. 804**

He is liable only for gross faults in the administration for which he has charge.

**Art. 805**

He may sell movables of the succession only through a public officer, by auction and after the usual bills and notices.

Where he produces them in kind, he is liable only for depreciation or deterioration caused by his negligent conduct.

**Art. 806**

He may sell immovables only in the forms prescribed by the rules of procedure; he is obliged to transfer the proceeds thereof to mortgage creditors who made themselves known.

**Art. 807**

Where creditors or other persons concerned so require, he is obliged to give good and solvent security for the value

CIVIL CODE

of the movables contained in the inventory and for the portion of the proceeds of the immovables not transferred to mortgage creditors.

Where he fails to give that security, the movables shall be sold and the proceeds thereof deposited, as well as the proceeds not transferred of the immovables, for the purpose of discharging the liabilities of the succession.

### Art. 808

Where there are attaching creditors, a beneficiary heir may pay only in the order and manner fixed by the judge.

Where there are no attaching creditors he shall pay creditors and legatees as they present themselves.

### Art. 809

Creditors who did not attach, who present themselves after the auditing of the account and the payment of the balance , may only exercise their remedies against the legatees.

In either case, the remedy is time-barred after the lapse of three years, after the day of the auditing of the account and the payment of the balance.

### Art. 810

Costs of seals, if any have been affixed, of inventory and of account, are charged against the succession.

SECTION IV
Of Vacant Successions                                                                                           Articles 811 to 814

### Art. 811

Where, after expiry of the periods for making the inventory and deliberating, no one presents himself to claim a succession, and there are no known heirs or the known heirs have renounced, the succession is deemed vacant.

### Art. 812

The tribunal de grande instance in whose arrondissement  it is opened, shall appoint a curator on request of the persons concerned, or on demand of the Government procurator.

### Art. 813

A curator of a vacant succession is obliged first of all to have its state of being established by an inventory: he shall exercise and enforce its rights; he shall answer claims brought against it; he shall administer, with the responsibility of having the funds forming part of the succession, as well as the proceeds from the sale of movables or immovables, deposited into the funds of the receiver of the national office for the preservation of rights and with the responsibility of accounting to whomever it may belong.

### Art. 814

The provisions of Section III of this Chapter, on the forms of an inventory, the method of administration, and the accounts to be rendered by a beneficiary heir, shall apply moreover to curators of vacant successions,"insofar as they are not contrary to the provisions of Articles 1000 and 1001 of the Code of Civil Procedure" (Ord. no 58-1007 of 24 Oct. 1958).

CHAPTER VI
Of Partition and of Collations                                                                              Articles 815 to 892

SECTION I
Of Undivided Ownership and of Action for Partition                                     Articles 815 to 842

### Art. 815

*(Act no 76-1286 of 31 Dec. 1976)*

No one may be compelled to remain in undivided ownership and a partition may always be induced, unless it was delayed by judgment or agreement.

"On request of an undivided co-owner, a court may delay partition" (Act no 78-627 of 10 June 1978) for two years at the most where its immediate carrying out could affect the value of the undivided property"or where one of the undivided co-owners can settle in an agricultural holding depending on the succession only at the end of that period" (Act no 80-502 of 4 July 1980). That delay may be applied to the whole of the undivided property or only to part of it.

Furthermore, where undivided co-owners wish to remain in undivided ownership, the court may, on request of one or several of them, on the basis of the interests as they stand, and without prejudice to the application of Articles 832 to 832-3, allot his share, after appraisal, to the one who sought partition, either in kind, if it can easily be disjoined from the remainder of the undivided property, or in money, if the allotment in kind cannot be conveniently made, or if the applicant expresses his preference for it; where there is not a sufficient sum in the undivided property, the complement shall be remitted by those of the undivided co-owners who concurred in the request, without prejudice to the possibility for the other undivided co-owners to participate in it if they express the wish of doing so. The share of each of them in the undivided property shall be increased in proportion to his remittance.

### Art. 815-1

*(Act no 76-1286 of 31 Dec. 1976)*

Failing an amicable agreement, undivided ownership of an agricultural holding forming an economic unit and whose development was secured by the deceased or by his or her spouse may be maintained, under the terms fixed by the court, on request of the persons referred to in paragraphs 3 and 4 below . The court shall rule on the basis of the

CIVIL CODE

interests as they stand and of the possibilities of existence which the family can derive from the undivided property. The maintenance of undivided ownership remains possible where the holding includes elements of which the heir or the spouse was already owner or co-owner before the opening of the succession.

Undivided ownership may also be maintained on request of the same persons and under the terms fixed by the court, as regards ownership of premises used for habitation or for professional purposes which, at the time of the death, were actually used for that habitation or for those purposes by the deceased or his or her spouse. It shall be the same for movable articles which are useful for the exercise of the profession.

Where the deceased leaves one or several minor descendants, the maintenance of undivided ownership may be requested either by the surviving spouse, or by any heir, or by the statutory representative of the minors.

In the absence of minor descendants, the maintenance of undivided ownership may be requested only by the surviving spouse and provided that he was before the death, or has become by reason of the death, co-owner of the agricultural holding or of the premises used for habitation or for professional purposes. If it is a case of premises used for habitation, the spouse must have resided on the spot at the time of the death.

Maintenance of undivided ownership may not be prescribed for a duration longer than five years. In may be renewed, in the case provided for in paragraph 3, until the coming of age of the youngest of the descendants, and, in the case provided for in paragraph 4, until the death of the surviving spouse.

**Art. 815-2**
*(Act no 76-1286 of 31 Dec. 1976)*
Any undivided owner may take the necessary steps for the preservation of the undivided property.

He may use for that purpose funds of the undivided property which he holds, and he is deemed to have the free disposal of them with regards to third parties.

Failing funds of the undivided property, he may compel his undivided co-owners to make with him the necessary expenditures.

Where undivided property is encumbered with an usufruct, those powers are effective against the usufructuary to the extent that the latter is responsible for repairs.

**Art. 815-3**
*(Act no 76-1286 of 31 Dec. 1976)*
Acts of administration and disposition relating to undivided property require the consent of all the undivided co-owners . They may give to one or several of them general authority for administration. A special authority is required for any act which does not belong to a normal management of the undivided property, as well as for the conclusion and renewal of leases.

Where one undivided owner takes up the management of the undivided property, with the knowledge of the others and nevertheless without opposition on their part, he is deemed to have received an implied authority, covering acts of administration, but not acts of disposition or conclusion or renewal of contracts.

**Art. 815-4**
*(Act no 76-1286 of 31 Dec. 1976)*
Where one of the undivided owners is unable to express his intention, another may be judicially entitled to represent him, in a general manner or for some particular transactions, the terms and extent of that representation being fixed by the judge.

Failing statutory power, contractual authority or judicial entitlement, the acts done by a undivided owner on behalf of another are effective with regard to the latter under the rules of management of another's business.

**Art. 815-5**
*(Act no 76-1286 of 31 Dec. 1976)*
An undivided owner  may be judicially authorized to do alone an act for which the consent of an undivided co-owner would be required, where the refusal of the latter imperils the common interest.

"The judge may not, on request of a bare-owner, order the sale of the full ownership of a property encumbered with an usufruct, against the wish of the usufructuary" (Act no 87-498 of 6 July 1987).

An act made within the terms fixed by the judicial authorization is effective against the undivided owner whose consent was wanting.

**Art. 815-6**
*(Act no 76-1286 of 31 Dec. 1976)*
The president of the tribunal de grande instance may prescribe or authorize all urgent measures which the common interest requires.

He may in particular authorize an undivided owner to collect from debtors of the undivided property or from depositaries of undivided money funds designed to meet urgent needs, while prescribing, where required, the terms of their use. That authorization does not involve qualifying as regards a surviving spouse or a heir.

He may also, either designate an undivided owner as administrator with obligation if there is occasion of giving security, or appoint a sequestrer. Articles 1873-5 to 1873-9 of this Code shall apply as may be thought proper to the powers and obligations of the administrator, unless they are otherwise regulated by the judge.

**Art. 815-7**
*(Act no 76-1286 of 31 Dec. 1976)*
The president of the court may also prohibit the shifting of tangible movables reserving the right to specifying those

CIVIL CODE

of which he grants the personal usage to one or another of the persons entitled, under the responsibility on the latter to give security, if he deems it  necessary.

**Art. 815-8**
*(Act no 76-1286 of 31 Dec. 1976)*
   Whoever collects revenues or incurs expenses for the account of the undivided ownership must keep a statement of them which is at the disposal of the undivided owners.

**Art. 815-9**
*(Act no 76-1286 of 31 Dec. 1976)*
   Each undivided owner may use and enjoy undivided property in accordance with its destination, to the extent compatible with the rights of the other undivided owners and with the effect of the acts lawfully made in the course of the undivided ownership. Failing an agreement between the persons concerned, the exercise of that right shall be regulated, provisionally, by the president of the court.
   An undivided owner who uses or enjoys privately an undivided thing is liable to an indemnity, unless otherwise agreed.

**Art. 815-10**
*(Act no 76-1286 of 31 Dec. 1976)*
   Fruits and revenues of undivided property accrue to the undivided ownership, in default of interim partition or of any other agreement establishing divided enjoyment.
   No inquiry relating to fruits and revenues may, however, be admissible more than five years after the date on which they were or could have been collected.
   Each undivided owner is entitled to benefits coming from undivided property and bears the loss in proportion to his rights in the undivided property.

**Art. 815-11**
*(Act no 76-1286 of 31 Dec. 1976)*
   Any undivided owner may claim his annual share in the benefits, less the expenses involved by acts to which he consented or which are effective against him.
   Failing another title, the extent of the rights of each in the undivided ownership results from the affidavit or from the abstract of inventory drawn up by the notaire.
   In case of controversy, the president of the tribunal de grande instance may order an interim distribution of the benefits, subject to an account to be made before the final liquidation.
   Up to the amount of available money, he may likewise order an advance in capital on the rights of an undivided owner in the partition to come.

**Art. 815-12**
*(Act no 76-1286 of 31 Dec. 1976)*
   An undivided owner who manages one or several undivided items of property is accountable for the products of his management. He is entitled to compensation for his activity on terms fixed amicably or, failing which, by judicial decision.

**Art. 815-13**
*(Act no 76-1286 of 31 Dec. 1976)*
   Where an undivided owner has improved at his expenses the condition of undivided property, account of it must be taken for him according to equity, with regard to the increase in value of the property at the time of partition or of transfer. Account shall be taken likewise for him of the necessary outlays he made out of his own money for the preservation of said property, even though they did not improve it.
   Reciprocally, an undivided owner is responsible for degradations and deteriorations which have diminished the value of the undivided property through his act or fault.

**Art. 815-14**
*(Act no 76-1286 of 31 Dec. 1976)*
   An undivided owner who intends to transfer, for value, to a person outside the undivided ownership, all or part of his rights in the undivided property or in one or several articles of that property shall give notice by extra-judicial act to the other undivided owners of the price and terms of the planned transfer as well as of the name, domicile and occupation of the person who intends to acquire it.
   Any undivided owner may, within the period of one month following that notice, make known to the transferor, by extra-judicial act, that he exercises a right of pre-emption at the price and terms of which he was notified.
   In case of pre-emption, the person who is exercising it shall have an instrument of sale drafted within a period of two months, counting from the date of sending his reply to the seller. After that period, his declaration of pre-emption is void by operation of law, fifteen days after a notice of default remained ineffective, and without prejudice to damages which may be claimed of him by the seller.
   Where several undivided owners exercise their rights of pre-emption, unless otherwise agreed, they are deemed to acquire together the portion put up for sale in proportion to their respective shares in the undivided ownership.
   Where terms of payment have been granted by the transferor, Article 833-1 shall apply.

**Art. 815-15**
*(Act no 76-1286 of 31 Dec. 1976)*

CIVIL CODE

Where there is occasion for an auction of all or part of the rights of an undivided owner in undivided property or in one or more articles of that property, the counsel or notaire must inform the undivided owners of it by notice one month before the date planned for the sale."Each undivided owner may take the place of the purchaser within a period of one month after the auction, by declaration at the court office or with the notaire" (Act no 78-627 of 10 June 1978).

The particulars established for the purpose of the sale must mention the rights of substitution.

**Art. 815-16**
*(Act no 76-1286 of 31 Dec. 1976)*
Every transfer or auction made in defiance of Articles 815-14 and 815-15 is void. An action for annulment is time-barred after five years. It may be brought only by those on whom notices were to be served or by their heirs.

**Art. 815-17**
*(Act no 76-1286 of 31 Dec. 1976)*
Creditors who might have levied execution on the undivided property before there was undivided ownership, and those whose claims result from the preservation or management of the undivided property, shall be paid by deduction from the assets before partition. They may, in addition, conduct attachment or seizure and sale of the undivided property.

Personal creditors of an undivided owner may not attach or seize the latter's share in undivided property, whether movable or immovable.

They have, however, the power to instigate partition in the name of their debtor or to intervene in a partition instigated by him. The undivided co-owners may stop the course of the action for partition by discharging the obligation in the name and on behalf of the debtor. Those who exercise that power shall be reimbursed by deduction from the undivided property.

**Art. 815-18**
*(Act no 76-1286 of 31 Dec. 1976)*
The provisions of Articles 815 to 815-17 shall apply to undivided property in usufruct to the extent that they are consistent with the rules on usufruct.

The notices provided for in Articles 815-14, 815-15 and 815-16 must be served on any bare owner and on any usufructuary. But a usufructuary may acquire a share in bare ownership only where no bare owner offers to acquire it; a bare owner may acquire a share in usufruct only where no usufructuary offers to acquire it.

**Art. 816**
A partition may be applied for even where one of the heirs has enjoyed separately a part of the property of the succession, if there was no instrument of partition nor possession adequate to acquire prescription.

**Art. 817**
*(Act of 19 June 1939)*
As regards minors or adults in guardianship, an action for partition may be brought by their guardians specially authorized by a family council.

As regards absent coheirs, the action belongs to the relatives vested with possession.

**Art. 818**
[repealed]

**Art. 819**
*(Act no 85-1372 of 23 Dec. 1985)*
Where all the heirs are present and fully capable, a partition may be made in such manner and through such act as the parties deem proper.

**Art. 820**
*(Act no 85-1372 of 23 Dec. 1985)*
Property of a succession may, in whole or in part, be subject to measures of preservation, such as the affixing of seals, on request of a party concerned or of the Government procurator's office, under the conditions and following the forms determined by the Code of Civil Procedure.

**Art. 821**
[repealed]

**Art. 822**
*(D.-Law of 17 June 1938)*
An action for partition and the controversies arising  either on the occasion of maintaining undivided ownership or during the proceedings of partition, shall be, on pain of annulment, submitted only to the court of the place of opening of the succession; it is before that court that auctions shall be made and that claims relating to the warranty of shares between coparceners and those for rescission of a partition shall be brought. In the case where an attempt to conciliation as provided for in Article 48 [repealed] of the Code of Civil Procedure takes place, the judge of the  tribunal d'instance of the place of opening of the succession shall alone be competent, on pain of annulment.

(Act of 15 Dec. 1921) Where all the parties agree, the court may be seized of an application for partition through a collective request signed by their counsels. If there is occasion for an auction, the request shall contain an upset price which will serve as an appraisal. In that case, the judgment shall be handed down in chambers and is not appealable

CIVIL CODE

where the submissions of the request are accepted by the court without modification.

(Act of 19 June 1939) The provisions of the preceding paragraphs shall apply without need of a previous authorization, whatever the capacity of the party concerned may be and even where he is represented by a judicial agent.

**Art. 823**

Where one of the coheirs refuses to consent to a partition, or where controversies arise, either as to the way of proceeding, or as to the manner of settling it, the court shall decide as in summary matters, or shall appoint, if necessary, for the proceedings of partition, one of the judges, on whose report it shall decide the controversies.

**Art. 824**

Appraisal of the immovables shall be made by experts chosen by the parties concerned, or, upon their refusal, appointed by the court of its own motion.

The memorandum of the experts shall state the basis of the appraisal; it shall indicate whether the article appraised can be conveniently partitioned; in what manner; finally, in case of partition, it shall fix each one of the shares that can be formed therefrom, and their value.

**Art. 825**

Appraisal of the movables, where there was no valuation in a regular inventory, must be made by knowledgeable persons, at a fair price and without increase.

**Art. 826**

Each one of the coheirs may claim his share of the movables and immovables of the succession in kind: nevertheless, where there are attaching or seizing creditors, or where the majority of the coheirs deem a sale necessary for the discharge of the debts and liabilities of the succession, movables shall be sold publicly in the ordinary manner.

**Art. 827**

*(D.-Law of 17 June 1938)*

Where the immovables cannot be conveniently partitioned or allocated in the conditions provided for by this Code, a sale by auction must take place before the court.

The parties, however, where they are all of full age, may consent that the auction be held before a notaire, on the choice of whom they agree.

**Art. 828**

After the immovables and movables have been appraised and sold, if there is occasion, the supervising judge shall send the parties before a notaire upon whom they agree, or whom he appoints of his own motion, if the parties do not agree upon a choice.

Before that officer shall be determined the accounts of what the parties may owe each other, the formation of the general mass, the composition of the shares and the allotments to be made to each of the coparceners.

**Art. 829**

Each coheir shall return to the mass, according to the rules hereafter laid down, the gifts which have been made to him and the sums of which he is debtor.

**Art. 830**

Where collation is not made in kind, the coheirs to whom it is owed, shall appropriate an equivalent portion from the mass of the succession.

Appropriations shall be made, as far as possible, on things of the same kind, character and good quality as those not returned in kind.

**Art. 831**

After those appropriations, out of what remains of the mass, the composition is made of as many equal shares as there are coparcener heirs or coparcener stocks.

**Art. 832**

*(D.-Law of 17 June 1938)*

In forming and composing shares, the parcelling out of lands and the splitting up of holdings must be avoided.

In so far as parcelling out of lands and splitting up of holdings can be avoided, each share must, as far as possible, be composed, in whole or in part, of movables or immovables, of rights or of claims of equivalent value.

"A surviving spouse or any co-owner heir may request a preferential allotment by way of partition, under the responsibility of a compensation, if any, of any agricultural holding, or part of agricultural holding, constituting an economic unit, or undivided portion of an agricultural unit, even formed in part from a property of which he was already owner or co-owner before the death, in whose development he actually participates or participated; in the case of an heir, the requirement as to participation may have been fulfilled by his or her spouse. If there is occasion, the request for preferential allotment may bear on shares of the capital, without prejudice to the application of the statutory provisions or of articles of association on the continuation of a partnership with the surviving spouse or one or several heirs.

"The same rules shall apply to any commercial, industrial or craft concern, whose importance does not exclude a family nature" (Act no 82-596 of 10 July 1982).

(Act no 80-502 of 4 July 1980) In the case where neither the surviving spouse, nor any co-owner heir requests the application of the provisions provided for in paragraph 3 above or those of Articles 832-1 or 832-2, preferential allotment

CIVIL CODE

may be granted to any coparcener provided he obliges himself to give on lease, within a period of six months, the property under consideration under the terms fixed in Chapter VII of Title I of Book VI [Chapter VI of Title I of Book IV] of the Rural Code to one or several of the coheirs fulfilling the personal requirements provided for in paragraph 3 above or to one or several descendants of those coheirs fulfilling the same conditions.

A surviving spouse or any co-owner heir may also request preferential allotment :

Of the ownership or right to lease of the premises which actually serve him or her as habitation, where he or she had residence here at the time of the death", with the furniture which garnishes them" (Act no 2001-1135 of 3 Dec. 2001);

Of the ownership or right to lease of the premises used for professional purposes which serve actually for the exercise of his or her occupation and of the furniture for professional purposes which garnishes the premises;

Of the whole of movable articles necessary for the holding of a rural property farmed by the deceased as tenant farmer or sharecropper where the lease continues for the profit of the applicant or where a new lease is granted to the latter.

Preferential allotment may be sought jointly by several persons entitled to inherit."Preferential allotment of the ownership of the premises and of the furniture which gaenishes it, referred to in paragraph 7, is as of right for a surviving spouse" (Act no 2001-1135 of 3 Dec. 2001).

"In the circumstances referred to in the preceding paragraph, an allottee surviving spouse may require from his coparceners periods, which may not exceed ten years, for payment of a fraction of the balance, equal to a half at the most. Unless otherwise agreed, the sums remaining due bear an interest at the statutory rate.

"In case of sale of the premises or of the furniture which garnishes them, the fraction of the balance which relates to it becomes immediately due; in case of partial sales, the proceeds of those sales shall be paid to the coparceners and appropriated to the fraction of the balance still due.

"Rights resulting from a preferential allotment may not prejudice rights for life of use and habitation which a spouse may exercise under Article 764" (Act no 2001-1135 of 3 Dec. 2001).

"Failing an amicable agreement, a request for preferential allotment shall be brought before the court, which shall decide on the basis of the interest as they stand; in case of several requests relating to a holding or a concern, the court shall take into account the fitness of the various applicants to manage that holding or concern and to remain therein, and in particular the duration of their personal taking part in the operation of the holding or of the concern" (Act no 82-596 of 10 July 1982).

Property which forms the subject of the allotment shall be appraised at its value on the day of partition.

Unless otherwise amicably agreed between the coparceners, a balance which may be oxed shall be paid cash.

## Art. 832-1
*(Act no 80-502 of 4 July 1980)*

Notwithstanding the provisions of Article 832, paragraphs"14 and 16" (Act no 2001-1135 of 3 Dec. 2001) and unless maintenance in undivided ownership is requested under Articles 815, paragraph 2, and 815-1, preferential allotment referred to in Article 832, paragraph 3, is as of right as regards any agricultural holding which does not exceed the limits of surface  fixed by decree in Conseil d'Etat. In case of several requests, the court shall designate the allottee or joint allottees on the basis of the interests as they stand and of the fitness of the various applicants to manage the holding and to remain therein.

In the circumstances referred to in the preceding paragraph, even where a preferential allotment was judicially granted, the allottee may require from his coparceners periods which may not exceed ten years for payment of a fraction of the balance, equal to a half at most. Except otherwise agreed, sums remaining due bear interest at the statutory rate.

(Act no 61-1378 of 19 Dec. 1961) In case of sale of the whole of an allotted property the fraction of the balance remaining owed becomes immediately due; in case of partial sales, the proceeds of those sales shall be paid to the coparceners and appropriated to the fraction of the balance still due.

[repealed]

## Art. 832-2
*(Act no 80-502 of 4 July 1980)*

Where maintenance in undivided ownership was not ordered under Articles 815, paragraph 2, and 815-1, and failing a preferential allotment in ownership provided for in Articles 832, paragraph 3, or 832-1, a surviving spouse or any co-owner heir may request preferential allotment of all or part of immovable property or rights for agricultural purposes depending on the succession, with a view to establishing an agricultural land grouping with one or several coheirs and, as the case may be, one or several third persons.

That allotment is of right where the surviving spouse or one or several of the coheirs fulfilling the personal qualifications provided for in Article 832, paragraph 3, require that there be given them on lease all or part of the property of the grouping, subject to the conditions laid down in Chapter VII of Title I of Book VI [Chapter VI of Title I of Book IV] of the Rural Code.

In case of several requests, the property of the grouping may, where its composition so permits, be the subject of several leases benefiting different coheirs; otherwise, and failing an amicable agreement the court shall designate the lessee taking into account the fitness of the various applicants to manage the  property concerned and to remain therein. Where the terms and conditions of that lease or of those leases were not the subject of an agreement, they shall be fixed by the court.

The immovable property and rights which the applicants do not intend to contribute to the agricultural land grouping, together with the other property of the succession, shall be allotted by priority, within the limits of their respective rights

CIVIL CODE

of succession, to the undivided owners who did not agree to the formation of the grouping. Where those undivided owners do not obtain the whole of their rights through the allotment thus made, a balance must be paid to them. Unless otherwise amicably agreed between the coparceners, a balance which may be owed shall be paid within the year following the partition. It may be effected through a giving in payment under the form of shares in the agricultural land grouping, unless the parties concerned, within the month following the proposal made to them, make known their opposition to that mode of payment.

Partition is complete only after the signature of the instrument of constitution of the agricultural land grouping and, if there is occasion, of the long-term lease or leases.

**Art. 832-3**
*(Act no 80-502 of 4 July 1980)*
Where an agricultural holding constituting an economic unit and not operated under the form of a partnership is not maintained in undivided ownership under Articles 815, paragraph 2, and 815-1, and was not the subject of a preferential allotment within the terms provided for in Articles 832, 832-1 or 832-2, a surviving spouse or any co-owner heir who wishes to continue the exploiting in which he or she actually participates or participated may require, notwithstanding any request for auction, that the partition be concluded subject to the condition that his or her coparceners grant to him or her a long-term lease under the terms fixed in Chapter VII of Title I of Book VI [Chapter VI of Title I of Book IV] of the Rural Code, on the lands of the holding which fall to them. Unless otherwise amicably agreed between the parties, the one who requests to benefit by those provisions shall receive by priority in his or her share the buildings for exploitation and habitation.

The preceding provisions shall apply to a part of an agricultural holding which can constitute an economic unit.

Account shall be taken, if there is occasion, of depreciation due to the existence of a lease in the appraisal of the lands included in the various shares.

Articles 807 and 808 [L. 412-14 and L. 412-15] of the Rural Code shall determine the specific rules for the lease referred to in the first paragraph of this Article.

Where there are several requests, the tribunal de grande instance shall designate the beneficiary or beneficiaries on the basis of the interests as they stand and of the fitness of the various applicants to manage all or part of the holding or to remain therein.

Where, due to the obvious unfitness of the applicant or applicants to manage all or part of the holding, the interests of the coheirs risk being imperilled, the court may decide that there is no occasion to apply the first three paragraphs of this Article.

An economic unit referred to in paragraph 1 can be formed in part of property of which a surviving spouse or a heir was already owner or co-owner before the death. As regards a heir, the requisite of participation may have been fulfilled by his or her spouse.

**Art. 832-4**
*(Act no 80-502 of 4 July 1980)*
The provisions of Articles 832, 832-1, 832-2 and 832-3 shall benefit a spouse or any heir, whether co-owner in full or bare ownership.

The provisions of Articles 832, 832-2 and 832-3 shall benefit also a beneficiary, universal or by universal title, of the succession by virtue of a will or of a contractual institution.

**Art. 833**
Inequality of shares in kind shall be compensated by a reversion, either in the form of an annuity, or in money.

**Art. 833-1**
*(Act no 71-523 of 3 July 1971)*
Where the debtor of a balance has obtained time for payment and, as a result of economic circumstances, the value of the property put in his share has increased or lessened by more than one-fourth since the partition, the sums remaining due shall increase or lessen in the same proportion.

The parties may, however, agree that the amount of the balance will not vary.

**Art. 834**
Shares are made by one of the coheirs where they can agree between themselves on the choice and where the one chosen accepts the charge: otherwise the shares shall be made by an expert appointed by the supervising judge.

They shall then be drawn by lots.

**Art. 835**
Before drawing the lots, each coparcener is allowed to present objections as to their formation.

**Art. 836**
The rules established for the division of the masses to be partitioned shall also be followed in the subdivision to be made between the coparcener stocks.

**Art. 837**
Where, in operations referred to a notaire, controversies arise, the notaire shall draw up a memorandum of the difficulties and respective statements of the parties, and shall refer them to the supervisor appointed for the partition; and as to other issues, proceedings shall be conducted as prescribed by legislation relating to procedure.

CIVIL CODE

## Art. 838
*(Act no 64-1230 of 14 Dec. 1964)*

Where all coheirs are not present, a partition must be made in court, under the rules of Articles 819 to 837.

It shall be the same where there are among them non-emancipated minors or adults in guardianship, subject to Article 466.

Where there are several minors, a special and distinct guardian may be given to each of them.

## Art. 839
*(Act no 64-1230 of 14 Dec. 1964)*

Where there is occasion for an auction, in the case provided for in paragraph 1 of the preceding Article, it may be made only in court with the formalities prescribed for the transfer of the property of minors. Outsiders shall always be admitted.

## Art. 840
*(Act no 64-1230 of 14 Dec. 1964)*

Partitions made in accordance with the rules above prescribed in the name of"presumed absentees" (Act no 77-1447 of 28 Dec. 1977) and persons not present are final; they are temporary only where the prescribed rules were not complied with.

## Art. 841
[repealed]

## Art. 842
After partition, each coparcener shall receive the instruments of title pertaining to the property which falls on him.

Instruments of title of a divided property shall remain to the one who has the largest part, with the responsibility to assist with them those of his coparceners who have an interest therein, where he is required to do so.

Instruments of title common to a whole inheritance shall be delivered to the one whom all the heirs have chosen to be the depositary of them, with the responsibility to assist the coparceners with them, whenever required. Where there is a difficulty about that choice, it shall be regulated by the judge.

SECTION II

Of the Collations, Appropriation and Abatement of Gratuitous Transfers Made        Articles 843 to 869

to Persons Entitled to Inherit

## Art. 843
*(Act of 24 March 1898)*

Every heir, even beneficiary, coming into a succession, shall return to his coheirs everything he has received from the deceased, by gift inter vivos, directly or indirectly; he may not keep the gifts made to him by the deceased unless they were made expressly over and above his share, or with exemption from collation.

Legacies made to a heir are deemed to be made over and above his part, unless the testator has expressed his wish to the contrary, in which case the legatee may only claim his legacy by taking less.

## Art. 844
*(Act no 71-523 of 3 July 1971)*

Gifts made over and above the share or with exemption from collation may be retained, and legacies may be claimed by an heir coming into a partition, only up to the amount of the disposable portion: the excess is subject to reduction.

## Art. 845
An heir who renounces a succession may nevertheless retain the gift inter vivos or claim the legacy made to him up to the amount of the disposable portion.

## Art. 846
A donee who was not a presumptive heir at the time of the gift, but who is entitled to inherit on the day of the opening of the succession, is also bound to collation, unless the donor has exempted him from it.

## Art. 847
Gifts and legacies made to the son of a person who is entitled to inherit at the time of the opening of the succession, are always deemed to have been made with exemption from collation.

The father coming  to the succession of the donor is not bound to collate them.

## Art. 848
Likewise, a son coming in his own right to the succession of the donor is not bound to collate a gift made to his father, even if he has accepted the latter's succession; but where the son comes only by representation, he shall collate what was given to his father, even in the case where he has repudiated his succession.

## Art. 849
Gifts and legacies made to the spouse of a spouse entitled to inherit are deemed to be made with exemption from collation.

Where gifts and legacies are made jointly to two spouses, one of whom only inherits, the latter collates the half;

CIVIL CODE

where the gifts are made to the spouse entitled to inherit, he or she shall collate the whole.

**Art. 850**

Collation is made only to the succession of the donor.

**Art. 851**

Collation is due for what has been devoted to the settling of one of the coheirs, or for the payment of his debts.

**Art. 852**

The expenses of food, support, education, apprenticeship, the ordinary costs of outfitting, those of weddings and usual presents, shall not be collated.

**Art. 853**

It shall be the same with profits which a heir may have made out of agreements entered into with the deceased, where those agreements did not offer any indirect advantage when they were made.

**Art. 854**

Likewise, no collation is due for partnerships concluded without fraud between the deceased and one of his heirs, where the articles thereof were regulated by an authentic instrument.

**Art. 855**

*(Act no 71-523 of 3 July 1971)*

A property which perishes through a fortuitous event and without fault of the donee is not subject to collation.

Where, however, that property was restored through an indemnity received because of its loss, a donee shall collate it in the proportion that the indemnity served to restore it.

Where the indemnity was not used for that purpose, it is itself subject to collation.

**Art. 856**

Fruits and interests from things subject to collation are due only from the day of the opening of the succession.

**Art. 857**

Collation is only due by a coheir to his coheir; it is not due to legatees nor to creditors of the succession.

**Art. 858**

*(Act no 71-523 of 3 July 1971)*

Collation is made by taking less. It may not be required in kind unless otherwise stipulated in the instrument of gift.

In case of such a stipulation, conveyances and creations of real rights granted by the donee are extinguished in consequence of collation, unless the donor has consented to them.

**Art. 859**

*(Act no 71-523 of 3 July 1971)*

An heir also has the power to collate in kind property given which still belongs to him provided that property be free from any encumbrance or occupancy with which it was not already burdened at the time of the gift.

**Art. 860**

*(Act no 71-523 of 3 July 1971)*

Collation is due of the value of the property given at the time of partition, according to its condition at the time of the gift.

Where the property was transferred before partition, account shall be taken of the value it had at the time of transfer and, where a new property was substituted for the property transferred, of the value of that new property at the time of partition.

The whole, unless otherwise stipulated in the instrument of gift.

Where it results from such a stipulation that the value to be collated is less than the value of the property determined according to the rules of appraisal provided for by Article 922 below, that difference forms an indirect advantage vested in the donee over and above his share.

**Art. 861**

*(Act no 71-523 of 3 July 1971)*

Where collation is made in kind and the condition of the property given was improved by the act of the donee, account thereof must be taken to him, in consideration of that by which their value has increased at the time of partition or transfer.

Likewise account must be taken to the donee of the necessary expenses which he made for the preservation of the property, even if they have not improved it.

**Art. 862**

*(Act no 71-523 of 3 July 1971)*

A coheir who makes collation in kind may retain possession of the property given until the sums due to him for expenses or improvements have been actually reimbursed.

**Art. 863**

*(Act no 71-523 of 3 July 1971)*

A donee, on his part, must, in case of collation in kind, account for degradations and deteriorations which have

CIVIL CODE

reduced the value of the property given through his act or fault.

**Art. 864**
*(Act no 71-523 of 3 July 1971)*
A gift made in advance of his share to a compulsory heir who accepts the succession shall be appropriated to his share of reserve and, subsidiarily to the disposable portion, unless otherwise agreed in the instrument of gift.
The excess is subject to abatement.
A gift made in advance of his share to a compulsory heir who renounces the succession is treated as a gift over and above the donee's share.

**Art. 865**
*(Act no 71-523 of 3 July 1971)*
A gratuitous transfer made over and above the beneficiary's share shall be appropriated to the disposable portion. The excess is subject to abatement.

**Art. 866**
*(Act no 71-523 of 3 July 1971)*
Gifts made to a person entitled to inherit, or to persons entitled to inherit, jointly, which exceed the disposable portion may be retained in whole by the beneficiaries, whatever the excess may be, provided they compensate the coheirs in money.

**Art. 867**
*(Act no 71-523 of 3 July 1971)*
Where a legacy made to a person entitled to inherit, or to persons entitled to inherit, jointly, relates to a property or several items of property which compose a whole whose value exceeds the disposable portion, the legatee or legatees may, whatever the excess, claim in totality the subject matter of the gratuitous transfer, provided they compensate the coheirs in money. It shall be likewise even where the gratuitous transfer involves movable items of property which were in the common use of the deceased and of the legatee.

**Art. 868**
*(Act no 71-523 of 3 July 1971)*
Where abatement may not be required in kind, a donee or legatee is debtor for an indemnity equivalent to the excess portion of the abatable gratuitous transfer. That indemnity shall be calculated according to the value of the articles donated or bequeathed at the time of partition, and their condition on the day when the gratuitous transfer took effect.
It is payable at the time of partition, save agreement between the coheirs. However, where the subject matter of the gratuitous transfer is an item of the property which may be the subject of a preferential allotment, periods may be granted by the court, account being taken of the interests as they stand, if they were not granted by the transferor. The granting of those periods may not in any case have the effect of deferring payment of the indemnity beyond ten years from the opening of the succession. The provisions of Article 833-1 shall then apply to the payment of the sums due.
Failing agreement or stipulation to the contrary, those sums bear interests at the statutory rate in civil matters. Advantages resulting from periods and methods of payment granted do not constitute a gratuitous transfer.
In case of sale of the whole of a property donated or bequeathed, the sums remaining due become immediately due; in case of partial sales, the proceeds of those sales are paid to the coheirs and appropriated to the sums still due.

**Art. 869**
*(Act no 71-523 of 3 July 1971)*
Collation of a sum of money is equal to its amount. Where, however, it was used to acquire property, collation of the value of that property is due, in the way provided for in Article 860.

SECTION III
Of the Payment of Debts                                                       Articles 870 to 882

**Art. 870**
Coheirs contribute between themselves to the payment of the debts and liabilities of the succession, each one in proportion to what he takes from it.

**Art. 871**
A legatee under universal title contributes with the heirs pro rata to his benefit; but a specific legatee is not held for the debts and liabilities, except however a foreclosure action against a bequeathed immovable.

**Art. 872**
Where immovables of a succession are encumbered by annuities with a special mortgage, each  coheir may require that the annuities be reimbursed and the immovables freed before the composing of the shares. Where the coheirs partition the succession in the condition in which it stands, the encumbered immovable must be appraised at the same rate as the other immovables; the capital of the annuity shall be deducted from the total value; the heir in whose share that immovable falls has alone the charge of servicing the annuity and is liable for it towards his coheirs.

**Art. 873**
Heirs are held to the debts and liabilities of the succession personally for their equal share and portion, and by

CIVIL CODE

mortgage for the whole; subject to their remedy either against their coheirs, or against the universal legatees, for the part to which the latter must contribute.

**Art. 874**

A specific legatee who has paid a debt encumbering a bequeathed immovable remains subrogated to the rights of the creditor against the heirs and successors under universal title.

**Art. 875**

A coheir or successor under universal title who, because of a mortgage, has paid more than his share of a common debt, has a remedy against the other heirs or successors under universal title only for the share which each of them must bear personally, even in the case where the coheir who paid the debt has caused himself to be subrogated to the rights of the creditor; without prejudice, however, of the rights of a coheir who, because of benefit of inventory, has retained the power to demand payment of his personal claim, like any other creditor.

**Art. 876**

In case of insolvency of one of the coheirs or successors under universal title, his share of the mortgage debt must be divided pro rata between all the others.

**Art. 877**

Enforceable instruments against a deceased are equally enforceable against a heir personally; creditors, however, may seek enforcement only eight days after notice of those instruments has been served upon the heir personally or at his domicile.

**Art. 878**

They may request, in any case and against any creditor, separation of the deceased's patrimony from the heir's patrimony.

**Art. 879**

That right, however, may no longer be exercised where there is novation in the claim against the deceased, by acceptance of the heir as debtor.

**Art. 880**

It is time-barred, with regard to movables, after the lapse of three years.

With regard to immovables, an action may be brought as long as they are in the hands of the heir.

**Art. 881**

Creditors of an heir are not allowed to request the separation of the patrimonies against the creditors of the succession.

**Art. 882**

In order to prevent that partition be made in fraud of their rights, creditors of a coparcener may oppose its being made out of their presence; they have the right to intervene in it at their own expense; but they may not attack a partition achieved, unless, however, it was made without them and notwithstanding an objection they would have made.

SECTION IV

Of the Effects of Partition and of Warranty of Shares                              Articles 883 to 886

**Art. 883**

*(Act no 76-1286 of 31 Dec. 1976)*

Each coheir shall be deemed to have succeeded alone and immediately to all the effects comprised in his share, or falling to him through auction, and never to have had ownership of the other effects of the succession.

It shall be the same as to the property which came to him through any other act leading to the cessation of undivided ownership. One shall not distinguish depending on whether the act causes undivided ownership to cease in whole or in part, with regard only to some items of property or to some heirs.

However, transactions lawfully performed either under an agency given by the coheirs, or under a judicial authorization, maintain their effects whatever the allotment of the property which was the subject thereof may be at the time of the partition.

**Art. 884**

Coheirs remain respectively warrantors towards each other only for disturbances and dispossession which result from a cause previous to the partition.

The warranty may not arise where the kind of dispossession suffered was excepted by a specific and express clause of the instrument of partition; it ceases where a heir suffers dispossession by his own fault.

**Art. 885**

Each coheir is personally obliged in proportion to his hereditary share to indemnify his coheir for the loss which dispossession caused to him.

Where one of the coheirs is insolvent, the portion for which he is responsible must be equally divided between the warrantor and all the solvent coheirs.

**Art. 886**

The warranty of solvency of the debtor of an annuity may be enforced only within the five years following the

CIVIL CODE

partition. Warranty on account of insolvency does not arise where it happened only since the partition achieved.

SECTION V
Of Rescission in Matters of Partition                                              Articles 887 to 892

**Art. 887**
Partitions may be rescinded for reason of violence or deception.
There may also be occasion for rescission where one of the coheirs establishes, to his prejudice, loss amounting to more than one fourth. The mere omission of an article of the succession does not give rise to an action for rescission, but only to a supplement to the instrument of partition.

**Art. 888**
An action for partition is allowed against any act aiming at putting an end to an undivided ownership, between coheirs, whether it be characterized as a sale, exchange, settlement, or in  any other manner.
But, after the partition, or the act which takes its place, an action for rescission is no longer admissible against a settlement made over the real difficulties which the first act presented, even though no suit has been initiated on that subject.

**Art. 889**
An action is not admitted against a sale of rights to succession made without fraud to one of the coheirs, at his own risk, by his other coheirs or one of them.

**Art. 890**
In order to decide whether there has been loss, the articles shall be appraised according to their value at the time of partition.

**Art. 891**
The defendant in a claim for rescission may stop the course of it and prevent a new partition by offering and delivering to the plaintiff the supplement of his hereditary share, either in money, or in kind.

**Art. 892**
A coheir who has transferred his share in whole or in part, is no longer entitled to bring an action for rescission on ground of deception or violence, where the transfer which he made is subsequent to the discovery of the deception, or to the ending of the violence.

**TITLE II**
**OF GIFTS INTER  VIVOS AND OF WILLS**                                         **Articles 893 to 1100**

CHAPTER I
General Provisions                                                            Articles 893 to 900-8

**Art. 893**
One may dispose of his property gratuitously only by gift inter vivos or by will, in the forms hereinafter laid down.

**Art. 894**
A gift inter vivos is a transaction by which the donor divests himself now and irrevocably of the thing donated, in favour of the donee who accepts it.

**Art. 895**
A will is a transaction by which a testator disposes, for the time when he is no longer alive, of the whole or part of his property, and which he may revoke.

**Art. 896**
Substitutions are prohibited.
Any disposition by which a donee, an heir appointed or a legatee, is assigned the duty to keep and return to a third party, is void, even with regard to the donee, the heir appointed or the legatee.
[repealed]

**Art. 897**
Are excepted from the first two paragraphs of the preceding Article the dispositions which the fathers and mothers and the brothers and sisters are allowed to make under Chapter VI of this Title.

**Art. 898**
A disposition by which a third party is called to take a gift, an inheritance or a legacy, in case a donee, an heir appointed or a legatee would not take it, shall not be considered as a substitution, and is valid.

**Art. 899**
It shall be the same as regards an inter vivos or testamentary disposition by which a usufruct is donated to one person and bare ownership to another.

**Art. 900**
In any inter vivos or testamentary disposition, the conditions which are impossible or those which are contrary to legislation or good morals, shall be deemed to be not written.

CIVIL CODE

## Art. 900-1

*(Act no 71-526 of 3 July 1971)*

Clauses of inalienability concerning a property donated or bequeathed are valid only where they are temporary and justified by a serious and legitimate interest. Even in that case, a donee or legatee may be judicially authorized to dispose of the property if the interest which justified the clause has disappeared or if it happens that a more important interest so requires.

[repealed]

The provisions of this Article do not prejudice gratuitous transfers granted to juridical persons or even to natural persons responsible for forming juridical persons.

## Art. 900-2

*(Act no 84-562 of 4 July 1984)*

A beneficiary may apply for judicial revision of the conditions and charges encumbering the gifts or legacies which he has received, where, in consequence of a change of circumstances, performance of them has become for him extremely difficult, or seriously detrimental.

## Art. 900-3

*(Act no 84-562 of 4 July 1984)*

A claim for revision shall be  brought as a main action; it may be so also as a counterclaim, in reply to an action for performance or revocation brought by the heirs of the disposing person.

It shall be brought against the heirs; it shall be brought at the same time against the Government procurator's office where there is doubt as to the existence or identity of some of them; where there is no known heir, it must be brought against the Government procurator's office.

The latter shall, in any case, have the case communicated to him.

## Art. 900-4

*(Act no 84-562 of 4 July 1984)*

A judge seized of a claim for revision may, according to the circumstances and even of his own motion, either reduce the quantity or intervals of the performances encumbering the gratuitous transfer, or modify their character making allowance for the intention of the disposing person, or even merge them with analogous performances resulting from other gratuitous transfers.

He may authorize the transfer of all or part of the property which is the subject matter of the gratuitous transfer with ordering that the proceeds thereof be used for purposes in keeping with the intention of the disposing  party.

He shall prescribe measures adapted to maintain, as far as possible, the denomination which the disposing person intended to give to his gratuitous transfer.

## Art. 900-5

*(Act no 84-562 of 4 July 1984)*

A claim is admissible only ten years after the death of the disposing person or, in case of a succession of claims, ten years after the judgment which ordered the previous revision.

A beneficiary must justify the steps he took, during the interval, to perform his obligations.

## Art. 900-6

*(Act no 84-562 of 4 July 1984)*

Third party application for rehearing against a judgment acceding to an application for revision is admissible only in case of fraud chargeable to the donee or legatee.

The retraction or reformation of the judgment attacked does not give rise to any action against the third party purchaser in good faith.

## Art. 900-7

*(Act no 84-562 of 4 July 1984)*

Where, after revision, performance of the conditions or charges, such as it was originally provided, becomes possible again, it may be requested by the heirs.

## Art. 900-8

*(Act no 84-562 of 4 July 1984)*

Shall be deemed not written any clause by which a disposing party deprives a gratuitous transfer a person who questions the validity of a clause of inalienability or requests authorization to transfer.

CHAPTER II

Of the Capacity to Dispose or to Receive by Inter Vivos Gift or by Will                    Articles 901 to 912

## Art. 901

To make an inter vivos gift or a will one must be of sound mind.

## Art. 902

All persons may dispose and receive, either by inter vivos gift, or by will, except those whom legislation declares to be incapable.

## Art. 903

CIVIL CODE

A minor under sixteen years of age may not in any way dispose, except for what is provided for in Chapter IX of this Title.

**Art. 904**

*(Act no 64-1230 of 14 Dec. 1964)*

A minor who has reached the age of sixteen years and is not emancipated, may only dispose by will, and only to the extent of half of the property which legislation allows an adult to dispose of.

(Act of 28 Oct. 1916) Where, however, he is called up for a campaign of war, he may, during the duration of the hostilities, dispose of the same portion as if he were of full age, in favour of any of his relatives, or of several of them up to the sixth degree inclusive or in favour of his surviving spouse.

Failing relatives of the sixth degree inclusive, a minor may dispose as a person of full age would do.

**Art. 905**

[repealed]

**Art. 906**

To be capable of receiving inter vivos, one need only to be conceived at the time of the gift.

To be capable of receiving by will, one need only to be conceived at the time of the death of the testator.

However, the gift or will may only take effect if the child is born viable.

**Art. 907**

A minor, although he has reached the age of sixteen, may not dispose to the benefit of his guardian, even by will.

(Act no 64-1230 of 14 Dec. 1964) A minor, having become of age or emancipated, may not dispose, either by gift inter vivos or by will, to the benefit of the person who was his guardian, unless the final account of the guardianship has been previously rendered and audited.

In the above two cases, the ascendants of minors who are or who were their guardians are excepted.

**Art. 908 and 908-1**

[repealed]

**Art. 908-2**

*(Act no 72-3 of 3 Jan. 1972)*

In inter vivos and testamentary dispositions, the phrases"sons and grandsons, children and grandchildren", without other addition or designation, refer to illegitimate descent as well as legitimate, unless the contrary results from the instrument or from circumstances.

**Art. 909**

Doctors in medicine or surgery, health officers and pharmacists who have treated a person during the disease of which he dies, may not benefit from the inter vivos or testamentary dispositions which he made in their favour during the course of that illness.

Are excepted :

1° Specific remunerative dispositions, with regard to the means of the disposing party and to the services rendered;

2° Universal dispositions, in the case of relationship up to the fourth degree inclusive, provided however the deceased has no heir in the direct line; unless the person in whose favour the disposition was made is himself one of those heirs.

The same rules shall apply to ministers of worship.

**Art. 910**

Dispositions inter vivos or by will to the benefit of almshouses, of the poor of a commune or of public-utility institutions may only take effect as they are authorized by decree.

(Ord. no 2005-856 of 28 July 2005) However the dispositions inter vivos or by will to the benefit of foundations, congregations and partnerships having the capacity to receive gratuities, except the partnerships or foundations whose activities and those of their managers are referred to in Article 1 of the Act of 12 June 2001 to Strengthen Prevention and Punishment of Sectarian Organizations which Interfere with Human Rights and Fundamental Freedoms, may be accepted freely by them, except if there is an objection justified by the incapacity of the legatee or donee institution for making use of the gratuitous transfer in accordance with its statutory purpose. The objection is raised by the administrative authority to which the gratuitous transfer is declared, in the way provided for by a decree in Conseil d'Etat. The objection shall deprive the acceptance of effect.

**Art. 911**

Any disposition in favour of a person under a disability is void, whether it is disguised under the form of a contract for value, or is made under the names of intermediaries.

Are deemed intermediaries the father and mother, the children and descendants, and the spouse of the person under a disability.

**Art. 912**

[repealed]

CHAPTER III

Of the Disposable Portion of Property and of Abatement                                          Articles 913 to 930

CIVIL CODE

SECTION I
Of the Disposable Portion of  Property                                       Articles 913 to 919

**Art. 913**
*(Act no 72-3 of 3 Jan. 1972)*
Gratuitous transfers, either by inter vivos acts or by wills, may not exceed half of the property of a disposing person, where he leaves only one child at his death; one-third, where he leaves two children; one-fourth, where he leaves three or a greater number.[...]

**Art. 913-1**
*(Act no 72-3 of 3 Jan. 1972)*
Are included in Article 913, under the name of children, descendants in whatever degree, although they must be counted only for the child whose place they take in the succession of the disposing party.

**Art. 914**
*(Act no 72-3 of 3 Jan. 1972)*
Gratuitous transfers, either by inter vivos acts or by wills, may not exceed half of the property where, failing children, a deceased leaves one or several ascendants in each of the lines, paternal and maternal, and three-fourths where he leaves ascendants only in one line.
The property thus reserved for the benefit of ascendants is received by them in the order that the law calls them to succeed: they alone are entitled to that reserve in all cases where a partition concurrently with collaterals would not give them the portion of property assigned to it.

**Art. 914-1**
*(Act no 2001-1135 of 3 Dec. 2001)*
Gratuitous transfers, either by inter vivos acts or by wills, may not exceed three-fourths of the property where, failing descendants and ascendants, a deceased leaves a surviving spouse, not divorced, against whom does not exist an order of judicial separation become res judicata  and who is not a party to divorce or judicial separation proceedings.

**Art. 915 to 915-2**
[repealed]

**Art. 916**
"Failing descendants, ascendants or a surviving spouse, not divorced, against whom an order of judicial separation become res judicata  does not exist and who is not a party to divorce or judicial separation proceedings" (Act no 2001-1135 of 3 Dec. 2001), gratuitous transfers by inter vivos acts or by wills may exhaust the whole property.

**Art. 917**
Where a disposition by inter vivos act or by will is of a usufruct or of an annuity whose value exceeds the disposable portion, the heirs for whose benefit the law establishes a reserve have the option, either to perform that disposition or to waive ownership of the disposable portion.

**Art. 918**
The value in full ownership of property transferred, either on condition of paying a life annuity, or non-returnable, or with reservation of a usufruct, to one of the persons entitled to inherit in the direct line, shall be appropriated to the disposable portion; and the excess, if any, shall be collated to the mass. That appropriation and that collation may not be requested by those of the other persons entitled to inherit in the direct line who may have consented to those transfers, and, in no case, by persons entitled to inherit in the collateral line.

**Art. 919**
*(Act of 24 March 1898)*
The disposable portion may be donated in whole or in part, either by act inter vivos or by will, to the children or other persons entitled to inherit from the donor, without being subject to collation by the donee or legatee coming to the succession, provided that, as regards gifts, the disposition was made expressly over and above the share.
A declaration that a gift is over and above the share may be made, either in the instrument containing the disposition, or after, in the form of inter vivos or testamentary dispositions.

SECTION II
Of the Abatement of Gifts and Legacies                                 Articles 920 to 930

**Art. 920**
Dispositions either inter vivos or mortis causa, which exceed the disposable portion shall be abated to that portion at the time of the opening of the succession.

**Art. 921**
Abatement of dispositions inter vivos may be requested only by those for whose benefit the law makes a reserve, by their heirs or assigns: donees, legatees or creditors of a deceased may not request that abatement or benefit by it.

**Art. 922**
*(Act no 71-523 of 3 July 1971)*
Abatement is determined by forming a mass of all the property existing at the death of the donor or testator.

CIVIL CODE

One shall add fictitiously to it, after deducting the debts, that of which he has disposed by gift inter vivos according to its condition at the time of the gift and its value at the opening of the succession. Where property has been transferred, account shall be taken of its value at the time of transfer and, if there was substitution, of the value of the new property on the day of the opening of the succession.

One shall calculate on all that property, having regard to the kind of heirs whom he leaves, the portion which the deceased may have disposed of.

**Art. 923**

There shall never be occasion to abate gifts inter vivos, until the value of all the property included in the testamentary dispositions has been exhausted; and where there is occasion for that abatement it shall be done beginning with the last gift and so on, going back from the last to the oldest.

**Art. 924**

*(Act no 71-523 of 3 July 1971)*

A compulsory heir favoured over and above his share beyond the disposable portion and who accepts the succession bears the abatement in value as is laid down in Article 866; up to his rights in the reserve, abatement shall be made by taking less.

He may claim all the articles bequeathed where the reducible portion does not exceed his share in the reserve.

**Art. 925**

Where the value of the inter vivos gifts exceeds or equals the disposable portion, all the testamentary dispositions lapse.

**Art. 926**

Where the testamentary dispositions exceed, either the disposable portion, or that part of the portion remaining after deduction of the value of the inter vivos gifts, abatement shall be made pro rata, without any distinction between universal legacies and specific legacies.

**Art. 927**

Nevertheless, in all cases where the testator expressly declared that he intends that a legacy be paid in preference to others, that preference must take place: and the legacy to which it applies shall be abated only where the value of the others does not complete the statutory reserve.

**Art. 928**

A donee shall return the fruits of what exceeds the disposable portion from the day of the death of the donor, where a claim for abatement was brought within the year; otherwise, from the day of the claim.

**Art. 929**

*(Act no 71-523 of 3 July 1971)*

Rights in rem created by a donee are extinguished by the effect of abatement. Those rights, however, maintain their effects where the donor consented to them in the constitutive instrument or in a subsequent instrument. The donee is responsible for depreciation resulting from it.

**Art. 930**

An action for abatement or recovery may be brought by the heirs against third parties holding immovables which were part of gifts and were conveyed by the donees, in the same manner and in the same order as against the donees themselves, and after attachment or seizure and sale of their property. That action must be brought following the order of the dates of the conveyances, beginning by the most recent.

(Act no 71-523 of 3 July 1971) Where a donor has consented to the transfer with the accord of all compulsory heirs born and alive at the time of it, an action may no longer be brought against a third party holder.

CHAPTER IV
Of Inter Vivos Gifts                                                    Articles 931 to 966

SECTION I
Of the Form of Inter Vivos Gifts                                        Articles 931 to 952

**Art. 931**

All acts containing an inter vivos gift shall be executed before  notaires, in the ordinary form of contracts; and there shall remain the original of them, on pain of annulment.

**Art. 932**

An inter vivos gift is binding upon the donor and produces effect only from the day when it is accepted in express terms.

Acceptance may be made during the lifetime of the donor, by a subsequent and authentic instrument of which the original shall remain; but then the gift has effect, with regard to the donor, only from the day when he has been given notice of the instrument which establishes that acceptance.

**Art. 933**

Where the donor is of full age, acceptance must be made by him or in his name, by a person having a power of attorney, containing authority to accept the gift made, or a general authority to accept all gifts which have or may have

CIVIL CODE

been made.

That power of attorney must be executed before notaires; and an office copy of it must be annexed to the original of the gift, or to the original of the acceptance , if made by a separate instrument.

**Art. 934**

[repealed]

**Art. 935**

A gift made to a non-emancipated minor or to an adult in guardianship must be accepted by his guardian, in accordance with Article 463, in the Title Of Minority, of Guardianship and of Emancipation.

[repealed]

(Act no 64-1230 of 14 Dec. 1964) Nevertheless, the father and mother of a non-emancipated minor, or the other ascendants, even during the lifetime of the father and mother, although they are not guardians of the minor, may accept on his behalf.

**Art. 936**

A deaf and dumb person who knows how to write may accept by himself or through an agent.

Where he cannot write, acceptance must be made by a curator appointed for that purpose, according to the rules laid down in the Title Of Minority, of Guardianship and of Emancipation.

**Art. 937**

Gifts made to the benefit of almshouses, of the poor of a commune or "subject to the provisions of Article 910, paragraph 2" (Ord. no 2005-856 of 28 July 2005), of public-utility institutions must be accepted by the administrators of those communes or institutions, after they have been duly authorized.

**Art. 938**

A gift duly accepted is complete by the sole consent of the parties; and ownership of the articles donated is transferred to the donee without need of any other delivery.

**Art. 939**

*(Ord. no 59-71 of 7 Jan. 1959)*

Where there is a gift of property capable of being mortgaged, registration of the instruments containing the gift and the acceptance, as well as the notice of acceptance, if it took place by separate instrument, must be made at the land registry in the arrondissement  where the property is situated.

**Art. 940**

[repealed]

Where a gift is made to minors, to adults in guardianship, or to public institutions, registration shall be made at the suit of guardians, curators or administrators.

**Art. 941**

*(Ord. no 59-71 of 7 Jan. 1959)*

Failure to have the registration made may be set up by all interested persons, except, however, those who are responsible for having the registration made, or their assigns, and the donor.

**Art. 942**

*(Act no 85-1372 of 23 Dec. 1985)*

Minors and adults in guardianship shall not be reinstated in case of failure to accept or register the gifts; subject to their remedy against their guardians, if there is occasion, and without reinstatement taking place, even where the guardians are insolvent.

**Art. 943**

An inter vivos gift may only include the existing property of the donor; where it includes property to come, it is void in this regard.

**Art. 944**

Any inter vivos gift made subject to conditions whose performance depends on the sole intention of the donor, is void.

**Art. 945**

It is likewise void where it was made under the condition of paying debts or liability other than those which existed at the time of the gift, or which are expressed either in the instrument of gift, or in a statement which should be annexed thereto.

**Art. 946**

In the case where the donor has reserved to himself the freedom to dispose of an article included in the gift, or of a fixed sum out of the property donated, if he dies without having disposed of them, the said article or sum shall belong to the donor's heirs, notwithstanding all clauses and stipulations to the contrary.

**Art. 947**

The four preceding Articles shall not apply to the gifts mentioned in Chapters VIII and IX of this Title.

CIVIL CODE

**Art. 948**

Any act of gift of movable effects is valid only as to the effects of which a statement of appraisal, signed by the donor and the donee, or by those who accept for the latter, is annexed to the original of the gift.

**Art. 949**

A donor is allowed to reserve for his benefit or to dispose for the benefit of another, of the enjoyment or the usufruct of the movable or immovable property donated.

**Art. 950**

Where a gift of movable effects is made with reservation of usufruct, the donee is obliged, at the expiry of the usufruct, to take the effects donated which are in kind, in the condition in which they are; and he has an action against the donor or his heirs on account of the articles which do not exist, up to the amount of the value which was given to them in the statement of appraisal.

**Art. 951**

A donor may stipulate a right of reversion of the items donated, either for the case of the predecease of the donee alone, or for the case of the predecease of the donee and of his descendants;

That right may be stipulated only for the benefit of the donor alone.

**Art. 952**

The effect of the right of reversion is to rescind all conveyances of the immovable property donated, and to make the property revert to the donor, free and unencumbered by any liabilities and mortgages, except, however, the mortgage of dowry and of ante-nuptial agreements, where the other property of the donor spouse is not sufficient and only in the case where the gift was made by the same ante-nuptial agreement from which those rights and mortgages result.

SECTION II

Of Exceptions to the Rule of  Irrevocability of  Inter Vivos Gifts                    Articles 953 to 966

**Art. 953**

An inter vivos gift may be revoked only for non-performance of the conditions under which it was made, on account of ingratitude, and on account of unforeseen birth of children.

**Art. 954**

In the case of revocation for non-performance of the conditions, the property shall revert to the hands of the donor free of all charges and mortgages granted by the donee: and the donor shall have the same rights against third parties holding the immovables donated as he would have against the donee himself.

**Art. 955**

An inter vivos gift may be revoked on account of ingratitude only in the following cases:

1° Where the donee has made an attempt against the life of the donor;

2° Where he has been guilty of cruelty, serious offences or grievous insults against him;

3° Where he refuses maintenance to him.

**Art. 956**

Revocation on account of non-performance of conditions or of ingratitude may never take place by operation of law.

**Art. 957**

A claim for revocation on account of ingratitude must be brought within the year, from the day of the offence with which the donee is charged by the donor, or from the day when the offence could have been known by the donor.

That revocation may not be applied for by the donor against the heirs of the donee, or by the heirs of the donor against the donee, unless, in the latter case, the action has been initiated by the donor, or he has died within a year after the offence.

**Art. 958**

*(Ord. no 59-71 of 7 Jan. 1959)*

A revocation on account of ingratitude may not prejudice transfers made by a donee, or mortgages and other real encumbrances with which he may have burdened the subject matter of the gift, provided they all are previous to the registration of the claim for revocation at the land registry of the place of the property.

In case of revocation, the donee shall be ordered to return the value of the articles transferred, with regard to the time of the claim, and the fruits, from the day of that claim.

**Art. 959**

Gifts in favour of marriage may not be revoked on account of ingratitude.

**Art. 960**

All inter vivos gifts made by persons who had no children or descendants presently living at the time of the gift, of whatever value they may be, and for whatever reason they may have been made, and although they were reciprocal or remunerative, even those made in favour of marriage by persons other than the ascendants to the spouses, or by the spouses to each other, are revoked by operation of law by the unforeseen birth of a "child of the donor, even posthumous" (Ord. no 2005-856 of 28 July 2005), or by legitimation by subsequent marriage of an illegitimate child,

CIVIL CODE

where he was born after the gift.

**Art. 961**

That revocation shall take place, although the child of the donor was conceived at the time of the gift.

**Art. 962**

A gift is likewise revoked even if the donee has taken possession of the property donated and the latter has been left with him by the donor after the birth of the child; without, however, the donee being obliged to return the fruits collected by him, of whatever nature they may be, before the day when notice of the birth of the child [...] was served on him by process or other instrument in due form; and even where the claim for recovering the property donated was brought only after that notice.

**Art. 963**

Property included in a gift revoked by operation of law, shall revert to the patrimony of the donor free from all encumbrances and mortgages granted by the donee, without there being appropriated, even subsidiarily, to the restitution of the dowry of the wife of that donee, to her recoveries or other ante-nuptial agreements; and that shall take place even though the gift was made in favour of the marriage of the donee and included in the agreement, and the donor has bound himself as surety, through the gift, for the performance of the ante-nuptial agreement.

**Art. 964**

Gifts revoked in this way may not be revived or resume their effect, either by the death of the donor's child, or by any confirmatory instrument; and where the donor wishes to donate the same property to the same donee, either before or after the death of the child through whose birth the gift was revoked, he may do so only by a new disposition.

**Art. 965**

Any clause or agreement by which a donor renounces the revocation of a gift on account of unforeseen birth of a child, shall be considered as void and may not produce any effect.

**Art. 966**

A donee, his heirs or assigns, or others detaining things donated, may set up prescription to assert a gift revoked by the unforeseen birth of a child only after a possession of thirty years, which may start running only from the day of the birth of the latest child of the donor, even posthumous; and without prejudice to interruptions, as provided by law.

CHAPTER V

Of Testamentary Dispositions                                        Articles 967 to 1047

SECTION I

Of General Rules on the Form of Wills                              Articles 967 to 980

**Art. 967**

Any person may dispose by will, either under the name of appointment of an heir, or under the name of legacy, or under any other denomination suitable for expressing his wish.

**Art. 968**

A will may not be made in the same instrument by two or several persons, either for the benefit of a third person, or as a mutual and reciprocal disposition.

**Art. 969**

A will may be holographic, or made by a public instrument, or in the secret form.

**Art. 970**

An holographic will is not valid unless it is entirely written, dated and signed  by the hand of the testator: it is not subject to any other form.

**Art. 971**

*(Act no 50-1513 of 8 Dec. 1950)*

A will by public instrument shall be received by two notaires or by one  notaire attended by two witnesses.

**Art. 972**

*(Act no 50-1513 of 8 Dec. 1950)*

Where a will is received by two notaires, it shall be dictated to them by the testator; one of those  notaires shall write it himself or shall have it written by hand or mechanically.

Where there is only one notaire, it must also be dictated by the testator; the notaire shall write it himself or shall have it written by hand or mechanically.

In either case, it must be read over to the testator.

All of which shall be expressly mentioned.

**Art. 973**

*(Act no 50-1513 of 8 Dec. 1950)*

That will must be signed by the testator in the presence of the witnesses and of the notaire; where the testator declares that he does not know how to sign or is unable to do so, his declaration shall be expressly mentioned in the instrument, as well as the cause which prevents him from signing.

CIVIL CODE

**Art. 974**

*(Act no 50-1513 of 8 Dec. 1950)*

The will must be signed by the witnesses and by the notaire.

**Art. 975**

Legatees, in whatever class they may be, their relatives by blood or marriage up to the fourth degree inclusive, or clerks of the notaires by whom the instruments are received, may not be taken as witnesses of a will by public instrument.

**Art. 976**

*(Act no 50-1513 of 8 Dec. 1950)*

Where a testator wishes to make a secret will, the paper which contains the dispositions or the paper used as an envelope, if there is one, shall be closed, stamped and sealed up.

The testator shall present it thus closed, stamped and sealed up to the notaire and to two witnesses, or he will have it closed, stamped and sealed up in their presence and he shall declare that the contents of that paper is his will, signed by him, and written by him or by another, while affirming in that latter case, that he has personally verified its contents; he shall indicate, in all cases, the mode of writing used (by hand or mechanical).

The notary shall draw up, in original not recorded, an instrument of superscription which he shall write or have written by hand or mechanically on that paper, or on the sheet used as an envelop and bearing the date and indication of the place where it was done, a description of the cover and of the print of the seal, and mention of all the above-mentioned formalities; that instrument shall be signed by the testator as well as by the notaire and the witnesses.

All that is mentioned above shall be done without interruption and without attending to other instruments.

In case the testator cannot sign the instrument of superscription owing to an impediment arisen since the signature of the will, mention shall be made of the declaration which he makes of it and of the reason he gives for it.

**Art. 977**

*(Act no 50-1513 of 8 Dec. 1950)*

Where the testator does not know how to sign or was unable to do so when he had his dispositions written, one shall proceed as laid down in the preceding Article; in addition, there shall be mentioned on the instrument of superscription that the testator declared that he did not know how to sign or was unable to do so when he had his dispositions written.

**Art. 978**

Those who do not know how or are unable to read, may not make dispositions in the form of a secret will.

**Art. 979**

*(Act no 50-1513 of 8 Dec. 1950)*

In case the testator is unable to speak, but can write, he may make a secret will, subject to the express condition that the will be signed by him and written by him or another, that he present it to the notaire and to the witnesses and that he write at the top of the instrument of superscription, in their presence, that the paper he presents is his will and sign. Mention shall be made in the instrument of superscription that the testator has written and signed those words in the presence of the notaire and of the witnesses and, furthermore, all which is prescribed by Article 976 and is not inconsistent with this Article shall be complied with.

In all cases provided for in this Article and in the preceding Articles, a secret will in which the statutory formalities were not complied with and which is void as such, is valid however as a holographic will, where all the requisites for its validity as holographic will are fulfilled, even if it was named a secret will.

**Art. 980**

*(Act no 50-1513 of 8 Dec. 1950)*

Witnesses called to take part in wills must be French and of full age, know how to sign and have the enjoyment of their civil rights . They may be of either sex but a husband and his wife may not be witnesses to the same instrument.

SECTION II

Of Particular Rules on the Form of Certain Wills                                        Articles 981 to 1001

**Art. 981**

*(Act of 17 May 1900)*

Wills of soldiers, of sailors of the State and of persons employed with the armies may be received in the cases and on the terms provided for in Article 93, either by a superior officer or military doctor of a corresponding rank, in the presence of two witnesses; or by two officials of the Quartermaster Department or two officers of the commissariat; or by one of those officials or officers in the presence of two witnesses; or finally, in an isolated detachment, by the officer commanding the detachment, with the assistance of two witnesses, where it does not exist in the detachment a superior officer or military doctor of a corresponding rank, an official of the Quartermaster Department or an officer of the commissariat.

The will of the officer commanding an isolated detachment may be received by the officer coming after him in order of duty.

The right to make a will in the way provided for in this Article shall extend to prisoners in the hands of the enemy.

**Art. 982**

CIVIL CODE
*(Act of 17 May 1900)*
Wills mentioned in the preceding Article may also, where the testator is ill or wounded, be received in hospitals or military medical units such as defined by military regulations, by the senior surgeon, whatever his rank may be, with the assistance of the managing administration officer.

Failing that administration officer, the presence of two witnesses is necessary.

### Art. 983
*(Act of 8 June 1893)*
In all cases, an original in duplicate of the wills mentioned in the two preceding Articles shall be made.

Where this formality could not be fulfilled because of the state of health of the testator, an office copy of the will shall be drawn up to take the place of the second original; that office copy shall be signed by the witnesses and by the instrumentary officers. Mention shall be made therein of the reasons which prevented the second original from being drawn up.

As soon as communications are possible and within the shortest time, the two originals or the original and the office copy of the will shall be addressed separately and by different mails, under closed and sealed cover, to the Minister of War or of the Navy, to be filed with the notaire indicated by the testator or, failing an indication, with the president of the chamber of notaires of the arrondissement  of the last domicile.

### Art. 984
*(Act of 8 June 1893)*
A will made in the manner established above is void six months after the testator has come to a place where he is at liberty to use the ordinary forms, unless, before the expiry of that period, he is again placed in one of the special situations provided for in Article 93. The will is then valid during that special situation and during a new period of six months after its expiry.

### Art. 985
Wills made in a place with which all communication is interrupted because of the plague or other contagious disease, may be made before the judge of the tribunal d'instance or before one of the municipal officials of the commune, in the presence of two witnesses.

(Act of 28 July 1915) This provision shall apply to those suffering from those diseases, as well to those who are in the contaminated places, although they are not presently ill.

### Art. 986
*(Act of 28 July 1915)*
Wills made in an island of the European territory of France, where there exists no office of notaire, when there is an impossibility of communicating with the continent, may be received as is laid down in the preceding Article. The impossibility of communicating must be certified in the instrument by the judge of the tribunal d'instance or the municipal official who received the will.

### Art. 987
The wills mentioned in the two preceding Articles become void six months after communications have been re-established in the place where the testator is, or six months after he has gone to a place where they are not interrupted.

### Art. 988
*(Act of 8 June 1893)*
In the course of a sea voyage, either on the way or during a stoppage in port, where it is impossible to communicate with land, or where it does not exist in the port, if it is in a foreign country, a French diplomatic or consular agent vested with the functions of a notaire, wills of persons present on board shall be received, in the presence of two witnesses: on ships of the State, by the administration officer or, in his absence, by the captain or one who fulfils his functions; and on other ships by the captain, master or skipper, with the assistance of the chief officer, or, in their absence, by those  who fulfil their functions.

The instrument shall indicate that of the above provided circumstances in which it was received.

### Art. 989
*(Act of 8 June 1893)*
On ships of the state, under the circumstances provided for in the preceding Article, the will of the administration officer shall be received by the captain or by one who fulfils his functions and, where there is no administration officer, the will of the captain shall be received by the one coming after him in order of duty.

On other ships, the will of the captain, master or skipper, or that of the chief officer, shall, under the same circumstances, be received by the persons who come after them in order of duty.

### Art. 990
*(Act of 8 June 1893)*
In all cases, an original in duplicate of the wills mentioned in the two preceding Articles shall be made.

Where that formality could not be fulfilled because of the state of health of the testator, an office copy of the will shall be drawn up to take the place of the second original; that office copy shall be signed by the witnesses and by the instrumentary officers. Mention shall be made of the reasons which prevented the second original from being drawn up.

CIVIL CODE

**Art. 991**

*(Act of 8 June 1893)*

At the first stoppage in a foreign port where there is a French diplomatic or consular agent , one of the originals or the office copy of the will shall be delivered, under closed and sealed cover, into the hands of that official, who shall forward it to the Minister of the Navy, in order that it may be deposited as is stated in Article 983.

**Art. 992**

*(Act of 8 June 1893)*

Upon the arrival of the ship in a French port, the two originals of the will, or the original and its office copy, or the original which remains, in case of transmission or delivery effected during the course of the voyage, shall be deposited, under closed and sealed cover, for the ships of the State, at the office of commissioning, and for other ships, at the office of seamen's registration. Each of those documents shall be addressed separately and by different mails, to the Minister of the Navy, who shall forward them as is stated in Article 983.

**Art. 993**

*(Act of 8 June 1893)*

On the list of the crew, in regard to the name of the testator, mention shall be made of the delivery of the originals or office copy of the will made to the consulate, to the office of commissioning or to the office of seamen's registration, in accordance with the prescriptions of the preceding Articles.

**Art. 994**

*(Act of 8 June 1893)*

A will made during the course of a sea voyage, in the form prescribed in Articles 988 and following, is valid only where the testator dies on board or within six months after landing in a place where he could have redone it in the ordinary forms.

However, where the testator undertakes a new sea voyage before expiry of that period, the will is valid during the duration of that voyage and during a new period of six months after the testator has disembarked again.

**Art. 995**

*(Act of 8 June 1893)*

Dispositions inserted in a will made, in the course of a sea voyage, to the benefit of the officers of the ship other that those who are relatives by blood or marriage of the testator, are null and void.

It shall be the same, whether the will is made in the holographic form or received in accordance with Articles 988 and following.

**Art. 996**

*(Act of 8 June 1893)*

A reading shall be given to the testator, in the presence of the witnesses, of the provisions of Articles 984, 987 or 994, as the case may be, and mention of that reading shall be mentioned in the will.

**Art. 997**

*(Act of 8 June 1893)*

The wills included in the above Articles of this Section shall be signed by the testator, by those who have received them and by the witnesses.

**Art. 998**

*(Act of 8 June 1893)*

Where a testator declares that he is unable or does not know how to sign, mention shall be made of his declaration, as well as of the reason which prevents him from signing.

In the case where the presence of two witnesses is required, the will shall be signed by one of them at least, and mention shall be made of the reason why the other did not sign.

**Art. 999**

A French person who is in a foreign country may make his testamentary dispositions by instrument under private signature, as is prescribed in Article 970, or by authentic instrument, in the forms in use in the place where the instrument is made.

**Art. 1000**

Wills made in a foreign country may be enforced on property situated in France only after they have been registered at the office of the domicile of the testator, where he has kept one, otherwise, at the office of his last known domicile in France; and in the case the will contains dispositions of immovables there situated, it shall be also registered at the registry of the situation of those immovables, without a double tax being charged.

**Art. 1001**

The formalities to which the various wills are subject under the provisions of this Section and the preceding one shall be complied with on pain of annulment.

SECTION III

Of the Appointments of Heirs and of Legacies in General                              Article 1002

**Art. 1002**

CIVIL CODE

Testamentary dispositions are either universal, or by universal title, or specific.

Each of those dispositions, whether made under the designation of appointment of an heir, or made under the designation of legacy, produces its effect according to the rules hereafter laid down for universal legacies, for legacies by universal title, or for specific legacies.

SECTION IV

Of Universal Legacies                                                                Articles 1003 to 1009

**Art. 1003**

A universal legacy is a testamentary disposition by which a testator donates to one or more persons the entirety of the property which he may leave at his death.

**Art. 1004**

Where, at the death of a testator, there are heirs to whom a portion of his property is reserved by law, those heirs are seized by operation of law, by the death, of all the property of the succession; and a universal legatee is compelled to request of them the delivery of the property included in the will.

**Art. 1005**

However, in the same cases, a universal legatee has the enjoyment of the property included in the will from the day of the death, where a claim for delivery was brought within one year after that time; otherwise, that enjoyment shall only commence from the day of a claim brought in court, or from the day when delivery was voluntarily agreed to.

**Art. 1006**

Where at the death of a testator there are no heirs to whom a portion of the property is reserved by law, a universal legatee is seized by operation of law by the death of the testator, without being compelled to request delivery.

**Art. 1007**

*(Act no 66-1012 of 28 Dec. 1966)*

Before it produces its effects, an holographic or secret will shall be deposited in the hands of a notaire. The will shall be opened where it is sealed . The notaire shall draw up at once a memorandum of the opening and of the condition of the will, while specifying the circumstances of the deposit. The will as well as the memorandum shall take their place among the original records of the notaire.

Within the month following the date of the memorandum, the notaire shall address an office copy of it and a facsimile of the will to the chief clerk of the tribunal d'instance of the place of opening of the succession, who shall acknowledge receipt of those documents and shall place them among his original records.

**Art. 1008**

In the case of Article 1006, where the will is holographic or secret, a universal legatee is bound to apply to be vested with possession, by an order of the president, written at the foot of a petition, to which the instrument of deposit shall be joined.

**Art. 1009**

A universal legatee who competes with an heir to whom the law reserves a portion of the property, is liable for the debts and charges of the succession of the testator, personally to the extent of his share and portion, and as to mortgages to the extent of the whole; and he is responsible for paying all the legacies, except in case of abatement, as is stated in Articles 926 and 927.

SECTION V

Of Legacies under Universal Title                                                     Articles 1010 to 1013

**Art. 1010**

A legacy under universal title is one by which the testator bequeaths a portion of the property of which the law permits him to dispose, such as a half, a third, or all his immovables, or all his movables, or a fixed portion of all his immovables or of all his movables.

Any other legacy constitutes only a specific disposition.

**Art. 1011**

Legatees by universal title are obliged to request delivery from the heirs to whom a portion of property is reserved by law; and, failing them, from the heirs called in the order established by the Title Of Successions.

**Art. 1012**

A legatee by universal title is liable, like a universal legatee, for the debts and charges of the succession of the testator, personally to the extent of his share and portion, and as to mortgages to the extent of the whole.

**Art. 1013**

Where a testator has disposed of only a part of the disposable portion, and has done so by universal title, that legatee is responsible for paying the specific legacies pro rata with the natural heirs.

SECTION VI

Of Specific Legacies                                                                  Articles 1014 to 1024

**Art. 1014**

CIVIL CODE

An outright legacy gives to the legatee, from the day of the death of the testator, a right to the thing bequeathed, which right may be transmitted to his heirs or assigns.

Nevertheless, a specific legatee may be vested with the possession of the thing bequeathed, or claim the fruits or interests of it only from the day of his claim for delivery, made following the order established by Article 1011, or from the day when delivery was voluntarily granted to him.

**Art. 1015**

Interests or fruits of a thing bequeathed accrue to the legatee, from the day of the death, and without a claim having been brought by him in court:

1° Where the testator has expressly expressed his wish in this regard in the will;

2° Where an annuity or a pension has been bequeathed as a maintenance.

**Art. 1016**

The costs of a claim for delivery shall be charged to the succession, without however a reduction of the statutory reserve resulting from it.

Recording fees are due by the legatee.

All of which, unless otherwise directed by the will.

Each legacy may be registered separately, without that registration benefiting to anyone other than the legatee or his assigns.

**Art. 1017**

The heirs of the testator, or other debtors for a legacy, are personally liable for its payment, each one pro rata of the share and portion by which he benefits in the succession.

They are responsible as to mortgages for the whole, up to the amount of the value of the immovables of the succession which they may hold.

**Art. 1018**

The thing bequeathed shall be delivered with its necessary accessories, and in the condition in which it stands on the day of the death of the donor.

**Art. 1019**

Where a person who bequeathed ownership of an immovable, has increased it thereafter by acquisitions, those acquisitions, even if contiguous, shall not be deemed to form a part of the legacy, failing a new disposition.

It may not be so of improvements or of new constructions made on the tenement bequeathed, or of an enclosure whose space the testator has increased.

**Art. 1020**

Where, before the will or afterwards, a thing bequeathed has been mortgaged for a debt of the succession, or even for the debt of a third person, or where it is burdened with a usufruct, the one who is obliged to pay the legacy is not bound to disencumber the thing, unless he has been directed to do so by an express provision of the testator.

**Art. 1021**

Where a testator has bequeathed a thing belonging to others, the legacy is void, whether the testator knew or not that the thing did not belong to him.

**Art. 1022**

Where a legacy is of an undetermined thing, the heir are not obliged to give it of the best quality, and he may not offer it of the worst.

**Art. 1023**

A legacy made to a creditor, may not be deemed a set-off against his claim, nor a legacy made to a servant a set-off against his wages.

**Art. 1024**

A specific legatee is not liable for the debts of the succession, subject to the abatement of the legacy, as above stated, and subject to a foreclosure action by creditors.

SECTION VII

Of Testamentary Executors                                   Articles 1025 to 1034

**Art. 1025**

A testator may appoint one or several testamentary executors.

**Art. 1026**

He may vest them in possession of the whole or only of part of his movables; but vesting may not last for more than one year and one day after his death.

Where he did not grant it to them, they may not demand it.

**Art. 1027**

An heir may cause vesting to cease  by offering to deliver to the testamentary executors a sum sufficient to pay the legacies of movables, or by justifying that payment.

CIVIL CODE

**Art. 1028**

A person who may not bind himself may not be a testamentary executor.

**Art. 1029**

[repealed]

**Art. 1030**

A minor may not be a testamentary executor, even with the authorization of his guardian [or curator, repealed by implication].

**Art. 1031**

Testamentary executors shall have seals affixed, where some of the heirs are minors, adults in guardianship or absentees.

They shall have an inventory made of the property of the succession, in the presence of the presumptive heir, or he having been duly summoned.

They shall induce the sale of movables, if there is insufficient money to pay the legacies.

They shall  take care that the will is carried out; and, in case of controversy as to its carrying out, they may intervene to support its validity.

They shall account for their management on the expiry of the year from the death of the testator.

**Art. 1032**

The powers of a testamentary executor may not pass to his heirs.

**Art. 1033**

Where there are several testamentary executors who have accepted, one alone may act in default of the others; and they are jointly and severally liable for the account of the movables which was entrusted to them, unless the testator has divided their duties and each of them has confined himself to those which were assigned to him.

**Art. 1034**

Expenses incurred by a testamentary executor for affixing seals, for the inventory, the account and other expenses relating to his duties, shall be charged to the succession.

SECTION VIII

Of the Revocation of Wills and of their Lapse                                   Articles 1035 to 1047

**Art. 1035**

Wills may only be revoked, in whole or in part, by a subsequent will, or by an instrument before notaires, containing the declaration of a change of intention.

**Art. 1036**

Subsequent wills which do not revoke previous ones in an express manner annul only those of the dispositions therein contained which are inconsistent with the new ones, or which are contrary to them.

**Art. 1037**

A revocation made in a subsequent will produces its full effect, even though the new will is not carried out through a disability of the heir appointed or the legatee, or their refusal to take it.

**Art. 1038**

Any transfer made by the testator of all or part of the thing bequeathed, even by a sale with option of redemption or by exchange, involves revocation of the legacy as to everything that was transferred, even though the subsequent transfer is void and the thing has returned to the hands of the testator.

**Art. 1039**

Any testamentary disposition lapses where the one in whose favour it was made does not survive the testator.

**Art. 1040**

Any testamentary disposition made under a condition depending upon an uncertain event, and such that, in the intention of the testator, that disposition is to be carried out only where the event happens or does not happen, lapses if the appointed heir or the legatee dies before the condition is fulfilled.

**Art. 1041**

A condition which, in the intention of the testator, only suspends the carrying out of the disposition, does not prevent the appointed heir or the legatee from having a vested right transmissible to his heirs.

**Art. 1042**

A legacy lapses, where the thing bequeathed totally perishes in the lifetime of the testator.

It shall be likewise where it perishes after his death, without the act or fault of the heir, although the latter may have been on notice to deliver it, if it would likewise have perished in the hands of the legatee.

**Art. 1043**

A testamentary disposition lapses where the appointed heir or the legatee repudiates it or is incompetent to take it.

**Art. 1044**

CIVIL CODE

There shall be occasion for accruer to the benefit of the legatees, in the case where a legacy is made jointly to several of them.

A legacy shall be deemed jointly made where it is made by one and the same disposition and where the testator did not assign the share of each of the co-legatees in the thing bequeathed.

**Art. 1045**

It shall likewise be deemed jointly made when a thing which is not susceptible of being divided without deterioration is donated by the same will to several persons, even separately.

**Art. 1046**

The same causes which, according Article 954 and the first two provisions of Article 955, allow a claim for revocation of an inter vivos gift, shall justify a claim for revocation of testamentary dispositions.

**Art. 1047**

Where that claim is based upon a grievous insult against the memory of the testator, it must be brought within one year after the day of the offence.

CHAPTER VI

Of Dispositions Allowed in Favour of Grandchildren of a Donor or Testator or of          Articles 1048 to 1074
Childrenof his Brothers and Sisters

**Art. 1048**

Property of which the father and mother may dispose, may be donated by them, in whole or in part, to one or several of their children by inter vivos or testamentary act, with the obligation of returning that property to the children born and to be born, in the first degree only, of said donees.

**Art. 1049**

Is valid, in case of death without children, a disposition which a deceased made by inter vivos or testamentary act for the benefit of one or several of his brothers or sisters, of all or part of the property which is not reserved by law in his succession, with the obligation of returning that property to the children born and to be born, in the first degree only, of said donee brothers or sisters.

**Art. 1050**

The dispositions allowed by the two preceding Articles are valid only where the obligation to return is for the benefit of all the children born and to be born of the institute, without exception or preference by reason of age or sex.

**Art. 1051**

Where, in the above cases, an institute subject to restitution for the benefit of his children dies, leaving children in the first degree and descendants of a pre-deceased child, the latter shall take the portion of the pre-deceased child, by representation.

**Art. 1052**

Where a child, brother or sister to whom property was donated by an inter vivos act, without obligation of restitution, accepts a new gratuitous transfer made by an inter vivos or testamentary act, subject to the condition that the property previously donated be burdened with that obligation, they are no longer allowed to divide the two dispositions made for their benefit and to renounce the second to be satisfied with the first, even if they offer to return the property included in the second gift.

**Art. 1053**

The rights of the substitutes take effect from the time when, for whatever reason, the enjoyment of the child, the brother or the sister institutes comes to an end: an anticipated waiver of the enjoyment for the benefit of the institutes may not prejudice creditors of the institute antecedent to the waiver.

**Art. 1054**

[repealed by implication]

**Art. 1055**

*(Act no 64-1230 of 14 Dec. 1964)*

A person who makes the dispositions allowed by the preceding Articles may, by the same act, or by a subsequent act, in authentic form, appoint a guardian in charge of the execution of  those dispositions: that guardian may be dispensed only for one of the causes expressed in Articles 428 and following.

**Art. 1056**

Failing such guardian, one shall be named at the suit of the institute or of his guardian where he is a minor, within a period of one month after the day of the death of the donor or testator, or after the day when, since that death, the act containing the disposition has become known.

**Art. 1057**

An institute who did not comply with the preceding Article loses the benefit of the disposition; and, in that case, the right may be declared to be vested in the substitutes, at the suit either of the substitutes where they are of full age, or of their guardian or curator, where they are minors or adults in guardianship, or of any relative of the substitutes of full age,

CIVIL CODE

minors or  adults in guardianship, or even ex officio, at the suit of the Government procurator of the tribunal de grande instance of the place where the succession was opened.

**Art. 1058**

After the death of the person who has disposed with an obligation of restitution, there shall be made, in the ordinary forms, an inventory of all the property and effects composing the succession, except, nevertheless, in case of a specific legacy. That inventory shall include an appraisal at a fair price of the movables and movable effects.

**Art. 1059**

It shall be done at the request of the institute and within the period fixed in the Title Of Successions, in the presence of the guardian appointed for the execution. The expenses shall be taken from the property included in the succession.

**Art. 1060**

Where an inventory was not made on request of the institute within the above period, it shall be done within the following month at the suit of the guardian appointed for the execution, in the presence of the institute or of his guardian.

**Art. 1061**

Where the two preceding Articles have not been complied with, the same inventory shall be done, at the suit of the persons designated in Article 1057, the institute or his guardian and the guardian appointed for the execution being summoned.

**Art. 1062**

The institute shall have a sale passed on to, by bills and auctions, of all the movables and effects included in the disposition, with the exception nevertheless of those mentioned in the two following Articles.

**Art. 1063**

The furniture and other movable things which are included in the disposition under the express condition of keeping them in kind, shall be returned in the condition in which they are at the time of the restitution.

**Art. 1064**

Cattle and implements used to exploit lands shall be deemed included in the donations inter vivos or testamentary of said lands; and the institute is bound only to have them appraised and evaluated, in order to return a like value at the time of the restitution.

**Art. 1065**

Within a period of six months after the day of the closing of the inventory, an institute shall invest the ready money, the funds coming from the proceeds of the movables and effects which have been sold, and what is received from bills receivable.

That period may be extended if there is occasion.

**Art. 1066**

An institute is likewise bound to invest the funds coming from bills receivable which are recovered and from redemptions of annuities; and this, within three months at the latest after he has received them.

**Art. 1067**

That investment shall be made in accordance with the directions of the maker of the disposition, where he designated the nature of the property in which the investment must be made; otherwise, it may be made only in immovables or with a prior charge on immovables.

**Art. 1068**

The investment prescribed by the preceding Articles shall be made in the presence and at the suit of the guardian appointed for the execution.

**Art. 1069**

*(Ord. no 59-71 of 7 Jan. 1959)*

Dispositions by inter vivos or testamentary acts, with an obligation of restitution, shall, at the suit either of the institute or of the guardian appointed for the execution, be registered, as to immovables in accordance with the statutes and regulations relating to land registration, and as to preferential or mortgaged claims following the prescriptions of Articles 2148 and 2149, paragraph 2, of this Code.

**Art. 1070**

Lack of"registration" (Ord. no 59-71 of 7 Jan. 1959) of an instrument containing a disposition may be set up by creditors and third parties purchasers, even against minors or adults in guardianship, subject to the remedy against the institute and the guardian for the execution, and without the minors or adults in guardianship being reinstated against that lack of"registration" (Ord. no 59-71 of 7 Jan. 1959), even where the institute and the guardian are insolvent.

**Art. 1071**

Lack of"registration" (Ord. no 59-71 of 7 Jan. 1959) may not be made good or considered as remedied by knowledge which the creditors or third parties purchasers may have had of the disposition in other ways than by the"registration" (Ord. no 59-71 of 7 Jan. 1959).

**Art. 1072**

CIVIL CODE

Donees, legatees, and even the [deleted] heirs of the person who made the disposition, and likewise their donees, legatees or heirs may not, in any event, set up against the substitutes the lack of"registration" (Ord. no 59-71 of 7 Jan. 1959) or of recording.

**Art. 1073**

A guardian appointed for the execution is personally liable, where he has not, in every way, complied with the rules hereabove laid down for establishing the property, for the sale of movables, for the investment of the funds, for the registration and recording and, in general, where he has not taken all the necessary steps so that the obligation of restitution be well and faithfully fulfilled.

**Art. 1074**

Where the institute is a minor, he may not, even in case of insolvency of his guardian, be reinstated against non-compliance with the rules prescribed by the Articles of this Chapter.

CHAPTER VII
Of Partitions Made by Ascendants                                        Articles 1076 to 1075-3

**Art. 1075**

The father and mother and other ascendants may make a distribution and partition of their property between their children and descendants.

That act may be made under the form of a partition made by gift or of a partition made by will. It shall comply with the formalities, requisites and rules prescribed for inter vivos gifts in the first case, and for wills in the second, subject to the application of the provisions which follow.

(Act no 88-15 of 5 Jan. 1988) Where their property includes an individual concern of an industrial, commercial, craft, agricultural or professional character, the father and mother and other ascendants may, under the same conditions and with the same effects, distribute and partition them between their children and descendants and other persons under the form of a partition made by gift, provided the tangible and intangible property allocated for the exploiting of the concern is part of that distribution and that partition, and that distribution and that partition have the effect of assigning to those other persons only the ownership of all or part of that property or its enjoyment.

**Art. 1075-1**

A partition made by an ascendant may not be attacked for reason of loss.

**Art. 1075-2**

The provisions of Article 833-1, paragraph 1, shall apply to balances which are the responsibility of donees, notwithstanding any agreement to the contrary.

**Art. 1075-3**

Where the whole of the property which an ascendant leaves on the day of his or her death has not been included in the partition, that item of his or her property which has not been included shall be assigned or partitioned in accordance with the law.

SECTION I
Of Partitions Made by Gifts                                        Articles 1076 to 1078-3

**Art. 1076**

A partition made by gift may have as its subject matter only existing property.

A gift and a partition may be made by separate acts, provided the ascendant is a party to both acts.

**Art. 1077**

Property received by descendants as an anticipated partition constitutes an advancement of their portions of reserve, unless it was donated expressly over and above their shares.

**Art. 1077-1**

A descendant who did not participate in a partition made by gift or who received a part below his portion of the reserve may bring an action for abatement where there does not exist at the opening of the succession property not included in the partition and sufficient to form or make his reserve complete, account being taken of the gratuitous transfers by which he may have profited.

**Art. 1077-2**

Partitions made by gifts shall follow the rules of inter vivos gifts for all which regards appropriation, calculation of the reserve and abatement.

An action for abatement may be brought only after the death of the ascendant who made the partition or of the survivor of the ascendants in case of joint partition. It is time-barred after five years from the said death.

A child not yet conceived at the time of a partition made by gift has a similar action to form or make his hereditary share complete.

**Art. 1078**

Notwithstanding the rules which apply to inter vivos gifts, the property donated  must, unless otherwise agreed, be appraised at the day of the partition made by gift as regards appropriation and calculation of the reserve, provided all the children living or represented at the death of the ascendant have received a share in the anticipated partition and have

CIVIL CODE

expressly accepted it, and no reservation of a usufruct bearing on a sum of money has been provided for.

**Art. 1078-1**

The shares of certain"beneficiaries" (Act no 88-15 of 5 Jan. 1988) may be formed, in whole or in part, from gifts, either subject to collation, or over and above their shares, which they already received from the ascendant, with regard possibly to the investments and re-investments which they may have made in the interval.

The date of appraisal applicable to an anticipated partition shall also apply to the previous gifts which are thus incorporated into it. Any stipulation to the contrary shall be deemed not written.

**Art. 1078-2**

The parties may also agree that a previous gift over and above a donee's share be incorporated into a partition and appropriated to the portion of the reserve of the donee as an advancement.

**Art. 1078-3**

The agreements specified in the two preceding Articles may take place even in the absence of new gifts of the ascendant. They shall not be considered as gratuitous transfers between descendants but as a partition made by the ascendant.

SECTION II

Of Partitions Made by Wills                                                        Articles 1079 to 1080

**Art. 1079**

A partition made by a will produces only the effects of a partition. Its beneficiaries have the capacity of heirs and may not forego availing themselves of the will in order to claim a new partition of the succession.

**Art. 1080**

A child or descendant who did not receive a share equal to his portion of the reserve may bring an action for abatement in accordance with Article 1077-2.

CHAPTER VIII

Of Gifts Made by Ante-nuptial Agreement to Spouses and to Children to be Born of     Articles 1081 to 1090 the Marriage

**Art. 1081**

Every inter vivos gift of existing property, although made by an ante-nuptial agreement to the spouses or to one of them, is subject to the general rules prescribed for the gifts made as such.

It may not take place for the benefit of children to be born except in the cases stated in Chapter VI of this Title.

**Art. 1082**

The father and mother, other ascendants, collateral relatives of the spouses and even outsiders may dispose of all or part of the property they will leave on the day of their death, by an ante-nuptial agreement, as well for the benefit of said spouses, as for the benefit of children to be born of their marriage, in case the donor would survive the donee spouse.

Such gift, although made only for the benefit of the spouses or of one of them, shall always, in the said case of survival of the donor, be presumed made for the benefit of the children and descendants to be born of the marriage.

**Art. 1083**

A gift, in the form specified in the preceding Article, is irrevocable, in this sense only that the donor may not dispose gratuitously of the property contained in the gift, with the exception of moderate sums, by way of reimbursement or otherwise.

**Art. 1084**

A gift by an ante-nuptial agreement may be done cumulatively of existing and future property, in all or in part, provided a statement of the debts and charges of the donor existing at the time of the gift is annexed to the instrument; in which case, the donee shall be at liberty, at the time of the death of the donor, to retain the existing property, by waiving the difference of the donor's property.

**Art. 1085**

Where the statement mentioned in the preceding Article was not annexed to the instrument containing a gift of the existing and future property, a donee is obliged to accept or repudiate that gift in whole. In case of acceptance, he may claim only the property existing on the day of the death of the donor, and he is liable to pay all the debts and charges of the succession.

**Art. 1086**

A gift may also be made by an ante-nuptial agreement in favour of the spouses and of children to be born of their marriage, subject to the condition of paying without distinction all the debts and charges of the succession of the donor, or subject to other conditions of which the fulfilment depends upon his wish, by whatever person the gift is made: the donee is obliged to fulfil the conditions unless he prefers to renounce the gift; and in case a donor by an ante-nuptial agreement has reserved to himself the power to dispose of an article included in the gift of his existing property, or of a fixed sum to be taken out of that same property, if he dies without having disposed of them, the article or the sum shall be deemed included in the gift and shall belong to the donee or his heirs.

CIVIL CODE

**Art. 1087**

Gifts made by an ante-nuptial agreement may not be attacked or declared void on the pretext of lack of acceptance.

**Art. 1088**

Any gift made in favour of a marriage lapses where the marriage does not follow.

**Art. 1089**

Gifts made to one of the spouses, under the terms of Articles 1082, 1084 and 1086 above, lapse where the donor survives the donee spouse and his or her descendants.

**Art. 1090**

All gifts made to spouses by their ante-nuptial agreement are, when the succession of the donor opens, abatable up to the portion which the law allows the donor to dispose of.

CHAPTER IX

Of Dispositions between Spouses, either by Ante-nuptial Agreement or during          Articles 1091 to 1100 Marriage

**Art. 1091**

Spouses may, by an ante-nuptial agreement, make to each other, or one to the other, such gift as they deem proper, under the amendments hereafter laid down.

**Art. 1092**

Any inter vivos gift of existing property, made between spouses by an ante-nuptial agreement shall not be deemed made under condition of survival of the donee where that condition is not formally expressed; and it shall be subject to all the rules and forms above prescribed for these kinds of gifts.

**Art. 1093**

A gift of future property, or of existing and future property, made between spouses by an ante-nuptial agreement, either single or reciprocal, shall be subject to the rules laid down by the preceding Chapter, as regards similar gifts made by a third person, except that it may not pass to the children born of the marriage, in case of death of the donee spouse before the donor spouse.

**Art. 1094**

*(Act no 72-3 of 3 Jan. 1972)*

A spouse may, either by an antenuptial agreement, or during marriage, in case he or she leaves no [...] children or descendants, dispose in favour of the other spouse in ownership, of everything he or she may dispose of in favour of a stranger, and, in addition, of the bare ownership of the portion reserved to ascendants by Article 914 of this Code.

**Art. 1094-1**

*(Act no 72-3 of 3 Jan. 1972)*

Where a spouse leaves children or descendants, [...] born or not of the marriage, [...] he or she may dispose in favour of the other spouse, either of ownership of what he or she may dispose of in favour of a stranger, or of one-fourth of his property in ownership and of the other three-fourths in usufruct, or else of the totality of property in usufruct only.

**Art. 1094-2**

[repealed]

**Art. 1094-3**

*(Act no 72-3 of 3 Jan. 1972)*

Children or descendants may, notwithstanding any stipulation of the disposing party to the contrary, require, as to property subject to usufruct, that an inventory of movables as well as a statement of immovables be drawn up, that funds be invested and that bearer securities be, at the choice of the usufructuary, converted into registered securities or deposited with an accredited depositary.

**Art. 1095**

A minor may, by an ante-nuptial agreement, donate to the other spouse, either by a single gift or by a reciprocal gift, only with the consent and assistance of those whose consent is required for the validity of the marriage; and with that consent, he may donate everything the law allows a spouse of full age to donate to the other spouse.

**Art. 1096**

(Act no 2004-439 of 26 May 2004).- A gift of future property made between spouses during marriage is always revocable.

A gift of existing property made between spouses may be revocable only subject to the conditions set out in Articles 953 to 958.

Gifts of existing or future property made between spouses are not revoked by the unforeseen birth of children.

**Art. 1097 and 1097-1**

[repealed]

**Art. 1098**

*(Act no 72-3 of 3 Jan. 1972)*

CIVIL CODE

Where a remarried spouse made, to his or her second spouse, within the limits of Article 1094-1, a gratuitous transfer in ownership, each child of the first bed has, so far as he is concerned, unless otherwise unequivocally directed by the disposing party, the power to substitute to the fulfilment of that transfer the waiver of the usufruct of the share of succession he would have received failing a surviving spouse.

Those who have exercised that power may require the application of the provisions of Article 1094-3.

**Art. 1099**

Spouses may not indirectly donate to each other more what they are allowed by the above provisions.

[repealed]

**Art. 1099-1**

*(Act no 67-1179 of 28 Dec. 1967)*

Where a spouse acquires a property with funds which were donated to him or her by the other for that purpose, the gift is only of the funds and not of the property in which they were invested.

In that case, the rights of the donor or of his or her heirs have as their subject matter a sum of money according to the present value of the property. Where the property has been transferred, one considers the value it had on the day of the transfer, and where a new property has been substituted to the property transferred, the value of that new property.

**Art. 1100**

[repealed]

**TITLE III**

**OF CONTRACTS AND OF CONVENTIONAL OBLIGATIONS IN GENERAL**          **Articles 1101 to 1369-11**

CHAPTER I

Preliminary Provisions                                                    Articles 1101 to 1107

**Art. 1101**

A contract is an agreement by which one or several persons bind themselves, towards one or several others, to transfer, to do or not to do something.

**Art. 1102**

A contract is synallagmatic or bilateral where the contracting parties bind themselves mutually towards each other.

**Art. 1103**

It is unilateral where one or more persons are bound towards one or several others, without there being any obligation on the part of the latter.

**Art. 1104**

It is commutative where each party binds himself to transfer or do a thing which is considered as the equivalent of what is transferred to him or of what is done for him.

Where the equivalent consists in a chance of gain or of loss for each party, depending upon an uncertain event, a contract is aleatory.

**Art. 1105**

A contract of benevolence is one by which one of the parties procures a purely gratuitous advantage to the other.

**Art. 1106**

A contract for value is one which obliges each party to transfer or do something.

**Art. 1107**

Contracts, whether they have a specific denomination or not, are subject to general rules, which are the subject matter of this Title.

Particular rules for certain contracts are laid down under the Titles relating to each of them; and the particular rules for commercial transactions are laid down by the legislation that relates to commerce.

CHAPTER II

Of the Essential Requisites for the Validity of Agreements                  Articles 1109 to 1108-2

**Art. 1108**

Four requisites are essential for the validity of an agreement:

The consent of the party who binds himself;

His capacity to contract;

A definite object which forms the subject-matter of the undertaking;

A lawful cause in the obligation.

**Art. 1108-1**

(Act no 2004-575 of 21 June 2004).- Where a writing is required for the validity of a legal transaction, it may be established and stored in electronic form in the way provided for in Articles 1316-1 and 1316-4 and, where an authentic instrument is required, in Article 1317, paragraph 2.

CIVIL CODE

Where a mention written in the own hand of the person who binds himself is required, the latter may appose it in electronic form where the conditions in which it is apposed are likely to vouch that it can only be apposed by the person himself.

**Art. 1108-2**

(Act no 2004-575 of 21 June 2004).- Exception is made to the provisions of Article 1108-1 in regard to:

1° Instruments under private signature relating to family law and the law of succession;

2° Instruments under private signature relating to suretyship or property charge, of commercial or non-commercial character, except where they are drawn up by a person for the needs of his occupation.

SECTION I

Of Consent                                                                                      Articles 1109 to 1122

**Art. 1109**

There is no valid consent, where the consent was given only by error, or where it was extorted by duress or abused by deception.

**Art. 1110**

Error is a ground for annulment of an agreement only where it rests on the very substance of the thing which is the object thereof.

It is not a ground for annulment where it only rests on the person with whom one has the intention of contracting, unless regard to/for that person was the main cause of the agreement.

**Art. 1111**

Duress exerted against the person who has contracted the obligation is a ground for annulment even though it was exerted by a third party different from the one for whose benefit the agreement was made.

**Art. 1112**

There is duress where it is of a nature to make an impression upon a reasonable person and where it can inspire him with a fear of exposing his person or his wealth to considerable and present harm.

Regard shall be paid, on this question, to the age, the sex and the condition of the persons.

**Art. 1113**

Duress is a ground for annulment of a contract, where it is exerted not only against a contracting party, but also against the party's spouse, against his or her descendants or ascendants.

**Art. 1114**

Reverential fear alone towards a father, mother or other ascendant, without any duress being exerted , may not suffice to annul a contract.

**Art. 1115**

A contract may no longer be attacked on the ground of duress where, since duress has ceased, that contract has been approved, either expressly, or by conduct, or in letting the time fixed by law for restitution elapse.

**Art. 1116**

Deception is a ground for annulment of a contract where the schemes used by one of the parties are such that it is obvious that, without them, the other party would not have entered into the contract.

It may not be presumed, and must be proved.

**Art. 1117**

An agreement entered into by error, duress or deception is not void by operation of law; it only gives rise to an action for annulment or rescission, in the cases and in the manner explained in Section VII of Chapter V of this Title.

**Art. 1118**

Loss vitiates agreements only in certain contracts and with regard to certain persons, as will be explained in the same Section.

**Art. 1119**

As a rule, one may, bind oneself and stipulate in his own name, only for oneself.

**Art. 1120**

One may, nevertheless stand guarantee for a third party, by promising his acting; subject to a compensation against him who stood guarantee or promised to obtain ratification, where the third party refuses to keep the undertaking.

**Art. 1121**

One may likewise stipulate for the benefit of a third party, where it is the condition of a stipulation which one makes for oneself or of a gift which one makes to another. He who made that stipulation may no longer revoke it, where the third party declares that he wishes to take advantage of it.

**Art. 1122**

One is deemed to have stipulated for himself and for his heirs and assigns, unless the contrary is expressed or results from the nature of the agreement.

CIVIL CODE

SECTION II
Of the Capacity of Contracting Parties                                  Articles 1123 to 1125-1

**Art. 1123**
Any person may enter into a contract, unless he has been declared incapable of it by law.

**Art. 1124**
*(Act no 68-5 of 3 Jan. 1968)*
Are incapable of entering into a contract, to the extent defined by law:
Non-emancipated minors;
Adults protected within the meaning of Article 488 of this Code.

**Art. 1125**
*(Act no 68-5 of 3 Jan. 1968)*
Persons capable of binding themselves may not set up the incapacity of those with whom they have made a contract.

**Art. 1125-1**
*(Act no 68-5 of 3 Jan. 1968)*
Except for authorization by court, it is forbidden, on pain of annulment, for whomever exercises a function or fills an employment in an institution sheltering elderly persons or dispensing psychiatric care, to stand as purchaser of a property or assignee of a right belonging to a person admitted to the institution, or to take on lease lodgings occupied by that person before his admission to the institution.
For the implementation of this Article, shall be deemed intermediaries, the spouse, ascendants and descendants of the persons to whom the above-enacted prohibitions apply.

SECTION III
Of the Object and Subject Matter Of Contracts                           Articles 1126 to 1130

**Art. 1126**
Any contract has for its object a thing which one party binds himself to transfer, or which one party binds himself to do or not to do.

**Art. 1127**
The mere use or the mere possession of a thing may be the object of a contract, like the thing itself.

**Art. 1128**
Only things which may be the subject matter of legal transactions between private individuals may be the object of agreements.

**Art. 1129**
An obligation must have for its object a thing determined at least as to its kind.
The quantity of the thing may be uncertain, provided it can be determined.

**Art. 1130**
Future things may be the object of an obligation.
One may not however renounce a succession which is not open, or make any stipulation with respect to such succession, even with the consent of him whose succession is concerned.

SECTION IV
Of Cause                                                                Articles 1131 to 1133

**Art. 1131**
An obligation without cause or with a false cause, or with an unlawful cause, may not have any effect.

**Art. 1132**
An agreement is nevertheless valid, although its cause is not expressed.

**Art. 1133**
A cause is unlawful where it is prohibited by legislation, where it is contrary to public morals or to public policy.

CHAPTER III
Of the Effect of Obligations                                            Articles 1134 to 1167

SECTION I
General Provisions                                                      Articles 1134 to 1135

**Art. 1134**
Agreements lawfully entered into take the place of the law for those who have made them.
They may be revoked only by mutual consent, or for causes authorized by law.
They must be performed in good faith.

**Art. 1135**

CIVIL CODE

Agreements are binding not only as to what is therein expressed, but also as to all the consequences which equity, usage or statute give to the obligation according to its nature.

SECTION II
Of the Obligation to Transfer                                                                     Articles 1136 to 1141

**Art. 1136**

An obligation to transfer carries that of delivering the thing and of keeping it until delivery, on pain of damages to the creditor.

**Art. 1137**

An obligation to watch over the preservation of a thing, whether the agreement has as its object the profit of one party, or it has as its object their common profit, compels the one who is responsible to give it all the care of a prudent administrator.

That obligation is more or less extensive as regards certain contracts, whose effects, in this respect, are explained under the Titles which relate to them.

**Art. 1138**

An obligation of delivering a thing is complete by the sole consent of the contracting parties.

It makes the creditor the owner and places the thing at his risks from the time when it should have been delivered, although the handing over has not been made, unless the debtor has been given notice to deliver; in which case, the thing remains at the risk of the latter.

**Art. 1139**

A debtor is given notice of default either through a demand or other equivalent act"such as a letter missive, where a sufficient requisition results from its terms" (Act no 91-650 of 9 July 1991), or by the effect of the agreement where it provides that the debtor will be put in default without any notice and through the mere expiry of time.

**Art. 1140**

The effects of an obligation to convey or deliver an immovable are regulated in the Title Of Sales and in the Title Of Prior Charges and Mortgages.

**Art. 1141**

Where a thing which one is bound to transfer or deliver to two persons successively is purely movable, the one of the two who has been put in actual possession is preferred and remains owner of it, although his title is subsequent as to date, provided however that the possession is in good faith.

SECTION III
Of the Obligation to Do or not to Do                                                           Articles 1142 to 1145

**Art. 1142**

Any obligation to do or not to do resolves itself into damages, in case of non-performance on the part of the debtor.

**Art. 1143**

Nevertheless, a creditor is entitled to request that what has been done through breach of the undertaking be destroyed; and he may have himself authorized to destroy it at the expense of the debtor, without prejudice to damages, if there is occasion.

**Art. 1144**

A creditor may also, in case of non-performance, be authorized to have the obligation performed himself, at the debtor's expense ."The latter may be ordered to advance the sums necessary for that performance" (Act no 91-650 of 9 July 1991).

**Art. 1145**

Where there is an obligation not to do, he who violates it owes damages by the mere fact of the violation.

SECTION IV
Of Damages Resulting from the Non-Performance of an Obligation                Articles 1146 to 1155

**Art. 1146**

Damages are due only where a debtor is given notice to fulfil his obligation, except nevertheless where the thing which the debtor has bound himself to transfer or to do could be

transferred or done only within a certain time which he has allowed to elapse."Notice of default may follow from a letter missive where a sufficient requisition results from it" (Act no 91-650 of 9 July 1991).

**Art. 1147**

A debtor shall be ordered to pay damages, if there is occasion, either by reason of the non-performance of the obligation, or by reason of delay in performing, whenever he does not prove that the non-performance comes from an external cause which may not be ascribed to him, although there is no bad faith on his part.

**Art. 1148**

There is no occasion for any damages where a debtor was prevented from transferring or from doing that to which

CIVIL CODE

he was bound, or did what was forbidden to him, by reason of force majeure or of a fortuitous event.

**Art. 1149**

Damages due to a creditor are, as a rule, for the loss which he has suffered and the profit which he has been deprived of, subject to the exceptions and modifications below.

**Art. 1150**

A debtor is liable only for damages which were foreseen or which could have been foreseen at the time of the contract, where it is not through his own intentional breach that the obligation is not fulfilled.

**Art. 1151**

Even in the case where the non-performance of the agreement is due to the debtor's intentional breach, damages may include, with respect to the loss suffered by the creditor and the profit which he has been deprived of, only what is an immediate and direct consequence of the non-performance of the agreement.

**Art. 1152**

Where an agreement provides that he who fails to perform it will pay a certain sum as damages, the other party may not be awarded a greater or lesser sum.

(Act no 75-597 of 9 July 1975) Nevertheless, the judge may"even of his own motion" (Act no 85-1097 of 11 Oct. 1985) moderate or increase the agreed penalty, where it is obviously excessive or ridiculously low. Any stipulation to the contrary shall be deemed unwritten.

**Art. 1153**

(Act no 75-619 of 11 July 1975) In obligations which are restricted to the payment of a certain sum, the damages resulting from delay in performance shall consist only in awarding interests at the statutory rate, except for special rules for commerce and suretyship.

(Ord. no 59-148 of 7 Jan. 1959) Those damages are due without the creditor having to prove any loss.

(Act no 75-619 of 11 July 1975) They are due only from the day of a demand for payment"or of another equivalent act such as a letter missive where a sufficient requisition results from it" (Act no 92-644 of 13 July 1992), except in the case where the law makes them run as a matter of right.

(Act of 7 April 1900) A creditor to whom his debtor in delay has caused, by his bad faith, a loss independent of that delay may obtain damages distinct from the interest on arrears of the debt.

**Art. 1153-1**

*(Act no 85-677 of 5 July 1985)*

In all matters, the award of a compensation involves interest at the statutory rate even failing a claim or a specific provision in the judgment. Save as otherwise provided by legislation, that interest runs from the handing down of the judgment unless the judge otherwise rules . In case a udgment  allowing an indemnity for compensation of a loss is unreservedly affirmed by an appellate judge,  the determination as a matter of law produces interest as from the judgment of first instance. In the other cases, an indemnity allowed on appeal produces interest from the judgment given in appeal. The appellate judge may always derogate from the provisions of this paragraph.

**Art. 1154**

Interests due on capital may produce interest, either by a judicial claim, or by a special agreement, provided that, either in the claim, or in the agreement, the interest concerned be owed at least for one whole year.

**Art. 1155**

Nevertheless, the revenue owed, such as farm rents, rents, arrearages of perpetual or life annuities, produce interest from the day of the claim or of the agreement.

The same rule shall apply to the restitution of fruits and to interest paid by a third party to a creditor on behalf of the debtor.

SECTION V

Of the Interpretation of Agreements                                              Articles 1156 to 1164

**Art. 1156**

One must in agreements seek what the common intention of the contracting parties was, rather than pay attention to the literal meaning of the terms.

**Art. 1157**

Where a clause admits of two meanings, one shall rather understand it in the one with which it may have some effect, than in the meaning with which it could not produce any.

**Art. 1158**

Terms which admit of two meanings shall be taken in the meaning which best suits the subject matter of the contract.

**Art. 1159**

What is ambiguous shall be interpreted by what is in use in the region where the contract was made.

**Art. 1160**

Terms which are customary shall be supplemented in the contract, even though they are not expressed there.

CIVIL CODE

**Art. 1161**

All the clauses of an agreement are to be interpreted with reference to one another by giving to each one the meaning which results from the whole instrument.

**Art. 1162**

In case of doubt, an agreement shall be interpreted against the one who has stipulated, and in favour of the one who has contracted the obligation.

**Art. 1163**

However general the terms in which an agreement is phrased may be, it shall include only the things upon which the parties appear to have intended to contract.

**Art. 1164**

Where in a contract one case was expressed for explaining the obligation, it shall not be deemed that it was thereby intended to reduce the scope of the agreement which extends as of right to cases not expressed.

SECTION VI

Of the Effect of Agreements with Respect to Third Parties                Articles 1165 to 1167

**Art. 1165**

Agreements produce effect only between the contracting parties; they do not harm a third party, and they benefit him only in the case provided for in Article 1121.

**Art. 1166**

Nevertheless, creditors may exercise their debtor's rights and actions, except those which are exclusively dependent on the person.

**Art. 1167**

They may also, on their own behalf, attack transactions made by their debtor in fraud of their rights.

(Act no 65-570 of 13 July 1965) They shall nevertheless, as to those of their rights which are laid down in the Title Of Ante-nuptial Agreement and of Matrimonial Regimes, comply with the rules therein prescribed.

CHAPTER IV

Of the Various Kinds of Obligations                Articles 1168 to 1233

SECTION I

Of Conditional Obligations                Articles 1168 to 1184

Paragraph 1

Of Condition in General and of its Various Kinds                Articles 1168 to 1180

**Art. 1168**

An obligation is conditional where it is made to depend upon a future and uncertain event, either by suspending it until the event happens, or by cancelling it, according to whether the event happens or not.

**Art. 1169**

A casual condition is one which depends upon chance and which is in no way in the power of the creditor or of the debtor.

**Art. 1170**

A potestative condition is one which makes the fulfilment of the agreement depend upon an event which one or the other of the contracting parties has the power to make happen or to prevent.

**Art. 1171**

A mixed condition is one which depends at the same time upon the wish of one of the contracting parties, and upon the wish of a third party.

**Art. 1172**

Any condition relating to an impossible thing, or contrary to public morals, or prohibited by law, is void, and renders void the agreement which depends upon it.

**Art. 1173**

A condition not to do an impossible thing does not render void the obligation contracted upon that condition.

**Art. 1174**

An obligation is void where it was contracted subject to a potestative condition on the part of the one who binds himself.

**Art. 1175**

Every condition must be fulfilled in the manner in which the parties have in all likelihood wished and intended that it should be.

**Art. 1176**

CIVIL CODE

Where an obligation is contracted subject to the condition that an event will happen within a fixed time, that condition is deemed failed where the time has elapsed without the event having happened . Where there is no time fixed, the condition may always be fulfilled; and it is deemed failed only when it has become certain that the event will not happen.

**Art. 1177**

Where an obligation is contracted subject to the condition that an event will not happen in a fixed time, that condition is fulfilled when that time has expired without the event having happened: it is so too when, before the term, it is certain that the event will not happen; and where there is no determined time, it is fulfilled only when it is certain that the event will not happen.

**Art. 1178**

A condition is deemed fulfilled where it is the debtor, bound under that condition, who has prevented it from being fulfilled.

**Art. 1179**

A condition which is fulfilled has a retroactive effect to the day when the undertaking was contracted. Where the creditor dies before the condition is fulfilled, his rights pass to his heir.

**Art. 1180**

A creditor may, before the condition is fulfilled, take all steps to preserve his right.

Paragraph 2
Of Condition Precedent                                                                                    Articles 1181 to 1182

**Art. 1181**

An obligation contracted under a condition precedent is one which depends either on a future and uncertain event, or on an event having presently happened, but still unknown to the parties.

In the first case, the obligation may be performed only after the event.

In the second case, the obligation takes effect as from the day when it was contracted.

**Art. 1182**

Where an obligation was contracted under a condition precedent, the thing which is the subject matter of the agreement remains at the risk of the debtor who has bound himself to deliver it only in the case of the occurrence of the condition.

Where the thing perishes entirely, without the fault of the debtor, the obligation is extinguished.

Where the thing has been deteriorated without the fault of the debtor, the creditor has the choice either to avoid the obligation, or to demand the thing in the condition in which it is, without any price reduction.

Where the thing has been deteriorated through fault of the debtor, the creditor has the right either to avoid the obligation, or to demand the thing in the condition in which it is, with damages.

Paragraph 3
Of Condition Subsequent                                                                                 Articles 1183 to 1184

**Art. 1183**

A condition subsequent is one which, when it is fulfilled, brings about the revocation of the obligation, and which puts things back in the same condition as if the obligation had not existed.

It does not suspend the fulfilment of the obligation; it only compels the creditor to return what he has received, in the case where the event contemplated by the condition happens.

**Art. 1184**

A condition subsequent is always implied in synallagmatic contracts, for the case where one of the two parties does not carry out his undertaking.

In that case, the contract is not avoided as of right. The party towards whom the undertaking has not been fulfilled has the choice either to compel the other to fulfil the agreement when it is possible, or to request its avoidance with damages.

Avoidance must be applied for in court, and the defendant may be granted time according to circumstances.

SECTION II
Of Obligations with a Term                                                                              Articles 1185 to 1188

**Art. 1185**

A term differs from a condition, in that it does not suspend the undertaking, of which it only delays the fulfilment.

**Art. 1186**

What is due only with a term may not be claimed before the expiry of the term; but what was paid in advance may not be recovered.

**Art. 1187**

A term is always presumed stipulated in favour of the debtor, unless it follows from the stipulation, or from the circumstances, that it was also agreed in favour of the creditor.

CIVIL CODE

**Art. 1188**

*(Act no 85-98 of 25 Jan. 1985)*

A debtor may no longer claim the benefit of a term where by his own act he has lessened the guarantees which he had given his creditor by the contract.

SECTION III

Of Alternative Obligations                                                                    Articles 1189 to 1196

**Art. 1189**

The debtor of an alternative obligation is discharged by the delivery of one of the two things which were included in the obligation.

**Art. 1190**

The choice belongs to the debtor, where it was not expressly granted to the creditor.

**Art. 1191**

A debtor may discharge himself by delivering one of the things promised; but he may not compel the creditor to receive a part of one and a part of the other.

**Art. 1192**

An obligation is outright, although contracted in an alternative manner, where one of the two things promised could not be the subject matter of the obligation.

**Art. 1193**

An alternative obligation becomes outright, where one of the things promised perishes and may no longer be delivered, even through the fault of the debtor. The price of that thing may not be offered in its place.

Where both have perished, and the debtor is at fault as to one of them, he shall pay the price of the one which has perished last.

**Art. 1194**

Where, in the cases provided for in the preceding Article, the choice was conferred to the creditor under the agreement,

Either one of the things only has perished; and then, if it is without fault of the debtor, the creditor shall have the one which remains; if the debtor is at fault, the creditor may demand the thing which remains, or the price of the one which has perished;

Or both things have perished; and then, if the debtor is at fault as to both, or even only as to one of them, the creditor may demand the price of one or the other, at his choice.

**Art. 1195**

Where both things have perished without the fault of the debtor, and before he was put in default, the obligation is extinguished, in accordance with Article 1302.

**Art. 1196**

The same principles shall apply in case there are more than two things included in the alternative obligation.

SECTION IV

Of Joint and Several Obligations                                                          Articles 1197 to 1216

Paragraph 1

Of Joint and Several Creditors                                                             Articles 1197 to 1199

**Art. 1197**

An obligation is joint and several between several creditors, where the instrument of title expressly gives to each of them the right to demand payment of the whole claim, and payment made to one of them discharges the debtor, although the benefit of the obligation is to be partitioned and divided between the various creditors.

**Art. 1198**

It is at the choice of the debtor to pay one or another of joint and several creditors , so long as he is not prevented by legal proceedings instituted by one of them.

Nevertheless, a release given by only one of the joint and several creditors discharges the debtor only for the share of that creditor.

**Art. 1199**

An act which interrupts the running of the statute of limitation with respect to one of the joint and several creditors benefits the other creditors.

Paragraph 2

Of Joint and Several Debtors                                                             Articles 1200 to 1216

**Art. 1200**

There is joint and several liability on the part of debtors where they are bound for a same thing, so that each one may be compelled for the whole, and payment made by one alone discharges the others towards the creditor.

CIVIL CODE

**Art. 1201**

An obligation may be joint and several although one of the debtors is bound differently from another for payment of the same thing; for instance, where one is bound only conditionally, whereas the other's undertaking  is outright, or where one has been given time which has not been granted to the other.

**Art. 1202**

Joint and several liability may not be presumed: it must be expressly stipulated.

This rule only ceases in the cases where joint and several liability exists as a matter of right, under a statutory provision.

**Art. 1203**

A creditor of an obligation contracted jointly and severally may apply to the one of the debtors he wishes to choose, without the latter being allowed to set up the benefit of division.

**Art. 1204**

Proceedings brought against one of the debtors do not prevent the creditor from instituting similar ones against the others.

**Art. 1205**

Where a thing due has perished through the fault of one or several of the joint and several debtors or after they were given notice of default, the other debtors are not discharged from the obligation to pay the price of the thing; but they are not liable for damages.

The creditor may only recover damages from the debtors through whose fault the thing has perished or from those who were under notice of default.

**Art. 1206**

Proceedings instituted against one of the joint and several debtors interrupts the running of the statute of limitation with respect to all.

**Art. 1207**

A demand for interest brought against one of the joint and several debtors causes interest to run with respect to all.

**Art. 1208**

A joint and several co-debtor sued by the creditor may set up all the defences which result from the nature of the obligation, and all those which are personal to him, as well as those which are common to all the co-debtors.

He may not set up defences which are purely personal to some of the other co-debtors.

**Art. 1209**

Where one of the debtors becomes the sole heir of the creditor, or where the creditor becomes the sole heir of one of the debtors, the merger extinguishes the joint and several claim only for the share and portion of the debtor or of the creditor.

**Art. 1210**

A creditor who consents to a division of the debt with respect to one of the co-debtors retains his joint and several action against the others, but only under deduction of the share of the debtor whom he has discharged from the joint and several liability.

**Art. 1211**

A creditor who receives severally the share of one of his debtors, without reserving in the receipt the joint and several liability or his rights in general, renounces joint and several liability only with respect to this debtor.

A creditor is not deemed to release the debtor from the joint and several liability where he receives from him a sum equal to the portion for which he is bound, where the receipt does not mention that it is for his share.

It shall be likewise as to a mere claim brought against one of the debtors for his share, where the latter has not admitted the claim, or where  no compensatory judgment has been handed down.

**Art. 1212**

A creditor who receives severally and without reservation from one the co-debtors his portion in the arrears or interest on the debt, loses the joint and several liability only for the arrears or interest due, not for those to become due or for the capital, unless the several payment has been continuing for ten consecutive years.

**Art. 1213**

An obligation contracted jointly and severally towards a creditor is divided by operation of law between the debtors, who are  liable between themselves only each one for his share and portion.

**Art. 1214**

The co-debtor of a joint and several obligation, who paid it in full, may recover from the others only the share and portion of each one of them.

Where one of them is insolvent, the loss occasioned by his insolvency shall be apportioned pro rata between all the other solvent co-debtors and the one who made the payment.

**Art. 1215**

In case the creditor waives the joint and several action with respect to one of the debtors, if one or several of the

CIVIL CODE

other co-debtors become insolvent, the portion of those insolvent shall be apportioned pro rata between all the debtors, even between those previously discharged from the joint and several liability by the creditor.

**Art. 1216**

Where the affair for which the debt was contracted jointly and severally concerns only one of the joint and several co-obligors, the latter are liable for the whole debt towards the other co-debtors, who must be considered with regard to him only as his sureties.

SECTION V
Of Divisible and Indivisible Obligations                              Articles 1220 to 1219

**Art. 1217**

An obligation is divisible or indivisible according to whether its object is a thing which in its delivery, or an act which in its performance, is or not susceptible of a division either physical or intellectual.

**Art. 1218**

An obligation is indivisible, although the thing or act which is its object is divisible by its nature, where the way in which it is considered in the obligation does not render it susceptible to part performance.

**Art. 1219**

A stipulated joint and several liability does not give the character of indivisibility to an obligation.

Paragraph 1
Of the Effects of Divisible Obligations                              Articles 1220 to 1221

**Art. 1220**

An obligation which is susceptible of being divided must be performed between the creditor and the debtor as though it were indivisible. Divisibility operates only as to their heirs, who may claim the debt or are bound to pay it only for the shares which they receive or for which they are liable as representing the creditor or the debtor.

**Art. 1221**

The principle established in the preceding Article is subject to exceptions, with regard to the heirs of a debtor:
1° Where the debt is secured by a mortgage;
2° Where it is of a thing certain;
3° Where it is a question of an alternative debt of things at the choice of the creditor, of which one is indivisible;
4° Where one of the heirs is made alone responsible, by the instrument of title, of the performance of the obligation;
5° Where it results, either from the nature of the undertaking, or from the thing which is the object of it, or from the purpose intended in the contract, that the intention of the contracting parties was that the debt should not be partially discharged.

In the first three cases, the heir who possesses the thing due or the tenement mortgaged for the debt may be sued for the whole on the thing due or on the tenement mortgaged, subject to his remedy against his co-heirs. In the fourth case, the heir who is alone responsible for the debt, and in the fifth case, each heir, may also be sued for the whole, subject to his remedy against his co-heirs.

Paragraph 2
Of the Effects of Indivisible Obligations                              Articles 1222 to 1225

**Art. 1222**

Each one of those who have jointly contracted an indivisible debt is liable for the whole, although the obligation was not contracted jointly and severally.

**Art. 1223**

It shall be likewise with regard to the heirs of a person who has contracted such an obligation.

**Art. 1224**

Each heir of the creditor may demand performance of an indivisible obligation in whole.

He may not release alone the whole debt; he may not receive alone the price instead of the thing. Where one of the heirs has alone released the debt or received the price of the thing, his co-heir may claim the indivisible thing only by taking into account the portion of the co-heir who has given the release or received the price.

**Art. 1225**

An heir of the debtor, who is sued for the whole obligation, may request time for joining his co-heirs in the action, unless the debt is of such a nature that it can be discharged only by the sued heir, against whom judgment may then be given, subject to his remedy for compensation against his co-heirs.

SECTION VI
Of Obligations with Penalty Clauses                              Articles 1226 to 1233

**Art. 1226**

A penalty is a clause by which a person, in order to ensure performance of an agreement, binds himself to something in case of non-performance.

CIVIL CODE

**Art. 1227**

Nullity of the principal obligation involves that of the penalty clause.
Nullity of the latter does no involve that of the principal obligation.

**Art. 1228**

A creditor, instead of claiming the penalty stipulated against the debtor who is under notice of default, may proceed with the performance of the principal obligation.

**Art. 1229**

A penalty clause is a compensation for the damages which the creditor suffers from the non-performance of the principal obligation.
He may not claim at the same time the principal and the penalty, unless it was stipulated for a mere delay.

**Art. 1230**

Whether the original obligation contains, or not a term within which it must be performed, the penalty is incurred only where the one who is bound either to deliver, or to take, or to do, is under notice of default.

**Art. 1231**

*(Act no 75-597 of 9 July 1975)*
Where an undertaking has been performed in part, the agreed penalty may", even of his own motion," (Act no 85-1097 of 11 Oct. 1985) be lessened by the judge in proportion to the interest which the part performance has procured for the creditor, without prejudice to the application of Article 1152. Any stipulation to the contrary shall be deemed  not written.

**Art. 1232**

Where an original obligation contracted with a penalty clause relates to an indivisible thing, the penalty is incurred by the breach of only one of the heirs of the debtor, and it may be claimed, either for the whole against the person in breach, or against each of the co-heirs for their share and portion, and by mortgage for the whole, subject to their remedy against the one who caused the penalty to be incurred.

**Art. 1233**

Where an original obligation contracted under a penalty is divisible, the penalty is incurred by the one of the debtor's heirs who contravenes that obligation, and for the share only for which he was bound in the principal obligation, without there being any action against those who have performed it.

An exception is made to this rule where the penalty clause having been added for the purpose that payment may not be made partially, a co-heir has prevented the performance of the obligation in whole. In that case, the entire penalty may be claimed against him, and against the other co-heirs for their portion only, and subject to their remedy.

CHAPTER V
Of the Extinguishment of Obligations                    Articles 1235 to 1234

**Art. 1234**

Obligations are extinguished:
By payment;
By novation;
By voluntary release;
By set-off;
By merger;
By the loss of the thing;
By nullity or rescission;
By the effect of a condition subsequent, as was explained in the preceding Chapter; and
By the running of the statute of limitation, which will be the subject matter of a special Title.

SECTION I
Of Payment                    Articles 1235 to 1265 to 1270

Paragraph 1
Of Payment in General                    Articles 1235 to 1248

**Art. 1235**

Any payment supposes a debt: what has been paid without being owed is subject to restitution.
Restitution is not allowed with respect to natural obligations which were voluntarily discharged.

**Art. 1236**

An obligation may be discharged by any person having an interest therein, such as a co-obligee or a surety.
An obligation may even be discharged by a third party who has no interest therein, provided that party acts in the name and on behalf of the debtor, or, where he acts in his own name, he is not subrogated to the rights of the creditor.

**Art. 1237**

CIVIL CODE

An obligation to do may not be discharged by a third party against the wish of the creditor, where the latter has an interest in having it performed by the debtor himself.

**Art. 1238**

In order to pay validly, one must be the owner of the thing given in payment, and be capable of transferring it.

Nevertheless, the  payment of a sum of money or of some other thing which is consumed by use, may not be recovered from a creditor who has consumed it in good faith, although the payment of it was made by a person who was not the owner or who was not capable of transferring it.

**Art. 1239**

Payment must be made to the creditor, or somebody having authority from him, or authorized by the court or by statute to receive for him.

Payment made to a person who has no authority to receive for the creditor, is valid, where the latter ratifies it or has profited by it.

**Art. 1240**

Payment made in good faith to one who was in possession of the claim is valid, even if the possessor is afterwards dispossessed.

**Art. 1241**

Payment made to a creditor is not valid, where he was incapable of receiving it, unless the debtor proves that the thing paid has turned to the advantage of the creditor.

**Art. 1242**

Payment made by a debtor to his creditor, notwithstanding an attachment or a garnishment is not valid, with respect to the attaching or garnishing creditors: the latter may, according to their rights, compel him to pay again, subject, in that case only, to his remedy against the creditor.

**Art. 1243**

A creditor may not be compelled to receive a thing different from the one which is owed to him, although the value of the thing offered is equal or even greater.

**Art. 1244**
*(Act no 91-650 of 9 July 1991)*

A debtor may not compel a creditor to receive  payment in part of a debt, even divisible.

**Art. 1244-1**
*(Act no 91-650 of 9 July 1991)*

However, taking into account the debtor's position and in consideration of the creditor's needs, a judge may, within a two-year limit, defer or spread out the payment of sums due.

By a special judgement, setting out the grounds on which it is based,

, the judge may order that the sums corresponding to the deferred due dates carry interest at a reduced rate which may not be lower than the statutory rate or that the payments be appropriated first to the capital.

Furthermore, he may subordinate those measures to the performance, by the debtor, of acts appropriate for facilitating or guaranteeing the payment of the debt.

The provisions of this Article shall not apply to debts for maintenance.

**Art. 1244-2**
*(Act no 91-650 of 9 July 1991)*

The      judgment handed down under Article 1244-1 stays,  the enforcement proceedings which may have been instituted by the creditor. Increases of interest or penalties incurred because of delay cease to be due during the period fixed by the judge.

**Art. 1244-3**
*(Act no 91-650 of 9 July 1991)*

Any stipulation contrary to the provisions of Articles 1244-1 and 1244-2 shall be deemed not written.

**Art. 1245**

The debtor of a thing certain and determined is discharged by the delivery of the thing in the condition in which it is at the time of delivery, provided that deteriorations which happened to it did not come from his act or his fault, or from that of persons for whom he is responsible, or that before those deteriorations he was not under notice of default.

**Art. 1246**

Where a debt is of a thing determined only as to its kind, a debtor is not obliged to give it in the best of its kind; but he may not offer it in its worst.

**Art. 1247**
*(Ord. no 58-1298 of 23 Dec. 1958)*

Payment must be made in the place designated by the agreement . Where a place is not designated, payment, if it is for a thing certain and determined, must be made at the place where the thing forming the object of the obligation was at the time of that obligation.

CIVIL CODE

Periodical payments ordered for maintenance must be made, subject to a contrary order of the judge, at the domicile or at the residence of the person who is to receive them.

Apart from those cases, payment must be made at the domicile of the debtor.

**Art. 1248**

The costs of payment are borne by the debtor.

Paragraph 2
Of Payment with Subrogation                                                              Articles 1249 to 1252

**Art. 1249**

Subrogation to the rights of a creditor for the benefit of a third person who pays him is either conventional or statutory.

**Art. 1250**

Such subrogation is conventional:

1° Where a creditor receiving his payment from a third person subrogates him to his rights, actions, prior charges or mortgages against the debtor: that subrogation must be express and made at the same time as the payment;

2° Where a debtor borrows a sum for the purpose of paying his debt, and of subrogating the lender to the rights of the creditor. In order that this subrogation be valid, the instrument of loan and the receipt must be drawn up before notaires ; in the instrument of loan there must be declared that the sum was borrowed in order to make the payment, and in the receipt, there must be declared that the payment has been made from the funds furnished for this purpose by the new creditor. That subrogation has its effect without the concurrence of the wish of the creditor.

**Art. 1251**

Subrogation takes place by operation of law:

1° For the benefit of the person who, being himself a creditor, pays another creditor who is preferred to him by reason of his prior charges or mortgages;

2° For the benefit of the purchaser of an immovable, who employs the price of his purchase for the payment of the creditors to whom that property was mortgaged;

3° For the benefit of the person who, being bound with others or for others to the payment of a debt, was interested in discharging it;

4° For the benefit of a beneficiary heir who paid from his own funds the debts of a succession.

**Art. 1252**

The subrogation established by the preceding Articles takes place, as well against sureties as against debtors: it may not prejudice a creditor where he has only been paid in part; in that case, he may enforce his rights, for what remains due to him, in preference to the person from whom he received only part payment.

Paragraph 3
Of Appropriation of Payments                                                              Articles 1253 to 1256

**Art. 1253**

A debtor of several debts has the right to declare, when he pays, what debt he intends to discharge.

**Art. 1254**

A debtor of a debt which bears interest or produces arrears , may not, without the consent of the creditor, appropriate the payment which he makes to the capital in preference to the arrears or interest: a payment made on capital and interest, but which is not in full, shall be appropriated first to interest.

**Art. 1255**

Where a debtor of various debts has accepted a receipt by which the creditor has appropriated what he received to one of those debts in particular, the debtor may no longer request appropriation to a different debt, unless there has been deception or trick on the part of the creditor.

**Art. 1256**

Where a receipt does not bear any appropriation, the payment shall be appropriated to the debt which the debtor had at that time the greatest interest in discharging among those which are likewise due; otherwise, to the debt due, although less burdensome than those which are not.

Where the debts are of equal nature, appropriation shall be made to the oldest; all things being equal, it shall be made proportionately.

Paragraph 4
Of Tenders of Payment and of Deposit                                              Articles 1257 to 1265 to
                                                                                                          1270

**Art. 1257**

Where a creditor refuses to receive his payment, the debtor may make him an actual tender, and upon the refusal of the creditor to accept it, deposit the sum or the thing tendered.

Actual tenders followed by a deposit discharge the debtor; they take the place of payment with respect to him,

CIVIL CODE

where they are validly made, and the thing thus deposited remains at the risk of the creditor.

**Art. 1258**
In order that an actual tender be valid, it is necessary:
1° That it be made to a creditor having capacity to receive, or to the one who has authority to receive for him;
2° That it be made by a person capable of paying;
3° That it be for the entire sum due, for the arrears or interest due, for liquidated costs, and for a sum for non-liquidated costs, subject to its being made up;
4° That the term have elapsed, where it was stipulated in favour of the creditor;
5° That the condition under which the debt has been contracted has happened;
6° That the tender be made at the place agreed upon for payment and that, where there is no special agreement as to the place of payment, it be made either to the person of the creditor, or at his domicile, or at the domicile elected for performance of the agreement;
7° That the tender be made by a ministerial officer having capacity for such acts.

**Art. 1259**
[repealed]

**Art. 1260**
The costs of an actual tender and of a deposit are borne by the creditor, where they are valid;

**Art. 1261**
So long as the deposit has not be accepted by the creditor, the debtor may withdraw it; and where he withdraws it, his co-debtors or his sureties are not discharged.

**Art. 1262**
Where a debtor has himself obtained a judgment become res judicata, which has declared his tender and deposit good and valid, he may no longer, even with the consent of the creditor, withdraw his deposit to the detriment of his co-debtors or of his sureties.

**Art. 1263**
A creditor who has consented to the debtor's withdrawing his deposit after it had been declared valid by a judgment become res judicata, may no longer, for the payment of his claim, enforce the prior charges and mortgages which attached thereto: he has only a mortgage from the day when the act by which he has consented to the withdrawal of the deposit has been clothed with the forms required to establish a mortgage.

**Art. 1264**
Where the thing owed is a thing certain which must be delivered at the place where it is, the debtor must demand of the creditor that he removes it, by notice served upon him personally or to his domicile or to the domicile elected for the performance of the agreement. That demand made, where the creditor does nor remove the thing and the debtor needs the place in which it is set, he may obtain from the court permission to deposit it in some other place.

**Art. 1265 to 1270**
[repealed]

SECTION II
Of Novation                                                                Articles 1271 to 1281

**Art. 1271**
Novation is brought about in three ways:
1° Where a debtor contracts towards his creditor a new debt which is substituted for the old one, which is extinguished;
2° Where a new debtor is substituted for the old one who is discharged by the creditor;
3° Where, by the effect of a new undertaking, a new creditor is substituted for the old one, towards whom the debtor is discharged.

**Art. 1272**
Novation may be brought about only between persons capable of contracting.

**Art. 1273**
Novation may not be presumed; the wish to bring it about must clearly result from the instrument.

**Art. 1274**
Novation by substitution of a new debtor may be brought about without the assistance of the first debtor.

**Art. 1275**
A delegation by which a debtor gives a creditor another debtor who binds himself towards the creditor, does not bring about a novation, unless the creditor has expressly declared that he intended to discharge his debtor who made the delegation.

**Art. 1276**
A creditor who has discharged a debtor by whom a delegation was made, has no remedy against that debtor, where

CIVIL CODE

the delegate becomes insolvent, unless the instrument contains an express reserve or the delegate was already [under a judicial arrangement], or insolvent at the time of the delegation.

**Art. 1277**

A mere indication, made by a debtor, of a person who is to pay in his stead, does not bring about a novation.

It shall be likewise as to a mere indication made by a creditor, of a person who is to receive for him.

**Art. 1278**

Prior charges and mortgages of a former claim do not pass to the one which is substituted to it, unless the creditor has expressly reserved them.

**Art. 1279**

Where novation is brought about by substitution of a new debtor, the original prior charges and mortgages of the claim do not pass on the property of the new debtor.

(Act no 71-579 of 16 July 1971) The original prior charges and mortgages of the claim may be reserved with the consent of the owners of the encumbered property, for the guarantee of the performance of the undertaking of the new debtor.

**Art. 1280**

Where novation is brought about between a creditor and one of the joint and several debtors, the prior charges and mortgages of the former claim may be reserved only on the property of the person who contracts the new debt.

**Art. 1281**

Co-debtors are released by a novation made between a creditor and one of the joint and several debtors.

A novation brought about with respect to a principal debtor discharges the sureties.

Nevertheless, where a creditor in the first case, has required adhesion of the co-debtors or, in the second case, that of the sureties, the former claim subsists, where the co-debtors or the sureties refuse to agree to the new arrangement.

SECTION III

Of Remission of Debt                                                                                   Articles 1282 to 1288

**Art. 1282**

A voluntary remittance of the original instrument under private signature, by a creditor to a debtor, is proof of discharge.

**Art. 1283**

A voluntary remittance of the executory copy of the instrument of title establishes a presumption of remission of the debt or of payment, without prejudice to proof of the contrary.

**Art. 1284**

A voluntary remittance of the original instrument under private signature, or of the executory copy of the instrument of title, to one of the joint and several debtors, has the same effect for the benefit of his co-debtors.

**Art. 1285**

A remission or agreed discharge for the benefit of one of the joint and several co-debtors releases all the others, unless the creditor has expressly reserved his rights against the latter.

In that last case, he may recover the debt only after deducting the share of the one to whom he has made the remission.

**Art. 1286**

A remittance of a thing given as "pawn or" (Ord. no 2006-346 of 23 March 2006) pledge does not suffice to establish a presumption of remission of debt.

**Art. 1287**

A remission or agreed discharge granted to a principal debtor releases the sureties;

That granted to a surety does not release the principal debtor;

That granted to one of the sureties does not release the others.

**Art. 1288**

What a creditor has received from a surety to discharge his security shall be appropriated to the debt, and turn to the discharge of the principal debtor and of the other sureties.

SECTION IV

Of Set-Off                                                                                             Articles 1289 to 1299

**Art. 1289**

Where two persons are indebted to each other, set-off is brought about between them and both debts are extinguished, in the manner and in the cases hereafter laid down.

**Art. 1290**

Set-off is brought about as of right by the sole operation of the law, even without the knowledge of the debtors; the two debts are reciprocally extinguished, from the moment when they happen to exist at the same time, to the extent of

CIVIL CODE

their respective amounts.

**Art. 1291**

Set-off takes place only between two debts which have likewise as their object a sum of money or a certain quantity of fungibles of the same kind and which are likewise liquid and due.

Performances in crops or commodities which are undisputed and whose price is fixed by market lists, may be set off against liquid and due sums.

**Art. 1292**

Days of grace are not a bar to set-off.

**Art. 1293**

Set-off takes place whatever the origin of either debt may be, except in the case:

1° Of a claim for restitution of a thing of which the owner has been unjustly deprived;

2° Of a claim for restitution of a deposit or of a loan for use;

3° Of a debt due for maintenance declared not liable to attachment.

**Art. 1294**

A surety may raise set-off for what the creditor owes to the principal debtor.

But a principal debtor may not raise set-off for what the creditor owes to the surety.

Similarly, a joint and several debtor may not raise set-off for what the creditor owes to his co-      debtor.

**Art. 1295**

A debtor who has accepted outright the assignment which a creditor made of his rights to a third party may no longer raise against the assignee a set-off which he might have raised against the assignor before the acceptance.

With regard to an assignment which was not accepted by the debtor, but notice of which has been served upon him, it prevents only set-off as to claims subsequent to that notice

**Art. 1296**

Where the two debts are not payable at the same place, set-off may be raised only by giving satisfaction as to the costs of delivery.

**Art. 1297**

Where several debts due by the same person may be set off , the same rules are followed as to set-off as those established for appropriation by Article 1256.

**Art. 1298**

Set-off may not take place to the detriment of the vested rights of third parties. Thus, a person who, being a debtor, has become a creditor after an attachment has been made in his hands by a third party may not raise set-off to the detriment of the attaching party.

**Art. 1299**

He who has paid a debt which was extinguished as of right by set-off may no longer, by enforcing the claim for which he has not raised set-off, avail himself of the prior charges or mortgages attached thereto, to the detriment of third parties, unless he had good reason for not being aware of the claim which would have set off his debt.

SECTION V

Of Merger                                                                               Articles 1300 to 1301

**Art. 1300**

Where the capacities of creditor and debtor are united in the same person, a merger is made as of right which extinguishes both claims.

**Art. 1301**

A merger which is brought about in the person of a principal debtor benefits his sureties;

That which is brought about in the person of a surety does not involve extinguishment of the principal obligation ;

That which is brought about in the person of a creditor, benefits his joint and several co-debtors only as to the share and portion of which he was debtor.

SECTION VI

Of the Loss of a Thing Due                                                             Articles 1302 to 1303

**Art. 1302**

Where a thing certain and determined which was the object of an obligation perishes, may no longer be the subject matter of legal transactions between private individuals, or is lost in such a way that its existence is absolutely unknown, the obligation is extinguished if the thing has perished or has been lost without the fault of the debtor, and before he was under notice of default.

Even where the debtor is under notice of default, if he has not assumed fortuitous events, the obligation is extinguished in the case where the thing would also have perished in the hands of the creditor if it had been delivered to him.

The debtor is obliged to prove the fortuitous event which he alleges.

CIVIL CODE

In whatever manner a thing which has been stolen may have perished, or been lost, its loss does not excuse the person who took it away from restitution of its price.

**Art. 1303**

Where a thing perishes, may no longer be the subject matter of legal transactions between private individuals, or is lost, without the fault of the debtor, he is obliged, if there are any rights or actions for indemnity with respect to that thing, to assign them to his creditor.

SECTION VII

Of the Action for Annulment or Rescission of Agreements                    Articles 1304 to 1314

**Art. 1304**

*(Act no 68-05 of 3 Jan . 1968)*

In all cases where an action for annulment or rescission of an agreement is not limited to a shorter time by a special statute, that action lasts five years.

In case of duress, that time runs only from the day when it has ceased; in case of error or deception, from the day when they were discovered.

As regards transactions entered into by a minor, the time runs only from the day of majority or emancipation; and as regards transactions entered into by a protected adult, from the day when he had knowledge of them, while being in a situation to validly redo them. It runs against the heirs of a person under a disability only from the day of the death, unless it has begun to run previously.

**Art. 1305**

*(Act no 64-1230 of 14 Dec. 1964)*

A mere loss gives rise to rescission in favour of a non-emancipated minor, with respect to all kinds of agreements.

**Art. 1306**

A minor is not entitled to rescission on the ground of loss, where it results only from a casual and unforeseen event.

**Art. 1307**

-A mere declaration of majority, made by a minor, is not a bar to rescission.

**Art. 1308**

*(Act no 74-631 of 5 July 1974)*

A minor who practises a profession is not entitled to rescission against undertakings which he has taken upon himself in the practice thereof.

**Art. 1309**

A minor is not entitled to rescission against the terms contained in his ante-nuptial agreement where they were made with the consent and assistance of those whose consent is required for the validity of his marriage.

**Art. 1310-**

He is not entitled to rescission against the obligations resulting from his intentional or unintentional wrongs.

**Art. 1311**

He is no longer allowed to repudiate an undertaking which he had entered into during his minority where he has ratified it when an adult, whether that undertaking was void in its form, or only subject to rescission.

**Art. 1312**

*(Act of 18 Feb. 1938)*

Where minors or adults in guardianship are entitled in those capacities to rescission against their undertakings, the repayment of what may have been paid during the minority or the guardianship of adults in consequence of those undertakings, may not be demanded, unless it is proved that what has been paid has turned to their benefit.

**Art. 1313**

Adults are entitled to rescission for loss only in the cases and subject to the conditions specially laid down in this Code.

**Art. 1314**

Where the formalities required with regard to minors or adults in guardianship either for the conveyance of an immovable, or for the partition of a succession, have been fulfilled, they shall be, in relation to those transactions, considered as though they had made them during majority or before the guardianship of adults.

CHAPTER VI

Of the Proof of Obligations and of Payment                    Articles 1316 to 1315-1

**Art. 1315**

A person who claims the performance of an obligation must prove it.

Reciprocally, a person who claims to be released must substantiate the payment or the fact which has produced the extinguishment of his obligation.

**Art. 1315-1**

CIVIL CODE
*(Act no 2000-230 of 13 March 2000)*
The rules relating to documentary evidence, oral evidence, presumptions, admissions of parties and oaths are explained in the following Sections.

| | |
|---|---|
| SECTION I | |
| Of Documentary Evidence | Articles 1316 to 1340 |
| | |
| Paragraph 1 | |
| General Provisions | Articles 1316 to 1316-4 |

**Art. 1316**
Documentary evidence, or evidence in writing, results from a sequence of letters, characters, figures or of any other signs or symbols having an intelligible meaning, whatever their medium and the ways and means of their transmission may be.

**Art. 1316-1**
A writing in electronic form is admissible as evidence in the same manner as a paper-based writing, provided that the person from whom it proceeds can be duly identified and that it be established and stored in conditions calculated to secure its integrity.

**Art. 1316-2**
Where a statute has not fixed other principles, and failing a valid agreement to the contrary between the parties, the judge shall regulate the conflicts in matters of documentary evidence by determining by every means the most credible instrument, whatever its medium may be.

**Art. 1316-3**
An electronic-based writing has the same probative value as a paper-based writing.

**Art. 1316-4**
The signature necessary to the execution of a legal transaction identifies the person who apposes it. It makes clear the consent of the parties to the obligations which flow from that transaction. When it is apposed by a public officer, it confers authenticity to the document.
Where it is electronic, it consists in a reliable process of identifying which safeguards its link with the instrument to which it relates. The reliability of that process shall be presumed, until proof to the contrary, where an electronic signature is created, the identity of the signatory secured and the integrity of the instrument safeguarded, subject to the conditions laid down by decree in Conseil d'État.

| | |
|---|---|
| Paragraph 2 | |
| Of Authentic Instruments | Articles 1317 to 1321-1 |

**Art. 1317**
An authentic instrument is one which has been received by public officers empowered to draw up such instruments at the place where the instrument was written and with the requisite formalities.
(Act no 2000-230 of 13 March 2000) It may be drawn up on an electronic medium where it is established and stored in conditions fixed by decree in Conseil d'État.

**Art. 1318**
An instrument which is not authentic because of the lack of power or incapacity of the officer, or of a defect in form, has the value of a private instrument, if it was signed by the parties.

**Art. 1319**
An authentic instrument is conclusive evidence of the agreement it contains between the contracting parties and their heirs or assigns.
Nevertheless in case of a criminal complaint for forgery, the execution of the instrument allegedly forged is suspended by the indictment; and in case of allegation of forgery made incidentally, the courts may, according to the circumstances, suspend temporarily the execution of the instrument.

**Art. 1320**
An instrument, either authentic, or under private signature, is evidence between the parties, even of what is expressed only in declaratory terms, provided the declaration has a direct connection with the operative part. Declarations irrelevant to the operative part may only be used as a commencement of proof.

**Art. 1321**
Counter letters may be effective only between the contracting parties; they may not be effective against third parties.

**Article 1321-1**
*(Ord. no 2005-1512 of 7 Dec. 2005)*
Is void and of no effect a counter letter whose purpose is an increase in the price stipulated in the agreement of transfer of an office ministériel and any contract whose purpose is to conceal part of the selling price of an immovable or the price of the transfer of business assets or of a goodwill or of the transfer of a right to a lease or of the benefit of an

CIVIL CODE

undertaking to lease relating to the whole or part of an immovable and the whole or part of the balance of a barter or of a partition including immovables, business assets or a goodwill.

Paragraph 3
Of Instruments under Private Signature                                    Articles 1322 to 1332

**Art. 1322**

An instrument under private signature, acknowledged by the person against whom it is set up, or statutorily held as acknowledged, is, between those who have signed it and between their heirs and assigns, as conclusive as an authentic instrument.

**Art. 1323**

A person against whom an instrument under private signature is set up is obliged to formally admit or disclaim his handwriting or his signature.

His heirs or assigns may confine themselves to declare that they are not aware of the handwriting or the signature of their predecessor in title.

**Art. 1324**

In the case where the party disclaims his handwriting or his signature, and in the case where his heirs or assigns declare that they are not aware of them, a verification shall be ordered in court.

**Art. 1325**

Instruments under private signature which contain synallagmatic agreements are valid only insofar as they have been made in as many originals as there are parties having a distinct interest.

One original suffices for all the persons who have the same interest.

Each original must indicate the number of originals which have been made.

Nevertheless, a failure to mention that the originals have been made in duplicate, triplicate, etc., may not be set up by the party who has performed on his part the agreement entered  on the instrument.

(Ord. no 2005-674 of 16 June 2005) The requirement of a plurality of originals  is deemed to be met with respect to contracts in electronic form where the instrument is established and stored as provided in Articles 1316-1 and 1316-4 and the process allows each party to dispose of a copy or have access thereto.

**Art. 1326**

*(Act no 80-525 of 12July 1980)*

The legal transaction by which one party alone undertakes towards another to pay him a sum of money or to deliver him a fungible must be ascertained in an instrument which carries the signature of the person who subscribes that undertaking as well as the mention, written "by himself" (Act no 2000-230 of 13 March 2000), of the sum or of the quantity in full and in figures. In case of difference, the instrument under private signature is valid for the sum written in full.

**Art. 1327**

[repealed]

**Art. 1328**

Instruments under private signature have a date against third parties only from the day when they have been registered, from the day of the death of the one or one of those who have signed them, or from the date when their gist is established in instruments drawn up by public officers, such as memoranda of sealing or of inventory.

**Art. 1329**

The registers of merchants are not evidence of the supplies therein mentioned against  persons who are not merchant, except for what will be stated with regard to oaths.

**Art. 1330**

The books of merchants are evidence against them; but he who wishes to take advantage from them may not separate from them what they contain contrary to his claim.

**Art. 1331**

Family registers and papers do not constitute an instrument of title for the one who wrote them. They are evidence against him: 1° in all cases where they formally state a payment received ; 2° where they contain an express mention that the entry has been made to make good a defect of the instrument in favour of the person in whose benefit they state an obligation.

**Art. 1332**

A writing made by a creditor at the end, in the margin or on the back of an instrument who has always remained in his possession, is evidence, although not signed or dated by him, where it tends to establish the discharge of the debtor.

It shall be likewise with a writing made by a creditor on the back, or in the margin, or at the end of the duplicate of an instrument or of a receipt, provided that duplicate is in the hands of the debtor.

Paragraph 4
Of Tallies                                                                    Article 1333

CIVIL CODE
**Art. 1333**

Tallies corresponding to their samples are evidence between persons who are in the practice of thus establishing the supplies they furnish or receive in retail.

Paragraph 5
Of Copies of Instruments                                                                                            Articles 1334 to 1336

**Art. 1334**

Where the original instrument is still extant, copies are evidence only of what is contained in the instrument, whose production may always be required.

**Art. 1335**

Where the original instrument no longer exists, copies are evidence according to the following distinctions:

1° Executory or first office copies are evidence as the original is: it shall be likewise with the copies which have been made under the authority of the court, the parties being present or duly summoned, or with those which have been made in the presence of the parties and by their mutual consent.

2° Copies which, without the authority of the court or without the consent of the parties and since the delivery of the executory or first office copies, have been made from the original of the instrument by the notaire who received it, or by one of his successors, or by public officers who, in such capacity, are depositaries of the originals, may, in case or loss of the original, be evidence when they are ancient.

They shall be deemed ancient where they are more than thirty years old.

Where they are less than thirty years old, they may only be used as a commencement of proof in writing.

3° Where the copies made from the original of an instrument were done by the notaire who received it, or by one of his successors, or by public officers who, in such capacity, are depositaries of the originals, they may be used, however ancient they may be, only as a commencement of proof in writing.

4° Copies of copies may, according to the circumstances, be considered as mere information.

**Art. 1336**

The registration of an instrument on public registers may only be used as a commencement of proof in writing; and even for that purpose it shall be necessary :

1° That it be certain that all the originals of the notaire, of the year in which the instrument appears to have been made, are lost, or that one proves that the loss of the original occurred through a particular accident;

2° That there exist an orderly list of the notaire, which establishes that the instrument was made at the same date.

Where, owing to the concurrence of these two circumstances oral evidence is admitted, those who were witnesses to the instrument shall be heard, if they are still alive.

Paragraph 6
Of Instruments of Recognition and of Confirmation                                        Articles 1337 to 1340

**Art. 1337**

Instruments of recognition do not relieve from the production of the original instrument, unless its terms are specially stated therein.

What they may contain in addition to the original instrument, or what is different therein, has no effect.

Nevertheless, where there are several consistent recognitions, supported by possession, and of which one dates back thirty years, the creditor may be relieved from producing the original instrument.

**Art. 1338**

An instrument of confirmation or ratification of an obligation against which legislation allows an action for annulment or rescission is valid only where are found therein the gist of that obligation, mention of the ground of the action for rescission, and the intention to cure the defect upon which that action is based.

Failing an instrument of confirmation or ratification, it is sufficient that the obligation be performed voluntarily after the time when the obligation might be validly performed or ratified.

Confirmation, ratification, or voluntary performance in the forms and at the time determined by law, implies waiver of the grounds and exceptions which might be raised against that instrument, without prejudice however to the rights of third parties.

**Art. 1339**

A donor may not cure by any act of confirmation the defects of a gift inter vivos, void as to form: it must be remade in the form prescribed by law.

**Art. 1340**

Confirmation or ratification, or voluntary performance of a gift by the heirs or assigns of a donor, after his death, implies that they waive their right to raise either the defects in form or any other defences.

SECTION II
Of Oral Evidence                                                                                            Articles 1341 to 1348

**Art. 1341**
*(Act no 80-525 of 12 July 1980)*

An instrument before notaires or under private signature must be executed in all matters exceeding a sum or value

CIVIL CODE

fixed by decree1, even for voluntary deposits, and no proof by witness is allowed against or beyond the contents of instruments, or as to what is alleged to have been said before, at the time of, or after the instruments, although it is a question of a lesser sum or value.

All of which without prejudice to what is prescribed in the statutes relating to commerce.

1 D. no 80-533 of 15 July 1980 : 5 000 F (800 €)

**Art. 1342**
*(Act no 80-525 of 12 July 1980)*
The above rule shall apply where an action contains, in addition to a claim for capital, a claim for interest which, added to the capital, exceeds the figure provided for in the preceding Article.

**Art. 1343**
*(Act no 80-525 of 12 July 1980)*
A person who has brought a claim exceeding the figure provided for in Article 1341 may no longer be allowed to produce oral evidence, even by reducing his original claim.

**Art. 1344**
*(Act no 80-525 of 12 July 1980)*
Oral evidence may not be allowed on a claim for a sum even lesser than that which is provided for in Article 1341, where that sum is declared to be the balance or to form part of a larger claim which is not proved in writing.

**Art. 1345**
*(Act no 80-525 of 12 July 1980)*
Where, in the same proceedings, a party asserts several claims for which he has no written instrument, and where, joined together, they exceed the sum provided for in Article 1341, oral evidence of them may not be allowed, although the party alleges that those claims come from different origins and that they were formed at different times, unless those rights are derived from succession, gift or otherwise, from different persons.

**Art. 1346**
All claims, whatever their ground may be, which are not fully justified in writing, shall be brought by the same process, after which the other claims of which there is no written evidence may not be received.

**Art. 1347**
The above rules are subject to exception where there exists a commencement of proof in writing.
Is so called any instrument in writing which emanates from the person against whom a claim is brought, or from the person he represents, and which makes probable the alleged fact.
(Act no 75-596 of 9 July 1975) May be considered by the judge as equivalent to a commencement of proof in writing the declarations made by a party at the time of his personal examination, his refusal to answer or his absence at the examination .

**Art. 1348**
*(Act no 80-525 of 12 July 1980)*
The above rules are also subject to exceptions where the obligation arises from a quasi-contract, an intentional or unintentional wrong, or where one of the parties either did not have the material or moral possibility to procure a written proof of a legal transaction, or has lost the instrument which served him as written proof in consequence of a fortuitous event or of force majeure.
They are also subject to exceptions where a party or a depositary has not kept the original instrument and presents a copy which is a reproduction that is not only faithful but also enduring. Is deemed enduring an indelible reproduction of the original which involves a non-reversible alteration of the medium.

SECTION III
Of Presumptions                                                                                    Articles 1350 to 1349

**Art. 1349**
Presumptions are the consequences that a statute or the court draws from a known fact to an unknown fact.

Paragraph 1
Of Presumptions Established by Statute                                          Articles 1350 to 1352

**Art. 1350**
A statutory presumption is one which is attached by a special statute to certain transactions or to certain facts; such as:
1° The transactions which a statute declares void, as presumed made in fraud of its provisions, from their nature alone;
2° The cases in which a statute declares ownership or discharge to result from certain determined circumstances;
3° The authority which law gives to res judicata;
4° The force which law attaches to an admission of a party or to his oath.

**Art. 1351**
The force of res judicata  takes place only with respect to what was the subject matter of a judgment. It is necessary

CIVIL CODE

that the thing claimed be the same; that the claim be based on the same grounds; that the claim be between the same parties and brought by them and against them in the same capacity.

**Art. 1352**

A statutory presumption dispenses from any proof him in whose favour it exists.

No proof is allowed against a statutory presumption, where, on the basis of such presumption, the law annuls certain transactions or denies a right of action, unless it reserves contrary evidence and subject to what will be said on judicial oath and admissions.

Paragraph 2
Of Presumptions Which are not Established by Statute                    Article 1353

**Art. 1353**

The presumptions which are not established by a statute are left to the insight and carefulness of the judges, who shall only admit serious, precise and concurrent presumptions, and in the cases only where statutes admit oral evidence, unless a transaction is attacked for reason of fraud or deception.

SECTION IV
Of Admissions of a Party                               Articles 1354 to 1356

**Art. 1354**

An admission which is set up against a party is either extra-judicial or judicial.

**Art. 1355**

An allegation of an extra-judicial admission which is purely verbal is useless whenever the claim is one in which oral evidence would not be admissible.

**Art. 1356**

A judicial admission is a declaration which a party or his special agent makes in court.

It is conclusive evidence against him who made it;

It may not be divided against him;

It may not be revoked, unless it is proved that it was the result of an error of fact. It might not be revoked under the pretext of an error of law.

SECTION V
Of Oaths                                               Articles 1358 to 1357

**Art. 1357**

A judicial oath is of two kinds :

1° The one which a party tenders to the other in order to make the judgment of the case depend upon it: it is called decisive ;

2° The one which is tendered by the judge of his own motion to one or another of the parties.

Paragraph 1
Of Decisive Oaths                                      Articles 1358 to 1365

**Art. 1358**

A decisive oath may be tendered in any kind of controversies whatsoever.

**Art. 1359**

It may be tendered only as to a fact which is personal to the party to whom it is tendered.

**Art. 1360**

It may be tendered at all stages of the case and although there exists no commencement of proof in writing of the claim or of the defence in relation to which it is instigated.

**Art. 1361**

A person to whom an oath is tendered, who refuses it or does not consent to tender it back to his opponent, or an opponent to whom it has been tendered back and who refuses it, shall be defeated in his claim or in his defence.

**Art. 1362**

An oath may not be tendered back where the fact to which it relates does not concern both parties, but is purely personal to the one to whom the oath was tendered.

**Art. 1363**

Where an oath tendered or tendered back has been taken, the opponent is not admitted to prove the falsity of it.

**Art. 1364**

The party who has tendered or tendered back an oath may no longer retract where the opponent has declared that he is ready to take the oath.

**Art. 1365**

An oath is evidence only for the benefit of the person who has tendered it or against him, and for the benefit of his

CIVIL CODE

heirs and assigns or against them.

Nevertheless an oath tendered by one of the joint and several creditors to a debtor discharges the latter only for the share of that creditor;

An oath tendered to a principal debtor discharges also the sureties;

The one tendered to one of the joint and several debtors benefits the co-debtors;

And the one tendered to a surety benefits the principal debtor.

In the last two cases, the oath of a joint and several co-debtor or of a surety benefits the other co-debtors or the principal debtor only where it has been tendered in connection with the debt, and not with the circumstance of the joint and several liability or of the security.

Paragraph 2
Of Oaths Tendered by a Judge of his Own Motion                    Articles 1366 to 1369

**Art. 1366**

A judge may tender an oath to one of the party, in order either to make the decision of the case depend upon it, or only to fix the amount of the order.

**Art. 1367**

A judge may tender an oath of his own motion, with reference either to a claim or to a defence set up against it, only subject to the following two conditions; it is necessary:

1° That the claim or the defence be not fully substantiated;

2° That it be not wholly deprived of proof.

Outside those two cases, the judge must either admit or dismiss the claim outright.

**Art. 1368**

An oath tendered by the judge of his own motion to one of the parties may not be tendered back by that party to the other.

**Art. 1369**

An oath as to the value of a thing claimed may be tendered by the judge to the plaintiff only where it is otherwise impossible to establish that value.

Even in that case, the judge must determine the sum up to the amount of which the plaintiff shall be believed on his oath.

CHAPTER VII
Of Contracts in Electronic Form                                   Articles 1369-1 to
                                                                  1369-11

SECTION I
Of the Exchange of Information in case of a Contract in Electronic Form    Articles 1369-1 to
                                                                  1369-3

**Article 1369-1**

Electronic means may be resorted to in order to render contractual terms or information regarding goods or services available.

**Article 1369-2**

Information which is requested for the purpose of concluding a contract or that which is addressed during its performance may be transmitted by electronic mail where their addressee has accepted the use of this means.

**Article 1369-3**

Information aimed at a professional may be addressed to him by electronic mail when he has communicated his electronic address.

Where this information must be entered in a form, the latter one must be made available to the person who has to fill it up, by electronic means.

SECTION II
Of the Conclusion of a Contract in Electronic Form                Articles 1369-4 to
                                                                  1369-6

**Art. 1369-4**

Any person who, in a professional capacity, by electronic means, proposes the delivery of goods or the provision of services, shall make available the applicable contract terms in a way that allows their filing and reproduction. Without prejudice to the conditions of validity specified in the offer, his author shall remain bound by it so long as it is available by electronic means of his own accord.

The offer shall also state:

1° The different steps to follow to conclude the contract by electronic means;

2° The technical means allowing the user to identify and correct input errors before the conclusion of the contract;

3° The languages offered for the conclusion of the contract;

CIVIL CODE

4° In case of filing of the contract, the details of this filing by the author of the offer and the conditions of access to the filed contract;

5° The ways of consulting by electronic means the professional and commercial rules by which the author of the offer has the intention to be bound, should the occasion arise.

**Art. 1369-5**

For the valid conclusion of a contract, the recipient of the offer must have had the possibility of checking the particulars of his order and its whole price, and of correcting possible errors, before confirming it in order to express his acceptance.

The author of the offer shall acknowledge without undue delay and by electronic means the receipt of the order which has been addressed to him in this way.

The order, the confirmation of the acceptance of the offer and the acknowledgement of receipt must be deemed received when the parties to whom they are addressed are able to access them.

**Art. 1369-6**

Exception is made to the obligations referred to in Article 1369-1, 1° to 5°, and in Article 1369-2, paragraphs 1 and 2, in regard to the contracts for the delivery of goods or the provision of services which are concluded exclusively by exchange of electronic mail.

Furthermore, it is permissible to derogate from the provisions of Article 1369-2 and of Article 1369-1, 1° to 5°, in the contracts concluded between professionals.

SECTION III

Of the Sending or Delivering of a Writing by Electronic Means                    Articles 1369-7 to 1369-9

**Article 1369-7**

An ordinary letter relating to the conclusion or performance of a contract may be sent by electronic mail.

The appending of the date of sending shall result from an electronic process whose reliability is presumed, until evidence contrary to it, where it meets the requirements fixed by decree in Conseil d'Etat.

**Article 1369-8**

A charged letter relating to the conclusion or performance of a contract may be sent by electronic mail provided that this mail is dispatched by a third person according to a process which allows to identify that third person, to designate the sender, to ensure the identity of the addressee and to establish whether the letter has been delivered or not to the addressee.

At the option of the sender, the contents of that letter may be printed by the third person on paper in order to be delivered to the addressee or may be addressed to the latter by electronic means. In the latter case, where the addressee is not a professional, he must have requested the sending by that way or have accepted the use of it during previous exchanges.

Where the appending of the date of sending or of receipt results from an electronic process, the reliability of the latter is presumed, until evidence contrary to it, where it meets the requirements fixed by decree in Conseil d'Etat.

An advice of delivery may be addressed to the sender by electronic means or by any other device which allows him to store it.

The details of implementation of this Article shall be fixed by decree in Conseil d'Etat.

**Article 1369-9**

Apart from the cases provided for in Articles 1369-1 and 1369-2, the delivery of a writing in electronic form is actual where the addressee, after being able to make himself acquainted with it, has given advice of its delivery.

Where a provision sets out that a writing must be read to the addressee, the delivery of an electronic writing to the party concerned in the way provided for in paragraph 1 is deemed to be reading .

SECTION IV

Of Certain Requirements as to Form                    Articles 1369-10 to 1369-11

**Article 1369-10**

Where a writing on paper is subject to certain requirements as to legibility and arrangement, a writing in electronic form shall meet equivalent requirements.

The requirement of a detachable form is met by an electronic process which allows to have access to the form and send it back by the same means.

**Article 1369-11**

The requirement of a sending in several copies is deemed to be met in electronic form where the writing may be printed by the addressee.

**TITLE IV**

**OF UNDERTAKINGS FORMED WITHOUT AN AGREEMENT**                    **Articles 1371 to 1370**

**Art. 1370**

CIVIL CODE

Certain undertakings are formed without the intervention of any agreement, either on the part of him who binds himself, or on the part of him towards whom he is bound.

Some of them result from the sole authority of legislation; others arise from an act personal to the one who is obligated.

The former are the undertakings formed involuntarily, such as those between neighbouring owners, or those of guardians and other administrators who may not refuse the duties which are imposed upon them.

Undertakings arising from an act personal to him who is bound result either from quasi- contracts, or from intentional or unintentional wrongs; they constitute the subject-matter of this Title .

CHAPTER I
Of Quasi-Contracts                                                                Articles 1371 to 1381

**Art. 1371**

Quasi-contracts are purely voluntary acts of man, from which there results some undertaking towards a third party, and sometimes a reciprocal undertaking of both parties.

**Art. 1372**

Where one voluntarily manages another's business, whether the owner is aware of the management, or whether he is not, he who manages contracts a tacit undertaking to continue the management which he has embarked on, and to complete it until the owner is in a position to look after it himself; he must also take charge of all the continuations of that business.

He is then subject to all the obligations which would result from an express authority which the owner might have confided to him.

**Art. 1373**

He is bound to continue his management, although the owner  happens to die before the business is achieved , until a heir is able to take over the business.

**Art. 1374**

He is bound to bring to the management of the business all the care of a prudent administrator.

Nevertheless, the circumstances which have led him to take the responsibility of the business may authorize the judge to restrain the damages which would result from the faults or negligent conduct of the manager.

**Art. 1375**

The owner whose business has been well managed must fulfil the undertakings which the manager has contracted in his name, indemnify him for all the personal undertakings into which he has entered and reimburse him for all the useful or necessary expenses which he has incurred.

**Art. 1376**

He who receives by error or knowingly what is not owed to him is bound to make restitution to the person from whom he has unduly received it.

**Art. 1377**

Where a person who, by error, believed himself to be the debtor, pays a debt, he has the right to recovery against the creditor.

Nevertheless, that right ceases where the creditor has cancelled his instrument of title in consequence of the payment, subject to the remedy of the person who has paid against the true debtor.

**Art. 1378**

Where there has been bad faith on the part of the person who received, he is bound to make restitution, of the capital as well as of interest or fruits, from the day of payment.

**Art. 1379**

Where the thing unduly received is an immovable or a tangible movable, the person who has received it binds himself to make restitution in kind, if it exists, or of its value, if it has perished or deteriorated through his fault; he is even guarantor of its loss by fortuitous event, if he received it in bad faith.

**Art. 1380**

Where the person who received in good faith has sold the thing, he must make restitution only of the proceeds of the sale.

**Art. 1381**

The person to whom a thing is restored must account, even to a possessor in bad faith, of all the necessary and useful expenses which have been incurred for the preservation of the thing.

CHAPTER II
Of Intentional and Unintentional Wrongs [Of Torts]                              Articles 1382 to 1386

**Art. 1382**

Any act whatever of man, which causes damage to another, obliges the one by whose fault it occurred, to compensate it.

CIVIL CODE

**Art. 1383**
Everyone is liable for the damage he causes not only by his intentional act, but also by his negligent conduct or by his imprudence.

**Art. 1384**
A person is liable not only for the damages he causes by his own act, but also for that which is caused by the acts of persons for whom he is responsible, or by things which are in his custody.

(Act of 7 Nov. 1922) However, a person who possesses, regardless of the basis thereof,  all or part of a building or of movable property in which a fire has originated is not liable towards third parties for damages caused by that fire unless it is proved that the fire must be attributed to his fault of to the fault of persons for whom he is responsible.

(Act of 7 Nov. 1922) This provision may not apply to the landlord and tenant relationship, which remains governed by Articles 1733 and 1734 of the Civil Code.

(Act no 70-459 of 4 June 1970) The father and mother, in so far as they exercise "parental authority" (Act no 2002-305 of 4 March 2002), are jointly and severally liable for the damage caused by their minor children who live with them.

Masters and employers, for the damage caused by their servants and employees in the functions for which they have been employed;

Teachers and craftsmen, for the damage caused by their pupils and apprentices during the time when they are under their supervision.

(Act of 5 April 1937) The above liability exists, unless the father and mother or the craftsmen prove that they could not prevent the act which gives rise to that liability.

(Act of 5 April 1937) As to teachers, the faults, imprudence or negligent conducts invoked against them as having caused the damaging act must be proved by the plaintiff at the trial, in accordance with the general law.

**Art. 1385**
The owner of an animal, or the person using it, during the period of usage, is liable for the damage the animal has caused, whether the animal was under his custody, or whether it had strayed or escaped.

**Art. 1386**
The owner of a building is liable for the damage caused by its collapse, where it happens as a result of lack of maintenance or of a defect in its construction.

**TITLE IV bis**
**OF LIABILITY FOR DEFECTIVE PRODUCTS**                                      Articles 1386-1 to
                                                                             1386-18

**Art. 1386-1**
A producer is liable for damages caused by a defect in his product, whether he was bound by a contract with the injured person or not.

**Art. 1386-2**
(Act no 2004-1343 of 9 Dec. 2004).- The provisions of this Title shall apply to compensation for damage caused by personal injury.

They shall apply also to compensation for damage above an amount fixed by décret to an item of property other than the defective product itself.

**Art. 1386-3**
A product is any movable, even though incorporated into an immovable, including the products of the soil, of stock-farming, of hunting and fishing. Electricity shall be deemed a product.

**Art. 1386-4**
A product is defective within the meaning of this Title where it does not provide the safety which  a person is entitled to expect.

In order to appraise the safety which a person is entitled to expect, regard shall be had to all the circumstances and in particular to the presentation of the product, the use to which one could reasonably expect that it would be put, and the time when the product was put into circulation.

A product shall not be considered defective for the sole reason that a better product is subsequently put into circulation.

**Art. 1386-5**
A product is put into circulation when the producer has voluntarily parted with it.

A product is put into circulation only once.

**Art. 1386-6**
Is a producer, the manufacturer of a finished product, the producer of a raw material, the manufacturer of a component part, where he acts as a professional.

For the implementation of this Title, shall be treated in the same way as a producer any person acting as a professional:

1° Who presents himself as the producer by putting his name, trade mark or other distinguishing feature on the

CIVIL CODE

product;

2° Who imports a product into the European Community for sale, hire, with or without a promise of sale, or any other form of distribution.

Shall not be deemed producers, within the meaning of this Title, the persons whose liability may be sought on the basis of Articles 1792 to 1792-6 and 1646-1.

**Art. 1386-7**

"A seller, a hirer, with the exception of a finance lessor or a hirer similar to a finance lessor, or any other professional supplier is liable for the lack of safety of a product in the same conditions as a producer only if the latter remains unknown" (Act no 2004-1343 of 9 Dec. 2004).

The remedy of a supplier against a producer is subject to the same rules as a claim brought by a direct victim of a defect. However, he must take action within the year following the date of his being summoned.

**Art. 1386-8**

In case of damage caused by a product incorporated into another, the producer of the component part and the one who has effected the incorporation are jointly and severally liable.

**Art. 1386-9**

The plaintiff is required to prove the damage, the defect and the causal relationship between defect and damage.

**Art. 1386-10**

A producer may be liable for a defect although the product was manufactured in accordance with the rules of the trade or of existing standards or although it was the subject of an administrative authorization.

**Art. 1386-11**

A producer is liable as of right unless he proves:

1° That he did not put the product into circulation;

2° That, having regard to the circumstances, it is probable that the defect which caused the damage did not exist at the time when the product was put into circulation by him or that this defect came into being afterwards;

3° That the product was not for the purpose of sale or of any other form of distribution;

4° That the state of scientific and technical knowledge, at the time when he put the product into circulation, was not such as to enable the existence of the defect to be discovered;  or

5° That the defect is due to compliance with mandatory provisions of statutes or regulations.

The producer of a component part is not liable either where he proves that the defect is attributable to the design of the product in which the component has been fitted or to the directions given by the producer of that product.

**Art. 1386-12**

A producer may not invoke the exonerating circumstance provided for in Article 1386-11, 4°, where damage was caused by an element of the human body or by products thereof.

[repealed]

**Art. 1386-13**

The liability of a producer may be reduced or disallowed where, having regard to all the circumstances, the damage is caused both by a defect in the product and by the fault of the injured person or of a person for whom the injured person is responsible.

**Art. 1386-14**

The liability of a producer towards an injured person shall not be reduced where the act or omission of a third party contributed to the production of the damage.

**Art. 1386-15**

The clauses which tend to exempt from or to limit the liability for defective products are forbidden and shall be deemed not written.

Nevertheless, as to damages caused to property not used by the injured party mainly for his own private use or consumption, the clauses stipulated between professionals are valid.

**Art. 1386-16**

Except for fault of the producer, the liability of the latter, based on the provisions of this Title, shall be extinguished on the expiry of a period of ten years after the actual product which caused the damage was put into circulation, unless the injured person has in the meantime instituted proceedings.

**Art. 1386-17**

An action for the recovery of damages based on the provisions of this Title is time-barred after a period of three years from the date on which the plaintiff knew or ought to have known the damage, the defect and the identity of the producer.

**Art. 1386-18**

The provisions of this Title may not affect any rights which an injured person may have according to the rules of contractual or tort liability or of a special liability system.

A producer remains liable for the consequences of his fault or for that of the persons for whom he is responsible.

CIVIL CODE

**TITLE V**
**OF ANTE-NUPTIAL AGREEMENTS AND OF MATRIMONIAL REGIMES**          **Articles 1387 to 1581**

CHAPTER I
General Provisions                                                  Articles 1387 to 1387-1

**Art. 1387**

Legislation regulates conjugal association, with respect to property, only in default of special agreements, which the spouses may enter into as they deem proper, provided they are not contrary to public morals and to the following provisions.

**Art. 1388**

Spouses may derogate neither to the duties and rights which result for them from  marriage, nor to the rules of parental authority, statutory administration and guardianship.

**Art. 1389**

Without prejudice to gratuitous transfers which may take place according to the forms and in the cases provided for by this Code, spouses may not make any agreement or waiver whose object would be to change the statutory order of successions.

**Art. 1390**

They may, however, stipulate that, at the dissolution of the marriage by the death of one of them, the survivor will have the power to acquire or, should the occasion arise, to have allotted to him or her certain personal property of the first to die, on condition that he or she accounts for it to the succession, according to the value which they have on the day when that power is exercised.

**Art. 1391**

An ante-nuptial agreement shall determine the property to which the power granted to the survivor will relate. It may fix methods of appraisal and terms of payment, except abatement in favour of beneficiary heirs where there is an indirect advantage.

Taking into account those clauses and failing an agreement between the parties, the value of the property shall be fixed by the tribunal de grande instance.

**Art. 1392**

The power granted to the survivor lapses where he did not exercise it, by notice served upon the heirs of the predeceased, within a period of one month after the day when the latter gave him notice to come to a decision. That notice may not take place before the expiry of the period provided for in the Title Of Successions for making an inventory and deliberating.

Where served within that period, the notice generates a sale on the day when the power is exercised or, where appropriate, constitutes a process of partition.

**Art. 1393**

Spouses may declare, in a general way, that they intend to marry under one of the regimes provided for by this Code.

In the absence of special stipulations derogating from the community regime or modifying it, the rules established in the first Part of Chapter II shall constitute the ordinary law of France.

**Art. 1394**

All matrimonial agreements shall be drawn up in an instrument before notaire, in the presence and with the simultaneous consent of all the persons who are parties thereto or of their agents.

At the time of the signature of the agreement, the notaire shall deliver to the parties a certificate on unstamped paper and without costs, stating his name and place of residence, the names, first names, occupations and residences of the future spouses, as well as the date of the ante-nuptial agreement . That certificate shall state that it must be lodged with the officer of civil status before the celebration of the marriage.

Where the record of marriage mentions that an ante-nuptial agreement was not made, the spouses shall be, with regard to third parties, deemed married under the regime of general law, unless, in the transactions entered into with those third parties, they have declared that they made an ante-nuptial agreement.

[repealed by Ord. no 2005-428 of 6 May 2005]

**Art. 1395**

An ante-nuptial agreement must be drawn up before the celebration of the marriage and may take effect only on the day of that celebration.

**Art. 1396**

Amendments made in ante-nuptial agreements before the celebration of the marriage must be established by an instrument drawn up in the same forms. Furthermore, no change or counter-letter is valid without the presence and the simultaneous consent of all the persons who were parties to the ante-nuptial agreement, or of their agents.

Any amendments or counter-letters, even provided with the forms prescribed by the preceding Article, shall be without effect with respect to third parties, unless they were drawn up at the end of the original of the ante-nuptial agreement; and a notaire may deliver neither an executory nor an office copy of the ante-nuptial agreement without

CIVIL CODE

transcribing the amendment or counter-letter at the end.

After the celebration of the marriage, there may be no amendment to the matrimonial regime except by the effect of a judgment, either on the application of one of the spouses, in the case of separation of property or of other judicial protective measures, or on joint petition of both spouses, in the case of the following Article.

**Art. 1397**

After two years of application of a matrimonial regime, either conventional or statutory, the spouses may agree in the interest of the family to amend it or even to change it entirely, by a notarial instrument, which shall be submitted to the approval of the court of their domicile.

All persons who were parties to the modified agreement shall be summoned in the proceedings in approval; but not their heirs, if they have died.

An approved change has effect between the parties from the judgment and, with regard to third parties, three months after mention of it has been entered in the margin of both copies of the record of marriage. However, even failing that mention, an amendment is effective against third parties where, in the transactions entered into with them, the spouses have declared that they have amended their matrimonial regime;

Mention of the judgment of approval shall be made on the original of the amended ante-nuptial agreement.

The application and the decision of approval shall be published on the terms and subject to the penalties provided for in the Code of Civil Procedure [...].

Where there has been a fraud on their rights, creditors may resort to a third party application for revocation of the judgment of approval in the way provided for in the Code of Civil Procedure.

**Art. 1397-1**

(Act no 75-617 of 11 July 1975).-The provisions of the preceding Article shall not apply to the agreements entered into by spouses in the course of divorce proceedings with the view of liquidating their matrimonial regime.

Articles 1450 and"265-2" (Act no 2004-439 of 26 May 2004) shall apply to those agreements.

**Art. 1397-2**

*(Act no 97-987 of 28 Oct. 1997)*

Where spouses specify the law applicable to their matrimonial regime under the Convention on the law applicable to matrimonial regimes, made in The Hague on 14 March 1978, Articles 1397-3 and 1397-4 shall apply.

**Art. 1397-3**

*(Act no 97-987 of 28 Oct. 1997)*

Where the specification of the applicable law is made before the marriage, the future spouses shall present to the officer of civil status either the instrument through which they have operated that specification, or a certificate delivered by the competent person to establish that instrument. A certificate shall state the names and first names of the future spouses, the place where they are living, the date of the instrument of specification, as well as the names, qualifications and residence of the person who has established it.

Where the specification of the applicable law is made in the course of a marriage, the spouses shall have the measures or public notice relating to the specification of the applicable law made subject to the conditions and forms provided for in the new Code of Civil Procedure.

On the occasion of the specification of the applicable law, before the marriage or in its course, the spouses may specify the nature of the matrimonial regime they choose.

[repealed by Ord. no 2005-428 of 6 May 2005]

**Art. 1397-4**

*(Act no 97-987 of 28 Oct. 1997)*

Where the specification of the applicable law is made in the course of a marriage, that specification takes effect between the parties from the establishment of the instrument of specification and, with respect to third parties, three months after the formalities of public notice provided for in Article 1397-3 have been fulfilled.

However, even failing fulfilment of those formalities, the specification of the applicable law is effective against third parties where, in the transactions entered into with them, the spouses have declared which law  is applicable to their matrimonial regime.

**Art. 1397-5**

*(Act no 97-987 of 28 Oct. 1997)*

Where a change in the matrimonial regime takes place in accordance with a foreign law which governs the effects of the marriage, the spouses shall have public notice made as provided for in the new Code of Civil Procedure.

**Art. 1397-6**

*(Act no 97-987 of 28 Oct. 1997)*

A change of matrimonial regime takes effect between the parties from the  judgment or from the instrument which provides for it and, with respect to third parties, three months after the formalities of notice provided for in Article 1397-5 have been fulfilled.

However, even failing fulfilment of those formalities, the change of matrimonial regime is effective against third parties where, in the transactions entered into with them, the spouses have declared that they have amended their matrimonial regime.

**Art. 1398**

CIVIL CODE

A minor having capacity to contract marriage has capacity to consent to all the agreements of which that contract is susceptible and the agreements and gifts he has made therein are valid, provided he had, in making the agreement, the assistance of all the persons whose consent is necessary for the validity of the marriage.

Where matrimonial conventions have been entered into without that assistance, the annulment thereof may be sued for by the minor or by the persons whose consent was required, but only up to the expiry of the year following the coming of age.

**Art. 1399**

An adult in guardianship or curatorship may not enter into matrimonial conventions unless assisted, at the contract, by those who must consent to his marriage.

Failing that assistance, annulment of the agreements may be sought within the year of the marriage, either by the person under a disability himself, or by those whose consent was required, or by the guardian or the curator.

**Article 1387-1**

*(Act no 2005-882 of 2 Aug. 2005)*

Where divorce is granted, if liabilities or securities have been created by the spouses, jointly and severally or separately, in the context of the management of a concern, the tribunal de grande instance  may rule that the exclusive burden thereof shall be borne by the spouse who retains the professional assets or, failing which, the professional qualifications which served as a basis for the concern.

CHAPTER II

Of the Regime of Community of Property               Articles 1401 to 1528 to 1535

Part I

Of the Statutory Community of Property               Articles 1401 to 1400

**Art. 1400**

Community of property which is established failing an agreement or by a simple declaration of being married under the community of property regime, is subject to the rules explained in the following three Sections.

SECTION I

Of What a Community is Composed as to Assets and Liabilities          Articles 1401 to 1419 and 1420.

Paragraph 1

Of the Assets of the Community               Articles 1401 to 1408

**Art. 1401**

The assets of the community comprise acquisitions made by the spouses together or separately during the marriage, and coming both from their personal activity and from savings made on the fruits and incomes of their personal property.

**Art. 1402**

Any property, movable or immovable, shall be deemed an acquisition of the community where it is not proved that it is a separate property of one of the spouses in accordance with a provision of law.

Where a property is one of those which do not display proof or mark of their origin, personal ownership of a spouse, if disputed, shall be established in writing. Failing an inventory or other contemporaneously constituted proof, the judge may take into consideration all writings, in particular family instruments of title, registers and papers, as well as bank documents and invoices. He may even admit testimonial or presumptive evidence, where he observes that it was materially or morally impossible for one spouse to obtain a writing.

**Art. 1403**

Each spouse retains full ownership of his or her separate property.

The community is entitled only to fruits collected and not consumed. But a reimbursement may be due to it, at the time of the dissolution of the community, for fruits which a spouse failed to collect or has fraudulently consumed, without, however, any inquiry being admissible further than the last five years.

**Art. 1404**

Constitute separate property by their nature, even where they have been acquired during the marriage, clothes and belongings for the personal use of one of the spouses, actions for compensation for bodily or moral harm, inalienable claims and pensions, and, more generally, all property which has a personal character and all rights exclusively attached to the person.

Constitute also separate property by their nature, but subject to a reimbursement if there is occasion, implements necessary to the occupation of one of the spouses, unless they are accessory to business assets or to an enterprise forming part of the community.

**Art. 1405**

Remain separate property the items of property of which the spouses had ownership or possession on the day of

CIVIL CODE

the celebration of the marriage, or which they acquire, during the marriage, through succession, gift or legacy.

A gratuitous transfer may stipulate that the property which is its subject-matter will belong to the community. Property falls into community, unless otherwise stipulated, where a gratuitous transfer is made jointly to both spouses.

Property surrendered or transferred by the father, mother or other ascendant to one of the spouses, either in order to discharge what he owes to him or her, or under the obligation of paying debts of the donor to outsiders, remain separate property, subject to reimbursement.

**Art. 1406**

Constitute separate property, subject to reimbursement if there is occasion, property acquired as accessory to a separate property as well as new securities and other increases connected with securities which are separate property.

Constitute also separate property, through the effect of real subrogation, claims and indemnities which take the place of separate property, as well as property acquired in investment or reinvestment, in accordance with Articles 1434 and 1435.

**Art. 1407**

Property acquired in exchange for a property which belonged separately to one of the spouses is itself separate property, subject to reimbursement due to the community or by it, where there is a balance.

However, where the balance charged to the community is greater than the value of the transferred property, the property acquired in exchange falls into the common stock, subject to reimbursement for the benefit of the transferor.

**Art. 1408**

An acquisition, made by auction or otherwise, of a part of a property of which one of the spouses was an undivided owner, does not constitute an acquisition, subject to the reimbursement due to the community for the sum it may have supplied.

Paragraph 2
Of the Liabilities of the Community                    Articles 1409 to 1419
and 1420.

**Art. 1409**
*(Act no 85-1372 of 23 Dec. 1985)*
The liabilities of the community comprise:
- definitively, maintenance due by the spouses and debts incurred by them for the support of the household and the education of children, under Article 220;
- definitively or subject to reimbursement, according to the circumstances, other debts arising during the community.

**Art. 1410**
Debts which the spouses owed on the day of the celebration of the marriage, or with which the successions and gratuitous transfers falling to them during the marriage are burdened, remain personal to them, both as to capital and to arrears or interest.

**Art. 1411**
In the case of the preceding Article, creditors of either spouse may only enforce payment on the separate property "and the income" (Act no 85-1372 of 23 Dec. 1985) of their debtor.

They may also, however, seize property of the community where the movables which belonged to their debtor on the day of the marriage or which fell to him by succession or gratuitous transfer have been merged into the common patrimony and can no longer be identified under the rules of Article 1402.

**Art. 1412**
Reimbursement is due to the community which has paid a personal debt of a spouse.

**Art. 1413**
(Act no 85-1372 of 23 Dec. 1985).-Payment of debts which either spouse owes, for whatever reason, during the community, may always be enforced on community property, unless there was fraud of the debtor spouse and bad faith of the creditor, and subject to reimbursement due to the community, if there is occasion.

**Art. 1414**
*(Act no 85-1372 of 23 Dec. 1985)*
The earnings and wages of a spouse may be attached by the creditors of his or her spouse only where the obligation was contracted for the support of the household or the education of children, under Article 220.

Where the earnings and wages are paid into a current or deposit account, the latter may be attached only under the conditions determined by decree.

**Art. 1415**
*(Act no 85-1372 of 23 Dec. 1985)*
Each spouse may obligate only his separate property and his income, by surety or loan, unless they have been contracted with the express consent of the other spouse, who, in that case, does not obligate his separate property.

**Art. 1416**
A community which has discharged a debt for which it may have been sued under the preceding Articles, is

CIVIL CODE

nevertheless entitled to reimbursement, whenever that undertaking had been contracted in the personal interest of one of the spouses, for example for the acquisition, preservation or improvement of a separate property.

**Art. 1417**

A community is entitled to reimbursement, deduction being made, if there is occasion, of the benefit derived for it, where it paid fines incurred by one spouse by reasons of criminal offences, or damages and costs for which he or she had been held liable in tort.

It is likewise entitled to reimbursement where the debt which it discharged was contracted by one of the spouses in contempt of the duties which the marriage  prescribed to him or her.

**Art. 1418**

Where a debt has become a community debt in only one spouse's right, it may not be enforced on the separate property of the other.

Where it is joint and several, a debt is deemed to become a community debt in both spouses' right. [repealed]

**Art. 1419 and 1420.**

[repealed]

SECTION II

Of Administration of the Community and of the Separate Property          Articles 1421 to 1440

**Art. 1421**

*(Act no 85-1372 of 23 Dec. 1985)*

Each spouse has the power to administer alone the common property and to dispose of it, subject to being accountable for faults committed in his or her management. Transactions entered into without fraud by a spouse are enforceable against the other.

A spouse who follows a separate profession, has alone the power to perform acts of administration and disposition necessary for it.

All of which is subject to Articles 1422 to 1425.

**Art. 1422**

*(Act no 85-1372 of 23 Dec. 1985)*

One spouse may not, without the other, dispose inter vivos, gratuitously, of the common property.

(Ord. no 2006-346 of 23 March 2206) Nor may he, without the other, assign a common property to the guarantee of a third person's debt.

**Art. 1423**

(Act no 85-1372 of 23 Dec. 1985).-A legacy made by one spouse may not exceed his or her share in the community.

Where a spouse has bequeathed a property of the community, the legatee may claim it in kind only if, by the effect of partition, the property falls into the share of the testator's heirs; if the property does not fall into the share of those heirs, the legatee is entitled to reimbursement of the total value of the property bequeathed, on the share, in the community, of the heirs of the testator spouse and on the separate property of the latter.

**Art. 1424**

*(Act no 85-1372 of 23 Dec. 1985)*

One spouse may not, without the other, transfer or encumber with rights in rem immovables, business assets and enterprises depending on the community, or non-negotiable rights in a firm and tangible movables whose alienation requires public notice. One spouse may not, without the other, collect the capital coming from those operations.

**Art. 1425**

*(Act no 85-1372 of 23 Dec. 1985)*

One spouse may not, without the other, give on lease a rural tenement or an immovable for commercial, industrial or craft use depending on the community. Other leases on common property may be entered into by one spouse alone and are subject to the rules provided for regarding  leases made by a usufructuary.

**Art. 1426**

*(Act no 85-1372 of 23 Dec. 1985)*

Where one of the spouses is, in an enduring way, unable to express his or her wish, or if his or her management of the community reveals unfitness or fraud, the other spouse may request in court to be substituted for him or her in the exercise of those powers. The provisions of Articles 1445 to 1447 shall apply to that request.

A spouse thus entitled by court has the same powers which the spouse whom he or she replaces would have had; he or she may, with the authorization of the court, enter into transactions for which his or her consent would have been required if a substitution had not taken place.

A spouse deprived of his or her powers may, later on, request their restitution to the court, by establishing that their transfer to the other spouse is no longer justified.

**Art. 1427**

*(Act no 85-1372 of 23 Dec. 1985)*

Where one of the spouses has gone beyond his or her powers on common property, the other may apply for

CIVIL CODE

annulment of it, unless he has ratified the transaction.

An action for annulment may be brought by the spouse during two years after the day when he had knowledge of the transaction, without never being admissible more that two years after the dissolution of the community.

**Art. 1428**

Each spouse has the administration and enjoyment of his or her separate property and may dispose of it freely.

Art.1429.

-Where one of the spouses is, in an enduring way, unable to express his or her wish, or if he or she imperils the interests of the family, either by allowing his or her separate property to waste away or by dissipating or embezzling the income withdrawn from them, he or she may, on application of the other spouse, be divested of the rights of administration and enjoyment attributed by the preceding Article. The provisions of Article 1445 to 1447 shall apply to that application.

Unless the appointment of a judicial administrator appears necessary, the judgment shall grant to the plaintiff spouse the power to administer the separate property of the divested spouse, as well as to collect the fruits thereof, which shall be appropriated to the marriage expenses and the excess used for the benefit of the community.

From the application, the deprived spouse may dispose alone of the bare ownership of his or her property only.

He or she may, later on, request the restitution of his or her rights to the court, if he or she establishes that the causes which had justified the divesting no longer exist.

**Art. 1430**

[repealed]

**Art. 1431**

Where, during the marriage, one of the spouses grants to the other the administration of his or her separate property, the rules of agency shall apply. The agent spouse is, however, dispensed from accounting for fruits, where the power of attorney does not expressly so require.

**Art. 1432**

Where one of the spouses takes in hand the management of the separate property of the other, with the knowledge of the latter but nevertheless without opposition on his or her part, there is deemed to be an implied agency, with authority to make acts of administration and enjoyment, but not acts of disposition.

That spouse shall be responsible for his or her management towards the other as would an agent. However, he or she must account only for existing fruits; as regards those which he or she failed to collect or fraudulently consumed, he or she may be sued only within a limitation of the last five years.

Where one of the spouses has interfered in the management of the separate property of the other in contempt of an established opposition, he or she is liable for all the results of his or her interference and accountable without limitation for all the fruits which he or she has collected, failed to collect or fraudulently consumed.

**Art. 1433**

The community owes reimbursement to the owner spouse whenever it has drawn benefit from separate property.

It shall be so, notably, where it has collected funds which were separate property or which came from the sale of a separate property, without there having been made investment or re-investment.

Where a controversy arises, proof that community drew benefit from separate property may be adduced by any means, including testimony and presumptions.

**Art. 1434**

Investment or re-investment is deemed made with regard to a spouse, whenever, at the time of an acquisition, it is declared that it was made from separate funds, or from funds coming from the disposal of a separate property, and in order to take its place as investment or re-investment. Failing such declaration in the instrument, investment or re-investment takes place only through agreement of the spouses and produces effect only in their reciprocal relationships.

[repealed]

**Art. 1435**

*(Act no 85-1372 of 23 Dec. 1985)*

Where investment or re-investment is made in anticipation, the property acquired is separate, provided that the sums expected from the separate patrimony be paid to the community within five years after the date of the transaction.

**Art. 1436**

*(Act no 85-1372 of 23 Dec. 1985)*

Where the price and expenses of the acquisition exceed the sum from which investment or re-investment was made, the community is entitled to reimbursement for the excess. Where, however, the share of the community is greater than that of the acquiring spouse, the property acquired falls into community, subject to reimbursement due to the spouse.

**Art. 1437**

Whenever a sum is taken from the community, either to discharge the personal debts or charges of one of the spouses, such as the price or part of the price of a separate property of his or her own, or the redemption of land services, or for the recovery, preservation or improvement of his or her personal property, and generally whenever one

CIVIL CODE

of the two spouses draws a personal profit from the community property, he or she owes reimbursement therefor.

**Art. 1438**

Where the father and mother jointly make a gift in favour of a common child without specifying the portion for which they intended to contribute thereto, they are deemed to have contributed each for one half, whether the gift was provided or promised from community property, or whether from personal property of one of the spouses.

In the second case, the spouse from whose personal property the gift was made has, on the property of the other, an action for compensation for half of the said gift, having regard to the value of the property donated at the time of the gift.

**Art. 1439**

A gift made to a common child from community property is charged to the community.

(Act no 85-1372 of 23 Dec. 1985) It is borne by each spouse for one half on the dissolution of the community, unless one of them, in making it, expressly declared that he or she would take charge of it for the whole or for a share exceeding one half.

**Art. 1440**

Warranty of the gift is due from any person who made it; and interest runs as from the day of the marriage, although there is a term for the payment, unless otherwise stipulated.

| | |
|---|---|
| SECTION III | |
| Of the Dissolution of the Community | Articles 1441 to 1492 to 1496 |
| Paragraph 1 | |
| Of the Causes for Dissolution and of Separation of Property | Articles 1441 to 1452 to 1466 |

**Art. 1441**

A community is dissolved:
1° By the death of one of the spouses;
2° "By declared absence" (Act no 77-1447 of 28 Dec. 1977);
3° By divorce;
4° By judicial separation;
5° By separation of property;
6° By change of matrimonial regime.

**Art. 1442**

*(Act no 85-1372 of 23 Dec. 1985)*

No continuance of a community may take place, notwithstanding any agreement to the contrary.

Either spouse may request, if there is occasion, that, in their mutual relations, the effect of the dissolution be carried back to the date when they ceased to live together and collaborate. [repealed]

**Art. 1443**

Where through the disorder of the affairs, misadministration or misconduct of one spouse, it appears that the upholding of the community imperils the interest of the other spouse, the latter may sue  in court for separation of property.

Any voluntary separation is void.

**Art. 1444**

Separation of property, although ordered in court, is void where the proceedings tending to liquidate the rights of the parties have not be initiated within three months after the judgment has become res judicata  or where the final settlement has not occurred within the year of the opening of the process of liquidation. The period of one year may be extended by the president of the court in the form of interim relief proceedings.

**Art. 1445**

The application and judgment of separation of property shall be given public notice on the terms and subject to the penalties provided for by the Code of Civil Procedure [...].

A judgment ordering a separation of property extends back as to its effect to the day of the application.

Mention of the judgment shall be made in the margin of the record of marriage  as well as on the original of the ante-nuptial agreement.

**Art. 1446**

Creditors of a spouse may not apply for a separation of property in his or her right.

**Art. 1447**

Where an action for separation of property has been brought, creditors may demand from the spouses, by paper served in the courthouse, to have the application and supporting documents communicated to them. They may even intervene in the case for the preservation of their rights.

Where separation has been ordered in fraud of their rights, they may appeal against it by way of third party

CIVIL CODE

application for revocation of judgment, under the conditions provided for in the Code of Civil Procedure.

**Art. 1448**

The spouse who has obtained the separation of property shall contribute, in proportion to his or her means and to those of the other spouse, both to the household expenses and to those relating to the education of children.

He or she shall bear entirely those expenses, where nothing is left to the other.

**Art. 1449**

A separation of property judicially ordered has the effect of putting the spouses under the regime of Articles 1536 and following.

(Act no 85-1372 of 23 Dec. 1985) The court, where it pronounces separation, may order that one of the spouses shall pay his or her contribution into the hands of the other spouse, who shall assume alone thenceforth with regard to third parties the payment of all the liabilities of the marriage.

**Art. 1450**

[removed, cf Art. 265-2]

**Art. 1451**

*(Act no 75-617 of 11 July 1975)*

The agreements"entered under Article 265-2" (Act no 2004-439 of 26 May 2004) thus entered into are suspended, with regard to their effects, until the pronouncement of the divorce; they may be enforced, even in the relations between spouses, only where the judgment has gained force of res judicata.

One of the spouses may request that the judgment of divorce modify the agreement where the consequences of divorce fixed by that judgment call into question the bases of the liquidation and partition.

**Art. 1452 to 1466**

[repealed]

Paragraph 2
Of Liquidation and Partition of the Community                    Articles 1467 to 1481

**Art. 1467**

After the dissolution of the community, each spouse shall retake that of his or her property which did not fall into the community, where it exists in kind, or the property subrogated thereto.

Then shall take place the liquidation of the common stock, as to assets and liabilities.

**Art. 1468**

Shall be established in the name of each spouse an account of the reimbursement which the community owes to him or her and of the reimbursement which he or she owes to the community, in accordance with the rules prescribed in the preceding Sections.

**Art. 1469**

Reimbursement shall be, in general, equal to the smaller of the two sums which the expenditures made and the profit still extant represent.

However, it may not be less than the expenditure made where the latter was necessary.

(Act no 85-1372 of 23 Dec. 1985) It may not be less than the profit still extant where the value borrowed was used to acquire, preserve or improve a property which is found, on the day of the liquidation of the community, in the borrower patrimony. Where the property acquired, preserved or improved has been alienated before the liquidation, the profit shall be appraised on the day of the alienation; where a new property has been subrogated to the alienated property, the profit shall be appraised with regard to that new property.

**Art. 1470**

Where, after the balance is made, the account presents a residue in favour of the community, the spouse shall return the amount thereof to the common stock.

Where it presents a residue in favour of a spouse, the latter has the option either to require payment or to appropriate common property up to the amount due.

**Art. 1471**

*(Act no 85-1372 of 23 Dec. 1985)*

Appropriations shall be enforced first on ready money, next on the movables and subsidiarily on the immovables of the community. A spouse who makes the appropriation is entitled to choose the movables and immovables which he or she appropriates. He or she  may not, however, prejudice by that option the rights which the other spouse may have to request the continuation of the undivided property or the preferential allotment of certain items of property.

Where the spouses wish to appropriate the same property, one shall proceed by drawing lots.

**Art. 1472**

*(Act no 85-1372 of 23 Dec. 1985)*

In case the community is not adequate, the appropriations of each spouse shall be in proportion to the amount of the reimbursement which are due to him or her.

However, where the inadequacy of the community is imputable to the fault of one of the spouses, the other spouse may make appropriation before him or her on the whole of common property; he or she may make them subsidiarily on

CIVIL CODE

the separate property of the liable spouse.

**Art. 1473**

Reimbursement due by the community or to the community bears interest by operation of law from the day of the dissolution.

(Act no 85-1372 of 23 Dec. 1985) However, where a reimbursement is equal to the profit still extant, interest runs from the day of liquidation.

**Art. 1474**

Appropriations in common property constitute an operation of partition. They do not confer on the spouse who enforces them any right to be preferred to the creditors of the community, except the priority resulting from legal mortgage, where there is occasion.

**Art. 1475**

After all appropriations have been carried out on the stock, the excess shall be divided by halves between the spouses.

Where an immovable of the community is an annex of another immovable belonging separately to one of the spouses, or where it is contiguous to that building, the owner spouse has the power to have it allotted to him or her by deduction from his or her share or subject to a balance, according to the value of the property on the day when allotment is requested.

**Art. 1476**

Partition of a community, as to everything relating to its forms, continuation of undivided ownership and preferential allotment, auction of property, effects of partition, warranty and balances is subject to all the rules established in the Title Of Successions with respect to partitions between coheirs.

However, as to communities dissolved by divorce, judicial separation or separation of property, preferential allotment is never as of right, and it may always be ordered that the whole of a balance which may be due shall be payable cash.

**Art. 1477**

(Act no 2004-439 of 26 May 2002) Likewise, the spouse who has knowingly concealed the existence of a common debt shall take charge of it definitively.

**Art. 1478**

After a partition is closed, where one of the spouses is the personal creditor of the other, for instance because the proceeds of his or her property have been used to pay a personal debt of the other spouse, or for any other cause, he or she may enforce the claim against the share of the community coming to the other or against the other's separate property.

**Art. 1479**

The personal claims which the spouses have to enforce against each other do not give rise to appropriation and bear interest only from the day of the demand.

(Act no 85-1372 of 23 Dec. 1985) Unless otherwise agreed by the parties, they shall be appraised according to the rules of Article 1469, paragraph 3, in the cases for which it provides; interest then runs from the day of the liquidation.

**Art. 1480**

Gifts which one of the spouses may have made to the other shall be enforced only on the share of the donor in the community and on his or her separate property.

**Art. 1481**

[repealed]

|  |  |
|---|---|
| Paragraph 3 | |
| Of Obligation and of Contribution to Liabilities after Dissolution | Articles 1482 to 1492 to 1496 |

**Art. 1482**

*(Act no 85-1372 of 23 Dec. 1985)*

Each spouse may be sued for the whole of the debts existing on the day of dissolution, which had entered into the community in his or her own right.

**Art. 1483**

Each spouse may be sued only for half of the debts which had entered into the community in the other spouse's right.

(Act no 85-1372 of 23 Dec. 1985) After partition, and save the case of concealment, he or she is liable for them only up to the share of the assets which he or she receives, provided there was an inventory, and under the obligation to account both for the contents of that inventory and for what he or she has received through the partition, as well as for the common liabilities already discharged.

**Art. 1484**

The inventory provided for in the preceding Article shall be made in the forms regulated by the Code of Civil

CIVIL CODE

Procedure, adversarily with the other spouse or the latter having been duly summoned. It shall be closed within nine months after the day when the community was dissolved, except for extension of time granted by an interim relief judge. It shall be asserted genuine and true before the public officer who received it.

**Art. 1485**

Each spouse shall contribute by halves to the community debts for which a reimbursement was not due, as well as to the costs of sealing, inventory, sale of movables, liquidation, auction and partition.

He or she bears alone the debts which had become common only subject to reimbursement chargeable to him or her.

**Art. 1486**

The spouse who may take advantage of the benefit of Article 1483, paragraph 2, does not contribute for more than the share of the assets which he or she receives to the debts which had entered into the community in the other spouse's right, unless it is a question of debts for which he or she owed reimbursement.

**Art. 1487**

The spouse who paid above the portion for which he or she was liable under the preceding Articles has a remedy for the excess against the other.

**Art. 1488**

He or she has not, for that excess, any recovery against the creditor, unless the receipt states that he or she intends to pay only within the limit of his or her obligation.

**Art. 1489**

The spouse who, by the effect of a mortgage enforced on an immovable which he received in partition, is sued for the whole of a community debt has as of right a remedy against the other for half of that debt.

**Art. 1490**

The provisions of the preceding Articles are not a bar to a clause of the partition which, without prejudicing the rights of third parties, obliges either spouse to pay a portion of the debts other than that which is fixed above, or even to discharge the liabilities in full.

**Art. 1491.**

-The heirs of the spouses exercise, in case of dissolution of the community, the same rights as the spouse whom they represent and are subject to the same obligations. [repealed]

**Art. 1492 to 1496**

[repealed]

Part II
Of Conventional Community                                    Articles 1498 to 1497

**Art. 1497**

Spouses may, in their ante-nuptial agreement, modify statutory community by any kinds of agreement not contrary to Article 1387, 1388 and 1389.

They may, especially, agree:

1° That the community shall include movables and acquisitions;

2° That it will be derogated to the rules relating to administration;

3° That one of the spouse will have the power to appropriate certain property on condition of an indemnity;

4° That one of the spouses will have an appropriation clause;

5° That the spouses will have unequal shares;

6° That there will be a universal community between them.

The rules on statutory community shall remain applicable on all questions which have not been the subject of the agreement of the parties.

SECTION I
Of the Community of Movables and Acquisitions                 Articles 1498 to 1502

**Art. 1498**

Where spouses agree that there will be between them a community of movables and acquisitions, the common assets comprise, in addition to property which would form part of it under the regime of statutory community, the movable property of which the spouses had ownership or possession on the day of the marriage or which has fallen to them afterwards through succession or gratuitous transfer, unless the donor or testator has stipulated the contrary.

Remains separate property, nevertheless, that of the movable property which would have formed separate property by its nature by virtue of Article 1404, under the statutory regime, if it had been acquired during the community.

Where one of the spouses acquires an immovable after the ante-nuptial agreement, which contained a stipulation of community of movables and acquisitions, and before the celebration of the marriage, the immovable acquired during that interval enters the community, unless the acquisition was made in performance of some clause of the ante-nuptial agreement, in which case it is regulated according to the agreement.

**Art. 1499**

CIVIL CODE

Form part of the liabilities of the community, under that regime, other than the debts which would form part of it under the statutory regime, a fraction of those with which the spouses were already burdened when  they married, or with which successions and gratuitous transfer which fall to them during the marriage are burdened.

The fraction of liabilities which the community bears is proportionate to the fraction of assets which it receives, according to the rules of the preceding Article, either from the patrimony of the spouse on the day of the marriage, or from the whole of property which is the subject of the succession or gratuitous transfer.

In order to establish that proportion, the consistency and value of the assets shall be proved in accordance with Article 1402.

**Art. 1500**

The debts to which the community is liable, as a counterpart of the property it receives, are its final responsibility.

**Art. 1501**

The apportionment of liabilities prior to the marriage or burdening successions and gratuitous transfers may not prejudice the creditors. They keep, in all cases, the right to seize property which previously constituted their security. They may even enforce their payment against the whole of the community, where the movable property of their debtor has been merged into the common patrimony and may no longer be identified under the rules of Article 1402.

**Art. 1502**

[repealed]

SECTION II

Of the Clause of Joint Administration                                         Articles 1503 to 1504 to 1510

**Art. 1503**

*(Act no 85-1372 of 23 Dec. 1985)*

Spouses may agree that they will administer jointly the community.

In that case, the acts of administration and of disposition of community property shall be made under the joint signature of both spouses, and they involve as of right joint and several liability of the spouses.

Acts of preservation may be done separately by each spouse.

**Art. 1504 to 1510**

[repealed by implication]

SECTION III

Of the Clause of Appropriation on Condition of Indemnity                        Articles 1511 to 1514

**Art. 1511**

Spouses may stipulate that the survivor or one of them if he or she survives, or even one of them in all the cases of dissolution of the community, will have the power to appropriate certain common property, with the responsibility of accounting for it to the community according to the value it has on the day of partition, unless otherwise agreed.

**Art. 1512**

An ante-nuptial agreement may fix the bases of appraisal and the terms of payment of a possible balance. Having regard to those clauses and failing an agreement between the parties, the value of that property shall be fixed by the tribunal de grande instance.

**Art. 1513**

A power of appropriation lapses where the benefiting spouse does not exercise it by notice served upon the other spouse or his or her heirs within a period of one month after the day when the latter have served upon him or her notice to come to a decision. That notice may not itself be served before the expiry of the period provided for in the Title Of Successions for making an inventory and deliberating.

**Art. 1514**

Appropriation is an operation of partition: property appropriated is deduced from the share of the benefiting spouse; where its value exceeds that share, there is occasion for payment of a balance.

Spouses may agree that the indemnity owed by the maker of an appropriation will be deduced subsidiarily from his or her rights in the succession of the predeceased spouse.

SECTION IV

Of the Appropriation Clause                                                     Articles 1515 to 1519

**Art. 1515**

It may be agreed in an ante-nuptial agreement, that the survivor of the spouses, or one of them if he or she survives, will be authorized to appropriate from the common stock, before any partition, either a specified sum, or a specified property in kind, or a specified quantity of a determined kind of property.

**Art. 1516**

Appropriation is not considered as a gift, either as to substance, or as to form, but as a agreement relating to marriage  and between partners.

CIVIL CODE

**Art. 1517**

[repealed]

**Art. 1518**

*(Act no 85-1372 of 23 Dec. 1985)*

Where community is dissolved in the lifetime of the spouses, there is no occasion for the making of an appropriation; but the spouse, to whose benefit it was stipulated, keeps his or her right for the case of survival,"subject to Article 265" (Act no 2004-439 of 26 May 2002). He or she may require surety from the other spouse in warranty of those rights.

**Art. 1519**

Creditors of the community are always entitled to have the articles appropriated sold, subject to the remedy of the spouse against the remainder of the community.

SECTION V

Of the Stipulation of Unequal Shares                                             Articles 1520 to 1525

**Art. 1520**

Spouses may derogate from the partition established by law.

**Art. 1521**

Where it has been stipulated that a spouse and his or her heirs will have only a certain share in the community, such as a third or a fourth, the spouse thus limited or his or her heirs are liable for the debts of the community only in proportion to the share which they take from the assets.

The agreement is void where it compels the spouse thus limited or his or her heirs to bear a larger part, or where it exempts them from bearing a share of the debts equal to that which they take from the assets.

**Art. 1522 and 1523**

[repealed]

**Art. 1524**

Allotment of the entire community may be agreed only for the case of survival, either for the benefit of a specified spouse, or for the benefit of whoever survives. The spouse who thus retains the whole of the community is obliged to pay all its debts.

It may also be agreed, for the case of survival, that one of the spouses will have, in addition to his or her half, the usufruct of the predeceased's share. In that case, he or she shall contribute to the debts, as to the usufruct, according to the rules of Article 612.

The provisions of Article 1518 shall apply to those clauses when the community is dissolved in the lifetime of the two spouses.

**Art. 1525**

A stipulation of unequal shares and a clause of full allotment are not deemed a gift, neither as to substance nor as to form, but simply agreements relating to marriage  and between partners.

Unless otherwise stipulated, they may not prevent the heirs of the predeceased spouse to take back the contributions and capital having fallen into the community in the right of  their predecessor in title.

SECTION VI

Of Universal Community                                                             Article 1526

**Art. 1526**

Spouses may by their ante-nuptial agreement establish a universal community of their property, movable and immovable, present and future. However, unless otherwise stipulated, property which Article 1404 declares separate by its nature does no fall into that community.

A universal community bears definitively all the debts of the spouses, present and future.

Provisions Common

to the Two Parts of Chapter II                                                     Articles 1527 to 1528 to

1535

**Art. 1527**

The advantages which either spouse may draw from the clauses of a conventional community, as well as those which may result from a mingling of movables or of debts, are not deemed gifts.

(Act no 2001-1135 of 3 Dec. 2001) However, in the case where there are children who are not born of the two spouses, any agreement having the consequence of donating to one of the spouses beyond the portion regulated by Article 1094-1, in the Title Of Gifts Inter Vivos and of Wills is ineffective as to the whole excess; but mere gains resulting from common business and from savings made out of the respective although unequal incomes of both spouses are not considered as an advantage made to the prejudice of the children of another bed.

**Art. 1528 to 1535**

[repealed]

CIVIL CODE

CHAPTER III

Of the Regime of Separate Property

Articles 1536 to 1544 to 1568

**Art. 1536**

Where spouses have stipulated in their ante-nuptial agreement that their property will be separate, each of them keeps the administration, enjoyment and free disposal of his or her personal property.

Each remains alone liable for the debts arising in his or her self, before or during marriage,  except in the case of Article 220.

**Art. 1537**

The spouses shall contribute to the expenses of the marriage in accordance with the terms of their agreement; and where none exists in this regard, in the proportion determined by Article 214.

**Art. 1538**

With respect both to the other spouse and to third parties, a spouse may prove by any means that he or she has the exclusive ownership of a property.

The presumptions of ownership established in the ante-nuptial agreement are effective with respect to third parties, as well as in the relations between spouses, unless otherwise agreed. Counter proof is as of right, and may be made by any means appropriate to establish that the property does not belong to the spouse designated by the presumption, or even, where it belongs to him or her, that it was acquired through a gratuitous transfer from the other spouse.

Property on which neither spouse may establish an exclusive ownership is deemed to belong to them in undivided ownership, to each by half.

**Art. 1539**

Where, during the marriage, one of the spouses entrusts to the other the administration of his personal property, the rules of agency shall apply. The agent spouse is however exempted from accounting for the fruits, if the power of attorney does not expressly oblige him or her to do so.

**Art. 1540**

Where one of the spouses takes the management of the other's business in hand, with the knowledge of the latter and nevertheless without opposition on his or her part, she or he is deemed to have an implied agency, with authority to make acts of administration and enjoyment, but not acts of disposition.

That spouse is responsible for his or her management to the other as an agent. However, he or she is accountable only for the existing fruits; as regards those which he has failed to collect or fraudulently consumed, he may be sued only within the limit of the last five years.

Where one of the spouses has interfered in the management of the other's property in contempt of an established opposition, he or she is responsible for all the consequences of that interference, and accountable without limitation for all the fruits which he or she has collected, failed to collect or fraudulently consumed.

**Art. 1541**

One of the spouses is not the warrantor of a failure to invest or reinvest the other's property, unless he or she has interfered in operations of alienation or collection or unless it is proved that the funds were received by him or her, or he or she has profited by them.

**Art. 1542**

*(Act no 75-617 of 11 July 1975)*

After dissolution of a marriage by the death of one of the spouses, the partition of the undivided property between spouses with separate property, as to all that relates to its forms, maintenance of undivided ownership and preferential allotment, auction of property, effects of partition, warranty and balances, is subject to all the rules which are established in the Title Of Successions for partitions between co-heirs.

The same rules shall apply after divorce or judicial separation. However, preferential allotment shall never be as of right. It may always be decided that the whole of a balance which may be owed shall be payable cash.

**Art. 1543**

*(Act no 85-1372 of 23 Dec. 1985)*

The rules of Article 1479 shall apply to the claims which one spouse may have to enforce against the other.

**Art. 1544 to 1568**

[repealed]

CHAPTER IV

Of the Regime of Separation in Acquisitions

Articles 1569 to 1581

**Art. 1569**

Where the spouses have declared that they married under the regime of participation in acquisitions, each of them keeps the administration, enjoyment and free disposal of his or her personal property, without distinguishing between that which belonged to him or her on the day of the marriage or which has come to him or her after by succession or gratuitous transfer and that which he or she has acquired for value during the marriage. During the marriage, that regime operates as if the spouses were married under the regime of separation of property. At the dissolution of the regime,

CIVIL CODE

each spouse is entitled to participate by halves in value in the net acquisitions found in the patrimony of the other, and estimated owing to the double appraisal of the original patrimony and of the final patrimony.

The right to participate in the acquisitions may not be assigned as long as the matrimonial regime is not dissolved. Where dissolution occurs through the death of one spouse, his or her heirs have, on the net acquisitions made by the other, the same rights as their predecessor in title.

**Art. 1570**
*(Act no 85-1372 of 23 Dec. 1985)*

An original patrimony includes the property which belonged to the spouse on the day of the marriage and those which he or she has acquired afterwards by succession or gratuitous transfer, as well as all property which, in the regime of community, constitutes separate property by its nature without giving rise to reimbursement. Account shall not be taken of the fruits of that property nor of the parts of that property which would have been in the nature of fruit or of which the spouse has disposed through gift inter vivos during the marriage.

The composition of the original patrimony shall be proved by a descriptive statement, even under private signature, established in the presence of the other spouse and signed by him or her.

Failing a descriptive statement, or where it is incomplete, proof of the composition of the original patrimony may be adduced only through the means of Article 1402.

**Art. 1571**
*(Act no 85-1372 of 23 Dec. 1985)*

Original property shall be appraised according to its condition on the day of the marriage or of the acquisition and according to its value on the day when the matrimonial regime is liquidated. Where it has been alienated, one shall retain its value on the day of the alienation. Where new property has been subrogated to property alienated, one shall take into consideration the value of that new property.

From the original assets shall be deducted the debts with which they were burdened, re-evaluated, if there is occasion, according to the rules of Article 1469, paragraph 3. Where the liabilities exceed the assets, that excess shall be fictitiously united to the final patrimony.

**Art. 1572**

Form part of the final patrimony all the property which belongs to a spouse on the day when the matrimonial regime is dissolved, including, where appropriate, that of which he or she may have disposed of mortis causa and without excluding the sums of which he or she may be creditor against the other spouse. Where there is a divorce, judicial separation or anticipated liquidation of the acquisitions, the matrimonial regime is deemed dissolved on the day of the application.

The composition of the final patrimony shall be proved by a descriptive statement, even under private signature, which a spouse or his or her heirs must establish in the presence of the other spouse or of his or her heirs, or they having been duly summoned. That statement shall be drawn up within nine months after the dissolution of the matrimonial regime, except for extension of time granted by the president of the court in the form of interim relief proceedings.

Proof that the final patrimony would have included other property may be adduced by any means, even by testimony and presumptions.

Each spouse may, as to the property of the other, require the fixing of seals and an inventory in accordance with the rules provided for in the Code of Civil Procedure.

**Art. 1573**
*(Act no 85-1372 of 23 Dec. 1985)*

To the existing property shall be fictitiously joined the property which is not included in the original patrimony and of which a spouse has disposed by gift inter vivos without the consent of the other spouse, as well as that which he or she has fraudulently alienated. An alienation on

condition of a life annuity or non-repayable shall be presumed to have been made in fraud of the spouse's rights, unless the latter agreed.

**Art. 1574**
*(Act no 85-1372 of 23 Dec. 1985)*

Existing property shall be appraised according to its condition at the time of the dissolution of the matrimonial regime and to its value on the day of the liquidation of the latter. Property alienated by gifts inter vivos, or in fraud of the rights of the other spouse shall be appraised according to its condition on the day of the alienation and to the value which it would have had, if it had been kept, on the day of the liquidation.

From the assets thus replenished shall be deducted all the debts which are not yet discharged, including the sums which may be owed to the other spouse.

The value, on the day of alienation, of the improvements brought about during the marriage in an original property donated by one spouse without the consent of the other before the dissolution of the matrimonial regime shall be added to the final patrimony.

**Art. 1575**

Where the final patrimony of a spouse is less than his or her original patrimony, the deficit is borne entirely by that spouse. Where it is greater, the increase constitutes the net acquisitions and gives rise to participation.

Where there are net acquisitions on both sides, they shall first be set off. Only the excess shall be partitioned: the

CIVIL CODE

spouse whose gain is the lesser is creditor with regard to the other spouse for half of that excess.

To a claim for participation, one shall add, in order to put them under the same settlement, the sums of which a spouse may in other respects be creditor towards the other, for values provided during the marriage  and other indemnities, deduction being made, where necessary, of what that spouse may be debtor towards the other.

**Art. 1576**

A claim for participation gives rise to payment in money. Where a debtor spouse meets serious difficulties in making it entirely as soon as the liquidation is closed, the judges may grant him or her a time which may not exceed five years, subject to the condition of giving security and paying interest.

A claim for participation may however give rise to a settlement in kind, either by consent of both spouses, or under an order of the judge where the debtor spouse proves serious difficulties which prevent him or her from discharging it in money.

The settlement in kind provided for in the preceding paragraph is considered as an operation of partition where the property allotted was not included in the original patrimony or where the allottee spouse shares in the succession of the other.

The liquidation is not effective against creditors of the spouses: they retain the right to seize property allotted to the spouse of their debtor.

**Art. 1577**

*(Act no 85-1372 of 23 Dec. 1985)*

A creditor spouse shall enforce payment of his or her claim for participation first on existing property and subsidiarily, beginning with the most recent alienations, on the property mentioned in Article 1573 which had been alienated by gifts inter vivos or in fraud of the rights of the other spouse.

**Art. 1578**

Upon dissolution of the matrimonial regime, where the parties do not agree to proceed to liquidation through agreement, one of them may apply to the court for having it proceeded to in court.

The rules prescribed for reaching a judicial partition of successions and communities shall apply to that application, as may be thought proper.

The parties shall communicate reciprocally to each other and shall communicate to the experts designated by the judge, all information and documents appropriate to the liquidation.

A claim for liquidation is time-barred after three years from the dissolution of the matrimonial regime. Claims lying against third parties "under Article 1167" (Act no 85-1372 of 23 Dec. 1985) are time- barred after two years from the close of the liquidation.

**Art. 1579**

Where application of the rules of appraisal provided for by Articles 1571 and 1574 above would lead to a result obviously contrary to equity, the court may derogate from them on the application of one of the spouses.

**Art. 1580**

Where the disorder of the affairs, misadministration or misconduct of one spouse, give rise to fearing that the continuance of the matrimonial regime  imperils the interest of the other, the latter may apply for the anticipated liquidation of his or her claim for participation.

The rules of separation of property shall apply to that application.

Where the application is entertained, the spouses shall be placed under the system of articles 1536 to 1541.

**Art. 1581**

When stipulating participation in acquisitions, the spouses may adopt any term not contrary to Articles 1387, 1388 and 1389.

They may in particular agree on a clause of unequal partition, or stipulate that the survivor of them or one of them if he or she survives, will be entitled to the whole of the net acquisitions made by the other.

It may also be agreed between the spouses that the one who, at the time of the dissolution of the regime, has against the other a claim for participation, may demand the giving in payment of certain property of the other spouse, if he or she establishes an essential interest in having it attributed to him or her.

**TITLE VI**
**OF SALES**                                                                                           **Articles 1582 to 1701**

CHAPTER I
Of the Nature and Form of Sale                                                          Articles 1582 to 1589-2

**Art. 1582**

A sale is an agreement by which one person binds himself to deliver a thing, and another to pay for it.

It may be made by an authentic instrument or by an instrument under private signature.

**Art. 1583**

It is complete between the parties, and ownership is acquired as of right by the buyer with respect to the seller, as soon as the thing and the price have been agreed upon, although the thing has not yet been delivered or the price paid.

**Art. 1584**

CIVIL CODE

A sale may be made outright or subject to a condition either precedent or subsequent.

It may also have as its object two or more alternative things.

In all these cases, its effect is regulated by the general principles relating to agreements.

**Art. 1585**

Where goods are not sold in bulk but by weight, number or measure, a sale is not complete, in that the things sold are at the risk of the seller until they have been weighed, counted or measured; but the buyer may claim either the delivery or damages, if there is occasion, in case of non-performance of the undertaking.

**Art. 1586**

Where, on the contrary, the goods have been sold in bulk, the sale is complete although the goods have not yet been weighed, counted or measured.

**Art. 1587**

With respect to wine, oil and other things which it is customary to taste before buying them, there is no sale so long as the buyer has not tasted and accepted them.

**Art. 1588**

A sale made upon trial shall always be deemed made under a condition precedent.

**Art. 1589**

A promise of sale is the same as a sale, where there is reciprocal consent of both parties as to the thing and the price.

(Act of 30 July 1930) Where that promise relates to plots already in lots or to be in lots, its acceptance and the agreement that will result therefrom shall be established by the payment of an instalment on the price, whatever the name given to that instalment may be, and by the vesting with possession of the plot.

The date of the agreement, even put into legal form afterwards, is that of the payment of the first instalment.

**Art. 1589-1**

*(Act no 2000-1208 of 13 Dec. 2000)*

Is rendered void any unilateral undertaking entered into for the purpose of acquiring an immovable property or right for which a payment is required or received from the person who binds himself, whatever the cause and the form thereof may be.

**Art. 1590**

Where a promise to sell was made with an earnest, each contracting party is at liberty to withdraw.

The one who has given it, by losing it.

And the one who has received it, by returning twice the amount.

**Art. 1591**

The price of a sale must be determined and stated by the parties.

**Art. 1592**

It may however left to the estimation of a third person; where that person is unwilling or unable to make an estimate, there is no sale.

**Art. 1593**

The costs of instruments and other accessory to a sale shall be charged to the buyer.

**Article 1589-2**

*(Ord. no 2005-1512 of 7 Dec. 2005)*

Is void and of no effect a unilateral undertaking to sell relating to an immovable, business assets, a right to a lease concerning  the whole or part of an immovable or to the securities of the companies referred to in Articles 728 and 1655 ter of the General Code of Taxation, where it is not established by an authentic instrument or by an instrument under private signature registrated within ten days as from the date of its acceptance by the beneficiary. So shall it be with any transfer relating to said undertakings which has not been the subject of an authentic instrument or of an instrument under private signature registrated within ten days as from its date.

CHAPTER II

Of Those Who May Buy and Sell                                                                          Articles 1594 to 1597

**Art. 1594**

All those to whom legislation does not forbid to do so may buy or sell.

**Art. 1595**

[repealed]

**Art. 1596**

May not, either by themselves or through intermediaries, become purchasers, on pain of annulment:

Guardians, as to the property of those under their guardianship;

Agents, as to the property which they have charge of selling;

Administrators, as to that of the communes or public institutions entrusted to their care;

CIVIL CODE
Public officers, as to national property whose sale is made through their duties.

**Art. 1597**
Judges, [repealed by implication], members of the judiciary acting as Government procurators, registrars, bailiffs, avoués, counsels, advocates and notaries may not become assignees of suits, contested rights and actions which are within the jurisdiction of the court in the territory within which they exercise their duties, on pain of annulment, and of costs and damages.

CHAPTER III
Of Things Which May be Sold                                              Articles 1598 to 1601

**Art. 1598**
Everything which may be the subject of legal transactions between private individuals may be sold, where special statutes do not prohibit their alienation.

**Art. 1599**
The sale of a thing belonging to another is void: it may give rise to damages where the buyer did not know that the thing belonged to another.

**Art. 1600**
[repealed]

**Art. 1601**
Where, at the time of the sale, the thing sold has wholly perished, the sale is void.
Where only a part of the thing has perished, the buyer has the choice to waive the sale or to claim the part saved, by having the price determined proportionally.

CHAPTER III-1
Of the Sales of Buildings to be Erected                                   Articles 1601-1 to
                                                                          1601-4

**Art. 1601-1**
The sale of a building to be erected is that by which the seller binds himself to erect a building within a period determined by the contract.
It may be concluded for future delivery or in a future state of completion.

**Art. 1601-2**
A sale for future delivery is the contract by which the seller undertakes to deliver the building on its completion, and the buyer undertakes to take delivery of it and to pay the price of it at the date of delivery. The transfer of ownership is achieved by operation of law by the acknowledgement of the completion of the building through an authentic instrument; it is effective retroactively on the day of the sale.

**Art. 1601-3**
A sale in a future state of completion is the contract by which a seller transfers at once to the buyer his rights in the ground as well as the ownership of the existing structures. The works to come  become the property of the buyer as they proceed; the buyer is bound to pay the price of them as the work proceeds.
The seller keeps the powers of a building owner until approval of the work.

**Art. 1601-4**
An assignment by a purchaser of the rights arising from a sale of a building to be erected substitutes by operation of law the assignee in the obligations of the buyer towards the seller.
Where the sale was united with an agency, the latter continues between the seller and the assignee.
Those provisions shall apply to any transfer inter vivos, voluntary or compulsory, or by reason of death.

CHAPTER IV
Of the Obligations of the Seller                                          Articles 1604 to 1603

**Art. 1602**
The seller is obliged to explain clearly what he binds himself to.
Any obscure or ambiguous agreement shall be interpreted against the seller.

**Art. 1603**
He has two main obligations, that to deliver and that to warrant the thing which he sells.

SECTION I
General Provisions

SECTION II
Of Delivery                                                               Articles 1604 to 1624

**Art. 1604**
Delivery is the transfer of the thing sold into the power and possession of the buyer.

CIVIL CODE

**Art. 1605**

The obligation to deliver immovables is fulfilled on the part of the seller where he has handed over the keys, in case of a building, or where he has handed over the instruments of title.

**Art. 1606**

Delivery of movable effects is the outcome :

Either of a real delivery;

Or of the handing over of the keys of the buildings which contain them;

Or even of the sole consent of the parties, where the transfer cannot take place at the time of the sale, or where the buyer already had them in his power on another basis.

**Art. 1607**

Delivery of intangible rights is made either by handing over the instruments of title, or by the use which the purchaser makes of them with the consent of the seller.

**Art. 1608**

The expenses of delivery shall be charged to the seller, and those of removal to the buyer, unless otherwise agreed.

**Art. 1609**

Delivery shall be made at the place where the thing sold was at the time of the sale, unless otherwise agreed.

**Art. 1610**

Where the seller fails to make delivery within the time agreed upon between the parties, the purchaser may, at his choice, apply for avoidance of the sale, or for his being vested with possession, if the delay results only from an act of the seller.

**Art. 1611**

In all cases, the seller shall be ordered to pay damages, where the purchaser has suffered a loss because of the failure to deliver at the agreed time.

**Art. 1612**

The seller is not obliged to deliver the thing where the buyer does not pay the price of it unless the seller has granted him time for the payment.

**Art. 1613**

Nor is he obliged to deliver, even if he has allowed time for the payment, where, since the sale, the buyer [is under a judicial arrangement] or insolvent, so that the seller is in imminent danger of losing the price; unless the buyer gives him security to pay at the time-limit.

**Art. 1614**

The thing must be delivered in the condition in which it is at the time of the sale.

From that day, all the fruits belong to the purchaser.

**Art. 1615**

The obligation to deliver the thing includes its accessories and all that was designed for its perpetual use.

**Art. 1616**

The seller is obliged to deliver the capacity such as it is specified in the contract, subject to the modifications hereinafter expressed.

**Art. 1617**

Where the sale of an immovable was made with indication of the capacity, at the rate of so much for a measure, the seller is obliged to deliver to the purchaser, if the latter so requires, the quantity stated in the contract;

And if he cannot do so, or if the purchaser does not so require, the seller is obliged to suffer a proportionate reduction in price.

**Art. 1618**

Where, on the contrary, in the case or the preceding Article, the capacity is greater than the one stated in the contract, the purchaser has the choice to provide the surplus of the price, or to repudiate the contract, if the excess is one-twentieth above the capacity declared.

**Art. 1619**

In all other cases,

Whether the sale is made of a definite and limited thing,

Whether it has as its object distinct and separate tenements,

Whether it begins with the measure, or by the designation of the property sold followed by the measure,

The expression of that measure does not give rise to any increase of price, in favour of the seller for the excess of measure, or in favour of the purchaser, to any diminution in price for lesser measure, unless the difference between the actual measure and the one expressed in the contract is of one-twentieth more or less, with regard to the value of all the things sold, unless otherwise stipulated.

**Art. 1620**

CIVIL CODE

In the case where, under the preceding Article, it is necessary to raise the price for excess of measure, the purchaser has the choice either to repudiate the contract or to provide the surplus of the price, with interest if he has kept the immovable.

**Art. 1621**

In all cases in which the purchaser is entitled to repudiate the contract, the seller is bound to return to him, besides the price, if he has received it, the costs of the contract.

**Art. 1622**

An action for an increase of price, on the part of the seller, and that for a diminution in price or for termination of the contract, on the part of the buyer, must be brought within the year, after the day of the contract, on pain of lapse.

**Art. 1623**

Where two tenements have been sold by the same contract for one and the same price, with the designation of the measures of each of them, and where there is less capacity in the one, and more in the other, set-off is made up to the amount due; and an action, either for an increase, or for a diminution in price, takes place only in accordance with the rules above laid down.

**Art. 1624**

The question of ascertaining upon whom, between the seller and the purchaser, falls the loss or deterioration of the thing sold before its delivery, shall be decided according to the rules prescribed in the Title Of Contracts or of Conventional Obligations in General.

SECTION III
Of Warranty                                                          Articles 1625 to 1649

Paragraph 1
Of Warranty against Dispossession                          Articles 1625 to 1640.

**Art. 1625**

The warranty which the seller owes to the purchaser has two objects: the first is the peaceful possession of the thing sold; the second, the latent defects of that thing, or redhibitory vices.

**Art. 1626**

Although no stipulation as to warranty has been made at the time of the sale, the seller is obliged as of right to warrant the purchaser against a dispossession of the thing sold which he may suffer in whole or in part, or against encumbrances alleged on that thing, and not declared at the time of the sale.

**Art. 1627**

The parties may, by particular agreements, add to this obligation of right or diminish its effect; they may even agree that the seller may not be subject to any warranty.

**Art. 1628**

Although it be said that the seller may not be subject to any obligation, he nevertheless remains liable to that which results from an act which is his own; any agreement to the contrary is void.

**Art. 1629**

In the same case of stipulation of no warranty, the seller, in case of dispossession, is bound to return the price, unless the purchaser knew, at the time of the sale, of the danger of dispossession, or unless he bought at his own risk.

**Art. 1630**

If a warranty has been promised, or if no stipulation was made in this respect, where the purchaser is dispossessed, he is entitled to claim against the seller:
1° The return of the price;
2° That of the fruits where he is obliged to return them to the owner who dispossesses him;
3° The expenses incurred in relation with the warranty claim of the buyer, and those incurred by the original plaintiff;
4° Finally, damages, as well as the expenses and proper costs of the contract.

**Art. 1631**

Where, at the time of dispossession, the thing sold has decreased in value or has been significantly damaged, either owing to the negligent conduct of the buyer, or by accidents of force majeure, the seller nevertheless is bound to return the whole price.

**Art. 1632**

But if the purchaser has derived some profit from the dilapidations made by him, the seller is entitled to retain from the price a sum equal to that profit.

**Art. 1633**

Where the thing sold has increased in price at the time of the dispossession, even independently from an act of the purchaser, the seller is obliged to pay him what it is worth above the price of the sale.

**Art. 1634**

CIVIL CODE

A seller is bound to repay the purchaser or to make the person who dispossesses him repay him for all the useful repairs and improvements which he has made on the tenement.

**Art. 1635**

Where a seller has sold the tenement of another in bad faith, he is obliged to repay the purchaser for all the expenses, even for luxury or pleasure, which the latter may have made on the tenement.

**Art. 1636**

Where a purchaser is dispossessed from only part of the thing, which is of such importance, in proportion to the whole, that the purchaser would not have bought without the part of which he is dispossessed, he may have the sale terminated.

**Art. 1637**

Where, in case of dispossession of part of a tenement sold, the sale is not terminated, the value of the part of which the purchaser is dispossessed shall be reimbursed to him according to an appraisal at the time of the dispossession, and not in proportion to the total price of the sale, whether the thing sold has increased or decreased in value.

**Art. 1638**

Where a property sold is, without any declaration having been made, encumbered with non-apparent servitudes which are of such importance that it is to be presumed that the purchaser would not have bought if he had known of them, he may apply for termination of the contract, unless he prefers to content himself with an indemnity.

**Art. 1639**

The other questions to which damages resulting for the purchaser from the non-performance of the sale may give rise shall be decided in accordance with the general rules established in the Title Of Contracts and of  Conventional Obligations in General.

**Art. 1640.**

-A warranty against dispossession ceases where the purchaser has allowed a final judgment, or a judgment no longer appealable, to be handed down against him without joining his seller in the proceedings, if the latter proves that there were sufficient grounds to have the action dismissed.

Paragraph 2
Of Warranty against the Defects of the Thing Sold                              Articles 1641 to 1649

**Art. 1641**

A seller is bound to a warranty on account of the latent defects of the thing sold which render it unfit for the use for which it was intended, or which so impair that use that the buyer would not have acquired it, or would only have given a lesser price for it, had he known of them.

**Art. 1642**

A seller is not liable for defects which are patent and which the buyer could ascertain for himself.

**Art. 1642-1**

*(Act no 67-547 of 7 July 1967)*

The seller of a building to be erected may not be discharged, either before approval of the work, or before the expiry of a period of one month after the vesting of the purchaser into possession, for defects of construction then patent.

There may be no occasion for avoidance of the contract or for diminution in price where the seller binds himself to repair the defect.

**Art. 1643**

He is liable for latent defects, even though he did not know of them, unless he has stipulated that he would not be bound to any warranty in that case.

**Art. 1644**

In the cases of Articles 1641 and 1643, the buyer has the choice either of returning the thing and having the price repaid to him or of keeping the thing and having a part of the price repaid to him, as appraised by experts.

**Art. 1645**

Where the seller knew of the defects of the thing, he is liable, in addition to restitution of the price which he received from him, for all damages towards the buyer.

**Art. 1646**

Where the seller did not know of the defects of the thing, he is only liable for restitution of the price and for reimbursing the buyer for the costs occasioned by the sale.

**Art. 1646-1**

*(Act no 78-12 of 4 Jan. 1978)*

The seller of a building to be erected is liable, from the approval of the work, for the obligations for which the architects, contractors and other persons bound towards the building owner by a contract of hiring of industry and services are themselves liable under Articles 1792, 1792-1, 1792-2 and 1792-3 of this Code.

Those warranties benefit the successive owners of the building.

CIVIL CODE

There may be no occasion for avoidance of the sale or diminution in price where the seller binds himself to repair the damages specified in Articles 1792, 1792-1 and 1792-2 of this Code and to take upon himself the warranty provided for in Article 1792-3.

**Art. 1647**

Where the thing which had defects perishes because of its bad quality, the loss falls upon the seller who is liable to the buyer for restitution of the price and other compensations explained in the two preceding Articles [Articles 1645 and 1646].

But a loss occasioned by a fortuitous event falls upon the buyer.

**Art. 1648**

The action resulting from redhibitory vices must be brought by the buyer"within a period of two years following the discovery of the vice" (Ord. no 2005-136 of 17 Feb. 2005).

(Act no 67-547 of 7 July 1967) In the case provided for in Article 1642-1, the action must be brought, under pain of being time-barred, within the year following the date on which the seller may be discharged from patent defects.

**Art. 1649**

It does nor take place with regard to sales made by order of the court.

CHAPTER V
Of the Obligations of the Buyer                                                      Articles 1650 to 1657

**Art. 1650**

The main obligation of the buyer is to pay the price on the day and at the place fixed by the sale.

**Art. 1651**

Where nothing has been fixed in this regard at the time of the sale, the buyer must pay at the place and at the time where and when delivery is to be made.

**Art. 1652**

The buyer owes interest on the price of the sale up to the time of the payment, in the three following cases:
Where it has been so agreed at the time of the sale;
Where the thing sold and delivered produces fruits or other incomes;
Where the buyer is under notice to pay.
In that last case, interest runs only from the notice.

**Art. 1653**

Where the buyer is disturbed or rightly fears that he will be disturbed by an action, either for a mortgage  or for recovery  of property, he may suspend the payment of the price until the seller has caused the disturbance to cease, unless the latter prefers to give security, or unless it was stipulated that the buyer will pay notwithstanding a disturbance.

**Art. 1654**

Where the buyer does not pay the price, the seller may apply for avoidance of the sale.

**Art. 1655**

The avoidance of a sale of immovables  shall be ordered at once where the seller is in danger of losing the thing and the price.

Where that danger does not exist, the judge may grant the purchaser a period more or less long according to the circumstances.

Where that period expires without the buyer having paid, the avoidance of the sale shall be ordered.

**Art. 1656**

Where it has been stipulated at the time of the sale of immovables that, failing payment within the period agreed upon, the sale will be avoided by operation of law, the purchaser may nevertheless pay after the expiry of the period, so long as he is not given notice by a demand for payment; but, after that demand, the judge may not grant him any period.

**Art. 1657**

In matters of sale of commodities and movable effects, the avoidance of the sale takes place by operation of law, and without any demand, for the benefit of the seller, after the expiry of the period agreed  upon for the removal.

CHAPTER VI
Of Avoidance and Rescission of Sales                                            Articles 1659 to 1658

**Art. 1658**

Independently of the grounds for annulment or avoidance already explained in this Title, and of those which are common to all agreements, a contract of sale may be avoided through the exercise of a power of redemption and on account of the cheapness of the price.

SECTION I
Of Power of Redemption                                                            Articles 1659 to 1673

**Art. 1659**

CIVIL CODE

A power of redemption or repurchase is an agreement by which the seller reserves to himself the taking back of the thing sold, through restitution of the purchase price, and the reimbursement which Article 1673 deals with.

**Art. 1660**

A power of redemption may not be stipulated for a time exceeding five years.

Where it has been stipulated for a longer time, it shall be reduced to that time.

**Art. 1661**

The time fixed is of the essence and may not be extended by the judge.

**Art. 1662**

Where the seller has not exercised his power of redemption within the time fixed, the purchaser remains the irrevocable owner.

**Art. 1663**

The time runs against all persons, even against a minor, subject to a remedy against those whom it may concern, if there is occasion.

**Art. 1664**

The seller under a clause of redemption may exercise his power against a second purchaser, even when the power of redemption has not been declared in the second contract.

**Art. 1665**

The purchaser under a clause of redemption exercises all the rights of his seller; he may acquire ownership by prescription both against the true owner and against those who claim rights or mortgages on the thing sold.

**Art. 1666**

He may oppose the benefit of seizure and sale against the creditors of his seller.

**Art. 1667**

Where the purchaser under a clause of redemption of an undivided part of a property becomes the successful bidder for the whole in an auction sale induced against him, he may compel the seller to take back the whole when the latter wishes to make use of the clause.

**Art. 1668**

Where several persons have jointly sold, and by a same contract, a common property, each may exercise the power of redemption only for the share which he had in it.

**Art. 1669**

It shall be the same where the person who has sold a property alone has left several heirs.

Each one of these co-heirs may make use of the power of redemption only for the share he takes in the succession.

**Art. 1670**

But, in the case of the two preceding Articles, the purchaser may demand that all the co-sellers or all the co-heirs be joined in the proceedings in order to agree between them as to the redemption of the whole property; and where they do not agree, their action shall be dismissed.

**Art. 1671**

Where the sale of a property belonging to several persons has not been jointly made and of the whole property together, and where each  has only sold the share which he had therein, they may exercise separately the power of redemption on the portion which belonged to them;

And the purchaser may not compel the one who enforces it in that way to redeem the whole.

**Art. 1672**

Where the purchaser has left several heirs, the power of redemption may be exercised against each of them only for his share, in the case where the thing is still undivided, and in that where the thing sold has been partitioned between them.

But, where a partition of the succession has taken place, and the property sold has fallen to the share of one of them, the power of redemption may be exercised against him for the whole.

**Art. 1673**

A seller who makes use of a clause of redemption shall reimburse not only the purchase price, but also the expenses and fair costs of the sale, the necessary repairs and those which have increased the value of the tenement, up to the amount of that increase. He may be vested into possession only after having discharged all those obligations.

(Ord. no 59-71 of 7 Jan. 1959) Where the seller comes into his property again through the effect of a clause of redemption, he retakes it free of all encumbrances and mortgages with which the purchaser may have burdened it, provided that the clause has been duly registered at the land registry, before the registration of the said encumbrances and mortgages. He is bound to carry out the leases made without fraud by the purchaser.

SECTION II

Of Rescission of Sales because of Loss                                        Articles 1674 to 1685

**Art. 1674**

Where a seller has suffered a loss greater than seven-twelfths of the price of an immovable, he is entitled to apply

CIVIL CODE

for the rescission of the sale, even though he may have expressly renounced in the contract the faculty of applying for that rescission and have declared to donate the surplus.

**Art. 1675**

In order to ascertain whether there has been a loss of the seven-twelfths, the immovable must be appraised according to its condition and its value at the time of the sale.

(Act of 28 Nov. 1949) In the case of a unilateral promise of sale, the loss is appraised on the day of its execution.

**Art. 1676**

The claim is no longer admissible after the expiry of two years, after the day of the sale.

That time runs against [married women, repealed by implication], and against absentees, adults in guardianship and minors coming in the right of an adult who has sold.

That time also runs and is not suspended during the period stipulated for a clause of redemption.

**Art. 1677**

Proof of loss may be allowed only through judgment, and in the case only where the facts alleged are probable and serious enough to induce a presumption of loss.

**Art. 1678**

That proof may be adduced only through a report drawn by three experts who are obliged to make a single joint memorandum, and to give but a single opinion by a plurality of votes.

**Art. 1679**

Where there are different opinions, the memorandum shall contain the reasons thereof, but it shall not be allowed to disclose the opinion of each expert.

**Art. 1680**

The three experts shall be appointed by the court, unless the parties have agreed to appoint all three jointly.

**Art. 1681**

In the case where the action for rescission is entertained, the purchaser has the choice, either to return the thing while taking back the price which he paid for it, or to keep the tenement while paying the balance of the fair price, after deducting one-tenth of the total price.

A third party in possession has the same right, save his warranty against his seller.

**Art. 1682**

Where the purchaser prefers to keep the thing by paying the balance specified by the preceding Article, he owes the interest of that balance, from the day of the claim for rescission.

Where he prefers to return it and to take back the price, he shall return the fruits from the day of the claim.

Interest on the price which he has paid is also counted for him from the day of the same claim, or from the day of payment, where he has not collected any fruits.

**Art. 1683**

Rescission for loss does not take place in favour of the buyer.

**Art. 1684**

It does not take place in any sale which, according to law, may only be made by order of the court.

**Art. 1685**

The rules explained in the preceding Section for cases in which several persons have sold jointly or separately, and for the one in which the purchaser has left several heirs, shall likewise be complied with when bringing an action for rescission.

CHAPTER VII

Of Auction                                                                 Articles 1686 to 1688

**Art. 1686**

Where a thing common to several persons cannot be partitioned conveniently and without loss;

Or where, in a partition of property in common made amicably, there is any property which none of the coparceners can or wishes to take,

A sale thereof shall be made by auction and the proceeds shall be distributed between the co-owners.

**Art. 1687**

Each co-owner is at liberty to request that outsiders be given notice of the sale: they shall necessarily be given notice where one of the co-owners is a minor.

**Art. 1688**

The method and formalities to be complied with for an auction are explained in the Title Of Successions and in the Code of Civil Procedure.

CHAPTER VIII

Of Assignment of Claims and Other Incorporeal Rights                        Articles 1689 to 1701

CIVIL CODE

**Art. 1689**

In case of assignment of a claim, or of a right or of an action against a third party, delivery takes place between the assignor and the assignee by handing over the instrument of title.

**Art. 1690**

An assignee is vested with regard to third parties only by notice of the assignment served upon the debtor.

Nevertheless, the assignee may likewise be vested by acceptance of the assignment given by the debtor in an authentic act.

**Art. 1691**

Where, before the debtor has been given notice by the assignor or the assignee, the debtor has paid the assignor, he is lawfully discharged.

**Art. 1692**

The sale or assignment of a claim includes the accessories of the claim, such as security, prior charges and mortgages.

**Art. 1693**

A person who sells a claim or any other incorporeal right must warrant its existence at the time of the assignment, even though it is made without warranty.

**Art. 1694**

He is responsible for the solvency of the debtor only where he has bound himself thereto, and only up to the amount of the price which he has received for the claim.

**Art. 1695**

Where he has promised the solvency of the debtor, that promise only relates to the present solvency, and does not extend to the future, unless the assignor has expressly so stipulated.

**Art. 1696**

A person who sells an inheritance without specifying its contents in detail, is bound to warrant only his capacity as heir.

**Art. 1697**

If he had already benefited by fruits of some tenement or received the amount of some claim belonging to that inheritance, or sold some effects of the succession, he is bound to reimburse the purchaser therefor, unless he has expressly reserved them at the time of the sale.

**Art. 1698**

The purchaser must on his part reimburse the seller for what the latter has paid for the debts and charges of the succession, and recompense him for everything for which he was creditor, unless otherwise stipulated.

**Art. 1699**

A person against whom a litigious right has been assigned may have himself released by the assignee by reimbursing him for the actual price of the assignment with the expenses and fair costs, and with interest from the day when the assignee has paid the price of the assignment made to him.

**Art. 1700**

A matter is deemed litigious as soon as there is a case and controversy as to the merits of the right.

**Art. 1701**

The provision laid down in Article 1699 shall not apply:

1° In the case where the assignment has been made to a co-heir or co-owner of the right assigned;

2° Where it has been made to a creditor in payment of what is due to him;

3° Where it has been made to the possessor of the property to which the litigious right relates.

**TITLE VII**
**OF EXCHANGES**                                                                      **Articles 1702 to 1707**

**Art. 1702**

An exchange is a contract by which the parties give to each other one thing for another.

**Art. 1703**

An exchange is the outcome of the sole consent of the parties, in the same manner as a sale.

**Art. 1704**

Where one of the exchangers has already received the thing given to him in exchange and he proves afterwards that the other contracting party is not the owner of that thing, he may not be compelled to deliver the thing that he has promised in mutual exchange, but only to return the thing which he has received.

**Art. 1705**

The exchanger who is dispossessed of the thing which he has received in exchange has the choice between claiming damages or claiming back his thing.

CIVIL CODE

**Art. 1706**
Rescission on account of loss does not take place in contracts of exchange.

**Art. 1707**
All the other rules laid down for contracts of sale shall apply to exchanges as to other issues.

**TITLE VIII**
**OF HIRING**                                                              **Articles 1708 to 1831**

    CHAPTER I
    General Provisions                                    Articles 1708 to 1712

**Art. 1708**
There are two kinds of contracts of hiring:
One for things,
And one for work.

**Art. 1709**
The hiring of things is a contract by which one of the parties binds himself to have the other enjoy a thing during a certain time, and at a charge of a certain price which the latter binds himself to pay him.

**Art. 1710**
The hiring of work is a contract by which one of the parties binds himself to do something for the other, at a charge of a price agreed between them.

**Art. 1711**
These two modes of hiring are further subdivided into several particular kinds:
The hiring of houses and movables is called a lease for rent;
That of rural property, an agricultural lease;
That of work or of service, a hire;
That of animals of which the profits are divided between the owner and the one to whom he entrusts them, a livestock lease;
Estimates, contracts or fixed bargains, for the undertaking of a work at a charge of a determined price, are also hiring, where the material is provided by the one for whom the work is done.
These last three kinds have special rules.

**Art. 1712**
Leases of national property, of the property of communes and public institutions are subject to special rules.

    CHAPTER II
    Of the Rental of Things                               Articles 1714 to 1713

**Art. 1713**
One may rent all kinds of property, movables and immovables.

    SECTION I
    Of Rules Common to Leases of Houses and of Rural Property        Articles 1714 to 1751

**Art. 1714**
*(Ord. of 17 Oct. 1945; Act no 46-682 of 13 April 1946)*
One may lease either in writing or verbally, except, as regards rural property, for the application of the rules particular to agricultural leases and sharecropping.

**Art. 1715**
Where a lease made without any writing has not yet been carried out, and one of the parties denies it, proof may not be adduced through witnesses, however moderate the price may be, and although it is alleged that a deposit was paid.
Oath may be tendered only to the one who denies the lease.

**Art. 1716**
Where there is a controversy as to the price of a verbal lease which is being carried out, and there is no receipt, the owner shall be believed upon his oath, unless the tenant prefers to apply for an appraisal by experts; in which case, the costs of the appraisement shall be charged to him, if the   appraisal exceeds the price which he has declared.

**Art. 1717**
A lessee has the right to sublet or even to assign his lease to another person, unless that faculty has been forbidden to him.
It may be forbidden wholly or in part.
Such a clause is always strict.

**Art. 1718**
*(Act no 65-570 of 13 July 1965)*
The provisions of Article 595, paragraphs 2 and 3, relating to leases made by usufructuaries shall apply to leases

CIVIL CODE

made by a guardian without authorization of the family council.

**Art. 1719**

A lessor is bound, by the nature of the contract, and without need of any particular stipulation:

1° To deliver the thing leased to the lessee "and, where the main dwelling of the latter is concerned, a decent lodging" (Act no 2000-1208 of 13Dec. 2000);

2° To maintain that thing in order so that it can serve the use for which it has been let;

3° To secure to the lessee a peaceful enjoyment for the duration of the lease;

4° (Act no 46-682 of 13 April 1946) To secure also the permanence and quality of plantings.

**Art. 1720**

A lessor is bound to deliver the thing in good repair of whatever character.

He must, during the term of the lease, make all the repairs which may become necessary, other than those incumbent upon lessees.

**Art. 1721**

A warranty is due to the tenant for all vices or defects of the thing leased which prevent use of it, although the lessor did not know of them at the time of the lease.

Where any loss results to the lessee from those vices or defects, the lessor is obliged to indemnify him.

**Art. 1722**

Where, during the term of the lease, the thing leased is wholly destroyed by a fortuitous event, the lease is terminated by operation of law; where it is destroyed only in part, the lessee may, according to the circumstances, apply either for a reduction in price, or even for termination of the lease. In either case, no compensation is owed.

**Art. 1723**

A lessor may not, during the term of the lease, change the form of the thing leased.

**Art. 1724**

Where, during the lease, the thing leased needs urgent repairs which cannot be postponed until its end, the lessee must bear them, whatever inconvenience they cause him and although he is deprived of a part of the thing leased while they are being made.

But where those repairs last more than forty days, the rent shall be reduced in proportion to the time and to the part of the thing leased of which he has been deprived.

Where the repairs are of such a nature that they render uninhabitable what is required for the lodging of the lessee and his family, he may have the lease terminated.

**Art. 1725**

A lessor is not bound to warrant the lessee against disturbance which third persons cause to his enjoyment by assault, without claiming  in other respects any right to the thing leased; but the lessee may proceed against them in his own name.

**Art. 1726**

Where, on the contrary, the tenant or the farmer have been disturbed in their enjoyment in consequence of an action relating to the ownership of the tenement, they are entitled to a proportionate reduction of the rent of the lease or agricultural lease, provided that a notice of the disturbance and of the impediment has been served upon the owner.

**Art. 1727**

Where those who have committed assault claim to have some right to the property leased, or where the lessee himself is summoned in court to be ordered to relinquish all or part of that thing, or to suffer the exercise of some servitude, he must have the lessor made a party to warranty proceedings and shall be left out of the action, if he so demands, by naming the lessor on whose behalf he possesses.

**Art. 1728**

A lessee is bound to two main obligations:

1° To make use of the thing leased as a prudent administrator and according to the purposes intended by the lease, or according to those presumed under the circumstances, failing an agreement;

2° To pay the rent at the agreed times.

**Art. 1729**

Where the lessee uses the thing leased for another use than the one for which it was intended, or from which damage may result to the lessor, the latter may, according to the circumstances, have the lease terminated.

**Art. 1730**

Where an inventory of fixtures has been made between the lessor and the lessee, the latter must return the thing such as he received it, according to that inventory, except for what has perished or has been deteriorated through decay or force majeure.

**Art. 1731**

Where no inventory has been made, the lessee is presumed to have received the premises in a good state of repairs incumbent upon lessees, and must return them in the same state, except for proof to the contrary.

CIVIL CODE

**Art. 1732**
He is answerable for the deteriorations or losses occurring during his enjoyment, unless he proves that they took place without his fault.

**Art. 1733**
He is answerable for fire, unless he proves:
That the fire happened by a fortuitous event or force majeure, or by a defect of construction, or
That the fire was communicated through a neighbouring house.

**Art. 1734**
*(Act of 5 Jan. 1883)*
Where there are several tenants, they are all liable for a fire in proportion to the rental value of the part of the building which they occupy;
Unless they prove that the fire has originated in the dwelling of one of them, in which case, that one alone is liable; or
Unless some of them prove that the fire could not have started with them, in which case those ones are not liable.

**Art. 1735**
A lessee is responsible for the deteriorations and losses which occur through the act of persons of his house or of his sub-tenants.

**Art. 1736**
Where a lease was made without writing, one of the parties may give the other notice to quit only by observing the period fixed by the usage of the place.

**Art. 1737**
A lease ceases by operation of law at the expiry of the term fixed, where it has been made in writing, without it being necessary to give notice to quit.

**Art. 1738**
Where, at the expiry of written leases, the lessee remains and is left in possession, a new lease takes place, whose effect is regulated by the Article relating to leases made without writing.

**Art. 1739**
Where a notice to quit has been served, the lessee, although he has continued his enjoyment, may not invoke a tacit renewal.

**Art. 1740**
In the case of the two preceding Articles, a security given for a lease does not extend to the obligations resulting from an extension.

**Art. 1741**
A contract of lease is terminated by the loss of the thing leased and by the respective failure of the lessor and the lessee to perform their undertakings.

**Art. 1742**
A contract of lease is not terminated by the death of the lessor or by that of the lessee.

**Art. 1743**
*(Ord. no 45-2380 of 17 Oct. 1945; Act no 46-682 of 13 April 1946)*
Where a lessor sells a thing leased, the purchaser may not evict the agricultural tenant, sharecropper or tenant who has an authentic lease or one whose date is undisputable.
He may, however, evict a tenant of non-rural property where he has reserved that right by the contract of lease.

**Art. 1744**
*(Ord. no 45-2380 of 17 Oct. 1945)*
Where it was agreed at the time of the lease that in case of sale, the purchaser would be allowed to evict the lessee and no stipulation was made as to damages, the lessor is bound to indemnify the tenant in the following manner;

**Art. 1745**
In case of a house, apartment or shop, the lessor shall pay to the evicted tenant, as damages, a sum equal to the price of the rent during the time which, according to the usage of the place, is allowed between the notice to quit and the departure.

**Art. 1746**
In case of rural property, the indemnity which the lessor must pay shall be one-third of the price of the lease for the whole time which remains to run.

**Art. 1747**
Where manufactures, factories or other establishments which require large advances are concerned, the indemnity shall be fixed by experts.

**Art. 1748**

CIVIL CODE
*(Ord. no 45-2380 of 17 Oct. 1945)*
A purchaser who wishes to make use of the faculty reserved by the lease to evict a tenant in case of sale is also bound to inform him within the period customary in the place for notices to quit.

**Art. 1749**
*(Ord. no 45-2380 of 17 Oct. 1945)*
Tenants may not be evicted  unless the damages explained above have been paid to them by the lessor or, in his default, by the new purchaser.

**Art. 1750**
Where a lease is not made by authentic instrument or has not an undisputable date, the purchaser is not liable for any damages.

**Art. 1751**
*(Act no 62-902 of 4 Aug. 1962)*
The right to a lease of premises, without professional or commercial character, which is actually used for the dwelling of two spouses and even where the lease was concluded before the marriage, is, whatever their matrimonial regime may be and notwithstanding any agreement to the contrary, considered to belong to both spouses.
In case of divorce or judicial separation, that right may be allotted by the court seized of the application for divorce or judicial separation, on account of the social and family interests concerned, to one of the spouses, subject to the rights to reimbursement or indemnity for the benefit of the other spouse.
(Act no 2001-1135 of 3 Dec. 2001) In case of death of one of the spouses, the surviving spouse co-lessee has an exclusive right on it, except where he or she expressly renounces it.

SECTION II
Of Special Rules for Leases of Houses                                        Articles 1752 to 1762

**Art. 1752**
A tenant which does not garnish the house with sufficient furniture may be evicted, unless he gives sufficient security to answer for the rent.

**Art. 1753**
A sub-tenant is liable to the owner only up to the amount of the price of his sub-lease which he may owe at the time of the seizure, without his being allowed to set off payments made in advance.
Payments made by a sub-tenant either under a stipulation contained in his lease, or as a consequence of the usage of the place, are not deemed to be made in advance.

**Art. 1754**
Repairs incumbent upon the tenant or those of routine maintenance for which a tenant is responsible, unless otherwise stipulated, are those which are considered as such by the usage of the place and, among others, the repairs to be made :
To fireplaces, back-plates, mantelpieces and mantelshelves;
To the plastering of the bottom of walls of flats and other places of dwelling, to the height of one metre;
To pavements and tiles of rooms, where only a few are broken;
To panes of glass, unless they are broken by hail, or other accidents, extraordinary and by force majeure, for which a tenant may not be made responsible;
To doors, windows, boards for partitioning or closing shops, hinges, bolts and locks.

**Art. 1755**
None of the repairs deemed as incumbent upon a tenant may be charged to tenants, where they are occasioned only through decay or force majeure.

**Art. 1756**
The cleaning of wells and that of cesspools are charged to the lessor, unless there is a clause to the contrary.

**Art. 1757**
A lease of furniture supplied to garnish a whole house, a whole main building, a shop, or all others flats, is deemed made for the usual duration of leases of houses, main buildings, shops or other flats, according to the usage of the place.

**Art. 1758**
A lease of a furnished apartment is deemed made by the year where it has been made for so much a year;
By the month, where it has been made for so much a month;
By the day, where it has been made for so much a day.
Where nothing shows that the lease was made for so much a year, a month or a day, the tenancy is deemed made according to the usage of the place.

**Art. 1759**
Where the tenant of a house or a flat continues his enjoyment after the expiry of the lease in writing, without objection on the part of the lessor, he shall be deemed to occupy them under the same conditions, for the term fixed by the usage of the place, and he may not leave nor be evicted except  after a notice to quit served according to the usage

CIVIL CODE
of the place.

**Art. 1760**
In case of termination owing to the fault of the lessee, the latter is bound to pay the price of the rent during the time necessary for re-renting, without prejudice to damages which may have resulted from the abuse.

**Art. 1761**
A lessor may not terminate the tenancy, although he declares that he wishes to occupy himself the house leased , unless there is a stipulation to the contrary.

**Art. 1762**
Where it was agreed, in the contract of lease, that the lessor may come and occupy the house, he is bound to give notice to quit in advance, at the times fixed by the usage of the place.

SECTION III
Of Special Rules for Agricultural Leases                                    Articles 1763 to 1778

**Art. 1763**
[repealed]

**Art. 1764**
In case of breach, the owner is entitled to re-enter into enjoyment and the lessee shall be ordered to pay the damages resulting from the non-performance of the lease.

**Art. 1765**
Where, in an agricultural lease, tenements are given a lesser or greater capacity than the one they really have, there is occasion for an increase or a decrease  in price for the farmer only in the cases and under the conditions expressed in the Title Of Sales.

**Art. 1766**
Where the lessee of a rural property does not furnish it with cattle and implements necessary for its farming, where he abandons cultivating, where he does not cultivate as a prudent owner, where he makes of the thing leased a use other than that for which it was intended, or, in general, where he does not comply with the terms of the lease and the lessor suffers a loss thereby, the lessor may, according to the circumstances, have the lease terminated.
In case of termination owing to an act of the lessee, he is liable for damages, as is stated in Article 1764.

**Art. 1767**
Any lesser of rural property is bound to store the crops in the place provided for that purpose according to the lease.

**Art. 1768**
A lessee of rural property is bound to give notice to the owner of all encroachments which may be committed against the tenements, on pain of all costs and damages.
That notice must be given within the same period as that fixed for the case of an originating claim according to the distance between places.

**Art. 1769**
Where the lease is made for several years, and, during the term of lease, the whole or half of a crop at least is carried off by fortuitous events, the farmer may ask for a rebate of the price of the lease, unless he is compensated by the preceding crops.
Where he is not compensated, the appraisal of the rebate may take place only at the end of the lease, at which time, a set-off shall be made of all the years of enjoyment;
And nevertheless the judge may temporarily exempt the lessee from paying a part of the price by reason of the loss suffered.

**Art. 1770**
Where a lease is only for one year, and the loss is of the whole or at least of half the fruits, the lessee is discharged from a proportionate part of the price of the rent.
He may not claim any rebate where the loss is of less than one-half.

**Art. 1771**
A farmer may not obtain any rebate where the loss of the fruits occurs after they have been separated from the ground, unless the lease gives the owner a share of the crop in kind; in which case, the owner must bear his share of the loss, provided the lessee was not under notice to deliver his share of the crop to him.
Neither may a farmer ask for a rebate, where the cause of the damage existed and was known at the time when the lease was made.

**Art. 1772**
A lessee may be made responsible for fortuitous events by an express stipulation.

**Art. 1773**
That stipulation shall only apply to ordinary fortuitous events, such as hail, lightning, frost or failure of the crop.
It may not extend to extraordinary fortuitous events, such as the ravages of war, or a flood, to which the country is

CIVIL CODE

not ordinarily subject, unless the lessee has been made responsible for all the fortuitous events, foreseen or unforeseen.

**Art. 1774**

An unwritten lease of a rural tenement, is deemed made for the time which is necessary in order that the lessee collects all the fruits of the property farmed.

Thus an agricultural lease of a field, of a vineyard, and of any other tenement whose fruits are collected in whole during the course of a year, is deemed made for one year.

A lease of arable lands, where they are divided by break or season, is deemed made for as many years as there are breaks.

**Art. 1775**

*(Act of 15 July 1942)*

A lease of rural properties, although unwritten, ceases at the expiry of the time specified by the preceding Article only through the effect of a written notice to quit given by one of the parties to the other, six months at least before that time.

Failing a notice to quit given in the time above specified, a new lease takes place whose effect is regulated by Article 1774.

It shall be the same where, at the expiry of written leases, the lessee remains and is left in possession.

**Art. 1776**

[repealed]

**Art. 1777**

A departing farmer must leave to the one who succeeds him in the cultivation, suitable lodging and other facilities for the work of the following year; and reciprocally, the entering farmer must provide the one who is departing with suitable lodging and other facilities for the consumption of fodder and for harvests which remain to be made.

In either case, the usage of the place must be complied with.

**Art. 1778**

A departing farmer must also leave the straws and manure of the year, where he has received them on entering into possession; and even where he did not receive them, the owner may retain them according to his appraisal.

CHAPTER III

Of the Hiring of Industry and Services                                Articles 1780 to 1779

**Art. 1779**

There are three main kinds of hiring of industry and services:

1° The hiring of workers who enter the service of someone;

2° That of carriers, as well by land as by water, who undertake to carry persons or goods;

3° (Act no 67-3 of 3 Jan. 1967) That of architects, contractors for work and technicians following research, estimates or contracts.

SECTION I

Of the Hiring of Servants and Workers                                Articles 1780 to 1781

**Art. 1780**

One person may engage his services only for a time , or for a specified undertaking.

(Act of 27 Dec. 1890) The hiring of services made without determination of duration may always cease through the wish of one of the contracting parties.

Nevertheless, the termination of the contract through the wish of one only of the contracting parties may give rise to damages.

To fix the compensation to be granted, if any, account shall be taken of usages, of the nature of the services hired, of the time elapsed, of the deductions made and of the payments made in view of a retirement pension, and, in general, of all the circumstances which may establish the existence and determine the extent of the loss caused.

The parties may not renounce in advance the contingent right to claim damages under the above provisions.

The controversies to which the application of the preceding paragraphs may give rise, when they are brought before civil courts and before courts of appeal, shall be prepared for trial as summary proceedings and tried as emergencies.

**Art. 1781**

[repealed]

SECTION II

Of Carriers by Land and Water                                Articles 1782 to 1786

**Art. 1782**

Carriers by land and by water are subject, for the custody and preservation of the things which are entrusted to them, to the same obligations as innkeepers who are dealt with in the Title Of Deposits and of Sequestration.

**Art. 1783**

They answer not only for what they have already received in their boat or carriage, but also for what has been delivered to them in port or in warehouse, to be placed in their boat or carriage.

CIVIL CODE

**Art. 1784**

They are liable for the loss and damages of the things which are entrusted to them, unless they prove that they have been lost or damaged by fortuitous event or force majeure.

**Art. 1785**

Common carriers by land or by water, and public haulage contractors, must keep account books for the money, the articles and parcels which they take charge of.

**Art. 1786**

Common carriers and directors of public carriage and haulage, masters of boats and ships, are in addition subject to particular regulations which constitute the law between them and other citizens.

SECTION III

Of Estimates and of Works                                                          Articles 1787 to 1792-7

**Art. 1787**

Where one instructs a person to do a work, it may be agreed that he will furnish his work or his industry only, or that he will also furnish the material.

**Art. 1788**

Where, in case the worker furnishes the material, the thing happens to perish, in whatever manner, before it is delivered, the loss falls upon the worker, unless the master was given notice to receive the thing.

**Art. 1789**

In case the worker furnishes his work only, if the thing happens to perish, the workman is liable for his fault only.

**Art. 1790**

Where, in the case of the preceding Article, the thing happens to perish, although without any fault on the worker's part, before the work was received, and without the master being given notice to check it, the worker may not claim any wages, unless the thing has perished through defect of the material.

**Art. 1791**

Where a work for several pieces or by measure is concerned, it may be checked by parts: checking is deemed to have been made for all the parts paid, if the master pays the worker in proportion to the work done.

**Art. 1792**

*(Act no 78-12 of 4 Jan. 1978)*

Any builder of a work is liable as of right, towards the building owner or purchaser, for damages, even resulting from a defect of the ground, which imperil the strength of the building or which, affecting it in one of its constituent parts or one of its elements of equipment, render it unsuitable for its purposes.

Such liability does not take place where the builder proves that the damages were occasioned by an extraneous event.

**Art. 1792-1**

*(Act no 78-12 of 4 Jan. 1978)*

Are deemed builders of the work:

1° Any architect, contractor, technician or other person bound to the building owner by a contract of hire of work;

2° Any person who sells, after completion, a work which he built or had built;

3° Any person who, although acting in the capacity of agent for the building owner, performs duties similar to those of a hirer out of work.

**Art. 1792-2**

*(Act no 78-12 of 4 Jan. 1978)*

The presumption of liability established by Article 1792 also extends to damages affecting the strength of the elements of equipment of a "work" (Ord. no 2005-658 of 8 June 2005), but only where the latter are an indissociable and integral part of the works of development, foundation, ossature, close or cover.

An element of equipment is deemed to be an indissociable part of one of the works "of development, foundation, ossature, close or cover" (Ord. no 2005-658 of 8 June 2005) where the demounting, disassembling or replacing thereof cannot be effected without deterioration or removal of material from that work.

**Art. 1792-3**

*(Act no 78-12 of 4 Jan. 1978)*

Other elements of equipment of a "work" (Ord. no 2005-658 of 8 June 2005), are the subject of a warranty of good running for a minimum period of two years "as from its approval" (Ord. no 2005-658 of 8 June 2005).

**Art. 1792-4**

*(Act no 78-12 of 4 Jan. 1978)*

The manufacturer of a work, of a part of a work or of an element of equipment designed and produced for meeting precise and predetermined requirements when in working order, is jointly and severally liable for the obligations placed by Articles 1792, 1792-2 and 1792-3 on the hirer out of work who made use, without modification and in compliance with the directions of the manufacturer, of the work, part of work or element of equipment concerned.

CIVIL CODE

For the purpose of this Article, shall be treated in the same way as manufacturers:

A person who imported a work, a part of work or an element of equipment manufactured abroad;

A person who presented it as his own work by having his name, his trade mark or any other distinguishing sign appear on it.

**Art. 1792-5**

*(Act no 78-12 of 4 Jan. 1978)*

Any clause of a contract having the purpose, either of excluding or limiting the liability provided for in Articles 1792, 1792-1 and 1792-2, or of excluding "the warranties provided for in Articles 1792-3 and 1792-6" (Act no 90-1129 of 19 Dec. 1990) or of limiting their extent, or setting aside or limiting the joint and several liability provided for in Article 1792-4, shall be deemed not written.

**Art. 1792-6**

*(Act no 78-12 of 4 Jan. 1978)*

Approval is the act by which the building owner declares that he accepts the work with or without reservation. It occurs at the suit of the first requesting party, either amicably or, failing which, judicially. In any case, it shall be pronounced adversarily.

The warranty of perfected completion, to which a contractor is held during a period of one year, after the approval, extends to the repairs of all shortcomings indicated by the building owner, either through reservations mentioned in the memorandum of approval, or by way of written notice as to those revealed after the approval.

The periods required for the carrying out of the works of repair shall be fixed by common agreement by the building owner and the contractor concerned.

Failing such an agreement or in case of non-carrying out within the period fixed, the works may, after a notice of default remained ineffective, be carried out at the expenses and risks of the defaulting contractor.

The carrying out of the works required under the warranty of perfected completion shall be established by common agreement or, failing which, judicially.

The warranty does not extend to the works required to remedy the effects of normal wear or of use.

**Art. 1793**

Where an architect or a contractor has undertaken to erect a building at a fixed price, according to a plan settled and agreed with the owner of the ground, he may not ask for any increase in the price, either under the pretext of increase in labour or material, or under that of changes or additions made in the plan, unless those changes or additions have been authorized in writing and the price agreed with the owner.

**Art. 1794.**

-A master may, by his wish alone, terminate a contract at a fixed price, although the work has already begun, by compensating the contractor for all his expenses, for all his works, and for all that he could have earned in that undertaking.

**Art. 1795**

A contract of hiring of work is dissolved by the death of the worker, of the architect or of the contractor.

**Art. 1796**

But the owner is bound to pay to their succession, in proportion to the price given in the agreement, the value of the works done and that of the materials prepared, only where those works or materials can be useful to him.

**Art. 1797**

A contractor is responsible for the acts of the persons whom he employs.

**Art. 1798**

Masons, carpenters and other workers who have been employed in the construction of a building , or of other works made under a contract to do work, have an action against the person for whom the works have been done only up to the amount for which that person is debtor towards the contractor, at the time when their action is instituted.

**Art. 1799**

Masons, carpenters, locksmiths and other workers who enter directly into contracts for a definite lump sum, are subject to the rules prescribed in this Section: they are contractors as to the part they undertake.

**Art. 1799-1**

*(Act no 94-475 of 10 June 1994)*

A building owner who enters into a private constructional works contract referred to in Article 1779, 3°, must warrant to the contractor the payment of the sums owed when they exceed a threshold fixed by decree in Conseil d'État  1.

Where a building owner has recourse to a specific credit for financing the works, the credit institution may not pay the amount of the loan to a person different from the ones mentioned in Article 1779, 3°, so long as the latter have not received payment of the whole of the claim arising from the contract corresponding to the loan. Payments shall be made by a written order and under the exclusive responsibility of the building owner into the hands of the person or of an agent appointed for that purpose.

Where a building owner does not have recourse to a specific credit or where he has recourse to it only in part, and failing a guarantee resulting from a particular stipulation, payment shall be warranted by a joint and several suretyship agreed to by a credit institution, an insurance company or an institution of collective guarantee, according to terms fixed

CIVIL CODE

by decree in Conseil d'État. So long as no guarantee has been given and the contractor is not paid for the works carried out, the latter may suspend performance of the contract after a notice of default remained ineffective at the end of a period of fifteen days.

(Act no 95-96 of 1 Feb. 1995) The provisions of the preceding paragraph shall not apply where the building owner enters into a constructional works contract on his own behalf and to meet needs which do not belong to an occupation relating to that contract.

The provisions of this Article shall not apply to the contracts concluded by a body referred to in Article L. 411-2 of the Building and Housing Code or by a semi-public company, for lodgings to be rented which have received an aid of the State and have been carried out by that body or company.

1 D. no 99-658 of 30 July 1999: 79 000 F (12 000 €)

**Art. 1792-7**

*(Ord. no 2005-658 of 8 June 2005)*

Shall not be considered as elements of equipment of a work within the meaning of Articles 1792, 1792-2 1792-3 and 1792-4 the elements of equipment, including their accessories, whose sole function is to allow the exercise of an occupation in the work.

CHAPTER IV

Of Leases of Livestock                                                                Articles 1800 to 1831

SECTION I

General Provisions                                                                        Articles 1800 to 1803

**Art. 1800**

A lease of livestock is a contract by which one of the parties gives the other a stock of cattle to be kept, fed and cared for, under the terms agreed between them.

**Art. 1801**

There are several kinds of leases of livestock:
Simple or ordinary lease of livestock,
Lease of livestock by halves,
Lease of livestock given to a farmer or sharecropper.
There is also a fourth kind of contract improperly named lease of livestock.

**Art. 1802**

A lease of livestock may be made for any kind of animals capable of increase or of profit for agriculture or trade.

**Art. 1803**

Failing special agreement, those contracts are regulated by the following principles.

SECTION II

Of Ordinary Leases of Livestock                                                    Articles 1804 to 1817

**Art. 1804**

An ordinary lease of livestock is a contract by which one person gives another cattle to be kept, fed and cared for, on condition that the lessee will profit from half the increase in stock and will also bear one-half of the loss.

**Art. 1805**

*(Act of 9 June 1941)*

The statement of the number, description and appraisal of the animals delivered, which appears in the lease, does not transfer ownership of them to the lessee. It has no other purpose than to be used as basis for the settlement to occur on the day when the contract comes to an end.

**Art. 1806**

A lessee is bound to give the care of a prudent owner to the preservation of the livestock.

**Art. 1807**

He is liable for a fortuitous event only where it was preceded by some fault on his part, without which the loss would not have occurred.

**Art. 1808**

In case of dispute, the lessee is bound to prove the fortuitous event, and the lessor is bound to prove the fault which he ascribes to the lessee.

**Art. 1809**

A lessee who is discharged by a fortuitous event is always bound to account for the hides of the animals.

**Art. 1810**

*(Act of 5 Nov. 1941)*

Where the livestock perishes in whole without a fault of the lessee, the loss falls on the lessor.

Where only a part of it perishes, the loss is borne jointly, according to the price of the original appraisal and that of the appraisal at the expiry of the lease.

CIVIL CODE

**Art. 1811**

It may not be stipulated:

That the lessee shall bear the total loss of the livestock, although occurred through a fortuitous event and without his fault;

Or that he shall bear in the loss a greater share than in the profits;

Or that the lessor shall, at the end of the lease, set apart something more than the livestock which he has furnished. Any agreement of this kind is void.

The lessee shall alone benefit from milk, manure and work of the animals leased.

The wool and the increase in stock shall be divided.

**Art. 1812**

A lessee may not dispose of any animal of a herd or flock, either from the stock or from the increase, without the consent of the lessor who himself may not dispose of it without the consent of the lessee.

**Art. 1813**

Where livestock is given to the tenant of another, notice of it must be given to the landlord from whom that tenant holds; otherwise, he may seize it and have it sold for what his tenant owes him.

**Art. 1814**

A lessee may not shear without the consent of the lessor.

**Art. 1815**

Where no time has been fixed by the agreement for the duration of a lease, it is deemed made for three years.

**Art. 1816**

The lessor may claim its termination sooner, where the lessee does not fulfil his obligations.

**Art. 1817**

*(Act of 9 June 1941)*

At the end of the lease or at the time of its termination, the lessor shall set apart animals of each kind in order to obtain a stock of cattle similar to that which he delivered, in particular as to number, breed, age, weight and quality of the animals; the excess shall be partitioned.

Where there are not enough animals to replenish the stock of cattle such as defined above, the parties shall account to each other for the loss on the basis of the value of the animals on the day when the contract comes to an end.

Any agreement under which, at the end of the lease or at the time of its termination, the lessee shall leave a stock of cattle of a value equal to the price of the appraisal of the one which he received, is void.

SECTION III

Of Leases of Livestock by Halves                    Articles 1818 to 1820

**Art. 1818**

A lease of livestock by halves is a firm in which each contracting party furnishes one half of the cattle, which remain in common for profits or for loss.

**Art. 1819**

A lessee shall alone profit from milk, manure and works of the animals, as in an ordinary lease of livestock.

A lessor shall be entitled only to one half of the wool and of the increase.

Any agreement to the contrary is void, unless the lessor is the owner of the farm of which the lessee is farmer or sharecropper.

**Art. 1820**

All the other rules of an ordinary lease of livestock shall apply to a lease of livestock by halves.

SECTION IV

Of Leases of Livestock Granted by an Owner to his Farmer or Sharecropper    Articles 1821 to 1830

Paragraph 1

Of Livestock Leased to a Farmer                    Articles 1821 to 1826

**Art. 1821**

*(Act of 9 June 1941)*

Such lease (also called iron lease of livestock) is one by which the owner of an agricultural holding gives it on lease on condition that at the expiry of the lease, the farmer shall leave the same stock of cattle as that which he received.

**Art. 1822**

*(Act of 9 June 1941)*

The statement of the number, description and appraisal of the animals delivered, which appears in the lease, does not transfer ownership of them to the lessee. It has no other purpose than to be used as basis for the settlement to occur on the day when the contract comes to an end.

**Art. 1823**

CIVIL CODE

All profits belong to the farmer during the period of his lease, unless otherwise agreed.

**Art. 1824**

In leases of livestock leased to a farmer, the manure is not among the personal profits of the lessees, but belongs to the farm, for the cultivation of which it must be exclusively used.

**Art. 1825**

*(Act of 5 Oct. 1941)*

Loss, even total and by fortuitous event, falls wholly upon the farmer, unless otherwise agreed.

**Art. 1826**

*(Act of 9 June 1941)*

At the end of the lease or at the time of its termination, the lessee shall leave animals of each kind composing a stock of cattle similar to that which he received, in particular as to number, breed, age, weight and quality of the animals.

Where there is an excess, it belongs to him.

Where there is a deficit, settlement between the parties shall be made on the basis of the value of the animals on the day when the contract comes to an end.

Any agreement under which, at the end of the lease or at the time of its termination, the lessee shall leave a stock of cattle of a value equal to the price of the appraisal of the one which he received, is void.

Paragraph 2
Of Livestock Leased to a Sharecropper                                    Articles 1827 to 1830

**Art. 1827**

*(Act of 5 Oct. 1941)*

Where the livestock perishes in whole without a fault of the sharecropper, the loss falls on the lessor.

**Art. 1828**

It may be stipulated that the sharecropper shall surrender to the lessor his part of the fleece at a price below the ordinary value;

That the lessor shall have a larger share of the profit;

That he shall have half of the milk;

But it may not be stipulated that the sharecropper shall bear the whole loss.

**Art. 1829**

Such lease comes to an end with the lease of the farm.

**Art. 1830**

As to other issues, it shall be subject to all the rules of an ordinary lease of livestock.

SECTION V
Of the Contract Improperly Named Lease of Livestock                      Article 1831

**Art. 1831**

Where one or several cows are given to be sheltered and fed, the lessor keeps ownership over them; he has only the profit of the calves which are born of them.

**TITLE VIII bis**
**OF THE CONTRACT OF REAL ESTATE PROMOTION**                             **Articles 1831-1 to**
                                                                          **1831-5**

**Art. 1831-1**

A contract of real estate promotion is an agency for the joint interest of both parties by which a person said"real estate promoter" binds himself towards a building owner to have the carrying out of a program of construction of one or several buildings undertaken for an agreed price and by way of contracts of hiring of services, as well as to undertake himself or have undertaken, for an agreed remuneration, all or part of the legal, administrative and financial formalities or transactions concurring for the same purpose. That promoter is the warrantor of the performance of the obligations placed on the persons with whom he has dealt on behalf of the building owner. "He is in particular responsible for the obligations resulting from Articles 1792, 1792-1, 1792-2 and 1792-3 of this Code" (Act no 78-12 of 4 Jan. 1978).

Where a promoter binds himself to perform personnaly part of the operations of the program, he is bound, as to those operations, for the obligations of a hirer out of works.

**Art. 1831-2**

As to the promoter, the contract involves authority to conclude contracts, approve the works, close agreements and generally, do in the name of the building owner, all the transactions required by the carrying out of the program, up to the amount of the lump-sum agreed.

However, a promoter binds the building owner, by the loans he contracts or the acts of disposal he enters into, only under a special agency contained in the contract or in a subsequent instrument.

The building owner is bound to perform the undertakings contracted on his behalf by the promoter within the authority which the latter holds under a statute or the agreement.

CIVIL CODE
**Art. 1831-3**

Where, before the completion of the program, the building owner assigns the rights he has on it, the assignee is substituted to him by operation of law, as to assets and liabilities, for the whole of the contract. "The assignor is warrantor of the performance of the obligations placed on the building owner by the contract assigned" (Act no 72-649 of 11 July 1972).

Special agencies given to the promoter continue between the latter and the assignee.

The promoter may not substitute a third party for himself in the performance of the obligations which he has contracted with the building owner without the consent of the latter.

A contract of real estate promotion is effective against third parties only from the date of its entry on the land register.

**Art. 1831-4**

The task of a promoter comes to an end with the delivery of the work only where the accounts for construction have been definitely settled between the building owner and the promoter, all of which without prejudicing the actions for damages which may belong to the building owner against the promoter.

**Art. 1831-5**

Judicial arrangement or liquidation does not involve as of right the termination of a contract of real estate promotion. Any stipulation to the contrary shall be deemed not written.

### TITLE IX
### OF FIRMS AND COMPANIES                                        Articles 1832 to 1873

CHAPTER I
General Provisions                                        Articles 1832 to
                                                          1844-17

**Art. 1832**
*(Act no 85-697 of 11 July 1985)*

A firm is established by two or several persons which agree by a contract to appropriate property or their industry for a common venture with a view to sharing the benefit or profiting from the saving which may result therefrom.

It may be established, in the cases provided for by statute, through an act of will of one person alone.

The members bind themselves to contribute to losses.

**Art. 1832-1**

"Even where they use only community property for the contributions to a firm or for the acquisition of shares of a firm, two spouses alone or with other persons may be members of a same firm and participate together or not in the management of the firm" (Act no 82-596 of 10 July 1982).

The advantages and gratuitous transfers resulting from a firm agreement between spouses may not be avoided because they would constitute disguised gifts, where their terms have been regulated by an authentic instrument.

**Art. 1832-2**
*(Act no 82-596 of 10 July 1982)*

One spouse may not, under the penalty provided for in Article 1427, make use of community property in order to make a contribution to a firm or acquire non-negotiable shares of a firm without the other spouse being informed thereof and proof of it being adduced in the instrument.

The capacity of member is acknowledged to the spouse who makes the contribution or the acquisition.

The capacity of member is also acknowledged, for half of the shares subscribed or acquired, to the spouse who gave notice to the firm of his or her intention to be personally a member. Where he or she gives notice of his or her intention at the time of the contribution or acquisition, the acceptance or agreement of the members is effective as to both spouses. Where the notice is after the contribution or acquisition, the clauses requiring approval provided for this purpose in the articles of association or of partnership are available as against the spouse; at the time of the resolution on approval, the member spouse does not participate in the vote and his or her shares are not taken into account in calculating the quorum and the majority.

The provisions of this Article shall apply only to firms whose shares are not negotiable and only until dissolution of the community.

**Art. 1833**

Every firm must have lawful objects and be formed in the common interest of the members.

**Art. 1834**

The provisions of this Chapter shall apply to all firms and companies, unless otherwise provided for by statute by reason of their form or of their objects.

**Art. 1835**

The memorandum and the articles of association or of partnership must be drawn up in writing. They shall determine, in addition to the contributions of each member, the form, the objects, the name, the registered place of business, the capital of the firm, the duration of the firm and its rules of functioning.

**Art. 1836**

CIVIL CODE

Unless otherwise stipulated, the memorandum and the articles may be amended only by unanimous agreement of the members.

In no case may the commitments of a member be increased without his consent.

**Art. 1837**

Every firm whose registered place of business is located on the French territory is subject to the provisions of French law.

Third parties may avail themselves of the registered place of business determined in the articles, but the latter is not available as against them where the actual place of business is located elsewhere.

**Art. 1838**

The duration of a firm may not exceed ninety-nine years.

**Art. 1839**

Where the memorandum and the articles do not contain all the statements required by legislation or where a formality prescribed by it for the formation of a firm was omitted or irregularly completed, any person concerned may apply to the court for having the regularization of the formation ordered, by the imposition of a periodic penalty payment. The Government procurator's office is entitled to sue for the same purposes.

The same rules shall apply in case of amendment of the memorandum and of the articles.

The action for purposes of regularization provided for in paragraph 1 is time-barred after three years from the registration of the firm or from the recording of the instrument amending the memorandum or the articles.

**Art. 1840**

The promoters, as well as the first members of the management, direction and administrative organs, are jointly and severally liable for the loss caused either by the want of a compulsory statement in the memorandum or the articles, or by the omission or irregular completion of a formality prescribed for the formation of the firm.

In case of amendment of the memorandum or of the articles, the provisions of the preceding paragraph shall apply to the members of the management, direction and administrative organs then in office.

The action is time-barred after ten years from the day when one or the other, according to the circumstances, of the formalities provided for in Article 1839, paragraph 3, has been completed.

**Art. 1841**

Firms which have not been thereto authorized by statute are prohibited to make public offerings or to issue negotiable securities, on pain of invalidity of the contracts concluded or of the securities issued.

**Art. 1842**

Firms other than the undisclosed partnerships referred to in Chapter III enjoy juridical personality from their registration.

Until registration the relations between members are governed by the firm agreement and by the general principles of law which apply to contracts and obligations.

**Art. 1843**

Persons who have acted on behalf of a firm in the making before registration are liable for the obligations arising from the acts so performed, jointly and severally where the firm is a merchant, jointly in the other cases. A firm regularly registered may take upon itself the undertakings entered into, which are then deemed to have been contracted by it as from the outset.

**Art. 1843-1**

A contribution of property or of a right subject to registration in order to be effective as against third parties may be registered before the registration of the firm and on condition that the latter takes place. From the latter, the effects of the formality retroact to the date of its fulfilment.

**Art. 1843-2**

The rights of each member in the capital of the firm are in proportion to his contribution at the time of the formation of the firm or in the course of its existence.

(Act no 82-596 of 10 July 1982) Contributions in industry do not take part in the formation of the capital of the firm but give rise to an assigning of shares which entitles to the partition of profits and net assets, on condition that the losses are contributed to.

**Art. 1843-3**

Each member is debtor towards the firm for all that he has promised to contribute to it in kind, in money or in industry.

Contributions in kind shall be executed by transfer of the corresponding rights and by the actual availability of the property.

Where a contribution relates to ownership, the contributor is warrantor towards the firm in the same way as a seller towards his buyer.

Where it relates to enjoyment, the contributor is warrantor towards the firm in the same way as a lessor towards his lessee. However, where a contribution relating to enjoyment concerns generic things or any other property bound to be renewed during the duration of the firm, the contract transfers to the latter the ownership of the property contributed, on condition that he returns a same quantity, quality and value thereof; in that case, the contributor is warrantor in the way

CIVIL CODE

provided for in the preceding paragraph.

The member who was to contribute a sum to the firm and has not done so, becomes by operation of law and without notice, debtor for interests on that sum from the day when it should have been paid and without prejudice to greater damages, if there is occasion. "Furthermore, where calls for funds in order to pay up the full amount of capital have not been made within a statutory period, any person concerned may apply to the president of the court who shall decide by way of interim relief proceedings either to order the administrators, directors and managers to carry out those calls for funds by imposing a periodic penalty payment, or to appoint an agent in charge of carrying out that formality" (Act no 2001-420 of 15 May 2001).

The member who has bound himself to contribute his industry to the firm shall account to it for all the profits which he has gained through the activity which is the subject matter of his contribution.

**Art. 1843-4**

In all cases considering the assignment of a member's rights in the firm, or the redemption of those rights by the firm, the value of those rights shall be determined, in case of dispute, by an expert appointed, either by the parties, or failing an agreement between them, by order of the president of the court who shall decide by way of interim relief proceedings and whose  judgment shall be final.

**Art. 1843-5**

*(Act no 88-15 of 5 Jan. 1988)*

In addition to an action for compensation for the loss personally suffered, one or several members may institute an action on behalf of the firm against the directors. The claimants are entitled to seek compensation for the loss suffered by the firm; in case of award, the damages shall be allocated to the firm.

Shall be deemed not written any clause of the memorandum or of the articles leading to subordinate the bringing of an action on behalf of a firm to a preliminary opinion or to the authorization of the meeting of the members or which would imply anticipated waiver of the bringing of that action.

No decision of a meeting of members may lead to extinguish an action for compensation against the directors for fault committed in the fulfilment of their duties.

**Art. 1844**

Every member has the right to participate in collective decisions.

The co-owners of an undivided share of the capital shall be represented by a single proxy, chosen among the undivided owners or outside. In case of disagreement, the proxy shall be designated in court, at the suit of the first requesting party.

Where a share is burdened with a usufruct, the right to vote belongs to the bare-owner, except for decisions relating to the allocation of profits, in which case it is reserved for the usufructuary.

The memorandum or the articles may derogate from the two preceding paragraphs.

**Art. 1844-1**

Unless otherwise agreed, the share of each member in the profits and his contribution to losses are determined in proportion to his hare in the capital of the firm and the share of a member who has contributed only his industry is equal to that of the member who has contributed the least.

However, a stipulation by which a member is allotted the whole of the profit gained by the firm, or is released for the whole of the losses, the one by which a member is excluded in whole from the profit or is liable for the whole of the losses shall be deemed not written.

**Art. 1844-2**

*(Act no 78-753 of 17 July 1978)*

A mortgage or any other security in rem on property of the firm may be given by virtue of powers resulting from resolutions or delegations established under private signatures, although the mortgage or of the security must be granted by an authentic instrument.

**Art. 1844-3**

The proper transformation of a firm into a firm of another type does not involve the creation of a new juridical person. It shall be the same as to extension of duration or any other amendment of the memorandum or articles.

**Art. 1844-4**

A firm, even in liquidation, may be absorbed by another firm or participate in the formation of a new firm, by way of merger.

It may also transfer its patrimony by way of split-off to existing or new firms.

Those dealings may occur between firms of different types.

They shall be decided, by each firm concerned, in the way provided for as to amendment of the memorandum or articles.

Where the dealing involves the creation of new firms, each of them shall be formed in accordance with the rules appropriate to the type of firm adopted.

**Art. 1844-5**

"The reuniting of all the shares of the capital into a single hand does not involve the dissolution of the firm by operation of law. Any person concerned may apply for that dissolution where the situation has not been regularized within the period of one year. The court may grant the firm a maximum period of six months to regularize the situation. It

CIVIL CODE

may not rule for dissolution where, on the day when it decides, that regularization has occurred" (Act no 81-1161 of 30 Dec. 1981).

The fact that the usufruct of all the shares of capital belongs to the same person has no consequence as to the existence of the firm.

"In case of dissolution, it involves the universal transfer of the patrimony of the firm to the sole member, without there being occasion for liquidation. The creditors may object to the dissolution within a period of thirty days after the recording of the latter. A judicial decision shall dismiss the objection or order either the payment of the claims, or the constitution of warranties where the firm offers any and where they are considered sufficient. The transfer of the patrimony is carried out and the juridical person vanishes only at the end of the period for objection or, if there is occasion, where the objection has been dismissed in first instance or where the payment of the claims has been made or the warranties constituted" (Act no 88-15 of 5 Jan. 1988).

"The provisions of paragraph 3 shall not apply to firms whose sole member is a natural person" (Act no 2001-420 of 15 May 2001).

**Art. 1844-6**

An extension of the duration of a firm must be decided by a unanimous vote of the members, or, where the memorandum or articles so provide, by the majority required for their amendment.

One year at least before the date of the expiry of the firm, the opinion of the members must be taken for the purpose of deciding whether the duration of the firm must be extended.

Failing which, any member may apply to the president of the court ruling by interim ex parte order, for the appointment of a judicial agent in charge of instituting the consultation provided for above.

**Art. 1844-7**

A firm comes to an end:

1° By the expiry of the time for which it was formed, except for an extension of duration decided in accordance with Article 1844-6;

2° By the achievement or the extinction of its objects;

3° By annulment of the firm agreement;

4° By anticipated dissolution decided by the members;

5° By anticipated dissolution ordered by the court on application of a member for just reasons, notably in case of non-performance of his obligations by a member, or of disagreement between members which paralyses the running of the firm;

6° By anticipated dissolution ordered by the court in the case provided for in Article 1844-5;

7° "By the effect of a judgment ordering the winding-up [...]" (Act no 88-15 of 5 Jan. 1988);

8° For any other reason specified in the memorandum or articles.

**Art. 1844-8**

The dissolution of a firm involves its liquidation, except for the cases provided for by Article 1844-4 "and by Article 1844-5, paragraph 3" (Act no 88-15 of 5 Jan. 1988). It is effective against third persons only after it has been recorded.

A liquidator shall be appointed in accordance with the provisions of the memorandum or of the articles. Where they are silent, he shall be appointed by the members or, where the latter were unable to make that appointment, by order of the court. A liquidator may be dismissed in the same manner. The appointment and the dismissal are effective against third persons only after they have been recorded. Neither the firm nor third persons may, in order to elude their undertakings, avail themselves of an irregularity in the appointment or dismissal of a liquidator, where the latter has been duly recorded.

The juridical personality of a firm still exists for the needs of liquidation until recording of its closing.

Where the closing of a liquidation has not happened within three years after the dissolution, the Government procurator's office or any person concerned may refer the matter to the court which shall have the liquidation instituted or completed, where it has begun.

**Art. 1844-9**

After paying the debts and reimbursing the capital of the firm, the partition of the assets shall be made among the members in the same proportion as their participation in the profits, except for clause or agreement to the contrary.

The rules relating to the partition of successions, including preferential allotment, shall apply to partitions between members of a firm or company.

However, the members may lawfully decide, either in the memorandum or articles, or by a separate resolution or instrument, that certain property shall be allotted to certain members. Failing which, any property contributed which is found in kind in the assets to be partitioned shall be allotted, on his request and on condition of adjustment, if there is occasion, to the member who had contributed it. That faculty shall be exercised before any other right to a preferential allotment.

All members, or some of them only, may also remain in undivided ownership of all or part of the property of the firm. Their relationships as to that property shall be then regulated, at the close of the liquidation, by the provisions relating to undivided ownership.

**Art. 1844-10**

Annulment of a firm may result only from the infringement of the provisions of Articles 1832, 1832-1, paragraph 1, and 1833 or from one of the grounds for annulment of contracts in general.

CIVIL CODE

Any clause of the memorandum or of the articles contrary to a mandatory provision of this Title, the sanction of whose infringement is not annulment of the firm, shall be deemed not written.

Annulment of transactions or resolutions of the organs of a firm may result only from the infringement of a mandatory provision of this Title or from one of the grounds for annulment of contracts in general.

**Art. 1844-11**

An action for annulment is extinguished where the ground for annulment has ceased to exist on the day when the court rules on the merits in first instance, unless that annulment is based on the wrongfulness of the objects of the firm.

**Art. 1844-12**

In case of annulment of a firm or of transactions or resolutions subsequent to its formation, based on a defect in consent or on the disability of a member, and where regularization may take place, any person having an interest therein may put on notice the person who is able of doing so, either to regularize, or to sue for annulment within a period of six months on pain of being time-barred. The firm shall be informed of that putting on notice.

The firm or a member may submit to the court seized within the period provided for in the preceding paragraph, any measure appropriate to clear away the interest of the plaintiff, particularly through the redemption of his rights in the firm. In that case the court may, either rule for annulment or make compulsory the proposed measure where they have been previously adopted by the firm in the conditions provided for the amendments of the memorandum or of the articles. The vote of the member whose redemption of the rights is applied for is of no effect on the decisions of the firm.

In case of dispute, the value of the rights in the firm to redeem from a member shall be determined in accordance with the provisions of Article 1843-4.

**Art. 1844-13**

A court to which an action for annulment has been referred, may, even of its own motion, fix a period to allow for the remedy of the invalidities. It may not order annulment less than two months after the date of the originating process.

Where, in order to remedy an invalidity, a meeting must be convened, or a consultation of the members take place, and where proof is given of a proper notice convening that meeting or of the sending to the members of the text of the proposed resolutions with the documents which must be communicated to them, the court shall grant by judgment the period necessary for the members to come to a decision.

**Art. 1844-14**

The actions for annulment of a firm or of transactions or resolutions subsequent to its formation are time-barred after three years from the day when annulment was incurred.

**Art. 1844-15**

Where annulment of a firm is ordered, it puts an end, without retroactivity, to the performance of the contract.

As regards the juridical person which may have come into being, it produces the effects of a judicially ordered dissolution.

**Art. 1844-16**

Neither the firm nor the members may avail themselves of an annulment with regard to third parties in good faith. However, annulment resulting from a disability or from one of the defects in consent is available even against third parties by the person under a disability and his statutory representatives, or by the member whose consent was abused by error, deception or duress.

**Art. 1844-17**

An action for compensation based on the annulment of the firm or of transactions and resolutions subsequent to the formation is time-barred after three years from the day when the judgment of annulment has become res judicata.

The vanishing of the ground for annulment is not a bar to the bringing of an action for damages for the purpose of compensating the loss caused by the defect by which the firm, the transaction or the resolution was vitiated. That action is time-barred after three years from the day when the invalidity was remedied.

CHAPTER II
Of Partnership for Non-Commercial Purposes                    Articles 1845 to 1870-1

SECTION I
General Provisions                                             Articles 1845 to 1845-1

**Art. 1845**

The provisions of this Chapter shall apply to all firms for non-commercial purposes, unless they are derogated from by the particular statutory status to which some of them are subject.

Have non-commercial character all firms to which legislations does not attribute another character by reason of their form, nature or objects.

**Art. 1845-1**

The capital of a partnership shall be divided into equal shares.

(Act no 2001-1168 of 11 Dec. 2001) The provisions of Chapter I of Title III of Book II of the Commercial Code relating to the variable capital of companies shall apply to partnerships for non-commercial purposes.

SECTION II

**Art. 1846**

A partnership shall be managed by one or several persons, partners or not, appointed either by the articles of partnership, or by a special act, or by a resolution of the partners.

The articles shall fix the rules for the designation of the manager or managers and the method of organization of the management.

Unless otherwise provided in the articles, a manager shall be appointed by a resolution of the partners representing more than half of the shares of the partnership.

Where the articles are silent, and where the partners have not decided otherwise at the time of the appointment, the managers shall be deemed appointed for the duration of the partnership.

Where, for whatever reason, a partnership is deprived of a manager, any partner may apply to the president of the court deciding by interim relief order for the designation of a judicial agent in charge of convening a meeting of the partners for the purpose of appointing one or several managers.

**Art. 1846-1**

Apart from the cases referred to in Article 1844-7, a partnership comes to an end through anticipated dissolution which a court may order on application of any person concerned, where it has been devoid of manager for more than one year.

**Art. 1846-2**

The appointment and cessation of duties of the managers must be recorded.

Neither a partnership nor third parties may avail themselves of an irregularity in the appointment of managers or in the cessation of their duties in order to elude their undertakings, where those decisions have been duly recorded.

**Art. 1847**

Where a juridical person carries on the management, its managers are subject to the same conditions and obligations and incur the same civil and penal liabilities as though they were managers on their own behalf, without prejudice to the joint and several liability of the juridical person which they direct.

**Art. 1848**

In the relationships between partners, a manager may do all the acts of management which the interest of the partnership requires.

Where there are several managers, they exercise those powers separately, except for the right which belongs to each of them to object to a transaction before it is concluded.

All of which failing a special provision in the articles on the method of administration.

**Art. 1849**

In the relationships with third parties, a manager binds the partnership through transactions which fall under the objects of the partnership.

In case of plurality of managers, they possess separately the powers provided for in the preceding paragraph. An objection made by one manager to the transactions of another manager is of no effect with regard to third parties, unless it is proved that they have had knowledge of it.

Clauses of the articles limiting the powers of the managers may not be invoked against third parties.

**Art. 1850**

Each manager is liable individually towards the partnership and towards third parties, either for violations of statutes and regulations, or for an infringement of the articles, or for faults committed in his management.

Where several managers have participated in the same acts, their liability is joint and several towards third parties and partners.

However, in their relationships between them, the court shall determine the contributory share of each in the compensation for the loss.

**Art. 1851**

Unless the articles provide otherwise, a manager may be dismissed by a resolution of the partners representing more than half of the shares of the partnership. Where a dismissal is decided without just reason, it may give rise to damages

A manager may also be dismissed by the courts for a legitimate cause, on application of any partner.

Unless otherwise provided, the dismissal of a manager, whether he is a partner or not, does not involve dissolution of the partnership. Where the dismissed manager is a partner, he may, unless the articles provide otherwise, or the other partners decide anticipated dissolution of the partnership, withdraw from it in the way provided for in Article 1869, paragraph 2.

SECTION III
Of Collective Resolutions                                                        Articles 1852 to 1854

**Art. 1852**

Resolutions which exceed the powers conferred upon managers shall be passed according to the provisions of the articles or, failing such provisions, by the partners unanimously.

CIVIL CODE

**Art. 1853**

Resolutions shall be passed by the partners convened in a meeting. The articles may also provide that they will result from a written consultation.

**Art. 1854**

Resolutions may also result from the consent of all the partners expressed in an instrument.

SECTION IV
Of Notice to Partners                                                                            Articles 1855 to 1856

**Art. 1855**

The partners are entitled to obtain, at least once a year, notice of the books and documents of the partnership, and to ask questions in writing on the management of the partnership, to which a reply must be made in writing within the period of one month.

**Art. 1856**

The managers must, at least once in the year, account for their management to the partners. That statement of accounts must include a comprehensive written report on the activity of the partnership during the year or the accounting period elapsed including a statement of the profits realized or foreseeable and of the losses incurred or foreseen.

SECTION V
Of the Liability of Partners with regard to Third Parties                                       Articles 1857 to 1860

**Art. 1857**

With regard to third parties, partners are liable indefinitely for debts of the partnership in proportion to their share in the capital of the partnership on the date when falling due or on the day of cessation of payments.

A partner who has contributed only his industry is liable like the one whose contribution in the capital is the smallest.

**Art. 1858**

Creditors may sue a partner for payment of the debts of the partnership only after suing first and vainly the juridical person.

**Art. 1859**

All actions against partners who are not liquidators or their heirs and assigns are time-barred after five years from the time when the dissolution of the partnership has been recorded.

**Art. 1860**

Where there is insolvency, personal bankruptcy, judicial liquidation or judicial arrangement befalling a partner, unless the others unanimously decide to dissolve the partnership by anticipation or that dissolution is provided for by the articles, reimbursement shall be made, subject to the conditions set out in Article 1843-4, of the rights in the partnership of the party concerned, who then loses the status of partner.

SECTION VI
Of the Transfer of Shares of the Capital                                                        Articles 1861 to 1868

**Art. 1861**

Shares of the capital may be transferred only with the approval of all the partners.

The articles may however agree that the approval will be obtained by a majority which they fix, or that it may be granted by the managers. They may also dispense from approval the transfers made to partners or to the spouse of one of them. Unless otherwise provided by the articles, transfers made to ascendants or descendants of the transferor are not subject to approval.

Notice shall be given of the planned transfer, with request for approval, to the partnership and to each one of the partners. Notice shall be given only to the partnership where the articles provide that the approval may be granted by the managers.

Where two spouses are simultaneously members of one partnership, the transfers made by one of them to the other must, in order to be valid, result from a notarial instrument or from an instrument under private signature having acquired an undisputable date otherwise than by the death of the transferor.

**Art. 1862**

Where several partners express their wish to acquire, they are, unless there is a clause or an agreement to the contrary, deemed purchasers in proportion to the number of shares which they held previously.

Where no partner stands as purchaser, the partnership may have the shares acquired by a third person designated by the other partners unanimously or according to the methods provided for by the articles. The partnership may also initiate the redemption of the shares for the purpose of cancelling them.

The transferor shall be given notice of the names of the proposed purchaser or purchasers, partners or third persons, or of the offer of redemption by the partnership, as well as of the price offered. In case of dispute on the price, the latter shall be fixed in accordance with the provisions of Article 1843-4, the whole without prejudice to the right of the transferor to keep his shares.

**Art. 1863**

Where no offer of redemption is made to the transferor within a period of six months after the last of the notifications

CIVIL CODE

provided for in Article 1861, paragraph 3, approval of the transfer shall be deemed granted, unless the other partners decide, within the same period, the anticipated dissolution of the partnership.

In the latter case, the transferor may cause that decision to lapse by making it known that he waives the transfer within a period of one month after the said decision.

**Art. 1864**

The provisions of the two preceding Articles may be derogated from only in order to modify the period of six months stared in Article 1863, paragraph 1, and provided the period stated in the articles be not  over one year or below one month.

**Art. 1865**

A transfer of shares of capital must be drawn up in writing. It shall be made invokable against the partnership under the forms provided for in Article 1690 or, where the articles so stipulate, by transfer on the registers of the partnership.

It may be invoked against third persons only after completion of those formalities and after recording.

**Art. 1866**

Shares of the capital may be the subject of a pledge attested, either by an authentic instrument, or by an instrument under private signature served upon the partnership or accepted by it in an authentic instrument and giving rise to a recording whose date determines the rank of the pledgee creditors. Those whose instruments are recorded on the same day rank equally.

The prior charge of a pledgee creditor stands on the pledged rights on the capital through the sole fact of recording the pledge.

**Art. 1867**

Any partner may obtain from the other partners their approval of a plan of pledge under the same conditions as their approval of a transfer of shares.

A consent given to a plan of pledge involves approval of the transferee in case of forced sale of the shares of capital on condition that notice of the sale be given to the partners and the partnership at least one month before the sale.

Each partner may substitute himself for the purchaser within a period of five clear days from the sale. Where several partners exercise that faculty, they shall be, unless there is a clause or an agreement to the contrary, deemed purchasers in proportion to the number of shares which they held previously. Where no partner exercises that faculty, the partnership may redeem the shares itself, for the purpose of cancelling them.

**Art. 1868**

Notice must be given likewise of a forced sale which does not result from a pledge to which the other partners have given their approval, one month before the sale to the partners or to the partnership.

The partners may, within that period, decide to dissolve the partnership or to acquire the shares in the way provided for in Articles 1862 and 1863.

Where a sale has taken place, the partners or the partnership may exercise the faculty of substitution which is theirs under Article 1867. The non-exercise of that faculty involves approval of the purchaser.

SECTION VII

Of the Withdrawal or Death of a Partner                                          Articles 1869 to 1870-1

**Art. 1869**

Without prejudice to the rights of third persons, a partner may withdraw totally or partially from the partnership, subject to the conditions laid down in the articles or, failing which, after authorization given by a unanimous resolution of the other partners. That withdrawal may also be authorized by a judicial decision for just reasons.

Unless Article 1844-9, paragraph 3, applies, the partner who withdraws is entitled to reimbursement of the value of his rights in the partnership, fixed in accordance with Article 1843-4, failing an amicable agreement.

**Art. 1870**

A partnership is not dissolved by the death of a partner, but continues with his heirs or legatees, unless the articles provide that they must be approved of by the partners.

It may however be agreed that the death will involve dissolution of the partnership or that it will continue with only the surviving partners.

It may also be agreed that the partnership will continue either with the surviving spouse, or with one or several of the heirs, or with any other person designated by the articles or where the latter so authorize, by a testamentary disposition.

Unless the articles provide otherwise, where the succession devolves upon a juridical person, the latter may become a partner only with the approval of the other partners, granted under the conditions provided for by the articles, or failing which, by unanimous agreement of the partners.

**Art. 1870-1**

Heirs or legatees who do not become partner are entitled only to the value of the shares in the capital of their predecessor in title. That value must be paid to them by the new holders of the shares or by the partnership itself where it has redeemed them for the purpose of cancelling them.

The value of these shares in the capital shall be determined on the day of death in the conditions provided for in Article 1843-4.

CIVIL CODE
CHAPTER III
Of Undisclosed Partnership                                         Articles 1871 to 1873

**Art. 1871**
Partners may agree that the partnership will not be registered. The partnership is then called "undisclosed partnership". It is not a juridical person and is not subject to registration.

The partners freely agree upon the objects, operation and methods of the undisclosed partnership, provided that the mandatory provisions of Articles 1832, 1832-1, 1833, 1836, paragraph 2, 1841, 1844, paragraph 1 and 1844-1, paragraph 2, be not derogated from.

**Art. 1871-1**
Unless a different organization has been provided for, the relationships between partners are governed, as may be thought proper, either by the provisions which apply to partnerships for non-commercial purposes, where the firm is of a non-commercial character, or, where it is of a commercial character, by those which apply to partnerships for commercial purposes.

**Art. 1872**
With regard to third parties, each partner remains owner of the property which he placed at the disposal of the partnership.

Shall be deemed undivided between the partners the property acquired by investment or re-investment of undivided funds during the partnership and that which was undivided before being placed at the disposal of the partnership.

It shall be likewise for that which the partners have agreed to place in undivided ownership.

It may furthermore be agreed that one of the partners is, with regard to the others, owner of all or part of the property which he acquires with a view to the carrying out of the objects of the partnership.

**Art. 1872-1**
Each partner contracts in his own name and is alone bound with regard to third parties.

However, where the undisclosed partners act as partners to third parties' knowledge, each one of them is bound with regard to the latter for the obligations arising from acts performed in that capacity by one of the others, jointly and severally where the partnership is a merchant, jointly, in the other cases.

It shall be the same as to a partner who, through his interference, has led the contracting party to believe that he intended to bind himself towards him or of whom it is proved that the undertaking has turned to his benefit.

In all cases, as to property deemed undivided under Article 1872, paragraph 2 and 3, shall apply in the relationships with third parties, either the provisions of Chapter VI of Title I of Book III of this Code, or, where the formalities provided for in Article 1873-2 have been completed, those of Title IX bis of this Book, all the partners being then, unless otherwise agreed, deemed managers of the undivided ownership.

**Art. 1872-2**
Where an undisclosed partnership is of indefinite duration, its dissolution may result at any time from a notice served by one of them on all the partners, provided that the notice be in good faith and not made inopportunely.

Unless otherwise agreed, no partner may request partition of the undivided property under Article 1872 so long as the partnership is not dissolved.

**Art. 1873**
The provisions of this Chapter shall apply to de facto partnerships.

**TITLE IX bis**
**OF AGREEMENTS RELATING TO THE EXERCISE OF UNDIVIDED RIGHTS**          **Articles 1873-2 to 1873-1**

**Art. 1873-1**
The persons having rights to be exercised on undivided property, as owners, bare owners or usufructuaries may enter into agreements relating to the exercise of those rights.

CHAPTER I
Of Agreements relating to the Exercise of Undivided Rights in the Absence of a          Articles 1873-2 to
Usufructuary                                                                 815-17 shall apply t

**Art. 1873-2**
Where they all consent thereto, undivided co-owners may agree to remain in undivided ownership.

On pain of annulment, the agreement must be drawn up in an instrument including the description of the undivided property and indication of the shares belonging to each undivided owner. Where the undivided property includes claims, the formalities of Article 1690 shall take place; where it includes immovables, the formalities of land registration shall take place.

**Art. 1873-3**
The agreement may be concluded for a determined duration which may not exceed five years. It may be renewed by an express decision of the parties. A partition may be instigated before the agreed term only where there are proper reasons for it.

CIVIL CODE

The agreement may also be concluded for an indeterminate duration. In that case, a partition may be instigated at any time, provided it is not in bad faith or inopportune.

It may be decided that an agreement for a determined duration will be renewed by tacit extension of the period, for a determined or indeterminate duration. Failing such agreement, the undivided ownership shall be governed by Articles 815 and following at the expiry of the agreement for a determined duration.

**Art. 1873-4**

The capacity or power to dispose of the undivided property is required for an agreement  designed to maintain undivided ownership.

The agreement may, however, be concluded on behalf of a minor, by his statutory representative alone; but in that case, the minor, become of age, may put an end to it, whatever its duration may be, within the year following his majority.

[repealed]

**Art. 1873-5**

The undivided co-owners may appoint one or several managers, chosen from among themselves or not. The methods of appointing and dismissing a manager may be determined by a unanimous decision of the undivided owners.

Failing such an agreement, a manager taken from among the undivided owners may be dismissed from his duties only by a unanimous decision of the other undivided owners.

A manager who is not an undivided owner may be dismissed in the way agreed upon among his principals or, failing which, by a decision taken by a majority of the undivided owners as to number and shares.

In all cases, dismissal may be ordered by the court on application of one undivided owner where the manager, through his mismanagement, imperils the interests of the undivided ownership.

Where a dismissed manager is an undivided owner, the agreement shall be deemed concluded for an indeterminate duration from his dismissal.

**Art. 1873-6**

A manager represents the undivided owners within his authority, either for transactions of civil life, or in court as plaintiff or defendant. He shall give, in a merely declaratory way, the names of all the undivided owners in the first procedural document.

A manager shall administer the undivided ownership and exercises for this purpose the powers "conferred on each spouse" (Act no 85-1372 of 23 Dec. 1985) on community property. He may, however, dispose of tangible movables only for the needs of a normal use of the undivided ownership, or also where things difficult to preserve or subject to decay are concerned. Any clause extending the authority of a manager shall be deemed not written.

**Art. 1873-7**

A manager shall exercise the authority given by the preceding Article even where there is a person under a disability among the undivided owners.

Nevertheless, Article 456, paragraph 3, shall apply to leases granted in the course of an undivided ownership.

**Art. 1873-8**

Decisions which exceed the authority of a manager shall be passed unanimously, except for the manager, where he is himself an undivided owner, to avail himself of the remedies provided for by Articles 815-4, 815-5 and 815-6.

Where there are minors or adults under a disability among the undivided owners, the decisions referred to in the preceding paragraph give rise to the application of the rules of protection provided for in their favour.

It may be agreed between the undivided owners that in the absence of persons under a disability certain categories of decisions will be passed otherwise than unanimously. However, no undivided immovable may be transferred without the agreement of all the undivided owners unless it is under Articles 815-4 and 815-5 above.

**Art. 1873-9**

An agreement of undivided ownership may regulate the methods of administration in case of a plurality of managers. Failing special stipulations, the latter hold separately the authgority provided for by Article 1873-6, subject to the right of each to object to any transaction before it is concluded.

**Art. 1873-10**

Unless otherwise agreed, a manager is entitled to remuneration for his work. The terms of it shall be fixed by the undivided owners, to the exclusion of the party concerned, or, failing which, by the president of the tribunal de grande instance  who shall give a provisional ruling.

A manager is liable as an agent for the faults he commits in his management.

**Art. 1873-11**

Each undivided owner may require notice of all documents relating to the management. A manager must, once a year, account for his management to the undivided owners. On that occasion, he shows in writing the profits made and the losses incurred or foreseeable.

Each undivided owner is obliged to participate in the expenses for preservation of the undivided property. Failing a special agreement, Articles 815-9, 815-10 and 815-11 of this Code shall apply to the exercise of the right of use and enjoyment, as well as to the sharing of profits and losses.

**Art. 1873-12**

CIVIL CODE

In case of transfer of all or part of the rights of an undivided owner in the undivided property, or in one or several items of that property, the undivided co-owners enjoy the rights of pre-emption and substitution provided for by Articles 815-14 to 815-16 and 815-18 of this Code.

The agreement shall be deemed concluded for an indeterminate duration where, for any reason whatever, an undivided share devolves upon a person not belonging to the undivided ownership.

**Art. 1873-13**

The undivided owners may agree that upon the death of one of them, each survivor may acquire the share of the deceased or that the surviving spouse, or any other designated heir may have it allotted to him "on condition that he accounts for it to the succession according to its value at the time of the acquisition or of the allotment" (Act no 78-627 of 10 June 1978).

Where several undivided owners or several heirs simultaneously exercise their faculty of acquisition or allotment, they shall be deemed, unless otherwise agreed, to acquire together the share of the deceased in proportion to their respective rights in the undivided ownership or the succession.

The provisions of this Article may not prejudice the application of the provisions of Articles 832 to 832-3.

**Art. 1873-14**

A faculty of acquisition or allotment lapses where its beneficiary has not exercised it through notice served on the surviving undivided owners or on the heirs of the predeceaser within the period of one month after the day when he has been given notice to come to a decision. That notice may not itself take place before the expiry of the period provided for in the Title Of Successions for making an inventory and deliberating.

Where no faculty of acquisition or allotment has been provided for, or where it has lapsed, the share of the deceased falls to his heirs or legatees. In such case, the agreement of undivided ownership shall be deemed concluded for an indeterminate duration from the day of the opening of the succession.

**Art. 1873-15**

"815-17 shall apply to creditors of an undivided ownership, as well as to personal creditors of the undivided owners.

However, the latter may instigate partition only in the cases where their debtor could himself instigate it. In the other cases, they may sue for seizure and sale of the share of their debtor in the undivided ownership by complying with the formalities provided for by the Code of Civil Procedure. The provisions of Article 1873-12 shall then apply.

**Art. 815-17 shall apply to creditors of an undivided ownership, as well as to personal creditors of the undivided owners**

However, the latter may instigate partition only in the cases where their debtor could himself instigate it. In the other cases, they may sue for seizure and sale of the share of their debtor in the undivided ownership by complying with the formalities provided for by the Code of Civil Procedure. The provisions of Article 1873-12 shall then apply.

CHAPTER II

Of Agreements relating to the Exercise of Undivided Rights in the Presence of a        Articles 1873-16 to

Usufructuary        1873-18

**Art. 1873-16**

Where undivided property is burdened with a usufruct, agreements, subject as a rule to the provisions of the preceding Chapter, may be concluded, either between the bare owners, or between the usufructuaries, or between the ones and the others. There may also be an agreement between those who are in undivided ownership as to enjoyment and the one who is bare owner of the whole property, as well as between a universal usufructuary and the bare owners.

**Art. 1873-17**

Where the usufructuaries were not parties to the agreement, third parties who have dealt with the manager of an undivided ownership may not avail themselves of the powers which would have been granted to him by the bare owners to the prejudice of the rights of usufruct.

**Art. 1873-18**

Where an agreement concluded between usufructuaries and bare owners provides that decisions will be passed by a majority in number and in shares, the rights to vote attaching to shares is divided by halves between the usufruct and the bare ownership, unless the parties agreed otherwise.

Any expense exceeding the obligations of a usufructuary, such as defined in Articles 582 and following, binds him only with his consent given in the agreement itself or through a later instrument.

The transfer of full ownership of the undivided property may not be made without the consent of the usufructuary, except for the case where it is induced by the creditors entitled to sue for sale.

**TITLE X**

**OF LOANS**        **Articles 1875 to 1874**

**Art. 1874**

There are two kinds of loans:
That of things which can be used without being destroyed,
And that of things which are consumed by the use which is made of them.
The first kind is called loan for use or commodate;
The second is called loan for consumption , or simply loan.

CIVIL CODE

CHAPTER I

Of Loans for Use or Commodates                                    Articles 1875 to 1891

SECTION I

Of the Nature of a Loan for Use                                    Articles 1875 to 1879

**Art. 1875**

A loan for use or commodate is a contract by which one of the parties delivers to the other a thing to be used, on condition that the borrower returns it after making use of it.

**Art. 1876**

Such loan is essentially gratuitous.

**Art. 1877**

The lender remains the owner of the thing loaned.

**Art. 1878**

Everything which may be the subject of legal transactions between private individuals, and which is not consumed by use may be the object of such an agreement.

**Art. 1879**

Undertakings which are formed by a commodate pass to the heirs of the person who lends, and to the heirs of the person who borrows;

But where a loan was made only on account of the borrower, and to him personally, then his heirs may not continue to enjoy the thing loaned.

SECTION II

Of the Undertakings of the Borrower                                Articles 1880 to 1887

**Art. 1880**

The borrower is bound to take care of the keeping and preservation of the thing loaned like a prudent owner. He may use it only for the use determined by its nature or by the agreement; all of which, on pain of damages, if there is occasion.

**Art. 1881**

Where the borrower employs the thing for another use, or for a longer time than he ought, he is liable for the loss occurred, even through a fortuitous event.

**Art. 1882**

Where the thing loaned perishes through a fortuitous event of which the borrower could have preserved it by making use of his own, or where, being able to save only one of them, he preferred his own, he is liable for the loss of the other.

**Art. 1883**

Where the thing has been appraised when loaned, the loss which happens, even through a fortuitous event, falls on the borrower, unless otherwise agreed.

**Art. 1884**

Where the thing deteriorates through the sole effect of the use for which it was borrowed, and without any fault on the part of the borrower, he is not liable for the deterioration.

**Art. 1885**

The borrower may not retain the thing to offset what the lender owes him.

**Art. 1886**

Where the borrower has made some expense in order to use the thing, he may not reclaim it.

**Art. 1887**

Where several persons have jointly borrowed the same thing, they are jointly and severally liable towards the lender.

SECTION III

Of the Undertakings of One Who Lends for Use                       Articles 1888 to 1891

**Art. 1888**

The lender may take back the thing loaned only after the term agreed upon or, failing an agreement, after it has served the use for which it was borrowed.

**Art. 1889**

Nevertheless, where, during that period, or before the need of the borrower has ceased, the lender happens to be in a pressing and unforeseen need of the thing, the judge may, according to the circumstances, compel the borrower to return it to him.

**Art. 1890**

CIVIL CODE

Where, during the term of the loan, the borrower has been compelled, for the preservation of the thing, to some extraordinary expense, necessary and so urgent that he was no able to inform the lender thereof, the latter is liable to reimburse him.

**Art. 1891**

Where the thing loaned has such defects that it may cause harm to the person who uses it, the lender is liable, where he knew of the defects and did not warn the borrower.

CHAPTER II
Of Loans for Consumption or Simple Loans                          Articles 1892 to 1904

SECTION I
Of the Nature of the Loan for Consumption                          Articles 1892 to 1897

**Art. 1892**

A loan for consumption is a contract by which one of the parties delivers to the other a certain quantity of things which are consumed by use, on condition that the latter shall return as much to him in the same kind and quality.

**Art. 1893**

Through such a loan, the borrower becomes the owner of the thing loaned; and the loss falls upon him, in whatever manner it occurs.

**Art. 1894**

Things which, although of the same kind, differ individually, such as animals, may not be given by way of loan of consumption:  it is then a loan for use.

**Art. 1895**

The obligation which results from a loan of money is always for the numerical sum stated in the contract.

Where there is a rise or a fall in currency before the time of payment, the debtor must return the numerical sum loaned, and must do so only in the currency having legal tender at the time of the payment.

**Art. 1896**

The rule laid down in the preceding Article shall not apply, where the loan was made in bullions.

**Art. 1897**

Where bullions or commodities have been loaned, whatever the rise or fall in their price may be, the debtor shall always return the same quantity and quality, and return only that.

SECTION II
Of the Obligations of the Lender                          Articles 1898 to 1901

**Art. 1898**

In a loan for consumption, the lender is held to the liability established by Article 1891 for a loan for use.

**Art. 1899**

The lender may not claim the things loaned back before the agreed time.

**Art. 1900**

Where no time has been fixed for restitution, the judge may allow the borrower a period according to the circumstances.

**Art. 1901**

Where it has only been agreed that the borrower would pay when he could, or he had the means, the judge shall fix a time for the payment, according to the circumstances.

SECTION III
Of the Undertakings of the Borrower                          Articles 1902 to 1904

**Art. 1902**

The borrower is bound to return the things loaned, in the same quantity and quality and at the time agreed.

**Art. 1903**

Where he is unable to do so, he is bound to pay their value taking into account the time and the place where the thing was to be returned according to the agreement.

Where those time and place have not been regulated, payment shall be made at the price of the time and the place where the loan was made.

**Art. 1904**

*(Act of 7 April 1900)*

Where the borrower does not return the things loaned or their value at the agreed  time, he owes interest thereon from the day of the notice or of the judicial claim.

CHAPTER III

CIVIL CODE

Of Loans at Interest                                                Articles 1905 to 1914

**Art. 1905**

It is lawful to stipulate interest for a simple loan, either of money, or of commodities, or of other movable things.

**Art. 1906**

The borrower who has paid interest which was not stipulated may neither reclaim it, nor appropriate it to the capital.

**Art. 1907**

Interest is statutory or conventional. Statutory interest is fixed by statute1. Conventional interest may exceed statutory interest whenever a statute does not so prohibit2.

The rate of conventional interest must be fixed in writing.

1 Monetary and Financial Code Art. L. 313-2

2 Consumer Code Art. L. 313-1 to L. 313-3

**Art. 1908**

A receipt for capital given without reservations as to the interest gives rise to a presumption of payment of the latter and operates discharge of it.

**Art. 1909**

Interest may be stipulated upon a capital which the lender undertakes not to reclaim.

In that case, the loan takes the name of settlement of an annuity.

**Art. 1910**

That annuity may be settled in two ways, perpetually or for life.

**Art. 1911**

A perpetual annuity is essentially redeemable.

The parties may agree only that the redemption will not take place before a time which may not exceed  ten years, or without notification has been given to the creditor at the period of notice which they have determined.

**Art. 1912**

The debtor of an annuity settled as perpetual may be compelled to redeem it:

1° Where he ceases to perform his obligations during two years;

2° Where he fails to furnish the lender with the security promised by the contract.

**Art. 1913**

The capital of an annuity settled as perpetual becomes also due in case of [judicial arrangement] or insolvency of the debtor.

**Art. 1914**

The rules relating to life annuities are laid down in the Title Of Aleatory Contracts.

### TITLE XI
### OF DEPOSITS AND OF SEQUESTRATIONS                   Articles 1915 to 1963

CHAPTER I

Of Deposit in General and of its Different Kinds              Articles 1915 to 1916

**Art. 1915**

As a rule, a deposit is a transaction by which one receives the thing of another, on condition of keeping it and returning it in kind.

**Art. 1916**

There are two kinds of deposits: actual deposit and sequestration.

CHAPTER II

Of Actual Deposits                                          Articles 1917 to 1954

SECTION I

Of the Nature and Essence of the Contract of Deposit         Articles 1917 to 1920

**Art. 1917**

An actual deposit is a contract essentially gratuitous.

**Art. 1918**

It may have as its object only movable things.

**Art. 1919**

It is complete only by the actual or symbolic handing over of the thing deposited.

A symbolic handing over is sufficient where the depositary is already in possession, in some other capacity, of the thing which one agrees to leave with him as a deposit.

**Art. 1920**

CIVIL CODE

Deposit is voluntary or necessary.

SECTION II
Of Voluntary Deposits                                                                     Articles 1921 to 1926

**Art. 1921**
A voluntary deposit is concluded by the reciprocal consent of the person who makes the deposit and of the one who receives it.

**Art. 1922**
A voluntary deposit may only be made by the owner of the thing deposited or with his express or tacit consent.

**Art. 1923**
[repealed]

**Art. 1924**
"Where a deposit which exceeds the figure provided for in Article 1341 is not proved in writing" (Act no 80-525 of 12 July 1980), the one who is sued as depositary is believed on his declaration, either as to the fact itself of the deposit, or as to the thing which was its object, or as to the fact of its restitution.

**Art. 1925**
A voluntary deposit may take place only between persons capable of contracting.
Nevertheless, where a person capable of contracting accepts a deposit made by a person under a disability, he is liable for all the obligations of a true depositary; he may be sued by the guardian or administrator of the person who made the deposit.

**Art. 1926**
Where a deposit was made by a person who is capable to a person who is not, the person who made the deposit has only a claim for the recovery of the thing deposited, so long as it exists in the hands of the depositary, or a claim in restitution up to the amount of the benefit derived by the latter.

SECTION II
Of the Obligations of a Depositary                                                        Articles 1927 to 1946

**Art. 1927**
A depositary must take, in the keeping of the thing deposited, the same care  as he does in the keeping of the things which belong to him.

**Art. 1928**
The provision of the preceding Article shall be applied more strictly:
1° Where the depositary has volunteered for receiving the deposit;
2° Where he has stipulated a salary for the keeping of the deposit;
3° Where the deposit has been made solely in the interest of the depositary;
4° Where it has been expressly agreed that the depositary would be liable for any kind of fault.

**Art. 1929**
A depositary is not, in any case, liable for the accidents of force majeure, unless he was given notice to return the thing deposited.

**Art. 1930**
He may not make use of the thing deposited, without the express or implied permission of the depositor.

**Art. 1931**
He may not attempt to know what the things are which have been deposited with him, when they have been entrusted to him in a closed chest or under a sealed cover.

**Art. 1932**
A depositary must return the exact same thing which he has received.
Thus, a deposit of sums of money must be returned in the same coins in which it was made, either in the case of increase or in the case of decrease of their value.

**Art. 1933**
A depositary is only bound to return the thing deposited in the condition in which it is at the time of restitution. Deteriorations which did not occur through his act shall be borne by the depositor.

**Art. 1934**
A depositary from whom the thing was taken away through a force majeure , and who has received a price or something in its place, must restore what he has receive in exchange.

**Art. 1935**
An heir of the depositary, who has sold in good faith the thing of whose deposit he was not aware, is only bound to return the price which he has received, or to assign his action against the buyer, where he has not received the price.

CIVIL CODE

**Art. 1936**

    Where a thing deposited has produced fruits which were collected by the depositary, he is obliged to return them. He owes no interest on money deposited, except from the day when he has been given notice to make the restitution.

**Art. 1937**

    A depositary must return the thing deposited only to the one who has entrusted it to him, or to the one in whose name the deposit was made, or to the one who has been designated to receive it.

**Art. 1938**

    He may not require the one who made the deposit to prove that he was the owner of the thing deposited.

    Nevertheless, where he discovers that the thing has been stolen, and who the true owner is, he must give the latter notice of the deposit which was made to him, with demand to claim it within a determined and sufficient period. Where the one to whom notice has been given fails to claim the deposit, the depositary is lawfully discharged by the handing over of it to the one from whom he received it.

**Art. 1939**

    In case of [...] death of the person who made the deposit, the thing deposited may be returned only to his heir.

    Where there are several heirs, it must be returned to each of them for their share and portion.

    Where the thing deposited is indivisible, the heirs must agree between them to receive it.

**Art. 1940**

*(Act no 85-1372 of 23 Dec. 1985)*

    Where the person who has made the deposit has been deprived of his powers of administration, the deposit may be returned only to the one who has the administration of the property of the depositor.

**Art. 1941**

*(Act no 85-1372 of 23 Dec. 1985)*

    Where a deposit has been made by a guardian or an administrator, in one of these capacities, it may be returned only to the person whom the guardian or administrator represented, if their management or administration has come to an end.

**Art. 1942**

    Where the contract of deposit specifies the place where the restitution must be made, the depositary is bound to bring the thing deposited to that place. Where there are transport costs, they shall be charged to the depositor.

**Art. 1943**

    Where the contract does not specify the place of restitution, it must be done in the very place of the deposit.

**Art. 1944**

    A deposit must be returned to the depositor as soon as he claims it, even where the contract has fixed a determined period for the restitution; unless there is in the hands of the depositary an attachment or a forbidding to return and remove the thing deposited.

**Art. 1945**

    [repealed by implication]

**Art. 1946**

    All the obligations of a depositary come to an end where he happens to discover and prove that he is himself the owner of the thing deposited.

            SECTION IV

            Of the Obligations of the Person by Whom a Deposit was Made          Articles 1947 to 1948

**Art. 1947**

    The person who made a deposit is bound to reimburse the depositary for expenses incurred for the preservation of the thing deposited, and to indemnify him for all the losses which the deposit may have occasioned him.

**Art. 1948**

    A depositary may retain the deposit until full payment of what is owed him by reason of the deposit.

            SECTION V

            Of Necessary Deposits           Articles 1949 to 1954

**Art. 1949**

    A necessary deposit is one which was forced by some accident, such as a fire, ruin, pillage, shipwreck or other unforeseen event.

**Art. 1950**

*(Act no 80-525 of 12 July 1980)*

    Proof by witnesses may be admitted as to a necessary deposit, although the amount concerned exceeds the figure provided for by Article 1341.

**Art. 1951**

CIVIL CODE

As to other issues, a necessary deposit shall be governed by all the rules previously laid down.

**Art. 1952**

*(Act no 73-1141 of 24 Dec. 1973)*

Innkeepers or hotel-keepers are liable, as depositaries, for clothes, luggage and various effects brought into their business premises by a traveller lodging with them; the deposit of effects of that kind shall be considered as a necessary deposit.

**Art. 1953**

*(Act no 73-1141 of 24 Dec. 1973)*

They are liable for theft or for damage to those effects, whether the theft was committed or the damage caused by their servants or employees, or by strangers going to and fro in the hotel.

That liability is unlimited, notwithstanding any clause to the contrary, in case of theft or deterioration of all kinds of effects deposited within their hands or which they refused to receive without rightful reason.

In all other cases, damages due to a traveller are, to the exclusion of any agreed lower limitation, limited to the equivalent of one-hundred times the price of rental of lodging per day, except when the traveller proves that the damage he has suffered results from a fault of the person who shelters him or of the persons for whom the latter is responsible.

**Art. 1954**

*(Act no 73-1141 of 24 Dec. 1973)*

Innkeepers or hotel-keepers are not liable for thefts or damage which happen through force majeure, nor for the loss which results from the nature or from a defect of the thing, on condition that they prove the fact which they allege.

In derogation to the provisions of Article 1953, innkeepers or hotel-keepers are responsible for the objects left in vehicles parked on a place of which they have private enjoyment up to the amount of fifty times the price of rental of lodging per day.

Articles 1952 and 1953 shall not apply to living animals.

CHAPTER III

Of Sequestrations                                                                                   Articles 1955 to 1963

SECTION I

Of the Various Kinds of Sequestration                                                              Article 1955

**Art. 1955**

Sequestration is either conventional or judicial.

SECTION II

Of Conventional Sequestration                                                                    Articles 1956 to 1960

**Art. 1956**

Conventional sequestration is a deposit made by one or several persons, of a thing in contest, into the hands of a third party who binds himself to return it, after the controversy is over, to the person who will be judged entitled to obtain it.

**Art. 1957**

Sequestration need not be gratuitous.

**Art. 1958**

Where it is gratuitous, it is governed by the rules of an actual deposit, subject to the differences hereinafter stated.

**Art. 1959**

Sequestration may have as its object not only movable effects, but also immovables.

**Art. 1960**

A depositary in charge of a sequestration may be discharged, before the end of the controversy, only by consent of all the interested parties, or for a reason judged rightful.

SECTION III

Of Judicial Sequestration or Deposit                                                             Articles 1961 to 1963

**Art. 1961**

A court may order sequestration:

1° Of movables seized on a debtor;

2° Of an immovable or of a movable thing whose ownership or possession is in contest between two or several persons;

3° Of things which a debtor tenders in order to be discharged.

**Art. 1962**

The appointment of a judicial custodian produces reciprocal obligations between the attaching party and the custodian. A custodian must give the care of a prudent owner for the preservation of the things seized.

He must present them, either to the attaching party for being discharged in case of sale, or to the party against

CIVIL CODE

whose property execution has been levied, in case of cancellation of the seizure.

The obligation of an attaching party consists in paying the custodian the salary fixed by law.

**Art. 1963**

Judicial sequestration shall be given, either to a person agreed upon by the parties concerned, or to a person appointed by the judge of his own motion.

In either case, the one to whom a thing is entrusted is subject to all the obligations which a conventional sequestration involves.

**TITLE XII**
**OF ALEATORY CONTRACTS**                                                    **Articles 1965 to 1964**

**Art. 1964**

An aleatory contract is a reciprocal agreement whose effects, as to advantages and to losses, either for all the parties, or for one or several of them, depend upon an uncertain event.

Such are:

Insurance contracts;

Bottomry contracts;

Gaming and betting;

Contracts for life annuity.

The first two are governed by maritime law.

CHAPTER I
Of Gaming and Betting                                                        Articles 1965 to 1967

**Art. 1965**

Legislation does not grant any action for a gaming debt or for the payment of a bet.

**Art. 1966**

Games proper to train in the use of arms, foot or horse races, chariot races, tennis and other games of the same kind which involve skill and bodily exercise, are excepted from the precedent provision.

Nevertheless, the court may dismiss the complaint where the sum seems excessive.

**Art. 1967**

In no case may the loser recover what he has voluntarily paid, unless there was, on the part of the winner, deception, fraud or swindling.

CHAPTER II
Of Contract for Life Annuity                                                 Articles 1968 to 1983

SECTION I
Of the Requisites for the Validity of the Contract                           Articles 1968 to 1976

**Art. 1968**

A life annuity may be settled for value, for a sum of money or for a valuable movable thing, or for an immovable.

**Art. 1969**

It may also be settled, purely gratuitously, by gift inter vivos or by will. It must then bear the forms required by legislation.

**Art. 1970**

In the case of the preceding Article, a life annuity may be abated, where it exceeds what one is allowed to dispose of; it is void, where it is for the benefit of a person incapable of receiving it.

**Art. 1971**

A life annuity may be settled either on the head of the one who furnishes the price of it, or on the head of a third person, who has no right to enjoy it.

**Art. 1972**

It may be settled on one or several heads.

**Art. 1973**

It may settled for the benefit of a third person, although the price is paid by another person.

In the latter case, although it has the character of a gratuitous transfer, it is not subject to the forms required for gifts; except for the cases of abatement and avoidance stated in Article 1970.

(Act no 63-1092 of 6 Nov. 1963) Where, settled by spouses or one of them, an annuity is stipulated to be revertible in favour of the surviving spouse, the clause which imports that property is to revert to him or her may have the character of a gratuitous transfer or that of a transaction for value. In that latter case, the reimbursement or the indemnity owed by the beneficiary of the reversion to the community or to the succession of the predeceaser is equal to the value of the reversion of the annuity. Except for contrary intention of the spouses, an annuity is deemed to have been granted gratuitously.

CIVIL CODE
**Art. 1974**
A contract for life annuity created on the head of a person who was dead at the day of the contract does not produce any effect.

**Art. 1975**
It shall be the same for a contract by which an annuity was created on the head of a person suffering from an illness of which he died within twenty days after the date of the contract.

**Art. 1976**
A life annuity may be settled at the rate which it please the parties to fix.

SECTION II
Of the Effects of the Contract between the Contracting Parties                Articles 1977 to 1983

**Art. 1977**
The one in whose favour a life annuity was settled for a price may apply for the termination of the contract where the grantor does not give the guarantees stipulated for its performance.

**Art. 1978**
The mere failure to pay the income of the annuity does not entitle the one in whose favour it is settled to apply for the reimbursement of the capital or to re-enter into the tenement transferred by him: he only has the right to seize and have the property of his debtor sold and to have ordered or agreed that, out of the proceeds of the sale, a sufficient sum be invested for the payment of the income.

**Art. 1979**
A grantor may not exonerate himself from paying the annuity, by offering to reimburse the capital, and waiving recovery of the income paid; he is bound to pay the annuity during the whole life of the person or persons on whose heads the annuity was settled, whatever the duration of the life of those persons may be and however onerous the payment of the annuity may have become.

**Art. 1980**
A life annuity is acquired by the annuitant only in proportion to the number of days he has lived.
Nevertheless, where it was agreed that it would be paid in advance, the instalment which ought to be paid is acquired from the day when its payment ought to be made.

**Art. 1981**
A life annuity may be stipulated to be exempt from execution only where it was settled gratuitously.

**Art. 1982**
[repealed by implication]

**Art. 1983**
The annuitant of an annuity may claim income only by proving his existence, or that of the person on whose head it was settled.

**TITLE XIII**
**OF AGENCY**                                                          **Articles 1984 to 2010**

CHAPTER I
Of the Nature and Form of Agency                                       Articles 1984 to 1990

**Art. 1984**
An agency or power of attorney is a transaction by which a person gives to another the authority to do something for the principal and in his name.
An agency  is formed only through acceptance of the agent.

**Art. 1985**
"An agency may be given by an authentic instrument or by an instrument under private signature, even by letter. It may also be given verbally, but proof of it by witness is received only in accordance with the Title Of Contracts or of Conventional Obligations in General"(Act no 80-525 of 12 July 1980).
Acceptance of an agency may be only tacit and result from the performance of it effected by the agent.

**Art. 1986**
An agency is gratuitous, unless there is an agreement to the contrary.

**Art. 1987**
It is either special and for one or several deals only, or general and for all the affairs of the principal.

**Art. 1988**
An agency worded in general terms includes only acts of administration.
Where it is intended to transfer or mortgage, or do some other transaction relating to ownership, the agency must be express.

CIVIL CODE

**Art. 1989**

An agent may do nothing beyond what is expressed in his agency: the authority to compromise does not include that to enter into an arbitration agreement.

**Art. 1990**

*(Act no 65-570 of 13 July 1965)*

A non-emancipated minor may be chosen as an agent; but the principal has an action against him only in accordance with the general rules relating to the obligations of minors.

CHAPTER II

Of the Obligations of the Agent                                                   Articles 1991 to 1997

**Art. 1991**

An agent is bound to perform the agency so long as he responsible for it, and is liable for the damages which may result from his non-performance.

He is also bound at the death of the principal to complete a matter initiated, where there is danger in delay.

**Art. 1992**

An agent is liable not only for intentional breach, but also for faults committed in his management.

Nevertheless, the liability for faults is implemented less rigorously against the one whose agency is gratuitous than against the one receiving a salary.

**Art. 1993**

Every agent is bound to account for his management, and to return to the principal all that he received by virtue of his power of attorney, even where what he received was not owed to the principal.

**Art. 1994**

An agent answers for the one whom he has substituted for himself in his management: 1° where he did not receive the authority to substitute someone; 2° where that authority was granted to him without designation of a person and the one whom he has chosen was notoriously incompetent or insolvent.

In all cases, a principal may directly sue the person whom the agent has substituted for himself.

**Art. 1995**

Where there are several proxies or agents appointed by the same instrument, there is no joint and several liability between them, unless it is expressed.

**Art. 1996**

An agent owes interest on sums employed for his own use, from that use; and on those of which he is debtor for the balance, from the day when he is given notice.

**Art. 1997**

An agent who has given the party with whom he contracts, in that capacity, a sufficient knowledge of his authority is not held to any warranty for what has been made outside the scope of that authority, unless he has personally taken charge of it.

CHAPTER III

Of the Obligations of the Principal                                                 Articles 1998 to 2002

**Art. 1998**

A principal is bound to perform the undertakings contracted by the agent, in accordance with the authority granted to him.

He is bound for what may have been done outside its scope, only where he has expressly or tacitly ratified it.

**Art. 1999**

A principal must reimburse the agent for the advances and expenses which the latter made for the performance of the agency, and pay him his salary where it has been promised.

Where no fault may be ascribed to the agent, the principal may not dispense with making those reimbursements and payments, even if the matter did not succeed, and he may not have the amount of the expenses and advances reduced on the pretext that they could have cost less.

**Art. 2000**

A principal must also compensate the agent for the losses which the latter has incurred on the occasion of his management, without an imprudent act being ascribable to him.

**Art. 2001**

Interest on the advances made by the agent is owed to him by the principal, from the day of the advances which are proved.

**Art. 2002**

Where an agent has been appointed by several persons, for a common affair, each of them is jointly and severally liable towards him for all the effects of the agency.

CIVIL CODE

CHAPTER IV

Of the Different Ways in Which an Agency Comes to an End                    Articles 2003 to 2010

**Art. 2003**

An agency comes to an end:

By the revocation of the agent;

By the renunciation of the agency by the latter;

By the [..] death, guardianship of adults or insolvency, either of the principal, or of the agent.

**Art. 2004**

A principal may revoke his power of attorney when he pleases and compel, if there is occasion, the agent to return to him, either the instrument under private signature which contains it, or the original of the power of attorney, where it has been delivered without being recorded, or the office copy, where the original has been kept.

**Art. 2005**

A revocation of which only the agent has been given notice is not effective against third parties who have dealt without knowing of that revocation, except for the remedy of the principal against the agent.

**Art. 2006**

The appointment of a new agent for the same affair involves revocation of the first one, from the day when notice of it has been given to the latter.

**Art. 2007**

An agent may renounce the agency by giving notice of his renunciation to the principal.

Nevertheless, where that renunciation prejudices the principal, he must be compensated by the agent, unless the latter is unable to continue the agency without himself suffering a considerable loss.

**Art. 2008**

Where an agent has no knowledge of the death of the principal or of one of the other causes which make an agency come to an end, what he has done in that ignorance is valid.

**Art. 2009**

In the above cases, the undertakings of the agent shall be performed with regard to third parties who are in good faith.

**Art. 2010**

In case of death of an agent, his heirs must give notice of it to the principal, and, in the meantime, attend to what the circumstances may require in the interest of the latter.

**TITLE XIV**

**[repealed;  Art. 2011 to 2043 removed to Art. 2288 to 2320]**

**TITLE XV**

**OF COMPROMISES**                                                        Articles 2044 to 2058

**Art. 2044**

A compromise is a contract by which the parties settle an arisen controversy, or prevent a controversy from arising.

That contract must be made in writing.

**Art. 2045**

In order to compromise, one must have the capacity to dispose of the things included in the compromise.

A guardian may compromise on behalf of a minor or of an adult in guardianship only in accordance with Article 467, in the Title Of Minors, of Guardianship and of Emancipation; and he may compromise with a minor come of age with respect to the account of guardianship only in accordance with Article 472 of the same Title.

communes and public institutions may compromise only with the express authorization of the President of the Republic.

**Art. 2046**

A compromise may take place as to civil interests resulting from an offence.

The compromise does not prevent prosecution by the Government procurator's office.

**Art. 2047**

One may add to a compromise the stipulation of a penalty against the party who fails to perform it.

**Art. 2048**

Compromises are confined to their purpose: a renunciation made therein of all rights, actions and claims extends only to what relates to the controversy about which the compromise has arisen.

**Art. 2049**

Compromises regulate only the controversies which are comprised therein, whether the parties have expressed their intention in special or general terms, or that intention comes out as a necessary consequence of what is expressed.

**Art. 2050**

CIVIL CODE

Where a person who has made a compromise as to a right which he had in his own name acquires afterwards a similar right in the name of another person, he is not bound by the compromise previously made with respect to the right newly acquired.

**Art. 2051**

A compromise made by one of the interested parties does not bind the others and may not be invoked by them.

**Art. 2052**

Compromises have, between the parties, the authority of res judicata of a final judgment.

They may not be attacked on account of an error of law, nor on account of loss.

**Art. 2053**

Nevertheless, a compromise may be rescinded, where there is an error as to the person or as to the subject-matter of the controversy.

It may also be rescinded where there is deception or duress.

**Art. 2054**

An action for rescission of a compromise also lies where it has been made in execution of an instrument which is void, unless the parties have expressly dealt about the nullity.

**Art. 2055**

A compromise made on documents which have since then been found false is entirely void.

**Art. 2056**

A compromise made as to a suit come to an end owing to a judgment having force of res judicata, of which the parties or one of them were not aware, is void.

Where the judgment unknown to the parties was subject to appeal, the compromise is valid.

**Art. 2057**

Where the parties have compromised generally on all the matters which they might have with one another, the instruments which were then unknown to them and which may have been afterwards discovered, are not a ground for rescission, unless they have been kept through the act of one of the parties.

But the compromise is void where it relates to one matter only to which it is proved, by the newly discovered instruments, that one of the parties had no right.

**Art. 2058**

An error of calculation in a compromise must be corrected.

**TITLE XVI**

**OF ARBITRATION AGREEMENTS**                                                          **Articles 2059 to 2062 to 2070**

**Art. 2059**

All persons may make arbitration agreements relating to rights of which they have the free disposal.

**Art. 2060**

One may not enter into arbitration agreements in matters of status and capacity of the persons, in those relating to divorce and judicial separation or on controversies concerning public bodies and institutions and more generally in all matters in which public policy is concerned.

(Act no 75-596 of 9 July 1975) However, categories of public institutions of an industrial or commercial character may be authorized by decree to enter into arbitration agreements.

**Art. 2061**

*(Act no 2001-420 of 15 May 2001)*

Except where there are particular statutory provisions, an arbitration clause is valid in the contracts concluded by reason of a professional activity.

**Art. 2062 to 2070**

[repealed]

**TITLE XVII**

**[repealed; see BOOK IV]**

**TITLE XVIII**

**[repealed; see BOOK IV ]**

**TITLE XIX**

**OF FORCED SALES AND OF RANKING AMONG CREDITORS**                         **Articles 2204 to 2218**

CHAPTER I

Of Forced Sales                                                                                 Articles 2204 to 2217

CIVIL CODE

**Art. 2204**

A creditor may sue for a forced sale: 1° of immovable property and of its accessories deemed to be immovables belonging in ownership to his debtor; 2° of a usufruct belonging to his debtor on property of the same nature.

**Art. 2204-1**

*(Act no 72-626 of 5 July 1972)*

The proceedings and forced sale produce towards the parties and third parties the effects determined by the Code of Civil Procedure.

**Art. 2205**

(Ord. no 2006-346 of 23 March 2006) Leases granted by a debtor under a seizure or attachment, whatever their duration may be, are not enforceable against the creditors who levy execution.

**Art. 2206**

The immovables of a minor, even emancipated, or of an adult in guardianship may not be put up for sale before seizure and sale of the movables.

**Art. 2207**

Seizure and sale of the movables are not required before a forced sale of the immovables possessed in undivided ownership by an adult and a minor or an adult in guardianship, where the debt is common to them, or where proceedings have been initiated against an adult or before the guardianship of adults.

**Art. 2208**

[repealed]

**Art. 2209**

A creditor may enforce the sale of the immovables which are not mortgaged to him, only in the case of insufficiency of the property mortgaged to him.

**Art. 2210**

A forced sale of items of property situated in different arrondissements  may only be instigated successively, unless they are part of a same business.

It shall take place in the court in whose territory the main place of the business is, or failing a main place, the part of the property which brings in the greatest income, according to the assessment roll.

**Art. 2211**

Where the items of property mortgaged to the creditor and those not mortgaged, or those situated in different arrondissements , form part of one and the same business, the sale of the whole shall be enforced at the same time, if the debtor so requires; and the proceeds of the auction shall be itemized, if there is occasion.

**Art. 2212**

Where a debtor proves, by authentic leases, that the net and free income of his immovables for a year, is sufficient for payment of the debt in capital, interest and costs, and where he offers the assignment thereof to the creditor, the proceedings may be suspended by the judges, subject to their being resumed if there occurs some attachment or obstacle to the payment.

**Art. 2213**

A forced sale of immovables may be enforced only under a judgment or an authentic instrument, for a certain and liquid debt. Where the debt is for a ready money, not liquidated, the proceedings are valid; but the auction may be held only after the liquidation.

**Art. 2214**

The assignee of a judgment or of an authentic instrument may sue for a forced sale only after notice of the assignment has been served on the debtor.

**Art. 2215**

The proceedings may take place under a provisional or final judgment, provisorily enforceable, notwithstanding an appeal; but an auction may be made only after a final  judgment, without possibility of appeal, or become res judicata.

The proceedings may not be instituted under default judgments during the period for application to set the judgment aside.

**Art. 2216**

Proceedings may not be annulled on the pretext that the creditor has instituted them for a larger sum than what is owed to him.

**Art. 2217**

Any proceedings for forced sale must be preceded by an order to pay served, at the suit and request of the creditor, on the person of the debtor or at his domicile, through a bailiff.

"For purpose of their being recorded, the orders to pay bearing on shares depending on an immovable subject to the status of co-ownership shall be deemed not to bear on the portion of common parts which is included in those shares.

"Nevertheless, the seizing creditors shall enforce their rights on the said portion, taken in its consistence at the time

CIVIL CODE

of the transfer whose proceeds are the subject matter of the division" (Act no 79-2 of 2 Jan. 1979).

The forms of the order to pay and those of the proceedings for a forced sale are  regulated by the laws relating to procedure.

CHAPTER II

Of the Ranking of Creditors and of the Division of the Proceeds between Them          Article 2218

**Art. 2218**

The ranking of the creditors and the division of the proceeds of the immovables and the manner of proceeding thereto are regulated by the laws on procedure.

**TITLE XX**

**OF PRESCRIPTION AND OF POSSESSION**                                          **Articles 2219 to 2283**

CHAPTER I

General Provisions                                                           Articles 2219 to 2227

**Art. 2219**

Prescription is a manner of acquiring or of discharging oneself at the end of a certain time and subject to the conditions determined by law.

**Art. 2220**

Prescription may not be renounced beforehand: a prescription which has accrued may be renounced.

**Art. 2221**

A renunciation of prescription may be express or implied: implied renunciation results from an act which implies waiver of the right acquired.

**Art. 2222**

A person who has not the power of alienation does not have the power of renunciation of a prescription which has accrued..

**Art. 2223**

Judges may not supply of their own motion a plea of prescription.

**Art. 2224**

Prescription may be set up at all stages of a case, even before a court of appeal, unless the party who had not set up the plea of prescription should be presumed, by reason of the circumstances, to have renounced it.

**Art. 2225**

Creditors, or any other person having an interest in the prescription's being accrued, may set it up, although the debtor or owner renounces it.

**Art. 2226**

One may not prescribe the ownership of things which may not be the subject matter of legal transactions between private individuals.

**Art. 2227**

The State, public institutions and communes are subject to the same prescriptions as private individuals, and may likewise set them up.

CHAPTER II

Of Possession                                                               Articles 2228 to 2235

**Art. 2228**

Possession is the detention or enjoyment of a thing or of a right which we hold or exercise by ourselves, or by another who holds and exercises it in our name.

**Art. 2229**

In order to be allowed to prescribe, one must have a continuous and uninterrupted, peaceful, public and unequivocal possession, and in the capacity of an owner.

**Art. 2230**

One is always presumed to possess for oneself, and in the capacity of an owner, where it is not proved that one has begun by possessing for another.

**Art. 2231**

Where one has begun by possessing for another, one is always presumed to possess in the same capacity, unless there is proof to the contrary.

**Art. 2232**

Acts which are merely allowed or simply tolerated may not give rise to possession or prescription.

**Art. 2233**

CIVIL CODE

Acts of duress may not give rise to a possession capable of bringing about prescription either.
Possession begins to produce effects only from the time the duress has ceased.

**Art. 2234**

A present possessor who proves that he has formerly possessed, is presumed to have possessed during the intervening time, unless there is proof to the contrary.

**Art. 2235**

To complete a prescription, one may join to one's possession that of one's predecessor, in whatever manner one may have succeeded to him, whether by virtue of a universal or specific title, or for value or gratuitously.

CHAPTER III

Of the Causes Which Prevent Prescription                                       Articles 2236 to 2241

**Art. 2236**

Those who possess for another never acquire ownership by prescription, whatever the time elapsed may be.
Thus a farm tenant, a depositary, a usufructuary, and all those who precariously hold the thing of an owner, may not prescribe it.

**Art. 2237**

The heirs of those who held the thing on any of the bases designated in the preceding Article, may not prescribe either.

**Art. 2238**

Nevertheless, the persons mentioned in Articles 2236 and 2237 may prescribe where the basis of their possession is reversed, either owing to a cause arising from a third party, or by an adverse claim they have raised against the right of the owner.

**Art. 2239**

Those to whom farm tenants, depositaries or usufructuaries and other persons who hold precariously have transmitted the thing by a conveyance, may prescribe it.

**Art. 2240**

One may not prescribe against one's own title, in the sense that one may not modify as to himself the cause and principle of his possession.

**Art. 2241**

One may prescribe against one's title, in the sense that one prescribes the discharge of an obligation which one has contracted.

CHAPTER IV

Of the Causes Which Interrupt or Suspend the Running of Prescription          Articles 2242 to 2259

SECTION I

Of the Causes Which Interrupt Prescription                                     Articles 2242 to 2250

**Art. 2242**

Prescription may be interrupted either naturally or according to law.

**Art. 2243**

Natural interruption takes place where a possessor is deprived of the enjoyment of the thing, for more than one year, either by the previous owner, or even by a third person.

**Art. 2244**

*(Act no 85-677 of 5 July 1985)*
A service of process, even for interim relief, an order to pay or a seizure, on the person whom one wishes to prevent from prescribing, interrupt prescription, as well as the periods within which an action must be brought.

**Art. 2245**

An application for conciliation before the [arrondissement] interrupts prescription from the day of its date, where it is followed by a service of process in due time.

**Art. 2246**

A service of process, even before a judge without jurisdiction, interrupts prescription.

**Art. 2247**

Where a summons is void by infringement of a procedural requirement,
Where the plaintiff discontinues his claim,
Where he leaves the suit to lapse,
Or where he is defeated in his claim,
Interruption shall be deemed never to have occurred.

**Art. 2248**

CIVIL CODE

Prescription is interrupted where the debtor or possessor acknowledges the right of the person against whom he was prescribing.

**Art. 2249**

A service of process made in accordance with the above Articles upon one of the joint and several debtors, or his acknowledgement, interrupts prescription against all the others, and even against their heirs.

A service of process made upon one of the heirs of a joint and several debtor or an acknowledgement by that heir does not interrupt prescription against the other coheirs, even if the claim is secured by a mortgage, where it is not indivisible.

That service of process or that acknowledgement interrupts prescription, with regard to the other co-debtors, only for the share for which that heir is liable.

In order to interrupt prescription for the whole, with regard to the other co-debtors, it is necessary to have a service made on all the heirs of the deceased debtor, or an acknowledgement of all the heirs.

**Art. 2250**

A service made upon a principal debtor, or his acknowledgement, interrupts prescription against the surety.

SECTION II

Of the Causes Which Suspend the Running of Prescription                    Articles 2251 to 2259

**Art. 2251**

Prescription runs against all persons, unless they come within some exception established by law.

**Art. 2252**

*(Act no 64-1230 of 14 Dec. 1964)*

Prescription does not run against non-emancipated minors and adults in guardianship, except for what is stated in Article 2278 and with the exception of the other cases determined by law.

**Art. 2253**

It does not run between spouses.

**Art. 2254**

Although there is no separation resulting from an ante-nuptial agreement or a judgment, prescription runs against a married woman, with regard to the property of which the husband has the administration, subject to her remedy against the husband.

**Art. 2255 and 2256**

[repealed]

**Art. 2257**

The statute of limitations does not run :

With regard to a chose in action which depends upon a condition, until that condition occurs;

With regard to a claim on a warranty, until dispossession has taken place;

With regard to a chose in action on a fixed day, until that day has occurred.

**Art. 2258**

The statute of limitations does not run against a heir under benefit of inventory, with regard to claims which he has against the succession.

It runs against a succession which is vacant, although not provided with a curator.

**Art. 2259**

It still runs during the three months allowed for making an inventory and the forty days for deliberating.

CHAPTER V

Of the Time Required to Prescribe                    Articles 2260 to 2281

SECTION I

General Provisions                    Articles 2260 to 2261

**Art. 2260**

Prescription is counted by days and not by hours.

**Art. 2261**

It accrues when the last day of the period is over.

SECTION II

Of Thirty-Year Prescription                    Articles 2262 to 2264

**Art. 2262**

All claims, in rem as well as in personam, are prescribed by thirty years, without the person who alleges that prescription being obliged to adduce a title, or a plea resulting from bad faith being allowed to be set up against him.

**Art. 2263**

CIVIL CODE

After twenty-eight years from the date of the last instrument of title, the debtor of an annuity may be compelled to furnish at his expense a new instrument to his creditor or to his assigns.

**Art. 2264**

The rules of prescription on matters other than those mentioned in this Title are explained in the Titles which relate to them.

SECTION III

Of Ten- and Twenty-Year Prescription                                    Articles 2265 to 2270-2

**Art. 2265**

A person who acquires an immovable in good faith and under a just title prescribes ownership of it by ten years, where the true owner lives on the territory of the court of appeal within whose limits the immovable is situated; and by twenty years, where he is domiciled outside of the said territory.

**Art. 2266**

Where the true owner has had his domicile at different times, within and outside the territory, one must, in order to complete the prescription, add to what is lacking to make up ten years of presence, a number of years of absence twice what is lacking to complete the ten years of presence.

**Art. 2267**

An instrument which is void for a defect as to its form may not serve as the basis for a prescription by ten and twenty years.

**Art. 2268**

Good faith is always presumed, and it is on the person who alleges bad faith to prove it.

**Art. 2269**

It is sufficient that good faith has existed at the time of the acquisition.

**Art. 2270**

*(Act no 78-12 of 4 Jan. 1978)*

Any natural or juridical person who may be liable under Articles 1792 to 1792-4 of this Code is discharged from the liabilities and warranties by which they are weighed down in application of Articles 1792 to 1792-2, after ten years from the approval of the works or, in application of Article 1792-3, on the expiry of the period referred to in this Article.

**Art. 2270-1**

*(Act no 85-677 of 5 July 1985)*

Claims for tort liability are barred after ten years from the manifestation of the injury or of its aggravation.

(Act no 98-468 of 17 June 1998) Where the injury is caused by torture and acts of cruelty, assault or sexual aggressions committed against a minor, the action in tort liability is barred after twenty years.

**Art. 2270-2**

*(Ord no 2005-658 of 8 June 2005)*

Claims for liability directed against subcontractors for reason of damages affecting a work or elements of equipment of a work specified in Articles 1792 and 1792-2 are barred after ten years as from the approval of the works and, as to the damages affecting those of the elements of equipment specified in Article 1792-3, after two years as from that same approval.

SECTION IV

Of Some Particular Prescriptions                                    Articles 2271 to 2281

**Art. 2271**

*(Act no 71-586 of 16 July 1971)*

The claim of teachers and schoolmasters of sciences and arts for the lessons which they give by the month;

That of innkeepers and caterers for reason of board and lodging which they furnish, are barred after six months.

**Art. 2272**

*(Act no 71-586 of 16 July 1971)*

The claim of bailiffs, for the fees of the instruments they serve and the commissions which they perform;

That of the masters of boarding schools, for the boarding fees of their pupils, and of the other masters for the price of the apprenticeship, are barred after one year.

The claim of physicians, surgeons, dental surgeons, midwives and pharmacists, for their visits, operations, and medicines, is barred after two years.

The claim of merchants, for the goods which they sell to private individuals who are not merchants, is barred after two years.

**Art. 2273**

The action of counsels for the payment of theirs costs and fees, is barred after two years, from the judgment in the proceedings or from the conciliation of the parties, or since the revocation of the said counsels. As to cases not closed, they may not institute judicial proceedings for their costs and fees which date back more than five years.

CIVIL CODE

**Art. 2274**

In the above cases, limitation takes place although the supplies, deliveries, services and works have been continued.

The statute of limitation ceases to run where there was an  account stated, acknowledgment in writing or a summons which has not lapsed.

**Art. 2275**

Nevertheless, the persons against whom those limitations are raised may tender the oath to those who raise them, on the question of knowing whether the thing has really been paid.

The oath may be tendered to widows and heirs, or to the guardians or the latter, where they are minors, in order to have them declare that they were not aware of the thing being owed.

**Art. 2276**

*(Act no 71-586 of 16 July 1971)*

Judges as well as the persons who have represented or assisted the parties are no longer chargeable for the papers and documents five years after the judgment or the end of their duties.

Bailiffs are also no longer chargeable after two years since the performance of the commission or the service of instruments of which they had the responsibility.

**Art. 2277**

*(Act no 71-538 of 7 July 1971)*

The actions for payment:

Of salaries;

Of arrears of perpetual and life annuities and those of periodical payments;

(Act no 2005-32 of 18 Jan. 2005) Of rents, farm rents and tenant's charges;

Of interest of sums loaned,

and generally of everything which is payable annually or at shorter periodical times, are barred after five tears

(Act no 2005-32 of 18 Jan. 2005) Are also barred after five years the claims for the recovery of rents, farm rents and tenant's charges.

**Art. 2277-1**

*(Act no 89-906 of 19 Dec. 1989)*

An claim directed against persons statutorily empowered to represent or assist parties in court by reason of the liability which they thus incur is barred  after ten year from the end of their duties.

**Art. 2278**

The limitations in question in the Articles of this Section, run against minors and adults in guardianship; subject to their remedy against their guardian.

**Art. 2279**

In matters of movables, possession is equivalent to a title.

Nevertheless, the person who has lost or from whom a thing has been stolen, may claim it during three years, from the day of the loss or of the theft, against the one in whose hands he finds it, subject to the remedy of the latter against the one from whom he holds it.

**Art. 2280**

Where the present possessor of a thing lost or stolen has bought it at a fair or market, or at a public sale, or from a merchant selling similar things, the original owner may have it returned to him only by reimbursing the possessor for the price which it has cost him.

(Act of 11 July 1892) A lessor who claims, under Article 2102, the movables displaced without his consent and which have been bought in the same conditions, must likewise reimburse the buyer for the price which they have cost him.

**Art. 2281**

Prescriptions commenced at the time of the publication of this Title shall be regulated in accordance with former laws.

Nevertheless, prescriptions then commenced and for which, under the former laws, would still be necessary more than thirty year from the same time, shall become complete by that period of thirty years.

CHAPTER VI

Of the Mode of Protecting Possession                                        Articles 2282 to 2283

**Art. 2282**

Possession is protected, regardless of the substance of the right, against disturbance which affects or threatens it.

Protection of possession is also granted to a person who holds a thing against all other than the one from whom he holds his rights.

**Art. 2283**

Claims for the protection of possession may be brought by those who possess or hold peacefully in the way provided for by the Code of Civil Procedure. (Ord.no 2002-1476 of 19 Dec. 2002)

CIVIL CODE
# BOOK IV
## OF SECURITIES

**Article 2284**

Whoever has personally made himself liable is bound to fulfil his undertaking out of all his movable or immovable property, existing and to come. [ex art. 2092]

**Article 2285**

The property of a debtor is the common pledge of his creditors; and the proceeds of it shall be distributed among them pro rata, unless there are lawful causes of priority between the creditors. [ex art. 2093]

**Article 2286**

May avail himself of a right of retention on a thing:

1° The person to whom the thing was handed over until payment of his debt;

2° The person whose outstanding debt results from the contract which binds him to deliver it;

3° The person whose outstanding debt was born on the occasion of the possession in fact of the thing.

A right of retention is lost through voluntary transfer of possesssion.

**Article 2287**

The provisions of this Book shall not prevent the application of the rules provided for in case of [insolvency proceedings] or in case of the opening of proceedings for the treatment of situations of over-running into debts of private persons.

## TITLE I
## OF PERSONAL SECURITIES

**Article 2287-1**

Personal securities regulated by this Title are suretyship, independent guarantee and letter of intent.

### CHAPTER I
### Of Suretyship

Articles 2288 to 2320

#### SECTION I
#### Of the Nature and Extent of Suretyship

Articles 2288 to 2297

**Article 2288**

A person who makes himself surety for an obligation binds himself towards the creditor to perform that obligation, if the debtor does not perform it himself. [ex Art. 2011]

**Article 2289**

A suretyship may exist only on a valid obligation.

One may nevertheless stand surety for an obligation, although it may be avoided by a defence purely personal to the obligor; for instance, in case of minority. [ex Art. 2012]

**Article 2290**

A suretyship may not exceed  what is owed by the debtor, nor be contracted under more onerous conditions.

It may be contracted for a part of the debt only, and under less onerous conditions.

A suretyship which exceeds the debt, or which is contracted under more onerous conditions, is not void: it is only reducible to the extent of the principal obligation. [ex Art. 2013]

**Article 2291**

One may become surety without an order of the person for whom one becomes bound, and even without his knowledge.

One may also become surety, not only of the principal debtor, but also of the person who has given security for him. [ex Art. 2014]

**Article 2292**

Suretyship is not presumed; it must be express, and one may not extend it beyond the limits within which it was contracted. [ex Art. 2015]

**Article 2293**

Indefinite suretyship of a principal obligation extends to the accessories of the debt, even to the costs of the first claim, and to all those subsequent to the notice given of it to the surety.

Where that suretyship is contracted by a natural person, the latter shall be informed by the creditor of the evolution of the amount of the debt secured and of those accessories at least once a year at the date agreed between the parties or, failing which, at the anniversary date of the contract, on pain of forfeiture of all the accessories of the debts, costs and penalties. [ex Art. 2016]

**Article 2294**

CIVIL CODE

The undertakings of the sureties, except judicial constraint, pass to their heirs, where the undertaking was such that the surety was bound to it. [ex Art. 2017]

**Article 2295**

A debtor compelled to give a surety must present one who has capacity to contract, sufficient property to answer for the subject matter of the obligation, and whose domicile is in the territory of the cour d'appel where it must be given. [ex Art. 2018]

**Article 2296**

The solvency of a surety shall be appreciated only with regard to his landed property except in matters of commerce, or where the debt is moderate.

Regard shall not be had to immovables in dispute or whose seizure and forced sale would be too difficult because of remoteness of their location. [ex Art. 2019]

**Article 2297**

Where a surety received by the creditor, voluntarily or in court, becomes afterwards insolvent, a new one shall be given.

The sole exception to that rule takes place where the surety was given only under an agreement by which the creditor required such a person as surety. [ex Art. 2020]

SECTION II
Of the Effect of Suretyship                                                Articles 2298 to 2310

Sub-section 1
Of the Effect of Suretyship between Creditor and Surety                    Articles 2298 to 2304

**Article 2298**

A surety is bound towards the creditor to pay him only upon the debtor's failure, whose property must be previously exhausted, unless the surety has renounced the benefit of seizure and sale*, or unless he is bound jointly and severally with the debtor, in which case the effect of his undertaking is governed by the principles established for joint and several debts. [ex Art. 2021]

**Article 2299**

A creditor is bound to exhaust the main debtor's property only where the surety requires him to do so, on the institution of proceedings against the latter. [ex Art. 2022]

**Article 2300**

A surety who requires seizure and sale must point out to the creditor the property of the principal debtor and furnish a sufficient sum to have the proceedings carried out.

He may not point out property of the principal debtor situated out of the arrondissement of the cour d'appel of the place where payment must be made, nor property which is in litigation, nor that which is mortgaged for the debt and no longer in the possession of the debtor. [ex Art. 2023]

**Article 2301**

Whenever the surety has pointed out the property authorized by the preceding Article and has furnished a sufficient sum to have the seizure and sale carried out, the creditor is, to the extent of the property pointed out, liable towards the surety for the insolvency of the principal debtor which has occurred in consequence of his failure to institute proceedings. In any case, the amount of the debts resulting from a suretyship may not have the effect of depriving a natural person who stood as surety of a minimum income fixed by Article L. 331-2 of the Consumer Code. [ex Art. 2024]

**Article 2302**

Where several persons have become surety of the same debtor for a same debt, each one is liable for the whole debt.  [ex Art. 2025]

**Article 2303**

Nevertheless, each one, unless he has renounced the benefit of division*, may demand that the creditor previously divide his action and reduce it to the part and portion owed by each surety.

Where, at the time when one of the sureties had the division effected, some of them were insolvent, that surety is proportionately liable for those insolvencies; but he may no longer be sued for insolvencies happening after the division. [ex Art. 2026]

**Article 2304**

Where a creditor has himself and voluntarily divided his action, he may not go back on that division, although there were insolvent sureties even before the time when he consented thereto. [ex Art. 2027]

Sub-section 2
Of the Effect of Suretyship between Debtor and Surety                      Articles 2305 to 2309

**Article 2305**

A surety who has paid has his remedy against the principal debtor, whether the suretyship has been given with or without the knowledge of the debtor.

CIVIL CODE

That remedy shall take place both for the principal and for the interest and costs; nevertheless, the surety has a remedy only for the costs he has incurred since he has given notice to the principal debtor of the proceedings instituted against him.

He also has a remedy for damages, if there is occasion. [ex Art. 2028]

**Article 2306**

A surety who has paid the debt is subrogated to all the rights which the creditor had against the debtor. [ex Art. 2029]

**Article 2307**

Where there were several principal debtors, jointly and severally liable for a same debt, he who stood as surety for them all has, against each of them, a remedy for the recovery of the whole debt. [ex Art. 2030]

**Article 2308**

A surety who paid a first time has no remedy against a principal debtor who paid a second time, where he has not informed him of his paying; except for his remedy for recovery against the creditor.

Where a surety has paid without being sued and without informing the principal debtor, he has no remedy against him in the case where, at the time of payment, that debtor would have had arguments to have the debt declared extinct; except for his remedy for recovery against the creditor. [ex Art. 2031]

**Article 2309**

Even before paying, a surety may bring suit against the debtor to be indemnified by him:
1° Where he is sued in court for payment;
2° Where the debtor is [under a judicial arrangement] or insolvent;
3° Where the debtor was bound to discharge him within a certain time;
4° Where the debt has become due by the expiry of the term for which it was contracted;
5° At the end of ten years, where the principal obligation has no fixed term of maturity, unless the principal obligation, such as a guardianship, is not extinguishable before a determinate time. [ex Art. 2032]

Sub-section 3
Of the Effect of Suretyship between Co-Sureties                    Article 2310

**Article 2310**

Where several persons have been sureties for the same debtor in regard to the same debt, a surety who has satisfied the debt has a remedy against the other sureties, for the share and portion of each of them;

But this remedy only takes place where the surety has paid in one of the cases mentioned in the preceding Article. [ex Art. 2033]

SECTION III
Of the Extinguishment of Suretyship                      Articles 2311 to 2316

**Article 2311**

The obligation which results from a suretyship is extinguished by the same causes as other obligations. [ex Art. 2034]

**Article 2312**

A merger which takes place in the persons of a principal debtor and his surety, where they become heirs one to the other, does not extinguish the action of the creditor against the person who has stood as surety for the surety. [ex Art. 2035]

**Article 2313**

A surety may set up against the creditor all the defences which belong to the principal debtor, and which are inherent to the debt;

But he may not set up the defences which are purely personal to the debtor. [ex Art. 2036]

**Article 2314**

A surety is discharged where the subrogation to the rights, mortgages and prior  charges of the creditor, may no longer take place in favour of the surety, by the act of that creditor. Any clause to the contrary is deemed not written. [ex Art. 2037]

**Article 2315**

The voluntary acceptance on the part of a creditor of an immovable or of any property in payment of the principal debt, discharges the surety, even where the creditor is afterwards evicted therefrom. [ex Art. 2038]

**Article 2316**

A mere extension granted by the creditor to the principal debtor does not discharge the surety, who may in that case sue the debtor to compel him to pay. [ex Art. 2039]

SECTION IV
Of Statutory and Judicial Sureties                      Articles 2317 to 2320

**Article 2317**

CIVIL CODE

Whenever a person is bound, by law or by a judgment, to give a surety, the surety tendered must fulfil the conditions required in Articles 2295 and 2296.

Moreover, where a judicial surety is concerned, the surety must be liable to judicial constraint. [ex Art. 2040]

**Article 2318**

A person who cannot find a surety is admitted to give instead a pawn as sufficient pledge. [ex Art. 2041]

**Article 2319**

A judicial surety may not demand the seizure and sale of the principal debtor's property. [ex Art. 2042]

**Article 2320**

A person who has merely become the surety of a judicial surety may not demand the seizure and sale of the property of the principal debtor and of the surety. [ex Art. 2043]

CHAPTER II

Of Independent Guarantee                                                      Article 2321

**Article 2321**

An independent guarantee is an undertaking by which the guarantor binds himself, in consideration of a debt subscribed by a third party, to pay a sum either on first demand or subject to terms agreed upon.

A guarantor is not bound in case of patent abuse or fraud of the beneficiary or of collusion of the latter with the principal.

A guarantor may set up no defence depending on the guaranteed obligation.

Unless otherwise agreed, that security does not follow the guaranteed obligation.

CHAPTER III

Of Letter of Intent                                                           Article 2322

**Article 2322**

A letter of intent is an undertaking to do or not to do whose purpose is the support provided to a debtor in the performance of his obligation in respect of his creditor.

**TITLE II**

**OF REAL SECURITIES**                                                **Articles 2323 to 2373**

SUB-TITLE I

GENERAL PROVISIONS                                                   Articles 2323 to 2328

**Article 2323**

The lawful causes of priority are prior charges* and mortgages. [ex Art. 2094]

**Article 2324**

A prior charge* is a right which the character of a debt gives to a creditor to have priority over the other creditors, even mortgagees. [ex Art. 2095]

**Article 2325**

Among creditors who have prior charges, the priority is settled by the different characters of the prior charges. [ex Art. 2096]

**Article 2326**

The creditors having prior charges who are in the same rank shall be paid pro rata. [ex Art. 2097]

**Article 2327**

The prior charge by reason of the rights of the Public Treasury and the order in which it comes are regulated by the statutes which relate to them.

The Public Treasury may not, however, obtain a prior charge to the detriment of rights previously vested in third parties. [ex Art. 2098]

**Article 2328**

Prior charges may be over movables or over immovables. [ex Art. 2099]

SUB-TITLE II

OF SECURITIES OVER MOVABLES                                         Articles 2331 to 2329

**Article 2329**

Securities over movables are:

1° Prior charges over movables;

2° Pledge of corporeal movables;

3° Pledge of incorporeal movables;

4° Retention of title as a security.

CHAPTER I

CIVIL CODE

Of Prior Charges over Movables                                                    Articles 2331 to 2330

**Article 2330**

Prior charges are either general, or special over certain movables. [ex Art. 2100]

SECTION I

Of General Prior Charges                                                    Article 2331

**Article 2331**

Debts which have precedence over the generality of movables are those hereinafter expressed, and they shall be enforced in the following order:

1° Court costs;

2° Funeral expenses;

3° Any expenses relating to the latest illness, whatever its outcome may have been, concurrently among those to whom they are owed;

4° Without prejudice to the possible application of the provisions of  Articles L. 143-10, L. 143-11, L. 742-6 and L. 751-15 of the Labour Code:

Wages of domestic staff for the year elapsed and the current year;

The deferred salary resulting from the contract of employment established by Article 63 of the Decree of 29 July 1939 relating to French family and birth rate [Articles L. 321-13 to L. 321-21 of the Rural Code], for the year elapsed and the current year;

The debt of the surviving spouse established by Article 14 of Act no 89-1008 of 31 December 1989 relating to the development of commercial and artisanal undertakings and to the improvement of their economic, legal and social environment, and the debt of the surviving spouse established by Article L. 321-21-1 of the Rural Code;

The pay for the last six months of employees, apprentices, and the allowance owed by the employer to young people in training scheme of initiation to professional life, such as provided for in Article L. 980-11-1 of the Labour Code;

The allowance for the end of the contract provided for by Article L. 122-3-4 of the Labour Code and the allowance to compensate for lack of job security provided for in Article L. 124-4-4 of the same Code;

Allowance owed by reason of failure to comply with the term of notice provided for in Article L. 122-8 of the Labour Code and the compensatory allowance provided for in Article L. 122-32-6 of the same Code;

Allowances owed for paid holidays;

Allowances for dismissal owed in compliance with collective labour agreements, collective agreements of branches, labour regulations, usages, and the provisions of Articles L. 122-9, L. 122-32-6, L. 761-5 and L. 761-7 of the Labour Code for the whole of the portion lower than or equal to the ceiling provided for in Article L. 143-10 of the Labour Code and for one-fourth of the portion higher than the said ceiling;

Allowances owed, if there is occasion, to employees under Articles L. 122-3-8, paragraph 2, L. 122-14-4, L. 122-14-5, paragraph 2, L. 122-32-7 and L. 122-32-9 of the Labour Code;

5° The furnishing of supplies to a debtor and his family during the last year and, within the same period, the products delivered by an agricultural producer in the context of an approved long-term inter-professional agreement, as well as the sums owed by any contracting party of a farmer in compliance with an approved standard contract;

6° The debt of the victim of the injury or of his successors and assigns relating to medical, pharmaceutical and funeral expenses, and to the allowances allocated following a temporary incapacity for work;

7° Grants owed to workmen and employees by equalization funds and other approved bodies for servicing family allowances or by employers dispensed from joining such an institution under Article 74 f [repealed]of Book I of the Labour Code.

8° Debts of equalization funds or other approved bodies for servicing family allowances towards their adherents for the contributions which the latter have undertaken to pay them for purpose of payment of family allowances and equalization of the burdens resulting from the payment of aforesaid benefits. [ex Art. 2101]

SECTION II

Of Special Prior Charges                                                    Article 2332

**Article 2332**

Debts which have precedence over particular movables are:

1° Rents and farm-rents of immovables on the fruit of the year's crop, and on the price of everything which garnishes the house rented or the farm, and of everything which is used for the working of the farm: namely, for everything which is due, and for everything which shall become due, where the leases are authentic, or, where being under private signature, they have an undisputable date; and, in both cases, the other creditors have the right to relet the house or the farm for the remainder of the lease, and to profit by the leases or rents, on condition, however, that they pay the owner everything which may still be owed to him.

And, failing authentic leases, or where, being under private signature, they do not have an undisputable date, for one year after the expiry of the current year.

The same prior charge exists for the repairs incumbent upon the tenant and for everything relating to the execution of the lease. It also exists for all debts resulting, for the benefit of the owner or tenant, from the occupation of the premises, regardless of the basis thereof.

Nevertheless, the sums owed for seeds, for manure and ameliorators, for anti-cryptogamic and insect products, for products designed for the destroying of animal or plant parasites harmful to farming, or for the expenses of the year's

CIVIL CODE

crop, shall be paid out of the proceeds of the crop, and those owed for implements out of the proceeds of those implements, in priority to the owner in either case.

The owner may seize the movables which furnish his house or his farm, where they have been removed without his consent, and he retains his prior charge over them, provided he has made his claim; namely: where the furniture which garnished a farm is concerned, within forty day; and within fifteen days, where the furniture garnishing a house is concerned;

2° A debt on the pawn which is in the possession of the creditor;

3° Expenses incurred for the preservation of a thing;

4° The price of unpaid movable effects, where they are still in the possession of the debtor, whether he has bought on credit or not;

Where the sale was not made on credit, the seller may even claim back those effects as long as they are in the possession of the buyer, and prevent a re-sale, provided the claim is made within eight days after the delivery, and the effects are in the same condition in which the delivery was made;

However, the seller's prior charge may only be enforced after that of the owner of the house or of the farm, unless it is proved that the owner knew that the furniture and other articles garnishing his house or his farm did not belong to the tenant;

No change is made in the statutes and customs of commerce relating to claims for recovery;

5° The supplies of an innkeeper , on the effects of a traveller which have been carried to his inn;

6° [repealed]

7° Debts resulting from abuses and unfaithful conducts of public officials in the fulfilment of their duties, on the funds of their pawn, and on the interest which may be owed thereon;

8° Debts arising from an accident for the benefit of the third persons injured in that accident or their assigns, on the indemnity of which the insurer, under a contract of liability insurance, admits that he is or has been judicially held debtor by reason of the contract of insurance.

No payment made to the insured person may be in full discharge as long as creditors with prior charges  have not been paid off;

9° Debts arising from a contract of employment of the auxiliary employee of a home worker corresponding to the definition of Article L. 721-1 of the Labour Code, on the sums owed to that worker by the hirers of services. [ex Art. 2102]

SECTION III
Of the Rank of Prior Charges                                                    Articles 2332-1 to
                                                                               2332-3

**Article 2332-1**

Unless otherwise provided, special prior charges rank before general prior charges.

**Article 2332-2**

General prior charges shall be enforced in the order settled by Article 2331, save the prior charge of the Public Treasury whose rank is regulated by the statutes which relate to it, and the prior charge of social insurance offices which ranks equally with the prior charge of employees.

**Article 2332-3**

The special prior charges of a landlord, of a preserver and of a seller of a movable shall be enforced in the following order:

1° The prior charge of a preserver, where the expenses for preservation are subsequent to the rise of the other prior charges;

2° The prior charge of a landlord, who was unaware of the existence of the other prior charges;

3° The prior charge of a preserver, where the expenses for preservation are antecedent to the rise of the other prior charges;

4° The prior charge of a seller of a movable;

5° The prior charge of a landlord, who was aware of the existence of the other prior charges.

Among the preservers of a same movable, priority shall be given to the most recent. Among the sellers of a same movable, it shall be given to the earliest.

For the implementation of the above rules, the prior charge of an innkeeper shall be put on the same footing as that of a landlord; and that of the auxiliary employee of a home worker as that of the seller of a movable.

CHAPTER II
Of Pledge of Corporeal Movables                                              Articles 2333 to 2354

SECTION I
Of the Ordinary Law of Pledge                                                Articles 2333 to 2350

**Article 2333**

A pledge is an agreement by which the pledgor gives to a creditor the right to be paid in preference to his other creditors out of a corporeal movable or a set of corporeal movables, actual or future.

The debts secured may be actual or future; in the latter case, they must be determinable.

CIVIL CODE

## Article 2334

A pledge may be given by the debtor or a third party; in the latter case, the creditor may only bring a claim concerning the property transferred as security.

## Article 2335

The pledge of the thing of another is void. It may give rise to damages where the creditor did not know that the thing belonged to another.

## Article 2336

A pledge is complete by the establishing of a writing which contains the description of the debt secured, the quantity of the pledged units of property, as well as of their species or nature.

## Article 2337

A pledge is enforceable against third parties through its being offered to public notice.

It is so likewise through delivery of the property which it concerns to the creditor or an agreed third party.

Where a pledge has been duly offered to public notice, the particular successors of the pledgor may not avail themselves of Article 2279.

## Article 2338

A pledge is offered to public notice through registration on a special registry whose details shall be regulated by a decree in Conseil d'Etat.

## Article 2339

A pledgor may require the cancellation of a registration or the restoration of the pledged property only after paying in full both the capital and the interest and cost of the secured debt.

## Article 2340

Where a same property has been the subject matter of several non possessory pledges, the rank of the creditors is regulated by the order of their registrations.

Where a property transferred as a non possessory pledge is subsequently the subject matter of a pawn, the right of preference of the previous pledgee creditor is enforceable against the subsequent pledgee creditor where it is duly registered notwithstanding the right of retention of the latter.

## Article 2341

Where a pawn attaches on fungibles, the creditor shall keep them separate from the things of the same nature which belong to him. Failing which, the pledgor may avail himself of the provisions of Article 2344, paragraph 1.

Where the agreement exempts the creditor from that obligation, he acquires the ownership of the pledged things on condition to return the same quantity of equivalent things.

## Article 2342

Where a non possessory pledge attaches on fungibles, the pledgor may dispose of them if the agreement so provides on condition to replace them by the same quantity of equivalent things.

## Article 2343

A pledgor must refund to the creditor or to the third party agreed upon useful or necessary expenses which the latter has incurred for the preservation of the pledge.

## Article 2344

Where the thing is delivered, the pawnor may claim the restoration of the property pawned, without prejudice to damages, where the creditor or the third party agreed  upon does not carry out his obligation of preservation of the pawn.

Where there is no delivery of the thing, the creditor may avail himself of the lapse of the term* of the secured debt or request an additional pledge if the pledgor does not carry out his obligation of preservation of the pledge.

## Article 2345

Unless otherwise agreed upon, where the mere possessor of the pledged property is the creditor of the secured debt, he collects the increase of that property and appropriates it to the interests or, in their absence, to the capital of the debt.

## Article 2346

In case of failure to pay the secured debt, a creditor may have ordered in court the sale of the pledged property. That sale shall take place following the rules on enforcement proceedings to which a contract of pledge may not derogate.

## Article 2347

A creditor may also have ordered in court that the property will remain with him in payment.

Where the value of the property exceeds the amount of the secured debt, the sum which equals the difference shall be paid to the debtor or, if there are other pledgee creditors, shall be deposited.

## Article 2348

When creating the pledge or afterwards, it may be agreed  that in case of failure to perform the secured obligation, the creditor will become owner of the pledged property.

CIVIL CODE

The value of the property shall be determined on the day of the transfer by an expert designated by amicable agreement or judicially, in the absence of an official quotation of the property on a regulated market within the meaning of the Monetary and Financial Code. Any clause to the contrary is deemed not written.

Where that value exceeds the amount of the secured debt, the sum which equals the difference shall be paid to the debtor or, if there are other pledgee creditors, shall be deposited.

**Article 2349**

A pledge is indivisible notwithstanding the divisibility of the debt between the heirs of the debtor or those of the creditor.

An heir of the debtor, who has paid his portion of the debt, may not claim the restoration of his portion in the pledge, so long as the debt is not wholly discharged.

Reciprocally, an heir of the creditor, who has received his portion of the debt, may not release the pledge to the detriment of those of his co-heirs who are not paid. [ex Art. 2083]

**Article 2350**

The deposit of sums, effects or securities, judicially ordered for guarantee or as a provisional measure, involves the special lien and the prior charge of Article 2333. [ex Art. 2084]

SECTION II
Of the Pledge of a Motor Vehicle                                    Articles 2351 to 2353

**Article 2351**

Where it  attaches to a registered land motor vehicle or a trailer, a pledge is enforceable against third parties through the declaration thereof which is made to the administrative authority under the terms prescribed by decree in Conseil d'Etat [shall come into force on a date that shall be fixed by decree and which may not be subsequent to 1 July 2008].

**Article 2352**

Through the issue of a receipt of the declaration, a pledgor creditor shall be deemed to have kept the pledged property in his possession [shall come into force on a date that shall be fixed by decree and which may not be subsequent to 1 July 2008].

**Article 2353**

Whatever may be the quality of the debtor, the enforcement of a pledge is subject to the rules provided for in Articles 2346 to 2348 [shall come into force on a date that shall be fixed by decree and which may not be subsequent to 1 July 2008].

SECTION III
Common Provisions                                                        Article 2354

**Article 2354**

The provisions of this Chapter are not a bar to the application of the special rules provided for in commercial matters or in favour of authorized pawnbroker's establishments.

CHAPTER III
Of Pledge of Incorporeal Movables                            Articles 2355 to 2366

**Article 2355**

A pledge of an incorporeal thing is the allocation of an incorporeal movable or of a set of incorporeal movables, actual or future, as security for an obligation.

It may be conventional or judicial.

Judicial pledge is regulated by the rules which apply to enforcement proceedings.

Failing special provisions, a conventional pledge which attaches to debts is regulated by this Chapter.

Failing special provisions, a conventional pledge which attaches to other incorporeal movables is regulated by the rules laid down for the pledge of corporeal movables.

**Article 2356**

On pain of nullity, the pledge of a debt shall be concluded in writing.

Debts secured and debts pledged shall be designated in the instrument.

Where they are future, the instrument must allow their individualization or contain elements which allow it, such as the indication of the debtor, the place of payment, the amount of the debts or their estimate and, if there is occasion, their due date.

**Article 2357**

Where a pledge attaches to a future debt, the pledgee creditor acquires a right on the debt as from the rise of the latter.

**Article 2358**

The pledge of a debt may be established  for a specified time.

It may attach to a portion of a debt, save where the latter is indivisible.

CIVIL CODE

**Article 2359**
A pledge extends to the accessories of the debt unless otherwise agreed.

**Article 2360**
Where a pledge  attaches to an account, the pledged debt must be understood as being the credit balance, provisional or final, on the day of the enforcement of the security with the reservation of the regularization of the current transactions, following the rules on enforcement proceedings.
With the same reservation, in case of the opening against the pledgor of [insolvency proceedings] or of proceedings for the treatment of situations of over-running into debts of private persons, the rights of the pledgee creditor attaches on the balance of the account on the date of the jugement d'ouverture.

**Article 2361**
The pledge of a debt, actual or future, takes effect as between the parties and is enforceable against third parties as from the date of the instrument.

**Article 2362**
In order to be enforceable against the debtor of the pledged debt, the pledge of the debt must be notified to him or he must intervene in the instrument.
Failing which, the pledgor alone duly receives payment of the debt.

**Article 2363**
After notice, the pledged creditor alone duly receives payment of the pledged debt in capital as well as in interest.
Each creditor may enforce it, the others being duly summoned.

**Article 2364**
The sums paid for reason of the pledged debt shall be appropriated to the secured debt where it is due.
Otherwise, the pledgee creditor shall keep them as security on an account open in an institution entitled to receive them on condition to return them if the secured obligation is performed. In case of default of the debtor of the pledged debt and eight days after a formal requisition remained ineffective, the creditor shall allocate the funds to the repayment of his debt to the extent of unpaid sums.

**Article 2365**
In case of default of his debtor, a pledgee creditor may have assigned to him, by the judge or in the way provided for in the agreement, the pledged debt as well as all the rights which attach to it.
He may also wait till the debt becomes due.

**Article 2366**
Where a sum in excess of the secured debt is paid to the pledgee creditor, the latter owes the difference to the pledgor.

CHAPTER IV
Of Retention of Title as a Security                                              Articles 2367 to 2372

**Article 2367**
Ownership of a property may be retained as security through a clause of retention of title which stays the transferring effect of a contract until payment in full of the obligation which compensates for it.
Ownership so retained is the accessory of the debt whose payment it secures.

**Article 2368**
A retention of title shall be agreed upon in writing.

**Article 2369**
The reserved  title of a fungible may, up to the amount of the debt remaining due, attach to property of same nature and quality detained by the debtor or on his behalf.

**Article 2370**
The incorporation to another thing of a thing whose title is retained is not a bar to the rights of the creditor where those things may be separated without suffering damage.

**Article 2371**
Failing payment in full on due date, a creditor may  claim the restoration of the property in order to get back the right to dispose thereof.
The value of the resumed property shall be appropriated, for payment, on the balance of the secured debt.
Where the value of the resumed property exceeds the amount of the secured debt still due, the creditor owes to the debtor a sum equal to the difference.

**Article 2372**
The right of ownership burdens the debtor's debt with respect to a subpurchaser or to the indemnity under an insurance policy which is subrogated to the property.

SUB-TITLE III
OF SECURITIES OVER IMMOVABLES                                            Articles 2374 to 2373

CIVIL CODE

## Article 2373

Securities over immovables are prior charges, antichresis and mortgages.
Ownership of an immovable may also be retained as security.

CHAPTER I
Of Prior Charges over Immovables                                                    Articles 2374 to 2386

SECTION I
Of Special Prior Charges                                                                          Article 2374

## Article 2374

Creditors having precedence over immovables are:

1° A seller, on the immovable sold, for payment of the price;

Where there are several successive sales whose price is owed wholly or partly, the first seller has priority over the second, the second over the third, and so on;

1° bis Jointly with a seller and, if there is occasion, with a lender of funds mentioned in 2°, a syndicate of co-owners, on the fraction of co-ownership sold, for payment of the expenses and works mentioned in Articles 10 and 30 of Act no 65-557 of 10 July 1965 establishing the status of co-ownership of built immovables, which relate to the current year and to the last four years elapsed.

However, the syndicate has priority over a seller and a lender of funds as to debts relating to the expenses and works of the current year and of the last two years elapsed.

2° Even in the absence of subrogation, those who have procured the funds for the purchase of an immovable, provided it was authentically established, by the instrument of loan, that the sum was intended for that use, and by the receipt of the seller, that the payment was made out of the funds borrowed;

3° Co-heirs, on the immovables of the succession, for the warranty of the partitions made between them, and of balances or reversions on lots; for the warranty of the indemnities owed under Article 866, the immovables given or bequeathed shall rank with the immovables of the succession;

4° Architects, contractors, masons and other workers employed to erect, rebuild or repair buildings, canals and other works whatsoever, provided nevertheless that a memorandum has been previously drawn up by an expert appointed ex officio by the tribunal de grande instance in whose territory the buildings are situated, for the purpose of establishing an inventory of the premises with respect to the works which the owner claims he intends to perform, and that the works, within six months at the most after their completion, have been accepted by an expert also appointed ex officio;

But the amount of the prior charge may not exceed the values established by the second memorandum, and it shall be reduced to the increase in value which exists at the time of the transfer of the immovable and resulting from the works which have been done thereon;

5° Those who have loaned the funds to pay or reimburse the workers, enjoy the same prior charge, provided that that use is authentically established by the instrument of loan, and by the receipt of the workers, as was laid down above for those who have loaned funds for the acquisition of an immovable;

6° Creditors and legatees of a deceased person on the immovables of the succession, for the warranty of the rights which they hold under Article 878;

7° Prospective owners by virtue of a contract of lease with option to sell* regulated by Act no 84-595 of 12 July 1984 defining lease with option to sell immovables on the immovable which is the subject matter of the contract, for the warranty of the rights which they hold under that contract. [ex Art. 2103]

SECTION II
Of General Prior Charges                                                                   Articles 2375 to 2376

## Article 2375

Debts having precedence over the generality of immovables are:

1° Court costs;

2° Without prejudice to the possible application of the provisions of  Articles L. 143-10, L. 143-11, L. 742-6 and L. 751-15 of the Labour Code:

The wages of domestic staff for the year elapsed and the current year;

The deferred salary resulting from the contract of employment established by Article 63 of the Decree of 29 July 1939 relating to French family and birth rate [Articles L. 321-13 to L. 321-21 of the Rural Code], for the year elapsed and the current year;

The  debt of the surviving spouse established by Article 14 of Act no 89-1008 of 31 December 1989 relating to the development of commercial and artisanal undertakings and to the improvement of their economic, legal and social environment, and the debt of the surviving spouse established by Article L. 321-21-1 of the Rural Code;

The pay for the last six months of employees, apprentices, and the allowance owed by the employer to young people in training scheme of initiation to professional life, such as provided for in Article L. 980-11-1 of the Labour Code;

The allowance for the end of the contract provided for by Article L. 122-3-4 of the Labour Code and the allowance to compensate for lack of job security provided for in Article L. 124-4-4 of the same Code;

The allowance owed by reason of failure to comply with the term of notice provided for in Article L. 122-8 of the Labour Code and the compensatory allowance provided for in Article L. 122-32-6 of the same Code;

The allowances owed for paid holidays;

CIVIL CODE

The allowances for dismissal owed in compliance with collective labour agreements, or collective agreements of branches, labour regulations, usages, and the provisions of Articles L. 122-9, L. 122-32-6, L. 761-5 and L. 761-7 as well as the allowance provided for in Article L. 321-6 of the Labour Code for the whole of the portion lower than or equal to the ceiling provided for in Article L. 143-10 of the Labour Code and for one-fourth of the portion higher than the aforesaid ceiling;

The allowances owed, if there is occasion, to employees under Articles L. 122-3-8, paragraph 2, L. 122-14-4, L. 122-14-5, paragraph 2, L. 122-32-7 and L. 122-32-9 of the Labour Code. [ex Art. 2104]

**Article 2376**

Where, failing movables, the creditors having a prior charge enumerated in the preceding Article present themselves to be paid out of the proceeds of an immovable competing with the other creditors having prior charges over the immovable, they have priority over the latter and enforce their rights in the order indicated in the aforesaid Article. [ex Art. 2105]

SECTION III
Of Cases when Prior Charges must be Registered                    Articles 2377 to 2386

**Article 2377**

As between creditors, prior charges produce effect with regard to immovables only where they are given public notice by being registered at the land registry, in the manner determined by the following Articles and by Articles 2426 and 2428. [ex Art. 2106]

**Article 2378**

The debts enumerated in Article 2375 and the debts of the syndicate of co-owners enumerated in Article 2374 are exempt from the formality of registration. [ex Art. 2107]

**Article 2379**

A seller who has precedence or a lender who has procured funds for acquiring an immovable, preserves his prior charge by a registration which shall be made, at his suit, in the form provided for in Articles 2426 and 2428, and within a period of two months after the instrument of sale; the prior charge ranks from the time of the said instrument.

The claim for avoidance established by Article 1654 may not be brought after lapse of the seller's prior charge, or failing registration of it within the period fixed above, to the detriment of third parties who have acquired rights on the immovable in the purchaser's right and have registered them. [ex Art. 2108]

**Article 2380**

In the case of a sale, agreed for future delivery in accordance with Article 1601-2, of a building to be erected the prior charge of the seller or that of the lender of funds ranks from the time of the instrument of sale where registration is made before the expiry of a period of two months from the acknowledgement of the completion of the immovable by an authentic instrument. [ex Art. 2108-1]

**Article 2381**

A coheir or coparcener preserves his prior charge over the property of each share or over the property auctioned for the balances and reversions or for the proceeds of the auction, by a registration made at his suit on each one of the immovables, in the form provided for in Articles 2426 and 2428, and within a period of two months after the instrument of partition or the auction or the instrument fixing the compensation laid down by Article 866 of this Code; the prior charge ranks from the time of the aforesaid instrument or of the auction. [ex Art. 2109]

**Article 2382**

Architects, contractors, masons and other workers employed to erect, rebuild or repair buildings, canals or other works, and those who, in order to pay and reimburse them, have loaned the funds whose use has been established, preserve their prior charge by the double registration made:
1° Of the memorandum which establishes the condition of the premises;
2° Of the memorandum of acceptance,
from the time of registration of the first memorandum. [ex Art. 2110]

**Article 2383**

Creditors and legatees of a deceased person preserve their prior charge by a registration made respecting each immovable of the succession, in the form provided for in Articles 2426 and 2428, and within four months of the opening of the succession; the prior charge ranks from the time of the aforesaid opening. [ex Art. 2111]

**Article 2384**

Prospective owners preserve their prior charge by a registration made at their suit respecting the immovable which is the subject matter of the contract of lease with option to sell*, in the form provided for in Articles 2426 and 2428 and within a period of two months after the signature of that contract; the prior charge ranks from the time of the said contract. [ex Art. 2111-1]

**Article 2385**

The assignees of these various preferential debts all exercise the same rights as the assignors, in their stead and place. [ex Art. 2112]

**Article 2386**

CIVIL CODE

Mortgages registered on the immovables allocated to the warranty of debts which have precedence, within the period allowed by Articles 2379, 2381 and 2383 for requiring the registration of a prior charge, may not prejudice creditors who have a prior debt.

All preferential debts subject to the formality of registration, with respect to which the requisites above laid down in order to preserve the prior charge have not been fulfilled, do not nevertheless cease to be mortgages, but the mortgage ranks, with regard to third parties, only from the time of the registration. [ex Art. 2113]

CHAPTER II
Of Antichresis                                                                      Articles 2387 to 2392

**Article 2387**

Antichresis is the allocation of an immovable as security for an obligation; it involves dispossession of him who establishes it.

**Article 2388**

The provisions relating to conventional mortgage laid down in Article 2397, last paragraph, and in Articles 2413, 2414, 2416, 2417 and 2421 shall apply to antichresis.

Shall also apply the provisions relating to the effect of mortgage laid down in Articles 2458 to 2460.

**Article 2389**

A creditor shall collect the revenue of the immovable allocated as security, on the condition that he appropriates it annually to the interest, if any is due to him, and then to the capital of the debt.

He is bound, on pain of forfeiture, to provide for the preservation and maintenance of the immovable and may use the fruit collected for that purpose before appropriating it on the debt. He may, at any time, discharge himself from that obligation by restoring the property to his owner.

**Article 2390**

A creditor may, without losing its possession, lease the immovable either to a third party or to the debtor himself.

**Article 2391**

A debtor may not claim the restoration of the immovable before the debt has been wholly discharged.

**Article 2392**

The rights of a creditor by way of antichresis are extinguished in particular:

1° Through the extinguishment of the principal obligation;

2° Through anticipated restoration of the immovable to his owner.

CHAPTER III
Of Mortgages                                                                        Articles 2393 to 2425

SECTION I
General Provisions                                                                  Articles 2393 to 2399

**Article 2393**

A mortgage is a right in rem on immovables allocated to the discharge of an obligation.

It is, by its nature, indivisible and subsists in entirety on all the immovables allocated, on each one and on each portion of those immovables.

It follows them, in whatever hands they may pass. [ex Art. 2114]

**Article 2394**

A mortgage exists only in the instances and according to the forms authorized by law. [ex Art. 2115]

**Article 2395**

It is either statutory, or judicial, or conventional. [ex Art. 2116]

**Article 2396**

A statutory mortgage is one which results from a statute.

A judicial mortgage is one which results from judgments.

A conventional mortgage is one which results from agreements. [ex Art. 2117]

**Article 2397**

May alone be mortgaged:

1° Immovable property which may be the subject matter of legal transactions between private individuals, and its accessories deemed immovable;

2° The usufruct of the same property and accessories for the time of its duration. [ex Art. 2118]

A mortgage covers the improvements which occur to the immovable.

**Article 2398**

Movables may not be followed [in the hands of another] in consequence of a mortgage. [ex Art. 2119]

**Article 2399**

No innovation is made by this Code to the provisions of maritime laws concerning ships and vessels. [ex Art. 2120]

CIVIL CODE

SECTION II
Of Statutory Mortgages                                       Articles 2400 to 2411

Sub-section 1
General Provisions                                           Articles 2400 to 2401

**Article 2400**

Independently of statutory mortgages resulting from other Codes or from particular statutes, the rights and debts to which a statutory mortgage is granted are:

1° Those of one spouse, on the property of the other;

2° Those of minors or adults in guardianship, on the property of a guardian or statutory administrator;

3° Those of the State, of departments, of communes and of public institutions, on the property of collectors and accounting administrators;

4° Those of a legatee, on the property of the succession, under Article 1017;

5° Those stated in Article 2331, 2°, 3°, 5°, 6°, 7° and 8°. [ex Art. 2121]

**Article 2401**

With reservation both of the exceptions resulting from this Code, from other Codes or from particulars statutes and of the right of the debtor to avail himself of the provisions of Articles 2444 and following, a creditor benefiting from a statutory mortgage may register his right on all the immovables which currently belong to his debtor, subject to his complying with the provisions of Article 2426.

Under the same reservations, he may have complementary registrations made respecting the immovables subsequently entered into the patrimony of his debtor. [ex Art. 2122]

Sub-section 2
Of Particular Rules for the Statutory Mortgage of Spouses       Articles 2402 to 2408

**Article 2402**

Where spouses have stipulated participation in acquisitions, the clause, except for agreement to the contrary, vests both by operation of law with the faculty to register a statutory mortgage to secure the debt in participation.

Registration may be made before dissolution of the matrimonial regime; but it has effect only from that dissolution and provided that the immovables burdened exist at this date in the patrimony of the debtor spouse.

In case of anticipated liquidation, a registration prior to the request has effect as from the day of the latter, a subsequent registration having effect only as from its date as stated in Article 2425.

A registration may also be made within the year which follows the dissolution of the matrimonial regime; it then takes effect as from its date. [ex Art. 2136]

**Article 2403**

Outside the case of participation in acquisitions, a statutory mortgage may be registered only by intervention of the court, as explained in this Article and the following one.

Where one of the spouses institutes a claim for the purpose of establishing a debt against his or her spouse or the heirs of the latter, he or she may, from the lodging of the claim, require a provisional registration of his or her statutory mortgage, by showing the original of the summons served, as well as a certificate from the clerk which attests that the matter has been referred to the court. The same right exists in case of counter-claim, upon showing of a copy of the pleadings.

A registration is valid for three years and renewable. It is subject to the rules of Chapters IV and following of this Title.

Where the claim is entertained, the decision shall be mentioned, at the suit of the plaintiff spouse, in the margin of the provisional registration, on pain of nullity of that registration, within a month after the day when it became final. It constitutes the instrument of title for a final registration which takes the place of the provisional registration and which ranks at the date of the latter. Where the amount of the capital of the debt allowed and of its accessories exceeds the sum which the provisional registration secures, the excess may be maintained only by a registration made in accordance with the provisions of Article 2428 and taking effect from its date, as stated in Article 2425.

Where the claim is dismissed in full, the court, on request of the defendant spouse, shall order the striking off of the provisional registration. [ex Art. 2137]

**Article 2404**

Likewise, where, during the marriage, there is occasion to transfer from one spouse to the other the administration of certain property, in accordance with Article 1426 or Article 1429, the court, either in the very judgment which orders the transfer, or in a subsequent judgment, may decide that a registration of the statutory mortgage shall be made respecting the immovables of the spouse who will have the responsibility of administering it. If so, it shall fix the sum for which registration will be made and designate the immovables which will be burdened with it. If not, it may nevertheless decide that the registration of a mortgage will be replaced by establishing a pawn, of which it itself shall determine the terms.

Where, later on, new circumstances seem to require it, the court may always decide, by judgment, that either a first registration or complementary registrations shall be made or that a pawn shall be established.

The registrations provided for by this Article shall be made and renewed at the request of the government procurator's office. [ex Art. 2138]

CIVIL CODE

**Article 2405**

Where a statutory mortgage has been registered under Articles 2402 or 2403, and unless an express clause of the ante-nuptial agreement prohibits it, the spouse who profits by the registration may agree, to the benefit of the other spouse's creditors or of his or her own creditors, to an assignment of his or her rank or to a subrogation to the rights resulting from his or her registration.

It shall be the same as to a statutory mortgage or, possibly, a judicial mortgage securing periodical payments ordered, or liable to be ordered to a spouse, for himself or herself or for the children.

Where the spouse who profits by the registration, by refusing to agree to an assignment of rank or to a subrogation, prevents the other spouse from creating a mortgage which the interest of the family would require or where he or she is unable to express his or her intention, the judges may authorize that assignment of rank or that subrogation subject to the conditions which they deem necessary for the protection of the rights of the spouse concerned. They have the same powers where the ante-nuptial agreement contains the clause referred to in the first paragraph. [ex Art. 2139]

**Article 2406**

Where a mortgage has been registered under Article 2404, an assignment of rank or a subrogation may result, for the duration of the transfer of administration, only from a judgment of the court which has ordered that transfer.

As soon as the transfer of administration comes to an end, an assignment of rank or a subrogation may be made in the way provided for in Article 2405. [ex Art. 2140]

**Article 2407**

Judgments given under the two preceding Articles shall be handed down in the forms regulated by the Code of Civil Procedure.

Subject to the provisions of Article 2403, a statutory mortgage of spouses is subject, as to renewal of registrations, to the rules of Article 2434. [ex Art. 2141]

**Article 2408**

The provisions of Articles 2402 to 2407 shall be made known to spouses or future spouses in the way provided for by a decree. [ex Art. 2142]

Sub-section 3
Of Particular Rules for the Statutory Mortgage of Persons in                    Articles 2409 to 2411

Guardianship

**Article 2409**

At the opening of any guardianship, the family council, after  hearing the guardian, shall decide whether a registration must be required on the immovables of the guardian. If so, it shall fix the sum for which the registration will be made and designate the immovables which will be burdened with it. If not, it may nevertheless decide that the registration of a mortgage will be replaced by the establishing of a pawn, of which it itself shall determine the terms.

In the course of the guardianship, the family council may always order, where the interests of the minor or of the adult in guardianship seem to require it, that either a first registration or complementary registrations will be made or that a pawn will be established.

In the cases where statutory administration takes place under Article 389, the judge of guardianships, who gives judgment either of his own motion or on the request of a relative by blood or by marriage or of the government procurator's office, may likewise decide that a registration will be made on the immovables of the statutory administrator, or that the latter must establish a pawn.

The registrations provided for by this Article shall be made at the request of the clerk of the judge of guardianships, and the costs shall be charged to the account of the guardianship.  [ex Art. 2143]

**Article 2410**

A ward, after his or her coming of age or emancipation, or an adult in guardianship, after withdrawing of the guardianship of adults, may require the registration of his or her statutory mortgage or a complementary registration, within a period of one year.

This right may, furthermore, be exercised by the heirs of the ward or of the adult in guardianship within the same period, and in case of death of the person under a disability before the ending of the guardianship or the withdrawing of the guardianship of adults, within the year of the death.  [ex Art. 2144]

**Article 2411**

During the minority and the guardianship of adults, a registration made by virtue of Article 2409 shall be renewed by the clerk of the arrondissement, in accordance with Article 2434 of the Civil Code.   [ex Art. 2145]

SECTION III
Of Judicial Mortgages                                                    Article 2412

**Article 2412**

A judicial mortgage results from adversary or default judgments, final or provisional, in favour of the one who has obtained them.

It also results from arbitral awards provided with an enforcement order, as well as from judicial decisions handed down in a foreign country and whose execution has been authorized by a French court.

With reservation of the right of the debtor to avail himself, either pending suit, or at any other time, of the provisions

CIVIL CODE

of Articles 2444 and following, a creditor who benefits by a judicial mortgage may register his right respecting all the immovables currently belonging to his debtor, subject to his complying with the provisions of Article 2426. He may, under the same reservations, have complementary registrations made respecting the immovables subsequently entered into the patrimony of his debtor.

[ex Art. 2123]

SECTION IV
Of Conventional Mortgages                                    Articles 2413 to 2424

**Article 2413**

Conventional mortgages may be granted only by those who have the capacity of conveying the immovables which they burden with them. [ex Art. 2124]

**Article 2414**

Those who on an immovable have only a right suspended by a condition, or avoidable in certain cases, or subject to rescission, may only grant a mortgage subject to the same conditions or to the same rescission

The mortgage of an undivided immovable retains its effect whatever the result of the partition may be where it has been granted by all the co-owners. Otherwise, it retains its effect only in so far as the co-owner who has granted it is, at the time of the partition, apportioned with that or those undivided immovables or, when the immovable is sold by auction to a third party, if that co-owner is apportioned with the proceeds of the sale.

The mortgage of a share in one or several undivided immovables retains its effect only in so far as the co-owner who has granted it is, at the time of the partition, apportioned with that or those undivided immovables; then, it retains it in the whole extent of that apportionment without being limited to the share who belonged to the co-owner who has granted it; when the immovable is sold by auction to a third party, it retains also it where that co-owner is apportioned with the proceeds of the sale.

**Article 2415**

The property of minors, of adults in guardianship and of absentees, so long as its possession is conferred only temporarily, may be mortgaged only for the causes and in the forms established by law or by virtue of a judgment. [ex Art. 2126]

**Article 2416**

A conventional mortgage may only be granted by an instrument drawn up in authentic form. [ex Art. 2127]

**Article 2417**

Contracts entered into in foreign countries may not establish a mortgage on immovables in France, unless there are provisions contrary to this principle in political statutes or in treaties. [ex Art. 2128]

**Article 2418**

The granting of a conventional mortgage is valid only where the authentic constitutive title of the debt or a subsequent authentic instrument declares in specific terms the nature and the location of each one of the immovables on which the mortgage is granted, as stated in Article 2426 below. [ex Art. 2129]

**Article 2419**

As a rule, a mortgage may be granted only on existing immovables.

**Article 2420**

By exception to the preceding article, a mortgage may be granted on immovables  to come in the following circumstances and subject to the following conditions:

1° He who does not possess existing and unencumbered immovables or who does not possess sufficient quantity of them  to secure the debt may agree that each one which he may subsequently acquire be allocated to the payment of the latter as the acquisitions proceed;

2° He whose existing immovable burdened with a mortgage has perished or suffered deteriorations so that it has become insufficient for the security of the debt may do so likewise, without prejudice to the right of the creditor to enforce at once his reimbursement;

3° He who possesses an existing right which allows him to build for his benefit on another's tenement may mortgage the buildings whose erection is initiated or merely planned; in case of destruction of the latter, the mortgage burdens as of right new buildings erected on the same place.

**Article 2421**

A mortgage may be granted for security of one or several debts, existing or to come. Where they are to come they must be determined.

Their grounds shall be determined in the instrument.

**Article 2422**

A mortgage may be subsequently allocated to secure debts other than those mentioned in the constitutive instrument provided that the latter lays so down expressly.

The mortgagor may then offer it as security, up to the sum provided for in the constitutive instrument and specified in Article 2423, not only to the original creditor, but also to a new creditor although the first one has not been paid.

The agreement for the coverage of new debts which he concludes, either with the original creditor or with the new

CIVIL CODE

creditor, shall be drawn up in notarial form.

Public notice thereof shall be given, with the formalities laid down in Article 2430, on pain of its being ineffective against third parties.

Its date of registration fixes, as between them, the rank of the creditors registered on a  mortgage which provides for the coverage of future debts.

The provisions of this Article are of public policy and any clause contrary to them shall be deemed not written.

**Article 2423**

A mortgage is always granted, as regards the capital, up to a fixed sum which the notarial instrument shall specify on pain of annulment. Where appropriate, the parties shall estimate for that purpose the annuities, benefits and undetermined, contingent or conditional rights. Where the debt is subject to an index-linking clause, the guarantee extends to the revalued debt, provided the instrument so specifies.

A mortgage extends by operation of the law to interest and other accessories.

Where it is granted for security of one or several debts to come and for an undetermined duration, the mortgagor may at any time terminate it subject to his giving a three month's notice. Once terminated, it is still extant only for security of pre-existing claims.

**Article 2424**

A mortgage is transferred with the secured debt by operation of the law. A mortgagee  may subrogate an other creditor to a mortgage and retain his debt.

He may also by a ranking agreement transfer his rank of registration to a third party of a subsequent rank, with whom he changes places.

SECTION V
Of the Rank of Mortgages                                                                          Article 2425

**Article 2425**

As between creditors, a mortgage, either statutory, or judicial, or conventional, ranks only from the day of the registration made by the creditor at the land registry, in the form and manner prescribed by law.

Where several registrations are required on the same day as to the same immovable, that which is required by virtue of the instrument of title bearing the remotest date shall be deemed of prior rank, whatever the order resulting from the register provided for in Article 2453 may be.

However, the registrations of separations of patrimony provided for by Article 2283, in the case referred to in Article 2386, paragraph 2, as well as those of the statutory mortgages provided for in Article 2400, 1°, 2° and 3°, shall be deemed of a rank prior to the one of any registration of judicial or conventional mortgages made on the same day.

Where several registrations are made on the same day as to the same immovable, either by virtue of instruments of title provided for in the second paragraph but bearing the same date, or for the benefit of requiring parties vested with the prior charge or the mortgages referred to in the third paragraph, the registrations rank equally whatever the order of the above mentioned register may be.

The registration of an interim protective judicial mortgage shall be deemed of an earlier rank than that conferred to an agreement for the coverage of new debts where the registration of the aforesaid agreement is subsequent to the registration of the interim protective judicial mortgage.

The order of priority between creditors having a prior charge or mortgage and holders of warrants, insofar as the latter are secured on property deemed immovable, is determined by the dates on which the respective instruments have been given public notice, the recording of warrants remaining subject to the special statutes which regulate them. [ex Art. 2134, amended]

CHAPTER IV
Of the Registration of Prior Charges and Mortgages                            Articles 2426 to 2457

SECTION I
Of the Mode of Registration of Prior Charges and Mortgages               Articles 2426 to 2439

**Article 2426**

Shall be registered at the land registry of the location of the property:

1° Prior charges over immovables, subject to the sole exceptions referred to in Article 2378;

2° Statutory, judicial or conventional mortgages.

A registration which may never be made by the registrar of his own motion, may take place only for a sum and for immovables which are determined, subject to the conditions laid down in Article 2428.

In any case, the immovables respecting to which a registration is required must be individually designated, with indication of the commune where they are situated, exclusive of any general designation, even limited to a given territorial area. [ex Art. 2146]

**Article 2427**

Creditors who have a prior charge or mortgage may not profitably make registration respecting to the preceding owner, from the recording of the transfer made for the benefit of a third party. Notwithstanding that recording, a seller, a lender of funds for acquisition and a coparcener may profitably register, within the periods provided for in Articles 2379 and 2381, the prior charges which Article 2374 confers upon them.

CIVIL CODE

A registration produces no effect between the creditors of a succession where it has been made by one of them only after the death, in case the succession is accepted only under benefit of inventory or is declared vacant. However, the prior charges granted to a seller, a lender of funds for an acquisition, a coparcener, as well as to the creditors and legatees of the deceased, may be registered within the periods provided for in Articles 2379, 2381 and 2383, notwithstanding an acceptance under benefit or the vacancy of the succession.

In case of seizure of immovables, of [insolvency proceedings] or of proceedings in view of a judicial arrangement, the registration of prior charges and mortgages produces the effects regulated by the provisions of the Code of Civil Procedure and by those of Titles II, III or IV of Book VI of the Commercial Code. [ex Art. 2147]

In the départements of Bas-Rhin, Haut-Rhin and Moselle, in case of enforcement over an immovable, the registration of prior charges and mortgages produces the effects regulated by the provisions of the Act of 1 June 1924.

**Article 2428**

The registration of prior charges and mortgages shall be made by the land registrar following the filing of two schedules dated, signed and certified to be corresponding to each other by the signatory of the certificate of identity provided for in paragraph 13 of this Article; a decree in Conseil d'Etat shall determine the requirements as to form which the schedule designed to be kept in the land registry must comply with. In the case where the registrant did not use a prescribed form, the registrar shall nevertheless accept the deposit, subject to the provisions of the penultimate paragraph of this Article.

However, in order to have judicial mortgages or securities registered, a creditor shall present, either himself or through a third party, to the land registrar:

1° The original, an authentic office copy or a literal extract from the judicial decision giving rise to the mortgage, where the latter results from the provisions of Article 2412;

2° The authorization of the judge, the judicial decision or the instrument of title in matters of judicial provisional securities.

Each of the schedules shall contain exclusively, on pain of rejection of the formality:

1° The designation of the creditor, of the debtor or of the owner, where the debtor is not the owner of the burdened immovable, in accordance with paragraph 1 of Articles 5 and 6 of the Decree of 4 January 1955;

2° The election of domicile, by the creditor, in any place situated in France, in overseas departments or in the territorial authorities of Saint-Pierre -et-Miquelon;

3° The indication of the date and nature of the instrument of title giving rise to the security or of the instrument of title creating the debt as well as the origin of the obligation secured by the prior charge or thee mortgage and, if there is occasion, the actual indication of the clause of coverage of new debts provided for in Article 2422. Where a notarial instrument is concerned, the name and residence of the draftsman shall be specified. As to the registrations required in compliance with the provisions referred to in Articles 2383 and 2400, 1° to 3°, the schedules shall set out the origin and nature of the debt;

4° The indication of the capital of the debt, of its accessories and of the normal date of maturity; in any case, the applicant shall appraise the annuities, benefits and undetermined, contingent and conditional rights, without prejudice to the application of Articles 2444 and 2445 for the benefit of the debtor; and where the rights are contingent or conditional, he shall summarily indicate the event or the condition upon which the existence of the debt depends. In the cases where the debt is coupled with an index-linking clause, the registration shall mention the original amount of the debt as well as the index-linking clause. Where the amount of the debt is not denominated in euros, it shall be immediately followed by its exchange value in euros determined according to the latest rate of exchange  known at the date of the title creating the security or the debt;

5° The designation, in accordance with paragraphs 1 and 3 of Article 7 of the Decree of 4 January 1955, of each immovable respecting to which a registration is required;

6° The indication of the date, volume and number under which the title of ownership of the debtor (or of the owner, where the debtor is not the owner of the immovables burdened) was registered, when that title is subsequent to 1 January 1956;

7° The certification that the amount of the capital of the secured debt mentioned in the schedule is not greater than that shown in the title creating the security or the debt.

A schedule designed to be kept in the land registry shall contain, in addition, a mention of certification of the identity of the parties, prescribed by Articles 5 and 6 of the Decree of 4 January 1955.

A filing shall be refused:

1° Failing the presentation of the title creating the security as to mortgages and judicial securities;

2° Failing the mention referred to in paragraph 13, or where the immovables are not individually designated, with indication of the commune* where they are situated.

Where the registrar, after having accepted the filing, notices the omission of one of the mentions prescribed by this Article, or a discrepancy between, on the one hand, the statements relating to the identity of the parties or to the designation of the immovables contained in the schedule, and, on the other hand, those same statements contained in schedules or titles already recorded since 1 January 1956, the formality shall be rejected, unless the applicant regularizes the schedule or produces the proof which establishes its accuracy, in which cases, the formality ranks on the date of the filing of the schedule noted in the register of filings.

A formality shall also be rejected where the schedules include an amount of secured debt greater than that which appears in the title as regards mortgaged and judicial securities, as well as in the case referred to in the first paragraph of this Article, where the applicant does not substitute a new schedule on a prescribed form to the schedule irregular as

CIVIL CODE

to form.

The decree above provided for shall determine the details of a refusal of a filing or of a rejection of a formality. [ex Art. 2148 amended]

**Article 2429**

For the sake of their registration, prior charges and mortgages bearing on shares depending on a building subject to the status of co-ownership shall be deemed not to burden the portions of the common parts included in those shares.

Nevertheless, the registered creditors shall enforce their rights on the said portion taken in its consistence at the time of the transfer whose proceeds are the subject matter of the division; that portion shall be deemed burdened with the same securities as the individual shares and with those securities only. [ex Art. 2148-1]

**Article 2430**

Shall be recorded by the registrar, under the form of mentions in the margin of the existing registrations, the subrogations to prior charges and mortgages, withdrawals, reductions, assignments of priority and transfers which have been granted, extensions of time, changes of domicile and, as a general rule, any modifications, in particular as to the person of the creditor who benefits by the registration, which do not have the effect of worsening the condition of the debtor.

It shall be the same as to gratuitous transfers by inter vivos or testamentary instrument, on condition of restitution, bearing on debts secured by prior claims or mortgages.

Shall be recorded under the same form the agreements which must be so under Article 2422.

The instruments and judicial decisions recording those different agreements or transfers and the copies, extracts, or office copies filed at the land registry for the purpose of execution of the mentions shall contain the designation of the parties in accordance with the first paragraph of Articles 5 and 6 of the Decree of 4 January 1955. That designation need not be certified.

Furthermore, in case a mentioned modification bears only on part of the immovables burdened, the said immovables shall be individually designated, on pain of refusal of the filing. [ex Art. 2149 amended]

**Article 2431**

The registrar shall mention the filing of the schedules on the register prescribed by Article 2453 hereinafter, and shall return to the applicant both the instrument of title or the office copy of the same, and one of the schedules at the bottom of which he shall mention the date of the filing, the volume and the number under which the schedule intended for the archives has been filed.

The date of the registration is determined by the mention entered into the register of filings.

The schedules intended for the archives shall be bound without being removed through the good offices of and at the expense of the registrars.  [ex Art. 2150]

**Article 2432**

A creditor with a prior charge whose title has been registered, or a mortgage creditor registered for a capital producing interest and arrears, has the right to be marshalled, for three years only, on the same rank as for his principal, without prejudice to the special registrations to be made, importing mortgage from their date, for the interest and arrears other than those preserved by the original registration.

However, a creditor has the right to be marshalled for the whole interest, on the same rank as his principal, where the mortgage has been granted as security for the  loan for life defined by Article L. 314-1 of the Consumer Code. [ex Art. 2151]

**Article 2433**

A person who has required a registration as well as his representatives or assigns under an authentic instrument are entitled to change at the land registry the domicile elected by him in that registration, provided they choose and designate a new one situated in metropolitan France, in overseas départements or in the territorial authority of Saint-Pierre-et-Miquelon.  [ex Art. 2152]

**Article 2434**

Registration preserves a prior charge or a mortgage up to the date which the creditor shall fix complying with the following provisions:

Where the principal of a secured obligation must be paid at one or several due dates, the extreme effective date of a registration made before the due date or the last due date provided for is, at most, two years after that due date without allowing however the duration of the registration to exceed fifty years.

Where the due date or the last due date is undetermined, in particular in the case provided for by Article L. 314-1 of the Consumer Code, or where a mortgage is coupled with a clause of coverage of new debts provided for in Article 2422, the duration of the registration is at most fifty years after the day of the formality.

Where the due date or the last due date is prior to or concomitant with the registration, the duration of the registration is at most ten years after the day of the formality.

Where a security secures several debts and the latter are such that several of the three preceding paragraphs apply, the creditor may require either, for each of them, distinct registrations, or a single registration for the whole up to the remotest date.

It shall be the same where, the first of those paragraphs alone being applicable, the different debts do not involve the same due dates or last due dates.  [ex Art. 2154 amended]

CIVIL CODE

**Article 2435**

A registration ceases to produce effect where it has not been renewed at the latest at the date referred to in the first paragraph of Article 2434.

Each renewal is required up to a determined date. That date shall be fixed as stated in Article 2434 by distinguishing according to whether the due date or the last due date, even where it results from an extension of time, is determined or not and whether it is subsequent or not to the day of the renewal.

Renewal is compulsory, in case the registration has produced its statutory effect, in particular, in case of sale of the immovable burdened, until payment or deposit of the proceeds. [ex Art. 2154-1]

**Article 2436**

Where one of the periods referred to in Articles 2434 and 2435 has not been complied with, a registration does not have any effect beyond the date of the expiry of that period. [ex Art. 2154-2 amended]

**Article 2437**

Where a provisional registration of the statutory mortgage of spouses or of a judicial mortgage has been made, the provisions of Articles 2434 to 2436 shall apply to the final registration and to its renewal. The date from which the periods shall begin to run is that of the final registration or of its renewal. [ex Art. 2154-3]

**Article 2438**

Unless otherwise stipulated, the expenses of the registrations shall be advanced by the registrant and charged to the debtor, and the expenses of the recording of the instrument of sale which a seller may require with a view to the registration of his prior charge within the prescribed time, shall be charged to the buyer. [ex Art. 2155]

**Article 2439**

The claims to which registrations may give rise against creditors shall be brought before the court having jurisdiction, by summons served upon their persons, or at the last of the domiciles elected by them on the schedules of registration, even in case of death, either of the creditors, or of those at whose residence they have elected domicile. [ex Art. 2156]

|  |  |
|---|---|
| SECTION II | |
| Of the Cancellation and Reduction of Registrations | Articles 2440 to 2457 |
| Sub-section 1 | |
| General Provisions | Articles 2440 to 2445 |

**Article 2440**

Registrations are cancelled by the consent of the parties concerned and having capacity therefor, or by virtue of a judgment not subject to appeal or having become res judicata. [ex Art. 2157]

Cancellation  is incumbent to a creditor who did not initiate a registration under the form of a mention in the margin, provided for in Article 2422, paragraph 4.

**Article 2441**

In both cases, those who require cancellation shall file at the registrar's office the office copy of the authentic instrument containing the consent, or that of the judgment.

No document in proof is required to support the office copy of the authentic instrument concerning the statements establishing the status, capacity and qualifications of the parties, where those statements are certified as accurate in the instrument by the notaire or the administrative authority.

Where a cancellation concerns the registration of a conventional mortgage, it may be required by the filing at the registrar's office of an office copy of the notarial instrument certifying that the creditor, on demand of the debtor, agreed to that cancellation; the registrar's inspection shall restrict itself to the formal conformity of the instrument excluding its substantial validity. [ex Art. 2158 amended]

**Article 2442**

A cancellation without consent shall be applied for before the court in whose territory the registration was made, unless that registration was made to secure a contingent or undetermined order, on whose enforcement or determination the debtor and the alleged creditor are in litigation or are to be judged in another court; in which case the claim for cancellation  shall be brought or remitted there.

However, the agreement entered into by the creditor and the debtor to bring a claim, in case of controversy, before a court which they have designated, shall be enforced between them.  [ex Art. 2159]

**Article 2443**

Cancellation shall be ordered by the courts, where a registration was made without being based on legislation or on a title, or where it was made by virtue of a title either irregular or extinguished or satisfied, or where the rights of prior charge or of mortgage are wiped out by legal remedies. [ex Art. 2160]

**Article 2444**

Where the registrations made under Articles 2400 and 2401 are excessive, the debtor may apply for their reduction by complying with the rules of jurisdiction established by Article 2442.

Are deemed excessive the registrations which burden several immovables where the value of a single one or of some of them exceeds a sum equal to double the amount of the debts in capital and statutory accessories, increased

CIVIL CODE
by one-third of that amount. [ex Art. 2161]

**Article 2445**
May also be reduced as excessive the registrations made according to an appraisal made by the creditor of conditional, contingent or undetermined debts whose amount was not fixed by the agreement.

In that case, the excess shall be appraised by the court according to the circumstances, probabilities and presumptions of fact, in such a manner as to conciliate the rights of the creditor with the interest of preserving credit to the debtor, without prejudice to new registrations to be made with a mortgage from the day of their date, where events have raised the undetermined debts to a larger sum. [ex Art. 2162]

Sub-section 2
Particular Provisions relating to Mortgages of Spouses and of          Articles 2446 to 2448
Persons in Guardianship

**Article 2446**
Where a statutory mortgage has been registered under Articles 2402 or 2403, and except for an express clause of the ante-nuptial agreement which forbids it, the spouse who profits by the registration may give a total or partial withdrawal of it.

It shall be the same as to a statutory mortgage, or possibly a judicial mortgage securing periodical payments ordered, or liable to be ordered  to a spouse, for himself or herself or for the children.

Where the spouse who profits by the registration, by refusing to reduce the mortgage or to give a withdrawal of it, prevents the other spouse from creating a mortgage or making a transfer which the interest of the family would require or where he or she is unable to express his or her intention, the judges may authorize that reduction or withdrawal subject to the conditions which they deem necessary for the protection of the rights of the spouse concerned. They have the same powers where the ante-nuptial agreement contains the clause referred to in the first paragraph.

Where a mortgage has been registered under Article 2404, the registration may, for the duration of the transfer of administration, be cancelled or reduced only by virtue of a judgment of the court which has ordered that transfer.

As soon as the transfer of administration comes to an end, a cancellation or reduction may be made in the way provided for in paragraphs 1 and 3 above. [ex Art. 2163]

**Article 2447**
Where the value of the immovables on which the mortgage of a minor or of an adult in guardianship has been registered notably exceeds what is necessary to secure the management of the guardian, the latter may request the family council to reduce the registration to the immovables which are sufficient.

He may likewise request it to reduce the appraisal made of his obligations towards the ward.

In the same cases, where a registration has been made on his immovables under Article 2409, a statutory administrator may request the judge of guardianships to reduce it, either as to the immovables burdened, or as to the sums secured.

Furthermore, if there is occasion, a guardian and a statutory administrator may, subject to the same conditions, request a total withdrawal of the mortgage.

The total or partial cancellation of the mortgage shall be made upon presentation of an instrument of withdrawal signed by a member of the family council having received delegation to that effect, as to the immovables of a guardian, and upon presentation of a decision of the judge of guardianships, as to the immovables of a statutory administrator. [ex Art. 2164]

**Article 2448**
Judgments on request of a spouse, a guardian or a statutory administrator in the cases provided for in the preceding Articles shall be handed down in the forms regulated in the Code of Civil Procedure.

Where a court orders the reduction of a mortgage to certain immovables, the registrations made on all the others shall be cancelled.  [ex Art. 2165]

Sub-section 3
Of the Public Inspection of Registers and of the Liability of Registrars   Articles 2449 to 2457

**Article 2449**
Land registrars are compelled to deliver to all those who so require a copy or extract of the documents, other than the schedules of registration, filed at their registry within the limit of fifty years preceding that of the demand, and a copy or extract of the subsisting registrations, or a certificate to the effect that there exists no document or registration coming within the scope of the request.

They are also compelled to deliver upon demand, within a period of ten days, copies of or extracts from the land-book, or a certificate to the effect that there exists no card coming within the scope of the request. [ex Art. 2196]

**Article 2450**
They are liable for the loss resulting:

1° From failure to record instruments and judicial decisions filed at their registries, and required registrations, any time that failure to record does not result from a decision of refusal or of rejection;

2° From the omission, in the certificates which they deliver, of one or several of the existing registrations, unless, in this latter case, the error comes from insufficient or inaccurate designations which may not be ascribed to them. [ex Art.

CIVIL CODE
2197]

**Article 2451**

Where a registrar, delivering a certificate to the new holder of a right referred to in Article 2476, omits a registration of a prior charge or mortgage, the right remains in the hands of the new holder free from the undisclosed prior charge or mortgage, provided the delivery of the certificate has been required by the party concerned as a consequence of the recording of his title. Without prejudice to his possible remedy against the registrar, the creditor who benefits by the omitted registration does not lose the right to avail himself of the rank which that registration confers on him so long as the price has not been paid by the purchaser or as intervention in the ranking initiated between the other creditors is permitted. [ex Art. 2198]

**Article 2452**

Except in the cases where they are entitled to refuse a filing or to reject a formality, in accordance with the provisions of statutes and regulations relating to land registration, registrars may not refuse or delay the fulfilment of a formality or the delivery of documents duly required, on pain of damages to the parties; for that purpose, memoranda of refusals or delays shall, at the suit of the requiring party, be forthwith drawn up, either by a judge of the arrondissement, or by a court usher of the court, or by another bailiff or a notaire with the assistance of two witnesses. [ex Art. 2199]

**Article 2453**

Registrars are compelled to have a register in which they shall enter, day by day and in numerical order, the filings made with them of instruments, judicial decisions, schedules and, generally, of documents filed for the purpose of the execution of a formality of registration.

They may fulfil the formalities only at the date and in the order of the filings made with them.

Each year a duplicating of the registers closed during the preceding year shall be deposited without cost at the clerk's office of a tribunal de grande instance  or of a tribunal d'instance situated in an arrondissement different from the one where the registrar resides.

The court in whose clerk's office the duplicating will be deposited shall be designated by an order of the Minister of Justice.

A decree shall determine the details of application of this Article and, in particular, the technical processes which may be used for the making of the duplicating to be deposited at the clerk's office. [ex Art. 2200]

**Article 2454**

A register kept in compliance with the preceding Article shall be numbered and initialled upon each page, by first and last, by the juge d'instance in whose territory the registry is established. It shall be closed every day.

Notwithstanding the preceding paragraph, a written data-processing document may take the place of a register; in that case, it shall be identified, numbered and dated as soon as it is established by wholly trustworthy forms of proof. [ex Art. 2201]

**Article 2455**

In performing their duties, registrars are compelled to comply with all the provisions of this Chapter, on pain of a fine of 30 to 300 € for the first infringement, and of dismissal for the second; without prejudice to damages to the parties, which shall be paid before the fine. [ex Art. 2202]

**Article 2456**

The mentions of the filings shall be made on the register whose keeping is prescribed by Article 2453, following each other, without any blank or interlineations, on pain, against the registrar, of a fine of 60 to 600 €, and of damages to the parties, also payable by priority over the fine. [ex Art. 2203]

**Article 2457**

In the land registries whose register is kept in accordance with the provisions of Article 2454, paragraph 2, there shall be delivered a certificate of the formalities accepted for filing and awaiting recording in the land card-index on the immovables individually designated in the request for information. A decree in Conseil d'Etat shall specify the contents of that certificate. [ex Art. 2203-1]

CHAPTER V
Of the Effect of Prior Charges and Mortgages                    Articles 2458 to 2474

SECTION I
Particular Provisions relating to Conventional Mortgages          Articles 2458 to 2460

**Article 2458**

Unless he takes action to sell the mortgaged property under the terms provided for by the rules which apply to enforcement proceedings, to which a contract of mortgage may not derogate, a mortgagee may request the court to retain the immovable by way of satisfaction. However, that option is not open to him where the immovable is the main residence of the debtor.

**Article 2459**

It may be agreed  in a contract of mortgage that the creditor shall become owner of the mortgaged immovable. However, that clause is ineffective in regard to the immovable which is the main residence of the debtor.

CIVIL CODE

**Article 2460**

In the circumstances referred to in the two preceding Articles, the immovable shall be appraised by an expert designated  by amicable agreement or judicially.

Where its value exceeds the amount of the secured debt, the creditor owes the debtor a sum equal to the difference; where there exist other mortgagees, he shall deposit it.

SECTION II

General Provisions                                                                                         Articles 2461 to 2474

**Article 2461**

Creditors who have a prior charge or a mortgage registered on an immovable, follow it in whatever hands it may pass, in order to be marshalled and paid following the order of their debts or registrations. [ex Art. 2166]

**Article 2462**

Where a third party in possession does not comply with the formalities hereinafter established to free his property, he remains, by the sole effect of the registrations, liable as a possessor for all the mortgage debts and he has the benefit of the time limits and periods granted to the original debtor. [ex Art. 2167]

**Article 2463**

A third party in possession is bound, in the same case, either to pay all the interest and capital due, to whatever sum they may amount, or to relinquish unreservedly the mortgaged immovable. [ex Art. 2168]

**Article 2464**

Where a third party in possession fails to comply fully with one of these obligations, each mortgagee is entitled to have the immovable sold against him, thirty days after serving an order to pay on the original debtor, and demanding that the third party in possession pay the debt due or relinquish the inherited property. [ex Art. 2169]

**Article 2465**

Nevertheless, a third party in possession who is not personally liable for the debt, may object to the sale of the mortgaged property which has been transferred to him, where other immovables mortgaged for the same debt have remained in the possession of the principal debtor or debtors, and require their previous seizure and sale in the manner regulated in the Title Of Suretyship ; during these proceedings, the sale of the mortgaged property shall be postponed. [ex Art. 2170]

**Article 2466**

The defence of seizure and sale is not available against a creditor who benefits by a prior charge or who has a special mortgage on the immovable. [ex Art. 2171]

**Article 2467**

As to relinquishment by reason of a mortgage, it may be done by all third parties in possession who are not personally liable for the debt and who have the capacity to transfer. [ex Art. 2172]

**Article 2468**

It may be done even after the third party in possession has acknowledged the debt or where a judgment has been given against him in that capacity only: until a sale by auction, relinquishment does not prevent a third party in possession from taking back the immovable by paying the whole debt and the costs. [ex Art. 2173]

**Article 2469**

Relinquishment by reason of a mortgage is made at the clerk's office of the court of the situation of the property; and that court shall record it.

On the petition of the most diligent party concerned, a curator shall be appointed for the immovable relinquished, against whom the sale of the immovable shall be conducted in the forms prescribed for forced sales. [ex Art. 2174]

**Article 2470**

Deteriorations resulting from the act or negligent conduct of a third party in possession, to the detriment of creditors benefiting by a mortgage  or a prior charge, give rise against him to a claim for compensation; but he recovers his upkeep and improvements only up to the additional value resulting from the improvement. [ex Art. 2175]

**Article 2471**

The fruits of a mortgaged immovable are owed by a third party in possession only from the day of the demand to pay or relinquish, and, where the proceedings instituted have been discontinued for three years, from the new demand which will be made. [ex Art. 2176]

**Article 2472**

Servitudes and rights in rem which the third party in possession had on the immovable before his possession, are revived after the relinquishment or after the sale by auction made against him.

His personal creditors, after all those who are registered on the previous owners, shall enforce their mortgage on the property relinquished or auctioned, according to their rank. [ex Art. 2177]

**Article 2473**

A third party in possession who has paid the mortgage debt, or relinquished the immovable, or suffered the forced sale of that immovable has a remedy for warranty, as allowed by law, against the principal debtor. [ex Art. 2178]

CIVIL CODE

**Article 2474**

A third party in possession who wishes to redeem his property by paying the price shall comply with the formalities established in Chapter VI of this Title. [ex Art. 2179]

CHAPTER VI
Of the Mode of Redeeming  Property from Prior Charges and Mortgages          Articles 2475 to 2487

SECTION I
Particular Provisions Relating to Conventional Mortgages          Article 2475

**Article 2475**

Where, on the occasion of the sale of a mortgaged immovable, all the registered creditors agree with the debtor that the proceeds shall be allocated to the full or part satisfaction of their debts or of some of them, they shall exercise their right of preferential payment out of the proceeds and may assert it as against any assignee or any creditor attaching the debt of the proceeds.

Through that payment, the immovable is redeemed from the right to follow it attaching to the mortgage.

Failing an agreement such as provided for in paragraph 1, the formalities of redemption are proceeded to in accordance with the following Articles.

SECTION II
General Provisions          Articles 2476 to 2487

**Article 2476**

Contracts which transfer the ownership of immovables or immovable rights in rem which third parties in possession wish to redeem from prior charges and mortgages shall be recorded in the land registry of the situation of the property, in accordance with the statutes and regulations relating to land registration. [ex Art. 2181]

**Article 2477**

The mere recording in the land registry of the conveyances does not redeem an immovable from mortgages and prior charges which burden it.

A seller conveys to a purchaser only the ownership and the rights he himself had on the thing sold: he conveys them subject to the same prior charges and mortgages with which the thing sold was burdened. [ex Art. 2182]

**Article 2478**

Where a new owner wishes to protect himself against the effect of the proceedings authorized in Chapter V of this Title, he is bound, either before the proceedings, or within one month, at the latest, after the first demand which is made to him, to serve on the creditors, at the domiciles they have elected in their registrations, notice of:

1° An extract of his title, containing only the date and character of the instrument, the name and precise designation of the seller or of the donor, the nature and situation of the thing sold or donated; and where a set of items of property is concerned, only the general designation of the domain and of the arrondissements  in which it is situated, the price and the costs forming part of the sale price, or the appraisal of the thing where it has been donated;

2° An extract of the recording of the instrument of sale;

3° A summary schedule of registrations showing the charges in rem which burden the immovable [ex Art. 2183 amended]

**Article 2479**

The purchaser or the donee shall declare, in the same instrument, that he is ready to pay, forthwith, the mortgage debts and charges, only up to the amount of the price, or, where he received the immovable by gift, to the value he has declared without distinction between debts due or not due. [ex Art. 2184 amended]

**Article 2480**

Where the new owner has served that notice within the fixed period, any creditor whose title has been registered, may require the sale of the immovable by public auction, provided that:

1° The request is served on the new owner within forty days, at the latest, of the notice served at his request;

2° It contains undertaking of the requesting party to raise the price, or to have it raised, to one-tenth above the one stipulated in the contract, or declared by the new owner;

3° The same notice is served within the same period on the previous owner, principal debtor;

4° The original and the copies of these notices are signed by the requiring creditor, or by his agent with express authority, who, in that case, is obliged to give a copy of his power of attorney;

5° He offers to give security up to the amount of the price and charges.

All of which, on pain of annulment. [ex Art. 2185 amended]

**Article 2481**

Where the creditors have failed to require a sale by auction within the period and in the manner prescribed, the value of the immovable remains definitely fixed at the price stipulated in the contract, or declared by the new owner, who is in consequence discharged from all prior charge and mortgage, by paying the said price to the creditors who are allowed to receive it according to their rank, or by depositing it. [ex Art. 2186]

**Article 2482**

In case of a resale by auction, it shall take place by complying with the forms established for forced sales, at the suit

CIVIL CODE

either of the creditor who has required it, or of the new owner.

The party seeking execution shall state in the placards the price stipulated in the contract, or declared, and the additional sum to which the creditor has obliged himself to raise it or to have it raised. [ex Art. 2187]

**Article 2483**

The highest bidder is bound, beyond the auction price, to return to the dispossessed purchaser or donee the expenses and proper costs of this contract, those of the registration at the land registry, those of the notices and those incurred by him to have the resale made. [ex Art. 2188]

**Article 2484**

A purchaser or donee who retains the immovable put up for auction, by becoming the highest bidder, is not bound to have the judgment enforcing the auction registered. [ex Art. 2189]

**Article 2485**

The withdrawal of the creditor who has required a sale by auction may not prevent the public auction, even where the creditor pays the amount of the bid, unless all the other mortgagees expressly agree thereto. [ex Art. 2190]

**Article 2486**

A purchaser who has become the final bidder has his remedy such as allowed by law against the seller, for the repayment of what exceeds the price stipulated by his title, and for the interest of that excess, from the day of each payment. [ex Art. 2191]

**Article 2487**

In the case where the title of the new owner includes immovables and movables, or several immovables, some mortgaged and some not, situated in the same or in several arrondissements  of registries, transferred for one and the same price, or for distinct or separate prices, forming part of the same business or not, the price of each immovable subject to particular and separate registrations, shall be declared in the notice of the new owner, by itemizing the total price expressed in the title, if there is occasion.

A creditor who outbids may in no case be compelled to extend his bid either over the movables, or over immovables other than those which are mortgaged for his debt and situated in the same arrondissement; but the new owner has a remedy against his predecessors in title for compensation for the loss which he may suffer, either from the division of the objects of his purchase, or from that of the business. [ex Art. 2192]

CHAPTER VII
Of the Extinguishment of Prior Charges and Mortgages                          Article 2488

**Article 2488**

Prior charges and mortgages are extinguished :

1° By extinguishment of the principal obligation except for the case provided for in Article 2422;

2° By the creditor's renunciation of the mortgage under the same exception;

3° By the fulfilment of the formalities and conditions prescribed to third parties in possession to redeem the property which they have acquired;

4° By prescription.

Prescription is acquired to a debtor, as to the property which is in his hands, by the time prescribed by the statute of limitations in respect of the actions which give a mortgage or a prior charge.

As to the property which is in the hands of a third party in possession, it is acquired by him by the time regulated for prescription of ownership for his benefit: in the case where prescription depends upon a title, it begins to run only from the day when that title has been recorded in the land registry of the situation of the immovables.

Registrations made by a creditor do not interrupt the running of the prescription established by law in favour of the debtor or of the third party in possession.

5° By the termination allowed by Article 2423, last paragraph and as far as provided for by this provision. [ex Art. 2180 amended]

# BOOK V
# PROVISIONS APPLICABLE IN MAYOTTE                          **Articles 2491 to 2490**

**Article 2489**

This Code shall apply in Mayotte subject to the conditions set out in this Book. [ex Art. 2284]

**Article 2490**

For the implementation of this Code in Mayotte, the terms listed below shall be replaced as follows:

1° "Tribunal de grande instance" or "arrondissement" by: "tribunal de première instance";

2° "Court" or "Court of appeal" by: "tribunal supérieur d'appel";

3° "juge d'instance" by: "presiding judge of the tribunal de première instance or his deputy";

4° "Département" or "arrondissement" by: "collectivité départementale";

5° [repealed]

6° "decree of 4 January 1955" by : "provisions of Book IV, Title IV";

7° "land registry" by : " land-book office " ;

CIVIL CODE

8° "registrar of mortgages" by : "registrar of immovable property";
9° "registration at the land registry" by : "registration in the land-book";
10° "land card-index" by : "land-book". [ex Art. 2285]

**PRELIMINARY TITLE**
**PROVISIONS RELATED TO THE PRELIMINARY TITLE**                    Article 2491

### Article 2491
Articles 1 to 6 shall apply in Mayotte. [ex Art. 2286]

**TITLE I**
**PROVISIONS RELATED TO BOOK ONE**                    Articles 2492 to 2499

### Article 2492
Articles 7 to 32-5 and 34 to 515-8 shall apply in Mayotte. [ex Art. 2287]

### Article 2493
For its implementation in Mayotte, Article 26, paragraph 1, is worded as follows:
"Declarations of nationality shall be received by the presiding judge of the tribunal de première instance or his deputy in the form prescribed by decree* in Conseil d'Etat". [ex Art. 2288]

### Article 2494
For its implementation in Mayotte, Article 55, paragraph 1, is worded as follows:
"Declarations of birth shall be made within fifteen days of the delivery to the officer of civil status of the place". [ex Art. 2289]

### Article 2495
Articles 57 and 61-3 shall apply in the wording of Act no 93-22 of 8 January 1993 which modifies the Civil Code as to civil status, family and the rights of the child and establishes a family causes judge.
Amendments made to these Articles by Act no 2002-304 of 4 March 2002 relating to the family name shall come into force in Mayotte on 1 January 2007. [ex Art. 2290]

### Article 2496
The provisions of Book I, title VI, shall apply in Mayotte to the persons subject to the civil status of local law who reach the age required to marry from 1 January 2005. [ex Art. 2290-1]

### Article 2497
Article 331, 331-2, 332-1, 334-2 and 334-5 shall apply in Mayotte in the wording of Act no 93-22 of 8 January 1993.
Articles 333-4, 333-6, 334-1 shall apply in Mayotte in the wording of Act no 72-3 of 3 January 1972.
Article 333-5 shall apply in Mayotte in the wording of Act no 87-570 of 22 July 1987.
Amendments made to these Articles by Act no 2002-304 of 4 March 2002 relating to the family name and Articles 311-21 and 311-22 shall come into force in Mayotte on 1 January 2007. [ex Art. 2291]

### Article 2498
Articles 354, 361 and 363 shall apply in Mayotte in the wording of Act no 93-22 of 8 January 1993.
Amendments made to these Articles by Act no 2002-304 of 4 March 2002 relating to the family name shall come into force in Mayotte on 1 January 2007. [ex Art. 2292]

### Article 2499
For the implementation in Mayotte of Articles 515-3 and 515-7, the words "court office of the arrondissement" are replaced by "court office of the tribunal de première instance". [ex Art. 2293]

**TITLE II**
**PROVISIONS RELATED TO BOOK TWO**                    Articles 2500 to 2502

### Article 2500
Articles 516 to 710 shall apply in Mayotte subject to the adaptations specified in Articles 2501 and 2502. [ex Art. 2294]
The provisions relating to immovables shall apply only subject to the provisions of Title IV of this Book.

### Article 2501
For the implementation of Article 524, paragraph 9, fishes in stretches of water unconnected with watercourses, canals and streamlets and fishes in piscicultures and piscicultural enclosures shall be treated as immovables by destination when they have been placed by the owner for the use and working of the tenement. [ex Art. 2295]

### Article 2502
For the implementation of Article 564, the words: "or stretches of water referred to in Articles 432 and 433 [L. 231-6 and L. 231-7] of the Rural Code [now Articles L. 431-6 and L. 431-7 of the Environmental Code]" shall be replaced by: "piscicultures or piscicultural enclosures". [ex Art. 2296]

**TITLE III**
**PROVISIONS RELATED TO BOOK THREE**                    Articles 2503 to 2508

CIVIL CODE

## Article 2503

Articles 711 to 832-2, 832-4 to 2283 shall apply in Mayotte subject to the adaptations specified in Articles 2504 to 2508. [ex Art. 2297]

The provisions relating to immovables shall apply only subject to the provisions of Title IV of this Book.

## Article 2504

The provisions of Article 832, paragraph 5 and those of Article 832-2, paragraphs 2, 3 and 5 shall not apply in Mayotte. [ex Art. 2298]

## Article 2505

For the implementation in Mayotte of Article 832-4, paragraph 1, the words: "832, 832-1, 832-2 and 832-3" shall be replaced by the words: "832, 832-1 and 832-2".

For the implementation of Article 832-4, paragraph 2, the words "832, 832-2 and 832-3" shall be replaced by the words: "832 and 832-2". [ex Art. 2299]

## Article 2506

In Article 1069, the words: "following the prescriptions of Articles 2148 and 2149, paragraph 2, of this Code" shall be replaced by the words: "following the rules locally applicable in matters of registration of prior charges and mortgages". [ex Art. 2300]

## Article 2507

For the implementation in Mayotte of Article 1873-13, the words: "832 to 832-3" shall be replaced by the words: "832 to 832-2". [ex Art. 2301]

## Article 2508

The provisions of Title XIX of Book III and of Title II of Book IV shall apply in Mayotte subject to the provisions of Title IV of this Book and to the following provisions:

1° Article 2331-4° shall apply in Mayotte on the following terms:

a) In paragraph 1, the words "Articles L. 143-10, L. 143-11, L. 742-6 and L. 751-15 of the Labour Code" shall be replaced by "Articles L. 143-9 and L. 143-10 of the Labour Code applicable in the collectivité départementale of Mayotte";

b) Paragraph 3 shall not apply;

c) Paragraph 4 is replaced by the following provisions:

The debt of the surviving spouse of the head of an artisanal or commercial undertaking who proves by any means thathe or she has directly and actually contributed to the operation of the undertaking for at least ten years without receiving a salary or taking part in the profits and losses of the undertaking.

The aforesaid debts are of an amount equal to three times the annual minimum guaranteed inter-professional salary existing on the day of the death within 25% of the assets of the succession and, if there is occasion, the amount of the own rights of the surviving spouse in the formalities of partition of the succession and liquidation of the matrimonial regime shall be reduced by the amount of that debt. As to the calculation of succession taxes, that debt shall be added to the share of the surviving spouse

d) Paragraph 5 is replaced by the following provisions:

The wages of employees and apprentices for the last six months;

e) Paragraph 6 shall not apply;

f) Paragraph 7 is replaced by the following provisions:

Allowance owed by reason of failure to comply with the term of notice provided for in Article L. 122-21 of the Labour Code applicable in the collectivité départementale of Mayotte;

g) In paragraph 9, the words :"Articles L. 122-9, L. 122-32-6, L. 761-5 and L. 761-7 as well as the allowance laid down in Article L. 321-6 of the Labour Code for the whole of the portion lower than or equal to the ceiling provided for in Article L. 143-10 of the Labour Code and for one-fourth of the portion higher than the said ceiling" are replaced by the words: "Article L. 122-22 of the Labour Code applicable in the collectivité départementale of Mayotte or ander Articles 80c and 80d of Act of 29 mars 1935 on the status of journalists";

h) In paragraph 10, the words :"Articles L. 122-3-8, paragraph 2, L. 122-14-4, L. 122-14-5, paragraph 2, L. 122-32-7 and L. 122-32-9 of the Labour Code" are replaced by the words :"Articles L. 122-10 and L. 122-29 of the Labour Code applicable in the collectivité départementale of Mayotte";

2° In Article 2332, sub-paragraph 9° shall not apply;

3° In Article 2377, the words :" by a registration at the land registry in the way fixed by the following Articles and by Articles 2426 and 2428" are replaced by the words :"by registration in the land-book kept by the registrar of immovable property, in the way established by law, and from the date of that registration, subject to the exceptions laid down by the following Articles";

4° In Articles 2425 and 2431, the reference to the register provided for by Article 2453 is replaced by a reference to the register of filings of deeds and documents to be registered. [ex Art. 2302 amended. Shall come into force on 1 January 2008]

## TITLE IV

## PROVISIONS RELATING TO THE REGISTRATION OF LAND TITLE AND OF RIGHTS   Articles 2510 to 2509
OVER IMMOVABLES

CIVIL CODE
## Article 2509

In Mayotte, rights over immovables, prior charges and mortgages as well as the rules relating to the organization, establishment, transfer and extinguishment of rights in rem over immovables and other rights and deeds subject to registration are those of civil legislation of ordinary law, subject to the provisions of this Title.

CHAPTER I
Of the System of Registration of Land Title                                      Articles 2510 to 2529

SECTION I
General Provisions                                                               Articles 2510 to 2515

## Article 2510

The registration of an immovable guarantees the right of ownership as well as any other right established in the title deed drawn up at the end of proceedings allowing the disclosure of the entirety of the rights already constituted over that immovable. The details of those proceedings shall be prescribed by decree in Conseil d'Etat.

## Article 2511

Subject to the provisions of paragraphs 3 and 4 of this Article, the immovables of any nature, built or not, save those belonging to the public domain, shall be registered in the land-book of Mayotte specified in Article 2513. The transfers and constitutions of rights over those immovables shall be registered in the same book .

Any unregistered immovable which is the subject of a sale in court shall be registered before the knocking down in the way provided for by decree in Conseil d'Etat.

Plots of immovables upon which private tombs are built may be registered.

Collective rights in rem sanctioned by custom are not subject to registration. Their being converted into individual rights of ownership allows registration of the immovable.

## Article 2512

Registration of immovables and entry of the rights specified in Article 2521 in the land-book are compulsory whatever the legal status of the owner or of the holder of the rights may be.

Irrespective of the reciprocal rights and claims of parties for the enforcement of their agreements, the rights specified in Article 2521 have effect as against third parties only where they have been given public notice by way, according to the circumstances, of registration or of entry in the land-book as provided for in this Chapter.

## Article 2513

The land-book is constituted of the registers intended for giving public notice of rights over immovables.

The land-book is kept by the land-book office. It may be run, by this office, under electronic form in the way provided for in Article 1316-1.

## Article 2514

Registration of immovables and entry of the rights specified in Article 2521 takes place on application lodged in the way set out by decree in Conseil d'Etat.

An advance entry may be made upon judgment with a view to insure its rank of entry to one of the rights specified in Article 2521 or to secure the effectiveness of a subsequent rectification.

## Article 2515

A claim for recovery of a right over an immovable not disclosed during the proceedings of registration is inadmissible.

SECTION II
Of the Registration of Land Title and of its Effects                             Articles 2516 to 2520

## Article 2516

An immovable to register shall have first of all its boundaries marked out.

However, an owner, in agreement with the bordering owners, may waive the setting of boundaries.

The boundary-stones belong to the owner whose immovable has its boundaries marked out.

## Article 2517

Registration shall give rise to the establishment of a title-deed by the registrar of immovable property.

A title-deed proves, as and when necessary, the status of owner.

It shall constitute in court the starting point of the rights over an immovable at the time of the registration.

Special title-deeds may be established after registration on application by the parties concerned.

## Article 2518

An alteration of the title-deed after registration is evidence of the rights therein specified only until contrary proof.

## Article 2519

A title-deed and its entries preserve the right which they relate as far as they have not been cancelled or altered and are evidence as against third parties that the person herein designated is vested with the rights herein specified.

## Article 2520

Where he rejects an application for registration or is of opinion that he may not give effect to it, the registrar

CIVIL CODE

forwards it to the court.

It shall be the same where there exist objections or application for entry whose withdrawal in authentic form has not been given or to which the applicant refuses to assent.

The court may order registration, wholly or partly, of the immovables as well as the entry of the real rights and encumbrances whose existence he has verified. He shall have rectified, if necessary, the setting of boundaries and the drawing of the immovable.

The registrar shall establish the title-deed in accordance with the judgment which orders registration when it has become final, after possible rectification of the setting of boundaries and of the drawing of the immovable or compliance with the prescribed formalities.

SECTION III
Of the Registration of Rights over an Immovable                                     Articles 2521 to 2529

**Article 2521**

Without prejudice to other rights whose entry is provided for by the provisions of this Code, of other Codes or of the civil legislation applicable in Mayotte, shall be entered on the land-book, with a view to be effective as against third parties:

1° The following rights in rem over immovables:

a) Ownership of immovable property;

b) Usufruct of the aforesaid ownership established by human will;

c) Use and habitation;

d) Emphyteosis, governed by Articles L. 451-1 to L. 451-12 of the Rural Code;

e)  Superficie;

f) Servitudes;

g) Antichresis;

h) The right in rem resulting from a title of occupation of the public domain of the State or of one of its public undertakings issued under the Code of the Domain of the State and of Public Authorities applicable in Mayotte;

i) Prior charges and mortgages;

2° Leases for a term of more than twelve years and, even as to a lease for a shorter term, the receipts or assignments of a duration equivalent to three years of rent or rent of farm not due;

3) Rights subject to public notice under 1° and 2°, resulting from deeds or judgments establishing or deciding termination, revocation, annulment or rescission of an agreement or of a transfer mortis causa.

However, servitudes which originate from the situation of the premises or which are established by law are exempted from entry.

**Article 2522**

Shall be entered on the land-book, on pain of inadmissibility, where they relate to the rights specified in Article 2521, 1° and 2°, claims which are brought to obtain termination, revocation, annulment or rescission of an agreement or of a transfer mortis causa.

**Article 2523**

The holder of one of the rights specified in Article 2521 may not be entered before the right of his immediate predecessor in title has itself been  entered.

The holder of a right other than ownership may only be entered after the owner of the immovable has been entered, save where the latter has been acquired by prescription or accession.

**Article 2524**

Any instrument relating to a right liable to being entered shall be, for the sake of entry, drawn up in authentic form by a notaire, a regular court or an administrative authority.

Any transfer inter vivos, or transaction declaratory of ownership of immovable property, any transaction inter vivos creating or transferring a land servitude drawn up under another form shall be followed, under pain of lapse, by an authentic instrument or, in case of refusal of one party, by an application to the court, within six months following the drawing up of the instrument.

The proof necessary for the instruments drawn up in authentic form in order to establish the rights transferred or created over a registered  immovable  shall be fixed by decree in Conseil d'Etat. This decree shall also fix the list of the documents to be filed in order to obtain the entry of rights in case of the opening of a succession.

**Article 2525**

Officiers ministériels and public authorities are under a duty to have entered, forthwith and irrespective of the consent of the parties, the rights specified in Article 2521 which result from instruments drawn up by themselves and specified in Article 2524.

**Article 2526**

Any person having an interest therein requests of the registrar the entry, cancellation or rectification of the entry of a right, by producing the instruments drawn up in authentic form and other documents whose filing is prescribed by this Title.

**Article 2527**

The registrar of immovable property or the court where the matter is brought before it, shall check whether the right

CIVIL CODE

referred to in the application is liable to be entered, whether the instruments filed in support of the application comply with the prescribed form, and whether the predecessor in title of the right is himself entered in accordance with Article 2523.

**Article 2528**

Where they have not been entered, rights subject to entry under Article 2521 are ineffective as against third parties who, over the same immovable, have acquired from the same predecessor in title, competing rights subject to entry.

Where they have been entered, those rights are also ineffective where the rights alleged by those third parties, have been entered previously.

However, third parties who themselves were in charge of having the competing rights entered may not avail themselves of that provision, nor may their universal successors .

**Article 2529**

Where several formalities which are likely to produce consequences effective as against third parties under Article 2528, are requested on the same day over the same immovable, the one which is requested by virtue of the title-deed whose date is the oldest is deemed of a previous rank, whatever the order of the entered filings may be.

Where a formality which is compulsory under Article 2521, 1° exclusive of i, and 2° and likely to produce consequences effective as against third parties under Article 2528, and an entry of a mortgage are requested on the same day over the same immovable, and the deed to be entered and the title of the entry bear the same date, the entry is deemed of a previous rank, whatever the order of the entered filings may be.

Where competing formalities, which are compulsory under Article 2521, 1° exclusive of i, and 2° and likely to produce consequences effective as against third parties under Article 2528 are requested on the same day and the deeds to be published bear the same date, the formalities are deemed of the same rank.

Where a formality likely to produce consequences effective as against third parties under Article 2528 and the entry of an order to pay deemed to be seizure are requested on the same day over the same immovable, the rank of the formalities is regulated, whatever the order of the entered filings may be, according to the dates, on the one hand, of the enforcement order specified in the order to pay, on the other hand, of the title of the competing formality; where the titles are of the same date, the entry of the order to pay deemed to be seizure is deemed to be of a preferable rank.

In any case, the entries of separations of estates provided for in Article 2383, where Article 2386, paragraph 2, of the same Code so provides, as well as those of statutory mortgages provided for in Article 2400 (1°, 2° and 3°), are deemed  of a rank previous to that of any other formality requested on the same day.

CHAPTER II
Miscellaneous Provisions                                                    Articles 2530 to 2534

SECTION I
Prior Charges and Mortgages                                              Articles 2530 to 2532

**Article 2530**

Notwithstanding the provisions of Article 2375 the only general prior charges over immovables applicable in Mayotte are court costs and the rights of the Public Treasury. These two prior charges are exempted from entry on the land-book.

**Article 2531**

Are alone liable to mortgages:

1° Immovable property which may be the subject matter of legal transactions and its accessories deemed immovables;

2° Usufruct of the same property and accessories, during the time of its duration;

3° Emphyteosis, during the time of its duration;

4° The right of superficie.

**Article 2532**

A conventional mortgage be granted only through an instrument drawn up in authentic form. The transfer and withdrawal of a mortgage shall take place in the same form.

Agreements concluded outside Mayotte may have validly in view the constituting of a mortgage over immovables situated in Mayotte only where they comply with the provisions of this Title.

SECTION II
Of Forced Sales                                                               Articles 2533 to 2534

**Article 2533**

A creditor holder of a nominal certificate of entry issued by the registrar of immovable property, or of an enforcement order may, failing payment on the date of maturity, sue for the forced sale of the registered  immovables of his debtor allocated to his debt.

Where several immovables are allocated to the same debt, execution may only be levied simultaneously against each of them after authorization of the court.

**Article 2534**

For the sake of their being given public notice, the orders of enforcement concerning shares depending on an

CIVIL CODE

immovable subject to the status of co-ownership are deemed not to concern the portion of the common property included in these shares.

Nevertheless, the creditors who levy execution exercise their right over said portion, considered in its consistency at the time of the transfer whose proceeds form the suject matter of the distribution.

# GLOSSARIES

Articles 1 to 88

I

**English terms whose meaning is more or less distorted**      Articles 1 to 63

**Absence**
Absence : not the fact of being away from one's usual place of residence (which is non-présence) but the situation of a person missing and whose existence is uncertain (cf. Art. 112).

**Absentee**
Absent : not a person away from his usual place of residence (who is non-présent ), but a person who is missing and whose existence is dubious. (cf. Art. 112).

**Affidavit**
Acte de notoriété, cf. Art. 71, 311-3, 730-1.

**Ante-nuptial agreement**
Contrat de mariage: an agreement by which prospective spouses exempt themselves from the statutory matrimonial regime by regulating division of property and powers thereon during the marriage. Cf. Matrimonial regime.

**Apparent status**
Possession d'état; see definition in Article 311-1

**Appeal**
Appel. N.B. French appel, 1) is only a method of review of the decision of a court of first instance by an intermediate appellate court (cf. Court of appeal); and 2) involves re-consideration of the whole case (factual as well as legal issues).

**Article**
Like E.C. enactments, French statutes and codes are divided into Articles, not Sections. A Section is a subdivision of a Chapter. Cf. also Paragraph.

**Authentic instrument**
Acte authentique:  is defined by Art. 1317; it has a special probative effect, cf. Art. 1319; a notarial instrument is only one species of the category of acte authentique of which a judgment, for instance, is another species.

**Beneficiary heir**
Héritier bénéficiaire:  the heir who has accepted a succession under benefit of inventory (Art. 793 et seq.), whose patrimony thus remains separated from that of the deceased (comp. Succession) and whose liability is thus limited to the amount which he receives.

**Benefit of seizure and sale**
Bénéfice de discussion : the right of a surety to compel the creditor to levy execution upon the property of the principal debtor before resorting to the surety.

**Benefit of division**
Bénéfice de division : the right of one of several co-sureties to require the creditor to divide his action and to reduce it to the amount of the share and portion of each surety.

**Bequeath (to)**
Léguer. cf Legacy.

**Children's aid service**
Service de l'aide sociale à l'enfance : service concerned with child welfare and which in particular provides foster care.

**Commencement of proof in writing**
(also translated by beginning of written proof, incipient written evidence): commencement de preuve par écrit : an imperfect written proof (Art. 1347) which allows oral evidence by way of exception to the rule of Article 1341 which requires a writing in order to prove most legal transactions.

**Community regime**
Régime en communauté: the matrimonial regime imposed by law (failing a regime chosen by the parties in an ante-nuptial agreement) which involves, besides the property rights of each spouse, property owned in common by both spouses.

**Compulsory heir**
Héritier réservataire : the heir entitled to that portion of the succession (cf. Reserve) of which the deceased was not entitled to dispose freely.

CIVIL CODE

**Court of appeal**
Cour d'appel : an intermediate appellate court; there are 30 cours d'appel in Metropolitan France. Cf. Appeal.

**Creditor**
Créancier: "Creditor" should be understood as meaning not only a person to whom money is owed, but one to whom any obligation whatsoever is owed by another person, the debtor.

**Debt**
Dette: "Debt" should be understood as meaning not only a sum of money due but any obligation whatsoever, and not only the obligation of the debtor to perform, but also the right of the creditor to enforce performance.

**Debtor**
Débiteur: cf. Creditor and Debt

**Decree**
Décret : order of the Government, signed by the President of the Republic, which may contain provisions either regulatory (e.g. the decree referred to in Article 1341) or individual (e.g. the decree of naturalisation referred to in Article 21-15).

**Disposable portion**
Quotité disponible : that portion of a succession of which the deceased was entitled to dispose freely; comp. Reserve.

**Family causes judge**
Juge aux affaires familiales : judge of the tribunal de grande instance who has jurisdiction over family matters.

**Firms and companies**
Sociétés; cf. &ldquo;companies or firms&rdquo;, EC Treaty Art. 48 [ex Art. 58], para 2; comp. &ldquo;companies and other bodies&rdquo;, ETS n° 57 (Establishment of Companies) Art. 1. The concept of Société encompasses institutions homologous to companies limited by shares as well as institutions homologous to partnership (cf. Partnership); all these institutions are considered as contracts (cf. Art. 1832, 1844-7, 3°, 1844-10, para. 1) and subjected to a common core of rules.

**Giving in payment**
Dation en paiement  : an act by which a debtor delivers a property to his creditor, who is willing to receive it, in satisfaction of a debt and in place of what was owed (usually, a payment in money).

**Government procurator**
Procureur de la République;  a member of the Government procurator's office.

**Government procurator's office**
Ministère public . It should be noted 1) that the ministère public which acts as prosecutor in criminal cases, also plays an important part in civil proceedings; 2) that its members, like the judges, are members of the judiciary (magistrats)  and are subjected to many rules, relating in particular to selection, professional training, appointment and promotion, which also apply to judges.

**Institute**
Grevé: a person instituted as heir by a gratuitous transfer of property, but with the obligation to pass over the property at his death to children born or to be born, called the substitutes.

**Interim ex parte order**
Ordonnance sur requête : a remedy granted on the application of a party without his opponent being heard, often in case of urgency, to obtain interim relief.

**Joint and several creditors**
Créanciers solidaires. French law does know the institution of joint and several creditors, cf. Art. 1197-1199.

**Judge of guardianships**
Juge des tutelles : a judge of the tribunal d'instance in charge of the protection of minors and adults under a disability.

**Judicial arrangement**
Redressement judiciaire: a reorganization plan, ordered by the court, of a merchant unable to meet its obligations.

**Judicial liquidation**
Liquidation judiciaire:  realization of assets and discharge of liabilities of a merchant unable to stay in business, through distribution among the creditors.

**Juvenile judge**
Juge des enfants : a judge of the Juvenile Court (tribunal pour enfants), a court with criminal jurisdiction, who has jurisdiction in all matters relating to educational assistance.

**Lease with option to sell an immovable**
Location-accession à la propriété immobilière, Act n° 84-595 of 12 July 1984 : a contract (of rare occurrence) by which a seller binds himself towards a prospective owner to convey to him for value the ownership of all or part of an immovable after a time of enjoyment through a subsequent declaration of intention, on condition of payment, in instalments or

CIVIL CODE
deferred, of the purchase price, and of a rent until the declaration.

**Legacy**
Legs : as to testamentary dispositions, French law does not distinguish with respect to the nature of the property which is the subject-matter of the disposition. Accordingly, the words Bequeath, Legacy and Legatee have been used indiscriminately in any case.

**Legatee**
Légataire : cf. Legacy.

**Loss**
Lésion: disproportion in a contract between what one party receives and what he gives (Art. 491-2, 510-3, 1118, 1304 et seq;, 1312-1314, 1674 et seq.), or between the shares of co-parceners (Art. 887 et seq.), or between the hope of an heir and the reality of a succession (Art. 783).

**Management of another's business**
Gestion d'affaires (negotiorum gestio) : the conducting of another's affair or affairs, on his behalf and in his interest, but without authority nor authorization; a kind of spontaneous agency.

**Matrimonial regime**
Régime matrimonial : "A matrimonial regime is a system of principles and rules governing the ownership and management of the property of married persons as between themselves and toward third persons" (Civil Code La. art. 2325). Cf. Ante-nuptial agreement.

**Mortgage**
Hypothèque. The word "mortgage" has been used for greater convenience, although there is an essential difference between the traditional mortgage and an hypothèque : the latter is not a transfer of the legal title to the mortgagee, defeasible on payment of the debt, but is only a right in the property owned by another (ius re aliena), a charge on another's property, securing a claim. Thus, it offers similar features with the charge by way of legal mortgage.

**Notarial instrument**
Acte notarié : instrument drawn up by a notaire and which has the character of an authentic instrument.

**Paragraph**
(1) Infrequently, a subdivision of a Section, noted "§" and numbered;
(2) Generally, a subdivision (indented line, alinéa) of an Article, unnumbered.

**Partnership for commercial purposes**
Corresponds more or less to société en nom collectif.

**Partnership for non-commercial purposes**
Corresponds more or less to société civile. The word "partnership" has been used for the sake of commodity, although there are significant differences between a partnership and a société : notably, (unless it is undisclosed) the latter shall be registered and has a separate juridical personality from the date of that registration. Comp. Firms and companies.

**Payment**
Paiement :  "Payment" should be understood as meaning not only the delivery of money due, but the performance of any obligation whatsoever.

**Patrimonial rights**
Droits patrimoniaux  : rights pertaining to a person's patrimony, i.e. which have a pecuniary value.

**Patrimony**
Patrimoine : the whole of a person's assets and liability, both existing and future, assessable in money.

**Periodic penalty payment**
Astreinte : cf  EC Treaty, Art. 83 [ex Art. 87] (2) (a)

**Peremptory exception**
Fin de non-recevoir : bar to proceedings.

**Presumptive heir**
Héritier présomptif : a person entitled to the succession of another, in the lifetime of the latter.

**Prior charge**
Privilège : "The notion of privilège is a curious compound of the English concept of lien, including both the possessory lien of the common law and the non-possessory equitable lien, and of the idea of priority between categories of competing creditors" (Amos and Walton's Introduction to French Law, second ed. by F. H. Lawson, A. E. Anton, L. Neville Brown, Oxford, Clarendon Press, 1963, p. 248).

**Prudent administrator, prudent owner**
Bon père de famille (litt. prudent man of property), rough functional equivalent of the reasonable man.

**Real subrogation**

CIVIL CODE

Subrogation réelle : the substitution of one thing in the place of another.

**Redhibitory vice**
Vice rédhibitoire : an essential defect in a thing sold which involves rescission of the sale.

**Reserve**
Réserve : portion of the succession of which the deceased was not entitled to dispose freely. Comp. Disposable portion.

**Section**
cf. Article.

**Substitute**
Appelé : cf Institute.

**Succession**
Succession. It should be kept in mind that in French law, the patrimony of the deceased (assets and liabilities) vests by operation of law in the heirs at the moment of the death (acceptance is retroactive to the opening of the succession; but an heir may repudiate it) and is in undivided ownership as between them until partition, which relates to liabilities as well as to assets. Comp. Beneficiary heir.

**Term**
Terme: a period of time granted to a debtor for the performance of the obligation.

**Undisputable date**
Date certaine : a date of which an instrument is evidence with regard to third parties (cf. Art. 1319, 1328).

**Universal title**
(Book III, Title I, heading of Chapter I): titre universel: right to receive the entirety of a succession; comp. universal legacy, art. 1003, and legacy under universal title, art. 1010.

**II**
**Untranslatable French terms**                                              **Articles 64 to 88**

**Arrondissement**
cf. Commune.

**Avoué**
A quasi-public officer, although he has a profession, who acts as agent of the parties in civil proceedings and takes all procedural steps before a court of appeal.

**Canton**
cf. Commune.

**Cause**
A rather confused concept. Roughly speaking, there is want of cause in a contract when the performance of one party is not counterbalanced by a performance of the other party, and an unlawful cause is an unlawful motive.

**Collectivité départementale**
Administrative subdivision of Mayotte.

**Commune**
Note on the Administrative Organization of
France
.
France
 is divided into 26 régions (including four overseas regions); the régions, created in 1960/1972 are not alluded to in the Civil Code. Régions are divided into départements; there are 96 metropolitan départements. Départements are divided into arrondissements; there are 339  arrondissements. Arrondissements are divided into cantons; there are 3 995 cantons. Cantons are divided into communes; there are 36 555 metropolitan communes. Thus, a commune is only a rough equivalent to an English parish.

**Conseil constitutionnel**
A quasi jurisdictional body charged with the review of the constitutionality of French legislation between the times of its enactment and promulgation.

**Conseil d'État**
An administrative (and jurisdictional) body which acts as advisor to the Government as to legislation and regulations.

**Département**
cf. Commune.

**Force majeure**
An event beyond the control of a party, which he could not foresee, prevent or avoid.

**Journal Officiel**

CIVIL CODE
An official publication in which statutes and regulations are authoritatively published.

**Juge d'instance**
A judge of the tribunal d'instance.

**Jugement d'ouverture**
In insolvency proceedings, a judgment (an order) of the court which opens the case.

**Livret de famille**
A booklet which the officer of civil status establishes, inter alia, at the time of the marriage and hands over to the spouses. It contains an extract from the record of marriage of the spouses and will be completed later on by extracts from the records of birth of the children born of the marriage, of those adopted, by extracts from the records of death of them all and by mention of the records or judgments having an incidence on a record, an extract from which appears on the livret de famille. A photocopy of that livret is conclusive evidence of the civil status and family position of the person concerned with respect to administrative bodies and public institutions.

**Notaire**
A public officer, although he has a profession, one of whose duties is to draw up authentic instruments between private persons.

**Office ministériel**
The assigned function of an officier ministériel.

**Officier ministériel**
An officer of the court (court clerk) or a public (notaire) or quasi-public (avoué) officer appointed by the Minister of Justice.

**Ordonnance**
(1) (abbr. Ord.) : a mode of delegation of legislative power to the Executive: the French Constitution of 1958 empowers the Parliament to authorize the Government to take measures which are normally within the legislative domain. through ordonnances, subject to parliamentary ratification;
(2) : Name given to certain judicial decisions handed down by a single judge court.

**Ordonnance de non-conciliation**
Where his attempt to reconcile the spouses has been unsuccessful, the judge hands down this kind of ordonnance, which orders a new attempt at conciliation or authorizes the plaintiff to summon the other spouse.

**Préfet**
The depositary of the authority of the State in a département; there are also Préfets de région.

**Superficie**
Right of ownership over buildings and plantations, different and independent from the right of ownership of the land.

**Tribunal de grande instance**
Court of major jurisdiction of first instance. There exist 175 metropolitan tribunaux de grande instance, at least one per département.

**Tribunal de première instance**
Court of first instance.

**Tribunal d'instance**
Court of minor jurisdiction of first instance. There exist 462 metropolitan tribunaux d'instance, each of them having jurisdiction over the territory of several cantons.

**Tribunal supérieur d'appel**
Intermediate appellate court in Mayotte.

Exhibit 10

RECUEIL DALLOZ SIREY - 1988

# FRENCH HIGH COURT

## (3RD CIV. DIV)

### 14 January 1987

**SALE, Promise of sale, Promise equivalent to sale, Agreement on thing and price, Accessory term, Ratification by a notary, Parties, Consent, Constituent element (no), complete sale.**

*The sale between the parties is complete as soon as they agree upon the thing and the price and the absence of a final agreement on the accessory elements of the sale cannot prevent the complete character of the sale unless the parties agreed to postpone the formation of the contract until the determination of these terms (1).*

*With respect to ss. 1134 and 1589 of civ. c. [1], the court of appeal legally justified its decisions by holding, subject to no appeal, that the parties to the agreement had agreed upon the thing and the price, and that if they provide for the ratification by a notary, it does not result from the provisions of this agreement (promise of sale of real property and chattels) or the circumstances of the cause that they wanted this accessory term to be a constituent element of their consent in order to declare the agreement valid (2).*

> **Rep. civ.** and update, Vol. *Promesse de vente* by L. Boyer, n° 167 et seq.; *Vente (éléments constitutifs)*, by Ph. Malaurie, n° 3 et seq., 7 et seq.

THE COURT; - On the sole ground: - Considering that, in accordance with the appealed decision (Orleans, *aud. sol.,* 23 May 1985) deciding on appeal following dismissal[2] ,in a private agreement[3] of 13 Nov. 1978, Mrs. Steinlen agreed to sell to Mr. Lignel a house and the works of the Steinlen family in her possession for consideration payable in cash and a monthly life annuity; that the agreement specified that it would assess with the National Library whether to make this house a museum or a Steinlen foundation, that Mr. Lignel agreed on various points including that of providing Mrs. Steinlen with the necessary means to finalise the biography of her uncle, Alexandre Steinlen and to arrange for the publication of a book and to organise a series of exhibitions of the works of the Steinlen family; that it was mentioned that the agreement would only have a binding effect after being ratified by a notary; that after the payment of a part of the price due in cash and the first term of the life annuity, Mrs. Steinlen refused to proceed with this agreement; - considering that Mrs. Lebel-Orset representing the rights of the Mrs. Steinlen complains about the decision of having declared valid the agreement entered into between Mrs. Steinlen and Mr. Lignel on 13 Nov. 1978 while, in accordance with the ground, "if the sale is complete as soon as the agreement of the parties on the thing and the price is established, the parties have the liberty to subject the complete and final character of the sale to the completion of a condition precedent, that in this instance, in the agreement of 13 Nov. 1978 in relation to the sale of not only a real property asset but also chattels and related rights, the parties had expressly provided that the agreement would only have a binding effect if it was ratified by a notary (Mr. du Boys, 104, rue Faubourg Saint Honore), that, by only holding that the parties have agreed upon the thing and the price since 13 Nov. 1978 and it had not been established that Mrs. Steinlen had wanted to make accessory conditions listed in the agreement an essential term of the sale without looking at what the common intention of the parties was in specifying in the agreement of 13 Nov. 1978 that their agreement only has a binding effect if it had been ratified by a designated notary to affirm that it did not result from any provisions of the agreement or the circumstances of the cause that the parties had wanted to postpone the inception of the contract until the signature of the formal agreement[4], the court of appeal did not based its decision on any legal ground with respect to s. 1134 of civ. c. and was in breach of s. 1589 of civ. c. by wrongful application.";

However, considering that after stating rightfully that the sale between the parties is complete as soon as it is agreed upon the thing and the price and that the absence of a final agreement on the accessory terms of the sale cannot prevent the complete character of the sale unless the parties agreed to postpone the inception of the contract until the determination of these terms, the decision which is not subject to appeal holds that the parties to the agreement of 13 Nov. 1978 had agreed upon the thing and the price since that date and that if they provide for the ratification of the agreement by a notary, it does not result from the provisions of this agreement or the circumstances of the cause that they wanted to make this accessory term a constituent element of their consent; that by these sole grounds, the decision is legally justified;

Based on these grounds, dismisses.

From 14 Jan. 1987 – 3rd civ. div. – Mr. Monégier du Sorbier, pres – Senselme, A. judge– Mrs. Ezratty, dep. pros. – S.C.P.

---

[2] Translator's note: in accordance with the rules applicable to the French court system, the French High Court had dismissed a decision of a court of appeal and referred the current matter to another court of appeal in order for this court to make a decision on the merits of the matter. In this instance, the French High Court referred the matter to the Court of Appeal of Orleans.

[3] Translator's note: under French law, a private agreement is an agreement made in writing, but not sealed or witnessed. Whenever we refer to a private agreement in this document, this definition will apply.

[4] Translator's note: under French law, a formal agreement is an agreement which must be drawn up by a notary or a public authority. Whenever we refer to a formal agreement in this document, this definition will apply.

---

[1] Translator's note: civ. c. means French Civil Code.

JURISPRUDENCE                                                    [Illegible]

Lyon Caen-Fabiani-Liard et S.C.P. Guiguet-Bachellier-Potier de la Varde, sol.

NOTE

(1 and 2) By an agreement of 13 Nov. 1978, Mrs. Steinlen agreed to sell Mr. Lignel a building as well as the works of the Steinlen family for consideration of the payment of an amount in cash, life annuity and various other services. The agreement stated that "it would only have a binding effect if it was ratified by a notary". After having accepted the first payments that were provided for, Mrs. Steinlen refused to deliver the goods, subject matter of the contract, on the basis that it was not a final sale, but "a simple draft of intention".

This qualification was held by the court of appeal of Paris in a decision of 15 June 1981 (unpublished). Noting the agreement on the thing and the price, the court interpreted the terms of the contract as having to postpone the transfer of ownership until the date of the agreement drawn by a notary. It deduced from it that the disputed agreement does not create the obligations which characterise a sale, but only an "obligation to do something, which can create a personal debt in a form of damages for the benefit of the purchaser in the case of a refusal of the vendor to perform her obligation". On the appeal of Mr. Lignel, the decision was dismissed for a lack of legal ground (Civ. 3rd, 5 Jan 1983, D. 1983.617, note Jourdain; J.C.P. 1984.II.20312, Note H. Thuillier) because, after having noted the agreement of the essential terms of the sale, the court of appeal refused to give it effect without having specified "if the formality of the agreement drawn up by a notary was necessary for the final agreement between the vendor and the purchaser to be entered into".

The matter was referred to the court of appeal of Orleans, which dismissed the first decision and decided that the disputed agreement was indeed a final sale. The court indeed considered that it was not established that the parties "agreed to postpone the formation of the contract until the formal agreement". The application of ss. 1134 and 1589 of civ. c. then led to decide that the agreement on the thing and the price was sufficient to the inception of the contract and the parties were ordered to perform. The second appeal, intended by the heir of Mrs. Steinlen, reproached the decision of the court of Orleans for not having given any legal ground to its decision with respect to s. 1134 of civ. c. and being in breach of s. 1589. These criticisms were dismissed by the 3rd Civil Division of the French High Court in the decision provided above.

Its decision should end any confusions or uncertainties concerning the regime of a bilateral promise of sale (or another consensual contract). These hesitations are in relation to the definition of the bilateral promise itself, contract in which the parties give consent to a future contract, that they subject the inception to the completion of contractual formality (Weill et Terre, Droit Civil, Les obligations, 4th ed., 1982, n$^{o}$ 109; Boyer, Les promesses synallagmatiques de vente. Contribution à la théorie des avant-contracts, Rev. Trim. Dr. civ. 1949.1; J. Schmidt, Négociation et conclusion de contrats, ed. Dalloz, 1982, n$^{o}$ 554, p.297). The ambiguity of the promise comes from the fact that it seems necessary to merge it with the final contract when it is consensual as it already includes the consent to this contract. If this is the case, the bilateral promise will never be an autonomous preliminary contract so that its practical usefulness seems to be limited. We however sense that the intention of the parties is often to enter into two distinct agreements, the first one preparing the second one. The theoretical regime of the promise, such that it results from ss. 1589 and 1134 of civ. c. and of their interpretation in case law, perfectly answers the preoccupations of the practice.

This regime seems, in definitive, simple: in principle, the "promise of sale is equivalent to sale" (I); exceptionally, it can only be a preliminary contract, which "is not equivalent to sale" (II).

*I.   – In principle, the promise of sale is "equivalent to sale".*

By providing that: "the promise of sale is equivalent to sale, when there is a reciprocal consent of both parties on the thing and the price", s. 1589 of civ. c. provides an example to the rule stated in s. 1583 in which the sale is complete "as soon

as the thing and the price are agreed on ..." We deduce from it that the sale (and any other consensual contract) is formed by an agreement on the terms that the law deems essential. Such agreement is therefore necessary, but also sufficient to the inception of the contract, which explains the solution of s. 1589 of civ. c.

*A.   – The agreement on the essential terms is necessary.*

The consent necessary to the inception of the contract must at least be on the essential terms of the agreement.

The determination of the essential terms which depends on the nature of the contract is relatively simple for the nominate contracts[5] there are the terms which belong to the (statutory or case law) definition of the relevant contract. The thing and the price are therefore the essential terms which characterise the sale. The price is usually the characteristic term of all contracts for valuable consideration. In an innominate contract[6], the obligations which are mandatory to achieve the economic objective constitute its essential terms. In the absence of an agreement on one of these terms, the case law refuses to recognises the inception of a contract (For example, HC. 3rd , 26 Feb. 1975, Bull. civ. III, n$^{o}$ 83, p. 62: disagreement on the subject matter of the contract: HC. 3rd, 22 March 1977, ibid. III, n$^{o}$ 144, p.111; HC. 9 June 1980, D. 1981. LR.40: disagreement on the price).

An agreement where the essential terms are outstanding is neither a final contract, nor a promise of this contract (For example, Paris, 5th div., 24 Apr. 1980, Juris Data, n$^{o}$ 0435; Paris, 25th div. B, 20 Feb. 1985, ibid., n$^{o}$ 020690): in accordance with the interpretation of the intention of the parties, it may be a simple "draft" contract, an agreement in principle or a partial contract.

By neglecting the terms other than the thing or the price, s. 1583 of civ. c. implicitly recognises that the agreement on the essential terms is necessary but also sufficient for the inception of a consensual contract.

*B.   – The agreement on the essential terms is necessary.*

All the terms other than those which could be qualified as essential due to the nature of the contract are deemed to be accessory (until proven the opposite). A disagreement on these terms does not prevent the inception of the contract. For instance, it is so for the terms and conditions of execution of the obligations (For ex: Civ. 3rd, 16 Jul. 1974, D. 1974.681, note Malaurie; Rep. Defrénois 1975, art. 30882, n$^{o}$ 3, p.383, note Albert; Com. 17 Apr. 1980, J.C.P., éd. C.I., 1980.I.8848) or the tax implications of the agreement (Civ. 3rd, 14 Jan. 1975, Bull. civ. III, n$^{o}$ 11, p. 9).

This rule is applied to the clause in which the parties provide for the completion of a specific formality. Such a provision is deemed to be a simple term and condition of the execution of the contract definitely created by consent on the legal essential terms (See Civ. 1st, 6 Oct. 1965, Bull. civ. I., n$^{o}$ 460, p. 350.; Civ. 3rd, 2 May 1968, ibid. n$^{o}$ 182, p. 144; J.C.P. 1968. IV.100; 7 Dec. 1971, J.C.P. 1972.IV.19; Paris, 18 Feb. 1976, Rev. loyers 1977.403, note Viatte; Civ. 3rd, 13 June 1978, Gaz. Pal. 1978.2 Somm. 354; 31 Jan. 1978, D. 1978.348; Paris, 29 Apr. 1982, Juris Data, no 023776; 17 Nov. 1983, ibid., no 028307; 14 May 1984, ibid., no 022461).

An agreement relating to a sale which constitutes the agreement on the thing and the price is therefore, in principle, the final sale not only due to s. 1589 but also the application of ss. 1583 and 1138 of civ. c. If the formality proposed by the parties is a formal agreement, the judicial decision recognising the final character of the sale will be deemed to be this agreement and will be able to be published at the request of the claimant.

---

[5] Translator's note: the French Civil Code provides specific provisions for all the contracts of common use such as sale, lease etc. These contracts are known as "nominate contracts".

[6] Translator's note: as opposed to the nominate contracts, the other contracts are known as "innominate contracts". The innominate contracts must only comply with the general contract rules stated in the French Civil Code.

RECUEIL DALLOZ SIREY - 1988

In this instance, entering into the final sale may seem to be substantiated to the existence of the commencement of the performance of the obligations by the purchaser, accepted without contestation by the vendor. She was then particularly unwelcome to argue that it was only a preliminary contract. Even if the parties had initially wanted to postpone the sale until the formal contract, the commencement of the performance would waive this additional condition to the inception of the final contract. Contrary to the solemn formalities required by law, the contractual formalities may indeed be subject to a waiver (Civ. 1st, 13 June 1961, Bull civ. I, n° 311, p.245; 6 July 1964, ibid. I, n° 369, p. 288; 24 Nov. 1965, ibid, I, n° 652, p. 496; Rev. trim. dr, civ. 1966.529, obs. Chevallier; 5 Feb. 1971, D. 1971.281).

In order to recognise the merits of the arguments of the vendor, we should have then demonstrated that there are instances where the promise of sale "is not equivalent to sale" and that the agreement in dispute is one of these instances.

### II.     – Exceptionally, the promise of sale "is not equivalent to sale"

Being an exceptional solution, it is important to define the conditions and the effects.

#### A.     – Conditions of the preliminary contract of a bilateral promise

The validity of the promise as an autonomous contract always requires that it includes the agreement on the essential terms of the final contract as the promise already gives consent to this contract. However, the latter will only be created if the parties complete the formality that they agree to complete. The principle of consensualism[7] does not indeed prohibit the parties to elect a specific form to express their intention; on the contrary, it gives them the choice of this form. If the parties have voluntarily subjected the validity (the inception) of their contract to a form not required by law, this form becomes mandatory for them in accordance with s. 1134 of civ. c. (M.J. Guerriero, L'acte juridique solennel, L.G.D.J., 1975, p.85).

The bilateral promise may therefore be a preliminary contract, which is distinguished from the final sale, if, according to the intention of the parties, the formality chosen was a condition of the inception of the sale. All the decisions made in the current matter recognise this principle. The implementation of this solution implies that the intention of the parties in relation to the role exercised by the formality that they provided for is known. As the inception of the contracts is not, in principle, subject to any specific form, an intention of derogating from it must be clearly expressed: "the statement in a private agreement for sale providing for the agreement on the thing and the price that a future agreement drawn up by a notary will be drafted only has the effect to subject the inception and the efficiency of the contract to the completion of this formality if such an intention of the parties clearly results from either the terms of the agreement or the circumstances" (Claim. 4 May 1936, D.H. 1936.313).

As a consequence, if the clause is ambiguous and requires an interpretation, we cannot recognise that it derogates from the principle of the consensual inception of the contract. In this instance, the two decisions of the court of appeal can be distinguished concerning the interpretation of the intention of the parties in relation to the meaning of the clause in dispute, which will lead to opposed solutions on the merits. The court of Paris had recognised that the parties had "subjected the transfer of ownership of the assets to the purchaser until the signature of the agreement drawn up by the notary"; on the contrary, the court of Orleans decided that the clause was only an accessory term to the sale. Such a clause indeed maintains a doubt about the role that the parties intended to give to the agreement drawn up by the notary. It seems to be a clause of style to which they did not provide a specific meaning: its terms are not sufficiently explicit to express the

intention of derogating from the common[8] law of the inception of the contracts. (See Civ. 21 Nov. 1932, D.H. 1933.20, where, concerning the clause providing for the payment "in gold and silver coins and in no other way", the court holds that such a "clause of style" would not be deemed to be an essential term of the agreement for sale…").

In any doubt concerning the role given to the formality provided for, this one must be deemed to be a simple term and condition of execution of the final contract created by agreement on its essential terms (the solution is contrary to the one specified in s. 14 of the Swiss Code of the obligations and ss. 125 and 154. para. 2 of B.G.B.[8], which presume that the form voluntarily chosen by the parties is a condition of the inception of the contract).

This solution which is consistent with the fundamental principles of French contract law, raises the issue of the practical drafting of bilateral promises where the parties intend to enter into a preliminary contract.

The apparent incertitude of the case law concerning the regime of the bilateral promise is in reality explained by the imprecision of the contractual provisions, which makes their interpretation difficult. The fact that the parties postpone the transfer of ownership to the date of the regularisation of the contract is not sufficient to establish that they agree to postpone the inception of the sale to this date (Civ. 3rd, 2 May 1968, above-mentioned; Aix-en-Provence, 12 Jan. 1965, J.C.P. 1965.II.14312, note Deghilage). In such a case, it may be a final sale with a title retention clause. As rightly observed by the court of Douai (Douai, 8 Sep. 1983, D.1984.413, note Jestaz et Morand-Deviller): "Considering that the sale will have the effect of transferring the ownership only due to the fact that its constituent terms are met, it will be the intention of the parties that will determine a distinct date of the transfer if they judge it useful; that, therefore, the sole fact of a postponed transfer is not sufficient to lead to the conclusion that the sale was not entered into, as it is clearly because it pre-existed that the provision which is related to it could occur."

In the promise of sale is "equivalent to sale", it could also include a clause postponing the transfer of ownership to which it usually leads to, as illustrated by the recent decision of the court of Lyon (Lyon. 1st ch. A, 29 May 1985, n° rôle 3460.A/B, Genillon C. Berger, LEXIS): "Considering that in accordance with the provisions of s. 1589 of civ. c., the promise of sale is equivalent to sale if there is the reciprocal consent of two parties on the thing and the price; Considering that such consent was noted in the agreement of 11 August 1980, a complete sale occurred between Mrs. Genillon and Mrs. Berger; that, if the subject matter of this sale is the shares of Mrs. Boutier, it had been ratified by her on 24 Nov. 1981; Considering that the sale being complete since 11 August 1980, the clause providing that, one year after the sale of the shares of Mrs. Boutier, Mrs. Genillon will sell to Mrs. Berger her own shares, must be interpreted as postponing the transfer of ownership to this date; Considering that this transfer, which was not subjected to either the signature of a new agreement, or a formal notice, occurred by the effect of the agreement of 11 August 1980, one year after the agreement ratifying the sale of the shares of Mrs. Boutier, that is 24 Nov. 1981; Considering that Mrs. Genillon is therefore entitled to obtain from Mrs. Berger the price of the sale of her shares in accordance with the payment terms provided in the contract". The courts decided on the formality provided, the decision being subject to no appeal (Civ. 3rd, 9 June 1971, Bull. civ. III, n° 364, p. 259; 11 Oct. 1978, D. 1979.I.R.60; 11 June 1980, D.1981.I.R.12). The deadline given to the purchaser to arrange for the drafting of the formal agreement may play a role of condition subsequent (Civ. 3rd, 31 Jan. 1978, D. 1978.348) or condition precedent (Civ. 3 Dec. 1934, S. 1935.1.68). If we wondered whether the formal agreement required by the law itself (s. R. 443-20 of constr. and build. c.[10]) was a condition of the transfer of ownership or inception

---

[7] Translator's note: under French law, the principle of consensualism is a principle in accordance with which a legal transaction is not subject to any specific form for its validity, the consent having alone the power of creating obligations.

[8] Translator's note: "common" in the sense ordinary (opposite to special), rather than the Anglo-Saxon "common law".

[9] Translator's note: B.G.B means the German civil code.

[10] Translator's note: const. and build. c. means the French code of construction and building.

of sale, the court of Douai elected the second interpretation by observing that "the cited text goes further and locates the cause of the transfer in the formal agreement itself" (Douai, 8 Sept. 1983, above).

The passing of the formal agreement (or another formality) must therefore be clearly considered as a "determining cause" or an "essential term" of the final sale by the parties. The case law indeed recognises that the parties may subject the inception of the contract to the agreement on the terms that they consider essential (For ex., Civ. 3rd, 2 May 1978, J.C.P. 1978.II. 19465, note Fieschi-Vivet; D. 1979.317, note Schmidt-Szalewski; Civ. 1st, 21 Feb. 1979, J.C.P. 1980.II.19482, note Fieschi-Vivet).

If, in this current matter, the parties had expressed such an intention, their agreement would have been a preliminary contract creating specific effects, which may have been distinguished from those of the final contract.

### B. – Effects of the preliminary contract of a bilateral promise

The interest of a bilateral promise, which may be distinguished from the contract that it prepares, resides in the specificity of its effects. Therefore, if the final contract transfers the rights, the promise does not achieve this transfer: the sale is "not equivalent to sale". The right of the future purchaser is then analysed as a personal debt, even if the sale is about a real property (Civ. 1st, 30 Apr. 1970, Bull. civ. III, n$^o$ 148, p.119; J.C.P. 1971.II.16674; this right therefore becomes part of the common assets of the spouses). The French High Court decided that, until the signature of the agreement drawn up by a notary, the parties only have an obligation to do, which could only create... a personal debt in the form of damages" (Civ. 3rd, 2 Apr. 1979, Bull. civ. III, n$^o$ 81, p. 63; J.C.P. 1981.II.19697, Note Dagot; Journ. not. av. 1979.1129, art. 55059, note J.V.; Rev. dr. Immob. 1980.71, obs. Groslière et Jestaz).

The promise of a conveyance will not create any obligation of transferring the ownership. In exceptional cases where it exists, the obligation to give can only be created by a valid contract, the purpose of which is to transfer the rights (Weill et Terré, Droit civil, 2. Les biens, 2nd ed., 1980,n$^{os}$ 512 et seq.). Clearly, the promise is not yet the final contract, which will alone be able to transfer the ownership or create the obligation to give. The vendor cannot be ordered to perform the obligation of transferring the ownership to the purchaser, because it is not the debtor of such obligation. If there is a formal agreement and that agreement alone will be equivalent to a sale, this means that each party may prevent the inception of the contract by refusing to undertake the formality provided for (See Jestaz et Morand-Deviller, note under Douai, 8 Sep. 1983, above)

The subject matter of the contract of promise is to prepare the final contract, by creating the obligation to undertake the formality provided for by the contract. Can this obligation be subject to specific performance? Such an order seems possible, as this does not imply a physical constraint on the reluctant debtor, which is the only constraint prohibited under s. 1142 of civ. c. However, if this promise creates the obligation of expressing the consent in a contractual form, we may consider that the refusal to proceed with it at the end of a timeframe will make the performance impossible (Stack, Droit Civil, Obligations, 2nd ed., 1986, by Roland and Boyer, t.2, n$^o$ 2264). The daily fine for delay in the performance of a contract would then be useless.

The rights of the creditor will, however, be compromised if the proposed final contract is to be entered into with a third party in breach of the promise. For instance, in the case of a promise of sale, the right remains part of the vendor's assets until the final inception of the sale. If it is entered into with a third party, it cannot be cancelled in accordance with s. 1599 of civ. c., as it cannot be about a thing belonging to a third party. Except in the case of dishonest entente between the debtor and the third party, the contract entered into with the latter is valid and the creditor of the promise is only entitled to damages (Civ. 3rd, 2 Apr. 1979, above). This solution may seem to be shocking, but it is logical as we recognise that the promise of sale is not the sale; it leads to a high probability, but not a certainty of the entering into of this one.

From this point of view, the promise postponing the inception of the sale until the formal agreement must be distinguished from the sale (and the promise of sale equivalent to sale) postponing the transfer of ownership until this agreement. In this last case, the vendor cannot indeed validly sell the thing sold to the benefit of a third party.

A recent decision of the French High Court illustrates this case. A private agreement for sale provided that the effective transfer of ownership was postponed to the date of the signature of the formal agreement, which had to occur before a certain date and which was not done. Ulteriorly, the vendors entered into a second sale with a third party. The court of appeal held this sale to be complete on the ground that the first sale had become invalid because the formal agreement had not been drafted in the determined timeframe. This decision was dismissed on the ground, that "by deciding so, without assessing any other circumstance which may have established that the parties had therefore agreed to postpone the creation of their obligation to sell and to purchase to that date, the court of appeal did not provide any legal ground to its decision." (Civ. 3rd, 18 March 1987, decision n$^o$ 616, LEXIS. – See also Civ. 1st, 24 Jan. 1984, Bull. civ. I, n$^o$ 31, p 24.).

In summary, the regime of the bilateral promise as it results from the past case law is imprecise due to the difficulties of definition that it creates. The Steinlen matter has the merit of clearly reminding us that the promise of sale may be distinguished from the final contract; it belongs to the practice to draw the consequences.

JOANNA SCHMIDT,
Professor at the University of Lyon III
Honorary Director of the Institute
of business law and economy



# Exhibit 11

# PRIVATE LAW                    PRECIS

## Civil and Commercial Contracts

Francois Collart Dutilleul

Philippe Delebecque

9th edition

DALLOZ



[stamp - Allen and Overy LLP Paris -- Library]

# Civil and Commercial Contracts

9th edition

2011

Francois Collart Dutilleul
Professor at the University of Nantes,
Member of the University Institute of France

Philippe Delebecque
Professor at the Law Faculty of la Sorbonne
University Paris I Panthéon-Sorbonne

DALLOZ



332 Lease

§3.      Lease and licence

360      Patents, drawings and designs, copyright ◊ The issue of determining whether a
contract is a lease, or more generally a leasing of a thing, also arises in contracts where a
person who holds some intellectual or industrial property right grants a third party the use
of a patent, of a trademark, of a piece of work… whilst remaining the "owner" of it. This
issue first arose as to the licence of an invention patent, which is traditionally analysed as
a type of lease[1]. It also arose as to the licence of a trademark or of a corporate name
which is generally part of a distribution contract (see infra n°924) and the contents of
which the legislator has partially imposed[2]. The answer to it is however more delicate
when it pertains to drawings and designs due to the formalities imposed by the law[3]. In
the field of literary and artistic property, one may come across comparable difficulties in
contracts dealing with copyright[4]. Those difficulties were seriously increased in software
user licences[5]. Such difficulties result partially from the specificity attached to the "lease"
of an intangible right.

It cannot be disputed that, because of its subject-matter and its cause*, user licences are of the
same family as the leasing of a thing. The elements are "to make available" some property,
without transferring a "legal" right*, and in consideration for the payment of a royalty or, more
generally, some financial consideration. However, several obstacles may prevent the jump from a
mere resemblance to a lease to straight-out assimilation. With respect to a software user licence,
one of those obstacles lies in the absence of any duration term. This does not mean that a lease
may not be entered into for an indefinite period (see infra n°462). But a software licence is rarely
seen drafted as a contract involving continuing performance, notably because the user becomes the
owner of the hardware supporting the software. More often, the parties do not intend to limit
the effects of the contract on time[6], and the user does not bear any obligation of "restitution". This
is what differentiates a licence from a classic lease. In reality, the singularity of the rules
applicable to intellectual property should lead us to give user licences an autonomous definition.



---

[1] Ref. Roubier, *Intellectual property law*, Sirey, 1952, t.2 p260, n°183; J.Azéma and J.-C. Gallouz, *Intellectual
property law*, Précis Dalloz, passim; J.-J. Burst, *Patented and licenced*, Litec, 1970, p. 294, n°486; Joliet, "*The patent
license contract in Belgian and French civil law*", RTDCom. 1982. 167.
[2] Art. L.330-3, Commercial Code
[3] Ref. J.Azéma and J.-C. Gallouz, op. cit, passim.
[4] Ref. A. Lucas and H.-J. Lucas, *Treatise on literary and artistic property*, n°482.
[5] Ref. A. Lucas, J.Deveze, J. Frayssinet, *Computer and internet law*, PUF, n°739 et seq; A. Lucas and H.-J. Lucas
op.cit. n°686
[6] Ref. A. Lucas, J.Deveze, J. Frayssinet, *Computer and internet law*, PUF, n°747
*Translator's note:
"cause": proposed translation of a civil law concept ("cause"), justifying entering into a contract, the Common Law equivalent being
"consideration".
"legal" right: civil law concept (droit "réel"), meaning a right attached to a thing, that may also be translated as "jus in rem".

# Exhibit 12

Document 1 of 1

JurisClasseur Brevets

Quotation: 03,2009

# Fasc.  4740 :   PATENT LICENCE . - Formation of contracts. Inception of contracts

**Yves Reboul**

**Professor at the Law and Political Sciences Faculty of the University Robert Schuman of Strasbourg**

**Former Managing Director of the International Centre for the Study of Industrial Property**

**Director of the French section of the International Centre for the Study of Intellectual Property**

**Yann Basire**

**PhD student researching in private law**

**Research-Assistant at the International Centre for the Study of Intellectual Property**

## Key Points

1.- A licence contract for invention patents is a contract pursuant to which a patent holder **grants a third party part or whole of the use of his right to exploit the patent, against the payment of a royalty** (See n° 1 to 13).

2.- A licence contract for a patented invention is a **bilateral** contract**, for consideration** and with **successive** performance but it is not a consensual contract (See n°14 to 18).

3.- There are various types of licences: **authoritarian licences** which have a court or administrative origin or **voluntary licences** which result from negotiation (See n° 19 to 26).

4.- A **licence contract** has the characteristics of a lease provided that it meets **the requirements of the Code of Intellectual Property**. One should however distinguish between licence contracts pertaining to patents and **contracts of non –opposition** and **patent pools** (See n° 27 to 34).

5.- A licence contract for a patented invention may be **preceded** by agreements such as **letters of intent**, **options contracts or licence promises** (See n° 35 and 36).

6.- A licence contract for a patented invention is, like any other contract, **subject to the general law of contracts**. Nevertheless, general conditions of substance, applicable to all contracts, are preceded by **conditions of form specific** to this category of contracts such as the **requirement of a written document, registration with the National Patent Registry to make the contract enforceable, and stamping** as concerns a patent licence that is exploited (See n° 37 to 54).

7.- In accordance with the general law, there is no licence without **the meeting of the minds of the parties** (See n° 56).

8.- Licence contracts must in principle be entered into by **a person having full capacity, who holds the patent**. A patented invention may however be licensed by a **usufructuary, an attorney** or a **joint-owner** (See n° 57 to 63).

9.- The subject matter of a licence contract is the **use of a patented invention by the licensee**. However the scope of such right of use may be **more or less wide depending on contractual clauses** (See n° 64 to 74).

10.- **The subject matter of the obligation** in a licence contract is the "thing" upon which the obligation bears. For the patent holder, it is the patented invention; but some contract may add to such subject matter a non-



patented invention called know-how and/or technical assistance. For the licensee, it is the obligation to exploit the invention and to pay a price (See n° 75 to 98).

11.- The absence of consideration or the defective drafting of a clause may cause disputes. In such case, it will be necessary to **interpret the contract** (See n° 99 à 103).

## Table of Contents

## Introduction

**I. - Concept of licence of patented inventions**

**A. - Legal nature**

**B. - Legal definition**

**1° Different types of licences**

    **a) Authoritarian licences**

    **b) Voluntary licences**

**2° Definition of licence contracts**

**3° Necessary distinction between licences contracts and non-opposition contracts**

**4° Patent pools**

**5° Contracts prior to the execution of a licence contract**

**II. - Inception of licence contracts for patented inventions**

**A. - Conditions of form**

**1° Formalities required by the law as a condition for the validity of the contract**

**2° Publicity formalities**

    **a) Conditions of the registration of the licence contract with the National Patent Registry**

    **b) Effects of the registration of the licence contract with the National Patent Registry**

**3° Evidentiary formalities**

**4° Tax formalities**

**5° Administrative formalities**

**B. - Substantive conditions**

**1° Consent**



2° **Capacity and powers**

  a) **Capacity**

  b) **Powers**

3° **Subject matter**

  a) **Subject matter of the contract**

  b) **Subject matter of the parties' obligations**

  c) **Interpretation of licence contracts for a patented inventions**

4° **Cause**

## Bibliography

## Introduction

**1. -   Definition** – A licence contract of an invention patent is a contract by which a patent holder grants the whole or part of the use of his operating rights to a third party, against payment of a royalty. *(P. Roubier, Le droit de la propriété industrielle: Sirey 1952, v. 1, 1954, v. 2. - J.-J. Burst, Breveté et licencié : leurs rapports juridiques dans le contrat de licence: Litec 1970, coll. CEIPI, n° 13, p. 17).*

**2. -   Licence: no transfer of property-** Licence contracts of invention patents have great practical import, in particular at a time where transfers of technology take more and more importance in business matters.

Licence contracts of patents are the only means for the holder of a patented technique to transfer it to a third party without losing the ownership right over his invention.

**3. -   Assignment: transfer of property** – Indeed, a patent holder may use other means to transfer the invention he is protecting to a third party.

He may first think of selling his patent; this is then a patent assignment. The idiom is not great as it is not the patent that is sold but the invention protected by the patent and on which the patent holder holds a property right. It would be more correct to refer to the sale of the patented invention, which sale will result in the assignment of the patent rights. It is obvious that the patent holder does not sell his title which is the patent, but the subject matter of such patent, which is the invention. In any case, the sale will result in the transfer of the ownership of the invention to the transferee.

**4. -   Contribution to a company: transfer of property or simple use** – The patent holder may also transfer his patented invention by way of contribution to a company against shares. The invention has been subject to appropriation due to the filing of a patent, which may be analysed as a tangible asset which, as such, may be contributed to a company against shares. Such contribution may be of **the full property or of the use of it only**.

In the first case, the patent holder will lose the ownership of his invention to the benefit of the company recipient of the contribution; in the second case, the patent holder will remain the owner of his invention *(J. Reinhard, Apport en société des droits de propriété industrielle. Mélanges Chavanne : Litec 1990, p. 297).*



**5. -    Licence : simple right of use** – Finally the patent holder may grant a licence over his invention. In a licence contract, the patent holder only grants a simple right of use to the licensee; therefore he keeps the ownership of his invention and keeps his patent rights.

**6. -    Name of the contract** – We therefore note that the expression "licence contract of an invention patent" used constantly in practice is not very satisfactory. It is not, indeed, the patent which is licensed but the patented invention. It would therefore be preferable to name such contract "licence contract of the patented invention" rather than "licence contract of an invention patent".

**7. -    Licence : indirect use** – The practical importance of licence contracts may be easily explained. It is often impossible for the patent holder to use the patent himself and in all the countries. Inventors who are natural persons or small or medium businesses are often in that situation. Large and very large businesses may also use licences for the same reasons. As Mathély states it: *"it [a licence] is a legal tool which ensures with the greatest efficiency the industrial exploitation of discoveries" (P. Mathély, Le nouveau droit français des brevets : LJNA, 1992, p. 247).*

**8. -    Licence : French or foreign patent** – Licence contracts, because they may concern foreign patents, often have an international component.

**9. -    Licence with or without know-how** – It is necessary to note that pure licence contracts are less and less frequent, it is indeed not rare that the licensee wishes to benefit not only of the patented invention but also of the know-how held by the patent holder and which will allow him to exploit the patented invention under the best conditions. Thus some licence contracts are called "combined licence contracts" when they pertain to a patented technique and a non patented technique called know-how.

It is obvious that many contracts only concern know-how excluding any patented technique. It is then a contract for the communication of know-how, supply of know-how or licence of know-how.

**10. -    Licence : with or without technical assistance-** The subject matter of licence contracts many also be – in addition to a patented invention and to know-how – technical assistance that the patent holder will bring to the licensee in order to exploit the transferred technique, whether it is patented or not.

Traditionally, licence contracts of patented inventions were said to be "simple" or "straight" licences, that-is-to-say, a contract with a single subject matter being the patented invention. It has only been a few years since combined licence contracts have appeared: a patented invention and know-how with possibly a technical assistance.

**11. -    Licence and complex contracts** – The internationalisation of transactions pertaining to patented and/or unpatented techniques resulted in the creation of complex contracts in which the licence contract is a mere component. Such complex contracts are industrial wholes such as contracts called "turn-key", contract called "products in hand" or more recently contracts called "markets-in-hand".  The description of those contracts is quite lengthy. We will limit ourselves to state that a market-in-hand contract is a contract whereby a business agrees to transfer to another business a patented and/or unpatented technique, to supply its technical assistance, and build premises including those intended for the manufacturing, delivers or organises the delivery of the manufacturing supplies or equipment, recruits and trains the staff, starts the plant and undertakes to buy a specified production volume of its partner. Such contract constitutes in reality a group of contracts one element of which is constituted by the licence contract *(On these issues, V. J.-M. Deleuze, Le contrat de transfert de processus technologique: Masson, 3rd ed. 1982. - J.-H. Gaudin, Stratégie et négociations des transferts de techniques : ed. of Moniteur 1982 ; Guide pratique de l'ingénierie des licences et des coopérations industrielles : Litec 1993).*

**12. -** The developments that follow will be devoted to the licence contract of patented inventions only, which may also include the supply of know-how and technical assistance as an accessory.



**13. -   Plan –** After giving these general indications, the following paragraphs will deal with the **concept of licence of patented inventions (I)** and of **the inception of licence contracts of patented inventions (II)**.

## I. -  Concept of licence of patented inventions

**14. -   Plan –** We will first examine the legal nature of licence contracts (A) in order to study, in the second part, their legal definition (B).

Licence contracts of patented inventions are not defined nor regulated by the Code of Intellectual Property. Thus, in order to name it, in order to know the legal regime applicable to it, it is appropriate to discuss first the legal nature of licence contracts. Afterwards, giving it a legal definition may be contemplated.

### A. -  Legal nature

**15. -   Contracts pertaining to the use of the right to exploit an invention –** We saw that licence contracts are defined as contracts pursuant to which a patent holder grants the whole or part of the use of his operating rights to a third party, generally against payment of a royalty.

**16. -   Bilateral contracts, against payment and with successive performance –** Taking it from that definition, a licence contract of a patented invention appears as a bilateral contract, against payment and with successive performance.

**17. -   Contract executed as a deed –** But a licence contract is not a consensual contract. Section L.613-8 of the Code of Intellectual Property provides that *"The acts referred to in the first two paragraphs which comprise assignment or license shall be executed in writing, on pain of nullity"*. Formalities to which licence contracts are subject result in making them deeds.

**18. -    Civil, commercial or dual nature –** Licence contracts may be civil. However they are the most often commercial or dual.

The distinction has some import where an arbitration clause is provided. An arbitration clause is only valid when the contract is commercial *(Court of Appeal of Lyon, 11 Feb. 1952: Ann. propr. ind. 1952, p. 95)*. It is also interesting due to the jurisdiction of the commercial court *(French High Court. com., 27 Nov. 1963 : Ann. propr. ind. 1964, p. 130)*.

### B. -  Legal definition

**19. -   The expression "licence" covers various contractual transactions –** The reason for the grant of a patent right on an invention is to allow the holder of the right to "profit"[i] exclusively from its exploitation. The use of an asset is, in principle, a choice at the discretion of its owner who may decide when and how to exploit it. With respect to the exploitation of a patented invention, the recourse to a licence contract is not always freely granted while the contractual relationship created around the concept of "licence" may take various forms.

#### 1°  Different types of licences

**20. -   Authoritarian[ii] licences and voluntary licences –** French law recognises several types of licences. If it is true that the Code of Intellectual Property does not organise the legal regime of that contract, it however imposes on the patent holder, under certain circumstances justified by economic reasons or reasons of general interest, the obligation to grant licences to third parties. Such licences are called "authoritarian" as opposed to "voluntary".



a) **Authoritarian licences**

**21. -   Licences imposed on the patent holder by a court or by an administrative authority** – Authoritarian licences, as they are called, and also called "compulsory" licences or "forced" licences have in common that they impose on the patent holder a partner, a licensee, whom the patent holder did not choose. The patent holder is thus deprived in some respect of the right he has to be opposed to the exploitation of the protected invention.

There are seven authoritarian licences: some are granted by the judiciary and some are granted by administrative authorities.

1) **Licences of judicial origin**

**22. -   Licences following a failure to exploit and licences due to dependence** – These are licences of judicial origin: compulsory licences following a failure to exploit *(CPI[iii], s. L. 613-11 and L. 613-12)* and licences due to dependence *(CPI, s. L. 613-15)*. These two categories of licences have a judicial origin because they are both granted, under certain conditions, by the judiciary.

2) **Licences of administrative origin**

**23. -   Ex officio licences** – There are four types of licences granted ex officio. First, licences may be granted ex officio in the interest of public health *(CPI, s. L. 613-16 and L. 613-17)*, in the interest of national economy *(CPI, s. L. 613-18)* and for the needs of national Defense *(CPI, s. L. 613-19)*. Finally there is the case of compulsory licences for patents regarding the manufacture of pharmaceutical products for export towards countries experiencing public health problems *(CPI, s. L. 613-17-1)*. The Code of Public Health provides for a fifth type: licences granted ex officio in the interest of livestock breeding *(Public Health Code, s. L. 5141-13)*.

The patents are subject to the regime of ex officio licences at the end of an administrative procedure in order to satisfy a general interest.

b) **Voluntary licences**

**24. -   Distinction between "classical" licences and "legal" licences: -** For a long time, French law only recognised licences resulting from a contract the contents of which was more or less dense and resulted from negotiation between the parties subject of public order rules. These are what we may qualify as classical licences to be opposed to legal licences *(CPI, s. L. 613-10, abrogated)* created by the Law of 1978

**25. -   Legal licences: public offers to exploit patented inventions** – As a matter of truth, legal licences were half-way between purely voluntary licences and authoritarian licences. A patent holder could, through the intermediary of the French National Institute of Industrial Property (INPI), make an offer to undetermined third parties to enter into a licence contract. The regime of legal licences was only possible if the patent was given a documentary note stating no obvious prior claim on the patentability of the invention. Legal licences could only be non-exclusive. Thus a public offer to exploit was only possible if the patent holder had not already entered into an exclusive licence listed with the National Patent Register. The price, unless agreed amicably, was set by the court.

The recourse to legal licences offered a financial advantage to the patent holder, insofar as he benefit from a reduction of the annual fee provided by section L. 612-19 of the Code of Intellectual Property.

However, the law dated 26 July 2005 *(L. n° 2005-842, 26 July 2005 : Journal Officiel 27 July 2005)* removed the system of legal licences by abrogating section 613-10 of the Code of Intellectual Property.



**26.** – Only voluntary licences will be examined in the following developments.

## 2° Definition of licence contracts

**27.** - **Licence contract: lease**– Attempts have been made to establish a connection between licence contracts and other institution of the general law. Such attempts have generally ended in failure.

In the end we turned toward leases. Roubier did not hesitate to write: *"if it is true that licence contracts give licensees the use of the exploitation right, which is one of the attributes of patents, there is here nothing more than in a lease, where a tenant also obtains the use of a thing through a right, which is only a creditor's right"*(P. Roubier, op. cit. v. 2, n° 184, p. 264. - J.-J. Burst, op. cit. n° 18).

And, as a matter of fact, case law did not fail to declare with all the authors that licences show all the characteristics of leases *(Court of Appeal of Orléans, 13 July 1892 : DP 1993, 2, p. 329. – Court of Appeal of Paris, 22 June 1922 : Ann. propr. ind. 1922, p. 353. – Civil Court of Seine, 20 Oct. 1922 : Ann. propr. ind. 1923, p. 288. - H. Allart, Traité théorique et pratique des brevets d'invention et des brevets de fabrique: Paris, 6th ed. 1915, Taillefer and Claro, n° 274, p. 340).* We agree therefore to apply to that contract the rules provided by sections 1713 *et seq.* of the Civil Code. Indeed, some of those rules are not adapted to the subject matter of licence contracts, thus it is useful to provide for specific solutions in the contract, as, being renounceable, such rules allow it.

When a licence contract does not give any price, it is analysed by authors, not as a gift, but as a loan *(R. Fabre, Le prêt à usage en matière commerciale: RTD com. 1977, p. 193 et seq. and more specifically. p. 213 and 231).*

## 3° Necessary distinction between licences contracts and non-opposition contracts

**28.** - **Licence contract and obligation to exploit** – A non-opposition agreement is an agreement under which the patent holder agrees, against profit-sharing in the patent of another patent holder, not to oppose that patent holder his own patent and not to interfere with its exploitation.

This contract is also called "cross-licences". It constitutes a type of non-aggression pact. Large and very large enterprises set up between themselves mutual "licences" which allow them to combine their techniques under more favourable conditions.

Such contracts are not licences. They are real non-aggression pacts which only have one obligation, of the negative kind, born by the patent holder: not to oppose the exploitation by the partner of the agreements[iv] covered by the patent(s) listed in the pact.

Thus, as confirmed by case law, such contracts are not licences, which create a much bigger number of obligations born by each parties *(Court of Appeal of Lyon, 9 June 1981: JCP G 1982, IV, 223).* In particular, such contract does not provide, contrary to licence contracts, any obligation to exploit, unless provided otherwise obviously *(Court of Appeal of Lyon, 9 June 1981, prec.).*

The commercial chamber of the French High Court dismissed the appeal made against the judgment of the Court of Appeal of Lyon (*prec.*). As a matter of fact, a contract provided that the patent holder agreed not to oppose his patent to that of a third party, such third party agreeing, in case his patent was exploited, to remunerate the intellectual cooperation of the first patent holder, without making any positive undertaking to exploit his own patent. The court of appeal rightfully applied the clear and precise terms of this agreement when it defined it, not as a licence to exploit a patent, but as an agreement not to oppose a patent *(French High Court. com., 5 Jan. 1983 : D. 1984, below, read with p. 209, obs. J.-M. Mousseron and J. Schmidt ; JCP G 1983, IV, 86 and JCP G 1983, I, 12061, obs. J.-J. Burst; PIBD 1983, n° 324, III, p. 118; Dossiers brevets 1983, V, 5 ; JCP G 1984, II, 20182, obs. M. Vivant).*



Thus, the simple undertaking by a patent holder not to exercise an infringement suit does not constitute a licence. The requirement for positive obligations is confirmed, affirming the definition of licences as leases.

## 4°  Patent pools

**29. -   Patent pools: putting in common the right to exploit patents –** Patent pools are contracts under which two or more enterprises agree to share their patents under certain conditions.

Sharing may be set up legally by contributing the patents to a holding company. This does not constitute a patent pool.

Sharing may also be set up legally by the creation of a participative association[v]. Such case is not either a patent pool though a patent pool may be created by such means.

In a pool, each enterprise keeps the ownership of their patents and exploits them independently. Thanks to the pool, the present and future patents are attributed under certain terms provided in the contract to each of the participants but each other participant has the use of it as a licensee. The pool therefore essentially deals with the sharing of the right to exploit patents.

**30. -   Complexity of the way patent pools work –** The way patent pools work is generally complex. It is so as it is necessary to determine which participants will obtain the ownership of the patents, the conditions under which the fees will be paid, those under which the patents will be taken and defended, and finally the conditions of licences with third parties. It is therefore preferable to take this path with utmost caution.

Caution is all the more necessary that the creation of a pool, limited at the start, but easily likely to expand, is quite easy. The clause frequently provided is that pursuant to which the patent holder and the licensee give each other licence of improvements discovered by them during the contract. In the case where the original patents cannot give rise to multiple applications and where improvement patents are limited, there cannot be much difficulty. In the contrary case, without the parties clearly realising it initially, a patent pool is established: it may expand greatly and create major difficulties.

**31. -   Patent pools according to authors and case law in France –** In France, it does not seem that patent pools have attracted much attention from authors nor from the courts. According to authors there is only one judgment made by the Court of Lyon on 13 April 1951 (*RTD com. 1951, p. 752, Roubier*):

> By a judgment dated 13 April 1951, the civil court of Lyon resolved a complex piece of litigation opposing the companies D and H, manufacturers of elastic fabric. The company H, sued for infringement by the company D, invoked the invalidity of the patents of the latter company. Then a settlement was agreed under which the company H agreed to consider the patents of company D valid. Potential licences were consented between the two companies and a "pool" of patents over elastic fabric held by them was constituted. Article 15 of the settlement provided that if one of the patents, subject matter of the settlement, was definitively cancelled, the operating clauses of the "pool" would be reviewed. However, during litigation with a third company, all the patents brought to the "pool" by company D were declared invalid. Should Article 15 of the settlement agreement be triggered and the pool agreement reviewed? The court answers negatively: the invalidity pronounced between the company D and the third company stayed *res inter alios acta*[vi] (*Casalonga, Technical and practical treatise on invention patents : LGDJ 1949, t. 1*). The patents were only vulnerable in case of a new suit started by reason of this precedent. The situation of the company H was thus quite bad; firstly, pursuant to the clauses of the settlement agreement it could not require the invalidity of the patents of D and secondly such invalidity being essentially relative could not enable it to trigger Article 15 of the settlement agreement which required a definitive cancellation. So that such Article 15 may be triggered, it needed the - extremely rare – case where a patent is cancelled *erga omnes* by application of section 37 of the Law dated 5 July 1844; when the public prosecutor requires the invalidity of a patent either acting as an intervening party or acting as the principal party (patent invalid pursuant to paragraphs 2, 4 and 5 of section 30 of the Law dated 5 July 1844 - See. *Casalonga, op. cit. v. I, n° 540 and 612*). Could the settlement agreement not, in the absence of a review, be voided for absence of a consideration? The company H was also dismissed on this point. The company D did not only bring to the "pool" the patents, an apparent contribution considering the nullified patents: it also brought all the technical and industrial possibilities of a large establishment and such contribution constituted sufficient consideration for the contract…



**32. -   Patent pooling and antitrust legislation in the USA** – In the USA, patent pools have sparked substantial case law due to the application of anti-trust laws. The creation of pools, possibly completed with a policy of acquisition of third party patents, is an efficient means to create a more or less full monopoly over a field of activity. Thus there may be unlawful breach of free competition.

**33. -   Patent pools and infringement proceedings** – Each enterprise participating in a patent pool keeps the ownership of its patents. The French High Court deducted that the manager of the pool, like the licensee, lacks the capacity to start infringement proceedings by derivative action, and similarly lacks the capacity to start Paulienne proceedings against the withdrawal of the patent holder from infringement proceedings *(French High Court. com., 8 July 1958: JCP G 1959, II, 10981, note Plaisant)*.

**34. -   Patent pools and joint ownership** – When one of the invention patent joint-holders brought that patent to a "pool" created by him with a company holding another patent, with a view to granting a licence to third parties, first instance judges rightly decided to set the share of the royalties paid by the licensees of the pool payable to the other joint-holder, by reference to an arbitral award made between the two members of the pool, in order to find elements to estimate the respective value of their contribution as well as the value of the labour contribution made by the joint-holder of the litigious patent, without giving such arbitral award force *res judicata (French High Court. com., 18 Jan. 1971: Bull. civ. 1971, IV, n° 15)*.

When, for the purpose of granting licences to third parties, a pool was constituted by sharing three invention patents, and one of those patents was jointly held by two people, and only one of those two joint-holders participated in the pool, and one other patent was the exclusive property of the latter, first instance judges rightly decided, in order to set the amount of the share of royalties paid by the licensees and payable to the non-participating joint-holder, to take into consideration, among other factual elements, a prior final judgement according to which the only patent being joint-held was a basic patent and the second patent, which was in the pool, was only an application of that first patent *(French High Court. com., 18 Jan. 1971; Bull. civ. 1971, IV, n° 14)*.

**5° Contracts prior to the execution of the licence contract**

**35. -   Contracts prior to the licence contract** – Invention patent licence contracts may be preceded by various agreements such as letters of intent, option contracts or licence promises.

**36. -   Licence promises-** A promise to grant a licence is the act by which the patent holder agrees to grant a licence if the possible licensee communicates his will to do so. It is the contract frequently called by practice "option contract".

Conversely, the promise to take on a licence is the act by which the possible licensee agrees to take on a license if the patent holder communicates his will to do so.

The effect developed by the promise to enter into a licence contract consists in the creation of an obligation to enter intro a contract where the promisor is the debtor and the beneficiary is the creditor. If, within the timeframe, conditions and terms provided by this preparatory contract, the beneficiary "exercises the option", the contract is complete without the promisor needing to renew his act of will.

However, licence contracts are contract which, in order to be valid, must be documented in writing. The promisor who regrets giving his promise may then be tempted to refuse signing the written document. In the case of the promise to sell real property, case law allows the beneficiary of a promise to have a notarised deed (constituted by a court judgment) document the promisor's act of will contained in the promise contract and his own act of will expressed by exercising the option. In a judgment dated 17 February 1982, the French High Court did not raise any objection to the application of this mechanism to the matter of a promise to grant a licence for an invention patent *(French High*



*Court. com., 17 Feb. 1982: JCP CI 1982, I, 11084, obs. J.-J. Burst and J.-M. Mousseron; D. 1983, jurispr. p. 484, note J. Schmidt; PIBD 1983, n° 317, III, p. 32).*

When the promise to grant a licence does not provide for any clause obliging the beneficiary to exploit the patent before the final completion of the contract, the promisor cannot use the lack of exploitation to refuse completing the contract *(French High Court. com., 17 Feb. 1982, prec.).*

## II. - Inception of licence contracts for patented inventions

**37. - Inception of licence contracts subject to substantive and formal conditions** – Licence contracts for patented invention are, just like any other contracts, subject to the general law of contracts resulting from sections 1101 et seq. of the Civil Code. Nevertheless, the general substantive conditions applicable to all contracts are preceded by specific formal conditions applicable to this category of contracts. The inception of a valid and enforceable licence contract is therefore subject to two series of conditions: on the one hand, formal conditions (A) and on the other hand, substantive conditions (B).

### A. - Conditions of form

**38. - Formalities applicable to licence contracts** – Licence contracts are subject to various formalities, i.e. formalities required by the law as a condition for the validity of the contract, publicity and evidentiary formalities and also tax formalities.

#### 1° Formalities required by the law as a condition for the validity of the contract

**39. -** **Formalities ''ad validatem''** - Section L. 613-8 of the Code of Intellectual Property provides that *"The acts referred to in the first two paragraphs which comprise assignment or license shall be executed in writing, on pain of nullity".*

Licence contracts thus depart from the general principle of consent as a written document is required *ad validatem*; the absence of writing is therefore penalised by the invalidity of the contractual transaction. The rule was already consecrated by the case law before the law dated 2 January 1968, amended by the law dated 13 July 1978, thought the original wording of section 43 was quite equivocal *(French High Court. com., 4 Nov. 1976: Dossiers brevets 1977, III, n° 7. – District Court of Bordeaux, 22 Sept. 1987: PIBD 1987, n° 422, III, p. 435).*

The written document may be indifferently a private contract (in fee simple) or a notarised deed.

**40. -** **Relative invalidity of the contract** – It had been debated whether such invalidity is absolute or relative. It is indeed possible to construe, in the absence of a written document, a formal defect in the contract resulting in its absolute invalidity. It seems however that such invalidity is only relative. It is a solution widely admitted by authors and case law *(French High Court. com., 17 July 1962: D. 1962, somm. p. 10. - District Court of Paris, 27 June 2003 : Propr. industr. 2004, comm. 37, J. Raynard; PIBD 2003, n° 775, III, p. 567).*

The solution deserves to be approved insofar as the only purpose of the formality of a written document is to protect the parties. If the invalidity is relative, it is susceptible to be remedied by a confirmation and such confirmation may be tacit.
Such relative invalidity will nevertheless not prevent the judge from raising automatically the invalidity of the contract on the condition that the judge only grounds his decision on facts that are included in the debate *(Code of Civil Procedure section 7, paragraph 1)* and makes sure that the adversarial principle is respected *(Code of Civil Procedure section 16, paragraph 2).*

#### 2° Publicity formalities



**41. -   Formalities for its enforceability against third parties** – So that the contract may be enforceable against third parties it is necessary to register it with the National Patent Registry *(CPI, s. L. 613-9)*. This section provides: *"To have effect against others, all acts assigning or modifying rights deriving from a patent application or a patent must be entered in a register, known as the National Patent Register, kept by the National Institute of Industrial Property."*.

Such registration is subject to conditions (a) and has various effects (b).

### a)  Conditions of the registration of the licence contract with the National Patent Registry

**42. -   The persons entitled to register** – Section R. 613-53 of the Code of Intellectual Property regarding the National Patent Registry states in its second paragraph that *"Any acts modifying the ownership of the patent application or patent or the enjoyment of the rights deriving therefrom"* must be registered therein.

Section R.613-55, amended by decree n° 2004-199 dated 25 February 2004, lists the persons entitled to file a registration application. Thus only the parties to the deed or one of them, their assigns, their heirs or legatees, or their attorney are authorised to file a registration application.

One further requirement is necessary. The person indicated in the deed as being the holder of the intellectual property title before the modification resulting from the document must be registered as such in the registry *(CPI, s. R. 613-55, paragraph 2)*.

**43. -   Documents required for the registration** –Section R. 613-55 of the Intellectual Property Code indicates what documents must be provided in order to carry out a registration. They are, in addition to the registration application, either a copy or an excerpt of the document stating the modification of ownership or of use. Must also be provided some evidence of the payment of the fees payable and, if applicable, the power of attorney, under he is an industrial property attorney.

**44. -   Contents of the registration** – The registration may concern the whole of the licence contract or only an extract thereof. Indeed, some provisions must remain secret and do not need to be enforceable *vis a vis* third parties. In such case, the parties have two options. They may produce an extract of the document they drew and signed, certified true. In the other case the applicant must send to the French National Institute of Industrial Property. The French National Institute of Industrial Property may then return it upon request after verifying its faithfulness; no copy of the contract is thus kept by the French National Institute of Industrial Property.

**45. -   Examination of the registration application by the INPI -** The French National Institute of Industrial Property is entitled to reject registration application which do not comply with the conditions indicated above if the applicant has failed to regularise his application within the timeframe granted to him. The applicant however may appeal before the Court of Appeal of Paris. It is not the INPI's role to verify the contents of the document submitted to it: thus the Court of Appeal of Paris judged, regarding a sale of patents, that submitting the minutes of the board of directors of a public company which contained the offer of the transferor and the acceptance of the transferee and signed by both parties was sufficient. The INPI was not entitled to refuse the registration, as alleged by the claimant considering that the sale, being in fact a gift, should have been stated in a notarised deed under penalty of invalidity, in accordance with section 913 of the Civil Code while the documents submitted to it were, or at least appeared to be, evidencing a sale *(Court of Appeal of Paris, 21 March 1976: Dossiers brevets 1976, IV, n° 4)*.

No legislative or regulatory text subjects the registration of a document apparently modifying the rights attached to a patent with the National Patent Registry to the INPI's appreciation of the intrinsic validity of such document or to the hypothetical issue of a judgment *(Court of Appeal of Paris, 29 May 1986: PIBD 1986, n° 399, III, p. 352,* regarding a document including the termination of a contract).



**46. -   Publicity of registration –** Finally, any registration with the National Patent Registry is stated in the *Official Bulletin of Industrial Property*. The piece of information, subject matter of the registration, may then be brought to the knowledge of third parties as it is issued, to any person making a request, a copy of registrations or certificates reporting that there is no registration *(CPI, s. R. 613-59)*.

**b)  Effects of the registration of the licence contract with the National Patent Registry**

**1)  Between the parties**

**47. -   No effect between the parties –** Between the parties the registration with the National Patent Registry does not have any effect: though not registered a licence contract is valid. The strata body of a licensor had alleged that the non-registered contract was not enforceable against him. The Court of Paris righted up such argument by deciding that such contract was enforceable against him in his quality of the attorney of the licensor *(Court of Appeal of Paris, 21 March 1977: Dossiers brevets 1978, I, n° 6)*.

**2)  *Vis-à-vis* third parties**

**48. -    Enforceability against third parties –** Section L. 613-9 of the Code of Intellectual Property states one principle according to which a contract that has not been published cannot be enforced against third parties (Paragraph 1). However this rule of principle has an exception (paragraph 2).

**49. -   Principe of enforceability resulting from registration –** Section L. 613-9, paragraph 1 provides: *"To have effect against others, all acts assigning or modifying rights deriving from a patent application or a patent must be entered in a register, known as the National Patent Register, kept by the National Institute of Industrial Property"*. Licence contracts are therefore unenforceable against third parties.

The effect of the rule of principle stated by this law is that an exclusive licensee cannot start infringement proceedings under section L.615-2 of the Code of Intellectual Property if the licence contract is not registered and thus infringement seizures[vii] carried out by him are invalid *(District Court of Paris, 17 Feb. 1976: PIBD 1976, n° 175, III, p. 353. – District Court of Rennes, 14 Feb. 2000: PIBD 2000, n° 703, III, p. 383)*; as concerns non-exclusive licensees, they do not have the capacity to intervene in infringement proceedings stated by a patent holder so long as the licence contract is not registered *(District Court of Paris, 10 March 1975: Dossiers brevets 1975, IV, n° 7)*. But it is possible to regularise during the proceedings *(French High Court. com., 29 Nov. 1988 : Ann. propr. ind. 1989, p. 63. - Court of Appeal of Paris, 5 Feb. 1992: Ann. propr. ind. 1992, p. 127. - Court of Appeal of Paris, 26 Apr. 1994 : Bull. civ. 1994, IV, n° 153. – District Court of Paris, 10 March 1975, prec.)*; however the intervention of the licensee only has effect for the period starting from the date of registration of the contract *(District Court of Paris, 21 March 1974 : PIBD 1974, n° 133, III, p. 332. - District Court of Paris, 26 March 1975 : PIBD 1976, n° 161, III, p. 5. - Court of Appeal of Paris, 22 Sep. 1976 : PIBD 1977, n° 190, III, p. 174. - Court of Appeal of Paris, 19 Dec. 1995 : Ann. propr. ind. 1996, p. 97)*. Also, it was held that a licensee was not admissible to act in justice in relation to his own loss when the registration of the licence with the National Patent Register only took place after the expiry of the patent *(District Court of Paris, 20 Sep. 1996: PIBD 1997, n° 624, III, p. 25)*. Likewise, the authorisation given by the patent holder to the licensee to start infringement proceedings must also be registered with the National Patent Register *(Court of Appeal of Paris, 15 Apr. 1976: RTD com. 1976, p. 719, obs. A. Chavanne and J. Azéma. - Contra District Court of Paris, 19 June 1974: PIBD 1975, n° 139, III, p. 9)*. But it was held that, despite the absence of registration a non exclusive licensee has capacity to intervene in infringement proceedings started by the patent holder provided that the infringer was aware of the contract *(French High Court. com., 25 May 1976 : Ann. propr. ind. 1978, p. 170 ; D. 1978, below, read with p. 148 ; PIBD 1976, n° 179, III, p. 413 ; Dossiers brevets 1976, IV, n° 2)*.

The rule of unenforceability *vis-à-vis* third parties to an unregistered contract is also applicable to the relationship between people taking party in successive transactions pertaining to the same patent right. Thus, in the case of two



successive licence grants and each being exclusive, the licence right will belong, not to the beneficiary of the first grant, but to the beneficiary of the second grant when registered. Likewise concerning a non-exclusive licensee if the first one is not registered.

**50. -   Exception of enforceability despite the lack of registration** – The rule of unenforceability against third parties of an unregistered contract bears one exception provided by section L.613-9, paragraph 2 of the Code of Intellectual Property as follows: *"However, an act may have effect, prior to entry, against parties who have acquired rights after the date of such act, but who had knowledge of the act when acquiring the rights."*

An exclusive licensee whose contract is not registered may therefore oppose it to an exclusive or non-exclusive licensee who has entered into a later contract while the latter was aware of the existence of the first contract.

While an unpublished contract may not be enforced by the parties against third parties, pursuant to the general rules applicable to the legal publicity of legal documents, third parties are entitled to enforce an unpublished contract against the parties thereto. Thus, the Tribunal de Grande Instance of Marseille, by judgment dated 30 June 1975 *(District Court of Marseille, 30 June 1975: Dossiers brevets 1976, II, n° 5)* held that a licence contract was terminated, on the application of the licensee, on the grounds that the patent holder had already granted an exclusive licence pertaining to the same patent right to a third party whose contract was unpublished. The solution is not satisfactory because either the second licensee knew of the existence of the first licensee and entered into the contract whilst being aware of it; or the second licensee was not aware of the existence of the first licensee and was then entitled, not to obtain the termination of the contract but its annulment on the grounds of deception; the licensor's failure to disclose is certainly deceptive in this case.

A holding by the Court of Appeal of Paris dated 27 May 1987 *(Dossiers brevets 1987, IV, n° 7)* admitted that the failure to register a licence contract with the National Patent Register allow the annulment of a sub-licence contract. The solution is based on the idea that the licensee granted rights of which he did not give proof that he was the holder, considering that his licence was not registered with the National Patent Register.

The exception provided in section L.613-9 paragraph 2 exclusively concern third parties acting in bad faith who have acquired rights on the title. Thus a licensee who licence contract has not been published do not have capacity to start infringement proceedings against an infringing third party who is aware of the licence contract *(French High Court. com., 7 July 2004, n° 02-18.384 : JurisData n° 2004-024771; PIBD 2004, n° 793, III, p. 495 ; Propr. industr. 2006, comm. 28, P. Vigand).*

**51. -   Extension of the exception** – The law modernising the economy dated 4 August 2008 *(L. n° 2008-776 : Journal Officiel 5 August 2008)* has substantially amended section L.613-9 of the Code of Intellectual Property. Henceforth an unregistered licensee may intervene in proceedings by the title owner. He may thus obtain compensation for his own loss, despite the contract being unregistered. Indeed, section L.613-9 paragraph 3 provides that "a licensee who is a party to a licence which has not been registered with the National Patent Registry, also has capacity to intervene in the infringement proceedings started by the patent holder in order to obtain compensation of his own loss". It is necessary to bring some nuance to the case law contemplated above which prevent an unregistered licensee to intervene in proceedings *(District Court of Paris, 10 March 1975 : Dossiers brevets 1975, IV, n° 7. – French High Court. com., 29 Nov. 1988 : Ann. propr. ind. 1989, p. 63. - Court of Appeal of Paris, 5 Feb. 1992 : Ann. propr. ind. 1992, p. 127. - Court of Appeal of Paris, 26 Apr. 1994 : Bull. civ. 1994, IV, n° 153. – District Court of Paris, 20 Sep. 1996 : PIBD 1997, n° 624, III, p. 25. - District Court of Paris, 21 March 1974 : PIBD 1974, n° 133, III, p. 332. – District Court of Paris, 26 March 1975: PIBD 1976, n° 161, III, p. 5. - Court of Appeal of Paris, 22 Sep. 1976 : PIBD 1977, n° 190, III, p. 174. - Court of Appeal of Paris, 19 Dec. 1995: Ann. propr. ind. 1996, p. 97).* Indeed, due to the existence of this new paragraph, the principle of the unenforceability of a licence contract when it has not been registered with the NPR has been reduced to its simplest expression.



### 3° Evidentiary formalities

**52. - Written document *"ad probationem"*** – The existence of a written document, in addition to the fact that it satisfies the requirement in section L.613-8 paragraph 5 of the code, allows the parties to obtain proof of their contract.

A written document is very important when a licence contract has a civil or dual nature. Indeed, section 1341 of the Civil Code requires that any contract where the subject matter amounts to more than a certain amount set by decree must be in writing.

In case of dispute, evidence of the existence of the contract and of its contents as well as its date cannot be brought by witnesses nor by presumption. The existence of the contract may however be established by confession or oath.

When a contract has a commercial nature, a written document, still required for validity purposes, does not have the same import from an evidentiary perspective as evidence may be brought by any means including by witnesses.

### 4° Tax formalities

**53. - Tax registration** – When a licence is granted on an invention and that invention is exploited by the patent holder, the licence contract must be stamped[viii] within one month from the date of its execution. In case the invention is not exploited by the patent holder, stamping is not compulsory.

### 5° Administrative formalities

**54. - Abrogation of statements to INPI** – Decree n° 2008-1472 dated 30 December 2008 *(Journal Officiel 31 December 2008)* taken in application of Ordinance dated 11 December 2008 *(Ord. n° 2008-1301 : Journal Officiel 12 December 2008)* pertaining to invention patents and trademarks, taken on the basis of the Law modernising economy dated August 2008, has abrogated sections R. 624-1 to R. 624-7 of the Code of Intellectual Property which provided for statements of international transfers of techniques to the INPI. The purpose of this measure is to simplify administrative procedures. Thus, enterprises, bodies and natural people residing in France are not under the obligation to report contracts pertaining to intellectual property rights entered into with foreign entities, nor to give INPI annual reports of amounts in relation thereto. This measure was also intended for statistics and tax purposes. The tax office has long given up their use and statistics built on the basis of such data turned out to be irrelevant.

### B. - Substantive conditions

**55. - Plan** – It is important to examine the substantive conditions with regard to consent, capacity and powers, the subject matter and finally, the consideration.

### 1° Consent

**56. - Free consent expressing the true will of the parties** – Pursuant to the general law, there cannot be a licence contract without agreement on the intention of the parties.

Indeed, any contract requires the true, effective, conscious and free will of the parties *(section 1109 of the Civil Code)*. It is unlikely that these qualities would be lacking in a licence contract. However it is not a complete given.  For example, this may be the case for a licensee who has entered into an exclusive licence, while the licensor has already granted a licence for the same right to a third party, and said licence was not registered with the National Patent Registry at the time of signing the second contract, but was registered before the second licence could be registered; by not disclosing the first contract,  the licensor is certainly guilty of deceptive conduct and the consent of the second licensee was vitiated at the time of signing said licence contract (for examples of deceptive conduct, see *French High Court. com. 19 Apr. 1967: Quot. jur. 27 Jan. 1968. - C. rev. Monaco, 13 Dec. 1968: D. 1969, jurispr. p. 180)*.



Similarly, if the patent holder fails to disclose the fact that the patent application, which was the subject matter of the licence contract, has been converted into a certificate of utility, then they are at fault and the licensee's consent would be considered compromised *(District Court of Paris, 30 March 1987: PIBD 1987, n° 417, III, p. 312)*. Moreover, if the patent holder conceals the prior disclosure of the invention, they would be liable if their behaviour had induced the licensee to enter into the contract and to pay the stipulated amount payable upon signing the contract, where there is no real consideration *(Court of Appeal of Paris, 17 Dec. 1982: D. 1984, below, read with p. 212, obs. J.-M. Mousseron and J. Schmidt)*.

The date on which the contract is entered into is significant; it is thus recommended to specify in the contract the date on which it comes into force. It may be difficult to determine this date if the contract is signed by the parties at different times and where there has been an exchange of letter, faxes or telegrams, or where they have also communicated through telephone calls.

Where the contract is formed through the parties' correspondence or by the above-mentioned means - which are actually quite rare in practice – it is difficult to determine when and where the contract was formed.

Nevertheless, it is important to know this. As soon as the contract is formed, the parties cannot retract their offer or acceptance; and it is this date which determines the law that is applicable, which can be particularly relevant if the contract is entered into in a period of legislative changes.

Moreover, determining the place of the contract identifies which jurisdiction would be competent in the event of a dispute. In international contracts, it determines which law is applicable to the contract if the parties have not included a clause to this effect.

Under the general law, unless the parties have agreed on the time and place on which their contract is signed, case law usually rules that the contract is formed at the time when the offer is accepted. *(French High Court. soc., 22 Apr. 1955 and 22 June 1956: JCP G 1956, II, 9587. - French High Court. soc., 9 Oct. 1959: Bull. civ. 1959, IV, n° 785. - Court of Appeal of Lyon, 7 July 1971: RTD com. 1972, p. 335)*. However, the Commercial Division of the French High Court sometimes rules in favour of the dates documents were sent to determine when the contract is formed *(French High Court. com., 7 Jan. 1981: Bull. civ. 1981, III, n° 11. - French High Court. Com., 6 Oct. 1990: JCP G 1990, II, 21583, note B. Gross)*. It is true that the offer and acceptance can be revoked as long as the letter has not yet been received by the other party, without needing to see if they have been made aware of it *(French High Court 1st civ., 21 Dec. 1960: D. 1961, jurispr. p. 417, note Malaurie. - French High Court 1st civ., 2 Feb. 1972: Gaz. Pal. 1972, 1, jurispr. p. 702)*.

## 2° Capacity and powers

### a) Capacity

**57. - Contract entered into by a person with full capacity or by their representative –** The question that is raised is whether a licence which is a transfer of the right to use should be subject to the same rules as residential leases, in cases where the patent holder does not have full legal capacity. If so, then the licence would be considered a normal administrative transaction and the representative of the person without legal capacity could enter into the contract by themselves, without requiring authorisation from the family court.

This argument assimilating the licence to a lease should be upheld, if nothing else because there are no specific laws about requiring any authorisation from the family court when it comes to granting licences.

The licensee could be the State. It was ruled that the Conseil d'Etat did not have to hear a dispute regarding the performance of a patent licence contract for a process for preserving meat granted during wartime by a private person to the State. Indeed, it was decided that this was not a case of supply tender under the meaning given by the decree of 11 June 1866, but a contract under the general law *(CE, 15 Nov. 1922: Ann. propr. ind. 1923, I, p. 39. - T. civ. Seine, 13 Nov. 1942, cited in Casalonga: Traité des brevets d'invention, v. I, n° 776)*.



### b) Powers

**58. - Principle** – The issue of power is raised in several cases, particularly those under the regime of the usufruct, joint ownership, joint estates of spouses or licences granted by an attorney.

Outside these cases, the general rule is simply that only the owner of a patent duly registered with the National Patent Registry can validly grant a licence.

**59. - Invalidity of a licence granted by a licensor who is not the owner of the patent -** A licence granted by a person who is not the owner of the patent is null and void. In this case the licensee cannot raise the defence that they were acting in good faith, as they agreed to a licence with a person who was not registered with the National Patents Register as the owner of said patent *(Court of Appeal of Paris, 24 Apr. 1968: Ann. propr. ind. 1968, p. 76)*.

However, a decision of the Court of Appeal of Paris *(Court of Appeal of Paris, 10 May 1971)* ruled that a licensor who was not the owner of the patent at the time of entering into the licence contract, must, following the successful claim to the patent by a third party, terminate any unlawful licences, regardless of whether the licensees were acting in good faith. This decision was confirmed by the French High Court *(French High Court. com. 5 Jan. 1973: Ann. propr. ind. 1973, p. 245, note J.-J. Burst)*.

This solution is also upheld by section L. 613-8, paragraph 4, of the Intellectual Property Code which provides that: *"Subject to the cases referred to in section L. 611-8, assignment of the rights referred to in the first paragraph shall not affect the rights acquired by third parties prior to the date of assignment."*

**60. - Usufructuary** – A usufructuary is allowed to grant a licence *(P. Mathély, Le droit français des brevets d'invention: LJNA 1992, p. 326. - J.-J. Burst, Breveté et licencié : leurs rapports juridiques dans le contrat de licence : 1970, n° 28, p. 28)*.

**61. - Joint ownership -** Each joint-owner is allowed to grant an exclusive licence if they have the unanimous consent of all other joint-owners or with a court order *(CPI, s. L. 613-29, d)*; if the licence is non exclusive they may grant it on their own *(CPI, s. L. 613-29, c)*. However, the draft licence must be notified to the other joint owners along with an offer to sell their ownership share at a certain price.

Within three months of this notification, any of the joint-owners may oppose the grant of the licence provided that they buy the share of the owner who wishes to grant the licence. If agreement cannot be reached within three months, the price is set by the Tribunal de Grande Instance. The parties have one month from the notification of the judgement or, if there are appeal proceedings, from the final ruling, to waive the grant of the licence or the sale of their joint-ownership share, without prejudice to any damages that may be payable; in this case costs would be paid by the party making the waiver.

**62. - Licences granted by a spouse under a joint estate -** As there are no specific regulations governing a patent licence granted by one of the spouses of a joint estate, the applicable rules would be under the general law governing joint estates for spouses. section 1421 of the Civil Code provides that each of the spouses has the power to single-handedly manage jointly held assets, although they would remain liable for any faults or negligence in their management of the estate. As long as they are not fraudulent, any transactions entered into by one spouse are binding on and enforceable against the other.

However, when the asset is owned by only one of them, the spouse who owns it has the right to manage and use said asset and can dispose of it freely *(s. 1428 of the Civil Code)*.

**63. - Licence granted by an attorney** – As it is considered a general transaction* an authorised agent may grant a licence under a general power of attorney, whereas a special mandate is required for assigning the patent *(s. 1988 of the Civil Code)*.



   \*    Note of Translator:    chosen translation for *"acte d'administration"*.

It is advisable to verify the authority of the attorney before entering into any contract with them.  The best proof of their authority is asking them to present the written power of attorney.  It should be noted that under commercial law the burden of proof is much lighter, so a mandate can be proven by means other than a written document if the licensor has the status of being in trade.

In any case, it is also possible to apply the theory of apparent mandate. But for this so-called apparent mandate to exist, the circumstances must not allow third parties to verify the exact restrictions of the authority of the apparent attorney (*French High Court. Full Court., 13 Dec. 1962: D. 1963, jurispr. p. 277, note Calais-Auloy. - see also for examples, French High Court. com. 29 March 1966: JCP G 1967, II, 15310. - French High Court. com. 29 Apr. 1970: Bull. civ. 1970, IV, n° 125. - French High Court Com. 5 June 1972: Bull. civ. 1972, IV, n° 169*).

Third parties who enter into contracts with the legal representatives of commercial companies must check that the person they are dealing with does indeed have this capacity by asking for a K *bis* extract from the Trade and Companies Registry.

This simple formality would suffice when dealing with the legal representative of a public company (SA or société anonyme), a partnership with liability limited by shares (SCA) or a limited liability company (SARL). These companies are in fact legally bound to transactions entered into by their directors even if these transactions are not directly related to the company purpose, unless they can prove that the third party knew that the transaction was outside the scope of this company purpose or should have known under the circumstances *(s. L. 223-18, paragraph 5; s. L. 225-35, paragraph 2; s. L. 225-56, paragraph 2; s. L. 225-64, paragraph 2 and s. L. 226-7, paragraph 2 of the Commercial Code)*.

However, if the contract was with the general manager of a general partnership or with the representative of an economic interest group, it would be advisable to look at the by-laws to ensure that the proposed licence contract complies with the company purpose. If not, the approval of an extraordinary general meeting would be required *(ss. L. 221-5, L. 221-6 of the Commercial Code,).* The same rule applies to the representative of an economic interest group *(s. L. 251-11, paragraph 2 of the Commercial Code,).*

## 3° Subject matter

**64. -  Subject matter of the contract and subject matter of the obligation** – The general law pertaining to contracts distinguishes between the subject matter of the contract which encompasses all of the contractual operations described in its content and the subject matter of the obligations of the parties. The same distinction applies to licence contracts for patented inventions, but in this case there may be some difficulties in interpretation when the clauses have not been worded clearly.

Pursuant to the general law, the subject matter of the contract may be distinguished from the subject matter of the obligation. However, if the clauses of the contract are not clearly worded then some difficulties in interpretation arise.

### a) Subject matter of the contract

**65. -  Definition of the subject matter/Defining the purpose** – The subject matter of the contract is the legal transaction envisaged by the parties.

According to section 1108 of the Civil Code, the existence of a *"definite subject matter that forms the substance of the agreement"*, is an essential condition of the validity of a contract; so if there is no patent at the time the licence contract is signed, it will be declared null and void *(French High Court. com. 20 Oct. 1999: PIBD 1999, n° 687, III, p. 499).*

**66. -  Subject matter** – The subject matter of a licence contract is the licensee's use of a patented invention. But this right of use can be more or less extensive depending on the terms of the contract.



#### 1)  The licensee's right of use

**67. -   The licensee's right of use: a personal right** – The licensee's right over the invention is in fact a personal right of use, like the right of a person leasing a tangible asset. The licensee has a personal right enforceable against the patent holder, which means that the patent holder must give certain benefits with regard to the invention and the patent, but the licensee does not have a real right over the licensed invention.  Indeed, it has consistently been reinforced through case law that the licensee's right is a personal right of use, which can be likened to the right of a tenant.

For example:

- the licence contract is nothing more than the hiring of a thing *(Court of Appeal of Orléans, 18 July 1892: S. 1895, 2, p. 134; D. 1893, 2, p. 329)*;
- a licensee can be assimilated to a tenant and the rules of leases are applicable to licence contracts *(Commercial Court of Seine, 6 Nov. 1919 and Court of Appeal of Paris, 20 June 1922: Ann. propr. ind. 1922, p. 353)*;
- a licence contract has all the same characteristics as a lease contract, as it is simply the permission granted to exploit the patent *(Commercial Court of Boulogne-sur-Mer, 20 Oct. 1923: Ann. propr. ind. 1924, p. 32)*;
- a patent licence can be assimilated to a lease contract; its effects are spread over time and thus constitutes a contract for successive performance *(Court of Appeal of Paris, 21 Oct. 1999: PIBD 2000, n° 696, III, p. 181)*.

All authors indicate that a licence contract has all the characteristics of leases and agree that the provisions of sections 1713 of the Civil Code therefore apply *(P. Roubier, Le droit de la propriété industrielle, op. cit. n° 184. - E. Pouillet, Traité théorique et pratique des brevets d'invention et de la contrefaçon: Paris 1906, n° 284. - A. Casalonga, Traité théorique et pratique des brevets d'invention: LGDJ 1949-1958, 3 v. - J.-J. Burst, op. et loc. cit. J. Foyer and M. Vivant, op. cit. p. 432 and 440. - F. Pollaud-Dulian, Droit de la propriété industrielle: Montchrestien coll. Domat droit privé, 1999, n° 628 et seq. - Contra J. Morel, De la licence d'exploitation en manière de brevets d'invention: thesis Lyon 1926. - M. Planiol, note ss Court of Appeal of Orléans, 13 July 1892: DP 1893, 2, p. 329. - see above n° 27)*.

However, this right of use granted to the licensee under the contract may vary considerably in its scope.

#### 2)  Scope of the right of use.

**68. -   Content of the right of use: licence for manufacturing and/or sale -** A licence is usually granted for both manufacturing and sale.  It may also be granted for manufacturing only or for sale only. .

There is a separation of the licence for manufacturing and the licence for sale in cases where a patent holder cannot grant a complete licence to the same licensee because this licensee may have the industrial assets required for manufacturing, but does not have the means to sell or vice-versa.

**69. -   Full or partial licence -** A licence may be granted for all possible applications of the invention or only for certain applications.

In many cases, the applications for which a licence is granted are clearly defined; but in some cases this definition is unclear and difficult.  In this case, it could be questioned how to interpret the clause. It seems inappropriate to apply the principle of strict interpretation as this would unduly restrict the rights granted to the licensee, which would be against the warranty obligation incumbent on the patent holder.



The judge must interpret the clause in favour of the licensee. Therefore, even if it is not expressed in the contract, the licensee has a right to enjoy all the prerogatives attached to the patent. Any relevant clauses must therefore be very carefully worded. *(Court of Appeal of Paris, 17 March 1900: Ann. propr. ind. 1900, p. 78)*.

For patents issued since the introduction of the Law of 2 January 1968 which has very precise requirements, it must now be specified, in reference to these requirements, which part of the patent is licensed.

**70. - Territorial scope of the right of use -** A licence, unless formally restricted, is supposed to be granted for the whole territory for which the patent was issued.

However, it is conceivable that a licence would have territorial limits: the licensed territory could be a province or a region, etc. If the licence is limited to a certain territory, it does not apply to other territories *(Court of Appeal of Paris, 12 Oct. 1965: Ann. propr. ind. 1966, p. 32. - see also French High Court. Com. 25 April 1968: Bull. civ. 1968, IV, n° 130)*.

However, it must also be noted that a patent holder has the right to define the place of manufacturing and sale. Does this mean that the patent holder also has the right, if granting a licence for manufacturing and sale, to prohibit the licensee from selling to purchasers outside the licensed area?  The response to this question must be carefully qualified.  They are probably allowed to prohibit the licensee to actively pursue sales in the sector of another licensee: however, they are without doubt not allowed to prohibit the licensee from selling to a purchaser who is based in another sector, but has spontaneously come to buy from the licensee.

**71. - Exclusive or non-exclusive right of use -** A licence is exclusive where the patent holder undertakes not to grant other licences for the same invention and for the same territory.  A licence is non exclusive if there is no such commitment from the patent holder.

**72. - Exclusive licence and the licensor's right to exploit the patented invention–** It appears that an exclusive licence does not preclude the patent holder from operating the invention at the same time as the licensee; and it does not seem to matter if the patent holder has exploited the invention before or after entering into the licence contract *(J.-J. Burst, op. cit. n° 209, p. 117)*.

A decision of the Court of Paris on 1 May 1902 *(Ann. propr. ind. 1903, p. 258)* ruled that the exclusive licence clause did not necessarily imply the loss of the right to grant other licences.  As a waiver of a right cannot be presumed, the patent holder's right to personally exploit the invention remains intact in terms of ownership, without them having to expressly provide for this. The solution adopted by the Court of Paris does however give rise to the question of whether the Court had not simply recognised the patent holder's right to exploit due to the factual circumstances whereby the patent holder was already exercising this right at the time of granting the licence.

Some legal authors have concluded from this decision, by reasoning *a contrario*, that if the patent holder had not already commenced exploiting the invention at the time of entering into the licence, they would not be able to commence exploiting afterwards.  In this case, the patent holder would be deemed to have tacitly waived their right to exploit.

Other decisions of the judges of first instance do not seem to make any distinction between whether or not the patent holder is already exploiting the invention at the time of entering into the licence contract. It has therefore been ruled that if a patent holder grants a licence, no matter how exclusive or full it may be, this does not mean that the patent holder gave up his right to exploit *(Commercial Court of Seine, 21 Dec. 1917 and Commercial Court of Paris, 7 Nov. 1919: Ann. propr. ind. 1920, p. 150)*.

It is true however that the French High Court did rule as follows in one particular decision: *"in the event of an exclusive licence for France and all other countries, the patent holder is prohibited from having the patent exploited by any party other than the licensee, but does not commit to filing patent applications in all other countries" (French High Court 1st civ., 26 Jan. 1955: Ann. propr. ind. 1956, p. 1)*.



Moreover, a more recent judgement in the area of trademarks ruled that unless there was a clause in the contract providing otherwise, the owner of the trademark was prohibited from using it *(French High Court. com. 10 Jan. 1995, n° 92-18.923: Bull. civ. 1995, IV, n° 12)*. The question is then whether this solution could be transposed to the case of a licence for a patented invention.

This solution does not seem well-founded. From the perspective outlined above, the exclusivity of a licence can only have the consequence of prohibiting the patent holder from granting other licences. The expression "exclusive licence" is sufficiently clear: it is the licence that is exclusive and not the right to exploit that is granted under the licence. Therefore, where the patent holder exploits at the same time as the licensee, they do not exploit by virtue of a licence but by virtue of their actual right to the patent which they have not assigned.

Moreover, a waiver of a right cannot be presumed. So only in a case where the contract provides that the right granted to the licensee is an exclusive right of exploitation would the patent holder be prohibited from exploiting the patent at the same time as the licensee. It is even more important to expressly state this in the contract given that case law on this point is not completely settled.

Some decisions consider that the exclusivity granted to a licensee does not prevent a patent holder from operating at the same time as that licensee *(District Court of Paris, 18 Dec. 1985: PIBD 1986, n° 390, III, p. 175)*, while others hand down the opposite ruling *(District Court of Marseille, 3 July 1987: PIBD 1987, n° 420, III, p. 387)*.

It was also ruled that a licensor who actively pursued clientele in France and the United States after granting a "general and exclusive licence" of a French patent had committed a fault. Interestingly, this company was penalised on the grounds of unfair competition and even in the United States where no patent had been filed by the licensor. The contract provided for the possibility of the licensee filing the patent at their own costs but in the name of the patent holder *(Court of Appeal of Paris, 26 Oct. 1987: D. 1988, somm. p. 348)*.

**73. - Exclusive Licences and agreements that restrict competitions** – It is worth noting that the exclusivity of a licence may in certain circumstances by considered null and void as it is actionable under Article 81, paragraph 2, of the Amsterdam Treaty *(formerly the EC Treaty, Article 85, paragraph 2)* which in paragraph 1 sets out the principle of prohibition of agreements, decisions by associations of undertakings and concerted practices which restrict competition, subject to a possible repurchase under paragraph 3.

It was still ruled that a patent holder who granted an exclusive licence for the territory of a given State must warrant that territory against exports of articles produced in that country by beneficiaries of licences granted for other territories *(French High Court. com. 8 Dec. 1970: Bull. civ. 1970, IV, n° 337)*.

**74. - Non exclusive licence and the licensor's right to exploit the patented invention** – Where the licence is non exclusive, the patent holder obviously keeps the right to exploit and grant other licences to other licensees.

The parties to a licence contract sometimes include **a so-called « most favoured » clause**. This clause is mainly included in non exclusive licences, but it can also be included in exclusive licences. But in the second case, the issue can only arise where the patent holder has granted what are known as parallel licences, namely licences for another country where there is a valid patent.

This clause must also be very carefully drafted so there is no doubt about its scope. It usually concerns the amount of royalties. A patent holder, who has granted a licence at a certain rate, makes the commitment that if they grant other licences at a lower rate, they will reduce the royalties payable by the previous licensees to the new more advantageous rate. But the most favoured clause can also apply to other terms and conditions of the licence. Hence the need to be very specific and clear about the terms of the contract to which the clause applies.

The most favoured clause can give rise to certain issues. For example, a patent holder who grants one or more licences in consideration of certain royalties, and then enters into a cross-licence agreement under which licences are granted free of charge in exchange for a reciprocal free licence. Would this mean that the clause is breached in this case? The answer is obviously no, but the situation created in this instance is unclear.



### b) Subject matter of the parties' obligations

**75. - Definition** – The subject matter of the obligation is the "thing" over which there is an obligation.

**76. - Obligation of the patent holder** – The subject matter of the patent holder's obligation is first and foremost a patented invention, but this subject matter may in certain contracts also include a non patented invention called know-how, or technical assistance.

**77. - Obligation of the licensee** – The subject matter of the licensee's obligation is the price they must pay.

### 1) Subject matter of the patent holder's obligations

**78. - Patented invention** – The main subject matter of patent holder's obligation is still the patented invention; there would evidently not be a licence contract for a patented invention without the granting of a patented invention.

However, it is worth clarifying this assertion. Usually a licence contract is for a patented invention, namely an invention for which a patent has already been issued. However, there is no reason why a licence cannot be granted for an invention for which a patent is in the process of being issued.

**79. - Licence granted for a patent in the process of being issued** – When a contract is for an invention that is in the process of being patented, it is important to determine what happens if the patent is refused in one or all of the countries in question. A licence for a non patented invention that is under patent application is obviously much riskier than a licence for a patented invention.

It would be in the licensor's interest to be closely involved in the patent application process with the licensee, so that the licensee cannot accuse them of negligence or a poor defence of the invention.

It may also be worthwhile for the licensor to let the licensee choose which countries they wish to file a patent application in and then to closely follow the process with them.

**80. - Lapsing or termination** – Normally if the patent application is rejected in a country, the contract would be lapsing for this State. This lapse would be defined as: *"a valid legal transaction which is then deprived of any effect due to a development that occurred after its formation" (R. Guillien and J. Vincent, Lexique des termes juridiques, under the supervision of S. Guinchard and G. Montagnier: Dalloz, 15th ed. 2005).* In other words, lapsing is the state of no longer having legal effect, in which a legal transaction that was initially valid has now become, due to the disappearance of one of the elements required to constitute a contract, or the loss of an external element on which its legal validity was dependent. A contract that has lapsed no longer has any effect in the future. Some legal experts *(J. Azéma and J.-C. Galloux, Droit de la propriété industrielle: Précis Dalloz, 6th ed. 2006, n° 448, p. 279)* consider a failed patent application to be grounds for the resolution of the contract for non-performance. This solution is based on the fact that the right, and therefore the subject matter, existed at the time the application was filed but not at the end of the patent issue process. Due to this fact, if the patent is not issued, the licensor does not have the capacity to perform their contractual obligations, namely to grant the enjoyment of the patent. This resolution does not have a retroactive effect if it is a contract with successive performance, which is the case of a licence contract.

The debate over whether the contract should be declared to have lapsed or whether it should be terminated remains unresolved. In practical terms, the legal consequences are the same, either way the licence contract will no longer have any effect in the future.

The consequences of these solutions must however be qualified. In many cases the relationship between the licensor and the licensee is not completely made void if the patent is not issued. Indeed, the licence contract is



often linked to other contracts or clauses that grant benefits to the licensee. This is the case where know-how is also transferred or where a trademark, which would in principle be accessory, is included in the licence for the patented invention.  The licensee would thus continue to benefit from the other contracts and clauses that grant such benefits.

**81. -   Absence of the distinction between the rights that are the subject matter of the licence –** There is obviously no distinction made between an invention protected by a patent or by a certificate of utility; the invention may still be licensed regardless of the right protecting the invention .

**82. -   Cancellation of the patent and cancellation of the contract –** In any case, under the general law, there must be a subject matter.  This means that if the patent was cancelled after the licence was signed, the contract would be cancelled due to lack of a subject matter, and this cancellation would be retroactive *(Court of Appeal of Paris, 16 Jan. 1998: Ann. propr. ind. 1998, p. 25)*. Similarly, there would be no subject matter if the patent had lapsed at the time of entering into the contract *(French High Court. com. 13 June 1978: Dossiers brevets 1978, IV, n° 3. - District Court of Paris, 12 Nov. 1999: PIBD 2000, n° 698, III, p. 250)* or if the licensed invention was not patented *(French High Court. com. 20 Oct. 1999: PIBD 1999, n° 687, III, p. 499)*; the lapse of the patent during the performance of the contract would also result in the contract having lapsed or being terminated.  Either solutions could be contemplated.

**83. -   Improvements –** The licensed invention can be subject to improvements.  Moreover, a patent holder may discover improvements to the licensed invention during the course of the contract.  Both of these scenarios must be examined.

**84. -   Improvements existing at the time of entering into a licence contract –** Improvements that have already been made by the patent holder at the time of entering into the contract can be protected by either a long right (a patent) or a short right (a certificate of utility). Where these improvements are indicated in the contract – regardless of which right they are protected under – they constitute part of the subject matter of the patent holder's obligation.  But what if the contract does not indicate that the patent holder is also licensing the improvements made to the invention and already under protection at the time of entering into the contract?  Should they be considered as implicitly included in the licence?  This is an issue that remains unresolved.  However, it could be argued that the licensor should communicate these improvements to the licensee by virtue of their delivery obligation which also includes delivery of anything accessory to the leased thing.  It is difficult to refute the argument that these improvements would be accessory to the original invention.

**85. -   Improvements discovered and protected after entering into the licence contract -** A licensee has no claim to the improvements made by a licensor after commencing the licence contract.  However, the patent holder may undertake to license any improvements to the invention that they may discover after entering into the contract. But the concept of improvement may raise issues.  Is an improvement defined as a new invention that is technically linked to the original invention, which may be licensed? In this case, some legal experts refer to improvements from a technical perspective *(J. Azéma and J.-C. Galloux, op. cit. n° 455, p. 282)*. Conversely, could it mean any new invention that may successfully compete on the market with invention covered by the original patent?  In this case, it could be referred to as an improvement from a commercial perspective. *(J. Azéma and J.-C. Galloux, op. cit. n° 455, p. 282)*.

Some decisions have strictly defined the concept of improvement by affirming that it must be directly linked to the first invention *(French High Court. com. 16 July 1957: D. 1958, jurispr. p. 407. - Court of Appeal of Lyon, 5 Dec. 1974: RTD com. 1975, p. 295, obs. A. Chavanne and J. Azéma)*. The District Court of Avesne-sur-Helpe ruled in favour of the second theory in a judgment dated 2 February 1961 *(D. 1961, jurispr. p. 652, note Vasseur)*. This very unconvincing position is excessive.  The risk is that it may result in an invention that no longer has any technical link with the original invention being considered an improvement thereof.  Indeed, *"the choice between*



*the two proposed options must be made according to a criterion that gives as much certainty as possible to the actual concept" (J. Azéma and J.-C. Galloux, op. cit. n° 455, p. 282).*

In any case, this debate shows how important it is to include in the contract the most precise description possible of what the contracting parties would consider to be an improvement, in order to avoid disputes.

**86. -    Non patented technical knowledge or know-how** – Where a licence contract is only for one or more patented inventions, it is often called a "simple" or "straight" licence.  But the parties can also agree that the patent holder will not only grant the patented inventions but also their non-patented technical knowledge, referred to as know-how.

**87. -    Combined licence** – The concept of *know-how* comprises a range of technical information for which a person who wishes to save money and time is willing to pay a certain amount of money.

The licensee may wish to acquire this know-how which would enable them to exploit the licensed invention in optimal conditions and would avoid the need to conduct research or trials which can be lengthy and costly. The parties would then agree that the patent holder will transfer their know-how to the licensee.  This is then called a combined licence: for a patented invention and know-how.

**88. -  Content of know-how** – The tricky thing is specifying the exact content of the know-how in order to avoid any later discussions on the nature and scope of the know-how that must be communicated.

**89. -    Terms and conditions for the transfer of know-how** – There should also be very specific terms and conditions for how this know-how is to be transferred: submitting plans, files, drawings, receiving the licensee's employees at the patent holder's premises, sending the patent holder's employees to the licensee's premises.

**90. -    Price for the provision of know-how** – It is obvious that the price for providing this know-how should also be set very clearly.

**91. -    The costs involved in the transfer of know-how** – It would also be advisable to determine which party to the contract will bear the costs of transferring know-how, particularly when the patent holder has committed to provide not just the know-how they have at the time of entering into the contract, but also the know-how that they may develop during the term of the contract.  It may eventuate that in order for the licensee to receive this know-how, there may be frequent travel required by the employees of either the licensee or of the patent holder, which would incur significant costs.

If there are no provisions in the contract on this point, it seems that it would be decided that the costs of transferring know-how would have to be paid by the licensee by virtue of the principle that debts are payable at the debtor's address and not at the creditor's address *(see Fasc. 4710)*. If there is no formal commitment to the contrary, the patent holder's obligation is to make available rather than physically deliver the know-how. As a result the only obligation incumbent on the patent holder is to remove the secrecy around the know-how. This is where there is a close relationship between the licence contract for a patented invention and a contract for know-how. Both have the subject matter of giving the holder of the technique an obligation to remove the obstacle to exploiting the technique: either a legal obstacle in the case of a licence for a patented invention, or a tangible obstacle (commercial secrecy) in the contract for know-how.  That is why the terms contract for communicating know-how are not exactly correct; it would be more accurate to call it a contract for revealing know-how.

Finally, the contract should include all clauses that would be usually found in contracts for communicating know-how, in particular the confidentiality clause.

Obviously a patent holder who commits to providing their know-how to the licensee in a formal provision of the contract must perform their contractual obligation.  However, if the patent holder has never mass-produced the invention – a fact which the licensee should have known – they do not have an obligation to transfer the



knowledge and experience related to the practical application of the invention *(District Court of Paris, 20 Feb. 1989: Dossiers brevets 1989, V, n° 9)*. The obligation that they have agreed to under the contract is an obligation of due diligence only, the so-called "obligation to provide means".

**92. -   Know-how and technical assistance -** The licence contract can include a clause obligating the licensor to assist the licensee with the implementation of the patented invention.   Technical assistance should not be confused with know-how. It is complementary and subsidiary to the patented invention licensed and/or the know-how transferred. In practice, a patent holder who licenses a patented invention only has to give a copy of the patent to the licensee; if they have also committed to providing know-how they only have to submit documents that provide the practical information and support materials for this know-how.  However, there are some cases where submitting documents would not be sufficient to enable the licensee to implement the technical knowledge transferred.  The licensee would have to be trained in how to exploit the technique, as their employees may not be sufficiently qualified.

**93. -   Content of the technical assistance -** The contract must also be very explicit about the duration of this technical assistance, its terms and conditions, its scope, and finally who will pay any associated expenses.  *(see J.-J. Burst, L'assistance technique dans les contrats de transfert technologiques: D. 1979, chron. p. 1)*.

Where the patent holder has committed to provide *"their technical collaboration in order to ensure the results obtained are as desired"*, they will be partially liable for the failure of the operation *(District Court of Paris, 5 Feb. 1985: D. 1987, somm. p. 133, obs. J.-M. Mousseron and J. Schmidt)*. This type of clause for technical assistance would mean that the licence is also a joint venture agreement under which the parties have an obligation to work together to ensure the success of the operation.

**94. -   Licence for a trademark -** A licence for a patented invention can also be paired with a trademark licence, as an accessory to the first contract. It could also be the other way around, namely that the patent licence is accessory to the trademark licence. In either case such contracts should be carefully drafted in order to provide separate remuneration for each of the licences, which would be especially important in the event that the contract is partially cancelled due to the cancellation of either the patent or the trademark.

**2)  Subject matter of the licensee's obligations**

**95. -   Obligation to exploit the invention and pay a price –** The subject matter of the licensee's obligation is firstly to exploit the licensed invention and secondly to pay the price.  The obligation to exploit will be examined in further detail below, as it does not raise any issues at the time of entering into the contract.

However, when it comes to price, it is important to note that it must be determined or determinable, as this is a condition required for the validity of the contract.  A licence is generally a paid contract.  If there is no price it is likely to be reclassified as a gratuity.  However it should be noted that the absence of price does not necessarily mean that it is gratuitous.  If the patent holder gets a benefit, particularly a commercial benefit, then this constitutes consideration.  Some legal experts consider a licence without a price as a loan for use *(R. Fabre, Le prêt à usage en matière commerciale: RTD com. 1977, p. 193 and more specially p. 213)*.

**96. -   Setting the price –** The price may take two forms.  It can be a lump sum (cash) or proportional fees based on the extent to which the patent is exploited (royalties). In the second case, the price is set proportionally to the turnover made by the licensee by using the patented invention (see in particular on this issue, *F. X. Testu and S. Hill, Le prix de la licence de brevet dans les hautes technologies: l'exemple des biotechnologies : JCP E 2008, n° 9, p. 1269)*.

The question that arises is whether such clause regarding royalties based on the turnover made by the licensee meets the requirements of the rules of price setting laid down by the Civil Code. The Civil Code expressly requires certain contracts and in particular sales contracts, to have a price that is determined *(s. 1591)* or, at least,



determinable *(s. 1592)* at the time of payment in accordance with the provisions of the contract. The courts have, pursuant to the *Eurobra* precedent *(French High Court. com. 11 Oct. 1978: D 1979, jurispr. p. 135, note R. Houin; JCP G 1979, II, 19034, note Y. Loussouarn)* extended this price setting requirement to all contracts involving payment, but the requirement is no longer based on the above texts related to sales, but on section 1129 of the Civil Code regarding all contracts involving payment. It could be argued that setting a price in patent licence contracts in the form of royalties based on a percentage of the licensee's turnover meets the requirements of section 1129 of the Civil Code, which states that the subject matter of the obligation of the contracting parties, namely the price, should be determined or determinable. However, the validity of such a clause could be questioned after a decision of the Court of Appeal of Paris on 22 November 1972 *(D. 1973, jurispr. p. 93, note Malaurie)* handed down in the area of sales. The Court of Paris decided that the price was not determined because its amount depended on the results obtained by the purchaser using the purchased asset. With regard to the patent licence contract, could it not be claimed that the method of determining the price in proportion to the licensee's turnover does not meet the requirements of section 1129 of the Civil Code, if the amount of the price is dependent on the licensee's volume of activity, then does the price not depend completely on the will of the licensee alone? This becomes a risk when a combined method is used for determining royalties: a lump sum, supplemented by proportional royalties.

In four decisions dated 1 December 1995, the Full Court of the French High Court ceased the application of section 1129 of the Civil Code to price setting in contracts *(D. 1996, jurispr. p. 4, concl. M. Jéol, note L. Aynès; JCP E, II, 776, note L. Leveneur; Defrénois 1996, art. 36354, note Ph. Delebecque. - Colloque Paris, la détermination du prix: nouveau enjeux un an après les arrêts de l'Assemblée plénière: RTD civ. 1997, p. 1). "Case law is not ready to admit the validity of a sale made at the price given by the vendor subject to the judge controlling that there is abuse" (Ph. Malaurie and L. Aynès, les contrats spéciaux: Cujas, 1998, 12th ed.).*

This requirement of a determined or determinable price means that it is all the more important that the remuneration of the improvements licensed by the patent holder during the term of the contract, where the patent holder has not made any such commitment, is governed by a clause in the contract *(see above n° 82)*. In any case, the basis for calculating the royalties should be strictly related to the turnover derived from the licensed invention.

**97. -   Indivisible nature of royalties** – The Courts have been asked to give details on the issue that royalties cannot be split. Therefore in the event of licences for two patents having two different filing dates, the royalties are still payable in full without any possible discount when each patent expires one at a time. *(Court of Appeal of Paris, 13 Apr. 1959: Ann. propr. ind. 1959, p. 228)*.

**98. -   Contract for the loan of a patent**– Finally, there are cases where the licensee does not have to pay any price as no financial consideration is provided for under the contract. In this case, legal authors would classify this contract not as a gratuity but as a loan for use *(R. Fabre, Le prêt à usage en matière commerciale: RTD com. 1977, p. 193 et seq. and more specifically p. 213 and 231)*. It is what is known as a patent loan agreement. The consideration is indirect. It could be a way for the patent holder to test the market or to optimise the development of improvements to the invention *(F. X. Testu and S. Hill, op. cit.)*. Again, it is obviously advisable to draft the contract very carefully and specify the consideration involved, even if indirect. This would avoid the courts *"fiscally classifying this granting of a right to use as an irregular management transaction" (F. X. Testu and S. Hill, op. cit.)*.

**c) Interpretation of the licence contracts for a patented inventions**

**99. -   Plan** – If there is no clause or an unclear clause on a particular subject, disputes may arise. In this case an interpretation of the contract would be required. It is therefore useful to quickly examine what causes the need for interpretation and the principles of interpretation.

**1) Causes of interpretation**



**100. -   The confusion between "licence" and "assignment"** – In practice, the causes of interpretation are usually based on the issue of whether the contract is a licence contract or an assignment.

**101. -   Interpretation of the contract in favour of "licence"** - In principle, an assignment versus a licence for a patent are as different as a sale versus a lease of a tangible asset. However in practice, the confusion between a sale and lease is easier to resolve than the difference between a licence and an assignment. This is because a patent is a temporary right, but also and especially because it is over an intangible asset which can be exploited simultaneously be different parties.  Finally, one of the main reasons is that because of the more random nature of operating the patent, both types of contracts opt for a price calculated in accordance with turnover derived rather than one lump sum amount. So there is very little difference between the price set in an assignment of a patent, and the royalties paid under a licence.

It must be noted that the distinction between an assignment and a licence is very important from a fiscal point of view.  Issues arise when there is doubt over the meaning of the contract, and where there are not enough clear indications to give an answer. The contract in question would have to be interpreted as a licence contract by virtue of the general rule in the general law pertaining to contracts by which if there is any doubt, contracts should be interpreted in favour of the person who has agreed to the obligation *(s. 1162 of the Civil Code)* and because a licence takes less from the patent holder than an assignment *(see Pouillet, op. cit., n° 275)*.

The courts have a full discretion to appreciate facts: they assess on a case by case basis whether the contract in question is an assignment or a licence, as well as interpret the licence to decide whether it is exclusive or partial. It is worth dividing the decisions handed down on this point into two categories: whether they are interpreted as licences or assignments.

It was ruled that there was a licence and not an assignment in the following cases:

1° The contract that granted the right to manufacture and sell machines or instruments covered by a patent, just as the patent holder manufactures and sells the same articles, was considered by an interpretation of the courts based on the terms of this contract, as granting just the ability to exploit and not granting part of the ownership of the patent *(French High Court. req., 8 March 1852: DP 1852, 1, p. 80)*;

2° The right to exploit a patented invention alone and in a certain location, with the stipulation that firstly this right would not be transferable and was personal to the licensee, and that secondly any proceedings against infringement could only be brought by the patent holder, could be considered as excluding any concept of assignment and was just a licence right *(French High Court. req., 27 Apr. 1869 and Court of Appeal of Rouen, 10 June 1868: DP 1870, 1, p. 122; Ann. propr. ind. 1869, p. 225)*;

3° It was found that there was just a licence, and not an assignment, when examining the terms of an agreement under which the patent holder granted the right to exploit in consideration of royalties, while reserving ownership of the patent *(Court of Appeal of Paris, 5 March 1884: Ann. propr. ind. 1885, p. 42)*;

4° There is a licence and not an assignment of patents where the contract provided for the enjoyment and assignment of a patent in twenty-four departments, at the cost of royalties paid to the owners of the patent, and which also provided for the conditions under which the patent holders could reclaim their freedom to act in relation to the patent.

> **Commercial Court of Nantes, 28 Feb. 1912: Ann. propr. ind. 1913, p. 218**
>
> Whereas it is sufficient to examine the terms (of the contracts) to conclude that in this case it is a licence and not an assignment.
>
> Whereas not only does the contract expressly mention the actual word « licence », but states that L...., shall have the use and right to sell in twenty-four departments, in exchange for the payment of a royalty to the Bilange heirs or their legal successors in the event of the sale of the patent with said licence attached.



> Whereas in addition, the owner of the patent would reclaim their freedom to act in the departments that did not have a factory that was working in 1990.
>
> Whereas even if the word itself was not enough to define the nature of the contract, the terms and conditions under which it was entered into cannot cast any doubt on this point.

5° There is a licence for patents where it can be implied from the circumstances of the offer made by the patent holder, that the licensee accepted the offer under the proposed terms and conditions, paid royalties, of which receipt was given thereof by the patent holder and, generally speaking, fulfilled the obligations set out in exchange for the licence *(Civil Court of Rouen, 14 May 1928: Ann. propr. ind. 1929, p. 13)*.

**102. - Interpretation of the contract in favour of an "assignment"** – Case law made the opposite ruling that there was an assignment and not a licence as follows:

> 1° That the granting of the right to exploit a patented process exclusively and in a determined location, constituted a true assignment which gave the party involved the patent holder's monopoly *(Court of Appeal of Metz, 6 July 1865, under the French High Court, 24 Nov. 1866: Ann. propr. ind. 1866, p. 416)*;
> 2° That the granting of the exclusive right to exploit a patent over a certain period with the express reserve of ownership in favour of the assignor, could be considered as an assignment, not of the ownership but of the usufruct of the patent *(Court of Appeal of Rouen, 2 Jan. 1869: S. 1869, 2, p. 300)*;
> 3° That the granting the exclusive and absolute right to exploit a patent without reserves to a company would give said company all the effective rights of an assignee during its term *(see a critical analysis of this decision, Allart, op. cit. n° 256. - French High Court, 14 March 1884: Ann. propr. ind. 1885, p. 73)*;
> 4° That where a person granted the exclusive right to exploit the patent has also been given the authority to take direct legal action against infringing parties, these circumstances would presume that this is not a licence but in reality an assignment, especially as the agreement was classified as such in a letter finalising and confirming the rights and obligations of the parties *(Court of Appeal of Rouen, 14 Dec. 1892: Ann. propr. ind. 1893, p. 180)*;
> 5° That a contract formalising the agreement of the parties on the thing that is its subject matter as well as the price at which said thing would be transferred from the ownership of one party to another, has the essential characteristics of a sales contract. In this matter it could not be claimed as a licence to exploit patents. The concept of a licence, which implies that the licensor retains the actual ownership of the patents for which they have granted permission to use, would exclude this transfer of ownership which is explicitly and repeatedly mentioned in the contract *(Commercial Court of Seine, 2 May 1928: Ann. propr. ind. 1929, p. 185)*;
> 6° That a contract stating that *"the current and future patents assigned without any other warranty other than their existence and that the defence of said patents is waived in favour of the licensee to be carried out at their costs, risks and perils"* was not a patent licence but an assignment *(French High Court. com. 16 July 1957: D. 1958, jurispr. p. 107, note Bird. - Court of Appeal of Paris, 23 May 1935: Ann. propr. ind. 1937, p. 138)*.

## 2) Principles of interpretation

**103. - Interpretation in favour of the patent holder** – Issues often arise in the application of a licence, with regard to determining whether, if the laws are not clear on the subject, it should be interpreted in favour of the patent holder or the licensee. It could be argued that there is a general principle, in the absence of any other clues, that a licence should be interpreted in favour of the patent holder and against the licensee, pursuant to the Civil Code *(s. 1162)*, according to which, if there is any doubt, the contract should be interpreted against the party who has stated the terms and in favour of the party who has agreed to said terms. In other words, the limitation of the rights to the patent granted to the licensee should be strictly interpreted. This is especially the case when



determining the territorial scope of the licence *(Court of Appeal of Paris, 12 Oct. 1965: Ann. propr. ind. 1966, p. 32. - see also French High Court. civ., 26 Jan. 1955: Propr. ind. 1956, p. 1. - French High Court. com. 25 Apr. 1968: Bull. civ. 1968, IV, n° 130).*

**4° Cause**

**104. -   Valid cause –** The existence of a valid cause is one of the four essential conditions of the validity of a contract *(section 1108 of the Civil Code).* The cause is also what provides the mutual motivation for both parties to enter into the contract.  The Courts sometimes use the argument of cause or more precisely the absence of cause to cancel the licence contract, due to the invalidity of the patent which is the subject matter of the contract: *"Given that for well-founded reasons that the Court also upholds, the first Judges agreed to Mr Borstcher's request to declare as null and void the licence contract dated 2 September 1985 (...) that Mr Borstcher is right to argue that the invalidity of its main claim deprives the contract of its cause" (Court of Appeal of Paris, 16 Jan. 1998: Ann. propr. ind. 1999, p. 24).*

## Bibliography

**H. Allart**
*Traité théorique et pratique des brevets d'invention*: Paris, 3rd ed. 1911

**J. Azéma and J.-C. Galloux**
*Droit de la propriété industrielle*: Précis Dalloz, 6th ed. 2006

**M. Brochon**
*Échanges techniques, stratégies de l'innovation et du savoir-faire technologique*: SCM Publications 1977, Neuilly

**J.-M. Burguburu**
*Les clauses d'exonération et de limitation des responsabilités dans les contrats de licence de brevets et de savoir-faire*: Dossiers Brevets 1994, II

**J.-J. Burst**
*Breveté et licencié: leurs rapports juridiques dans le contrat de licence*: Litec 1970
*La portée de la clause de non-garantie dans les contrats de cession de brevets d'invention en cas d'annulation du contrat*: D. 1976, chron. p. 115
*L'assistance technique dans les contrats de transfert technologique*: D. 1979, chron. p. 1

**A. Chavanne and J. Azéma**
*Le nouveau régime des brevets d'invention*: Dalloz 1981

**A. Chavanne and J.-J. Burst**
*Droit de la propriété industrielle*: Dalloz, 5th ed. 1998

**J.-M. Deleuze**
*Le contrat de transfert de processus technologique*: Masson, 3rd ed. 1982
*Les rémunérations des transferts de technologie*: Dossiers brevets (Centre for business law) University of Montpellier 1980, I

**R. Fabre**
*Le prêt à usage en matière commerciale*: RTD com. 1977, p. 193



**J. Foyer and M. Vivant**
*Le droit des brevets*: PUF 1991

**D. François**
*L'obligation de garantie dans le contrat de transfert de techniques brevetées*: Bull. inf. Weinstein, Sep. 1977, p. 5

**J.-C. Galloux**
*Droit de la propriété industrielle*: Cours Dalloz 2000

**J.-H. Gaudin**
*Stratégie et négociations des transferts de techniques*: Moniteur 1982
*Guide pratique de l'ingénierie des licences et des coopérations industrielles*: Litec 1993

**O. Lestrade**
*L'obligation de garantie dans les contrats d'exploitation de brevets*: thesis Montpellier 1974

**J.-P. Martin**
*Les cessions de licence de brevet d'invention sont-elles opposables aux tiers par leur publication ?*: RD prop. intell. 1998, n° 87, p. 15

**P. Mathely**
*Le nouveau droit français des brevets d'invention*: LJNA 1991

**J. Morel**
*De la licence d'exploitation en matière de brevets d'invention*: thesis Lyon 1926

**J.M. Mousseron**
*L'obligation de garantie dans les contrats d'exploitation de brevets d'invention*: Hommages Desbois, p. 157
*L'obligation de garantie dans les contrats d'exploitation de brevets*: Dossiers brevets 1978, I
*L'arbitre face aux préjudices nés des licences de brevets et/ou de savoir-faire*: Dossiers brevets 1994, II

**J.M. Mousseron and J. Schmidt-Szalewski**
*La gestion contractuelle des risques dans les transferts de techniques*: Dossiers brevets 1993, I

**J.M. Mousseron and A. Sonnier**
*Le droit français nouveau des brevets d'invention*: Litec 1978, coll. CEIPI, n° 22

**B. Phelip**
*Brevets d'invention*: J. Delmas & Cie, 3rd ed

**F. Pollaud-Dullian**
*Droit de la propriété industrielle*: Montchrestien, coll. Précis Domat, 1999

**E. Pouillet**
*Traité théorique et pratique des brevets d'invention et des secrets de fabrique*: Paris, 6th ed. 1915, Taillefer and Claro

**R. Roubier**
*Le droit de la propriété industrielle*: Paris, 1954, v. 2

**J. Schmidt-Szalewski**
*Droit de la propriété industrielle*: Dalloz 1984



**J. Schmidt-Szalewski and J.-L. Pierre**
*Droit de la propriété industrielle*: Litec, 4th ed. 2008

**F.X. Testu and S. Hill**
*Le prix de la licence de brevet dans les hautes technologies: l'exemple des biotechnologies*: JCP E 2008, n⁰ 9, 1269

© LexisNexis SA

---

[i] Translators'note: chosen translation for "jouir". "Jouissance" is translated as the "use".
[ii] Translator's note: direct translation for "autoritaire".
[iii] Translator's note: CPI means the Code of Intellectual Property
[iv] Translator's note: direct translation of "convention". However we believe it is a typo to be replaced by "invention".
[v] Translator's note: chosen translation of "association en participation", a type of general partnership.
[vi] Translator's note: translation from the Latin in the text: "a thing done between others"
[vii] Translator's note: proposed translation of the concept "saisie-contrefaçon"
[viii] Translator's note: chosen translation for "soumis à l'enregistrement" directly translated as "submitted to registration", meaning registration for tax purposes.



Exhibit 13

Philippe MALAURIE ● Laurent AYNÈS

# SPECIAL CONTRACTS

Philippe MALAURIE
Laurent AYNÈS
Pierre-Yves GAUTIER

4th Edition

DEFRÉNOIS
Lextenso éditions



# CIVIL LAW

## Philippe MALAURIE ● Laurent AYNÈS

Presentation of the series

In addition to Philippe Malaurie and Laurent Aynès, the series of Civil Law include authors who are concerned with the renewal of the statement of positive law and related issues.

These textbooks are addressed to those who wish to understand in what is the frame of the social structure– students, academics, professionals – by following a lively and strict method.

Published textbooks

General introduction

Individuals – protection of underage individuals and adults

Assets

Obligations

Special contracts

Securities – land registration

Family

Succession – gifts

Types of antenuptial settlement

---

**Find all our books**
**Defrenois – Gualino - Joly**
**LGDJ - Montchresllen**
**on our website:**
**@www.lextenso-editions.fr**

© 2009, Defrénois, Lextenso éditions
33, rue du Mail, 75081 Paris Cedex 02
ISBN: 978-2-85623-161-6

[Logo
DANGER:
PHOTOCOPYING
KILLS BOOKS]



[…]

**601. Lease of a thing**. – Yet, leases of moveable property are not ignored by the law. The Civil Code mentions it twice (s. 1711 and 1713); two laws regulate leases of intangible moveable property: lease management[i] of a business (s. L.144-1 et seq. of the Commercial Code) and the lease of company shares and members' shares (s. L.239-1 et seq. of the Commercial Code).

Leases of moveable property, secondary in 1804, developed substantially, especially in several fields. In the field pertaining to consumers, where leases may constitute credit transactions[4], when their duration is close to amortisation, if it pertains to property the value of which entirely resides in its use (vehicles, home electrical appliances…): the total sum of the rent represents the price, to which interest is added. The French High Court[5] has held that such a contract was not subject to the rules provided by the Consumer Code[6] pertaining to credit transactions. In the field pertaining to professional equipment, under the form of renting or service-rental: when professional equipment is of great complexity, requires regular maintenance and is quickly outdated due to technical progress (ex: telephone switchboards…), its user is sometimes better off leasing it rather than owning it outright, which avoids making an investment that quickly becomes useless. Leases deal with company shares, in order to facilitate the transfer of small and medium enterprises (SME), as a kind of trial period for the future manager and the current owner, or even as a lease of intangible property. Such a lease is restricted to natural persons only and its possibility must be provided for in the company constitution. The parties would apportion the rights and obligations (dividends, attendance at general meetings, etc.) in the same manner as in a usufruct situation. Its delivery is carried out by recording it in the shareholders' company registry.

Those various types of leases are not identical: in general, the obligations of the lessee are aggravated in the first case while those of the lessor (maintenance, warranty…) are aggravated in the second case. The advantage of leases of moveable property, sheltered from mandatory legislation, is to give free reign to contractual will.

In what measure, when the parties did not express themselves on this point, are the provisions of the Civil Code (s. 1714 to 1762), manifestly drafted for leases of real property, applicable to leases of moveable property?[7] The principle commonly accepted is that the rules pertaining to the parties' respective obligations, to the duration of leases and to the special liability of the lessee for fires or damage caused to it[8] are applicable but not the provisions of the Code pertaining to evidence (s. 1715 et seq.) and to the duration of tacit renewal (s. 1736 and 1759): leases of moveable property are, on those points, subject to the general law of contracts.

---

[4] French High Court. civ 1st, 11 October 1989, *Bull. civ.* I, n° 317; *D.*, 1991.225, n. crit. P. Ancel; *contra* J. STOUFFLET, "The protection of consumers using credit", in *Ét. de Lagrange*, p. 231; J. CALAIS-AULOY and STEINMETZ, *Droit de la consommation*, Dalloz, 7th ed., 2006, n° 335.

[5] Ch. VOLAIT, *La location-service, une technique locative d'équipement pour l'entreprise*, th. Paris I, roneo, 1976; B. GRELON, *Les entreprises de service*, Economica, 1978, n° 302 et seq.; S. DAUPHIN, "L'essor de la location de longue durée", *Contrats, conc.consom*, 1997, chron. n° 2; *below*, n° 824.

[6] V.C. MALECKI, *D.* 2005, chron. 2382.

[7] French High Court. civ., 16 August 1882, *DP*, 1883.I.213, 1st case; *S*, 1884.I.33, n. A. Esmein; *"The general rules applicable to leases of real property are also applicable to leases of moveable property, insofar as they are compatible with the nature of the property."*

[8] French High Court. civ., 16 August 1882, n. prec. ; French High Court. civ 1st, 5 May 1998, *Contrats, conc. consom.*, 1998, comm. n° 112, n. L. Leveneur; n.p.B.

On the matter of leases pertaining to intangible property, the French High Court excludes the application of section 1732 (liability for damage caused)[9] and 1733 (liability for fires)[10], to leases of a business (lease management). When the lease pertains to a business monopoly, it takes the name of "licence" (patents and trademarks) or "concession" (copyright).

Contrary to leases pertaining to moveable property, leases of real property are strictly regulated.

---

[i]   Translator's note: "lease management": proposed translation for "location-gerance", which means a highly regulated lease whereby the owner of a business (lessor) leases out that business to a manager (lessee).

---

[9] French High Court. com., 2 July 1996, *Bull. civ.* IV, n° 198; *RTD civ.*, 1996.923, obs., P.-Y. Gautier "*Section 1732 pertaining to leases of houses and of rural property is not applicable to the relationship between the lessor and the lessee [locataire-gérant] of a business*"; crit. by P.-Y. GAUTIER, *RTD civ.*, 2000.352.
[10] French High Court. com., 21 April 1992, *Bull. civ.* IV, n° 168; *JCP* G, 1993.II.22101, n. T. Dubaele: Section 1733 "*is not applicable to leases of businesses, which are intangible property*".

# Exhibit 14

Philippe MALAURIE ● Laurent AYNÈS

# SPECIAL CONTRACTS

Philippe MALAURIE
Laurent AYNÈS
Pierre-Yves GAUTIER

4th Edition

DEFRÉNOIS
Lextenso éditions



# CIVIL LAW

## Philippe MALAURIE ● Laurent AYNÈS

<u>Presentation of the series</u>
In addition to Philippe Malaurie and Laurent Aynès, the series of Civil Law include authors who are concerned with the renewal of the statement of positive law and related issues.
These textbooks are addressed to those who wish to understand in what is the frame of the social structure– students, academics, professionals – by following a lively and strict method.

<u>Published textbooks</u>
General introduction
Individuals – protection of underage individuals and adults
Assets
Obligations
Special contracts
Securities – land registration
Family
Succession – gifts
Types of antenuptial settlement

> **Find all our books**
> **Defrenois – Gualino - Joly**
> **LGDJ - Montchresllen**
> **on our website:**
> **@www.lextenso-editions.fr**

[Logo
DANGER:
PHOTOCOPYING
KILLS BOOKS]

<unknown>© 2009, Defrénois, Lextenso éditions
33, rue du Mail, 75081 Paris Cedex 02
ISBN: 978-2-85623-161-6</unknown>



[…]

## §2. A PERSONAL RIGHT

**621. A pointless controversy. -** Pursuant to sections 1709 and 1719, the use by the lessee is a debt owed by the lessor; the lessee therefore holds a debt as a creditor.

This was opposed by a famous controversy in the 19th century[39], revivified in our time due to the blossoming of protective special statuses: status of farming; commercial leases and residential leases[40]; it opposed those defending the argument that the lessee's right is "real", to those defending the argument that the lessee's right is "personal". The enforceability of the lessee's right against the purchaser of the real property (s. 1743) and against a subsequent lessee[41], the right of renewal giving the lessee vocation to perpetuity, precisely named commercial or rural "property", would thus make it a *jus in re* and not only a *jus ad rem*.

The stake of the controversy is more theoretical than practical; most of the consequences of the qualification have been specially provided for: the enforceability of leases (s. 1743), the publicity of long term leases (Decree 4 January 1955, s. 28-1°), protection awarded to those in possession (s. 2278), jurisdiction, issue of leases between spouses (s. 1751, regarding residential leases) or in joint ownership of asset upon marriage (s. 1425, Law 23 December 1985).

---

[39] TROPLONG, v. II, n° 473: *"Section 1743 is maybe the most serious and fecund of the whole matter of leasing. It is that section that transformed the subject matter of this contract; it is that section that took the lessee's right from the class of relative rights* (jus ad rem) *into the category of absolute rights* (jus in re)*"*; D. HOUTCIEFF, *RRJ* 2003-4, 2300 et seq.

[40] J. DERRUPPÉ, *La nature juridique du droit du preneur à bail et la distinction des droits réels et des droits de créance*, th. Toulouse, 1952; "Souvenir et retour sur le droit réel du locataire", *in Ét. L. Boyer*, Toulouse, 1996, p. 169.

[41] For ex: *French High Court. soc., 1st June 1954, Merker, Bull. civ*. IV, n° 383; *JCP* G, 1955.II.8507, n. Mayer-Jack, 2nd case: between two successive lessees of the lease thing, the one that has the prior claim must prevail over the other, *"his right, enforceable against third parties since the day it had received a definite date, thus being enforceable against the right of Dame Bouche* (the other tenant) *being subsequent to his"*.

However, the Court of Strasbourg considers that a very long-term lease is property and allows a lessee to benefit from the protection of a property right guaranteed by the European Convention on Human Rights[42].

The discussion reveals the relativity of the categories of "real rights" and "personal rights": a right is more or less personal or real. Though case law has long established the personal character of the lessee's right[43], it applies to the conflict between two successive lessees the rules particular to conflicts between real rights[44]. The substantial prerogatives granted by special statutes to lessees tend to, like in the 14th century, reconstitute slowly a "useful" domain for the benefit of the lessee and to leave the lessor the "eminent domain".

As it has some enforceability, the right of the lessee is given the prerogatives of a real right, especially with respect to special statutes: entitlement to duration, with the right to renew or to be maintained on the premises, to the property, with the pre-emption right; even sometimes (farming status) a direct right to the hired thing, with the right to modify its structure. Nevertheless, such right remains personal. It suffices to observe its violation by the lessor: the lessee must seek the lessor's contractual liability and does not have any means to recover directly the use of the leased thing[45].

**622. Lease and usufruct. -** Due to their subject matter, usufructs are close to leases: "a usufruct is the right to use things which are the property of another"… (s. 578), and may also result from a contract. But a usufruct dismantles property: the usufructor gets the *usus* and the *fructus* whereas the bare-owner gets the *abusus*[46].

Being the holder of a real right, the usufructor may be directly put in possession of the thing, may use it and may collect its fruit, without expecting or demand anything from the bare-owner. The relationship between the usufructor and the bare-owner are dominated by reciprocal independence and ignorance; at most, the bare-owner may have the usufructor's abusive use penalised by a court ordering the forfeiture of the usufruct (s. 618).

The usufructor's real right is of moveable or immoveable quality depending on its subject matter (s. 526); it may be subject to a real surety (charge or mortgage), may be freely transferred or leased (subject to the provisions of s. 595, last paragraph), which constitutes substantial differences from the right of the lessee; a sub-lease depends on the contract entered into with the lessor and the transfer of a lease is often restricted by the contract or the law.

---

[42] ECHR, 16 November 2004, *Buncrona v. Finland*, *RDC* 2005.467, obs. A. Debet: "*a lease for a duration of three hundred years gives the lessee a patrimonial interest being in the category of leases which constitute an "asset" with the meaning given by section 1 of the Protocole 1*"; in this case, the Finnish Crown had granted in the 18th century for a duration of three hundred years to the ancestors of the Bruncrona family the rights to islands and vast aquatic species; in 1998, the department of water and forests department of the Finnish republic ordered the Bruncrona family to leave the location. The courts found against Finland.
[43] **Req. 6 March 1861, *synd. Vollot*, *DP*, 1861.I.417; S., 1861.I.713, the first of a long series: "*a lease does not carry out any dismantling of ownership, which remains whole in the hands of the lessor, for whom it is only a means to make it productive and to collect its fruit [...]; under former legislation, the purely personal and moveable character of the rights that a lease grants to the lessee has never been questioned [...]; considering the silence maintained by the Napoleonic Code on this aspect, it is impossible to admit that the Napoleonic Code, by reproducing the definition given by Pothier of a lease, intended to transform the nature of that contract in order to change and modify its effects…*" The case is based on tradition.
[44] Ref. *above*.
[45] The protection flowing from possession is granted to the holder *"against any other than that from whom he holds his rights"* (s. 2278, paragraph 2).
[46] *Les biens*, coll. Droit civil.

SECTION II

# THE PAYMENT OF RENT

Just like the price in a sale[47], the rent is essential to the lease of things. In its absence, the lease would be void, or would not be a lease but the loan of a thing. The price is generally in cash but could be paid in kind (for example: goods, portion of production).

**623. Lease and commodatum**[i]. – Like a lease, the loan for the use of a thing gives the right to use a thing and obliges the beneficiary of the loan to give it back (s. 1875)[48]. But the two contracts are radically opposed due to their essence, free (s. 1876) or against payment (s.1709). The existence of a rent or of another type of consideration[49] is incompatible with a loan for the use of a thing, often used to disguise a lease in order to avoid the mandatory regime applicable to commercial leases[50].

What must be understood by "rent"? The French High Court considers that a lease must provide for a "genuine" rent[51]. But it is not necessary that such rent should enrich the lessor[52]. More particularly, to make the premises available cannot be for free, though it may not have an immediate consideration, because it is one of the elements of a complex contract (for example: supplies contract or sale). The absence of rent prohibits the qualification as a lease. The courts sometimes choose the qualification of a loan for the use of a thing, which is debatable, or more adequately, the qualification of an undefined contract[53].

---

[i] Translator's note: "commodatum": proposed translation of "commodat"; also loan for use.

---

[47] *Above*, n[os] 68-71.

[48] *Below*, n° 910.

[49] French High Court. civ 3rd, 14 January 2004, *Bull. civ.* III, n° 6; *RDC*, 2004, p. 708, obs J.-B. Seube; in this case, the company Bouygues had granted a wholly-owned limited company (EURL) a "loan for use of a thing" regarding rural land; at the expiration of the contract, the company asked the other to leave the land; the judges found against Bouygues, having requalified the contract into a rural lease; appeal was dismissed as the judges *"had noted that the contract [...] put the onus on the EURL [...] to pay for all the expenses pertaining to the operation, including land tax"*.

[50] French High Court. soc., 31 January 1958, *Bull. civ.* IV, n° 187; *D.*, 1958.449: *"the appeal judges having noted [...] in their reasons, that the Servant spouses had paid a monthly indemnity of FF 1,000 [...], could not, without contradicting themselves, qualify as "a loan" a contract entered against cash consideration under which the Servant spouses had occupied the premises with the owner's consent"*; French High Court. civ. 1st, 9 January 1961, *Bull. civ.* I, n° 18; on the contrary, in the absence of a rent and of an occupation indemnity: see French High Court. civ. 3rd, 9 May 1983, *JCP* G, 1983.IV.225, n.p.B.: a "lease" for one franc of rent cannot be qualified as a loan; French High Court. civ. 3rd, 4 March 2008, n.p.B.; *RDC* 2008.836, n. J.-B. Seube: if there is no rent for a building with a commercial use, there is no commercial lease.

[51] French High Court. soc., 16 January 1953, *Bull. civ.* III, n° 54: the reimbursement of tax is not a genuine rent; French High Court. civ 3rd, 20 December 1971, *Bull. civ.* III, n° 644: nullity of a lease for meanness of the rent. *"The existence of a lease, whatever duration, including the statement of a genuine rent…"*; unless there are particular circumstances: for ex. French High Court. civ 1st, 16 March 1964, *Bull. civ.* I, n° 152: lease by a town council to a society "for education and recreation" for a rent of one franc, justified by the general interest served by the society.

[52] French High Court. com., 2 February 1967, *Bull. civ.* III, n° 58: the reimbursement by a sub-tenant of all or part of the rent paid by the main tenant is sufficient to exclude the qualification of a loan.

[53] French High Court. civ. 3rd, 31 March 1978, *An. loy.* 1979.131 (supply contract); n.p.B.; *below*, n° [illegible].

Exhibit 15

**Domat** private law

ALAIN
BÉNABENT

# Civil law

# Civil and commercial special contracts

9th edition

**Montchrestien**

lextenso éditions



Find all our tittles
**Defrénois – Gualino – Joly**
**LGDJ – Montchrestien**
on our website
**@ www.lextenso-editions.fr**

[Logo
**DANGER:
PHOTOCOPYING
KILLS BOOKS]**

© 2011, Montchrestien,
Lextenso éditions,
33, rue du Mail, 75081 Paris Cedex 02
ISBN 978-2-7076-1682-1 – ISSN: 0767-4309



SECTION 4   **PRICE NECESSITY**

**Contract for valuable consideration.** Like sale, lease is **by essence** a contract for valuable consideration: there is no lease without a price and property enjoyment must necessarily entail consideration.

This necessity marks the distinction between lease and *loan for use*, which means enjoyment without consideration (on this distinction, *see below*, n° 631), and *capital contribution in enjoyment*, where the partner simply receives shares when making the property available to the partnership (section 1843, para. 3 imposes the same guarantee on him as on the lessor).

But, this price does not necessarily represent a sum of money. Most of the time, it indeed has a monetary nature and it is periodically paid: we then talk about "rent" (on its determination, *see below*, n° 526). But it can have a different nature and consists in a property transfer (which is the case in "*share cropping*": below, n° 605) or even in the supply of services[24]. However, if these services are provided with subordination, the contract constitutes a contract of employment at the same time: should one then cumulatively apply the lease's rules as well as the employment contract's rules? This thorny and obscure question in positive law also affects company accommodation[25].

---

[24] For the rental of a utility room in exchange for several hours of work, see Civ. 3rd, 17 March 1975, *Bull.* III, n° 103 — 11 May 1993, *Loyers et copropriété* 1993.255.
[25] The lease can be separated from the contract of joint employment (Civ. 3rd, 23 June 1993, *Bull.* III, n° 96). — For the analysis of an accessory term in a practical training contract: Civ. 1st, 8 June 1999, *Bull.* I, n° 192; *D.* 2000.423, note JULIEN.

# Exhibit 16

PRIVATE LAW                                    **PRECIS**

# Civil and commercial contracts

Francois Collart Dutilleul

Philippe Delebecque

9th edition

**Dalloz**



# Civil and
# commercial contracts

*9th edition*

*2011*

**François Collart Dutilleul**

Professor at the University of Nantes,

member of the University Institute of France

**Philippe Delebecque**

Professor at the Sorbonne Law School,

University of Paris I Panthéon-Sorbonne

**DALLOZ**



**674   ENTERPRISE**

**734   *Price determined by the judge*[4]** ◆ It is quite common to see the price of the service not being fixed from the start. The process is not illegal and does not lead to the nullity of the contract. The price will be specified by the contractor himself at the end of the work. It will be fixed at the moment where the contractor will send his bill. Generally, the client accepts and pays the required amount. But nothing stops him from contesting it and referring it to the judge so that he determines the price and specifies it after considering the circumstances of the cause and the importance of the given services. This is a good example of judiciary intervention in the contract, often unknown, but which deserves to be approved[5].

---

[4] See F. Labarthe, " Le juge et le prix dans le contrat d'entreprise", *Mélanges Normand* 2003, 275.

[5] See also concerning a contract about conception and organisation of an event for which no document including an agreed remuneration amount had been drafted, the judges determined the price (18 293 Euros) considering the obligations met by the parties and the conditions in which they were carried out: Paris 25th div. A 13 Jan. 2006, *Mirrione v. Cabinet Gibson*. When the price claimed by the contractor proves to be insufficient, we cannot imagine that the judge may review it after the acceptance of the client, except if the contractor had made a calculation error. It will also be the case if the price was accepted by the client from the start. It remains that the insufficient price can be questioned based on sections L.225-39 and L. 225-42 of the French Commercial Code, see Com. 9 Apr. 1996, *Bull. Civ.* IV, n° 118.

The case law indeed decides that "a preliminary agreement on the precise amount of the due remuneration, in the context of a locatio operis[i], is not an essential element of the validity of a contract of this type"[1] and that "it is the judges' responsibility to determine the price considering the elements of the cause including the quality of the work provided"[2]. The solution applies to all works contracts. Nevertheless, to enable this judiciary intervention, the price must not be the subject matter of a contractual forecast made by the parties and above all the service must have been carried out.

Note that it is one thing for the judge to determine the price but it is another to review it. Case law accepts the judicial review of the price, but – with good reason – only if the remuneration is in the form of a fee and if this fee seems to be over the value of the provided service[3]. It is also necessary for the fees not to have been agreed on as a fixed fee or once again for the service to be knowingly carried out.

---

[1] Civ. 1st 15 June 1973, *Bull. civ*. I, n° 202, concerning a binding agreement between a consulting-engineer and a survey association with a view to create a workshop for disabled people.; 3rd Dec. 1970, *Bull. civ*. III, n° 663 (architect); 4 Oct. 1989, *Bull. civ*. I, n° 30 (private research agency). See also 9 Feb. 1977, *Bull. civ*. I, n° 74; 19 Dec. 1973, *Bull. civ*. I, n° 360; *Civ*. 3rd 16 Feb. 1983, *Bull. civ*. III, n° 49; *Civ*. 1st 19 June 1990, *Bull. civ* I n° 170; D. 1991. somm. 318, obs. Aubert; Com. 29 Jan. 1991, *Bull. civ*. IV, n° 43; JCP 1991. II. 21751; *RTD civ*. 1991. 323 obs. J. Mestre; Civ. 1st 24 Nov. 1993, *Bull. civ*. n° 339; *RTD civ*. 1994.632 obs. P.-Y. Gautier; 28 Nov. 2000, *Bull. civ*. I, n° 305; CCC 200.38, obs. Leveneur; JCP 2001.I.301, n° 11, obs. F. Labarthe. See also *Civ*. 3rd 17 March 2004, *Bull. civ*. III, n°57: "subject to no appeal, the court of appeal, which determined the remuneration to which the architect could claim for the work that was designed and carried out without disturbance, made the deductions justified by the noted defects and non-compliances in calculating the fee due to B. by the client "; also *Civ*. 3rd 20th Jan. 2004, n°U02.19-460, blaming a court of appeal for refusing to estimate the contractor's service fee which it had noted the presence in its principle; also: *Civ*. 3th 17 March 2004, n° 02-17.681, stating that the judges of merits have a discretionary power for this assessment. The case law of the judges of merits is also very instructive, see Aix 23 Nov. 1984, *Bull. Aix*, n° 6: "in terms of works contract, in absence of preliminary agreement on the contractor's remuneration, the judges of merits have a discretionary power to determine the price". See also, Aix 4 Apr. 1979, *Bull. Aix*, n° 150; Civ. 3rd 19 Feb. 1992, *Bull. civ*. III, n° 49; Paris 15 Sept. 1995, *SARL SM Conseil*.
[2] The judge takes into consideration the work carried out, practices, circumstances, professional qualification (Civ.1st 30 June 1992, *Bull. civ*. I, n° 212) or the quality of the work provided (Civ. 1st 18 Nov. 1997, *Bull. civ*. I, n° 313); *Defrénois* 1998. 405, obs. A. Bénabent; *RTD civ*. 1998. 402, obs. Gautier). The judge may also follow price lists (Civ. 3rd 4 Jul. 1972, *Bull. civ*. III, n° 442; 4 Dec. 1991, *Bull. civ*. III n° 303), but this practice is not mandatory because these price lists do not have a regulatory value (HC. 4 March 1958, *D*. 1958. 495).
[3] See Civ. 1st 3 Nov. 1986, *Bull. civ*. I, n° 150; *JCP* 1987.II.20791, note Viandier (public accountant); Com. 2 March 1993, *Bull. civ*. IV, n° 83 (management consulting).

We must add that the courts do not either prohibit recalculating the price (see price reduction) when the service carried out is defective[1].

**735    *Consumer contract* ◆** Moreover, this solution should disappear in the relationships between professionals and consumers. Indeed economic regulation requires professionals to inform consumers on the offered contract prices (s. L.113-3, cons. c.[ii]). Every product salesperson or service provider must indeed, through marking, labelling, displaying or via any other appropriate means, inform the consumer on prices, potential limitations of contractual responsibility and special sales conditions, in accordance with the terms and conditions decided by ministerial orders. In fact, a whole series of specific regulations fully regulates the prices of the everyday services (see *below* n° 748).

As a result, works contracts which bind a professional to a consumer and which do not determine a price from the start are illegal at least from a penal point of view. In this respect, it could be stricken by nullity[2] in the absence of a fairer and more adapted penalty (fine, judicial determination, price reduction…) for this imperfect legal document (s. L. 111-1, cons. c, requiring the professional to inform the consumer about the core service features).

**736    *Invoicing* ◆** Services for a professional activity require invoicing (s. L. 441-3, com. c.[iii])[3]. The invoice must include the same information as that established between professionals (*see above* n° 97). The obligation of invoicing is general because it applies "to all manufacturing, retail and services activities, including those of public persons" (s. L. 410-1, com. c.). This means it applies to all operations,

[1] See Aix 12 Jul. 1977, *Bull. Aix*, n° 202; Paris 17 March 1987, D. 1988, 219, note Mirbeau-Gauvin; *RTD civ.* 1988.535, obs. J. Mestre. The theory of the price reduction is therefore not peculiar to the contract of sale, see also, Com. 2 March 1993, *Bull. civ.* IV, n° 83; 6 Jul. 1993, *Bull. civ.* IV, n° 280; 25 Feb. 1998, *Bull. civ.* III, n° 44; more gen. see Ch. Albiges, "Le développement discret de la réfaction du contrat", *Mélanges Cabrillac*, 3 s.; also K. de la Asunction Planes, *La réfaction du contrat*, LGDJ, 2006, préf. Picod.
[2] The draft Consumer Code was in this sense. Its s. L. 180 indeed provided that "the price must be determined or determinable at the time of the inception of the contract between the professional and the consumer", and added that this price "cannot depend on either a subsequent agreement between the parties or the professional's intention influencing the price, or the elements used to determine it"; see *contra Civ.* 1st 15 Dec. 1998, *Bull. civ.* I, n° 366, so legally stating that the provisions in question do not lay down any civil penalty such as the nullity of contract and that no nullity could be claimed on the ground of the lack of determination of the price or a change of consent.
[3] See Mousseron: "Une nouvelle science: la facturologie" *Cah. dr. entr.* Apr. 1988. 3; Caprioli, "La dématérialisation de la facture commerciale au regard de sa polyvalence juridique", *Cah . dr. entr.* Jan. 1993. 34.

whatever their contractual qualification[1]. The invoice must be issued as soon as the service is carried out, which means as soon as it is completed or, if it consists of a contract with sucessive completion dates, then at each milestone.

The rules are different for services provided by professionals to consumers. Usually, the professional must issue an invoice stating the elements of the price as soon as it exceeds €100 and as long as the contract has not been preceded by the establishement of a descriptive and detailed quote (Order nº 83-50/A, 3 Oct. 1983)[2].

Concerning real estate work (building work, plumbing…), the same obligation applies, but without any exception,  the non-issue being penalised differently (fine of 25% of the transaction's total amount).

---

[i] Translator's note: Locatio operis is a term used in civil law to signify the hiring of labor and services. It is a contract by which one of the parties gives a certain work to be performed by the other, who binds himself to do it for the price agreed between them, which he who gives the work to be done promises to pay to the other for doing it.

[ii] Translator's note: cons. c. means the French Consumer Code.

[iii] Translator's note: com. c. means the French Commercial Code.

---

[1] See cep., Paris 7 Jul. 1987, D. 1987. IR 198.

[2] See Rep. QE nº 3271, *JO débats* AN.229; *JCP* 1988. IV. 130. For applications, see Crim. 6 June 1988, *Bull. crim*. nº 252; 3 Apr. 1997, D. *aff.* 1997.856.

# Exhibit 17

Philippe Malaurie ● Laurent Aynes

# SPECIFIC CONTRACTS

Philippe Malaurie
Laurent Aynes
Pierre-Yves Gautier

4th Edition

DEFRENOIS
Lextenso editions



# CIVIL LAW

## Philippe Malaurie ● Laurent Aynes

<u>Presentation of the series</u>
In addition to Philippe Malaurie and Laurent Aynes, the series of Civil Law include authors who are concerned with the renewal of the statement of positive law and related issues.
These textbooks are addressed to those who wish to understand in what is the frame of the social structure– students, academics, professionals – by following a lively and strict method.

<u>Published textbooks</u>
General introduction
Individuals – protection of underage individuals and adults
Assets
Obligations
Specific contracts
Securities – land registration
Family
Succession – gifts
Types of antenuptial settlement

---

**Find all our books**
**Defrenois – Gualino - Joly**
**LGDJ - Montchresllen**
**on our website:**
**@www.lextenso-editions.fr**

---

[Logo
DANGER:
PHOTOCOPYING
KILLS BOOKS]

© 2009, Defrenois, Lextenso editions
33, rue du Mail, 75081 Paris Cedex 02
ISBN: 978-2-85623-161-6



## I.   – Cost-plus contract

**766 – Unspecified price: fees.** – Contrary to what had been decided for the sale, it is not necessary that the price be specified in the contract[2]. Here, case law does not apply section 1129, which, during that time, led to the nullity of the sale and other contracts for having an unspecified price. As in the agency, the price will indeed here depend on a human activity of which the scope may not be known in advance. The price will therefore be fixed by an agreement between the parties after the performance. In the absence of an agreement, the judge (or the arbitrator) will determine it in accordance with the value of the work (cost + profit).

If the customer relies on the fairness of the contractor in his work, the price will be that determined by him after the performance of his work. This will also happen in relationships with professionals (doctors, lawyers, architects). Fees, even determined in advance, may be submitted to judicial review (usually a reduction) which will take into account the importance of the service, the quality and reputation of the service provider, the time spent, etc[3]. This review is based on the imprecise character of the service expected from the contractor at the time of the contract; the fees must also be reduced in case of a faulty performance[4]. If they are agreed on after the performance of the service, the review is excluded[5]. The fees may be determined by a tariff of fees provided in an industry agreement as slowly and with difficulty established by lawyers. These rates are not mandatory, but may be used as a reference[6]. If a deposit is paid, the final amount will be reviewable and either decreased or increased by the judge[7].

---

[2] Ex: order of work of art: HC. civ. 1st, 24 November 1993, *Monneret, Bull.* Civ. I, n° 339; Contracts, conc. consom, 1994, n° 20, n. L Leveneur; *RTD civ.*, 1994.631, obs. P.-Y. Gautier: "*A prior agreement on the exact amount of the remuneration is not an essential term of the lease agreement of a work so that, in the absence of such agreement, the judges of merits will determine the remuneration considering the elements of cause.*"

[3] Ex.: 1. **Lawyer**: HC. civ. 1st, 3 March 1998, *Bull. civ.* I, n° 85; JCP G, 1998. II.10115, concl. Sainte-Rose: "*the second of these texts* (art. L.10, 31 December 1971, amended) *should prevent the courts to reduce the fees initially agreed by the lawyer and his client when those seem to be exaggerated with respect to the service rendered.*" 2. **Genealogist**: HC. civ. 1st, 5 May 1998, *Bull. civ.* 1, n° 168; *Defrenois* 1998.1042, n. Ph. Delebeque; *Contracts, conc. consom.*, 1998, comm. n° 111, n. L. Leveneur. 3. **Stock exchange consulting firm**: Paris, 27 February 2001, *RDT com.*, 2002.943, obs. M. Storck. 4. **Arbitrators**: Paris, 13 December 2001, *D.*, 2003.2475, obs. Th. Clay: "*the work of arbitrators indisputably deserves to be remunerated up to what can legitimately be claimed.*"

[4] Continuous case law: Ex.: HC. com., 2 March 1993, *Bull. civ.* IV, n° 83: "*the expertise report showed the bad quality of the service of CFCI.*"

[5] HC. civ. 2nd, 18 September 2003, *Bull. civ.* II, n° 279; *RTD civ.*, 2004.114, obs. P.-Y. Gautier: "*if the judges of merits made a final decision on the amount of the fee due to the lawyer in accordance with the agreements between the parties and the circumstances of the cause, they cannot reduce it if the principle and amount of the fee were accepted by the client after the service was rendered, whether or not the latter was preceded by the agreement*";  in this instance, the order of the first president, which was denied, had reduced the fees by explaining that for several grounds, they were excessive: "*the unusual rate, the simplicity of the procedure, the ordinary outcome obtained (...) contributed to make difficult to understand the importance of the amount that he* (the client) *gave to his counsel*"; HC. civ. 2nd, 21 April 2005, *JCP* 2005.IV.2321; n.p.B.

[6] Ex.: the tariff established by the board of architects is only mandatory if the parties refer to it: HC. civ. 3rd, 5 February 1985, *RDI*, 1985.255; n.p.B

[7] HC. civ. 1st, 19 June 2001, *Bull. civ.* I, n° 178, (decreased, therefore partial reimbursement by lawyer): "*after making a final decision with respect to the amount of fees, the first president ordered [...] the reimbursement of the additional amount received.*"

In the absence of a specific clause, the contractor must demonstrate that the price that he asked for is not excessive[8] and the client to whom he asked for payment[9] ordered him to do the work.

II. - Fixed price contract

**767 – Globally fixed price. –** The price may be determined in a global manner by the parties in the contract prior to the completion of the work. It may not be unilaterally varied by one of them; the contractor may not ask for an increase, even if the cost of the work exceeds his forecasts. This is only an application of the general law: the binding force of the contract and the condemnation of the theory of unforeseen circumstances; but the final determination of the price is consistent with its indexation.

With respect to each party, this system, unpredictable as any fixed price, has its advantages and disadvantages. For the contractor, he bears the risks of the work; not much the financial and economic risks, because if it is specified and well-drafted, the indexation protects him against the increase in labour or material costs without making him richer; especially the unforseen difficulties of the work in relation to, for instance, the nature of the land, flood, etc. For the customer, the fixed priced allows him to know in advance the price that he will have to pay, but he bears the risk that the contractor will complete the works at a lower cost at the expense of the quality of the works.

---

*Note of the translator: HC means French High Court.

---

[8] Ex,: * HC. civ. 1st, 18 November 1997, *Bernheim, Bull, civ.* I, n° 313; *D. Aff.*, 1998.21; *Defrenois* 1998.405, obs. A. Benabent; *RTD civ.*, 1998.372, obs. J. Mestre and 402, obs. crit. P.-Y. Gautier; in this instance, a chartered accountant took legal action against his client to obtain payment of his fees that the latter had found to be excessive; the court of appeal refused to vary them: "*the justice system will not examine the quality of an advice and, in the absence of a costs agreement, it is only important to determine whether or not the billing was exorbitant with respect to the reputation of consultant and industry standards.*"   Appeal before the French High Court: "*As a plaintiff, the service provider must prove the amount of the debt and to this effect, provide the elements for the determination of this amount, and the judge will assess the latter by considering in particular the quality of the work provided.*"

[9] Ex. HC. civ. 1st, 2 November 2005, *Bull.civ.* I, n° 398; *D.*, 2006.841, n.F. Garron: "*the company Brout* (the garage owner) *would have had to establish that Ms Ghislain* (the customer) *had ordered or accepted the works undertaken on her vehicle; in the absence of such proof, it could not obtain payment of these works on the ground of the contract to which it was bound or commence an action* de in rem verso *regardless of the latter.*"

# Exhibit 18

**Domat** private law

ALAIN
BÉNABENT

# Civil law

## Civil and commercial special contracts

9th edition

**Montchrestien**

lextenso éditions



| Find all our books |
| :---: |
| **Defrénois – Gualino - Joly** |
| **LGDJ - Montchresllen** |
| on our website: |
| **@ www.lextenso-editions.fr** |

[Logo
DANGER:
PHOTOCOPYING
KILLS BOOKS]

© 2011, Montchrestien,
Lextenso éditions
33, rue du Mail, 75081 Paris Cedex 02
ISBN 978-2-7076-1682-1 – ISSN: 0767-4309



### 2. Absence of condition of determination of the price

**55**   **Principle.** If the principle of remuneration is at the essence of the works contract, which cannot be free (*above*, n° 748), it is however not necessary for this price to be fixed from the inception of the contract.

Here is a very special rule, which for a long time, was specific to the works contract only and which was recently extended by the French High Court through a general concept applying to all contracts about services: "in contracts which do not generate an obligation to give, a prior agreement on the precise payment amount of remuneration is not a core element of the inception of these contracts"[95].

This is a traditional rule for the works contract[96]. As a result, if the parties did not forecast the price, the contract nevertheless concluded will have to be completed **by the judge**. We will see further, when going through the performance of the contract, the way in which the price due by the client must be determined, either in the case of a silence of the contractor even when implementing or reviewing the agreed price (see *below*, n° 812).

---

[95] Com., 29 January 1991, *Bull*. IV, n° 43; *J.C.P.* 91.II.217751, note LEVENEUR.
[96] Civ. 1st, 15 June 1973, *Bull*. I, n° 202 — Civ. 3rd, 18 January 1977, *Bull*. III, n° 25 — Civ. 1st, 4 October 1989, *Bull*. I, n° 301 for a **private research agency** — 19 June 1990, *Bull*. I, n° 170; *D*. 1991, Som. 317, obs. AUBERT, for **legal fees** — 24 November 1993, *Bull*. I, n° 339 for **a painting artist** — Civ. 1st, 28 November 2000, *Bull*. I, n° 305; *J.C.P.* 2001.I.301, n° 11, obs. LABARTHE — *C.C.C.* 2001, n° 38.

---

[i] Translator's note: "common" in the sense ordinary (opposite to special), rather than the Anglo-Saxon "common law".



# Exhibit 19

PRIVATE LAW                                                    **PRECIS**

# CIVIL AND COMMERCIAL

# CONTRACTS

François Collart Dutilleul

Philippe Delebecque

9th Edition

**DALLOZ**



[stamp - Allen and Overy LLP Paris – Library]

# CIVIL AND COMMERCIAL
# CONTRACTS

9th Edition

2011

## François Collart Dutilleul

Professor at the University of Nantes
Member of the Institut Universitaire de France

## Philippe Delebecque

Professor at the School of Law – Sorbonne
University Paris I Panthéon-Sorbonne

**DALLOZ**



---

CHAPTER 1
**ELEMENTS OF A CONTRACT**

---

428  ***Plan*** ◊ Like any consensual contract, a lease is in principle formed by the meeting of the minds of the lessor and the lessee. But the Code lays out specific rules to prove this meeting, that is to say to prove the lease itself (Section 1). Then, the traditional rules of capacity, applicable to leases, are not sufficient to take into account all the conditions related to the "power" to enter into such a contract (Section 2). Finally, a lease presents the double particularity to be a temporary and onerous contract. It is thus entered into for a specific period of time (Section 4), and the payment of rent (Section 3).

SECTION 1. **CONSENT**

429  According to the general theory of contract, a lease is formed when the lessor and the lessee agree upon the essential elements. This meeting of the minds and the proof of this meeting present a few specificities.

Paragraph 1. **Meeting of the Minds**

430  ***Principle and Limits of Consensualism***[i] ◊ The wills of the lessor and of the lessee must agree upon the subject matter of the contract[1], the rent, and the term. This theoretical schematic of the meeting of the minds, which is sufficient to ensure the validity of the contract[2], does not sit well with the reality of a real property lease.

In some cases, indeed, the lessor may be required to enter into a contract of lease, which constitutes the greatest infringement to the consensualism principle. We can find examples of these forced leases in the preferential allotment regime (s. 831 et seq. Civil Code) or even in the rules regarding the divorce (s. 285-1, Civil Code). Special acts also provide some examples[3], in particular when the law gives to the lessee an automatic right to renewal of his contract (See *below*  n° 559).

---

[1] See for ex., Civ. 1st 23 May 1995, *Bull. civ.* 1, n° 214; Defrénois 1996. 345, Obs. Delebecque; *RTD civ.* 1995. 620, obs. Mestre (Videogram rental, determined subject matter); Com. 19 Nov. 1996, *Bull. civ.* IV. n° 275; D. 1997. J. 609, note Zelcevir-Duhamel (Rental of video tapes to a professional, subject matter arbitrarily determined by the lessor, null and contract).
[2] The absence of agreement at the commencement date of the lease is not an essential element: Civ. 3rd 28 Oct. 2009, *Bull. civ.* III, n° 237; *RDC* 2010. 676, obs. Grimaldi.
[3] Section L. 417-12, rural code (sharecropping leases converted into farming leases)…



In some other cases, on the contrary, the landlord may be prohibited to lease his property. This is especially the case if a real property is under a notice of insalubrity (s. L. 1331-28-2, CSP) or dangerous structure (s. L. 511-1 et seq., CCH). Furthermore, in these cases, if the leased property is meant to be the principal residence of the lessee, it cannot be deemed to be decent in accordance with section 1719, 1st of the Civil Code (s. 5, Decr. n° 2002-120, 30 Jan. 2002).

Apart from these qualifications, the meeting of the minds occurs according to the methods prescribed by the common[ii] law. Generally speaking, it is the mechanisms of offer and acceptance which are its vectors.

431  ***Preliminary Contracts to a Lease*** ◊ Nothing prohibits using a more complex process for the formation of the contract. Preliminary contracts, which we have already seen in the context of the sale (see *above* n° 59), find here another area of application under the same terms and conditions.

Thus, the parties can enter into a bilateral promise of lease which will be equivalent to a lease by analogy with the provisions of section 1589 of the Civil Code[1]. This form of promise is usually characterised by the provision of terms and conditions such as conditions precedent.

The parties can also postpone the formation itself of the contract by entering first into a unilateral promise of lease. The essential elements of the lease, including the thing, the rent, and the term must be determined or determinable[2] subject to nullity. But this promise only binds one of the parties who has then already given its consent to the final contract of lease. The co-contracting party remains free to consent or not to the final contract and has a right of option which it must exercise within a determined timeframe.

Moreover, a landlord and a prospective tenant may conclude an agreement giving a right of pre-emption on the lease to this particular prospective tenant.  By contract, if the landlord decides to lease this property, he is required to lease it to the beneficiary of the agreement. Unlike in an agreement giving a right of pre-emption of a sale, in the context of a long-term lease it does not constitute a "*restriction to the right to sell for which a public notice would be mandatory in accordance with the provisions of section 28-2° of the decree of 4 January 1955*".[3] As a result, it is not opposable to a third party acting in good faith and gives right to damages in case of breach.

---

[i] Translator's note: under French law, the principle of consensualism is a principle in accordance of which a legal transaction is not subject to any specific form for its validity, the consent having alone the power of creating obligations.

[ii] Translator's note: "common" in the sense ordinary (opposite to special), rather than the Anglo-Saxon "common law".

---

[1] See Civ. 3rd 20 May 1992, *Bull. civ*. III, n° 152. It will be different in the context of a sale, where the parties make the formal agreement is a constituent element of their consent: Civ. 3rd 28 May 1997, *Bull. civ*. III, n° 116; CCC August-September. 1997. 131, obs. Leveneur. Translator's note: under French law, a formal agreement is an agreement which must be drawn up by a notary or a public authority.

[2] See Civ. 3rd 27 June 1973, *Bull. civ*. III, n° 446, D. 1973. IR 198.

[3] Civ. 3rd 13 March 1979, *Bull. civ*. III, n° 63; D. 1979. 546, note E. Franck; Defrénois 1979. 1318, obs. E. Franck and 1651, obs. J.-L. Aubert; *Rev loyers* 1979. 310, note [Ilegible] *RTD* civ. 1980. 134, obs. C. Giverdon, Adde J.-L. Aubert "Brèves remarques sur l'éventualité d'un revirement de jurisprudence en matière de publicité des pactes de préférences" D. 1980. Chron. 41; F. Collart Dutilleul, *Les contrats préparatoires à la vente d'immeuble*, Sirey, 1988, n° 341.

Exhibit 20

Philippe MALAURIE ● Laurent AYNÈS

# SPECIAL CONTRACTS

Philippe MALAURIE
Laurent AYNÈS
Pierre-Yves GAUTIER

4th Edition

# DEFRÉNOIS

lextenso editions



# CIVIL LAW

## Philippe MALAURIE ● Laurent AYNÈS

Presentation of the series

In addition to Philippe Malaurie and Laurent Aynès, the series of Civil Law include authors who are concerned with the renewal of the statement of positive law and related issues.

These textbooks are addressed to those who wish to understand in what is the frame of the social structure– students, academics, professionals – by following a lively and strict method.

Published textbooks

General introduction
Individuals – protection of underage individuals and adults
Assets
Obligations
Special contracts
Securities – land registration
Family
Succession – gifts
Types of antenuptial settlement

Find all our books
**Defrénois – Gualino - Joly**
**LGDJ - Montchresllen**
on our website:
**@www.lextenso-editions.fr**

[Logo
DANGER:
PHOTOCOPYING
KILLS BOOKS]

© 2009, Defrenois, Lextenso editions
33, rue du Mail, 75081 Paris Cedex 02
ISBN: 978-2-85623-161-6



This tenancy in common ends by the share and allocation of the right of lease (s. 831-2 civ. c.[i]; rur. c., s. L. 441-34).

## SECTION II

## CONSENT

**647. Common Law[ii] and Special Law.** – In accordance with the common law, the lease is formed when the parties agree on the essential elements: the thing and its use, the obligation to pay a rent and the commencement date. What is required by the common law is however weakened for several reasons. Most real property leases are governed by a special act imposing upon the parties a minimum term, a right to renew or remain on the premises; moreover, in some leases (subject to the Act of 1st September 1948), the amount of rent is taxed; generally, the silence of the parties may be replaced by the uses, standard forms, and customary practices. Finally, the effective performance of the contract plays a role that it cannot have towards a conveyance[54]. A lease can then exist and create legal effects without the agreement upon the essential elements having been formally verified. Only a promise of lease is subject to the general rules of contracts.

Normally, the lessor can choose the lessee, provided that his choice does not give rise to any unlawful discrimination (A. 6 July 1989, s. 1st and s. 22-2, which prohibits even the presentation of any passport photo!). Sometimes, the special law will even remove the freedom of consent for a humanitarian purpose, creating a "mandatory lease": thus, the Act of 29 July 1998 in relation to social exclusions allows public authorities to requisition empty premises, in order to provide accommodation to the poorest, after having refurnished these premises, the landlord receiving an indemnity from the intermediary agency, which consists in fact in a sub-lease, of which the term is normally limited, given that a "normal" lease can still be contracted between the parties, if they desire so.

**648. Promise of lease; pre-emption agreement** – Like the sale, the lease, may be preceded by preliminary contracts to which the common law essentially applies: unlike a simple draft or an agreement in principle, the promise of lease is mandatory for one of the parties (unilateral promise) or for both (bilateral promise) if the intention of an obligation is expressed by a sufficient determination of the elements of the contract[55].

The bilateral promise of lease, in which the lessor and the lessee are definitely committed is "equivalent to lease" and the lessor may be ordered to let the lessee enter and enjoy the property and if applicable, to pay a periodic penalty[56].

---

[i] Translator's note: civ. c. means the French Civil Code

[ii] Translator's note: "common" in the sense ordinary (opposite to special), rather than the Anglo-Saxon "common law"

---

[54] *Below* n° 649.

[55] French High Court, Civ. 3rd, 20 May 1992, *Bull. civ.* III, n° 152; *D.*, 1993, summ., 68, obs. E. Martine: "*The promise of lease is equivalent to lease if there is an agreement between the parties on the thing and the price…*", in this instance, the owners of a rural property had promised to lease it for a period of 21 years; decided by the judge that the lease had been entered into; *Les obligations*, coll. Droit civil.

[56] Consistent case law since French High Court, civ., 3 April 1838, *Jur. Gen., vol. Louage*, n° 80.



# Exhibit 21

CIVIL LAW

# Alain Sériaux

# Civil contracts

FUNDAMENTAL LAW COLLECTION

[Logo]



BY THE SAME AUTHOR

BY THE SAME EDITOR

*Les successions. Les libéralités*, coll. "Droit fondamental", 2nd ed., 1993.
*Droit canonique*, coll. "Droit fondamental", 1996.
*Droit des obligations*, coll. "Droit fondamental", 2nd ed., 1998.
*Les personnes*, coll. "Que sais-je?", 2nd ed., 1997.
*Le droit naturel*, coll. "Que sais-je?", 2nd ed., 1999.

WITH ÉCONOMICA EDITIONS

*La faute du transporteur*, 2nd ed., 1997, pref. P. Bonassies.

WITH ELLIPSES EDITIONS

*Le droit: une introduction*, 1997.
*Le commentaire de textes juridiques: lois et règlements*, 1997.
*Le commentaire de textes juridiques: arrêts et jugements*, 1997.
*Droits et libertés fondamentaux*, 1998.

ISBN 2 13 051536 3

Legal deposit– 1st edition: 2001; April

© Presses Universitaires de France, 2001
6, avenue Reille, 75014 Paris



142                                              Contracts pertaining to making property available

[…]

**Section I**
**The formation of a lease**

    **50**  CONSENT. - The wills of the lessor and of the lessee must at least meet on the essential elements of the lease: the thing leased, the term of the lease and the rent.



Failing that, the contract must be held void.[1] In addition, a lease is a contract formed *solo consensu*: as soon as the wills meet on those essential characteristics, the transaction is complete and final. Case law concludes that a promise to lease is as good as a lease when there is an agreement as to the thing to be leased, the term and the price of the lease.[2]

Expressing consent is not normally subject to any formality: section 1714 of the Civil Code stipulates "one may lease either by writing or verbally". It is nevertheless frequent that special laws require that a written document is signed by the parties and that it contain various mandatory wording.[3]

Providing evidence of verbal consent may be difficult. In this respect the Civil Code retains an original solution. Section 1715 provides that "if a lease has been entered into without a written document and performance has not started and that one party denies it, evidence cannot be provided by witnesses, however small the rent may be and despite arguing that a deposit has been made (paragraph 1). The oath may only be deferred to the party who denies the lease (paragraph 2)". This express exception to the principle that evidence of contracts regarding assets worth FF 5,000 or less is free (ref. section 1341 of the Civil Code) may be explained by the desire to protect one or the other of the parties against the too easy recourse to biased testimonies, either in favour of the alleged lessor or in favour of the alleged lessee. Case law has however attempted to limit the scope of section 1715. It first held that the article only applies to the relationship between the alleged parties.[4] Moreover, bearing on its initial restriction, it makes it easy

---

[1] See Civ 3rd, 27 June 1973 (*Bull. civ*. III, n° 446): failure to agree on the rent. The judge cannot set it himself: Civ. 3rd, 26 January 1973 (prec).

[2] Civ 1st, 14 December 1960 (*Bull. civ*, I, n° 543); Civ. 3rd, 7 April 1976 (*Bull. civ*. III, n° 138); 20 May 1992 (*Bull. civ*, III, n° 152); 28 May 1997 (*Bull. civ*., III, n° 116) which highlights that the parties had not made the reiteration by notarised deed a constitutive element of their agreement. The unilateral promise to grant a lease is not however a lease agreement but a sui generis contract like the unilateral promise to sell. We also find here preferential agreements, see Civ. 1st, 9 March 1965 (*Bull. civ*. I, n° 176).

[3] See for example; for residential leases, s. 3, L. 6 July 1989. Such formalism is inspired from the double concern to protect the lessee's consent and to subject the stipulated clauses to policing. *Adde*: the other reserves announced by this section, *in fine*.

[4] Evidence of a lease may be brought by any means when a third party alleges its existence. See Com. 27 June 1955 (*Gaz. Pal*, 1955.2.223): the main lessor may show by any means the existence of a sub-lease; Civ 3rd, 28 June 1978 (*Bull. civ. III*, n° 271), evidence of the quality of the lessee may be brought by any means to obtain compensation for disturbance due to a crime of assault caused by a third party to the lease.



to have it set aside by accepting evidence that performance has started may be brought by any means.[1]

**51**  SUBJECT MATTER. - During its formation, a lease must determine at least the essential elements of the agreed transaction. Failure to do so is penalised by the absolute nullity of the contract. This allows judges to check, if necessary, that the transaction is equitable and lawful.

The leased thing, whether it is moveable or immoveable property, must be available for trade.[2] It must also be determined or at least determinable. Determination of the leased things is very important: the application of specific rules often depends on it.[3] The term of the availability must also be set out. It may however be a fixed term (with the possible option to renew, whether express or tacit), or an indefinite term.[4] Minimum or maximum durations are often imposed by the law for such and such leases, which may thus become mandatorily renewable under certain conditions, in particular of duration.[1]

Setting the rent, and possibly any accessory payment[2], normally depends on the former two elements, the leased thing and the term of the lease, since the rent is the consideration for the grant of the right to use. The rent may be payable in money or in

---

[1] Evidence of a start of performance may be brought by any means: Civ 3rd, 20 December 1971 (*Bull. civ.* III, n° 642), which excludes the necessity to bring preliminary written evidence in the form of rent receipts. However it must start the performance of the lease agreement; showing the occupation of the premises by the alleged lessee is therefore not sufficient. See Civ 3rd, 4 February 1975 (*Bull. civ.* III, n° 37); 5 January 1978 (*Bull. civ.* III, n° 10).

[2] Are thus excluded immoral things (e.g. rental of pornographic films - but it does not concern us much), unlawful things (e.g. rental of torture tools) and dangerous things (e.g. lease of a building threatening to collapse, without observing required precautions).

[3] Leases for residential, crafts or commercial use or for farming operation: it is almost always due to their subject matter that leases come within the scope of specific laws. Moreover, it is the precise determination of such subject matter that allows us to know whether such specific regulations are applicable. See for example: Civ 3rd, 30 May 1996 (*Bull. civ*, III, n° 122).

[4] The term remains fixed when the lease is granted until the death of the lessee (uncertain term): Civ 3rd, 18 January 1995 (*Bull. civ*, III, n° 16, Rev.*dr.immob.*, 1995.598, obs. F. Collart Dutilleul).

[1] For example, regarding residential leases, a minimum three year lease, unless an exception, when the lessor is a natural person and a minimum six year lease when the lessor is a legal entity: s. 10, L. 6 July 1989. Their renewal must operate for the same duration (*ibid.*). Regarding commercial leases, the term cannot be under nine years (s. 3-1, D. 30 September 1953); but the parties may agree on a shorter term provided that it does not exceed two years (*ibid*. s. 3-2). The renewal of a commercial lease must operate for a duration of nine years minimum (*ibid*. s. 7).There are similar rules for rural leases.

[2] Rental maintenance expenses, stamp fees, if applicable…

NATIONAL ACCREDITATION AUTHORITY FOR TRANSLATORS AND INTERPRETERS
NAATI No. 57513
VERONIQUE MORGAN-SMITH
TRANSLATOR
ENGLISH <-> FRENCH

kind; it may also be reduced in order to take into account works that the lessee contractually agrees to carry out on the leased thing. The agreement between the parties may also provide that, instead of making payments from time to time at each agreed term, a lump-sum be paid for a pre-defined term, by the payment by the lessee of the repair works normally incumbent upon the lessor.[1] Always, the rent must be determined or at least objectively determinable at the time of signature of the contract.[2] Except under particular laws, when it is impossible to determine the rent the judge cannot step in on behalf of the parties to set the rent.[3] It is possible to index the rent under the usual conditions in this matter, unless a more special law provides otherwise.[4] The rent must be genuine[5], which does not mean that it must be fully just: the lessor may be satisfied with a price below the market rent of the leased thing; conversely, the lessee may accept a higher price. It is an issue of opportunity, the control of which belongs to the parties only. Lesion[i] is not a cause of nullity for a lease.

[…]

---

[i] Translator's note: "lésion" means a contractual imbalance as defined by the law.

---

[1] Soc, 6 February 1985 (*Bull. civ*. V, n° 89).
[2] See Civ. 1st, 14 December 1960 (prec), which admits that rent may be determined by arbitrators precisely appointed by the parties. Compare with lack of precision: Civ. 3rd, 27 April 1976 (*Bull. civ*. III, n° 176); Com, 16 October 1967 (*Bull. civ*., III, n° 324); Civ. 3rd, 22 April 1980 (*Bull. civ*. III, n° 82), disagreement on the starting point of the lease; Com, 9 June 1987 (*D.*, 1990, *Somm*., 323, obs. J. Huet).
[3] Civ 3rd, 26 January 1972 (*Bull. civ*. III, n° 64); 10 December 1975 (*Bull. civ*. III, n° 369) which reserves the case of a particular legislation. For an example, see Civ., 14 November 1892 (*DP*. 1893.1.11). Compare with Civ. 3rd, 3 October 1968 (*Bull. civ*. III, n° 356, *RTD* civ. 1969.351, obs. G.Cornu). All the more, the judge could not allow himself to change the rent during the performance of the lease. *Contra*: Paris, 17 March 1987 (*D.*, 1988.219, n. J.-R. Mirbeau-Gauvain, *RTD* civ., 1988.535, obs. J. Mestre).
[4] See for example: s. 17 *d*, L. 6 July 1989, which limits both the moment when the index may come into play and its effect on raising the rent.
[5] Civ 3rd, 27 April 1976 (prec).

Exhibit 22

PRIVATE LAW                                              PRECIS

Civil Law

# Obligations

François Terré
Philippe Simler
Yves Lequette

10th Edition

**DALLOZ**



Civil Law

# Obligations

10th Edition

2009

**François Terré**

Emeritus professor at Panthéon-Assas University (Paris II)
Member of the Institute

**Philippe Simler**

Emeritus professor at the University of Strasbourg
Honorary Dean of the Faculty of Law,
Political Sciences and Management of Strasbourg

**Yves Lequette**

Professor at Panthéon-Assas University (Paris II)

**DALLOZ**



On the other hand, according to section 901 of the French Civil Code, *gifts* can be contested after the death of their author, without having the proof of mental disorder, is subject to the limitations of section 414-2.   Being provided for by transactional documents of impoverishment without consideration, gifts directly threaten the interests of the family. The solution fits perfectly with the distrusting attitude that civil law usually has towards gratuitous transactional documents.[2]

## SUB-SECTION 2. **Consent as a Meeting of the Minds**

104. ***Presentation*** ◊ Traditionally, a contract is outlined as the product of the meeting of an offer and its acceptance. A person, the offeror, emits an offer to enter into a contract that is accepted by the offeree. When the meeting of the minds occurs, the acceptance gives rise to a contract. When the offeror and the acceptor are in the presence of each other, this agreement is easily achieved by the almost simultaneous expression of their wills. However, it is necessary to fulfil some formalities – drafting a written contract, remittance of a thing – to complete a contract, when, derogating from the consensualism principle[i], the Code confers to contracts a formal character.

   In practice, this ideal system is often disturbed by the intervention of *complicating factors*.

   A contract can be entered into between parties that did not meet. In this case, they either need to use a way to transmit their will, it is a *contract inter absentes*, also known as *contract by correspondence*, or one of the parties sends a representative to the other party, it is a *contract by representation*. Also sometimes, because of the importance and the complexity of the stakes, contracts will be preceded by a long negotiation, which is itself punctuated by preliminary agreements. The inception of the contract is spread over time; it is then a *contract step by step*. Sometimes it is the opposite, and any form of negotiation might be prohibited. One of the parties proposes a contract, which it previously and exclusively drafted and the other party can only accept or refuse it. Any counter-offer is prohibited. It is an *adhesion contract*. Also sometimes, the parties have their pre-established template which is most of the time drafted by a third party, it is a *standard contract*. Finally, the positive law sometimes forces the parties to enter into a contract, it is a *mandatory contract*.

---

[2] *Les successions, Les libéralités*, n$^{os}$ 243 et seq.; see also, X. Martin, L'insensibilité des rédacteurs du Code civil à l'altruisme, *Rev. hist. dr. fr. et étr.* 1982.589.

We will successively consider the traditional analysis of the exchange of consents (para. 1), then the analysis of various factors which make the meeting of the minds more complex (para. 2).

### §1. **Traditional Analysis of the Exchange of Consents**[1]

105.  *Division* ◊ A contract rises from the meeting of an offer and its acceptance. We will analyse each of these elements (A), before assessing the form requirements that the meeting of the minds must satisfy (B).

### A. **The Elements of an Agreement**

106.  *1° The Offer* ◊ We will first define the *concept* of an offer to enter into a contract, before examining its *legal regime*.

107. *a) Concept* ◊ There are some features that a proposition to enter into a contract must necessarily have so that we can call it an offer in the strictest meaning of the word, they are its *constituent elements*. There are others that, without being an integral part of the concept of offer, allow outlining its physiognomy, they are its features.

108. *1) Constituent elements* ◊ The usual meaning of an offer is any proposition to enter into a contract. The legal meaning of this term refers to a tighter reality. An offer, also known as pollicitation[ii], is a definite proposition to enter into a contract, of which the *conditions have been determined*, so that its acceptance is sufficient to enter into this contract.[2] According to this terminology, any proposition to enter into a contract which does not fall within the scope of this definition, because it is insufficiently definite or firm, must be defined as an *invitation to negotiate* or as a call for tenders. That is for example the case, when a person approaches a company and asks them to assess the conditions in which they could meet some of its needs. That is also the case for an advertisement that would propose to sell a specific item while mentioning that "the price is negotiable" or even that the item will be "sold to the highest bidder", for a letter in which its author would indicate that he is "considering" selling a real

---

[1] Concerning the exchange of consents, see the special issue of *Revue de jurisprudence commerciale,* November 1995.
[2] According to the terms of Art 2-2 of the Unidroit Principles, "A proposition to enter into a contract constitutes an offer if it is sufficiently definite and indicates the intention of the offeror to be bound in case of acceptance". According to the terms of Art. 2-201 of the Principles of European Contract Law "A proposal amounts to an offer if: (a) it is intended to result in a contract if the other party accepts it, and (b) it contains sufficiently definite terms to form a contract". – Translator's note: This article is not article 2-2 but 2.1.2 of the Unidroit Principles.



property of which he is the owner, without any other indications such as the price,[1] for a request for information on the intentions of a company regarding the renewal of a contract.[2] This is also true for advertising documents that only boast about the merits of a product without giving all of its features or its price.[3] This is finally also the case for a note in a tourist guide to encourage applications to a shooting club.[4]

109. ***The Precision of an Offer*** ◊ A declaration of will does not constitute an offer if it is not sufficiently definite.[5] For the acceptance alone to be sufficient to form the contract, the offer must describe clearly the contract that is to be formed, stating at least the *essential elements*.

The distinction between the elements that are essential to the contractual relationship that the parties seek to create, which must be included in the offer, and those which are accessory to this contractual relationship gives rise to some difficulties. The doctrine has undertaken in laying down a few guidelines. The essential elements would be those "that give its colour to a contract and in the absence of which the latter cannot be characterised".[6] But these guidelines are still vague, especially for innominate contracts[iii]. Thus it is case law that defines the outline of these essential elements most of the time.

In principle, in contracts of which the subject matter is a permutation of value, it is the terms of this exchange themselves that constitute the essential elements. The solution is expressly formulated for a sale in section 1583 of the Civil Code which sets out that an agreement on the thing and on the price is sufficient to form the contract.[7] However, the degree of precision required depends largely on the nature of the proposed contract. Thus if, generally speaking, the price is an essential element of contracts for valuable consideration, there are sometimes propositions to enter into a contract that are analysed as an offer even though they do not specify it.

THE APTITUDE TO CONSENT    123

---

[1] Paris 29 Jan. 1996, D. *aff.* 1996.389, *Defrénois* 1996.1360, obs. D.Mazeaud.

[2] Civ. 1st, 24 Nov. 1998, D. 1999, somm. com. p. 110, obs. Delebècque.

[3] Concerning the legal value of advertising documents, see F. Labarthe, *La notion de document contractuel*, thesis Paris I, ed. 1994, nos 136 et seq., p.100 et seq. Nevertheless, case law considers advertising documents more and more often as a source of definite and firm commitments (see Com., 17 June 1999, *Bull. civ.* IV, n° 195, p.170, *JCP* 1998.1.144 n° 8, obs. Viney, *RTD civ.* 1998.364, obs. Mestre; Civ. 3rd, 17 July 1997, *RJDA* 1998 n° 6, p. 10, *RTD civ.* 1998.363, obs. Mestre).

[4] Civ. 1st, 7 April 1987, *Bull. civ.* I, n° 119, p. 88.

[5] Civ. 3rd, 27 June 1973, *Bull. civ.* III, n° 446, p. 324. See also about a *sponsoring* contract, Versailles, 2 Nov. 1995, D. 1996, IR p. 32.

[6] Pothier, *Traité des obligations*, 1st Part, n° 6 et seq., p. 6.  Read with J.-L., Aubert, *Notions et rôle de l'offre et de l'acceptation dans la formation du contrat*, thesis Paris, ed. 1970 n° 52 (the essential elements are those "without which it would be impossible to know which type of agreement has been entered into"); Ph. Delebecque, *Les clauses allégeant les obligations,* thesis roneot. Aix 1981, p. 198 (these are "the central, specific elements which express the legal and economic operation that the parties want to carry out"). – See also A. Laude, *La reconnaissance par le juge de l'existence d'un contrat,* thesis Aix ed. 1992, n° 318 et seq., p. 203.

[7] Read with Art.14-1 of the Vienna Convention: "A proposal is sufficiently definite if it indicates the goods and expressly or implicitly fixes or makes provision for determining the quantity and the price.". – Translator's note: The Vienna Convention actually refers to the United Nations Convention on Contracts for the International Sale of Goods, which was signed in Vienna in 1980.

NATIONAL ACCREDITATION AUTHORITY FOR TRANSLATORS AND INTERPRETERS
NAATI No. 57513
VERONIQUE MORGAN-SMITH
TRANSLATOR
ENGLISH <-> FRENCH ©

Such is the case in contracts in which it is not customary to determine the price in advance (*below*, n° 287). In a lease, the offer must state the leased thing, the amount of the rent, and the commencement date.[1] And in a contract regarding the recruitment of an actress for the filming of a movie, the Court of Paris defined as essential the financial remuneration of the artist as well as the commencement date of the filming.[2]

110. ***The Firmness of an Offer*** ◊ In order for a proposition to contract to be considered as an offer, its acceptance alone must be sufficient to form a contract. Thus, a proposition cannot be an offer, even though it contains all the essential elements of the proposed contract, if its author shows his will not to be legally bound in case of acceptance.[3] Such is the case when the author of a proposition reserves the possibility to approve his co-contracting party.

Such a reservation can be the result of an express provision: an industrialist, a shopkeeper provides a definite contractual proposition to his prospective clients, while specifying that his offer is subject to "confirmation".[4] As a result, he who took the initiative of proposing the contract intends to have the last word regarding its inception; he remains free to accept or decline orders that are passed to him on the basis of its contractual proposition. The fact that he reserves the right to approve his co-contracting party then triggers a "true reversal of situation"[5]: the recipient of the contractual proposition becomes the offeror, even though he only accepted the conditions determined by its author.[6]

Such a reservation may also be implied and be the result of the nature of the proposed agreement itself. Such is the case if the proposition to enter into a contract which is addressed to the public is in fact *intuitu personae*, that is to say a contract in which the consideration of the person is determining. By publishing an advertisement for a property which is available for rent or for a job offer, its author obviously does not intend to be bound to the first person that will respond to the advertisement, even if this person would accept the conditions of rent or of the salary that he would have proposed. He remains free to choose, amongst the people who have responded to his advertisement, the co-contracting party that he thinks has the best guarantees or even not to choose any.

---

[1] Toulouse 21 Feb. 1984, *RTD civ.* 1984.707, obs.  J. Mestre; see cited references.
[2] Paris, 13 Dec. 1984, *RTD civ.* 1986.97, obs. J. Mestre. Regarding distribution contracts, case law had the opportunity to specify that a territorial exclusive clause was the essence of a commercial concession contract but not of a franchise contract (Com., 9 Nov. 1993, *CCC* 1994, n° 23, obs. L. Leveneur).
[3] Com., 6 March 1990, *JCP* 1990 II 21583, note B. Gross, *D*. 1991, somm. com. 317, obs. Aubert *RTD civ.* 1990.462, obs. J. Mestre.
[4] B. Gross, La formation des ventes commerciales sujettes à confirmation. *Mélanges Roblot*, 1984, p. 433 et seq.; concerning the legality of these clauses in consumer contracts, see S. Erhardt, La clause de confirmation de commande à la lumière de la règlementation des clauses abusives, *CCC* 2007, Etude n° 1.
[5] A. Sériaux, *Droit des obligations*, n° 10.
[6] Concerning the unconscionable nature of such a clause. See Toulouse, 6 Dec. 1995, *D*. 1996, IR p. 87.



This is also true for an offer about a loan as the offeror must be able to assess the solvability of the acceptor.[1] Once again, the offerer is not the person who takes the initiative to start the contractual process but the person who responded to the advertisement.

We could not however consider that an offer would be defined as an invitation to negotiate because this offer includes a reservation. It will depend on the nature of the latter.[2]

In order to distinguish between the reservations which deprive an offer from its specific value, and from those which let it exist, it was proposed to oppose the relative reservations - that is to say those which are opposable to some people only - to the absolute reservations - that is to say those who are opposable to all.[3] Only the first type would involve a change in their nature. In reality, it seems more accurate to examine whether the reservation gives the author of the contractual proposition the possibility to "arbitrarily unbind himself".[4] If so, this is only an invitation to negotiate. Affected by a potestative condition[iv] for the benefit of its author, the offer does not bind him. If not, the offer keeps its own value. Thus, an offer made "while stocks last" is still a genuine offer. As long as he is not out of stock, the offeror must meet any order he receives. Far from depending only on the will of the person who binds himself, the occurrence of the condition then results of sufficiently objective considerations so that judicial review is possible. Likewise, a reservation which is a condition of which the occurrence would depend only on the will of the offeree would not change the nature of the offer. Thus, a letter whereby an automotive manufacturer proposes to a distributor a new contract provided that the latter commits himself to stop representing another brand constitutes a true offer.[5]

We can add that if several incompatible offers coming from the same person coexisted, their recipient would not be allowed to choose the most favourable one.[6] The intentions of the offeror being equivocal, the offer is neither sufficiently definite, nor sufficiently firm.

111. **Protection of consumers** ◊ Some texts about the protection of consumers state that the contractual offer necessarily comes from the professional, even if it did not take the initiative of the contractual transaction and precisely regulate the forms, the content of this offer and the timeframe for which it must be valid. As part of a whole of measures of which the subject matter is to put the consumer in the position of expressing an informed and thoughtful consent, these provisions will be examined in relation to the protection of consent (below, n[os] 262 et seq.)

---

[1] Com., 31 Jan. 1966, *Bull. civ.*. III, n° 64, p. 54, *D.* 1966. 537, note Cabrillac and Rives-Lange.
[2] See B. Célice, *Les réserves et le non vouloir dans les actes juridiques,* thesis Paris, 1968.
[3] J.-L. Aubert, thesis prec., n[os] 41 et seq.
[4] Ghestin, 3rd ed., n° 295.
[5] Com., 4 June 1990, *Bull. civ.,* IV, n° 240, p. 195.
[6] Civ. 1st, 18 July 1967, *Bull. civ.* I, n° 268, p. 199.



112. **2) Characteristics** ◊ The offer may be implied or express, made to the public or a pre-determined person, including or not a timeframe.

113. **The expression of the offer** ◊ The offer must be expressed in order to lead to the formation of a contract by the acceptance of a third party. Otherwise, no potential contracting party could accept it as it did not know about it.

   The methods of expression of a will may be extremely various: in writing (a letter, a catalogue, a flyer, an advertisement, a pro-forma invoice[1]), orally, purely material conducts. Thus, despite their basic character, the exhibition of an object with its price in a window, a taxi parked in a reserved parking space, milometer ready and driver waiting[2], an automatic teller machine in working order... may be analysed as genuine contractual offers. Better, these offers are usually defined as express, because they result from behaviours or situations, which aim to bring the contractual proposition to the knowledge of a third party.[3] It is sometimes taught that the offer implying an initiative is difficult to conceive as an implied offer.[4] The positive law nevertheless gives few extremely rare examples. Thus by remaining in the rented premises at the end of a lease, the lessee implicitly offers to renew the latter. In the absence of an opposition of the lessor, there will be an implied renewal of the lease (s. 1738 of the French Civil Code).[5]

114. **The destination of the offer** ◊ The offer may be addressed to one or several pre-determined persons – this is the case of someone who writes to such and such individual to propose a definite matter –, to a public[6], for example by displaying objects with their prices, using flyers, catalogues and advertisements.[7] In this practice, this distinction sometimes has a tendency to fade due to certain commercial behaviours: offers made to a large public identified by databases often take the form of personalised letters.

---

i Translator's note: under French law, the principle of consensualism is a principle in accordance of which a legal transaction is not subject to any specific form for its validity, the consent having alone the power of creating obligations.

ii Translator's note: pollicitation is a synonym of offer.

iii Translator's note: the French Civil Code provides specific provisions for all the contracts of common use such as sale, lease etc. These contracts are known as "nominate contracts". As opposed to the nominate contracts, the other contracts are known as "innominate contracts". [T]he innominate contracts must only comply with the general contract rules stated in the French Civil Code.

iv Translator's note: [p]Potestative condition means a condition depending upon the will of a party to a contract.

---

1 Concerning *pro-forma* invoices which constitute an offer, see Labarthe, *La notion de document contractual*, thesis Paris I, ed. 1994, n° 315.

2 Civ. 1st, 2 Dec. 1969, *Bull. civ.* I, n° 381 p. 303, *RTD civ.* 1970.589, obs. G. Cornu.

3 Flour, Aubert and Savaux, n° 138.

4 Malaurie, Aynès and Stoffel-Munck, n° 467.

5 P. Godé, *Volonté et manifestations tacites*, thesis Lille, ed. 1977, n° 22 et seq.

6 A. Vialard, L'offre publique de contrat, *RTD civ.* 1971.750.

7 The offer may be addressed to the public, with the exception of certain persons. Thus, the promotional offer made by a supermarket targets its customers and not a professional reseller or a wholesaler which cannot purchase a large quantity of products offered in promotion (Paris, 2 March 1992, *D.* 1992 IR p. 152; read with Com., 3 Dec. 2003, *JCP* 2004.II.10181, note J.-C. Serna).

NATIONAL ACCREDITATION AUTHORITY FOR TRANSLATORS AND INTERPRETERS © NAATI No. 57513 VERONIQUE MORGAN-SMITH TRANSLATOR ENGLISH <–> FRENCH

Exhibit 23

# LEASE

## *This page should not be inserted in the book*



# LEASE

by
Carole AUBERT DE VINCELLES
Professor at the University Jean Moulin-Lyon III

## DIVISION

**General Remarks**, 1-13**.**
**CHAP. 1. – Qualification,** 14-36.
**SECT. 1. – Enjoyment of a thing,** 15-25.
ART. 1. – A THING, 15-16.
ART. 2. – ENJOYMENT, 17-25.
Paragraph 1. – *Leases and bailments,* 19-21.
Paragraph 2. – *Leases and works contracts,* 22-24.
Paragraph 3. – *Lease and sale,* 25.
**SECT. 2. – Enjoyment by the lessor,** 26-30.
ART. 1. – LEASES AND USUFRUCT, 27.
ART. 2. – LEASES AND REAL LEASES, 28-30.
**SECT. 3. – Payment of a price,** 31-34.
**SECT. 4. – Term,** 35-36.
**CHAP. 2. – Formation of a lease,** 37-76.
**SECT. 1. – Parties,** 38-58.
ART. 1. – THE LESSOR, 39-50.
Paragraph 1. – *Where the lessor does not have legal capacity,* 40-41.
Paragraph 2. – *Where the lessor is not the owner,* 42-50.
ART. 2. – THE LESSEE, 51-58.
Paragraph 1. – *Where the lessee is a contracting party,* 51-52.
Paragraph 2. – *Where the lessee is married,* 53-58.
**SECT. 2. – Consent,** 59-67.
ART. 1. – MEETING OF MINDS, 59-60.
ART. 2. – PROOF, 61-67.
Paragraph 1. – *Proof of the existence of the lease,* 62-64.
Paragraph 2. – *Proof of the content of the lease,* 65-67.
**SECT. 3. – Rent,** 68-74.
ART. 1. – DETERMINATION OF THE RENT, 69-73.

ART. 2. – RENT REVIEW, 74.
**SECT. 4. – Term,** 75-76.
**CHAP. 3. – Effects of a lease,** 77-150.
**SECT. 1. – Rights and obligations of the parties,** 77-140.
ART. 1. – THE LESSEE, 77-108.
Paragraph 1. – *Rights of the lessee,* 77-89.
Paragraph 2. – *Obligations of the lessee,* 90-108.
ART. 2. – THE LESSOR, 109-134.
Paragraph 1. – *Obligation to deliver* 111-116.
Paragraph 2. – *Maintenance Obligation,* 117-122.
Paragraph 3. – *Obligation to ensure quiet enjoyment,* 123-127.
Paragraph 4. – *Warranty Obligation,* 128-133.
Paragraph 5. – *Safety Obligation,* 134.
ART. 3. – VALIDITY OF CONTRACTUAL ARRANGEMENTS 135-140.
Paragraph 1. – *Common law regarding obligations,* 136-138.
Paragraph 2. – *Unconscionable clauses,* 139-140.
**SECT. 2. – Non-performance of a lease,** 141-150.
ART. 1. – RESCISSION, 145-148.
ART. 2. – CONTRACTUAL LIABILITY, 149-150.
**CHAP. 4. – End of a lease,** 151-163.
**SECT. 1. – General causes for ending a lease,** 152-157.
ART. 1. – LOSS OF THE THING, 152-153.
ART. 2. – SALE OF THE LEASED THING, 154-156.
ART. 3. – DEATH OF ONE OF THE PARTIES, 157.
**SECT. 2. – Causes related to the term of the contract,** 158-163.
ART. 1. – PERIODIC CONTRACTS, 159-160.
ART. 2. – FIXED TERM CONDTRACTS, 161-163.



# BIBLIOGRAPHY

P.-H. ANTONMATTEI and J. RAYNARD, Droit civil, Contrats spéciaux, 5th ed., 2007 Litec. – J.-L. AUBERT ( under supervision), Gestion de l'immeuble, 1997, Dalloz Action. – AUBRY and RAU, v. 5, par ESMEIN, paragraph 361 et seq. – J. AZÉMA and J.-Ch. GALLOUX, Droit de la propriété industrielle, 6th ed., 2006, Précis Dalloz. – O. BARRET, Les contrats portant sur le fonds de commerce, 2001, LGDJ. – BAUDRY-LACANTINERIE and WAHL, Du contrat de louage, 2nd ed., 1900. – E. BÉGUIN and J.-L. JEGHERS (under supervision), Baux : Actualité législative et jurisprudentielle, 2005, Bruylant. – BÉNABENT, Droit civil, Les contrats spéciaux civils et commerciaux, 7th ed., 2006, Montchrestien. – BIHR and GROSS, Contrats, ventes civiles et commerciales, baux d'habitation, baux commerciaux, 2nd ed., 2004, PUF, Thémis. – Th. BONNEAU, Droit bancaire, 6th ed., 2005, Montchrestien. – J. CAYRON, La location de biens meubles, pref. Ph. DELEBECQUE, 1999, PUAM. – Fr. COLLART-DUTILLEUL and Ph. DELEBECQUE, Contrats civils et commerciaux, 7th ed., 2004, Précis Dalloz. – GINOSSAR, Droit réel, propriété et créance, 1960 LGDJ. – J. GHESTIN, Ch. JAMIN and M. BILLIAU, Traité de droit civil, Les effets du contrat, 3rd ed., 2001, LGDJ. – GUILLOUARD, Traité du contrat de louage, 1887, Pedone. – HERVE DES LYONS and Y. ROUQUET, Baux d'habitation : rapports propriétaires-locataires, secteur privé, secteur HLM, loi de 1948, 5th ed., 2007, Dalloz. – HUET, Les principaux contrats spéciaux, 2nd ed., 2001, LGDJ. – LE GALL, L'obligation de garantie dans le louage des choses, 1962, LGDJ. – Ph. MALAURIE, L. AYNÈS and P.-Y. GAUTIER, Les contrats spéciaux, 3rd ed., 2007, Defrénois. – MAZEAUD and CHABAS, Leçons de droit civil, v. 3, by DE JUGLART, 2nd vol., 2nd part, Montchrestien. – PLANIOL and RIPERT, Traité pratique de droit civil français, v. 10, by GIVORD and TUNC, LGDJ, nos 413 et seq. – ROZÈS, Les travaux et constructions du preneur sur les fonds loués, 1976, LGDJ. – SAINT-ALARY-HOUIN, Le droit de préemption, 1979, LGDJ. – TERRÉ and SIMLER, Les biens, 7th ed., 2006, Précis Dalloz. – TROPLONG, Du louage, v. 2. – Travaux de l'Association Capitant, Le droit au logement (journées mexicaines (1982), v. 33, 1984, Economica.

O. ABRAM, Le sort du bail en cas de vente de l'immeuble loué, AJDI 2002. 588. – B. AMAR-LAYANI, La tacite reconduction, D. 1996, chron. 143. – F. ARCHER, La responsabilité civile du propriétaire bailleur pour le trouble de voisinage causé par son locataire, Defrénois, 2001. 607. – ARGNEY, Le bail des immeubles du mineur, JCP, ed. N, 1988. I. 343. – C. AUBERT DE VINCELLES, Pour une généralisation, encadrée, de l'abus dans la fixation du prix, D. 2006, chron. 2629. – AUBERT, Le congé délivré à des copreneurs solidaires, Rev. Administrer June 1991, p. 4. – G. AZÉMA, Les problèmes posés par les locaux professionnels, Rev. loyers 1990. 257 ; Bail et diagnostic de performance énergétique, Rev. loyers et fermages 2007, n° 878, p. 262. – O. BÉJAT, Les obligations du bailleur en cas de désamiantage, AJDI 2004. 364. – J.-P. BLATTER, La délivrance de la chose louée et la responsabilité du bailleur, Loyers et copr., Nov 2000, chron. 1 ; Les modifications apportées par la loi SRU à la loi du 6 juillet 1989 et au droit commun du bail d'habitation et mixte, AJDI 2001. 210. –

BOCCARA, Tacite reconduction et baux commerciaux, JCP 1996. I. 3898. – V. BRÉMOND, Réflexions autour du transfert à cause de mort du contrat de bail d'habitation, JCP, ed. N, 2002. 1234 and 1240. – Ph. BRIAND, La mise aux normes et le bail d'habitation, Defrénois 2004. 831. – D. BUREAU and N. MOLFESSIS, Les arrêts de l'assemblée plénière de la Cour de cassation en matière de détermination du prix dans les contrats, Petites affiches 1995, n° 155, p. 11. – J. CAYRON, La location mobilière et montages juridiques, Dr. et patrimoine, May 1999, p. 78. – CHEMINADE, La nature juridique du congé en matière de louage de choses et de services, RTD civ. 1972. 307. – F. COHET-CORDEY, Le bail mixte, l'usage professionnel et le droit au renouvellement, AJPI 1996. 573 ; L'obligation de délivrance du bailleur dans les contrats de location d'un bien immeuble, AJPI 1998. 1014. – CORLAY, L'obligation du bailleur en cas d'abus de jouissance d'un locataire au préjudice d'un autre locataire, D. 1979, chron. 27. – Ch. COUTANT-LAPALUS, Présentation de la loi instituant un droit opposable au logement, Loyers et copr. 2007, alerte 15. – CREMONT, Le logement de la famille en période de crise, JCP, ed. N, 1999. 271. – M. DAGOT, La clause d'habitation bourgeoise, JCP 1967. I. 2108 ; Le bail d'un bien indivis, JCP 1985. I. 3178. – DALLANT, Les positions actuelles de l'article 1743 du code civil, JCP 1958. I. 1431. – D. DENIS, La cession de bail immobilier, D. 1976, chron. 269. – DERREZ, Le congé par un copreneur solidaire, Ann. Loyers 1992. 884. – J. DERRUPPÉ, Les rapports locatifs immobiliers à la fin du XXe siècle, Études P. Catala, 2001, Litec, p. 653 ; Souvenir et retour sur le droit réel du locataire, in Mélanges Boyer, 1996, PU Toulouse, p. 169. – A. DJIGO, La responsabilité du fait des gens de la maison, Loyers et copr. 2000, chron. 4 ; Voies de fait commises par des tiers et garantie du bailleur, Loyers et copr. 2001, chron. 4. – P. ESMEIN, Les conventions d'occupation précaire d'un immeuble, JCP 1952. II. 1059. – G. FAU and R. PORTE, Vers un statut des locaux exclusivement professionnels?, Ann. loyers 1988.108. – D. FERRIER, Les apports au droit commun des obligations, in La détermination du prix : nouveaux enjeux, un an après les arrêts de l'assemblée plénière, RTD com.1997. 49. – M.-A. FRISON-ROCHE, De l'abandon du carcan de l'indétermination à l'abus dans la fixation du prix, RJDA 1/96 p 3. – V. GERNEY-RYSSEN, Les baux professionnels dans l'attente d'un nouveau statut, JCP, ed. N, 1991. I. 65. – GODFRIN, Le droit au logement, un exemple d'influence des droits fondamentaux sur le droit de propriété, in Mélanges Bolze, Economica, 1999, p. 137. – D. GRILLET-PONTON, Le droit du bail d'habitation à l'épreuve de la réglementation locative: une nouvelle désacralisation de la propriété ?, JCP 2000. I. 240. – M. GRIMALDI, Présentation de la loi du 23 juin 2006 portant réforme des successions et des libéralités, D. 2006, chron. 2551 ; J.-Cl. civ., art. 1708-1762. – LABORD-LACOSTE, Le louage d'immeuble : évolution historique, Mélanges R. Savatier, 1965, Dalloz, p. 423. – J. LAFOND, La clause d'acceptation des lieux loués "dans l'état où ils se trouvent", JCP, ed. N, 1996, prat. 3715 ; Les critères du "logement décent", JCP, ed. N, 2002. I. 1177 ; Réparations aux "clos et couvert", ibid. 1993. I. 45. – P. LAMBERT, Le droit de l'homme à un logement décent, RUDH 2001, n° 45, p. 47. – J. LEPROVAUX, Les nouvelles règles de gestion de l'indivision successorale issues de la loi du 23 juin 2006, JCP, ed. N, 2006. 1381. – L'HÔTE, Le congé délivré par un seul des



copreneurs, Défrénois 2003. 1383. – LOTTI, Le bail conjugal d'habitation, JCP, ed. N, 1993. II. 325. – Ph. MALAURIE, La réforme de la protection juridique des majeurs, Petites affiches 28 March 2007, n° 63, p. 5. – E. MALLET, Bail d'habitation et caution. Précautions, Loyers et copr. 2003, chron. 4. – R. MARTIN, La Cour européenne des droits de l'homme et les loyers, Ann. loyers 1992. 657. – N. MOLFESSIS, Les exigences relatives au prix en droit des contrats, Petites affiches 2000, n° 90, p. 41. – J. MONÉGER, À propos de l'obligation de délivrer un logement décent, D. 2005, chron. 305 ; À la recherche du bail professionnel, Petites affiches 12 July 2002, p. 19 ; Regards sur le projet de loi relatif au droit opposable au logement, JCP 2007, Actu. 40. – D. NAUDIN, Les baux professionnels pour un statut décentralisé, AJPI 1990. 8. – H. PAULIAT, L'objectif constitutionnel de droit à un logement décent : vers le constat de décès du droit de propriété ?, D. 1995, chron. 283. – J.-P. PIZZIO, La notion de convention d'occupation précaire et son application jurisprudentielle, JCP 1980. I. 2975. – P. QUILICHINI, Le droit au logement opposable, AJDI 2007. 364. – J.-G. RAFFRAY, Feu l'extension conventionnelle du statut des baux commerciaux aux locations professionnelles, JCP, ed. N, 2005. 1352 ; Les baux professionnels: réflexions sur une législation imparfaite, JCP, ed. N, 1991.I. 269. – RAYNAUD DE LAGE, L'entretien, RRJ 2001/4. 1269. – J. RÉMY, Le droit au logement : une longue marche, Rev. loyers 2007. 206. – J. ROCHFELD, Logement décent-Caractéristiques (Décr. n° 2002-120 du 30 janv. 2002 relatif aux caractéristiques du logement décent pris pour l'application de l'art. 187 de la loi n° 2000-1208 du 13 déc. 2000 relative à la solidarité et au renouvellement urbains), RTD civ. 2002. 571. – ROY-LOUSTANAU, Le contrôle judiciaire de la validité des conventions d'occupation précaire,

D. 1988, chron. 216 ; Une convention prétorienne originale : la convention d'occupation précaire de locaux commerciaux, RTD com. 1987. 333. – R. SAVATIER, L'explosion en droit civil, Mélanges Marty, Univ. Toulouse, 1978, p. 1019. – Y.-M. SÉRINET, L'effet rétroactif de la résolution pour inexécution en droit français, in Les sanctions de l'inexécution des obligations contractuelles, Études de droit comparé, LGDJ, Bruylant, 2001, p. 589. – Y. SERRA, La liberté de concurrence du bailleur dans les baux commerciaux, Dr. et patrimoine, July-August 1995, p. 38. – M. STORCK, Indivision successorale et transmission d'entreprise, Petites affiches 28 June 2007, n° 129, p. 11. – B. VIAL-PEDROLETTI, Lois du 5 March 2007 : incidences sur les baux d'habitation, Loyers et copr. 2007, study 6 ; Poursuite du bail à son terme et sort des garanties de paiement, ibid. 2001, chron. 1 ; Le concubin du locataire, ibid. 2003, chron. 3 ; Qui paie l'indemnité d'occupation ?, ibid. 2000, chron. 9. – J. VIATTE, La détermination du loyer est-elle un élément constitutif du bail ?, Rev. loyers 1969. 327. – YAMBA, Les copreneurs, JCP, ed. N, 1997. I. 87. – ZAJAC, Le bail accidentel de la chose d'autrui, JCP, ed. N, 1995. I. 641.

CHEVASSUS, L'obligation de conservation et de restitution du preneur dans le louage d'immeuble, thesis, Dijon, 1969. – DERRUPPÉ, La nature juridique du droit du preneur à bail et la distinction des droits réels et des droits de créance, thesis, Toulouse, 1952. – F. KENDERIAN, Évolution contemporaine du statut des baux immobilier d'exploitation, commerciaux, ruraux, professionnels, thesis, Bordeaux IV, 2001. – O. MARCHAND, Le contrat de bail, thesis, Paris I, 1993. – N. MOULIGNER, Le bail des époux, thesis, Limoges, 2003. – E. SALLES, Le droit au logement dans la jurisprudence française, thesis, Montpellier I, 2001.

**General Remarks.**

1. *Definition.* — A contract for the hiring of things, or a lease, is presented by the Civil Code as a type of hiring, alongside the hiring of work (Civil Code, s. 1708). The hiring of things is defined in section 1709 as "a contract by which one of the parties binds himself to give up to another the enjoyment of a thing during a certain time, and for a certain price, which the latter binds himself to pay him". The lease is thus categorised as a contract by virtue of which a person, the lessor, will grant temporary enjoyment of a thing to another person, the lessee, in consideration of a price, generally called rent.

2. *Civil Code.* — Leases are first and foremost governed by the Civil Code, the provisions of which largely date back to 1804. These provisions are far from being consistent, and the Code distinguishes between three types of rules: those that are common to leases of houses and rural leases (Civil Code, ss. 1714 to 1751), those that are particular to rental leases (Civil Code, sections 1752 to 1762) – which are understood as the hiring of houses and moveables (Civil Code, s. 1711) – and finally, those that are particular to rural leases (Civil Code, ss. 1763 to 1778). The law governing leases arising from the Civil Code represent a very minor percentage of this law, generally because of the large number of special laws that have been developed to govern particular leases. Although

these leases have somewhat restricted the area of application of the Civil Code, the rules pertaining to general leases remain nevertheless very useful.

3. *Special leases* — Special leases have developed considerably, particularly in the second half of the 20th century, and exclusively in the area of real property leases. Alongside very particular older leases which are considered as abnormal leases (F. COLLART-DUTILLEUL and Ph. DELEBECQUE, Contrats civils et commerciaux, 7th ed., 2004, Précis Dalloz, n° 389) or "false leases" (BÉNABENT, Droit civil, Les contrats spéciaux civils et commerciaux, 7th ed., 2006, Montchrestien, n° 313) – which are "emphyteutic[i] leases (see emphyteutic lease) and building leases (see building lease) granting a real[ii] right (see *below,* n[os] 28 et seq.) – there are three main types of special leases which depend on the allocated use of the building. Firstly, the residential lease is certainly the one that has been subject to the most legislative changes, mainly due to a regime based on constraints that are as much economic as social.  Several laws have been passed, each with different objectives:  the Law n° 48-1360 of 1st  September 1948 which was never abrogated (see residential leases and professional leases ; Law of 1st Sept. 1948), the Quilliot Law of 22 June 1982, then



the Méhaignerie Law n° 86-1290 of 23 December 1986 (see residential leases and mixed leases ; Law of 23 Dec. 1986), and finally the Law n° 89-462 of 6 July 1989 (see residential leases and mixed leases; individual tenant-landlord relations, Law of 6 July 1989) which applies to "the hiring of premises for mainly residential use or for a mixed professional and residential use as well as garages, parking spaces, gardens and other premises, rented in addition to the main premises and by the same lessor" (s. 2). Secondly, *commercial leases* (see commercial leases), are for premises used for carrying out a commercial business or trade, and their rules are now codified in the Commercial Code (Commercial Code, s. L. 145-1 et seq.). Finally, *rural leases* (see Rural leases), with their provisions now codified in the Rural Code (Rural Code, s. L. 411-1 et seq.), apply to any building used for agricultural purposes, in order to carry out a business of the same nature.

4. *Fundamental rights and leases.* — Leases have not escaped the movement towards the subjectification of rights (concerning the general movement, see not. J. CARBONNIER, La pulvérisation du droit en droits subjectifs, *in* Droit et passion du droit sous la V° République, 1996, Flammarion, p. 121 et seq.). The lessee now has transferrable and fundamental rights that are recognised, beyond the distinction of special leases. It's not so much the lessee that is protected under these rights, but their place of residence, the law tends to assimilate the dwelling to the person inhabiting it: if the person is the owner, property law offers sufficient protection, however if they are only a tenant, their right over the thing is indirect, exercised through the lessor which allows them the enjoyment of the thing; the lessee of a residential lease may therefore need further protection. Housing has been personified, so that the lessee becomes a person that can be protected under recognised fundamental human rights. The lessee is recognised under two series of rights, the first a national one – the right to housing – and the second an international right under the European Convention for the Protection of Human Rights and Fundamental Freedoms.

5. *Right to decent housing.* — Generally speaking, the Law of 6 July 1989 recognises in section 1 that "the right to housing is a fundamental right". By affirming this principle, which did not at that time have any particular effect, the legislator recognised housing as a higher value and inherent human right (GODFRIN, Le droit au logement, un exemple d'influence des droits fondamentaux sur le droit de propriété, *in* Mélanges Bolze, 1999, Economica, p. 137; P. LAMBERT, Le droit de l'homme à un logement décent, RUDH 2001, n° 45, p. 47). Since then, the right to housing has been extended by enabling the lessee to invoke this right in a more concrete way (E. SALLES, Le droit au logement dans la jurisprudence française, thesis, Montpellier I, 2001). Firstly, it should be mentioned that the rules aim to protect access to housing, particularly by attempting to prevent any discriminatory behaviour. These provisions were integrated into the law of 6 July 1989 governing residential leases, although they apply to any lease pertaining to housing (s. 22-2, Law of 6 July 1989, created by the Law n° 2002-73 of 17 Jan. 2002, and amended by the Law n° 2007-290 of 5 March 2007). Above all, two new subjective rights were created: the right to decent housing and an enforceable right to housing. The *right to decent housing,* apart from a right that is enforceable against the lessor, is above all a fundamental right that the Constitutional

Council (Constitution Council. 19 Janu. 1995, n° 94-359 DC, JO 21 Jan.) declared an "objective with constitutional value" on the basis of paragraphs 10 and 11 of the preamble of the Constitution of 1946, as well as on the principle of the protection of human dignity arising from paragraph 1 (H. PAULIAT, L'objectif constitutionnel de droit à un lodgement décent : vers le constat de décès du droit de propriété ?, D. 1995, chron. 283 ; B. JORION, La possibilité pour toute personne de disposer d'un logement décent est un objectif de valeur constitutionnelle, AJDA 1995. 455).

6. *Enforceable right to housing.* — A more recent development, propelled by the media, is the "enforceable right to housing" arising from the Law n° 2007-290 of 5 March 2007, introducing the enforceable right to housing and various measures in favour of social cohesion. The two main provisions of this law aim to firstly ensure that the State guarantees the right to housing (Building and Housing Code, s. L. 300-1) and secondly allows the right to recourse before an administrative court if housing or accommodation is not offered within a reasonable timeframe to those declared as priority applicants by the departmental mediation committee. (Building and Housing Code, s. L. 441-2-3-1). It will be applicable from 1 December 2008 for people deemed as priority applicants, and from 1 January 2012 for all others that are eligible (Ch. COUTANT-LAPALUS, Présentation de la loi instituant un droit opposable au logement, Loyers et copr. 2007, alerte 15 ; J. MONÉGER, Regards sur le projet de loi relatif au droit opposable au logement, JCP 2007, Actu. 40 ; P. QUILICHINI, Le droit au logement opposable, AJDI 2007. 364 ; J. RÉMY, Le droit au logement : une longue marche, Rev. loyers 2007. 206, D. 2007. 809, Point de vue).

7. *European Convention on Human Rights and French High Court.* — The European convention for the protection of human rights and fundamental freedoms is increasingly invoked in contractual relations and in particular in landlord-tenant relations. The French High Court made some particularly resounding decisions in which it upheld the fundamental human rights of the tenant. Like any other person, the tenant has the right to respect of their family life under Article 8 , paragraph 1, of the European Convention; the recognition of this right for a tenant has the effect of invalidating any clause in a lease preventing the tenant from lodging members of their family ("the clauses of a residential lease cannot, by virtue of Article 8, paragraph 1, of the Convention for the Protection of Human Rights and Fundamental Freedoms, have the effect of depriving the lessee of the ability to provide accommodation to their immediate family" : French High Court. 3rd civ. 6 March 1996, n° 93-11.113 , Bull. civ. III, n° 60 ; D. 1997. 167, note Lamy, JCP. 1996. I. 3958, n° 1, obs. Jamin, JCP 1997. II. 22764, note Nguyen Van Tuong, RTD civ. 1996. 1024, obs. Marguénaud , Defrénois 1996. 1432, obs. Bénabent, RD imm. 1996. 620, obs. Collart-Dutilleul and Derruppé ; 22 March 2006, n° 04-19.349, Bull. civ. III, n° 73, RDC 2006. 1149, obs. Seube, RTD civ. 2006. 722, obs. Marguénaud). Similarly, the lessor cannot infringe on the respect of the privacy of the tenant, by either entering the tenant's home without permission in order to inspect the premises (on the basis of s. 9 of the Civil Code: French High Court. 3rd civ. 25 Feb. 2004, n° 02-18.081, Bull. civ. III, n° 41, D. 2004, somm. 1631, obs. Caron, and 2005, panor. 753, obs. Damas, Defrénois 2004.



1721, obs. Aubert, RDC 2004. 988, obs. Seube), or by taking photographs of the inside of the tenant's home (on the basis of s. 9 of the Civil Code and Article 8 of the European Convention, "the right of each person to privacy extends to the internal presentation of premises which constitute their home and [...] the use of photographs taken of it are subject to the permission of the person concerned", French High Court. 1st civ. 7 Nov. 2006, n° 05-12.788 , Bull. civ. I, n° 466, D. 2007. 700, note Brugnière, RTD civ. 2007. 87, obs. Hauser). However, the French High Court is less inclined to recognise the religious freedom enshrined in Article 9 of the European Convention in contractual relationships. Therefore there is no obligation incumbent upon the lessor, unless by express agreement, to enable respect of religious practices (therefore the installation of a door code to facilitate the religious practice of lessees is not an obligation for the lessor, despite Article 9 of the European Convention of Human Rights: French High Court. 3rd civ. 18 Dec. 2002, n° 01-00.519, Bull. civ.III, n° 262, D. 2004, somm. 844, obs. Damas, AJDI 2003. 182, obs. Guérin et Rouquet, Dr. et patrimoine, July-August 2003, p. 85, obs. Loiseau, RTD civ. 2003. 383, obs. Marguénaud, and p. 575, obs. Libchaber, RDC 2004. 231, obs. Rochfeld, RDC 2004. 348, obs. Lardeux ; for the refusal to uphold religious freedom in the provisions of a strata title by-laws[iii]: French High Court 3rd civ. 8 June 2006, n° 05-14.774 , Bull. civ. III, n° 140, Petites affiches 2006, n° 133, p. 9, note Fenouillet, RJPF 2006, n° 10, p. 12, note Putman, RTD civ. 2006. 722, obs. Marguénaud). Finally, Article 1 of the additional Protocol no 1 which upholds the right to respect of property is now being invoked by parties to a residential lease, and in particular for commercial leases and "the recognised right to the tenant's commercial property" (French High Court. 3rd civ. 18 May 2005, n° 04-11.349, Bull. civ. III, n° 109, RTD civ. 2005. 619, obs. Revet, D. 2006, panor. 925, obs. Damas, RDC 2005. 1093, obs. Seube).

8. *European Convention on Human Rights and the European Court.* — The decisions made by the European Court of Human Rights in the area of leases are even rarer, but are beginning to appear on the basis of Article 1 of Protocol n° 1 which upholds the right to the respect of property (paragraph 1: "Every natural or legal person is entitled to the quiet enjoyment of his possessions. No one shall be deprived of his possessions except in the public interest and subject to the conditions provided for by law and by the general principles of international law" and paragraph 2: "The preceding provisions shall not, however, in any way impair the right of a State to enforce such laws as it deems necessary to control the use of property in accordance with the general interest or to secure the payment of taxes or other contributions or penalties"). It is usually lessors who invoke this provision and the violation of their right to property, either due to difficulties in recovering their property (European Court of Human Rights, 28 Sep. 1995, Spadea and Scalabrino vs Italy, and Scollo vs Italy; 28 July 1999, Immobiliare Saffi vs Italy), or due to a legislative environment that is too strict particularly concerning rents (European Court of Human Rights 19 Dec. 1989, Mellacher and others vs Austria).

In this spirit, the Court recently ruled against Poland for having legislation about leases that impaired the property rights of lessors and thus violated Article 1 of Protocol n° 1 of the Convention, as it failed to strike a fair balance between the general public interest and the protection of the right to property (European Court of Human Rights, 19 June 2006, Hutten-Czapska vs Poland, req. n° 35014/97, RTD civ. 2006. 719, obs. Marguénaud). Less frequently, a tenant may invoke their right to quiet enjoyment of the property. The European Court recently affirmed that "a 300-year lease grants the lessees a proprietary interest coming within the category of leases that constitute property in the meaning of Article 1 of Protocol n° 1. The terms and conditions in which under which this lease was ended are incompatible with the right to property upheld in this Article" (European Court of Human Rights 16 Nov. 2004, Bruncrona vs Finland, req. n° 41673/98, RDC 2005. 467, obs. Debet).

9. *Area of General leases: Principles.* — Despite the existence of special statutes, the rules of the Civil Code related to leases are essential in that they constitute the common[iv] law governing leases; therefore any area that is not governed by a special statute remains subject to the rules governing leases under the Civil Code. Firstly, common law rules can apply to a lease even if it is subject to a special statute, to the extent that these statutes do not govern everything. In particular, the legislation on residential leases and commercial leases leave wide gaps without specific provisions, justifying the application of common law rules of leases. Such is the case, for example, for the rules pertaining to proof (proof of the commercial lease under s. 1715 of the Civil Code: French High Court. 3rd civ. 13 March 2002, n° 00-15.194, Bull. civ. III, n° 59, Petites affiches 18 Nov. 2002, p. 15, note Stoffel-Munck, Defrénois 2002. 1541, obs. J. Honorat) or those relating to liability in the event of a fire. Above all, the common law pertaining to leases applies to all lease contracts that do not fall within the scope of application of one of the special statutes, and may relate to leases for both moveable and real property.

10. *Area of General leases: Leases for moveable property.* — As moveable property had little value in 1804, it is not covered by the Civil Code generally speaking (TERRÉ and SIMLER, Les biens, 7th ed., 2006, Précis Dalloz, n° 28), and there is no particular mention of leases for moveable property. Although a lease can indiscriminately cover either moveable or real property (Civil Code, s. 1713), the rules of the Civil Code seem clearly thought out for real property. As moveable property is very diverse in nature, most of the leases concerning this type of property are not subject to special statutes (see not. J. CAYRON, La location de biens meubles, pref. Ph. DELEBECQUE, 1999, PUAM). There are some however, such as the licence contract (Intellectual Property Code, s. L. 613-8 et seq.) which is a sort of lease for an intangible asset (not. J. AZÉMA and J.-Ch. GALLOUX, Droit de la propriété industrielle, 6th ed., 2006, Précis Dalloz, n° 485 ; F. COLLART-DUTILLEUL and Ph. DELEBECQUE,*op. cit.*, n° 360), or even the lease management[v] of a business (Commercial Code, s. L.144-1 et seq. ; O. BARRET, Les contrats portant sur le fonds de commerce, 2001, LGDJ). Most leases for moveable property are therefore subject to the rules of the Civil Code; even though these rules have been written for real property, they apply to moveable property "to the extent that it is compatible with the nature of things" (French High Court. civ. 16 August 1882, DP 1883. 1. 213, S. 1884. 1. 33, note Esmein).



**11.** *Area of General leases: Professional Leases.*

— A "Professional Lease" is the name generally given to leases over a building used for professional activities other than commercial businesses or trades, namely the private practice of the professions, which does not come under the special statute for residential leases or commercial leases (F. KENDERIAN, Évolution contemporaine du statut des baux immobiliers d'exploitation, commerciaux, ruraux, professionnels, thesis, Bordeaux IV, 2001; F. COHET-CORDEY, Le bail mixte, l'usage professionnel et le droit au renouvellement, AJPI 1996. 573; J. MONÉGER, À la recherche du bail professionnel, Petites affiches 12 July 2002, p. 19; J.-G. RAFFRAY, Les baux professionnels : réflexions sur une législation imparfaite, JCP, ed. N, 1991. I. 269 ; Feu l'extension conventionnelle du statut des baux commerciaux aux locations professionnelles, *ibid.* 2005. 1352). Although the rules of general leases apply to professional leases, they must however be interpreted slightly differently since a provision of the Law of 6 July 1989 which added a section 57 A to the non repealed part of the previous law of 23 December 1986.  As the common law pertaining to leases does not give any particular stability to the lessee, members of various professions petitioned for a more stable occupancy right so that they could run their practices more effectively. This particular provision of the Law of 1989 thus provides a basis for a regime in relation to the term of leases pertaining to "premises used for professional practice only", regardless of whether the professional lessee is a legal person (French High Court. 3rd civ. 10 June 1998, RD imm. 1998. 696, obs. Collart-Dutilleul and Derruppé) or an association (French High Court. 3rd civ. 10 Dec. 2002, n° 99-21.858, Bull. civ. III, n° 255, Loyers et copr. 2003, comm. 87, obs. Vial-Pedroletti) : these leases must be entered into for a term of at least six years, and should be in writing (however even the absence of a written document is not a cause of nullity: Court of Appeal of Montpellier, 6 Feb. 2001, Loyers et copr. 2002, comm. 54, obs. Vial-Pedroletti);  they are tacitly renewed for the same term, unless a notice of non-renewal is served, giving at least six months' notice.  There is a chance that soon a new law could create a new special statute.

**12.** *Area of General leases: Leases for a non-primary residence* — The application of Law of 6 July 1989 is limited to buildings used as a primary residence (s. 1), and therefore relegates to common law any lease for a dwelling that is not the primary residence, namely seasonal rentals, secondary residences and even company provided accommodation. Similarly, common law applies to the rental of various types of buildings such as a garage (where rented separately and not as part of a residential lease subject to the Law of 1989) or a block of land.

**13.** *Area of General leases: Leases for furnished dwellings.*

— Particular consideration must be given to leases for furnished dwellings, as this regime has, due to various new laws, become more specific and independent. For a long time, leases for furnished rentals for residential use, as long as the furniture provided is considered adequate to make it liveable (French High Court. 3rd civ. 18 July 2000, n° 98-21.452, Loyers et copr. 2001, comm. 62, obs. Vial-Pedroletti), were subject to common law governing leases (because they were excluded from the scope of the Law of 1989). The Law n° 98-657 of 29 July 1998 relating to the fight against exclusion, provided an outline of a set of regulations governing furnished rentals by introducing special provisions in the Building and Housing Code (Building and Housing Code, ss. L. 632-1 to L. 632-3). This law has already been amended, and expanded by the so-called " Borloo" law, n° 2005-32 of 18 January 2005 for promoting social cohesion, which provides that all furnished rentals must be subject to a written lease of one year, renewable by tacit agreement for the same term. The lessor can prevent this renewal of the lease only by giving three months notice and on the basis of the same just causes as those provided for in the Law 6 July 1989, that is "either to re-occupy or sell the dwelling, or with just and serious cause such as a breach of one of the tenant's obligations".  More recently, the Law n° 2007-290 of 5 March 2007 introducing the enforceable right to housing has further amended these provisions by stipulating that after the term, the rent can only be increased by a percentage "no higher than the Rental Reference Index mentioned in section 17d of the Law n° 89-462 of 6 July 1989".

# CHAPTER 1

## Qualification.

**14.** The definition of a lease under s.1709 of the Civil Code includes two main factors: the enjoyment of a thing and the existence of a price. Therefore, the lessor must allow this enjoyment of the thing by the lessee, for a certain period and in exchange for which the lessee must pay him rent.

### SECTION 1
### Enjoyment of a thing

### ART. 1 – A THING

**15.** According to section 1713 of the Civil Code a lease may cover "all kinds of moveable and real property", implying the absence of any restriction on the kind of property leased. It could therefore be for a tangible or intangible asset, even

though section 1703 refers to "a thing", implying a more material connotation (concerning the lease of intangible assets, see not. J. CAYRON, La location des biens meubles, pref. Ph. DELEBECQUE, 1999, PUAM, n$^{os}$ 68 et seq.). The only restriction that could be potentially applied is from the common law pertaining to contracts: that the leased thing must belong to the commercial world (TERRÉ, SIMLER and LEQUETTE, Les obligations, 9th ed., 2005, Précis Dalloz, n° 274).

**16.** Without making specific reference to the general theory of contracts and their purpose, the thing must exist at the time the lease is entered into, though it could also be a future thing (Civil Code, s.1130), but must be clearly defined.



## ART. 2. – ENJOYMENT

**17.** *Free and exclusive enjoyment.* — A lease grants the lessee a temporary right of enjoyment of the thing. This enjoyment by the lessee must, according to the courts, be exercised freely for the contract to be classified as a lease (therefore, the provision of a safe by a bank to a client cannot be a lease, as the client does not have free access to the safe: French High Court. com. 11 Oct. 2005, n° 03-10.975, Bull. civ. IV, n° 206, D. 2005, AJ 2869, obs. Delpech, JCP 2006. I. 111, n° 13, obs. Stoffel-Munck, Contrats, conc., consom. 2006, comm. 19, note Leveneur, RTD com. 2006. 177, obs. Legeais). The enjoyment must also be exclusive (F. COLLART-DUTILLEUL and Ph. DELEBECQUE, Contrats civils et commerciaux, 7th ed., 2004, Précis Dalloz, n° 348 ; less clearly, BIHR and GROSS, Contrats, ventes civiles et commerciales, baux d'habitation, baux commerciaux, 2nd ed., 2004, PUF, Thémis, n° 432): "if there is not freely available and exclusive use of these premises, the agreement signed between the parties cannot be classified as a lease" (for a pool to which access was provided to a teacher: French High Court. 3rd civ. 11 Jan. 2006, n° 04-19.736, Bull. civ. III, n° 10, Defrénois 2006. 721, note Savaux, D. 2007, panor. 903, obs. Damas, RDC 2006. 758, obs. Seube ; rappr. : French High Court. 3rd civ. 13 Feb. 2002, n° 00-17.994 , Bull. civ. III, n° 40, D. 2002, AJ 1204, obs. Rouquet, AJDI 2002. 289, obs. Dumont, and p. 450, obs. Blatter).

**18.** The lease is not the only contract which grants enjoyment of a thing to the contracting party: depending on the form this enjoyment takes and its terms and conditions, the courts distinguish whether it qualifies as a lease or other types of contractual relations that may be closely related, such as a bailment, a works contract or a sale.

### Paragraph 1 – Leases and bailments

**19.** A bailment is defined in section 1915 of the Civil Code as an "agreement by which one party receives the thing of another, in order to keep it and return it in kind". Although in a bailment, such as in a lease for moveable property, there is the restitution of a thing, the main difference lies in the purpose of this restitution: whereas in a bailment, the purpose is the keeping of the thing by the bailee, and this constitutes the main obligation; in a lease, the purpose is the use of the lessee of the thing, the keeping of it being accessory to this purpose. Despite these distinctions, some contractual situations may give rise to uncertainty about this, especially where a person gives access to another person to an area for receiving moveable property: the question is then whether the person using the area is a lessee or a bailee. Case law mainly focuses on safes and parking spots.

**20.** *Safes.* — The provision of a safe by a bank to a client is a contract which has not yet been clearly defined, as the courts tend to rule by exclusion, which leads to the conclusion that it may be a contract *sui generis*. Apparently implying that it may indeed be a lease (French High Court. 1st civ. 29 March 1989, Bull. civ. I, n° 142, JCP 1990. II. 21415, note *Putman et Sollety*, RTD civ. 1989. 560, obs. Rémy), the French High Court now refutes the above argument as the client does not have free access to the safe (French High Court. com. 11 Oct. 2005, prec.). This contract cannot be a bailment either as the

banker does not have free access to the safe (see Th. BONNEAU, Droit bancaire, 6th ed., 2005, Montchrestien, n$^{os}$. 782 et seq; BÉNABENT, *op. cit.,* n° 719).

**21.** *Vehicle parking space.*—Providing a parking space for a moveable property (car, boat or caravan) could be classified as a bailment or a lease depending on the situation: the person using the area could be a lessee or a bailee depending on what power is exercised over the thing. If the surveillance of the thing is excluded from the contract, then it can only be a lease, which is generally the case for paid parking areas in private garages (French High Court. 1st civ. 23 Feb. 1994, n° 92-11.378, Bull. civ. I, n° 76, D. 1995. 214, note Dion, RTD civ. 1994. 616, obs. Jourdain, Contrat, conc., consom.1994, comm. 94, obs. L. Leveneur ; French High Court. 3rd civ. 12 June 1996, n° 94-19.052, Bull. civ. III, n° 137), or camping spots (French High Court. 1st civ. 3 Feb. 1982, Bull. civ. I, n° 60). Only in a case where a person gives a thing to another so that the latter keeps it safe, would the person receiving the thing be qualified as a bailee (French High Court. com. 13 Dec. 1982, Bull. civ. IV, n° 405, RTD civ. 1983. 555, obs. Rémy).

### Paragraph 2 – Leases and works contracts.

**22.** Leases and works contracts have very little in common in their essential characteristics, apart from a valuable consideration. Aside from this factor, the service that is central to the agreement is fundamentally different as the lessor must temporarily provide property to the lessee and allow them quiet enjoyment, while the service provider must do something that carries out an assignment a purpose for their client (Civil Code, s. 1710). The distinction becomes even more difficult where the performance of a service must be carried out via or in conjunction with the provision of a thing: so that the provision of a thing and the performance of a service cannot be separated from the use of the thing (providing a theatre ticket, transport, or a furnished room in a hotel or residence, telephone or internet subscription contracts, or even complex contracts for leasing IT equipment that include not just the provision of hardware but the design of software and maintenance, etc.). Faced with these different situations, the courts assess on a case by case basis whether there is only one way the contract can be classified in the matter at hand, namely whether the contract is a works contract in one of its many forms, or a lease.

**23.** *Lease or works contract.* — The courts qualify the contract according to various criteria applied on a case by case basis. One of the first criteria used is that of accessory obligation: so where the contractual situation is characterised by a main obligation, and the other obligation is only accessory to this main one, the contract will be classified in accordance with its main obligation. So for example in the case of a hotel services agreement (a very specific works contract insofar as the obligations of the hotel operator are more onerous; see on this subject not. F. COLLART-DUTILLEUL and Ph. DELEBECQUE, *op. cit.,* n$^{os}$ 816 et seq.), should the hotel operator be considered as a service provider or as a lessor of furnished dwelling? If the contractual relationship highlights the services provided by the hotel operator, the courts will



qualify it as a hotel services agreement (French High Court. soc. 12 March 1954, D. 1954. 311, RTD civ. 1954. 515, obs. J. Carbonnier, Rev. loyers 1954. 280: "A hotel services agreement can be distinguished from a lease of a furnished rental, not by the terms of payment, but by the provision of secondary services that are not customary in a lease for a furnished rental"; concerning hotel services agreements, see also French High Court. 1st civ. 26 Feb. 1991, n° 89-17.501, Bull. civ. I, n° 78, RTD civ. 1992. 140, obs. Gautier). The courts apply the same reasoning to contracts for holiday rentals or nursing homes, by virtue of which a company offers temporary enjoyment of furnished dwellings, with the possibility of accessing additional services at an extra cost. The French High Court does not consider these contracts as leases (French High Court. Full Court. 10 Apr. 1970, Bull. ass. plen. n° 2 [holiday rentals]; French High Court. 3rd civ. 1st July 1998, n° 96-17.515, Bull. civ. III, n° 145, Contrats, conc., consom. 1998, comm. 140, obs. L. Leveneur, JCP, ed. E, 1999. 215, obs. Vialla [nursing homes, for the contracts called admission agreements]). On the contrary, if the services are limited and the client must, for example, clean the premises before returning them, it will be easier to qualify the contract as a lease (French High Court. 1st civ. 19 Oct. 1999, n° 97-13.525 , Bull. civ. I, n° 278, Petites affiches 16 Nov. 2000, n° 229, p. 19, note Thioye, RD imm. 2000. 96, obs. Collart-Dutilleul ; see also French High Court 3rd civ. 26 June 1996, no 94-16.850, Bull. civ. III, no 161).

**24.** A second criterion applied by the courts, to follow on from the first criterion, is control over the thing (BÉNABENT, *op. cit.,* n° 486 ; Fr. COLLART-DUTILLEUL and Ph. DELEBECQUE, *op. cit.,* n° 706) : if the person providing the thing to the other contracting party still retains control over the thing, then it will be more likely classified as a works contract rather than a lease. The courts apply this reasoning to distinguish between the leasing of horses and horse-riding agreements which are works contracts (French High Court. 1st civ. 27 March 1985, Bull. civ. I, n° 111; 11 March 1986, *ibid.* I, n° 64, RTD civ.1986. 608, obs. Rémy ; see also the case of a company operating a golf course who allowed a teacher to use the golf course in exchange for the payment of a percentage of his earnings through his lessons, classified as a works contract and not a lease : Court of Appeals of Versailles, 10 May 2000, RD imm. 2000. 609, obs. Collart-Dutilleul).

Paragraph 3. –<em>Lease and sale.</em>

**25.** The fundamental difference between a lease and a sale is the effect of transfer of property inherent in a sale as opposed to the personal right of enjoyment granted by a lease. Therefore it is inconceivable for a lease to be for a consumable thing: where the use of the thing means it would be consumed, this would preclude it from being returned at the end of the contract (French High Court. 3rd civ. 25 Oct. 1983, Bull. civ. III, n° 197 : "There cannot be a lease contract as the lessee consumes the very substance of the thing which is the subject of the contract" ; see also French High Court. 3rd civ. 30 May 1969, Bull. civ. III, n° 437). The provision of such a thing could be classified as either a simple loan, or a sale. But it is important to distinguish between the thing that is the substance of the contract and which cannot be altered in

the lease, and its fruits which, in themselves, belong to the lessee. The grey area between a sale and a lease is illustrated by contracts allowing a third party to extract the products of a quarry or mine. The courts consider that it can only be a sale of materials to be extracted (goods in anticipation) and not a lease for land to be used, due to the change in the substance of the land (French High Court. 3rd civ. 30 May 1969, Bull. civ. III, n° 437, D. 1969. 561, JCP 1970. II. 16173, obs. Hubrecht, RTD civ. 1970. 188, obs. Cornu). The characteristics of a lease or a sale can be merged in the same complex contract to form a credit leasing contract (a contract *sui generis,* French High Court. 3rd civ. 3 Nov. 1981, Bull. civ. III, n° 173, Grands arrets…, n° 272), or a lease purchase contract (L. 12 July 1984), to which the rules governing leases generally do not apply.

SECTION 2<br/>**Enjoyment of the Lessor.**

**26.** *Personal Right.* — A lease grants the lessee a personal right of enjoyment insofar as the lessee exercises their right through the lessor who must in turn allow them quiet enjoyment. The question of whether the lessee has a real or personal right has caused heated debate, not only in the 19th century (see TROPLONG, Du louage, v. 2, p. 269 et seq.), but especially since the introduction of special laws that considerably reinforce the lessee's rights (see not. DERRUPPÉ, La nature juridique du droit du preneur à bail et la distinction des droits réels et des droits de créance, thesis, Toulouse, 1952 ; Souvenir et retour sur le droit réel du locataire, *in* Mélanges Boyer, PU Toulouse, 1996, p. 169 ; GINOSSAR, Droit réel, propriété et créance, 1960). The French High Court has for a long time supported the argument that the lessee's right is a personal right (French High Court. req. 6 March 1861, DP 1861. 1. 417 ; S. 1861. 1. 713, GAJC, n° 255), without finally resolving the debate (not. Ph. MALAURIE, L. AYNÈS and P.-Y. GAUTIER, Les contrats spéciaux, 3rd ed., 2007, Defrénois, n° 621 ; P.-H. ANTONMATTEI et J. RAYNARD, Droit civil, Contrats spéciaux, 5th ed., 2007, Litec, n° 336). The fact that it is a personal right but not a real right enables a lease to be distinguished from two other closely related situations, usufruct and real leases.

ART. 1 – LEASES AND USUFRUCT

**27.** The rights granted to the lessee and the usufructuary are closely related as both of them hold a right to the enjoyment of a thing (Civil Code, s. 578 : "Usufruct is the right of enjoying things owned by another, in the same manner as the proprietor himself, but on condition of preserving them substantially"). The essential difference lies in the fact that the lessee holds a personal right while the usufructuary holds a real right: whereas the lessee's right is only exercised through the will of the lessor who allows him enjoyment, the usufructuary has a direct right over the thing. Indeed, the distinction between a personal right and a real right can be disputed in view of developments in the laws governing leases in general as well as some specific laws which have considerably strengthened the rights of the lessee over the thing (see not. Ph. MALAURIE, L. AYNÈS and P.-Y. GAUTIER, *op. cit.,* n° 621). Nevertheless, it is still the case



that the lessee cannot resume enjoyment of the thing if they have been evicted and cannot take further action against a lessor who has discharged their obligation under the contract.

### ART. 2. – LEASES AND REAL LEASES

**28.** Real leases, or "false" leases is the name given to (BÉNABENT, *op. cit.,* n° 313 ; J. HUET, Traité de droit civil, Les principaux contrats spéciaux, 2nd ed., 2001, LGDJ, n° 21117), "emphyteutic leases " (Rural Code, ss. L. 451-1 to L. 451-14) and building leases (Building and Housing Code, ss. L. 251-1 to L. 251-9).

**29.** *Long term leases* — A long-term lease (see Emphyteutic Lease) is the lease of a real property that grants the lessee, called the emphyteutic lessee, a more extensive right of enjoyment than in an ordinary lease; in addition to the right of enjoyment usually given to a lessee, the emphyteutic lessee has a real temporary right to the real property, called emphyteusis, which can be mortgaged (Rural Code, s. L.451-1), in exchange for a nominal payment. This real right allows the emphyteutic lessee to add value to the property by carrying out works, plantation or construction.  In order to distinguish this type of lease from an ordinary lease, the courts look to see if the contract has the essential elements of a emphyteutic lease (for example: freedom of the assignment of the lease: French High Court. 3rd civ. 7 April 2004, n° 02-19.870, Bull. civ. III, n° 72; freedom of  the use of the premises: 13 May 1998, n°s 96-13.586 and 96-14.076, *ibid.* III, n° 101, D. 1998, somm. 346, obs. A. Robert; and a nominal payment in consideration of the acquisition by the lessor of improvements and the real right: French High Court. 3rd civ. 5 Dec. 2001, n° 99-20.871, Bull. civ. III, n° 142).

**30.** *Building Leases.* — A building lease (Building and Housing Code, ss. L. 251-1 to 251-9; see Building Lease) is closely related to a long-term lease in that it gives the lessee a real right to the real property, but is essentially characterised by the fact that the lessee has an obligation to build (French High Court. 3rd civ. 11 June 1986, Bull. civ. III, n° 93); these two factors are in themselves sufficient to distinguish this "lease" from a general lease.

### SECTION 3
### Payment of a price.

**31.** *Existence of a price.* — A lease is, by definition, a contract for a valuable consideration; the price is the consideration for the right to enjoyment granted by the lessor. Any contract without a price that also grants a right of enjoyment cannot be classified as a lease: such a contract would be null and void as a lease but could be classified as another type of contract if the conditions of such contract are met.  It could be classified is as a loan for use or a commodatum[vi], which can be essentially distinguished from a lease by the fact that a commodatum is, by definition, a contract that is free of charge, but which gives a right of use over a thing (Civil Code, s.1875). Therefore, depending on whether or not a valuable consideration exists in the agreement in dispute, it could be classified as a lease (for a rural lease. French High Court. 3rd civ. 14 January 2004, n° 02-12.663 , Bull. civ. III, n° 6, RDC

2004. 708, obs. Seube) or a loan for use (French High Court 3rd civ. 13 March 2002, n° 00-17.707 , Bull. civ. III, n° 60).

**32.** The mere existence of a price may not be sufficient to qualify the agreement as a lease; it also has to be shown that the price is in consideration of the enjoyment of the asset and must be linked to its rental value and to the effective period of time for which it is used  (in relation to the refusal to qualify as a lease a collaboration agreement with retrospective fees, "The contract had a valuable consideration and the price paid was not equivalent to a rent, due to its variable nature that had no bearing with any rental value and was not related to the effective period of time for which the premises were used": French High Court 3rd civ. 22 Oct. 2003, n° 02-12.977, Bull. civ. III, n° 178, JCP, ed. E, 2004. 602, note Ferrier, Defrénois 2004. 445, obs. Aubert, Petites affiches 11 Oct. 2004, n° 203, p. 5, obs. Pignarre, RDC 2004. 362, obs. Seube).

**33.** *Serious Price.* — For a contract to be a lease, not only must there be a price, but the price must be sufficiently serious (French High Court. req. 20 July 1893, S. 1893. 1. 424 ; French High Court 3rd civ. 20 Dec. 1971, Bull. civ. III, n° 644 ; 27 April 1976, Bull. civ. III, n° 176; regarding the nullity of  an agreement for use and housing due to a lack of consideration ,  where it was found that, given the economics of the contract, the price charged to the beneficiaries was derisory : French High Court 1st civ. 10 May 2005, n° 03-12.496, Bull. civ. I, n° 203, JCP 2005. I. 181, n° 6, obs. Périnet-Marquet, AJDI 2005. 934, obs. Prigent).  However, the existence of a symbolic price or derisory sum does not necessarily preclude this required element of valuable consideration  which allows an agreement to be classified as a lease.  In this case, one must consult and borrow the case law relating sales: if the contract is one part of a whole picture, the price must be assessed in view of the whole picture which represents the general economics of the  agreement, and enables the consideration to be extended beyond the subject matter of the sale (concerning sales : French High Court 3rd civ. 3 March 1993, n° 91-15.613,Bull. civ. III, n° 28, JCP. 1994. I. 3744, note Fabre-Magnan, RTD civ. 1994. 124, obs Gautier ; French High Court 1st civ. 13 June 2006, n° 04-15.456, Bull. civ. I, n° 306, D. 2007. 277, note Ghestin, RDC 2007. 256, obs. Mazeaud ; concerning the lease: French High Court 1st civ. 16 March 1964, Bull. civ. I, n° 152, lease by a town to an educational association for the rent of one franc, justified by the public interest that the association served).

**34.** *Components of the price.* — The price may take different forms. It could consist of a monetary sum to be paid in regular instalments, called rent, but it can also be payment in kind and take the form of services rendered in consideration  (French High Court 3rd civ. 17 March 1975, Bull. civ. III, n° 103 ; 11 May 1993, n° 91-18.126, Loyers et copr. 1993. 255) or in the transfer of a thing.  There is a grey area with regard to companyprovided accommodation: if the existence of a subordinate relationship is required for the recognition of an employment contract, there is also the question of whether the provision by the employer of housing in consideration for particular services constitutes a lease (see on this subject note: French High Court 3rd civ. 23 June 1993, n° 91-20.817 , Bull. civ. III, n° 96 ; French High Court 1st civ. 8 June 1999, n° 97-15.969 , Bull. civ. I, n° 192,D. 2000. 423, note Julien).



## SECTION 4
### Term.

**35.** *Leases and precarious occupation agreements.*
— For there to be a lease, section 1709 of the Civil Code requires the lessor to allow the lessee enjoyment of the thing "for a certain time". Therefore, the intention of the parties must necessarily include the will to allow enjoyment for a certain time, with a certain agreed stability; if on the contrary, it is provided that the right to enjoyment could cease at any time, without notice or penalty, then this enjoyment becomes precarious and is therefore not classified as a lease. Case law thus distinguishes between a lease and the so-called precarious occupancy agreement, a contract *sui generis* which came about in practice (P. ESMEIN, Les conventions d'occupation précaire d'un immeuble, JCP 1952. II. 1059 ; J.-P. PIZZIO, La notion de convention d'occupation précaire et son application jurisprudentielle, JCP 1980. I. 2975). As it is different from a lease, this agreement is not subject to the regime for leases (therefore, the special regime covering fire in section 1733 is not applicable: French High Court 3rd civ. 17 July. 1996, n° 94-16.590, Bull. civ. III, n° 184, Defrénois 1997. 403, obs. Bénabent, RD imm. 1996. 619, obs. Collart-Dutilleul and Derruppé). The terms and conditions of a precarious occupancy agreement vary from one contract to another (a price that is more or less nominal) and its term can be shorter or longer depending on the particular circumstances (French High Court 3rd civ. 20 December.1971, Bull. civ. III, n° 639).

**36.** *Precarious occupation agreements and special statutes.*
—By entering into a precarious occupation agreement, the parties can be exempt from special mandatory statutes, in particular that relating to commercial lease (French High Court 3rd civ. 5 March 1997, n° 95-12.384 , Bull. civ. III, n° 47 ; 16 Feb. 2000, n° 97-13.752 ,*ibid.* III, n° 33). For rural leases, the law specifically stipulates cases where a precarious occupation agreement may be entered into (Rural Code, s. L. 411-2). In order to prevent fraud, the courts are particularly vigilant and check whether this precarious nature is justified by objective and legitimate factors (French High Court 3rd civ. 25 May 1977, Bull. civ. III, n° 220 ; 19 Nov 2003, n° 02-15.887 , *ibid.* III, n° 202 ; 9 Nov 2004, n° 03-15.084 , *ibid.* III, n° 195, RDC 2005. 31, obs. Seube, Loyers et copr. 2005, comm. 13, obs. Brault ; ROY-LOUSTANAU, Une convention prétorienne originale : la convention d'occupation précaire de locaux commerciaux, RTD com. 1987. 333 ; Le contrôle judiciaire de la validité des conventions d'occupation précaire, D. 1988, chron. 216).

# CHAPTER 2

## Formation of a lease.

**37.** Like any contract, a lease must meet the conditions of validity set out in section 1108 of the Civil Code. Among these general conditions, there are some specific provisions regarding the parties to the contract (see *below* n^os 38 and seq.), their consent (see *below,* n^os 60 et seq.) as well as the rent, which is the subject matter of one of the obligations (see *below,* n^os 69 et seq.). Finally, more particular to leases, there are a number of observations regarding the term of the lease (see *below,* n^os 76 et seq.).

## SECTION 1
### Parties.

**38.** *Day-to-day transactions[vii]* — The rights of the parties over the asset will generally depend on the qualification of the transaction. In general, the inception of a lease, or its renewal, is considered a day-to-day transaction which is a transaction relating to the normal and usual management of the patrimony (F. COLLART-DUTILLEUL and Ph. DELEBECQUE, *op. cit.,* n° 437 ; P.-H. ANTONMATTEI and J. RAYNARD, *op. cit.,* n° 284). However, the term which is often given to a lease and the substantial nature of the rights granted to the lessee, as well as the allocated use of the property, can mean that a lease could be understood as a transaction that is closely related to a transaction affecting the patrimony[viii] , which is why the legislator has made provisions that derogate from the general rules of power, whether it be in favour of the lessor or lessee.

### ART. 1. – THE LESSOR.

**39.** The most common scenario is the case where the lessor is the owner of the leased property: as the owner of full rights over the property, it is his decision whether to give the enjoyment of it to a third party in consideration for a price. But a lease does not necessarily imply ownership of the property by the lessor, as a lessor could still have a number of rights over the property that allows them to grant enjoyment of it to a third party.

Paragraph 1. *Where the Lessor does not have legal capacity*

**40.** *Before the law no 2007-308 of 5 March 2007 reforming the legal protection of adults.* — Due to the nature of the contract, the lessor must have the capacity to enter into day-to-day transactions, but given the particular nature of leases which can be for an extended period and grant substantial rights to the lessee, the law sets out specific rules in this area. The guardian of a minor or an adult under guardianship can, on its own, enter into a lease but its legal effect will be limited depending on the term of the lease; like leases entered into by an usufructuary (see *below,* n° 46), leases entered into by the guardian itself are unenforceable against an incapable person who has since become capable after nine years (Civil Code, s.1718). Furthermore the lease has limited effects when it comes to a minor who has since come of age, as the lessee has no right of renewal at the end of the lease (Civil Code s.456, para. 3). For leases to have their full legal effect, they must be entered into by the guardian with the authorisation of the board of guardians[ix], the guardianship tribunal or the administrator[x] (regarding the validity of a lease entered into by an adult under guardianship,



see Court of Appeal of Paris, 12 Nov. 2002, Loyers et copr. 2003, comm. 102, obs. Vial-Pedroletti ;concerning the nullity of a condition report signed alone by an adult under guardianship : Court of Appeal of Pau, 5 Sept. 2006, *ibid.* 2007, comm. 45, obs. Vial-Pedroletti.

**41.** *With the law n° 2007-308 of 5 March 2007 reforming the legal protection of adults.* — This law, which comes into force on 1 January 2009 (concerning the law in general, see not. Ph. MALAURIE, *La réforme de la protection juridique des majeurs,* Petites affiches 28 March 2007, n° 63, p. 5 ; A.-M. LEROYER, Majeurs-Protection juridique [L, 2007-308 of 5 March 2007 reforming the protection of adults], RTD civ. 2007. 394), could further amend the regime of leases entered into by an incapable lessor or its guardian. Firstly, it should be noted that sections 1718 and 595 of the Civil Code have not been amended; therefore any lease agreed to by the guardian only is not enforceable against the incapable person who has since become capable except during the nine-year period from the date of the execution. Moreover, the current section 456, paragraph 3 (in force until 31 December 2008) will be almost word for word the same as the new section 504, paragraph 3, with a wider scope of application for adults under guardianship: "Leases agreed to by the guardian will not grant the lessee any right of renewal or right to remain in the premises upon termination of the lease, if the incapable person subsequently becomes capable, even if there are legal provisions to the contrary. These provisions are however not applicable to leases entered into before the period of guardianship and which have been renewed by the guardian". However, it is uncertain whether this law shall remain in force or whether it may be amended in the near future. Indeed, the new law specifies that a decree made by the Council of State[xi] shall set "day-to-day transactions relating to the normal and usual management of the patrimony of the person under guardianship "and transactions affecting the patrimony would bind this person in a substantial and enduring way" (New Civil Code, s.496, para.3), transactions for which representation by the guardian would be required (Civil Code, new s.496, para.1). Currently, depending on whether the transaction is considered a day-to-day transaction or one affecting the patrimony, the guardian may either enter into the transaction alone (Civil Code, new s. 504, para. 1) or with the authorisation of the board of guardians or the judge (Civil Code, new s.505). The fate of leases will become clearer once this decree is passed, which could have a ripple effect and amend the current section 1718 of the Civil Code.

Paragraph 2. – *Where the Lessor is not the owner.*

A. – Where the lessor holds a right over the thing.

1° Where the Lessor is a tenant in common

**42.** *New rule of the majority vote* — A tenant in common can lease a thing that holds in tenancy in common[xii], but must comply with the rules related to tenancy in common (Civil Code, s.815-3). These rules have been amended by the Law n° 2006-728 of 23 June 2006 reforming successions and gifts (M. STORCK, Indivision successorale et transmission d'entreprise, Petites affiches 28 June 2007, n° 129, p. 11 ; J. LEPROVAUX, Les nouvelles règles de gestion de l'indivision successorale issues de la loi du 23 June 2006, JCP, ed. N,

2006. 1381 ; M. GRIMALDI, Présentation de la loi du 23 juin 2006 portant réforme des successions et des libéralités, D. 2006, chron. 2551, Dr. et patrimoine 2006, n° 37, p. 2551). While in the past any day-to-day transaction or transaction affecting the patrimony relating to an asset held as tenants in common requires unanimity (Civil Code, s.815-3), the new law, which came into force on 1st January 2007, allows for a majority vote, in particular for leases: " The tenants in common of at least two thirds of the rights held as tenants in common, can with this majority decision : […] 4° Enter into and renew leases except those pertaining to a building used for rural, commercial, industrial or trade purposes" (Civil Code, s.815-3). It is therefore now possible, for either a tenant in common who alone holds two thirds of the rights held as a tenant in common, or for several tenants in common who between them hold the same proportion of rights, to enter into or renew a lease governed by the rules of the Civil Code (or a residential lease subject to the Law of 1989, with the only exceptions provided for under this law being commercial or rural leases). This provision was not included in the initial draft law and resulted from an amendment voted on first reading by the National Assembly (Amendment n° 130, presented by Mr. HUYGUES to the National Assembly on first reading).

**43.** However, the other tenants in common must be informed of the decision or the lease will be unenforceable (paragraph 6: "They have an obligation to inform the other tenants in common. Failure to do so will make these decisions unenforceable against the latter)". This unenforceability of the lease with regard to the uninformed tenants in common could give rise to an eviction order against the lessee (see under the regime of the previous law where the agreement of all tenants in common was required subject to the unenforceability of the lease: French High Court 3rd civ. 4 February 1975, Bull. civ. III, n° 53; French High Court 1st civ. 27 Oct. 1992, RTD civ. 1993. 614, obs. Zenati). The evicted lessee could always invoke the liability of the tenant in common who granted the lease (French High Court 3rd civ. 5 May 1999, n° 97-17.570, Bull. civ. III, n° 105). Given the serious consequence of this failure to inform the other tenants in common, it is important to be particularly careful about the way the notice of information is given, especially as the law is silent on this aspect.

**44.** *Agency Agreement.*— If the tenants in common wish to enter into an agency agreement with one of them or a third party relating to the inception or renewal a general lease, they can make such a decision by this same majority vote (Civil Code, s. 815-3, 2°), and are no longer required to make an unanimous decision as required under the Law of 1976. The previous provision which prevented any implied agency agreement relating to the inception or renewal of leases is retained (Civil Code, s.815-3 *in fine*) (French High Court 1st civ. 25 Oct. 2005, n°s 03-14.320 and 03-14.321, Bull. civ. I, n° 387, JCP 2006. I. 127, n° 6, obs. Périnet-Marquet, Dr. fam. 2006, n° 16, note Beignier [1st esp.], AJDI 2006. 272, obs. Beaugendre). Although the Law of 1976 required a special agency agreement (Civil Code, former s. 815-3, para. 1), the new law does not specify anything in this regard and only states in general terms that a majority vote is required in order to enter a general agency agreement. The consequences on the apparent agency agreement could be significant insofar as some experts believe that the theory of apparent agency[xiii]



cannot be upheld due to the requirement for an express and special agency agreement (P. CATALA, L'indivision, Defrénois 1981, art. 32576, n° 92; see also French High Court 3rd civ. 23 March 1977, Bull. civ. III, n° 150).  But not all share this opinion and believe that the application of the theory of apparent agency is still possible (not. BÉNABENT, *op. cit.,* n° 326 ; P.-H. ANTOMATTEI and J. RAYNARD, *op. cit.,* n° 286 ; F. COLLART-DUTILLEUL and Ph. DELEBECQUE, *op. cit.,* n° 453).

2°  Where the Lessor is a usufructuary

.

**45.** *Principle of freedom.* — The Civil Code (Civil Code, s.595) sets out specific provisions in cases where the lessor is a usufructuary: as a holder of a temporary real property right, the term of the lease granted could impair the rights of the bare-owner when the latter recovers full property rights. Where the usufructuary has the consent of the bare owner, any lease may be granted and will be binding. Furthermore, any rural leases and commercial leases granted by the usufructuary without the owner's consent will not be valid (Civil Code, s.595, para. 4). For other leases, and in particular general leases and residential leases, the principle applied is the principle of the usufructuary's freedom to grant a lease (Civil Code, s.595, para. 1): disposing of the usus and the fructus, the usufructuary is free to grant them temporarily to a third party (and can also lease a business: French High Court 1st civ. 25 Nov.1986, D. 1987. 141, note G. Morin, JCP 1987. II. 20866, note Cohen). The usufructuary therefore becomes the lessor and takes on all obligations and guarantees arising from this status (French High Court 2nd civ. 7 Dec. 1961, Bull. civ. II, n° 842; see in the case of fire and section 1733 of the Civil Code: French High Court 3rd civ. 22 June 1977, Bull. civ. III, n° 277).  The lease is invalid where there has been violation of the rights of the bare-owner, pursuant to common law (nullity of a nine-year lease which was to take effect only upon the death of the usufructuary and which could be renewed at the will of the lessee only: French High Court 3rd civ. 4 Oct.1972, Bull. civ. III, n° 498).

**46.** *Limitations with regard to the term of the lease* — However, in order to protect the bare-owner, section 595 of the Civil Code reduces the term of leases depending on whether it is under or over nine years.  If the lease granted is for a term of over nine years and during the lease the usufruct is terminated, it is binding with regard to the bare-owner only for nine years of the time remaining to run "so as to ensure the lessee only has the right to enjoyment for the period of nine years in which he is" (Civil Code, s. 595, para. 2). Therefore, the bare-owner is within its rights to give notice to the tenant, once the usufruct is terminated, for the end of the current nine-year period, regardless of the legal regime governing the lease (Court of Appeal of Versailles, 16 Oct. 1998, D. 1999 somm. 136, obs. CRDP Nancy II). If the lease granted is for a term equal to or under nine years, and is for a house (s.595, para. 3, sets out an equivalent provision for a rural lease, made useless by paragraph 4 which requires the consent of the bare-owner), the usufructuary cannot authorise in advance the renewal of a lease or enter into another lease in advance more than two years before the expiry of a current lease (Civil Code, s.595, para. 3).

3° Where the Lessor is a married couple with a joint estate

**47.**  As a lease can grant enduring rights to the lessee, it is subject to particular rules when it pertains to an asset that belongs to the joint estate of a married couple (N. MOULIGNER, Le bail des époux, thesis, Limoges, 2003). There is strong protection in a case where one of the spouses wishes to lease a jointly owned property to be used for agricultural, commercial, industrial or trade activities: these special leases, which are particularly protective of the lessee, can only be entered into with the consent of both spouses (Civil Code, s.1425). On the other hand, other leases on a jointly owned property (unless it is for the family home, s.215), namely residential leases or general leases, can be signed by just one spouse and are subject to the rules provided for leases entered into by usufructuaries which are then transposed  (Civil Code, s.1425; see *above*, n°s 45 et seq.).

B. – Where the Lessor does not have a right over the thing

**48.** *Leases over a thing belonging to another.*— A lease over a thing belonging to another is considered by the doctrine (not. F. COLLART-DUTILLEUL and Ph. DELEBECQUE, *op. cit.,*n° 448 ; Ph. MALAURIE, L. AYNÈS and P.-Y. GAUTIER, *op. cit.,* n° 636) and case law (French High Court civ. 17 May 1927, DP 1928. 1. 25, note Capitant, concl. Matter, S. 1927. 1. 89, note Esmein ; French High Court 1st civ. 7 Nov. 1950, Bull. civ. I, n° 217 ; French High Court 3rd civ. 7 Oct, 1998, n° 96-20.409, *ibid.* III, n° 187 ; Court of Appeals of Paris, 9 Jan, 2001, Loyers et copr. 2001, comm. 110, obs. Vial-Pedroletti), as a valid lease between the parties, "in the absence of any interference with enjoyment of the leased property" (French High Court 3rd civ. 7 Oct. 1998, prec.). The acquisition of ownership thus has no consequence on the *inter partes* regime of the current lease (French High Court 3rd civ. 13 Feb. 1985, Bull. civ. III, n° 33). If the enjoyment of the lessee is disturbed by the lessor's lack of ownership, the lessee can invoke the lessor's civil contractual liability; as they do not hold rights over the thing, the lessor cannot grant the lessee the promised enjoyment and is thus in breach of contract.  A loss of ownership of the thing during the lease, thus affecting the ability to grant enjoyment of it, would result in the termination of the lease agreement t ("a loss of ownership of the leased thing by the lessor as a result of a deed of sale will necessarily lead to the termination of the lease agreement", French High Court com. 12 Oct. 1993, n° 91-17.621, Bull. civ. IV, n° 327, Contrats, conc., consom. 1994, comm. 5, obs. Leveneur).

**49.** However there is still  a debate over whether a lease granted over a thing belonging to another without the lessor having any right whatsoever over the thing would in fact render the contract null and void due to a lack of consideration.  Indeed, if the lessor does not have the ability, at the time of entering into the contract, to grant enjoyment over the thing, the lessee's obligation lacks consideration and could justify the rescission of the contract (concerning reservations about the nullity, see BÉNABENT, *op. cit.,* n° 324).



**50.** With respect to the genuine owner, the lease is not enforceable and this owner could evict the lessee at any moment, unless the latter invokes the theory of appearance[xiv] (French High Court 1st civ. 2 Nov. 1959, Bull. civ. I, n° 448, JCP 1960. II. 11456, RTD civ. 1960. 327, obs. Carbonnier; French High Court 3rd civ. 4 Feb. 1975, Bull civ. III, n° 36 ; 21 Jan. 1981, *ibid.* III, n°17). If the lessor loses ownership of the thing during the lease, due to his right being cancelled, those leases entered into without any fraud, namely contracts that were agreed to in good faith by the tenant, seem to remain in effect (French High Court 3rd civ. 25 Oct. 1983, Bull. civ. III, n° 196).

ART. 2. – THE LESSEE

Paragraph 1. – *Where the Lessee is a contracting party.*

**51.** *Principle: only the contracting party is the lessee.* — As long as the lessee has the capacity to enter into a contract, the lessee who signs a contract with the lessor is the only holder of the lease (French High Court 3rd civ. 24 Jan. 1996, n° 91-18.227, Bull. civ. III, n° 17) and no third party can be recognised as another equivalent lease-holder. If a third party is recognised as joint holder of the lease, it's only because they are considered as a contracting party: the lease could be oral, the behaviour of the parties could be sufficient for that person to be considered as a lessee (for example, see French High Court 3rd civ. 14 Nov. 1996 and Court of Appeal of Versailles, 20 Sep. 1996, RD imm. 1997. 141, obs. Collart-Dutilleul and Derruppé). Under common law regarding obligations, when the lessee dies their obligations are passed on to their heirs or assigns. (Civil Code, s.1742 ; see. *below,* n° 157).

**52.** *Limits for special leases.* — There are some leases that allow certain exceptions by allowing others who have not signed the lease to be recognised as lessees; therefore in residential leases, the spouse, the partner of a civil union or the known de facto spouse can become the lessee when the contracting party dies or leaves the home (s.14, Law of 6 July 1989; see Residential Leases, Commercial Leases).

Paragraph 2. – *Where the lessee is married*

**53.** *Principle of joint lease* — Common law pertaining to leases sets out a special provision for residential leases in relation to married couples (N. MOULIGNER, thesis prec.) : " The right to the lease of the premises, if they are not used for commercial or professional purposes, and effectively serve as the home of the married couple, regardless of what regime their marriage falls under and notwithstanding any provision to the contrary, even if the lease was entered into before the marriage, is deemed to belong to both spouses" (Civil Code, s.1751). This joint lease even applies to any housing provided to one of the spouses as part of their employment (French High Court 3rd civ. 10 Jan. 2007, n° 05-19.914, Loyers et copr. 2007, comm. 67, obs. Vial-Pedroletti). In the event of divorce or legal separation, the Courts can end this joint lease and attribute the lease to one of the spouses in accordance with the interests in dispute (Civil Code, s.1751, para.2). As an exception to the application of succession laws, in the event of the death of one of the spouses, "the surviving spouse who is joint lessee can hold an exclusive right over it unless they expressly give up this right" (s.1751, para.3, L. 3 Dec. 2001).

**54.** *Joint lease through marriage.* — Even when spouses are legally separated, they are considered as joint lessees "until the transcription of a divorce order in the margin of the civil registry" (French High Court 2nd civ. 3 Oct. 1990, n° 88-18.453 , Bull. civ. II, n° 177, D. 1992, somm. 219, obs. Lucet, JCP, ed. N, 1991. II. 57 [2nd esp.], obs. Simler, Defrénois 1991. 1126 [1st esp.], obs. Champenois ; French High Court 3rd civ. 27 May 1998, n° 96-13.543 , Bull. civ. III, n° 109, Dr. fam. 1998, n° 95, obs. Lécuyer [same case] ; 2 Feb. 2000, n° 97-18.924, Bull. civ. III, n° 18, D. 2001, somm. 168, obs. CRDP Nancy II,JCP 2000. I. 245, n° 8, obs. Wiederkehr, Defrénois 2000. 1177, obs. Bénabent, Dr. fam. 2000, n° 41, note Beignier ; 31 May 2006, n° 04-16.920 , Bull. civ. III, n° 135, RDC 2006. 1143, obs. G. Lardeux). Joint lease applies more to marriage than to de facto relationships, with the determining factor being that the dwelling has been used, at least for some of the time, as the family home (not. French High Court 3rd civ. 31 May 2006, préc.).

**55.** *Consequences of joint lease.* — This principle of joint lease, in the case of spouses, means that each spouse is personally considered as a lessee, with a separate status independent from the other, leading to several major consequences. Firstly, it implies that both spouses must be a personal recipient of any legal document influencing the current lease, subject to the unenforceability against the non-recipient. Therefore, if a lessor wishes to give notice to both spouses, they must deliver it personally to both of them (French High Court 3rd civ. 10 May 1989, Bull. civ. III, n° 103, RTD civ. 1990. 300, obs. Rémy ; 18 March 1992, n° 90-13.759 , Bull. civ. III, n° 92 ; 27 January 1993, n° 90-21.825, *ibid.* III, n° 11, D. 1993, somm. 173, obs. Bihr, JCP 1994. I. 3733, n° 4, obs. Wiederkehr), or it will not be binding on the non-recipient (French High Court 3rd civ. 23 Jan. 1985, Bull. civ. III, n° 16, RTD civ. 1985. 735, obs. Rémy, JCP, ed. N, 1986. II. 73, obs. Simler ; 20 July 1994, n° 92-21.682, Bull. civ. III, n° 149). Similarly, in the case of eviction, both spouses must be parties to the order (French High Court 3rd civ. 23 Jan. 1985, prec.; 20 Jan. 1988, Bull. civ. III, n° 12).

**56.** Furthermore, any legal document from one of the spouses must also come from the other for it to take full effect and be binding on both of them. Therefore, if the spouses wish to give notice, they must do it in both their names for that notice to take effect (French High Court soc. 4 Nov. 1967, RTD civ. 1968. 388, obs. Cornu; French High Court 3rd civ. 20 Feb. 1969, JCP. 1969. II. 15946, obs. R. D.; 19 June 2002, n° 01-00.652, Bull. civ. III, n° 140, D. 2003, somm. 731, obs. Damas, Defrénois 2003. 672, note Brémond, RJPF 2002-10/18, obs. A. L., Loyers et copr. 2002, comm. 221, note Vial-Pedroletti). Similarly, the extension of the lease by a variation signed by only one spouse is not binding on the other (French High Court 3rd civ. 25 Sept. 2002, n° 01-01.034 , Bull. civ. III, n° 171, JCP 2003. I. 111, n° 1, obs. Wiederkehr), nor is a waiver of certain provisions of the law implying that the execution of a second lease is not binding on the other person who did not sign the contract, in the absence of proof that such a waiver was expressly made (French High Court 3rd civ. 29 Nov. 2000, n° 98-23.068, Bull. civ. III, n° 176).



**57.** Finally, the fact that each spouse is personally a lessee of the lease implies that each spouse also has a personal obligation towards the lessor, independently of the other spouse. Therefore, the discharge of the obligation of one party does not discharge the other of his/her obligation; so if the debt owed to the lessor by the lessee is discharged , it can still remain at the charge of his/her spouse (in the event of the discharge a debt of a co-contracting party in the absence of a declaration of insolvency procedures of the latter: French High Court 3rd civ. 23 March 2005, n° 03-20.457, Bull. civ. III, n° 69, D. 2005, AJ 1084, obs. A. Lienhard , panor. 2114, obs. Brémond , and 2006, panor. 958,obs. Damas, AJDI 2005. 466, obs. Le Corre). Similarly, in the relationship with the lessor, section 220 of the Civil Code provides for the joint and several liability of household debts incurred by one spouse (debts of unpaid rent), the principle of joint lease means that those debts will be ultimately shared by both spouses.

**58.** *Restriction: Law of 6 July 1989.* — These consequences of the automatic joint lease of spouses are restricted by a particular provision of the Law of 6 July 1989 concerning residential leases, with a de facto application to most current residential leases today. By virtue of section 9-1 of this law, added by the SRU Law of 13 December 2000, "notwithstanding the provisions of sections 515-4 and 1751 of the Civil Code, any notices or legal documents served in application thereof by the lessor are as of right binding on the lessee's partner by civil union or de facto spouse if the existence of this partner or spouse was not made known to the lessor". Therefore, if the lessee does not personally inform the lessor of the marriage during the lease (it is incumbent on the lessee to prove that this information was given, French High Court 3rd civ. 19 Oct. 2005, n° 04-17.039, Bull. civ. III, n° 198, D. 2006, panor. 960, obs. Damas, Loyers et copr. 2005, comm. 218, obs. Vial-Pedroletti) and the uninformed lessor gives notice or serves any other legal document on the lessee, it will also be binding on their partner or spouse. However, if the lessor has been informed yet does not address the document to the two spouses, then section 1751 of the Civil Code takes full effect and the notice will only be binding on the single recipient (not. Court of Appeal of Montpellier,19 Nov 2001, Loyers et copr. 2002, comm. 145).

SECTION 2
**Consent**

ART1. – MEETING OF THE MINDS.

**59.** *Consensual Contract.*— A lease is a consensual contract which is formed once agreement is reached on the essential elements of the contract. No particular form is required for the validity of a general lease, unlike special leases which have introduced different mechanisms and protective measures. Therefore it does not matter if the lease is in writing or oral, its form has no impact on the validity of the contract. Section 1714 of the Civil Code, according to which it is possible to lease "in writing or orally" is not as it may initially seem a fundamental rule per se, but a rule regarding proof (see *below,* n°s 61 et seq.).

**60.** *Preliminary contracts.* — As is the case with any contract, a lease can be subject to preliminary contracts or pre-contracts. Parties may therefore decide that prior to a final lease agreement they will sign a unilateral promise, including terms by which the promisor commits to enter into the lease if the beneficiary exercises the option (French High Court 3rd civ. 27 June 1973, Bull. civ. III, n° 446), or even preferential agreement in which the promisor commits to offer the lease to the beneficiary as soon as they decide to lease the property. More frequently in the case of leases, a bilateral promise of lease may be entered into; using the same process as a sale and by analogous application of section 1589 of the Civil Code, a promise of lease is equivalent to a lease (French High Court 3rd civ. 20 May 1992, n° 90-21.109 , Bull. civ. III, n° 152, D. 1993, somm. 68, obs. E.-N. Martine ; 28 May 1997, n° 95-17.953, Bull. civ. III, n° 116).

ART. 2. – PROOF.

**61.** The Civil Code sets out specific provisions concerning proof of a lease, provisions that derogate from common law. When it comes to proof, the Civil Code makes a distinction between an oral lease and a written lease: the proof requirements are not the same for oral leases as they are for written leases. The rules of proof also differ according to the purpose of the evidence: whether proving the existence or the content of a lease.

Paragraph 1 – *Proof of the existence of the lease.*

**62.** *Written instrument, oath or admission.*— Although proof of the lease by third parties is free of restrictions, the same does not apply to the parties of the lease. The ultimate proof is a written document satisfying the terms and conditions of sections 1316 et seq of the Civil Code relating to the proof of obligations, namely a a private agreement[xv] (Civil Code, s.1322 et seq.) or a formal agreement[xvi] (Civil Code, s.1317 et seq.). Generally speaking, in the area of proof, the oath and the admission are presented as methods of proof that are always admissible even where a document in writing is required under section 1341 of the Civil Code (TERRÉ, Introduction générale au droit, 7th edition, 2006, Précis Dalloz, n° 639). Section 1715 para. 2, confirms this for the oath by specifying that "an oath may only be given from the person denying the lease", so this restriction over which party can give an oath has consequently limited the number of leases that are able to be proven in this way.

**63.** *Oral lease which has not yet been performed* — Section 1715 of the Civil Code provides for the method of proof in the case of an oral lease which has not yet been performed. Insofar as the existence of such a lease is suspect, given there is no visible proof, the law is more demanding and derogates from common law principles: proof by witnesses is not allowed no matter what sums are involved in the lease, as an exception to section 1341 of the Civil Code. The exceptions to this section cannot therefore apply: even if there has been a prima facie evidence in writing[xvii] (French High Court 3rd civ. 18 March 1987, Bull. civ. III, n° 54) and even if there have been payments (French High Court 3rd civ. 16 May 2000, n° 98-17.803, Loyers et copr., 2000, comm. 185, obs. B. Vial-Pedroletti) or in the event that it is impossible to



LEASE

provide a written document; proof by witnesses is always inadmissible and cannot be used to open a case under section 1348, paragraph 1 (see however an expert who believes it is possible to use proof from witnesses in the case of a moral impossibility of a person of procuring a document in writing: BÉNABENT, *op. cit.,* n° 331). Therefore the only possible forms of proof allowed for oral leases are an oath (Civil Code, s.1715, para. 2) or an admission.

**64.** *Oral lease which has begun to be performed.* — The courts have made an *a contrario* interpretation of section 1715 by considering that proof by witnesses and presumption are possible where a oral lease has begun to be performed (French High Court 3rd civ. 13 March 2002, n° 00-15.194, Bull. civ.III, n° 59, Defrénois 2002. 1541, obs. Honorat, Petites affiches 18 Nov 2002, n° 230, p. 7, note Stoffel-Munck, Rev. Loyers 2002. 337, obs. Canu). It must therefore be proven that the lease has already begun to be performed, in order to then prove by implication that the lease exists. To prove this commencement of performance, the courts require proof of the essential elements of a contract and in particular the payment of an agreed price, as merely occupying the premises is not sufficient proof (French High Court 3rd civ. 5 Jan. 1978, Bull. civ. III, n° 10). Given that there are no restrictions on proving that performance of the lease has begun (French High Court 3rd civ. 26 Feb. 1971, Bull. civ. III, n° 147, RTD civ. 1971. 867, obs. Cornu; 20 Dec. 1971, Bull.civ. III, n° 642), this case law in fact means that there are no restrictions on evidence to prove the existence of a lease that has already begun to be performed.

Paragraph 2. – *Proof of the content of the lease.*

**65.** *Common law pertaining to proof.* — Proof of the contents of the lease does not constitute, as a general principle, a departure from the general rules governing proof: therefore, proof must be provided in application of sections 1341 et seq of the Civil Code. However, for two particular elements of the contract, the factors that mostly determine the consent of the parties, the law and case law provides for particular rules regarding proof.

**66.** *Proof of the rent.* — Section 1716 of the Civil Code sets out specific provisions when it comes to proving the amount of rent in a oral lease which has begun to be performed: the only types of admissible evidence are receipts, the oath of the lessor, or if the tenant prefers, an appraisal by experts. No other type of evidence is admissible (French High Court 3rd civ.15 March 2000, n°ˢ 98-11.855 and 98-13.028, Bull. civ. III, n° 54, Contrats, conc., consom. 2000, comm. 90, obs. Leveneur, RD imm. 2000. 253, obs. Collart-Dutilleul). The respective roles of the judge and the expert when it comes to setting the price in application of section 1716 are not very clear. Once the price is determined by experts chosen by the lessee, and the expert report is signed, it seems that the judge can still at his discretion set the price of the lease that has been performed. But the judge does not seem bound to follow the expert in the amount proposed in the absence of an agreement to the contrary, which gives him considerable discretion when setting the price of the lease. (French High Court civ. 14 Nov 1892, DP.1893. 1. 11 ; French High Court 3rd civ. 3 Oct. 1968, Bull. civ. III, n° 356, RTD civ. 1969. 351, obs. Cornu; see also: F. COLLART-DUTILLEUL and Ph.

DELEBECQUE, *op.cit.,* n° 435 ; Ph. MALAURIE, L. AYNÈS and P.-Y. GAUTIER, *op.cit.,* n° 649 ; J. VIATTE, La détermination du loyer est-elle un élément constitutif du bail?, Rev. loyers 1969. 327).

**67.** *Proof of the term.* — According to case law, the term of a lease can only be proven if in writing. Therefore, a lease for which the term is disputed, whether it is an oral or written lease, must be considered a periodic lease[xviii] and follow this regime (French High Court civ. 28 July. 1908, DP 1908. 1. 461, S. 1909. 1. 381; 24 Feb. 1948, S. 1949. 1. 108), or will have the minimum term resulting from a special statute (nine years for commercial and rural leases, three years for residential leases).

SECTION 3
**Rent.**

**68.** *Existence of rent* — A lease is a contract for valuable consideration by definition (Civil Code, s.1709); while rent is one of the conditions required for a lease to be valid and as already mentioned is one of the essential characteristics of its qualification (see *above,* n°ˢ 31 et seq.). Regarding rent, two elements must be analysed: its determination and its review

ART. 1. – DETERMINATION OF RENT.

**69.** *Freedom to set the sum.*—There is no provision of the Civil Code that relates to the amount of the rent: the parties are thus free to reach their own agreement on this amount, which is a particular element of the regime governing general leases, as opposed to special regimes that do have provisions on setting the rent.

**70.** *Determination of rent, a condition of validity?* — Although the existence of a rent that is being paid is a condition of validity of the lease, the determination of the amount is another matter. Several experts are of the opinion that the determination of the amount of the rent is a condition of validity of the lease (F. COLLART-DUTILLEUL and Ph. DELEBECQUE, *op. cit.,* n° 459; BÉNABENT, *op. cit.,* n° 322 ; P.-H. ANTONMATTEI and J. RAYNARD, *op. cit.,* n° 304). However, there is some doubt on this subject. No decision has clearly stated whether the determination of the price of a lease was required for it to valid, or whether it is not. The decisions generally cited by those defending the need to determine the price are more related to the requirement of an agreement on the price and not on how the amount is determined (for example: French High Court 3rd civ. 27 June 1973, Bull. civ. III, n° 446, RTD civ. 1983. 748, obs. Chabas). As for the decisions implying that it is not necessary to determine the amount of the rent, these are generally pertaining to complex contracts that combine both a lease and service (see three of the decisions made by the French High Court. Full Court. 1st Dec. 1995 [4 arrêts], JCP. 1995. II. 22565, concl. Jéol, note Ghestin, JCP, éd. E, 1996. II. 776, note Leveneur, D. 1996. 13, concl. Jeol, note Aynès , Petites affiches 27 Dec. 1995, n° 155, p. 11, obs. Bureau and Molfessis).

**71.** The main reason which would support the view that the price does not need to be determined at the time the lease is



entered into for it to be valid would be based on the consequences of the decisions made by the Full Court on 1 December 1995 (prec.). Indeed, since these decisions, which have had major consequences on the regime affecting price in contracts (see not. C. AUBERT DE VINCELLES, Pour une généralisation, encadrée, de l'abus dans la fixation du prix, D. 2006, chron. 2629), there is no longer a general legal requirement with regard to setting the price at the time of entering into the contract, as section 1129 of the Civil Code "[is] no longer applicable to setting a price" (more recently: section 1129 of the Civil Code "is not applicable to setting the price in any matter", French High Court 1st civ. 12 May 2004, n° 03-13.847, RDC 2004. 925, obs. Mazeaud). No laws resulting from the general theory regarding contracts would appear to require more than an agreement on the price between the parties for the contract to be valid. Only specific legal provisions can now make the determination of the price a condition of validity of a contract. However, legal provisions related to general leases have not made the determination of the price a condition of validity of the lease. Indeed, no legal provision related to this type of contract mentions the requirement of a price determined at the time that the contract was entered into, unlike section 1591 of the Civil Code relating to sales. Only section 1709 mentions a price, but only states that as an essential element, a price must exist, there is no mention of how it should be determined.

**72.** These reasons support the conclusion that a lease can be valid without the parties having determined the amount that should be paid. If this is the only impact of the decision of 1st December 1995 (see also: D. BUREAU et N. MOLFESSIS, Les arrêts de l'assemblée plénière de la Cour de cassation en matière de détermination du prix dans les contrats, Petites affiches 1995, n° 155, p. 11, spec. n° 24 ; read with. : N. MOLFESSIS, Les exigences relatives au prix en droit des contrats, *ibid.* 2000, n° 90, p. 41, spec. n° 10 ; D. FERRIER, Les apports au droit commun des obligations, *in* La détermination du prix : nouveaux enjeux, un an après les arrêts de l'assemblée plénière, RTD com. 1997. 49, spec. n° 13 ; M.-A. FRISON-ROCHE, De l'abandon du carcan de l'indétermination à l'abus dans la fixation du prix, RJDA 1/96, p. 3, spec. n° 16 ; read with.: Ph. MALAURIE, L. AYNÈS and P.-Y. GAUTIER, *op.cit.,* n° 649 ; J. VIATTE, section prec.), it may be unfortunate as it is considered preferable, from a legal policy point of view, that a price should be agreed upon at the time of entering into the contract. Otherwise this type of reasoning could lead to the courts setting the price themselves in cases where parties disagree on the amount to be paid, as they do for works contracts, although they seem hesitant to do so for leases (for example: French High Court 3rd civ. 10 Dec. 1975, Bull. civ. III, n° 369; 8 Feb. 2006, n° 05-10.724 , *ibid.* III, n° 25).

**73.** *Abuse in the determination of the price* — In all cases, the courts do not seem opposed to the idea of applying the theory of abuse in the determination of the price of a lease agreement . It was applied in a recent decision relating to the lease of a safe (the Court considered that there was a lease in this case, but the debate was not about how the contract should be classified; see *above,* n° 20). Although in this matter, the first civil division did not consider it an abuse in light of the circumstances, this theory was applied (French

High Court 1st civ. 30 June 2004, n° 01-00.475, Bull. civ. I, n° 190, RTD civ. 2004. 749, obs. Gautier, and 2005. 126, obs. Mestre and Fages, D. 2005. 1828, note Mazeaud, RDC 2005. 275, obs. Stoffel-Munck).

ART. 2. – RENT REVIEW

**74.** *Contractual freedom and index clause.* — There are no particular legal provisions governing rent review, a subject in relation to which the Civil Code remains silent. Therefore common law regarding index clauses must be applied, namely the index chosen must have a direct relationship with the type of property leased or with the business carried out by one of the parties (Monetary and Financial Code, s. L.112-1 et seq.). With regard to leases for constructed buildings, the INSEE index of construction costs can be chosen, which has been replaced by the "Rental Reference Index" under the Law of 26 July 2005 promoting social cohesion.

SECTION 4

**Term.**

**75.** *Fixed Term or Periodic Leases* — The term of a lease is one of its essential elements, as it is a contract for future performance, insofar as the enjoyment granted by the lease must occur over time. As the right to enjoyment is granted "for a certain time" (Civil Code, s.1709), the lease can either be a fixed-term or periodic lease. A fixed term lease is a lease where the parties have provided for a limited term, at the end of which the lease will terminate. A periodic lease is a lease where the parties have not determine a particular term; they could therefore terminate it at any time by complying with a notice period, pursuant to the general regime for permanent contracts. It must be noted that an oral lease made without any written instrument is automatically a periodic lease (Civil Code, s.1736), because proof of the term must be in writing (see *above,* n° 67).

**76.** *Prohibition against perpertual leases.* — A lease must be for a certain term (Civil Code, s. 1709) which confirms that a lease, like any contractual obligation, cannot be permanent. The basis for this prohibition is not so much section 1709 of the Civil Code but historic principles translated into case law (see not. J. GHESTIN, Ch. JAMIN and M. BILLIAU, Traité de droit civil, Les effets du contrat, 3rd ed., 2001, LGDJ, n° 88 et seq.). The prohibition is not so much against a term which can be continually renewed but a situation where one of the parties would never be able to terminate the contract. This is the case for an ongoing contract which is renewed constantly where one of the parties was not able to terminate it (French High Court com. 3 Jan. 1989, Bull. civ. IV, n° 3, RTD civ. 1989. 532, obs. Mestre ; 3 Nov. 1992, Bull. civ. IV, n° 339), or a lease where the term depends on an arbitrary decision of one of the parties while the other party is unable to unilaterally terminate the contract. (French High Court 3rd civ. 15 Jan. 1976, Bull. civ. III, n° 16 ; 27 May 1998, n° 96-15.774, *ibid.* III, n° 110, Dalloz Affaires 1998. 1251, obs. Y. R., RD imm. 1998. 424, obs. Collart-Dutilleul and Derruppé ; 13 March 2002, n° 99-14.152 , Bull.civ. III, n° 61, D. 2002, AJ 1758, obs. Rouquet, Loyers et copr.2002, comm. 149, note Brault and Pereira-Osouf, Rev. Loyers 2002. 334, obs. Quément, RTD



civ. 2002. 511, obs. Mestre et Fages). However, a lease granted to the lessee "for life" is not considered a perpetual lease (French High Court 3rd civ. 4 Jan. 1973, Bull. civ. III, n° 4; 18 Jan. 1995, n° 92-17.702 , *ibid.* III, n° 16). As a penalty, a lease deemed as a perpetual lease will be null and void (French High Court civ. 20 March 1929, DP. 1930. 1. 13 ; French High Court 3rd civ. 15 Dec. 1999, n° 98-10.430, Bull.

civ. III, n° 242, JCP. 2000. II. 10236, concl. Weber, JCP, ed. N, 2000. 559, note Billiau, Contrats, conc., consom. 2000, comm. 77, obs. Leveneur), unless a special law stipulates a maximum term that would then apply.   The nullity of the head lease leads to that of the sub-lease (French High Court civ. 29 May 1954, D. 1954. 640).

## CHAPTER 3
### Effects of a lease

### SECTION 1
**Rights and obligations of the parties.**

ART. 1. – LESSEE.

Paragraph 1. – *Rights of the lessee.*

**77.** *Personal right of enjoyment.* — The lessee's fundamental right that is inherent in a lease is that of enjoyment of the property (see *above,,* n°s 17 et seq.). This right, which is personal insofar as it can only be exercised through the lessor who allows the lessee said enjoyment, is an essential characteristic of the lease and the reverse of the lessor's main obligation.  Two other rights flow on from this right: the right to sub-lease and the right to transfer one's own right to a third party (regarding the lessee's recognised fundamental rights see *above,* n°s 4 to 8).

A. – Right to sub-lease

**78.** Under section 1717 of the Civil Code, "the lessee has the right to sub-lease [...], as long this has not been expressly prohibited".  It can be fully or partially prohibited. The lessee thus has the right to sub-lease the property received by virtue of the lease that forms the basis of the contractual relationship between them and the main lessor (sub-leasing is generally prohibited in special leases: see residential leases, s. 8 of the Law of 6 July 1989; for commercial leases, s. L.145-31, para. 1 of the Commercial Code; for rural leases, s. L.411-35 of the Rural Code). Even though it is a right, it is not a public policy right and the parties may decide to limit or cancel this right.  They can for example decide that any sub-lessee must be approved by the lessor. If there is a clause restricting the lessee's right to sub-lease, and the lessee breaches it by sub-leasing illegally, the sub-lease agreement remains valid between the contracting parties and the head lessor is bound towards the sub-lessee in its main obligations for as long as they have the right to enjoyment of the premises (French High Court, 3rd civ. 30 March 1978, Bull. civ. III, n° 131). However, this sub-lease agreement is unenforceable against the head lessor who can decide to terminate the lease (which would in turn terminate the sub-lease agreement, see *below,* n° 85).

**79.** *Existence of a second lease.* — For sub-leasing to occur, the lease between the head lessee and sub-lessee must obviously be a lease that meets the conditions of this type of contract (see *above,* n°s 14 et seq.). So if the lessee grants another right to a third party that is not a right of a lease, then this contract between the lessee and a third party cannot be classified as a sub-lease agreement. Case law has on many occasions been required to assess the characteristics of a

sub-lease agreement in order to distinguish it from other situations, such as a lease management.(see for example, in the case of a commercial lease and a potential lease management: French High Court 3rd Civil Division  9 July 2003, n° 02-11.141, Bull. civ. III, n° 148;  see also French High Court 3rd civ. 23 May 1995, Contrats, conc., consom. 1995. 142, obs. Leveneur ; 26 Nov. 1997, n° 95-20.558 , Bull. civ. III, n° 209), the fact that the lessee has granted hunting rights to a third party (no sub-lease agreement as long as the head lessee has complete hunting rights: French High Court com. 16 Nov. 1999, n° 96-21.295, Bull. civ. IV, n° 199), providing accommodation to a family member (French High Court 3rd civ. 14 Dec. 1994, n° 92-15.129, Bull. civ. III, n° 210), or even a collaboration agreement (which cannot be classified as sub-lease due to the fact that the price, a percentage of earnings, was not in consideration of the enjoyment of the premises: French High Court 3rd civ. 22 Oct. 2003, n° 02-12.977, Bull. civ. III, n° 178, Loyers et copr. 2004, comm. n° 4).

1° Relationships between the head lessor and head lessee

**80.** As the lessee has a right to sub-lease, they do not have to request the approval of the lessor, unless of course stipulated in one of the provisions of the lease.  The lessor can be totally unaware of the existence of a sub-lessee, and its contracting party remains its main debtor: the lessee remains liable towards the lessor for all their obligations under the lease entered into between them, and therefore is responsible for maintaining the property in good condition and paying the rent.

**81.** The head lessor can invoke the liability of the head lessee for any breach by the sub-lessee of the lessee's main obligations: vis-à-vis the head lessor, the head lessee is liable for any breaches by the sub-lessee that it has itself chosen (French High Court. 3rd civ. 13 June 1969, Bull. Civ III, n° 480). Furthermore, if the sub-lessee does not pay their rent or causes any damage to the property rented, the head lessee must remedy the situation itself and cannot invoke the liability of the sub-lessee (concerning damage, s.1735 of the Civil Code). The fact that the lessor may have approved the sub-lessee does not change the liability of the head lessee. The only thing that could have an effect is where the lessor has itself chosen the sub-lessee: it cannot subsequently reproach the lessee for this choice.

2° Legal actions of the main lessor against the sub-lessee.

**82.** *Direct legal action for payment* — In theory, any parties who is not contractually  cannot take any direct legal action against each other, unless the law recognises this right



(TERRÉ, SIMLER et LEQUETTE, *op. cit.* [n° 15], n°s 1187 et seq.). However, despite this principle, case law has recognised the right to direct legal action in several different areas (for example, direct legal action by the sub-agent towards the principal). In the area of general leases, section 1753 of the Civil Code, a provision regarding "rental leases", creates a right for the head lessor to take direct legal action for payment against the sub-lessee. Such legal action is only possible under two conditions: it can only be exercised for the amount of the price charged for the sub-lease and not for the amount remaining due at the time of the hearing (French High Court 3rd civ. 1st Oct. 1997, n° 95-20.741, RD imm. 1998. 142, obs. Collart-Dutilleul and Derruppé). It therefore seems to be an imperfect direct legal action (see on this general issue TERRÉ, SIMLER and LEQUETTE, *op. cit.,* n° 1190). However, in a decision made on 19 February 1997, the third civil division does not seem to apply all the consequences of this second condition apparently required under section 1753, by limiting their interpretation of the said section to "direct legal action against the sub-lessee within the limit of the sub-lease agreement" (French High Court. 3rd civ. 19 Feb. 1997, n° 95-12.491, Bull. civ. III, n° 35, Loyers et copr. 1997, comm.176, obs. Brault and Mutelet; but it seems that the request of the parties was not clear on this issue).

**83.** *Legal action for liability.* — If the negligence or fault of the sub-lessee has caused damage to the head lessor, the latter could take action against the sub-lessee for civil liability in tort, particularly in cases of damage to property, thus allowing the lessor to take legal action against another debtor other than its direct contracting party. The civil action for liability would be in tort as there is no contract between them.
(BÉNABENT, *op. cit.,* n° 351-2).

### 3° Legal action of the sub-lessee against the head lessor

**84.** *Legal action for liability.* — The sub-lessee should be able to invoke the civil liability in tort of the head lessor in the event where damage suffered has been directly caused by the negligence or fault of the head lessor: if the head lessee is the lessor of the sub-lessee and, under this contract, is personally liable for all the obligations of the lessor towards this sub-lessee, then the head lessor could have its liability invoked for any breach on its part (the sub-lessee will therefore have two possible debtors, one on the basis of contract law and the other on the basis of tort law).

### 4° Termination of the sub-lease.

**85.** *Termination of the head lease.* — The sub-lease agreement, as an independent lease between the head lessee tenant and the sub-lessee, can terminate for all of the same reasons as any lease in general (see *below,* nos 151 et seq.). As a sub-contract, the sub-lease agreement also be terminated when the head lease is terminated ; indeed, the head lessee is no longer able to perform the sub-lease agreement and allow the enjoyment of a property that is no longer in its possession (French High Court 3rd civ. 19 June 1970, Bull. civ. III, n° 434 ; 10 Oct. 1979, *ibid.* III, n° 173). Similarly, an eviction notice against the head lessee does not need to be served on the sub-lessee as the eviction notice

against the head lessee is also valid against the sub-lessee (French High Court 3rd civ. 30 Nov 2005, n° 04-18.686, Bull.civ. III, n° 229, Dr. et procédures 2006. 152, note Salati, AJDI 2006. 371, note de La Vaissière). If the termination of the head lease allows the head lessee to retain possession of the property, the sub-lease agreement is not terminated; so where the head lease is terminated due to the head lessee becoming both owner and head lease, the sub-lease agreement is not necessarily terminated (French High Court 3rd civ. 2 Oct, 2002, n° 00-16.867, Bull. civ. III, n° 188, D. 2003. 937, note Dagorne-Labbe, AJDI 2003. 27, note Blatter, and p. 401, étude Veiga, Rev. Loyers 2002. 623, obs. Vaissie, RTD civ. 2003. 300, obs. Mestre and Fages).

### B. – Right to assign the lease

**86.** Section 1717 of the Civil Code allows the lessee to "assign its lease to another", in the absence of any provision to the contrary (like sub-leasing, some special statutes provide for particular provisions when it comes to the lessee assigning its right). Despite this right granted by the law, some experts argue about whether the lessee may assign its right in a contract that could be classified as *intuitu personae* due to the circumstances (BÉNABENT, *op.cit.,* n° 350). The assignment of a lease is one of the limited examples of assignment of contracts authorised by law (concerning the assignment of a contract in general and the difficulties it raises, see not. TERRÉ, SIMLER et LEQUETTE, *op. cit.* [n° 15], n°s 1309 et seq.).

**87.** *Contract between the assignor and the assignee*— The assignment of the right to a lease can have a different legal qualification depending on the terms and conditions under which it operates between the parties. It is indeed always a transfer of ownership of a sum payable and therefore a debt, but the qualifications vary depending on whether a price is provided for or not. Therefore, if a price is paid in consideration, it would be an assignment (which in practice is sometimes called a "takeover" or "lease premium" as the case may be) or a gift, or even a contribution in kind. In the absence of an intention to gift and of a price, it could also be classified as a contract *sui generis* (French High Court soc. 12 Nov. 1954, D. 1955. 22, RTD civ. 1955. 334, obs. J. Carbonnier). As soon as it is classified as a given type of contract, all the special rules for that contract will apply. This assignment of contract will also involve the assignment of the sum payable and the assignment of the debt (French High Court soc. 12 Nov 1954, prec.).

**88.** *Assignment of sum payable*— By the assignment of the lease, the assignee becomes the new lessee of the lessor and acquires all the rights of the assignee-lessee that the tenant would have had against the lessor. The assignment of the sum payable which the assignee-lessee would have against the lessor must follow the rules of section 1690 of the Civil Code to be enforceable against the lessor: therefore notice of the assignment must be served on the lessor for it to be binding on the lessor, even if the lessor has given prior approval. (French High Court. 3rd civ. 6 Feb. 1979, Bull. civ. III, n° 34 ; for the contribution in kind: French High Court 3rd civ. 2 Feb. 1977, *ibid.* III, n° 58). These formalities are not



required if the lessor agrees unequivocally to the assignment after having been informed of it (French High Court, Full Court, 14 Feb. 1975, D. 1975. 349, Gaz. Pal. 1975. 1. 342, note Brault), which could be proven by the fact that rent has been received from the assignee and receipts issued thereof in the name of the assignee (French High Court 3rd civ. 14 Dec. 1994, n° 92-19.351 , Bull. civ. III, n° 212).

**89.** *Assignment of debt.* — The assignment of a lease also means the assignment of the debts owed by the assignor-lessee to the lessor, namely the obligation to pay the rent, as well as the various other obligations incumbent upon it (such as repairs, etc.). There are two main problems with this, which are inherent in any assignment of a contract other than a lease and over which the experts and the court decisions are often divided. The first difficulty consists in knowing whether the assignee is bound to the debts of the assignor towards the lessor, especially if these debts were accrued prior to the assignment. For now, case law makes a distinction in accordance with the type of debt. If it is unpaid rent on the part of the assignor, the assignee, in the absence of any agreement to the contrary, is not bound to bear these debts (French High Court 3rd civ. 12 July 1988, Bull. civ. III, n° 125, RTD civ. 1990. 679, obs. Rémy, RTD com. 1989. 217, obs. Pédamon; Court of Appeal of Paris, 11 July 1986, D. 1987. 55, note Fabiani, RTD civ. 1987. 538, obs. Mestre ; French High Court 3rd civ. 16 Feb. 2000, n° 97-22.156, Bull. civ. III, n° 32). However, the assignee is liable for prior damage (French High Court 3rd civ. 27 Oct. 1993, Loyers et copr. 1994, comm. 97; 13 June 2001, AJDI 2002. 28, obs. Briand; 9 July 2003, n° 02-11.794, Bull. civ. III, n° 145, D. 2003, AJ 2312, obs. Rouquet , JCP 2003. I. 186, n°s 20 et seq., obs. Barthez, Gaz. Pal. 2003. 3142, note Barbier, AJDI 2003. 756, obs. Dumont, Loyers et copr. 2003, comm. 197, obs. Brault and Pereira-Osouf, RTD civ. 2003. 725, obs. Gautier). The second difficulty centres around debts accrued after the assignment: is the assignor the guarantor, and therefore the lessor could, if the assignee is in default of payment, take action against the assignor? The answer to this question is beyond the scope of the law regarding leases and is more generally about the approach taken toward the assignment of a contract and its legal implications (concerning this debate see not. TERRÉ, SIMLER and LEQUETTE, *op. cit.* [n° 15], n° 1310). The assignment does not seem to discharge the initial tenant (the assignor) from its obligations unless the lessor expressly agrees to it (concerning the difficulties raised see SIMLER et LEQUETTE, *op. cit.*, n° 1310 ; for the assignment of a lease classified as a delegation see BÉNABENT, *op. cit.,* n° 350), and in the absence of such agreement, the assignor-lessee remains guarantor (French High Court. soc. 9 Nov. 1956, Gaz. Pal. 1957.1. 120 ; French High Court. 3rd civ. 8 Dec. 1993, Loyers et copr. 1994, comm.98 ; French High Court. 1st civ. 21 March 2000, Contrats, conc., consom. 2000, comm. 122, obs. Leveneur ; *contra* : French High Court, 3rd civ. 12 July 1988, préc.).

Paragraph 2. – *Obligations of the lessee.*

A. – Obligations during the lease.

**90.** Under sections 1728 to 1735 of the Civil Code, the lessee has two series of obligations: those related to the property and those related to the payment of the agreed price.

1° Obligations related to the property.

a. – *Use as a "prudent administrator*[xix]*".*

**91.** *Peaceful use* — Section 1728 of the Civil Code requires the lessee to use the "thing leased as a prudent administrator", implying a peaceful use. The lessee must not be a perpetrator of violence (French High Court. 3rd civ. 3 June 1992, n° 90-20.422, Gaz.Pal. 1992. 2. 656, note Barbier ; 2 July 1997, *ibid.* 1997. 2. 695, note Barbier) or of excessive noise (French High Court. 3rd civ. 16 Nov. 1993, Loyers et copr. 1994, comm. 13). It is all the more important that the lessor is able to require the lessee itself to be liable towards all third parties for any disturbances or nuisance to neighbours caused by its tenant (F. ARCHER, La responsabilité civile du propriétaire bailleur pour le trouble de voisinage causé par son locataire, Defrénois 2001. 607). The Law n° 2007-297 of 5 March 2007 on the prevention of delinquency has given the tenant a more onerous duty by introducing stricter penalties in the event of damage to property or nuisance to neighbours; this law has also amended the wording of section 1729 of the Civil Code by sanctioning the fact that the lessee does not use the thing as a prudent administrator by a potential termination of the lease, thus interpreting section 1729 of the Civil Code in the light of its previous section (concerning the law, see B. VIAL-PEDROLETTI, Lois du 5 mars 2007 : incidences sur les baux d'habitation, Loyers et copr. 2007, study 6).

**92.** *European Convention on Human Rights.*— If the lessee must comply with the use of the premises, its compliance must also be combined with certain fundamental human rights: the lessor cannot enforce, by one of the provisions of the lease, a use that would be contrary to the European Convention for the Protection of Human Rights and Fundamental Freedoms. Therefore a clause of a lease prohibiting the lessee from lodging any people other than himself and their children was deemed as invalid and "non-written" as it violated the right to family life protected under Article 8-1 (French High Court 3rd civ. 6 March 1996 and 22 March 2006, prec. *above,* n° 7).

b. – *Respect of the purpose of the property.*

**93.** Section 1728, 1° of the Civil Code stipulates that the lessee must use the leased thing "according to the purposes intended by the lease, or according to those presumed under the circumstances, in the absence an agreement". The term "purpose" is generally considered to mean residential purpose or the practice of a certain professional activity. While the lease was entered into with a certain purpose of the premises, the parties can change this by complying with any clauses in the lease on this issue, or by mutual agreement.

**94.** *Clauses for private use.*—The so-called "clauses for private use", or exclusive residential clauses, prohibit any professional activity in the leased premises (DAGOT, La clause d'habitation bourgeoise, JCP 1967.I. 2108). For a long time, the courts have scrupulously upheld these contractual provisions by sanctioning any contrary behaviour (for example: French High Court soc. 19 Dec. 1958, Bull. civ. IV, n° 1382 ; French High Court 3rd civ. 4 Jan. 1991, n° 89-10.959, *ibid.* III, n° 2, RTD civ. 1992. 138, obs. Gautier ; 16



July 1997, n° 95-17.272, RD imm. 1997. 629, obs. Collart-Dutilleul and Derruppé). These clauses are now raising new issues firstly due to the increasing recognition of subjective rights such as the right to work, the right to respect for privateor family life, and secondly due to the modern phenomenon of working from home. It is now becoming more difficult for the courts to uphold a provision that is either in the contract, or based on fundamental rights that are recognised elsewhere. If there is no disturbance caused by the professional practice, the courts increasingly tend to allow it, even where there is an exclusive residential clause. Therefore, a lessee may practise as a professional stylist (French High Court 3rd civ. 14 Jan. 2004, n° 02-12.476 , Bull. civ. III, n° 2, AJDI 2004. 289, note Rouquet), or provide child care (French High Court 3rd civ. 14 May 1997, n° 95-18.290, Bull. civ. III, n° 100, RD imm. 1997. 495, obs. Collart-Dutilleul and Derruppé).

c. – *Respecting the substance.*

**95.** A lessee  must respect the substance of the leased thing, that is they must respect its structure and not transform the thing without the lessor's express approval (French High Court. soc. 9 June 1966, Bull. civ. IV, n° 573 ; French High Court. 3rd civ. 13 Nov 1997, Bull. civ. III, n° 202, Dalloz Affaires 1997. 1457, RTD civ. 1998. 124, obs. Jourdain, and p. 696, obs. Gautier). Regarding real property assets, the substance of the thing is defined as the layout of rooms, windows and openings and general structure (French High Court. 3rd civ. 13 Nov. 1997, prec.). As soon as any major transformation changes the substance of the thing, even if it constitutes an improvement, increases its value or is required by safety regulations (French High Court 3rd civ. 26 Sept 2001, n° 00-10.759 , Bull. civ. III, no 102), the approval of the lessor is always required.  However, the lessor's refusal to authorise an alteration to the premises may be considered unconscionable. 27 June 1990, n° 89-10.115, Bull. civ. III, n° 154).  This obligation stems from the obligation of restitution incumbent upon the lessee at the end of the lease, restitution which must be in the same condition that they received it, except for changes due to ageing, normal wear and tear, or a force majeure (Civil Code, ss.1730 and 1755).

d. – *Conservation of the property.*

**96.** *Maintenance and repairs.* — As a consequence of the obligation of restitution in kind, the obligation to conserve the thing is implied from the various provisions related to the repairs and maintenance that must be carried out by the lessee.   The provisions regarding repairs are in the part related to the particular rules for rental leases (Civil Code, s.1754). This section gives an indicative list of the repairs that must be carried out by the lessee, unless stipulated otherwise in the lease (and outside the scope of any special statutes). These repairs are generally part of normal maintenance of the thing, without affecting the structure.  For example, a person renting a vehicle must carry out normal maintenance, such as changing the oil or fixing a flat tyre (BÉNABENT, *op. cit.,* n° 339). However, a lessee is not responsible for repairs that are required as a result of a force majeure or age-related decay of the thing (Civil Code, s.1755); therefore, the deterioration in paint work in a building caused by normal wear and tear of the

thing is not within the maintenance obligation of the lessee (French High Court. 3rd civ. 7 March 1972, Bull. civ. III, n° 151 ; 17 Oct. 1990, n° 88-20.194, *ibid.* III, n° 188).

**97.** *Damage and Loss. General remarks* — Under section 1732 of the Civil Code, the lessee is liable for any damage or loss of the leased thing occurring during the lease: it is a strict liability that the lessee can reverse by proving they are not at fault, if the damage is due to decay or caused by a force majeure (Civil Code, s.1730). It is incumbent on the lessee to prove that the damage occurred without any fault on its part (French High Court 3rd civ.16 Dec. 1997, RD imm. 1998. 304, obs. Collart-Dutilleul and Derruppé), and not on the lessor to prove that the alleged fault of the tenant is the cause of the damage (French High Court. 3rd civ. 28 Jan. 2004, n° 02-11.814 , Bull. civ. III, n° 12, D. 2004, IR 537). But the lessor must also prove that the damage occurred while the tenant had enjoyment of the property (French High Court. 3rd civ. 18 March 1998, n° 96-11.624 , Bull. civ. III, n° 62, RD imm. 1998. 426, obs. Collart-Dutilleul and Derruppé ; 8 April 1992, n° 90-15.665 , Bull. civ. III, n° 119). The lessor can only invoke this liability at the end of the lease, when they are in a position to officially declare, at the time of returning the property, the extent of damage and the lessee's failure to repair it. However, if the durability of the thing was compromised, the lessor could take action during the lease to invoke the lessee's liability so that it immediately repairs the damage.

**98.** This liability applies to all leases, even leases for moveable property (French High Court 1st civ. 22 July 1968, D. 1968. 622; 5 May 1998, n° 96-14.683 , Contrats, conc., consom. 1998, comm. 112, note Leveneur), as well as a the lease-purchase of a real property (French High Court 3rd civ. 2 March 2005, n° 02-15.298, Bull. civ. III, n° 55, JCP 2006. II. 10037, note Hardouin-Le Goff, RDC 2005. 1087, obs. Seube), but not to contracts between a lessor and the lessee^{xx}  of a business (French High Court com. 2 July 1996, n° 93-14.130 , Bull. civ. IV, n° 198, Contrats, conc., consom. 1996, comm. 197, note Leveneur, RTD civ. 1996. 923, obs. Gautier ; French High Court 3rd civ. 13 Oct. 1999, n° 97-16.614 , Contrats, conc., consom. 2000, comm. 21, note Leveneur, RTD civ. 2000. 352, obs. Gautier). A clause which makes the lessee liable for loss or deterioration can be deemed as invalid on the grounds of being an unconscionable clause (in a car-rental contract: French High Court 1st civ. 6 Jan. 1994, Bull. civ. I, no 8 ; see *below,* n° 139).

**99.** *Damage and Loss. Case of household members.*—This is a sort of vicarious liability ; the lessee remains liable for any damage or loss caused by "members of his household or his sub-lessees" (Civil Code, s.1735; A. DJIGO, La responsabilité du fait des gens de la maison, Loyers et copr. 2000, chron. 4). Case law has given a wide interpretation of this principle by considering "members of his household" to include the lessee's mistress, (French High Court. civ. 13 Dec. 1927, DP 1928. 1. 99, note Dallant), a plumber who came to carry out repairs at the request of the lessee (French High Court soc. 29 May 1954, D. 1954. 571; Court of Appeals of Paris, 4 Feb. 1998, JCP, ed. N, 1998. 1530, note Djigo, Loyers et copr. 1998, comm. 116, obs. Vial-Pedroletti, Petites affiches 10 May 1999, obs. Laperou ; pourvoi rejeté by the French High Court. 3rd civ. 19 Jan. 2000, n° 98-12.697, Bull. civ. III, n° 8, RCA



2000, comm. 125, note Groutel), or even removalists (Court of Appeals of Paris, 23 May 2002, Loyers et copr. 2003, comm. 54, obs. Vial-Pedroletti). However, section 1735 does not apply to a person invited to a house but who does not live, even temporarily, in the leased property and who did not come at the request of the lessee for professional purposes (French High Court 3rd civ. 16 June 2004, n° 03-12.528, Bull. civ. III, n° 119, D. 2005, panor. 749, obs. Damas, JCP 2004. II. 10196, note Djigo, Defrénois 2004. 1723, obs. Aubert).

### e. – Specific rules in the event of a fire

**100.** *Presumption of liability.* — The Civil Code provides for specific rules regarding damage to property caused by fire (Civil Code, ss.1733 and 1734), provisions which give the lessee a more onerous responsibility by introducing a presumption of liability in the event of fire, which made sense historically (in 1804, when these Civil Code provisions were drafted, fires were more frequent due to the methods of construction, thus requiring constant vigilance by the lessee). As these provisions are in the section dealing with general leases, they apply to all leases, whether for moveable property (French High Court 1st civ. 6 May 1968, JCP 1970. II. 16157, note Chevassus; exclusion of a lease for a business: French High Court com. 21 April 1992, JCP 1993. II. 22101, note Dubaele) or real property (French High Court 1st civ. 10 July 2001, n° 98-16.687, Bull. civ. I, n° 207). They apply to relationships between the lessor and its lessee (and therefore between the head lessee tenant and its sub-lessee: French High Court 3rd civ. 24 January 2007, n° 06-13.028, Bull. civ. III, n° 6, Loyers et copr. 2007, comm. 70, obs. Vial-Pedroletti), but not between the lessor and the sub-lessee(French High Court 3rd civ. 8 December. 1993, n° 90-13.904 , Bull. civ. III, n° 159 ; 17 July 1996, n° 94-16.590, ibid. III, n° 184, Defrénois 1997. 403, obs. Bénabent, RD imm. 1996. 619, obs. Collart-Dutilleul and Derruppé).

**101.** *Causes for exoneration.* — Similarly to the general regime for damage and loss (Civil Code, s.1732), there is a presumption of liability with regard to the lessee, but it is more onerous insofar as it cannot free itself of this liability by proving it was not at fault.  There are only three exonerating causes set out under section 1733 of the Civil Code (French High Court civ. 10 Feb. 1919, 2 decisions, DP 1921. 1. 193, note Lalou). The first is *force majeure*; the lessee can be exonerated if they can prove that the fire was caused by the unlawful act of a third party (French High Court 3rd civ. 12 Dec. 1990, n° 89-14.919, Bull. civ. III, n° 260 ; 18 March 1998, n° 96-10.769 , ibid.. III, n° 61; 21 Sept 2005, n° 04-14.706, AJDI 2006. 191, note de La Vaissière). The second exonerating cause is where the existence of a *construction defect* would have caused the fire; as it is a autonomous exonerating cause, there is no need to prove that it constitutes a force majeure (French High Court 3rd civ. 21 March 1990, n°s 88-16.187 and 88-18.141, Bull. civ. III, n° 79, Defrénois 1990. 1352, obs. Vermelle, RTD civ. 1991. 138, obs. Rémy ; 12 March 2002, n° 00-17.739, RCA 2002, comm. 205, note Groutel, Loyers et copr. 2002, comm. 168, obs. Vial-Pedroletti).  With regards to the *construction defect*, case law will assimilate it to a lack of maintenance that would be attributed to the lessor (so it does not have to be shown as force majeure either: French High Court 3rd civ. 15 June 2005, n° 04-12.243, Bull. civ. III, n° 128, D. 2005. 2580, note

Rakotovahiny, and 2006, panor. 958, obs. Damas, JCP, ed. N, 2005. 1365, note Raby, Defrénois 2006. 425, note A. Donnier, RCA 2005, comm. 324, note Groutel). Finally, the last exonerating cause is where the lessee can prove that the "fire came from a neighbouring house" (French High Court 3rd civ. 16 March 1988, Loyers et copr. 1988, comm. 6).

**102.** *Compensation* — If the lessee is held liable then it will have to pay compensation; this follows on from common law rules regarding civil liability and the purpose is to compensate for the cost of building it again, regardless of how old the asset is (French High Court 3rd civ. 9 Jan. 1991, n° 89-16.661, Bull. civ. III, n° 12; 19 July 1995, n° 93-16.106, ibid. III, n° 191).

**103.** *Several lessees.* — Section 1734 of the Civil Code provides for a specific case where fire occurs in the premises leased by several leases; in this case, "all are liable for the fire, in proportion to the rental value of the part of the building they occupy". They can be exonerated from this liability by proving that either the fire started in a certain dwelling other than theirs, or that it could not have started in theirs (Civil Code, s.1734, para. 2 and 3).

### 1° Obligation to pay the price.

**104.** *Payment of the agreed price* — The lessee must "pay the price of the lease under the agreed terms" (Civil Code, s.1728, 2°). This obligation is the consideration of the right to enjoyment granted by the lessor, and the payment must comply with any terms provided in the contract, at the agreed intervals.  Due to its regular nature, the payment of rent and rental charges are subject to the five-year limitation period of section 2277 of the Civil Code (this limitation is now the same as that of the action for reimbursement of rents paid in error since the so-called "Borloo" law, Law n° 2005-32 of 18 January 2005 for the planning of social cohesion. Before, the limit period for the legal action for reimbursement of payment made in error followed common law (French High Court, mixed div., 12 April 2002, Bull. mixed div., n° 2, BICC 1 June 2002, concl. Guérin, read with Duvernier, D. 2002. 2433, note Aubert de Vincelles, JCP 2002. II. 10100, note Billiau, Defrénois 2002. 1265, obs. Libchaber, AJDI 2002. 517, obs. Briand, Loyers et copr. 2002, chron. 10, par Vial-Pedroletti). This five-year limitation period also applies to legal action for payment of compensation for occupation[xxi](French High Court 3rd civ. 8 Nov. 2006, no 05-11.994, Bull. civ. III, no 221, D. 2007, panor. 347, obs. Damas, Defrénois 2007. 457, obs. Libchaber, Loyers et copr.2007, p. 16, obs. Vial-Pedroletti).

**105.** *Guarantees of payment* — The law grants only the lessor of a building a special lien regarding the moveables of the rented premises (Civil Code, s.2332, 1°, that ordinance no 2006-346 of 23 March 2006 related to securities has not amended in its content, formerly s. 2102). In general, at the time of the inception of the lease, the lessor will request a "bond", constituting a collateral security in cash, as well as a guarantee.  If there is no specific provision in the contract to this effect, the rental bond cannot be used for compensation in lieu of rent (French High Court 3rd civ. 14 Nov. 1973, Bull. civ. III, n° 579, RTD civ.1974. 633, obs. Cornu ; 4 March 1998, n° 95-21.560, Bull. civ.III, n° 50, Defrénois 1998. 1460, obs. Bénabent) and is limited to the contractual term of the lease



(Civil Code, s.1740 ; B. VIAL-PEDROLETTI, Poursuite du bail à son terme et sort des garanties de paiement, Loyers et copr. 2001, chron. 1 ; E. MALLET, Bail d'habitation et caution. Précautions, *ibid.* 2003, chron. 4). One issue that is often debated in case law is what happens to the rental bond in the event of the sale of the leased property: does the rental bond continue to exist despite the change of creditor? After heated debate through case law, the Full Court of the French High Court ruled in favour of the full transfer, in the absence of any contrary provision, of the rental bond to the new lessor as an accessory of the rents due and transferred (French High Court Full Court. 6 Dec. 2004, Bull. ass. plen., n° 14, BICC 1st March 2005, read with Lardet, concl. De Gouttes, D. 2005. 227, note Aynès, et panor. 750, obs. Damas, JCP 2005. II. 10010, note S. Piedelièvre, ed. N, 2005. 1103, note Raby, and ed. E, 2004. 1902, note Belloct and de Fréminville, Defrénois 2005. 316, note Aynès, and p. 634, obs. Savaux, RLDC 2005/13, n° 529, note Houtcieff, AJDI 2005. 240, obs. Cohet-Cordey, RTD com. 2005. 51, obs. Monéger, and p. 404, obs. Legeais, decision dimissing the appeal against: Court of Appeal of Rouen, 10 Dec. 2002, D. 2003. 688, note Larroumet, JCP 2003. I. 124, n° 8, obs. Simler ; *contra* previously: French High Court com. 26 Oct. 1999, Bull. civ. IV, n° 184, D. 2000. 224, note Aynès, Defrénois 2000. 480, note S. Piedelièvre, JCP 2000. II. 10320, note Casey, and ed. E, 2000. 416, note Gout, Rev. loyers 2002. 11, study Mutelet, Banque and Droit, Jan.-Feb. 2000, p. 57, obs. Rontchevsky). Similarly, in case of merger-acquisition of a company which owns the leased property, the rental bond guaranteeing the payment of rent would, in the absence of any provision stipulating otherwise, be fully transferred to the acquiring company (French High Court com. 8 Nov. 2005, n° 01-12.896, Bull. civ. IV, n° 218, JCP 2005. II. 10170, note Houtcieff [2nd esp.], D. 2006. 1. 123, n°s 17 et seq., obs. Barthez, and p. 131, n° 9, obs. Simler, JCP, éd. E, 2006. 1000, note D. Legeais [1st esp.], Dr. et patrimoine, Feb. 2006, p. 126, obs. Dupichot, Banquet and Droit, Jan.-Feb. 2006, p. 52, obs. Rontchevsky, RTD com. 2006. 179, obs. Legeais, Rev. sociétés 2006. 57, note Coquelet [1st esp.]).

**106.** *Exception for non-performance.* — A recurring issue is whether the lessee can argue that the lessor is in breach of their obligations in order to justify the lessee's application of the exception for non-performance and thus a suspension of rental payments. Generally, the courts authorise the lessee to suspend rental payments where they are deprived, due to a fault of the lessor, of enjoyment of the thing in accordance with its intended purpose (French High Court. 3rd civ. 21 Dec. 1987, n° 86-13.861, Bull. civ. III, n° 212, RTD civ. 1988. 371, obs. Rémy ; 21 Nov. 1990, n° 89-16.189, Bull. civ. III, n° 238 ; regarding non-payment of charges : French High Court. 3rd civ. 12 June 2001, AJDI 2002. 122, obs. Briand ). However it would seem that it does not necessarily have to be a total deprivation of enjoyment, as long as it is sufficiently significant, which is at their full discretion assessed by the judges of merits (French High Court 3rd civ. 15 Dec. 1993, n° 92-12.324, Bull. civ. III, n° 168, D. 1994. 462, note Storck ; 1st March 1995, n° 93-13.812 , Bull. civ. III, n° 60, Gaz. Pal. 1996. 1. 125, note Barbier, RD imm. 1995. 600, obs. Collart-Dutilleul and Derruppé, JCP 1996. I. 338, obs. Jamin ; see also French High Court 3rd civ. 11 Jan. 2006, n° 04-30.240 , Bull. civ. III, n° 13, D. 2006, AJ 443, obs. Chevrier). Unless there is such a

prevention of enjoyment, the lessee cannot cease paying its rent (for example: Court of Appeal of Versailles, 18 June 1999, RD imm. 2000. 611, obs. Collart-Dutilleul).

B. – Obligation of restitution at the end of the lease.

**107.** *Restitution in the state in which it was received.*— At the end of the lease, the lessee, must return the leased property to the lessor and must "return the thing as he received it" (Civil Code, s.1730). The lessee is therefore liable for any damage to the property unless they can prove one of the exonerating cause provided for in section 1732 (see *above*, n°s 97 to 99). The purpose of the condition report is to prove the state of the thing at the time the lessee was granted enjoyment of the property in order to demand its restitution in the same state (Civil Code, s.1730). It also makes it possible to officially assess the lessee's performance of all their obligations related to the property (the condition report is deemed to be a fact until proven otherwise: French High Court. 3rd civ. 23 May 2002, n° 00-13.144 , Bull. civ. III, n° 110, AJDI 2002. 681, note Laporte-Leconte ; and in this regard, is not subject to the formality of two originals as prescribed by section 1325: French High Court. 3rd civ. 23 May 2002, n° 01-00.938, Bull. civ. III, n° 109, D. 2003, somm. 732, obs. Damas, Contrats, conc., consom. 2002, comm. 137, note Leveneur). If there is no condition report, the lessee is presumed to have received the property in good condition with regard to repairs required and must therefore return it in this same state (Civil Code, s.1731); it is thus incumbent upon the lessee to prove that the damage reported is due to decay or a force majeure (French High Court. 3rd civ. 23 Jan. 2007, n° 05-21.232, Loyers et copr. 2007, comm. 69, obs. Vial-Pedrolletti).

**108.** *Fate of improvements and constructions.* — Generally speaking, the rule is that the lessor can require the lessee to return the property in the state in which they found it on the date they were granted enjoyment of it, regardless of the quality of the changes made to the property by the lessee. However, depending on how the changes made are classified, they could be subject to a different regime under section 555 of the Civil Code (provision applicable to leases, even when the works have been authorised by the lessor: French High Court. 3rd civ. 10 Nov. 1999, n° 97-21.942, Bull. civ. III, n° 211, D. 2000, AJ 77, obs. Rouquet , Defrénois 2000. 312, obs. Atias, Gaz. Pal. 2000. 2. 1975, note Barbier, RD imm. 2000. 20, obs. Bruschi ; see already French High Court 1st civ. 7 March 1955, D. 1955. 590, note Saint-Alary, JCP 1956. II. 9053, note Weill and Becqué ; French High Court. com. 1 March 1960, S. 1961. 1. 204, note Plancqueel ; French High Court. 3rd civ. 9 Jan. 1979, Gaz. Pal. 1979. 2. 309, note Plancqueel ; 3 Oct. 1990, n° 88-18.415 , Bull. civ. III, n° 180). In this regard, where there have been simple improvements, they can be kept by the lessor without having to financially compensate the lessee (French High Court. 3rd civ. 8 Jan. 1997, n° 95-10.339, Bull. civ. III, n° 8, Petites affiches 29 May 1998, n° 64, p. 20, note Ralser). On the other hand, if the changes to the thing are new buildings or works, section 555 of the Civil Code applies and the lessor would have to pay the lessee if they decide to keep them (unless there has been an agreement between them regarding the works).



ART. 2. – THE LESSOR.

**109.** By law, the lessor has four main obligations "by the very nature of the contract, without requiring a specific provision" (Civil Code, s.1719, para.1): to deliver the thing, to maintain it, to allow quiet enjoyment and finally to guarantee the leased thing. Unless there is an express provision to this effect, no other obligation can be imposed on the lessor (regarding the refusal of allowing the lessee's religious practices as a contractual obligation, see *above*, n° 7).

**110.** *Obligation to inform.* — As is the case for many contracts, an obligation to inform and advice begins to be developed as part of the lessor's responsibility, regardless of any specific clause in the contract. Firstly, this requirement could come from the law itself; the Law n° 2004-1343 of 9 December 2004 introduced a diagnostic report of energy performance governed by the new sections L. 134-1 to L.134-4 of the Building and Housing Code, amended by ordinance no 2005-655 of 8 June 2005 which requires lessors to provide this diagnostic report to any lessee requesting it. This obligation seems to be only incumbent, under section L. 134-3 of the Building and Housing Code, on lessors governed by the law of 6 July 1989; it would make more sense if it was a requirement for any lessor of a main residence (see Bail et diagnostic de performance energique. Rev. loyers et fermages 2007, n° 878, p. 262). The courts do not often recognise an obligation to inform on the part of the lessor. It does not seem to be an independent obligation, as the failure to inform is usually penalised on the grounds of other recognised obligations. Therefore a failure to inform in relation to the presence of asbestos in the building is used against the lessor in relation to their warranty against hidden defects (if the information is given to the lessee, then the defect is not hidden, and the guarantee cannot not be applied: French High Court. 3rd civ. 2 July 2003, n° 02-14.642, Bull. civ. III, n° 138, D. 2004. 1411, note Pignarre , and somm. 839, obs. Damas , Contrats, conc., consom. 2003, comm. 173, note Leveneur [2nd esp.], RD imm. 2003. 557, obs. Trébulle , Loyers et copr. 2003, comm. 201, obs. Brault and Pereira-Osouf, Rev. loyers 2003. 505, obs. Quement).

Paragraph 1 – *Obligation to deliver.*

**111.** The obligation to deliver is set out in sections 1719, 1°, and 1720 of the Civil Code. This obligation actually comprises three obligations: firstly to make the property available to the lesseem which constitutes the act of delivering it, secondly to deliver a property that is suitable for the intended purppose, and finally to provide a property "in a good state of repair".

A. – Delivery of the thing.

**112.** Mirroring the rules for sales, the lessor must make the leased property available to the lessee at the agreed date. This is the main obligation of the lessor (see the consequences on the restrictive clauses, *below*, n° 136) which enables the enjoyment of the thing by the lessee. It therefore implies that the property should be free of any occupation (French High Court. 3rd civ. 16 Jan. 1980, Bull. civ. III, n° 13 ; 28 Sep. 2005, n° 04-13.720, *ibid.* III, n° 175, D. 2006, panor. 958, obs. Damas). This obligation is incumbent on the lessor even if the lessee has not paid its first rental payment or its

bond (the lessee could then demand specific performance: French High Court. 3rd civ. 28 June 2006, n° 05-10.137 , Bull. civ. III, n° 161, D. 2007, panor. 904, obs. Damas, RTD civ. 2006. 785, obs. Gautier).

B. – A thing that is suitable

**113.** *Suitability for the agreed purpose.* — The lessor must deliver a thing that is suitable for the intended purpose provided for in the lease (French High Court. 3rd civ. 26 March 1997, n° 95-14.103, Bull. civ. III, n° 70), which could be professional or residential. This suitability is understood to mean compliance with legally required standards, and would especially include the removal of asbestos from a building (discovery of asbestos by the lessee during works despite the fact that a technical diagnostic report had declared there was no asbestos: French High Court, 3rd civ. 2 July 2003, n° 01-16.246, Bull. civ. III, n° 141, Contrats, conc., consom. 2003, comm. 173, note Leveneur [1st esp.], AJDI 2003. 751, obs. Rouquet, RD imm. 2003. 557, obs. Trébulle , Rev. loyers 2003. 501, obs. Quement, Loyers et copr. 2003, comm. 199, obs. Brault and Pereira-Osouf). However it is a different case if the removal of asbestos is made necessary only because of refurbishment works that the lessee has decided to undertake (French High Court. 3rd civ. 1 July 2003, n° 02-15.570, RD imm. 2003. 557, obs. Trébulle, Rev. loyers 2003. 497, obs. Vaissié).

**114.** *Professional Purpose.* — Where the contract provides that the property will be used for a particular type of activity or business, the property delivered must be suitable for this specific purpose. It is therefore incumbent on the lessor to ensure that the intended activity can be carried out (where materially impossible to carry out the works required to make the premises suitable for the intended purpose: French High Court 3rd. civ. 2 July 1997, n° 95-14.151, Bull. civ. III, n° 159), and to financially contribute towards making the property suitable if necessary (French High Court. 3rd civ. 5 June 2002, n° 00-19.037, Bull. civ. III, n° 123, RDC 2003. 118, obs. Lardeux). On the other hand, the lessor has no responsibility for the lessee's commercial success (where a shopkeeper setting up in a shopping centre was finally transferred: French High Court. 3rd civ. 13 June 2001, n° 99-17.985, Bull. civ. III, n° 78, D. 2001, somm. 3524 ; see also French High Court 3rd civ. 12 July 2000, n° 98-23.171, Bull. civ. III, n° 137, D. 2000, AJ 377, obs. Rouquet, JCP, ed. N, 2001. 66, note Keita, Contrats, conc., consom. 2000, comm. 172, note Leveneur, RD imm. 2000. 613, obs. Derruppé ). Recently, the French High Court decided that the owner of a shopping centre should maintain the communal areas of the shopping centre so as not to "deprive the lessees of the advantages that they have under the lease" (French High Court. 3rd civ. 31 Oct. 2006, n° 05-18.377, Bull. civ. III, n° 215, RDC 2007. 385, obs. Seube, JCP, ed. N, 2007. 1137, obs. Djigo, Loyers et copr. 2007. 16, obs. Pereira-Osouf, Defrénois 2006. 1886, obs. Ruet ; see *below,* n° 121).

**115.** *Residential purpose: decent housing* — J. LAFOND, The criteria of "decent housing", JCP, ed. N, 2002. I. 1177 ; Ph. BRIAND, La mise aux normes et le bail d'habitation, Defrénois 2004. 831 ; J. MONÉGER, À propos de l'obligation de délivrer un logement décent, D. 2005, chron. 305. – The SRU law n°



2000-1208 of 13 Dec. 2000 added an additional requirement to section 1719.1 of the Civil Code : if the leased property is the lessee's primary residence, the lessor must deliver "decent housing". The right to decent housing has now become an "objective of constitutional value" since the decision of the Constitutional Council of 19 January 1995 (DC n° 94-359, JO 21 Jan.). This requirement was also added into the law of 6 July 1989 related to residential leases (section 6). This provision aims to protect lessees ' health, safety and security. A decree (Decree n° 2002-120 of 30 January 2002) specifies the minimum requirements for decent housing: it must be protected from water leakages, must not comprise materials that are harmful to health, must have adequate natural light, reliable heating, running water and proper drainage (J. ROCHFELD, Logement décent-Caractéristiques (Decr. n° 2002-120 of 30 January 2002 relating to the characteristics of decent housing in application of s. 197 of law n° 2000-1208 of 13 Dec. 2000 relating to the urban solidarity and renewals RTD civ. 2002. 571). As this decent housing requirement is for the main residence, it would apply even more to those within the scope of law of 6 July 1989 (see residential leases and mixed leases [individual lessee-lessor relations: the Law of 6 July 1989]). Any housing, even if it is subject to the Law of 1948, must also meet the decent housing requirements and have running water (French High Court. 3rd civ. 15 Dec. 2004, n° 02-20.614, Bull. civ. III, n° 239, D. 2005, panor. 749, obs. Damas, JCP 2005. II. 10000, concl. Gariazzo, Defrénois 2005. 638, obs. Libchaber, RDC 2005. 746, obs. Seube).

### C. – A thing in a good state of repair

**116.** Section 1720, para. 1 of the Civil Code provides that the lessor must "deliver the thing in a good state of repair in all aspects". Unless there is a provision to the contrary, the lessor must deliver a property that satisfies the safety requirements of the law and other standards. This requirement tends to reinforced by case law regarding the suitability of the property delivered: to be suitable according to legal standards it would be both in a good state of repair and suitable for the intended purpose (see not. French High Court. 3rd civ. 5 June 2002, prec.). Clauses in which the lessee declares that they have full knowledge of the property and accept it in the state in which they find it are common practice (French High Court. 3rd civ. 12 Nov 1975, Bull. civ. III, n° 327) but do not exempt the lessor from their obligation to deliver a property suitable for the agreed use, as this could require certain repairs for which they would remain liable (for example: French High Court. 3rd civ. 2 July 2003, prec.).

### Paragraph 2. – Maintenance Obligation

**117.** *Sections 1719 and 1720.* — The maintenance obligation incumbent on the lessor results from two provisions: firstly section 1719.2, which provides that the lessor must "maintain this thing in a state in which it may be used for the intended purpose for which it has been leased"; then section 1720, para. 2, by virtue of which the lessor "must undertake, for the term of the lease, any repairs required other than those that are within the lessee's responsibility". These two provisions are generally linked together, one being a more specific explanation of the other (for example: BÉNABENT, *op. cit.,* no

334-5 ; F. COLLART-DUTILLEUL and Ph. DELEBECQUE, *op. cit.,* n° 494). Some decisions distinguish between the "maintenance" of section 1719 and the "repairs" of section 1720: in other words the lessor has an obligation to maintain the property while continually ensuring it is suitable to the agreed use, without needing to be informed by the lessee, unlike the repairs under section 1720 (French High Court, soc. 21 Feb. 1959, Bull. civ. IV, n° 286). The distinction between these two sections, based on the lessee's obligation to first give notice to the lessor, does not seem justified when the lessee wishes the lessor to assume liability for the repairs after the repairs have been carried out: the use of the substitution clause[xxii] under section 1144 of the Civil Code is contingent on a prior notice and a court order ("without a notice sent to the lessor about works that have to be carried out and a court order authorising the lessee to undertake said works, the lessor is not liable for paying the costs thereof", French High Court. 3rd civ. 20 March 1991, n° 89-19.866 , Bull. civ. III, n° 94 ; 5 March 1997, n° 95-16.017, *ibid.* III, n° 45 ; 16 July 1997, Contrats, conc., consom. 1997, comm. 175, obs. Leveneur ; 11 Jan. 2006, n° 04-20.142, Bull. civ. III, n° 9, D. 2006, IR 248, obs. Rouquet, JCP 2006. I. 123, n° 13 et seq., obs. Grosser).

**118.** *The lessor's obligation.*— It is the lessor, as the contracting party of the lessee, who is responsible for carrying out maintenance and repairs. Therefore, the lessee can only ask the lessor to carry out the required repairs, even if the lessor is a usufructuary and the repairs would normally be the responsibility of the bare-owner under the rules governing usufruct (French High Court. 3rd civ. 28 June 2006, n° 05-15.563, Bull. civ. III, n° 165, D. 2007, panor. 903, obs. Damas, AJDI 2006. 730, obs. Rouquet, RTD civ. 2006. 788, obs. Gautier). °

**119.** *Lessee at fault.* — Although the repairs required under sections 1719 and 1720 are the sole responsibility of the lessor, who must assume the cost, the lessee can be asked to contribute only in cases where the damage has been exacerbated through a fault on its part. Therefore a lessee who waits for a long time before notifying the lessor of the damage commits a fault that contributes to further damage being caused and can therefore be ordered to pay for part of the costs of repairs (regarding a tenant who waited eight years: French High Court. 3rd civ. 9 Feb. 2005, n° 03-19.609, Bull. civ. III, n° 32, Defrénois 2005. 1835, obs. Ruet).

**120.** *Structural works* — The two provisions agree however on the fact that all repairs that must be carried out by the lessor are those outside the scope of the tenant's responsibility, and that the repairs considered necessary under section 1720 are understood in the light of the previous section: the lessor must therefore undertake, over the term of the lease, any repairs other than those that are part of the routine maintenance required of the lessee, and that are necessary for the intended use as stipulated in the lease. Any repairs that are not considered routine maintenance by the lessee are those which are not cited in section 1754 of the Civil Code, and include but are not limited to major repairs to the structure of the thing. Among the repairs that fall under the responsibility of the lessor are the cleaning of the façade of the leased building (French High Court. 3rd civ. 12 April 1995, n° 93-



12.849, Bull. civ. III, n° 103), roof or wall repairs, an anti-termite treatment (Court of Appeal of Bordeaux, 9 Jan. 2001, Loyers et copr. 2001, comm. 168, obs. Vial-Pedroletti, or even repairs needed after leakage of sewerage from the neighbouring dwelling (French High Court 3rd civ. 25 Feb. 2004, n° 02-10.085, Bull. civ. III, n° 36, AJDI 2004. 371, obs. Rouquet).

**121.** *Extensions under case law* — The concept of necessary repairs extends beyond the main elements of the leased premises and can include the road or path leading towards them (for repairs on a corridor leading to a leased apartment where a tile was dislodged: French High Court 3rd civ. 22 March 2005, n° 04-13.821, AJDI 2005. 649, note Zalewski). Recently, the third civil division decided that the owner of a shopping centre should maintain the communal areas of the shopping centre so as not to "deprive the lessees of the advantages that they have under the lease" (French High Court 3rd civ. 31 Oct. 2006, n° 05-18.377 , Bull. civ. III, n° 215, RDC 2007. 385, obs. Seube, JCP, ed. N, 2007. 1137, obs. Djigo, Loyers et copr. 2007. 16, obs. Pereira-Osouf, Defrénois 2006. 1886, obs. Ruet). Although this decision does not seem to directly contradict the previous case law in the sense that the lessor still seems to have no obligation per se with regard to the commercial success of the tenant (see *above*, n° 114), the lessor indirectly has this obligation through its maintenance obligation: if for example a lack of maintenance leads to a lack of frequentation of a shopping centre, the lessor could be held liable (for a decision with a different position previously made on the maintenance obligation: French High Court. 3rd civ. 28 June 2005, n° 04-14.087, Loyers et copr. 2005, comm. 203, obs. Pereira-Osouf).

**122.** *Works required by administrative authorities* — The lessor is also responsible for "all works prescribed by administrative authorities, unless there is a provision that expressly states otherwise" (French High Court. 3rd civ. 13 July 1994, n° 91-22.260 , Bull. civ. III, n° 143). This contrary provision must not just specify the repairs that fall under the responsibility of the lessee (for example, the lessor is still liable for any cleaning and restoration work required by a decision by administrative authorities in spite of a clause stating that said cleaning is the responsibility of the lessee: French High Court. 3rd civ. 10 May 2001, n° 96-22.442 , Bull. civ. III, n° 58, D. 2001, somm. 3523, Gaz. Pal. 2002. 67, note Barbier), but must expressly state that the lessee is liable for any works required by administrative authorities (French High Court. 3rd civ. 28 Sep. 2005, n° 04-14.577, Bull. civ. III, n° 183, AJDI 2006. 114, obs. Zalewski). However, for these works to fall under the lessor's responsibility, they must be required in order to make the premises suitable for the intended purpose stated in the lease (for works required by the State, but which were not for the purpose of making the premises suitable for their intended purpose under the contract: French High Court. 3rd civ. 20 June 1989, n° 88-11.390 , Bull. civ. III, n° 142, RTD civ. 1990. 298, obs. Rémy ; French High Court. 2nd civ. 28 May 2003, Gaz. Pal. 2003. 3137, note Barbier, AJDI 2003. 577, obs. Ascensi).

Paragraph 3. – *Obligation to ensure quiet enjoyment.*

**123.** *Essential Obligation.* — Pursuant to section 1719.3 of the Civil Code, the lessor must "allow the lessee quiet enjoyment for the term of the lease". Where this obligation is placed in section 1719 does not reflect its importance, to the extent that it is certainly the most essential obligation, from which all the others stem (not. BÉNABENT, *op. cit.*, n° 334-3 ; P.-H. ANTONMATTEI and J. RAYNARD, *op. cit.,* n° 323): the essential effect of the lease is the lessee's enjoyment, which can only occur through the correlating obligation of the lessor. In most decisions related to the lessor's obligations, the obligation to ensure quiet enjoyment only rarely appears independently and is usually hidden behind the maintenance obligation or the guarantee obligation (for a decision referring only to quiet enjoyment as the fundamental obligation of the lessor: French High Court. 1st civ. 23 Feb. 1994, préc. *above,* n° 21).

**124.** *Disturbance of enjoyment by the lessor.* — Ensuring the quiet enjoyment of the lessee means that the lessor must refrain from any action that could disturb the lessee's enjoyment. This obligation firstly applies to the lessor who must ensure its own behaviour does not cause any disturbance. The lessor cannot change the form of the leased thing during the lease without the lessee's consent (Civil Code, s.1723; French High Court. 1st civ. 7 Feb. 1967, D. 1967. 211, note Breton). Moreover, it cannot unilaterally amend any of the terms and conditions of the enjoyment, or the elements comprising the property. Similarly, the lessor must for example ensure that any communal equipment of the building does not disturb the lessee's enjoyment through any noise emitted (even if the sound level is within the accepted standards: French High Court. 3rd civ. 4 Dec. 1991, n° 90-14.600 ,Bull. civ. III, n° 301).

**125.** *Respect of the fundamental rights of the lessee* — Recent legal developments have brought to light other specific applications under the European Convention on Human Rights, so a lessee cannot "deprive the lessee of the ability to lodge members of their immediate family on the grounds of the right to respect of family life (French High Court. 3rd civ. 6 March 1996, prec. *above,* n° 7), nor can they violate the tenant's right to privacy (French High Court. 3rd civ. 25 Feb. 2004, prec., and French High Court 1st civ. 7 Nov. 2006, prec. above, n° 7).

**126.** *Disturbing the enjoyment of co-lessees.* — In the grey area between section 1719 and section 1725 with regard to the absence of a guarantee against disturbances caused by a third party, recent case law tends to penalise the lessor for any disturbance of enjoyment that the lessee could suffer from another lessee of the same lessor, even if the disturbance is not in relation to the lease. Indeed, the courts do not consider the co-lessees as a "third party" in the sense of section 1725 (French High Court. 3rd civ. 16 Nov. 1994, n° 93-11.184, Bull. civ. III, n° 189, JCP, ed. N, 1995. II. 936, note Djigo; any person contractually linked to the lessor is not a third party: French High Court. 3rd civ. 7 Nov. 2001, n° 99-20.962 , Bull. civ. III, n° 121; nor is a client of the lessor: French High Court. 3rd civ. 22 Oct. 2003, n° 01-17.183, Bull. civ. III, n° 177, D. 2004. 2078, note Boulogne-Yang-Ting, and somm. 837, obs. Damas , RCA 2004, n° 13, note Groutel, Rev. loyers 2003. 645, obs. Canu), the lessor is liable for any disturbances caused by this co-lessee. The lessor can thus be held liable



for any nuisance and neighbourly disputes between two co-lessees (French High Court. 3rd civ. 20 April 2005, n° 03-18.390, Bull. civ. III, n° 96, D. 2006, panor. 958, obs. Damas, JCP, ed. N, 2005. 1400, note Djigo, Defrénois 2006. 432, obs. Ruet ; for prior case law which required said disturbance to be linked to the performance of the lease: French High Court. 1st civ. 1st March 1960, S. 1961. 233, obs. Plancqueel ; 18 July 1961, JCP, ed. N, 1961. II. 12301, note Esmein), or even for a fire that is reported to have started in the home of a co-lessee (French High Court. 3rd civ. 19 May 2004, n°s 02-19.908, 02-20.106 and 02-19.730, Bull. civ. III, n° 100, AJDI 2004. 804, obs. Rouquet).

**127.** *Competition against the lessee.* — Another issue that is raised is where competition against the lessee may be promoted by the lessor either through their own activity or by leasing premises close to the lessee to a third party (Y. SERRA, La liberté de concurrence du bailleur dans les baux commerciaux, Dr. et patrimoine, July-August 1995, p. 38). If there is no clause to the contrary, it seems that the lessor can conduct the same professional activity as its lessee (French High Court. civ. 6 Nov. 1867, DP 1868. 1. 129; French High Court. 3rd civ. 25 Feb. 1975, Bull. civ. III, n° 74, JCP 1975. II. 18096, note B. B., RTD civ. 1975. 736, obs.Cornu ; for an opposite opinion see F. COLLART-DUTILLEUL and Ph. DELEBECQUE, *op. cit.,* n° 497) or lease premises to a third party who intends to conduct a similar business (French High Court. com. 2 July 1991, n° 88-20.420, Contrats, conc., consom. 1991, comm. 231; French High Court. 3rd civ. 4 Dec. 1991, n° 90-11.569, Bull. civ.III, n° 300). However it is a different scenario if the lease has an exclusivity clause or non-compete clause.  In this case the "lessee benefits from an exclusivity clause agreed to by the lessor and is in its right to demand that the lessor ensures its other lessees comply with this clause, even if these lessees s are not parties to the contract" (French High Court. 3rd civ. 4 May 2006, n° 04-10.051, Bull. civ. III, n° 107, D. 2006, AJ 1454, obs. Rouquet, and 2007, panor. 1827, obs. Rozès, RTD civ. 2006. 554, obs. Mestre and Fages, JCP 2006. II. 10119, obs. Deshayes, RDC 2006. 1154, obs. Seube, and 2007. 267, obs. Mazeaud). The non-compete clause can even be cancelled, with effect from the date of the writ of summons, on the grounds of "a fault on the part of the lessor in performing the lease making it impossible to comply with the clause" (the parties' mutual intention was that the lessor add the clause in all the leases granted to the initial lessee's co-lessees, which was no longer the case after a certain period of time: French High Court. 3rd civ. 3 May 2007, n° 06-11.591, D. 2007, AJ 1335, obs. Rouquet, and p. 2068, note Rochfeld).

Paragraph 4. – *Warranty Obligation*

A. – Warranty against latent defects

**128.** *Latent defect.* — The warranty against latent defects arising from section 1721 of the Civil Code, concerns "all vices or defects of the thing leased which prevent use of it, although the lessor did not know of them at the time of the lease".  This warranty is similar to the warranty for a sale: if there is a latent defect in the thing, which existed at the time the lease began (see some experts who believe that the defect could occur during the lease: BÉNABENT, *op. cit.,* n° 335; P.-H.

ANTONMATTEI and J. RAYNARD, *op. cit.,* n° 318), which would prevent its normal use (for example regarding a building defect: French High Court. 3rd civ. 13 Oct. 1981, Bull. civ. III, n° 150 ; regarding the presence of asbestos: French High Court. 3rd civ. 2 July 2003, préc.*above,* n° 111). Even though the law seems silent on this point, the defect must be hidden from the lessee; and the fact of being hidden could be implied, like in the case of a sale, from two factors, firstly the capacity of the lessee and their degree of knowledge of the thing, and secondly, the nature of the thing leased (not. F. COLLART-DUTILLEUL and Ph. DELEBECQUE, *op. cit.,* n°s 273 et seq.). Like in a sale, the warranty  applies whether or not the warranty is due,  the lessor knew about the defect. But although the law relating to sales provides that being unaware of the defect is a condition for the liability of the vendor (particularly lessened since case law has implied that all sales professionals are unlikely to disclose the full truth), the law relating to leases does not impose this condition.

**129.** *Limitation Period.* — Unlike the warranty against latent defects  in sales, there is no rule about the limitation period that the lessee has to take legal action.  Therefore common law pertaining to contracts must apply, by virtue of which the lessee must take legal action within thirty years.   This limitation period is calculated from either the date of inception of the contract or the discovery of the defect; however according to case law on sales, the limitation period is calculated  from the date on which the defect is discovered.

**130.** *Penalties.* — The first potential penalty is invoking the contractual liability of the lessor for any damage suffered by the lessee as a result of the defect. However unlike the law governing sales, it does not matter if the lessor knew about the defect or not: the lessor will still be held liable (Civil Code, s.n 1721, para. 2). Other than compensation for damages, the lessee could also request the rescission of the contract if the disturbance caused is serious enough. Unlike the warranty for a sale, the lessor can be exempt by proving that a force majeure caused the damage (case of a badly installed hot water system: French High Court. 3rd civ. 26 Oct. 1977, Bull. civ.III, n° 357, Gaz. Pal. 1978. 2. 339, note Plancqueel ; decay through age is not an unforeseeable circumstance which exonerates the lessor unless it was caused by the lessor's negligence or failure to carry out proper maintenance: French High Court. 3rd civ. 27 Feb. 1973, Bull. civ. III, n° 150). This specific regime regarding the law relating to sales leads certain experts to conclude that section 1721 is merely an illustration of the lessor's contractual liability under contract law and not the foundation of a true warranty (BÉNABENT, *op. cit.,* n° 335).

B. –Warranty against eviction

**131.** *Interference caused by the lessor.* — Interference of quiet enjoyment could be caused by the lessor as much as by a third party. With regard to interference by the lessor there is no specific warranty provided for under the law per se, as it falls under the lessor's general obligation to allow the lessee quiet enjoyment (see *above,* n°s 123 et seq.), so any action contrary to this would be penalised on these grounds.  The same would apply to interference caused by people who are



in a contractual relationship with the lessor, such as co-lessees (concerning this subject see *above*, n° 126). Moreover, the lessor cannot change the form of the leased thing during the lease (Civil Code, s. 1723), which would also constitute an interference of the lessee's enjoyment.

**132.** *General interference caused by third parties.* — However, with regard to interferences caused by third parties, the law makes a distinction between legal interference and general interference. General interference caused by third parties is not covered by a warranty (Civil Code, s. 1725). Indeed, the lessor does not have any obligation with regards to the surveillance or the keeping of the thing, it does not have to provide a warranty against the actions of third parties; in such cases, it is up to the lessee to personally take action against the individuals concerned (see A. DJIGO, Voies de fait commises par des tiers et garantie du bailleur, Loyers et copr. 2001, chron. 4). The lessor is therefore not liable for any theft committed during the lease (French High Court. 3rd civ. 12 June 1996, n° 94-19.052, Bull. civ.III, n° 137), or even if the breaking of a rainwater pipe has an impact on the leased property (French High Court. 3rd civ. 28 June 2000, n° 98-20.406, Bull. civ. III, n° 128, Petites affiches 7 Dec. 2000, n° 244, p. 21, note Keita, RD imm. 2000. 610, obs. Collart-Dutilleul, Loyers et copr. 2000, comm. 246, obs. Vial-Pedroletti). However, the lessor could be held liable if the incident caused by a third party damages the property to the point that the lessor must carry out repairs under section 1720 (French High Court. 3rd civ. 25 Feb. 2004, n° 02-10.085, Bull. civ. III, n° 36, AJDI 2004. 371, obs. Rouquet). Similarly, the lessor may be liable if the interference was caused or facilitated through a fault on its part (regarding gross negligence of a caretaker of a building in a case of theft: French High Court. 3rd civ. 22 Feb. 1983, Bull. civ. III, n° 51; for a lack of precaution taken with scaffolding which facilitated theft: French High Court. 3rd civ. 28 Feb. 1990, n° 88-14.028, Bull. civ. III, n° 63, JCP, ed. N, 1990. II. 265, obs. Groutel). But, for the  warranty to be ruled out in cases involving interference from third parties, it must come from a true third party (where the third party is a co-owner of the lessor: French High Court. 3rd civ. 25 March 1998, n° 96-10.119, Bull. civ. III, n° 73, JCP 1998. II. 10107, note Djigo), which is not the case where the lessor is bound to them by a contract (see *above*, n° 126).

**133.** *Legal interferences caused by third parties.* — The lessor must provide a warranty against any legal interference from a third party (Civil Code, s. 1726), namely any third party claim of title over the property (ownership, easement, etc). Therefore, this warranty covers legal action by a third party with a claim over the property (which would be the case for the leasing of a thing belonging to another). In such a case section 1726 provides that the lessee may request a reduction in the price. This warranty is the equivalent in a lease to the warranty against third parties inherent in a sale (Civil Code, s. 1626): if the lessee is partially evicted its eviction request a reduction in price, and if completely evicted, it  could seek the termination of the lease as well as compensation for damages.

*Paragraph 5. – Safety Obligation*

**134.** *A new obligation* — Similar to the case for sales, the safety obligation does not arise from any general law related to leases, but from case law. The courts tend to rule that the lessor's obligation is an best endeavours obligation but not a performance obligation ("the lessor does not have any performance obligation with regards to the lessee's safety": French High Court. 3rd civ. 21 Nov. 1990, n° 89-15.922, Bull. civ. III, n° 236 ; see also French High Court. 3rd civ. 12 June 2003, n° 01-13.613, D. 2004. 523, note Beaugendre [2nd esp.], AJDI 2004. 113, obs. Beaugendre). This obligation seems to be independent and does not need to be connected to a failure to carry out maintenance or a defect in the thing (for a decision referring to an "best endeavours obligation in relation to safety" incumbent on the lessor, but which was not proven in the matter: French High Court. 2nd civ. 2 Dec. 1998, n° 96-22.197, RTD civ. 1999. 407, obs. Jourdain). This obligation certainly seems to be increasing, particularly since the decent housing requirement which has brought in certain safety standards, and these new requirements could make it easier to prove a safety breach as well as the causal link between the breach and the damage suffered by the lessee (see not. J. ROCHFELD, section prec.). This obligation arising from case law is now coupled with the special liability for defective products under section 1386-7 of the Civil Code, in cases where the lease is for moveable property and the lessor is a professional.

ART. 3. – VALIDITY OF CONTRACTUAL ARRANGEMENTS.

**135.** The rules relating to leases in the Civil Code are replaceable rules; so contractual arrangements are quite frequent. However this does not mean that the parties can put in whatever clause they like, the clauses must follow the rules of common law pertaining to contracts and the rules governing unconscionable clauses.

*Paragraph 1 – Common law obligations.*

**136.** *Essential obligations.* — Firstly, the parties cannot exempt themselves from their essential obligations (TERRÉ, SIMLER and LEQUETTE, *op. cit.* [n° 15], n° 610). For the lessor, there are two obligations that would be considered essential, which means that any clause exempting them from the said obligations would be deemed with any effect. The first essential  obligation is that of delivery, meaning that no clause can free the lessor from this obligation (French High Court. 3rd civ. 1st June 2005, n° 04-12.200 , Bull. civ. III, n° 119, Defrénois 2006. 439, obs. Ruet, AJDI 2005. 650, obs. Rouquet, RTD civ. 2005. 779, obs. Mestre and Fages). The essential obligation to deliver is to make the property available (French High Court. 1st civ. 11 Oct. 1989, Bull. civ. I, n° 317, D. 1991. 225, note Ancel), as well as to deliver property that is suitable for the agreed use (French High Court. 3rd civ. 5 June 2002, prec. *above*, n° 115). The second essential obligation incumbent on the lessor is to allow the lessee quiet enjoyment (French High Court. 1st civ. 23 Feb. 1994, prec. *above*, n° 21 ; see however French High Court civ. 16 July 1951, D. 1951. 587, JCP 1952. II. 6717, note Esmein ; French High Court 3rd civ. 28 Oct. 1974, Bull. civ. III, n° 379 ; 30 May 1996, n° 94-15.828 , Contrats, conc., consom. 1996, comm. 185, obs. Leveneur ; see  also BÉNABENT, *op. cit.,* n° 334-3 ; P.-H. ANTONMATTEI and J. RAYNARD, *op. cit.,* n° 323). Finally, with regard to the obligations incumbent on the



lessee, a clause exempting the lessee from paying rent would mean that the contract would be reclassified as it could no longer be deemed a lease.

**137.** *Accessory obligations.* — The other obligations of the lessor can be excluded by express agreement in the lease, such as the obligation to carry out maintenance (French High Court. 3rd civ. 11 Dec. 1991, n° 90-17.720, Bull. civ. III, n° 309) or the obligation to pay for repairs (French High Court. 3rd civ. 6 June 1978, Bull. civ. III, n° 237 ; 12 March 1985, *ibid.* III, n° 48), or even the warranty against latent defects (French High Court. 3rd civ. 31 Oct. 2006, n° 05-14.123, AJDI 2007. 302, obs. Denizot). However, pursuant to common law (Civil Code, section 1150), in the event of fraudulent misrepresentation or gross negligence, the lessor remains liable (French High Court. 3rd civ. 11 July 1972, Bull. civ. III, n° 454).

**138.** *Strict Interpretation of restrictive clauses.* — Even though some clauses which restrict obligations, particularly those of the lessor, are valid, they are strictly interpreted by the courts. Therefore a clause which renders the lessee responsible for "all repairs even roof repairs, would not exempt the lessor from a full re-roofing" (French High Court. 3rd civ. 11 Dec. 1984, Bull. civ. III, n° 209, RTD civ. 1985. 595, obs. Rémy ; see also French High Court. 3rd civ. 31 Oct. 2006, n° 05-19.171 , Bull. civ. III, n° 212, Loyers et copr. 2007, comm. 1, obs. Vial-Pedroletti ; see case law cited *above*, n° 122).

*Paragraph 2. – Unconscionable Clauses*

**139.** If a lease is entered into between a consumer or non-professional and a professional, any clause of the contract can be deemed invalid if it "aims to create or has the effect of creating, to the detriment of the non-professional or consumer, a significant imbalance between the rights and obligations of the parties to the contract" (Consumer Code, s. L.132-1). A clause in a car leasing contract was thus considered unconscionable because it "made the lessee incur, over a long term lease, all risks of loss or damage of the leased thing, even if those were caused by an unforeseeable and unpreventable event constituting a force majeure where there could be no fault attributed to the said lessee" (French High Court, 1st civ. 6 Jan. 1994, n° 91-19.424, Bull. civ. I, n° 8, D. 1994, somm. 209, obs. Delebecque, JCP 1994. II. 22237, note Paisant, and 1994. I. 3773, n° 25, obs. Viney, RTD civ. 1994. 601, obs. Mestre ; for another penalty clause deemed abusive, see in the same decision; see also French High Court .1st civ.17 March 1998, n° 96-11.593, Bull. civ. I, n° 116, Dalloz Affaires 1998. 662).

**140.** *Unconscionable Clauses Commission* — The unconscionable Clauses Commission (see www.clauses-abusives.fr) made several recommendations aiming to prevent a number of unconscionable clauses in certain leases. These recommendations are for indicative purposes only, but the courts tend to follow them quite closely. They are in the following contracts : *camping and caravan park contracts and leases for spaces for mobile residences* (Recommendation n° 05-01, BOCC of 23 June); *leases for premises for residential use* (Recommendation n° 00-01 supplementing recommendation n° 80-04, BOCC 22 June) ; *motor vehicle leasing contracts* (Recommendation n° 96-02,

BOCC 3 Sep.); *seasonal rental contracts* (Recommendation n° 94-04, BOCC 27 October, rectified on 9 December) ; *leasing contracts for certain real property other than motor vehicles* (Recommendation n° 91-04, BOCC 6 September); *safe or security deposit box leasing contracts* (Recommendation n° 87-01, BOCC 20 March); *advertising space leasing contracts* (Recommendation n° 80-01, BOSP 15 May; concerning contracts between a non professional lessor and a professional lessee of advertising space).

SECTION 2
**Non-performance of the lease.**

**141.** If one of the parties does not fulfil their obligations, there are several remedies that can be sought by the aggrieved party in accordance with common law pertaining to contracts. In accordance with some arrangements, the aggrieved party could seek specific performance of the contract, the exception for non-performance, the rescission of the lease, or invoking the other party's contractual liability.

**142.** *Specific performance* —Either the lessor or the lessee could require the other party to perform their obligations during the lease. The lessee could thus require the lessor to carry out repairs for which they are liable (Civil Code, s. 1720) or to properly maintain the thing (Civil Code, s. 1719), or even to cease any nuisance or behaviour that could disturb their quiet enjoyment (Civil Code, s. 1719). Similarly, the lessor could demand the lessee to cease any behaviour or nuisance that would constitute a non-peaceful use of the thing (Civil Code, s. 1728). With regard to the obligations incumbent on the lessee, it could be questioned whether these obligations must necessarily be performed during the lease or whether they must simply ensure they are fulfilled by the time the premises are returned. The answer to this question is important as in the first case the lessor could seek specific performance of the lessee's obligations during the lease, while in the second case they would have to wait until the end of the lease before being able to officially report or take action on any damage. It would be reasonable to assume that the lessor could require the lessee to immediately perform any obligation that would preserve the substance of the thing, which should not be altered or in any way jeopardised by the lessee. However, if the substance of the thing is not jeopardised, the lessor's obligation to allow the lessee enjoyment also implies allowing the lessee to carry out any minor repairs and maintenance they like at a time that suits them (for a contrary decision which relies on a contractual clause: French High Court. 3rd civ. 30 June 2004, n° 02-20.721, Bull. civ. III, n° 134, RDC 2005. 354, obs. Seube, Loyers et copr. 2005, comm. 12, obs. Brault). In order to order performance of the obligation, it is sufficient to only show that it has not been performed. There is no requirement to prove any harm suffered (French High Court. 3rd civ. 18 Nov 1980, Bull. civ. III, n° 177).

**143.** *Substitution.* — Pursuant to common law, the parties can invoke section 1144 of the Civil Code which enables the creditor of a non-performed obligation to order, at the expense of the debtor, the performance of the obligation by a third party. In such cases the courts require the creditor to give prior notice to the debtor to perform and that it then obtain a



court order ("in the absence of a notice sent to the lessor requesting the lessee to carry out the works, and without a court order authorising the lessee to commission the works, the lessor is not liable for bearing the expenses thereof", French High Court 3rd civ. 20 March 1991, n° 89-19.866, Bull. civ. III, n° 94 ; 5 March 1997, n° 95-16.017, *ibid.* III, n° 45 ; 16 July 1997, Contrats, conc., consom. 1997, comm. 175, obs. Leveneur ; 11 Jan. 2006, prec. *above*, n° 118). However, if the situation is urgent the creditor can bypass the court order (French High Court. 3rd civ. 22 Nov. 1995, n° 93-19.692).

**144.** *Exception for non-performance.* — The courts are vigilant about ensuring the exception for non-performance is not too easily invoked by the parties, especially by the lessee, in order to be freed from performing their obligations. The courts therefore require the violation of the lessee's enjoyment of the property to be quite significant, in order to justify the suspension of payments (see *above*, n° 106).

ARTICLE 1. – RESCISSION.

**145.** *Serious breach.* — In application of common law pertaining to contracts as well as section 1184 of the Civil Code, one of the parties to the lease can take legal action to terminate or rescind the lease if the other party fails to perform their obligations. The courts would then assess the seriousness of the fault in order to decide if this penalty is justified (French High Court. 3rd civ. 12 April 1972, JCP 1973. II. 17591, note Le Galcher-Baron ; 1st Oct. 1997, n° 95-18.950, Rev. loyers 1998. 101, note Teilliais, RD imm. 1998. 144, obs. Collart-Dutilleul and Derruppé). The breach can be on the part of the lessor or lessee.  Section 1729 of the Civil Code, which provides for the termination of the lease due to a fault of the lessee, was amended by the Law n° 2007-297 of 5 March 2007 preventing delinquency by penalising the lack of using the thing as a "prudent administrator" (on the law see B. VIAL-PEDROLETTI, Lois du 5 mars 2007 : incidences sur les baux d'habitation, Loyers et copr. 2007, study 6). It is unclear whether this addition alters the current state of the law insofar as the use of the thing as a prudent administrator is already an obligation pursuant to section 1728 of the Civil Code, and failure to do so could lead to the termination of the lease in accordance with common law pertaining to contracts.

**146.** *Termination or rescission* — A lease is a contract for successive performance which makes it difficult to apply the retroactivity (Y.-M. SERINET, L'effet rétroactif de la résolution pour inexécution en droit français, *in* Les sanctions de l'inexécution des obligations contractuelles, Études de droit comparé, 2001, LGDJ, Bruylant, p. 589 and seq.). Moreover, there is no reason that would justify a lease being retroactively rescinded when it may have been performed over an extended period (TERRÉ, SIMLER and LEQUETTE, *op. cit.* [n° 15], n° 655). This is why a termination of a lease is generally preferred to its rescission A decision made by the third civil division clarified an important factor in deciding when formulating general principles that termination was the normal penalty for a contract for successive performance except in the case where the lack of performance dated back to the start of the contract ("If, in a bilateral contract for successive performance, the termination does not apply to the time where the contract was regularly performed, the judiciary rescission of the contract for a failure to perform or for incomplete

performance dating back to the start of the contract would lead to the retroactive rescission of the contract", French High Court. 3rd civ. 30 April 2003, n° 01-14.890, Bull. civ. III, n° 87, JCP 2003. I. 170, n°s 15 et seq., obs. Constantin, and 2004. II. 10031, note Jamin, Defrénois 2003. 1175, obs. Savaux, Loyers et copr. 2003, chron. 9, par Vial-Pedroletti, Rev. loyers 2003. 407, obs. Humblot-Gignoux, Petites affiches 8 Dec. 2003, n° 244, p. 6, obs. Pignarre, RTD civ. 2003. 501, obs. Mestre and Fages, RDC 2004. 365, obs. Seube ; for a different previous solution which decided that "the termination of the contract has the effect, like rescission, of making the contract null and void and returning the parties to the state they were in beforehand, unless it is impossible on a practical level", see French High Court. 1st civ. 7 June 1995, n° 93-15.485 , Bull. civ. I, n° 244, JCP 1996.I. 3914, n° 5, obs. Jamin).

**147.** *Effective date of termination* —A decision of 30 April 2003 also brought in a new solution for determining when termination takes effect. The previous decisions deemed that the termination was effective from the date of the court decision (French High Court. 3rd civ. 26 June 1991, n° 89-21.640, Bull. civ. III, n° 188 ; 13 May 1998, n° 96-18.358 , *ibid.* III, n° 98, Contrats, conc., consom. 1998, comm. 113, note Leveneur), but it seems that from now on termination is deemed to take effect from the non-performance of the obligation, which seems more logical.  It still remains for the courts to determine the event which will take into account and characterise      the non-performance, which could be the service of either the notice or the statement of claim (French High Court. 3rd civ. 30 April 2003, prec.).

**148.** *Avoidance Clause.* — Pursuant to section 1184 of the Civil Code, the parties can provide for an avoidance clause in a contract in order to avoid going to court. This clause is not specific to leases and is subject to the regime slowly developed by the courts regarding serving prior notice or the role of good faith (TERRÉ, SIMLER and LEQUETTE, *op. cit.* [n° 15], n° 664).

ART. 2. –CONTRACTUAL LIABILITY

**149.** *Common law and special regime.* — The non-performance of obligations by one party can lead to the invoking of its civil contractual liability, under common law rules, except for cases where the lessee is liable for damage and loss due to fire, which is subject to a specific regime (see *above,* n°s 97 et seq.). By virtue of common law rules regarding civil contractual liability, the party held liable must repair all damage that was directly and predictably caused by a fault on its part (Civil Code, section 1151).

**150.** *Need to show harm.* — One particular difficulty is that the victim must necessarily prove that they have suffered harm as as a result of the non-performance of the contract in order to invoke the liability of the party at fault. After having deemed that showing harm was not necessary ("the compensation of the lessor for non-performance by the lessee of rental repairs provided for in the lease is not contingent upon either the performance of these repairs or proof of harm suffered": French High Court. 3rd civ. 30 Jan. 2002, n° 00-15.784, Bull. civ. III, n° 17, D. 2002. 2288, note Elhoueiss , and 2003, somm. 458, obs. Mazeaud, JCP 2002. I. 186, n°s 7 et seq.,



obs. Viney, Comm. com. élec. 2002, comm. 132, note Stoffel-Munck, Rev. loyers 2002. 210, obs. J. Rémy, RTD civ. 2002. 321, obs. Gautier, and p. 816, obs. Jourdain), the third civil division revised their position by deciding that "compensation can only be awarded if at the time of the decision, the court considers that there has been harm suffered as a result of a breach of contract" (French High Court. 3rd civ. 3 Dec. 2003, n° 02-18.033 , Bull. civ. III, n° 221, D. 2005, panor. 185, obs. Mazeaud, JCP 2004. I. 163, n°s 2 et seq., obs. Viney, Defrénois 2004. 1332, obs. Ruet, Contrats, conc., consom. 2004, comm. 38, note Leveneur, RDC 2004. 280, obs. Stoffel-Munck, and p. 359, obs. Seube, RTD civ. 2004. 295, obs. Jourdain). The latest case law from the third civil division has the disadvantage of not allowing any penalty for the non-performance of the contract: in both of the matters cited above, it was found that the lessee had not complied with their

maintenance obligation. It would seem logical to conclude that the damage suffered by the lessor would be assessed at the amount required to restore the premises to the state they were in before, even if, for various reasons, this was not done (in relation to the case law based on Section1145 which decided that the non-performance of an obligation not to do something would lead to compensation even where there was no proof of harm suffered: French High Court. 1st civ. 31 May 2007, n° 05-19.978, to appear in bulletin D. 2007, AJ 1725, obs. Gallmeister ; 10 May 2005, n° 02-15.910, Bull. civ. I, n° 201, Defrénois 2005. 1247, JCP. 2006. I. 111, n° 3, obs. Stoffel-Munck, RTD civ. 2005. 600, obs. Jourdain; see *contra* : French High Court. 1st civ. 26 Feb. 2002, n° 99-19.053, Bull. civ. I, n° 68, Defrénois 2002. 759, obs Savaux, Petites affiches 18 Nov. 2002, n° 230, p. 7, obs. Stoffel-Munck).

# CHAPTER 4
## End of a lease.

**151.** Regardless of any non-performance of the contract (for ending of a lease by rescission or termination, see *above*, n°s 145 et seq.), a lease can end for various causes that could be either general ones or specifically linked to the term of the lease.

## SECTION 1
### General causes for ending a lease.

### ART. 1. – LOSS OF THE THING.

**152.** *Total Loss* — A loss of the leased thing would lead to the termination of the lease (Civil Code, ss. 1741 and 1722). When the thing is destroyed by an act of God, the lease is rightfully terminated (Civil Code, s, 1722), implying that the lessee may cease paying rent and reclaim what it may have paid in advance (French High Court. 3rd civ. 1st April 1998, n° 96-10.399, Bull. civ. III, n° 76). When the building is ruined due to decay it would be considered a total loss leading to the termination of the lease, and the lessor does not have to carry out works that would be disproportionate to the value of the property (French High Court. 3rd civ. 29 Jan. 1975, Bull. civ. III, n° 35; 6 March 1984, *ibid.* III, n° 59; 8 Dec. 1993, n° 91-10.034, *ibid.* III, n° 160), unless the decay is due to a lack of maintenance on the part of the lessor (French High Court. 3rd civ., 30 Sep. 1998, n° 96-17.684 , Bull. civ. III, n° 177). Other cases that would be considered a loss of the thing is where it is condemned to be demolished, where it has become dangerous (French High Court. 3rd civ. 14 Jan. 2004, n° 01-12.510, Bull. civ. n° 8), or when it has become unsuitable for the agreed use (for a hotel: French High Court 3rd civ. 20 Jan. 1981, Bull. civ. III, n° 15 ; 19 March 1997, n° 95-16.719 , *ibid.* III, n°62). Regardless of whether the loss of the thing is due to an act of god or to a fault of one the parties, the difference is made at the time of the awarding of damages which may beat the cost of the party deemed liable for the loss (French High Court. com. 8 Oct. 1991, n° 89-10.491, Bull. civ. IV, n° 278 ; French High Court. 3rd civ. 22 Jan. 1997, n° 95-12.410, *ibid.* III, n° 17, D. 1998. 43, note Farnocchia, JCP 1997. II. 22943, note Djigo, RD imm. 1997. 296, obs. Collart-Dutilleul and Derruppé, Contrats, conc., consom. 1997, comm. 58, note

Leveneur ; 4 April 2001, n° 99-12.322, AJDI 2001. 600, obs. Briand).

**153.** *Partial loss*. — In the event of partial loss due to an unforeseeable circumstance, section 1722 of the Civil Code only allows for legal action by the lessee (French High Court. 3rd civ. 1st Feb. 1995, n° 92-21.376 , Bull. civ. III, n° 33, RD imm. 1995. 800, obs. Collart-Dutilleul and Derruppé) to seek either the termination of the lease, or a reduction in rent, but they cannot seek damages (Civil Code, s. 722). If the partial loss is due to a fault of the lessor, through a failure to carry out maintenance, the lessee could demand that repairs be carried out (French High Court. 3rd civ. 30 Nov. 1998, Bull. civ. III, n° 177).

### ART. 2. – SALE OF THE LEASED THING

**154.** *Transfer of the lease*. — The sale of the leased thing has no effect on any lease that may be entered into for the thing: the lease will be transferred with the thing to the new owner and the lessee could require the new owner to continue performance of the lease (Civil Code, s. 1743). This rule applies to any lease, whether it is over moveable or real property and to any sale (for an auction: French High Court. 1st civ. 19 March 1991, n° 89-20.352, Bull. civ. I, n° 90). The only condition required is proof that the lease is dated before the sale so that the new owner does not have to honour a lease entered into after the sale. A lease has an effective commencement date, as long as it has been entered into by either a formal agreement, or a private agreement that fulfils the requirements of section 1328 of the Civil Code (regarding an formal sale agreement of a business to which, in a private agreement dated on the same day, the vendor granted the purchaser a nine-year lease; it included the essential elements of a lease, which then had an effective commencement date: French High Court. 3rd civ. 15 March 2000, n° 98-14.354, Bull. civ. III, n° 55, D. 2000, AJ 285, obs. Rouquet). This rule is applied flexibly by the courts that have decided that a lease is enforceable on the new owner as long as it was aware of the existence of the lease at the time of the sale (French High Court. 3rd civ. 20 July 1989, n° 88-



13.413, Bull. civ. III, n° 169, RTD civ. 1990. 101, obs. Rémy ; 29 Sep. 1999, n° 97-22.129, Bull. civ. III, n° 188, RD imm. 2000. 95, obs. Collart-Dutilleul, Contrats, conc., consom. 2000, comm. 19, obs. Leveneur ; 11 Feb. 2004, n° 02-12.762, Bull. civ. III, n° 24, AJDI 2004. 371, obs. Rouquet, JCP. 2004. II. 10109, obs. Djigo, D. 2005, panor. 749, obs. Damas , Loyers et copr. 2004, comm. 84, obs. Vial-Pedroletti ; 7 March 2007, n° 05-10.794 , à paraître au Bulletin, Loyers et copr. 2007, comm. 89, obs. Vial-Pedroletti).

**155.** *Replaceable rule*. — The transfer of a lease with the sale of the thing is a public policy rule (Civil Code, section 1743, para. 2); so a lease can be drafted so that it will not be transferred with the sale of the leased thing, except for rural leases (also applies to residential leases subject to the Law of 6 July 1989). In such a case, the lessee would have the right to compensation for being evicted, calculated in accordance with the provisions in sections 1744 to 1750 of the Civil Code. Under the Civil Code, the right to compensation when evicted from a property is a public policy rule, so it cannot be contractually waived by the parties.

**156.** *Effects*. — The transfer of a lease is automatic, and the lessee does not need to take any official action, nor can it contest it.  It is effective as soon as the sale is completed (the sale does not need to be published for it to be binding on the lessee: French High Court. 3rd civ. 4 May 2000, n° 98-20.136, Bull. civ. III, n° 98) and continues into the future. Therefore any sums previously owed between the former lessor and the lessee without the new owner being able to claim or oppose them. Therefore the bond paid by the lessee to the first lessor cannot be claimed to anyone but the former lessor (French High Court. 3rd civ. 25 Feb. 2004, n° 02-16.589, Bull. civ. III, n° 37, AJ fam. 2004. 147, obs. Deis-Beauquesne, AJDI 2004. 379, obs. Rouquet) ; similarly, any back payments of unpaid rent are only owed to the initial lessor unless this debt is legally transferred with the lease (French High Court. 3rd civ. 2 Oct. 2002, n° 01-00.696, Bull. civ. III, n° 189, D. 2003, somm. 731, obs. Damas , AJDI 2003. 25, note Briand, Loyers et copr. 2002, comm. 276, obs. Vial-Pedroletti ; 24 April 2007, n° 06-16.286, *ibid.* 2007, comm. 140, obs. Vial-Pedroletti). Finally, any breaches on the part of the lessee prior to the transfer of the lease cannot be claimed by the new owner, unless these breaches continue after the transfer, and the lessee is liable for them under the current lease (therefore the owner of the leased property can hold the lessee responsible for any damages caused, on the grounds of the inherent obligation to return the property in good condition, without having to prove that said damage occurred after the sale: French High Court. 3rd civ. 21 Nov. 2001, n° 00-13.237 , Loyers et copr. 2002, comm. 57, obs. Vial-Pedroletti).  Despite inconsistent case law about what happens to the bond paid by the lessees, the courts have now decided that it will be transferred as part of the lease and that the bond is now in favour of the new owner (for previous case law, French High Court plenary assembly 6 December 2004, préc. *above*, n° 106). From the date of the sale of the leased property, the new owner becomes the lessor and is bound to the lease contract under its existing terms and conditions.

ART. 3. – DEATH OF ONE OF THE PARTIES

**157.** *No effect* The death of one of the parties has no effect on the lease (Civil Code, s. 1742): the rights and obligations of the deceased are transferred to their heirs, pursuant to common law (application of leases subject to the Law of 1948 : French High Court, 3rd civ. 26 June 1996, n° 94-17.238, Bull. civ. III, n° 155, Defrénois 1997. 404, obs. Bénabent, RD imm. 1996. 622, obs. Collart-Dutilleul and Derruppé ; 23 June 1998, n° 96-21.872 , Loyers et copr. 1999, comm. 65, obs. Vial-Pedroletti). In principle, a lease is therefore not an *intuitu personae* contract.  It can become so if the parties agree, in which case there will be an additional provision to reflect the will of the parties (see BRÉMOND, Réflexions autour du transfert à cause de mort du contrat de bail d'habitation, JCP, ed. N, 2002. 1234 and 1240).

SECTION 2
**Causes based on the term of the contract.**

**158.** The terms and conditions for ending a lease vary in accordance with the term given to the contract at the time it was entered into, whether it is a fixed term contract or a periodic contract.

ART. 1. – PERIODOC CONTRACTS.

**159.** *Non written leases*. — A lease is considered to be periodic if the parties have not agreed on a term for the lessee's enjoyment of the property.  The Civil Code wrongly calls a periodic lease a "non written lease" which is not strictly correct as an oral lease could be for both a fixed term contract and a periodic contract, but because of the rules of proof, a non written lease is deemed to be a periodic lease (see *above,* n° 67).

**160.** *Notice* —Where the lease is a periodic lease, the parties can terminate it by giving "notice".  Giving notice is a unilateral legal action borne of the will of whichever party intends to terminate the contract (French High Court. 3rd civ. 12 July 1988, Bull. civ. III, n° 126; 12 June 1996, n° 94-16.701, *ibid.* III, n° 138); it therefore does not have to be approved by the recipient.  In common law pertaining to leases, the notice does not have to follow any particular form to be valid as long as the desire to terminate the contract is evident and indisputable (French High Court. civ. 28 Dec. 1949, D. 1950. 158). The Civil Code requires only that the notice be given "in accordance with the timeframes set in relation to the use of the premises" (Civil Code, s. 1736), unless there is a timeframe provided for in the contract.  If the lessee continues to occupy the premises after the date set for the termination of the lease as per the notice given, this occupation is unlawful and holds no right; the lessor can therefore cease the occupation, by evicting the lessee.  It can also ask for a compensation for occupation, which has two functions: it is consideration for the enjoyment of the premises as well as compensation for the harm suffered (French High Court. 3rd civ. 18 Jan. 1989, Bull. civ.III, n° 15, Loyers et copr. 1989, comm. 4, note Vial-Pedroletti), which is why the amount of this sum can be higher than the rent.

ART. 2. – FIXED TERM CONTRACTS

**161.** The fixed term lease, which the Civil Code calls "a lease



in writing" is a lease with a term that has a specific and definite end date (such as upon the death of the lessee: French High Court 3rd civ. 18 Jan. 1995, n° 92-17.702, Bull. civ. III, n° 16, RD imm. 1995. 598, obs. Collart-Dutilleul) or an uncertain end date; it therefore expires at the end of the contractual term, "without having to give notice" (Civil Code, s. 1737). Being a fixed term contract, this lease cannot be terminated while still in progress even with notice; the lessor has the right to demand the payment of rent until the end of the agreed period (French High Court. 3rd civ. 3 April 2001, n° 99-17.738 , Loyers et copr. 2001, comm. 167, obs. Vial-Pedroletti). If at the end of the term the lessee remains in the premises against the lessor's will, the lessor can order its eviction as well as the payment of  a compensation for occupation for the time the lessee remains in unlawful possession of the property.

**162.** *Extension, renewal.* — Before the end of the term, the parties can agree to continue the lease after its expiry date under the same terms and conditions.  As the only amendment is the term, the contract is thus subject to an *extension,* until the end of the new fixed term.  The parties can also decide not to further extend the same contract, but to *renew* it: which means a new contract would apply after the previous one expires and it may contain new terms and conditions.

**163.** *Tacit renewal.* — If, at the end of the lease, the lessee remains in possession and the lessor allows it to do so, the law would consider this a tacit renewal of the lease. Indeed, under section 1738 of the Civil Code, "if, at the end of a written lease, the lessee remains and is allowed to remain in possession, a new lease is created which is governed by the section related to oral leases".  For there to be tacit renewal of the lease, there must be a tacitly expressed desire to do so from both parties: from the lessee by remaining in the premises and from the lessor by allowing them to retain possession.   Tacit renewal has two effects, firstly the extinguishment  of the expired contract and then the formation of a new lease, which in itself leads to two sets of consequences.  Firstly, if the initial lease is extinguished, the sureties that guarantee this lease are also cancelled and cannot therefore be carried over to the new lease unless there is express agreement to this effect. Similarly, if the initial lease had a preferential clause,it is not renewed (French High Court 3rd civ. 21 Dec. 1988, n° 87-14.943, JCP 1989. II. 21324). A new contract is then formed, which is an effect inherent to the tacit renewal of a general fixed term contract (see not. French High Court 1st civ. 15 Nov. 2005, n° 02-21.366 , Bull. civ. I, n° 413, D. 2006. 587, note Mekki, RDC 2006. 696, obs. Laithier, RTD civ. 2006. 114, obs. Mestre et Fages, Contrats, conc., consom. 2006, comm. 42, obs. Leveneur, Dr. et patrimoine, Oct. 2006, p. 97, obs. Stoffel-Munck : "Unless provided or intended otherwise, tacit renewal of a fixed term contract, the fixed term of which has produced its effects, gives rise to a new contract, without a fixed term, and which has elements that are not necessarily identical"). As it is therefore a different contract, a new law may be applicable to it at the date of renewal (French High Court. 3rd civ. 10 June 1998, n° 96-15.626, Bull. civ. III, n° 119 ; 27 Sep. 2006, n° 05-18.168 , *ibid.* III, n° 185, RDC 2007. 383, obs. Seube). As no terms and conditions have been discussed, by definition, it automatically converts to a  periodic contract (Civil Code, s. 1738), except for leases for a house or apartment, where the new lease seems to be for a further fixed term, for a term that is "set in accordance with the use of the premises" (Civil Code, s. 1759); in any case it has its own term (French High Court. 3rd civ. 23 June 1998, n° 96-17.697 , RD imm. 1998. 693, obs. Collart-Dutilleul). But only the term is different: even if it is a "new" contract, it is based on the same terms and conditions as the previous one (price, intended use, etc).



# ALPHABETIC INDEX

**Day-to-day transaction** 38.
**Direct legal action for payment**
– against the sub-lessee 82.
**Improvements and constructions**
108
**Preliminary contract** 60.
**Lease**
– building lease 30.
– commercial lease 3.
– emphytheutic lease 3, 29.
– lease for moveable property 10.
– perpetual lease 76.
– professional lease 11.
– real lease 28 et seq.
– non written lease 159.
– oral lease 159.
**Residential lease**
– for furnished dwellings 13.
– for non principal residence 12.
**Lessor** 39 et seq.
– compliance with the agreed purpose
113.
– residential purposes 115.
– professional purposes 114.
– ownership right 8.
– maintenance 117 et seq.
– warranty against third parties 131 et
seq.
– warranty against latent defects 128 et
seq.
– peaceful enjoyment 123 et seq.
– obligation to deliver 111 et seq.
– obligation to inform 112.
– safety obligation 134.
– obligations 109 et seq.
– repairs 116.
**Camping ground** 21.
**Bond**
– for rent 105.
– sale of the leased building 105.
**End of a lease** 151 et seq.
**Assigning the lease** 86 et seq.
– assigning the receivables 88.
– assigning the debt 89.
– unpaid rent 89.
– qualification 87 et seq.
**Horses**
– leasing of horses 24.
**Thing** 15 s.
– thing belonging to another 48 et seq.
– loss of the thing 152 et seq.
**Clause**
– unconscionable clause 96, 139 et seq.
– exclusive residential clause 94.
– non compete clause 127.
– avoidance clause 148.
**Restrictive or elusive clauses** 135 et
seq.
– interpretation of restrictive clause138.
**Civil Code** 2.
**Safe** 20.
**Co-lessees** 126.
**Unconscionable Clauses**
**Commission** 140.
**Commodatum** 31.
**Competition** 127.
**Compliance** 111 et seq.
see *Allocated purpose*
**Notice** 160.

**Consent** 59 et seq.
**Keeping the asset** 96 et seq.
**Contract**
– consensual 59.
– fixed term 75, 161 et seq.
– periodic 75, 159 et seq.
**Works contract**
– distinction 22 et seq.
**Licence contract** 10.
**Contract for the hiring of things**
– definition 1.
**Precarious Occupation Agreement** 35
s.
**European Convention on Human
Rights** 7, 92, 125.
**European Court of Human Rights** 8.
**Purchase-lease of real property**
– lessee's liability 98.
**Death of one of the parties** 157.
**Definition** 1.
**Damage and loss** 97 et seq.
**Delivery – compliant** see *Allocated
Use.*
**Bailment** 19 et seq.
**Allocated purpose**
– residential 115.
– decent housing 5, 115.
– delivery that is compliant with
allocated purpose113 et seq.
– professional 114.
– respect by the lessee of allocated
purpose 93 et seq.
**Divorce** 53.
**Area** 9 et seq.
**Right to decent housing** 5.
**Enforceable right to housing** 6.
**Personal right** 26.
**Right to respect of property** 8.
**Right to respect of family life** 7.
**Fundamental rights** 7 s., 92, 125.
– religious freedom 7.
– decent housing 5, 115.
– enforceable right to housing 6.
– respect of property 7, 8.
– family life 7.
– privacy 7.
**Term** 35 s., 75 et seq.
– prohibition on perpetual leases 76.
– fixed term 161 et seq.
– periodic 158 et seq.
**Writing** 159.
– non written lease 159.
**Vehicle parking space** 21.
**Maintenance and repairs**
– fault of the tenant 119.
– structural works 120.
– by the lessee 98.
– by the lessor 116, 117 et seq.
– repairs outside the scope of routine
maintenance by the lessee 120 .
**Spouses** 47, 53 et seq.
– joint lease 53 et seq.
– death 53.
– divorce 53.
– spouse of the lessor 47.
– married lessee 53.
– legal separation 54.
**Condition report** 107.
**Exception for non-performance** 106,
144.
**Specific performance** 142.
**Substitution** 117, 143.
**Force majeure**

– exemption of the lessor 130.
**Warranty against eviction** 131 et seq.
– interference by the lessor 131.
– legal interference by a third party 133.
– general interference by a third party
132.
**Warranty against latent defects** 128 s.
– limit period 129.
– force majeure 130.
– penalties 130.
**Household members**
– liability of the lessee 99.
**Hotels** 23.
**Legal capacity of the lessor** 40 s.
**Fire** 9, 100 et seq.
– causes for exoneration 101.
– presumption of liability 100.
**Tenancy in common** 42 et seq.
– agency agreement 43.
**Enjoyment** 15 et seq., 17 et seq.
– quiet enjoyment 123 s.
– free and exclusive enjoyment 17.
– interference with enjoyment 124.
**Religious Freedom** 7.
**Tenant**
See *Lessee*
**Holiday rental** 23.
**Lease Management of a business** 10.
**Decent housing** 115.
**Rent** 68 et seq.
– unpaid by the assignee 89.
see *Price.*
**Furnished rental** 13.
**Changes to the premises** 95.
**Invalidity**
– lease 76.
– perpetual lease 76.
– sub-letting 76.
**Obligation**
– of the lessor 109 et seq.
– of the lessee 90 et seq.
– essential 123, 136 et seq.
– to deliver 111 et seq.
– to inform 110.
– safety 134.
**Civil Union** 52 et seq., 58.
**Preferential agreement** 60.
**Payment** 104 et seq.
see *Price*
**Loss of the thing** 152.
– damage 97.
– partial 153.
– termination of lease 152 et seq.
– total 152.
**Lessee** 51 et seq.
– special leases 52.
– assignment 86 et seq.
– damage and loss 97 et seq.
– allocated purpose of the property 93.
– personal right to enjoyment 77 et seq.
– rights 5 et seq., 77 et seq.
– right to decent housing 5.
– enforceable right to housing 6.
– right to respect of family life 7.
– maintenance and repairs 96.
– heirs 51.
– fire 100 et seq.
– married 53.
– obligations 90 et seq.
– sub-lease 78 et seq.
– substance 95.
– use as a prudent administrator 91 et
seq.
– privacy 7.
**Loan for use** 31.

**Proof** 9, 61 et seq.
– oral lease 61, 63 et seq.
– contents 65 et seq.
– of the term 67.
– of rent 66.
– existence 62 et seq.
**Price** 31 et seq.
– abuse in the determination of the price
73.
– bond 105.
– consistency 34.
– determining the price 69 et seq.
– exception for non-performance 106.
– existence 31 et seq., 68.
– guarantees 105.
– payment 104 et seq.
– provisions 104.
– price review 74.
– serious price 33.
– suspension of payment 106.
**Promise of  lease** 60.
**Extension, renewal** 162.
**Qualification** 14 et seq.
**Repairs** 96, 116.
**Rescission** 145 et seq.
– avoidance clause 148.
– date of effective termination 147.
– gross negligence 145.
– loss of the thing 152.
– termination or rescission 146 .
.**Liability**
– contractual 147 et seq.
– damage and loss 97 et seq.
– fire 100 et seq.
– harm suffered 148.
**Restitution at the end of the lease**
107 et seq.
– condition report 107.
**Sub-lease** 78 et seq.
– direct legal action for payment 82.
– legal action for the liability of the
lessor 83.
– legal action for the liability of the sub-
lessee 84.
– approval of the lessor 80.
– termination of lease 85.
– contract 79.
– law 78.
– liability of the lessee 81.
**Tacit renewal** 163.
**Term**
– fixed term contract 161.
– periodic contract 159 et seq.
**Transfer of the lease**
– sale of the leased thing 154 et seq.
**Use as a prudent administrator** 91 et
seq.
**Usufruct** 27.
– usufructuary lessor 45 et seq.
– term of lease 46.
**Vehicle**
– parking 21.
**Sale**
– distinction 25.
– transfer of the lease 154 et seq.
– sale of the leased thing 154 et seq.
**Deterioration through age** 95, 96, 97,
102, 130, 152.
**Privacy**
– religious freedom 7.
– lessee 7.

---

[i] Translator's note: under French law, an emphyteutic lease is a long-term lease of land or buildings; 99 years or such similar long term, or even in
perpetuity. Whenever we refer to an emphyteutic lease in this document, this definition will apply.
[ii] Translator's note: "real" from the latin word "*res*" (thing) i.e. attached to a thing.
[iii] Translator's note: translation chosen for the word "règlement de co-propriété".
[iv] Translator's note: "common" in the sense ordinary (opposite to special), rather than the Anglo-Saxon "common" law.  Whenever we refer to common
law in this document, this definition will apply.
[v] Translator's note: "lease management" is the chosen translation for "location-gérance", which means a highly regulated lease whereby the owner of a
business (lessor) leases out that business to a manager (lessee). Whenever we refer to a lease management in this document, this definition will apply.
[vi] Translator's note: chosen translation for "commodatum"; also loan for use.
[vii] Translator's note: chosen translation for the concept of "acte d'administration.
[viii] Translator's note: translation chosen for the concept of "acte de disposition".
[ix] Translator's note: translation chosen for the concept of "conseil de famille".
[x] Trasnlator's note: translation chosen for the concept of "curateur".
[xi] Translator's note: translation chosen for the expression "Conseil d'Etat"
[xii] Translator's note: chosen translation for the concept of "indivision".

[xiii] Translator's note: translation chosen for the concept of "mandat apparent" as defined in French case law. The theory of apparent agency is a theory according to which reliance may be placed on an apparent power to act of the agent.

[xiv] Translator's note: translation chosen for the "théorie de l'apparence" as in defined in French case law. This theory of appearance is a theory according to which reliance may be placed on an apparent power to act in the person or entity sought to be held liable.

[xv] Translator's note: under French law, a private agreement is an agreement made in writing, but not sealed or witnessed. Whenever we refer to a private agreement in this document, this definition will apply.

[xvi] Translator's note: under French law, a formal agreement is an agreement which must be drawn up by a notary or a public authority. Whenever we refer to a formal agreement in this document, this definition will apply.

[xvii] Translator's note: translation chosen for the concept of "commencement de prevue par écrit".

[xviii] Translator's note: chosen translation for the concept of "bail à durée indéterminée". In this instance, a periodic lease refers to a lease which does not have a fixed term. Whenever we refer to a periodic lease or contract in this document, this definition will apply.

[xix] Translator's note: translation chosen for the concept "bon père de famille".

[xx] Translator's note: translation chosen for the word "locataire-gérant"; also the manager for the concept of lease management; see above n° v.

[xxi] Translator's note: translation chosen for the concept "indemnité d'occupation", which is where a lessee who has unlawfully occupied the premises beyond the term of the lease or after an eviction order is required to pay the lessor a sum to compensate it for the use of the premises and any harm suffered.

[xxii] Translator's note: translation chosen for the expression "faculté de remplacement"; section 1144 of the Civil Code enables the creditor of a non-performed obligation to order, at the expense of the debtor, the performance of the obligation by a third party.

