Exhibit 24

The: 09/11/2011

**French High Court**

**3rd Civil Division**

**Public hearing of 27 June 1973**

**No of appeal: 72-12321**

Published in the bulletin

**Appeal allowed**

**PDT MR. DE MONTERA, president**

AS. MR. DUTHEILLET - LAMONTHEZIE, associate judge

DEP. PROS. MR. TUNC, deputy prosecutor

Appellant, SOL. MR. CALON, solicitor(s)

**FRENCH REPUBLIC**

**ON BEHALF OF THE FRENCH PEOPLE**

ON THE SOLE GROUND, TAKEN IN ITS SECOND PART: CONSIDERING SECTIONS 1134 AND 1709 OF THE CIVIL CODE;

CONSIDERING THAT, THE PRICE BEING AN ESSENTIAL ELEMENT OF THE CONTRACT OF LEASING, A PROMISE OF LEASE IS ONLY EQUIVALENT TO A LEASE IF IT INCLUDES AN AGREEMENT BETWEEN THE PARTIES ON THE PRICE;

CONSIDERING THAT IT RESULTS FROM THE PARTICULARS OF THE APPEALED DECISION THAT AFTER HAVING ASKED MRS. X... TO MAKE ON HIM BEHALF AN OFFER OF USUFRUCT OR LIFETIME LEASE ON TWO REAL PROPERTIES BELONGING TO HIM TO RICHIERIS, ZAETTA TERMINATED THIS AGENCY AGREEMENT ON 28 DECEMBER 1966,

CONSIDERING THAT, ON 30 DECEMBER 1966, RICHIERIS ACCEPTED THE OFFER, BUT DID ONLY STATE ITS OPTION FOR THE LIFETIME LEASE ON 18 MAY 1967 AFTER ZAETTA NOTIFIED HIM OF THE TERMINATION OF THE AGENCY AGREEMENT ON 2 FEBRUARY 1967 AND PUT FORWARD THE TARDINESS OF THE ACCEPTANCE;

CONSIDERING THAT, TO DECLARE RICHIERIS THE HOLDER OF A LIFETIME LEASE, THE COURT OF APPEAL HOLDS THAT THE TERMINATION OF THE AGENCY AGREEMENT DID NOT LEAD TO THE TERMINATION OF THE OFFER, OF WHICH THE ACCEPTANCE COULD BE NOTIFIED DIRECTLY TO ZAETTA AND THAT THE CONTRACT HAD BECOME COMPLETE, "SUBJECT TO A TERM AND CONDITION OF EXECUTION" ON 30 DECEMBER 1966;

CONSIDERING THAT BY DECIDING SO, WITHOUT ASSESSING WHETHER THE PROMISE OF LEASE WHICH WAS ACCEPTED INCLUDED A PROVISION ON THE PRICE, THE COURT OF APPEAL DID NOT GIVE ANY LEGAL GROUND TO ITS DECISION;

BASED ON THESE GROUNDS AND WITHOUT BEING NECESSARY TO DECIDE ON THE FIRST PART OF THE GROUND: DISMISSES AND OVERRULES THE DECISION MADE BETWEEN THE PARTIES BY THE COURT OF APPEAL OF AIX-EN-PROVENCE ON 23 FEBRUARY 1972;

CONSEQUENTLY, PUTS THE CAUSE AND THE PARTIES BACK INTO THE SAME AND SIMILAR SITUATION WHERE THEY WERE BEFORE THE AFOREMENTIONED DECISION AND, TO RIGHTLY DO SO, REFERS THEM TO THE COURT OF APPEAL OF NIMES WHICH WILL BE CONSTITUTED DIFFERENTLY

**Publication**: Bulletin of the Decisions of the French High Court. 3rd Civil Division N. 446 P. 324

**Appealed decision**: Court of Appeal of AIX-EN-PROVENCE (1st Division) of 23 February 1972

**Titles and summaries:** OVERVIEW OF LEASE – PROMISE OF LEASE – BILATERAL PROMISE – CONDITIONS OF VALIDITY – AGREEMENT ON THE PRICE – NECESSITY. THE PRICE BEING AN ESSENTIAL ELEMENT OF THE CONTRACT OF LEASING, A PROMISE OF LEASE IS ONLY EQUIVALENT TO A LEASE IF IT INCLUDES AN AGREEMENT BETWEEN THE PARTIES ON THE PRICE.

*OVERVIEW OF LEASE – PRICE – AGREEMENT BETWEEN THE PARTIES – NECESSITY

**Case law**: See French High Court (3rd Civil Division) 1970-01-23 Bulletin 1970 III N.63 P. 45 (DISMISSED) AND THE CITED CASE see French High Court (3rd Civil Division) 1970-03-11 Bulletin 1970 III N.182 P.136 (DISMISSED) see French High Court (3rd Civil Division) 1971-12-20 Bulletin 1971 III N.644 P. 460 (DISMISSED)

**Sections applied:**
- 1134, Civil Code
- 1709, Civil Code



# Exhibit 25

The: 09/11/2011

**French High Court**

**3rd Civil Division**

**Public hearing of 28 October 2009**

**N<sup>o</sup> of appeal: 08-20224**

Published in the bulletin

**Appeal allowed**

**Mr. Lacabarats, president**

Mr. Peyrat, associate judge

Mr. Cuinat, deputy prosecutor

Mr. Copper-Royer, SCP Peignot and Garreau, solicitor(s)

**FRENCH REPUBLIC**

**ON BEHALF OF THE FRENCH PEOPLE**

THE THIRD CIVIL DIVISION OF THE FRENCH HIGH COURT made the following decision:

On the sole ground:

Considering section 1709 of the French Civil Code, together with section 1719 of the same code and section L.411 1 of the Rural Code;

Considering that the leasing of a thing is a contract by which one of the parties is committed to make the other enjoy a thing during a certain timeframe and in consideration of a certain price which the latter is committed to pay the former.

Considering that, in accordance with the appealed decision (Amiens, 16 September 2008), that Mr. X... who upheld that he was the beneficiary of a promise that he had accepted commenced proceedings against Mrs. Marie Henriette Y.... in order to be recognised as the holder of a rural lease in relation to plots of land owned by her;

Considering that, in order to dismiss the claim, the decision holds that the acceptance of the offer of a lease is only equivalent to a lease if it includes all the essential elements of the agreement which occurred and especially the necessary details in relation to the thing which is its subject matter, the price and the commencement date and that, in this instance, the draft in dispute does not include any provision relating to this date so that there could not have been a mutual consent of both parties about it;

By deciding so, the court of appeal, which added a condition relating to the commencement date of the lease, is in breach of the aforementioned provisions.



BASED ON THESE GROUNDS

DISMISSES AND OVERRULES the decision, in its entirety, made between the parties by the Court of Appeal of Amiens on 16 September 2008; consequently, puts the cause and the parties back into the situation where they were before the aforementioned decision and, to rightly do so, refers them to the Court of Appeal of Amiens which will be constituted differently.

Orders Mrs. Marie Henriette Y... to pay costs;

In view of section 700 of the New Code of Civil Procedure, dismisses the claim of Mrs. Marie Henriette Y... and orders her to pay Mr. X... the amount of €1,000;

States that this decision will be forwarded, at the initiative of the Chief Prosecutor of the French High Court, to be recorded either in the margin or following the decision allowing the appeal;

So made and judged by the third civil division of the French High Court and pronounced by the president in its public hearing of twenty-eight October two thousand and nine.

GROUND ANNEXED to the decision

Ground introduced by Mr. Copper-Royer, solicitor on behalf of Mr. X...

The ground reproaches the appealed decision of HAVING dismissed the claim of Mr. X..., which aims to having judged that he had entered into a long-term lease with Mrs. Widow A... in relation to plots of land located at the towns of HOUSSET and SONS ET RONCHERES owned by her.

ON THE GROUNDS THAT "Mr. Jacques Y... and Miss Cécile Y... formed between themselves a grouping known as GAEC LES TILLEULS for the valorisation of an agricultural exploitation of 179ha 39a 36ca including in particular the plots of land owned by Mrs. Marie-Henriette Y... located at the lands of HOUSSET registered in the land registry as ZI n° 9 of the locality LES BARAQUES and ZN n° 16 of the locality LE TRIAUMONT and of SONS ET RONCHERES registered in the land registry as ZL n° 6 of the locality LE TRIAUMONT of a total size of 43ha 51a 50ca;

"(...) Mr. Jacques Y... and Miss Cécile Y... committed themselves to the terms of the heads of agreement[i] of 20 January 2004:

- On one hand, to sell to Mr. Ludovic X..., who must purchase from them 22,270 shares which they held in, and which constituted the total amount of share capital of, GAEC LES TILLEULS within eight days of the completion of the last of the conditions precedent and at the latest on 31 May 2004, in consideration of the base price of 1,301,000, subject to a final determination following the establishment of the balance sheet and the profit and loss account at the effective date of the sale, of which an amount of 686,000 was payable within eight days of the completion of all conditions precedent and the balance became a six-year loan at a rate of 4.5% with a delayed reimbursement of the principal for the first two years;

" - on the other hand, by providing for themselves and Mrs. Marie-Henriette Y... for which they stand surety, to agree to grant to Mr. Ludovic X.... twenty-four year rural leases of all the plots of land operated by GAEC LES TILLEULS, which are not subject to "any repossession provided by section L. 416 of the Rural Code and "including approval for leasing it to the grouping or another company resulting from its restructure in consideration of a tenant farming of 176 per hectare during their term;

"(...) that the sale of shares is subject to various conditions precedent provided either for the exclusive interest of the purchaser (approval of Government Agency for Agriculture and Forest[ii], termination of



current leases by the purchasers, execution of twenty-four year leases for the benefit of the purchaser, resignation of their position as directors by the vendors on the date of the completion of sale) or for the exclusive interest of the vendors (provision of guarantees which are deemed to be sufficient to ensure the payment of part of the price which will become a loan and which may at their discretion have the form of mortgage, a promise of mortgage, joint and several family guarantee, guarantee on first request);

"(...) that the parties may also agree on a specific condition which they state to be essential to their commitment and without which they would not have entered into the contract in accordance with which the partial buyback of assets that the vendors had to be carried out, the completion of the sale of shares and the long-term leases were connected and could not be completed without each other so that, in the absence of the completion of this condition, the heads of agreement would be null and void, each party being not bound to each other anymore and no indemnity being due by either party;

(...) that, by stating that he had completed all the conditions precedent incumbent upon him within the required timeframes and had offered a guarantee sufficient to ensure the compliance with his obligation of payment of price while Mr. Jacques Y... and Miss Cécile Y... did not agree to finalise the agreement relating to the sale of shares of GAEC LES TILLEULS, Mr. Ludovic X... commenced proceedings against them before the District Court of LAON served by a bailiff on 6 January 2005, in which he requested that the sale of the aforementioned shares for the price and in the terms and conditions provided in the heads of agreement of 20 January 2004 be ordered;

"(...) that prior to the service of this statement of claim, Mr. Ludovic X... had:

" - by lodging a statement of claim on 23 December 2004, commenced the proceedings against Mrs. Marie-Henriette Y.... before the Mixed Court of Rural Leases of VERVINS, in which he requested that a lease including the terms and conditions of the draft lease that he received for the plots of land located at the lands of HOUSSET registered in the land registry as ZI n° 9 of the locality LES BARAQUES and ZN n° 16 of the locality LE TRIAUMONT for a total size of 16ha 21a 60ca be ordered;

"- by lodging a statement of claim on 24 December 2004, commenced the proceedings against Mrs. Marie-Henriette Y.... before the Mixed Court of Rural Leases of LAON, for the same purpose as above-mentioned for the plot of land located at the lands of SONS ET RONCHERES registered in the land registry as ZL n° 6 of the locality LE TRIAUMONT for a total size of 8ha 29a 90ca;

"(...) that no conciliation having occurred following these 2 statements of claim and the Mixed Court of Rural Leases of LAON having held by a decision of 23 January 2006 that it had no jurisdiction and referred the matter to the Mixed Court of Rural Leases of VERNINS, Mr. Ludovic X... maintained his claims before the latter Court by also requesting that an order for an amount of 1,600 be made in each of both instances where he had developed similar arguments in accordance with section 700 of the New Code of Civil Procedure; he also upheld that the Mixed Court had jurisdiction to decide on the existence of the rural lease, that his claim is based on the draft lease that the notary of Mrs. Marie-Henriette Y... had delivered to him, that for this reason, it was not necessary to stay the decision while awaiting for the decision of the District Court of LAON on the validity of the heads of agreement of 20 January 2004, and that only the decision relating to the long-term lease had to be recorded on the Land Registry[iii]; that in each of both instances, Mrs. Marie-Henriette Y... claimed that the Mixed Court had no jurisdiction as Mr. Ludovic X.... does not act in the capacity of a lessee at the time of his claims and claimed that she is a third party to the heads of agreement of 20 January 2004 that she did not ratify; that the claims against her should have been served by a bailiff "as they aimed



to acknowledge the existence of a long-term rural lease which must be recorded on the Land Registry; and that, in any case, it was justified to stay the decision while awaiting for the final decision on the validity of the heads of agreement of 20 January 2004 which he had referred to the District Court of LAON;

"it ordered Mr. Ludovic X... to pay the amount of 1,500 for wrongful procedure and unrecoverable costs (instance in relation to the plots of land located at HOUSSET) and on the other hand, the amount of 2,000 in accordance with section 700 of the New Code of Civil Procedure (instance concerning the plot of land located at SONS ET RONCHERES); that it is on the basis of these claims and grounds that the appealed decisions had been made;

"(...) that the instances RG n° 06/02595 and RG n° 06/02597 between the same parties in relation to the acknowledgment of a rural lease concerning the plots of land in dispute resulting from an unique draft, which then became the heads of agreement of 20 January 2004 must be joint under the n° RG 06/02595;

"(...) that during the proceedings before the Court, noting that the parties to the heads of agreement of 20 January 2004 had provided that the different transactions resulting from the heads of agreement could only be completed if all the transactions were completed and, in the absence of the completion of this condition, the agreement would be null and void and considering that it then existed a risk of contradiction between the decision that it had to make and those which had to occur in the instances where the appeals of the decisions made by the Mixed Court of Rural Leases VERVINS on 14 June 2006 are referred to the Court, the District Court of LAON decided to stay its decision on 13 March 2007 while awaiting for these decisions;

"(...) that Mrs. Marie-Henriette Y... denies the existence of a long-term rural lease for the benefit of Mr. Ludovic X... in the absence of the completion of the conditions precedent connected to the sale of the shares of GAEC LES TILLEULS to him by Mr. Jacques Y... and Miss Cécile Y... in the contractually determined timeframe in accordance with the terms and conditions of the heads of agreement of 20 January 2004, the null and void character of all the transactions provided by the latter, including "the execution of the lease due to the joint character that the parties had conferred to them, and the incomplete character of the draft mentioned by the respondent of which she challenges the communication by herself or by her notary outside of the proceedings;

"(…) that, however, while the execution of the lease is not subject to any conditions precedent in accordance with the heads of agreement of 20 January 2004, the dispute in relation to its validity with respect to conditions precedent to which the commitment to sell the shares of GAEC LES TILLEULS is subject is currently being judged by the District Court of LAON and the Court should not make a decision in relation to this matter;

"(...) that Mr. Ludovic X... argued that the existence of a rural lease between Mrs. Marie-Henriette Y... and him results from his acceptance of the offer that she made him to enter into such an agreement by delivering the draft lease to him;

" (...) that, however, without examining the circumstances in which the respondent, who remains silent in this matter, came into possession of the draft lease that he brought to these proceedings, which flagrantly includes a note of communication between the solicitors of the parties on 13 October 2004, date of which the proceedings had already commenced following the lodgement by Mr. Ludovic X...of a statement of claim for interlocutory proceedings which aims in particular to the execution of leases, which results from the exchange of communication in the first instance, that the acceptance of the offer of a lease is only equivalent to a lease if it includes all the essential elements of the agreement



which occurred and especially the necessary details in relation to the thing which is its subject matter, the price and the commencement date and that, in this instance, the draft in dispute does not include any provision relating to this date so that there could not have been a mutual consent of both parties about it; that the decisions made by the Mixed Court of Rural Leases of VERVINS will be dismissed as they held that the leases had been entered into between Mrs. Marie-Henriette Y.... and Mr. Ludovic X..." (appealed decision, p. 4, last para., p. 5 to 7)

WHILE the lease for a valuable consideration of a real property for agricultural use which is to be used to operate an agricultural activity is subject to the regime of rural lease, without the parties being able to derogate to it; that a bilateral promise of lease is equivalent to a lease if it includes the essential elements of the contract such as the thing and its purpose, the price to be paid by the lessee and the term of the contract; that by considering that the draft rural lease in dispute which included the description of the rental plots of land, the amount of farming rent and the fixed term of 24 years, could only be equivalent to a lease on the sole ineffective ground that it did not include any provision relating to an accessory term and condition such as the commencement date, the Court of Appeal breached the provisions of sections L.411-1 et seq. of the Rural Code and the provisions of sections 1709 et seq. of the Civil Code.

**Publication**: Bulletin 2009, III, n° 237

**Appealed decision**: Court of Appeal of Amiens of 16 September 2008

**Titles and summaries:** RURAL LEASE – Farming lease – Formation Inception – Date – Determination

The absence of determination of the commencement date of the lease does not prevent the formation of the lease contract.

LEASE (general rules) – Promise of lease – Bilateral Promise – Conditions of validity – Exclusion – Case – Determination of the commencement date of the lease

**Case law**: Concerning the principle according to which the promise of lease is equivalent to lease if there is an agreement on the thing and the price, read with: 3rd Civ., 28 May 1997, appeal no 95-17.953, Bull. 1997, III, n° 116 (appeal allowed), and the cited case

**Sections applied:**
- Sections 1709 and 1719 of the Civil Code; section L.411-1 of the Rural Code.

---

i Translator's note: translation chosen for the concept of "protocole d'accord".

ii Translator's note: Government Agency for Agriculture and Forest is the translation chosen for "DDAF", which stands for "Direction Departementale de l'Agriculture et de la Forêt".

iii Translator's note: translation chosen for the word "Conversation des Hypothèques".



# Exhibit 26

# BULLETIN

# of the decisions of the

# FRENCH HIGH COURT

## N⁰ 1
## CIVIL DIVISIONS
## January 1997

[Logo]

## GOVERNMENT GAZETTE
## OF THE FRENCH REPUBLIC

THIRD PART

THIRD CIVIL DIVISION

N° 115

**LEASE (General rules). – Lessor. – Obligations. – Ruin of the building. – Proof. – Onus.**

*If the ruin of the building, which is materialised by the threat of a collapse of a floor, is noted, the onus of proving that the ruin is due to the fault of the lessor and not to unforeseeable circumstances is incumbent upon the lessee, who is the plaintiff in the compensation proceedings.*

**28 May 1997.**                **Dismissal.**

On the sole ground;

Considering that, in accordance with the appealed decision (Aix-en Provence, 16 June 1994), the company Salins du Midi et Salines de l'Est (the company), owner of the premises for commercial use leased to the spouses Truteau, notified them of the termination of this lease due to the ruin of the building; that the lessees commenced proceedings against the lessor to obtain an expert report on whether the state of the building results from a lack of maintenance and repairs of the lessor;

Considering that the spouses Truteau reproaches the decision for dismissing their claim and for deciding that the lease was rightfully rescinded, while, in accordance with ground 1°, if the rescission of the lease results from the loss of the rented thing for whatever cause, the liability of the *lessor* towards the lessee is only set aside if it is established that the loss is caused by unforeseeable circumstances, force majeure or a fault of the lessee; that henceforth, by holding that, in order to dismiss the claim of the spouses Truteau regarding an expert report and decide that the lease by which the parties are bound was rightfully terminated in accordance with section 1722 of the Civil Code, the rented thing being destroyed in unforeseeable circumstances, the spouses Truteau did not provide any factual or legal arguments supporting a breach by the lessor, the company Salins du Midi et Salines de l'Est, of its obligation of maintenance of property, the ruin of the building which is materialised by the threat of a collapse of a floor, the court of appeal reserved the onus of proof and thus breached section 1315 of the Civil Code; 2° that refusal of ordering an expert report can only be justified by the shortcomings in the administration of proof by the party upon which it is incumbent in accordance with paragraph 2 of section 146 of the New Code of Civil Procedure; that henceforth, the proof of the loss of the rented thing due to unforeseeable circumstances or force majeure is incumbent upon the

lessor, which refer to it to justify the rightful termination without indemnity; that, by declaring that, in order to dismiss the claim of the spouses Truteau regarding an expert report, which aims to assess whether the state of the ruin of the building, which had motivated the termination of their lease by the company Salins du Midi et Salines de l'Est, did not result from the absence of maintenance, the lack of repairs of the property by the successive owners, that a judicial investigation cannot be ordered to compensate for the shortcomings of a party in the administration of the proof, the court of appeal breached paragraph 2 of section 146 of the New Code of Civil Procedure; 3° that the judge may appoint any person of his choice, who will provide comments and clarify an advice or report in relation to a factual issue which requires the opinion of a technician; that henceforth, the spouses Truteau, who challenged the termination of their lease undertaken by the lessor for cause of ruin of the rented building by requesting an expert report in order to assess whether the current state of the ruin of the building was due to the absence of maintenance or the lack of repairs of the property of owners, by affirming in order to dismiss their claim regarding an expert report, which was only about the causes of the ruin of the building that its wording aimed to submit a legal issue to the expert, the court of appeal, which could only hold that the ruin of the building was due to unforeseeable circumstances without examining whether there had been any lack of maintenance by the lessor, breached section 232 of the New Code of Civil Procedure;

However, considering that, having noted that the lessees cited as a ground the fault of the lessor, who denied them the right to claim the rightful termination of the lease and by doing so, to retain the right to an eviction indemnity in accordance with section 9-2° of the decree of 30 September 1953 and that the ruin of the building, which is materialised by the threat of a collapse of a floor, which was not challenged by the lessee, the court of appeal, which, without reversing the onus of proof, assessed the opportunity of ordering a judicial investigation, appreciation which is not subject to appeal, legally justified its decision on these sole grounds.

BASED ON THESE GROUNDS:

Appeal DISMISSED.

N° 95-14.352.



THIRD PART

THIRD CIVIL DIVISION

*Spouses Truteau versus*
*Salins du Midi et Salines de l'Est.*

*President*: Mr. Beauvois – *Associate judge*: Mr. Toitot. –
*Deputy prosecutor*: Mr. Sodini – *Solicitors*: la SCP
Guiguet, Bachellier et Potier de la Varde, Mr. Vuitton.

READ WITH :

3rd Civ., 13 December 1989, Bull. 1989, III, n$^o$ 234, p. 128
(dismissal).

## N$^o$ 116

**LEASE (General rules). – Promise of lease. – Bilateral
promise. – Conditions of validity. – Agreement on the
thing and the price.**

*The court of appeal which, in order to accept the claim for
payment of rents, holds that, in accordance with the
agreement between the parties, the lessee committed to
comply with the clauses of lease as long as the lessor did
not find a new lessee, that the lease agreement which was
provided for in the promise had not been regularised and
that, in the absence of a lessee, the original lease had to
continue to apply while the promise of lease was equivalent
to a lease if there is an agreement on the thing and the
price, and without noting any circumstances which may
demonstrate that the parties had made the repetition by an
agreement drawn up by a notary a constituent element of
their consent breached sections 1134 and 1714 of the Civil
Code.*

**28 May 1997.                    Appeal allowed.**

On the sole ground:

According to section 1134 of the Civil Code, together
with section 1714 of the same Code;

Considering that, in accordance with the appealed
decision (Nancy, 24 May 1995) the real estate investment
company Solobat (SCI) leased premises for commercial
use to the company Nasa for a period of 9 years from the
date of 1st January 1986; that, by an agreement of 15
September 1990, the company Nasa, which wanted to
change premises, authorised SCI to look for a new lessee;
that, on 4 April 1991, SCI gave a promise of commercial
lease to Mr. Roland, who paid the bond and took
possession of the premises; that on the ground that Mr.
Roland had not fulfilled his commitments and that the
promise of lease had not been performed, SCI who alleged
that the company Nasa had remained its lessee until the end
of the three-year

period sued it for payment of rents and expenses owed for
the last 3 trimesters of the year 1991;

Considering that, in order to accept the claim, the
decision holds that, in accordance with the agreement
between the parties on 15 September 1990, the company
Nasa committed to comply with the clauses of the lease as
long as the lessor would not find a new lessee, that, in the
absence of a lessee, the original lease must continue to
apply and the company Nasa must pay the rent until 31
December 1991, the lease agreement which was provided
for in the promise having not been regularised and the
payment of the rent by Mr. Roland having never occurred;

That, by deciding so, while the promise of lease is
equivalent to a lease if there is an agreement between the
parties on the thing and the price and without noting any
circumstances which may demonstrate that the parties had
made the repetition by an agreement drawn up by a notary
a constituent element of their consent, the court of appeal
breached the aforementioned sections;

BASED ON THESE GROUNDS:

DISMISSES AND OVERRULES the decision, in its
entirety, made between the parties by the Court of Appeal
of Nancy on 24 May 1995; consequently, puts the cause
and the parties back into the same and similar situation
where they were before the aforementioned decision and,
to rightly do so, refers them to the Court of Appeal of
Dijon.

N$^o$ 95-17.953

*Nasa*
*versus Solobat.*

*President*: Mr. Beauvois – *Associate judge*: Mr. Peyrat. –
*Deputy prosecutor*: Mr. Sodini – *Solicitors*: la SCP
Guiguet, Bachellier et Potier de la Varde, Mr. Luc-Thaler.

READ WITH :

3rd Civ., 20 May 1992, Bull. 1992, III, n$^o$ 152, p. 93
(dismissal) and the cited decisions.

## N$^o$ 117

**LEASE FOR RENT (Act of 6 July 1989). –
Repossession. – Section 15-III. – Repossession against a
person aged over seventy years. – Conditions. – Amount**



THIRD PART

**of funds. – Funds to take into account. – Regular funds.**

*The court of appeal, which dismisses a claim for eviction after having noted that the regular funds of the lessee were lower than the threshold provided by the Act and that she had to sell securities in order to meet the payment of the rent justifies its decision with respect to section 15-III of the Act of 6 July 1989.*

**28 May 1997.** **Dismissal.**

On the sole ground:

Considering that, in accordance with the appealed decision (Versailles, 9 June 1995) the company Aide à l'accession et à la propriété (AAAPL), which is the owner of an apartment leased by Miss Damour, aged over seventy years, delivered a leave notice to her due to the sale of the apartment and sued her for eviction;

Considering that the company Volney Invest, representing the rights of AAAPL reproaches the decision for dismissing its claim, while, in accordance with ground $1^o$, by stating that Miss Damour did not have any other regular funds than those defined as such by the expert and by noting that those were not sufficient to enable her to pay her rent, from which it resulted that, on the contrary, she had to have regular access to other funds, the court of appeal contradicted itself and is thus in breach of section 455 of the New Code of Civil Procedure; $2^o$ that by deciding so, without showing that it was only exceptional that during the year 1991, Miss Damour could supplement the amount of her fixed income as assessed by the expert by other funds, in this instance by the profit of the sale of assets owned by her, the court of appeal deprived its decision of any legal grounds with respect to section 15-III of the law of 6 July 1989;

However, considering that, having noted that the regular funds of Miss Damour were one and half times lower than the annual amount of minimum salary and the lessee had to sell investment funds to meet the payment of the rent in 1991, the court of appeal, which, without contradicting itself or being required to proceed with the assessment which it was not requested to undertake, held that the leave delivered to the lessee, which does not include an offer of accommodation corresponding to her needs, is not valid, legally justified its decision;

BASED ON THESE GROUNDS:

Appeal DISMISSED.

THIRD CIVIL DIVISION

$N^o$ 95-18.116.

*Volney Invest
versus Miss Damour.*

*President*: Mr. Beauvois – *Associate judge*: Mr. Toitot. – *Deputy prosecutor*: Mr. Sodini – *Solicitor*: la SCP Guiguet, Bachellier et Potier de la Varde.

READ WITH :

3rd Civ., 13 March 1991, Bull. 1991, III, $n^o$ 88, p. 52 (appeal allowed);
3rd Civ., 15 June 1994, Bull. 1994, III, $n^o$ 121, p. 76 (appeal allowed).

**$N^o$ 118**

**COMMERCIAL LEASE. – Eviction indemnity. – Payment. – Defect. – Remain in the premises. – Conditions. – Lessee remained in the premises.**

*The lessee who has remained in the premises and is the creditor of the eviction indemnity only benefits from the right to maintain in the premises.*

**28 May 1997.** **Appeal allowed.**



Exhibit 27

# BULLETIN

# of the decisions

# of the

# FRENCH HIGH COURT

**N° 1**

**CIVIL DIVISIONS**

**JANUARY 1992**

**[Logo]**

# GOVERNMENT GAZETTE
# OF THE FRENCH REPUBLIC



[...]

### Nº 152

# LEASE (general rules). - Promise of lease. – Bilateral promise. – Conditions of validity. – Agreement on the thing and the price.

*A promise of lease is equivalent to a lease if there is an agreement between the parties on the thing and the price.*

**20 May 1992.**                    **Dismissal.**

On the sole ground:

Considering that the jointly interested parties Waymel-Bajeux, representing the rights of Mr. and Mrs. Waymel, owners of the pieces of land rented by Mr. Melis, reproach the appealed decision (Douai, 28 September 1990) for deciding that the latter is a party to a contract of lease of 21 years from the date of 30 June 1981 and for therefore cancelling the eviction notice which was delivered to him by them on 25 March 1988 for the 30 September 1990, then, in accordance with ground, 1°) according to section L.411-4 of the Rural Code, contracts of lease must be in writing, and, in the absence of written documents, leases that are entered into orally are supposed to be entered into for 9 years, using the terms and conditions of standard contracts; that in this instance, it resulted from the terms of the sale agreement of the elements of their farm of 30 June 1981, that, in a simple promise of lease, Mr. and Mrs. Waymel had committed to lease all the plots of land of the farm, on one hand, in accordance with a single lease of 21 years, for the plots of land of which they were the owners, on the other hand, in accordance with written oral leases, for the plots of land which were owned by other owners; that thus, the private agreement of 30 June 1981, which only included a simple promise of lease, which was not repeated afterwards, could not constitute a written lease entered into for the benefit of Mr. Melis for a period of 21 years, but only a prima facie evidence in writing which enables establishing the existence of an oral lease of which the term was that prescribed by the common[i] law; that, then, by deciding so, the court of appeal did not give any legal ground to its decision with respect to the aforementioned section; 2°) that in any event, by deciding so, the court of appeal altered the nature of the private agreement[ii] of 30 June 1981, of which the clear and definite terms specified that it constituted a sale agreement relating to the personal and real properties of the farm of Mr. and Mrs Waymel, which also included a simple unilateral promise of lease (breach of section 1134 of the Civil Code);

However, considering that a promise of lease is equivalent to a contract of lease if there is an agreement on the thing and the price, the court of appeal legally justified its decision in holding, based on its own and adopted grounds, without any alteration, that from the date of the signature of the agreement of 30 June 1981, the parties agreed upon all the terms and conditions of the sales and the lease, provided for a period of 21 years, without this agreement requiring the future signature of a formal agreement[iii], and that Mr. and Mrs Waymel had in fact performed their commitments to lease the lands which they owned;

BASED ON THESE GROUNDS:
DISMISSES the appeal.

**Nº 90-21.109.**

*Jointly interested parties Waymel versus Mr. Melis.*

*President:* Mr. Senselme. - *Associate judge:* Mr. Boscheron. - *Deputy prosecutor:* Mr. Tatu - *Solicitors:* SCP Peignot and Garreau, Mr. Bouthors.

READ WITH:
1st Civ., 31 October 1962, Bull. 1962, I, nº 453, p.388 (Dismissal) and the cited decisions;
3rd Civ., 7 April 1976, Bull. 1976, III, nº 138, p. 111 (Dismissal).

[...]

---

[i] Translator's note: "common" in the sense ordinary (opposite to special), rather than the Anglo-Saxon "common law".
[ii] Translator's note: under French law, a private agreement is an agreement made in writing, but not sealed or witnessed.
[iii] Translator's note: under French law, a formal agreement is an agreement which must be drawn up by a notary or a public authority.



# Exhibit 28

JANUARY 1976

# BULLETIN
# of the decisions of the
# FRENCH HIGH COURT
# Civil Divisions
# N° 1

[Logo]

**PARIS**

**GOVERNMENT PUBLICATIONS OFFICE**

**1976**

NAATI No. 57513
VERONIQUE MORGAN-SMITH
TRANSLATOR
ENGLISH <-> FRENCH
NATIONAL ACCREDITATION AUTHORITY FOR TRANSLATORS AND INTERPRETERS

THIRD PART                                                          THIRD CIVIL DIVISION

[…]

**N° 138**

**LEASE AGREEMENTS IN GENERAL. – Promise of lease. – Bilateral promise. – Conditions of validity. – Sufficient findings.**

*The parties to an agreement which constitutes a promise of lease to which is attached a promise of sale of the rented premises are bound by a lease as soon as the beneficiary of the promise has manifested his intent not to proceed with his purchase project and the lease agreement has been performed, by the occupancy of the premises and the payment of rent.*

**7 April 1976**
                                                                                         **Dismissal**

On the sole ground, taken in two parts:

Considering that it results from the particulars of the appealed decision, that, following the private agreement dated 21 February 1970, *Société de gestion et de participation immobilière* promised to lease lands and buildings, for a period of nine years, to the economic interest grouping named *Société Centrale d'Approvisionnement du Sud*; that this grouping occupied the premises and paid rent agreed upon until the end of February 1972, date after which it moved somewhere else; that *Société de gestion et de participation immobilière* commenced proceedings for the payment of the sum of 642,163 Francs which corresponds to the rents for the period from 1st May 1972 to 30th May 1979; that while ordering judicial investigation, the Court of Appeal also decided that the parties were bound by a commercial lease of nine years, which may be terminated by the lessee at the end of each three-year period;

Considering that it reproached the Court of Appeal to having decided so, while, according to the ground, "on one hand, it resulted from the clear and definite terms of the agreement by which the parties are bound that it constituted a promise of lease and a promise of sale and that in this particular case, the elements of a lease were manifestly lacking, and that, on the other hand, one of the parties precisely emphasized in its submissions which remained unanswered

that the situation resulting from the promise of lease was of the nature of a periodic lease agreement";

But considering that the Court of Appeal finds that the parties had "agreed upon the rental premises, the term of the lease (nine years) and the amount of rent in the preliminary agreement freely drafted on 21 February 1970,"; that the court stated that this agreement constituted a promise of lease and a promise of sale of the rental premises to *Société Centrale d'Approvisionnement du Sud*, but that, this grouping having notified that it did not want to proceed with the purchase project by a letter dated 8 September 1970, "only the lease agreement had been performed by the occupancy of the premises subject to the lease and the regular payment of the invoices of the rental premises";

Considering that the judges of the Court of Appeal accurately deduced from these findings and particulars that the parties were bound by a lease agreement; that such characterisation excluding a situation of periodic lease, it was thus responded to the submissions supposedly neglected;

As a result, the ground cannot be accepted;

BASED ON THESE GROUNDS:

DISMISSES the appeal against the decision of 19 June 1974 handed down by the Court of Appeal of Aix-en-Provence.

N° 74-14.507.

*Société central d'approvisionnement du Sud against Société de gestion et de participation immobilière.*

President: Mr. Costa. – Associate judge: Mr. Viatte. – Deputy prosecutor: Mr. Paucot. – Solicitors: Mr. Sourdillat and Calon.

[...]



# Exhibit 29

Case 5:11-cv-01846-LHK   Document 918-2   Filed 05/13/12   Page 22 of 204

**JANUARY 1970**

# BULLETIN

## OF THE DECISIONS

## OF THE

# FRENCH HIGH COURT

**CIVIL DIVISIONS**

**N° 1**

[Logo]

**PARIS**

**GOVERNMENT PUBLICATIONS OFFICE**

**1970**



[...]

## N° 63

### OVERVIEW OF LEASE. – Promise of lease. – Bilateral promise. – Condition of validity. – Agreement on the price and the term. – Partial agreement. - Effect.

*In the absence of agreement between the parties on the price and the term of the lease, which are essential elements of the contract, the conditions for the existence of a lease are not met.*

*If a disagreement in relation to the rent of a joint part of the properties for which the lease is registered remains, a partial agreement and the occupancy of a part of the property do not demonstrate the existence of a lease agreement.*

*Is therefore legally justified the decision that, in these conditions, denies[i] the existence of a valid promise of lease.*

**23 January 1970.**                    **Dismissal.**

On the sole ground:

Considering that Laumain reproaches the appealed decision for denying the existence of a valid promise of lease that would have been made to him by Count on the ground that there had been no agreement either on the price or on the term of the lease, then, according to the appeal, that there had been a commencement of performance, that the price was determinable, that the term of the lease was not a condition of validity of the agreement and that the parties had clearly expressed their will to consider each other as bound by this lease;

However, considering that by interpreting the intention of the parties, interpretation which is not subject to appeal, the Court of Appeal, notes that neither Maigne, guardian of Count, nor the latter, who is now of legal age, entered into any agreement with Laumain regarding the rent of the residential property, which is a joint part of the properties for which the lease was proposed; that there was no agreement either on the term of the lease or on the fitting of the premises and that the fact that Laumain occupies the property does not demonstrate the existence of a lease agreement;

Consequently, considering that the Court of Appeal noted the absence of agreement between the parties on the price and the term of the lease, which are essential elements of the contract, was able to deduce that the conditions for the existence of a lease were not met, and justified its decision;

### BASED ON THESE GROUNDS:

DISMISSES the appeal against the decision made by the Court of Appeal of Amiens on 1 April 1968.

### N° 68-12.212

*Laumain versus Count.*

*President:* Mr. de Montera. - *Associate judge:* Mr. Dutheillet-Lamonthézie. - *Deputy prosecutor:* Mr. Laguerre. - *Solicitors:* Mr. Chareyre and Ryziger.

### READ WITH

1st Civ., 31 October 1962, *Bull.* 1962, I, n° 453 (1st), p. 388 (Dismissal);
Com., 23 February 1967, *Bull.* 1967, III, n° 88 (1st), p.84 (Dismissal).

[...]

---

[i] Translator's note: the word used in the original version (ie. "reunit", which means "meets") was crossed and replaced by handwriting with "denie", which means "denies".



# Exhibit 30

## Article L. 613-8 § 5 of the Intellectual Property Code

**Article L613-8**

Created by Law 92-597 1992-07-01 Annex JORF July 3rd 1992

The rights attached to a patent application or to a patent are transmissible as a whole or in part.

They may form the object, as a whole or in part, of an exploitation license concession, either exclusive or non-exclusive.

The rights conferred by the patent application or the patent may be invoked against a licensee who infringes one of the limits of his license imposed by virtue of the previous paragraph.

Under reservation of the case foreseen in article L. 611-8, a transmission of rights envisaged in the first paragraph cannot infringe on the rights acquired by third parties before the transmission date.

The acts relating to a transmission or a license, envisaged in the first two paragraphs, are documented in writing, under penalty of nullification.

# Exhibit 31

# CIVIL LAW
Philippe MALAURIE • Laurent AYNÈS

# OBLIGATIONS

Philippe MALAURIE

Laurent AYNÈS

Philippe STOFFEL-MUNCK

4th Edition

## ALLEN & OVERY
## LIBRARY

**DEFRÉNOIS**

Lextenso éditions



# OBLIGATIONS



They can undertake parallel negotiations, unless the parties had committed themselves to be exclusive.[17]

   The author of the termination of the negotiations is liable only in specific circumstances[18]; the sole fact that the negotiations go on and on does not justify a termination[19]; the fault is generally constituted by a sudden volte-face that puts an end to long negotiations and may lead to believe that a contract has been entered into[20]; this liability is in tort.[21] The loss which may be compensated includes the costs incurred by the negotiations and preliminary studies, not the loss of a chance of entering into a contract. It also does not include the advantages that would have resulted from the execution of the contract[22], since that would have indirectly given effect to a contract which was never entered into.[23] The victim is not entitled to the execution of the contract that the termination of negotiations would have affected.

## §2. OFFER

   **465. Negotiations; Offer; Promise.** – Sometimes, we also call an offer a *pollicitation*.[24i] It is the proposition which, if accepted by the offeree, will lead to the inception of the contract. It is more than an invitation to initiate negotiations, but less than a promise of contract, even if it is unilateral.

---

[17] Versailles, 15 March 1992, *Bull. Joly*, 1992.636 ; *RTD civ.*, 1992.753, obs. J. Mestre.

[18] J. GHESTIN, "La responsabilité délictuelle pour rupture abusive des pourparlers" *JCP* G, 2007.I.155.

[19] French High Court. Com. 4 Nov. 2008, *affaire des Folies-Bergères*, unpublished, *Contrats*, *conc. consom.*, 2009, comm. 41, obs. L. Leveneur.

[20] For ex.: *French High Court. Com. 26 Nov. 2003, *company Alain Manoukian*, *Bull. civ.* IV, n° 186; *D.*, 2004, AJ, 869, note A.S. Dupré-Dallemagne; *RDC* 2004.257, obs. D. Mazeaud; in this instance, parallel negotiations had been undertaken with a third party while leading the partner to believe that the negotiations were going to lead to the inception of a contract. In order to characterise fault, the Courts more and more consider the progress of negotiations and the sudden termination: French High Court. Com. 7 Jan. 1997 and 22 Apr. 1997, *D.*, 1998.45, note P. Chauvel; French High Court. Civ. 3rd, 3 Oct. 1972, *Bull. civ.* III, n° 491: the author of the termination had requested works to be undertaken, leading to believe that he would enter into the sale agreement.

[21] French High Court. Com. 20 March 1972, op.cit. *above*, note 17: "*the Court of Appeal [...] decided that the company Vilber-Lourmat* (which suddenly terminated  the negotiations) *was liable in tort*"; See *below*, n° 1002.

[22] Consistent case law; for ex: * French High Court. Com. 26 Nov. 2003, *Company Alain Manoukian*, op. cit.:" *The circumstances which constitute a fault made in the exercise of the right of unilateral termination of precontractual negotiations are not the cause of the loss of a chance of making profits that would be expected from the execution of the contract*". *Idem*, when the termination occurs because of a third party: French High Court. Civ. 3rd, 7 Jan. 2009, n° 07-20783, *Bull. civ.* III, n° 5.

[23] J. GHESTIN, "Les dommages réparables à la suite de la rupture abusive des pourparlers", *JCP* G, 2007.I.157 ; Paris, 10 March 2000, *JCP* G 2001.II.10470, note F. Violet.

[24] **Etymology**: from the Latin word *polliceor, eri*= to propose.



What distinguishes it from an invitation to initiate negotiations is that it is firm (that is to say it does not leave any possibility of withdrawal[25], contrary to what we sometimes call an offer subject to confirmation[26]) and definite (that is to say it includes the essential elements of the contract). Thus, no proposition to sell or buy would constitute an offer to sell or buy if it does not specify the thing and the price.[27] The condition is sufficient; it does not matter that the offer does not determine the terms and conditions of performance of the contract, such as for example, the date and place of the payment of the price; in this case, legal rules will apply, unless it results from the circumstances that the partners had made their agreement subject to this condition.

An offer distinguishes itself from a promise of contract because it is unilateral[28] and thus is not by itself subject to the acceptance by its addressee, whereas a promise of contract is an agreement. In addition, a promise gives to its beneficiary a subjective right of patrimonial nature, assignable and transferable, whereas an offeree is not entitled to any right against the offeror to the contract, which would become a part of his patrimony.[29]

**466. German Law.** – Unlike Latin and Anglo-American laws, under German law, an offer (*Angebot*) binds the offeror and is irrevocable for a certain period of time, unless it was specified that the offer was not binding (ex: *ohne obligo*: without any obligation for which he is liable: BGB[ii], §145).[30]

Numerous types of offers exist, which will be useful to distinguish (I) in order to determine their regime (II).

I. – Distinctions

There is no point in opposing implied and express offers, whereas it is useful to distinguish offers which are made to the public from offers which are made to a specific person, and especially if it is made with or without a timeframe.

---

[i] Translator's note: "pollicitation" is a synonym of offer.
[ii] Translator's note: "BGB" means German Civil Code

---

[25] Leading case, followed by a few others: French High Court. Com., 6 March 1990, *Bull. civ.* IV, n° 74; *D.*, 1991, sum., 317, obs. J.-L. Aubert; Defrénois 1991, s. 34987, n° 13, m. obs; *JCP* G, 1990.II.21583, note Gross; *JCP* E, 1990.II.15803, m. note: "*a proposition to enter into a contract between professionals only constitutes an offer if it specifies the will of its author to be bound if accepted*". In this instance, a "purchase order" established by the seller had specified "*that his offers would only be definite and binding upon his ratification and that any order would only be firm if he gave his acceptance*". Decided that as long as the purchase order had not been accepted, the buyer could withdraw it and ask for the reimbursement of the sums he had already paid.
[26] S. ERHARDT, "La clause de confirmation de commande à la lumière de la réglementation des clauses abusives" *Contrats, conc. consom.*, 2007, n° 1 : For a clause of confirmation of order, if the capacity of confirmation is conferred to a professional who enters into a contract with a consumer, it constitutes an unconscionable clause, even if it does not lead to a significant imbalance in accordance with the meaning of section L.132-1 of the Consumer Code, in particular because it leads the consumer to believe that the professional co-contracting party is bound. It should then be deemed to be null and void unless it specifies the grounds justifying the withdrawal of the professional (for ex.: insolvency of the buyer, impossibility to deliver the order), or includes a compensation for the benefit of a consumer, or clearly informs him.
[27] For ex.: Paris, 29 Jan. 1996, *Defrénois* 1996, s. 36434, n° 144, obs. D. Mazeaud: "In the absence of the determination of the price in the written document drafted by the owner of a real property, the proposition of the latter can only be analysed as an invitation to negotiate".
[28] *Above*, n° 429.
[29] French High Court. Civ. 1st, 5 Nov. 2008, *LPA* 6 March 2009, p. 8, note R. Loir: the addressee of an offer of land dies without having accepted it; one of his two sons accepts it on his behalf, without telling the other heir; decided that there is no concealment of estate assets: "*the letter of the 30th of June 1988 constituted only an offer of sale... to which Jaques C... did not give his acceptance before his death, it is rightly that the Court of Appeal... decided... that, like in the case of an unilateral promise of sale, neither a personal debt nor a right which may be transferred to his heirs had become part of his patrimony.*"
[30] Cl. WITZ, *Droit privé allemand*, v. 1, "Actes juridiques, droit subjectifs", Litec, 1992, n° 145.



Exhibit 32

## CIVIL LAW
Philippe MALAURIE - Laurent AYNÈS

# OBLIGATIONS

Philippe MALAURIE
Laurent AYNÈS
Philippe STOFFEL-MUNCK

4th Edition

## ALLEN & OVERY
## LIBRARY

**DEFRÉNOIS**

Lextenso éditions



# OBLIGATIONS



[...] The borrower, presumed third party beneficiary, has no right against the insurer. In the example of group insurance subscribed by an employer or an association, the premium is due by the third party beneficiary who then becomes the debtor, which the provision for the benefit of a third party does not explain. Besides, case law is not faithful to this analysis.[40] It would be better to consider that with some authors, group insurance relating to a loan is a contract which only has effects between the banker and the insurer, the borrower being the insured head. The other effects of the operation would be the result of the loan contract.

II. — Effects

The effects of the provision for the benefit of a third party must be distinctly examined in relation to the three relationships in question: between the stipulator and the promisor, between the third party and the promisor, and between the third party and the stipulator.

**817. Between the stipulator and the promisor**. — The stipulator and the promisor are bound by the main contract. It is obvious that rights and obligations resulting from it must be performed: for example, the promisor can require from the stipulator to perform the commitments made towards him.

Are added to the special relationships resulting from the annexed provision: the stipulator is interested in the legal relationships created by the provision and may check its implementation. If the promisor does not perform his obligations towards the beneficiary, the stipulator may commence proceedings in relation to cancellation (he will take back the service he has provided) or specific performance[41] or contractual liability[42]; actions for which he has at least a moral interest: forcing the promisor to perform the service he owes to a third party.

---

[40] Ex.: French High Court. civ. 1st, 22 May 2008, *Bull. civ.* I, n° 145; *RTD civ.* 2008, 477, obs. B. Fages: *"Although a consequence of a provision for the benefit of a third party, a subscription to an insurance contract does create a direct contractual relationship from a bilateral nature between the subscriber and the insurer, who agrees with it, whose provisions as such must comply with the aforementioned text (Consumer Code. s. L. 132-1)"*; decided that a group insurance contract is then a contract concluded between the insurer and a consumer for the application of the law of unconscionable clauses. In reality, the subject matter of the provision for the benefit of a third party is the right of entering into an insurance contract directly with the insurer; after the subscription, the stipulator completely steps aside; he is not personally the debtor for premiums. His role is close to that of an agent. *Below*, n° 819.

[41] French High Court. Civ. 1st, 12 Jul. 1956, *Bull. civ.* I, n° 306; *D.*, 1956.749, n. J. Radouant: *"if the beneficiary of a provision for the benefit of a third party obtains its own direct right against the promisor, the stipulator is at least entitled to commence an action in performance of the promise subscribed by the debtor"*. In this instance, Perret, the purchaser of the shares of the company de Virieu committed to invest $60 million in the company de V. to the vendor, Fornas; this commitment having not been fulfilled, the company de V. filed for bankruptcy. Fornas sued Perret *"so that he be ordered to pay to the company $60 million for which he was the debtor."* The Court of Appeal dismissed him: *"he could not commence an action which normally only belonged to the company"*. Appeal allowed.

[42] 1st ex: French High Court. 14 May 1979, *Bull. civ.* IV, n° 153; *D.*, 1980.157, n. Chr. Larroumet: *"the stipulator (a) is entitled to cite his commitment undertaken by the promisor for the benefit of a third party"*; in this instance, the vendor of a business is committed to recruit all the personnel which the purchaser would make redundant; if the vendor does not perform its obligation, it  was decided that the purchaser may claim damages as it would be itself required to pay compensation to the personnel who was made redundant. 2nd ex.: a contingency fund has the capacity to require a group insurer to perform insurance contracts for the benefits of its members: French High Court. Civ. 1st, 7 June 1989, see *above* n° 816.



Exhibit 33

# CIVIL LAW
Philippe MALAURIE - Laurent AYNÈS

# OBLIGATIONS

Philippe MALAURIE
Laurent AYNÈS
Philippe STOFFEL-MUNCK

4th Edition

## ALLEN & OVERY
## LIBRARY

**DEFRÉNOIS**

Lextenso éditions



# OBLIGATIONS



II. — Effects

**806. Two phases**. — Imperfect agency produces its effects in two phases. When the agent interacts with the co-contracting party, he personally is the creditor and the debtor of the latter. But the agent will then transfer the benefit and responsibility of the contract to the principal.

At first, the principal has no action against the third party; only the agent can sue. Except for brokerage: the principal can sue the co-contracting party with whom the broker has dealt with.

Similarly, the third party cannot sue the principal; it can only sue the agent. The rule even applies to the brokerage. If there is a simulation, which is usually the case of a man of straw, the third parties can put forward either the ostensible act or the secret act if everyone knows him and can prove it.[10] . They can then either sue the man of straw or the one he conceals.

It is rare that an agency is completely imperfect.

SECTION II

# PROVISION FOR THE BENEFIT OF A THIRD PARTY

**807. Concept.** — By using the provision for the benefit of a third party, the contract confers a right to a person who is neither a party nor a principal. In the contract entered between two persons, the stipulator (S) and the promisor (P), the promisor (P) commits itself for the benefit not only of the stipulator but also of a third party, which is known as the third party beneficiary (T). The third party beneficiary directly becomes the creditor of the promisor.

For example, life insurance usually includes a provision for the benefit of a third party: the insurer promises the insured (who in return, pays it premiums) to pay a capital sum to the beneficiary of his choice at the time of death: the insured is the stipulator; the insurer is the promisor. Also, in trust, when the settlor designates a beneficiary (s. 2011 and 2028). Many institutions can be explained by the provision for the benefit of a third party.

In a provision for the benefit of a third party, the violation of the principle of privity of contract is certain, because the agreement gives a right to a third party who was not and will not be a party.

We will outline the general characteristics (§1) then the regime (§2) of this institution.

### §1. GENERAL CHARACTERISTICS

Even though its development has slowed down, the provision for the benefit of a third party has been a living institution for more than a hundred years. At first, this is astonishing because it is against the principle of privity of contract, as section 1119 reminds it: "*As a rule, one may, bind oneself and stipulate in his own name, only for oneself.*" Section which seems to prohibit the provision for the benefit of a third party, except for the two exceptions listed in section 1121: "*One may [...] stipulate for the benefit of a third party, where it is the condition of a stipulation which one makes for oneself or of a gift which one makes to another.*" This rapid development can be better explained by the history (I) than by the analysis (II).

---

[10] *Above*, n° 771.



Exhibit 34

PRIVATE LAW

**PRECIS**

Civil law

# Obligations

François Terré
Philippe Simler
Yves Lequette

10th edition

Dalloz



Civil law

# Obligations

10th edition

2009

**François Terré**

Emeritus Professor of Panthéon-Assas University (Paris II)
Member of the Institute

**Philippe Simler**

Emeritus Professor of Strasbourg University
Honorary Dean of the Faculty of Law,
Political Sciences and Management of Strasbourg

**Yves Lequette**

Professor at Panthéon-Assas University (Paris II)

# Dalloz



- or the third party does not want to commit. Having not fulfilled his obligation, the surety[i] is liable towards the stipulator[1] and must pay him damages[2]; in the case of a promise of good offices, for the surety to be liable, it would be required to demonstrate that not only did the third party not commit but also that the surety did not give due care;

- or the third party agrees to commit. Having fulfilled his obligation, the surety is released. Unlike a guarantor, he will not be liable if the third party does not then fulfil its commitment. The surety could however expressly or tacitly promise not only the commitment of a third party, but also the performance of this commitment (*above*, n° 509).

**2)  Concerning the third party**. The third party for whom someone stands surety did not commit iself.[3] The surety did not promise the act of a third party but on his own; he simply committed to obtain the third party's consent. There is therefore no derogation to the rule according to which a third party cannot be made a debtor by a contract in which it is not a party.

The freedom of a third party has some limits. Firstly, the third party is often morally required to ratify:  the surety is often a close relative and the third party will hesitate to refuse ratification for which the surety would be liable. Secondly, the third party will partially lose his legal freedom if he becomes the heir of the surety. Besides, in principle, he certainly keeps the right not to ratify the promise, but will be required to fulfil the obligation of indemnity which is vested in his author.[4] It is also necessary to set aside the case where, in addition to the obligation resulting from the promise, the third party accepts another obligation, especially an obligation of guarantee which is also transferred to his heirs; it is also the case if the surety, who is the joint owner of a property, sold the whole property, and accepted the joint obligation of warranty against eviction[5] towards the purchaser.

When the third party expressly or tacitly[6] ratifies the promise, the French High Court considers it as a

---

[1] It is not necessary in this case to establish fault. All that is needed is the promised result not to be reached (Paris 19 June 1998, *Bull. Joly* 1998.1952, *RTD civ*. 1999.100, obs. Mestre).

[2] Provided of course that the beneficiary of the promise suffered harm; v. Soc., 9 Dec. 1957, D. 1957.355; Com., 14 Jan. 1980, *Bull. civ*. IV, n° 16, p.13, *JCP* 1980.IV, p. 122; comp. Civ. 1st, 7 Oct. 1964, *Bull. civ*. I n° 433, p. 335, *RTD civ*. 1965.808, obs. J. Chevallier.

[3] Com. 25 Jan. 1994, *Bull. civ*. IV, n° 34, p. 26, *D*. 1994, sum. com. p. 211, obs. Delebecque. In particular, as a result, in the time preceding a potential ratification or in its absence, only the surety may request the cancellation of sale, if necessary (Civ. 3rd, 25 May 1976, *Bull. civ*. III, n° 229, p.177)

[4] Req. 22 Jul. 1879, *S*. 80.1.20; Req. 5 March 1935, *S*. 1935.1.150; Civ. 1st, 26 Nov. 1975, *D*. 1976.353, note C. Larroumet, *RTD civ*. 1976.575, obs. G. Cornu, 1977.117, obs. Y. Loussouarn; comp. Lyon 11 March 1980, *D*. 1981.617 note Peyrard.

[5] Civ. 23 June 1859, *DP* 59.1.299; 28 Dec. 1926, prec.; Bordeaux, 11 Feb. 1948 *JCP* 1948.II.4092, note Hubrecht; Rennes, 20 March 1950, *S*. 1950.2.121, note G. Lagarde.

[6] Civ., 24 Oct. 1905, *DP* 1906.1.153; Com., 22 Jul. 1986, prec.



unilateral act that does not require the intervention of the beneficiaries of the promise[1] and which has retrospective effect to the date of the ratified agreement so that the third party is committed from this date.[2] By ratifying it, the third party retrospectively stands in for the surety. Even though this pleasant solution takes back in time the rights of the co-contracting party who dealt with the surety and therefore ensures the legal security of those who in the meantime would have entered into a contract with him, it only imperfectly reconciles with the principle of privity of contracts.[3]

### § 2. Provision for the benefit of a third party

**511** *General points* ◊ There is a provision for the benefit of a third party if in a contract, one of the parties, known as the *stipulator*, obtains from the other party known as the *promisor*, the commitment that this party will give or do something for the benefit of a third party, the *beneficiary*, who then becomes a creditor without being a party to the contract.

For example, an individual provides that in consideration of the payment of a yearly premium, the insurance company will pay a principal sum to either his widow or his children when he is deceased; in this situation, the insured makes a provision for the benefit of a third party under his own personal name. Or also an individual A makes a donation to B, by providing that B will pay a life annuity to C.

At first, everything happens as if the stipulator has been acting for the third party beneficiary. But a provision for the benefit of a third party is different from an agency contract in the way that the stipulator enters into the contract under his personal name, and not as an agent of the third party beneficiary. More precisely, the stipulator enters itself into the contract for the benefit of a third party without receiving the power to do so, and the question is whether this contract can produce effects for the benefit of a third party, that is if the third party for the benefit of whom the provision was made acquires the right to sue the promisor for the performance of the service provided for its benefit.

In principle, a provision for the benefit of a third party is prohibited by the Code (s. 1119), which, in section 1121, recognises its validity only in exceptional circumstances and without very clearly specifying its conditions and effects. It gained a large practical importance during the XIX[th] century. This is one of the most characteristic examples of the transformation of the law and the role played by case law in this transformation.[4]

**512** *Division* ◊ […]

---

[i] Translator's note: translation chosen for the concept of "porte-fort" as defined in French case law.

---

[1] Civ. 3rd, 7 March 1979, *D.* 1979, IR p. 395.
[2] Civ., 22 Jan. 1896, *DP* 97.1.476; Civ. 1st, 30 Jan. 1957, *D.* 1957.182, *RTD civ.* 1957.682, obs. H. and L. Mazeaud; 8 Jul. 1964, *D.* 1964.560; Civ. 3rd, 2 Dec. 1971, *D.* 1972, sum. 86.
[3] Carbonnier, v. 4 n° 124.
[4] E. Lambert, *Du contrat en faveur des tiers*, thesis, Paris, 1893; Champeau, *La stipulation pour autrui*, thesis Paris, 1893; G. Flattet, *Les contrats pour le compte d'autrui*, thesis Paris, 1950, n°s 106 et seq.; C. Larroumet, *Les opérations juridiques à trois personnes*, thesis roneot., Bordeaux, 1968, n°s 146 et seq.; J. François, *Les opérations juridiques triangulaires attributives (stipulation pour autrui, délégation de créance)*, thesis dactyl. Paris II, 1994.

Exhibit 35a

# JOURNAL

# of the decisions of the

# FRENCH HIGH COURT

[Logo]

## GOVERNMENT GAZETTE
## OF THE FRENCH REPUBLIC



FIRST PART                                                    FIRST CIVIL CHAMBER

[...]

## Nᵒ 343

**PROVISION FOR THE BENEFIT OF A THIRD PARTY – Beneficiary – Acceptance – Provision with charge – Validity**

In case of acceptance by the beneficiary, the provision for the benefit of a third party does not exclude the beneficiary from having to fulfil certain obligations.

As a result, the commitment undertaken by the purchaser of a piece of land to make a gift of this land to his son, who subsequently manifested his intention of taking possession of it and to include in the deed a clause prohibiting the donor or its assigns from selling or subdividing the real property for fifteen years and requiring them to operate themselves during this period of time, it constitutes a valid provision for the benefit of a third party.

**8 December 1987**                          **Dismissed.**

On the sole ground taken into 3 branches:

Considering that, in accordance with the statements of the judges of merits, by the agreement of 5 October 1972, the *Societe d'aménagement foncier et d'etablissement rural de Lorraine* (Safer) sold to Mrs. Lebert a piece of land; that, in this agreement, Mrs. Lebert committed to making a gift of this land to her son Mr. Jacques Lebert in the next five years, the deed having to include a clause prohibiting the donor or its assigns from selling, building or subdividing the real property for fifteen years and requiring them to operate themselves during this period of time; that by the agreement of the same date, Mrs. Lebert leased this land to her son; that, in 1976, the relationship between Mrs. Lebert and her son broke down, he left the exploitation; that, on 1st December 1978, Mrs. Lebert sold the real property back to Safer; that, in 1979, Mr. Jacques Lebert issued to his mother a statement of claim for payment as an indemnity of the value of the real property that he should have received as a gift; that in its dismissal decision, the Court of Appeal (Nancy, 15 November 1984) accepted the claim by recognising that the appellant was the beneficiary of a provision for the benefit of a third party;

Considering that Mrs. Lebert reproached the appealed decision for having therefore decided that, in accordance with the ground, on one hand, the contracts for the benefit of a third party are null and void and if it can give rise to a right for the benefit of a third party, the provision for the

benefit of a third party will not impose an obligation or prohibitions provided for on him and that, it follows that the provision for the benefit of a third party cannot have the promise of gift for the benefit of a third party "including a charge and a clause of non-transferability provided for without him being involved" as a subject matter; on the other hand, while a contract may not make a third party a debtor without incurring nullity and that, if one can make a promise for a third party by promising the fact of a latter, a third party remains free of not ratifying the promise and that it follows that by not assessing whether Mr. Jacques Lebert would not be forced to ratify the obligation to operate and not to sell the real property if he accepted the provision for the benefit for a third party, the Court of Appeal deprived its decision of any legal basis; and finally, while the non-performance of the promise of obligation without consideration is not at fault, the Court of Appeal marred its decision with a lack of legal ground by not assessing if the circumstances of the matter had deprived of a consideration the promise of gift in dispute.

However, considering that, in case of acceptance by the beneficiary, the provision for the benefit of a third party does not exclude the beneficiary from having to fulfil certain obligations; that by having admitted that by refusing to give, as she committed herself to, the land in dispute to her son who had manifested his intention by taking possession of it and by, on the contrary, proceeding with its sale, Mrs. Lebert had caused him to suffer a loss for which she must provide compensation, the Court of Appeal rightfully recognised the validity of this provision for the benefit of a third party, that this ground has therefore no merits.

BASED ON THESE GROUNDS:
Appeal DISMISSED.

Nᵒ 85-11.769.

*Mrs. Lebert*
*versus Mr. Lebert*

*President*: Mr. Fabre – *Associate judge*: Mr. Kuhnmunch. – *Deputy prosecutor*: Mrs. Flipo – *Solicitors*: Mr. Parmentier and Cossa.



# Exhibit 35b

[Logo]

**French High Court**
**1st Civil Division**
**Public hearing of Tuesday 8 December 1987**
**N° of appeal: 85-11769**
Published in the bulletin

**Dismissal.**

**President: Mr. Fabre, president**
Associate judge: Mr. Kuhnmunch, associate judge
Deputy Prosecutor: Mrs. Flipo, deputy prosecutor
Solicitors: Mr. Parmentier and Cossa., solicitor(s)

### FRENCH REPUBLIC

### ON BEHALF OF THE FRENCH PEOPLE

On the sole ground, taken into three parts:

Considering that, in accordance with the particulars of the judges of merits, by the deed of 5 October 1972, the Société d'aménagement foncier et d'établissement rural de Lorraine (Safer) sold to Mrs. X... a plot of land; that, in this deed, Mrs. X... had undertaken to gift such a plot within the next five years to her son Mr. Jacques X... , the deed having to include a clause prohibiting the donee or his assigns for fifteen years from selling, partitioning or dividing the property and requiring them to operate themselves during that time; that by the deed made on the same date,  Mrs. X... had leased this plot to her son; that, in 1976, as the relationship between Mrs. X... and her son broke down, he left the farm; that, on 1st December 1978, Mrs. X... re-transferred the property to Safer; that, in 1979, Mr. Jacques X...  sued his mother to obtain a payment, as an indemnity, of the value of the property that he should have received as a gift; that in its dismissal decision, the Court of Appeal (Nancy, 15 November 1984) accepted the claim by admitting that the appellant was the beneficiary of a provision for the benefit of a third party;

Considering that Mrs. X... reproached the appealed decision for having therefore decided that, in accordance with the ground, on one hand, the contracts for the benefit of a third party are null and void and if it can create a right for the benefit of a third party, the provision for the benefit of a third party will not impose an obligation or prohibitions provided for on him and that, it follows that the provision for the benefit of a third party cannot have the promise of gift for the benefit of a third party "including a liability and a clause of non-transferability provided for without his knowledge" as a subject matter; on the other hand, while a contract may not make a third party a debtor without incurring nullity and that, if one can make a promise for a third party by promising the fact of a latter, a third party remains free of not ratifying the promise and that it follows that by not assessing whether Mr. Jacques X...  would not be forced to ratify the obligation to operate and not to sell the property if he accepted the provision for the benefit for a third party, the Court of Appeal deprived its decision of any legal basis; and finally, while the non-performance of the promise of obligation without consideration is not at fault,  the Court of Appeal marred its decision with a lack of legal ground by not assessing if the circumstances of the matter had deprived of a consideration the promise of gift in dispute.



However, considering that a provision for the benefit of a third party does not exclude, in the case of the beneficiary's acceptance, that the beneficiary should be bound by certain obligations; that, having admitted that by refusing to gift, as she had promised, the contended plot to her son who had manifested the intention of taking possession of it and, on the contrary, by proceeding with selling it, Mrs. X... had caused him a loss which she was liable to compensate, the Court of Appeal was right to recognise the validity of such a provision for the benefit of a third party, that this ground has therefore no merits.

BASED ON THESE GROUNDS:

Appeal DISMISSED

**Publication**: Bulletin 1987 I N° 343 p. 246

**Appealed decision**: Court of Appeal of Nancy of 15 November 1984

**Titles and summaries:** PROVISION FOR THE BENEFIT OF A THIRD PARTY – Beneficiary – Acceptance – Provision including liability – Validity

The provision for the benefit of a third party does not exclude, in the case of the beneficiary's acceptance, that the beneficiary should be bound by certain obligations. The commitment undertaken by the purchaser of a plot of land to gift such a plot to her son who ulteriorly manifested the intention of taking possession of it and to include in the deed a clause prohibiting for fifteen years the donee or his assigns from selling or dividing the property and requiring them to operate themselves during that time then constitute a valid provision for the benefit of a third party.

*CONTRACTS AND OBLIGATIONS – Effects – Effects towards third parties – Provision for the benefit of a third party – Contract between the promissor and the stipulator – Commitment to consent to a gift including a liability – Acceptance by the beneficiary
*GIFT – Liabilities - Commitment to consent to a gift including liabilities – Acceptance by the beneficiary – Effect

**Case law**: READ WITH: 3rd Civil Division, 1973-04-10, Bulletin 1973, III, n° 273, p. 197 (dismissal); 1st Civil Division, 1978-11-21, Bulletin 1978, I, n° 356, p. 276 (dismissal), and the cited decision.



Exhibit 36

[...]

## CONTRACTS AND OBLIGATIONS, Provision for the benefit of a third party, Beneficiary, Acceptance, Obligation, Possibility. – CIV 1st, 8 Dec. 1987

The provision for the benefit of a third party does not exclude, in the case of the beneficiary's acceptance, that the beneficiary should be bound by certain obligations.

When S.A.F.E.R. sold to an individual a plot of land and that, in this deed, the purchaser undertook to gift such a plot within a certain timeframe to her son - the deed having to include a clause prohibiting the donee or his assigns for fifteen years from selling, partitioning or dividing the property and requiring them to operate themselves during that time and after the son left the farm, the mother re-transferred the property to S.A.F.E.R., the judges of merits, having admitted that by refusing to gift, as she had promised, the contended plot to her son who had manifested the intention of taking possession of it and, on the contrary, by proceeding with selling it, the mother had caused him a loss which she was liable to compensate, were right to recognise the validity of such a provision for the benefit of a third party.

**CIV. 1st, 8 Dec. 1987. – (Mrs. Lebert v. Lebert) - Mr. Fabre, pres - Kuhnmunch, ass. judge - Mrs. Flipo, dep. pros - Mr. Parmentier and Cossa, sol. – Dismissal of appeal against Nancy, 1st div., 15 Nov. 1984.**

(*Bull*. civ. I, n° 343, p. 246).

*Validity of the provision for the benefit of a third party of which the beneficiary accepts certain obligations.*

(1) Contrary to the view expressed in a recent and extremely interesting study, we do not believe that the decision of 8 Dec. 1987 creates a "new concept" in relation to the provision for the benefit of a third party. (See Venandet, La stipulation pour autrui avec obligation acceptée par le tiers bénéficiaire, J.C.P. 1989.I.3391, especially n° 37). In our view, the wording of the key consideration of the decision, which is well-thought of (see Venandet, *op.cit.*, n° 4) appears to fully maintain the traditional conception of the provision for the benefit of a third party.

"The provision for the benefit of a third party does not exclude, in the case of the beneficiary's acceptance, that the beneficiary should be bound by certain obligations".

The wording clearly suggests a *chronology*: there is first a provision for the benefit of a third party, then an – eventual – acceptance of beneficiary from which – and only from which – this beneficiary may find itself to be bound by certain obligations.

In this context, the transaction may be analysed in two elements:

-  Firstly, the provision for the benefit of a third party creates an immediate right for the benefit of a beneficiary: from the time of the meeting of the minds between the stipulator and the promisor, this right becomes part of the patrimony of the designated beneficiary. (See. J. Flour and J.-L. Aubert, *Droit civil. Les obligations,* vol. 1, *L'acte juridique,* ed. 1988, n° 476,3°, p. 381).

-  Secondly, if the beneficiary accepts the benefit which is thus allocated to him, his acceptance may have as a subject matter not only the entry of the right arising from the provision in his patrimony, but also the creation of certain obligations related to the provision, by which he can only be bound from the time he expressed his will to accept them.

In other words, in our view, the precise meaning of the solution accepted by the French High Court appears to be able to be worded as follows: on one hand, in accordance with the traditional analysis, the provision for the benefit of a third party may immediately create only a right: however, on the other hand, the beneficiary which accepts may, by its acceptance, subscribe to obligations connected to the benefit. More briefly, the solution accepts the compatibility between the provision for the benefit of a third party and the subscription to certain obligations by the beneficiary at the time of its acceptance of the benefit.

In the mechanism accepted by the decision of 8 Dec. 1987, there is therefore a double transaction in accordance with the observation that we had already made in relation to a previous decision of the same jurisdiction (Civ. 1st, 21 Nov. 1978, *Bull. civ.* I, n° 356, p. 276: *Rép. Defrénois*, art. 32077, n° 50, especially p.1177):

-  a provision for the benefit of a third party, which only creates a right for the benefit of the beneficiary from the time of the meeting of the minds between the stipulator and the promisor;

-  an accessory agreement, which results from the fact that the subject matter of the acceptance given by the beneficiary is not only the entry of the right in its patrimony but also the creation of obligations that it specifically accepts.

We must then specify that the connection between these two transactions be carried out through a condition, the acceptance of the obligations being the final entry of the benefit in the patrimony of a third                                    party.          In

SOMMAIRES COMMENTES

this way, the right arising from the provision for the benefit of a third party has a conditional character; this does not contradict the principle of the provision for the benefit of a third party according to which it can only create a right. And it is then clear that it is not the provision for the benefit of a third party which binds the beneficiary but the agreement given by the latter, which is accessory to the declaration of his will to benefit from the provision provided for his benefit.

In our view, the acknowledgment of this duality of legal relationships appears to be preferable to the admission of a newly united concept of the provision for the benefit of a third party as proposed by Mr. Venandet.

First, it underlines that if the transaction, in its entirety, is indeed "inseparable" (Venandet, *op. cit.,* n° 18) through a condition, at least its effects are normally spread in time: the right is conditional to the benefit and is prior to the obligation of the beneficiary. And this avoids the awkward situation caused by the retrospective effect of the acceptance to the beneficiary in the united conception (See on this point, Venandet, *op. cit.*, n° 21).

Secondly, the autonomy which is thus to be ensured between the obligation and the benefit prevents the apparition of the issue, which inevitably arises from the united conception: that of the balance between the benefit and the obligation required by the necessary protection of a benefit worthy of its name – in the absence of which it would be any provision for the benefit of a third party. In the dualist conception, there are, more simply, on one hand, a pure and simple benefit and on the other hand a contractual commitment, which the beneficiary may accept or refuse at his discretion. It is therefore necessary to subject the validity of the transaction to the provision of a "limited obligation" which does not absorb the total benefit (Venandet, *op. cit.*, n° 26). This avoids a discretion, which often would risk being extremely artificial – the experience acquired in relation to gifts including liabilities shows it enough. This ensures the process a maximum of flexibility.

Besides, it does not appear that, by noting certain obligations by which the beneficiary could be bound due to his acceptance, the French High Court expressed its will of particular balancing – of which the key risk is often too personal for the beneficiary as it was the case in this instance. Instead, it seems that the wording shows the requirement of an extremely definite specification of the obligations wanted, which allows for, if necessary, a third party to accept them at its discretion.

That being so, the issue is whether it is legitimate to admit the combination of the provision for the benefit of a third party and a contractual debt for which the beneficiary is liable. In our view, a positive answer is required.

With respect to the *fundamental principles of contract law,* the mechanism does not raise any issues. In particular, the principle that no one may be a debtor without consenting to it is well respected.

With respect to the *theory of the provision for the benefit of a third party,* the solution accepts no laxity which would challenge this theory itself. The provision for the benefit of a third party remains a mechanism which is adapted to certain particular situations, not to all of them. It is a means to create a right for the benefit of a third party in a contract: it is not a way to assign the entire contract.

Finally, with respect to the *needs of the practice,* the admission of this combination of the provision for the benefit of a third party and certain obligations subscribed by the third party beneficiary provides a useful legal framework for an institution which especially needs it – *group insurance.* Despite its considerable practical importance as rightly underlined by Mr. Venandet (*op. cit.*, n° 27 et seq.), this type of insurance is chronically under-regulated and the draft Act regarding various measures relating to insurances currently before the Parliament only brings an extremely limited remedy (See draft Act, *Senate*, second ordinary session 1988-1989, n° 234, s. 16). This type of insurance, in which one sometimes recognised, a bit hastily, a kind of insurance for account of various beneficiaries - without taking into account the fact that, in the insurance for account of various beneficiaries, the variable is represented by the *beneficiary* of the insurance, while in the group insurance, it is the *risk covered*, that is the subscriber for whom the insurance in question is subscribed – relies, without any doubt, on the provision for the benefit of a third party. However, on a closer analysis, this is not sufficient to explain the various aspects of the regime of this insurance. In particular, the insurances subscribed as a guarantee for bank loans, the provision for the benefit of a third party cannot explain that the subscriber must pay the premiums related to his insurance and, in this regard, he is committed to the stipulator. On the contrary, the provision for the benefit for a third party and the related acceptance by the beneficiary of certain obligations provides an excellent explanation: at the same time as he declares that he wants to benefit from all the guarantees subscribed by the bank, the borrower-subscriber is committed towards the latter (the stipulator) to pay the insurance premiums, the subscription of this commitment being the condition for benefiting from the offered guarantees. And the necessity of the autonomy between this autonomy and the benefit is particularly obvious in this case: indeed, it is not about a "limited" obligation which protects "the benefit", but simply the price of the insurance.



--------------------------

## II.- Implied contracts.

**BUSINESS MANAGEMENT[i] – Definition, Useful action, Theft, Department Store, Customer, Intervention, Opposition of professional, Action of self-sacrifice, Subject matter of petty theft, Recovery - CIV. 1ST, 26 Jan. 1988.**

The decision receiving, on the ground of business management, a claim for compensation made by an injured customer against the company operating a department store while he chased a criminal who just stole its proceeds is legally justified if subject to no appeal, the Court of Appeal holds that this individual had acted on behalf of the department store, that his intervention had been useful as he had allowed to recover the stolen amount and that the opportunity of this intervention was such that the initiative taken was justified, without the operating company being able to claim that it had given instructions to its employees to not intervene in such a case (1).

**CIV. 1ST, 26 Jan. 1988. – (S.A.R.L. Etabl. Gabriel Cash and Carry C. Soc. Winterthur and others). – Mr. Fabre, pres. – Jouhaud, ass. judge – Charbonnier, dep. sol. – Mr. Foussard and Goutet. sol. – Dismissal of appeal against Aix-en-Provence, 27 Nov. 1985.**

(*Bull. civ.* I, n° 25, p. 16; J.C.P. 1989.II.21217, note Y. Dagorne-Labbe).

### The opposition of the owner[ii] which excludes the regime of business management

(1) The solution accepted by the decision of 26 Jan. 1988 is largely due to the assessment of the judges of merits, which is not subject to appeal and applies the regime of business management in the case of a spontaneous intervention of a customer of a department store against the authors of the theft carried out against the latter.

Going beyond the voluntary collaboration with the police often admitted in such circumstances to exclude the business management due to the lack of intention of acting of the "manager", the judges of merits considered that the action of the plaintiff did not showed the necessary altruism even though, from the beginning, it had been deprived of such motivation. It is allowed to approve this assessment that is used to acknowledge the recovery of the stolen sums and that which led the judges to admit the usefulness of the regime of business management.

However, concerning this last point, the decision of 26 Jan. 1988 allows us to see an hesitation of judges, which is caused by the fact – which is obviously underlined by the defender – that the intervention of the manager[iii] had occurred despite the opposition of the owner, who had prohibited its employees from taking similar actions. In this regard, the judges had, in this instance, admitted that "the opportunity of such intervention was such that the initiative thus taken was justified without (the defender) being able to claim (that it) had given instructions to its employees to not intervene in such a case. The reasoning thus leads to a double assessment of the *usefulness* and the *opportunity* of management. This is a decision which is bizarre and excessively demanding in so far as the "usefulness" and the "opportunity" are only two different manners of naming the same condition of application of the regime of business management. (See J. Flour and J.-L. Aubert, *Droit civil. Les obligations*, vol. 2, *Le fait juridique*, 4th ed. 1989, n° 12; See also, Malaurie and Aynès, *Droit Civil, Les obligations*, 1985, n° 506).

The judges specially refer to the *opportunity* in order to overcome the objection made by the defender in relation to its opposition to the intervention carried out by the plaintiff, which draws the attention to this particular circumstance, more accurately to the manner its role should be understood. In this regard, the doctrine appears to be divided.

According to some, the opposition of the manager[iv] does exclude the regime of business management because it constitutes a *fault* of the so-called manager: the "manager" ignores the will of the owner and adopts an illegitimate behaviour and this illegitimacy prohibits him to claim the application of the regime of protection of business management. (See. J. Flour and J.-L. Aubert, *op. cit.,* n° 5; Malaurie and Aynès, *op. cit.* n° 564).

However, according to others, the opposition of the owner would only exclude the regime of business management if it affirms *a priori* the uselessness of this intervention (concurring, Goré, *Rép.* civ. Dalloz, vol. *Gestion d'affaires*, n° 50).

We must note that while, in accordance with the ground, we recognise the role of the opposition of the owner, we are led to believe a different conception of this opposition.

In the first opinion, only the opposition notified to the "manager" or at least *known* by him may play a role: in the absence of such knowledge, he cannot be at fault.

On the contrary, in the second opinion, the simple fact that the opposition in relation to such and such intervention is rightly made by the owner may be considered as sufficient to exclude the regime of business management.



The care taken in this instance by the judges of merits to dismiss the impact of the prohibition made by the department store to its employees – category of which the plaintiff did not belong to – of intervening in case of an armed assault, could indicate a preference of these same judges for the second opinion. Maybe, the French High Court may even be considered as sharing this preference in so far as its dismissal decision repeats the details of their ground.

However, it seems that such an understanding of the role of the opposition of the owner does not fit well in the regime of business management: if the owner is protected by the requirement of an appropriate management, there is no reason to exclude the protection that the law grants the good manager as long as he is not guilty of wrongful interference. Therefore the opposition of the owner, which excludes the regime of business management can only be an opposition of which the manager had knowledge in due course.

---------------------------

**RECOVERY OF PAYMENT MADE IN ERROR, Action in recovery, Conditions, Absence of debt, Creditor, Negligent debtor. – COM. 12 Jan. 1988.**

The payment made in error by a person who is not a debtor does not give the right to reimbursement if the creditor only received what the debtor owed him and if the debtor blames himself for paying it without taking any required caution (1).

**COM. 12 JAN. 1988. (Credit Lyonnais C. Soc. anon. Parisot, constructions mécaniques and others). – Mr. Baudoin, pres. – Peyrat, ass. judge – Cochard, dep. pros. – S.C.P. Vier-**

**Barthélémy, sol. – Dismissal of appeal against Nancy, 3rd div., 25 March 1988.**

(*Bull. civ.* IV, n° 22, p.15).

***Denial of a right of reimbursement of the negligent debtor who paid the creditor.***

(1) The decision of 12 Jan. 1988 reaffirms the solution which today seems to be well established by case law and which is stated as a principle: "the payment made in error by a person who is not a debtor does not give the right to reimbursement if the creditor only received what the debtor owed him and if the debtor blames itself for paying it without taking any required caution". In this instance, it was a gross error of the bank which transferred twice the amount to the account of the beneficiary.

This solution to which the 1st Civil Division (see. Civ. 1st, 18 July 1979, D.1980.172, note Vasseur; J.C.P. 1979.II.19238, submissions Gulphe) was opposed and of which the Commercial Division had seemed to abandon (See. Com. 4 Dec. 1978, D.1979.324, note Derouin) is today recognised by both of these divisions (See concurring, Com. 26 Nov. 1985, *Bull. civ.* IV, n° 281, p. 238; D. 1986.I.R.240, obs. A. Honorat: Civ. 1st, 15 Jan. 1985, *Bull. civ.* I, n° 20, p. 20. – See J. Flour and J.-L. Aubert, *Droit civil. Les obligations,* vol. 2, *Le fait juridique,* 4th ed. 1989, n° 31 (in print).

---

[i] Translator's note: translation chosen for the concept of "gestion d'affaires" as defined by French case law.

[ii] Translator's note: translation chosen for the word "maître" or "géré" as part of the concept of "gestion d'affaires".

[iii] Translator's note: translation chose for the word "gérant" as part of the concept of "gestion d'affaires".

[iv] Translator's note: the French version refers to the "manager" but there seems to be some confusion and in our view, the French version actually meant to refer to the "owner".



Exhibit 37

# FRENCH CASE LAW
# IN CIVIL LAW

## A. - Persons and family rights

## B. - Obligations and special contracts

### I.- *Obligations in general*

### Jacques MESTRE

*Professor at the University of law, economics and sciences of Aix-Marseille*

### I.- SOURCES OF THE OBLIGATION

#### a)    The contract

#### 1)    *Formation of the contract*

**1**. - *Of the silent will to commit oneself*

Except for the cases, albeit more and more numerous (this *Gazette* 1988, n° 2), where the law otherwise provides, the will to commit oneself contractually is not subject to any particular formality, and may therefore be implicit or express. Still, it must not be equivocal and, behind such an apparent passivity, an unquestionable adhesion to the legal act must show through. However, such an appreciation of human behaviour may be quite delicate for a court, especially *in the presence* (if we may say so) *of silence*. In this case indeed there are not even any "significant" acts such as for example the fact of remaining on the premises at the expiry of a lease or the fact of sending goods after receiving an order; the judge is simply confronted to "total passivity" (P. Godé, *Volonté et manifestations tacites*, P.U.F., 1977, preface J. Patarin, n° 158) or even, to use Voirin's more brutal expression (note at D.P. 1939. 5), "the void".



[…]

**10.** *The provision for the benefit of a third party does not exclude, in the presence of the beneficiary's acceptance, that the beneficiary should be bound by certain obligations.*

The judgment held by the *First Civil Division of the French High Court on 8 December 1987* (*Bull. civ.* I, n° 343, p. 246) incontestably establishes a precedent and deserves particular attention.

By deed dated 5 October 1972, the company SAFER de Lorraine had sold Mrs. Lebert a plot of land. In the deed, Mrs. Lebert had undertaken to gift such a plot within the 5 years to her son Jacques, and the gift deed had to include a clause prohibiting the donee and his assigns for fifteen years from selling, partitioning or dividing the property, and requiring them to operate themselves during that time. By deed made on the same day, Mrs. Lebert had leased the plot to her son. In 1976, as the relationship between Mrs. Lebert and her son had broken down, he left the farm. On 1st December 1978, Mrs. Lebert re-transferred the property to SAFER and in 1979 Jacques sued his mother to obtain payment, as an indemnity, of the value of the property he should have received as a gift.

The judges of first instance dismissed the suit but the Court of Appeal of Nancy upheld his suit by admitting that he was indeed the beneficiary of a provision for the benefit of a third party. Mrs. Lebert appealed to the French High Court alleging that contracts for the benefit of a third party are void and that a provision for the benefit of a third party, even though it may create a right for the benefit of a third party, cannot impose an obligation on such third party nor impose prohibitions established without his/her knowledge: thus such a mechanism cannot provide for a promise of gift to the benefit of a third party which "would include a liability and a clause of non-transferability provided for without his knowledge".

The First Civil Division however dismissed the appeal: "considering that a provision for the benefit of a third party does not exclude, in the case of the beneficiary's acceptance, that the beneficiary should be bound by certain obligations; that, having admitted that by refusing to gift, as she had promised, the contended plot to her son who had manifested the intention of taking possession of it and, on the contrary, by proceeding with selling it, Mrs. Lebert had caused him a loss which she was liable to compensate, the Court of Appeal was right to recognise the validity of such a provision for the benefit of a third party".

It would be potentially possible, if we knew the factual circumstances better, to question the factual solution, and for example, to ask whether the son's departure from the farm could not, maybe, constitute a tacit renunciation to later seek the benefit of the provision for the benefit of a third party. However, in the absence of any particular information, we need to construe this case as it is presented, i.e. as a case establishing a general precedent and we will formulate three observations on it.

*Our first observation*: it overturned previous case law…predictably. It overturns the case law established by the Third Civil Division on 10 April 1973 which approved a Court of Appeal for declaring that "pursuant to sections 1119 et seq. of the Civil Code, a provision for the benefit of a third party can only create a right for the benefit of a third party and cannot create an obligation to its charge stipulated



OBLIGATIONS AND SPECIAL CONTRACTS                     533

without its knowledge" (D. 1974.21, note Ch. Larroumet). But, since then, the field had been prepared in allowing us to foresee a possible evolution: in particular, a case before the First Civil Division dated 21 November 1978 (D. 1980.309, note C. Carreau; J.C.P. 1980.II.19315, note P. Rodière; *Rép. Defrénois* 1979, p. 1176, obs. J.-L. Aubert), held in the following circumstances. A bank had entered into a services contract with a money transporter for the benefit of their clients, foreseeing that the users of such services would pay the bills themselves. One of them, being the victim of a hold-up during a badly organised money transfer, claimed from the transporter compensation for its loss but opposed the argument that he was external to the contract: the fact that he had to pay himself the bills excluded that it may have been a provision for the benefit of a third party. The judges of first instance nevertheless disregarded the objection, and the First Civil Division approved them: according to its own words, "the fact that the contract gave the company Sogara (the client) the obligation to pay the bills, did not exclude the existence of a provision for the benefit of a third party". And more recently, in a case dated *2 June 1987* (*Bull. Joly des sociétés,* 1987, p. 691), *the Court of Appeal of Versailles (1st Division)* even anticipated on the positive formulation of the *Dame Lebert* case in circumstances equally very interesting which shed a good light on the practical importance of the issue. The facts were that, in order to end a budding dispute, two divorced spouses, who had remained under the regime of tenancy in common[1] by common consent, had signed draft "heads of agreement[2]", under which, among other provisions, the former husband promised to sell his son 90 shares of a public limited company of which he was the majority shareholder, for a price of FF 648,000 payable over five years. However, the husband later refused to come to the notary's office in order to carry out the share transfer and, when sued by his son, alleged that his promise was void as it "constituted a provision for the benefit of a third party which included a substantial financial consideration payable by the beneficiary". However, here again the argument was swept aside by the Court of Versailles who considered that "if a provision for the benefit of a third party can only create a right for the benefit of the third party beneficiary and cannot lay on him the onus of any obligation stipulated without his knowledge, it does not exclude and does not make such a provision void so long as the third party beneficiary accepts the obligation placed upon him"; as a matter of fact, "Mr. Philippe S., by demanding that his father sign the transfer agreement of the 90 shares for a consideration of FF 648,000 in accordance with the agreement entered into by his parents, ratified such an agreement under conditions which resulted in perfecting the agreement between them".

Thus, the *Dame Lebert* case consecrates an evolution rather than carries out a real rupture in case law. And this, for another reason still, which has been insufficiently underlined on the morrow of the holding given on 21 November 1978. Such a reason is that, in 1973, when the Third Civil Division issued its holding, the alleged provision for the benefit of a third party was invoked against its alleged beneficiary: in other words, the promissor had used it to claim from the third party the performance of an obligation, the acceptance of which was reasonably questioned according to the facts. In 1978 on the contrary, and then in two cases in 1987, it was the third party who invoked the benefit of a provision for the benefit of a third

---

[1] Translator's note: chosen translation for the concept of "indivision".
[2] Translator's note: chosen translation for "protocole d'accord".



party and it was the promissor who, to avoid his liability, brought forward the correlative obligation in a – we will admit it – very artificial manner as such an obligation was clearly accepted, even – like in 1978 – already performed!

Therefore, and this is *our second observation*, it seems difficult to contest the current position of the French High Court. Let us review the wording of section 1165 of the Civil Code: "Contracts are only enforceable against the parties to the contract; they do not harm third parties and they do not profit third parties except in the case provided in section 1121". The meaning of the section is clear: if an exception to the principle of privity of contracts is admissible, it is so because it is favourable to the third party, because it is profitable to that third party. But, from there, why retain from such a last hypothesis the narrowest conception possible and why not admit, on the contrary, that there may be "profit" within the meaning given by the law even when an obligation is attached to the right of the third party beneficiary? It seems to us that this second approach, more realistic, imposes itself all the better as the third party remains in control of the decision: he is free not to accept the provision for the benefit of a third party if he thinks it is disadvantageous in the end. It seems to us that this is actually what the French High Court intended to highlight when it took care to mention that obligations are obviously conceivable only "in the case of an acceptance by the beneficiary". We finally need to add that, even when the provision for the benefit of a third party does not include an obligation, the third party is already often brought to evaluate the advantages and the disadvantages of its possible acceptance, since, taking its rights from the main contract, quite cumbersome clauses may be enforceable against it (e.g. a provision of non-warranty), without it being able in this contract "to divide the clauses, invoke the ones and reject the others" (Req., 15 Nov. 1909, D.P. 1991. I.393, note Dupuich).

Finally, *our third observation*, much briefer, will be to highlight that the case *Dame Lebert* indirectly brings its stone to the building already well started of contract transfers since, just as well, an obligation may today clearly be attached to the right of the third party beneficiary and thus evoke a true bilateral relationship. Even the contractual whole is concerned considering that the third party beneficiary is becoming even more than before a party to a contract that he did not enter into.

**11.** *The price reduction of the contract is approved by the courts*

Reviewing the price of the contract is generally presented as being original to sales in trade. And as a matter of fact, this is where it has found its most spectacular expression (see Com., 23 March 1971, D. 1974.40, note M. Alter). But a recent case before the Court of Appeal of Paris (1$^s$ Division, D. *urg*., *17 March 1987*, D.1988.219, note J.-R. Mirbeau-Gauvin) reveals that the contemporary judge has maybe decided to give a broader application, a real technique of the common law of contracts, following in this, implicitly, the *Legal Vocabulary* of the Dean Cornu (P.U.F., 1987, p. 667) who defines a price reduction as a "reduction of the price of the goods at the time of delivery, when they are not delivered under the agreed conditions" and "more generally, the re-evaluation of a piece of work, of work depending on the circumstances or on a change of forecasts".

Under the facts, the regional inter-federal union of private sanitary and social works (U.R.I.O.P.S.S.) had leased from the company Moucassin a room with 220 seats equipped with specific equipment in order to organise a work meeting, and this



for a price of FF 45,000. However, the state of the room and of its equipment was of a lesser quality than that described in the contract. The U.R.I.O.P.S.S. therefore took the initiative to pay the lessor only FF 35,000. The lessor seized the court of first instance, who condemned the unilateral attitude of the lessee but the Court of Appeal of Paris chose to overturn the judgment: "the U.R.I.O.P.S.S., who had protested as soon as the 2nd day of the lease could validly, not retain part of the price as an exception based on the non-performance owed by the other party, but operate the reduction of the price which was under the facts justified by the mediocrity of the services rendered and their manifest insufficiency".

To tell the truth, as Mr. Mirbeau-Gauvin demonstrates in his aforementioned note, other hypotheses of price reduction, outside the case of sales in trade, had already been encountered, such as the quite classical case law pronouncing the reduction of the fees of business agents and other agents when the service promised has not been fully delivered, or further, the case before the Third Civil Division, commented here (5 Dec. 1984, this *Gazette* 1986, 344), allowing that the judges of first instance could reduce the locking-in indemnity payable by the beneficiary of the option to purchase when the beneficiary has communicated his will not to acquire before the end of the option period (see however, since, Civ 3rd, 10 Dec. 1986, this *Gazette* 1988, 144, obs. J. M.). These similarities indeed lead the drafter of this note to suggest as a true basis for price reductions, despite appearances to the contrary, section 1134, paragraph 1 of the Civil Code. And, as a matter of fact, it is by considering what each party brings initially to the contract and their reciprocity that it is then justified to reduce their performance in parallel.

Nevertheless, one must not underestimate the originality of the case commented here. Indeed, traditionally it is the judge who, at the request of the partially unsatisfied creditor, grants himself the right to reduce the financial counterpart. However, under the facts, it was the creditor who, practising private justice, took it into his hands to invoke a type of exception of partial non-performance. […]



# Exhibit 38

**Recueil Dalloz 1994 p. 145**
**The contractual provision for the benefit of a third party.**

**Didier R. Martin**

Do two swallows make spring? In any case, it is a fact that the two noted decisions[1] will be sufficient to create the illusion of a renewal of the provision for the benefit of a third party. An obligation for the beneficiary could also be conceivable, at least as soon as he would accept his liability.[2]

The idea firstly breaks through in the decision of 21 Nov. 1978. In this instance, a company (SOGARA) customer of the *Credit commercial de France* (CCF) wanted to cite on the terms and conditions of guarantee and the tariff of transport of cash of the agreement entered into between the Société parisienne de surveillance (SS) and CCF for obtaining damages against the latter for the loss suffered at the time of a transfer of funds undertaken without the precautions agreed on with CCF. In it, it was discussed that the agreement provided for the provision for the benefit of a third party on the ground that, according to the agreement, the interested customer would also bear the payment of the cost of transport. To this, the Court objected that the imputation of the payment of the invoices to the company SOGARA, "which the latter had accepted, does not exclude the existence of a provision for the benefit of a third party". The enigmatic statement was going to be clarified by a decision of 8 Dec. 1987. The matter is about a piece of land purchased from the SAFER de Lorraine by Madam Lebert for the consideration of a promise to give it to her son in the next five years and the obligation of the latter to operate it personally and to not build or subdivide it for the next fifteen years. The mother having not held her commitment, the son argued a provision for his benefit in order to have her ordered to pay him an indemnity equal to the value of the land that he should have received as a gift. Here the opportunity is given to the Court to clearly state that "in case of acceptance by the beneficiary, the provision for the benefit of a third party does not exclude the beneficiary from having to fulfil certain obligations".

While saying this, contrary to the dominant opinion, the French High Court indeed seems to recognise that the provision for the benefit of a third party may, if necessary, be connected to a charge or obligation of the beneficiary. However, this is maybe only an optical effect where the validating institution did not know how to recognise the almost common, if not familiar, formula of the provision for the benefit of a third party. And yet such a provision does not in any way contravene the most traditional regime of its kind. We only need to alternatively examine the subject matter (I) and the fate (II) to convince ourselves.

I. – The subject matter of the provision
In its basic or primary configuration, the provision for the benefit of a third party is about the performance of a service owed by the promisor. Here the hypothesis however is that it is not only about one of the obligations of the contract entered into but also about the bilateral terms of a future agreement. This means that the subject matter is a contractual promise (A) from which results a contractual option (B) for the beneficiary.

A. – The promise of contract
The idea that the provision for the benefit of a third party may constitute "a general method of the formation of a contract for the benefit of a third party" is not new.[3] But its doctrinal recognition suffered with no doubt from its neighbouring concepts such as the techniques of representation, man of straw or promise for another[i]. While the practice gave multiple examples of it in the form of agreements entered into on behalf of which it will belong: usually, customers or subscribers. In such a case, the manoeuvring consists of an economic agent to predetermine the content of the supply or service contract and provide its advantages to the interested partners including members of its network and its customers. So that the aforementioned beneficiaries can, if they wish

---

[i] Translator's note: this means that someone makes an undertaking to ensure that a third party performs his obligation.



to do so, subsequently enter into the same contract in the pre-agreed terms and conditions. We can see the interest of a process which will, due to the bargaining power of the stipulator, grant access to the beneficiaries to contractual conditions which they could not have obtained independently by individual and separate discussion with the relevant supplier or service provider. In particular, the economy and the aim of group insurance contracts, agreements entered into by the trade reference centres and in the aforementioned instance, the agreement between CCF and SPS are as such.

This is where we can see that, in these different cases, the agreement from which results the provision for the benefit of a third party only constitutes a framework agreement in the conditions of which the beneficiaries can pretend to enter into the implementation contracts between themselves and the promisor. The observation is material. Because it specifies the subject matter of the commitment of the promisor which consists of the promise of entering into a contract with the designated beneficiaries in accordance with the terms of the agreement from which the provision derives. This is not specifically about the offer but about the unilateral promise from the promisor of a contract specified in the agreement with the stipulator. It therefore correlatively results that the provision is not a performance of a service, but entering into a future and predetermined contract in which the promisor already agreed upon by giving in advance its consent to such a contract. This was also the case in the *Lebert* matter. Because the provision made by SAFER in favour of the son Lebert resulted from a contract – which is here a gift[ii]– to which the mother had properly consented since the purchase of the land. An appropriate option therefore corresponded, by substantive coherence, to this provision of a potential contract.

B. – The contractual option

An option symmetrically corresponds to any unilateral promise: that of effectively entering into such a contract by a corresponding manifestation of the will or waiving it by letting the promise lapse due to the expiry of the applicable timeframe without accepting the contract. This is clearly a contractual option that by the contractual provision for the benefit of a third party, the parties to the framework agreement wanted to vest into the designated beneficiary(ies).  Indeed, the idea which presides the underlying agreement arranges for them a legal configuration which, if they agree upon it, lets them enter into a determined contract where the main terms have been pre-negotiated for their benefit and in any case, pre-agreed upon. This is where you can see that the provision for the benefit of a third party is perfectly adapted to this configuration as it leads to: 1) the stipulator to satisfy its commercial interest or its institutional objective[4] by procuring its customers or members a usually favourable contractual opportunity; 2) the promise to ensure for itself an opportunity of, if not captive, at least regular, customers; 3) the beneficiaries to sign a pre-determined and more favourable standard contract it they wish to do so.

Naturally, so that a genuine provision for the benefit of a third party may be identified in the operational system created, it is important that the commitment of the promisor – which is here the promise of a contract – be connected to the right of the beneficiary towards him. This right is not indeed a mystery. It really clearly consists of the right itself which is vested in the beneficiary of a unilateral promise of a contract: that of definitively entering into the promised contract in the timeframe determined to this effect.[5] We will admit that this is not a small prerogative. We will concede that as a paradox, it consists of a right more fundamentally direct than that which is given to the beneficiary of a provision of performance for the benefit of a third party: because the promise of contract does not indeed have any usefulness – or even any interest – for the stipulator; the latter did not obtained it as a consideration for a reciprocal commitment (as it does not commit itself to anything) but only to grant access for the sole benefit of the aforementioned beneficiary. This is therefore its own purpose, its primary conception and not a technical effect of the provision that the right of a contractual option was given to the person of the beneficiary. Such a feature will not however take place if the stipulator

---

ii Translator's note: under French law, a gift may be the subject matter of a contract as French law does not require consideration for the formation of a contract.



provides for the promised contract to be first to itself and subsidiarily for the determinable third party. Such is in particular the case for the promise for sale with an option for an assignment. We know that case law analyses the substitution agreed on as a provision for the benefit of a third party.[6] And it is without doubt wrongful that the solution is either criticised,[7] or approved on the ground of "the flexibility which characterises the provision for the benefit of a third party".[8] Because in this matter, the provision was neither in breach nor behaving itself. It is sufficient to see a contractual provision for the benefit of a third party subject to the designation of the substituted third party in the allowed substitution. During this transaction which consists of two successive steps, the direct right to a contract only appears at the time when, the substitution having occurred, the provision for the benefit of a third party becomes certain. But it is true that this direct right, like the necessary effect of this agreement, has not then been created since the original contract of promise. This may not be without any impact on the consequences of the provision.

II.- The consequences of the provision

They are organised around two combined factors: on one hand that it is a simple provision for the benefit of a third party which may be cancelled at any useful time; on the other hand that it is about a future contract for the formation of which only a will is outstanding. This second factor where the figure finds its singularity, eclipses without erasing the interest of the first one whose theory is also well known. The question therefore becomes more typically that of the consequences of the contract, which is the subject matter of the provision; it suggests that its fate (A) and its effect (B) must be successively examined.

A.- The fate of the promised contract

It firstly depends on the fate of the provision itself which may be cancelled at any useful time. In which case the framework agreement will be become null and void due to the absence of subject matter and the promisor released from his consent to a future contract.[9] However, in the practice of a contract for the benefit of a third party, the cancellation appears to be unlikely. Also the fate of a contract is principally determined by the will of the designated beneficiary, depending on whether or not he does accept the contractual transaction created for his benefit. The potential acceptance here provokes a special consideration. Of course, the acceptance of the beneficiary is not irrelevant even in the case of the provision of a service for the benefit of a third party, as it consolidates its direct right against the promisor. However, as the arrangement is only advantageous for the beneficiary because it does not include a correlative obligation for which he is liable, the courts are not always required to comply with the requirements of the common[iii] law of this kind in relation to the acceptance.[10] Concerning the contractual provision for the benefit of a third party, the acceptance by the beneficiary is pointed out by a singularly increased importance and scope. Importance firstly because the expressed acceptance seals the promised contract. It constitutes the positive exercise of the contractual option forming the direct right of the beneficiary and by doing so contributes to the inception of the contract promised in the agreement including the provision. The acceptance of the beneficiary is equivalent to the close of the option created by the unilateral promise of a contract referred to in the provision and the completion of the transaction.[11] From this, also its scope. Because by accepting, personally and on his behalf, the contract provided for – in the pre-agreed terms – the beneficiary establishes a binding relationship with the promisor which forces him to fulfil his duties and conditions provided for which he is liable. It results from these observations that the acceptance of the contractual provision may be identified as a contractual acceptance. That it must therefore be treated similarly and result from either a declaration of intention or tacitly expressing without any doubt an acceptance by conduct of the contract provided for. In any case, the French High Court invites to undertake this particular verification of the will of the beneficiary by expressly linking the validity of the provision for the benefit of a third party and the obligation of acceptance by the beneficiary in the aforementioned *SOGARA* and *Lebert* decisions.

---

iii Translator's note: "common" in the sense ordinary (opposite to special), rather than the Anglo-Saxon "common law".

However that may be, the promised contract on which the provision is about may have become binding and final since the acceptance of the beneficiary. There is therefore a distinct and separate agreement from the framework agreement between the promisor and the stipulator and from which it only borrows the benefit of the promise of the contract included in the provision. The arrangement in which an implementation contract is entered into in good faith, in accordance with the terms of, and by performing, the framework agreement is identified. Shall we be surprised that one of the parties to the implementation contract is, in fact, a third party to the framework agreement? No, because it is the own effect of the contractual provision for the benefit of a third party to offer to a designated party the opportunity of entering into an implementation contract in accordance with the framework agreement negotiated by the stipulator and promised to all the beneficiaries agreed upon by the common part of both agreements. Also, the only motive of surprise is that this duality of different agreements – on one hand, a framework agreement, on the other hand the implementation contract – was not clearly diagnosed[12] despite not only of its pregnancy, but also its explanatory force. This explains that, for example, in the context of a group insurance, which covers the risk of invalidity for the borrowers of a bank, a client - subscriber of the insurance policy cannot be subject to a restrictive amendment of the definition of the risk covered by an amendment of the group contract during the period of the guarantee.[13] Indeed, the implementation contract carried out by the individual acceptance of the insurance is definitively formed under the conditions of the promise of contract at the date of acceptance by the beneficiary and as a separate contract, the subsequent amendments of the terms of the promise included in the framework agreement do not apply to it. By expressing its intention by which it approves and creates it, the third party breaks the genetic link between the matrix and the implementation, between the promised contract and the contract entered into.

B.- The effect of the contract entered into

The acceptance by the beneficiary of the contractual provision for the benefit of a third party leads to a division, and a consecutive juxtaposition of two contractual realities substantially connected but legally separated. The framework agreement, founder of the promise of the contract provided for, first survives as an element distinct of this "double contractual situation".[14] At least, if the provision includes other beneficiaries, customers or members of the stipulator for which the possibility of entering into the promised contract on their own behalf remains. The other element of this duality resides in the new contract formed by the acceptance. Contract created, of course, by the acceptance of the promise provided for, but entered into by the legal independence of the own contractual relationship between the promisor and the beneficiary of the framework agreement. Detached from it, the contract thrives under the authority of a specific binding power in accordance with the potentially bilateral content of the promised contract.  In accordance with it, as a contractual debtor, the beneficiary of the provision becomes a party to the contract and will be personally liable for the price, premium, indemnity or cost provided for as a condition of the accepted promise of contract. This is precisely where the secrecy of the orthodoxy sensed by the French High Court in the aforementioned decisions, but misused by the statement that the provision for the benefit of a third party would not exclude the beneficiary "from having to fulfil certain obligations". In the aforementioned decisions, the Court did not recognise that the provisions for the benefit of third parties in question are about the promise of a determined contract and not the performance of a service. In such a case, it is not from the provision itself that results in an obligation for which the accepting beneficiary is liable. On the contrary, it results only from the terms of the contract agreed upon by the acceptance of the promise of the contract provided for.  The provision in itself, which is only a potential contract, only vests in the beneficiary a right to enter into it in its predetermined content. And as we know, this right considered in its individuality does not give rise to any correlative obligation, imply any connected charge or is not doubled by an inherent duty. Therefore, we cannot say that the provision gives an obligation which is not related to itself; because the obligation or charge to be undertaken by the accepting beneficiary is not provided as such, it does not express a specific volition of the stipulator, but the pure effect of the contract entered into by the acceptance of the third party of a open promise of contract in his

We can see from this analysis of things, that the pure concept of the provision for the benefit of a third party which would not itself hold the beneficiary to any obligation[15] is preserved; without any explanatory contortion – which disqualifies too complicated glosses – or insipid appeal to the flexible malleability of the provision. Gaining (or planting?) coherence, even due to an orthodoxy, which is a bit blind"[16] is worth all the euphoria of the complaisance argued in denaturing the archetypes.

**Key words:**

**CONTRACTS AND OBLIGATIONS** * Contract * Provision for the benefit of a third party * Subject matter * Promise of contract * Contractual Option

---

[1] French High Court. 1st civ, 21 Nov. 1978, *D.* 1980.309, note C. Carreau; *Defrénois* 1979, s. 32077, p. 1176,   n° 50, obs, J.-L. Aubert; *JCP* 1980.II.19315, note P. Rodière; *Bull. civ.* I, n° 356; 8 Dec. 1987, *Bull. civ.* I,          n° 343; *D.* 1989. *Sum.* 233, obs. J.-L. Aubert; *RTD civ.* 1988.532, obs. J. Mestre.

[2] G. Venandet, La stipulation pour autrui avec obligation acceptée par le tiers bénéficiaire, *JCP ed. N* 1990.I.11.

[3] G. Flattet, *Les contrats pour le compte d'autrui*, Thesis, Paris, 1950, n° 106.

[4] Such is the case of La SAFER de Lorraine in the *Lebert* matter.

[5] F. Terré, P. Simler, Y. Lequette, *Droit civil – Les obligations*, Précis Dalloz, 5th ed., n° 183.

[6] French High Court. 3rd civ., 2 Jul. 1969, *Bull. civ.* III, n° 541; *Defrénois* 1970.36, and D. 1970.150, note J.-L. Aubert; 17 Apr. 1984, *D.* 1985.234, note I. Najjar; *RTD civ.* 1985.178, obs. P. Rémy.

[7] In particular: J.-L. Aubert, note prec, *Defrénois* 1970.36.

[8] F. Collart Dutilleul, *Les contrats préparatoires à la vente d'immeuble*, Sirey, 1988, n° 31.

[9] The framework agreement, which does not indeed present any contractual usefulness of the stipulator, indeed loses any reason of being if the promise of contract that it includes cannot be accepted by the beneficiary (ies) of the cancelled provision.

[10] J. Ghestin, *Traité de droit civil, Les effets du contrat*, LGDJ, 1992, p. 838, n° 857.

[11] Except if, like in the *Lebert* matter, the agreement to be entered into provides for a formal agreement to which it subjects its validity. In this instance, it would have been sufficient for the acceptance of the son Lebert to be given in such a form in the determined timeframe.

[12] See however under the decisions referred to in the text: J. – L. Aubert, notes prec., note n° 1, which weighs up well "a double contractual relationship" without however specifying clearly the contract formed by the acceptance of the beneficiary. See also for a definition of a contract for the benefit of a third party: J. Ghestin, *op. cit.*, p. 834, n° 855.

[13] French High Court, 1st civ, 5 Dec. 1978, *Defrénois,* art. 32093, p. 1232, obs. J. –L. Aubert, French consumer code, s. L. 312-9, 2°.

[14] J.-L. Aubert, obs. prec, *Defrénois* 1979.1235.

[15] French High Court. 3rd civ., 10 Apr. 1973, *D.* 1974.21, note C. Larroumet.

[16] G. Venandet, *loc. cit.*, n° 14.

Recueil Dalloz © Editions Dalloz 2011



Exhibit 39

# CIVIL LAW
Philippe MALAURIE - Laurent AYNÈS

# OBLIGATIONS

Philippe MALAURIE
Laurent AYNÈS
Philippe STOFFEL-MUNCK

4th Edition

## ALLEN & OVERY
## LIBRARY

**DEFRÉNOIS**

Lextenso éditions



# OBLIGATIONS



[...] This strictness was regrettable and was repealed by the law of 13 July 1930 in relation to insurances (Insurance Code, s. L. 132-8). Today, we recognise a provision for the benefit of a third party insofar as the parties can postpone the effects of their agreement until the birth of the beneficiary. An individual can be future and determinable at the same time.

**815. Acceptance and rescission.** – It is not necessary for the beneficiary to acquire his right that he accepts the provision. The originality of this concept clearly holds from the fact that his right occurs prior to his acceptance, it occurs from the date of the inception of the contract between the promisor and the stipulator.  His consent does not give rise to his right[35]: thus, the provision for the benefit of a third party derogates from section 1165.

Acceptance by the beneficiary reinforces the provision for the benefit of a third party that the stipulator will no longer be able to rescind. It can be express, but often results from the behaviour of the beneficiary, in particular the fact that he exercises his right.

Prior to acceptance, the stipulator can rescind the provision for the benefit of a third party, even by a will, which will only become effective after his death.[36] Rescission can also be deduced from the actions of the stipulator, incompatible with maintaining the right of the beneficiary, which is called an implied rescission.[37]

**816. Group insurance.** – In the context of a group insurance, a bank (or an employer) enters into a contract with an insurance company in order to cover the risks of death, unemployment and disability of the members of a group (borrowers or employees). The French High Court sees such provision as a provision for the benefit of a third party. The French High Court draws several conclusions from this. Thus, if the risk occurs, the insurance company replaces the borrower who is then released and if he paid, he made a payment that was not due that he can repeat.[38] Also, by applying the principle by which the provision for the benefit of a third party cannot be rescinded in case of acceptance by the third party beneficiary, the French High Court decided that after the subscription of the insured (borrower or employee), a limitation of cover resulting from a subsequent amendment cannot be opposed to it.[39]

The legal nature of a group insurance is controversial. The provision for the benefit of a third party does not explain everything: in a group insurance linked to a loan, it is the lender who becomes the sole and unique creditor of the insurance company; the borrower, presumed third party beneficiary,

[35] For ex.: French High Court. Com, 23 Feb. 1993, *Defrénois* 1993, s. 35617, n° 101, obs. L. Aynès; *RTD civ.* 1994.99, obs J. Mestre; n.p.B.: "*the acceptance by the beneficiaries was not necessary in the relationship between them and the promisor*"; See however: French High Court. civ. 1st, 10 June 1992, *Bull. civ.* , n° 174; *D.*, 1992.693, note J.-L. Aubert: "*If the beneficiary of a gratuitous contract, which provides for the payment of an allowance in the event of the death of the insured, dies prior to his acceptance, the secondary beneficiaires, but not his heirs are entitled to the allowance*".
[36] French High Court. civ. 1st, 24 June 1969, *Bull. civ.* I, n° 246; *D.*, 1969.544; *Gaz. Pal.*, 1969.II.246: "*the provision according to which the benefit of an insurance is allocated to a determined beneficiary only becomes irrevocable if it accepts it, and the rescission of the provision while the stipulator is alive is unilateral and must produce effect, even if it is only known by the promisor and the third party beneficiary  after the death of the stipulator; this rescission may include a will.*"
[37] See in particular A. TONGLET, "La révocation implicite du tiers bénéficiaire d'une stipulation pour autrui", *LPA*, n° 172, 29 August 2000, p. 4 et seq.
[38] French High Court. civ. 1st, 14 Nov. 1995, *Bull. civ.* I, n° 404; *Defrénois* 1996, s. 36354, n° 59, obs. Ph. Delebecque.
[39] French High Court. civ. 1st, 5 Dec. 1978, *Bull. civ.* I, n° 371; *D.*, 1979.401, note Berr and Groutel; *Defrénois* 1979, s. 32093, n° 62, obs. J.-L. Aubert: "[…] *P. was the beneficiary of the provision included in the contract entered into between the bank and the insurance company; this provision had become irrevocable towards the spouses P. because they had given their acceptance*"; French High Court. civ. 1st, 26 April 1983, *Bull. civ.* I, n° 129; L., 13 July 1979, s. 6 of the Law of 31 December 1989, concerning insurances that are not linked to the reimbursement of a loan, authorises the subcriber and the insurance company to modify guaranties provided that they first inform the subscriber (Insurance Code, s. L. 140-4).



has no right against the insurer. In the example of a group insurance subscribed by an employer or an association, the premium is due by the third party beneficiary who then becomes the debtor, which the provision for the benefit of a third party does not explain. Besides, case law is not faithful to this analysis.[40] It would be better to consider that with some authors, group insurance relating to a loan is a contract which only has effects between the banker and the insurer, the borrower being the insured head. The other effects of the operation would be the result of the loan contract.

## II. — Effects

The effects of the provision for the benefit of a third party must be distinctly examined in relation to the three relationships in question: between the stipulator and the promisor, between the third party and the promisor, and between the third party and the stipulator.

**817. Between the stipulator and the promisor**. — The stipulator and the promisor are bound by the main contract. It is obvious that rights and obligations resulting from it must be performed: for example, the promisor can require from the stipulator to perform the commitments made towards him.

Are added to the special relationships resulting from the annexed provision: the stipulator is interested in the legal relationships created by the provision and may check its implementation. If the promisor does not perform his obligations towards the beneficiary, the stipulator may commence proceedings in relation to rescission (he will take back the service he has provided) or specific performance[41] or contractual liability[42]; actions for which he has at least a moral interest: forcing the promisor to perform the service he owes to a third party.

---

[40] Ex.: French High Court. civ. 1st, 22 May 2008, *Bull. civ.* I, n° 145; *RTD civ.* 2008, 477, obs. B. Fages: *"Although a consequence of a provision for the benefit of a third party, a subscription to an insurance contract does create a direct contractual relationship from a bilateral nature between the subscriber and the insurer, who agrees with it, whose provisions as such must comply with the aforementioned text (Consumer Code. s. L. 132-1)"*; decided that a group insurance contract is then a contract concluded between the insurer and a consumer for the application of the law of unconscionable clauses. In reality, the subject matter of the provision for the benefit of a third party is the right of entering into an insurance contract directly with the insurer; after the subscription, the stipulator completely steps aside; he is not personally the debtor for premiums. His role is close to that of an agent. *Below*, n° 819.

[41] French High Court. civ. 1st, 12 Jul. 1956, *Bull. civ.* I, n° 306; *D.*, 1956.749, n. J. Radouant: *"if the beneficiary of a provision for the benefit of a third party obtains its own direct right against the promisor, the stipulator is at least entitled to commence an action in performance of the promise subscribed by the debtor"*. In this instance, Perret, the purchaser of the shares of the company de Virieu committed to invest $60 million in the company de V. to the vendor, Fornas; this commitment having not been fulfilled, the company de V. filed for bankruptcy. Fornas sued Perret *"so that he be ordered to pay to the company $60 million for which he was the debtor."* The Court of Appeal dismissed him: *"he could not commence an action which normally only belonged to the company"*. Appeal allowed.

[42] 1st ex: French High Court. Com. 14 May 1979, *Bull. civ.* IV, n° 153; *D.*, 1980.157, n. Chr. Larroumet: *"the stipulator (a) is entitled to cite his commitment undertaken by the promisor for the benefit of a third party"*; in this instance, the vendor of a business is committed to recruit all the personnel which the purchaser would make redundant; if the vendor does not perform his obligation, it was decided that the purchaser may claim damages as he would be itself required to pay compensation to the personnel who was made redundant. 2nd ex.: a contingency fund has the capacity to require a group insurer to perform insurance contracts for the benefit of its members: French High Court. civ. 1st, 7 June 1989, see *above* n° 816.



Exhibit 40

RDCO2008-4-008

Revue des contrats, 01 October 2008, n° 4, P. 1135 – All rights reserved

**Contracts**

## f) Provision for the benefit of a third party

HC[1]. Civ 1st, 22 May 2008, appeal n° 05-21822, LEDC, July 2008, p.4, obs. G. Pillet

Although it is a consequence of a provision for the benefit of a third party, the subscription to a group insurance contract will create a contractual relationship of a bilateral nature between the subscriber and the insurer who agrees to it, the provisions of which are subject as such to the provisions of section L.132-1 of the French Consumer Code.

Group insurance contract; provision for the benefit of a third party; bilateral contractual relationship between the insurer and the subscriber.

The limits of use of the provision for the benefit of a third party in relation to a group insurance. – our friends of the column "Contracts of consumer" would forgive me for stepping onto their patch and mention a decision, which is evidently of their "competence" as it is in relation to the scope of the protection against abusive clauses and the interpretation of clauses provided for in a consumer contract. But if we choose to cross this symbolic border which separates the respective columns, it is because it leads us to wonder about the relevance of grounds developed by the French High Court to make its decision, grounds which rely on the exploitation of contractual mechanisms of common law[2].

In this instance, a personal loan consumer which subscribed to a group insurance contract entered into by the credit institution and an insurance company made a claim for the deletion of the clause provided in this contract, which provided for the exclusion of risk coverage by the insurer by arguing that it was abusive. The judges of merits had dismissed it because the clause in dispute was provided by the contract entered into by the credit institution and the insurance company, it did not fall in the scope of section L.132-1 of the Consumer Code which grants the judge the power of deleting the abusive clauses provided that the clauses had been provided for in the contract entered into between a professional and a consumer. In this instance, the consumer of an insured credit was only a third party to a contract between two professionals in which the clause in dispute had been provided for: it did not fall in the scope of the specific legal protection. In accordance with section L.132-1 of the Consumer Code, the French High Court censured the decision of the judges of merits on the ground that: "Although it is a consequence of a provision for the benefit of a third party, the subscription to a group insurance contract will create a contractual relationship of a bilateral nature between the subscriber and the insurer who agrees to it, the provisions of which are subject as such to the provisions of the aforementioned section".

For the first civil division of the French High Court, we understand it if the consumer of an insured credit falls in the scope of the legal protection against the abusive clauses, as it is organised by the

---

[1]Translator's note: HC means the French High Court.
[2] Translator's note: "common" in the sense ordinary (opposite to special), rather than the Anglo-Saxon "common law".

Consumer Code, it is because it is its subscription to the group insurance contract that creates a direct and bilateral contractual relationship between the insurer and him.

What is, in accordance with the common[3] law of contract, stimulating in this decision, it is the reference to the provision for the benefit of a third party maintained by the Court, while today it seems quite conceivable to oust it to explain the specific contractual situation of the insured. Indeed, this reference to the provision for the benefit of a third party to describe the relationships between the insurance company and the insured borrower leads them to believe that the group insurance contract relies on this contractual triangular figure: the insurance company (the promisor) entered into a contract with the credit institution (the stipulator) in which it commits for the benefit of future borrowers-consumers (third party beneficiaries) of the latter. However, as stated in the letter of the decision, "although it is the consequence of the provision for the benefit of a party", the subscription of the third party beneficiary to the group insurance contract provides for the effects which are otherwise more significant than a simple provision for the benefit of a third party. Indeed, while the latter only creates a personal debt against the promisor for the benefit of a third party beneficiary, in the studied case it is a direct and bilateral contractual and direct relationship, which is created between the promisor and the third party beneficiary. In other words, while, in principle by the effect of the provision for the benefit of a third party, a third party becomes the creditor and benefits from the right of debt in relation to a group insurance against the promisor, the third party to the original contract entered into between the promisor and the stipulator becomes the co-contractor of the promisor. If we think about it more closely and assess the various phases of the contractual process, we come to wonder, after other things, whether the reference to the mechanism of the provision for the benefit of a third party to identify the situation of the insured borrower is not a pure and simple artifice. Firstly, because "the borrower, the presumed third party beneficiary, has no right against the insurer (Ph. Malaurie, L. Aynès and Ph. Stoffel-Munck, Les obligations, Defrénois, 2007, spec., n° 816). Then, because, from the creation of a direct contractual relationship with the insurer, the insured has the obligation (payment of premiums) which is not accessory to its right (if such a right exists...) but which constitutes its consideration, hence the bilateral nature of a contractual relationship with the insured; this is hardly consistent with the classical situation of a third party beneficiary of a provision for the benefit of a third party as the commitments which weighs on him "cannot be considered as attached to its right, but as a genuine consideration" (H. Groutel, F. Leduc, Ph. Pierre and M. Asselin, Traité du contrat d'assurance terrestre, Litec, 2008, spec. n° 2455). Finally, because at the time when the insurance comes into play, when the risk covered has occurred, it is then the credit institution which is in the situation of the creditor of the insurer-promisor (Ph. Malaurie, L. Aynès and Ph. Stoffel-Munck, Les obligations, op. et loc. cit.) ; solution besides stated in the decision of 14 November 1995, in which the French High Court stated that: "the credit institution, beneficiary of the group insurance contract to which the subscriber gave its subscription and in accordance with which in a case of a disaster, the insurer must substitute itself to it for the reimbursement of the balance of the guaranteed loans, directly collects at that time the benefit of the insurance by the effect of the provision made to its benefit, which is equivalent to the payment of the debt by the borrower and discharges the latter." (HC. Civ. 1st, 14 Nov. 1995, Bull. civ.I, n° 404).

Many reasons to definitely debunk a provision for the benefit of a third party to explain the contractual situation of the borrower which subscribed to a group insurance company, to stop reasoning from a unique contract, bilateral in its inception but triangular in its effects and to definitely recognise the idea of the duality of contracts. Therefore, it seems appropriate to consider that the group insurance firstly relies on a framework contract entered into by a credit institution and the insurance company,

---

[3] See translator's note n° 2



collective insurance contracts which prefigures and organises the entering into of other contracts, a mixture of individual contracts which will be created by the subscription of the consumers borrowers of the credit institution. In fact, "the subscription of a group contract by a credit institution has itself only the finality to allow the organised deployment of insurances to come" (H. Groudel, F. Leduc, Ph. Pierre and M. Asselin, Traité du contrat d'assurance terrestre, op. cit, spec. n° 2447). As provided in the framework contract of insurance, the insurance company promises the credit institution to conclude in the contractual conditions determined in the individual insurance contracts. At a pinch, we could then detect a provision for the benefit of a third party which is reduced to create a right which is "itself net of liabilities and created ab initio" for the benefit of the borrowers (H. Groutel, F. Leduc, Ph. Pierre and M. Asselin, Traité du contrat d'assurance terrestre, op. cit., spec. n° 2455). On one hand, consent of the insurance company which by the effect of the framework contract, has committed to the credit institution only to assess the subscription applications forwarded by the latter on behalf of the borrowers (...) On the other hand, consent of the applicant for insurance" (H. Groutel, F. Leduc, Ph. Pierre and M. Asselin, Traité du contrat d'assurance, op. cit., spec., n° 2455). By its subscription, which allows "the entering into of a personal contract within a collective contract" (B. Beignier, Droit du contrat d'assurance, PUF, 1999, spec. n° 180), the borrower, customer of the credit institution, becomes therefore the co-contractor of the insurer to which it is exclusively linked and the contract which links them creates reciprocal and interdependent obligations, which is a sign of its bilateral character.

And this is therefore because the individual contract entered into between the subscriber and the insurer is an insurance contract which prefigured in the framework contract entered into between the latter and the credit institution, that its configuration, in other words the obligations that it creates and the provisions that it includes, necessarily derives from the collective contract.

Many reasons to decide, as it was done by the French High Court that the credit consumer, party to an insurance contract entered into in the performance of the insurance framework contract, is perfectly justified to require the deletion of the abusive clause provided in the latter and transposed in the former.

We will specify that after having decided that the consumer could therefore benefit from the protective legislation against the abusive clauses, the French High Court automatically held the ground resulting from the breach of section L.133-2 of the Consumer Code.  Text which, in any doubt, requires the judge to interpret the contract in the sense the most favourable to the consumer. Concerning this side of the decision, we will refer to the observations of the specialists of the consumer law which "peg away" in another column of this Journal. We will simply note that the French High Court applies section L.141-4 of the Consumer Code, resulting from the Act of 3 January 2008 by anticipation in accordance with which "the judge may automatically raise all the provisions of the current code in the dispute arising from its application".  Is it necessary to specify that the rule provides for a considerable improvement of the protection of consumers in today's law (on this precise subject matter, see. D. Fenouillet, in RDC 2008, p.352).

**Denis MAZEAUD**



Exhibit 41

PRIVATE LAW                                    PRECIS

Civil Law

# Obligations

François Terré

Philippe Simler

Yves Lequette

10th Edition

DALLOZ



Civil Law

# Obligations

10th Edition

2009

**François Terré**

Emeritus professor at Panthéon-Assas University (Paris II)

Member of the Institute

**Philippe Simler**

Emeritus professor at the University of Strasbourg

Honorary Dean of the Faculty of Law,

Political Sciences and Management of Strasbourg

**Yves Lequette**

Professor at Panthéon-Assas University (Paris II)

DALLOZ



184. ***1• Contractual Negotiations*** – The contractual negotiations correspond to what is called the "preliminary period" during which the future contracting parties exchange their point of views, formulate and discuss proposals that they mutually make to each other in order to determine the content of the contract, without being assured of entering into that contract. This phase is essential, because the balance of powers in the contract and the quality of its drafting depend on how smoothly these negotiations go.

Focusing on a simplified outline of the formation of contracts, the Civil Code is silent on this preliminary period. So is, which is more surprising, the United Nations Convention on Contracts for the International Sale of Goods. It was thus left to case law to answer the two main questions, which these negotiations pose:

    a) What are the obligations of the parties during these contractual negotiations?

    b) When assessing the results of the negotiations, what is the threshold from which the contract is deemed to be entered into if the parties agree upon certain elements?

185. **a)** ***Obligations of the Negotiators. The common**[i] **law*** – The pre-contractual period is governed by two concepts: freedom and good faith.[1]

**Freedom**. Each party must be able to freely stop the negotiations. This is so in the traditional conception of contracts. Being an essential part of the functioning of the market economy, the contractual freedom assumes that one can run parallel negotiations[2], compare various proposals, choose the most advantageous proposals and therefore terminate the negotiations with those who proposed the less advantageous proposals.

**Good Faith.** It governs the performance of a contract (s. 1134, para. 3) but also its formation.[3] The parties must negotiate in good faith.

Case law combines these two directives according to the following method. If, in principle, the parties are free to terminate the negotiations, they however are liable if the termination is wrongful by nature.[4] This is true not only if the author of the termination is driven by an intention to harm its partner,

---

[1] See J. Schmidt, La période précontractuelle en droit français, *RID comp.* 1990.545 et seq.; Les accords précontractuels en droit français, in *Les principales clauses des contrats conclus entre professionnels,* 1990, p. 9 et seq.; La sanction de la faute précontractuelle, *RTD civ.* 1974.46 et seq.; D. Mazeaud, Mystères et paradoxes de la période précontractuelle, *Mélanges Ghestin*, 2001, p. 637, especially, p. 641; P. Mousseron, Conduite des négociations contractuelles et responsabilité civile délictuelle, RTD *com.* 1998.243; J. Ghestin, La responsabilité délictuelle pour rupture abusive des pourparlers, *JCP* 2007.1.155 and 157.

[2] Versailles, 5 March 1992, *Bull. Joly,* 1992.636 note J. Schmidt, *RTD civ.* 1992.752, obs. J. Mestre; read with Com., 15 Dec. 1992, *RJDA* 1993, n° 260, *RTD civ.* 1993.577, obs. J. Mestre.

[3] P. .Jourdain, La bonne foi dans la formation du contrat, *Trav. Ass. H. Capitant* 1992, p. 121 et seq. The commentary on the Unidroit Principles for international commercial contracts specifies that the parties must act in good faith during the negotiations.

[4] The concept of wrong which is not understood strictly is often used by case law as a means to find a balance between the exercise of a freedom and the need to moralise the behaviour of individuals. For example, this is the case for the freedom of marriage and of breaking the engagement, or even the freedom of commencing proceedings.

NATIONAL ACCREDITATION AUTHORITY FOR TRANSLATORS AND INTERPRETERS
NAATI No. 57513
VERONIQUE MORGAN-SMITH
TRANSLATOR
ENGLISH <-> FRENCH
©

but also when he acts in *bad faith*[1], or even with blameworthy irresponsibility[2] during the negotiations. If one of the interested parties makes its partner trust it and then betrays this trust, it may then be liable.[3] The more the negotiations have progressed[4] or if a professional is involved, the greater this trust will be. In this regard, the key period is constituted by the expression of an offer to enter into a contract, *stricto sensu*. By addressing to its partner a firm and definite proposition to enter into a determined contract, the offeror makes its partner trust him, trust which would be betrayed by a premature withdrawal of the offer.

   For all practical purposes, the fault consists of initiating the negotiations without having any serious intention to enter into a contract[5], in order to deter the partner from negotiating with a third party or to obtain the disclosure of secrets, of maintaining the uncertainty of the potential co-contracting party without any real and serious reason[6], of initiating the negotiations without mentioning the necessity of a loan and continuing these negotiations without mentioning that he did not obtain this loan[7], of negotiating using a very exaggerated price and at the same time undertaking parallel negotiations for the same thing with another potential co-contracting party using a price that is clearly inferior[8], of prolonging negotiations knowing they will not reach an agreement[9], or even of "suddenly and unilaterally terminating the negotiations which were already progressed with no legitimate reason".[10] Conversely, the termination of negotiations is not wrongful

---

[1] Civ. 1ᵉ, 12 April 1976, *Bull. civ.* I. n° 122, p. 98, *Defrénois* 1977, p. 389, obs. J.-L. Aubert; Com., 26 Nov. 2003, *Manoukian, Bull civ.* IV, n° 186, D. 2004, p.869, note A.-S. Dupré-Dallemagne, *JCP* 2004.I.163, n° 18, obs. G. Viney, *JCP* E 2004, p. 738, obs. Stoffel-Munck, *RDC* 2004, p. 257, obs. D. Mazeaud, *RTD civ.* 2004, p. 80, obs. Mestre and Fages, *Grands arrêts*, vol. 2, n° 142; Paris, 10 March 2000, *JCP* 2001 II 10470, note F. Violet.

[2] Com., 22 Feb. 1994, *Bull. civ.* IV, n° 79, p.79, *RJDA* 1994, n° 765, p. 611, *RTD civ*. 1994.849, obs. J. Mestre, *RJ com.* 1996. 105, obs. Karini.

[3] Com. 11 July 2000, *CCC* 2000, n° 174; Paris 13 Dec. 1984, *RTD civ.* 1986.97, obs. J. Mestre (it is not an wrongful termination so long as the party who terminated them did not lead its partner to be believe that they would reach an agreement).

[4] Civ. 1ᵉ, 14 June 2000, *CCC* 2000, n° 157, note Leveneur.

[5] Rennes, 8 July 1929, *DH* 1929.548.

[6] Paris, 19 Jan. 2001, *D.* 2001 IR p. 677.

[7] Civ. 1ᵉ, 6 June 1998, *JCP* 1998.II.10066, note B. Fages, *Defrénois* 1998.743, obs., D. Mazeaud.

[8] Civ. 2ⁿᵈ, 4 June 1997, *RTD civ.* 1997.921, obs. J. Mestre.

[9] Com. 22 Feb. 1994, *Bull. civ.* IV, n° 72, p. 55, *RTD civ.* 1994.850, obs. J. Mestre: 7 April 1998, *D.* 1999.514, note P. Chauvel.

[10] Com. 20 March 1972, *Bull civ.* IV n° 93, p. 90, *JCP* 1973 II 17543, note J. Schmidt, *RTD civ.* 1972, p. 779, obs. G. Durry; 7 Jan. and 22 April 1997, *D.* 1998.45, note P. Chauvel, *RTD civ.* 1997.651, obs. Mestre; read with Paris 13 May 1989, *RTD civ.* 1989.736, obs. J. Mestre; Riom, 10 June 1992, *RJDA* 1992, n° 893, p. 732, *RTD civ.* 1993.343, obs. J. Mestre; Agen 21 August 2002, *JCP* 2003.II.10162, note A. Lecourt.

if it is justified by a legitimate reason: disagreement as to the price, incapacity to meet the technical requirements that were sought, economic difficulties.[1]

In order not to jeopardize excessively the contractual freedom, judges will require an established and unquestionable fault.[2] The simple fact of entering, even knowingly, into a contract with a party which had commenced negotiations with a third party does not itself constitute a fault for which the author could be liable, except if this is motivated by the intention to harm or accompanied by deceptive conduct.[3]

This however does not mean that this liability is contractual. The theory according to which a preliminary contract would exist by which the parties agree to implicitly answer to the other party about the faults that it commits during the negotiations[4], was clearly rejected by case law. It is a liability in tort (see *below*, n° 409).[5]

The victim will be compensated for its loss and receive damages for the losses incurred, that is, the costs incurred due to the negotiations. The question is whether the loss of a chance of making profits that would be expected from the execution of the contract may be compensated receives a negative answer.[6] Finally, specific performance, which would result in the forced execution of the proposed contract, should not be

---

[1] Com. 20 Nov. 2007, *RTD civ*. 2008.101, obs. B.Fages. See J. Ghestin, art. prec., JCP 2007.I.155, n° 27.

[2] Pau, 14 Jan. 1969, *D*. 1969, p. 716: "one cannot easily recognise that a professional may be liable for not continuing the negotiations and for negotiating with a competitor without seriously restricting the principles of contractual freedom and commercial security; in other words, the fault *in contrahendo* must be established and unquestionable" *(Translator's note: "in contrahendo" means entering into a contract)*; read with Com. 10 June 1986, *Bull. civ*. IV, n° 123, p. 104, *RTD com*. 1987.570, obs. Hémard and Bouloc. For an example of a legitimate reason for termination of negotiations, see Bourges, 19 Oct. 2000, *JCP* 2001, IV.2003.

[3] Com., 26 Nov. 2003, prec. It is different if the third party also participates in the breach of a contract validly entered into (*below*, n° 494).

[4] Ihering, De la *culpa in contrahendo* ou des dommages-intérêts dans les conventions nulles ou restées imparfaites, *Oeuvres choisies*, translation by Meulenaere, vol. II, p. 1-100. For an in depth analysis of the thesis of Ihering, See E. Gaudemet, *Théorie génerale des obligations,* New ed, by H. Desbois and J. Gaudemet, 1965, p. 195 et seq.

[5] Com. 11 Jan. 1984, *Bull. civ*. IV, n° 16, p. 23, *RTD civ*. 1985, p. 159, obs. J. Mestre; See also Civ. 3rd, 3 Oct. 1972, *Bull*. civ. III. n° 491, p. 359 which bases its dismissal on the sole ground of sections 1382 and 1383; Com. 12 Feb. 2002, *CCC* 2002, n° 90, obs. Leveneur; read with Com. 23 May 1989, *JCP* E 1989, II. 18761, *RTD civ*. 1989.736, obs. J. Mestre. Pre-contractual disputes are not subject to the general terms and conditions of one of the parties, in particular concerning jurisdiction clauses, even in the case where the negotiators have continuous dealings with each other in relation to other contracts (Com. 9 April 1996, *Bull. civ*.. IV, n° 117, p. 99 *RTD civ*. 1997.121, obs. Mestre). *CJCE* 17 Sept. 2002, *JCP* 2003.I.152, n° 8, obs. Viney, *Defrénois* 2003, p. 254, obs. Libchaber (application of section 5-3 of the Brussels Convention of 27 September 1968).

[6] Com., 26 Nov. 2003, prec; Civ. 3rd, 28 June 2006, *JCP* 2006.II.10130, note O. Deshayes, *CCC* 2006, n° 223, note Leveneur, *RDC* 2006.1069, obs. D. Mazeaud, *Defrénois* 2006.1858, obs. Libchaber, *RTD civ*. 2006.754, obs. Mestre and Fages; 7 Jan. 2009, *RTD civ*. 2009.113, obs. B. Fages. Concerning this issue, see O. Deshayes, Le dommage précontractuel, *RTD com*. 2004, p. 187; M. Fabre-Magnan, *De l'obligation d'information dans les contrats,* thesis Paris I, ed. 1992, n° 601 et seq. However, case law considers the loss of a chance of entering into a contract with a third party as a loss which may be compensated: Com., 7 April 1998, *JCP* E 1999.579, note J. Schmidt-Szalewski.

upheld.  If the victim himself had committed a fault by being reckless, this would be a contributory liability, which would lead to the damages that he is entitled to be reduced.[1]

Maybe because, in the relevant sectors, there is a sort of dogma which says that "one is free not to continue negotiations even if they are at an advanced stage"[2], also without any doubt because the genuine sanction for such practices is the reputation of the company, actions in liability in this area of law were relatively rare. They are more frequent today because of, without any doubt, the importance of the incurred costs and of the economic stakes.

The focus is therefore on the wrongful termination of negotiations but it should not overshadow the fact that these may be terminated by a mutual agreement of the parties. In this case, the payment of an indemnity may sometimes be due, for example if one of the parties used the premises provided by the other party during the negotiations.[3]

186.  ***Contractual Organisation of Negotiations*** – The length and complexity of the negotiations is often proportional to the importance of the proposed contract. In order to facilitate these negotiations, the interested parties may enter into agreements – often called letter of intent, preliminary agreement, temporary contract, or contract of negotiation[4] – of which the purpose is to organise the negotiation process.  These agreements define the objectives that the parties propose to reach and may specify the conditions of the negotiation process: the timeframe within which the negotiations will have to occur, the person who may initiate these negotiations, types of discussions… Consequently, it results from it a double obligation which is not in tort anymore, but contractual: the obligation to negotiate, and the obligation to negotiate in good faith. The first obligation is analysed as an obligation of performance-guarantee, that is to say that each of the parties may be liable if they have not taken the required initiatives within a determined timeframe, whereas the second one is a simple obligation of best endeavours: each party commits to make serious and constructive propositions[1], but do not promise to reach an agreement. As required by contractual freedom! As in the previous hypothesis, the breach of this obligation may give rise to damages, but not to the forced execution of the contract as compensation.

Sometimes, this preliminary contract provides for *accessory obligations* of which the purpose is to determine the frame of the negotiation. [...]

---

[i] Translator's note: "common" in the sense ordinary (opposite to special), rather than the Anglo-Saxon "common law".

---

[1] Civ. 1st, 5 Nov. 1996, *RTD civ.* 1998.97, obs. J. Mestre; Com. 15 Oct. 2002, *RJDA* 2003, n° 218, *RTD civ.* 2003, p. 282, obs. J. Mestre and B. Fages. Concerning this issue, see P. Chauvel, Rupture des pourparlers et responsabilité délictuelle, *Droit et patrimoine*, 1996, n° 43, especially n° 27.
[2] G. Durry, *RTD civ.* 1972, p. 780.
[3] Civ. 3rd, 3 July 2002, *RJDA* 2002, n° 971, *RTD civ.* 2002.804, obs. Mestre and Fages.
[4] Concerning the diversity of the terms used, see F. Labarthe, *La notion de document contractuel*, thesis Paris I, ed. 1994, n° 211, p.135.
[1] Civ. 3rd, 16 April 1973, *Bull. civ.* III, n° 287, p. 207.



Exhibit 42

Document 1 of 1

JurisClasseur Contrats - Distribution > Fasc. 200 : CONTRACTS "INTUITU PERSONÆ" > I. – Concept of "intuitu personæ"

Quotation : 01,2012

Last updated: 01 September 2001

# B. Relativity

**32. Variable Intensity and « Shape » -** The concept of *intuitu personæ* is polymorphous, as we just saw while we examined the consideration of natural or legal persons (*intuitu firmæ*) or companies (*intuitu societatis*) and, for all of these, we took into account their identity, qualities, reputation, or solvency. That is not all, far from it. It is possible to affirm that the concept of *intuitu personæ*, in all its diverse forms, has a variable intensity and "shape". Several manifestations of this fact will be examined.

**33. Subjective or Objective -** *Intuitu personæ* is subjective when it is inspired by feelings (in gratuitous contracts), whereas it is objective (in contracts for valuable consideration) when it is used to redirect the contractual risks (See *above nᵒ 4*). The difference between the two is that, depending on the situation, *intuitu personæ* will be an essential element of the contract or simply a guarantee of its performance (See *below n° 36*). Even when it is objective, *intuitu personæ* can still include a part of subjectivity. If the contractual risks are always objective, the qualities taken into consideration to mitigate these risks can be subjective (human qualities such as seriousness, or talent) or objective (financial capacity, competence). In either case, a person other than the one who is considering it can assess the exact role of *intuitu personæ*: however, this third party will not necessarily be able to verify the existence of the expected qualities if they are subjective. *Intuitu personæ* can thus be more or less controlled, depending on the situation. Moreover, the co-contracting parties are more or less interchangeable (See *below n° 79 to 83*). This fundamental distinction will meet or explain other distinctions.

**34. Is it of the Essence of Contracts? -** *Intuitu personæ* is of the essence or nature of some contracts (gifts, loans, contract on the person of the partner himself. – See *below n° 38 to 39)* unless there is either a special clause or circumstance (gift to a foundation, donation of blood or sperm: in this case, the feeling towards a person fades before a feeling towards mankind or part of it). It can then be put forward that, when *intuitu personæ* is essential, its absence is a cause of nullity of the contract, whereas if non-essential, the parties can remove it (*G. Kostic, L'intuitu personæ dans les contrats de droit privé: Thesis, prec, n° 1, n° 29*). But, conversely, the consideration of the person results in other cases from the sole will of the parties, who artificially imprint this character, expressly or implicitly, in their contract, in any contracts, even contracts of sale (for example, an object to which one is sentimentally attached and, having to sell it, does not want it to "fall" into anybody's hands). This idea that there are contracts in which *intuitu personæ* would be the product of the essence of the agreement justifies that case law strictly judges the clauses limiting the consideration of the person in a contract that should include it, either by limiting its scope of application (clause specifying the elements taken into consideration by the franchisee, *French High Court. com., 24 Nov. 2009, n° 08-16.428: Comm. com. élect. 2010, comm. 42, note M. Malaurie-Vignal; D. 2009, p. 2932; Bull. Joly Sociétés 2010, p. 243, obs. X. Vamparys),* or by monitoring its application by the beneficiary of the clause (exclusion of the consideration of the person of the franchisor by the franchisee, *Court of Appeal of Dijon, 8 Apr. 2010: JCP E 2010, 1412, note N. Dissaux. – Court of Appeal of Paris, 2 Apr. 2008: JurisData n° 2008-364977).*



**35. Subject matter, Consideration or Guarantee of the Contract –** In some contracts, the person of the contracting parties itself is the subject matter of the obligation: medical or surgical contract, contract for the creation of literacy, artistic or intellectual work (such as a contract with a lawyer), contract entered into in order to use the voice or the image of a person, boarder agreement[i], etc. In others, such as in gratuitous contracts (*animus donandi,* most of the time motivated by feelings), it is their consideration. Being the subject matter or consideration of a contract, if this element comes to disappear, the contract must disappear as well: that is what explains that it is, in principle, non-transferable. Finally, in a third category, the person, being neither the subject matter nor the consideration, and even if taken into consideration, does not affect the binding power of the contract; it is only a way of reinforcing the reality (or even the quality) of the performance of the contract, a bit like a guarantee: the co-contracting party was chosen because of his competence, reputation, solvency, but he could be replaced, if necessary (See *below n° 79 to 83)*, by someone possessing the same competence, reputation, and solvency. It is usually the case, for example, in the context of sale agreements, supply agreements, licence agreements, franchising agreements, maintenance agreements, security agreements, agency agreements, insurance agreements etc. when they were entered into *intuitu personæ*.

**36. Bilateral or Unilateral –** If the person of the co-contracting party is the subject matter or the consideration of the obligation, *intuitu personæ* is bilateral, not because, *ab initio,* each party would have entered into a contract only in consideration of the other party (fundamentally, very often, the donee, somewhat ungrateful, gives more importance to the donation than to the person of the donor!), but because *intuitu personæ* is related to the very structure of the obligation; because of the nature of the subject matter or considerations, these concepts cannot be considered unilaterally: the consideration of the obligation of one of the parties is the subject matter of the obligation of the other and *vice-versa* (at least in bilateral contracts). Therefore, in these circumstances, *intuitu personæ* affects the quality of the creditor as well as of the debtor. But if *intuitu personæ* (or *firmæ* as well as *societatis*) was only applied to the contract as a minor guarantee of performance (See *below n° 36)*, it is the existence of risks for one of the co-contracting parties, or for both of them, that will determine if it is unilateral or bilateral (For example, see, *C. Vilmart, Conséquences de la cession d'un franchiseur sur les contrats des parfumeurs franchisés: JCP E 2004, 1191)*.

**37. Simple or Multiple –** We call simple the *intuitu personæ* that is ordinary, bilateral or unilateral, and multiple that which consists of two or three successive steps: an *intuitu personæ* obligation is attached to another *intuitu personæ* obligation to which, for example, it provides a guarantee. It is so for the surety[ii] - which provides a personal guarantee intrinsically marked with *intuitu personae* - guaranteeing a contract which was itself entered into *intuitu personæ*. This does not tell us what the obligations of the surety are, that is to perform by itself or to pay damages (See *below n° 75)*.

**38. Isolated or Grouped –** The classic shape of a contract is an agreement entered into between two persons. It is often replaced nowadays by groups of contracts (according to the title of the famous work of *B. Teyssié, pref. J.-M. Mousseron, Les groupes de contrats: LGDJ, 1975)*. In various distribution networks, a group of *intuitu personæ* contracts is created by addition, each distributor being integrated into the network because of his qualities. Also, in the construction of a large complex, the main contractor, chosen by the client because of his skills and reputation, can contract out various parts of the works to be performed, while asking for the approval of the client. A chain of *intuitu personæ* sub-contracts will thus be created, the approval of the client serving the purpose of preserving the personal aspect of the legal relationship (See *above n° 27*, on groups of companies).



**39. Inclusion or Exclusion –** In our view, *intuitu personæ* of inclusion means a clause that compels a person, natural or legal, of which/whom the qualities suggest that the creditor will be satisfied, to perform an obligation. *Intuitu personæ* of exclusion is less about obtaining the commitment of someone that he will perform himself an obligation than preventing him from contracting out without asking the approval of the creditor (See *below n° 69)*. To tell the truth, these two aspects seem to be indivisibly connected.

**40. - Positive or Negative –** According to an author (*M. Contamine-Raynaud, L'intuitu personæ dans les contrats: thesis, above, n° 1, n° 180), intuitu personæ* is positive if the offeror wants to find in his potential co-contracting party a precise quality that he deems indispensable. This *intuitu personæ* would be at his discretion. In negative *intuitu personæ*, the offeror only aims to set aside certain persons who have certain flaws (for example with an approval clause), without seeking a person or a quality in particular: then his refusal could be controlled by a judge, in particular in order to verify that it is not motivated by any racial, political, religious or social considerations. However, it seems hard to differentiate these two *intuitu personæ* from each other: is the absence of a quality that is sought distinct from the existence of a quality that is unwanted? Example: what is the difference between the provision that X will not enter into a contract with someone who does not have a specific degree (negative *intuitu personæ)* and the affirmation that he will only enter into a contract with someone who has a specific degree (positive *intuitu personæ)*? Is it not simply both sides of the same thing?

**41. Obvious or Hidden –** Obviously taking a person into consideration, in full light, can be opposed to doing so in the shadow, through simulation. A simulation implies an *intuitu personæ* regarding the genuine co-contracting party, at least when it takes the form of an interposition of persons, through the use of a figurehead, also pictorially called a man of straw *(Ph. le Tourneau: Rep. civ. Dalloz, V° Mandat, n° 81)*. This practice is rather common, especially for gifts and in corporate law (in particular for the incorporation of dummy or shell corporations, *French High Court. com., 2 June 1987, n° 85-18.865: JurisData n° 1987-001260; Bull. civ. 1987, IV, n° 132)*, but also in other fields (See *French High Court. com., 27 June 1989, n° 87-17.654: JurisData n° 1989-002124; Bull. civ. 1989, IV, n° 209; D. 1990, jurispr. p. 314, note J. Bonnard*, interposition of persons to escape a contractual obligation of approval. – *French High Court. 3rd civ., 8 July 1992: JCP G 1993, II, 21982, note G. Wiederkehr)*. A simulation is a cause of nullity of the combination only if it is dishonest. Third parties who have an interest can claim the existence of a counter deed[iii] and thus reveal the genuine interested party via a declaration of simulation (Example: *French High Court. 3rd civ., 4 June 2003, n° 02-12.275: JurisData n° 2003-019276; Bull. civ. 2003, III, n° 123. – Court of Appeal of Paris, 11 July 1990: D. 1991, jurispr. p. 33, note C. Larroumet)*. In a declaration of a friend[iv] or a declaration of order, the order reveals the name of the true buyer whose identity was, until then, kept secret (*(Ph. le Tourneau, Droit de la responsabilité et des contrats, op. cit., n° 4000*, legally speaking, it is a conditional agency agreement).

**42. Static or Dynamic -** *Intuitu personæ* is static if, because of its nature (the person who is the subject matter or the consideration of the obligation), or because of an *ad hoc* clause, it is fixed *ne varietur*: changing the person would mean the termination of the contract. To this, it is possible to add the clauses that, in companies limited by shares, aim to preserve the capital balance between the shareholders or various groups of shareholders. It is dynamic if it can evolve, that is that the contract includes terms and conditions relating

to the substitution of a person in the contractual relationship through an approval clause (See *below n° 81)*. Even better, in the absence of any clause, it has been decided that "the fact that a contract was entered into by taking into account the consideration of the person of the co-contracting party is not an obstacle to the transfer of the rights and obligations of the latter to a third party so long as the other party gives his approval"



*(French High Court. com., 7 Jan. 1992, prec, n° 26.* - See *below n° 79 to 83).* When *intuitu personæ* is not of the essence of the contract, but only a way to reinforce its performance (See *above n° 35)* and prevent the risks, the parties can undo what they did: it is only the application of the contractual freedom.

**43. Temporary or Permanent –** Being static or dynamic is very well; but is *intuitu personæ* necessarily stable or can it be only short-lived? It would be possible to imagine that the consideration of the person should exist at the inception of the contract, and would then lose its power, or even disappear as time goes by, since time transforms everything and eases any fears. It is not the case: as a consideration of a contract, *intuitu personæ,* if it is of the essence of the contract or if it was artificially integrated, must remain during the whole contractual life *(intuitu personæ perseverans).* Also, if some constitutive element of the specific affinities between the parties came to disappear, the contract could then be terminated at once (See *below n° 85 to 92):* To tell the truth, its initial balance had been shattered and it had no reason to exist anymore. Such is the sword of Damoclès always hanging over *intuitu personæ* contracts, paradoxically stupid when it comes to their performance, by the addition of this additional requirement at the time of their formation.

**44. Light or Powerful -** *Intuitu personæ* aims to the reality of the performance itself as well as to the quality of the performance. And, concerning the latter, the aspects of the personality that may have been determining are rather diverse (seriousness, morality, talent, originality, punctuality, solvency, etc.). If we take for example partnerships, a general partnership and a limited partnership: *intuitu personæ* is stronger in the first one than in the second one. The intensity of *intuitu personæ* can thus vary from one contract to the other: between the one that is essential (natural?) and the one that is secondary (artificial?), there is room for various nuances; this explains that the consequences of the importance of the person of the co-contracting party are not systematically and integrally found in all agreements taking into account the consideration of the person.

**45. During the Contract or After the Contract –** Verified during the negotiations, possibly specified in a preliminary contract, such as a preferential agreement, *intuitu personæ* will dominate the performance of the contract that was entered into in consideration of the person. But, by definition, it will logically cease to exist at the same time as the contract which included it. However, it can remain, either after the death of the principal (*post mortem* agency agreement, See *below n° 97),* or, outside of this marginal case, after the termination of the contract, through a non-compete clause. Because of the qualities of the person, a franchisee for example, the customers have a relationship with him and maybe would be more loyal, after the termination of contract, to him than to the brand of the franchisor: the purpose of this clause is to prevent this. In the end, it is as if the person was taken into consideration backwards, which translates into an obligation not to do something *(J.-Y. Mazan and R. Samson, Contrat de collaborateur libéral et clause de non-concurrence: la nécessaire recherche d'une harmonie: JCP E 2009, 1332).*

© LexisNexis SA

---

i Translator's note: Translation chosen for the concept of "bail à nourriture". Such an agreement is an agreement by which one of the contracting parties commits to feed, house and look after the other party in exchange for a financial consideration.
ii Translator's note: translation chose for the concept of "caution".
iii Translator's note: translation chosen for the concept of "contre-lettre".
iv Translator's note: Translation chosen for the concept of "élection d'ami". Such declaration is a declaration of the agent stating the name of his principal.

Exhibit 43

# CIVIL LAW
Philippe MALAURIE - Laurent AYNÈS

# OBLIGATIONS

Philippe MALAURIE
Laurent AYNÈS
Philippe STOFFEL-MUNCK

4th edition

## ALLEN & OVERY
## LIBRARY

**DEFRÉNOIS**

lextenso éditions



# OBLIGATIONS



## SECTION III

## DISTINCTIONS ACCORDING TO THE QUALITY OF CONTRACTING PARTIES

By focusing on the quality of contracting parties, for a long time, the distinction was made between the contracts with and without *intuitus personae* (para.1); today a distinction taking into account the quality of the consumer has been added (para.2).

### § 1. CONTRACTS WITH OR WITHOUT INTUITUS PERSONAE

**420. Consideration of the person.** — A contract shows *intuitus personae*[63] when its creation and its performance depend on the person of the co-contracting party[64]. The consideration of the person then constitutes the cause of commitment, in the same sense as the English term *consideration*, which is the near equivalent of cause, as defined in French law.

In this type of contracts, an offer can only be accepted if the offeror has given his agreement to the personality of the acceptor; an error on the identity results in nullity; the payment cannot be made by a third party; the contract is intransferable to a living person and non-inheritable in the case of death; the sub-contract is prohibited[65].

There are some types of contracts which are usually entered into *intuitu personae* because of the trust that must unite the contracting parties; for example, the agency contract. Conversely, in some other more numerous cases, the contract is not usually concluded *intuitu personae* because their goal is before all the completion of economic service; for example, in the case of a sale or a lease. The intention of the parties can withdraw *intuitus personae* where it usually finds itself and, conversely, put it where it normally does not exist.

*Intuitus personae is* often relative; it is more or less marked. Sometimes, *intuitus personae* is subjective and takes into account the individual capacities of the person *("because it was him, because it was me")*[66]; sometimes, on the other hand, *intuitus personae* is more objective and takes into account only certain qualities of the person (for ex.: possession of a diploma). Moreover, *intuitus personae* can be bilateral[67] or more often unilateral[68]. For example, concerning the agreement that a car manufacturer gives to its dealer; the question is often raised at the time of the sale of the dealership; the courts now control the refusal of agreement by sanctioning wrongful refusal.[69]

---

[63] *Intuitus personae* = consideration of the person. Etymology: from Latin *tueor, eri* = to look at; *intueor* = to attentively look at. *See*: the tutor.

[64] **Biblio.**: M. CONTAMINE-RAYNAUD, *L'intuitus personae dans les contrats*, th. Paris II, 1974, ronéo; D. HOUTCIEFF, "Contribution à l'étude de l'*intuitus personae", RTD civ.,* 2003.3.

[65] *Below* n° 837.

[66] MONTAIGNE, for his friendship with La Boétie: "*Si on me presse de dire pourquoi je l'aimais… " Essais*, I, Ch. 28, *De l'amitié.*

[67] Ex: an employment contract binding a journalist to a newspaper editor, or a sportsman to his club, or an actor to a cinema producer…: for each of the parties, consideration of the other person (talent, reputation, skill, political, religious or moral opinions, honesty…) is determinant.

[68] 1ˢᵗ ex: employment contract or ordinary works contract, or contract work or services: the identity of the employer or the client is generally not determinant for the employee or the contractor. But the personal capacities of the employee or the contractor (even more for an architect, a lawyer, a doctor…) are for the employer or the client. 2ⁿᵈ ex: leasing things (lease): the capacities of the lessor are generally irrelevant to the tenant, whereas those of the latter (solvability, punctuality, honesty, education…) can matter to the lessor.

[69] Ex. French High Court. com., 5 Oct. 2004, *sté Rover France, Bull. civ.* IV, n° 181; *JCP* G, 2005.I.114, n° 11, obs. M. Chagny; *RDC* 2005.288, obs. Ph. Stoffel-Munck; the court of appeal had sentenced the franchisor: "*the absence of agreement was n...*

Some authors assume that *intuitus personae* recoils in contemporary law, which would be more sensitive to the economic objectives of the contract than to its subjective data; for example, the transfer of the contract would today be easier, or even sometimes imposed[70]. On the other hand, others insist on its reform with an *intuitus firmae*, applicable to groups[71].

## § 2. QUALITY OF THE CONSUMER

**421. Definitions: consumer and professional.** — For more than thirty years, numerous legislative reforms have revealed a new classification, which is attached to the quality of the contracting party, distinguishing the contracts entered into between professionals and consumers[72] from the other contracts, entered into between professionals or between consumers[73]. The contracts entered into between professionals and consumers are subject to consumer law, which aims to protect consumers. The notion of consumer is objectively defined in an objective way by the consumer contracts[74], that is the contracts which are not entered into for the needs of a professional activity[75].

European law requires that the consumer be an individual[76], whereas French law accepts them to be a body corporate if they do not act "in a professional capacity"[77].

---

*motivated by the personality of the candidate."* Appeal: these grounds are "*inappropriate to establish that the criticised refusal of agreement, which could be based on motives other than those relating to the personality of the candidate, was illegitimate.*" Thus, the decision 1) does not exclude the judicial review of the agreement; 2°) reveals that *intuitus personae* cannot only depend on the capacities of the person, but also on other data, such as the company's viability. See *Les contrats spéciaux*, coll. Droit civil.

[70] AZOULAI, "L'élimination de *l'intuitus personae* dans le contrat", in *La tendance à la stabilité du rapport contractuel*, p.1 et seq., textbook conducted by P. Durand, LGDJ, 1960.
[71] M. CONTAMINE-RAYNAUD, *op. cit.*, *above*, n° 61; Cath. PRIETO, *La société contractante*, vol. Aix, PUAM, 1994, n°s 700 et seq., shows that often, in particular in the retail contracts, what matters is not the body corporate but the individuals who constitute it.
[72] **Etymology:** double: 1) from Latin *consummo, are* = to add up, to achieve (ex: the consummation of marriage); from Latin *consumo, ere* = to destroy.
[73] **Biblio.:** J. CALAIS-AULOY and F. STEINMETZ, *Droit de la consommation*, 7th ed., Dalloz, 2006; N. SAUPHANOR, *L'influence du droit de la consommation sur le système juridique*, vol. Paris I, LGDJ 2001, pref. J. Ghestin; D. MAZEAUD, "Droit commun du contrat et droit de la consommation. Nouvelles frontières". *Ét. J. Calais-Auloy*, Dalloz 2004, p.697 et seq.
[74] Even patients in their relationships with their doctors: French High Court. crim., 15 May 1984, *Bull. crim.*, n° 178; D., 1985.106, n. Marguery: "*people with whom a doctor enters into a medical contract must be considered [...] as consumers of the services in question*"; A. LAUDE, "Le consommateur de soins", D., 2000, chron. 415.
[75] Consistent and well-supplied case law: ex. French High Court. civ. 1st, 8 Jul. 2003, *sol. implicite*, *JCP* G, 2004.II.10107, n. C. Duvert and N. Sauphanor-Brouillaud, I.123, n° 18, obs. N. Sauphanor-Brouillaud; n.p.B; with slightly different grounds, the instance and the solution were identical in French High Court. civ. 1st, 3 May 1998, *Bull. civ.* I, n° 125; *D.*, 1990.60, n. J. Karita de Van; in this instance, a priest had bought a copying machine via a lease-purchase for the needs of his parish; the lease-purchase company sued him for debt recovery, until his demand of the nullity of the contract was accepted because it was in breach of consumer law: "*there was no direct link between the activity of the parish of Mr. Darty, France who as the priest of the Saint-Laurent parish, had entered into the contracts in dispute and the purchase of a copying machine; it was rightfully decided that he was entitled to put forward the protective clauses of the Consumer Code, regardless of whether this "purchase" was made for the needs of the parish*". Conversely, this means that consumer law does not apply to contracts entered into by a professional with another professional for the needs of their profession. **Biblio.:** A lot of articles on this matter; ex.: G. PAISANT, "A la recherche du consommateur", *JCP* G, 2003.I.121.
[76] Concerning unconscionable clauses: CJCE, 22 Nov. 2001, *D.*, 2002.2929, n. Pizzio; *JCP* G, 2002.II.10047, n. G. Paisant; *Contrats, conc., consom.*, 2002. n° 18, obs. P.G. Raymond.
[77] Also for the application of s. L. 132-1 con. c. relating to wrongful clauses: French High Court. civ. 1st, 15 March 2005, *Bull. civ.* I, n° 135; *D.*, 2005.1948, n. Boujeka; *JCP* G 2005.II.10114, n. G. Paisant; *JCP* E, 2006.769, n. Bakouche; *RDC*, 2005.740, obs. D. Fenouillet; *Defrénois* 2005.2009.

NAATI No. 57513
VERONIQUE MORGAN-SMITH
TRANSLATOR
ENGLISH <-> FRENCH
NATIONAL ACCREDITATION AUTHORITY FOR TRANSLATORS AND INTERPRETERS

Exhibit 44

Document 1 of 1

JurisClasseur Contrats – Distribution > Fasc. 200 : CONTRACT "INTUITU PERSONAE"

Quotation: 01.2012

Last updated: 1 September 2001

# Introduction

**1. - The Unawareness in Celebrity** - *Intuitu personæ*: it is a common expression, known and used daily by all legal practitioners and of which, however, the key lines remain blurry (we already encountered a similar paradox about four years ago, when examining the *nemo auditur* rule[1]: as if the formulation in Latin, which came relatively late, created some sort of respectful fear, preventing scrutiny of its mysteries. – See also *below n° 61* about the *affectio societatis[2]*). It is true that it is ignored by the Civil Code, as it was by Pothier: the concept that it expresses only appears in a few sections of the Civil Code, section 1110 in relation to an error as to the person, section 1237 in relation to the termination of obligations to do something, and section 1879 in relation to the death of the borrower. Of course, it led to several important studies of good quality (firstly, *F. Valleur, L'intuitu personæ dans les contrats: thesis, Paris, 1938; M. Contamine-Raynaud, L'intuitu personæ dans les contrats: thesis, Paris II, 1974.* - Then, later, *G. Kostic, L'intuitu personæ dans les contrats de droit privé: thesis, Paris V, 1997; D. Krajeski, L'intuitu personæ dans les contrats: thesis, Toulouse, 1998)*. However, neither manuals, nor treatises, encyclopaedias or handbooks about contract law specifically discuss this concept and only consider some of its effects (especially the question of the error as to the person in contracts entered into *intuitu personæ*); the same goes for manuals, of which the table of contents does not usually include the expression (for a historical study of the concept and of its different conceptions, *D. Arteil, L'exécution du contrat par un non-contractant, pref. Rose-Noëlle Schütz: LGDJ, 2006, n° 48 et seq.)*.

**2. - Definition –** The expression *intuitu personæ* is used to characterise operations "in which the personality of one of the parties is deemed to be essential […], because of its specific skills, of the nature of the service that is expected of it, etc." *(G. Cornu, Vocabulaire juridique, V° Intuitu personæ: PUF, 2007)*. In reality, it would be suitable to add the opposition between "personal" contracts and "impersonal" contracts to the great doctrinal classifications of contracts to complement those included in the Civil Code. In the former, the consideration of the person of the partner is material (was attentively examined, in accordance with the etymology of the word *intuitu*, which comes from *intueor*), whereas it is irrelevant in the latter. A specific regime is related to the definition of an *intuitu personæ* contract (See *below n° 62 to 97)*. In this category, the intention to bind oneself (*animus negotii contrahendi*) is insufficient: the *delectus personarum* (according to the expression used by American legal practitioners) is material, that is to say, the will to deal with such individual or corporation (comp. *G. Kostic, thesis prec., n° 1, n° 6)*.  An author introduced the concept of *intuitu personæ* as expressing the legal (contractual) consequences of the way one contracting party sees the other, whether it is indulgent or exigent *(D. Krajeski, thesis prec., n° 1, n° 4)*. In our world dominated by economic value where money is power, anonymity in exchanges seems to have to predominate, especially since contracts tend to become "standardised contracts". However, the consideration of the person did not disappear, far from it and it has even experienced a development in certain areas (See *below n° 10)*. Besides, unlike what certain minds which are far from reality may think, friendship is not unknown in the business world; better, there are countries where the negotiations concerning the inceptions of an important contract will succeed only if the negotiators have precisely managed an atmosphere of trust and affinities approaching a true friendship. Besides feelings, the development of



contracts for the supply of services contributes to the persistence of the concept of *intuitu personæ*, by the fact that the quality of the performance depends on the qualities of the co-contracting party. That makes pertinent the question of the choice of the co-contracting party.

**3. - Proof –** The rule to be laid down is that, in principle, the person of the co-contracting party is not taken into consideration in the contract *(Civil Code, s. 1110, para. 2)*. Henceforth, it falls on the person who claims the existence of this particularity to prove it *(CA Paris, 16 Oct. 2008)*. However, gratuitous contracts, like those which are about a personal service of intellectual nature and implement a peculiar know-how are assumed to have been entered into *intuitu personæ*, unless it is proven otherwise. Subject to no appeal, the judges of merits will assess this classification *(French High Court. com., 10 July 1989: Dr. informatique et télécoms 1993, n° 1, p. 26, obs. J. H.)*.

**4. - Implementation of Contractual Freedom –** In reality, the fact that the person of the creditor or debtor is taken into account in such and such contract, is only an implementation of the contractual freedom of contract which allows the parties to shape the contract the way they want, provided that they comply with the provisions of public order[3]. The contractual freedom is, first and foremost, a freedom of choice, of election, which is part of the circle of affinity relationships between human beings, at the heart of the social life (comp., *G. Moser, Les relations interpersonnelles: PUF, 1994*, but who limits his analysis to friendly and amorous relationships). *Intuitu personæ* can be one element of those which constitute the whole contract, of which various clauses balance each other. Louis XIV advised his grandson, who was going to Spain to become King Philippe V, "create bonds with no one". This precept, maybe suitable for heroes (above the human condition) and for wise men (not concerned with earthly things), cannot guide ordinary men. The daily life of each person is woven, more or less, by feelings or interests (in more concrete words: heart and wallet): these are two of the main motives for action which wittingly justifies taking into consideration the person of the co-contracting party. This opposition is not purely descriptive and is not limited to motives for action: it is operative and affects the legal regime of *intuitu personæ*, which itself is marked by this duality. It is possible to oppose feelings to risks. In gratuitous contracts, *intuitu personæ* is the consideration, which expresses a feeling. On the other hand, in contracts for valuable consideration, the intensity and existence of *intuitu personæ* are determined by the presence of contractual risks linked to the circumstance or the nature of the service to be performed. The qualities of the co-contracting party are precisely intended to prevent them *(D. Krajeski, L'intuitu personæ dans les contrats: thesis prec., n° 1, n° 208)*; henceforth, *intuitu personæ* is objective. As a perfect illustration of the contractual freedom, *intuitu personae* cannot be based on any of these two motives, and results from the sole will to link the contract to the person of the co-contracting party so as to avoid sub-contracting (See *below n° 69 to 73)* or the assignment of the contract (See *below n° 79 to 83)*. In these hypotheses, the contract will often include a clause providing for the existence of the consideration of the person and its definite consequences (for example, *CA Paris, 18 March 2009: JurisData n° 2009-023237)*.

**5. - The Limits of this freedom. Example: rules regulating competition –** As always, this freedom is not complete; it is even commonplace to state that it has been constantly declining since the First World War. In this area, as in numerous others, the contractual freedom is not whole anymore. A very significative example can be found in the rules regulating competition. These rules prohibit certain practises relating to prices (re-sale at a loss, *Commercial Code, s. L. 442-2*. – Minimum price or mandatory margin, *Commercial Code., s. L. 442-5)* and a whole set of practices restricting competition at the micro-economic level (discriminatory practices, *Commercial Code, s. L. 442-6, I, 1°*. – Practices of exploiting a partner, *Commercial Code, s. L. 442-6, I, 2°*. – Or sudden break downs of relationships, *Commercial Code, L. 442-6, I, 5°)*. These interdictions are reinforced by measures



which aim to ensure the transparency of the market. In reflecting on the motives of the interdiction of the restrictive practices between competitors and the obligation of transparency, it appears that it is the equality between competitors that is sought for. In law, in business, it is possible, and even advised, to be virtuous *(Ph. le Tourneau, L'éthique des affaires et du management au XXIe siècle Dalloz-Dunod, 2000, 2e tirage 2001)*, but favouritism, specific dilection, intimate inclination, are not always called for; sometimes, these feelings are even sometimes illegal if they are concretely expressed through one of the practises sanctioned by the Commercial Code, which therefore paralyses the play of *intuitu personæ (Ph. le Tourneau, Liberté, égalité et fraternité dans le droit de la concurrence: Gaz. Pal. 1991, 2, doctr, p. 348)*. However, an objective conception of *intuitu personæ* leads to another perspective on this point: the objective *intuitu personæ* adapts itself to the aforementioned provisions of the Commercial Code, insofar as the exceptions match the interest to enter into an *intuitu personæ* contract: bad faith, insolvency, the will to create a new distribution network (In that sense, see *D. Krajeski, L'intuitu personæ dans les contrats, thesis, prec., n° 113)*.

**6. - Other examples: companies in difficulty** – Another more noticeable limitation results from the rules applicable to companies in difficulty. During a company insolvency procedure, the law allows the continuation and assignment of contracts (See *below n° 90)*.  Other texts that could be cited here that, directly or indirectly, limit *intuitu personæ*, such as many sections of the Consumer Code or the law relating to residential leases; indeed, by instituting regimes of public order[4], the personalisation of contracts in these areas is more difficult to implement. But, these comments lose their relevance when it comes to an objective conception of *intuitu personæ* (See *below n° 33)*.

**7. - Other examples: respect of individuals** – According to the limits of *intuitu personæ*, it is necessary to consider texts which do not point out the behaviour of the contracting parties but limit the opinion that they have of each other. Certain qualities of an individual cannot be taken into consideration to give grounds for a contract or its content. Section 225-1 of the Criminal Code generally prohibits any distinction based on origin, sex, marital status, pregnancy, physical appearance, health, disabilities, genetic characteristics, lifestyle, sexual orientation, age, political beliefs, union activity, the fact that a person genuinely or supposedly belongs or does not belong to a determined ethnic group, nation, race, or religion. This prohibition is applicable to the choices of corporations. It applies to most of the contractual relationships through section 225-2 of the same Code; and it is, here or there, taken over by specific provisions. In particular, sections L. 1132-1 et seq. of the Labour Code prohibit any discrimination in work relationships, from recruitment to dismissal or during the career management. Essentially, the idea expressed in these different texts is that individuals cannot make contracts a place of expression of political and religious ideas. One of the aforementioned elements cannot then be taken into consideration if it is not linked to the lawful subject matter or consideration of a contract. This first and already important limitation is not the only one. If certain qualities cannot, most of the time, be taken into consideration, certain means of knowledge of these qualities are prohibited. These prohibited means are those that would infringe on personal privacy or human dignity (such as tailing, See *French High Court. soc., 26 Nov. 2002, n° 00-42.401: JurisData n° 2002-016588; JCP G 2003, I, 150, obs. B. Teyssié; D. 2003, p. 1858, note J.-M. Bruguière)*.

**8. - Specificity of consumer law regarding "intuitu personæ"** – Consumer law, which has considerably developed, introduced a particularity regarding *intuitu personæ*. Certainly, like any mandatory law, it limits the contractual freedom. But, in addition, it is itself surrounded by *intuitu*



*personæ* as it takes into account the quality of individuals, consumers and professionals, to protect the former and extend the obligations of the others. However, this *intuitu personæ*, which is pre-determined for each category of people, results from the law, whereas *intuitu personæ* that we will examine is contractual. And, in consumer law, individuals not being defined by the legislator as definite human beings of flesh and blood, but as broad and vague categories (consumers, professionals), its determination is rather difficult whereas in general the co-contracting party who is chosen for his identity or his qualities is clearly known in any case (for a global analysis of the legal origin of *intuitu personæ*, See., *D. Krajeski, thesis prec., n° 1, n° 230).*

**9. - The Decline of "Intuitu Personæ" due to the Practice** – On the one hand, the practice has led to a diminution of the role of *intuitu personæ*, in particular because of the multiplication of standardised contracts (in the supermarket sector), perfectly anonymous, and insofar as some contracts, considered as gratuitous contracts by the Civil Code, have in fact become contracts for valuable consideration, used by professionals, such as agency or bailment *(Ph. le Tourneau, Droit de la responsabilité et des contrats: Dalloz Action, 2012-2013, n° 6264 and 3983).* But nothing prohibits choosing an agent or a custodian based on his personal qualities.

**10. - Permanence and evolution of "intuitu personæ"** – Thus, *intuitu personæ* abandoned some grounds in certain areas of which we just gave a few examples (there would be others *M. Azoulai, L'élimination de l'intuitu personæ dans le contrat, in P. Durand and alii, La tendance à la stabilité du rapport contractuel: LGDJ, 1960, p.* 1, a little excessive, mostly based on a study of corporate law). But, on the other hand, this concept has conquered new grounds, in particular in numerous recent commercial contracts, for example franchising or maintenance contracts (See, *below n° 26),* technical support, engineering, advertising, large international contracts, opening of credit, in venture capital companies (See, *below n° 59 to 61)* and, generally speaking, in corporate groups (See *below n° 25 to 29, intuitu firmæ).* In other words, *intuitu personæ* is a living and also changing concept: it keeps evolving and, if it is hunted from one side, it rises on the other side (comp., *M.-E. André, L'intuitu personæ dans les contrats entre professionnels, Mél. M. Cabrillac: Dalloz Litec, 1991, p. 23).*

**11. - Plan** – As *intuitu personæ* is a concept that is still used, it must be examined by itself (I), by proposing distinctions (A), which will be a way to define it in a more precise manner, by showing its relativity (B) and its scope of application (C). Then we will examine its legal regime (II).

© LexisNexis SA

---

[1] Translator's note: nemo auditur propriam turpitudinem allegans is a civil law maxim which may be translated into English as "no one can be heard to invoke his own turpitude"or "no one shall be heard, who invokes his own guilt".The maxim operated with another, in pari causa turpitudinis cessat repetitio (where both parties are guilty, no one may recover), to preclude a court from intervening in a dispute involving an unlawful transaction.
[2] Translator's note: affectio societatis means the intent (affectio) of future shareholders to incorporate a company (societatis) together.
[3] Translator's note:  Section 6 of the Civil Code provides that contracts cannot be in breach of public order laws.
[4] Translator's note: See above n° 3.



# Exhibit 45

Document 1 of 1.

Jurisclasseur Contracts − Distribution > Fasc. 200 : « CONTRAT "INTUITU PERSONAE" > I. Concept of « intuitu personae »

Quotation : 01,2012

Last updated: 01 September 2001

### C. Scope of Application

**46. Eliminations −** Contracts governed by public law can be entered into *intuitu personæ* (such as concessions of public utility services) or *intuitu pecuniæ* (giving a public contract to the lowest bidder). We will not deal with those subjects (concerning concessions of public utility services, see *D. Krajeski, thesis, prec, n° 1, n° 256)*. The concept of *intuitu personæ* is often rather lively in employment contracts (for example, *Court of Appeal of Brussels, 28 Oct. 1997: D. 1998, jurispr. p. 598, note B. Edelman,* expressly defining the link between salaried journalists and a newspaper company as a *intuitu personæ* relationship. - *J. Candat and Y. Paguerre, L'intuitu personæ dans le reclassement des salariés: JCP S 2010, 1212).* We will however remove straightaway employment contracts from the scope of this study, because they are the subject matter of a specific discipline and are subject to special rules intended to prevent some aspect of the employee's personality to be taken into account too much (See especially *M.-A. Peano, L'intuitu personæ dans le contrat de travail: Dr. social 1995, p. 129; G. Kostic, L'intuitu personæ dans les contrats de droit privé: thesis, prec, n° 1, n° 144; D. Krajeski, thesis, prec, n° 1, n° 262*; Add, *M. Despax, La vie extra-professionnelle du salarié et son incidence sur le contrat de travail: JCP G 1963, I, 1776; J.-E. Fidélité et exécution du contrat de travail: Dr. social 1991, p. 376).* The concept of *intuitu personae* may however have an essential role in this area: its existence will sometimes allow the reclassification of a contract in order to apply such specific rules to the latter (The personality of the general manager was stipulated as essential in a company, application of section L. 7321-1 of the Labour Code: *French High Court. soc., 1st Feb. 2011, n° 08-45. 223, 08-45.295, 09-65.999. − French High Court. soc., 26 Nov. 2008, n° 06-45.104: Bull. civ. 2008, V, n° 235; D. 2009, 1251. − Court of Appeal of Versailles, 18 Jan. 2011, JurisData n° 2011-000544).*

**47. It is impossible to give a List of Contracts that are entered into "intuitu personæ" −** The first crucial observation that needs to be laid down is that it is impossible and illusory to try and draw up, on the face of it, a list of *intuitu personæ* contracts. Why? Firstly, because of the extreme diversity of contracts; mostly, because *intuitu personæ* is one element among all the elements that form a contract: it may be that it was not specially expressed, but that it implicitly results from such and such clause (such as a clause pre-approval of a new party − See *below n° 61).* Furthermore, if the parties may include this feature into a contract which, in essence, would not be *intuitu personæ,* they may also remove it from a contract which automatically comprises it, except for some exceptions (for example, a loan agreement, without this element, might be invalidated outside of the context of cash loans; however, I may lend an object not only to a precise person, but also to a group of persons, a family, a class in a school, a sports team, etc. - See *above n° 24 and 25, intuitu familiæ).* We may list, at most, contracts which are often entered into in consideration of a person. Some of them have already been encountered above (residential leases, preferential agreements, etc.). We will list some others (See *below n° 49.* - See also, the list laid out by *G. Kostic, L'intuitu personæ dans les contrats de droit privé: thesis, prec, n° 1, n° 25),* without trying to be exhaustive.

**48. Characterisation by Judges −** Also, the characterisation is left to the discretion of trial judges *(French High Court. com., 10 July 1989: Dr. informatique et télécoms 1993, n° 1, p. 26, obs. J. H.):* in the event of a dispute, it is for them to seek the presence of an *intuitu personæ* in a contract, analysing its clauses, its general economy, the professions of the parties, customs, the circumstances in which the contract was entered into… In other words, the assessment is done in a concrete manner, even if it relies on subjective and objective elements. Judges can determine fairly easily the existence

of an objective *intuitu personæ* by listing the risks linked to the contract in question (See in that regard, *D. Krajeski, thesis, prec, n° 1, n° 284*).

**49. Affection or Friendship Contracts –** The first type of contracts that are usually entered into *intuitu personæ* are charity contracts, motivated by feelings (affection or friendship): especially donations and loans. However, donations can occur in favour of an organisation (blood or sperm "banks", foundations, etc.), that is to say without taking into consideration a precise person, but a category of persons (disabled people, women wishing to undertake an *in vitro* fertilisation using donor's sperm, etc.). The Civil Code also considers powers of attorney and bailment as friendship contracts and thus as gratuitous contracts. Nowadays, these contracts are often professional and for a price *(Ph. le Tourneau, Droit de la responsabilité et des contrats, op. cit., n° 3984 and 6267)*. However, *intuitu personæ* remains important and almost automatic in powers of attorney, because of the particular trust that the principal places in the agent to whom he entrusts his business.

**50. Some Contracts for Services –** The *intuitu personæ* nature of a contract may be presumed when a contract for services focuses on the personality of the other party himself (medical or surgical contracts, actors, professional athletes, etc.), or when the activity is mainly or completely of an intellectual nature (the traditional examples are registered professions: lawyers, doctors, architects; but it is also the case for engineers in engineering contracts; for the creator of an advertising campaign, or for technical assistants). It does not mean that the consideration of the person had remained unchanged in these contracts as the other party only binds himself to one person in particular. The idea has evolved so that, at least for some of these contracts, they may be entered into with legal entities (See *above n° 24 to 29*) or allow the expected service to be performed by several persons (See *below n° 79 to 83*). But, contrary to what the authors of the Civil Code had expected, contracts for services as such, are not truly *intuitu personæ* contracts anymore (or if they have remained *intuitu personæ*, this element has become rather faint), in particular when the inception is purely or essentially physical (for example: transport or maintenance), except when applied to services that have just been specified or specific clauses (See on the role of *intuitu personæ* in contracts for hire or for services, the important developments of *J. Huet, Les principaux contrats spéciaux: LGDJ, 2nd ed. 2001, n° 32117*).

**51. Distribution Contracts –** Contracts that are used to organise distribution through intermediaries, almost always contain *intuitu personæ*: *intuitu personæ* is intrinsic to the contract (and sometimes bilateral, especially in franchising contracts). A manufacturer, sole importer, selector, or the creator of a franchise system, in short the owner of a distribution network, intends to exercise a choice as to the distributors of his products or the supplier of his services, agents, sales agents, approved or selected distributors (selective distribution), concessionaries, franchise holders. Such appointment is based on various criteria, which may range from one network to the other: skills of the candidates (or their aptitude to acquire those skills following training), sometimes their experience, their financial situation, the fact that they have premises at their disposal (as owners or lessees), etc. The intensity of the consideration of the person varies depending on the type of contract: it is in franchise contracts that it is the strongest, because of the transfer of confidential know-how (compare the grounds upon which the court based its decision in *Court of Appeal of Paris, 7 Nov. 1996: JCP G 1997, II, 22857, note P. Mousseron. – Court of Appeal of Dijon, 8 March 2011, JurisData n° 2011-007159)* and it is in selective distribution that it is the weakest because the selection criteria are not arbitrary but objective *(French High Court. com., 4 May 1999*: unpublished; *RJDA 1999, n° 777*, emphatically denies the existence of *intuitu personæ* "relationships" in a selective distribution network, which seems excessive to us): however whether a monopoly provision has been included in the contract or not does not seem decisive in that regard (in this respect, *M. Malaurie-Vignal, Intuitu personæ et liberté de la concurrence dans les contrats commerciaux: JCP E 1998, I, p. 260*. - Contra, *J. Huet, Les principaux contrats spéciaux, op. cit., n° 11614). Intuitu personæ* is translated, during a contracts' life, into all kinds of constraints and checks (*Ph. le Tourneau, Les contrats de concession : Litec Professionnels, 2nd ed. 2010. – Les contrats de franchisage: Litec Professionnels, 2nd ed. 2007; M. Behar-Touchais and G. Virassamy, Les contrats de la distribution).*

**52. Intellectual Property Contracts** – Intellectual property contracts, governed by the Code of the same name, namely publishing agreements, patent license contracts, trademark license agreements, software license contracts, are dominated by a bilateral *intuitu personæ*, that is to say from the creditor's side as well as from the debtor's side. In his important treatise, Henri Desbois dedicated a number of pages to such *intuitu personæ* (H. Desbois, Le droit d'auteur en France: Dalloz, 2nd ed. 1966, n° 589. – Add in particular, *C. Caron, Droit d'auteur et droits voisins: Litec, 2010, n° 424 and 426. - P.-Y. Gautier, Literary and artistic property: PUF, 7th ed. 2010, n° 368).* Creativity is without doubt, after charity contracts, the field in which the consideration of the person seems the most self-evident. The reason is that a piece of artwork, whatever it is, is an emanation from the personality which, more than any other act related to human life, brings to light a part of the interiority of a being: thus, in general, a creative mind does not entrust his destiny, randomly, to the first person he sees, but to a natural or legal person that he chose for their competence to make the artist's work known to the public whilst respecting it, or, conversely, use it in the most discrete manner (*Court of Appeal of Aix-en-Provence, 21 Jan. 2010, n° 2010-21).* On the margin of intellectual property, three contracts are also affected by bilateral *intuitu personæ*: firstly, transfer of know-how contracts (See on this characterisation *Ph. le Tourneau, Le parasitisme: Litec, 1998, n° 207);* then, contracts for the transfer of reputation (it would be more exact to call these contracts to share reputation; See *Ph. le Tourneau, Le parasitisme, op. cit., n° 122);* finally, (a bit misguidedly) patronage agreements, under which a paint art merchant buys in advance the work of an artist for a predetermined period of time *(P. Kayser, Un conflit de la liberté des conventions et de la liberté d'auteur – le contrat dit de mécénat, Mél. A. Audinet: PUF, 1968, p. 129).*

**53. Common Interest Mandate Agreement** – Some contracts are considered as being of common interest. Actually, in all bilateral contracts, except aleatory and leonine contracts, both parties must find their own interest therein. But this expression, which was created for mandates, legalised for commercial agents (*Section L. 134-4, paragraph 1 of the Commercial Code,),* is used to specify that the parties have the same interest in the perpetuation of that contract, so that the mandate becomes irrevocable (except *mutuus dissensus* or legitimate motive): the characterisation of being a common interest contract paralyses the discretionary ability to terminate an indefinite mandates (*Ph. le Tourneau, Droit de la responsabilité et des contrats, op. cit., n° 4129).* It would seem logical to deduce that the consideration of the personality of the agent, generally decisive, is coupled with the consideration of the person of the principal: it would be a bilateral *intuitu personæ.* However, the reification of contractual relationships, resulting from their irrevocability, may lead us to say that, on the contrary, persons fade before the subject matter of the contract, resulting in the disappearance of the *intuitu personæ.*

A singular decision of the *French High Court* drew a new and excessive consequence from the existence of a common interest mandate agreement: it admitted that the trial judges have the power to impose on a former mandated agent (commercial agent) a non-competition obligation *(French High Court. com., 25 June 1991, n° 89-20.506: JurisData n° 1991-001769; JCP E 1992, II, 303, note G. Virassamy; Bull. civ. 1991, IV, n° 236; D. 1992, jurispr. p. 249, note A. Batteur).* Thus, in a surprising way, a non-competition obligation, normally created by the law or a contract, could result from a judicial decision.

**54. -  Other Common Interest Contracts** – Section L. 330-3 of the Commercial Code creates a pre-contractual disclosure obligation in some supermarket distribution contracts, and also classifies these contracts as common interest contracts, and it is possible to deduce from this classification that they are generally entered into bilaterally and with *intuitu personæ.* In addition, this expression was used, not in an operative way, but in a descriptive way, to describe what is (or ought to be) a distributorship contract: it certainly requires a community of views and interests, as well as a greater collaboration than under other more general contracts. The law has not deemed it necessary to define the legal regime of these contracts. As a result, licensors at large, nowadays as well as before, have a discretionary right (that is to say they do not have to provide reasons for their decision) to refuse the renewal of a fixed term contract or to terminate an indefinite term contract *(Ph. le Tourneau, Droit de*

*la responsabilité et des contrats, op. cit., n° 5608)*, unless the termination is too sudden or abusive *(Commercial Code, s. L. 442-6, I, 5. - Ph. le Tourneau, op. cit., n° 5611 and 6909)*.

**55. Banking Contracts –** Most of the banking contracts are impregnated with *intuitu personæ*. Firstly, the framework agreement to open a bank account (under which the banker is not liable, unless there is an abuse of right, if he refuses to open a bank account) and the grant of a loan *(French High Court. com., 15 March 2011, n° 10-11.650)*. The same might not be true for contracts in which the bank makes a safe available to a client and ensures its security, since this obligation seems to be lacking any personal consideration.

**56. Personal Securities. Sureties. –** Because of their name, personal securities, in the forefront of which we find sureties, seem to be entered into with *intuitu personæ*, since the person taken into consideration is the main debtor. But the person taken in consideration may also be the surety and even the creditor (*C. Mouly, Les causes d'extinction du cautionnement, pref. M. Cabrillac: Litec, 1979, n° 299)*. Originally, sureties were only granted between friends or close relatives, gratuitously, but nowadays they are often granted by financial agencies against payment (in that regard, *Ph. Malaurie, L. Aynès and P. Crocq, Les sûretés, la publicité foncière: Defrénois, 2nd ed. 2009, n° 106. - Ph. Pétel, M. Cabrillac, C. Mouly and S. Cabrillac, Droit des sûretés: Litec, 9th ed. 2010, n° 47)*, which does not exclude, *a priori,* the fact that the personality of the primary debtor (the guaranteed) might be taken into consideration.

**57. Letters of Intent –** The practice has created substitutes to sureties (*J.-J. Daigre, Les substituts du cautionnement: CDE 1992, n° 6, p. 4; Ph. Simler, Les solutions de substitution au cautionnement: JCP G 1990, I, 3427)*. The simplest ones are letters of intent, which always seem to be *intuitu personæ, firmæ,* or *societatis* (at least on the part of its grantor), but their intensity is inversely proportional to the power of the commitment they create. Section 2322 of the Civil Code defines this mechanism (*Ordinance 23 March 2006*, letters of intent are mentioned in section 2287-1 among personal securities): "*a letter of intent is an undertaking to do or not to do whose purpose is the support provided to a debtor towards the performance of his obligation vis à vis his creditor*". This definition preserves the richness of letters of intent, but still limits their possibilities.

**58. Independent or Autonomous Guarantees –** The second substitute to sureties are autonomous or independent guarantees, also called, equivocally, first-demand guarantees, which give a creditor a better guarantee than a surety would. They were also integrated into the Civil Code within the personal securities category *(Section 2321 of the Civil Code – Ordinance n° 2006-346, 23 March 2006: "an undertaking under which the guarantor binds himself, in consideration of a debt subscribed by a third party, to pay a sum either on first demand or subject to terms agreed upon.")*. The undertaking thus taken on by a bank is its own; the bank must perform it on first demand (or, in accordance with a clause of the contract, on first demand upon production of specific documents), without being able to refuse under any exceptions resulting from the underlying relationship between the supplier and the buyer. (See *French High Court. com., 1st Feb. 1994: RJDA 1994, n° 617.* – The bank can however dispute the terms of the undertaking, *French High Court. com., 12 July 2005, n° 03-20.365: JurisData n° 2005-029488; JCP G 2005, I, 185, obs. Ph. Simler and Ph. Delebecque; Bull. civ. 2005, IV, n° 161)*: in that regard, it is automatic (See in particular on this type of guarantee, *Ph. Malaurie, L. Aynès and P. Crocq, Les sûretés, la publicité foncière, op. cit., n° 330. - C. Mouly, Les causes d'extinction du cautionnement, pref. M. Cabrillac, op. cit., n° 395. - A. Prüm, Les garanties à première demande. pref. B. Teyssié: Litec, 1994)*. This automatism does not exclude, *a priori,* the existence of *intuitu personæ*, neither on the part of the guarantor, nor on the part of the guaranteed or the beneficiary of the guarantee. However, for all practical purposes, they have become marketable collaterals, in return for remuneration, and the consideration of the person is not as important as it once was for sureties.

**59. Company Law –** The concept of *intuitu personæ* exists in partnerships (for a *SCEA*[1] see *French High Court. com., 12 Feb. 2008, n° 06-20.966: Dr. sociétés 2008, comm. 74, R. Mortier)*. It is particularly strong in civil companies and in specific types of partnerships: general partnerships[2]. It is

also strong regarding limited partners in limited partnerships[3], but almost disappears in partnerships limited by shares[4] *(Ph. Merle, Sociétés commerciales: Dalloz, 10th ed. 2005, n° 129, 162 and 589).* Traditionally, there was no *intuitu personæ* in share capital companies. Things have changed *(M. Cachia, Le déclin de l'anonymat dans les sociétés par action, Mél. P. Kayser: PUAM, 1979, v. 1, p. 213; S. Helot, La place de l'intuitu personæ dans la société de capitaux: D. 1991, chron. p. 143; I. Pascual, La prise en considération de la personne physique dans le droit des sociétés, prec., n° 26. - C. Prieto, La société contractante, op. cit., n° 26).* We have already given an account of the importance of personal relationships in groups of companies and the means to control those using shareholders' agreements *(P.-Y. Bérard, Les fusions à l'épreuve de l'intuitu personae: RTD com. 2007, p. 279, n° 8 et seq.; D. Mainguy, Cession de contrôle et sort des contrats de la société, prec., n° 29; G. Parléani, Les pactes d'actionnaires: Rev. sociétés 1991, p. 1. – French High Court. com., 7 March 1989, n° 87-17.212: JurisData n° 1989-000694; JCP E 1989, II, 15617, concl. M. Jéol, note Y. Reinhard, pacte de préférence).*

**60. Company Law: Continuation** – More generally, a certain personal colouration may be observed in share capital companies[5]; either pursuant to agreements outside of the articles of incorporation, such as the aforementioned shareholders agreements *(French High Court. com., 7 March 1989, prec.),* oddly those that organise "the decision making process of the company" *(J.-P. Ferret, Les pactes aménageant le processus décisionnel de la société: CDE 1992, n° 1, p. 32).* But some clauses contained in the articles of incorporation may have the same purpose, especially in public companies, such as approval clauses *(Section L.228-23 of the Commercial Code),* or pre-emption clauses. The latter give to the shareholders (or to some of them), or even to the company, the possibility or the obligation to acquire preferentially the shares that a shareholder wishes to sell. This is generally done in order to prevent the intrusion of third parties deemed undesirable; which is the same as reintroducing a certain consideration of personality. It is contrary to the abstract nature of shares and their free transferability (hence, when there is an approval clause and the proposed transferee has not been approved, the company has an obligation to acquire the shares or to make sure they are acquired, *s. L.228-24, paragraph 2 of the Commercial Code.* – See, in particular on this question, *B. Dalbiès, L'agrément dans les cessions de titres sociaux: RRJ 1994, p. 865. - J.-P. Désideri, La préférence dans les relations contractuelles, pref. J. Mestre: PUAM, 1997, n° 131. - I. Pascual, La prise en considération de la personne physique dans le droit des sociétés, prec., n° 26, n° 42; P. Blanchard, Les clauses de changement de contrôle instruments de stabilisation et de sauvegarde: RD aff. int. 2006, p. 159; Paul Le Cannu, La transformation et les tiers: Bull. Joly Sociétés 2010, p. 415).* The articles of incorporation may seem to be giving more power to *intuitu personae,* it is however necessary to note that the use of contracts may sometimes be the only possibility for shareholders to mutually control each other *(A. Morin, Intuitu personæ et sociétés cotées, prec. n° 26, especially. n° 19).* This movement has been reinforced. Firstly, by the emergence of simplified joint stock companies, of which the *intuitu personæ* nature is indisputable, in particular manifesting itself by the possibility to insert in the articles of incorporation, in accordance with the law, four clauses regarding the assignment of shares (temporary inalienability; general approval; notification of the modification of the control of one of the shareholders; compulsory assignment of shares. *J.-J. Daigre, Les clauses relatives au fonctionnement de la société: CDE 1994, n° 2, p. 11; M. Delebecque, Société par actions simplifiée et pactes d'actionnaires, in dir. A. Couret and P. Le Cannu, Société par actions simplifiée: Bull. Joly Sociétés 1994, p. 61; Benoît Le Bars, L'utilisation de la SAS dans les groupes de sociétés: Bull. Joly Sociétés 2008, p. 254).* Furthermore, it is possible to integrate the concept of *intuitu personae* in a company by issuing different types of shares depending on the types of shareholders *(S. Schiller, prec., n° 26, especially n° 38).* Finally, we are not surprise to note that the concept of *intuitu personæ* plays a sizeable role in limited liability companies[6], since they have a hybrid nature, neither partnerships, nor share capital companies *(Ph. Merle, Sociétés commerciales, prec., n° 59, n° 12 and n° 174).* A similar comment may be made regarding economic interest groups[7] *(French High Court. com., 29 Jan. 2008, n° 07-10.797).*

**61. Comparison with "Affectio Societatis"** – It is traditionally admitted, although section 1832 of the Civil Code barely mentions it, that the existence of a company implies the existence of an *affectio societatis,* the intent to associate. Just as the *intuitu personæ,* it is a vague and multiform concept. In

partnerships[8], it seems to widely match the concept of *intuitu personæ*: the associated members must have the intent to work together towards a common goal, on an equal footing, and it is even said sometimes, to treat each other as brothers *(jus fraternitatis),* which implies that they chose each other in consideration of their person. The lack of *affectio societatis* is a cause of nullity. And a dissension between the associated members (and not a simple disagreement), when it paralyses the operation of the company, justifies its winding-up *(Section 1844-7, 5° of the Civil Code. - H. Matsopoulou, La dissolution pour mésentente des associés: Rev. sociétés 1998, p. 21; I. Pascual, prec., n° 26. – French High Court. 1st civ., 18 May 1994: Bull. Joly Sociétés 1994, p. 841, note C. Prieto. – French High Court. div. mixed, 16 Dec. 2005, n° 04-10.986: JurisData n° 2005-031451; Bull. civ., div. mixed, 1994, n° 9; Defrénois 2006, s. 38364, note D. Gibirila*, judgment overturned because it allowed the winding-up of a company because of a dissension but on the grounds that it did not amount to a paralysis of the functioning of the company). This provision cannot be set aside in any way, as it is a public order provision *(French High Court. 1st civ., 18 July 1995, Seassal: D. affaires 1995, p. 72)*. But it cannot be used by the member from whom the dissension originated *(French High Court. com., 16 June 1992: Bull. Joly Sociétés 1992, p. 944, obs. P. Le Cannu)*. Judges cannot compel a partner or shareholder claimant to assign his shares to the company or to other partners or shareholders who propose to buy them *(French High Court. com., 12 March 1996: RJ com. 1997, p. 163, obs. B. Fages)*.  In share capital companies, the *affectio societatis* is considerably further away from the concept of *intuitu personæ*: the shareholders, usually, do not care about who the other shareholders are; the *affectio societatis* is then reduced to "the simple awareness of common interests" *(G. Cornu, Vocabulaire juridique, V° Affectio societatis: PUF, 2007. - N. Reboul, Remarques sur une notion conceptuelle et fonctionnelle: l'affectio societatis: Rev. sociétés 2000, p. 425)*. If this minimum requirement does not exist, there is no company (See *French High Court. com., 12 Oct. 1993: Rev. sociétés 1994, p. 283, note F. Benac-Schmidt*, redefinition of a contribution as a loan). It then corresponds to a sort of *affectio contractus* which must exist in any contract, the common wish to see a contract properly performed which, in general law, implies a more rigorous requirement: the duty of loyalty (See *above n° 15)*.

---

[1] Translator's note: French agricultural development company.
[2] Translator's note: chosen translation for "société en nom collectif".
[3] Translator's note: chosen translation for "société en commandite simple".
[4] Translator's note: chosen translation for "société en commandite par actions".
[5] Translator's note: chosen translation for "societe de capitaux", a type of company where share capital is of consideration only.
[6] Translator's note: chosen translation for "société à responsabilité limitée".
[7] Translator's note: "EIG" chosen translation for "groupement d'intérêt économique".
[8] Translator's note: chosen translation for "société de personne", i.e. a type of company or partnership where the shareholders/partners are chosen on the basis of their personality.

# Exhibit 46

4th Edition

# MANUAL

**[Logo]**



**Warning of the Editor**

Any use or electronic processing of personal data which is included in this textbook is formally prohibited.

> [Logo
> DANGER:
> PHOTOCOPYING
> KILLS BOOKS]

The logo which is included on the cover of this book deserves an explanation. Its purpose is to warn the reader against the threat, which represents the mass development of copying for the future of written work, more particularly in the areas of law, economics and management.

Indeed, the Intellectual Property Code of 1st July 1992 expressly prohibits copying for collective use without the consent of the legal beneficiaries. This practice is generalised in the tertiary education, which leads to a dramatic decrease of the purchase of books to the point that even that the possibility that the authors create new work and properly publish it is threatened.

© LexisNexis SA, 2007
Registered office : 141, rue de Javel – 75015 Paris

This work in all its components (including the *result* of the implemented knowledge, research, analysis, undertaken interpretations and more generally the choices of form and content made in the consolidation of the reproduced texts) is protected by the provisions of the Intellectual Property Code including the provisions relating to copyright. These rights are the exclusive property of LexisNexis SA. Any partial or total reproduction by whatever means, which was not authorised by the legal beneficiaries is strictly prohibited. In particular, LexisNexis reserves the right to reproduce by reprography in order to make copies of this work, in what form, for the purpose of sale, lease, advertising, promotion, or any other commercial use in accordance with the provisions of s. L. 122-10 of the Intellectual Property Code relating to the collective management of the right of reproduction by reprography.

ISBN 978-2-7110-0694-6



THE PROTECTION OF PRACTICAL INVENTIONS

The contracts regarding non patented know-how, despite being often called "licences", should be distinguished from them by their subject matter, which is not a property right, but secret non proprietary knowledge. They are business contracts, in the wider sense, where the characteristic obligation consists in the communication of confidential information (573[1]). Patent licences may be cooperation tools between businesses, including in the shape of the mutual concession of cross-licences ("cross-licensing"), or of a pool of patents ("pools") which are put in common by their holders under certain conditions (574[2]).

**274 - Regime.** Though licences are the favourite means to "transfer technology", they are subject to the legal regime of the lease of things (Civil Code s. 1708 et seq.), supplemented by a few isolated rules set out by section L.613-8 of the Intellectual Property Code (575[3]). Due to the particularly close cooperation relationship that patent licences establish between the parties, patent licences are conceived as having regard to the personal qualities of the contracting party; thus, it is marked by "*intuitus personae*" which imposes certain specific solutions. Licences are generally contracted by professionals, which excludes the application of consumer law (576[4]).

The whole of these provisions enables us to set out in detail the conditions and effects of a licence contract.

## 1º Conditions of the contract

**275 – Structure.** Licences must comply with formal conditions common to all patent contracts (see *above*, nº 252); as for substantial conditions, licences must obey the conditions set out by section 1108 of the Civil Code applicable to all contracts: the parties' consent, their capacity, a subject matter and some consideration that exist and are lawful.

---

[1](573) J. SCHMIDT-SZALEWSKI : *Rep. Com. Dalloz*, Vol. Savoir-faire, 2001, nᵒˢ 65 et seq. – J.-M. MOUSSERON, *Secret et contrat. De la fin de l'un à la fin de l'autre*, Mélanges Jean Foyer, PUF, 1997, p. 257. – Ph. DEVESA, *De la nature juridique de la licence de savoir-faire*, Mélanges J.-J. Burst, Litec, 1997, p.137.

[2](574) Y. REBOUL, *Licence de brevet : J.-Cl. Brevets*, Fasc. 4740. – P. BREESE and Y. DE KERMADEC, *La propriété intellectuelle au service de l'innovation*, Ed. Nathan, 2004, coll. "Repères pratiques", p. 94. – F. LEVEQUE and Y. MENIERE, *Économie de la propriété intellectuelle*, La Découverte, 2003, coll. "Repères", p. 106.

[3](575) J.-H. GAUDIN, *Guide pratique de l'ingénierie des licences et coopérations industrielles*, Litec, 1993. – Ph. LE TOURNEAU, *L'ingénierie, les transferts de technologie et de maitrise industrielle*, Litec, 2003. – J. AZEMA, P. KAMINA and *allii*, *Les accords de transfert de technologie*, pref. J. RAYNARD, Litec, 2005, coll. "Act. dr. entr.". Vol. 23. – J. SCHMIDT-SZALEWSKI, Les contrats d'exploitation de brevet en droit privé, in *Les contrats d'exploitation des droits de brevets d'invention*, Colloque de l'Institut de France, 10 March 2005, Ed. Tec & Doc, 2006, p. 3 – B. CARMELO, Th. WACINSKI, Ph. TRAMOY, *La récente évolution des accords de licence : Biofutur* Oct. 2006, p.57.

[4](576) Paris, 14 June 2006 : *PIBD* 2006, 836, III, 561, the regime of unconscionable consumer clauses is not applicable.



### a)  Conditions pertaining to the parties

**276 – Quality.** The licensor must hold a right on the licensed patent; either a right attached to the thing (ownership of the patent), or at least a right attached to the person (licensee granting a sub-licence).

In most cases, licences are granted by the patent holder himself, by virtue of his property right on the patented invention. […].



# Exhibit 47

CORPUS PRIVATE LAW

Directed by Nicolas Molfessis

INTELLECTUAL PROPERTY

# INDUSTRIAL PROPERTY

## Frédéric Pollaud-Dulian

[Bar Code]
**[Logo] ECONOMICA**



*[Handwritten Kf4 POL]*

*[Handwritten - K17483]*
CORPUS PRIVATE LAW

Directed by Nicolas Molfessis

# INTELLECTUAL PROPERTY

# INDUSTRIAL PROPERTY

## Frédéric Pollaud-Dulian
PPN 148319912

[Stamp]                                   [Stamp]

**[Logo] ECONOMICA**
49, rue Héricart, 75015 Paris

1/2



*In Memoriam*
Jacqueline and Marcel

© Ed. ECONOMICA, 2011

All rights of reproduction, translation, adaptation and execution reserved in all countries.



SUB-SECTION 1

# THE COMMON[i]* LAW OF VOLUNTARY LICENCES

## A. Conditions applicable to licences

**694. – Legal status.** Patent licences, which are bilateral contracts, are assimilated to lease contracts[1]: a patent holder grants a third party the whole or part of the enjoyment of his right to operate, in consideration for a royalty, whilst retaining the ownership of the patent. The rules set out in the Civil Code for lease contracts (sections 1713 et seq.) must thus be transposed to patent licences. However, when a licence is expressed to be free, it must be assimilated to a loan (section 1874 et seq. of the Civil Code). The licensee only obtains a personal right, i.e. a creditor's right against the patent holder who must ensure the licensee's peaceful enjoyment of the subject matter of the licence, and not a real[ii] right attached to the invention or the patent[2].

**695. – "Intuitu personae" character.** Authors agree to consider that licences have an "*intuitu personae*" character[3], that the consideration of the person of the licensee, of his aptitudes, of the trust he inspires in the licensor, is essential. The "*intuitus personae*" prevents the licensee from assigning his licence or from contributing his licence in consideration for shares in a company without the licensor's consent. He cannot either grant a sub-licence[4]. On the other hand, a licence may be transferred as part of a business[5], or, in the case of insolvency proceedings, within the framework of the assignment of the business as an ongoing concern (section L. 642-7 of the Commercial Code)[6].

### 1) Conditions on the substance

**696 – Quality of the licensor.** […][7]

---

[1] POUILLET, Treatise, 5th ed, n° 284; J.FOYER and M.VIVANT, p 432 and 440. *Contra*, P.MATHELY, prec, p. 322 according to who "*such assimilation is quite useless, as contracts under French law are not classified under definite categories. In truth, licences are* sui generis *contracts which are made original due to their subject matter and their aim*". See also: F. COLLART-DUTILLEUL and P. DELEBECQUE, "Contrats civils et commerciaux", 7th ed. (2004 prec., n° 360.
[2] ROUBIER, Treatise Vol. 2, n° 183-184.
[3] Concurring: J. FOYER and M. VIVANT, p. 433 and 435, A. CHVANNE and J.-J. BURST, Precis, 5th ed., n° 345, P. MATHELY, prec, p. 335; ROUBIER, Treatise, Vol. 2, n° 184; CASALONGA, treatise, Vol. 1, n° 758.
[4] Paris, 13 May 1906, D. 1908.5.1; Trib. Seine, 28 June 1933, Annales 1934, p. 38.
[5] Paris 13 December 1882, Annales, 1884, p. 88.
[6] Colmar, 13 June 1990, D. 1991 p. 97, obs. FABIANI.
[7] Paris, 30 January 1991, PIBD 1991, n° 500-III-302.



This book was printed in November 2010 in the factory of Normandie Roto Impression S.A.S.
61250 Lonrai
N$^o$ of printing: 104106
Legal deposit: November 2010

Printed in France

[Stamp]

---

i Translator's note: "common" in the sense ordinary (opposite to special), rather than the Anglo-Saxon "common law".
ii Translator's note: "real" from the latin word "*res*" (thing) i.e. attached to a thing.

# Exhibit 48

Document 1 of 1

JurisClasseur Brevets

Cote: 11,1990

# Fasc.  491: PATENT LICENCES. - Effects of a licence contract. – Termination of a licence contract

**Jean-Jacques BURST**

**Professor of the Faculty of Law and Political Sciences at Robert Schuman University, Strasbourg**

**General Manager of the International Industrial Property Studies Centre**

## Analytical Summary

### I. - EFFECTS OF A LICENCE CONTRACT

**A.  - Obligations incumbent on the patent holder**

  **1° Delivery Obligation**

    **a) Granting enjoyment of the licensed invention to the licensee**

    **b) Communication of improvements**

    **c) Communication of know-how**

    **d) Technical Assistance**

  **2° Warranty Obligation**

    **a) Warranty Obligation in relation to the patented invention**

    **b) Warranty Obligation in relation to the know-how transferred**

**B. - Obligations incumbent on the licensee**

  **1° Obligations of the licensee with regard to the patented invention**

    **a) Positive Obligations**

    **b) Negative Obligations**

  **2° Obligations of the licensee with regard to the know-how transferred**

    **a) Positive Obligations**

    **b) Negative Obligations**

## II. – TRANSFER OF THE LICENCE CONTRACT

**A. – Personal nature of the contract with regard to the licensee**

  **1° Prohibition of sub-licences**

    **a) Principle**

    **b) Scope of the prohibition**

  **2° Transfer of the contract**



a) Assignment of the contract alone

b) Assignment of the contract as part of the business

**B. - Personal nature of the contract with regard to the patent holder**

1° Inability to assign the contract by application of section 1237 of the Civil Code

2° Inability to assign the licence because it is a bilateral contract

3° Section 43, paragraph 4 of the Law of 2 January 1968

4° Surrender by the patent holder of the patent or of certain claims

## III. – END OF A LICENCE CONTRACT

**A. – Standard termination of the contract**

1° Causes

a) Fixed term contract

b) Indefinite term contract

c) Contract without any indication of term

2° Consequences

a) Right to renew the contract

b) Inventory repurchase

**B. – Early termination of the contract**

1° Where there are no relevant clauses

a) Termination or recission of the contract

b) Nullity of the contract

c) Effects of the termination, rescission or nullity of the contract

2° Where there are no relevant clauses

3° Competent Jurisdiction

## IV – CORPORATE GROUPS

## Bibliography

## I. -  EFFECTS OF THE LICENCE CONTRACT

**1. -**  A licence contract creates certain obligations for the patent holder *(A)* and for the licensee *(B)*.

**A. -  Obligations incumbent on the patent holder**

**2. -**  Like a lessor, a patent-holder has a delivery obligation *(1°)* and a warranty obligation *(2°)*.

1°  **Delivery Obligation**



**3. -**  Under his delivery obligation the patent holder must allow the licensee enjoyment of the licensed invention *(a)*, with any            improvements made to the invention *(b)*; and if applicable they must communicate their know-how *(c)* and provide technical            assistance *(d)*.

### a)  Granting of enjoyment to the licensee of the licensed invention

**4. -**  The patent holder must grant enjoyment of the licensed invention to the licensee.

Strictly speaking, this obligation is more about what cannot be done.  Indeed, it prevents the patent holder from placing any obstacle to the licensee's peaceful enjoyment of the licensed invention.  This of course applies to the licensed invention and to any            improvements made to it which are protected by the patent prior to the inception of the contract.

### b)  Communication of improvements

**5. -**  The patent holder may have committed to licensing the improvements to the original invention.  This clause may apply not only to the existing improvements at the time of the inception of  the contract but also to subsequent improvements.

If the contract provides for this communication obligation, the patent holder must comply.

**6. -**  However, it is not so clear if there is no clause in the contract providing that the patent holder must communicate any            improvements they make.

It is obvious that the improvements already in existence at the time of the inception of the contract must be licensed *(see above Fasc. 490)*.

But what happens to the improvements made after the formation of the contract?

Does the licensor have an obligation to communicate these improvements to the licensee?

According to some legal experts, the basic obligation of acting in good faith when entering into and performing any contract is sufficient grounds to support the argument that a licensor has an obligation to communicate improvements *(R. Roubier, op. cit. v. 2, n° 188, p. 276. - A. Vasseur, note of the District Court of Avesnes-sur-Helpe 2 Feb. 1961: D. 1961, 652. - J.J. Burst, op. cit. n° 86, p. 60)*. The general rule set out by section 1135 of the Civil Code, which states that *«contracts create obligations in relation to not only what is expressed in the contract, but also for all the consequences which equity, common practice or the law would give to an obligation according to its nature"*, seems to further support the conclusion that the licensor has an obligation to communicate their improvements to the licensee.

Other legal experts disagree, with the counter-argument that only improvements made prior to the inception of the contract must be granted to the licensee, and only if they are covered by a certificate of addition and not a separate patent.

Case law in this area is extremely limited and therefore gives no clear answer on the principle. The District Court of Avesnes-sur-Helpe ruled that the licensor had an obligation to communicate their improvements even where there was no clause to this effect in this contract, based on the principle of natural implications of the contract and also due to his warranty obligation.  The argument based on the warranty obligation is somewhat flawed.  The warranty obligation does not in itself directly require the patent holder to license their improvements; it merely prohibits the patent holder from using the improvement for as long as he refuses to license it to the licensee, because under his warranty, he cannot actively obstruct the licensee's business.

The Court of Paris admitted that an obligation to communicate improvements incumbent on the patent holder could be implied from provisions of  the contract and the *mutual intention of the parties (Paris 6 Nov. 1961: Ann. prop. ind. 1963, 19, note P. Mathély)*.

Two decisions from the Court of Paris (2 July 1952: *Ann. prop. ind. 1955, 65, note R. Plaisant and* Paris 4 Feb. 1959: *D. 1959, 348)* seem to uphold this obligation incumbent on the patent holder.

It must be noted that this issue has still not been completely settled.  It is therefore recommended to pay careful attention to the drafting of the licence contract and either formally provide for this obligation, or expressly exclude it.  In the first case, it would be prudent to give a very clear and specific definition of what constitutes an improvement *(see above Fasc. 490)*.

**7. -**  Apart from the improvements that the patent holder may have discovered after the inception of the contract, there are also improvements that could be acquired by them in other ways.

Indeed, they could acquire improvements by either entering into a contract, or by making an application to the relevant authorities.

Acquiring an improvement under a contract could involve the acquisition of a right protecting an improvement, or being granted a licence for the improvement.

Alternatively, the patent holder could legally grant the right to exploit the improvement by applying for a licence of dependency *(Law of 1968, s. 36)*.

The question would then be whether the licensee has any claim to the licence for these improvements if there is no clause to this effect in the contract.

For improvements licensed to the patent holder either amicably or as a result of proceedings for a licence of dependency, it appears that the patent holder cannot sub-license the said improvements without consent from the owner of the right protecting these improvements. Indeed, sub-licensing is automatically prohibited unless there is a clause stating otherwise *(see Fasc. 490)*.

As for an improvement acquired by the patent holder through the assignment of a patent, it could be ruled that the patent holder must license the said improvement, based on the principle of natural implications of the contract *(see J.J. Burst, op. cit. n° 98, p. 66)*.

### c)  Communication of know-how

**8. -**  If the patent holder has committed to providing his know-how to the licensee, he  must perform this obligation under the terms and conditions set out in the contract *(see Fasc. 490)*.

**9. -**  However, there is still debate over whether the patent holder has an obligation to provide know-how if there is no clause to this effect.  It is true that the description of the licensed invention should enable the licensee to make it. So a priori it could be argued that the patent holder does not need to provide anything else.  Even so, it could still be questioned whether the patent holder has an obligation to enable the licensee to exploit the patent under the best possible conditions where they can assist in this regard.

With regard to the licensor's know-how at the time of the inception of the contract, it could be argued that they do have an obligation to communicate it, based on the principle of -performinga contract in good faith laid down by section 1134 of the Civil Code. Moreover, it seems that the very limited case law on this subject could be interpreted in this way *(French High Court. Com. 12 Feb. 1969: Quot. jur. 27-29 May 1969, n° 62, 10. - Paris 12 May 1970: P.I.B. D. 1970, III, 227)*.

With regard to know-how discovered during the contractual period, the principle of natural implications of the contract could potentially lead to the conclusion that the patent holder has an obligation to communicate this know-how.

### d)  Technical Assistance

**10. -**  If the patent holder has committed to providing technical assistance to the licensee, he must perform his obligation in accordance with the provisions of the contract *(see Fasc. 490)*.

**11. -**  However, if the parties have not made any provision to this effect, it is unclear whether the patent holder has an obligation to provide technical assistance to the licensee.

It would be somewhat excessive to make it a general rule that the patent holder must provide assistance.

The French High Court, however, seems to consider the patent holder's assistance to be of *crucial importance* in operating the patent for the invention *(French High Court. Com. 4 Nov. 1958: Bull. civ. III, n° 372. - see also Paris 19 Dec. 1929: Ann. prop. ind. 1930, 143)*.

The District Court of Paris ruled that *unless expressly provided in the contract, the licensor has no obligation to provide the licensee with technical assistance (District Court of Paris 20 March 1976: D.S. 1979, div. p. 5; Dossiers brevets 1977, I, n° 3)*.

These two decisions are not contradictory.  The District Court of Paris was certainly right in affirming that in theory, the patent holder does not have to provide technical assistance unless there is a clause stating otherwise.

But the French High Court also has grounds for deciding that this obligation exists where the provision of this assistance is required to exploit the invention.

The solution can thus be supported by section 1615 of the Civil Code which states *"the obligation to deliver the thing comprises all its accessories and all elements necessary for its perpetual use"*.  Obviously an "accessory" has a

functional quality, meaning something that the owner has so closely linked to the thing that if they were separated, the thing would not be complete and would not be able to be used in the way the purchaser would have expected.

Even if this argument based on section 1615 of the Civil Code is dismissed due to a doubt about whether technical assistance could be considered as accessory, it could be decided that the patent holder still has this responsibility on the basis of an obligation to give "information" or "assistance".

An increasing number of decisions has meant that according to case law, the vendor or lessor has an obligation to provide "assistance" if they sell or lease advanced technology equipment to a customer who is not sufficiently informed *(see the cited case law, J.J. Burst, L'assistance technique dans les contrats de transfert technologique: D.S. 1979, div. 1).*

However, where the person receiving the patented technique is a specialist, the patent holder is not bound by this obligation to provide assistance. Moreover, in such a case, technical assistance is no longer "accessory" in the sense of section 1615 of the Civil Code as by definition the receiver is capable of accessing the knowledge and skills required for working the invention licensed to them.

**2° Warranty obligation**

**12. -** The warranty obligation incumbent on the patent holder must firstly be examined in relation to the patented invention *(a)* and then in relation to the know-how provided by the patent holder when such communication is required of them *(b)*.

**a) Warranty obligation in relation to the patented invention**

**13. -** The warranty obligation incumbent on the patent holder is against latent defects *(1)* and disturbance of the licensee's enjoyment *(2)*.

**1  Obligation of warranty against latent defects**

**14. -** a) **Definition of the obligation**. – The licensor must, under section 1721 of the Civil Code, warrant the licensee against material defects in the invention itself *(risk of explosion, impossible to obtain the promised result, etc.)*.

**15. -** This purely legal obligation means the patent holder is liable for compensating the licensee for any damages that the licensee may have suffered *(French High Court 3rd civ., 24 June 1975: D.S. 1976, 193, note J. Schmidt. - Riom 2 April 1979 and Paris 18 March 1974: Dossiers brevets 1980, IV, n° 7).* The patent holder must also compensate a licensee who has himself been ordered to compensate for damage caused by the invention to third parties *(the customer of the licensee)* as a result of a defect in the invention *(French High Court 3rd civ., 24 June 1975, prec. - Riom 2 April 1979 and Paris 18 March 1974 prec.).* The person benefiting from the warranty obligation can also be the victim of the defect – usually the licensee's customer – for whom case law recognises a right to direct legal action against the patent holder on the grounds of either civil liability in tort or contractual liability *(Riom 2 April 1979 and Paris 18 March 1974, prec.).* But it is self-evident that the patent holder is only liable for *design defects,* and not *manufacturingdefects* in the production of the invention, for which the licensee is liable *(French High Court 3rd civ., 24 June 1975, prec., - Riom 2 April 1979 and Paris 18 March 1974, prec.).* Of course, a different rule applies where the patent holder is contracted to oversee the manufacture; in such a case, the patent holder is liable for manufacturing defects in the same way that the licensee would be liable if they had the sole responsibility in this regard *(Riom 18 March 1979, prec.: On the issue of the warranty against latent defects, see J.M. Mousseron, L'obligation de garantie dans les contrats d'exploitation de brevets d'invention, Hommages H. Desbois, p. 157. - A. Chavanne and J.J. Burst, Droit de la propriété industrielle, 2e ed, n° 243, p. 160, Dalloz 1980).*

The Court of Appeal of Paris ruled that the harmfulness of a licensed product is a defect in the invention.  The patent holder, being liable for the warranty against latent defects, must refund the price received in accordance with section 1641 of the Civil Code. But they do not have to pay damages in such a case *(Civil Code, s. 1645)* unless it is shown that they knew about the defect *(Paris 29 Oct. 1987).* This solution was applied to a contract for the assignment of a patented invention, but it would also clearly apply to a licence contract.

An invention that cannot be technically produced has a design defect. As this would come under the patent holder's warranty, the contract will be terminated due to  the fault of the patent holder *(French High Court Commercial Chamber, 11 July 1988: Ann. prop. ind. 1989, 55; JCP G 88, IV, 336; D.S. 1988, below, read with 238).*

The High Court expressed it as follows:

Justifies its decision to order the termination of the exclusive licence contract for exploiting the patent due to  the fault of the licensor, as the court of appeal, after having clearly stated that design defects are counted as material defects in the invention itself and are thus covered by the licensor's warranty, and that the licensor was also supposed to warrant the technical viability of the invention, has found that in their assessment, given that the



patents' instructions could not be used to produce the promised result, thereby rules that there is a design defect in the device protected by these industrial property rights.

**16. -**  If there are significant defects in the invention *(design defects)* the licensee can seek the termination of the licence contract or simply a reduction in fees depending on the magnitude of the defect.

**17. -**  In any case, the patent holder's warranty covers the technical viability of the invention *(French High Court. Com. 25 June 1975: D.S. 1976, 193, note J.J. Burst. - Lyon 5 Dec. 1974: Ann. prop. ind. 1975, 39. - Paris 9 June 1977: Ann. prop. ind. 1978, 275).*

**18. -**  However, the patent holder gives no warranty in relation to the commercial value or success of the invention *(District Court of Paris 24 Feb. 1975: P.I.B. D. 1975, III, 401. - Paris 26 May 1975: Ann. prop. ind, 1975, 232. - Paris 9 June 1977: Ann. prop. ind. 1978, 275; J.C.P. 80, II, 19430, note R. Plaisant).*

This rule is based on the following rationale: "...  as long as the patent can be exploited industrially, even with major difficulties and at an exorbitant price, its industrial and commercial success depends on the skills and competence of the assignee or licensee. Moreover, with their knowledge of the patent, the state of the art and current market conditions, it is up to them to assess the invention for both its commercial and industrial viability" *(R. Plaisant, note cited above).*

In any case, this assertion that the patent holder does not give any warranty in relation to the commercial success of the invention has been qualified by case law. Indeed, there is a special distinction made between a material defect that makes it impossible to exploit the invention which is covered by the warranty, and the commercial success of the invention which is not covered by the warranty, namely a third scenario whereby the invention can technically be made, but at a price which is prohibitive to market accessibility.

In light of this distinction, the Court of Appeal of Paris ruled that: "The ability to exploit firstly requires technical viability, and then commercial viability; if the invention can only be made under laboratory conditions or at costs that prohibit its access to the market, then the patented invention must be considered impossible to exploit" *(Paris 2 June 1988: D.S. 1988, below, read with 202; Rev. trim. dr. com. 1988, 623, observ. A. Chavanne and J. Azema).* The Court has certainly been clear in specifying that the licensee must prove impossibility by showing insurmountable difficulties; and if he cannot prove this then he  will be liable for the termination of the contract.  It was also upheld that no fault could be attributed to the licensee if he  could not "put the invention on the market mainly because the cost price would have been too high, severely compromising its access to the market" *(District Court of Paris 18 Dec. 1985: D. S. 1987, somm. 133, observ. J.M. Mousseron and J. Schmidt).*

**19. -**  The patent holder's warranty does not cover simple developments required by the licensed technique: these are the responsibility of the licensee. Development of the invention falls under the licensee's obligations and risks, unless he  can show "insurmountable difficulties" or that it is "impossible to exploit" *(Paris 9 June 1977: J.C.P. 80, II, 19430, note R. Plaisant. - see also Paris 5 Nov. 1955. Ann. prop. ind. 1957, 427. - Paris 16 March 1963: Ann. prop. ind. 1963, 385. - District Court of Paris 24 Feb. 1975: P.I.B. D. 1975, III, 401; Dossiers brevets 1975, I, 6).*

**20. -**  This raises the question of whether the patent holder's warranty extends to results, namely how the invention performs. If there is an express clause in the contract warranting these results or excluding such a warranty, the answer is straightforward *(French High Court. Com. 12 Dec. 1984: Bull. civ. IV, n° 346).* However it is less clear if there is no such clause in the contract. It would be logical to assume that given all the factors involved in the implementation of a licensed technique which are beyond the control of the patent holder, that the patent holder does not provide any warranty in relation to results, unless there is an express clause to this effect.

**21. -**  b) **No-warranty against latent defects**. - A clause excluding the warranty against latent defects is valid only if the patent holder was unaware of the defect, as nobody can legally protect themselves if they act in bad faith *(Paris 9 June 1977: J.C.P. 80, II, 19430, note R. Plaisant. - Colmar 18 April 1984: D.S. 1986, below, read with 138, observ. J.M. Mousseron et J. Schmidt).*

**22. -**  A clause stating that the patent holder provides no warranty beyond the actual existence of the patent is therefore valid *(Paris 9 June 1977, prec.).*

**23. -**  It could be questioned whether the case law related to professional sellers should apply here, which rules that the professional seller is always presumed to be acting in bad faith, even if this clause could at least in some cases be with any effect . However,legal experts tend to support the validity of clauses limiting  or excluding liability in the area of sales, or at least between professionals specialising in the same field *(Ph. Malinvaud, Pour ou contre la validité des clauses limitatives de la garantie des vices cachés dans la vente: JCP G 75, I, 2690. - J. Bigot, Plaidoyer pour les*



*clauses limitatives de garantie et de responsabilité dans les contrats de vente et de fourniture entre professionnels: JCP G 76, I, 2755. - B. Mercadal, La limitation de garantie des vices cachés dans la vente des produits fabriqués: J.C.P. 76, ed. C. I., II, 12157).* Case law has adopted the same solution and now upholds that clauses that exclude or limit the warranty against latent defects are valid where the purchaser is a professional specialising in the same field as the vendor *(see in favour of this argument, French High Court. Com. 8 July 1975: J.C.P. 76, II, 18332. - Cpr French High Court. 3rd civ., 7 Feb. 1973: J.C.P. 75, II, 17918, note Ghestin. - French High Court. Com. 8 Oct. 1973: J.C.P. 75, II, 17927, note Ghestin).* Two more recent decisions have confirmed, as a general rule regarding this type of relationship, *(equal to equal in the knowledge of equivalent things)* a return to the principle of contractual freedom *(French High Court. Com. 6 Nov. 1978: Bull. civ. IV, n° 250; J.C.P. 79, II, 19178, note Ghestin. - French High Court. 3rd civ., 30 Oct. 1978, same reference).* Such a clause in relation to the warranty can be valid if there is an identified specialised field, as this professional background is considered as evidence of competence.

**24. -** Could it not be implied from this case law that in cases where the licensee is as competent as the patent holder, the clause excluding the warranty is completely valid? The Court of Appeal of Colmar applied this case law to a patent licence contract by ruling that a no-warranty clause is valid if it is between professionals of the same field *(Colmar 18 April 1984: P.I.B. D. 1984, III, 221. - see also Lyon 29 Dec. 1986: JCP E 88, II, 15160, observ. J.J. Burst and J.M. Mousseron).*

**25. -** A no-warranty clause exempts the licensor from any obligation to pay damages to the licensee. However, it does not prevent the termination or rescission of the contract *(O. Lestrade, L'obligation de garantie dans les contrats d'exploitation de brevets, thesis, Droit Montpellier 1974, n° 239, p. 189. - R. Plaisant, note under Paris 9 June 1977, prec.).* Only the so-called "at its own risks" clause would prevent the termination or rescission of the contract and would allow the patent holder to keep the price paid.

## 2  Warranty against eviction

**26. -** a) **Definition**. – The eviction of the licensee's enjoyment can come from three sources: from legal defects affecting the patent, from third parties or from the licensor.

**27. -** *Warranty against eviction  due to legal defects affecting the patent.* – The patent for the licensed invention could have a legal defect *(lack of novelty in the industry, etc.)* which may cause its cancellation.

**28. -** The question is whether this defect would be under the patent holder's warranty against latent defects or his warranty against eviction.

It would seem that such a case would constitute a disturbance of the licensee's right as the very existence of the right is challenged *(Civil Code, s. 1726. - Contra J.M. Mousseron, Mélanges Desbois, prec.).* The patent right would no longer exist *(see J.J. Burst, La portée de la clause de non-garantie dans les contrats de cession de brevet d'invention en cas d'annulation du contrat: D.S. 1976, div. 115).*

The point of distinguishing between the warranty against defects and the warranty against eviction becomes relevant where there is a no-warranty clause in the contract *(see below n° 59).*

The District Court of Toulouse, in a judgement on 21 July 1975 *(D.S 1976, 262, note J.J. Burst)* confirmed by a decision of the Court of Toulouse on 17 June 1976 *(Ann. prop. ind. 1976, 219, note J.J. Burst and appeal dismissed by the French High Court. Com. 3 May 1978: D.S. 1979, 247, note J.J. Burst),* decided that the cancellation of the patent would trigger the warranty against eviction in the case of an *assignment of a patent.* The solution was applied again in a decision by the Court of Paris on 2 October 1978 *(D.S. 1980, 139, note J.M. Mousseron).* It would of course also apply to a *licence.*

It was also upheld that, in the case of an *assignment* of a patent, an assignee that was familiar with the search report for the patent had entered into the contract at their own risk and peril, which exempted the assignor from having to refund any of the price *(Paris 2 Oct. 1978: D.S. 1980, 139, note J.J. Burst).*

**29. -** The rescission of the contract based on the warranty against eviction is not the only remedy available when a patent is cancelled.

**30. -** Consistent case law has ruled that the nullity of the patent would make the licence contract null and void as it would lack its subject matter *(French High Court. req. 5 Dec. 1881: D.P. 82, 360. - 29 June 1933: Ann. prop. ind. 1935, 78. – French High Court. civ. 5 April 1960: Ann. prop. ind. 1965, 176. - Paris 29 Jan. 1963: Ann. prop. ind. 1963, 363. - see also French High Court. Com. 17 March1980: P.I.B. D. 1980, III, 151).*



**31. -** If the contract is rescinded  on the grounds of the warranty against eviction, or terminated due to a lack of subject matter, then in either case the consequence for the patent holder is not only  the collapse of the contract , but that he may be ordered to reimburse any royalties received and pay damages.

These are the general rules of law.

**32. -** It is not unusual however for the contract to provide for what happens to royalties already paid by the licensee to the patent holder in the event that the patent is cancelled, which would then lead to the rescission or termination of the contract *(see below n° 181 et seq.)*; if there is no clause to this effect, then according to case law, the court's assessment would largely depend on the issue, amongst other factors of the case, of whether the licensee had quiet enjoyment of the patent before it was terminated*(see below n° 186 et seq.).*

**33. -** *Warranty against eviction  due to the actions of third parties.* – There are several ways that the licensee could be disturbed by the actions of third parties.

**34. -** The first example of where the licensee is disturbed in its enjoyment of the licensed patent is where third parties infringe the patent.

What recourse does the licensee have against these infringing parties?

**35. -** In principle, only the patent holder can initiate legal proceedings against third parties for infringing the patent.

The patent holder must therefore take legal action against the infringement *(Paris 14 March 1901: Ann. prop. ind. 1901, 349. - Paris 23 Dec. 1927: Ann. prop. ind. 1928, I, 118. - see also French High Court. Com. 26 Feb. 1968: Bull. civ. IV, n° 82. - P. Roubier, op. cit. v. 2, n° 188, p. 279. - J.J. Burst, op. et loc. cit.)*; as the warranty against eviction due to the actions  of third parties aims specifically to prevent, cease or compensate for any interference with quiet enjoyment caused by third parties; so if the patent holder does not take action, the licensee can seek the termination of the contract and compensation for damages from the patent holder.

**36. -** However the licensee can only take part in legal proceedings if they have registered their licence with the National Patent Registry *(District Court of Paris 12 July 1972: P.I.B. D. 1973, III, 75).*

The licensee can take part in legal proceedings even if they are only selling the licensed invention *(Paris 8 Nov. 1989: P.I.B.D. 1990, n° 473, III, 126).* And where the licensed invention is sold by one licensee but manufactured by another, both licensees can take part in the proceedings *(District Court of Paris 20 Jan. 1988: P.I.B.D. 1988, n° 435, III, 252).*

Can the licensee take part in appeal proceedings?

The Court of Appeal of Paris gave a negative response to this question:

> Given that FIT is not admissible to  part in the appeal proceedings;
>
> That although under the terms of section 554 of the New Code of Civil Procedure, a person who was neither a party nor represented in the first instance can take part in appeal proceedings as long as it has an interest in it, this provision does not allow a person involved in appeal proceedings to submit a new dispute and seek personal recourse if it has not been through the first level of jurisdiction;
>
> And given that in this matter the request put forward by the licensee FIT is a distinct request from that put forward by the patent holder, section 53, paragraph 4, in the Law of 2 January 1968 granting the right for it to take part in the legal proceedings against infringement "in order to seek remedy for loss that is specific to it"; and that its request for remedy of a loss that is different from that of the patent holder is aimed at seeking personal recourse that has not been subject to the first level of jurisdiction;
>
> And in this respect the request is inadmissible in the appeal proceedings *(Paris 4 Jan. 1984: Dossiers brevets 1984, III, 2).*

If a party's involvement does not occur until the appeal they are not allowed "to submit a new dispute and request for personal recourse that has not been through the first level of jurisdiction" *(for the same opinion see French High Court 2nd civ., 11 June 1975: Bull. civ. II, n° 172).*

Furthermore, infringement proceedings initiated mainly by the patent holder would interrrupt the running of the limitation period with respect to the licensee's right to take legal action *(French High Court. Com. 25 May 1976: D.S. 1978, below, read with 148; Ann. prop. ind. 1978, 170; Dossiers brevets 1977, V, 6).* Legal action by the licensee is thus admissible even if is initiated more than three years after the last infringement suit, as the patent holder's legal action has interrupted the running of the limitation period. However, it must be noted that the District Court of Paris ruled that the patent holder's legal action did not affect the  limitation period on the licensee's right to take legal action due to the fact that the two legal proceedings – one initiated by the patent holder and the other by the licensee – did not have the same cause or the same purpose *(District Court of Paris 22 Jan. 1987: P.I.B. D. 1987, III, 226).*

Finally, legal proceedings by the licensee for unfair competition on the grounds of facts that are distinct from those of the infringement are also inadmissible *(District Court of Paris 31 May 1989. P.I.B. D. 1989, III, 9).*

**37. -** However, the patent holder cannot seek compensation for damage suffered by a licensee who was not involved in the legal proceedings *(Paris 2 March 1971: Ann. prop. ind. 1971, 119, note J.J. Burst; D.S. 1972, 45, note J. Azema, appeal dismissed by French High Court. Com. 23 Jan. 1973: P.I.B.D. 1973, 155).*

**38. -** But an exclusive licensee can bring proceedings for infringement on two conditions: firstly that this right has not been precluded by an express provision in the contract, and secondly that the licensee has served prior notice to the patent holder to take legal action in this regard, and the notice has not been acted upon *(Law of 1968, s, 53).*

The wording of section 53-2 of the Law of 2 January 1968 is somewhat confusing. This provision is aimed at *"the beneficiary of an exclusive right to exploit".* Can this be clearly construed to mean that the exclusive licensee could be assimilated to the holder of an exclusive right to exploit? Wouldn't an exclusive right to exploit imply that the person holding that right would be the only one authorised to exploit the invention? Given that an exclusive licensee usually shares the right to exploit the invention with the patent holder, the licensee's right is not exclusive and therefore section 53 does not apply to it.

On the other hand, an exclusive licensee who is entitled to legal action has no claim against the patent holder's failure to act *(District Court of Paris 30 March 1987: P.I.B. D. 1987, III, 312).*

**39. -** Indeed, a licensee can always initiate the legal proceedings against infringement instead of the patent holder where the latter gives it the authority to do so and as long as it is a special agency agreement rather than a general agency agreement *(see J.J. Burst, op. cit. n° 259, p. 148 et seq.).*

However, a third party who is sued for infringement by a licensee cannot seek the nullity of the patent in its counterclaim if the patent holder is not involved in the proceedings *(Paris 21 March 1973: Ann. prop. ind. 1973, 92, note J.J. Burst)*; however, they are able to use the argument that the patent is null and void as a defence.

**40. -** There is a secondary issue raised if there is no relevant clause in the contract, which is determining whether a licensee who initiates or takes part in the legal proceedings must bear all legal costs or whether it has any recourse against the patent holder in this regard. There does not seem to be any case law on this point. According to the former law, where the licensee is the agent of the patent holder, the patent holder usually requires the licensee to pay legal costs.

It would seem that even where the licensee has a recognised right to take legal action, there is no impact on the warranty obligation incumbent on the patent holder, so the licensee can still hold the patent holder liable in this regard.

The situation is different when the licensee is involved in the legal proceedings, as once the patent holder has initiated the proceedings, it has fulfilled its obligation. The licensee would then have no recourse against the patent holder in this case, unless the patent holder is negligent while conducting the court case.

Finally, it is also unclear whether, in the event of unsuccessful legal proceedings, the licensee has any recourse against the patent holder on the grounds that the patent does not have the scope of protection that it claimed to have. It comes back to an issue of defect.

However, it seems that any issue regarding the scope of protection of the patent would be considered a patent rather than a latent defect, and is therefore not covered by the warranty against latent defects laid down by the Civil Code (ss. 1641 and 1642). The licensee would therefore have no recourse against the patent holder. There does not seem to be any case law on this point.

**41. -** Case law has ruled that the licensee has the right to bring proceedings against third parties who infringe the patent, either for damages or for unfair competition *(Paris 3 June 1952: Ann. prop. ind. 1952, 238. - Paris 20 July 1953: Ann. prop. ind. 1953, 275. - see also French High Court. Com. 24 Oct. 1956: Bull. civ. III, n° 254. - Paris 12 Oct. 1965: Ann. prop. ind. 1966, 32. - see Burst, op. cit. n° 255).*

It has been ruled that a third party that knowingly participates in the breach of a debtor's obligation is personally liable and has an obligation under civil liability in tort: as a result, the third party accomplice is liable for compensating not only foreseeable damages, as would be the case under contract law, but also unforeseeable damages, as because of the interference of the acts of the debtor and the third party accomplice, they are joint and severally liable for everything, *in solidum,* as long as the third party knew of the existence of the contract between the main perpetrator of the breach and the creditor of the breached obligation.

It would then follow that a company who was granted an exclusive licence for the sale and manufacturing of a patent owned by a foreign company is entitled to seek full compensation for the damage caused by any third party which was

NATIONAL ACCREDITATION AUTHORITY FOR TRANSLATORS AND INTERPRETERS
NAATI No. 57513
VERONIQUE MORGAN-SMITH
TRANSLATOR
ENGLISH <-> FRENCH
©

fully aware, as shown by its behaviour and its communications, of the contract between the patent holder and the licensee, yet attempted to push out the licensee by dealing directly with the company that owns the patent *(Commercial Court of Seine, 23 Sep. 1958: Quot. jur. 14 March 1959. – For a case involving importing while infringing the licensee's rights see Paris 2 Oct. 1965: Ann. prop. ind. 1966, 32).*

**42. -**  This solution is confirmed by the Law of 2 January 1968 (ss. 53-4) which states that *"any licensee can be involved in the infringement suit brought by the patent holder, in order to seek compensation for loss suffered that is specific to it".*  This applies if the licence is an exclusive or a simple licensee.

If a licensee can be involved in the infringement suit, even though such legal action is refused to a simple licensee, it can also take action on its own account for this same purpose.

**43. -**  Another way that third parties could obstruct the licensee is by bringing infringement proceedings against it.  The typical example would be where a third party holds a patent that they believe has been infringed by the licensee's products. If this is the case, the patent for the licensed invention would obviously be null and void.

The licensee would then have several courses of action to end the licence contract.

**44. -**  Firstly, they could seek the termination or rescission of the contract on the grounds of the warranty against legal defects in the patent, or on the grounds of the warranty against eviction due to the actions of third parties.

**45. -**  As there is a defect in the patent -  in this case the lack of novelty – it could be null and void; and its nullity would in turn justify the nullity of the licence contract on the grounds that it has no subject matter *(see above Fasc. 490 et below Fasc. 180).*

**46. -**  The licensee could still claim compensation for damages.

**47. -**  Finally, any penalty for infringement that the licensee has been ordered to pay must be paid by the patent holder in cases where the licensee was acting in good faith *(J.J. Burst, op. cit. n° 276 et seq., p. 158 et seq. – see for the case of an assignment of a patent, Paris 2 Oct. 1978: D.S. 1980, 139, note J.-M. Mousseron).*

**48. -**  Again, the patent holder has an obligation to assist the licensee in the legal proceedings.

**49. -**  The licensee can also be sued for infringement even if the patent for the licensed invention is perfectly valid. This could happen if the licensed patent is under the dependency of a dominant patent belonging to a third party.  The patent holder would have to pay damages to the licensee pursuant to its contractual warranty against eviction, especially where the patent holder should have obtained a licence for the dominant patent *(J.-M. Mousseron, Mélanges Desbois, op. cit. p. 176).*

**50. -**  The licensee could still be disturbed in its quiet enjoyment of the licensed invention if the monopoly offered under the licence is threatened by a prior personal possessory right that the licensee was unaware of at the time of entering into the contract. In this case the licensee could seek the termination or rescission of the contract, or a reduction in price.

**51. -**  Finally, the licensee could be disturbed in its operation of the patented invention in cases where as a result of legal proceedings for a claim over the patent, it becomes clear that the licensor was not the true owner. The licence contracts entered into by this licensor would be deemed as formed *a non domino* and all licensees would no longer have any legal right, regardless of whether the parties were acting in good or bad faith *(Paris 24 April 1968: Ann. prop. ind. 1968, 76).* The true owner of the patent would even be able to bring legal action for infringement against the usurper and their assignees *(French High Court. Com. 13 April 1972: Bull. civ. IV, n° 98).*

This is the solution given by section 43, paragraph 4 of the Law of 2 January 1968. Although it affirms the principle that changes in ownership of the patent do not affect any current licences for the invention protected by the patent, it makes an exception for cases where the change in licensor results from a successful legal challenge of that patent in favour of a new rightful patent holder. This express exception applies the general principle of the nullity of contracts entered into *a non domino*. Furthermore, this section does not distinguish between licensees acting in good faith and those who are not.  Of course, a licensee who has acted in good faith could still seek compensation from the patent holder for all damages resulting from the licence being null and void and its operation ceased.

**52. -**  *Warranty against eviction due to the personal actions of the licensor.* – The patent holder's obligation to warrant against eviction due to its own actions obviously precludes it from pursuing the licensee for infringement of the invention for which it granted a licence *(Paris 21 March 1977: P.I.B. D. 1978, III, 1; Dossiers brevets 1978, I, n° 6);*



the same prohibition applies to the patent holder bringing infringement proceedings in relation to a dominant patent that it holds.

**53. -**  Under the same warranty obligation, the patent holder must pay the patent fees in order to maintain its validity. Of course it may be the licensee who has to pay these annual fees if this is what has been agreed to under the licence contract *(French High Court. Com. 15 Jan. 1969: Quot. jur. 22 April 1969, n° 47, p. 6)*. Even if it has not been decided differently in the contract, failure to pay the patent fees would lead to the termination of the licence contract and the patent holder  would be fully liable *(French High Court. civ. 25 May 1869: Ann. prop. ind. 1869, 393. - French High Court. Com. 6 Nov. 1957: Bull. civ. III, n° 297. - Paris 3 March 1953: Ann. prop. ind. 1953, 1)*. As the licensee would no longer have quiet enjoyment of the leased thing, they are entitled to be freed from their contractual obligations of paying royalties for the exploitation of an invention that has fallen into the public domain and that any interested party could access free of charge.

Where the licence contract provides that if the patent lapses due to the non-payment of fees, any royalties already paid shall be kept by the patent holder, then the licensee cannot claim any reimbursement of said royalties *(District Court of Paris 10 Nov. 1988: P.I.B.D. 1989, n° 450, III, 105)*.

**54. -**  The obligation to warrant against the personal actions of the licensor also precludes it from exercising its right to surrender the patent under section 47 of the Law of 2 January 1968, unless the licensee has given its consent. *(Law of 68, s. 47, para. 3)*.

**55. -**  It could be questioned whether this obligation goes as far as precluding the licensor from its right to exploit the invention in the case of an exclusive licence. The answer seems to be no, due to the rule that a waiver of a right must be express and cannot be presumed *(see Fasc. 490)*.

**56. -**  b) **Exclusion of warranty against eviction**. – A no-warranty clause is valid as long as the patent holder was acting in good faith when it included it in the contract. This is based on a general principle.

**57. -**  So in principle, a clause excluding the warranty against eviction due to legal defects in the patent would be valid *(Paris 2 Oct. 1978: Dossiers brevets 1980, 139, note J.M. Mousseron, for a sale agreement)*.

A contract containing the standard clause stating that the licensor "does not warrant anything other than the existence of the patents and their technical knowledge" is a licence with a clause excluding warranty. And, according to the Court of Appeal of Lyon, "the exclusion of warranty can validly apply to legal defects which could potentially affect the patents, especially in this case where the plaintiffs, who are professionals in their field, have entered into a contract after extensive discussions" *(Lyon 29 Oct. 1986: JCP E 88, II, 15160, observ. J.J. Burst and J.M. Mousseron)*.  It is should be noted that the Court of Appeal of Lyon applied the case law which had already been well established in the area of sale agreements and leases for tangible assets to a patent licence contract, by arguing that the lessee of the invention was a professional in the same field as the lessor, in order to justify the exclusion of warranty.

**58. -**  The exclusion of warranty against eviction due to the actions of third parties is also valid.  Case law even considers that a licensee who was aware of the search report should be deemed to have entered the contract at its own risk and perils. So in this case the licensee did not have to pay any infringement penalty that the licensee could have been ordered to pay *(Paris 2 Oct. 1978, prec.)*.

**59. -**  What is the usual scope of the no-warranty against eviction clause?  Under section 1629 of the Civil Code a no-warranty clause does not preclude the reimbursement of the price by the vendor.  Even with a no-warranty clause, the patent holder will still have to reimburse the price to the licensee.  But the no-warranty clause exempts the patent holder from paying any damages to the licensee *(J.J. Burst, La portée de la clause de non-garantie dans les contrats de cession de brevets d'invention en cas d'annulation du brevet: D.S. 1976, div. 115)*. However, the patent holder would not have to reimburse the price if the contract was entered into at the risk and perils of the licensee *(For a case of an assignment of patent, see District Court of Toulouse 21 July 1975: D.S.1976, 262, note J.J. Burst. - Toulouse 17 June 1976: Ann. prop. ind. 1976, 219, note J.J. Burst and French High Court. Com. 3 May 1978: D.S. 1979, 247, J.J.-Burst)*.

It is also worth noting that for the French High Court, a clause stating that the assignor *"does not give any warranty other than against its own actions"* is not equivalent to the clause of acquisition at the risk and perils of the purchaser *(French High Court. Com. 3 May 1978, prec.)*.

However, a clause stating that the assignor *"cannot be held liable under any circumstances"* is analysed as a clause of acquisition at the risk and perils of the purchaser *(District Court of Lyon 2 Dec. 1977: Dossiers brevets 1977, IV, n° 7)*.



The French High Court considered that the decision to order the rescission of a licence contract at the fault of the licensor was in breach of section 1134 of the Civil Code, as the contract included a clause by which the licensee accepted all potential risks with regard to the validity of the patent and its commercial operation. *(French High Court. Com. 11 March 1986: D. S. 1987, somm. 134, observ. J.M. Mousseron and J. Schmidt; JCP E 87, II, 16055, observ. J.J. Burst and J.M. Mousseron; Rev. trim. dr. com. 1987, 45, observ. A. Chavanne and J. Azéma)*. In this matter, an exclusive patent licence provided: "The licensee, having been informed that no prior art search had been conducted in relation to the patent concerned, accepts all potential risks of the licence, both in relation to the legal validity of the patent concerned and its commercial operation. The licensee is prohibited from directly or indirectly challenging the validity of the patent concerned". The contract also provided that the licensee had an obligation to pay a minimum lump sum payment for royalties as well as a penalty clause in the event of non-performance. The licensee, alleging difficulties in the implementation of the invention, refused to pay the royalties and sought the rescission of the contract at the fault of the patent holder. The court decision ordering the rescission of the contract was overturned due to violation of section 1134 of the Civil Code based on what the court of appeal had accepted "the discussion of potential risks in relation to the commercial operation and the validity of the patent contrary to the law of the parties". The licensee therefore had to pay the minimum royalties despite the fact that it was impossible to exploit the patent.  The clause in question obviously made it a contract entered into at the  own risks of the licensee. This clause thus converted the licence into an aleatory contract.

If a licence contract is entered into "at the own risks of the licensee", a patent holder who has acted in good faith can keep the royalties paid despite the nullity of the patent *(Lyon 12 Jan. 1989: Dossiers brevets 1989, I, 8)*.

**60. -**  This leads to two observations:

- The "at its own risks" clause must be drafted very carefully, as it cannot be implied from the circumstances;
- The no-warranty clause must also be carefully drafted to very clearly indicate what risks of eviction the patent holder is excluding from its warranty, to avoid it becoming just a standard formula.

**61. -**  Finally, with regard to the warranty against the personal actions of the licensor,  we know that under section 1628 of the Civil Code, the vendor *(the patent holder)* cannot exempt itself from the obligation to warrant against eviction due to its own personal actions. A no-warranty clause with regard to the patent holder's own actions is null and void.

**62. -**  It is important to briefly discuss the no-challenge clause.

The no-challenge clause is a clause by which the licensee undertakes not to contest the validity of the patent, which has the effect of preventing the licensee from seeking the termination of the contract due to a lack of subject matter or on the grounds of the patent holder's warranty against eviction due to legal defects.

This clause was considered valid by the French High Court *(French High Court. Com. 7 Dec. 1964: Ann. prop. ind. 1965, 174; D.S. 1966, 182, note R. Plaisant. - 23 March 1974: D.S. 1975, 537, note J.-P. Sortais)*. It was declared null and void, under Article 85, paragraph 1 of the EC Treaty, by the European Community Commission *(see Fasc. n° 540. - see below n° 105)*.

The Court of Appeal of Colmar declared the no-challenge clause valid under Article 85 of the EC Treaty on the grounds that the contract in which it was included was a contract of minor importance *(Colmar 18 April 1984: D.S. 1986, below, read with 138, observ. J.M. Mousseron and J. Schmidt)*.

For its part, the European Court of Justice ruled:

> A no-challenge clause in a patent licence contract can, depending on the legal and economic context, have an effect of restraining competition in the sense of Article 85, paragraph 1, of the Treaty.  Such a clause does not however restrain competition where the licence was granted free of charge and the licensee does not have to suffer any disadvantages with regard to competition as a result of paying royalties, or even where the licence was granted in exchange for payment but is for an outdated technical process no longer used by the company who accepted the no-challenge clause *(European Court of Justice, 27 September1988, aff. 65/86, Bayer AG et a. c. Suelhoefer: JCP E 88, I, 17869)*.

**b)  Warranty obligation in relation to the know-how transferred**

**1  Warranty against defects**

**63. -**  Does a patent holder providing know-how under a licence contract also assume a warranty obligation?

**64. -**  It must be pointed out that an agreement to communicate know-how is classified as a works contract.



Under the Civil Code, a works contract, unlike a sale contract or lease, does not have a legal warranty obligation, except for the case of a construction works contract.

However, it has been admitted that works agreement do have an implied warranty obligation. As a result the patent holder must warrant against latent defects, unless there is a clause stating otherwise.

These latent defects could be in the technique transferred. In such a case, a design defect is attributed to the patent holder; while a manufacturing defect is obviously excluded from the patent warranty.  As it is the licensee who exploits the technique, it assumes liability for any manufacturing defect.

But the fact that the results obtained are not as expected could also be due to poor communication of the techniques in question. The patent holder would then be liable.

The patent holder would no longer be liable if it was shown that the results were different due to the licensee's misunderstanding of the techniques transferred.

**65. -**  However, clauses restricting or excluding liability can be upheld as valid depending on how clearly it was stated that there is no warranty against any latent defects that may be contained in the techniques transferred *(B. Gross, L'obligation de garantie dans le contrat de vente, n° 157, p. 166. - D. rép. civ., 2nd ed. V° Contrat d'entreprise, n° 157, p. 166)*. The case law on common law[i] pertaining to works contracts is divided on this point *(For an opinion in favour, see French High Court. civ. 18 Oct. 1911, 2 decisions; D.P. 1912, 1, 113,  note Planiol. - French High Court. 2nd civ., 19 May 1958: J.C.P. 58, II, 10808. – For an opinion against see Lyon 25 March 1963. Gaz. Pal. 1963, 2, 182. - see also French High Court 1st civ., 19 Oct. 1964: Bull. civ. I, 349)*.

### 2  Warranty against its own actions

**66. -**  Any waranty here would come from the contract itself.

A clause in a licence contract could in fact give the patent holder an obligation of exclusivity with regard to the know-how.  Under this clause the patent holder undertakes not to communicate the techniques transferred to any of its other partners.

The patent holder can also undertake not to use the know-how provided.   In this case it is often erroneously referred to as "assignment of know-how" *(For more details, see Fasc. 110)*.

## B. -  Obligations incumbent on the licensee

**67. -**   The obligations incumbent on the licensee are both in regard to the patented invention *(1°)* and   the know-how received*(2°)*.

### 1°  Obligations of the licensee with regard to the patented invention

**68. -**  The licensee has various contractual obligations: some are positive*(a)*, and some are negative*(b)*.

#### a)  Positive Obligations

**69. -**  The licensee has two positive obligations:  to exploit *(1)* and to pay royalties *(2)*.

### 1  Obligation to exploit

**70. -**  a) **Obligation to exploit**. - The licensee has not only the right, but also the obligation to exploit.  This principle is consistently upheld in case law.  It is largely based on the fact that if the licensee either fails to exploit or insufficiently exploits the patent, the patent holder would face the risk of compulsory licensing due to the absence of exploitation.

The principle also applies whether the licence is exclusive or simple, but its application is even stricter in the first case *(For a case of a non exclusive licence, see Rouen 5 Feb. 1951: Ann. prop. ind. 1951, 78; Rev. trim. dr. com. 1951, 748, observ. Chavanne. – For the general principle see French High Court 18 March 1929: Ann. prop. ind. 1929, 359. - French High Court. req. 7 May 1934: Ann. prop. ind. 1935, 53. - French High Court. 16 Jan. 1956: Ann. prop. ind. 1958, 168. - French High Court. Com. 16 May 1961: Bull. civ. III, n° 212. - 2 Dec. 1963: Ann. prop. ind. 1964, 128. - 17 Nov. 1965: Ann. prop. ind. 1966, 287. - 25 June 1968: D.S. 1969, 23. - Paris 12 May 1956: Ann. prop. ind. 1957, 427. - Paris, 16 Feb. 1968: Ann. prop. ind. 1968, 100. - Lyon 22 Oct. 1981: P.I.B. D. 1982, III, 75. – see also French High Court. Com, 4 Nov. 1974: Dossiers brevets 1975, V, n° 3)*.



**71. -**  In the event of termination of the contract with notice, the obligation to exploit continues throughout the notice period *(Paris 5 Nov. 1955: Ann. prop. ind. 1957, 427).*

**72. -**  This is the general principle, but there are three areas for consideration *(for a more in depth analysis see Burst, op. cit. n° 318 et seq.).*

Firstly, the attempt to exploit must be effective and serious. An apparent or fictitious attempt to exploit is not sufficient *(Paris 8 April 1964: J.C.P. 64, II, 13876, note Plaisant; Rev. trim. dr. com. 1965, 396, note Chavanne).*

In accordance with case law, the licensee must exploit "fully and to the best of its abilities", except where it is technical impossible, which must be proven by the licensee *(District Court of Paris 20 Feb. 1989: Dossiers brevets 1989, V, 9. - District Court of Paris 5 July 1984: P.I.B. D. 1985, III, 17. - Paris 2 June 1988: Rev. dr. prop. ind. 1989, 21, p. 56; D.S. 1988, below, read with 202),* the licensee must exploit fully, without restriction and for the full term of the contract, even if this obligation is not expressly stated in the contract *(Paris 2 July 1981: D.S. 1984, below, read with 212, observ. J.M. Mousseron and J. Schmidt).*

**73. -**  Only "insurmountable difficulties in developing the invention would free the licensee from its obligation to exploit *(Paris 13 Feb. 1981: P.I.B. D. 1981, III, 127).* Indeed, the responsibility for development of the invention falls on the licensee *(Paris 13 Feb. 1981, prec. - Lyon 5 Dec. 1974: Ann. prop. ind. 1975, 39. - District Court of Paris 10 April 1980: P.I.B. D. 1980, III, 177. - Paris 30 April 1987: Rev. dr. prop. ind. 1987, 13, p. 64).*

**74. -**  It is worth examining the impact of difficulties experienced by the licensee with regard to the production and exploitation of the invention.

After having found that the licensee of an exclusive licence for the manufacture, sale and exploitation of a machine was required, in order to progress from the "project" phase to the "manufacturing" phase, to conduct lengthy studies involving numerous designs and plans, and that they had paid substantial sums to the patent holder without having been able to make any sale of the machine, the court of appeal ruled that the licensee had not committed any fault that would justify the judiciary termination of the contract *(French High Court. Com. 16 May 1961: Bull. civ. III, n° 212).*  A licensee is deemed not to be in breach of this obligation if, despite repeated efforts, it has not been able to exploit the patent due to the proven impossibility of using the invention, and in these circumstances the patent holder has no grounds to take legal action against said licensee for damages caused by non-performance of their obligations. *(French High Court. req. 7 May 1934: Ann. prop. ind. 1935, 53. - see also Paris 4 Feb. 1958: Ann. prop. ind. 1959, 224).*

**75. -**  Secondly, these "insurmountable difficulties" can be technical, but also commercial *(District Court of Paris 1 March 1989: Dossiers Brevets 1990, II, 8).*

So if the invention can only be made at cost prices that are too high, seriously compromising its access to the market, no fault can be attributed to the licensee *(District Court of Paris 5 Feb. 1985: D. S. 1987, somm. 133, observ. J.M. Mousseron and J. Schmidt. - District Court of Paris 18 Dec. 1985: Dossiers brevets 1986, IV, 5).* Similarly, an invention that can only be made under laboratory conditions at prices that exclude its access to the market is considered impossible to exploit; but it is up to the licensee to prove this, as its obligation is to exploit fully and use its best endeavours, just as there must be "insurmountable difficulties" in exploiting the patent to prove that it is impossible, as the responsibility for development falls on the licensee *(District Court of Paris 1 March 1989: P.I.B.D. 1989, n° 459, III, 375).*

**76. -**  Thirdly, the question is that if the licensee has an obligation to exploit the original patents, does the same obligation apply to any improvements that have been communicated to it.  In theory, it does, for the same reasons.

The difficulty lies in the fact that the licensee, in signing the contract, knew of the original patent but did not know of its improvements. It could, at the appropriate time, decide that the improvements are of no interest or may even compromise successful exploitation.

There does not seem to be any case law on this point and the doctrine is limited *(see Burst, op. cit. n° 347 et seq.).*

The rule seems to be as follows: the licensee must in theory exploit the patented improvements; however only if the improvements are genuinely useful.

**77. -**  The penalty for a failure to exploit is the termination of the licence at the fault of the licensee, with or without damages.

**78. -**  b) **Subject matter of the obligation to exploit**. - *Minimum exploitation*. - The licence contract can include a clause in which the licensee commits to a minimum turnover.

This clause is different from the clause requirign the licensee to pay minimum royalties.



**79. -**  It is usually admitted that the difference between the two clauses is generally considered to be as follows: the second is an obligation to pay minimum royalties, but the licensee does not commit exploit at a scale that would allow it to reach a level turnover equivalent to the minimum royalties *(French High Court. Com. 15 July 1969: Bull. civ. IV, n° 267. - Paris 4 Feb. 1958: Ann. prop. ind. 1959, 224).* In a way, there is a form of exemption granted with regards to the obligation to exploit in consideration for the payment of the minimum amount.

However, the District Court of Paris ruled that *"the provision for a minimum amount of royalties does not exempt the licensee from using its best endeavours to exceed the minimum amount set"*. For the Court, the minimum amount of royalties was merely a lower limit, and the licensee still had an obligation to try to exceed it by exploiting the patent as much as possible, using their best endeavours *(District Court of Paris 3 Oct. 1975: P.I.B. D. 1976, III, 232; Rev. trim. dr. com. 1976, 503, observ. A. Chavanne and J. Azéma).* The solution was confirmed in the same terms by the Court of Paris (22 Nov. 1977: *Dossiers brevets 1979, n° 5).*

**80. -**  Where the licensee has not reached the minimum turnover to which it committed, there is a partial failure to perform the contract and the patent holder can seek its termination as well as damages;  however the patent holder can also seek damages calculated on the items that were not manufactured *(Reims 5 Jan. 1976: Ann. prop. ind. 1977, 117).*

It was thus held in a case of a licence providing that the licensee had to make a minimum quota of sales, and also that if the royalties were not paid at the agreed dates, the licence could be terminated as of right if the patent holder so desired,  the courts used their discretion in pronouncing that as the contract did not have a clause requiring the licensee to pay royalties corresponding to the required minimum quota of sales during the lifetime of the patent, the only penalty applicable to the licensee would be loss of exclusivity *(French High Court. Com. 8 Dec. 1970: Bull. civ. IV, n° 336).*

**81. -**  A minimum turnover clause entails a performance obligation. If the figure set is not reached, the patent holder can seek the termination of the contract and damages from the licensee *(Paris 20 May 1977: P.I.B. D. 1978, III, 78).*

**82. -**  *Maximum level of exploitation.*– The licence contract can also set a maximum quota for exploitation, but such a provision must be approached carefully, as it could be against French and/or European competition laws (*see Fasc. 540*).

**83. -**  g) **Terms and conditions of the obligation to exploit**. – *Exclusive supplier*. – The licensee can undertake to obtain its supply of raw materials or intermediary products from the licensor.

A clause for exclusive supply is theoretically valid under French law.

However concerning French law, it seems to be subject to the provisions of the Law of 14 October 1943 which limits its validity to 10 years *(see J.-J. Burst, op. cit. n° 378, p. 228).*

**84. -**  The most serious issues that this clause may raise will be whether it is compatible with French and European competition laws *(V. Fasc. 540).*

**85. -**  *Compliance with quality standards* – The patentee may wish to have the licensee comply with quality standards in the manufacture and commercialisation of the licensed invention; in which case the licensee undertakes to comply with said standards.

A clause of compliance with quality standards is usually paired with a clause of control of these standards provided for the benefit of the licensor.

**86. -**  These clauses are valid under French law; however they can cause difficulties with competition laws and in particular European competition laws *(V. Fasc. 540).*

**87. -**  *Trademarks on patented products.* – The licence for a patented invention, where paired with a trademark licence, will necessarily include a clause governing how the trademark is affixed on the products manufactured and sold by the licensee.

**88. -**  *Communication of improvements.*– In theory, a licensee who exploits the licensed invention could also make improvements to the invention.

**89. -**  It is then a matter of determining who owns the improvements made in such a case.

Some contracts have a clause stating that any improvements made by the licensee are protected under the name of the patent holder.

Although this clause is certainly valid under French law, it is null and void under European competition laws (*see Fasc. 540*).

**90. -**  It would therefore be preferable to replace this clause with another clause providing that any improvements made by the licensee will belong to the licensee, but that the licensee undertakes to grant a licence for the said improvements to the patent holder.

Such a clause is valid under European competition laws as long as the promised licence is not exclusive (*see Fasc. 540*). However, a clause by which the licensee automatically authorises the patent holder to sub-licence the said improvements to other licensees is unlikely to be valid under European competition laws (*see Fasc. 540*).

**91. -**  But the main difficulty is in determining whether the licensee has an obligation to communicate their improvements over the course of the licence to the patent holder if there is no express clause to this effect.

It is difficult to give a clear response.  An implied obligation could be assumed by arguing the principle of the obligation of loyalty that exists in any contract involving collaboration between the parties (*see J.-J. Burst, op. cit. n° 347 et seq., p. 205 et seq.*).  But it would have to be shown through the obligations that the parties have towards each other that the contract could be considered a genuine collaboration agreement.

## 2  Obligation to pay royalties

**92. -**  a) **Subject matter of the payment**. - The payment of a price, usually royalties, is a condition required for the validity of the licence contract, pursuant to section 1129 of the Civil Code. However, the gratuitous nature of the licence does not necessarily make it null and void.  Indeed, it was ruled that a free licence in the context of a transaction for crossed licences was not void as each licensor received consideration for the exchange *(Paris 21 March 1977: Dossiers brevets 1978, I, n° 6)*.

**93. -**  The contract may include a minimum royalty clause *(see Fasc. 490)*.

The question is whether the guaranteed minimum royalties' clause applies if the licensee does not exploit the licensed patents.

The French High Court gave a negative response, as follows:

> Whereas secondly after having found that the licensee did not exploit patent n° 1 088 565 applied for on 7 August 1951 and none of the other patents of Mr Beyrard were implemented industrially despite several attempts, the Court of Appeal having found on one hand that section 4 of the contract provided for minimum annual royalties in consideration of the exclusivity granted by Mr Beyrard and on the other hand that the exclusivity clause was null and void following the decision of the European Commission; and in light of these decisions and observations the Court of Appeal, setting aside all other ample reasons, has decided that as from 7 August 1971 no minimum royalty or penalty is owed *(French High Court. Com. 22 July 1986: Dossiers brevets 1986, IV, 2)*.

This decision is very significant.  To understand its impact, it is important to briefly summarise the facts of the case. A licence contract was entered into with regard to the 1951 patents that were said to be first generation patents. The contract included a clause stating that it was entered into for the lifetime of the most recent original patent or current or future improvement thereof.  The patent holder has registered new patents that were known as being of the second and third generation patents. The licensee gave notice to the patent holder to inform him that it no longer intended to pay royalties for the second and third generation patents.  The licensee served a statement of claim on the patent holder to terminate the licence contract for breach of Articles 59 of the ordinance of 30 June 1945 and Article 85 of the EC Treaty. They also lodged a complaint with the European commission, which then cancelled various clauses of the contract, including the above-mentioned clauses. The District Court of Paris and the Court of Appeal of Paris upheld the invalidity of the clauses pronounced by the Commission. As the licensee did not exploit the second or third generation patents, were they still bound to pay the minimum royalties?  The French High Court decided that there was no such obligation in this case.  This factual summary is important, as it should not be assumed that if the licensee simply does not exploit the licensed patent it can be released from its obligation to pay minimum royalties.

**94. -**  The price can be calculated in various ways: a lump sum price paid in several instalments; or fixed royalties or royalties based on a percentage of turnover or profits.  In these last two cases it is important to be very precise when specifying the basis for the calculation: turnover, sales price, profits, etc. The basis for the calculation must be strictly related to the subject matter of the licence. Otherwise, the clause is at risk of breaching Article 85, paragraph 1 of the EC Treaty.

It is therefore surprising that it was upheld that a clause stating that the licensee had to pay royalties on all of its turnover and not just on the turnover made through the licensed patents was legal and valid *(Paris 20 May 1986: JCP E*

88, I, 15160, observ. J.-J. Burst and J.-M. Mousseron and District Court of Paris 2 Feb. 1987: P.I.B. D. 1987, III, 245). Such a solution cannot be freely applied since it is clear that the contract in dispute is not in compliance with European competition laws.

In cases where the royalties are proportional to the turnover, the patent holder must include a clause in the contract which authorises it to check or have a third party check the turnover figures declared by the licensee.

Finally, as per the provisions of section 1129 of the Civil Code, the price of the licence must be determined or determinable.

It could be questioned whether royalties based on the licensee's turnover meet this requirement.

The District Court of Paris ruled that the price of an assignment of a patent for an invention was indeterminable if it was based on the exploitation of the invention and no minimum level of exploitation was set *(District Court of Paris 13 April 1988: P.I.B. D. 1988, III, 389)*. It could be feared that this solution – applied to an assignment of patent – could be followed for cases involving a licence. In any case, it is debatable. The turnover made by a licensee – like an assignee of a patent – does not entirely depend on its own volition. There are other factors that come into play such as market conditions, competition, etc. So we should approve the French High Court's decision that the price of an *assignment* of a patent that was based on turnover is determinable *(French High Court. req. 5 May 1905: D.P. 1906, 1, 360)*.

Moreover, it was found that the price of a sale of certain parts of a professional firm that was based on turnover made by the purchaser was determinable *(French High Court. 1st civ., 28 June 1988: D.S. 1989, 121, note Malaurie)*. The same solution was followed for a sale of shares whose price was based on the company's turnover and the rents it paid *(French High Court. Com. 15 June 1982: J.C.P. 84, II, 20141, note Grillet-Ponton)*.

**95. -**   It is also possible to make use of more than one option to achieve a combination of different types of royalties. It could be agreed for example to set a minimum lump sum regardless of the volume of production, and then supplement this amount with proportional royalties based on the turnover made by the licensee.

**96. -**   The royalties can be increased over time, or in rare cases, decrease over time. They can be indexed *(see J.-J. Burst, op. cit. n° 414)*.

**97. -**   The determination of the amount of royalties can be allocated to a third party pursuant to section 1591 of the Civil Code, as long as this third party acts as an expert and not an arbitrator. It is necessary to provide for a procedure to appoint the expert, even in a case where one of the parties may refuse the appointment *(For a tacit licence or a de facto licence, French High Court. Com. 1st Dec. 1964: Bull. civ. III, n° 527)*.

**98. -**   Royalties are considered indivisible.  This is what has been decided by case law in the situation where a licence contract is for a patent as well as for any future patents that may be lodged by the patent holder over the course of the contract. If the licensor is awarded new patents, the royalties will continue to be owed until the expiry of the last patent granted. And the royalties must still be paid in their entirety without the possibility of requesting any reduction as each patent expires *(Paris 13 April 1959: Ann. prop. ind. 1959, 228)*.  However, the European Commission considers that this solution is against Article 85, paragraph 1 of the EC Treaty *(see Fasc. 540)*.

**99. -**   b) **Terms and Conditions of payment**. – The obligation to pay royalties begins either at the inception of the contract or at the time of the exploitation *(French High Court. Com. 23 March 1965: Bull. civ. III, n° 217. - Paris 31 Oct. 1912: Ann. prop. ind. 1912, 427)*.

**100. -**   The obligation to pay royalties continues until the expiry of the contract *(Paris 13 April 1919: Ann. prop. ind. 1919, 228. - Paris 29 Jan. 1963: Ann. prop. ind. 1963, 221. - see also French High Court. Com. 27 Nov. 1963: Ann. prop. ind. 1966, 290, sursis à statuer sur le paiement de la redevance jusqu'à la décision sur la nullité du brevet)*.

**101. -**   Royalties are owed for the entire term of the contract.  In case of a judiciary termination, they are due until the date set by the court decision *(Paris 14 June 1962: Ann. prop. ind. 1962, 68)*.

**102. -**   Sometimes the term of the contract exceeds the lifetime of the patents, in which case the obligation to pay royalties continues after the expiry of the licensed patents. The Court of Paris ruled that such a provision was valid *(Paris 29 Jan. 1963: Ann. prop. ind. 1963, 361)*. However, its validity would be much more dubious under European competition laws *(see Fasc. n. 500)*.

Where the patent has fallen into the public domain, the payment of royalties is without consideration and a contract



with a term of 50 years should be considered as null and void, unless the contract provided that the royalties were to be paid over a period greater than the period for which the patent was valid *(District Court of Paris 26 March 1986: P.I.B. D. 1986, III, 288)*. If justified in this way, the obligation to pay royalties for an expired patent could be considered legal under European competition laws *(see Fasc. 500)*.

**103. -**   It is often provided that royalties acquired or paid will be retained by the patent holder in the event of termination or rescission of the licence contract. This clause is considered valid *(A. Chavanne: Rev. trim. dr. com. 1961, 75. - P. Roubier, op. cit. v. II, n° 189. - Civil Court of Seine 11 Dec. 1911: Ann. prop. ind. 1912, 67)*.

Some contracts include a clause providing that, in the event that the patent was successfully challenged by a third party and thus cancelled, or if it was infringed by a third party, the royalties would be paid into a secure account until the outcome of the proceedings.  In the absence of such a clause it is possible to obtain a court order for the consignation[ii] of royalties *(French High Court. Com. 18 Nov. 1980: Dossiers brevets 1980, I, n° 5. – On all issues related to royalties, see J.-M. Deleuze, Les rémunérations des transferts de technologie: Dossiers brevets 1980, 1, n° 6)*.

**b)  Negative Obligations**

**104. -**   Among the negative obligations that the licensee often takes on under a licence contract, are the no-challenge obligation*(1)*,  the non-competition obligation *(2)*  and the obligation not to export to certain territories. *(3)*

**1  The No-challenge Obligation**

**105. -**   The no-challenge obligation means that the licensee cannot challenge the validity of the patent, which in turn means it cannot seek the termination or rescission of the licence contract.

**106. -**   Such an obligation can only result from an express clause in the licence contract.

**107. -**   It is deemed valid by the French High Court *(French High Court. Com. 7 Dec. 1964: Ann. prop. ind. 1965, 174; D.S. 1966, 182, note R. Plaisant. - 23 March 1974: D.S. 1975, 537, note J.-P. Sortais)*.

**108. -**   This clause must be strictly applied, as decided by the French High Court in its decision on 17 December 1964 *(Ann. prop. ind. 1965, 172; D.S. 1966, 184, note R. Plaisant)*. According to this decision, the licensee who agreed to the clause reserves the right to oppose the invalidity of the patent if it are sued for infringement.

**109. -**   The no-challenge clause raises three areas for consideration.

**110. -**   It must be questioned whether the no-challenge clause precludes the licensee's right to seek the termination of the contract for lack of subject matter.  Isn't the right to seek the termination or rescission of a contract a public policy right?

**111. -**   Moreover, the no-challenge clause is no longer as effective since section 50 bis of the Law of 2 January 1968, reformed by the Law of 1978, decided that the decision to cancel a patent had an *erga omnes* effect. The cancellation of a patent is now enforceable for and against any person.  As a result the effect of the no-challenge clause is dramatically reduced, as the cancellation of the licensed patent at the request of a third party could be used as grounds by the licensee to seek the termination or rescission of the licence contract.

**112. -**   Finally, the no-challenge clause is greatly threatened by the application or European competition laws *(see Fasc. 540)*.

However, the European Court of Justice has pronounced:

> A no-challenge clause in a patent licence contract can, depending on the legal and economic context, have an effect of restraining competition in the sense of Article 85, paragraph 1, of the Treaty.  Such a clause does not however restrain competition where the licence including it was granted free of charge and the licensee is therefore not at a competitive disadvantage due to the payment of royalties or where the licence has been granted for a price but is for a technically outdated process which is not being used by the company who accepted the no-challenge obligation *(European Court of Justice, 27 September1988, aff. 65/86, Bayer AG et a. c. Suelhoefer: JCP E 88, I, 17869)*.

**113. -**   The clause in which the licensee cannot challenge the validity of the patent can be assimilated to a clause by which *the licensee recognises the validity of the patent.* However, this recognition does not prevent the patent from being cancelled at the request of the licensee *(Pans 24 July 1912: Ann. prop. ind. 1913, 35. - T. civ. Seine 8 May 1914: Ann. prop. ind. 1920, 62. - J.J. Burst, op. cit.; n° 309)*. This clause would give rise to the same reservations about its effectiveness under European competition laws as the no-challenge clause.

## 2  Non-competition Obligation

**114. -**  The question is whether a licensee, particularly an exclusive licensee, has the right to conduct any business that competes with that resulting from the licence. This question could apply to either the term of the contract or even after the expiry of the contract.

**115. -**  During the contract, unless there is a clause with very clear and specific terms that provides otherwise, the licensee has the right to conduct any business, even one that is in competition, as long as it does act fraudulently.

It was ruled that where the licensee does not cease manufacturing the licensed object, yet the turnover generated by sales decreases and the licensee begins manufacturing an equivalent yet different machine, as long as there is no deliberate manoeuvre on its part, the licensee has not committed any fault justifying the termination of the contract pronounced against it *(Paris, 4th div., 8 April 1964: J.C.P. 64, II, 13876, note R. Plaisant).*

It was also upheld that if there is no exclusivity clause benefiting the licensor, the licensee is not in breach if it seeks to promote its own products at the same time as those of the patent holder *(District Court of Paris 17 Oct. 1985: JCP E 87, II, 16055, observ. J.J. Burst and J.M. Mousseron. - District Court of Brive 23 Oct. 1987: P.I.B.D. 1988, n° 432, III, 182).*

A clause can be included to prohibit such actions. This clause is valid like any other non-compete clause as long as it is limited in both space *(see Burst, op. cit. n° 360)* and time.  In this area, like the non-competition obligation of a vendor of a business, it is based on the grounds of the general obligation incumbent on the licensee to perform the contract in good faith.

In the case of a licence contract to exploit a patent for an invention prohibiting the licensee from "outsourcing the manufacturing" of any articles of the same genre as those provided for under the contract, the Court of Appeal had valid grounds for declaring the licensee company was liable for the activities of another company, if based on unchallenged grounds,  the decision referred to a "subtle game played by the manager of the licensee company, who also held the position as technical commercial director of another company", "in its takeover of the latter company, the total confusion between these two companies, so closely intertwined that they shared everything, from management to premises, equipment and personnel", enabled the licensee company to hide behind the "puppet company" which represented the other, and which the Court of Appeal upholds as an instance of unfair competition "through an intermediary".

The clause of a licence contract to exploit a patented invention that prohibited the licensee from taking any interest in "articles of the same genre as those described" in the contract is unclear.  Its effect must therefore be ultimately assessed  at their discretion by the judges of merits *(French High Court. Com. 15 July 1965: Bull. civ. III, n° 437).*

**116. -**  It is possible to include a clause prohibiting the licensee from carrying out the activity that was the subject-matter of the licence *after the expiry* of the contract.  The prohibition on the activity must be strictly limited in space or time.

**117. -**  These clauses are likely to present issues for the application of rules against respective practices.

## 3  Obligation of non-exportation to certain territories

**118. -**  The contractual territory is usually limited to the country which issued the patent that covers the patented invention. So for example the contractual territory would be France where the invention is protected by a French patent.

So the question is whether the licensee can export to a territory that is not provided for in the contract.  Often patent holders are careful to include a clause in the contract that prohibits the licensee from exporting. Case law seems to uphold this clause as valid *(French High Court. Com. 25 April 1968: Bull. civ. IV, n° 130; D. S. 1968, somm. 103).* In any case this solution should be approved as the non-exportation clause should be considered as implicitly agreed upon in a licence contract.

Moreover, Article 43, paragraph 3 seems to uphold the same rule by stating: *"the rights granted by a patent application or patent can be used against a licensee that infringes one of the limits of its licence imposed by virtue of the preceding paragraph".*

However, it is true that the preceding paragraph mentioned in the provision does not make any reference to the territorial limits that may be included in a licence, but simply says that patents can be *"subject, either completely or partially, to the granting of an exclusive or non exclusive licence to exploit".*



However, case law has considered that a licensee who exploits outside its territory is guilty of infringement *(Paris 21 Dec. 1989: P.I.B.D. 1990, n° 476, III, 243)*. Of course, such infringement would be based on the assumption that the patent holder holds a patent in the territory to which the licensee is exporting without consent. If not, going outside the licensed sector is a breach. Therefore even just participating in an international fair organised on a territory in which the licensor has exclusive rights was considered a breach on the part of the licensee *(District Court of Paris 17 Oct. 1985: Dossiers brevets 1986, III, 5; P.I.B. D. 1986, III, 69)*. However, it is important to take into account that European competition laws do not allow export bans to be imposed on a licensee for a territory that is a European Member State in which the patent holder does not hold a patent *(see Fasc. 540)*.

**119. -** It is however very clear that the non-exportation clause can be actionable under Article 85, paragraph 1 of the EEC Treaty *(see Fasc. 540)*.

### 2° Obligations of the licensee with regard to the know-how transferred

**120. -** Here are all the common clauses in a licence contract for know-how *(see Fasc. 460)*.

**121. -** These clauses include obligations for the licensee, some of which are positive *(a)* and some which are negative *(b)*.

#### a) Positives Obligations

##### 1 Obligation to use the know-how

**122. -** The licensee obviously has an obligation to use the know-how received.

**123. -** Often the contract will specify that the know-how can only be used in a specific territory and only for the purposes set out in the contract.

##### 2 Obligation to pay a price

**124. -** The parties to the licence contract have the choice between two options: either a single price for the licence for the patented invention and the provision of know-how, or else they may provide for a separate remuneration for the know-how.

The second option seems preferable to the first as it avoids difficulties in determining the price for the know-how when the contract is partially terminated or rescinded due to the cancellation of the patent covering the licensed invention.

Where a separate price is set for the know-how, it is important to ensure that it is determined or determinable *(see Fasc. 490)*.

**125. -** The price can be a lump sum, payable in several instalments; it can also be set in the form of fixed royalties, or royalties based on a percentage of turnover or profits, or even a combination of both *(see above n° 94. - see also A. Chavanne and J.J. Burst, op. cit. n° 496, p. 271)*.

#### b) Negative Obligations

##### 1 Confidentiality Obligation

**126. -** The licensee may undertake not to disclose the know-how received; which among other implications means they cannot pass it on to any other party.

##### 2 Obligation to cease exploitation at a date set by the contract

**127. -** The patent holder's provision of know-how could be final or temporary. It is temporary where the licensee is no longer supposed to use this know-how once the contract expires. Such a solution is rarely implemented; usually the supply of the know-how is final, namely the licensee can continue to use it after the end of the contract.

**128. -** We note that placing time limits on the transfer of know-how would create issues under European competition laws.

## II. - TRANSFER OF THE LICENCE CONTRACT



**129. -** The licence contract is traditionally considered to be a *intuitu personae* contract, insofar as the licensee cannot freely assign*(A)*, however it is seldom asked whether the *intuitu personae* restriction would also apply to the patent holder*(B)*.

## A. -  Personal nature of the contract with regard to the licensee

**130. -** The licensee has been granted the right to exploit due to its personal characteristics. As a consequence the licensee is prohibited from sub-leasing by granting a sub-licence *(1°)* and from freely assigning their contract *(2°)*.

### 1° Prohibition of sub-licences

**131. -** It is important to firstly clarify the principle underlying this prohibition*(a)*, and then examine its scope *(b)*.

#### a) Principle

**132. -** If the licensee was to grant a sub-licence this would mean granting in turn all of its own licensing rights to a third party. It is therefore a form of sub-leasing.  Indeed, section 1717 of the Civil Code expressly authorises a lessee to sub-lease as long as this right is not revoked by the lessor. It could be decided that the same should apply to the licensee. However, in reality this is not the case and even partial sub-license is prohibited.

Indeed, it was ruled that the nature of the licence is that it grants only its beneficiary the right to personally exploit the patent and that, unless there are provisions to the contrary, the licensee must ensure that it alone has the enjoyment of this right *(Civil Court of Seine 10 Dec. 1904 and Paris 31 May 1906: La Loi, 16 June 1906)*.

If the licensee were to grant an unauthorised sub-licence it would constitute a breach of its obligation to exploit personally.  The licensee's contractual liability would be invoked and the contract may be terminated at the fault of the licensee. *(Civil Court of Seine 23 June 1933: Ann. prop. ind. 1934, 39, note F. Jacq)*. Moreover, a sub-licence granted under such circumstances would be null and void. The sub-licensee would be considered to be infringing the patent and cannot raise the defence of having a licence for the patent. *(Paris 31 May 1906: D.P. 1908, 5, 1)*. The licensee would be considered an accomplice in the infringement by providing the means for it and would be jointly liable with the sub-licensee unless it could prove that it was acting in good faith.

This solution is justified. If the licensee was chosen because of their aptitudes, solvency etc., it is understandable that the patent holder would not want the invention to be exploited by a third party who may not have the same credentials.

These are the consequences of the *intuitus personae* nature of the licence contract, as set out in section 1237 of the Civil Code that states: *"The obligation to perform cannot be transferred to third party against the will of the creditor, where the creditor has an interest in having the obligation performed by the debtor himself"*.  It is clear from this provision that the obligations arising under the contract are strictly personal to the parties involved. They cannot be assigned to, or be performed by, a third party.

The prohibition against sub-licensing, except where express consent has been given by the patent holder, thus has valid legal grounds.

**133. -** But this prohibition can be removed by a clause in the contract *(P. Roubier, op. cit. v. II, n° 184, p. 264. - Paris 19 March 1902: Ann. prop. ind. 1903, 264)*.

In this case, the contract must at least specify whether the licensee has to give the patent holder a percentage of the royalties that they receive from sub-licensees.

Obviously a sub-licence contract for a patent that has not been the subject of a licence contract is void for a lack of subject matter *(Paris 27 May 1987: D. S. 1988, somm. 349, observ. J.M. Mousseron and J. Schmidt)*. And if a licensee granted a sub-licence without registering its own licence in the National Patents Registry, the sub-licence contract would be terminated.  The licensee cannot prove that it holds the rights that it is granting to the sub-licensee *(Ibid.)*.

**134. -** It is this *intuitus personae* character of the licence contract that explains why the receiver, under the application of the Law n° 67-563 of 13 July 1967 on insolvency procedures could not, on the basis of section 38, order the continuation of the licence contract due to the licensee being under receivership or liquidation proceedings *(District Court of Paris 7 March 1974: Gaz. Pal. 1974, 1, 390. - District Court of Paris 3 July 1981: P.I.B. D. 1981, III, 238. - Paris 6 Jan. 1983: Dossiers brevets 1983, III, 6)*. This is also the reason why the receiver could not assign the licence contract against the will of the patent holder, even though there was a clause in the contract that authorised the assignment of the contract *(District Court of Paris 3 July 1981, prec.)*.

Would this solution still be valid under the application of the Law of 25 January 1985 on insolvency procedures?

It is seriously doubtful that it would.



In an unclear provision, section 37, paragraph 5 of this law states that *"notwithstanding any legal provision... no termination or rescission of a contract can result from simply commencing receivership proceedings"*.

The French High Court had to rule on a contract for a current account, traditionally considered within commercial practice as an *intuitu personae* contract, in order to decide whether such contracts entered into in the consideration of the contracting party as a specific person would still have to cease once receivership proceedings were underway. It ruled that the Law of 25 January 1985 rejected "any distinction based on whether the contracts were entered into on the basis of considering the specific person" *(French High Court. Com. 8 Dec. 1987: D. S. 1987, 53, 2 e esp., note Derrida; J.C.P. 88, II, 20927, note Jeantin: Rev. trim. dr. com. 1988, 97, observ. Cabrillac and Teyssié)*. The Court of Appeal confirmed the solution *(Lyon, aud. sol. 5 Dec. 1988: D. S. 1988, 52, 2 e esp., note Derrida)*. It is true that continuing the current account contract as requested by the receiver helped operations to continue during the observation period. The French High Court went even further by deciding that the rule is also applicable to liquidation proceedings *(French High Court. Com. 17 Oct. 1989: D. S. 1990, somm. 2, observ. Derrida)*.

The High jurisdiction considered that there was no need to distinguish between *intuitu personae* contracts and other contracts, so there would be a tendency to accept the same rule as applying to the patent licence contract. The receiver is therefore entitled to order the continuation of the licence contract even if the licensee is under receivership or liquidation proceedings.  And any clause providing for the termination of the contract as of right in such circumstances would not override the will of the receiver.

### b)  Scope of the prohibition

**135. -**   The personal nature of the licence contract raises the question of whether the licensee can commission the services of third party in exploiting the patent *(1)* and whether they are free to choose their suppliers *(2)*.

### 1  Outsourcing by the licensee to third parties

**136. -**   Without actually granting a sub-licence, the licensee may require the services of third parties, namely sub-contractors.

In this case, the sub-contractor does not sell to the public, as this is done by the licensee; it only sells to the licensee. The prohibition on sub-licences does not prohibit the licensee from outsourcing the manufacturing to a sub-contractor.

The licensee has the right to have something manufactured on its behalf, and exclusively on its behalf, by a sub-contractor, unless there is an express clause to the contrary in the contract *(Paris 27 Jan. 1866: Ann. prop. ind. 1869, 289. - Rouen 7 Jan. 1866: Ann. prop. ind. 1869, 295. - J.-J. Burst, op. cit. n° 373, p. 225. – For a very special case, see French High Court. Com. 13 May 1969: Bull. civ. IV, n° 161)*.

**137. -**   Obviously if they are bound by a confidentiality obligation, the licensee cannot sub-contract if this would require it to pass on all or part of the know-how transferred under the licence contract.

### 2  The licensee's freedom to choose suppliers

**138. -**   As a general rule, the licensee has complete freedom in its choice of suppliers.

However there are cases where this choice is restricted.

The first case is where a licensee has agreed under the terms of the contract to use the patent holder as its only supplier *(see above n° 83)*.

**139. -**   The second case is where there is there are separate licences for the manufacturing and for the sale of the licensed articles. Obviously in such a case the beneficiary of the sales licence must use the manufacturing licensee as its sole supplier.

**140. -**   The third case is where the licence is only for the sale of a medicine made with an active substance, the manufacturing of which is licensed to a third party.

### 2°  Transfer of the contract

**141. -**   The contract can either be transferred alone *(a)* or with a business*(b)*.

### a)  Assignment of the contract alone



**142. -** The licensee is not authorised to assign its licence contract on its own *(Civil Court of Seine 10 Dec. 1904 and Paris 31 May 1906: The Law of 16 June 1906. - T. civ. Seine 23 June 1933: Ann. prop. ind. 1934, 39. - Commercial Court of Nantes 28 Feb. 1912: Ann. prop. ind. 1913, 218).*

**143. -** The contribution in kind of the licence contract to the company would constitute a breach of contract and would justify its termination *(Civil Court of Seine 23 June 1933: Ann. prop. ind. 1934, 39).*

This rule is based on the concept of *intuitus personae.*

**b) Assignment of the contract as part of a business**

**144. -** Assigning the contract is allowed if it is assigned as part of a business *(Paris 13 Dec. 1882: Ann. prop. ind. 1884, 88. - District Court of Paris 11 Jan. 1970: Bull. I.N.P.I. 1970, 111).* Of course such a case must comply with the provisions of section 1690 of the Civil Code.

Indeed, it is considered that as the whole company is transferred as a going concern, the *intuitus personae* element is conserved *(P. Roubier, op. cit. v. II, n° 184, p. 264 et seq.).*

However, in reality this solution is debatable.

In the event of the sale of the licensee's business, the patent holder may not wish the licence to benefit what may be one of its most direct and perhaps most threatening competitors.

It would therefore be more appropriate to decide that the *intuitus personae* nature of the licence contract precludes the transfer of the contract even when transferred with the whole business.

**145. -** It is not unusual however for patent holders to be careful to include a clause in the licence contract that prohibits the assignment of the contract and also provides that the patent holder can terminate the contract in the event of merger, takeover or change of control of the licensee company.

**B. -** **Personal Nature of the contract with regard to the patent holder**

**146. -** It could be questioned whether the patent holder can freely assign the licence contract or if, on the contrary, any assignment of the contract alone is prohibited, just as it is for the licensee.

There would be two main reasons for raising this question: does section 1237 of the Civil Code prevent the contract from being freely assigned? *(1°);* and is the ability to assign the contract prevented by the fact that the contract in question is a bilateral contract *(2°)*?

There are some observations to be made in light of section 43, paragraph 4 of the Law of 2 January 1968 *(3°).*

It is however clear that the patent holder cannot freely surrender the patent or some of its claims *(4°).*

**1°** **Inability to assign the contract by application of section 1237 of the Civil Code**

**147. -** Section 1237 of the Civil Code states that the obligation to perform cannot be transferred to a third party against the will of the creditor if the creditor has a particular interest in having the obligation performed by the debtor.

It is clear that section 1237 is not applicable where the patent holder does not take on any positive obligations due to the effect of the no-warranty clauses.

On the other hand, section 1237 would fully apply where the patent holder does have positive obligations of a personal nature, which must be performed by the patent holder, such as technical assistance, know-how, communication of improvements, etc.

**2°** **Inability to assign the licence because it is a bilateral contract**

**148. -** Where the contract creates positive obligations for both the patent holder and the licensee, there is undoubtedly a bilateral contract.

The assignment of a bilateral contract would be considered an assignment of a receivable  and an assignment of a debt. Although the first is regulated by the Civil Code, the second is not. Does this imply that it is impossible to assign such a contract? The answer is no.



However, the consent of the assignee is required for the contract to be assigned, as the contract comprises debts, and nobody can be deprived of its debtor without its consent *(C. Lapp, Essai de la notion de cession de contrat synallagmatique à titre particulier, thesis Strasbourg 1950)*. So for the assignment of a licence contract to be perfectly valid, it would require not only the consent of the patent holder and its assignee, but also the consent of the licensee.

Case law seems to adopt the same position *(Paris 22 June 1905: Ann. prop. ind. 1906, 68, note Claro; D.P. 1912, 1, 397, note Claro. - Cpr Commercial Court of Nantes, 28 Feb. 1912: D.P. 1913, 2, 101)*.

### 3°  Section 43, paragraph 4 of the Law of 2 January 1968

**149. -**  Section 43, paragraph 4 of the Law of 2 January 1968 states:  *"Except for the case provided for in* section 2*, a transfer of the rights set out in the first paragraph shall not harm the rights acquired by third parties before the date of the transfer"*.

The case provided for in section 2 is where a claim for the proprietary right to the invention is successful.  In such a case, any licence contracts that may have been entered into by the former owner of the patent would be deemed as having been formed *a non domino*.

However, where the holder of the patent assigns its right, any prior licence contracts entered into must be taken over by the assignee. This is the solution set out by section 43, paragraph 4.

**150. -**  Does this imply that the said provision would then authorise the patent holder to freely assign its right? Certainly not, as such a conclusion would go well beyond the letter of the literal meaning of section 43, paragraph 4. This provision should be understood to simply mean that licence contracts entered into before the assignment of the patent are to be maintained.

### 4°  Surrender by the patent holder of the patent or of certain claims

**151. -**  Under the terms of section 47, paragraph 1 of the Law of 2 January 1968, the *"owner of a patent can at any time surrender either the whole patent or one or more claims of the patent"*.

And according to the 3rd paragraph of the same section, *"if real rights under a possessory lien or licence have been registered at the National Patent Registry, the surrender of these rights is only admissible if consent has been given by the owner of the said rights"*.

The surrender of a patent or any of its claims is thus subject to the licensee's consent.

## III. -  END OF A LICENCE CONTRACT

**152. -**  A licence contract can be terminated when it was supposed to *(A)* or early *(B)*.

## A. -  Standard termination of the contract

**153. -**  In order to examine the natural termination of a contract, we must examine the causes *(1°)* and then the consequences of this standard termination of the contract *(2°)*.

### 1°  Causes

**154. -**  There are two situations depending on whether the contract is for a fixed term *(a)* or an indefinite term *(b)* or where it has no indication of the term *(c)*.

#### a) Fixed term contracts

**155. -**  The licence contract is often entered into for a fixed term. This term can vary: either the term for which the patent or patents for the licensed invention are valid or a shorter term.  Some contracts even have a term that exceeds the validity of the patent, but this is a controversial provision as it is considered a breach of Article 85, paragraph 1 of the EC Treaty *(see Fasc. 540)*.

The contract can naturally reach the end of its term and be renewed if there is a clause of tacit renewal.  If the parties have not indicated the term of the renewed contract, then it will become an indefinite term contract.

Unless the contract is renewed, then the expiry of the term would constitute a cause for the natural termination of the contract.



### b)  Indefinite term contract

**156. -**  According to common law, a contract entered into for an indefinite term can be terminated at any time by either of the parties subject to compliance with a notice period.

Clearly, a contract entered into for an indefinite term can be dangerous for either party and in particular for the licensee who may have made significant investments towards the development and production of the licensed invention and would therefore lose its contract before getting any return on such investments.

If the patent holder does not comply with a notice period, it commits a fault *(District Court of Paris 1st Feb. 1985: P.I.B. D. 1986, III, 59)*.

### c)  Contract without any indication of term

#### 1  Fixed term or indefinite term contract:

**157. -**  A contract without any indication of term raises the obvious question: is it an indefinite term contract or a contract with a term limited to the validity of the patent(s) protecting the licensed inventions? Case law tends to favour the second option *(Paris 1st March 1963: Ann. prop. ind. 1953, 28)*.

The Court of Paris upheld in this case that it could be concluded from the wording of the contract and the intention of the parties that the licence was entered into for the lifetime of the patents to which it applied.  And it could not be argued in this case that the clauses of the contract providing that the parties could also benefit from the patents for improvements made the licence contract of an indefinite term; indeed, granting the benefit of the patent for the improvement seemed to extend the licence for the lifetime of the patent, but did not necessarily convert it into an indefinite term contract.

**158. -**  If there is no term indicated, the licence is for an indefinite term. It can be terminated at any time *(Paris 10 August 1958: Ann. prop. ind. 1960, 38. - Paris 29 Jan. 1963: Ann. prop. ind. 1963, 28)*.

Where no term has been provided for, the patent holder has the right to terminate the **oral contract** of licence to exploit at any time. A former licensee who admits to having continued to exploit after the termination of the licence is guilty of infringement *(Paris 10 Nov. 1959: Ann. prop. ind. 1960, 58)*.

**159. -**  A licence for improvements discovered by the patent holder, or a reciprocal licence for the improvements discovered by the licensee, tends to make the matter much more complicated if there is no term provided for in the licence.  The same applies to a licence for a patent and know-how.

Indeed, a licence for improvements can significantly extend the term of the licence, as do improvement patents or certificates of addition.

A further complication arises from the definition of what constitutes an improvement.  If this is strictly defined, namely by reference to a certificate of addition, the extension of the contract would be limited. On the contrary, if it is defined loosely, the extension of the term can be for much longer.

Given the case law ruling that a licence does not become an indefinite term contract simply because it has included improvements in its scope *(Paris 1st March 1963: Ann. prop. ind. 1963, 28, prec., n° 157)*, the term of the licence is only extended for the term of the improvements.

Once again, it depends on the facts of the matter and the parties' intention. It would be tempting to think that if there is no term provided for in the contract, particularly if the concept of improvement can be interpreted in a wider sense, then it becomes an indefinite term contract once the original patents expire. Otherwise, with each further improvement the parties could be bound to a contract with a subject matter that only vaguely resembles its original subject matter. The contract would be null and void in the absence of agreement on a specific subject matter.

#### 2  Term for the performance of various obligations

**160. -**  The licence can include various obligations, and in particular the licensee has an obligation to exploit.

In the case of a patent licence contract granted to a company intending to commercialise the said patents by either negotiating them, by creating operating companies, or by granting sub-licences, the fact that there was no timeframe formally set for the performance of the contractual obligations did not render the contract null and void under section 1174 of the Civil Code.



The failure to expressly set a timeframe does not in fact allow the said company to unilaterally avoid its obligations where the contract includes an implied obligation to comply with a certain timeframe, due to the rule that such an obligation is common practice in those types of contracts and it must be followed by the parties, even if not formally expressed *(District Court of Paris, 3rd div. 17 March 1969, Adiba c. Sté Française de Coopération Industrielle).*

### 3  Extension of the patents

**161. -**  One particular issue arises in cases where the lifetime of the patent is extended during the licence. This can occur when the standard legal term is extended; or when the term of the patent is extended due to exceptional circumstances, such as war.

As regards the first scenario, the issue was resolved by the decree of 29 July 1939.

This decree of 29 July 1939 changed the validity of patents previously set at fifteen years to twenty years, and any patents in force at the date of promulgation of the decree would benefit from this five-year increase. Section 3 of the decree of 29 July 1939 governed the application of this extension to patent assignments or licences: stating that these would continue to be performed, unless the beneficiaries of these contracts declared their intention to waive this extension by giving six months' notice before the original expiry date they had agreed upon.

If the parties cannot come to an agreement, the courts rule on the price and royalties to be paid during the extension period of the rights of assignees and licensees *(see French High Court. Com. 8 Nov. 1954: JCP G 54, IV, 169; Bull. civ. III, n° 330. - Commission prolongation des brevets 12 July 1922: Ann. prop. ind. 1922, 321. - see also CE 3 August 1923: Ann. prop. ind. 1924, 7. - Casalonga, op. cit., v. I, n° 756).*

In the second scenario, section 9 of the Law of 20 July 1944 and the Law of 2 April 1946 provide that licence contracts would continue to apply, subject to the licensee's right to waive this extension within three months of the date on which the decision to extend or restore the patent was made.

### 2°  Consequences

**162. -**  There are two issues worth exploring: the right to renew the contract *(a)* and inventory repurchase *(b).*

#### a)  The right to renew the contract

**163. -**  It is possible that a fixed term contract that reaches the end of its term may not be renewed by the patent holder; a non-renewal does not constitute an abuse of the right *(District Court of Paris 30 March 1987: JCP E 88, II, 15160, observ. J.J. Burst and J.M. Mousseron);* the licensee cannot claim any compensation if the patent holder decides against renewal. The same applies when the patent holder decides to terminate an indefinite term contract in compliance with the notice period *(District Court of Paris 1st Feb. 1985: P.I.B. D. 1986, III, 59).*

#### b)  Inventory repurchase

**164. -**  If the contract is terminated for one of the above-mentioned causes, the licensee must immediately cease exploiting for the remainder of the period for which the patent for the invention is valid.

But at that point in time, the licensee may still have a stock of patented products made by using the patented process. In principle, the licensee would not be allowed to sell these products.  And section 30 bis of the Law of 2 January 1968 does not change this general rule, as the patent holder's right is not yet exhausted. The patent holder's right is only exhausted once the products are put on the market.

**165. -**  If the licensee is not authorised to sell these products, is the licensor required to repurchase them?  According to the solution given by case law in the area of commercial licenses, it would seem the answer is no in at least two cases: where the patent holder has decided not to renew a fixed term contract or has legally terminated an indefinite term contract, without committing any fault. It is only in a case where the patent holder terminates an indefinite term contract suddenly and without reasonable grounds that the licensee could claim that the patent holder has an inventory repurchase obligation *(see J.J. Burst, op. cit. n° 226 et seq., p. 129 et seq.).*

It is worth noting that a supplier who terminates a distribution contract without complying with a notice period and thus allowing the distributor to sell or otherwise dispose of its inventory, acts "unlawfully and against accepted practice" *(District Court of Paris 17 Oct. 1985: Dossiers brevets 1986, III, 5).*

**166. -**  Indeed, if the parties wish to avoid such difficulties in determining what happens to unused inventory after the contract terminates, it is recommended that they resolve the issue by including a relevant clause in the contract.



## B. - Early termination of the contract

**167. -**  There are two distinct situations here: where there are no clauses in the contract *(1°)* and where there are clauses in the contract *(2°)*. But the disputes that could result from the termination of the contract could also create difficulties in determining the appropriate jurisdiction *(3°)*.

### 1°  Where there are no relevant clauses

**168. -**  If there are no relevant clauses, the licence contract could end either due to its termination or rescission *(a)*, or nullity *(b)*. Below is a summary of the penalties that could be imposed on the party responsible for the termination or rescission of the contract *(c)*.

#### a)  Termination or rescission of the contract

**169. -**  The termination or rescission of the contract could be pronounced on the grounds of the exclusive fault of the patent holder *(1)*, or the licensee *(2)*, or pronounced against both parties *(3)*. It is interesting to note the cases where the courts have refused to order a termination or rescission *(4)*.

##### 1  At the exclusive fault of the patent holder

**170. -**  a) **Non performance of the obligation to allow enjoyment.** – If the patent holder breaches its obligation of delivery and in particular fails to perform its obligation of granting enjoyment, the contract could be terminated on the grounds of the exclusive fault of the patent holder *(Paris 19 Dec. 1929: Ann. prop. ind. 1930, 143. - see above n° 4)*.

**171. -**  b) **Non performance of the obligation to provide know-how and technical assistance.** – Evidently, the contract would be terminated or rescinded at the exclusive fault of the patent holder where it is bound to provide its know-how and technical assistance technique and does not fulfil this obligation *(see above n° 8 et seq.)*.).

**172. -**  g) **Non performance of the obligation to communicate improvements**. – The same would apply where the patent holder does not perform its obligation to communicate any improvements it may have implemented *(see above n° 5 et seq.)*.

**173. -**  d) **Non performance of the obligation to allow continued enjoyment**. - The contract would be terminated or rescinded at the exclusive fault of the patent holder where:

- the patent holder refuses or neglects its duty to take legal action against infringing parties *(see above n° 34)*;
- the patent holder has not kept the patent in force *(see above n° 53 and above n° 78)*;
- the licensee was found guilty of infringement *(see above n° 43)*;
- the licensed invention has a material design defect *(see above n° 14 et seq.)*;
- the patent holder has not, generally speaking, allowed the licensee quiet enjoyment and has not provided the warranty against eviction *(Paris 14 March 1901: Ann. prop. ind. 1901, 349. - Paris 23 Dec. 1927: Ann. prop. ind. 1928, 118)*;
- where the patent holder has not complied with its exclusivity obligation; any third party who is an accomplice in this violation of the patent holder's obligation will also be liable *(Paris 10 Jan. 1978: P.I.B. D. 1978, III, 343)*.

##### 2  At the exclusive fault of the licensee

**174. -**  a) **Non-performance of the obligation to pay royalties**. – One of the essential obligations incumbent on the licensee is the payment of royalties, so failure to pay is penalised by the termination or rescission of the contract at the exclusive fault of the licensee *(Paris 20 June 1922: Ann. prop. ind. 1922, 353. - Paris 19 June 1962: Ann. prop. ind. 1962, 168. - see also French High Court. Com. 27 Nov. 1963: Ann. prop. ind. 1964, 130. - Decisions concerning the payment of a minimum amount of royalties, Paris 31 Oct. 1955, Ann. prop. ind. 1957, 427. - Paris 19 March 1963. Ann. prop. ind. 1963, 885. - French High Court. 1st civ., 12 Nov. 1962: Bull. civ. I, n° 470. - Also, French High Court. Com. 15 July 1969: Bull. civ. IV, n° 267)*.

**175. -**  b) **Non-performance of the obligation to exploit**. – The licensee's failure to perform its obligation to exploit would lead to the termination or rescission of the contract *(see above n° 177 et seq. - French High Court. Com. 2 Dec.*



*1963: Ann. prop. ind. 1964, 130. - Paris 22 Nov. 1977: Ann. prop. ind. 1979, 305)*, as it is the licensee's responsibility to put the invention into production and overcome any difficulties, unless they are insurmountable *(T. civ. Paris 10 April 1980: P.I.B. D. 1980, III, 177. - Paris 13 Feb. 1981: P.I.B. D. 1981, III, 127).*

**176. -  g) Non-performance of other obligations**. – As part of exploiting the licence, the licensee can go beyond the scope of the restrictions set by the contract.

Where the licensee has misjudged the territorial constraints provided for in the contract, it will be considered, at least when it comes to manufacturing, as an infringing party *(T. civ. Seine 10 Nov. 1920: Ann. prop. ind. 1921, 48)*. By exploiting in a territory for which it is not licensed, the licensee can harm another licensee who has been granted a licence for that territory. This other licensee could also bring proceedings for unfair competition *(French High Court. Com. 25 April 1968: Bull. civ. IV, n° 130)*.

Where the first licensee has limited its activity to merely selling in a territory of another licensee, the rule is less clear due to the application of European competition laws *(see Fasc. n. 500)*.

A licensee can also go beyond the scope of its contract by using the licensed invention for a purpose that has not been provided for under the contract *(Paris 15 Nov. 1882 and French High Court. Com. 24 Nov. 1883: Ann. prop. ind. 1888, 266. - Paris 27 May 1923: Ann. prop. ind. 1927, 20).*

In such a case, the licensee is definitely guilty of infringement. Section 43, paragraph 3 gives a solution on the matter. It states: *"The rights granted by the patent application or patent can be invoked against a licensee who infringes one of the restrictions of their licence imposed under the preceding paragraph"*.

The preceding paragraph of section 43 provides: *"They (the rights granted by a patent application or patent) are subject, either completely or partially, to the granting of an exclusive or non exclusive licence to exploit"*.

It was also decided that a licensee is also guilty of infringement if it grants a sub-licence for manufacturing which prohibits the original licensee from manufacturing, and despite this prohibition, this original licensee still manufactures the licensed article *(French High Court. Com. 18 Nov. 1980: Dossiers brevets 1980, I. 5)*.

It must therefore be concluded that a licensee who misjudges one or more of its obligations commits a fault under section 1184 of the Civil Code, which would engender the termination or rescission of the contract.  But where the breach of contract also constitutes an infringement of the patent holder's right, the licensee is also guilty of infringement. It is therefore important to distinguish between what is an infringement of the patent holder's monopoly and what is a mere breach of contract.  It is self-evident that a licensee who is guilty of infringement also commits a fault with regard to its contractual liability *(Paris 5 Dec. 1907: Ann. prop. ind. 1908, 32. - see also French High Court. Com. 21 Feb. 1910: Ann. prop. ind. 1910, 338. - Paris 22 June 1905 and French High Court. req. 29 Jan. 1907: Ann. prop. ind. 1906, 99 and 1907, 173).*

**177. -**  It was thus ruled that the contract would be terminated at the exclusive fault of the licensee where it commits the following faults:

-   where it fails to perform its contractual obligations, however minor. Even if the said obligations seem to be simple details, they still constitute the law of the parties; and the fact that they are mentioned in the contract is sufficient to make their non-performance constitute a breach of contract by the licensee;
-   In particular, the licensee cannot argue the waiver of the patent holder regarding some clauses of the contract and demand their performance under the pretence that it could have waivered some specific clauses or the contract.  This would constitute a presumption of a waiver, which is against the clear principles of common law in this matter *(Civil Court of Seine 12 Jan. 1906: The Law of 15 January 1906. - Paris 20 March 1913: Ann. prop. ind. 1914, 1, 5. - see also French High Court. req. 18 March 1919: Ann. prop. ind. 1929, 1, 359)*;
-   Where it claims to be the exclusive licensee of a patent despite a court order that has become final, and contrary to the truth *(Civil Court of Seine 12 Jan, 1906, prec.)*;
-   Where it assigns its licence to a third party, despite its obligation to conserve the *intuitus personae* nature of the licence *(Paris 31 May 1906: The Law of 16 Jan. 1906. – Civil Court of Seine 23 June 1933: Ann. prop. ind. 1934, 39, note F. Jacq, Apport en société de la licence contrairement aux clauses de celle-ci)*;
-   Where it tries to substitute the patented article that is subject matter of the licence with a similar article which it then sells to its customer base *(Paris 31 May 1906, prec.)*;
-   Where they give the patent holder inaccurate accounts of the manufactured products *(Louviers 21 June 1912: Ann. prop. ind. 1913, 1, 127)*;
-   Where it does not pay the annual fees of the patent that have been placed under its responsibility, and as a result the patent lapses *(T. civ. Seine 23 June 1933)*;
-   Where it grants a sub-licence without the patent holder's consent *(see above n° 132)*.

## 3 Pronounced against both parties

**178. -**   The termination of the contract could be pronounced against both parties, if each of them is in breach of contract *(French High Court, Com. 4 Nov. 1958: Bull. civ. III, n° 372).*

There would also be a termination without awarding of damages where the licensee has ceased payment of royalties for two years and where the patent holder has affirmed, before any claim for termination of the contract, to any person who has relations with its licensee, that the latter no longer has the right to exploit its licence, and these actions have made it impossible for the licensee to exploit *(Commercial Court of Seine 15 Dec. 1922: Ann. prop. ind. 1923, 1, 150).*

Similarly, where the patent holder requests termination for lack of exploiting its licence, the termination can be pronounced against both parties if there are difficulties experienced by the licensee in exploitation of developing the invention *(see above n° 118. - By analogy, see French High Court. Com. 16 May 1961: Bull. civ. III, n° 212).*

The licensee is under a strict obligation to exploit promptly, and has full responsibility for developing the invention: it will therefore be liable if it does not produce the quantities that it committed to under the contract.

The licensee also commits a fault if it breaches its contractual obligation to have the articles produced carry the inscription that they are manufactured under the patent holder's licence.

As for the patent holder, it commits a fault if it causes the failure of some of the licensee's projects.

As a consequence, the termination of the licence contract would be pronounced against both parties *(Paris 22 May 1973: Ann. prop. ind. 1974, 205).*

The rescission of a licence contract was pronounced against both parties where the licensee breached its obligation to exploit and manufacture, even though the difficulties of producing the prototype were not insurmountable, but in this case the patent holder was also liable for not having facilitated the production of the prototype, thus breaching its obligation to provide technical assistance *(Nîmes 11 March 1987: Juris-Data n° 090091).*

The termination of a licence contract had to be pronounced against both parties in a case where on the one hand the licensee had not deliberately tried to "freeze" the patent holder's invention, as it had emerged from the expert's report that it had invested 18 million francs in order to be able to exploit and it was in its obvious interest to succeed in this endeavour, and on the other hand the patent holder had complied with its commitment by making considerable efforts towards the final development of its invention *(District Court of Paris 5 February 1985: P.I.B. D. 1986, III, 184).*

## 4  Refusal by the judge to order the termination or rescission

**179. -**  It was however ruled in the following cases that there would be no termination due to insufficient cause:

-   Where the licensee did not place the S.G.D.G caption[iii] on the products *(Paris 22 June 1905: Ann. prop. ind. 1906, 49)*;
-   Where the patent holder failed or refused to take legal action against infringing parties, but had assigned this right to the licensee itself *(Paris 19 March 1900: Ann. prop. ind. 1903, 264)*;
-   Where the licensed invention did not work properly, but the licensee had declared in the contract that it had full knowledge of its value *(Commercial Court of Saint-Etienne 21 March 1905: Gaz. Lyon 13 April 1905)*;
-   Where the patent was not valid, but the licensee had waived its right to the patent holder's warranty under the contract *(Lyon 13 Feb. 1906: Ann. prop. ind. 1907, 1, 219. - Paris 17 May 1923: Ann. prop. ind. 1927, 1, 27)*;
-   Where the patent was cancelled prior to the licence contract, but as a result of criminal proceedings and due to a different application of the licensed invention, but regardless of this issue affecting the patent the licensee had benefited from peaceful enjoyment of its right to exploit *(Grenoble 20 July 1877: Ann. prop. ind. 1878, 83)*;
-   Where the licensee claimed to be an exclusive licensee even though, in contracts subsequent to the licence contract, it waived this right, and yet it retained the title of sole licensee, without waiting for the court decision to officially change its status as a result of these contracts *(Paris 22 June 1905: Ann. prop. ind. 1906, 49)*;
-   Where the licensee granted a sub-licence for manufacturing with a prohibition on its own ability to manufacture, and it committed an infringing act *(French High Court. Com. 18 Nov. 1980: Dossiers brevets 1980, 1, n° 5)*;



> - Where the licensee, authorised by the contract to grant sub-licences, refused to accept a sub-licensee who did not agree to the licensee's specific conditions. In this case it was not an abuse but merely a use of a right, as an abuse can only result from an act that harms another without legitimate and understandable reasons *(Commercial Court of Seine, 21 Nov. 1912: Ann. prop. ind. 1913, 2, 69)*;
> - Where there was a minimum manufacturing quota, and where failure to reach this quota was stipulated by the contract as grounds for termination, and the licensee failed to meet this quota due to a fault of the patent holder *(French High Court. req. 31 Oct. 1905: Ann. prop. ind. 1906, 133. - see above n° 78 et seq., in relation to the failure to exploit or operating insufficiently, especially in cases where it is impossible for the licensee to exploit, as they cannot technically produce it. - In particular, Paris 1st March 1963: Ann. prop. ind. 1963, 28, note n° 47)*.

Where a patent grants in successively two exclusive licences to different licensees, the second licensee cannot, where it has not been established that the first licensee has been able to exploit the patent, and that it has not itself been disturbed in its enjoyment of its licence due to the patent holder's breach of its obligations, take legal action against the patent holder *(French High Court. Com. 25 Jan. 1972: Bull. civ. IV, n° 29)*.

## b) Nullity of the contract

**180. -** The licence contract may be null and void for all the usual grounds provided for under common law: lack of consent, invalid consent, etc.

It was for these reasons that a licence contract was null and void for fraudulent misrepresentation where the patent holder had concealed the true nature of the process that was the subject matter of the contract from the contracting party, by letting it believe that the process enabled a piece of wood to be split into four 9.2 mm panels that would have this same thickness across the whole surface, whereas in reality the process could not be used in this way *(Paris 4 Feb. 1986: Ann. prop. ind. 1987, 115. – For other examples, see Fasc. 490)*.

The most frequent cause of nullity of a licence contract is the nullity of the patent in question *(District Court of Paris 29 June 1973: P.I.B. D. 1973, III, 62. - Paris 17 Dec. 1982: P.I.B. D. 1983, III, 79: Dossiers brevets 1983, II, 2. - District Court of Paris 20 Jan. 1986: Dossiers brevets 1986, VI, 3. - District Court of Paris 11 March 1986: JCP E 87, I, 16055, observ. J.J. Burst and J.M. Mousseron; Dossiers brevets 1986, V, 2. - District Court of Nancy 20 March 1986: Rev. dr. prop. ind. 1986, 6,128. - District Court of Rennes 19 Dec. 1988: P.I.B.D. 1989, n° 468, III, 654. - Lyon 12 Jan. 1989: D. S. 1990, somm. 152, observ. J.M. Mousseron and J. Schmidt)*. The nullity of the contract due to the nullity of the patent is based on the lack of a subject matter for the contract and/or the lack of consideration in the licensee's obligation to pay royalties *(see above n° 30)*.

A partial nullity of a patent would lead to the nullity of the contract in its entirety if the main part of the patent were null *(Paris 17 Dec. 1982: Dossiers brevets 1983, II, 2)*.

In the case of a combined licence – for both the licensed invention and know-how – the nullity of the patent would lead to the nullity of the entire contract where the know-how is considered to be accessory *(District Court of Nancy 20 March 1986, prec.)*. Indeed, the contract would only be partially null if the licensee could still continue to use the know-how despite the nullity of the patent and if this know-how was considered to be sufficiently substantial.

But the contract could include a no-challenge clause *(see above n° 105)*.

Nevertheless, a declaration made by the licensee in the contract whereby it acknowledges the validity of the patent, does not preclude it from seeking the nullity of the contract *(Civil Court of Seine 8 May 1914: Ann. prop. ind. 1920, 62. - see also above n° 113)*.

It was also ruled that the nullity of the patent would lead to the rescission of the right of any sub-licence contract, as the patent holder has not fulfilled its obligation to grant a right *(Paris 18 Feb. 1977: P.I.B. D. 1977, III, 381)*.

## c) Effects of termination, rescission or nullity of the contract

### 1 Termination or rescission

**181. -** The rescission of a contract is the penalty for the non-performance by one or both of the parties of their obligations under the contract. The rescission has a retroactive effect, as though the contract had never existed.

**182. -** However, where the contract which has not been performed is a contract for consecutive performance, the courts will often decide against a rescission, which is retroactive, and pronounce a termination which is not retroactive and only has an effect from that point onwards and into the future.

**183. -** Case law in the area of licence contracts generally follows this distinction.



The courts decide to pronounce a termination where it considers that the licensee has gained sufficient benefit from the contract; but they opt for the rescission where they consider that in fact the licensee has not gained any benefit under the contract and the patent holder is ordered to refund all royalties paid, whereas in the first case, the patent holder keeps the said royalties, and the licensee is only freed from the obligation to pay them in the future.

**184. -**  Whether the contract is terminated or rescinded, the licensee no longer has the right to exploit the licensed invention, subject to being guilty of infringement.

**185. -**  The termination or rescission of a contract could have the effect of not just ending the contract, but of the liable party having to pay damages, unless there is a no-warranty clause *(see above n° 21 et seq. and above n° 56 et seq.).*

The patent holder, particularly when it is a natural person who is well-known in scientific circles, could even seek compensation for non-economic loss suffered that could be caused by the termination of the contract at the exclusive fault of the licensee *(District Court of Paris 1st March 1990, unpublished).*

## 2 Nullity

**186. -**  Nullity is the penalty applied where there is a legal defect in the formation of the contract. In the area of patent licence contracts the most frequent cause cited is the invalidity of the patent for the licensed invention *(see above n° 30).*

**187. -**  Nullity usually has a retroactive effect. The contract is not only null and void for the future, but also for the past. In principle, the patent holder should refund any royalties it has been paid.  But case law makes the same distinction as above, namely that patent holder should pay back royalties only in cases where the licensee has not had quiet enjoyment of the licensed invention *(Paris 17 Dec. 1982: P.I.B. D. 1983, II, 79).* In the opposite case, a patent holder acting in good faith is allowed to keep them *(French High Court. civ. 17 May 1839: S. 39, 1, 677. - French High Court. civ. 29 July 1891, 2 decisions: S. 91, 1, 393. - District Court of Paris 11 March 1986: JCP E 87, I, 16055, observ. J.J. Burst and J.M. Mousseron; Dossiers brevets 1986, V, 2. - Lyon 12 Jan. 1989: D. S. 1989, somm. 152, observ. J.M. Mousseron and J. Schmidt).*

The licensee is considered to have had quiet enjoyment of the patent where, prior to the proceedings that led to the patent being null and void, the validity of the patent was not "challenged by any third party" *(see for example District Court of Paris 11 March 1986: Dossiers brevets 1986, V, 2).*

Finally, the nullity of the contract would not require the patent holder to reimburse royalties where the licensee has entered into the contract at its own risks *(Lyon 12 Jan. 1989: D. S. 1990, somm. 152, observ. J.M. Mousseron and J. Schmidt).*

Evidently, the nullity of the patent would allow the contract to continue for all matters regarding know-how, where the contract is also for the provision of know-how. Indeed, it was ruled that the nullity of the patent does not exempt the licensee from paying royalties owed if they still benefit from know-how and technical assistance *(District Court of Paris 17 June 1974: P.I.B. D. 1974, III, 426).* However, the entire contract would be null and void if said know-how is considered merely accessory *(District Court of Nancy 20 March 1986: Rev. dr. prop. ind. 1986, 6, 128).*

**188. -**  In all other areas, the nullity of the contract has the same consequences as termination or rescission. The patent holder could therefore be ordered to pay damages, except where there is a no-warranty clause *(see above n° 155 et seq.).*

The patent holder will not be ordered to pay damages where the licensee has prior to signing the licence contract, performed tests allowing it to assess the results of the claimed invention, and would therefore be deemed to have agreed to exploit at its own risks *(Paris 17 Dec. 1982: P.I.B. D. 1983, III, 79).*

As the contract is null and void, the patent holder can obviously no longer hold the licensee liable for any breach of the non-competition clause *(Lyon 12 Jan. 1979, prec.).*

## 3  Cases where a termination, rescission or nullity has been admitted

**189. -**  *French High Court. req. 21 Feb. 1910: Ann. prop. ind. 1910, 1, 338. - French High Court. req. 29 June 1933: Ann. prop. ind. 1935, 78. - French High Court. 6 Feb. 1934: Ann. prop. ind. 1935, 77. - French High Court. 7 May 1934: Ann. prop. ind. 1935, 53. - French High Court civ. 5 April 1960: Ann. prop. ind. 1965, 176: D. 1960, 717, note Holleaux. - French High Court. Com. 5 Oct. 1964: Bull. civ. III, n° 404.*



Ruled:

1° that a rescission of a licence *(should be read as: termination)* is only final after the notification of the decision ordering it.  Consequently, an infringement seizure against the licensee before notification of the decision is null and void as well as premature; it is valid for the licensee to continue manufacturing until the notification is served, and royalties must still be paid *(French High Court. req. 21 Feb. 1910: Ann. prop. ind. 1910, 1, 338)*;

2° that the fact that the patent holder has granted a licence for a patented invention that cannot be produced industrially gives rise to the termination of the contract, precluded that the licensor may be required to pay damages to the licensee in the form of a partial reimbursement of royalties *(French High Court. req. 29 June 1933. Ann. prop. ind. 1935, 78. - see also French High Court. req. 6 Feb. 1934: Ann. prop. ind. 1935, 77 and 7 May 1934: Ann. prop. ind. 1935, 53)*;

That:

3° The invalidity of a licence contract resulting from the invalidity of a patent does not necessarily have the effect of retroactively depriving any consideration the remuneration paid by the licensee in consideration for the prerogatives that it has effectively enjoyed *(French High Court. 5 April 1960, prec.)*;

4° That, having presided over the proceedings brought by the patent holder for payment of royalties and for the rescission of the contract, and the proceedings for the invalidity of the patent brought by the licensee, the court of appeal, having found that the licensee has been able to gain the advantages it expected from the patent and has not had any disturbance in their enjoyment, can rule that there should be payment in consideration for these advantages *(French High Court. Com. 5 Oct. 1964, prec. - see again Paris 22 June 1905: Ann. prop. ind. 1906, 49; D. 1912, 2, 396, note Planiol. - T. civ. Seine 23 June 1933: Ann. prop. ind. 1934, 39, note F. Jarq. - Amiens 18 Feb. 1938: Gaz. Pal. 1938, 1, 350)*.

**190. -**   In a case where a rescission was pronounced, it was held:

1° That where a patent holder, despite its express promise to protect the licensee from any legal proceedings or claims that could impinge on its freedom to exploit the patent, has not performed its obligation as it did not take legal action against infringing parties.  The decision to order the rescission of the contract with reimbursement of royalties paid and awarding of damages is an exact application of section 1184 of the Civil Code. And as a result of this non-performance observed by the court it has taken the just approach of restoring things to the same state as if the contract had never existed *(French High Court. req. 5 Dec. 1881: D.P. 82, 1, 360)*;

2° That, where it is consistently shown that the licensed processes cannot be used industrially and do not deliver on the promises made by the patent which the licensee was entitled to expect, there are grounds for rescinding the contract. Based on a lack of consideration, this termination is not only effective in the future, but cancels any effect of the contract and exempts the licensee from any payment of all royalties that were or would be payable *(Commercial Court of Nantes, 18 Feb. 1912: Ann. prop. ind. 1913, 1, 217)*;

3° That where the licensed patent is null, the licence contract must be declared as rescinded and not just terminated, as the licensee cannot be assimilated to the lessee disturbed in their enjoyment, whose lease is therefore terminated only from the moment that the disturbance begins *(Civil Court of Seine 26 July 1917. Ann. prop. ind. 1926, 1, 355 and the relevant note)*;

4° That where a licensee has not met the prerequisites on which the granting of the licence depended, the patent holder can seek the rescission of the contract; as nobody can transfer a thing which does not legally belong to it, and as the fulfilment of the said condition has a retroactive effect even with regard to third parties, any rights that the licensee may have assigned or licensed to third parties are also null *(French High Court. req. 18 March 1829: Ann. prop. ind. 1829, 1, 359)*;

5° That the invalidity of the patent due to lack of novelty would justify the nullity of the contract for lack of consideration, especially where the licensee  has not yet begun to exploit *(T. civ. Seine 19 March 1933: Ann. prop. ind. 1933, 247)*;

6° That a patent licence for non-patentable pharmaceutical products must be rescinded and the price reimbursed *(Commercial Court of Lyon, 18 June 1935)*.

## 4  Review

**191. -**   Pursuant to common law, the courts cannot amend the terms of a contract on the grounds that unforeseen circumstances have arisen during the performance of the contract *(Bourges 7 July 1942: Ann. prop. ind. 1942, 95)*:



A licence contract to exploit a patent irrevocably binds the parties by application of section 1134 of the Civil Code; therefore the licensee cannot request a reduction in royalties it is required to pay, on the grounds that circumstances have changed things in a way that was unforeseeable, or that the steering committee has decided to cut prices, as this decision does not constitute an act of State  has made it impossible to perform the obligation. A licence contract entered into without a fixed term specified is not null and void for being against freedom of trade, if it can be deduced from the intention of the parties that it was entered into for the term of the patents.

**192. -   A saving clause** as a full right included in the contract would lessen the major impacts of the theory of unpredictability.

## 2° Where there are relevant clauses

**193. -**   Clauses providing for the unilateral and termination of the contract are frequently included. Their wording is tricky.  It would be prudent to provide for prior notice so that the contract is not rescinded too quickly, as the licensee has a tendency to be behind schedule in exploiting the patent, and the patent holder has an interest in maintaining the contract.

**194. –** The following decisions are cited with regard to cases on this matter.

In the case of a clause included in a contract granted to an industrialist for the exclusive licence for the manufacture, sale and operation of a machine, which gave the licensee, in consideration of the payment of a lump sum, the ability to terminate the contract at certain fixed dates of the year, the court of appeal which stated that "this right to terminate without any explanation" would be construed as the licensee being free to choose at any stage of their studies and trials whether to pursue or abandon the manufacturing in consideration for this lump sum compensation for any loss suffered by the inventor, decided on valid legal grounds that the non-performance of the contract could not justify the awarding of damages greater than those provided for in the contract and ruled that the disputed clause should apply regardless of the date on which notice to terminate was given, even if it was before any commercial exploitation of the patent *(French High Court. Com. 16 May 1961: Bull. civ. III, n° 212).*

In the case of a licence for only the manufacture and sale of thread cones which provides that "the licence will be terminated in the event of the total and final ceasing of the licensee's industrial and commercial business in manufacturing...for whatever reason, and included, as an example of the total and final ceasing of the licensee's industrial and commercial business, the fact of not being able to proceed with exploiting this licence, either after attempts to produce the prototype machine, or during any other period", the judges of merits using their discretion to interpret this ambiguous clause decided that the fact of ceasing manufacture of the cones did count as "not being able to exploit the licence" and that under these circumstances the licensee was able to terminate the contract.

In explaining the reasons why a licensee with a licence to exploit a patent for an invention had to cease their business, namely the fact that it was impossible to obtain satisfactory products with the licensed process after several years of manufacturing, the judges ruling on the principle, who concluded that it was not a condition that depended only on the will of one the parties, decided, with an interpretation at their own discretion, that the situation as described was that provided for under the contract as a case of ceasing of manufacturing *(French High Court. Com. 25 June 1968: D.S. 1969, 23).*

**195. -**  A licence contract can and frequently does include a clause for a full right of rescission. Often, it provides for what would happen if the licensee is subject to insolvency proceedings such as receivership or the liquidation of assets. It was ruled that the *intuitu personae* nature of the licence contract would prevent the receiver from requiring the continuation of the contract pursuant to section 38 of the Law of 13 July 1967.

Where the contract includes a clause providing for a full right of rescission which does not include any damages in case of a non exploitation by the licensee, the patent holder can still seek the judiciary rescission including exclusive award of damages of the contract and awarding of damages *(French High Court. Com. 2 Oct. 1979: D.S. 1980, below, read with 429, observ. J.-M. Mousseron and Ch. Le Stanc).*

**196. -**  A licence contract may also include a penalty clause.

## 3° Competent jurisdiction

**197. -**  Section 68 of the Law of 2 January 1968, in its amended version, specifies that *"all disputes arising from this law are subject to the jurisdiction of the courts of first instance and their corresponding court of appeal".*

The third paragraph of section 68 states that recourse to arbitration is possible *"under the terms provided in* sections 2059 and 2060 of the Civil Code*".*



**198. -** This provision implies that disputes about a public policy requirement of the Law of 1968 are under the jurisdiction of the courts of the district courts and cannot be submitted to arbitration or the jurisdiction of the Commercial Court.

**199. -** The issue is then about determining which provisions of the Law of 1968 should be regarded as public policy requirements. Some cases seem simple: disputes relating to the validity of patents are clearly excluded from arbitration. The validity or nullity of a patent impacts freedom of trade and industry. Also excluded from arbitration are disputes involving the State, and the interest of national defence *(Law of 1968, ss. 26 and 45)*. The same applies to disputes regarding *ex officio* licences or compulsory licences.

**200. -** However, all disputes purely based on contract law can be submitted to arbitration and are also within the jurisdiction of the Commercial Court *(royalties, obligation to communicate know-how, technical assistance, improvements, warranty obligations, etc.)*.

**201. -** Therefore the patent holder's breach of its exclusivity obligation can be settled by an arbitration agreement *(French High Court. Com. 16 Oct. 1973: Bull. civ. IV, n° 282)*.

**202. -** A dispute regarding performance of the contract can be subject to arbitration, even if the contract is for a trademark and a patent, as long as the parties are in dispute over a contractual issue *(District Court of Paris 17 March 1981: Dossiers brevets 1981, VI, n° 2)*.

**203. –** A dispute can be subject to arbitration if the only issue is the payment of royalties *(Paris 15 June 1981: P.I.B. D. 1982, III, 15)*.

But an arbitration clause does not preclude bringing the matter before the judge who hears interlocutory proceedings if it is urgent *(District Court of Marseille, Ord. ref. 3 July 1987: P.I.B. D. 1987, III, 387)*.

Under common law, an arbitration clause is void if the party assigning the rights is not a professional *(District Court of Paris 19 April 1985: P.I.B. D. 1986, III, 29)*.

**204. -** On the contrary, legal proceedings for unfair competition against a third party which has falsely claimed that it holds a patent, licence or patent application, is subject to the exclusive jurisdiction of the District Court of *(Paris 19 Jan. 1981: J.C.P. 82, II, 19743)*.

**205. -** It was on purely legal grounds that a decision held that the claim of the sub-licensee for the nullity of the contract based on the fact that the licensed patents were not valid, was within the jurisdiction of the District Court: indeed, as the dispute concerned the validity of the licensed patents, it is subject to the provisions of section 68 of the Law of 2 January 1968.

It was also alleged that the decision did not uphold a contractual clause invoked by the main licensee, which prohibited the sub-licensee from challenging the validity of the patents: indeed, the Court, which only ruled on its jurisdiction, was not able to assess the merits of this dismissal claim.

Similarly, it was fitting that the Court that did not uphold an arbitration clause of a licence contract, on the grounds that the nullity of the patents were a matter of public policy ("l'ordre public") and that this reason alone would preclude the dispute from arbitration: this was indeed ample reason for the decision *(French High Court. Com. 23 April 1974: Ann. prop. ind, 1976, p. 129)*.

**206. -** The legal action for the termination of a licence contract initiated by the licensor for non-payment of royalties and failure to communicate reports on the business did not enter within the technicalities of patent law and therefore was not subject to the special rules of jurisdiction laid down by section 68 of the Law of 2 January 1968. As these proceedings were essentially a commercial dispute under common law, the clause within the contract stating the relevant jurisdiction must therefore be applied *(Angers 19 Jan. 1976: Gaz. Pal. 1977, 1, 75)*.

A claim by a licensee for the nullity of a clause of a contract providing that in the event of receivership proceedings the contract would be immediately terminated, was within the jurisdiction of the Commercial Court and not the District Court, as section 68 only applies to disputes arising from the application of the Law of 1968 *(Paris 12 Dec. 1983: Ann. prop. ind. 1983, 176. – Along the same lines, Paris, 19 June 1986: D. S. 1987, somm. 128, observ. J.M. Mousseron and J. Schmidt)*.

Even more surprising was the solution applied by the Court of Appeal of Paris (7 July 1976*: Ann. prop. ind. 1976, 135)* which held:

The general gist of the terms of section 68 of the Law of 2 January 1968, especially if they are compared to section 34 of the Law of 5 July 1844, clearly implies that the legislator intended an united approach to disputes arising from the application of the law to patents. This is however a specific law that derogates from common law with regard to the

NATIONAL ACCREDITATION AUTHORITY FOR TRANSLATORS AND INTERPRETERS
NAATI No. 57513
VERONIQUE MORGAN-SMITH
TRANSLATOR
ENGLISH <-> FRENCH
©

proceedings it institutes and must therefore be strictly interpreted, and each case must be examined to determine if the dispute relates to the specific technicalities of patent law or merely the rules governing contracts, in which case the dispute is subject to the general rules of jurisdiction.

Legal action to seek performance of a licence contract does constitute a dispute arising under the Law of 2 January 1968 as it is this specific law that governs licence contracts, which like the assignment of a patent, was instituted by section 43 of the Law of 2 January 1968.

Although a claim for reimbursement of royalties for technical assistance would usually be under the jurisdiction of the Commercial Court in cases where this was the only issue, in another case it could be considered accessory to the claim for performance of the licence contract as it has an obvious interconnected relationship with the licence contract.

A claim for reimbursement of the annual fees of the patent also comes under the special jurisdiction of the Law of 1968, as the obligation to pay the annual fees was provided for under section 41 of the Law.

Finally, the District Court is the only competent jurisdiction if the defendant, in performing a licence contract, raises the defence of the nullity of the patents due to lack of novelty *(Paris, 5th division, 7 July 1976, prec.)*.

The Court of Appeal of Caen also held that a dispute over licence contract was subject to the jurisdiction of the District Court even if the parties were professionals and the contract included a clause stating that the relevant jurisdiction was the Commercial Court *(Caen 17 Sep. 1982: J.C.P. 83, II, 20037, note critique of M. Vivant; Ann. prop. ind. 1983, 174)*.

The District Court of Paris also ruled that "any proceedings arising in relation to contracts concerning patents are therefore subject to the provisions of section 68." *(District Court of Paris 16 April 1984: P.I.B. D. 1984, III, 209)*.

This same jurisdiction also ruled, in relation to a dispute concerning the licensee's non-payment of the minimum royalties, that the District Court was the only competent jurisdiction as the public policy requirements of section 68 were applicable, even though both parties were professionals *(District Court of Paris 24 Oct. 1988: P.I.B.D. 1989, n° 450, III, 103)*. The Court made the observation that section 68 of the Law of 1968 uses a very general wording and refers to the District Court any dispute that could arise under this law, and that there was no need to distinguish between issues related to patents per se, or to licence contracts.

**207. -** A jurisdiction clause in a licence contract with a foreign licensee is valid and applicable *(District Court of Paris 13 Jan. 1987: P.I.B. D. 1987, III, 196)*.

By virtue of Article 5 of the Brussels Convention, the action for rescission of a licence contract between a French patent holder and German licensee were subject to the jurisdiction of the German courts *(District Court of Paris 29 Jan. 1988: P.I.B. D. 1988, III, 277)*. A case where the French party sought to terminate a licence contract covering 24 countries, on the grounds of the German licensor's breach of its obligation to provide information, was not sufficiently linked to France to justify it being under the jurisdiction of the District Court of Paris. The German courts were deemed the competent jurisdiction by application of Article 5 of the Brussels Convention *(Ibid.)*.

However, the Dispute Court[iv] has opted for a wide interpretation of section 68.

**208. -**  The licensee can be the State; but the State can also be the patent holder.

The Dispute Court had to rule whether section 68 was applicable to contractual relations between the State and an individual in the private sector. The dispute was over the French government's performance of a patent licence contract entered into with a private individual in relation to certain types of weapons. The District Court of Paris ratified the argument raised by the Defence Minister that the Court did not have jurisdiction and that it should be referred to the Administrative Court of Paris *(District Court Paris 30 April 1987: P.I.B. D. 1987, III, 329)*. In the appeal initiated by the patent holder, the Court of Paris dismissed this decision, on the grounds that it was not an administrative law contract that would be subject to the jurisdiction of the Administrative Courts, but rather a contract under private law *(Paris 15 Nov. 1988: P.I.B.D. 1989, n° 450, III, 100)*. The Minister of Justice then brought the matter before the Dispute Court, which ruled in favour of the jurisdiction of the judiciary courts on the grounds that "the claim against the State for non-performance of a licence contract to exploit... is not one of the exceptions provided for by section 68 of the Law n° 68-1 of 2 January 1968 in relation to disputes arising from this law" *(Dispute Court 6 June 1989: P.I.B.D. 1989, n° 465, III, 552; Dossiers brevets 1989, II, 1; D. S. 1990, somm. 151, observ. J.M. Mousseron and J. Schmidt)*. As already noted: "this decision is of the utmost importance for resolving all conflicts regarding jurisdictions arising from the application of patent law, as it proposes a very wide interpretation of the general rule of competent jurisdiction provided for in section 68 and a narrow reading of the exception allowed under this section" *(J.M. Mousseron and J. Schmidt, op. et loc. cit.)*.

It has already been ruled that the Council of State[v] should not be called upon to settle a dispute over the performance of a patent licence contract for a process for conserving meat that was granted in wartime by a private individual to the State. This was in fact a contract governed by common law *(Council of State 15 Nov. 1922: Ann. prop. ind. 1923, 1)*.



## IV - CORPORATE GROUPS

**209. -**  There are certain issues that may arise specifically because the patent holder or licensee is a member of a corporate group.

**210. -**  As mentioned above, it must be specified at the time of the inception of the contract if it has been agreed on behalf of or for the benefit of a third party *(see Fasc. 490)*.

The licensor is necessarily the owner of the patent for the invention that is licensed.

Due to the legal autonomy of each of the companies in the group, only the company who has signed the contract is contractually bound by it.

However, despite the supposed legal autonomy of a subsidiary, the actual circumstances could imply strict dependence between the parent company and the subsidiary, and the parent company could have given a certain impression that would lead the licensor to believe that it was the parent company that was taking on the licence contract "on its account". In this case, the parent company would be held liable for the non-performance of a licence contract signed by its subsidiary *(District Court of Paris 5 July 1984: Dossiers brevet 1984, I, 6; P.I.B. D. 1985, III, 17)*.

The licensor is necessarily the owner of the patents.

The licensee, especially if it does not have the right to grant sub-licences, may wish to extend the benefit of the contract to other companies in the same group.  It can disregard the prohibition against sub-licences for companies belonging to the same group.  The difficulty is in defining the group.  The simplest solution is to only include subsidiaries according to the definition of the Law of 24 July 1966 on Commercial Companies *(s. 354 et seq)*; however, it may not be applicable to the matter in question. It is important to adopt the most precise definition possible, as referring to concept of control may seem apt in theory, but is dangerous in reality due to lack of clarity.

**211. -**  The same issue applies to improvements. It applies to both the patent holder and the licensee. In the case where one or both of them are *holding companies,* it must be made clear to which companies in the group the other party must communicate the improvements.  Again it comes back to the same problem of defining the group.

**212. -**  Finally, as mentioned *above,* the question can be raised for sub-licences and assignments.  A licensee agrees to a clause prohibiting any transfer of the licence in any form, but this does not apply to companies within the group, particularly in the event of a merger.

## Bibliography

See *above* Fascicule 490.

© LexisNexis SA

---

[i] Translator's note: "common" in the sense ordinary (opposite to special), rather than the Anglo-Saxon "common law". Whenever we refer to common law in this document, this definition will apply.

[ii] Translator's note: under French law, it is a deposit which a debtor makes of the thing that he owes, into the hands of a third person, and under the authority of a court of justice.

[iii] Translator's note: S.G.D.G. is an abbreviation of *sans garantie du gouvernement* which means "a system patented without the government's guarantee" and is a legal disclaimer exempting the State from any liability for the exploitation of the licenced invention.

[iv] Translator's note: translation chosen for "Tribunal des conflits".  Under French law, the Dispute Court means the court arbitrating concurrence of jurisdiction between the French administrative and judiciary courts.  Please note that the French court system is split into 2 court systems: (1) administrative courts where the State is usually one of the parties to the proceedings as opposed to (2) judiciary courts where both parties are usually private, natural or legal persons.

[v] Translator's note: translation chosen for the expression "Conseil d'Etat", which is the French Administrative High Court.



Exhibit 49

Document 1 of 1

JurisClasseur Contrats – Distribution > Fasc. 200 : CONTRAT "INTUITU PERSONAE" > I. Concept of "intuitu personae" > A. – Distinctions > 1° "Intuitu personæ" and "intuitu bonorum"

Cote: 01,2012

Last updated: 1 September 2001

## 1° "Intuitu personæ" and "intuitu bonorum"

### a) "Intuitu personæ"

**13. - "Intuitu personæ stricto sensu" : Identity.  The Two Sides of Identity** – The first and more traditional *intuitu personæ* is the one that, according to the terms of the expression, links with the person itself of the co-contracting party. And, by aiming at the person, it is his identity that is at issue. There has been little study on this (See however, *A. Supiot, L'identité professionnelle, Mél. J. Savatier: PUF, 1992, p. 409; J.-F. Renucci, L'identité du cocontractant : RTD com. 1993, p. 441.* - And, by non-legal practitioners, *C. Lévi-Strauss (dir.), L'identité: PUF, 2nd ed. 1987).* Truly, it is ambiguous. If it first brings to mind the elements that officially identify a person (surname, first name, age, place of residence, etc.), which is the only meaning acknowledged in the Robert dictionary, there is however a second accepted meaning that deserves to be mentioned: the identity is also a combination of all the physical and moral features that characterise a precise human being, and make him a unique person, the totality of the aspects that define a personality (comp., *G. Cornu, Vocabulaire juridique, V° Identité: PUF, 2011).* The first, superficial, is the official identity; the second, more in depth, is the moral identity.

**14. - The Official Meaning of Identity** – It is clear that the identity – if we use the first meaning - of the donee or of the borrower, is often decisive (but not always: I can donate to a not-for-profit organisation which, for example, rescues orphans or victims of such cataclysm): it is the *intuitu personæ* of affection. Likewise, in an onerous contract, it is important to know the identity of the partner, in order to know if he is competent, or the capacity in which he is acting (joint tenant, *de facto* business partner, lessee-manager, etc.). His age is not always irrelevant: if we consider a lifetime annuity contract.

**15. - The Moral Identity (the qualities of a person)** – However, beyond the strict official identity, it is most of the time the identity that we qualify as moral identity, that is to say essentially the qualities of a person (*electa industria personæ)* that are taken into consideration, his proficiency, his imagination, his know-how, his skilfulness (for example in a gaming contract), his reputation (resulting from his proficiency or, at least, implying it, which is a form of the appearance), his profession, or even his morality (comp., *CA Paris, 3 Nov. 1994: RJDA 1995, n° 406; D. 1996, somm. p. 115, obs. D. Mazeaud*, noting in relation to a contract between the organiser of an exhibition and an exhibitor, that "concerning public relations, the reputation, the renown, the experience and the dynamism of the service provider are decisive", so the impossibility to assign the contract). In other words, the focus is on the personality more than on the person. It is the case of a sick person who goes to a reputable specialist, a litigant with a famous lawyer, a company wishing to acquire a specific data processing system from an information technology consulting firm which has proven itself, a person entrusting the management of his portfolio to a specialist (*French High Court, com., 9 Apr. 1996: D. affaires 1996, p. 671, etc.).* But also a wholesaler who turns to a commission agent who is well-known in the area, of a merchant who wishes to become a franchisee of a product or service, of the notoriety of the franchisor (at the same time as he examines the reliability of the franchisee's system), etc. It is possible to classify these different qualities in two large categories. It is either the person himself that



is taken into consideration or his situation (See on this distinction, *D. Krajeski, thesis precited, n° 1, n° 408*). When it is the person himself that is taken into consideration, he may be of interest because of his particularities: physical (subject to making sure that it does not lead to discrimination, see *above n° 7*), psychic (same comment regarding philosophical choices) or social (professional capacities on the one hand, interpersonal qualities on the other hand). His situation may be of interest on a material (technical capacity), financial (solvability), or purely familial point of view. An example of when the personality is taken into account is the use of tests before recruiting an employee, but it is also sometimes the case prior to the signature of a business contract, for example to become a franchisee or a concessionaire. In distribution law, the concept of *intuitu personæ* often manifests itself, in the eyes of third parties, by an affiliation to a network, which is itself identified by diverse rallying symbols for the client base (whatever the type of network: authorised or selected distributors, concessionaires, franchisees. – See in particular *Ph. le Tourneau, Les contrats de concession: Litec Professionnels, 2nd Ed., 2010. - Les contrats de franchisage : Litec Professionnels, 2nd Ed. 2007. - M. Behar-Touchais and G. Virassamy, Les contrats de la distribution: LGDJ, 1999*. - Adde, See *below Fasc. 1000 to 1050*). If the head of the network is not satisfied with the conduct of the distributor, of whom the performances do not match the quality rules of the network anymore, he withdraws the distributor's accreditation by terminating the contract.

**16. - "Intuitu personæ" and Trust** – There is another way to consider the basic *intuitu personæ*: it is to consider whether it shows a particular trust between the contracting parties; it is particular because any contract of which the performance is not instantaneous includes a part of a reciprocal trust *(A. Chirez, La confiance en droit contractuel: thesis, Nice, 1977; O. Moréteau, L'estoppel et la protection de la confiance légitime, thesis Lyon, 1990*; See, for a detailed analysis of its consequences, *Ph. le Tourneau, Droit de la responsabilité et des contrats, op. cit., n° 3675 et seq.)*. The term trust hides two states. Trust expresses what a person feels but also what he seeks to feel. A person enters into a contract in consideration of another specific person because time or trials have given rise and consolidated a feeling of trust towards that person (can be called confirmed trust). But one chooses his co-contracting party in consideration of the qualities that are likely to give rise to trust (hope of trust). It depends on several elements, some being technically measurable (thus the contingency in an insurance contract). The duty of good faith, which has been emphasised over the last few years (Especially since *Y. Picod, Le devoir de loyauté dans l'exécution du contrat, Preface G. Couturier: LGDJ, 1989*), is without doubt only one side of this trust. Once again, there are contracts in which a person "trusts" his co-contracting party in a special way, so that the consideration of the person becomes an essential element of the contract. This is not the same as stating that trust makes the consideration of the person become subjective. The need for trust rises from the general risks generated by the contract. Even an element that seems subjective refers to the objective analysis of the contractual relationship (See for an example, *F. Pollaud-Dulian, Les contrats entre peintres et marchands ou galeries d'art: Dr. et patrimoine January. 2004, p. 24*). Nevertheless, this does not mean that this trust cannot be transferred to another, in one way or another (See *below 73 to 75*). Moreover, what is falsely known as the sale of the client base is actually a full or partial contract of introduction to a determined client base *(French High Court. 1ˢᵗ civ., 7 Oct. 1997, n° 95-16.948: JurisData n° 1997-003852; D. 1998, jurispr. p. 78, note B. Beignier. – French High Court, 1ˢᵗ civ., 7 Nov. 2000, n° 98-17.731: Bull. civ. 2000, I, n° 283; RTD civ. 2001, 167, obs. T. Revet*; See the detailed analysis of *Auguet, Concurrence et clientèle - Contribution à l'étude critique du rôle des limitations de concurrence pour la protection de la clientèle, Preface Y. Serra: LGDJ, 2000; F. Vialla, Les contrats du fonds libéral: Dr. et patrimoine Sept. 2002, p. 32)*; it consists in presenting the successor to the client base (and not to compete with him): although, what is its subject matter, if not a relationship of trust?

© LexisNexis SA



# Exhibit 50

### Fr. Terré, Ph. Simler and Y. Lequette, Les obligations, 10th ed., Dalloz 2009, No. 73, p. 85 Civil law

**73)**   1° ***Contract by mutual agreement and contract of adherence*** <> In the concept of the drafters of the civil code, the contracts concluded by mutual agreement are the fruit of a free discussion between the parties. After having negotiated the terms, the concessions possibly to be granted of in relation to their initial pretensions, the parties reach to an agreement in principle that is balanced.  Each individual is the best judge of their own interests, how could they moreover agree to a contract which brings them prejudice?

It is to forget that equal under the law, the men are not so. Powerful and humble, rich and poor, clever and clumsy, adroit and ignorant coexist in every society, The contractual liberty then becomes the means for the first to impose on the second draconian conditions. Still discrete at the end of the **XIXth** century, this danger could only grow because of an ever bigger industrial and commercial concentration. Also, some authors have denounced, at the beginning of the XXth century, the threat represented to  contractual justice, by contracts *of adhésion*[1]. By that is understood contracts where their conclusion results, not from a free discussion as desired under the classical concept, 'but from the adherence, from whence its name, of the economically weak party to the draft prepared by the strong party[2], Thus it goes from contracts concluded by individuals with some large societies enjoying a monopoly (SNCF, EDF, GDF) or of a dominant position (insurance companies).

Although it corresponds to an incontestable social reality, this distinction did not have, in positive law, the success that some predicted for it,: French law, indeed, never has submitted the contract of adherence to a proper regime proper[3]; it was content with regulating imperatively the content of some contracts that are, in general, contracts of adherence, for example insurance contract *(infra,* n° 196 subseq.). It is on another distinction that the civil law leans in order to protect the weak party.

---

1.   R. Salelles, *On the declaration of will, contribution  to the study of the legal act in the German Civil Code,* 1901, n° 89 s., p. 229 s.
2.   G. Berlioz, *The contract of adhesion,* 2nd éd., 1976.
3.   This remark must be nuanced since the European directive of April 5, 1993 made reference expressly to the contract of adherence to define the abusive terms *(infra,* no  328).

Exhibit 51

<u>**J.-J. Burst, Breveté et licencié. Leurs rapports juridiques dans le contrat de license,**</u>
<u>**Pref. D. Bastian, Litec 1970, No. 19, p. 20**</u>

**INTERNATIONAL STUDY CENTER OF INDUSTRIAL PROPERTY**

*Faculty of law and Political and Economic Science of Strasbourg*

Jean-Jacques BURST
Doctor of law
Assistant to the Faculty of Law
and Political and Economic science of Strasbourg

# PATENTED
AND

# LICENSED
Their legal reports in the
license contract.

**Preface by**

**Daniel BASTION**

**Professeor to the Faculty of Law**

and of the policitcal and economic sciences of Strasbourg

Director of the CEXPX                                                      r\n

[FACULTY SEAL]

**TECHNICAL LIBRARIES**
**1970**

**19.** — It is finally toward the lease that one quite naturally turns. And Roubier did not hesitate to affirm: "If it is true that the license contract confers on the licensee the enjoyment of the right of exploitation, which is one of the attributes of the patent, there is nothing more there than in the lease contract, where the tenant also obtains the enjoyment of the thing by means of a right, that is only a right of a financial claim (49). And, in fact, the jurisprudence has not failed to affirm with the entire doctrine that the license presented all the characteristics of a least contract (50).

(49) P. Roberter{??}, *op..cit* t. 2, n° 184, p.. 264.

(50) Orleans Jul. 13 1892: DJ. 1883; 2, 329;—Paris 22 Jun 22 1922: *Ann prop. ind.* 1922, 353. —Trib. da Seine Oct 20 1922: *Am.* prop. ind 1923, 288 ;—H. **Allard**, op. *cit.*, n ° 257, p. 229 : 'The license contract that the law. of 1844 did not define may be likened to a lease contract; E. POUILLET op. cit. N., n° 284, p. 355: "Because, if the principles governs the sale are particularly applicable to the conveyance, it appears to us the conveyance, that those of the lease contract must apply to the simple license.

—**A. Caslonga**, *Technical and practical treatise on invention patents*, 1949, t.1 no. 757, p. 432. "The license contract is rather a lease contract"

**J. Schmidt-Szalewski and J.-L. Pierre, Industrial property law, 4th ed., Litec 2007, No. 273, p. 109**

**273. - Definition**. The patent license is a contract by which the patent owner authorizes a licensee to the exploitation of his right in return for the payment of a consideration. In this definition are found the characteristic contract elements of leasing things; it is, in effect, this qualification that is retained by the dominant doctrine (567) and the jurisprudence (568).  It is true that when it is granted under gratuitous title, the authorization to exploit becomes a usage loan contract (569), but the practical rarity of this hypothesis permits considering it as highly unlikely. Contracts that do not answer this definition are not qualified as licenses. Thus, is not a license, but a common interest mandate, the contract by which the patent owner entrusts to a person to take care of the management and the introduction of the patent (570), nor "the non-compete agreement", by which the patent owner hires a third party, for a profit-sharing consideration, to exploit the patent, and not to oppose this latter with his own patent and neither to hinder the exploitation (571), nor the contract controlling research (572). The contracts pertaining to the non patented know-how, although often titled "licenses", are distinguished by their purpose, that does not consist of a property right, but in confidential knowledge not appropriated. It is about enterprise contracts *lato sensu,* where the characteristic obligation consists in the communication of confidential information (573). The patent licenses may be instruments of cooperation between enterprises, specifically in the form of reciprocal concessions of licenses ("cross-licensing"), or communities ("pools") of patents, whose holders join them together in common according to certain modes (574).


---------------------

(567)    J-J Burst, Patented and Licenses.  Their legal relationships in the license contract, pref. D.Bastian Librairies techniques, 1970, No. 486 – J. Foyer and M. Vivant, op cit. p. 433 – J-M Mousseron and J. Schmidt – Szalewski,. Rep., com. Dalloz. V. Invention patent, 3rd edition 2003, no. 275  only Mr. Mathey considers that the license is a *sui generis* agreement: *French law of invention patents*. 2nd ed. 1991, p. 385

(568) Paris, June 22, 1922. *Ann. prop. ind.* 1923, p353. – Oct 21, 1999:  *D. 2002, p. 1196, obs Schmidt – Szalewski, PIED* 2000, 696, III, 181.

(569)  R. Fabre.  *The loan for usage in commercial matters:  RTD com.* 1977. p. 193

(570)  Aix-en-Provence, Feb 13, 1980:  *Bull. Aix,* 1980, 1, p.66

(571)    Cass. Com. Jan 5, 1983: Bull. civ. IV, no. 1; JCP 1984m II, 20182, note Mr. Vivant – *On a cooperation agreement*: Cass. com, May 6, 1996; PIBD 1996, III, 429

(572)    L:yon, May 23, 1990:  Ann. propr. Ind. 1990., p. 65 – Y. Resou. The research contracts, Litec, 1978,.coll. "CEIPI"

(573)    J. Schmidt – Szalewski:  Rep. com, Dalloz. V. Savoir-faire, 2001, No. 65 and ss. J.M. Mousseron, *Secret and contract. From the end of one to the end of the other*. Mélanges. Jean Foyer, PUF, 1997, p. 257 – 257 – Ph. Devesa, *On the legal nature of the knowledge license*, Mélanges, J-J Burst, Litec, 1997, p. 137

(574)    Y. Resou. Patent license.  J. Cl. Patents, Fasc. 4740 – P. Breesé and Y. de Kermadec, *Intellectual property in the service of innovation*.  Ed. Nathan, 2004, coll "Repéres practiques" (Practical markers) p. 94 – F. Lévéque and Y. Menène. *Economics of intellectual property. The Discovery*, 2003, coll. "Repères" p. 106.

Exhibit 52

Exhibit 53

## J. Azema and J.-Chr. Galloux, Industrial property law, 6th ed., Dalloz 2006, No. 485, p. 298

**485**  ***The license contract is a leasing contract*** <> The patent license contract may be defined as being the contract by which the holder of a patent grants to a third party, as a whole or in part, the enjoyment of his exploitation right, in return for the payment of a royalty. From this definition it results that by only conveying a right of enjoyment the patent holder retains the ownership of the patent. The dominant doctrine, approved by jurisprudence, shows that the license concession presents all the characteristics of leasing[1] and agrees thereby to apply to it the provisions of articles 1713 and subseq. of the civil code. Some authors consider that in the hypothesis where the license would be free it would be analyzed under a usage loan.

1.  P. Roubier, op. cit. t.2 no. 184 p.264 E. Pouillet. *Theoretical and practical treatise* of *invention patents and fabrication secrets*, Paris, 1915, 6th ed. by A. Taillefer & Caro, No. 284, p. 355; A . Casalonga, *Theoretical and practical treatise of invention patents, 1949,* t.1 no. 757, p. 432, J-M. Mousseron, *Encyclopédie Dallioz, loc. cit. no. 452; J.J. Burst, Patent license. J. Cl. Patent, fasc. 490-491; Contra, J. Morel, On the exploitation license in matters of invention patents.* Lyon thesis, 1926, p. 11; Orleans, July 13, 1892, D.P. 1893.2.329; Paris, June 22, 1922,  *Ann. propr. ind.* 1922,353; Trib. Com. Seine., October 20, 1922, *Ann. propr. Ind.* 1923.288

Exhibit 54

## N. Binctin, International property law, LGDJ 2010, No. 877, p. 549

**877**. The concession contract[68], or license contract, constitutes the foremost agreement of the intellectual property. This essential contract represents the most important mass of agreements, it focuses the attention of law on the competition through regulation 772/2004[69] when it is qualified as a technology transfer agreement, it exploits the tangible specificities of intellectuals assets due to which it is possible to grant an enjoyment concomitant with a same asset to an infinity of people without the enjoyment of the asset by each of them perturbs the enjoyment of another.  The license contract leads to the simultaneous satisfaction of complementary interests.[70]

The license, or concession, takes the legal form of a leasing contract, a lease, the object of which is an intellectual asset. Without transfer of ownership, it has the effect of granting the enjoyment of the asset to the licensee - concessionaire -, under the contract conditions. With the image of conveyance, contractual freedom predominates and is extensively solicited by the practitioners, affording a vast domain of legal creativity.  Upon the silence of the intellectual property Code on the matter, and from absence of specific provisions, the common law of leases, stated in articles 1708 and according to the civil code applies, which constitutes common law of the concession in intellectual property. Used as an instrument for regulation of intellectual property, the license recognizes some special régimes, either to protect one party, or to limit the effects of a possible abuse of ownership:

----------------

68. The reference work of Burst, *Patented and Licensed, Their legal relationships in the license contract, Litec 1970, where the solutions are largely applicable to the set of concessions and intellectual assets.*
See also, P. le Tourneau, *The concession contracts,* 2nd ed. Litec Professionels, 2010, same author, *Computer and Electronic contracts.* 6th ed. Dalloz, 2010, coll. Reference.
69.  Regulation no. 772/2004 concerning the application of article 100 $ 3 of the TFUE to the technology transfer agreement categories , JOUE of Apr; 27, 2004, L.123/11; see *infra*, no. 104 sq
70.  In this sense, A. Abello, *The license, regulation instrument of intellectual property rights.* LGDJ, 2008. No. 295 sq.

# Exhibit 55

**M. Planiol and G. Ripert, *Droit civil français*, ch. X, *Contrats civils*, LGDJ 1956, by Fr. Givord et A. Tunc, No. 470, p. 602**

**470**. **Determinable nature of the price.**—The lease price must be not only serious, but certain, that is to say determined or at least determinable (3). Consequently, if the parties - after reaching an accord on the principle of the conclusion of a lease, forget to fix its price or do not reach an agreement on the matter, the supposed lease shall be struck down; with an absolute voidance, due to an absence of price. Thus the contract will be null and void foreseeing that the parties will agree amiably on the price.  If this agreement does not take place (4). If the tenant was in fact in possession of the asset, he shall not owe any rent to the lessor, save for an occupation indemnity representative of the prejudice suffered (5).

But it is sufficient that the price, if it is not determined by the lease, be at least determinable. The parties may rely for example on a referee's assessment, solution that is foreseen explicitly for the sale contract (art. 1592): it is necessary, that the solutions released regarding the sale seems to extend under this hypothesis, that means that, in case of refusal of the chosen referee, the lease will not be formed, the court has no competence either to designate another referee, or to fix the price itself, The contrary solution, which was that of

--------------------------------------------

( 3 )  Aix, February 10, 1927, S. 1927, 2, 80.
(4) Civ. November 14, 1892, S. 93, 1, 22, D. 93, 1, 11,. —Comp. Pau,: March 22, 1898. D 1900, 2, 97, Boistel note,.
 (5) Orleans, February 12, 1842, S. 42, 2, 459. —Guillouard, I, n° 66.

Pothier (1), could only be admitted if the contract terms manifested the will of the parties to maintain the contract in spite of the referee's refusal (2).

It sometimes happens that the lease reserves to one party the care of fixing the amount of the rent; there is not doubt that this clause is null and void, as constituting a potestative condition (art. 1174), if this care is left to the tenant (3). The contrary opinion is sustained, if the lease left this authority to the lessor (4):  it seems however there is also in this case a potestative condition, the lessor can practically withdraw the contract from the tenant by proposing an exorbitant price to him.

More frequent today is the hypothesis in which the parties decide to conclude a lease at the price fixed by the law, or in matters of rural leases, or especially concerning leases of dwellings, in this latter case the lease specifying that the amount of the rent shall be the one fixed according to the "corrected area". On the difference of the clause, obviously indeterminate, envisaging "the use of the premises" (5), it appears certain that such a clause is valid (6), that is if the law gives in fact the necessary elements for a precise fixing of the price; probably, although in the system it says "corrected area", there are some elements (category, location, decrepitude...) which are topics of subjective assessment and can cause a disagreement between the parties. But, in a legislation where the price depends less on the autonomy of will than of legal or regulatory data external to the contracting parties, it appears possible to admit that they may be able to submit to the justice their points of disagreement, then especially as, considering the public order nature of this legislation, they would have had the authority to ask for the revision of a contractual rent.

On the contrary, in matters of commercial leases, where no legal fixing of the original rent exists, the parties cannot give to the judge the commercial property nor the power to fix the original price, or to review it outside of the cases foreseen by the law.

(1)  *Traité du louage (treatise of leasing)*, n° 37.
(2)  Guiillouard, I, *n* 65;—Baudry-Lacantinerie and Wahl, I, n° 832, text and notes 2 and 3;—Trib. civ Seine, April 12, 1954, *Rev. Loyers,* 1954, 331.
(3)  Baudry-Lacantinerie and Wahl, I, n" 833.
(4)  Duveigier, I, n° 207;—Boistel, note under Pau, March 22, 1S98, S. 1900, 2, 97; comp. Trib. civ. Valence, December 19, 1929, *Gaz. Pal.,* 1930, 1, 372; Aix, February 10, 1927, S. 1927, 2, 80; Trib. civ. Montbéliard, February 21, 1951,D. 1951, Som. 71,
(5)  Baudry-Lacantinerie and Wahl, I, n° 832,
(6)  V. en matière du baux ruraux (V. in rural lease matters): Soc. February 16, 1951, S, 1952, 1, 9, note J., P. B., *rev. Fermage (Tenant farmin)s,* 1951, 234, *Rev.. trim. dr civ.,* 1952, 240,obs. Carbonnier.

Exhibit 56

## P. A. Fenet, *Travaux préparatoires du Code civil*, Ch. 14, p. 312

312                              DISCUSSIONS, GROUNDS, etc,

The greatest part of things which are said under this title, belong to the substance and the nature of the leasing contract, and are only supported on the general rules of written law, of common law, lastly on the principle of this philosophy which is exactly the heart and soul of the jurisprudence.

Therefore this will be better for me to tighten down more closely within the limits, only having as the object the most important or the most doubtful, and open to discussion.

ch.1    The first six articles only consist in the division into several kinds of leases, in their definitions, and in the other matters of any evidence.

1714    The sole consent on the thing leased and on the price creates a lease (a); may therefore be done in writing or verbally, as is said stated in article 7:  since the acts which are prepared in it, either under private signature, or before notary publics, are only filed to serve as the proof of the contract, or to acquire mortgage and enforcement rights (b).

1715    Article 8 relates:  "If the lease without written document has not yet been received "no enforcement, and that one of the parties denies it.

"The proof can be received by witnesses,

"Any nominal (sum) whatever the price, and whatever is alleged "that earnest money has been given;

"The oath may only be referred for hearing to the one who denies the lease."

This article, as it is conceived, properly avoids proceedings without that the interest of anyone is harmed, since it is under the hypothesis that the lease has not yet had the least execution.

1717    Article 10 declares that "the tenant has the right to sub-lease and even to convey his lease to another, if this power has not been forbidden to him.

--------------------------------

(a)  Pothier, du Louage, page 3, edition d'Orleans, 1771
(b)  Idem,  page 52, 56

Exhibit 57

## G. Baudry-Lacantinerie, *Précis de droit civil*, Ch. 3, 7th ed. 1900, No. 646, p. 387

**646. Distinction of the sale and the lease.** - The lease presents a very great analogy with the sale. In one and another contract we encounter the same essential elements: ***consensus, res, pretium.*** As it is permitted most of the time to argue by analogy to the sale contract; the remark has been made by the recorder of the Tribunal. Specifically there would be room to apply to the promises of lease what the law says on promises of sale. The main difference between the two contracts consists in that the sale generates an obligation to ***give,*** while the lease contract only generates an obligation to ***do;*** by specifying, while the seller himself agrees to make the buyer owner, the lessor only agrees to have the taker enjoy his thing or his services.

In our opinion this difference entails another one. The sale can be considered in our law as a translation contract of property by its nature; the law, considers the obligation immediately executed that the seller contracts as to *give*, at least when the sale has as object a certain body. From article 4500 draws this consequence that the sale of the thing by another is null, is null, because it conceals a legal impossibility, the seller cannot transfer a property that does not belong to him. Should this provision be understood as leasing? Must it be said that the lease of a thing by another is null? We do not believe so. The lease is not a translation contract of ownership, but simply a contract producing obligations, because no rule of law nor of any reason to challenge that an obligation is contracted relative to the thing of another, except for the damages which may arise from the failure to execute this obligation. In two words the sale of the thing by another is null, because the transfer of ownership may not occur of a thing where one is not the owner oneself. On the contrary the leasing of the thing of another is valid, because nothing is opposed to an obligation that may be contracted relative to a thing which belongs to another.

Sometimes doubts are raised on the point of knowing whether such an agreement constitutes a sale or a lease. The name that the parties give to the operation should only constitute an element that is quite secondary to the assessment by the judge who has to determine**,** in case of contestation, the actual nature of the contract. It is above all by examining close up the various elements that he must decide, according to the rule *Contractus, non ex nominee, sed ex re legem accipiunt.* Further that practice reveals a manifest tendency of the parties to dissimulate under the name *lease* of veritable sales, undoubtedly because the lease gives rise to the perception of fiscal right not so high as the sale.

Exhibit 58

### A. Boistel, note under Pau, 22 March 1898, DP 1900.2.97

(1 and 2) It is indisputable, in spite of the silence maintained on the point or title of *leasing*, that in the lease contract the price should be certain and determined; there is room to apply by analogy in contract the arts. 1591 and 1592 civil code relative to the sale (See. Jur. Gen. V. Leasing, No. 101).  First of all if the code does not express itself formally in this regard, it provides at least indications which leave no doubt on the thoughts of its drafters.  Art. 1709 says that the lessor's obligations is contracted "by means of a certain price the tenant agrees to pay."

# Exhibit 59

**Pollaud-Dulian, *cit. op.* , No. 701, p. 369**

**701. - Price**. The license may be conveyed free of charge, it then acts in the form of a loan. When it has an onerous nature, the licensee must disburse royalties to the license grantor. These royalties may have a fixed sum, or proportional nature, for example to the licensee's turnover or production; they may be adjusted at one time, in a staggered or periodic fashion.  They may include an exemption or a cap or, on the other hand, a minimum of royalties guaranteed to the grantor. The absence of price is sanctioned by an absolute voidance [4].

--------------------------
4. Paris, Oct. 10, 2003. Prop. Ind. 2005, rem. J. RAYNARD; Lyon, February 5, 2009. PIBD 2009 no. 895-III-989.

Exhibit 60

**Civ. 3, 22 February 1967, *Bull. III*, No 87, p. 83**

Cassation Court (Supreme Court of Appeal)

Commercial Courtroom

Public hearing February 22 1967.

Appeal No.

Published in bulletin

DISMISSAL

**FRENCH REPUBLIC**

**ON BEHALF OF THE FRENCH PEOPLE**

ON THE FIRST GROUND: WHEREAS THE INFIRMATIVE DECISION CHALLENGED IS IMPUGNED (PARIS, 24TH OCTOBER 1964) FROM DECLARING IT NULL, AS STRUCK DOWN UNDER THE TERMS OF ARTICLE 1174 OF THE CIVIL CODE, THE AGREEMENT ENTERED INTO ON 27 JULY 1957 BETWEEN NICOLARDOT AND *COMPAGNIE GÉNÉRALE DE TÉLÉGRAPHIE SANS FIL* ("CSF"), WHEREAS THE APPELLATE COURT HELD THAT THE OBLIGATION CHARGED TO NICOLARDOT WAS AN OBLIGATION TO DO, WHICH IS COMPULSORILY RESOLVED IN DAMAGES, THAT ANY PARTY WHICH AGREES TO AN OBLIGATION TO DO SOMETHING, AGREES IMPLICITLY, BUT NECESSARILY, TO THE PAYMENT OF DAMAGES IN THE EVENT OF NON-EXECUTION OF THE OBLIGATION, AND THAT THE LOWER COURT JUDGES COULD ONLY DECIDE THAT THE ABOVE AGREEMENT ONLY CHARGED NICOLARDOT WITH A SIMPLY POTESTATIVE OBLIGATION, ON THE GROUNDS THAT IT WOULD HAVE SUFFICED TO DECLARE THE EXCESSIVE DEMANDS IN ORDER TO AVOID IT, AND SUCH AN ATTITUDE OF NICOLARDOT RESULTED IN OBLIGING HIM TO SETTLE DAMAGES WITH CSF, IN SUCH A MANNER THAT IT DID NOT DEPEND ON HIM ALONE TO AVOID THE OBLIGATION THAT HE CONTRACTED;

WHEREAS THE APPELLATE COURT STATED THAT IT RESULTS FROM THE TERMS OF THE AGREEMENT, WHICH IT REPRODUCED, THAT THE OBJECT OF NICOLARDOT'S UNDERTAKING WAS ESSENTIALLY "AN OBLIGATION TO DO, OR MORE PRECISELY, TO CONVEY OR TO HAVE CONVEYED TO CSF", IF IT SO REQUESTED BEFORE DECEMBER 1, 1957, THE EXCLUSIVE EXPLOITATION LICENCE OF THE TWO PATENTS AS DEFINED IN THE AGREEMENT, THAT THE AGREEMENT DID NOT SET A PRICE FOR THIS CONVEYANCE, AND DOES NOT CONTAIN ANYTHING THAT WOULD ALLOW DETERMINING ITS IMPORTANCE, THE BASES FOR CALCULATION AND THE MODES;

THAT, UNDER THESE CIRCUMSTANCES, THE APPELLATE COURT WAS ABLE TO DECIDE THAT

EVEN THE WORDING OF THE AGREEMENT CHARGED NICOLARDOT ONLY WITH A MERELY POTESTATIVE OBLIGATION, SINCE, TO AVOID IT, IT WAS SUFFICIENT FOR HIM TO DECLARE EXCESSIVE REQUIREMENTS;

THAT THE GROUND IS UNFOUNDED.

ON THE ADDITIONAL GROUND, COMPRISING TWO PARTS: WHEREAS THE DEFERRED DECISION IS APPEALED FROM DECLARING NULL THE AGREEMENT OF JULY 27, 1957, WHEREAS ON THE ONE HAND, A VOIDANCE CLAUSE INSERTED INTO AN AGREEMENT CANNOT HAVE THE AGREEMENT DECLARED VOID, UNLESS THE CLAUSE CONSTITUTES AN ESSENTIAL CLAUSE, AND THAT THE APPELLATE COURT SHOULD HAVE, ON ITS OWN INITIATIVE, RULED ON THIS POINT, WHEREAS, ON THE OTHER HAND, THAT THE ORIGINATING COURT JUDGES, REPLACING THE LITIGIOUS CLAUSE IN THE WHOLE CONTEXT OF THE AGREEMENT, AND INTERPRETING THE CLAUSES IN ACCORDANCE WITH ONE ANOTHER, HAD DECIDED THAT THIS AGREEMENT IMPOSED AN OBLIGATION ON NICOLARDOT TO SEEK FOR CSF A PERIOD OF EXCLUSIVE USE, DURING WHICH, IT WOULD CONSTRUCT, WITH THIS ASSISTANCE OF THE LATTER, A PROTOTYPE IMMEDIATELY APPLICABLE TO WATER TREATMENT, WHICH WOULD ALLOW IT TO ASSESS THE VALUE OF THE PATENTS, AND WOULD WORK OUT WITH HIM THE METHODS OF GRANTING A LICENCE ON THESE PATENTS, THAT NICOLARDOT, HAD PROMISED A SINGLE PERIOD DURING WHICH HE WOULD NOT CONTRACT WITH THIRD PARTIES, HAD FIRMLY COMMITTED, AND NOT UNDER A MERE POTESTATIVE CONDITION, AND THAT IT IS ONLY BY AN EXTENSIVE MODIFICATION OF THE WHOLE OF THE AGREEMENT, THAT THE JUDGES OF THE LOWER COURT OF APPEAL, WHO HAD THE OBLIGATION OF INTERPRETING THE CLAUSES IN ACCORDANCE ONE ANOTHER, AND TO RESPOND TO THE GROUNDS OF THE ORIGINATING COURT JUDGES, DECIDED THAT THE AGREEMENT IMPOSED A PURELY POTESTATIVE OBLIGATION ON NICOLARDOT.

WHEREAS AFTER HAVING DECLARED THAT THE COMMITMENT SIGNED BY NICOLARDOT WAS ESSENTIALLY TO CONVEY OR TO HAVE THE LICENCE CONVEYED, AND THAT THE TEXT ITSELF OF THE AGREEMENT OF JULY 27, 1957 IMPOSED ONLY A PURELY POTESTATIVE OBLIGATION, THE APPELLATE COURT IN RESPONDING TO THE ARGUMENTS OF THE JUDGMENT TO WHICH NICOLARDOT CONFINED HIMSELF TO REQUEST PURELY AND SIMPLY THE CONFIRMATION, STATING THAT, TO EXCLUDE THE CONSEQUENCES BROUGHT ON BY THE LITERAL INTERPRETATION OF THE CONTRACT, THE COURT FOCUSED ON RESEARCHING FURTHER AND IN VIOLATION OF WHAT THE TEXT SHOULD BE, ON THE NATURE AND SCOPE OF THEIR RECIPROCAL SERVICES, THE INTENT OF THE PARTIES TO CONFER A POSSIBLE SENSE TO THEIR WISHES AND A VALIDITY TO THEIR CONTRACT, WHICH WOULD ONLY NEGLECT IT IN APPEARANCE,

THAT THE APPELLATE COURT, WHICH, AS SAID IN RESPONSE TO THE FIRST GROUND, WAS ABLE TO RETAIN THE PURELY POTESTATIVE NATURE OF THE OBLIGATION THAT NICOLARDOT SIGNED, SOVEREIGNLY ASSESSED THE ESSENTIAL NATURE OF THE NULL CLAUSE;

THAT THE GROUND, CONSEQUENTLY, MAY NOT BE ADMITTED.

ON THE SECOND GROUND: WHEREAS THE APPEAL BEFORE THE DECISION IMPUGNED DOCUMENTED THAT CSF WAS FOUNDED IN OBTAINING THAT THE LITIGIOUS AGREEMENT BE DECLARED CANCELLED FOR THE EXCLUSIVE FAULTS COMMITTED BY NICOLARDOT AND THE "SOPRONIC" COMPANY, FOR WHICH IT WAS WARRANTED, IF ITS NULLITY HAD NOT( ALREADY) BEEN RECOGNISED.

BUT WHEREAS, THE APPELLATE COURT HAVING SUSTAINED THE MAIN CLAIM BROUGHT BY CSF, BY DECLARING NULL AND VOID THE AGREEMENT OF 27 JULY 1957, THE GROUNDS UNDER CRITICISM, WHICH ANSWERED THE SUBSIDIARY CLAIM OF THE LATTER WHICH RELATED TO THE RESOLUTION OF THE AGREEMENT, COULD BE TAKEN AS MORE THAN AMPLE;

THAT THE GROUND IS THEREFORE WITHOUT MERIT;

ON THESE GROUNDS:

IT DISMISSES THE APPEAL BEFORE THE APPELLATE COURT ON THE DECISION RENDERED OCTOBER 24 1964. No/ 85-10544. NICOLARDOT AND OTHERS VERSUS COMPAGNIE GENERAL DE TELEGRAPHIE SANS FIL.;

PRESIDING JUDGE MX    RECORDER MR. BRUNJHES – GENERAL COUNSEL: MR. LAMBERT LAWYERS:  MESSRS RYZIGER AND NICOLAS. IN THE SAME SENSE. ON No. 2.

JUNE 17, 1963, BULL 1963, III, No. 305 (1st), P. 254

Titles and summaries: 1 OBLIGATION CONDITIONS POTESTATIVE CONDITION PURELY POTESTATIVE CONDITION OBLIGATION TO MAKE DEBTOR MAY AVOID IT BY DECLARING EXCESSIVE DEMANDS INVENTION PATENT PROMISE OF CONCESSION LICENSE.

1  THE JUDGES, WHO NOTE THAT AN AGREEMENT, RELATING TO PROMISE OF EXCLUSIVE EXPLOITATION LICENSE CONCESSION OF AN INVENTION PATENT, HAD NOT FIXED THE PRICE OF THIS CONCESSION, AND IT DID NOT CONTAIN ANY ELEMENT PERMITTING TO DETERMINE FROM IT THE IMPORTANCE, THE BASES OF CALCULATION AND THE MODES, WERE ABLE TO DECIDE THAT THE OBLIGATION TO DO, AS WELL AS THE RESPONSIBILITY OF THE PROMISING PARTY, IS PURELY POTESTATIVE, FOR TO AVOID IT, IT IS SUFFICIENT FOR HIM TO DECLARE EXCESSIVE DEMANDS.

2  NULLITY AGREEMENT NULL CHARACTER CLAUSE ESSENTIAL SOVEREIGN ASSESSMENT OF THE TRIAL JUDGE.

2 THE TRIAL JUDGES SOVEREIGNLY ASSESS WHETHER THE NULL CLAUSE OF AN AGREEMENT PRESENTS AN ESSENTIAL NATURE AND WHETHER ITS NULLITY SHOULD, AS OF NOW, INCLUDE THAT OF THE AGREEMENT.

3. JUDGEMENTS AND MOTIVATED DECISIONS AMPLE GROUNDS RESPONDING TO A SUBSIDIARY DEMAND DECISION SUSTAINING THE PRINCIPAL CLAIM

3   THE GROUND, WHICH RESPONDS TO A SUBSIDIARY CLAIM, MAY BE HELD AS AMPLE, AS OF NOW THAT THE JUDGES HAVE SUSTAINED THE PRINCIPAL CLAIM.

Exhibit 61

<u>**A. Laude, *La reconnaissance par le juge de l'existence d'un contrat*,**</u>
<u>**Pref. J. Mestre, puam 1992,**</u>
<u>**No. 322, p. 204**</u>
<u>**No. 331, p. 211**</u>
<u>**No. 332, p. 212**</u>
<u>**No. 338, p. 217**</u>

322. - **It is allowed to disengage from the set of the jurisprudence on the existence or not of a legal contractual commitment, a principle according to which any provision of an agreement that foresees the payment of a price is essential so that this agreement relates to a legal obligation. However, it is important to illuminate this principle to specify the very notion of financial service (A), before considering the different agreements that construct it into an essential element (B).**

**331. - Other contracts more remote from the sale** consider the financial service as an essential element. Thus as with the price in the sale, the rent is the essence of the leasing contract, and this is regardless of the fact whether it concerns a furnished or real estate lease (695).  The judges no longer make a distinction in the scope of building leases according to whether they are used for dwelling, or professional or commercial use. The solutions retained are general solutions. This is how the terms of the recitals can be surveyed, in principle, "that the contract is a synallagmatic contract that is perfected as soon as the parties are agreed on the thing and on the price... " (696). This solution is identical in the case of promissory lease: the Court of Cassation notes that the supposed promise of lease that does

-------------------------------------

(695)    See Articles 1709 and subseq. of the Civil Code.  Under the term of Article 1709 of the Civil Code three elements are essential to the leasing contract:  the thing, the price and the duration.
(696)    Cassation with October 1967, Bull. Civ. III. No. 324 p. 310; also T.G.I. Dijon, 2nd ch. February 10, 1972, J.C.P. 1972-II, no. 17156 note Yves LEMOINE.

mentions neither the duration of the rental, nor the rent, deducing from that, "absence of agreement of the parties on these essential elements, there cannot be a promise of valid lease... " (697). Besides, a promise of lease that lacks precision regarding the determination of the sole price cannot be valid, because, "to produce legal effects a promise of lease, must specify, either directly, or by reference to modes of determination and assessment the price of the renting... " (698). Thus, the judges note that it is not a written lease qualified by "promise of lease" that returns to a subsequent writ for the establishment of the charges and conditions (699). It is precisely what is emphasized in a decision of principle of the Cassation Court about a writ qualified by the parties of promissory lease, in which allusion was made to a subsequent writ. The Court notes that the judge of the grounds does not exceed his sovereign power of assessment, "by declaring that the aforesaid writ was not, in the intention of the signatories, a merely provisional draft intended to received its execution insofar as it would be followed for a firm and regular lease act, containing all stipulations necessary for its legal existence" (700). Thus, we may note that if the power of assessment of the judges of the grounds has a great extent, it recognizes a limit: the observation of the agreement of the parties on the essential elements necessary for its validity and its qualification. And if, in the case in point, the parties are not considered as being bound, it is because their wills did not meet and agree on what is indispensable to the essence, to the very being of the contract (701).

332. - Finally, the financial provision is the essential element of the various contracts. It is thus a license of exclusive exploitation of an invention patent (702), of an exploitation contract of a say a quarry (703). Precisely concerning this contract, the need for the price is clearly affirmed by the judges. The Cassation Court notes that "the litigious agreement, that is mentioned without ambiguity the parcels to exploit, that specified that the exploitation would be made until the complete exhaustion and that fixed a firm price, *contained the agreement of the parties on the thing and on the price, and included the necessary and sufficient elements to constitute a perfected synallagmatic contract* (704). The agreement of the parties on the thing and the price is therefore *properly* a

(697)  Cass. civ. 3rd January 8, 1975, Bull. civ. III, n° 2, p. 2,
(698)  Cass. civ. 3rd October 16, 1967, Bull. civ. III, n° 324, p.310.
(699)  Cass. civ. 3rd, May 10, 1977 J.C.P. 1977-IV, p. 168.
(700)  Cass. civ. November 12, 1889, D.P. 1890-1, p.33.
(701)  In this case, it was the duration and the price that was not sufficiently specified.
(702)  Cass. civ. February 22, 1967 3rd, Bull. civ. III, n° 87, p. 83.
(703)  Cass. civ. 1st, October 30, 1979, G.P. 1980 panorama of jurisprudence, p. 45.
(704)  Cass. civ. 1st, October 30, 1979, op. cit..

*necessary and sufficient condition for the very existence of this contract.* **No matter that the parties are not yet in the case agreed on the payment terms or the duration of the exploitation that are only the accessory elements, not essential to the validity of the convention. The Court specifies that these conditions would then be adjusted in accordance with the use on the material, which foresaw specifically a staggering of the payments, considering the progress of the extraction..**

**Besides, the determination of the price, or more precisely the level of the commission is an essential element of the commercial agency contract that, without it, cannot exist (705). Thus, when a demand by telex to sing a role has been addressed to a singer's agent, it has been judged that no agreement has been concluded and the parties remain at the talking stage when none of the correspondences mentioned the proposed rubber stamp or request (706).**

----------------------------------

**(705)**     **CA Paris, 4th chamber, Feb 8, 1984, G.P. 1984. summary, p. 174**
**(706)**     **CA Paris, 1st ch. June 16, 1986, D1986. No. 26. Flash of jurisprudence p. 1**

**338. - Nevertheless, it is already a domain in which the jurisprudence has scorned this requirement of article 1129: it is the one of the enterprise contracts, in which the obligation to do it is the primordial truth.**

**When the provision of services requested are those that have been executed, even if at the time of conclusion, the contract did not determine the price, the courts judge in a constant fashion, they can themselves, upon lack of agreement between the parties (719) or firm estimate previously decided, fix this price,**

---------------------------------------

(719) For an example of such an agreement see Cass. com November 18, 1975, G.P. 1976 panorama, p. 39 where the Court retains that a decision rightfully retained that an agreement of fees has compulsory force when it has been freely discussed after complete success of the mission entrusted to a business agent by a customer whose Appellate court has estimated sovereignty that it had been capable to assess the value of the service rendered.

218                         Recognition by the judge of the existence of a contract

(720). The contract is therefore validly formed as soon as the parties are agreed on the very principle of the payment of a price, and this even though it has not been determined, even if it not determinable at the time of the contract conclusion. The judges have the possibility then to fix the price in different manners at the level which the elements in question represent. Thus, from the moment an agreement took place between a private detective and a customer to perform an investigation on slanderous subjects that would have resulted in that regard, it was analyzed in a work contract, it has been admitted that the remuneration for the private police agency could be fixed by the judge according to the elements in question, in the absence of agreement between the parties (721). In the same way, considering a work lease contract not fixing the amount of fees due to a technical adviser, the Cassation Court notes "that a prior agreement on the *exact amount* of the remuneration is not an essential element of a contract of this nature and that the judges can in this hypothesis, fix it considering the elements of the case." (722). If the agreement cannot exist on the exact amount of the price it does not mean as far as it cannot exist on the principle itself of the payment of a price. In effect only the determination of the price is non essential to this contract, but on the other hand, the principle itself of an agreement on the price remains. That is to say that the financial provision remains nevertheless essential to these contracts concluded under onerous title.

        The judge can likewise determine the price by reference to the professional usage (723), or even from an appraisal report. Thus, in execution of a verbal contract, a contractor had done various clearance works with the bulldozer on a person's behalf. In the absence of agreement on the amount of work, the contractor assigned his co-contracting party in payment of the sums that he claimed were due to him. The judges while referring to the findings of the expert's report, has only made use of the power that belonged to them to determine the importance and the cost of works (724).

-----------------------------------------------------

(720)  Concerning a vehicle repair contract, the Appellate court of Besançon sentenced the owner of the car to settle the mechanic's invoice amounting to 5,800 F. In this case, the owner of the vehicle had signed an order for repairs by mentioning the defective parts to be replaced, but without any limiting figure had been fixed. The Appellate court considers "that the customer is debtor of works done, if he had wanted. to know what the repair of his car would cost him, it was up to him to have the garage establish an estimate beforehand ", CA Besançon, October 20, 1977, G.P. 1978 jurisprudence, p. 547, note Georges DAVERAT.
(721)  Cass. civ. February 9, 1977, Bull. civ. I, n° 74, p. 58.
(722)   Cass. civ. 1st, June 15, 1973, Bull. civ. I, n° 202, p. 180.
(723)   Cass. com. June 25, 1973, D 1973, summary, p. 1S0 that admits that an Appellate court can only refer to the professional uses to determine the amount of fees due to a study office in case of non realization of the project studied, from the moment of the correspondence exchanged between the parties for the transfer of the contract, the study office had specified that, in this hypothesis, its fees would be calculated retroactively.
(724) Cass. Com November 6, 1978, J.C.P. 1979- IV, p. 21

Exhibit 62



# Nelles
# Translations

20 N. Wacker Drive - Suite 1408 - Chicago, IL 60606 - 312-977-9772  Fax-866-615-8606

## <u>Certification</u>

This is to certify that the foregoing translation of the Exhibit 30-Article L. 613-8 § 5 of the

Intellectual Property Code was made from French to English by a competent translator well

acquainted with both languages, and that, to the best of our knowledge and belief, it is a true and

complete rendering into English of the original document.

DATE: May 10, 2012

_____

Donald W. Hanley, CEO



**Nelles Translations**

20 N. Wacker Drive - Suite 1408 - Chicago, IL 60606 - 312-977-9772  Fax-866-615-8606

## <u>Certification</u>

This is to certify that the foregoing translation of the Exhibit 50-Fr. Terré, Ph. Simler and Y. Lequette, Les obligations, 10th ed., Dalloz 2009, No. 73, p. 85 was made from French to English by a competent translator well acquainted with both languages, and that, to the best of our knowledge and belief, it is a true and complete rendering into English of the original document.

DATE: May 10, 2012

_____

Donald W. Hanley, CEO



# Nelles Translations

20 N. Wacker Drive - Suite 1408 - Chicago, IL 60606 - 312-977-9772  Fax-866-615-8606

## <u>Certification</u>

This is to certify that the foregoing translation of the Exhibit 51-J.-J. Burst, Breveté et licencié.
Leurs rapports juridiques dans le contrat de license, Pref. D. Bastian, Litec 1970, No. 19, p. 20
was made from French to English by a competent translator well acquainted with both languages,
and that, to the best of our knowledge and belief, it is a true and complete rendering into English of
the original document.

DATE: May 10, 2012

_____
Donald W. Hanley, CEO



# Nelles
# Translations

20 N. Wacker Drive - Suite 1408 - Chicago, IL 60606 - 312-977-9772  Fax-866-615-8606

## __Certification__

This is to certify that the foregoing translation of the Exhibit 52-J. Schmidt-Szalewski and J.-L.
Pierre, Droit de la propriété industrielle, 4th ed., Litec 2007, No. 273, p. 109 was made from
French to English by a competent translator well acquainted with both languages, and that, to the
best of our knowledge and belief, it is a true and complete rendering into English of the original
document.

DATE: May 10, 2012

Donald W. Hanley, CEO



## **Nelles Translations**

20 N. Wacker Drive - Suite 1408 - Chicago, IL 60606 - 312-977-9772  Fax-866-615-8606

## **Certification**

This is to certify that the foregoing translation of the Exhibit 53-J. Azema and J.-Chr. Galloux, Droit de la propriété industrielle, 6th ed., Dalloz 2006, No. 485, p. 298 was made from French to English by a competent translator well acquainted with both languages, and that, to the best of our knowledge and belief, it is a true and complete rendering into English of the original document.

DATE: May 10, 2012

_____

Donald W. Hanley, CEO



# Nelles
# Translations

20 N. Wacker Drive - Suite 1408 - Chicago, IL 60606 - 312-977-9772  Fax-866-615-8606

## __Certification__

This is to certify that the foregoing translation of the Exhibit 54-N. Binctin, Droit de la propriété intellectuelle, LGDJ 2010, No. 877, p. 549 was made from French to English by a competent translator well acquainted with both languages, and that, to the best of our knowledge and belief, it is a true and complete rendering into English of the original document.

DATE: May 10, 2012

_____

Donald W. Hanley, CEO



## Nelles
## Translations

20 N. Wacker Drive - Suite 1408 - Chicago, IL 60606 - 312-977-9772  Fax-866-615-8606

# <u>Certification</u>

This is to certify that the foregoing translation of the Exhibit 55-M. Planiol and G. Ripert, Droit civil français, ch. X, Contrats civils, LGDJ 1956, by Fr. Givord et A. Tunc, No. 470, p. 602 was made from French to English by a competent translator well acquainted with both languages, and that, to the best of our knowledge and belief, it is a true and complete rendering into English of the original document.

DATE: May 10, 2012

_____

Donald W. Hanley, CEO



**Nelles Translations**

20 N. Wacker Drive - Suite 1408 - Chicago, IL 60606 - 312-977-9772  Fax-866-615-8606

## <u>Certification</u>

This is to certify that the foregoing translation of the Exhibit 56-P. A. Fenet, Travaux préparatoires du Code civil, Ch. 14, p. 312 was made from French to English by a competent translator well acquainted with both languages, and that, to the best of our knowledge and belief, it is a true and complete rendering into English of the original document.

DATE: May 10, 2012

_____

Donald W. Hanley, CEO



## Nelles Translations

20 N. Wacker Drive - Suite 1408 - Chicago, IL 60606 - 312-977-9772  Fax-866-615-8606

## <u>**Certification**</u>

This is to certify that the foregoing translation of the Exhibit 57-G. Baudry-Lacantinerie, Précis de droit civil, Ch. 3, 7th ed. 1900, No. 646, p. 387 was made from French to English by a competent translator well acquainted with both languages, and that, to the best of our knowledge and belief, it is a true and complete rendering into English of the original document.

DATE: May 10, 2012

_____

Donald W. Hanley, CEO



## Nelles Translations

20 N. Wacker Drive - Suite 1408 - Chicago, IL 60606 - 312-977-9772  Fax-866-615-8606

# __Certification__

This is to certify that the foregoing translation of the Exhibit 58-A. Boistel, note under Pau, 22 March 1898, DP 1900.2.97 was made from French to English by a competent translator well acquainted with both languages, and that, to the best of our knowledge and belief, it is a true and complete rendering into English of the original document.

DATE: May 10, 2012

_____

Donald W. Hanley, CEO



**Nelles
Translations**

20 N. Wacker Drive - Suite 1408 - Chicago, IL 60606 - 312-977-9772  Fax-866-615-8606

## <u>Certification</u>

This is to certify that the foregoing translation of the Exhibit 59-Pollaud-Dulian, *cit. op.* , No.
701, p. 369 was made from French to English by a competent translator well acquainted with both
languages, and that, to the best of our knowledge and belief, it is a true and complete rendering into
English of the original document.

DATE: May 12, 2012

_____

Donald W. Hanley, CEO



# Nelles Translations

20 N. Wacker Drive · Suite 1408 · Chicago, IL 60606 · 312-977-9772  Fax-866-615-8606

## <u>**Certification**</u>

This is to certify that the foregoing translation of the Exhibit 60-Civ. 3, 22 February 1967, *Bull.*
*III*, No 87, p. 83 was made from French to English by a competent translator well acquainted with
both languages, and that, to the best of our knowledge and belief, it is a true and complete rendering
into English of the original document.

DATE: May 12, 2012

_____
Donald W. Hanley, CEO



# Nelles
# Translations

20 N. Wacker Drive - Suite 1408 - Chicago, IL 60606 - 312-977-9772  Fax-866-615-8606

## <u>Certification</u>

This is to certify that the foregoing translation of the Exhibit 61-A. Laude, La reconnaissance par le juge de l'existence d'un contrat, Pref. J. Mestre, puam 1992, including these parts:

- No. 322, p. 204
- Laude, cit. op., No. 331, p. 211
- Laude, op. cit., No. 332, p. 212
- Laude, op. cit., No. 338, p. 217

were made from French to English by a competent translator well acquainted with both languages, and that, to the best of our knowledge and belief, it is a true and complete rendering into English of the original document.

DATE: May 12, 2012

_____

Donald W. Hanley, CEO