QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Cal. Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Cal. Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Michael T. Zeller (Cal. Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | CASE NO. 11-cv-01846-LHK |
| Plaintiff, | |
| vs. | **SAMSUNG'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | **Date:    June 21, 2012**<br>**Time:    1:30 p.m.**<br>**Place:   Courtroom 8, 4th Floor**<br>**Judge:  Hon. Lucy H. Koh** |
| Defendants. | PROPOSED PUBLIC REDACTED VERSION |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION .................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.      INTRODUCTION ................................................................................................ 1

II.     APPLE'S TRADE DRESS IS INVALID BECAUSE IT IS FUNCTIONAL ..................... 1

    A.      The iPad and iPhone Trade Dresses Are Indisputably Functional Under The Doctrine Of Utilitarian Functionality ............................................................... 3

    B.      The iPad and iPhone Trade Dresses Are Indisputably Functional Under The Doctrine Of Aesthetic Functionality ............................................................... 7

III.    APPLE'S DILUTION CLAIM SHOULD BE DENIED BECAUSE IT CANNOT PROVE THAT THE ASSERTED TRADE DRESSES ARE FAMOUS ........................... 8

IV.     APPLE'S DESIGN PATENTS ARE INVALID ...................................................... 10

    A.      The D618,677 and D593,087 Patents Are Obvious. ............................... 10

    B.      The D504,889 Patent Is Obvious. ......................................................... 14

    C.      D604,305 and D617,334 Are Anticipated And Obvious ........................ 15

    D.      The D'334 Patent Is Invalid Due To The On-Sale Bar ........................... 16

V.      APPLE'S UTILITY PATENTS ARE INVALID OR NOT INFRINGED ...................... 17

    A.      Claim 8 Of The '915 Patent Is Not Infringed ....................................... 17

    B.      Claim 50 Of The '163 Patent Is Invalid ................................................ 18

    C.      Claim 19 Of The '381 Patent Is Invalid ................................................ 20

    D.      Claim 8 Of The '607 Patent Is Invalid ................................................. 22

VI.     APPLE'S ANTITRUST CLAIMS FAIL FOR LACK OF DAMAGES ......................... 23

VII.    CONCLUSION .................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

### <u>Cases</u>

4   *Apple Computer, Inc. v. Microsoft Corp.*,
        35 F.3d 1435 (9th Cir. 1994).......................................................................................1

5

6   *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*,
        457 F.3d 1062 (9th Cir. 2006).................................................................................2, 7

7   *Aurora World Inc. v, Ty, Inc.*,
        719 F. Supp. 2d 1115 (C.D. Ca. 2009).........................................................................8

8

9   *Autodesk, Inc., v. Dassault Systems Solidworks Corp.*,
        685 F. Supp. 2d 1001 (N.D. Cal. 2009).........................................................................9

10  *Avery Dennison Corp. v. Sumpton*,
        189 F.3d 868 (9th Cir. 1999)........................................................................................8

11

12  *In re Borden*,
        90 F.3d 1570 (Fed. Cir. 1996)....................................................................................11

13  *Chip-Mender, Inc. v. Sherwin-Williams Co*,
        2006-1 Trade Cas. ¶ 75,148 (N.D. Cal. 2006) ...........................................................25

14

15  *Crocs, Inc. v. ITC*,
        598 F.3d 1294 (Fed. Cir. 2010)..................................................................................15

16  *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*,
        158 F.3d 1002 (9th Cir. 1998).................................................................................2, 3

17

18  *Durling v. Spectrum Furniture Co.*,
        101 F.3d 100 (Fed. Cir. 1996).......................................................................10, 12, 13

19  *First Brands Corp. v. Fred Meyer, Inc.*,
        809 F.2d 1378 (9th Cir. 1987).....................................................................................9

20

21  *Genentech, Inc. v. Amgen*,
        289 F.3d 761 (Fed. Cir. 2002)....................................................................................18

22  *Glaxo Group Ltd. v. Apotex, Inc.*,
        376 F.3d 1339 (Fed. Cir. 2004)..................................................................................10

23

24  *Handgards v. Ethicon*,
        601 F.2d 986 (9th Cir. 1979)......................................................................................25

25  *Horphag Research Ltd. v. Garcia*,
        475 F.3d 1029 (9th Cir. 2007)....................................................................................10

26

27  *KSR*,
        550 U.S. at 417 ...........................................................................................................15

28

*In re Klein*,
   987 F.2d 1569 (Fed. Cir. 1993) ..................................................................13

*LA Gear, Inc. v. Thom McAn Shoe Co.*,
   988 F.2d 117 (Fed. Cir. 1993) ....................................................................10

*Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*,
   199 F.3d 1009 (9th Cir. 1999) ..................................................................3, 6

*MEMC Elec. Materials v. Mitsubishi Materials Silicon Corp.*,
   2004 WL 5363616 (N.D. Cal. 2004) ..........................................................18

*Nissan Motor Co. v. Nissan Computer Corp*,
   378 F.3d 1002 (9th Cir. 2004) ..................................................................8, 9

*Pagliero v. Wallace China Co*,
   198 F.2d 339 (9th Cir. 1952) ......................................................................7

*Pfaff v. Wells Elecs*,
   525 U.S. 55 (1998) ....................................................................................16

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
   22 F.3d 1299 (Fed. Cir. 2008) ....................................................................21

*Qualitex Co. v. Jacobson Prods. Co.*,
   514 U.S. 159 (1995) ....................................................................................2

*Rambus, Inc. v. Hynix Semiconductor Inc.*,
   2008 WL 5411564 (N.D. Cal. 2008) ..........................................................18

*Rickards v. Canine Eye Registration Found., Inc.*,
   704 F.2d 1449 (9th Cir. 1983) ....................................................................25

*Schering Corp. v. Geneva Pharms., Inc.*,
   339 F.3d 1373 (Fed. Cir. 2003) ..................................................................10

*Seed Lighting Design Co., Ltd. v. Home Depot*,
   2005 WL 1868152 (N.D. Cal. Aug. 3, 2005) ..............................................15

*Talking Rain Beverage Co. v. South Beach Beverage Co.*,
   349 F.3d 601 (9th Cir. 2003) ......................................................................3

*Thane Int., Inc., v. Trek Bicycle Corp.*,
   305 F.3d 894 (9th Cir. 2002) ......................................................................8

*Tie Tech, Inc., v. Kinedyne Corp.*,
   296 F.3d 778 (9th Cir. 2002) ..................................................................1, 8

*Toscano v. PGA Tour, Inc.*,
   201 F. Supp. 2d 1106 (E.D. Cal. 2002) ......................................................24

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
   532 U.S. 23 (2001) ..................................................................................2, 3

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
    587 F.3d 1339 (Fed. Cir. 2009) ..................................................................15

### **Statutes**

15 U.S.C. § 2 .................................................................................................24

15 U.S.C. §1114 ..............................................................................................3

15 U.S.C. §1125(a)(3) ......................................................................................3

15 U.S.C. § 1125(c)(2)(A) ...............................................................................8

35 U.S.C. § 102(a) ...........................................................................15, 19, 21

35 U.S.C. § 102(b) .................................................................................19, 21

35 U.S.C. § 102(g)(2) ....................................................................................21

35 U.S.C. § 103(a) .........................................................................................10

35 U.S.C. § 112 ..............................................................................................15

### **Miscellaneous**

MCCARTHY ON TRADEMARK at § 24:106, 24-310 (2008 ed.) ..........................9

*AppLens and LaunchTile: Two Designs for One-Handed Thumb Use
    on Small Devices*, CHI 2005, ACM, Apr. 2-7, 2005,
    ("LaunchTile Publication") ........................................................................19

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on June 21, 2012, at 1:30 p.m., or as soon as the matter may be heard by the Honorable Lucy H. Koh in Courtroom 8, United States District Court for the Northern District of California, Robert F. Peckham Federal Building, 280 South 1st Street, San Jose, CA 95113, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively "Samsung") shall and hereby do move the Court pursuant to Federal Rule of Civil Procedure 56 for summary judgment.   This motion is based on the following Memorandum, supporting declarations, the record, and such other matters that may be presented at or before the hearing on the motion, as well as this Court's claim construction of Apple's design patents, which is expected to leave no material dispute of non-infringement.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Hundreds of hours of depositions, millions of pages of document production, and dozens of motions in this action have yielded one unifying fact:   Apple's case fails as a matter of law. Apple lacks evidence that could create a genuine dispute as to any material fact regarding Samsung's entitlement to judgment as a matter of law on Apple's remaining claims.

**II.   APPLE'S TRADE DRESS IS INVALID BECAUSE IT IS FUNCTIONAL**

The Ninth Circuit long ago rejected Apple's bid to protect its graphic user interface elements on the grounds of functionality.   *Apple Computer, Inc. v. Microsoft Corp.*, 35 F. 3d 1435, 1444 (9th Cir. 1994) ("[I]conic representation of familiar objects from the office environment are not protectable … [GUIs] are a tool to facilitate communication between the user and the computer ....").   Apple brought that case against its then-leading competitor under copyright law; this time, it has chosen to rehash those claims and others under the guise of trade dress.   But the same functionality concerns apply with at least equal force in trade dress law and likewise render Apple's asserted intellectual property rights invalid.   *See, e.g., Tie Tech, Inc., v. Kinedyne Corp.,* 296 F.3d 778, 785 (9th Cir. 2002).

02198.51855/4759022.4

Under binding Supreme Court precedent, "trade dress protection may not be claimed for product features that are functional."[1]   *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 29 (2001) (citations omitted).   In trade dress law, functionality is not limited to what is "dictated by function"; it is defined expansively.   It includes utilitarian functionality, which inquires whether the claimed feature is "essential to the use or purpose of the device or when it affects the cost or quality of the device."[2]   *Id.* at 33.   If the feature is essential to the use or purpose of the article *or* affects its cost or quality, "the inquiry is over—the feature is functional and not protected."   *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.,* 457 F.3d 1062, 1072 (9th Cir. 2006) (citations omitted).   There is no need to "proceed further to consider if there is a competitive necessity for the feature" or "engage ... in speculation about other design possibilities."   *TrafFix,* 532 U.S. at 33-34.   Functionality also includes aesthetic functionality, which inquires "whether protection of the feature as a trademark would impose a significant non-reputational-related competitive disadvantage."   *Au-Tomotive Gold,* 457 F.3d at 1072.   A design feature "which, *in itself and apart from its identification of source,* improves the usefulness or appeal of the object it adorns" is aesthetically functional.   *Id.* at 1073.   Thus, if a design feature has "intrinsic aesthetic appeal," it cannot be monopolized as trade dress.   *Id.*   Apple's asserted trade dresses serve unquestionably utilitarian purposes.   Even if not, however, Apple itself has strenuously argued that they are aesthetically appealing.   *E.g.,* Amended Compl. ¶¶ 1, 3, 4; Ex.

---

[1]   The rule broadly prohibiting the appropriation of functional features as trade dress stems from "a fundamental right to compete."   *Tie Tech,* 296 F.3d at 785.   "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature."   *Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 164-65 (1995).   This is because "copying is not always discouraged or disfavored by the laws which preserve our competitive economy.   . . .   Allowing competitors to copy will have salutary effects in many instances." *TrafFix Devices,* 532 U.S. at 29.   Accordingly, the Court has cautioned "against misuse or over extension of trade dress."   *Id.*

[2]   A product feature or combination of features "need only have *some* utilitarian advantage to be considered functional," not necessarily "*superior* utilitarian advantages."   *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.,* 158 F. 3d 1002, 1007 (9th Cir. 1998).

48[3]  (Urbach Report ¶¶ 21, 28, 33; 44,45); Ex. 49 (Winer Report ¶ 82-86)).

**A.     The iPad and iPhone Trade Dresses Are Indisputably Functional Under The Doctrine Of Utilitarian Functionality**

Apple carefully defined its asserted trade dresses to sound similar to the Samsung's products, so it excluded such features as the Apple logo, the Apple name, or the "home" button. Apple bears the burden of proving non-functionality of its limited trade dresses,[4] but it has proffered no evidence that any of the features of its claimed trade dresses do not "affect the cost or quality" of the iPhone and iPad.[5]  *TrafFix,* 532 U.S. at 33-34.

For trade dress purposes, this confirms functionality.   *See Disc Golf Ass'n,* 158 F. 3d at 1007.   As shown below, everything that Apple claims is part of its trade dresses is functional.

**Trade Dress Element Identified In Amended Complaint - iPhone (Original)[6]**

*Rectangle with evenly rounded corners:*

---

[3]  All cites to "Ex." are cites to the Declaration of Brett Arnold, submitted herewith, and the paragraphs of that declaration that contain the reference to the exhibit.

[4]     Apple bears the burden of proving that its unregistered trade dress is not functional.   15 U.S.C. §1125(a)(3).   For claims under 15 U.S.C. §1114, Samsung may rebut the evidentiary presumption afforded the registration by a preponderance of the evidence, which eliminates the evidentiary significance of Apple's registrations and shift the burden back to Apple to prove that its trade dress is not functional.   *See Talking Rain Beverage Co. v. South Beach Beverage Co.,* 349 F.3d 601, 603 (9th Cir. 2003).

[5]     Apple's sole proffered "evidence" of non-functionality, as articulated by its experts, is that Samsung could have employed alternate designs.   However, for utilitarian functionality, the existence of alternatives does nothing to undermine the functionality identified by Samsung; it is legally irrelevant.   *E.g., TrafFix,* 532 U.S. at 33-34.   In any event, the proposed "alternatives" identified by Apple are functionally different from the iPhone and/or iPad and accordingly are not true alternatives.   *See Leatherman,* 199 F. 3d at 1013-14 (noting that claimed alternative designs must offer "exactly the same features" as the plaintiff's product).   Rather, each has one or more attributes that makes it less useful to consumers and/or more difficult or costly to manufacture than the iPhone and/or iPad, such as a smaller screen, a physical keyboard, less rounded corners, a bulkier form factor, buttons on the front surface, and/or a visually cluttered front face, which distracts from the display screen.   Ex. 66 (Bressler Report ¶¶ 331-341); ).

[6]     *See* Amended Compl. ¶¶ 32, 49, 57.

**SAMSUNG'S MOTION FOR SUMMARY JUDGMENT**

- Rounded corners make a device more comfortable to hold and easier to pick up when it is lying on a flat surface. Ex. 51 (APLNDC0003040119-124); Ex. 74 (Sherman Rpt. pp. 89, 97); Ex. 75 (Lehto Rpt. p. 8); ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████

- Rounded corners are mechanically stronger than sharp ones.   Ex. 74 (Sherman Rpt. p. 90)

- It is easier, more reliable, and less expensive to manufacture clean and accurate corners that are rounded versus sharp.   Ex. 74 (Sherman Rpt. p. 90).

*Flat clear surface covering front:*

- A flat front surface enables the user's fingers to slide easily over the active area of the display and efficiently execute actions such as scrolling and selecting text.   In contrast, if the display area was surrounded by a raised edge or abutted by physical buttons, the user's fingers would be more likely to bump against those elements, reducing the ease of operating the touch screen.   Ex. 74 (Sherman Rpt. p. 90); Ex. 75 (Lehto Rpt. p. 8).

- The absence of other physical design elements, such as physical buttons, contrasting surfaces, and even other surface ornamentation, eliminates visual distractions and clutter that can detract from the user's access to the touch screen and experience of using it. Ex. 53 (Apple Utility Patent No. 7,768,462, col. 4, line 53); Ex. 3 (███████████████████████ █████ Ex.75 (Lehto Rpt. p. 8); Ex. 74(Sherman Rpt. p. 91).

- A smooth front surface allows the user to wipe the screen clean without bumping into, or lodging dust or dirt into, crevices and gaps created by physical buttons and keyboards and the contact area between two different surfaces. Ex. 75 (Lehto Rpt. p. 8); Ex. 74 (Sherman p. 90); ████████████████████████████████████████████████████████████ ███████████████

- Flat glass is less costly and less difficult to manufacture and is more scratch resistant than plastic.   Ex. 11 (█████████████████████████ ████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████

- A flat glass surface affects the performance of touch sensors to work well. Ex. 74 (Sherman Rpt. p. 94); ████████████████████████████████

*Large display screen under clear surface:*

- A proportionally large screen enhances media viewing and facilitates the input of touch commands by providing more room for error in making touch commands. ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████

- A clear front surface protects the screen and allows it to be visible. Ex. 74 (Sherman Rpt.

pp. 91, 94).

*Black color:*

- It is less costly to manufacture smartphones with black surfaces. ███████████
███████████████████████████████

*Substantial black borders above/below display:*

- The wide, opaque borders at the top and bottom of the screen, ██████████████
███████ hide components necessary to the operation of the touch screen sensors, as well as the antennae, speaker and receiver and accommodate the iPhone home button. Ex. 54 ██████████████████████████████████████
██████████████████████████████

- The receiver and speaker components are most effective if aligned with the receiver hole, which is most logically placed near the top of the device, leaving the lower portion for the antennae components. ████████████████

- Opaque borders provide an area where users' fingers and thumbs can safely hold and touch the device without triggering the active display area of the screen. █████████
█████████████

*Narrower black borders on either side of display* [in addition to reasons above]*:*

- The side borders protect the fragile display screen from damage in the event the phone is dropped or hit. █████████████████ Ex. 74 (Sherman p. 98).

- The side borders cannot be eliminated because components that enable the touch technology to work must surround the display screen. ████████████████
████████████ Ex. 74 (Sherman pp. 91, 98).

*Metallic bezel around flat clear surface:*

- The bezel provides structural support, joins and holds the front and back pieces of the device, and protects the display screen and cover from side impacts and drops.   Ex. 62 (SAMNDCA00366492-366517, Apple's US Patent Nos. 7,688,574, column 7, lines 53-64); Ex. 74 (Sherman Rpt. p 102);█████████████████████████████████
██████████████████████████████████

*Matrix of colorful square icons with evenly rounded corners:*

- Icon matrixes provide an organizing structure for quickly and easily locating icons. ████
████████████████); Ex. 75 (Lehto Rpt. p. 22-23); Ex. 76 (Lucente Rpt. p. 16-17).

- The rounded rectangular shape of the icons evoke the shape of buttons or keys on a

physical keypad and signal to the user that the icons should be pressed. ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 76 (Lucente Rpt. p. 18); Ex. 75 (Lehto Rpt. p. 24).

- Each individual icon, including its graphical elements and colors, serves as a "a visual shorthand to communicate an idea or some kind of information that in an application is represented with a visual to identify it at a glance." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 76 (Lucente Rpt.pp. 25-30); Ex. 75 (Lehto pp. 25-26);

*Bottom row ("dock") of colorful square set off from other icons which does not change as other pages are viewed:*

- The dock enables users to easily access the most frequently used icons from each page. ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 76 (Lucente Rpt. p. 17).

- The placement of the dock at the bottom of the screen makes one-handed use more convenient. ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 76 (Lucente Rpt. p. 17-18).

**Trade Dress Element Identified In Amended Complaint - iPhone 3G** (in addition to all elements asserted for iPhone trade dress) (*See* Amended Compl. ¶¶ 35, 59.)

*A row of small dots on the display screen when the device is turned on:*

- This row of dots informs the user which page of the multi-page interface they are viewing. ▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 76 (Lucente Rpt. p. 25); Ex. 75 (Lehto Rpt. p. 30).

**Trade Dress Element Identified In Amended Complaint – iPad/iPad2** (in addition to overlapping elements asserted for iPhone trade dress) (*See* Amended Compl. ¶¶ 44, 65, 67.)

*Metallic rim around flat clear surface:*

- The metallic rim around provides structural integrity.   Ex. 75 (Lehto Rpt p. 37).

Although trade dress must be viewed as a whole, "where the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional."   *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F. 3d 1009, 1013 (9th Cir. 1999).   The record reveals that the elements are configured as they are to *optimize the functionality* of the devices.   The use of most or all of the claimed design features in the same or similar configuration by numerous smart phones and tablets on the market today further confirms functionality.   *See* Ex. 74 (Sherman Rpt., Ex. C)**.**

Moreover, when viewed together, the individual functional elements identified by Apple cannot give rise to protectable trade dress.   The entirety of the iPhone and iPad trade dresses

1    defer to their display screens by putting the primary emphasis on them and not doing anything to

2    distract attention from the display.  ████████████████████████████████████████████

3    ████████████████; Ex. 65 (*Objectified* (2009)).    Because the display screen is the

4    primary means by which users interact with these devices—i.e., the *raison d'etre* for the

5    products—these overall configurations indisputably affect the quality of the articles.

**B.    The iPad and iPhone Trade Dresses Are Indisputably Functional Under The Doctrine Of Aesthetic Functionality**

8         The aesthetic functionality doctrine prohibits monopolization of aesthetic features that in

9    and of themselves contribute to consumer sales, as compared to features that have a pure source

10   identifying function and do not otherwise cause consumers to purchase the product.  *See Tie*

11   *Tech*, 296 F.3d at 785; *Au-Tomotive Gold*, 457 F.3d at 1072. Thus, to the extent that the

12   appearance of Apple's claimed trade dresses contribute to consumer sales as Apple maintains, they

13   are not protectable as trade dress as a matter of law.  *E.g., Pagliero v. Wallace China Co,* 198

14   F.2d 339 (9th Cir. 1952) (china pattern was functional because "the attractiveness and eye appeal"

15   were "at the heart of basic consumer demand for the product").

16        Apple has claimed repeatedly that the design-related attributes of the iPhone and iPad

17   contribute to their market success.    Amended Compl. ¶ 1, 3, 4; Ex. 48 (Urbach Report ¶¶ 21, 28,

18   33; 44,45); Ex. 49 (Winer Report ¶ 82-86).  ██████████████████████████████

19   ██████████████████████████████████████████████████████████████████████

20   ██████████████████████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████  Apple's

24   position that the otherwise functional elements of its trade dress are somehow transformed into

25   source identifiers because they are aesthetically pleasing is at odds with the law.    To the contrary,

26   if the "elegant design" of Apple's products makes them more appealing to consumers, than it *may*

27   *not* be exclusively appropriated under trademark law.  *See Tie Tech*, 296 F.3d 778, 785 ("features

28   which constitute the actual benefit that the consumer wishes to purchase" were not protectable);

*Aurora World Inc. v, Ty, Inc.*, 719 F. Supp.2d 1115, 1149, (C.D. Ca. 2009) (holding that aesthetic features of plush toys were functional because they are "essential selling features of the toys").

### III.   APPLE'S DILUTION CLAIM SHOULD BE DENIED BECAUSE IT CANNOT PROVE THAT THE ASSERTED TRADE DRESSES ARE FAMOUS

Because protection from dilution comes close to being a "right [] in gross," it is a cause of action "reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value."   *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999).   To prevail on its dilution claims, Apple must prove that the trade dresses it claims here—which do not include the Apple logo, the Apple name, or the "home" button—are "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). The level of recognition required is exceptionally high: the trade dress must be so famous that it is a "household name."   *See Thane Int., Inc., v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2002).   The Ninth Circuit has rejected evidence of awareness of even 65% of the general U.S. consuming public as sufficient to show fame and rejected that "Nissan" and "Avery Dennison" are famous marks.   *Nissan Motor Co. v. Nissan Computer Corp*, 378 F.3d 1002, 1014 (9th Cir. 2004); *Avery Dennison*, 189 F.3d 868.   Although it bears the burden of doing so, Apple failed to produce evidence sufficient to support a finding of the required fame in its limited trade dresses.

***Survey evidence.***   Apple's own survey evidence, proffered by Hal Poret, proves that the recognition levels for the limited trade dresses Apple is claiming, without the Apple logo or name or home button, are too low to prevail on its claims.   Samsung disputes that Mr. Poret's numbers are valid, reliable, or derived from an appropriate survey universe, which would have been the general U.S. consuming population instead of the more tech-savvy subset actually surveyed.[7]

---

[7]   Ex. 69 (Poret Tr. at 133:8-19.)   Consumers surveyed for the iPhone study had purchased a mobile phone in the past 12 months or were likely to do so in the next 12 months, or own a mobile phone that they purchased more than a year ago or that was purchased for them. Ex. 70 (Poret Rpt. p. 35).   Consumers surveyed for the iPad study had purchased a tablet in the past 12 months or were likely to in the next 12 months or had purchased a mobile phone or
   (footnote continued)

1    However, Poret's numbers represent the absolute high-water mark of Apple's evidence of fame,

2    and they fall short, revealing that not even 60% of those surveyed were aware of the limited iPad

3    or iPhone trade dress Apple is claiming.  *Id.*   Even if this were a survey of the general public,

4    Apple's results are too low to establish fame. *E.g., Nissan Motor,* 378 F.3d at 1014; 4 MCCARTHY

5    ON TRADEMARK at § 24:106, 24-310 (2008 ed.) ("[M]inimum threshold survey response should be

6    in the range of 75% of the general consuming public of the United States.").

7        ***Advertising.***   Nor can Apple's advertising carry its burden because it does not promote

8    the ***as-claimed*** trade dresses.   To be probative of fame, a plaintiff's advertising must not merely

9    depict the product, but "must *feature* in some way the [claimed] trade dress itself."   *First Brands*

10   *Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir. 1987) (finding that plaintiff's advertising

11   did not *stress* the color and shape of the bottle); *see also Autodesk, Inc., v. Dassault Systems*

12   *Solidworks Corp.*, 685 F. Supp. 2d 1001, 1014 (N.D. Cal. 2009) (advertising that showed the

13   claimed trade dress was not probative because it did not stress it "in a manner that would support

14   an inference of secondary meaning").   Apple cannot point to any advertising that promotes its ***as-***

15   ***claimed*** trade dresses as source identifiers, or urges consumers to "look for" specific elements of

16   those trade dresses.   *See First Brands,* 809 F.2d at 1383.   Rather, Apple's ads focus on product

17   functionality, and many do not even show the entire asserted trade dress.[8]   In addition, Apple

18   does not market the iPhone and iPad to the general U.S. public, but targets a narrow subset of

19   consumers who are not only tech-savvy, but are able to afford the substantial cost of these devices.

20   Ex. 73 (Winer Rpt. ¶¶ 95-97).   This subset of consumers was likely even more select at the time

21   the first accused Samsung product was first released—i.e., the only time relevant to the issue of

22   fame.   *See Horphag Research Ltd. v. Garcia*, 475 F. 3d 1029, 1036 (9th Cir. 2007).

---

23

24   notebook/laptop computer in the past 12 months or were likely to do so in the next 12 months.
     Ex. 70 (Poret Rpt. p. 36).

25      [8]    *See, e.g.,* iPhone 3G "Touching is Believing" print advertisements featuring a hand
     scrolling through various apps not claimed by Apple's asserted trade dress.   *See* Ex. 71

26   (APLNDC00000114 – 118 (Album covers from "Music" app), APLNDC00000119 ("Maps" app),
     APLNDC00000120 (NYT from "Safari" app), APLNDC00000121 (Email message from "Mail"

27   app), APLNDC00000122 (chat conversation from "Messages" app") (APLNDC00000114-22);
     *see also* Ex. 72a-i ("There's an app for that" campaign, focusing on applications not pre-installed).

28

1    Because Apple lacks sufficient evidence that would support a finding of fame under the

2    dilution law, Samsung is entitled to summary judgment in its favor on Apple's dilution claim.

3    **IV.    APPLE'S DESIGN PATENTS ARE INVALID**

4    Apple's design patents are invalid in light of prior art.  The record has now been

5    developed far more than the preliminary injunction record to which the Federal Circuit limited its

6    opinion.  *Apple v. Samsung*, 2012-1105, at 31 n.6 (Fed. Cir. May 14, 2012); *see also Glaxo*

7    *Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1346 (Fed. Cir. 2004) ("An appellate court's

8    preliminary injunction opinion has no conclusive bearing at the trial …)."   Hundreds of hours of

9    deposition testimony and new prior art references leave no material dispute that Apple's remaining

10   design patents were obvious at their alleged conception.    *See, e.g.,* Ex. 74 (Sherman Decl. Ex. B).

11   Obviousness is a less stringent standard than anticipation and infringement, which are

12   mirror images.  *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003)

13   ("[T]hat which would literally infringe if later in time anticipates if earlier.")   If several

14   references would have been combined by a designer of ordinary skill in the art to disclose the

15   design, the patent is invalid as obvious.   35 U.S.C. § 103(a); *Durling v. Spectrum Furniture Co.*,

16   101 F.3d 100, 103 (Fed. Cir. 1996); *LA Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 117, 1124

17   (Fed. Cir. 1993) ( person skilled in the art is "presumed to have perfect knowledge of all pertinent

18   prior art").   The obviousness analysis begins with a primary reference that has "basically the

19   same" design characteristics as the claimed design.  *Durling*, 101 F.3d at 103.   Secondary

20   references may "be used to modify it to create a design that has the same overall visual appearance

21   as the claimed design" if the references are sufficiently related that "the appearance of certain

22   ornamental features in one would suggest the application of those features to the other."   *Id.*

23   **A.    The D618,677 and D593,087 Patents Are Obvious.**

24   Both D'677 and D'087 are obvious in light of prior art.  Apple's inventors and expert

25   testified that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

26

27

28

Although the Federal Circuit's opinion said JP'638 alone did not *anticipate* D'087 due to the contour in the side view, *see* No. 2012-1105 at 23, the design properly serves as a primary reference for obviousness because it creates basically the same visual impression but for that one difference.   *See In re Borden*, 90 F.3d 1570, 1575 (Fed. Cir. 1996).



**JP 1241638** (Ex. _4, Issued June 2005)   **D618,677** (Ex. 5)      **D593,087** (Ex. 6)

Numerous secondary references that Apple did not disclose to the PTO teach both a flat, flush, continuous surface and a black front face, showing that it would have been obvious to a designer skilled in the art at the alleged invention date to modify the JP'638 design with these features.   *See Durling*, 101 F.3d at 103.   Shown below are few of those references (of which only the LG Chocolate was part of the preliminary injunction record):



| **JP 1204221** | **iRiver U10 MP3 Player** | **LG Chocolate** | **Nokia Fingerprint Concept** |
| (Issued May 2004) | (Released late 2005)[10] | (Released March 2006) | (Public in 2004)[11] |
| Ex.  7. | Arnold Decl. ¶ 12 | Arnold Decl. ¶ 13 | Ex.  10 |

As these references show, using black on the front of an electronic device was common at the time

**SAMSUNG'S MOTION FOR SUMMARY JUDGMENT**

1  D'087 and D'677 were allegedly conceived on April 20, 2006. ▮▮▮▮▮▮▮▮▮▮

2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4  ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮

6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The file history for D504,889, which became public in

7  2005, also included photos Apple submitted of a mockup that used black on the front surface:[10]

8        Many combinations of prior art render the D'677 obvious, including using the iRiver or

9  Nokia Fingerprint Concept as a primary reference and the JP 1204221 or LG Chocolate, which

10  both disclose oblong shapes and less rounded edges than the Nokia Fingerprint Concept, as a

11  secondary reference.   Likewise, the JP 1204221, which discloses all the elements of the D'677,

12  but has slightly less narrow side borders and a barely perceptible circular element to the left of the

13  oblong shape (as does the iPhone 4), properly serves as a primary reference, combined with

14  JP'638, which is very similar to D'677 on those two elements.   Given the sparse "design

15  elements" in each of these minimalist prior art designs, slight variations on each of those elements

16  were obvious to those of ordinary skill in the art.   *See Durling*, 101 F.3d at 103 (noting that

17  where obviousness references are similar, they suggest application of features one to another).

18        Further, to overcome an obviousness rejection, Apple claimed that the D'677 design was

19  distinct from the prior art solely because it disclosed "a substantially continuous transparent

20  surface on an electronic device and the substantially smooth or flush transition between the display

21  screen and the rest of the front face of the device" (*see* Ex. 16 at APLPROS0000011936)—one of

22  the very features Apple has asserted the D'889 patent, filed in 2004 and published in 2005,

23  disclosed.[11]   The D'889 is unquestionably a proper secondary reference.   Like the D'087 and

24

25  _____

26     [10] Ex. 13 (photos from file history); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮; Ex. 15 (photos of the actual mockup pictured in the D'889 file history).

27     [11] *See* Ex. 2, 2/15/12 Stringer Tr. at 365:21-366:6; Ex. 1, 8/5/2011 Woodring Tr. at 280:8-14.

28  Samsung does not believe this is what the D'889 discloses, but if its claim construction is not

    (footnote continued)

**SAMSUNG'S MOTION FOR SUMMARY JUDGMENT**

1   D'677, it is for an "electronic device," and Apple cited it to the PTO as prior art for both patents.[12]

2   The same fourteen people named as inventors on D'889 are also named inventors of D'087 and

3   D'677 and were thus aware of their own earlier design.   And Apple's expert, Peter Bressler,

4   testified that ██████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████████.[13]

6        The D'087 design is similarly obvious.   It differs from the D'677 primarily in the

7   presence of a bezel and the lack of the color black, which the KR 30-0398307 (issued November

8   15, 2005) and the Bluebird Pidion BM-200 (released 2005) show.   Ex. __, __.



14        **KR 30-0398307** (Ex.19)        **Bluebird Pidion BM-200**[14]   (Arnold Decl. ¶ 24)

15   The bezel of either of these references combined with JP'638, JP'221, or iRiver yields an

16   invalidating design with the "same overall visual appearance" as D'087.   *See Durling*, 101 F.3d

17   at 103.[15]   As a matter of law, this renders the D'087 obvious.

_____

24   accepted, Apple is estopped from disputing that the D'889 discloses a flat, continuous surface
25   from edge to edge.
      [12] *See* Ex. 17 at APLPROS0000010467 (D'087); Ex. 16 at APLPROS0000011784 (D'677).
26      [13] Ex. 18, 4/23/2012 Dep. of Peter Bressler at 180:20-181:16, 182:11-20, 184:3-8.
        [14] Ex. 20, 3/8/2012 Dep. of Sungyub Lee at 8:24-27:25 and Dep. Exs.
27      [15] D'087 is invalid if any of its embodiments is obvious.   *See In re Klein*, 987 F.2d 1569,
      1570 (Fed. Cir. 1993).   Embodiment 2 claims only the internal rectangle, like the iRiver U10.

28

02198.51855/4759022.4

Case No. 11-cv-01846-LHK

**SAMSUNG'S MOTION FOR SUMMARY JUDGMENT**

**B.      The D504,889 Patent Is Obvious.**



D504,889            D500,037

D'889 is also invalid in view of prior art that was not in the preliminary injunction record. (Ex. 21 (D'889).)   U.S. patent D500,037 shows the design for a "bezel-less flat panel display" that was filed a year before D'889's alleged conception.[16]   (Ex. 22.)   D'037 has nearly the same rectangular shape with a transparent and/or reflective surface running from edge to edge on the front of the device with no interruptions, giving the same "unframed" impression as D'889.[17]      D'037 is also symmetrical and smooth in all views and has a relatively thin profile.   Because it creates the same basic visual appearance as D'889, it is a proper primary reference.

In addition, the "Brain Box" display shown to the right is an Apple design made public at least as early as 1997.[18] As Apple witnesses acknowledged, ███████████ ████████████████████████████████████[19] The Brain Box display shows a profile more similar in



---

[16]  Apple alleges a conception date of Sept. 3, 2003. Ex. 23, at 7.

[17]  The optional mask region on the front of D'889 is also shown in D'037.   Figure 3 of the patent shows the mask underneath the continuous, transparent cover piece, and the accompanying utility patent confirms a mask under the top transparent layer surrounding the active display area. *See* Ex. 24, U.S. Patent 6,919,678 at column 5, line 53 to column 6, line 31.

[18]  The image is from *AppleDesign* by Paul Kunkel (1997).   (Ex. 25 at 144.)

[19]  Ex. 11, Feb. 9, 2012 Dep. of Douglas Satzger at 153:5-156:21 and Dep. Ex. 8.   A named inventor of D'889 testified ███████████████████████████ in which the design was published.   *Id.*

**SAMSUNG'S MOTION FOR SUMMARY JUDGMENT**

proportion to the D'889 in terms of thickness and shape than D'037, and in combination, they create the same overall visual appearance as D'889, with either serving as the primary or secondary reference to the other.[20]   "[T]he scope and content of the prior art" thus demonstrate that "the level of ordinary skill in the art" was sufficient, and likely, to result in the design of D'889 at the time of its alleged invention.[21]   *Crocs, Inc. v. ITC,* 598 F.3d 1294, 1308 (Fed. Cir. 2010); *see also KSR,* 550 U.S. at 417.

### C.   D604,305 and D617,334 Are Anticipated And Obvious

A design is unpatentable if it was known or described in a printed publication before its invention by the applicant.   35 U.S.C. § 102(a).   Apple allegedly conceived of D'305 and D'334 no earlier than April 26, 2007.   (Ex. 23 at 9.)   Images of the iPhone shown to the public on January 9, 2007, and that were immediately published, anticipate these patents, or at least renders

---

[20]   Both of these display devices are appropriate obviousness references because D'889 claims broadly it is an "electronic device" and the file history shows that the design corresponded to both a tablet device and a display or screen that could be coupled to a computing device.   Ex. 26 at APLPROS0000010190, File Wrapper for D504,889.   But these are not the only prior art references that taught flat, uninterrupted front and back surfaces on a rectangular shape with rounded corners and a thin profile.   *See* Ex. 27 (JP1178470); Ex. 28 (KR 30-0304213); Ex. 24. In addition, among his other designs, inventor Roger Fidler testified that in 1981 he created a tablet design that was rectangular with four evenly rounded corners, a flat clear surface running from edge to edge, no physical buttons, and a thin form factor.   (Ex. 29, 9/23/2011 Dep. of Roger Fidler at 290:22-299:10 and Dep. Ex.).   These additional references confirm that these features were obvious prior to the alleged conception of D'889.

[21]   The D'889 patent is also invalid due to indefiniteness because its figures are ambiguous and leave the scope of the design open to conjecture.   35 U.S.C. § 112; *see also Seed Lighting Design Co., Ltd. v. Home Depot,* 2005 WL 1868152, *8 (N.D. Cal. Aug. 3, 2005); *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.,* 587 F.3d 1339, 1352 (Fed. Cir. 2009) ("Claims are considered indefinite when they are not amenable to construction or are insolubly ambiguous."). Ex. 38 (11/21/11 De Iuliis Tr. 188:24-190:10); Ex. 39 10/31/11 (Howarth Tr. 100:9-13; 104:13-105:10); Ex. 40 (11/27/11 Coster Tr. 29:3-30:21); Ex. 43 (10/24/2011 Rohrback Tr. at 99:6-102:25), Ex. 39 (10/31/11 Howath at 92:18-96:7), Ex. 41 (11/27/11 Kerr Tr. 27:19-28:25); Ex. 42 (10/31/11 Zorkendorfer Tr. at 44:18-65:11; Ex. 43, 10/24/11 Rohrbach Tr. at 95:11-109:20; 115:25-116:13; Ex. 44, 10/27/11 Whang Tr. at 72:21-78:25; Ex. 40, Coster Tr. at 12:4-6; 31:9-32:4; 36:5-37:6; Ex. 41, Kerr Tr. at 26:24-28:25; Ex. 39, Howarth Tr. at 92:19-113:6; 270:19-284:16; Ex. 45, 11/8/11 Satzger Tr. at 31:20-23; 37:5-38:1; Ex. 3, 12/1/11 Ive Tr. at 155:7-10; 160:7-162:19; Ex. 46, 2/8/12 (ITC) Howarth Tr. at 162:7-166:4; Ex. 47, 2/23/12 (ITC) Rohrbach Tr. at 111:12-116:14).   Samsung will address this further at claim construction.

them obvious.[22]





**Jan. 9, 2007 Press Release**          **D'305**          **D'334**

The January 9, 2007 design differs slightly from D'305 and D'334, with different numbers and placements of icons, for example. ███████████████████████████████████ ███████████████████████████████ ██████████████████████████████████████ ███████████████████████ This anticipates the D'305 and D'334.

### D.      The D'334 Patent Is Invalid Due To The On-Sale Bar

The on-sale bar applies when two conditions are satisfied: (i) the product is offered for sale more than a year prior to the filing date; and (ii) the invention is ready for patenting before its filing date.   *Pfaff v. Wells Elecs*, 525 U.S. 55, 67 (1998).   By June 29, 2007, Apple had not only announced the iPhone, it was offering it for sale in the U.S.[23]   These sales occurred more than a year before July 15, 2008, when Apple filed the application for D'334.   Because, ██████████████ ████████████ an ordinary observer would find the design in the D'334 patent substantially the same as the design in the D'305 patent,[24]  which Apple claims was embodied in the original iPhone,[25] these sales trigger the on-sale bar and invalidate the D'334 patent.   *See* 35 U.S.C. § 102(b); *Pfaff v. Wells Elecs*, 525 U.S. at 67.

---

[22]  *See* Ex. 31 (www.apple.com/iphone/, as visited Jan. 11, 2007 by web.archive.org); Ex. 17 at APLPROS0000010469, APLPROS0000010479-481 (printout from www.gsmarena.com on March 12, 2007, included in Apple's application for D'087).

[23]  *See* Ex. 37, at 2, ██████████████████████████████████████ ████████████████████████ 

[25]  *See* Ex. 37, at 2.

**SAMSUNG'S MOTION FOR SUMMARY JUDGMENT**

1   **V.     APPLE'S UTILITY PATENTS ARE INVALID OR NOT INFRINGED**

2          Apple asserts four claims from the following touch screen patents:   U.S. Patent Nos.

3   7,844,915 (claim 8), 7,864,163 (claim 50), 7,469,381 (claim 19), and 7,663,607 (claim 8).   As

4   explained below, the undisputed evidence shows that these claims are not infringed or invalid.

5          **A.     Claim 8 Of The '915 Patent Is Not Infringed**

6          Claim 8 of the '915 patent describes a computer-based method for distinguishing between

7   scroll and gesture operations.   Ex. 85 ('915 patent).   The claim requires a particular operation:

8   "determining whether the *event object invokes* a scroll or gesture operation."   Thus, the "event

9   object" (not some other object) must "invoke" the scroll or gesture operation.

10         In claim 8, "object invokes" means "the object calls a method or function."   Gray Decl.

11  ¶ 21.   The



17                              Technical dictionaries concur.   Gray Ex. 16 (Microsoft Computer

18  Dictionary at 287 (5th ed. 2002)).

19         Apple   identifies   Android's   MotionEvent   object   as   the   "event   object"   in   the   accused

20  products.   Gray Exs. 13 & 14 (Singh Infringement Report, ¶ 322–23 & Ex. 17 at 16).

25

26

27

28

**SAMSUNG'S MOTION FOR SUMMARY JUDGMENT**

1   ████████████████████████████████████████████████████████████

2   ██████████████████  Consequently, Samsung's accused devices cannot infringe claim 8.[26]

3     Apple attempts to salvage infringement by rewriting the claim.   In particular, Apple

4   argues that the "event object" need not "invoke" a scroll or gesture operation; it need only be used

5   by *another* object – ██████████████████ – that invokes a method or function.[27]   This is not what

6   the claim says.   The claim is clear: "*the event object* invokes" the scroll or gesture operation

7   itself.   By contrast, Apple's litigation driven interpretation ignores the well-known meaning of

8   "invokes" in the field as confirmed by the inventors, technical dictionaries, and Apple's own

9   expert.   Indeed, before this case, Apple's expert had ***never*** used the phrase "object invokes" in

10  the way he (and Apple) are now using it in claim 8.[28]   Apple's claim construction argument

11  should be rejected and summary judgment should be entered.

**B.  Claim 50 Of The '163 Patent Is Invalid**

13    Claim 50 of the '163 patent relates to a technique for enlarging and translating a "structured

14  electronic document" on a touch screen.   Ex. 86 ('163 patent).   Claim 50 generally requires: (1)

15  enlarging and translating a structured electronic document to substantially center a first box of

16  content in response to a first gesture; and (2) translating the structured electronic document to

17  substantially center a second box of content in response to a second gesture.

---

[26]  Because Apple failed to assert a doctrine of equivalents theory in its infringement contentions, it is precluded from doing so now.   *MEMC Elec. Materials v. Mitsubishi Materials Silicon Corp.*, 2004 WL 5363616, at *4 (N.D. Cal. 2004) (precluding reliance of doctrine of equivalents theory not disclosed in infringement contentions); *Rambus, Inc. v. Hynix Semiconductor Inc.*, 2008 WL 5411564, at *3 (N.D. Cal. 2008) (same); *Genentech, Inc. v. Amgen*, 289 F.3d 761, 773–74 (Fed. Cir. 2002).



[27]

**SAMSUNG'S MOTION FOR SUMMARY JUDGMENT**

1    Years before the '163 patent application was filed, this very technique was invented and

2    publicly disclosed by Dr. Benjamin Bederson.   In 2004, Dr. Bederson developed a prototype

3    "LaunchTile System" – the LaunchTile program running on a Compaq Pocket PC.   The

4    LaunchTile System was publicly disclosed through demonstrations, videos, and power point slides

5    at the April 2005 ACM Conference on Human Factors in Computing Systems.   Bederson Decl., ¶

6    8, Exs. D, E, & F.   Indeed, Dr. Bederson presented a video demonstration (the "LaunchTile

7    Video") specifically depicting one of two invalidating behaviors that are the basis for this motion

8    at the conference.   *Id.* Ex. D.   Additionally, at the conference, Dr. Bederson presented the paper

9    *AppLens and LaunchTile: Two Designs for One-Handed Thumb Use on Small Devices*, CHI 2005,

10   ACM, Apr. 2-7, 2005, ("LaunchTile Publication").   Bederson Ex. A.   Thus, the LaunchTile

11   System, the LaunchTile Video, and the LaunchTile Publication each independently qualify as

12   prior art under 35 U.S.C. §§ 102(a), (b), and (g)(2).

13   LaunchTile consists of a single interactive zoomspace with 36 tiles (6x6 matrix) embedded

14   within.   Gray Decl. at ¶ 65; Bederson Decl. at ¶ 10.   This zoomspace is a "structured electronic

15   document" comprising a plurality of boxes of content.[29]   Gray Decl. at ¶¶ 76-82.   While at the

16   outermost level of zoom (World view), a user can select a 4-tile Zone within the 36 tiles.   In

17   response to this first gesture, LaunchTile enlarges and translates the zoomspace so that the 4-tile

18   Zone is centered on the display.   Gray Decl. at ¶¶ 84-90, Exs. 4 & 5 (videos).   While in the

19   Zone view, a user can then select any one of the 4 tiles.   In response to this second gesture,

20   LaunchTile again translates the zoomspace so that the selected tile is centered on the display.

21   Gray Decl. at ¶¶ 92-97, Exs. 4 & 5.   These steps meet every limitation of claim 50 and therefore

22   anticipate.   Gray Decl. ¶ 97, Ex. 3 (claim chart).[30]

23

24

---

25   [29]   A "structured electronic document" is a "two dimensional information space containing
26   embedded coding that provides some meaning or 'structure' to the document."   Gray Decl. at ¶
     60.   Dr. Singh does not dispute this construction.   Gray Ex. 6 (Singh Dep. at 80:25-81:1).
27   [30]   Additionally, from Zone view, a user can drag the zoomspace to an adjacent 4-tile Zone
     and select a single tile.   Gray Decl. at 95 & Ex. 5.   This is an alternative, invalidating operation.
28

**SAMSUNG'S MOTION FOR SUMMARY JUDGMENT**

1    Apple contends that LaunchTile does not anticipate because the zoomspace is not

2  "enlarg[ed]" and "translat[ed]" when a user selects a 4-tile zone.   Gray Ex. 15 (Singh Rebuttal

3  Report, ¶ 33).   Instead, Apple claims that selected portion of the zoomspace is replaced by

4  "entirely different content with a different visual appearance."   *Id*.   Apple's argument is based

5  on a flawed and unsupported construction of "structured electronic document."

6    Under Apple's construction, the visual appearance of content within a structured electronic

7  document cannot change when enlarged.   However, nothing in the claim language, specification

8  or prosecution history precludes the changing or substitution of content in a structured electronic

9  document when enlarged.   Certainly, one of ordinary skill in the art would not believe such a

10  change or substitution of content *within* a structured electronic document renders the document a

11  "different" document when enlarged.   Furthermore, a webpage – an example of a structured

12  electronic document offered in the '163 specification (Col. 18 ll. 50-52)   – often contains

13  embedded content which is replaced when the webpage refreshes.   Gray Decl., ¶ 89.   This

14  replacement does not render the webpage a "different" webpage.   *Id*.   Likewise, any change or

15  replacement of content when enlarging the zoomspace in LaunchTile does not somehow transform

16  the zoomspace into an "entirely different" structured electronic document.[31]   For the foregoing

17  reasons, Claim 50 is invalid as anticipated.

18    **C.    Claim 19 Of The '381 Patent Is Invalid**

19    Claim 19 of the '381 patent relates to a snap-back feature.   The feature operates as

20  follows: when a user places a finger on a screen and drags an electronic document past its edge

21  and then releases the finger, the document bounces back to fill the screen.   Ex. 83 ('381 patent).

22

23

24

25    [31]    Although not relevant under the proper construction of "structured electronic document,"

26  Apple's assertion that LaunchTile presents entirely different content when the zoomspace is
enlarged is not correct.   The change in appearance results from further rendering of the tile based

27  on content existing within the single, hierarchical data structure of LaunchTile; it does not result
from "replacement" of tile content.   *See* Gray Decl., ¶¶ 43, 50-53; Bederson Decl., ¶ 15-17.

28

**SAMSUNG'S MOTION FOR SUMMARY JUDGMENT**

The snap-back feature was not new when Apple filed its '381 patent application in December 2007.[32]  Years earlier, in 2001, Mitsubishi Electric Research Laboratory ("MERL") developed a touch screen device called DiamondTouch.  Bogue Decl., ¶ 4.  By early 2005, MERL developed a program in the United States that ran on DiamondTouch called Tablecloth.  *Id.*, ¶¶ 4-13.  Tablecloth includes the same snap-back feature claimed in the '381 patent.  van Dam Decl., ¶¶50-55, Exs. 3 and 4.  In fact, the Tablecloth source code includes a function named "snapBack."  Forlines Decl., ¶ 9.  In early 2005, Tablecloth was installed on a DiamondTouch device located in the MERL visitor lobby in Cambridge, MA, was available for visitors to freely use without a nondisclosure agreement, and was used to publicly demonstrate the snap-back feature.  Bogue Decl., ¶ 9, 12, Exs. 4 and 5 (videos).  Furthermore, Tablecloth's snap-back feature was shown to potential customers at a conference in San Jose, CA in March 2006.  *Id.*, ¶12.  Thus, Tablecloth qualifies as prior art under 35 U.S.C. §§ 102(a), (b), and (g)(2).

As described in the declaration of Dr. van Dam and the supporting claim chart and videos, Tablecloth discloses each limitation of claim 19 of the '381 patent.  Tablecloth displays a first portion of an electronic document.  Van Dam Decl., ¶ 71-73, 97-99.  In response to movement of a finger on the screen, Tablecloth displays a second portion of the document.  *Id.*, ¶ 74-75, 100-101.  In response to the edge of the document being reached, Tablecloth displays a third portion and an area beyond the edge of the document.  *Id.*, ¶ 76-78, 102-104.  Finally, in response to detecting that the finger is no longer on the touch screen display, Tablecloth displays a fourth portion of the document such that the area beyond the edge is no longer displayed.  *Id.*, ¶ 79-81, 105-107.  Thus, Tablecloth anticipates claim 19.

Apple argues that Samsung has not identified an "electronic document" in Tablecloth.  That argument, however, is based on a non-existent claim construction dispute.  Samsung has identified "electronic documents" under both Apple's and Samsung's definitions.  Whether

---

[32]  The cited provisional patent applications do not disclose the subject matter of asserted claim 19; thus this claim is not entitled to an earlier priority date.  *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 22 F. 3d 1299, 1305-06 (Fed. Cir. 2008) (plaintiff has burden of proving earlier date).

1   electronic document is construed as Apple has proposed: "some visual representation on the

2   screen that has a … defined set of boundaries" (Van Dam Ex. 2 (Balakrishnan Dep. at 27:19-25))

3   or as Samsung has proposed: "information that is visually represented on a screen that has a

4   defined set of boundaries," Van Dam Decl. ¶ 32, both of which are consistent with the phrase's

5   plain and ordinary meaning and the intrinsic evidence, there is no dispute that claim 19 is

6   anticipated by Tablecloth and invalid.

7        **D.    Claim 8 Of The '607 Patent Is Invalid**

8        The '607 patent relates to a touch panel configured to detect multiple touches.   Ex. 84

9   ('607 patent).   Earlier this year, the International Trade Commission ("ITC") issued a final

10   decision finding independent claim 1 and dependent claim 7 of the '607 patent invalid.   Von

11   Herzen Decl., ¶¶ 22-27 and Exs. 2, 5, 6.   In that proceeding, an Administrative Law Judge and

12   the Commission both concluded that U.S. Patent No. 7,372,455 ("Perski") and the Smartskin

13   paper ("Smartskin") independently invalidate claims 1 and 7.[33]   *Id.*

14        Apple has dropped claims 1 and 7 in this case (presumably because of the ITC decision)

15   and now only asserts claim 8.   However, claim 8 depends from claims 1 and 7 and adds nothing

16   more than a trivial circuit component that was very well known to one of ordinary skill in the art

17   for over a *decade* prior to the filing of the '607 Patent.   *Id.*, ¶¶ 28-57.   Consequently, claim 8 is

18   also invalid in view of Perski and Smartskin.[34]

19        Apple argues that Perski does not disclose the "multitouch" limitation of claims 1 and 7.

20   But as Dr. Von Herzen explains, there is "absolutely no difference" between the multitouch

21   algorithm disclosed in Perski and the algorithm of the '607 patent.   *Id.*, ¶¶ 60-73.   The ITC also

22   rejected this argument, holding that the "method disclosed in Perski [] for detecting multiple

23   touches is *virtually identical* to the disclosure in the '607 Patent."   *Id.*, ¶ 23.

24   _____

25

26   [34]    For the Court's convenience, Dr. von Herzen has prepared claim charts comparing the
27   limitations of claim 8 to each of the Perski and Smarksin references.   Von Herzen Decl., Ex. 17.
     These claim charts prove by clear and convincing evidence that all the limitations of claim 8 are
28   disclosed or rendered obvious by each of Perski and Smartskin.

Apple claims that Smartskin does not disclose the "transparent capacitive sensing medium" limitation of claims 1 and 7.   However, Smartskin expressly discloses that "a transparent SmartSkin sensor can be obtained . . . ."   *Id.*, ¶¶ 81-93.   Even if Smartskin had not expressly disclosed a transparent sensor, converting either one of the described opaque embodiments into transparent form would be an "obvious design choice" yielding extremely predictable results. *Id.*, ¶ 82.   The ITC, while describing anticipation "an extremely close call," also found this limitation to be obvious in view of Smartskin.   *Id.*, ¶¶ 24-27.

Claim 8 merely adds a common and trivial limitation to claims 1 and 7: a "virtual ground charge amplifier."   This well-known circuit element adds nothing inventive.   *Id.*, ¶¶ 28-57, 74-77, 94.   Indeed, the charge amplifier configuration covered by claim 8 was well known as an "integrator" for more than a decade.   For example, a popular 1989 textbook offers dozens of examples of an *identical* charge amplifier configuration.   *Id.*, ¶¶ 34-39.   In addition, a 1977 IEEE paper and a university physics experiment detail the exact same circuit.   *Id.*, ¶¶ 40, 43-44. The charge amplifier configuration was also extremely well known in the capacitive touch sensor field for use as a "capacitive measuring element" more than a decade before the '607 patent was filed.   *Id.*, ¶¶ 45-57.   Blonder, Gerpheide '658, and Gerpheide '017 all describe capacitive touch sensors with identical charge amplifiers used to detect touches.   *Id.*   Thus, one of ordinary skill in the art would find the addition of a "virtual ground charge amplifier" to be a trivial modification to Perski or Smartskin that would have yielded predictable results—namely the filtering of noise and unwanted charge coupling.   *Id.*, ¶¶ 54, 76, 77, 94.   Consequently, claim 8 would be obvious to one of ordinary skill in the art in view of Perski or Smartskin and is invalid.   *Id.*, ¶¶ 77, 94.

## VI.   APPLE'S ANTITRUST CLAIMS FAIL FOR LACK OF DAMAGES

Apple's antitrust counterclaim for damages should be dismissed because Apple has not adduced any evidence of damages.   Summary judgment is proper when there is "no competent or relevant evidence from which a jury could fairly estimate damages."   *Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1452-53 (9th Cir. 1983).   In *Rickards*, the Court granted summary judgment on the asserted antitrust damages claims where the plaintiff had not "identified their expert witnesses nor designated documents supporting their damages claims." *Id.*;

1    *see also Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1124 (E.D. Cal. 2002) (finding

2    summary judgment appropriate when there is no admissible evidence of damages).

3          In response to interrogatories, Apple failed to identify any facts supporting its claim to

4    damages.    In response to Samsung's Interrogatory No. 79, which required Apple to "IDENTIFY

5    all facts supporting APPLE's Twenty-Eight Counterclaim (Violation of Section 2 of the Sherman

6    Act, 15 U.S.C. § 2)," Apple identified no documents supporting its claim for damages and no

7    witnesses that would testify regarding such damages.    Ex. 81 (Apple's Obj. and Resp. to

8    Samsung's Fourth Set of Interrogatories (Mar. 10, 2012))). Instead, ████████████████████

9    ████████████████████████████████████████ Similarly, in response to Samsung's

10   Interrogatory No. 8, which required Apple to "fully describe any and all damages that APPLE is

11   claiming . . . and the detailed basis for any such damages claims," ██████████████████

12   ████████████████████████████████ made no attempt to substantiate

13   those claims. Ex. 80 (Apple's Supp. Obj. and Resp. to Samsung's First Set of Interrogatories (Mar.

14   7, 2011))).

15         Apple's sole expert on antitrust issues, Dr. Janusz Ordover, admitted during deposition that

16   he had no evidence of the amount of damages that Apple suffered. ██████████████████

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████

26

27

28

**SAMSUNG'S MOTION FOR SUMMARY JUDGMENT**

1    Merely demonstrating that a party has incurred litigation costs is insufficient to sustain a

2  claim for antitrust damages,[35] but, even if evidence of such costs were sufficient, Apple has failed

3  to offer any evidence of the costs it has incurred here.   Apple has not produced any documents,

4  such as invoices, establishing legal fees incurred and Dr. Ordover admitted he did not know the

5  amount of such expenses.   Ex. 82 at 253:15-17.   Because Apple has not offered "competent or

6  relevant evidence from which a jury could fairly estimate damages," this Court should grant

7  summary judgment denying its antitrust damages claims.   *Rickards*, 704 F.2d at 1452-53.

8  **VII.    CONCLUSION**

9    For the foregoing reasons, Samsung respectfully asks the Court to grant its Motion for

10  Summary Judgment on all claims described above.

11  DATED: May 17, 2012                    QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP
12

13                                         By   */s/ Victoria Maroulis*
                                              Charles K. Verhoeven
14                                            Kevin P.B. Johnson
                                              Victoria F. Maroulis
15                                            Michael T. Zeller
                                              Attorneys for SAMSUNG ELECTRONICS CO.,
16                                            LTD., SAMSUNG ELECTRONICS AMERICA,
                                              INC., and SAMSUNG
17                                            TELECOMMUNICATIONS AMERICA, LLC

18

19

20

21

22

23

24

25  _____

26    [35]   *See Chip-Mender, Inc. v. Sherwin-Williams Co*, 2006-1 Trade Cas. ¶ 75,148 (N.D. Cal.
     2006). Litigation costs have only been recognized as antitrust damages in the context of *sham*
27  *litigation*, which Apple has not alleged.   *Handgards v. Ethicon*, 601 F.2d 986, 997 (9th Cir.
     1979).

28