QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California  94065-2139
Telephone:     (650) 801-5000
Facsimile:      (650) 801-5100

Michael T. Zeller (Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS CO.,
LTD., SAMSUNG ELECTRONICS AMERICA,
INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | CASE NO. 11-cv-01846-LHK |
| Plaintiff, | |
| vs. | **DECLARATION OF STEPHEN GRAY IN SUPPORT OF SAMSUNG'S MOTION FOR SUMMARY JUDGMENT** |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendant. | |

## DECLARATION OF STEPHEN GRAY

I, Stephen Gray, declare:

1.      I have personal knowledge of the facts set forth herein, and am competent to testify to the same.

2.      I submit this declaration in support of Samsung's Motion for Summary Judgment of invalidity on U.S. Patents 7,844,915 and 7,864,163.  If asked at hearings or trial, I am prepared to testify regarding the matters I discuss in this declaration

3.      I reserve the right to supplement or amend this declaration based on any new information that is relevant to my opinions.

4.      I am being compensated for my work in this matter at my standard consulting rate of $370 per hour.  I am also being reimbursed for expenses that I incur.  My compensation is not contingent upon the results of my study or the substance of my testimony.

## I.      PROFESSIONAL BACKGROUND

5.      I am an independent consultant.  All of my opinions stated in this Declaration are based on my personal knowledge and professional judgment.  In forming my opinions, I have relied on my knowledge and experience in graphical user interfaces and operating systems; software development practices; programming, including C and graphical programming; and on the documents and information referenced in this Declaration.  I have attached as Exhibit 1 a true and correct copy of my current curriculum vitae (CV), which details my education and experience. The following thus provides only a brief overview of some of my experience that is relevant to the matters set forth in this Declaration.

6.      Since the mid-1970s, I have designed, developed, and deployed computing systems and products that operate in server, desktop, and graphical environments.  As such, I have acquired expertise and am an expert in the areas of server computing architecture and design, graphical user interfaces, operating systems, local area and wide area networks, and various programming languages used in the development of those systems and products.  I have been employed by or retained as a consultant, including acting as a litigation consultant, for numerous

1   companies such as Burroughs, Filenet, Fujitsu, Marriott Corporation, MCI, Northern Telecom,

2   Olivetti, TRW, and Xerox, as well as other companies.

3       7.      I have several relevant professional experiences that further demonstrate my

4   expertise in the field of graphical user interfaces.  In late-2001 to mid-2002, as Chief Technology

5   Officer for Networld Exchange Inc., I was responsible for the design, development, and

6   deployment of a suite of products that delivered eCommerce functions.  These functions were

7   provided over the Internet and included product catalog information display, purchase and/or

8   purchase order creation, order delivery to fulfillment systems, and order status reporting.  The

9   products for which I had responsibility provided an electronic shopping graphical user interface

10  for business-to-business and business-to-consumer transactions.  The graphical user interface was

11  designed to support both vendors of products as well as customers.  Each of these user interfaces

12  were an optimization based on the specific user class.

13      8.      In the mid-1990s I was a consultant for Xerox.  One of my assignments there was

14  to develop a graphical interface for network attached office products.  For example, one of the

15  graphical user interfaces I designed provided end-user visibility into printer queues supporting

16  distributed network printers.   Another graphical user interface I designed provided network

17  operations distributed job management control.

18      9.      As a software development professional, I have had numerous occasions to review

19  bodies of source code.  I have analyzed source code written in several variants of C, SQL,

20  COBOL, RPG, variants of Basic, Java, Perl, several Assembler languages, and others. For

21  example, as an individual contributor at Xerox during the mid-1980s to 1990, I evaluated the

22  quality of source code from third-party software providers for possible inclusion in the Xerox

23  product line.  Also, I evaluated the source code of several application software packages for

24  completeness and maintainability, and for possible inclusion into the NTN product line in 2000-

25  2001.  During my early career, I spent time maintaining source code written by others.  In each of

26  these assignments, I analyzed the source code to identify the data structures, logical flow,

27  algorithms, and other aspects.

28

10.     During my career as a software development professional, I have several relevant professional experiences that demonstrate my expertise in the field of operating system technologies.   I have performed operating system programming assignments, I have publicly lectured regarding various operating systems, and I have provided litigation support where operating system technology was central to the matter.

11.     Finally, I have been retained by attorneys for plaintiffs and defendants in several matters where the concepts and practice of graphical user interface technology was a central issue. The matters include contract disputes: GTE v. Videotron; Eyefinity, Inc. v. Entigo; HealthFirst v. HealthTrio; Waltrip Associates v. Kevin Kimperlin & Spencer Trask Ventures, as well as patent infringement: WebSide Story v. NetRatings; ICR v. Harpo; Leader v. Facebook; Fotomedia v. Yahoo!; Cisco v. Telcordia; Ampex v. Kodak, et al and ICI v. Red Hat and Novell.

## II.     APPLICABLE LEGAL PRINCIPLES

12.     I am informed by counsel that "prior art" includes public information, public knowledge, and public acts that occur before an application for a patent was filed.   Prior art includes patents, journals, Internet publications, systems, and products.

13.     I am further informed by counsel that a prior art reference "anticipates" an asserted claim of a patent, and thus renders the claim invalid, if all the elements of the claim are disclosed in that prior art reference, either explicitly or inherently (*i.e.*, necessarily present or implied).

14.     I make this Declaration with the understanding that anticipation must be shown by clear and convincing evidence.

## III.    MATERIALS CONSIDERED

15.     In forming my opinions in this Declaration, I reviewed a number of materials, including U.S. Patent Nos. 7,844,915 (the "'915" Patent) and 7,864,163 (the "'163 Patent") as well as their respective file histories, and relevant portions of the record in this case to date.   I have reviewed the Expert Infringement and Rebuttal Reports of Dr. Karan Singh as well as the deposition transcript of Dr. Karan Singh.   In forming my opinions, I have also relied on the Declaration of Dr. Benjamin Bederson dated May 17, 2012.

16.     In addition, I rely on the same materials I reviewed and considered in preparing my Expert Invalidity and Rebuttal Reports.  Exhibit 2 is a true and correct copy of the materials I considered in preparing my Expert Invalidity Report and Expert Rebuttal Report in this case.

## IV.     THE '915 PATENT

### A.     OVERVIEW OF THE '915 PATENT

17.     The '915 Patent, entitled "Application Programming Interfaces for Scrolling Operations," issued on Nov. 30, 2010 from an application filed Jan. 7, 2007. The named inventors of the '915 Patent are Andrew Platzer and Scott Herz. The Patent is assigned to Apple Inc.

18.     The '915 Patent relates to the field of application programming interfaces that provide user interface operations, such as scrolling. The '915 Patent specifically concerns the problem of distinguishing among different touch-based user inputs, i.e., gestures, and responding by carrying out an appropriate operation in a computer system.  As of the date of invention this was not a new problem, and a number of solutions to this problem already existed in the art.

19.     The '915 Patent generally describes a programming interface for recognizing touch-based user input that signals either a "scrolling" operation or a non-scrolling "gesture" operation, including scaling and rotation.

20.     I understand that Apple has asserted that Samsung's devices infringe independent Claim 8 of the '915 Patent.  Claim 8 is reproduced below:

> 8.  A machine readable storage medium storing executable program instructions which when executed cause a data processing system to perform a method comprising:
> [a] receiving a user input, the user input is one or more input points applied to a touch-sensitive display that is integrated with the data processing system;
> [b] creating an event object in response to the user input;
> [c] determining whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation;
> [d] issuing at least one scroll or gesture call based on invoking the scroll or gesture operation;
> [e] responding to at least one scroll call, if issued, by scrolling a window having a view associated with the event object; and

1

[f] responding to at least one gesture call, if issued, by scaling the view associated with the event object based on receiving the two or more input points in the form of the user input.

2

3

**B.     CLAIM CONSTRUCTION**

4

21.     Based on my experience, the plain and ordinary meaning to one of ordinary skill in the art of the phrase "object invokes" in the context of claim 8 of the '915 Patent is that the object itself calls a method or function.  In other words, a person of ordinary skill in the art would understand the phrase "the event object invokes a scroll or gesture operation" to mean that the event object calls a method or function for scrolling or scaling.

5

6

7

8

22.     At their depositions, both inventors of the '915 Patent gave testimony that supports my conclusion regarding the plain and ordinary meaning of "the event object invokes."  Attached to this Declaration as Exhibits 8 and 9 are true and correct copies of relevant excerpts from the deposition testimony of Scott Herz and Andrew Platzer, respectively.

9

10

11

12

13

14

15

16



17

18

19

20

21

22

Ex. 8: Herz Depo Trans. at 95:6-96:10.

23

24



25

26

27

28

DECLARATION OF STEPHEN GRAY

Ex. 9: Platzer Dep. at 79:7 to 80:5.

23.     This inventor testimony is consistent with the common usage of this phrase in the field.  Attached to this Declaration as Exhibit 16 is a true and correct copy of a standard computer science dictionary, which use the phrase "invoke" in the manner referred to in the '915 Patent and in the same sense used by the '915 inventors.  Ex. 16: *Microsoft Computer Dictionary* (5th ed. 2002) at 287 (defining "invoke" as "to call or activate; used in reference to commands and subroutines").

24.     Attached to this Declaration as Exhibit 13 is a true and correct copy of relevant excerpts from the Expert Infringement Report of Apple Expert Karan Singh.  Attached to this Declaration as Exhibit 14 is a true and correct copy of Exhibit 17 to Dr. Singh's Expert Infringement Report.  The Singh Report asserts that the Android system's MotionEvent object represents the "event object" required in Claim 8.  Ex. 13: Singh Report at ¶¶ 320-324, 387.  But instead of asserting that the MotionEvent object invokes a scroll or gesture operation, the Singh Report maintains that ***another***, different object includes a method, WebView.handleQueuedMotionEvent(), that invokes a scroll or gesture operation (*e.g.,* handleTouchEventCommon() for a single input point and handleMultiTouchInWebView() for two or more input points).  Ex. 13: Singh Infringement Report at ¶¶ 331-332, 388.  Dr. Singh also testified that the event object does not have to invoke the scroll or gesture operation.  Attached to

this Declaration as Exhibit 7 is a true and correct copy of the deposition transcript of Karan Singh, Volume II.



Ex. 7: Singh Dep. Trans. Vol. II at 319:16-320:6.

25.    Dr. Singh's proposed definition ignores the plain meaning of the term "invoke" as used in the phrase "event object invokes" – namely, "the event object invokes a scroll or gesture operation."  Dr. Singh argues that certain gestures "invoke" an operation, whereas the claim requires something else:  Claim 8 says that the "event object invokes," and not the "user input invokes."  Yet Dr. Singh claims that the Epic 4G manual shows that "a Swipe, Slide, or Drag, all of which invoke a scroll operation, are distinguished from a Pinch or Spread, which invoke a gesture operation."  Ex. 13: Singh Infringement Report at ¶¶ 311-312.

26.    As described above, the '915 claims provide context for the claimed use of the phrase "object invokes."  A person of ordinary skill in the art would understand that Claim 8 describes a process whereby an "event object invokes" – specifically, claim 8 recites "executable program instructions" in a computer.  In this context, one of skill would understand that an "object" is a programmatic construct, a basic building block used in computer programming languages, including object-oriented programming languages - and a person of ordinary skill would therefore understand that "invokes" here is being used to refer to invocation in the programming context.  As the inventors recognized, this meaning of "invokes" is the commonly understood meaning of the term in the field, particularly in the context of program instructions for software.

27.     I therefore disagree with Apple's apparent claim construction and interpretation, as it is inconsistent with the plain and ordinary meaning of the term.  A person of ordinary skill in the art would understand that the claims require "determining whether the event object invokes a scroll or gesture operation" and so the event object must perform the indicated action (*i.e.*, an invocation).  An event object that is simply passed to other methods or modules does not take any action; it is passive data, and one of ordinary skill would not understand such an interaction as an "object invoking" an operation.

**C.      The Accused Android Products Do Not Perform The Claimed "Event Object Invokes A Scroll Or Gesture Operation"**

28.     In my opinion, the Accused Products do not infringe independent Claim 8 of the '915 patent, either literally or under the doctrine of equivalents.

**1.      Literal Infringement**

29.     Claim 8 recites the following requirement:

> [c] determining whether the *event object invokes* a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation;

(emphasis added.)

30.     As discussed above, a person of ordinary skill in the art would understand the phrase "the event object invokes a scroll or gesture operation" to mean that the event object calls a method or function for scrolling or scaling displayed content.  Applying the plain and ordinary meaning of the phrase "the event object invokes a scroll or gesture operation," Samsung's Accused Products do not perform this limitation.

31.     The claim limitation relating to the event object invoking a scroll or gesture operation in Claim 8[c] is preceded by the limitation, "creating an event object in response to the user input" in Claim 8[b].  Therefore, both limitations refer to the same "event object."

32.     At paragraph 322 of Exhibit 13, the Singh Report asserts that the Android system's MotionEvent object represents the event object described in the claim.  *See also* Ex. 13: Singh

Infringement Report at ¶ 387.  However, Apple fails to show that the MotionEvent object invokes a scroll or gesture operation.  In fact, it does not.

33.     I note that Android's MotionEvent object is used to "report movement (mouse, pen, finger, trackball) events.  The MotionEvent object does not call a method or function to scroll or scale content.  Rather, the MotionEvent object may hold either absolute or relative movements and other data, depending on the type of device.  *See* http://developer.android.com/reference/android/view/MotionEvent.html.

> Some devices can report multiple movement traces at the same time.
> Multi-touch screens emit one movement trace for each finger.  The
> individual fingers or other objects that generate movement traces are
> referred to as pointers.  Motion events contain information about all
> of the pointers that are currently active even if some of them have
> not moved since the last event was delivered.

*Id.*  Thus, the MotionEvent object is a passive container of information with respect to scroll or gesture operations, which does not call, initiate, cause or take any other actions with respect to scroll or gesture operations.

34.     Rather than alleging that the MotionEvent object invokes a scroll or gesture operation, which would be inaccurate, the Singh Report maintains that ***another*** Android object, called WebView, includes a method called handleQueuedMotionEvent() that invokes a scroll or gesture operation.  Ex. 13: Singh Infringement Report ¶¶ 331, 388.

35.     The Singh Report goes on to state that the handleTouchEventCommon() method is invoked by the WebView for a single touch input point, while the handleMultiTouchInWebView() method is invoked for two or more touch input points.  *Id.*  Attached to this Declaration as Exhibit 17 is a true and correct copy of produced source code from the Accused Products.  ████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

36.     The Singh Report provides no additional discussion of how the "event object invokes" the scroll or gesture operation, as required by this limitation of Claim 8.  *See* Ex. 13: Singh Report ¶¶ 321-323, 388.

Case No. 11-cv-01846-LHK
DECLARATION OF STEPHEN GRAY

37.     For at least these reasons, the Accused Products do not literally infringe Claim 8 of the '915 Patent.

## 2.     Doctrine of Equivalents

38.     Dr. Singh asserts that "[t]o the extent that this limitation is not met literally, in my opinion it is met under the doctrine of equivalents because each of the Accused Products perform steps insubstantially different from determining whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation, and accomplishes the same function in the same way to achieve the same result."  Ex. 13: Singh Infringement Report at ¶ 333.

39.     I disagree.  In my opinion, the Accused Products do not infringe under the doctrine of equivalents.

40.     I am informed that under the "function-way-result" test, an element in an accused product is equivalent to a claimed limitation only if the element of the accused product performs substantially the same function as the claim limitation, in substantially the same way, and achieves substantially the same result.

41.     The function of this limitation is "determining whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation."  As stated above, this function is not performed by the accused MotionEvent object. ████████████████

████████████████████████████████████████

████████████████████  ████████████████████████  Thus, MotionEvent objects do not perform the same function as the event objects of the '915 patent.

42.     The Singh report fails to particularly address how MotionEvent objects perform the recited function in the same "way" as the event objects disclosed in the '915 patent.  As discussed above, there is no "way" for MotionEvent objects to invoke scroll or gesture operations.  The alleged scrolling and scaling methods are not implemented by MotionEvent objects and are not

1    called by methods that MotionEvent implements.  Thus, the differences between the "way" the

2    Accused Products operate and the way in which the claim limitation operates are not insubstantial.

3        43.    The claimed result is invocation of a scroll or gesture operation by an event object,

4    based on the event object's interpretation of one-finger input as a scroll and multi-finger input as a

5    scaling operation.  As explained above, this does not occur in the Accused Products.  Thus, the

6    differences between the "result" the Accused Products and claim limitation are not insubstantial.

7        44.    Moreover, in my opinion, Dr. Singh advances an equivalents argument that

8    expands the scope of the claim language to the point that claim elements are eliminated.  Claim 8

9    states that "*the event object* invokes a scroll or gesture operation."  If something other than the

10   event object may invoke the scroll or gesture operation, this would eliminate the "event object"

11   identified in this limitation.  Dr. Singh's equivalents argument effectively rewrites "determining

12   whether the event object invokes a scroll or gesture operation" as "determining whether to invoke

13   a scroll or gesture operation," effectively eliding "the event object" from Claim 8[c].

14   **V.    THE '163 PATENT**

15       **A.    OVERVIEW OF THE '163 PATENT**

16       56.    The '163 Patent, entitled "Portable Electronic Device, Method and Graphical User

17   Interface for Displaying Structured Electronic Documents," issued on January 4, 2011 from an

18   application filed on September 4, 2007.  The Patent purports to claim priority to a provisional

19   application filed as early as September 6, 2006.  The named inventors of the '163 Patent are Bas

20   Ording, Scott Forstall, Greg Christie, Stephen O. Lemay, Imran Chaudhri, Richard Williamson,

21   Chris Blumenberg, and Marcel Van Os.  The Patent is assigned to Apple Inc. on its face.  A

22   review of the file history shows that Apple filed a certificate of correction on January 14, 2011 to

23   remove Bas Ording as an inventor and add Andre M.J. Boule as an inventor.

24       57.    The '163 Patent relates to methods and systems for navigating a large information

25   space on portable electronic devices with limited display screens.  This limitation of portable

26   electronic devices was well-known by persons in the art prior to the filing of the application for

27   the '163 Patent.

28

58.   The independent claims of the '163 Patent generally cover a two-step process for zooming and panning to areas of interest contained within a structured electronic document.

59.   I understand that Apple has asserted that Samsung's devices infringe independent Claim 50 of the '163 Patent.  Claim 50 is reproduced below:

> **50.**  A portable electronic device, comprising:
>
> **[a]** a touch screen display; one or more processors; memory; and one or more programs, wherein the one or more programs are stored in the memory and configured to be executed by the one or more processors,
>
> **[b]** the one or more programs including: instructions for displaying at least a portion of a structured electronic document on the touch screen display, wherein the structured electronic document comprises a plurality of boxes of content;
>
> **[c]** instructions for detecting a first gesture at a location on the displayed portion of the structured electronic document; instructions for determining a first box in the plurality of boxes at the location of the first gesture; instructions for enlarging and translating the structured electronic document so that the first box is substantially centered on the touch screen display;
>
> **[d]** instruction[s] for, while the first box is enlarged, detecting a second gesture on a second box other than the first box; and instructions for, in response to detecting the second gesture, translating the structured electronic document so that the second box is substantially centered on the touch screen display.

## B.   CLAIM CONSTRUCTION

60.   I understand that the Court has not yet issued a claim construction order affecting the '163 Patent.  For purposes of this Declaration, I understand that the term "structured electronic document" from Claim 50 of the '163 Patent will likely require construction.  In my analysis, I have applied the definition of structured electronic document I offered in paragraph 274 of my Expert Invalidity Report:

> At the time of the '163 Patent, persons skilled in the art would have been familiar with structured electronic documents and their various applications.  As understood by those in the art, a "structured electronic document" refers to any type of two-dimensional information space containing embedded coding that provides some meaning or "structure" to the document.  The coding is embedded within the content of the document and specifies how elements or objects are to be arranged within the information space and relative to one another.  Thus, the comingling of data providing *structure* and data providing *content* in the code of the document is a distinguishing feature of a structured electronic document.

61.     Attached to this Declaration as Exhibit 6 is a true and correct copy of volume I of the deposition transcript of Apple's Expert Karan Singh. ███████████████████████

███████████████████████████████████████████████████  ████

████████████████████████████████████████████████████████

████████████████████████████████████████

## C.     OVERVIEW OF PRIOR ART

62.     I understand that Benjamin Bederson and his colleagues created a graphical user interface for mobile devices in 2004 known as LaunchTile (also, sometimes referred to as LaunchPoint).  This user interface is described in an indexed publication entitled AppLens and LaunchTile: Two Designs for One-Handed Thumb Use on Small Devices (hereafter "LaunchTile Publication"), which was published no later than April 7, 2005 and was prepared by Dr. Bederson for the ACM Conference on Human Factors in Computing Systems (known as the CHI Conference).  I also understand that during the CHI Conference in April 2005 (and later at a May 2005 symposium at the Human-Computer Interaction Lab at the University of Maryland) Dr. Bederson and his team discussed their work on LaunchTile and gave live demonstrations.

63.     In forming my opinion, I have personally used a HP Compaq ipaq h1900 series model 1950 PocketPC device running LaunchTile.  I have reviewed the Declaration of Benjamin Bederson dated May 17, 2012.  I have also reviewed the source code for a variant of LaunchTile (called XNav) which appears to have identical or substantially similar functionality to the relevant LaunchTile functionality.  I have personally used the XNav program running on a Sony VGN-U750P touch-screen device.

64.     In the LaunchTile Publication, Bederson describes the use of gestures on a touch screen user interface for navigation within an information or content space.   The space is constrained by the form factor of the smart phone:

> For device interaction when using a touch-sensitive screen, both designs utilize a gestural system for navigation within the application's zoomspace. While our designs do not directly address one-handed text entry, they are compatible with a variety of existing single-handed text input techniques, including single- and multi-tap alphanumeric keypad input, as well as miniature thumb keyboards and unistroke input systems executed with a thumb (e.g., Graffiti [6], Quikwriting [17]).

Case No. 11-cv-01846-LHK

DECLARATION OF STEPHEN GRAY

1  Declaration of Benjamin Bederson in Support of Samsung's Motion for Summary Judgment

2  (hereafter "Bederson Decl.") Ex. A at 202.

3       65.    LaunchTile consists of an "interactive zoomspace" containing 36 application tiles,

4  divided into nine zones of four tiles each.  When the entire zoomspace was in view, the

5  LaunchTile Publication referred to the view as "World View."



"Zone" – a
4 tile cluster

World View

14      66.    The zoomspace includes a blue button ("Blue") in the center of each 4-tile "Zone."

15 Any portion of a Zone can be selected to enlarge and translate the zoomspace such that the four-

16 tiled Zone fills the touch-screen display.  After this enlarging of the zoomspace, the four tiles in

17 view are referred to as the "Zone View":



"Application tile"

Zone View

27      67.    From the Zone View, LaunchTile permits the user to select any one of the four

28 Application tiles and thereby once again enlarge and translate the zoomspace such that the

Application tile fills the touch-screen display. Additionally, from Zone View, a user can pan to neighboring 4-tile clusters by "dragging" the zoomspace with his or her thumb, either vertically or horizontally on the "rails" separating each application tile. As the user initiates the pan process, the "zoomspace moves with the thumb during dragging." Bederson Decl. Ex. A at 205.

68. As described by Bederson, LaunchTile was designed to provide the user with an interface "to navigate through a group of embedded electronic elements (Application tiles) contained in the single interactive zoomspace." Bederson Decl. at ¶ 11. To this end, Bederson describes LaunchTile running on a portable electronic device as consisting of a single, hierarchical object-oriented data structure. Bederson Decl. at ¶ 13. My analysis of the XNav source code confirms this overall design architecture.

### D. THE '163 PATENT IS ANTICIPATED

69. After considering the evidence in the record, it is my opinion that Claim 50 of the '163 Patent is anticipated by the LaunchTile System, the LaunchTile Video (*see* Bederson Decl. Ex. D), and by the LaunchTile Publication, (*see* Bederson Decl. Ex. A). Attached to this Declaration as Exhibit 3 is a detailed claim chart demonstrating how LaunchTile discloses each and every element of Claim 50. Along with my analysis, this claim chart includes relevant citations to the evidentiary record. Attached to this Declaration as Exhibits 4 and 5 are videos representing two alternative behaviors of the LaunchTile System that I believe anticipate the '163 Patent.

#### 1. Claim 50, Element [a]

70. Element [a] to Claim 50 recites:

"A portable electronic device, comprising: a touch screen display; one or more processors; memory; and one or more programs, wherein the one or more programs are stored in the memory and configured to be executed by the one or more processors."

71. The Compaq ipaq h1900 series model 1950 Pocket PC is a portable electronic device with a touch screen display.

72.     The HP ipaq 1950 Pocket PC Quick Specs describe the device as including a Samsung SC32442 processor and main memory of 32 MB SDRAM.  *See* HP ipaq 1950 Quick Specs (Dkt 168-13).

73.     Finally, the LaunchTile program, when running on the ipaq device, "was stored in the memory and configured to be executed by the one or more processors of the portable electronic device."  Bederson Decl. at ¶ 9.

74.     For these reasons, it is my opinion that the LaunchTile System discloses this element of Claim 50.

### 2.     Claim 50, Element [b]

75.     Element [b] to Claim 50 recites:

> "the one or more programs including: instructions for displaying at least a portion of a structured electronic document on the touch screen display, wherein the structured electronic document comprises a plurality of boxes of content."

76.     When running on an ipaq device, the LaunchTile System initially displays an interactive zoomspace consisting of a 6x6 grid of active tiles.  It is my opinion that this 6x6 zoomspace is a "structured electronic document" with 36 embedded Application tiles, each of which is also a structured electronic document.  The 36 embedded Application tiles as well as 2x2 groupings of these Application tiles ("Zones") are visually significant areas of interest and constitute the "plurality of boxes" of content.

77.     The zoomspace satisfies the construction I have offered for "structured electronic document," because it is a two-dimensional information space – the visual manifestation of the single, hierarchical object oriented data structure Bederson describes.  The zoomspace contains "structure" in the form of embedded coding that provides how the various elements (*i.e.* Application tiles and Zones) are to be arranged within the zoomspace and relative to one another.  Bederson Decl. at ¶ 13.  The "content" (derived from the Application level of the hierarchy) and the "structure" (information dictating how the Application tiles are to be visually arranged) exist together in the hierarchical data structure that is visually depicted to the user as a structured electronic document.

78.     The advantages of using such a hierarchical design structure are apparent: such a design ensures a logical connection between each of the elements in the hierarchy.  This permits the zoomspace to utilize and display appropriate data from the embedded Applications, regardless of the level of zoom.  *See* Bederson Decl. at ¶ 15.

79.     The Bederson Declaration expressly recognizes that LaunchTile's creation of the object-oriented data structure is very similar to the process by which a browser interprets an HTML page.  Bederson Decl. at ¶ 13.  Because the '163 Patent expressly states that a "web page" is an example of structured electronic document, this reinforces my opinion that LaunchTile's interactive zoomspace is a structured electronic document.

80.     Attached to this Declaration as Exhibit 15 is a true and correct copy of relevant excerpts from the Expert Rebuttal Report of Apple's Expert Karan Singh.  I would note that the Singh Rebuttal Report does not appear to dispute my opinion that the zoomspace constitutes a "structured electronic document."  Ex. 15: Rebuttal Report of Apple Expert Karan Singh at ¶ 33 n.1 ("I express no opinion as to whether the portions of the World View, Zone View, and Application View displayed by LaunchTile . . . individually constitute 'structured electronic documents' within the meaning of the '163 Patent.").

81.     Attached to this Declaration as Exhibits 10, 11, and 12 are true and correct copies of relevant excerpts from the deposition testimony of '163 Patent inventors Scott Forstall, Richard Williamson, and Greg Christie, respectively. ██████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████

    ███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

    ███████████████████████████████████████████

███████████████████████████ █████████████████████

████████████████████████████████████████████████

████████████████████████ █████████████████████████

████████████████████████████████████████████████

82.     For these reasons, it is my opinion that the LaunchTile System discloses this element of Claim 50.

### 3.     Claim 50, Element [c]

83.     Element [c] to Claim 50 recites:

> "instructions for detecting a first gesture at a location on the displayed portion of the structured electronic document; instructions for determining a first box in the plurality of boxes at the location of the first gesture; instructions for enlarging and translating the structured electronic document so that the first box is substantially centered on the touch screen display."

84.     LaunchTile contains instructions for detecting a first gesture at a location on the displayed portion of the zoomspace (*i.e.*, structured electronic document) and instructions for determining a first box in the plurality of boxes (*i.e.*, a 2x2 Zone).  Bederson Decl. at ¶ 16.  This is consistent with my opinion based on my use of LaunchTile running on an ipaq device and an analysis of the similar XNav source code.

85.     It is further my opinion that LaunchTile's instructions for displaying an animated transition from World view to Zone view are "instructions for enlarging and translating the structured electronic document [*i.e.* the zoomspace] so that the first box [*i.e.* 2x2 Zone] is substantially centered on the touch screen display."[1]  In other words, it would not be correct to describe the Zone view as a different "structured electronic document."  The Zone view is merely an "enlarged" and "translated" view of the same zoomspace that existed at the World view.  Although the four embedded tiles that remain in view render additional content from the

_____

[1]     I have also opined that the term "substantially centered" is indefinite because it fails to reasonably apprise persons of skill in the art as to what is being claimed.  For purposes of this Declaration, however, I assume that LaunchTile's enlarging and translating of the zoomspace such that a Zone or Application tile fills the touch-screen display is at least an example of "substantially centering" a "box of content."

1    Application-level of the hierarchical data   structure, the two-dimensional information space

2    presented to the user is still derived from the same underlying collection of content and structure.

3        86.    At the display level, Video Exhibits 4 and 5 in support of this Declaration make

4    clear that LaunchTile's animated transitions are designed to give the user the impression that the

5    zoomspace itself is "enlarged" and "translated."  Additionally, with respect to the transition from

6    Zone view to Application view, the LaunchTile Publication describes the process as "[a]n

7    animated zoom [that] draws the zoomspace toward the user until the target application fills the

8    entire display."  Bederson Decl. Ex. A at 205.  It is significant that the LaunchTile user interface

9    includes consistent visual metaphors such as a large, blue on-screen button in the middle of each

10   Zone and dividing "rails" between each Application tile.  These visual metaphors, which exist in

11   World view and in an enlarged form in Zone view, reinforce to the user that a single, unified

12   information space is at all times being viewed and displayed.

13       87.    Additionally, at the code level, LaunchTile's overall hierarchical design structure

14   clearly indicates that during each zooming transition, "it is still fundamentally the same

15   hierarchical object oriented data structure that is visually displayed to the user.  The four tiles that

16   happen to be displayed in Zone view are the same embedded Application tiles (albeit rendered in

17   further detail) that were present at World view."  Bederson Decl. at ¶ 17.  This is precisely what I

18   would expect from a program employing a top-down hierarchical data structure.  Indeed, the

19   whole purpose of employing such a structure is to leverage the inherent logical connections

20   between the lower-level elements and the top-most element in the hierarchy.  When a hierarchical

21   data structure (like LaunchTile) consists of many lower-level elements, each containing a large

22   amount of data, it is sometimes the case that the available screen space may limit the amount of

23   content that can be rendered from the lower-level elements.[2]  But this does not change the fact that

24   _____

25       [2]  By contrast HTML documents (which are also transformed into a hierarchical structure) are
26   specifically designed such that the amount of content associated with any one element does not
     overwhelm the structure within which it is placed.  In other words, HTML documents are coded so
27   that the entire "document" can be rendered at once.  However, there is no requirement in Claim 50
     that the entire "document" be rendered upon the initial displaying step.

28

*all* the content exists as one cohesive data structure, represented to the user as a "structured electronic document."

88.   The Singh Rebuttal Report's primary criticism of my position is that "moving to a different layer in LaunchTile . . . does not merely enlarge or translate a structured electronic document, but instead displays different and additional content." Ex. 15: Singh Rebuttal Report at ¶ 31.  However, as described above, LaunchTile's rendering of additional content during the step from World view to Zone view does *not* mean that the original, embedded tiles have been replaced.  In fact, during deposition questioning, even Dr. Singh appears to have recognized that there is no requirement that an "electronic document" (a term encompassing a "structured electronic document," Ex. 6: Singh Dep. Trans. Vol. I at 73:14-15) be all at once visually manifested to the user:

Ex. 6: Singh Dep. Trans. Vol. I at 178:22-179:22 (emphasis added).

████████████████         This is exactly how Dr. Bederson describes the zoomspace and its embedded elements in LaunchTile.  Bederson Decl. at ¶ 14 ("[W]hile the zoomspace did consist of a collection of embedded tiles that were distinct areas of interest . . . those embedded tiles were always part of one unified zooomspace that was dependent on a single object-oriented data structure for its content during the rendering process.").

89.     Finally, even if the tiles (embedded structured electronic documents) were entirely replaced during the enlarging and translating step, this would not change my opinion that the zoomspace, within which the tiles exist at any particular level of zoom, is the same structured electronic document throughout the navigation process.  In a somewhat analogous situation, I am aware that web pages (structured electronic documents encoded in HTML) sometimes contain embedded objects displaying live content in the form of advertising material, stock quotes, or "breaking news" headlines.  When a user manually refreshes the web page or, in some cases, after some pre-set amount of time, the embedded object will be updated or even replaced with entirely new different content.  However, no person of ordinary skill in the art would believe that they were viewing a different webpage (*i.e.*, "structured electronic document") merely because the content in one embedded element had changed.

90.     For these reasons, it is my opinion that the LaunchTile System discloses this element of Claim 50.

### 4.     Claim 50, Element [d]

91.     Element [d] to Claim 50 recites:

> "instruction[s] for, while the first box is enlarged, detecting a second gesture on a second box other than the first box; and instructions for, in response to detecting the second gesture, translating the structured electronic document so that the second box is substantially centered on the touch screen display."

92.     LaunchTile contains instructions for detecting a second gesture at a location on a second box (i.e. Application tile).  Bederson Decl. at ¶ 19.  This is consistent with my opinion based on my use of the LaunchTile running on an ipaq device and an analysis of the similar XNav source code.

93.     It is my opinion that in Zone view, each of the four Application tiles constitute second "boxes" of content "other than the first box" notwithstanding the fact that the second "boxes" happen to be within the boundaries of the first box.

94.     It is further my opinion that a gesture on one of the four Application tiles within the Zone view (as depicted in Video Exhibit 4) "enlarges" and "translates" the zoomspace such that the "second box" (*i.e.* Application tile) is at least "substantially centered" on the touch-screen display.  For the same reasons described in Section V.D.3, it is my opinion that this operation meets the requirements of the claim limitation notwithstanding the fact that LaunchTile renders additional content.  Additionally, it is my opinion that this operation meets the requirements of the claim limitation notwithstanding the fact that the process involves an "enlarging" step in addition to the required "translating" step.

95.     Alternatively, if the claim language is construed to preclude the "second box" from existing within the boundaries of the "first box," I believe the many other commonly used operations in LaunchTile anticipate Claim 50.  For instance, the LaunchTile Publication describes how from Zone view, "the user can use his or her thumb directly to drag the zoom space" (*i.e.* translate the "structured electronic document") in order to bring another Zone into view.  Bederson Decl. Ex. A at 205.  Therefore, as shown in Video Exhibit 5 attached to this Declaration, after a gesture at the location of a first box (*i.e.* first Zone), the user is able to drag a second Zone with four additional "second boxes" of content into view.  A gesture at any one of these second boxes would then cause the translation of the zoomspace to bring the Application tile fully into view, as described by the '163 Patent.  It is my opinion that this operation meets the requirements of the claim limitation notwithstanding the fact that the user performs an "interim gesture" between the "first" and "second" gestures explicitly called for by the claim.

96.     For these reasons, it is my opinion that the LaunchTile System discloses this element of Claim 50.

97.     Because the LaunchTile System and the LaunchTile Publication disclose each and every limitation of Claim 50, it is my opinion that Claim 50 is anticipated by these prior art reference.

Case No. 11-cv-01846-LHK
DECLARATION OF STEPHEN GRAY

## VI.     OTHER COMMENTS

98.     The opinions expressed in this Declaration are my opinions based on my review to date of the evidence in the record.  I reserve the right to amend or update my opinions as appropriate in response to future developments regarding claim construction.

99.     At a hearing or trial, I reserve the right to use as exhibits various documents produced in this case that refer or relate to the matters discussed in this Declaration or to either of my Expert Reports.  I have not yet selected particular exhibits that might be used.  I also reserve the right to create or assist in the creation of certain demonstrative evidence that will assist me in testifying.

1

2

3      I declare under penalty of perjury under the laws of the United States that the foregoing is

4   true and correct.  Executed on the 17 of May, 2012, in SAN FRANCISCO.

5

6                                                    _____

7                                                    Stephen Gray

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28