# EXHIBIT 6

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

| |  |
|---|---|
| In the Matter of<br><br>**CERTAIN MOBILE DEVICES, AND RELATED SOFTWARE THEREOF** | Inv. No. 337-TA-750 |

# COMMISSION OPINION

## I.   BACKGROUND

### A.   Procedural History[1]

The Commission instituted this investigation on November 30, 2010, based on a complaint filed by Apple Inc., f/k/a Apple Computer, Inc., of Cupertino, California ("Apple"). 75 *Fed. Reg.* 74081-82. The complaint alleges violations of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337"), in the importation into the United States, the sale for importation, and the sale within the United States after importation of certain mobile devices and related software by reason of infringement of certain claims of U.S. Patent Nos. 7,812,828; 7,663,607 ("the '607 Patent"); and 5,379,430 . The Commission's notice of investigation named Motorola, Inc. n/k/a Motorola Solutions of Schaumburg, Illinois ("Motorola, Inc.") and Motorola Mobility, Inc. of Libertyville, Illinois ("Motorola") as respondents. The Office of Unfair Import Investigation ("IA") was named as a participating party. On August 16, 2011, the presiding administrative law judge ("ALJ") issued an initial determination ("ID") granting a joint

---

[1] The procedural history of the investigation prior to the issuance of the final ID is fully set forth in that document. *See* Final ID at 1-2.

1

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

unopposed motion to terminate the investigation as to Motorola, Inc. *See* Order No. 10 (Aug. 16, 2011). The Commission determined not to review Order No. 10. *See* Notice (Aug. 31, 2011).

On January 13, 2012, the ALJ issued his final ID ("Final ID"), finding no violation of Section 337. In particular, as is relevant to this opinion, the ALJ found that the asserted claims of the '607 Patent are invalid for anticipation under 35 U.S.C. § 102 and invalid for obviousness under 35 U.S.C. § 103. On January 30, 2012, Apple filed a petition for review of certain aspects of the final ID. In particular, Apple requested that the Commission review the ID's findings that the asserted claims of the '607 Patent are invalid.[2] On February 7, 2012, Motorola and the IA filed responses to Apple's petition for review.[3]

On March 16, 2012, the Commission determined to review the final ID in part, and on review, to affirm the ID's finding of no violation of Section 337 and to terminate the investigation. *See* Notice of Commission Decision to Review In Part And On Review To Affirm a Final Determination Finding No Violation of Section 337; Termination of Investigation (March 16, 2012). In particular, the Commission determined to review the ID's finding that the asserted claims of the '607 Patent are obvious under 35 U.S.C. § 103 in view of the reference "SmartSkin: An Infrastructure for Freehand Manipulation on Interactive Surfaces" by Jun Rekimoto ("SmartSkin"), either alone or in combination with Japan Unexamined Patent Application Publication No. 2002-342033A to Jun Rekimoto ("Rekimoto '033"). As discussed below, on review, the Commission affirms the ID's finding of obviousness in view of the SmartSkin

---

[2] Also on January 30, 2012, Motorola filed a contingent petition for review of certain aspects of the final ID.

[3] The IA's February 7, 2012, filing included her response to Motorola's contingent petition. Apple also filed a response to Motorola's contingent petition on February 7, 2012.

2

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

reference in combination with Rekimoto '033 and finds that Motorola has demonstrated by clear and convincing evidence that the asserted claims of the '607 Patent are invalid under 35 U.S.C. § 103 based on modified reasoning.

### B.     Patent at Issue

The '607 Patent is entitled "Multipoint Touchscreen" and is directed to a touch panel that has a transparent capacitive sensing medium configured to detect multiple touches or near touches that occur simultaneously and at different locations on the touch panel. In response to the multiple touches, the sensing medium produces distinct signals representative of the location of the touches. The inventors of the '607 Patent are Steve Hotelling, Joshua A. Strickon, and Brian Q. Huppi. The patent is assigned to Apple. The '607 Patent has 11 claims, of which claims 1-7 and 10 were asserted against Motorola.

Asserted claim 1 of the '607 Patent and its dependent asserted claims 2-7 are directed generally to a touch panel having a transparent capacitive sensing medium configured to detect multiple, co-occurring touches at different locations on the touch panel and to produce signals representative of the location of the touches. The touch panel comprises two layers of transparent electrically-isolated conductive lines where the two layers are spatially separated from each other and where the conductive lines in one layer are positioned transverse to the conductive lines in the other layer, creating an array of intersection points. Capacitive monitoring circuitry is configured to detect changes in the capacitance between the two layers of conductive lines, indicating the location of the multiple touches on the touch panel. Asserted claim 10 of the '607 Patent is directed generally to a display arrangement comprising a display for a graphical user interface and a transparent touch panel, which has a multipoint sensing arrangement configured

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

to recognize multiple, co-occurring touches at different locations on the touch panel by sensing a resulting change in capacitive coupling associated with the touches and is capable of outputting this information to a host device to form a pixilated image. The touch panel has three glass plates separating two transparent conductive layers. Each conductive layer contains a plurality of spaced parallel lines having the same pitch and linewidths, where the lines in one of the layers are perpendicular to the lines in the other layer.

## II.   STANDARD OF REVIEW

Once the Commission determines to review an initial determination, its review is conducted *de novo*. *Certain Polyethylene Terephthalate Yarn and Prods. Containing Same*, Inv. No. 337-TA-457, Comm'n Op. at 9 (June 18, 2002). Upon review, the "Commission has 'all the powers which it would have in making the initial determination,' except where the issues are limited on notice or by rule." *Certain Flash Memory Circuits and Prods. Containing Same*, Inv. No. 337-TA-382, USITC Pub. 3046, Comm'n Op. at 9-10 (July 1997) (quoting *Certain Acid-Washed Denim Garments and Accessories,* Inv. No. 337-TA-324, Comm'n Op. at 5 (Nov. 1992)). Commission practice in this regard is consistent with the Administrative Procedure Act. *Certain EPROM, EEPROM, Flash Memory, and Flash Microcontroller Semiconductor Devices and Prods. Containing Same,* Inv. No. 337-TA-395, Comm'n Op. at 6 (Dec. 11, 2000) ("*EPROM*"); *see also* 5 U.S.C. § 557(b).

Upon review, "the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial determination of the administrative law judge." 19 C.F.R. § 210.45(c). "The Commission also may make any findings or conclusions that in its judgment are proper based on the record in the proceeding." *Id.* This rule reflects the

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

fact that the Commission is not an appellate court, but is the body responsible for making the final agency decision. On appeal, only the Commission's final decision is at issue. *See EPROM* at 6 (citing *Fischer & Porter Co. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1574, 1576-77 (Fed. Cir. 1987)).

### III.   OBVIOUSNESS OF THE '607 PATENT

Under 35 U.S.C. § 103(a), a patent is valid unless "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). The ultimate question of obviousness is a question of law, but "it is well understood that there are factual issues underlying the ultimate obviousness decision." *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997).

Once claims have been properly construed, "[t]he second step in an obviousness inquiry is to determine whether the claimed invention would have been obvious as a legal matter, based on underlying factual inquiries including: (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art; and (4) secondary considerations of non-obviousness." *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1354 (Fed. Cir. 1999) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)). The Federal Circuit previously required that, in order to prove obviousness, the patent challenger must demonstrate, by clear and convincing evidence, that there is a "teaching, suggestion, or motivation to combine." The Supreme Court, however, rejected this "rigid approach" in *KSR Int'l Co. v. Teleflex Inc.*:

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

> The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents. The diversity of inventive pursuits and of modern technology counsels against limiting the analysis in this way. In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends. Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility.

550 U.S. 398, 419 (2007).

In determining that the SmartSkin reference (RX-367) does not anticipate the asserted claims of the '607 Patent, the ALJ concluded that the only limitation SmartSkin does not disclose is "the use of transparent conductive lines using [indium tin oxide] ITO." Final ID at 148. Specifically, the ALJ found that the inclusion of the discussion concerning transparent ITO electrodes in the section entitled "Conclusion and Directions for Future Work" "indicates that it likely was not contemplated for that specific reference." *Id.*; *see* RX-367 (SmartSkin) at 7.

Motorola argued before the ALJ that SmartSkin in combination with Rekimoto '033 renders the claim limitations concerning the use of transparent electrodes, separate layers, and the use of glass members recited in the '607 Patent obvious, while the IA additionally argued that SmartSkin alone "would make it obvious to try to use transparent electrodes." *Id.* at 172. Apple argued that SmartSkin does not disclose the transparent electrode limitations for the same reasons that the ALJ found SmartSkin does not anticipate the asserted claims of the '607 Patent. *See id.* Apple also argued that the combination of SmartSkin and Rekimoto '033 does not disclose the layer and glass limitations. *Id.* Specifically, Apple asserted that, because, Rekimoto '033 and SmartSkin disclose different sensors, there is no motivation to combine the references

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

without "improper hindsight bias." *Id.* Apple further argued that "Rekimoto '033 discloses only a single glass substrate and not the second and third glass member" recited in the asserted claims of the '607 Patent. *Id.*

The ID finds that "SmartSkin alone would render the use of transparent electrodes obvious." *Id.* In particular, the ALJ concluded that "[SmartSkin] *itself* discloses using transparent electrodes[,]" and, therefore, SmartSkin provides the motivation to do so. *Id.* at 172-173. The ALJ also found that "ITO was well known at the time." *Id.* The ALJ, therefore, found that "SmartSkin would motivate one of ordinary skill in the art to use transparent electrodes and that the use of materials, such as ITO, in creating the transparent electrodes was well known at the time [of the invention of the '607 Patent]" and as such "would have been obvious to one of ordinary skill in the art." *Id.*[4] The ID also finds that "SmartSkin, in combination with Rekimoto '033, renders the asserted claims of the '607 Patent obvious." *Id.* Noting Apple's arguments concerning why SmartSkin does not anticipate the '607 Patent, the ALJ found that SmartSkin discloses the "glass member" limitations and that SmartSkin in combination with Rekimoto '033, which was published within months of the publication of the SmartSkin reference, disclose the "glass member" and "layer" limitations. *Id.* at 176 (citing JX-367 (SmartSkin) at 4 and Fig. 9; RX-1888 (Rekimoto '033) at Fig. 9).[5]

The Commission concurs with the ALJ's conclusion that SmartSkin provides the reason

---

[4] The ID finds that, with respect to the '607 Patent, one of ordinary skill in the art "would have a bachelor's degree in electrical engineering, physics, computer engineering, or a related field and [two to three] years of work experience with input devices." ID at 17.

[5] The ID construes the claim limitation "glass member" to mean "a glass or plastic element." ID at 53. The parties do not contest this construction.

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

to combine the use of transparent electrodes made of materials such as ITO with the mutual-capacitance sensor for detecting multiple touches on the sensor surface disclosed in SmartSkin. *See* RX-1885C (Wolfe Direct Witness Statement) at Q. 321. We also agree with the ALJ that SmartSkin in combination with Rekimoto '033 discloses the transparent electrode limitations, the layer limitations, and the glass member limitations recited in the asserted claims of the '607 Patent, with Rekimoto '033 disclosing the layer and glass member limitations.[6] The Commission, however, finds that SmartSkin provides "one of ordinary skill . . . [with] a reasonable expectation of success" that the combination of transparent ITO electrodes with the mutual-capacitance touch screen disclosed in SmartSkin would be operable for different reasons than those articulated in the final ID. *See Velander v. Garner*, 348 F.3d 1359, 1363 (Fed. Cir. 2003).[7]

The claim limitations in dispute, which are referred to as the "transparent limitations," are highlighted below:

> 1. A touch panel comprising a **transparent capacitive sensing medium** configured to detect multiple touches or near touches that occur at a same time and at distinct locations in a plane of the touch panel and to produce distinct signals representative of a location of the touches on the plane of the touch panel for each of the multiple touches, wherein the **transparent capacitive sensing medium** comprises:
>
> a **first layer** having a plurality of **transparent first conductive lines** that are electrically isolated from one another;

---

[6] We disagree with the ALJ's conclusion that Rekimoto '033 teaches the use of transparent electrodes. *See id.* at 174.

[7] We do not review, and therefore do not address, the ID's findings concerning secondary considerations. ID at 176-177.

8

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

> a **second layer** spatially separated from the **first layer** and having a plurality of **transparent second conductive lines** that are electrically isolated from one another, the second conductive lines being positioned transverse to the first conductive lines, the intersection of transverse lines being positioned at different locations in the plane of the touch panel, each of the second conductive lines being operatively coupled to capacitive monitoring circuitry;
>
> wherein the capacitive monitoring circuitry is configured to detect changes in charge coupling between the first conductive lines and the second conductive lines.
>
> 4. The touch panel as recited in claim 1 wherein the **transparent first conductive lines** of the first layer are disposed on a first glass member, and wherein the **transparent second conductive lines** of the second layer are disposed on a second glass member, the first glass member being disposed over the second glass member.
>
> 6. The touch panel as recited in claim 1 wherein the conductive lines are formed from **indium tin oxide (ITO)**.

'607 Patent at 21:35-22:13.

Apple contends that SmartSkin discloses the use of only opaque, rather than transparent, sensors and that SmartSkin's purported disclosure of transparent ITO represents only speculative, future possibilities. The ID finds, and Apple does not dispute, that the use of ITO in creating transparent conductive lines or electrodes was well known at the time of the invention of the '607 Patent. *See* Final ID at 173. The evidence supports this conclusion. In particular, the SmartSkin reference, which is prior art to the '607 Patent, states that "most of today's flat panel displays rely on active-matrix and transparent electrodes[.]" JX-367 (SmartSkin) at 7. Motorola's expert, Dr. Wolfe, likewise testified that "two-layer sensors with rows and columns of ITO [are] standard products" (Wolfe, Tr. at 1391:11-22) and that "the use of transparent

9

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

electrodes . . . has been known in the art for twenty years" (RX-1885C (Wolfe Direct Witness Statement) at Q. 326).

In *KSR*, the Supreme Court stressed that, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Int'l Co.*, 550 U.S. at 416. Here, the use of transparent ITO in combination with the mesh grid touch sensor of SmartSkin is just the type of "combination of familiar elements" that *KSR* discusses. *See* JX-367 at 7 and Fig. 2. Motorola's expert, Dr. Wolfe, who has over twenty years of experience making capacitive touch overlay sensors using ITO, testified at the hearing precisely on this point as follows:

> Q. Figure 2 [of SmartSkin] doesn't show a transparent sensor, does it?
>
> A. It is the same kind of drawing that's in the '607 [Patent]. To a person who understands the technology, it doesn't matter whether that sensor is transparent or opaque.
>
> Q. But there is nothing in figure 2 that is a transparent sensor. In fact, if you read the whole thing, you know that the sensor that they are talking about in figure 2 is a non-transparent sensor, opaque, right?
>
> A. No, you know that they describe how to build a sensor with rows and columns of conductors, and then they talk about a particular first embodiment they made that was opaque, and then how you could build a transparent one as well.

Wolfe, Tr. 1309:14-1310:5; *see also id.* at 1391:11-22 ("[t]wo-layer sensors with rows and columns of ITO were standard products, and I think that a person of ordinary skill, who we agree is a touchscreen engineer . . . would just read this to say this is an ordinary row and column ITO touch overlay that's being used in a unique way in the SmartSkin product."); *id.* 1392:20-1393:8 (stating that he has been making ITO touch screen products since 1983).

Apple's expert, Dr. Subramanian, disputed this conclusion, testifying that SmartSkin

10

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

"provide[s] no instructions for how to 'obtain' a transparent sensor using ITO and . . . even the researchers working on the [SmartSkin] system who authored the article believed that such a transparent sensor was merely a future possibility[.]" CX-569C (Subramanian Rebuttal Witness Statement) at Q. 117. But the evidence supports the conclusion that using transparent ITO for the "transparent conductive lines" claimed in the '607 Patent and discussed in SmartSkin would have been within the ability of one of ordinary skill in the art. In particular, Dr. Wolfe testified as follows:

> The '607 patent does not disclose any special characteristics of the ITO that make it suitable for use in the '607 patent; not its resistivity, capacitance, uniformity, thickness, or thermal characteristics. In any case, none of these need be disclosed since normal, commercially available and well known ITO materials are suitable for both SmartSkin and the '607 Patent.

RX-1885C at Q. 326; *see also* Wolfe, Tr. at 1390:19-1397:16 (discussing that one of ordinary skill in the art would know how to implement the SmartSkin sensor using transparent ITO electrodes).

Apple further contends that SmartSkin does not enable the use of a transparent ITO sensor with the multi-touch mutual-capacitance system disclosed in that reference because substituting transparent ITO conductive lines for the opaque copper lines used with one embodiment of the voltage-based sensing system of SmartSkin would require a complete redesign. *See* Subramanian, Tr. at 1533-34, 1536-39, 1574-84, 1585-97.[8] Specifically, Apple's

---

[8] Motorola argued that Apple waived any argument concerning the different types of sensors used in the SmartSkin system and the system disclosed in the '607 Patent because Dr. Subramanian did not mention the issue in his witness statements and because Apple failed to raise the issue in its pre-hearing statement. During the hearing, Motorola belatedly objected to Dr. Subramanian's testimony during his re-direct examination, but the ALJ ruled that the

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

expert, Dr. Subramanian, testified under cross-examination that, because the voltage-sensor used in the SmartSkin system receives very low strength signals, it is very sensitive to the resistance of the material used to conduct the current from the signal source to the receiver, hence the use of low resistance copper conductors in the SmartSkin system. Subramanian, Tr. at 1537:17-1538:17. Dr. Subramanian further explained that transparent ITO has such a high resistance and thus a lower conductivity – approximately 100 times less than copper – that ITO cannot be used successfully in a voltage-sensing system. *Id.*; *see also* JX-367 (SmartSkin) at Fig. 2; '607 Patent at Figs. 12, 13, 17:12-61. Dr. Subramanian compared the system disclosed in SmartSkin to the multi-touch system disclosed in the '607 Patent, which he explained uses a detector that counts charge in lieu of sensing voltage to account for the low conductivity of transparent ITO. Subramanian, Tr. 1582:11-1584:7. Apple contends that, because of the different types of sensors used to implement the SmartSkin system and the system disclosed in the '607 Patent, it would not have been obvious to combine the two systems. *Id.* (citing Subramanian, Tr. at 1537:2-1539:10).

It is axiomatic that, in evaluating an assertion of obviousness, the correct comparison is between the prior art and the claims. *See Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) ("A party seeking to invalidate a patent based on obviousness must prove by clear and convincing evidence 'that a skilled artisan would have been motivated to combine the teachings of the prior art references *to achieve the claimed invention*, and that the skilled artisan would have had a reasonable expectation of success in doing so.'") (emphasis

---

testimony was admissible. Tr. 1584:20-1585:7. We do not disturb the ALJ's decision.

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

added). Apple's arguments concerning the different types of sensing systems used in SmartSkin and the '607 Patent ignore this basic principle.

The claim language of the '607 Patent recites "wherein the capacitive monitoring circuitry is configured to detect changes in charge coupling between the first conductive lines and the second conductive lines" (claim 1) and "a multipoint sensing arrangement configured to simultaneously detect and monitor the touch events and a change in capacitive coupling associated with those touch events at distinct points across the touch panel" (claim 10). '607 Patent at 21:53-55, 22:31-35. As such, Apple's arguments concerning the difficulty of implementing a transparent ITO sensor with a voltage-sensing system are irrelevant since the claimed invention is not drawn to a particular sensing arrangement. *See* '607 Patent at 17:12-35.[9] In fact, Dr. Subramanian testified that counting charge "is not the only function that has to exist within the [claimed] capacitive monitoring circuitry." Subramanian, Tr. at 824:5-15.

Moreover, in discussing whether U.S. Patent No. 7,372,455 to Perski, et al. ("Perski '455") anticipates the asserted claims of the '607 Patent, Apple's expert, Dr. Subramanian, testified that Perski '455 discloses "a straight voltage amplifier, similar to that of [the SmartSkin

---

[9] Although Motorola argued that the claim limitation "capacitive monitoring circuitry" of claim 1 required construction, the ALJ found that the term did not require construction because none of the issues surrounding the limitation (*i.e.*, whether the circuitry of the Accused '607 Products or the domestic industry products satisfy this limitation) were dependent on the construction of this limitation. *See* Final ID at 49, n. 6. Furthermore, the ALJ noted that the parties' proposed constructions of the limitation were similar such that there was no real distinction between them. *Id.* Specifically, Motorola and the IA proposed that "capacitive monitoring circuitry" means "circuitry that senses changes in capacitance," while Apple proposed that the limitation has its plain and ordinary meaning. *See* Respondent Motorola's Post-Hearing Brief at 19 (Oct. 19, 2011). Notably, none of the proposed constructions limited "capacitive monitoring circuitry" to a specific type of sensor.

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION

reference]." Subramanian, Tr. at 1605:25-1606:2. Perski '455, by way of U.S. Patent Provisional Application No. 60/406,662 ("Morag '662) (filed in August 2002), which Perski '455 incorporates by reference, explicitly discloses the use of a voltage amplifier in a voltage-sensing system with high-resistance transparent electrodes. Specifically, Morag '662 explains as follows:

> The resistance of the conductive lines is relatively high and it might exceed 100 KOhm for a line. Higher resistance of transparent conductors results in a higher transparency of the material. Therefore, it is a general object of the present invention to enable working with high resistance of the sensor grid.

RX-703 at 5 ¶ 2 (Morag '662). As this reference makes clear, the concept of using a voltage-sensing system with high-resistance transparent electrodes was known in the art at the time of the '607 Patent.

## IV.   CONCLUSION

For the reasons discussed above, the Commission finds that the asserted claims of the '607 Patent are obvious in view of SmartSkin in combination with Rekimoto '033.

By order of the Commission

James R. Holbein
Secretary

Issued: March 28, 2012

14

CERTAIN MOBILE DEVICES AND RELATED SOFTWARE        Inv. No. 337-TA-750

## CONFIDENTIAL CERTIFICATE OF SERVICE

I, James R. Holbein, hereby certify that the attached **COMMISSION OPINION** has been served by hand upon the Commission Investigative Attorney, Anne Goalwin, Esq., and the following parties as indicated on **March 28, 2012.**

*(signature)*

James R. Holbein, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

### On Behalf of Complainant Apple Inc.:

Mark G. Davis, Esq.
**WEIL, GOTSHALL & MANGES LLP**
1300 Eye Street, NW, Suite 900
Washington, DC  20005

(  ) Via Hand Delivery
( x ) Via Overnight Delivery
(  ) Via First Class Mail
(  ) Other:_____

### On Behalf of Respondent Motorola Mobility, Inc.:

Charles F. Schill, Esq.
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue, NW
Washington, DC  20036

(  ) Via Hand Delivery
( x ) Via Overnight Delivery
(  ) Via First Class Mail
(  ) Other:_____