# Watson Declaration

# EXHIBIT 2

## The State of Patent Litigation

### Chief Judge Randall R. Rader
### United States Court of Appeals for the Federal Circuit

### E.D. Texas Judicial Conference

Yesterday I returned to my room to find this magnificent book entitled _AMERICA'S TEAM.   To my surprise, the book was not about the Washington Redskins, but my real question is simple: After the results of the game last night, does the sender wish to stand and let me know that he sent the book?

Every year the President of the United States addresses Congress to assess the State of the Union.   Before I presume to address the state of patent litigation, I am anxious to confess that I come far short of presidential stature, but then you are not the Congress either.   At current approval ratings, perhaps we are both better off.

As long as Congress continues their rolling approval of temporary budgets to prevent a governmental shutdown, I have the great privilege of presiding over patent disputes.   As you can imagine, I have seen the state of patent litigation evolve over the past two decades and have also heard various reactions from some of the legends of our profession.

From the lawyer's perspective, I can give the state of patent litigation in two words: NOT ENOUGH.     For the corporate litigant, I can predict a similar two-

word evaluation: TOO . . . EXPENSIVE; for the Patent Office: GOOD START; for the damages expert: DEMANDING SUPPLY; for the venture funding firm: PROFIT PROSPECT; for the legal academic: CRITICISM BONANZA; for the judges: NO COMMENT; from my perspective: NEEDS IMPROVEMENT!

I

Let me introduce my topic with a story: Several years ago our government sent me to China on a mission of importance.   In Beijing, I met with the U.S. Ambassador, Sandy Rand, who asked me to encourage the Chinese judiciary to enforce non-Chinese IP rights as aggressively as Chinese rights.   Now I must confess that I saw a great danger in advising the highly-skilled Chinese judges on the administration of their own law in their own jurisdiction.   I could, however, advocate, as I have often in foreign nations, the need for an international standard of judicial performance.   Under this international standard, to some degree implicit in TRIPS, courts must enforce IP regardless of the character, nationality, ownership, or origin of those rights.

With that determination, I traveled south to Shanghai and delivered my address to a large gathering of judges and IP professionals:   Courts have an obligation to render the same justice to all nationalities!   I finished with a flourish. The applause had not subsided when the hand of the President of the Shanghai

High Court shot into the air.  I acknowledged my friend and he arose with a simple question:   "Is that the way they do it in the Eastern District of Texas?"

When the clamor died down, I answered: "While I do not have any statistics on Texas judgments, I would not be surprised if juries in Marshal or Tyler are pretty hard on foreign corporations, BUT," I continued, "you have to understand that in East Texas, anyone who comes from East of Shreveport or West of Dallas is considered 'foreign.'"

My attempt at humor dampened the impact of the question for that audience, but the question itself has haunted me.   In truth, the US must adhere to the high principles it preaches.   We need to equalize the playing field for plaintiffs and defendants, whether they are home grown or foreign, a solo garage inventor or a Fortune 100 Company.   The landscape of patent litigation is changing, and likewise, we need to keep evaluating and adapting with it.   The question of my friend in Shanghai is a reprimand, a threat, a challenge, but most important, a call to IMPROVE.

Now the Shanghai question singled out the Eastern District of Texas, but we are all in this together.   No doubt "ED Tex" gets much of the attention only due to its emergence as a focal point for IP enforcement in the US, as did E.D. Virginia and Delaware before it.   As I suggest, we are all responsible for the implicit reprimand in that Shanghai question—trial judges, trial attorneys, corporate IP

managers, IP rights holders, and yes, appellate judges, too.   Moreover I would suggest that our responsibility to improve has recently multiplied.   I do not need to remind anyone that a consortium of buyers purchased a couple thousand patents recently for billions, with a B!   With the market prophesying the importance of our work, and the increase of media attention and consumer interest, we must raise our vision and strengthen our resolve to respond to the challenge in the Shanghai question.

To better qualify myself to call our discipline to a higher vision and a stronger resolve, I sought more first-hand trial experience.   Although I had presided as a trial judge in Washington, Chicago, Brooklyn, Syracuse, Oakland and more, I undertook to act as a District Judge in Texas.   I was very grateful that Chief Judge Folsom, Judge Ward, Judge Davis, and Judge Clark welcomed me to their district and made extensive arrangements for my visit.   I must say, I knew my fellow judges were happy to share their heavy dockets, but I was not quite prepared for the extent of their generosity.   Without any intention to embarrass, I thought I had volunteered to preside over one patent case; I got six!   Now THAT's Southern hospitality! (Incidentally, Chief Judge Folsom's prediction was correct.   Of the six, only one went all the way to trial.)

The experience allowed me to break in my cowboy boots, enjoy some real Texas barbecue at the Country Tavern, and swelter in unbreakable 100 degree heat.

And of course, I have a few observations from my experience as a trial judge as well:   First, the quality and dedication of the judges in the Eastern District of Texas is inspiring.   I do not need to tell this audience that they preside with vast grace and skill.

Next, the juries also inspired me.   As I noted, I have presided over juries in many jurisdictions.   Invariably up to twenty percent of my jury pool made every attempt to evade their civic duty.   Not in Marshal!   Every person was willing to make sacrifices, if necessary, to serve.   I observed many jurors who served despite hardships.   In particular, I can still see the face of one lady who announced that she alone owned and operated a radio station, and did not know what would happen to her radio business if she was picked for the jury.   When she was selected as juror number 3, she did not voice a single complaint.   She assumed her seat and served attentively and effectively for an entire week.   Based on my limited experience, I heartily commend the jurors of the Eastern District of Texas.

At this point, however, I want to return to the Shanghai question and its implicit challenge to improve our administration of justice.   With that challenge echoing in our ears, I would like to focus on six ways to improve patent litigation:

1.    Discovery management and control.   In the electronic age, discovery procedures designed for the 19th and 20th centuries just do not work for complex

patent litigation. For example, blanket stipulated orders requiring the production of all relevant documents leads to waste.   Courts must control the cost and efficiency of electronic discovery.

2.   Summary judgment.   In these vast technical lawsuits, summary judgment is the key to efficient resolution of disputes.   The bar has a responsibility to work with the bench to present, if at all possible, a summary judgment motion, or maybe TWO, that can end the litigation or narrow the case to dimensions more amenable to settlement.

3.   Transfer motions and Joinder.   In an era when 14 different districts have stepped forward and volunteered to expertly handle patent disputes, the bar should again work with the bench to file cases or find venues that best suit the convenience of parties and logical distribution of these important cases. Moreover the trend towards an excess number of parties also unnecessarily multiplies the complexity of already-complex litigation.

4.   Early procedural and substantive valuation of cases.   All patents and all patent cases are not created equal!   The bar needs to work with the bench to determine at an early stage the economic value of the case for both parties.   With that evaluation in mind, the court may then tailor its timing and procedures to make sure a billion-dollar case gets a "billion-dollar" process and a thousand-dollar case gets its due as well.

5.    Rules and Practice.   Much of the value of our US system of adjudication lies in the individuality and independence of the judges themselves. At the same time, our courts need to understand that these complex and demanding patent cases profit from an announced and dependable set of procedural rules that all parties understand in advance.

6.    Troll and grasshopper control.   No doubt you would like to know right now what this entails, but I am going to keep you in suspense on this last category.

Oh yes, and there is a seventh recommendation, tailored to ED Tex, which I will also save to the end.

II

Every person in this room understands that the greatest weakness of the US court system is its expense.   And the driving factor for that expense is discovery excesses.   Electronic recordkeeping in the modern age has multiplied the expense of looking behind every curtain.   As we all understand, the modern electronic age has rendered old discovery processes obsolete or, at least inappropriate for the vast complexity and volume of large patent disputes.   Patent cases, in particular, produce disproportionally high discovery expenses.   In one 2010 report, the Federal Judicial Center determined that "Intellectual Property cases had costs almost 62% higher, all else equal…."

We all understand as well that those expenses multiply exponentially when attorneys use discovery as a tactical weapon.    Generally, the production burden of expansive e-requests outweighs their benefits.    I saw one analysis that concluded that .0074% of the documents produced actually made their way onto the trial exhibit list—less than one document in ten thousand.    And for all the thousands of appeals I've evaluated, email appears even more rarely as relevant evidence.

Our courts are in danger already of becoming an intolerably expensive way to protect innovation or prove freedom to operate.    These vast expenses can force accused infringers to acquiesce to non-meritorious claims.    This only serves as an unhealthy tax on innovation and open competition.

To address this problem, the Advisory Council of the Federal Circuit created a special subcommittee to draft a model rule for e-discovery governance.    The subcommittee included some vastly skilled judges and attorneys from various regions and backgrounds.    For this conference, I will note that Judge Everingham participated extensively and effectively as a member of that subcommittee.    After the subcommittee's work, the entire Federal Circuit Advisory Council considered and unanimously adopted the model rule that I have the honor of unveiling today.

This proposed Model Order on E-Discovery in Patent Cases should serve as a helpful starting point for district courts to enforce responsible, targeted use of e-

discovery in patent cases.  The goal of this Model Order is to streamline e-discovery, particularly email production, and require litigants to focus on the proper purpose of discovery—the gathering of material information—rather than on unlimited fishing expeditions.

This Model Order begins with a discovery process whereby the parties exchange core documentation concerning the patent, the accused product, the prior art, and the finances before seeking email production.  Just as Federal Rule of Civil Procedure 30 presumptively limits cases to ten depositions and seven hours per deposition, this Model Order presumptively limits the number of record custodians and the number of search terms for email production requests.  When the default numbers with limits on depositions were first included in the Federal Rules, veteran lawyers panicked that these limits were arbitrary and would prevent the discovery of critical information.  But after two decades of experience, few question the wisdom of these limits.  And the era of the endless deposition is fortunately over.

Under this new e-discovery model order, each party seeking email production presumptively gets 5 custodians per producing party and 5 search terms per custodian.  However, the parties may jointly agree to modify these limits or request court modification for good cause.

The Order also contemplates that a discovering party may exceed the discovery limits.   If the party wants to exceed those limits, however, they do so at their own expense.   I believe cost shifting will encourage more conscientious requests, as we all know, when you are ordering drinks at a bar, you order a little more wisely when you know you are paying the tab!

One other point, a large source of e-discovery cost is the pre-production review of documents by attorneys.   Even with claw-back provisions, pre-production review is often necessary to ensure adversaries do not receive privileged or sensitive but irrelevant documents.   This Model Order addresses attorney-client and work product protections to minimize expensive pre-production review.

In sum, the Model Order of the Advisory Council of the Federal Circuit promises to bring some discipline to e-discovery expenses.   Of course, for this Model Order to have a real impact, district judges will need to put these suggestions (or some variation) into practice.   Fortunately, district courts have inherent power to control their dockets to further "economy of time and effort for itself, for counsel and for litigants."   *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936).   I would respectfully ask our bar to work with the bench to implement this first improving vision.   I will attach the model order to the printed version of this speech.

III

Next, the patent litigation system needs more effective, summary judgment practice.   At this point, I want to repeat something I said before: our US common law system profits vastly from the independence and individuality of the judicial officers who render the judgment that ultimately characterizes the system.   These individual judges often have varying conceptions of the best way to supply that judgment.   Moreover individual parties and attorneys, who vastly influence the procedural posture of every case, also have varying procedural strategies and objectives.

Nonetheless, as you have come to realize, much of my message can be summarized with an allusion to the "goose that laid the golden egg" fable. Needless to say, if we cannot control the cost, complexity, and complications of patent litigation, the litigants that we serve will simply find a better way, or a better place, to resolve their disputes.   Unchecked and uncontrolled inflation of litigation costs can potentially kill our golden goose and leave us empty handed. But, YES, I would also slightly amend the "goose" fable for our setting.   Patents and inventions are essential to the global economy, and in our case, geese are laying eggs—resolving patent   disputes—all around the world.   If the US system requires a litigant to "feed the goose" ten ounces of gold only to get a golden egg of five ounces in return, obviously geese from other counties that don't require

such an investment, such as Germany or Japan or China, become more appealing. We must be careful not to drive away our golden goose by self-imposed encumbrances.

Summary judgment can streamline processes and, at the same time, produce a proper record for decision and appeal.   As the Supreme Court wisely explained in Celotex, summary judgment is not a "disfavored procedural shortcut," but rather an integral part of the Federal Rules "to secure the just, speedy and inexpensive determination of every action."

At some personal peril, let me refer to my experience in Texas.   As I mentioned, I received 6 cases.   Of that number, a jury verdict concluded one case, three settled after the court indicated some of its directions in pre-trial motions and arguments, and the court resolved two more by summary judgment.   Of course, I do not suggest that five-sixths of all cases can reach resolution through aggressive pre-trial proceedings.   Nor do I suggest that a third of all cases deserve summary judgment.   The actual numbers may be even higher.

I do suggest that it is the duty of the bar to assist the bench in presenting proper motions to reduce the time and expense of lengthy proceedings.   As I suggested before, this improvement requires the parties to present a summary judgment motion, or maybe two, that either resolves the case entirely or reduces it to dimensions amenable to settlement. The bar must realize that it too has a stake

in pursuing a more efficient adjudicatory system.   Now, I realize that not every case can be entirely dismissed on a motion; but I do believe most cases have specific issues that can be resolved on summary judgment.   The bar has the first responsibility to present summary judgment motions that identify these particular issues.   The Federal Circuit receives and resolves the vast majority of its patent cases under summary judgment rules.   The same should probably apply to district courts.   Besides, aggressive summary judgment practice clears a congested trial court docket for cases that really deserve a full trial.   We must strive to use summary judgment tools effectively to control costs and keep our golden goose healthy.

IV

Next, transfer motions and joinder practice.   I am not going to present a lengthy dissertation on the legal merits of a correct venue.   I am not even going to discuss courts and counsel as public servants who should seek the best interests of its clientele.   Instead I am going to appeal to your common sense.   Plaintiffs, you must evaluate whether your chosen venue is a rational option BEFORE filing a Complaint.   Before setting the wheels of the litigation machine in motion and expending party and judiciary efforts, give all your options equal consideration. The Northern District of California, the District of Delaware, or the Eastern

District of Texas should not be chosen by default, or for attorney convenience, especially with 12 other districts participating in the Patent Pilot Program.

Moreover, the best way for us to strengthen our judicial system is to share and promote other venues.   Think about it!   In your personal relationships, you actually advance yourself by advancing others.   When you praise and aggrandize others, the reflection enhances you!   Courts and counsel are really no different! If courts and counsel share and promote other forums where appropriate, in the long run, they are really promoting themselves as the most reasonable and the most respectable of all.

I would ask you to remember too that in the long run our US judicial system is really competing with the world.   In that sense, a conscientious effort to pursue and continue litigation in a more convenient and proper US district court is really advancing ourselves on the world stage where it most matters.

On joinder, I will just note that the Federal Circuit Advisory Council, under the dynamic leadership of its Chairman Ed Reines, intends to turn its full attention to the trend toward cases and appeals with many parties.   This trend is very evident and worrisome to our Court as well.

V

All patents and all patent cases are not created equal!   Case management is really the skill of giving each case the time and effort it deserves.   Of course, the

14

most fundamental aspect of that skill is learning to discern the true value of each case.   At this point, I could use the standard verbalization that I have used throughout this speech about "the bar has the obligation to assist the bench in evaluating cases," but frankly that will not work for this area of improvement—damages and accurate case valuation.   Every attorney seems to believe, genuinely, that his or her case is the most important one on any judge's docket.

Thus, for this improvement, I think I am addressing primarily the judges.   I recommend that trial judges use their authority, including DAUBERT inquiries, to ascertain early in the case the approximate dollar value of the case.   With some searching inquiry into the parties' damages model, the trial judge can get a good idea of the worth of the contested technology and its implications in the market place.   The parties also benefit from early damages discussions and disclosures because it can provide a realistic evaluation of both Defendant's exposure and Plaintiff's damages calculation and further promote early and effective mediation. This inquiry can occur at the onset of the case during case management conferences or even a little later in connection with *Markman* hearings.

With an understanding of the case's true worth, the trial judge would then be poised to identify cases that would benefit from tailoring the standard procedures to fit the case and its significance.   In colloquial terms, the court may adjust timing and procedures of the case to make sure a billion-dollar case gets a "billion-

dollar's worth" of process—adequate time and witnesses and confidential information protections and more—and a thousand-dollar case gets . . . well, less.

May I observe at this point that I am reluctant to advise masterful district judges about case management.   In truth, I believe that these judges know this subject better than me.   Still I am concerned that our system as a whole tends to overlook and "undervalue" the damages and valuation stage of our adjudicatory process.   From the attorney's standpoint, we understand that the defendant wants to avoid damages discussions because it seems to admit that remedies are warranted.   And the plaintiff wants to postpone remedies discussions until it has shown fault because damages will escalate in the face of established culpability. Therefore, I suggest to my fellow judges that we are going to have to take the initiative to improve patent procedure by intervening ourselves to get a realistic valuation of the case much earlier.

## VI

Rules.   Again this improvement involves me in the uncomfortable enterprise of advising my brighter and more experienced colleagues.   I do not want to enter the debate about the merits of the strict patent case rules of the Northern District of California or more lenient rules in some other District.   I merely want to suggest that clear and defined rules make every game fairer. Particularly in the 14 districts that have enlisted for the Patent Pilot Project, I

would suggest the merits of some uniform procedures that clarify expectations in advance.   With expectations settled, the bar involved in the case can then focus on an efficient way to achieve each step of the process.

VII

At last we have reached the one that you wanted to hear about right at the outset: Troll and grasshopper control!   Of course, before we can control trolls and grasshoppers, we have to know who they are.   And again, OF COURSE, that is the difficulty!   Even some Supreme Court justices have referred to the non-practicing entity, the proverbial NPE.   We also all understand that the NPE designation sweeps in some unintended "culprits" like universities and research clinics and can also extend to almost every corporation and business because they practice only a fraction of their patent portfolio.   For that reason, I have always preferred an alternative definition of a "troll," namely, any party that attempts to enforce a patent far beyond its actual value or contribution to the prior art.

Every "troll" discussion, however, needs a note of balance.   Just as trolls litter the patent system with marginally meritorious lawsuits, so the system also suffers from the IP "grasshopper."      The IP grasshopper is the entity that is quick to steal the "inventor-ant's" work and research investment because he did no work himself and the winter of competition approaches.   We can recognize the grasshopper because he refuses to pay any license fee until his legs and claws are

held to the proverbial litigation fire.    Once again, a grasshopper is hard to define, but I can venture a description according to the same basic notion that helped us identify the troll:   A grasshopper is any entity which refuses to license even the strongest patent at even the most reasonable rates.

Frankly I am not sure who causes more meritless litigation—the troll asserting patents beyond their value or the grasshopper refusing to license until litigation has finally made it impossible to avoid.   I am surer, however, that both the troll and the grasshopper tend to blame and feed off of each other.    Neither deserves encouragement or tolerance.   And so that gets us to the prospect of controlling trolls and grasshoppers.

As I have suggested, it is difficult to control the troll or the grasshopper in advance because they cannot really be identified until their abuse is already over— the troll has lost its case of little value or gotten negligible value for a nominally winning case; the grasshopper has finally accepted a reasonable license fee after dragging the court and the patent owner through years of litigation.   The troll and the grasshopper only emerge after the case is over and the court has lost its ability to remedy the abuse.

Well . . . not so fast!   The court does have one remaining option to control trolls and squash grasshoppers—reverse the fees and costs!   When the case is over and the court can identify a troll or a grasshopper, I strongly advocate full-

scale reversal of attorney fees and costs!   Of course, the bar can help here by making a motion.   While I understand that the case must qualify as exceptional, I believe that adequate documentation of "trolls" or "grasshoppers" would qualify. Keep in mind that the Federal Circuit reviews a finding of an exceptional case for clear error and the award of attorney's fees for a very infrequent abuse of discretion.   Just one further word:   this improvement suggestion is not really discarding the American rule that each party pays its own attorney.     Instead this fee reversal recommendation is a tool to discourage cases that are brought only to obtain revenue from litigation avoidance instincts.     In that sense, this recommendation is part of the responsibility of the bench and bar to protect the integrity of the US judicial structure.

VIII

I think I promised one more recommendation, in this case, specifically targeted at ED TEX!   My recommendation is really quite simple and based on personal experience:   Marshall really needs more good restaurants!

IX

I want to return for just a moment to the Shanghai question that should strengthen our determination to improve.   I told you my smart aleck answer to the question, but in truth, I went on to give a more complete answer.   I noted that far less than 4% of all patent cases reach the trial stage and many of those trials do not

employ a jury.   Nonetheless the prospect of trial and the specter of a jury—whether in Texas or any other state—can drive parties to settlement at unjustified rates.   Settlement, by and large, is essential to the success of the US system of dispute resolution.   Without settlements, the system would collapse under its own weight.   Nonetheless, those settlements must occur on fair, neutral, and justified economic terms, not as the result of stratagems, threats, or fears.   Otherwise our system is failing.

We all, bench and bar alike, owe our system more than we can ever repay. We know that our liberties are priceless and we know that we owe much of that liberty to our law enforcement and judicial systems.   Moreover we know that our discipline—patent law—fosters prosperity and economic growth regardless of upturns or downturns in the market.   Bearing that in mind, we have an obligation to pass this system on to our children and their children in as good or better shape than we found it.   We need to ensure that patent law continues to serve its purpose of fostering innovation and that patent litigation does not become an unwieldy, unpredictable, and unaffordable burden on innovation.   Thus, I encourage each of us, bench and bar alike, to raise our vision and strengthen our resolve to make our courts and our patent litigation better in the future.   We need to answer that Shanghai question in the future with a single uniform response: we do not allow our courts to be used for anything, except the pursuit of justice!   Thank you.

20