Exhibit J

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Charles K. Verhoeven (Bar No. 170151)
2     charlesverhoeven@quinnemanuel.com
   50 California Street, 22nd Floor
3  San Francisco, California 94111
   Telephone: (415) 875-6600
4  Facsimile: (415) 875-6700

5     Kevin P.B. Johnson (Bar No. 177129
      kevinjohnson@quinnemanuel.com
6     Victoria F. Maroulis (Bar No. 202603)
      victoriamaroulis@quinnemanuel.com
7  555 Twin Dolphin Drive, 5th Floor
   Redwood Shores, California  94065-2139
8  Telephone:     (650) 801-5000
   Facsimile:     (650) 801-5100
9
      Michael T. Zeller (Bar No. 196417)
10    michaelzeller@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
11 Los Angeles, California 90017
   Telephone: (213) 443-3000
12 Facsimile: (213) 443-3100

13 Attorneys for SAMSUNG ELECTRONICS CO.,
   LTD., SAMSUNG ELECTRONICS AMERICA,
14 INC. and SAMSUNG
   TELECOMMUNICATIONS AMERICA, LLC
15
                   UNITED STATES DISTRICT COURT
16
          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION
17

| | |
|---|---|
| APPLE INC., a California corporation, | CASE NO. 11-cv-01846-LHK |
| Plaintiff, | |
| vs. | **EXPERT REPORT OF ERIC STASIK REGARDING ETSI AND STANDARDS-SETTING MATTERS** |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendant. | |

EXPERT REPORT OF ERIC STASIK REGARDING ETSI AND STANDARDS-SETTING MATTERS

1 support Apple's contention that the value of handsets derives from features other than the cellular
2 interface.  It may not have been clear at that time that technologies related to wireless
3 communication would retain their importance as numerous smart phone features are dependent on
4 transmission of substantial amounts of data.  Moreover, the addition of 3G wireless connectivity
5 adds value to all the features of a smart phone.  In any event, in my experience, the royalty rates
6 offered for patent portfolios relating to wireless standards have not declined, even as a variety of
7 new features are now available on handsets.

## VI. SAMSUNG'S LICENSE WITH INTEL

### A. Does Samsung's patent cross license with Intel create "pass through" rights to Sasmsung's Patents?

71. Donaldson's opines that licensing professionals in the telecommunications industry would expect a licensing agreement to provide for "pass through rights."  I disagree.

72. "Pass through rights" from chipset manufacturers to handset manufacturers has been a matter of intense interest and scrutiny for as long as I have worked in the industry.  It is a well-known fact in the mobile industry, both inside and outside the licensing profession, that GSM/UMTS chipset manufacturers generally do not receive licenses that provide for "pass through rights" to handset manufacturers.[3]  For example, in 2007, Qualcomm issued a press release explaining:

> *In a ruling in prior litigation between Qualcomm and Texas Instruments, the Delaware Supreme Court wrote: "To protect its stream of royalties from the hand set manufacturers,* **Qualcomm's licenses with integrated circuit manufacturers deny the licensees any so called 'pass through rights' that would otherwise relieve the hand set manufacturers of their obligation to pay CDMA royalties to Qualcomm.***"*

(Qualcomm Press Release March 20, 2007, Exhibit 25 (emphasis added).)

73. Indeed, in F3Q08 earnings call with investors discussing the settlement ending the long-running patent dispute with Nokia, Qualcomm's Steve Altman confirmed that Qualcomm

---

[3] On the other hand, it is also well-known that CDMA chipsets manufactured by Qualcomm for many years enjoyed pass-through rights under cross-licenses negotiated by Qualcomm.  "In addition, many of our license agreements include extremely valuable pass-through rights from which our customers of our QUALCOMM chipsets can benefit."  (Qualcomm F1Q06 Earnings Conf. Call Transcript, Exhibit 24 at 2.)

1  "did not get pass through rights" from Nokia and "companies that buy chips from (Qualcomm)
2  similar to buying chips from other companies . . . would require a (separate) license agreement
3  with [Nokia]."   (QUALCOMM Inc. F3Q08 (Qtr End 07/24/08) Earnings Call Transcript, Exhibit
4  26 at 12.)[4]

5      74. More recently, in their 2010 Annual Report, Qualcomm assured its investors that:

> *We have entered into such agreements with QCT competitors, including Broadcom, Fujitsu, Icera, Infineon (Intel recently announced an agreement to acquire Infineon's Wireless Solutions business), Mediatek, NEC, Renesas Electronics, Texas Instruments and VIA Telecom.   These agreements generally permit the manufacture of CDMA-based and/or OFDMA-based integrated circuits and/or baseband software for use on such integrated circuits.   In exchange for these rights, we receive rights that allow us to use certain intellectual property rights of these companies for specified purposes.   **In every case, these agreements do not allow such integrated circuit suppliers to pass through rights under Qualcomm's patents to their customers for use in wireless devices manufactured or sold by such suppliers' customers, and such customers' sales of CDMA-, WCDMA- and OFDMA- based cellular devices into which such suppliers' integrated circuits are incorporated require separate licensing arrangements with us in order to use our patented technologies.***

(Qualcomm Form 10-K (Annual Report) (excerpt), Filed 11/03/10 for the Period Ending 09/26/10, Exhibit 27 at 18.)

    75. Donaldson appears to conflate pass-through provisions with the legal doctrine of exhaustion.   Regardless of whether licensees are aware of the doctrine of exhaustion, licensees typically include specific pass-through provisions to ensure that their customers obtain legal protection.

---

[4] The transcript further states, in pertinent part:

> Mark Mckechnie – American Technology:   Great, thank you and congrats on the settlement, it sounds like good deal for both.   I wanted to ask a question here for Steve on pass through rights and specifically does QUALCOMM actually get pass through rights on some of the Nokia GSM patents for your customers?   I'm really just trying to figure out is would LG or Samsung or an Apple if they use your chips be free from Nokia IP issues by using the QUALCOMM chips?   Thank you.
>
> Steven Altman:   We did not get pass through rights, but we did get assignment of the significant number of patents which we would be able to offer as licenses to our customers.   So companies that buy chips from us similar to buying chips from other companies would – to the extent they use Nokia IP would negotiate with Nokia, the terms of a license agreement to those companies.

76. I have been asked by Samsung to determine whether, based upon my experience preparing and negotiating license agreements in the telecommunications industry and the language of the agreement, the parties to the agreement intended to limit Intel's rights to selling products of its own design. A review of a redacted copy of the agreement leads me to conclude that this was the parties' intention. First, the preamble of the Intel Agreement demonstrates that the purpose of the agreement was to "increase [the parties'] freedom to design and manufacture their *own* new products without infringing the rights of the other . . . ." (Exhibit 28, 1993 Agreement at 1 (emphasis added).) Second, Section 3.1 of the Intel Agreement provides that Intel is only licensed "to have [products] developed exclusively for INTEL." (*Id.*, 1993 Agreement § 3.1.) Further, the parties amended Section 3.1(a) to provide that Intel *does not* have the right to sublicense and to require that any manufacture by a third party was solely for the purpose of supplying Intel. (*Id.*, 2004 Amendment § 3.1(a)(1) ("without the right to sublicense"); *id.* § 3.1(a)(1) (granting a right to have Intel Licensed Products made by "another manufacturer *for supply solely to INTEL* for use, import sale of disposition by INTEL pursuant to the license granted above in Section 3.1(a)(1)").) Third, Section 3.2 limits Intel's foundry rights under the agreement to the manufacture of products designed by Intel and excludes product designs by third parties. (*Id.*, 1993 Agreement § 3.2.) Fourth, Section 7.12 prohibits Intel from creating or acquiring a subsidiary where "a primary purpose of such creation or acquisition is to extend the benefits of this Agreement to a third party." (*Id.*, 2004 Amendment § 7.2.)

## VII. TRIAL EXHIBITS

77. If called as a witness at trial, I may rely on visual aids and demonstrative exhibits that demonstrate the bases of my opinions. Examples of these visual aids and demonstrative exhibits may include, for example, interrogatory responses, deposition testimony and deposition exhibits, as well as charts, or diagrams.

78. Other than as referred to in this report, I have not yet prepared any exhibits for use at trial as a summary or support for the opinions expressed in this report, but I expect to do so in accordance with the Court's scheduling orders.