# Exhibit K

Highly Confidential - Attorneys' Eyes Only

Page 1

1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
2                     SAN JOSE DIVISION
3      -------------------------------x
4      APPLE INC., a California
       corporation,
5
                          Plaintiff,
6                                                Case No.
       vs.                                       11-CV-01846-LHK
7
       SAMSUNG ELECTRONICS CO., LTD, a
8      Korean business entity; SAMSUNG
       ELECTRONICS AMERICA, INC., a New
9      York corporation; SAMSUNG
       TELECOMMUNICATIONS AMERICA, LLC,
10     a Delaware limited liability
       company,
11
                          Defendants.
12
       -------------------------------x
13
14         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
15            VIDEOTAPED DEPOSITION OF JOHN HAUSER, a
16         witness called by the Defendants, taken
17         pursuant to the applicable provisions of the
18         Federal Rules of Civil Procedure, before James
19         A. Scally, RMR, CRR, a Notary Public in and
20         for the Commonwealth of Massachusetts, at the
21         offices of WilmerHale, 60 State Street,
22         Boston, Massachusetts, on Friday, April 27,
23         2012, commencing at 9:31 a.m.
24         TSG Job # 48803
25

Highly Confidential - Attorneys' Eyes Only

Page 11

```
 1   that that's no longer in issue in this case.  Should a        09:38:36
 2   patent expert interpret my information for any other          09:38:41
 3   patents, I can't comment upon that.                           09:38:44
 4       Q.   Okay.  So we're going to now talk about the          09:38:45
 5   qualitative interviews which you discuss in your report in    09:38:51
 6   paragraphs 35 to 41, beginning on page 20.                    09:38:55
 7           So you say in your report in the second sentence      09:39:07
 8   of paragraph number 35, "I instructed AMS to conduct in-     09:39:10
 9   depth interviews with current Samsung smartphone and tablet   09:39:15
10   owners."                                                      09:39:18
11           Do you see that?                                      09:39:19
12       A.   I see that sentence, yes.                            09:39:19
13       Q.   Okay.  Do you know anything about the process by     09:39:22
14   which these 20 people were selected?                          09:39:27
15       A.   Yes.                                                 09:39:31
16       Q.   Tell me everything you know about this process.      09:39:32
17       A.   I'll tell you what I can remember at the moment.     09:39:35
18   These potential qualitative interviewees were selected        09:39:40
19   using Bernett Research.                                       09:39:49
20       Q.   Sorry?                                               09:39:51
21       A.   Bernett.  I will provide a spelling of that as       09:39:52
22   well.  It's a Boston-based firm.  We work with them quite a   09:39:54
23   bit.                                                          09:40:01
24           And these were selected to be representative --       09:40:01
25   not random, as it is not necessary for qualitative            09:40:03
```

Highly Confidential -  Attorneys' Eyes Only

Page  12

| | | |
|---|---|---|
| 1 | interviews -- representative of Samsung's smartphone and | 09:40:08 |
| 2 | tablet users.  These were interviews that were about 30 to | 09:40:14 |
| 3 | 45 minutes.  They were open-ended, exploratory interviews. | 09:40:19 |
| 4 | They were conducted by professionals at Applied Marketing | 09:40:24 |
| 5 | Science.  During these interviews, they're just exploring | 09:40:30 |
| 6 | the words and phrases that consumers use; they're exploring | 09:40:33 |
| 7 | how consumers talk about these smartphones and tablets. | 09:40:37 |
| 8 | And it's basically background that's part of the design of | 09:40:42 |
| 9 | the study.  It's not the study itself. | 09:40:46 |
| 10 |     Q.   Okay.  Could you spell the name of that firm that | 09:40:51 |
| 11 | you mentioned that selected these 20 people? | 09:40:53 |
| 12 |     A.   B-e-r-n-e-t-t.  And I will make sure of that | 09:40:59 |
| 13 | spelling, but that's the best I can remember at the moment. | 09:41:06 |
| 14 |     Q.   Okay.  And you said you'd used them before? | 09:41:09 |
| 15 |     A.   Yes.  They're a common partner of Applied | 09:41:15 |
| 16 | Marketing Science, AMS. | 09:41:19 |
| 17 |     Q.   Do you know how many people they invited? | 09:41:25 |
| 18 |     A.   No, I do not. | 09:41:28 |
| 19 |     Q.   Do you know how they ended up with 20? | 09:41:39 |
| 20 |     A.   The rule of thumb is that we talk to these people | 09:41:43 |
| 21 | until we feel we have a good understanding of the market | 09:41:49 |
| 22 | information that will help me design the questionnaire. | 09:41:55 |
| 23 |         And there's also some good scientific evidence | 09:41:58 |
| 24 | that 20 is more than sufficient.  I'd cite a 1980 -- 1993 | 09:42:00 |
| 25 | paper that I wrote published in Marketing Science called | 09:42:08 |

Highly Confidential - Attorneys' Eyes Only

Page  13

| | | |
|---|---|---|
| 1 | "The Voice of the Customer."  It's actually won a number of | 09:42:13 |
| 2 | awards.  And it indicates that 20 is more than sufficient. | 09:42:17 |
| 3 | Q.   Okay.  Do you know the split between tablet versus | 09:42:23 |
| 4 | smartphone customers in this -- within this group of 20? | 09:42:25 |
| 5 | A.   It's -- I don't know the exact split, but what I'm | 09:42:29 |
| 6 | trying to do is have both tablet and smartphone users in | 09:42:33 |
| 7 | there.  It would be approximately 50/50. | 09:42:37 |
| 8 | Q.   Are you -- what are you basing that 50/50 -- what | 09:42:42 |
| 9 | are you basing the 50/50 on? | 09:42:45 |
| 10 | A.   As I said, it's approximately 50/50.  I don't know | 09:42:47 |
| 11 | the exact number.  That would be typical in this type of | 09:42:49 |
| 12 | interviewing. | 09:42:52 |
| 13 | Q.   Okay.  Would you be surprised if it was some other | 09:42:53 |
| 14 | split? | 09:42:58 |
| 15 | A.   Well, it's quite possible.  It's always possible. | 09:43:01 |
| 16 | You talk to one person and learn everything you need to | 09:43:04 |
| 17 | know.  It's unlikely.  So I would be surprised if they | 09:43:06 |
| 18 | talked to just one person in either one of these. | 09:43:11 |
| 19 | I do know that a number of these people owned both | 09:43:13 |
| 20 | tablets and smartphones, so essentially getting information | 09:43:17 |
| 21 | on both.  And that's not -- 50/50 -- it's a little bit less | 09:43:25 |
| 22 | than 50/50 that I did check on.  But the goal is to have a | 09:43:28 |
| 23 | set of people who are going to give us the words and | 09:43:35 |
| 24 | phrases. | 09:43:38 |
| 25 | Q.   And how do you know that -- how do you know that | 09:43:38 |

Highly Confidential - Attorneys' Eyes Only

Page 16

1     Q.    Okay.  Do you know the gender distribution of this          09:46:19

2  group of 20?                                                          09:46:21

3     A.    I do not know the gender distribution other than            09:46:22

4  knowing that, as is appropriate, we have both males and              09:46:24

5  females in this sample and that it's not particularly                09:46:29

6  skewed one way or the other.                                         09:46:32

7     Q.    And how do you know that?                                   09:46:34

8     A.    This is -- this is the standard way of doing                09:46:35

9  things.  AMS has been doing this for 24 years now, and I             09:46:38

10 have established the procedures, I know the rules and                09:46:47

11 procedures they work with, and I'm confident that they              09:46:49

12 follow those.                                                        09:46:52

13    Q.    Do you know the income distribution of this group           09:46:56

14 of 20?                                                                09:46:59

15    A.    I do not know the income distribution nor do I              09:47:01

16 need to know the income distribution.  What I do need to             09:47:03

17 know in these qualitative interviews that are a part of the          09:47:06

18 design process, not part of the study, is that we have               09:47:09

19 people represented across the income distributions.                  09:47:12

20    Q.    And you know that because that -- that's the                09:47:16

21 standard procedure?                                                  09:47:20

22    A.    This would be the standard procedure, procedures            09:47:21

23 that we've put in place and we've followed for 24 years.             09:47:25

24    Q.    But you -- you don't know specifically if it was            09:47:28

25 followed here, do you?                                               09:47:30

Highly Confidential - Attorneys' Eyes Only

Page 20

```
 1   material?                                              09:52:16

 2       A.   What do you mean?                             09:52:17

 3       Q.   Well, a memo or notes or anything like that.  Did   09:52:19

 4   you write anything down and give it to anyone at AMS for   09:52:27

 5   the purpose of AMS coordinating this group of 20 people for  09:52:33

 6   the interviews?                                        09:52:40

 7            MR. ILLOVSKY:  Objection to form.             09:52:40

 8       A.   Well, just so that -- I don't want to make -- I   09:52:43

 9   want to make things clear that there are, of course, papers   09:52:48

10   that I've written, and, you know, most of them are required   09:52:51

11   to read these.  Beyond those papers, and that's just in   09:52:54

12   general methodology, there is nothing specific to this case   09:52:58

13   that was -- that I gave them that was written.         09:53:03

14       Q.   You told them to follow standard procedures;   09:53:05

15   correct?                                               09:53:08

16       A.   Yes, I did.                                   09:53:09

17       Q.   You told them to conduct interviews that you could   09:53:10

18   use to form -- to write a questionnaire; correct?     09:53:14

19       A.   Yes.                                          09:53:21

20       Q.   And you expected that they followed your      09:53:22

21   direction; correct?                                    09:53:27

22       A.   Yes.  I mean I've worked with them many times,   09:53:30

23   and, yes, I -- I am confident that they followed my   09:53:33

24   directions.                                            09:53:39

25       Q.   That's based on past experience; correct?    09:53:41
```

Highly Confidential - Attorneys' Eyes Only

Page 24

| | | |
|---|---|---|
| 1 | citizen check on them. | 09:58:17 |
| 2 | Q.    Okay.  Did you -- did you ask -- do you know -- do | 09:58:18 |
| 3 | you know anything about the employment status of any of | 09:58:24 |
| 4 | these people?  Like are they unemployed or employed, do you | 09:58:26 |
| 5 | know that? | 09:58:31 |
| 6 | A.    What we know is that they own smartphones or that | 09:58:31 |
| 7 | they own tablets.  We know that they're -- you know, cover | 09:58:34 |
| 8 | a broad set of demographic characteristics or sufficiently | 09:58:38 |
| 9 | broad so that they form background. | 09:58:48 |
| 10 | Again, it's not a study in and of itself; it's | 09:58:52 |
| 11 | just information I'm using to design a study.  And I'm | 09:58:55 |
| 12 | following qualitative guidelines.  And the qualitative | 09:58:58 |
| 13 | guidelines, I don't think you're going to find that says | 09:59:02 |
| 14 | you have to have a particular set matching up -- a | 09:59:04 |
| 15 | particular set of demographics that will match up to that. | 09:59:09 |
| 16 | What you want to do is you want to hear what people have to | 09:59:12 |
| 17 | say.  You're essentially trying to sample the words and | 09:59:15 |
| 18 | phrases that people use. | 09:59:18 |
| 19 | Q.    Well, so, for example, if everyone in the sample | 09:59:19 |
| 20 | was from Boston and everyone made over $100,000 a year, and | 09:59:24 |
| 21 | everyone was white, would that be a good -- would that be a | 09:59:30 |
| 22 | good sample for your qualitative interviews? | 09:59:36 |
| 23 | MR. ILLOVSKY:  Objection to form. | 09:59:39 |
| 24 | Incomplete hypothetical. | 09:59:41 |
| 25 | A.    Yeah.  It's -- I mean you're forming a | 09:59:43 |

Highly Confidential - Attorneys' Eyes Only

Page 25

```
 1   hypothetical that's not true, for one thing.  But let me       09:59:46
 2   answer that.  And if this were a study, and it's not, if       09:59:51
 3   this were a study that I was going to try and project from,    10:00:00
 4   then I might be worried about that.  Now, what's sort of       10:00:04
 5   interesting and why I'm hesitating is because if it turns      10:00:11
 6   out that any set of characteristics are not correlated with    10:00:18
 7   the variable of interest, then in fact you can project from    10:00:21
 8   that.  But, of course, I wouldn't know that ahead of time.     10:00:24
 9        Q.   Do you know which smartphones and tablets were       10:00:30
10   represented in this group of 20?                               10:00:33
11        A.   Again, we're trying to get words and phrases.  No,   10:00:36
12   I do not.                                                      10:00:39
13        Q.   Okay.                                                10:00:40
14        A.   Well, yes, I do.  They're Samsung smartphones and    10:00:41
15   tablets.                                                       10:00:44
16        Q.   Do you know which models?                            10:00:44
17        A.   I am trying to remember, and I can probably check    10:00:47
18   on that, whether or not we tried to be rich in the actual      10:00:49
19   smartphones and tablets that are at issue in this case.        10:00:55
20   Again, it's just background, it's qualitative background       10:01:01
21   that I'm using to design -- that's going to help me design     10:01:05
22   the study.                                                     10:01:07
23        Q.   And do you know how ownership -- do you know if      10:01:08
24   ownership of a Samsung smartphone or tablet was checked for    10:01:12
25   this group of 20?  Did they bring the devices with them to     10:01:18
```

Highly Confidential - Attorneys' Eyes Only

Page 26

| | | |
|---|---|---|
| 1 | these qualitative interviews? | 10:01:22 |
| 2 | MR. ILLOVSKY:  Objection to form. | 10:01:25 |
| 3 | Compound. | 10:01:25 |
| 4 | A.   Can you ask it as two separate questions? | 10:01:28 |
| 5 | Q.   Do you know whether these 20 people brought their | 10:01:33 |
| 6 | device to these qualitative interviews? | 10:01:36 |
| 7 | A.   I do not know whether or not they brought the | 10:01:39 |
| 8 | device to the qualitative interviews. | 10:01:41 |
| 9 | Q.   Do you know if the ownership of a Samsung | 10:01:43 |
| 10 | smartphone or tablet was verified? | 10:01:47 |
| 11 | A.   Well, do you mean -- you mean when I came in here, | 10:01:53 |
| 12 | they asked for my license; did we ask to see it?  No, we | 10:01:56 |
| 13 | didn't ask to see it. | 10:02:00 |
| 14 | Q.   So they -- they told Bernett that they owned one? | 10:02:01 |
| 15 | A.   Well, they told Bernett, but given the set of | 10:02:06 |
| 16 | qualitative interviews and given that the interviewers from | 10:02:10 |
| 17 | Applied Marketing Science are asking people about their | 10:02:15 |
| 18 | smartphones, and they're Samsung, and these are Samsung | 10:02:18 |
| 19 | issues, Samsung smartphones and tablets, that question | 10:02:22 |
| 20 | wouldn't actually come up during the qualitative interview. | 10:02:27 |
| 21 | So it's highly likely that, you know, unless they | 10:02:31 |
| 22 | specifically lied to us, which is doubtful, that they did | 10:02:35 |
| 23 | in fact own Samsung smartphones or tablets. | 10:02:39 |
| 24 | Q.   Were these people compensated for these | 10:02:43 |
| 25 | interviews? | 10:02:45 |

Highly Confidential - Attorneys' Eyes Only

Page 30

1   which one to use at which point.                                    10:07:32

2         A random sample, which is an equal probability of             10:07:34

3   selection sample, says that anybody in the population has            10:07:37

4   an equal probability of being in the sample.  It's a gold            10:07:40

5   standard to which no particular method that we know of can           10:07:43

6   attain.  Internet comes about as close as we can get.                10:07:48

7         So what we look for is a representative sample,                 10:07:53

8   and a representative sample is that if I have these people,          10:07:57

9   they will act, when I ask them questions, those questions            10:08:01

10  will represent what the target population would say.  So             10:08:07

11  they would act as a surrogate for the target population.             10:08:11

12  And in the two studies that I do, I have representative              10:08:14

13  samples.                                                             10:08:18

14        Now, in a qualitative study, a qualitative study              10:08:19

15  is really best thought of as deep background.  It's not a            10:08:23

16  study in and of itself, as used in this report, and it's            10:08:27

17  providing input to the design of the questionnaire.  So as           10:08:33

18  a result, what I'm trying to do is have people who are               10:08:40

19  Samsung smartphone or tablet users, it does not have to be           10:08:44

20  randomly distributed across any demographic characteristic,          10:08:49

21  as long as, in some sense, they help me understand words             10:08:53

22  and phrases that's going to be helpful.                              10:08:58

23        If I were trying to project from the qualitative               10:09:00

24  sample, which I'm not, then I might want it to be either             10:09:03

25  representative or random.  But I'm appropriately using the           10:09:06

Highly Confidential - Attorneys' Eyes Only

Page 31

```
 1   qualitative sample.                                         10:09:09

 2       Q.   Okay.  You mentioned -- you mentioned the phrase   10:09:11

 3   "target population."  What is your target population here?   10:09:15

 4       A.   For which study?                                   10:09:19

 5       Q.   For the smartphone study.                          10:09:20

 6       A.   So we're now talking about the quantitative        10:09:23

 7   questionnaire.                                              10:09:27

 8       Q.   Well, you -- you used the phrase.  I'm just -- I   10:09:27

 9   need to understand how you meant it in what you just said.  10:09:29

10       A.   Well, I think my report's very clear.  I did two   10:09:34

11   studies.  One was a -- basically a conjoint study for       10:09:37

12   smartphones, and the other was a conjoint study for         10:09:40

13   tablets.  I then described some other things I did to make  10:09:43

14   sure that I was confident in those studies.  And are we     10:09:48

15   switching gears now and we're talking about the conjoint    10:09:51

16   study for smartphones?                                      10:09:54

17       Q.   Well, I just need to -- I just need to know how    10:09:55

18   you are defining that term, "target population," because    10:09:59

19   you used it in your last answer.                            10:10:02

20       A.   Well, the target population is -- for the conjoint 10:10:05

21   study are consumers or people who, I guess "own" is the     10:10:10

22   characteristic we use, Samsung smartphones that are at      10:10:17

23   issue in this case.                                         10:10:23

24       Q.   And what about the tablets?                        10:10:30

25       A.   The tablet study, the conjoint study, the target   10:10:34
```

Highly Confidential -  Attorneys' Eyes Only

Page  32

```
 1   population are -- is people who own Samsung tablets that        10:10:38

 2   are at issue in this case.                                      10:10:42

 3       Q.    So that the people at AMS, they're the ones who       10:10:55

 4   conducted these interviews; correct?                            10:11:02

 5       A.    Yes, that's correct.                                  10:11:04

 6       Q.    And do you know who at AMS conducted these            10:11:05

 7   interviews?                                                     10:11:08

 8       A.    Yes, I do.                                            10:11:08

 9       Q.    Can you tell me their names?                          10:11:09

10       A.    The people who conducted the qualitative             10:11:12

11   interviews, that's the ones we're talking about now?           10:11:16

12       Q.    Correct.                                              10:11:18

13       A.    Okay.  And I've already provided the spelling to     10:11:19

14   the court reporter, Elizabeth -- she just got married, so I    10:11:22

15   may not pronounce her name right -- Valaquez.  And then the    10:11:29

16   other one was Patty Yanes.                                     10:11:35

17       Q.    Do you know how to spell that last name?             10:11:41

18       A.    Yes, I do.  It is Y-a-n-e-s.                         10:11:43

19       Q.    And did Elizabeth Valaquez and Patty Yanes, did     10:11:59

20   they know that this survey -- these interviews were being      10:12:04

21   undertaken to support a report that you were going to          10:12:10

22   submit on behalf of Apple in this litigation?                  10:12:13

23       A.    This is qualitative background information.  It's    10:12:16

24   possible they knew.  I -- I don't recall.  Again, it's --      10:12:20

25   this is really just information I'm using in the background    10:12:25
```

Highly Confidential - Attorneys' Eyes Only

Page 33

```
1   to help design a survey.                                10:12:27
2       Q.   Did you tell them that it was -- it was to support   10:12:29
3   a report you were going to submit on behalf of Apple?   10:12:33
4       A.   I do not recall telling them.                  10:12:36
5       Q.   What's -- what would be the standard procedure?  10:12:38
6       A.   For qualitative interviews, it could go either  10:12:43
7   way.  There's no -- again, it's not relevant, because we're  10:12:47
8   really just trying to design a survey and understand what's  10:12:52
9   going on.  It's not a study in and of itself.           10:12:55
10      Q.   And do you know -- do you know, did they tell the  10:13:02
11  20 people in the qualitative interviews, did the people  10:13:07
12  from AMS tell the interviewees that this was to support a  10:13:11
13  report in litigation?                                   10:13:17
14      A.   I'm confident that they did not, but, again,   10:13:23
15  that's a standard procedure.                            10:13:27
16      Q.   But you don't know if they -- you don't know   10:13:28
17  whether they did or not; right?                         10:13:29
18      A.   I would be surprised if they did.              10:13:30
19      Q.   And what do you know about the -- the background  10:13:37
20  of Elizabeth Valaquez?                                  10:13:38
21      A.   Well, I know that, again, they've gone through AMS  10:13:42
22  training, that I've spoken to them a number of times;   10:13:46
23  they're well aware; they're good qualitative interviewers.  10:13:50
24  The qualification for qualitative interviewer is really  10:13:56
25  someone who can speak and can listen very carefully.  And  10:14:00
```

Highly Confidential - Attorneys' Eyes Only

Page 54

```
 1    none of those things.                                  10:44:10

 2       Q.   Yeah.   I was asking about any sort of prior   10:44:11

 3    experience that she may have had dealing specifically with  10:44:14

 4    either smartphones or tablets.  Prior to her undertaking  10:44:17

 5    this project, do you know whether she had any specific  10:44:22

 6    training in smartphones or tablets?                    10:44:25

 7       A.   Do you mean did she get a course in smartphone --  10:44:29

 8       Q.   Well, has she ever researched smartphone       10:44:32

 9    customers, tablet customers?  Had she done any of that  10:44:35

10    background work prior to this project?  Do you know?   10:44:38

11               MR. ILLOVSKY:  Objection.  Asked and        10:44:45

12            answered.                                       10:44:46

13       A.   I don't know for sure.                          10:44:47

14       Q.   Okay.  And is that the same -- would your answer  10:44:48

15    be the same as to Ms. Yanes?                            10:44:51

16       A.   I don't know for sure.                          10:44:57

17       Q.   Okay.  And did you deal directly with Ms. Valaquez  10:44:58

18    on this project?                                        10:45:11

19       A.   Well, did I speak to them, yes.                 10:45:16

20       Q.   Okay.  Do you remember about how often you spoke  10:45:18

21    to Ms. Valaquez about this project?  Was it daily?     10:45:24

22       A.   Daily?  It certainly wasn't daily.              10:45:30

23       Q.   Okay.  Do you remember about how many           10:45:33

24    conversations you had with her about this project?     10:45:33

25       A.   No.                                             10:45:36
```

Highly Confidential - Attorneys' Eyes Only

Page 55

```
 1     Q.   Is it more than 50?                         10:45:37

 2     A.   No, it wasn't more than 50.                 10:45:41

 3     Q.   Was it fewer than ten?                      10:45:42

 4     A.   You know, it's the ballpark of that, maybe. 10:45:46

 5     Q.   Okay.                                       10:45:50

 6     A.   But, again, bright lines, more than ten, less than  10:45:50

 7  ten, that's a hard answer for me to give.           10:45:53

 8     Q.   Okay.  And were these telephone conversations?  10:45:56

 9     A.   Yes, they were telephone.                   10:45:59

10     Q.   They were all telephone conversations?      10:46:00

11     A.   Oh, I'm trying to remember.  I do remember some of  10:46:06

12  the AMS people coming to my office once, but I don't  10:46:21

13  remember whether Elizabeth or Patty were -- were involved  10:46:25

14  in that visit.                                      10:46:30

15     Q.   Was that visit about this case?             10:46:31

16     A.   Yes.                                        10:46:33

17     Q.   Okay.  So you -- you don't know if -- you don't  10:46:34

18  know if that was about the in-depth interviews; right?  It  10:46:40

19  could have been about the pretest; it could have been about  10:46:46

20  the study?                                          10:46:49

21          MR. ILLOVSKY:  Objection to form.           10:46:50

22     A.   The visit was as part of the design of the  10:46:53

23  questionnaire.                                      10:46:56

24     Q.   Do you remember anything specifically that you  10:47:07

25  discussed with Ms. Valaquez in these conversations that you  10:47:10
```

Highly Confidential - Attorneys' Eyes Only

Page 56

1    had with her?                                                10:47:14

2        A.   Well, we discussed what she's learning, how people  10:47:17

3    describe smartphones, and, you know, as developing the       10:47:24

4    questionnaire, are these features the type of features that  10:47:35

5    people can understand the phrasing of; are they the type of  10:47:39

6    features that people mentioned as being important, or at     10:47:42

7    least, you know, part of their overall decision making.      10:47:45

8        Q.   So did she ever -- did she ever write you a memo    10:47:58

9    or any other -- did she put this ever down like in an        10:48:01

10   e-mail or some sort of document that she sent you?           10:48:06

11            MR. ILLOVSKY:  Objection to form.                   10:48:12

12        Compound.                                               10:48:13

13       Q.   Did she ever do it that way?                        10:48:13

14       A.   Not that I recall.                                  10:48:15

15       Q.   Okay.  So all your communications with her about    10:48:16

16   the in-depth interviews, they were oral?                     10:48:20

17       A.   To the best of my recollection, they were oral.     10:48:22

18       Q.   Okay.  And would that be the same for Patty Yanes?  10:48:24

19       A.   Yes, that would be correct.                         10:48:29

20            I'm -- as you know, I have a cold.  I was           10:48:32

21   wondering if at some point we could have a break.            10:48:34

22            MR. GALVIN:  We can take a break                    10:48:37

23        right now if you want.                                  10:48:38

24            THE WITNESS:  Okay.                                 10:48:39

25            THE VIDEOGRAPHER:  Going off the                    10:48:39

Highly Confidential - Attorneys' Eyes Only

Page 57

```
1            record.  The time is 10:48.                    10:48:40

2                 (Recess.)                                 10:48:42

3                 THE VIDEOGRAPHER:  We're back on the      10:57:35

4            record.  The time is 10:57.                    10:58:04

5    BY MR. GALVIN:                                         10:58:07

6        Q.  Dr. Hauser, earlier you mentioned that a firm  10:58:10

7    called Bernett selected the 20 people for the in-depth 10:58:13

8    interviews; correct?                                   10:58:18

9        A.  Well, I mean they provide a sample, and AMS then 10:58:22

10   selected them.                                         10:58:26

11       Q.  They -- they provided -- so did they provide --  10:58:26

12   did they offer AMS a pool larger than 20, and then AMS 10:58:30

13   selected 20 from that larger pool?                     10:58:36

14       A.  I don't recall.  But they -- chances are they  10:58:38

15   would provide names, and AMS would then call.  And, you 10:58:43

16   know, you can't always reach everybody.  So it would be a 10:58:47

17   broader set of names.                                  10:58:50

18       Q.  Okay.  So would it be standard to just then select 10:58:51

19   the 20 people, the first 20 people that AMS was able to 10:59:02

20   reach?                                                 10:59:07

21                 MR. ILLOVSKY:  Objection to form,        10:59:08

22            vague.                                         10:59:09

23       A.  Well, this is a set of people who are smartphone 10:59:10

24   users that Bernett has either pre-recruited or part of 10:59:13

25   their panel, and AMS is trying to do qualitative       10:59:20
```

Highly Confidential - Attorneys' Eyes Only

Page 71

1    time they were reasonably complete.                          11:20:31

2          But we began to discover that we wanted a better        11:20:35

3    way.  And so we looked into a lot of different methods.  We   11:20:39

4    looked into procedures where you say these two are most      11:20:44

5    similar; this is -- which one of the three things, which is  11:20:49

6    dissimilar.  We looked into open-ended interviews.  We       11:20:54

7    looked into a lot of different ways of getting this          11:20:57

8    information.                                                 11:21:00

9          And, I remember, she's now a chaired professor at      11:21:01

10   Utah, Professor Abbie Griffin and I basically undertook a    11:21:09

11   study, and also Steve Gaskin, who's at Applied Marketing     11:21:14

12   Science now, another one of my students, we -- we tried a    11:21:19

13   number of different methods.  And I don't want to bore you   11:21:22

14   with all the various methods.  But the ones we found most    11:21:26

15   useful were the open-ended, qualitative, voice of the        11:21:29

16   customers type interviews.  And we were somewhat surprised   11:21:34

17   at the time that 10 to 20 were sufficient.  And we           11:21:39

18   published this.  And, you know, a lot of mathematics along   11:21:42

19   with it.  And we've been using it ever since.                11:21:46

20         And, of course, over time, you know, as we train       11:21:48

21   people at AMS, they get very good at asking the questions.   11:21:51

22   But I found that by doing open-ended interviews, it really   11:21:55

23   helps me design a good conjoint analysis questionnaire.  It  11:22:00

24   also helps me design perceptual mapping questionnaires; it   11:22:03

25   helps me design other questionnaires.  I -- I would tend     11:22:08

Highly Confidential - Attorneys' Eyes Only

Page  72

1    probably not to do a market research study unless I had,                    11:22:10

2    you know, previous -- was just repeating a questionnaire                    11:22:16

3    without qualitative interviews, but there are other                         11:22:19

4    researchers who have other ways of finding out information                  11:22:21

5    that will help them write a questionnaire.                                  11:22:25

6        Q.   Do you know if -- do you know whether Ms. Valaquez                 11:22:32

7    took notes during these interviews?                                         11:22:38

8        A.   I don't think she did.  It's -- it's very                          11:22:42

9    interesting, and, again, we tried this.  It's not that                      11:22:47

10   it's -- it's not without some thought.  If I take notes,                    11:22:50

11   and I see you're taking notes as I'm -- as you're talking                   11:22:58

12   to me, although right now you're staring at me, and, you                    11:23:02

13   know, you're trying to listen to every word I say and take                  11:23:06

14   it in.  We want the interviewers to be able to listen very                  11:23:09

15   carefully to consumers.  If they're taking notes, this                      11:23:14

16   distracts them.  It also somehow stops the rapport.  And we                 11:23:18

17   want this to be a conversation back and forth.                              11:23:24

18        So we want the interviewers to really concentrate                      11:23:26

19   on the interviewee and probe back and forth.  They're                       11:23:30

20   trying to get to the point where they understand what's                     11:23:35

21   going on.  They pass that along to me.  That helps me make                  11:23:38

22   the decisions for the questionnaire.  It's -- as I've said                  11:23:43

23   earlier, it's neither necessary nor sufficient.  It's                       11:23:48

24   another input into the design of the questionnaire.                         11:23:52

25       Q.   Okay.  So you've mentioned that they passed it                     11:23:57

Highly Confidential - Attorneys' Eyes Only

Page  73

1    along.  They -- do you have any idea, after they completed          11:24:01

2    the interview -- let's just take -- let's just take the             11:24:07

3    very first interview that Ms. Valaquez conducted, the first         11:24:11

4    in-depth interview she conducted.                                   11:24:18

5        A.   Okay.                                                      11:24:19

6        Q.   Do you have any understanding as to how much time         11:24:20

7    passed from when that interview concluded until when Ms.            11:24:22

8    Valaquez told you about that first in-depth interview?              11:24:27

9        A.   Well, you're creating something -- the way you've          11:24:34

10   described it is not how it happened.                                11:24:40

11       Q.   Okay.  Tell me, you can --                                 11:24:41

12       A.   So the way you've described it, you said, "Here's          11:24:43

13   an interview," she tells me everything about the interview.         11:24:46

14   No.  I think I've made it pretty clear throughout this              11:24:48

15   whole process that it's -- these interviews build upon one          11:24:53

16   another.  And during this process, you know, they're trying         11:24:58

17   to get this deep understanding, and then they brief me.             11:25:02

18       Q.   At the end of all of the 20 interviews?                    11:25:05

19       A.   At the end of the -- well, if I'm unhappy with the         11:25:08

20   briefing, I'll have them go do more, of course.  But -- but         11:25:11

21   I was happy at this point, and I felt that they -- they             11:25:15

22   gave me a sufficient number of attributes that seemed to            11:25:18

23   make sense; they had good face validity; they checked out          11:25:21

24   with respect to websites.  You know, all the things that go         11:25:25

25   into having this distraction attributes into the conjoint          11:25:27

Highly Confidential - Attorneys' Eyes Only

Page  74

1    analysis.                                                    11:25:32

2         So they served their purpose, I was very               11:25:32

3    comfortable with their purpose, and I think the             11:25:34

4    interviews -- the qualitative interviews were one of the    11:25:37

5    many inputs to designing that questionnaire.                11:25:42

6         Q.   Okay.  I think you mentioned earlier that it's    11:25:45

7    your understanding that the qualitative interviews occurred 11:25:47

8    over a span of two weeks; correct?                          11:25:51

9         A.   I -- I think what I said, and I'm not sure, you   11:25:54

10   know.  I -- I don't know exactly how long, the ballpark of  11:25:57

11   two weeks.  But I -- I don't know.                          11:26:04

12        Q.   Okay.  Why did you say two weeks, or how is       11:26:05

13   that -- why did you -- why did you say two weeks?  What --   11:26:09

14   what's the basis of that understanding?                     11:26:12

15        A.   That's roughly how long it takes to do 20         11:26:16

16   interviews.                                                 11:26:18

17        Q.   Do you know whether after -- after an interview   11:26:19

18   was conducted, the interviewer made notes for themselves    11:26:26

19   about what happened in that particular interview?           11:26:34

20        A.   I don't know for sure.  I'd be surprised if they  11:26:41

21   did, but I don't know for sure.                             11:26:43

22        Q.   Why would -- why would that surprise you?         11:26:49

23        A.   Well, what the interviewer is trying to do is, you 11:26:52

24   know, they're trying to build this -- this understanding;   11:26:55

25   and, you know, at some point they're going to come and say, 11:26:58

Highly Confidential - Attorneys' Eyes Only

Page  75

| | | |
|---|---|---|
| 1 | "Okay, here are a set of features, Dr. Hauser."  And, you | 11:27:01 |
| 2 | know, I'll start writing them down, and, you know, with | 11:27:09 |
| 3 | some help, obviously, I listen to them, they're | 11:27:11 |
| 4 | professionals, and then we'll try to create some levels | 11:27:14 |
| 5 | that make sense.  And, of course, you know, my own | 11:27:17 |
| 6 | expertise in kind of knowing how to write questions, also, | 11:27:22 |
| 7 | you know, looking at the Internet and seeing what else is | 11:27:26 |
| 8 | out there.  All these things go into that design. | 11:27:30 |
| 9 | Ultimately I do a study.  And the study stands on | 11:27:32 |
| 10 | its own.  And I think probably the best way to think about | 11:27:38 |
| 11 | it is if I wrote down attributes that were poorly phrased, | 11:27:42 |
| 12 | then we would pick it up in the pretest.  And that would | 11:27:47 |
| 13 | just waste time and money.  So I don't want to do that.  I | 11:27:51 |
| 14 | want to get that -- that right.  Also, if I wrote down | 11:27:55 |
| 15 | attributes that were unimportant, then we would pick that | 11:27:58 |
| 16 | up in the conjoint analysis. | 11:28:01 |
| 17 | So the study -- again, some people, conjoint | 11:28:03 |
| 18 | analysis, just write down the attributes, and then they | 11:28:09 |
| 19 | rely on the pretests and the conjoint analysis itself to | 11:28:12 |
| 20 | pick up these things.  That's not the way I like to do it. | 11:28:16 |
| 21 | I like to start by having an understanding of the market, | 11:28:19 |
| 22 | or at least an understanding of the words and phrases of | 11:28:22 |
| 23 | the consumers in the market. | 11:28:27 |
| 24 | Q.   So let's -- let's -- let's assume that you're | 11:28:31 |
| 25 | right, that the in-depth interview process took two weeks. | 11:28:33 |

Highly Confidential - Attorneys' Eyes Only

Page 79

```
 1     A.    If we take a look at my --                     11:33:28

 2           MR. ILLOVSKY:  Wait.  Wait.                     11:33:30

 3           Objection to form.  Vague.                      11:33:31

 4     A.    Okay.  If we look at page 6, paragraph 7, of my 11:33:41

 5    expert report, which is Exhibit 1, "I was asked by counsel  11:33:51

 6    for plaintiff to design and conduct two surveys, one for   11:33:57

 7    smartphones and one for tablets, to determine the price    11:34:02

 8    premium," et cetera.                                  11:34:04

 9           I -- that's -- those studies were not done by  11:34:05

10    interviewers.  Those studies were Internet studies.   11:34:09

11     Q.    In Exhibit -- what's been marked as Exhibit 13, so  11:34:13

12    do you read -- do you read this section as only pertaining  11:34:21

13    to the actual survey conducted in the conjoint study?  11:34:27

14     A.    The qualitative interviews weren't -- were     11:34:36

15    background to help me design the study.  This is not --    11:34:38

16    this particular paragraph is -- she's stating it for  11:34:43

17    surveys, okay, not for qualitative interviews.  Again, the  11:34:48

18    qualitative interviews are not part of my survey.     11:34:53

19     Q.    But --                                         11:34:57

20     A.    You're reading her -- you're reading her       11:34:59

21    statements out of context.                            11:35:02

22     Q.    The qualitative interviews are not part of your  11:35:03

23    study?                                                11:35:06

24     A.    The qualitative --                             11:35:07

25           MR. ILLOVSKY:  Objection.  Misstates           11:35:08
```

Highly Confidential - Attorneys' Eyes Only

Page 80

| | | |
|---|---|---|
| 1 | the prior testimony. | 11:35:10 |
| 2 | A.   Okay.  The qualitative interviews helped me design | 11:35:12 |
| 3 | the studies that I -- I did.  They were neither necessary | 11:35:16 |
| 4 | nor sufficient.  They were background that helped me write | 11:35:20 |
| 5 | a survey. | 11:35:23 |
| 6 | Q.   So, in that sense, aren't they involved in your | 11:35:24 |
| 7 | study? | 11:35:29 |
| 8 | MR. ILLOVSKY:  Objection to form. | 11:35:30 |
| 9 | Argumentative, vague. | 11:35:32 |
| 10 | A.   Yeah.  You -- I mean, again, let's -- let's be | 11:35:34 |
| 11 | very clear what we have.  We have some things that were | 11:35:36 |
| 12 | done that were background, and then we have a study.  Okay. | 11:35:39 |
| 13 | The study is 100 percent reproducible.  You've been | 11:35:42 |
| 14 | providing -- provided all the materials.  The study is the | 11:35:46 |
| 15 | Internet study.  And that's what you can work -- work from. | 11:35:50 |
| 16 | You can -- you can pretest it yourself.  You can analyze | 11:35:57 |
| 17 | our data.  You know, you can have new respondents respond | 11:36:01 |
| 18 | to it.  So it's entirely testable.  And I understand that, | 11:36:04 |
| 19 | I've been certainly instructed -- I've given instructions | 11:36:11 |
| 20 | that everything related to the study has been provided. | 11:36:13 |
| 21 | Now, there were things, information, you know, | 11:36:17 |
| 22 | that helped me write the study, write the questionnaire, | 11:36:19 |
| 23 | and that's background.  And, yeah, that's -- you know, I've | 11:36:23 |
| 24 | described those to you. | 11:36:27 |
| 25 | Q.   So isn't it -- isn't it fair to say that one of | 11:36:36 |

Highly Confidential - Attorneys' Eyes Only

Page 81

| | | |
|---|---|---|
| 1 | the steps in this particular study involved interviews? | 11:36:39 |
| 2 | A.   There were -- | 11:36:47 |
| 3 | MR. ILLOVSKY:  Well, wait a minute. | 11:36:48 |
| 4 | Objection to form.  Vague. | 11:36:49 |
| 5 | Go ahead. | 11:36:51 |
| 6 | A.   Okay.  There were 455 conjoint analysis interviews | 11:36:52 |
| 7 | for the smartphone, and there were 415 conjoint analysis | 11:37:00 |
| 8 | interviews for the tablet study.  So, yes, there were | 11:37:04 |
| 9 | interviews. | 11:37:09 |
| 10 | Q.   And what about the -- and weren't there 20 | 11:37:09 |
| 11 | qualitative interviews and 20 pretest interviews? | 11:37:12 |
| 12 | A.   There were 20 qualitative interviews that were | 11:37:16 |
| 13 | part of helping me design the study, and there were 20 | 11:37:22 |
| 14 | pretest interviews to help me decide that the study in fact | 11:37:25 |
| 15 | was legible, but they're not the study per se. | 11:37:29 |
| 16 | Q.   It's not the study per se, but the interviews -- | 11:37:44 |
| 17 | the interviews, those were -- weren't those part of the -- | 11:37:50 |
| 18 | weren't those part of the survey because they formed the | 11:37:56 |
| 19 | basis of the survey? | 11:37:58 |
| 20 | MR. ILLOVSKY:  Objection to form. | 11:38:01 |
| 21 | It's argumentative, mischaracterizes the | 11:38:03 |
| 22 | prior testimony. | 11:38:05 |
| 23 | A.   They were neither necessary nor sufficient.  They | 11:38:11 |
| 24 | helped me design the study.  They are not -- | 11:38:14 |
| 25 | MR. ILLOVSKY:  Is that the study or | 11:38:17 |

Highly Confidential - Attorneys' Eyes Only

Page 162

```
1       A.   Oh, God, I'm trying to remember this.  I'm trying       14:33:45

2   to remember whether it's within the 16, within the 4, or        14:33:51

3   within the total.  I'd have to go look that up again to be      14:33:55

4   sure.                                                           14:33:59

5       Q.   Okay.                                                   14:34:00

6       A.   But basically what we're trying to do is you can       14:34:02

7   see the opposite, that if I had, say, a particular level        14:34:06

8   appearing with another features level a lot, that could         14:34:11

9   make my design inefficient, or if I had the levels not          14:34:17

10  balanced essentially across people and across attributes,       14:34:22

11  that also could lead to inefficiencies.                         14:34:26

12       So there's an algorithm -- again, I can look up            14:34:30

13  the details of it -- that tells me how to level balance it.     14:34:33

14  And I think we've -- someplace in here, we've given the         14:34:38

15  Sawtooth CVC technical paper reference, and you can just        14:34:41

16  look it up yourself as well.  But I'm trying to remember        14:34:47

17  the details of what level balancing does.                       14:34:49

18       I can say, though, that we did post-test the               14:34:52

19  design, and the design is 100 percent efficient.  So it         14:34:55

20  worked.                                                         14:35:01

21       Q.   Within each -- for each respondent, do you know       14:35:10

22  how many -- how many -- were all 64 hypothetical products       14:35:14

23  they were shown, were those all different?                      14:35:21

24       A.   No, no, no.  They're randomly chosen, right,          14:35:26

25  subject to these criterion -- criteria.                         14:35:29
```

Highly Confidential - Attorneys' Eyes Only

Page 163

```
 1      Q.   So do you know how many different hypothetical        14:35:32

 2   products a respondent saw?                                     14:35:35

 3      A.   No.  But we can get that from the data.                14:35:39

 4      Q.   They -- they were generated randomly for -- for        14:35:44

 5   each respondent?                                               14:35:47

 6      A.   Each time we hit a choice task subject to these        14:35:49

 7   criterion -- criteria, they in fact are randomly generated,    14:35:52

 8   yes.                                                           14:35:57

 9      Q.   Okay.  So we did, what was that, we came up with       14:35:57

10   that number of like 4,000 or something --                      14:36:05

11      A.   Well, that's the total number of possible --           14:36:07

12      Q.   Configurations?                                        14:36:14

13      A.   -- configurations, right.  That's just taking 4 to     14:36:15

14   the 7th, which is 2 to the 14th.                               14:36:21

15      Q.   Okay.  So that the standard method of -- of level      14:36:26

16   balancing, that's contained within the Sawtooth software;      14:36:29

17   is that what you said?                                         14:36:32

18      A.   Yes, it is.                                            14:36:33

19      Q.   Okay.  All right.  Let's now go on to pretesting,      14:36:35

20   and you talk about that starting at paragraph 42 of your       14:36:40

21   report, which is on page 23.                                   14:36:43

22      A.   Yes.                                                   14:36:51

23      Q.   So how do pretests -- you say that you removed or      14:36:51

24   minimized pretest help to assess the potential for and         14:36:55

25   remove or minimize demand artifacts and to ensure that all     14:37:02
```

Highly Confidential - Attorneys' Eyes Only

Page 164

```
1    survey questions were understood as intended.  So how do        14:37:06

2    pretests reduce demand artifacts?                               14:37:10

3        A.   Well, if we identify them and we rephrase so that      14:37:13

4    they're not there.                                              14:37:18

5        Q.   And how do you identify them?                          14:37:21

6        A.   Well, as the -- these are -- these are serious         14:37:25

7    pretests.  When -- as the interviewer is going through,         14:37:30

8    they will ask at the end of completing the survey questions     14:37:33

9    such as "What was the purpose of the survey?"  You know,        14:37:36

10   "Did the survey indicate to you that you should answer one      14:37:41

11   way or the other?"  It depends upon the actual interviewer,     14:37:48

12   but we -- we want -- people naturally are going to say,         14:37:51

13   "Yes, this feature was about making choices among              14:37:54

14   smartphones," or it might say that, you know, "You varied a    14:37:58

15   number of features, and you made me make a choice."  They      14:38:03

16   may be even smart enough to say, "You want to figure out       14:38:06

17   how much I want to pay for these features."  That's rare,      14:38:09

18   but they may do that.                                          14:38:13

19        What we don't want is we don't want them to               14:38:15

20   realize that we're focusing on the touchscreen feature.  We    14:38:18

21   don't want them to say, "Oh, this is for litigation."  We      14:38:21

22   don't want them to say, "Oh, this is being done to get a       14:38:23

23   high number" or a low number or whatever.  And as long as      14:38:31

24   they sort of say a general statement, because, you know,       14:38:36

25   they are -- they are smart people, by and large, you know,     14:38:38
```

Highly Confidential - Attorneys' Eyes Only

Page 165

```
1    that's okay.                                              14:38:43

2          But if there is a demand artifact there, then I'll  14:38:44

3    go back, and I'll rewrite the survey in such a way that we 14:38:48

4    get rid of that demand artifact.  And, you know, then we'd 14:38:52

5    have to do some more pretests where we continue on.  We    14:38:57

6    didn't see any demand artifacts, but we did do a demand    14:39:01

7    artifact test, and we did it explicitly.                   14:39:04

8          Q.   The -- you know, the website printouts that we  14:39:08

9    looked at, they didn't -- none of them, you know, mentioned 14:39:11

10   touchscreen reliability.  So do you think it's possible     14:39:16

11   that by asking them about touchscreen reliability, you      14:39:19

12   focussed them on that feature?                              14:39:22

13         A.   This definitely is something that the pretests are 14:39:24

14   looking for.  If they said, "Now, this is about touchscreen  14:39:28

15   reliability," we would have said, "Okay, we need to          14:39:32

16   disguise it further," and that did not come up.              14:39:35

17         Q.   That didn't come up in any of the 20 people that  14:39:37

18   you talked to?                                               14:39:40

19         A.   That's right.                                     14:39:42

20         Q.   Okay.  Who -- where did you get these 20 people?  14:39:44

21         A.   It's also from Bernett.                           14:39:48

22         Q.   These aren't the same people?                     14:39:50

23         A.   Of course not.                                    14:39:52

24         Q.   And as with the -- the 20 people that Bernett got 14:39:55

25   to -- got for AMS to interview in the -- the in-depth        14:40:03
```

Highly Confidential - Attorneys' Eyes Only

Page 166

```
 1    interview, the qualitative portion, do you know anything        14:40:10

 2    about the demographics of these 20 people?                      14:40:15

 3        A.   Okay.  Are we going to spend another two hours on      14:40:18

 4    this?  These are a set of, again, qualitative pretests.  No     14:40:21

 5    one, if they understand survey research, would expect the       14:40:30

 6    pretest to be matching up to any vector of demographics.        14:40:33

 7    That would be incorrect and would -- would suggest a            14:40:36

 8    person's not an expert.  In fact, what you want to do is        14:40:39

 9    you want to have some women, some men, some old, some           14:40:44

10    young, you know, basically to seeing how human beings react     14:40:49

11    to the survey, and that's what we did.  So pretty much all      14:40:54

12    the answers I gave this morning for qualitative interviews      14:40:58

13    apply to the pretests.                                          14:41:01

14        Q.   So are -- what -- what -- what population are          14:41:03

15    these 20 people representative of?                              14:41:07

16        A.   In general, human beings.  But they are definitely    14:41:14

17    Samsung smartphone -- English speakers, English speaking.      14:41:19

18    In general they are smartphone -- Samsung smartphone or        14:41:27

19    Samsung tablet users.                                          14:41:30

20        Q.   You know that for sure?                               14:41:39

21        A.   That was to be the recruit, yeah.                     14:41:41

22        Q.   And did you -- did you have -- did you direct         14:41:46

23    Bernett personally in the selection of the 20 people to        14:41:51

24    participate in the pretest?                                     14:41:56

25        A.   Well, I think all the answers I gave this morning     14:42:00
```

Highly Confidential - Attorneys' Eyes Only

Page 189

```
 1       A.   I'm testifying -- I'm sorry -- hesitating.        15:22:51

 2   Responsible -- I mean there's a clerical function here     15:22:55

 3   which is typing changes in.  And that may have been done by 15:22:59

 4   the technical person at Applied Marketing Science.  I can   15:23:05

 5   give -- give you his name, if you'd like.  And --          15:23:08

 6       Q.   How were those changes conveyed to the technical  15:23:12

 7   person at Applied Marketing Science?                       15:23:16

 8       A.   Well, recall that I'm talking to my development   15:23:19

 9   team during this process.  My development team includes    15:23:22

10   Jason and Patty.  It also includes their supervisors, Steve 15:23:27

11   Gaskin and Shelley Schussheim, both of which I've given you 15:23:32

12   the spelling of.  And usually it's a conference call.  You  15:23:36

13   know, they'll call, we'll talk about it.  And there are     15:23:43

14   changes that I'll recommend.  And then they'll make the     15:23:50

15   changes to the survey.  Again, there's a clerical step      15:23:53

16   where the programming actually makes those changes.  And    15:24:00

17   then the pretest continues.                                 15:24:03

18       Q.   What are some of the changes that you remember     15:24:16

19   occurring in the survey besides what's -- besides what's on 15:24:20

20   the -- the summary of changes?  Is there anything else you  15:24:24

21   recall that -- other ways that the survey changed?  Do you  15:24:29

22   recall anything else?                                       15:24:39

23       A.   I -- the -- I think Exhibit 9, Exhibit H, is a     15:24:39

24   good description of the changes or things we learned.  And  15:24:48

25   obviously this was reflected in word -- wording changes.    15:24:52
```

Highly Confidential - Attorneys' Eyes Only

Page 190

1    But, you know, there's only one survey that I used to          15:24:57

2    collect data, and that's the survey in the end.  So it's       15:25:01

3    not as if we are collecting data, analyzing data, changing     15:25:05

4    the data, in -- in a way that will favor one party or the      15:25:10

5    other.  We're just not doing that.  We were just worried at    15:25:14

6    this point as to whether or not the questions are              15:25:17

7    understandable.                                                15:25:19

8        Q.   Okay.  And after -- after, you said, about two        15:25:24

9    weeks and, you know, multiple changes, you were satisfied      15:25:29

10   that the -- the questionnaire was easy to understand;          15:25:34

11   right?                                                         15:25:34

12       A.   This is what was reported to me, that people now      15:25:38

13   understand the question well, they're not picking up any       15:25:42

14   demand artifacts, and they're actually asking, doing probes    15:25:46

15   for them, that respondents can answer the question.  And so    15:25:48

16   now -- now we start the study.  Everything up to this point    15:25:52

17   has been designing the study.  And now I, let's say, pull      15:25:57

18   the trigger on the study, and now we're actually going to      15:26:02

19   start collecting data.                                         15:26:05

20           It better have been right at that point.  And it       15:26:09

21   was right.  We got very high completion rates.  They're in     15:26:12

22   the high 90s or at least mid to high 90s.  So people           15:26:19

23   completed the survey once they started it.  We've good         15:26:24

24   internal validity.  So this process worked.  We got a          15:26:27

25   good -- we were able to field a study.  It's the study         15:26:32

Highly Confidential - Attorneys' Eyes Only

Page 191

```
 1   that's important.  The stuff before that is just the means        15:26:35
 2   by which the study was designed.                                  15:26:37
 3       Q.   Okay.  Let's talk about the -- let's talk about          15:26:39
 4   the sample, and that's beginning in paragraph number 48 in        15:26:43
 5   what's been marked as Exhibit 1.  One characteristic of the       15:26:48
 6   sample was a willingness to participate in research               15:26:56
 7   surveys; right?                                                   15:27:02
 8       A.   This is a panel, correct.                                15:27:05
 9       Q.   So is there any bias associated with willingness         15:27:08
10   to participate in surveys?                                        15:27:12
11       A.   You know, we've been -- I remember basically when        15:27:14
12   I was research director at NSF Center, we were -- we were         15:27:21
13   worried about this early on, that suddenly the modality of        15:27:28
14   the Internet was coming in, a lot of product development          15:27:35
15   research was going to the internet, and it was fairly new,        15:27:38
16   and we did worry about it early on.  And we did some              15:27:42
17   validity tests; they -- they seemed to be fine.                   15:27:45
18        What's happened at this point in 2012 is these               15:27:48
19   Internet panels are very well managed, and it is true that        15:27:52
20   they are opt-in panels.  And if you think about it,               15:27:59
21   absolutely every market research you do is opt-in.  So, but       15:28:04
22   we don't have any evidence that the Internet panels, which        15:28:13
23   are opt-in panels, are causing any bias.  And, to the             15:28:15
24   contrary, we've got some pretty good evidence that they           15:28:21
25   work well.                                                        15:28:24
```

Highly Confidential - Attorneys' Eyes Only

Page 272

1  PLEASE ATTACH TO THE DEPOSITION OF JOHN HAUSER

2  CASE:  APPLE INC. VS. SAMSUNG ELECTRONICS CO., LTD., ET AL

3  DATE TAKEN:  APRIL 27, 2012

4                      ERRATA SHEET

5  Please refer to Page 272 for Errata Sheet instructions and

6  distribution instructions.

7  PAGE  LINE CHANGE          REASON

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15      I have read the foregoing transcript of my

16 deposition, and except for any corrections or changes noted

17 above, I hereby subscribe to the transcript as an accurate

18 record of the statements made by me.

19

20      Executed this _____ day of _____, 2012.

21

22                      _____

                        JOHN HAUSER

23

24

25

Highly Confidential - Attorneys' Eyes Only

Page  273

1  COMMONWEALTH OF MASSACHUSETTS                    SUFFOLK, SS.

2

3          I, JAMES A. SCALLY, RMR, CRR, a Certified
Shorthand Reporter and Notary Public duly commissioned and
4  qualified in and for the Commonwealth of Massachusetts, do
hereby certify that there came before me on the 27th day of
5  April, 2012, at 9:31 a.m., the person hereinbefore named,
JOHN HAUSER, who provided satisfactory evidence of
6  identification as prescribed by Executive Order 455 (03-13)
issued by the Governor of the Commonwealth of
7  Massachusetts, was by me duly sworn to testify to the truth
and nothing but the truth of his knowledge concerning the
8  matters in controversy in this cause; that he was thereupon
examined upon his oath, and his examination reduced to
9  typewriting under my direction; and that this is a true
record of the testimony given by the witness to the best of
10  my ability.

          I further certify that I am neither
11  attorney or counsel for, nor related to or employed by, any
of the parties to the action in which this deposition is
12  taken, and further, that I am not a relative or employee of
any attorney or counsel employed by the parties hereto or
13  financially interested in the action.

14  Dated: April 28th, 2012.

15          My Commission Expires:  April 23, 2015

16

17

18          _____

          James A. Scally, RMR, CRR
19          CSR/Notary Public

20

21

22

23

24

25

| | | |
|---|---|---|
| 1 | Name of Case: | *Apple Inc. v. Samsung Electronics Co., Ltd., et al.*, Case No. 11-cv-1846 LHK |
| 2 | Date of deposition: | April 27, 2012 |
| 3 | Name of witness: | John Hauser |

Reason Codes:

    1.    To clarify the record.
    2.    To conform to the facts.
    3.    To correct transcription errors.

| Page | Line | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 13 | 20 | "so essentially getting information on both." | "so talking to them you are essentially getting information on both." | 1 |
| 17 | 17 | "to be in any match to the" | "to match the" | 1 |
| 23 | 13 | "point I don't" | "point – I don't" | 3 |
| 24 | 13 | "find that says" | "find guidelines that say" | 1 |
| 29 | 9–10 | "drawn from the education." | "drawn based on education." | 1 |
| 30 | 22 | "phrases that's" | "phrases – that's" | 1 |
| 31 | 22 | "characteristic" | "characterization" | 3 |
| 34 | 15 | "talk about actually break" | "actually talk about during breaks" | 1 |
| 43 | 3 | "that it's not atypical" | "it's not atypical to ask" | 1 |
| 46 | 7 | "qualitative" | "quantitative" | 3 |
| 56 | 3 | "as developing" | "as we are developing" | 1 |
| 66 | 9 | "are we" | "have we" | 3 |
| 70 | 8 | "Internets" | "the Internet" | 3 |
| 71 | 16 | "customers" | "customer" | 3 |
| 73 | 25 | "this" | "these" | 3 |
| 80 | 20 | "that…has been" | "for…to be" | 1 |
| 89 | 19 | "a – them" | "respondents" | 1 |
| 91 | 23 | "cancels an" | "cancels" | 3 |
| 93 | 19 | "ATT" | "AT&T" | 3 |
| 97 | 6 | "exemplars" | "examples" | 3 |
| 102 | 16, 17 | "importances" | "importance" | 3 |
| 105 | 11 | "a footnote" | "the footnote" | 3 |
| 110 | 20 | "responding" | "respondent" | 3 |
| 115 | 24 | "ulcers, about" | "ulcers, 2, about" | 1 |

| 120 | 16 | "time and to" | "time to" | 3 |
|---|---|---|---|---|
| 120 | 17 | "answer the time" | "ahead of time" | 1 |
| 135 | 12 | "them, pretty much" | "them, we get pretty much" | 1 |
| 135 | 17 | "it – taking" | "it – paying" | 3 |
| 141 | 9 | "4,000" | "16,000" | 2 |
| 141 | 12 | "4096" | "16,384" | 2 |
| 141 | 14 | "4,096" | "16,384" | 2 |
| 152 | 2 | "directions" | "descriptions" | 3 |
| 154 | 21 | "HTMI" | "HDMI" | 3 |
| 162 | 8 | "features" | "feature's" | 3 |
| 165 | 5 | "where we" | "before we" | 3 |
| 166 | 10 | "to seeing" | "to see" | 3 |
| 166 | 21 | "was to be the" | "was required to be a" | 1 |
| 169 | 19 | "use the" | "use" | 1 |
| 172 | 22 | "testing the" | "testing over the" | 1 |
| 177 | 8 | "got somewhat" | "got a somewhat" | 3 |
| 180 | 4 | "you sort of animate" | "you animate" | 1 |
| 185 | 23 | "professional – if you had an interviewer to respondent" | "professional interviewers" | 1 |
| 196 | 17 | "age, no difference" | "age, re-weighting makes no difference" | 1 |
| 212 | 22 | "but I" | "but – I" | 3 |
| 213 | 9 | "complete" | "completed" | 3 |
| 229 | 13 | "are not tied" | "are tied" | 3 |
| 232 | 19 | "intuitous" | "intuitive" | 3 |
| 233 | 6 | "that's that" | "that's the" | 3 |
| 248 | 3 | "pays" | "pay figures" | 1 |
| 248 | 17 | "at as that changes price," | "at, as price changes," | 1 |
| 250 | 16 | "be to" | "be" | 3 |
| 255 | 16 | "convergent" | "robustness" | 3 |
| 256 | 24 | "are" | "is" | 3 |
| 264 | 7 | "variants" | "variables" | 3 |
| 266 | 13 | "also student" | "also a student" | 3 |

Dated: May 29 , 2012

_____
JOHN HAUSER