QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Cal. Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Cal. Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Michael T. Zeller (Cal. Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | CASE NO. 11-cv-01846-LHK |
| Plaintiff, | **SAMSUNG'S OPPOSITION TO APPLE INC.'S MOTION TO EXCLUDE TESTIMONY OF SAMSUNG'S EXPERTS** |
| vs. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | **Date: June 21, 2012**<br>**Time: 1:30 pm**<br>**Place: Courtroom 8, 4th Floor**<br>**Judge: Hon. Lucy H. Koh** |
| Defendants. | **FILED UNDER SEAL** |

02198.51855/4786308.1

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.      INTRODUCTION............................................................................................. 1

II.     THERE IS NO BASIS TO EXCLUDE THE OPINIONS OF ITAY SHERMAN.............. 1

        A.      Mr. Sherman Meets The Qualification Requirements Of Rule 702........................ 1

                1.      Mr. Sherman's Decades Of Experience With The Design Of
                        Telecommunication Devices Qualifies Him As Someone With
                        Ordinary Skill In The Art ....................................................................... 1

                2.      Mr. Sherman Is Qualified To Opine On The Impressions Of The
                        Ordinary Observer ................................................................................... 4

        B.      Mr. Sherman Applied the Proper Legal Tests to His Analyses ............................ 5

III.    SAM LUCENTE'S OPINIONS ARE RELEVANT AND ADMISSIBLE ........................ 7

        A.      Mr. Lucente's Obviousness Opinion Is Consistent With Governing Law............... 8

        B.      Mr. Lucente Applied The Correct Legal Standards For Similarity And
                Distinctiveness ........................................................................................ 9

        C.      Mr. Lucente's Opinion that Apple's Design Patents and Trade Dress are
                Invalid as "Functional" Should Be Admitted.......................................... 10

        D.      Mr. Lucente's Non-Infringement Analysis Should Be Admitted .......................... 11

IV.     THE TESTIMONY OF DR. MARK LEHTO IS RELEVANT AND ADMISSIBLE....... 12

V.      THE OPINIONS OF NICHOLAS GODICI AS ADMISSIBLE ................................... 13

        A.      Nicholas Godici is Qualified to Offer Expert Opinions on PTO Procedures.......... 13

        B.      Apple's Substantive Challenges Are Also Misguided ............................................ 16

VI.     APPLE'S CHALLENGES TO SAMSUNG'S SURVEY EXPERTS LACK MERIT....... 17

        A.      Expert George Mantis' Tablet Survey Is Relevant And Probative ........................ 17

        B.      Dr. Michael Mazis' Survey Is Reliable And Relevant To Show Lack Of
                Fame ............................................................................................... 19

        C.      Dr. Michael Kamins Conducted A Valid And Reliable Study Discrediting
                Apple's Expert.................................................................................... 19

VII.    MICHAEL WAGNER'S OPINIONS ARE ADMISSIBLE............................................. 21

A.    Mr. Wagner's Apportionment of Profits for Design Patents Is Appropriate. ......... 21

B.    Mr. Wagner Correctly Applied the *Panduit* Test. ..................................................... 21

C.    Apple's Attacks on Mr. Wagner's Apportionment Methodology Are
Meritless. ............................................................................................................... 22

**OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF SAMSUNG'S EXPERTS**

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*American Greetings Corp. v. Dan-Dee Imports, Inc.*,
    619 F. Supp. 1204 (D.N.J. 1985), *modified on other grounds*,
    807 F.2d 1136 (3d Cir. 1986)..................................................................18

*Amini Innovation Corp. v. Anthony California, Inc.*,
    439 F.3d 1365 (Fed. Cir. 2006).............................................................6, 11

*Art Attacks Ink, LLC v. MGA Entertainment Inc.*,
    581 F.3d 1138 (9th Cir. 2009)................................................................9, 10

*Au-Tomotive Gold, Inc. v. Volkswagon of America, Inc.*,
    457 F.3d 1062 (9th Cir. 2006)..............................................................11, 13

*Bausch & Lomb, Inc. v. Alcon Laboratories, Inc.*,
    79 F. Supp. 2d 252 (W.D.N.Y. 2000) ...................................................15, 16

*Black & Decker (U.S.) v. Pro-Tech Power, Inc.*,
    26 F. Supp. 2d 834 (E.D. Va. 1998).......................................................3, 4

*C. Van Der Lely N. V. v. F. Lli Maschio, S.n.c.*,
    221 U.S.P.Q. 34 (S.D. Ohio 1983) ............................................................15

*Cameco Indus., Inc. v. Louisiana Cane Mfg.*,
    No. 92-3158, 1995 WL 468234 (E.D. La. July 27, 1995)...........................16

*In re Certain Liquid Crystal Display Devices, Inv. 337-TA-631*,
    2008 WL 4682821 (Aug. 7, 2008) ............................................................15

*Chef'n Corp. v. Trudeau Corp.*,
    No. C08-01135 MJP, 2009 U.S. dist. LEXIS 47013, at *5...........................4

*Corning Inc. v. SRU Biosystems, No. Civ. A 03-0633*,
    2005 WL 2465900 (D. Del. Oct. 5, 2005)....................................................5

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009) ................................................................21

*Degelman Industries Ltd. v. Pro-Tech Welding and Fabrication*,
    2011 WL 6752565 (W.D.N.Y. Dec. 23, 2011) ..........................................15

*Durling v. Spectrum Furniture Co.*,
    101 F.3d 100 (Fed. Cir. 1996) ...................................................................8

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
    543 F.3d 665 (Fed. Cir. 2008).....................................................................8

*Five Star Manufacturing, Inc. v. Ramp-Lite Manufacturing, Inc.*,
    4 Fed. Appx. 922, 2001 WL 120070 (Fed. Cir. Feb. 12, 2001) ...............12

*Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*,
   2010 WL 3075318 (N.D. Ga. 2010)..................................................................................15

*Fortune Dynamic v. Victoria's Secret Stores Brand*,
   618 F.3d 1025 (9th Cir. 2010).........................................................................17, 19, 20

*Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*,
   988 F. Supp. 322 (S.D.N.Y. 1997)...................................................................................18

*Gormin Co. v. White*,
   81 U.S. 511 (1871) ...............................................................................................................4

*Hangarter v. Provident Life & Accident Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004)..............................................................................................1

*Jada Toys, Inc. v. Mattel, Inc.*,
   518 F.3d 628 (9th Cir. 2008)............................................................................................18

*Keystone Retaining Wall Systems, Inc. v. Rockwood Retaining Wall, Inc.*,
   Civ. No. 00-496 (RHK/SRN), 2001 U.S. Dis. LEXIS 26272 (D. Minn. Oct. 9, 2001) ..............4

*LA Gear, Inc. v. Thom McAn Shoe Co.*,
   988 F.2d 117 (Fed. Cir. 1993) ............................................................................................8

*Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*,
   199 F.3d 1009 (9th Cir. 1999)...........................................................................7, 11, 13

*Lemelson v. General Mills, Inc.*,
   No. 77-4558, 1987 WL 26134 (N. D. Ill. Dec. 1, 1987) .........................................15

*Liquid Dynamics Corp. v. Vaughan Co.*,
   449 F.3d 1209 (Fed. Cir. 2006) .........................................................................................7

*PHG Techs, LLC v. St. John Cos.*,
   469 F.3d 1361 (Fed. Cir. 2006) .......................................................................................10

*Philip M. Adams & Associates, LLC v. Winbond Electronics Corp.*,
   2010 WL 3791970 (D. Utah Sep. 21, 2010) ...............................................................15

*Power Controls Corp. v. Hybrinetics, Inc.*,
   806 F.2d 234 (Fed. Cir. 1986)...................................................................................6, 13

*Read Corp. v. Portec, Inc.*,
   970 F.2d 816 (Fed. Cir. 1992) .........................................................................................11

*Reiffen v. Microsoft Corp.*,
   270 F. Supp. 2d 1132 (N.D. Cal. 2003) ........................................................................15

*Revlon Consumer Prods. Corp. v. L'Oreal S.A.*,
   No. 96-192, 1997 WL 158281 (D. Del. Mar. 27, 1997) ............................................15

*Richardson v. Stanley Works, Inc.*,
   597 F.3d 1288 (Fed. Cir. 2010) .............................................................................6, 10, 13

*SEB S.A. v. Montgomery Ward & Co., Inc.*,
    594 F.3d 1360 (Fed. Cir. 2010), *aff'd sub nom. Global-Tech Appliances, Inc. v. SEB S.A.*,
    131 S. Ct. 2060, 179 L. Ed. 2d 1167 (2011) ..................................................................3

*Sansion Hosery Mills, Inc. v. Warren Knitting Mills, Inc.*,
    202 F.2d 395 (3d Cir. 1953).............................................................................................14

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
    309 U.S. 390 (1940)........................................................................................................23

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.*,
    932 F.2d 1453 (Fed. Cir. 1991).......................................................................................21

*Slip Track Sys., Inc. v. Metal-Lite, Inc.*,
    304 F.3d 1256 (Fed. Cir. 2002)........................................................................................2

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
    550 F.3d 1356 (Fed. Cir. 2008)..................................................................................3, 15

*THOIP v. Walt Disney Co.*,
    690 F. Supp. 2d 218 (S.D.N.Y. 2010) ............................................................................20

*Tone Bros., Inc. v. Sysco Corp.*,
    1992 WL 200128 (S.D. Iowa Mar. 1993) ......................................................................14

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
    532 U.S. 23 (2001)....................................................................................................11, 13

*Trilogy Comms., Inc. v. Times Fiber Comms., Inc.*,
    109 F.3d 739 (Fed. Cir. 1997).........................................................................................22

*Truckstop.net LLC v. Sprint Comms. Co.*,
    537 F. Supp. 2d 1126 (D. Idaho 2008)............................................................................22

*United States v. Davis*,
    471 F.3d 783 (7th Cir. 2006)...........................................................................................14

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
    529 U.S. 205 (2000)..........................................................................................................9


### Rules and Statutes

15 U.S.C. § 1125(a)....................................................................................................................18

15 U.S.C. § 1125(c)(2)(A)(iii) ...................................................................................................19

35 U.S.C. § 171 ...........................................................................................................................6

37 C.F.R. 1.152 ..........................................................................................................................16

H. R. Rep. No. 1966 at 3 (1886), reprinted in 18 Cong. Rec. 834 (1887) ................................21

Fed. R. Evid. 702..........................................................................................................................1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

In moving to exclude the testimony of eight of Samsung's expert witnesses, Apple repeatedly mischaracterizes the legal standards that apply to Apple's claims, as well as the experts' qualifications and the bases for their opinions   Apple also simply ignores the sections of the experts' reports that show that the experts applied the correct law to the evidence in this case in reaching their opinions.   At most, the issues Apple raises with respect to these experts go to the weight of the opinions, not their admissibility, and should be dealt with in cross-examination.

### II.     THERE IS NO BASIS TO EXCLUDE THE OPINIONS OF ITAY SHERMAN

#### A.     Mr. Sherman Meets The Qualification Requirements Of Rule 702

Under Fed. R. Evid. 702, a witness is "qualified as an expert by knowledge, skill, experience, training, or education."   This provision "contemplates a broad conception of expert qualification," with an expert needing only a "minimal foundation of knowledge, skill, and experience."   *Hangarter v. Provident Life & Accident Ins. Co*., 373 F.3d 998, 1016 (9th Cir. 2004).

##### 1.     Mr. Sherman's Decades Of Experience With The Design Of Telecommunication Devices Qualifies Him As Someone With Ordinary Skill In The Art

Apple's challenge to Mr. Sherman's qualifications as a designer of ordinary skill in the art rests on a self-serving definition of expertise and its selective reading of Mr. Sherman's qualifications.   Mr. Sherman holds a bachelor's degree with honors in electrical engineering and a masters degree with honors in biomedical engineering.   (Dkt. No. 940-3, Ex. 1 (Filed Under Seal), Sherman Report, at 1).   He has more than 20 years experience in the telecommunications industry, the last ten of which have been spent working on mobile device technology and products. (*See* Declaration of Itay Sherman ("Sherman Decl."), Dkt No. 172, ¶ 6).   He previously served as the Chief Technology Officer for Texas Instruments Mobile Connectivity Group, where he developed components for mobile handsets and worked with mobile device manufacturers to develop technological solutions in light of design constraints.   (*See* Dkt. No. 940-3, Ex. 1 (Filed Under Seal) at 1).

1    Mr. Sherman also served for three years as the Chief Technology Officer for modu Ltd, a

2  manufacturer of mobile telephones and accessories.   (*Id.*)   As modu's CTO, Mr. Sherman

3  worked on and oversaw the industrial design, mechanical design, and technology of modu's

4  products.   (*Id*. at 1-2).   His role required understanding the technologies and components

5  available for handset design and manufacture.   (Dkt. No. 172, ¶ 10).   Mr. Sherman's position as

6  CTO also required that he analyze size and placement limitations, define parameters for the

7  achievable dimensions of different designs, and study competing handsets to understand design

8  tradeoffs.   *Id*.   Mr. Sherman was responsible for obtaining all of modu's handset design patents

9  and other intellectual property registrations.   (*See* Dkt. No. 940-3, Ex. 1 (Filed Under Seal) at 2).

10  Since leaving modu, Mr. Sherman has served as a consultant to companies that design products for

11  the mobile market and a lecturer on handset technology.

12    Mr. Sherman's education and experience fully answers any questions Apple has raised

13  regarding his qualifications.[1]   First, consistent with the standards generally outlined by Samsung's

14  non-infringement expert Robert Anders, Mr. Sherman holds an undergraduate degree in

15  engineering[2] and has far more than 1-2 years of experience in designing electronic devices.[3]

16  Apple mischaracterizes Mr. Sherman's experience as limited to managing industrial designers

---

[1]   Indeed, Apple previously asked this Court to block Mr. Sherman's access to evidence in this case precisely *because* his work is so closely tied to the technology at issue in this case.   (*See*, Dkt. No. 502-08 (Apple's Opposition to Samsung's Motion to Permit Samsung's Expert Itay Sherman to Review Design Materials Designated Under the Protective Order) at 1-7).   In that brief, Apple admitted that Mr. Sherman "provides recent and ongoing consulting services to Apple's competitors regarding the same technology that is at issue in this case."   (*Id.* at 7).

[2]   The Federal Circuit has confirmed that holding a particular degree is not required for one to be of ordinary skill in the art and relevant industry experience will suffice.   *See Slip Track Sys., Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1266-67 (Fed. Cir. 2002) (rejecting argument that witnesses with years of construction experience needed formal engineering degrees in order to be skilled in the art of withstanding seismic forces).

[3]   Apple's motion incorrectly paraphrases Mr. Anders' definition, which reads as follows: "In my opinion, a person of ordinary skill in the art or a designer of ordinary skill in the art is a designer of ordinary capabilities in the field of the design of consumer, commercial or industrial products.   It is my opinion that such a person would have at least an undergraduate degree in engineering or industrial design, and about 1-2 years of experience in designing electronic devices. Alternatively, a designer in academia who conducted research of the interface of products to people and taught industrial design students the design of electronic devices would also be identified as a designer skilled in the art."   (Dkt. No. 940-7, Expert Report of Robert Anders, at 15).

**OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF SAMSUNG'S EXPERTS**

working on mobile devices.   (Mot. at 4.)   Even if this inaccurate summary of Mr. Sherman's experience were true, Apple provides no reason why that experience would not provide a sufficient foundation for Mr. Sherman's opinions.   Indeed, Apple never challenged on appeal this Court's earlier decision to credit Mr. Sherman's testimony at the preliminary injunction stage that it would have been obvious to a designer of ordinary skill in the art to combine the elements disclosed in the prior art to arrive at a design that would be substantially similar to the D'889 patent.   *See* Docket No. 449 at 43-44.

Mr. Sherman determined that the relevant art for purposes of his analysis is the design of electronic devices, including those with displays.   (*Id.*)   While Apple argues this standard is too low so as to be "meaningless," it is fully consistent with the design patents at issue, which claim a design for an "electronic device" with a display, as well as the relevant prior art.   (*See* Martin Decl., Exs. A-C (D'889, D'677, and D'087 patents).)   Mr. Sherman's two decades of experience with mobile devices that were actually commercially produced more than qualify him as one of "ordinary skill."

Apple's challenge is not supported by the authorities it cites.   In *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356 (Fed. Cir. 2008), the district court admitted testimony from a patent law expert who "had no experience whatsoever" in the pertinent field of designing "tarps or covers."   *Id.* at 1361-62.   Because of the witness' complete lack of experience in the pertinent field, the Federal Circuit found that the district court abused its discretion in permitting the witness to testify on the issues of noninfringement and invalidity.   *Id.* at 1362.   *See SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1373 (Fed. Cir. 2010), *aff'd sub nom. Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 179 L. Ed. 2d 1167 (2011) (*Sundance* concerned "the unusual situation" of a patent lawyer offering a substantive technical opinion even though he had no relevant technical experience at all in the field).   Mr. Sherman is not a patent lawyer opining on technical matters.   He is an engineer, with decades of experience working with mobile devices, opining on the similarities and differences in the design of mobile devices.

Apple's reliance on *Black & Decker (U.S.) v. Pro-Tech Power, Inc.*, 26 F. Supp. 2d 834 (E.D. Va. 1998) is also misguided.   Contrary to Apple's misleading summary of the case (Mot. at

**OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF SAMSUNG'S EXPERTS**

5:7-9), the reason the court discounted that expert's opinion was not that he had insufficient background as an industrial designer, but that he lacked experience as a designer of the products at issue, power tools, and instead had worked on fitness products.   26 F. Supp. 2d at 848.   Unlike that expert, Mr. Sherman has years of experience with the design of the products at issue.

### 2.   Mr. Sherman Is Qualified To Opine On The Impressions Of The Ordinary Observer

Apple's challenge to Mr. Sherman's qualifications to testify regarding the ordinary observer again ignores Mr. Sherman's experience in the mobile phone industry.   As the CTO of two different companies that were active in the mobile device market, Mr. Sherman became familiar with factors that drive consumer choice based on his studies of competing mobile devices, and was actively involved in discussions with leading U.S. cellular carriers.   (*See* Dkt. No. 940-3, Ex. 1 (Filed Under Seal) 2).   This experience qualifies Mr. Sherman to opine regarding the ordinary observer.   *See, e.g., Gormin Co. v. White*, 81 U.S. 511, 530 (1871) (taking into account testimony by persons experienced in trade that customers would find accused design substantially the same as patented design).   Indeed, Apple itself has asserted that its own expert Cooper Woodring is qualified to opine on the views of the ordinary observer even though he never worked in the mobile phone or tablet industry "based on his many years of experience in designing consumer products and observing and studying consumer behavior in purchasing consumer electronics."   (Dkt. No. 234-01 at 15.)   Having set the bar so low, Apple cannot contend Mr. Sherman does not pass muster.

The cases cited by Apple are inapposite.   One involved a patent attorney attempting to opine on infringement in an area (retaining wall block design) in which he had no expertise. *Keystone Retaining Wall Systems, Inc. v. Rockwood Retaining Wall, Inc.*, Civ. No. 00-496 (RHK/SRN), 2001 U.S. Dis. LEXIS 26272, at *19 (D. Minn. Oct. 9, 2001).   In the other, the court concluded that expert testimony on ordinary observers' thoughts and perceptions would not assist the trier of fact.   *Chef'n Corp. v. Trudeau Corp.*, No. C08-01135 MJP, 2009 U.S. dist. LEXIS 47013, at *5.   While the court in *Chef'n Corp* also found the expert declarations to lack a sufficient foundation, "because there is no evidence that the opinions are based on consumer

-4-                          Case No. 11-cv-01846-LHK
**OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF SAMSUNG'S EXPERTS**

1   surveys or interviews[,]", nothing in the opinion suggests that this is the only foundation that

2   would have sufficed, and, as noted above, Mr. Sherman has ample foundation for his opinions.

3           **B.**        <u>**Mr. Sherman Applied the Proper Legal Tests to His Analyses**</u>

4           Mr. Sherman's report properly identified the governing legal standards and applied those

5   to the facts of the case.   There is no requirement that an expert repeatedly recite the same tests

6   throughout the report, and any discrepancy that might exist (and there are none) would at best

7   affect the weight of his opinion.   *See Corning Inc. v. SRU Biosystems,* No. Civ. A 03-0633, 2005

8   WL 2465900, at *1 (D. Del. Oct. 5, 2005) (denying motion to exclude expert testimony based on

9   claim that expert applied wrong legal standard because any discrepancy between expert's analysis

10  and the legal standard went to weight, not admissibility, of testimony).

11          For instance, Mr. Sherman's report is not subject to exclusion because he fails to use the

12  terms "primary" or "secondary" when describing prior art references, or analyze whether those

13  references were "basically the same" as the asserted design patents.   (Mot. at 6).   Mr. Sherman

14  identified the correct legal standards for anticipation and obviousness, which governed his

15  invalidity analyses, including the requirement that a prior art reference create "substantially the

16  same" visual impression as the patented design.   (*See* Dkt. No. 940-3, Ex. 1 (Filed Under Seal) at

17  6; Mot. at 3).   Having set forth his understanding of the proper legal standards, Mr. Sherman

18  opined that a number of prior art references shared "substantial similarity" with the patented

19  designs (*see e.g.,* Dkt. No. 940-3, Ex. 1 (Filed Under Seal) at 57, 71), and referred to those

20  invalidity concepts without repeating the governing legal standard each time.   (*Id.* at 27 (D'889 is

21  "anticipated" by prior art because the prior art "would be substantially the same in the eyes of an

22  ordinary observer."); 46 (D'677 appears "substantially the same" as JP 638 prior art reference); 59

23  (D'677 is obvious in light of the lack of any "significant" differences between it and prior art

24  reference); 67 (D'087 and JP638 designs "are not significantly different"); 71 (opining regarding

25  the "substantial similarity" between the prior art and D'087 design).)

26          Mr. Sherman's report unquestionably contains an orderly discussion of each design patent,

27  the relevant prior art, and the prior art reference(s) that anticipate the claimed design, followed by

28  an analysis of whether one of the anticipating references (*i.e.,* the primary reference), alone or in

1    combination with other references, render the patented design obvious.   (*See, e.g., id.* at 53

2    (discussing obviousness of the D'677 patent in light of the JP D1214638 patent as modified, alone

3    or in combination with other prior art references), 68 (same, D'087 patent).)   In short, Mr.

4    Sherman clearly identifies the primary reference for each patent and discusses why it would have

5    been obvious to modify that reference based on features disclosed by secondary prior art

6    references, only without some of the legal jargon.

7         Apple's challenge to Mr. Sherman's opinions on functionality suffer from a similar flaw.

8    As with obviousness and anticipation, Mr. Sherman articulates the proper legal standards in his

9    Report, and recognizes that:

10       . . . courts have articulated tests for functionality of design patents in different
         ways. One is that a design element is functional "if it is essential to the use or
11       purpose of the article or if it affects the cost or quality of the article."   Another is
         that the design is "deemed to be functional when the appearance of the claimed
12       design is 'dictated by' the use or purpose of the article."   It is my opinion that
         United States Design Patent Nos. D504,889, D618,677, D593,087 and D622,270
13       are functional under any formulation, *and I have used that understanding in
         forming my opinions in this report regarding functionality of Apple's design
14       patents*.

15   (Dkt. No. 940-3, Ex. 1 (Filed Under Seal) at 4 (emphasis added)).   These functionality standards

16   are well-founded in law,[4] and support Mr. Sherman's analysis of the functionality of the patented

17   designs on both an element-by-element basis and as a whole.   (*See id.* at 88 (overall product

18   design of the D'889 is functional); 93 ("aside from the fact that function dictates the D'677 design

19   as a whole, the key individual claimed elements of the D'677 are themselves functional"); 102

20   (similar discussion of D'087 design).)[5]   *See Power Controls Corp.,* 806 F.2d at 239 ("In

21   determining whether a design is primarily functional, the purposes of the particular elements of the

22   design necessarily must be considered.").

23   _____

24       [4]   A design patent protects only "new, original and ornamental design." 35 U.S.C. § 171.   A
         design element is functional "if it is essential to the use or purpose of a design or if it affects the
25       cost or quality of the article."   *Amini Innovation Corp. v. Anthony California, Inc.*, 439 F.3d 1365,
         1371 (Fed. Cir. 2006) (internal quotations, citation omitted).   If the patented design is primarily
26       functional rather than ornamental, the patent is invalid.   *Power Controls Corp. v. Hybrinetics,
         Inc.*, 806 F.2d 234, 239 (Fed. Cir. 1986).
27       [5]   Even if the patented designs were not invalid as functional, Mr. Sherman's functionality
         analysis would still be relevant to construing Apple's design patents, which are not entitled to
28       protection for any elements that are not "ornamental."   *See Richardson*, 597 F.3d at 1293-94.

**OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF SAMSUNG'S EXPERTS**

1    Finally, Apple makes the same argument with respect to Mr. Sherman's opinion regarding

2  the functionality of Apple's trade dress.   (Mot. at 7.)   Once again, Apple glosses over Mr.

3  Sherman's express statement that his opinion regarding the functionality of Apple's asserted trade

4  dress considers the claimed elements "taken together and individually."   (Dkt. No. 940-3, Ex. 1

5  (Filed Under Seal) at 105.)   That approach is legally appropriate.   *See Leatherman Tool Group,*

6  *Inc. v. Cooper Industries, Inc.,* 199 F.3d 1009, 1013 (9th Cir. 1999) ("Leatherman is correct that

7  trade dress must be viewed as a whole, but where the whole is nothing other than the assemblage

8  of functional parts, and where even the arrangement and combination of the parts is designed to

9  result in superior performance, it is semantic trickery to say that there is still some sort of separate

10  'overall appearance' which is nonfunctional.").

11    Mr. Sherman drafted his own report.   He is not a lawyer, so the report does not read like it

12  was prepared by one.   Nonetheless, his opinions are supported, reliable, consistent with applicable

13  precedent, and will assist the jury as trier of fact.   They should not be excluded.

14  **III.    SAM LUCENTE'S OPINIONS ARE RELEVANT AND ADMISSIBLE**

15    Apple does not challenge Sam Lucente's qualifications to testify on obviousness,

16  functionality, or non-infringement.   Nor does Apple dispute that Mr. Lucente qualifies as

17  someone of ordinary skill in the relevant art.[6]   Instead, following the pattern of nit-picking an

18  expert's failure to recite legal terminology, Apple criticizes Mr. Lucente's inability in his

19  deposition to express his opinions using the language of the case law.   But any such alleged

20  technical deficiencies go to weight of Mr. Lucente's opinions, not to their admissibility. *See*

21  *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1221 (Fed. Cir. 2006) (holding that so

22  long as expert's testimony rests on "good grounds," then any inadequacies or flaws go to the

23  weight of the evidence, not admissibility, and should be tested by the adversarial process).

24

25    [6]    Mr. Lucente has a Bachelors of Science in Design, and has worked for over thirty years as
26  an industrial designer for IBM Corporation, Netscape Corporation, and most recently Hewlett-
   Packard Corporation (HP).   At HP, he set up and headed a team of over 300 design professionals
27  who designed thousands of products including laptops, tablets, media players and mobile phones.
   Mr. Lucente also has served as a consultant for numerous other companies in the information
28  technology and consumer electronics industries.

## A.   Mr. Lucente's Obviousness Opinion Is Consistent With Governing Law

Mr. Lucente's expert opinion that Apple's two graphic user interface ("GUI") patents, D'305 and D'334, are obvious in light of the prior art should be admitted.   Apple does not dispute that Mr. Lucente accurately summarizes in his Report the law on which he relies.   (Martin Decl. Ex. D, Lucente Report, at 4-5.)   Mr. Lucente then identified a number of "Primary Obviousness References" which supported his obviousness opinions.   (*Id.* at 33-58.)   Although Mr. Lucente did not intone the mantra "basically the same overall visual impression" every time he discussed one of the primary references, he cited the correct legal standards and correctly applied them.

Apple may disagree with Mr. Lucente's choice of primary references, and is free to cross-examine him regarding the extent to which those primary references are "basically the same" as Apple's patents.   However, given the breadth of Apple's desired construction and infringement allegations, those references give the same visual impression as the two design patents, i.e. a grid arrangement of icons on a mostly solid background.   (*Id.* at 33-58.)   When combined with the secondary references Mr. Lucente identifies, these references render the claimed designs obvious.[7] Should the Court construe Apple's design patents more narrowly, as Samsung advocates, Mr. Lucente's opinions on obviousness of the D'305 and D'344 patents will reflect that construction, but his broader discussion of the prior art would remain relevant to infringement, which must be assessed in view of the prior art.   *See Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 670-71 (Fed. Cir. 2008) (en banc).

Apple's challenge to Mr. Lucente's obviousness opinion is predicated primarily on a misleading summary of Mr. Lucente's deposition testimony.   For example, one of the primary references selected by Mr. Lucente was the GUI of the LG Prada phone.   Mr. Lucente selected several screen images to show the reference in his Report.   Apple claims that Mr. Lucente applied the wrong standard simply because in his deposition he refused to isolate one of the photos as

---

[7]   If several references would have been combined by a designer of ordinary skill in the art to disclose something substantially similar to the design in the eyes of an ordinary observer, the patent is invalid as obvious. See *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 103 (Fed. Cir. 1996); *LA Gear, Inc. v. Thom McAn Shoe* Co., 988 F.2d 117, 1124 (Fed. Cir. 1993) (person skilled in the art is "presumed to have perfect knowledge of all pertinent prior art").

1   being "basically the same" as the Apple patent.   But he repeated that it was the combination of the

2   Prada's screens – in other words the GUI – that formed the basis for his opinion concerning D'305

3   and D'334, which are each entitled "Graphical User Interface For A Display Screen Or Portion

4   Thereof."   (*See* Martin Decl. Ex. E, Lucente Dep. Tr. at 42:24-43:4.) (Q:   Was there one

5   particular screen of the LG Prada that you thought was basically the same as design 305?   A:   . . .

6   to me, it was a combination of the images that made it similar . . . .).)   So when Mr. Lucente

7   replied that no single screen was basically the same, he added – in a portion of the response Apple

8   did not include – that it was 'the combination of these screens shows that it would be obvious to a

9   designer skilled in the art to . . . create what is shown in D 305."   (*Id.* at 47:2-15.)   Similarly,

10  with respect to the Japanese design patent JP226, when asked whether he had an opinion as to

11  whether it is the "basically the same as Apple's design 334" he testified that his "opinion is that

12  it's similar in the ways that I defined it."   (*Id.* at 57:23-58:6).   He added:   "So I would say I do

13  have an opinion, but I need to be articulate about which aspects of it relate to those patents to the

14  D305, D334, and D790."   (*Id.* at 58:6-9.)

15      Like Mr. Sherman, Mr. Lucente is not a lawyer.   But his Report and deposition show that

16  he accepted the proper legal tests for obviousness and applied them by selecting primary

17  references that met the legal standards.   Apple's misleading summary of Mr. Lucente's deposition

18  is no basis to exclude his opinions, and at most goes to the weight.

19      **B.   Mr. Lucente Applied The Correct Legal Standards For Similarity And Distinctiveness**

20

21      Apple argues that Mr. Lucente applied the wrong legal test for trade dress distinctiveness,

22  but, again, does not dispute that he set forth the proper legal standards in his Report.   (Dkt. No.

23  941 at 6 (citing *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000) and *Art

24  Attacks Ink, LLC v. MGA Entertainment Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009)).   The fact that

25  he only discusses certain aspects of Apple's claimed trade dress in his Report does not provide a

26  basis to exclude the opinion, given that the correct legal test was applied.   Notably, Apple does

27  not cite any of Mr. Lucente's deposition testimony to support its assertion that Mr. Lucente

28  incorrectly applied the distinctiveness test.

1     Apple's challenge to Mr. Lucente's likelihood of confusion opinion is flawed for similar

2 reasons.   Apple acknowledges that Mr. Lucente articulates the correct factors to govern his

3 analysis.   (Mot. at 9:17.)   The fact that he chooses only to discuss three of the factors "most

4 relevant to [his] experience" (Martin Decl. Ex. F, Lucente Rebuttal Report, at 47.) is not a basis to

5 exclude his opinion.   Nor is his reference to what consumers have come to expect and

6 functionality in his similarity analysis, because those variables are relevant to the strength of the

7 trade dress and, therefore, are appropriate to consider.   (*Id*. at 6 (citing *Art Attacks, supra*).)

8    ## C.   Mr. Lucente's Opinion that Apple's Design Patents and Trade Dress are Invalid as "Functional" Should Be Admitted

9

10     Apple cherry picks one word – "only" – out of one of several Federal Circuit decisions

11 referenced in Mr. Lucente's discussion of functionality in his Report, and argues that this alone

12 requires exclusion of his opinion.   (Mot. at 10.)   Not so.   As with Mr. Lucente's other opinions,

13 his Report correctly articulates the legal standard for functionality.   (Dkt. No. 941 at 3-4.

14 *See* Section II, *supra*.)   In addition to the one case Apple highlights, Mr. Lucente's Report also

15 correctly notes various additional ways in which the Federal Circuit has articulated the

16 functionality test, and confirms that in his opinion, "the Asserted Design Patents are functional

17 *under any formulation*."   (*Id*. at 4 (emphasis added).)

18     If the patented design is "primarily functional rather than ornamental, the patent is

19 invalid."   *PHG Techs, LLC v. St. John Cos.*, 469 F.3d 1361, 1366 (Fed. Cir. 2006).   Mr. Lucente

20 applies these standards to the specific functional benefit provided by the patented designs on both

21 an element-by-element basis and as a whole.   (*See* Dkt. No. 941 at 19-25).   Mr. Lucente also

22 states that "functionality is not only relevant to determining whether a design patent is invalid, but

23 also to the appropriate claim construction of the patent because "it would indeed be improper to

24 allow" "a claim scope that includes . . . utilitarian elements."   (Dkt. No. 941 at 4 (citing

25 *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1294 (Fed. Cir. 2010).)   Thus, even if the

26 asserted design patents are not found to be "primarily functional" such that they are invalid, the

27 functionality of their respective elements is relevant to both claim construction and the

28 infringement assessment that compares the construed claim to the accused products.

**OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF SAMSUNG'S EXPERTS**

1    Apple's argument that Mr. Lucente improperly ignored the existence of alternative designs

2    as proposed by Apple's expert Susan Kare (Mot. at 10.) is untenable.   The existence of alternative

3    designs cannot negate utilitarian functionality.   *See Au-Tomotive Gold, Inc. v. Volkswagon of*

4    *America, Inc.*, 457 F.3d 1062, 1072 n.8 (9th Cir. 2006); *TrafFix Devices, Inc. v. Marketing*

5    *Displays, Inc.*, 532 U.S. 23, 33-34 (2001) ("There is no need, furthermore, to engage…in

6    speculation as to other design possibilities").   Further, Ms. Kare laid no foundation that the

7    "alternatives" she identified were actually viable.   Indeed, she admitted in deposition that ████

8    ███████████████████████████████████████████████████████████████████████████

9    ██████████. (*See* Martin Decl. Ex. G, Kare Dep. Tr. at 129:24 – 130:2; 135:18-136:6).

10    Mr. Lucente's opinion regarding the functionality of the entirety of Apple's trade dress

11    based on the combination of merely functional elements is also appropriate.   When the whole

12    trade dress is an assemblage of functional parts, as is the case with Apple's asserted trade dress,

13    then there is no separate "overall appearance" that is non-functional.   *See Leatherman Tool,*

14    *supra.*   This determination can only be made by first breaking down the elements of the claimed

15    trade dress and evaluating the functionality of each.   That is exactly what Mr. Lucente did.

16    **D.    Mr. Lucente's Non-Infringement Analysis Should Be Admitted**

17    Neither of the two arguments Apple makes provides a basis to exclude Mr. Lucente's non-

18    infringement opinion.   First, Mr. Lucente can speak to the ordinary observer's impressions.

19    Indeed, he conducted and reviewed consumer research while at IBM and HP regarding how

20    ordinary observers, i.e., consumers, perceive designs of mobile devices.   (Martin Decl. Ex. E at

21    64:5 – 66:13.)   Second, Mr. Lucente properly excluded from his infringement analysis all of the

22    functional elements of Apple's design patents, which is precisely what the case law requires. *Read*

23    *Corp. v. Portec, Inc.*, 970 F.2d 816, 825 (Fed. Cir. 1992) ("If a design includes both functional and

24    ornamental features, infringement occurs if an ordinary person "would be deceived by reason of

25    the common features in the claimed and accused designs which are ornamental."); *Amini*

26    *Innovation Corp. v. Anthony Cal. Inc.*, 439, F.3d 1365, 1372 (Fed. Cir. 2006).   Thus, Mr.

27    Lucente's well-founded and helpful opinions should be admitted.

28

**OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF SAMSUNG'S EXPERTS**

# IV.   THE TESTIMONY OF DR. MARK LEHTO IS RELEVANT AND ADMISSIBLE

Apple does not challenge Dr. Lehto's qualifications, and for good reason:   Dr. Lehto has twenty-five years of experience in the discipline of human factors and ergonomics.   He is a tenured professor at Purdue University in this field and he has authored numerous publications on the subject, including the widely used text "Human Factors and Ergonomics for Engineers." (Dkt. No. 940-9, Lehto Report, pp. 1-2; Martin Decl. Ex. H, Lehto Report, Exs. A and B). Contrary to Apple's criticisms, (Mot. at 12.), Dr. Lehto's opinions are supported by a host of publications from the relevant literature, all of which are cited throughout his report.   (*See* Dkt. No. 940-9 at 5-6, 8, 11-14, 17-19, 22-26, 30, 33-34.)

There is no basis for Apple's claim that Dr. Lehto failed to apply the proper legal test for functionality.   As Apple acknowledges, Dr. Lehto articulated in his Report the "dictated by function" test that Apple contends should govern the inquiry.   (Mot. at 12.)   He also sets forth the standard articulated by the Federal Circuit that a design element is functional if it "is essential to the use or purpose of the article or if it affects the cost or quality of the article" and he states that his conclusions regarding the functionality of the various design patents hold true "however the functionality inquiry is framed."   (Dkt. No. 940-9 at 3.)   Even if Apple were correct that, in response to its repeated deposition questioning on the supposedly proper definition of the legal standard, Dr. Lehto articulated the standard eight different ways using his own language, that alleged fault is irrelevant; Dr. Lehto is not an expert on the law.   His Report confirms he applied the correct law.

There also is no merit to Apple's claim that Dr. Lehto looked only at individual elements and failed to consider whether the "overall design" is functional.   As his report makes clear, Dr. Lehto considered the functionality of both the individual design features of the asserted patents *and* the designs as a whole.   (*See, e.g.,* Dkt. No. 940-9 at 6, 24, 29, 30).   Moreover, there is nothing improper in the design patent context about Dr. Lehto's analysis of the functionality of each of the claimed elements of the design.   *See, e.g., Five Star Manufacturing, Inc. v. Ramp-Lite Manufacturing, Inc.,* 4 Fed. Appx. 922, 2001 WL 120070, at *1 (Fed. Cir. Feb. 12, 2001) (functionality of each element of a patented design is relevant).   Indeed, assessing the

1  functionality of each design element is a necessary for the appropriate claim construction that will

2  inform both obviousness and infringement analyses.   When a design contains both ornamental

3  and function aspects, the Court must factor out the functional elements because the patentee "is

4  entitled to a design patent whose scope is limited to those [ornamental] aspects alone and does not

5  extend to any functional elements of the claimed article."   *Richardson, supra*.   Moreover, as

6  discussed above, analysis of each element is also appropriate for assessing the functionality of

7  trade dress.   *Leatherman Tool, supra*.

8          Apple also wrongly asserts that Dr. Lehto did not consider evidence of alternative designs

9  in his analysis.   He testified that he did (Martin Decl. Ex. I, Lehto Dep. Tr. at 43:2-14) and that

10  they did not affect his opinion.   (*Id*. at 150:1-9.)   Even if he had not, that would not render his

11  testimony irrelevant or invalid.   Dr. Lehto's testimony addresses the purpose of each element of

12  the designs at issue from a human factors/ergonomics point of view, which is highly relevant to

13  the question of functionality.   *See Power Controls, supra.*

14          Discussion of alternative designs also is not necessary to make his report relevant to

15  Apple's trade dress claims.   Once a trade dress feature has been found to be essential to the use or

16  purpose of the article *or* to affect its cost or quality, "the inquiry is over—the feature is functional

17  and not protected,"  *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.,* 457 F.3d 1062, 1072

18  (9th Cir. 2006), and there is no need to "proceed further to consider if there is a competitive

19  necessity for the feature" or "engage ... in speculation about other design possibilities."   *TrafFix

20  Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 33-34 (2001) (citations omitted).

21          In sum, Dr. Lehto's testimony is relevant to the functionality of Apple's design patents and

22  trade dress and should be presented to the jury.   Apple's arguments are based on an inaccurate

23  presentation of Mr. Lehto's report and testimony, and the governing legal principles.

24  **V.      THE OPINIONS OF NICHOLAS GODICI AS ADMISSIBLE**

25          **A.      Nicholas Godici is Qualified to Offer Expert Opinions on PTO Procedures**

26          Nicholas Godici will opine on specific points of PTO procedure.   Among other things, he

27  will opine that for the USPTO to issue two patents concerning a given type of device, a patent

28  issued later in time must claim "something new and different as compared to" a patent issued

**OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF SAMSUNG'S EXPERTS**

1   earlier in time; otherwise the USPTO will not issue the subsequent patent because it is not novel

2   when compared to the prior patent.[8]   (*See*, *e.g.*, Dkt. No. 940-10, Godici Report, at ¶¶ 31-33.)   He

3   will also explain that applicants seeking a patent must in good faith declare to the USPTO that

4   their design is "new and different" instead of being subsumed in a prior design patent.   (*Id.* at

5   ¶ 38.)   He will also testify about the procedures established at the PTO for processing design

6   patent applications, focusing on the use of broken lines. (*Id.* at ¶¶ 84-95.)

7           There is no merit to Apple's assertion that Mr. Godici is not qualified to speak to these

8   issues.   Mr. Godici was an employee of the United States Patent and Trademark Office ("PTO")

9   for almost 33 years from June 1972 to March 2005, starting out as a primary examiner and

10  ultimately serving as the Commissioner of the PTO for five years.   (Dkt. No. 167-1, Godici Decl.

11  in Support of Samsung's Opposition to Apple's Motion for a Preliminary Injunction, Ex. 1 at 1-2.)

12  Mr. Godici also served as the Acting Under Secretary of Commerce for Intellectual Property and

13  Director of the USPTO from January to December 2001 and, in 2009, at the request of the

14  Secretary of Commerce, Mr. Godici accepted a temporary assignment at the USPTO as an expert

15  advisor to the Secretary and Acting Under Secretary, prior to Senate confirmation of the new

16  Under Secretary nominated by the President.   (Dkt. No. 940-10 at 3.)   Mr. Godici is an expert on

17  the rules, practices, and procedures before the PTO, including those related to the examination and

18  prosecution of utility and design patent applications.   *See e.g., United States v. Davis*, 471 F.3d

19  783, 789 (7th Cir. 2006) ("Experts are permitted to testify regarding how their government agency

20  applies rules as long as the testimony does not incorrectly state the law or opine on certain

21

22

---

23      [8]   Apple challenges the relevance of this opinion, arguing that subsequent patents cannot
24  inform the construction of earlier ones.   (Mot. at 16.)   As explained below, Mr. Godici is not
    opining on the construction of Apple's patents, only on the novelty requirement as applied by the
25  PTO, when prior patents cover the same designs.   But in any event, the one case Apple cites,
    *Tone Bros., Inc. v. Sysco Corp.*, 1992 WL 200128 (S.D. Iowa Mar. 1993), has been vacated by the
26  Federal Circuit, and relied on a Third Circuit opinion, *Sansion Hosery Mills, Inc. v. Warren
    Knitting Mills, Inc.*, 202 F.2d 395 (3d Cir. 1953), that, without providing any authority, simply
27  asserted "we deem of no importance that [the inventor] perhaps out of an abundance of caution
    obtained another patent apparently quite similar to the one before us."   202 F.2d at 397.   *Tone
28  Bros* does not affect the admissibility of Mr. Godici's opinions.

**OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF SAMSUNG'S EXPERTS**

1  ultimate legal issues in the case.").   Mr. Godici has served as an expert witness in thirty-six

2  matters other cases in the past four years.   (Dkt. No. 167-2, Godici Decl., Ex. 2 at 1-2.)

3          Courts routinely allow expert testimony regarding PTO procedures in patent cases,[9] and

4  have in fact admitted Mr. Godici's testimony on this topic.   For example, in *Philip M. Adams &*

5  *Associates, LLC v. Winbond Electronics Corp.*, 2010 WL 3791970 (D. Utah Sep. 21, 2010), the

6  Court noted Mr. Godici's "over 30 years experience in the patent field, including serving as the

7  Commissioner of the United States Patent and Trademark Office ('USPTO') from 2000 to

8  2005[,]" and allowed him to testify on "USPTO policies and procedures, the rules and procedural

9  requirements governing the filing and prosecution of patent applications in the USPTO and the

10  grant of U.S. patents by the USPTO, the duty of candor and good faith and disclosure that those

11  substantively involved in the preparation and prosecution of a patent application owe to the

12  USPTO, and the requirements for establishing equitable conduct."   2010 WL 3791970, at *1, *3.

13  Similarly, in *Degelman Industries Ltd. v. Pro-Tech Welding and Fabrication*, 2011 WL 6752565

14  (W.D.N.Y. Dec. 23, 2011), the court allowed Mr. Godici to "testify with respect to practice and

15  procedure before the PTO . . . .").[10]

16

17  _____

18  [9]   *E.g.*, *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361 n.2 (Fed. Cir. 2008) ("We have no reason to doubt that Mr. Bliss – an experienced patent attorney – is qualified

19  to testify as to patent office procedure generally"); *Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*, 2010 WL 3075318, at * 2 (N.D. Ga. 2010) (allowing expert who "worked at the

20  PTO for more than thirty years" to testify on PTO procedure which is "complex and involves specialized expertise"); *Bausch & Lomb, Inc. v. Alcon Laboratories, Inc.*, 79 F. Supp. 2d 252, 255

21  (W.D.N.Y. 2000); *Reiffen v. Microsoft Corp.*, 270 F. Supp. 2d 1132, 1145-46 (N.D. Cal. 2003); *Lemelson v. General Mills, Inc.*, No. 77-4558, 1987 WL 26134 , at *2 (N.D. Ill. Dec. 1, 1987)

22  (permitting testimony of former PTO commissioner); *C. Van Der Lely N. V. v. F. Lli Maschio, S.n.c.*, 221 U.S.P.Q. 34, 39 (S.D. Ohio 1983) (overruling objection to qualifying an expert on the

23  practice and procedure of the USPTO); *Revlon Consumer Prods. Corp. v. L'Oreal S.A.*, No. 96-192, 1997 WL 158281 at *3 (D. Del. Mar. 27, 1997) (allowing testimony regarding USPTO

24  practice and procedure).
   [10]   Apple misleadingly suggests Mr. Godici's opinions were excluded in this and another case

25  for lack of relevant design patent expertise.   Mot. at 14 & n.2.   But in *Degelman*, the Court excluded Mr. Godici's opinions on obviousness, validity or inequitable conduct with respect to

26  utility patents, issues on which he is not seeking to opine here.   (Martin Decl. Ex. J, Godici Dep. Tr. at 8:2-5.)   *In re Certain Liquid Crystal Display Devices*, Inv. 337-TA-631, 2008 WL 4682821

27  (Aug. 7, 2008) is also inapposite.   In that investigation, Mr. Godici was to opine on the "omission of information material to patentability" of two utility patents.   2008 WL 4682821 at *1.   That is

28  not the same type of testimony Apple is attacking here.

1    Apple's claim that Mr. Godici lacks expertise in design patents (Mot. at 14.) is both wrong

2    and immaterial.   Mr. Godici's opinions do not require extensive experience as a design patent

3    examiner.   He is simply explaining the PTO's procedural rules and applying them to this case.

4    The vast majority of those procedural rules are identical for both design and utility patents and Mr.

5    Godici has examined over 7,000 patent applications.   (Dkt. No. 940-10 at 3, 5.)   Even with

6    respect to the isolated instances where procedures for design and utility patents differ, Mr.

7    Godici's years of supervising design patent examiners certainly qualify him to testify about the

8    procedures he required them to follow.[11]

9    **B.    Apple's Substantive Challenges Are Also Misguided**

10    Apple acknowledges that Mr. Godici does not intend to offer any opinions on what is

11    covered or not covered by Apple's design patents (Mot. at 16.), but then spends more than a page

12    arguing why he should not be allowed to do so.   Because these arguments do not address opinions

13    Mr. Godici intends to offer, they should be ignored.

14    Apple's criticisms of Mr. Godici's testimony regarding the use of broken lines in design

15    patent applications are also without merit.   Mr. Godici will testify about the procedures

16    established at the PTO for processing design patent applications containing broken lines, including

17    how the PTO applies and interprets the MPEP guidelines.   The procedures involved are the

18    PTO's procedures for an applicant to comply with 37 CFR 1.152.   Mr. Godici is qualified to

19    testify to these procedures based upon his more than 30 years at the PTO, including his tenure as

20    the Commissioner.   Clearly, this is specialized knowledge outside of the jury's experience.   If

21    Apple takes issue with particular aspects of Mr. Godici's opinions, it can raise those issues on

22    cross-examination.   They are not a proper ground to exclude the opinion.

23    _____

24    [11]   *Bausch & Lomb, Inc*, 79 F. Supp. 2d at 255 ("To the extent that Alcon intends to elicit
      testimony from Harmon concerning the general procedures involved in the patent application

25    process, such testimony may be helpful to the jury, and is therefore admissible."); *Cameco Indus.,
      Inc. v. Louisiana Cane Mfg.*, No. 92-3158, 1995 WL 468234, at *4 (E.D. La. July 27, 1995)

26    ("[P]laintiff intends to elicit testimony from its expert about the patent application process, the
      operations and functions of the patent and trademark office, and the materiality of relevant prior

27    art. [. . . .] [T]he Court finds that the proposed testimony of plaintiff's expert is relevant and that it
      would be admissible to rebut Louisiana Cane's inequitable conduct defense.").

28

1    VI.   **APPLE'S CHALLENGES TO SAMSUNG'S SURVEY EXPERTS LACK MERIT**

2          Apple's criticisms of Samsung's survey experts go to the weight of the evidence, not

3    admissibility.   *See Fortune Dynamic v. Victoria's Secret Stores Brand*, 618 F.3d 1025, 1036 (9th

4    Cir. 2010) ("technical inadequacies in a survey, including the format of the questions or the

5    manner in which it was taken, bear on the weight of the evidence, not its admissibility").

6          A.    **Expert George Mantis' Tablet Survey Is Relevant And Probative**

7          Apple claims that by asking about the product's brand name at the start of the study, Mr.

8    Mantis improperly cued respondents away from the trade dress.   (Mot. at 18.)   That is absurd.

9    The fact that so many respondents identified Samsung as the maker of its devices speaks to the

10   non-infringing nature of the Samsung product's appearance (and the prominent on-product

11   position of the Samsung trademark), not to any bias imposed by the surveying expert.   A

12   confusion survey should assess consumer reaction to a product as it appears in the marketplace,

13   which is precisely what Mr. Mantis' study did.   *See Fortune Dynamic,* 618 F.3d at 1037-38

14   (recognizing that a proper consumer confusion survey replicates "real world conditions").

15         In addition, respondents in Mr. Mantis' study were given *eight* opportunities during the

16   course of the survey to identify the source and/or affiliation of the product being tested.[12]   Thus,

17   Mr. Mantis' study went beyond simply asking respondents to identify the brand name on the

18   device.   It probed to ascertain the respondents' perceptions of any brand or corporate entity that

19

---

20         [12]   Respondents were asked (1) "What is the brand name of this phone or the name of the
21   company you think makes this phone, or don't you know?" and if "yes" then "what makes you say
     that? (Martin Decl. Ex. K, Mantis G., "Likelihood of Confusion Study," at Appendix A, p. 4.)   (2)
22   "Do you think that the company that makes this tablet computer makes any other brands, or don't
     you know?" and if "yes," then "What other brands do you think are made by that company?" (*Id.*
23   at Appendix A, p. 5.); (3) "Do you think the company that makes this tablet computer is or is not
     connected to or affiliated with any other company or brand, or don't you know?," and if "yes,"
24   then "With which other company or brand?"   (*Id*. at Appendix A, pp. 6-7); and, finally, (4) "Do
     you think that this tablet computer is or is not made with the approval or authorization of any other
25   company or brand, or don't you know?," and if "yes," then "With which other company or
     brand?" (*Id*. at Appendix A, p. 7).   Moreover, the introduction to the study told respondents to
26   "[p]lease look at this tablet computer as you would if you were purchasing it" and contained no
     directive to look for or focus on the brand name. In fact, Mr. Mantis built his study
27   conservatively, in a manner that minimized the branding, as compared to the real-world
     marketplace, where consumers encounter signage and branding around the tablet displays and
28   clearly demarcated, branded sections in stores.

1  was related to the manufacturer or that had licensed or sponsored it, giving respondents repeated

2  opportunities to identify Apple and/or its trade dress as the source—tracking the language of

3  Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

4        The authority cited by Apple on "reading tests" is inapposite.   Those surveys involved

5  either a word-matching exercise, where respondents were explicitly asked to select a particular

6  brand-named toy from a group display, *see American Greetings Corp. v. Dan-Dee Imports, Inc.*,

7  619 F. Supp. 1204, 1216 (D.N.J. 1985), *modified on other grounds*, 807 F.2d 1136 (3d Cir. 1986),

8  or a sequential presentation of stimuli in which the common element turned on a shared name.

9  *See Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*, 988 F. Supp. 322, 335 (S.D.N.Y. 1997).

10  Unlike a group or seriatim viewing where respondents were to make a specific name match, Mr.

11  Mantis' study showed respondents a single device, with no mention of brand name at the time of

12  the presentation and, only after examining the device, were respondents asked a series of open-

13  ended questions to flesh out their impressions of the stimulus.   This was not a word-association or

14  reading exercise, and "literacy levels" played no part.   (Mot. at 19.)   Mr. Mantis' survey was

15  properly formulated, provides relevant and reliable data to the issue of likely confusion, and

16  should be admitted.   *See* FRE 401, 402, 702, 703.

17        Although none of Apple's trade dress claims have yet been dismissed, Samsung

18  understands that there may be no claim of trade dress infringement as to iPhones by the time of

19  trial.   Mr. Mantis' point-of-sale confusion study as to smart phones will still be relevant to show

20  that Apple cannot satisfy the association prong of the dilution inquiry.   *Jada Toys, Inc. v. Mattel,

21  Inc.*, 518 F.3d 628, 636 (9th Cir. 2008) (consumer confusion survey is probative of consumer

22  association in dilution context).   Moreover, Mr. Mantis also conducted a point-of-sale confusion

23  study as to tablet computers, which Apple does not deny will continue to be relevant because

24  Apple has not agreed to withdraw its trade dress infringement claims as to iPad products.

25

26

27

28

1      **B.      Dr. Michael Mazis' Survey Is Reliable And Relevant To Show Lack Of Fame**

2          Even if all of Apple's trademark infringement claims relating to the icons are dismissed, all

3  but one of the icons are part of the asserted trade dress that remains at issue.   Dr. Mazis' study,

4  which tests consumers' recognition of these icons and the extent to which they associate the icons

5  with Apple, is thus relevant to the claimed fame of the alleged trade dress.   *See* 15 U.S.C. §

6  1125(c)(2)(A)(iii) (extent of actual recognition among consumers is a factor in assessing fame).

7          Apple complains that Dr. Mazis should not have asked respondents about their familiarity

8  with icons appearing on the products at issue in the case – smart phones and tablet computers –

9  because this excluded potential awareness of these icons in other contexts, such as on a desktop

10 computer.   (Mot. at 20.)   First, this criticism of Dr. Mazis' study plainly goes to the weight of the

11 evidence and not its admissibility.   *See Fortune Dynamic*, 618 F.3d at 1036.   Second, this

12 argument ignores the fact that the qualified respondents in Dr. Mazis' study were smart phone or

13 tablet owners, hence most likely to have encountered the icons in these contexts.   (*See* Martin

14 Decl. Ex. L, Expert Report of Michael B. Mazis, Ph.D at ¶¶ 1, 9, 44, 45.)   Further, the products

15 whose trade dress is alleged to have been infringed and/or diluted are smart phones and tablet

16 computers: Apple's iPhone and iPad.   Third, none of the trademarked icons are used in Apple's

17 desktop computers.   In short, Dr. Mazis conducted a probative and reliable study that will assist

18 the jury in determining whether the alleged iPhone and iPad trade dress have achieved the

19 necessary fame to support Apple's dilution claims.   It should not be excluded.

20     **C.      Dr. Michael Kamins Conducted A Valid And Reliable Study Discrediting**
        **Apple's Expert**

21

22         In addition to rebutting Apple expert Dr. Kent Van Liere's association study, Dr. Kamins

23 also conducted a study with live interviews that replicated Dr. Van Liere's internet-based survey

24 using static images of phones.   Dr. Kamins used the actual phones for which Dr. Van Liere used

25 only pictures, and added an LG G2x as another "control" to test the impact of the flawed

26 Blackberry control phone used by Dr. Van Liere.   Dr. Kamins' survey reveals the fatal flaw in Dr.

27 Van Liere's decision to prevent survey respondents from seeing the actual products at issue, and to

28

**OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF SAMSUNG'S EXPERTS**

1   show them only photographs instead.   (Martin Decl. Ex. M, Rebuttal Report of Michael A.

2   Kamins, Ph.D at at 2-21.)

3         Apple now criticizes Dr. Kamins' choice of control on the grounds that it shares too many

4   features with the iPhone.   Apple's argument lacks merit.   First, as Apple acknowledges, a proper

5   control should "share as many characteristics with the experimental stimulus as possible."[13]

6   (Mot. at 20.)   Second, the features common to the iPhone and the LG G2x are functional and, as

7   such, are common to most smart phones on the market today.   Third, Apple's assertion that the

8   two devices are "too close" for the LG G2x to serve as a proper control is belied by the fact that

9   Apple has never identified the LG G2x as an infringing device, or commenced litigation against

10  the LG G2x product.   Moreover, the Blackberry Storm used by Apple's expert meets many of the

11  alleged trade dress elements: it has an overall rectangular shape, a largely flat front face, narrow

12  borders on either side of a large display and wider borders above and below it, as well as a matrix

13  of icons when turned on to the applications page.   Fourth, Apple's position is inconsistent with

14  the case law as well.   *See Fortune Dynamic*, 618 F.3d at 1036.[14]   Fifth, Dr. Kamins properly

15  selected as a control a phone whose overall appearance is perceived as a smart phone, unlike the

16  Blackberry Storm.   Given its history as a maker of mobile email devices and PDAs, the

17  Blackberry brand evokes a separate, *sui generis* category.   The Blackberry Storm unsurprisingly

18  obtained skewed results that inflated the perceived association in Dr. Van Liere's study.

19        Finally, in replicating Apple's study, Dr. Kamins *also* used the Blackberry Storm as an

20  alternate control and reported the results.   Thus, even if the Court were somehow to deem that the

21  LG G2x was an improper choice, Dr. Kamins' opinions stand unassailed because Apple admits

22  that the Blackberry Storm is a proper control.   Dr. Kamins' survey is reliable rebuttal evidence

23  and should be admitted.

24

25  [13]   Apple cannot fairly contend that a control should have none of the asserted trade dress
    elements because it is the iPhone trade dress as a whole that Apple claims Samsung infringes.
26  [14]   The one case Apple cites, *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218 (S.D.N.Y.
27  2010), simply notes that a survey without a proper control can be excluded.   The actual survey in
    that case, involving T-shirts with a Disney character with and without words, bears no
28  resemblance to the survey Dr. Kamins conducted.   690 F. Supp. 2d at 240-41.

**OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF SAMSUNG'S EXPERTS**

1   **VII.   MICHAEL WAGNER'S OPINIONS ARE ADMISSIBLE**

2         **A.   Mr. Wagner's Apportionment of Profits for Design Patents Is Appropriate.**

3         Apple attacks Mr. Wagner because he properly apportions Samsung's profits for the

4   accused devices between patented design elements and other features.   But whether

5   apportionment is appropriate is a legal question for summary judgment, *not* grounds for a *Daubert*

6   motion.   Notably, none of Apple's authorities address a *Daubert* motion.   Apple's effective

7   request for judgment is procedurally inappropriate and should be denied on this ground alone.

8         In any event, apportionment must be undertaken here.   It is indisputable that the accused

9   Samsung devices are complex technology products combining many innovations; their value is

10  overwhelmingly a result of *technology*, not design. ██████████████████████████████

11  ████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ███████████████████   Apple cannot claim with a straight face that Samsung's profits on its

14  accused devices are wholly attributable to allegedly infringing Apple's design patents.   *Cf.* H. R.

15  Rep. No. 1966 at 3 (1886), reprinted in 18 Cong. Rec. 834 (1887) (noting, in 1886, that "it is the

16  design that sells the article, and so that makes it possible to realize any profit at all").   Any

17  damages award failing to recognize that 21st century products like smart phones and tablets

18  comprise hundreds – if not thousands – of discrete components ignores modern reality, hands an

19  undeserved windfall to the patentee, and inflicts a grave injustice on the infringer.[15]

20        **B.   Mr. Wagner Correctly Applied the *Panduit* Test.**

21        The *Panduit* test requires that, where there are substitute products in the market, a patentee

22  seeking lost profits must show evidence of demand related to the patented feature.   *See Slimfold*

23  *Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1458 (Fed. Cir. 1991) (upholding denial of lost

24  profits where patentee failed to establish consumer demand was driven by advantages of the

25  patent).   Contrary to Apple's assertion, *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567

---

27        [15]   None of Apple's cases involved complex technology products, or products the appeal
28  of which to consumers was clearly driven by technical features more than the patented design.

1   F.3d 1314 (Fed. Cir. 2009) did not change this requirement.   Rather, it merely held that evidence

2   of demand for the patented features "goes to the availability of acceptable noninfringing

3   substitutes under the second *Panduit* factor."   567 F.3d at 1131.   Accordingly, Apple must show

4   demand related to its asserted patents, and Mr. Wagner should be allowed to testify to lack of

5   demand, either in the context of the first or second *Panduit* factors.

6            **C.      Apple's Attacks on Mr. Wagner's Apportionment Methodology Are Meritless.**

7            Apple's attacks on Mr. Wagner's apportionment methodology rely exclusively on a 14-

8   page declaration submitted by Dr. Russell Winer that can only be characterized as an unauthorized

9   and untimely sur-rebuttal to Mr. Wagner's report.   The Court's August 25, 2011 Scheduling

10  Order allowed the parties only two rounds of expert reports: opening (March 22, 2012), and

11  rebuttal (April 16, 2012).   (Dkt. No. 187 at 2.)   The opinions expressed in Dr. Winer's

12  declaration are nowhere found in his expert report; Samsung had no opportunity to depose him

13  about them, or to offer any form of response; and Apple did not seek the Court's leave to file the

14  declaration.   What is more, Dr. Winer's sur-rebuttal is an unfair attempt to circumvent the

15  Court's May 2, 2012 Order limiting each side to one 25-page *Daubert* motion.   (Dkt No. 901 at

16  1:22-23.)   Dr. Winer's declaration and Apple's criticisms based on it should be stricken, or at

17  very least disregarded. *See, e.g., Truckstop.net LLC v. Sprint Comms. Co.*, 537 F. Supp. 2d 1126

18  (D. Idaho 2008) (excluding expert rebuttal declaration where opinions were not contained in the

19  expert's report and the declaration was untimely); *Trilogy Comms., Inc. v. Times Fiber Comms.,*

20  *Inc.*, 109 F.3d 739, 744-45 (Fed. Cir. 1997) (*accord*).[16]

21           Even if the Court is inclined to consider Dr. Winer's undisclosed opinions, they are easily

22  dismissed.   Mr. Wagner presented four independent bases to support his conclusion regarding the

23  value of design as a whole.   Notably, neither Apple nor Dr. Winer takes serious issue with ██

24  ███████████████████████████████████████████████ (Martin Decl. Ex. O,

25  Correct Expert Report of Michael J. Wagner at ¶¶ 353-355), or ████████████████

26  _____

27  [16]   To the extent the Court is inclined to consider Dr. Winer's unauthorized sur-rebuttal,
    Samsung requests the opportunity to depose Dr. Winer about his new opinions and to submit a
28  response by one of its experts.

**OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF SAMSUNG'S EXPERTS**

1  ███████████████████████████████████████ (*Id.*

2  at ¶¶ 356-358.)    Although Apple asks the Court to summarily exclude Mr. Wagner's entire

3  apportionment methodology, two critical independent benchmarks used to support his conclusion

4  ████████████████████████████████████ are not even

5  addressed by Apple's motion.    (*Id.* at ¶ 361.)

6     For the two independent bases that are challenged, Dr. Winer's primary attack is upon ███

7  █████████████████████████████████████████████

8  ███████████████████████████████ (Mot. at 22; Dkt. No.

9  940, Declaration of Russell S. Winer in Support of Apple's Motion to Exclude Testimony of

10  Samsung's Experts ("Winer Decl.") at 6:11-18.)  ███████████████████

11  ██████████████████████████████ (*Id.* at 8:1-3.)

12     Further, Mr. Wagner's method is eminently reasonable.    In essence, ████████

13  ████████████████████████████████████████

14  █████████████████████████████████████████

15  ███████████████████████████████ (Martin Decl. Ex. O, at

16  ¶¶ 347-352, 359-360.)   Likewise, Mr. Wagner ██████████████

17  █████████████████████████████████████████

18  ██████████████████████████████████████████████

19  ██████████  Contrary to Apple's assertions, such aggregations are an accepted

20  methodology in the literature and "completely analogous to the everyday, and perfectly defensible,

21  practice of treating the sum of correct answers on a multiple choice test, each of which is binary,

22  as an interval scale."[17]    Other than Dr. Winer's *ipse dixit*, Apple fails to cite a single study,

23  article, or opinion that has criticized these types of calculations.    *Sheldon v. Metro-Goldwyn*

24  *Pictures Corp.*, 309 U.S. 390, 408 (1940) ("[W]hat is required [for apportionment of profits] is not

25  mathematical exactness but only a reasonable approximation."); *see also id.* at 404.

---

27     [17]   *See, e.g.*, Martin Decl. Ex. P, Geoff Norman, "Likert scales, levels of measurement and the

28  'laws' of statistics," Adv. in Health Sci. Educ. (2010) 15:625–632.



1    Dr. Winer's next criticism is that ████████████████████████████

2    ████████████████████████████    (Winer Decl. at 6:1-3; Mot. at 24.)

3    Not true.   For example, ████████████████████████████████████

4    ████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████

6    ████████████████████████████████████████████

7    ████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10   ████████████    (Martin Decl. Ex. O at ¶¶ 359-360.)   ██████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14    Dr. Winer next complains that ██████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████    (Mot. at 24; Winer Decl. at 10:3-7.)   But contrary to Dr. Winer's *ipse dixit* assertions, ██

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████   Mr.

20   Wagner's calculations are based on an accepted academic methodology.

21    Dr. Winer also attacks Mr. Wagner ██████████████████████

22   ████████████████████████    (Mot. at 24; Winer Decl. at 11:13-12:7.)   This

23   criticism is nonsense.   Dr. Winer ████████████████████████████

24

25    [18]    *See*, *e.g.*, Martin Decl. Ex. Q, at SAMNDCA10246338, SAMNDCA10246388-
26   SAMNDCA10246390; Martin Decl. Ex. R, Göb, R., McCollin, C., and Ramalhoto, M., "Ordinal
     Methodology in the Analysis of Likert Scales," Quality & Quantity, Vol. 41.5, 2007-10-01.   For
27   an example of a similar implementation, *see*, *e.g.*, Martin Decl. Ex. S, Lien, G., *et al.*,
     "Management and Risk Characteristics of Part-Time and Full-Time Farmers in Norway," Review
28   of Agricultural Economics, Vol. 28.1, 111–131.

1

2  (Winer Decl., Ex. 1.)

3

4

5

6

7  (Martin Decl. Ex. O at ¶ 365.)

8

9

10      Finally, Dr. Winer criticizes Mr. Wagner

11

12

13

14

15

16      Apple's and Dr. Winer's criticisms of Mr. Wagner are nothing more than untimely and

17  erroneous *ipse dixit.*   Mr. Wagner's apportionment methodology relied on multiple data sources

18  (some of which were not even challenged by Apple) and well-reasoned calculations to show that

19

20  DATED: May 31, 2012                    QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP
21

22                                        By */s/ Victoria F. Maroulis*

23                                            Victoria F. Maroulis
                                              Attorneys for SAMSUNG ELECTRONICS
24                                            CO., LTD., SAMSUNG ELECTRONICS
                                              AMERICA, INC., and SAMSUNG
25                                            TELECOMMUNICATIONS AMERICA, LLC

26

27      [19]   For the same reasons discussed above, Apple's and Dr. Winer's criticisms of Mr. Wagner's

28  apportionment methodology with respect to the '607 patent also fail.