# EXHIBIT M

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | | |
|---|---|---|
| APPLE INC., a California corporation | : | |
| | : | |
| Plaintiff, | : | Case No. 11-cv-01846-LHK |
| | : | |
| v. | : | |
| | : | |
| SAMSUNG ELECTRONICS CO., LTD., a | : | |
| Korean business entity; SAMSUNG | : | |
| ELECTRONICS AMERICAN, INC., A New York | : | |
| Corporation; SAMSUNG | : | |
| TELECOMMUNICATIONS AMERICA, LLC, a | : | |
| Delaware limited liability company | : | |
| | : | |
| Defendants. | : | |

_____

## REBUTTAL REPORT OF MICHAEL A. KAMINS, Ph.D.

_____

## I. BACKGROUND AND QUALIFICATIONS

1.  I am presently Director of Research, Full Professor and Area Head of Marketing with tenure at the Harriman School of Business at Stony Brook University-SUNY. At Stony Brook, I have exclusively taught courses in marketing at the graduate level inclusive of Marketing Research, Marketing Management and Marketing Strategy. Prior to my position at Stony Brook, I was an Associate Professor of Marketing, with tenure, at the Marshall School of Business Administration at the University of Southern California where I taught for over 24 years. While at USC, I taught courses at the executive, doctoral, graduate and undergraduate level in strategic marketing management and marketing research. I also taught in USC's prestigious Global Executive MBA program (GEMBA) in Shanghai, China, as well as in the USC Executive MBA program.

2.  My research has been recognized at the national level. For example, my paper with Valerie Folkes titled, "Effects of Information about Firms Ethical and Unethical Actions on Consumers' Attitudes," was selected to represent the year "1999" in the *Journal of Consumer Psychology's* Special Issue celebrating 20 years of publication. I have also advised numerous companies regarding their advertising, marketing and marketing-research practices, both in my capacity as Director of the IBEAR (International Business Education and Research) International Business Consulting Project at the University of Southern California, as well as in many other independent consulting assignments.

3. In terms of research, my doctoral dissertation at New York University focused on consumers' evaluation of brands as a function of varying advertising techniques and communication strategies. My dissertation was published in the *Journal of Marketing Research*. Throughout my career, I have focused on how consumers interpret advertising and promotional material through the measurement of attitude, cognition, behavioral-intention and verbal protocols. I have also conducted over 500 consumer surveys across various products and services in the last 25 years. This academic experience derived through both theoretical development and applied primary research (*i.e.*, using both surveys and experiments) has enabled me to understand how the typical consumer would react to advertising claims across a wide range of product categories.

2

4. One of my current research thrusts in the academic arena involves branding, specifically the image conveyed by certain brand characteristics. My current research interests also include the study of strategic bidding in an auction environment, as well as consumer perceptions of price bundling. My publication in the *Journal of Consumer Research* (December, 2009) deals with price bundling and BOGO's ("buy one get one free"), and my paper in the *Strategic Management Journal* focuses on the relative importance of employee and consumer perceptions in the evaluation of a focal company (May, 2010). ). My most recent article in the *Journal of Interactive Marketing* (2011) examines social factors and cues, both within the auction listing and externally, that motivate sniping behavior.

5.  I received a Bachelor of Business Administration in 1974 from Bernard M. Baruch College in New York, with a major in Statistics. I received my MBA from the same institution in 1977. In 1984 I received my Ph.D. in Marketing from New York University. Since receiving my doctoral degree, I have published over fifty academic articles and proceedings in major academic journals, including *the* *Journal of Marketing*, *Journal of Marketing Research*, *Journal of Consumer Research*, *Strategic Management Journal*, *Journal of Consumer Psychology*, *Journal of the Academy of Marketing Science*, *Journal of Interactive Marketing*, *Journal of Advertising* and the *Journal of Advertising Research*. I have also conducted extensive survey research in both an academic and consulting environment, including surveys on the issue of confusion, secondary meaning and dilution. I have testified in relation to confusion at both the state and federal court level, and before the California Public Utilities Commission (CPUC) regarding issues of false and deceptive advertising and consumer interpretation of that advertising.

6. Finally, I have consulted for such companies and individuals as Cingular Wireless, Con-Agra, Hilton Hotels, AT&T, Bank One, Canon, LensCrafters, Pinkberry, Panda Express, Sears, The State of California, The State of New York (Eliot Spitzer, AG), Bill Medley (Righteous Brothers), Muhammad Ali, Kareem-Abdul Jabbar, and the Doors. I am compensated at the rate of $600/hour for consultation, deposition, and trial time in this case. My curriculum vitae is attached as Exhibit A, and a record of all cases in which I have testified at deposition or trial within the past 4 years is attached as Exhibit B.

3

7.  I reserve the right to consider and/or rely upon other expert reports that may be filed in this matter, as well as the testimony of any fact or expert witnesses at a deposition or at trial and to provide my opinion with respect to these facts and testimony. Moreover, I reserve the right to offer rebuttal testimony to any evidence or argument presented by the opposing party in this case. To the extent that any new information is made available to me after submission of this report, I will evaluate that information to determine whether it has any impact on the opinions and conclusions set forth in this report. I reserve the right to amend this report to take that information into consideration.

## II. MY TASKS IN THIS CASE

8. I was asked to review the expert reports submitted by Dr. Kent D. Van Liere in the matter of *Apple Inc. v. Samsung* as to the reliability and validity of the primary research he conducted, as well as to conduct my own study regarding association given actual usage and handling of the smart phone. This research involved two empirical studies addressing: (1) post-sale confusion between specific tablets of both companies, and (2) dilution, or more precisely the degree to which consumers associate the look and design of two Samsung Galaxy smart phones with Apple and its smart phones. It is my opinion that due to methodological flaws and generalizations that are unsupported by the data, both studies offered by Dr. Van Liere are fatally flawed. Therefore, the conclusions he draws based upon his research are unreliable and invalid. My specific concerns regarding each study, which led to my conclusions, are detailed in the sections of the report that follow.

## III. EVALUATION OF DR. VAN LIERE'S POST-SALE CONFUSION STUDY FOR TABLET COMPUTERS

9. For both the post-sale confusion study discussed in this section, and for the dilution/association study discussed in the next section, the framework that I will use to evaluate Dr. Van Liere's research derives from that proposed by Fred W. Morgan ("Morgan") in his *Journal of Marketing* article entitled "Judicial Standards for Survey Research: An Update and Guidelines." The *Journal of Marketing* is a top-tier marketing and professional journal, and Morgan is a respected authority in the area of survey research in the judicial arena. The Morgan article both reviews and illustrates characteristics of trustworthy research as discussed in the

Handbook of Recommended Procedures and the Manual for Complex Litigation. Morgan's framework is designed to identify six critical areas in the assessment of the validity and reliability and ultimately trustworthiness of survey evidence. These criteria are: 1) Universe definition and sample selection; 2) Design of the survey instrument; 3) Administration of the survey instrument; 4) Interviewers' qualifications and techniques; 5) Data analysis and presentation; and 6) Administration of the overall project. I will provide commentary as appropriate in each area, but will begin by a broad overview of Dr. Van Liere's research protocol.

- **Problems With Dr. Van Liere's Research Protocol**

## The Results Cannot Be Generalized Beyond the Situation Tested

10. As noted by Dr. Van Liere, "A post-sale confusion survey presents consumers with the product as they might experience it in a real-world setting after it has been purchased by another individual." (Van Liere Report, page 3) This statement suggests that the construct of "post-sale confusion" is extremely complex, because the researcher is faced with a multitude of variables when attempting to establish the appropriate "real-world" setting to examine. For example, in a post-purchase situation, is the consumer's exposure to the product typically for only a short period of time while quickly passing the user engaged in usage of the device? Or, is it for a longer period of time, for example, as one sits on an airplane behind another passenger who uses the product for the duration of the flight? Moreover, does one see the device alone and not in the context of other devices, or does one observe it in the rather standard scenario where different devices are being used in close proximity, such as on a long wooden table in a library or at a Starbucks coffee house? The ability to see a device in the presence of another device likely would reduce confusion between the two, because the consumer is presented with the actual products and therefore does not have to rely upon his/her memory of another product to evaluate whether they are the same or different, as is the case for the Samsung tablet in the Van Liere confusion study. Moreover, is there a brand name on the product and is it visible for a long period of time or is it even visible at all?

11. One study undertaken by one experimenter cannot account for all of these factors, and thus choices in terms of the research design must be made that affect the generalizability of the study. Whatever choice is made subsequently reduces the study of post-purchase confusion to the **specific** exposure situation studied, reducing the generalizability of the findings to the localized study as conducted by the researcher. Given its particularized context, detailed below, Dr. Van Liere's study is quite limited in its generalizability and thus cannot represent valid and reliable conclusions regarding the overall presence of post-sale confusion, even for the tested products.

- First, Dr. Van Liere showed each respondent a single short video clip of a woman using, either a Samsung Galaxy tablet model or a Barnes & Noble Nook e-reader, outside of the presence of any (other) tablet products. Hence the respondent was never given the opportunity to evaluate the devices in the proximity of another brand and instead had to rely upon his/her memory of other tablets, such as the iPad, to consider the source of the product. Such an approach increases the likelihood of confusion because memory is not as reliable as having the ability (as in certain "real-world" contexts) of seeing the devices side-by-side or in proximity to one another. Such pairwise comparisons highlight design comparisons, which in turn clarify the similarities and differences between brands and enable a more reliable and valid measure of actual confusion.

- Second, Dr. Van Liere used two alternative videos of the Samsung product with and without the brand name printed on the front face. I am informed that Samsung sold the Galaxy Tab 10.1 tablet for a short time without the brand name printed on the front side of the tablet, which is the side featured in the stimuli videos, and since that time has sold only Galaxy Tab 10.1 tablets with the Samsung name printed on the front. The results from the branded and unbranded tablets should not have been combined and averaged.

- Third, Dr. Van Liere presents each stimulus to the respondent using a video where an individual user attempts to employ the device in a similar manner, and the viewer is given the perspective of moving from left to right directly behind the user. Therefore, results regarding the measurement of post-purchase confusion, are by definition limited to **this particular** exposure in the Van Liere study, and only to the Galaxy Tab 10.1 or Nook model shown, and hence are not generalizable.

**The Chosen Control Improperly Skews the Results**

12. Dr. Van Liere exposed each respondent to one of three different conditions, two of which were the "test" cells, and one was the "control" condition. The test cells involved exposing respondents to a 48 second video of a woman using the Samsung Galaxy Tab 10.1, either with or

without the brand name visible to the user or the viewer of the video. The control cell involved exposure to a Barnes & Noble's Nook device, with the trademark "n" logo clearly visible on the front of the device near the bottom. The visible stylized "n" logo resulted in an incomplete experimental design, because there should have been a control for the brand-not-visible Samsung tablet **as well as** a control for the brand-visible Samsung device. The research design should have had four cells (*i.e.*, two test cells and two control cells), as opposed to its three cells. The lack of a brand-not-visible control cell rendered the study incomplete.

13. A more egregious error results from the fact that the single version of the Nook presented to respondents in the video was the image **with** the brand logo present. Using the pattern observed in Dr. Van Liere's data for the Samsung branded and unbranded products, as well as simple logic, the degree of confusion with the brand name visible is likely lower than when the brand name is not visible. Choosing the version with the logo present to control against **both** test cells (branded and unbranded) ensured that a smaller degree of confusion would be found in the control cell – which is ultimately subtracted from both test cells. The research protocol developed by Dr. Van Liere thus created an inherent bias toward finding higher net confusion in the unbranded (brand name not visible) Samsung test cell, due to the application of an inappropriate, unmatched control.

14. Another significant issue is the use of the Nook as a control in the first place. The Nook is much smaller than an iPad and has a unique frame in which the bottom left corner of the device is cut out, which creates the impression of a handle or connector. This physical design difference is very obvious in the video and is likely to trigger an association or memory of the specific device in a number of respondents. In addition, while one can generously – but incorrectly – describe the Nook as a "tablet," it is more appropriately classified as an "e-ink-reader." (John Falcone C/net 3/13/12- *news.**cnet**.com/8301-17938_105-20009738-1*). Falcone describes three categories of products: 1) black and white e-ink-readers; 2) 7 inch color LCD media tablets; and 3) full-size color tablet computers. The black and white Nook as featured in Dr. Van Liere's research fits into the first category. The Nook is primarily a book reader that can run a limited number of applications. It is priced significantly lower and does not have the same features or capabilities as Apple's or Samsung's tablet computers. While the iPad and Galaxy tablets can

serve as e-readers, the converse is not true. This was quite evident in Dr. Van Liere's video because the Nook displayed a rather drab page of text from a document or book, as opposed to the colorful internet sites displayed by the Galaxy Tab products in the test videos. It is also worth noting that Barnes & Noble released a product called the Nook Tablet last year, which has additional features found on tablet computers, but Dr. Van Liere did not use the Nook Tablet product for his control. Because the Nook device used by Dr. Van Liere is markedly different in size, visual design, and function and form from the Samsung Galaxy (as well as the Apple iPad), use of the Nook as the control minimizes the degree of confusion evident in the control cell. Because control-cell confusion is subtracted from confusion in the test condition, artificially reduced control data improperly and inaccurately increases the overall confusion level shown in Dr. Van Liere's study.

15. The intrinsic differences between the Nook and iPad and Galaxy Tab are to be expected, given that the Nook serves a different function. On page 10 of his report, Dr. Van Liere quotes Shari Diamond as noting, in regard to the control stimulus, that it should "share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." (Diamond, 2011, p. 258)  The Nook fails in this regard, because its size, functionality, case design and general look are not consistent with the product class at issue in this action, namely tablet computers. Lacking a proper control, Dr. Van Liere's study did not generate accurate data on which to base reliable findings.

16. Better control devices, for example, would have been an LG Slate or Motorola Xoom or other tablet computers that perform essentially the same functions as the Apple iPad and the Samsung Galaxy devices and have a general look and appearance that is closer to the brands at issue.

- **Improper Sample Selection**

17. Dr. Van Liere selected a sampling plan where men and women were equally represented in his final sample, as were individuals between the age of 18-24; 25-34; 35-44; 45-54; 55-64 and 65+. As his source for the demographic representation of his sample, Dr. Van Liere uses a Pew

Research report ("Pew Report") on tablet **and** e-book reader users. (Van Liere Report, page 7, footnote 8.) Notably, however, the Pew Report characterizes the Nook **separately** from the Galaxy Tablet and iPad. The Nook is characterized as an "e-book reader," while the Galaxy Tablet and iPad are classified as tablet computers. The Pew Report identifies different demographic growth rates for e-readers and tablets. If different demographic growth rates are indicated, this implies that the Pew report separates the e-reader and tablet into different categories, since a uniform growth rate would have been shown if both products were believed to belong to the same market. (*See* page 5 of the Pew Report, attached as Exhibit C). Notably, the Pew Report shows that those in the 30-49 year old category were almost 4 times as likely to own a tablet computer (as of mid-January 2012), relative to those who were 65+. (*See* Pew Report, p. 3.) Dr. Van Liere's sample neither accounts for nor reflects these relative demographic percentages.

18. The greatest variance in ownership across a given demographic variable occurred for income, where those in the $75,000+ annual income category were 4.5 times more likely than those who earned less than $30,000 to own a tablet computer. In addition, college graduates were more than six times more likely to own a tablet versus those who identified "some high school" as their education. (Pew Report, p. 3.) Dr. Van Liere's report is silent regarding these variables, and, given this great variance in percentage of ownership, at minimum Dr. Van Liere should report the degree to which his sample fits these demographic characteristics

19. When one considers race/ethnicity, the Pew Report shows the following ownership statistics of tablets for various ethnic groups as of mid-January 2012:  White 19%; African American 21%; and Hispanic 21%. When weighted by the relative presence of each ethnic group in the United States population as of 2012 (White 64.86%; Hispanic 15.1% and African American 12.85%), the relative percentage of each ethnic group in Dr. Van Liere's confusion study should have been as shown in the first column of Table 1 below. This column reflects the proper weighting as a function of usage and relative percentage of the United States population,

accounting for both the relative presence of each ethnic group in the United States population and the relative degree of tablet ownership by each ethnic group:[1]

### TABLE 1

### REPRESENTATIVE AND ACTUAL PERCENTAGE OF ETHNIC GROUPS  IN THE SAMPLE FOR THE CONFUSION STUDY:

|  | REPRESENTATIVE SAMPLE | ACTUAL SAMPLE |
|---|---|---|
| White: | 67.79% | 60.50% |
| African American: | 14.80% | 26.54% |
| Hispanic: | 17.41% | 12.96% |

20. The actual relative percentage of ethnic groups considered in the sample by Dr. Van Liere is noted in the right column of Table 1 above. It becomes evident that when compared to what would be considered a "representative" sample, Dr. Van Liere has over sampled African Americans by 80% and under-sampled Hispanics by 25%. Because his sample is not representative of the actual ethnic user base of tablet computers, Dr. Van Liere's findings are not reliable nor are they valid, hence the numbers reported by Dr. Van Liere in terms of confusion cannot be trusted as representative of those who actually own tablet computers.[2]

• **The Design of Dr. Van Liere's Survey Instruments Is Biased**

21. The first question in Dr. Van Liere's survey is improperly leading. It asks respondents: "In your opinion, what tablet computer was shown in the video?" This question biases respondents into believing the device shown was a tablet when they may not have initially perceived it as such. Even if the subject's initial inclination might not have been to believe there was a tablet computer in the video, the question directs him/her to understand that the product in the video

---

[1] The relative percentages were calculated only as a function of the three main ethnicities: White, Hispanic and African American.

[2] It may also lack representativeness on other demographic factors as well; ethnicity was chosen as a test case.

**was** a tablet computer. By this suggestion, the question discourages responses based solely on what respondents independently would have known about the product category. The question therefore causes a set of respondents to guess at the answer, and when people guess they typically think of the market leader, namely Apple. (*see* Kamins, Alpert and Perner, 2003). By generating confusion unrelated to the trade dress at issue, Dr. Van Liere's initial question improperly drives up the level of confusion in his test results. Particularly because this is the lead question in the survey, it renders the results invalid and unreliable.[3]

- **Improper Coding**

22. Dr. Van Liere mentions that "respondents were coded as confused if they named iPad **or** Apple when asked what device was shown or what company makes the device." As written, this suggests that the respondent had two attempts to name Apple or iPad. While this approach seemingly makes sense on the surface, it does not if there is an inconsistency between a respondent's answer to both questions (what device was shown and who makes the device). For example, if a given respondent named Samsung as the device shown, but Apple as the company that makes the device, it become necessary to ascertain the reason for the perceived affiliation between Apple and Samsung. It could have nothing to do with the look or trade dress of the iPad, but rather could stem from an independent notion, perhaps formed by reading a newspaper article or watching a news program, that the two companies had entered into a business arrangement. There are several responses such as these in the data (*e.g.*, respondents 570, 573, 825), and the only way to disentangle trade-dress confusion from confusion triggered by extraneous, irrelevant information is to examine the follow-up question, "What makes you say that?" There is no evidence that Dr. Van Liere analyzed that data, however, because it is not mentioned in his report. Nor were subjects directly asked to address this issue in their open-ended responses. Towards the end of his survey Dr. Van Liere could have asked questions as to whether respondents believed generally that Samsung and Apple enjoyed a business relationship

---

[3] It is also confusing in and of itself, because the word "what" in the question can mean almost anything to the respondent. For example, it could relate to sub-brand identification like "Galaxy," model designation such as "Tab 10.1," or simply a brand name like "Samsung."

or partnership, or if indeed they were part of the same corporate entity, and the basis for their belief.

23. Moreover, there is evidence within Dr. Van Liere's study of individuals who answered iPad simply as a default, due to the strong presence in the market of Apple's iPad and the fact that the iPad is the market leader of the category and some consider it to be the pioneer. One of the characteristics of such a brand is that it sets the consumer's expectation as to what the prototype paradigm for the product class should look like, (Carpenter and Nakamoto, 1989), and hence becomes the default option when consumers are presented with a product in the category and asked for the source. There is significant evidence of such a perspective on the part of respondents in the sample. Consider respondent 331, who responded "Apple" when shown the "Nook," and then stated "Because they are the number one leading computer manufacturer in the world besides Microsoft, they come out with the latest inventions." Respondent 388 answered "Apple" as the source for the unbranded Samsung, and gave as his/her rationale: "Because they were the first ones with it." Respondent 674, who answered "Apple" for the unbranded Samsung tablet, noted that it was because it was "the most common one I could ever think of." See also respondents 444, 610, and 629 for interesting comments which reflect the same theme. Obviously, if the goal is to address confusion as a function of "look" or "design," it would be improper to count such responses as evidence of this construct because these answers demonstrate that the respondents' confusion was not based on anything related to the product design.

24. Also problematic is the fact that although "test[ing] whether the look and design of a Samsung Galaxy Tab 10.1 caused consumers to confuse this product with an iPad or Apple product," Dr. Van Liere coded as confused respondents who simply "named iPad or Apple when asked what device was shown or what company makes the device." (Van Liere Report, p. 11.) But without knowing **why** respondents named iPad or Apple, those mentions alone may not have any relationship to **trade dress** confusion. Dr. Van Liere should have classified respondents as confused only if they mentioned or made clear that the look of the product or a design element was the cause for their confusion. Counting every single mention of Apple or iPad is not consistent with trustworthy research and exaggerates the level of alleged trade dress confusion

beyond how it should be fairly measured. Thus, Dr. Van Liere's findings are not reliable nor valid.[4]

- **Inaccurate and Unverified Data Analysis and Presentation**

25. Using this overly broad net that captures confusion wholly unrelated to trade dress, Dr. Van Liere claims that 6% of respondents believed the branded Samsung tablet was made by Apple and that 19% of respondents believed the unbranded Samsung tablet was made by Apple. Remarkably, however, Dr. Van Liere then averages the alleged confusion responses when the Samsung product is presented in branded and unbranded form to arrive at a "net" confusion rate of 12%. Averaging confusion rates is wrong—as evidence by the very fact that respondents had such different reactions to them. I understand that an ultimate question for the fact finder will be whether a particular device is likely to cause confusion, not whether Samsung's overall sales of products are likely to cause confusion. If that were the proper inquiry, Dr. Van Liere should have tested other Samsung products as well, such as different sized tablet products.

26. All that can properly be stated is that the level of confusion present in Dr. Van Liere's study, according to his overbroad calculations, is that it can be as low as 6% for the branded Tab 10.1 or as high as 19% for the unbranded Tab 10.1. A pairwise t-test designed to detect whether or not confusion of 6% is significantly different from the absence of confusion shows that it is not ($t_{(397)}$ = 1.38, p = non-significant). Therefore, the interval estimate of confusion can include within it **no** confusion at all ($t_{(397)}$ = 1.38, p = non-significant). That is, the use of a t-test allows for the examination of whether a specific degree of confusion (6% in the present case) is statistically different from a zero confusion rate. The result presented shows that we can be highly confident that no difference exists between the measured degree of confusion (6%) and the presence of no confusion – in other words, simply that 6% confusion is not significantly greater than zero confusion – to conclude that no confusion is present. Statistically then, Dr. Van Liere's findings support the assertion that exposure to the Samsung tablets relative to the control does not generate confusion.

---

[4] In the next section of my Report, I recalculate the degree of confusion based on mentions of Apple or iPad together with a design or "look" reason.

27. Dr. Van Liere did not report a measure of reliability for his findings above, nor did he indicate which specific respondents were coded in **any** condition as indicative of confusion between the stimuli presented, with an Apple tablet. Moreover, Dr. Van Liere's criteria for determining confusion between the given stimuli and Apple seemed overly broad as noted in Paragraph 23 above, because Dr. Van Liere broadly coded as confused respondents who simply "named iPad or Apple when asked what device was shown or what company makes the device," without regard for whether or not the rationale given related to "design" or "look."

28. In order to evaluate the conclusions and coding decisions of Dr. Van Liere, open-ended questions (specifically, question numbers 2, 3, 3a and 3b) were coded by the use of a team of three coders who independently evaluated each statement made by each respondent for each question, and then combined them into an assessment of the brand or company that makes or sells the product.

29. Coders were trained by Dr. Kamins and were given instructions as set forth in Exhibit D.

30. Dr. Kamins' coding protocol was sufficiently detailed to detect finer details and nuances in subjects' responses and thereby create a tougher standard of reliability. That is, coders were instructed to note whether or not the rationale supplied by respondents for their answers, and used by the coders as a basis for determination of brand designation, was strong or weak. In addition, they were to make note of confusion between brands as a function of source. Such individuals, who also appeared to confuse trade dress issues, were counted as confused, however if their confusion was limited to source issues, they were not counted as confused. Thus, for all three coders to agree on a brand designation, not only did they have to identify the same brand independently, but they had to also indicate agreement as to the strength of the rationale.

31. The three coders were graduate students from Stony Brook University, who were currently taking a course in Marketing Strategy. The students were compensated for their coding duties by the law firm representing the defendants at a rate of $65.00 per hour. Each student was provided the printed version of the first two pages of every respondent's Excel sheet from the Van Liere confusion study. The students were not told the nature of the Van Liere study nor were they alerted to the significance or meaning of the video-selection column. This procedure was

followed so as not to bias the students in terms of their coding tasks. They were simply asked to determine if a brand/company assignment could be identified from the responses to Dr. Van Liere's four open-ended questions. To further disguise the study, the students coded for the presence of any and all brands, not just Apple or Samsung. Essentially, they coded what they were presented by the respondent.

32. I classified the response as representative of a given brand if one of the following results occurred:

- All three coders named the same brand without any caveat.[5]
  (reliability = 100%)

- All three coders named the same brand and one coder noted a "weaker" reason for classification (reliability = .333)[6]

- All three coders named the same brand and two coders noted a "weaker" reason for classification (reliability = .333)[7]

The results of the re-coding of Dr. Van Liere's data reveals the findings in Table 2 below based upon the unbiased approach taken by the trio of coders (the number of those confused and the reliability factor are presented in brackets).

**TABLE 2**

**CONFUSION BETWEEN CELLS WITH APPLE OR IPAD**

| | |
|---|---|
| Samsung Unbranded | 31.15% (62…r=.807) |
| Samsung Branded | 17.59% (35…r=.867) |
| Nook (Control) | 16.00% (32…r=.792)[8] |

---

[5] That is, the reason given for classification was not characterized as "weaker." (n=50 for "Samsung unbranded" condition; n=28 for Samsung branded; n=22 for Nook-Control).

[6] (n=9 for "Samsung unbranded;" n=5 for "Samsung branded;" and n=4 for Nook-Control).

[7] (n=3 for "Samsung unbranded;" n=2 for "Samsung branded;" and n=6 for Nook-Control).

[8] All of these reliabilities exceed that required in exploratory research as specified by Nunnally (1970).

33. Just as Dr. Van Liere did in his study, I subtract the amount of confusion associated with the control product from each of the tested Samsung products to obtain the net confusion level. Using Dr. Van Liere's underlying data – which is inherently flawed for various reasons set forth above  – the net confusion rate with Apple actually amounts to 15.15% when the product is unbranded and 1.59% when it is branded. If, for the sake of comparison, we were to imitate Dr. Van Liere's "average" of confusion rates, confusion would be reported at 8.37%. Exhibit E is an Excel spreadsheet containing the final coding information for this analysis.

34. Dr. Van Liere's study suffers from serious methodological flaws directly affecting the reliability of the data. There is no information provided in terms of who coded the data as being indicative of confusion. If Dr. Van Liere was the only coder, then there is a further issue regarding the reliability and validity of his interpretation of the data. There would be inherent and inescapable bias, because Dr. Van Liere was hired by Apple to conduct the report and he was aware of the goals of the survey and what Apple hoped to prove with it. In addition, if he were the only coder, there is no way to measure the reliability or validity of the coding. At minimum three coders should have interpreted the verbal responses to the questions focusing on "What tablet computer was shown in the video" as well as "What brand or company puts out the tablet shown in the video?" The use of three coders would have enabled measurement of reliability as a function of the relative agreement rate among the coders, as was evident in the recoding of the data.

35. Dr. Van Liere does not inform the reader whether or not the data were validated nor what percentage of the sample was validated. This information should be provided in order to assess the trustworthiness of the underlying data. The absence of this information casts further doubt on Dr. Van Liere's findings.

36. Finally, some cell counts do not make sense, causing concern about the overall validity of the data. For example, in Dr. Van Liere's Table 2, the number of "Samsung branded" subjects was 199 while the number of "Samsung unbranded" subjects was also 199; however, the total of "Combined Samsung" subjects was only 397. (Van Liere Report, p. 12.) In addition, one respondent indicated that he/she worked for Apple (respondent 787) and thus should have been

deleted, which leads one to wonder how many **other** individuals also had potentially biasing experiences, yet slipped though the inadequate screens set up by Dr. Van Liere.

## IV. EVALUATION OF DR. VAN LIERE'S "ASSOCIATION" STUDY FOR PHONES

- **Flawed Research Protocol**

37. Dr. Van Liere used an internet panel of respondents to test the strength of association between Apple and two different Samsung phones, the Samsung Fascinate, which is also known as the Galaxy Showcase, and the Samsung Galaxy SII Epic 4G Touch. He makes the claim that he "used two different phones to test an array of Samsung phones that allegedly infringe the trade dress elements at issue here." (Van Liere Report, page 14.) The results from two stimuli, however, cannot be generalized into findings for other Samsung models that were not tested. Despite what Dr. Van Liere claims, he cannot extend his findings or conclusions to Samsung phones other than the two models used in his study.

38. Dr. Van Liere's research design included three cells, two of which were "test" cells that exposed each respondent to two photographic images of one of the two Samsung phones, and a third "control" cell that exposed respondents to two photographic images of the Blackberry Storm 9550. The Blackberry Storm 9550 is a poorly chosen control, however, because the general look or design of the phone is very different from that of the iPhone. Alternative control brands could have been the HTC Touch Pro 2 or the LG G2x. As in the previous study on confusion, the limitation to the use of only one control brand ties results down to the specific control brand utilized, reducing the generalizability of the study.

39. In conducting his dilution/association survey, Dr. Van Liere failed to take a somewhat obvious precaution to avoid the introduction of significant bias into the testing procedure. He should have asked respondents about the brand name of the device they were using to view the images and participate in the internet survey, but he did not ask that question. If the device were made by one of the parties (a Samsung or Apple brand), then the respondent should have been eliminated from consideration. Such exposure during the survey could well have exerted an

17

impact, subliminal or otherwise, upon the respondent's evaluation of the images. Without inquiry into such exposure, there is now absolutely no way of knowing if bias resulted. Because Dr. Van Liere did not use the necessary screening devices in his research protocol, he introduced the potential for significant bias. As a result, his findings are neither valid nor reliable.

- **Improper Universe Definition**

40. According to Dr. Van Liere, the appropriate population to study regarding the construct of association is the "general population of the United States 18 years or older." (Van Liere Report, page 13.) The logic that he provides for studying such a population is that "dilution is intended to protect trademarks/trade dresses that have some degree of fame. For a mark to be famous it must be recognized by the general population. See McCarthy, 24:92." (Van Liere Report, page 13, footnote 16.) While the general population may be relevant for the degree of **fame** to be attributed to a trademark or service mark, the standard to be applied for the **association** of that mark with another is the perceptions of consumers of the junior user's products, as in forward confusion analysis. (McCarthy, 24:119)

- **Biased Survey Questions**

41. Dr. Van Liere's initial question significantly biases the entirety of his study. Addressing "association" – the ultimate and underlying purpose of the study – his initial question asked: "Does the look and design of the phone bring to mind or create any association for you with other phones?" This first question improperly introduces significant bias by suggesting to the respondent that indeed there **is** an association between the phone shown and some other phone. However, a purpose of the study was to determine **whether or not** there was such an association, so to suggest an association exists at the outset represents an egregious violation of proper basic-research protocol. By asking right from the start if there is an association between the stimulus (an image of a given phone) and another phone, the thought of association is placed in the consumer's mind when it may have not been there before. The question also fails to include the converse option ("Does **or doesn't** the look and design of the phone bring to mind or create any

association for you with other phones?"), which is itself another violation of basic research methodology.

42. Moreover, Dr. Van Liere's follow-up question also forces the issue. He asks: "You may have already told us this, but what company or companies do you associate with the look and design of the phone?" If an association with another company is not teased out of the consumer after the first question, it is almost certainly extracted by this second question. The respondent has not necessarily provided any foundation for an association with any company at all, yet is now being asked to pinpoint one. By this time, the respondent may feel that the "correct" answer to the question series is "yes," and the company that comes to mind is the one with the largest market share, namely Apple (Seitz, 2012).[9]

43. Dr. Van Liere could have easily asked the "association" question without making the link for the consumer. Consider the option of asking the open-ended question: "What does the look and design of the phone make you think of?" His failure to do so renders the results of his study unreliable, as potentially the product of respondents' guesswork.

- **The Data Simply Reflect Apple as the Default Brand**

44. The data presented in Table 3 of Dr. Van Liere's report underscore that many Apple mentions are due to its being the brand or market leader. Consider the fact that there is a stronger association between the experimental stimulus presented and the Apple iPhone when Apple is the only brand mentioned. Relative to those who associate the stimulus with Apple as well as other brands (in other words, analyzing the number of respondents who associate the phone exclusively with Apple ("A") against the number who associate the phone with several brands, of which Apple is one; an A to A+x ratio), the findings for the percentage of those subjects who associate it uniquely with Apple can be seen across experimental conditions in my Table 3 below:

---

[9] Dr. Van Liere's confusion study demonstrates that some respondents named Apple because of its brand strength– the market leader/founder springing first to mind.

**TABLE 3**

**ASSOCIATION OF GIVEN PHONE WITH APPLE**

|  |  | Fascinate/ Showcase | Galaxy S II (EPIC 4G) | Blackberry Storm |
|---|---|---|---|---|
| Percentage of respondents who associate stimuli uniquely with Apple **(A)** |  | 35.0% | 35.0% | 8.0% |
| Percentage of respondents who Associate stimuli with Apple & other brands | **(A+X)** | 17.0% | 16.0% | 6.0% |
|  | **(A/A+X)** | **67.3%** | **68.6%** | **57.1%** |

45. These percentages of unique associations with Apple are not significantly different among the three brands (chi-square = 1.10, p>n.s.). This closeness suggests that a given brand's **strength** of association with Apple is independent of its **overall degree** of association with Apple. This data implies that for any brand, be it Samsung or Blackberry, the strength of association with Apple is the same – Apple is the default brand to mention when shown a smart phone image and asked to identify a brand of phone. This default position may be due to Apple's strength in smart phone market share, (AppleInsider 4/3/12 reports that Apple has a 30.2% share of the domestic smart-phone market, second to Google), or simply to the strength of the Apple brand generally. However, it **is not** due to trade dress. If it were, the control condition would reflect different relative strength of association than the test condition, especially given the distinct appearance of the Blackberry device.

## IV. DR. KAMINS' MALL INTERCEPT STUDY FOR ASSOCIATION

46. This section of the report describes a survey I designed and conducted to examine the degree to which consumers associate Samsung phones with Apple phones in a mall environment where they are able to handle and use them rather than only seeing photographic images of them as in Dr. Van Liere's survey. I tested the same Samsung and control phones as did Dr. Van Liere, but I also added another control phone to my survey.

### a.  Research Protocol

47. In this study, I replicated Dr. Van Liere's methodology as closely as possible by testing the identical phones (with one additional phone) and asking the identical substantive questions. Specifically, I tested the Samsung Fascinate/Galaxy Showcase and Galaxy S II Epic 4G Touch, as well as the Blackberry Storm 9550. The main difference is that the study was conducted in a mall environment rather than on the internet. A mall setting enables the respondents to handle and use the phone, unlike a survey over the internet where subjects are only able to examine photos of a phone from specific angles limiting generalizability. Essentially, my study of the exact brands and models of smart phones that Dr. Van Liere studied, allows me to test for the effect of actual handling and usage of a real product – rather than merely viewing photos – on the degree of association that the average consumer makes with Apple.

48. The second difference in my study was that in addition to the Blackberry Storm 9550 used by Dr. Van Liere, I included a second control smart phone in my study, the LG G2x. This additional control enables  examination of the presence of net incremental association, if any, introduced by Dr. Van Liere into his experiment through the use of the Blackberry Storm as a control as opposed to another brand.

49. The survey methodology involved a mall intercept approach of the general population 18 years of age or older in order to match Dr. Van Liere's population description. The requirement was to expose each of the four smart phones to approximately 100 respondents (for a total of roughly 400 respondents). The four phones tested were the Samsung Fascinate/Galaxy Showcase, Samsung Galaxy SII Epic 4G Touch; LG G2x, and Blackberry Storm 9550. Approximately 90 interviews were completed in each of five mall locations in or near Tampa, Atlanta, Chicago, San Francisco and Philadelphia.

### b. Design of the Survey Instrument

50. The survey began as potential participants were intercepted in the mall and told the following:

> "Hello, my name is _____ and I'm with Quick Test/Heakin Research, an independent research firm. We are conducting a research project and we would very much like to include your opinions. I would like to ask you a few questions to see if you qualify for this study and, if so, invite you to come back with me to our office to participate in the short survey. The interview will take just 10 minutes and if you complete the survey, we will pay you $5 for taking the time to help us out."

The interviewer then recorded the potential participant's gender in Screener 1 (S1), and asked them their age in categorical form which was required to be 18 years old or older (S2). To attain consistency with Dr. Van Liere, potential respondents were asked in S3: "In the last year, which if any of the following products have you purchased," the choice options were: "laptop computer," "tablet computer," "desktop computer," "digital music player, such as an mp3 player," or "mobile phone or cell phone." Response options noted alongside the products were "yes," "no" or "Don't know."

51. In S4, respondents were given the same choice and response options, however the question asked was slightly different as potential respondents were asked: "In the next year, which if any of the following products do you expect to purchase?" Again following Dr. Van Liere's screener, potential respondents were then asked in S5: "Are you or any member of your household employed by: "A company that sells travel packages?," "A company that sells videos or DVD's," and/or a "market research company." Only those who responded "No" to the third option were allowed to continue. In S6 potential respondents were asked: "Have you participated in another survey regarding mobile phones or tablet computers in the last 12 months?" Only those who responded "No" were allowed to continue with the research screening process. Finally, potential respondents were asked in S7: "Do you usually wear glasses or contact lenses when shopping?" If a given individual had proceeded through all of these screeners, and did not wear glasses or contact lenses when shopping, they then were given an invitation to participate in the main survey. If they indicated in S7 that they indeed required glasses or contact lenses to shop, they were then asked in S8: "Do you have your eyeglasses with you or are you wearing

contact lenses?" If they had their eyeglasses or contact lenses on, then they were invited to participate in the research, if not, the interview was terminated, and the individual was thanked. (The screener questionnaire is attached as Exhibit F).

52. The invitation appeared as follows below and was read by the interviewer to the potential respondent:

> "Great; you qualify for the study. I have some additional questions and we need to show you a product before asking you these questions. Please come with me to the interviewing area where you can look at the item. We will give you $5 for taking the time to help us and the interview should take less than 10 minutes."

The individuals who agreed to participate in the main survey were then asked for their name and telephone number, and had to provide a first name and telephone number at minimum to qualify for inclusion in the main study.

53. When the respondents arrived at the interviewing site within the mall, they were told the following, which mirrors Dr. Van Liere's questionnaire language:

> "Today, we are going to ask you to look at a mobile phone, after which we will ask you some questions about what you saw. We are interested in your honest opinions. There are no right or wrong answers. If for any question you don't know the answer or don't have an opinion, please do not guess."

54. The respondents were then given a mobile phone to hold, and the interviewer told them:

> "Here is a mobile phone. Please look at the phone as long as you like. Feel free to move through the various pages and handle the phone. But since the phone is not activated you won't be able to make calls or connect to the internet. Let me know when you are done and ready to answer a few short questions."

55. After each individual had finished examining and using the phone, he/she was then asked the first question in the survey, identical to that in Dr. Van Liere's study, as follows: "Does the look and design of this phone bring to mind or create any association with any other phones?" If the response was affirmative, respondents were asked Question #2 in an open-ended form identical to Dr. Van Liere's study: "What other phones do you associate with the look and design of this phone?" To imitate Dr. Van Liere's study as closely as possible, the instructions required the interviewer to record the verbatim responses and not to ask for additional responses. Question #3 followed, again in open-ended form: "What makes you say that?" The instructions for the interviewer were to record the verbatim responses and not to clarify or probe for any additional responses," because Dr. Van Liere's internet study had no such probes or prompts. Respondents

23

who answered "no" or "don't know" to Question #1, on the other hand, proceeded immediately to Question #6 about their purchasing and shopping habits regarding smart phones.

56. Question #4, continued on this theme and was identical to that asked by Dr. Van Liere: "You may have already told us this, but what company or companies do you associate with the look and design of this phone?" Responses were recorded verbatim without additional prompts. Finally, Question #5 again asked "What makes you say that" as in Question #3, with the same instructions given to the interviewer as in Question #3.

57. The set of the first five questions thus properly duplicated those asked by Dr. Van Liere in his study of association, so that comparisons could later be made between the studies. All respondents answered some additional questions to obtain additional information about their purchase habits related to smart phones. Questions 6, 7 and 8 asked in sequence the following: "In the past six months have you purchased or shopped for a smartphone?" (options provided to Q6 were "Yes" "No" and "Don't Recall"); then "Do you currently own a smartphone?" (options for Q7 were "Yes" or "No"); and for those who answered "Yes" to Q7 "Which brand and model?" was asked in Q8.  Validation of the sample was undertaken and 63.2% of those sampled were validated a number which exceeds industry standards.  (The main questionnaire is attached as Exhibit G).

### c. Results

58. The data was coded by a team of five individuals inclusive of Dr. Kamins and the original set of three coders who coded Dr. Van Liere's tablet study on confusion. The categories chosen in which to code the data were selected to match as closely as possible those selected by Dr. Van Liere in his "association" study. Specifically, the coding team was told to code the data for the first five questions, which had been asked in identical form by Drs.  Van Liere and Kamins.

59. I met with the team of four graduate students and explained to them that coding was to be based on an overall impression that they received from the entire set of five questions, evaluated together. The coding categories were as follows: 1) "Only Apple brand mentioned;" 2) "Apple and other brands mentioned;" 3) "Other brands mentioned but not Apple;" 4) "Only Samsung

mentioned;" 5) "Samsung and other brands mentioned;" and 6) "Respondent does not mention any brand."[10]

60. The coding team was informed that cell-phone carriers such as "Boost," "T-Mobile" and "AT&T" were not to be counted as a brand of cell phone manufacturer since they were providers. I personally met with the team of coders and led a practice coding session on a limited set of questionnaires, so that the team would understand the nuances of coding in this study before they began. A code was assigned for a given respondent as a function of majority agreement. The reliability was assessed as follows: if all coders agreed it was 100%; if four of five coders agreed it was 60%; if three of five coders agreed it was 30%.[11] The overall degree of reliability across coders was high at 89.87%, lending a great degree of trustworthiness to the findings.

61. A total of 428 respondents completed the survey, and of these respondents, 237 (55.4%) indicated that the look and design of the phone they were presented with brought to mind an association with another phone or phones. In the study, 106 respondents were exposed to the Blackberry Storm phone, 105 to the LG G2x, 111 to the Samsung Galaxy S II Epic Touch, and 106 to the Samsung Galaxy Showcase. When asked whether or not the phone was associated with any other phones, 33 individuals indicated that the Samsung Galaxy SII Epic Touch was so associated (29.7%), whereas the number for the Galaxy Showcase was 29 (27.4%). The percentage of association for the two control phones with another phone or phones was 14 individuals (13.2%) for the Blackberry Storm and 37 individuals for the LG G2x (35.2%) control phone.[12]

62. This data shows two important findings. First, the degree of association that the LG G2x phone has with another phone or phones is as high as, or higher than the Samsung phones tested.

---

[10] Consistent with Dr. Van Liere's report, this code is reserved for those respondents who indicate that they associate the look and design with other phones, but then provide no specific brand or type of phone.

[11] In only one case, two individuals represented the majority (*e.g.*, two of five coders had identical codes, the other three had different codes).  In that case the reliability score was 10%.

[12] The categories used for association with other phones for the Samsung phones included the "Apple" code; "Apple with other brands" code; and "Samsung with Other Brands" code. For the "control" phones, I used the following categories: "Apple" "Apple with other brands" "Samsung" and "Samsung with other brands".

This finding is also evident when the "other" phone association is restricted to Apple. Second, the results for the Blackberry phone, the ***sole*** "control" phone used in Dr. Van Liere's study, are inconsistent with the control I added, the LG G2x, as well as with both of the Samsung phones. This stark inconsistency (13.2% vs. 35.2%) casts significant doubt on the validity of Dr. Van Liere's choice of a control.

63. In terms of "association" with Apple, for the Samsung Galaxy SII Epic Touch, 20 individuals made a unique association with the Apple brand (18.0%) and five more individuals associated it with Apple and other phones (4.5%). For the Samsung Galaxy Showcase, 21 respondents associated the phone uniquely with Apple (19.8%), and four more individuals associated it with Apple and other brands (3.8%). In the control condition, 22 individuals (21.0%) expressed a unique association between the LG G2x phone and an Apple phone; one additional individual associated the LG G2x phone with Apple and other phones (.9%). By comparison, 1 respondent (.9%) associated the Blackberry Storm exclusively with Apple, and 4 respondents (3.8%) associated it with Apple as well as other brands. Exhibit H is an Excel spreadsheet containing the final coding information for this analysis. This data is presented in table 4 below:

## TABLE 4

## PERCENT OF RESPONDENTS ASSOCIATING PHONE SHOWN WITH APPLE

|  | Samsung Galaxy SII Epic Touch | Samsung Showcase | LG G2x | Blackberry Storm |
|---|---|---|---|---|
|  | (n=111) | (n=106) | (n=105) | (n=106) |
| **Total Association With Apple** | **25 (22.5%)** | **25(23.6%)** | **23(22.0%)** | **5 (4.7%)** |
| Apple Only Brand Mentioned | 20 (18.0%) | 21 (19.8%) | 22(21.0%) | 1 (.9%) |
| Apple and Other Brands Mentioned[13] | 5   (4.5%) | 4 (3.8%) | 1(.9%) | 4 (3.8%) |
| **Total Association With Samsung** | **22 (19.8%)** | **20 (18.9%)** | **15(14.3%)** | **9 ( 8.5%)** |
| Samsung Only Brand Mentioned | 14 (12.6%) | 16 (15.1%) | 13(11.6%) | 2 (1.9%) |
| Samsung and Other Brands Mentioned | 8 ( 7.2%) | 4 (  3.8%) | 2 ( 1.9%) | 7 (6.6%) |
| **Other Brands Mentioned (Not Apple)** | **14 (12.6%)** | **7 (6.6%)** | **13 (12.4%)** | **23 (21.7%)** |
| **Don't Know** | **9 ( 8.1%)** | **6 (5.7%)** | **11 (10.5%)** | **9 (  8.5%)** |
| **Not Associated With other Phones** | **41(36.9%)** | **48 (45.3%)** | **43 (40.9%)** | **60 (56.6%)** |

64.  Table 4 above suggests the following conclusions in terms of association. First, the
Blackberry Storm is not an effective control; it appears to be   perceived a brand that is not
associated with Apple at all (4.7% total association). The Blackberry Storm also is not perceived
as being associated with Samsung (8.5%). In fact, it has the highest frequency among all of the
brands studied **_not_** to be associated with other smart phones (56.6%) and significantly higher
than the LG G2x (40.9%). Further, in terms of relative strength of association (Apple only brand
mentioned/Apple and other brands mentioned), it is significantly lower (1/5 = 20%) than the LG
G2x control (22/23= 95.6%). The data thus suggest that the Blackberry Storm is a poor choice of
control, because it is perceived by the relevant target market as a distinct device, separate and
apart from Apple and Samsung in the smart-phone industry; the LG G2x by contrast is not so
perceived.

---

[13] Seven subjects were coded as both being Apple and other brands AND Samsung and other
brands since they mentioned BOTH Apple and Samsung in their verbal protocol.

65. To gain the fullest indication of the degree of association between control brands and Apple through a larger sample size of "control" objects, we can combine the results from both the LG G2x and the Blackberry Storm conditions and then use the average for the control percentage.

66. The "net" rate of association in terms of the degree to which respondents link the look and design of either Samsung phone with Apple can be calculated as the rate at which they mention Apple in the test conditions minus the degree to which they make such an association in the control condition. When this calculation is performed the results are as below in Table 5:

**TABLE 5**

**NET ASSOCIATION WITH APPLE**

**[Average of LG G2x and Blackberry Storm]**

**Samsung Epic 4G Touch**          22.5% -13.3% = 9.2%

**Samsung Galaxy Showcase**      23.6% -13.3% = 10.3%

67. These findings are significantly lower than that reported by Dr. Van Liere, and can be explained from two perspectives. First, in the present study individuals were allowed to handle and use the phones as opposed to seeing two images on the internet as stimuli. The present study therefore effectively replicated the standard-usage environment in which one would engage the phone post purchase in the field, lending to strength in external validity. Secondly, the present findings show that the control phone that Dr. Van Liere chose is not appropriate because respondents do not consider it to be a competitive phone to those produced by Apple, Samsung and LG, among others. Hence, the low association caused by using an inappropriate control served to artificially inflate Dr. Van Liere's association numbers.

68. Furthermore, if I were to use **only** the more trustworthy control, the LG G2x, then association would range from .5% for the Samsung Galaxy SII Epic Touch (22.5% – 22.0%) and 1.6% for the Samsung Galaxy Showcase (23.6% - 22.0%). These numbers are not significantly different from no association at all. If I used only the poorly selected Blackberry Storm as a control, which is what Dr. Van Liere did in his report, then association levels would be 17.8% for the Samsung

Galaxy SII Epic Touch (22.5% – 4.7%) and 18.9% for the Samsung Galaxy Showcase (23.6% - 4.7%). Thus, the exact same comparison done by Dr. Van Liere, as flawed as it may be, still yields approximately half of the net association levels he claimed to find in his internet study.

## IV. CONCLUSIONS FOR THE CONFUSION STUDY

69. Dr. Van Liere's confusion study is fatally flawed for many reasons. The major flaws rendering the study unreliable, invalid and untrustworthy include the following:

- The "Nook" e-reader is an invalid control because it is not a tablet computer.

- The product exposure in both the test and control cells does not capture exposure when the Apple is seen alongside another product, and thus the survey protocol inflates confusion. This could easily have been accounted for in the research protocol.

- The research protocol relies upon memory for the Apple tablet but not for Samsung, which increases the potential for confusion.

- The design is incomplete and is missing a control cell for the unbranded Samsung condition, inflating confusion.

- The sample studied admittedly does not match the demographic profile of tablet users, and hence is not generalizable.

- Confusion is recorded for any mention of Apple or iPad, instead of properly being restricted to those who are confused because of a design feature. Hence, confusion is over-estimated.

- Individuals who work in the computer industry or for Apple should have been excluded, yet were not.

## V. CONCLUSIONS FOR THE ASSOCIATION STUDY

70. This study also suffers from significant and fatal flaws which make the findings unreliable:

- The brand name of the device the respondent used to participate in the study was not accounted for, which introduced significant bias into the results.

- The universe selected – the general U.S. population – is overbroad for an association survey and thus contains irrelevant data.

- Dr. Van Liere's first and second questions were impermissibly leading and suggestive, tainting the entirety of the study.

- The Blackberry Storm 9550 is a poorly chosen and unreasonable control.

- The data actually show that if a unique association is made, it is equally as strong between Blackberry and Apple as between Samsung and Apple – a result indicative of an overall smart-phone category effect and Apple's role as market leader, and not due to trade dress.

- My own study replicating Dr. Van Liere's study in a usage environment shows that the actual degree of association between two different Samsung phones and Apple, when appropriate controls are used is de minimis, and when the average of two controls are used the degree of association is still very low and approximately one third to one quarter of that observed in Dr. Van Liere's internet study.


I reserve the right to supplement or amend this Report based on any facts, documents, or information that may come to my attention after the date of this Report. As part of my trial testimony, I may prepare and rely on demonstrative aids—such as charts, tables, and graphs—as I deem necessary and advisable to assist the trier of fact.


April 16, 2012

Dr. Michael A. Kamins

Bibliography

Carpenter, Gregory S., and Kent Nakamoto (1989), "Consumer Preference Formation and Pioneering Advantage," Journal of Marketing Research, 26 (August), pp. 285-98.

Diamond, Shari (2012), "Reference Manuel on Scientific Evidence, 2nd Edition.

Falcone, John P. (2012), "Kindle vs. Nook vs. iPad: Which eBook reader Should You Buy?" c/Net, March 13th 2012.

Kamins, Michael A., Frank H. Alpert and Lars Perner (2003), "Consumers' Perceptions and Misperceptions of Market Leadership and Market Pioneership, Journal of Marketing Management, 19, pp. 807-834.

McCarthy, C. Thomas (2012), McCarthy on Trademarks and Unfair Competition, 4th Edition.

Morgan, Fred W. (1990), "Judicial Standards for Survey Research: An Update and Guidelines," Journal of Marketing, Vol. 54(January), pp. 59-70.

Nunnally, Jum C. (1970),  Introduction to Psychological Measurement. New York, New York, McGraw-Hill.

Pew Report (2012), "Tablet and e-Book Readership Nearly double Over the Holiday Period," On e-Readers and Tablets," January 23rd 2012.

Seitz, Patrick (2012), "Apple iPhone Expanding its Smart Phone Market Share," *Investor's Business Daily*, April 2nd 2012.