# Exhibit 61

Confidential Attorneys' Eyes Only
Outside Counsel

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
                    SAN JOSE DIVISION
 3
 4   APPLE INC., a California      Case No.
     corporation,
 5                                 11-cv-01846-LHK
              Plaintiff,
 6
     v.
 7
     SAMSUNG ELECTRONICS CO.,
 8   LTD., a Korean business
     entity; SAMSUNG ELECTRONICS
 9   AMERICA, INC., a New York
     corporation; SAMSUNG
10   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited
11   liability company,
12            Defendants.
13              C O N F I D E N T I A L
14       A T T O R N E Y S'   E Y E S   O N L Y
15           O U T S I D E   C O U N S E L
16              VIDEOTAPED DEPOSITION
17             BENJAMIN B. BEDERSON, Ph.D.
18                  Washington, D.C.
19             Saturday, September 17, 2011
20                     9:30 a.m.
21
22   Job No. 41965
23
24   Reporter:  Linda S. Kinkade, RDR, CRR, RMR, CSR
25   Videographer:  Conway Barker
```

Confidential Attorneys' Eyes Only
Outside Counsel

Page 2

1
2
3
4
5       The following is the videotaped deposition
6   of BENJAMIN B. BEDERSON, Ph.D. held at the offices
7   of:
8
9
10      Morrison & Foerster
11      2000 Pennsylvania Avenue, N.W.
12      Washington, DC 20005
13
14
15
16      Taken pursuant to applicable Rules of Civil
17  Procedure, before Linda S. Kinkade, Registered
18  Diplomate Reporter, Certified Realtime Reporter,
19  Registered Professional Reporter, Registered Merit
20  Reporter, Certified Shorthand Reporter (CA), and
21  Notary Public, in and for the District of Columbia.
22
23
24
25

Page 3

1   APPEARANCES:
2
3       On Behalf of Plaintiff APPLE INC., a
4   California corporation:
5           MICHAEL A. JACOBS, ESQUIRE
6           DEOK KEUN AHN, ESQUIRE
7           Morrison & Foerster
8           425 Market Street
9           San Francisco, California 94105
10
11
12
13
14      On Behalf of Defendant SAMSUNG ELECTRONICS
15  CO.:
16          ERIC HUANG, ESQUIRE
17          AARON KAUFMAN, ESQUIRE
18          Quinn Emanuel Urquhart & Sullivan
19          51 Madison Avenue
20          22nd Floor
21          New York, New York 10010
22
23
24
25

Page 4

1           INDEX OF EXAMINATION
2   EXAMINATION OF BENJAMIN BEDERSON, Ph.D.   PAGE
3       BY MICHAEL A. JACOBS, ESQUIRE      8

Page 5

1          INDEX OF EXHIBITS
2          (Attached to transcript)
3   NO.       BATES RANGE   DESCRIPTION     PAGE
4   Exhibit 211  N/A      Source Code     19
                          using System
5   Exhibit 212  N/A      Source Code     19
                          Email.cs
6   Exhibit 213  N/A      Source Code     19
                          ShellForm.cs
7   Exhibit 214  N/A      Source Code    138
                          Landscape.cs
8   Exhibit 215  BEDERSON   Email         161
       0000132    correspondence
9                BEDERSON    from J.
       0000134    SanGiovanni to
10                B. Bederson,
                  A. Karlson
11                sent
                  08/23/2004
12  Exhibit 216  BEDERSON   Email         168
       0000244    correspondence
13                from J.
                  SanGiovanni to
14                B. Bederson
                  sent
15                08/17/2005
16  Exhibit 217  BEDERSON   Email         172
       0000008    correspondence
17                from B.
                  Bederson to J.
18                SanGiovanni
                  sent
19                08/25/2005
20  Exhibit 218  BEDERSON   Email         174
       0000150    correspondence
21                from J.
                  SanGiovanni to
22                B. Bederson
                  sent
23                09/22/2004
24
25

Confidential Attorneys' Eyes Only
Outside Counsel

Page 6

```
 1      INDEX OF EXHIBITS (continued)
 2  NO.      BATES RANGE  DESCRIPTION       PAGE
 3  Exhibit 219  BEDERSON    Email        174
             0000157      correspondence
 4                        from J.
                          SanGiovanni to
 5                        B. Bederson
                          sent
 6                        08/25/2004
 7  Exhibit 220  BEDERSON    Email        174
             0000236      correspondence
 8           BEDERSON    from J.
             0000237      SanGiovanni to
 9                        B. Bederson
                          sent
10                        05/17/2005
11  Exhibit 221  N/A        Exhibit A,    184
                          Abstract
12                        AppLens and
                          LaunchTile
13  Exhibit 222  N/A        Behaviour &   204
                          Information
14                        Technology
15  Exhibit 223  N/A        Photograph:   218
                          iPAQ File
16                        Explorer
17  Exhibit 224  N/A        Photograph:   227
                          iPAQ Pocket PC
```

Page 7

```
 1           P R O C E E D I N G S
 2       VIDEOGRAPHER:  This is the beginning
 3  of tape 1 in the deposition of Benjamin Bederson
 4  in the matter of Apple, Incorporated versus
 5  Samsung Electronics Company, Limited, et al., in
 6  the United States District Court for the
 7  Northern District of California, San Jose
 8  Division, case number 11-CV-01846-LHK.
 9       This deposition is being held at
10  Morrison & Foerster, 2000 Pennsylvania Avenue,
11  northwest, Washington, D.C. on September 17th,
12  2011 at approximately 9:36.
13       Would counsel please identify yourselves and
14  state whom you represent.
15       MR. JACOBS:  Michael Jacobs,
16  Morrison & Foerster, for plaintiff Apple.
17       MR. HUANG:  Eric Huang of Quinn
18  Emanuel for the witness and Samsung.  With me is
19  Aaron Kaufman, also with Quinn Emanuel.
20       MR. JACOBS:  And with me is Matt Ahn.
21  Do you want to put your voices on video?
22       MR. KAUFMAN:  Aaron Kaufman, Quinn
23  Emanuel.
24       MR. AHN:  And Matthew Ahn, Morrison &
25  Forester.
```

Page 8

```
 1       VIDEOGRAPHER:  The court reporter is
 2  Linda Kinkade.  The video camera operator is
 3  Conway Barker, both in association with TSG.
 4       Would you please swear in the witness and
 5  we can begin.
 6
 7           BENJAMIN BEDERSON, Ph.D.
 8       Being first duly sworn, testified as
 9  follows:
10               EXAMINATION
11  BY MR. JACOBS:
12       Q.  Good morning, Dr. Bederson.
13       A.  Good morning.
14       Q.  Have you had your deposition taken
15  before?
16       A.  Yes, I have.
17       Q.  In what context?
18       A.  A few different contexts.
19       Q.  So you've had your deposition taken
20  several times?
21       A.  Yes.
22       Q.  In any other patent cases?
23       A.  Yes.
24       Q.  What do you recall?  Which cases?
25       A.  I was a fact witness for one case that
```

Page 9

```
 1  was for -- I was working with Hillcrest Labs
 2  that was opposed to Nintendo, and I was an
 3  expert witness for Yahoo! against girafa, and I
 4  was an expert witness for GemStar and --
 5       Q.  Which piece of the GemStar litigation
 6  was that?
 7       A.  It was a -- I'm trying to remember the
 8  opposition.  I don't recall.  And there is
 9  another one I'm not -- I believe there is one
10  more that I'm not -- one or two more that I'm
11  not remembering right now.
12       Q.  Did the work that you did that's
13  reflected in your declaration in this case, the
14  LaunchTile and XNav, did that figure in any of
15  the previous cases that you were involved in?
16       A.  No, it did not.
17       Q.  In the two -- I think you mentioned
18  two cases in which you were retained as an
19  expert witness, Yahoo! and GemStar.  Is that --
20  did I recall what you said correctly?
21       A.  Yes.
22       Q.  Did you testify at trial in either of
23  those cases?
24       A.  In GemStar I testified in an
25  arbitration hearing.
```

Confidential Attorneys' Eyes Only
Outside Counsel

Page 202

1  engage people that only speak one language to
2  collaboratively work together with
3  machine-translation systems to translate text
4  from one language to another language.
5      Q.  In your declaration you talk about a
6  physics-based metaphors for user interface
7  design.  Do you recall that?  It's at paragraph
8  31.
9      A.  I do.
10      Q.  So what is the relationship between
11  these physics-based metaphors and LaunchTile?
12          MR. HUANG:  Objection to the form of
13  the question.
14          THE WITNESS:  The idea of
15  physics-based metaphors is that, if you can
16  build an interactive system, user interface, on
17  a computer that has interaction characteristics
18  that are similar to the way objects behave in
19  the real world, then we expect that they will be
20  easier for a user to predict how they will
21  behave and to use them.
22      So the connection to LaunchTile is that, for
23  example, there may be others, but, for example, if I
24  want to move this piece of paper in the real world,
25  I can use my thumb by pressing down, moving it, and

Page 203

1  letting go, and it follows my thumb (indicating).
2      And on LaunchTile it moves Zones in the same
3  way.  You press down, you drag the Zone with you,
4  and you let go.
5      There are also physics metaphors, things --
6  behaviors -- in the natural world where objects have
7  a natural -- not natural -- the structure of the
8  physical system results in there being a location
9  that they naturally gravitate to.  In fact we even
10  use that word, "gravitate," because it's a physics
11  metaphor.
12      So, for example, if I pick this thing up and
13  I let go, gravity is not going to let it get stuck
14  in the middle.  It will go to the end.  If I move it
15  all the way more and let it go, it naturally goes
16  there.  So this object has two natural positions,
17  and that's kind of a basic characteristic of physics
18  (indicating).
19          MR. HUANG:  Can we let the record
20  reflect he was demonstrating on part of the
21  table?
22  BY MR. JACOBS:
23      Q.  Anything else?
24      A.  So, similarly, motivated by those
25  kinds of principles, the snapping feature in

Page 204

1  LaunchTile is motivated by the idea that, if
2  there are some places that are convenient for
3  the interface to go to, then you should make the
4  interface naturally take you to those places and
5  not let you get stuck in inconvenient places.
6      Q.  So you published an article recently,
7  "The Promise of Zoomable User Interfaces."
8      Mark this as the next in order.
9      (Exhibit No. 222 marked for
10  identification.)
11  BY MR. JACOBS:
12      Q.  The Promise of Zoomable User
13  Interfaces by Benjamin B. Bederson, 2011, Taylor
14  & Francis.  What was this published in?
15      A.  This was published in a journal named
16  Behaviour & Information Technology.
17      Q.  In 2011?
18      A.  Yes.
19      Q.  On page 4 you have a discussion of
20  Desert Fog citing Jul and Furnas.  Desert Fog
21  labels a phenomena that you describe as allowing
22  users to fly through the space going absolutely
23  anywhere including deep into the spaces between
24  objects.  Do you see that?
25      A.  No, actually.  Sorry.  Where are you?

Page 205

1      Q.  It's on the right-hand column of --
2  it's such a vivid image I thought it might just
3  jump from the page.  The right-hand column of
4  page 4, second paragraph.
5      A.  Yes, I see this.
6      Q.  So just to maybe start a little bit
7  earlier, different zoomable user interfaces have
8  also had various navigation mechanisms, which
9  are ways for users to move through the space.
10  Again, there is a trade-off between flexibility
11  and usability.  Some interfaces allow users to
12  fly through the space going absolutely anywhere,
13  including deep into the spaces between objects,
14  resulting in some researchers labeling this
15  phenomenon Desert Fog, Jul and Furnas.  Then you
16  say, very few other applications let a user
17  navigate beyond the actual content.
18      Can you explain the contrast you were
19  drawing there between ZUIs and other applications?
20          MR. HUANG:  Objection to the form.
21          THE WITNESS:  Sure.  So if we continue
22  reading this paragraph, it describes this idea
23  of not letting you navigate between the actual
24  content.  I believe it says, almost every
25  document browser and editor limits navigation to

Confidential Attorneys' Eyes Only
Outside Counsel

Page 206

1   the available content with the notable exception
2   of Microsoft Excel's scroll bar arrows, Apple
3   numbers, and Google -- I'm sorry -- with the
4   notable exception of Microsoft Excel's scroll
5   bar arrows. Apple numbers and Google
6   spreadsheet, on the other hand, do limit
7   navigation. On the other hand, some interfaces
8   allow you only to click on objects to zoom into
9   them and click on a zoom out button to zoom out,
10  making it impossible to get lost, but also
11  giving less control over exactly where you look.
12      So the point of this paragraph was to
13  describe that there are some applications that let
14  the user navigate in space possibly -- navigating
15  can be simple scrolling or it could be this kind of
16  zooming navigation, which is a little bit more
17  uncommon, or it could be 3-D navigation in a 3-D
18  world.
19      Sorry. I was describing that sometimes you
20  can navigate to a place where there is no content.
21  If there is no content, then you're kind of in a
22  place that essentially -- typically -- represented
23  with an empty screen. And that was a concern
24  because that would make a user feel disoriented
25  since there is nothing on the screen.

Page 207

1       And I said that it was more common for
2   applications to stop a user from navigating to a
3   place where there was no content, although it
4   occurred, both in widespread applications like Excel
5   and in many ZUIs, in at least those.
6       Q. So the basic contrast you were drawing
7   was between those ZUIs that are flexible but
8   haven't addressed this problem of getting lost
9   in Desert Fog, and most applications which do
10  constrain you to the space that's filled by
11  content. Is that -- am I capturing the essence
12  of your paragraph correctly?
13          MR. HUANG: Objection to the form of
14  the question.
15          THE WITNESS: The paragraph said --
16  well, it didn't say "most." It said there were
17  few applications that let you move to a place
18  where there is no content, although I did
19  describe some, and many constrained you to
20  navigating only within available, visible
21  content.
22  BY MR. JACOBS:
23      Q. And that -- but you were describing
24  that, as of 2011, there remains this problem in
25  ZUIs of flying through the space going

Page 208

1   absolutely anywhere this phenomenon labeled
2   Desert Fog, correct?
3           MR. HUANG: Objection to the form of
4   the question.
5           THE WITNESS: No. This was -- there
6   was no date here that specified that -- when the
7   idea of constraining ZUIs to content happened.
8   So this paragraph does not imply that, as of
9   2011, there were no mechanisms to constrain
10  ZUIs.
11      In fact that last sentence explains ZUIs
12  that do constrain you to content, where it says,
13  on the other hand, some interfaces allow you
14  only to click on objects to zoom into them,
15  which means we must be talking about zooming
16  interfaces, and click on a zoom button to zoom
17  out making it impossible to get lost.
18      So there is nothing here about when there
19  were interfaces that -- zooming interfaces --
20  that did or did not stop you from getting lost.
21  BY MR. JACOBS:
22      Q. And on page 5, under "Applications,"
23  you refer to a chart, Table 1, shows a selection
24  of zoomable application, only true ZUIs are
25  shown. It captures a range of what people have

Page 209

1   been using zooming for and makes apparent the
2   range of approaches that people have taken with
3   regard to layout, flexibility and navigation.
4       You go on to say, it is also clear that
5   the essential problem of getting lost in Desert
6   Fog has not been consistently avoided.
7   Furthermore, it's clear there is no consistency
8   in the mechanisms that are used to navigate
9   through space.
10      Do you see that?
11      A. I do.
12      Q. So as of 2011 did you regard the
13  essential problem of getting lost in Desert Fog
14  as a -- as something that was still apparent in
15  zoomable user interfaces available on the market
16  today?
17          MR. HUANG: Objection to the form of
18  the question.
19          THE WITNESS: I think this paragraph
20  states that, as of 2011, some zoomable
21  interfaces had that problem, that a user could
22  get lost in Desert Fog, but it -- so...
23  BY MR. JACOBS:
24      Q. And how do you -- looking at your
25  chart, how do you read the chart to identify

Confidential Attorneys' Eyes Only
Outside Counsel

Page 210

1  whether the Desert Fog problem has been
2  addressed in a particular ZUI?
3          MR. HUANG:  Objection to the form.
4          THE WITNESS:  There is not anything in
5  this chart that explicitly addresses which of
6  these applications prevent getting lost in
7  Desert Fog or not.
8  BY MR. JACOBS:
9      Q.  So if you look at the more modern,
10  maybe the second page of Table 1 -- let me back
11  up.
12      Is it the case, then, that the educated --
13  maybe sort of your peers in the field -- would
14  understand from this chart which ones still had
15  the Desert Fog problem?
16          MR. HUANG:  Objection to the form.
17          THE WITNESS:  I don't think there is
18  anything in this chart that labels these
19  different applications as preventing Desert Fog
20  or not, so a peer might analyze and come up with
21  their own interpretation of it, but I don't
22  think it's represented in this chart.
23  BY MR. JACOBS:
24      Q.  So if you look at the ZUIs that you
25  listed as from 2008 on, do you have a

Page 211

1  categorization in your own mind of which of
2  those represent the Desert Fog problem?
3      A.  No, I do not.
4      Q.  So I guess I have to just press you a
5  little bit because your article says it's
6  apparent from this chart or it is clear that the
7  essential problem of getting lost in Desert Fog
8  has not been consistently avoided.  Do you see
9  that?
10          MR. HUANG:  Objection to the form.
11  BY MR. JACOBS:
12      Q.  I guess I should ask you, why is it
13  clear from -- why is it clear that the essential
14  problem of getting lost in Desert Fog has not
15  been consistently avoided?
16      A.  So just to be clear, the way I read
17  this paragraph in question, the first paragraph
18  of section 2.3, is it describes Table 1.  The
19  first part of the paragraph explicitly refers to
20  Table 1.  And then this sentence does not
21  explicitly refer to Table 1.  It just says, it
22  is also clear that the essential problem of
23  getting lost in Desert Fog has not been
24  consistently avoided.  So the connection in that
25  sentence to Table 1 is ambiguous.

Page 212

1      However, I don't think each of these
2  applications is described in this paper anywhere
3  else, so looking at this paper now, I think a reader
4  might be able to use some of their knowledge about
5  the way navigation works that is not described in
6  this paper and possibly infer which of these
7  applications enabled a user to get lost in Desert
8  Fog or not.  But as I read this now, I don't think
9  it is actually clear, so I would say that was a --
10  that sentence could have been written better.
11  BY MR. JACOBS:
12      Q.  So if you're presenting this paper at
13  a conference and somebody raises his hand at the
14  back of the room and says, Bederson, why is it
15  so clear, can you defend this statement in your
16  paper that it is clear that this problem of
17  getting lost in Desert Fog has not been
18  consistently avoided, what would your answer be?
19          MR. HUANG:  Objection to the form of
20  the question.
21          THE WITNESS:  Well, I think this table
22  does not make it clear by itself.  I would have
23  to look at the rest of the paper to see if I
24  made any further clarification of that, and I
25  don't recall if I did or not.

Page 213

1  BY MR. JACOBS:
2      Q.  Just as you look at some of the
3  applications, the ZUIs that are listed on the
4  table, do you regard the Apple iPhone, year
5  2007, but the iPhone you're referring to, I
6  guess, is the 2010 version of it, do you regard
7  that as having resolved the problem of getting
8  lost in Desert Fog?
9      A.  So in this particular -- in this table
10  I'm to read, the thing that comes closest to the
11  Desert Fog issue is the right-most column that
12  talks about navigation mechanism for zooming,
13  and for the Apple iPhone it says, tap to zoom
14  in, physical button to zoom out.
15      So I think it's probably referring to the
16  home screen application icons where you tap on one
17  of those application icons and it has a zooming
18  transition.  It zooms in to launch the application
19  icon and you can press the hardware button at the
20  bottom of the device to zoom out.
21      So at least in that case it solves -- that
22  interface solves the Desert Fog problem as
23  described.  So this is a case where, with some
24  external knowledge, you could interpret this to
25  understand that, but it was not explicit in this --

Confidential Attorneys' Eyes Only
Outside Counsel

Page 214

1  not fully explicit in this table.
2          MR. JACOBS:  Could you just give us
3  like three minutes to make sure -- oh, actually,
4  we need to go one more demo, right?  We figured
5  out how to move the blue highlighter in XNav.
6  And so if we can get you over by the video to
7  just demonstrate that mode, that would be great.
8          THE WITNESS:  Okay.
9          VIDEOGRAPHER:  Off the record at 4:37.
10     (Brief interruption.)
11         VIDEOGRAPHER:  Back on the record at
12  4:39.
13  BY MR. JACOBS:
14     Q.  Dr. Bederson, we've given you again
15  the Sony Vaio with the XNav on it that we were
16  demonstrating earlier in the deposition, and
17  we've now learned how to move the blue
18  highlighter into the center of the screen and
19  illustrate the case where the blue highlighter
20  is between -- it ends up between email headers
21  when the stylus or the finger is lifted from the
22  screen; is that correct?
23     A.  Yes.
24     Q.  Can you demonstrate that for us?
25     A.  Actually right now that highlight is

Page 215

1  at the bottom of the screen.  Would you like me
2  to move it to the middle of the screen?
3     Q.  Yes, please.
4     A.  So now the highlight is in the middle
5  of the screen.  If I drag -- tap and then drag
6  the email list so that the two emails both
7  overlap the highlight and I let go, then the
8  emails will snap so that one of them ends up
9  being completely underneath the highlight.
10    Q.  In this demonstration, which is the
11  device that you had loaded with the -- with
12  XNav, what are the -- what are the email headers
13  populated with?  Is it a notional screen of
14  email headers or were there actual emails that
15  were received on an email client on this device?
16        MR. HUANG:  Objection to the form of
17  the question.
18        THE WITNESS:  So these email headers
19  in this XNav software were stored as images of
20  the headers on the disc and they were loaded off
21  of a disc.  So they were essentially
22  precalculated as email headers.  They did come
23  from actual emails.
24  BY MR. JACOBS:
25    Q.  But if one were to -- just to

Page 216

1  underline the point, if one were to click on or
2  otherwise seek to get the underlying text of the
3  email on this device, the device does not have
4  the full email underneath the header, correct?
5          MR. HUANG:  Objection to the form of
6  the question.
7          THE WITNESS:  If you tap on one of
8  these email, I believe -- so, I guess, if you
9  press this button, it opens up a special kind of
10  menu, and, if you press the plus button, then it
11  will open up a representation of an email.
12  BY MR. JACOBS:
13    Q.  Is that the same email for every
14  header?
15    A.  Yes, it is.
16    Q.  So it's kind of a -- this is really a
17  prototype of what it could -- what this device
18  could do if you figured out how to get an email
19  client to create images for each header, store
20  them in the database, and link them to the
21  underlying message, correct?
22    A.  I think you just proposed a possible
23  architecture for implementing an email system.
24  So what I would say is this is a prototype that
25  demonstrates how email can work in this

Page 217

1  environment.
2     Q.  With a prepopulated database of images
3  representing email headers and a single email
4  text, correct?
5          MR. HUANG:  Objection to the form.
6          THE WITNESS:  I would say with a
7  hard-coded set of email headers and a single
8  content of email.
9  BY MR. JACOBS:
10    Q.  Thank you.
11        MR. JACOBS:  Let's go off the record
12  again.
13        VIDEOGRAPHER:  Off the record at 4:43.
14    (Proceedings recessed.)
15        VIDEOGRAPHER:  Back on the record at
16  4:45.
17  BY MR. JACOBS:
18    Q.  So a couple other devices were given
19  to us by Quinn Emanuel, counsel for Samsung, and
20  I want to just check with you if you know
21  anything about the providence of those devices
22  and the appearance that one sees when one opens
23  them up.
24        So we have this iPAQ here that we
25  received, and we've taken a picture of the

Confidential Attorneys' Eyes Only
Outside Counsel

Page 222

1  that device or a different device.
2      MR. HUANG: We can represent that that
3  is the device that Professor Bederson provided
4  to us.
5  BY MR. JACOBS:
6      Q. And did you load -- were you the
7  person who loaded XNav on it?
8      A. I think I was at some point in the
9  past but not for the purposes of this
10 litigation.
11     Q. So actually you anticipated where I
12 was going. Was this something that you had on
13 the shelf in your -- in a section for LaunchTile
14 that happened to have had LaunchTile loaded on
15 it from the 2004 or 2005 period?
16     A. It was in a box with stuff, not just
17 for LaunchTile.
18     Q. But it --
19     A. And I pulled it out and it had
20 LaunchTile on it already -- XNav already on it.
21     Q. It had XNav on it. And, therefore, to
22 the best of your recollection, the XNav that's
23 on it actually dates back from the development
24 and Microsoft's interaction period that we were
25 discussing today, correct?

Page 223

1      A. Correct.
2      MR. JACOBS: I think we're done.
3  Thank you.
4      MR. HUANG: Thank you.
5      THE WITNESS: Thank you.
6      VIDEOGRAPHER: This concludes the
7  deposition of Dr. Bederson. Off the record at
8  4:57 and it consists of five tapes.
9      (Proceedings concluded.)
10
11 //
12     (Signature having not been waived, the
13 deposition of BENJAMIN B. BEDERSON, Ph.D.
14 concluded at 4:57 p.m.)

Page 224

1      CERTIFICATE OF SHORTHAND REPORTER
2           NOTARY PUBLIC
3
4      I, Linda S. Kinkade, RDR, CRR, RMR, CSR,
5  the notarial officer before whom the foregoing
6  proceedings were taken, do hereby certify that the
7  foregoing transcript is a true and correct record of
8  the proceedings; that said proceedings were taken by
9  me stenographically, to the best of my ability, and
10 thereafter reduced to typewriting; and that I am
11 neither counsel for or related to, nor employed by
12 any of the parties to this case and have no
13 interest, financial or otherwise, in its outcome.
14     IN WITNESS WHEREOF, I have hereunto set my
15 hand and affixed my notarial seal this 17th day of
16 September 2011.
17
18
19 _____
        Linda S. Kinkade
20
21
22 NOTARY PUBLIC IN AND FOR
23 THE DISTRICT OF COLUMBIA
24 My commission expires: July 14, 2012
25

Page 225

1      ACKNOWLEDGMENT OF DEPONENT
2
3      I, BENJAMIN B. BEDERSON, Ph.D., do hereby
4  acknowledge that I have read and examined the
5  foregoing testimony, and the same is a true, correct
6  and complete transcription of the testimony given by
7  me, with the exception of the noted corrections, if
8  any, appearing on the attached errata sheet signed
9  by me, to the best of my knowledge and belief.
10
11
12
13 _____  _____
14  (Date)          (Signature)
15
16
17     Subscribed and sworn to before me this _____
18 day of _____, 20__.
19     My commission expires _____.
20     Notary Public _____
21
22
23
24
25