Exhibit 2

1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                             NORTHERN DISTRICT OF CALIFORNIA

10                                   SAN JOSE DIVISION

11

12   APPLE INC., a California corporation,        Case No.    11-cv-01846-LHK

13                 Plaintiff,                      **REBUTTAL EXPERT REPORT
                                                   OF SUSAN KARE**
14          v.

15   SAMSUNG ELECTRONICS CO., LTD., A
     Korean business entity; SAMSUNG
16   ELECTRONICS AMERICA, INC., a New York
     corporation; SAMSUNG
17   TELECOMMUNICATIONS AMERICA, LLC, a
     Delaware limited liability company,
18
                  Defendants.
19

20           **CONFIDENTIAL – CONTAINS MATERIAL DESIGNATED AS HIGHLY
          CONFIDENTIAL – ATTORNEYS' EYES ONLY PURSUANT TO A PROTECTIVE
21                                     ORDER****

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2                                                                                          **Page**

3  I.      INTRODUCTION ........................................................................................1

4  II.     QUALIFICATIONS ...................................................................................1

   III.    MATERIALS CONSIDERED ....................................................................1

5  IV.     RELEVANT LEGAL PRINCIPLES ..........................................................2

6  V.      THE OVERALL APPEARANCE OF EACH CLAIMED DESIGN AND
           ASSERTED TRADE DRESS IS NOT DICTATED BY FUNCTION ...........................4

7          A.      Graphical User Interfaces Do Not Require Use of a Grid and
8                  Rounded Rectangles....................................................................4

9          B.      The Functions Identified by Mr. Lucente Do Not Dictate the
                   Appearance of Any of the Claimed Designs.........................................6

10         C.      The Functions Identified By Mr. Lucente Do Not Dictate the
                   Appearance of the Asserted Trade Dress ....................................21

11  VI.    THE ASSERTED TRADEMARKS DO NOT PREVENT OTHERS
           FROM CREATING EFFECTIVE ICONS COMMUNICATING THE
12         SAME CONCEPTS ...................................................................................21

13  VII.   MR. LUCENTE DOES NOT DEMONSTRATE THAT THE CLAIMED
           DESIGNS ARE OBVIOUS IN LIGHT OF THE PRIOR ART ...................29

14         A.      Mr. Lucente Does Not Identify Prior Art that Is Basically the Same
                   as Any of the Claimed Designs ....................................................29

15         B.      Mr. Lucente Provides No Combinations of Prior Art that Result in
                   an Overall Design that Is Substantially the Same as Any of the
16                 Claimed Designs .........................................................................47

17  VIII.  MR. LUCENTE DOES NOT IDENTIFY GRAPHICAL USER
           INTERFACES THAT HAVE SUBSTANTIALLY THE SAME
18         OVERALL APPEARANCE AS THE GRAPHICAL USER INTERFACE
           ELEMENT OF APPLE'S ASSERTED TRADE DRESS ...............................62

19  IX.    SUPPLEMENTATION ..............................................................................62

20  X.     EXHIBITS TO BE USED...........................................................................63

21

22

23

24

25

26

27

28

# REBUTTAL EXPERT REPORT OF SUSAN KARE

## I.     INTRODUCTION

1.      I, Susan Kare, submit this Rebuttal Expert Report in connection with certain patent, trade dress, and trademark claims being asserted by Apple Inc. ("Apple") in the above-captioned case.  I have been informed that Apple has alleged that Defendants Samsung Electronics Co. Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC have infringed Apple's patents, trade dress, and trademarks.

2.      This Rebuttal Expert Report is in response to the Expert Report of Sam Lucente dated March 22, 2012 ("Lucente Report").[1]

3.      As in my Expert Report dated March 22, 2012 ("Opening Expert Report"), the asserted design patents are referred to individually as the "D'790 Patent," the "D'305 Patent," and the "D'334 Patent," and collectively as the "Design Patents."  The designs shown in the Design Patents are referred to collectively as the "Claimed Designs" and individually as the "D'790 Design," "D'305 Design," and "D'334 Design."  The iPhone, iPhone 3G, iPhone 3GS and iPhone 4 are referred to collectively as the "iPhone Devices."

## II.    QUALIFICATIONS

4.      My qualifications and background are set forth in Section II of my Opening Expert Report.

## III.   MATERIALS CONSIDERED

5.      In forming the opinions set forth in this report, I considered and relied upon the Expert Report of Sam Lucente, the materials identified in this report, and the materials considered in preparing my Opening Expert Report (*see* Section III of Opening Expert Report).  I have also considered the materials listed in Exhibit 1 of this report.

---

[1] I have been informed that Apple has objected to Mr. Lucente's report because it relies on materials and theories that are not properly in this case.  Nevertheless, I have been asked to respond to certain of Mr. Lucente's opinions as I understand them

1   person having ordinary skill in the relevant art would not necessarily have experience designing

2   electronic devices themselves (*e.g.*, hardware components).

3       **Trademark Protection**

4       16.     A trademark prevents others from using a reproduction, copy, or colorable

5   imitation of a trademark in a way that is likely to cause confusion or mistake as to the origin of

6   any goods or services.[17]

7   **V.    THE OVERALL APPEARANCE OF EACH CLAIMED DESIGN AND
       ASSERTED TRADE DRESS IS NOT DICTATED BY FUNCTION**

8

9       **A.    Graphical User Interfaces Do Not Require Use of a Grid and Rounded
             Rectangles**

10

11      17.     In his report, Mr. Lucente asserts that a graphical user interface ("GUI") is a

12  "functional tool."  (Lucente Report at 7.)  While a GUI does perform a function, it does not

13  follow that every visual element of a graphical user interface is dictated by functional concerns,

14  as Mr. Lucente suggests.

15      18.     For example, it is not true that "any successful program" must use a grid for

16  placement of icons on the screen.  (Lucente Report at 10.)  Although the screens of the Xerox Star

17  GUI shown in the Lucente Report appear to align icons on a "desktop" screen to a regular grid,

18  operating systems such as Windows XP and OS X do not require icons to be in a grid on the

19  desktop screen.  Using a grid is optional in those interfaces and is a matter of user preference.

20  Likewise, as demonstrated in my Opening Expert Report, a grid is not required for the interface

21  of mobile devices.

22      19.     It is also not true that the use of rounded rectangles as the only background or

23  container shape for icons is required for a GUI to function.  Desktop computer GUIs such as

24  Windows XP and OS X do not require icons to be bordered by rounded rectangles, and instead

25  feature icons with irregular shapes.  Likewise, as demonstrated in my Opening Expert Report,

26  there are many options for designing a GUI for a mobile device that do not use rounded

27  rectangles.

28  ---
[17] 15 U.S.C. §§ 1114, 1125(a).

20.     Mr. Lucente's statement that the "Apple iOS Human Interface Guidelines also emphasize the functionality of the icons themselves" is misleading.[18] (Lucente Report at 12.)  In fact, the guidelines quoted by Mr. Lucente stress the visual appearance of icons, not their functionality.  The language that Mr. Lucente quotes about "embracing simplicity," starting with a "basic shape," and adding details "cautiously" are *design* guidelines clearly intended to make icons more visually appealing.  (*Id.* at 12.)  This language does not emphasize the "functional aspect of an icon," as the icons themselves are only the part of the GUI that is visible to the user.  Moreover, the fact that icons may "communicate" does not mean that they are purely functional.  In fact, the language that Mr. Lucente quotes actually makes clear that icons *are* decorative (e.g., are graphic designs) but that they also communicate ideas.  (*Id.* at 13.)  "Far from being *merely decorative*, the icons and images in your app play an essential role in communicating with users." (emphasis added).)

21.     Even the particular guidelines that Mr. Lucente cites emphasize the decorative nature of icons.  For example, the guidelines explain that icons on the "home screen" are automatically modified to have rounded corners, a drop shadow, and a reflective shine.  (Lucente Report at 13.)  These are Apple's desired visual effects, but they are not inherently required by the functionality of the GUI in which they appear.  In the iPhone GUI, for example, rounded rectangles represent buttons that can be activated by the user's finger, and if the rectangles instead had sharp corners with no added visual effects, that functionality would be unaffected

22.     Mr. Lucente does not support his claim that "[i]cons in the shape of rounded rectangles as a functional element on a touch interface were used on the first smartphone, the IBM Simon." (Lucente Report at 14.)  Although the IBM Simon shown in the Lucente Report does display a two-column array of icons, those icons do not each have a rounded rectangle shape.  It is unclear, therefore, how Mr. Lucente concludes that "[r]ounded rectangles are used consistently throughout the Simon design."  (*Id.*)  Mr. Lucente may be referring to the rectangles used to depict telephone buttons (see Figure 1, below), but those rectangles contain text only, not

---

[18] The iOS guidelines, which concern icons developed by third-party developers, do not appear to be relevant to understanding the visual appearance of the icons depicted in Apple's Design Patents.

graphical icons.  Also, while those rectangles appear to have a white pixel or two at the corners of the black outline, they do not read as having significantly rounded corners.  As shown below in the middle image of Figure 1, the two-column "icon grid" displayed by the Simon clearly did not employ rounded rectangles.




**Figure 1**

### B. The Functions Identified by Mr. Lucente Do Not Dictate the Appearance of Any of the Claimed Designs

23.     Mr. Lucente concludes that the Claimed Designs are functional because they utilize design concepts that Mr. Lucente claims are "fundamental components of human-computer interaction."  (Lucente Report at 16-25.)  However, Mr. Lucente never considers whether the overall visual impression created by each of the Claimed Designs is primarily due to the functions he identifies.  In fact, each design concept (and associated function) that Mr. Lucente identifies could be implemented such that the resulting overall design would be very different than each of the Claimed Designs.

1
2

### 1.     The Overall Visual Appearance of the D'790 Design Is Not Dictated By Function

3

24.     Mr. Lucente concludes that the D'790 Patent has no "decorative" elements

4    because, according to his analysis, each design element he identifies has some functional role in a

5    GUI.  Those elements are: a rectangular display, an icon grid, an icon dock, and the spacing,

6    proportions, shape and number of icons.  Individually or collectively, however, the functions that

7    Mr. Lucente assigns to these elements do not require or necessarily yield the visual appearance of

8    the D'790 Design.

9

### (a)     Rectangular Display Screen

10

25.     Mr. Lucente first claims that "[t]he rectangular shape of [the display] element is

11   driven by display screen technology." (Lucente Report at 16.)  He further states that "[a]lternative

12   designs would be more expensive and more difficult to develop, and would not have the

13   organizational benefits of the rectangular shape."  (*Id.*)  Mr. Lucente does not provide any support

14   for these statements regarding limitations of display screen technology.  Even accepting his

15   statements as true, Mr. Lucente offers no explanation for the particular proportions and

16   orientation shown in the D'790 Design, which are the actual elements that contribute to its overall

17   visual appearance.  As shown in Exhibit 9 to my Opening Expert Report, rectangular displays

18   with various other height-to-width ratios are possible for GUIs.  Each example in that exhibit has

19   a rectangular screen, but not all of them have a height-to-width ratio close to the ratio in the

20   D'790 Design, which is 1.5:1.  The difference is especially noticeable in examples E and G,

21   which are noticeably wider than the D'790 Design, and to a lesser extent in example A, which

22   appears narrower.  In each of those examples, the different proportions of the rectangular screen

23   contribute to the different overall visual impressions created by the design.  These examples show

24   that even if a rectangle were the only shape available for a display screen, the proportions of the

25   rectangular display shown in the D'790 Design would not be required or dictated by function.

26
27
28

**(b)      Grid of Icons**

26.      Mr. Lucente next claims that "[a] grid of icons is functional because it serves as an organizational structure that allows a user to see and understand information quickly." (Lucente Report at 16.)  Mr. Lucente even claims that an icon grid is "fundamental."  (*Id.*)  I disagree with Mr. Lucente because an icon grid is not required for a GUI to function.  As shown in Exhibit 10 of my Opening Expert Report, there is a wide variety of icon arrangements that are used in smartphones.  Thus, the particular icon grid arrangement shown in the D'790 Patent is not required or dictated by function, as there are other ways to organize user interface elements on a rectangular screen.

27.      Mr. Lucente further claims that the spacing of the icons in the D'790 Patent is functional because it allows for a user to select only one icon at a time using a human finger, a human hand with a stylus, or a human hand with a mouse, and that the specific rows and columns shown in the D'790 Patent design are a function of the size of the screen and number of icons displayed.  (Lucente Report at 16-17.)  I disagree with Mr. Lucente on both points.

28.      First, when Mr. Lucente refers to "the spacing of icons" in the D'790 Patent, he is referring to the rounded rectangle elements, which are containers for icons, not necessarily icons themselves.  As discussed further in paragraph 35, below, the function of those containers being selectable (with a finger, stylus, or a mouse) depends on the area of the physical screen designated as the "hit area" for the containers, which is not necessarily the same as the area of the container itself.  Accordingly, that function does not dictate the spacing between the containers (or, by extension, the spacing between the icons within the containers).  The Blackberry Storm 2 and Nokia N9 (Figures 2 and 3, below) show how the spacing of elements on a touch screen is not dictated by the function of being selectable.  In both figures, graphic containers analogous to the rounded rectangles in the D'790 Patent are within, but do not necessarily define the boundaries of, separate selectable areas on the screen.  In the Blackberry Storm 2, however, the square "badges" containing the icons have almost no space separating them, whereas in the Nokia N9 the icons are contained in much smaller, nearly circular shapes that have noticeable empty space between them.  It is an ornamental decision whether to adopt minimal spacing between icon

1   containers, as in the Blackberry Storm 2, as opposed to having more space between the

2   containers, as in the Nokia N9.





**Figure 2**
**Blackberry Storm 2**

**Figure 3**
**Nokia N9**

29.   Second, as noted above, the proportions of the rectangular shape of the display screen are not dictated by function.  Accordingly, even if Mr. Lucente were correct that the size of the screen dictated the specific rows and columns in the D'790 Design, that does not mean that the "rows and columns in a grid are functional," as Mr. Lucente claims, because the number of rows and columns could be altered by changing the dimensions of the screen.  (Lucente Report at 16.)  Exhibits 6 through 13 of my Opening Expert Report are a sampling of the many possibilities for utilizing an icon grid in ways that result in noticeably different visual impressions.  These examples demonstrate that the particular appearance of the icon grid in the D'790 Design is not required or dictated by the functions Mr. Lucente identifies.

30.   Mr. Lucente's remaining commentary about the D'790 Patent is either irrelevant or misguided.  He notes that the difference in vertical versus horizontal spacing between the squares in the grid is functional "because it allows space for text under the icons."  (Lucente Report at 17.)  However, there is no text under the squares in the grid in the D'790 Design, so this purported functionality does not come from the design itself.  Mr. Lucente bases his claim on

1   statements by Imram Chaudhri, which I have been informed is not normally a proper basis for

2   interpreting a patent.

3                          **(c)      Grouping of Icons**

4          31.     Mr. Lucente also relies on the supposed principle that "objects sharing similar

5   attributes, e.g., multiple squares with rounded corners, are perceived as a group." (*Id.*)  But Mr.

6   Lucente does not explain how those attributes themselves (squares with rounded corners) are

7   anything but one design option for the visual appearance of the icons individually and for the

8   screen overall.  There are infinite ways to design objects on a screen so that they are perceived as

9   a group.  As the examples in Exhibits 6 through 13 of my Opening Expert Report demonstrate,

10  even if one were to make the design decision to present icons as a group, the use of squares with

11  rounded corners, as in the D'790 Design, or even icons with consistent shapes is not required or

12  dictated by function.

13                         **(d)      Dock of Icons**

14         32.     Mr. Lucente next claims that the "lower four squares with rounded corners" are a

15  "dock of frequently-used icons" and are thus "functional elements."  (Lucente Report at 17.)  I do

16  not see anything in the D'790 Patent that refers to or requires this alleged functionality of the

17  bottom row of icons.[19]  Mr. Lucente's sole basis for reading this functionality into the patent is

18  the testimony of Mr. Chaudhri, who testified about the design of the iPhone as it related to the

19  D'790 Patent.  I have been informed that it is not normally proper to rely on inventor testimony.  I

20  have also been informed that the design as shown in the patent itself, and not products that may

21  embody the design, is the proper basis for evaluating a design patent.  Because the D'790 Patent

22  itself does not indicate one way or another how the bottom row of icons would actually function

23  in a GUI, there appears to be no basis for Mr. Lucente's conclusion.

24         33.     Moreover, even if Mr. Lucente as correct that the bottom row of squares in the

25  D'790 Design represents a "dock of frequently-used icons," that would not mean that the design

26  element in the D'790 Design is merely functional.  There is no functional requirement that such a

27  ---
[19] For convenience, I have used the term "dock" to refer to the bottom row of icons.  This is simply to make clear that
    I am referring to the same design element that Mr. Lucente is referring to and is not an adoption of Mr. Lucente's
28  position on that element's function.

1    dock must use rounded rectangle shapes or elements with a similar shape and size as the other

2    elements in the design.  Exhibits 9 (examples C, F, G, H, F[20]) and 13 of my Opening Expert

3    Report contain multiple examples of screens with "docks" that do not follow the visual approach

4    of the D'790 Design.  In these examples, the items in the row at the bottom of the screen

5    noticeably depart from the graphical styles used in the icons elsewhere.  These examples

6    demonstrate that even if one makes design choice to have a single grouping of "frequently-used

7    icons" at the bottom of the screen, that functional concern does not require, or dictate, the

8    appearance of the separate row of icons in the lower portion of the screen in the D'790 Design.

9

10                              (e)      **Shape and Size of Icons**

11            34.      Mr. Lucente claims that the spacing, proportions, shape, and number of the squares

12    in the D'790 Patent are functional.  Regarding size and shape, Mr. Lucente says they are

13    functional "because the consistent size and shape conveys the form of a selectable button and

14    communicates that the icons share similar attributes so that they perceived [*sic*] as a group."

15    (Lucente report at 18.)  But this would be true of *any* consistent size and shape and says nothing

16    about the visual appearance of the D'790 Design or the particular design choice to use consistent

17    rounded rectangles.  Various examples demonstrate this.  The Nokia N9, shown in Exhibit 12 of

18    my Opening Expert Report and above in Figure 3, shows icons set inside consistent shapes (with

19    four rounded sides) that clearly read as a group of "buttons."  The Blackberry Storm 2, shown in

20    Exhibit 8 of my Opening Expert Report and above in Figure 2, has icons set on square badges,

21    each clearly reading as a separate button while also being part of a clear grouping of icons.  In

22    Exhibits 6 and 7 of my Opening Expert Report, the icons themselves have different shapes and

23    are not presented on a set of identical background containers, but they have consistent

24    perspectives and clearly read as a group of buttons.  Obviously, a desire to present icons as a

25    group does not dictate a particular GUI appearance or the particular appearance of the D'790

26    Design.

27    _____

28    [20] In the phone labeled "F" in Exhibit 9 of my Opening Expert Report, the dots along the bottom of the screen are labeled "dial," "phonebook," "messages," and "widgets."  (*See* Exhibit 2).

35.     Regarding the relative size of the squares, Mr. Lucente says it is functional "because the relative size allows a person to see the icon and a human finger better to select the icon." (Lucente Report at 18.)  However, icons or icon containers, such as the rounded rectangles in the D'790 Patent, are not necessarily the same size as the "hit area" (the "selectable" or "tappable" area on a screen) associated with the icons or icon containers.  Accordingly, the icon containers shown in the D'790 Patent could be larger or smaller without affecting the user's ability to activate the underlying application; that functionality is provided anywhere within the "hit area," which can be a different size than the icon or icon container.  This fact is demonstrated on devices such as the Pantech Hotshot and Sony Ericsson Experia arc S, which have icons that can be selected by touching the screen within an area that contains, but is considerably larger than, the icon images themselves.  As shown in Figures 4 and 5, this fact is easily demonstrated using a stylus to select the icons by touching the screen in the area outside of each icon[21]:



**Figure 4**

---

[21] In Figures 4 and 5, the highlighted rectangle around the icon corresponds to the area that can be touched by a stylus or a finger to select that icon. For the pictures shown in Figures 4 and 5 and Exhibit 3, a stylus (a pen with a metallic body and a foam tip on the non-writing end) was used for clarity.  The same effect shown in Figures 4 and 5 can be demonstrated on other devices, including the Nokia N9 and the iPhone Devices.  The Pantech Hotshot and Sony Ericsson arc S were used here as examples because the visual effects when an icon is selected on those devices are particularly clear.

1
2
3
4
5
6
7
8
9
10
11



**Figure 5**

12  (*See also* Exhibit 3.)  Likewise, in the D'790 Patent, the size of the rounded rectangle shapes

13  could be much smaller—possibly even minuscule—without changing the selectable area

14  associated with the icon.  The size of the icons or icon containers themselves is thus not dictated

15  by the function of being selectable by a human finger.  The choice of icon or icon container size

16  is an ornamental design decision.

17          36.     Even if the size of each icon or icon container were required to be identical to a

18  selectable area on the screen, Mr. Lucente does not show how that dictates the size of the rounded

19  rectangles in the D'790 Patent.   Mr. Lucente cites a study that reports 9.2mm as the minimum

20  button size for "discrete tasks" (defined as including "activating buttons, radio buttons and

21  checkboxes") "without degrading performance and preference."  (*See* Lucente Report at 18 fn.

22  46.)  Mr. Lucente says that the "icons depicted in the D'790 Patent align to these targets," but he

23  does not explain what that means.  (*Id.* at 18.)

24          37.     The D'790 Patent contains one figure, and the rounded rectangles in that figure

25  measure approximately 14mm across, much larger than the 9.2mm reported in the cited study.[22]

26  To the extent that Mr. Lucente meant to refer to the iPhone display, that is an irrelevant

27  ─────────────
    [22] I have been informed that drawings in patents are not interpreted as representing absolute sizes of the claimed
28  design.  The D'790 figure is more than 18cm tall and is obviously not intended to represent any absolute size for the
    claimed GUI appearance.

comparison under the law as explained to me by counsel.  Moreover, I have been informed that if the drawing were scaled down so that size of the display screen matched the size of the iPhone screen, the rounded rectangles would be approximately 8.4mm x 8.4mm, nearly 10 percent smaller in each dimension than the 9.2mm minimum reported in the cited study.[23, 24]  Thus, even accepting the premise that there is a minimum "target size" for buttons on a display to function, the size of the rounded rectangles in the D'790 Patent either far exceeds the minimum size that Mr. Lucente claims is required for them to function (using the absolute size of the printed patent), or is smaller than that minimum size (using the patent drawing scaled down to the size of an iPhone).  These facts do not support Mr. Lucente's conclusion that the size of the rounded rectangles is dictated by there being an optimal "target size," and I know of no other support for Mr. Lucente's conclusion.

38.     Moreover, mobile phone devices on the market demonstrate that icons can function as buttons in a touch screen GUI even when they are smaller than 8.4mm (the size of the squares in the D'790 Patent scaled down relative to the iPhone screen).  The Nokia N9, for example, has icons that are less than 8mm x 8mm, and the Pantech Hotshot has icons that are less than 7mm x 7mm.

### (f)     Number of Icons

39.     Mr. Lucente also claims that "the number of the icons is functional because the number is determined by the overall area of the rectangular outline, the size of the icon, shape of the icon, the spacing of the icon in the grid *and the number of icons desired by the user and/or the manufacturer*."  (Lucente Report at 18 (emphasis added).)  With respect to the first four factors listed, Mr. Lucente is simply saying that the number of icons depends on other design elements.  As explained above, the functions that Mr. Lucente assigns to those design elements do not

---

[23] The calculation provided to me, at my request, is as follows: the ratio of the iPhone screen size (3.5 inches, or 8.89cm, diagonal) to and the size of the display in the printed D'790 Patent (approximately 14.8cm, diagonal) is approximately .6:1 (8.89/14.8:1), so scaling the 14mm-wide squares in the printed D'790 Patent down to the relative size of the actual iPhone would result in squares 8.4mm wide (14mm x .6 = 8.4mm).

[24] It is also unclear how the Apple iOS Human Interface Guidelines relate to Mr. Lucente's conclusions.  He states that the guidelines specify a "comfortable minimum size of tappable UI elements," but he does not analyze whether the rounded rectangles depicted in the D'790 Patent correspond to and therefore may have been "dictated by" that minimum size.

dictate specific appearances for those elements, nor do they dictate the appearance of the overall design.  For each element, including whether to utilize a grid at all, a mobile device manufacturer need not adopt a visual approach similar to the D'790 Design, and designs having various numbers of icons are possible.  As shown in Exhibits 9 and 10 of my Opening Expert Report and below in Figure 6, GUIs having very different overall appearances compared to the D'790 Patent are possible.



**Figure 6** [25]

40.     Regarding the final factor (the number of icons desired), Mr. Lucente credits the testimony of the named inventors, who explained that additional icons could be placed in the "blank" fourth row in the D'790 Patent.  Even if this were a proper interpretation of the patent, it would not mean that the overall appearance of the design is dictated by function, because the additional icons would not substantially change the overall visual impression created by the claimed design.

41.     I believe that Mr. Lucente's conclusion that "the claimed elements of the D'790 Design are all functional, and not decorative, whether taken as individual elements, or the design

---

[25] http://www.lovebargaining.com/t8585-hd2-43-inch-screen-windows-mobile-65-os-50-pixel-camera-build-in-gps-wifi-gsensor-cell-phone-p-276.html (left);
http://www.designbuzz.com/entry/blue-bee-touchscreen-interface-wraps-itself-around-the-phone (right).

as a whole" (Lucente Report at 19), is not correct.  As explained above, Mr. Lucente does not establish that the functions he assigns to the "claimed elements" require the particular appearance of each element or of the overall appearance of the design.

> **2.**   **The Overall Visual Appearance of the D'305 Design Is Not Dictated By Function**

42.     Mr. Lucente concludes that the D'305 Patent has no "decorative" elements because, under his analysis, each design element he identifies serves some functional role in a GUI.  Those elements are: a rectangular display; an icon grid; an icon dock; the spacing, proportions, shape and number of icons; status indicators; icons themselves; and words under the icons.  Individually or collectively, however, the functions that Mr. Lucente assigns to these design elements do not require the visual appearance of the D'305 Design.

43.     Regarding the rectangular display, icon grid, icon dock, and the spacing, proportions, shape and number of icons, Mr. Lucente incorporates his analysis of the D'790 Patent, discussed above.  For the reasons explained above, Mr. Lucente's analysis does not demonstrate that the appearance of the D'305 Design is required by functional considerations. Mr. Lucente adds to his analysis with respect to the gray area behind the icon dock, claiming that "[t]he use of a color or shading to functionally group the icons on the dock is a functional necessity."  (Lucente Report at 20.)  This is untrue, as icons could be visually grouped in the dock without the use of a color background.  The obvious example is the interface graphics used in current iPhone Devices, which displays a virtual shelf as a base for the bottom row of icons (see Figure 7, below).



**Figure 7**

44.     Mr. Lucente also concludes that the status bar—the row containing status indicators at the top of the screen in the D'305 Design—is a "merely functional" element, although he does not even attempt to argue that the visual appearance of the status bar in the D'305 Design is primarily dictated by any function.  (Lucente Report at 20)  In fact, just as Mr. Lucente concedes that certain details of the icon dock "could be an ornamental choice" (*id.*), the particular appearance of the status bar is an ornamental choice.  Mr. Lucente's own alleged prior art examples reveal the many different ornamental designs that a status bar could use, including more colorful status bars with varying thickness and a status bar that appears at the bottom of a screen instead of the top.  (*Id.* at 41, 53-56, 62-63.)  Moreover, the status bar in the D'305 Design does not play a significant role in creating the overall appearance of the design, so even if its appearance were entirely determined by function, that would have little relevance to whether the overall appearance of the D'305 Design is dictated by function.

45.     Mr. Lucente also concludes that the icons in the D'305 Patent "are functional because they are metaphors for the function the user wishes to access."  (Lucente Report at 21.)  At no point in his report does Mr. Lucente consider the fact that icons, including those shown in the D'305 Patent, can have unique visual appearances.  Instead, Mr. Lucente concludes that

1   "icons" in general are "fundamental, functional elements" because they perform a function in

2   terms of "human-computer interaction."  (*Id*. at 23.)

3          46.     I understand that this is not sufficient to establish that the icon designs shown in

4   the D'305 Patent are dictated by function.  In fact, I conclude that they are not dictated by

5   function because the particular visual appearance of the icons could be altered with no effect on

6   the functionality of a mobile device, as Mr. Lucente's own report demonstrates.  Mr. Lucente

7   states that the "Phone" and "Mail" icons in the D'305 Patent are the same as common phone and

8   envelope symbols, but the simple, black and white, "standard icons" that Mr. Lucente cites have

9   visual appearances that are extremely different than the corresponding D'305 Patent icons.

10  (Lucente Report at 22.)  Mr. Lucente also lists 14 examples of phone icons and 22 examples of

11  mail icons, all using the same basic symbols used in the D'305 Patent but each having a visual

12  appearance clearly different than the corresponding D'305 Patent icons.  (*Id.* at 63-61, 74-76.)

13  Mr. Lucente's report thus shows that the use of a particular "metaphor" or type of symbol (*e.g.*, a

14  phone or a letter) for an icon image does not dictate any one visual appearance, so the particular

15  visual appearance of the icons in the D'305 Patent cannot be "merely functional."

16         47.     In connection with his discussion of icons, Mr. Lucente states that "the functional

17  use of color is depicted in the D'305 Patent."  (Lucente Report at 23.)  Other than with respect to

18  the green color of the Phone icon, however, Mr. Lucente does not explain any "functional use of

19  color" in the D'305 Patent.

20         48.     Mr. Lucente also claims that words below icons "are a fundamental, functional

21  element for human-computer interaction."   (Lucente Report at 24.)  While the text in the D'305

22  Design describes the icon above it, the particular visual appearance of the text (*e.g.*, the specific

23  font, color, and size) is a design choice.  Even the location of text below icons is not dictated by

24  function; rather, it is dictated by design convention and creative preference.[26]  Images in Mr.

25  Lucente's own report shows that text can be placed above icon images, and it can also be placed

26  inside the same "container" as an icon image, unlike the text in the D'305 Design.  (*Id*. at 44.)

27  

28  [26] Placing text labels above icons is arguably favorable from a functional perspective because it could make it easier
    for users to touch icons without obscuring the labels.

Moreover, Mr. Lucente's example of the BellSouth/IBM Simon shows that the use of text below icons is not a functional necessity for some icons.  According to Mr. Lucente, the designers of the Simon determined that the row of icons at the bottom of the screen did not require text labels, thereby "conserving valuable screen space."  (Lucente Report at 15.)  This shows that the choice to include text labels for *all* icons, as in the D'305, is not dictated by function.  Finally, the words in the D'305 Design do not play a significant role in creating the overall appearance of the design, so even if their exact appearance were determined by function, that would have little weight as to whether the overall appearance of the design is dictated by function.

49.     I believe that Mr. Lucente's conclusion that "the graphical user interface design shown in the D'305 Patent is functional, not decorative, whether taken as individual elements or the design as a whole" (Lucente Report at 24) is not correct.  As explained above, Mr. Lucente does not establish that the functions he assigns to the "claimed elements" require the particular appearance of each element or of the overall appearance of the design.

### 3.     The Overall Visual Appearance of the D'334 Design Is Not Dictated By Function

50.     For the D'334 Patent, Mr. Lucente incorporates his analysis of the D'305 Patent to conclude that the "corresponding elements of the D'334 'design' are merely functional and not decorative for all of the same reasons."  (Lucente Report at 25.)  For all of the reasons discussed above with respect to the D'790 and D'305 Patents, Mr. Lucente's conclusion that the elements of the D'334 Patent are not "decorative" is incorrect.

51.     Mr. Lucente concludes that the "dot elements of the D'334 'design' are merely functional and not decorative."  (Lucente Report at 25.)  His entire analysis is the statement that the dots "are purely functional because they visually show which of two pages is displayed."  (*Id.* at 25.)  But Mr. Lucente does not analyze the actual appearance of the dots in the D'334 Design, and he ignores the fact that page indicators can have varied appearances based on the decorative preference of the designer or creative guidelines.  Figure 8 shows various examples for the appearance of page indicators that are clearly different than the dots in the D'334 Design:

1
2
3
4
5
6
7
8
9
10
11
12

  

**Figure 8**
**(Pantech Hotshot, Sony Ericsson Xperia arc S, and Pantech Pocket)**

13

14  These examples show that even if, as Mr. Lucente claims, "page indicators . . . are a fundamental,

15  functional element for human-computer interaction," the specific appearance of the page

16  indicators in the D'334 Design represents a decorative choice. (*Id.* at 24-25.)

17      52.     Moreover, the row of dots in the D'334 Design does not play a key role in creating

18  the overall appearance of the design, so even if its appearance were entirely determined by

19  function, that would have little weight as to whether the overall appearance of the design is

20  dictated by function.

21      53.     I believe that Mr. Lucente's conclusion that "the claimed elements of the D'334

22  Design are all functional, and not decorative, whether taken as individual elements, or the design

23  as a whole" (Lucente Report at 25) is not correct.  As explained above, Mr. Lucente does not

24  establish that the functions he assigns to the "claimed elements" require the particular appearance

25  of each element or of the overall appearance of the design.

26
27
28

1

2

      **C.**     **The Functions Identified By Mr. Lucente Do Not Dictate the Appearance of the Asserted Trade Dress**

3

4

5

6

7

8

9

      54.     Mr. Lucente reaches the conclusion that "each of the three Asserted Trade Dress elements is functional," relying on the same analysis he applied to the Design Patents.  (Lucente Report at 25.)  As demonstrated above, however, that analysis does not consider whether the functions Mr. Lucente assigns to the "Asserted Trade Dress Elements" require the particular appearance of each element or the overall appearance of the trade dress.  Mr. Lucente never even acknowledges the actual visual appearance of each part of the Asserted Trade Dress or of the overall Asserted Trade Dress, neither of which is primarily functional.[27]

10

11

**VI.**     **THE ASSERTED TRADEMARKS DO NOT PREVENT OTHERS FROM CREATING EFFECTIVE ICONS COMMUNICATING THE SAME CONCEPTS**

12

13

14

15

16

17

18

      55.     Mr. Lucente states that "[b]ecause the Asserted Trademarks are used as icons they are functional."  (Lucente Report at 27.)  The significance of that conclusion is unexplained, as none of the legal standards regarding "functionality" that Mr. Lucente set forth in his report pertains to trademarks.  Although icons may be used to communicate concepts to users, Mr. Lucente's conclusion that Apple's ownership of each of the "Asserted Trademarks"[28] prevents others from using an efficient method of visually communicating certain concepts to users is wrong.

19

20

21

22

23

24

      56.     First, Mr. Lucente claims that U.S. Trademark Reg. No. 3,886,196 "uses a familiar and conventional icon for the function of making a phone call."  (Lucente Report at 27.)  Mr. Lucente misuses the term "familiar and conventional icon."  The Apple Phone icon uses a representation of a conventional *symbol* for the function of making a phone call, but the icon itself has a particular design, orientation, and graphic style not required by any convention.  Apple's Phone icon is rounded and incorporates colors and visual effects as described in my Opening

25

26

27

28

[27] As Mr. Lucente acknowledges, the Asserted Trade Dress concerns hardware elements as well as GUI-related elements.  Neither Mr. Lucente's report nor this rebuttal report addresses the hardware-related elements.
[28] The Asserted Trademarks are: U.S. Trademark Reg. No. 3,886,196 (Phone icon); U.S. Trademark Reg. No. 3,886,169 (Notes icon); U.S. Trademark Reg. No. 3,889,642 (Messages icon); U.S. Trademark Reg. No. 3,886,200 (Photos icon); U.S. Trademark Reg. No. 3,889,685 (Settings icon); U.S. Trademark Application Serial No. 85/041,463 (iTunes icon); and U.S. Trademark Reg. No. 2,935,038 (iTunes Eighth Notes + CD icon).

**X.    EXHIBITS TO BE USED**

129.    I anticipate using as exhibits during trial certain documents and things referenced or cited in this report or accompanying this report.  I also anticipate using other demonstrative exhibits or things at trial.

Dated: April 16, 2012

_____
SUSAN KARE

Exhibit 1

*Apple Inc. v. Samsung*, No. 11-01846 LHK (PSG)
Additional Materials Considered by Susan Kare
Rebuttal Expert Report

| BEG BATES | END BATES |
|---|---|
| SAMNDCA00379541 | SAMNDCA00379545 |

| |
|---|
| Lucente Report |
| Graphical user interface of computer running Windows XP Professional Version 2002, Service Pack 3 |
| Graphical user interface of computer running OS X 10.6.8 |
| Transcript of Deposition of Imram Chaudhri (October 14, 2011) |
| Pantech Hotshot mobile phone |

1

Exhibit 2

Peter Mauro Schroepfer
6397 Thornhill Dr.
Oakland, CA 94611

schroepfer@gmail.com
seobanseok@gmail.com

Certificate of Translation

13 April 2012

I hereby certify that this Korean to English translation of the Korean text located above the four dots which are immediately above the word "Anycall" in the image located at http://c2499022.cdn.cloudfiles.rackspacecloud.com/wp-content/uploads/2008/05/samsung-haptic-phone.png, accessed at 201204132218 and embedded in the webpage located at http://www.unwiredview.com/2008/05/08/samsung-anycall-haptic-phone-100000-units-sold-pink-and-white-versions-on-the-way/ is an accurate and complete rendering of the contents of the source document to the best of my knowledge. I further certify that I translated said document, that I am competent in both languages and have twenty years of professional experience in Korean to English translation.

By: _____
Peter Mauro Schroepfer



Exhibit 3





