**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

1   HAROLD J. MCELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
2   MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
3   JENNIFER LEE TAYLOR (CA SBN 161368)
jtaylor@mofo.com
4   ALISON M. TUCHER (CA SBN 171363)
atucher@mofo.com
5   RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
6   JASON R. BARTLETT (CA SBN 214530)
jasonbartlett@mofo.com
7   MORRISON & FOERSTER LLP
425 Market Street
8   San Francisco, California  94105-2482
Telephone:  (415) 268-7000
9   Facsimile:  (415) 268-7522

WILLIAM F. LEE
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

10

11   Attorneys for Plaintiff and
Counterclaim-Defendant APPLE INC.

12

13   UNITED STATES DISTRICT COURT

14   NORTHERN DISTRICT OF CALIFORNIA

15   SAN JOSE DIVISION

16

| | |
|---|---|
| 17   APPLE INC., a California corporation, | Case No.    11-cv-01846-LHK (PSG) |
| 18                 Plaintiff, | **DECLARATION OF PETER W. BRESSLER IN SUPPORT OF APPLE'S OPPOSITION TO SAMSUNG'S MOTION FOR SUMMARY JUDGMENT** |
| 19          v. | |
| 20   SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG | |
| 21   ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG | |
| 22   TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| 23                 Defendants. | |
| 24 | |

25

26   **PUBLIC REDACTED VERSION**

27

28

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

I, Peter W. Bressler, FIDSA, hereby declare as follows:

## I.       INTRODUCTION AND QUALIFICATIONS

1.       I have been retained by counsel for Apple Inc. (Apple) in the above-captioned patent litigation matter against Samsung Electronics Co. Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, Samsung).  I give this declaration in that capacity, and the matters stated herein are of my own personal knowledge or are my professional opinions.  If called as a witness, I could and would testify competently as to them.

2.       I am currently a product design consultant and an Adjunct Associate Professor in the Integrated Product Design Program at the University of Pennsylvania.

3.       My curriculum vitae, which includes a listing of papers, patents, and other materials which I have authored within the last ten (10) years, is attached hereto as Exhibit 1.  My CV also includes a listing of the cases in which I have testified as an expert at trial or by deposition within the last four (4) years.  It also includes a history of the positions that I have held at the national level of the Industrial Designers Society of America (IDSA).  Also, it lists my educational background, which includes a Bachelor of Fine Arts degree in Industrial Design from Rhode Island School of Design in 1968.

4.       In 2010, I received my profession's highest award, the IDSA Personal Recognition Award, which had been bestowed upon only 25 others in the history of the profession before my receipt of the award.

5.       I am the founder and formerly the Board Chair at Bresslergroup, Inc., a design research, strategic product planning, industrial design, product development, and engineering consulting firm.  As the founder of Bresslergroup, Inc., I have been involved with over 700 clients and over 3,000 product design and development projects.

6.       Several of my projects include industrial designs for telephone handsets for IMM, cell phones for Motorola, video phones for Worldgate, audio products for Polk Audio, tablet computers for Telepad, digital tire gauges for MSI International, and touchscreen video gaming devices for Merit Industries.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

7.     I have been awarded over 70 United States patents for physical products.  These patents are divided roughly equally between utility and design patents, a listing of which is provided in my CV.

8.     In order to create attractive and successful designs, an industrial designer must have an understanding of what the consumer will see and appreciate in a particular design.  Such an understanding of the ordinary consumer's visual impressions is built up over years of experience in industrial design, and in the process of critiquing, testing, and reiterating one's designs.  From my over 40 years of industrial design work and design experience with consumer electronics, I have developed extensive experience regarding how ordinary consumers see, recognize, and understand the industrial design of consumer electronics.

9.     Over the course of my career, I have also spent considerable time participating in consumer testing that involves determining consumers' visual understanding of various products, including consumer electronics products.

10.     I have also been trained in Synectics, which is a process for facilitating group interaction that encourages the exchange of information, creativity, and innovation.  This training has allowed me to more effectively communicate with, and gather information from, consumers in the course of my research.

11.     During my career, I have participated in well over one hundred and fifty consumer or user research projects employing a wide range of techniques, including focus groups, consumer preference studies, point of sale observations, ethnographic analyses, personal interviews, mall intercept surveys, and product usability testing.  Examples of such projects include:

a.     Point of sale observation of mobile phone purchasers;

b.     Consumer preference interviews regarding audio speakers at the Consumer Electronics Show;

c.     Consumer preference focus groups for selection of DVD camcorder concepts;

d.     Hidden and participatory consumer group creativity sessions and preference testing for kitchen appliances; and

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

e.     Ethnographic in-home interviews and observations to provide generative concept development for home office products.

12.     There are a number of common elements in my research experience involving consumer electronics designs.  First, my work has involved the observation of ordinary consumers as they make visual assessments of consumer electronics designs, including at the point of purchase.  Second, it has involved interviewing ordinary consumers on the aesthetic features, visual effects, and visual impressions that they observe and experience in relation to consumer electronics designs.  Third, it has involved interviewing ordinary consumers on the aesthetic features, visual effects, and visual impressions that they use to identify, distinguish, and evaluate consumer electronics designs.

13.     Through all of these experiences, I have gained an understanding of the level of observation and visual acuity brought to bear by an ordinary consumer when purchasing consumer electronics.  I have also gained an understanding of how ordinary observers perceive consumer electronics designs:  for example, how strong a visual effect must be before attracting the notice of the ordinary consumer, and how much weight an ordinary consumer gives to strong visual effects or themes when identifying or comparing designs.

## II.     BACKGROUND

14.     I have been asked to provide my opinion with respect to the validity of United States Patent Nos. D618,677 and D593,087 (the D'677 Patent and the D'087 Patent, respectively).  Specifically, I have been asked to provide this Declaration to address issues that I understand have been raised by Samsung in connection with Samsung's Motion for Summary Judgment ("Samsung's Motion" or "Mot.").  For the reasons set out below, it is my opinion that the D'677 and D'087 Patents are not obvious in view of prior art.

15.     I have also been asked to provide my opinions with respect to the validity of Apple's iPhone and iPad trade dress.  For the reasons set out below, it is my opinion that these trade dresses are not functional.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

### III.   MY UNDERSTANDING OF THE LAW OF DESIGN PATENT OBVIOUSNESS

16.     I have been informed by Apple's counsel that design patents are presumed to be valid and that a party challenging a patent's validity must show by clear and convincing evidence that the patent is invalid.  *See L.A. Gear v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993).

17.     I have been informed that, for design patents, a finding of obviousness requires identification of a primary reference that creates "basically the same" visual impression as the patented design.  *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 103 (Fed. Cir. 1996) (citation omitted).  Only after a primary reference satisfying that standard has been identified can secondary references be considered to construct a hypothetical piece of "prior art" for purposes of comparison to the patented design.  *Id.*  To combine references, the visual appearance of the primary and secondary references must be "so related that the appearance of certain ornamental features in one would suggest the application of those features to the other."  *In re Borden*, 90 F.3d 1570, 1575 (Fed. Cir. 1996) (internal quotations omitted); *see Apple Inc. v. Samsung Elecs. Co.*, No. 2012-1105, 2012 U.S. App. LEXIS 9720, at *36-37 (Fed. Cir. May 14, 2012) (prior art cannot be secondary reference where it "is so different in visual appearance from" primary reference that it would not suggest the application of design features found in one reference to the other).  If "major modifications would be required to make [the prior art design] look like the claimed designs, it cannot qualify as a [primary reference]."  *In re Harvey*, 12 F.3d 1061, 1063 (Fed Cir. 1993).

18.     I have been informed that "[w]hether to combine earlier references to arrive at a single piece of [hypothetical] art for comparison with the potential design or to modify a single prior art reference" is determined from the point of view of a designer of ordinary skill in the art. *Int'l Seaway Trading Corp.*, *v. Walgreens Corp.* 589 F.3d 1233, 1240 (Fed Cir 2009) .  "Once that piece of [hypothetical] prior art has been constructed, obviousness, like anticipation, requires application of the ordinary observer test" and a "focus on the overall designs."  *Id*. at 1240-41.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

19.    I have been informed that "the ordinary observer test, whether applied for infringement or invalidity, and the obviousness test, applied for invalidity under Section 103, focus on the *overall designs*." *Int'l Seaway Trading*, 589 F.3d at 1240-41 (emphasis in original) (internal quotations omitted, citation omitted).  If the prior art merely suggests "components of [the patented] design, but not its overall appearance, an obviousness rejection is inappropriate." *In re Harvey*, 12 F.3d at 1063 (citation omitted).

20.    I have been informed that a proper obviousness analysis, like a proper infringement analysis, requires a comparison of all of the views shown in the design patent to the corresponding views of the prior art reference.  *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1379 (Fed. Cir. 2002) ("[T]he 'ordinary observer' analysis is not limited to the ornamental features of a subset of the [patent's] drawings, but instead must encompass the claimed ornamental features of all figures of a design patent.").

21.    I understand that the Federal Circuit has held that it is error to use broad verbal descriptions of a patented design for purposes of analyzing obviousness:  "[T]he focus in a design patent obviousness inquiry should be on visual appearances rather than design concepts." *Durling*, 101 F.3d at 104; *In re Harvey*, 12 F.3d at 1064 ("[W]e hold that the Board should have focused on actual appearances, rather than 'design concepts'.").  Accordingly, I understand that the obviousness focus must remain on the visual appearance of the designs at issue, and not on verbal descriptions or generalized design concepts, such as "smartphones that are substantially free of ornamentation."

## IV.    THE D'677 AND D'087 PATENTS ARE NOT OBVIOUS

22.    In my opinion the D'677 and D'087 patents are not obvious in light of prior art because there is no proper primary reference against either patent.  And even if one or more references is used as a primary reference, the combinations proposed by Samsung are insufficient to render obvious either patent.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

B.      **Samsung Fails to Identify Any Proper Primary References Against the D'677 Patent**

23.      None of the alleged primary references against the D'677 patent is suitable.  In preparing my opinion as to whether references should be considered a primary reference, I took note of the Federal Circuit's recent decision in this case.  In particular, I noted that the Fidler 1994 mockup was found not to be a primary reference against the D'889 patent because it differed from the D'889 patent's overall visual impression and, in particular, lacked "the impression of an unbroken slab of glass extending from edge to edge on the front side of the tablet."  *See Apple Inc. v. Samsung Elecs. Co.*, No. 2012-1105, 2012 U.S. App. LEXIS 9720, at *29 (Fed. Cir. May 14, 2012).

| Fidler 1994 Mockup[1] | D'889 |
|---|---|
|  | |

24.      **JP'638 Patent**.[2]  The front face of the JP'638 patented design is significantly convex and not flat.  The convex front surface of the JP'638 design can be seen in its perspective and side views.  The JP'638 design does not have a front surface that is transparent edge-to-edge like the D'677 design and instead has an opaque frame surrounding the display area.  This edge-to-edge glass appearance is a distinctive visual element of the iPhone design and of the D'677 patent.  The JP'638 design creates a very different overall visual impression than the D'677

_____

[1] Ex. 2 comprises photographs that accurately represent the 1994 Fidler mockup.

[2] Arnold Decl. In Support of Samsung's Motion for Summary Judgment ("Arnold Decl.") Ex. 4.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

patent because the JP'638 design is lacking this visual element.  Based on the contrast in overall

visual impressions, it is my opinion that the designer of ordinary skill in the art would not find the

D'677 design to be basically the same in overall visual impression as the JP'638 design.  Major

modifications are required to make the JP'638 design look like the D'677 patent.

| JP'638 Patent | D'677 patent |
|---|---|
| <br><br>The red arrows point to the portion of the perspective view of the JP'638 design where the convex front surface can be seen most clearly. |  |
|  |  |

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

| JP'638 Patent | D'677 patent |
|---|---|
|   The red arrows point to the portion of the top and bottom views of the JP'638 design where it is most clearly visible that the design lacks a continuous surface comprised of a single piece of material that extends from edge-to-edge across the front of the device. |  |
|   The red arrows point to the portions of the side views of the JP'638 design where the convex front surface can be seen most clearly. |  |

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

25.     **iRiver U10**.[3]  The U10 design also fails as a primary reference.  In particular, the U10 design includes wide borders to the left and right of the screen that create a very different visual impression from the appearance of the D'677 design, which gives the overall visual impression of very narrow lateral borders.  Also, the U10 is entirely missing one of the elements of the D'677 design—a lozenge-shaped speaker slot centered in the border region above the display.  In terms of form factor, the U10 is also noticeably wider and more square-shaped than the D'677 design.

| U10 | D'677 patent |
|---|---|



---

[3] Ex. 3 comprises photographs that accurately represent the U10.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

| U10 | D'677 patent |
|---|---|
|  | |
|  |  |

26.　　Accordingly, it is my opinion that the U10 design would not appear basically the same to the designer of ordinary skill in the art.  Any attempt to narrow the U10's lateral borders, change the proportion of the U10's overall shape, and add a speaker slot would constitute major modifications to the U10's front surface.

27.　　**Nokia Fingerprint Phones**.[4]  The Fingerprint phones cannot serve as a primary reference because they produce a drastically different visual impression than the D'677 patent.

---

[4] Arnold Decl. Ex. 10.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

| Nokia Fingerprint Phones | D'677 Patent |
|---|---|
|  |  |
|  |  |
| **Corresponding views unavailable.** |  |
|  |  |

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

28.     As an initial matter, the disclosure of the Fingerprint phones is incomplete, because no full front view is unavailable.  But even from the incomplete disclosure, distinctive visual differences are immediately apparent.

29.     In particular, the Fingerprint phone has a distinctly rounded overall shape.  Its top and bottom ends are rounded and its shoulders are gently sloped.  This visual impression stands in stark contrast to the straight ends of the D'677 design's rectangular shape and its evenly curved corners.  The Fingerprint phone is also significantly narrower in width in proportion to the D'677 design.

30.     Moreover, the Fingerprint phone does not include any disclosure of a continuous front surface that is transparent from edge-to-edge.  Although I understand that Mr. Vilas-Boas stated in his declaration that such a surface was disclosed, the photographs attached to Mr. Vilas-Boas's declaration do not show it.  (*See* Arnold Decl. Ex. 10.)

31.     Further differences exist in the geometries shown in the front face of the Fingerprint phone.  It is difficult to fully appreciate the appearance of the borders surrounding the display screen in the Fingerprint phone, because no full frontal view is shown.  But from the perspective view, I ascertain that the display screen is not centered on the front face because the top border is significantly wider than the bottom border.  The Fingerprint phone also has a circle-shaped speaker feature, which looks very different from the lozenge-shaped slot of the D'677 design.

32.     Accordingly, it is my opinion that, even if a complete disclosure were obtained, the Fingerprint phone design would not appear basically the same in overall visual appearance as the D'677 patent to the designer of ordinary skill in the art.  Any attempt to alter the Fingerprint to make it look like the D'677 design would constitute a major modification.  In particular, the overall shape of the phone would have to be made wider and more rectangular, a transparent front surface would have to be added across the entire front face, the display screen would have to be centered, and the speaker feature design would have to be revamped.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

33.   **JP'221**.[5]  The JP'221 design cannot serve as a primary reference against the D'677 patent because it fails to disclose an edge-to-edge transparent front surface.  There's also no indication in the JP'221 reference that a continuous and transparent surface is covering the entire front face of the device.  Rather, JP'221 shows an opaque black border around a matte gray screen.  There is no indication that any kind of transparent surface stretches over the gray display area or the black border.  Samsung's expert, Mr. Anders, could not point out anything in the figures of the JP'221 patent that affirmatively indicated a transparent surface covering the entire front face of the device.  (Bartlett Declaration In Support of Apple's Opposition ("Bartlett Decl.") Ex. 18 at 288:23-289:11.)  Accordingly, the JP'221 Patent does not disclose this distinctive visual element of the D'677 patent, and the ordinary designer would not view the JP'221 patent as producing basically the same visual impression as the D'677 patent.

| JP'221 Patent | D'677 Patent |
|---|---|
|  |  |

---

[5] Arnold Decl. Ex. 7.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

| JP'221 Patent | D'677 Patent |
|---|---|
|  |  |
|  |  |
|  |  |

### C.    Samsung's Proposed Combinations Do Not Render Obvious the D'677 Patent

34.    Even if one of Samsung's identified references were used as a primary reference, none of the combinations of references proposed by Samsung renders obvious the D'677 patent.

35.    In preparing my opinion as to whether primary references were so related in visual appearance compared with secondary references as to be combinable, I took note of the Federal

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

Circuit's recent decision in this case.  In particular, I noted that the Federal Circuit found the visual impression of the Fidler 1994 mockup to be so different from that of the TC1000 that the designer of ordinary skill in the art would not find a suggestion to combine these references.  *See Apple*, 2012 U.S. App. LEXIS 9720, at *37.  In particular, the Federal Circuit decision highlighted the TC1000's additional gray border around the screen, rounded over rim design, and additional indicator lights in concluding that it did not present a minimalist appearance and could not be combined with the Fidler tablet.  *Id*.

| **Fidler 1994 Mockup** | **TC1000**[6] |
|---|---|
|  |  |

### 2.    Combinations with JP'638.

36.    **JP'638 and JP'221**.  The proposed combination of JP'638 and JP'221 fails because the distinct visual impression of these two references would preclude the ordinary designer from finding a suggestion to combine them.  In particular, the JP'638 reference has a convex front surface, a thick, tapered front enclosure casing around its front surface, and a complex multi-part back body.  In contrast, the JP'221 design's front surface appears flat.  And the JP'221 design lacks a bezel element altogether.  Moreover, the JP'221 has a butterfly-shaped profile that is markedly different than the JP'638 design.  Accordingly, given the significant contrast in these visual impressions, the designer of ordinary skill in the art would not find a suggestion to apply visual elements found in the JP'221 to the JP'638 design, and vice versa.

_____

[6] Ex. 4 comprises accurate photographs of the TC1000.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

37.     The proposed combination also fails because neither reference discloses an edge-to-edge transparent front surface.  As discussed in the foregoing, the JP'638 patent lacks an edge-to edge transparent front surface.  There's also no indication in the JP'221 reference that a continuous and transparent surface is covering the entire front face of the device.

38.     Therefore, a distinctive element of the D'677 design is entirely missing from the proposed combination of JP'638 and JP'221 references—a continuous, transparent edge-to-edge surface.  This difference alone would be readily noticed by the ordinary observer and given significant weight in a visual comparison.  Accordingly, it is my opinion that an ordinary observer would not find the D'677 design to be substantially the same as a combination of the JP'638 and JP'221 designs.

| JP'638 Patent | JP'221 Patent |
|---|---|
|  The red arrows point to the portion of the perspective view of the JP'638 design where the convex front surface can be seen most clearly. |  |

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

| JP'638 Patent | JP'221 Patent |
|---|---|
|  |  |
| <br><br>The red arrows point to the portion of the top and bottom views of the JP'638 design where it is most clearly visible that the design lacks a continuous surface comprised of a single piece of material that extends from edge-to-edge across the front of the device. |  |

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

| JP'638 Patent | JP'221 Patent |
|---|---|
|  The red arrows point to the portions of the side views of the JP'638 design where the convex front surface can be seen most clearly. |  |

39.     **JP'638 and Fingerprint**.  The proposed combination of JP'638 and Fingerprint fails at least because neither reference discloses an edge-to-edge transparent front surface, as discussed in the foregoing.  Accordingly, it is my opinion that an ordinary observer would not find the D'677 design to be substantially the same as a combination of the JP'638 and Fingerprint designs.

40.     Moreover, it is my opinion that the designer of ordinary skill in the art would not find a suggestion to combine these two references because of their contrasting visual impressions.  In particular, the Fingerprint phone's front surface appears flat, while the JP'638 design has a convex front surface.  The Fingerprint has sloping shoulders and rounded top and bottom ends, while the JP'638 design is rectangular.  The Fingerprint phone has a display that is shifted vertically off-center and a circular speaker element, while the JP'638 design shows a centered display and a small, slot-shaped speaker.  The Fingerprint phone also appears black, while the JP'638 lacks any color designation.  These differences in visual impressions would preclude the

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

ordinary designer from finding a suggestion to take design elements from the Fingerprint and

apply them to the JP'638, and vice versa.

| JP'638 Patent | Nokia Fingerprint Phones |
|---|---|
|  The red arrows point to the portion of the perspective view of the JP'638 design where the convex front surface can be seen most clearly. |  |
|  |  |

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

| JP'638 Patent | Nokia Fingerprint Phones |
|---|---|
| <br><br>The red arrows point to the portion of the top and bottom views of the JP'638 design where it is most clearly visible that the design lacks a continuous surface comprised of a single piece of material that extends from edge-to-edge across the front of the device. | **Corresponding views unavailable.** |
| <br><br>The red arrows point to the portions of the side views of the JP'638 design where the convex front surface can be seen most clearly. |  |

41.     Moreover, the visual impressions of these two designs include further differences in theirs body portions, where the Fingerprint phone appears thinner, longer, narrower and simpler in construction than the JP'638 design.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

42. **JP'638 and U10**.  The proposed combination of JP'638 and U10 fails because the designer of ordinary skill in the art would not find a suggestion to combine these two references due to their contrasting visual impressions.  In particular, the U10's front surface appears flat and reflective, while the JP'638 design has a convex front surface without any indication of reflectivity or transparency.  The U10 has a much squarer form factor compared to the narrower JP'638 design.  The U10 form factor is not one that could be used as a mobile phone.  And the U10 is missing one of only two visual elements shown on the front face of the JP'638 design— the slot shaped speaker element.  The U10 also appears black, while the JP'638 lacks any color designation.  These differences in visual impression would preclude the ordinary designer from finding a suggestion to take design elements from the U10 and apply them to the JP'638, and vice versa.

| JP'638 Patent | U10 |
| --- | --- |
| <br><br>The red arrows point to the portion of the perspective view of the JP'638 design where the convex front surface can be seen most clearly. |  |

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

| JP'638 Patent | U10 |
|---|---|
|  |  |
|   The red arrows point to the portion of the top and bottom views of the JP'638 design where it is most clearly visible that the design lacks a continuous surface comprised of a single piece of material that extends from edge-to-edge across the front of the device. |  |

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

| JP'638 Patent | U10 |
|---|---|
| <br><br>The red arrows point to the portions of the side views of the JP'638 design where the convex front surface can be seen most clearly. |  |

43.     Moreover, the visual impressions of these two designs include further differences in theirs body portions, where the U10 simpler in construction than the multi-part JP'638 design.

44.     **JP'638 and LG Chocolate**.  The proposed combination of JP'638 and LG Chocolate fails because the designer of ordinary skill in the art would not find a suggestion to combine these two references due to their contrasting visual impressions.  Particular differences between the two designs include the Chocolate's much smaller screen that is shifted toward the upper portion of the front face and its prominent silver and red buttons on the bottom of the front face.  And although the front surfaces on the JP'638 and LG Chocolate both are not flat, the Chocolate curves across the vertical axis whereas the JP'638 is convex across the horizontal access.  Also, the top and bottom ends of the Chocolate design are not straight.  The Chocolate also appears black, while the JP'638 lacks any color designation.  These differences in visual impression would preclude the ordinary designer from finding a suggestion to take design elements from the Chocolate and apply them to the JP'638, and vice versa.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

| JP'638 Patent | LG Chocolate |
|---|---|
|  |  |
|  | <br>(Facing right) |
| The red arrows point to the portions of the side views of the JP'638 design where the convex front surface can be seen most clearly. | |

### 3.  Combinations with U10.

45.  **U10 and JP'221**.  The proposed combination of U10 and JP'221 fails because the designer of ordinary skill in the art would not find a suggestion to combine these two references due to their contrasting visual impressions.  Particular differences between the two designs include the JP'221 design's lack of a continuous transparent front surface.  Moreover, the JP'221 design's form factor is narrower with very different proportions than the U10.  The U10 also has wider lateral borders to the left and right of its display screen.  Also, the U10 is missing one of

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

1 only a few visual elements on the JP'221's front face—the slot element above its screen.  These

2 differences in visual impression would preclude the ordinary designer from finding a suggestion

3 to take design elements from the JP'221 and apply them to the U10, and vice versa.



| U10 | JP'221 Patent |
|-----|---------------|

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

| U10 | JP'221 Patent |
|-----|---------------|
|  |  |

46.     Moreover, the visual impressions of these two designs include further differences in theirs body portions, where the JP'221 has a thinner, butterfly-shaped profile with multiple moving parts, in contrast with the thicker, single unit of the U10.

47.     **U10 and LG Chocolate**.  The proposed combination of U10 and LG Chocolate fails because the designer of ordinary skill in the art would not find a suggestion to combine these two references due to their contrasting visual impressions.  Particular differences between the two designs include the LG Chocolate's smaller, vertically off-center screen, and the curved profile of its front surface.  Moreover, the form factor of the Chocolate is narrower than the U10, and the Chocolate includes a speaker element, which the U10 entirely lacks.  Furthermore, the Chocolate includes prominent silver and red buttons on its front surface, which are not part of the U10 design.  These differences in visual impression would preclude the ordinary designer from finding a suggestion to take design elements from the Chocolate and apply them to the U10, and vice versa.

48.     Moreover, the visual impressions of these two designs include further differences in theirs body portions, where the Chocolate has a narrower, multi-banded profile, in contrast with the thicker, single unit profile of the U10.

49.     Even if they are combination, the proposed combination also fails because neither design discloses the facial features of the D'677 patent.  Neither the U10 or the Chocolate has the D'677 patent's large centered screen that leaves very thin lateral borders and wider balanced

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

borders on top and bottom.  Without this distinctive visual feature, the ordinary observer would

not find any hypothetical combination of these references substantially the same as the D'677

patent.

| U10 | LG Chocolate[7] |
|---|---|



**4.      Combinations with Fingerprint.**

50.      **Fingerprint and JP'221**.  The proposed combination of Fingerprint and JP'221

fails because the designer of ordinary skill in the art would not find a suggestion to combine these

two references due to their contrasting visual impressions.  Particular differences between the two

designs include the JP'221 design's more rectangular form factor and centered display, which are

not part of the Fingerprint design.  Moreover, the Fingerprint has a circular speaker element, in

contrast with the JP'221 design.  These differences in visual impression would preclude the

_____

[7] Ex. 5.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

ordinary designer from finding a suggestion to take design elements from the JP'221 design and apply them to the Fingerprint, and vice versa.

51.     Moreover, the visual impressions of these two designs include further differences in theirs body portions, where the Fingerprint has a thinner profile, in contrast with the thicker, multi-part, butterfly-shaped profile of the JP'221 design.

52.     Even if they are combinable, the proposed combination also fails because neither design discloses the continuous transparent front surface of the D'677 patent.  As discussed previously, neither the Fingerprint design or the JP'221 design discloses the D'677 patent's edge-to-edge, continuous, and transparent front surface.  Without this distinctive visual feature, the ordinary observer would not find any hypothetical combination of these references substantially the same as the D'677 patent.

| Nokia Fingerprint Phones | JP'221 Patent |
|---|---|
|  |  |
|  |  |

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

| Nokia Fingerprint Phones | JP'221 Patent |
|---|---|
| **Corresponding views unavailable.** |  |
|  |  |

53.     **Fingerprint and LG Chocolate**.  The proposed combination of Fingerprint and LG Chocolate fails because the designer of ordinary skill in the art would not find a suggestion to combine these two references due to their contrasting visual impressions.  Particular differences between the two designs include the LG Chocolate's smaller off-center display screen, and the curved profile of its front surface.  Moreover, the Chocolate's speaker element is horizontally oriented, in contrast with the circular element in the Fingerprint.  And the Chocolate includes prominent silver and red buttons on its front surface, which are not found on the Fingerprint. These differences in visual impression would preclude the ordinary designer from finding a suggestion to take design elements from the Chocolate and apply them to the Fingerprint, and vice versa.

54.     Moreover, the visual impressions of these two designs include further differences in their body portions, where the Chocolate has a thicker, multi-banded profile, in contrast with the thinner longer narrower profile of the Fingerprint.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

55.     Even if they are combinable, the proposed combination also fails because neither design discloses the facial features of the D'677 patent.  Neither the Fingerprint or the Chocolate has the D'677 patent's large centered screen that leaves very thin lateral borders and wider balanced borders on top and bottom.  Without this distinctive visual feature, the ordinary observer would not find any hypothetical combination of these references substantially the same as the D'677 patent.

| Nokia Fingerprint Phones | LG Chocolate |
|---|---|
|  |  |
|  |  |

### 5.     Combinations with D'889 patent

56.     The ordinary designer would not find a suggestion to combine one of the aforementioned references without a continuous transparent front surface with the D'889 design. In particular, the D'889 patent is so different in visual impression from each of the JP'638, JP'221, and Fingerprint designs that the ordinary designer would not take visual elements from

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

the D'889 patent and apply them to these phone designs.  In particular, the form factor and proportion of the D'889 design is much different than the longer narrower designs of JP'638, JP'221, and Fingerprint.  Moreover, the D'889 has uniform borders around its front surface, where as the phone designs have wider borders at top and bottom.  The D'889 patent is also missing any form of a speaker element.

57.     Moreover, none of the phone references has the distinct "sheet of glass" visual impression of the D'889 patent.  The JP'638 design's front surface is convex and not flat.  And neither the JP'221 or the Fingerprint reference has a thin rim surrounding its front surface.  The body portions of the phone references introduce further distinctions in visual impression when compared against the simple, thin, and rounded body design of the D'889 patent.

| D'889 Patent[8] | JP'638 Patent | JP'221 Patent | Fingerprint |
|---|---|---|---|
|  |  |  |  |

---

[8] Arnold Decl. Ex. 21.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

1
2
3
4
5
6
7
8



9
10

**D.**     **Samsung Fails to Identify Any Proper Primary References Against the D'087 Patent**

11     58.     **JP'638**.  All views of the JP'638 reference must be considered in order to fully

12  account for a number of key visual differences in the JP'638 design that cannot be seen from the

13  front elevational view, including the fact that the front surface is convex and not continuous.

14

| JP'638 Patent | D'087 Patent (Selected Embodiments) |
|---|---|
| The red arrows point to the portion of the perspective view of the JP'638 design where the convex front surface can be seen most clearly. | FIG. 9<br><br>FIG. 17 |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

| JP'638 Patent | D'087 Patent (Selected Embodiments) |
|---|---|
|  | <br>FIG. 11    FIG. 19 |
| <br><br>The red arrows point to the portions of the side views of the JP'638 design where the convex front surface can be seen most clearly. | <br>FIG. 7    FIG. 8 |
| <br><br>The red arrows point to the portion of the top and bottom views of the JP'638 design where it is most clearly visible that the design lacks a continuous surface comprised of a single piece of material that extends from edge-to-edge across the front of the device. | <br>FIG. 5<br><br>FIG. 6 |

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

59.   As is made apparent from the side views, the JP'638 patent shows a significantly convex, non-flat front surface.  The JP'638 surface is surrounded by an enclosure part that tapers toward the top and bottom of the device.  The effect of the convex surface and tapered enclosure part in the JP'638 can be distinctly seen in its profile views, which markedly contrast with the profile views of the D'087 patent.  Not only does the convex surface in the JP'638 design produce a very different visual impression than the iPhone design, the thin uniform bezel of the iPhone also starkly contrasts with the thick, tapered enclosure part of the JP'638 design.  Moreover, the JP'638 design has a smaller speaker slot that is shifted noticeably higher than the D'087 design.

60.   Due to the contrasting visual impressions, it is my opinion that the designer of ordinary skill in the art would not find the overall visual impression of the JP'638 patent to be basically the same as the D'087 patent.

61.   **KR30-0398307[9] and Bluebird Pidion BM-200[10] ("Pidion")**.  The Pidion design appears to be the commercial embodiment of the KR'307 patent, so I will treat these designs together.  The difference in overall visual impression between the Pidion design and the D'087 patent leads to my opinion that the ordinary designer would not find them to be basically the same.

| KR'307 Patent | D'087 Patent (Selected Embodiments) |
|---|---|
| [Perspective View] | FIG. 9 |



---

[9] Arnold Decl. Ex. 19.

[10] Ex. 6 comprises accurate photographs of the Pidion BM-200.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION



| KR'307 Patent | D'087 Patent (Selected Embodiments) |
|---|---|

FIG. 17

FIG. 11          FIG. 19

FIG. 7     FIG. 8

[Plan View]

[Bottom View]

FIG. 5

FIG. 6

62.     In particular, the front face of the Pidion design presents a very different

impression than the D'087 design.  The Pidion design has a much smaller screen as a percentage

of its front surface, creating top and bottom borders and lateral borders that are significantly

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

wider than the D'087 design.  The Pidion design also has a row of four pronounced physical buttons arrayed along its bottom border.  The Pidion speaker slot is also significantly larger and more complex than its D'087 counterpart.  The sunken screen (or raised border) of the Pidion design is also a key difference, as it causes the front surface to not be completely flat like the D'087 patent.  Accordingly, it is my opinion that the designer of ordinary skill would not find the Pidion design basically the same as the D'087 design.

63.    **iRiver U10**.  The U10 design also fails as a primary reference.  In particular, the U10 design entirely lacks the distinctive bezel of the D'087 patent.  Moreover, the U10 includes wide borders to the left and right of the screen that create a very different visual impression from the appearance of the D'087 design, which gives the overall visual impression of very narrow lateral borders.  Also, the U10 is missing one of the elements of the D'087 design—a lozenge-shaped speaker slot centered in the border region above the display.  In terms of form factor, the U10 is also noticeably wider and more square-shaped than the D'087 design.



| U10 | D'087 Patent (Selected Embodiments) |
|---|---|

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION



| U10 | D'087 Patent (Selected Embodiments) |
|---|---|

64.     Accordingly, it is my opinion that the U10 design would not appear basically the same to the designer of ordinary skill in the art as the D'087 patent.

65.     **JP'221**. The JP'221 design cannot serve as a primary reference because it fails to disclose the D'087 patent's distinctive bezel design.  In fact, the JP'221 design has no bezel at all.  Accordingly, the ordinary designer would not view the JP'221 patent as producing basically the same visual impression as the D'087 patent.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

| JP'221 Patent | D'087 Patent (Selected Embodiments) |
|---|---|
|  | <br>FIG. 9<br><br><br>FIG. 17 |
|  | <br>FIG. 11    FIG. 19 |
|  | <br>FIG. 5<br><br><br>FIG. 6 |

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

| JP'221 Patent | D'087 Patent (Selected Embodiments) |
|---|---|
|  | <br>FIG. 7    FIG. 8 |

**E.    Samsung's Proposed Combinations Do Not Render Obvious the D'087 Patent**

**1.    Combinations with JP'638.**

66.    **JP'638 and JP'221**.  The proposed combination of JP'638 and JP'221 fails at least because neither reference discloses the thin, uniform, and continuous bezel of the D'087 patent.  As previously discussed, the JP'638 design includes a thicker front enclosure casing that is tapered at the top and bottom.  The JP'221 design includes no bezel at all, and so cannot cure these deficiencies in the JP'638 design.  Without this distinctive feature, the ordinary observer would not find any hypothetical combination of these references to be substantially the same as the D'087 patent.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

| JP'638 Patent | JP'221 Patent |
|---|---|
| <br><br>The red arrows point to the portion of the perspective view of the JP'638 design where the convex front surface can be seen most clearly. |  |
|  |  |
| <br><br>The red arrows point to the portion of the top and bottom views of the JP'638 design where it is most clearly visible that the design lacks a continuous surface comprised of a single piece of material that extends from edge-to-edge across the front of the |  |

| JP'638 Patent | JP'221 Patent |
|---|---|
| device. | |
|   The red arrows point to the portions of the side views of the JP'638 design where the convex front surface can be seen most clearly. |  |

67.   **JP'638 and Fingerprint**.  The proposed combination of JP'638 and Fingerprint fails because the ordinary designer would not find a suggestion to combine the two references given their distinct visual impressions.  The differences in these designs were discussed earlier in connection with the D'677 patent and apply equally to the D'087 patent.  Moreover, the JP'638 patent includes a thick tapered front enclosure casing around its convex front surface, where as the Fingerprint does not have a bezel at all.

68.   The proposed combination also fails because neither reference discloses the thin, uniform, and continuous bezel of the D'087 patent.  As previously discussed, the JP'638 design includes a thicker front enclosure casing that is tapered at the top and bottom.  The Fingerprint design includes no bezel at all, and so cannot cure these deficiencies in the JP'638 design.  Without this distinctive feature, the ordinary observer would not find any hypothetical combination of these references to be substantially the same as the D'087 patent.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

| JP'638 Patent | Nokia Fingerprint Phones |
|---|---|
|  The red arrows point to the portion of the perspective view of the JP'638 design where the convex front surface can be seen most clearly. |  |
|  |  |
|  The red arrows point to the portion of the top and bottom views of the JP'638 design where it is most clearly visible that the design lacks a continuous surface comprised of a single piece of material that extends from edge-to-edge across the front of the | **Corresponding views unavailable.** |

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

| JP'638 Patent | Nokia Fingerprint Phones |
|---|---|
| device. | |
| The red arrows point to the portions of the side views of the JP'638 design where the convex front surface can be seen most clearly. |  |

69.     **JP'638 and U10**.  The proposed combination of JP'638 and U10 fails because the ordinary designer would not find a suggestion to combine the two references given their distinct visual impressions.  The differences in these designs were discussed earlier in connection with the D'677 patent and apply equally to the D'087 patent.  Moreover, the JP'638 patent includes a thick tapered front enclosing casing around its convex front surface, where as the U10 does not have a bezel at all.

70.     The proposed combination also fails because neither reference discloses the thin, uniform, and continuous bezel of the D'087 patent.  As previously discussed, the JP'638 design includes a thicker front enclosure casing that is tapered at the top and bottom.  The U10 design includes no bezel at all, and so cannot cure these deficiencies in the JP'638 design.  Without this distinctive feature, the ordinary observer would not find any hypothetical combination of these references to be substantially the same as the D'087 patent.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

| JP'638 Patent | U10 |
|---|---|
|   The red arrows point to the portion of the perspective view of the JP'638 design where the convex front surface can be seen most clearly. |  |
|  |  |
|   The red arrows point to the portion of the top and bottom views of the JP'638 design where it is most clearly visible that the design lacks a continuous surface comprised of a single piece of material that extends from edge-to-edge across the front of the |  |

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

| JP'638 Patent | U10 |
|---|---|
| device. | |
| <br><br>The red arrows point to the portions of the side views of the JP'638 design where the convex front surface can be seen most clearly. |  |

71.     **JP'638 and LG Chocolate**.  The proposed combination of JP'638 and Chocolate fails because the ordinary designer would not find a suggestion to combine the two references given their distinct visual impressions.  The differences in these designs were discussed earlier in connection with the D'677 patent and apply equally to the D'087 patent.  Moreover, the JP'638 patent includes a thick tapered front enclosure casing around its convex front surface, where as the Chocolate does not have a bezel at all.

72.     The proposed combination also fails because neither reference discloses the thin, uniform, and continuous bezel of the D'087 patent.  As previously discussed, the JP'638 design includes a thicker front enclosure casing that is tapered at the top and bottom.  The Chocolate design includes no bezel at all, and so cannot cure these deficiencies in the JP'638 design.  Without this distinctive feature, the ordinary observer would not find any hypothetical combination of these references to be substantially the same as the D'087 patent.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

| JP'638 Patent | LG Chocolate |
|---|---|
|  |  |
|   The red arrows point to the portions of the side views of the JP'638 design where the convex front surface can be seen most clearly. |   (Facing right) |

2. **Combinations with Pidion.**

73. **Pidion and JP'638**.  The proposed combination of Pidion and JP'638 fails

because the ordinary designer would not find a suggestion to combine the two references given

their distinct visual impressions.  The Pidion design has a much larger and more complex speaker

element than the JP'638.  The Pidion front surface includes a sunken display area and four

separate physical buttons, while the JP'638 design has a convex front surface without these

additional elements.  The JP'638 design also has a thicker tapered front enclosure casing around

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

1   its front surface.  These differences in visual impression would preclude the ordinary designer

2   from finding a suggestion to take elements from the Pidion design and apply them to the JP'638,

3   and vice versa.  Moreover, the JP'638 design has a complex multi-part body design that is not

4   shared with the Pidion.

5        74.    The proposed combination also fails because neither reference discloses a front

6   surface like the D'087 patent.  As discussed previously, the JP'638 patent has a convex front

7   surface while the Pidion has a sunken display area and four separate physical buttons.  Without an

8   edge to edge flat front surface, the ordinary observer would not find any hypothetical combination

9   of these references to be substantially the same as the D'087 patent.

| KR'307 Patent | JP'638 Patent |
|---|---|
| [Perspective View]<br> | <br>The red arrows point to the portion of the perspective view of the JP'638 design where the convex front surface can be seen most clearly. |
|  |  |

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

| KR'307 Patent | JP'638 Patent |
|---|---|
|  | <br><br>The red arrows point to the portions of the side views of the JP'638 design where the convex front surface can be seen most clearly. |
|  | <br><br>The red arrows point to the portion of the top and bottom views of the JP'638 design where it is most clearly visible that the design lacks a continuous surface comprised of a single piece of material that extends from edge-to-edge across the front of the device. |

75.   **Pidion and JP'221**.  The proposed combination of Pidion and JP'221 fails because the ordinary designer would not find a suggestion to combine the two references given their distinct visual impressions.  The Pidion design has a much larger and more complex speaker element than the JP'221.  The Pidion front surface includes a sunken display area and four

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

1   separate physical buttons, which is not seen in the JP'221.  The JP'221 design is also entirely

2   missing a bezel element and has black color on its borders.  These differences in visual

3   impression would preclude the ordinary designer from finding a suggestion to take elements from

4   the Pidion design and apply them to the JP'221, and vice versa.  Moreover, the JP'221 design has

5   a thicker, butterfly-shaped profile that contrasts with the Pidion.



| KR'307 Patent | JP'221 Patent |
|---|---|

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

| KR'307 Patent | JP'221 Patent |
|---|---|
| [Plan View]  [Bottom View] |  |

76.   **Pidion and U10**.  The proposed combination of Pidion and U10 fails because the ordinary designer would not find a suggestion to combine the two references given their distinct visual impressions.  The Pidion design has a much large and complex speaker element that does not exist on the U10.  The Pidion front surface includes a sunken display area and four separate physical buttons, which also do not exist on the U10.  The Pidion also has a narrower form factor and smaller screen when compared to the U10.  Moreover, the U10 is entirely lacking the band that surrounds the front surface of the Pidion.  These differences in visual impression would preclude the ordinary designer from finding a suggestion to take elements from the Pidion design and apply them to the U10, and vice versa.



| KR'307 Patent | U10 |
|---|---|
| [Perspective View] |  |

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION



| KR'307 Patent | U10 |
|---|---|

F.    **Secondary Considerations Support the Non-Obviousness of the D'677 and D'087 Patents**

77.    I have been instructed that secondary considerations of non-obviousness must be considered in an obviousness analysis.  Such secondary considerations with respect to a design patent include, among other things:  (1) commercial success of the claimed invention; (2) praise or industry acclamation for the claimed invention; (3) initial expressions of disbelief or skepticism by experts in the field; and (4) copying.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *see also Catalina Lighting v. Lamps Plus*, 295 F.3d 1277 (Fed. Cir. 2002)

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

1   (considering secondary considerations to affirm nonobviousness of design patent).  Samsung's

2   Motion fails to refer to any of these secondary considerations of non-obviousness.

3                                  **b.      Commercial Success**

4           78.     I have reviewed Russell Winer's declaration dated May 30, 2012.  I understand

5   that Dr. Winer concludes that Apple's iPhone has been highly commercially successful.  I

6   additionally understand that Dr. Winer concludes that the iPhone's commercial success is due, at

7   least in part, to its distinctive exterior design.

8           79.     The iPhone design prominently features the front face and bezel.  The D'677

9   patent claims the design for the front face of an electronic device, and that design is embodied in

10  the Apple iPhone (original), iPhone 3G, iPhone 3GS, iPhone 4, and iPhone 4S.  In particular, the

11  front face of the iPhone (original), iPhone 3G, iPhone 3GS, iPhone 4, and iPhone 4S each have

12  the same overall shape and proportion as the D'677 design.  Additionally, each iPhone has a flat,

13  black, transparent, rectangular front surface that runs to the perimeter of the face of the phone.

14  This flat, black, transparent, rectangular front surface is claimed in the D'677 patent.

15  Furthermore, the curved corners on the face of each iPhone have the same proportion as the

16  curved corners depicted in the D'677 patent.  The front surfaces of the each iPhone and the

17  claimed D'677 design are substantially free of ornamentation.  Moreover, the front face of each

18  iPhone has a rectangular display screen centered on the front surface with very narrow borders on

19  either side of the display screen and substantial borders above and below the display screen.  This

20  centered display screen with narrow lateral borders and wider borders above and below is also

21  claimed in the D'677 patent.  Each of the iPhones and the patented D'677 design also have a

22  horizontal lozenge-shaped speaker slot horizontally centered on the front surface above the

23  display screen.

24          80.     The D'087 patent claims the front face and bezel of an electronic device, and the

25  D'087 design is embodied by the iPhone (original), iPhone 3G, and iPhone 3GS.  In particular,

26  the design of the iPhone (original), iPhone 3G, and iPhone 3GS contains a flat rectangular front

27  face substantially free of added adornment, evenly curved corners, and a thin continuous bezel

28  curving in a rounded fashion from the upper extent of the side surface toward the front surface.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

Moreover, the front face of the iPhone (original), iPhone 3G, and iPhone 3GS has a rectangular display screen centered on the front surface with very narrow borders on either side of the display screen and substantial borders above and below the display screen.  This centered display screen with narrow lateral borders and wider borders above and below is also claimed in the D'087 patent.  The iPhone (original), iPhone 3G, and iPhone 3GS and the patented D'087 design also has a horizontal lozenge-shaped speaker slot horizontally centered on the front surface above the display screen.

### c.     Industry Praise

81.     The iPhone's distinctive design, as embodied in the D'677 and D'087 patents, has received widespread industry acclaim.  Among other forms of recognition, the iPhone received the 2008 International Design Excellence Award (IDEA) Best in Show,[11] a 2008 Design and Art Direction "Black Pencil" award,[12] and a 2008 International Forum (iF) Product Design Award.[13] *Time* named the iPhone its "invention of the year" for 2007[14] and Engadget named it one of its "Ten Gadgets That Defined the Decade."[15]  *Time*'s top reason for recognizing the iPhone was that "[t]he iPhone is pretty."  Similarly, Engadget stated that the iPhone constituted a "sea change" and observed that "as we close out the decade . . . world-class industrial design is a given.  The game has changed."  Moreover, an RBC Capital Markets analyst report commented that "Apple's iPhone in June 2007 disruptively raised the standard for a new kind of Smartphone design and user experience, breaking sales launch records, sparking competitive responses, and *defying accepted conventions*."[16]

---

[11]  (Ex. 7.)

[12]  (Ex. 8.)

[13]  (Ex. 9.)

[14]  (Ex.10.)

[15]  (Ex. 11.)

[16]  (Ex. 12 at APL-ITC796-0000458649 (emphasis added).)

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

82.     The iPhone's beauty and distinctive appearance have also been praised in many articles, including the following:

- A *New York Times* review of the iPhone dated January 11, 2007, entitled "Apple Waves Its Wand at the Phone." The article notes that "[a]s you'd expect of Apple, the iPhone is gorgeous." It likens Apple's creation of the iPhone to the work of "the fairy godmother in 'Cinderella'": transformation of a "homely and utilitarian object, like a pumpkin or a mouse, into something glamorous and amazing . . . ."[17]

- A New York Times article dated June 27, 2007, describes the iPhone as "a tiny, gorgeous hand-held computer," and notes that "[t]he phone is so sleek and thin, it makes Treos and Blackberrys look obese."[18]

- A Korea JoonsAng Daily Internet article dated February 18, 2008, entitled "Apple iPhone Tops List of Innovative inventions," reporting the results of a survey of 599 Korean CEOs by Samsung Economic Research Institute, in which the CEOs indicated that the "iPhone's sleek design caught their eye."[19]

- A Wall Street Journal article, dated June 27, 2007, entitled "Testing Out the iPhone," which states that smartphone "designers have struggled to balance screen size, keyboard usability and battery life . . . . [T]he iPhone is, on balance, a beautiful and breakthrough handheld computer."[20]

83.     The iPhone is not merely an example of excellence in design. The purity of design expression pushes the iPhone into the realm of art. In recognition of the iPhone's aesthetic beauty, iPhones have been added to the permanent collections of museums including the San Francisco Museum of Modern Art and the Museum for Kunst und Gewerbe (Arts & Crafts) in Hamburg, Germany. The iPhone has been displayed in exhibitions including:

- *Less and More:  The Design Ethos of Dieter Rams*, San Francisco Museum of Modern Art, August 27, 2011, through February 20, 2012; and

- *Stylectrical*, Museum for Kunst und Gewerbe (Arts & Crafts), August 26, 2011, through January 15, 2012.

---

[17] (Ex. 13.)

[18] (Ex. 14.)

[19] (Ex. 15.)

[20] (Ex. 16.)

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

84.     Additionally, the United States Patent and Trademark office featured iPhone shaped displays in an exhibit showcasing Steve Jobs' numerous patents and trademarks, titled "The Patents and Trademarks of Steve Jobs – Art and Technology that Changed the World."[21]

### d.     Initial Skepticism

85.     There was initial skepticism of the iPhone design around the time of its release. Many media reports predicted that the iPhone would fail.[22]  One industry observer commented that phones "go in and out of style so fast that unless Apple has half a dozen variants in the pipeline, its phone, even if immediately successful, will be passé within 3 months."[23]  Others commented that the iPhone's edge-to-edge flat front screen would lead to failure.[24]  Indeed, Microsoft CEO Steve Ballmer predicted that the iPhone would fail partly because the Apple iPhone did not "have a keyboard."[25]

[21] (Ex. 17.)

[22] (See, e.g., Ex. 18.)

[23] (Ex. 19.)

[24] (Ex. 20.)

[25] (Ex. 23.)

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

**e.    Copying**

88.    As shown in Ex. 95, before the iPhone was released in 2007, Samsung's mobile phones generally looked very different from the iPhone.  For example, many of Samsung's phones had multiple buttons that dominated the front face and some had full "QWERTY" keyboards, either as part of the front or as a "slider" behind the front.  In addition, Samsung's phones did not look similar to the claimed D'677 or D'087 designs that depict a rectangular shape with evenly rounded corners.  For example, Samsung's i700, released in 2004, had a straight top edge with angular corners that are close to 90 degrees, and a curved bottom edge that does not transition smoothly to the vertical sides.  Samsung's i730 and i830, released in 2005 and 2006, used a somewhat similar curved design for both the top and bottom edges, which lack the iPhone's smooth, rounded transition to the vertical sides.

89.    After the iPhone was released, Samsung reduced the number of buttons on some of its phones, and adopted some design elements that are somewhat similar to the iPhone.  However, until Samsung released the Galaxy S in 2010, the overall design of its phones was not substantially the same as the iPhone.  For example, the M7600 Beat DJ, released in May 2009, had an oval shape that is very different from the iPhone.  The i8910 Omnia HD, released around the same time, had a more rectangular shape, but both its top and bottom edges were curved, and there is an abrupt transition to the vertical sides.  The AT&T Sunburst A697, released in March 2010, has smooth transitions between the top and bottom edges and the sides, but is curved in a very different manner than the Phone.  The Jet s800 (released in June 2009) moved toward a rectangular shape, but showed some visually prominent differences from the D'677 and D'087 designs.  Unlike the iPhone, the transparent portion of the front surface of the Jet does not run to the perimeter of the device.  The Jet also differs from the iPhone in that the speaker slot is shaped

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

like a slightly arched trapezoid and is positioned at the top of the front face, and there is a hexagonal button in the opaque bottom of the device with the top point of the opaque hexagon extending into the area of the border below the screen.  In addition, the front face of the Jet is not flat; rather, the bottom portion of the front face of the Jet slopes downward, as illustrated by the photo on the left side below.[26]



90.     The numerous alternative designs noted above show that Samsung could have created a design for its Galaxy S smartphone that was substantially different from the patented iPhone designs.  Samsung's final designs for its Galaxy S smartphones, however, look substantially the same as the iPhone.



---

[26] Ex. 24 comprises accurate photographs of the Samsung Jet.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

## V. THE D'889 PATENT IS NOT OBVIOUS

### A. The Prior Art Does Not Render the D'889 Patent Obvious

105. The proposed combination of the D'037 patent with the Brain Box fails for a number of reasons. First, neither disclosure can serve as a primary reference against the D'889 patent. Second, the references cannot be combined because the incomplete disclosure of the Brain Box does not allow the ordinary designer to ascertain its overall visual impression and compare it against D'037 patent. Finally, even if these two designs are combined, a number of key visual features from the D'889 patent would still be missing.

106. **D500,037**.[29] The D'037 patent cannot serve as a primary reference against the D'889 patent. In particular, the D'037 design lacks a distinctive feature of the D'889 patent—an edge to edge transparent front surface and an underlying rectangular element that marks even borders all the way around the perimeter of the device. In contrast, the D'037 patent merely uses straight surface shading to indicate a continuous front surface. No oblique lines are used in the D'037 patent to indicate that its front surface is entirely transparent. And no rectangular element is visible in the front surface.

---

[27] "First Look: Samsung Vibrant Rips Off iPhone 3G Design," Priya Ganapati, Gadget Lab, July 15, 2010, http://www.wired.com/gadgetlab/2010/07/first-look-samsung-vibrant-rips-off-iphone-3g-design/).

[28] "Samsung Galaxy S: How Does It Measure Up to the Competition?," Ginny Mies, PCWorld, June 29, 2010);
http://www.pcworld.com/article/200142/samsung_galaxy_s_how_does_it_measure_up_to_the_competition.html).

[29] Arnold Decl. Ex. 22.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

| D500,037 | D'889 Patent Claim |
|----------|--------------------|
| | FIG. 1 |
| | FIG. 2 |
| | FIG. 3 |
| | FIG. 4 |
| | FIG. 5 |
| | FIG. 6 |
| | FIG. 7 |

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

| D500,037 | D'889 Patent Claim |
|----------|--------------------|
| |  *FIG. 8* |

107.    Moreover, additional differences exist in the D'037 design, including a thicker profile with cut edges.  There is also a showing in the D'037 design that a rectangular foot element is attached to the rear of the device.

108.    Accordingly, it is my opinion that the ordinary designer would not find the D'037 design to have basically the same visual impression as the D'889 patent.

109.    **Brain Box**.[30]  The "Brain Box" design cannot serve as a primary reference at least because the disclosure of the design is incomplete.  As shown below, there is only one perspective view of the front of the device available.  Therefore, the design of the back and profile are unknown.  The ordinary designer could not ascertain the overall visual impression of the Brain Box design without a complete disclosure.  Accordingly, the ordinary designer could not compare the overall visual impressions of the Brain Box with the D'889 patent for purposes of determining whether they are basically the same, because the ordinary designer could not know whether the back and sides of the Brain Box design are drastically different from the D'889 patent, or very similar.  Moreover, there is no reason to consider the display portion of the Brain Box as a separate device.  The photograph shows the display portion and the desktop portion as one integrated design and nothing in the photograph indicates that they were separable.  Accordingly, the desktop portion of the Brain Box produces further differences in visual impression compared with the D'889 patent.

---

[30] Arnold Decl. Ex. 25.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

| Brain Box | D'889 Patent Claim |
|---|---|
|  | FIG. 1 |
| **No corresponding view available** | FIG. 2 |
| **No corresponding view available** | FIG. 3 |
| **No corresponding view available** | FIG. 4 |
| **No corresponding view available** | FIG. 5<br>FIG. 6 |

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

| Brain Box | D'889 Patent Claim |
|---|---|
| No corresponding view available | *FIG. 7* <br> *FIG. 8* |

110.   **D'037 and Brain Box**.  The proposed combination of these two references fails because the ordinary designer could not find the two to be so related in visual impression.  In particular, because the Brain Box disclosure is incomplete, the ordinary designer could not ascertain its overall visual impression, and could not compare it against that of the D'037 patent.  For example, drastic differences in the design of the unseen back portion of the Brain Box would drastically alter its overall visual impression.  The ordinary designer would also note the differences introduced by the desktop portion of the Brain Box when compared to the D'037 patent.

111.   Furthermore, even if the two disclosures were combined, a number of important visual elements from the D'889 patent would still be missing.  In particular, neither the D'037 patent figures or the Brain Box picture discloses an edge-to-edge transparent and flat front surface surrounded by a thin rim.  The D'037 design's front surface is not transparent.  And the single photograph of the Brain Box is ambiguous as to whether the front surface is entirely flat or surrounded by a raised frame.  Robert Brunner, head of Apple industrial design from 1989 to 1997, and someone who had seen the Brain Box concept apart from this single photograph, testified that the Brain Box did not have a fully flat front surface, but rather was surrounded by a raised frame at its outside edges.  (Bartlett Decl. Ex. 20 at 40:5-41:20.)  Mr. Brunner's view is corroborated in the photograph by the appearance of an apparent material break line in the front face of the Brain Box.

112.   In addition, neither the Brain Box or the D'037 patent discloses the even borders that appear beneath the transparent front surface of the D'889 patent, or the D'889 patent's rounded edge profile.  Accordingly, even a hypothetical combination of the references would not appear substantially the same to the ordinary observer.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

**B.     Secondary Considerations Support the Non-Obviousness of the D'889 Patent**

113.    The non-obviousness of the D'889 patent is underscored by secondary indicia of nonobviousness as relating to the iPad 2, which is an embodiment of the D'889 design.

**b.     Commercial Success**

114.    I have reviewed Russell Winer's declaration dated May 30, 2012.  I understand that Dr. Winer concludes that Apple's iPad 2 has been highly commercially successful.

115.    The D'889 patent claims an electronic device and the D'889 design is embodied by the iPad 2.  Both the D'889 and the iPad 2 have an uninterrupted transparent surface that extends all the way to the perimeter and that is substantially free of added adornment, a uniform mask surrounding the active area of the display behind the transparent front surface, evenly curved corners, a substantially flat back that curves upwards at the side to meet the front plane at an edge, and the appearance of a metallic rim surrounding the front surface.

**c.     Industry Praise**

116.    The design of Apple's iPad line of products has received widespread acclaim. Among other forms of recognition, the iPad received the Red Dot award for Product Design and Best of the Best in 2010,[31] a 2011 International Forum (iF) Product Design Award,[32] a 2011 Design and Art Direction "Black Pencil" award.[33] *Time* magazine named the iPad as one of the 50 best inventions of 2010,[34] and *Popular Science* chose it as a top gadget of 2010.[35]  *Time* recognized Apple for "reinventing a product category that its competitors have given up on" and

---

[31]Red Dot, iPad, http://en red-dot.org/2783 html?cHash=005c9238f0aa9615b2c1026db05140fc&detail=7562.

[32] iF, Online Exhibition, http://exhibition.ifdesign.de/entry_search_de.html?search=ipad.

[33] D&AD, Professional Awards, http://www.dandad.org/awards/professional/2011/categories/prod/product-design/13339/ipad.

[34] Harry McCracken, "The 50 Best Inventions of 2010:  iPad, Time, Nov. 11, 2010, http://www.time.com/time/specials/packages/article/0,28804,2029497_2030652,00.html.

[35] Popular Science, "Best of What's New:  2010," http://www.popsci.com/bown/2010/category/gadgets.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

declared that the iPad was "magical" and "revolutionary."  Similarly, *Popular Science* stated that

with the iPad, "Apple made what everyone wanted: a sleek device with a gorgeous screen."  The

iPad 2 won a 2012 International Forum (iF) Product Design Award.[36]

117.  The beauty and distinctive appearance of the iPad and iPad 2 have also been

praised in many articles, including the following:

- A *Wall Street Journal* article dated April 1, 2010, entitled "Laptop Killer?
  Pretty Close" describes the iPad as a "sleek" and "beautiful new touch-
  screen device from Apple [that] has the potential to change portable
  computing."[37]

- A *USA Today* Internet article dated March 31, 2010, entitled "Verdict is in
  on Apple iPad: It's a winner," which describes Apple's tablet as "stunning
  to look at and blazingly fast," and notes that "[t]he half-inch thick,
  magazine-size iPad is thin and , at 1.5 pounds, light with a gorgeous,
  glossy, backlit 9.7-inch multitouch display."[38]

- A *PC Magazine* internet article dated March 31, 2010, entitled "Apple
  iPad" describes the iPad as having a "sleek design" and as a "gorgeous"
  device.[39]

- *USA Today* article dated March 10, 2011 reports the "iPad 2 is even better
  than the original" and notes the iPad is "a splendid slab" that is "second to
  none."[40]

- A *New York Times* article dated March 9, 2011 praising that the iPad 2 will
  dominate the market because, in part, of its "beauty."[41]

- An *Engadget* internet article dated March 9, 2011, entitled "iPad 2
  Review." The article reports "[from an industrial design standpoint, the
  iPad 2 just seriously raised the bar on sleek, sexy computer hardware" and

---

[36] iF, Online Exhibition, http://exhibition.ifdesign.de/entry_search_de.html?search=ipad.

[37] Walter Mossberg, "Laptop Killer?  Pretty Close," The Wall Street Journal, Apr. 1, 2010,
http://online.wsj.com/article/SB10001424052702304252704575155982711410678.html.

[38] Edward Baig, "Verdict Is In On Apple iPad: It's a Winner," USA Today, April 2, 2010,
http://www.usatoday.com/tech/columnist/edwardbaig/2010-03-31-apple-ipad-review_N htm.

[39] Tim Gideon, "Apple iPad," PCMag, Mar. 31, 2010,
http://www.pcmag.com/article2/0,2817,2362042,00.asp.

[40] Edward Baig, "iPad 2 is Even Better Than Original," USA Today, March 10, 2012,
http://www.usatoday.com/tech/columnist/edwardbaig/2011-03-10-baig10_ST_N htm.

[41] David Pogue, "Appeal of iPad 2 is a Matter of Emotions," New York Times, March 9, 2011,
http://www nytimes.com/2011/03/10/technology/personaltech/10pogue html?_r=3.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

notes that "it looks and feels amazingly sleek when you hold it."[42]

### d.   Initial Skepticism

118.    There was considerable of pre-launch initial skepticism of the iPad design by industry experts.  For instance, one commentator criticized the iPad as "not so pretty," explaining:

> • A hallmark of all Apple products is design. More often than not, the devices the company releases are far more beautiful than any competing product. But the iPad is different. The device's bezel is huge, making the screen look smaller than it really is. Worst of all, a quick comparison between the iPad and its competition reveals that some products, especially HP's Slate, are actually on equal footing, if not better looking than Apple's iPad. Unfortunately for HP, few people know that.[43]

119.    Another media report predicted failure of the iPad:

> • Like a moth to a hot trend, Apple (AAPL) will fly into the netbook flame and get burned. The company will unveil a 10-inch touchscreen tablet computer sometime this year, say analysts. Not only does Apple want to showcase its design prowess, the company desperately needs a new hit to revitalize its computer line-up. . . . [B]eyond the core fan base, Apple will discover what other PC makers have known for a while: Consumers find big tablets hard to swallow.[44]

120.    Others criticized the iPad's lack of physical keyboard.[45]  And others complained that the "iPad is a heavy, bulky piece of gear and uncomfortable to hold for long periods."[46]

121.    The iPad 2 incorporated many of the design features of the iPad of which the industry was skeptical.

---

[42] Joshua Topolsky, "iPad 2 Review," Engadget, Mar. 9, 2011, http://www.engadget.com/2011/03/09/ipad-2-review/.

[43] Don Reisinger, "10 Reasons Why the iPad Would Fail Without the Apple Logo," eWeek.com, Jan. 28, 2010, http://www.eweek.com/c/a/Mobile-and-Wireless/10-Reasons-Why-the-iPad-Would-Fail-Without-the-Apple-Logo-428320/1/.

[44] Scott Moritz, "Apple's Netbook Foray Will Flop," The Street, Mar. 24, 2009, http://www.thestreet.com/print/story/10476593.html.

[45] Jeremy Muncy, "5 Reasons Why the iPad Fails to Impress," WebProNews, Feb. 1, 2010, http://www.webpronews.com/5-reasons-why-the-ipad-fails-to-impress-2010-02.

[46] Rick Broida, "How to hold an iPad comfortably in one hand." CNET, Mar. 7, 2011, http://reviews.cnet.com/8301-31747_7-20040287-243.html.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

### e.    Copying

122.    Before the release of the iPad, Samsung released a line of tablets that looked very different from the iPad.  The Samsung Q1 line of tablets had a recessed display screen surrounded by a large frame with multiple buttons and other features that dominated the front face.[47]  The Q1 looked nothing like the D'889 design or the iPad.



124.    Subsequently, Samsung launched its Galaxy Tab 10.1 product, which looks substantially similar to the D'889 design and the iPad 2.  The media confirmed that the Galaxy Tab 10.1 "looks very similar to the iPad 2"[48] and that "[t]o the eye, the two look almost alike in terms of thickness."[49]

## VI.    MY UNDERSTANDING OF THE LAW ON TRADE DRESS FUNCTIONALITY

125.    I have not been asked to offer an opinion on the law; however, as an expert opining on trade dress functionality, I understand that I am obliged to follow existing law.  I have been informed by counsel that product design trade dress is entitled to protection only if it is nonfunctional.  A trade dress is functional "if it is essential to the product's use or if it [favorably] affects the cost and quality of the article."  *Fuddruckers, Inc. v. Doc's B.R. Others, Inc*., 826 F.2d 837, 842 (9th Cir. 1987).

126.    I understand that in determining functionality, a product's trade dress must be analyzed as a whole, and not by its individual elements.  *Fuddruckers*, 826 F.2d at 842

---

[47] http://www.engadget.com/2006/03/09/samsungs-q1-ultramobile-pc/.

[48] Eliane Fiolet, "Galaxy Tab 10.1 Review," Ubergizmo, May 21, 2011, http://www.ubergizmo.com/2011/05/galaxy-tab-10-1-review/.

[49] John V., "Samsung Galaxy Tab 10.1 vs Apple iPad 2," Phonearena.com, June 15, 2011, http://www.phonearena.com/reviews/Samsung-Galaxy-Tab-10.1-vs-Apple-iPad-2_id2765.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

1  ("functional elements that are separately unprotectable can be protected together as part of a trade

2  dress"). "The fact that individual elements of the trade dress may be functional does not

3  necessarily mean that the trade dress *as a whole* is functional." *Clicks Billiards, Inc. v.*

4  *Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001) (emphasis in original).

5       127.   I understand that courts generally consider four factors in assessing the

6  functionality of a trade dress:

7       (1) Whether the design yields a utilitarian advantage;

8       (2) Whether alternative designs are available;

9       (3) Whether advertising touts the utilitarian advantages of the design; and

10       (4) Whether the particular design results from a comparatively simple or inexpensive

11  method of manufacture. *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th

12  Cir. 1998).

13  **VII.   APPLE'S TRADE DRESS RELATED TO THE IPHONE IS NOT FUNCTIONAL**

14       128.   I understand that the trade dress at issue in this matter involves the distinctive

15  shape and appearance of certain Apple products. In particular, the original iPhone trade dress

16  ("the Original iPhone Trade Dress") includes:

17       •      a rectangular product with four evenly rounded corners;

18       •      a flat clear surface covering the front of the product;

19       •      the appearance of a metallic bezel around the flat clear surface;

20       •      a display screen under the clear surface;

21       •      under the clear surface, substantial black borders above and below the display

22  screen and narrower black borders on either side of the screen;

23       •      when the device is on, a matrix of colorful square icons with evenly rounded

24  corners within the display screen; and

25

26

27

28

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

- when the device is on, a bottom dock of colorful square icons with evenly rounded corners set off from the other icons on the display, which does not change as other pages of the user interface are viewed.[50]

129.    The iPhone 3G trade dress includes all of the elements of the Original iPhone Trade Dress, plus "when the device is on, a row of small dots on the display screen" (the "iPhone 3G Trade Dress").[51]  The iPhone 4 trade dress includes all of the elements of the Original iPhone and the iPhone 3G trade dress except that it does not have a metallic bezel, but does have a thin metallic band around the outside edge of the iPhone 4, which creates a thin rim adjacent to the face of the phone (the "iPhone 4 Trade Dress").[52]  The iPhone 4's profile is also much flatter than the previous versions of the iPhone.

130.    The iPhone trade dress (the "iPhone Trade Dress") includes the elements that are common to all versions of the iPhone, namely:

- a rectangular product with four evenly rounded corners;

- a flat clear surface covering the front of the product;

- a display screen under the clear surface;

- under the clear surface, substantial neutral (black and white) borders above and below the display screen and narrower neutral borders on either side of the screen;

- when the device is on, a matrix of colorful square icons with evenly rounded corners within the display screen; and

- when the device is on, a bottom dock of colorful square icons with evenly rounded corners set off from the other icons on the display, which does not change as other pages of the user interface are viewed.[53]

---

[50] Amended Complaint, ¶ 57.

[51] Amended Complaint, ¶¶ 35, 59–60.  The iPhone 3G trade dress also applies to iPhone 3GS.  *See* Amended Complaint, ¶ 35.

[52] Amended Complaint, ¶ 37, 61-62.

[53] Amended Complaint, ¶¶ 63–64.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

1       131.    I have been asked to opine only on the functionality of the collection of trade dress

2  elements that are considered part of the industrial design, i.e., excluding the elements that

3  correspond to the matrix of icons and the bottom dock row of icons that appear when the phones

4  are turned on.



---

[54] Bartlett Decl. Ex. 1 at 101:3-8; Ex. 55 (APLNDC0002303105-134); Ex. 56 (APLNDC0002454404-412); Ex. 57 (APLNDC0002329800-801); Ex. 58 (APLNDC0002336678-679).

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION



136.    Further, numerous alternative designs to the industrial design embodied in the various iPhone Trade Dresses were and are commercially available.  These alternative designs depicted below are commercially available through multiple channels such as retail stores or online vendors such as Amazon.com and Bestbuy.com.  Because these alternative designs were commercially released, they show that the design protected by each iPhone Trade Dress is not required for a smartphone and that multiple designs exist for a functioning smartphone.

137.    Indeed, the iPhone 4 is actually a very successful example of an alternative design to the iPhone 3G Trade Dress because the iPhone 4 lacks a bezel and includes a metallic band that forms the appearance of a thin rim around its edges.  Likewise, the iPhone 3G is an alternative design to the iPhone 4 Trade Dress.  The iPhone 4 demonstrates that the overall iPhone 3G Trade Dress is not essential to the function of a smartphone product and the iPhone 3G demonstrates that the overall iPhone 4 Trade Dress is not essential to the function of a smartphone product.

138.    There are numerous instances of third-party designs that work equally well for smartphones.  For instance, Sony Ericsson has released the Xperia Arc S smartphone[57], which is a much more square design alternative to the various iPhone Trade Dresses.  There is no appearance of a metallic bezel on the phone.  There is also no flat clear surface covering the front of the product.  The phone has three prominent metallic buttons arranged in an arc shape below

---

[55] Ex. 55  (APLNDC0002303105-134); Ex. 56  (APLNDC0002454404-412).

[56] Ex. 57 (APLNDC0002329800-801); Ex. 58 (APLNDC0002336678-679).

[57] Ex. 59 comprises accurate photographs of the Xperia Arc S.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

the display screen.  Commentators have applauded the distinct Xperia Arc S alternative design:  it is "a stylish phone that's actually distinguishable from the mostly black oblongs we stare at each day."[58]  Others have praised that "it's still one of the slimmest, sexiest and all-round loveliest gadgets you can buy today."[59]



139.     Pantech has manufactured a smartphone called the Crossover[60] that has "angled" rather than rounded corners.  Reviewers have praised that these "angled corners add visual interest"[61] to the phone's design and that the angled corners "actually make[] a huge difference, offering more places to easily grip the phone."[62]  Indeed, the Crossover "feel[s] like it naturally belongs nestled in the palm of [one's] hand."[63]  The Crossover has also been complimented for its "sporty and rugged look."[64]  There is also no flat clear surface covering the front of the product.

---

[58] Mat Smith, "Sony Ericsson Xperia Arc S Review," Engadget, Nov. 6, 2011, http://www.engadget.com/2011/11/06/sony-ericsson-xperia-arc-s-review/.

[59] TechRadar, "Sony Ericsson Xperia Arc S Review," Oct. 13, 2011, http://www.techradar.com/reviews/phones/mobile-phones/sony-ericsson-xperia-arc-s-1033402/review.

[60] Ex. 60 comprises accurate photographs of the Crossover.

[61] CNET, "Pantech Crossover," http://reviews.cnet.com/smartphones/pantech-crossover-at-t/4505-6452_7-34813352.html#reviewPage1.

[62] Brad Molen, "Pantech Crossover Review," Engadget, June 7, 2011, http://mobile.engadget.com/2011/06/07/pantech-crossover-review/.

[63] *Id.*

[64] *Id.*

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

Also, the phone has distinctive trapezoidal arrangements above and below the display screen, distinguishing the phone from the industrial design elements of the various iPhone Trade Dresses.



140.    Nokia has manufactured the Nokia Lumia 800[65] phone, which is an alternative design to the industrial design aspects of each of the iPhone trade dress.  The Lumia 800 does not have a flat clear surface covering the front of the product; rather, the clear surface of the Lumia 800 is curved and does not cover the entire front of the product.[66]  Moreover, when viewed from the front, the Lumia 800 has squared corners rather than rounded corners and a blue frame surrounding the display screen.  The design of the Lumia 800 phone has been praised as "[i]t's natural and pleasant to the touch, with great ergonomics and weight balance — the diametric opposite of the cold and impersonal appearance of most modern technology."[67]  Others have commented that the Lumia 800 "is a dream to observe and handle, with its smooth curves fitting snugly to the hand."[68]

---

[65] Ex. 61 comprises accurate photographs of the Lumia 800.

[66] Nokia, Nokia Lumia 800 Specifications, http://www.nokia.com/gb-en/products/phone/lumia800/specifications/.

[67] Vlad Savov, "Nokia Lumia 800 Review," The Verge, Nov. 3, 2011, http://www.theverge.com/2011/11/3/2534861/nokia-lumia-800-review.

[68] TechRadar, "Nokia Lumia 800 Review," Mar. 8, 2012, http://www.techradar.com/reviews/phones/mobile-phones/nokia-lumia-800-1039101/review.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**




141.     Casio has manufactured the G'zOne Commando[69], which is an alternative design to the industrial design aspects of the various iPhone Trade Dresses.  Rather than a rectangular-shape with rounded corners, the Commando has a "diamond like shape" that includes a "hard rubber casing" that protects the phone.[70]  The rubber also provides a "better grip" on the phone.[71]  A reviewer has praised that "it's very comfortable to hold for long conversations."[72]  There is also no flat clear surface covering the front of the product.




---

[69] Ex. 62 comprises accurate photographs of the Commando.

[70] CNET, "Casio G'zOne Commando," http://reviews.cnet.com/smartphones/casio-g-zone-commando/4505-6452_7-34660420 html#reviewPage1.

[71] Armando Rodriguez, "Casio G'zOne Commando," PCWorld, May 2, 2011, http://www.pcworld.com/article/226883/casio_gzone_commando_review_a_super_durable_android_smartphone html.

[72] Jamie Lendino, "Casio G'zOne Commando," PCMag, May 9, 2011, http://www.pcmag.com/article2/0,2817,2385020,00.asp.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

142.    LG has manufactured the Optimus T[73]  phone, which does not have a flat clear surface covering the front of the product.  Instead, the phone has a large asymmetrical opaque frame on the front of the product surrounding the clear surface.  The bottom portion of the frame includes three buttons including a prominent gray button that protrudes into the clear surface. Reviewers have commented that the phone has a "stylish and comfortable design"[74] and "a nice comfortable feel in the hand."[75]



143.    Moreover, many of Samsung's own commercially released phones are themselves alternative designs to the iPhone Trade Dresses.  For instance, each of these Samsung phones[76] below differ from the industrial design aspects of the various iPhone Trade Dresses.

---

[73] Ex. 63 comprises accurate photographs of the Optimus T.

[74] Jamie Lendino, "LG Optimus T," PCMag, Nov. 23, 2010, http://www.pcmag.com/article2/0,2817,2373001,00.asp.

[75] CNET, "LG Optimus T," http://reviews.cnet.com/smartphones/lg-optimus-t-burgundy/4505-6452_7-34204892.html#reviewPage1.

[76] From left to right:  Samsung i8910 Omnia HD (released May 2009); Samsung M7600 Beat DJ (released May 2009); Samsung Sunburst SGH-A697 (released March 2010); Samsung Gravity Touch SGH-T669 (released June 2010); Samsung Gem SCH-I100 (released February 2011).  *See* Ex. 64 for accurate photographs of these phones.  These phones do not constitute an exhaustive list of Samsung's alternative designs that may be relevant; they are merely representative of some alternatives that Samsung has commercialized.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

Original iPhone                    iPhone 3G                    iPhone 4

144.    For example, Samsung's Sunburst, Beat DJ, Gravity Touch, and Gem phones (bottom row below) do not have rounded corners; rather the entire top and bottom sides of these phones are rounded at the top, unlike the design reflected in the iPhone Trade Dresses, which has a flat side along the top.



**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

145.    Moreover, Samsung's Sunburst, Omnia HD, Gravity Touch, and Gem phones do not have a flat clear surface covering the front of the phone.  Instead, these phones have arrays of opaque buttons on the bottom portion of the front of the phone.

   

146.    The fact that Samsung and other manufacturers have commercially released phones with alternative designs suggests that Samsung could have successfully manufactured the designs with equivalent functionality for the end user.  There are many alternative designs by third-party competitors that serve equivalent functionality as the iPhone Trade Dresses.  The alternative designs discussed in the foregoing are in no way comprehensive.  The smartphone field is filled with alternative, commercially viable designs that illustrate the nonfunctionality of the various iPhone Trade Dresses.  Other phone designs that illustrate alternative renderings of individual design elements include HTC Touch Dual, T-Mobile My-Touch, Palm Treo 700p, HTC 7 Trophy T8686, Sony Ericsson Xperia S, Pantech Hotshot CDM8992VW, Modu 1 and associated jackets, Modu T and associated jackets, Modu W, and Nokia X5-01.  These designs illustrate the vast array of design choices Samsung possessed with respect to every design element of its phones and undercut any contention that utilitarian or functional considerations dictated the iPhone Trade Dresses.  (*See* Ex. 64.)

147.    Furthermore, Samsung itself has applied for and received design patents on the ornamental design for its smartphones – many of which feature relatively large screens suitable for use as a touch screen.  Samsung's own design patents undercut any contention that smartphone design (or more specifically, touch-screen smartphone design) is restricted by function to the iPhone Trade Dresses.  For example, U.S. D555,131[77] to Samsung claims a phone design with a large display screen.  But the D'131 design, as shown below, also has curved top

---

[77] Ex. 65.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

and bottom sides, angled corners, adornments on the front face, and numerous other differences

from the various iPhone Trade Dresses.



148.    Other Samsung design patents similarly illustrate the design alternatives available

to Samsung for every feature of a phone, including U.S. Patent Nos. D561,156, D616,857,

D561,155, D562,794, D624,046, D616,856, and D629,780.[78]

_____

[78] Ex. 66.

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

152.     Based on the above, I conclude that there is no utilitarian advantage to the industrial design aspects of the various iPhone Trade Dresses as opposed to alternative designs. There are also many alternative designs with functionality equal to the iPhone Trade Dresses. Furthermore, based on the testimony of Apple product designers, I understand that the industrial design of the iPhone Trade Dresses was actually difficult to manufacture, and not the result of a simple method of manufacture.  I am also unaware of any advertising that touts the utilitarian advantages of the industrial design aspects of the various iPhone Trade Dresses.

153.     In light of these factors, which I understand are the factors that courts consider in determining whether trade dress is functional, I conclude that the industrial design aspects of the various iPhone Trade Dresses are not functional.  Given that the industrial design elements of the iPhone Trade Dresses are not functional as a whole, I have no reason to believe that adding a matrix of colorful icons and a bottom dock of stationary icons would render the overall design essential to the function of the products at issue.

## VIII.    APPLE'S TRADE DRESS RELATED TO THE IPAD IS NOT FUNCTIONAL

154.     The iPad trade dress includes:

- a rectangular product with four evenly rounded corners;

- a flat clear surface covering the front of the product;

- the appearance of a metallic rim around the flat clear surface;

- a large display screen under the clear surface;

- under the clear surface, substantial neutral (black or white) borders on all sides of the display screen; and

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

1       •     when the device is on, a matrix of colorful square icons with evenly rounded

2  corners within the display screen.[79]

3       155.    The iPad 2 Trade Dress at issue includes all of the elements of the iPad Trade

4  Dress.[80] For this reason, my analysis will focus solely on the iPad Trade Dress.

5       156.    As for the iPhone, I have been asked to opine only on the functionality of the

6  collection of iPad Trade Dress elements that are considered part of the industrial design, i.e.,

7  excluding the elements that correspond to the matrix of icons and the bottom dock row of icons

8  that appear when the phones are turned on.



26  [79] Amended Complaint, ¶¶ 65–66.

27  [80] Amended Complaint, ¶¶ 65–68.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

1

2

3        159.    Further, numerous alternative designs to the iPad Trade Dress were and are

4    commercially available.  These alternative designs depicted below are commercially available

5    through multiple channels such as retail stores or online vendors such as Amazon.com and

6    Bestbuy.com.  Because these alternative designs were commercially released, they show that the

7    design protected by the iPad Trade Dress is not required for a tablet, and that there are multiple

8    designs for a functioning tablet.

9        160.    For instance, Barnes & Noble has manufactured the Nook tablet[81], which is

10   another design alternative to the iPad Trade Dress.  Unlike the iPad Trade Dress, the Nook tablet

11   does not have a flat clear surface covering the front of the product with a neutral border under the

12   clear surface; rather, the Nook tablet has a gray opaque frame surrounding the display of the

13   device, which may increase comfort of the device in hand.  For instance, one commentator has

14   noted that "[t]he Nook Tablet does feel a little better in your hand, largely because the border

15   around the screen has a textured finish whereas the [other tablet] has a glossy, clear plastic

16   border."[82]  The Nook Tablet also does not have the appearance of a metallic rim surrounding the

17   front surface.  Furthermore, the Nook tablet has a distinctive "loop" at one corner such as it does

18   not have four evenly rounded corners. A reviewer observed that this "loop" design "serves as

19   both a handle and a way to conceal the reader's MicroSD card slot."[83]  Another review explained

20   that this "loop" was a design decision by Barnes & Noble to "set the device apart from other

21   tablets."[84]

22   _____

23         [81] Ex. 83 comprises accurate photographs of the Nook.

24         [82] CNET, "Barnes & Noble Nook Tablet," http://reviews.cnet.com/tablets/barnes-noble-nook-tablet/4505-
     3126_7-35059751 html#reviewPage1.

25         [83] Sascha Segan, "Barnes & Noble Nook Tablet Review," Nov. 18, 2011, PCMag,
26   http://www.pcmag.com/article2/0,2817,2396554,00.asp.

27         [84] Brian Heater, "Barnes & Noble Nook Tablet Review," Nov. 21, 2011, Engadget,
     http://www.engadget.com/2011/11/21/barnes-and-noble-nook-tablet-review/.

28

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

1

2

3       

4

5

6

7       161.    Vinci has manufactured an alternative design that has chamfered corners instead of

8   rounded corners and a rubberized "protective ring" surrounding the tablet.[85]  Reviewers have

9   noted that the protective ring "serves as a bumper against drops or collisions" and that "one of the

10  Vinci's greatest advantages is that it isn't nearly as easy to break as an iPad."[86]  The Vinci tablet

11  also does not have the appearance of a metallic rim surrounding the front surface.

12

13

14        

15

16

17

18

19      162.    Acer has manufactured the Iconia A500[87] tablet that is an alternative design to the

20  iPad Trade Dress.  The Iconia A500 does not have a flat clear surface covering the front of the

21  product.  Rather there is a distinctive opaque aluminum casing that wraps from the back to the

22  front such that it borders only the longer sides of the display.  There also does not appear to be an

23  appearance of a metallic rim around the flat clear surface. Reviewers have noted that this is a

24  ────────────────

25          [85] Ex. 84 comprises accurate photographs of the Vinci tablet.

26          [86] David Pierce, "Vinci Tab Review," PCMag, Sep. 22, 2011,
    http://www.pcmag.com/article2/0,2817,2392593,00.asp.

27          [87] Ex. 85 comprises accurate photographs of the Iconia A500.

28

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION**

"good look" and that the Iconia A500 delivers "solid performance . . . and a sturdy metal design."[88]



163.    Likewise, Coby has manufactured the Kyros[89] that does not have a flat clear surface covering the front of the product.  Rather, the front display of the Kyros is framed by an opaque plastic housing. The Kyros has been commended for being a "strong performing, well built tablet."[90]



---

[88] Bradford, K.T., "Acer Iconia Tab A500 Review," Laptop, Apr. 20, 2011, http://www.laptopmag.com/review/tablets/acer-iconia-tab-a500.aspx.

[89] Ex. 86 comprises accurate photographs of the Kyros.

[90] William Harrel, "Coby Kyros Internet 8" Touch Screen Tablet Review & Ratings," Computer Shopper, http://computershopper.com/tablets/reviews/coby-kyros-internet-8-touchscreen-tablet-mid8024/%28page%29/.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

164.    Sony has manufactured the Tablet S[91] which has an alternative "folded" design distinct from the iPad Trade Dress.  Commentators praised the industrial design as "smart" and that "[i]ts unique wedge shape gives it a futuristic look and provides improved balance in your hand compared with the flat competition."[92]  Also, when "placed on a table, the screen's forward slant minimizes glare and makes it more comfortable to type."[93]  Others have complimented that "it's one of the best-looking Android tablets around" with its "[c]omfortable, ergonomic design," and that as compared to the iPad2, which "tires [the] wrist very quickly, . . . the Tablet S feels like it weighs much less than its 21.2 ounces." [94]



165.    The alternative designs discussed in the foregoing are in no way comprehensive.  The tablet computer field is filled with alternative, commercially viable designs that illustrate the nonfunctionality of the iPad Trade Dress.  Other available alternative designs include, for instance, the Panasonic Toughbook tablet, the Sony Reader, or the Sony Tablet P, as shown

---

[91] Ex. 87 comprises accurate photographs of the Tablet S.

[92] CNET, "Sony Tablet S," http://reviews.cnet.com/tablets/sony-tablet-s-32gb/4505-3126_7-35003724.html#reviewPage1.

[93] Id.

[94] Sascha Segan, "Sony Tablet S," PCMag, Dec. 5, 2011, http://www.pcmag.com/article2/0,2817,2397089,00.asp.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

below, or the GriDPAD 2050, the Motion Computing LS800, and the Freescale smartbook

concept.[95]  *See* Ex. 93.

 

166.    Moreover, the alleged prior art cited by Samsung against the D'889 design in its

opposition to Apple's Motion for Preliminary Injunction constitute alternative designs to the iPad

Trade Dress.  For example, JP1142127 (Ex. 88), JP0887388 (Ex. 89), JP0921403 (Ex. 90), U.S.

Patent No. D461,802 (Ex. 91), the TC 1000, (Ex. 4), and the Fidler Mock-up (Ex. 2) are all far

afield from the Apple iPad Trade Dress aesthetically.

167.    Furthermore, Samsung's own commercially released tablet prior to the iPad – the

Samsung Q1[96] – constituted an alternative design to the iPad Trade Dress.  The Samsung Q1 has

a raised opaque black housing surrounding the recessed display on the front surface.  The housing

on the front surface had a variety of different physical buttons.  The Q1 was praised for its

"beautiful, featherweight design" with a "sleek case" and that the "[b]uttons around the screen

also help [the user] navigate." [97]

---

[95] These tablets do not constitute an exhaustive list of alternative designs that may be relevant; they are merely representative of some alternatives that have been commercialized.

[96] Ex. 92 comprises accurate photographs of the Q1.

[97] CNET, "Samsung Q1 Ultramobile PC," http://reviews.cnet.com/laptops/samsung-q1-ultramobile-pc/4505-3121_7-31781057.html#reviewPage1.

SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION

1

2

3

4

5

6

 

7

8

9

10

168.    The fact that Samsung and other manufacturers have commercially released tablets with alternative designs suggests that Samsung could have successfully manufactured the designs with equivalent functionality for the end user.  There are many alternative designs by Samsung and third-party competitors that serve equivalent functionality as the iPad Trade Dress.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

172.    Based on the above, I conclude that there is no utilitarian advantage to the industrial design aspects of the iPad Trade Dress as opposed to alternative designs.  There are also many alternative designs with functionality equal the iPad Trade Dress.  Furthermore, based on

26

27

28

**SUBJECT TO PROTECTIVE ORDER – CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION**

the testimony of Apple Product Designers, I understand that the industrial design of the iPad Trade Dress was actually difficult to manufacture, and not the result of a simple method of manufacture. I am also unaware of any advertising that touts the utilitarian advantages of the industrial design aspects of the iPad Trade Dress.

173. In light of these factors, which I understand are the factors that courts consider in determining whether trade dress is functional, I conclude that the industrial design aspects of the iPad Trade Dress are not functional. Given that the industrial design elements of the iPad Trade Dress are not functional as a whole, I have no reason to believe that adding a matrix of colorful icons when the product is on would render the overall design essential to the function of the products at issue.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed this 29th day of May, 2012, at the District of Columbia.

PETER W. BRESSLER, FIDSA