Apple v. Samsung
Confidential – Attorneys' Eyes Only

1

2

3

4

5

6

7

8  UNITED STATES DISTRICT COURT

9  NORTHERN DISTRICT OF CALIFORNIA

10  SAN JOSE DIVISION

11

| | |
|---|---|
| 12 APPLE INC., a California corporation, | Case No.    11-cv-01846-LHK |
| 13          Plaintiff, | **DECLARATION OF DR. KARAN SINGH, PH.D. IN SUPPORT OF APPLE'S OPPOSITION TO SAMSUNG'S MOTION FOR SUMMARY JUDGMENT** |
| 14      v. | |
| 15 SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG | |
| 16 ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG | |
| 17 TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| 18 | |
| 19          Defendants. | |

20

21  **\*\*CONFIDENTIAL – CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY PURSUANT TO A PROTECTIVE ORDER\*\***

22

23  **PUBLIC REDACTED VERSION**

24

25

26

27

28

I, KARAN SINGH, do hereby declare as follows:

1.      I have personal knowledge of, and am competent to testify to, the facts and opinions set forth herein.

2.      I have been asked by counsel for Apple to provide an expert declaration in the above-captioned case.  I submit this Declaration in support of Apple's Opposition to Samsung's Motion for Summary Judgment.  I have been asked by counsel to review and respond to the opinions and assertions made in the Declaration of Stephen Gray in Support of Samsung's Motion for Summary Judgment.

3.      I reserve the right to supplement this Declaration if additional data or other information that affects my opinions becomes available or to respond to any additional matters that may addressed by any witness testifying on behalf of Samsung, if asked to do so.

4.      I am being compensated at my standard hourly consulting rate of $450 and my compensation is in no way dependent upon the opinions I offer or upon the outcome of the litigation between Apple and Samsung.

## II.     QUALIFICATIONS

5.      I am the same Dr. Karan Singh who submitted an opening expert report regarding Samsung's infringement of U.S. Patent Nos. 7,864,163 (the "'163 patent"), 7,844,915 (the "'915 patent") and 7,853,891 ("Infringement Report"), and a rebuttal expert report regarding the validity of those patents ("Validity Report").  The portions of my Infringement Report relating to the '915 patent are attached hereto as Exhibit 1.  The portions of my Validity Report relating to the '915 patent and the '163 patent, including the LaunchTile reference, are attached hereto as Exhibit 2.

6.      Here, I provide a brief summary of my qualifications.  My qualifications and experience are stated more fully in my curriculum vitae, which includes a list of all my honours, patents, presentations, grants, and publications from the last five years, and is attached to this Declaration as Exhibit 3.

7.      I received my Bachelor of Technology degree in Computer Science from the Indian Institute of Technology in 1991. I was awarded a Master of Science degree in 1992, and a

Apple v. Samsung
Confidential – Attorneys' Eyes Only

Ph.D. in 1995, both in Computer and Information Science, from Ohio State University.  I can read and program fluently in object-oriented programming languages, such as C++ and Java.

8.     In 1994, I was invited to conduct research at the Advanced Telecommunications Research laboratory in Kyoto, Japan.  During this time I researched virtual reality technology, specifically designing graphical environments in which human characters could interact with computing systems.

9.     My Ph.D. dissertation, which I presented in 1995, was on creating representations of humans which could interact in graphical environments.

10.     In 1995, I joined Alias Wavefront in Toronto, Canada. While there I designed character animation and facial modeling tools for the first release of Maya, which is a software system for computer graphical modeling, animation, and rendering which won a technical Oscar in 2003, one of only 38 such awards since 1930.  This software, which I worked on for more than two years, is still the premiere software package today for these functions.  I worked at Alias Wavefront until 1999.

11.     I have worked with Chris Landreth, a director of animated films, since I started with Alias Wavefront in 1995.  Chris and I worked together on the design of Maya, and have subsequently worked on a number of film projects. Notable among these projects is the short film "Ryan," which won an Oscar for Best Animated Short in 2005.

12.     Later in 1999, I joined a start-up company in California called Paraform Inc. While there I worked to develop a system which transformed data from real objects which had been scanned using lasers into useable digital models for downstream applications.

13.     For several months in 1999 I was a Visiting Professor of Computer Science at the University of Otago in New Zealand. During that time I taught and conducted research in computer graphics.

14.     Since 2002, I have been an Associate Professor of Computer Science at the University of Toronto where I co-direct a graphics and human computer interaction laboratory known as dgp (dynamic graphics project).   I have conducted research and taught classes in graphics and in human computer interaction.  During this period, I have also undertaken

consulting projects with various companies in the computer graphics and design industries. Since 2002, I have also been the Chief Scientist at Geometry Systems, which is a company which designs software for the reverse engineering of physical objects into usable digital models. I also co-founded Arcestra, Inc. in 2006, which is a software service for conceptualizing and visualizing architectural interiors.

15.     My current research focus is on interaction techniques for pen and touch based devices inspired by a sketching metaphor.

16.     I have previously testified by deposition as an expert in proceedings before the International Trade Commission in the ITC Investigation In re Certain Electronic Digital Media Devices and Components Thereof, Inv. No. 337-TA-796 on behalf of complainant Apple.

## III.     MATERIALS REVIEWED

17.     In forming my opinions as stated in this Declaration I reviewed a large volume of materials relating to the '915 patent and the '163 patent and to Samsung's arguments with respect to those patents.  A subset of the materials I reviewed included the '163 and '915 patents and their file histories, the LaunchTile videos and papers attached to Mr. Bederson's Declaration, the XNav code produced in this litigation, Mr. Gray's Invalidity Report and his Rebuttal Report on Non-Infringement, the Gray  and Bederson Declarations and exhibits filed in support of Samsung's Motion for Summary Judgment, and all of the deposition transcript and dictionary excerpts and other materials cited in this Declaration.  Additional materials that I reviewed in forming my opinion in this case were disclosed in my opening Infringement Report and in my rebuttal Validity Report.

## IV.     UNDERSTANDING OF THE LAW

18.     I have not been asked to offer an opinion on the law; however, as an expert assisting the Court in determining patent infringement and validity, I understand that I am obliged to follow existing law.  I have therefore been asked to apply the following legal principles to my analysis of patent infringement and validity:

19.     I understand that to determine whether there is infringement of a patent:  (1) the claims of the patent must be construed; and (2) the properly construed claims must then be compared with the accused products.

20.     Where the Court has construed a claim term, I have applied that construction. Where no claim construction has been issued by the Court, I have interpreted the claims as one of ordinary skill in the art would have at the time the relevant patent was filed in light of its claim language, specification, and prosecution history.

21.     As the second step in the infringement analysis, I understand that the properly construed claim must be compared to the accused products.  I understand that infringement requires that every limitation of a claim be met, either literally or equivalently, by the accused device.

22.     I understand that one test for determining equivalence is to determine whether the differences between the claimed limitation and the accused product are insubstantial.  I understand that another test for determining equivalence is to examine whether the step used by the accused product performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed step.

23.     I understand that to prove direct infringement of a device claim, a plaintiff must show that a defendant "makes, uses, offers to sell, or sells," within the United States, or imports into the United States, an accused device that reads on every limitation of the patent claim.

24.     I understand that a device literally and directly infringes a claim of a patent if all of the asserted claim elements are found in the accused device or method.

25.     I have been informed by counsel that by United States statute, a patent is presumed valid.  I understand that the patent challenger bears the burden of proving invalidity of the patent by clear and convincing evidence.

26.     I have been informed by counsel that, for a finding of invalidity of a patent under 35 U.S.C. § 102, which is known as "anticipation," each and every element of a claim, as properly construed, must be found either explicitly or inherently in a single prior art reference, subject to the limitations imposed by § 102 in paragraphs (a)–(g).  I understand that under

principles of inherency, if the extrinsic evidence makes clear that the prior art necessarily functions in accordance with or includes the claimed limitations, it anticipates.  I understand that inherency may not be established by probabilities or possibilities.  I also understand that, in order to anticipate a patent claim, a prior art reference must also be enabling, such that a person of ordinary skill in the art could practice the invention without undue experimentation.

27.     I have been informed by counsel that a claim is invalid under 35 U.S.C. § 102(a) if the claimed invention was known or used by others in the U.S., or was patented or published anywhere, before the applicant's invention.  I further have been informed that a claim is invalid under 35 U.S.C. § 102(b) if the invention was patented or published anywhere, or was in public use, on sale, or offered for sale in the United States, more than one year prior to the filing date of the patent application.  And I have been informed that a patent claim is invalid under 35 U.S.C. § 102(e), if an invention described by that claim was described in a U.S. patent granted on an application for a patent by another that was filed in the U.S. before the date of invention for such a claim.  A claim is also invalid, as I understand, under 35 U.S.C. §102 (f) if the invention was invented by another prior to the claimed invention.  It is also my understanding that a claim is invalid under 35 U.S.C. §102 (g)(2) if, prior to the date of invention for the claim, the invention was made in the U.S. by another who had not abandoned, suppressed or concealed the invention.

## V.     THE SAMSUNG ACCUESED PRODUCTS INFRINGE CLAIM 8 OF THE '915 PATENT

28.     In my opinion, each of the Samsung Accused Products meets each and every limitation of claim 8 of the '915 patent literally and, in the alternative, under the doctrine of equivalents, as explained below.  Videos of various Accused Products performing the limitations of this claim were included in my Infringement Report as Exhibit 18 (Galaxy Tab 10.1), Exhibit 19 (Galaxy S II), Exhibit 20 (Vibrant), and Exhibit 21 (Captivate).  They are renumbered as Exhibits 4, 5, 6 and 7 to this Declaration.

29.     **Claim 8.**  Claim 8 recites:

A machine readable storage medium storing executable program instructions which when executed cause a data processing system to perform a method comprising:

Apple v. Samsung
Confidential – Attorneys' Eyes Only

[a] receiving a user input, the user input is one or more input points applied to a touch-sensitive display that is integrated with the data processing system;

[b] creating an event object in response to the user input;

[c] determining whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation

[d] issuing at least one scroll or gesture call based on invoking the scroll or gesture operation;

[e] responding to at least one scroll call, if issued, by scrolling a window having a view associated with the event object;

[f] responding to at least one gesture call, if issued, by scaling the view associated with the event object based on receiving the two or more input points in the form of the user input.

30. **Claim 8 – Preamble and limitations [a] , [b], [d], [e] and [f]**  Each of the Accused Products is either a smartphone or tablet running a version of the Android operating system, which includes a data processing system.  Each Accused Product includes a computer readable storage medium storing executable program instructions which when executed cause the data processing system to perform the method described in claim 8.  I have previously submitted an Expert Report on the Infringement of the '915 patent, providing details on how the Accused Products meet the preamble (if it is a claim limitation) and every limitation found in Claim 8.  In my Infringement Report I discussed method claim 1 in detail, and opined that device claim 8 was infringed for essentially the same reasons as method claim 1, because claim 8 in essence claims a device for performing the method of claim 1.  My infringement opinions included claim charts as Exhibit 17 to my Infringement Report, which were submitted as Exhibit 14 to Mr. Gray's Declaration.  They also included claim charts as Exhibit 16 to my Infringement Report, which is attached to this Declaration as Exhibit 8.  I incorporate those claim charts by reference in this Declaration.

31. Because Samsung's Motion and Mr. Gray's Declaration do not contest that the Samsung Accused Products infringe the preamble or the limitations Mr. Gray had labeled as [a], [b], [d], [e] and [f], but instead challenge only whether the Accused Products meet limitation [c], I

1   will focus on that limitation rather than reiterating all of the reasons why the other limitations are

2   present in the Samsung Accused Products.

3       32.     **Claim 8 – Element [a] "receiving a user input, the user input is one or more**

4   **input points applied to a touch-sensitive display that is integrated with the data processing**

5   **system."**

6       33.     In my opinion, each of the Accused Products infringes this limitation.  The

7   Accused Products receive a user input.  The user input includes one or more input points (one or

8   more fingers) applied to the touch-sensitive display that is integrated with the Samsung device.

9   Samsung has not disputed this in its Motion or in Mr. Gray's Declaration.

10      34.     For example, the Galaxy Tab 10.1 and the Galaxy S II receives a user input with

11  one input point (one finger) applied to the touch-sensitive display as illustrated below.  The

12  touch-sensitive displays are integrated into the Galaxy Tab 10.1 and the Galaxy S II.

13      35.     Based on my observations of the Accused Products, as well as my analysis of the

14  source code for each major release of Android running on the Accused Products (Android 2.1,

15  2.2, 2.3, and 3.1), I have determined that each Accused Product receives a user input, where the

16  user input is one or more input points applied to the touch-sensitive display that is integrated with

17  the device.  The claim chart in Exhibit 17 to my Infringement Report identified analogous code

18  that satisfies this element in Android 2.1, 2.2, and 2.3.  (Gray Decl. at Ex. 14.)

19      36.     **Claim 8 – Element [b] "creating an event object in response to the user**

20  **input."**  In my opinion, each of the Accused Products includes a machine readable storage

21  medium storing executable program instructions which when executed cause a data processing

22  system to create an event object in response to the user input.  Samsung has not disputed this in

23  its Motion or in Mr. Gray's Declaration.

24      37.     Each of the Accused Products, via the Android platform on which it operates,

25  creates an event object in response to the user input.

26      38.     Under the public Android platform, a MotionEvent object is created in response to

27  a touch on the touch screen.  (http://developer.android.com/reference/android/view/

28  MotionEvent.html.)

39.

40.     Based on my observations of the Accused Products, as well as my analysis of the

source code for each major release of Android running on the Accused Products (Android 2.1,

2.2, 2.3, and 3.1), I have determined that each Accused Product includes similar computer code

that creates an event object in response to user input.  The claim chart in Exhibit 17 to my

Infringement Report identifies analogous code that satisfies this element in Android 2.1, 2.2, and

2.3.  (Gray Decl. at Ex. 14.)

41.     **Claim 8 – Element [c] "determining whether the event object invokes a scroll

or gesture operation by distinguishing between a single input point applied to the touch-

sensitive display that is interpreted as the scroll operation and two or more input points

applied to the touch-sensitive display that are interpreted as the gesture operation."**  In my

opinion, each of the Accused Products meets this limitation.

42.     The Accused Products determine whether an event object invokes a scroll or

gesture operation by distinguishing between a single input point (one finger) applied to the touch-

sensitive display that is interpreted as the scroll operation and two or more input points (more

than one finger) applied to the touch-sensitive display that are interpreted as the gesture operation.

43.     For example, the Galaxy Tab 10.1 tablet distinguishes between a scroll operation

when one finger is applied to the touch-sensitive display and a gesture operation when two or

more fingers are applied to the touch-sensitive display.

Apple v. Samsung
Confidential – Attorneys' Eyes Only



(Scroll operation when one input point is applied.)



(Gesture operation when two or more input points are applied.)

44.     For example, the Galaxy S II phone distinguishes between a scroll operation when one finger is applied to the touch-sensitive display and a gesture operation when two or more fingers are applied to the touch-sensitive display, as illustrated below:

Apple v. Samsung
Confidential – Attorneys' Eyes Only



1.     (Scroll operation when one input point is

 

2.     (Gesture operation when two or more input points are applied.)

45.



46.

47.     Based on my inspection of Samsung source code for each major release of Android running on the Accused Products (Android 2.1, 2.2, 2.3, and 3.1), I have determined that each Accused Product includes similar computer code that distinguishes between a single input point (one finger) applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points (more than one finger) applied to the touch-sensitive display that are interpreted as the gesture operation.  The claim chart in Exhibit 17 to my Infringement Report identifies analogous code that satisfies this element in Android 2.1, 2.2, and 2.3.  (Gray Decl. at Ex. 14.)

48.     I understand that this limitation is the only one that Mr. Gray addresses in his Declaration in support of Samsung's Summary Judgment Motion.  I further understand that Mr. Gray alleges that the MotionEvent object does not "invoke" a scroll or gesture operation.  I disagree with Mr. Gray, because the Accused Products contain a MotionEvent object that "invokes" a scroll or gesture operation, either literally or under the doctrine of equivalents.

Apple v. Samsung
Confidential – Attorneys' Eyes Only

49.     I understand that Mr. Gray interprets the term "invoke" to mean that the event object must itself "call" a scroll or gesture operation.  In essence, this would mean the event object must itself call the operation with no intervening steps.  I disagree with Mr. Gray's interpretation of "invoke," as it fails to interpret "invoke" in light of the specification.

50.     In my opinion, based on the context provided by the '915 patent specification and claims, a person of ordinary skill in the art would understand that "invoke" means "causes" or "causes a procedure to be carried out."

51.     The specification refers multiple times to the "user input invokes a scroll," which means that user input causes a scroll operation to occur.  As one example, the specification discloses, "The method 1000 for providing the scroll hysteresis operation includes transferring a scroll hysteresis call to determine whether a **user input invokes a scroll** at block 1002." (Arnold Decl. Ex. 85 ['915 Patent] at 10:66-11:2 (emphasis added).)  As another example, the specification discloses, "In an embodiment, the library of the framework provides an API for specifying a scroll hysteresis operation to determine whether a **user input invokes** a scroll." (*Id.* at 22:62-64 (emphasis added.))  Similarly, the specification discloses that the "user input" may "invoke a gesture" on the view associated with the user input.  (*Id.* at 13:37-39.)  One skilled in the art would understand that "user input" cannot itself "call" scroll or gesture operation code, but instead causes the scroll or gesture operation to occur via intervening hardware detection and software steps.  Mr. Gray's narrow construction of "invokes" is contrary to the specification.

52.     Similarly, the specification discloses that the "software invokes an animation that performs a scaling transform on the view associated with the user input."  (Arnold Decl. Ex. 85 ['915 Patent] at 15:4-6.)  One skilled in the art would understand. In light of this description, that the software event object does not or need not call a scroll or scaling function directly, but rather that the general code for scrolling and scaling would perform those operations.

53.      I disagree with Mr. Gray's assertion that there is a significant distinction in the '915 patent between "event object invokes" and "user input invokes."  (*See* Gray Decl. ¶ 25.) The patent specification often refers to "event object" as shorthand for "user input in an event object."  As explained in the specification, "A multi-touch driver of the device receives the user

input and packages the event into an event object."  (*See* Arnold Decl. ['915 Patent] at 12:30-32.)

The previous limitation of claim 8, "creating an event object in response to the user input,"

indicates that the event object includes the user input information.  Moreover, the interchangeable

use of "event object" and "user input" is illustrated throughout the specification, which refers to

the "event object," "user input," and "software" to invoke, or cause, various operations.  (*Id.* at

10:16-11:12, 13:37-39, 15:4-6, 22:62-64.)

54.     The specification also expressly describes how the event object is used to cause

scroll or gesture operations to execute via multiple steps.  In each of the below examples, the

event object does not itself call scroll or gesture operation code, but the event object's user input

information is used to cause the scroll or gesture operation code to execute.  For example, the

specification discloses, "A window server receives the **event object** and determines whether the

event object is a gesture event object.  If the window server determines that a gesture event object

has been received, then **user interface software issues or transfers the handle gesture call** at

block 1302 to a software application associated with a view."  (Arnold Decl. Ex. 85 ['915 Patent]

at 12:32-37 (emphasis added).)  In this way, the user input information in the event object causes

the gesture operation to execute.  Similarly, the specification discloses, "If the **events are hand**

**events based on a user input, the events are routed to the window** they occurred over.  The

**window then routes these events to the appropriate control by calling the instance's mouse**

**and gesture methods**.  The control that receives a mouse down or mouse entered function will

continue to get all future calls until the hand is lifted.  **If a second finger is detected, the gesture**

**methods or functions are invoked**." (*Id.* at 12:9-16 (emphasis added).).  In this way, the event

object is based on the user input, causes a routing from the window to the user interface control,

which then calls a scroll or gesture operation based upon whether the event object contains a one-

finger or two-finger user input.  The specification is entirely consistent with my interpretation of

"invokes."  Mr. Gray's narrow definition limiting "invokes" to the event object itself calling a

scroll or gesture operation with no intervening steps contradicts the specification.

55.     My opinion that "invokes" means "causes" or "causes a procedure to be carried

out" is supported by dictionaries published near the time of the '915 patent invention.  For

1    example, the Oxford English Dictionary defines "invoke" in the "Computing" context as "cause

2    (a procedure) to be carried out."  (Oxford Dictionary of English (2d Ed.) (2005) attached as

3    Exhibit 9.)  As another example, Merriam Webster's Dictionary defines "invoke" as "to bring

4    about, cause."  (Merriam Webster's Dictionary (2004) attached as Exhibit 10.)

5         56.      I disagree with Mr. Gray's statement that MotionEvent object never invokes a

6    scroll or gesture operation.  (*See* Gray Decl. ¶ 35.)

7

8

9

10        57.      Mr. Gray attempts to shift focus onto the WebView class, which is merely an

11   abstraction for a set of code that assists with routing event information to the window animation

12   software that executes the scrolling or scaling.  (*See* Gray Decl. ¶¶ 34-35.)  Mr. Gray never

13   contests that Samsung code calls the scroll or gesture operation depending upon the number of

14   touch points, but instead alleges it is WebView, not the event object, that calls the scroll or

15   gesture operation.  I disagree with Mr. Gray.  The specification clearly discloses that the window

16   or user interface code would use the event object's user input information to cause a call to the

17   scroll or gesture operation.   As I explained above, the specification discloses that the window

18   class (*i.e.*, WebView) calls the scroll and gesture methods using the event: "If the events are hand

19   events based on a user input, the **events are routed to the window** they occurred over.  The

20   **window then routes these events to the appropriate control by calling the instance's mouse**

21   **and gesture methods**." (Arnold Decl. ['915 Patent] at 12:9-16 (emphasis added).)  Further, the

22   specification explains that the window's user interface software (*i.e.*, WebView) issues or

23   transfers the gesture call based on the event:  "A window server receives the event object and

24   determines whether the event object is a gesture event object.  If the **window server** determines

25   that a gesture event object has been received, then **user interface software issues or transfers**

26   **the handle gesture call** at block 1302 to a software application associated with a view." (*Id.* at

27   12:32-37 (emphasis added).)  Thus, the '915 patent specification clearly shows that "invokes"

28   includes the use of additional code (such as WebView) to assist with routing the event object

Apple v. Samsung
Confidential – Attorneys' Eyes Only

1    information and, depending on whether the event object indicates there is one or more input

2    points, call the scroll or gesture operation.

3         58.

4

5

6

7                                                                                            This is

8    precisely what it means to "determin[e] whether the event object invokes a scroll or gesture

9    operation by distinguishing a single input point . . . and two or more input points . . . ," as recited

10   in claim 8[c].

11       59.      I also disagree with Mr. Gray's comment that the MotionEvent object is a passive

12   container of information.  (*See* Gray Decl. ¶ 33.)

13

14

15                           .)

16       60.      I further understand that Samsung alleges that the "named inventors agree with its

17   construction," but neither co-inventor agreed that "invoke" was limited to the event object itself

18   calling a function.  Co-inventor Mr. Herz testified, "[A]n example of invoking something would

19   be . . . *causing that code to run*."  (Bartlett Decl. Ex. 53 at 95:15-19.)  Herz also testified, "*So in

20   the example I gave invoking could mean, yeah, causing something to happen.*"  (*Id.* at 95:20-

21   96:1.)  Further, in response to a question, "Is there a way the view can determine whether the

22   event is associated with a scroll or gesture operation,"

23

24

25

26

27                                           Contrary to Mr. Gray's out-of-context citation, Mr. Herz

28

1    supports my interpretation that the "event object" does not itself call the scroll or gesture

2    operation code, but instead causes the scroll or gesture operation to occur.

3         61.    In addition, the other co-inventor, Mr. Platzer qualified his statement, "With

4    regards to the patent, I'm not comfortable in defining 'invoked.'

5

6

7                                                                            Mr. Platzer never

8    testified that the event object needed to itself call a scroll or gesture operation.

9         62.    Samsung's Motion mischaracterizes my extensive testimony on the meaning of

10   "invoke," and even deletes a key sentence for the snippet of testimony it does quote.  I explained

11   multiple times that the meaning of "invokes" depends on the context.  (Gray Decl. Ex. 7 at

12   313:14-319:15.)

13        63.    Further, I note that Samsung and Mr. Gray have been unclear and inconsistent as

14   to the meaning of "invoke" and how it might relate to an "event object."  Samsung initially

15   asserted, after fact discovery closed, that Apple had failed to prove "determining whether the

16   event object invokes a scroll or gesture operation, as 'event objects' are incapable of invoking

17   operations."  This assertion would be mean that "invoke" should be interpreted as an

18   impossibility, which contradicts the '915 patent specification.

19        64.    Moreover, in his expert report, Mr. Gray states, "In my 35 years of systems

20   experience, I have never observed a system where an event object invoked a method."  (Bartlett

21   Decl. Ex. 31 at  ¶ 266.)  As I observed in my Validity Report, the construction that an event

22   object *never* invokes a method appears to be inconsistent with the notion that it would have been

23   obvious for a person of ordinary skill to add an event object that calls a scroll operation.  (Ex. 2

24   at ¶ 177, 202, 226.)  At his deposition, Mr. Gray retracted his earlier position, identifying his

25   paragraph 266 as an error in his Invalidity Report:  "That's not true.  That's the inaccuracy."

26   (Bartlett Decl. Ex. 30 at 52:20-53:11.)   I agree that Mr. Gray's earlier position in his Invalidity

27   Report was inaccurate, and I think his current position is inaccurate as well.

28

65.     I further note that Mr. Gray also retracted his earlier reference to Mr. Platzer's testimony.  Mr. Gray earlier said that Platzer "agreed" with him in his expert report but changed his opinion at the deposition.  (Bartlett Decl. Ex. 30 at 53:12-19.)  I agree that Mr. Gray's earlier statement was inaccurate, and I think his new position again saying that Platzer "supports" his opinion also is incorrect.  (*See id.* at 53:12-19; Gray Decl. ¶ 22.)

66.     For the above reasons, it is my opinion that the Accused Products literally infringe claim 8[c] as each is a machine readable medium containing instructions that "determine[e] whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation."

67.     To the extent that this limitation is not met literally, in my opinion it is met under the doctrine of equivalents.  I disagree with Samsung's proposed claim construction for "invoke," but even if I were to adopt Samsung's new proposed construction, the Accused Products infringe under the doctrine of equivalents because each of the Accused Products is a machine readable medium containing instructions that perform steps insubstantially different from "determining whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation."

68.     It also is my opinion that, even if I were to adopt Samsung's new proposed construction, the Accused Products infringe under the doctrine of equivalents because they perform substantially the same function in substantially the same way to obtain substantially the same result.

69.     First, it is my opinion that the Accused Products perform substantially the same function as the recited limitation.  The function of the limitation is "*determining* whether the event object invokes a gesture operation by distinguishing between a single input point applied to the touch-sensitive surface display that is interpreted as the scroll operation and two or more input

Apple v. Samsung
Confidential – Attorneys' Eyes Only

points applied to the touch-sensitive display that are interpreted as the gesture operation." ('915 patent claim 8[c] (emphasis added).)  In the context of the '915 patent specification and claim 8, the function is *determining* based on distinguishing between one or two or more user input points in the event object whether a scroll or gesture operation should execute.  The functions are the same.

70.    Second, the Accused Products perform this function in substantially the same way as in the claim limitation.  The Accused Products all perform a logical test using the event object's user input information.

71.    I disagree with Mr. Gray's characterization that my position eliminates the "event object" limitation.  (*See* Gray Decl. ¶ 44.)

].)  Moreover, the user input data is contained within the event object.  Thus, the "event object" is used as part of the "way" to achieve this limitation.

72.    Finally, the Accused Products obtain substantially the same result, *i.e.*, the execution of either the scroll operation or gesture operation code, depending on whether there is a single input point or two or more input points.

73.    For the above reasons, it is my opinion that the Accused Products infringe claim 8[c] under the doctrine of equivalents as each is a machine readable medium containing instructions that perform the equivalent of "determining whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation."

Apple v. Samsung
Confidential – Attorneys' Eyes Only

74.     **Claim 8 – Element [d] "issuing at least one scroll or gesture call based on invoking the scroll or gesture operation."**  In my opinion, each of the Accused Products meets this limitation.  I understand that Samsung and Mr. Gray have not disputed this point.

75.     The images reproduced above show the Galaxy 10.1 tablet and the Galaxy S II smartphone issuing a scroll call when the scroll operation is invoked and issuing  a gesture call when the gesture operation is invoked.  The software steps are summarized below.

76.



77.     Based on my inspection of Samsung source code for each major release of Android running on the Accused Products (Android 2.1, 2.2, 2.3, and 3.1), I have determined that each Accused Product includes similar computer code that issues at least one scroll or gesture call based on invoking the scroll or gesture operation.  The claim chart in Exhibit 17 to my Infringement Report identifies analogous code that satisfies this element in Android 2.1, 2.2, and 2.3.  (Gray Decl. at Ex. 14.)

78.     **Claim 8 – Element [e] "responding to at least one scroll call, if issued, by scrolling a window having a view associated with the event object."**  In my opinion, each of the Accused Products meets this limitation, and I understand that Samsung and Mr. Gray have not contested this point.  The images of the Galaxy 10.1 tablet and Galaxy S II phone performing scrolling reproduced above demonstrate the performance of this limitation.  The software steps are discussed below.

79.

Apple v. Samsung
Confidential – Attorneys' Eyes Only



80.

81.

82.

83.     Based on my inspection of Samsung source code for each major release of

Android running on the Accused Products (Android 2.1, 2.2, 2.3, and 3.1), I have determined that

each Accused Product includes similar computer code that responds to at least one scroll call by

Apple v. Samsung
Confidential – Attorneys' Eyes Only

1    scrolling a window having a view associated with the MotionEvent.  The claim chart in Exhibit

2    17 to my Infringement Report identifies analogous code that satisfies this element in Android 2.1,

3    2.2, and 2.3.  (Gray Decl. at Ex. 14.)

4        84.    **Claim 8 – Element [f] "responding to at least one gesture call, if issued, by**

5    **scaling the view associated with the event object based on receiving the two or more input**

6    **points in the form of the user input."**  In my opinion, each of the Accused Products meets this

7    limitation, which Samsung and Mr. Gray do not dispute.

8        85.    For example, the Galaxy 10.1 tablet and the Galaxy S II phone will respond to at

9    least one gesture call by scaling the view (zooming) associated with the MotionEvent object

10   based on receiving two or more input points in the form of the user input, as shown in the

11   "scaling" images reproduced above.  The software steps are discussed below.

12       86.

87.    Based on my inspection of Samsung source code for each major release of Android running on the Accused Products (Android 2.1, 2.2, 2.3, and 3.1), I have determined that each Accused Product includes similar computer code that responds to at least one gesture call, if issued, by scaling the view associated with the event object based on receiving the two or more input points in the form of the user input.  The claim chart in Exhibit 17 to my Infringement Report identifies analogous code that satisfies this element in Android 2.1, 2.2, and 2.3.  (Gray Decl. Ex. 14.)

## VI.    LAUNCHTILE DOES NOT INVALIDATE CLAIM 50 OF THE '163 PATENT

88.    Claim 50 of the '163 patent recites[1]:

A portable electronic device, comprising:

[a] a touch screen display; one or more processors; memory; and one or more programs, wherein the one or more programs are stored in the memory and configured to be executed by the one or more processors,

[b] the one or more programs including: instructions for displaying at least a portion of a structured electronic document on the touch screen display, wherein the structured electronic document comprises a plurality of boxes of content;

[c] instructions for detecting a first gesture at a location on the displayed portion of the structured electronic document; instructions for determining a first box in the plurality of boxes at the location of the first gesture; instructions for enlarging and translating the structured electronic document so that the first box is substantially centered on the touch screen display;

[d] instruction[s] for, while the first box is enlarged, a second gesture is detected on a second box other than the first box; and instructions for, in response to detecting the second gesture, the structured electronic document is translated so that the second box is substantially centered on the touch screen display.

89.    As stated in my Validity Report (attached as Exhibit 2) at ¶¶ 29-38, it is my opinion that Claim 50 of the '163 patent is not anticipated or otherwise invalidated by the LaunchTile System, the LaunchTile Publication describing it (Bederson Decl., Ex. A), or the XNav System (which operates substantially identically to the LaunchTile System for purposes

---

[1] I adopt the separation of claim elements set forth in Mr. Gray's Declaration.

Apple v. Samsung
Confidential – Attorneys' Eyes Only

1  relevant to this litigation).  For convenience, I will refer collectively to these three pieces of

2  alleged prior art as "LaunchTile" except when discussing content or functionality that is specific

3  to one of them.

4      90.     I incorporate here by reference the arguments for validity over LaunchTile made in

5  paragraphs 29-38 of my Validity Report.  (Ex. 2.)  I made these arguments in my Validity Report

6  in the context of claim 2, but they apply equally to claim 50, which has claim limitations

7  substantially identical to those in claim 2.  Mr. Gray agrees that "Claim 2 is a 'computer

8  implemented method' claim, and generally tracks the language of independent claims 49, 50, 51,

9  and 52."  (Bartlett Decl. Ex. 31  ¶ 289.)  Claim 50 requires one or more programs including

10  "instructions for" performing each of the method steps described in claim 2.  LaunchTile fails to

11  anticipate claim 50 for at least the same reasons that it fails to anticipate claim 2.

12      **A.      Overview of LaunchTile**

13      91.     LaunchTile is a research prototype system that provides the ability to launch 36

14  applications via tiles presented using a display abstraction that its authors call an "interactive

15  zoomspace." (Bederson Decl., Ex. A at 204.)  The zoomspace provides three levels of display: the

16  World View, which displays application tiles (symbolic visual representations) corresponding to

17  each of the 36 applications in a 6-by-6 grid; the Zone View, which displays four application tiles

18  with additional application-related content in a 2-by-2 grid; and the Application View, which

19  launches and allows a user to interact with each application itself.  Clicking or tapping on a

20  location in the World View initiates an animation that fills the screen with a Zone View

21  rendering—distinct from the content displayed in the corresponding portion of the World View—

22  of the four application tiles around the location of the user's touch.  Once the Zone View is

23  rendered, clicking or tapping on one of the four displayed application tiles launches the

24  application—for example, an email client application or a mapping application—to which the

25  selected application tile corresponds.

26      92.     As the above description suggests, LaunchTile targets an entirely different

27  problem from the one that is solved by claim 50 of the '163 patent: LaunchTile addresses the use

28  of a fixed set of applications in a predefined layout, whereas the '163 patent deals with reading

and navigating arbitrarily-sized structured electronic documents on a small screen.  LaunchTile creates substantively different renderings of a fixed set of iconic application tiles. These tiles facilitate the launching of the applications to which the tiles correspond.  Claim 50, by contrast, applies enlargement and translation to a unified, but arbitrarily sized, structured electronic document to aid a user's viewing of areas of interest in that document.  LaunchTile fails to disclose multiple elements of claim 50, as the analysis that follows will demonstrate.

### B.  Claim 50, Element [b]

93.  LaunchTile does not disclose the element of claim 50 of "instructions for displaying at least a portion of a structured electronic document on the touch screen display, wherein the structured electronic document comprises a plurality of boxes of content."

94.  According to Mr. Gray, LaunchTile displays a structured electronic document in the World View. (Gray Decl. ¶ 76 ("It is my opinion that this 6x6 zoomspace is a 'structured electronic document' with 36 embedded Application tiles, each of which is also a structured electronic document.").)  I disagree.  As I opined in my deposition in response to Samsung's questioning on this point (Gray Decl. Ex. 6 at 171:14-176:15), the mere fact that LaunchTile arranges a set of otherwise conceptually independent application tiles into a grid for display does not automatically qualify that collection as a single electronic document.

95.  In my opinion, those of skill in the art of the '163 patent would understand that there must be some conceptual relationship or commonality in the information in a "document" that is sufficient to justify treating that information as a single, discrete entity.  For electronic documents, the classic indication of such a relationship is the storage of information in a single file, such as a text file, an image file, an HTML file, or a spreadsheet file.  Where a single file is not present, information must be related in a conceptually equivalent way to be considered a "document."

96.  As I discussed in my Infringement Report, the display of a web page, such as the *New York Times* home page, in a mobile device's web browser is a paradigm example of the display and navigation of a structured electronic document that the '163 patent targets.  The *New York Times* home page is a structured electronic document that includes several boxes of content

1   that mobile devices—including Apple's iOS products and the Samsung Accused Products—can

2   display on their touch screen displays.  These devices detect a user's double tap gesture (two taps

3   on the touch screen in quick succession) on a box of content, and respond to that gesture by

4   determining which box was tapped and then enlarging and translating the web page to

5   substantially center that box on the screen.  If the user proceeds to double tap on a second box of

6   content on the web page, the web page is translated to substantially center that second box on the

7   screen.

8          97.     The various application tiles that LaunchTile is programmed to display together to

9   create the World View screen are not one electronic document.  The different applications that

10  these tiles represent are entirely conceptually independent of one another: they are separate

11  programs designed to run independently and accomplish different tasks.  LaunchTile purposely

12  uses different levels of abstraction to provide three different layers of information about a fixed

13  number of application programs.  At each layer the system displays different content distinct from

14  the content in other layers, and it launches distinct application programs when an individual tile is

15  touched.

16         98.     My review of the XNav source code, which I understand is functionally equivalent

17  in the relevant respects to the code for the LaunchTile, confirms that the "interactive zoomspace"

18  that Mr. Gray identifies as the structured electronic document displayed in the World View is

19  actually just a programmatically assembled collection of separate image files representative of the

20  36 disparate applications displayed in the World View.  This is consistent with Dr. Bederson's

21  own description of LaunchTile. (Bederson Decl. ¶ 14 ("In our prototype implementation, the

22  individual tiles in LaunchTile were typically represented by one or more image files (.png

23  files).").)

24         99.     Dr. Bederson and Mr. Gray attempt to manufacture a connection between the

25  various application tiles in the World View by resorting to the idea that LaunchTile's code for

26  displaying these separate pieces assembles all of them into a  "single, hierarchical object oriented

27  data structure."  (Bederson Decl. ¶ 13; cited by Gray Decl. ¶ 77.)  Such a data structure—which is

28  a programming construct *created by LaunchTile* to facilitate display that could be populated with

arbitrary, unrelated content—is not an "electronic document" within the meaning of the '163

patent because it lacks the prior semantic association of its contents that a "document" requires.

100.    Dr. Bederson's inapt comparison of LaunchTile's display-facilitating "data

structure" to an HTML document (Bederson Decl. ¶ 13:9-12) highlights a key distinction between

LaunchTile's operation and the display of a true electronic document, such as the rendering of an

HTML document in a web browser.  Dr. Bederson claims that LaunchTile's "**creating** [a] single,

hierarchical object oriented data structure that is then translated into the visual representation

displayed to the user" (emphasis added) is "similar to the process that occurs when a typical web

browser application interprets and transforms the elements of a standard HTML document into

what is known as a data object model that can then be visually presented to the user as a single,

unified web page."  (*Id.*)  A web browser, however, does not "creat[e]" the HTML documents

that it displays.  Rather, unlike LaunchTile—which creates <u>at runtime</u> (i.e., when the program is

executed and the display is rendered) the "single object-oriented data structure" to which Dr.

Bederson and Mr. Gray refer[2]—a web browser takes as input a discrete quantum of information

that is already semantically associated as a unified HTML "document."  That a browser performs

additional processing to render an HTML document into viewable form does not change the fact

that it takes a unified HTML document as input, while LaunchTile merely assembles, for display

purposes, disparate image resources representative of independent applications.

101.    For the reasons above, it is my opinion that the World View in LaunchTile does

not "display[] at least a portion of a structured electronic document" and therefore does not

disclose this element of claim 50.

### C.    Claim 50, Element [c]

102.    LaunchTile does not disclose the element of claim 50 of "instructions for detecting

a first gesture at a location on the displayed portion of the structured electronic document;

instructions for determining a first box in the plurality of boxes at the location of the first gesture;

---

[2] Dr. Bederson is careful to limit his testimony to say only that "embedded tiles were always part of one unified zooomspace that was dependent on a single object-oriented data structure for its content **during the rendering process**." (Bederson Decl. ¶ 14 (emphasis added).)) No such unifying structure exists prior to—or independently of—LaunchTile's being executed.

1   [and] instructions for enlarging and translating the structured electronic document so that the first

2   box is substantially centered on the touch screen display."

3          103.    Mr. Gray opines that "LaunchTile's instructions for displaying an animated

4   transition from World view to Zone view" disclose this element of claim 50.  (Gray Decl. ¶ 85.)

5   As I discussed in my Validity Report, I disagree.  Claim 50 requires that the "structured electronic

6   document" that is "enlarge[ed] and translate[ed]" (such that the enlarged portion of it is

7   "substantially centered on the touch screen display") must be the same structured electronic

8   document that includes a location where "a first gesture" is detected and "a first box" is

9   determined.  LaunchTile does not meet this requirement because the content displayed in the

10   World View is entirely replaced with different content, assembled by LaunchTile from different

11   underlying graphical assets, when the system transitions from World View to Zone View.  Total

12   replacement of content does not meet any reasonable definition of "enlarging and translating,"

13   and any "box" that existed in the World View is not part of the Zone View.  The images in

14   Exhibit 3 to Mr. Gray's Declaration plainly show entirely different content displayed before and

15   after the transition from World View to Zone View.  For example, the single phone icon in the

16   World View becomes a list of calls in the Zone View; the email and calendar cells similarly

17   become detailed lists in the Zone View where they were merely iconic representations in the

18   World View:



25          104.    Mr. Gray attempts to unify the entirely different content of the World View and

26   Zone View into a single structured electronic document by claiming that the "zoomspace" itself is

27   the structured electronic document of interest.  (Gray Decl. ¶ 85.)  But the zoomspace is not an

28   "electronic document" at all.  It is, rather, an abstraction that refers to different possible

Apple v. Samsung
Confidential – Attorneys' Eyes Only

1    renderings of a set of independent application tiles.  As discussed in the previous section in the

2    World View context, it is the <u>LaunchTile program itself</u> that assembles, at runtime, separate

3    image files representative of independent applications into the different grids that are displayed in

4    the World and Zone Views.  None of these layouts are dictated by any discrete "document" in the

5    way that, for example, a preexisting HTML file encapsulates a web page that is rendered in a web

6    browser.

7         105.    Mr. Gray mischaracterizes my deposition testimony stating that an electronic

8    document is "usually some cohesive piece of information" to claim that it supports his conclusion

9    that "the embedded tiles at the World view are part of the same 'document' rendered in further

10   detail at Zone view." (Gray Decl. ¶ 88.)  My statement cuts exactly the opposite way, supporting

11   the contrary conclusion that there is no "document" in common across the World and Zone

12   Views.  The separate image resources representative of independent applications that LaunchTile

13   assembles do not together constitute "some cohesive piece of information" on their own.  The

14   hierarchical relationship between them, on which Mr. Gray depends, is only imposed by

15   LaunchTile itself as the program executes.  This indicates the lack of any true "document" on

16   display across the different levels of LaunchTile, not the presence of one.

17        106.    Even if one considered the programmatically imposed layout of four application

18   tile images in a given Zone View a structured electronic document, it would still not be <u>the same</u>

19   <u>structured electronic document</u> as anything displayed in the World View.  As the images above of

20   the World-to-Zone View transition show and my review of XNav code confirms, LaunchTile

21   assembles each 2-by-2 tile Zone View from image resources different from those that represent

22   the same applications in the World View.  The mere conceptual association with the same

23   underlying applications is not enough, in my opinion, to qualify these otherwise entirely distinct

24   renderings of content as the same structured electronic document.  Because the content of any

25   given set of four application tiles displayed in the World View is completely different from the

26   tiles representing those same applications in the Zone View, it is clear that the Zone View

27   rendering is not the result of simply "enlarging and translating" any purported structured

28   electronic document displayed in the World View.

Apple v. Samsung
Confidential – Attorneys' Eyes Only

107.     In his deposition, Mr. Gray admitted that the "Zone View" does not result from enlarging and translating the same "structured electronic document" from which the box of content was selected:

> Q.  Is it your opinion that the transition from the world view to the zone view shown on page 4 of your Appendix 7 [the LaunchTile invalidity claim chart], that what has been enlarged and translated is the same structured electronic document that is shown in the world view?
>
> A.  **No.**  The document which is being shown in the zone view on page 4 is a box of content from the structured electronic document shown in the world view.

(Bartlett Decl. Ex. 30 at 205:21-206:3 (emphasis supplied).)

In responding to a follow-up question, Mr. Gray confirmed that the Zone View was not an "enlarging" of the four tiles as they were displayed in the World View:

> Q.  It's different content.  It's not simply an enlarging of the images that are shown in the tile in the world view; it is a –looking at different data and displaying different data rather than displaying the same thing in a larger font size or a larger image, right?
>
> [Objection; argumentative, misstates the document]
>
> A.  Let me agree that it is not a magnification of what's in the—in the upper right hand corner of the first box of the world view.  It is not a magnification—the upper right hand corner of the zone view is not a magnification of the original.  That's accurate.

(*Id.* at 209:12-25.)

108.     Dr. Bederson invokes a concept he calls "semantic zooming" to try to justify his conclusion that "[t]he four tiles that happen to be displayed in Zone view are the same embedded Application tiles (albeit rendered in further detail) that were present at World view."  (Bederson Decl. ¶¶ 17-18.)  Dr. Bederson describes a semantic zooming object as "a procedural object that renders itself differently depending on its viewing size," and he contends that LaunchTile uses such objects.  (*Id.* ¶ 18.)  In my opinion, a semantic zooming object that renders itself entirely differently across two level of zoom does not meet claim 50's requirement of "enlarging and translating" a single structured electronic document to effect the transition between the two levels.

Apple v. Samsung
Confidential – Attorneys' Eyes Only

1   109.   Mr. Gray states that "even if the tiles (embedded structured electronic documents)

2   were entirely replaced during the enlarging and translating step, this would not change [his]

3   opinion that the zoomspace, within which the tiles exist at any particular level of zoom, is the

4   same structured electronic document throughout the navigation process."  (Gray Decl. ¶ 89.)  He

5   goes on to state:

> In a somewhat analogous situation, I am aware that web pages
> (structured electronic documents encoded in HTML) sometimes
> contain embedded objects displaying live content in the form of
> advertising material, stock quotes, or "breaking news" headlines.
> When a user manually refreshes the web page or, in some cases,
> after some pre-set amount of time, the embedded object will be
> updated or even replaced with entirely new different content.
> However, no person of ordinary skill in the art would believe that
> they were viewing a different webpage (i.e., "structured electronic
> document") merely because the content in one embedded element
> had changed.  (*Id.*)

12   110.   The "live content" that Mr. Gray identifies that "refreshes" within a web page is

13   not analogous to the replacement of content that occurs in LaunchTile on the transition from

14   World View to Zone View.  In the web-page-live-content scenario, the same HTML document is

15   displayed before and after the refresh of embedded content.  As explained above, LaunchTile has

16   no cross-transition analogue to the HTML document, because each level of its display is

17   assembled programmatically from disparate entities and is merely a fixed layout independent of

18   the inherent structure of a single document.  In the web page case, the parts of the displayed

19   HTML document other than the embedded refreshing portion remain the same across the refresh.

20   When LaunchTile transitions from World View to Zone View, it completely replaces content

21   displayed in the prior view with new content derived from separate underlying image resources.

22   111.   For the reasons stated and shown above, LaunchTile does not disclose element [c]

23   of claim 50.

24   **D.   Claim 50, Element [d]**

25   112.   Neither does LaunchTile disclose the element of claim 50 of "instruction[s] for,

26   while the first box is enlarged, a second gesture is detected on a second box other than the first

27   box; and instructions for, in response to detecting the second gesture, the structured electronic

28

1    document is translated so that the second box is substantially centered on the touch screen

2    display."

3        113.    Mr. Gray opines that this element of claim 50 is disclosed by LaunchTile's

4    launching of an application via a gesture on an application tile displayed in Zone View.  (Gray

5    Decl. ¶¶ 92-95.)  I disagree.  Mr. Gray's interpretation fails to appreciate the significance of the

6    act of <u>launching an application</u> in LaunchTile.  This step, as LaunchTile's name suggests, is of

7    critical—indeed, defining—importance to the system, and it distinguishes it fundamentally from

8    the invention of claim 50 of the '163 patent.

9        114.    As an initial matter, it is my opinion that claim 50's requirement of a gesture on a

10   "second box other than the first box" is not met when the second box is wholly contained within

11   the first box.  This is the case when, as Mr. Gray describes, a user enlarges a Zone View and then,

12   without scrolling to a different four-tile view, clicks on an application tile that is fully within the

13   Zone View that Mr. Gray defines as the "first box."  A "second box other than the first box"

14   requires, by its plain terms, a second box that is not any part of the first box.

15       115.    The LaunchTile invention was, according to its authors, motivated by "the

16   problem [of] navigating device applications" on smartphone and PDA devices.  (Bederson Decl.,

17   Ex. A at 201.) LaunchTile sought to provide, in particular, "high-value at-a-glace information for

18   several applications at once, as well as on-demand application launch when users desire more

19   detailed information."  (*Id.*)  These dual goals central to LaunchTile's design—(1) providing "at-

20   a-glance information" about several unlaunched applications simultaneously and (2) allowing

21   "on-demand application launch" to enable use of the applications' full functionalities—

22   fundamentally define the way the system operates.  Mr. Gray's interpretation of LaunchTile,

23   however, ignores that it has the ability to "launch" applications at all, because he contends that

24   LaunchTile's individual applications in their launched, interactive mode are part of the same

25   "electronic document" as the application-launching tiles displayed in the World View and Zone

26   View.  This is contrary to the well understood meaning of launching an application, as well as the

27   treatment of applications in the Bederson paper on LaunchTile (Bederson Decl., Ex. A).

28

116.     An application is a software program that performs particular user-oriented tasks. When a user launches an application, such as the Email application, from LaunchTile's Zone View, that application fills the entire screen, and it allows the user to interact with the application to perform the tasks that the application is designed to accomplish.  In the case of LaunchTile's Email application, for example, launching the application displays a scrollable email client inbox, and the user can select an individual email to open it.  This application-level functionality has nothing to do with the display of grids of application-launching tiles in the World View and Zone View: the content is entirely different, and it supports entirely different user interaction for a different purpose.  It is not accurate, in my opinion, to say that the entirety of an interactive application is part of the same "electronic document" as a set of application-launching tiles that includes one tile that can launch that application.  For example, when a user taps on an individual LaunchTile, it is not "substantially centered" by "translating the structured electronic document" as claim 50 requires—any more than a Microsoft Word icon on a Windows desktop is "substantially centered" by "translating" the desktop's array of application icons when the user clicks on the icon to launch the Word application.

117.     The Bederson paper on LaunchTile itself (Bederson Decl., Ex. A) repeatedly treats the applications themselves as distinct from the World View and Zone View composed of application-launching tiles.  For example, the paper states that "Although the original focus of our designs was on the application 'shell', we extended the LaunchTile interaction philosophy to the application level, where we sought to make interaction consistent with navigation among the application tiles."  (Bederson Decl., Ex. A at 205.)  The LaunchTile authors distinguished between "the application 'shell'" that allowed "navigation among the application tiles" (i.e., the World View and the Zone View) from the "application level" where interactive applications themselves could be used.  In describing implementation details, the paper again distinguishes between the "shell" and "the applications themselves."  (*Id.* at 206.)  The authors do not describe "translating" any part of the shell to transition to the application level.  Rather, they write that "[t]he user taps any of the 4 notification tiles within Zone view to launch the corresponding application."  (*Id.* at 205.)  Thus it appears that even LaunchTile's own authors did not conceive

Apple v. Samsung
Confidential – Attorneys' Eyes Only

1    of all three of LaunchTile's levels as part of a unified electronic document.  They treated the "the

2    application 'shell'" (i.e., the World View and the Zone View)—which provided "high-value at-a-

3    glace information for several applications at once" (*id.* at 201)—as distinct from "the applications

4    themselves" (*id.* at 206) that gestures in the shell could "launch."

5         118.    My inspection and use of LaunchTile and XNav confirm that launching an

6    application from the Zone View does not merely "translate[e]" the representative content

7    displayed in the Zone View.  For example, launching the email application brings up a more

8    detailed and longer list of emails in an inbox, and a user can select an individual email to view it.

9    Dr. Gray's own images of LaunchTile's transition at the launch of the email application show the

10   application's different visual appearance from the static thumbnail provided in the Zone View:



11
12
13
14
15
16
17
18
19
20        119.    The unimplemented applications in the LaunchTile and XNav prototypes—which

21   include 33 of the 36 notification tiles (all except the email application that Mr. Gray uses as his

22   example and two others)—provide the best illustration of the fact that the Zone View and the

23   Application View display entirely distinct content.  Selecting a notification tile in Zone View that

24   corresponds to an unimplemented application results in the display of a placeholder screen—

25   shared by all of the unimplemented applications—that says "Application Under Construction."  It

26   is readily apparent that no notification tile in Zone View displays this text, so it cannot be the case

27   that an Application View displaying this text is the result of merely "translat[ing]" any electronic

28   document displayed in Zone View.



Select Calendar Application

As shown above, selecting the unimplemented Calendar Application in XNav brings up a mostly blank screen with the text "Application Under Construction" on it.

120.    Underscoring the separation between the Zone and World Views and the applications themselves, Mr. Gray conceded at his deposition that once a single application has been launched, there is no way to pan or scroll to see any other box of content from the World View or Zone View:

> Q.  And you cannot scroll or pan when you're in the LaunchTile application view to see any of the adjacent LaunchTile zone view boxes, right?
>
> [Objection, compound]
>
> A.  My best recollection of the way that this operates is that—is that—let me think.  I don't, sitting here right now, I don't remember certainly whether there is an ability to slide back to the other view. But I think not.  I think—so let me—sorry.
>
> I believe that from the selected second box, which has been expanded and centered on page 5, is labeled the "LaunchTile application view," that it is—from there, I don't know of a navigation path back to the first box other than to go back up to the world view and then select the zone again.

(Bartlett Decl. Ex. 30 at 214:16-215:6.)  Mr. Gray's testimony further confirms that the Application view is not obtained by merely "translating" or "scrolling" the structured electronic document from which the application tile was selected.

Apple v. Samsung
Confidential – Attorneys' Eyes Only

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.  Executed on May 31, 2012.

3

4

5

6                                          /s/
       _____
7                                          Karan Singh

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28