QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

  Kevin P.B. Johnson (Bar No. 177129)
  kevinjohnson@quinnemanuel.com
  Victoria F. Maroulis (Bar No. 202603)
  victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California  94065-2139
Telephone:     (650) 801-5000
Facsimile:      (650) 801-5100

  Michael T. Zeller (Bar No. 196417)
  michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>          Plaintiff and Counter-Defendant,<br><br>     vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>          Defendant and Counterclaimant. | CASE NO. 11-cv-01846-LHK (PSG)<br><br>**SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS AT THE CLOSE OF EVIDENCE, IN ORDER** |

## <u>SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS</u>

Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung") respectfully submit their proposed disputed post-evidence jury instructions in one sequential, full set, for the following reason.   Due to the format of the joint disputed jury instructions, many of Samsung's instructions were separated and placed out of order in the joint document, which makes it difficult for the Court to evaluate Samsung's disputed jury instructions as a set.  The Apple disputed instructions are largely kept in their intended sequential order in the joint document.   Samsung believes that it would be helpful for the Court to be able to evaluate Samsung's proposed instructions as one consecutive set, just like Apple's.  This filing provides the Court with that alternative for review of the Samsung proposed instructions.   Samsung informed Apple of their intent to file this pleading in an email dated July 11, 2012; and Apple did not object.


DATED: July 16, 2011                    Respectfully submitted,

                                        QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP



                                        By /s/ Victoria Maroulis
                                          Charles K. Verhoeven
                                          Kevin P.B. Johnson
                                          Victoria F. Maroulis
                                          Michael T. Zeller
                                          Attorneys for SAMSUNG ELECTRONICS CO.,
                                          LTD., SAMSUNG ELECTRONICS AMERICA,
                                          INC. and SAMSUNG
                                          TELECOMMUNICATIONS AMERICA, LLC

# TABLE OF CONTENTS

**Page**

INSTRUCTION NO. 12—BURDENS OF PROOF--GENERALLY ............................................. 2

INSTRUCTION NO. 12.1—BURDEN OF PROOF— CLEAR AND CONVINCING
EVIDENCE ........................................................................................................ 3

INSTRUCTION NO. 13—TWO OR MORE PARTIES— DIFFERENT LEGAL RIGHTS .......... 4

INSTRUCTION NO. 14—CHARTS AND SUMMARIES ...................................................... 5

INSTRUCTION NO. 14.1—CHARTS AND SUMMARIES IN EVIDENCE ............................... 6

INSTRUCTION NO. 15—RETURN OF VERDICT .............................................................. 7

INSTRUCTION NO. 16—SUMMARY OF CONTENTIONS ................................................. 8

INSTRUCTION NO. 16.1—SUMMARY OF CONTENTIONS ............................................... 14

INSTRUCTION NO. 16.2—SUMMARY OF UTILITY PATENT CONTENTIONS .................. 15

INSTRUCTION NO. 17—UTILITY PATENTS—INTERPRETATION OF CLAIMS .............. 18

INSTRUCTION NO. 18—UTILITY PATENTS—INFRINGEMENT GENERALLY ............... 20

INSTRUCTION NO. 19—UTILITY PATENTS—DIRECT INFRINGEMENT ........................ 21

INSTRUCTION NO. 20—UTILITY PATENTS—LITERAL INFRINGEMENT ...................... 22

INSTRUCTION NO. 21—UTILITY PATENT INFRINGEMENT UNDER THE
DOCTRINE OF EQUIVALENTS ......................................................................... 23

INSTRUCTION NO. 58.1—INDUCING PATENT INFRINGEMENT ................................... 25

INSTRUCTION NO. 23—UTILITY PATENTS—INVALIDITY—BURDEN OF PROOF ....... 26

INSTRUCTION NO. 25—UTILITY PATENTS—ANTICIPATION/STATUTORY BARS....... 27

INSTRUCTION NO. 25.1—UTILITY PATENT ANTICIPATION (STATUTORY BAR) ........ 29

INSTRUCTION NO. 26—UTILITY PATENTS—OBVIOUSNESS.......................................... 30

INSTRUCTION NO. 28—EQUITABLE DEFENSES – WAIVER ............................................ 32

INSTRUCTION NO. 29—EQUITABLE DEFENSES – EQUITABLE ESTOPPEL .................. 33

INSTRUCTION NO. 27—PATENT EXHAUSTION ............................................................ 34

INSTRUCTION NO. 82.1—REQUIREMENTS OF THE ETSI IPR POLICY—
AVAILABILITY OF LICENSES .......................................................................... 35

INSTRUCTION NO. 16.3—SUMMARY OF DESIGN PATENT ISSUES ................................ 36

INSTRUCTION NO. 42 (First Samsung Proposed Instruction) DESIGN PATENTS—
          INTERPRETATION OF PATENT CLAIMS ................................................. 37

INSTRUCTION NO. 42 (Second Samsung Proposed Instruction)—DESIGN PATENTS—
          INTERPRETATION OF PATENT CLAIMS ................................................. 38

INSTRUCTION NO. 44.5—DESIGN PATENT PROSECUTION HISTORY ESTOPPEL ........ 39

INSTRUCTION NO. 44—DESIGN PATENTS—DIRECT INFRINGEMENT .......................... 40

INSTRUCTION NO. 44.1— DESIGN PATENT DIRECT INFRINGEMENT –
          LIABILITY MUST BE PROVED FOR EACH ENTITY SEPARATELY ...................... 41

INSTRUCTION NO. 44.2—DESIGN PATENT DIRECT INFRINGEMENT—
          "ORDINARY OBSERVER TEST" .............................................................. 42

INSTRUCTION NO. 44.3—DESIGN PATENT DIRECT INFRINGEMENT—
          COMPARISONS ................................................................................ 44

INSTRUCTION NO. 44.4—DESIGN PATENT DIRECT INFRINGEMENT—
          ORNAMENTAL VERSUS FUNCTIONAL FEATURES .................................. 45

INSTRUCTION NO. 58.2—INDUCING DESIGN PATENT INFRINGEMENT ...................... 46

INSTRUCTION NO. 45—DESIGN PATENTS—INVALIDITY BURDEN OF PROOF .......... 47

INSTRUCTION NO. 46—DESIGN PATENTS—ANTICIPATION/STATUTORY BARS ........ 48

INSTRUCTION NO. 46.1—ANTICIPATION – A SINGLE REFERENCE OR A SINGLE
          PRODUCT ....................................................................................... 49

INSTRUCTION NO. 46.2—DESIGN PATENT ANTICIPATION – PUBLIC USE AND
          PUBLIC DISPLAY ............................................................................. 50

INSTRUCTION NO. 46.3—ANTICIPATION – DATE OF INVENTION ................................ 51

INSTRUCTION NO. 47.1—DESIGN PATENT OBVIOUSNESS ............................................. 52

INSTRUCTION NO. 47.2—DESIGN PATENT OBVIOUSNESS – PRIMARY AND
          SECONDARY REFERENCES .............................................................. 53

INSTRUCTION NO. 47.3—DESIGNER OF ORDINARY SKILL IN THE ART .................... 54

INSTRUCTION NO. 47.4—DESIGN PATENT OBVIOUSNESS – SECONDARY
          FACTORS INDICATING NONOBVIOUSNESS .......................................... 55

INSTRUCTION NO. 49— DESIGN PATENT -- DRAWINGS ............................................. 56

INSTRUCTION NO. 50— DESIGN PATENT INVALIDITY – INDEFINITENESS ................ 57

INSTRUCTION NO. 51—DESIGN PATENT INVALIDITY – DOUBLE PATENTING .......... 58

INSTRUCTION NO. 48— DESIGN PATENTS—INVALIDITY—LACK OF
          ORNAMENTALITY ........................................................................... 59

INSTRUCTION NOs. 30/52—PATENT DAMAGES—GENERALLY ...................................... 60

INSTRUCTION NO. 31/53—PATENT DAMAGES — LOST PROFITS —
    GENERALLY ........................................................................................................... 61

INSTRUCTION NO. 32/53.1—PATENT DAMAGES — LOST PROFITS — FACTORS
    TO CONSIDER ...................................................................................................... 62

INSTRUCTION NO. 53.2 LOST PROFITS – MARKET SHARE ................................ 63

INSTRUCTION NO. 53.3—DAMAGES – AMOUNT OF LOST PROFITS .............................. 64

INSTRUCTION NO. 55 (First Samsung Proposed Instruction)—PATENT DAMAGES—
    REASONABLE ROYALTY—ENTITLEMENT—DEFINITION—RELEVANT
    FACTORS .............................................................................................................. 65

INSTRUCTION NO. 55 (Second Samsung Proposed Instruction)—PATENT
    DAMAGES—REASONABLE ROYALTY—ENTITLEMENT—DEFINITION—
    RELEVANT FACTORS ........................................................................................... 66

INSTRUCTION NO. 55.1—REASONABLE ROYALTY – RELEVANT FACTORS ............... 67

INSTRUCTION NO. 54—ADDITIONAL REMEDY FOR DESIGN PATENT
    INFRINGEMENT – DEFENDANT'S PROFIT ..................................................... 69

INSTRUCTION NO. 56—PATENT DAMAGES—DATE OF COMMENCEMENT—
    PRODUCTS ........................................................................................................... 70

INSTRUCTION NO. 40—CALCULATING DAMAGES IN CASES OF INDUCEMENT ....... 71

INSTRUCTION NO. 59—DESIGN AND UTILITY PATENTS—WILLFUL PATENT
    INFRINGEMENT ................................................................................................... 72

INSTRUCTION NO. 82—BREACH OF CONTRACT – OBLIGATION TO LICENSE
    PATENTS ON FRAND TERMS .......................................................................... 73

INSTRUCTION NO. 83—BREACH OF CONTRACT – OBLIGATION TO TIMELY
    DISCLOSE INTELLECTUAL PROPERTY RIGHTS ("IPR") ............................ 74

INSTRUCTION NO. 84—MONOPOLIZATION ─ ELEMENTS ............................................. 75

INSTRUCTION NO. 84.1—MONOPOLIZATION – MONOPOLY POWER
    GENERALLY ......................................................................................................... 76

INSTRUCTION NO. 85—MONOPOLIZATION ─ RELEVANT MARKET ............................ 77

INSTRUCTION NO. 85.1—MONOPOLIZATION RELEVANT TECHNOLOGY--
    MARKET ................................................................................................................ 78

INSTRUCTION NO. 85.2—MONOPOLIZATION RELEVANT GEOGRAPHIC
    MARKET--MARKET ............................................................................................ 79

INSTRUCTION NO. 86—MONOPOLIZATION EXISTENCE OF MONOPOLY
    POWER—INDIRECT PROOF ............................................................................. 80

INSTRUCTION NO. 86.1—MONOPOLIZATION—EXISTENCE OF MONOPOLY POWER—DIRECT PROOF..................................................................... 82

INSTRUCTION NO. 87—MONOPOLIZATION — WILLFUL ACQUISITION OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS ................................. 83

INSTRUCTION NO. 88—MONOPOLIZATION — ANTICOMPETITIVE BEHAVIOR IN STANDARD-SETTING ........................................................................ 85

INSTRUCTION NO. 89—MONOPOLIZATION — SAMSUNG'S INTENT ............................ 86

INSTRUCTION NO. 91—MONOPOLIZATION — INJURY AND DAMAGES ...................... 87

INSTRUCTION NO. 70—TRADE DRESS........................................................................ 88

INSTRUCTION NO. 71—DEFINITION–TRADE DRESS ........................................... 89

INSTRUCTION NO. 72—TRADE DRESS LIABILITY—THEORIES AND POLICIES .......... 90

INSTRUCTION NO. 73—TRADE DRESS—NO LIABILITY FOR COPYING...................... 91

INSTRUCTION NO. 67—TRADE DRESS INFRINGEMENT—ELEMENTS AND BURDEN OF PROOF (15 U.S.C. § 1125(a)(1)) ......................................... 92

INSTRUCTION NO. 62—TRADE DRESS PROTECTABILITY—NON-FUNCTIONALITY ..................................................................................... 93

INSTRUCTION NO. 61—TRADE DRESS PROTECTABILITY—DISTINCTIVENESS ......... 94

INSTRUCTION NO. 61.1—SECONDARY MEANING—ADVERTISING .............................. 95

INSTRUCTION NO. 61.2—SECONDARY MEANING—SALES SUCCESS.......................... 96

INSTRUCTION NO. 61.3—SECONDARY MEANING—EXCLUSIVITY OF USE ................ 97

INSTRUCTION NO. 61.4—SECONDARY MEANING—COPYING ....................................... 98

INSTRUCTION NO. 61.5—SECONDARY MEANING—ACTUAL CONFUSION ................ 99

INSTRUCTION NO. 61.6—SECONDARY MEANING—TIMING........................................ 100

INSTRUCTION NO. 68—INFRINGEMENT—LIKELIHOOD OF CONFUSION ................... 101

INSTRUCTION NO. 69—TRADE DRESS INFRINGEMENT—LIKELIHOOD OF CONFUSION—SLEEKCRAFT TEST (15 U.S.C. §§ 1114(1), 1125(a))....................... 102

INSTRUCTION NO. 69.1—LIKELIHOOD OF CONFUSION FACTORS—STRENGTH OF TRADE DRESS ................................................................................ 104

INSTRUCTION NO. 69.2—LIKELIHOOD OF CONFUSION FACTORS— SIMILARITY OF TRADE DRESS ................................................................ 105

INSTRUCTION NO. 69.3—LIKELIHOOD OF CONFUSION FACTORS—INTENT............. 106

INSTRUCTION NO. 69.4—LIKELIHOOD OF CONFUSION FACTORS—
        ADVERTISING ........................................................................ 107

INSTRUCTION NO. 63—TRADE DRESS DILUTION—ELEMENTS AND BURDEN
        OF PROOF ................................................................................ 108

INSTRUCTION NO. 63.1—TRADE DRESS DILUTION—ELEMENTS ................................ 109

INSTRUCTION NO. 64—TRADE DRESS DILUTION ELEMENT—FAME ........................ 110

INSTRUCTION NO. 64.1—TRADE DRESS DILUTION—FAME—SURVEY
        EVIDENCE ............................................................................... 112

INSTRUCTION NO. 65—TRADE DRESS DILUTION ELEMENT #3—USE OF
        ACCUSED TRADE DRESS IN COMMERCE AFTER  APPLE TRADE DRESS
        BECAME FAMOUS ..................................................................... 113

INSTRUCTION NO. 66—TRADE DRESS DILUTION ELEMENT #4—DILUTION ............. 114

INSTRUCTION NO. 81—DILUTION—TARNISHMENT ...................................................... 115

INSTRUCTION NO. 63.2—TRADE DRESS FUNCTIONALITY—DILUTION —
        BURDEN OF PROOF ................................................................. 116

INSTRUCTION NO. 74—TRADE DRESS DAMAGES IN GENERAL ................................... 117

INSTRUCTION NO. 75—TRADE DRESS DAMAGES—PLAINTIFF'S ACTUAL
        DAMAGES (15 U.S.C. § 1117(a)) .............................................. 118

INSTRUCTION NO. 76—TRADE DRESS DAMAGES—DEFENDANT'S PROFITS (15
        U.S.C. § 1117(A)) ..................................................................... 119

INSTRUCTION NO. 76.1—DAMAGES—TRADE DRESS INFRINGEMENT—
        APPORTIONMENT OF DEFENDANT'S PROFITS .................................... 120

ALTERNATIVE INSTRUCTION NO. 77 -- TRADE DRESS  DAMAGES –
        REASONABLE ROYALTY ........................................................ 121

INSTRUCTION NO. 78—TRADE DRESS DILUTION DAMAGES— WILLFULNESS
        REQUIRED FOR DILUTION DAMAGES ................................................ 123

INSTRUCTION NO. 79—MONETARY REMEDIES—TRADE DRESS DILUTION—
        ACTUAL NOTICE REQUIREMENT ...................................................... 124

INSTRUCTION NO. 80—TRADE DRESS DAMAGES—NO DOUBLE-COUNTING ........... 125

INSTRUCTION NO. 78.1—MONETARY REMEDIES—ONLY ONE RECOVERY PER
        ACCUSED PRODUCT ................................................................ 126

**SAMSUNG'S PROPOSED POST EVIDENCE DISPUTED JURY INSTRUCTIONS**

1

2

## <u>INSTRUCTION NO. 12—BURDENS OF PROOF--GENERALLY</u>

3

When a party has the burden of proof on any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

4

5

You should base your decision on all of the evidence, regardless of which party presented it.

6

**Source**

7

Ninth Circuit Model Civil Jury Instr. – 1.3 (2007 Ed.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

1

2

## INSTRUCTION NO. 12.1—BURDEN OF PROOF—

## CLEAR AND CONVINCING EVIDENCE

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means you must be persuaded by the evidence that the claim or defense is highly probable.  This is a higher standard of proof than proof by a preponderance of the evidence.

You should base your decision on all of the evidence, regardless of which party presented it.

**Source**

Ninth Circuit Model Civil Jury Instr. – 1.4 (2007 Ed.)

## <u>INSTRUCTION NO. 13—TWO OR MORE PARTIES—</u>

## <u>DIFFERENT LEGAL RIGHTS</u>

You should decide the case as to each party separately.  Unless otherwise stated, the instructions apply to all parties.

**Source**

Ninth Circuit Model Civil Jury Instr. – 1.5 (2007 Ed.)

## INSTRUCTION NO. 14—CHARTS AND SUMMARIES

Certain charts and summaries not received in evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

**Source**

Ninth Circuit Model Civil Jury Instr. – 2.12 (2007 Ed.)

## INSTRUCTION NO. 14.1—CHARTS AND SUMMARIES IN EVIDENCE

Certain charts and summaries have been received into evidence to illustrate information brought out in the trial.  Charts and summaries are only as good as the underlying evidence that supports them.  You should, therefore, give them only such weight as you think the underlying evidence deserves.

**Source**

Ninth Circuit Model Civil Jury Instr. – 2.13 (2007 Ed.)

## INSTRUCTION NO. 15—RETURN OF VERDICT

A form of Special Verdict has been prepared for you.  [Any explanation of the verdict form may be given at this time.]  The answer to each question must be the unanimous answer of the jury.  Your foreperson will write the unanimous answer of the jury in the space provided below each question.  When you have finished the Special verdict form, your foreperson will sign and date it, and advise the court that you are ready to return to the courtroom.

**Source**

Ninth Circuit Model Civil Jury Instr. – 3.3 (2007 Ed.)

## INSTRUCTION NO. 16—SUMMARY OF CONTENTIONS

The parties in this case are Apple Inc. and Samsung Electronics Company Ltd. (sometimes referred to as "SEC"), Samsung Electronics America Inc. (sometimes referred to as "SEA"), and Samsung Telecommunications America LLC (sometimes referred to as "STA"). In these Instructions I will refer to Apple Inc. as "Apple," and I generally will refer to Samsung Electronics Company Ltd., Samsung Electronics America Inc., and Samsung Telecommunications America LLC collectively as "Samsung" for the purposes of a specific Instruction. However, you must consider the evidence and decide the case separately as to Samsung Electronics Company, Samsung Electronics America, and Samsung Telecommunications America, regardless of whether I refer to them collectively as "Samsung" or individually.

Apple has brought claims against Samsung seeking money damages from Samsung for alleged trade dress infringement and dilution, and utility patent and design patent infringement, relating to Samsung's smartphone and tablet products. Samsung has denied Apple's allegations, has sought a determination that it does not infringe any of rights of Apple and sought a declaration that Apple's trade dress, design patent, and utility patents are invalid.

Samsung also has brought claims against Apple for patent infringement relating to Apple's iPhone, iPad and iPod products. Apple has denied Samsung's allegations, has sought a declaratory judgment as to Samsung's counterclaims and asserted further claims of monopolization, violation of the California Unfair Competition Law, and breach of contract associated with Samsung's assertion of patents that Samsung has declared to be essential to certain wireless telecommunications standards. In addition, Apple seeks a declaration that it is irrevocably entitled to a fair, reasonable and non-discriminatory ("FRAND") license to those essential patents, and which sets forth the FRAND terms and conditions of that license. Samsung has denied Apple's allegations.

Specifically, your job will be to decide the following:

**Apple's Claims**

1. Whether the Gallery, Contacts, Web Browser or ThinkFree Office applications in the following Samsung products infringe Claim 19 of U.S. Patent No. 7,469,381:

- Galaxy Tab
- Galaxy Tab 10.1
- Captivate
- Continuum
- Droid Charge
- Epic 4G
- Exhibit 4G
- Fascinate
- Galaxy Ace
- Galaxy Prevail
- Galaxy S (i9000)
- Galaxy S 4G
- Gravity
- Indulge
- Infuse 4G
- Intercept

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

- Mesmerize
- Nexus S
- Nexus S 4G
- Replenish
- Showcase Galaxy S
- Sidekick
- Vibrant
- Galaxy S II (pre-August 26, 2011 versions)

2.  Whether the Web Browser application in the following Samsung products infringe Claim 8 of U.S. Patent No. 7,844,915:

- Galaxy Tab
- Galaxy Tab 10.1
- Acclaim
- Captivate
- Continuum
- Droid Charge
- Epic 4G
- Exhibit 4G
- Fascinate
- Galaxy Ace
- Galaxy Prevail
- Galaxy S (i9000)
- Galaxy S 4G
- Gem
- Gravity
- Indulge
- Infuse 4G
- Intercept
- Mesmerize
- Nexus S
- Nexus S 4G
- Replenish
- Showcase Galaxy S
- Sidekick
- Transform
- Vibrant
- Galaxy S II (pre-August 26, 2011 versions)

3.  Whether the Web Browser application in the following Samsung products infringe Claim 50 of U.S. Patent No. 7,864,163:

- Galaxy Tab
- Galaxy Tab 10.1

- Acclaim
- Captivate
- Continuum
- Droid Charge
- Epic 4G
- Exhibit 4G
- Fascinate
- Galaxy Ace
- Galaxy Prevail
- Galaxy S (i9000)
- Galaxy S 4G
- Gem
- Gravity
- Indulge
- Infuse 4G
- Intercept
- Mesmerize
- Nexus S
- Nexus S 4G
- Replenish
- Showcase Galaxy S
- Sidekick
- Transform
- Vibrant
- Galaxy S II (pre-August 26, 2011 versions)

4.  Whether Samsung infringes:

    a.  U.S. Patent No. D618,677 by selling the following smartphone;

- Samsung Galaxy Ace (SHW-M240S);
- Samsung Infuse 4G (SGH-1997);
- Samsung Galaxy S i9000 (SHW-M1105);
- Samsung Galaxy Fascinate (SCH-I500) (a/k/a Galaxy Showcase and Galaxy Mesmerize);
- Samsung Galaxy S 4G (SGH-T959V) / Vibrant (SGH-T959).

    b.  U.S. Patent No. D593,087 by selling the following smartphones;

- Samsung Galaxy Ace (SHW-M240S);
- Samsung Infuse 4G (SGH-1997);
- Samsung Galaxy S i9000 (SHW-M1105);
- Samsung Galaxy Fascinate (SCH-I500) (a/k/a Galaxy Showcase and Galaxy Mesmerize);
- Samsung Galaxy S 4G (SGH-T959V) / Vibrant (SGH-T959)

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

c. U.S. Patent No. D604,305 by selling the following smartphones;

- Captivate;
- Continuum;
- Droid Charge;
- Epic 4G;
- Fascinate;
- Gem;
- Galaxy S i9000;
- Galaxy S 4G;
- Indulge;
- Infuse 4G;
- Mesmerize;
- Showcase;
- Galaxy S Showcase i500;
- Vibrant.

d. U.S. Patent No. D504,889 by selling the following tablet computers:

- Galaxy Tab 10.1

e. Whether Apple's asserted patent claims are valid;

5. Whether Samsung has diluted the iPhone trade dress based on the trade dress Registration No. 3,470,983 by selling the following smartphones:

- Fascinate
- Galaxy S 4G
- Galaxy S Showcase (i500)
- Infuse 4G
- Mesmerize
- Vibrant

6. Whether Samsung has diluted the unregistered iPhone trade dress by selling the following smartphones:

- Fascinate
- Galaxy Prevail
- Galaxy S 4G
- Galaxy S Showcase (i500)
- Infuse 4G
- Mesmerize
- Vibrant

7. Whether Samsung has diluted the unregistered iPhone 3G trade dress by selling the following smartphones:

- Fascinate
- Galaxy Prevail
- Galaxy S 4G
- Galaxy S Showcase (i500)
- Infuse 4G
- Mesmerize
- Vibrant

8. Whether Samsung has diluted or infringed the unregistered iPad trade dress by selling the following tablet computers:

   - Galaxy Tab 10.1
   - Galaxy Tab 10.1 LTE

9. Whether Samsung has diluted or infringed the unregistered iPad 2 trade dress by selling the following tablet computers:

   - Galaxy Tab 10.1
   - Galaxy Tab 10.1 LTE

10. Whether Apple's claims are barred by Samsung's defenses.

11. The remedies to which Apple is entitled, if any, as a result.

**Samsung's Claims**

1. Whether Apple infringes:

   a. Claims 10 and 15 of U.S. Patent No. 7,675,941 by selling the following smartphone and tablet computer;

      - iPhone 4
      - iPad2 3G

   b. Claims 17 and 18 of U.S. Patent No. 6,928,604 by selling the following smartphones and tablet computers;

      - iPhone 3G
      - iPhone 3GS
      - iPhone 4
      - iPad 3G
      - iPad2 3G

   c. Claims 15 and 16 of U.S. Patent No. 7,447,516 by selling the following smartphone and tablet computer;

      - iPhone 4

- iPad2 3G

    d.  Claim 9 of U.S. Patent No. 7,698,711 by selling the following;

- iPhone 3G
- iPhone 3GS
- iPhone 4
- iPhone 4S
- iPad 2
- iPod Touch (4th Generation)

    e.  Claim 1 of U.S. Patent No. 7,577,460 by selling the following; or

- iPhone 3G
- iPhone 3GS
- iPhone 4
- iPhone 4S
- iPad 2
- iPod Touch (4th Generation)

    f.  Claim 10 of U.S. Patent No. 7,456,893 by selling the following.

- iPhone 3GS
- iPhone 4
- iPhone 4S
- iPad 2
- iPod Touch (4th Generation)

2.  Whether Samsung's asserted patent claims are valid;

3.  Whether Samsung's asserted patent claims are enforceable;

4.  Whether Samsung's claims are barred by Apple's defenses;

5.  Whether Samsung has engaged in breach of contract or violated antitrust or unfair competition law in connection with its standards-related conduct or its assertion of patents that it has declared essential to industry standards; and

6.  The remedies to which Samsung is entitled, if any, as a result.

**Source**

N.D. Cal. Model Patent Jury Instr. A.3

# PATENTS

## <u>INSTRUCTION NO. 16.1—SUMMARY OF CONTENTIONS</u>

I will now give you a summary of each side's contentions in this case with respect to design and utility patent infringement.  I will then tell you what each must prove to win on each of its contentions.

Your job is to decide whether the asserted claims of the design or utility patents  have been infringed and whether any of the asserted claims are invalid.  If you decide that any claim of the asserted patents have been infringed and is not invalid, you will then need to decide any monetary damages to be awarded to either Apple or the Samsung to compensate for the infringement.

**Source**

Adapted from N.D. Cal. Model Instructions, B.1.

## UTILITY PATENT SPECIFIC INSTRUCTIONS

### INSTRUCTION NO. 16.2—SUMMARY OF UTILITY PATENT CONTENTIONS

I will now give you a summary of the positions of the parties with respect to utility patent infringement.

Apple alleges that the following devices infringe the '381, '915 and '163 utility patents:

| Utility Patent(s) | Device(s) Accused of Infringing |
|---|---|
| '381 | Gallery, Contacts, Web Browser or ThinkFree Office applications in the Galaxy Tab, Galaxy Tab 10.1, Captivate, Continuum, Droid Charge, Epic 4G, Exhibit 4G, Fascinate, Galaxy Ace, Galaxy Prevail, Galaxy S (i9000), Galaxy S 4G, Gravity, Indulge, Infuse 4G, Intercept, Mesmerize, Nexus S, Nexus S 4G, Replenish, Showcase Galaxy S, Sidekick, Vibrant, Galaxy S II (pre-August 26, 2011 versions) |
| '915 | Web Browser application in the Galaxy Tab, Galaxy Tab 10.1, Acclaim, Captivate, Continuum, Droid Charge, Epic 4G, Exhibit 4G, Fascinate, Galaxy Ace, Galaxy Prevail, Galaxy S (i9000), Galaxy S 4G, Gem, Gravity, Indulge, Infuse 4G, Intercept, Mesmerize, Nexus S, Nexus S 4G, Replenish, Showcase Galaxy S, Sidekick, Transform, Vibrant, Galaxy S II (pre-August 26, 2011 versions) |
| '163 | Web Browser application in the Galaxy Tab, Galaxy Tab 10.1, Captivate, Continuum, Droid Charge, Epic 4G, Exhibit 4G, Fascinate, Galaxy Ace, Galaxy Prevail, Galaxy S (i9000), Galaxy S 4G, Gem, Gravity, Indulge, Infuse 4G, Intercept, Mesmerize, Nexus S, Nexus S 4G, Replenish, Showcase Galaxy S, Sidekick, Transform, Vibrant, Galaxy S II (pre-August 26, 2011 versions) |

Each of the Samsung entities deny that any of these devices infringe any Apple patent. Apple bears the burden of proving by a preponderance of the evidence its allegations that each device infringes each separate patent. Therefore, you the jury must determine infringement for each patent separately, considering each individual device separately. You must not consider the patents or devices in groups to determine infringement on that basis.

In addition, each of the Samsung entities argue that the asserted claims of the Apple patents are invalid. To prove invalidity of any utility patent claim, the alleged infringer must persuade you by clear and convincing evidence that the claim is invalid.

Samsung alleges that the following devices infringe the '941, '604, '516, '711, '460 and '893 utility patents:

| Utility Patent(s) | Device(s) Accused of Infringing |
| --- | --- |
| '941 | iPhone 4,  iPad 2 3G |
| '604 | iPhone 3G, iPhone 3GS, iPhone 4, iPad 3G, iPad 2 3G |
| '516 | iPhone 4,  iPad 2 3G |
| '711 | iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S, and iPod Touch (4th Generation) |
| '460 | iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S, iPad 2, and iPod Touch (4th Generation) |
| '893 | iPhone 3GS, iPhone 4, iPhone 4S, iPad 2, and iPod Touch (4th Generation) |

Apple denies that any of these devices infringe any Samsung patent and argues that, in addition, the asserted claims of the Samsung patents are invalid.  Samsung bears the burden of proving by a preponderance of the evidence its allegations that each device infringes each separate patent. Therefore, you the jury must determine infringement for each patent separately, considering each individual device separately.  You must not consider the patents or devices in groups to determine infringement on that basis.

In addition, Apple argues that the asserted claims of the Samsung patents are invalid.  To prove invalidity of any utility patent claim, the alleged infringer must persuade you by clear and convincing evidence that the claim is invalid.

Your job will be to decide whether any of the asserted claims of each patent have been infringed and whether those claims are invalid.  If you decide that any of the asserted claims has been infringed and is not invalid, you will then need to decide any money damages to be awarded to compensate for infringement.  You will also need to make a finding as to whether the infringement was willful.  If you decide that any infringement was willful, that decision should not affect any damage award you give.  I will take willfulness into account later.

**Source**

N.D. Cal. Model Patent Jury Instr. A.3, B.1; AIPLA Model Patent Jury Instructions, 3.0; 35 U.S.C. § 271; 35 U.S.C. 289; *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*, 162 F.3d 1113, 1116¬17 (Fed. Cir. 1998); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993); *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir.1998) (*en banc*); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), aff'd, 517 U.S. 370, 374, 116 S.Ct. 1384, 1388, 134 L. Ed. 2d 577 (1996); *Sun Hill Indus., Inc. v. Easter Unlimited, Inc.*, 48 F.3d 1193, 1196 (Fed. Cir. 1995); *Payless Shoesource, Inc. v. Reebook Int'l Ltd.*, 998 F.2d 985, 990 (Fed. Cir. 1993); *but see, L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1125-26 (Fed. Cir. 1993) ("When the patented design and the design of the article sold by the patentee are substantially the same, it is not error to compare the patentee's and the accused articles directly, indeed, such comparison may facilitate application of Gorham criterion of whether an ordinary purchaser would be deceived into thinking that one were the other.");

1   *Braun, Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 820 n.8 (Fed. Cir. 1992); *Lee v.
    Dayton-Hudson Corp.*, 838 F.2d 1186, 1189 (Fed. Cir. 1988).

## INSTRUCTION NO. 17—UTILITY PATENTS—INTERPRETATION OF CLAIMS

Before you decide whether the parties have infringed the claims of the other's utility patents, or whether the claims are invalid, you will need to understand the patent claims.  As I mentioned, the utility patent claims are numbered sentences at the end of the patent that describe the boundaries of the utility patent's protection.  It is my job as judge to explain to you the meaning of any language in the claims that needs interpretation.

I have interpreted the meaning of some of the language in the utility patent claims involved in this case.  You must accept those interpretations as correct. My interpretation of the language should not be taken as an indication that I have a view regarding the issues of infringement and invalidity. The decisions regarding infringement and invalidity are yours to make.

**'711 Patent Terms:**

*"applet"*

The term "applet" appears in Claim 9 of Samsung's '711 Patent.  The term "applet" means "an application designed to run within an application module."  This definition is how a person of ordinary skill in the art in 2005 would define "applet."  An "applet" runs within an application module rather than within another program, and need not be operating system-independent.

**'381 Patent Terms:**

*"edge of [an or the] electronic document"*

The disputed term "edge of [an or the] electronic document" appears in claim 19 of Apple's '381 Patent.  "Edge of [an or the] electronic document" has its plain and ordinary meaning.  The meaning of "edge of [an or the] electronic document" is not limited to an external boundary, but may also refer to edges that are internal, such as when an electronic document is embedded in another electronic document.

**'915 Patent Terms:**

*"scrolling a window having a view associated with the event object"*

The disputed term "scrolling a window having a view associated with the event object" is found in claim 8 of Apple's '915 Patent.  "Scrolling a window having a view associated with the event object" has its plain and ordinary meaning.  The meaning of "scrolling a window having a view associated with the event object" is not limited to mean content viewed through the window must move in the same direction as the user input.

*"invokes"*

The disputed term "invokes" is found in claim 8 of Apple's '915 Patent.  The term "invokes" means "causes" or "causes a procedure to be carried out."

For claim language where I have not provided you with any meaning, you should apply the claim language's plain and ordinary meaning, as it would have been understood by a person of ordinary skill in the art.  I will provide you with a definition of "a person of ordinary skill in the art in Instruction No. _[Court to insert final number]__."

**Source**

N.D. Cal. Model Patent Jury Instr. B.2; *Markman v. Westview Instruments, Inc.*, 517 U.S. 370,

384-391 (1996); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304-13 (Fed. Cir. 1999); *Cybor Corp. v. FAS Techs.*, 138 F.3d 1448 (Fed. Cir. 1998) (*en banc*); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995) (*en banc*); Order Construing Disputed Claim Terms of U.S. Patent Nos. 7,698,711; 6,493,002; 7,469,381; 7,663,607; 7,812,828; 7,844,915; and 7,853,891 (Dkt. 849).

1

## INSTRUCTION NO. 18—UTILITY PATENTS—INFRINGEMENT GENERALLY

2
3

I will now instruct you on the rules you must follow in deciding whether each party has proven that the other party has infringed one or more of the asserted claims of its utility patents.

4

To prove infringement of any of Apple's claims, Apple must persuade you by a preponderance of the evidence that Samsung has infringed that claim.  Each Samsung entity must be considered separately when determining infringement.  To prove induced infringement of any of Apple's claims, Apple must persuade you both that someone else directly infringed that claim, and that Samsung induced that infringement, by a preponderance of the evidence.

5
6
7

Likewise, to prove infringement of any of Samsung's claims, Samsung must persuade you by a preponderance of evidence that Apple has infringed that claim.  To prove induced infringement of any of Samsung's claims, Samsung must persuade you both that someone else directly infringed that claim, and that Apple induced that infringement, by a preponderance of the evidence.

8
9

I will explain the concepts of direct infringement and inducing infringement in a moment.

10

**Source**

11

N.D. Cal. Model Patent Jury Instr. B.3.1; *Warner-Lambert Co. v. Teva Pharm. USA, Inc.,* 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005); *Seal-Flex, Inc. v. Athletic Track and Court Constr.,* 172 F.3d 836, 842 (Fed. Cir. 1999); *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1468-69 (Fed. Cir. 1993).

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

## **INSTRUCTION NO. 19—UTILITY PATENTS—DIRECT INFRINGEMENT**

A utility patent's claims define what is covered by the patent.  A product directly infringes a utility patent if it is covered by at least one claim of the patent.

Deciding whether a claim has been directly infringed is a two-step process.  The first step is to decide the meaning of the utility patent claim.  I have already made this decision for some of the patent claims, and I have already instructed you as to the meaning of some of those claims.  The second step is to decide whether the accused party has made, used, sold, offered for sale, or imported into the United States a product covered by a claim of the utility patent.  If so, it infringes.  You, the jury, make this decision.

With one exception, you must consider each of the asserted claims of the patent individually, and decide whether the accused party's product infringes that claim.  The one exception to considering claims individually concerns dependent claims.  A dependent claim includes all of the requirements of a particular independent claim, plus additional requirements of its own.  As a result, if you find that an independent claim is not infringed, you must also find that its dependent claims are not infringed.  On the other hand, if you find that an independent claim has been infringed, you must still separately decide whether the additional requirements of its dependent claims have also been infringed.

With regards to Samsung's utility patents, you will hear evidence about Samsung's commercial products and Apple's accused products.  Likewise, with regards to Apple's utility patents, you will hear evidence about Apple's commercial products and Samsung's accused products.  However, in deciding the issue of infringement you may not compare one party's accused products to the other party's commercial products.  Rather, you must compare the accused product to the claims of the patent when making your decision regarding infringement.

You must consider separately whether each of Samsung's accused devices infringe each disputed claim of Apple's patents. Samsung's devices infringe a patent if every element in one of the patent's claims is found in Samsung's device.

You must also consider separately whether each of Apple's accused devices infringe each disputed claim of Samsung's patents. Apple's devices infringe a patent if every element in one of the patent's claims is found in Apple's device.

Whether or not the accused party knew its product infringed or even knew of the patent does not matter in determining direct infringement.

There are two ways in which a patent claim may be directly infringed.  A claim may be "literally" infringed, or it may be infringed under the "doctrine of equivalents."  The following instructions will provide more detail on these two types of direct infringement.

**Source**

N.D. Cal. Model Patent Jury Instr. B.3.2; 35 U.S.C. § 271; *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310-11 (Fed. Cir. 2005); *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1330-34 (Fed. Cir. 2001); *Seal-Flex, Inc. v. Athletic Track and Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999); *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993); *In re Seagate Tech., LLC*, 497 F. 3d 1360, 1368 (Fed. Cir. 2007) (*en banc*) ("patent infringement is a strict liability offense").

## <u>INSTRUCTION NO. 20—UTILITY PATENTS—LITERAL INFRINGEMENT</u>

To decide whether a product literally infringes an asserted claim of a utility patent, you must compare that product with the patent claim and determine whether every requirement of the claim is included in that product.  If so, the product literally infringes that claim.  If, however, the product does not have every requirement in the patent claim, the product does not literally infringe that claim.  You must decide literal infringement for each asserted claim separately.

If the patent claim uses the term "comprising," that patent claim is to be understood as an open claim.  The asserted claims for all of the patents in this dispute are to be understood as open claims.  An open claim is infringed as long as every requirement in the claim is present in the accused product.  The fact that the accused product also includes other parts will not avoid infringement, as long as it has every requirement in the patent claim.

**Source**

N.D. Cal. Model Patent Jury Instr. B.3.3; *MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1352-53 (Fed. Cir. 2005); *Netword, LLC v. Centraal Corp.,* 242 F.3d 1347, 1353 (Fed. Cir. 2001); *Cole v. Kimberly-Clark Corp.,* 102 F.3d 524, 532 (Fed. Cir. 1996); *Ecolab, Inc. v. FMC Corp.,* 535 F.3d 1369 (Fed. Cir. 2009); *Cross Med. Prods. v. Medtronic Sofamor Danek*, 424 F.3d 1293 (Fed. Cir. 2005); *BMC Res., Inc. v. Paymentech, L.P.,* 498 F.3d 1373 (Fed. Cir. 2007).

**INSTRUCTION NO. 21—UTILITY PATENT INFRINGEMENT UNDER THE**

**DOCTRINE OF EQUIVALENTS**

If you decide that the products accused of infringing Samsung's '460 patent do not literally infringe, you must then decide whether those products infringe the asserted claim under what is called the "doctrine of equivalents." Because Apple has not asserted infringement under the doctrine of equivalents for its '381, '915 and '163 patents and Samsung has not asserted infringement under the doctrine of equivalents for its '893 and '711 patents, you cannot determine infringement under the doctrine of equivalents for these patents.[1] You will only determine whether those patents are literally infringed.

If you decide that the accused products do not literally infringe an asserted utility patent claim, you must then decide whether that product infringes the asserted claim under what is called the "doctrine of equivalents." Certain of Apple's accused products are accused of utility patent infringement under the "doctrine of equivalents."

Under the doctrine of equivalents, the product can infringe an asserted utility patent claim if it includes parts that are identical or equivalent to the requirements of the claim. If the product is missing an identical or equivalent part to even one requirement of the asserted utility patent claim, the product cannot infringe the claim under the doctrine of equivalents. Thus, in making your decision under the doctrine of equivalents, you must look at each individual requirement of the asserted utility patent claim and decide whether the product has either an identical or equivalent part to that individual claim requirement.

A part of a product is equivalent to a requirement of an asserted claim if a person of ordinary skill in the field would think that the differences between the part and the requirement were not substantial as of the time of the alleged infringement.

Changes in technique or improvements made possible by technology developed after the patent application is filed may still be equivalent for the purposes of the doctrine of equivalents if it still meets the other requirements of the doctrine of equivalents set forth in this instruction.

One way to decide whether any difference between a requirement of an asserted claim and a part of the product is not substantial is to consider whether, as of the time of the alleged infringement, the part of the product performed substantially the same function, in substantially the same way, to achieve substantially the same result as the requirement in the patent claim.

In deciding whether any difference between a claim requirement and the product is not substantial, you may consider whether, at the time of the alleged infringement, persons of ordinary skill in the field would have known of the interchangeability of the part with the claimed requirement. The known interchangeability between the claim requirement and the part of the product is not necessary to find infringement under the doctrine of equivalents. However, known interchangeability may support a conclusion that the difference between the part in the product and the claim requirement is not substantial. The fact that a part of the product performs the same function as the claim requirement is not, by itself, sufficient to show known interchangeability.

---

[1] Because Apple failed to assert a doctrine of equivalents theory for the asserted claims of the '381, '915, and '163 patents in its infringement contentions, it is precluded from doing so now. *MEMC Elec. Materials v. Mitsubishi Materials Silicon Corp.*, 2004 WL 5363616, at *4 (N.D. Cal. 2004) (precluding reliance of doctrine of equivalents theory not disclosed in infringement contentions); *Rambus, Inc. v. Hynix Semiconductor Inc.*, 2008 WL 5411564, at *3 (N.D. Cal. 2008) (same); *Genentech, Inc. v. Amgen*, 289 F.3d 761, 773–74 (Fed. Cir. 2002).

1

**Source**

2

N.D. Cal. Model Patent Jury Instr. B.3.4; *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002); *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997);

3

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950); *Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.*, 467 F.3d 1370, 1379-82 (Fed. Cir. 2006); *Pfizer, Inc. v. Teva*

4

*Pharms., USA, Inc.*, 429 F.3d 1364, 1378 (Fed. Cir. 2005); *Johnston & Johnston Assoc. v. R.E. Service Co.*, 285 F.3d 1046 (Fed. Cir. 2002) (*en banc*); *Multiform Desiccants, Inc. v. Medzam,*

5

*Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998); *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 397 (Fed. Cir. 1994).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

## **INSTRUCTION NO. 58.1—INDUCING PATENT INFRINGEMENT**

Apple argues that Samsung's Korean parent, SEC, has actively induced its subsidiaries in the United States, STA and SEA, to infringe Apple's utility patents. Samsung argues that Apple has actively induced third parties to infringe Samsung's utility patents.

In order for there to be inducement of infringement by an alleged infringer, someone else must directly infringe a claim of the patent; if there is no direct infringement by anyone, there can be no induced infringement. In order to be liable for inducement of infringement, the alleged infringer must:

      1.    have intentionally taken action that actually induced direct infringement by another;

      2.    have been aware of the patent; and

      3.    have known that the acts it was causing would be infringing.

If the alleged infringer did not know of the existence of the patent or that the acts it was inducing were infringing, it cannot be liable for inducement unless it actually believed that it was highly probable its actions would encourage infringement of a patent and it took intentional acts to avoid learning the truth. It is not enough that the accused infringer was merely indifferent to the possibility that it might encourage infringement of a patent. Nor is it enough that the accused infringer took a risk that was substantial and unjustified.

If you find that the alleged infringer was aware of the patent, but believed that the acts it encouraged did not infringe that patent, or that the patent was invalid, the alleged infringer cannot be liable for inducement.

**Source**

N.D. Cal. Model Patent Jury Instr. B.3.9; 35 U.S.C. § 271(b); *Global-Tech Appliances, Inc. et. al. v. SEB S.A.*, 131 S. Ct. 2060, 2067 (2011); *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304-06 (Fed. Cir. 2006) (*en banc*) (quoting Metro-*Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005)); *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060 (2011); *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683 (Fed. Cir. 2008).

SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

1  **INSTRUCTION NO. 23—UTILITY PATENTS—INVALIDITY—BURDEN OF PROOF**

2  I will now instruct you on the rules you must follow in deciding whether the alleged infringer has
   proven that the asserted claims of the other party's utility patents are invalid.  Before discussing

3  the specific rules, I want to remind you about the standard of proof that applies to this defense.  To
   prove invalidity of any utility patent claim, the alleged infringer must persuade you by clear and

4  convincing evidence that the claim is invalid.

5  During this case, both Apple and Samsung have submitted evidence, including but not limited to,
   prior art that was not considered by the United States Patent and Trademark Office (PTO) during

6  the prosecution of the patents at issue.  Each contends that such prior art invalidates certain claims
   of the other's utility patents.  In deciding the issue of invalidity, you may take into account the fact

7  that the prior art was not considered by the PTO when it issued the utility patent.  Prior art that
   differs from the prior art considered by the PTO may carry more weight than the prior art that was

8  considered and may make the alleged infringer's burden of showing by clear and convincing
   evidence that a utility patent claim is invalid easier to sustain.

9  **Source**

10
11 N.D. Cal. Model Patent Jury Instr. B.4.1; *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2242,
   2251 (2011); *Buildex, Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988); *Hybritech,*

12 *Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986).

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INSTRUCTION NO. 25—UTILITY PATENTS—ANTICIPATION/STATUTORY BARS**

A utility patent claim is invalid if the claimed invention is not new.  For the claim to be invalid because it is not new, all of its requirements must have existed in a single device or method that predates the claimed invention, or must have been described in a single previous publication or patent that predates the claimed invention.  In patent law, these previous devices, methods, publications or patents are called "prior art references."  If a utility patent claim is not new we say it is "anticipated" by a prior art reference.

In order to be anticipating, a prior art reference must enable one of ordinary skill in the art to make the invention without undue experimentation.  If the prior art is a patent, there is a presumption that it is enabled.  However, if the prior art is a publication, there is a presumption that it is not enabled.

The description in the written reference does not have to be in the same words as the claim, but all of the requirements of the claim must be there, either stated or necessarily implied, so that someone of ordinary skill in the field looking at that one reference would be able to make and use the claimed invention.

Here is a list of the ways that the alleged infringer can show that a patent claim was not new:

> If the claimed invention was already publicly known or publicly used by others in the United States before the date of conception;

> If the claimed invention was already patented or described in a printed publication anywhere in the world before the date of conception.  A reference is a "printed publication" if it is accessible to those interested in the field, even if it is difficult to find;

> If the claimed invention was already made by someone else in the United States before the date of conception, if that other person had not abandoned the invention or kept it secret;

> If the claimed invention was already described in another issued U.S. patent or published U.S. patent application that was based on a patent application filed before the date of conception;

> If the patent holder and alleged infringer dispute who is a first inventor, the person who first conceived of the claimed invention and first reduced it to practice is the first inventor. If one person conceived of the claimed invention first, but reduced it to practice second, that person is the first inventor only if that person (a) began to reduce the claimed invention to practice before the other party conceived of it and (b) continued to work diligently to reduce it to practice.  A claimed invention is "reduced to practice" when it has been tested sufficiently to show that it will work for its intended purpose or when it is fully described in a patent application filed with the PTO.

Since it is in dispute, you must determine a date of conception for certain of the claimed inventions. Conception is the mental part of an inventive act and is proven when the invention is shown in its complete form by drawings, disclosure to another or other forms of evidence presented at trial.

**Source**

N.D. Cal. Model Patent Jury Instr. B.4.3a1; 35 U.S.C. § 102(a), (c), (e), (f) and (g); *Flex-Rest, LLC v. Steelcase, Inc.*, 455 F.3d 1351, 1358-60 (Fed. Cir. 2006); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1379-82 (Fed. Cir. 2005); *Apotex U.S.A., Inc. v. Merck & Co.*, 254 F.3d 1031, 1035 (Fed. Cir. 2001); *Mycogen Plant Science, Inc. v. Monsanto Co.*, 243 F.3d

1316, 1330 (Fed. Cir. 2001); *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1367-70 (Fed. Cir. 2000); *Singh v. Brake*, 222 F.3d 1362, 1366-70 (Fed. Cir. 2000); *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349 (Fed. Cir. 1998); *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576-78 (Fed. Cir. 1997); *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 78 F.3d 540, 545 (Fed. Cir. 1996); *In re Bartfeld*, 925 F.2d 1450 (Fed. Cir. 1985); *Ralston Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d 1570, 1574 (Fed. Cir. 1985); *American Stock Exch., LLC v. Mopies*, 250 F. Supp. 2d 323 (S.D.N.Y. 2003); *In re Wyer*, 655 F.2d 221, 226 (C.C.P.A. 1981); *Impax Labs, Inc. v. Aventis Pharms. Inc.,* 468 F.3d 1366, 1381-84 (Fed. Cir. 2006); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354 (Fed. Cir. 2003); *Helifix, Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000); *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1479 (Fed. Cir. 1986); *Elan Pharms., Inc. v. Mayo Found.*, 346 F.3d 1051, 1057 (Fed. Cir. 2003) (remanding the case to the district court for a determination of whether the prior art reference enabled persons of ordinary skill to make the invention without undue experimentation); *In re Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985).

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE, IN ORDER

**INSTRUCTION NO. 25.1—UTILITY PATENT ANTICIPATION (STATUTORY BAR)**

A patent claim is invalid if the patent application was not filed within the time required by law. This is called a "statutory bar."  For a patent claim to be invalid by a statutory bar, all of its requirements must have been present in one prior art reference dated more than one year before the patent application was filed.  Here is a list of ways an alleged infringer can show that the patent application was not timely filed:

> – if the claimed invention was already patented or described in a printed publication anywhere in the world one year before effective filing date of patent application.  A reference is a "printed publication" if it is accessible to those interested in the field, even if it is difficult to find.;

> – if the claimed invention was already being openly used in the United States one year before the application filing date and that use was not primarily an experimental use (a) controlled by the inventor, and (b) to test whether the invention worked for its intended purpose;

> – if a device or method using the claimed invention was sold or offered for sale in the United States, and that claimed invention was ready for patenting, one year before the application filing date.

For a claim to be invalid because of a statutory bar, all of the claimed requirements must have been either (1) disclosed in a single prior art reference, (2) implicitly disclosed in a reference to one skilled in the field, or (3) must have been present in the reference, whether or not that was understood at the time.  The disclosure in a reference does not have to be in the same words as the claim, but all the requirements must be there, either described in enough detail or necessarily implied, to enable someone of ordinary skill in the field of [identify field] looking at the reference to make and use the claimed invention.

Authorities

35 U.S.C. § 102(b) and (d); *Pfaff v. Wells Elec. Inc.*, 525 U.S. 55 (1998); *Schering Corp. v. Geneva Pharms.,* 339 F.2d 1273 (Fed Cir. 2003); *Helifix Ltd. v. Blok-Lok, Ltd*., 208 F.3d 1339, 1346 (Fed. Cir. 2000); *Abbot Labs. v. Geneva Pharms., Inc.*, 182 F.3d 1315, 1318 (Fed. Cir. 1999); *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354 (Fed. Cir. 1999); *J.A. LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1581 (Fed. Cir. 1986); *In re Hall*, 781 F.2d 897, 898-99 (Fed. Cir. 1986); *D.L. Auld Co. v. Chroma Graphics Corp*., 714 F.2d 1144, 1150 (Fed. Cir. 1983).

## INSTRUCTION NO. 26—UTILITY PATENTS—OBVIOUSNESS

Not all innovations are patentable.  A utility patent claim is invalid if the claimed invention would have been obvious to a person of ordinary skill in the field at the time the application was filed. This means that, even if all of the requirements of the claim cannot be found in a single prior art reference that would anticipate the claim or constitute a statutory bar to that claim, a person of ordinary skill in the field who knew about all this prior art would have come up with the claimed invention.

The ultimate conclusion of whether a claim is obvious should be based upon your determination of several factual decisions.

First, you must decide the level of ordinary skill in the field that someone would have had at the time the claimed invention was made.  In deciding the level of ordinary skill, you should consider all the evidence introduced at trial, including:

>    (1)    the levels of education and experience of persons working in the field;

>    (2)    the types of problems encountered in the field; and

>    (3)    the sophistication of the technology.

Second, you must decide the scope and content of the prior art.  The parties disagree as to whether certain prior art references should be included in the prior art you use to decide the validity of the claims.  In order to be considered as prior art, these references must be reasonably related to the claimed invention of that patent.  A reference is reasonably related if it is in the same field as the claimed invention or is from another field to which a person of ordinary skill in the field would look to solve a known problem.

Third, you must decide what difference, if any, existed between the claimed invention and the prior art.

Finally, you must determine which, if any, of the following factors have been established by the evidence:

>    (1)    commercial success of a product due to the merits of the claimed invention;

>    (2)    a long felt need for the solution provided by the claimed invention;

>    (3)    unsuccessful attempts by others to find the solution provided by the claimed invention;

>    (4)    copying of the claimed invention by others;

>    (5)    unexpected and superior results from the claimed invention;

>    (6)    acceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention;

>    (7)    independent invention of the claimed invention by others before or at about the same time as the named inventor thought of it; and

>    (8)    other evidence tending to show obviousness.

The presence of any of factors 1-7 may be considered by you as an indication that the claimed invention would not have been obvious at the time the claimed invention was made, and the

presence of factor 8 may be considered by you as an indication that the claimed invention would have been obvious at such time. Although you should consider any evidence of these factors, the relevance and importance of any of them to your decision on whether the claimed invention would have been obvious is up to you.

A patent claim composed of several elements is not proved obvious merely by demonstrating that each of its elements was independently known in the prior art. In evaluating whether such a claim would have been obvious, you may consider whether the alleged infringer has identified a reason that would have prompted a person of ordinary skill in the field to combine the elements or concepts from the prior art in the same way as in the claimed invention. There is no single way to define the line between true inventiveness on the one hand (which is patentable) and the application of common sense and ordinary skill to solve a problem on the other hand (which is not patentable). For example, market forces or other design incentives may be what produced a change, rather than true inventiveness. You may consider whether the change was merely the predictable result of using prior art elements according to their known functions, or whether it was the result of true inventiveness. You may also consider whether there is some teaching or suggestion in the prior art to make the modification or combination of elements claimed in the patent. Also, you may consider whether the innovation applies a known technique that had been used to improve a similar device or method in a similar way. You may also consider whether the claimed invention would have been obvious to try, meaning that the claimed innovation was one of a relatively small number of possible approaches to the problem with a reasonable expectation of success by those skilled in the art. However, you must be careful not to determine obviousness using the benefit of hindsight; many true inventions might seem obvious after the fact. You should put yourself in the position of a person of ordinary skill in the field at the time the claimed invention was made and you should not consider what is known today or what is learned from the teaching of the patent.

**Source**

N.D. Cal. Model Patent Jury Instr. B.4.3b (Alternative 2); 35 U.S.C. § 103; *Graham v. John Deere Co.*, 383 U.S. 1 (1966); *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 407 (2007); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654 (Fed. Cir. 2000); *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 957 (Fed. Cir. 1997); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 991 (Fed. Cir. 1988); *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1000 (Fed. Cir. 1986); *Pentec. Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 313 (Fed. Cir. 1985); *Novo Nordisk A/S v. Becton Dickinson & Co.*, 304 F.3d 1216, 1219-20 (Fed. Cir. 2002); *Wang Labs. v. Toshiba Corp.*, 993 F.2d 858, 864 (Fed. Cir. 1993); *Daiichi Sankyo Co. v. Apotex, Inc.,* 501 F.3d 1254, 1256 (Fed. Cir. 2007)*; Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000); *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355 (Fed. Cir. 2000); *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718-19 (Fed. Cir. 1991).

## <u>INSTRUCTION NO. 28—EQUITABLE DEFENSES – WAIVER</u>

### [CONDITIONAL INSTRUCTION ONLY.  SAMSUNG DOES NOT BELIEVE APPLE'S EQUITABLE CLAIMS SHOULD BE DECIDED BY THE JURY.]

Apple has also asserted a defense of waiver to Samsung's claim that Apple infringes Samsung's '604 patent, '516 patent, and '941 patent.  In order to prove waiver, Apple must show by clear and convincing evidence that Samsung, with full knowledge of the material facts, intended to relinquish its rights to enforce the '604, '941 and '516 patents.

Apple asserts that Samsung's failure to disclose the existence of the Korean patent applications on which the '604, '941 and '516 patents claim priority constitutes a waiver of its right to enforce these patents and renders the patents unenforceable.  To find that Samsung has waived its right to enforce the patents, you must find that each of the following factors is met:

1.      Samsung had a duty to disclose the existence of the Korean patent applications to ETSI as a member of that organization.

2.      The Korean patent applications were in fact essential to an ETSI standard.

3.      Samsung breached its disclosure duty by failing to disclose the Korean patent applications.

4.      Appropriate circumstances exist to justify a finding that the '604, '941, and '516 patents are unenforceable against products practicing the ETSI standard, including the accused products.

**Source**

*Qualcomm Inc. v. Broadcom Corp*, 548 F.3d 1004 (Fed. Cir. 2008). ("In order to prove waiver, Broadcom must show by clear and convincing evidence either that Qualcomm, with full knowledge of the material facts, intentionally relinquished its rights to enforce the 104 and 767 patents or that its conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished.").

**INSTRUCTION NO. 29—EQUITABLE DEFENSES – EQUITABLE ESTOPPEL**

**[CONDITIONAL INSTRUCTION ONLY.  SAMSUNG DOES NOT BELIEVE APPLE'S EQUITABLE CLAIMS SHOULD BE DECIDED BY THE JURY.]**

The owner of a patent may forfeit its right to any relief from an alleged infringer where: (1) the patent holder communicates something in a misleading way to the infringing party about the lack of infringement or about not being sued, (2) the alleged infringer relies upon the misleading communication from the patent holder, and (3) due to its reliance, the alleged infringer will be materially harmed if the patent holder is allowed to assert a claim relating to the issue that is inconsistent with the patent holder's prior misleading communication.  This is referred to as an "equitable estoppel" and it is a defense that Apple contends precludes any recovery by Samsung with respect to the '604, '941, or '516 patents.  Apple must prove each of these elements by a preponderance of the evidence, but even if all these elements are proven, equitable estoppel need not be found if such a finding would be unfair in light of the conduct of the parties.

Apple contends that Samsung made communications about its "declared essential" patents before Samsung filed this lawsuit.  A communication may be made through written or spoken words, conduct, silence, or a combination of words, conduct, and silence.  Conduct may include action or inaction.  Whether in fact Samsung communicated with Apple about its "declared essential" patents prior to the filing of this lawsuit, and whether in fact that communication, if you find there to have been any, was misleading, are questions that must be answered by considering the facts and circumstances as they existed at the time.

Material harm to Apple can be economic in form.  Whether Apple suffered economic prejudice is a question that must be answered by evaluating whether Apple changed its economic position as a result of its reliance on any misleading communication from Samsung about its "declared essential" patents, resulting in losses beyond merely paying for infringement (such as if Apple could have switched to a noninfringing product if sued earlier) and whether losses as a result of any change in economic position could have been avoided.

**Source**

Adapted from Federal Circuit Bar Association Model Patent Jury Instr. B.5.3; *A.C. Aukerman Co. v. R.L Chaides Const. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) (*en banc*); 35 U.S.C. § 282; *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770 (Fed. Cir. 1995) (to establish equitable estoppel, one must show reliance on patentee's misleading conduct); *Winbond Electronics Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363, 1374-75 (Fed. Cir. 2001).

## <u>INSTRUCTION NO. 27—PATENT EXHAUSTION</u>

Apple has also asserted a defense of "patent exhaustion" to Samsung's claim that Apple infringes Samsung's '604 patent, '516 patent, and '941 patent.  I will now explain the "patent exhaustion" defense to you.

Apple claims that Samsung has licensed the use of the '604, '516, and '941 patents to Intel. Apple further claims that since it purchased baseband processor chips from Intel that are covered by the license and that Apple therefore it is not liable for infringing Samsung's patents. This is called the "patent exhaustion" defense. In other words, Apple claims that Samsung's licenses to Intel baseband processor exhausts Samsung's patent rights as to the use of Samsung's technologies in the Intel chips.

Apple has the burden of proving the "exhaustion" defense by a preponderance of the evidence.  In order to meet this burden, Apple must show that:

    **First**, that Intel was authorized to sell the baseband processor chip under the terms of a license agreement between Samsung and Intel.  In making your determination, you must evaluate whether the terms of Samsung's license with Intel authorized the sales of the baseband chips.

    **Second**, that Intel made an initial sale in the United States of the Intel baseband chips incorporated in the accused products.  In evaluating whether the sales took place in the United States, you must consider whether the baseband processor chips were actually delivered to Apple or its contractors in the United States.

    **Third**, that the Intel baseband processor chips substantially embody the inventions of the '604 patent, '516 patent, and '941 patent.

Apple must prove each of these elements to prevail on this defense.  If Apple does not prove any one of these elements, you must reject Apple's affirmative defense and find for Samsung on this issue.

**Source**

*Quanta Computer, Inc. v. LG Elecs, Inc.*, 553 U.S. 617 (2008); *Ninestar Tech. Co. v. Int'l Trade Comm'n,* 667 F.3d 1373 (Fed. Cir. 2012); *Fujifilm Corp. v. Benun*, 605 F.3d 1366 (Fed. Cir. 2010); *LaserDynamics, Inc. v. Quanta Storage America, Inc.*, No. 2:06-CV-348-TJW-CE, 2009 U.S. Dist. LEXIS 115848 at *3 (E.D. Tex. 2009); *MedImmune, LLC v. BioPharma, Inc.*, No. C 08-9550 JF HRL, 2011 WL 61191 at *17 (N.D. Cal. 2011); *Wing Shing Prods. Ltd. v. Simatelex Manufactory Co.*, 479 F. Supp. 2d 388, 403 (S.D.N.Y. 2007); *Transocean Offshore Deepwater Drilling, Inc. v. Stena Drilling Ltd.*, 659 F. Supp. 2d 790, 801 (S.D. Tex. 2009); 2009); *Intel Corp. v. Broadcom Corp.,* 173 F. Supp. 2d 201, 222 (D. Del 2001); *Gilson v. Republic of Ireland*, 787 F.2d 655, 658 (D.C. Cir. 1986); *PPG Industries, Inc. v. Guardian Industries Corp.*, 597 F.2d 1090, 1093 (6th Cir. 1979); *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1114 (Del. 1985); *Minebea Co. v. Papst*, 444 F. Supp. 2d 68 (D.D.C. 2006); *Cornell Research Found., Inc. v. Hewlett-Packard Co.,* No. 5:01-CV-1974, 2007 WL 4349135 at *51 (N.D.N.Y. Jan. 31, 2007).

**INSTRUCTION NO. 82.1—REQUIREMENTS OF THE ETSI IPR POLICY—**

**AVAILABILITY OF LICENSES**

If you find that Samsung's '604 patent, '516 patent, and '941 patent are valid and that Apple has infringed those patents, Apple has raised a defense of breach of contract.  Apple contends that Samsung has an obligation to license Samsung's patents that are essential to the UMTS standard, an obligation to negotiate in good faith, and an obligation to disclose IPRs to ETSI in a manner consistent with the ETSI IPR Policy and that Samsung breached these obligations.  However, there is no allegation that Apple has an existing license to Samsung's '604 patent, '516 patent, and '941 patent.

**Source**

Order of May 4, 2012, at 20:1-21:25 ("First, there is no existing license between Apple and Samsung because there was no firm offer and acceptance of the terms of the license that Apple claims already exists. Both experts agree that an offer and acceptance are essential to contract formation under French law….").

## <u>INSTRUCTION NO. 16.3—SUMMARY OF DESIGN PATENT ISSUES</u>

I will now summarize the issues that you must decide and for which I will provide instructions to guide your deliberations with respect to Apple's design patent infringement claims.  You must decide the following:

      1      Whether Apple has proved by a preponderance of the evidence that Samsung Electronics Company, Samsung Electronics America, and/or Samsung Telecommunications America have each infringed any of the D'677, D'087, D'305 and D'889 design patents.

      2      Whether Samsung has proved by clear and convincing evidence that any of the D'677, D'087, D'305 and D'889 design patents are invalid.

      3      If you determine that one or more of the D'677, D'087, D'305 and D'889 design patents are infringed and not invalid, what amount of damages Apple has proved by a preponderance of the evidence, if any.

**Source**

AIPLA Model Jury Instruction 1.

1

### **INSTRUCTION NO. 42 (First Samsung Proposed Instruction) DESIGN PATENTS—**

2

### **INTERPRETATION OF PATENT CLAIMS**

3
4

Before you decide whether Samsung Electronics Company, Samsung Electronics America, and/or Samsung Telecommunications America have infringed one or more of the asserted design patents, or whether the design patents are invalid, you will have to understand the design patent claims.

5
6
7

Unlike utility patents, a design patent can only have one claim. That claim covers all the figures in the patent. It is permissible to illustrate more than one embodiment of a design in a single design patent application. Multiple embodiments may be presented only if they are directed to substantially the same design and are not patentably distinct from one another.

**Source**

8
9
10
11

AIPLA Model Jury Instruction 2; 37 C.F.R. § 1.153; *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (en banc); *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1311-12 (Fed. Cir. 2005) (en banc); *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1285-86 (Fed. Cir. 2002); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 374, 116 S.Ct. 1384, 1388 (1996).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **INSTRUCTION NO. 42 (Second Samsung Proposed Instruction)—DESIGN PATENTS—**

2    **INTERPRETATION OF PATENT CLAIMS[2]**

3

4    It is my job as a judge to interpret for you what is claimed by the patents.  You must accept my
     interpretations as correct.  My interpretations should not be taken as an indication that I have an
     opinion one way or another regarding the issues of infringement and invalidity.  The decisions

5    regarding infringement and invalidity are yours to make.

6    [READ COURT'S CLAIM CONSTRUCTIONS]

7    **Source**

8    AIPLA Model Jury Instruction 2.1; 37 C.F.R. § 1.152; *Phillips v. AWH Corp.*, 415 F.3d 1303
     (Fed. Cir. 2005) (en banc); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995)

9    (en banc) *aff'd,* 517 U.S. 370 (1996); *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679-80
     (Fed. Cir. 2008) (en banc); *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

_____

[2] Samsung reserves the right to modify this instruction once the Court issues an order
regarding claim construction.

-38-                            CASE NO. 11-cv-01846-LHK (PSG)

1

## <u>INSTRUCTION NO. 44.5—DESIGN PATENT PROSECUTION HISTORY ESTOPPEL</u>

2

3   You are instructed that the scope of a design patent can be limited by what is called "prosecution
    history estoppel." As you have already heard, during prosecution of a patent, the patent applicant
4   often makes arguments and amendments in an attempt to convince the Patent Office examiner to
    grant the patent. The party seeking to obtain a patent may amend his patent claims or submit
5   arguments in order to define or narrow the meaning of the claims to obtain the patent. Once it has
    done so, it is not entitled to patent coverage that would be broad enough to cover the same feature
    that was used to distinguish the invention during the prosecution of the patent.

6

7   You are instructed that prosecution history estoppel applies in the following way:

8   Apple overcame a non-final obviousness rejection by the Patent Office during prosecution of the
    D'677 patent by claiming that the design disclosed the overall impression of a substantially
9   continuous transparent surface on an electronic device and the substantially smooth or flush
    transition between the display screen and the rest of the front face of the device. The D'677 patent
10  is not entitled to broader coverage than this description.

11  **Source**

12  AIPLA Model Jury Instruction 3.13; *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002); *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 30-34
13  (1997); *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679-80 (Fed. Cir. 2008) (en banc)
    ("[A] trial court can usefully guide the finder of fact by addressing a number of other issues that
14  bear on the scope of the claim. Those include such matters as . . . assessing and describing the
    effect of any representations that may have been made in the course of the prosecution history,");
15  *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124-25 (Fed. Cir. 1993) ("As for other
    patented inventions, reference is made to the prior art and the prosecution history in order to give
16  appropriate weight to the factors that contributed to patentability.").

17

18

19

20

21

22

23

24

25

26

27

28

## INSTRUCTION NO. 44—DESIGN PATENTS—DIRECT INFRINGEMENT

Questions _____ through _____ of the Verdict Form read as follows:   [READ TEXT OF INFRINGEMENT VERDICT QUESTIONS].

I will now instruct you as to the rules you must follow when deciding whether Apple has proven that one or more of the Samsung entities has infringed the D'677, D'087, D'305 and/or D'889 design patents.

Patent law gives the owner of a valid design patent the right to exclude others from applying the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or selling or offering to sell any article of manufacture to which such design or colorable imitation has been applied within the United States during the term of the patent.  Any person or company that has engaged in any of those acts without the design patent owner's permission infringes the patent.  Here, Apple alleges that the following devices infringe the D'677, D'087, D'305 and D'889 design patents:

| Design Patent(s) | Device(s) Accused of Infringing |
| --- | --- |
| D'677 | Samsung Galaxy Ace (SHW-M240S); Samsung Infuse 4G (SGH-1997); Samsung Galaxy S i9000 (SHW-M1105); Samsung Galaxy Fascinate (SCH-I500) (a/k/a Galaxy Showcase and Galaxy Mesmerize); Samsung Galaxy S 4G (SGH-T959V) / Vibrant (SGH-T959). |
| D'087 | Samsung Galaxy Ace (SHW-M240S); Samsung Infuse 4G (SGH-1997); Samsung Galaxy S i9000 (SHW-M1105); Samsung Galaxy Fascinate (SCH-I500) (a/k/a Galaxy Showcase and Galaxy Mesmerize); Samsung Galaxy S 4G (SGH-T959V) / Vibrant (SGH-T959). |
| D'305 | Captivate; Continuum; Droid Charge; Epic 4G; Fascinate; Gem; Galaxy S i9000; Galaxy S 4G; Indulge; Infuse 4G; Mesmerize; Showcase; Galaxy S Showcase i500; and Vibrant. |
| D'889 | Galaxy Tab 10.1 |

Each of the Samsung entities deny that any of these devices infringe any Apple design patent. Apple bears the burden of proving by a preponderance of the evidence its allegations that each device infringes each separate patent.  Therefore, you the jury must determine infringement for each patent separately, considering each individual device separately.  You must not consider the patents or devices in groups to determine infringement on that basis.

**Source**

AIPLA Model Patent Jury Instructions 3.0; 35 U.S.C. § 289; *Crocs, Inc. v. International Trade Com'n*, 598 F.3d 1294, 1304-06 (Fed. Cir. 2010); *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*, 162 F.3d 1113, 1116-17 (Fed. Cir. 1998); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993).

1

**INSTRUCTION NO. 44.1— DESIGN PATENT DIRECT INFRINGEMENT – LIABILITY**

2

**MUST BE PROVED FOR EACH ENTITY SEPARATELY**

3

In this case, Apple asserts that Samsung Electronics America, Samsung Telecommunications
America, and Samsung Electronics Company have each directly infringed the D'677, D'087,

4

D'305 and D'889 design patents.  Even if you determine that a particular device infringes one of
the patents, you may not find any of the Samsung entities liable for direct infringement unless

5

Apple proves by a preponderance of the evidence that the particular Samsung entity has, in the
United States, made, used, offered to sell, or sold the device.  You must determine this liability

6

separately for each Samsung entity and each device.

7

**Source**

8

AIPLA Model Patent Jury Instructions, 3.1; 35 U.S.C. § 289; *BMC Resources v. Paymentech,
L.P.*, 498 F.3d 1373, 1380-81 (Fed. Cir. 2007); *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d

9

1314, 1330-32 (Fed. Cir. 2001); *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836,
842 (Fed. Cir. 1999); *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889

10

(Fed. Cir. 1988); *Crocs, Inc. v. International Trade Com'n*, 598 F.3d 1294, 1304-06 (Fed. Cir.
2010).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INSTRUCTION NO. 44.2—DESIGN PATENT DIRECT INFRINGEMENT—"ORDINARY**

**OBSERVER TEST"**

Design patent infringement cannot be found unless the accused product creates an appearance deceptively similar to the claimed design.

To determine whether an accused product is deceptively similar to a patented design, you must use the "ordinary observer test."  The ordinary observer test provides that:

> If, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

Said another way, two designs are substantially the same if their resemblance is deceptive to the extent that it would induce an ordinary observer, giving such attention as a purchaser usually gives, to purchase an article having one design supposing it to be the other.

There are some characteristics of this ordinary observer that you must take into account  in determining whether two designs are deceptively similar.  First, the ordinary observer is someone who purchases smartphones and/or tablet computers and who gives the same level of attention to those products as a normal purchaser would give in that purchasing context.  You must assume that the ordinary observer is capable of making a reasonably discerning decision when observing the Samsung designs to determine whether they have an appearance that is deceptively similar to the patented designs.

Second, you must assume that the ordinary observer views the design patents and the accused products in light of earlier designs, known as "prior art."  When the differences between the design in the patent and the accused products are viewed in light of the prior art, the ordinary observer's attention will be drawn to those aspects of the patented design that are different from the prior art.  And when the patent design is close to the prior art designs, small differences between the patent design and the Samsung products are likely to be important to the ordinary observer.

**Source**

*Gorham Co. v. White*, 81 U.S. 511, 528 (1871); *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 681 (Fed. Cir. 2008) (en banc) ("The question before this court under the standard we have set forth above is whether an ordinary observer, familiar with the prior art Falley and Nailco designs, would be deceived into believing the Swisa buffer is the same as the patented buffer."); *id.* at 683 ("In the language used by the Supreme Court in *Gorham*, 81 U.S. at 528, we hold that the accused design could not reasonably be viewed as so similar to the claimed design that a purchaser familiar with the prior art would be deceived by the similarity between the claimed and accused designs, 'inducing him to purchase one supposing it to be the other.'"); *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1296 (Fed. Cir. 2010) ("[I]nfringement cannot be found unless the accused product creates an appearance deceptively similar to the claimed design") (citing *Egyptian Goddess*); *Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1313 (Fed. Cir. 2001) ("Two designs are substantially the same if their resemblance is deceptive to the extent that it would induce an ordinary observer, giving such attention as a purchaser usually gives, to purchase an article having one design supposing it to be the other."); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993) ("Design patent infringement requires a showing that the accused design is substantially the same as the claimed design.  The criterion is deception of the ordinary observer, such that one design would be confused with the other."); *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1323 (Fed. Cir. 2007) ("[T]he purchaser of the patented and accused designs in this case is the purchaser of one of a

retail product's component parts that is thereafter assembled with other parts to make the retail product.  To hold that such a purchaser is the appropriate hypothetical ordinary observer fits squarely with our precedent that the ordinary observer is a person who is either a purchaser of, or sufficiently interested in, the item that displays the patented designs and who has the capability of making a reasonably discerning decision when observing the accused item's design whether the accused item is substantially the same as the item claimed in the design patent."); *id.* at 1324 ("Specifically, *the question to be addressed* in applying the ordinary observer test *is whether the ordinary observer would be deceived* by the accused design because it is substantially similar to the patented design.") (emphasis added); *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.*, 162 F.3d 1113, 1117 (Fed. Cir. 1998) ("The measure of infringement of a design patent is deception of the ordinary observer, when such person gives the design the attention usually given by a purchaser of the item bearing the design."); *id.* ("[T]he focus is on the actual product that is presented for purchase, and the ordinary purchaser of that product.  The accused tire, the Hercules Power Trac, is a truck tire. The district court correctly invoked the ordinary trucker or fleet operator who purchases truck tires, as the person from whose viewpoint deceptive similarity to the '080 design is determined."); *Crocs, Inc. v. International Trade Com'n*, 598 F.3d 1294, 1303 (Fed. Cir. 2010) ("To show infringement under the proper test, an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design."); *id.* at 1306 ("These side-by-side comparisons of the '789 patent design and the accused products suggest that an ordinary observer, familiar with the prior art designs, would be deceived into believing the accused products are the same as the patented design.  In one comparison after another, the shoes appear nearly identical.  If the claimed design and the accused designs were arrayed in matching colors and mixed up randomly, this court is not confident that an ordinary observer could properly restore them to their original order without very careful and prolonged effort."); *OddzOn v. Just Toys*, 122 F.2d 1396, 1405 ("The patentee 'must establish that an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental.'") (quoting *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 825 (Fed. Cir. 1992)); *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 676 (Fed. Cir. 2008) (en banc) ("When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art.  And when the claimed design is close to the prior art designs, small differences between the accused design and the claimed design are likely to be important to the eye of the hypothetical ordinary observer."); *id.* at 678 ("[D]ifferences between the claimed and accused designs that might not be noticeable in the abstract can become significant to the hypothetical ordinary observer who is conversant with the prior art.").

## INSTRUCTION NO. 44.3—DESIGN PATENT DIRECT INFRINGEMENT—

## COMPARISONS

You have heard evidence about certain Apple products and models, such as the various generations of iPhones and iPads, as well as the 035 model.  If you determine that any of Apple's products or models embody an Apple patent design because they are substantially the same as that design and have no material distinctions, you may compare the product or model directly to the accused Samsung products.  This may facilitate your determination of whether an ordinary observer would be deceived.  However, if you determine that a particular Apple product or model does not embody a patented design, you may not compare it to the accused devices.

**Source**

*Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1189 (Fed. Cir. 1988) ("When no significant distinction in design has been shown between the patent drawing and its physical embodiment, it is not error for the court to view them both, and to compare the embodiment of the patented design with the accused devices."); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1125-26 (Fed. Cir. 1993) ("When the patented design and the design of the article sold by the patentee are substantially the same, it is not error to compare the patentee's and the accused articles directly, indeed, such comparison may facilitate application of Gorham criterion of whether an ordinary purchaser would be deceived into thinking that one were the other."); *Braun, Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 820 & n.8 (Fed. Cir. 1992).

SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

1    **INSTRUCTION NO. 44.4—DESIGN PATENT DIRECT INFRINGEMENT—**

2    **ORNAMENTAL VERSUS FUNCTIONAL FEATURES**

3    Design patents do not protect the functional aspects of a design, only the ornamental aspects. Thus, to determine infringement under the ordinary observer test as I have instructed you on previously, you must consider only the ornamental design features of the design patents. You must not consider functional elements for purposes of comparing a design patent to an accused device in deciding infringement. Apple must prove by a preponderance of the evidence that the ordinary observer would be deceived by reason of the common features in the claimed and accused designs that are ornamental. The similarity cannot be a result of any functional features.

**[THE FOLLOWING ALTERNATIVE PARAGRAPH TO BE READ IN THE EVENT THE COURT ALLOWS THE JURY TO DETERMINE WHICH FEATURES ARE FUNCTIONAL FOR INFRINGEMENT PURPOSES.]**

Design patents do not protect the functional aspects of a design, only the ornamental aspects. Thus, to determine infringement under the ordinary observer test as I have instructed you on previously, you must consider only the ornamental design features of the design patents. You must not consider functional elements for purposes of comparing a design patent to an accused device in deciding infringement. A feature is functional if the feature is essential to the use or purpose of the article. A design feature also is functional if it affects the cost or quality of the article. If you determine that any of the design patents includes functional features, you cannot find infringement unless Apple proves by a preponderance of the evidence that the ordinary observer would be deceived by reason of the common features in the claimed and accused designs that are ornamental. The similarity cannot be a result of any functional features.

**Source**

*Read Corp. v. Portec, Inc.*, 970 F.2d 816, 825-26 (Fed. Cir. 1992) ("[Where] a design is composed of functional as well as ornamental features, to prove infringement a patent owner must establish that an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental."); *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997); *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293-94 (Fed. Cir. 2010); *id.* at 1296 ("We also agree that, ignoring the functional elements of the tools, the two designs are indeed different."); *Amini Innovation Corp. v. Anthony Cal. Inc.*, 439 F.3d 1365, 1371-72 (Fed. Cir. 2006) ("An aspect is functional 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'"); *PHG Tech., Inc. v. St. John Co., Inc.*, 469 F.3d 1361, 1366 (Fed Cir. 2006); *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1456 (Fed Cir. 1997).

## INSTRUCTION NO. 58.2—INDUCING DESIGN PATENT INFRINGEMENT[3]

To show induced infringement, Apple must prove by a preponderance of the evidence that someone has directly infringed the D'677, D'087, D'305 and D'889 design patents and that Samsung Electronics Company, Samsung Electronics America and/or Samsung Telecommunications have actively and knowingly aided and abetted that direct infringement. Apple must show that Samsung Electronics Company, Samsung Electronics America and/or Samsung Telecommunications America actually intended to cause the acts that constitute direct infringement, knew of the patent, and knew or should have known that their actions would lead to actual infringement. Intent to cause the acts that constitute direct infringement may be demonstrated by evidence of active steps taken to encourage direct infringement. If there is no direct infringement by anyone, there can be no induced infringement.

**Source:**

AIPLA Model Patent Jury Instructions, 3.3; 35 U.S.C. § 271(b); *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc) ("Under section 271(b), '[w]hoever actively induces infringement of a patent shall be liable as an infringer.' 35 U.S.C. § 271(b). To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they 'actively and knowingly aid[ed] and abett[ed] another's direct infringement.' *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed.Cir.1988) (emphasis in original). However, 'knowledge of the acts alleged to constitute infringement' is not enough. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed.Cir.2003) (citation omitted). The 'mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven.' *Id.* at 1364 (citing *Manville*, 917 F.2d at 554)").*See also Tegal Corp. v. Tokyo Electron Co., Ltd.*, 248 F.3d 1376, 1379 (Fed. Cir. 2001) ("In *A. Stucki Co. v. Worthington Industries, Inc.*, 849 F.2d 593, 7 USPQ2d 1066 (Fed.Cir.1988), we considered whether evidence of mere inaction by a parent company in the face of infringement by a subsidiary-i.e., a failure to stop infringement-could constitute either direct infringement or active inducement. . . . We also concluded that evidence of mere inaction did not constitute inducement, and we therefore affirmed the directed verdict in favor of the defendant."); *A. Stucki Co. v. Worthington Industries, Inc.*, 849 F.2d 593, 597 (Fed. Cir. 1988) ("Stucki's difficulty is two-fold: (1) the facts do not add up to inducement of infringement; and (2) the inferences Stucki posits are not justifiable. Stucki says "although no document exists which states that the Worthington officials advised RDI to continue its infringement," the evidence shows "it is an inescapable conclusion that the Worthington officials did assent to, endorse and condone continued infringement." Absent evidence of active inducement, however, Stucki's "inescapable conclusion" is mere speculation, not a justifiable inference. The district court was not obliged to make the jury engage in such speculation. *See Anderson*, 477 U.S. at 251, 106 S.Ct. at 2512. Stucki's evidence is not "evidence on which the jury could reasonably find" that Worthington had "actively" induced infringement under 35 U.S.C. § 271(b)."); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004); *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1342 (Fed. Cir. 2003); *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468-69 (Fed. Cir. 1990).

---

[3] Samsung does not believe Apple should be permitted to offer evidence or argument on any indirect infringement theory. Out of an abundance of caution, however, and without waiving any right to object, Samsung proposes this instruction should Apple be allowed to offer such evidence or argument.

## INSTRUCTION NO. 45—DESIGN PATENTS—INVALIDITY BURDEN OF PROOF

Once you have considered the issue of infringement, you must consider whether Apple's patents are valid. Samsung has asserted that each of the Apple design patents is invalid. This means that even if you find that a patent has been infringed, you must still determine whether that patent is actually a valid one. Simply because the US Patent Office issued a design patent does not mean that it is valid. Samsung must prove this by clear and convincing evidence.

An issued design patent may be found invalid where:

(a) it is anticipated by a single earlier design;

(b) it is obvious in view of one or more earlier designs;

(c) it is indefinite, which means it is unclear;

(d) it is the second patent on the same design, which is called double patenting; or

(e) it is a functional design, not an ornamental one.

A design patent with multiple embodiments is invalid even if just one of the embodiment is found to be anticipated or obvious.

I will give you more guidance on each of these reasons.

**Source**

35 U.S.C. §§ 102, 103,171; *In re Klein*, 987 F.2d 1569, 1570 (Fed. Cir. 1993) (citing *Ex Parte Appeal No. 315-40*, 152 USPQ2d 71, 72 (TTAB 1965). See each section below for authority.

## INSTRUCTION NO. 46—DESIGN PATENTS—ANTICIPATION/STATUTORY BARS

Before I describe the different ways a design patent can be invalidated, I will instruct you about documents and things called "prior art." The term "prior art" will be used in several of the following instructions on invalidity. Prior art is also a term used in the infringement test for design patents because the ordinary observer is deemed to know about all the prior art and to view the accused products and Apple patents in light of the prior art. In general, prior art refers to early patents, designs, and devices that were made before Apple's designs were invented or filed with the Patent Office. That is, these are designs that were already known in the world before Apple's designs were ever made or submitted to become patents.

There are some rules that determine whether you may consider a particular early design as prior art. In some instances, you will need to look to the date the Apple design was made to determine if an early design is prior art; in other instances you will look to the filing date of the Apple design regardless of what the invention date is. Prior art includes any of the following items received into evidence during trial:

    1     Any design or product that was publicly known or used by others in the United States before the patented Apple design was made;

    2     Any design or product that was patented or described in a printed publication in the United States or a foreign country before the Apple design was made;

    3     Any issued United States patent or published United States patent application that was filed before the Apple design was made;

    4     Any publications, including patents and design registrations, that were published or issued more than one year before the filing date of the Apple patent;

    5     Any design or product that was in public use or on sale in the United States more than one year before the Apple patent was filed;

    6     Any design or product that was made by anyone before the named inventors created the patented design or product where the design or product was not abandoned, suppressed, or concealed.

An inventor's own earlier designs can be used as prior art to invalidate his or her later patents.

**Source**

35 U.S.C. § 102.

## INSTRUCTION NO. 46.1—ANTICIPATION – A SINGLE REFERENCE OR

## A SINGLE PRODUCT

Now that you have been instructed about prior art, I'll explain how it can be used to determine whether a design patent is invalid.  In basic terms, the design must be new and novel in light of the prior art.  A design that is not new or novel in light of prior art is said to be "anticipated by the prior art."  A design that is "anticipated" is not entitled to patent protection.

The same standard of deceptive similarity that applied to infringement also applies to anticipation.  Therefore, to find that an Apple design patent is anticipated, Samsung must prove by clear and convincing evidence that a single prior art reference is so similar in appearance to the Apple patent that an ordinary observer would be deceived into believing they were the same design.

**Source**

Adapted from AIPLA Model Patent Jury Instructions, 6.0; 35 U.S.C. §§ 102,171; *Gorham Co. v. White*, 81 U.S. 511, 526-27 (1871); *Int'l Seaway Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1240 (Fed. Cir. 2009) ("In light of Supreme Court precedent and our precedent holding that the same tests must be applied to infringement and anticipation, and our holding in *Egyptian Goddess* that the ordinary observer test is the sole test for infringement, we now conclude that the ordinary observer test must logically be the sole test for anticipation as well.  In doing so, we will prevent an inconsistency from developing between the infringement and anticipation analyses, and we will continue our well-established practice of maintaining identical tests for infringement and anticipation.").

## INSTRUCTION NO. 46.2—DESIGN PATENT ANTICIPATION – PUBLIC USE AND

## PUBLIC DISPLAY

A design patent is invalid if, under the deceptive similarity test I have described, the same or substantially the same design was in public use or on public display in this country prior to the time the patented design was invented.  In determining whether a design was in public use or on public display, you must consider the activities that occurred in public and how much access and knowledge the public had of the display or use.  A public display of a design at a trade show, for example, is generally considered a public use.

**Source**

35 U.S.C. §102(a) & (b); *Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1379 (Fed. Cir. 2004); *Continental Plastic Containers v. Owens Brockway Plastic Prods., Inc.*, 141 F.3d 1073, 1079 (Fed. Cir. 1998); *Fitzgerald v. Arbib*, 268 F.2d 763 (C.C.P.A. 1959); *In re Mann*, 861 F.2d 1581, 1581 (Fed. Cir. 1988); *see also*, *Baxter Int'l, Inc. v. Cobe Labs., Inc.,* 88 F.3d 1054, 1058-59 (Fed. Cir. 1996); *TP Labs., Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 971-72 (Fed. Cir. 1984).

## INSTRUCTION NO. 46.3—ANTICIPATION – DATE OF INVENTION

Since the date of invention of the Apple design patents is in dispute in this case, you must determine whether Apple has proved the dates its designs were invented.  If you determine that Apple has not proved when its designs were invented, you must assume that it was not until the filing date of the patents.

**Source**

N.D. Cal. Model Patent Instructions, B.4.3.a1; *Continental Plastic Containers v. Owens Brockway Plastic Prods., Inc.*, 141 F.3d 1073, 1077-79 (Fed. Cir. 1998) ("[D]esign inventions are reduced to practice as soon as an embodiment is constructed"); *Mas v. Root*, 54 F.2d 435, 435 (C.C.P.A. 1932).

## <u>INSTRUCTION NO. 47.1—DESIGN PATENT OBVIOUSNESS</u>

Even if a design is not anticipated by a single reference, it may still be invalid because it was an obvious design at the time it was made.  Design patents are not valid when the design is an obvious one.  This means that it would have been obvious for a designer of skill in the field to combine or modify earlier designs to arrive at the design in the patent.

In deciding whether any design is invalid because it was obvious at the time it was made, you should analyze whether there are any relevant differences between the prior art and the design from the view of a person of ordinary skill in the art at the time of the invention.

You do not need to look for precise teachings in the prior art directed to the subject matter of the claimed invention.  You may take into account the creative steps and inferences that a person of ordinary skill in the art would have employed when viewing the prior art at the time of the invention.  For example, if the claimed invention combines elements already known in the prior art and the combination yielded results that were predictable to a person of ordinary skill in the art at the time of the invention, then this evidence would make it more likely that the claim is obvious.  On the other hand, if the combination of known elements yielded unexpected or unpredictable results, or if the prior art teaches away from combining the known elements, then this evidence would make it more likely that the claim that successfully combined those elements was not obvious.

A claim is not proved obvious merely by demonstrating that each of the elements was independently known in the prior art.  Most inventions rely on building blocks long since uncovered, and claimed discoveries almost of necessity will likely be combinations of what is already known.  Therefore, you should consider whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art in the relevant field to combine the known elements in the way the claimed invention does.  The reason could come from the prior art, the background knowledge of one of ordinary skill in the art, the nature of the problem to be solved, market demand, or common sense.

If you find that a reason existed at the time of the invention to combine the elements of the prior art to arrive at the claimed design, this evidence would make it more likely that the claimed invention was obvious.

**Source**

AIPLA Model Jury Instruction 7.2; *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S.Ct. 1727, 1742-43 (2007); *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1536-37 (Fed. Cir. 1983); *Medtronic, Inc., v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1567-68 (Fed. Cir. 1983); *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1384-85 (Fed. Cir. 2009) ("Design patents, like utility patents, must meet the nonobviousness requirement of 35 U.S.C. §103, and it is not obvious that the Supreme Court necessarily intended to exclude design patents from the reach of *KSR*."); *Smith v. Whitman Saddle Co.*, 148 U.S. 674, 681-82, 13 S.Ct. 768, 770-71, 37 L.Ed. 606 (1893) ("The presence or the absence of the central open slot was not material, and we do not think that the addition of a known cantle to a known saddle, in view of the fact that such use of the cantle was common, in itself involved genius or invention, or produced a patentable design… The shape of the front end being old, the sharp drop of the pommel at the rear seems to constitute what was new and to be material. . . . If, therefore, this drop were material to the design, and rendered it patentable as a complete and integral whole, there was no infringement.").

SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

## INSTRUCTION NO. 47.2—DESIGN PATENT OBVIOUSNESS – PRIMARY AND SECONDARY REFERENCES[4]

Even if a design is not anticipated by a single reference, it may still be invalid because it was an obvious design at the time it was made.  Design patents are not valid when the design is an obvious one.  This means that it would have been obvious for a designer of skill in the field to combine or modify earlier designs to arrive at the design in the patent.

There are several steps you have to take in determining that a design patent is invalid because it is obvious.

First, you have to find that there is a prior art reference that has basically the same design as the one in the patent.  This is called a primary reference.  The primary reference does not have to be deceptively similar to the design in the patent, since that is a higher standard.

If you find that there is a primary reference for the patent, the next step is to find one or more secondary references that are similar in appearance to the primary reference such that the appearance of ornamental features in one would suggest application of those features to the other.  If you find that there are one or more such secondary references, the features of those references can be used to modify the primary reference to look more like the patented design.

Finally, you must decide whether this combined obviousness reference is substantially the same as the design in the patent using the standard of deceptive similarity you used for infringement and anticipation.

Samsung must prove obviousness by clear and convincing evidence.

**Source**

*In re Rosen*, 673 F.2d 388, 390 (C.C.P.A. 1982); *Durling v. Spectrum Furniture Co., Inc.*, 101 F.3d 100, 103 (Fed. Cir. 1996) ("More specifically, the inquiry is whether one of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design."); *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1384-85 (Fed. Cir. 2009) ("Design patents, like utility patents, must meet the nonobviousness requirement of 35 U.S.C. §103, and it is not obvious that the Supreme Court necessarily intended to exclude design patents from the reach of KSR."); *Int'l Seaway Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1240 (Fed. Cir. 2009) ("For design patents, the role of one skilled in the art in the obviousness context lies only in determining whether to combine earlier references to arrive at a single piece of art for comparison with the potential design or to modify a single prior art reference.  Once that piece of prior art has been constructed, obviousness, like anticipation, requires application of the ordinary observer test, not the view of one skilled in the art.").

---

[4] Samsung offers this instruction on obviousness as an alternative in the event the prior obviousness instruction based on *KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727 (2007), is not accepted by the Court.

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

1

## INSTRUCTION NO. 47.3—DESIGNER OF ORDINARY SKILL IN THE ART

2

3

The determination of whether a claimed design is obvious is based on the perspective of the ordinary designer skilled in the art.  The ordinary designer skilled in the art is presumed to be familiar with all of the prior art designs that you have determined to be reasonably relevant.

4

5

6

A designer of ordinary skill in the art is a designer of ordinary capabilities in the field of electronic products.  Such a person would have an undergraduate degree in a discipline such as engineering or industrial design, and about 1-2 years of experience in designing electronic devices.  Alternatively, a designer in academia who taught industrial design students the design of electronic devices would also be identified as a designer skilled in the art.

7

**Source**

8

9

*KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727 (2007): *Titan Tire Corp v. Case New Holland, Inc.*, 566 F.3d 1372, 1380-81 (Fed. Cir. 2009); *Durling v. Spectrum Furniture Co., Inc.*, 101 F.3d 100, 103 (Fed. Cir. 1996).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INSTRUCTION NO. 47.4—DESIGN PATENT OBVIOUSNESS – SECONDARY

## FACTORS INDICATING NONOBVIOUSNESS

Before deciding the issue of obviousness, you must consider other factors that might show that the designs were not obvious despite the prior art.  You may only consider those factors that Apple has established through evidence admitted at trial.  No factor alone is dispositive, and you must consider the obviousness or nonobviousness of the claimed design as a whole.  Here are the questions you should ask:

1      If there were products embodying the claimed designs that were commercially successful, was that success due to the claimed design, or was the success instead due to other factors such as the technology and usefulness of the Apple devices, advertising, promotion, salesmanship, the Apple ecosystem, or any other features of the devices besides the design claimed in the design patents?

2      Was there a long felt need for the specific look or claimed design of the Apple patents?

3      Did others try, but fail to create the claimed design?

4      Did others copy the claimed design?  Where parties have a practice of marketing very similar products, however, evidence of copying is not a strong indicator of nonobviousness, but rather a measure of the extent to which parties in the market typically follow developments by their competitors, whether patented or not.

5      Did the claimed design achieve an unexpectedly superior appearance over the closest prior art?  Remember again that this refers only to the ornamental appearance of the design, not its functional features.

6      Did others in the field praise the claimed design or express admiration for the claimed design?  For patents that do not claim the entire design of the device, any praise must be directed to the specific designs that are claimed in the patent.

7      Did others accept licenses under the D'667, D'087, D'035 or D'889 design patents?

**Source**

*Graham v. John Deere Co.*, 383 U.S. 1, 17-18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966); *Avia Group Intern., Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1563 (Fed. Cir. 1988); *see also Jore Corp. v. Kouvato, Inc.*, 117 Fed. Appx. 761, 765, 2005 WL 27553 (Fed. Cir. 2005); *Kwik-Site Corp. v. Clear View Mfg. Co., Inc.*, 758 F.2d 167, 173 (Fed. Cir. 1985); *Wrigley v. Cadbury*, 2011-1140, 2012 U.S. App. LEXIS 12834, *19 (Fed. Cir. June 22, 2012).

1

**INSTRUCTION NO. 49— DESIGN PATENT -- DRAWINGS**

2
3
4

The necessity for good drawings in a design patent application cannot be overemphasized.  As the drawing constitutes the whole disclosure of the design, it is of utmost importance that it be so well executed both as to clarity of showing and completeness, that nothing regarding the design sought to be patented is left to conjecture.  The reason for this is that patents are property rights and the public deserves to know what is covered by the patent and what is not.

5

**Source**

6

35 U.S.C. §112; MPEP 1503.02.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **INSTRUCTION NO. 50— DESIGN PATENT INVALIDITY – INDEFINITENESS**

2

Where a design patent includes ambiguities, inconsistencies, or features that are not readily understandable or could cause confusion, the design is likely indefinite.  For example, lack of appropriate surface shading in the drawing as filed may render the design indefinite.  You must determine whether the Apple patents are indefinite such that they would not enable a designer skilled in the art to make the designs without having to guess at what is claimed in the patent drawings.

3

4

5

**Source**

6

35 U.S.C. §112; MPEP 1503.02.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INSTRUCTION NO. 51—DESIGN PATENT INVALIDITY – DOUBLE PATENTING

If an inventor obtains a second patent for a design that is already covered by a former patent, the second patent is invalid.  This is especially true where the patents are issued to the same inventor or inventors.  To be valid, the invention in the second patent has to be distinctly different and independent from the design in the first patent.  The difference cannot be a mere distinction in the breadth or scope of the claim.  In other words, the second patent cannot simply be a broader, more generic version of the earlier patent.  Also, it is the date the patents issue and not the date they were filed that determines priority for patents issued to the same inventor for the same invention.

**Source**

35 U.S.C. 171 ("Whoever invents any new, original, and ornamental design for an article of manufacture may obtain a patent therefor"); *Miller v. Eagle Mfg. Co*., 151 U.S. 186, 198 (1894) ("[N]o patent can issue for an invention actually covered by a former patent, especially to the same patentee, although the terms of the claims may differ; that the second patent, although containing a broader claim, more generical in its character, than the specific claims, contained in the prior patent, is also void.").

# INSTRUCTION NO. 48— DESIGN PATENTS—INVALIDITY—LACK OF ORNAMENTALITY

As I mentioned in Instruction No. 44.4, design patents protect the ornamental appearance of an article of manufacture, not the functionality of the article.  You'll remember that when you determine infringement, you have to ignore any features that are functional and compare only the ornamental features.  When determining invalidity, you have to decide if the design as a whole is functional rather than ornamental.  In determining whether the overall design is functional, the functionality of each of the various elements that comprise the patented design may be relevant.

You should consider the following criteria in deciding whether any of the designs in Apple's patents are functional, and are therefore ineligible for design patent protection:

1. Whether the design in the patent represents the best design

2. Whether alternative designs would adversely affect the usefulness of the article

3. Whether there are any utility patents related to the same article

4. Whether there is any advertising touting particular features of the design as having specific usefulness

5. Whether there are any elements in the design that are purely ornamental

Samsung must prove that the D'667, D'087, D'035 or D'889 design patent claims are functional by clear and convincing evidence.

**Source**

35 U.S.C. §171 (a design patent may be granted for any "new, original and ornamental design for an article of manufacture."); *PGH Technologies, LLC v. St. John Co., Inc.*, 469 F.3d 1361, 1366 (Fed. Cir. 2006) ("Our cases reveal a 'list of ... considerations for assessing whether the patented design as a whole—its overall appearance—was dictated by functional considerations,' including: whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility; and whether there are any elements in the design or an overall appearance clearly not dictated by function." (quoting *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1456 (Fed. Cir. 1997)); *id.* at 1367 ("Our case law makes clear that a full inquiry with respect to alleged alternative designs includes a determination as to whether the alleged 'alternative designs would adversely affect the utility of the specified article,' such that they are not truly 'alternatives' within the meaning of our case law."); *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288 (Fed. Cir. 2010); *Five Star Manufacturing, Inc. v. Ramp Lite Manufacturing, Inc.,* 4 Fed.Appx. 922, 2001 WL 120070 (Fed. Cir. Feb, 12, 2001) ("The design of a utilitarian article is deemed to be functional when the appearance of the claimed design is dictated by the use or purpose of the article. *L.A. Gear, Inc. v. Thom McAn Shoe Co*., 988 F.2d 1117, 1123, 25 USPQ2d 1913, 1917 (Fed.Cir.1993). While the functionality of each of the various elements that comprise the patented design may be relevant, the ultimate question is whether the claimed design, viewed in its entirety, is dictated by the utilitarian purpose of the article. *Id.; see also Power Controls Corp. v. Hybrinetics, Inc.*, 806 F.2d 234, 239, 231 USPQ 774, 777-78 (Fed.Cir.1986) (finding that testimony from an inventor as to the functionality of each feature of a patented design is evidence of the functionality of the patented design).").

## INSTRUCTION NOs. 30/52—PATENT DAMAGES—GENERALLY

I will instruct you about the measure of damages for infringement of both utility and design patents.  By instructing you on damages, I am not suggesting which party should win on any issue. If you find that the alleged infringer (Samsung Electronics Company, Samsung Electronics America, Samsung Telecommunications America and/or Apple) infringed any valid claim of a patent, you must then determine the amount of money damages to be awarded to the patent holder (Samsung and/or Apple) to compensate it for the infringement. You should evaluate damages separately for each party you find to have infringed, and may not award more than the patent holder seeks.

The amount of those damages must be adequate to compensate the patent holder for the infringement. A damages award should put the patent holder in approximately the financial position it would have been in had the infringement not occurred, but in no event may the damages award be less than a reasonable royalty. You should keep in mind that the damages you award are meant to compensate the patent holder and not to punish an infringer.

The patent holder has the burden to persuade you of the amount of its damages. You should award only those damages caused by the infringement that the patent holder proves it suffered by a preponderance of the evidence. While the patent holder is not required to prove its damages with mathematical precision, it must prove them with reasonable certainty. The patent holder is not entitled to damages that are remote or speculative.

**Source**

N.D. Cal. Model Patent Jury Instr. B.5.1 (modified).

1    **INSTRUCTION NO. 31/53—PATENT DAMAGES — LOST PROFITS — GENERALLY**

2    In this case, Apple seeks to recover lost profits for some of Samsung's sales of certain products. Samsung does not seek to recover lost profits for Apple's sales of allegedly infringing products.

3

4    To recover lost profits for infringing sale, Apple must show that, but for the infringement, there is a reasonable probability that it would have made sales that Samsung Electronics Company, Samsung Electronics America and Samsung Telecommunications America made of each allegedly

5    infringing product.  Apple must show the share of Samsung Electronics Company's, Samsung Electronics America's and Samsung Telecommunications America's sales of each product that it would have made if the allegedly infringing product had not been on the market.

6

7    You must allocate the lost profits based upon the customer demand for the patented feature or design of each of the allegedly infringing products.  That is, you must determine which profits

8    derive from the patented invention or design that Samsung Electronics Company, Samsung Electronics America and Samsung Telecommunications America allegedly sells, and not from

9    other features of these infringing products.

10   **Source**

11   N.D. Cal. Model Patent Jury Instr. B.5.2 (modified).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INSTRUCTION NO. 32/53.1—PATENT DAMAGES — LOST PROFITS — FACTORS TO**

**CONSIDER**

Apple is entitled to lost profits if it proves all of the following:

    (1)   that there was a demand for the patented inventions and designs [alternate: that there was demand for the patented products];

    (2)   that there were no non-infringing substitutes for each of the allegedly infringing products, or, if there were, the number of the sales of each product made by Samsung Electronics Company, Samsung Electronics America and Samsung Telecommunications America that Apple would have made despite the availability of other non-infringing substitutes.  An alternative may be considered available as a potential substitute even if it was not actually on sale during the infringement period. Factors suggesting that the alternative was available include whether the material, experience, and know-how for the alleged substitute were readily available.  Factors suggesting that the alternative was not available include whether the material was of such high cost as to render the alternative unavailable and whether Samsung had to design or invent around the patented technology to develop an alleged substitute;

    (3)   that Apple had the manufacturing and marketing capacity to make any infringing sales actually made by Samsung Electronics Company, Samsung Electronics America and Samsung Telecommunications America and for which Apple seeks an award of lost profits; and

    (4)   the amount of profit that Apple would have made if Samsung Electronics Company, Samsung Electronics America and Samsung Telecommunications America had not allegedly infringed.

**Source**

N.D. Cal. Model Patent Jury Instr. B.5.3 (modified).

1

## INSTRUCTION NO. 53.2 LOST PROFITS – MARKET SHARE

2

3

One way Apple may prove the number of sales it would have made if the alleged infringement had not happened is to prove its share of the relevant market excluding infringing products.  You may award Apple a share of profits equal to that market share.

4

5

In deciding Apple's market share, you must decide which products are in its market.  Products are in the same market if they are sufficiently similar to compete against each other.  Two products are sufficiently similar if one does not have a significantly higher price than or possess characteristics significantly different than the other.

6

**Source**

7

N.D. Cal. Model Patent Jury Instr. B.5.3a (modified).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INSTRUCTION NO. 53.3—DAMAGES – AMOUNT OF LOST PROFITS

Apple may calculate its lost profits on any lost sales by computing the lost revenue for sales it claims it would have made but for the infringement and subtracting from that figure the amount of additional costs or expenses it would have incurred in making those lost sales, such as cost of goods, sales costs, packaging costs, and shipping costs.  Fixed costs that do not vary with increases in production or scale should not be subtracted from Apple's lost revenue, if any.

**Source**

Federal Circuit Bar Association Model Patent Jury Instr. B.6.2 (modified).

**INSTRUCTION NO. 55 (First Samsung Proposed Instruction)—PATENT DAMAGES—**

**REASONABLE ROYALTY—ENTITLEMENT—DEFINITION—RELEVANT FACTORS**

Both Samsung and Apple seek an award of a reasonable royalty for alleged patent infringement.

If the holder of a patent does not seek lost profits (like Samsung), or has not proved its claim for lost profits, or proved its claim for lost profits for only a portion of the sales alleged to infringe the patent, then the patent holder should be awarded a reasonable royalty for all infringing sales for which it has not been awarded lost profits damages.

A reasonable royalty must be limited to compensation for the amount and type of alleged infringement that actually occurred.

**Source**

N.D. Cal. Model Patent Jury Instr. B.5.6 (modified); *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1117 (N.D. Cal. 2011) (citing 35 U.S.C. 284); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("At all times, the damages inquiry must concentrate on compensation for the economic harm caused by infringement of the claimed invention.").

**INSTRUCTION NO. 55 (Second Samsung Proposed Instruction)—PATENT DAMAGES—**

**REASONABLE ROYALTY—ENTITLEMENT—DEFINITION—RELEVANT FACTORS**

A royalty is a payment made to a patent holder in exchange for the right to make, use or sell the claimed invention. This right is called a "license." A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the patent holder and the infringer taking place prior to the time when the infringing activity first began. In considering the nature of this negotiation, you must assume that the patent holder and the infringer would have acted reasonably and would have entered into a license agreement. You must also assume that both parties believed the patent was valid and infringed. Your role is to determine what the result of that negotiation would have been. The test for damages is what royalty would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

A royalty can be calculated in several different ways and it is for you to determine which way is the most appropriate based on the evidence you have heard. One way to calculate a royalty is to determine what is called an "ongoing royalty." To calculate an ongoing royalty, you must first determine the "base," that is, the product on which the infringer is to pay. You then need to multiply the revenue the defendant obtained from that base by the "rate" or percentage that you find would have resulted from the hypothetical negotiation. For example, if the patent covers a nail, and the nail sells for $1, and the licensee sold 200 nails, the base revenue would be $200. If the rate you find would have resulted from the hypothetical negotiation is 1%, then the royalty would be $2, or the rate of .01 times the base revenue of $200.

If the patent covers only part of the product that the infringer sells, then the base would normally be only that feature or component. For example, if you find that for a $10,000 car, the patented feature is the tires which sell for $5, the base revenue would be $5. However, in a circumstance in which the patented feature is the reason customers buy the whole product, the base revenue could be the value of the whole product. Even if the patented feature is not the reason for customer demand, the value of the whole product could be used if, for example, the value of the patented feature could not be separated out from the value of the whole product. In such a case, however, the rate resulting from the hypothetical negotiation would be a lower rate because it is being applied to the value of the whole product and the patented feature is not the reason for the customer's purchase of the whole product.

A second way to calculate a royalty is to determine a one-time lump sum payment that the infringer would have paid at the time of the hypothetical negotiation for a license covering all sales of the licensed product both past and future. This differs from payment of an ongoing royalty because, with an ongoing royalty, the licensee pays based on the revenue of actual licensed products it sells. When a one-time lump sum is paid, the infringer pays a single price for a license covering both past and future infringing sales.

It is up to you, based on the evidence, to decide what type of royalty is appropriate in this case for Samsung and/or Apple.

**Source**

N.D. Cal. Model Patent Jury Instr. B.5.7 (modified).

**INSTRUCTION NO. 55.1—REASONABLE ROYALTY – RELEVANT FACTORS**

In determining the reasonable royalty for Samsung and/or Apple, you should consider all the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors that you may consider in making your determination are:

(1) The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty.

(2) The rates paid by the licensee for the use of other patents comparable to the patent-in-suit.

(3) The nature and scope of the license, as exclusive or nonexclusive, or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold.

(4) The licensor's established policy and marketing program to maintain his or her patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

(5) The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

(6) The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his nonpatented items, and the extent of such derivative or convoyed sales.

(7) The duration of the patent and the term of the license.

(8) The established profitability of the product made under the patents, its commercial success, and its current popularity.

(9) The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

(10) The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention.

(11) The extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

(12) The portion of the profit or of the selling price that may be customary in the particular business or in comparable business to allow for the use of the invention or analogous inventions.

(13) The portion of the realizable profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

(14) The opinion and testimony of qualified experts.

(15) The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had

been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors.  You may also consider any other factors which in your mind would have increased or decreased the royalty the infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people.  The final factor establishes the framework which you should use in determining a reasonable royalty, that is, the payment that would have resulted from a negotiation between the patent holder and the infringer taking place at a time prior to when the infringement began.

**Source**

Federal Circuit Bar Association Model Patent Jury Instr. B.6.7 (modified).

**INSTRUCTION NO. 54—ADDITIONAL REMEDY FOR DESIGN PATENT INFRINGEMENT – DEFENDANT'S PROFIT[5]**

In this case, Apple alternatively seeks Samsung Electronics Company's, Samsung Electronics America's, and Samsung Telecommunications America's profit from sales of products alleged to infringe Apple's design patents.  Accordingly, if you find infringement by Samsung Electronics Company, Samsung Electronics America and/or Samsung Telecommunications America, do not find Apple's design patents are invalid, and do not award Apple lost profits and/or a reasonable royalty, you may award Apple Samsung Electronics Company's, Samsung Electronics America's and/or Samsung Telecommunications America's total profit on sales of products alleged to infringe Apple's design patents.

The "total profit" of Samsung Electronics Company, Samsung Electronics America and/or Samsung Telecommunications America means the entire profit on the sale of the article to which the patented design is applied, or with which it is used and not just the portion of profit attributable to the design or ornamental aspects of the patent.  "Total profit" does not include profit attributable to other products that may be sold in association with an infringing article embodying the patented design.   A design patent owner can recover the profit not only of the manufacturer or producer of an infringing article, but also of other sellers in the chain of distribution, if any such profits are proven by Apple by a preponderance of the evidence.

If you find infringement by any Samsung defendant, and do not award Apple lost profits and/or a reasonable royalty, you may award Apple all profit earned by that defendant on sales of products alleged to infringe Apple's design patents, and that is attributable to whatever infringement you have found by that particular defendant.  Profit is determined by deducting certain expenses from gross revenue.  Gross revenue is all of the infringer's receipts from the sale of products using any design found infringed.  Apple has the burden of proving the infringing defendant's gross revenue by a preponderance of the evidence.

Expenses can include costs incurred in producing the gross revenue, such as the cost of the goods.  Other costs may be included as deductible expenses if they are attributable to the sales of the infringing products resulting in a nexus between the infringing products and the expense.  Samsung has the burden of proving the deductible expenses and the portion of the profit attributable to factors other than use of the infringed design by a preponderance of the evidence.

Unless you find that a portion of the profit from the sale of the infringing product is attributable to factors other than use of the infringed design, you shall find that the total profit is attributable to the infringement.

**Source**

Intellectual Property Owners Association, Proposed Design Patent Model Jury Instr., No. 10.8 (modified).

---

[5] Samsung objects to Apple's attempt to obtain both lost profits and infringer's profits as unsupported by any legal authority.  Samsung offers this instruction solely in the event that the Court disagrees.  Samsung also offers this instruction subject to its objection that any disgorgement of profits should be subject to apportionment.

**INSTRUCTION NO. 56—PATENT DAMAGES—DATE OF COMMENCEMENT—**

**PRODUCTS**

In determining the amount of damages, you must determine when the damages began.  Damages commence on the date that the alleged infringer has both infringed and been notified of the alleged infringement of the patent.

If you find that the patent holder sells a product that includes the claimed invention, you must determine the date that the alleged infringer received actual notice of the patent and the specific product alleged to infringe.  Actual notice means that the patent holder communicated to the alleged infringer a specific charge of infringement of the patent by a specific accused product or device.  The filing of the complaint and counterclaims in this case qualified as actual notice, so the damages period begins no later than the dates the complaint and counterclaims were filed.  The patent holder has the burden of establishing that it is more probable than not the alleged infringer received notice of infringement before the complaint and counterclaims were filed.

If you find that the patent holder does not sell a product covered by the patent, damages begin without the requirement for actual notice. If you find that the patent was granted before the infringing activity began, damages should be calculated as of the date you determine that the infringement began. If you find that the patent was granted after the infringing activity began, damages should be calculated as of the date the patent issued.

While you may identify an earlier date by which Apple had actual notice of Samsung's claims of infringement based on your evaluation of the evidence, Samsung's counterclaims provided Apple such notice by no later than June 16, 2011.  With respect to Samsung's U.S. Patent No. 7,577,460, damages should be calculated as of August 18, 2009, because the patent contains only a method claims.

While you may identify an earlier date by which Samsung Electronics Company, Samsung Electronics America and/or Samsung Telecommunications America had actual notice of Apple's claims of infringement based on your evaluation of the evidence, Apple's lawsuit provided Samsung such notice for the '381, '915 and D'677 patents by no later than April 15, 2011, and for the '163, D'305, D'889 and D'087 patents by no later than June 16, 2011.

**Source**

N.D. Cal. Model Patent Instr. B.5.8 (modified); Federal Circuit Bar Association Model Patent Jury Instr. B.6.8 (modified); *Mformation Techs., Inc. v. Research In Motion Ltd.*, C 08-04990 JW, 2011 WL 6357804 at *15 (N.D.Cal. Dec. 19, 2011) (Ware C.J.) ("The marking requirements of § 287(a) do not apply to patents containing only method claims.  *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1581 (Fed.Cir.1983).").

## INSTRUCTION NO. 40—CALCULATING DAMAGES IN CASES OF INDUCEMENT[6]

Apple asserts that Samsung Electronics Company, Samsung Electronics America and Samsung Telecommunications America have each actively induced another to infringe Apple's patents.

Samsung asserts that Apple has actively induced another to infringe Samsung's patents.

In order to recover damages for induced infringement, the patent holder (Samsung and/or Apple) must either prove that the accused product necessarily infringes the patent in suit or prove acts of direct infringement by others that were induced by the accused infringer.  Because the amount of damages for induced infringement is limited by the number of instances of direct infringement, the patent holder must further prove the number of direct acts of infringement of the patent in suit, for example, by showing individual acts of direct infringement or by showing that a particular class of products directly infringes.

**Source**

N.D. Cal. Model Patent Instr. B.5.9 (modified).

---

[6]  Samsung does not believe that Apple has properly asserted inducement of patent infringement in this case.  *See* Samsung's Motion *In Limine*, No. 3.  It includes this instruction solely in the event the Court disagrees.

## INSTRUCTION NO. 59—DESIGN AND UTILITY PATENTS—WILLFUL PATENT

## INFRINGEMENT

In this case, Apple argues both that Samsung infringed and, further, that Samsung infringed willfully.  Likewise, Samsung argues that Apple infringed and, further, that Apple infringed willfully.  If you have decided that the alleged infringer has infringed, you must go on and address the additional issue of whether or not this infringement was willful.  Willfulness requires a determination that the alleged infringer acted recklessly.

To prove that the alleged infringer acted recklessly, the patent holder must prove the state of mind of the alleged infringer by clear and convincing evidence.  The patent holder must persuade you by clear and convincing evidence that the alleged infringer actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.  To determine whether the alleged infringer had this state of mind, consider all facts which may include, but are not limited, to:

(1)  Whether or not the alleged infringer acted in accordance with the standards of commerce for its industry;

(2)  Whether or not the alleged infringer intentionally copied a product of the patent holder that is covered by the patent;

(3)  Whether or not there is a reasonable basis to believe that the alleged infringer did not infringe or had a reasonable defense to infringement;

(4)  Whether or not the alleged infringer made a good-faith effort to avoid infringing the patent, for example, whether the alleged infringer attempted to design around the patent; and

(5)   Whether or not the alleged infringer tried to cover up its infringement.

**Source**:

Federal Circuit Model Patent Jury Instr. B.3.8; 35 U.S.C. § 284; *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (standard for finding willfulness); *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1346 (Fed. Cir. 2001) (burden of proof for willfulness); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1354 (Fed. Cir. 1999) (knowledge of the patent necessary to show willfulness); *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992) (identifying factors that may show willfulness); *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 510 (Fed. Cir. 1990) (history of Federal Circuit decisions on willfulness); *Bard Peripheral Vascular, Inc. v. W.L Gore & Assoc., Inc.,* No. 2010-1510, 2012 U.S. App. LEXIS 13561, at *13 (Fed. Cir. June 14, 2012) ("the ultimate legal question of whether a reasonable person would have considered there to be a high likelihood of infringement of a valid patent should always be decided as a matter of law by the judge").

1

**BREACH OF CONTRACT**

2

**INSTRUCTION NO. 82—BREACH OF CONTRACT – OBLIGATION TO LICENSE**

3

**PATENTS ON FRAND TERMS**

4  Samsung has submitted declarations to ETSI in which Samsung identified the '516, '604, and
'941 patents, or related patents or applications, as IPRs that it believed may be considered
5  essential to the UMTS standard.  In those declarations, Samsung declared that it would be
prepared to grant irrevocable licenses under those IPRs on fair, reasonable and non-
6  discriminatory terms and conditions to the extent the IPRs remain essential to the UMTS
standard.  In order to demonstrate breach of this provision, Apple must prove that all of the
7  conditions for performance of this obligation occurred, that Samsung did not fulfill this
obligation, that Apple was harmed, and that this harm was caused by Samsung's failure to
8  perform this obligation.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **INSTRUCTION NO. 83—BREACH OF CONTRACT – OBLIGATION TO TIMELY**

2    **DISCLOSE INTELLECTUAL PROPERTY RIGHTS ("IPR")**

3    The November 1997 ETSI IPR Policy provides:

4        Each MEMBER shall use its reasonable endeavours to timely
     inform ETSI of ESSENTIAL IPRs it becomes aware of. In

5    particular, a MEMBER submitting a technical proposal for a
     STANDARD shall, on a bona fide basis, draw the attention of

6    ETSI to any of that MEMBER's IPR which might be ESSENTIAL
     if that proposal is adopted.

7

8    In order to demonstrate breach of this provision, Apple must prove that all of the conditions for
     performance of this obligation occurred, that Samsung did not fulfill this obligation, that Apple
     was harmed, and that this harm was caused by Samsung's failure to perform this obligation.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## INSTRUCTION NO. 84—MONOPOLIZATION ─ ELEMENTS

2   Apple alleges that Samsung failed to disclose its intellectual property rights in the patents essential to the UMTS standard to an organization called ETSI, and thus violated Section 2 of the Sherman Act.

3   If you determine that these three patents are in fact standard essential patents, you must then evaluate whether Apple has proven that Samsung violated antitrust laws.  To win on its antitrust claim, Apple

4   must prove each of the following elements is more likely true than not true:

5       **First,** that the alleged technology market is a relevant antitrust market;

6       **Second,** that Samsung possessed monopoly power in that market;

7       **Third,** that Samsung willfully acquired or maintained its monopoly power in that market by engaging in anticompetitive conduct; and

8

9       **Fourth,** that Samsung's anticompetitive conduct was a substantial factor in causing injury to Apple in its business or property.

10   If you find that Apple has proved each of these elements, then you must find for Apple and against Samsung on the monopolization claim.  If you find that Apple has failed to prove any one or more of

11   these elements, then you must find for Samsung and against Apple on this claim.

12   **Source**

13   Adapted from ABA Model Antitrust Jury Instructions, at C-2.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **<u>INSTRUCTION NO. 84.1—MONOPOLIZATION – MONOPOLY POWER GENERALLY</u>**

2    Monopoly power is the power to control prices and exclude competition in a relevant antitrust
     market.  More precisely, a firm is a monopolist if it can profitably raise prices substantially above

3    the competitive level for a significant period of time.  To prove a monopolization claim, one of the
     elements Apple must prove is that Samsung has monopoly power in a relevant antitrust market.

4    However, monopoly power, in and of itself, is not unlawful.  A patent owner who does no more
     than take advantage of the right to exclude created by its patent does not violate the antitrust laws.

5
     I will now provide further instructions about how you may determining whether the Apple has met

6    its burden of proving Samsung's alleged monopoly power in a relevant market.

7    **Source**

8    ABA Model Antitrust Jury Instructions, at C-4; *United States v. E.I. du Pont de Nemours & Co.*,
     351 U.S. 377, 389 (1956); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585

9    (1987).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 11-cv-01846-LHK (PSG)
                                      SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
                                      AT THE CLOSE OF EVIDENCE. IN ORDER

## INSTRUCTION NO. 85—MONOPOLIZATION — RELEVANT MARKET

Apple must prove that it is more likely true than not true that Samsung had monopoly power in one or more relevant markets.  Defining the relevant market is essential to determining whether Samsung had monopoly power because whether a company has monopoly power depends on the contours of the market.

There are two aspects you must consider in determining whether Apple has met its burden of proving the relevant market or markets.  The first is the existence of a relevant technology market.  The second is the existence of a relevant geographic market.

If, after considering all the evidence, you find that Apple has proven both a relevant technology market and a relevant geographic market, then you must find that Apple has met the relevant market requirement and you must consider the remaining elements of its unlawful monopolization claims.

If you find that Apple has failed to prove either a relevant technology market or a relevant geographic market, then you must find for Samsung and against Apple on Apple's unlawful monopolization claim.

**Source**

Adapted from ABA Model Antitrust Jury Instructions, at C-6

## INSTRUCTION NO. 85.1—MONOPOLIZATION RELEVANT TECHNOLOGY--

## MARKET

A "technology" refers to an invention or process for accomplishing something, and is sometimes covered by a patent.  The basic idea of a relevant technology market is that the technologies within it are reasonable substitutes for each other from the user's point of view; that is, the technologies compete with each other.  In other words, a relevant technology market includes the technologies that a user believes are reasonably interchangeable or reasonable substitutes for each other. Technologies need not be identical or precise interchangeable as long as they are reasonable substitutes.  This is a practical test, and you may consider the actual behavior of users and the marketing efforts of licensors.

**Source**

Based generally on *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007); *Hynix, et al. v. Rambus Inc.*, Case No. 06-cv-00244-RMW, Ckt. No. 1254 (Final Jury Instructions), at 26-27.

## INSTRUCTION NO. 85.2—MONOPOLIZATION RELEVANT GEOGRAPHIC

## MARKET--MARKET

The relevant geographic market is the area in which Samsung faces competition from other firms that compete in the relevant product market and to which customers can reasonably turn for purchases.  When analyzing the relevant geographic market, you should consider whether changes in prices or product offerings in one area have substantial effects on prices or sales in another area, which would tend to show that both areas are in the same relevant geographic market.  The geographic market may be as large as global or nationwide, or as small as a single town or even smaller.

Apple has the burden of proving the relevant geographic market by a preponderance of the evidence.  In this case, Apple claims that the relevant geographic market is worldwide.  Samsung asserts that Apple will not show that such a market exists or that Samsung has monopoly power in it. In determining whether Apple has met its burden and demonstrated that its proposed geographic market is proper, you may consider several factors, including:

- the geographic area in which Samsung licenses its patents and where Samsung's customers are located;
- the geographic area to which customers turn for supply of the product;
- the geographic area to which customers have turned or have seriously considered turning;
- the geographic areas that suppliers view as potential sources of competition;
- whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

**Source**
ABA Model Instructions, pp. C-13–C-14; *United States v. Grinnell Corp.*, 384 U.S. 563 (1966); *Lantec, Inc. v. Novell, Inc.*, 306 F.3d. 1003, 1026-27 (10th Cir. 2002); *ReMax Int'l, Inc. v. Realty One, Inc.*, 173 F.2d 995 (6th Cir. 1999); *Morgenstern v. Wilson*, 29 F.3d 1291 (8th Cir. 1994); ABA Section of Antitrust Law, 1 Antitrust Law Developments 577-89 (5th ed. 2002); *Battle v. Liberty Nat'l Life Ins. Co.*, 493 F.2d 39, 45 (5th Cir. 1974); *Apani Southwest, Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002) (finding alleged geographic market of 27 city-run facilities insufficient to support Clayton Act and Sherman Act § 1 claims); *FTC v. Tenet Health Care*, 186 F.3d 1045 (8th Cir. 1999) (holding that the government must present evidence concerning where consumers could practicably go for care, not where they actually do go).

## INSTRUCTION NO. 86—MONOPOLIZATION EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF

If you find that plaintiffs have proven a relevant market, then you should determine whether Samsung has monopoly power in that market.  As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market.

### Market Share

The first factor that you should consider is Samsung's market share.  A market share above 50 percent may be sufficient to support an inference that a defendant has monopoly power, but in considering whether a defendant has monopoly power it is also important to consider other aspects of the relevant market, such as market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors. Along with a defendant's market share, these factors should inform you as to whether the defendant has monopoly power. The likelihood that a company has monopoly power is stronger the higher that company's share is above 50 percent.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that a defendant has monopoly power. However, if you find that the other evidence demonstrates that defendant does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that the defendant has monopoly power.

### Barriers to Entry

You may also consider whether there are barriers to entry into the relevant market. Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products). Evidence of low or no entry barriers may be evidence that defendant does not have monopoly power, regardless of defendant's market share, because new competitors could enter easily if the defendant attempted to raise prices for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that defendant has monopoly power.

### Number and Size of Competitors

You may consider whether the defendant's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares and number of competitors act as a check on the defendant's ability to price its products. If the defendant's competitors are vigorous or have large or increasing market shares, this may be evidence that the defendant lacks monopoly power. On the other hand, if you determine that the defendant's competitors are weak or have small or declining market shares, this may support an inference that the defendant has monopoly power.

### Conclusion

If you find that Samsung has monopoly power in the relevant market, then you must consider the remaining elements of Apple's monopolization claim. If you find that Samsung does not have monopoly power, then you must find for Samsung and against Apple on this claim.

1

**Source**

2

Based on ABA Model Antitrust Jury Instructions, at C-16 to C-19 and the authorities cited
therein.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **INSTRUCTION NO. 86.1—MONOPOLIZATION—EXISTENCE OF MONOPOLY**

## **POWER—DIRECT PROOF**

If you find that plaintiff has proven a relevant market, then you should determine whether defendant has monopoly power in that market. As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market.

Plaintiff has the burden of proving that defendant has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels. Plaintiff must prove that defendant has the power to do so by itself -- that is, without the assistance of, and despite competition from, any existing or potential competitors.

Plaintiff must also prove that defendant has the power to maintain prices above a competitive level for a significant period of time. If defendant attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then defendant does not have monopoly power.

Similarly, plaintiff must prove that defendant has the ability to exclude competition. For example, if defendant attempted to maintain prices above competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then defendant does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that defendant has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as the ability to offer superior products or services, the ability to maintain an efficient business operation, or superior advertising or marketing [expand or contract list as appropriate]. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that defendant would lose a substantial amount of sales if it raised prices substantially, or that the defendant's profit margins were low compared to its competitors, erratic, and/or decreasing, might be evidence that the defendant does not have monopoly power.

If you find that defendant has monopoly power in the relevant market, then you must consider the remaining elements of this claim. If you find that defendant does not have monopoly power, then you must find for defendant and against the plaintiff on this claim.

**Source**

Based on ABA Model Antitrust Jury Instructions, at C-23 and the authorities cited therein.

## INSTRUCTION NO. 87—MONOPOLIZATION — WILLFUL ACQUISITION OF

## MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS

The next element plaintiffs must prove is that Samsung willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. In addition, you should distinguish the acquisition of monopoly power through anticompetitive acts from the acquisition of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, which is not unlawful.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals – or the achievement of these goals – unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether Samsung's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

For example, suppose there are five firms that make printers for home computers and that these printers comprised a relevant product market. Suppose also that Firm A developed a more efficient manufacturing process that allowed it to sell profitably at a lower price than its competitors. If Firm A grew its market share and achieved monopoly power by selling profitably at a lower price, it would not be unlawful for Firm A to achieve monopoly power in this way. Developing more efficient processes and developing the ability to sell profitably at lower prices is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct even if it has a negative effect on competitors.

Similarly, in the same example, suppose Firm B developed and patented a revolutionary new printer and consumers so preferred Firm B's printer that Firm B achieved monopoly power. It would not be unlawful for Firm B to achieve monopoly power in this way. Firm B "built a better mousetrap," which is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct.

By contrast, in the same example, suppose not only that Firm C makes printers, but also that Firm C is the world's only manufacturer of computers and that there are barriers to entry in the computer market such that no other firm will be able to enter that market. Suppose also that Firm C altered its computers in such a way that only Firm C's printers would work with its computers, and that the alteration does not improve the design of Firm C's computers or provide any benefits to competition or consumers – the only effect of the alteration is to exclude competing printer makers from the marketplace. If Firm C thereby prevented its printer competitors from competing and achieved monopoly power, it would be unlawful for Firm C to achieve monopoly power in the printer market in this way.

As these examples show, the acts or practices that result in the acquisition of monopoly power

must represent something more than the conduct of business that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason. You may not find that a company willfully acquired monopoly power if it has acquired that power solely through the exercise of superior foresight and skill; or because of economic or technological efficiency, including efficiency resulting from scientific research; or by obtaining a lawful patent; or because changes in cost or taste have driven out all but one supplier.

If you find that Apple has proven by a preponderance of the evidence that Samsung willfully acquired monopoly power through anticompetitive acts, then you must consider whether the Apple has proved the remaining elements of their monopolization claim. If, however, you find that Apple did not prove this element by a preponderance of the evidence, then you must find for Samsung and against the plaintiffs on this claim.

**Source**

Based on ABA Model Antitrust Jury Instructions, at C-26 to C-30 and the authorities cited therein; *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1370-72 (Fed. Cir. 2002); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068-73 (Fed. Cir. 1998), *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 996 (9th Cir. 1979)).

## INSTRUCTION NO. 88—MONOPOLIZATION — ANTICOMPETITIVE BEHAVIOR IN

## STANDARD-SETTING

Apple alleges that Samsung willfully acquired or maintained monopoly power in the technologies based on anticompetitive behavior at ETSI.  ETSI is a standard-setting organization.  A standard can enhance consumer welfare by ensuring interoperability of products and devices.  The ideal standard-setting process can allow members of a standard-setting organization to make an objective comparison between multiple technologies before a standard is adopted.  To the extent the marketplace only recognizes one standard, the process of standardization may eliminate alternative technologies.  When a patented technology is incorporated into a standard, adoption of the standard may eliminate alternatives to the patented technology.  Nevertheless, "winning" the competition between two technologies to be included in the standard may enhance consumer welfare and not be anticompetitive even if the technology is covered by a patent.

Apple contends that Samsung's conduct with respect to the disclosure of its declared essential patents was anticompetitive.  In order to prove that this conduct was anticompetitive, Apple must show that (1) ETSI members shared a clearly defined expectation that members would use reasonable endeavors to timely inform ETSI of essential IPR that the member became aware of; (2) Samsung knowingly failed to use reasonable endeavors to timely inform ETSI of essential IPR; (3) ETSI members relied on the requirement that Samsung would disclose such essential IPR when they adopted the standards; and (4) Samsung later attempted to enforce such a patent against a standards-compliant device.

Apple contends that Samsung's conduct with respect to making available licenses to declared essential IPRs was anticompetitive.  In order to prove that this conduct was anticompetitive, Apple must show that (1) ETSI members shared a clearly defined expectation that members would be prepared to grant licenses to essential patents on FRAND terms and conditions; (2) Samsung knowingly did not intend to grant licenses to essential patents on FRAND terms and conditions; (3) ETSI members relied on the requirement that Samsung would be prepared to grant licenses to essential patents on FRAND terms and conditions when they adopted the standards; and (4) Samsung later attempted to enforce an essential patent against a standards-compliant device.

In addition, Apple must prove that Samsung induced ETSI to adopt its standard.  In other words, Apple must prove that there was an alternative technology that ETSI was considering during the standard setting process and that ETSI would have adopted an alternative standard had it known of Samsung's intellectual property rights.

**Source**

Adapted from ABA Model Antitrust Jury Instructions, at C-26, D-64, and the authorities cited therein; *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007); November 1997 ETSI IPR Policy.

## <u>INSTRUCTION NO. 89—MONOPOLIZATION — SAMSUNG'S INTENT</u>

Samsung has introduced evidence that its licensing decisions were based on legitimate business purposes.  A refusal to cooperate that is designed to protect or further the legitimate business purposes of a monopolist does not violate the antitrust laws, even if that refusal injures competitors.  In general, the desire, to maintain monopoly power or to block entry of competitors is not a legitimate business purpose.  A legitimate business purpose is one that benefits the actor regardless of any harmful effect on competitors, such as a purpose to promote efficiency or quality, offer a better product or service, or increase short run profits.  Thus, a refusal to cooperate that harms Samsung's independent interests and makes sense only to obtain or maintain monopoly power is not based on legitimate business purposes.  A refusal to cooperate that is based in part on legitimate business reasons, even if it is also motivated by the desire to harm competitors, does not violate the antitrust laws. It is Apple's burden to prove that Samsung's refusal to cooperate was not motivated by legitimate business purposes.

**Source**

Based on ABA Model Antitrust Jury Instructions, at C-39; *City of Vernon v. Southern Cal. Edison Co.*, 955 F.2d 1361, 1266 (9th Cir. 1992).

## INSTRUCTION NO. 91—MONOPOLIZATION — INJURY AND DAMAGES

If you find that Samsung has violated Section 2 of the Sherman Act as alleged by Apple, you must then decide if Apple is entitled to recover damages from Samsung.

Apple is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation.

**First**, Apple must prove that it was in fact injured as a result of Samsung's alleged violation of the antitrust laws.

**Second**, Apple must prove that Samsung's alleged illegal conduct was a material cause of Apple's injury. This means that Apple must prove that some damages occurred as a result of Samsung's alleged antitrust violation, and not some other cause. Apple is not required to prove that Samsung's alleged antitrust violation was the sole cause of its injury; nor need Apple eliminate all other possible causes of injury.

**Third**, Apple must prove that its injury is the type of injury that the antitrust laws were intended to prevent. If Apple's injury was caused by a reduction in competition or acts that would otherwise harm consumers, then Apple's injury is an "antitrust injury." The costs and expenses in defending against the assertion of essential patents may be antitrust injury. On the other hand, if Apple's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then Apple's injuries are not antitrust injuries and Apple may not recover damages for those injuries under the antitrust laws.

If you find that Apple has suffered injury to its business or property, you must determine whether Apple has proven that it is entitled to damages for such injury. The amount of any such damages is the amount of damages that Apple has proven at trial with reasonable certainty.

## <u>INSTRUCTION NO. 70—TRADE DRESS</u>

Apple seeks damages from Samsung for trade dress infringement and dilution arising from Samsung's sale of certain phones and tablets.  Samsung denies infringing or diluting Apple's alleged trade dresses and contends they are invalid.  Here are the instructions you must follow in deciding these claims.

**Source**

Ninth Circuit Model Civil Jury Instr. ("Model Instructions") No. 15 (modified).

## INSTRUCTION NO. 71—DEFINITION–TRADE DRESS

Trade dress is the non-functional physical detail and design of a product which identifies the product's source and distinguishes it from the products of others.  Trade dress may include features such as size, shape, color, color combinations, texture, or graphics.  In other words, trade dress is the form in which a company presents a product or service to the market, its manner of display.

The trade dresses at issue in this case involve certain products sold by Apple.   Trade dress rights in product designs are more limited than rights in trade dress packaging cases because most product designs are intended to make the product more useful or more appealing to consumers and are not intended to identify the source of the product.

**Source**

Ninth Circuit Model Instructions No. 15.2 (modified); *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213 (2000) ("In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing."); *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2003) ("And in *Wal-Mart*, supra, we were careful to caution against misuse or overextension of trade dress.  We noted that "product design almost invariably serves purposes other than source identification.").

1    **INSTRUCTION NO. 72—TRADE DRESS LIABILITY—THEORIES AND POLICIES**

2    The trade dress laws balance three often-conflicting goals:  (1) protecting the public from being
     misled about the nature and source of goods and services, so that the consumer is not confused or
3    misled in the market; (2) protecting the rights of a business to identify itself to the public and its
     reputation in offering goods and services to the public; and (3) protecting the public interest in fair
4    competition in the market.

5    The balance of these policy objectives vary from case to case, because they may often conflict.
     Accordingly, each case must be decided by examining its specific facts and circumstances, of
6    which you are to judge.

7    **Source**

8    Ninth Circuit Model Instructions No. 15.4 (modified).

1

## INSTRUCTION NO. 73—TRADE DRESS—NO LIABILITY FOR COPYING

2

Trade dress law prohibits the copying of protectable trade dress only in order to prevent the likelihood of consumer confusion as to source.  It does not otherwise prohibit competitors from

3  copying each other's products.  Nor does it protect a company's innovation and creativity.

4  **Source**

5  *Dastar Corp v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 36 (2003) ("reading §43(a) of the Lanham Act as creating a cause of action for, in effect plagiarism – the use of otherwise

6  unprotected works and inventions without attribution – would be hard ."); *Wal-Mart Stores v. Samara Brothers, Inc.*, 529 U.S. 205 (2000) (no cause of action for trade dress violation because

7  asserted trade dress was not source identifying even though Wal-Mart produced 'knockoffs' of children's clothes designed and manufactured by Samara Broths, containing only 'minor

8  modifications' of the original designs.); *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001) (The Supreme Court has been 'careful to caution against misuse or

9  overextension" of trademark related protections into areas traditionally occupied by patent and copyright."); *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11 (1982)

10  (designs cannot be protected under the Lanham Act unless they "identify the source of the product rather than the product itself"); *Bonito Boats v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157

11  (1989) ("The defendant . . . may copy plaintiff's goods slavishly down to the minutest detail; but he may not represent himself as the plaintiff in their sale.") (internal quotation marks omitted);

12  *Newton v. Thomason*, 22 F.3d 1455, 1463 (9th Cir. 1994) ("must show that, in selecting [accused] name, Appellees intended to profit by confusing consumer") (internal quotation marks omitted);

13  *Bretford Manufacturing, Inc. v. Smith System Manufacturing Corp.*, 419 F.3d 576, 581 (7th Cir. 2005) ("Businesses often think competition unfair, but federal law encourages wholesale copying,

14  the better to drive down prices.").

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INSTRUCTION NO. 67—TRADE DRESS INFRINGEMENT—ELEMENTS AND

## BURDEN OF PROOF (15 U.S.C. § 1125(a)(1))

In this action, Apple contends that Samsung's Galaxy Tab 10.1 tablet computers infringe Apple's unregistered trade dresses for the iPad and iPad 2 tablet computers.

To prove trade dress infringement, Apple bears the burden of proof by a preponderance of the evidence on each of the following elements for each of its claimed trade dresses:

    1.    Apple must prove that the claimed trade dresses are not functional.

    2.    Apple must prove that the claimed trade dresses have acquired distinctiveness through secondary meaning.

    3.    Apple must prove that Samsung used trade dress similar to Apple's claimed trade dresses without Apple's consent in a manner that is likely to cause confusion among consumers as to the source, sponsorship, affiliation, or approval of Samsung's goods.

If you find that **each** of the elements on which Apple has the burden of proof has been proved, your verdict should be for Apple.  If, on the other hand, Apple has failed to prove any one of these elements, your verdict must be for Samsung.

**Source**

Ninth Circuit Model Instructions No. 15.6 (modified); *Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 808 (9th Cir. 2003) ("Generally, to recover for trade dress infringement under [15 U.S.C.] § 1125, a plaintiff must show that 'its trade dress is protectable and that defendant's use of the same or similar trade dress is likely to confuse consumers.'  A trade dress is protectable if it is 'nonfunctional and has acquired secondary meaning and if its imitation creates a likelihood of consumer confusion.'") (citations omitted); *Talking Rain Beverage Co. Inc. v. South Beach Beverage Co.*, 349 F.3d 601, 603 (9th Cir. 2003) (citing as elements of proof necessary to show infringement of a bottle design as: "(1) nonfunctionality, (2) distinctiveness and (3) likelihood of confusion.").

## INSTRUCTION NO. 62—TRADE DRESS PROTECTABILITY—NON-

## FUNCTIONALITY

Trade dress that is functional is invalid and not protectable.  You must decide whether the alleged trade dresses asserted by Apple in this action are functional.

There are two types of functionality you should consider in deciding whether Apple's claimed trade dresses are functional:  utilitarian functionality and aesthetic functionality.  If any of Apple's claimed trade dresses are functional in either of these ways, that trade dress is invalid and you must find for Samsung on it.

- Utilitarian functionality means that a claimed feature of the trade dress is:

    (a) essential to the product's use or purpose *or*

    (b) affects the cost or quality of the product.

    It is non-functional if its shape or form makes no contribution to the product's function or operation.  If the feature is part of the actual benefit that consumers wish to purchase when they buy the product, the feature is functional.  However, if the feature serves no purpose other than as an assurance that a particular entity made, sponsored or endorsed the product, it is non-functional.

- Aesthetic functionality means that a claimed design feature of the trade dress improves the attractiveness and eye-appeal of the design.  Trade dress is aesthetically functional if limiting its use would impose a significant non-reputational-related competitive disadvantage upon a company.  If the entire significance of a feature is merely to associate goods with a particular source, the feature is non-functional.

Functionality is determined by considering the trade dress as a whole and not the individual elements alone.  However, if the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, then the trade dress as a whole is functional.

**Source**

Ninth Circuit Model Instructions No. 15.11(modified) ; *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001) (trade dress protection may not be claimed for product features that are functional); *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 165 (1995) ("[I]f exclusive use of a feature would put competitors at a significant non-reputation-related disadvantage ["the feature in general terms is functional]."); *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1067-74 (9th Cir. 2006) (discussing and defining aesthetic and utilitarian functionality); *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 782 (9th Cir. 2002) ("The physical details and design of a product may be protected under the trademark laws only if they are nonfunctional...."); *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F. 3d 1009, 1013 (9th Cir. 1999) ("[W]here the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional."); *Mattel, Inc. v. MGA Entertainment, Inc.*, 782 F. Supp. 2d 911, 1007-8 (C.D. Cal. 2011); *Aurora World Inc. v, Ty, Inc.*, 719 F. Supp.. 2d 1115, 1149 (C.D. Ca. 2009) ("Other design features, such as the fanciful coloring of the toys, are aesthetically functional as that term is used in Au-Tomotive Gold."); *The Jumpitz Corp. v. Viacom Intern., Inc.*, No. 09-CV1063, 2010 WL 3238953, * 7 (Aug. 13, 2010, S.D. Cal. 2010).

## INSTRUCTION NO. 61—TRADE DRESS PROTECTABILITY—DISTINCTIVENESS

To prove infringement of its claimed iPad and iPad 2 trade dresses, Apple has the burden of proving by a preponderance of the evidence that the claimed trade dresses are distinctive.

To prove distinctiveness, Apple must show that its claimed trade dresses have "secondary meaning." Trade dress has secondary meaning when its primary significance in the minds of the prospective consumers is not the product itself, but the identification of the product with a single source, regardless of whether consumers know who or what that source is.

To find that the claimed trade dress have acquired secondary meaning, you must find by a preponderance of the evidence that a significant proportion of prospective purchasers of tablet computers associates the claimed trade dress with a single source.

When you are determining whether the claimed trade dress has acquired a secondary meaning, you may consider the following factors:

    1.    Consumer Perception. Whether the people who purchase tablet computers associate the claimed trade dress with Apple;

    2.    Advertisement. To what degree and in what manner Apple may have advertised using the claimed trade dress;

    3.    Demonstrated Utility. Whether Apple has successfully used the claimed trade dress to increase the sales of iPad or iPad 2;

    4.    Extent of Use. The length of time and manner in which Apple has used the claimed trade dress;

    5.    Exclusivity. Whether Apple's use of the claimed trade dress was exclusive;

    6.    Copying. Whether Samsung intentionally copied Apple's alleged trade dress.

    7.    Actual Confusion. Whether Samsung's use of Apple's alleged trade dress has led to actual confusion among a significant number of consumers.

The presence or absence of any particular factor should not necessarily resolve whether the claimed trade dresses have acquired secondary meaning.

Apple's claimed trade dresses are protectable only to the extent you find it has acquired distinctiveness through secondary meaning. If either the claimed iPad or iPad 2 trade dress has not required a sufficient level of secondary meaning, then that trade dress is invalid and not entitled to protection and your verdict on that trade dress must be for Samsung.

**Source**

Ninth Circuit Model Instruction 15.10 (modified); *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 211 (2000)("a mark has acquired distinctiveness. . . if it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.") (internal quotations omitted); *Filipino Yellow Pgs. v. Asian Journal Publications*, 198 F. 3d 1143, 1151 (9th Cir. 1999) ("Secondary meaning can be established in many ways, including . . . direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant.").

1

## **INSTRUCTION NO. 61.1—SECONDARY MEANING—ADVERTISING**

2

To be probative of secondary meaning, Apple's advertising must direct the consumer to those features claimed as trade dress or identify or stress them, such as by directing the consumer to "look for" the claimed features.  Merely featuring the relevant aspects of the product does not support a finding of secondary meaning.

3

4

**Source**

5

*First Brands Corporation v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir. 1987) (advertisements must identify and feature the claimed trade dress in order to support a finding of secondary meaning; plaintiff failed to use "look for" advertising); *Yankee Candle Co., Inc. v. Bridgewater Candle Co*., LLC, 259 F.3d 25, 44 (2d Cir. 2001) ("[I]t is advertising that specifically directs a consumer's attention to a particular aspect of the product. To be probative of secondary meaning, the advertising must direct the consumer to the features claimed as trade dress. [Citation.] Merely 'featuring' the relevant aspect of the product in advertising is no more probative of secondary meaning than are strong sales; again to provide protection based on extensive advertising would extend trade dress protection to the [elements for which protection is sought] without any showing that the consumers associate the dress with the product's source."); *Autodesk, Inc., v. Dassault Systems Solidworks Corp.*, 685 F. Supp. 2d 1001, 1014 (N.D. Cal. 2009); *Walker & Zanger, Inc. v. Paragon Industries, Inc.,* 549 F. Supp. 2d 1168, 1180 (ND Cal 2007) (quoting same; plaintiff failed to use "look for" advertising).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## INSTRUCTION NO. 61.2—SECONDARY MEANING—SALES SUCCESS

2

Sales success by itself will typically not be as probative of secondary meaning in a product configuration case as in a trademark case, since the product's market success could be attributable to the desirability of the product design rather than the source-designating capacity of the trade dress.  And unlike with a trademark, where repeated purchases of a product support an inference that consumers have associated the mark with the producer or source, one can much less confidently presume that a consumer's repeated purchase of a product has created an association between a particular product configuration and the source.

**Source**
*Continental Laboratory Products, Inc. v. Medax Intern., Inc.*, 114 F. Supp. 2d 992, 1002-03 (S.D.Cal. 2000) (quoting *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1452-53 (3d Cir. 1994) ("Sales success by itself will typically not be as probative of secondary meaning in a product configuration case as in a trademark case, since the product's market success may well be attributable to the desirability of the product configuration rather than the source-designating capacity of the supposedly distinguishing feature or combination of features. And unlike with a trademark, where repeated purchases of a product support an inference that consumers have associated the mark with the producer or source, one can much less confidently presume that a consumer's repeated purchase of a product has created an association between a particular product configuration and the source."); *Yankee Candle Co., Inc. v. Bridgewater Candle Co.*, 99 F. Supp. 2d 140, 155 (D. Mass. 2000); 4 *McCarthy* § 15:47 at 15-67 ("Popularity of a product is not synonymous with secondary meaning. Large sales of the product may be due to dozens of factors, only one of which may be the drawing power of the trademark.").

1

## <u>INSTRUCTION NO. 61.3—SECONDARY MEANING—EXCLUSIVITY OF USE</u>

2

If there are numerous other products in the market with the same or similar trade dresses, this tends to support a finding that the trade dress does not have secondary meaning.

3

4

**Source**

*Miss World (UK), Inc. v. Mrs. American Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) ("Simply put, a mark which is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive'.  It is merely one of a crowd of marks.  In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other."); *Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F. 3d 971 (8th Cir. 2006) (considering use of mark by third-parties and newspapers); *CG Roxane LLC v. Fiji Water Co. LLC,* 569 F. Supp. 2d 1019 (N.D. Cal. 2008) ("Courts view a mark's use by competitors as strong evidence of how the public perceives the term. …Naturally, when more members of the public see a mark used by several producers in the industry, the less likely they will identify a particular producer with that mark.") (internal quotation marks, citations omitted).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## INSTRUCTION NO. 61.4—SECONDARY MEANING—COPYING

2

To support a finding of secondary meaning, deliberate copying must be an intentional attempt to capitalize on a company's reputation or good will.  Mere attempts to copy a product are not necessarily probative since the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product.  Thus the relevant intent is not just the intent to copy but, rather, the intent to "pass off" ones goods as those of another.

3

4

5

**Source**

6

*Bonito Boats v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157 (1989) ("The defendant . . . may copy plaintiff's goods slavishly down to the minutest detail; but may not represent himself as the plaintiff in their sale.") (internal quotation marks omitted); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc*., 826 F.2d 837, 845-46 (9th Cir. 1987) ("Competitors may intentionally copy product features for a variety of reasons. They may, for example, choose to copy wholly functional features that they perceive as lacking any secondary meaning because of those features' intrinsic economic benefits."); *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1085 (9th Cir. 2005) (found no intent because the defendant did not have "any intention of capitalizing on [plaintiff's] trademark.").

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INSTRUCTION NO. 61.5—SECONDARY MEANING—ACTUAL CONFUSION

Evidence of just a few instances of actual confusion is inadequate to support a finding of secondary meaning.

**Source**

*Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 987 (9th Cir. 1995) (failure to list actual confusion as one of the factors the jury should have considered in determining whether the plaintiff had established secondary meaning was not harmless error); *Japan Telecom, Inc. v. Japan Telecom America Inc.*, 287 F.3d 866, 873-74 (9th Cir. 2002) (holding that a few instances of actual confusion is not probative of secondary meaning).

## INSTRUCTION NO. 61.6—SECONDARY MEANING—TIMING

Apple must prove by a preponderance of the evidence that the claimed iPad and iPad 2 trade dresses acquired secondary meaning before date that Samsung first sold a product that Apple claims is infringing its claim trade dresses.

If you find that Apple has not shown by a preponderance of the evidence that the alleged iPad or iPad 2 trade dress acquired secondary meaning before May 9, 2011, then you must find for Samsung.

**Source**

*Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794 (9th Cir. 1970) (plaintiff must prove the existence of secondary meaning in its trademark at the time and place that the junior user first began use of that mark).

## INSTRUCTION NO. 68—INFRINGEMENT—LIKELIHOOD OF CONFUSION

To prevail on its trade dress infringement claim, Apple must prove by a preponderance of the evidence that there is a likelihood of consumer confusion between Samsung's Galaxy Tab 10.1 and the trade dresses of Apple's iPad and iPad 2 tablet computers that Apple is claiming.  In other words, Apple must prove that prospective consumers of tablet computers are likely to mistakenly purchase a Samsung Galaxy Tab 10.1 tablet computer believing that it is an Apple iPad or iPad 2 tablet computer.

A likelihood of confusion requires that you find that confusion among reasonably prudent consumers is probable, and not merely a possibility.

**Source**

Ninth Circuit Model Instructions No. 15.16 (modified); *Murray v. Cable Nat'l. Broadcasting Co.,* 86 F.3d 858, 861 (9th Cir. 1996) (confusion must be "probable, not simply a possibility") (*quoting Rodeo Collection, Ltd. v. Western Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987)).

**INSTRUCTION NO. 69—TRADE DRESS INFRINGEMENT—LIKELIHOOD OF**

**CONFUSION—SLEEKCRAFT TEST (15 U.S.C. §§ 1114(1), 1125(a))[78]**

You must decide whether Samsung's use of its accused products is likely to cause confusion about the source of Samsung's tablet computers.  Apple alleges consumer confusion has occurred at three times:  before the purchase (called "initial interest" confusion), at the moment of the purchase (called "point of sale" confusion), and after the purchase (called "post-sale" confusion).

To establish any of these types of confusion, Apple must prove by a preponderance of the evidence that any such consumer confusion affected consumers' decisions to purchase tablet computers.

In addition, to establish initial interest confusion, Apple must prove by a preponderance of the evidence that a significant number of consumers are likely to go to a store or a website with the intention of purchasing an iPad and mistakenly assume that a Samsung tablet computer is an iPad and then, even after their initial assumption is corrected, decide to purchase the Samsung tablet computer because it would be too much effort to locate an iPad instead.

In addition, to establish point of sale confusion, Apple must prove by a preponderance of the evidence that a significant number of consumers are likely to purchase a Samsung tablet falsely believing it to be an iPad.

In addition, to establish post-sale confusion, Apple must prove by a preponderance of the evidence that a significant number of consumers are likely to incorrectly believe that a Samsung tablet is an iPad after it has been purchased and that this consumer confusion has caused consumers not to purchase an iPad and caused injury to Apple's reputation.

I will suggest some factors you should consider in deciding whether there is a likelihood of consumer confusion based on Apple's alleged iPad trade dress or alleged iPad 2 trade dress.  The presence or absence of any particular factor that I suggest should not necessarily resolve whether there was a likelihood of confusion, because you must consider all relevant evidence in determining this.

     1.     Strength or Weakness of the Plaintiff's Trade Dress. The more the consuming public recognizes the plaintiff's trade dress as an indication of origin of the plaintiff's goods, the more likely it is that consumers would be confused about the source of the defendant's goods if the defendant uses a similar trade dress.

     2.     Defendant's Use of the Trade Dress. If the defendant and plaintiff use their trade dress on the same, related, or complementary kinds of goods there may be a greater likelihood of confusion about the source of the goods than otherwise.

---

[7]   Apple agreed to add the bolded section to the master joint set of disputed instructions that it was keeping for the parties in an email from Marc Pernick dated July 13, 2012 at 2:48 p.m. Samsung does not know why the bolded section does not appear in the parties' Disputed Instructions.

[8]   Samsung objects to informing the jury about the various theories of consumer confusion for the reasons set forth in Samsung's Objection To Apple's Jury Instruction No. 69 ("TRADE DRESS INFRINGEMENT—LIKELIHOOD OF CONFUSION—SLEEKCRAFT TEST"). However, in the event the Court chooses to educate the jury on the different forms of confusion, Samsung proposes this instruction.

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

3.      Similarity of Plaintiff's and Defendant's Trade Dress.  If the overall impression created by the plaintiff's trade dress in the marketplace is similar to that created by the defendant's trademark in appearance there is a greater chance of likelihood of confusion.

4.      Actual Confusion.  If use by the defendant of the plaintiff's trade dress has led to a significant number of instances of actual confusion, this suggests a likelihood of confusion.  As you consider whether the trade dress used by the defendant creates for consumers a likelihood of confusion with the plaintiff's trade dress, you should weigh any instances of actual confusion against the opportunities for such confusion.  If the instances of actual confusion have been relatively frequent, you may find that there has been substantial actual confusion.  If, by contrast, there is a very large volume of sales, but only a few isolated instances of actual confusion you may find that there has not been substantial actual confusion.

5.      Defendant's Intent.  If the defendant adopted trade dress similar to the plaintiff's with the intent to deceive consumers, this increases the likelihood of consumer confusion.

6.      Marketing/Advertising Channels. If the plaintiff's and defendant's products are likely to be sold in the same or similar stores or outlets, or advertised in similar media, this may increase the likelihood of confusion.

7.      Consumer's Degree of Care.  The more sophisticated the potential buyers of the goods or the more costly the goods, the more careful and discriminating the reasonably prudent purchaser exercising ordinary caution may be. They may be less likely to be confused by similarities in the plaintiff's and defendant's trade dresses.

**Source**

Ninth Circuit Model Instructions No. 15.16 (modified); *Art Attacks, LLC. v. MGA Entertainment Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009) ("To prove trade dress infringement, a plaintiff must demonstrate that (1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion between the plaintiff's and defendant's products"); *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F. 3d 1137, 1144 (9th Cir. 2011) ("[W]e must apply the *Sleekcraft* test in a flexible manner, keeping in mind that the eight factors it recited are not exhaustive, and that only some of them are relevant to determining whether confusion is likely in the case at hand."); ***Brookfield Communications, Inc. v. West Coast Entm't, 174 F.3d 1036, 1066 (9th Cir. 1999) ("Suppose West Coast's competitor (let's call it "Blockbuster") puts up a billboard on a highway reading—"West Coast Video: 2 miles ahead at Exit 7" —where West Coast is really located at Exit 8 but Blockbuster is located at Exit 7. Customers looking for West Coast's store will pull off at Exit 7 and drive around looking for it. Unable to locate West Coast, but seeing the Blockbuster store right by the highway entrance, they may simply rent there. Even consumers who prefer West Coast may find it not worth the trouble to continue searching for West Coast since there is a Blockbuster right there. Customers are not confused in the narrow sense: they are fully aware that they are purchasing from Blockbuster and they have no reason to believe that Blockbuster is related to, or in any way sponsored by, West Coast."); Rearden LLC v. Rearden Commerce, Inc., __ F.3d ___, 2012 WL 2402012, *19  (9th Cir. June 27, 2012) ("Trademark infringement protects only against mistaken purchasing decisions and not against confusion generally.") (quoting Bosley Med. Ins., Inc. v. Kremer, 403 F.3d 673, 677 (9th Cir. 2005); Bosley Med. Inst., Inc. v. Kremer, 403 F. 3d 672, 677 (9th Cir. 2005) (post sale confusion results when product is viewed by a third party subsequent to purchase); Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 213 (2000) (consumers "almost invariably" do not perceive product configurations as indicators of source); Karl Storz Endoscopy-America v. Surgical Tech., 285 F. 3d 848, 854 (9th Cir. 2002) (injury from post sale confusion is reputational).***

1

## INSTRUCTION NO. 69.1—LIKELIHOOD OF CONFUSION FACTORS—STRENGTH

2

## OF TRADE DRESS

3

When products with similar trade dress permeate the marketplace, the strength of the trade dress decreases, and the likelihood that consumers will be confused is lessened.

4

**Source**

5

6

*Miss World (UK), Inc. v. Mrs. American Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) ("Simply put, a mark which is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive'. It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other."), *abrogated on other grounds*; *Schwan's IP, LLC v. Kraft Pizza Co.,* 460 F. 3d 971 (8th Cir. 2006) (considering use of mark by third-parties and newspapers); *CG Roxane LLC v. Fiji Water Co. LLC,* 569 F. Supp. 2d 1019 (N.D. Cal. 2008) ("Courts view a mark's use by competitors as strong evidence of how the public perceives the term. …Naturally, when more members of the public see a mark used by several producers in the industry, the less likely they will identify a particular producer with that mark.") (internal quotation marks, citations omitted).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INSTRUCTION NO. 69.2—LIKELIHOOD OF CONFUSION FACTORS—SIMILARITY

## OF TRADE DRESS

In assessing similarity of the trade dresses, you may consider the use of the of the "Samsung" trademark on Galaxy Tab 10.1 product and Apple's use of Apple's trademarks and logos on the iPad and iPad 2 product.  If you find that the parties trade names or other source identifying features are featured prominently on the products, then consumer confusion is unlikely.

**Source**

*AMF Inc. v. Sleekcraft Boats,* 599 F. 2d 341, 351 (9th Cir. 1979) (use of a prominent "house-mark" reduces likelihood of confusion); *Rodan & Fields, LLC v. Estee Lauder Companies, Inc.*, No. 10–CV–02451–LHK,  2010 WL 3910178, *3 (Oct. 5, 2010, N.D. Cal) ("The prominence of the trade names on the packaging strongly supports a finding that consumer confusion is unlikely") (*citing Bristol–Myers Squibb Co. v. McNeil–P.P. C., Inc.*, 973 F.2d 1033, 1045–46 (2d Cir. 1992) ("[W]e conclude that, although [the trade dresses of Tylenol PM and Excedrin PM] share many similar elements, the prominence of the trade names on the two packages weighs heavily against a finding of consumer confusion resulting from the overall look of the packaging.")).

1

## **INSTRUCTION NO. 69.3—LIKELIHOOD OF CONFUSION FACTORS—INTENT**

2

Mere attempts to copy a product are not necessarily probative of an intent to deceive consumers
since it may well be emulating a desirable or functional feature of the product and not attempting

3

to confuse consumers.  The law permits a defendant to copy the plaintiff's product down to the
minutest detail, as long as the defendant does not represent itself as the plaintiff in the sale of those

4

products.

5

**Source**

6

*Bonito Boats v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157 (1989) ("The defendant . . . may
copy plaintiff's goods slavishly down to the minutest detail; but may not represent himself as the

7

plaintiff in their sale.") (internal quotation marks omitted); *Fuddruckers, Inc. v. Doc's B.R.
Others, Inc.*, 826 F.2d 837, 844-845 (9th Cir. 1987) ("Competitors may intentionally copy

8

product features for a variety of reasons. They may, for example, choose to copy wholly
functional features that they perceive as lacking any secondary meaning because of those

9

features' intrinsic economic benefits."); *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d
1073, 1085 (9th Cir. 2005) (found no intent because the defendant did not have "any intention of

10

capitalizing on [plaintiff's] trademark.").

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

1

## INSTRUCTION NO. 69.4—LIKELIHOOD OF CONFUSION FACTORS—

2

## ADVERTISING

3
4

The fact that both Apple and Samsung advertise in mainstream media and sell their products on the Internet and other major retail chains does not weigh in favor of likely confusion because these channels are used by most commercial retailers today.

5

**Source**

6
7

*Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F. 3d 1137, 1151 (9th Cir. 2011) ("[T]shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion.").

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

1

## INSTRUCTION NO. 63—TRADE DRESS DILUTION—ELEMENTS AND

2

## BURDEN OF PROOF

3

In this case, Apple contends that Samsung has diluted Apple's trade dresses.

4

"Dilution" means a lessening of the capacity of a famous trade dress to identify and distinguish goods or services as coming from a single source. The purpose of the anti-dilution laws is to protect against erosion of a famous trade dress's value as a source identifier, or the tarnishment of a famous trade dress's image. The mere fact that consumers mentally associate the junior user's mark with the senior user's mark is not enough to establish dilution.

5

6

7

Dilution is reserved for a limited set of trade dresses that are famous, meaning that they are so widely known that they are like a household name among members of the general public. It will be for you to decide whether Apple's serted trade dresses are famous enough to be protected under dilution law and, if so, whether those trade dresses have been diluted.

8

9

**Source**

10

15 U.S.C. § 1125(c)(1); *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1179-1180 (9th Cir. 2007) ("Dilution is a cause of action invented and reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge their value."); *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2002) ("[F]or purposes of § 1125(c), a mark usually will achieve broad-based fame only if a large portion of the general consuming public recognizes that mark. Put another way . . . the mark must be a household name.").

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE, IN ORDER

## <u>INSTRUCTION NO. 63.1—TRADE DRESS DILUTION—ELEMENTS</u>

In order to prove dilution, Apple must prove **<u>each</u>** of the following elements by a preponderance of evidence:

      1.     That each of the alleged trade dresses are famous;

      2.     That each of the alleged trade dresses are not functional;

      3.     That each of the alleged trade dresses are distinctive by having acquired secondary meaning;

      4.     That each of the alleged trade dresses were famous before any of the accused Samsung products were sold to the public; and

      5.     That Samsung's alleged use of each of the claimed trade dresses is likely to cause dilution of the distinctive quality of each alleged trade dress.

**Source**

*Visa Intern. Service Ass'n v. JSL Corp.*, 610 F.3d 1088, 1089-90 (9th Cir. 2010) ("A plaintiff seeking relief under federal anti-dilution law must show that its mark is famous and distinctive, that defendant began using its mark in commerce after plaintiff's mark became famous and distinctive, and that defendant's mark is likely to dilute plaintiff's mark.").

## INSTRUCTION NO. 64—TRADE DRESS DILUTION ELEMENT—FAME

Apple bears the burden of proving that each of its alleged trade dresses are famous.

Trade dress is considered to be famous if it is widely recognized by the general consuming public of the United States as a designation of the source of the products of the trade dress' owner.  To be considered famous, a trade dress (or trademark) must be must be so well know as to be akin to a "household name."  The level of distinctiveness required to establish fame is significantly greater than to establish secondary meaning.  For example, trademarks such as NISSAN and COACH have not been famous enough to be protected under dilution law.

You may consider the following factors when considering whether each of Apple's alleged trade dresses are famous.  These factors are only suggestions and may not constitute all of the possible types of evidence whether a trade dress is famous.  The presence or absence of any one particular factor on this list should not necessarily determine whether a trademark is famous.  You should consider all the relevant evidence in making your determination.  These factors should be not be counted up to see which party has more, but should be carefully weighed given the specific facts and circumstances of this case. The factors you should consider are:

    1.    The duration, extent, and geographic reach of advertising and publicity of the trade dress, whether advertised or publicized by the owner or third parties.  To be probative of fame, Apple's advertising must direct the consumer to those features claimed as trade dress or identify them, such as by directing the consumer to "look for" the claimed features.  Merely featuring the relevant aspect of the product does not suffice.

    2.    The amount, volume, and geographic extent of sales of goods or services offered using the trade dress.  Although in some instances a large number of sales may be considered evidence of fame, in the case of trade dress for product design, sales are not necessarily evidence of fame if sales are more likely driven by the desirability of the product itself.

    3.    The extent of actual recognition of the trade dress; and

    4.    Whether the trade dress is registered.

**Source**

15 U.S.C. § 1125(c)(2)(A) (defining a famous mark as "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."); *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2002) ("[F]or purposes of § 1125(c), a mark usually will achieve broad-based fame only if a large portion of the general consuming public recognizes that mark. Put another way. . . the mark must be a household name."); 15 U.S.C. § 1125(c)(1) (listing factors to assess fame); *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F. 3d 1002 (9th Cir. 2004); *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 879 (9th Cir. 1999) ("[F]amousness requires more than mere distinctiveness." ); *Jada Toys v. Mattel*, 496 F.3d 974, 981-82 (9th Cir. 2007); *Coach Services, Inc. v. Triumph Learning LLC*, 96 U.S.P.Q.2d 1600, 1611 (T.T.A.B. 2010) (COACH trademark was not famous enough to qualify for dilution protection), *aff'd on point* 101 U.S.P.Q.2d 1713, 2012 WL 540069 (Fed. Cir. 2012); *TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88 (2d Cir. 2001) (holding THE CHILDREN'S PLACE mark was not famous); *First Brands Corporation v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir. 1987) (advertisements must identify and feature the claimed trade dress in order to support a finding of secondary meaning); *Yankee Candle Co., Inc. v. Bridgewater Candle Co.*, L.L.C., 259 F.3d 25, 44 (2d Cir. 2001) ("[I]t is advertising that specifically directs a consumer's attention to a particular aspect of the product. To be probative of secondary meaning, the advertising must direct the consumer to the features claimed as trade dress. [citation] Merely 'featuring' the relevant aspect of the product in

advertising is no more probative of secondary meaning than are strong sales; again to provide protection based on extensive advertising would extend trade dress protection to the [elements for which protection is sought] without any showing that the consumers associate the dress with the product's source."); *Continental Laboratory Products, Inc. v. Medax Intern., Inc*., 114 F. Supp. 2d 992, 1002-03 (S.D.Cal. 2000) (quoting *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd*., 40 F.3d 1431, 1452-53 (3d Cir. 1994) ("Sales success by itself will typically not be as probative of secondary meaning in a product configuration case as in a trademark case, since the product's market success may well be attributable to the desirability of the product configuration rather than the source-designating capacity of the supposedly distinguishing feature or combination of features. And unlike with a trademark, where repeated purchases of a product support an inference that consumers have associated the mark with the producer or source, one can much less confidently presume that a consumer's repeated purchase of a product has created an association between a particular product configuration and the source."); *Autodesk, Inc., v. Dassault Systems Solidworks Corp.*, 685 F. Supp. 2d 1001, 1014 (N.D. Cal. 2009);*Walker & Zanger, Inc. v. Paragon Industries, Inc.,* 549 F. Supp. 2d 1168, 1180-81 (ND Cal 2007); 4 *McCarthy* § 15:47 at 15-67 ("Popularity of a product is not synonymous with secondary meaning. Large sales of the product may be due to dozens of factors, only one of which may be the drawing power of the trademark.").

1

**INSTRUCTION NO. 64.1—TRADE DRESS DILUTION—FAME—SURVEY EVIDENCE**

2

Survey evidence is not necessary to support a finding of fame.  But famousness requires a high level of consumer recognition of a claimed dress such that to support fame of an alleged trade dress, generally, some 75% or more of the general U.S. consuming public should recognize the trade dress as a designation of source of the goods or services of the alleged trade dress's owner.

3

4

**Source**

5

6

15 U.S.C. § 1125(c)(2)(A) (defining a famous mark as "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."); 4 *McCarthy on Trademarks and Unfair Competition* § 24:106, 24-310 (2008 ed.) ("[M]inimum threshold survey response should be in the range of 75% of the general consuming public of the United States."); *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F. 3d 1002, 1014 (9th Cir. 2004) (survey showing 65% consumer recognition insufficient to prove fame); *Carnival Corp. v. SeaEscape Casino Cruises*, Inc., 74 F. Supp. 2d 1261, 1270-1271 (S.D. Fla. 1999) (68% consumer recognition did not support a finding of fame); *Hershey Foods Corp. v. Mars, Inc.*, 998 F. Supp. 500, 515 (M.D. Pa. 1998) (abbreviated Reese's trade dress not found famous not withstanding a survey which found 94% of respondents recognized the abbreviated trade dress).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE, IN ORDER

## INSTRUCTION NO. 65—TRADE DRESS DILUTION ELEMENT #3—USE OF

## ACCUSED TRADE DRESS IN COMMERCE AFTER

## APPLE TRADE DRESS BECAME FAMOUS

Apple must prove that each of its claimed trade dresses were famous prior to the time that Samsung began the accused use.

Apple must prove by a preponderance of the evidence that its claimed iPhone trade dresses were famous by November 2007, the date Samsung first sold a product accused of using the iPhone trade dress.

Apple must prove by a preponderance of the evidence that its claimed iPad trade dress was famous by June 8, 2011, the date Samsung first sold a product accused of diluting the iPad trade dress.

Apple must prove by a preponderance of the evidence that its claimed iPad 2 trade dress was famous by June 8, 2011, the date Samsung first sold a product accused of diluting the iPad 2 trade dress.

If Apple has proven by a preponderance of the evidence that a particular trade dress was famous as of the date indicated, then Apple has proven the element of fame.  If Apple has not proven that a particular trade dresses was famous as of the date indicated, then Apple has not proven the element of fame, and you must find for Samsung on Apple's dilution claim as to that trade dress.

**Source**

*Visa Intern. Service Ass'n v. JSL Corp.*, 610 F.3d 1088, 1089-90 (9th Cir. 2010) ("A plaintiff seeking relief under federal anti-dilution law must show that its mark is famous and distinctive, that defendant began using its mark in commerce after plaintiff's mark became famous and distinctive, and that defendant's mark is likely to dilute plaintiff's mark."); Amended Complaint Paragraph 80 ("Samsung released the Samsung F700 in November 2007 — copying the clean flat clear surface of the Apple iPhone Trade Dress and the Apple iPhone/iPhone 3G/iPhone 4 Trade Dress.").

## INSTRUCTION NO. 66—TRADE DRESS DILUTION ELEMENT #4—DILUTION

To prove dilution of an alleged trade dress by blurring, Apple must prove by a preponderance of the evidence that the accused Samsung products have created an association with Apple which impairs the distinctiveness of those alleged trade dresses.

Factors you can consider in determining whether dilution by blurring has occurred include:

      1.     The degree or similarity between the alleged trade dress and the accused product.. The more similar they are, the more likely an association will arise between the products.

      2.     The degree of acquired distinctiveness through secondary meaning of Apple's alleged trade dresses.  The more distinctive a trade dress is in the marketplace, the greater protection it is entitled to.  On the other hand, if trade dress is common in the marketplace, it is entitled to less protection from dilution.

      3.     The extent to which Apple is engaged in substantially exclusive use of the alleged trade dresses.  If you find that companies other than Apple use the same or similar trade dress in connection with smart phones or tablets, then dilution by blurring is less likely.

      4.     The degree of recognition of the alleged trade dresses with Apple;

      5.     Whether Samsung intended to create an association with Apple's alleged trade dresses; and

      6.     Any actual association between the alleged trade dress and the accused products. The association must be created solely by the similarity of the trade dresses and not from some other source.  In other words, this means that the required "association" cannot be created just because the two products possess some similar characteristics.

These factors should be weighed by you given the facts and circumstances of the case.

**Source**

15 U.S.C. § 1125(c)(2)(B) (listing non-exhaustive factors for dilution by blurring); 4 *McCarthy* § 24:119 (discussing the meaning and significance of each of the TDRA dilution by blurring factors); *id*. ("Consideration of third party uses is relevant both here, in determining if blurring is likely, as well as in the first instance in determining if a mark is "famous."  A mark that is merely one of several identical or very similar marks is already "diluted" in fact.  In such a case, the junior user's actions can hardly be said to be likely to cause any significant further "dilution" of such a mark. . . . The statute does not require that the mark be "unique" in the strict sense: one of a kind. There can be some existing third party uses that do not significantly impact on the public mind, but if there are third party uses, the scope of protection against blurring may be constricted according to the quantity and type of the third party uses."); *id.,* at § 24:116 ("The required 'association' must be created solely by the similarity of the conflicting marks, not from some other source. This means that the required 'association' cannot be created just because the two products possess some similar characteristics."); *Schwan's IP, LLC v. Kraft Pizza Co.,* 460 F. 3d 971 (8th Cir. 2006) (considering use of mark by third-parties and newspapers); *CG Roxane LLC v. Fiji Water Co. LLC,* 569 F. Supp. 2d 1019 (N.D. Cal. 2008) ("Courts view a mark's use by competitors as strong evidence of how the public perceives the term. …Naturally, when more members of the public see a mark used by several producers in the industry, the less likely they will identify a particular producer with that mark.") (internal quotation marks, citations omitted).

SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

## INSTRUCTION NO. 81—DILUTION—TARNISHMENT

**[Apple has represented that it is not seeking to establish dilution by tarnishment. If Apple agrees not to make any arguments that sound in tarnishment or submit its own jury instruction on tarnishment, Samsung will withdraw its request for this instruction.]**

To prove dilution by tarnishment, Apple must prove by a preponderance of the evidence that the design of Samsung's products harms the reputation of the Apple's trade dress by improperly associating it with an inferior or offensive product or service.

**Source** 15 U.S.C. § 1125(c)(2)(C).

**INSTRUCTION NO. 63.2—TRADE DRESS FUNCTIONALITY—DILUTION —BURDEN**

**OF PROOF**

As I have instructed you in connection with Apple's infringement claim, trade dress that is functional is invalid and not protectable.  You must decide whether the product trade dress asserted by Apple in this action is functional.

To prove trade dress dilution, Apple has the burden of proving by a preponderance of the evidence that the claimed, unregistered trade dresses are not functional.

Samsung has the initial burden of proving by a preponderance of the evidence that the iPhone trade dress depicted in U.S. Registration No. 3,470,983 is functional.  If Samsung makes this showing, the burden shifts to Apple to prove by a preponderance of the evidence that the trade dress is not functional.

**Source**

15 U.S.C. §1125(a)(3) ("In a civil action for trade dress infringement…for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."); *Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F. 2d 769, 775 (9th Cir. 1981) ("registration ... shifts the burden of proof from the plaintiff . . . to the defendant, who must introduce sufficient evidence to rebut the presumption of plaintiff's right to such protected use.").

## <u>INSTRUCTION NO. 74—TRADE DRESS DAMAGES IN GENERAL</u>

I am going to provide you with details on the calculation of damages for Apple's trade dress infringement claim. All of these instructions apply only if you find that Samsung Electronics Company, Samsung Electronics America or Samsung Telecommunications America has in fact infringed upon Apple's trade dress. The fact that I am giving you these instructions should not be taken as an indication that an infringement has taken place. They are to be used only in the event you make a specific finding that Samsung Electronics Company, Samsung Electronics America or Samsung Telecommunications America has in fact infringed on Apple's trade dress.

If Apple prevails on its claim for trade dress infringement, you may award Apple damages only if it has proven actual consumer confusion resulting from Samsung Electronics Company's, Samsung Electronics America's or Samsung Telecommunications America's infringement or that their actions were intentionally deceptive.

If Apple has established actual consumer confusion or intentional deception by Samsung Electronics Company, Samsung Electronics America or Samsung Telecommunications America, it is your duty to determine Apple's damages. The burden is on Apple to prove damages by a preponderance of the evidence. Damages are the amount of money that will reasonably and fairly compensate Apple for any injury that you find was caused by a defendant's alleged infringement of Apple's trade dress. The factors that you may consider, which I will explain to you in greater detail, are any Apple lost sales and lost profits from the alleged infringement.

Proof of damages to a certainty is not required. However, the burden is on Apple to show any damages to a reasonable certainty, and awarded damages may not be speculative.

**Source**
ABA 3.6.1 (modified).

1

**INSTRUCTION NO. 75—TRADE DRESS DAMAGES—PLAINTIFF'S ACTUAL**

2

**DAMAGES (15 U.S.C. § 1117(a))**

3   Apple has the burden of proving actual damages by a preponderance of the evidence.  Damages
means the amount of money which will reasonably and fairly compensate Apple for any injury to
4   Apple you find was caused by Samsung Electronics Company's, Samsung Electronics America's
or Samsung Telecommunications America's alleged infringement of Apple's trade dress.

5

You should consider any lost profits that Apple would have earned but for Samsung Electronics
6   Company's, Samsung Electronics America's or Samsung Telecommunications America's alleged
infringement.  Profit is determined by deducting all expenses from gross revenue.

7

If you find that any loss in sales shown by Apple was caused by other market factors and not as a
8   result of Samsung Electronics Company's, Samsung Electronics America's or Samsung
Telecommunications America's alleged infringement, then you should not award any amount for
9   lost profits or should reduce any such amount to account for the other market factors.

10

**Source**

11

Ninth Circuit Model Instruction No. 15.25 (modified) and the accompany Comment.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

## INSTRUCTION NO. 76—TRADE DRESS DAMAGES—DEFENDANT'S PROFITS

### (15 U.S.C. § 1117(A))

Apple also seeks Samsung Electronics Company's, Samsung Electronics America's, and Samsung Telecommunications America's profits from sales alleged to infringe Apple's trade dress on which you do not award Apple its alleged lost profits.  To recover Samsung Electronics Company's, Samsung Electronics America's and/or Samsung Telecommunications America's profits attributable to infringement, Apple has the burden of proving by clear and convincing evidence that the Samsung defendant found to infringe the trade dress acted willfully or in bad faith when it infringed Apple's trade dress.

Willful infringement means a deliberate intent to deceive consumers.

If you find that the infringing Samsung defendant did not intend to deceive consumers, you may not award that defendant's profits to Apple.

**Source**

*Adray v. Adry–Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995); *Lindy Pen Co., Inc. v. Bic Pen Co.*, 982 F. 2d at 1407 (9th Cir. 1993) ("Willful infringement carries a connotation of deliberate intent to deceive. Courts generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct that meets this standard."); *CollegeNET, Inc. v. XAP Corp.*, 483 F.2d 1058, 1066 (D. Oregon 2007) ("A finding of willful misconduct under the Lanham Act must be supported by clear and convincing evidence.  *See Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.*, 294 F.3d 227, 229 (1st Cir.2002).  *See also Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 208 (3d Cir.1995); *Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F.Supp.2d 332, 341 & n. 8 (D.N.J.2001)").

SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

**INSTRUCTION NO. 76.1—DAMAGES—TRADE DRESS INFRINGEMENT—**

**APPORTIONMENT OF DEFENDANT'S PROFITS**

Apple is only entitled to profits earned by an infringing defendant that are attributable to the infringement, if any, which Apple must prove by a preponderance of the evidence. You may not include in any award of profits any amount that you took into account in determining damages.

Profit is determined by deducting all expenses from gross revenue.

Gross revenue is all of the infringing defendant's receipts from using the trade dress in the sale of an infringing product. Apple has the burden of proving the infringing defendant's gross revenue by a preponderance of the evidence and with a reasonable certainty.

Expenses are all costs that the infringing defendant incurred in the production, distribution, or sale of the infringing products. The infringing defendant has the burden of proving the expenses.

You must also deduct from the profit award, if any, the portion of the profit attributable to factors other than the infringing defendant's use of the trade dress. The infringing defendant has the burden of proving profit attributable to factors other than the trade dress by a preponderance of the evidence.

**Source**

Ninth Circuit Model Instructions No. 15.26 (modified); *Rolex Watch, U.S.A., Inc., v. Michel Co.*, 179 F.3d 704, 712 (9th Cir. 1999) (plaintiff carries burden to show with "reasonable certainty" the defendant's gross sales from the infringing activity); *Lindy Pen Co.*, 982 F.2d at 1405-1408 (plaintiff has the burden of proof as to damages).

**ALTERNATIVE INSTRUCTION NO. 77 -- TRADE DRESS  DAMAGES – REASONABLE**

**ROYALTY[9]**

Apple is alternatively seeking actual damages in the form of a reasonable royalty.  To the extent you decide that Apple is not entitled to lost profits or to Samsung Electronics Company's, Samsung Electronics America's, and/or Samsung Telecommunications America's profits from an allegedly infringing sale, you may award Apple a reasonable royalty for that sale.

A royalty is a payment made to the owner of a trade dress by a non-owner in exchange for rights to use the trade dress.  A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the owner of the trade dress and the infringer taking place prior to the time when the infringing activity first began.  You may only impose a reasonable royalty for trade dress infringement, however, if you first find to a reasonable certainty that before the filing of this lawsuit Apple and the infringing defendant had or contemplated a license for the specific trade dress for which Apple claims damages.

If you find that Apple has demonstrated that a pre-lawsuit licensing arrangement existed, you should assume for purposes of the hypothetical negotiation that both parties understood the trade dress to be valid and infringed.  You should take into account what Apple's and the infringing defendant's expectations would have been if they had negotiated a royalty and had acted reasonably in their negotiations.  Your role is to determine what Apple and the infringing defendant would have agreed upon if they had negotiated in this manner, not just what either Apple or the infringing defendant would have preferred.

In determining a reasonable royalty, you may consider the following factors, in addition to any others that are shown by the evidence:

Royalties that others paid to Apple for the same trade dress;

Royalties that the infringing defendant paid to others for comparable trade dress;

Whether Apple had a policy of licensing or not licensing the trade dress;

Whether Apple and the infringing defendant are competitors;

Whether use of the trade dress helps to make sales of other products or services;

Whether the product made using the trade dress is commercially successful, as well as its profitability;

The advantages of using the trade dress over products not covered by the trade dress;

The extent of the infringing defendant's use of the trade dress and the value of that use to the defendant;

Any royalty amounts that are customary for similar or comparable trade dress;

---

[9]  As noted in the Joint Pre-Trial Order, Samsung does not believe that Apple is entitled to present a reasonable royalty theory for its trade dress infringement and dilution claims because: (a) it failed to disclose such theory in response to written discovery, even though specifically asked to do so; and (b) there is almost no legal support for such a theory in the context of a pure trade dress claim.

1    The portion of the profit on sales that is due to the trade dress, as opposed to other factors, such as features not covered by the trade dress or features, or improvements developed by defendant;

2

3    Expert opinions regarding what would be a reasonable royalty.

4    **Source**

5    *A&H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 208-09 (3rd Cir. 1999); *Buffalo Wild Wings Sings, Inc. v. Buffalo Wings & Rings*, No. 09-1426 (JRI/SER), 2011 WL

6    4537970, at *3-5 (D. Minn. Sept. 29, 2011); *Tokidoki, LLC v. Fortune Dynamic, Inc.*, No. CV07-1923 DSF, 2009 WL 2366439, at *14-15 (C.D. Cal., July 28, 2009).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

1

## **INSTRUCTION NO. 78—TRADE DRESS DILUTION DAMAGES—**

2

## **WILLFULNESS REQUIRED FOR DILUTION DAMAGES**

3
4
I have already instructed you about the meaning of, and when and how to calculate actual damages and infringer's profits with respect to Apple's trade dress infringement claim.  Those same standards apply to Apple's trade dress dilution claim with the following differences.

5
6
7
8
9
10
In order to recover monetary damages, either actual damages or infringer's profits, for its dilution claim, Apple must prove by a preponderance of the evidence that the trade dress was in fact injured or harmed by the alleged dilution.  Additionally, Apple must prove by clear and convincing evidence that Samsung Electronics Company, Samsung Electronics America and/or Samsung Telecommunications America willfully intended to cause dilution of the trade dresses. In other words, Apple must show that Samsung Electronics Company, Samsung Electronics America and Samsung Telecommunications America intended to trade on the recognition of Apple's trade dress or intended to harm Apple's reputation.  If you do not find that Apple's trade dress was in fact injured or harmed and that Samsung Electronics Company, Samsung Electronics America and/or Samsung Telecommunications America intended to trade on the recognition of Apple's trade dress or intended to harm Apple's reputation, you may not award Apple any damages for trade dress dilution.

11

12
**Source**

13
14
15
16
17
18
19
15 U.S.C. § 1117(a) (governs the award of monetary remedies in Lanham Act cases and provides for an award of defendant's profits, any damages sustained by the plaintiff, and the costs of the action); 4 *McCarthy* § 24:132 at 24-410 ("More than a mere likelihood of impairment or harm is needed to recover any damages or profits. Some proof of actual impairment or harm to the famous mark is required. In traditional likelihood of confusion law, courts require that more than a mere likelihood of confusion is required for damages: proof is usually needed that some consumers were actually confused or deceived. Similarly, in the author's view, monetary recovery for dilution requires some proof that the famous mark was in fact injured or harmed by the defendant's conduct."); *CollegeNET, Inc. v. XAP Corp*., 483 F.2d 1058, 1066 (D. Oregon 2007) ("A finding of willful misconduct under the Lanham Act must be supported by clear and convincing evidence. *See Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd*., 294 F.3d 227, 229 (1st Cir.2002).  See *also Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd*., 50 F.3d 189, 208 (3d Cir.1995); *Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F.Supp.2d 332, 341 & n. 8 (D.N.J.2001)").

20
21
22
23
24
25
26
27
28

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

## INSTRUCTION NO. 79—MONETARY REMEDIES—TRADE DRESS DILUTION—

## ACTUAL NOTICE REQUIREMENT

In order for Apple to recover damages for dilution of the registered iPhone trade dress, Apple has the burden of proving by a preponderance of the evidence that Samsung Electronics Company, Samsung Electronics America, and Samsung Telecommunications America had either statutory or actual notice that Apple's iPhone trade dress was registered.

Samsung Electronics Company, Samsung Electronics America, and Samsung Telecommunications America had statutory notice if:

> Apple displayed the particular alleged trade dress with the words "Registered in U.S. Patent and Trademark Office"; or

> Apple displayed the particular alleged trade dress the words "Reg. U.S. Pat. & Tm. Off.";
> or

> Apple displayed the particular alleged trade dress with the letter R enclosed within a circle,
> thus ®.

**Source**

Model Instructions No. 15.24 (modified).

1

### INSTRUCTION NO. 80—TRADE DRESS DAMAGES—NO DOUBLE-COUNTING

2

If you determine that Apple is entitled to monetary relief on its trade dress infringement or dilution claims, you should not award Apple monetary relief twice for the same sale of a Samsung product alleged to infringe or dilute Apple's trade dress. If you award Apple one form of remedy with respect to some but not all of Samsung's sales, you may award Apple a different remedy with respect to any remaining sales that you find infringed or diluted Apple's trade dress. However, you should not award Apple twice for the same sale.

3

4

5

**Source**

6

*Nintendo of America, Inc. v. Dragon Pacific Int'l*, 40 F.3d 1007, 1010 (9th Cir. 1994) ("Recovery of both plaintiff's lost profits and disgorgement of defendant's profits is generally considered a double recovery under the Lanham Act.")

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 11-cv-01846-LHK (PSG)
SAMSUNG'S PROPOSED DISPUTED JURY INSTRUCTIONS
AT THE CLOSE OF EVIDENCE. IN ORDER

1

**INSTRUCTION NO. 78.1—MONETARY REMEDIES—ONLY ONE RECOVERY PER**

2

**ACCUSED PRODUCT**

3 In calculating damages in this case, you may only award damages once with respect to each sale of
an accused product, even if you find that the product infringed more than one type of intellectual
4 property.  For example, if you find that an accused product infringes a utility patent and you
decide to award the patent holder lost profits resulting from the sale of that infringing product, you
5 may not award lost profits again because you find that the product also infringes another patent or
diluted trade dress.  You may only award damages once with respect to each sale of an accused
6 product, even if you find that the product infringes or dilutes multiple items of intellectual
property.
7

8 **Source**
*Aero Products Int'l, Inc. v. Intex Recreation Corp.,* 466 F.3d 1000, 1016 (Fed. Cir. 2006).
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28