QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Cal. Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Cal. Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Michael T. Zeller (Cal. Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>             Plaintiff,<br><br>       vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>             Defendants. | CASE NO. 11-cv-01846-LHK<br><br>**SAMSUNG'S TRIAL BRIEF**<br><br>PUBLIC REDACTED VERSION |

I.      **INTRODUCTION**

In this lawsuit, Apple seeks to stifle legitimate competition and limit consumer choice to maintain its historically exorbitant profits.   Android phones manufactured by Samsung and other companies – all of which Apple has also serially sued in numerous forums worldwide -- offer consumers a more flexible, open operating system with greater product choices at a variety of price points as an alternative to Apple's single, expensive and closed-system devices.

That Samsung is able to offer such a wide variety of quality mobile telecommunications devices is no coincidence.   Samsung has been researching and developing mobile telecommunications technology since at least as early as 1991 and invented much of the technology for today's smartphones.   Indeed, Apple, which sold its first iPhone nearly twenty years after Samsung started developing mobile phone technology, could not have sold a single iPhone without the benefit of Samsung's patented technology.   Even as Apple has carried out a coordinated campaign of dragging Samsung's name through the mud in this lawsuit and in the media, it has used Samsung's patented technology while flatly refusing to pay for its use.

For good measure, Apple seeks to exclude Samsung from the market, based on its complaints that Samsung has used the very same public domain design concepts that Apple borrowed from other competitors, including Sony, to develop the iPhone.   Apple's own internal documents show this.   In February 2006, before the claimed iPhone design was conceived of, Apple executive Tony Fadell circulated a news article that contained an interview of a Sony designer to Steve Jobs, Jonathan Ive and others.   In the article, the Sony designer discussed Sony portable electronic device designs that lacked "excessive ornamentation" such as buttons, fit in the hand, were "square with a screen" and had "corners [which] have been rounded out."   Ex. 18 (DX 649).[1]   Immediately after this article was circulated internally, Apple industrial designer Shin Nishibori was directed to prepare a ███████ design for an Apple phone and had CAD drawings and a three-dimensional model prepared.   *See* Exs. 1-2 (DX 623; DX 562).

---

[1]      All citations to "Ex." refer to exhibits attached to the Declaration of Joby Martin, filed concurrently herewith.

1   Eliminating any doubt about the origin of the design's inspiration, Apple's internal CAD drawings

2   ████████████████████████████████████████ on the phone design.   *Id.*   Only days

3   later, Apple designer Richard Howarth reported that, in contrast to another internal design that was

4   then under consideration, Mr. Nishibori's █████████████████████████████████████

5   ████████████████████████████████████████████   As Mr.

6   Nishibori has confirmed, his ███████ design changed the direction of the project that yielded

7   the final iPhone designs.

8          Contrary to the image it has cultivated in the popular press, Apple has admitted in internal

9   documents that its strength is not in developing new technologies first, but in successfully

10  commercializing them.   When Apple was developing its campaign to promote the first iPhone, it

11  considered – and rejected – advertisements that touted alleged Apple "firsts" with the iPhone.   As

12  one Apple employee explained to an overly exuberant Apple marketer, ███████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ██████████████████████████████

17         Also contrary to Apple's accusations, Samsung does not need or want to copy; rather, it

18  strives to best the competition by developing multiple, unique products.   Samsung internal

19  documents from 2006, well before the iPhone was announced, show rectangular phones with

20  rounded corners, large displays, flat front faces, and graphic interfaces with icons with grid

21  layouts.   Furthermore, much of what Apple complains of is the "benchmarking" of competitive

22  products by Samsung.   But this is a universal practice in the smartphone, tablet and other

23  consumer electronics markets.   It involves doing side-by-side product comparisons of

24  competitors' products.   Samsung certainly does this; so does Apple, and so does any company

25  interested in continually improving its products for the benefit of consumers.   There is nothing

26  wrong with this common industry practice.   That Apple itself zealously engages in the same type

27  of benchmarking says everything about the disingenuous nature of Apple's allegation that this

28  evidences "copying."

1    Apple's anticompetitive lawsuit should not be rewarded, and Apple should pay Samsung

2    for Apple's use of Samsung's patented technology, without which Apple could not have become a

3    successful participant in the mobile telecommunications industry.

4    **II.    APPLE'S COPYING ALLEGATIONS ARE BASELESS**

5    In order to distract from the weakness of its infringement claims, Apple offers misguided

6    allegations of copying that are refuted by evidence of Samsung's independent creation.   Prior to

7    the iPhone's announcement in January 2007, Samsung was already developing numerous products

8    and models with the same design features that Apple now claims were copied from the iPhone.

9    In the summer of 2006, Samsung began designing its next generation of mobile phones, based on

10   the market trend of ever-increasing screen size.   At that time, Samsung's designers envisioned a

11   basic design: a simple, rounded rectangular body dominated by a display screen with a single

12   physical button on the face.   *See, e.g.,* Exs. 5-6 (DX 522; DX 625).   For example, internal

13   Samsung design presentations from the summer of 2006 showed the following designs Samsung

14   was considering:



24   *Id.*   One of these designs became the Samsung F700 phone, which was the subject of a Korean

25   design registration application in December 2006, a month before Apple unveiled the iPhone.

26   Ex. 7 (DX 519).   Tellingly, Apple at first included Samsung's F700 in its indiscriminant

27   "copying" allegations, but later withdrew its infringement charges once Samsung's prior,

28

independent creation left Apple no choice but to concede that its copying accusations against that device were false.

Also during this time period during the Summer and Fall of 2006, Samsung designers envisioned a simple icon interface, with rounded rectangular icons arranged in a grid format, appropriately spaced for the size of the screen and the human hand.  *See, e.g.,* Ex. 8 (DX 566). As one example, an internal Samsung design presentation dated September 14, 2006 showed the following GUI layouts and adjustable orientations:

 

*Id*.

As these documents confirm, Samsung independently developed the allegedly copied design features months before Apple had even announced the iPhone.   It did not switch its design direction because of the iPhone.   Contrary to Apple's cherry-picked "pre" and "post" iPhone choices of Samsung's phones, Samsung designed and developed large screen smartphones before the iPhone—as well as bar type phones, sliders, and folder phones.   Samsung continued to do so after the iPhone as well:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16
17
Ex. 9 (DX 684).

18          In contrast, Apple's supposed proof of copying consists of competitive benchmarking and

19 analysis documents created by Samsung.   Apple itself, however, regularly conducts the same

20 types of detailed competitor analyses that it now contends proves copying.   For example, Apple

21 conducted tear-downs of Samsung products—such as the Vibrant, Galaxy Tab 10.1, Juke, and YP-

22 R1 MP3 player—to analyze ████████████████████

23 ████████████   Exs. 10-13 (DX 708; DX 714; DX 715; DX 717).   Apple maintains and regularly

24 circulates a "competitive tracker," which keeps close tabs on competing smartphones and tablets,

25 compiling data on ██████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████

28

1    For its part, Apple's "revolutionary" iPhone design was derived from the designs of a

2  competitor—Sony.   In February 2006, before the claimed iPhone design was conceived of, Apple

3  executive Tony Fadell circulated a news article to Steve Jobs, Jonathan Ive and others.   In the

4  article, a Sony designer discussed Sony designs for portable electronic devices that lacked buttons

5  and other "excessive ornamentation," fit in the hand, were "square with a screen" and had "corners

6  [which] have been rounded out."   Ex. 18 (DX 649).   Right after this article was circulated

7  internally, Apple industrial designer Shin Nishibori was directed to prepare a ███████ design

8  for an Apple phone and then had CAD drawings and a three-dimensional model prepared.   *See*

9  Exs. 1-3 (DX 623; DX 690; DX 562).   Confirming the origin of the design, these internal Apple

10  CAD drawings prepared at Mr. Nishibori's direction even had ████████████████████

11  on the phone design, as the below images from Apple's internal documents show:



20  Soon afterward, on March 8, 2006, Apple designer Richard Howarth reported that, in contrast to

21  another internal design that was then under consideration, Mr. Nishibori's ███████ design

22  enabled ████████████████████████████████████████████████

23  ██████████████████████████████████████████   As Mr.

24  Nishibori has confirmed in deposition testimony, this ███████ design he prepared changed

25  the course of the project that yielded the final iPhone design.

26    Design was not the only thing Apple took from other companies in developing the iPhone.

27  While Apple touts itself in the popular press as a company of "firsts," it recognizes the opposite

28  internally.   As Apple admitted in internal emails, Apple was not the first ███████

1     ███████████████████████████████████████████ Ex. 4 (DX 578).

2 Nor was it the ████████████████████████████ *Id.*  Indeed, as one

3 Apple employee explained to an overly enthusiastic marketer, ████████████

4 ████████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████████

6 ███████████████████████████ *Id.*

## III.    APPLE'S UTILITY PATENTS

Apple's utility patents relate to ancillary features that allow users to perform trivial touch screen functions, even though these technologies were developed and in widespread use well before Apple entered the mobile device market in 2007.  Samsung does not infringe any of Apple's patents and has located dead-on prior art that invalidates them.

### A.    Claim 19 of U.S. Patent No. 7,469,381 Patent is Invalid and Not Infringed

Apple asserts that 23 Samsung products infringe claim 19 of the '381 patent, which claims a touch screen device capable of performing a "bounce-back" function.   Samsung's products do not infringe claim 19.   As an initial matter, Apple and its expert's infringement analysis is improperly limited to "representative" products and source code, and generalizations that other products running the same major release of the Android operating system behave in the same way. Products running the same Android release often behave differently, however.   Thus, Apple's reliance on "representative" products and source code cannot meet its burden of proving infringement by many of the accused products.

In addition, Samsung's products exhibit numerous features that do not meet the limitations of the '381 patent, as interpreted by the Court.   These non-infringing features include (1) a "hold still" behavior, where Samsung's products do not translate the electronic document in a second direction; (2) a general snapping behavior, where Samsung's products snap forward, not backward, if the user scrolls beyond a threshold point; and (3) a "hard stop" behavior, where Samsung's products do not display an area beyond the edge of the electronic document.

Furthermore, the '381 patent is invalid in light of the prior art that discloses the same "bounce-back" feature.   These references include the Tablecloth program installed on the

1   DiamondTouch system developed by Mitsubishi Electric Research Laboratory ("MERL"), the

2   LaunchTile and XNav programs developed by Dr. Benjamin Bederson, and International

3   Publication Number WO 03/081458.[2]

4   **B.      Claim 8 of U.S. Patent No. 7,844,915 Is Invalid and Not Infringed**

5       Apple asserts that 25 Samsung products infringe claim 8 of the '915 patent, which claims a

6   touchscreen device capable of distinguishing between single-input scroll operations and multi-

7   input gesture operations.   Samsung's products do not infringe claim 8 for at least two reasons.

8   First, Samsung's products do not include an "event object" that "invokes a scroll" or gesture

9   operation.[3]   Apple identifies a MotionEvent object in the accused products as the "event object"

10  created in response to detecting user input.   Apple concedes, however, that a completely different

11  object—the WebView object, which is not an "event object"—is the only object that causes

12  scrolling or scaling.   Second, Samsung's products permit multi-finger scrolling, and therefore

13  distinguish between scrolling and gesture operations based on criteria other than the number of

14  inputs, as required by claim 8.

15      Moreover, Apple did not invent multi-touch gesture recognition.   The '915 patent is

16  invalid in light of prior art such as the Mandelbrot program installed on MERL's DiamondTouch

17  system, Japanese Patent Publication Number 2000-163031, and Jefferson Han's multi-touch

18  system from the 2005 SIGGRAPH conference.

19  **C.      Claim 50 of U.S. Patent No. 7,864,163 Is Invalid and Not Infringed**

20      Apple asserts that 25 Samsung products infringe claim 50 of the '163 patent, which claims

21  a touch screen device capable of enlarging and translating a "structured electronic document."

22  Apple cannot carry its burden of proving infringement of claim 50, however.   For example,

---

24

25   [2]   By discussing specific prior art references, Samsung in no way waives its right to present
26  evidence of other prior art references cited in Samsung's Invalidity Contentions, interrogatory
    responses, and Notice of Prior Art Pursuant to 35 U.S.C. § 282.

27   [3]   The Court construed "event object invokes" a scroll or gesture operation to mean the
    "event object causes" a scroll or gesture operation.   (Dkt. 1159 at 18-20.)

28

Apple fails to identify how Samsung's products display a structured electronic document with a plurality of boxes of content; instead, Apple's expert merely superimposes rectangles on logical regions of a webpage.   Apple also fails to show that the accused products "determin[e] a first box in the plurality of boxes at the location of the first gesture," because Apple only addresses cases involving a *single* box—not a plurality of boxes—at the location of the first gesture.   Finally, Apple fails to show that the accused products translate the structured electronic document so that the first and second boxes are substantially centered, because the instances of alleged infringement only show centering in one direction or no direction at all, or cases where no "translating" occurs because the box is already centered prior to the gesture.

Moreover, the '163 patent discloses the use of techniques (zooming and panning) that were well-known, as shown by references.   For instance, Dr. Bederson's LaunchTile and XNav programs publicly disclosed each limitation of claim 50 prior to Apple's asserted conception date. The '163 patent is also anticipated by Bryan Agnetta's prior invention, described in a provisional patent application, No. 60/718,187.   Finally, U.S. Patent Publication No. 2002/0030609 reinforces the '163 patent's lack of novelty by showing a motivation to combine techniques used in application management systems with browser applications on portable electronic devices.

## IV.    APPLE'S DESIGN PATENT CLAIMS

Apple persists in misstating the legal standards for design patent infringement, including as it seeks to present them to the jury during trial.

### A.    Design Patent Infringement Requires Deceptive Similarity

Apple must prove that an ordinary observer, conversant with the prior art, would be deceived into buying the accused product thinking that it was the same design as the patented design.   The Supreme Court so held in *Gorham Co. v. White*, 81 U.S. 511, 528 (1872):   "We hold, therefore, that if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, *if the resemblance is such as to **deceive** such an observer, **inducing** him to purchase one supposing it to be the other*, the first one patented is infringed by the other."   (emphasis added).   As the Court explained, deception is required and is fundamental to the purpose of design patent protection:

It is persons of the latter class [i.e., ordinary observers] who are the principal purchasers of the articles to which designs have given novel appearances, and if they are misled, and induced to purchase what is not the article they supposed it to be, if, for example, they are led to purchase forks or spoons, deceived by an apparent resemblance into the belief that they bear the "cottage" design, and, therefore, are the production of the [patent holder] …, when in fact they are not, the patentees are injured, and that advantage of a market which the patent was granted to secure is destroyed.

*Id.* (emphasis added).

*Gorham* remains binding precedent, and the Federal Circuit's *en banc* decision in *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008), reiterated that *Gorham* is the sole test for infringement.   "In the language used by the Supreme Court in *Gorham*, 81 U.S. at 528, we hold that the accused design could not reasonably be viewed as so similar to the claimed design that a purchaser familiar with the prior art would be deceived by the similarity between the claimed and accused designs, 'inducing him to purchase one supposing it to be the other.'"   543 F.3d at 681.   The Federal Circuit has recited and applied this standard time and time again—both before and after *Egyptian Goddess*.   *See, e.g., Crocs v. ITC*, 598 F.3d 1294, 1303 (Fed Cir. 2010) ("To show infringement under the proper test, an ordinary observer, familiar with the prior art designs, **would be deceived** into believing that the accused product is **the same** as the patented design.") (emphasis added); *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1295 (Fed. Cir. 2010) (infringement occurs where "an ordinary observer **would be deceived** into thinking that any of the [accused] designs were the same as [the] patented design") (emphasis added); *Amini Innovation Corp. v. Anthony California, Inc.*, 439 F.3d 1365, 1371 (Fed. Cir. 2006) ("If a design includes both functional and ornamental features, infringement occurs if an ordinary person **'would be deceived** by reason of the common features in the claimed and accused designs which are ornamental.'" (quoting *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 825 (Fed. Cir. 1992)) (emphasis added)).

Apple concedes that *Gorham*'s "such as to deceive" language is "an elaboration on how similar two designs must be to be 'substantially the same.'"   *See* Disputed Jury Instructions, Dkt No. 1232 at 164.   Yet, Apple advocates withholding from the jury this indispensable aspect of the legal test.   *Id.*   Apple likewise seeks to truncate *Gorham*'s language that deception must be

considered in the purchasing context.   Dkt No. 1232 at 165.   As its justification, Apple contends that Samsung supposedly uses the phrase "to suggest that there needs to be evidence of deception of a consumer purchasing a Samsung product for an Apple product in order to prove infringement."   Dkt No. 1232 at 164.   Tellingly, Apple cites nothing where Samsung has advocated such a requirement.   Also contrary to Apple's suggestion, courts have repeatedly found evidence of deception — or lack thereof — in the real world purchasing context to be relevant to the inquiry.   *See, e.g.*, *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1125-26 (upholding a design patent infringement ruling based on evidence of real world confusion between products); *Arminak & Assocs. Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1324 (Fed. Cir. 2007) (relying on expert and lay testimony there would be no confusion between patentee's product and accused product); *OddzOn Prods, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405-07 (Fed. Cir. 1997) (finding real world confusion evidence relevant but insufficient because it did not factor out functional features).

As another justification for its misstatements of the *Gorham* test, Apple complains that "emphasis on the 'purchase' phrase in *Gorham* may mislead the jury away from focusing on and comparing the claimed *designs*."   *Id.* at 165 (emphasis in original).   But informing the jury about the proper legal standard as articulated by binding precedent is scarcely a distraction or misleading.   Indeed, the very definition of what makes two designs "substantially the same" is that the ordinary observer would be deceived in purchasing.   "Two designs are substantially the same *if* their resemblance is *deceptive to the extent* that it would *induce* an ordinary observer, giving such attention as a purchaser usually gives, *to purchase* an article having one design supposing it to be the other."   *Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1313-14 (Fed. Cir. 2001) (emphasis added); *see also Arminak*, 501 F.3d at 1321 ("This test *requires* an objective evaluation of the question of whether a hypothetical person called the 'ordinary observer' would find substantial similarities between the patented design and the accused design, so as to be *deceived into purchasing* the accused design believing it is the patented design.") (emphasis added).   This Court has recognized this as well, expressly ruling that "designs are 'substantially the same, if the resemblance is such as to deceive [an ordinary observer], inducing

1   him to purchase one supposing it to be the other.'"   Dkt No. 449 at 9-10 (quoting *Egyptian*

2   *Goddess*, 543 F.3d at 670).[4]

3   **B.    Minor Differences Matter**

4         Apple argues that "[m]inor differences should not prevent a finding of infringement."

5   Dkt No. 1232 at 157.   But this is contrary to law.   The hypothetical ordinary observer is

6   assumed to be familiar with the prior art.   *Egyptian Goddess*, 543 at 681-83.   Here, the crowded

7   field of art includes a spectrum of rectangular devices with rounded corners, flat surfaces, bezels,

8   display screens with borders around them, and lozenge shapes above display screens.

9   Accordingly, the hypothetical ordinary observer will readily identify and take into account

10   differences that may go unnoticed in the abstract, such as the specific roundness of a corner,

11   thickness of a border, or shape of a bezel.   "[D]ifferences between the claimed and accused

12   designs that might not be noticeable in the abstract can become significant to the hypothetical

13   ordinary observer who is conversant with the prior art."   *Egyptian Goddess*, 543 F.3d at 678; *see*

14   *also id.* ("[W]hen the claimed design is close to the prior art designs, *small differences* between

15   the accused design and the claimed design are likely to be important to the eye of the hypothetical

16   ordinary observer.") (emphasis added).   This Court too has recognized this already, noting that

_____

18         [4] This and other formulations of the test appear verbatim in Samsung's instruction, yet Apple
19   erroneously suggests that Samsung is rewording the standard.   Dkt No. 1232 at 164.   Apple also
     quarrels with the phrase "deceptively similar" used in Samsung instructions as shorthand for the
20   infringement test.   This is surprising because the phrase is pulled straight out of Federal Circuit
     precedent.   Just two years ago in *Richardson v. Stanley Works*, for example, the Federal Circuit
21   stated that "infringement cannot be found unless the accused product creates an appearance
     ***deceptively similar*** to the claimed design."   597 F.3d at 1296 (citing *Egyptian Goddess*).   In
22   *Arminak v. Saint-Gobain*, the Federal Circuit commended the trial court for applying the design
     patent infringement test "in the proper manner" because it "determine[d] whether an ordinary
23   observer would find the accused design ***deceptively similar***" to the patented design.   501 F.3d
     1314, 1327 (Fed. Cir. 2007).   And *Egyptian Goddess* itself said that where an accused design
24   copies a novel feature of the asserted design, it is "more likely to be regarded as ***deceptively***
     ***similar*** to the claimed design, ***and thus infringing***."   543 F.3d at 677 (emphasis added).
25   Apple's related objection to Samsung's design patent infringement instruction that the phrase
     "deceptively similar" is used instead of the phrase "substantially the same" in what is otherwise a
26   direct quote from *Arminak* is wrong.   Dkt No. 1232 at 165.   As shown, the phrase "deceptively
27   similar" was the choice of the *Arminak* Court itself.   It is not the creation of Samsung.

"the prior art references identified by Samsung, as well as the overall simplicity of the D'677 patent, may make minor differences between the patent-in-suit and the front view of the Infuse 4 — for example, the addition of buttons and writing on the Samsung Infuse 4 that are not present in the Apple patents — take on greater significance in the eyes of the ordinary observer."  Dkt No. 449 at 27; *see also id* at 26 ("Moreover, given the simplicity of the design at issue, and the fact that consumers purchasing this product are purchasing an expensive electronic device, minor differences between the patent and the accused device are likely to take on greater significance in the eyes of the ordinary observer.").

Minor differences that are important to the ordinary observer conversant with the prior art can certainly prevent a finding of infringement.  For example, in *Smith v. Whitman Saddle Co.*, 148 U.S. 674 (1893), a case heavily relied on in *Egyptian Goddess*, the hypothetical ordinary observer was held to distinguish the accused and claimed saddle designs based solely on the angle of the drop at the rear of the pommel because a combination of prior art designs yielded a design having all but that feature.  *Id.* at 682; *see also Arminak v. Saint-Gobain*, 501 F.3d 1314, 1324-25 (Fed. Cir. 2007) (finding ordinary observer would not be deceived where only minor differences existed).  As another example, in *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*, 162 F.3d 1113, 1115 (Fed. Cir. 1998), the plaintiff asserted infringement of the patent on the left below by the design on the right.



The court held that "[a]lthough there are apparent similarities in the overall appearance of the designs, we affirm the conclusion that the trucker as ordinary observer would notice the differences in the designs and recognize that they are not colorably the same."  *Id.* at 1121-22. Any generalized argument by Apple that minor differences must preclude a finding of non-

infringement is therefore unsupported by law and misleading.   This is especially true where, as here, Apple is claiming only parts of a hand-held device with minimal features.

### C.    Design Patents Do Not Protect The Shape Or Configuration Of A Design Absent The Surface Ornamentation

Apple urges that its design patents cover the shape or configuration of an article regardless of the surface ornamentation.   This is contrary to precedent as well as legislative amendments to the Patent Act, which currently permits design patents only for the "new, original, and *ornamental* design for an article of manufacture."   35 U.S.C. 171 (emphasis added).

The Patent Act previously offered protection for shapes, but that provision was removed over a century ago.   Before then, the Patent Act protected a range of design patent types including those for "any new, useful, and original ***shape or configuration*** of any article of manufacture."   Act of July 8, 1870, c. 230, § 71, 16 Stat. 209 (emphasis added); *see also* Act of Aug. 29, 1842, c. 263, § 3, Stat. 543 (providing protection for "any new and original ***shape or configuration*** of any article of manufacture") (emphasis added).   In 1902, Congress replaced that section with what is essentially the language in effect today.   *See* Act of May 9, 1902, c. 783, § 4929, 32 Stat. 193 ("Any person who has invented any new, original, and ***ornamental design*** for an article of manufacture . . .") (emphasis added); Act of July 19, 1952, c. 950, § 171, 66 Stat. 805 ("Whoever invents any new, original and ***ornamental design*** for an article of manufacture may obtain a patent therefor . . ."); *see also* 37 C.F.R. § 1.153 ("The claim shall be in formal terms to the ornamental design for the article (specifying name) as shown, or as shown and described.").

Federal Circuit law confirms that design patents are "limited to ornamentation" and "do not and cannot include claims to the structural or functional aspects of the article."   *Lee v. Dayton-Hudson*, 838 F.2d 1186, 1188 (Fed. Cir. 1988).   There, the Court cited to the current statute in rejecting the patentee's argument that "the novelty of his design resides in its basic configuration, not the surface details".   *Id.*   Relatedly, mere symmetry is also not a protectable ornamental feature.   *In re Carletti*, 328 F.2d 1020, 1022 (Cust. & Pat. App. 1964) ("The creation or origination of an ornamental design does not reside in the mere avoidance of dissymmetry.").

1    Apple's attempt to assert its patents to monopolize the shape of an article irrespective of the

2    surface details found in either the patent or the accused devices is contrary to law.

3    **V.       SAMSUNG'S PATENT INFRINGEMENT CLAIMS AGAINST APPLE**

4            Unlike Apple, which was not a participant in the mobile communications industry until it

5    released the first iPhone in mid-2007, Samsung began developing mobile communications

6    technology in 1991.   Samsung has since invested billions of dollars in developing the backbone

7    of the industry and the wireless standards necessary for smartphones.   Between 2005 and 2010

8    alone, Samsung invested $35 billion in research and development relating to telecommunications

9    technology, with over 20,000 engineers worldwide dedicated to telecommunications research and

10   development.

11           Apple relied heavily on Samsung's technology to enter the telecommunications space, and

12   it continues to use Samsung's technology to this day in its iPhone and iPad products.   For

13   example, Samsung supplies the flash memory, main memory, and application processor for the

14   iPhone.   Samsung also manufactures Apple's A5X processor and is the sole supplier of the

15   Retina display used in the new iPad.   But Apple also uses patented Samsung technology that it

16   has not paid for.   This includes standards-essential technology required for Apple's products to

17   interact with products from other manufacturers, and several device features that Samsung

18   developed for use in its products.

19           **A.       Apple's Infringement of Samsung's Standards Patents**

20           Standards organizations are an important part of telecommunications technology, setting

21   requirements that ensure that components from different manufacturers are compatible.   The

22   most important telecommunications organization is the European Telecommunications Standards

23   Institute, or ETSI, which produces global standards for information and communications

24   technologies.   ETSI creates these standards in "working group" meetings in which companies

25   submit proposals identifying a new standard or an improvement on an existing standard.

26   Samsung has played an active role in these working group meetings, and its contributions have

27   helped build the standards used in the telecommunications industry.   Some of these contributions

28

1  are the subject of the three standards-essential patents at issue in this lawsuit, which Apple uses

2  and benefits from through its compliance with ETSI standards.

3      The first of these, U.S. Patent No. 7,675,941 ("the '941 patent"), is directed to a "method

4  and apparatus for transmitting/receiving packet data using pre-defined length indicator in a mobile

5  communications system."   In general, the '941 patent allows a cell phone's processor to quickly

6  determine what kind of data is being sent, allowing for less computing time, faster data speeds and

7  longer battery lives.   Specifically, when data is transmitted in a mobile device it is first broken

8  into chunks and these chunk broken into even smaller groups.   When the data is received, a

9  computer processor re-assembles the smaller groups back into the original data.   The '941 patent

10  recognizes which of these smaller groups of data can be processed most quickly and then unpacks

11  those particular groups and immediately forwards them to the correct component, reducing the

12  time and resources required to process data and resulting in faster data transfer.

13      This technology, referred to as the "Alternative E-Bit Technology," is required by the

14  3GPP specification.   In order to sell a wireless phone, Apple must comply with the 3GPP

15  specification, which necessitates use of the Alternative E-Bit Technology.   Apple's products

16  therefore benefit from the Alternative E-Bit Technology and infringe Samsung's '941 patent.

17      Samsung's second standards patent, U.S. Patent No. 7,447,516 ("the '516 patent"), is

18  directed to a "method and apparatus for data transmission in a mobile telecommunication system

19  supporting enhanced uplink service."   The '516 patent keeps the power used by radio antennae

20  on mobile devices below the limit imposed by the Federal Government, while simultaneously

21  ensuring that all necessary information is still sent.   The '516 patent thus helps reduce

22  interference in crowded networks and helps calls intended for one person from being overhead by

23  others.   Apple's infringement of the '516 patent is confirmed by its compliance with the 3GPP

24  standard as well as third-party testing documents.

25      **B.**     **Apple's FRAND Defenses Are Meritless**

26      Long before Apple even announced any of its 3G products that use Samsung's standards-

27  essential technology, Samsung had offered licenses for these patents(along with other patents) to

28  virtually every major player in the mobile phone industry, successfully striking cross-licensing

1  deals with all of them.  After Apple released products that use the technology patented in the

2  '941 and '516 patents, Samsung similarly offered a cross-licensing deal to Apple, asking for a fair

3  and reasonable royalty in return for Apple's use of Samsung's technology.   Unlike all the major

4  players in the mobile phone industry, however, Apple refused to enter a cross-licensing deal with

5  Samsung.

6          Instead, despite the fact that virtually every other major industry participant was willing to

7  take a license from Samsung for use of the standards-essential patents in this suit, Apple claimed

8  that Samsung's patents are unenforceable because, according to Apple, Samsung should have

9  disclosed these patents to ETSI during the working group discussions concerning the technology.

10  But the '941 and '516 patents did not even *exist* at that point.   What Apple is really arguing is

11  that Samsung should have disclosed confidential Korean patent applications during the working

12  group discussions—but this is contrary to ETSI's own rules, which expressly exclude confidential

13  information from ETSI's disclosure requirements for intellectual property rights, or so-called

14  IPRs.   In fact, ETSI's Guide on IPRs instructs ETSI members that technical meetings are not an

15  appropriate place for discussion of IPRs.   And Apple's own expert on this issue, a former

16  Chairman of the Board of ETSI, has stated that he cannot recall a participant ever disclosing IPRs

17  in the working group meetings.

18          Apple argues in the alternative that Samsung's proposed royalty is not fair and reasonable,

19  but Samsung's opening offer to Apple is consistent with the royalty rates other companies charge

20  for use of their standards-essential patents.   Moreover, Apple never even made a counteroffer.

21  Instead, it simply rejected Samsung's opening offer, refused to negotiate further and to this day

22  has not paid Samsung a dime for Apple's use of Samsung's standards-essential technology.

23          **C.      Apple's Infringement of Samsung's '460, '711 and '893 Patents**

24          In addition to infringing Samsung's standards patents, Apple's products use features

25  invented and patented by Samsung, and infringe the three remaining patents Samsung has asserted

26  in this lawsuit.   The first of these patents, U.S. Patent No. 7,577,460 ("the '460 patent"), is

27  directed to the integration of a cell phone, digital camera and email technologies in a single device.

28  Samsung is    asserting Claim 1 of the '460 patent at trial, which describes Samsung's   innovation

as a five-step method performed on a camera phone.   Together, these five steps describe three core functions performed on a camera phone – sending text-only emails, sending emails displaying both text and an image, and sequentially displaying images stored on the device. Apple's products perform the five steps and three core functions described in the '460 patent.

The technology patented by the second of Samsung's feature patents, U.S. Patent No. 7,456,893 ("the '893 patent"), is also used by Apple's iPhones and iPads.   The '893 patent allows users to bookmark an image in an image gallery so that, after taking new pictures with the camera, the user returns to that same image instead of the new images.   At the time of this invention, galleries on digital cameras displayed the most recently captured image, which resulted in users losing their place in the image gallery if they paused to take new photos.   Samsung's bookmarking invention is described in claim 10 of the '893 patent, which is infringed by Apple's iPhones and iPads.   Importantly, Apple did not incorporate this patented feature into any of its devices until seven months after the '893 Patent issued.

The third of Samsung's asserted feature patents, U.S. Patent No. 7,698,711 ("the '711 patent"), addresses the longstanding problem earlier mobile devices had with allowing users to multi-task while listening to music in the background.   The patented technology solved this problem by providing users with the ability to play music in the background while simultaneously accessing other programs and menus.   Apple's products use this feature and infringe Samsung's '711 patent.

## VI.   DAMACES

### A.   Unlike Samsung's Reasonable Royalty Claims, Apple's Claims For Lost Profits and Disgorgement of Samsung's Profits Lack Credibility

Apple's overreaching claim for damages is a natural extension of its attempt to monopolize the marketplace.   It demands the entirety of Samsung's revenues on the accused phones and tablets for the alleged infringement of a design patent that shows little more than a blank rectangle with rounded corners.   It seeks to collect "lost profits" despite the fact that no one buys phones because they have "bounce back" feature or other manifestations of Apple's alleged inventions

1   asserted in this case.   Damages are meant to compensate, not confer an absurd windfall at the

2   expense of competitions and consumers worldwide."

3       Samsung, on the other hand, has simply demanded a reasonable royalty for its patents.

4   Samsung invested billions of dollars in researching and developing wireless technology, including

5   contributions Samsung has made to the UMTS standard.   The UMTS standard is important to the

6   performance of smartphones and, like other smartphone manufacturers, Apple charges consumers

7   a premium for devices that use UMTS standards because they perform better.   Unlike Samsung,

8   however, Apple did not contribute to the development of the UMTS standard.   Nor has Apple

9   paid for its use of the UMTS technology Samsung developed.   Apple should not be allowed to

10   free-ride on Samsung's investments without paying for the use of Samsung's technology.

11       Samsung's royalty rate for its standards patents is a reasonable percentage of the selling

12   price of the device using the UMTS standard, which is consistent with other industry license rates

13   for smartphones using standards patents.   While Samsung's standards patents enable a mobile

14   device to actually work, Samsung's feature patents make mobile devices more convenient for

15   people to use.   Consequently, the royalty for those patents is less.

16       **A.**   **Under Section 289, Apple May Only Recover Profits From The Allegedly**

17   **Infringing Cases Of Samsung's Products, Not Their Functional Contents And Components.**

18       Apple seeks to recover windfall profits that bear no proportion to any claimed harm to

19   Apple or alleged wrongful gains by Samsung.   According to Apple, the *cases* of Samsung's

20   phones and tablets are infringing because those cases infringe Apple's patented designs.   Yet

21   Apple seeks *all* of Samsung's profits from sales of the accused phones and tablets on the grounds

22   that 35 U.S.C. § 289 purportedly grants such a windfall – even if the non-infringing contents of

23   Samsung's devices are in fact what creates Samsung's profits.   Apple's request for a non-

24   compensatory windfall overlooks Section 289's requirement that profits disgorgement be limited

25   to the "article of manufacture" to which a patented design is applied, and is contrary to law.   The

26   Court has not previously addressed the identity of Section 289's "article of manufacture" as

27

28

1   applied to the D'889, D'087 and D'677 design patents; it will need to do so should liability be

2   found.

3       The Federal Circuit explained in *Nike Inc. v. Wal-Mart Stores*, 138 F.3d 1437, 1442 (Fed.

4   Cir. 1998), that the legislature removed "the need to apportion the infringer's profits between the

5   patented design and the article bearing the design" in the Act of 1887, which led to the current

6   Section 289.   It remains necessary under Section 289, however, to determine the amount of

7   profits earned from the "article of manufacture to which [the patented] design or colorable

8   imitation has been applied".   35 U.S.C. § 289.   A Second Circuit case explains how to make that

9   determination where, as here, the product that is sold consists of an ornamental case that surrounds

10  a functional core.   *See Bush & Lane Piano Co. v. Becker Bros.*, 222 F. 902, 903-904 (2d Cir.

11  1915) ("*Bush & Lane Piano*"); *see also Bush & Lane Piano Co. v. Becker Bros.*, 234 F. 79 (2d

12  Cir. 1916) (opinion after remand) ("*Bush & Lane Piano II*").

13      In *Bush & Lane Piano*, the plaintiff proved infringement of its patented design for a piano

14  case – i.e., "the structure which incloses and holds in position the piano proper, viz., the part

15  which produces the music. The former appeals to the eye, the latter to the ear."   222 F. at 903.

16  Applying the Act of 1887, the predecessor to Section 289, the Court ***reversed*** an award of "the

17  entire profits of the sales of the piano and case," holding instead that only "the profits upon the

18  sale of the case" could be disgorged.   *Id.*   The Court explained:

19          To attribute the sale of 958 Imperial pianos solely to the design of the case which
            inclosed them seems unwarranted. Such a supposition is unsupported by the proof
20          and involves too violent a presumption to be accepted. What Lane invented was a
            piano case, not a piano. He received a patent for a 'piano case' and not for a piano,
21          but he has recovered the profits on 958 pianos.

22  *Id.* at 904.   A dissent urged that all profits from piano sales properly were awarded under the Act

23  of 1887 because "the article which the complainant manufactures and sells is a piano and the

24  article to which the design is applied is a piano," and the "complainant neither manufactures the

25  case nor sells it separately."   *Id.* at 905-06 (Ward, J., dissenting).   But for the majority,

26  "[w]hen the patent owner is awarded the profits due to his design he receives all he is entitled to.

27  If the rule be established that a design for a case enables the owner to collect damages for the case

28  not only, but for the contents of the case as well, it will lead to results which shock the conscience.

1   A design for a watch case will include the watch itself. A design for a gun case will include the

2   gun, a design for a hat case will include the hat and so on."   *Id.* at 905.

3       This holding is fully consistent with Section 289, and the Act of 1887 on which it is based.

4   As the Federal Circuit explained in *Nike*, the Act of 1887 was a response to a "series of cases

5   involving carpet designs," where infringing defendants were found "liable for no more than

6   'nominal damages' of six cents because the patentees could not show what portion of their losses

7   or the infringers' profits was due to the patented design and what portion was due to the

8   unpatented carpet."   *Nike,* 138 F.3d at 1441.   The legislature removed "the need to apportion the

9   infringer's profits between the patented design and the article bearing the design" in response.

10  *Id.*   But this removal of the need to apportion did ***not*** remove the need to limit an award of profits

11  to "the article bearing the design" itself, and to determine what the article bearing the design

12  actually is.   *Id.*   In *Bush & Lane Piano*, the article bearing the design was the infringing piano

13  case; without engaging in apportionment proscribed by the Act of 1887, profits therefore were

14  properly "confined to the subject of the patent - a piano case."   222 F. at 904.   This presents an

15  unresolved issue that will require the Court's attention; while the Court has previously addressed

16  apportionment under Section 289, *see* June 29, 2012 Order at 9, it has not resolved what the

17  relevant "article of manufacture" is as applied to Apple's design patents.

18      In some cases the article bearing the infringing design is inseparable from the entire article

19  as sold, and therefore all profits from sales of the article are recoverable under Section 289.   An

20  infringing carpet design, *see Dobson v. Dornan*, 118 U.S. 10 (1886), or a design for a spoon

21  handle, *see Gorham v. White,* 81 U.S. 511 (1871), "is inseparable from the article to which it is

22  attached, or of which it is a part," and all profits from sales of such infringing products are

23  recoverable.   *Bush & Lane Piano,* 222 F. at 904.   By contrast, a "patent for a 'book binding'

24  cannot, either justly or logically, be so identified with the entire book as to give all the profits on a

25  work of literary genius to the patentee of a binding, although the binding was manufactured with

26  and for that one book, and has no separate commercial existence.   The binding and the printed

27  record of thought respond to different concepts; they are different articles."   *Bush & Lane Piano*

28  *II*, 234 F. at 81-82.   So too as to the outer case of a functional product.   Even though the piano

"case and works were merely component parts of an integral whole, and [] there was no instance of a sale of a piano without a case, or a case without works," only profits attributable to the case itself could be awarded because the case, and not the piano works, was "the article to which the design was applied".   *Id.* at 79, 83 (affirming award of profits based on proportionate cost of case versus works).

Any ruling that grants "the owner of a design patent for a receptacle intended to hold an expensive article of manufacture the profits made on the sale of the receptacle and its contents, must certainly lead to inequitable results and cannot be sustained."   *Bush & Lane Piano,* 222 F. at 904-905.   Apple seeks *precisely* such a ruling from the Court.   Following the Second Circuit's guidance, the Court should reject Apple's request for windfall profits that are not attributable to the allegedly infringing phone and tablet cases sold by Samsung.

DATED: July 23, 2012

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By   */s/ Victoria F. Maroulis*
Victoria F. Maroulis
Attorneys for SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC