# EXHIBIT 9
# FILED UNDER SEAL

Highly Confidential - Attorneys' Eyes Only

1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                 SAN JOSE DIVISION
4

5    APPLE INC., a California
     corporation,
6

                   Plaintiff,
7

     vs.                        CASE NO.  11-cv-01846-LHK
8

     SAMSUNG ELECTRONICS CO.,
9    LTD., a Korean business
     entity; SAMSUNG ELECTRONICS
10   AMERICA,INC., a New York
     corporation; SAMSUNG
11   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited
12   liability company,
13                 Defendants.
     _____/
14

15

16       H I G H L Y   C O N F I D E N T I A L
17       A T T O R N E Y S'  E Y E S   O N L Y
18

19   VIDEOTAPED DEPOSITION OF JEFFREY JOHNSON, Ph.D.
20            REDWOOD SHORES, CALIFORNIA
21            THURSDAY, April 26, 2012
22

23   BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR
24   CSR LICENSE NO. 9830
25   JOB NO. 49051

Highly Confidential - Attorneys' Eyes Only

Page 5

1   MR. TUNG:  Mark Tung from Quinn Emanuel for      09:16

2   Samsung, and with me is Aileen Kim.              09:16

3

4               JEFFREY JOHNSON,

5          having been sworn as a witness

6        by the Certified Shorthand Reporter,

7             testified as follows:

8

9          EXAMINATION BY MR. AHN                     09:17

10      MR. AHN:  Good morning, Dr. Johnson.          09:17

11      THE WITNESS:  Good morning.                   09:17

12      MR. AHN:  We've already met off the record,   09:17

13  but I just want to introduce myself again.  My name is  09:17

14  Matthew Ahn.  I'm an attorney for Morrison & Foerster,  09:17

15  representing Apple in this action.  I'm just going to   09:17

16  ask you a few questions -- actually, probably more      09:17

17  than a few questions -- about the expert report that    09:17

18  you submitted for this case.                             09:17

19    Q   I believe you were previously deposed in this    09:17

20  action approximately eight months ago; is that right?   09:17

21    A   In October.                                        09:17

22    Q   In October.  About six months ago?               09:17

23    A   Uh-huh.                                            09:17

24    Q   Okay.  So the same basic rules are going to       09:17

25  apply.  I'm going to ask you some questions.  Your      09:17

Highly Confidential - Attorneys' Eyes Only

Page 53

1       MR. AHN:  Q.  Did you discuss the contacts      10:33

2  application for any specific device or just in      10:33

3  general?                                            10:33

4    A    Just in general.                             10:33

5    Q    Did you think it was necessary to discuss it 10:33

6  in the context of specific devices?                 10:33

7       MR. TUNG:  Objection; vague.                   10:34

8       THE WITNESS:  There were some questions about  10:34

9  what versions of the Android software corresponded to 10:34

10  what behaviors.                                     10:34

11      MR. AHN:  Q.  Can you expand on that.           10:34

12      MR. TUNG:  Objection; vague.                    10:34

13      THE WITNESS:  Well, first of all, Mr. Kho       10:34

14  implemented the list functionality.  He was not the 10:34

15  implementer of the contacts application.  The contacts 10:34

16  application is built on the list control.  And so he 10:34

17  was the implementer of the list control that the    10:34

18  contact application uses.                           10:34

19      So he -- he could answer questions about how    10:35

20  the list functionality behaves but not about how -- 10:35

21  there were -- there were specific questions about the 10:35

22  contact application itself that he was not able to   10:35

23  answer.                                             10:35

24      MR. AHN:  Q.  What types of questions were      10:35

25  you asking him about the contacts application itself? 10:35

Highly Confidential - Attorneys' Eyes Only

Page 54

1        MR. TUNG:  Objection; vague.                    10:35

2        THE WITNESS:  I was -- I was asking him         10:35

3   functions about -- questions about the list         10:35

4   functionality because that's what he implemented, and 10:35

5   we were asking questions about the behavior of the  10:35

6   lists under certain -- you know, which -- which --  10:35

7   which versions of the software the list functionality 10:35

8   did exhibit certain behaviors.                      10:35

9        MR. AHN:  Q.  What were the specific issues     10:36

10  that you wanted to discuss with Mr. Kho?  Was it just 10:36

11  the general operation of the contacts list, or were 10:36

12  there any specific cases or examples that you wanted 10:36

13  to discuss with him?                                10:36

14       MR. TUNG:  Objection; vague.                    10:36

15       THE WITNESS:  It was the general behavior,      10:36

16  the overall behavior of the list control that's used 10:36

17  in the contacts application.                        10:36

18       There were also questions about the --         10:36

19  certain features, such as, for example, the -- the  10:36

20  blue glow and how that -- how that worked, and how the 10:36

21  implementation -- how -- how the implementation -- how 10:37

22  the implementation went or how -- how -- what -- what 10:37

23  it took in order to implement the blue glow, for     10:37

24  example.                                            10:37

25       MR. AHN:  Q.  What is blue glow?               10:37

Highly Confidential - Attorneys' Eyes Only

Page 55

1    A    Blue glow is a means of showing the -- the        10:37

2  user that they've reached the end of the document       10:37

3  that's an alternative to revealing the area beyond the   10:37

4  end of the document and then bouncing back.  So the      10:37

5  blue glow is a -- is a blueish-shaded glow that          10:37

6  appears at the edge of the document that the user has    10:37

7  reached.                                                 10:37

8    Q    In your opinion, that's an alternative to        10:38

9  what I'm going to refer to as the '381's functionality   10:38

10 of showing an area beyond the edge and then snapping     10:38

11 back?                                                    10:38

12   A    Yes.                                              10:38

13   Q    Do you think it's a good alternative?            10:38

14        MR. TUNG:  Objection; vague.                     10:38

15        THE WITNESS:  I think that it's -- I -- I        10:38

16 think that it's -- it's a workable alternative.  I --    10:38

17 and with my user interface designer hat on, it's --      10:38

18 it's probably not as intuitive as the -- the bounce,     10:38

19 but it's certainly better than some other               10:38

20 alternatives.                                            10:38

21        MR. AHN:  Q.  Why is it not as intuitive as      10:38

22 the bounce?                                              10:38

23        MR. TUNG:  Objection; vague.                     10:38

24        THE WITNESS:  Well, because the user would       10:38

25 have to learn what the blue glow means.                  10:38

Highly Confidential - Attorneys' Eyes Only

Page 56

1        MR. AHN:  Dr. Balakrishnan referred to some      10:39

2   user commentary that he had seen on the Internet       10:39

3   regarding the blue glow functionality, and I believe   10:39

4   he stated that many users were frustrated by it and    10:39

5   felt that it wasn't as good as the bounce or the snap   10:39

6   back functionality.                                     10:39

7        Q    Do you agree with Dr. Balakrishnan?          10:39

8        A    Well, I haven't seen -- I didn't -- I -- I -- 10:39

9   I guess I don't dis -- agree or disagree with his --   10:39

10  his conclusion because I haven't seen that Internet --  10:39

11  those Internet discussions.  I'm not aware of Internet  10:39

12  discussions about the -- the device.                    10:39

13       Q    For the blue glow, you had mentioned that you 10:39

14  had discussed with Mr. Kho the implementation of that  10:39

15  feature; is that correct?                               10:40

16       A    Yes.                                          10:40

17       Q    Can you tell me what he told you in that      10:40

18  regard.  Did he discuss just how it's implemented or   10:40

19  how long it took him to develop that functionality?    10:40

20       A    He did discuss those things.                  10:40

21       Q    Okay.  Let's take them in order.              10:40

22            Can you tell me about how it's implemented    10:40

23  inside of the contacts application.                     10:40

24       A    What he said was that the -- that it          10:40

25  wasn't -- once they decided on what it -- what the      10:40

Highly Confidential - Attorneys' Eyes Only

1    behavior should -- sorry.  Let me start over.                10:40

2          Once they decided what the behavior should          10:40

3    be -- that is, the blue glow -- implementing it was         10:40

4    not that difficult because what they decided to do was      10:40

5    to have the blue glow extend out from the edge the          10:40

6    same distance that the document would have pulled away      10:41

7    from the edge.  And so although that calculation is a       10:41

8    complex calculation, they didn't have to redo that          10:41

9    calculation because it was already done.                    10:41

10        Q    Why is that a complex calculation?               10:41

11             MR. TUNG:  Objection; vague.                      10:41

12             THE WITNESS:  I don't actually know why it's      10:41

13   a complex calculation, but he said that it was a            10:41

14   complex calculation.  He -- apparently, there's some        10:41

15   function that's related to the distance that the user       10:41

16   has pulled his finger across the -- across the screen.      10:41

17   And in order to -- the document doesn't -- doesn't          10:41

18   follow necessarily the finger that -- that full --          10:42

19   that full distance.                                         10:42

20             And so -- and so the blue glow -- similarly,      10:42

21   the amount that it -- that it extends out from the          10:42

22   edge of the document is based on this complex               10:42

23   function, but he didn't explain to me what the complex      10:42

24   function is.                                                10:42

25             MR. AHN:  Q.  When you see the blue glow          10:42

Highly Confidential - Attorneys' Eyes Only

Page 58

1   itself, is that something that's overlaid on top of          10:42

2   the image?                                                   10:42

3          MR. TUNG:  Objection; vague.                          10:42

4          THE WITNESS:  Yes.                                    10:42

5          MR. AHN:  Q.  How do you know that?                   10:42

6   A    Because I saw it.                                       10:42

7   Q    So it's not something that's, for lack of a             10:42

8   better way of describing it, becoming part of the            10:42

9   image, but it's just some type of layer that's over          10:42

10  the image?                                                   10:42

11         MR. TUNG:  Objection; vague.                          10:42

12         THE WITNESS:  Again, all I know is that the            10:42

13  blue glow appears in the image.  I don't know whether         10:43

14  it's implemented with layers because I didn't discuss         10:43

15  that with Mr. Kho.                                           10:43

16         MR. AHN:  Q.  Have you ever seen any source           10:43

17  code for the blue glow functionality?                        10:43

18  A    No.                                                     10:43

19  Q    You mentioned that the blue glow itself                 10:43

20  appears from the edge of the photograph; is that             10:43

21  right?  Strike that.                                         10:43

22         You mentioned that the blue glow itself would         10:43

23  appear from the edge of, for example, the contacts           10:43

24  list inside the contacts application; is that right?         10:43

25         MR. TUNG:  Objection; mischaracterizes                10:43

Highly Confidential - Attorneys' Eyes Only

Page 59

1   testimony.                                            10:43

2        THE WITNESS:  It would -- it would -- it        10:43

3   would appear from either the top or the bottom of the 10:43

4   list, depending on which -- if you reached the top, it 10:43

5   would appear from the top edge.  If you reached the   10:43

6   bottom, it would appear from the bottom edge.         10:44

7        MR. AHN:  Q.  When you see the blue glow, are    10:44

8   you seeing something that's beyond the edge of the    10:44

9   contacts list?                                        10:44

10   A    No.                                             10:44

11   Q    What are you looking at, then?                  10:44

12   A    You're looking at the edge of the document or   10:44

13   the edge of the contact list in this case, and you're 10:44

14   looking at a blue glow that is superimposed over     10:44

15   the -- the document edge.                            10:44

16   Q    You mentioned that Mr. Kho stated that it was   10:44

17   not that difficult to implement the blue glow        10:44

18   functionality.                                       10:44

19        Did he give you a time frame for how long it   10:44

20   took them to design that functionality?             10:44

21   A    No, he did not give me a time frame.           10:44

22        What he said was that deciding -- given the    10:44

23   fact that there was a team of people working together 10:45

24   on -- on this, deciding what the behavior should be is 10:45

25   what took time.  And then once they decided,         10:45

Highly Confidential - Attorneys' Eyes Only

Page 60

1   implementing it did not take much time at all.        10:45

2      Q   But he --                                       10:45

3      A   So there were difference -- there were          10:45

4   differences of opinion on the team as to what the     10:45

5   desired behavior should be.                            10:45

6      Q   Did he tell you about any of those              10:45

7   differences of opinion?                                10:45

8      A   No.                                             10:45

9      Q   And he didn't give you a specific time frame    10:45

10  for how long -- long it took to actually implement the 10:45

11  functionality; is that correct?                        10:45

12     A   Correct.  He just said once they decided what   10:45

13  it should do, it was pretty easy to do.                10:45

14     Q   Do you agree with him on that?                  10:45

15         MR. TUNG:  Objection; vague.                    10:45

16         THE WITNESS:  I have no way of judging          10:45

17  whether he -- I just have to go by what he said.  I    10:46

18  don't -- I don't -- I didn't look at the source code.  10:46

19  I mean, he -- what he said was the blue glow extends   10:46

20  out the same distance that the document would have     10:46

21  pulled away from the edge.  And so to me, it makes     10:46

22  sense that that wouldn't be difficult.                 10:46

23         MR. AHN:  Q.  Is there anything else that you   10:46

24  discussed with Mr. Kho?                                10:46

25     A   Yes.  I remember asking him questions about     10:46

Highly Confidential - Attorneys' Eyes Only

Page 61

1  whether there were any situations in which the          10:46

2  contacts list moves in a two-dimensional way.          10:46

3      Q   What was his response?          10:46

4      A   Well, he said several times during the course          10:46

5  of the conversation that he did not implement the          10:47

6  contacts application.  He only implemented the list          10:47

7  functionality, which has built into it a number of          10:47

8  different possible behaviors.  But the contacts          10:47

9  application doesn't make use of everything that the          10:47

10  list functionality can do.          10:47

11      One thing that we had noted before we talked          10:47

12  to him was that it is possible to take specific list          10:47

13  items -- in certain versions of the software, it's          10:47

14  possible to take specific list items and move them          10:47

15  left to right, but the list as a whole only moves up          10:47

16  and down.          10:47

17      So we were asking him about other possible          10:47

18  situations in which there could be two-dimensional          10:47

19  motion.          10:47

20      Q   Based on your own examination of the Samsung          10:47

21  products, were there any instances in which you could          10:47

22  have the contacts list move in two dimensions?          10:47

23      A   The list as a whole -- no.          10:48

24      As I said, we did notice situations in which          10:48

25  specific items could be moved left or right.          10:48

1   person who is using the device to make that decision?   10:57

2        MR. TUNG:  Objection; mischaracterizes   10:57

3   testimony; beyond the scope; vague; incomplete   10:58

4   hypothetical.   10:58

5        THE WITNESS:  No.  I think it would depend on   10:58

6   the designer of the application.   10:58

7        MR. AHN:  Q.  Can you explain what you mean   10:58

8   by that.   10:58

9        MR. TUNG:  Same objections.   10:58

10        THE WITNESS:  The -- the -- the application   10:58

11   is designed so that -- so that its contents can be   10:58

12   organized in certain ways.  So, for example, in most   10:58

13   computer systems we have folders, and we can put   10:58

14   folders inside folders.   10:58

15        MR. AHN:  Q.  So let's try it this way:  If   10:58

16   you had a folder inside the gallery that said "photos   10:59

17   from college," and then there was another folder that   10:59

18   said "photos from law school," you would consider   10:59

19   those to be separate electronic documents; is that   10:59

20   correct?   10:59

21        MR. TUNG:  Same -- same objections.   10:59

22        THE WITNESS:  I would consider the folders to   10:59

23   be electronic documents, just as the photographs are   10:59

24   electronic documents.   10:59

25        MR. AHN:  Q.  And if you simply had an entire   10:59

Highly Confidential - Attorneys' Eyes Only

Page 69

1    gallery full of images, and you looked at the first      10:59

2    column of that and said, "Well, the first column is      10:59

3    going to be my law school photographs; I consider that   10:59

4    to be a separate electronic document," would that make   10:59

5    sense to you?                                            10:59

6         MR. TUNG:  Objection; incomplete                    10:59

7    hypothetical; beyond the scope; vague.                   10:59

8         THE WITNESS:  Yeah, I -- I don't know.              10:59

9    That's a hard question to answer because -- because      10:59

10   regardless of what -- regardless of what the designer    10:59

11   does, sometimes the users have to make up -- they have   11:00

12   to use the device in such a way that allows them to do   11:00

13   things that the designer may not have thought of.        11:00

14        And so -- so, for example, I know from my own       11:00

15   case, when I'm putting together a slide show for my      11:00

16   friends, I'll make sure that I'll allot pictures for     11:00

17   certain -- certain subjects are first, and then other    11:00

18   ones follow.                                             11:00

19        So whether -- whether the photographs, let's        11:00

20   say, that describe the departure on my vacation are a    11:00

21   separate document from the photographs that describe     11:00

22   the -- that depict the return from my vacation are --    11:00

23   are separate documents, is sort of in the mind of me,    11:00

24   the user.                                                11:01

25        MR. AHN:  Q.  Did you discuss the blue glow         11:01

Highly Confidential - Attorneys' Eyes Only

Page 70

1   functionality in the gallery with Mr. Nam?                    11:01

2       A    Probably.  I'm not sure -- I'm not sure I            11:01

3   remember whether we discussed blue glow with Mr. Nam.         11:01

4           The main person I remember discussing it with        11:01

5   was Mr. Kho, but I'm not -- I'm not sure.                     11:01

6       Q    Do you know if the blue glow is implemented          11:01

7   the same way in the contacts application as it is in          11:01

8   the gallery application?                                      11:01

9       A    I don't know.                                        11:01

10      Q    And you don't recall if you had that specific        11:01

11  discussion with Mr. Nam regarding blue glow and the          11:01

12  gallery; correct?                                             11:01

13      A    Correct.                                             11:01

14      Q    Was there anything else that you remember            11:01

15  discussing with Mr. Nam?                                      11:02

16      A    Hold still.                                          11:02

17      Q    What do you mean by that?                            11:02

18      A    The behavior of the gallery in which, when           11:02

19  you drag an image -- when -- first of all, you have to        11:02

20  go into zoomed-in mode.  So you're in zoomed-in mode,        11:02

21  looking at a picture magnified.                               11:02

22          And when you move your finger slowly and pan          11:02

23  the picture and the edge of the document is -- the            11:02

24  edge of the photograph is reached and you let go, it         11:02

25  does not bounce back necessarily to the -- so that          11:02

Highly Confidential - Attorneys' Eyes Only

Page 71

1   the -- the area beyond the edge is -- is no longer          11:02

2   displayed.  It doesn't necessarily bounce back.            11:03

3       It -- if you are moving your finger slowly             11:03

4   enough and you let go, it just stays where -- exactly      11:03

5   where it is.                                               11:03

6   Q   You just said that it does not bounce back             11:03

7   necessarily.  Does that mean in some instances --          11:03

8   instances it would and in some instances it wouldn't?      11:03

9   A   You have to be moving your finger very slowly          11:03

10  and then let go for it not to bounce back.                 11:03

11  Q   What do you think of that functionality?              11:03

12      MR. TUNG:  Objection; vague.                           11:03

13      MR. AHN:  And by "that functionality," I'm             11:03

14  referring to the hold still functionality.                 11:03

15      MR. TUNG:  It's still -- still vague.                  11:03

16      THE WITNESS:  I -- what I thought of it was            11:03

17  that it -- let's see.                                      11:03

18      It's hard to -- it's hard to make it happen.          11:03

19  So my -- my feeling was that it would -- it has a          11:04

20  certain -- it has a certain purpose.  There's a            11:04

21  certain purpose behind it, but one would have to know      11:04

22  that purpose in order to -- to do it because if you        11:04

23  move your finger too fast, it does bounce back.            11:04

24      MR. AHN:  Q.  What is the purpose of having            11:04

25  that functionality?                                        11:04

Highly Confidential - Attorneys' Eyes Only

Page 131

1   to the electronic document in order to be beyond its        13:39

2   edge.                                                        13:39

3       MR. TUNG:   Objection; mischaracterizes                  13:39

4   testimony.                                                   13:39

5       THE WITNESS:   The -- the elements of Claim 1            13:39

6   of the patent say that in response to an edge of the         13:39

7   screen -- the edge of the document being reached, an        13:39

8   area beyond the edge of the document is displayed.           13:39

9       So what that means to me is at the time in               13:40

10  which some -- the area -- the edge of the document is        13:40

11  reached, something -- some software does something to        13:40

12  display something.                                           13:40

13      And what the software is doing is moving the             13:40

14  document aside and letting -- allowing the -- in the         13:40

15  Samsung phones, the -- the Samsung devices, it's             13:40

16  moving the -- the document aside and allowing the            13:40

17  background to be seen.                                       13:40

18      And that background was set up at the                    13:40

19  beginning of the application, not in -- in response to       13:40

20  reaching the edge of the document.                           13:40

21      MR. AHN:   Q.  Is the background being                   13:40

22  displayed when you can't see it?                             13:40

23   A   It's not being -- it's not being -- it's not            13:41

24  visible to the user.  It's -- so in that sense, it's         13:41

25  not being displayed.                                         13:41

Highly Confidential - Attorneys' Eyes Only

Page 132

1    Q   Is there anything else you recall about your        13:41

2    discussion with Sun Young Kim from ThinkFree?           13:41

3    A   I think I just mentioned two things.  One is        13:41

4    that -- no.  Well, all I can remember -- all I          13:41

5    remembered with my conversation with him is we just     13:41

6    discussed backgrounds.                                   13:41

7        And the other thing that I remembered was           13:41

8    that I have seen source code for that -- for that       13:41

9    application, which I wasn't sure I had seen before.     13:41

10   Q   Is that listed in the materials considered in      13:41

11   your expert report?                                      13:41

12   A   Well, let's see.  Whoops.  Wrong document.         13:41

13       I don't see it listed here.  I think that it       13:42

14   mentions in -- in the report that I viewed source      13:42

15   code.  Let's see.  ThinkFree Office.  Let me just look 13:42

16   here.  Materials considered.                            13:43

17       Right now, I'm not finding where it -- it          13:43

18   mentions in here that I considered some soft -- some   13:43

19   of the source code for ThinkFree Office.                13:43

20   Q   Okay.  Let me ask you a little bit more about      13:43

21   the blue glow design-around that we previously         13:43

22   discussed.                                               13:44

23   A   Uh-huh.                                              13:44

24   Q   Do you know when that functionality was            13:44

25   implemented in Samsung's devices?                      13:44

Highly Confidential - Attorneys' Eyes Only

Page 133

|    |                                                            |       |
|----|------------------------------------------------------------|-------|
| 1  | A    Well, based on my conversations with the              | 13:44 |
| 2  | Samsung engineers, it was implemented sometime in -- I      | 13:44 |
| 3  | believe they said it was sometime in 2011, but I --         | 13:44 |
| 4  | I'm not -- I'm not really sure.  I -- they didn't           | 13:44 |
| 5  | mention a specific date.  They just talked about the        | 13:44 |
| 6  | sort of time of the year.  I think it was early 2011.       | 13:44 |
| 7  | I don't -- I'm not actually positive about that.            | 13:44 |
| 8  | Q    You yourself have not seen the source code             | 13:44 |
| 9  | for that functionality; is that correct?                    | 13:44 |
| 10 | A    That's correct.                                        | 13:45 |
| 11 | Q    You also offered the opinion that this is not          | 13:45 |
| 12 | a particularly complicated design-around, that it was       | 13:45 |
| 13 | fairly easy to implement; do you recall that?               | 13:45 |
| 14 | A    Yes.                                                    | 13:45 |
| 15 | Q    Would implementing that type of functionality          | 13:45 |
| 16 | be something that was well known by people in the           | 13:45 |
| 17 | field?                                                       | 13:45 |
| 18 | MR. TUNG:  Objection; vague.                                | 13:45 |
| 19 | THE WITNESS:  People in what field?                         | 13:45 |
| 20 | MR. AHN:  In the field of user interfaces,                  | 13:45 |
| 21 | human/computer interaction.                                 | 13:45 |
| 22 | MR. TUNG:  Objection; vague.                                | 13:45 |
| 23 | THE WITNESS:  Well, as I said, the Samsung                  | 13:45 |
| 24 | engineers told me that it took them a while to figure       | 13:45 |
| 25 | out on -- among their team what the -- what the design      | 13:45 |

Highly Confidential - Attorneys' Eyes Only

Page 134

1    should be.  And then once they designed -- figured        13:45

2    that out, then they -- implementing it was not hard.      13:46

3         I don't think there was any -- from that,            13:46

4    I -- I am saying that I am -- I'm getting that            13:46

5    there's -- there wasn't sort of a preconceived idea of    13:46

6    what the design should be.  And certainly, in my          13:46

7    experience before, I haven't seen that kind of a way      13:46

8    of indicating that you've reached the edge of a           13:46

9    document.                                                 13:46

10        MR. AHN:  Let me turn now to the '381 patent         13:46

11   itself.                                                   13:46

12    Q   You previously testified that you had a              13:46

13   general understanding what the patent was about, and I    13:46

14   think you said that it offered visual feedback            13:46

15   regarding reaching the end of an electronic document;     13:46

16   is that accurate?                                         13:46

17    A   Yes.  It's a patent about displaying -- yes.         13:46

18   It's giving users visual feedback when they reach the     13:47

19   edge of a -- edge of a document.                          13:47

20    Q   Do you know what problem the '381 patent was         13:47

21   trying to solve?                                          13:47

22        MR. TUNG:  Objection; vague.                         13:47

23        THE WITNESS:  Well, it says in the                   13:47

24   specification it was trying to solve -- or in the --      13:47

25   in the -- in the beginning of the patent, in the          13:47

Highly Confidential - Attorneys' Eyes Only

Page 135

1   introduction, it says that it's trying to solve the        13:47

2   problem of the user knowing that they received --          13:47

3   reached the end of the document.                           13:47

4           MR. AHN:  Q.  Do you think that was an issue       13:47

5   prior to the '381 patent?                                  13:47

6       A   Yes.                                               13:47

7       Q   Why?                                               13:47

8       A   Because users would reach ends of documents       13:47

9   and need some feedback that they reached the end.          13:47

10      Q   Do you recall what types of feedback or lack       13:47

11  of feedback that existed prior to the '381 patent?         13:47

12          MR. TUNG:  Objection; vague and beyond the         13:47

13  scope.                                                     13:47

14          THE WITNESS:  Well, prior to the '381 patent,      13:47

15  I'm not sure.  I mean, prior to bounce, there were --      13:48

16  there was -- there were user interfaces that did           13:48

17  nothing, that basically did a hard stop.                   13:48

18          There -- I don't know what other -- you know,      13:48

19  typically in a word processor, let's say Microsoft         13:48

20  Word, when you reach the end of the document, it           13:48

21  stops.                                                     13:48

22          But you weren't scrolling by dragging your         13:48

23  finger.  You were scrolling by pulling a scroll bar on     13:48

24  the side of the screen, and that was usually in the        13:48

25  opposite direction that the document was moving.  So       13:48

Highly Confidential - Attorneys' Eyes Only

Page 202

1      A    An edge that is at the extreme -- or a          16:00

2   scrollable edge is actually at the -- at the edge of    16:00

3   an electronic document in the -- that's -- I guess the   16:00

4   edge is perpendicular to the direction of movement of    16:00

5   the -- of the document, you know.  In the constrained    16:00

6   case, it's perpendicular to the edge.  If the document   16:00

7   is -- can move in an unconstrained way, then some of     16:00

8   the -- then all of the edges are scrollable edges,       16:00

9   really.                                                  16:00

10      MR. AHN:  I'm going to hand you what I've           16:01

11   marked as Exhibit No. 4.                                16:01

12          (Document marked J. Johnson Exhibit 4           16:01

13           for identification.)                            16:01

14      THE WITNESS:  So are we through with this?          16:01

15      MR. AHN:  No.  You can leave that open in           16:01

16   front of you.                                            16:01

17      THE WITNESS:  Okay.                                 16:01

18      MR. AHN:  I'll come back to it.                     16:01

19      Exhibit 4 is just a screen capture from the         16:01

20   New York Times homepage from yesterday.                 16:01

21      THE WITNESS:  Okay.                                 16:01

22      MR. AHN:  Q.  Can you tell me in Exhibit 4          16:01

23   what you would consider to be the scrollable edges.     16:01

24      MR. TUNG:  So I'll object that this is a -- a       16:01

25   printout on a piece of paper, and you're asking about   16:01

Highly Confidential - Attorneys' Eyes Only

Page 203

1   edges in the context of the '381 document --          16:01

2   '381 patent.                                          16:01

3          MR. AHN:  Let me give you some context.        16:01

4    Q   This is just a screen capture of Internet        16:01

5   Explorer showing the New York Times homepage.  And I'm 16:01

6   curious as to, if you were looking at this on the     16:02

7   screen of a computer, what you would consider to be a 16:02

8   scrollable edge?                                      16:02

9          MR. TUNG:  So I'll still make the same         16:02

10  objection.                                            16:02

11         THE WITNESS:  Yeah, it would be -- it would    16:02

12  be nicer if this picture had -- had the browser also  16:02

13  shown in it so that I could see something about       16:02

14  where -- you know, how the browser is.                16:02

15         But assuming that the browser is oriented      16:02

16  vertically on the page the same way that this is, then 16:02

17  I would consider scrollable edges to be the top and   16:02

18  the bottom because we are viewing the entire width of 16:02

19  the page.                                             16:02

20         And, therefore, the -- when -- the way the     16:02

21  browser operates is that it's constrained when you're 16:02

22  looking at the -- when you're zoomed out, to me.      16:02

23         And so the scrollable edges are the top and    16:02

24  the bottom.                                           16:02

25         MR. AHN:  And, in fact, if this were being     16:02

Highly Confidential - Attorneys' Eyes Only

Page 204

1   displayed on one of the accused Samsung products with   16:03

2   blue glow in it, if you tried to go up and down, you   16:03

3   would actually see the blue glow appear from the top   16:03

4   or the bottom, depending on the direction of the   16:03

5   scroll; is that correct?   16:03

6        MR. TUNG:  Objection; incomplete   16:03

7   hypothetical.  I'll just say same objections.   16:03

8        THE WITNESS:  If you are scrolling the page   16:03

9   down and you reach the top, then the blue glow would   16:03

10   appear from the top edge.  If you're scrolling up and   16:03

11   you reach the bottom, then the blue glow would appear   16:03

12   from the bottom edge.   16:03

13        MR. AHN:  Q.  What about the photograph   16:03

14   towards the center of the page?  Would you consider   16:03

15   that an electronic document?   16:03

16    A   That's a document inside a document, yes.   16:03

17    Q   So in this example, would you consider the   16:03

18   overall New York Times page as the electronic   16:03

19   document, with other electronic documents embedded in   16:03

20   it?   16:03

21    A   Well, I -- I suppose so.  Yes, I would.   16:03

22   Balakrishnan has said in his statement that a photo --   16:04

23   photographs are electronic documents, so -- and I   16:04

24   agree with him.   16:04

25    Q   Would you consider the edges of the   16:04

Highly Confidential - Attorneys' Eyes Only

Page 205

1    photograph to be scrollable edges in this example?    16:04

2        MR. TUNG:  Same -- same objection.    16:04

3        THE WITNESS:  Well, this sort of depends    16:04

4    on -- on the application because in some applications,    16:04

5    as we've seen, there is -- there is snap in between    16:04

6    documents in a -- an electronic -- in documents that    16:04

7    are contained in an electronic document; that is to    16:04

8    say, the subordinate documents.  There is snap in    16:04

9    between them, and in other applications there isn't    16:05

10   any such snap.    16:05

11       So, for example, in ThinkFree Office, if it's    16:05

12   in the vertical mode, there is no snap in between any    16:05

13   pages.  But if it's in the horizontal mode, then there    16:05

14   is snap in ThinkFree Office.    16:05

15       And similarly, in this browser, there --    16:05

16   there isn't -- there isn't -- there isn't snap between    16:05

17   the sub -- subdocuments of the main document.    16:05

18       Now, first of all, I will say that even if    16:05

19   there were snap between subordinate documents in a    16:05

20   browser, I wouldn't expect that snap to ever appear or    16:05

21   to be noticeable unless I were to zoom that -- that --    16:06

22   zoom the document display up such that the photograph    16:06

23   filled the entire display.    16:06

24       You know, I have seen other applications in    16:06

25   which if I -- if I zoomed up so the page was looking    16:06

Highly Confidential - Attorneys' Eyes Only

Page 251

1    THE WITNESS:  Well, it -- like I said, it        17:28

2  shares some characteristics.  I don't know what the   17:28

3  form factor is for the Apple phone.                   17:28

4    For example, the iPhone -- I don't know if       17:28

5  they're wider than this is, you know.  In other words, 17:28

6  there's a certain aspect ratio here.  I don't know if  17:28

7  the iPhone is the same aspect ratio.  But it does      17:29

8  share some characteristics of an iPhone, yes.          17:29

9    MR. AHN:  You can go ahead and power it on.       17:29

10  And if you want to go ahead and examine the build     17:29

11  information, that's fine.                             17:29

12    THE WITNESS:  It is hardware version i500.04.    17:29

13  Mode No. SCH-i500.  Formula Version Firmware Version   17:29

14  2.1.  Update 1.  Baseband version S:I500.04K.DJ20.     17:29

15  Kernel version 2.6.29, and Build No. SCH-i500.DJ20.    17:30

16    MR. AHN:  Q.  I just want to direct your         17:30

17  attention to page 22 of your report.  At the table at  17:30

18  the top, in row number 12, it states the Galaxy S      17:30

19  Showcase i500, and then it states Android Version      17:30

20  2.3.5; do you see that?                                17:30

21    A   I see that.                                   17:30

22    Q   That's a different version than the Galaxy S  17:30

23  Showcase that's been marked as Exhibit 8; correct?     17:30

24    A   Correct.                                       17:30

25    Q   The opinions that you've expressed about the  17:30

Highly Confidential - Attorneys' Eyes Only

Page 252

1    Galaxy S Showcase that you examined are not          17:30

2    necessarily applicable to the Galaxy S Showcase that  17:31

3    is Exhibit 8; correct?                                17:31

4        A    That's correct.                              17:31

5        Q    Go ahead and open up the Gallery application 17:31

6    on that phone.  And go ahead and try moving the       17:31

7    document around.                                      17:31

8            Do you see the blue glow functionality?       17:31

9        A    No.                                          17:31

10       Q    Taking a look at your report again, on       17:31

11   page 22, the box that is checked is the fourth        17:31

12   non-infringement position, and looking at page 23 of  17:31

13   your report, the fourth non-infringement position is  17:31

14   blue glow; is that right?                             17:32

15       A    Correct.                                      17:32

16       Q    So even if your opinion regarding            17:32

17   non-infringement on the Galaxy S Showcase phone that  17:32

18   you examined was based on the fact that it had the    17:32

19   blue glow functionality, that opinion does not apply  17:32

20   to the Galaxy S Showcase phone that is Exhibit 8;     17:32

21   correct?                                              17:32

22       A    Correct.                                      17:32

23       Q    You can go ahead and set that aside.         17:32

24            Why don't we take a quick break.  I think I'm 17:32

25   just about finished                                   17:32

Highly Confidential - Attorneys' Eyes Only

Page 253

1        THE VIDEOGRAPHER:  The time is 5:33 p.m., and        17:32
2    we are off the record.                                   17:32
3        (Recess taken.)                                      17:32
4        THE VIDEOGRAPHER:  The time is 5:43 p.m., and        17:42
5    we are on the record.                                    17:42
6        MR. AHN:  Q.  Dr. Johnson, have you been             17:42
7    asked to testify at the trial of this case?              17:42
8    A    Not yet.                                            17:42
9    Q    Is it your understanding that you intend to         17:42
10   testify at trial in this case?                           17:42
11   A    I don't know.  That -- I guess it's a               17:43
12   possibility, but I don't really know.                    17:43
13       MR. AHN:  Thank you for your time today.  I          17:43
14   have no further questions.                               17:43
15                                                            17:43
16              EXAMINATION BY MR. TUNG                        17:43
17       MR. TUNG:  So I have a couple of questions,          17:43
18   and if it's okay, I'll just proceed.  So I think we      17:43
19   were on Exhibit 8.                                       17:43
20       Can you mark this as Exhibit 9.                      17:43
21       THE WITNESS:  It's the expert report.                17:43
22       (Document marked J. Johnson Exhibit 9                17:43
23        for identification.)                                17:43
24       MR. TUNG:  And then mark this one as                 17:43
25   Exhibit 10.                                              17:43