# EXHIBIT 13
# FILED UNDER SEAL

1      IN THE UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4    APPLE, INC., a California Corporation

5    vs.                         CN:11-CV-01846-LHK

6    SAMSUNG ELECTRONICS COMPANY,

7    LTD, a Korean business entity; SAMSUNG

8    ELECTRONICS AMERICA, INC., a New

9    York Corporation; SAMSUNG

10   TELECOMMUNICATIONS AMERICA, LLC,

11   a Delaware Limited Liability Company.

12   _____/

13

14

15      The videorecorded deposition of RAVIN

16   BALAKRISHNAN, PH.D., was held on Friday, April 20,

17   2012, commencing at 9:07 A.M., at the Law Offices of

18   Quinn Emanuel, 1299 Pennsylvania Avenue, N.W., Suite

19   825, Washington, D.C., before Ronda J. Thomas, a

20   Notary Public.

21

22

23   REPORTED BY:

24   Ronda J. Thomas, RPR, CLR

25   JOB NO. 48807

Page 6

1   Morrison and Foerster on behalf of the plaintiff,        09:08

2   Apple.                                                    09:08

3           MR. AHN:  Matthew Ahn of Morrison and            09:08

4   Forester on behalf of Apple.                              09:08

5           MR. BUSEY:  And, also, I'm representing the       09:08

6   witness.                                                  09:08

7           THE VIDEOGRAPHER:  Will the court reporter        09:08

8   please swear the witness.                                 09:08

9   Whereupon,                                                09:08

10          RAVIN BALAKRISHNAN, PH.D.,                        09:08

11  called as a witness, having been first duly sworn to tell 09:08

12  the truth, the whole truth, and nothing but the truth, was 09:08

13  examined and testified as follows:                        09:08

14          EXAMINATION BY MR. JOHNSON:                       09:08

15  Q    Good morning, Dr. Balakrishnan.                      09:08

16  A    Good morning.                                        09:09

17  Q    How many times have you been deposed now?            09:09

18  A    I don't have a precise count.  I would say           09:09

19  somewhere between half a dozen and ten.                   09:09

20          (Brief pause.)                                    09:09

21  Q    Sorry about that.                                    09:09

22          Is the bulk of your consulting work now for       09:09

23  Apple?                                                    09:09

24          MR. BUSEY:  Objection just to form.               09:09

25  A    The current litigation consulting I'm doing          09:09

Page 59

1   also accused of infringing the '381, right?                  10:38

2      A      Yes, it is.  Or I've accused a Galaxy S4G.          10:38

3   Whether it's the exact same one I don't know.                10:38

4      Q      Take a look at the ThinkFree Office               10:38

5   application and tell me if it infringes the '381            10:38

6   patent?                                                     10:38

7      A      Sure.                                             10:38

8             MR. BUSEY:  Can counsel represent what            10:39

9   version of the Galaxy S4G this is?                          10:39

10            MR. JOHNSON:  2.3.3.                              10:39

11     A      So I've just tried the ThinkFree Office           10:39

12  with two different PDF files and I cannot get it to do      10:39

13  the same functionality that I saw on the Galaxy S4G         10:39

14  with the ThinkFree Office in counsel's office.              10:40

15     Q      So Exhibit 4, the ThinkFree Office                10:40

16  application in Exhibit 4 doesn't infringe the '381          10:40

17  patent, right?                                              10:40

18     A      ThinkFree Office that I'm using right now         10:40

19  on Exhibit 4, this particular version does not seem to      10:40

20  infringe.                                                   10:40

21     Q      Is it your understanding that some of the         10:40

22  versions of ThinkFree Office infringe and some don't?       10:40

23     A      ThinkFree Office versions that I tested on        10:40

24  the phones I list in paragraph 37 of my report do           10:40

25  infringe as I've indicated.                                 10:41

Page 60

1      Given what I've seen today with this        10:41

2  version of ThinkFree Office on the Exhibit 4 and the   10:41

3  one I just examined on the earlier exhibit, which I    10:41

4  believe was Exhibit 3, those two do not appear to      10:41

5  infringe.                                              10:41

6      So as a result at least these two versions    10:41

7  of ThinkFree Office do not.                            10:41

8    Q    The question I have is:  When you looked at  10:41

9  the phones and products that were at Apple's counsel's 10:41

10 office, did you see any phones that had the ThinkFree  10:41

11 Office application that did not infringe?              10:41

12   A    I do not recall seeing any ThinkFree Office  10:41

13 applications that I tried that did not infringe the    10:42

14 381.                                                  10:42

15   Q    Do you recall seeing any phones at Apple's   10:42

16 counsel's office or tablets where the Browser         10:42

17 application did not infringe?                          10:42

18   A    I believe so, yes.                            10:42

19   Q    Can you tell me which ones those were?        10:42

20   A    I don't have that on top of my head but I    10:42

21 might have it in the report.  Give me one minute.     10:42

22      (Witness reading.)                              10:42

23   A    So in my report in paragraph 261 as one      10:43

24 example the Gem, G-E-M, phone did not appear to do the 10:43

25 '381's feature in the Browser and you get a hard stop  10:43

Page 61

1    instead of the snap back.  And the other alternative        10:43

2    that I've seen is what's referred to as the blue glow       10:43

3    effect, which I talk about a little about it in             10:43

4    paragraph 262.                                              10:44

5            I don't list in this the devices that have          10:44

6    that.  My job here was to deal with the infringement        10:44

7    but I definitely have seen devices that do the blue         10:44

8    glow instead of the snap back.                              10:44

9        Q    So the devices that exhibit the hard stop          10:44

10   do not infringe the '381 patent?                            10:44

11           MR. BUSEY:  Objection to the extent it's            10:44

12   ambiguous.  It calls for a legal conclusion.  Go ahead.     10:44

13       A    So device running the Browser application,         10:44

14   and in the Browser application if it does the hard stop     10:44

15   or not the snap back or rubber-banding, then the            10:44

16   Browser application on that device would not infringe.      10:44

17           There may be other applications, like the           10:44

18   Contacts, that may not have a hard stop and might           10:44

19   infringe.                                                   10:44

20       Q    What do you mean by hard stop?                     10:44

21       A    By hard stop, I mean when you hit the edge         10:44

22   of the -- well, let's take it back to the claim.            10:44

23           For example claim element F here, which             10:45

24   says once you've reached the edge of the document,          10:45

25   displaying an area beyond the edge of the document,         10:45

Page 62

1    where it does not do that, and it does not do the          10:45

2    snapback functionality in elements G and H.               10:45

3              And a simple example of that is what I just      10:45

4    saw in the ThinkFree Office on Exhibit 4.                  10:45

5        Q    And the blue glow does not infringe              10:45

6    the '381 patent either?                                    10:45

7        A    If it is only the blue glow and not the          10:45

8    blue glow in additional to the snapback that's in '381,   10:45

9    then a device or an application, having just the blue      10:45

10   glow and not doing the '381 snapback functionality,        10:45

11   would not infringe.                                        10:45

12       Q    Were there any other characteristics of the      10:45

13   Browser on products that you reviewed, besides the hard    10:46

14   stop and blue glow that you believe don't infringe?        10:46

15             MR. BUSEY:  Objection.  Ambiguous.              10:46

16       A    I believe I've seen a Browser that had a          10:46

17   yellow glow, but effectively it's the same                 10:46

18   functionality as the blue glow but a different color.      10:46

19   And that, that would be the same as blue glow from a       10:46

20   functionality point of view.                               10:46

21       Q    Any others?                                       10:46

22             MR. BUSEY:  Same objection.                     10:46

23       A    That's all I can recall right now.               10:46

24       Q    Did you review any products that had a           10:46

25   Contacts application that did not infringe?                10:46

Page 63

1    A      You said Contacts application?          10:46

2    Q      Yes.                                     10:46

3    A      I believe I have seen Contacts applications    10:47

4  on some Samsung phones that had a blue or a yellow glow    10:47

5  functionality instead of the snapback functionality of    10:47

6  the '381, and that would not infringe.          10:47

7    Q      Did you see any Contacts applications on    10:47

8  Samsung phones that exhibited a hard stop?        10:47

9    A      Honestly, I don't recall offhand.  I might    10:47

10  have.                                           10:47

11    Q      Okay.  Do you remember seeing any Samsung    10:47

12  products that have a Gallery application that do not    10:47

13  infringe the '381 patent?                        10:47

14          MR. BUSEY:  Objection again to being    10:48

15  ambiguous.  Go ahead.                           10:48

16    A      I might have.  I don't recall exactly    10:48

17  whether I have or not because many of these, there are    10:48

18  so many of these phones that I've tried.  And I don't    10:48

19  have a list of the ones that don't do the '381.    10:48

20    Q      You weren't interested in the ones that    10:48

21  don't infringe, right?                          10:48

22    A      I was not making, keeping track of it.    10:48

23    Q      There are some phones that have a Gallery    10:48

24  application that exhibit a blue glow, right?      10:48

25    A      That might be true.  I, I just don't have a    10:48

Page 64

1   precise recollection of that.                          10:48

2       Q     Do you know which ones?                       10:48

3       A     I just said I don't have a precise            10:48

4   recollection.                                           10:48

5       Q     Do you have any -- do you have an imprecise   10:48

6   recollection?                                           10:48

7       A     No, unfortunately.                            10:48

8       Q     Are there Samsung products that have a        10:49

9   Gallery application that exhibit a hard stop?            10:49

10      A     I have to give the same answer.  I might      10:49

11  have seen them but I don't recall offhand.              10:49

12      Q     Are you aware of any Samsung products in      10:49

13  the Gallery application that exhibit a hold still        10:49

14  phenomenon?                                             10:49

15            MR. BUSEY:  Objection --                      10:49

16      Q     Sorry -- where the photo doesn't snap in      10:49

17  either direction, it just, if you move it, it stays     10:49

18  put?                                                    10:49

19            MR. BUSEY:  Objection.  Ambiguous and         10:49

20  confusing.                                              10:49

21      A     When you move it and it stays put?  So you    10:49

22  move it off the edge and it stays put, is that what     10:49

23  you're saying?                                          10:49

24      Q     Right.                                        10:49

25      A     I have seen some Samsung products with a      10:49

Page 132

1        MR. BUSEY:  Let me see that, please.        01:59

2    A    Okay.                                        01:59

3    Q    Are we looking at one electronic document    01:59

4  there, two electronic documents, more than that?   01:59

5    A    I'm looking at at least two electronic       01:59

6  documents, yes.                                      01:59

7    Q    And what are the two electronic documents?   01:59

8    A    Well, the first one is this list of stocks.  01:59

9  The second one is this list of looks, like news     02:00

10  headlines at the bottom.                            02:00

11   Q    And where is the edge of the documents?      02:00

12   A    In each case?                                 02:00

13   Q    Yeah.                                         02:00

14   A    The, in the one on the top, the edge is on   02:00

15  the top of the list and the bottom of the list and the  02:00

16  sides of the list.                                  02:00

17        And the same with the bottom, the news,      02:00

18  news feed.  It's at the top of the list of the news  02:00

19  feeds and bottom of the list of the news feeds -- news  02:00

20  feed.                                               02:00

21   Q    What does elastically attached mean as it's  02:01

22  used in claim 16?                                   02:02

23        (Witness reading.)                            02:02

24   A    In the context of the claims, it means the,  02:02

25  when moving from, the document from one, one direction  02:02

Page 133

1  to the other direction so the area beyond the edge        02:02

2  disappears, that movement gives the appearance of it       02:02

3  being attached with an elastic band, for example, the      02:03

4  analogies to the physical world.  So it doesn't            02:03

5  instantly snap back, like instantly you see a elastic      02:03

6  movement or an animation.                                  02:03

7      Q     Do the bounce features that you reviewed in      02:03

8  the Samsung products elastically snap back, or do they     02:03

9  instantly snap back?                                       02:03

10         MR. BUSEY:  Objection.  Ambiguous.  Calls          02:03

11 for a legal conclusion.                                    02:03

12     A     They all elastically snap back.                  02:03

13         I'm sorry, the, just to clarify that, the          02:03

14 Gallery and Contacts and Browser accused products          02:03

15 elastically snap back.                                     02:03

16     Q     Your analysis with respect to claims 19 and      02:04

17 20 are, is based upon your analysis of claim 1, right?     02:04

18         MR. BUSEY:  Objection to the extent it             02:04

19 mischaracterizes the witness' prior testimony.             02:04

20         (Witness reading.)                                 02:04

21     A     The analysis of the functionality is based,      02:05

22 it's in part based on the analysis I did in claim 1        02:05

23 but, of course, claim 19 talks about things like memory    02:05

24 and programs and instructions, and that is the             02:05

25 additional analysis presented in my report.                02:05

Page  134

1    Q    Okay.  Well, claim 19, for example,          02:05

2  paragraph 191, you say:                              02:05

3         Because these devices perform the elements   02:05

4  described in claims 1 and 19, they must have         02:05

5  instructions for performing those methods and a storage  02:05

6  medium for those instructions as recited in those   02:05

7  claims.                                              02:05

8         Have you confirmed that the accused devices  02:05

9  actually have those instructions?                    02:05

10   A    Yes, because I looked at the source code on  02:06

11  the machines in Quinn's offices in Redwood Shores.  02:06

12   Q    So why does your report say they must have   02:06

13  as opposed to they do, in fact, have?               02:06

14         Is there a distinction there in your mind   02:06

15  or no?                                               02:06

16   A    They do have and they must have, because     02:06

17  without, without having it, they wouldn't be able to do  02:06

18  this functionality.                                  02:06

19   Q    Okay.  Now, with respect to section Y of     02:06

20  your report, you talk about the difficulty of design  02:06

21  around?                                              02:06

22   A    I'm sorry, what paragraph is that?           02:06

23   Q    261.                                          02:06

24   A    Yes.                                          02:07

25   Q    Can you list for me, what are the            02:07

Page 135

1    non-infringement alternatives to a '381 patent?              02:07

2        A    That I've seen in the Samsung devices?              02:07

3        Q    Yes.                                                02:07

4        A    Okay.  So the first one that we have               02:07

5    already talked about is what has been referred to as a      02:07

6    hard stop.  And that's discussed in paragraph 261 of my     02:07

7    report.                                                      02:07

8            If there's a hard stop, and there isn't,            02:07

9    the bounceback or snapback effect that's found in the       02:07

10   claims of the '381.                                          02:07

11           Similarly, if it uses the blue glow effect          02:07

12   which we have discussed and I talk about in the 262,         02:07

13   sorry, paragraph 262, again, assuming the blue glow is       02:07

14   there and the functionality that is infringing the          02:07

15   claims, which is the snapback functionality is no            02:07

16   longer there, then that would not be infringing.            02:08

17           And as I said, I think, earlier this                02:08

18   morning, I've seen a yellow glow as well, which would        02:08

19   be effectively the same --                                  02:08

20       Q    Have you seen --                                   02:08

21       A    -- the same as the blue glow.                      02:08

22       Q    Have you seen any other non-infringing             02:08

23   alternatives?                                                02:08

24           MR. BUSEY:  I'm going to object as                  02:08

25   ambiguous.  Go ahead.                                        02:08

Page 165

1   so --                                                    03:06

2        Q     Okay.  Was a DiamondTouch device with a       03:06

3   tabletop cloth application ever sold to anyone?          03:06

4        A     I do not know.                                03:06

5        Q     Was a DiamondTouch device with the            03:06

6   Tablecloth application ever used in public?              03:06

7        A     I don't know.                                 03:06

8        Q     I think you said you weren't sure whether     03:07

9   the DiamondTouch device that was in the lobby of MERL    03:07

10  had Tablecloth on it, right?                             03:07

11       A     That's right, at that timeframe.              03:07

12       Q     Are you aware of any other timeframe in       03:07

13  which the DiamondTouch device in the MERL lobby had      03:07

14  Tablecloth on it?                                        03:07

15       A     I'm not aware of it having it.  It might      03:07

16  have.  But I do not recall ever seeing Tablecloth on     03:07

17  the device in the lobby.                                 03:07

18       Q     Did you work with Mr. Forlines?              03:07

19       A     Yes.                                          03:07

20       Q     What did you work on together?                03:07

21       A     We worked on a variety of different           03:07

22  research projects involving user interfaces over the     03:07

23  years.                                                   03:08

24       Q     Can you be any more specific?                 03:08

25       A     Well, I can start from my CV because I've     03:08

Page 166

1   published some papers with him.  I'll make it more          03:08

2   concrete.                                                   03:08

3           And I'm assuming you mean -- are you saying         03:08

4   during that timeframe or in general?                        03:08

5       Q      In general.                                      03:08

6       A      So one project I worked on was on a user         03:08

7   interface for zooming and pointing using a handheld,        03:08

8   interactive handheld projector.  That was one piece of      03:09

9   research.                                                   03:09

10          Another piece of research was on gesture            03:09

11  registration on a direct-touch surface.                     03:09

12          Another piece of research was a study,              03:09

13  experimental evaluation of how it displays position and     03:09

14  the orientation of the user's control space with            03:09

15  effective user performance and preference.                  03:09

16          Another study was on what we call hybrid            03:09

17  pointing, a way to switch between absolute and relative     03:09

18  pointing between, with direct input devices.                03:09

19          Another one was a study, an experimental            03:10

20  study on the effects of size, group size, the number of     03:10

21  people in a group, and the display configuration on the     03:10

22  visual search tasks.                                        03:10

23          There was another study on the perception          03:10

24  of elementary graphical elements and tabletop               03:10

25  environments.                                               03:10

Page 167

1        Another study on direct touch versus mouse        03:10

2    input for tabletop displays.                          03:10

3        And yet another study on evaluation of            03:10

4    tactile feedback compared to direct versus indirect   03:10

5    stylus input in pointing and crossing selection tasks. 03:10

6    Q     How about Mr. Bogue?  Did you work with          03:10

7    Mr. Bogue?                                             03:10

8    A     I did not work with Mr. Bogue on any            03:10

9    research projects per se.                              03:11

10   Q     And how about Mr. Wigdoor?  Did you work on     03:11

11   anything in particular with Mr. Wigdoor while at       03:11

12   consulting for Mitsubishi Electric Research Labs?      03:11

13   A     Yes.                                             03:11

14   Q     Can you tell me what you worked on?             03:11

15   A     Sure.                                            03:11

16       Some of that overlaps the list I just read.       03:11

17   Mr. Forlines was the co-author on some of that work as 03:11

18   well.  Let me just go through this again.              03:11

19       So this is with Mr. Wigdoor at MERL?              03:11

20   Q     Right.                                           03:11

21   A     So there was a research, piece of research      03:11

22   done -- yeah, I think this was done at MERL.  I'm not  03:11

23   100 percent sure whether some of it was done at the    03:12

24   University as well.  It's work in 2005 investigating   03:12

25   the effect of orientation on the readability of text in 03:12

Page 168

1  tabletop displays.                                                03:12

2           That study I mentioned earlier on display             03:12

3  position and control space orientation and user                 03:12

4  performance and preference.                                      03:12

5           A piece of research called under the table             03:12

6  interaction.                                                     03:12

7           Another piece of research which looked at              03:12

8  the effects of group size and display configuration --          03:12

9           THE COURT REPORTER:  Of what size?                     03:12

10          THE WITNESS:  Excuse me -- group size and              03:12

11 display configuration on visual search.                          03:12

12     A     Another study, which I believe I mentioned            03:13

13 earlier, perception of elementary graphical elements in         03:13

14 tabletop and multisurface environments.                          03:13

15          The study on direct touch versus mouse                 03:13

16 input for tabletop displays.                                     03:13

17          I think that's pretty much it for MERL.                03:13

18     Q     You've reviewed Mr. Van Dam's report,                 03:13

19 right?                                                           03:13

20          MR. BUSEY:  Objection.  Ambiguous.                     03:13

21     A     The report in this case, '381?  Yes.                  03:13

22     Q     Yeah.                                                 03:13

23          And is it your opinion that the prior art             03:13

24 references for the '381 patent have to be manipulated           03:13

25 in just the right way to profuse the allegedly                  03:13