# EXHIBIT 9
# FILED UNDER SEAL

Highly Confidential - Attorneys' Eyes Only

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5    APPLE INC., a California
     corporation,
6
                Plaintiff,
7
     vs.                        CASE NO.  11-cv-01846-LHK
8
     SAMSUNG ELECTRONICS CO.,
9    LTD., a Korean business
     entity; SAMSUNG ELECTRONICS
10   AMERICA,INC., a New York
     corporation; SAMSUNG
11   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited
12   liability company,
13              Defendants.
     _____/
14

15

16        H I G H L Y   C O N F I D E N T I A L

17        A T T O R N E Y S'  E Y E S   O N L Y

18

19   VIDEOTAPED DEPOSITION OF JEFFREY JOHNSON, Ph.D.

20           REDWOOD SHORES, CALIFORNIA

21           THURSDAY, April 26, 2012

22

23   BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR

24   CSR LICENSE NO. 9830

25   JOB NO. 49051

Highly Confidential - Attorneys' Eyes Only

Page 5

1    MR. TUNG:  Mark Tung from Quinn Emanuel for        09:16

2  Samsung, and with me is Aileen Kim.                   09:16

3

4              JEFFREY JOHNSON,

5          having been sworn as a witness

6        by the Certified Shorthand Reporter,

7            testified as follows:

8

9          EXAMINATION BY MR. AHN                        09:17

10    MR. AHN:  Good morning, Dr. Johnson.               09:17

11    THE WITNESS:  Good morning.                        09:17

12    MR. AHN:  We've already met off the record,        09:17

13  but I just want to introduce myself again.  My name is  09:17

14  Matthew Ahn.  I'm an attorney for Morrison & Foerster,  09:17

15  representing Apple in this action.  I'm just going to   09:17

16  ask you a few questions -- actually, probably more      09:17

17  than a few questions -- about the expert report that    09:17

18  you submitted for this case.                           09:17

19    Q   I believe you were previously deposed in this   09:17

20  action approximately eight months ago; is that right?  09:17

21    A   In October.                                     09:17

22    Q   In October.  About six months ago?             09:17

23    A   Uh-huh.                                         09:17

24    Q   Okay.  So the same basic rules are going to     09:17

25  apply.  I'm going to ask you some questions.  Your     09:17

Highly Confidential - Attorneys' Eyes Only

Page 53

1      MR. AHN:  Q.  Did you discuss the contacts      10:33

2   application for any specific device or just in      10:33

3   general?                                            10:33

4      A   Just in general.                             10:33

5      Q   Did you think it was necessary to discuss it 10:33

6   in the context of specific devices?                 10:33

7      MR. TUNG:  Objection; vague.                     10:34

8      THE WITNESS:  There were some questions about   10:34

9   what versions of the Android software corresponded to 10:34

10  what behaviors.                                      10:34

11     MR. AHN:  Q.  Can you expand on that.            10:34

12     MR. TUNG:  Objection; vague.                     10:34

13     THE WITNESS:  Well, first of all, Mr. Kho       10:34

14  implemented the list functionality.  He was not the 10:34

15  implementer of the contacts application.  The contacts 10:34

16  application is built on the list control.  And so he 10:34

17  was the implementer of the list control that the    10:34

18  contact application uses.                            10:34

19     So he -- he could answer questions about how    10:35

20  the list functionality behaves but not about how -- 10:35

21  there were -- there were specific questions about the 10:35

22  contact application itself that he was not able to   10:35

23  answer.                                              10:35

24     MR. AHN:  Q.  What types of questions were      10:35

25  you asking him about the contacts application itself? 10:35

Highly Confidential - Attorneys' Eyes Only

Page 54

| | | |
|---|---|---|
| 1 | MR. TUNG:  Objection; vague. | 10:35 |
| 2 | THE WITNESS:  I was -- I was asking him | 10:35 |
| 3 | functions about -- questions about the list | 10:35 |
| 4 | functionality because that's what he implemented, and | 10:35 |
| 5 | we were asking questions about the behavior of the | 10:35 |
| 6 | lists under certain -- you know, which -- which -- | 10:35 |
| 7 | which versions of the software the list functionality | 10:35 |
| 8 | did exhibit certain behaviors. | 10:35 |
| 9 | MR. AHN:  Q.  What were the specific issues | 10:36 |
| 10 | that you wanted to discuss with Mr. Kho?  Was it just | 10:36 |
| 11 | the general operation of the contacts list, or were | 10:36 |
| 12 | there any specific cases or examples that you wanted | 10:36 |
| 13 | to discuss with him? | 10:36 |
| 14 | MR. TUNG:  Objection; vague. | 10:36 |
| 15 | THE WITNESS:  It was the general behavior, | 10:36 |
| 16 | the overall behavior of the list control that's used | 10:36 |
| 17 | in the contacts application. | 10:36 |
| 18 | There were also questions about the -- | 10:36 |
| 19 | certain features, such as, for example, the -- the | 10:36 |
| 20 | blue glow and how that -- how that worked, and how the | 10:36 |
| 21 | implementation -- how -- how the implementation -- how | 10:37 |
| 22 | the implementation went or how -- how -- what -- what | 10:37 |
| 23 | it took in order to implement the blue glow, for | 10:37 |
| 24 | example. | 10:37 |
| 25 | MR. AHN:  Q.  What is blue glow? | 10:37 |

Highly Confidential - Attorneys' Eyes Only

Page 55

1    A    Blue glow is a means of showing the -- the      10:37

2    user that they've reached the end of the document      10:37

3    that's an alternative to revealing the area beyond the      10:37

4    end of the document and then bouncing back.  So the      10:37

5    blue glow is a -- is a blueish-shaded glow that      10:37

6    appears at the edge of the document that the user has      10:37

7    reached.      10:37

8    Q    In your opinion, that's an alternative to      10:38

9    what I'm going to refer to as the '381's functionality      10:38

10   of showing an area beyond the edge and then snapping      10:38

11   back?      10:38

12   A    Yes.      10:38

13   Q    Do you think it's a good alternative?      10:38

14        MR. TUNG:  Objection; vague.      10:38

15        THE WITNESS:  I think that it's -- I -- I      10:38

16   think that it's -- it's a workable alternative.  I --      10:38

17   and with my user interface designer hat on, it's --      10:38

18   it's probably not as intuitive as the -- the bounce,      10:38

19   but it's certainly better than some other      10:38

20   alternatives.      10:38

21        MR. AHN:  Q.  Why is it not as intuitive as      10:38

22   the bounce?      10:38

23        MR. TUNG:  Objection; vague.      10:38

24        THE WITNESS:  Well, because the user would      10:38

25   have to learn what the blue glow means.      10:38

Highly Confidential - Attorneys' Eyes Only

Page 56

| | | |
|---|---|---|
| 1 | MR. AHN:  Dr. Balakrishnan referred to some | 10:39 |
| 2 | user commentary that he had seen on the Internet | 10:39 |
| 3 | regarding the blue glow functionality, and I believe | 10:39 |
| 4 | he stated that many users were frustrated by it and | 10:39 |
| 5 | felt that it wasn't as good as the bounce or the snap | 10:39 |
| 6 | back functionality. | 10:39 |
| 7 | Q   Do you agree with Dr. Balakrishnan? | 10:39 |
| 8 | A   Well, I haven't seen -- I didn't -- I -- I -- | 10:39 |
| 9 | I guess I don't dis -- agree or disagree with his -- | 10:39 |
| 10 | his conclusion because I haven't seen that Internet -- | 10:39 |
| 11 | those Internet discussions.  I'm not aware of Internet | 10:39 |
| 12 | discussions about the -- the device. | 10:39 |
| 13 | Q   For the blue glow, you had mentioned that you | 10:39 |
| 14 | had discussed with Mr. Kho the implementation of that | 10:39 |
| 15 | feature; is that correct? | 10:40 |
| 16 | A   Yes. | 10:40 |
| 17 | Q   Can you tell me what he told you in that | 10:40 |
| 18 | regard.  Did he discuss just how it's implemented or | 10:40 |
| 19 | how long it took him to develop that functionality? | 10:40 |
| 20 | A   He did discuss those things. | 10:40 |
| 21 | Q   Okay.  Let's take them in order. | 10:40 |
| 22 | Can you tell me about how it's implemented | 10:40 |
| 23 | inside of the contacts application. | 10:40 |
| 24 | A   What he said was that the -- that it | 10:40 |
| 25 | wasn't -- once they decided on what it -- what the | 10:40 |

Highly Confidential - Attorneys' Eyes Only

Page 57

1    behavior should -- sorry.  Let me start over.        10:40

2        Once they decided what the behavior should      10:40

3    be -- that is, the blue glow -- implementing it was  10:40

4    not that difficult because what they decided to do was  10:40

5    to have the blue glow extend out from the edge the   10:40

6    same distance that the document would have pulled away  10:41

7    from the edge.  And so although that calculation is a  10:41

8    complex calculation, they didn't have to redo that   10:41

9    calculation because it was already done.             10:41

10       Q   Why is that a complex calculation?          10:41

11           MR. TUNG:  Objection; vague.                 10:41

12           THE WITNESS:  I don't actually know why it's  10:41

13   a complex calculation, but he said that it was a     10:41

14   complex calculation.  He -- apparently, there's some  10:41

15   function that's related to the distance that the user  10:41

16   has pulled his finger across the -- across the screen.  10:41

17   And in order to -- the document doesn't -- doesn't    10:41

18   follow necessarily the finger that -- that full --    10:42

19   that full distance.                                  10:42

20       And so -- and so the blue glow -- similarly,     10:42

21   the amount that it -- that it extends out from the   10:42

22   edge of the document is based on this complex         10:42

23   function, but he didn't explain to me what the complex  10:42

24   function is.                                         10:42

25           MR. AHN:  Q.  When you see the blue glow     10:42

Highly Confidential - Attorneys' Eyes Only

Page 58

1    itself, is that something that's overlaid on top of          10:42

2    the image?                                                    10:42

3          MR. TUNG:  Objection; vague.                            10:42

4          THE WITNESS:  Yes.                                      10:42

5          MR. AHN:  Q.  How do you know that?                     10:42

6    A    Because I saw it.                                        10:42

7    Q    So it's not something that's, for lack of a              10:42

8    better way of describing it, becoming part of the             10:42

9    image, but it's just some type of layer that's over          10:42

10   the image?                                                    10:42

11         MR. TUNG:  Objection; vague.                            10:42

12         THE WITNESS:  Again, all I know is that the             10:42

13   blue glow appears in the image.  I don't know whether         10:43

14   it's implemented with layers because I didn't discuss         10:43

15   that with Mr. Kho.                                            10:43

16         MR. AHN:  Q.  Have you ever seen any source             10:43

17   code for the blue glow functionality?                         10:43

18   A    No.                                                      10:43

19   Q    You mentioned that the blue glow itself                  10:43

20   appears from the edge of the photograph; is that              10:43

21   right?  Strike that.                                          10:43

22         You mentioned that the blue glow itself would           10:43

23   appear from the edge of, for example, the contacts            10:43

24   list inside the contacts application; is that right?          10:43

25         MR. TUNG:  Objection; mischaracterizes                  10:43

Highly Confidential - Attorneys' Eyes Only

Page 59

1    testimony.                                              10:43

2         THE WITNESS:  It would -- it would -- it          10:43

3    would appear from either the top or the bottom of the  10:43

4    list, depending on which -- if you reached the top, it 10:43

5    would appear from the top edge.  If you reached the    10:43

6    bottom, it would appear from the bottom edge.          10:44

7         MR. AHN:  Q.  When you see the blue glow, are     10:44

8    you seeing something that's beyond the edge of the     10:44

9    contacts list?                                         10:44

10     A    No.                                             10:44

11     Q    What are you looking at, then?                  10:44

12     A    You're looking at the edge of the document or   10:44

13   the edge of the contact list in this case, and you're  10:44

14   looking at a blue glow that is superimposed over       10:44

15   the -- the document edge.                              10:44

16     Q    You mentioned that Mr. Kho stated that it was   10:44

17   not that difficult to implement the blue glow          10:44

18   functionality.                                         10:44

19         Did he give you a time frame for how long it     10:44

20   took them to design that functionality?                10:44

21     A    No, he did not give me a time frame.            10:44

22         What he said was that deciding -- given the      10:44

23   fact that there was a team of people working together  10:45

24   on -- on this, deciding what the behavior should be is 10:45

25   what took time.  And then once they decided,           10:45

Highly Confidential - Attorneys' Eyes Only

Page 60

1    implementing it did not take much time at all.            10:45

2       Q   But he --                                          10:45

3       A   So there were difference -- there were             10:45

4    differences of opinion on the team as to what the         10:45

5    desired behavior should be.                               10:45

6       Q   Did he tell you about any of those                 10:45

7    differences of opinion?                                   10:45

8       A   No.                                                10:45

9       Q   And he didn't give you a specific time frame       10:45

10   for how long -- long it took to actually implement the    10:45

11   functionality; is that correct?                           10:45

12      A   Correct.  He just said once they decided what      10:45

13   it should do, it was pretty easy to do.                   10:45

14      Q   Do you agree with him on that?                     10:45

15          MR. TUNG:  Objection; vague.                       10:45

16          THE WITNESS:  I have no way of judging             10:45

17   whether he -- I just have to go by what he said.  I       10:46

18   don't -- I don't -- I didn't look at the source code.     10:46

19   I mean, he -- what he said was the blue glow extends      10:46

20   out the same distance that the document would have        10:46

21   pulled away from the edge.  And so to me, it makes        10:46

22   sense that that wouldn't be difficult.                    10:46

23          MR. AHN:  Q.  Is there anything else that you      10:46

24   discussed with Mr. Kho?                                   10:46

25      A   Yes.  I remember asking him questions about        10:46

Highly Confidential - Attorneys' Eyes Only

Page 61

1   whether there were any situations in which the          10:46

2   contacts list moves in a two-dimensional way.           10:46

3       Q    What was his response?                         10:46

4       A    Well, he said several times during the course  10:46

5   of the conversation that he did not implement the       10:47

6   contacts application.  He only implemented the list     10:47

7   functionality, which has built into it a number of      10:47

8   different possible behaviors.  But the contacts         10:47

9   application doesn't make use of everything that the     10:47

10  list functionality can do.                              10:47

11      One thing that we had noted before we talked        10:47

12  to him was that it is possible to take specific list    10:47

13  items -- in certain versions of the software, it's      10:47

14  possible to take specific list items and move them      10:47

15  left to right, but the list as a whole only moves up    10:47

16  and down.                                               10:47

17      So we were asking him about other possible          10:47

18  situations in which there could be two-dimensional      10:47

19  motion.                                                 10:47

20      Q    Based on your own examination of the Samsung   10:47

21  products, were there any instances in which you could   10:47

22  have the contacts list move in two dimensions?          10:47

23      A    The list as a whole -- no.                     10:48

24      As I said, we did notice situations in which        10:48

25  specific items could be moved left or right.            10:48

Highly Confidential - Attorneys' Eyes Only

Page 68

1   person who is using the device to make that decision?   10:57

2        MR. TUNG:  Objection; mischaracterizes   10:57

3   testimony; beyond the scope; vague; incomplete   10:58

4   hypothetical.   10:58

5        THE WITNESS:  No.  I think it would depend on   10:58

6   the designer of the application.   10:58

7        MR. AHN:  Q.  Can you explain what you mean   10:58

8   by that.   10:58

9        MR. TUNG:  Same objections.   10:58

10       THE WITNESS:  The -- the -- the application   10:58

11   is designed so that -- so that its contents can be   10:58

12   organized in certain ways.  So, for example, in most   10:58

13   computer systems we have folders, and we can put   10:58

14   folders inside folders.   10:58

15       MR. AHN:  Q.  So let's try it this way:  If   10:58

16   you had a folder inside the gallery that said "photos   10:59

17   from college," and then there was another folder that   10:59

18   said "photos from law school," you would consider   10:59

19   those to be separate electronic documents; is that   10:59

20   correct?   10:59

21       MR. TUNG:  Same -- same objections.   10:59

22       THE WITNESS:  I would consider the folders to   10:59

23   be electronic documents, just as the photographs are   10:59

24   electronic documents.   10:59

25       MR. AHN:  Q.  And if you simply had an entire   10:59

Highly Confidential - Attorneys' Eyes Only

Page 69

1    gallery full of images, and you looked at the first       10:59

2    column of that and said, "Well, the first column is        10:59

3    going to be my law school photographs; I consider that     10:59

4    to be a separate electronic document," would that make     10:59

5    sense to you?                                              10:59

6         MR. TUNG:  Objection; incomplete                     10:59

7    hypothetical; beyond the scope; vague.                     10:59

8         THE WITNESS:  Yeah, I -- I don't know.               10:59

9    That's a hard question to answer because -- because        10:59

10   regardless of what -- regardless of what the designer     10:59

11   does, sometimes the users have to make up -- they have    11:00

12   to use the device in such a way that allows them to do    11:00

13   things that the designer may not have thought of.          11:00

14        And so -- so, for example, I know from my own        11:00

15   case, when I'm putting together a slide show for my       11:00

16   friends, I'll make sure that I'll allot pictures for      11:00

17   certain -- certain subjects are first, and then other     11:00

18   ones follow.                                               11:00

19        So whether -- whether the photographs, let's         11:00

20   say, that describe the departure on my vacation are a     11:00

21   separate document from the photographs that describe       11:00

22   the -- that depict the return from my vacation are --     11:00

23   are separate documents, is sort of in the mind of me,     11:00

24   the user.                                                  11:01

25        MR. AHN:  Q.  Did you discuss the blue glow          11:01

Highly Confidential - Attorneys' Eyes Only

Page 70

1  functionality in the gallery with Mr. Nam?                   11:01

2     A    Probably.  I'm not sure -- I'm not sure I            11:01

3  remember whether we discussed blue glow with Mr. Nam.        11:01

4        The main person I remember discussing it with          11:01

5  was Mr. Kho, but I'm not -- I'm not sure.                     11:01

6     Q    Do you know if the blue glow is implemented          11:01

7  the same way in the contacts application as it is in         11:01

8  the gallery application?                                      11:01

9     A    I don't know.                                        11:01

10    Q    And you don't recall if you had that specific        11:01

11 discussion with Mr. Nam regarding blue glow and the         11:01

12 gallery; correct?                                            11:01

13    A    Correct.                                             11:01

14    Q    Was there anything else that you remember            11:01

15 discussing with Mr. Nam?                                     11:02

16    A    Hold still.                                          11:02

17    Q    What do you mean by that?                            11:02

18    A    The behavior of the gallery in which, when          11:02

19 you drag an image -- when -- first of all, you have to      11:02

20 go into zoomed-in mode.  So you're in zoomed-in mode,       11:02

21 looking at a picture magnified.                              11:02

22        And when you move your finger slowly and pan         11:02

23 the picture and the edge of the document is -- the          11:02

24 edge of the photograph is reached and you let go, it        11:02

25 does not bounce back necessarily to the -- so that         11:02

Highly Confidential - Attorneys' Eyes Only

Page 71

1   the -- the area beyond the edge is -- is no longer      11:02

2   displayed.  It doesn't necessarily bounce back.         11:03

3        It -- if you are moving your finger slowly         11:03

4   enough and you let go, it just stays where -- exactly   11:03

5   where it is.                                            11:03

6    Q   You just said that it does not bounce back         11:03

7   necessarily.  Does that mean in some instances --       11:03

8   instances it would and in some instances it wouldn't?   11:03

9    A   You have to be moving your finger very slowly      11:03

10  and then let go for it not to bounce back.              11:03

11   Q   What do you think of that functionality?           11:03

12       MR. TUNG:  Objection; vague.                       11:03

13       MR. AHN:  And by "that functionality," I'm         11:03

14  referring to the hold still functionality.              11:03

15       MR. TUNG:  It's still -- still vague.               11:03

16       THE WITNESS:  I -- what I thought of it was         11:03

17  that it -- let's see.                                   11:03

18       It's hard to -- it's hard to make it happen.       11:03

19  So my -- my feeling was that it would -- it has a       11:04

20  certain -- it has a certain purpose.  There's a         11:04

21  certain purpose behind it, but one would have to know   11:04

22  that purpose in order to -- to do it because if you     11:04

23  move your finger too fast, it does bounce back.         11:04

24       MR. AHN:  Q.  What is the purpose of having        11:04

25  that functionality?                                     11:04

Highly Confidential - Attorneys' Eyes Only

Page 131

1  to the electronic document in order to be beyond its     13:39

2  edge.                                                     13:39

3       MR. TUNG:  Objection; mischaracterizes             13:39

4  testimony.                                                13:39

5       THE WITNESS:  The -- the elements of Claim 1       13:39

6  of the patent say that in response to an edge of the     13:39

7  screen -- the edge of the document being reached, an     13:39

8  area beyond the edge of the document is displayed.       13:39

9       So what that means to me is at the time in         13:40

10 which some -- the area -- the edge of the document is    13:40

11 reached, something -- some software does something to    13:40

12 display something.                                        13:40

13      And what the software is doing is moving the        13:40

14 document aside and letting -- allowing the -- in the     13:40

15 Samsung phones, the -- the Samsung devices, it's         13:40

16 moving the -- the document aside and allowing the        13:40

17 background to be seen.                                    13:40

18      And that background was set up at the               13:40

19 beginning of the application, not in -- in response to   13:40

20 reaching the edge of the document.                       13:40

21      MR. AHN:  Q.  Is the background being              13:40

22 displayed when you can't see it?                          13:40

23   A   It's not being -- it's not being -- it's not     13:41

24 visible to the user.  It's -- so in that sense, it's     13:41

25 not being displayed.                                      13:41

Highly Confidential - Attorneys' Eyes Only

Page 132

1    Q   Is there anything else you recall about your          13:41

2    discussion with Sun Young Kim from ThinkFree?            13:41

3    A   I think I just mentioned two things.  One is         13:41

4    that -- no.  Well, all I can remember -- all I           13:41

5    remembered with my conversation with him is we just      13:41

6    discussed backgrounds.                                   13:41

7         And the other thing that I remembered was           13:41

8    that I have seen source code for that -- for that        13:41

9    application, which I wasn't sure I had seen before.      13:41

10   Q   Is that listed in the materials considered in        13:41

11   your expert report?                                      13:41

12   A   Well, let's see.  Whoops.  Wrong document.           13:41

13        I don't see it listed here.  I think that it        13:42

14   mentions in -- in the report that I viewed source        13:42

15   code.  Let's see.  ThinkFree Office.  Let me just look   13:42

16   here.  Materials considered.                             13:43

17        Right now, I'm not finding where it -- it           13:43

18   mentions in here that I considered some soft -- some     13:43

19   of the source code for ThinkFree Office.                 13:43

20   Q   Okay.  Let me ask you a little bit more about        13:43

21   the blue glow design-around that we previously           13:43

22   discussed.                                               13:44

23   A   Uh-huh.                                              13:44

24   Q   Do you know when that functionality was              13:44

25   implemented in Samsung's devices?                        13:44

Highly Confidential - Attorneys' Eyes Only

Page 133

1    A    Well, based on my conversations with the        13:44

2   Samsung engineers, it was implemented sometime in -- I    13:44

3   believe they said it was sometime in 2011, but I --    13:44

4   I'm not -- I'm not really sure.  I -- they didn't    13:44

5   mention a specific date.  They just talked about the    13:44

6   sort of time of the year.  I think it was early 2011.    13:44

7   I don't -- I'm not actually positive about that.    13:44

8    Q    You yourself have not seen the source code    13:44

9   for that functionality; is that correct?    13:44

10    A    That's correct.    13:45

11    Q    You also offered the opinion that this is not    13:45

12   a particularly complicated design-around, that it was    13:45

13   fairly easy to implement; do you recall that?    13:45

14    A    Yes.    13:45

15    Q    Would implementing that type of functionality    13:45

16   be something that was well known by people in the    13:45

17   field?    13:45

18         MR. TUNG:  Objection; vague.    13:45

19         THE WITNESS:  People in what field?    13:45

20         MR. AHN:  In the field of user interfaces,    13:45

21   human/computer interaction.    13:45

22         MR. TUNG:  Objection; vague.    13:45

23         THE WITNESS:  Well, as I said, the Samsung    13:45

24   engineers told me that it took them a while to figure    13:45

25   out on -- among their team what the -- what the design    13:45

Highly Confidential - Attorneys' Eyes Only

Page 134

1    should be.  And then once they designed -- figured        13:45

2    that out, then they -- implementing it was not hard.      13:46

3         I don't think there was any -- from that,            13:46

4    I -- I am saying that I am -- I'm getting that            13:46

5    there's -- there wasn't sort of a preconceived idea of    13:46

6    what the design should be.  And certainly, in my          13:46

7    experience before, I haven't seen that kind of a way      13:46

8    of indicating that you've reached the edge of a           13:46

9    document.                                                 13:46

10        MR. AHN:  Let me turn now to the '381 patent         13:46

11   itself.                                                   13:46

12    Q   You previously testified that you had a              13:46

13   general understanding what the patent was about, and I    13:46

14   think you said that it offered visual feedback            13:46

15   regarding reaching the end of an electronic document;     13:46

16   is that accurate?                                         13:46

17    A   Yes.  It's a patent about displaying -- yes.         13:46

18   It's giving users visual feedback when they reach the     13:47

19   edge of a -- edge of a document.                          13:47

20    Q   Do you know what problem the '381 patent was         13:47

21   trying to solve?                                          13:47

22        MR. TUNG:  Objection; vague.                         13:47

23        THE WITNESS:  Well, it says in the                   13:47

24   specification it was trying to solve -- or in the --      13:47

25   in the -- in the beginning of the patent, in the          13:47

Highly Confidential - Attorneys' Eyes Only

Page 135

1  introduction, it says that it's trying to solve the      13:47

2  problem of the user knowing that they received --        13:47

3  reached the end of the document.                         13:47

4       MR. AHN:  Q.  Do you think that was an issue        13:47

5  prior to the '381 patent?                                13:47

6     A    Yes.                                             13:47

7     Q    Why?                                             13:47

8     A    Because users would reach ends of documents      13:47

9  and need some feedback that they reached the end.        13:47

10    Q    Do you recall what types of feedback or lack     13:47

11 of feedback that existed prior to the '381 patent?       13:47

12      MR. TUNG:  Objection; vague and beyond the          13:47

13 scope.                                                   13:47

14      THE WITNESS:  Well, prior to the '381 patent,       13:47

15 I'm not sure.  I mean, prior to bounce, there were --    13:48

16 there was -- there were user interfaces that did         13:48

17 nothing, that basically did a hard stop.                 13:48

18      There -- I don't know what other -- you know,       13:48

19 typically in a word processor, let's say Microsoft       13:48

20 Word, when you reach the end of the document, it         13:48

21 stops.                                                   13:48

22      But you weren't scrolling by dragging your          13:48

23 finger.  You were scrolling by pulling a scroll bar on   13:48

24 the side of the screen, and that was usually in the      13:48

25 opposite direction that the document was moving.  So     13:48

Highly Confidential - Attorneys' Eyes Only

Page 202

1      A    An edge that is at the extreme -- or a          16:00

2   scrollable edge is actually at the -- at the edge of    16:00

3   an electronic document in the -- that's -- I guess the   16:00

4   edge is perpendicular to the direction of movement of    16:00

5   the -- of the document, you know.  In the constrained    16:00

6   case, it's perpendicular to the edge.  If the document   16:00

7   is -- can move in an unconstrained way, then some of     16:00

8   the -- then all of the edges are scrollable edges,       16:00

9   really.                                                  16:00

10         MR. AHN:  I'm going to hand you what I've          16:01

11   marked as Exhibit No. 4.                                16:01

12         (Document marked J. Johnson Exhibit 4             16:01

13          for identification.)                             16:01

14         THE WITNESS:  So are we through with this?        16:01

15         MR. AHN:  No.  You can leave that open in         16:01

16   front of you.                                           16:01

17         THE WITNESS:  Okay.                               16:01

18         MR. AHN:  I'll come back to it.                   16:01

19         Exhibit 4 is just a screen capture from the       16:01

20   New York Times homepage from yesterday.                 16:01

21         THE WITNESS:  Okay.                               16:01

22         MR. AHN:  Q.  Can you tell me in Exhibit 4        16:01

23   what you would consider to be the scrollable edges.     16:01

24         MR. TUNG:  So I'll object that this is a -- a     16:01

25   printout on a piece of paper, and you're asking about   16:01

Highly Confidential - Attorneys' Eyes Only

Page 203

1    edges in the context of the '381 document --        16:01

2    '381 patent.                                         16:01

3         MR. AHN:  Let me give you some context.         16:01

4    Q    This is just a screen capture of Internet       16:01

5    Explorer showing the New York Times homepage.  And I'm  16:01

6    curious as to, if you were looking at this on the    16:02

7    screen of a computer, what you would consider to be a 16:02

8    scrollable edge?                                     16:02

9         MR. TUNG:  So I'll still make the same          16:02

10   objection.                                           16:02

11        THE WITNESS:  Yeah, it would be -- it would     16:02

12   be nicer if this picture had -- had the browser also 16:02

13   shown in it so that I could see something about      16:02

14   where -- you know, how the browser is.               16:02

15        But assuming that the browser is oriented       16:02

16   vertically on the page the same way that this is, then 16:02

17   I would consider scrollable edges to be the top and  16:02

18   the bottom because we are viewing the entire width of 16:02

19   the page.                                            16:02

20        And, therefore, the -- when -- the way the      16:02

21   browser operates is that it's constrained when you're 16:02

22   looking at the -- when you're zoomed out, to me.     16:02

23        And so the scrollable edges are the top and     16:02

24   the bottom.                                          16:02

25        MR. AHN:  And, in fact, if this were being      16:02

Highly Confidential - Attorneys' Eyes Only

Page 204

1   displayed on one of the accused Samsung products with      16:03

2   blue glow in it, if you tried to go up and down, you        16:03

3   would actually see the blue glow appear from the top        16:03

4   or the bottom, depending on the direction of the            16:03

5   scroll; is that correct?                                    16:03

6        MR. TUNG:  Objection; incomplete                       16:03

7   hypothetical.  I'll just say same objections.               16:03

8        THE WITNESS:  If you are scrolling the page            16:03

9   down and you reach the top, then the blue glow would        16:03

10  appear from the top edge.  If you're scrolling up and       16:03

11  you reach the bottom, then the blue glow would appear       16:03

12  from the bottom edge.                                       16:03

13       MR. AHN:  Q.  What about the photograph                16:03

14  towards the center of the page?  Would you consider         16:03

15  that an electronic document?                                16:03

16   A   That's a document inside a document, yes.              16:03

17   Q   So in this example, would you consider the             16:03

18  overall New York Times page as the electronic              16:03

19  document, with other electronic documents embedded in       16:03

20  it?                                                         16:03

21   A   Well, I -- I suppose so.  Yes, I would.                16:03

22  Balakrishnan has said in his statement that a photo --      16:04

23  photographs are electronic documents, so -- and I          16:04

24  agree with him.                                             16:04

25   Q   Would you consider the edges of the                    16:04

Highly Confidential - Attorneys' Eyes Only

Page 205

1    photograph to be scrollable edges in this example?       16:04

2            MR. TUNG:  Same -- same objection.               16:04

3            THE WITNESS:  Well, this sort of depends          16:04

4    on -- on the application because in some applications,   16:04

5    as we've seen, there is -- there is snap in between      16:04

6    documents in a -- an electronic -- in documents that    16:04

7    are contained in an electronic document; that is to     16:04

8    say, the subordinate documents.  There is snap in       16:04

9    between them, and in other applications there isn't      16:05

10   any such snap.                                           16:05

11           So, for example, in ThinkFree Office, if it's    16:05

12   in the vertical mode, there is no snap in between any    16:05

13   pages.  But if it's in the horizontal mode, then there  16:05

14   is snap in ThinkFree Office.                             16:05

15           And similarly, in this browser, there --         16:05

16   there isn't -- there isn't -- there isn't snap between   16:05

17   the sub -- subdocuments of the main document.            16:05

18           Now, first of all, I will say that even if       16:05

19   there were snap between subordinate documents in a       16:05

20   browser, I wouldn't expect that snap to ever appear or   16:05

21   to be noticeable unless I were to zoom that -- that --   16:06

22   zoom the document display up such that the photograph    16:06

23   filled the entire display.                               16:06

24           You know, I have seen other applications in      16:06

25   which if I -- if I zoomed up so the page was looking     16:06

Highly Confidential - Attorneys' Eyes Only

Page 251

1     THE WITNESS:  Well, it -- like I said, it     17:28

2  shares some characteristics.  I don't know what the     17:28

3  form factor is for the Apple phone.     17:28

4     For example, the iPhone -- I don't know if     17:28

5  they're wider than this is, you know.  In other words,     17:28

6  there's a certain aspect ratio here.  I don't know if     17:28

7  the iPhone is the same aspect ratio.  But it does     17:29

8  share some characteristics of an iPhone, yes.     17:29

9     MR. AHN:  You can go ahead and power it on.     17:29

10  And if you want to go ahead and examine the build     17:29

11  information, that's fine.     17:29

12     THE WITNESS:  It is hardware version i500.04.     17:29

13  Mode No. SCH-i500.  Formula Version Firmware Version     17:29

14  2.1.  Update 1.  Baseband version S:I500.04K.DJ20.     17:29

15  Kernel version 2.6.29, and Build No. SCH-i500.DJ20.     17:30

16     MR. AHN:  Q.  I just want to direct your     17:30

17  attention to page 22 of your report.  At the table at     17:30

18  the top, in row number 12, it states the Galaxy S     17:30

19  Showcase i500, and then it states Android Version     17:30

20  2.3.5; do you see that?     17:30

21     A   I see that.     17:30

22     Q   That's a different version than the Galaxy S     17:30

23  Showcase that's been marked as Exhibit 8; correct?     17:30

24     A   Correct.     17:30

25     Q   The opinions that you've expressed about the     17:30

Highly Confidential - Attorneys' Eyes Only

Page 252

1  Galaxy S Showcase that you examined are not          17:30

2  necessarily applicable to the Galaxy S Showcase that  17:31

3  is Exhibit 8; correct?                                17:31

4      A    That's correct.                              17:31

5      Q    Go ahead and open up the Gallery application 17:31

6  on that phone.  And go ahead and try moving the       17:31

7  document around.                                      17:31

8          Do you see the blue glow functionality?       17:31

9      A    No.                                          17:31

10     Q    Taking a look at your report again, on       17:31

11 page 22, the box that is checked is the fourth        17:31

12 non-infringement position, and looking at page 23 of  17:31

13 your report, the fourth non-infringement position is  17:31

14 blue glow; is that right?                             17:32

15     A    Correct.                                     17:32

16     Q    So even if your opinion regarding            17:32

17 non-infringement on the Galaxy S Showcase phone that  17:32

18 you examined was based on the fact that it had the    17:32

19 blue glow functionality, that opinion does not apply  17:32

20 to the Galaxy S Showcase phone that is Exhibit 8;     17:32

21 correct?                                              17:32

22     A    Correct.                                     17:32

23     Q    You can go ahead and set that aside.         17:32

24          Why don't we take a quick break.  I think I'm 17:32

25 just about finished                                   17:32

Highly Confidential - Attorneys' Eyes Only

Page 253

1      THE VIDEOGRAPHER:  The time is 5:33 p.m., and      17:32

2  we are off the record.                                  17:32

3      (Recess taken.)                                     17:32

4      THE VIDEOGRAPHER:  The time is 5:43 p.m., and      17:42

5  we are on the record.                                   17:42

6      MR. AHN:  Q.  Dr. Johnson, have you been           17:42

7  asked to testify at the trial of this case?             17:42

8  A   Not yet.                                            17:42

9  Q   Is it your understanding that you intend to        17:42

10  testify at trial in this case?                         17:42

11  A   I don't know.  That -- I guess it's a             17:43

12  possibility, but I don't really know.                  17:43

13      MR. AHN:  Thank you for your time today.  I       17:43

14  have no further questions.                             17:43

15                                                         17:43

16          EXAMINATION BY MR. TUNG                        17:43

17      MR. TUNG:  So I have a couple of questions,        17:43

18  and if it's okay, I'll just proceed.  So I think we    17:43

19  were on Exhibit 8.                                     17:43

20      Can you mark this as Exhibit 9.                    17:43

21      THE WITNESS:  It's the expert report.             17:43

22      (Document marked J. Johnson Exhibit 9             17:43

23       for identification.)                             17:43

24      MR. TUNG:  And then mark this one as              17:43

25  Exhibit 10.                                            17:43