# EXHIBIT 13
# FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

APPLE, INC., a California Corporation

vs. CN:11-CV-01846-LHK

SAMSUNG ELECTRONICS COMPANY, LTD, a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York Corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware Limited Liability Company.

___________________________________/

The videorecorded deposition of RAVIN BALAKRISHNAN, PH.D., was held on Friday, April 20, 2012, commencing at 9:07 A.M., at the Law Offices of Quinn Emanuel, 1299 Pennsylvania Avenue, N.W., Suite 825, Washington, D.C., before Ronda J. Thomas, a Notary Public.

REPORTED BY:

Ronda J. Thomas, RPR, CLR

JOB NO. 48807

Morrison and Foerster on behalf of the plaintiff, Apple. 09:08

MR. AHN: Matthew Ahn of Morrison and Forester on behalf of Apple. 09:08

MR. BUSEY: And, also, I'm representing the witness. 09:08

THE VIDEOGRAPHER: Will the court reporter please swear the witness. 09:08

Whereupon, 09:08

RAVIN BALAKRISHNAN, PH.D., 09:08

called as a witness, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows: 09:08

EXAMINATION BY MR. JOHNSON: 09:08

Q Good morning, Dr. Balakrishnan. 09:08

A Good morning. 09:09

Q How many times have you been deposed now? 09:09

A I don't have a precise count. I would say somewhere between half a dozen and ten. 09:09

(Brief pause.) 09:09

Q Sorry about that. 09:09

Is the bulk of your consulting work now for Apple? 09:09

MR. BUSEY: Objection just to form. 09:09

A The current litigation consulting I'm doing 09:09

also accused of infringing the '381, right? 10:38

A Yes, it is. Or I've accused a Galaxy S4G. Whether it's the exact same one I don't know. 10:38

Q Take a look at the ThinkFree Office application and tell me if it infringes the '381 patent? 10:38

A Sure. 10:38

MR. BUSEY: Can counsel represent what version of the Galaxy S4G this is? 10:39

MR. JOHNSON: 2.3.3. 10:39

A So I've just tried the ThinkFree Office with two different PDF files and I cannot get it to do the same functionality that I saw on the Galaxy S4G with the ThinkFree Office in counsel's office. 10:40

Q So Exhibit 4, the ThinkFree Office application in Exhibit 4 doesn't infringe the '381 patent, right? 10:40

A ThinkFree Office that I'm using right now on Exhibit 4, this particular version does not seem to infringe. 10:40

Q Is it your understanding that some of the versions of ThinkFree Office infringe and some don't? 10:40

A ThinkFree Office versions that I tested on the phones I list in paragraph 37 of my report do infringe as I've indicated. 10:41

Given what I've seen today with this version of ThinkFree Office on the Exhibit 4 and the one I just examined on the earlier exhibit, which I believe was Exhibit 3, those two do not appear to infringe. 10:41

So as a result at least these two versions of ThinkFree Office do not. 10:41

Q The question I have is: When you looked at the phones and products that were at Apple's counsel's office, did you see any phones that had the ThinkFree Office application that did not infringe? 10:41

A I do not recall seeing any ThinkFree Office applications that I tried that did not infringe the 381. 10:42

Q Do you recall seeing any phones at Apple's counsel's office or tablets where the Browser application did not infringe? 10:42

A I believe so, yes. 10:42

Q Can you tell me which ones those were? 10:42

A I don't have that on top of my head but I might have it in the report. Give me one minute. 10:42

(Witness reading.) 10:42

A So in my report in paragraph 261 as one example the Gem, G-E-M, phone did not appear to do the '381's feature in the Browser and you get a hard stop 10:43

instead of the snap back. And the other alternative that I've seen is what's referred to as the blue glow effect, which I talk about a little about it in paragraph 262. 10:43 10:43 10:43 10:44

I don't list in this the devices that have that. My job here was to deal with the infringement but I definitely have seen devices that do the blue glow instead of the snap back. 10:44 10:44 10:44 10:44

Q So the devices that exhibit the hard stop do not infringe the '381 patent? 10:44 10:44

MR. BUSEY: Objection to the extent it's ambiguous. It calls for a legal conclusion. Go ahead. 10:44 10:44

A So device running the Browser application, and in the Browser application if it does the hard stop or not the snap back or rubber-banding, then the Browser application on that device would not infringe. 10:44 10:44 10:44 10:44

There may be other applications, like the Contacts, that may not have a hard stop and might infringe. 10:44 10:44 10:44

Q What do you mean by hard stop? 10:44

A By hard stop, I mean when you hit the edge of the -- well, let's take it back to the claim. 10:44 10:44

For example claim element F here, which says once you've reached the edge of the document, displaying an area beyond the edge of the document, 10:45 10:45 10:45

where it does not do that, and it does not do the snapback functionality in elements G and H. 10:45

And a simple example of that is what I just saw in the ThinkFree Office on Exhibit 4. 10:45

Q And the blue glow does not infringe the '381 patent either? 10:45

A If it is only the blue glow and not the blue glow in additional to the snapback that's in '381, then a device or an application, having just the blue glow and not doing the '381 snapback functionality, would not infringe. 10:45

Q Were there any other characteristics of the Browser on products that you reviewed, besides the hard stop and blue glow that you believe don't infringe? 10:45 10:46

MR. BUSEY: Objection. Ambiguous. 10:46

A I believe I've seen a Browser that had a yellow glow, but effectively it's the same functionality as the blue glow but a different color. And that, that would be the same as blue glow from a functionality point of view. 10:46

Q Any others? 10:46

MR. BUSEY: Same objection. 10:46

A That's all I can recall right now. 10:46

Q Did you review any products that had a Contacts application that did not infringe? 10:46

A You said Contacts application? 10:46

Q Yes. 10:46

A I believe I have seen Contacts applications on some Samsung phones that had a blue or a yellow glow functionality instead of the snapback functionality of the '381, and that would not infringe. 10:47

Q Did you see any Contacts applications on Samsung phones that exhibited a hard stop? 10:47

A Honestly, I don't recall offhand. I might have. 10:47

Q Okay. Do you remember seeing any Samsung products that have a Gallery application that do not infringe the '381 patent? 10:47

MR. BUSEY: Objection again to being ambiguous. Go ahead. 10:48

A I might have. I don't recall exactly whether I have or not because many of these, there are so many of these phones that I've tried. And I don't have a list of the ones that don't do the '381. 10:48

Q You weren't interested in the ones that don't infringe, right? 10:48

A I was not making, keeping track of it. 10:48

Q There are some phones that have a Gallery application that exhibit a blue glow, right? 10:48

A That might be true. I, I just don't have a 10:48

precise recollection of that. 10:48

Q Do you know which ones? 10:48

A I just said I don't have a precise recollection. 10:48

Q Do you have any -- do you have an imprecise recollection? 10:48

A No, unfortunately. 10:48

Q Are there Samsung products that have a Gallery application that exhibit a hard stop? 10:49

A I have to give the same answer. I might have seen them but I don't recall offhand. 10:49

Q Are you aware of any Samsung products in the Gallery application that exhibit a hold still phenomenon? 10:49

MR. BUSEY: Objection -- 10:49

Q Sorry -- where the photo doesn't snap in either direction, it just, if you move it, it stays put? 10:49

MR. BUSEY: Objection. Ambiguous and confusing. 10:49

A When you move it and it stays put? So you move it off the edge and it stays put, is that what you're saying? 10:49

Q Right. 10:49

A I have seen some Samsung products with a 10:49

MR. BUSEY: Let me see that, please. 01:59

A Okay. 01:59

Q Are we looking at one electronic document there, two electronic documents, more than that? 01:59

A I'm looking at at least two electronic documents, yes. 01:59

Q And what are the two electronic documents? 01:59

A Well, the first one is this list of stocks. The second one is this list of looks, like news headlines at the bottom. 01:59 02:00

Q And where is the edge of the documents? 02:00

A In each case? 02:00

Q Yeah. 02:00

A The, in the one on the top, the edge is on the top of the list and the bottom of the list and the sides of the list. 02:00

And the same with the bottom, the news, news feed. It's at the top of the list of the news feeds and bottom of the list of the news feeds -- news feed. 02:00

Q What does elastically attached mean as it's used in claim 16? 02:01 02:02

(Witness reading.) 02:02

A In the context of the claims, it means the, when moving from, the document from one, one direction 02:02

to the other direction so the area beyond the edge disappears, that movement gives the appearance of it being attached with an elastic band, for example, the analogies to the physical world. So it doesn't instantly snap back, like instantly you see a elastic movement or an animation. 02:02 02:02 02:03 02:03 02:03 02:03

Q Do the bounce features that you reviewed in the Samsung products elastically snap back, or do they instantly snap back? 02:03 02:03 02:03

MR. BUSEY: Objection. Ambiguous. Calls for a legal conclusion. 02:03 02:03

A They all elastically snap back. 02:03

I'm sorry, the, just to clarify that, the Gallery and Contacts and Browser accused products elastically snap back. 02:03 02:03 02:03

Q Your analysis with respect to claims 19 and 20 are, is based upon your analysis of claim 1, right? 02:04 02:04

MR. BUSEY: Objection to the extent it mischaracterizes the witness' prior testimony. 02:04 02:04

(Witness reading.) 02:04

A The analysis of the functionality is based, it's in part based on the analysis I did in claim 1 but, of course, claim 19 talks about things like memory and programs and instructions, and that is the additional analysis presented in my report. 02:05 02:05 02:05 02:05 02:05

Q Okay. Well, claim 19, for example, paragraph 191, you say: 02:05

Because these devices perform the elements described in claims 1 and 19, they must have instructions for performing those methods and a storage medium for those instructions as recited in those claims. 02:05

Have you confirmed that the accused devices actually have those instructions? 02:05

A Yes, because I looked at the source code on the machines in Quinn's offices in Redwood Shores. 02:06

Q So why does your report say they must have as opposed to they do, in fact, have? 02:06

Is there a distinction there in your mind or no? 02:06

A They do have and they must have, because without, without having it, they wouldn't be able to do this functionality. 02:06

Q Okay. Now, with respect to section Y of your report, you talk about the difficulty of design around? 02:06

A I'm sorry, what paragraph is that? 02:06

Q 261. 02:06

A Yes. 02:07

Q Can you list for me, what are the 02:07

non-infringement alternatives to a '381 patent? 02:07

A That I've seen in the Samsung devices? 02:07

Q Yes. 02:07

A Okay. So the first one that we have already talked about is what has been referred to as a hard stop. And that's discussed in paragraph 261 of my report. 02:07

If there's a hard stop, and there isn't, the bounceback or snapback effect that's found in the claims of the '381. 02:07

Similarly, if it uses the blue glow effect which we have discussed and I talk about in the 262, sorry, paragraph 262, again, assuming the blue glow is there and the functionality that is infringing the claims, which is the snapback functionality is no longer there, then that would not be infringing. 02:08

And as I said, I think, earlier this morning, I've seen a yellow glow as well, which would be effectively the same -- 02:08

Q Have you seen -- 02:08

A -- the same as the blue glow. 02:08

Q Have you seen any other non-infringing alternatives? 02:08

MR. BUSEY: I'm going to object as ambiguous. Go ahead. 02:08

so -- 03:06

Q Okay. Was a DiamondTouch device with a tabletop cloth application ever sold to anyone? 03:06

A I do not know. 03:06

Q Was a DiamondTouch device with the Tablecloth application ever used in public? 03:06

A I don't know. 03:06

Q I think you said you weren't sure whether the DiamondTouch device that was in the lobby of MERL had Tablecloth on it, right? 03:07

A That's right, at that timeframe. 03:07

Q Are you aware of any other timeframe in which the DiamondTouch device in the MERL lobby had Tablecloth on it? 03:07

A I'm not aware of it having it. It might have. But I do not recall ever seeing Tablecloth on the device in the lobby. 03:07

Q Did you work with Mr. Forlines? 03:07

A Yes. 03:07

Q What did you work on together? 03:07

A We worked on a variety of different research projects involving user interfaces over the years. 03:08

Q Can you be any more specific? 03:08

A Well, I can start from my CV because I've 03:08

published some papers with him. I'll make it more concrete. 03:08 03:08

And I'm assuming you mean -- are you saying during that timeframe or in general? 03:08 03:08

Q In general. 03:08

A So one project I worked on was on a user interface for zooming and pointing using a handheld, interactive handheld projector. That was one piece of research. 03:08 03:08 03:09 03:09

Another piece of research was on gesture registration on a direct-touch surface. 03:09 03:09

Another piece of research was a study, experimental evaluation of how it displays position and the orientation of the user's control space with effective user performance and preference. 03:09 03:09 03:09 03:09

Another study was on what we call hybrid pointing, a way to switch between absolute and relative pointing between, with direct input devices. 03:09 03:09 03:09

Another one was a study, an experimental study on the effects of size, group size, the number of people in a group, and the display configuration on the visual search tasks. 03:10 03:10 03:10 03:10

There was another study on the perception of elementary graphical elements and tabletop environments. 03:10 03:10 03:10

Another study on direct touch versus mouse input for tabletop displays. 03:10 03:10

And yet another study on evaluation of tactile feedback compared to direct versus indirect stylus input in pointing and crossing selection tasks. 03:10 03:10 03:10

Q How about Mr. Bogue? Did you work with Mr. Bogue? 03:10 03:10

A I did not work with Mr. Bogue on any research projects per se. 03:10 03:11

Q And how about Mr. Wigdoor? Did you work on anything in particular with Mr. Wigdoor while at consulting for Mitsubishi Electric Research Labs? 03:11 03:11 03:11

A Yes. 03:11

Q Can you tell me what you worked on? 03:11

A Sure. 03:11

Some of that overlaps the list I just read. Mr. Forlines was the co-author on some of that work as well. Let me just go through this again. 03:11 03:11 03:11

So this is with Mr. Wigdoor at MERL? 03:11

Q Right. 03:11

A So there was a research, piece of research done -- yeah, I think this was done at MERL. I'm not 100 percent sure whether some of it was done at the University as well. It's work in 2005 investigating the effect of orientation on the readability of text in 03:11 03:11 03:12 03:12 03:12

tabletop displays. 03:12

That study I mentioned earlier on display position and control space orientation and user performance and preference. 03:12

A piece of research called under the table interaction. 03:12

Another piece of research which looked at the effects of group size and display configuration -- 03:12

THE COURT REPORTER: Of what size? 03:12

THE WITNESS: Excuse me -- group size and display configuration on visual search. 03:12

A Another study, which I believe I mentioned earlier, perception of elementary graphical elements in tabletop and multisurface environments. 03:13

The study on direct touch versus mouse input for tabletop displays. 03:13

I think that's pretty much it for MERL. 03:13

Q You've reviewed Mr. Van Dam's report, right? 03:13

MR. BUSEY: Objection. Ambiguous. 03:13

A The report in this case, '381? Yes. 03:13

Q Yeah. 03:13

And is it your opinion that the prior art references for the '381 patent have to be manipulated in just the right way to profuse the allegedly 03:13