HAROLD J. MCELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RACHEL KREVANS (CA SBN 116421)
rkrevans@mofo.com
JENNIFER LEE TAYLOR (CA SBN 161368)
jtaylor@mofo.com
ALISON M. TUCHER (CA SBN 171363)
atucher@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
JASON R. BARTLETT (CA SBN 214530)
jasonbartlett@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

WILLIAM F. LEE
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Attorneys for Plaintiff and
Counterclaim-Defendant APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 11-cv-01846-LHK (PSG)<br><br>**APPLE'S TRIAL BRIEF**<br><br>**Trial:** **July 30, 2012**<br>**Time:** **9:00 a.m.**<br>**Place:** **Courtroom 8, 4th Floor**<br>**Judge:** **Hon. Lucy H. Koh** |

# TABLE OF CONTENTS

**Page**

I. SAMSUNG HAS VIOLATED APPLE'S INTELLECTUAL PROPERTY RIGHTS ....................................................................................................... 3

    A. Samsung Infringes Apple's Design Patents ........................................... 3

        1. Apple's Elements of Proof ........................................................ 3

        2. Design patent infringement depends on whether Samsung's product designs appear substantially the same to an ordinary observer as Apple's patented designs........................................................ 4

        3. A patented design is "functional" only if the design is "dictated by" function ................................................................................... 6

        4. Samsung must identify a primary obviousness reference that creates "basically the same" overall visual impression as the patented design ........................................................................................ 7

        5. Some of Samsung's defenses have already been rejected or excluded .................................................................................. 8

    B. Samsung Infringes Apple's User-Interface Software Patents............... 9

    C. Samsung Has Infringed and Diluted Apple's iPad Trade Dress and Diluted Apple's iPhone Trade Dress............................................................... 10

        1. Samsung is infringing Apple's iPad trade dress ..................... 11

        2. Samsung has diluted Apple's iPad Trade Dress ..................... 13

        3. Samsung has diluted Apple's iPhone Trade Dress .................. 14

        4. Samsung's trade dress defenses are based on legally incorrect premises .................................................................................. 15

II. SAMSUNG'S TORTS RESULT FROM AN INTENTIONAL CORPORATE STRATEGY TO COPY APPLE AND ITS PRODUCTS ................................. 16

    A. Samsung's Own Documents Show that Samsung Copied Apple ....................... 16

    B. Samsung's Copying Establishes the Intent Required for Willful Infringement and for Inducement and Supports Apple's Trade Dress Claims ..................................................................................... 18

III. SAMSUNG'S VIOLATION OF APPLE'S INTELLECTUAL PROPERTY RIGHTS GIVES RISE TO BILLIONS OF DOLLARS IN DAMAGES..................... 20

    A. Apple Is Entitled to Substantial Monetary Damages ......................... 20

        1. Samsung's Profits ................................................................... 21

        2. Apple's Lost Profits ............................................................... 22

        3. Reasonable Royalty................................................................ 24

    B. Special Considerations Apply to Calculating Trade Dress Damages ................. 25

        1. Samsung Cannot Rebut the Presumption That All Profits Are Attributable to Samsung's Infringing Activity ......................... 25

        2. Actual Notice Is Not Required to Recover Damages for Violation of Unregistered Trade Dress Rights......................................... 26

**TABLE OF CONTENTS**
(continued)

Page

IV.   APPLE WILL BE ENTITLED TO A PERMANENT INJUNCTION ............................ 26

V.    SAMSUNG'S ASSERTED DECLARED-ESSENTIAL PATENTS ARE NOT
      INFRINGED AND INVALID ................................................................................... 27

      A.    The '941 Patent ............................................................................................ 28

            1.    Apple Does Not Infringe the '941 Patent ........................................ 29

            2.    The '941 Patent Is Invalid ................................................................ 31

      B.    The '516 Patent ............................................................................................ 31

            1.    Apple Does Not Infringe the '516 Patent ........................................ 32

            2.    The '516 Patent Is Invalid ................................................................ 33

      C.    No Willful Infringement of the Declared-Essential Patents ........................ 33

VI.   SAMSUNG'S RIGHTS IN THE ASSERTED DECLARED ESSENTIAL
      PATENTS HAVE BEEN EXHAUSTED BY INTEL'S AUTHORIZED SALE OF
      LICENSED BASEBAND CHIPS TO APPLE ......................................................... 34

VII.  SAMSUNG'S STANDARD-SETTING DECEIT RESULTS IN WAIVER OF ITS
      RIGHTS TO ASSERT THE PATENTS AGAINST APPLE ................................... 36

VIII. SAMSUNG IS ESTOPPED FROM ASSERTING ITS PATENTS AGAINST
      APPLE BECAUSE OF ITS STANDARD-SETTING DECEIT ............................. 37

IX.   SAMSUNG'S FEATURE PATENTS ARE NOT INFRINGED AND INVALID ......... 37

      A.    The '460 Patent ............................................................................................ 38

            1.    Apple Does Not Infringe The '460 Patent ....................................... 38

            2.    The '460 Patent Is Invalid ................................................................ 41

      B.    The '893 Patent ............................................................................................ 42

            1.    Apple Does Not Infringe The '893 Patent ....................................... 42

            2.    The '893 Patent Is Invalid ................................................................ 43

      C.    The '711 Patent ............................................................................................ 43

            1.    Apple Does Not Infringe The '711 Patent ....................................... 43

            2.    The '711 Patent Is Invalid ................................................................ 44

      D.    No Willful Infringement of the Feature Patents .......................................... 45

X.    SAMSUNG'S STANDARD-SETTING DECEIT HAS RESULTED IN BREACH
      OF CONTRACT AND VIOLATIONS OF THE ANTITRUST AND UNFAIR
      COMPETITION LAWS ......................................................................................... 45

      A.    Samsung Has Breached Two Contractual Obligations Critically Important
            to the 3GPP Standard-Setting Process ......................................................... 45

            1.    Samsung Repeatedly Breached Its Duty to Timely Disclose IPR ........... 46

            2.    Samsung Breached its Duty to Grant FRAND Licenses ........................ 47

      B.    Samsung Has Violated The Antitrust Laws By Its Standard-Setting
            Misconduct .................................................................................................... 49

1
2

**TABLE OF CONTENTS**
(continued)

**Page**

3  XI.    SAMSUNG'S CLAIMED DAMAGES ARE EXCESSIVE AND
4         UNSUPPORTED ........................................................................................ 50

           A.     To The Extent That Samsung Is Entitled To Any Remedy, its FRAND
5                  Damages Cannot Exceed $0.0049 Per Unit for Each Infringed Patent............... 50

           B.     The Royalty Damages Sought by Samsung on The '460, '711, and '893
6                  Patents Are The Product of Flawed Methodology and Are Overstated............. 53

7  XII.   APPLE'S SUMMARY EXHIBITS COMPLY WITH FEDERAL RULE OF
           EVIDENCE 1006........................................................................................ 54

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
   960 F.2d 1020 (Fed. Cir. 1992)............................................................................ 37

*AMF, Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979)....................................................................... 11, 20

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
   580 F.3d 1340 (Fed. Cir. 2009)..................................................... 30, 40, 43, 44

*Amini Innovation Corp. v. Anthony California, Inc.*,
   439 F.3d 1365 (Fed. Cir. 2006)................................................................................. 7

*Apple Inc., v. Samsung Elecs. Co.*,
   678 F.3d 1314 (Fed. Cir. 2012)...................................................................*passim*

*Apple Inc. v. Motorola, Inc.*,
   No. 11-cv-08540,
   2012 WL 1959560 (N.D. Ill. May 22, 2012) ....................................... 54

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
   457 F.3d 1062 (9th Cir. 2006).................................................................. 15, 16

*Bard Peripheral Vascular v. W.L. Gore & Assocs.*,
   No. 2010-1510,
   2012 U.S. App. Lexis 13561 (Fed. Cir. Jun. 14, 2012) ...................... 19

*Bergstrom v. Sears, Roebuck & Co.*,
   496 F. Supp. 476 (D. Minn. 1980) ................................................................. 21

*Braun, Inc. v. Dynamics Corp.*,
   975 F.2d 815 (Fed. Cir. 1990)............................................................................ 6

*Cel-Tech Communications v. LA Cellular*,
   973 P.2d 527 (Cal. 1999) ............................................................................... 49

*Clamp Mfg. Co. v. Enco Mfg. Co.*,
   870 F.2d 512 (9th Cir. 1989)............................................................................ 12

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
   251 F.3d 1252 (9th Cir. 2001).................................................................. 12, 13

*Cornell Univ. v. Hewlett-Packard Co.*,
   609 F. Supp. 2d. 279 (N.D.N.Y. 2009) .......................................................... 51

sf-3170923

*Crocs, Inc. v. International Trade Com'n,*
    598 F.3d 1294 (Fed. Cir. 2010) ........................................................................... 4

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,*
    567 F.3d 1314 (Fed. Cir. 2009) ........................................................................... 24

*Dwyer Instruments, Inc. v. Sensocon, Inc.,*
    No. 09-CV-10-TLS,
    2012 U.S. Dist. LEXIS 78491 (N.D. Ind. June 5, 2012) .................................... 26

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) .......................................................................... 27, 52, 53

*Egyptian Goddess, Inc. v. Swisa, Inc.,*
    543 F.3d 665 (Fed. Cir. 2008) ............................................................................. 3

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
    304 F.3d 1289 (Fed. Cir. 2002) ........................................................................... 30

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
    535 U.S. 722 (2002) ............................................................................. 41, 43, 44

*First Brands Corp. v. Fred Meyer, Inc.,*
    809 F.2d 1378 (9th Cir. 1983) .................................................................... *passim*

*Gales v. Winco Foods,*
    No. C 09-058913 CRB,
    2011 U.S. Dist. LEXIS 96125 (N.D. Cal. Aug. 26, 2011) .................................. 55

*Global-Tech Appliances, Inc., v. SEB S.A.,*
    131 S. Ct. 2060 (2011) ........................................................................................ 20

*Gorham Co. v. White,*
    81 U.S. 511 (1872) ........................................................................................... 5, 6

*In re Seagate Tech. LLC,*
    497 F.3d 1360 (Fed. Cir. 2007) ............................................................... 19, 33, 45

*Intel Corp. v. Terabyte Int'l, Inc.,*
    6 F.3d 614 (9th Cir. 1993) ................................................................................... 22

*Kamar Int'l, Inc. v. Russ Berrie & Co., Inc.,*
    752 F.2d 1326 (9th Cir. 1984) ....................................................................... 21, 25

*Keith v. Volpe,*
    618 F. Supp. 1132 (C.D. Cal. 1985) ................................................................... 55

*L.A. Gear, Inc. v. Thom McAn Shoes Co.,*
    988 F.2d 1117 (Fed. Cir. 1993) ......................................................................... 5, 6

v

*Lindy Pen Co. v. Bic Pen Corp.*,
   982 F.2d 1400 (9th Cir. 1993)..................................................................... 20

*Loral Fairchild Corp. v. Sony Corp.*,
   181 F.3d 1313 (Fed. Cir. 1999)................................................................... 40

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)................................................................... 51

*Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*,
   152 F.3d 1368 (Fed. Cir. 1998)................................................................... 40

*Mattel, Inc. v. MCA Records, Inc.*,
   296 F.3d 894 (9th Cir. 2002)....................................................................... 13

*Mehus v. Emporia State Univ.*,
   222 F.R.D. 455 (D. Kan. 2004).................................................................... 55

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
   420 F.3d 1369 (Fed. Cir. 2005)................................................................... 35

*Micro Chem. v. Lextron, Inc.*,
   318 F.3d 1119 (Fed. Cir. 2003)................................................................... 22

*Miracle Blade, LLC v. Ebrands Commerce Group, LLC*,
   207 F. Supp. 2d 1136 (D. Nev. 2002).......................................................... 55

*Nike, Inc. v. Wal-Mart*,
   138 F.3d 1437 (Fed. Cir. 1998)................................................................... 21

*Nintendo of Am. v. Dragon Pac. Int'l*,
   40 F.3d 1007 (9th Cir. 1994)....................................................................... 25

*North American Philips Corp. v. American Vending Sales, Inc.*,
   35 F.3d 1576 (Fed. Cir. 1994)..................................................................... 35

*Phoenix v. Com/Systems, Inc.*,
   706 F.2d 1033 (9th Cir. 1983)..................................................................... 56

*Qualcomm Inc. v. Broadcom Corp.*,
   548 F.3d 1004 (Fed. Cir. 2008)............................................................. 36, 37

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
   553 U.S. 617 (2008).................................................................................... 34

*Read v. Portec*,
   970 F. 2d 816, 827 (Fed. Cir. 1992)............................................................ 19

*Ring Plus, Inc. v. Cingular Wireless Corp.*,
   614 F.3d 1354 (Fed. Cir. 2010)................................................................... 40

vi

sf-3170923

*Rodan & Fields, LLC v. Estee Lauder Cos.*,
    No. 10-cv-02451-LHK,
    2010 U.S. Dist. LEXIS 109573 (N.D. Cal. Oct. 5, 2010) ....................................................... 14

*Rolex Watch, U.S.A., Inc., v. Michel Co.*,
    179 F.3d 704 (9th Cir. 1999) ................................................................................................. 25

*Sands, Taylor & Wood v. The Quaker Oats Co.*,
    978 F.2d 947 (7th Cir. 1992) ................................................................................................. 25

*SEB S.A. v. Montgomery Ward & Co., Inc.*,
    594 F.3d 1360 (2010) ............................................................................................................ 19

*Thorn EMI N.A. v. Hyundai Electronics Industries*,
    No. 94-332 RRM,
    1996 U.S. Dist. LEXIS 21170 (D. Del. July 12, 1996) ................................................... 34, 35

*Tulip Computers Int'l v. Dell*,
    262 F. Supp. 2d 358 (D. Del. 2003) ...................................................................................... 35

*United States v. Cuddy*,
    147 F.3d 1111 (9th Cir. 1998) ................................................................................................. 8

*United States v. Francis*,
    131 F.3d 1452 (11th Cir. 1997) ............................................................................................. 55

*United States v. Gardner*,
    611 F.2d 770 (9th Cir. 1980) ................................................................................................. 55

*United States v. Morin*,
    627 F.3d 985 (5th Cir. 2010) ................................................................................................. 55

*United States v. Rizk*,
    660 F.3d 1125 (9th Cir. 2011) ............................................................................................... 55

*United States v. Shirley*,
    884 F.2d 1130 (9th Cir. 1989) ............................................................................................... 55

*Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*,
    520 U.S. 17 (1997) ................................................................................................................. 31

**STATUTES**

15 U.S.C. 1111 (2006) ................................................................................................................. 26

sf-3170923

15 U.S.C.
   § 1115(a) .................................................................................................................... 14
   §§ 1115(a), 1125(a)(3) .............................................................................................. 14
   § 1116........................................................................................................................ 26
   § 1117........................................................................................................................ 21
   § 1117(a) (2006)........................................................................................................ 25
   § 1125(a)(1)(A) ...................................................................................................... 5, 11
   § 1125(c) .................................................................................................................... 13
   § 1125(c)(2)................................................................................................................ 13
   § 1125(c)(2)(B) ..................................................................................................... 13, 20

35 U.S.C.
   § 283.......................................................................................................................... 26
   § 284 (2006) .............................................................................................................. 22
   § 289 (2006) ..................................................................................................... 5, 21, 22

Cal. Bus. & Prof. Code § 17200 et seq. ........................................................................ 49

sf-3170923

1

## INTRODUCTION

2      Samsung is on trial because it made a deliberate decision to copy Apple's iPhone and

3   iPad.  Apple's innovations in product design and user interface technology resulted in strong

4   intellectual property rights that Samsung has infringed.  Try as it might, Samsung cannot deflect

5   attention from its own copying by the patents it has asserted against Apple.  To the contrary, the

6   trial will expose how Samsung deceived the international body responsible for creating the

7   UMTS wireless standards to slip its patents into the standard and illegally monopolize technology

8   markets.

9      These pictures, by now familiar to the Court, remain the basic story of our case:

10

11  | Samsung Smartphones **BEFORE** iPhone | Apple's iPhone (announced Jan. 2007) | Samsung Smartphones **AFTER** iPhone |
12  | --- | --- | --- |
13  |  |  |  |

23

24

25

26

27

28

sf-3170923

| Samsung Touchscreen Tablet<br>**BEFORE** iPad | Apple's iPad 2<br>(announced March 2011) | Samsung Touchscreen Tablet<br>**AFTER** iPad 2 |
|---|---|---|
|  |  |  |

Samsung once sold a range of phones and a tablet of its own design.  Now Samsung's mobile devices not only look like Apple's iPhone and iPad, they use Apple's patented software features to interact with the user.

The intellectual property that Apple has asserted against Samsung goes to the heart of the extraordinary success of the iPhone and the iPad.  Samsung's asserted patents, on the other hand, claim minor features, which are not practiced by the accused products and, in any event, were invented by others before Samsung.  Furthermore, the two asserted declared-essential patents are unenforceable because Samsung unquestionably violated the Intellectual Property Rights (IPR) Policy of the European Telecommunications Standards Institute (ETSI) UMTS standard by failing timely to disclose that it had filed for patents on the very proposals that it was pushing ETSI to adopt.  Samsung also exhausted its rights with respect to these patents when it licensed Intel to sell the chipsets that Samsung now accuses of infringement.

This will brief summarizes the elements of Apple's proof for its claims and counterclaims, and explains why Samsung's attempts to avoid the consequences of its decision to copy Apple must fail.  It also explains why Apple does not infringe any of Samsung's asserted patents and the reasons they are invalid and, in the case of the declared-essential patents, unenforceable.  Along

2

1   the way, we briefly address legal issues the Court may need to resolve, while pointing out how

2   decisions this Court and the Federal Circuit have already made have simplified that task.

3   **I.      SAMSUNG HAS VIOLATED APPLE'S INTELLECTUAL PROPERTY RIGHTS**

4          Samsung has violated Apple's rights in (A) design patents that protect the iPhone's and

5   iPad's industrial design and the iPhone's Graphical User Interface (GUI) design; (B) utility

6   patents that protect software features that make the iPhone and iPad easy and fun to use; and

7   (C) trade dress rights that protect the iPhone's and iPad's distinctive appearance, which

8   consumers closely associate with Apple.

9          **A.      Samsung Infringes Apple's Design Patents**

10              **1.      Apple's Elements of Proof**

11         Samsung's products infringe Apple's D'677 and D'087 iPhone design patents; D'889

12  tablet design patent; and D'305 iPhone GUI design patent.  Samsung's product designs appear

13  substantially the same as Apple's designs to an ordinary observer familiar with the prior art,

14  which is the test for design patent infringement.  *See Egyptian Goddess, Inc. v. Swisa, Inc.*,

15  543 F.3d 665, 670, 678 (Fed. Cir. 2008) (en banc).  This Court previously found likely

16  infringement of the D'677 and D'889 patents in its preliminary injunction ruling.  (Dkt. No. 452

17  at 24-27.)

18         At trial, Apple will present the testimony of Peter Bressler, a former President of the

19  Industrial Designers Society of America (IDSA), who in 2010 received the profession's highest

20  honor, an IDSA Personal Recognition Award.  Mr. Bressler will compare Samsung's product

21  designs to Apple's patented designs from the perspective of an ordinary observer and explain why

22  he believes they infringe.  Similarly, Susan Kare, a graphic designer with 30 years of experience

23  designing user interface graphics and icons, will analyze Samsung's GUI designs.  In addition to

24  side-by-side comparisons, Apple will present evidence that many people — industry observers,

25  consumers, Samsung's business partners, and even some in Samsung's design group —

26  considered Samsung's products to look very similar to Apple's products that embody the patented

27  designs.

28

sf-3170923

1    Samsung contests infringement and argues that Apple's patents are not valid.  But

2    Samsung builds its case around "experts" such as Robert Anders and Itay Sherman.  Mr. Anders

3    has made his living since the 1990s as a professional witness.  Mr. Sherman has worked in the

4    industry but candidly admits he is "not . . . an industrial design expert."  (Dkt. No. 1059-1 at 1.)

5    Apple's patents enjoy a presumption of validity, and Samsung will be unable to rebut that

6    presumption.  This Court and the Federal Circuit have already held that Samsung failed to present

7    a substantial validity challenge to the D'677, D'087, and D'889 patents in opposing Apple's

8    preliminary injunction.  (Dkt No. 452 at 23-24; *Apple Inc., v. Samsung Elecs. Co.*, 678 F.3d 1314,

9    1326-27, 1330-32 (Fed. Cir. 2012).)  At trial, Mr. Bressler, Dr. Kare, and other witnesses will

10   testify that Apple's patented designs differed significantly from the prior art and were not dictated

11   by function.  Apple itself considered numerous alternatives, and others in the industry (including

12   Samsung) marketed a range of different designs.  The initial skepticism that met Apple's

13   announcement of the iPhone and of the iPad, followed by the extraordinary commercial success

14   of these products, is evidence that the designs were not obvious.  Indeed, such secondary

15   considerations as the commercial success of a product embodying the patented design "can be the

16   most probative evidence of nonobviousness in the record."  *Crocs, Inc. v. International Trade*

17   *Com'n*, 598 F.3d 1294, 1310 (Fed. Cir. 2010) (internal quotation omitted).  This conclusion is

18   strongly reinforced by Samsung's deliberate copying.

19   Samsung cannot change the central fact that its products are strikingly similar to Apple's

20   patented designs.  Nor can it change the novelty and extraordinary success of Apple's designs.

21   Samsung will instead attempt to confuse the issues with a hodgepodge of defenses based on

22   incorrect legal standards.  Samsung's defenses will fail.

23              **2.      Design patent infringement depends on whether Samsung's product
                          designs appear substantially the same to an ordinary observer as
24                        Apple's patented designs.**

25   Samsung attempts to avoid infringement by importing a trademark-like concept of

26   consumer "deception" into design patent law.  Samsung contends Apple must show not only that

27   Samsung's products "appear substantially the same" to an ordinary observer as the claimed

28   design, but also that purchasers are "deceived" into buying Samsung's products thinking they are

4

1    Apple's.  (Dkt. No. 1232 at 163.)  This Court applied the correct test by finding likely

2    infringement based on substantial similarity, without any evidence of deception.  The jury should

3    be instructed to apply the same test.

4         Samsung's insistence on consumer "deception" as an essential element is contrary to the

5    Patent Act and controlling precedent.  Unlike the Lanham Act, the design patent provisions do

6    not refer to "deception" or "confusion."  *Compare* 15 U.S.C. § 1125(a)(1)(A) (Lanham Act) *with*

7    35 U.S.C. § 289 (liability for applying to a product "the patented design, or any colorable

8    imitation thereof").  The Supreme Court in *Gorham Co. v. White*, 81 U.S. 511 (1872), referred to

9    deception, but only *after* stating that the "true test of identity" is "sameness of appearance"; that

10   "slight variance in configuration" does not destroy "substantial identity"; and that the key issue is

11   whether, "in the eye of an ordinary observer," the accused design is "substantially the same" as

12   the patented design.  *Id.* at 526-28.  Deception is a result that may follow if the two designs

13   appear substantially the same, but the Court did not hold that designs are substantially the same

14   *only if* "deception" is shown.  This is confirmed by the Supreme Court's application of its rule,

15   which relied on a detailed comparison between the patented design and the defendant's design to

16   conclude there was "no substantial difference."  *Id.* at 528-29.

17        Consistent with this reading of *Gorham*, this Court found in its preliminary injunction

18   order that Samsung is likely infringing the D'889 and D'677 patents based on a "side-by-side

19   comparison" of the Samsung products with the patented designs, without any evidence of actual

20   or likely deception.  (Dkt. No. 452 at 25-27, 45-48.)  On appeal, Samsung emphasized that

21   "Apple has not identified a single example of customer confusion."  (*Apple Inc. v. Samsung Elecs.

22   Co., Ltd.*, Federal Circuit No. 2012-1105, Brief of Defendants-Appellees, dated January 9, 2012,

23   at 63.)  The Federal Circuit nonetheless found that Apple was likely to prevail on the merits of the

24   D'889 patent.  *Apple*, 678 F.3d at 1328, 1333.

25        Other Federal Circuit precedent confirms that design patent infringement does not require

26   consumer deception.  In *L.A. Gear, Inc. v. Thom McAn Shoes Co.*, 988 F.2d 1117, 1120-21 (Fed.

27   Cir. 1993), the district court found the defendant liable for both design patent infringement and

28   unfair competition based on trade dress infringement.  On appeal, the Federal Circuit reversed the

5

sf-3170923

1  finding of unfair competition because it found that purchasers were unlikely to be deceived into

2  buying the accused product thinking it was the plaintiff's product.  *Id.* at 1134.  The Federal

3  Circuit nonetheless found design patent infringement, emphasizing that "[d]esign patent

4  infringement relates solely to the patented design, and does not require proof of unfair

5  competition in the marketplace."  *Id.* at 1126.

6       Similarly, in *Braun, Inc. v. Dynamics Corp.*, 975 F.2d 815, 821 (Fed. Cir. 1990), the

7  defendant argued that "a trier of fact may not as a matter of law find design patent infringement,"

8  unless there is empirical "evidence that the blender's design would deceive ordinary observers."

9  The Federal Circuit held that the defendant waived this argument by failing to present it to the

10  district court but went on to observe that "[n]othing in *Gorham* suggests that, in finding design

11  patent infringement, a trier of fact may not as a matter of law rely exclusively or primarily on a

12  visual comparison of the patented design, as well as the device that embodies the design, and the

13  accused device's design."  *Id.*

### 3.   A patented design is "functional" only if the design is "dictated by" function.

16       Relying on Federal Circuit authority, this Court has held that a design is not "functional"

17  merely because it has "a utilitarian purpose" or "enhance[s] the user experience;" rather, the

18  design must be "dictated by function."  (Dkt. No. 452 at 13, citing *L.A. Gear,* 988 F.2d at 1123.)

19  This Court also held that the relevant inquiry for invalidity is not "'the utility of each of the

20  various elements that comprise the design,'" but the functionality of the patented design "as a

21  whole."  (*Id.*, quoting *L.A. Gear,* 988 F.2d at 1123.)  Based on these standards, the Court rejected

22  Samsung's arguments that the iPhone and tablet design patents are invalid as "functional," and

23  that almost every element of Apple's designs should be ignored as "functional" in deciding

24  whether Samsung's products appear substantially the same as Apple's designs.  (*Id.* at 11-15, 39-

25  40.)

26       Samsung ignores these rulings.  Samsung's proposed jury instructions do not even

27  mention the "dictated by function" test.  (Dkt. No. 1232 at 178, 204.)  Instead, Samsung dissects

28  Apple's patented designs into numerous elements and then contends that each element is

sf-3170923

1    "functional" because it "affects the cost or quality of the article."  (Dkt. No. 1189 at 21; Dkt. No.

2    1232 at 178.)  Affecting "cost or quality" is a trademark concept that does not belong in design

3    patent law.  Samsung cites a Federal Circuit case that mentioned "cost or quality," but that case

4    did not apply "cost or quality" in deciding design patent functionality, and cited a Supreme Court

5    case that used this test in the context of *trade dress* functionality.  *Amini Innovation Corp. v.*

6    *Anthony California, Inc.*, 439 F.3d 1365, 1371 (Fed. Cir. 2006), citing *Inwood Labs., Inc.v. v. Ives*

7    *Labs., Inc.*, 456 U.S. 844, 851 (1987).  The Federal Circuit emphasized that "discounting of

8    functional elements must not convert the overall infringement test to an element-by-element

9    comparison," and reversed the district court's finding of no design patent infringement on that

10   ground.  *Id.* at 1372.

### 4.    Samsung must identify a primary obviousness reference that creates "basically the same" overall visual impression as the patented design

13        This Court and the Federal Circuit have held that design patent obviousness requires

14   Samsung to identify (1) a primary prior art reference whose overall visual impression is

15   "basically the same" as the patented design; and (2) a secondary prior art reference whose overall

16   appearance is so related to the primary reference that the appearance of certain ornamental

17   features in one would suggest the application of those features in the other.  *Apple*, 678 F.3d at

18   1329-30.  (*See also* Dkt. No. 1170 at 7-8.)  Despite these rulings, Samsung has proposed a jury

19   instruction on obviousness that *does not even mention* the controlling design patent test, and relies

20   instead on rules that apply to utility patents.  (Dkt. No. 1232 at 185.)  Samsung has proposed an

21   "alternative" instruction in case its primary instruction is rejected, but that instruction still

22   deviates from the controlling test in several respects, including by referring to "deceptive

23   similarity."  (*Id.* at 187.)

24        Samsung experts Itay Sherman and Sam Lucente have relied on numerous prior art

25   references to support their obviousness opinions while not identifying any reference that they

26   contend creates "basically the same" overall visual impression as the patented designs.  At trial,

27   Samsung's experts should not be allowed to opine that a design is obvious without applying the

28   correct legal test.

sf-3170923

**5.      Some of Samsung's defenses have already been rejected or excluded**

Prior rulings of the Federal Circuit, this Court, and Judge Grewal preclude Samsung from relying on several non-infringement and invalidity theories.

As a result of the Federal Circuit's decision on Apple's motion for a preliminary injunction, Samsung should be barred from relying on Fidler as a primary obviousness reference, the Compaq TC1000 as a secondary reference to Fidler, and JP'638 for anticipation of the D'087 patent.  The Federal Circuit held that Fidler cannot qualify as a primary reference because it does not create "basically the same" visual impression as the D'889 design.  *Apple*, 678 F.3d at 1330-32.  It also held that the Compaq TC1000 "is so different in visual appearance from the Fidler reference" that it cannot qualify as a "secondary reference" to "bridge the gap between Fidler and the D'889 design." *Id.* at 1331.  It further held that the JP'638 cannot qualify as an anticipatory reference for the D'087 patent because, when the claimed side view is taken into account, "the differences between the arched, convex front of the '638 reference distinguish it from the perfectly flat front face of the D'087 patent." *Id.*  The Federal Circuit based its rulings on the appearances of the patented designs and Samsung's references, which new evidence cannot change.  Thus, these decisions bind Samsung at trial as law of the case. *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998).[1]

This Court has also properly narrowed Samsung's case by granting (except as to the LG Prada) Apple's Motions in Limine #2 and #3 to exclude references that are not prior art.  (Dkt. No. 1267 at 3.)  In addition, the Court held in its summary judgment order that Apple's January 2007 iPhone image is not prior art against Apple's GUI design patent because it has the same inventors and was not publicly displayed more than one year before the D'305 priority date. (Dkt. No. 1158 at 38-39.)  And Judge Grewal has stricken prior art references and invalidity and non-infringement contentions that Samsung failed to disclose in timely responses to Apple's interrogatories.  (Dkt. No. 1144 at 3-5.)  Samsung's failure timely to disclose these contentions

---

[1] The Federal Circuit noted that its ruling that Samsung's "alternative prior art references" do not invalidate the D'889 patent was limited to "this preliminary stage of the litigation," but gave no similar caveat concerning the Fidler, Compaq TC1000, and JP'638 references.  678 F.3d at 1332 n.6.

sf-3170923

1    bars Samsung from presenting them at trial in any manner, whether through experts or fact

2    witnesses of either side.

3              **B.    Samsung Infringes Apple's User-Interface Software Patents**

4              Apple will prove at trial that Samsung is infringing three patents directed to innovative

5    features of its multi-touch user interface: the '381 "rubberbanding" (what Samsung refers to as

6    "bounce" or "latex") patent, the '163 "tap-to-zoom" patent, and the '915 "scroll vs. gesture"

7    patent.  Infringement is clear from using the Samsung products and reviewing the source code, as

8    Apple's experts Ravin Balakrishnan and Karan Singh will explain.  Apple will also present

9    evidence that Samsung deliberately copied Apple's features.

10             The Court's claim construction rulings leave Samsung with only a few scattered non-

11   infringement arguments that plainly lack merit.  Samsung's own expert conceded that Samsung

12   infringes the '163 patent.  Samsung's original non-infringement defense to the '915 patent cannot

13   survive the Court's construction of "invokes" in rejecting Samsung' motion for summary

14   judgment.  (Dkt. No. 1158 at 18-20.)  Samsung has an alternative argument that a few of its

15   products do not infringe the '915 patent because they can be made to perform what Samsung's

16   expert calls "two-finger scrolling" (*i.e.*, a combination of translating and minimal or

17   imperceptible zooming).  But Samsung's argument fails because it adds a new limitation that is

18   not part of the claim, namely that scrolling and scaling are mutually exclusive.

19             As to the '381 patent, this Court has already found likely infringement, rejecting the claim

20   constructions that were the basis for Samsung's non-infringement defenses.  (Dkt. No. 452 at

21   52-56; Dkt. No. 1266.)  Samsung apparently continues to argue that it does not infringe because

22   "first direction" requires the human finger to move with single-pixel precision, even though the

23   Court has rejected that argument.  (*See* Dkt. No. 452 at 55 ("because the term 'first direction'

24   does not require linear movement, Samsung's devices do infringe").)  Samsung may also assert

25   that some of its products do not infringe the '381 patent because they can be manipulated to avoid

26   rubberbanding, by making slow and minimal finger movements.  But the Accused Products do

27   "rubberband" in normal operation and thus necessarily include the instructions for performing the

28   claimed method, which is all that asserted claim 19 requires.

1    Lacking any plausible non-infringement argument, Samsung has no choice but to argue

2    invalidity.  Samsung cannot overcome the presumption of validity with clear and convincing

3    evidence.  Samsung's prior art references fail to disclose key limitations of Apple's inventions, as

4    Apple's experts will explain.  Samsung's deliberate copying and the iPhone's and iPad's

5    commercial success reinforce the conclusion that Apple's inventions were far from obvious.

6    Moreover, Judge Grewal struck prior art references to the '915 patent cited by Samsung's expert

7    Stephen Gray, as well as references cited by Andries Van Dam (except as technical background

8    to the '381 patent).  (Dkt. No. 1144 at 3, 5.)  Samsung cannot rely on these references as prior art.

9    Finally, Judge Grewal's rulings preclude Samsung from presenting evidence of any efforts

10   to design around Apple's software patents.  On May 4, 2012, Judge Grewal ruled that as a

11   sanction for Samsung's unjustified failure to produce "design-around" source code for Samsung's

12   products until long after the Court-ordered deadline, Samsung "shall be precluded from offering

13   any evidence of its design-around efforts for the ''381 . . . and '163 patents. . . ."  (Dkt. No. 898 at

14   9.)  In response to Samsung's motion for "clarification," Judge Grewal confirmed that his order

15   meant what it said:  during the jury trial, Samsung could not offer "any evidence of its design-

16   arounds," meaning "no source code evidence, no non-source code evidence, no evidence of any

17   kind, whether for liability or any other purpose."  (Dkt. No. 1106 at 3-4.)  Samsung did not file a

18   timely objection to Judge Grewal's June 19 Order.  (Dkt. 1274-2, at 3.)

19      **C.**     **Samsung Has Infringed and Diluted Apple's iPad Trade Dress and Diluted**
                **Apple's iPhone Trade Dress**
20

21   Samsung has both infringed and diluted Apple's distinctive iPad trade dress and has

22   diluted Apple's famous iPhone trade dress.  Apple's trade dress is protected by trade dress

23   Registration No. 3,470,983, Apple's unregistered iPhone 3G trade dress, its unregistered

24   combination iPhone trade dress, and its unregistered iPad/iPad 2 trade dress.  (*See* Exhibit A

25   hereto.)  Samsung's sale of products that are virtually indistinguishable from the iconic iPhone

26   and iPad violates Apple's trade dress rights.

27   At trial, Samsung will be unable to overcome the presumption that Apple's registered

28   trade dress is valid and protectable.  Apple will prove that Apple's unregistered trade dress is

1  protectable (*i.e.*, distinctive and non-functional), and that Samsung has diluted and infringed

2  Apple's trade dress.

3         **1.      Samsung is infringing Apple's iPad trade dress**

4         There is no question that Samsung's sale of its accused tablets is likely to cause confusion

5  about the source, sponsorship, or approval of those tablets, which is the Lanham Act test for

6  infringement.  15 U.S.C. § 1125(a)(1)(A).  Indeed, as the Court noted, Samsung's Galaxy Tab

7  10.1 is "virtually indistinguishable" from the iPad 2.  (Dkt. No. 452 at 47.)

8         Apple will show likely confusion under the factors set forth in *AMF, Inc. v. Sleekcraft*

9  *Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), which include (1) strength of the trade dress;

10  (2) similarity of the trade dress; (3) evidence of actual confusion; (4) marketing channels used;

11  and (5) defendant's intent in selecting the trade dress.  Likely confusion can occur before a

12  purchase, at the moment of the purchase ("point of sale"), or "post-sale," such as when a

13  consumer sees somebody using a Galaxy Tab 10.1 in a café and wrongly assumes that person is

14  using an iPad.  Apple relies on both point-of-sale and post-sale confusion.

15         Apple will present overwhelming evidence of likely confusion under the *Sleekcraft* factors.

16  This evidence will show that Apple's iPad trade dress is strong and closely associated with Apple.

17  Philip Schiller, Apple's Senior Vice President of Worldwide Marketing, will testify regarding

18  Apple's widespread advertising campaign for the iPad that specifically emphasizes its distinctive

19  appearance; the extensive and highly favorable coverage by the media and industry analysts; the

20  iPad's outstanding commercial success; and Apple's and Samsung's head-to-head competition.

21  Apple will also present evidence of a survey conducted by Hal Poret, which confirmed that

22  consumers associate the iPad trade dress with Apple.  Russell Winer, a highly experienced

23  marketing expert, will testify that Apple's trade dress is strong, and that Samsung's competing

24  products are sold in similar marketing channels to Apple's.

25         Apple will also present evidence that Samsung's accused tablets are very similar to the

26  iPad trade dress, and have caused actual confusion.  The similarity is clear from a direct

27  comparison between Samsung's tablets and the iPad trade dress.  It is also shown by widespread

28  comments in the media and by others struck by the similarity.  Apple will present evidence of

sf-3170923

1  actual confusion — consumers who mistook Samsung's tablets for iPads — even though such

2  evidence is not required to prevail on a trade dress infringement claim.  This evidence includes

3  Samsung documents that show consumers returned the Galaxy Tab 10.1 to Best Buy because they

4  mistakenly thought that they were buying an Apple product.  (PX59 at 19.) It also includes a

5  survey conducted by Kent Van Liere, which concluded that consumers are likely to associate

6  Samsung's Galaxy Tab 10.1 with Apple in a post-sale environment.

7       Apple will also show that Samsung deliberately copied Apple's iPad trade dress, and even

8  redesigned its Galaxy Tab 10.1 to make it look more similar to the iPad 2.  This evidence includes

9  Samsung's own documents and admissions.

10       In addition to showing likely confusion, Apple will show that Apple's iPad trade dress is

11  distinctive and non-functional, and thus protectable.  Trade dress is distinctive when consumers

12  identify the trade dress with a particular source.  *Clicks Billiards, Inc. v. Sixshooters, Inc.*,

13  251 F.3d 1252, 1261 (9th Cir. 2001).  Factors relevant to distinctiveness include (1) the length

14  and nature of Apple's use of the trade dress; (2) the nature and extent of Apple's advertising and

15  promotion of its trade dress; (3) efforts made to promote a conscious connection between Apple's

16  trade dress and Apple's products; (4) association of Apple's trade dress with Apple by purchasers

17  of Apple products using the trade dress; (5) successful use of the trade dress to increase Apple's

18  sales; (6) whether Apple authorized anyone else to use its trade dress; and (7) whether Samsung

19  intentionally copied Apple's trade dress.  *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 517

20  (9th Cir. 1989).  The evidence from Mr. Schiller and others that shows Apple's trade dress is

21  strong also establishes the requisite distinctiveness.

22       As for functionality, a trade dress is not functional unless, taken as a whole, the trade dress

23  is essential to the use or purpose of the device or the trade dress affects its cost or quality.  *Clicks

24  Billiards,* 251 F.3d at 1258.  Factors relevant to the functionality of a trade dress include whether

25  Apple's advertising touted the utilitarian advantage of its trade dress; whether the trade dress

26  results from a simple or inexpensive method of manufacture; whether the trade dress yields a

27  utilitarian advantage; and whether alternative designs are available.  (Dkt. No. 1159 at 5.)  Apple

28  will show that its iPad trade dress is not functional under these factors, based on the testimony of

1    Apple employees and experts, as well as documentary evidence, including the evidence that this

2    Court cited in denying Samsung's motion for summary judgment.  (*Id.* at 5-7.)  Chris Stringer, a

3    Senior Director of Industrial Design at Apple, will testify that aesthetic rather than functional

4    considerations drove the design of the iPad and iPad 2.  Design expert Peter Bressler will testify

5    that the design of the iPad and iPad 2 is not essential to the use or purpose of these devices.

6                  **2.**       **Samsung has diluted Apple's iPad Trade Dress**

7    Unlike trade dress infringement, dilution does not require a showing of likely confusion;

8    rather, "dilution" means a lessening of the capacity of a famous trade dress to identify and

9    distinguish goods.  (*See* Dkt. No. 1232 at 254, 256 (similar definitions in Apple's and Samsung's

10   jury instructions).)  Apple relies, in particular, on "dilution by blurring," meaning that the accused

11   tablets have impaired the distinctiveness of Apple's famous iPad trade dress through an

12   association arising from the similarity between the appearance of the two products. *See* 15 U.S.C.

13   § 1125(c)(2)(B).  Thus, evidence that Samsung's sale of similar-looking tablets makes the

14   asserted iPad trade dresses seem less distinctive and less closely associated with Apple shows

15   dilution by blurring, even if consumers understand that Samsung's tablets are made by Samsung.

16   *See Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 905 (9th Cir. 2002) ("Dilution . . . does not

17   require a showing of consumer confusion").

18    Trade dress dilution requires a showing that the trade dress was famous when the

19   defendant began offering the products accused of diluting the trade dress.  *See* 15 U.S.C.

20   § 1125(c) (defining the elements of a dilution claim).[2]  Apple must show that the iPad trade dress

21   was "famous" by June 8, 2011, which is when Samsung first sold a product (the Galaxy Tab 10.1)

22   accused of diluting the iPad trade dress.[3]  (*See* Dkt. No. 1232 at 264-65 (jury instructions of

23   Apple and Samsung agreeing on this date).)  Trade dress is famous if it is widely recognized by

24   the general consuming public as identifying the source of the goods. 15 U.S.C. § 1125(c).  Apple

25

_____

26   [2]   15 U.S.C. § 1125(c)(2) refers to dilution of trademarks, but § 1125(c)(4) expressly extends dilution to cover trade dress as well.

27   [3]   On July 3, 2012, the parties filed a "Joint Case Narrowing Statement" that dismissed any trade dress claims against Samsung's original Galaxy Tab 7.0.  (Dkt. No. 1178 at 2.)  Thus, the earliest

28   Samsung tablet at issue is the Tab 10.1, which Samsung released on June 8, 2011.

sf-3170923

1   will show fame through evidence of extensive advertising, industry praise, sales, and widespread

2   recognition of the iPad trade dress.

3        Apple will also present evidence that Samsung's sale of look-alike tablets has diluted the

4   distinctiveness of Apple's iPad trade dress.  The evidence largely overlaps with the evidence of

5   trade dress infringement discussed above.  For example, although evidence of likely and actual

6   confusion between the Galaxy Tab 10.1 and the iPad is not required for trade dress dilution, it

7   strongly supports this claim.  Also, marketing expert Russell Winer will explain how Samsung's

8   sales of look-alike products impairs the distinctiveness of Apple's trade dress.

9   ### 3.        Samsung has diluted Apple's iPhone Trade Dress

10       Samsung has diluted Apple's registered and unregistered iPhone trade dress, which is

11  valid, protectable, and famous.  Registered trade dress is presumed to be valid and protectable, so

12  Samsung has the burden of proving that Apple's registered iPhone trade dress lacks

13  distinctiveness and is functional.  15 U.S.C. §§ 1115(a), 1125(a)(3); *Rodan & Fields, LLC v.*

14  *Estee Lauder Cos.*, No. 10-cv-02451-LHK, 2010 U.S. Dist. LEXIS 109573, at *15 (N.D. Cal.

15  Oct. 5, 2010) (registration of trade dress entitles owner to presumption of protectable rights under

16  15 U.S.C. § 1115(a), but plaintiff must show inherent distinctiveness or secondary meaning when

17  trade dress is not registered).  Samsung will not be able to meet that burden.  Indeed, the evidence

18  of fame cited in the Court's summary judgment ruling shows that Apple's registered and

19  unregistered iPhone trade dress is both famous and distinctive.  (*See* Dkt. No. 1189 at 10-11.)

20  Apple must show that the iPhone trade dress was famous by July 15, 2010, which is when

21  Samsung released a product (the "Vibrant" version of the Galaxy S) that Apple has accused of

22  diluting its iPhone trade dress.[4]  (*See* Joint Pretrial Statement, Dkt. No. 1189 at 2, 11.)

23       Samsung's sale of numerous products that use the iPhone trade dress has unquestionably

24  resulted in "dilution by blurring," by making the iPhone trade dress seem less distinctive and less

---

25  [4]  The parties' July 7, 2012, "Joint Case Narrowing Statement" clarified that Apple has not

26  accused Samsung's "F700" of using Apple's iPhone Trade Dress.  Apple's First Amended
    Complaint alleged that the F700 used *one portion* of Apple's trade dress ("the clean flat clear

27  surface"), but did not accuse the F700 of using *all elements* of Apple's trade asserted dress, which
    consists of the combination of multiple elements, and did not accuse the F700 of diluting Apple's

28  iPhone trade dress. (Dkt. No. 75 ¶ 80.)

14

1   closely associated with Apple.  Apple will show dilution by blurring by evidence that will include

2   Hal Poret's survey showing that significant numbers of consumers associate the asserted iPhone

3   trade dresses with Apple, as well as a survey by Kent Van Liere regarding consumers' association

4   of the accused products with Apple.  Apple will also present evidence that Samsung deliberately

5   copied the iPhone trade dress.

6           **4.      Samsung's trade dress defenses are based on legally incorrect premises**

7           Lacking any valid defense, Samsung resorts, once again, to incorrect legal standards in an

8   attempt to show that Apple's trade dress is not protectable because it is "functional."

9           As this Court has held, Ninth Circuit precedent "requires that in evaluating functionality,

10  the trade dress should be *considered as a whole* rather than as a collection of individual

11  elements."  (Dkt. No. 1158 at 5 (emphasis added), citing *Clicks Billiards*, 251 F.3d at 1259.)

12  Despite this ruling, Samsung's proposed jury instructions misleadingly define functionality as

13  meaning that "*a claimed feature* of the trade dress" is essential to the product's use or purpose or

14  affects its cost or quality.  (Dkt. No. 1232 at 262 (emphasis added).)  Samsung's experts Itay

15  Sherman and Sam Lucente have compounded this error by focusing on individual elements rather

16  than the functionality of the trade dress as a whole.  Indeed, as this Court noted, "Samsung does

17  not offer any support for its assertion that the arrangement of features in the overall trade dress is

18  strictly functional . . . ."  (Dkt. No. 1158 at 5.)

19          Samsung has also proposed an incorrect and extraordinarily broad definition of "aesthetic

20  functionality" that would effectively obliterate trade dress rights.  As this Court noted, aesthetic

21  functionality is "a limited doctrine"; the Ninth Circuit has questioned whether it even exists

22  independently from "utilitarian functionality."  (Dkt. No. 1158 at 7-8, citing *Clicks Billiards*, 251

23  F.3d at 1259 and *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1382 n.3 (9th Cir.

24  1983).)  Yet Samsung asserts that a patent is invalid for aesthetic functionality if "a claimed

25  design feature of the trade dress improves the attractiveness and eye-appeal of the design."  (Dkt.

26  No. 1232 261-262.)  Samsung cites a district court case that refers to *Au-Tomotive Gold, Inc. v.*

27  *Volkswagen of Am., Inc.*, 457 F.3d 1062, 1068 (9th Cir. 2006), but *Au-Tomotive Gold* does not

28  support Samsung.  The Ninth Circuit in *Au-Tomotive-Gold* "rejected the notion that 'any feature

1   of a product which contributes to the consumer appeal and saleability of the product is, as a

2   matter of law, a functional element of the product.'" 457 F.3d at 1069, 1073 (quoting *Vuitton et*

3   *Fils S.A. v. J. Young Enterprises, Inc.*, 644 F. 2d 769, 773 (9th Cir. 1981).) Such an expansive

4   view of aesthetic functionality would "provide[] a disincentive for development of imaginative

5   and attractive design," because "[t]he more appealing the design, the less protection it would

6   receive." *Id.* at 1073 (internal quotation and citation omitted). Indeed, such a view "would be the

7   death knell for trademark protection," since "it would mean that simply because a consumer likes

8   a trademark, or finds it aesthetically pleasing, a competitor could adopt and use the mark on its

9   own products." *Id.* In sum, while *Au-Tomotive Gold* suggests the doctrine of aesthetic

10  functionality might have "some limited vitality," it squarely rejects Samsung's overreaching

11  interpretation. 457 F.3d at 1069-70, 1073.

12  **II.   SAMSUNG'S TORTS RESULT FROM AN INTENTIONAL CORPORATE
        STRATEGY TO COPY APPLE AND ITS PRODUCTS**

13

14      **A.   Samsung's Own Documents Show that Samsung Copied Apple**

15      Samsung's documents show that the similarity of Samsung's products is no accident or, as

16  Samsung would have it, a "natural evolution." Rather, it results from Samsung's deliberate plan

17  to free-ride on the iPhone's and iPad's extraordinary success by copying their iconic designs and

18  intuitive user interface. Apple will rely on Samsung's own documents, which tell an

19  unambiguous story.

20      Samsung's documents show that Samsung developed an overall plan to copy Apple's

21  innovative designs and features so that it could compete with Apple. In September 2007,

22  Samsung concluded that the iPhone's "beautiful design" and "[e]asy and intuitive" user interface

23  could make it as successful as the iPod, which captured 75% of the global MP player market in

24  just five years. (PX34 at 38.) Samsung concluded that it "will have to compete with the iPhone

25  in whatever way," and that the iPhone's hardware is "easily copied, including its "Touch Screen

26  UI." (*Id.* at 37.) In September 2008, Samsung's CEO commented that Samsung should probably

27  adopt "the Apple i-Phone's Touch Method (C Type)," which "is becoming the De facto standard

28  in the market." (PX9 at 1.) In December 2008, a Samsung-commissioned study concluded that

16

1    consumers loved the iPhone as a phone that "can do everything"; that Apple had overtaken

2    Samsung as the "most stylish" brand; and that high-end users had a strong interest in switching to

3    a touch interface.  (PX36 at 10, 20-22, 32).  In February 2010 — five months before Samsung

4    began selling its infringing Galaxy S smartphone in the U.S. — Samsung Mobile Division

5    President JK Shin told Samsung's designers that the difference in user experience between the

6    iPhone and Samsung's flagship smartphone, the "Omnia," is that of "Heaven and Earth," and that

7    he hears comments that Samsung should "make something like the iPhone."  (PX 40 at 2, 4.)

8         With regard to Apple's design patent and trade dress claims, Samsung's documents show

9    that Samsung developed and released products that look almost identical to Apple's, despite

10   repeated warnings that Samsung's products were too similar.  As part of a formal, Samsung-

11   sponsored evaluation, famous designers warned Samsung that the Galaxy S "looked like it copied

12   the iPhone too much," and that "innovation is needed." (PX47 at 1.)  The designers explained that

13   the appearance of the Galaxy S "[c]   oosely resembles the iPhone shape so as to have no

14   distinguishable elements," and "[a]ll you have to do is cover up the Samsung logo and it's

15   difficult to find anything different from the iPhone."  (PX47 at 27.)  Similarly, in February 2010,

16   Google told Samsung that Samsung's "P1" and "P3" tablets (Galaxy Tab and Galaxy Tab 10.1)

17   were "too similar" to the iPad and demanded "distinguishable design vis-à-vis the iPad for the

18   P3."  (PX42, PX43 at 2.)  In 2011, Samsung's own Product Design Group noted that it is

19   "regrettable" that the Galaxy S "looks similar" to older iPhone models.  (PX53 at 2.)  And a

20   Samsung-commissioned analysis concluded that Samsung's smartphone container icons were

21   "too iPhone-like" and were "strongly associated with the iPhone UI."  (PX 41 at 192, PX41 at

22   193.)  This evidence involves the products that Apple has accused of infringing its design patents

23   and violating its trade dress rights, including the Galaxy S phone (sold in the U.S. as the

24   "Vibrant" and other names), the Galaxy Tab 10.1, and the icon containers that Samsung used on

25   its smartphones.

26        With regard to Apple's user-interface software patents, Samsung's documents show that

27   Samsung deliberately copied numerous features of Apple's products because it recognized that

28   consumers preferred those features.  Samsung's copying was pervasive, was directed from the

highest levels of the company, and reached the patented features at issue in this litigation. For

example, in May 2010, Samsung concluded from an extremely detailed side-by-side comparison

of the iPhone and Samsung's Galaxy S Vibrant that the Samsung phone was "[d]ull because no

special effects are provided when dragging web page to the bottommost or side edges." The

iPhone, in contrast, "[g]enerates fun for the user with a visual element that seems to bounce."

This is the feature claimed by Apple's '381 patent. Samsung concluded that it should implement

"fun visual effect," and it did. (PX46 at 66.) Similarly, in April 2011, Samsung concluded from

a comparison of one of its tablets with the iPad that Samsung's tablet lacked the iPad's "Fun,

Wow Effect" because there was no "springing Bounce effect" during topmost and bottom-most

diagonal movements. (PX57 at 19, 57 at 73) Samsung copied the rubberbanding (or "bounce")

feature in its tablets. Samsung's documents also show that Samsung copied the "tap-to-zoom"

feature claimed by the '163 patent, because it concluded that consumers prefer Apple's method.

An internal report analyzing one of Samsung's prototype phones concluded Samsung should

"[a]dopt Double-Tap as a supplementary zooming method . . . . The UX of iphone can be used as

a design benchmark." (PX38 at 24; PX38 at 19.) And in March 2010, Samsung concluded from

an extremely detailed side-by-side comparison of its Galaxy S with the iPhone that Samsung

should copy numerous iPhone features, such as Apple's implementation of tap-to-zoom, Apple's

alternative scrolling methods (drag or double tap), and Apple's consistent menu and memo icons.

(PX 44 at 33, 58, 65, and 131.) Once again, this evidence is linked directly with the specific

infringing features of the products that Apple has accused of infringement.

**B.      Samsung's Copying Establishes the Intent Required for Willful Infringement
and for Inducement and Supports Apple's Trade Dress Claims**

The evidence at trial will show that Samsung copied Apple's products without taking care

to design around patented designs and technology. This is paradigmatic willful infringement. It

is also helps to establish indirect patent infringement and dilution and infringement of Apple's

trade dresses.

Apple's evidence of willfulness dates back to 2007. When Steve Jobs introduced the

iPhone at a Macworld Expo, he announced to the world "we patented it" with more than 200

sf-3170923

1    applications.  (PX 32.)  When Samsung released copycat smartphones in July 2010, Apple

2    immediately confronted Samsung to demand that it stop infringing.  Senior Apple executives

3    showed Samsung, in side-by-side comparisons, how the design of the Galaxy phone imitated the

4    iPhone and walked Samsung through how the product infringed various Apple utility patents,

5    including the '381.  (PX 52 at 17-19, 50-51.)  Samsung was undeterred.  It continued to release

6    infringing products.  In fact, after learning that its original Galaxy Tab looked confusingly like an

7    iPad, Samsung's response was to design its next-generation tablet to look even more like an iPad

8    2.

9            When Samsung copied Apple's products it willfully infringed Apple's patents.  Whether

10   an "infringer deliberately copied the ideas or design of another" is the first factor in the Federal

11   Circuit's list for analyzing willfulness.  *Read v. Portec*, 970, F. 2d 816, 827 (Fed. Cir. 1992).

12   Apple will establish for the Court the objective unreasonableness of Samsung's conduct, *Bard*

13   *Peripheral Vascular v. W.L. Gore & Assocs.*, 2010-1510, 2012 U.S. App. Lexis 13561 at *6 (Fed.

14   Cir. Jun. 14, 2012), and will prove to the jury that Samsung knew or should have known of the

15   risk that it was infringing Apple's design and utility patents.  *See also*, *In re Seagate Tech. LLC*,

16   497 F.3d 1360, 1371 (Fed. Cir. 2007).

17          The evidence at trial of Samsung's willful infringement, together with other evidence of

18   Samsung's willfulness and its litigation misconduct, will support a post-verdict finding that this is

19   an exceptional case warranting treble damages.  In addition to the evidence of Samsung's

20   copying, the Court can and should consider Samsung's willful refusal to stop infringing Apple's

21   patents after both this Court and the Federal Circuit found Samsung was likely infringing Apple

22   patents as to which it had failed to raise a substantial question of validity.  (Dkt. 1206-1 at 19-20.)

23   The Court should also consider all three of the sanctions orders Judge Grewal has entered against

24   Samsung for its failure to produce documents as ordered by the Court.  (*Id*. at 21-22.)

25          The evidence of Samsung's intentional copying also supports a finding of inducement.

26   Apple will show that SEC infringed Apple's patents both directly and by inducing its subsidiaries

27   to infringe.  SEC's infringement was direct, as it sold phones and tablets directly into the United

28   States.  *SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1375 (2010), *aff'd on other*

19

1    *grounds*, 131 S. Ct. 2060 (2011) .  And SEC induced its subsidiaries to infringe because SEC

2    knew or was willfully blind to the fact that their sales infringed Apple's patents.  *Global-Tech*

3    *Appliances, Inc., v. SEB S.A.,* 131 S. Ct. 2060, 2069 (2011).

4            Finally, the evidence that Samsung copied Apple and brought to market products it knew

5    were confusingly similar to the iPhone and iPad clinches Apple's trade dress case.  Samsung's

6    knowing adoption of a product configuration similar to Apple's trade dress goes to the "intent"

7    prong of infringement.  *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354 (9th Cir. 1979).

8    And "intent to create an association" is an element of dilution by blurring.  15 U.S.C.

9    § 1125(c)(2)(B).  Because the evidence will show Samsung's intent to trade on Apple's goodwill

10   and reputation and to deceive consumers, Apple will be entitled to damages for Samsung's willful

11   infringement of its trade dress.  *Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400, 1407 (9th Cir.

12   1993).

13           In sum, SEC and its subsidiaries will be liable for infringing and diluting Apple's

14   intellectual property, and will be liable for an amount that will include treble damages.

15   **III.    SAMSUNG'S VIOLATION OF APPLE'S INTELLECTUAL PROPERTY RIGHTS
16           GIVES RISE TO BILLIONS OF DOLLARS IN DAMAGES**

17           **A.    Apple Is Entitled to Substantial Monetary Damages**

18           Samsung adopted as its number one goal to "Beat Apple" in the smartphone and tablet

19   markets, and it chose to compete by copying Apple.  Samsung's infringing sales have enabled

20   Samsung to overtake Apple as the largest manufacturer of smartphones in the world.  Samsung

21   has reaped billions of dollars in profits and caused Apple to lose hundreds of millions of dollars

22   through its violation of Apple's intellectual property.  Apple conservatively estimates that as of

23   March 31, 2012, Samsung has been unjustly enriched by about $2 billion, and has additionally

24   cost Apple about $500 million in lost profits.  Apple also conservatively estimates that it is

25   entitled to over $25 million in reasonable royalty damages on the proportionately small set of

26   remaining sales for which it cannot obtain an award of Samsung's profits or Apple's own lost

27   profits, for a combined total of $2.525 billion.

28

sf-3170923

1          **1.      Samsung's Profits**

2          The law provides that anyone who sells "a colorable imitation" of a patented design "shall

3   be liable to the [patent] owner to the extent of his total profit."  35 U.S.C. § 289 (2006).  The

4   Federal Circuit has held that "total profit" means exactly that—all profits received by the

5   infringer for sale of the product without reducing that profit to account for the alleged

6   contribution of the patented design.  *Nike, Inc. v. Wal-Mart*, 138 F.3d 1437, 1442 (Fed. Cir.

7   1998); *see also Bergstrom v. Sears, Roebuck & Co.*, 496 F. Supp. 476, 495 (D. Minn. 1980).

8   Similarly, 15 U.S.C. § 1117 requires Samsung's to disgorge the profits it obtained from sales that

9   dilute or infringe Apple's trade dress.

10         This remedy begins with undisputed facts.  Samsung admits that its total sales revenue

11  from selling the accused products in the United States exceeds $7.8 billion through March 31,

12  2012.  Samsung bears the burden of proving any deductible expenses, including the costs incurred

13  in producing the gross revenue and any other costs that are directly attributable to the sale of the

14  infringing products.  *Kamar Int'l, Inc. v. Russ Berrie & Co., Inc.*, 752 F.2d 1326, 1332 (9th Cir.

15  1984) (overhead expenses may be deducted from award of profits in a copyright action "only

16  when the infringer can demonstrate it was of actual assistance in the production, distribution or

17  sale of the infringing product").  By subtracting Samsung's cost of goods sold, as reported by

18  Samsung in connection with the infringing sales, Apple has calculated that Samsung's gross

19  profits during the damages period exceeds $2 billion.

20         Samsung claims that an additional $1 billion of operating expenses should be deducted

21  from its accused gross profits, beyond the deductions for costs of goods sold.  These expenses,

22  however, do not bear a sufficient nexus to the production, distribution, or sale of the accused

23  products to warrant deduction.  Samsung's claimed deductions are bloated with such generalized

24  overhead expenses as depreciation, general maintenance, fixed labor, and general research and

25  development costs for other products, and are not even consistent with how Samsung's accounts

26  are labeled in its internal accounting database.  Apple will also show that the financial data

27  Samsung produced to support its claimed deductions is an unreliable allocation of various

28

sf-3170923

1    expenses, prepared solely for purposes of this litigation and repeatedly characterized by errors

2    and inconsistencies.

3        Samsung wrongly claims that any award of infringer's profits under 35 U.S.C. § 289

4    should be apportioned to address the specific value to Apple's design patents.  The Court has

5    already resolved this issue when it correctly held that this position was "contrary to law."  (Dkt.

6    No. 1157 at 9.)  The Court has also excluded the testimony of Michael Wagner because he used

7    unreliable methods by which to argue that only one percent of Samsung's profits were

8    attributable to Apple's designs in connection with the trade dress case.  (Dkt No. 1157 at 9-10.)

9                    **2.      Apple's Lost Profits**

10       Separately, Apple's design and utility patent infringement claims entitle Apple to

11   "damages adequate to compensate for the infringement . . . together with interest and costs as

12   fixed by the court."  35 U.S.C. § 284 (2006).  Under well-established case law, this means that

13   Apple may recover the profits that Apple lost as a result of Samsung's infringing sales.  *Micro*

14   *Chem. v. Lextron, Inc.*, 318 F.3d 1119, 1126-27 (Fed. Cir. 2003).  Further, Apple can recover its

15   lost profits resulting from violations of its trade dress.  *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d

16   614, 621 (9th Cir. 1993).

17       Apple conservatively estimates that Samsung's trespasses on the intellectual property in

18   this case have caused Apple to lose about $500 million in profits.  These lost profits arise from

19   sales that differ from and are in addition to the sales that are the focus of Apple's disgorgement

20   claims discussed above.

21       Apple took steps to tailor its calculation conservatively to this case.  First, Apple limited

22   the periods during which it calculated lost sales of Apple products to times during which

23   Samsung would need to redesign products to avoid infringing Apple's intellectual property.  That

24   is, Apple looks only to the gains that it would have made while Samsung was hypothetically

25   creating a non-infringing alternative.  Second, Apple focused it reallocation of sales under what is

26   known as a *Mor-Flo* analysis on the specific market shares Apple held at each carrier.  This

27   approach results in a lost profits calculation that captures the specific dynamics present at each

28   carrier as well as in the market generally.  Third, Apple's damages expert independently assessed

1    Apple's capacity constraints, making the analysis even more conservative.  Due to all these

2    adjustments, Apple's calculations show that Apple would have gained approximately 7.5 percent

3    of the infringing smartphone sales made by Samsung, and about 10.5 percent of the infringing

4    tablet sales made by Samsung, which are sales Apple would have made "but for" Samsung's IP

5    violations.  These figures are far smaller than the 17 to 45 percent market share that Apple

6    actually held for smartphones during the damages period and the 60 to 90 percent market share

7    that Apple actually held for tablets.  As noted above, Apple will seek either Samsung's profits

8    (where its design rights are being violated) or a reasonable royalty (where only a utility patent is

9    being infringed) for the remaining sales that are not accounted for in lost profits.

10         Samsung asserts that Apple is not entitled to lost profits at all because Samsung's accused

11   products do not compete in the same market segments as Apple's products.  The Court has

12   already recognized that "the parties are clearly direct competitors."  (Dkt. No. 1157 at 11.)

13   Samsung's own documents state that "the iPhone is in direct competition with a large number of

14   Samsung devices," (PX183 at SAMNDCA10036088), and that Samsung made it a primary

15   objective to "Beat Apple" by "divert[ing] Apple's inflow of subscribers" (PX27 at 3).  Samsung's

16   documents even state that in 2012 the U.S. market has become "a two-horse race" between Apple

17   and Samsung.  (PX27 at 1.)

18         Samsung also claims that Apple cannot recover lost profits because consumers do not

19   actually care about any of the patented features.  This misstates the facts and the law.  Apple has

20   extensive evidence showing demand for Apple's proprietary features.  Professor Hauser's

21   conjoint survey shows that Samsung's customers are willing to pay between $90 and $100 above

22   the base price of a $199 smartphone and a $499 tablet, respectively, to obtain the patented

23   features covered by Apple's utility patents.  (PX30.)  Samsung's market research and its blatant

24   copying of Apple's intellectual property further refute Samsung's litigation position that Apple's

25   intellectual property does not drive value and sales.  In any event, the law does not require a

26   showing of demand unique to the patented features, but instead begins with proof of damages for

27   the products as a whole.  Thus, recovering lost profits under *Panduit* "requires a showing of

28   (1) demand for the *patented product*, (2) absence of acceptable noninfringing substitutes,

23

1    (3) manufacturing and marketing capability to exploit the demand, and (4) the amount of profit

2    that would have been made." *See Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d

3    1314, 1329-31 (Fed. Cir. 2009) (emphasis added).  Apple will easily meet this standard at trial.

4        Finally, Samsung argues that Apple did not have the manufacturing capacity to make the

5    lost sales, based on temporary backlogs immediately following new product launches.  This

6    argument ignores the evidence that Apple's supply constraints were relatively short-lived, and did

7    not coincide with the specific time periods during which Apple claims lost profits.

8                        **3.     Reasonable Royalty**

9        Finally, Apple has calculated about $25 million of reasonable royalty damages based on

10   infringing sales for which Apple is not seeking to recover either Samsung's profits or Apple's lost

11   profits.  Because this component of damages relates to products that infringe only the utility

12   patents, it is the smallest component of Apple's calculation.  These damages are based on per-unit

13   reasonable royalty rates of $2.02 for infringement of the '381 patent, $3.10 for use of the '915

14   patent, $2.02 for use of the '163 patent, and $24 for use of any of Apple's design patents or trade

15   dress rights.  These amounts were calculated based on standard economic models frequently used

16   in calculating reasonable royalty damages, including an evaluation of the well-worn *Georgia*

17   *Pacific* factors.  These methods are all commonly used and approved by the Federal Circuit in

18   patent cases.

19       Samsung in contrast claims that Apple's sole remedy should be an absurdly low royalty

20   payment of $28,452.  This number is based on Samsung's belief that it would take less than a

21   month fully to design around all of Apple's intellectual property, and that it could do so without

22   losing a single sale.  Samsung's position is based on self-serving, hypothetical testimony from its

23   own engineers, as translated by Samsung's in-house litigation attorneys. The testimony violates

24   Judge Grewal's order regarding evidence of Samsung's alleged design-arounds with respect to

25   the '381 and the '163 Patents.  (Dkt. No. 1106 at 3-4.)  Moreover, it is inherently incredible.  If

26   Samsung could have avoided this lawsuit and this trial at a cost of less than $30,000, it would

27   have done so.

28

sf-3170923

**B.     Special Considerations Apply to Calculating Trade Dress Damages**

The law provides similar remedies for trade dress infringement and dilution as it does for design patent infringement.  Apple may recover Apple's lost profits, Samsung's profits, and reasonable royalty damages based on Samsung's violation of Apple's trade dress.  15 U.S.C. § 1117(a) (2006); *Sands, Taylor & Wood v. The Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992), *on remand*, 1993 WL 204092 (N .D. Ill. 1993), *aff'd in part and rev'd in part*, 34 F.3d 1340, 32 U.S.P.Q.2d 1065 (7th Cir. 1994).  There are two important differences specific to trade dress damages.  First, a defendant may attempt to apportion an award of infringer's profits based on trade dress infringement.  Second, actual notice is not a prerequisite for recovery based on infringement of unregistered trade dress or dilution of any trade dress, whether registered or unregistered.

These two considerations are discussed in turn below.

**1.     Samsung Cannot Rebut the Presumption That All Profits Are Attributable to Samsung's Infringing Activity**

Under Ninth Circuit law, it is Apple's burden only to establish Samsung's gross sales associated with the trade dress violation, and Apple then enjoys a presumption that this sum may be recovered as damages.  *Rolex Watch, U.S.A., Inc., v. Michel Co.*, 179 F.3d 704, 712 (9th Cir.1999) (plaintiff carries burden to show with "reasonable certainty" defendant's gross sales from infringing activity).  Samsung bears the burden of establishing all deductions, whether for costs that are "actually attributable to sales of the infringing items," or for amounts that are "demonstrably not attributable" to the protected design.  *Nintendo of Am. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994); *Kamar Int'l, Inc.*, 752 F.2d at 1329.

Samsung adopted an excessively aggressive position on apportionment that it could not support, and as a result all of Samsung's evidence on apportionment has been excluded under Rule 702.  (Dkt. No. 1157 at 9-10.)  Samsung therefore cannot rebut the presumption that all of its infringing sales are attributable to infringement, and Apple will recover all of Samsung's profits on the infringing or diluting sales.  *Nintendo of Am. v. Dragon Pac. Int'l*, 40 F.3d 1007,

25

1   1012 (9th Cir. 1994) ("where infringing and noninfringing elements of a work cannot be readily

2   separated, all of a defendant's profits should be awarded to a plaintiff").

3           **2.      Actual Notice Is Not Required to Recover Damages for Violation of
                       Unregistered Trade Dress Rights**

4

5           Apple is entitled to recover damages on all of its trade dress claims without regard to

6   whether it gave Samsung actual notice of those claims.

7           The statutory requirement for actual notice applies only to infringement of registered trade

8   dress rights.  15 U.S.C. 1111 (2006) ("in any suit for infringement under this chapter by such a

9   registrant. . . no profits and no damages shall be recovered . . . unless the defendant had actual

10  notice of the registration").  By its own terms, the notice statute does not apply to Apple's

11  unregistered trade dress claims, nor to Apple's claims based on trade dress dilution.  3 McCarthy

12  on Trademarks & Unfair Competition § 19:144 (4th ed.) ("because the [§ 1111] requirement of

13  notice only applies to registered marks, it is, of course, not a limitation on recovery of damages

14  under a [§ 1125(a)] count for infringement of an unregistered mark); *Dwyer Instruments, Inc. v.*

15  *Sensocon, Inc.*, No. 3:09-CV-10-TLS, 2012 U.S. Dist. LEXIS 78491, at *29 (N.D. Ind. June 5,

16  2012) ("This Court agrees that the notice language of § 1111 only applies to registered marks and

17  to claims for infringement of such registered marks.").

18          With one exception, all of Apple's trade dress claims are for unregistered rights, and the

19  registered right supports only a dilution claim, not an infringement claim.  In any event, Apple did

20  notify Samsung of its trade dress claims as early as July 2010 when Apple initiated executive-

21  level discussions in an attempt to stop Samsung's copying.  Samsung did not listen to Apple, but

22  willfully continued to violate Apple's trade dress rights.

23  **IV.     APPLE WILL BE ENTITLED TO A PERMANENT INJUNCTION**

24          After the jury finds that Samsung has violated Apple's intellectual property rights, Apple

25  will move for an injunction to stop future violations.  *See* 35 U.S.C. § 283; 15 U.S.C. § 1116.  A

26  permanent injunction requires a showing that (1) the plaintiff has incurred irreparable injury;

27  (2) monetary damages and other legal remedies are inadequate to compensate for that injury;

28  (3) an injunction is warranted in view of the balance of hardships; and (4) the public interest

26

sf-3170923

1   would not be disserved by a permanent injunction.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S.

2   388, 391-92 (2006).

3          The Court has already issued a preliminary injunction against the Galaxy Tab 10.1 in this

4   case, and a preliminary injunction against the Galaxy Nexus in Apple's second lawsuit against

5   Samsung.  The Court found that Samsung's sale of products that likely infringe Apple's patents is

6   likely to have "downstream effects" on Apple's market share and sales of future products that

7   cannot be remedied through monetary damages.  The Court also found that the public interest

8   favors enforcement of intellectual property rights, and that an infringer that elects to build its

9   business on products that violate such rights has no basis to complaint about any "hardship"

10  resulting from an injunction.  This is particularly so when, as here, the parties are direct

11  competitors and the infringement results from deliberate copying.  (*See*, *e.g.*, Dkt. 1135.)  A

12  finding at trial that Samsung has violated Apple's intellectual property rights will put Apple in an

13  even stronger position to obtain an injunction, since this will be a final judgment rather than a

14  preliminary finding of likely success on the merits.

15         An injunction is an equitable remedy for the Court to decide, and Apple understands that

16  the Court intends to schedule post-trial briefing that may include evidence not presented at trial.

17  To support a permanent injunction, Apple will rely on much of the same evidence that the Court

18  has already considered in connection with the preliminary injunctions.  Apple may also present

19  additional evidence, including documents that Samsung improperly failed to produce during the

20  preliminary injunction phase of this case.  (Dkt. No. 898.)  Apple will request the Court to issue a

21  permanent injunction as promptly as possible after trial to put a stop to the irreparable harm

22  Samsung's copying is inflicting on Apple.

23  **V.      SAMSUNG'S ASSERTED DECLARED-ESSENTIAL PATENTS ARE NOT
            INFRINGED AND INVALID**
24

25         Samsung alleges that practice of U.S. Patent Nos. 7,675,941 and 7,447,516 ("the declared-

26  essential patents") is required to comply with two short sections of the voluminous UMTS

27  telecommunications standard, and that all Apple products operate on a UMTS network.  Samsung

28  alleges that these patents are important to UMTS; innovations over prior art wireless

27

technologies; procured through above-board, proper Samsung conduct during the standard-setting process; and not "exhausted" by Samsung's license with Intel.

Samsung is wrong on all counts.

**First**, as Apple will demonstrate at trial, the declared-essential patents are not, in fact, required to practice UMTS.  The claims of these patents do not read on the relevant portions of the UMTS standard.

**Second**, Samsung's declared-essential patents are, even on their own terms, trivial features that are invalid in view of the extensive prior art.  Each is directed to tiny tweaks that were known or obvious in light of the crowded field of prior art.

**Third**, Samsung engaged in standard-setting misconduct that renders these patents unenforceable.  Samsung hid its patents from the standards working groups—breaching its duty to timely disclose them—and compounded this violation by demanding non-FRAND compensation, which breached Samsung's FRAND commitments for these patents.

**Fourth**, Samsung's infringement allegations are directed to functionality contained in the Intel baseband processors.  Pursuant to a cross-license agreement, Samsung authorized Intel to sell these chips, and Intel's authorized sales to Apple terminated Samsung's rights with respect to any Samsung patents substantially embodied in those chips.

For all these reasons, Samsung's declared-essential patent allegations will fail at trial.

### A.    The '941 Patent

In May 2005, Samsung convinced 3GPP to adopt a proposal to make minor changes to a few subsections of Section 25.322, one of hundreds of subsections of the UMTS specification that make up the overall 3GPP specification.  Unbeknownst to 3GPP, less than a week before making its proposal, Samsung filed a patent application in Korea—the priority application to the '941 patent—that Samsung contends covers the technology described in the proposal.  Samsung did not disclose to 3GPP that it had filed this patent application.  Indeed, Samsung did not disclose that it claimed to hold intellectual property rights over the technology until more than two years later, in August 2007.  By that time, Section 25.322 had been frozen for almost two years, and it was too late for 3GPP to consider alternative proposals.

28

1    Samsung claims that the '941 patent covers a feature in Release 6.4.0 and subsequent

2    versions of Section 25.322 of the 3GPP specification called the "Alternative E-bit interpretation."

3    The feature relates to the meaning given to a one bit field in the "header" of data packets.  The

4    header provides information that is used during the "segmentation" (*i.e.*, breaking apart) and

5    reassembly of data packets for wireless transmission, and Samsung contends that the Alternative

6    E-bit interpretation utilizes headers more efficiently in certain limited circumstances (although the

7    '941 patent acknowledges that the feature also sometimes leads to *inefficiencies*).

8    Under the 3GPP specification, it is mandatory for all mobile devices that support UMTS

9    to respond or react to the Alternative E-bit interpretation if they are signaled to do so by the

10   network operator or "carrier"—here, AT&T.  It is not, however, mandatory that any carrier

11   actually signal any mobile devices to implement the Alternative E-bit interpretation, and Samsung

12   cannot show that AT&T implements the feature on its network.  Thus, while Samsung contends

13   that the Alternative E-bit interpretation allows for data to be sent more efficiently, it cannot show

14   that the feature has actually resulted in any use, much less efficiency gains in the real world.

15   Samsung dropped its previously-asserted method claims—presumably because it cannot

16   show that the accused products have ever used the Alternative E-bit interpretation—and now

17   accuses Apple of infringing only apparatus claims 10 and 15.  Samsung relies on a false syllogism

18   that the accused products support 3GPP Release 6.4.0 and subsequent versions of the standard;

19   that mobile devices must be capable of implementing the Alternative E-bit interpretation in order

20   to be compliant with the standard; that the asserted claims of the '941 patent cover the Alternative

21   E-bit interpretation; and therefore that the accused Apple products infringe the asserted claims.

22   But Samsung is wrong on several counts.

23   ### 1.    Apple Does Not Infringe the '941 Patent

24   The asserted claims do not cover the Alternative E-bit interpretation described in the

25   3GPP standard, and therefore the accused products do not infringe the '941 patent.  In particular,

26   the Alternative E-bit interpretation set forth in the standard describes setting the value of a one-bit

27   field in the header of data packets called protocol data units ("PDUs") to indicate whether a PDU

28   contains "a complete SDU [service data unit], which is not segmented, concatenated, or padded."

sf-3170923

1    A mobile device will understand a specific bit in that field (*i.e.*, a 0) to indicate that the PDU

2    contains a complete SDU and nothing else.  In contrast, the asserted claims describe a one-bit

3    field that indicates whether a PDU contains "an entire SDU."  As the named inventors on the '941

4    patent acknowledged during their depositions, a PDU can contain "an entire SDU" and nothing

5    else, but also can contain "an entire SDU" with padding or "an entire SDU" concatenated with

6    another SDU.

7            This difference is critical.  The Alternative E-bit described in the standard is set to a value

8    (*i.e.*, 0) to indicate only the single situation in which the SDU exactly matches the size of the

9    PDU data field, and thus there is nothing else in the data field.  By contrast, the '941 claims

10   require that the one-bit be set to the same value (*i.e.*, 0) whenever the PDU contains an "entire

11   SDU," so that the claimed one-bit would be set to 0 in three different situations: (1) when the

12   PDU contains an entire SDU with padding; (2) when the PDU contains an entire SDU with

13   concatenation; and (3) when the PDU contains an entire SDU without padding or concatenation.

14   This difference means that a mobile device programmed to the standard would not be able to

15   communicate properly with a mobile device that was programmed according to the '941 claims.

16           Samsung has indicated that it is not relying on the doctrine of equivalents ("DOE") for the

17   '941 patent.  (*See* Dkt. No. 1232, at 88.)  In any event, such arguments should be excluded

18   because Samsung's expert, Dr. Williams, failed to provide opinions regarding the DOE with any

19   particularity in his report.  *See, e.g.*, *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340,

20   1382 (Fed. Cir. 2009) (DOE requires "particularized testimony and linking argument").  In

21   addition, prosecution history estoppel bars Samsung from relying on the DOE for the "entire

22   SDU" limitation because Samsung added that limitation by amendment during prosecution in an

23   attempt to overcome a prior art rejection from the Patent Office.  *See, e.g.*, *Festo Corp. v.

24   Shoketsu Kinzoku Kogyo Kabushiki Co.*, 304 F.3d 1289 (Fed. Cir. 2002) (en banc).  Furthermore,

25   the all-elements rule precludes the DOE because a finding that the accused Alternative E-bit

26   interpretation (which indicates that a PDU contains a complete SDU that is *not* segmented,

27   concatenated, or padded) is equivalent to the claimed "entire SDU" (which means that the SDU

28

30

1   can be concatenated or padded within the PDU) would vitiate that claim limitation altogether.

2   *See*, *e.g.*, *Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997).

3         **2.**    **The '941 Patent Is Invalid**

4        Many techniques for segmenting and reassembling data packets, including the use of

5   header bits to indicate the contents of a PDU, were well known before the '941 patent.  The

6   asserted claims are anticipated by, or would have been obvious in view of, U.S. Patent No.

7   6,819,658 ("Agarwal"), which discloses all elements of the asserted claims, and in particular

8   discloses both a one-bit field and a pre-defined length indicator for indicating certain information

9   about the contents of PDUs.  The asserted claims are also rendered obvious in light of one or

10   more of prior art references including Agarwal, U.S. Patent Application No. 2002/0016852

11   ("Nishihara"), and PCT Application No. WO 02/43332 ("Petersen"), each alone or in view of

12   other secondary references, which also disclose each of the elements of the asserted claims.  The

13   Patent Office was aware of none of this prior art during prosecution of the '941 patent.

14       **B.**    **The '516 Patent**

15        Reflecting a corporate policy of deception in its conduct before ETSI during the UMTS

16   standard-setting process, Samsung followed the same pattern of non-disclosure with the '516

17   patent as the '941 patent.  In May 2005, Samsung persuaded 3GPP to adopt a proposal to make

18   minor changes to a subsection of Section 25.214 of the UMTS specification.  The Samsung

19   inventors presenting the proposal deliberately failed to inform 3GPP that in June 2004 they had

20   filed a patent application in Korea—the priority application to the '516 patent—that Samsung

21   contends covers the technology described in the proposal.  Indeed, Samsung waited more than a

22   year—until May 2006—to disclose to ETSI that Samsung claimed to hold intellectual property

23   rights over the technology.  By that time, Section 25.322 had been frozen for approximately 11

24   months, and it was too late for 3GPP to consider alternative proposals.

25        Samsung alleges that claims 15 and 16 cover a feature in Release 6.6.0 and later versions

26   of the 3GPP standard TS 25.214 relating to power control on the uplink, i.e., from the mobile

27   device to the base station.  There are five total uplink channels in Release 6.  Generally, using

28   more power increases data reliability because more power makes it easier to overcome

31

1    interference in the atmosphere.  But it is possible that the total transmit power that the mobile

2    device plans to use or is using exceeds the maximum power level that the network will allow or

3    that the device can use for transmission.  In that case, as the prior art clearly taught, the mobile

4    device must reduce the amount of power it is transmitting.  The 3GPP standard TS 25.214

5    Release 6.6.0 requires that when the total transmit power for all five of these channels exceeds the

6    maximum allowed power, then the transmit power for one of those channels, the E-DPDCH

7    channel, is scaled down.

8           Samsung's infringement argument for the '516 patent is the same as for its other declared-

9    essential patent.  Samsung again relies on a false syllogism that the accused products (Apple

10   iPhone 4 and iPad 2 3G) comply with the 3GPP Release 6.6.0 and subsequent versions of the

11   standard; that the '516 patent covers the power control portion of TS 25.214 Release 6.6.0; and

12   therefore that the accused products infringe the asserted claims.  But, once again, Samsung is

13   wrong.

14                    **1.       Apple Does Not Infringe the '516 Patent**

15          The asserted claims of the '516 patent do not cover the power control portion of TS

16   25.214 Release 6.6.0, and therefore the accused products do not infringe.  In particular, the

17   asserted claims consider the transmit power for only two of the five channels when determining

18   whether the claimed "total transmit power" exceeds the mobile device's maximum allowed power

19   and, if it does, the claimed device scales down the transmit power factor for the second channel.

20   The asserted claims, therefore, call for an apparatus containing a controller that calculates total

21   transmit power by considering the transmit power for only two of the five channels.  In contrast,

22   the 3GPP standard evaluates the transmit power for all five of the channels when determining

23   whether to reduce power.  The standard, therefore, calls for a controller that calculates total

24   transmit power differently from what is required by the asserted apparatus claims.

25          Apple anticipates that Samsung may try to prove infringement by presenting opinions

26   from its expert that Judge Grewal struck because they were not disclosed in (and actually

27   diverged from) Samsung's infringement contentions.  Samsung has not alleged that the accused

28   products infringe the '516 patent under the DOE (*see* Dkt. No. 1232 at 88), but again any such

1   arguments should be excluded because Samsung's expert failed to provide opinions regarding the

2   DOE with any particularity in his report.

3                    **2.       The '516 Patent Is Invalid**

4          Many techniques for reducing power in a mobile device when the total transmit power has

5   been exceeded were well known before the '516 patent.  The asserted claims would have been

6   obvious in light of one or more prior art references, including TS 25.214 version 6.1.0, TR 25.896

7   version 6.0.0, Japanese Patent Application No. 2002-190774 ("Hatta"), the admitted prior art in

8   the '516 patent and U.S. Patent No. 6,510,148 ("Honkasalo"), each alone or in view of other

9   references.  The prior art discloses all elements of the asserted claims, and it would have been

10  obvious to combine those teachings.  The admitted prior art in the '516 patent and TS 25.214

11  version 6.1.0 combined with TR 25.896 disclose everything in the '516 patent except unequal

12  scaling of the transmit power factors.  However, Hatta solves the same problem as the '516 patent

13  by reducing the transmit power for one class of channels while maintaining constant the transmit

14  power for a second class of channels.  It would have been obvious to scale down the power on the

15  E-DPDCH channel first because the E-DPDCH channel uses HARQ, which requires less power

16  to transmit because the data can be retransmitted.  The prior art also teaches that the enhanced

17  data channel would have a lower priority.  Accordingly, a person of ordinary skill in the art of the

18  '516 patent would have had no difficulty combining these references.  The Patent Office was

19  aware of none of this prior art during the prosecution of the '516 patent.

20          **C.       No Willful Infringement of the Declared-Essential Patents**

21         The reasonableness of Apple's non-infringement, invalidity, unenforceability (waiver,

22  estoppel), and patent exhaustion defenses to Samsung's declared-essential patents demonstrate, as

23  a matter of law, that Apple did not act "despite an objectively high likelihood that its actions

24  constituted infringement of a valid patent."  *In re Seagate Technology, LLC*, 497 F.3d 1360, 1371

25  (Fed. Cir. 2007) (en banc).  In addition, there is no evidence that an "objectively defined risk . . .

26  was either known or so obvious that it should have been known to" Apple.  *Id*. at 1371.  There is

27  also no evidence that Apple copied the declared-essential patents or otherwise had the subjective

28  intent to infringe.  Furthermore, Samsung is required to license the asserted declared-essential

                                                      33

1    patents on FRAND terms.  Apple could not have willfully infringed patents that Samsung is,

2    under any circumstances, obligated to license on FRAND terms to any implementer of the UMTS

3    standard.

4    **VI.    SAMSUNG'S RIGHTS IN THE ASSERTED DECLARED ESSENTIAL PATENTS
           HAVE BEEN EXHAUSTED BY INTEL'S AUTHORIZED SALE OF LICENSED
5           BASEBAND CHIPS TO APPLE**

6          Samsung's infringement claims under the declared essential patents are precluded by the

7    doctrine of patent exhaustion.  "The longstanding doctrine of patent exhaustion provides that the

8    initial authorized sale of a patented item terminates all patent rights to that item."  *See Quanta*

9    *Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008).  Samsung has accused Apple's

10   products of infringing the declared-essential patents because they comply with the UMTS

11   standard.  All the accused functionality resides in one component: the baseband processor, which

12   Intel sells to Apple.  Through an agreement between Intel and Samsung, Intel is licensed to sell

13   directly or indirectly to Apple baseband chipsets that embody Samsung's declared-essential

14   patents, and Intel's sales to Apple thus exhaust Samsung's patent rights.

15         Samsung makes two arguments that exhaustion does not apply, neither of which has merit.

16   First, Samsung claims that the express authorization it gave Intel to "sell (directly or indirectly)"

17   baseband chipsets embodying its patents is inoperative because Intel supposedly acquired those

18   chipsets from an unlicensed subsidiary.  As Samsung would have it, limitations on Intel's "have

19   made" rights—which do not apply to the contractual provision authorizing Intel's sales—would

20   be a nullity if Intel were authorized to sell products it acquires from infringing suppliers.

21   Samsung's argument is wrong, as the court in *Thorn EMI N.A. v. Hyundai Electronics Industries*,

22   1996 U.S. Dist. LEXIS 21170 (D. Del. 1996), held under virtually identical circumstances.  As

23   *Thorn* explained, "the purpose of [have made rights] is to extend the license protections to the

24   foundry and to protect [the licensee] from inducement suits."  *Id*. at *14.  Consequently, it would

25   not read the limitations on the have made rights out of the contract to give full effect to the plain

26   contract language granting an unqualified right to sell.  *Id*.  If the manufacturer was not a

27   beneficiary of have made rights, any rights the patentee might have against the manufacturer are a

28   matter wholly separate and apart from the licensee's unfettered sales right.  *Id*.

                                                    34

1        Moreover, Intel bargained for and paid compensation to Samsung for the unfettered right

2   to "sell (directly or indirectly)" the baseband chipsets at issue here.  Accordingly, Samsung has

3   been fully compensated for sales of chipsets it claims are covered by its patents, and the

4   conditions for exhaustion are satisfied.  It makes no sense that Intel would be deprived of its

5   unqualified contractual right to "sell (directly or indirectly)" simply because it was also granted

6   entirely separate and independent "have made" rights.  Put simply, having bargained for rights

7   that *go beyond* the unqualified right to sell, Intel cannot be in a worse position than a party that

8   had bargained *only* for the unqualified right to sell.[5]

9        Second, Samsung argues that sales of the relevant baseband chipsets were not U.S. sales

10  and therefore do not trigger patent exhaustion because Apple directs Intel to deliver the chips to

11  its contract manufacturers located abroad.  But, among other indicia of a U.S. sale, negotiations

12  for the chipset sales occurred in the United States, the chipsets were sold through a U.S.

13  subsidiary of Intel to Apple in the United States, the relevant orders were placed in the United

14  States, and payment was invoiced and received in the United States.  As the Federal Circuit has

15  held, the location of contract negotiations, among other factors, can define the location of a sale.

16  *See*, *e.g.*, *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1377

17  (Fed. Cir. 2005) (focusing on the location of contracting and finding that a sale occurred in Japan

18  where all of the negotiations, ordering, invoicing, and shipping instructions were in Japan, despite

19  the fact that delivery was in Texas).  Contrary to Samsung's argument, the place of delivery is not

20  dispositive.  *See*, *e.g.*, *North American Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d

21  1576, 1579 (Fed. Cir. 1994) ("[I]t is possible to define the situs of the tort of infringement-by-sale

22  either in real terms as including the location of the seller and the buyer and perhaps the points

23  along the shipment route in between, or in formal terms as the single point at which some legally

24  operative act took place . . . .  [A]ppellee has failed to explain why the criterion should be the

25  place where the legal title passes rather than the more familiar places of contracting and

26  _____

27  [5] Samsung points to another case from the same court that it claims reaches the opposite conclusion.  *See Tulip Computers Int'l v. Dell*, 262 F. Supp. 2d 358 (D. Del. 2003).  That decision, however, fails to distinguish the logic of *Thorn* and is an incorrect application of Federal Circuit precedent.  Apple submits that *Thorn* is the better-reasoned

28  decision, and should be applied here.

35

sf-3170923

1   performance."). Here, Intel was in fact authorized to sell baseband chipsets incorporating the

2   declared-essential patents regardless of the provenance of those chipsets and the patents are

3   substantially embodied, if at all, in the baseband processors Intel sells to Apple.

4   **VII.   SAMSUNG'S STANDARD-SETTING DECEIT RESULTS IN WAIVER OF ITS**
        **RIGHTS TO ASSERT THE PATENTS AGAINST APPLE**
5

6           Samsung's failure to disclose its IPR as required by the ETSI IPR Policy also results in an

7   implied waiver of any right it would otherwise have to assert its declared-essential patents against

8   implementers of the UMTS standard.  Under the doctrine of implied waiver, Samsung's conduct

9   "was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such

10  right has been relinquished."  *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020 (Fed. Cir.

11  2008).  The evidence will show the following elements required for waiver:  (1) Samsung had a

12  duty to timely disclose the asserted patents (or related patents or applications) during the UMTS

13  standard-setting process, and (2) Samsung failed to do so.  *See Qualcomm*, 548 F.3d at 1020.

14          Samsung contends that (1) Apple can only establish unenforceability by proving an

15  intentional waiver, and (2) its disclosure obligations extend only to patents found to be actually

16  essential.  Samsung is wrong on both counts.  First, waiver need not be intentional; it may be

17  implied.  *See Qualcomm*, 548 F.3d at 1020 (upholding jury instruction on waiver that "was not

18  limited to 'true waiver,' [i.e., intentional waiver] but also addressed 'implied waiver'").  Second,

19  *Qualcomm* upheld a finding of waiver where the rules of the relevant standard-setting

20  organization (like the ETSI IPR Policy) required disclosure of IPR that "might be essential" to the

21  standard and where it was found that the undisclosed patents "reasonably might be necessary" to

22  practice the standard.  *Id*. at 1022.

23          Both elements of implied waiver under Qualcomm are met.  Samsung had a duty under

24  ETSI's IPR Policy to timely disclose patents and patent applications that "might be essential" to

25  the ETSI standard, and Samsung breached that duty.

26

27

28

## VIII.   SAMSUNG IS ESTOPPED FROM ASSERTING ITS PATENTS AGAINST APPLE BECAUSE OF ITS STANDARD-SETTING DECEIT

Due to its breach of its disclosure obligations under the ETSI IPR Policy, Samsung is equitably estopped from asserting the '516 and '941 patents.  Under the doctrine of equitable estoppel, a patent holder's infringement claim may be barred where the alleged infringer proves by a preponderance of the evidence that (1) the patentee was silent in the face of a duty to disclose IPR, (2) the standard-setting body relied on the patentee's adherence to its disclosure rules in deciding to standardize the relevant technology, and (3) implementers of the standard can no longer select alternative technologies that perform the standardized function covered by the patent.  *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028, 1042-43 (Fed. Cir. 1992) (en banc).

Samsung contends that Apple must prove that *Apple itself*, rather than 3GPP, relied on an understanding that Samsung would fulfill its disclosure obligations and thereby suffered material harm.  The Federal Circuit, however, has made clear that equitable estoppel may apply based on disclosure violations in the standard-setting context, *see Qualcomm*, 548 F.3d at 1021 n.8 ("[E]quitable estoppel may generally be an appropriate legal framework for analysis of breaches of disclosure duties in the SSO context[.]"), and it is, of course, the standard-setting body and its members—not the implementer (unless the implementer was also participating in the standard-setting activities)—that rely on standard-setting disclosure obligations.  3GPP members, including Apple, substantially relied on adherence to the ETSI IPR Policy's disclosure obligations when determining whether to incorporate a given technology into the UMTS standard.

All the elements of equitable estoppel have been met.  As discussed in Section V above, Samsung had a duty to timely disclose the '516 and '941 patents (or related patents or applications) that "might be essential" to the ETSI standard, and Samsung failed to meet that duty.

## IX.   SAMSUNG'S FEATURE PATENTS ARE NOT INFRINGED AND INVALID

The innovative Apple products that Samsung accuses do not infringe Samsung's U.S. Patent Nos. 7,577,460, 7,456,893, and 7,698,711, and, in any event, all three of these patents are

sf-3170923

1    invalid.  Samsung's patents are narrow in scope, covering only specific and outmoded

2    technologies that are not practiced by any of the accused products.  Specifically, Samsung asserts

3    claim 1 of the '460 patent against the Apple iPhone 3G, iPhone 3GS, iPhone 4, iPad 2, and iPod

4    touch (4th Generation); claim 10 of the '893 patent against the Apple iPhone 3GS, iPhone 4, iPad

5    2, and iPod touch (4th Generation); and claim 9 of the '711 patent against the iPhone 3G, iPhone

6    3GS, iPhone 4, and iPod touch (4th Generation).[6]  (Dkt. 1189 at 13; Yang Opening Expert

7    Report, March 16, 2012, at ¶ 17.)  Claim 1 of the '460 patent covers a specific and convoluted

8    method of sending emails from sub-modes with and without images; claim 10 of the '893 patent

9    covers an apparatus displaying a last-viewed image rather than a last-captured image no matter

10   how long a user switches away from an image viewing mode; and claim 9 of the '711 patent

11   covers a device using a particular software element called an "applet" to play music in the

12   background.

13            In contrast, the accused products operate in fundamentally different ways and are based on

14   more modern technologies that differ substantially from the outmoded methods claimed in the

15   Samsung patents.  For example, the accused products employ built-in applications ("apps") that

16   are more flexible, modern, and innovative than the more static and outdated "modes" claimed in

17   the Samsung patents.  Furthermore, the Samsung patents are invalid as anticipated or obvious

18   over prior art including references that Samsung did not disclose to the Patent Office.

19   **A.    The '460 Patent**

20            **1.    Apple Does Not Infringe The '460 Patent**

21            The '460 patent does not cover the more sophisticated and innovative methods employed

22   by the accused products in the sending of email with or without photo images.  Rather, the '460

23   patent requires a complicated and hard to follow series of steps involving "modes" and "sub-

24   modes" that are not employed in the accused products.  Specifically, the '460 patent claim

25   requires that a user enter a first e-mail transmission sub-mode from a portable phone mode; enter

26   a second e-mail transmission sub-mode from a display sub-mode displaying an image most

27   

28   [6] For the '711 patent, Samsung has made no monetary damages claims for alleged infringement of the iPod touch
     (4th Generation).

sf-3170923

38

1    recently captured in a camera mode; display other images using scroll keys; and transmit the two

2    e-mails.  The steps described by the '460 patent are significantly different from the simple and

3    elegant method Apple provides to users for sending photos, which cannot be practiced as claimed

4    in the '460 patent.

5           Indeed, claim 1 of the '460 patent is so convoluted that even Samsung has had difficulty

6    explaining it.  To date, Samsung has offered three different interpretations of what the claim

7    requires.  Samsung initially asserted that Apple infringes when a user employs the following

8    series of steps:  enter the Mail app and start a first email; return to the Home screen; enter the

9    Photos app and start a second email including an image; return to the Home screen; enter the

10   Camera app and display photos through the use of left and right arrows; return to the Mail app

11   and send the first email; and return to the Photos app and send the second email.  (Samsung's

12   Disclosure of Asserted Claims and Infringement Contentions (Patent L.R. 3-1, 3-2), Sept. 7,

13   2011, Ex. J at 3, 5, 9, 10, 12.)  Presumably recognizing that it would be impossible to demonstrate

14   that Apple users actually performed such a convoluted series of steps, Samsung tried to broaden

15   its interpretation after retaining Dr. Yang as an expert witness.  In his report, Dr. Yang asserted a

16   new theory that Apple infringes when a user merely performs "three core functions": (1) sending

17   an e-mail with text; (2) sending an e-mail with a photo; and (3) scrolling through photos.  Finally,

18   perhaps recognizing that survey results would demonstrate how few people actually practiced the

19   '460 patent under Dr. Yang's new "three core functions" theory, Samsung's survey expert Dr.

20   Sukumar provided still another interpretation of the '460 patent in the customer survey that he

21   conducted.  Samsung's survey in support of its damages claim with respect to the '460 patent

22   simply asked customers about the "[a]bility to send the photo in the body of an email."  (Sukumar

23   Opening Expert Report, March 16, 2012, at 3, 31.)

24          The accused products operate in a fundamentally different manner from the method

25   claimed in the '460 patent.  *First*, the accused products do not employ "modes" and "sub-modes"

26   as claimed.  Specifically, the accused products do not have the (1) "first" and "second E-mail

27   transmission sub-mode"; (2) "portable phone mode"; (3) "camera mode"; and (4) "display sub-

28   mode."  Rather, in contrast to the fixed and inflexible "modes" and "sub-modes" claimed in the

39

1  '460 patent, the accused products employ built-in "apps" that provide multiple different

2  functions, can be added to or removed from the Apple device, and are designed to operate at the

3  same time.  The accused products also employ a more modern and sophisticated "swiping"

4  method to view photos from a gallery of stored photos in lieu of the "scroll key" method claimed

5  in the '460 patent.  **Second**, it is not even possible for accused products to perform Samsung's

6  convoluted method steps in the manner required by the claim.  For example, it is not possible to

7  instruct the Photos or Camera app to e-mail a most recently captured image, and then browse

8  through "other" images while that e-mail is pending.[7]  Not surprisingly, Samsung has provided no

9  evidence that Apple itself practices the claimed method or induces anyone else to practice the

10  claimed method.

11         Samsung has failed to come forward with evidence sufficient to prove literal infringement

12  or to satisfy the legal standard governing the doctrine of equivalents.  Specifically, Samsung has

13  utterly failed to provide the particularized testimony and linking argument that is required before

14  Samsung can rely on the doctrine of equivalents.  Therefore, the Court should not permit

15  Samsung to rely on this theory in any way, including the presentation of any evidence to the jury

16  in support of this assertion.  *See*, *e.g.*, *Amgen*, 580 F.3d at 1382 (doctrine of equivalents requires

17  "particularized testimony and linking argument").

18         For example, Dr. Yang offers the conclusion in his report, unadorned by any supporting

19  analysis, that "[u]se of swiping on iPhone 4S is insubstantially different from use of scroll keys,"

20  and "[u]nder the doctrine of equivalents, swiping meets this claim element."[8]  (*See* Yang Opening

21  Report at Ex. 1A-1, step three (asserting "doctrine of equivalents" but omitting

22

23  [7] Samsung may argue that the method steps of claim 1 of the '460 patent need not be performed in order.  This ignores the plain meaning of the claim term "sequentially displaying *other* images" following the step "displaying *an image* most recently captured."  *See*, *e.g.*, *Ring Plus, Inc. v. Cingular Wireless Corp.*, 614 F.3d 1354, 1364 (Fed. Cir.

24  2010) (for steps to occur out of order would recite an "illogical sequence" based on claim language); *Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1321-1322 (Fed. Cir. 1999) ("Although not every process claim is limited to the

25  performance of its steps in the order written, the language of the claim, the specification and the prosecution history support a limiting construction in this case."); *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368,

26  1375-1376 (Fed. Cir. 1998) (order in claimed steps "is apparent from the plain meaning of the claim" and claimed steps could not be performed "in any order").

27  [8] This Court denied Samsung's motion to amend its Infringement Contentions to add the iPhone 4S to the case. (Order Denying Samsung's Motion to Amend Invalidity Contentions; Order Denying Samsung's Motion to Amend

28  Infringement Contentions, Mar. 27, 2012, at 10-12, [Dkt 836].)

sf-3170923

1    function/way/result or other particularized analysis).)  This purely conclusory testimony without

2    any linking argument falls far short of the applicable legal standard and is precisely the type of

3    generalized and unsupported evidence that should be excluded from the trial.  Further, Dr. Yang's

4    expert report provides no argument regarding infringement of any other limitations of claim 1

5    under the doctrine of equivalents.

6         In any event, Samsung should be estopped from asserting that the accused products

7    infringe the following limitation in the '460 patent: "sequentially displaying other images stored

8    in a memory through the use of scroll keys."  During prosecution of the grandparent application

9    to the '460 patent, Samsung added the step of "sequentially displaying other images stored in a

10   memory through the use of scroll keys" to pending claim 20 (corresponding to issued claim 1 of

11   the '460 patent) to overcome a prior art rejection.  (JX-1066 at 11/12/2002 Amendment

12   APLNDC-WH-A 0000014250 to 251.)  Samsung also added the requirement of displaying an

13   image "most recently" captured in a camera mode as part of the same amendment to overcome

14   prior art.  (Id.)  Because these limitations were added by amendment during prosecution to

15   overcome prior art, Samsung is estopped from claiming that the accused products infringe the

16   step of "sequentially displaying other images stored in a memory through the use of scroll keys"

17   or the second e-mail transmission sub-mode displaying an image "most recently" captured in a

18   camera mode under the doctrine of equivalents.  *See Festo*, 535 U.S. at 734 ("Prosecution history

19   estoppel . . . preclud[es] a patentee from regaining, through litigation, coverage of subject matter

20   relinquished during prosecution of the application for the patent" (internal quotation omitted)).

21              **2.      The '460 Patent Is Invalid**

22        The '460 patent claim is nothing more than an obvious product of the convergence of

23   known old technologies.  Samsung may allege that it invented the camera phone, but this

24   allegation is not relevant to the claimed method of the '460 patent and, in any event, it is wrong:

25   many camera phones existed prior to the '460 patent.  Indeed, the prior art includes camera

26   phones capable of sending e-mail with text, e-mail with photos, and sequentially displaying

27   photos with scroll keys.  (*See*, *e.g.*, U.S. Patent No. 6,690,417 (TX 120); U.S. Patent No.

28   6,069,648 (TX 119); U.S. Patent No. 6,009,336 (TX 118).)  Dr. Yang's "three core functions"

sf-3170923

1   were all well-known in the prior art, and the narrow and convoluted '460 patent claim represents

2   nothing more than an obvious combination of old technologies applied in a standard and

3   predictable manner.

**B.      The '893 Patent**

**1.      Apple Does Not Infringe The '893 Patent**

6   Conventional digital cameras, which were well-known prior to the '893 patent, provided

7   modes, such as a photographing mode to allow a user to take pictures and a stored-image display

8   mode to view the pictures.  The purported problem identified by the '893 patent was that

9   conventional digital cameras did not allow a user to return to a last-viewed image in display mode

10  following a mode-switching operation, and instead would display a most recently captured image.

11  The '893 patent claims a digital image processing apparatus, such as a digital camera, that can

12  switch between stored-image display mode and photographing mode, and return to a most

13  recently viewed image in display mode "irrespective of a duration" the apparatus was in the

14  photographing mode.

15  The accused products operate in a fundamentally different manner and lack several

16  elements of the claim asserted by Samsung.  *First*, the accused products do not have a "stored-

17  image display mode" or a "photographing mode" as claimed in the '893 patent.  Instead of

18  employing inflexible "modes," or states of operation, like a conventional digital camera, the

19  accused products are sophisticated computing devices that use built-in "apps," independent pieces

20  of software for capturing and viewing images.  *Second*, the accused products do not display the

21  most recently viewed image when returning to the Photos app from the Camera app "irrespective

22  of a duration" that a user operated the Camera app.  The most recently viewed image is not

23  displayed, for example, after the device requires memory use elsewhere and loses the state of the

24  Photos app.

25  Samsung has failed to come forward with evidence sufficient to prove literal infringement

26  and has stated that it is not relying on the doctrine of equivalents for the '893 patent.  (*See* Dkt.

27  No. 1232, at 88.)  In any event, Samsung has failed to provide the particularized testimony and

28  linking argument that is required before Samsung can rely on the doctrine of equivalents.

sf-3170923

1    Therefore, the Court should not permit Samsung to rely on this theory in any way, including the

2    presentation of any evidence to the jury in support of this assertion.  *See*, *e.g.*, *Amgen*, 580 F.3d at

3    1382 (doctrine of equivalents requires "particularized testimony and linking argument"). [9]

4              **2.      The '893 Patent Is Invalid**

5            The asserted claim of the '893 patent is invalid because it is anticipated or rendered

6    obvious by several prior art references either alone or in combination.  For example, as the

7    prosecution history of the '893 patent makes clear, U.S. Patent No. 6,867,807 to Malloy

8    Desormeaux teaches every limitation of the asserted claim except for the "irrespective of a

9    duration" limitation.  (JX-1065 at 1065.038 - 1065.044, *e.g.*, July 10, 2008 Amendment.)  This

10   limitation is an obvious and predictable common-sense design choice, as further demonstrated by

11   other anticipatory prior art, *e.g.*, Korean Patent No. 10-2004-0013792 ("KR '792 patent").  (*See*

12   TX 112.)

13           Finally, the asserted claim fails for lack of written description because the specification

14   lacks support for the "irrespective of a duration" claim limitation.  Samsung added this limitation

15   by amendment to overcome a prior art rejection without identifying support in the specification,

16   and still has not identified any.

17       **C.      The '711 Patent**

18              **1.      Apple Does Not Infringe The '711 Patent**

19           The '711 patent does not cover the more sophisticated and innovative methods employed

20   by the accused products relating to the play of music and multi-tasking.  Rather, the '711 patent

21   claims a pocket-sized mobile communication device with a particular implementation for playing

22   music in the background while the user multitasks.  Specifically, the '711 patent claims that a

23   user is able to play an MP3 music file, switch to a standby mode, select another function such as

24   text messaging, and use that second function while the music play continues in the background.

25

26   _____

[9] Should Samsung attempt to argue that claim 10's "irrespective of a duration" limitation is infringed under the
doctrine of equivalents, such argument must be barred by prosecution history estoppel.  This limitation was added by

27   amendment to overcome prior art, and Samsung cannot recapture that claim scope having surrendered it during
prosecution.  *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002).  *See also* File

28   History for '893 Patent, Amendment of July 10, 2008.

sf-3170923

1   The claims require that the music background play is implemented using an "applet," a special

2   type of software application.

3      In contrast, the accused products do not practice the limitation in the '711 patent requiring

4   the "music background play object, wherein the music background play object includes an

5   application module including at least one applet" limitation.  Specifically, the accused products

6   do not use an "applet" for playing music in the background as claimed.  The iOS operating

7   system used in the accused products is not designed to employ an "applet" as defined by the

8   Court and as claimed by Samsung.  (The Court has defined "applet" as "an application designed

9   to run within an application module.")  Not surprisingly, Samsung has failed to identify any

10  source code for the accused products relating to an application designed to run within an

11  application module, for the simple reason that no such source code exists.  Furthermore, while

12  claim 9 requires an "MP3 mode" for selection by a user, the accused products play music by

13  launching a music application, not by selecting a mode.  In the absence of an MP3 mode, the

14  accused products cannot infringe the asserted claim.

15     Samsung has failed to come forward with evidence sufficient to prove literal infringement

16  and has stated that it is not relying on the doctrine of equivalents for the '711 patent.  *See* Dkt.

17  No. 1232, at 88.  In any event, Samsung should be precluded from asserting the doctrine of

18  equivalents because it has failed to provide the particularized testimony and linking argument that

19  is required to do so.  *See*, *e.g.*, *Amgen*, 580 F.3d 1340, 1382 (Fed. Cir. 2009) (doctrine of

20  equivalents requires "particularized testimony and linking argument").[10]

21              **2.      The '711 Patent Is Invalid**

22     The '711 patent is invalid for obviousness.  Playing music in the background while multi-

23  tasking, as described in the '711 patent, was well-known on prior art mobile phones, for example,

24  the Sony Ericsson K700i.  "Applets" also were well-known in the prior art, including for purposes

25  of playing music files on mobile phones.  (*See*, *e.g.*, Q.H. Mahmoud, "The J2ME Mobile Media

---

26  [10] Should Samsung attempt to argue that claim 9's limitation "wherein the music background play object includes an
    application module including at least one applet" is infringed under the doctrine of equivalents, such argument must

27  be barred by prosecution history estoppel.  This limitation was added by amendment to overcome prior art, and
    Samsung cannot recapture that claim scope having surrendered it during prosecution.  *See Festo*, 535 U.S. at 734.

28  See also File History for '711 Patent, Amendment of December 8, 2009.

1  API." ("Mahmoud") (TX 115).)  And the claimed features in the '711 patent are taught by a

2  straightforward combination of prior art patents.  (*See*, *e.g.*, U.S. Pub. App. No. 2003/0236814 to

3  Miyasaka ("Miyasaka") (TX 92), U.S. Patent No. 6,928,648 to Wong ("Wong") (TX 91), U.S.

4  Pub. App. No. 2004/0077340 to Forsyth ("Forsyth") (TX 88).)  Thus, the alleged invention is no

5  more than an obvious and predictable combination of old technologies.

6          **D.**     **No Willful Infringement of the Feature Patents**

7          Samsung's allegation that Apple willfully infringed the '460, '893 and '711 patents fails

8  as a matter of law because Apple has multiple strong, independent grounds for non-infringement

9  and invalidity.  Samsung will be unable to demonstrate that Apple had the subjective intent to

10  infringe or acted despite an objectively high likelihood that its actions constituted infringement.

11  The record is devoid of any evidence that an "objectively defined risk . . . was either known or so

12  obvious that it should have been known to" Apple, *Seagate*, 497 F.3d at 1371, or that Apple

13  copied the '460, '893, or '711 patents or otherwise had the subjective intent to infringe.

14  **X.**    **SAMSUNG'S STANDARD-SETTING DECEIT HAS RESULTED IN BREACH OF**
15          **CONTRACT AND VIOLATIONS OF THE ANTITRUST AND UNFAIR**
        **COMPETITION LAWS**

16          **A.**     **Samsung Has Breached Two Contractual Obligations Critically Important to**
17               **the 3GPP Standard-Setting Process**

18          Samsung has breached two contracts critically important to the integrity of the standard

19  setting process of the Third Generation Partnership Project ("3GPP") for the UMTS standard.

20  First, Samsung breached its contractual duty under the European Telecommunications Standards

21  Institute ("ETSI") IPR Policy to timely disclose IPR that it now claims is essential to the UMTS

22  standard.  This misconduct was part of systematic Samsung corporate efforts to commit standard-

23  setting deceit in order to implant its IPR into the UMTS standard.  Second, Samsung breached its

24  contractual obligation to grant licenses on FRAND terms to standard implementers when it

25  refused to offer Apple such a license and sought to enjoin Apple from selling products that

26  support the UMTS standard.

27

28

sf-3170923

### 1.     Samsung Repeatedly Breached Its Duty to Timely Disclose IPR

Samsung breached ETSI's IPR Policy because (1) Samsung owned IPR it was obligated to disclose and (2) Samsung failed to timely disclose that IPR during the UMTS standard-setting process.[11]  ETSI's IPR Policy imposes the following disclosure obligation:

> Each MEMBER shall use its reasonable endeavours to timely inform ETSI of ESSENTIAL IPRs it becomes aware of.  In particular, a MEMBER submitting a technical proposal for a STANDARD shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

*See* Apple Ex. 74, ETSI IPR Policy Cl. 4.1.  When Samsung submitted a technical proposal, the plain language of the second sentence of Clause 4.1 required disclosure of Samsung's IPR ***before*** the standard was frozen (and therefore while standard-setting participants were still able to consider IPR claims in determining whether to standardize a given technology).  Samsung's '516 and '941 patents cover technology it proposed and now claims has been standardized as part of the UMTS.  Accordingly, Samsung was plainly required to disclose those patents before the standard was frozen; otherwise the requirement particularized in the second sentence—disclosure of IPR that *might* be essential *if that proposal is adopted*—would make no sense.

Samsung's non-disclosure was pervasive and deliberate.  Named inventors of the '941 and '516 patents attended the relevant working group meetings shortly after filing patent applications in Korea.  Notwithstanding that the chairperson began each working group meeting at 3GPP by admonishing participants that they must comply with their duty to timely disclose IPR that might be essential to a technical proposal under consideration, the named inventors sat silent.  Although Samsung's IPR related to the technology Samsung proposed for adoption, Samsung employees with actual knowledge of that fact intentionally failed to disclose in breach of Clause 4.1.  Samsung's failure to disclose positioned Samsung to hold up Apple (and the industry) by threatening to obtain an injunction against its sales of UMTS-compliant products, thereby injuring

---

[11] Samsung concedes that it is and has been at all relevant times a member of ETSI.  Samsung is therefore contractually bound by the ETSI IPR Policy, and Apple is entitled to enforce it as a member of ETSI and a third party beneficiary.  *See* Samsung's Answer to Apple's Counterclaims in Reply at ¶ 45; *Apple Inc. v. Samsung Elecs. Co. Ltd.*, No. 11-CV-01846 (N.D. Cal. May 14, 2012) ("May 14 Order")at 17 ("Under French law, a contract may be created between the association and its members, and among members of the association…[A] third party beneficiary may sue to enforce the execution of a contract.") (citations omitted).

sf-3170923

1    Apple.  Moreover, this purposeful concealment of IPR during the standard setting deliberations

2    was pursuant to Samsung corporate practice that such IPR should not be disclosed until after the

3    standard was frozen.  Samsung has sought to justify this practice by arguing that one cannot know

4    for certain if IPR is involved in the standard until after the standard is set, but this excuse

5    disintegrates in the face of an ETSI requirement to disclose, before standard adoption, any IPR

6    which "might be essential."

7                   **2.       Samsung Breached its Duty to Grant FRAND Licenses**

8           Samsung also flagrantly breached its FRAND commitments to ETSI and its members

9    (including Apple).  Samsung made a general FRAND commitment on December 14, 1998 and

10   specific FRAND commitments for the two asserted declared-essential patents on May 16, 2006

11   and August 7, 2007, respectively.  Samsung has breached its FRAND commitments by seeking to

12   enjoin Apple from selling products that support the UMTS standard and by refusing to offer

13   Apple a license to declared-essential patents on FRAND terms.

14          ETSI's IPR Policy and Samsung's FRAND commitments prohibited Samsung from

15   seeking injunctions or refusing to offer licenses on FRAND terms.  Samsung admits, as it must,

16   that its declared-essential patents are subject to FRAND obligations.  Samsung's demands for a

17   2.4% royalty on the entire selling price of the accused products is unfair, unreasonable, and

18   discriminatory.

19          *First*, Samsung's royalty demand is inconsistent with its own and other UMTS declared-

20   essential patent holders' licensing practices.  It has never sought or received a 2.4% FRAND

21   royalty from any licensee, and indeed cannot even explain where that number came from.

22   Indeed, Samsung has never received any payment from any of its licensees for access to its

23   declared-essential patents.  Analysis of Samsung's licenses show that the value it has received for

24   its declared-essential UMTS patents (in the form of cross-licenses) is orders of magnitude less

25   than it has demanded from Apple.  In addition, Samsung's royalty demands are multiple times

26   more than Apple has paid any other patentees for licenses to their declared-essential patent

27   portfolios.

28

sf-3170923

**Second**, Samsung's 2.4% royalty demand on the entire selling price of Apple's products is exorbitant and non-FRAND on its face.  Based on the average selling price of the iPhone, the royalty that Samsung demands would equal $14.40 per unit, or more than 100% of the price of a baseband chipset—the only component of Apple's products, if any, that employs UMTS technology.  Moreover, based on Samsung's proportionate share of all patents that have been declared essential to the UMTS standard (about 5.4%), if all holders of declared-essential patents were to take the abusive position Samsung asserts, total royalties on the iPhone would be hundreds of dollars, or more than twenty times the baseband chipset price.

**Third**, Samsung's positions here are all the more remarkable, given that it has taken diametrically opposite positions in other litigations, when the shoe was on the other foot and it was seeking a FRAND license to UMTS declared-essential patents.  As to royalty rate, Samsung has stated that for GSM products—an earlier mobile telecommunications standard—a 5-7% aggregate royalty rate "represents an upper bound to a fair cumulative rate for a licensee with no significant intellectual property to cross-license."  Re-amended Defence and Counterclaim of Samsung at ¶ 80.4.6, *Telefonaktiebolaget LM Ericsson*, (Bates No. APLNDC-WH-A0000022602 at 22634).  Here, Samsung is advocating a royalty that is equivalent to nearly 50% of the entire selling price of Apple products.  As to royalty base, while Samsung now seeks to tax the entire sales price of Apple's products, it has previously advocated for a royalty on far less than the full sales price of its products on the grounds that wireless handsets "are in significant part, and increasingly, determined by extraneous features that do not relate to the licensed telecommunications technology, such as photo and video cameras, games, color screens, mp3 players, and radio."  Id. at ¶ 80C.  Finally, Samsung seeks to enjoin the sales of Apple's products based on its FRAND-committed patents.  But Samsung previously unequivocally recognized that injunctions are unavailable on patents covered by FRAND commitments:  "Ericsson must be prepared to grant a license to Samsung under FRAND conditions.  So Ericsson is only entitled to royalties the extent of which still have to be agreed and has no right to an injunction nor to compensation of damages, because of its refusal to offer Samsung a license on FRAND terms."  See Samsung Statements in Main Proceeding (NL) (Oct. 4, 2006) SAMNDCA00393902 at

48

1   SAMNDCA00393914.  By exploiting its declared-essential patents to hold-up Apple for either

2   excessive royalties or a coerced license to Apple's differentiating patents instead of negotiating a

3   license in good faith, Samsung has harmed Apple, forcing it to expend significant resources

4   defending against Samsung's improper claims.

5       **B.      Samsung Has Violated The Antitrust Laws By Its Standard-Setting**
            **Misconduct**
6

7       Samsung's standard-setting deceit has enabled Samsung to illegally monopolize relevant

8   technologies markets, in violation of Section 2 of the Sherman Act.[12]  *See Apple Inc. v. Samsung*

9   *Elecs. Co. Ltd.*, No. 11-CV-01846 (N.D. Cal. May 14, 2012) ("May 14 Order") (holding that

10  Apple sufficiently alleged monopolization); *Apple Inc. v. Samsung Elecs. Co. Ltd.*, No. 11-CV-

11  01846 (N.D. Cal. Oct. 18, 2011) ("Oct. 18 Order") (same).  Specifically, Samsung (1)

12  deliberately and dishonestly failed to timely disclose IPRs it now claims cover technologies

13  incorporated into the UMTS standard and (2) falsely promised to license its declared essential

14  patents to all UMTS implementers on FRAND terms.  Samsung sought to wield this ill-gotten

15  monopoly power to illegally and abusively hold up Apple for exorbitant royalties and to coerce

16  Apple to license to Samsung Apple's differentiating patents covering the distinctive functions and

17  designs that distinguish its products in the marketplace.

18      Samsung has illicitly gained and wrongfully employed monopoly power in each of the

19  relevant technology markets—power control scaling technology and Voice-Over-Internet-

20  Protocol ("VOIP") header technology.  Each of these markets includes both a technology that

21  Samsung claims is covered by one of its asserted declared-essential patents and technologies that

22  were reasonable substitutes for that technology pre-standardization.  Through its standard-setting

23  deceit, Samsung illegally excluded competition and acquired monopoly power in each of these

24  markets.  As noted in the breach of contract section above, Samsung deliberated violated the

---

[12] By violating Section 2 of the Sherman Act, Samsung has also violated the California Unfair Competition Law, which is broader.  *See* Cal. Bus. & Prof. Code § 17200 et seq.; *Cel-Tech Communications v. LA Cellular*, 973 P.2d 527, 561, 566 (Cal. 1999) (holding that violations of other laws constitute violations of the "unlawful" part of the UCL, and that a business practice is unfair under the UCL if it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.").

49

1   ETSI IPR policy by concealing known patent rights in connection with proposals under

2   consideration for standardization by ETSI, and falsely promising that any declared essential

3   patent would be licensed to all comers on FRAND terms.  Instead, Samsung abused its

4   wrongfully obtained monopoly power by refusing to offer Apple FRAND license terms and

5   seeking to enjoin Apple from practicing the UMTS standard.  In the standard-setting context, a

6   firm willfully, and anti-competitively, acquires monopoly power when it "'intentionally [and]

7   false[ly] promises to license essential proprietary technology on FRAND terms,'" the standard

8   setting organization "'reli[es] on that promise when including the technology in the standard, and

9   [] the patent holder[] subsequent[ly] breach[es] . . . that promise . . . .'"  *Apple*, May 14 Order at

10  10 (quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007)).

11         Last, Apple has suffered antitrust damages as a direct result of Samsung's exclusionary

12  conduct.  *See Apple Inc. v. Samsung Elecs. Co. Ltd.*, No. 11-CV-01846, slip op. of June 30, 2012,

13  at 40 ("because Apple has alleged patent holdup stemming from Samsung's failure to disclose

14  essential patents to ETSI and Samsung's failure to license on FRAND terms, and because Apple's

15  litigation costs stem directly from Samsung's alleged anticompetitive behavior, these litigation

16  costs are a sufficient basis for a potential award of antitrust damages").

17  **XI.    SAMSUNG'S CLAIMED DAMAGES ARE EXCESSIVE AND UNSUPPORTED**

18      **A.    To The Extent That Samsung Is Entitled To Any Remedy, its FRAND
19            Damages Cannot Exceed $0.0049 Per Unit for Each Infringed Patent**

20         If Apple is found liable for infringement of either of the two asserted declared-essential

21  patents, Samsung's royalty should not exceed its proportional share of reasonable aggregate

22  royalties for all IPR declared essential to the UMTS standard, applied to an appropriate royalty

23  base.  Samsung's declared-essential patents represent only a small portion of the total set of

24  declared essential UMTS patents—around 5.45%.[13]  Thus, even apart from its use of an

25  inappropriate base, Samsung cannot properly demand a royalty of 2.4%, which represents almost

26  half of what Samsung has said should be the entire aggregate royalty for all UMTS technologies.

27  _____

28  [13] *See* Fairfield Resources International, "Review of Patents Declared as Essential to WCDMA Through December 2008" (Jan. 6, 2009) (Samsung holds 103 of 1889 declared-essential patent families).

sf-3170923

1    Equally important, the appropriate rate should not be applied to the sales price of the iPhone or

2    iPad, which contain computer and application functionality far beyond simple UMTS wireless

3    phone technology.  Rather, the royalty should be applied to a base equal to the price of the

4    baseband processor, the smallest priceable unit containing the accused functionality.  See Federal

5    Trade Commission, The Evolving IP Marketplace at 212 ("The practical difficulty of identifying

6    a royalty rate that accurately reflects the invention's contribution to a much larger, complex

7    product often counsels toward choosing the smallest priceable component that incorporates the

8    inventive feature.") (Mar. 2011); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336–39

9    (Fed. Cir. 2009) (holding royalty based on sales of the infringing product inappropriate where the

10    rate does not "account[] for the proportion of the base represented by the infringing component or

11    feature."); *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 288 (N.D.N.Y. 2009)

12    (selecting a processor as the royalty base where it was the smallest priceable unit).  Apple will

13    show that Samsung's contention that the appropriate royalty base is the average selling price of an

14    iPhone or iPad is inconsistent with Samsung's FRAND obligations, as Samsung itself has

15    acknowledged in past litigation:

16        19.  Other elements of the mobile units which have nothing to do
17        with the invention covered by the patents should not be a basis for
            royalties, e.g. keypad, microphone, loudspeaker, ringer/vibrator,
18        basic display, batter, charger and case.  Likewise, add-ons which
            have nothing to do with telephony, like camera, keyboard, mp3
19        player, memory and memory cards, application processors, colour
            displays, luxury casing etc. should not enlarge the paid royalties.

20        20.  To calculate the royalties as a fixed percentage of turnover
21        [sales revenue] seems therefore not justified.

22        . . . .

23        22.  Furthermore, a percentage of the whole turnover is also hostile
            to innovation since every newly introduced feature leads to a 'tax'
24        to the IPR owner and is a barrier to innovation.

25    Second Expert Report Submitted by Samsung (NL) (April 13, 2007), SAMNDCA00393946 -

26    SAMNDCA00393953.

27        In determining the rate to apply to the royalty base, the jury must take into account

28    Samsung's FRAND commitments.  In particular, a FRAND rate must reflect the inherent value of

51

1   the patented technology pre-standardization, and cannot take into account value derived from the

2   standardization of the technology.  Indeed, a fundamental objective of a FRAND commitment is

3   to ensure that patentees not exploit hold up power derived from the fact that their IPR has been

4   standardized.  *See Apple, Inc. v. Motorola, Inc.*, No. 1:11-cv-08540 (N.D. Ill. June 22, 2012),

5   ECF No. 1038, slip op. at 18 (Posner, J., sitting by designation) ("The purpose of the FRAND

6   requirements . . . is to confine the patentee's royalty demand to the value conferred by the patent

7   itself as distinct from the additional value—the hold-up value—conferred by the patent's being

8   designated as standard-essential.").  Moreover, Apple's calculation of a FRAND rate—unlike

9   Samsung's—appropriately considers the cumulative impact of royalties to avoid "royalty

10  stacking," *i.e.*, an excessive aggregate royalty burden on the selling price of Apple's standard-

11  compliant products.  In addition, by virtue of its FRAND commitment, Samsung cannot be

12  entitled to an injunction, even if assuming (erroneously) it could otherwise satisfy the four-part

13  eBay standard.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).  As Judge Posner

14  recently explained in holding that injunctions are unavailable on FRAND-committed patents (at

15  least absent extraordinary circumstances not present here):

16           By committing to license its patents on FRAND terms, Motorola committed to
             license [its declared-essential patent] to anyone willing to pay a FRAND royalty
17           and thus implicitly acknowledged that a royalty is adequate compensation for a
             license to use that patent.  How could it do otherwise?  How could it be permitted
18           to enjoin Apple from using an invention that it contends Apple must use if it wants
             to make a cell phone with UMTS telecommunications capability – without which
19           it would not be a cell *phone*.

20  *Apple, Inc. v. Motorola, Inc.*, No. 1:11-cv-08540, slip op. of June 22, 2012, at 18–19 (emphasis in

21  original) ("*Motorola*").

22          At bottom, as Samsung has conceded in prior litigation, having made a FRAND

23  commitment, Samsung could never show that damages (*i.e.*, FRAND royalties) are inadequate

24  compensation for practicing its patents—a pre-requisite under the *eBay* standard, *see eBay Inc.*,

25  547 U.S. at 391.  As Judge Posner held: "A FRAND royalty would provide all the relief to which

26  [the patentee] would be entitled if it proved infringement . . . and thus it is not entitled to an

27  injunction."  *Motorola*, slip. op. at 21.  Similarly, having told anyone that wishes to implement

28  the relevant standard that they may practice its declared-essential patents in return for FRAND

1   royalties, Samsung cannot reasonably contend that it would be "irreparably harmed" by others

2   practicing the patents—which is another pre-requisite to an injunction under *eBay*. *See eBay Inc*.,

3   547 U.S. at 391. Samsung's proper remedy for any finding of infringement of its declared-

4   essential patents is a FRAND royalty—the remedy it agreed to accept when it made its FRAND

5   commitment.

6   **B.    The Royalty Damages Sought by Samsung on The '460, '711, and '893**
**Patents Are The Product of Flawed Methodology and Are Overstated**

7

8        Samsung seeks reasonable royalty damages for alleged infringement of the '460, '711,

9   and '893 patents. No lost profits damages are sought. Dr. Vincent O'Brien, Samsung's damages

10  expert, opines that total damages through December 31, 2011 are about $17.5 million, comprised

11  of $12,307,153 for the '460 patent, $3,340,248 for the '893 patent, and $1,855,706 for the '711

12  patent.

13       Apple will prove that Dr. O'Brien's damages methodology is fundamentally flawed and

14  incapable of producing reliable royalty damages. Dr. O'Brien's entire damages framework is

15  built upon an unsupported assumption that the price of a $0.99 app is a proxy for consumer value

16  created by the patented technologies. Applying this misguided assumption, Dr. O'Brien used the

17  same formula to calculate royalty damages for each of the non-essential patents. The three

18  elements of the calculation are (1) the price of a $0.99 app in the iTunes App Store, (2) a 30%

19  split of revenue between Samsung and Apple, and (3) the percentage of "usage" of the allegedly

20  infringing feature by consumers. The first two variables in Dr. O'Brien's formula are fixed; only

21  the third variable, usage percentage, changes for each patent. Among the many flaws in Dr.

22  O'Brien's methodology are the following:

23       First, there is no support for using the price of a $0.99 app purchased and downloaded

24  from the iTunes Store as the starting point to calculate a reasonable royalty for alleged use of the

25  non-essential patents, which are not apps downloaded from the iTunes Store but functions built

26  into the accused devices. The vast majority of apps, over 80%, are downloaded for free, not

27  $0.99. Moreover, the specific apps that Dr. O'Brien cited in his report as containing

28  "functionality similar to the Feature Patent technologies" have generated only several hundred

53

1    downloads.  Given such minimal demand, it makes no economic sense to project the price of a

2    $0.99 app onto the millions of units of accused Apple devices.

3        Second, Dr. O'Brien's use of a 30% revenue split is arbitrary and leads to overstatement

4    of damages.  Samsung cannot point to a single patent license negotiation where such a split was

5    proposed, let alone agreed upon.

6        Finally, Dr. O'Brien relies on the survey of Dr. Sukumar for the "usage" percentages for

7    each patent, but the survey results are flawed and unreliable for a variety of reasons.  Dr.

8    Sukumar failed to conduct a proper pretest to ensure that respondents understood the survey.  In

9    designing the survey, Dr. Sukumar used inaccurate and overbroad descriptions of the accused

10   features resulting in inflated usage and value responses.  Dr. Sukumar also failed to measure

11   frequency of usage of the features, making his "usage" percentages irrelevant for purposes of

12   ascertaining value.  *See Apple, Inc. v. Motorola, Inc*., 2012 WL 1959560, at *5 (N.D. Ill. May 22,

13   2012), No. 11–cv–08540 (indicating that frequency of usage of the patented feature is a relevant

14   factor that should be included in a survey supporting a damages calculation).  Dr. O'Brien's

15   damages formula fails to calculate a reasonable royalty tied to the economic value of the three

16   Samsung non standards-essential patents and is unsupported and unreliable.

**XII.    APPLE'S SUMMARY EXHIBITS COMPLY WITH FEDERAL RULE OF EVIDENCE 1006**

19       Apple's trial exhibits include summaries of evidence on matters such as financial data,

20   media coverage of the iPhone, and meeting minutes.  Federal Rule of Evidence 1006 authorizes

21   these summary exhibits.  It states that "[t]he contents of voluminous writings, recordings, or

22   photographs which cannot conveniently be examined in court may be presented in the form of a

23   chart, summary, or calculation," provided that the underlying evidence is "made available for

24   examination or copying, or both, by other parties at reasonable time and place."  Fed. R. Evid.

25   1006.

26       Consistent with this rule, Apple's exhibits accurately summarize voluminous underlying

27   evidence on a specific issue, which can be more efficiently presented in summary form than

28   through numerous separate documents directed to the same point.  Samsung has *not* argued that

1    Apple's summaries are inaccurate or that Samsung does not have access to the underlying

2    evidence.  Rather, Samsung has suggested that Rule 1006 is directed solely to financial or

3    mathematical data.  (July 18, 2012 Hearing Tr. at 47-48; Dkt. No. 1236-4 at 3).

4         Nothing in Rule 1006 or the case law limits its application to these specific types of

5    information.  The plain language of the rule itself, which references photographs, proves

6    Samsung wrong.  And courts regularly admit a wide range of evidence under Rule 1006.  In

7    *United States v. Morin*, 627 F.3d 985, 997-98 (5th Cir. 2010), the court admitted a Rule 1006

8    summary of video excerpts from 16 different security cameras, explaining that the video evidence

9    "was sufficiently voluminous and complex for the district court to allow . . . testimony

10   summarizing the video."  Courts have also admitted Rule 1006 summaries of telephone

11   conversation recordings (*United States v. Francis*, 131 F.3d 1452, 1457 (11th Cir. 1997)), survey

12   data (*Mehus v. Emporia State Univ.*, 222 F.R.D. 455, 461 (D. Kan. 2004); *Keith v. Volpe*, 618 F.

13   Supp. 1132, 1161 (C.D. Cal. 1985)), and comparison infomercials (*Miracle Blade, LLC v.

14   Ebrands Commerce Group, LLC*, 207 F. Supp. 2d 1136, 1146 (D. Nev. 2002)).  "The purpose of

15   Rule 1006 is to allow the use of summaries when the documents are unmanageable or when the

16   summaries would be useful to the judge and jury."  *United States v. Rizk*, 660 F.3d 1125, 1130

17   (9th Cir. 2011); *Gales v. Winco Foods*, No. C 09-058913 CRB, 2011 U.S. Dist. LEXIS 96125, at

18   *22 n.9 (N.D. Cal. Aug. 26, 2011) (overruling objection).  The Ninth Circuit endorses use of the

19   rule when it will "contribute[] to the clarity of the presentation to the jury" and "avoid[] needless

20   consumption of time."  *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980); *see also*

21   *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (summary evidence can reduce

22   unnecessary delay and help jury evaluate "factually complex and fragmentally revealed"

23   evidence).  These decisions rebut Samsung's cramped view of Rule 1006.

24        Samsung's specific objections to particular exhibits (such as hearsay or relevance) can be

25   dealt with during the trial before the specific exhibit is presented.  In the meantime, Apple notes

26   several general points.

27        First, as Apple explained at the hearing, Apple is generally relying on the summary Rule

28   1006 exhibit, and not the underlying documents.  In limited situations where Apple may present

55

sf-3170923

1   the underlying document as an exhibit, Apple has also designated that document as a separate

2   exhibit.

3        Second, several of Apple's Rule 1006 exhibits were attachments to an expert report or

4   summarize evidence that the expert identified and relied on in his or her report as to a specific

5   issue.  This is a proper use of Rule 1006.

6        Third, Samsung's assertion that Apple has improperly summarized numerous documents

7   in a single exhibit is not well-taken.  (*See* Dkt. No. 1236-4 at 1-3.)  That is precisely what Rule

8   1006 allows and encourages.  *Union Planters Bank, N.A.*, 273 B.R. 764, 768 (S.D. Ill. 2001).

9   Ironically, Samsung also objects that the underlying evidence for Apple's Exhibit 123 is *not*

10  sufficiently voluminous to comply with Rule 1006.  (Dkt. No. 1236-4 at 4.)  But this exhibit

11  complies with Rule 1006 because it summarizes over 300 pages of standards-related meeting

12  minutes, the vast majority of which are irrelevant to this case, into a simple 11-page chart with

13  relevant excerpts.  Where, as here, "the underlying documents were available for inspection by

14  the defendants," the summary exhibit is "admissible under Fed. R. Evid. 1006."  *Phoenix v.*

15  *Com/Systems, Inc.*, 706 F.2d 1033, 1038 (9th Cir. 1983).

16                              **CONCLUSION**

17       In an interview a few weeks ago, Apple's Chief Executive Officer Tim Cook explained

18  the significance of this case for Apple.  "[I]t is important for Apple not to be the developer for the

19  world," Mr. Cook said. "We just want other people to invent their own stuff."[14]

20       Apple looks forward to a trial that will vindicate its intellectual property rights.  Samsung

21  must play by the rules.  It must invent its own stuff.  Its flagrant copying and massive

22  infringement must stop.

23

24

25

26

27

---

28  [14] http://allthingsd.com/20120611/apples-tim-cook-says-hello-the-full-d10-interview-video/.

sf-3170923

Dated: July 23, 2012                    MORRISON & FOERSTER LLP


                                        By:  _____/s/ _Michael A. Jacobs_____
                                                MICHAEL A. JACOBS

                                             Attorneys for Plaintiff
                                             APPLE INC.

sf-3170923