# Exhibit 8
# (Submitted Under Seal)

Highly Confidential - Outside Counsels' Eyes Only

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                   SAN JOSE DIVISION
 4
 5   APPLE INC., a California
     corporation,
 6
                 Plaintiff,
 7
     vs.                           CASE NO.  11-cv-01846-LHK
 8
     SAMSUNG ELECTRONICS CO.,
 9   LTD., a Korean business
     entity; SAMSUNG ELECTRONICS
10   AMERICA,INC., a New York
     corporation; SAMSUNG
11   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited
12   liability company,
13              Defendants.
     _____/
14
15
16        H I G H L Y   C O N F I D E N T I A L
17         O U T S I D E  C O U N S E L  O N L Y
18
19      VIDEOTAPED DEPOSITION OF JONATHAN IVE
20            SAN FRANCISCO, CALIFORNIA
21            THURSDAY, DECEMBER 1, 2011
22
23   BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR
24   CSR LICENSE NO. 9830
25   JOB NO. 43920
```

Highly Confidential - Outside Counsels' Eyes Only

Page 5

1       MR. ZHANG:  Patrick Zhang, Morrison &
2  Foerster, for Apple.
3       THE VIDEOGRAPHER:  Will the court reporter
4  please swear in the witness.
5
6                    JONATHAN IVE,
7           having been sworn as a witness
8         by the Certified Shorthand Reporter,
9                 testified as follows:
10
11      THE VIDEOGRAPHER:  You may proceed.
12
13             EXAMINATION BY MR. ZELLER
14      MR. ZELLER:  Q.  Good morning.
15   A   Good morning.
16   Q   I understand you've had the pleasure of being
17  deposed at least a couple of times before, but one, if
18  I understand correctly, and tell me if -- if you
19  recall this, was a case called Apple versus Future
20  Power?
21   A   Yes, I do recall.
22   Q   All right.
23      And generally speaking, that was about the
24  iMac?
25   A   Yes.

Highly Confidential - Outside Counsels' Eyes Only

Page 38

1  insofar as it's describing the iPhone?
2      A    I do agree with that statement.
3      Q    And is there anything about the external
4  outward appearance of the hardware of the iPhone that,
5  in your view, makes it more accessible, easier to use
6  and -- and much less technically intimidating than --
7  than previously available devices?
8           MR. JACOBS:  External -- objection; vague.
9           THE WITNESS:  Could you just repeat that.
10          MR. ZELLER:  Sure.
11          If we can read it back, please.
12          (Whereupon, record read by the Reporter as
13  follows:
14          "Q.  And is there anything about the external
15              outward appearance of the hardware of the
16              iPhone that, in your view, makes it more
17              accessible, easier to use and -- and much
18              less technically intimidating than -- than
19              previously available devices?")
20          THE WITNESS:  Yes, I believe there are
21  aspects of its appearance that consequently, it has
22  that effect and that result.
23          MR. ZELLER:  Q.  And please tell me what, in
24  your view, about the outward appearance, the external
25  hardware of the -- the iPhone, makes it more

Highly Confidential - Outside Counsels' Eyes Only

Page 39

1  accessible, easier to use and -- and less technically
2  intimidating.
3      A   I think something that is beautiful, that is
4  simple, that's calm, that has clarity, from my
5  experience, people are not intimidated by products
6  that have that appearance.  They don't perceive them
7  to be complex and difficult to use because of the
8  appearance of simplicity, of order, of calm.  And I
9  think products that are beautiful, people like to use.
10     Q   And you used the word "clarity."  What do you
11 mean by clarity in the context that we're talking
12 about here; specifically, the -- this external
13 appearance of the iPhone?
14     A   I think clarity comes with some -- some order
15 and is consequent to -- to simplicity.
16     Q   And what do you mean by "simplicity" in this
17 context as a -- as a designer?
18     A   That you are trying to communicate a
19 hierarchy of what's important, and that you work to
20 get rid of distractions.
21     Q   In the context of the -- the iPhone design,
22 what would you consider to be distractions?
23         MR. JACOBS:  Objection; form.
24         THE WITNESS:  I -- I -- I don't really
25 understand the question.  I just said in the iPhone

Highly Confidential - Outside Counsels' Eyes Only

Page 40

1  design, we -- we try to make it simple.
2          MR. ZELLER:  Right.  I understand.
3          THE WITNESS:  So --
4          MR. ZELLER:  And so --
5          THE WITNESS:  -- are you talking generally?
6          MR. ZELLER:  Yeah.
7      Q   And, of course, any time that I ask an
8  unclear question, which will certainly happen today,
9  just speak up, and I'm happy to rephrase it.
10     A   Yes.
11     Q   You mentioned that, yes, affirmatively what
12 you were trying to do and -- and wanted to do as part
13 of the iPhone design was to work to get rid of
14 distractions, as you said.
15         And -- and what I'm really trying to find out
16 is, is that were there -- were there design components
17 or elements that were at one point potentially part of
18 the iPhone design that you considered to be a
19 distraction and, therefore, eliminated it?
20     A   An example of a potential distraction could
21 be fasteners that hold case parts together.  The most
22 typical fastener used in products of the iPhone scale
23 would be a screw.  So in many products you'll see
24 multiple screw heads and holes.
25         It is often believed that there is a

Page 41

1  functional imperative to have screws.  It certainly
2  makes the product easier to design, easier to
3  manufacture, normally cheaper.
4           And so, for example -- this is just one -- we
5  work very hard to try and develop architectures to
6  develop a process and a method of assembly, a
7  structural story, so that we don't have visible
8  fasteners on the outside of the product.
9       Q   During the -- the course of the design and
10 development of the iPhone itself, the first iPhone,
11 were there any aspects of the design that you
12 personally looked at and -- and said that was a
13 distraction and, therefore, got rid of it?
14          MR. JACOBS:  Objection; form.
15          THE WITNESS:  I specifically recall working
16 on the design and detailing of -- of screws.  The
17 process is so fluid and is a constant series of
18 conversations that I know that I cannot specifically
19 recall the many instances when we're talking about how
20 to best create a -- a beautiful hierarchy for the
21 product.
22          MR. ZELLER:  Q.  Do you recall any iteration
23 of the first iPhone design that Steve Jobs looked at
24 and considered to be a distraction and told people he
25 thought it was a distraction?

Highly Confidential - Outside Counsels' Eyes Only

Page 44

1  design that you wanted to come up with, the -- for
2  the -- the first iPhone could be undermined by certain
3  features.
4      A   Yes.
5      Q   And you had mentioned among them putting,
6  say, for example, the FCC regulatory artwork or
7  barcodes or other matter on that front flat surface as
8  examples of something that could undermine the design
9  that you were going for.
10     A   Yes.
11     Q   And so my question is:  Would you put in that
12 same category as other kinds of writing or other kind
13 of matter on the front flat surface that would
14 undermine that design to include a company name or
15 logo?
16     A   I understand.
17         No.  I would see the -- I think a logo -- a
18 company logo, I think, is in a very different category
19 from barcodes and regulatory icons.
20     Q   And why do you say that?
21     A   Because it's your brand.  We use our logo in
22 many different contexts.  I think it's a beautiful
23 logo.
24         So the decision not to include the logo or
25 the word "Apple" wasn't because we were concerned that

Highly Confidential - Outside Counsels' Eyes Only

Page 45

1  that would undermine our design story and intent and
2  goal.  It's just that we were confident that the phone
3  we were developing was going to be distinct and
4  beautiful, would be -- be new, would be recognizable,
5  and like the iPod, would become synonymous with the
6  brand.
7       Q   Why is it that the various versions of the
8  iPhones only have a -- a single button on the front
9  surface?
10      A   We were very clear at the early stages, as I
11 described previously, that for -- for this idea of
12 this infinity edge pool, this -- this oily pond, to --
13 to actually work, there couldn't be multiple buttons
14 or features that would distract and make -- and
15 undermine that design goal.
16          And I do remember from some of the earliest
17 stages of working on the program that we -- that we
18 drew a simple circular button, and we tried to balance
19 that with a centered display, and then the rectangular
20 receiver slot with radio sensor at either end.  So
21 we -- from the -- the earliest sketches, we -- we had
22 details like that, and that they did not seem to -- to
23 undermine the design intent.
24          I actually think the round -- the circular
25 button is really quite beautiful.  It's concave.  It

Page 46

1  has a gentle -- a gentle, very large radius, concave
2  section.
3      Q   From your perspective, is that design of
4  the -- the single home button that we're talking about
5  here on the front surface of the iPhone design, an
6  important part of -- of the overall aesthetic of it?
7      A   It's a part of the aesthetic.  I think
8  it's -- it's not as important as, you know, this flat
9  infinity edge pool.  It's not as important, in my
10 mind, as, you know, this thin, constant-sectioned
11 bezel that just delicately wraps around the perimeter,
12 remaining constant.  But it's an element that is -- I
13 think is beautiful and I think -- I think doesn't
14 undermine the design intent at all.
15     Q   In your view, if the original iPhone looked
16 exactly the same as it went to market, but it didn't
17 have any button on the front flat surface, do you
18 think that would make it a different design, in your
19 view?
20         MR. JACOBS:  Objection; form.
21         THE WITNESS:  Can you -- could you repeat
22 that, please.
23         MR. ZELLER:  Sure.
24     Q   If -- if the iPhone design --
25     A   Yes.

Highly Confidential - Outside Counsels' Eyes Only

Page 63

1   design that --
2       A   Yes.
3       Q   -- you did see previously?
4       A   Yes.
5       Q   And do you generally recognize what's
6   depicted here as a printout of a -- a CAD design that
7   was -- was generated in connection with the first
8   iPhone?
9       A   Yes, I recognize this as the design -- one
10  of -- one of many, but the design that I drew the
11  section for you.
12      Q   And for the record, you're referring to
13  the -- the drawing that you made that we marked as
14  Exhibit 1176?
15      A   So, for example, you can see that on the --
16  the second page.
17      Q   And when you say "the second page," you're
18  referring to the second page of images that's part of
19  Exhibit 1 that we're talking about?
20      A   That's right.
21      Q   And, generally speaking, do you recognize
22  this design that's shown here in the CAD printout
23  that's Exhibit 1 to Mr. Stringer's declaration as
24  being one of the designs that was -- was considered
25  but ultimately rejected for the original iPhone?

Highly Confidential - Outside Counsels' Eyes Only

Page 64

1   A   Yes, I do.
2   Q   And what were the reasons why the design
3   that's shown here in -- in Exhibit 1 was rejected?
4   A   I remember -- I don't have complete
5   recollection of discussions with Steve and the team.
6   I have a recollection that Steve thought it was ugly.
7       It was refined, and we had spent -- we had
8   some fairly detailed models that were made.  So the
9   discussions were around models, not the -- the CAD.
10  And I think that we collectively felt that we could
11  make something more beautiful than this.
12  Q   Focusing on the design that's shown here as
13  part of Exhibit 1 to Mr. Stringer's declaration, do
14  you believe that this -- this design here distracts in
15  any way from the display?
16  A   No.  I think this design -- no.
17  Q   Was the fact that it had these edges on the
18  front surface around the -- the display, in other
19  words, part of the metal surface, actually was on the
20  front surface, one of the reasons it was rejected?
21  A   No.
22  Q   Was that --
23  A   Not that I recall.
24  Q   Was there ever any discussions there within
25  Apple about the -- the fact that this design that's

Highly Confidential - Outside Counsels' Eyes Only

Page 65

1  shown here in Exhibit 1 had a rim or -- or metal on
2  the front surface that distracted from the display?
3     A   No.  My recollection of the -- the discussion
4  relating to this was just that it -- it wasn't truly
5  beautiful.
6         You see, the -- the clear material was
7  coplanar with -- with the shell, with the body.  What
8  I mean by that, it was a continued -- continuous
9  surface.
10        And so this design, I think, very
11 successfully -- very successfully featured the
12 display.  It has equal borders on the forehead and the
13 chin.  It has equal -- that the distance is -- is the
14 same on both the right- and left-hand side.  The clear
15 material was -- I actually remember quite specifically
16 just the detail of the junction between the clear
17 material and the other aluminum.
18        And so I think this design was really --
19 really quite successful in -- in establishing a
20 hierarchy where the display was visually distinct and
21 special, but I remember that we just didn't think that
22 it was -- was beautiful.  We thought we could do
23 better.
24    Q   Any other reasons you can recall this -- this
25 design being rejected?

Highly Confidential - Outside Counsels' Eyes Only

Page 66

1    A    No.  What I recall was, I recall the word
2 "ugly," and I recall the sentiment that we could do
3 better, that we could make a more beautiful, a more
4 distinctive phone.
5    Q    Any other reasons you can remember?
6    A    That's my recollection.
7    Q    If you can please take a look at the page 3
8 in Mr. Stringer's declaration, which is Exhibit 1161.
9         You'll see in paragraph 10 he's talking here
10 about the development of the -- the first iPhone, and
11 he says:
12         "In fact, as late as March 2006, the
13 industrial design team was working on a detailed
14 proposal for a very different iPhone design."
15         Do you see that language?
16    A    Yes, in paragraph 10.
17    Q    Right.
18         And then it continues on in paragraph 11
19 where he's discussing the exhibits, including the
20 exhibit that we just talked about, and he says:
21         "Attached as Exhibits 1 through 6 are CAD
22 renderings of some of the alternate iPhone designs we
23 pursued and considered during the development process
24 for the iPhone."
25         Do you see that part?

Highly Confidential - Outside Counsels' Eyes Only

Page 227

1   A   That's right.
2   Q   Got it.
3       MR. JACOBS:  Can we take a couple of minutes?
4       MR. ZELLER:  Sure.
5       THE VIDEOGRAPHER:  One moment, please.
6       We're off the record at 8:26 p.m.
7       THE REPORTER:  6:28.
8       (Recess taken.)
9       THE VIDEOGRAPHER:  We are back on the record
10  at 6:36 p.m.
11      You may proceed.
12      MR. ZELLER:  Q.  Sequentially, was the idea
13  for having an oily pond or infinity edge pool as the
14  design done first for the tablet, or the phone, or the
15  iPod Touch?
16  A   Well, as an idea, that -- that is a -- as a
17  thought, as a story, the first explorations of that, I
18  think, occurred with the -- the first explorations
19  associated with the iPad.
20      I can't remember when.  I wouldn't begin to
21  know when I could put a date on that, but I think
22  that's something that we found significant and
23  beautiful and had a particular relevance to handheld
24  products that featured a display and that was combined
25  with touch sensors and multi-touch technology.

Highly Confidential - Outside Counsels' Eyes Only

Page 228

1    So I think we -- we started exploring designs
2 around that story really fairly early on.
3    Q   All right.
4       And sequentially that was first with the
5 tablet design?
6    A   Yes; I think that -- my recollection was
7 that's the first time that we were working on a
8 handheld design that had this multi-touch capability
9 that allowed you to touch it with your finger, so I
10 think that was really the first time we explored
11 designs as part of that story.
12   Q   And then sequentially, as part of the -- the
13 story that we're talking about, the oily pond or the
14 infinity --
15   A   Yes.
16   Q   -- pool, was next the iPod Touch or the
17 iPhone?
18   A   It would have been whatever product came --
19 came next.
20   Q   Do you remember which one that was?
21   A   I'm afraid I don't.
22   Q   And, in your view, was this design story or
23 design goal of an oily pond or infinity edge pool met
24 with the iPad and iPad 2 designs?
25   A   I think they are examples that reflect that

Page 229

1  thinking.
2      Q   Did it -- in your view, did those designs
3  fall short of that goal in any way of this -- this
4  oily pond or this infinity edge pool story?
5      A   I don't know if I would say they -- they fell
6  short.  I think they are reflections of the goals that
7  we set ourselves and the interests that we -- we had
8  in trying to create a beautiful product that -- that
9  featured this clear material that extended to the
10 edge, extended to the perimeter of the product.
11         So I think they were reflections of that
12 thinking that we were happy with.
13     Q   And -- and focusing just on this, this fact
14 of the oily pond or the infinity edge pool, one aspect
15 of the design that you mentioned achieving that goal
16 is the fact that the front surface of these electronic
17 devices that we're talking about has a flat,
18 continuous surface on the front.
19     A   Yes, that was an aspect of that exploration,
20 that discussion, that story.
21     Q   What else, in your view, achieves that
22 effect, specifically of the oily pond or the infinity
23 edge pool effect, beyond, as we just talked about,
24 the -- the continuous flat surface?
25     A   So what we were interested in was that flat

1    A    Right.  I see.

2    Q    -- do you have any -- any knowledge or
3  information as to whether or not there are any use
4  advantages in having a symmetrical presentation of a
5  display with a mobile device?

6    A    No.  Based on my experience, based on what I
7  know today, I would only continue to be aware of the
8  functional -- the manufacturing, the engineering, the
9  multiple aspects of the engineering challenges as a
10 result of -- of having the -- the display centered.

11   Q    Can you -- can you think of any engineering
12 advantages or utilitarian advantages at all to having
13 the symmetrical presentation?

14        MR. JACOBS:  Objection; asked and answered.

15        THE WITNESS:  The -- the advantage that I can
16 think of, I -- I can answer that generally.  The
17 advantage I could -- you know, I thought of during the
18 development was that it was beautiful.  That was the
19 advantage I remember.  That's the advantage I'm aware
20 of now.

21        MR. ZELLER:  Q.  Any others?

22   A    That it was beautiful and I think enabled
23 the -- the story that we were so interested in in
24 terms of this, this infinity edge pool, this black
25 oily pond.

Highly Confidential - Outside Counsels' Eyes Only

Page 256

1         CERTIFICATE OF REPORTER

2

3

4      I, ANDREA M. IGNACIO HOWARD, hereby certify

5  that the witness in the foregoing deposition was by me

6  duly sworn to tell the truth, the whole truth, and

7  nothing but the truth in the within-entitled cause;

8

9      That said deposition was taken in shorthand

10 by me, a Certified Shorthand Reporter of the State of

11 California, and was thereafter transcribed into

12 typewriting, and that the foregoing transcript

13 constitutes a full, true and correct report of said

14 deposition and of the proceedings which took place;

15

16     That I am a disinterested person to the said

17 action.

18

19     IN WITNESS WHEREOF, I have hereunto set my

20 hand this 2nd day of December, 2011.

21

22     _____

23 ANDREA M. IGNACIO HOWARD, RPR, CCRR, CLR, CSR No. 9830

24

25