# D'AMATO DECLARATION
# EXHIBIT C
# FILED UNDER SEAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN JOSE DIVISION
 4
 5   APPLE INC., a California       )
     corporation,                   )
 6                                  )
                     Plaintiff,     )
 7                                  )
             vs.                    )    No: 11-cv-01846
 8                                  )         LHK
     SAMSUNG ELECTRONICS CO., LTD., )
 9   a Korean business entity;      )
     SAMSUNG ELECTRONICS AMERICA,   )
10   INC., a New York corporation,  )
     SAMSUNG TELECOMMUNICATIONS     )
11   AMERICA, LLC, a Delaware       )
     limited liability company,     )
12                                  )
                     Defendants.    )
13   _____)
14
15         DEPOSITION OF CHRISTOPHER STRINGER
16              Redwood Shores, California
17              Wednesday August 3, 2011
18
19
20
21
22
23   Reported By:
24   LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201
25   JOB NO. 40906
```

Page 5

1       MS. CARUSO:  Margret Caruso, Quinn
2   Emanuel, for Samsung.
3       MR. JACOBS:  Michael Jacobs,
4   Morrison Foerster, for Apple.
5       MR. ZHANG:  Patrick Zhang,
6   Morrison Foerster, for Apple.
7       MS. TIERNEY:  Erica Tierney for
8   Apple.
9       THE VIDEOGRAPHER:  Thank you.
10   Will the court reporter please administer
11   the oath, and we can proceed.
12
13  C H R I S T O P H E R   S T R I N G E R:
14       called as a witness, having been duly
15       sworn by the Certified Shorthand
16       Reporter, was examined and testified as
17       follows:
18  EXAMINATION BY:
19  MR. ZELLER:
20       Q    Good morning.
21       A    Hi.
22       Q    Have you ever had your deposition
23  taken before?
24       A    Yes.
25       Q    On how many times?

1   this is not a corporate topic.
2            MR. ZELLER:  I'm not going to
3       debate with you the scope of the topics
4       right now.
5       Q.   Can you answer the question?
6       A.   Can you please read back the
7   question.
8            (Record read as follows:
9            Question:  My question is:  Why
10           did Apple manufacture, as the
11           iPad, a device that did not look
12           exactly like the device that's
13           depicted in the drawings on
14           Exhibit 8?)
15      A.   This was a design from 2005.  We
16  continued the design process from this point
17  through to the introduction of the product.  We
18  tried many different approaches to details during
19  that time.
20      Q.   I understand you tried different
21  approaches.  I understand it's not the same
22  product, identically.  My question is:  Why not?
23           MR. JACOBS:  Objection.  Asked and
24      answered.
25           THE WITNESS:  Because there's an

1    infinite number of ways that any product
2    can look, and we exhaustively work toward
3    getting the best solution when we release
4    a product.
5        Q.   Did Apple, or anyone else that you
6    know of, create any prototypes that looked
7    identical to the drawings in Exhibit 8?
8        A.   Please be clear on what you mean
9    by "prototypes"?
10       Q.   Any kind of three-dimensional
11   representation, working or non-working?
12            MR. JACOBS:  Objection.  Vague.
13       A.   We make three-dimensional
14   representations of most of the ideas that we
15   consider to be good.  I would expect that we
16   would have built this, but I cannot be absolutely
17   certain in this form.
18       Q.   When was the first three-
19   dimensional representation of what's depicted
20   here in Exhibit 8 created?
21       A.   I would have to look at the
22   records to answer that question.
23       Q.   Have you looked?
24            MR. JACOBS:  Counsel, if I can
25            interrupt at this stage.

1           We have, in preparing this
2  witness for this deposition, located
3  documents that would -- that represent
4  Apple's best ability to respond to
5  questions of this sort.
6           And so rather than ask the
7  witness to memorize all that, we have
8  assembled this material, and -- and this
9  would be the time, given the question
10 you've asked, that I would hand the
11 witness those documents so that he can
12 speak to Apple's best current information
13 on the question you've posed.
14      MR. ZELLER:  And if I can just get
15 some clarification on this.
16          These are materials he did
17 look at before, so he's familiar with
18 them already?
19      MR. JACOBS:  That's correct.
20      MR. ZELLER:  And were these
21 produced previously or are these --
22      MR. JACOBS:  Yes.
23      MR. ZELLER:  -- new?
24      MR. JACOBS:  To my best -- our
25 best information is that all of these

1  some questions about the process of product
2  design as viewed from industrial design at
3  Apple. And I want to start with how does a --
4  how does the product get germinated? How do you
5  come up with the idea for a new product?
6       A.   There is no single path for
7  defining how we come up with a new product at
8  Apple, whether it be a new product platform or a
9  generational change or update. Typically, the
10 design process is a maniacally maintained meeting
11 program where the designers get together to
12 discuss, debate, sketch and conceive of product
13 ideas that is predominantly my exposure to new
14 product invention.
15      Q.   How are the -- describe -- set the
16 scene for us. Describe the kind of meetings that
17 you're referring to?
18      A.   It's actually around the kitchen
19 table. We in a meeting format not dissimilar to
20 this. We just sit around with sketches. We
21 debate. We are harshly critical of each other's
22 ideas. We build on each other's ideas. We
23 celebrate the great ideas. We are constantly
24 searching to create simple, understandable
25 products that are iconic in appearance, which is

1  surprisingly the hardest form of design to be
2  sort of absent of unnecessary decoration or
3  features.
4      Q.   What do you do after a typical
5  meeting with the designs that are still, if you
6  will, on the table?
7      A.   We will take good ideas, and
8  sometimes less good ideas, and we will develop
9  them in three dimensions, using the CAD sculpting
10 group as our resource for doing so.
11     Q.   And what's the mechanism for
12 information transfer to a CAD engineer or CAD
13 operator?
14     A.   The CAD sculptors, we will sit
15 with them, either one on one or multiple
16 designers with a single CAD sculptor, and we will
17 point to the screen, we will show sketches.  We
18 will, on occasion, create our own rudimentary CAD
19 files that we would share with the CAD sculptor
20 as a starting point to make a more sophisticated
21 three-dimensional representation of our ideas.
22     Q.   After CAD drawings are created, is
23 there often another step in reviewing the
24 appropriateness of a particular design?
25     A.   We will take promising designs and

1  we will model them in three dimensions.  We have
2  three-dimensional multi-action milling machines,
3  so we can build models that quite truthfully
4  represent what a product -- to represent a
5  product.
6         Q.    And then what do you do with those
7  models?
8         A.    We bring them back to the design
9  group and we cycle back through the harsh
10 criticisms and the process of isolating the
11 positive attributes that we will keep and
12 continue to iterate as we finesse the design.
13        Q.    So you mentioned continuing to
14 iterate.  What do you mean by that?
15        A.    We quite maniacally will work
16 through any detail, for example, a opening, an
17 enclosure for a camera.  Does it have a trim, is
18 it a thick trim, is it a thin trim, is it a deep
19 trim, is it three-dimensional, is it textured,
20 what material is it, is it made of the same
21 material as the housing?  How do we figure out
22 how to make it the size that we might want it to
23 be?  So we have to do rudimentary sections and
24 consider how the products might be made in order
25 to achieve whatever goal we set for ourselves.

1    Q.   What's the mechanism of
2 interactions between you and people who would
3 actually implement the design?
4    A.   We have -- we are in constant
5 dialogue with the product design department and
6 the operations department, both of whom are
7 critical in the implementation of these designs.
8 We are constantly trading ideas and developing
9 manufacturing techniques and challenging
10 technologies in their form factor in order to
11 cram them into our designs.
12    Q.   Was that process followed with
13 respect to the development, the process you've
14 described in general terms, was that the process
15 that was followed with respect to the development
16 of the iPad?
17    A.   Yes.
18    Q.   So applying that general process
19 to the development of the iPad, did somebody come
20 to the industrial design group and say, we want
21 you guys to design a tablet computer that's, say,
22 got a certain form factor?
23    A.   No.
24    Q.   How did it happen?
25    A.   I do not recall the exact details,

1   designs on it so that the witness could
2   be asked about CAD designs, and I'm
3   holding it for the video camera now.
4   Other than that, I think we are done.
5       MR. ZELLER:  And we obviously
6   reserve our rights and I think you intend
7   to leave, if I understand things
8   correctly.
9       MR. JACOBS:  Off the record.
10      THE VIDEOGRAPHER:  This marks the
11  end of Tape Number 5 of five and
12  concludes today's deposition of
13  Christopher Stringer.  The time is
14  7:04 p.m. and we are off the record.
15      (Time noted:  7:04 p.m.)
16
17
18
19              CHRISTOPHER STRINGER
20
21  Subscribed and sworn to before me
22  This  1st  day of  SEPTEMBER, 2011.
23  _____
24
25

1          C E R T I F I C A T E

2  STATE OF CALIFORNIA   )

3                           )

4  COUNTY OF SAN FRANCISCO )

5      I, LINDA VACCAREZZA, a Certified

6  Shorthand Reporter for the State of

7  California, do hereby certify:

8      That CHRISTOPHER STRINGER, the

9  witness whose deposition is hereinbefore

10 set forth, was duly sworn by me and that

11 such deposition is a true record of the

12 testimony given by such witness.

13     I further certify that I am not

14 related to any of the parties to this

15 action by blood or marriage; and that I

16 am in no way interested in the outcome of

17 this matter.

18     IN WITNESS WHEREOF, I have hereunto

19 set my hand this 3rd day of

20 August, 2011.

21

22 *[signature]*

23 LINDA VACCAREZZA, CSR. NO. 10201

24

25

*Apple v. Samsung*
Case No. 11-CV-01846-LHK

ERRATA SHEET

Deponent: Chris Stringer, on behalf of Apple Inc.
Date: August 3, 2011

| Page | Line(s) | Original Text | Change to Text | Reason for Change |
|---|---|---|---|---|
| 7 | 25 | I'm the director | I'm a director | Transcription error |
| 14 | 3 | Is Director | It's Director | Transcription error |
| 22 | 13 | Because there were | Because they were | Transcription error |
| 24 | 17 | Sidney | Sydney | Transcription error |
| 25 | 15 | Seymore Powel | Seymour Powell | Transcription error |
| 30 | 12-13 | For the purpose that have exhibition there | For the purpose of having exhibitions. There was.... | Transcription error |
| 46 | 12 | Every product that we make it | Every product that we make is | Transcription error |
| 75 | 6 | In a course way | In a coarse way | Transcription error |
| 77 | 22 | The rear house to go a single piece | The rear housing to get a single piece | Transcription error |
| 80 | 14 | Essentially chasse | Essentially a chassis | Transcription error |
| 101 | 21 | Monotone plain | Monotone plane | Transcription error |
| 129 | 12-13 | There was a long, thin rectangle as my best recollection | There was a long, thin rectangle is my best recollection | Transcription error |
| 172 | 21 | It that is multiple meanings | It has multiple meanings | Transcription error |
| 176 | 2 | It is disadvantage | It is a disadvantage | Transcription error |

sf-3035163

1

| Page | Line(s) | Original Text | Change to Text | Reason for Change |
|---|---|---|---|---|
| 192 | 6 | Traces in a grade | Traces in a grid | Transcription error |
| 192 | 11 | That the grids | That the grid is | Transcription error |
| 197 | 8 | The designers are a | The designs are a | Transcription error |
| 200 | 5 | Our CAD sculptures | Our CAD sculptors | Transcription error |
| 208 | 9 | It would be more commercial viable | It would be more commercially viable | Transcription error |
| 231 | 14 | There is a whole slue | There is a whole slew | Transcription error |
| 260 | 20 | Thick, raised bevel | Thick, raised bezel | Transcription error |
| 261 | 21 | Raised thick bevel | Raised thick bezel | Transcription error |
| 275 | 24 | Which aren't very clear | Which are very clear | Transcription error |
| 278 | 25 | Dotted men | Dotted man | Transcription error |
| 286 | 9 | When this patent drawing | What this patent drawing | Transcription error |
| 297 | 20 | Johnny | Jony | Transcription error |
| 297 | 22 | That results | The results | Transcription error |
| 299 | 20 | Cal Cid | Cal Seid | Transcription error |
| 310 | 8 | As I think you've asking me | As I think you're asking me | Transcription error |

Dated: 9-1-11                                         By: _____
                                                           Chris Stringer

[NOTARY BLOCK]