# Exhibit 3
# (Submitted Under Seal)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

APPLE INC., a California corporation,

Plaintiff,

vs. CASE NO. 11-cv-01846-LHK

SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA,INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,

Defendants.

____________________________/

H I G H L Y  C O N F I D E N T I A L
A T T O R N E Y S'  E Y E S  O N L Y

VIDEOTAPED DEPOSITION OF TANG YEW TAN
REDWOOD SHORES, CALIFORNIA
FRIDAY, MARCH 2, 2012

BY: ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR
CSR LICENSE NO. 9830
JOB NO. 47065

Highly Confidential - Attorneys' Eyes Only

Page 2

FRIDAY, MARCH 2, 2012
10:10 A.M.

VIDEOTAPED DEPOSITION OF TANG YEW TAN, taken at QUINN EMANUEL URQUHART & SULLIVAN, LLP, 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California, Pursuant to Notice, before me, ANDREA M. IGNACIO HOWARD, CLR, CCRR, RPR, CSR License No. 9830.

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 3

A P P E A R A N C E S:

FOR APPLE INC.:
MORRISON & FOERSTER
By: ANDREW E. MONACH, Esq.
425 Market Street
San Francisco, California 94105

FOR SAMSUNG ELECTRONICS CO. LTD:
QUINN EMANUEL URQUHART & SULLIVAN
By: MARY H. MCNEILL, Esq.
50 California Street
San Francisco, California 94111

ALSO PRESENT: Aric Kerhoulas, Videographer

---oOo---

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 4

REDWOOD SHORES, CALIFORNIA
FRIDAY, MARCH 2, 2012
10:10 A.M.

THE VIDEOGRAPHER: Good morning. This marks 10:09 the beginning of Disc 1 of the videotaped deposition 10:09 of Tang Yew Tan. 10:09

In the Matter of Certain Electronic Digital 10:09 Media Devices -- I'm sorry -- In the Matter Apple 10:09 versus Samsung Electronics, et al. 10:09

In the United States District Court, for the 10:09 Northern District of California, San Jose Division. 10:09 Case No. 11-CV-01846-LHK. 10:09

This deposition is being held at the office 10:10 of Quinn Emanuel at 555 Twin Dolphin Drive in 10:10 Redwood Shores, California. 10:10

The date today is March 2nd, 2012, and the 10:10 time is approximately 10:10 a.m. 10:10

My name is Aric Kerhoulas from TSG Reporting, 10:10 Incorporated. Our court reporter today is Andrea 10:10 Marie Ignacio, in association with TSG. 10:10

Will counsel please introduce yourselves for 10:10 the record. 10:10

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 5

MS. MCNEILL: Mary McNeill of Quinn Emanuel 10:10 for Samsung. 10:10

MR. MONACH: Andrew Monach, Morrison & 10:10 Foerster, representing Apple and the witness. 10:10

THE VIDEOGRAPHER: If the court reporter will 10:10 please swear in the witness, we can proceed. 10:10

TANG YEW TAN,
having been sworn as a witness
by the Certified Shorthand Reporter,
testified as follows:

EXAMINATION BY MS. MCNEILL 10:10

MS. MCNEILL: Good morning, Mr. Tan. 10:10

**Q How are you today? 10:10**

A Fine, thank you. 10:10

**Q We met briefly earlier, but my name is Mary 10:10 McNeill, and I'm counsel for Samsung, and I'll be 10:11 asking you a few questions today. 10:11**

A Yes. 10:11

**Q Do you understand that you're under oath 10:11 today? 10:11**

A Yes. 10:11

**Q And that your testimony today has the same 10:11 effect as it would if you were in court? 10:11**

TSG Reporting - Worldwide 877-702-9580

2 (Pages 2 to 5)

Highly Confidential - Attorneys' Eyes Only

Page 18

these documents helped refresh your recollection about? 10:26

A Can you -- when you say refresh my memory about, about what? 10:26

**Q That's what I'm trying to determine. You said that you looked at some e-mails that helped refresh your memory about things that had happened. 10:26**

**And I'm trying to decide: What subject matter about the product design of the iPhone did you read about that helped refresh your memory? 10:26**

MR. MONACH: Object to the form of the question. 10:26

THE WITNESS: I cannot remember specific e-mails. Again, there were a lot of e-mails that we went through, so -- 10:26

MS. MCNEILL: Okay. 10:26

**Q And if you could direct your attention back to page 8 of Exhibit 2100, please. 10:26**

**What did you do to prepare yourself to testify about the function or performance benefits of Apple's design patents? 10:27**

MR. MONACH: Object to the form of the question; assuming facts not in evidence, in light of the topics on which this witness was designated in correspondence by counsel. 10:27

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 19

MS. MCNEILL: And to the extent your answer is the same as your answer was with respect to Topic 2, you can state that as well. 10:27

MR. MONACH: Again, I'll -- I'll remind the witness not to disclose any specifics of attorney-client communications. 10:27

THE WITNESS: I met with Andy on Monday, again, for the whole day, and I spoke to my peers, Brian Lynch and John Ternus. 10:27

MS. MCNEILL: Okay. 10:28

**Q Did you do anything different to prepare for Topic 3 as you did to prepare for Topic 2? 10:28**

MR. MONACH: Object to the form of the question to the extent it misstates the scope of the witness' 30(b)(6) designation. 10:28

THE WITNESS: No. They're all part of the same conversation. 10:28

MS. MCNEILL: Q. And do you recall looking at any specific e-mails that helped refresh your memory with respect to Topic 3? 10:28

A No particular communications I remember. 10:28

**Q And directing your attention to the fourth topic below that, did you do anything different to prepare for Topic 4 than you did to prepare for Topics 2 and 3 that we've previously discussed? 10:28**

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 20

A No. 10:28

**Q Did you prepare for Topic 4 the same way you prepared for Topics 2 and 3? 10:29**

A Yes. 10:29

**Q And in preparation for Topic 4, did you review any e-mails that helped refresh your recollection about the subject matter of this topic? 10:29**

A No. 10:29

**Q Do you recall reviewing any documents in general that refreshed your recollection about the subject of Topic 4, any reference or consideration of any Samsung or third-party products by anyone at Apple? 10:29**

A Not that I recollect. 10:29

**Q And did Apple ever consider using curved glass on the front surface of the iPhone instead of flat glass? 10:29**

A Yes. 10:29

**Q And what were Apple's actions with respect to that consideration? 10:29**

A We did a -- we did a feasibility study -- a feasibility study with the cross-functional team. 10:30

**Q I'm sorry. What kind of study did you say? 10:30**

A Feasibility. 10:30

**Q Visibility. 10:30**

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 21

**And what were the results of the visibility study that you performed with the cross-functional team? 10:30**

MR. MONACH: I believe that may miss -- inadvertently misstate his testimony, but let's be clear. 10:30

Did you say visibility or feasibility? 10:30

THE WITNESS: Feasibility. 10:30

MR. MONACH: Feasibility. 10:30

MS. MCNEILL: Okay. 10:30

**Q What were the results of the feasibility study that you performed with the cross-function team with respect to using curved glass on the iPhone? 10:30**

A Our studies showed that it was possible to make a curved glass product. 10:31

**Q And why wasn't curved glass pursued on the iPhone? 10:31**

A We presented the facts to the industrial design team, and they ultimately decide whether it's -- whether they wanted it curved or flat. So I'm not privy to the decisions they make. 10:31

**Q Do you have any understanding of why they made that decision? 10:31**

A No. I'm not part of the industrial design group. 10:31

TSG Reporting - Worldwide 877-702-9580

6 (Pages 18 to 21)

Highly Confidential - Attorneys' Eyes Only

Page 22

**Q But regardless of whether you're part of the specific team, do you have any independent understanding of why the industrial design -- design team decided not to use curved glass on the iPhone? 10:31**
A No. 10:31
**Q And is that your best recollection on the subject of why -- 10:31**
MR. MONACH: Asked and answered -- asked and answered. 10:31
MS. MCNEILL: Q. -- Apple didn't use the curved glass on the iPhone? 10:31
A Yeah, I have no knowledge of what -- how they decided to go with the cover of the glass. 10:31
**Q And what were the facts that you presented to the industrial design team to help inform their decision about using curved glass versus flat glass on the iPhone? 10:32**
A I can't recall the full details because it's been a few years since we've done that. I can't remember the details of it. All I know is that we presented some data, and the details of the data is vague to me. 10:32
**Q And setting aside the specific details of the exact data that you presented, based on your research, do you have an understanding of the different facts 10:32**

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 23

**that were presented with regard to curved glass versus a flat glass? 10:32**
A Again, it's been a while. It's been a few years that we presented the data. I know that we did, but I can't remember the details. 10:33
**Q And setting aside the specific details of the data, do you have any understanding of why it would be more beneficial to use flat glass on the iPhone versus curved glass? 10:33**
MR. MONACH: Object to the form of the question; assumes facts not in evidence; and to the extent it purports to misstate his prior testimony, it misstates his prior testimony. 10:33
THE WITNESS: Again, I have no privy to the decision that's made why they wanted to go flat or curved. The industrial design team basically makes that decision. 10:33
MS. MCNEILL: Q. And separating aside the industrial design team's decision and specific memory about specific facts you presented to them, do you, Mr. Tan, siting here today, have an understanding as to the benefits of using flat glass versus curved glass on a mobile device? 10:34
MR. MONACH: Object to the form of the question; lack of foundation; vague. 10:34

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 24

THE WITNESS: I personally think that both were feasible, and -- and that's the fact that we presented. And that's what -- that's what -- that's what I recollect. 10:34
MS. MCNEILL: Q. And do you have any understanding of why the flat glass was chosen over the curved glass, given that both were feasible? 10:34
MR. MONACH: Objection; asked and answered multiple times. 10:34
You can do it again. 10:34
THE WITNESS: Basically, we presented the facts. The industrial design group made the decision. And because I'm not a part of the industrial design group, I am not privy to any decision that was made. 10:34
MS. MCNEILL: Q. Did Apple ever make any models of phones using curved glass? 10:34
A It has been a few years, but I seem to recollect that. 10:35
**Q And do you recall how many models were made with curved glass? 10:35**
A I can't recollect how many there were made. 10:35
**Q Do you recall who made the phone models that used curved glass? 10:35**
A I can't recollect. 10:35
**Q And do you recall -- or do you know whether 10:35**

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 25

**Apple still has those models? 10:35**
A I don't know. 10:35
**Q And did Apple ever conduct any analyses of the manufacturing feasibility of using curved glass? 10:35**
MR. MONACH: Objection; vague. 10:35
THE WITNESS: I vaguely remember. Again, it's been a few years. My recollection is that we did do a study. 10:35
MS. MCNEILL: Q. And do you recall what the study told you? 10:35
A No, I don't. It's been a few years. 10:35
**Q Do you recall in any way the results of any research performed related to using flat glass versus using curved glass on the iPhone? 10:36**
MR. MONACH: Objection; asked and answered, in part. 10:36
THE WITNESS: Again, I think the -- the study showed that both were feasible, but that's all I can recollect. 10:36
MS. MCNEILL: Q. Do you recall that one was more feasible or cost-effective than the other? 10:36
MR. MONACH: Object to the form of the question. 10:36
THE WITNESS: I don't recollect the cost part of it. 10:36

TSG Reporting - Worldwide 877-702-9580

7 (Pages 22 to 25)

Highly Confidential - Attorneys' Eyes Only

Page 26

MS. MCNEILL: Q. Do you recall whether one was more feasible than the other? 10:36
MR. MONACH: Objection; vague. 10:36
THE WITNESS: I believe both are feasible. 10:36
MS. MCNEILL: And to the extent that both were feasible, do you recall whether one was more feasible than the other? 10:36
MR. MONACH: Objection; asked and answered; vague. 10:36
THE WITNESS: Again, I know -- I know it's feasible, but I don't remember whether one was more than the other. 10:37
MS. MCNEILL: Okay. 10:37
**Q Did Apple ever conduct any analyses of the financial feasibility of using curved glass on the iPhone? 10:37**
A I personally don't recollect. I handle the product design. That's not a group that handles the costing of materials. So I -- I don't recollect the cost analyses of a curved versus flat glass. 10:37
**Q And in preparation for today's deposition, did you review any documents that referenced analyses of the manufacturing feasibility of using curved glass? 10:38**
A No, I did not. 10:38

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 27

**Q And did Apple consider an alternative design for the iPhone with the screen sunken into the body of the phone? 10:38**
A Can you define what "sunken into the body of the phone" means? 10:38
**Q As opposed to a flat continuous surface from edge to edge. Did Apple ever consider an alternative design for the iPhone where the screen was sunken into the body of the phone? 10:38**
A I know that we did review a series of different designs, and yes, that was part of -- that was basically one of the design considerations that were taken into account. 10:38
**Q And what were others? 10:38**
MR. MONACH: Object to the form of the question as being beyond the scope of the 30(b)(6) topics. 10:39
But to the extent you have personal information, you can testify to it. 10:39
THE WITNESS: So this -- you mentioned there's a sunken. There's a flush. Then there's also this -- there's also proud glass, which is classified as curved glass to be a product surface. 10:39
MS. MCNEILL: Okay. 10:39
**Q So you consider proud another way to describe 10:39**

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 28

**what would be -- what we also discuss as being curved glass; is -- is that true? 10:39**
A Yes. 10:39
**Q And why didn't Apple pursue any of those alternative designs, the sunken-in glass or the proud glass? 10:39**
MR. MONACH: Object to the form of the question as assuming facts not in evidence and misstating the prior testimony; vague. 10:40
THE WITNESS: Again, I think we -- we -- from what I recollect, we -- we did our study, we presented our findings to the industrial design group, and they made the decision. 10:40
MS. MCNEILL: Q. And specifically with respect to have -- to the alternative design of the screen that's sunken into the body, what were the results of the study that you performed? 10:40
A It's been a few years since we presented that finding, so I can't recollect exactly. There are some performance -- there are some performance tradeoffs with either a flush or a sub-flush display. 10:40
**Q And do you recall generally what those performance tradeoffs were with respect to the flush or sub-flush display? 10:41**
A Generally, with the screen that's recessed 10:41

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 29

from the surface, there is more protection of the -- the display itself in a -- in a reliability event, yeah. 10:41
**Q And any other general tradeoffs that you can recall with respect to the sunk -- to the flush glass versus the sub-flush display? 10:41**
A I mean, there are other manufacturing considerations that can be taken into account. The execution of it is different. It's -- with a -- with a -- with a sub-flush glass, the -- the way you manufacture the bezel and the -- I mean, the enclosure and the way we architect the display would be very different. 10:41
**Q And how so? 10:41**
A It's -- 10:42
**Q How would the way that you manufacture the enclosure and architecture of the display be different with sub-flush glass? 10:42**
MR. MONACH: Object to form. 10:42
THE WITNESS: Just different forms of -- again, that question is very vague. But with every -- with every different design, there are challenges that go with the fabrication of it. But in -- from what I remember, flush and sub-flush glass were feasible. 10:42
MS. MCNEILL: And separate from whether or 10:42

TSG Reporting - Worldwide 877-702-9580

8 (Pages 26 to 29)

Highly Confidential - Attorneys' Eyes Only

Page 30

not they were feasible, I guess I'm trying to 10:42
determine the manufacturing tradeoffs with respect to 10:42
flush glass versus sub-flush glass. 10:42

**Q Do you remember any of those tradeoffs 10:42**
**generally, aside from the increased protectability 10:42**
**that you discussed earlier? 10:43**

A That's all I can recollect on protectability. 10:43

**Q And do you remember generally the results of 10:43**
**the studies you performed with respect to the proud 10:43**
**glass over flush glass? 10:43**

MR. MONACH: Objection; asked and answered 10:43
about five times. 10:43

You can do it again. 10:43

THE WITNESS: I can't recollect. It's been a 10:43
few years. 10:43

MS. MCNEILL: Q. Why did Apple, despite its 10:43
feasibility, decide not to pursue -- strike that. 10:43

Why didn't Apple pursue the design of 10:43
sunken-in glass? 10:43

A Again, as I mentioned, we presented our 10:43
findings. The industrial design team made the 10:43
decision. 10:44

**Q And do you have any knowledge as to how the 10:44**
**industrial design team came to its decision? 10:44**

A No, I don't. 10:44

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 31

**Q And with respect to the proud glass versus 10:44**
**the flush glass, do you have any knowledge as to how 10:44**
**the design team came to its decision? 10:44**

MR. MONACH: Objection; asked and answered 10:44
about seven times now. 10:44

You can do it again. 10:44

THE WITNESS: Again, I'm not part of the 10:44
industrial design group, so I don't know how they came 10:44
about the decision. 10:44

MS. MCNEILL: Q. Did Apple ever make any 10:44
models of the design with the screen or base plate 10:44
sunken into the phone? 10:44

A Yes. 10:44

**Q Do you know whether Apple keeps these models? 10:44**

A If I recollect, yes. 10:44

**Q Do you know where Apple keeps these models? 10:44**

A I can't recollect, but I -- I can't 10:44
recollect, but I know we do keep prototypes of all 10:45
past experiments. Put one up in the product design 10:45
lab. 10:45

**Q And did Apple ever produce any of these 10:45**
**models to Samsung? 10:45**

MR. MONACH: Objection; lack of foundation; 10:45
calls for speculation; completely outside the scope of 10:45
the 30(b)(6) designations. 10:45

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 32

THE WITNESS: I don't know. 10:45

MS. MCNEILL: Q. Did Apple ever conduct any 10:45
studies or perform any research about whether a 10:45
sunken-in screen would be convenient for a user of a 10:45
touch screen phone compared to a flat screen? 10:45

MR. MONACH: Objection; vague. 10:46

THE WITNESS: What do you mean by "conduct 10:46
any studies or perform any research"? Can you 10:46
elaborate, please? 10:46

MS. MCNEILL: Q. Any sort of investigation. 10:46

Did Apple try to learn any information about 10:46
how users would interact with a sunken-in screen 10:46
versus a flat continuous surface? 10:46

A Not -- not as far as I -- not -- not as far 10:46
as I know. 10:46

MR. MONACH: Before I forget, we've had a 10:46
number of questions about topics and subjects that 10:46
have been Attorneys' Eyes Only. So we will designate 10:46
the entire transcript as Attorneys' Eyes Only under 10:46
the protective order. We also reserve the right to 10:46
have the witness review and correct the transcript. 10:46

MS. MCNEILL: Q. Mr. Tan, were any 10:46
considerations of third-party products made by anyone 10:46
at Apple who made design decisions? 10:46

MR. MONACH: Object to the form of the 10:47

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 33

question as vague. 10:47

THE WITNESS: Yeah. Can you maybe elaborate 10:47
more on "considerations"? I mean, were there any 10:47
considerations of third-party products made by -- what 10:47
do you mean by that? Can you elaborate? 10:47

MS. MCNEILL: Q. What part of that question 10:47
is unclear to you? 10:47

A "Considerations of third-party products," 10:47
what does that mean? Consideration of third-party 10:47
products made by -- 10:47

**Q Do you know what it means to consider 10:47**
**something? 10:47**

A Yes. 10:47

MR. MONACH: Object to the form of the 10:47
question. 10:47

THE WITNESS: So maybe another way to answer, 10:47
we do do competitive take-aparts of other company 10:47
products. 10:48

MS. MCNEILL: Q. And approximately how 10:48
often, would you say? 10:48

A Five, six times a year. 10:48

**Q And are these competitor teardowns made in 10:48**
**connection with each of Apple's major designs, meaning 10:48**
**for the iPhone, the iPad and the iPod Touch? 10:48**

MR. MONACH: Object to the form of the 10:48

TSG Reporting - Worldwide 877-702-9580

9 (Pages 30 to 33)

Highly Confidential - Attorneys' Eyes Only

Page 54

industrial design group kept records of the models it created? 11:42

A I don't know. 11:42

MS. MCNEILL: At this time, I'd like to ask the court reporter to hand Mr. Tan Exhibit 21 -- what has previously been marked as Exhibit 2102, please. 11:43

**Q Mr. Tan, you have in front of you what has been previously marked as Exhibit 2102. I will represent to you that this is a copy of Apple's amended complaint. 11:43**

**If you could please turn to page 10 of Exhibit 2102, and refer your attention to paragraph 34. If you can please read silently while I read aloud: 11:43**

**"The end result is an elegant product that is more accessible, easier to use and much less technically intimidating than previously available smartphones and PDAs." 11:43**

**Do you see where it says that, Mr. Tan? 11:43**

A Yes. 11:44

**Q And do you agree that Apple's product designs create products that are more accessible? 11:44**

MR. MONACH: Object to the form of the question as vague and ambiguous. Object that it's beyond the scope of the 30(b)(6) designation. 11:44

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 55

THE WITNESS: I'm not an expert in user accessibility, so I can't comment to that. 11:44

MS. MCNEILL: Q. And do you agree that Apple's product design makes its products easier to use? 11:44

MR. MONACH: Object to the form of the question as vague and ambiguous and compound. Object that it's beyond the scope of the 30(b)(6) for this witness. 11:44

THE WITNESS: Again, I can't -- I can't speak for all users out there, so I can't -- I can't comment as to whether Apple makes products easier to use. 11:44

MS. MCNEILL: Q. Can you identify any specific source of the design that became the iPhone? 11:44

MR. MONACH: Object to the form of the question as vague and ambiguous. 11:44

THE WITNESS: I don't. 11:45

MS. MCNEILL: Q. Can you identify manufacturing constraints that Apple experienced throughout the process of the design of the iPhone? 11:45

MR. MONACH: Objection; vague; calling for a narrative; compound. 11:45

You can -- you can -- you can answer. 11:45

THE WITNESS: Do you have a particular iPhone in mind, or is this a vague -- a general -- when you 11:45

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 56

said "iPhone," is there a particular model in particular? 11:45

MS. MCNEILL: Q. For purposes of this question, we'll stick with the original iPhone model. 11:45

A Okay. 11:45

MR. MONACH: Same objection. 11:45

You can answer. 11:45

THE WITNESS: There -- there were -- I do recollect vaguely some manufacturing challenges. 11:45

MS. MCNEILL: Q. And which manufacturing challenges do you recall with respect to the original iPhone? 11:45

A There were challenges in making a high polish, high hardness, what we call a bezel, the -- the metal ring that goes around the front of the phone. 11:46

I remember manufacturing challenges in making flat pristine glass with a lot of detailed feature that is -- that is added into the glass itself. For example, the opening for the receiver part, the menu button, and also the -- the edge details on the glass. 11:46

I do remember manufacturing challenges in making the aluminum enclosure for the back housing and keeping to the exact geometry that is defined by the industrial design group. 11:46

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 57

**Q And any other manufacturing constraints with respect to the original iPhone you can think of? 11:46**

A Not that I can recollect at this moment. It's been a few years. 11:47

**Q And you testified that Apple experienced manufacturing constraints with respect to the bezel of the original iPhone. Can you tell me a little bit about those, please. 11:47**

MR. MONACH: Object to the extent it slightly misstates the prior testimony. 11:47

You can answer. 11:47

THE WITNESS: So it was very clear from the industrial design group that they -- they wanted a high polish ring of -- a high polish ring of steel around the -- the glass. So we -- we had -- we had to work closely with the manufacturers in Asia to achieve that using -- especially using a high -- a grade of high hardness stainless steel. 11:47

MS. MCNEILL: Q. And in working closely with manufacturers in Asia to develop this feature, what specific manufacturing constraints did you encounter? 11:47

A The fact that we actually had to achieve the -- the geometry, the look that the industrial design group was -- was pushing for. 11:48

**Q And what about the geometry that the 11:48**

TSG Reporting - Worldwide 877-702-9580

15 (Pages 54 to 57)

Highly Confidential - Attorneys' Eyes Only

Page 58

**industrial design group was pushing for created 11:48**
**manufacturing constraints? 11:48**
MR. MONACH: Object to the form of the 11:48
question. 11:48
You can answer. 11:48
THE WITNESS: Yes, it's -- it's a -- it's a 11:48
complex surface that we -- it's a complex surface to 11:48
manufacture. 11:48
MS. MCNEILL: Q. And why is that? 11:48
A The geometries that were given to us by the 11:48
industrial design group were not geometric surfaces. 11:48
They are splined surfaces, so you -- it's -- it's more 11:48
challenging to make splined surfaces. 11:48
**Q And what do you mean they're not geometric, 11:48**
**they're splined surfaces; what do you mean by that? 11:49**
A So splined surfaces are surfaces that cannot 11:49
be defined by geometry, by dimensions. You can't put 11:49
a particular dimension to it. They are basically 11:49
surfaces that are indeterminate. They are -- from my 11:49
understanding of this, they are surfaces that are 11:49
complex. 11:49
So say, for example, if you have something 11:49
that looks like a circle, you could represent it as a 11:49
circle with a certain dimension, or it could be a 11:49
splined circle with subtle geometric changes. So it's 11:49

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 59

a very subtle detail in between a spline and 11:49
geometric. 11:49
So it's -- a lot of the industrial design 11:49
surfaces are splined surfaces, and we always make it 11:49
to the -- we try to make it to the industrial design 11:49
surfaces. So there are definitely manufacturing 11:50
challenges. 11:50
**Q And you mentioned that you try to make it to 11:50**
**the industrial design surfaces. Are there instances 11:50**
**you can recall where you weren't capable of making it 11:50**
**to that industrial design team's specifications? 11:50**
A Not as I can -- not that I can recollect. 11:50
We -- we make our products to the surface as 11:50
defined by industrial design. Even when it's 11:50
difficult to do it, we do it. 11:50
**Q And are there any instances you can recall 11:50**
**where specifications from the industrial design group 11:50**
**were modified based on manufacturing constraints with 11:50**
**the original iPhone? 11:50**
A Not that I can recollect. 11:50
**Q And you mentioned that the industrial design 11:50**
**team wanted a ring of steel on the original iPhone. 11:50**
**Do you have an understanding as to why? 11:50**
A No. I am not part of the industrial design 11:51
group, so I don't know what drove that motivation. 11:51

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 60

**Q And what manufacturing constraints did Apple 11:51**
**experience with respect to the flat pristine glass of 11:51**
**the original iPhone? 11:51**
A Like I mentioned, when we -- when we 11:51
manufactured this glass, there are some small details 11:51
in the glass -- for example, the opening for the 11:51
receiver and the menu button -- that required precise 11:51
manufacturing that added a lot of processes and steps. 11:51
And also, the -- because it's glass, we have 11:51
to treat the edge of the glass and add a chamfer, 11:51
subtle details that will make the -- the -- the 11:51
product according to industrial design's goal. 11:51
**Q And any other such subtle details you can 11:52**
**think of? 11:52**
MR. MONACH: Objection; form. 11:52
THE WITNESS: It had to be flat. The 11:52
industrial design wanted it to be flat. 11:52
MS. MCNEILL: Q. And were there any 11:52
manufacturing constraints or issues that Apple 11:52
encountered in the course of making the design flat? 11:52
A There are definitely challenges in making it 11:52
flat to the specification ID wanted. It was very 11:52
challenging, but we were able to do it with a lot of 11:52
work and a lot of processes. 11:52
**Q Was it more challenging or less challenging, 11:52**

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 61

**to your knowledge, than it would have been to create a 11:52**
**curved glass surface for the iPhone? 11:52**
MR. MONACH: Objection; vague; lack of 11:52
foundation; incomplete hypothetical. 11:52
THE WITNESS: As far as I know, we can -- we 11:52
can also fabricate curved glass. Is it more difficult 11:52
or less difficult? I am in no position to say. 11:53
MS. MCNEILL: Q. What were the manufacturing 11:53
challenges that Apple experienced with respect to the 11:53
receiver opening on the glass of the iPhone? 11:53
A If you -- if you actually looked at the 11:53
detail of the opening of the glass itself, there is a 11:53
subtle chamfer. Basically, it's a -- we call it a 11:53
chamfer, which is a bevel on the glass. And so 11:53
getting that precise angle in a glass was a challenge. 11:53
Getting it to the level of polish and finish 11:53
that the industrial design group wanted was a big 11:53
challenge. 11:53
**Q And can you think of any functions served by 11:53**
**the chamfer that you mentioned? 11:53**
MR. MONACH: Objection; vague. 11:53
THE WITNESS: As far as I know, that's -- 11:53
that's a detail from the industrial design group that 11:53
they found important, so we were making it according 11:53
to their -- 11:54

TSG Reporting - Worldwide 877-702-9580

16 (Pages 58 to 61)

Highly Confidential - Attorneys' Eyes Only

Page 62

MS. MCNEILL: Q. And do you -- 11:54
A -- request. 11:54
**Q -- do you have any independent knowledge as 11:54**
**to why that feature was considered? 11:54**
A Not that I know of. 11:54
**Q Do you have any knowledge of the function of 11:54**
**the aluminum enclosure for the back housing of the 11:54**
**original iPhone? 11:54**
MR. MONACH: Objection; vague. 11:54
THE WITNESS: I mean, we could make the 11:54
enclosure from any different material, really, 11:54
actually. Is there any functional reason why it's 11:54
aluminum? No. It was basically, again, a direction 11:54
from industrial design that they wanted it made from 11:54
aluminum. 11:54
MS. MCNEILL: Q. And were any other 11:54
materials besides glass considered for the original 11:54
iPhone? 11:54
A Yes. We -- some of the early prototypes we 11:54
actually investigated are using a plastic surface 11:55
rather than glass. 11:55
**Q And why was glass ultimately chosen over 11:55**
**plastic? 11:55**
A I have no knowledge of why they decided 11:55
ultimately to go with glass. But we did do a lot of 11:55

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 63

development with both plastic and glass, and 11:55
ultimately, the choice was to go with glass. 11:55
**Q But you have no personal knowledge as to why 11:55**
**Apple made that choice? 11:55**
A I mean, I can -- I can tell you the benefits 11:55
of -- of glass and plastic. But as to why Apple made 11:55
a decision -- why the industrial design team made a 11:55
decision, no. 11:55
**Q And what are the benefits of glass versus 11:55**
**plastic, as you know? 11:55**
A Glass is a -- is a harder surface. It's -- 11:55
it doesn't scratch as easily. But the downside to 11:55
glass is that it's a very brittle material, and when 11:56
you drop -- when you drop a glass, its likelihood of 11:56
brittle fracture is high compared to plastics, for 11:56
example. 11:56
**Q And aside from it being a hard surface, more 11:56**
**resistant to -- more resistant to scratches, can you 11:56**
**think of any other benefits for glass over plastic for 11:56**
**the surface of a mobile phone? 11:56**
A Nothing I can think of. 11:56
**Q What manufacturing constraints did Apple 11:56**
**experience with respect to the menu button on the 11:56**
**original iPhone? 11:56**
A Can you be more specific in manufacturing 11:56

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 64

constraints. What particular manufacturing 11:57
constraints are you referring to? 11:57
**Q I'm referring to the ones that you test -- 11:57**
**you testified earlier that Apple experienced 11:57**
**manufacturing challenges with respect to the menu 11:57**
**button on the original iPhone. 11:57**
A Well, I meant the -- the menu button opening 11:57
in the glass. 11:57
**Q And what manufacturing constraints did Apple 11:57**
**experience with respect to the menu button -- menu 11:57**
**button opening in the glass? 11:57**
MR. MONACH: Object to the slight 11:57
mischaracterizing of the prior testimony and changing 11:57
of the words. 11:57
You can answer. 11:57
THE WITNESS: Okay. So just to be clear, we 11:57
are talking about the opening of the menu button in 11:57
the glass, similar to the receiver opening in the top. 11:57
It's a hard material to add a hole through. 11:57
Also, if you -- there are some dimensional 11:57
tolerances that -- to keep dimensional tolerances in 11:57
glass exactly to the -- to the requirement that ID had 11:58
is -- is very challenging. 11:58
And also, if you look at the glass, there's a 11:58
subtle chamfer again on the top -- on the top surface. 11:58

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 65

So small details that are difficult to 11:58
add -- that are challenging to add into glass. 11:58
MS. MCNEILL: Q. And can you call -- can you 11:58
recall an instance where some of the details from the 11:58
industrial design team were altered due to 11:58
manufacturing issues or challenges? 11:58
MR. MONACH: Objection; asked and answered. 11:58
THE WITNESS: Are there any -- I mean, we -- 11:58
in the course of working with ID, we do -- we do 11:58
provide feedback on manufacturing challenges, and ID 11:58
sometimes changes just very slightly in fractions of 11:59
millimeters, just very subtle details. 11:59
But as far as I recollect, there's nothing 11:59
that comes to mind. 11:59
MS. MCNEILL: Q. And can you recall 11:59
generally any slight tweaks or changes that any 11:59
industrial design team made as a result of the 11:59
feedback that they were given about the manufacturing 11:59
process? 11:59
A None that I can recollect. 11:59
**Q And can you recall the feedback that you gave 11:59**
**to the industrial design team with respect to the 11:59**
**original iPhone's bezel -- the manufacturability of 11:59**
**the original iPhone's bezel, I should say? 11:59**
A I don't remember specific feedback that I 11:59

TSG Reporting - Worldwide 877-702-9580

17 (Pages 62 to 65)

Highly Confidential - Attorneys' Eyes Only

Page 74

**to the industrial design team with respect to the substantial black borders on Apple products?** 12:09

A In particular to the iPhone, I know that we give them feedback that we could change that -- that black border to -- to certain dimensions that they were asking for, and we give them some options, but ultimately, they decided what it needed to be -- what they wanted it to be. 12:09

**Q And what was the feedback that you gave them about the borders?** 12:09

MR. MONACH: Objection; asked and answered. 12:10
You can do it again. 12:10

THE WITNESS: Yeah. I mean, I especially remember them asking us to look at different steps in the width of the black border. We provided an analysis, and then they ultimately decided what they want the black border width to be. 12:10

MS. MCNEILL: Q. And did the analyses that your team provided the industrial design team, to your knowledge, guide their decision about how the black border should be? 12:10

MR. MONACH: Objection; lack of foundation. 12:10

THE WITNESS: From what I recollect, it was basically possible to do it in the different width that they requested. It was ultimately their decision 12:10

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 75

to choose which one they wanted. 12:10

MS. MCNEILL: Q. And did they consider your feedback and the data that your team provided in coming to that decision, to your knowledge? 12:10

A To my knowledge, not that I know of. 12:10

**Q Can you think of another reason why they would ask you to perform that research other than to consider the results of it?** 12:11

MR. MONACH: Object to the form of the question as vague and calling for speculation. 12:11

THE WITNESS: Again, as to why they would ask me, I am responsible for product design on phones, so they wanted us to understand the manufacturing feasibility, the design feasibility of it. 12:11

MS. MCNEILL: Q. And your understanding about the manufacturing and design feasibility of the black borders, is that the -- what is your understanding about the manufacturing and design feasibility of the black borders? 12:11

MR. MONACH: Objection; vague; asked and answered to some degree. 12:11
You can do it again. 12:11

THE WITNESS: So from what I recollect, basically, their request was to look at different border width, and we provided analysis -- 12:11

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 76

MS. MCNEILL: Q. What were the different widths that were -- 12:11

MR. MONACH: I don't think he was finished. 12:11
Go ahead. 12:11

THE WITNESS: And it was basically the industrial design team who ultimately decided what they wanted. 12:12

MS. MCNEILL: Q. And what were the different widths that were presented? 12:12

A I can't remember the specifics of the widths. It's been a few years. 12:12

**Q And can you remember any manufacturing constraints or issues with respect to any of the widths that the industrial design team provided you with?** 12:12

A Honestly, I can't remember, and -- yeah. 12:12

**Q Directing your attention back to Exhibit 2102, line 12, do you see where it says:**
**"A matrix of colorful square icons with evenly rounded corners."** 12:12

A I do see that statement on line 12, yes. 12:12

**Q Did you provide any manufacturability feedback to the industrial design team about that aspect of Apple's product design?** 12:12

A No. 12:13

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 77

**Q Can you identify any specific source of the design that ultimately became the iPad?** 12:13

MR. MONACH: Objection; lack of foundation; outside the scope of the 30(b)(6). 12:13
You can testify to your knowledge or understanding. 12:13

THE WITNESS: Again, I'm not part of the industrial design group. I can't tell, no. 12:13

MS. MCNEILL: Q. Do you have any independent recollection about the design process of the iPad? 12:13

A Do you have any -- not -- 12:13

MR. MONACH: Same -- pardon -- same objection. 12:13

THE WITNESS: So I did not work on the development of iPad 1 and iPad 2, so... 12:13

MS. MCNEILL: Q. Did you work on the development of a tablet computer in your early tenure at Apple? 12:14

A Yes, I did. 12:14

**Q And approximately when did you begin working on the tablet computer?** 12:14

A I can't recollect exactly, to be honest. 12:14

**Q Would you recollect the general year that you began work on the tablet computer?** 12:14

A I can't recollect the exact year. 12:14

TSG Reporting - Worldwide 877-702-9580

20 (Pages 74 to 77)

Highly Confidential - Attorneys' Eyes Only

Page 102

CERTIFICATE OF REPORTER

I, ANDREA M. IGNACIO HOWARD, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings which took place;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of March 2012.

____________________________________

ANDREA M. IGNACIO HOWARD, RPR, CCRR, CLR, CSR No. 9830

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 103

I N D E X

DEPOSITION OF TANG YEW TAN

EXAMINATION

| | PAGE |
|---|---|
| BY MS. MCNEILL | 5 |

E X H I B I T S

| EXHIBIT | PAGE |
|---|---|
| Exhibit 2100 Samsung's Amended First 30(b)(6) Deposition Notice to Apple Inc. (Design and Trade Dress Topics); 10 pgs. | 6 |
| Exhibit 2101 Black & White Photos, Bates Nos. APLNDC-NCC00000274 - '76; 3 pgs. | 37 |
| Exhibit 2102 Amended Complaint for Federal False Designation of Origin and Unfair competition, Federal Trademark Infringement, Federal Trade Dress Dilution, State Unfair Business Practices, Common Law Trademark Infringement, Unjust Enrichment, and Patent Infringement; 64 pgs. | 49 |

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 104

E X H I B I T S (Continued.)

| EXHIBIT | PAGE |
|---|---|
| Exhibit 2103 Black & White Photos, Bates Nos. APLPROS0000018778 - '98; 21 pgs. | 79 |
| Exhibit 2104 Apple Confidential - Need to Know Q79 Vision, Bates Nos. APLNDC00011071 - '75; 5 pgs. | 81 |
| Exhibit 2105 12-7-03 E-mail String, Subject: Picvue Visit preparation, Bates Nos. APLNDC00033885 - '87; 3 pgs. | 83 |
| Exhibit 2106 12-11-03 E-mail String, Subject: Wintek 12_11_03 update, Bates Nos. APLNDC00033903 - '09; 7 pgs. | 86 |
| Exhibit 2107 1-9-04 E-mail String, Subject: Re: Active area of display, Bates Nos. APLNDC0002237653 - '54; 2 pgs. | 88 |
| Exhibit 2108 5-25-04 E-mail String, Subject: Re: ESD for Q79 Zephyr, Bates Nos. APLNDC0001247400 - '401; 2 pgs. | 92 |
| Exhibit 2109 9-20-04 E-mail String, Subject: Re: Picvue, Bates Nos. APLNDC00033643 - '645; 3 pgs. | 95 |

///

///

TSG Reporting - Worldwide 877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 105

E X H I B I T S (Continued.)

| EXHIBIT | PAGE |
|---|---|
| Exhibit 2110 9-21-04 E-mail String, Subject: Re: RD's opinion about the technology of capacitive T/P, Bates Nos. APLNDC00033646 - '51; 6 pgs. | 95 |

---oOo---

TSG Reporting - Worldwide 877-702-9580

27 (Pages 102 to 105)