# Exhibit 6
# (Submitted Under Seal)

Highly Confidential - Outside Counsel's Eyes Only

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN JOSE DIVISION
 4
 5   APPLE INC., a California
     corporation,
 6
                  Plaintiff,
 7
     vs.                        CASE NO.  11-cv-01846-LHK
 8
     SAMSUNG ELECTRONICS CO.,
 9   LTD., a Korean business
     entity; SAMSUNG ELECTRONICS
10   AMERICA,INC., a New York
     corporation; SAMSUNG
11   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited
12   liability company,
13                Defendants.
     _____/
14
15
16        H I G H L Y   C O N F I D E N T I A L
17           O U T S I D E  C O U N S E L  O N L Y
18
19    VIDEOTAPED DEPOSITION OF CHRISTOPHER STRINGER
20            REDWOOD SHORES, CALIFORNIA
21              FRIDAY, NOVEMBER 4, 2011
22
23   BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR
24   CSR LICENSE NO. 9830
25   TSG JOB NO. 43706
```

Highly Confidential - Outside Counsel's Eyes Only

Page 2

1  FRIDAY, NOVEMBER 4, 2011
2       9:56 a.m.
3
4
5
6  VIDEOTAPED DEPOSITION OF CHRISTOPHER
7  STRINGER, taken at QUINN EMANUEL URQUHART &
8  SULLIVAN, LLP, 555 Twin Dolphin Drive,
9  Suite 560, Redwood Shores, California,
10 Pursuant to Notice, before me,
11 ANDREA M. IGNACIO HOWARD, CLR, CCRR, RPR,
12 CSR License No. 9830.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1  A P P E A R A N C E S:
2
3     FOR APPLE INC.:
4     MORRISON & FOERSTER
5     By: MICHAEL A. JACOBS, Esq.
6     425 Market Street
7     San Francisco, California 94105
8
9
10
11
12    FOR SAMSUNG ELECTRONICS CO. LTD:
13    QUINN EMANUEL URQUHART & SULLIVAN
14    By: MICHAEL T. ZELLER, Esq.
15    865 South Figueroa Street, 10th Floor
16    Los Angeles, California 90017
17
18
19
20    ALSO PRESENT: Benjamin Gerald, Videographer
21         Cyndi Wheeler, Apple, Inc.
22
                  ---oOo---
23
24
25

Page 4

1       REDWOOD SHORES, CALIFORNIA
2       FRIDAY, NOVEMBER 4, 2011
3            9:56 a.m.
4
5
6
7     THE VIDEOGRAPHER: Good morning. This marks
8  the beginning of the disc labeled No. 1 of the
9  videotaped deposition of Chris Stinger --
10    MR. JACOBS: Stringer.
11    THE VIDEOGRAPHER: -- Stringer. In the
12 matter Apple, Incorporated versus Samsung Electronics
13 Company Limited, et al.
14    Held in the United States District Court for
15 the Northern District of California, San Jose
16 Division. Case number is 11-cv-01846-LHK.
17    This deposition is being held at 555 Twin
18 Dolphin Drive, in the city of Redwood Shores,
19 California. Taken on November 4th, 2011, at
20 approximately 9:56 a.m.
21    My name is Benjamin Gerald from TSG
22 Reporting, Incorporated, and I am the legal video
23 specialist. The court reporter is Andrea Ignacio, in
24 association with TSG Reporting.
25    At this time, will counsel please identify

Page 5

1  themselves for the record.
2     MR. ZELLER: Mike Zeller for Samsung.
3     MR. JACOBS: Michael Jacobs from Morrison &
4  Foerster for Apple. With me is Cyndi Wheeler from
5  Apple Legal.
6     THE VIDEOGRAPHER: Thank you.
7     Will the reporter please swear the witness.
8
9         CHRISTOPHER STRINGER,
10   having been sworn as a witness,
11   by the Certified Shorthand Reporter,
12       testified as follows:
13
14    THE VIDEOGRAPHER: Thank you.
15    Please proceed.
16
17       EXAMINATION BY MR. ZELLER
18    MR. ZELLER: Let's please mark as
19 Exhibit 1161 the Reply Declaration of Christopher
20 Stringer in Support of Apple's Motion for Preliminary
21 Injunction.
22       (Document marked Exhibit 1161
23        for identification.)
24    MR. ZELLER: Q. Please let me know when
25 you've reviewed 1161.

Highly Confidential - Outside Counsel's Eyes Only

Page 18

1    Q  Focusing your attention at the first page --
2  or on the page of Exhibit 1, this is a CAD file
3  showing the front face, then part of one of the sides
4  of M68, which, as you said, was an iPhone concept; is
5  that correct?
6    A  Yes.
7    Q  Do you have a name for what surrounds the
8  display screen that's on the front surface of this
9  design?
10   A  I would call that the housing.
11   Q  People within Apple also sometimes call it
12 the case, C-A-S-E?
13   A  I would find that unlikely.
14   Q  Well, why was it Apple didn't use this design
15 that's depicted in Exhibit 1 of your declaration?
16   A  We chose an alternate design.
17   Q  Why?
18   A  We found a more beautiful, more iconic form
19 factor for this product.
20   Q  Any other reasons?
21   A  No.
22   Q  Who made that decision?
23   A  The design group at Apple made that decision.
24   Q  No one in particular made that decision?
25   A  Correct.

Page 19

1        MR. JACOBS:  Objection; form.
2        MR. ZELLER:  Q.  Isn't it true that Steve
3  Jobs rejected this design?
4    A  That is not my recollection.
5    Q  Well, isn't it true, whether it was this
6  exact design or not, that Steve Jobs rejected the
7  initial iPhone designs that had the housing, the term
8  you used, around the front of the screen on the front
9  because it distracted from the display screen?
10   A  I do not recall that to be a fact.
11   Q  Well, weren't you at a meeting where Steve
12 Jobs told everyone that the design that had this
13 housing on the front surface was being scrapped?
14   A  I do not recall such a meeting.
15   Q  Well, directing your attention to the design
16 that's shown in Exhibit 1 to your declaration, does
17 having the housing that also extends on the front
18 surface around the display, in your view, distract
19 from the display screen?
20       MR. JACOBS:  Objection; form.
21       THE WITNESS:  I do not understand the
22 question.
23       MR. ZELLER:  Q.  What's unclear about it to
24 you?
25   A  I do not know what you mean by "distract."

Page 20

1    Q  Well, why is it that the iPhone, as
2  manufactured, doesn't have ornamentation on its front
3  surface, other than the button?
4        MR. JACOBS:  Objection; form; assumes facts
5  not in evidence.
6        THE WITNESS:  We found a more iconic design
7  that we found more beautiful.
8        MR. ZELLER:  Q.  Any other reason?
9        MR. JACOBS:  Same objection.
10       THE WITNESS:  That is the reason.
11       MR. ZELLER:  I didn't ask for "the reason."
12   Q  Is there any other reason?
13       MR. JACOBS:  Same objection.
14       THE WITNESS:  I -- we did not need another
15 reason.
16       MR. ZELLER:  Q.  So the answer is no.  That
17 was the sole reason; correct?
18   A  We found a more beautiful design.
19   Q  You've already said that.
20       My question is:  Is there any other reason at
21 all?
22   A  *We based our decision on the facts that we
23 found a more beautiful form factor, a more iconic form
24 for this design.
25   Q  Let's mark that.

Page 21

1    A  Excuse me?
2    Q  I'm giving a direction to the reporter to
3  mark it so when we raise this with the judge, we'll
4  read this testimony back.
5        Directing your attention to paragraph 7 of
6  your declaration which we've marked as Exhibit 1161,
7  in that same sentence I read earlier, you say here
8  that you are familiar with:
9        "The manufacturing and technical challenges
10 for those products."
11       Do you see that?
12   A  Excuse me.  Could you repeat which line I'm
13 looking for.
14   Q  This is paragraph 7 on page 2 of your
15 declaration.  The full sentence starts on line 10 and
16 ends with line 12, and the part I'm focusing on now is
17 where you say you're familiar with:
18       "The manufacturing and technical challenges
19 for these products."
20   A  Correct.
21   Q  Please tell me what your full basis is for
22 saying that you're familiar with the manufacturing and
23 technical challenges for these products.
24   A  I understand how we build these products.
25   Q  Have you been to the manufacturing facilities

Highly Confidential - Outside Counsel's Eyes Only

Page 78

1      That might mean that we redesign the product
2  from scratch at one most extreme case -- and I cannot
3  recall an example of that -- and it might mean we
4  compromise the level of robustness that we introduce
5  in the product.
6      I am speculating at this point. I cannot
7  recall the exact nature of how we responded to the
8  drop test in this particular example.
9    Q  Can you tell me, with respect to the exterior
10 design of any version of the iPod Touch, whether you
11 recall any changes being made in response to any drop
12 testing report?
13   A  Changes are always made if we choose to
14 improve the results.
15   Q  And did that happen with the exterior design
16 of any iPod Touch?
17   A  As to whether it implements the exterior
18 design, it -- we would have designed a solution that
19 we thought to be beautiful and iconic that served all
20 of the requirements, one of those requirements being
21 some level of robustness that may be a -- a tradeoff,
22 based on an appearance judgment.
23   Q  Right. I understand.
24      But I'm trying to find out: Do you recall if
25 that actually happened with the exterior design of any

Page 79

1  iPod Touch?
2    A  The drop test results do not design products.
3  We design products to satisfy the level of robustness
4  or product ruggedness that we think appropriate
5  when -- when designing the device.
6      So I'm afraid I'm not sure how to answer your
7  question. But obviously, you don't seem satisfied
8  with the answer.
9      MR. JACOBS:  Can we go off the record for a
10 second. I may be able to help you. I recognize you
11 trying to get a yes or no answer to something, and I
12 may be able to facilitate that.
13     MR. ZELLER:  Okay.
14     THE VIDEOGRAPHER:  This marks the end of disc
15 No. 2 in the deposition of Chris Stinger --
16     THE WITNESS:  Stringer.
17     THE VIDEOGRAPHER:  -- Stringer. The time is
18 1:50 p.m., and we are off the record.
19     (Recess taken.)
20     THE VIDEOGRAPHER:  This marks the beginning
21 of Disc No. 3 in the deposition of Chris Stringer.
22     The time is 1:59 p.m., and we are back on
23 record.
24     MR. ZELLER:  Q.  At any time were any changes
25 made to the exterior of any iPod Touch design in

Page 80

1  response to any drop test report?
2    A  I do not recall a specific instance when that
3  occurred.
4    Q  Are you saying you don't recall one way or
5  another?
6    A  I do not recall that occurring specifically.
7    Q  Is it your memory that it did not occur, or
8  you're just not recalling one way or another?
9       That's what I'm trying to figure out.
10   A  The latter. I do not recall. I don't
11 recall. I don't remember a specific time when that
12 would -- had occurred.
13   Q  Were any changes made to the exterior of any
14 iPhone design in response to any drop test report?
15   A  I do not recall.
16   Q  Were any changes made to the exterior of any
17 iPad design in response to any drop test report?
18   A  I do not recall.
19   Q  Do you recall one way or another whether any
20 drop test report influenced any aspect of any iPod
21 Touch design?
22   A  The question is broad. "Influence" is -- can
23 be construed to varying degrees. And the design, to
24 my mind, includes the interior of the product.
25      So internal changes no doubt were made. I do

Page 81

1  not recall specific instances of that. I'm trying to
2  give you a lengthy answer to give you an understanding
3  of our design process.
4    Q  Let me -- let me rephrase that.
5       Do you recall one way or another whether any
6  drop test report influenced any aspect of the exterior
7  of any iPad -- iPod Touch design?
8    A  No.
9    Q  Do you recall one way or another whether any
10 drop test report influenced the exterior design of any
11 iPad product?
12   A  No.
13   Q  Do you recall one way or another whether any
14 drop test report influenced the exterior design of any
15 iPhone product?
16   A  No.
17   Q  Is there a group within Apple that's
18 responsible for conducting drop testing and producing
19 drop test reports?
20   A  Yes.
21   Q  What's the name of the group?
22   A  Reliability. We refer to them as the rel
23 guys. In fact, they may have a slightly different
24 name. I might be misquoting it as reliability.
25   Q  Who is the head of that group, as you

Highly Confidential - Outside Counsel's Eyes Only

Page 102

1  glass or a shadow beneath it, or a combination of
2  both.
3     Q  Well, let me -- let me try it with another
4  image, and maybe we'll come back to this in a minute.
5  If you'd take a look at the next page, which is
6  '18791.
7     A  Yes.
8     Q  And maybe this is a better image to try and
9  work from, but you'll see that there is a -- a darker
10 line that runs in between the lighter-colored housing
11 and then the so-called glass, but is really plastic
12 flat surface; do you see that darker line?
13    A  Yes.
14    Q  Does that darker line, in your view,
15 correspond to the broader gap that you talked about
16 earlier with respect to the 035 model?
17    A  It looks to me to be some combination of --
18 and of the edge of what we call the glass -- cover
19 glass and shadow beneath it.  And my guess is it's --
20 the lines show -- what we see is shadow.
21    Q  Is the broader gap depicted in this photo,
22 the broader gap that you talked about earlier that
23 is --
24    A  This is a dreadful quality reproduction of a
25 photograph.  Yes, the broader gap is depicted very

Page 103

1  badly, but I can tell where it is on the picture.
2     Q  Okay.  Well, terrific.
3        If I could perhaps hand you a pen, and if you
4  could label where you see that -- that broader gap
5  that you had described and testified earlier with
6  respect to the 035 model.
7     A  There.
8     Q  And maybe the most convenient way of doing
9  this, if you could maybe hold it up for the -- the
10 camera, and then just kind of show where it runs on
11 the -- on the page.
12    A  Well, the narrower gap is depicted by this --
13       THE VIDEOGRAPHER:  Sir, can you show --
14       THE WITNESS:  Okay.  The narrow gap is
15 depicted by this gray fuzzy line here.  The broader
16 gap is in some part depicted by the dark shadow and
17 the light area next to it.
18       MR. ZELLER:  And it runs along --
19       THE WITNESS:  It runs around the full, with
20 less and less clarity, edge of the photograph.  I have
21 to say it's -- it's too poor an image to discern much
22 of anything above the line.
23       MR. JACOBS:  Should we mark this as a new
24 depo exhibit?
25       MR. ZELLER:  Yes, I think so.

Page 104

1        So let's, for the record, please mark as the
2  version of 841 that now has Mr. Stringer's marking on
3  it on page '18791 as Exhibit 841A.
4        (Document marked Exhibit 841A
5         for identification.)
6        MR. ZELLER:  If we can go back to
7  Exhibit 1170.  And by the way, did you want to send
8  those mockups back?
9        MR. JACOBS:  That would be great.
10       MR. ZELLER:  Okay.  So let's go off the
11 record.
12       THE VIDEOGRAPHER:  The time is 2:42 p.m., and
13 we are off the record.
14       (Recess taken.)
15       THE VIDEOGRAPHER:  The time is 2:55 p.m., and
16 we are back on the record.
17       MR. ZELLER:  Direct your attention to the
18 '889 design patent, which was previously marked as
19 Exhibit 8.
20       MR. JACOBS:  I'll just hand you my copy.
21       THE WITNESS:  All right.  Thank you.
22       MR. ZELLER:  Q.  Please take a look at
23 Figure 1.
24    A  Yes.
25    Q  You'll see on Figure 1 that at least as part

Page 105

1  of the -- at least along part of the -- generally what
2  we'll call the perimeter area of the front, there's a
3  darker, thicker line?
4     A  Which figure are you looking at?
5     Q  This is Figure 1.
6     A  Figure 1.
7     Q  Do you see where at least on part of the
8  perimeter, there is a line that is darker and thicker?
9     A  Which would be the second line from the left
10 on the left side of the figure.
11    Q  Right, on the left side.
12       And then on the bottom portion of Figure 1,
13 it appears to run -- to be the line that is -- that
14 the -- is the edge, at least from that perspective?
15    A  It looks like the edge, yes.
16    Q  Do you know what that thicker line depicts?
17    A  It's -- on the lower edge, it's the -- it
18 looks like the edge of the housing.
19    Q  Well, what about on the left side?
20    A  It's the edge of the housing.
21    Q  So on both the left side and the bottom side,
22 you construe that darker, thicker line to be where the
23 edge of the housing is?
24    A  I do construe that.  And it's -- my
25 assumption is confirmed by looking at Figure 3 that

27

Page 122

1  No. 3 of 3 and concludes today's deposition of Chris
2  Stringer.
3       The time is 3:23 p.m., and we are off record.
4       (WHEREUPON, the deposition ended at
5       3:23 p.m.)
6              ---oOo---
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 123

1              J U R A T
2
3
4  I, CHRISTOPHER STRINGER, do hereby certify
5  under penalty of perjury that I have read the
6  foregoing transcript of my deposition taken
7  on November 4, 2011; that I have made such
8  corrections as appear noted herein in ink,
9  initialed by me; that my testimony as
10 contained herein, as corrected, is true and
11 correct.
12
13
14 DATED this ____ day of _____, 2011,
15 at _____, California.
16
17
18
19 _____
20      SIGNATURE OF WITNESS
21
22
23
24
25

Page 124

1           CERTIFICATE OF REPORTER
2
3
4      I, ANDREA M. IGNACIO HOWARD, hereby certify
5  that the witness in the foregoing deposition was by me
6  duly sworn to tell the truth, the whole truth, and
7  nothing but the truth in the within-entitled cause;
8
9      That said deposition was taken in shorthand
10 by me, a Certified Shorthand Reporter of the State of
11 California, and was thereafter transcribed into
12 typewriting, and that the foregoing transcript
13 constitutes a full, true and correct report of said
14 deposition and of the proceedings which took place;
15
16     That I am a disinterested person to the said
17 action.
18
19     IN WITNESS WHEREOF, I have hereunto set my
20 hand this 4th day of November 2011.
21
22     _____
23 ANDREA M. IGNACIO HOWARD, RPR, CCRR, CLR, CSR No. 9830
24
25

Page 125

1              I N D E X
2
3  DEPOSITION OF CHRISTOPHER STRINGER
4
5            EXAMINATION
6                       PAGE
7     BY MR. ZELLER           5
8     BY MR. JACOBS         119
9
10           E X H I B I T S
11 EXHIBIT                         PAGE
12 Exhibit 1161  Reply Declaration of Christopher   5
13      Stringer in support of Apple's
14      Motion for a Preliminary
15      injunction; 50 pgs.
16 Exhibit 1162  Colored Photograph Ad of iPad    26
17      Thinner and Lighter; 1 pg.
18 Exhibit 1163  U.S. Patent No. D627,777 S;       41
19      7 pgs.
20 Exhibit 1164  U.S. Patent No. D637,596 S;       41
21      7 pgs.
22 Exhibit 1165  U.S. Patent No. D621,825 S;       41
23      14 pgs.
24 Exhibit 1166  Sketchbooks, Bates Nos.           41
25      APLNDC0000037650 - '95; 46 pgs.