# EXHIBIT 1

# FILED UNDER SEAL

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 1

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4   APPLE INC., a California         )
    corporation,                      )
5                                     )
                   Plaintiff,         )
6                                     )
          vs.                         ) No: 11-CV-01846-LHK
7                                     )
    SAMSUNG ELECTRONICS CO., LTD,     )
8   a Korean business entity;         )
    SAMSUNG ELECTRONICS AMERICA,      )
9   INC., a New York corporation;    )
    SAMSUNG TELECOMMUNICATIONS        )
10  AMERICA, LLC, a Delaware          )
    limited liability company         )
11                                    )
                   Defendants.        )
12  _____)

13

14      **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

15

16             DEPOSITION OF QUIN HOELLWARTH

17                Redwood Shores, California

18                Tuesday, October 25, 2011

19

20

21

22

23  Reported By:

24  LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201

25  JOB NO. 42859

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 2

         Tuesday, October 25, 2011

                9:32 a.m.


     Videotaped deposition of QUIN
HOELLWARTH, held at Quinn Emanuel
Urquhart & Sullivan, LLP, 555 Twin
Dolphin Drive, Redwood Shores,
California, pursuant to
Subpoena before Linda Vaccarezza, a
Certified Shorthand Reporter of the
State of California.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 3

```
 1        A P P E A R A N C E S:
 2              QUINN EMANUEL URQUHART & SULLIVAN
 3              Attorneys for Defendants
 4                  865 South Figueroa Street
 5                  Los Angeles, California 90017
 6           BY:  MICHAEL T. ZELLER, ESQ.
 7                ANNA NEILL, ESQ
 8                michaelzeller@quinnemanuel.com
 9                annaneill@quinnemanuel.com
10
11              MORRISON & FOERSTER
12              Attorneys for Plaintiff
13                  755 Page Mill Road
14                  Palo Alto, California 94304
15           BY:  ERIK J. OLSON, ESQ.
16                ejolson@mofo.com
17
18
19
20  also present:  Wendy Anna Herby,
                   Apple in-house Counsel
21
22
23
24
25  Videographer:  Jason Kocol
```

TSG Reporting 877-702-9580

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 4

1  THE VIDEOGRAPHER: This is the
2  start of tape labeled Number 1 of the
3  videotaped deposition of Quin Hoellwarth
4  in the matter Apple Incorporated versus
5  Samsung Electronics Company, Limited, in
6  the United States District Court,
7  Northern District of California, San Jose
8  division. Case number 11-CV-01846-LHK.
9  This deposition is being held at 555 Twin
10 Dolphin Drive, Redwood Shores,
11 California, on October 25th, 2011. It is
12 approximately 9:32 a.m.
13         My name is Jason Kocol and I'm
14 a legal video specialist from TSG
15 Reporting, Incorporated, headquartered at
16 747 Third Avenue, New York, New York.
17 The court reporter is Linda Vaccarezza in
18 association with TSG Reporting.
19         Will counsel please introduce
20 yourselves for the record.
21    MR. ZELLER: Mike Zeller for
22 Samsung.
23    MS. NEILL: Anna Neill for Samsung.
24    MR. OLSON: Erik Olson of Morrison
25 & Foerster on behalf of Apple and the

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 5

```
 1        witness.
 2             THE VIDEOGRAPHER:  Will the court
 3        reporter please swear in the witness.
 4                    QUIN HOELLWARTH,
 5                    having been duly
 6        sworn, by the Certified Shorthand
 7        Reporter, was examined and testified as
 8        follows:
 9                    EXAMINATION
10   BY MR. ZELLER:
11        Q.   Good morning.
12        A.   Good morning.
13        Q.   Please tell us and spell your full
14   name for the record.
15        A.   Quin Hoellwarth.  Q-U-I-N, C as a
16   middle initial, Hoellwarth, H-O-E-L-L-W-A-R-T-H.
17        Q.   Have you ever been known as or
18   gone by any other name?
19        A.   I have not.
20        Q.   And are you currently employed?
21        A.   I am.
22        Q.   By whom?
23        A.   Apple.
24        Q.   How long have you worked for
25   Apple?
```

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 102

```
 1            12:13 p.m.)
 2                 THE VIDEOGRAPHER:  The time is
 3       12:13 p.m.  We are on the record.
 4   BY MR. ZELLER:
 5       Q.    You've an opportunity to review
 6   the 889 design patent?
 7       A.    I have.
 8       Q.    Do you recognize this as an issued
 9   patent that you worked on the application for?
10       A.    Yes.
11       Q.    And you did this back when you
12   were with Beyer Weaver & Thomas?
13       A.    Yes.
14       Q.    Was your involvement complete
15   prior to the time that you went and began working
16   as an Apple employee or did your work on this
17   design patent application continue on?
18                 MR. OLSON:  Did he work on, you
19          mean the prosecution?
20                 MR. ZELLER:  Yes.
21                 THE WITNESS:  I started at Apple
22          in 2007.  This issued in 2005.
23       Q.    So the answer is that it was
24   completed before you left?
25       A.    Yes.
```

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 103

1      Q.    Before you left Beyer Weaver &
2  Thomas?
3      A.    Yes.
4      Q.    And generally speaking, what did
5  you do in connection with the application that
6  resulted in the 889 design patent?
7      A.    What do you mean, generally do?
8  Can you be more specific?
9      Q.    Well, please tell me what the
10  nature of your tasks and responsibilities were in
11  connection with the 889 design patent in the
12  prosecution?
13      A.    I prepared the patent application
14  and filed it. Is that what you mean?
15      Q.    When you say that you prepared the
16  application, were you responsible for the
17  generation of the figures that are shown here in
18  the 889 design patent?
19      A.    Yes.
20      Q.    I take it you didn't draw them
21  yourself?
22      A.    Are you asking me if I did or --
23      Q.    Right.
24      A.    I did.
25      Q.    You drew these?

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 104

1     A.    I did.
2     Q.    Did you draw all nine of the
3  figures?
4     A.    I believe so.
5     Q.    Generally speaking, in connection
6  with those design patent applications that you
7  worked on when you were with Beyer Weaver &
8  Thomas, did you actually draw the figures?
9     A.    I did.
10    Q.    Since you've been working as an
11 employee for Apple, with respect to those design
12 patent applications that you've worked on, do you
13 typically actually draw the figures?
14    A.    No.
15    Q.    So that practice changed at some
16 point?
17    A.    Yes, when I started at Apple.
18    Q.    Since the time period you began
19 working for Apple, who has prepared the figures
20 for the design patent applications?  And I'm
21 talking about actually physically drew them.
22    A.    In some circumstances, the outside
23 counsel.  Actually, an outside counsel prepares
24 the final drawings.  It's probably a better
25 answer.

1        Q.   My question is, is more pedestrian

2 and mundane. I'm trying to find out in those

3 instances where you were involved with design

4 patent applications after starting with Apple,

5 who was the person who actually physically does

6 the drawing?

7        A.   Well, in what time frame, because

8 it's an organic process.

9        Q.   Well, I've been focusing on the

10 time period since you began working for Apple.

11 But if the person who actually does the drawings

12 changed over time, please tell me that.

13        A.   Well, let's just say it varies or

14 it depends.

15        Q.   In general, are the figures of the

16 Apple design patent applications prepared by

17 Apple employees?

18        A.   The drawings for the patent

19 applications?

20        Q.   Right.

21        A.   No.

22        Q.   Typically, in those instances

23 where you've been involved with the applications,

24 are they done by outside vendors?

25        A.   Since being at Apple?

1  out the facts from you.  What I can say is is
2  that, that these -- and I'm talking about exactly
3  in this form is how it was produced by an Apple
4  prosecuting firm, the Stern firm, as I understand
5  it.  That's my best understanding.
6           A.    This is from the file wrapper.
7           Q.    I believe that there are photos
8  that are in the file wrapper that I'm going to
9  ask you about next that I believe correspond to
10 these.  But again, I'm just an outside lawyer.
11 I'm trying to see how these things are related.
12 And that's my -- that's the point of my
13 questioning.  So it's a little hard for me to
14 make representations to you about any of this
15 because that's part of what I'm trying to find
16 out.
17               MR. OLSON:  Did we provide source
18          information for these?
19               MR. ZELLER:  I don't think so.  My
20          last understanding -- we have asked for
21          the native files of these, these images.
22               MR. OLSON:  And I'm happy to
23          address that as well, but go ahead.
24               MR. ZELLER:  And any original
25          photographs so that we would have clear

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 121

1        images of it and the like.  But, you
2        know, the information we have is pretty
3        limited.  It was, as I understand it,
4        produced by Stern, which I believe took
5        over the prosecution, but -- and that's
6        probably why it's in possession of them.
7        But it doesn't -- we don't know what the
8        ultimate source of this was.
9                 It was presumably transferred
10       from Beyer Weaver & Thomas at some point
11       would be my assumption, but again, that's
12       part of what I'm trying to find out.  So
13       maybe if we step back for a minute and
14       try some kind of foundational things and
15       see if this helps --
16       A.    Okay.
17       Q.    -- jog your memory on any of
18  this.  And let's first focus on the '889 design
19  patent for a moment.
20       A.    Yes.
21       Q.    At some point, did you actually
22  have a three-dimensional model that you were
23  shown or had access to that helped you form the
24  basis of the drawings that you made on the '889
25  design patent?

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 122

```
 1        A.    Yes.
 2        Q.    And if you could direct your
 3   attention to the page of Exhibit 841 that bears
 4   Bates number APLPROS 0000018789.
 5        A.    18789?
 6        Q.    Yes.  And you'll see this is a
 7   photograph of an individual.  Is this you?
 8        A.    Yes.
 9        Q.    And this photograph shows you
10   holding a three-dimensional tablet mock-up?
11        A.    Yes.
12        Q.    And does this depict the three-
13   dimensional mock-up that you had available to you
14   as a resource to create the '889 design patent
15   figures?
16        A.    Yes.
17        Q.    And in the course of that, was
18   there one model that you had to do that?
19              MR. OLSON:  As opposed to?
20              MR. ZELLER:  As opposed to more
21        than one.
22              THE WITNESS:  I don't recall.
23        Q.    Directing your attention to the
24   last page of Exhibit 841.
25        A.    (Witness complies.)
```

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 123

1    Q.   You'll see that this is a
2  cornucopia of you?
3    A.   Yes.
4    Q.   Do you know who created these?
5    A.   I mean, I don't know but I think
6  it was me.
7    Q.   And then directing your attention
8  to the other photographs that are part of Exhibit
9  841 which show various perspectives of the mock-
10 up, did you take these photos?
11   A.   It's likely.
12   Q.   Do you recall where you did this?
13 In other words, were you at the Beyer law firm's
14 offices?  Did you go to Apple to do this?  Do you
15 remember?
16   A.   Yes, I remember.
17   Q.   And where was it?
18   A.   Apple.
19   Q.   And I take it that's the occasion
20 in which you were provided the mock-up that's
21 depicted in these photographs and other images
22 that we have marked as Exhibit 841?
23   A.   I believe so.
24   Q.   Do you know where the photographs
25 are?

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 140

1  mock-up?
2       A.    Just to verify, point to what
3  you're talking about.
4       Q.    You'll see that there's an area
5  here between the glass surface and then what
6  sometimes people call the bezel, there's an
7  actual physical gap or groove that runs all
8  around the perimeter of the front of the device.
9       A.    It does feel that way.
10      Q.    And as you can tell from looking
11 at the mock-up and also can tell from this
12 photograph at 842, underneath that opening, that
13 gap or groove, there are a series of holes?
14      A.    Are you referring to these holes?
15      Q.    Yes.
16      A.    Much easier to see in the
17 picture.
18      Q.    And you do see, even though it's a
19 little tougher to actually see it in the physical
20 mock-up, but you do see that underneath the gap
21 or that groove that runs around the front surface
22 of the mock-up that there's a series of holes?
23      A.    Does -- I can't tell that they are
24 holes from what I'm looking at, but there's a
25 series of something, a feature.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 141

```
 1        Q.   Is there some word you would use
 2   to describe what those are, if you can't tell
 3   that they are holes?
 4        A.   I mean, I would call them a
 5   feature.  With regards to the device, the picture
 6   it seems -- it appears more like a hole, series
 7   of holes.
 8        Q.   Now, in the course of working on
 9   the '889 design patent prosecution, did it come
10   to your attention that the design had vents that
11   ran around the perimeter of the front of the
12   device?
13        A.   I don't recall.
14        Q.   Directing your attention to
15   Exhibit 841, and specifically --
16             MR. OLSON:  Let him find 841.
17             MR. ZELLER:  841.
18             THE WITNESS:  This one.
19   BY MR. ZELLER:
20        Q.   Right.
21        A.   Okay.
22        Q.   Directing your attention to
23   Exhibit 841 and specifically page APLPROS
24   0000018791.
25        A.   This one?
```

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 142

```
 1          Q.    Yes.  Now, you'll see that this
 2   depicts a closer end view of the corner of the
 3   mock-up that you had, right?
 4          A.    Okay.
 5          Q.    And, again, this is the mock-up
 6   that was used to create the design drawings that
 7   are shown in the '889 design patent, right?
 8          A.    I think, yes.
 9          Q.    You'll see from this perspective
10   that running around the perimeter of the front of
11   the device that's shown that there is that
12   thicker black line.  Do you see that?
13          A.    I see a thicker black line.
14          Q.    And that corresponds to the groove
15   or the gap in the mock-up that you have, correct?
16              MR. OLSON:  Objection.  Lack of
17          foundation.
18              THE WITNESS:  I don't know what
19          that is.
20          Q.    Is the physical mock-up that you
21   have in front of you --
22          A.    Yes.
23          Q.    -- that your counsel brought and
24   photographs of which we have marked as Exhibit
25   842 and 843 the mock-up that is depicted here in
```

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 143

```
 1   Exhibit 841?
 2        A.    Exhibit 842?  You're saying these
 3   photos that you took which represents this, are
 4   you saying is what was in the case?
 5        Q.    Let me break it down further.  Is
 6   the physical mock-up that your counsel brought
 7   the physical mock-up that's depicted in
 8   Exhibit 841?
 9        A.    I don't know.
10        Q.    Who would know?
11        A.    I don't know.  I don't know that
12   there's a person.  It may have been Cal Seid.
13        Q.    Directing your attention to
14   Exhibit 841, specifically page APLPROS 000001879.
15        A.    Yes.
16        Q.    This is a photograph that was
17   submitted to the patent office by Apple in
18   connection with the '889 design patent
19   prosecution, correct?
20             MR. OLSON:  I don't think you're
21         on the same page.
22             THE WITNESS:  This one?
23             MR. ZELLER:  Yes.
24             MR. OLSON:  You have a different
25         number down.
```

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 350

1   THE VIDEOGRAPHER:  This marks the
2   end of the addendum to Tape Number 5 of
3   today's deposition of Quin Hoellwarth,
4   and concludes today's deposition.
5            The time is 8:47 p.m.  We are
6   off the record.
7
8        (Time noted: 8:47 p.m.)
9
10
11
12
13                  _____
14                     QUIN HOELLWARTH
15
16
17   Subscribed and sworn to before me
18   This       day of              , 2011.
19
20   _____
21
22
23
24
25

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 351

1      C E R T I F I C A T E
2  STATE OF CALIFORNIA      )
3                           )
4  COUNTY OF SAN FRANCISCO  )
5      I, LINDA VACCAREZZA, a Certified
6  California, do hereby certify:Shorthand
7  Reporter for the State of
8      That QUIN HOELLWARTH, the witness
9  whose deposition is hereinbefore set
10 forth, was duly sworn by me and that such
11 deposition is a true record of the
12 testimony given by such witness.
13     I further certify that I am not
14 related to any of the parties to this
15 action by blood or marriage; and that I
16 am in no way interested in the outcome of
17 this matter.
18     IN WITNESS WHEREOF, I have hereunto
19 set my hand this 26th day of October, 2011.
20
21
22  _____
23  LINDA VACCAREZZA, CSR. NO. 10201
24
25