# EXHIBIT 14
# FILED UNDER SEAL

1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

SAN JOSE DIVISION

7

| APPLE INC., a California corporation, | Case No.   11-cv-01846-LHK |
|---|---|
| Plaintiff, | |
| v. | **REBUTTAL EXPERT REPORT OF PETER W. BRESSLER, FIDSA** |
| SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |

8

9

10

11

12

13

14

15

16

**\*\*CONFIDENTIAL – CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY PURSUANT TO A PROTECTIVE ORDER\*\***

17

18

19

20

21

22

23

24

25

26

27

28

67.     The D'677 patent is further distinguished from the JP'638 Patent based on additional differences, including the smaller speaker slot depicted in the JP'638 Patent, which is narrower relative to the overall design than the speaker slot depicted in the D'677 patent, and the relative narrowness of the front face of the JP'638 design as compared to the D'677 design. Mr. Sherman concedes these differences.  (Sherman Report at 7.)

68.     As a result of Mr. Sherman's erroneous analysis, key differences between the JP'638 design's front surface and the corresponding portions of the D'677 patent were ignored: (1) the JP'638 design's significant camber; (2) its lack of a continuous front surface covered entirely by a single piece of material; (2) its lack of edge-to-edge transparency across the front surface; and (4) its lack of a black color designation.  These differences would be readily noticed by the ordinary observer and given significant weight in a visual comparison.  Based on the contrast in overall visual impressions, it is my opinion that an ordinary observer would not find the D'677 design to be substantially the same as the JP'638 design.[6]

69.     **JP'221 Patent**.  I also disagree with Mr. Sherman that the JP'221 patent anticipates the D'677 design.  In particular, there's no indication in the JP'221 reference that there is a continuous and transparent surface covering the entire front face of the device.  Rather, JP'221 shows an opaque black border around a matte gray screen.  Moreover, despite Mr. Sherman's assertion otherwise (Sherman Report at 34), there is no indication that any kind of transparent surface stretches over the gray display area.  Accordingly, the JP'221 Patent does not disclose a continuous transparent front surface that extends over the entire front face of the device.

---

[6] Mr. Sherman's analysis also refers to the Sharp 825SH product as the implementation of the JP'638 design.  I am informed, however, that the Sharp 825SH product was not announced and released until 2008, after the D'677 patent had been filed in 2007 and is not prior art.  Moreover, I find that there are significant differences between the JP'638 design and the Sharp 825SH phone that make it clear that the latter is not an accurate representation of the JP'638 design.  Most significantly, the Sharp phone has much less camber to its front surface when compared to the JP'638 design, and the Sharp phone appears to use a black-colored transparent front surface, which is not indicated in the JP'638 design.

70.     Also, the lateral borders of the design in the JP'221 patent are noticeably wider than the lateral borders depicted in the D'677 patent.

71.     Accordingly, Mr. Sherman's analysis ignores that a distinctive element of the D'677 design is entirely missing from the JP'221 reference—a continuous, black-colored, transparent edge-to-edge surface.  This difference alone would be readily noticed by the ordinary observer and given significant weight in a visual comparison.  Based on the contrast in overall visual impressions, it is my opinion that an ordinary observer would not find the D'677 design to be substantially the same as the JP'221 design.

72.     **D'889 patent**.  As explained above, Mr. Sherman does not opine that an ordinary observer would find the D'677 design to be substantially the same as the D'889 design.  Nor does Mr. Sherman opine that he finds the D'677 design to be substantially the same as the D'889 design.  When the ordinary observer test is applied, I believe that an ordinary observer would not find the D'677 design to be substantially the same as the D'889 design.

73.     Mr. Sherman's analysis of the D'889 patent relates primarily to the flat, continuous, and transparent front surface of the D'889 design.  Mr. Sherman, however, ignores a number of differences between the D'677 design and the D'889 design that are readily apparent to the ordinary observer.

| D'889 patent | D'677 Patent |
|---|---|
|  FIG. 1 |  |



FIG. 3

75.     Moreover, the overall appearance of the D'889 design is also unlike that of the D'677 design because the D'889 design does not have the shape and proportion of a hand-held mobile phone.  The portion of Figure 9 of the D'889 patent depicted in dotted lines shows the environment surrounding the design disclosed in the D'889 patent, and illustrates the D'889 design in use.  The way in which the D'889 design is depicted as being held and used in a person's hand in Figure 9 underscores that the D'889 design is not of a shape and proportion similar to a hand-held mobile phone.



*FIG. 9*

76.     As noted above, a number of key differences were omitted as a result of Mr. Sherman's failure to fully analyze the differences between the D'677 patent and the D'889 patent.  These differences in the D'889 patent would be readily noticed by the ordinary observer

83.     As is made apparent from the side views, the JP'638 patent shows a significantly cambered, non-flat front surface.  The JP'638 surface is surrounded by an enclosure part that tapers toward the top and bottom of the device.  The effect of the cambered surface and tapered enclosure part in the JP'638 can be distinctly seen in its profile views, which markedly contrast with the profile views of the D'087 patent.  Not only does the cambered surface in the JP'638 design produce a very different visual impression than the iPhone design, the thin uniform bezel of the iPhone also starkly contrasts with the thick, tapered enclosure part of the JP'638 design.  Moreover, the JP'638 design has a smaller speaker slot that is shifted noticeably higher than the D'087 design.

84.     Accordingly, it is my opinion that the ordinary observer would not find the overall visual impression of the JP'638 patent substantially the same as that of the D'087 patent.

85.     **JP D1241383 ("the JP'383 patent")**.  Mr. Sherman alleges that the JP'383 design anticipates the D'087 patent.  I disagree.  The JP'383 reference includes a number of confusing and inconsistent drawings purportedly disclosing an electronic device inside a transparent cover.  Due to the overlapping lines introduced by this design, and apparent contradictions within different figures, an ordinary observer would not be able to ascertain a single design from the JP'383 figures that is substantially the same as the D'087 design.

| JP'383 Patent | D'087 Patent (Selected Embodiments) |
|---|---|
|  | <br>FIG. 9<br><br><br>FIG. 17 |



87.     Similarly, the perspective view below does not disclose any borders on the lateral sides of the display screen.  From the perspective views of the JP'383 design, it is clear that the screen effectively cuts across the entire front surface, and that no border is left on the lateral edges of the display.  I believe that an ordinary observer would not understand narrow lateral borders to be part of the JP'383 design.



88.     Accordingly, the JP'383 reference fails to disclose a single consistent design to the ordinary observer.  To the extent some figures appear to show a design that Mr. Sherman claims is anticipatory, this position is not corroborated by the other views, and therefore the JP'383 reference constitutes an incomplete disclosure that cannot be used to compare against the D'087

1   significant that major modifications of each Fidler design would be required to make any of them

2   appear substantially the same as the D'889 design.

3        103.    Even if any of the Fidler designs were considered a primary reference against the

4   D'889 design, the unmodified Fidler design would not appear substantially the same to the

5   ordinary observer, as I opined previously.

6        104.    Moreover, Mr. Sherman has not identified any secondary reference that he

7   proposes to combine with any of the Fidler designs.  Mr. Sherman suggests, however, that

8   modifications "to have the identical profile as the D'889, as well as changes in aspect ratios and

9   width of rims, would have been trivial to someone skilled in the art to produce the design of the

10  D'889."  (Sherman Report at 30.)  But Mr. Sherman fails to provide any explanation why the

11  proposed modifications would have been obvious to the ordinary designer at the time the D'889

12  design was invented, or any suggestion that would have caused the ordinary designer to make the

13  proposed modification.  Accordingly, Mr. Sherman's statement is unsupported and conclusory in

14  my opinion.  Furthermore, Mr. Sherman's analysis does not even address the lack of a continuous

15  transparent front surface on the original Fidler designs.  Even if one changed the profiles, the

16  aspect ratios, and the width of the rims of the Fidler designs, as suggested by Mr. Sherman, the

17  resulting design would still not have a continuous transparent front surface with a viewable

18  rectangular element as in the D'889 patent.

19       105.    As discussed previously, I disagree that the differences between each Fidler design

20  and the D'889 design are trivial.  Neither the Fidler 1981 design nor the Fidler 1997 Plexiglas

21  sheet is an executable tablet design at all.  They are mere concepts or abstractions that would

22  need to be built from the ground up according to the blueprint of the D'889 design.  The Fidler

23  1981 and 1994 tablet mockups feature thick, raised, asymmetrical frames over a display screen,

24  rather than a thin rim surrounding a fully continuous, transparent surface that is without added

25  adornment aside from an underlying rectangular element that marks an even border.  This

26  modification alone would not have been trivial or obvious to the designer of ordinary skill in the

27  art at the time the D'889 patent was invented, as evidenced by the fact that Mr. Sherman could

28  not identify a single prior art reference having this particular design feature.

106.     Therefore, even if one of the Fidler designs were considered a primary reference, it is my opinion that the ordinary designer, at the time the D'889 design was invented, would not have found it obvious to modify any of the Fidler designs to arrive at the D'889 design.

107.     **The D'037 Patent.**  Due to the same visual differences identified in my foregoing treatment of the D'037 patent, it is my opinion as a designer of ordinary skill in the art that the D'037 design does not present basically the same overall visual impression as the D'889 patent. Notably, the D'037 patent fails to disclose a tablet having a continuous transparent front surface through which a centered rectangular element is visible.  The differences between the D'037 design and the D'889 patent are significant enough that major modifications to the D'037 design would be required to make it substantially the same as the D'889 design.

108.     Even if the D'037 patent were considered a primary reference against the D'889 design, the unmodified design would not appear substantially the same to the ordinary observer, as I opined previously.

109.     Moreover, Mr. Sherman has not identified any secondary reference that he proposes to combine with the D'037 design.  Mr. Sherman suggests, however, that modifications "to have the identical profile as the D'889, as well as changes in aspect ratios and width of rims, would have been trivial to someone skilled in the art to produce the design of the D'889." (Sherman Report at 30.)  But Mr. Sherman fails to provide any explanation why the proposed modifications would have been obvious to the ordinary designer at the time the D'889 design was invented, or any suggestion that would have caused the ordinary designer to make the proposed modification.  Accordingly, Mr. Sherman's statement is unsupported and conclusory in my opinion.

110.     As discussed previously, I disagree that the differences between the D'037 design and the D'889 design are trivial.  The D'037 design merely discloses a continuous front surface, and not a transparent front surface with a viewable rectangular element marking an even border. Even if one changed the profiles, the aspect ratios, and the width of the rims of the D'037 patent, as suggested by Mr. Sherman, the resulting design would still not have a continuous transparent front surface with a viewable rectangular element as in the D'889 Patent.  Moreover, the D'037 is

1   also significantly thicker than the D'889 design, and has straight sides that form an angled edge

2   with the back surface that differs from the D'889 design.  It would not have been trivial or

3   obvious to the ordinary designer at the time the D'889 design was invented to change all these

4   features of the D'037 design to the exact features claimed in the D'889 patent.  This is evidenced

5   by the fact Mr. Sherman could not identify a single prior art reference having these design

6   features of the D'889 patent.

7        111.    Therefore, even if the D'037 patent were considered a primary reference, it is my

8   opinion that the ordinary designer, at the time the D'889 design was invented, would not have

9   found it obvious to modify the D'037 design to arrive at the D'889 design.

10       112.    **The D'157 Patent.**  Due to the same visual differences identified in my foregoing

11   treatment of the D'157 patent, it is my opinion as a designer of ordinary skill in the art that the

12   D'157 design does not present basically the same overall visual impression as the D'889 patent.

13   Notably, the D'157 patent fails to disclose a tablet having a continuous transparent front surface

14   through which a centered rectangular element is visible.  The differences between the D'157

15   design and the D'889 patent are such that major modifications to the D'157 design would be

16   required to make it look like the D'889 design.

17       113.    Even if the D'157 patent were considered a primary reference against the D'889

18   design, the unmodified design would not appear substantially the same to the ordinary observer,

19   as I opined previously.

20       114.    Moreover, Mr. Sherman has not identified any secondary reference that he

21   proposes to combine with the D'157 design.  Mr. Sherman suggests, however, that modifications

22   "to have the identical profile as the D'889, as well as changes in aspect ratios and width of rims,

23   would have been trivial to someone skilled in the art to produce the design of the D'889."

24   (Sherman Report at 30.)  But Mr. Sherman fails to provide any explanation why the proposed

25   modifications would have been obvious to the ordinary designer at the time the D'889 patent was

26   invented, or any suggestion that would have caused the ordinary designer to make the proposed

27   modification.  Accordingly, Mr. Sherman's statement is unsupported and conclusory in my

28   opinion.

115.   As discussed previously, I disagree that the differences between the D'157 design and the D'889 design are trivial.  At most, the D'157 design discloses an opaque frame surrounding a transparent surface.  It does not disclose a transparent front surface with a viewable rectangular element that marks an even border around the element.  Even if one changed the profiles, the aspect ratios, and the width of the rims of the D'157 patent, as suggested by Mr. Sherman, the resulting design would still not have a continuous transparent front surface with a viewable rectangular element as in the D'889 Patent.  That modification alone would not have been trivial or obvious to the ordinary designer at the time the D'889 patent was invented, as evidenced by Mr. Sherman's inability to identify a single prior art reference having this feature of the D'889 patent.

116.   Therefore, even if the D'157 patent were considered a primary reference, it is my opinion that the ordinary designer, at the time the D'889 design was invented, would not have found it obvious to modify the D'157 design to arrive at the D'889 design.

117.   **JP D1142127 ("the JP'127 patent").**  Mr. Sherman appears to assert that the JP'127 patent is a primary reference against the D'889 patent.  I disagree with any such opinion. The JP'127 design discloses an opaque frame around a center display area.  The opaque frame also includes patterns formed of circular holes on the left and right-hand sides.  The opaque frame is also raised above the front surface, such that it is visible in the profile views.  This visual appearance is distinctly different than that of the D'889 design.  Moreover, the JP'127 patent includes a visible notch on its top surface and various other visual elements on its back surface, which do not exist in the D'889 patent.  Due to these visual differences, it is my opinion as a designer of ordinary skill in the art that the JP'127 design does not present basically the same overall visual impression as the D'889 patent.  The differences between the JP'127 design and the D'889 patent are such that major modifications to the JP'127 design would be required to make it substantially the same as the D'889 design.

| JP'127 Patent | D'889 Patent |
|---|---|

| JP'127 Patent | D'889 Patent |
|---|---|
|  |   FIG. 1 |
| No corresponding view. |   FIG. 2 |
|  |   FIG. 3 |
|  |   FIG. 4 |
|  |   FIG. 5  FIG. 6 |
|  |   FIG. 7  FIG. 8 |

1    transparent or reflective.  The D'802 design includes a protrusion on the top area for what

2    appears to be a pen-holder slot that is located on the front surface.  Its side profile also slopes

3    downward and outward from the front surface to a wider base.  In light of these visual

4    differences, it is my opinion that the designer of ordinary skill in art would not find the D'802

5    reference to be basically the same in overall visual impression as the D'889 patent.  The

6    differences between the D'802 design and the D'889 patent are such that major modifications to

7    the D'802 design would be required to make it be substantially the same as the D'889 design.

8        124.    Mr. Sherman appears to assert that the D'802 design includes a transparent surface

9    over the entire front face.  I disagree with any such opinion.  In particular, Figure 1 of the D'802

10   reference uses only oblique lines in the inner rectangular portion of the front face.  Moreover,

11   there is a clear transition in material shown between the inner portion of the patterned border and

12   the flat center surface, which suggests that a different non-transparent material is used for the

13   border.  Moreover, the outer bounds of the patterned border show no indication of a transparent

14   surface on top of the patterned border and reaching the edge of the design where the rim slopes.

15   When the perspective view of Figure 1 is viewed in conjunction with the profile views, it appears

16   that no additional transparent surface exists over the patterned border.

17       125.    The front view of Figure 6 includes one set of oblique lines that cross over the

18   boundary between the center area and the patterned border.  However, given the aforementioned

19   visual cues, it appears to be a contradiction in the drawings.  As seen even in Figure 6, there is a

20   clear transition in material between the flat center area and the border region having textured

21   patterns.  Moreover, the top two sets of oblique lines in Figure 6 do not cross into the border area

22   and appear situated and lend confusion.  Therefore, any interpretation of this one set of oblique

23   lines as disclosing a design having a continuous transparent surface over the rectangular portion

24   and the inner portion of the patterned border would conflict with all of the other visual cues that

25   indicate otherwise. It also would not be an edge-to-edge transparent front surface because the

26   outer boundaries of the patterned border show no indication of a transparent surface.

27       126.    Regardless, even if such a continuous transparent front surface existed in the

28   D'802 design, key differences described above in paragraph 125 would remain, and it would not

134.    Even if the JP'221 design were considered a primary reference for the D'677 patent, for the reasons discussed above, the JP'221 design would not appear substantially the same as the D'677 design to an ordinary observer and therefore would not render the D'677 patent obvious on its own.  Mr. Sherman does not suggest any modifications to the JP'221 design or identify any secondary references for combination with the JP'221 design, so I cannot further rebut his opinion that the JP'221 patent renders the D'677 patent obvious.

135.    **The D'889 Patent.**  To the extent Mr. Sherman implies that the D'889 patent could be considered a primary reference against the D'677 patent, I disagree.  As discussed in detail above, the overall appearance of the D'889 design is significantly different from that of the D'677 patent.  In particular, the D'889 patent has a different form factor, different proportions, lacks the unique border configuration of the D'677 design, and is missing a lozenge-shaped slot feature.  The D'889 design also lacks the D'677 patent's black color.  The D'889 design cannot be used as a primary reference, because in my opinion, it does not create basically the same visual impression as the D'677 design to the designer of ordinary skill in the art.

136.    Even if the D'889 design were considered a primary reference for the D'677 patent, for the reasons discussed above, the D'889 design would not appear substantially the same as the D'677 design to an ordinary observer and therefore would not render the D'677 patent obvious on its own.  Mr. Sherman does not suggest any modifications to the D'889 design or identify any secondary references for combination with the D'889 design, so I cannot further rebut his opinion that the JP'221 patent renders the D'677 patent obvious.

137.    **The JP'638 Patent.**  To the extent Mr. Sherman implies that the JP'638 patent could be considered a primary reference against the D'677 patent, I disagree.  As discussed in detail above, the overall appearance of the JP'638 design is significantly different from that of the D'677 patent.  In particular, the JP'638 design lacks a flat, continuous, and edge-to-edge transparent front surface, which is an integral visual element of the D'677 design.  The JP'638 design cannot be used as a primary reference, because in my opinion, it does not create basically the same visual impression as the D'677 design to the designer of ordinary skill in the art.  Major modifications are required to make the JP'638 design look like the D'677 patent.



| Nokia Fingerprint Phones | D'677 Patent |
|---|---|

146.     As an initial matter, the disclosure of the Fingerprint phones is incomplete, because a full front view of the "MODO CINEMA" mode of the Fingerprint phone, relied on by Mr. Sherman, is unavailable.  But even from the incomplete disclosure, distinctive visual differences are immediately apparent.

147.     In particular, the Fingerprint phone has a distinctly rounded overall shape.  Its top and bottom ends are rounded and its shoulders are gently sloped.  This visual impression stands in stark contrast to the straight ends of the D'677 design's rectangular shape and its evenly curved

1   corners.  The Fingerprint phone is also significantly narrower in width in proportion to the D'677

2   design.

3        148.    Moreover, the Fingerprint phone does not include any disclosure of a continuous

4   front surface that is transparent from edge-to-edge.  The photographs provided by Mr. Sherman

5   do not show such a continuous transparent front surface over the entire front face of the phone.

6   Although I understand that Mr. Vilas-Boas stated in his declaration that such a surface was

7   disclosed, the photographs attached to Mr. Vilas-Boas's declaration do not show it.  (*See*

8   SAMNDCA00326383-85; SAMNDCA00326380-82.)

9        149.    Further differences exist in the geometries shown in the front face of the

10  Fingerprint phone.  It is difficult to fully appreciate the appearance of the borders surrounding the

11  display screen in the Fingerprint phone, because no full frontal view of the "MODO CINEMA"

12  mode is shown.  But from the perspective view, I ascertain that the display screen is not centered

13  on the front face because the top border is significantly wider than the bottom border.

14  Furthermore, Mr. Sherman admits that the Fingerprint phone has a circle-shaped speaker feature,

15  which looks very different from the lozenge-shaped slot of the D'677 design.

16       150.    Any attempt to alter the Fingerprint to make it look like the D'677 design would

17  constitute a major modification.  In particular, the overall shape of the phone would have to be

18  made wider and more rectangular, a transparent front surface would have to be added across the

19  entire front face, the display screen would have to be centered, and the speaker feature design

20  would have to be revamped.  Accordingly, it is my opinion that, even if a complete disclosure

21  were obtained, the Fingerprint phone design would not appear basically the same in overall visual

22  appearance as the D'677 patent to the designer of ordinary skill in the art.

23       151.    Even if the Fingerprint phone were considered a primary reference, the Fingerprint

24  phone design would not appear substantially the same as the D'677 design to an ordinary

25  observer for the reasons discussed above.  Therefore, the unmodified Fingerprint phone design

26  would not render the D'677 patent obvious on its own.

27       152.    I disagree with Mr. Sherman's suggestion that it would have been obvious to

28  modify the Fingerprint design to change the speaker opening design to that of the D'677 design.

REBUTTAL EXPERT REPORT OF PETER W. BRESSLER, FIDSA
Case No. 11 cv-01846-LHK                                                              56

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



| D'590 Patent | D'677 patent |
|---|---|

21    156.    In particular, in the D'590 design, rather than having rounded corners at the top of the flat front surface, two sharp right angles are formed.  A number of horizontal lines break the front surface before it continues with a backward leaning slope.

24    157.    Despite Mr. Sherman's description of an "inset display below a flat transparent surface" in the D'590 design, there is in fact no indication of a display screen in that design. (Sherman Report at 55.)  As such, the D'590 does not show a rectangular display area centered on the front surface leaving very narrow borders to the left and right, and wide even borders above and below.  The D'590 design also fails to disclose the lozenge-shaped speaker slot of the D'677

1   patent.  Furthermore, there are two long buttons protruding from the sloped top portion of the

2   D'590 design.  The visual appearance of those buttons has no corresponding feature in the D'677

3   patent.  The D'590 patent is also missing the black color designation of the D'677 patent.

4        158.    Accordingly, it is my opinion that the ordinary designer would not find the D'590

5   patent basically the same in visual appearance as the D'677 patent.  Any attempt to add a centered

6   display area, add borders surrounding the display, change the shape of the sloped top, add black

7   color, and remove the protruding buttons, would constitute a major change to the D'590 design's

8   front surface.

9        159.    Even if the D'590 design were considered a primary reference, for the reasons

10  discussed above, the D'590 design would not appear substantially the same as the D'677 design

11  to an ordinary observer and therefore would not render the D'677 patent obvious on its own.

12       160.    The only modification Mr. Sherman proposes for the D'590 design is the addition

13  of an "earpiece slot."  But the only rationale that Mr. Sherman provides for adding such a feature

14  is directed to function, i.e., "add an earpiece slot to modify the design for mobile telephone use,"

15  and not visual appearances.  Moreover, because Mr. Sherman fails to identify any secondary

16  reference that he proposes to use to modify the D'590 design to add this feature, I am unable to

17  opine on whether the two designs of the alleged combination would be so related as to suggest a

18  modification of the D'590 design.  I am also unable to opine on the exact appearance of the

19  design that would result from this modification.

20       161.    Even if this hypothetical modification to the D'590 patent were made to add a

21  speaker slot exactly like the D'677 design, it is my opinion that the resulting design would not be

22  viewed by the ordinary observer as substantially the same as the D'677 design.  Numerous key

23  differences would remain in the hypothetically modified D'590 design, as discussed in the

24  foregoing, including squared upper corners, a lack of display screen, lack of a black front surface,

25  and an upper portion sloping back from the front with a large horizontal button.

26       162.    **iRiver U10**.  To the extent Mr. Sherman implies that the U10 should be considered

27  a primary reference against the D'677 patent, I disagree.  Because the U10 design includes

28

163.     In particular, the U10 design includes wide borders to the left and right of the screen that create a very different visual impression from the appearance of the D'677 design, which gives the overall visual impression of very narrow lateral borders.  Also, the U10 is entirely missing one of the elements of the D'677 design—a lozenge-shaped speaker slot centered in the border region above the display.  In terms of form factor, the U10 is also noticeably wider and more square-shaped than the D'677 design.

164.     Accordingly, it is my opinion that the U10 design would not appear basically the same to the designer of ordinary skill in the art.  Any attempt to narrow the U10's lateral borders, change the proportion of the U10's overall shape, and add a speaker slot would constitute major modifications to the U10's front surface.

165.     Even if the U10 design were considered a primary reference, for the reasons discussed above, the U10 design would not appear substantially the same as the D'677 design to an ordinary observer and therefore would not render the D'677 patent obvious on its own.

166.     The only modification Mr. Sherman proposes for the U10 design is the addition of an "earpiece slot."  But the only rationale that Mr. Sherman provides for adding such a feature is directed to function, i.e., "add an earpiece slot to modify the design for mobile telephone use," and not visual appearances.  Moreover, because Mr. Sherman fails to identify any secondary reference that he proposes to use to modify the U10 design to add this feature, I am unable to opine on whether the two designs of the alleged combination would be so related as to suggest a modification of the U10 design.  I am also unable to opine on the exact appearance of the design that would result from this modification.

167.     Even if a hypothetical modification to the U10 design were made to add a speaker slot exactly like the D'677 design, it is my opinion that the resulting design would not be viewed by the ordinary observer as substantially the same as the D'677 design.  In particular, key differences in the square form factor and distinctly wider lateral borders would remain to render the visual appearance of the modified U10 design significantly different in the eyes of the ordinary observer.

168.   **Additional References**.  Mr. Sherman cites several more references under the heading "Additional References That Reinforce The Obviousness of D'677."  (Sherman Report at 57-65.)  Many of these references are not prior art based on Apple's January 5, 2007 patent filing date or its April 20, 2006 invention date, facts that Mr. Sherman do not dispute.  (APLNDC00014230-31; APLNDC00014237-44.)  The remaining references in this section in fact underscore the non-obviousness of Apple's designs.

169.   **F700, Korean design patent KR30-0452985, and D560,192**.  The application for the KR'985 Patent was not published until August 27, 2007.  The D'192 patent was not filed until December 22, 2006.  Accordingly, neither reference is prior art to the D'677 patent.  Regardless, neither reference discloses a continuous, transparent, and black-colored front surface.  Mr. Sherman does not allege a public release date for the supposed embodiment of the KR'986 patent—the Samsung F700—but I have been informed that this phone was not announced until February 2007.[10]  Accordingly, the F700 is also not prior art to Apple's D'677 patent.[11]

170.   **Korean design patent KR30-0418547**.  The KR'547 Patent was first published in July 2006 and thus is not prior art to the D'677 patent.  It is therefore inappropriate to factor this patent into an obviousness analysis.  But regardless, the KR'547 patent presents a drastically different visual impression than the D'677 patent, with its much squarer form factor, much smaller display area, and wider lateral borders.  There is also no black color designation in the KR'547 patent.

171.   **JP D1241383**.  To the extent Mr. Sherman implies that the JP'383 Patent could be considered a primary reference against the D'677 patent, I disagree.  As discussed earlier, the JP'383 patent includes a number of confusing and inconsistent drawings purportedly disclosing an electronic device inside a transparent case.  Due to the overlapping lines introduced by this design, and apparent contradictions within different figures, a single design cannot be ascertained

---

[10] http://www.phonearena.com/news/Samsung-announces-iPhone-rival---F700-is-5-megapixel-beast_id1768 (APLNDC-Y0000238813-18).

[11] Mr. Sherman also cites to Samsung internal documents (SAMNDCA00321457-656) in his report.  (Sherman Report at 39-40).  These documents are not prior art (allegedly dated July - September 2006) and were not public (marked "Highly Confidential – Attorneys' Eyes Only").

174.     Even if the JP'383 Patent were considered a primary reference, for the reasons discussed above, the JP'383 design would not appear substantially the same as the D'677 design to an ordinary observer and therefore would not render the D'677 patent obvious on its own.

175.     The only modification Mr. Sherman proposes for the JP'383 design is the addition of an "earpiece slot."  But Mr. Sherman fails to provide any rationale for why the ordinary designer would modify the JP'383 reference in this manner.  Moreover, because Mr. Sherman fails to identify any secondary reference that he proposes to use to modify the JP'383 design to add this feature, I am unable to opine on whether the two designs of the alleged combination would be so related as to suggest a modification of the JP'383 design.  I am also unable to opine on the exact appearance of the design that would result from this modification.

176.     Even if this hypothetical modification to the JP'383 design were made to add a speaker slot exactly like the D'677 design, it is my opinion that the resulting design would not be viewed by the ordinary observer as substantially the same as the D'677 design.  In particular, the lack of an edge-to-edge transparent and black-colored front surface would render the visual appearance of the modified design not substantially the same as the D'677 design in the eyes of the ordinary observer.

177.     **European Union design rights registration 000569157-0005 & LG Prada** (EU Registration 000569157-0005).  I am informed that EU Registration 000569157-0005 is not prior art to the D'677 patent.  EU Registration 000569157-0005 was not submitted until September 2006, five months after the invention date of the design claimed in the D'677 patent.  Although Mr. Sherman does not allege a public disclosure date for the LG Prada, I have been informed that the LG Prada was not made public until after Apple's invention date.

178.     Regardless, the Prada design presents a very different visual appearance than the D'677 patent.  In particular, the Prada's side borders are wider and contrast with the "big screen" impression given by the D'677 patent.  Also, the Prada includes a complicated button arrangement along its bottom that is raised from the front surface and runs the full extent of the bottom border.  In contrast, the D'677 patent presents a simple, flat appearance along its bottom border.  Moreover, the Prada's black borders are made of an opaque plastic material that presents

1  a different visual appearance than the transparent surface claimed by the D'677 patent.

2  Accordingly, it is my opinion that the Prada reference would not appear substantially the same to

3  the ordinary observer or basically the same to the designer of ordinary skill in the art.

4        179.    These same visual differences apply to the design of the European Registration,

5  which also lacks a transparent and black-colored front surface.  Accordingly, it is my opinion that

6  the design of the European Registration would not appear substantially the same to the ordinary

7  observer or basically the same to the designer of ordinary skill in the art.  Mr. Sherman does not

8  suggest any modifications to EU Registration 000569157-0005 or the Prada designs or identify

9  any secondary references for combination with the EU Registration 000569157-0005 or the Prada

10  designs so I cannot further rebut his opinion that the EU Registration 000569157-0005 or the

11  Prada designs renders the D'677 patent obvious.

12        180.    **United States Design Patent D534,516 (the D'516 Patent) & LG Chocolate**.

13  Mr. Sherman does not assert that the D'516 Patent or its apparent embodiment, the LG Chocolate,

14  meets the stringent requirements of a primary reference.  To the extent Mr. Sherman implies that

15  the D'516 Patent or the LG Chocolate could be considered a primary reference against the D'677

16  patent, I disagree.  Neither the D'516 design nor the LG Chocolate creates basically the same

17  visual impression as the D'677 design.  The D'516 Patent and the LG Chocolate do not have a

18  centered display screen with balanced borders above and below the screen.  Rather, the display

19  screen is aligned closer to the top of the design than to the center.  Furthermore, the display

20  screen in the LG designs is proportionally much smaller than the display screen in the D'677

21  design.  The side borders to the right and left of the screen in the LG designs are also wider than

22  the D'677 design.  Moreover, the top and bottom ends of the Chocolate design are not straight.

23  And the D'516 design lacks black color.  There is also substantial ornamentation in the form of a

24  large button in the LG designs.  In the Chocolate, this button is metal with a metallic-appearing

25  rim and red marking, and it is surrounded by a number of smaller red buttons on the front surface

26  below the display screen.

27

28



| LG Chocolate | D'677 patent |
|---|---|

181.    Accordingly, it is my opinion that neither of the LG designs would appear

basically the same in overall visual impression as the D'677 design to the ordinary designer.

Major modifications would be required to make the D'516 design or the LG Chocolate design

look like the D'677 patent.  Even if the D'516 Patent or the LG Chocolate were considered a

primary reference, for the reasons discussed above, neither design would appear substantially the

same as the D'677 design to an ordinary observer.

182.    **K3 MP3 Player** (the K3).  Although Mr. Sherman states that the K3 "became

public in 2006" (Sherman Report at 44 ), it appears that the K3 was in fact debuted at the

Consumer Electronics Show in January 2007[12] and publicly released in March 2007.[13]

Accordingly, I am informed that the K3 may not be prior art to the D'677 patent.  Even if it were

considered, the K3's lack of a flat front surface, very small display screen located in the upper

half of the front face, wide lateral borders around the display, and lack of a speaker slot render the

K3 drastically different than the D'677 design.

183.    **JPD1280315 & JPD1295003.**  JPD1280315 was not publicly available until

September 2006, and JPD1295003 was not publicly available until February 2007.  Thus, I have

---

[12] Samsung YP-K3: The K5's Little Brother, Sans Speaker, Gadgetsportable Media,
http://gizmodo.com/218232/samsung-ypk3-the-k5s-little-brother-sans-speaker?tag=gadgetsportablemedia
(last visited Apr. 2, 2012).

[13] Samsung Media Alerts (Jan. 8, 2007),
http://www.samsung.com/us/news/newsRead.do?news_group=productnews&news_type=consumerproduct&news_ctgry=mp3&news_seq=3483.

1    been informed that these references are not prior art in light of the invention date of the D'677

2    patent and should not be considered.

3          184.    Regardless, neither of these references can serve as primary references for the

4    D'677 design.  Neither JP reference discloses a continuous and transparent front surface.  The

5    JP'315 design includes a non-rectangular shape, a screen that is off-center and lacks a lozenge-

6    shaped speaker element.  The JP'003 design includes a number of physical buttons arrayed across

7    the bottom portion, a speaker slot that is shifted all the way to the top of the front face, and an

8    extraneous rounded square feature.  The JP'003 design also includes a series of concentric rings

9    on the outer bound of its front face.

10         185.    Accordingly, these additional references merely confirm the novelty and

11   nonobviousness of Apple's D'677 iPhone design.

12         186.    **Unapplied References**.  Mr. Sherman lists a number of alleged prior art

13   references in his report that he does not assert as anticipatory references or references that render

14   the D'677 patent obvious.  In particular, Mr. Sherman describes the alleged designs for KR30-

15   0394921, Olympus MR500i,[14] D500,037, D497,364, and U.S. Patent No. 6,919,678.  I disagree

16   with a number of Mr. Sherman's assertions regarding the visual appearance disclosed by these

17   references.  But as Mr. Sherman has not provided any specific opinions as to how these

18   references invalidate the D'677 patent, I am unable to rebut them.  I reserve the right, however, to

19   offer such rebuttals if Mr. Sherman later provides specific opinions on how these references

20   invalidate the D'677 patent.

21

22

23          [14] As mentioned, Mr. Sherman does not provide any specific opinions that the Olympus MR500i
     invalidates the D'677 patent.  Regardless, I have reviewed photographs and diagrams obtained from
24   Olympus' web site that show that the MR500i has a wide raised frame around its display screen.
     Accordingly, the MR500i does not have a flat, continuous, front surface that is transparent from edge-to-
25   edge.  *See* http://www.olympusamerica.com/cpg_section/cpg_archived_product_details.asp?fl=&id=1146;
     http://www.olympusamerica.com/files/oima_cckb/MR-500i_Basic_Manual_EN_FR_ES.pdf.  Thus Mr.
26   Sherman incorrectly asserts that the MR500i has a "transparent flat front face."  (Sherman Report at 36.)
     Because the MR500i design includes distinct visual differences from the D'677 patent, it fails to create
27   basically the same visual impression as the D'677 design, does not anticipate the D'677 patent, and cannot
     be used as a primary reference.
28

1      193.    Moreover, Mr. Sherman's analysis fails to account for the difference in appearance

2  between the thin, continuous, uniform bezel of the D'087 patent, which also has an inwardly

3  sloping profile, and the thicker, significantly tapered appearance of the JP'638 design's enclosure

4  part.  None of the three references suggested by Mr. Sherman contains a bezel element like that of

5  the D'087 patent.

6      194.    Furthermore, KR30-0418547 was first published in July 2006, JPD1280315 was

7  not publicly available until September 2006, and JPD1295003 was not publicly available until

8  February 2007.  Thus, I have been informed that these references are not prior art in light of the

9  invention date of the D'087 patent and should not be considered in any event.

10     195.    Accordingly, even if the JP'638 design were found to be a primary reference, it is

11  my opinion that it would not have been obvious to the ordinary designer to modify the JP'638

12  patent to arrive at the D'087 design, or a design that is substantially the same to the ordinary

13  observer.

14     196.    **JP D1241383.**  Due to the inconsistencies set forth in my foregoing analysis of the

15  JP'383 design, it is my opinion that the ordinary designer would not be able to ascertain a single

16  consistent design from that reference. As such, it is an incomplete disclosure that is unsuitable for

17  use as a primary reference.

18     197.    **JP D1295003.**  To the extent Mr. Sherman alleges the JP'003 patent as a primary

19  reference, I disagree.  The difference in overall visual impression between the JP'003 design and

20  the D'087 patent leads to my opinion that the ordinary designer would not find them to be

21  basically the same.

| JP'003 Patent | D'087 Patent (Selected Embodiments) |
|---|---|

| JP'003 Patent | D'087 Patent (Selected Embodiments) |
|---|---|
|  | 

FIG. 5



FIG. 6 |

198.     In particular, the JP'003 design shows a front surface that is set significantly below its bezel, unlike the D'087 design, where the bezel and front surface are shown to be flush.  The JP'003 design's bezel is not uniform in appearance.  Rather, it appears thinner near the top and bottom of the device.  Moreover, a number of concentric rings or steps appear on the inside face of the bezel where it meets the front surface.  A prominent row of physical buttons appear across the bottom border of the JP'003 design where the D'087 design is unadorned.  The JP'003 design also includes a rounded-square element near the top right of its front face, and its speaker element is located higher up on the front face—immediately under the bezel.  For all of these reasons, the JP'003 design presents a very different overall visual impression than the D'087 patent.  And major modifications would be required to make the JP'003 design look like the D'087 design.

199.     Even if the JP'003 design were considered a primary reference, it is my opinion that an ordinary observer would not perceive the JP'003 design to be substantially the same as the D'087 design.  Accordingly, the unmodified JP'003 design would not render the D'087 design obvious.

200.     Mr. Sherman suggests that the JP'003 design can be modified with the Nokia Fingerprint phone design to produce the D'087 design.  But Mr. Sherman does not specifically describe what portions of the Fingerprint design he proposes to add to the JP'003 design and what portions of the Fingerprint design he proposes to replace in the JP'003 design.  Moreover, Mr. Sherman does not provide any rationale for why the ordinary designer would seek to modify the JP'003 design with the Fingerprint phone design.

| KR'307 Patent | D'087 Patent (Selected Embodiments) |
|---|---|
|  | <br>FIG. 11    FIG. 19 |
|  | <br>FIG. 7    FIG. 8 |
| [Plan View]<br><br>[Bottom View]<br> | <br>FIG. 5<br><br>FIG. 6 |

204.    In particular, the front face of the KR'307 patent presents a very different impression than the D'087 design.  The KR'307 design has a much smaller screen as a percentage of its front surface, creating top and bottom borders and lateral borders that are significantly wider than the D'087 design.  The KR'307 design also has a row of four pronounced physical buttons arrayed along its bottom border.  The KR'307 speaker slot is also significantly larger and more complex than its D'087 counterpart.  Mr. Sherman further admits that the sunken screen (or raised border) of the KR'307 design is a difference.  (Sherman Report at 71.)

1  Accordingly, it is my opinion that the designer of ordinary skill would not find the KR'307

2  design basically the same as the D'087 design.

3      205.    Even if the KR'307 design were considered a primary reference, it is my opinion

4  that due to the aforementioned differences the ordinary observer would not find the unmodified

5  KR'307 design to be substantially similar to the D'087 design.  Moreover, Mr. Sherman does not

6  identify any references that he proposes to combine with the KR'307 design to arrive at the

7  D'087 design, nor does he identify any rationale for why the ordinary designer would modify the

8  KR'307 design to be more like the D'087 design.  Accordingly, it is my opinion that it would not

9  have been obvious for the ordinary designer to modify the KR'307 design to arrive at the D'087

10  design.

11      206.    **Korean design patent KR30-0452985**.  The application for the KR'985 Patent

12  was not published until August 27, 2007.  Accordingly, the KR'985 Patent is not prior art to the

13  D'677 patent and it is improper to consider the KR'985 Patent in determining whether the D'677

14  design is obvious.  Regardless, the KR'985 design's narrow form factor, asymmetrical bezel and

15  off-center screen contribute to an overall impression that is distinctly unlike the D'087 patent.

16      207.    **Korean design patent KR30-0418547**.  The KR'547 Patent was first published in

17  July 2006 and thus is not prior art to the D'677 patent.  Regardless, the KR'547 patent presents a

18  very different visual impression than the D'087 patent, with its complex, stepped bezel design,

19  concentric rings around the front surface where it meets the bezel, much smaller display area, and

20  much wider borders around the display.  Accordingly, it is my opinion that the ordinary designer

21  would not find the KR'547 patent to be basically the same in overall visual appearance as the

22  D'087 patent.

23      208.    Even if the KR'547 patent were considered a primary reference, the ordinary

24  observer would not find the unmodified KR'547 design substantially the same as the D'087

25  patent.  Therefore, it would not render obvious the D'087 patent by itself.  Mr. Sherman does not

26  identify any references that he proposes to combine with the KR'547 design to produce the D'087

27  design, nor does not he provide any rationale for why the ordinary designer would modify the

28

| LG Prada | D'270 Patent |
|----------|--------------|
|  | |

232.     Starting with the front face, the Prada has a prominent row of raised, complex buttons running across the entire bottom of the design.  The Prada is entirely missing the angled bezel that surrounds the front surface of the D'270 design.  In profile, the Prada has a large metallic band that runs down the middle of its body, and has a thicker, boxier form factor, unlike the thin and smoothly rounded profile of the D'270 patent.  Based on the contrasting visual impressions, it is my opinion that the Prada would not appear basically the same in overall impression as the D'270 patent to the ordinary designer.

233.     Even if the Prada were considered a primary reference, for the reasons discussed above, the unmodified Prada design would not appear substantially the same as the D'270 design to an ordinary observer.  Mr. Sherman does not suggest any modifications for the Prada or any secondary references for combination with the Prada to arrive at the D'270 patent.

234.     **JP 1142127.**  To the extent Mr. Sherman asserts the JP'127 design as a primary reference against the D'270 patent, I disagree.

1    evidence to show that elements of the exterior design contributed to the commercial success of

2    the iPad, iPhone, and iPod touch.

3         247.   As described in my initial Expert Report, the D'889 patent claims an electronic

4    device and the D'889 design is embodied by the iPad 2.  Both the D'889 and the iPad 2 have an

5    uninterrupted transparent surface that extends all the way to the perimeter and that is substantially

6    free of added adornment, a uniform mask surrounding the active area of the display behind the

7    transparent front surface, evenly curved corners, a substantially flat back that curves upwards at

8    the side to meet the front plane at an edge, and the appearance of a metallic rim surrounding the

9    front surface.

10        248.   Also, as explained in my initial Expert Report, the iPhone design prominently

11   features the front face and bezel.  The D'677 patent claims the design for the front face of an

12   electronic device, and that design is embodied in the Apple iPhone (original), iPhone 3G, iPhone

13   3GS, iPhone 4, and iPhone 4S.  In particular, the front face of the iPhone (original), iPhone 3G,

14   iPhone 3GS, iPhone 4, and iPhone 4S each have the same overall shape and proportion as the

15   D'677 design.  Additionally, each iPhone has a flat, black, transparent, rectangular front surface

16   that runs to the perimeter of the face of the phone.  This flat, black, transparent, rectangular front

17   surface is claimed in the D'677 patent.  Furthermore, the curved corners on the face of each

18   iPhone have the same proportion as the curved corners depicted in the D'677 patent.  The front

19   surfaces of the each iPhone and the claimed D'677 design are substantially free of ornamentation.

20   Moreover, the front face of each iPhone has a rectangular display screen centered on the front

21   surface with very narrow borders on either side of the display screen and substantial borders

22   above and below the display screen.  This centered display screen with narrow lateral borders and

23   wider borders above and below is also claimed in the D'677 patent.  Each of the iPhones and the

24   patented D'677 design also have a horizontal lozenge-shaped speaker slot horizontally centered

25   on the front surface above the display screen.

26        249.   As described in my initial Expert Report, the D'087 patent claims the front face

27   and bezel of an electronic device, and the D'087 design is embodied by the iPhone (original),

28   iPhone 3G, and iPhone 3GS.  In particular, the design of the iPhone (original), iPhone 3G, and

1   iPhone 3GS contains a flat rectangular front face substantially free of added adornment, evenly

2   curved corners, and a thin continuous bezel curving in a rounded fashion from the upper extent of

3   the side surface toward the front surface.  Moreover, the front face of the iPhone (original),

4   iPhone 3G, and iPhone 3GS has a rectangular display screen centered on the front surface with

5   very narrow borders on either side of the display screen and substantial borders above and below

6   the display screen.  This centered display screen with narrow lateral borders and wider borders

7   above and below is also claimed in the D'087 patent.  The iPhone (original), iPhone 3G, and

8   iPhone 3GS and the patented D'087 design also has a horizontal lozenge-shaped speaker slot

9   horizontally centered on the front surface above the display screen.

10          250.    As described in my initial Expert Report, the D'270 patent claims the design of an

11  electronic device, and the D'270 design is embodied by the iPod touch.  In particular, both the

12  D'270 patent and the iPod touch have the same overall shape and proportion in the front, back,

13  and profile views.  Just like the D'270 patent, the iPod touch has a flat, clear, rectangular front

14  surface with curved corners.  In both the D'270 patent and the iPod touch, the clear surface

15  extends across the front surface to the perimeter, which is also substantially free of added

16  adornment.  Both the patented D'270 design and the iPod touch have a rectangular display screen

17  centered on the front surface that leaves very narrow borders on either side of the display screen

18  and wide, balanced borders above and below the display screen.  Moreover, both the D'270

19  design and the iPod touch have an angled bezel surrounding the front surface that is continuous

20  and substantially uniform in appearance.

21                      **b.      Industry Praise**

22          251.    **iPad 2.**  The design of Apple's iPad line of products has received widespread

23  acclaim.  Among other forms of recognition, the iPad received the Red Dot award for Product

24  Design and Best of the Best in 2010,[17] a 2011 International Forum (iF) Product Design Award,[18]

25

26          ──────────────────────

27          [17] Red Dot, iPad, http://en.red-
    dot.org/2783.html?cHash=005c9238f0aa9615b2c1026db05140fc&detail=7562.

28          [18] iF, Online Exhibition, http://exhibition.ifdesign.de/entry_search_de.html?search=ipad.

### d.     Tablets Need Not Have a Flat Clear Surface Without Ornamentation

319.     Mr. Sherman's argument that tablets need to have a flat and clear surface without ornamentation is also unsupported by the many alternative designs that are commercially available, including Samsung's own tablet computer that was available before Apple's iPad.

320.     Samsung's Q1 tablet had a recessed screen surrounded by a raised frame, rather than a flat surface.  Moreover, the Q1 tablet had an opaque frame with buttons surrounding the display screen instead of a completely clear front surface as in the D'889 design.  The Q1 was praised for its "beautiful, featherweight design" with a "sleek case" and that the "[b]uttons around the screen also help [the user] navigate."[75]  Many users prefer physical buttons as they provide tactile feedback.

321.     Furthermore, many other third-party tablet devices have an opaque frame surrounding the display and thus do not have a completely front surface.  For instance, the Nook tablet has a gray opaque frame that has a "textured finish" that makes it "feel a little better in your hand."[76]  Likewise, the Coby Kyros has an opaque plastic housing that makes the device "sturdy."[77]  The Acer Iconia A500 also has a distinctive opaque aluminum casing that wraps around to the front surface.

322.     Mr. Sherman also argues that the "border around the screen shown in the D'889 is functional."  He argues that this border accommodates and hides components and wiring.  This argument is incorrect.  To the extent the border is used to hide components and wiring, this is an aesthetic – not a functional – consideration.  Second, Mr. Sherman's argument that the border accommodates components and wiring does not explain why the border needs to be uniform as in

---

[75] CNET, "Samsung Q1 Ultramobile PC," http://reviews.cnet.com/laptops/samsung-q1-ultramobile-pc/4505-3121_7-31781057.html#reviewPage1.

[76] CNET, "Barnes & Noble Nook Tablet," http://reviews.cnet.com/tablets/barnes-noble-nook-tablet/4505-3126_7-35059751.html#reviewPage1

[77] William Harrel, "Coby Kyros Internet 8" Touch Screen Tablet Review & Ratings," Computer Shopper, http://computershopper.com/tablets/reviews/coby-kyros-internet-8-touchscreen-tablet-mid8024/%28page%29/.

1

2   **V.     SUPPLEMENTATION**

3         426.    I reserve the right to supplement this report with new information and/or

4   documents that may be discovered or produced in this case, or to address any new arguments

5   offered by Samsung.

6

7   Dated:  April 16, 2012                                    _____

8                                                                    Peter W. Bressler

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28