# EXHIBIT 27
# FILED UNDER SEAL

Page 1432

BEFORE THE

UNITED STATES INTERNATIONAL TRADE COMMISSION

---

In the Matter of:      )  Investigation No.

CERTAIN MOBILE DEVICES    )  337-TA-750

AND RELATED SOFTWARE    )

---

Hearing Room A

United States

International Trade Commission

500 E Street, Southwest

Washington, D.C.

Friday, September 30, 2011

VOLUME V

The parties met, pursuant to the notice of the

Judge, at 9:00 a.m.

BEFORE:  THE HONORABLE THEODORE R. ESSEX

---

Page 1434

1   APPEARANCES (Continued):
2
3   For Respondent Motorola Mobility, Inc.:
4       CHARLES K. VERHOEVEN, ESQ.
5       DAVID EISEMAN, ESQ.
6       Quinn Emanuel Urquhart & Sullivan LLP
7       50 California Street, 22nd Floor
8       San Francisco, CA 94111
9
10      EDWARD J. DeFRANCO, ESQ.
11      Quinn Emanuel Urquhart & Sullivan LLP
12      51 Madison Avenue, 22nd FLoor
13      New York, New York 10010
14
15      DAVID A. NELSON, ESQ.
16      Quinn Emanuel Urquhart & Sullivan LLP
17      500 West Madison Street, Suite 2450
18      Chicago, Illinois 60661
19
20
21
22
23
24
25

---

Page 1433

1   APPEARANCES:
2       For Complainant Apple:
3       MARK G. DAVIS, ESQ.
4       BRIAN E. FERGUSON, ESQ.
5       ROBERT T. VLASIS, ESQ.
6       EDWARD S. JOU, ESQ.
7       CHRISTOPHER T. MARANDO, ESQ.
8       Weil, Gotshal & Manges LLP
9       1300 Eye Street, N.W., Suite 900
10      Washington, D.C. 20005
11
12      JILL J. HO, ESQ.
13      BRIAN C. CHANG, ESQ.
14      Weil, Gotshal & Manges LLP
15      201 Redwood Shores Parkway
16      Redwood Shores, CA 94065
17
18      MATTHEW D. POWERS, ESQ.
19      STEVEN S. CHERENSKY, ESQ.
20      PAUL T. EHRLICH, ESQ.
21      ROBERT L. GERRITY, ESQ.
22      Tensegrity Law Group LLP
23      201 Redwood Shore Parkway
24      Redwood Shores, CA 94065
25

---

Page 1435

1   APPEARANCES (Cont'd):
2
3   For ITC Staff:
4       LISA KATTAN, ESQ.
5       ANNE GOALWIN, ESQ.
6       U.S. International Trade Commission
7       500 E Street, S.W.
8       Washington, D.C. 20436
9
10
11      Attorney-Advisor:
12      GREGORY MOLDAFSKY, ESQ.
13      Attorney-Advisor
14      Office of Administrative Law Judges
15      U.S. International Trade Commission
16      500 E Street, S.W.
17      Washington, D.C. 20436
18
19
20      *** Index appears at end of transcript ***
21
22
23
24
25

1 (Pages 1432 to 1435)

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

Page 1464

1    Q.   Would you read it back?
2        THE REPORTER: "Question: Figure 2
3    and the associated text in SmartSkin, would you
4    say that that discloses a mutual capacitance
5    touch system that is configured to recognize
6    the relative positioning of two different
7    objects?"
8        THE WITNESS: I have no disagreement
9    with that statement with respect to figure 2.
10   BY MR. DeFRANCO:
11   Q.   Just for the record, I don't want to
12   belabor it. I want to move through some of the
13   figures in the SmartSkin reference that depict
14   that visually.
15       Let's turn to the next slide. Figure
16   7, for example, shows a person using two hands
17   to move objects, to move around the SmartSkin
18   surface and move two images.
19       Do you see that?
20   A.   Figure 7, if we look at the left, it
21   shows two halves of this image apart from each
22   other. And then the right-hand side of figure
23   7 shows that they have been pushed together.
24   So that's what it calls concatenating two
25   objects.

Page 1465

1        The object is actually, as you can see
2    from figure 7, projected from a camera above.
3    And that's why you actually see the projection
4    on the person's fingers.
5    Q.   Okay. And then if we move on to
6    figure 10, figure 10 shows a hand on the screen
7    and then it shows a two-fingered gesture. Do
8    you see that, sir?
9    A.   On the top row of figure 10, yes, I
10   agree.
11   Q.   And that two finger gesture is
12   reminiscent, wouldn't you say, of the pinch to
13   zoom sort of gesture, just generally?
14   A.   No. I mean, there is certainly a
15   starting point for two fingers you could use to
16   proceed into a pinch to zoom. This is a static
17   image. It doesn't actually show the pinching.
18   Q.   Okay. And then the figure 13, do you
19   see that it states there two-finger gestures
20   can be used to pick up objects? Do you see
21   that, sir?
22   A.   Yes, I see that.
23   Q.   And would you say that these figures
24   that are shown here are generalized examples of
25   multi-touch gestures in the SmartSkin

Page 1466

1    reference?
2    A.   These are certainly some of the
3    gestures that are discussed within the
4    SmartSkin reference and, indeed, I do agree
5    that these do involve multiple touches.
6    Q.   Let's talk a bit about transparency
7    and your opinion about what is or what is not
8    disclosed in the SmartSkin reference with
9    respect to transparency. Okay?
10   A.   I understand.
11   Q.   Let's go to slide RX-28.006. Again,
12   sir, in the discussion in this hearing about
13   SmartSkin, and this particular paragraph about
14   transparency, and obviously you think there is
15   some shortcomings as to the scope of the
16   disclosure of this particular paragraph; is
17   that fair enough?
18   A.   It is my opinion that there are
19   significant deficiencies with respect to this
20   paragraph. This paragraph is a discussion --
21   it falls within the section on future work.
22   Q.   I'm sorry, I didn't mean to cut you
23   off. We're going to go through your issues. I
24   just wanted to set that premise, okay?
25   A.   I understand.

Page 1467

1    Q.   But my point is that hopefully there
2    are some things we can agree on. And I just
3    want to establish that first, okay?
4    A.   I don't know if we will or not.
5    Q.   Okay. Well, let's give it a shot,
6    okay? So in this paragraph, can we at least
7    agree that it is disclosing the use of a
8    transparent sensor such as can be manufactured
9    or etched using ITO?
10   A.   In fact, this section discloses the
11   possibility in future work of using transparent
12   electrodes in a SmartSkin sensor that could be
13   obtained by using ITO.
14   Q.   Okay. You are referring to, I
15   believe, the beginning of the section. And I
16   didn't mean to not point that out to you, but
17   you said that before at the hearing, that the
18   future, I believe the future -- let's put that
19   up.
20       If you put the entire -- go back to
21   the entire page, Ryan. I want to point out
22   what the Doctor is referring to. Conclusion
23   and directions for future work.
24       I think that's what you are referring
25   to, sir, that the section that talks about

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342514

Page 1468

1  transparent electrodes, electrodes that could
2  be made out of transparent materials such as
3  ITO, that falls in a section of the SmartSkin
4  reference that's entitled conclusions and
5  directions for future work.  Do you see that?
6      A.   It does.  It is not in a section
7  that's related to what they have done.  In
8  fact, specifically it will not work with figure
9  2.
10     Q.   Now, sir, you don't dispute, though,
11 again, figure 2 discloses a mutual capacitance
12 device?
13     A.   That's correct.
14     Q.   Okay.  So I just want to make sure,
15 though, when you are referring to future work,
16 what that says in that paragraph about ITO, you
17 don't dispute that that's an accurate statement
18 as to what the article reference had said at
19 the time?
20     A.   I mean, if you are asking me, do the
21 words indium tin oxide appear in that section,
22 the answer is yes.  However, it is my opinion
23 for detailed technical reasons that that will
24 not -- that firstly, that is in a future work
25 section and that will not work with respect to

Page 1469

1  the mutual capacitance system of figure 2.
2      Q.   Okay.  But let's go back.  Can you
3  blow up that particular paragraph?
4          Now, by the way, sir, you're aware
5  that a person can apply for a patent without
6  actually having made a prototype that's covered
7  by each and every claim of a particular patent;
8  is that true?
9      A.   With respect to prototyping,
10 absolutely.
11     Q.   Right.  For example, as we have seen
12 during this hearing by way of example, patents
13 often have many dependent claims, right?
14     A.   Yes.
15     Q.   For example, dependent claims can
16 branch off an independent claim and lay out
17 individually different materials that can be
18 used for a particular aspect of an invention.
19 Is that fair?
20     A.   Yes, that's certainly possible.
21     Q.   And one of the reasons for that is the
22 inventors want to make sure that they don't
23 have a claim that's so broad that it is going
24 to be invalidated by the prior art, so if it
25 comes time for an assertion, they can point to

Page 1470

1  one that's a bit more specific and would
2  hopefully avoid the prior art, while at the
3  same time capturing the accused device.  Fair
4  enough?
5      A.   I can't comment on the inventor's
6  intent for doing what they do, but that would
7  certainly be an outcome of having narrower
8  claims being dependent on broader independent
9  claims.
10     Q.   And this patent, in particular, the
11 '607 patent, before we get back to SmartSkin,
12 it discusses ITO, doesn't it?
13     A.   Yes, there are claims that mention
14 ITO.  And within the spec, it talks about ITO.
15     Q.   Well, I don't think there are claims
16 that specifically -- well, let me go back.
17         It discusses ITO in the specification
18 in a number of places, correct?
19     A.   Yes.
20     Q.   But it doesn't specifically reference
21 any other type of transparent material, does
22 it?
23     A.   I'd have to check.  Give me one
24 second.  And by transparent, you mean
25 transparent conductor, not glass or plastic or

Page 1471

1  glass member?
2      Q.   Yes, yes.
3      A.   I believe that's right.  I believe
4  that says with a transparent conducting medium
5  such as indium tin oxide, but it doesn't offer
6  other alternatives that do exist, but the only
7  one it specifically calls out as an example is
8  ITO.
9      Q.   Right.  Were there other alternatives
10 at that time that existed to use as a
11 transparent conductive material?
12     A.   Yes.
13     Q.   In the devices we're talking about?
14     A.   Yes.
15     Q.   None of those are disclosed?
16     A.   Explicitly disclosed?
17     Q.   Yes.
18     A.   Beyond the statement -- beyond the
19 statement saying such as, yes, I agree.  The
20 only specific disclosure of a particular
21 material is ITO.
22     Q.   And in your deposition, if I have it
23 right, you talked about characteristics of ITO
24 specifically that are -- that one needs to
25 consider in determining exactly how to

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342515

Page 1472

1   implement or use ITO in a mutual capacitance
2   device that's intended to have multi-touch
3   capabilities.
4          Do you recall that, sir?
5      A.   I recall discussing the properties of
6   ITO in the context of how it would behave in
7   various systems.
8      Q.   Right.  Sure.  Right?  I mean, things
9   like thickness, the width, the shape are
10  considerations, right, for how ITO is going to
11  behave in a particular implementation?  Isn't
12  that fair?
13     A.   Generically, yes.
14     Q.   Resistance, you referred to
15  resistance.  The resistance of the material
16  itself impacts other characteristics that may
17  be relevant to the use in the particular
18  device, sir.  Is that correct?
19     A.   That's absolutely true, because the
20  resistivity of ITO is quite poor.
21     Q.   Right.  And certain characteristics or
22  features that are relevant to its transparency
23  are a function of resistivity; isn't that true,
24  sir?
25     A.   If you are asking me, is there a

Page 1473

1   tradeoff between transparency and resistance,
2   the answer is yes.  If you are asking me if
3   there is a tradeoff between transparency and
4   resistivity, that's not necessarily true.
5      Q.   Okay.  Yes, between resistance, there
6   is a tradeoff with transparency; is that
7   correct, sir?
8      A.   Yes, in the specific case where you
9   reduce resistance by increasing thickness, you
10  degrade transparency.
11     Q.   And some of the other characteristics
12  are capacitance, you said, correct?
13     A.   ITO on its own is a conductor.  When
14  we talk about capacitance of it, it would be
15  when configured in some other system.
16     Q.   But control, in terms of -- I am
17  simply asking in terms of the considerations
18  that go into designing a transparent
19  multi-touch system using ITO, you list the
20  characteristics, one is control of the
21  capacitance of the particular device at issue;
22  is that fair?
23     A.   Of the various capacitances of the
24  device at issue, yes, that would be true.
25     Q.   Yes.

Page 1474

1      A.   There is not a single capacitance.
2      Q.   I apologize for speaking over you.
3          The capacitance of the ITO that's
4   being used is part of that, isn't it?
5      A.   Capacitance is measured between -- is
6   a measure of -- capacitance is, in fact,
7   defined as DQ/DV, it is how much charge changes
8   for a given change in voltage.  So there has to
9   be a reference.
10         You can't talk about the capacitance
11  of ITO on its own.
12     Q.   Yes, no, absolutely.  But in
13  determining DQ over DV, you take into
14  consideration the capacitance effect of the
15  ITO?
16     A.   If you are talking about a capacitor
17  which includes one or more terminals made of
18  ITO, then in the calculation you would take
19  into account the area, among other things, of
20  the ITO.
21     Q.   And in designing a particular product,
22  you are certainly going to take into account
23  the area of the ITO and how it impacts
24  capacitance of the device overall.
25     A.   Yes, I agree with that.

Page 1475

1      Q.   Dispersion, you also mentioned
2   dispersion as another characteristic.  Can you
3   tell us what dispersion is?
4      A.   Certainly.  Dispersion is the change
5   in capacitance as a function of frequency and
6   more specifically it is the change in
7   dielectric constant as a function of frequency.
8      Q.   Okay.  Another characteristic, another
9   variable that needs to be taken into account
10  when designing a mutual capacitance transparent
11  device that has multi-touch capability; is that
12  fair?
13     A.   I'm sorry, I didn't understand the
14  question.
15         MR. DeFRANCO:  Would you read it back?
16         THE REPORTER:  "Question:  Okay.
17  Another characteristic, another variable that
18  needs to be taken into account when designing a
19  mutual capacitance transparent device that has
20  multi-touch capability; is that fair?"
21         THE WITNESS:  Again, I still don't
22  understand the question.
23  BY MR. DeFRANCO:
24     Q.   I'm sorry, I was talking about
25  dispersion.  Dispersion is another one of those

11 (Pages 1472 to 1475)

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

1   characteristics that needs to be taken into
2   account in designing a mutual capacitance
3   multi-touch device that is transparent.  Fair
4   enough?
5        A.   Yes, I agree with that.
6        Q.   Those three characteristics relate or
7   are all factors in the implementation of ITO --
8   using ITO; is that fair enough?
9        A.   In such a device?
10       Q.   Yes.
11       A.   With respect to such a device, you do
12  consider the characteristics we talked about.
13  Dispersion is actually more related to the
14  dielectric, not to the ITO itself.
15       Q.   But it is a factor?
16       A.   In terms of doing the design of a
17  mutual capacitance system, you would consider
18  dispersion.
19       Q.   Yes.  And the characteristics that we
20  discussed, to the extent they relate or are
21  impacted by ITO, the same would be true of
22  other materials that could be used as a
23  conductor in a given device?
24       A.   If you are asking me, do the
25  properties of the conductor affect the ability

1   to implement a system, the answer is
2   absolutely, yes.
3        Q.   Well, you said that -- we agreed, at
4   least, that ITO is discussed or disclosed in
5   the '607 patent, right?
6        A.   Yes.
7        Q.   And you agreed that there were no
8   other examples of a transparent conductive
9   material specifically disclosed.  Is that
10  correct?
11       A.   The only specific example was ITO,
12  yes.
13       Q.   And I think you said there are other
14  examples in the field.
15       A.   You mean, am I aware of other
16  materials?
17       Q.   Yes.
18       A.   Yes.  In fact, I work on them.  That's
19  how I know about them.
20       Q.   And as of your deposition -- by the
21  way, you have never yourself designed or made a
22  mutual capacitance multi-touch device using
23  ITO; is that correct?
24       A.   I have never made one.
25       Q.   You have never done that yourself?

1        A.   I have never made one myself.  That's
2   absolutely true.
3        Q.   My question, going back, simply is the
4   characteristics that you identified for us,
5   resistance, capacitance, dispersion, relating
6   to the material in a multi-touch sensor, those
7   would vary based on the material, wouldn't
8   they, sir?  They would be different for ITO
9   versus some other conductive material that you
10  might consider?
11       A.   Resistance will certainly vary.
12  Capacitance in the structure, if you use the
13  same area, will not vary very much.  In fact,
14  it probably won't vary at all.  And dispersion
15  is primarily dependent on the dielectric, not
16  on the conductor itself.
17       Q.   Okay.  Now, but it is your opinion,
18  sir, that prior to the '607 patent, one of
19  skill in the art would not know how to
20  properly, correctly or effectively deposit ITO
21  for use as an electrode in a mutual
22  capacitance, multi-touch device that could
23  detect more than one touch.  Is that correct?
24       A.   To realize said device, yes, I agree.
25       Q.   And, again, part of your criticism of

1   SmartSkin is that it doesn't teach one of skill
2   in the art how to do the -- how to do that,
3   excuse me, in the section where it talks about
4   using transparent ITO as the sensor in a
5   multi-touch device; is that fair?
6        A.   That is certainly one of my
7   criticisms.
8        Q.   Okay.  Let's be fair.  Let's talk
9   about the '607 patent, okay?  Let's put it on
10  the same playing field.
11            Ryan, let's bring up -- I have made
12  some slides of this last night just to move
13  forward through this a little more quickly.
14  We're going to put up different sections of the
15  patent, rather than having to refer you to it.
16            Ryan, let's turn first to RDX-006.
17  And I will tell you, sir, what I would like to
18  do is look through for every reference of ITO
19  in the patent.  If there is something I am
20  missing, something that comes to mind, feel
21  free to look at the spec itself, but I tried to
22  capture the relevant sentences that discussed
23  ITO and a bit around it to put it in context.
24       A.   I understand.
25       Q.   Fair enough?  But you are certainly

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342517

Page 1480

1  free to refer to anything else.  So, Ryan, we
2  should have RTX-007.  I guess that's 6.  Sorry
3  about that.
4        So, this is column 5, lines 27 to 67
5  of the '607 patent.  Do you see that?
6     A.   Yes.
7     Q.   This, if I have it right, is the first
8  reference to ITO in the '607 patent and it
9  says, "in order to produce a transparent
10 touchscreen, the capacitance sensing nodes are
11 formed with a transparent conductive medium
12 such as indium tin oxide (ITO)."
13       Do you see that, sir?
14    A.   I do.
15    Q.   And, again, before you mentioned, it
16 says such as, implying there are others, but
17 certainly it doesn't disclose any others; is
18 that right?
19    A.   It does not disclose any other than
20 explicitly disclosing indium tin oxide, but
21 that is provided in an exemplary fashion.
22    Q.   Okay.  And, by the way, it goes on to
23 discuss self-capacitance, sensing arrangements
24 and patterns for the remainder of that
25 paragraph and then we also put the beginning of

Page 1481

1  the next paragraph there, sir, excuse me, that
2  discusses mutual capacitance.
3        Do you see that?
4     A.   I see those paragraphs.
5     Q.   Okay.  Now, it is fair to say, though,
6  in this first discussion, there are no specific
7  details about how to implement or use ITO in a
8  mutual capacitance multi-touch device that's
9  transparent, is there, sir?
10    A.   Well, beyond saying that in a mutual
11 capacitance system, you have groups of
12 spatially separated lines formed on two
13 different layers, there is no additional
14 disclosure beyond what's already shown on the
15 screen.
16    Q.   That's all that's said there, right?
17 It doesn't discuss some of the characteristics
18 we talk about earlier, like impact on
19 resistance?
20    A.   These paragraphs do not mention
21 resistance, capacitance -- well, they do
22 mention capacitance, but they do not mention
23 resistance or dispersion.
24    Q.   And they don't give any other details
25 about the ITO, right?  I mean, it is fair to

Page 1482

1  say, isn't it, that at least based on this
2  paragraph alone, somebody skilled in the art
3  who is trying to replicate the mutual
4  capacitance device that can sense multiple
5  touches would need to do some experimentation,
6  wouldn't they?
7     A.   If you're asking me if they have never
8  deposited ITO before and they had to deposit
9  it, would they have to learn how to tune the
10 deposition parameters?  Yes, I agree.  The key
11 point is, however, the system of the '607
12 patent actually will work because the
13 disclosure of the circuitry allows it to work
14 with ITO.
15    Q.   Okay.  But at least in terms of --
16 we're talking now about depositing the ITO, the
17 shape of the ITO, the thickness of the ITO,
18 other characteristics of the ITO, how
19 transparent it is going to be based on the
20 resistivity, those factors we discussed
21 earlier, those details are not disclosed in
22 this portion; is that fair?
23    A.   In the paragraphs you have got on the
24 screen in RDX-28.007, I agree completely.
25    Q.   Let's turn to RDX-28.008.  Again, sir,

Page 1483

1  marching through just the ITO disclosures in
2  the '607, this is the next one we found.  It
3  says, "The electrodes 102 and sense traces 106
4  can be made from any suitable transparent
5  conductive material.  By way of example, the
6  electrodes 102 and traces 106 may be formed
7  from indium tin oxide."
8        This one is a little different, sir.
9  It doesn't say it on the slide, but I believe
10 this is referring to the self-capacitance
11 embodiment.  Nevertheless, it is discussing
12 ITO.  Do you see that, sir?
13    A.   This section is discussing ITO.
14    Q.   And then when it -- when it refers to
15 any suitable transparent -- any suitable
16 transparent conductive material, again, it
17 gives an example, the one example is ITO.  Do
18 you see that, sir?
19    A.   The explicitly called out material is
20 indeed ITO.
21    Q.   Now, the first sentence, as long as
22 we're here, says the electrodes and traces may
23 be placed on the member using any suitable
24 patterning technique, including, for example,
25 deposition, etching, printing and the like.

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342518

Page 1484

```
 1              Do you see that, sir?
 2         A.   I do.
 3         Q.   Now, that's -- when it says any
 4    suitable patterning technique, is that
 5    referring to the fact that those patterning
 6    techniques were known in the field at the time?
 7         A.   With respect to these, yes.
 8         Q.   With respect to the way to deposit ITO
 9    on a substrate.  Is that fair?
10         A.   With respect to how to deposit --
11    actually, here it is specifically pattern --
12    how to pattern ITO on a substrate, it is making
13    clear that there are multiple ways to do that
14    and they were known at the time.
15         Q.   Okay.  You could do it by deposition,
16    etching, and printing and the like, but it
17    doesn't discuss any specific processes for
18    doing that deposition, the etching, or the
19    printing.  Is that fair?
20         A.   If by that you mean, does it give the
21    details on how to do the deposition, how to do
22    the etching, how to do the printing?  Yes, I
23    agree, there is no further detail provided.
24         Q.   And would you agree that how the
25    deposition is done, how the etching is done,
```

Page 1485

```
 1    how the printing is done may affect the
 2    physical characteristics of the ITO?
 3         A.   You mean such as resistivity, et
 4    cetera?
 5         Q.   Yes.
 6         A.   Yeah, they do.
 7         Q.   Now, do you recall being asked at your
 8    deposition, sir, to explain where in the '607
 9    patent the inventors teach or disclose how to
10    create ITO electrodes as claimed in the patent?
11         A.   I recall some discussion of that.
12         Q.   And do you recall saying that there is
13    a fairly substantive discussion in column 10,
14    sir?
15         A.   Yes.
16         Q.   And do you recall --
17         A.   Well, I don't recall saying
18    specifically that, but it certainly would be a
19    section I would refer to.
20         Q.   Well, we can put it up.  The answer
21    that I have, sir, and this is at your
22    transcript 220, line 12 to 211, line 16, you
23    were asked:  Well, I guess let me ask you,
24    where in the '607 patent do they teach or even
25    disclose how to create ITO electrodes as
```

Page 1486

```
 1    claimed in the asserted claims of the patent?
 2         And I don't mean to test you, sir.
 3    You are welcome to look at your transcript of
 4    course.  It says:  Well, there is one fairly
 5    substantive discussion in column 10.
 6         Do you see that, sir?
 7         A.   I don't, but I have no reason to doubt
 8    I said that.
 9         Q.   Why don't we put that up on the
10    screen, Ryan.  Why don't you get the next
11    question and answer.  Go down to line 16,
12    please.
13         So we have put, this is continuous, it
14    is just two different pages.  That's why there
15    is two different boxes.
16         A.   I understand.
17         Q.   The top question, sir, is what I just
18    asked you.
19         "Question:  Well, I guess, let me ask
20    you, where in the '607 patent do they teach or
21    even disclose how to create ITO electrodes as
22    claimed in the asserted claims of the patent."
23    Do you see that, sir?
24         A.   I see that question.
25         Q.   It is a general question, you were
```

Page 1487

```
 1    asked to identify the ITO disclosure in the
 2    '607 patent.  Do you remember that?
 3         A.   That appears to be the case.
 4         Q.   And it appears to be the case, doesn't
 5    it, that you pointed specifically to the
 6    discussion in column 10 that we just took a
 7    look at.  Isn't that correct, sir?
 8         A.   That's true.
 9         Q.   And not that you doubted this, but
10    just so it is clear, you called that at the
11    time a fairly substantive discussion.  Is that
12    correct, sir?
13         A.   That is what I said.
14         Q.   And, in fact, you went down in
15    response to the next question, you specifically
16    read that portion of column 10 as part of your
17    answer to set forth what you viewed at the time
18    as a fairly substantive discussion.  Is that
19    correct?
20         A.   That's true.
21         Q.   Okay.  Let's turn to the next
22    disclosure of ITO in the '607 patent.  And this
23    should be on slide 009.  It is the '607 patent,
24    column 12, lines 35 to 45.
25         Do you see in this paragraph again it
```

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342519

Page 1488

1   is talking about the touchscreen, it works its
2   way down to ITO at the end, but it begins, "the
3   touchscreen 134 includes a transparent
4   electrode layer that is positioned over a glass
5   member 138."
6           Do you see that, sir?
7   A.   I see that language.
8   Q.   Now, it says at the end, "in most
9   cases, the electrode layer 136 is disclosed on
10  the glass member 138 using transparent --
11  sorry, "using suitable transparent conductive
12  materials and patterning techniques such as ITO
13  and printing."
14          Do you see that?
15  A.   Yes, I do.
16  Q.   Once again, the only suitable
17  conductive material disclosed is ITO; is that
18  correct, sir?
19  A.   In terms of the example provided, yes.
20  The only example provided is ITO.
21  Q.   And the example provided here is in
22  terms of the deposition technique in this
23  particular instance, it is patterning
24  techniques using a printing method.  Is that
25  fair?

Page 1489

1   A.   That's correct.
2   Q.   Okay.  It doesn't say anything more
3   about printing, it just says that's one of the
4   techniques that can be used.  Is that correct,
5   sir?
6   A.   In the sentence you have provided,
7   yes, it only says you can use printing.  It
8   doesn't give any details.
9   Q.   So let's move on to the next reference
10  in the '607 patent.  This is slide 10.  It
11  should have column 13, line 62 to column 14,
12  line 5.
13  A.   I see that.
14  Q.   And, again, sir, this portion of the
15  specification, and if I have it correctly, this
16  is referring to figure 9 of the patent, there
17  has been some time spent in the case on figure
18  9.  I probably should have started there.
19  Ryan, do you mind putting up figure 9 of the
20  '607 patent for a moment.
21          Just for reference purposes, sir, do
22  you recall figure 9?
23  A.   I do recall figure 9.
24  Q.   And figure 9 is a mutual capacitance
25  example where we have drive and sense lines; is

Page 1490

1   that correct, sir?
2   A.   Yes, I agree with that.
3   Q.   So let's go back, Ryan, to RDX-28.010.
4   Again, the last sentence in this section after
5   pointing out the different lines in figure 9,
6   it says, "furthermore, the lines 52 can be made
7   from any suitable transparent conductive
8   material.  By way of example, the lines may be
9   formed from indium tin oxide."  Do you see
10  that, again, sir?
11  A.   I believe the lines are 152, not 52,
12  but otherwise you read it correctly.
13  Q.   Yes, sir.  Thank you.
14          Now, let's take a look at RDX-010.
15  And this is column 14, lines 60 to column 15,
16  line 23.  Okay.  The good news is this is the
17  last reference.  It is a bit longer, but I just
18  want to work through it for a moment.
19          Okay, you have seen this portion
20  before?
21  A.   Yes.
22  Q.   I want you to have it in mind.  I see
23  you are reading it.  When you are done kind of
24  going through it, would you let me know?
25  A.   Certainly.  I have read it.

Page 1491

1   Q.   Let's just read in for the record the
2   first couple of lines.  It says, "as mentioned
3   above, the lines in order to form
4   semi-transparent conductors on glass, film or
5   plastic, may be patterned with an ITO
6   material."
7           Do you see that?
8   A.   Yes.
9   Q.   Now, by the way, this says glass,
10  film, or plastic.  Are those different types of
11  materials on which ITO can be placed using the
12  techniques that were discussed earlier such as
13  etching or printing?
14  A.   Etching doesn't place the ITO.
15  Etching removes the ITO.  But with respect to
16  could you deposit ITO on glass, film, or
17  plastic as called out here, the answer is yes.
18  Q.   Yes.  You are right, sir.  The ITO is
19  deposited and then the portions of the ITO film
20  that are not going to be used in the final
21  configuration of the device are etched away.
22  Is that correct, just like you etched away
23  glass to make a pattern?  Is that true?
24  A.   Yes, that's a reasonable description.
25  Q.   And the characteristics of the

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342520

Page 1492

1   substrate material, be it glass or film or
2   plastic, that's going to affect the deposition
3   process and the process that's used to create
4   the resulting pattern, if it is etching, for
5   example.  Isn't that true, sir?
6       A.   There is some impact of the substrate
7   on the deposition.  It depends -- the amount of
8   impact depends on the deposition technique, et
9   cetera.
10          Certainly usually you can get higher
11  quality ITO on glass than you do on plastic,
12  for example.
13      Q.   But if you are using plastic, for
14  example, there is -- the characteristics of
15  plastics varies widely in terms of the features
16  that a polymer engineer or a chemical engineer
17  would discuss.  Isn't that true?  You know
18  that, sir, right?
19      A.   For better or worse, I have been
20  working on plastic based electronics for many
21  years now and, yes, the properties of the
22  plastic do impact the layers that are put on
23  top of it.
24      Q.   Properties are things such as
25  hardness; is that correct?

Page 1493

1       A.   Yes.
2       Q.   And those properties are impacted or
3   those properties need to be taken into
4   consideration in the manufacturing process, for
5   example, when you are depositing the ITO layer.
6   Isn't that true?
7       A.   When you are integrating your system,
8   in other words, you are figuring out how you
9   are going to do the deposition, the space
10  within which you can choose the deposition
11  characteristics you want to use do depend on
12  the properties of the substrate.
13      Q.   Okay.  And the use of the device
14  itself -- well, I'm sorry.
15          Not only do the characteristics of the
16  substrate affect the deposition process, there
17  are also characteristics of the substrate that
18  must be taken into account when the device
19  itself is ultimately used.  Is that fair?
20      A.   You mean in terms of the design of the
21  device, the overall device?
22      Q.   Yes, sir.
23      A.   Yes.  That's true.
24          JUDGE ESSEX:  Pardon me.  Let me
25  interrupt you just a moment.

Page 1494

1       I read this as well, and I am reading
2   the paragraph, it is talking about in order to
3   prevent the aforementioned problem, the dead
4   areas between the ITO may be filled, and I
5   don't see the dead areas as an aforementioned
6   problem in that.  It doesn't make sense to me.
7   Can you help me out with that at all?
8       THE WITNESS:  Certainly, Your Honor.
9   Actually, it is easy to do it with a figure.
10  So we can do it with figure 9, if we could have
11  figure 9, I can explain from there.
12      Actually, let's use figure 10.  That's
13  even better.
14      So, Your Honor, if you look at figure
15  10, each of these (indicating) represents a
16  stripe of ITO.
17      JUDGE ESSEX:  Right.
18      THE WITNESS:  So in this example, we
19  deposit a blanket film of ITO that covers the
20  entire plastic.  And then we etch it out from
21  certain regions to form these lines.  So now
22  what you are left with if you swore to look at
23  the sheet of plastic, you have some regions
24  that have ITO.
25      JUDGE ESSEX:  Right.

Page 1495

1       THE WITNESS:  And other regions that
2   don't.  Now, it turns out the refractive index,
3   an optical property of a material, is different
4   for ITO and for plastic and is different for
5   ITO and for air.
6       It is also -- let's say you were then
7   going to put this in a sandwich where, for
8   example, you put a glue layer on top and then
9   sandwich them together.  Well, it may be
10  different for the ITO to the glue.
11      So now you have a problem.  You are
12  looking at a sheet of plastic.  Some regions,
13  the light is going through ITO, which has one
14  refractive index.  And the other regions, it is
15  going through glue, which has a different
16  refractive index.
17      And so the eye perceives a shimmer
18  because there is a variation in refractive
19  index.  So the dead area discussion is
20  referring to the areas between the ITO where
21  the ITO was removed.
22      JUDGE ESSEX:  Okay.  So it is a poorly
23  written paragraph then?  It didn't talk about
24  the refractive -- all right.  The problem of
25  the dead areas wasn't mentioned until it came

                16  (Pages 1492 to 1495)

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342521

Page 1496

1  up with filling those areas up, and --
2      THE WITNESS:  Yes, Your Honor.  I
3  think the reason they called it -- they hadn't
4  explained what dead areas were before, but in
5  the previous paragraph they discussed etching
6  away the ITO.  So that etching process creates
7  the dead areas.
8      JUDGE ESSEX:  Okay.  I'm sorry for the
9  interruption.  Go ahead.
10 BY MR. DeFRANCO:
11     Q.   So going back and following up on His
12 Honor's comment, it says in the second
13 paragraph, "in order to prevent the
14 aforementioned problem, the dead areas between
15 the ITO may be filled with index matching
16 materials."  Do you see that, sir?
17     A.   With indexing matching materials, yes,
18 I see that.
19     Q.   Yes.  I am having a little trouble
20 reading this morning.
21     It doesn't disclose any specific index
22 matching materials, does it, sir?
23     A.   You mean a specific example of an
24 indexing matching material?
25     Q.   Yes.

Page 1497

1      A.   That's true, it does not.
2      Q.   And ITO, again, as you said earlier, I
3  believe you said was the transparency is going
4  to be a function of resistivity; is that
5  correct?
6      A.   The parameters that affect
7  transparency also have resistivity.
8      Q.   Okay.  So you could, based on the way
9  your system is designed and the way the ITO is
10 deposited, the way the ITO is etched away, if
11 etching is used, all of that may ultimately
12 affect the transparency of the ITO when it is
13 in the completed device, is that fair?
14     A.   The way the ITO is deposited --
15     Q.   Let me ask a better question.  I'm
16 sorry.
17     A.   That's fine.
18     Q.   There are characteristics of the ITO
19 itself that impact the transparency; is that
20 right?
21     A.   Yes, that's true.
22     Q.   There are certainly different brands,
23 types, versions of ITO on the market.  There
24 was back in the 2003 time frame, wasn't there?
25     A.   There are certainly different

Page 1498

1  manufacturers who brand their ITO with their
2  respective brand names.
3      Q.   Right.
4      A.   And they have different properties.
5      Q.   Different properties, different types,
6  different costs, different characteristics.  Is
7  that true?
8      A.   If by -- I don't know what exactly you
9  mean by types, but they certainly have
10 different properties and they are targeted at
11 different costs and they are available in
12 different substrates.
13     Q.   And they have different
14 transparencies?
15     A.   Yes.
16     Q.   And they have different properties?
17     A.   That's true as well.
18     Q.   And all of that is going to impact the
19 transparency when the ITO is ultimately used in
20 any device, such as a pad or a phone.  Isn't
21 that true?
22     A.   Yes, that's true.
23     Q.   And this is talking about somehow you
24 have got to come up with an index matching
25 material that is going to appear to the user

Page 1499

1  that the transparency is uniform.  Is that
2  correct?
3      A.   That is the goal of this section, yes.
4      Q.   Okay.  And, in other words, you don't
5  want somebody to look at their pad or their
6  phone and see some sort of hint or trace of the
7  ITO lines, that would be unappealing to a user
8  of the device.  Is that fair?
9      A.   Certainly that's the general problem
10 that they are trying to address, yes.
11     Q.   Okay.  So after all the work that's
12 done to design a device, to pick the ITO, to
13 figure out the characteristics you need to
14 choose the brand with a certain transparency,
15 to deposit it, to etch it away, you have got to
16 figure out, if you choose to do so, what
17 indexing material to use to put in between the
18 lines to make sure that that unpleasant effect
19 doesn't occur.  Is that fair, sir?
20     A.   Yes, I generally agree with that.
21     Q.   Okay.  And you will agree it is going
22 to take a little bit of experimentation for
23 somebody skilled in the art to figure out
24 exactly what indexing material to use to
25 achieve that result in a particular device.  Is

17  (Pages 1496 to 1499)

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

Page 1500

1 that correct?
2    A.   If you are given an unknown system,
3 you would have to measure its properties and do
4 some experimentation.  It is not a significant
5 amount with respect to that.
6    Q.   Okay.  But you will agree that in this
7 particular implementation, the inventors didn't
8 disclose what indexing material they used, did
9 they?
10    A.   That's true.
11    Q.   They didn't disclose how they were
12 able to choose a proper or appropriate indexing
13 material; isn't that correct?
14    A.   Beyond saying that you could use an
15 index, a matched index material?
16    Q.   Yes.
17    A.   I agree.  I mean, that does give the
18 guideline.  It says you would use a matched
19 index material but, yes, I agree, beyond that,
20 they haven't said what material to use, for
21 example.
22    Q.   Okay.  And somebody skilled in the art
23 would take that guideline and determine what
24 indexing material to use in their own
25 configuration?

Page 1501

1    A.   Yes.
2    Q.   So going back, we started to talk
3 about the disclosure of ITO in this particular
4 section and just to finish up on that, it says,
5 "as mentioned above, the lines in order to form
6 semi-transparent conductors on glass, film, or
7 plastic, may be patterned with an ITO
8 material."
9       Do you see that?
10    A.   You are reading the first line again?
11    Q.   Yes.
12    A.   Yes.
13    Q.   Then it goes on, "this is generally
14 accomplished by depositing an ITO layer over
15 the substrate surface, and then by etching away
16 portions of the ITO layer in order to form the
17 lines."
18       Do you see that, sir?
19    A.   I do.
20    Q.   And it says, "as should be
21 appreciated, the areas with ITO tend to have
22 lower transparency than the areas without ITO."
23 Do you see that, sir?
24    A.   I do.
25    Q.   We have discussed that at length.  And

Page 1502

1 that phrase, doesn't it imply it should be
2 appreciated by somebody in the art who has used
3 ITO before; is that correct?
4    A.   Oh, yes.  You mean someone of skill in
5 the art who read it would know what that means?
6 Yes.
7    Q.   Yes.  Okay.  So we have walked through
8 now, sir, I believe, if I have it right, all
9 the portions of the '607 specification that
10 specifically reference ITO.  Is that fair?
11    A.   With respect to the referencing of ITO
12 itself, that's true.  We haven't looked at the
13 circuit, for example.
14    Q.   We haven't looked at the circuit, but
15 at least in discussing ITO, its properties,
16 what particular brand or type should be used,
17 dispersion characteristics, resistivity
18 characteristics, its impact on the capacitance,
19 all of those issues with respect to ITO itself,
20 we have covered the portions of the '607 patent
21 that in any way discuss ITO; is that correct,
22 sir?
23    A.   With respect to the discussion of ITO
24 itself, that is true.  We haven't discussed how
25 that's impacted by the circuit choices that you

Page 1503

1 make.
2    Q.   Okay.  There are other design choices
3 that may impact the type of ITO and the
4 characteristics that it has that are used in a
5 particular device; is that fair?
6    A.   There are certainly design choices.
7 There is also a sort of fundamental circuit
8 topology choices, which are not simple design
9 choices.
10    Q.   Correct.  And those are -- all of
11 those are going to impact a particular ITO
12 that's used in the device and how it is
13 deposited and the ultimate configuration?
14    A.   They will.  And more generally, they
15 may determine whether you can use ITO or not.
16    Q.   And how would one skilled in the art
17 determine whether they can use ITO or not in a
18 particular configuration, by experimenting?
19    A.   Certainly one thing you could do if
20 you were given a particular circuit topology
21 would be do a significant amount of
22 experimentation.  And in some cases, it
23 wouldn't work, and then you would essentially
24 be driven to do invention, come up with a new
25 topology that does work.

18 (Pages 1500 to 1503)

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

Page 1504

1    Q.    Now, let's talk a little bit about
2  another feature that you say is lacking in the
3  SmartSkin reference.  I believe another one is
4  you don't believe that SmartSkin discloses a
5  concept of layering and how that's covered in
6  the elements of the asserted claims of the '607
7  patent?
8    A.    With respect to specific layers,
9  that's true.
10    Q.    And in your opinion, generally, sir --
11  why don't we put up question number 118 and the
12  answer.  And here, sir, you say the layer
13  limitations are those limitations that require
14  the use of two different layers of conductive
15  lines in the touch sensor.  All of the asserted
16  claims require these limitations.
17        Do you see that?
18    A.    These layer limitations, yes, I see
19  that.
20    Q.    And you go on to say those are lacking
21  in SmartSkin; is that right?
22    A.    I say that the limitations that are
23  missing are identified in this particular CDX.
24    Q.    Now, is it also your opinion, sir,
25  that SmartSkin doesn't disclose layers because

Page 1505

1  it uses a copper mesh?
2    A.    You are talking about in relation to
3  figure 2?  That's true.
4    Q.    Yes.  Well, figure 2 of SmartSkin, you
5  are referring to?
6    A.    Correct.
7    Q.    Let's put up figure 2 and let's put up
8  a paragraph that we haven't looked at yet,
9  which should all be in slide 28.012.
10        Let's go through the same drill, sir.
11  Let's see what you and I can agree upon with
12  respect to figure 2, its disclosure as set
13  forth in the figure itself and the related text
14  of the SmartSkin article.  Okay?
15        You will agree with me, won't you,
16  that SmartSkin discloses a grid of transmitter
17  and receiver electrodes.  Isn't that fair?
18    A.    Yes, those are called out in the
19  second sentence of the paragraph on RDX-28.012.
20    Q.    And that is shown in figure 2 as well,
21  isn't it?  Can you point that out for us?
22    A.    Certainly.  If you are referring to
23  the grid of transmitter and receiver electrodes
24  using the language on RDX-28.002, the grid it
25  is specifically referring to, it is

Page 1506

1  specifically referring to with respect to
2  figure 2 is this grid of vertical and
3  horizontal copper wires.
4    Q.    And is it your opinion that the sensor
5  grid of electrodes in SmartSkin as shown in
6  figure 2 could not be implemented as having one
7  layer for the drive electrodes and having a
8  different layer for the sense electrodes?
9    A.    I understand the question.  Could I
10  have the CDX that you referred to or that I
11  referred to earlier in reference to the
12  question and answer you put up, please?
13    Q.    You mean your -- where I said this is
14  what you said was lacking?
15    A.    Yes.
16    Q.    Sure, sure.
17    A.    Thank you.
18    Q.    It is a small fee.  Let me find it.
19  It should be slide 003.  Is that the one you
20  wanted to see, sir?
21    A.    Yes.  Thank you.  No, it was the one
22  in answer to the -- was this the one I
23  referenced in the question you put up?  I can
24  find it.  If you put the question up again, I
25  can find it.  I have the binder in front of me.

Page 1507

1    Q.    Was it from your witness statement?
2  I'm sorry.
3    A.    I believe so.
4    Q.    Okay.  So let's find -- let's see if
5  we can get that back.  Hold on.
6    A.    I have them in front of me now if you
7  want.
8    Q.    You have the paragraph?
9    A.    Yes.  The question is up there and I
10  found the --
11    Q.    Got it.  Great.  Is that what you
12  wanted to refer to, sir?
13    A.    Yes, thank you.
14    Q.    Okay.  Now, my question was, sir, is
15  it your testimony that the sensor grid that is
16  the drive lines and the sense lines that are
17  shown in figure 2 of the SmartSkin reference
18  could not be implemented in a device that had
19  different layers for each?
20    A.    With respect to layers as used in
21  claims 1 and 10, for example?  Yes, that's
22  correct.
23    Q.    Yes.  And your opinion for that is
24  because it is a copper mesh to create the
25  capacitance nodes; is that correct?

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342524

Page 1508

1    A.    These are copper, and that is one of
2  the reasons for my opinion, yes.
3    Q.    But you will agree, won't you, that
4  based on the disclosure of figure 2 in the
5  SmartSkin reference, the use of copper wires in
6  a mutual capacitance device could take on a
7  variety of configurations, couldn't it?
8    A.    You mean if you are using copper
9  wires, could you do them in different ways?
10    Q.    Yes.
11    A.    Generally, yes, I agree, you could use
12  copper in different ways.
13    Q.    Okay.
14    A.    In this system.
15    Q.    Well, specifically, for example, you
16  could use copper wires in a mutual capacitance
17  configuration where the layers for the drive
18  and sense lines are spatially separated,
19  couldn't you?
20    A.    You could use copper wires such that
21  the wires are separated.  Those would not meet
22  the layer requirement of the claims.
23    Q.    But you could -- you could use them in
24  separate layers?  In other words, outside of a
25  mesh configuration, couldn't you, sir?

Page 1509

1    A.    If you are using layers outside of
2  what it means in the claims, where there are
3  specific characteristics tied to the layers,
4  yes, I agree you could have them spatially
5  separated.  That's possible.
6    Q.    We're just talking generally.  Apart
7  from the claims right now, one skilled in the
8  art -- it is your testimony, isn't it, that one
9  skilled in the art at the time was aware that
10  copper wires could be used in mutual
11  capacitance, not only in a mesh configuration
12  but on spatially separated layers as well;
13  isn't that true?
14    A.    Independent of the claim language,
15  without attributing the additional
16  characteristics imposed on layers by the
17  claims, yes, I agree they could be spatially
18  separated and if you want to call those layers
19  independent of the claim language, I agree with
20  that statement.
21    Q.    Okay.  Let's turn to another document,
22  the related patent application to the SmartSkin
23  reference.  You're aware of that reference,
24  sir, right?
25    A.    Yes.

Page 1510

1    Q.    And this is what's been referred to in
2  the case as a Rekimoto Japanese patent
3  application.  You're aware of that, sir?
4    A.    I am.  I believe he is the lead
5  author.
6    Q.    Let's put on the screen, please,
7  RDX-28.013.
8        Sir, this Rekimoto reference, this is
9  from one of the Sony engineers who also
10  authored or coauthored the SmartSkin article
11  that we talked about earlier.  Do you recall
12  that, sir?
13    A.    Yes, I believe so.
14    Q.    And this is one of the references that
15  Motorola relies on as prior art for its
16  position that the asserted claims of the '607
17  patent are invalid in this investigation.
18  You're aware of that, sir?
19    A.    Yes, I'm aware that this is one of the
20  pieces of art that Motorola relies on.
21    Q.    By the way, the prosecution history in
22  this case is pretty voluminous, just in terms
23  of number of pages.  Is that correct?
24    A.    It does have a large number of pages.
25    Q.    It has got -- for example, it has got

Page 1511

1  a copy of at least many if not most, possibly
2  all -- I didn't check -- but many of the
3  articles that are cited on the front of the --
4  or towards the beginning of the '607 patent as
5  prior art; is that correct?
6    A.    There are certainly some of them.  I
7  also have not checked if all of them are there.
8    Q.    Okay.  I counted, and we have been
9  through this, it is over 300 references cited
10  in the front of the '607 patent.
11    A.    I believe that's correct.
12    Q.    And the examiner read many of those
13  references in considering this application.  Is
14  that fair?
15    A.    Certainly I would assume the examiner
16  did.
17    Q.    And the vast majority -- you will see,
18  we can put something up, and I will represent
19  to you that at the end of the several pages of
20  references -- why don't we put it up, so I get
21  this right, Ryan.
22        It is page 5 of the '607 patent at the
23  end of the reference list.  One more page.
24  Blow that up.
25        Do you see there, sir, it says cited

20 (Pages 1508 to 1511)

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342525

Page 1544

```
 1    that page.
 2        Q.   Yeah.  At least on the front page of
 3    the document, it says February 9th, 2003.  Do
 4    you see that, sir?
 5        A.   I do.
 6        Q.   Okay.  And there is also a third
 7    reference in this group or family.  It is the
 8    Morag '662, which we will talk a little bit
 9    about later, but you have reviewed that as
10    well, haven't you?
11        A.   Yes.
12        Q.   Now, it is your testimony with respect
13    to this Perski reference, your opinion is that
14    it fails to disclose, enable, or render obvious
15    the multi-touch limitations required by the
16    asserted claims under either of the parties'
17    proposed constructions.  Is that correct, sir?
18        A.   That's correct.
19        Q.   So if we turn to the next slide,
20    RDX-28.020, the limitations not disclosed,
21    that's the fifth bullet point down if I'm
22    counting that correctly, do you see that, it is
23    multi-touch?
24        A.   Yes, that's referring to the preamble
25    limitations.
```

Page 1545

```
 1        Q.   So by way of comparison, you had a
 2    longer list as to what was not disclosed in the
 3    SmartSkin references, we're talking about one
 4    feature, multi-touch, that you believe is not
 5    disclosed in the Perski reference.  Is that
 6    fair?
 7        A.   We are talking about the preamble
 8    based limitations related to multi-touch.
 9        Q.   Yes, sir.
10        A.   Okay.
11        Q.   Now, let's show briefly paragraph 74
12    in your rebuttal witness statement.  Okay.  So
13    briefly this is where you characterize
14    multi-touch in the two set of asserted claims
15    here.  For example, with respect to claims 1 to
16    7, you say that the detection of multiple
17    touches or near touches that occur at the same
18    time and at distinct locations where the
19    production of distinct signals representative
20    of the location as required by claim 1 and
21    dependent claims 2 to 7.  Do you see that, sir?
22        A.   I do.
23        Q.   And then with respect to claim 10, you
24    have the characterization that's below that,
25    the recognition of multiple touch events that
```

Page 1546

```
 1    occur at different locations on the touch panel
 2    at the same time at distinct points across the
 3    touch panel.
 4             Do you see that?
 5        A.   Yes.
 6        Q.   And you go on to provide a bit of
 7    additional information, sir; is that correct?
 8        A.   Yes.
 9        Q.   Okay.  Now, in your opinion, Perski
10    suffers from the same problems as the prior art
11    to the '607; is that correct?
12        A.   Some of them, yes.
13        Q.   Okay.  Some of them.  And more
14    specifically, in your view, Perski is directed
15    to a single touch device; is that correct?
16        A.   Yes, that's primarily true.
17        Q.   You don't think -- in your opinion, it
18    doesn't disclose multi-touch or the processing
19    required for multi-touch; is that fair?
20        A.   In my opinion, it does not disclose
21    the multi-touch limitations as required
22    therewith by the relevant claims of the '607
23    patent.
24        Q.   Okay.  Let's turn to the next slide.
25    We're going to go through a bit in the
```

Page 1547

```
 1    remaining time of some slides that show
 2    different portions of the disclosure of the
 3    Perski references.  Okay?  Are you with me?
 4        A.   I am.
 5        Q.   All right.  Slide 021, do you see
 6    there that it is an excerpt from the Perski
 7    specification that says, "the goal of the
 8    finger detection algorithm in this method is to
 9    recognize all of the sensor matrix junctions
10    that transfer signals due to external finger
11    touch."
12             Do you see that, sir?
13        A.   I do.
14        Q.   "It should be noted that this
15    algorithm is preferably able to detect more
16    than one finger touch at the same time."
17             Do you see that, sir?
18        A.   I do see that language.
19        Q.   No dispute that it explicitly says
20    that the algorithm is preferably able in Perski
21    to detect more than one finger touch at the
22    same time?
23        A.   That language does exist in Perski.
24        Q.   Okay.  Let's go to the next slide,
25    please, slide 22.  A little bit more detail, a
```

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342534

**Page 1548**

1  little in the provisional application.  I just
2  want to be clear.  We're going to be going back
3  and forth between these related documents.  In
4  the interest of time, to do it more
5  efficiently, I am going to take a subject
6  matter at a time, but this is from the Perski
7  '808 provisional, the cover page that we looked
8  at, it is Exhibit RX-303 on page 4.
9        Okay?  You have seen this document
10  before?
11    A.  I have.
12    Q.  Okay.  Do you see, sir, that it says,
13  "the goal of the finger detection algorithm in
14  this method is to recognize all of the sensor
15  matrix junctions that bypass signals due to
16  external finger touch."  Do you see that, sir?
17    A.  I do.
18    Q.  It goes on to say, "it should be noted
19  that this algorithm is able to detect more than
20  one finger touch at the same time."
21        That's the same discussion we saw in
22  the other Perski document about being able to
23  detect more than one touch, for example, two
24  touches obviously; is that correct, sir?
25    A.  That's what this particular language

**Page 1549**

1  says, this further language that specifically
2  says it is too slow.
3    Q.  Okay.  Let's go on to slide 023.  This
4  is a figure that we have seen earlier in this
5  hearing, sir.  I am sure you recognize it out
6  of Perski.
7    A.  Yes, I do.
8    Q.  And do you see that next to that is
9  associated language that relates to the figure
10  2 that's depicted there?  It says that right in
11  the text.  Do you see that, sir?
12    A.  Yes.
13    Q.  And do you see that it states that a
14  two-dimensional sensor matrix 20 lies in a
15  transparent layer over an electronic display
16  device?  Do you see that, sir?
17    A.  Yes.
18    Q.  And it says, "an electric signal 22 is
19  applied to a first conductor line 24 in the
20  two-dimensional sensor matrix."
21        Do you see that, sir?
22    A.  I do.
23    Q.  And this has -- this configuration in
24  Perski, this has drive and sense lines, doesn't
25  it, no doubt?

**Page 1550**

1    A.  The second embodiment, the version
2  we're talking about here?
3    Q.  Yes, sir.
4    A.  Yes, I agree with that.
5    Q.  Okay, this particular embodiment shows
6  the drive lines, number 22 with that arrow
7  showing an alternating signal being applied.
8  Do you see that?
9    A.  Yes.  An AC voltage is applied at 22.
10    Q.  Right.  And then the arrow that's
11  exiting, that's the sense line at item 30.  Is
12  that correct, sir?
13    A.  That is, that is the particular sense
14  line associated with that node, produces a
15  voltage, and then later on they actually
16  disclose some voltage sensing circuitry for
17  that.
18    Q.  They do disclose voltage sensing
19  circuitry for that, for those sense lines in
20  Perski; is that right?
21    A.  Well, they actually disclose a voltage
22  sensing circuit for another embodiment.  That's
23  the only sensing circuit that they actually
24  disclose, but with respect to this, they also
25  say you are sensing the voltage signals coming

**Page 1551**

1  out.
2    Q.  Okay, fair enough.
3        This particular portion goes on to
4  read, "a finger 26 touches the sensor 20 at a
5  certain position, increases the capacitance
6  between the first conductor line 24 and the
7  orthogonal conductor line 28 which happens to
8  be at or closest to the touch position."
9        Do you see that, sir?
10    A.  Yes.
11    Q.  That's the same concept, mutual
12  capacitance we have been over and over again,
13  the finger touches, it impacts the capacitance,
14  which is detected by the sensing circuit and
15  then the rest of the operation is performed; is
16  that fair, sir?
17    A.  If you are asking me if this is
18  conceptually mutual capacitance, I don't
19  disagree with that.
20    Q.  Now, if we turn over to RDX-24, this
21  is some additional text that goes with that
22  same figure, sir, okay?  It says, "a number of
23  procedures for detection are possible."
24        You have seen this before, haven't
25  you?

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342535

Page 1552

1   A.   Yes.
2   Q.   It says, "the most simple and direct
3   approach is to provide a signal to each one of
4   the matrix lines in one of the matrix axes, one
5   line at a time, and to read the signal in turn
6   at each one of the matrix lines on the
7   orthogonal axis."  Do you see that?
8   A.   I do.
9   Q.   That is describing generally how the
10  sense operation is implemented in this
11  embodiment of Perski; is that correct?
12  A.   Yes, and in this particular
13  embodiment, it discusses scanning all the way
14  across node by node.
15  Q.   And this is a transparent
16  configuration that's intended or can be
17  displaced over a display device.  Isn't that
18  true?
19  A.   It is transparent as described here.
20  This section doesn't specifically talk about
21  putting it over a display, but it certainly is
22  transparent.
23  Q.   You don't dispute that this Perski
24  device is transparent, do you?
25  A.   No, I do not.

Page 1553

1   Q.   And in terms of these procedures, the
2   specification goes on in Perski and it says
3   this method enables the detection of multiple
4   finger touches.  Do you see that, sir?
5   A.   I do and you will note it doesn't say
6   at the same time there.  And further in the
7   next paragraph, it goes on to say this is too
8   slow.
9   Q.   Okay.  But at least you agree with me
10  in this particular paragraph, it does talk
11  about a transparent device and it talks about
12  how that is implemented in a particular
13  configuration and goes on to say specifically
14  that this method enables the detection of
15  multiple finger touches.  Is that correct?
16  A.   It does, but not at the same time.
17  Q.   Now, let's turn to slide RDX-026,
18  skipping ahead a little bit, Ryan.  Now, we're
19  back again, sir, to the provisional application
20  of Perski.  And there is an excerpt at the top
21  of the provisional application on page 4 along
22  with figure 2 from the provisional application.
23      Do you see that there?
24  A.   Yes, I do.
25  Q.   Now, just briefly, you don't dispute

Page 1554

1   that figure 2 shows a matrix of transparent
2   conductive lines and as we said before there
3   are drive and sense lines shown there?
4   A.   This is indeed a matrix.  I believe
5   there is description of the use of
6   transparency.  And there are indeed drive and
7   sense lines.
8   Q.   Okay.  And if we -- and that's
9   discussed in that portion of the Perski
10  provisional disclosure.  Do you see that in
11  that paragraph?
12  A.   That portion doesn't mention
13  transparency, but I believe it is mentioned
14  somewhere else.
15  Q.   Okay.
16  A.   But that is generally related to
17  figure 2.
18  Q.   Well, let's look at transparency with
19  respect to figure 2.  If we go to the next
20  slide, slide 27, you will see the excerpt at
21  the top, doesn't that disclose transparency?
22  It says, "the present invention utilizes a
23  patterned transparent conductive foil system,
24  used for detecting the location of an
25  electromagnetic stylus on top of a display

Page 1555

1   surface in order to enable multiple and
2   simultaneous finger inputs directly on the
3   display."
4       Do you see that, sir?
5   A.   I do.
6   Q.   So there it is saying for sure with
7   that question, it is transparent, obviously,
8   you don't disagree with that?
9   A.   I don't.
10  Q.   It also discloses that the purpose for
11  that is to enable multiple and simultaneous
12  finger inputs directly on display.  Do you see
13  that, sir?
14  A.   It does say that.  In fact, in the
15  main body, it goes on to say it is too slow.
16  Q.   Okay.  Let's turn to slide 28.  Again,
17  a little bit more about this figure 2.  It
18  says, "the most simple and direct approach is
19  to provide a signal to each of the matrix
20  lines, in one of the matrix axes, one line at a
21  time, and to read the signal at each one of the
22  matrix lines on the orthogonal axis."
23      Do you see that, sir?
24  A.   I do.
25  Q.   Okay.  It says, "it is possible to

31 (Pages 1552 to 1555)

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342536

Page 1556

1  sample a group of reception lines at the same
2  time, and even to sample all reception lines
3  simultaneously, thus reducing the number of
4  lines to N." Do you see that, sir?
5      A.   Thus reducing the number of steps to
6  N?
7      Q.   Yes, sir.
8      A.   Yes, I see that.
9      Q.   Now, I would like to turn for a moment
10 to the Morag provisional, which is, I believe,
11 incorporated by reference in the Perski '455
12 patent. Is that your understanding, sir?
13     A.   I understand that's what's being
14 claimed, yes.
15     Q.   Okay. So if we go to the next slide,
16 slide 29, please, Ryan, you have seen this
17 figure 1 from the Morag provisional; is that
18 right, sir?
19     A.   I believe so. Let me just turn to it,
20 please. Yes, I see it.
21     Q.   And you have also looked at that text,
22 and there is some highlighted text there in the
23 middle. I won't read that, but you have seen
24 that before, sir, haven't you?
25     A.   Yes, I have.

Page 1557

1      Q.   Now, if you look at that language in
2  that paragraph, sir, wouldn't you say that
3  generally discusses that there is reception
4  from the sensing lines, there is filtering and
5  amplification of the signal, there is sampling
6  into a digital representation, and then sending
7  that digital representation out to a DSP or
8  digital signal processor; is that right, sir?
9      A.   DSP is digital signal processor, but,
10 I'm sorry, I am looking for the language.
11     Q.   Okay.
12     A.   So it does say it amplifies the
13 signal. It says it filters out irrelevant
14 frequencies. It says it samples it into a
15 digital representation. And it says it
16 forwards it for further digital processing.
17     Q.   And would you agree that the digital
18 representation is processed to determine the
19 position of one or more objects and then that's
20 sent to some other circuitry?
21     A.   Well, that's not described here, but
22 certainly if that were the desired operation,
23 you would -- that would be something you would
24 probably do in the digital domain.
25     Q.   So where it states the digital unit 3

Page 1558

1  is responsible for running the digital
2  processing algorithms, the outcome of the
3  digital process is the position of one or more
4  physical objects, typical stylus, which is
5  forward to the host via interface 7."
6          Do you see that, sir?
7      A.   It is typically but, yes, I see that
8  language.
9      Q.   And it is using the information that's
10 received from the mutual capacitance grid to
11 send the data to the digital processing
12 algorithm so that it can detect the position of
13 more than one physical device. Isn't that
14 true, sir?
15     A.   Yes, I agree with that.
16     Q.   Okay. Now, let's take a look at -- at
17 least in terms of that language you don't
18 dispute Perski is talking about how to use an
19 algorithm and associated circuitry to detect
20 multiple touches in a transparent device?
21     A.   You mean Perski by incorporating
22 Morag?
23     Q.   Yes, sir.
24     A.   I understand. So with respect to the
25 incorporation, in Morag, it certainly says what

Page 1559

1  you do with what comes out of the grid. And if
2  I didn't answer your question fully --
3      Q.   No, you did, thank you.
4      A.   Okay.
5      Q.   Just want to turn briefly to another
6  version of the Perski figures on which we have
7  added some items. It is RDX-28030. I know you
8  have spent significant amount of time with
9  this. Just for the record and make sure we're
10 on the same page, this is figure 2 from the
11 Perski with some colorization of the drive and
12 sense lines. Do you see that, sir? Sense
13 lines are in red. Drive lines are in blue, one
14 each, in each of these two depictions?
15     A.   I see that.
16     Q.   And in the original Perski, what was
17 the circle that's yellow on top, what did that
18 reflect that was a circle in the drawing as it
19 originally existed?
20     A.   That is generally pointing to a
21 particular node on the figure.
22     Q.   And we have added a node. Do you see
23 that, a node below each one of those?
24     A.   I see that.
25     Q.   The Perski references we have been

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342537

1   talking about, they disclose the ability to
2   sense two different touches at two different
3   locations on a mutual capacitance transparent
4   device.  Isn't that, sir?
5       A.   Not at the same time.  Yes, I agree.
6   If you are talking about timing, yes, it does.
7       Q.   So your opinion is that it can detect
8   more than one, just not simultaneously?
9       A.   So there is two possibilities.  If it
10  uses the technique disclosed, it is too slow to
11  do it simultaneously.  If it uses the so-called
12  faster technique, it is not able to actually
13  detect multiple touches accurately.
14      Q.   Okay.  And that is one of the bases on
15  which you, in your opinion, distinguish the
16  Perski references; is that correct?
17      A.   That is something I have considered,
18  yes.
19      Q.   Now, do you remember that any specific
20  disclosure in the '607 patent that teaches the
21  detection of multiple fingers at the exact same
22  time?  In other words, is that explicitly
23  discussed anywhere in the '607 patent?
24      A.   If by exact same time, you mean at the
25  same picosecond, no.  In fact, that's not a

1   requirement.  But what is a requirement is that
2   it appears at the same time to the user.  And
3   that's my opinion with respect to claim
4   construction.
5       Q.   I don't want to quibble about times.
6   In terms of what it says in the '607
7   specification, there is no discussion about how
8   the invention gives the ability to detect two
9   touches or multiple touches at the exact same
10  time; is that correct?
11      A.   And by exact, you mean not as
12  perceived by the user but realtime?
13      Q.   Yes, in realtime?
14      A.   I agree with that.
15      Q.   And there is some -- as you said, if
16  there is fingers that are spread apart, not
17  this configuration, if my fingers are spread
18  apart on a device that's implemented using the
19  '607 patented technology, there is going to be
20  some time lag there as you were suggesting,
21  isn't there, sir?
22      A.   Not as perceived by the user, but in
23  terms of picosecond differences, for example,
24  yes, absolutely.
25      Q.   Certainly, but that's because of the

1   way that the sense lines are scanned, right,
2   from one side to the other, they are not
3   scanned at exactly the same time.  Isn't that
4   correct, sir?
5       A.   If you mean do you read all the nodes
6   simultaneously to the exact fraction, no, you
7   do not.
8       Q.   And I don't remember, you haven't done
9   any tests in this case as to whether a very
10  short, precise touch by two fingers at exactly
11  the same time could be detected by devices that
12  implemented the '607 invention?
13      A.   You mean have I taken a phone and
14  tried that?
15      Q.   Yes.  Have you done any -- well, have
16  you done any tests to see whether those two
17  touches could be recognized at an instantaneous
18  point in time?
19      A.   As perceived by me, yes, they clearly
20  are.  Are you asking me, have I used some sort
21  of ultra high speed camera to figure out if
22  they are actually perceived within picoseconds
23  of each other, no.
24      Q.   You haven't done any tests in that
25  regard, that's all I am asking?

1       A.   In that regard, no.
2       Q.   So then if we go back to this figure
3   that we're looking at, RDX-28030, there is no
4   discussion, if you look at -- consider those
5   two yellow points or two points of touch in the
6   Perski configuration, there is no discussion in
7   Perski that if there were a single large touch,
8   for an example, it could be recognized as two
9   different touches, if we talk about that
10  hypothetical.
11      A.   I disagree.  The Perski reference says
12  I believe you detect node by node and each node
13  corresponds to a touch.  So if by large you are
14  allowing it to overlap, that wouldn't
15  necessarily follow.
16      Q.   Let's take a look at column 14, lines
17  15 to 19 of the -- I think the easiest way to
18  do this, Ryan, is to go back to slide RDX-021.
19  Just where we were before, sir, at least there
20  is a specific disclosure in Perski that the
21  algorithm is able to detect more than one
22  finger touch at the same time, do you see that,
23  sir, that's the goal of the Perski reference?
24      A.   That is what it says with regard to
25  the goal in RX-708 at column 14, lines 15

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342538

Page 1564

1   through 19.
2        Q.   I thought you had said in a portion of
3   your rebuttal witness statement that a single
4   large touch could cause an output signal to
5   detect more than one conductor line and the
6   Perski detection method would register this as
7   two touches instead of one.  Is that right,
8   sir?
9        A.   Perhaps you could point me to it, but
10  that does sound like something I said.
11       Q.   We can look at it, but you don't
12  disagree with that?
13       A.   I don't disagree with that.
14       Q.   Okay.  So going back to Perski again
15  where we started, Perski never discusses that
16  as being a problem; isn't that true, sir?
17       A.   You mean does he say this is a
18  shortcoming of his method?
19       Q.   Yes.
20       A.   With respect to that, no, I don't
21  believe so.  He didn't recognize it, but it is.
22       Q.   You have taken a look at the witness
23  statements of the fact witnesses in this case
24  that relate to the '607 patent, specifically
25  you have read Mr. Hotelling's witness

Page 1565

1   statement, haven't you, sir?
2        A.   Yes, I have.
3        Q.   Okay.  And you actually considered
4   that, I think you may have referenced that in
5   some of your own testimony in the case, but be
6   that as it may, you have read that testimony,
7   haven't you?
8        A.   His witness statement?  Yes, I have.
9        Q.   And in his witness statement, he
10  identifies three classes of touch detection.
11  Do you recall that, sir?
12       A.   Not specifically, but I'm not -- I
13  don't have it in front of me right now.
14       Q.   Okay.  Well, let's put up -- I don't
15  know if you have this, Ryan, but the Hotelling
16  witness statement, question and answer 21.
17            MR. FERGUSON:  Excuse me, Your Honor,
18  I think this is confidential.
19            JUDGE ESSEX:  Well, I don't -- is this
20  Apple confidential?
21            MR. FERGUSON:  This would be Apple
22  confidential.
23            JUDGE ESSEX:  All right.
24            MR. DeFRANCO:  Let me try to do it
25  without putting that on the screen.

Page 1566

1            JUDGE ESSEX:  All right.  You are
2   going to try to avoid going into confidential?
3            MR. DeFRANCO:  I would like to.
4            JUDGE ESSEX:  You want to stay on the
5   public record?
6            MR. DeFRANCO:  Yes, sir.
7            JUDGE ESSEX:  All right.  Go ahead.
8   BY MR. DeFRANCO:
9        Q.   If we talk about a class of touch
10  detections, a touch detection system that takes
11  two touch points and averages them, which I
12  believe is shown as a problem with the prior
13  art in figure 1A.  Do you recall that, where
14  there is a little plus sign between the two?
15       A.   By figure 1A, you are referring to
16  figure 1A of the '607 patent?
17       Q.   Yes.
18       A.   Yes.
19       Q.   Perski is not one -- doesn't suffer
20  from that problem, does it, the ability to not
21  have to average two touch points, right?
22  Clearly Perski could separate, was an advance
23  over that class of touch devices, wasn't it,
24  sir?
25       A.   You are asking me with reference to

Page 1567

1   the node by node scanning method?
2        Q.   Yes.
3        A.   In the node by node scanning method,
4   Perski does not talk about averaging, so he
5   doesn't suffer from that problem.
6        Q.   And you didn't see anything in there
7   that said that Perski needed to average two
8   touches as the prior art did because of
9   limitations in terms of the configuration of
10  the electrodes and processing technology, that
11  sort of thing, correct?
12       A.   I don't believe I saw any discussion
13  of averaging with respect to being a problem in
14  that regard.
15       Q.   Okay.  And if we talk about a second
16  category or class of detection devices, those
17  that suffer from shadowing, you would agree,
18  wouldn't you, that Perski doesn't suffer from
19  the shadowing problem of that second category
20  or class of touchscreen devices, does it?
21       A.   You are talking about the scanning,
22  the node by node scanning version, not the
23  version that actually groups nodes?
24       Q.   Yes, right.
25       A.   Because the grouping one does suffer

34 (Pages 1564 to 1567)

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000342539

1  from it.  But the node-by-node scanning one
2  would not suffer from the shadowing behavior.
3         MR. DeFRANCO:  One moment, Your Honor.
4  I am trying to avoid the confidential record.
5         JUDGE ESSEX:  I understand.
6         MR. DeFRANCO:  Your Honor, with that,
7  I am going to finish with the
8  cross-examination -- conclude
9  cross-examination.
10        JUDGE ESSEX:  All right.
11        MS. KATTAN:  I have no questions, Your
12  Honor.
13        MR. FERGUSON:  Your Honor, it might
14  make sense if we take our lunch break now.  I
15  think that would speed up the redirect.  And
16  that would also then allow the recross to occur
17  right after my redirect and we can take it all
18  in one shot.  Get it done quicker.
19        JUDGE ESSEX:  All right.  That makes
20  some sense.
21        Doctor, we're going to go to recess.
22  Again, let me remind you to discuss anything
23  you want, other than your testimony and the
24  matters contained in your report.
25        All right.  We're in recess.  We will

1  be back in an hour, about ten until 1:00.
2         (Whereupon, at 11:49 a.m., a lunch
3  recess was taken.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              AFTERNOON SESSION
2                  (12:50 p.m.)
3         JUDGE ESSEX:  All right.  Are we
4  ready?
5         MR. FERGUSON:  We are, Your Honor.
6         JUDGE ESSEX:  All right.  Back on the
7  record.  Go ahead.
8         REDIRECT EXAMINATION
9  BY MR. FERGUSON:
10   Q.   Good afternoon, Dr. Subramanian.
11   A.   Good afternoon.
12   Q.   I would like to start with claim 1 of
13  the '607 patent, JX-2.  And you touched on the
14  preamble of claim 1 several times during your
15  cross-examination.  Do you remember that?
16   A.   Yes, I do.
17   Q.   I would like to start by breaking down
18  some of the elements in the preamble, so,
19  Chris, could we start with a transparent
20  capacitive sensing medium.  Great.
21        First of all, can you just briefly
22  explain what your opinion is with respect to
23  what that means?
24   A.   Certainly.  With respect to this
25  portion of the preamble, the words transparent

1  capacitive sensing medium indicate that the
2  touch panel that we're talking about will
3  comprise something that is transparent and it
4  is going to use capacitive sensing.
5         So those are two requirements of a
6  system that would implement claim 1.
7   Q.   Okay.  And now, Chris, let's go and
8  highlight in a different color "detect multiple
9  touches or near touches that occur at a same
10  time and at distinct locations in a plane of
11  the touch panel."
12        And, again, can you explain your
13  opinion with respect to what that claim
14  language means?
15   A.   Certainly.  This claim language says,
16  firstly, that we have to be able to detect
17  multiple, which means more than one touches or
18  near touches.  And those touches would occur at
19  the same time and be in distinct locations on
20  the plane of the touch panel.
21        Now, what does that mean by distinct
22  locations in a plane of the touch panel?  That
23  means we are able to detect when the touches
24  are made in different locations on the plane of
25  the touch panel.

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER