# EXHIBIT 2

Confidential Business Information
Pursuant to Protective Order

Page 1

1           UNITED STATES INTERNATIONAL TRADE COMMISSION

2                       WASHINGTON, D.C.

3

4

5    In the Matter of:

6    CERTAIN ELECTRONIC DIGITAL

     MEDIA DEVICES AND COMPONENTS    Inv. No.  337-TA-796

7    THEREOF

     _____/

8

9

10

11            CONFIDENTIAL BUSINESS INFORMATION

12             PURSUANT TO THE PROTECTIVE ORDER

13

14

15    VIDEOTAPED DEPOSITION OF CHRISTOPHER J. STRINGER

16                REDWOOD SHORES, CALIFORNIA

17             WEDNESDAY, FEBRUARY 15, 2012

18

19

20

21

22

23    BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR

24    CSR LICENSE NO. 9830

25    JOB NO. 46383

Confidential Business Information
Pursuant to Protective Order

Page 111

1  it was chosen.  I'm asking a question about whether

2  something is true or not.

3      Q    With respect to the first iPhone that you

4  have there in your hand, is an advantage of

5  integrating the touch screen into the display to make

6  the display touch sensitive is that this type of

7  arrangement can save space and reduce visual clutter?

8          MR. JACOBS:  Objection --

9          THE WITNESS:  It's --

10         MR. JACOBS:  -- form; logical disconnect.

11         THE WITNESS:  -- it seems logical that what

12  you've stated as fact is true.  However, there are

13  some nonobvious things that occur inside enclosures.

14  For example, how it behaves in drop, whether it's one

15  completely bonded laminated structure versus separate

16  layers with air gaps.  There are nonobvious things

17  that occur that can cause damage in various ways to

18  various parts of that structure.

19         So it is not necessarily true that the

20  overall product is thinner because you may have a

21  thinner module, but you might need more clearance

22  space behind it.  And in the sum of those parts, I'm

23  considering space to be a part.  Maybe it isn't

24  thinner.

25         So I can't -- though it seems obvious that

Confidential Business Information
Pursuant to Protective Order

Page 112

1    your statement was true, there are cases where it is

2    not.

3         MR. ZELLER:  Well, I'm not asking about other

4    cases.

5      Q    I'm asking specifically about the context of

6    the first iPhone that you have there in front of you.

7      A    And because I cannot recall the exact nature

8    of the construction of this phone and clearances and

9    so on, I cannot answer your question any better than I

10   already have.  So you have my complete answer.

11     Q    And if I understand you correctly, you can't

12   tell me specifically whether it's true or not as to

13   this first iPhone that an advantage of integrating the

14   touch screen into the display was to make the

15   display -- in order to make the display touch

16   sensitive was that this type of arrangement can save

17   space and reduce visual clutter; is that correct?

18        MR. JACOBS:  Objection; form.

19        THE WITNESS:  I believe that combining those

20   technologies can make things thinner.  Whether or not

21   it did in the case of this phone, I cannot speak to

22   that.

23        MR. ZELLER:  Q.  Directing your attention to

24   Column 5 of the '462 patent.  If you'd please read

25   that first paragraph at the top there in Column 5,

Confidential Business Information
Pursuant to Protective Order

Page 113

1  which runs through lines 1 through 12, to yourself.

2      A    Okay.

3      Q    First, you generally recognize the context

4  that is being discussed here is -- is the bezel --

5      A    Yes.

6      Q    -- for the -- for the phone, and in

7  particular the configuration of the bezel as shown in

8  Figure 1 of the drawing -- that drawing we looked at;

9  right?

10     A    Uh-huh.

11     Q    I'm sorry.  That's a yes?

12     A    Yes.  Excuse me.

13     Q    And you'll see this language here.  It says:

14          "In configurations such as the one shown in

15  FIG 1 in which bezel is formed around the periphery of

16  a surface of device (e.g., the periphery of the front

17  face of device), bezel may help to prevent damage to

18  display, (e.g., by shielding display from impact in

19  the event that device is dropped, etc.)."

20          Do you see that?

21     A    I see that.

22     Q    Do you believe that that's a true statement?

23     A    It may help --

24          MR. JACOBS:  Objection; form.

25          THE WITNESS:  -- it may help, as it says, but

Confidential Business Information
Pursuant to Protective Order

Page 114

1    I'm not sure what we're comparing it to.

2         MR. ZELLER:  I'm sorry.

3    Q   Are you saying you don't understand this

4    statement, or are you --

5    A   I agree that it may help.  But I don't know

6    that it does help because to determine that, we need

7    to be comparing it to some other material for some

8    relative measure.  Otherwise, this is almost

9    philosophical and non -- not practical.

10   Q   Well, do you have an understanding as to what

11   this statement means that I just read?

12        MR. JACOBS:  Objection; form; harassing the

13   witness.

14        THE WITNESS:  It seems to me that you're

15   asking if it might help.  And I agreed it might.

16        MR. ZELLER:  Q.  Well, I'm not -- I'm asking

17   about an Apple patent here.

18   A   Yes.

19   Q   Using Apple's language.

20   A   Yes.

21   Q   And my question is:  Do you have an

22   understanding as to when it says "in configurations

23   such as the one shown in FIG. 1," and continues on, do

24   you have an understanding of the meaning --

25   A   Yes.

Confidential Business Information
Pursuant to Protective Order

Page 115

1    Q    -- of that sentence?

2    A    Absolutely.

3    Q    And when you were saying you -- earlier that

4  you weren't sure what it's being compared to, do you

5  have an understanding as to what this is being

6  compared to?

7    A    No.  I have an understanding of some legal

8  text here that doesn't make complete sense to me as a

9  designer.  But it's -- it suggests -- to me, it's

10  suggesting that it may help prevent damage to a

11  display.  That is a very nonspecific claim in the way

12  that I understand the language as a designer.

13    Q    Well, let's then step back for a moment,

14  and -- and let's talk about the first iPhone that you

15  have in front of you as Exhibit 11.

16         That -- that has a bezel that is formed

17  around the periphery of the front surface of the

18  device?

19    A    Yes.

20    Q    Does that configuration of the bezel help

21  prevent damage to the display, such as by shielding it

22  from impact in the event that the device is dropped?

23         MR. JACOBS:  Objection; form.

24         THE WITNESS:  It is a part -- as a part of

25  the enclosure, depending on how it is dropped, on what

Confidential Business Information
Pursuant to Protective Order

Page 116

1  surface, at what angle, at what speed, from what

2  height, it may protect the glass.

3      MR. ZELLER:  Q.  Isn't it true that Apple

4  studied, at some length and expense, different

5  configurations of the bezel for the first iPhone in

6  order to determine what configurations best protected

7  the display screen from cracking or breaking in the

8  event that the device was dropped by the user?

9      A   We made prototypes of the product that

10  included the bezel, and yes, they were dropped.  But

11  from an appearance point of view, the design, if you

12  will, it remained unchanged in any significant way

13  through the process.

14      Q   Well, you say "in any significant way."  It

15  did change as a result of the drop testing; correct?

16      MR. JACOBS:  Objection; vague.

17      THE WITNESS:  It changed as a result of those

18  fine-tuning the design.  From a composition point of

19  view, we were trying to decide how much of a border we

20  wanted around the glass, the angles, the dimensions,

21  the corner radii.  We excruciatingly put through how

22  we wanted this thing to appear.  So yes, it did take

23  various forms along the way.

24      MR. ZELLER:  Q.  The reason why the iPhone

25  designs took various forms along the way was in

Confidential Business Information
Pursuant to Protective Order

Page 117

1   response to drop test results, among other things;

2   right?

3       A   I can tell you quite plainly that this shape

4   is not determined as a result of drop tests.

5           MR. ZELLER:  If you can read my question

6   back.

7       Q   I'd ask that you focus on my question and --

8   and answer that question.

9           (Whereupon, record read by the Reporter as

10  follows:

11          "Q.  The reason why the iPhone designs took

12           various forms along the way was in response

13           to drop test results, among other things;

14           right?

15          MR. JACOBS:  Objection; asked and answered;

16  harassing the witness.

17          THE WITNESS:  In my mind, the system, the

18  combination of all the parts that compose this

19  product, was made to work to be successful in drop

20  tests, which may have taken many different paths in

21  terms of internal detailing or how things are

22  connected, but it did not drive the visual design of

23  this product.

24          MR. ZELLER:  I'm not asking you about what

25  drives visual design.  I'm not asking about what

Confidential Business Information
Pursuant to Protective Order

Page 360

1    you're saying is that at least in comparison to the

2    hard button and the icon, you believe that the

3    receiver aperture is something that's more noticeable?

4        A    It is.

5        Q    In your view, is the overall impression that

6    this core of the iPhone design creates any different

7    if you move that receiver aperture up higher toward

8    the top or a bit lower than it's actually located on

9    the iPhone?

10            MR. JACOBS:  Objection; form.

11            THE WITNESS:  I think it's a most important

12   attribute that it is centered in the X axis.  If it

13   moved up and down a little, I don't think it would be

14   a huge deal.

15            MR. ZELLER:  Q.  And in your view, simply

16   moving the location of that aperture would cause you

17   to think that it's a -- a different design?

18            MR. JACOBS:  Objection; form.

19            THE WITNESS:  If the moving was just in the

20   Y axis, in this axis, it could remain visually to be

21   substantially -- substantially the same.

22            MR. ZELLER:  Q.  And when you say "Y axis" in

23   this context, you mean up or down, at least from the

24   orientation?

25       A    I know what you mean.  We mean the same

Confidential Business Information
Pursuant to Protective Order

Page 361

1    thing.

2           MR. JACOBS:  The -- okay.  Go ahead.

3           MR. ZELLER:  What's the next number?

4           THE REPORTER:  34.

5           MR. ZELLER:  Let's please mark as Exhibit 34

6    a one-page document showing a side-by-side of three

7    designs.

8           (Document marked Stringer Exhibit 34

9            for identification.)

10          THE WITNESS:  Thank you.

11          MR. ZELLER:  Q.  Do you recognize anything

12   that's here on Exhibit 34?

13      A   I recognize the center and the right images

14   as being extracted from various patent drawings that

15   we've reviewed today.

16      Q   And you recognize the center and the right

17   image or drawing as being from patents that you talked

18   about earlier as depicting iPhone designs?

19      A   That's right.

20      Q   Do you recognize the design on the left?

21      A   That's an interestingly phrased question.

22   It's clearly substantially the same as our patented

23   design, but I don't know what particular -- I'm

24   assuming that that is some drawing of a competitor's

25   phone, but it could just be a generic outline created

Confidential Business Information
Pursuant to Protective Order

Page 362

1    for the purpose of the question.  I don't know what it

2    is.

3        Q   Well, regardless of where it came from, in

4    your view, the design that's there on the left is the

5    same or substantially the same as the designs that are

6    shown there in the center and the right?

7            MR. JACOBS:  Objection; form.

8            THE WITNESS:  As I interpret the drawing,

9    yes.  This isn't a patent drawing, so I am not -- or

10   to my knowledge, I don't know if it's a patent

11   drawing, so I'm not looking for indications of

12   transparency or flatness.  I'd need more views to

13   really assess what it is I'm looking at.

14           But in fact, that is my -- my truly

15   considered answer is I'd like to see more views to

16   know what I'm looking at.

17           MR. ZELLER:  Q.  Based on what you see here,

18   you believe that they are substantially the same?

19           MR. JACOBS:  Objection; form.

20           THE WITNESS:  Based on what I'm looking at

21   here and in one -- one manner of looking at it, then

22   yes.

23           MR. ZELLER:  Q.  Sometimes when you've talked

24   about the core of the iPhone design, you refer to it

25   as being a quiet design; do you recall that?

Confidential Business Information
Pursuant to Protective Order

1    Q    Focusing on that aperture or hole that

2  appears near the top of the design that's on the

3  left --

4    A    I'm assuming that is an aperture, yes.

5    Q    -- you see that it is in a higher position

6  than the apertures on the iPhone designs there in the

7  center on the right?

8    A    Uh-huh.

9    Q    I'm sorry.  You said -- that's a yes?

10   A    Yes, I see.

11   Q    In your view, is that a minor difference, or

12 is that something that to you creates a substantially

13 different overall impression in terms of the design?

14   A    In my mind --

15       MR. JACOBS:  Objection; form.

16       THE WITNESS:  -- centering the detail in X,

17 if this is indeed a receiver detail and if this is

18 indeed a phone, is very important to me.  Where it is

19 placed in Y starts to become a lower-order detail.

20       MR. ZELLER:  Q.  And just to use my own lay

21 person's terminology, when you talk about X and Y in

22 this context, you're saying that -- well, you're

23 drawing.

24   A    Okay.

25       MR. ZELLER:  And let the record reflect that

Confidential Business Information
Pursuant to Protective Order

Page 365

1    the -- the witness has -- has actually drawn on

2    Exhibit 34 a depiction of what he's referring to as

3    the X and Y axis, and I appreciate that.

4         Q    And for the record, the X axis is running

5    across, and the Y axis is running up and down as an

6    orientation that you have there in front of you?

7         A    Yes.

8              MR. JACOBS:  Can we take a walking-around

9    break?

10             MR. ZELLER:  Yeah, now is a good time.

11             THE VIDEOGRAPHER:  This marks the end of

12   Volume I, Disc 5, in the deposition of Christopher

13   Stringer.

14             The time is 9:54 p.m., and we are off the

15   record.

16             (Recess taken.)

17             THE VIDEOGRAPHER:  This marks the beginning

18   of Volume I, Disc 6, in the deposition of Christopher

19   Stringer.  The time is 10:06 p.m., and we're on the

20   record.

21             MR. ZELLER:  Q.  One electronic device design

22   that was public before 2006 that you're aware of that

23   showed a clear, flat, continuous front surface that

24   ran from edge to edge was the '889 design; is that

25   correct?

Confidential Business Information
Pursuant to Protective Order

Page 366

1    A    What was the '889 design?  I don't know

2    designs by their numbers.

3    Q    That was Exhibit 5.

4    A    Okay.  Yes.

5    Q    And the "yes" is in response to my question?

6    A    Yes, I'm aware of that design.

7    Q    Were there other designs that you're aware of

8    that were public before 2006 that showed, for an

9    electronic device, a clear, flat, continuous front

10   surface that ran from edge to edge?

11   A    I cannot think of any such design at this

12   point in time.

13   Q    Is there anything you've ever investigated to

14   try and determine whether there were any such designs

15   prior to 2006?

16   A    No, I'm not aware of having -- having a

17   memory of investigating such a thing.

18        MR. ZELLER:  What's the next number?

19        THE REPORTER:  It's 35.

20        MR. ZELLER:  35?

21        Let's please mark as Exhibit 35 a copy of

22   United States Patent Application Publication

23   2004/0041504.

24        (Document marked Stringer Exhibit 35

25         for identification.)

Confidential Business Information
Pursuant to Protective Order

Page 367

1        THE WITNESS:  Thank you.  Okay.

2        MR. ZELLER:  Q.  Have you ever seen this

3   patent before, this patent application publication

4   rather?

5        MR. JACOBS:  You can answer outside of

6   deposition preparation.

7        THE WITNESS:  I have -- I think I've seen

8   this, this patent document.  I've definitely seen

9   images from it.  I think I've seen it in the context

10  of the whole document.

11       MR. ZELLER:  Q.  And what's the context in

12  which you recall seeing this patent application

13  publication or images from it?

14    A    That is in a preparation meeting for this

15  deposition.

16       MR. JACOBS:  I will also instruct you not to

17  discuss preparation meetings --

18       THE WITNESS:  Oh.

19       MR. JACOBS:  -- please.

20       THE WITNESS:  Okay.

21       MR. ZELLER:  And so let me back up for a

22  moment.

23    Q    Excluding any instance in which you saw

24  either this application publication, or portions of it

25  in connection with your deposition preparation, do you



Stringer
EXHIBIT NO. 54
2.15.12
Andrea Ignacio, CSR 9830