# EXHIBIT 11

Confidential Business Information Pursuant to Protective Order

Page 1

1          UNITED STATES INTERNATIONAL TRADE COMMISSION

2                        WASHINGTON, D.C.

3

4

5    In the Matter of:

6    CERTAIN ELECTRONIC DIGITAL

     MEDIA DEVICES AND COMPONENTS    Inv. No.  337-TA-796

7    THEREOF

     _____/

8

9

10

11            CONFIDENTIAL BUSINESS INFORMATION

12            PURSUANT TO THE PROTECTIVE ORDER

13

14

15        VIDEOTAPED DEPOSITION OF DOUGLAS SATZGER

16                SAN FRANCISCO, CALIFORNIA

17                THURSDAY, FEBRUARY 9, 2012

18

19

20

21

22

23    BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR

24    CSR LICENSE NO. 9830

25    JOB NO. 45787

Confidential Business Information Pursuant to Protective Order

1          THE WITNESS:  Are we now speaking about now

2     or --

3          MR. ZELLER:  Q.  I'm talking about today.

4     A     -- or 2000s?

5     Q     Today.

6     A     There are products in the market that way,

7     yes.

8     Q     And -- and you -- you don't think that it's

9     easier to keep those products clean --

10          MR. DAVIS:  Argumentative.

11          MR. ZELLER:  Q.  -- where they have a flat

12    surface as opposed to having a bezel on the -- the top

13    of the screen?

14    A     Well, I answered the question of, is it a

15    fact that it's easier to clean a flat screen than a

16    larger, non-flat screen with a -- with or without a

17    bezel.

18          And if you can -- can you restate the first

19    question.

20    Q     Yeah.  I think -- I think we somewhere got

21    our wires crossed.

22    A     Yeah.

23    Q     I'm just trying to find out if from -- from

24    your advan -- excuse me.  Let me just rephrase the

25    whole question.

Confidential Business Information Pursuant to Protective Order

Page 26

1        I'm just trying to find out from your

2    understanding and perspective as a designer whether

3    it's true that having a -- a device -- an electronic

4    device that has a flat screen, as opposed to having a

5    bezel or a rim or a frame on top of that screen, is

6    easier to keep clean?

7        A    Yes.  And that would be the case independent

8    of a flat monitor or a CRT.

9        Q    And it's true that one reason why it's easier

10   to keep clean in those circumstances is because dirt

11   and other materials can get caught up in that edge and

12   make it very difficult to -- to keep clean?

13       A    That would be one of them.

14       Q    Is one reason, too, as you understand it,

15   that flat screens become more popular over time, in

16   addition to the cost considerations and these other

17   advantages that we talked about, is that touch

18   technology has improved over time?

19       MR. HUNG:  Objection; vague; calls for expert

20   opinion.

21       THE WITNESS:  Touch -- touch technology has

22   improved, yes.

23       MR. ZELLER:  Q.  And -- and is it generally

24   the case that by incorporating a touch screen

25   technology into a display screen, that means that

Confidential Business Information Pursuant to Protective Order

Page 27

1  there can be fewer buttons or even no buttons on the

2  device because it's all done through the -- the

3  virtual buttons that appear on the display screen?

4       MR. HUNG:  Objection; vague; compound; calls

5  for expert opinion.

6       THE WITNESS:  It's possible.

7       MR. ZELLER:  Q.  Well, do you agree that over

8  time that by incorporating the touch technology into

9  the display screen, it can make the mobile devices

10 more compact, more mobile?

11      MR. HUNG:  Same objections; asked and

12 answered.

13      THE WITNESS:  Touch technology is -- is

14 integrated into the stack-up of the screen.  So the

15 screen is completely separate.  So I'm going to be

16 really careful about how I answer these because

17 understanding that process...

18      (Sotto voce discussion between counsel.)

19      MR. ZELLER:  Let's please mark as Exhibit 1 a

20 copy of United States Patent 7,768,462, which is

21 entitled "Multiband antenna for handheld electronic

22 devices."

23      (Document marked Satzger Exhibit 1

24       for identification.)

25      THE WITNESS:  Sorry.  Can I get a glass of

Confidential Business Information Pursuant to Protective Order

1    Q    Directing your attention to the text of the

2    patent.  So you want to flip past the drawings, and

3    you'll get to a page that is leading -- that has the

4    heading "Multiband Antenna for Handheld Electronic

5    Devices."  And if you could please then turn to the

6    next page, and you'll see that there are Columns 3 and

7    4 of text.

8    A    Yes.

9    Q    And just to give you a little bit of context

10   here, if you can take a look at -- starting at line 24

11   of Column 4, you'll see that there are some numbers

12   running down the center between the two columns.

13   A    Uh-huh.

14   Q    And it starts off, it says "Housing may have

15   a bezel," and then continues on; do you see that?

16   A    Uh-huh, yes.

17   Q    So if you could read to yourself that

18   paragraph and then the next paragraph which begins on

19   line 35:

20       "Bezel may serve to hold a display or other

21   device with a planar surface in place on device."

22   A    Yes.  Okay.  Yes.

23   Q    And you'll see as part of the context here,

24   it's talking about in the example of Figure 1; did you

25   see that portion?

Confidential Business Information Pursuant to Protective Order

1      A    Yes.

2      Q    So then picking up with the next paragraph,

3  and this is the paragraph beginning with line 45 and

4  runs through 53.

5      A    Yes.

6      Q    So if you could please read that paragraph to

7  yourself, and let me know when you've had a chance to

8  do that.

9      A    Okay.  Yes.

10     Q    Do you agree in the context of the smartphone

11 that an advantage of integrating a touch screen into

12 the display to make the display touch sensitive is

13 that this type of arrangement can save space and

14 reduce visual clutter?

15        MR. HUNG:  Objection; foundation; calls for a

16 legal conclusion and expert opinion.

17        THE WITNESS:  From a design point of view,

18 yes.

19        MR. ZELLER:  Q.  And then, directing your

20 attention to the next page, you'll see that there's

21 Column 5 on the left-hand side.

22     A    Yes.

23     Q    And then if you could please read that first

24 paragraph to yourself, and let me know when you've had

25 a chance to do that.

Confidential Business Information Pursuant to Protective Order

1      A    Yes.

2      Q    Do you agree that in configurations such

3   where the -- the bezel is formed around the periphery

4   of the surface of an electronic device, for example,

5   where the -- the bezel runs around the periphery of

6   the front face of the device, the bezel may help to

7   prevent damage to the display by shielding it from

8   impact in the event that the -- that the device is

9   dropped?

10          MR. HUNG:  Objection; calls for a legal

11   conclusion and expert opinion; also compound.

12          THE WITNESS:  It can.

13          MR. ZELLER:  Q.  That is your -- certainly

14   your understanding of one advantage of having the --

15   the bezel around the edge of a mobile electronic

16   device?

17          MR. HUNG:  Asked and answered; same

18   objection.

19          THE WITNESS:  It's -- it's one solution.

20          MR. ZELLER:  Q.  And it's one advantage to

21   having the bezel in that -- that place around the

22   front face of the device; right?

23      A    I think it's a solution.

24          MR. HUNG:  Same objections.

25          THE WITNESS:  Sorry.

Confidential Business Information Pursuant to Protective Order

Page 41

1          MR. HUNG:  You can answer.

2          THE WITNESS:  It's a solution.

3          MR. ZELLER:  Right.

4     Q    And I think we're not quite on the same page,

5     because what I'm trying to find out is -- you're

6     saying it's a solution.

7          But I'm asking:  When that solution is used,

8     is that an advantage?

9          So let -- let me try -- try it this way:  In

10    those instances where the solution that is chosen is

11    to have the -- a bezel that runs around the front face

12    of an electronic device, one advantage of that

13    configuration is that it can help prevent damage to

14    the display in the event that the device is dropped,

15    for example?

16         MR. HUNG:  Objection; calls for expert

17    opinion.

18         MR. DAVIS:  Incomplete hypothetical.

19         THE WITNESS:  If -- if the bezel is designed

20    to protect the glass, then correct.  If the bezel is

21    designed as decoration, then it serves no function

22    other than cosmetic decoration.

23         MR. ZELLER:  Q.  Well, in the context of the

24    first generations of iPhone that you worked on, which

25    you'll recall is the -- the context in which we're

Confidential Business Information Pursuant to Protective Order

1   talking about for this patent --

2       A    Uh-huh.

3       Q    -- is it the case that the placement of a

4   bezel with the first iPhone such that it ran around

5   the periphery of the front face of the device, that

6   it -- one advantage of -- of that configuration is

7   that it helped protect the display in the event that

8   the phone is dropped?

9           MR. HUNG:  Objection; assumes facts; calls

10  for expert opinion.

11          THE WITNESS:  In the design of the iPhone,

12  yes, it was a very structural forged metal piece that

13  was the structure of the product.

14          MR. ZELLER:  Q.  And in addition to the fact

15  that it was a structural forged metal, the placement

16  of the bezel around the front face of the iPhone

17  helped protect the display as well; right?

18          MR. HUNG:  Asked and answered; calls for

19  expert opinion.

20          THE WITNESS:  That was the goal of it, yes.

21          MR. ZELLER:  Q.  And in fact, when you were

22  working on the first generation of iPhone, as well as

23  the 3G and the 3GS, you from time to time saw or at

24  least were told about drop test reports for the -- for

25  the designs that you were working on; right?

Confidential Business Information Pursuant to Protective Order

Page 43

1    A   Correct.  I did not see.  I was told and

2   understand that pretty much every product has to go

3   through those two, either to meet carrier's

4   specifications, additionally the carriers too, as

5   well.

6    Q   And certainly, you understood that

7   components, such as the configuration of the -- the

8   bezel for these various iPhones, were -- were tested

9   in order to determine how well they did or didn't

10  protect the device when it was dropped; right?

11       MR. HUNG:  Objection -- objection; calls for

12  expert opinion; compound.

13       THE WITNESS:  Yeah, I would assume that

14  that's part of the trial.

15       MR. ZELLER:  Right.

16    Q   That was your understanding, based on

17  information you heard and received when you were there

18  at Apple; right?

19       MR. HUNG:  Same objection; asked and

20  answered.

21       THE WITNESS:  Yes.

22       MR. ZELLER:  And I know you mentioned that

23  you yourself didn't receive the written reports about

24  drop testing and other kinds of stress testing that

25  was done there within Apple.

Confidential Business Information Pursuant to Protective Order

1    Q    How is it you would typically receive that

2    information when you did receive it?

3    A    For my role in the group, I would receive it

4    through discussions as the -- part of the

5    collaborative team of designers.

6    Q    All right.

7         And you had, when you were focused on the

8    materials and color --

9    A    Yes.

10   Q    -- there at Apple, a technical liaison you

11   worked with?

12        MR. HUNG:  Objection; vague.

13        THE WITNESS:  Many.

14        MR. ZELLER:  Q.  Was there a particular

15   technical liaison you worked with?

16   A    It depends on the material or the application

17   or the process in the stage of the program.

18   Q    Let me try it this way:  There was a Ron

19   Moller --

20   A    Yes.

21   Q    -- who you worked with as a technical

22   liaison?

23   A    He was the industrial design color team's

24   technical lead for color materials and finishes.

25   Q    And did Mr. Moller liaison with the drop

Confidential Business Information Pursuant to Protective Order

1  same places, that kind of language does not appear in

2  the "Description" area?

3      A   Correct.

4      Q   And so is it the case that when you look at

5  the '677 design patent, you can't tell one way or

6  another whether those various areas with the broken

7  line are part of the -- the claim design or not?

8          MR. HUNG:  Calls for a legal conclusion.

9          You can answer.

10         THE WITNESS:  I -- I don't know.  I don't

11  understand why this is -- has a mesh and what this

12  patent is applying to, "a mesh" meaning the screen

13  hatch on the -- "screen" meaning a wire screen hatch

14  on the front surface of Figure 1 and Figure 3.

15         MR. ZELLER:  Q.  And in your last answer, you

16  were talking about the '677 design patent?

17     A   Yes.

18     Q   If -- if we were to assume for a moment that

19  that hatching pattern that's there on that top or

20  front surface is a designation of the color black, do

21  you believe that the use of the color black for

22  electronic devices by the 2006 time period was

23  something that was -- was new or original?

24     A   Assuming for some reason that that is

25  representing black, no.

Confidential Business Information Pursuant to Protective Order

1    Q   You would agree that by the 2006 time period,

2    black was a very standard color for electronic

3    devices, including portable electronic devices?

4        MR. HUNG:  Objection; calls for expert

5    opinion.

6        THE WITNESS:  Yes.

7        MR. ZELLER:  Q.  In fact, you would agree

8    that black was a common color for electronic devices,

9    including mobile electronic devices, going back to the

10   2000 time period and earlier; right?

11       MR. HUNG:  Same objection.

12       THE WITNESS:  I can't go back that far.  I

13   don't -- you know, mobile devices -- but it was

14   common.

15       MR. ZELLER:  Q.  Certainly just in terms of

16   the overall -- well, I'm sorry.

17       In terms of electronic devices that you were

18   familiar with by the 2000 time period, you would agree

19   that common coloring for them were -- was black?

20   A   In the electronics industry, black materials

21   are used, yes.

22   Q   When you say they are -- they were used,

23   you -- you would agree that in the electronics

24   industry, black materials and the color black was --

25   was commonplace at least as early as 2000?

Confidential Business Information Pursuant to Protective Order

Page 133

1      A    Yes.

2           MR. HUNG:  Objection; asked and answered.

3           THE WITNESS:  Sorry.

4           Yes.

5           MR. ZELLER:  Q.  Do you recall ever having

6      any kind of discussion or you yourself thinking, back

7      when you were working on the -- the first iPhone

8      design, that having the color black for the device was

9      somehow new or original?

10     A    No.

11     Q    Was the same true with respect to the color

12     black back during the time period when you were

13     working on the tablet computer designs?

14     A    No.

15     Q    I'm sorry.  It's a true statement that --

16     with respect to the tablet computers?

17     A    Yes.

18     Q    And maybe just so we have a clear record -- I

19     apologize.  I'm sure it's my fault.

20          But do you recall ever having any kind of

21     discussion or you yourself thinking, back when you

22     were working on the tablet computer designs within

23     Apple, that having the color black for the device was

24     somehow new or original?

25          MR. HUNG:  Objection; vague; assumes facts.

Confidential Business Information Pursuant to Protective Order

Page 152

1    the same or the same, or would you consider it to be a
2    different design from just an appearance point of
3    view?
4            MR. HUNG:  Objection; vague; calls for a
5    legal conclusion.
6            THE WITNESS:  I'd say it would be very
7    similar to -- to the customer.
8            MR. ZELLER:  Q.  But at least in terms of the
9    overall aesthetic of the display, you would agree that
10   changing or revising that front surface of the design
11   of the iMac as it was actually released, and then
12   making that front surface coplanar from edge to edge
13   so it's continuous, would, for all practical purposes,
14   from the consumer's point of view, be the same
15   design --
16           MR. HUNG:  Objection --
17           MR. ZELLER:  Q.  -- in its appearance?
18           MR. HUNG:  -- objection; calls for an expert
19   opinion; calls for a legal conclusion.
20           THE WITNESS:  It would be very similar from a
21   distance, yes.
22           MR. ZELLER:  I think I'm trying to drive at
23   something different.
24       Q   In terms of that overall aesthetic, do you
25   think it would be essentially the same to the -- to

Confidential Business Information Pursuant to Protective Order

Page 153

1    the end user?

2         MR. HUNG:  Objection; vague; calls for an

3    expert opinion; calls for a legal conclusion.

4         THE WITNESS:  Yes.

5         MR. ZELLER:  Let's please mark as Exhibit 8 a

6    multipage document, which is an excerpt from a book

7    called Apple Design by Paul Kunkel.

8              (Document marked Satzger Exhibit 8

9               for identification.)

10        THE WITNESS:  Thank you.

11        MR. ZELLER:  And what I'll do is I'll hand

12   you an actual copy of the Apple Design book by Paul

13   Kunkel, and I have flagged for you page 144.

14             And for record purposes, we marked as

15   Exhibit 8 -- the first page is a photocopy of page 144

16   from the Kunkel book.

17    Q    And so I'll hand that to you now.

18    A    Wow.

19    Q    First, you -- you've seen the Apple Design

20   book by Paul Kunkel before?

21    A    Yes.

22    Q    Did you see it back in the time period -- in

23   the 1997 time period when it came out?

24    A    Yes.

25    Q    And when you saw it back in the 1997 time

Confidential Business Information Pursuant to Protective Order

1  period, did you -- did you actually look through it

2  and read it?

3      A   Parts of it, yes.

4      Q   Did you find it to be an interesting book, I

5  mean, just from the perspective of showing the history

6  of -- of Apple Design?

7      A   Yeah, reasonably, yeah.

8      Q   And -- and you were an Apple designer at the

9  time when the book came out?

10     A   Yes.

11     Q   And you were interviewed by Mr. Kunkel for

12 some biographical information?

13     A   Basic, yes.

14     Q   And then you do recall seeing the book at

15 about the time it was published back in '97?

16     A   Yes.

17     Q   And do you remember how you got it?

18     A   That -- I got it through the office, and I

19 don't know if it was -- you know, how we got it.  I

20 don't know if we -- we purchased them or what.  Yeah.

21     Q   Do you remember there being a number of

22 copies that -- that designers received at the time it

23 came out?

24     A   Yes.

25     Q   And -- and regardless of the mechanics,

Confidential Business Information Pursuant to Protective Order

Page 155

1    you -- you got it through the company in some way?

2        A    Yes.

3        Q    And were you actually provided a copy of your

4    own or --

5        A    Yeah, I have a copy.

6        Q    All right.

7             And directing your attention to page 144,

8    you'll see that there is -- there are three

9    photographs on this page, and you'll see that there's

10   a larger one on the bottom.

11       A    Yes.

12       Q    And for reference, it's -- that's what's

13   referred to as Plate 195.

14       A    Yes.

15       Q    And just -- I'll read it into the record:

16            "195 showing the desktop brain box, flat

17   panel display and keyboard."

18            And then it says:

19            "Industrial design, Apple Computer, Gavin

20   Ivester" --

21       A    Ivester.

22       Q    -- "that" -- T-H-A-T -- "San Francisco,

23   California, Tony Guido and Sigmar Willnauer.  Dates of

24   design, April through June 1989."

25            Do you see that?

Confidential Business Information Pursuant to Protective Order

Page 156

1      A    Yes.

2      Q    And this page 144 was in this Paul Kunkel

3   book that you saw back in the 1997 time period; right?

4      A    Yes.

5      Q    And taking a look at the front of the display

6   panel that's shown here, do you see that, setting

7   aside the stand that it's sitting in, that the front

8   surface there appears to be flat and continuous from

9   edge to edge?

10         MR. HUNG:  Objection; the document speaks for

11   itself.

12         THE WITNESS:  It appears to be.

13         MR. ZELLER:  Q.  You don't have any reason to

14   doubt that?

15      A    No.

16      Q    And you don't have any reason to doubt that

17   you and other designers there at Apple, in fact, saw

18   this picture that's on page 144, as well as other

19   pictures back in the book in the 1997 time period when

20   it came out?

21      A    Correct.

22      Q    During the time period when you were there at

23   Apple, did you do any explorations in iPhones that

24   were white?

25      A    Time frame again?

Confidential Business Information Pursuant to Protective Order

Page 157

1    Q    When you were at Apple.

2    A    Yes.

3    Q    It's the case that with respect to the first

4    iPhone, as well as the 3G and the 3GS, those phones

5    did not come in the color white to consumers?

6    A    The first generation iPhone did not come in

7    white.  The second generation came in white.

8    Q    The 3G did?

9    A    The 3G and the 3GS came in white.

10   Q    All right.

11        And then there was a -- an iPhone 4 that was

12   in white as well --

13   A    Yes.

14   Q    -- after you -- it came to market after you

15   left?

16   A    Yes.

17   Q    And did you work on the white iPhone 3G or

18   3GS?

19   A    Yes.

20   Q    Did you work on both of those?

21   A    Let's see here.  They are pretty much the

22   same product, so I would say yes.

23   Q    With respect to the 3G and the 3GS, at least

24   in terms of whatever work was done in order to create

25   a white phone, it was the same?

Page 173

1   the user to see?

2       A   Components of the -- of the construction are

3   manufacturing, and those are -- could be adhesion,

4   glues.  All these things need to have assembly methods

5   from part to part.

6       Q   With respect to the first generation of

7   iPhone --

8       A   Yes.

9       Q   -- were there -- were there any components or

10  any -- was anything hidden by the mask for that

11  product in the way that we've been talking about it?

12          MR. HUNG:  Objection; vague.

13          THE WITNESS:  Yes.

14          MR. ZELLER:  Q.  And what is it that the --

15  the black mask for the first iPhone hid in terms of

16  components or whatever else it was?

17      A   Components and the attachment method or the

18  gluing of the front glass to the LCD.

19      Q   The black mask was used to make less visible

20  to the user the -- the point of attachment?

21      A   The -- the style of attachment or point of

22  attachment.

23      Q   And what were some of the components that

24  were hidden by the black or dark mask for the first

25  iPhone?

Confidential Business Information Pursuant to Protective Order

1    A    The front button assembly, the assembly of

2    the mesh in the earpiece, and the gluing of it to the

3    LCD.

4    Q    Anything else you remember?

5    A    No.

6    Q    And then with respect to the iPhone 3G and

7    3GS, was the black mask used to hide any components or

8    attachments or anything else?

9    A    Yes.

10   Q    And what was the black mask used for for the

11   3G and the 3GS in that regard?

12   A    Same things.  Components.  Pretty much all

13   the same stuff.

14   Q    And this point of attachment or adhesion?

15   A    Yes, yeah.

16   Q    And when you say "components" here with

17   respect to the 3G and the 3GS, these are the same

18   components you listed for the first iPhone?

19   A    Yes.

20   Q    Then with respect to the iPod Touch products

21   that you worked on, did they also have that black mask

22   area?

23   A    Yes.

24   Q    And with respect to the generations of the

25   iPod Touch that you worked on, did the black mask

Confidential Business Information Pursuant to Protective Order

1    serve to hide components or attachments or adhesion?

2        A    Yes.

3        Q    And is it the case that, as with the iPhone

4    version that we talked about, that with respect to the

5    iPod Touch products you worked on, the black mask was

6    used to hide components and the points of attachment

7    or adhesion between the screen components and other

8    parts of the phone?

9        A    Yes.

10       Q    Or in the case of the iPod Touch, the iPod

11   Touch?

12       A    Yep.

13       Q    And then what were the components that you

14   can recall the black mask hiding with respect to the

15   iPod Touch?

16       A    Everything:  The components, ambient light

17   sensors, the battery, antenna assemblies, connectors,

18   the home button, attachment methods, any internal

19   structure.

20       Q    And in terms of ensuring that the black mask

21   was able to actually hide the components and the

22   points of attachment or adhesions -- or adhesives,

23   rather -- for the iPhone products and the iPod Touch

24   products that you worked on, did you work with

25   particular technical people to ensure that that was

Confidential Business Information Pursuant to Protective Order

1    there's a page called "Stringer Exhibit 1"; you see

2    that?

3        A    Yes.

4        Q    And then if you turn the page, you'll see

5    that there are some CAD drawings here.

6        A    Uh-huh.

7        Q    In particular, there are two pages of CAD

8    drawings right behind Exhibit 1.

9        A    Yes.

10       Q    Do you recognize this?

11       A    Yes.

12       Q    And what do you recognize this as?

13       A    As the first concept around the iPhone.

14       Q    And by this time --

15       A    It was -- it was not called the iPhone at

16   that time.  Sorry.

17       Q    Right.

18       A    It was just a mobile device.

19       Q    And by this time, were we into the period you

20   were talking about earlier where it was already now

21   being conceptualized as a phone?

22       A    Yes.

23       Q    And when you were talking about the -- the

24   fact that the project became a phone, once there was a

25   touch screen, is this the kind of touch screen that

Confidential Business Information Pursuant to Protective Order

1   you're referring to?

2        A    Yes.

3        Q    And then if you take a look at Exhibit 2,

4   you'll see that there are a couple of more pages of

5   CAD drawings, as well as a file listing.

6        A    Yes.

7        Q    And then with respect to those two pages of

8   CAD images that are a part of Exhibit 2, do you also

9   recognize those as early iterations of the mobile

10  phone?

11       A    Yes.

12       Q    And I take it at some point the decision was

13  made not to go with the -- the design or the -- the

14  hardware that's shown here in Exhibits 1 and 2?

15       A    Yes.

16       Q    And -- and why -- what was the -- the reason

17  for that --

18            MR. HUNG:  Objection.

19            MR. ZELLER:  Q.  -- this change in direction?

20            MR. HUNG:  Objection; foundation.

21            THE WITNESS:  My recollection of it was that

22  to get the extruded aluminum design that was applied

23  to the iPod to work for the iPhone, there were too

24  many added features to allow it to be comfortable and

25  to work properly.

Confidential Business Information Pursuant to Protective Order

Page 194

1    MR. ZELLER:  Q.  And if you can please tell

2  me what you mean by that?

3    A   If you put an iPod up to your ear, the sharp

4  edges, because of the processes, aren't comfortable,

5  and you can't get antennas to work properly in a fully

6  enclosed metal jacket.

7    So each one of those things needed to apply

8  other features that started.  I mean, if you look at

9  the initial concept compared to this one, there's a

10  lot more features than this, and there's a lot more

11  parts so...

12    Q   And so as a result, this phone design shown

13  in Exhibits 1 and 2 that we're talking about here to

14  the Stringer declaration would be more complicated to

15  manufacture, more prone to break, and all the other

16  kinds of disadvantages that having a more complex

17  product involved?

18    MR. HUNG:  Objection; calls for expert

19  opinion; mischaracterizes prior testimony.

20    THE WITNESS:  I -- from a design point of

21  view, it was a lot more challenging.

22    MR. ZELLER:  Q.  And from your understanding,

23  is having a more complicated product of that kind also

24  more challenging or expensive from a manufacturing

25  standpoint"?

Confidential Business Information Pursuant to Protective Order

1     MR. HUNG:  Objection; vague; incomplete

2  hypothetical; calls for an expert opinion.

3     MR. ZELLER:  Q.  Or from a reliability

4  standpoint?

5     MR. HUNG:  Same objections.

6     THE WITNESS:  I can't -- no, I wouldn't say

7  so.

8     MR. ZELLER:  Q.  You just don't know one way

9  or another?

10    A   I don't know, yes.

11    Q   And when you say from a design point of view

12  it was a lot more challenging, it was for those

13  reasons you mentioned earlier?

14    MR. HUNG:  Objection; vague; asked and

15  answered; mischaracterizes.

16    THE WITNESS:  Yes.

17    MR. ZELLER:  Q.  And you mentioned that it

18  was more difficult to get the antenna, for example, to

19  work in a fully enclosed jacket of the kind that's

20  shown here in Exhibits 1 and 2?

21    A   Yes.

22    Q   Do you recall, was there testing that you saw

23  or that you heard about being done that -- that backed

24  that up?

25    A   Yes.

Confidential Business Information Pursuant to Protective Order

Page 196

1    Q    And then also you mentioned that another

2  aspect of this design that was shown in Exhibits 1 and

3  2 to the Stringer declaration is, is that by having

4  those sharper edges, it's just not as comfortable up

5  against the user's ear?

6    A    Yes.

7    Q    Were there other reasons why this was not as

8  comfortable from the -- the user perspective?

9          MR. HUNG:  Objection; vague; foundation.

10         THE WITNESS:  Not that I recall.

11         MR. ZELLER:  Q.  And I take it that people

12  within industrial design thought that -- that lack of

13  comfort, having something with the sharp edges up to

14  someone's ear or up next to their head was a -- was a

15  reason not to go with this design?

16         MR. HUNG:  Objection; foundation; calls for

17  speculation.

18         THE WITNESS:  I think that the solutions that

19  lent themselves to make it more comfortable were not

20  good for the overall design, the extruded shape.

21         MR. ZELLER:  Q.  And what were those -- those

22  solutions or potentially solu- -- potential solutions

23  you're referring to?

24    A    If you look at the -- there's no number on

25  this page, but under Exhibit 2, the second page of

Confidential Business Information Pursuant to Protective Order

1    open area of the active LCD and the edge of the glass.

2          MR. ZELLER:  Q.  So is that -- is that an

3    area different from the mask?

4          MR. HUNG:  Objection; foundation.

5          THE WITNESS:  It's defining the mask.

6          MR. ZELLER:  Okay.

7          THE WITNESS:  But it also defines the size of

8    the glass.

9          MR. ZELLER:  Q.  And then with respect to the

10   margins being wider, what's your understanding of --

11   of that?

12         MR. HUNG:  Same objection.

13         THE WITNESS:  If the short dimensions are 52,

14   they're two millimeters wider than the long

15   dimensions, which would be 50.  I'm just grabbing

16   numbers, so just as an example.

17         MR. ZELLER:  Q.  And were you, yourself,

18   involved in any of the -- the changes to the margins

19   for the tablet in order to accommodate the audio jack?

20     A    No.

21     Q    Do you know if there were changes that were

22   made to the margins for reasons other than -- than

23   accommodating the audio jack?

24         MR. HUNG:  Objection; foundation.

25         THE WITNESS:  No, I don't.

Confidential Business Information Pursuant to Protective Order

1          MR. ZELLER:  I'm going to designate as

2    Exhibit 12 a tangible item which is labeled "Apple

3    Proto 0355," and for the record, it was previously

4    marked as Exhibit 1455 at the deposition of Jony Ive,

5    and I'll hand that to you.

6               (Apple Proto 0355 marked Satzger Exhibit 12

7                for identification.)

8          MR. HUNG:  I understand our agreement,

9    Mr. Zeller, about showing him documents that he may

10   not have seen previously.  Particularly with these

11   models where I'm not sure of the date in terms of when

12   they were created.  I wanted to make sure we had an

13   understanding.

14         MR. ZELLER:  Yes, I -- I -- I will agree on

15   the blanket basis that anything and everything that --

16   that he sees during the deposition.

17         MR. HUNG:  Okay.  Thank you.

18         MR. ZELLER:  Q.  Have you seen that before?

19     A   This specific one, I'm not sure.  I'm fairly

20   sure this is, yeah, part of the model studies that

21   were done.

22     Q   So I take you don't have a specific

23   recollection of this one?

24     A   Of this specific design, I do.  This model, I

25   don't.

Confidential Business Information Pursuant to Protective Order

Page 210

1    Q   And -- and so if I understand you correctly,

2  that you do have a -- a general -- I'm sorry.

3        You have a recollection of the design, but --

4  but not as implemented in the three-dimensional model?

5    A   I don't know if I've seen this specific

6  model.  I'm very familiar with the design, yes, and

7  the reasons why this design is the way it is.

8    Q   And so that was going to be my next question.

9        Please tell me what it is that you understand

10  about this design.

11   A   The -- there's strong interest in doing two

12  pieces of shaped glass.  The part that I am not

13  remembering at all is why the face is broken up this

14  way.

15   Q   And setting that part of it aside about why

16  the face is broken up in that way, you recall that

17  there was -- I think as you said, there was a strong

18  interest within the group in doing a smartphone design

19  that had shaped glass?

20   A   Yes.

21   Q   And the particular prototype or model that

22  you have in front of you, the 0355 model, has shaped

23  glass on both the front and the back?

24   A   That was the intent.

25   Q   And ultimately this was not a design that was

Confidential Business Information Pursuant to Protective Order

1  used?

2      A    Correct.

3      Q    And if you can please tell me what's your

4  understanding of why that design with the shaped glass

5  was not used?

6      A    The technology in shaping the glass, the cost

7  relative to shaping the glass at the time, and some of

8  the design features of this specific shape were not

9  liked.

10      Q    And when you say that the -- that they were

11  not liked, what do you mean by that?

12      A    Originally this line wanted to stay straight

13  all the way through, and to get the transition without

14  shaping, doing a three-dimensional shape or like

15  complex surfacing on this part, this is a

16  single-dimensional process, that we changed it to an

17  extruded glass, and this line had to follow that

18  extrusion, and that shape down there is not as pure as

19  that shape there.

20      Q    And for the record, the portions that you are

21  referring to are the side?

22      A    The -- let's use the same terminology -- the

23  short order of the phone, the shape of the side.

24      Q    And what was your understanding as to the

25  cost of the shaping of the glass?

Confidential Business Information Pursuant to Protective Order

Page 212

1        MR. HUNG:  Objection; foundation.

2        THE WITNESS:  I -- that it was a lot.

3        MR. ZELLER:  Q.  And did you have an

4  understanding as to why that was?

5    A    The technology at the time had a lot to do

6  with it.  The qualities of the glass at the time had a

7  lot to do with it.  These are models -- I'm trying to

8  remember a time frame -- that were before gorilla

9  glass and before a lot of the other factors.

10   Q    And I take it that the 0355 prototype that

11 you have there was a model or a design, I should say,

12 that you saw after the explorations shown in

13 Exhibits 1 and 2 to Mr. Stringer's declaration?

14   A    I don't -- I don't recall the time frame.

15   Q    You're just not sure of --

16   A    I don't know exactly.  Yeah, I'm trying to

17 remember the sequence, and I don't know.

18   Q    It's 5:05.

19   A    Okay.

20   Q    So we should probably go off the record and

21 talk for a minute.

22        MR. DAVIS:  All right.

23        THE VIDEOGRAPHER:  The time is 5:04 p.m., and

24 we are off the record.

25        (Recess taken.)

Confidential Business Information Pursuant to Protective Order

Page 213

1      THE VIDEOGRAPHER:  The time is 5:12 p.m., and

2  we are back on the record.

3      MR. ZELLER:  So we've conferred off the

4  record, and the witness does need to -- to attend to

5  some personal obligations, so we're going to adjourn

6  for the day.

7      I haven't finished my questions.  I know that

8  Apple's attorney, as he's mentioned off the record and

9  will undoubtedly confirm on the record as well, also

10  has some question -- some questions, rather, that he

11  has for the witness.

12      So what our intention is is that we'll --

13  we'll let the witness go for today.  We'll adjourn the

14  deposition, and we will come to an agreement as to

15  some additional time to conclude the questioning by --

16  by both us and Apple.

17      MR. HUNG:  And that is correct.

18      MR. DAVIS:  And that's fine with us.

19      The only thing that we would ask is that --

20  is that you guys try to get it in in the next few

21  weeks.  You know, let's try to get the date nailed

22  down just because he's got other employment

23  obligations.  He's no longer with Apple, so I just

24  want to make sure we get the witness done.

25      MR. ZELLER:  Absolutely, and we do actually