# EXHIBIT 36

1          UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3            SAN JOSE DIVISION
4

5   APPLE INC., a California
    corporation,
6
              Plaintiff,
7
    vs.                        CASE NO.  11-cv-01846-LHK
8
    SAMSUNG ELECTRONICS CO.,
9   LTD., a Korean business
    entity; SAMSUNG ELECTRONICS
10  AMERICA,INC., a New York
    corporation; SAMSUNG
11  TELECOMMUNICATIONS AMERICA,
    LLC, a Delaware limited
12  liability company,
13            Defendants.
    _____/
14

15

16      H I G H L Y   C O N F I D E N T I A L
17      A T T O R N E Y S'  E Y E S   O N L Y
18

19   VIDEOTAPED DEPOSITION OF SUSAN KARE, Ph.D.
20          SAN FRANCISCO, CALIFORNIA
21          FRIDAY, April 27, 2012
22

23  BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR
24  CSR LICENSE NO. 9830
25  JOB NO. 48804

Highly Confidential - Attorneys' Eyes Only

Page 16

| | | |
|---|---|---|
| 1 | have to double-check. | 10:26 |
| 2 | MS. CARUSO:  Okay. | 10:26 |
| 3 | Q   Is it your recollection that the speech | 10:26 |
| 4 | balloon was part of the graphic element that you | 10:26 |
| 5 | create -- that you worked on for messaging? | 10:26 |
| 6 | A   Yes. | 10:27 |
| 7 | Q   Why was the speech balloon chosen for that | 10:27 |
| 8 | function? | 10:27 |
| 9 | A   I believe in that particular case, Fossil | 10:27 |
| 10 | provided some mockups, as clients do, that are their | 10:27 |
| 11 | notions, and I rendered them.  It was one of -- of a | 10:27 |
| 12 | range of options. | 10:27 |
| 13 | Q   When you say "a range of options," do you | 10:27 |
| 14 | mean a range of metaphors or something else? | 10:27 |
| 15 | A   Probably in that case, as in general, there | 10:27 |
| 16 | would be a range of metaphorical options, as well as | 10:27 |
| 17 | when there's one option, there's different ways always | 10:28 |
| 18 | to represent any one concept. | 10:28 |
| 19 | Q   But you chose to develop the speech balloon | 10:28 |
| 20 | concept for messaging? | 10:28 |
| 21 | MS. TAYLOR:  Objection; mischaracterizes her | 10:28 |
| 22 | testimony. | 10:28 |
| 23 | THE WITNESS:  I -- I think, as I said, I | 10:28 |
| 24 | believe that that was one visual in a mockup they gave | 10:28 |
| 25 | me that I explored, along with other -- along with | 10:28 |

Highly Confidential - Attorneys' Eyes Only

Page 17

1  other options.                                              10:28

2      MS. CARUSO:  Q.  Do you remember any of the             10:28

3  other options for the messaging function?                  10:28

4    A   I don't remember exactly what I provided, but        10:28

5  I could check.  I'd have to pull up the document and        10:28

6  look at it.                                                 10:28

7    Q   Do you think that a speech balloon is a              10:28

8  useful symbol in connection with messaging?                10:28

9      MS. TAYLOR:  Objection; that's vague.                  10:29

10     THE WITNESS:  I mean, I'm not quite sure what          10:29

11 you're asking, "useful."                                   10:29

12     MS. CARUSO:  Well, let's -- let's take a step          10:29

13 back.                                                       10:29

14   Q   What's the purpose of an icon, the kind that         10:29

15 you design?                                                 10:29

16   A   Usually, it's a visual shorthand to                  10:29

17 communicate an idea or some kind of information that        10:29

18 in an application is represented with a visual to           10:29

19 identify it at a glance.                                    10:29

20   Q   So when you set out to develop an icon, how          10:30

21 do you approach that task?                                  10:30

22   A   I would find out everything I could from the         10:30

23 client about what the icon was intended to communicate     10:30

24 or represent.  I would usually try to extract from the     10:30

25 client their notion of their need, and as I said           10:30

Highly Confidential - Attorneys' Eyes Only

Page 18

1   before, keeping in mind perhaps the intended audience      10:30

2   or marketing factors, and then you just want to know       10:30

3   what you're trying to symbolize and make that visual.      10:30

4       Q    When you say extract from the client their        10:31

5   need, what would you mean by that?                         10:31

6       A    Usually the client gives, when they need          10:31

7   icons, a list of deliverables, and the deliverables        10:31

8   would be the -- their -- their request for aspects of      10:31

9   a product.  That might be categories or navigational       10:31

10  or applications or any -- any parts of the product         10:31

11  that -- where it's helpful for the user to interact        10:31

12  with symbols.                                              10:31

13      Q    Is it a consideration for you how the user        10:32

14  will interact with the symbols?                            10:32

15      A    I probably focus most on how things look          10:32

16  versus how things work, but they go hand in hand.          10:32

17  These products are useful.                                 10:32

18      Q    Right.                                            10:32

19      A    So it's not pure fine art.                        10:32

20      Q    Would it make a difference to you in              10:32

21  designing a graphic element if it's a graphic element      10:32

22  that is going to be on a touch screen versus accessed      10:32

23  in some other way, like with a mouse or a stylus?          10:32

24      A    Conceptually, no.  There could be practical       10:32

25  considerations in a touch screen.  But generally, I        10:32

Highly Confidential - Attorneys' Eyes Only

Page 19

1   would say I would think about it the same way in terms   10:33

2   of concept and metaphor.   10:33

3       Q   What are some of the practical considerations   10:33

4   with a touch screen?   10:33

5       A   We would probably poll the client about --   10:33

6   there -- there might be issues of using your finger.   10:33

7   There might be size issues or position on the screen   10:33

8   to physically be able to use the device.   10:33

9       Q   When you say there might be issues with using   10:34

10  your finger, what kind of issues?   10:34

11      A   If you're using a finger versus a stylus,   10:34

12  depending on the device and the physical requirements   10:34

13  of the device, from device to device, there could be   10:34

14  issues of needing to have enough -- enough room to   10:34

15  select something.   10:34

16      Q   I'm trying to understand that a little more.   10:34

17          So what would affect the amount of room you   10:34

18  have to select something?   10:34

19      A   When there's a touch screen, there is a hit   10:35

20  area that is really an engineering concern, not   10:35

21  that -- that you would designate part of the screen   10:35

22  area to respond to your finger.  And the -- we might   10:35

23  find out from a client how much space they would want   10:35

24  to allot, how many pixel dimensions, so that it's   10:35

25  possible to hit one area and not another.   10:35

Highly Confidential - Attorneys' Eyes Only

Page 20

1   Q   Do you ever take into consideration how the          10:35

2   user will discover that hit area?                        10:35

3          MS. TAYLOR:  Objection; vague.                     10:36

4          THE WITNESS:  I -- we would usually be guided      10:36

5   by a client's request for what they need technically.    10:36

6          MS. CARUSO:  Q.  Have you ever considered          10:36

7   whether the user would be assisted by visual cues as      10:36

8   to what the hit area is?                                  10:36

9          MS. TAYLOR:  Objection; it's vague.                10:36

10         THE WITNESS:  I -- yeah, I'm not quite             10:36

11  sure -- I'm not quite sure what you're asking me.         10:36

12         MS. CARUSO:  Sure.                                 10:36

13  Q   Well, for example, if you're dealing with a          10:36

14  touch screen device, is there anything that would lead    10:37

15  you to believe that a -- given any engineering-driven     10:37

16  hit area -- is that what you referred to it as -- that    10:37

17  the icon size should bear any relationship to that hit    10:37

18  area?                                                     10:37

19         MS. TAYLOR:  Wait just a moment.  You paused       10:37

20  in the middle and just added in, like, that inner         10:37

21  question.  Could you ask it -- like, a clear question.    10:37

22  I'm sorry.                                                10:37

23         MS. CARUSO:  Q.  Do you have the question in       10:37

24  mind?                                                     10:37

25         MS. TAYLOR:  Objection; it's vague.                10:37

Highly Confidential - Attorneys' Eyes Only

Page 38

| | | |
|---|---|---|
| 1 | "What do you mean by simple?  That could | 11:09 |
| 2 | be -- I'm talking visual appearance, not -- that it | 11:09 |
| 3 | can communicate to a wide audience as being | 11:09 |
| 4 | representative of a concept." | 11:09 |
| 5 | MS. TAYLOR:  I think there was a long pause | 11:09 |
| 6 | after the "not."  I think she started a sentence and | 11:09 |
| 7 | then -- | 11:09 |
| 8 | MS. CARUSO:  Well, I would like to ask the | 11:09 |
| 9 | witness -- | 11:09 |
| 10 | MS. TAYLOR:  Okay. | 11:09 |
| 11 | MS. CARUSO:  -- to clarify what her testimony | 11:09 |
| 12 | was there because I don't want the transcript to be | 11:09 |
| 13 | confusing about what your testimony is. | 11:09 |
| 14 | THE WITNESS:  Okay.  I don't want to be | 11:09 |
| 15 | confusing, either. | 11:09 |
| 16 | When you asked what is simple, do you mean -- | 11:09 |
| 17 | MS. CARUSO:  I didn't ask what is simple. | 11:09 |
| 18 | Q   I asked:  How does being simple contribute to | 11:09 |
| 19 | good icon design? | 11:09 |
| 20 | A   So in a visual sense, simplicity might -- | 11:09 |
| 21 | could mean lack of extraneous detail, and that can | 11:09 |
| 22 | make an image that a user brings -- can project their | 11:10 |
| 23 | own idea onto something that's simple rather than | 11:10 |
| 24 | having an image that has so many details that it's | 11:10 |
| 25 | clearly defined as one very specific thing. | 11:10 |

Highly Confidential - Attorneys' Eyes Only

Page 39

1        So this is one way to think about when you        11:10

2    said what makes a good icon.  It's something that --        11:10

3    simplicity can mean someone doesn't have to puzzle        11:10

4    over, what is that?        11:10

5      Q   How does being clear contribute to an icon        11:11

6    being a good icon?        11:11

7      A   You know what, it's very difficult to talk        11:11

8    without talking -- you know, if we're looking at a        11:11

9    range of icons, we might say this.  I mean, I'm using        11:11

10   that word "clear" in the sense of as opposed to        11:11

11   unclear, puzzling.  So I think generally, it's better        11:11

12   to be -- I mean, it --        11:11

13     Q   Not puzzling?        11:11

14     A   Not puzzling.        11:11

15     Q   Is the -- the clarity you're talking about        11:11

16   here seems to be not so much visual clarity as        11:12

17   communicative clarity.        11:12

18     A   It could be either.        11:12

19     Q   So clarity meaning it's not a fuzzy image?        11:12

20     A   That could be one, like, drawn in a way that        11:12

21   you're drawing a -- if you were drawing a picture of a        11:12

22   pencil, and the style was fuzzy or impressionistic,        11:12

23   that might be unclear, or it could be conceptually        11:12

24   unclear.        11:12

25     Q   Okay.  You also identified the characteristic        11:12

Highly Confidential - Attorneys' Eyes Only

Page 40

1   of not loaded with extraneous detail.  How does that          11:12

2   contribute to a good icon?                                    11:12

3     A    It's like a traffic sign.  I think in some            11:13

4   ways, good icons are like traffic signs because one of        11:13

5   their purposes is to communicate.                             11:13

6        You know, a school crossing sign has a                   11:13

7   silhouette of a boy and girl holding hands, and               11:13

8   there's no technical reason they couldn't have 3-D            11:13

9   clothes and plaid skirts and carrying books that you          11:13

10  could read the name of the books they were carrying.          11:13

11       But I would say that would be extraneous                 11:13

12  detail.  It could almost impede your at-a-glance              11:13

13  recognition of what -- of that message.  So, I mean,          11:13

14  it's analogous to that kind of thing.                         11:13

15    Q    Okay.  So do you agree that good icons are            11:13

16  more like road signs than like illustrations?                 11:14

17       MS. TAYLOR:  Mischaracterizes her testimony.            11:14

18  It's also vague.                                              11:14

19       THE WITNESS:  I don't think you can                     11:14

20  completely generalize and say every icon needs to look       11:14

21  like a road sign.  I was using that as an example to          11:14

22  say when you're designing icons, you need to -- one of        11:14

23  the many things you need to consider is how much              11:14

24  detail when there's -- is there a point when extra            11:14

25  detail might be obfuscating rather than illuminating.         11:14

Highly Confidential -  Attorneys' Eyes Only

Page 41

1   MS. CARUSO:  Q.  And that goes to the           11:14

2   ultimate question of at-a-glance recognition that you   11:14

3   were talking about is the goal of the icon?       11:14

4   A   Well, there's not a single goal, but that is   11:14

5   a positive aspect.                                11:15

6   Q   What -- what other goals are there for icons?  11:15

7   A   Well, again, different products, different   11:15

8   icons, there could be different goals.  That's a --  11:15

9   the pur -- you need to think about the purpose of   11:15

10  where the icons are.  But as I said, usually they   11:15

11  communicate in a visual, shorthand way some concept or  11:15

12  purpose or...                                     11:15

13  Q   When you design icons, do you endeavor to   11:15

14  make them communicate their function immediately?   11:15

15  MS. TAYLOR:  Objection; it's vague.               11:15

16  THE WITNESS:  It -- an icon maybe needs to        11:15

17  communicate something.  It might -- but there's   11:16

18  probably a range of what that could be.  It might just  11:16

19  be -- it might be a category.  It might be an idea.   11:16

20  It might be some process.                         11:16

21  MS. CARUSO:  Q.  Would you agree that it's        11:16

22  important that the icon communicate immediately,   11:16

23  whatever it is it's communicating?                11:16

24  MS. TAYLOR:  Objection; it's vague.               11:16

25  THE WITNESS:  I mean, I don't know what the       11:16

Highly Confidential - Attorneys' Eyes Only

Page 42

1    alternative to "immediately" would be, but you -- they       11:16

2    exist to communicate.                                        11:16

3           MS. CARUSO:  Q.  And do you want it to be             11:16

4    memorable as well?                                           11:16

5        A   Easy to remember.                                    11:17

6        Q   Do you have a -- a website for your business?        11:17

7        A   I do.                                                11:17

8        Q   And do you have a biography on that website?         11:17

9        A   I believe so.                                        11:17

10       Q   Did you write that yourself?                         11:17

11       A   I may have had assistance with that.                 11:17

12       Q   Did you review what was posted on your               11:17

13   website about you?                                           11:17

14       A   Yes, I think so.                                     11:17

15       Q   All right.  Well, let's -- let's confirm.            11:17

16          MS. CARUSO:  Can we mark this as Exhibit 1.           11:17

17          (Document marked Kare Exhibit 1                       11:17

18           for identification.)                                 11:18

19          MS. CARUSO:  Ms. Kare, you see what has been          11:18

20   marked as Exhibit 1.                                         11:18

21       Q   Do you recognize this?                               11:18

22       A   The first paragraph is from -- I did a series        11:18

23   of products for the Museum of Modern Art in New York,        11:18

24   and that quote is from a copy that they put on the           11:18

25   back of the products.                                        11:18

Highly Confidential - Attorneys' Eyes Only

Page 43

1    Q    Do you agree that your icons communicate        11:18

2    their function immediately and memorably with wit and   11:18

3    style?                                                11:18

4    A    Well, that's what the Museum of Modern Art       11:19

5    said about the icons on those products.  And I        11:19

6    think -- I think in that particular case, that was    11:19

7    completely accurate.                                  11:19

8    Q    Okay.  Do you recognize this Exhibit 1 as a      11:19

9    printout from your website?                           11:19

10   A    Yes.                                             11:19

11   Q    In Paragraph 3, there's the statement:           11:19

12        "Kare believes that good icons should be more    11:19

13   like road signs than illustrations, easily            11:19

14   comprehensible and not cluttered with extraneous      11:19

15   detail."                                              11:19

16        Is that an accurate statement of your belief?    11:19

17   A    Yes.                                             11:20

18   Q    When did you -- well, let me -- before we get    11:20

19   there, we were talking earlier about your -- your     11:20

20   experience and your interactions with clients.        11:20

21        Aside from the consumers who are your            11:20

22   clients, have you spoken with other consumers of      11:20

23   graphic user interfaces about how they perceive       11:20

24   graphic elements?                                     11:21

25   A    In -- like, in passing or just --                11:21

Highly Confidential - Attorneys' Eyes Only

Page 44

| | | |
|---|---|---|
| 1 | Q   In any context. | 11:21 |
| 2 | A   Do I ever speak with people about -- could | 11:21 |
| 3 | you just ask me that one more time.  Just -- | 11:21 |
| 4 | Q   Aside from your clients, have you spoken with | 11:21 |
| 5 | anyone about their perceptions of graphic elements in | 11:21 |
| 6 | computers? | 11:21 |
| 7 | A   Just anecdotally? | 11:21 |
| 8 | Q   In any way. | 11:21 |
| 9 | A   Yes. | 11:21 |
| 10 | Q   Can -- how frequently does that happen? | 11:21 |
| 11 | A   To just be in a conversation about graphics? | 11:21 |
| 12 | Q   Yes.  About, specifically, graphic user | 11:22 |
| 13 | interfaces. | 11:22 |
| 14 | A   I mean, it's something that's interesting to | 11:22 |
| 15 | me, and I might talk about with -- casually.  I talk | 11:22 |
| 16 | about my colleagues, but I -- I don't know that I | 11:22 |
| 17 | could say minutes a day or... | 11:22 |
| 18 | Q   I -- I'm asking outside of your client | 11:22 |
| 19 | relationships or your work colleagues, those | 11:22 |
| 20 | conversations.  That's what I'm focusing on. | 11:22 |
| 21 | And I'm not asking for minutes a day, but is | 11:22 |
| 22 | it something that you do every day?  Is it something | 11:22 |
| 23 | maybe once a month?  Is it frequently? | 11:22 |
| 24 | MS. TAYLOR:  Objection; it's compound. | 11:22 |
| 25 | THE WITNESS:  I guess I never really | 11:23 |

Highly Confidential - Attorneys' Eyes Only

Page 73

1    Q   Do you think that gives the user any          12:39

2    information about how these icons work?          12:39

3        MS. TAYLOR:   Objection; it's vague.          12:39

4        THE WITNESS:   I think looking at this        12:39

5    picture, you don't know how anything works.  It's just  12:39

6    a picture.  You know, we bring to it our experience    12:40

7    with the phone, so it's easy to look at this.  But     12:40

8    someone who's never seen this might just see it as a    12:40

9    picture.                                        12:40

10       MS. CARUSO:   Q.   Like a picture that you    12:40

11   would hang on a wall?                           12:40

12   A    Possibly like a screen shot, but you wouldn't    12:40

13   necessarily know from this picture if it was a touch    12:40

14   screen or what -- what -- what those -- if those       12:40

15   images are images that can be interacted with and what 12:40

16   would happen if you did.                        12:40

17   Q   Do you think there's anything about the       12:40

18   images that might suggest to a user that they should   12:40

19   be touched?                                     12:40

20   A   I think that the -- I don't know.  I -- I --  12:41

21   I think that obviously, there's a picture and it says  12:41

22   "calculator."  So, you know, anyone with some         12:41

23   experience with any kind of icon on any other         12:41

24   device -- but it's kind of speculative.         12:41

25       I mean, we know and I know this is a -- that  12:41

Highly Confidential - Attorneys' Eyes Only

Page 74

1  this is an app screen, but it's -- really looking at        12:41

2  this, it's about the visual.                                12:41

3     Q   Do you think that the figure -- the I --             12:41

4  the -- well, the icons on Figure 2 have a button-like        12:42

5  sense to them?                                               12:42

6         MS. TAYLOR:  Objection; it's vague.                   12:42

7         THE WITNESS:  I think that they have a                12:42

8  unifying element that is -- can be a button shape, but       12:42

9  it's not the only button shape.                              12:42

10        MS. CARUSO:  Q.  Leaving aside whether it's           12:42

11  the only button shape, do you think that the image on       12:42

12  Figure 2 conveys a sense of buttons?                        12:42

13        MS. TAYLOR:  Objection; it's vague.                   12:43

14        THE WITNESS:  I think that there exist in the         12:43

15  real world physical buttons that these evoke, but --        12:43

16        MS. CARUSO:  Q.  How do you think that                12:43

17  these --                                                    12:43

18        MS. TAYLOR:  Could you let her finish.                12:43

19        She said "but."  Go ahead.                            12:43

20        THE WITNESS:  But again, that was -- it --            12:43

21  it's -- I wouldn't want to overgeneralize just because      12:43

22  it's a very specific shape.                                 12:43

23        MS. CARUSO:  Q.  In your report, you say:             12:43

24        "The button-like icons are all shaped as             12:43

25  squares with rounded corners."                             12:44

Highly Confidential - Attorneys' Eyes Only

Page 75

1    Do you agree that these are button-like      12:44

2  icons?                                          12:44

3    A    They are.  I just said there exist in the    12:44

4  real world buttons -- physical buttons that look --    12:44

5  that -- that these evoke.  So I guess another way to    12:44

6  say that is "button-like."                      12:44

7    Q    Okay.  And what about them evokes buttons?    12:44

8    A    I think that screen elements that are virtual    12:44

9  can -- because you can have -- you can design them to    12:44

10  look like anything.  You don't need a hard tool or --    12:44

11  it's the easiest way to do some virtual industrial    12:44

12  design.                                         12:44

13    You know, there's all -- all kinds of buttons    12:44

14  on refrigerators and calculators and blenders and auto    12:45

15  tellers.  You know, there's -- there's so many devices    12:45

16  that have so many buttons and a lot of buttons, but    12:45

17  not all, that -- that this is a shape that draws    12:45

18  from -- there were physical buttons that looked like    12:45

19  this before there were -- there were touch screens,    12:45

20  and that was what would make me say "button-like."    12:45

21    Q    All right.                              12:45

22    Is there anything about these icons that --    12:45

23  in addition to the shape that conveys a more    12:45

24  three-dimensional button-like quality?          12:45

25    A    Well, because of the high resolution and    12:45

Highly Confidential - Attorneys' Eyes Only

Page 76

1    because of the light source and -- I can't tell,          12:45

2    remember, without looking at this.  There may be just     12:46

3    the most subtle drop shadow to make them look as if       12:46

4    they virtually are raised above the plane on which        12:46

5    they sit.                                                 12:46

6        But there's differently -- the algorithm             12:46

7    that -- that creates these from flat art gives them a     12:46

8    little bit of dimension.                                  12:46

9    Q   So all of that helps give this button-like           12:46

10   feel?                                                     12:46

11   A   Yes.                                                 12:46

12   Q   You noted in describing the arrangement that        12:46

13   it's not completely random.                              12:47

14       Do you -- do you think it makes it easier for       12:47

15   a user to interact with a graphic user interface         12:47

16   that's organized in a way that's not completely          12:47

17   random?                                                  12:47

18   A   I think that it's a part of human nature to         12:47

19   want to have your stuff organized, whether it's on the   12:47

20   shelves of the supermarket or icons on your desktop,     12:47

21   that some kind of organizing structure underlying is     12:47

22   good; right?  If I were a psychologist, I would          12:47

23   probably know exactly why it's good.  But -- but         12:47

24   orderly is usually helpful for finding things.           12:48

25   Q   All right.                                           12:48

Highly Confidential - Attorneys' Eyes Only

Page  77

1        Do you think that the -- the black background   12:48

2    compared to the icon images helps the images stand out   12:48

3    more on the screen?                                      12:48

4        A    As opposed to?                                 12:48

5        Q    As opposed to, for example, a white            12:48

6    background.                                              12:48

7        A    I don't know.  I think you'd have to put side   12:49

8    by -- side by side.  If you put side by side two         12:49

9    images, then I could compare them.  But it's probably    12:49

10   one of those, it depends what the alternative is.        12:49

11       I think that in this case, I believe, as it          12:49

12   says in the report, there's kind of a dual-tone          12:49

13   colorful quality to the icons, that being against a      12:49

14   background that isn't equivalently colorful provides     12:49

15   contrast.  Probably doesn't have to be this black        12:49

16   background, but --                                       12:49

17       THE VIDEOGRAPHER:  I'm going to have to              12:49

18   adjust your mic.                                         12:49

19       THE WITNESS:  Oh, I'm sorry.  I'm sorry.  I          12:49

20   should have worn something thicker.                      12:49

21       THE VIDEOGRAPHER:  Go above your top button          12:50

22   to keep it in place.                                     12:50

23       THE WITNESS:  Okay.  Thanks.                         12:50

24       MS. CARUSO:  Q.  In looking at the image of          12:50

25   Figure 2, do you have any understanding of what is new   12:50

Highly Confidential - Attorneys' Eyes Only

Page 78

1   about this design?                                      12:50

2       A   As opposed to?                                  12:50

3       Q   As opposed to any prior graphic user           12:50

4   interfaces.                                             12:50

5           MS. TAYLOR:   I'm going to object to the        12:50

6   extent it's calling for a legal conclusion.            12:50

7           THE WITNESS:   I feel as if I would -- I would  12:50

8   need to compare it.  I mean, I guess that's what a     12:50

9   patent is about, and I know -- but I feel as if I      12:51

10  couldn't -- I couldn't say categorically that I know   12:51

11  exactly what's new about it.                           12:51

12          MS. CARUSO:   Q.  You said you would -- you     12:51

13  feel like you would need to compare it.  What would    12:51

14  you want to compare it to?                             12:51

15      A   Well, if you said, "Here is a -- here is a      12:51

16  handheld device, and here is the iPhone that is older, 12:51

17  and this is newer, what's new about it," then I could  12:51

18  see and I could say.                                   12:51

19          But in a vacuum, to just say what's new about  12:51

20  it, I don't know how -- I don't know what I would say. 12:51

21      Q   Is that something that you attempted to        12:51

22  provide an opinion on in any way, to look at the prior 12:51

23  art and identify what is new in the -- in the design   12:51

24  patent '334?                                           12:52

25      A   I believe that in my report and in my role,    12:52

Highly Confidential - Attorneys' Eyes Only

Page 87

1    know that for sure from looking at this.          14:09

2         MS. CARUSO:  Q.  If you were designing a     14:09

3    graphic user interface -- let me ask a different   14:09

4    question.                                           14:09

5         Have you ever designed a graphic user         14:09

6    interface in which you applied two dots for purely  14:09

7    ornamental purposes?                                14:10

8    A    I've certainly used little sets of dots to     14:10

9    separate things.                                    14:10

10   Q    I'm asking about just two dots.                14:10

11   A    Two?                                            14:10

12        Probably a few more than two.                  14:10

13   Q    All right.                                      14:10

14        So you said that in devices that use this      14:10

15   design shown in Figure 2, there is a purpose for these  14:10

16   two dots; is that correct?                          14:10

17        MS. TAYLOR:  Mischaracterizes her testimony.   14:10

18        THE WITNESS:  I know that this -- in this      14:10

19   patent, this is a visual appearance.  And I know that  14:10

20   in some iPhone devices they make use of this         14:10

21   appearance, and in those devices there's a purpose.  14:11

22   They're controls.                                    14:11

23        But I -- this is just based on my              14:11

24   understanding of what a -- and I'm not a lawyer -- of  14:11

25   what a -- I think I understand what the patent means,  14:11

Highly Confidential - Attorneys' Eyes Only

Page 88

1   just like this isn't a functioning device.  This is        14:11

2   just a picture.                                            14:11

3        MS. CARUSO:  Okay.                                    14:11

4    Q   So this picture -- nothing on this page               14:11

5   itself has any function whatsoever?                        14:11

6    A   Right.                                                14:11

7    Q   Just --                                               14:11

8        THE REPORTER:  Hold on.  I didn't get that.           14:11

9        MS. CARUSO:  Q.  So on the iPhone devices             14:11

10  that have dots located above the four icons at the         14:11

11  bottom, what purpose do they serve?                        14:11

12   A   In the device?                                        14:12

13   Q   Yes.                                                  14:12

14   A   It's an indicator of a -- that there is               14:12

15  multiple screens to access, and it's a control.           14:12

16   Q   Can you think of other ways to show that             14:12

17  there are multiple screens available on a device?         14:12

18   A   A lot of different ways.                              14:12

19   Q   Can you think of any that are more visually          14:12

20  simple than having two dots?                              14:12

21       MS. TAYLOR:  Objection; that's vague.                14:12

22       THE WITNESS:  I can think of other ways that         14:12

23  applications and devices show multiple screens.          14:12

24  Whether or not it's -- you know, there's relative         14:13

25  degrees of simplicity.                                    14:13

Highly Confidential - Attorneys' Eyes Only

Page 89

1    I mean, you can have tiny pages.  You can    14:13

2    have numbers, which in some ways is even more    14:13

3    explicit, and in some ways might be simpler than    14:13

4    counting five dots to see one through five and have    14:13

5    the number light up.    14:13

6    I think there -- you know, so many websites    14:13

7    have page indicators in that affordance.  Phone isn't    14:13

8    the only device where there's multiple screens to see,    14:13

9    so there are pretty many examples out there.    14:13

10    MS. CARUSO:  Q.  Are there any others you can    14:13

11    think of other than the ones you've identified?    14:13

12    MS. TAYLOR:  I assume you're not going to    14:13

13    give her her expert report to refer to because I think    14:13

14    she had multiple samples in there.    14:14

15    Go ahead from your memory.    14:14

16    THE WITNESS:  I mean, numbers, different    14:14

17    shapes, circles.  It's true that if I could look at my    14:14

18    report, I could look at some other phones and remind    14:14

19    myself.    14:14

20    MS. CARUSO:  Q.  You believe that your report    14:14

21    had different alternatives to the page dot indicators?    14:14

22    A    I'd probably start with that.  If it was a    14:14

23    test to show other page indicators, then we could look    14:14

24    online.  I'd start with my report.    14:14

25    Q    All right.    14:14

Highly Confidential -  Attorneys' Eyes Only

Page  173

1   beyond --                                           17:13

2         THE WITNESS:  I couldn't --                  17:13

3         MS. TAYLOR:  -- the scope of her expert       17:13

4   report.                                             17:13

5         THE WITNESS:  -- I couldn't say.  Better in   17:13

6   what way?  I don't -- I'm not an expert on the      17:13

7   functionality of that phone.                        17:13

8         MS. CARUSO:  Q.  As a user of cell phones, do 17:13

9   you find that some user interfaces are more intuitive 17:13

10  than others?                                        17:13

11        MS. TAYLOR:  Objection; it's vague; it's also 17:13

12  beyond the scope of her expert report.              17:14

13        THE WITNESS:  My real focus is on the -- the  17:14

14  ornamental visual design, looking at the Samsung phone 17:14

15  and the Apple phone.                                17:14

16        I -- I think, in general, some phones -- it's 17:14

17  hard to say this phone is better categorically than  17:14

18  this phone because sometimes one phone will do some -- 17:14

19  something really well, search the Internet and be    17:14

20  clear on the phone, and another phone which might be 17:14

21  inferior in those ways might have a feature keyboard 17:14

22  or -- that some people like physical keyboards and   17:14

23  swear by them and are willing to put up with a more  17:14

24  inferior browsing experience to get a keyboard.      17:14

25        So it depends on need, and it depends on the  17:14

Highly Confidential - Attorneys' Eyes Only

Page 174

1   person, and it depends on the task.  So whether          17:15

2   something is better depends on your priorities, not      17:15

3   exclusively how intuitive an interface might be.         17:15

4        MS. CARUSO:  Q.  So your focus is really on         17:15

5   the visual appearance; is that correct?                  17:15

6   A    (Witness nods head.)                                17:15

7        Again, the visual appearance in a graphical         17:15

8   UI, it's a marriage of looks, how it looks and how it    17:15

9   works.  I sit squarely on the how it looks side, but     17:15

10  there's still some carryover.  When you design, you      17:15

11  don't just design.  You don't just design to make --     17:15

12  to make it ornamental.                                   17:15

13  Q    But you didn't evaluate how it works, aside         17:15

14  from this report?                                        17:15

15  A    No.                                                 17:15

16  Q    Okay.  All right.                                   17:15

17  A    I wasn't asked to for this report.                  17:15

18  Q    All right.                                          17:16

19       What about for your rebuttal report?  Did you       17:16

20  consider the -- anything about the how it works side     17:16

21  of the --                                                17:16

22  A    Well --                                             17:16

23  Q    -- user interface?                                  17:16

24  A    -- they're -- they're not mutually exclusive.       17:16

25  And again, a good icon, it's not just, oh, it's          17:16

Highly Confidential - Attorneys' Eyes Only

Page 175

1    attractive.  That's not the scale.  So I would never    17:16

2    say I don't think about how things work, but I think a    17:16

3    lot about how things look.    17:16

4         And a primary part of what I was asked for    17:16

5    for this report was, is the overall visual impression    17:16

6    of this like the overall visual imprission of that?    17:16

7    Q    And you didn't evaluate how the Nokia N9    17:16

8    works?    17:16

9    A    I was not asked to.    17:16

10   Q    And you didn't evaluate how the Samsung    17:16

11   phones work?    17:16

12   A    Primary focus, a visual -- overall visual    17:17

13   impression of the applications screen.    17:17

14   Q    Okay.  Did you consider how any of the other    17:17

15   alternatives that you identified, how those graphic    17:17

16   user interfaces work?    17:17

17   A    Some.  Like the Prada phone that I held, I    17:17

18   could experience it or -- and I actually think, now    17:17

19   that I have the -- you know, in flipping through the    17:17

20   report, there were a couple of other phones that we    17:17

21   looked at.  There was a -- there was a BlackBerry.    17:17

22   You know, there were a lot of phones on the table.    17:17

23   And there is a list.    17:17

24   Q    Oh, where is that list?    17:17

25   A    There is a list in here.  The -- I was    17:17

Highly Confidential - Attorneys' Eyes Only

Page 189

1    his expert report?                                18:04

2        A    I looked at a number of the screen shots and   18:04

3    sometimes searched online to see if I could find a   18:04

4    bigger or clearer version.                         18:04

5        Q    In the process of looking at the prior art,   18:04

6    did it change your opinion in any way about the   18:04

7    similarity of the Samsung phones to the Apple design   18:04

8    patents?                                           18:04

9        A    No.                                       18:05

10       Q    All right.                               18:05

11            Did you consider whether the prior art might   18:05

12   affect how an ordinary observer would compare the   18:05

13   Samsung phones to the Apple design patents?        18:05

14       A    There's a lot.  I mean, he gave a lot of   18:05

15   examples.  So I -- it -- it would probably make sense   18:05

16   to -- in general, I didn't see anything that -- that   18:05

17   caused me to pause and reconsider.                 18:05

18       Q    Okay.                                     18:05

19            (Document marked Kare Exhibit 13          18:06

20             for identification.)                     18:06

21       MS. CARUSO:  Oh, sorry.                        18:06

22       THE VIDEOGRAPHER:  Just hand it to me, and     18:06

23   I'll hand it to her.                               18:06

24       MS. CARUSO:  This is better than having my     18:06

25   shoulder in the picture.                           18:06

Highly Confidential -  Attorneys' Eyes Only

Page 190

1          THE WITNESS:  If this is prior art, then --      18:06

2          MS. CARUSO:  Q.  Then what?  Is that a      18:06

3   problem?      18:06

4          MS. TAYLOR:  What number is that?      18:06

5          MS. CARUSO:  Exhibit 13.      18:06

6          MS. TAYLOR:  Okay.      18:06

7          MS. CARUSO:  Q.  Have you seen the image in      18:06

8   Exhibit 13 before?      18:06

9      A   It looks similar to phones I've seen before.      18:06

10     Q   Does it look similar in its overall      18:07

11  impression to the D '305 patent?      18:07

12         MS. TAYLOR:  It's one of those.      18:07

13         MS. CARUSO:  Q.  Or Exhibit 4 on your...      18:07

14     A   It looks similar, but not identical.      18:07

15     Q   Would you say it's substantially similar to      18:08

16  an ordinary observer?      18:08

17     A   Yes, probably.      18:08

18     Q   Why do you hesitate?      18:08

19     A   Well, there's -- there's just some small      18:08

20  differences, but I -- I would say they're very      18:08

21  similar.      18:08

22     Q   What differences do you note?      18:08

23     A   It's Wednesday, not Tuesday, nine versus six,      18:08

24  different time on the clock, notes to the left, one      18:08

25  extra icon on the third row.      18:08

Highly Confidential - Attorneys' Eyes Only

Page 191

1    Q   Is it your opinion that collectively those        18:08

things would change an ordinary observer's overall        18:08

impression?                                               18:08

4    A   No.  I just said they're very similar.            18:08

5    Q   All right.                                        18:08

6        Do you remember when you first saw an image       18:08

that -- that looked like Exhibit 13?                      18:09

8    A   I'm not sure.  I think there's a picture of       18:09

Steve Jobs holding up a phone, but I'm not sure if        18:09

this is that or not, and whether that's the phone or      18:09

if I'm confusing something else that I saw.               18:09

12   Q   I'll draw your attention to the fact that the     18:09

carrier identified on Exhibit 13 is Cingular, if that     18:09

helps you place the timing at all.                        18:09

15   A   I don't know.                                     18:09

16   Q   Okay.  Do you remember when the iPhone was        18:09

announced?                                               18:09

18   A   I don't know.                                     18:09

19   Q   Leaving aside if you remember the exact date      18:09

that it was announced, do you remember there being a      18:09

day that the iPhone was announced?                        18:10

22   A   Announced with an event or --                     18:10

23   Q   Announced --                                      18:10

24   A   -- announced --                                   18:10

25   Q   -- by Apple.                                      18:10

Highly Confidential - Attorneys' Eyes Only

Page 192

1        Steve Jobs introduced it at the Macworld     18:10

2   conference?                                        18:10

3     A    Yeah, and I went to that.                   18:10

4     Q    Okay.                                        18:10

5     A    But I don't know when it was.               18:10

6     Q    All right.                                   18:10

7          So you were there when the first iPhone was 18:10

8   introduced?                                        18:10

9     A    Yes.                                         18:10

10    Q    Do you remember any publicity after that    18:10

11  event that -- that showed a picture of the iPhone as 18:10

12  it was shown at that Macworld event?               18:10

13    A    I don't remember.                           18:10

14    Q    Do you remember if you went on Apple's      18:10

15  website and looked at any images of the phone after 18:10

16  attending that event?                              18:10

17    A    I went to Macworld, and there was one in a -- 18:10

18  like a plexi-box, but I -- I don't remember.  I don't 18:10

19  know about the website.                            18:11

20    Q    And attending that event, did it make you  18:11

21  want to get an iPhone 1?                           18:11

22    A    No.                                         18:11

23    Q    Why is that?                                18:11

24    A    A variety of personal reasons.             18:11

25    Q    Did any of those reasons have to do with the 18:11