# EXHIBIT 40

```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                   SAN JOSE DIVISION
 4   APPLE INC., a California
     corporation,
 5
 6           Plaintiff,
 7   vs.                          Case No. 11-CV-01846-LHK
 8   SAMSUNG ELECTRONICS CO., LTD.,
     a Korean business entity;
 9   SAMSUNG ELECTRONICS AMERICA,
     INC., a New York corporation;
10   SAMSUNG TELECOMMUNICATIONS
     AMERICA, LLC, a Delaware
11   limited liability company,
12           Defendants.
     _____/
13
14
15                    CONFIDENTIAL
16                ATTORNEYS' EYES ONLY
17                  OUTSIDE COUNSEL
18      VIDEOTAPED DEPOSITION OF DANIEL COSTER
                San Francisco, California
19              Thursday, October 27, 2011
20
21
22   Reported by:
     LORRIE L. MARCHANT, CSR No. 10523
23               RPR, CRR, CCRR, CLR
24   JOB NO. 43003
25
```

Confidential Attorneys' Eyes Only

Page 11

1   design -- excuse me.  Let me start that over again.
2           There was a portion in "Objectified" where
3   Mr. Ive said, in effect, that for the iPhone, the
4   design deferred to the display.
5           Did you see that part of it?
6       A.  As I said, I'm a bit embarrassed.  I didn't
7   see his part, so --
8       Q.  I see.  I understand.  So you're saying you
9   missed that whole part where Mr. Ive was --
10      A.  Unfortunately.  I'm sorry.
11      Q.  Well, that's quite all right for telling
12  me.  It avoids a few more questions, then.
13          What do you recall about your first
14  involvement in the development of the first tablet
15  computer design you can remember working on there at
16  Apple?
17      A.  Sorry.  Please ask the question again.
18      Q.  Sure.  Now what I'd like to do is focus on
19  the tablet computers that you've worked on there at
20  Apple.
21      A.  Yes.
22      Q.  And -- and my question is, is what's your
23  first memory about that project?
24      A.  I don't recall.  It's so long ago.  I'm
25  sorry.

Confidential Attorneys' Eyes Only

Page 12

1   Q.   Do you remember the approximate time period
2   where you worked on the initial tablet design?
3   A.   I'm sorry.  I can't recall.
4   Q.   Let me show you what was previously marked
5   as Exhibit 8, which is a copy of United States
6   Design Patent 504,889.
7        If you could please let me know when you've
8   had a chance to review that document.
9        You've had a chance to look at the '889
10  design patent?
11  A.   Yes.  Thank you.
12  Q.   Did you work on the design that's shown
13  here?
14  A.   Yes, I did.
15  Q.   You'll see that it has a -- a filing date,
16  and this is in the middle of the first column there
17  on the left, of March 17, 2004.
18       Do you see that?
19  A.   Correct.
20  Q.   Does that help refresh your recollection as
21  to any of the time periods you worked on this
22  design?
23  A.   This is the date of the application;
24  correct?
25  Q.   Right.

Confidential Attorneys' Eyes Only

Page 13

1  A.    But there's so much other things that's
2  happened, I'm sorry.  I can't recall.
3     Q.    Do you recall approximately how long it
4  took to complete the design that showed up in the
5  '889 design patent?
6     A.    Not offhand.  I'm sorry.
7     Q.    Can you recall whether that process -- just
8  getting to this design, right -- was a matter of --
9  of weeks or months or -- or years?
10    A.    I'm sorry.  I can't remember.  As I said,
11 it's a collaborative effort.  So sometimes we worked
12 on it, then maybe stopped, and other people worked
13 on it.  So it was a very team-oriented experience,
14 so it's very hard to nail down those dates.  I'm
15 sorry.
16    Q.    Generally speaking, do you recall the --
17 the design that was involved -- I'm talking about
18 the design process -- that was involved with the
19 design shown here in the '889 patent was -- was
20 something that was sort of a stop-and-start process
21 as opposed to something that was simply done in one
22 continuous time period?
23    A.    I can't recall.  I'm sorry.  It's hard to
24 remember.
25    Q.    Do you recall whose idea it was to come up

Confidential Attorneys' Eyes Only

Page 28

1  that way.  I'm just trying to find out whether you
2  have an understanding as to whether the line shown
3  there is broken or not and, therefore, part of the
4  claim design or not.
5          MR. KREEGER:  Objection.  Calls for a legal
6  conclusion.
7          Go ahead.
8          THE WITNESS:  Again, I -- I'm sorry.  I
9  can't interpret.
10         (Discussion off the record.)
11         BY MR. ZELLER:
12     Q.   Directing your attention to Figure 1 of the
13  '889 design patent --
14     A.   Yes.
15     Q.   -- you'll see that part of -- as part of
16  the perimeter on that front of the device, there's a
17  thicker line as compared to the others.
18     A.   Could you point to it?  I'm sorry.
19     Q.   Sure.  It's this part (indicating), that
20  runs right along here (indicating) and then sweeps
21  upward.  It's the darker, thicker line that's part
22  of Figure 1.
23     A.   I see, yes.
24     Q.   Do you have an understanding as to what
25  that depicts?

Confidential Attorneys' Eyes Only

1    A.   I'm sorry.  I don't.  Again, I can't
2  interpret these drawings.
3    Q.   Do you know whether the design that's shown
4  here in the '889 design patent shows a clear, flat
5  surface that runs from edge to edge?
6    A.   Yes.
7    Q.   And in your view, it does cover that?
8    A.   Again, it's -- I'm sorry.  Ask the question
9  again.  Sorry.  Does it cover what?  Sorry.
10   Q.   Sure.
11        Is it your understanding that the drawings
12 here do show a clear, flat surface that's continuous
13 and runs from edge to edge?
14   A.   Edge to edge on what?  Sorry.  You mean the
15 piece of glass is edge to edge in its own right,
16 though?
17   Q.   Right.
18   A.   The piece of glass has an edge, so that's
19 where it stops, I suppose.  As an overall -- again,
20 this drawing is -- depicts the overall design, so
21 that's -- that's not the only part of the thing that
22 you're seeing.
23   Q.   Does the -- do these drawings in the '889
24 design patent show or depict a gap or groove of any
25 kind?

Confidential Attorneys' Eyes Only

Page 30

1   A.   Again, I can't interpret that from here.
2   Q.   Do you have an under -- well, I'm sorry.
3   Strike that.
4        Does the design that's shown here in the
5   '889 design patent show or depict any vents?  And
6   for the record, I'm saying V-E-N-T-S.
7   A.   Again, I'm sorry.  The -- the drawing
8   depicts the design, so it's hard for me to give you
9   specific feedback.
10  Q.   Going back for a moment to that thicker,
11  darker line that's part of Figure 1 --
12  A.   Okay.
13  Q.   -- do you know whether that darker, thicker
14  line depicts a gap or a groove?
15  A.   No, I don't.
16  Q.   Do you know whether that darker, thicker
17  line depicts an area where there were vents?
18  A.   So what was the question again?  Sorry.
19  Q.   Do you know whether that darker, thicker
20  line in Figure 1 depicts where there were vents?
21  A.   No, I don't know.
22  Q.   Your counsel has brought a couple of tablet
23  mockups that I have a few questions about for you.
24       Why don't we start with the larger one.
25       And for the record, I'm -- I'm showing you

Confidential Attorneys' Eyes Only

Page 31

1  the three-dimensional mockup of -- of a -- of a
2  tablet computer design.  And this particular one is
3  the one with the -- what sometimes people refer to
4  as the "30-point connector" and then the single hole
5  as a -- on one of the sides.
6          So if I can hand that to you, please.  And
7  if you can take a look at the physical mockup, I'd
8  appreciate it.
9          And for the record, I'm going to hand you
10 what was previously marked as Exhibit 842, which is
11 a -- which is two pages of photographs with some
12 closeups of one of the mockups.
13         So first, directing your attention to the
14 physical mockup that you have in front of you, the
15 three-dimensional object --
16     A.   Yes.
17     Q.   -- had you seen that before today?
18     A.   Yes.
19     Q.   And did you see that in the course of your
20 work there at Apple?
21     A.   Correct.
22     Q.   Did you see that in the course of working
23 on the design that's shown here in the '889 design
24 patent?
25     A.   Yes.

Confidential Attorneys' Eyes Only

Page 32

1    Q.   Is -- is the mockup of the tablet that you
2    have in front of you the -- the design that's shown
3    in the '889 design patent?
4    A.   I believe so.
5    Q.   And directing your attention to what we
6    marked as Exhibit 842, which are the two pages of
7    photographs --
8    A.   Yes.
9    Q.   -- and these -- these are closeups of
10   that -- the mockup that you have in front of you.
11   A.   Okay.
12   Q.   And you'll see that there are -- those --
13   those arrows with the Letter A on both pages.
14        Do you see that?
15   A.   Yes.
16   Q.   And where those arrows are pointing and
17   labeled A, are those vents?
18   A.   Unfortunately, I -- I don't know.  They
19   look pretty, but I'm -- I'm -- I don't know if they
20   are vents or not.
21   Q.   And just if you could take a look at the
22   second page to satisfy yourself and be sure.  And
23   I'm referring to the second page of Exhibit 842, the
24   photographs.
25   A.   Thank you.

1  Q.  And so even after looking at that second
2  page, you can't determine whether those are vents?
3  A.  I'm sorry, no.
4  Q.  If you could do me a huge favor and just
5  hold the tablet up for the video camera so that we
6  have a record of what I showed you.
7      Also, if you could just show the bottom
8  part, where the connector is.  Yeah.  And then the
9  part where there is the hole, the port.  And then
10 the back surface too, please.
11     Okay.  Thank you very much.
12 A.  Sure.
13 Q.  Do you know who created the physical mockup
14 that you have in front of you?
15 A.  No.  I don't recall.
16 Q.  Do you remember the context in which you
17 saw it?  Was it at a meeting there at Apple, or --
18 or did someone come by and specifically show it to
19 you at some point?
20 A.  I'm sorry.  I don't recall.
21 Q.  At some point did you act as the liaison
22 between the industrial design group that you're a
23 part of and then other parts of the company as it
24 pertained to -- as it pertained to the iPad or the
25 iPad 2?

Confidential Attorneys' Eyes Only

Page 35

1   A.   Again, it's -- it's quite a collaborative
2   effort, so there's never normally a singular person.
3   So I think that's what the strength of the group is.
4   Q.   Did you work on the design for both the
5   iPad and the iPad 2?
6   A.   Yes.
7   Q.   Were you present when Steve Jobs announced
8   and unveiled the iPad 2?
9   A.   I'm sorry.  Present where?
10  Q.   Well, you recall that with some products,
11  major product announcements, Steve Jobs would --
12  would be the one who unveiled them and first showed
13  them to members of the press and the public?
14  A.   Yes.
15  Q.   And that happened with the iPad 2?
16  A.   Yes.
17  Q.   Were you present when he did that?
18  A.   Yes.
19  Q.   Do you remember, did Mr. Jobs say, in -- in
20  words or effect, that the design for the iPad 2
21  was -- was new?
22  A.   I don't recall.  Sorry.
23  Q.   Do you have any understanding or knowledge
24  as to what Mr. Jobs meant by that statement?
25  A.   I don't know.

Confidential Attorneys' Eyes Only

Page 36

1  MR. KREEGER:  Assumes facts.
2  THE WITNESS:  Like I said, it's -- I'm
3  sorry.  I can't answer your question.
4  BY MR. ZELLER:
5  Q.  Looking at the tablet design that's shown
6  in the '889 design patent, just in terms of its
7  overall appearance, do you think the design that's
8  shown here in the '889 design patent is the same
9  design as the iPad 2?
10  A.  I have no opinion about the overall design.
11  I'm sorry.
12  Q.  Do you have any view as to whether or not
13  the design in the '889 design patent is
14  substantially the same as the iPad 2?
15  A.  Again, it's hard for me to answer.  I don't
16  understand what the word "substantial" means in -- I
17  don't have an opinion about the overall, so it's --
18  it's hard to respond.
19  Q.  So -- so whether -- whether it's the same
20  or substantially the same, you just -- you don't
21  have an opinion either way?
22  A.  I'm sorry.
23  Q.  And just so we have a clear record, I
24  think -- I think I understand what you're saying,
25  but this gets put into a transcript, so your words

1    get taken literally.
2            You don't have an opinion one way or
3    another whether the design that's shown here in the
4    '889 design patent is the same or substantially the
5    same as the iPad 2 design?
6        A.   Correct.
7        Q.   Directing your attention to the '889 design
8    patent --
9        A.   Yes.
10       Q.   -- and specifically Figure 2, you'll see
11   that on the -- the -- the surface that's depicted
12   here of the device there are three sets of diagonal
13   lines?
14       A.   Yes.
15       Q.   Do you know what those diagonal lines
16   depict or mean?
17       A.   No.
18       Q.   If you could please take a look at
19   Figure 4.
20       A.   Yes.
21       Q.   You'll see that this is another view of
22   the -- what it says here is the bottom perspective,
23   the bottom view of the device.
24       A.   I don't see where it says bottom
25   perspective.  Sorry.

Confidential Attorneys' Eyes Only

1  Q. Well, I'll show you where that is.
2     If you look back at the first page.
3  A. Yes.
4  Q. In that second column, under the words
5  "description" --
6  A. Yes.
7  Q. -- it says, Figure 2 is a bottom
8  perspective view thereof.
9  A. Bottom view thereof.
10 Q. Right. Do you see that part?
11 A. Yes.
12 Q. And then it also says, Figure 4 is a bottom
13 view thereof?
14 A. Oh, yes.
15 Q. And so taking a look, then, at --
16 A. Thank you.
17 Q. -- Figure 4, which is another view of the
18 bottom of the device --
19 A. Yes.
20 Q. -- do you have any understanding as to why
21 those diagonal lines that were shown on Figure 2 on
22 the bottom are not shown in Figure 4?
23 A. No. I'm sorry. I don't.
24 Q. If you could please take a look at the last
25 page of the '889 design patent. This is Figure 9.

Case 5:11-cv-01846-LHK   Document 1382-7   Filed 07/26/12   Page 16 of 18

Confidential Attorneys' Eyes Only

Page 39

1   Q. You'll see that from the perspective of
2   the -- the man holding the device in the -- in the
3   drawing that the top of the device is somewhat wedge
4   shaped. Do you see that? Or tapering.
5       A.  Okay.
6       Q.  Do you know whether or not the design
7   that's shown in this design patent is showing a --
8   an edge that is -- is tapering or wedge shaped?
9       A.  No. I couldn't tell from the drawing.
10  Sorry.
11      Q.  And then also on Figure 9, you'll see that
12  there is a thicker, darker line that runs part of
13  the perimeter of the front.
14      A.  Can you show that to me?
15      Q.  Sure. It's that darker, thicker part
16  (indicating).
17      A.  Okay.
18      Q.  There's a line that runs around at least
19  part of the perimeter that can be seen of Figure 9.
20      A.  Yes. Well, is it -- is it two lines
21  together?
22      Q.  Well, that was going to be one of my
23  questions.
24          Do you know if it is?
25      A.  It's hard to know. The drawing is so bad.

Confidential Attorneys' Eyes Only

Page 40

1  Q. Do you know what, if anything, that line
2  depicts?
3  A. No, I don't. I'm sorry.
4  Q. I'm going to show you what's previously
5  marked as Exhibit 751, which is a copy of United
6  States Design Patent 622,270. And then I'm going to
7  show you another copy of the '270 design patent
8  which we have marked as Exhibit 429.
9       And for the record, the copy of it that's
10 marked as Exhibit 429 has some handwritten markings
11 on it, which is why it's marked separately.
12      And if you could please take a look at the
13 '270 design patent, the one that we've marked as
14 Exhibit 751.
15 A. Yes.
16 Q. You'll see that you're a named inventor on
17 this -- this design patent.
18 A. Yes.
19 Q. Was this a design you worked on at some
20 point?
21 A. Yes.
22 Q. And do you recognize, generally, what the
23 device is that this shows?
24 A. Yes.
25 Q. Is it the -- the first iPod touch?

1    A.   Yes, I believe so.

2    Q.   Was there anything that was new or original
3 about the design that's shown in the '270 design
4 patent as compared to designs that were already in
5 existence that you knew of?

6    A.   I can't recall.  I don't know -- I don't
7 know in the history of things how to relate what I'm
8 looking at here to -- as you said, what was around
9 at the time.  Sorry.

10   Q.   Do you have any understanding today as to
11 what was new or original about the design?

12   A.   No.  I'm sorry.

13   Q.   If you could please take a look at the
14 version of the '270 design patent that we marked as
15 Exhibit 429.  That's the other one.  And you may
16 want to keep the other one in front of you as well,
17 the clean copy of 751, just in case you need to
18 refer to it.

19        You'll see that on the version of the '270
20 design patent there are pages where there's some
21 handwritten markings on them.

22   A.   Which one is the 27- -- sorry, which one?

23   Q.   It's the one that's numbered 429 there.

24   A.   Yes.  Thank you.

25   Q.   So you'll see on Figure 1 and Figure 2