# EXHIBIT 82

1    A.   Samsung market power that I was
2    concerned about comes from asking for a rate,
3    FRAND rate, is one of the elements that I
4    believe -- for asking for a rate that I believe
5    is excessive. It reflects the fact that has
6    its patents in the standard and that gives them
7    the market power relative to what it would have
8    if the standard were not determined. So that's
9    number one.
10        Number two, it comes from Samsung's
11   request or demand for access to Apple's
12   differentiating intellectual property as a
13   price of admission to its SEPs. And also to
14   the extent that it does have the ability to ask
15   for injunction, and there is a dispute whether
16   it can or cannot, that only turbocharges the
17   ability to put pressure on Apple to succumb to
18   these requests for dollars and for IP.
19        Q.   But if Samsung can't ask for an
20   injunction, then there's no sword hanging over
21   Apple's head; correct, as you put it?
22             MS. MILLER:  Objection.
23        A.   Yes.  I'm speechless because I don't
24   fully understand the counter factual. Samsung
25   has asked for an injunction, so it's not like

Page 248

1  they cannot.  They did.  And they asked for an
2  injunction before they made a FRAND offer, what
3  they considered the FRAND offer to Apple.
4        So I don't understand what the
5  hypothetical scenario we are conjuring up.
6    Q.   So then I guess my question is:  Is
7  it the fact that Samsung has brought the
8  litigation and sought an injunction as opposed
9  to whether Samsung is going to actually obtain
10 the injunction that reflects Samsung's market
11 power, in your opinion?
12   A.   The threat of the injunction, the
13 probability that it may, is what is the concern
14 to me from the competitor's perspective.
15       It's my view that they should not be
16 allowed to ask for one, but they should be
17 perfectly permitted to go and sue Apple for
18 violating their intellectual property and ask
19 for damages, possibly with incremental penalty
20 for the reasons we discussed an hour ago.
21   Q.   So it's Samsung's bringing the
22 litigation and seeking the injunction that
23 demonstrates the market power?
24   A.   It is a component of their market
25 power, as we discussed, one of which -- there

1  are other aspects to it.  And the fact that
2  they can go in and ask for an injunction and
3  there is perhaps a probability they will obtain
4  it, is something that is of a competitive
5  concern, at least to me.
6           Certainly not necessarily to Dr.
7  Teece.  He doesn't think that there is anything
8  wrong with asking for an injunction unless
9  there are some competitive concerns that doing
10 so triggers.
11      Q.   Could you please turn to paragraph 24
12 of your report at page 12.
13      A.   Okay.
14      Q.   I'm sorry, it's actually the first
15 bullet point on page 13.
16      A.   "Samsung Conduct"?
17      Q.   Correct.
18      A.   Let me read that.
19           (Document Review.)
20           Yes.
21      Q.   In your opinion, is the harm to
22 downstream competition that Samsung might cause
23 contingent upon it prevailing on its claims?
24      A.   It says if Samsung were to prevail,
25 that would harm downstream competition.

Page 250

1   Q.   So in the absence of Samsung
2  prevailing on its claims, there would not be
3  harm to downstream competition?
4   A.   Yes.  It's like, you know, attempted
5  murder doesn't -- it's still bad news, but it's
6  not the same thing as killing somebody.
7   Q.   Well, sorry.  I appreciate the
8  editorializing, but just answer the questions
9  clearly.
10       If Samsung doesn't prevail in its
11 claims, then there is no harm to downstream
12 competition; correct?
13  A.   That is true within that limited
14 issue that I'm addressing here.  And, in
15 particular, if Samsung does not prevail, it
16 will be competing against Apple.  Apple will be
17 competing against Samsung.  Consumers will be
18 benefiting.
19       And sooner or later across all these
20 many jurisdictions, a resolution of the dispute
21 the dispute is going to come to some
22 resolution -- the dispute is going to come to
23 some resolution regarding the FRAND rate and
24 all the other aspects of this litigation, yes.
25  Q.   If Samsung does prevail, is it the

1   case that it's the court's action in enjoining
2   Apple that causes the antitrust entry?
3       A.   It would be hard to blame the court
4   for causing an antitrust injury.  The court
5   makes a ruling in response to Samsung's request
6   or demand for injunctive relief.
7            I am opposed to the whole concept of
8   Samsung asking for injunctive relief, given its
9   repeated FRAND commitments on these seven
10  patents, the blanket commitment and then the
11  individual FRAND commitments relating to each
12  one of those seven patents made late but,
13  nevertheless, they were made.
14      Q.   Are you aware of any actual -- strike
15  that.
16           Is it your opinion that Apple has
17  sustained any actual injury to date -- strike
18  that again.
19           Is it your opinion that Apple has
20  sustained antitrust injury to date?
21           MS. MILLER:  Objection.
22      A.   I think that "antitrust injury" is a
23  term of art.  It certainly sustained certain
24  harm due to the needs to defend itself across a
25  broad range of jurisdictions, that is no doubt

1   significant cost.
2            So that's a harm to Apple.  It has
3   yet to harm competition because Apple, at this
4   point, can pay the bills.  It does not have to
5   necessarily cut back on its R&D.  So we are
6   lucky that that's the -- that they are the
7   target as opposed to some other company which
8   may have a lesser ability to survive the
9   multi-jurisdictional litigation that Samsung
10  has rolled out in this particular situation.
11           So someone else may actually have --
12  be forced to exit, and such exit may, in fact,
13  harm competition and, therefore, be an
14  antitrust injury.
15       Q.   But -- so the only injury you're
16  aware of Apple sustaining to this point is
17  incurring litigation costs; correct?
18       A.   No.  I believe that they are also
19  incurring additional costs, such as the time of
20  the management that's being diverted perhaps
21  from other matters that they should be paying
22  attention to.  It's a competitive environment.
23  It's a highly -- it's a quickly moving
24  marketplace and, clearly, there's been a lot of
25  time and energy spent at Apple trying to

Page 253

1  respond to these litigations and trying to
2  perhaps map out how the -- how its market
3  circumstances are going to unfold, given the
4  allegations and the claims made by Samsung.
5         So there's more to the effect other
6  than just, you know, whatever the millions and
7  tens of millions of dollars worth of costs
8  incurred.  There is other less tangible
9  consequences.
10     Q.   In terms of the setting aside
11 legitimate costs, any other, with respect to
12 any injury that Apple has sustained, other than
13 litigation costs, have you conducted any
14 investigation as to the extent of that injury?
15     A.   No.  I have not conducted any such
16 investigation, neither do I know what Apple's
17 litigation costs have been heretofore.
18     Q.   So you haven't don't -- quantified
19 any of the injury that Apple has sustained as a
20 result of any antitrust injury; correct?
21     A.   I think you misspoke a couple of
22 times, but I know what you have in mind -- I
23 think that I have not quantified the dollar
24 harm to Apple as a result of these issues that
25 we are now talking about, the Samsung lawsuits

1    across the globe.
2        Q.    Are you aware of any evidence that
3    Apple has reduced its investments in products
4    and services implementing the standard as a
5    result of any of Samsung's activities?
6              And by the "standard," I mean the
7    UMTS standard.
8        A.    Not as yet.  There might be future
9    effects.
10       Q.    You're not aware of any effect on
11   Apple's handset market as the result of any
12   Samsung activity; is that correct?
13       A.    That is true.
14       Q.    In your antitrust report you discuss
15   a demand that Samsung made that we've spoke
16   about earlier for -- excuse me -- Apple's
17   non-declared essential patents in exchange for
18   Samsung's declared essential patents.
19             Do you recall that?
20       A.    The differentiating on intellectual
21   property, the DIPS, as we call them.  Some of
22   us called them.  Others, perhaps, have called
23   it something different.
24       Q.    Is it the case that Apple would only
25   be harmed by that demand if it had to accede to

Attorneys' Eyes Only - Pursuant to Protective Order

Page 255

1   it?
2           MS. MILLER:  Objection.
3      A.    Again, you're asking these
4   hypothetical questions.  If you say to me pay a
5   hundred million dollars, and I said no, and you
6   say, oh, okay, there is no, you know, there is
7   a demand, there is no payment; therefore, I
8   have not been harmed, clearly.
9           So the answer is that there was a
10  demand and Apple refused.  But what I'm
11  concerned about is the situation which the firm
12  like Samsung, again, I'm not singling, you
13  know, singling them out.  A firm like Samsung
14  which has a range of the portfolio of SEPs is
15  now using that portfolio to extract as a part
16  of payment for access to those SEPs, access to
17  the -- its rival's crown jewels almost; right?
18          This is the standards everybody has
19  those -- that IP, what makes Apple Apple and
20  what makes Samsung Samsung is their proprietary
21  technologies.  And now Samsung says, I want
22  access to it.  And I believe that is in
23  flagrant violation of the FRAND principles.
24     Q.    There's a question, to go back a
25  topic, that I neglected to ask you.

Page 256

1   A.   Okay.  Sure.
2   Q.   And I think I know the answer, but if
3   you'll entertain it.
4        Are you aware of any affect on
5   Apple's market share in the tablet market as a
6   result of Samsung's activity?
7   A.   No, sir.  No.
8   Q.   Okay.
9        Aside from Apple, are you aware of
10  any injury to any other participant in the
11  market for UMTS compliant products as a result
12  of Samsung's actions?
13  A.   I had not looked into that issue, to
14  be honest; and, therefore, I cannot say
15  anything beyond that.
16  Q.   I'd like to turn now to your opinions
17  regarding -- strike that.
18       I'd like to turn to your rebuttal
19  report regarding damages.
20  A.   Okay.
21  Q.   Do you have any opinion as to what a
22  reasonable royalty should be in this case?
23  A.   No.
24  Q.   With respect to the hypothetical
25  negotiation, do you agree that the hypothetical

Page 257

1  negotiation is presumed to incur on the eve of
2  infringement?
3      A.   That's what Georgia-Pacific factor or
4  the approach mandates.  And in a standard,
5  typical setting -- I hate to use the word
6  "standard" -- in a typical setting, that's the
7  reasonable date on which to presume that kind
8  of negotiation.
9           Here the situation is somewhat more
10 complicated, maybe much more complicated, as I
11 explained in my report, i.e., that the
12 infringement occurs, if we take the first --
13 just on the eve of the infringement, that eve
14 is in the world in which standards have already
15 been set.
16          And I believe that even if I were to
17 go with the Georgia-Pacific factors, in order
18 to determine what the right rate is, I explain
19 in my report that hypothetical negotiation
20 should take place prior to standard setting,
21 consistent with my -- or when the standard has
22 not yet been set, which is consistent with my
23 view that this ex ante approach is the right
24 way to look at the competitive dynamics of the
25 negotiation dynamics.