UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE, INC., a California corporation,           )<br>                                                                    )<br>                    Plaintiff,                          )<br>        v.                                                      )<br>                                                                    )<br>SAMSUNG ELECTRONICS CO., LTD., A      )<br>Korean corporation; SAMSUNG                  )<br>ELECTRONICS AMERICA, INC., a New York )<br>corporation; SAMSUNG                              )<br>TELECOMMUNICATIONS AMERICA, LLC, )<br>a Delaware limited liability company,          )<br>                                                                    )<br>                    Defendants.                       )<br>                                                                    )<br>_____ ) | Case No.: 11-CV-01846-LHK<br><br>ORDER REGARDING DESIGN<br>PATENT CLAIM CONSTRUCTION |

Samsung has asked the Court to construe Apple's Design Patent No. D618,677 ("the D'677 Patent"), D593,087 ("the D'087 Patent"), D504,889 ("the D'889 Patent"), and D604,305 ("the D'305 Patent") prior to the July 30, 2012 trial. The parties filed opening briefs on the design patent claim construction on June 12, 2012. Response briefs were filed on June 26, 2012. A hearing was held on July 24, 2012.

The parties' approaches to design patent claim construction can be summarized as follows. Samsung asks the Court to provide a detailed written description of the scope of each of the design patents-in-suit. Samsung's position is that a design patent claim construction is analogous to utility patent claim construction. In contrast, Apple would have the Court provide minimal instructions to the jury, and allow the drawings in the design patents to speak for themselves.

1

Case No.: 11-CV-01846-LHK
ORDER REGARDING DESIGN PATENT CLAIM CONSTRUCTION

1	The Court has reviewed the briefs and the relevant case law and concludes that Apple's position is supported by the Federal Circuit's approach to design patents. In contrast, Samsung's position invites the jury to commit error by viewing the designs element-by-element, instead of by the overall visual impression. In Part I, the Court reviews the Federal Circuit precedent regarding design patent claim constructions. In Part II, although the Court declines to follow Samsung's proposal of providing a detailed written claim construction of each patent, the Court provides guidance regarding the scope of each specific design patent-in-suit with respect to the drafting conventions and prosecution histories of each of the design patents. Additionally, the Court defers ruling on any limitations to the scope of the design patent that may arise from functional elements. The Court will provide a supplemental claim construction at the close of evidence addressing any potential functional limitations to the scope of the design patents-in-suit.

## I. Design Patent Claim Construction

A patent may be obtained for the ornamental design of an article of manufacture: "Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 171 (2006). The Federal Circuit, relying on Supreme Court precedent, has established the familiar "ordinary observer" test for design patent infringement. Under the ordinary observer test, an accused device infringes upon a design patent if "'in the eye of an ordinary observer, giving such attention as a purchaser usually gives,'" the design of the accused device and the patented design are "'substantially the same.'" The designs are "'substantially the same, if the resemblance [between the accused device's design and the patented design] is such as to deceive [an ordinary] observer, inducing him to purchase one supposing it to be the other.'" *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 670 (Fed. Cir. 2008) (quoting *Gorham Co. v. White*, 81 U.S. 511, 528 (1871)). In applying the ordinary observer test, the focus should be on "the overall design" of the patent. *See Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1239-41 (Fed. Cir. 2009).

As an initial matter, the Federal Circuit has noted that a trial court is not to approach a design patent claim construction in the same manner as a utility patent claim construction. *See Egyptian Goddess*, 543 F.3d at 680 ("[A]s a general matter, [trial] courts should not treat the

1    process of claim construction as requiring a detailed verbal description of the claimed design, as

2    would typically be true in the case of utility patents."). Indeed, the Federal Circuit has not

3    "prescribed any particular form that the [design patent] claim construction must take," but rather

4    has left the design patent claim construction process up to the discretion of the trial court. *Id.* at

5    679-80.

6          The Federal Circuit has cautioned against attempts to "construe" design patent claims by

7    providing a detailed verbal description of the claimed design. *Egyptian Goddess*, 543 F.3d at 679.

8    Indeed, the Federal Circuit has approved of a district court's construction of the asserted design

9    patent claim as meaning "a tray of a certain design . . . as shown in Figures 1-3," and has reversed

10   an infringement determination based on a written claim construction that impermissibly focused on

11   particular features of the design patent-in-suit. *Contessa Food Prods., Inc. v. Conagra*, 282 F.3d

12   1377, 1377 (Fed. Cir. 2002), *abrogated on other grounds by Egyptian Goddess*, 543 F.3d 665;

13   *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303-04 (Fed. Cir. 2010) (finding that the

14   "Commission placed undue emphasis on particular details of its written description of the patented

15   design" and that "the concentration on small differences in isolation distracted from the overall

16   impression of the claimed ornamental features").

17         There are sound reasons for this approach. For one, "a design is better represented by an

18   illustration than it could be by any description." *Egyptian Goddess*, 543 F.3d at 679 (citing

19   *Dobson v. Dornan*, 118 U.S. 10, 14 (1886)) (internal quotation marks omitted); *see also 180s, Inc.*

20   *v. Gordini U.S.A., Inc.*, 699 F. Supp. 2d 714, 728-29 (D. Md. 2010) (declining to issue a detailed

21   verbal description construing design patent claims because the "illustrative figures speak for

22   themselves"). Additionally, there are risks "entailed in such a [detailed verbal] description, such as

23   the risk of placing undue emphasis on particular features of the design and the risk that a finder of

24   fact will focus on each individual described feature in the verbal description rather than on the

25   design as a whole." *Egyptian Goddess*, 543 F.3d at 680.

26         In light of this discussion, this Court is generally persuaded that the ordinary observer test

27   must be applied based upon the overall visual impression of the claimed designs and will avoid a

28   detailed written claim construction describing various elements of the claimed designs. Therefore,

3

Case No.: 11-CV-01846-LHK
ORDER REGARDING DESIGN PATENT CLAIM CONSTRUCTION

the Court declines to adopt the detailed verbal claim constructions offered by Samsung. *See, e.g.*, Samsung's Opening Claim Construction Br. at 8, 12, 15.

Finally, two additional arguments in support of adopting a narrow claim construction for the design patents-in-suit asserted by Samsung are worth addressing. First, Samsung argues that the prior art limits the scope of each of the design patents-in-suit. Second, Samsung argues that Apple's subsequent design patents, issued after the asserted design patents here, also limit the scope of the patents-in-suit.

As to Samsung's first argument, the limitation in scope of a design patent in light of prior art is necessarily folded into the infringement analysis. As explained in *Egyptian Goddess*: "Particularly in close cases, it can be difficult to answer the [infringement] question . . . without being given a frame of reference. The context in which the claimed and accused designs are compared, i.e., the background prior art, provides such a frame of reference and is therefore often useful in the process of comparison." 543 F.3d at 676-77. In other words, the infringement analysis necessarily involves a three-way (or multiple-way) comparison between the patent-in-suit, the accused device, and the prior art references. "Where the frame of reference consists of numerous similar prior art designs, those designs can highlight the distinctions between the claimed design and the accused design as viewed by the ordinary observer." *Id.* at 677. Samsung's argument here is essentially an attempt to encourage the Court to adopt its position on infringement. The Court cannot do this without invading the province of the jury to determine infringement under the "ordinary observer" test. *See id.* ("An ordinary observer, comparing the claimed and accused designs in light of the prior art, will attach importance to differences between the claimed design and the prior art depending on the overall effect of those differences on the design.").

Second, Samsung urges the Court to narrow the scope of the patents-in-suit in light of Apple's subsequent design patent applications. Claim construction is to be viewed "at the time of the invention, i.e., as of the effective filing date of the patent application." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Samsung has offered no authority, and the Court is not aware of any authority, for limiting the claim scope of a design patent based on subsequent

patent applications. Indeed, if anything, the Federal Circuit has cautioned against relying upon evidence in subsequently filed patents in claim construction proceedings. *Cf. Water Tech. Corp. v. Calco*, Ltd., 850 F.2d 660, 667 (Fed. Cir. 1988) ("We must construe claims in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification. We see no reason why arguments made by a different attorney prosecuting later patent applications for a different inventor should be used to limit an earlier-issued patent.") (emphasis omitted) (internal quotation marks and citation omitted); *Keystone Retaining Wall Systems Inc. v. Rockwood Retaining Wall Inc.*, No. 00-496, 2001 WL 36102284, at *4-5 (D. Minn. Oct. 9, 2001). Accordingly, the Court is not persuaded by Samsung's attempts to limit the scope of the design patents-in-suit by a detailed verbal claim construction that relies on subsequent patent applications or prosecution histories of later filed patents.

## II. "Construction" of the Patents-In-Suit

Although detailed verbal claim constructions are disfavored in design patents, the Federal Circuit has explained that the trial court can nonetheless provide useful guidance to the jury regarding the scope of the claimed design:

> Apart from attempting to provide a verbal description of the design, a trial court can usefully guide the finder of fact by addressing a number of other issues that bear on the scope of the claim. Those include such matters as describing the role of particular conventions in design patent drafting, such as the role of broken lines, *see* 37 C.F.R. § 1.152; assessing and describing the effect of any representations that may have been made in the course of the prosecution history, *see Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.*, 162 F.3d 1113, 1116 (Fed. Cir. 1998); and distinguishing between those features of the claimed design that are ornamental and those that are purely functional, *see OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997) ("Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent.").

*Egyptian Goddess*, 543 F.3d at 680. Therefore, the Court will consider each of the design patents-in-suit to determine whether additional construction of the scope of the patent is necessary and will be useful to the jury.

### A. The D'087 Patent

In design patents, the patentee need not claim an entire article of manufacture. *See In re Zahn*, 617 F.2d 261, 268-69 (C.C.P.A. 1980). The patentee may indicate the claimed part of the design with the use of solid lines and may indicate the unclaimed, remaining article of manufacture with the use of broken lines. *Contessa Food Prods.*, 282 F.3d at 1378 ("If features appearing in the figures are not desired to be claimed, the patentee is permitted to show the features in broken lines to exclude those features from the claimed design, and the failure to do so signals inclusion of the features in the claimed design." (citing *Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1313 (Fed. Cir. 2001))); *see also* Manual of Patent Examining Procedure ("MPEP") 1503.02 (2006) ("Unclaimed subject matter may be shown in broken lines for the purpose of illustrating the environment in which the article embodying the design is used.").

The D'087 Patent specifically disclaims the subject matter shown by the use of broken lines. *See* D'087 Patent ("None of the broken lines form a part of the claimed design."). Additionally, the Federal Circuit explained that the D'087 Patent claims a "bezel encircling the front face of the patented design [that] extends from the front of the phone to its sides" and a flat contour of the front face, but does not claim the rest of the article of manufacture. *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). Without an instruction regarding this claim scope, the jury may mistakenly apply the "ordinary observer" test to the entire article of manufacture disclosed in the patent. Doing so would be error. Accordingly, the jury will be instructed that the use of broken lines in the D'087 Patent shows unclaimed subject matter.

Samsung raises two claim scope issues with respect to the D'087 Patent. First, Samsung argues that the lack of oblique line shading in the D'087 necessarily means that "the front surface of D'087 must be construed as opaque and non-transparent." Samsung Opp'n Br. at 10. Additionally, Samsung argues that the lozenge-shaped feature near the top is not an opening or hole in the surface, but instead a two-dimensional feature on the front surface, because design patent drafting requires that surface shading be used to distinguish between any open and solid areas. Samsung Opening Br. at 9.

The MPEP explains "[w]hile surface shading is not required under 37 CFR 1.152, it may be necessary in particular cases to shade the figures to show clearly the character and contour of all

6

1     surfaces of any 3-dimensional aspects of the design.  Surface shading is also necessary to

2     distinguish between any open and solid areas of the article." MPEP § 1503.2 (II).  Proper shading

3     "is of particular importance in the showing of three (3) dimensional articles where it is necessary to

4     delineate plane, concave, convex, raised, and/or depressed surfaces of the subject matter, and to

5     distinguish between open and closed areas." *Id*. at ¶ 15.49.  "Oblique line shading must be used to

6     show transparent, translucent and highly polished or reflective surfaces, such as a mirror." *Id*. at

7     1503.02 (II).

8            Samsung claims that MPEP's use of mandatory language ("Oblique line shading *must* be

9     used to show transparent . . . surfaces[.]") is dispositive: if the patentee intended to claim a

10    transparent surface as part of the D'087 Patent, it was *required* to use oblique lines to indicate as

11    much.  However, as Apple points out, the mandatory language does not necessarily mean that lack

12    of oblique line shading disclaims a transparent, translucent, or reflective surface, nor does the lack

13    of oblique line shading mean that the patentee only claimed an opaque surface.  In general, when a

14    patent fails to specify a limitation, the patentee is entitled to the broadest reasonable construction.

15    *See In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1363 (Fed. Cir. 2004).  The language of the

16    MPEP is consistent with this claim construction canon.  Indeed, the relevant section of the MPEP

17    only specifies that an inventor wishing to limit a particular surface to a transparent, translucent, or

18    reflective material must indicate the surface through the use of oblique lines.  It does not state that

19    *failure* to include oblique lines necessarily excludes the use of a transparent surface.  *See*

20    *Transmatic, Inc. v. Gulton Indus., Inc.*, 601 F.2d 904, 912-13 (6th Cir. 1979) (finding that a surface

21    without oblique lines could be transparent, translucent, or opaque).  Likewise, the Court is not

22    convinced that the failure to include surface shading on the lozenge-shaped feature on the front

23    face necessarily indicates a surface decoration.  Instead, the Court agrees with Apple that

24    "[w]hether open or closed" it will be for the jury to decide whether the accused device's "lozenge-

25    shaped element would appear as it does in the figures." Apple's Response at 7.  Therefore, the

26    Court will not include an additional limitation in the claim scope that the patentee has only claimed

27    an opaque surface, or that the lozenge-shaped element is only a surface decoration.

28

7
Case No.: 11-CV-01846-LHK
ORDER REGARDING DESIGN PATENT CLAIM CONSTRUCTION

1      Accordingly, the Court will provide the jury with the following instruction with respect to the D'087 Patent: "The D'087 Patent claims the ornamental design of an electronic device as shown in Figures 1-46. The broken lines in the D'087 Patent constitute unclaimed subject matter. Thus, the D'087 Patent claims the front face, a 'bezel encircling the front face of the patented design [that] extends from the front of the phone to its sides,' and a flat contour of the front face, but does not claim the rest of the article of manufacture."

### B. The D'677 Patent

The D'677 Patent, unlike the D'087 Patent, does not contain a broken line disclaimer disclaiming the subject matter delineated by the use of broken lines. The MPEP requires that unclaimed subject matter be described as forming no part of the claimed design. MPEP 1503.02 (III) ("Unclaimed subject matter must be described as forming no part of the claimed design or of a specified embodiment thereof."). Thus, unlike the D'087 Patent, the broken lines in the D'677 Patent may not indicate unclaimed aspects of the article of manufacture. *See Unique Indus., Inc. v. 965207 Alberta Ltd.*, 722 F. Supp. 2d 1, 10 n.2 (D.D.C. 2009) (noting that broken lines may be considered part of the claimed design, "if it is not clear that the inventor intended to exclude those portions from the claim").

In this case, however, the broken lines used in the D'677 Patent indicate unclaimed aspects of the design, despite the lack of a broken line disclaimer. Unlike other cases in which a court has found that broken lines indicate something other than an unclaimed aspect of the design, there is no reasonable alternative interpretation of the broken lines in this patent. *Cf. 180s, Inc*., 699 F. Supp. 2d at 729 (alternative explanation for the broken lines was more plausible); *Bernardo Footwear, L.L.C. v. Fortune Dynamics, Inc.*, No. 07-CV-0963, 2007 WL 4561476, at *1 (S.D. Tex. Dec. 24, 2007) (interpreting the use of broken lines in a patent). Moreover, the prosecution history of the D'677 Patent establishes that the broken lines were intended to be disclaimed. The patent application contained a broken line disclaimer, which remained through the final amendment. *See* Mazza Decl. Ex. 6 at APLNDC00030455, APLNDC00030641. Thus, it seems likely that the absence of a broken line disclaimer in the D'677 Patent that was issued was inadvertent. Because the prosecution history supports the broken line disclaimer, the public notice function regarding the

8

Case No.: 11-CV-01846-LHK
ORDER REGARDING DESIGN PATENT CLAIM CONSTRUCTION

1  meaning of the broken lines in the D'677 is served. Thus, the D'677 Patent disclaims all subject

2  matter but the front surface. *See, e.g.*, *In re Zahn*, 617 F.2d at 263 (drill bit drawn in broken lines

3  to show environment for claimed design of the drill shank); *Atlanta Motoring Accessories, Inc., v.*

4  *Saratoga Techs., Inc.*, 33 F.3d 1362, 1365 (Fed. Cir. 1994) (automobile hardtop outlined in broken

5  lines to show environment of rack device); *Goodyear Tire*, 162 F.3d at 1114 (broken lines used to

6  show tire sidewall, which formed no part of the design claimed).

7        In addition, the D'677 includes solid black surface shading and oblique line shading. The

8  MPEP guidelines will be useful for the jury to understand the meaning of these conventions. The

9  MPEP states that "solid black surface shading . . . [is] used to represent the color black" and

10 "[o]blique line shading must be used to show transparent, translucent and highly polished or

11 reflective surfaces." MPEP 1503.02 (II). Thus, the use of oblique line shading and solid black

12 surface shading in the D'677 Patent indicate that the patentee claimed a black surface that is also

13 transparent, translucent, highly polished, or reflective.

14       Accordingly, the Court will provide the jury with the following instruction with respect to

15 the D'677 Patent: "The D'677 Patent claims the ornamental design of an electronic device as

16 shown in Figures 1-6. The broken lines in the D'677 Patent constitute unclaimed subject matter.

17 The use of "solid black surface shading" on the D'677 Patent represents the color black. The use

18 of oblique line shading on the D'677 Patent is used to show a transparent, translucent and highly

19 polished or reflective surface.

20     **C. The D'889 Patent**

21       The MPEP requires that unclaimed subject matter be described as forming no part of the

22 claimed design. MPEP 1503.02 (III) ("Unclaimed subject matter must be described as forming no

23 part of the claimed design or of a specified embodiment thereof."). There is some ambiguity in the

24 D'889 patent regarding the meaning of the broken lines contained in figures 1, 3, and 9. The

25 broken lines in figures 1 and 3 appear to delineate the inset screen below the surface of the glass-

26 like front cover. The broken lines in figure 9 delineate both the inset screen on the electronic

27 device as well as the human figure holding the device. The D'889 Patent explicitly states that the

28

1 broken lines in figure 9 form no part of the claimed design. The D'889 Patent is silent, however,

2 regarding the use of the broken lines in the other figures. *See* D'889 Patent description.

3 The prosecution history sheds some light onto the meaning of the broken lines. Initially, the patentee did not include a broken line disclaimer for the broken lines appearing on the front surface of the device in figures 1, 3, and 9. *See* Mazza Decl. Ex. 7 at APLNDC00032359. Originally, the human figure in figure 9 was depicted in solid lines. The Examiner required the patentee to amend the drawings to depict the human figure in figure 9 in broken lines, and to include a broken line disclaimer establishing that the broken lines in figure 9 form no part of the claimed design. *See* Mazza Decl. Ex. 7 at APLNDC00032434-36. Based on this prosecution history, it appears that the broken lines in figures 1 and 3 of the D'889 Patent are intended to show an inset screen below the glass-like surface, and are part of the claimed design, while the human figure in figure 9 does not form a part of the claimed design. *See also Unique Indus.*, 722 F. Supp. 2d at 10 n. (noting that broken lines may be considered part of the claimed design, "if it is not clear that the inventor intended to exclude those portions from the claim"). *Bernardo Footwear*, No. 07-0963, 2007 WL 4561476, at *1 (interpreting the use of broken lines in a patent as part of the claimed design where the drafter failed to explain the significance of the broken lines).

17 The D'889 Patent also includes oblique line shading in several of the figures. As explained above, the MPEP guidelines state that "[o]blique line shading must be used to show transparent, translucent and highly polished or reflective surfaces." MPEP 1503.02 (II). The patentee included oblique line shading in Figures 1-3 and Figure 9. Thus, the use of oblique line shading indicates that the top perspective view of the claimed design, the top view of the claimed design, and the bottom perspective view of the claimed design disclose a transparent, translucent and highly polished or reflective surface. Notably, the bottom view does not disclose a transparent, translucent and highly polished or reflective surface.[1]

---

[1] At the design patent claim construction hearing, Apple argued that the oblique line shading in figure 2 represents something other than a transparent, translucent, or highly polished surface. However, it is unclear from the drafting rules, the case law, or the prosecution history why the Court should adopt a different construction for the oblique line shading in figure 2 than the oblique line shading used in figures 1, 3 and 9. Unlike the aberrational dotted lines in the D'677 Patent and the D'889 Patent, where Apple has been able to point to prosecution history to clarify the meaning of the drafting choices, Apple has not pointed to comparable evidence, other than speculation, to

10

Case No.: 11-CV-01846-LHK
ORDER REGARDING DESIGN PATENT CLAIM CONSTRUCTION

1    Accordingly, the Court will provide the jury with the following instruction with respect to

2    the D'889 Patent: "The D'889 Patent claims the ornamental design of an electronic device as

3    shown in Figures 1-9. The broken lines depicting the human figure in figure 9 do not form a part

4    of the claimed design. The other broken lines in the other figures are part of the claimed design.

5    The D'889 also includes oblique line shading on several of the figures. The oblique line shading in

6    Figures 1-3 and Figure 9 depicts a transparent, translucent and highly polished or reflective surface

7    from the top perspective view of the claimed design, the top view of the claimed design, and the

8    bottom perspective view of the claimed design."

### D. The D'305 Patent

#### 1. Drafting Conventions

The MPEP requires that unclaimed subject matter be described as forming no part of the claimed design. MPEP 1503.02 (III) ("Unclaimed subject matter must be described as forming no part of the claimed design or of a specified embodiment thereof."). The D'305 Patent states that: "The broken line showing of a display screen in both views forms no part of the claimed design." Accordingly, broken line disclaimer will be included in the Court's claim construction.

#### 2. Prosecution History

Samsung also argues that the prosecution history of the D627,790 ("D'790 Patent") limits the scope of the D'305 Patent. The D'305 Patent was filed on June 23, 2007, and issued on November 17, 2009. The D'790 Patent was filed on August 20, 2007, and issued on November 23, 2010, and is a continuation-in-part of United States Patent No. D608,366, which itself is a continuation-in-part of the D'305 patent. Both the D'305 and the D'790 patents are entitled "Graphical user interface for a display screen or portion thereof."

During the prosecution of the D'790 patent, Apple distinguished the claimed design from a prior art reference (Wada) by stating:

> Figure 4 of Wada discloses a matrix of 17 squares provided in 4 columns. The first column has 5 squares, the second, third and fourth columns have 4 squares. In contrast, Applicant's design is a matrix of 16 squares, each with rounded corners,

---

support an alternative meaning to the oblique line shading used in figure 2 of the D'889 Patent. Indeed, the shading in figure 2 looks very similar to the shading used in figures 1 and 3 to depict a transparent, translucent, or reflective surface.

11

Case No.: 11-CV-01846-LHK
ORDER REGARDING DESIGN PATENT CLAIM CONSTRUCTION

<blockquote>
provided in 4 columns. Each column has 4 rounded squares. The first three rows of rounded squares in each column are equally spaced apart. The third and fourth rows of rounded squares in each column is separated by a space equal to about one rounded square, giving the impression of a "missing row" of rounded squares. Thus, the appearance of the claimed design in [sic] quite different from the cited reference.
</blockquote>

Cashman Decl. Ex. 62, at APLPROS0000012230.

Samsung argues that the D'305 Patent, like the D'790 Patent, also discloses sixteen rounded squares giving the appearance of a missing row. According to Samsung, the statements made in the prosecution history of the D'790 Patent necessarily limit the scope of the D'305 Patent. Specifically, Samsung proposes that the D'305 patent be construed as having, inter alia, "four rows of four icons each, with an empty row between the third row and the dock row as shown in the figures."

In *Egyptian Goddess*, the Federal Circuit explained that a district court may guide the fact finder by addressing certain issues that bear on the scope of a design patent claim, including, inter alia, "the effect of any representations that may have been made during the prosecution history." 543 F.3d at 680 (citing *Goodyear Tire*, 162 F.3d at 1116). *Egyptian Goddess*'s description of the use of prosecution history in determining the scope of a design patent is consistent with the claim construction process for utility patents, which allows for statements made during prosecution to be considered as intrinsic evidence. *See, e.g. Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

In general, the prosecution history considered during utility patent claim construction is that of the patent in issue, although the Federal Circuit has carved out a few exceptions to this rule. *See Water Tech. Corp.*, 850 F.2d 660; *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979-80 (Fed. Cir. 1999); *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990). In particular, the Federal Circuit has held that "[w]hen multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay*, 192 F.3d at 980; *see also Jonsson*, 903 F.2d at 818-19. The Federal Circuit has since extended this logic to allow for the use of statements made during the prosecution of related, subsequently issued patents, provided the claim element at issue is the same in both patents. *Compare Goldberg v. Cytogen*,

1    Inc., 373 F.3d 1158, 1167-68 (Fed. Cir. 2004) (barring the use of a continuation-in-part patent to

2    interpret a parent patent because the material cited in the subsequently issued patent dealt with new

3    matter), *with Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004)

4    (interpreting a patent's claim terms based on statements made after that patent issued during the

5    prosecution of a subsequently-issued sibling patent containing the same term), *and CVI/Beta*

6    *Ventures, Inc. v. Tura LP*, 112 F.3d 1146 (Fed. Cir. 1997) (construing a claim term in one patent-

7    at-issue based on representations made during the prosecution of a subsequently issued, but related,

8    patent-at-issue that contained the same term).

9         The Court does not import the statements made in the prosecution history of the later filed

10   D'790 Patent to limit the claim scope of the D'305 Patent.  The exceptions to the rule against

11   consulting the prosecution history of non-asserted patents-in-suit described above have only been

12   applied to utility patents where it is clear that the disputed claim term has the same meaning in both

13   patents at issue.  This requirement is well suited to an analysis of the specific, enumerated, written

14   limitations of utility patents because it may be clear when the same claim term is at issue in both

15   related patents.  These rules are not necessarily applicable to design patents because there is no

16   clear analog to the same claim term appearing in both related patents.

17        While a utility patent is analyzed claim term by claim term, a design patent is analyzed

18   based on the design as a whole.  *See Egyptian Goddess*, 543 F.3d at 680.  Although the same

19   feature may appear in two design patents, the design patents may not have the same overall visual

20   impression.  It would be improper to isolate a disclaimer based on a single feature of a design

21   patent and apply it to limit the scope of a related design patent.  This is because it is often not

22   possible to determine whether the importance of the design element in the overall visual impression

23   is the same in two related patents.  The Court therefore rejects Samsung's construction of the

24   D'305 patent and agrees with Apple that no additional verbal description of the D'305 should

25   apply.

26        Accordingly, the Court will provide the jury with the following instruction with respect to

27   the D'305 Patent: "The D'305 Patent claims the ornamental design for a graphical user interface

28

for a display screen or portion thereof, as shown in Figures 1-2.  The broken line showing of a display screen in both views forms no part of the claimed design."

**IT IS SO ORDERED.**

Dated: July 27, 2012

_____
LUCY H. KOH
United States District Judge