| | |
|---|---|
| HAROLD J. MCELHINNY (CA SBN 66781) hmcelhinny@mofo.com<br>MICHAEL A. JACOBS (CA SBN 111664) mjacobs@mofo.com<br>RACHEL KREVANS (CA SBN 116421) rkrevans@mofo.com<br>JENNIFER LEE TAYLOR (CA SBN 161368) jtaylor@mofo.com<br>ALISON M. TUCHER (CA SBN 171363) atucher@mofo.com<br>RICHARD S.J. HUNG (CA SBN 197425) rhung@mofo.com<br>JASON R. BARTLETT (CA SBN 214530) jasonbartlett@mofo.com<br>MORRISON & FOERSTER LLP<br>425 Market Street<br>San Francisco, California 94105-2482<br>Telephone: (415) 268-7000<br>Facsimile: (415) 268-7522 | WILLIAM F. LEE william.lee@wilmerhale.com<br>WILMER CUTLER PICKERING HALE AND DORR LLP<br>60 State Street<br>Boston, MA 02109<br>Telephone: (617) 526-6000<br>Facsimile: (617) 526-5000<br><br>MARK D. SELWYN (SBN 244180) mark.selwyn@wilmerhale.com<br>WILMER CUTLER PICKERING HALE AND DORR LLP<br>950 Page Mill Road<br>Palo Alto, California 94304<br>Telephone: (650) 858-6000<br>Facsimile: (650) 858-6100 |

Attorneys for Plaintiff and
Counterclaim-Defendant APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 11-cv-01846-LHK (PSG)<br><br>**APPLE'S MOTION TO SEAL CONFIDENTIAL TRIAL EXHIBITS** |

APPLE'S MOTION TO SEAL CONFIDENTIAL TRIAL EXHIBITS
CASE NO. 11-CV-01846-LHK
sf-3175740

1    Apple files this motion to seal confidential trial exhibits in whole or in part pursuant to the
2  Court's instructions at the July 27 hearing.[1]  Mindful of the Court's desire to have the parties
3  clearly identify which sealing issues concern the trial and which concern documents filed with
4  previous motions, Apple is filing two separate motions.  This motion addresses documents
5  contained on the parties' trial exhibit lists.  Concurrently with this motion, Apple is separately
6  filing a motion addressing previously filed documents and motions only.

7    Apple seeks sealing here of a select group of documents that contain the only its most
8  competitively sensitive information.  All of the trial exhibits subject to this Motion meet the
9  "compelling reasons" standard for sealing.  These exhibits contain confidential trade secret
10  information, disclosure of which would severely harm Apple's competitive position and in some
11  cases damage third parties.  Specifically, these exhibits comprise (a) financial data concerning
12  Apple's manufacturing capacity, costs, prices, product-specific revenues, unit sales, profits, and
13  profit margins; (b) confidential source code and technical information; (c) information relating to
14  Apple's licensing strategies, including licensing terms relating to compensation, duration, and
15  scope; and (d) proprietary market research, including customer surveys conducted by Apple.
16  Apple also seeks to seal proprietary market research received from third party IDC pursuant to a
17  confidentiality agreement, the disclosure of which would harm IDC's livelihood.

18    Apple has submitted declarations from Jim Bean, Apple's Vice-President of Financial
19  Planning and Analysis, Henri Lamiraux, Vice President of iOS Apps & Frameworks, Beth
20  Kellerman, Apple's Litigation eDiscovery Manager, and Greg Joswiak, a Vice-President in
21  Apple's Product Marketing department, in support of its motion to seal.  These declarations
22  individually address each document Apple is seeking to seal, describe the measures the company
23  has used to maintain its confidentiality, and the competitive harm disclosure of the information
24  would create.

25   [1] On July 27th, Apple and Samsung filed a Joint Motion Regarding Sealing of Trial
Exhibits.  The Court has not yet ruled on this motion, and Apple urges that the Joint Motion be
26  granted.  However, in accordance with the Court's instruction to specify the trial exhibits at issue,
Apple also files this Motion to Seal Trial Exhibits to preserve its arguments relating to the
27  individual exhibits as to which it believes that sealing is appropriate.

28

APPLE'S MOTION TO SEAL CONFIDENTIAL TRIAL EXHIBITS
CASE NO. 11-CV-01846-LHK                                                                                      1
sf-3175740

## I.     LEGAL STANDARD

Two different standards apply on motions to seal.  The first standard is "good cause." This standard is normally applied to non-dispositive motions "because those documents are often 'unrelated, or only tangentially related, to the underlying cause of action.'"  *Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (citation omitted).  In *Kamakana*, the Ninth Circuit held that "[a] 'good cause' showing under Rule 26(c) will suffice to keep sealed records attached to non-dispositive motions."  *Id.* at 1180 (citation omitted).  *Accord Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) ("good cause" standard is not limited to discovery motions, but applies to all non-dispositive motions).

The Court has "'broad latitude' under Rule 26(c) 'to prevent disclosure of materials for many types of information, including, but not limited to, trade secrets or other confidential research, development, or commercial information.'"  *Reilly v. Medianews Grp., Inc.*, No. C 06-4332, 2007 U.S. Dist. LEXIS 8139, at *13 (N.D. Cal. Jan. 24, 2007) (quoting *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2002).  *See* Fed R. Civ. Pr. 26(c).

Courts regularly grant motions to seal under Rule 26(c) when a party has made a particularized showing that competitive harm may potentially result from the disclosure of confidential financial information.  For example, in *Reilly,* the court denied an intervenor's motion to unseal seventeen of nineteen documents because they contained "detailed financial information, including past and present revenues and projections of future revenues."  2007 U.S. Dist. LEXIS 8139, at *11-13; *see also Bean v. Pearson Educ., Inc.*, 11-8030, 2012 U.S. Dist. LEXIS 99540, at *5-6 (D. Ariz. July 16, 2012) (granting motion to seal non-public financial sales and distribution information because it revealed defendants "market research" and "profit and sales margins").

The standard is higher for dispositive pleadings because "the resolution of a dispute on the merits, whether by trial or summary judgment, is at the heart of the interest in ensuring the 'public's understanding of the judicial process and of significant public events.'"  *Kamakana*, 447 F.3d at 1179 (citation omitted).  For dispositive motions, there is "a strong presumption in favor of [public] access."  *Id.* at 1178 (citation omitted).  However, the right of access is not absolute.

1  A party can overcome the presumption by meeting the "compelling reasons" standard. *Id.* "In
2  general, 'compelling reasons sufficient to outweigh the public's interest in disclosure and justify
3  sealing court records exist when such 'court files might have become a vehicle for improper
4  purposes,' such as the use of records to gratify private spite, promote public scandal, circulate
5  libelous statements or release trade secrets." *Id.* at 1179 (quoting *Nixon v. Warner Commc'ns,*
6  *Inc.,* 435 U.S. 589, 598 (1978)).

7  It is well established in particular that information containing trade secrets should be
8  sealed: "The publication of materials that could result in an infringement upon trade secrets has
9  long been considered a factor that would overcome this strong presumption." *Apple Inc. v.*
10 *Psystar Corp.*, 658 F.3d 1150, 1162 (9th Cir. 2011) (remanding case because lower court failed to
11 articulate reasons for its sealing decision).

12 Reuters suggested at the July 27 hearing that financial information has a sort of second-
13 class trade secret status. (*See* July 27 Hr'g Tr. at 12 ("Financial information just simply isn't a
14 sealable trade secret of the same ilk as the secret formula of code or source code.").)  It isn't true.
15 The majority of trade secret cases in federal and state court in California concern non-technical
16 information, most typically confidential financial or business information.

17 In *In re Electronic Arts, Inc.*, for example, the Ninth Circuit held that licensing pricing
18 terms, royalty rates, and payment terms all constitute information that "plainly falls within the
19 definition of 'trade secrets.'" 298 Fed. App'x 568, 569 (9th Cir. 2008).  The Court found these
20 license terms should be sealed, and noted that, "[i]n *Nixon*, the U.S. Supreme Court established
21 that the 'right to inspect and copy judicial records is not absolute,' and, in particular, 'the
22 common-law right of inspection has bowed before the power of a court to insure that its records
23 are not used . . . as sources of business information that might harm a litigant's competitive
24 standing." *Id.* at 569 (quoting *Nixon*, 435 U.S. at 598).  *Electronic Arts* also relied for its holding
25 on *Whyte v. Schlage Lock Co.*, a leading California trade secret case which recognized the trade
26 secret status of a wide variety of types of financial information including documents disclosing
27 "profit margin" and "costs of production," as well as "confidential marketing research." 101 Cal.
28 App. 4th 1443, 1455–56 (2002).

California's Uniform Trade Secrets Act defines the term "trade secret" broadly. Specifically, it provides:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).

It is beyond dispute that financial information and other confidential business information that meets this test constitute trade secrets. *See, e.g., Whyte*, 101 Cal. App 4th 1443 at 1455-56; *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1075 (N.D. Cal. 2005) (upholding jury verdict for misappropriation of trade secrets including cost information contained in data sheets); *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 935-36 (N.D. Cal. 2008) (finding allegations that defendant improperly disclosed plaintiff's confidential information "including profit margins" stated trade secret claim). *See also Courtesy Temp. Serv. v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990) (billing rates and markup rates "irrefutably" of commercial value and qualify for trade secret protection). *See also Electronic Arts*, 298 Fed. App'x at 569 (relying on similar Restatement definition of trade secret providing that "'trade secret may consist of any formula, pattern, device or compilation which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it'") (quoting *Restatement of Torts* § 757 cmt. B).

As a result, just as the Ninth Circuit itself did in *Electronic Arts*, courts is in this Circuit routinely hold that confidential business and financial information that qualifies as a trade secret should be sealed under the *Kamakana* test. For example, in *AMC Tech., LLC v. Cisco Sys.*, Magistrate Grewal held that amount of fees and royalties paid for development and licensing of software should be sealed because disclosure would allow customers to determine Cisco's profit margins and "might be used for an improper purpose, including disclosure of Cisco's trade secrets. No. 5:11-cv-3403, 2012 U.S. Dist. LEXIS 9934 (N.D. Cal. Jan. 27, 2012).

APPLE'S MOTION TO SEAL CONFIDENTIAL TRIAL EXHIBITS
CASE NO. 11-CV-01846-LHK
sf-3175740

4

1    Similarly, in *TriQuint Semiconductor v. Avago Techs. Ltd.*, the court granted a motion to
2    seal confidential financial information including market analysis information, cost information,
3    capacity information and profit margins for specific products. No. CV 09-1531, 2011 U.S. Dist.
4    LEXIS 143942 at *10, 11, 21 (D. Ariz. Dec. 12, 2011). *See also Bauer Bros., LLC v. Nike, Inc.*,
5    09cv500, 2012 U.S. Dist LEXIS 72862 (S.D. Cal. May 24, 2012) (sealing financial information
6    including cost of goods sold for each product and confidential sales and marketing information);
7    *Powertech Tech., Inc., v.Tessera, Inc.*, No. C11-3121, 2012 U.S. Dist. LEXIS 75831, at *5 (N.D.
8    Cal. May 31, 2012) (granting motion to seal details of license agreement); *Network Appliance,*
9    *Inc. v. Sun Microsystems*, No. C-07-6053, 2012 U.S. Dist. LEXIS 21721, at *7 (N.D. Cal. Mar.
10   10, 2010) (sealing material that would subject third parties to competitive harm).
11   The license agreement that the Ninth Circuit ordered sealed in *Electronic Arts* was a trial
12   exhibit. 298 Fed. Appx. t 569. Apple agrees that, for evidence presented at trial that goes to the
13   merits of the issues at trial, the "compelling reasons" standard applies on a motion to seal, for the
14   reasons articulated in *Kamakana*. Sealing is appropriate because all the documents Apple seeks
15   to seal here meet that standard.
16   In some cases, however, material will be contained in documents that may be presented
17   into evidence by Samsung at trial that is not relevant to the merits at all. Specifically, Samsung
18   has included many documents on its exhibit list that consist of voluminous highly confidential
19   marketing research reports or financial reports when all it seeks to use from the document is a
20   page or two out of a hundred. The information contained in these documents is extremely
21   sensitive, but the vast majority of it has absolutely nothing to do with this case. The marketing
22   research reports, for example, contain data relating to surveys and analysis of Apple iPad and
23   iPhone buyers outside the United States and on issues that neither party contends are relevant.
24   Thus far, Apple has tried unsuccessfully to negotiate with Samsung to include only excerpts from
25   those documents on its exhibit list. The information contained in these documents that does not
26   relate to the merits of this action should be sealed under the "good cause" standard because,
27   similar to the reasoning expressed in *Kamakana* with respect to documents attached to a non-
28

dispositive motion, this information is 'unrelated, or only tangentially related, to the underlying cause of action.'" *Kamakana*, 447 F.3d at 1179.

In *Richardson v. Mylan Inc.*, for example, the Court granted a motion to redact the trial record to seal part of the testimony of two witnesses who testified at a jury trial. Case No. 09-CV-1041-JM (WVG), 2011 U.S. Dist. LEXIS 23969, at *6-8 (S.D. Cal. Mar. 9, 2011). The Court cited to *Kamakana*, and held that, "In order to prevail on a motion to seal portions of the trial transcripts, Defendants must demonstrate that their interest in concealing the information therein outweigh the public's interest in accessing it." *Id.* at *6. The Court found the defendants met that standard because the information was "commercially sensitive" but was of "comparatively little value to the public in terms of enhancing its 'understanding [of] the judicial process" because Defendants sought to seal a small portion of the overall transcript and the portions "do not include any information vital to understanding the nature of the underlying proceedings." *Id.* at *7 (citation omitted). The court emphasized that "courts have repeatedly mentioned trade secrets as an archetypal category of information for which sealing of court records is justified." *Id.* at *8.

Regardless of which standard the Court applies, it should take into account the fact that information contained in such documents is unrelated to the merits of the action in determining whether to seal it. *See Network Appliance*, *Inc. v. Sun Microsystems, Inc.*, Case No. C-0706053 (EDL), 2010 U.S. Dist. LEXIS 21721 at *13-14 (N.D. Cal. Mar. 10, 2010) (sealing, under compelling interest standard, material that would "do little to aid the public's understanding of the judicial process, but have the potential to cause significant harm" to one of the parties). The material Apple seeks to seal does not go to the core issues of the case, but is highly specific, going well beyond what would aid the public in understanding the parties' positions and the judicial process.

## II. THE COURT SHOULD GRANT APPLE'S NARROW REQUESTS TO SEAL

### A. The Court Should Seal Trial Exhibits Containing Apple's Confidential Financial Information

Apple seeks to seal the following trial exhibits in whole or part because they contain sensitive financial information, the disclosure of which would cause Apple competitive harm: PX 25, PX 67, PX 78, PX 102, PX 103, PX 181, DX 541, DX 542, DX 543, DX 544, DX 755, DX 756, and DX 777–DX 780.

These trial exhibits contain highly confidential financial information concerning Apple's manufacturing capacity, product-specific profits and profit margins, product-specific unit sales and revenue, and costs. Courts recognize that, provided appropriate efforts have been made to maintain their confidentiality, these types of information constitute trade secrets, and a compelling need exists for maintaining their confidentiality. *AMC Tech., LLC v. Cisco Sys.*, 2012 U.S. Dist. LEXIS 9934 (Jan. 27, 2012); *TriQuint Semiconductor v. Avago Techs. Ltd.*, 2011 U.S. Dist. LEXIS 143942 at *10, 11, 21 (D. Ariz. Dec. 12, 2011) (sealing confidential financial information including market analysis information, cost information, capacity information and profit margins for specific products).

Apple's financial information meets the definition of a trade secret under California's UTSA. Apple has submitted a declaration in support of this motion from Jim Bean, its Vice President of Worldwide Financial Planning and Analysis. The declaration explains, for each portion of each document that Apple seeks to have sealed, why Apple keeps it confidential and the steps Apple takes to do so. (Declaration of J. Bean, *passim*.) Each of these data are competitively sensitive and derive value from the fact that they are not shared with the general public or with others who could derive economic benefit from this data – Apple's competitors and suppliers. (Bean Decl. at 3–8.) If disclosed, Apple's competitors could use these data for "improper purposes." *Kamakura*, 447 F.3d at 1179.

Here, "compelling reasons" exist for sealing of these trial exhibits. Information concerning Apple's manufacturing capacity information is potentially valuable to Apple's competitors because they could use such information to increase production or decrease prices at

1    times when Apple would be most vulnerable to such actions. (Bean Decl. at ¶¶ 6–7.)  Capacity

2    information is also potentially valuable to Apple's suppliers, who could raise prices when Apple

3    is most likely to increase capacity.  (*Id.* at ¶ 6.)  The court recognized at the July 27 hearing that

4    capacity information could qualify for sealing if properly protected.  (July 27 Hr'g Transcript at

5    9).  Apple's manufacturing capacity data are disclosed in PX 25.

6           Information concerning Apple's costs, profits, profit margins, and product-specific unit

7    sales and revenue is also valuable to its competitors and suppliers.  Although Apple considers

8    margin data to be sensitive even when they are aggregated over a long period of time for broad

9    product categories, such data are far more commercially valuable – and competitively sensitive –

10   if they relate to specific products or to discrete periods of time.  (Bean Decl. at ¶¶ 5, 8.)  Apple's

11   competitors could use profits, costs, and margins data for specific products to undercut Apple's

12   prices by determining the products for which Apple has substantial profits, low costs, and wide

13   margins and thus would be most susceptible to a price cut.  (*Id.* at ¶ 8.)  Apple's suppliers could

14   use quarterly profits, costs, and margins data to determine when Apple has the lowest margins

15   and is thus more vulnerable to a cost increase.  (*Id.* at ¶ 8.)  Apple's costs, profits, profit margins,

16   and product-specific unit sales and revenue data are disclosed in Trial Exhibits PX 25, PX 67,

17   PX 78, PX 102, PX 103, PX 181, DX 542, DX 755, DX 543, DX 756, DX 541, DX 544, DX 777,

18   and DX 778–780.

19          Because of these significant risks of disclosure, Apple goes through extraordinary

20   measures to maintain the financial information discussed above.  Apple marks its financial

21   documents "confidential." (Bean Decl. at ¶ 3.)  Within Apple, access is restricted to only those

22   employees who "need-to-know." (*Id.*)  To gain access, employees must be approved by one of

23   two VP-level officers, one of whom is Mr. Bean, Apple's Vice President of Worldwide Financial

24   Planning and Analysis.  (*Id.*)  In addition, for costs, margin, and product-specific profit and loss

25   data such as those found in Exhibits PX 103, DX 541, DX 544, DX 777, which are among the

26   most sensitive information Apple maintains, Apple restricts disclosure to its executive team and

27   board of directors.  (*Id.* at ¶ 4.)

28

1   Apple also makes extraordinary efforts to prevent disclosure of costs information – found
2   in Exhibits PX 25, Exhibits PX 103, PX 181, DX 541, DX 544, DX 777, DX 779, and DX 780 –
3   to third parties. Apple obscures its component costs from its OEM partners by buying its own
4   components from other suppliers itself, rather than having the OEMS purchase the components
5   from other companies directly. (*Id.* at ¶ 4.)

6   The financial data found in Exhibits PX 25, PX 67, PX 78, PX 102, PX 103, PX 181,
7   DX 541, DX 542, DX 543, DX 544, DX 755, DX 756, and DX 777–DX 780 are therefore trade
8   secrets of Apple. *Whyte*, 101 Cal. App 4th at 1455-56; *O2 Micro Int'l Ltd.*, 399 F. Supp. 2d at
9   1075; *First Advantage Background Servs. Corp.*, 569 F. Supp. 2d at 935-36. As such, Apple's
10  interest in limiting disclosure outweighs the public's right of access. *Bauer Bros., LLC v. Nike,*
11  *Inc.*, 09cv500, 2012 U.S. Dist LEXIS 72862 (S.D. Cal. May 24, 2012) (finding compelling reason
12  to seal cost of goods sold for each product and confidential sales and marketing information);
13  *TriQuint Semiconductor*, 2011 U.S. Dist. LEXIS 143942 at *10, 11, 21 (finding compelling
14  reason to seal cost information and profit margins for specific products).

15  **B.   The Court Should Seal Apple's Confidential Source Code**

16  Apple trial exhibits PX 63 and 121 and Samsung trial exhibit DX 645 contain highly
17  confidential non-public Apple source code should be sealed. Apple trial exhibit PX 110 contains
18  detailed schematics of the Apple iBook and Apple iSight. As discussed in detail above, it is well
19  established that information containing trade secrets should be sealed, and Apple's source code is
20  clearly the type of information that qualifies as a trade secret. *See Agency Solutions.Com, LLC v.*
21  *TriZetto Group, Inc.*, 819 F. Supp. 2d 1001, 1017 (E.D. Cal. 2011) (summarizing California
22  Trade Secret law and stating that "source code is undoubtedly a trade secret").

23  Apple's declarations from its employees, Henri Lamiraux, its Vice President of iOS Apps
24  & Frameworks, and Beth Kellerman, a Litigation eDiscovery Manager establish "compelling
25  reasons" for sealing these files. *See Kamakana*, 447 F.3d at 1179; *In re Elec. Arts, Inc.*, 298 Fed.
26  Appx. at 569. It is indisputable that Apple derives independent economic value from its source
27  code, including its core iOS source code, and through the sale of devices that execute that code.
28  These declarations explain which source code files Apple seeks to have sealed, the importance of

1  the source code, and the extraordinary lengths Apple goes to in order to maintain the secrecy and
2  security of its source code. (*See* Lamiraux Decl. at ¶¶ 4-9; Kellerman Decl. at ¶¶ 5-8.) The
3  security measures surrounding Apple's iOS code include, but are not limited to, restricting access
4  to the code on a need-to-know basis, avoiding outside dissemination of the source code and
5  maintaining physical security over the code. (*See id.*)

6       Apple goes to great lengths to maintain the security and secrecy of its source code because
7  disclosure of its source code to the general public including Apple's competitors would cause
8  Apple significant competitive harm. Apple has expended considerable time and money
9  developing its iOS source code. If publicly available portions of this code were subject to
10 disclosure and copying, it would amount to a transfer of Apple's investment in developing the
11 iOS source code from it to a competitor, providing an unfair competitive advantage. (*See*
12 Lamiraux Decl. at ¶¶ 6-9.) Apple's detailed schematics of the Apple iBook and iSight are trade
13 secrets that should be sealed for the same reasons. (*See* Kellerman Decl. at ¶12).

14      In light of the nature of the source code as trade secrets of Apple, Apple's interest in
15 limiting disclosure outweighs the public's right of access. *See Abstrax, Inc. v. Sun Microsystems,*
16 *Inc.*, No. CV 09-5243-PJH, 2011 U.S. Dist. LEXIS 68596 at *8 (N.D. Cal. June 27, 2011) ("The
17 Court finds that those portions of Abstrax's filings that include Sun's confidential information
18 regarding revenue, products, internal manufacturing procedures, source code development, and
19 related deposition testimony meet the compelling reasons standard and out-weigh disclosure").
20 The Court should therefore grant Apple's motion and seal the source code trial exhibits, PX 63,
21 and 121 and DX 645 and Apple's detailed electrical schematics, PX 110.

22     **C.**    **The Court Should Seal Confidential and Proprietary Market Research Reports**
23

24         **1.**    **Compelling reasons exists for sealing Apple confidential buyer surveys**
25      Apple seeks sealing of DX 534, DX 614, DX 617, and DX 766–DX 776, which are Apple
26 iPhone "Buyer Surveys" and iPad "Tracking Studies," confidential market research surveys that
27 Apple conducts in order to gain insight into its customers' purchasing decisions and preferences
28 (Joswiak Decl. at ¶¶ 3–4, 8, 10), and DX 701, which amalgamates several Apple Buyer Surveys.

Exhibits DX 614, DX 772, DX 773, DX 774, DX 775, DX 534, DX 776, and DX 767 are quarterly iPhone Buyer Surveys created by Apple in fiscal years 2010 and 2011. (*Id.* at ¶ 8.) Apple generated these documents by conducting monthly surveys of purchasers of its iPhone products and compiling them each quarter. (*Id.* at ¶ 3.) Each quarterly survey follows a similar format and reports the same type of information for iPhone buyers from surveys conducted during the applicable quarter. (*Id.* at ¶ 8.) These Buyer Surveys would be of significant value to Apple's competitors, who lack access to Apple's customer base, and thus cannot replicate the thorough analysis contained in the Buyer Surveys, learn the preferences and profiles of Apple's customers, or observe trends over time. (*Id.* at ¶ 5.) Moreover, the conclusions that Apple has drawn from this data are equally valuable – Apple's competitors could use access to its analysis of its customers' preferences to gain insight into Apple's future product plans and marketing strategies. (*Id.* at ¶ 6.)

Exhibits DX 768, DX 769, DX 617, DX 770, DX 771, and DX 766 are iPad Tracking Studies created in fiscal years 2010 and 2011. (*Id.* at ¶ 10.) Similar to the iPhone Buyer Surveys, Apple conducts monthly surveys of purchasers of its iPad products and compiles them each quarter. (*Id.* at ¶ 4.) As with the iPhone Buyer Surveys, disclosure of the iPad Tracking Studies would severely harm Apple by giving its competitors insight into the reasons why Apple's customers purchase iPads, customers' usage habits, buying preferences, and demographics, and the conclusions that Apple has drawn from this information. (*Id.* at ¶ 11.)

Finally, disclosure of Exhibit DX 701, which amalgamates numerous Buyer Surveys, would harm Apple just as severely as would disclosure of the individual Buyer Surveys and Tracking Studies. The information contained in DX 701 can only be obtained from Apple's customer base and thus cannot be replicated by Apple's competitors. (*Id.* at ¶ 13.) Moreover, it contains precisely the kinds of trend data that would give Apple's competitors insight into Apple's strategic moves. (*Id.*)

Because of the value of the Buyer Surveys and Tracker Studies, Apple employs strict measures to protect them from disclosure. Apple stamps the documents confidential on a "need to know" basis. (*Id.* at ¶ 7.) Apple circulates the buyer surveys only to a small, select group of

executives.  (*Id.*)  Apple's Vice President of Worldwide iPod, iPhone and iOS Product Marketing, Greg Joswiak, personally restricts the dissemination of these marketing research surveys outside of this group of executives, routinely denies access, and only rarely approves further distribution and even then only if restricted to a survey-question-by-survey-question basis.  (*Id.*)

Courts have found that compelling reasons exist for sealing market analysis information like that found in the Buyer Surveys and Tracker Studies.  *TriQuint Semiconductor*, 2011 U.S. Dist. LEXIS 143942 at *10, 11, 21 (finding compelling reasons to seal market analysis); *Bauer Bros., LLC*, 2012 U.S. Dist LEXIS 72862, at *6 (finding compelling reasons to seal confidential sales and marketing information).  Apple's efforts to preserve their confidentiality, and the harm that Apple would suffer if this previously unknown information was disclosed qualifies these documents for trade secret protection and justifies sealing them.  Accordingly, the Court should grant Apple's request to seal Trial Exhibits DX 534, DX 614, DX 617, 701, and DX 766–DX 776.

### 2. Compelling reasons support sealing information derived from confidential third-party market research reports

In addition, Apple seeks to seal Exhibits 536 and 537, which are copies of full market research report by nonparty IDC and a full spreadsheet containing data underlying that report, respectively.  IDC is a market analysis firm that produces research reports that it sells subject to nondisclosure agreements.  Courts have sealed market analysis information of the type found in these exhibits.  *TriQuint Semiconductor v. Avago Techs. Ltd.*, 2011 U.S. Dist. LEXIS 143942 at *10, 11, 21 (D. Ariz. Dec. 12, 2011) (granting motion to seal market analysis information).

Compelling reasons for sealing Exhibits DX 536 and DX 537 exist.  Widespread dissemination of these IDC publications would impair its ability to sell the reports from which those datasheets were taken, thus causing it severe commercial harm.  (Sabri Decl. at ¶ 4 (Dkt. No. 1408-2.)  Because of the risk of widespread disclosure, IDC requires purchasers of its research reports agree not to disclose them to third parties.  (*Id.* at ¶ 3.)  The Court has recognized

1  the propriety of sealing such information if an appropriate showing is made. (*See* July 27 Hr'g
2  Tr. at 9-10.)

3  The public interest in access to Exhibits DX 536 and DX 537 is low. As Apple has
4  explained to the Court, limited data provided by IDC concerning Apple's and Samsung's market
5  shares will be filed on the public record. The full report and spreadsheet, however, are largely
6  irrelevant to the issues to be decided in this litigation.

7  Because the risk of commercial harm to IDC is severe and the public interest in access is
8  low, the Court should grant sealing of portions of Exhibits DX 536 and DX 537 as Apple has
9  requested.

10  **D.     The Court Should Seal Confidential Information Concerning Apple's Licenses**
11

12  The Ninth Circuit has held that non-public information contained in patent licenses is the
13  type of information "that plainly falls within the definition of 'trade secrets.'" *In re Electronic*
14  *Arts, Inc.*, 298 Fed.Appx. at 569 (reversing denial of request to seal licensing terms such as
15  royalty rates and payment terms under "compelling reasons" test because they constitute trade
16  secret information whose loss might harm a party's competitive standing); *see also TriQuint*
17  *Semiconductor, Inc. v. Avago Techs., Ltd.,* Case No. CV 09-1531-PHX-JAT, 2011 WL 6182346,
18  at *2-*4 (D. Ariz. Dec. 13, 2011) (redacting irrelevant financial information, including pricing
19  information, under compelling reason standard because disclosure "would harm TriQuint's
20  bargaining position and would give competitors the ability to directly under TriQuint and unfairly
21  win business."). Accordingly, patent licenses and documents reflecting or summarizing those
22  licenses, such as summaries created pursuant to Fed. R. of Evid. 1006 or internal royalty tracking
23  charts, should be treated as confidential trade secrets and protected from public disclosure.

24  Apple seeks to seal portions of the following trial exhibits that contain non-public, trade
25  secret information regarding Apple's licensing and acquisition efforts: DX 630.007-009; DX 757,
26  DX 758, PX 76, PX 78, and DX 593.

27  This licensing-related information is commercially valuable and has been kept
28  confidential, and thus qualifies for trade secret protection. *Electronic Arts, Inc.*, 298 Fed. Appx.

1  at 569; *Whyte*, 101 Cal. App 4th 1443 at 1455-56; *O2 Micro Int'l Ltd.*, 399 F. Supp. 2d at 1075.
2  It is commercially valuable because disclosure would harm Apple's competitive standing, as well
3  as the competitive standing of the other parties to the licensing agreements at issue.  (Bean Decl.
4  at ¶ 9.)  In particular, if terms of licenses to patents not subject to any FRAND obligation were
5  disclosed—such as, amounts paid, royalty rates, and duration—potential licensees and licensors
6  could use this information to gain an unfair negotiating advantage over Apple and the companies
7  involved in the license agreements.  (*Id.*)  Disclosure of the terms of these Apple license
8  agreements would reveal what Apple did in the past, and could permanently damage Apple's
9  negotiations in the future as third parties would expect similar terms, basing their expectations on
10 heavily negotiated agreements that were meant to be confidential.  (*Id.*)

11           Further, Apple has kept the terms of these licensing agreements confidential.  The licenses
12 contain non-disclosure provisions and Apple has honored these provisions and has not disclosed
13 the confidential information in these licenses publicly.  (*Id.*)  Even within Apple, very few
14 employees have access to these agreements, and they are maintained in a highly secure manner to
15 prevent any inadvertent disclosure.  (*Id.*)

16           The public interest in gaining access to Apple's trade secret information regarding its
17 patent licenses is limited.  *MMI, Inc. v. Baja, Inc.*, 743 F. Supp. 2d 1101, 1106 (D. Ariz. 2010)
18 (moving party demonstrated good cause to seal licensing agreement in patent infringement case in
19 part since "public has a diminished need for th[e] document because it is 'only tangentially
20 related to the underlying cause of action.'" (quoting *Kamakana*, 447 F.3d at 1179)).

21           Because disclosure of licensing and acquisition information would harm Apple's and third
22 parties' competitive positions and the public interest in disclosure is limited, a compelling need to
23 seal exists.  *Electronic Arts*, 298 Fed. Appx. at 569; *see also  Powertech Tec., Inc., v.Tessera,*
24 *Inc.*, 2012 U.S. Dist. LEXIS 75831, at *5 (N.D. Cal. May 31, 2012) (granting motion to seal
25 details of license agreement).

26
27
28

## III. CONCLUSION

For the foregoing reasons, Apple respectfully requests that the Court grant Apple's Motion and seal the following documents: PX25, PX63, PX67, PX76, PX78, PX102, PX103, PX110, PX121, PX181, PX182, DX534, DX536, DX537, DX541, DX542, DX543, DX544, DX581, DX587, DX589, DX593, DX614, DX617, DX630, DX645, DX701, DX755, DX756, DX757, DX758, DX766-776, DX777, DX778, DX779, DX780.

Dated: July 30, 2012

MORRISON & FOERSTER LLP

By: */s/ Michael A. Jacobs*
MICHAEL A. JACOBS

Attorneys for Plaintiff
APPLE INC.