1   HAROLD J. MCELHINNY (CA SBN 66781)       WILLIAM F. LEE
    hmcelhinny@mofo.com                      william.lee@wilmerhale.com
2   MICHAEL A. JACOBS (CA SBN 111664)        WILMER CUTLER PICKERING
    mjacobs@mofo.com                         HALE AND DORR LLP
3   RACHEL KREVANS (CA SBN 116421)           60 State Street
    rkrevans@mofo.com                        Boston, MA 02109
4   JENNIFER LEE TAYLOR (CA SBN 161368)      Telephone: (617) 526-6000
    jtaylor@mofo.com                         Facsimile: (617) 526-5000
5   ALISON M. TUCHER (CA SBN 171363)
    atucher@mofo.com
6   RICHARD S.J. HUNG (CA SBN 197425)        MARK D. SELWYN (SBN 244180)
    rhung@mofo.com                           mark.selwyn@wilmerhale.com
7   JASON R. BARTLETT (CA SBN 214530)        WILMER CUTLER PICKERING
    jasonbartlett@mofo.com                   HALE AND DORR LLP
8   MORRISON & FOERSTER LLP                  950 Page Mill Road
    425 Market Street                        Palo Alto, California 94304
9   San Francisco, California  94105-2482    Telephone: (650) 858-6000
    Telephone:  (415) 268-7000               Facsimile: (650) 858-6100
10  Facsimile:  (415) 268-7522

11

12  Attorneys for Plaintiff and
    Counterclaim-Defendant APPLE INC.

13

14                    UNITED STATES DISTRICT COURT

15                    NORTHERN DISTRICT OF CALIFORNIA

16                           SAN JOSE DIVISION

17  APPLE INC., a California corporation,      Case No. 11-cv-01846-LHK (PSG)

18                    Plaintiff,               **APPLE'S MOTION TO SEAL PRIOR
                                               MOTIONS AND EXHIBITS
19        v.                                   THERETO**

20  SAMSUNG ELECTRONICS CO., LTD., a
    Korean corporation; SAMSUNG
21  ELECTRONICS AMERICA, INC., a New
    York corporation; and SAMSUNG
22  TELECOMMUNICATIONS AMERICA,
    LLC, a Delaware limited liability company,
23
                      Defendants.
24

25

26

27

28

1    Apple files this further revised motion to seal pursuant to the Court's instructions at the

2    July 27 hearing.

3    Mindful of the Court's admonitions, Apple here seeks sealing of limited portions of fewer

4    than thirty documents.  Many of these documents were attached to non-dispositive motions, and

5    as such warrant sealing if they meet the "good cause" standard of Federal Rule of Civil Procedure

6    26(c).  However, all of Apple's documents meet the "compelling reasons" standard because the

7    portions Apple seeks to seal contain confidential trade secret information, disclosure of which

8    would severely harm Apple's competitive position and in some cases damage third parties.

9    Specifically, these excerpts comprise (a) financial data concerning Apple's manufacturing

10   capacity, costs, prices, product-specific revenues, unit sales, profits, and profit margins;

11   (b) information relating to Apple's licensing and acquisition strategies, including licensing terms

12   relating to compensation, duration, and scope; and (c) Apple's proprietary market research.

13   Apple also seeks to seal proprietary market research received from third party IDC pursuant to a

14   confidentiality agreement, the disclosure of which would harm IDC's livelihood.

15   Apple has submitted declarations from Jim Bean, Apple's Vice-President of Financial

16   Planning and Analysis, and Greg Joswiak, a Vice-President in Apple's Product Marketing

17   department, in support of its motion to seal.  These declarations individually address each

18   document Apple is seeking to seal, describe the measures the company has used to maintain its

19   confidentiality and the competitive harm disclosure of the information would create.

20   **I.    LEGAL STANDARD**

21   Two different standards apply on motions to seal.  For non-dispositive motions, the

22   standard is "good cause."  *Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1179-80 (9th

23   Cir. 2006).  In *Kamakana*, the Ninth Circuit held that "[a] 'good cause' showing under Rule 26(c)

24   will suffice to keep sealed records attached to non-dispositive motions." *Id.* at 1180 (citation

25   omitted).  *Accord Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) ("good

26   cause" standard is not limited to discovery motions, but applies to all non-dispositive motions).

27   The Court has "'broad latitude' under Rule 26(c) 'to prevent disclosure of materials for

28   many types of information, including, but not limited to, trade secrets or other confidential

1  research, development, or commercial information.'"  *Reilly v. Medianews Grp., Inc.*, No. C 06-

2  4332, 2007 U.S. Dist. LEXIS 8139, at *13 (N.D. Cal. Jan. 24, 2007) (quoting *Phillips v. Gen.*

3  *Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2002).  *See* Fed. R. Civ. P. 26(c).

4         Courts regularly grant motions to seal under Rule 26(c) when a party has made a

5  particularized showing as Apple has done here.  For example, in *Reilly,* the court denied an

6  intervenor's motion to unseal seventeen of nineteen documents because they contained "detailed

7  financial information, including past and present revenues and projections of future revenues."

8  2007 U.S. Dist. LEXIS 8139, at *11-13; *see also Bean v. Pearson Educ., Inc.*, 11-8030, 2012 U.S.

9  Dist. LEXIS 99540, at *5-6 (D. Ariz. July 16, 2012) (granting motion to seal non-public financial

10 sales and distribution information because it revealed defendants "market research" and "profit

11 and sales margins").

12        The standard is higher for materials attached to dispositive motions.  For dispositive

13 motions, there is "a strong presumption in favor of [public] access."  *Kamakana*, 447 F.3d at 1178

14 (citation omitted).  However, the right of access is not absolute.  A party can overcome the

15 presumption by meeting the "compelling reasons" standard.  *Id.*  "In general, 'compelling

16 reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records

17 exist when such 'court files might have become a vehicle for improper purposes,' such as the use

18 of records to gratify private spite, promote public scandal, circulate libelous statements, or release

19 trade secrets."  *Id.* at 1179 (quoting *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 598 (1978)).

20        It is well established in particular that information containing trade secrets should be

21 sealed: "The publication of materials that could result in an infringement upon trade secrets has

22 long been considered a factor that would overcome this strong presumption."  *Apple Inc. v.*

23 *Psystar Corp.*, 658 F.3d 1150, 1162 (9th Cir. 2011) (remanding case because lower court failed to

24 articulate reasons for its sealing decision).

25        Reuters suggested at the July 27 hearing that financial information has a sort of second-

26 class trade secret status.  (*See* July 27 Hr'g Tr. at 12 ("Financial information just simply isn't a

27 sealable trade secret of the same ilk as the secret formula of code or source code.").)  It isn't true.

28

1   The majority of trade secret cases in federal and state court in California concern non-technical

2   information, most typically confidential financial or business information.

3          In *In re Electronic Arts, Inc.*, for example, the Ninth Circuit held that licensing pricing

4   terms, royalty rates, and payment terms all constitute information that "plainly falls within the

5   definition of 'trade secrets.'"  298 Fed. App'x 568, 569 (9th Cir. 2008).  The Court found these

6   license terms should be sealed, and noted that, "[i]n *Nixon*, the U.S. Supreme Court established

7   that the 'right to inspect and copy judicial records is not absolute,' and, in particular, 'the

8   common-law right of inspection has bowed before the power of a court to insure that its records

9   are not used . . . as sources of business information that might harm a litigant's competitive

10  standing."  *Id.* at 569 (quoting *Nixon*, 435 U.S. at 598).  *Electronic Arts* also relied for its holding

11  on *Whyte v. Schlage Lock Co.*, a leading California trade secret case which recognized the trade

12  secret status of a wide variety of types of financial information including documents disclosing

13  "profit margin" and "costs of production," as well as "confidential marketing research."  101 Cal.

14  App. 4th 1443, 1455–56 (2002).

15         California's Uniform Trade Secrets Act defines the term "trade secret" broadly.

16  Specifically, it provides:

17         "Trade secret" means information, including a formula, pattern, compilation,
         program, device, method, technique, or process, that: (1) Derives independent
18       economic value, actual or potential, from not being generally known to the public
         or to other persons who can obtain economic value from its disclosure or use; and
19       (2) Is the subject of efforts that are reasonable under the circumstances to
         maintain its secrecy.
20

21  Cal. Civ. Code  § 3426.1(d).

22         It is beyond dispute that financial information and other confidential business information

23  that meets this test constitute trade secrets.  *See, e.g., Whyte*, 101 Cal. App 4th 1443 at 1455-56;

24  *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1075 (N.D. Cal. 2005)

25  (upholding jury verdict for misappropriation of trade secrets including cost information contained

26  in data sheets); *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d

27  929, 935-36 (N.D. Cal. 2008) (finding allegations that defendant improperly disclosed plaintiff's

28  confidential information "including profit margins" stated trade secret claim).  *See also Courtesy*

1    *Temp. Serv. v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990) (billing rates and markup rates

2    "irrefutably" of commercial value and qualify for trade secret protection); *see also Electronic Arts*,

3    298 Fed. App'x at 569 (relying on similar Restatement definition of trade secret providing that

4    "'trade secret may consist of any formula, pattern, device or compilation of information which is

5    used in one's business, and which gives him an opportunity to obtain an advantage over

6    competitors who do not know or use it'") (quoting *Restatement of Torts* § 757 cmt. B).

7        As a result, just as the Ninth Circuit itself did in *Electronic Arts*, courts is in this Circuit

8    routinely hold that confidential business and financial information that qualifies as a trade secret

9    should be sealed under the *Kamakana* test.  For example, in *AMC Tech., LLC v. Cisco Sys.*,

10   Magistrate Grewal held that amount of fees and royalties paid for development and licensing of

11   software should be sealed because disclosure would allow customers to determine Cisco's profit

12   margins and "might be used for an improper purpose, including disclosure of Cisco's trade secrets.

13   No. 5:11-cv-3403-PSG, 2012 U.S. Dist. LEXIS 9934 (N.D. Cal. Jan. 27, 2012).  Similarly, in

14   *TriQuint Semiconductor v. Avago Techs., Ltd.*, the court granted a motion to seal confidential

15   financial information including market analysis information, cost information, capacity

16   information and profit margins for specific products.  No. CV 09-1531, 2011 U.S. Dist. LEXIS

17   143942 at *10, 11, 21 (D. Ariz. Dec. 12, 2011).  *See also Bauer Bros., LLC v. Nike, Inc.*, 09cv500,

18   2012 U.S. Dist LEXIS 72862 (S.D. Cal. May 24, 2012) (sealing financial information including

19   cost of goods sold for each product and confidential sales and marketing information); *Powertech

20   Tech., Inc., v. Tessera, Inc.*, No. C11-3121, 2012 U.S. Dist. LEXIS 75831, at *5 (N.D. Cal. May

21   31, 2012) (granting motion to seal details of license agreement); *Network Appliance, Inc. v. Sun

22   Microsystems*, No. C-07-6053, 2010 U.S. Dist. LEXIS 21721, at *7 (N.D. Cal. Mar. 10, 2010)

23   (sealing material that would subject third parties to competitive harm).

24        Moreover, Apple proposes to leave unsealed the material that the public has the greatest

25   interest in seeing—namely, proposing that most briefs, expert reports, and declarations enter the

26   public record fully or largely unredacted. Apple does not seek to conceal the parties' arguments,

27   which will aid the public in understanding the judicial process. Rather, Apple seeks to seal

28   material that is highly specific, going well beyond what would aid the public in understanding the

1   parties' positions and the judicial process. This ensures the public has access to the material it has

2   the greatest interest in viewing. See, e.g. *Richardson v. Mylan Inc.*, Case No. 09-CV-1041-JM

3   (WVG), 2011 U.S. Dist. LEXIS 23969, at *7-8 (S.D. Cal. Mar. 9, 2011) (information "of

4   comparatively little value to the general public in terms of enhancing its understanding of the

5   judicial process" sealable) (internal quotation omitted); *Network Appliance*, 2010 U.S. Dist.

6   LEXIS 21721, at *13-14 (material that would "do little to aid the public's understanding of the

7   judicial process, but have the potential to cause significant harm" to one of the parties sealable).

8   The public will be able adequately to understand the rulings of the Court and the positions of the

9   parties from the material available publicly under Apple's proposal. The additional highly

10  sensitive details discussed in more detail below do not further that interest, but on the contrary

11  have the potential to cause significant harm to Apple, and in some cases third parties.

12  **II.     THE COURT SHOULD GRANT APPLE'S NARROW REQUESTS TO SEAL**

13        **A.     The Court Should Seal Apple's Confidential Financial Information**

14              **1.     The Court should seal confidential financial information filed in
15                   conjunction with nondispositive motions**

16      Apple seeks to seal the following portions of documents because they contain sensitive

17  financial information, the disclosure of which would cause Apple competitive harm:

18  - Paragraphs 116, 124, 127, 133, 136, 187, and 230 of the Expert Report of Terry
19    Musika ("Musika Expert Report") and Exhibits 16, 17.2, 20, 22, 26, 27, 34, 35, 39–
     39.3, 41.3, 46, and 47 thereto;

20  - Portions of Exhibits 16, 17.2, 20, 22, 26, 27, 32–35, 39–39.3, 41.3, 46, and 47 to the
21    Supplemental Expert Report of Terry Musika ("Musika Supplemental Report");

22  - Paragraphs 175, 178–180, 188, and 193 of the Corrected Expert Report of Michael J.
     Wagner ("Wagner Expert Report");

23  - Exhibit AA to the Declaration of Terry Musika in Support of Apple's Opposition to
24    Samsung's Daubert Motion ("Musika Declaration"); and

25  - Exhibits 20 and 21 to the Declaration of Christopher Price in Support of Samsung's
     Reply in Support of Samsung's Motion to Strike ("Price Declaration Exhibits").

26

27      The portions of the documents identified above contain highly confidential financial

28  information concerning Apple's manufacturing capacity, product-specific profits and profit

1    margins, product-specific unit sales and revenue, costs, and valuation of its intangible assets.

2    Courts recognize that, provided appropriate efforts have been made to maintain their

3    confidentiality, these types of information constitute trade secrets, and a compelling need exists

4    for maintaining their confidentiality.  *AMC Tech., LLC v. Cisco Sys.*, 2012 U.S. Dist. LEXIS 9934

5    (Jan. 27, 2012); *TriQuint Semiconductor v. Avago Techs. Ltd.*, 2011 U.S. Dist. LEXIS 143942

6    at *10, 11, 21 (D. Ariz. Dec. 12, 2011) (sealing confidential financial information including

7    market analysis information, cost information, capacity information and profit margins for

8    specific products).

9          Apple's financial information meets the definition of a trade secret under California's

10   UTSA.  Apple has submitted a declaration in support of this motion from Jim Bean, its Vice

11   President of Worldwide Financial Planning and Analysis.  The declaration explains, for each

12   portion of each document that Apple seeks to have sealed, why Apple keeps it confidential and

13   the steps Apple takes to do so.  (Declaration of J. Bean, *passim*.)  Each of these data are

14   competitively sensitive and derive value from the fact that they are not shared with the general

15   public or with others who could derive economic benefit from this data – Apple's competitors and

16   suppliers.  (*Id.* at ¶¶ 4-8)  If disclosed, Apple's competitors could use these data for "improper

17   purposes."  *Kamakura*, 447 F.3d at 1179.

18         The documents listed above all were filed in conjunction with non-dispositive motions.

19   The Musika Expert Report, Musika Supplemental Report, the exhibits to those reports, and the

20   Musika Declaration were all filed in conjunction with Samsung's Motion to Exclude Opinions of

21   Certain of Apple's Experts.  That Motion was not filed in connection with a summary judgment

22   motion and would not have conclusively decided the merits of any issue in this case.  Similarly,

23   the Price Declaration Exhibits were filed in connection with a motion to strike, another

24   nondispositive motion.

25         These documents would all qualify for sealing under the "compelling reasons" standard.

26   Because these documents were filed in conjunction with nondispositive motions, however, Ninth

27   Circuit law provides that the "good cause" standard of Federal Rule of Civil Procedure 26(c)

28   applies.  *See Kamakana*, 447 F.3d at 1179 ("[T]he public has less of a need for access to court

1    records attached only to non-dispositive motions because those documents are often 'unrelated, or

2    only tangentially related, to the underlying cause of action.'").  Moreover, as the Ninth Circuit has

3    explained, for documents like these that were submitted to the Court in connection with

4    nondispositive motions, "'the usual presumption of the public's right of access is rebutted.'"

5    *Kamakana*, 447 F.3d at 1179 (quoting *Phillips*, 307 F.3d at 1213).

6         Here, good cause for sealing exists.  Information concerning Apple's manufacturing

7    capacity information is potentially valuable to Apple's competitors because they could use such

8    information to increase production or decrease prices at times when Apple would be most

9    vulnerable to such actions.  (Bean Decl. at ¶ 6.)  Capacity information is also potentially valuable

10   to Apple's suppliers, who could raise prices when Apple is most likely to increase capacity.  (*Id*.)

11   Because of these significant risks of disclosure, Apple maintains its capacity data in confidence

12   by marking documents containing capacity data "confidential," restricting access within Apple on

13   only a "need-to-know" basis, and sharing with third parties only pursuant to strict nondisclosure

14   agreements.  (*Id.* at 3.)  The court recognized at the July 27 hearing that capacity information

15   could qualify for sealing if properly protected.  (July 27 Hr'g Transcript at 9:20).  Apple's

16   manufacturing capacity data are disclosed in Paragraphs 127 and 133 and Exhibits 17.2, 20, 26,

17   and 27 of the Musika Expert Report, Exhibits 17.2, 20, 26, and 27 of the Musika Supplemental

18   Report, Paragraphs 175, 178–180, 188, and 193 of the Wagner Expert Report, and the Price

19   Declaration Exhibits.

20        Information concerning Apple's costs, profits, and profit margins is also valuable to its

21   competitors and suppliers.  Although Apple considers margin data to be sensitive even when they

22   are aggregated over a long period of time for broad product categories, such data are far more

23   commercially valuable – and competitively sensitive – if they relate to specific products or to

24   discrete periods of time.  (Bean Decl. at ¶ 7.)  Apple's competitors could use profits, costs, and

25   margins data for specific products to undercut Apple's prices by determining the products for

26   which Apple has substantial profits, low costs, and wide margins and thus would be most

27   susceptible to a price cut.  (*Id.* at ¶ 7.)  Apple's suppliers could use quarterly profits, costs, and

28   margins data to determine when Apple has the lowest margins and is thus more vulnerable to a

1   cost increase.  (*Id.* at ¶ 8.)  As it does with capacity data, Apple protects the confidentiality of its

2   profit, profit margins, and costs data by marking documents bearing such information

3   "confidential," restricting access within Apple, and disseminating only pursuant to nondisclosure

4   agreements.  (*Id.* at ¶ 3.)  Apple's profit margins, profits, and costs data are disclosed in

5   Paragraphs 116, 124, 136, 187, and 230 and Exhibits 16, 20, 22, 34, 35, 39–39.3, 46, and 47 of

6   the Musika Expert Report, Exhibits 16, 20, 22, 34, 35, 39–39.3, 46, and 47 of the Musika

7   Supplemental Report, and the Musika Declaration.

8          The portions of documents identified herein contain competitively valuable financial

9   information that Apple has undertaken extraordinary efforts to keep confidential.  These

10  documents were submitted only in connection with nondispositive motions.  The Court should

11  therefore grant Apple's motion and seal these documents.  *Reilly*, 2007 U.S. Dist. LEXIS 8139,

12  at *11-12; *Bean*, 2012 U.S. Dist. LEXIS 99540, at *5-6.

13                    **2.    Compelling reasons exist to seal confidential financial information
                             submitted in connection with dispositive motions**
14

15         Apple also seeks to seal portions of two documents filed in connection with dispositive

16  motions – Exhibits 32 and 33 to the Musika Expert Report – that contain highly confidential

17  financial information.  Exhibits 32 and 33 are profit and loss statements related to iPhones and

18  iPads, respectively.  Apple's cost of goods sold ("COGS"), gross profit, gross margin, operating

19  expenses, operating profit, operating margin, and profit per unit are provided for each of these

20  product categories for each quarter beginning in fiscal year 2011 and continuing through the

21  second fiscal quarter of 2012.

22         Compelling reasons exist for sealing this highly confidential financial trade secret

23  information.  *Electronic Arts*, 298 Fed. App'x at 569.  These documents provide margin data on a

24  quarterly basis for the past year-and-a-half.  These documents also provide Apple's costs and

25  profits, which can be used to calculate Apple's margins, over that same period of time.  This

26  information has economic value derived from its not being known to Apple's competitors or

27  suppliers, who could use it to calculate Apple's current or future margins, thus giving them an

28  unfair advantage whether competing or contracting with Apple.  (Bean Decl. at ¶ 9.)  Because of

1   its sensitivity, Apple protects this information from widespread distribution by marking the

2   documents from which this information is derived "confidential," restricting disclosure only to

3   those Apple employees who need access, and prohibiting dissemination to the general public.  (*Id.*

4   ¶ 3)

5           The financial data found in Exhibits 32 and 33 of the Musika Expert Report are therefore

6   trade secrets of Apple.  *Whyte*, 101 Cal. App 4th at 1455-56; *O2 Micro Int'l Ltd.*, 399 F. Supp. 2d

7   at 1075; *First Advantage Background Servs. Corp.*, 569 F. Supp. 2d at 935-36.  As such, Apple's

8   interest in limiting disclosure outweighs the public's right of access.  *Bauer Bros., LLC v. Nike,*

9   *Inc.*, 09cv500, 2012 U.S. Dist LEXIS 72862 (S.D. Cal. May 24, 2012) (finding compelling reason

10  to seal cost of goods sold for each product and confidential sales and marketing information);

11  *TriQuint Semiconductor*, 2011 U.S. Dist. LEXIS 143942 at *10, 11, 21 (finding compelling

12  reason to seal cost information and profit margins for specific products).

13  **B.     The Court Should Seal Confidential Information Concerning Apple's**
    **Licenses and Acquisitions**

14

15          Apple seeks to seal portions of documents that relate to Apple's confidential patent

16  licensing and strategic acquisition efforts.  Courts have sealed documents concerning licensing

17  and acquisition agreements under both the "good cause" and "compelling reasons" standards.

18  *Elec. Arts*, 298 Fed. App'x at 569 (finding compelling reasons to seal licensing agreement); *MMI,*

19  *Inc. v. Baja, Inc.*, 743 F. Supp. 2d 1101, 1106 (D. Ariz. 2010) (finding good cause to seal

20  licensing agreement).  Apple's confidential information meets both standards here.

21          In particular, Apple seeks to seal portions of paragraphs 170 and 172 of the Musika Expert

22  Report.  As stated above, the Musika Expert Report was filed in connection with nondispositive

23  motions, so the "good cause" standard applies.  *Kamakura*, 447 F.3d at 1179.  Good cause applies

24  to seal portions of each of these paragraphs.  Paragraph 170 discusses a series of cross-licenses

25  between Apple and IBM; Apple seeks to seal only the discussions of payment terms and duration

26  of these cross-licenses.  Although the first of this series of licenses was executed in 1991, its

27  provisions remain commercially sensitive because it is related to and similar to a cross-license

28  entered between Apple and IBM in 2002, which superseded the 1991 license and is still in force.

1   Paragraph 172 discusses a cross-license and settlement Apple entered into with Nokia; Apple

2   seeks to seal discussion of the payment terms and duration of this license as well.  Apple keeps

3   confidential information relating to the specific terms of these licenses and has not disclosed them

4   publicly.  (Bean Decl. at ¶ 9.)  Disclosure of these terms could harm Apple by giving third parties

5   and potential licensees an insight into Apple's licensing strategies and willingness to accede to

6   certain terms.  (*Id.*)  Consequently, good cause exists to seal portions of Paragraphs 170 and 172.

7   *See Powertech Tech.*, 2012 U.S. Dist. LEXIS 75831, at *5 (granting motion to seal details of

8   license agreement).

9          Apple also seeks to have seal certain, limited discussions of its licensing agreements in

10  Samsung's Reply in Support of Its Motion to Strike Expert Testimony Based on Undisclosed

11  Facts and Theories ("Samsung's Motion to Strike Reply"), another nondispositive motion.

12  Specifically, Apple asks that the Court seal discussions of four licenses on pages 2-3 and in

13  Paragraphs 16–34 of the Declaration of Michael J. Wagner in support of that motion.

14         Apple keeps these terms confidential, and would be harmed if they were disclosed for the

15  same reasons described above with respect to the IBM and Nokia licenses.  There is therefore

16  both good cause and a compelling reason to grant sealing.

17         The Ninth Circuit has squarely held that non-public information contained in patent

18  licenses is the type of information "that plainly falls within the definition of 'trade secrets.'"  *In re*

19  *Electronic Arts, Inc.*, 298 Fed. Appx. at 569 (reversing denial of request to seal licensing terms

20  such as royalty rates and payment terms under "compelling reasons" test because they constitute

21  trade secret information whose loss might harm a party's competitive standing); *see also TriQuint*

22  *Semiconductor, Inc. v. Avago Techs., Ltd.,* Case No. CV 09-1531-PHX-JAT, 2011 WL 6182346,

23  at *2-*4 (D. Ariz. Dec. 13, 2011) (redacting irrelevant financial information, including pricing

24  information, under compelling reason standard because disclosure "would harm TriQuint's

25  bargaining position and would give competitors the ability to directly under TriQuint and unfairly

26  win business.").

27         Apple seeks to seal the following portions of documents that contain non-public trade

28  secret information regarding Apple's licensing and acquisition efforts:

1      • Musika Expert Report: excerpts found in ¶¶ 170 and 172–173

2      • Samsung's Reply in Support of Its Motion to Strike Expert Testimony Based on

3        Undisclosed Facts and Theories: pages 2–3 and 5 and ¶¶ 16–34 of the Wagner

4        Declaration in support

5      • Wagner Expert Report: excerpts found in ¶¶ 397–398, 404, 524

6      • The Deposition Transcript of Boris Teksler at 154:8–155:10

7      • Donaldson Expert Report at ¶¶ 71–72, 75–88, and 99 n. 18

8      • Apple's Responses to Samsung's Fourth Set of Interrogatories at p. 28 ln. 15–16, p. 29

9        ln. 5–19, p. 31 ln. 8–22, and p. 39 ln. 16–20.

10     • Exhibit C to the Wagner Declaration

11     This licensing information is commercially valuable and has been kept confidential and

12   thus qualifies for trade secret protection.  *In re Electronic Arts, Inc.*, 298 Fed.Appx. at 569; *Whyte*,

13   101 Cal. App 4th 1443 at 1455-56; *O2 Micro Int'l Ltd.*, 399 F. Supp. 2d at 1075.  It is

14   commercially valuable because disclosure would harm Apple's competitive standing, as well as

15   the competitive standing of the other parties to the licensing agreements at issue.  (Bean Decl.

16   at ¶ 9.)  In particular, if terms of licenses to patents not subject to any FRAND obligation) were

17   disclosed—in particular amounts paid, royalty rates and duration—potential licensees and

18   licensors could use this information to gain an unfair negotiating advantage over Apple and the

19   companies involved in the license agreements.  (*Id.*)  Disclosure of the terms of these Apple

20   license agreements would reveal what Apple did in the past, and could permanently damage

21   Apple's negotiations in the future as third parties would expect similar terms, basing their

22   expectations on heavily negotiated agreements that were meant to be confidential.  (*Id.*)

23     Further, Apple has kept the terms of these licensing agreements confidential.  The licenses

24   contain non-disclosure provisions and Apple has honored these provisions and has not disclosed

25   the confidential information in these licenses publicly.  (Bean Decl. at [].)  Even within Apple,

26   very few employees have access to these agreements, and they are maintained in a highly secure

27   manner to prevent any inadvertent disclosure.  (*Id.*)

28

1   Finally, the public interest in gaining access to Apple's trade secret information regarding

2   its patent licenses is limited. *MMI, Inc. v. Baja, Inc.*, 743 F. Supp. 2d 1101, 1106 (D. Ariz. 2010)

3   (moving party demonstrated good cause to seal licensing agreement in patent infringement case in

4   part since "public has a diminished need for th[e] document because it is 'only tangentially

5   related to the underlying cause of action.'" (quoting *Kamakana*, 447 F.3d at 1179)).

6   Because disclosure of licensing and acquisition information would harm Apple's and third

7   parties' competitive positions and the public interest in disclosure is limited, a compelling need to

8   seal exists. *Electronic Arts*, 298 Fed.Appx. at 569; *see also Powertech Tec., Inc., v.Tessera, Inc.*,

9   2012 U.S. Dist. LEXIS 75831, at *5 (N.D. Cal. May 31, 2012) (granting motion to seal details of

10  license agreement)

11  **C.    The Court Should Seal Confidential and Proprietary Market Research
            Reports**

12

13  **1.    Good cause exists for sealing Apple confidential buyer surveys**

14  Apple seeks sealing of Exhibits 25 and 26 to the Declaration of Jason Bartlett in Support

15  of Apple's Daubert Motion. That Motion would not have resolved the merits of any issue in this

16  Investigation and is thus nondispositive, such that the "good cause" standard applies to sealing of

17  Exhibits 25 and 26.

18  Exhibits 25 and 26 are Apple "Buyer Surveys," confidential market research surveys that

19  Apple conducts in order to gain insight into its customers' purchasing decisions and preferences.

20  (Joswiak Decl. ¶¶ 3-4.) Exhibit 25 comprises a lengthy excerpt from a quarterly report known as

21  the iPhone buyer survey conducted by Apple relating to the fourth fiscal quarter of 2010. (*Id.*

22  ¶ 3.) Apple generates these reports by conducting monthly surveys of buyers of its iPhone

23  products and compiling them each quarter. Exhibit 25 contains country-by-country data on the

24  reasons customers buy Apple's iPhone over other products such as the Android products sold by

25  Samsung. (*Id.*) It concerns the iPhone 4, a phone that Apple still actively markets and sells. (*Id.*)

26  Apple continues to make use of the information contained in Exhibit 25 today. (*Id.*)

27  Exhibit 26 is an excerpt from an iPad buyer survey for the month of August 2010. (*Id.* ¶

28  4.) Similar to the iPhone buyer surveys, it reports and analyses results obtained from surveys of

1   iPad buyers that Apple conducted in August 2010.  (*Id.*)  Like Exhibit 25, Exhibit 26 discusses

2   drivers for Apple's customers' purchasing decisions and preferences.  (*Id.*)  Apple considers this

3   information to be current and makes use of it in its marketing and product decisions.  (*Id.*)  There

4   was no product like the iPad when it was released in April 2010.  Obtaining information from

5   August 2010 would be very valuable to companies who are trying to put forward competing

6   products.  (*Id.*)

7         The iPhone and iPad Buyer Surveys excerpted in Exhibits 25 and 26 are highly

8   confidential and Apple employers strict measures to protect them from disclosure.  Apple stamps

9   the documents confidential on a "need to know" basis.  (*Id.* ¶ 7.)  Apple circulates the buyer

10  surveys only to a small, select group of executives.  (*Id.*)  Apple's Vice President of Worldwide

11  iPod, iPhone and iOS Product Marketing, Greg Joswiak, personally oversees dissemination of

12  buyer surveys outside of this group of executives, routinely denies access, and routinely approves

13  further distribution only when limited to a survey-question-by-survey-question basis.  (*Id.*)

14        The information contained in Exhibits 25 and 26 is extremely valuable.  Apple alone has

15  the access to its customer base needed to conduct the in-depth analysis found in Apple's buyer

16  reports.  Because they are unable to access this information, Apple's competitors can only

17  speculate about the preferences, profiles, and purchasing patterns of Apple's customers.  (*Id.* ¶ 5.)

18  Moreover, Exhibits 25 and 26 reveal not only Apple's customers' preferences, but also the

19  conclusions that Apple draws based on those preferences.  (*Id.*)  If a competitor were granted

20  access to these Exhibits, it would be better able to compete against Apple in the marketplace and

21  anticipate Apple's next product offerings, and would gain an unfair tactical advantage.  (*Id.*)

22        Courts have held that market analysis information is sealable under even the higher

23  compelling reasons standard applicable to documents filed with dispositive motions.  *TriQuint*

24  *Semiconductor*, 2011 U.S. Dist. LEXIS 143942 at *10, 11, 21 (finding compelling reasons to seal

25  market analysis); *Bauer Bros., LLC*, 2012 U.S. Dist LEXIS 72862, at *6 (finding compelling

26  reasons to seal confidential sales and marketing information).  As such, Exhibits 25 and 26

27  readily meet the lower good cause standard for sealing based on their economic value due to their

28  confidentiality, Apple's efforts to preserve their confidentiality, and the harm that Apple would

1   suffer if that confidentiality was violated.  Accordingly, the Court should grant Apple's request to

2   seal Exhibits 25 and 26.

3           **2.      Good cause supports sealing information derived from confidential**
                    **third-party market research reports**
4

5           Finally, Apple seeks to seal portions of Exhibits 11.1, 12.1, and 13.1 of the Musika Expert

6   Report and Musika Supplemental Report.  These Exhibits contains full datasheets from market

7   analysis reports prepared by IDC, a third-party research firm.  Courts have sealed market analysis

8   information such as found in these exhibits.  *TriQuint Semiconductor v. Avago Techs. Ltd.*,

9   2011 U.S. Dist. LEXIS 143942 at *10, 11, 21 (D. Ariz. Dec. 12, 2011) (granting motion to seal

10  market analysis information).

11          Exhibits 11.1, 12.1, and 13.1 were submitted to the Court in conjunction with

12  nondispositive motions, such that the "good cause" standard applies.  *Kamakura*, 447 F.3d at

13  1179.  Here, good cause exists because widespread dissemination of Exhibits 11.1, 12.1, and 13.1

14  would impair IDC's ability to sell the reports from which those datasheets were taken, thus

15  causing it severe commercial harm.  (Sabri Decl. ¶ 4.) (Dkt. No. 1408-2.)  Because of the risk of

16  widespread disclosure, IDC requires purchasers of its research reports agree not to disclose them

17  to third parties.  (*Id.* at ¶ 3.)  The Court has recognized the propriety of sealing such information if

18  an appropriate showing is made.  *See* July 27 Hearing Tr. at 10:18-20.

19          The public interest in access to the portions of Exhibits 11.1, 12.1, and 13.1 for which

20  Apple seeks sealing is low.  These portions relate to market shares held by nonparties to this

21  litigation; Apple does not seek sealing of the portions that relate to Apple and Samsung's

22  respective market shares.

23          Because the risk of commercial harm to IDC is severe and the public interest in access is

24  low, the Court should grant sealing of portions of Exhibits 11.1, 12.1, and 13.1 as Apple has

25  requested.

26  **III.    CONCLUSION**

27          For the foregoing reasons, Apple respectfully requests that the Court grant Apple's

28  Motion and seal the following documents:

1.   **Exhibits 25 and 26 to the Declaration Jason Bartlett in Support of Apple's Daubert Motion** (APLNDC-Y0000027256-27303 and APLNDC-Y0000023361-23393).

2.   **Portions of Expert Report of Terry L. Musika and exhibits thereto.**  The report with exhibits was filed as Exhibit A to the Declaration of Terry Musika in Support of Apple's Opposition to Samsung's Daubert Motion.  The report without exhibits was filed as Exhibit 3 to the Declaration of Joby Martin in Support of Samsung's Daubert Motion.  Excerpts of the report were filed as Exhibit Q to the Declaration of Mia Mazza in Support of Apple's Opposition to Samsung's Daubert Motion and Exhibit 6 to the Declaration of Joby Martin in Support of Samsung's Daubert Motion.

3.   **Portions of Supplemental Expert Report of Terry L. Musika and exhibits thereto.**  The report with exhibits was filed as Exhibit B to the Declaration of Terry Musika in Support of Apple's Opposition to Samsung's Daubert Motion.  Certain exhibits were also filed as Exhibits 1 and 10 to the Declaration of Joby Martin in Support of Samsung's Daubert Motion; Exhibits C and E to the Declaration of Terry Musika in Support of Apple's Opposition to Samsung's Motion for Summary Judgment; Exhibits K, Y, and Z to the Declaration of Terry Musika in Support of Apple's Opposition to Samsung's Daubert Motion; and Exhibit 7 to the Declaration of Joby Martin in Support of Samsung's Daubert Motion.

4.   **Portions of Samsung's Reply in Support of Motion to Strike** (Dkt. No. 1060) and the Declaration of Michael Wagner in Support thereof.

5.   **Portions of Corrected Expert Report of Michael J. Wagner (Vol. 1)**.  The report was filed as Exhibit B to the Declaration of Michael Wagner in Support of Samsung's Reply in Support of Motion to Strike.

6.   **Portions of Exhibit AA to the Declaration of Terry Musika in Support of Apple's Opposition to Samsung's Daubert Motion**.

7.   **Exhibits 20 and 21 to the Declaration of Christopher Price in Support of Samsung's Reply in Support of Samsung's Motion to Strike.**

8.   **Portions of Exhibit P1 to the Declaration of David Hecht in Support of Samsung's Opposition to Apple's Motion for Partial Summary Judgment**.

1        9.      **Portions of Exhibit 32 to the Martin Declaration in Support of Samsung's**

2   **Daubert Motion**.

3        10.      **Portions of Exhibit 67 to the Declaration of Brett Arnold in Support of**

4   **Samsung's Motion for Summary Judgment**.

5        11.      **Portions of Exhibit A to the Declaration of Janusz A. Ordover in Support of**

6   **Apple's Opposition to Samsung's Motion for Summary Judgment**.

7        12.      **Portions of Exhibit C to the Declaration of Michael Wagner in Support of**

8   **Samsung's Reply in Support of Motion to Strike**.

9        13.      **Exhibits 1-6 and 13 to the Declaration of Christopher Price in Support of**

10  **Samsung's Reply in Support of Samsung's Motion to Strike**.

11

12  Dated: July 30, 2012                    MORRISON & FOERSTER LLP

13

14                                          By:    /s/ Michael A. Jacobs

15                                               MICHAEL A. JACOBS

16                                          Attorneys for Plaintiff
                                            APPLE INC.

17

18

19

20

21

22

23

24

25

26

27

28