1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4

5

    APPLE INC., A CALIFORNIA    )  C-11-01846 LHK
6   CORPORATION,                )
                                )  SAN JOSE, CALIFORNIA
7                  PLAINTIFF,   )
                                )  JULY 31, 2012
8           VS.                 )
                                )  VOLUME 2
9   SAMSUNG ELECTRONICS CO.,    )
    LTD., A KOREAN BUSINESS     )  PAGES 283-555
10  ENTITY; SAMSUNG             )
    ELECTRONICS AMERICA,        )
11  INC., A NEW YORK            )
    CORPORATION; SAMSUNG        )
12  TELECOMMUNICATIONS          )
    AMERICA, LLC, A DELAWARE    )
13  LIMITED LIABILITY           )
    COMPANY,                    )
14                              )
                   DEFENDANTS.  )
15  _____

16              TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE LUCY H. KOH
17           UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22

23  OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                        CERTIFICATE NUMBER 9595
24

25

1    A P P E A R A N C E S:

2    FOR PLAINTIFF          MORRISON & FOERSTER
     APPLE:                 BY:  HAROLD J. MCELHINNY
3                                MICHAEL A. JACOBS
                                 RACHEL KREVANS
4                           425 MARKET STREET
                            SAN FRANCISCO, CALIFORNIA  94105
5

6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
     APPLE:                 HALE AND DORR
7                           BY:  WILLIAM F. LEE
                            60 STATE STREET
8                           BOSTON, MASSACHUSETTS  02109

9                           BY:  MARK D. SELWYN
                            950 PAGE MILL ROAD
10                          PALO ALTO, CALIFORNIA  94304

11   FOR THE DEFENDANT:     QUINN, EMANUEL, URQUHART,
                            OLIVER & HEDGES
12                          BY:  CHARLES K. VERHOEVEN
                            50 CALIFORNIA STREET, 22ND FLOOR
13                          SAN FRANCISCO, CALIFORNIA  94111

14                          BY:  VICTORIA F. MAROULIS
                                 KEVIN P.B. JOHNSON
15                          555 TWIN DOLPHIN DRIVE
                            SUITE 560
16                          REDWOOD SHORES, CALIFORNIA  94065

17                          BY:  MICHAEL T. ZELLER
                                 WILLIAM C. PRICE
18                               JOHN B. QUINN
                            865 SOUTH FIGUEROA STREET
19                          10TH FLOOR
                            LOS ANGELES, CALIFORNIA  90017

20

21

22

23

24

25

1

2                        INDEX OF PROCEEDINGS

3

4    OPENING STATEMENT BY MR. MCELHINNY      P. 304

5    OPENING STATEMENT BY MR. LEE            P. 353

6    OPENING STATEMENT BY MR. VERHOEVEN      P. 380

7

8

9

10

11

12

13                        INDEX OF WITNESSES

14   PLAINTIFF'S

15   **CHRISTOPHER STRINGER**
          DIRECT EXAM BY MR. MCELHINNY      P. 469
16        CROSS-EXAM BY MR. VERHOEVEN       P. 511
          REDIRECT EXAM BY MR. MCELHINNY    P. 537
17

18   **PHILIP SCHILLER**
          DIRECT EXAM BY MR. MCELHINNY      P. 541
19

20

21

22

23

24

25

INDEX OF EXHIBITS

|  | MARKED | ADMITTED |
|---|---|---|
| PLAINTIFF'S | | |
| 1040 | | 472 |
| 1041 | | 473 |
| 1043 | | 474 |
| 163 | | 481 |
| 164 | | 483 |
| 165 | | 486 |
| 166 | | 488 |
| 168 | | 490 |
| 167 | | 491 |
| 162 | | 492 |
| 1000 | | 497 |
| 1001 | | 497 |
| 1002 | | 498 |
| 1003 | | 498 |
| 171 | | 500 |
| 170 | | 502 |
| 1004 | | 504 |
| 1005 | | 504 |
| | | |
| DEFENDANT'S | | |
| 741 | 524 | 538 |
| 687 | | 534 |
| 740 | | 538 |

```
 1    SAN JOSE, CALIFORNIA                 JULY 31, 2012
 2                    P R O C E E D I N G S
 3              (WHEREUPON, THE FOLLOWING PROCEEDINGS
 4    WERE HELD OUT OF THE PRESENCE OF THE JURY:)
 5              THE COURT:  GOOD MORNING.
 6              SO WE ARE FILING RIGHT NOW AN AMENDED
 7    ORDER TO THE ORDER WE FILED LAST NIGHT BECAUSE THE
 8    THREE DEMONSTRATIVE EXHIBITS WERE FILED.  THIS IS
 9    WITH REGARD TO SAMSUNG'S OBJECTIONS TO APPLE'S
10    EXHIBITS FOR THE SECOND DAY OF TRIAL.
11              SO THE AMENDED ORDER -- I THINK OUR ORDER
12    WAS FILED AT 11:00 O'CLOCK.  OUR AMENDED ORDER IS
13    BEING FILED NOW AND WILL ADDRESS THE THREE
14    DEMONSTRATIVES WHERE WE RESERVED RULING LAST NIGHT.
15    OKAY?
16              WE ARE ALSO FILING NOW A -- RULINGS ON
17    THE OBJECTIONS ON THE STRINGER, CHRISTOPHER
18    STRINGER EXHIBITS, AND I GUESS AROUND MIDNIGHT LAST
19    NIGHT, SOMEONE FILED ADDITIONAL -- APPLE FILED
20    ADDITIONAL OBJECTIONS, CORRECT, ON ABOUT FOUR
21    ADDITIONAL EXHIBITS.
22              AND SO THAT RESPONSE TO THE OBJECTIONS
23    THAT WERE FILED AT MIDNIGHT WE'LL FILE PROBABLY
24    AROUND LUNCHTIME.
25              OKAY?  BUT WE ARE WORKING ON THAT.  YOU
```

```
 1    WILL GET ALL OF THE STRINGER EXHIBITS.

 2              SO WITH REGARD TO THE NISHIBORI, IT WAS

 3    IN OUR RULING LAST NIGHT ON APPLE'S OBJECTIONS TO

 4    THE SAMSUNG SLIDES AND EXHIBITS.

 5              THAT WILL BE ADMITTED SOLELY FOR

 6    FUNCTIONALITY AND FOR NO OTHER PURPOSE, OKAY?

 7              AND I'M GOING TO INSTRUCT THE PARTIES,

 8    DURING YOUR OPENING STATEMENTS, YOU CAN ONLY SAY

 9    WHAT THE EXHIBITS WILL SHOW, WHAT THE WITNESSES

10    WILL TESTIFY TO.

11              THERE SHOULD BE NO ARGUMENT, NO

12    INFERENCES, NO ARGUING THE LAW, AND IF YOU DO THAT,

13    I'M GOING TO STOP YOU IN THE MIDDLE OF YOUR OPENING

14    AND ASK YOU TO PLEASE STOP ARGUING THE CASE.

15              AND I'M ALSO GOING TO TELL THE JURY AT

16    THE BEGINNING THAT OPENING STATEMENT IS NOT

17    EVIDENCE, THAT THE ATTORNEYS ARE MERELY TO STATE

18    WHAT THE EXHIBITS AND THE WITNESSES WILL SAY AND

19    ARE NOT TO ARGUE THE CASE AND NOT TO MAKE

20    INFERENCES AND START ARGUING THE LAW AND THAT, IF

21    THEY DO SO, I WILL STOP THEM IN MID-SENTENCE AND

22    ASK THEM TO PLEASE STOP ARGUING.  OKAY?

23              SO I'M JUST PUTTING EVERYONE ON NOTICE

24    THAT THAT'S WHAT'S GOING TO HAPPEN, SO PLEASE DON'T

25    CROSS THE LINE.
```

```
 1              NOW, WE HAVE AN ISSUE WITH ONE OF OUR

 2    JURORS ALREADY.  MS. FRIESEN HAS INDICATED THAT HER

 3    EMPLOYER WILL NOT PAY HER DURING THE TIME THAT SHE

 4    IS SERVING AS A JUROR IN THIS CASE AND THAT THIS

 5    WILL CAUSE HER A SEVERE FINANCIAL HARDSHIP BECAUSE

 6    OF THE LENGTH OF THIS CASE, AND THE STRESS OF THIS

 7    SITUATION IS CAUSING HER ANXIETY TO THE POINT WHERE

 8    SHE CANNOT SLEEP, SHE'S HAVING PANIC ATTACKS, HER

 9    HUSBAND HAD TO DRIVE HER TO THE COURTHOUSE TODAY.

10              SHE SAYS THAT THE COMMUTE AND THE TRAFFIC

11    ARE CAUSING HER GREAT ANXIETY AND SHE IS REQUESTING

12    THAT SHE BE DISMISSED AS A JUROR.

13              SHE APOLOGIZES FOR THE VERY LATE NOTICE.

14    SHE SAYS THAT YESTERDAY SHE WAS UNAWARE THAT SHE --

15    THAT HER EMPLOYER WOULD NOT PAY HER FOR THE

16    DURATION OF THIS TRIAL.

17              SO LET ME HEAR FROM COUNSEL AS TO WHAT

18    YOU ALL WOULD LIKE TO DO, WHETHER YOU WOULD LIKE TO

19    HAVE ANY ADDITIONAL VOIR DIRE OF MS. FRIESEN.

20              MR. MCELHINNY:  I DON'T THINK WE WANT ANY

21    FURTHER VOIR DIRE OF HER, YOUR HONOR.

22              (PAUSE IN PROCEEDINGS.)

23              MR. VERHOEVEN:  WE DON'T NEED ANY

24    ADDITIONAL VOIR DIRE, EITHER, YOUR HONOR.

25              THE COURT:  OKAY.  SO THEN ARE BOTH
```

```
 1    PARTIES CONSENTING TO HER DISMISSAL?

 2              MR. LEE:  THAT'S FINE FOR APPLE, YOUR

 3    HONOR.

 4              MR. VERHOEVEN:  YES, YOUR HONOR.

 5              THE COURT:  ALL RIGHT.

 6              NOW, LET ME ASK MS. PARKER BROWN IF YOU

 7    WOULD JUST ASK MS. FRIESEN TO COME OUT, PLEASE.

 8              THE CLERK:  SURE.

 9              (PAUSE IN PROCEEDINGS.)

10              THE CLERK:  JUDGE, SHE'S IN THE REST

11    ROOM.

12              THE COURT:  OKAY.

13              MR. QUINN:  YOUR HONOR?

14              THE COURT:  YES.

15              MR. QUINN:  MAY I ADDRESS THE ISSUE OF

16    SLIDES 11 TO 19 WHICH I WAS PREPARED TO ARGUE --

17              THE COURT:  NO.  NO.  WE HAVE HAD THREE

18    RECONSIDERATIONS ON THAT, OKAY?  YOU'VE MADE YOUR

19    RECORD.  I'VE RULED.  WE NEED TO GO FORWARD.

20              MR. QUINN:  YOUR HONOR, I BEG THE COURT.

21              THE COURT:  SAMSUNG HAS HAD TEN MOTIONS

22    FOR RECONSIDERATION.  I'M DOING, AS QUICKLY AS I

23    CAN, RULINGS TO GIVE YOUR TEAM AS MUCH ADVANCED

24    NOTICE FOR YOUR PREPARATION OF WITNESSES AND

25    EXHIBITS.
```

1          MR. QUINN:  YOUR HONOR, I'VE BEEN

2     PRACTICING 36 YEARS.  I'VE NEVER BEGGED THE COURT

3     LIKE I'M BEGGING THE COURT NOW TO HEAR ARGUMENT ON

4     THIS ISSUE.

5          THIS RELATES TO A CENTRAL ISSUE THAT HAS

6     BEEN IN THE CASE FROM THE VERY BEGINNING.  THERE

7     WAS NO -- THEY SAY, IN THEIR PAPERS THEY FILED LAST

8     NIGHT, WE DIDN'T DISCLOSE IT IN THE CONTENTION

9     INTERROGATORIES.

10          YOUR HONOR, THERE IS NO INTERROGATORY

11    THAT REQUIRED US TO DISCLOSE THAT, AND WE DID.  ALL

12    OF THAT WAS SERVED -- ALL THOSE IMAGES IN THOSE

13    SLIDES WERE SERVED IN FEBRUARY --

14          THE COURT:  I'VE GIVEN YOU --

15          MR. QUINN:  -- IN THE PRELIMINARY

16    INJUNCTION --

17          THE COURT:  -- AN ADDITIONAL OPPORTUNITY

18    TO BRIEF THIS ISSUE YESTERDAY, OKAY?  I REVIEWED

19    WHAT YOU FILED YESTERDAY.  I HEARD ARGUMENT ON THIS

20    YESTERDAY.

21          MR. QUINN:  ALL RIGHT.  YOUR HONOR,

22    WHAT'S THE POINT --

23          THE COURT:  I'VE GIVEN YOU THREE MOTIONS

24    FOR RECONSIDERATION.

25          MR. QUINN:  -- OF HAVING THE TRIAL?

```
 1    WHAT'S THE POINT?

 2            THEY WANT TO CREATE THE COMPLETELY FALSE

 3    IMPRESSION, YOUR HONOR, THAT WE CAME UP WITH THIS

 4    DESIGN AFTER JANUARY OF 2007 AND, YOUR HONOR, WHAT

 5    THIS SUGGESTS, WHAT THEY'RE SEEKING IS TO EXCLUDE

 6    INDISPUTABLE EVIDENCE THAT WE HAD THAT DESIGN

 7    PATENT IN 2006.

 8            AND WE CAME OUT WITH THAT PRODUCT IN

 9    FEBRUARY OF 2007.

10            THE COURT:  MR. QUINN, PLEASE.  PLEASE.

11    WE'VE DONE THREE RECONSIDERATIONS ON THIS AND WE

12    NEED TO MOVE FORWARD.  WE HAVE A JURY WAITING.

13            YOU'VE MADE YOUR RECORD.  YOU'VE MADE

14    YOUR RECORD FOR APPEAL.  OKAY?

15            MR. QUINN:  ALL RIGHT.  CAN I ASK THE

16    COURT FOR SOME EXPLANATION, YOUR HONOR?  THERE IS

17    NO INTERROGATORY THAT REQUIRED IT.  WE DID DISCLOSE

18    IT IN THE PRELIMINARY INJUNCTION PAPERS.  WE GAVE

19    THEM THE DOCUMENTS --

20            THE COURT:  MR. QUINN, PLEASE, DON'T MAKE

21    ME SANCTION YOU.  PLEASE.  PLEASE.

22            MR. QUINN:  SO I WON'T GET --

23            THE COURT:  YOU'VE HAD THREE

24    RECONSIDERATIONS MOTIONS.  YOU'VE HAD AT LEAST TWO,

25    IF NOT THREE, IF NOT FOUR OPPORTUNITIES TO BRIEF
```

```
 1    THIS.  OKAY?  PLEASE, TAKE A SEAT.

 2              MR. QUINN:  ALL RIGHT.

 3              THE COURT:  ALL RIGHT.  WOULD YOU BRING

 4    OUT MS. FRIESEN?

 5              MR. QUINN:  YOUR HONOR, AS A MATTER OF

 6    PERSONAL PRIVILEGE, MAY I CHANGE THE SUBJECT?

 7              THE COURT:  NO.

 8              MR. QUINN:  ABOUT --

 9              THE COURT:  NO.  I WANT YOU TO SIT DOWN,

10    PLEASE.

11              (WHEREUPON, THE FOLLOWING PROCEEDINGS

12    WERE HELD IN OF THE PRESENCE JUROR FRIESEN.)

13              THE COURT:  OKAY.  MS. FRIESEN, WE

14    UNDERSTAND THAT YOUR SERVICE WOULD BE A SEVERE

15    ECONOMIC HARDSHIP ON YOU, AS WELL AS PSYCHOLOGICAL.

16    IT'S JUST VERY STRESSFUL; CORRECT?

17              JUROR:  I'M HAVING ANXIETY ATTACKS DUE TO

18    THE COMMUTE.  I'M NOT A VERY GOOD DRIVER.

19              THE COURT:  NO PROBLEM.  YOU DON'T NEED

20    TO EXPLAIN ANY FURTHER.

21              WE WANT TO THANK YOU FOR YOUR SERVICE AND

22    TO APOLOGIZE FOR THE ANXIETY AND THE STRESS THAT

23    THIS HAS ALREADY CAUSED YOU.

24              JUROR:  I'M SORRY FOR THE INCONVENIENCE.

25    I'M -- I DIDN'T REALLY THINK THAT IT WOULD AFFECT
```

1    ME THIS BAD.

2                THE COURT:  NOT AT ALL A PROBLEM.

3                YOU ARE THANKED AND EXCUSED.  YOU HAVE

4    FULFILLED YOUR JURY DUTY OBLIGATION.

5                I'M JUST GOING TO ASK THAT YOU PLEASE GO

6    SEE MR. YOUNGER ON THE SECOND FLOOR AND JUST CHECK

7    OUT AND HE CAN GIVE YOU THE PAPERWORK TO DEAL WITH

8    YOUR MILEAGE AND YOUR OTHER JUROR FEES AND WHATNOT.

9    OKAY?

10               SO THANK YOU.  YOU'RE EXCUSED FROM THE

11   JURY.

12               JUROR:  THANK YOU.

13               (WHEREUPON, THE FOLLOWING PROCEEDINGS

14   WERE HELD OUT OF THE PRESENCE OF JUROR FRIESEN.)

15               THE COURT:  ALL RIGHT.

16               THE CLERK:  ARE WE READY?

17               THE COURT:  YES.  LET'S BRING THEM OUT.

18               YOU HAVE THE VIDEO; CORRECT?

19               MR. JACOBS:  YES, YOUR HONOR.

20               THE CLERK:  JUDGE, I JUST REALIZED THAT

21   WE'RE MISSING MR. ROGERS.  HE'S NOT HERE YET.

22               THE COURT:  OKAY.  WE'LL WAIT FOR HIM.

23   CAN SOMEONE CALL HIM AND SEE IF HE'S ON HIS WAY?

24               THE CLERK:  OKAY.  I'LL DO THAT.

25               THE COURT:  THANK YOU.

```
 1              THE CLERK:  SORRY.  THAT'LL TEACH ME NOT
 2   TO DO A HEAD COUNT.
 3              THE COURT:  ALL RIGHT.  DO WE HAVE THE
 4   ORDERS THAT WERE FILED ON SPRINGER?
 5              OH, HE'S HERE?  OH, OKAY, PERFECT.  LET'S
 6   BRING THEM OUT AGAIN.
 7              (WHEREUPON, THE FOLLOWING PROCEEDINGS
 8   WERE HELD IN THE PRESENCE OF THE JURY:)
 9              THE COURT:  MR. CATHERWOOD, IF YOU'D LIKE
10   TO SLIDE DOWN SO THERE'S NO EMPTY CHAIR.  GREAT.
11   ALL RIGHT.  THANK YOU.
12              THE CLERK:  YOU MAY BE SEATED.
13              THE COURT:  ALL RIGHT.  WOULD YOU PLEASE
14   SHOW THE FEDERAL JUDICIAL CENTER VIDEO.
15              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
16   OPEN COURT OFF THE RECORD.)
17              THE COURT:  ALL RIGHT.  MAY WE HAVE THE
18   LIGHTS BACK ON, PLEASE?  THANK YOU.
19              ALL RIGHT.  I'M GOING TO READ AN ADDENDUM
20   TO THIS VIDEO AND THEN THE PARTIES HAVE ASKED THAT
21   I SHOW YOU ONE SAMSUNG UTILITY PATENT AND ONE APPLE
22   DESIGN PATENT.  THEY'RE IN YOUR JURY NOTEBOOKS, SO
23   IN A MINUTE WE'LL GO THROUGH THEM TOGETHER.  BUT
24   LET ME READ YOU THIS STATEMENT FIRST.
25              LADIES AND GENTLEMEN OF THE JURY, YOU'VE
```

1    JUST WATCHED A VIDEO ABOUT THE AMERICAN PATENT

2    SYSTEM.  THE VIDEO TALKED ABOUT PATENTS IN GENERAL.

3              IN FACT, THERE ARE DIFFERENT KINDS OF

4    PATENTS AND YOU WILL SEE TWO TYPES IN THIS CASE,

5    UTILITY PATENTS AND DESIGN PATENTS.

6              EVERYTHING YOU JUST HEARD ABOUT PATENTS

7    IN THE VIDEO APPLIES TO UTILITY PATENTS.

8              HOWEVER, THERE ARE SOME DIFFERENT RULES

9    AND PROCEDURES THAT APPLY TO DESIGN PATENTS WHICH

10   THE VIDEO DID NOT TALK ABOUT.

11             FOR THAT REASON, I WANT TO EXPLAIN TO YOU

12   BRIEFLY WHAT THOSE DIFFERENCES ARE.

13             AS THE VIDEO DESCRIBED, UTILITY PATENTS

14   ARE DESIGNED FOR INVENTIONS AND, TO BE PATENTABLE,

15   AN INVENTION MUST BE BOTH NEW AND USEFUL.

16             DESIGN PATENTS, ON THE OTHER HAND, DO NOT

17   COVER INVENTIONS, BUT RATHER, AS THEIR NAME

18   SUGGESTS, THEY COVER DESIGNS.

19             TO BE PATENTABLE, A DESIGN MUST MEET A

20   DIFFERENT TEST.  IT MUST BE A NEW, ORIGINAL, AND

21   ORNAMENTAL DESIGN.

22             IN GENERAL, A UTILITY PATENT PROTECTS THE

23   WAY AN ARTICLE WORKS, WHILE A DESIGN PATENT

24   PROTECTS THE WAY AN ARTICLE LOOKS.

25             SINCE THE DESIGN IS SHOWN BY ITS

1    APPEARANCE, A DESIGN PATENT MAY RELATE TO THE

2    CONFIGURATION OR SHAPE OF AN ARTICLE, TO THE

3    SURFACE ORNAMENTATION APPLIED TO AN ARTICLE, OR TO

4    THE COMBINATION OF SHAPE AND SURFACE ORNAMENTATION.

5            SO ALTHOUGH YOU HEARD IN THE VIDEO THAT A

6    UTILITY PATENT MUST DESCRIBE A NEW AND USEFUL WAY

7    OF SOLVING A PROBLEM, THIS PROBLEM-SOLVING

8    REQUIREMENT DOES NOT APPLY TO DESIGN PATENTS.

9            THE VIDEO DESCRIBED A PATENT AS

10   REPRESENTING A BARGAIN MADE BETWEEN THE GOVERNMENT

11   AND THE INVENTOR OF A UTILITY PATENT.  THAT WAS THE

12   IDEA THAT THE INVENTOR WOULD ADD SOMETHING NEW AND

13   USEFUL TO THE STATE OF THE ART IN RETURN FOR THE

14   RIGHT TO KEEP OTHERS FROM USING THE INVENTION FOR A

15   PERIOD OF TIME.

16           THE SAME KIND OF BARGAIN IS STRUCK WITH A

17   DESIGN PATENT INVENTOR.  IN RETURN FOR ADDING A

18   NEW, ORIGINAL, AND ORNAMENTAL DESIGN TO THE PUBLIC

19   KNOWLEDGE, THE INVENTOR CAN KEEP OTHERS FROM USING

20   THE CLAIMED DESIGN AS SHOWN AND SET FORTH IN THE

21   DRAWINGS OF THE DESIGN PATENT FOR A SET PERIOD OF

22   TIME.

23           UTILITY PATENTS NORMALLY LAST FOR 20

24   YEARS, WHEREAS DESIGN PATENTS LAST 14 YEARS.

25           YOU ALSO HEARD THAT FOR A UTILITY PATENT,

1    CONCEPTION OF THE INVENTION OCCURS WHEN IT IS

2    FORMULATED IN THE MIND OF THE INVENTOR CLEARLY

3    ENOUGH THAT HE OR SHE CAN WRITE IT DOWN AND EXPLAIN

4    IT TO SOMEONE.

5              FOR A DESIGN PATENT, CONCEPTION HAPPENS

6    WHEN THE DESIGN IS FORMULATED CLEARLY ENOUGH IN THE

7    MIND OF THE INVENTOR THAT HE OR SHE CAN DRAW THE

8    DESIGN.

9              THE VIDEO DESCRIBED THE APPLICATION FOR A

10   UTILITY PATENT AS A WRITTEN DOCUMENT IN WHICH THE

11   INVENTOR DESCRIBED THE INVENTION HE OR SHE IS

12   TRYING TO PROTECT.

13             THIS IS THE SAME FOR DESIGN PATENTS,

14   EXCEPT THAT DESIGN PATENTS RELY ON FIGURES TO

15   DESCRIBE THE DESIGN AND DO NOT INCLUDE LENGTHY

16   WRITTEN DESCRIPTIONS.

17             A DESIGN PATENT HAS SIMILARITIES IN

18   FORMAT TO THE MAIN PARTS OF A UTILITY PATENT THAT

19   THE VIDEO JUST WALKED YOU THROUGH.

20             I WILL USE THE '677 DESIGN PATENT, WHICH

21   IS IN TAB 6 OF YOUR JURY NOTEBOOKS, TO IDENTIFY THE

22   BASIC PARTS OF A DESIGN PATENT.  THERE ARE MANY

23   SIMILARITIES TO UTILITY PATENTS, BUT THERE ARE ALSO

24   SOME DIFFERENCES.

25             WHY DON'T I FIRST SHOW YOU THE SAMSUNG

1       UTILITY PATENT.  AS I SAID YESTERDAY, WE USE THE

2       LAST THREE DIGITS TO DESCRIBE IT, THE '460, WHICH

3       IS TAB 15.

4               DO YOU HAVE THAT BEFORE YOU, TAB 15?

5               SO IN THE UPPER RIGHT-HAND CORNER, YOU

6       HAVE THE PATENT NUMBER.  WE HAVE THE FULL NUMBER,

7       BUT WE GENERALLY JUST REFER TO PATENTS BY THEIR

8       LAST THREE DIGITS.  THAT'S WHY WE SAY THE '460.

9               AS THE VIDEO SHOWED YOU, THE DATE OF THE

10      PATENT IS IN THE RIGHT-HAND CORNER; THE TITLE OF

11      THE PATENT IS AT THE TOP OF THE LEFT COLUMN; WHO

12      THE INVENTORS ARE; AND IF THE INVENTORS HAVE

13      ASSIGNED THEIR RIGHTS TO SOMEBODY, THE ASSIGNEE IS

14      LISTED ON THE LEFT COLUMN AS WELL.

15              AND THE FIELD OF CLASSIFICATION SEARCH,

16      WHICH WAS ALSO MENTIONED ON THE VIDEO, STARTS ON

17      THE BOTTOM LEFT-HAND CORNER; AND THE ABSTRACT, OR

18      THE SPECIFICATION, IS THE DESCRIPTION, AND THAT

19      BEGINS ON THE SECOND COLUMN ON PAGE 1.

20              AND AS YOU FLIP THROUGH IT, YOU CAN SEE

21      THE VARIOUS FIGURES THAT ARE INCLUDED, AND IF YOU

22      LOOK AT WHAT'S NUMBERED AT THE BOTTOM AS 14739 --

23      SO THE NUMBERS ON THE TOP, WHEN YOU HEAR A

24      DESCRIPTION, A LOT OF PEOPLE WILL SAY COLUMN 1,

25      LINE WHATEVER.  SO THE NUMBER AT THE TOP WHERE IT

```
 1    SAYS 1, THAT MEANS COLUMN 1.  THE NUMBER 2 ON THE
 2    TOP OF THE RIGHT-HAND COLUMN, THAT'S COLUMN 2.  SO
 3    YOU MAY HEAR THROUGHOUT THIS TRIAL PEOPLE REFER TO
 4    LINE NUMBERS AND COLUMN NUMBERS AND THAT'S WHAT
 5    WE'RE REFERRING TO.
 6              THE SMALL NUMBERS IN THE MIDDLE OF THE
 7    TWO COLUMNS, THOSE ARE THE LINE NUMBERS.  OKAY?
 8              AND AS THE VIDEO SAID, THERE IS, IN THIS
 9    SPECIFICATION, OR ALSO CALLED AN ABSTRACT, THE
10    BACKGROUND OF THE INVENTION, SUMMARY OF THE
11    INVENTION, A DESCRIPTION OF EMBODIMENTS.
12              AND THEN IF YOU LOOK AT THE VERY LAST
13    PAGE, WHICH IS BATES NUMBER 14745, IF YOU LOOK AT
14    COLUMN 14 WHERE YOU SEE THE NUMBER 1, A DATA
15    TRANSMITTING METHOD, THAT IS THE CLAIM.
16              OKAY?  SO IN THIS PARTICULAR CASE, IN
17    THIS PARTICULAR PATENT, THERE'S ONE CLAIM.  BUT
18    YOU'LL SEE WITH THE OTHER PATENTS THERE MAY BE MANY
19    MORE CLAIMS.
20              BUT I HOPE THAT'S CLEAR WHEN THE PARTIES
21    REFER TO COLUMN NUMBERS AND LINE NUMBERS WHAT
22    THEY'RE TALKING ABOUT.  OKAY?
23              NOW GO TO TAB NUMBER 6 IN YOUR JURY
24    BINDERS.  AND THAT IS APPLE'S DESIGN PATENT '677.
25              AND THE FIRST PAGE OF A DESIGN PATENT HAS
```

1    MUCH OF THE SAME MATERIAL AS THE UTILITY PATENT I

2    JUST SHOWED YOU.

3              IT HAS A PATENT NUMBER ASSIGNED BY THE

4    PTO IN THE UPPER RIGHT CORNER; AND ON THE LEFT

5    SIDE, THE TITLE; THE NAMES OF THE INVENTORS; AND

6    SOMETIMES THE COMPANY THE INVENTORS HAVE ASSIGNED

7    THE PATENT TO; THE FILING DATE OF THE APPLICATION;

8    THE NUMBERS FOLLOWING THE HEADING FIELD OF SEARCH,

9    WHICH IDENTIFY THE CATEGORIES OF PREVIOUSLY ISSUED

10   PATENTS THE EXAMINER LOOKED AT OR SEARCHED; AND THE

11   LIST OF REFERENCES CITED.

12             ONE DIFFERENCE YOU CAN SEE, HOWEVER, IS

13   THAT WHILE IN THE UTILITY PATENT, THE CLAIMS CAME

14   AT THE END, HERE THE CLAIM IS ON THE FIRST PAGE.

15             IN SOME PATENTS -- IN SOME DESIGN

16   PATENTS, THE CLAIM WILL BE ON A FOLLOWING PAGE.

17             ANOTHER DIFFERENCE YOU WILL NOTICE IN

18   LOOKING AT THE SAMPLE PATENT IS THAT A DESIGN

19   PATENT DOES NOT HAVE A LENGTHY WRITTEN DESCRIPTION,

20   WHICH YOU HEARD IS CALLED THE SPECIFICATION IN

21   UTILITY PATENTS.

22             AND WHILE IN A UTILITY PATENT THE CLAIMS

23   DESCRIBE THE PATENTED INVENTION IN WORDS, THE CLAIM

24   OF A DESIGN PATENT IS THE DESIGN AS SHOWN IN THE

25   FIGURES, INCLUDING THE DESCRIPTION OF THE FIGURES

1    IMMEDIATELY BELOW THE SECTION HEADED CLAIM.

2              THE CLAIM AND DESCRIPTION SECTIONS ARE

3    THEN FOLLOWED BY FIGURES THAT SHOW THE PATENTED

4    DESIGN AS CLAIMED.

5              I WILL INSTRUCT YOU LATER ON HOW TO

6    UNDERSTAND THE FIGURES AND THE DESIGN THAT IS

7    LEGALLY CLAIMED IN EACH DESIGN PATENT THAT IS IN

8    THIS CASE.

9              UNLIKE UTILITY PATENTS, A DESIGN PATENT

10   CAN HAVE ONLY A SINGLE CLAIM, ALTHOUGH THERE MAY BE

11   MORE THAN ONE EMBODIMENT OF THE CLAIMED DESIGN AS

12   SHOWN IN THE FIGURES.

13             WHERE A DESIGN PATENT IS EVENTUALLY

14   GRANTED BY THE PTO, THOSE DRAWINGS DEFINE THE

15   BOUNDARIES OF THE PATENT'S PROTECTION AND THE

16   NOTICE TO THE PUBLIC OF THE CLAIMED DESIGN.

17             THE VIDEO ALSO DISCUSSED HOW THE PTO

18   PROCESSES PATENT APPLICATIONS.  THE PROCESS IS

19   LARGELY THE SAME FOR DESIGN PATENTS IN THAT AN

20   EXAMINER WHO SPECIALIZES IN DESIGN PATENTS WILL

21   REVIEW THE APPLICATION, INCLUDING THE FIGURES, WILL

22   SEARCH THE PRIOR ART, AND WILL THEN MAKE A DECISION

23   ABOUT WHETHER THE DESIGN AS CLAIMED IS PATENTABLE.

24             JUST LIKE WITH UTILITY PATENTS, YOU MAY

25   ALSO BE ASKED TO DECIDE ABOUT VALIDITY; THAT IS,

```
1    WHETHER THE DESIGN PATENT SHOULD HAVE BEEN ALLOWED

2    AT ALL BY THE PTO.

3            FOR EXAMPLE, THE PTO MAY NOT HAVE HAD

4    AVAILABLE TO IT ALL THE PRIOR ART THAT WILL BE

5    PRESENTED TO YOU.

6            A PERSON ACCUSED OF INFRINGING HAS THE

7    RIGHT TO ARGUE IN FEDERAL COURT THAT THE PATENT OR

8    PATENTS ARE INVALID BECAUSE THEY DO NOT MEET THE

9    REQUIREMENTS FOR PATENTABILITY.

10            IN THE SAME WAY YOU HEARD ABOUT UTILITY

11   PATENTS ON THE VIDEO, THE PATENT OFFICE IS PRESUMED

12   TO HAVE DONE ITS JOB CORRECTLY IN ISSUING DESIGN

13   PATENTS, SO A PARTY SEEKING TO PROVE A DESIGN

14   PATENT INVALID MUST MEET THE HIGHER STANDARD OF

15   PROOF THAT APPLIES TO UTILITY PATENTS.

16            AND FINALLY, JUST AS WITH UTILITY

17   PATENTS, WHEN AN INFRINGEMENT CASE SUCH AS THIS ONE

18   IS BROUGHT, IT IS UP TO YOU, THE JURY, TO DECIDE

19   THE FACTS OF THE CASE BASED ON THE LAW THAT I WILL

20   GIVE YOU AT THE CONCLUSION OF THE TRIAL.

21            ALL RIGHT.  WITH THAT, WE ARE NOW GOING

22   TO MOVE TO OPENING STATEMENTS, AND IT'S CALLED

23   "OPENING STATEMENTS" FOR A REASON.  AT THE END OF

24   THE CASE YOU WILL HEAR CLOSING ARGUMENTS, AND IT'S

25   CALLED "ARGUMENT" FOR A REASON.
```

```
 1              IN A CLOSING ARGUMENT, THE PARTIES ARE

 2    ALLOWED TO ARGUE THE CASE, TO DRAW INFERENCES FROM

 3    THE EVIDENCE.

 4              AN OPENING STATEMENT IS CALLED A

 5    "STATEMENT" BECAUSE IT'S SUPPOSED TO BE A STATEMENT

 6    OF WHAT THE WITNESSES WILL TESTIFY TO AND WHAT ALL

 7    THE DOCUMENTS WILL SHOW.  ARGUMENT IS IMPROPER IN

 8    AN OPENING STATEMENT.

 9              I HAVE NOTIFIED THE ATTORNEYS THAT THEY

10    ARE NOT TO ARGUE IN AN OPENING STATEMENT, AND IF

11    THEY DO SO, I MAY STOP THEM IN THE MIDDLE OF THEIR

12    STATEMENT AND ASK THEM TO PLEASE NOT ARGUE.

13              SO WITH THAT, LET ME ASK IF THE

14    PLAINTIFFS WISH TO GIVE AN OPENING STATEMENT.

15              MR. MCELHINNY:  WE DO, YOUR HONOR.

16              THE COURT:  OKAY.  GO AHEAD, PLEASE.  YOU

17    HAVE -- THE TIME IS NOW 9:33.

18              MR. MCELHINNY:  THANK YOU.

19              (WHEREUPON, MR. MCELHINNY GAVE HIS

20    OPENING STATEMENT ON BEHALF OF APPLE.)

21              MR. MCELHINNY:  MAY IT PLEASE THE COURT.

22              GOOD MORNING.  MY NAME IS HAROLD

23    MCELHINNY.  I'LL USE A LITTLE BIT OF MY TIME TO

24    REPEAT SOME OF THE INTRODUCTIONS THAT YOU HEARD

25    YESTERDAY IN CASE YOU HAD OTHER THINGS ON YOUR MIND
```

```
 1    WHEN THE INTRODUCTIONS HAPPENED YESTERDAY.

 2             FIRST I'D LIKE TO INTRODUCE BRUCE SEWELL,

 3    WHO IS THE SENIOR VICE-PRESIDENT AND GENERAL

 4    COUNSEL OF APPLE AND IS MY BOSS.

 5             I WOULD ALSO LIKE TO TALK ABOUT THE TRIAL

 6    TEAM, BECAUSE THESE ARE THE PEOPLE THAT YOU'LL BE

 7    SEEING FROM TIME TO TIME.

 8             STARTING IN THE BACK ROW, YOU HAVE

 9    MARK SELWYN; YOU HAVE JOE MUELLER; YOU HAVE

10    FRANCIS HO; YOU HAVE RACHEL KREVANS; BILL LEE, WHO

11    YOU MET YESTERDAY; AND MIKE JACOBS; AND AS I SAID,

12    MY NAME IS HAROLD MCELHINNY, AND WE ARE THE TEAM

13    THAT REPRESENTS APPLE.

14             SO THERE IS GOOD NEWS AND THERE IS BAD

15    NEWS.  THE GOOD NEWS IS, AS THE JUDGE HAS TOLD YOU,

16    AND YOU CAN HEAR HER TALKING ABOUT THE CLOCK, SHE

17    HAS US ON A VERY STRICT SCHEDULE TO MAKE SURE THAT

18    WE DO NOT WASTE ANY OF YOUR TIME.  THAT'S THE GOOD

19    NEWS.

20             THE BAD NEWS IS WHAT THAT MEANS IS

21    THERE'S GOING TO BE A LOT OF TESTIMONY AND A LOT OF

22    EVIDENCE THAT'S GOING TO COME VERY QUICKLY AND, AND

23    IT WILL JUST COME.  BUT WHAT I WANT YOU TO

24    UNDERSTAND FROM THE BEGINNING IS THAT BILL LEE AND

25    I ARE THE LEAD TRIAL COUNSEL FOR APPLE.  IT IS OUR
```

```
 1    JOB TO MAKE SURE THAT THAT EVIDENCE COMES IN

 2    CLEARLY, THAT IT GIVES YOU WHAT YOU NEED TO DO YOUR

 3    JOB.

 4            AND EVERYBODY, THANK YOU FOR YOUR SERVICE

 5    YESTERDAY, AND I'LL JUST SAY FOR YOU AT THE END OF

 6    THIS, WE WANT YOU TO BE GLAD THAT YOU SERVED ON

 7    THIS JURY.

 8            ALTHOUGH THERE WILL BE A LOT OF FACTS AND

 9    THERE WILL BE A LOT OF TESTIMONY, LIKE MOST

10    DISPUTES, WE THINK THAT ULTIMATELY THIS WILL COME

11    DOWN TO TWO PRETTY SIMPLE QUESTIONS, AND THE FIRST

12    QUESTION IS THIS:  HOW DID SAMSUNG MOVE FROM THESE

13    PHONES -- AND THESE ARE THE PHONES THAT SAMSUNG WAS

14    SELLING IN THE YEAR 2006 -- HOW DID THEY MOVE TO

15    THESE PHONES WHICH THEY WERE SELLING IN 2010?

16            LET'S LOOK AT THOSE FIRST PHONES AGAIN.

17    I LOVE THIS PICTURE BECAUSE WHEN I FIRST LOOKED AT

18    THIS, I DIDN'T REMEMBER WHAT PHONES LOOKED LIKE IN

19    2006.  THERE WAS A LOT OF TESTIMONY YESTERDAY ABOUT

20    OLD CELL PHONES, AND THERE THEY ARE.

21            BUT THE QUESTION IS, HOW DID SAMSUNG MOVE

22    FROM HERE IN 2006 TO HERE IN 2010?

23            AND TO ANSWER THAT QUESTION, WE HAVE TO

24    GO BACK TO JANUARY 9TH, 2007.  THAT'S WHEN

25    STEVE JOBS INTRODUCING THE IPHONE AT THE MAC WORLD
```

```
1    CONFERENCE IN MOSCONE CENTER IN SAN FRANCISCO IN A

2    CONFERENCE ATTENDED BY THOUSANDS OF PEOPLE.

3               MR. JOBS, AT THAT CONFERENCE, CALLED THE

4    IPHONE THREE DEVICES IN ONE:  AN IPOD, A PHONE, AND

5    AN INTERNET DEVICE.

6               YOU WILL HEAR FROM APPLE WITNESSES WHO

7    WERE INVOLVED IN THAT CONFERENCE, AND WHAT THEY'RE

8    GOING TO TELL YOU IS THAT APPLE HAD A VISION THAT

9    TECHNOLOGY SHOULD BE ABOUT MUCH MORE THAN SIMPLY

10   FUNCTIONALITY.

11              IT SHOULD BE ABOUT EXPERIENCE, HOW YOU

12   REACT TO YOUR PRODUCTS.  A WORLD IN WHICH THE LOOK

13   AND FEEL OF A DEVICE AND THE WAY THAT IT INTERACTS

14   WITH THE USER WOULD BE JUST AS IMPORTANT AS WHAT

15   THE DEVICE WAS CAPABLE OF ACCOMPLISHING.

16              THE EVIDENCE WILL BE THAT APPLE HAS MADE

17   THAT VISION A REALITY, SO MUCH THAT NOW IT REALLY

18   IS HARD TO REMEMBER WHAT PHONES LOOKED LIKE BEFORE

19   THIS CONFERENCE.

20              BUT AT THE SAME TIME THAT MR. JOBS

21   ANNOUNCED THE IPHONE, HE WARNED HIS NEW COMPETITORS

22   THAT APPLE HAD FILED FOR PATENT PROTECTION FOR MORE

23   THAN 200 NEW INVENTIONS INCORPORATED IN THE IPHONE,

24   OVER 200 PATENT APPLICATIONS FOR NEW INVENTIONS IN

25   A DEVICE THIS SIZE (INDICATING).
```

1    LET'S THINK ABOUT WHAT THAT MEANS.  THE

2    IPHONE, LIKE ALL OF APPLE'S PRODUCTS FROM THE FIRST

3    MACINTOSH COMPUTER TO THE APPLE STORE DOWN THE

4    STREET, IS ABOUT CREATING A UNIQUE AND SPECIAL USER

5    EXPERIENCE, AN EXPERIENCE THAT IS SO SEAMLESS AND

6    INTUITIVE THAT IT JUST FEELS RIGHT.

7    IT DOESN'T COME EASY, AND THAT'S WHY THE

8    WITNESSES WHO COME HERE WILL TELL YOU ABOUT THE

9    TEAMWORK AND THE INNOVATION THAT IT TOOK IN ORDER

10   TO MAKE THIS A REALITY.

11   THE EXPERIENCE THAT USERS HAVE WITH

12   PRODUCTS LIKE THE IPHONE ARISES OUT OF THE

13   RELATIONSHIP BETWEEN THE MANY INTERVENTIONS -- THE

14   MANY INNOVATIONS AND INVENTIONS THAT GOT PULLED

15   TOGETHER INTO THIS NEW DEVICE, INNOVATIONS LIKE THE

16   BOUNCE BACK FEATURE.

17   IF WE THINK ABOUT IT, YOU KNOW THAT IN AN

18   IPAD OR AN IPHONE, WHENEVER YOU GET TO THE BOTTOM

19   OF A LIST, YOU KNOW YOU'RE AT THE BOTTOM OF A LIST

20   BECAUSE IT BOUNCES BACK.  IT'S A LITTLE THING -- IT

21   SEEMS LIKE A LITTLE THING, BUT IF YOU THINK ABOUT

22   IT, OTHERWISE IF IT STOPPED, YOU WOULD THINK YOUR

23   PHONE WAS BROKEN.  OR IF IT JUST KEPT GOING INTO

24   WHITE SPACE, YOU WOULDN'T KNOW WHERE YOU WERE ON

25   YOUR SCREEN.

1          OTHER INVENTIONS WERE THE BLACK TO BLACK

2     COMPLETE FLAT FACE OF THE PHONE, WHICH WAS A NEW

3     LOOK, A LOOK THAT DIDN'T EXIST, THAT DRAWS PEOPLE

4     INTO THE DEVICE AND MAKES THEM WANT TO USE IT.

5          EACH OF THOSE INNOVATIONS, THE DESIGN OF

6     THE THING, THE BOUNCE BACK FEATURE, ALL OF THOSE

7     THINGS WERE COVERED BY INDIVIDUAL PATENTS BECAUSE

8     THEY ARE CRITICAL COMPONENTS THAT YOU HAD TO PULL

9     ALL TOGETHER TO GET A PRODUCT THAT WOULD WORK FOR

10    THE FIRST TIME.

11          MANY OF US ARE AT LEAST GENERALLY

12    FAMILIAR WITH APPLE'S HISTORY.  IN 1984, APPLE

13    INTRODUCED THE MACINTOSH COMPUTER, A COMPETITOR IN

14    THE P.C.  IT WAS FAMOUS FOR ITS NEW DESIGN, THE USE

15    OF THE MOUSE, AND ITS DISTINCTIVE ICONS.

16          THEN IN 2001, APPLE SURPRISED THE WORLD

17    WITH THE IPOD, APPLE'S VERSION OF AN MP3 PLAYER,

18    AGAIN, A PRODUCT IDENTIFIED BY A UNIQUE DESIGN THAT

19    THE WORLD IMMEDIATELY IDENTIFIED AS AN APPLE

20    PRODUCT.

21          THE IPOD LINE HAS BEEN SO SUCCESSFUL THAT

22    TODAY, TEN YEARS LATER, APPLE STILL SELLS MILLIONS

23    OF THEM EVERY YEAR.

24          SO BY 2001, APPLE WAS A FAMOUS COMPUTER

25    COMPANY AND IT WAS A FAMOUS MUSIC COMPANY.

1           BUT AS YOU'RE GOING TO HEAR FROM THE

2    PEOPLE WHO WORKED THERE AT THE TIME WHO WERE

3    INVOLVED IN THIS, APPLE WAS NOT CONTENT TO STAY A

4    COMPUTER COMPANY AND A MUSIC COMPANY.

5           APPLE HAS ALWAYS BEEN A FORWARD-LOOKING

6    COMPANY.  IT ALWAYS HAS ITS EYE ON THE FUTURE.

7    PEOPLE ARE ALWAYS TALKING ABOUT WHAT WILL APPLE'S

8    NEXT PRODUCT BE?  THE PEOPLE AT APPLE ARE ALWAYS

9    TALKING ABOUT WHAT WILL THEIR NEXT PRODUCT BE?

10          AND SO IN 2003, APPLE BEGAN A RESEARCH

11   PROJECT.  IRONICALLY, AS YOU'LL HEAR, WHEN THEY

12   STARTED THE PROJECT, IT WASN'T ABOUT THE PHONE.

13   THEY STARTED WORKING ON WHAT EVENTUALLY BECAME THE

14   IPAD.

15          BUT AS THESE PEOPLE, AS THESE ENGINEERS,

16   AS THESE DESIGNERS GOT TOGETHER IN THEIR SMALL

17   GROUP THAT WAS WORKING ON IT AND THEY WERE

18   DISCUSSING ABOUT THE PRODUCTS, THEY SUDDENLY

19   REALIZED THAT WHAT THE WORLD REALLY NEEDED, WHAT IT

20   DIDN'T HAVE, WAS A PHONE THAT HAD THE CAPABILITIES

21   OF A COMPUTER.

22          AND SO APPLE BEGAN TO DESIGN AN ENTIRELY

23   NEW PRODUCT, A PHONE, A WEB BROWSER, AND A MUSIC

24   PLAYER, A PHONE THAT HAD A DESIGN THAT THE WORLD

25   HAD NEVER SEEN BEFORE.

1       PHYSICAL KEYBOARDS WOULD BECOME A THING

2    OF THE PAST.

3       YOU'LL HEAR THAT TO DO THIS REQUIRED

4    COMBINING THE TALENTS OF PEOPLE FROM VARIOUS --

5    FROM MANY DIFFERENT FIELDS.  IT REQUIRED AN

6    ENTIRELY NEW HARDWARE SYSTEM, THE MAC OS SYSTEM

7    WHICH WORKED ON A COMPUTER HAD TO BE TRANSPORTED SO

8    THAT IT WOULD WORK ON A DEVICE AS SMALL AS A PHONE.

9       IT REQUIRED AN ENTIRELY NEW USER

10   INTERFACE, AND THAT INTERFACE HAD TO BECOME

11   COMPLETELY INTUITIVE.

12      THINK ABOUT THIS FOR A MINUTE.  THINK

13   ABOUT THE FIRST TIME PEOPLE PICKED UP ONE OF THESE

14   DEVICES.  WHAT WAS INTERESTING ABOUT IT, WHAT

15   STRUCK ME -- AND YOU CAN TELL I AM NOT OF THE YOUNG

16   TECHIE GENERATION -- BUT WHAT STRUCK ME ABOUT THIS

17   WAS THERE IS NO MANUAL.  IT DOESN'T TEACH YOU HOW

18   TO DO IT.

19      YOU HAD TO WALK INTO THE STORE, YOU HAD

20   TO PICK IT UP, AND YOU HAD TO IMMEDIATELY GET DRAWN

21   INTO HOW TO USE THE DEVICE, BECAUSE IF THAT DIDN'T

22   HAPPEN IMMEDIATELY, YOU WOULD NEVER BUY IT.  YOU

23   WOULD PUT IT BACK, YOU WOULD SAY IT WAS TOO HARD,

24   THAT THE HUNDREDS AND THOUSANDS, THE MILLIONS OF

25   PEOPLE THAT NEEDED TO TAKE THIS DEVICE -- THAT

1    NEEDED TO BUY THIS DEVICE WOULD NOT BE ATTRACTED TO

2    IT UNLESS IT WORKED FOR THEM THE FIRST TIME THEY

3    PICKED IT UP.

4              AND TO MAKE THAT HAPPEN FOR PEOPLE WHO

5    HAD NEVER USED A TOUCH SCREEN BEFORE REQUIRED

6    FORWARD THINKING, FORWARD INVENTIONS, GADGETS,

7    FEATURES THAT WOULD DRAW PEOPLE INTO THE PRODUCT

8    ITSELF.

9              AND FINALLY, IT REQUIRED A UNIQUE DESIGN,

10   A PRODUCT THAT WOULD SAY TO PEOPLE, "THIS IS AN

11   APPLE PRODUCT.  IT IS NOT A PRODUCT THAT ANY OTHER

12   COMPANY HAS EVER MADE."

13             SO THAT IS -- THIS IS WHAT THE PEOPLE IN

14   CUPERTINO DEVELOPED LESS THAN TEN MILES FROM THIS

15   COURTHOUSE.  THAT'S WHAT THIS TEAM PUT TOGETHER.

16             JUST FOR A MOMENT, IF YOU CAN GO BACK IN

17   TIME, THINK OF WHAT A RISK THAT WAS FOR THE

18   COMPANY.  THEY WERE A SUCCESSFUL COMPUTER COMPANY.

19   THEY WERE A SUCCESSFUL MUSIC PLAYER COMPANY.

20             AND THEY WERE ABOUT TO ENTER A FIELD THAT

21   WAS DOMINATED BY GIANTS.  NOKIA, MOTOROLA, SAMSUNG,

22   ALL OF THESE PEOPLE WERE IN THE TELEPHONE BUSINESS.

23             SAMSUNG AND APPLE -- OR APPLE HAD

24   ABSOLUTELY NO NAME IN THE FIELD, NO CREDIBILITY.

25   IT WAS AN ENTRY INTO AN AREA THAT, IF IT HAD GONE

1    BAD, COULD HAVE ENDED THE COMPANY'S FUTURE.

2             WE ALL KNOW NOW THAT IT WAS A SUCCESS.

3    WE ALL KNOW NOW THAT IT WORKED.  WE ALL FORGET

4    ABOUT HISTORY AND HOW THEY GOT THERE.  WE ALL

5    FORGET ABOUT THE RISKS.

6             BUT ON JANUARY 9TH, 2007 WHEN STEVE JOBS

7    AND PHIL SCHILLER -- YOU'LL MEET MR. SCHILLER,

8    HE'LL COME HERE AND TESTIFY -- WENT THROUGH THAT

9    PRESENTATION, THEY WERE LITERALLY BETTING THEIR

10   COMPANY.

11            CRITICAL ACCLAIM FOR THE IPHONE WAS

12   IMMEDIATE.  ON JANUARY 11TH, 2007, THE NEW YORK

13   TIMES COMPARED APPLE TO THE FAIRY GODMOTHER IN

14   CINDERELLA, WAVING A WAND AT SOME HOMELY AND

15   UTILITARIAN OBJECT, THE ORDINARY CELL PHONE, AND

16   TURNING IT INTO SOMETHING GLAMOROUS AND EXCITING,

17   THE IPHONE.

18            TIME MAGAZINE NAMED THE IPHONE THE 2007

19   INVENTION OF THE YEAR.  THEY CALLED IT -- THIS IS

20   THEIR WORDS, THIS IS NOT AN APPLE AD, THIS IS

21   TIME MAGAZINE -- THE PHONE THAT HAS CHANGED PHONES

22   FOREVER.  AND THEY SAID THE IPHONE IS CRITICAL.

23            THINK ABOUT THAT FOR A MOMENT.  APPLE HAS

24   CHANGED A PHONE INTO SOMETHING GLAMOROUS AND

25   AMAZING.  THE PHONE THAT HAS CHANGED PHONES

```
 1    FOREVER.
 2              PRESTIGIOUS PROFESSIONAL ORGANIZATIONS,
 3    AS YOU'LL HEAR, HAVE GIVEN IT AWARDS FOR ITS DESIGN
 4    AND ITS INGENUITY.  WE'LL TALK SPECIFICALLY, WHEN
 5    ONE OF THE DESIGNERS COMES, ABOUT THIS DESIGN ART
 6    DIRECTION AWARD, WHICH IS GENERALLY CONSIDERED TO
 7    BE THE HIGHEST ACHIEVEMENT IN THE DESIGN FIELD FOR
 8    A PRODUCT.
 9              THE WORLD IMMEDIATELY RECOGNIZED, THESE
10    PEOPLE, THESE CRITICS IMMEDIATELY RECOGNIZED THAT
11    APPLE HAD DONE SOMETHING NEW AND REVOLUTIONARY,
12    BOTH IN TERMS OF THE NATURE OF THE DEVICE, AND IN
13    TERMS OF THE NATURE OF THE DESIGN.
14              BUT YOU KNOW, AND THE REASON WE'RE HERE
15    IS BECAUSE APPLE PROTECTED EACH OF THESE INVENTIONS
16    WITH PATENTS.
17              YOU HEARD ABOUT, IN THE MOVIE, THE U.S.
18    PATENT AND TRADEMARK OFFICE.  WHAT YOU'LL HEAR
19    ABOUT HERE IS THAT EVEN THE PATENT AND TRADEMARK
20    OFFICE HAS RECOGNIZED THE SIGNIFICANCE OF APPLE'S
21    INVENTIONS AND THE IMPORTANCE OF THE PATENT
22    PROTECTIONS THAT APPLE HAS BEEN AWARDED.
23              THIS -- YOU SAW ONE OF THOSE THINGS IN
24    THE PRESENTATION.  THIS IS ANOTHER PRESENTATION
25    THAT THE PTO DID LAST DECEMBER, WHICH HAS NOW BEEN
```

```
 1    MOVED TO THE SMITHSONIAN MUSEUM AS A PERMANENT

 2    EXHIBIT, ABOUT THE IMPORTANCE OF THE APPLE

 3    INVENTIONS AND THE DESIGNS THAT HAVE BEEN AWARDED.

 4            SO APPLE ENTERS THE PHONE FIELD.

 5            APPLE'S COMPETITORS IMMEDIATELY RECOGNIZE

 6    THE IMPACT OF THIS NEW DEVICE.  THESE COMPETITORS

 7    INCLUDED, AS I MENTIONED, SAMSUNG ELECTRONICS

 8    CORPORATION, WHICH IS ONE OF THE THREE DEFENDANTS

 9    IN THIS CASE.

10            BUT AS YOU WILL HEAR, SAMSUNG IS NOT ONLY

11    A COMPETITOR OF APPLE.  IT IS ALSO ONE OF APPLE'S

12    MAJOR SUPPLIERS.

13            APPLE, LIKE MOST OTHER COMPANIES, BUYS

14    COMPONENTS FROM SUPPLIERS.  APPLE REGULARLY MEETS

15    WITH THOSE SUPPLIERS TO DESCRIBE FOR THEM THE

16    SEMICONDUCTORS AND OTHER COMPONENTS IT WILL NEED

17    FOR ITS PRODUCTS.

18            AND AS APPLE HAS BECOME MORE AND MORE

19    SUCCESSFUL, APPLE HAS PURCHASED MORE AND MORE PARTS

20    FROM SAMSUNG, BILLIONS OF DOLLARS FOR ELECTRONIC

21    PARTS YEAR AFTER YEAR.

22            SO AS BOTH A PHONE MAKER AND A SUPPLIER,

23    SAMSUNG SUDDENLY FOUND ITSELF COMPETING WITH ITS

24    LARGEST CLIENT.

25            BUT AS THE MAGAZINE ARTICLES SAY, IN
```

```
1    2007, APPLE CHANGED PHONES FOREVER.

2              WHAT DID THAT MEAN?

3              IT MEANT THAT A COMPETITOR LIKE SAMSUNG

4    COULD NOT CONTINUE TO MAKE THE SAME KINDS OF

5    PHONES, THE 2006 PHONES, THAT IT USED TO MAKE.

6              IT MEANT THAT APPLE HAD INVENTED

7    SOMETHING THAT WAS SO UNIQUE AND INNOVATIVE THAT

8    CUSTOMERS WOULD NO LONGER ACCEPT THE DEVICES THAT

9    LOOKED AND ACTED -- THAT DIDN'T HAVE TOUCH SCREENS,

10   FOR EXAMPLE.

11             FACED WITH THIS REALITY, THE EVIDENCE

12   WILL SHOW THAT SAMSUNG HAD TWO CHOICES:  IT COULD

13   ACCEPT THE CHALLENGE OF THE IPHONE, IT COULD CREATE

14   ITS OWN PRODUCTS, IT COULD INNOVATE, IT COULD COME

15   UP WITH ITS OWN DESIGNS, IT COULD BEAT APPLE FAIRLY

16   IN THE MARKETPLACE; OR IT COULD COPY APPLE.

17             SAMSUNG COULD LOOK AT THE DETAILS OF THE

18   IPHONE, DETAILS LIKE THE BOUNCE BACK FIGURE --

19   BOUNCE BACK FEATURE AND THE FLAT GLASS FACE AND

20   SAMSUNG COULD COPY THAT.

21             NOW, AS WE ALL KNOW, IT'S EASIER TO COPY

22   THAN TO INNOVATE.  IT'S FAR LESS RISKY BECAUSE, AS

23   THE EVIDENCE WILL SHOW, APPLE HAD ALREADY TAKEN THE

24   RISKS.  APPLE HAD INTRODUCED SOMETHING THAT WAS

25   WILDLY SUCCESSFUL IN THE MARKETPLACE.
```

```
 1              SO WHAT WILL THE EVIDENCE SHOW THAT

 2     APPLE'S TRUSTED SUPPLIER DID WHEN THE IPHONE WAS

 3     INTRODUCED?

 4              WE'RE GOING TO LOOK AT SAMSUNG'S OWN

 5     INTERNAL DOCUMENTS.

 6              NOW, AS YOU PROBABLY KNOW, IN LAWSUITS

 7     LIKE THIS, AS PART OF THE PROCESS, EACH COMPANY IS

 8     REQUIRED TO TURN ITS SECRET, CONFIDENTIAL, INTERNAL

 9     DOCUMENTS OVER TO THE LAWYERS FOR THE OTHER SIDE.

10     SO WE, AS THE LAWYERS FOR APPLE, HAVE HAD THE

11     OPPORTUNITY TO LOOK AT SAMSUNG'S INTERNAL

12     DOCUMENTS.

13              WHAT I'M ABOUT TO SHOW YOU ARE SAMSUNG

14     INTERNAL DOCUMENTS, TRANSLATIONS OF THEM, THAT HAVE

15     NEVER BEEN SEEN IN PUBLIC BEFORE.  APPLE DIDN'T

16     KNOW ABOUT THESE DOCUMENTS AT THE TIME THAT THEY

17     WERE CREATED.

18              SHORTLY AFTER THE IPHONE HIT THE MARKET,

19     ONE SAMSUNG DIVISION PREPARED THIS FEASIBILITY

20     REVIEW -- THIS IS AN ENGLISH TRANSLATION.  THIS

21     WILL BE EXHIBIT 34.  WHEN THE TRIAL IS ALL OVER,

22     YOU WILL ACTUALLY HAVE THIS PHYSICAL DOCUMENT IN

23     THE JURY ROOM WITH YOU -- TO ANALYZE THE IMPACT

24     THAT THE IPHONE WAS HAVING ON SAMSUNG'S MARKET.

25              THE PHONE FOCUSSED ON THE IPHONE'S USER
```

```
 1        INTERFACE AND ITS BEAUTIFUL DESIGN.

 2             "BEAUTIFUL DESIGN."  THESE WERE SAMSUNG'S

 3        OWN WORDS AT THE TIME.

 4             AND IT CONCLUDED, "COMPETING WITH THE

 5        IPHONE ONE WAY OR THE OTHER IS INEVITABLE."

 6             AND THEN IT NOTED -- H.W. STANDS FOR

 7        HARDWARE -- "THE HARDWARE PORTION IS EASY TO COPY."

 8             EXHIBIT 36 IS A SAMSUNG SURVEY FROM 2008

 9        DESCRIBING WHAT CONSUMERS WERE TELLING SAMSUNG'S

10        INTERVIEWERS ABOUT THE BEAUTIFUL NEW APPLE PRODUCT.

11        TOUCH PORTFOLIO -- BECAUSE THESE PHONES HAVE TOUCH

12        SCREENS, SO A TOUCH PORTFOLIO RELATES TO PHONE THAT

13        IS OPERATED FROM A TOUCH SCREEN.

14             THE PEOPLE IN THE MARKETPLACE WERE

15        TELLING SAMSUNG, CONSUMERS WERE SAYING THE IPHONE

16        HAS CHANGED THEIR NOTION OF WHAT A PHONE CAN AND

17        SHOULD DO.  IT'S NOT JUST USABLE.  IT'S NOT JUST

18        FUNCTIONAL.  IT'S ENJOYABLE, ENGAGING, AND COOL.

19             THEY SAID IT'S FUN.  IT SAYS THE GESTURES

20        LIKE THE TWO FINGERED PINCH AND FLICK, YOU'LL SEE

21        THAT -- YOU KNOW THAT ON PICTURES WHERE YOU CAN

22        EXPAND THE PICTURE JUST BY PINCHING IT OR PULLING

23        IT TOGETHER OR PULLING IT APART, THAT'S ONE OF THE

24        PATENTS IN THIS CASE -- AND IN 2008, CONSUMERS WERE

25        TELLING SAMSUNG THAT THAT WAS ONE OF THE THINGS
```

1      THAT THEY IMMEDIATELY NOTICED ABOUT THE PHONE.

2              AND THEY SAID IT WAS WHIMSICAL BECAUSE

3      THE LISTS BOUNCED.

4              THESE ARE A FEW OF THE FEATURES THAT

5      IMMEDIATELY CAPTURED THE PUBLIC'S ATTENTION.

6              SO AS THE MARKET TURNED AGAINST SAMSUNG'S

7      OWN DESIGNS, AT ITS HIGHEST CORPORATE LEVELS,

8      SAMSUNG DECIDED SIMPLY TO COPY EVERY ELEMENT OF THE

9      IPHONE.

10             SAMSUNG MAY BRING A COUPLE OF DESIGNERS

11     TO THIS TRIAL TO TELL YOU THAT THEY PERSONALLY

12     DIDN'T COPY.

13             BUT THE PRODUCTS THEY DESIGNED AND THE

14     DOCUMENTS THAT SAMSUNG HAS PROVIDED TELL A MUCH

15     DIFFERENT STORY.

16             LET'S LOOK AT EXHIBIT 40.

17             EXHIBIT 40 ARE NOTES FROM A FEBRUARY 2010

18     EXECUTIVE LEVEL MEETING SUPERVISED BY THE HEAD OF

19     SAMSUNG'S MOBILE PHONE DIVISION, J.K. SHIN, THE

20     HEAD OF THEIR MOBILE PHONE DIVISION.

21             MR. SHIN TOLD THE ASSEMBLED SAMSUNG

22     EXECUTIVES -- THIS IS 2010 -- THAT THE USER

23     INTERFACE OF SAMSUNG'S THEN CURRENT OFFERING, WHICH

24     WAS CALLED THE OMNIA -- AND HERE'S A PICTURE OF

25     WHAT THE OMNIA LOOKED LIKE, YOU SEE THE BUTTONS

1    DOWN AT THE BOTTOM.

2            SO HE'S TALKING ABOUT THE OMNIA AND HE

3    SAYS THE USER INTERFACE OF SAMSUNG'S OMNIA COULD

4    NOT COMPETE WITH THE IPHONE.

5            HE SAID THE IPHONE HAS BECOME THE

6    STANDARD.  HE TALKED ABOUT THE USER EXPERIENCE --

7    THAT'S -- THE U.S. IS USER EXPERIENCE -- BETWEEN

8    THE OMNIA AND THE IPHONE AND HE SAID IT IS A

9    DIFFERENCE BETWEEN HEAVEN AND EARTH.

10           IN 2010, THE HEAD OF THEIR MOBILE PHONE

11   DIVISION TOLD HIS EXECUTIVES THAT SAMSUNG FACED,

12   QUOTE, "A CRISIS OF DESIGN."

13           FINALLY, MR. SHIN TOLD HIS SENIOR

14   EXECUTIVES THAT THEIR MAJOR CUSTOMERS, THE PHONE

15   CARRIERS, WERE URGING SAMSUNG TO, QUOTE, "MAKE

16   SOMETHING LIKE THE IPHONE."

17           EVEN IF THESE DOCUMENTS THEMSELVES DIDN'T

18   SHOW COPYING, THE PRODUCTS THEMSELVES LEAD US TO AN

19   INESCAPABLE CONCLUSION.

20           AGAIN, THIS CHART SHOWS WHAT SAMSUNG'S

21   PHONES LOOKED LIKE BEFORE THE IPHONE.  THERE'S A

22   PHONE IN THERE THAT LOOKS LIKE THE PALM, AND SEE

23   THE ONE THAT LOOKS LIKE THE BLACKBERRY?

24           THIS CHART SHOWS THE PHONES THAT SAMSUNG

25   INTRODUCED RIGHT AFTER THE IPHONE CAME OUT FOR THE

1    NEXT PERIOD OF TIME.

2              THE ONE THAT IS CALLED AN F700 IS WHAT'S

3    CALLED A SLIDER PHONE.  YOU WOULD SLIDE IT OPEN TO

4    GET TO THE KEYBOARD.

5              BUT FINALLY, AFTER CAREFULLY MONITORING

6    APPLE'S SUCCESS AND THE FAILURE OF ITS OWN DESIGNS,

7    IN JUNE 2010, SAMSUNG INTRODUCED THE

8    GALAXY S I9000, A COMPLETE IPHONE CLONE.  SINCE

9    THEN THE SUCCESS OF THE GALAXY SERIES HAS LED TO A

10   SERIES OF IPHONE KNOCK-OFFS.

11             AGAIN, YOU DON'T HAVE TO TAKE OUR WORD

12   FOR IT.  CRITICS IMMEDIATELY CHIDED SAMSUNG FOR THE

13   OBVIOUS COPYING.  P.C. WORLD SAYS, "HOW FAMILIAR IT

14   LOOKED.  THE DESIGN IS ACTUALLY VERY

15   IPHONE 3GS-LIKE."

16             WIRED MAGAZINE WAS EVEN TOUGHER.  IT

17   SAYS, "SAMSUNG RIPS OFF THE IPHONE 3G DESIGN,

18   SHOCKINGLY SIMILAR."  THEY CALLED SAMSUNG'S DESIGN

19   A "DERIVATIVE DESIGN."

20             BUT SAMSUNG SIMPLY IGNORED THIS CRITICISM

21   AND PLOWED AHEAD WITH ITS STRATEGY.

22             PHONES AREN'T THE ONLY PRODUCTS INVOLVED

23   IN THIS CASE.  ON JANUARY 7, 2010, APPLE REPEATED

24   ITS SUCCESS BY INTRODUCING THE IPAD.

25             DO YOU BELIEVE THE IPAD HAS ONLY BEEN

1    AROUND FOR TWO YEARS?

2              AGAIN, CRITICAL ACCLAIM WAS IMMEDIATE.

3    TIME MAGAZINE NAMED THE IPAD AS ONE OF THE 50 BEST

4    INVENTIONS OF THE YEAR.  THEY SAID THAT APPLE IS

5    THE FIRST COMPANY THAT DESIGNED FINGER-FRIENDLY

6    HARDWARE AND SOFTWARE FROM SCRATCH, REINVENTING A

7    PRODUCT CATEGORY THAT ITS COMPETITORS HAVE GIVEN UP

8    ON.

9              TIME MAGAZINE CALLED IT MAGICAL AND THEY

10   CALLED IT REVOLUTIONARY.

11             AGAIN, NOT OUR WORDS.  THE WORDS OF

12   CRITICS AT THE TIME.

13             SAMSUNG IMMEDIATELY INTRODUCED AN EXACT

14   COPY INTO THE MARKETPLACE.

15             THIS IS WHAT SAMSUNG'S TABLET LOOKED LIKE

16   BEFORE THE IPAD WAS ANNOUNCED, AND THIS IS THE

17   GALAXY TAB 10.1 THAT SAMSUNG RELEASED A YEAR AGO IN

18   JUNE OF 2011 (INDICATING).

19             AGAIN, CRITICS IMMEDIATELY ATTACKED

20   SAMSUNG FOR ITS OBVIOUS COPYING.

21             ON MARCH 22ND, 2011, FAST COMPANY WROTE,

22   "SAMSUNG'S ANTI-IPAD 2 POLICY:  CLONE THE HECK OUT

23   OF IT."

24             THEY CALLED IT PRETTY MUCH CLONES OF

25   APPLE'S OFFERING.

```
1              AND IN WORDS THAT I MAY REPEAT IN THE
2    CLOSING, THEY SAID, "SAMSUNG HAS THROWN IN THE
3    TOWEL ON INNOVATIVE TABLET DESIGN AND HAS REALIZED
4    IT HAS TO MATCH APPLE'S SUCCESSFUL DESIGN TO
5    CAPTURE ANY MEANINGFUL MARKET SHARE."
6              TO BE CLEAR, SAMSUNG DID NOT SIMPLY COPY
7    THE OUTWARD APPEARANCE OF APPLE'S PHONE AND TABLET.
8              SAMSUNG COPIED EVERY DETAIL, INCLUDING
9    THE SPECIFIC PATENTED INVENTIONS THAT WE WILL TALK
10   ABOUT IN THIS TRIAL.
11             THIS WAS NOT ACCIDENTAL.  SAMSUNG'S
12   COPYING WAS INTENTIONAL.
13             IN THIS TRIAL, YOU WILL SEE DOCUMENTS
14   THAT SHOW HOW OVER 100 TIMES SAMSUNG MADE DETAILED
15   CHANGES TO ITS PHONE AND TABLETS SO THAT THE END
16   RESULT WAS IDENTICAL TO APPLE PRODUCTS.
17             THIS DOCUMENT WILL BE EXHIBIT 44, AND
18   AGAIN, YOU'LL HAVE IT IN THE JURY ROOM WHEN WE'RE
19   DONE.  THIS WAS THE ORIGINAL KOREAN DOCUMENT THAT
20   CAME FROM SAMSUNG.
21             WHEN YOU LOOK THROUGH IT, AND I'LL SHOW
22   YOU A PAGE IN A MINUTE, BUT WHEN YOU LOOK THROUGH
23   IT, YOU WILL SEE THAT FOR OVER 100 PAGES, EVERY
24   PAGE HAS A COMPARISON OF THE SI PHONE, WHICH
25   SAMSUNG WAS WORKING ON AT THE TIME, WITH THE
```

1    IPHONE, PAGE AFTER PAGE AFTER PAGE OF THIS

2    DOCUMENT.

3              AND IF WE LOOK AT A SAMPLE PAGE, EVERY

4    SINGLE ONE OF THE PAGES IN THE REPORT FOLLOWS THIS

5    SAME FORMAT.

6              AT THE TOP IT IDENTIFIES A DIFFERENCE

7    BETWEEN THE GALAXY S I AND THE IPHONE.  HERE YOU

8    CAN SEE THE BLUE HEADING AT THE TOP AND THEN THE

9    BULLET POINT BELOW WHERE IT SAYS, HERE'S THE WAY

10   THEY DO IT IN THE IPHONE, AND THE IPHONE -- AND

11   SOMETIMES IT'S HARD TO TELL THE DIFFERENCE, BUT THE

12   IPHONE IS ON THE LEFT -- AND HERE'S THE WAY THE

13   GALAXY S I DOES IT ON THE RIGHT.

14             AND THEN AT THE BOTTOM IT HAS WHAT'S

15   CALLED DIRECTIONS FOR IMPROVEMENT, AND IN EVERY

16   CASE, OVER 100 PAGES, IT RECOMMENDS COPYING OR

17   MAKING IT IDENTICAL TO THE IPHONE.

18             ON THIS PARTICULAR PAGE, YOU'LL SEE THAT

19   SAMSUNG CHANGED ITS ICONS TO LOOK MORE LIKE APPLE'S

20   ICONS, EVEN THOUGH THE APPLE ICON DESIGN WAS

21   PROTECTED BY THE U.S. DESIGN PATENT, ONE OF THE

22   ONES THAT'S IN YOUR BINDER.

23             EXHIBIT 57 FROM 2011 IS A SIMILAR REPORT,

24   BUT THIS ONE -- AGAIN, AN ENGLISH TRANSLATION THAT

25   YOU'RE SEEING HERE -- COVERS TABLET DESIGN.

1           THIS PAGE FROM THE REPORT COMPARES A

2      SAMSUNG TABLET THAT WAS UNDER DEVELOPMENT TO THE

3      IPAD 2.

4           NOW, IN THIS ONE THE SAMSUNG TABLET IS ON

5      THE LEFT AND THE IPAD IS ON THE RIGHT.

6           SAMSUNG SAYS THAT LEGIBILITY IS NOT

7      GOOD -- TALKING ABOUT ITS OWN -- AS THE ICON LABEL

8      IS TOO SMALL IN PROPORTION TO THE LARGE SCREEN.  IT

9      REMARKS THAT THE IPAD 2 HAS LARGE ICONS AND LABELS.

10          SO SAMSUNG RECOMMENDS THE PROPOSED

11     IMPROVEMENT OF INCREASING THE SIZE OF ICONS AND

12     LABELS IN ORDER TO MATCH THE IPAD 2.

13          AGAIN, YOU WILL HAVE THIS EXHIBIT AND

14     YOU'LL SEE THAT THERE ARE MANY PAGES IN THE RECORD,

15     EACH ONE A SIDE-BY-SIDE COMPARISON AND EACH ONE A

16     DECISION TO COPY APPLE.

17          TO BE BLUNT, THE TESTIMONY IS GOING TO

18     SHOW YOU THAT SAMSUNG HAS NOT BEEN HONEST ABOUT

19     THIS COPYING.

20          BEFORE WE GOT THE DOCUMENTS THAT I JUST

21     SHOWED YOU, AT THE VERY BEGINNING OF THIS CASE, AT

22     A TIME WHEN WE WERE TALKING ABOUT A SUBSET OF THE

23     PATENTS THAT ARE AT ISSUE, NOT ALL OF THEM, BUT A

24     SUBSET, AND A SUBSET OF THE PRODUCTS THAT ARE AT

25     ISSUE, NOT ALL OF THE ONES THAT ARE NOW, WE WERE

```
 1    ABLE TO QUESTION A SAMSUNG CORPORATE SPOKESMAN

 2    UNDER OATH ABOUT COPYING.

 3              THIS WAS A WITNESS THAT SAMSUNG HAD

 4    CHOSEN TO BE THEIR CORPORATE SPOKESMAN ON THE

 5    SUBJECT OF COPYING.

 6              HIS NAME IS JUSTIN DENISON.  AND THIS IS

 7    WHAT MR. DENISON TESTIFIED.

 8              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

 9    OPEN COURT OFF THE RECORD.)

10              MR. MCELHINNY:  "IN EACH CASE, THE

11    DESIGNERS SAID THEY HAD NOT."

12              THAT WAS TESTIMONY UNDER OATH IN THIS

13    CASE.

14              AS I MENTIONED SEVERAL TIMES, APPLE HAS

15    TAKEN STEPS TO PROTECT THE HUNDREDS OF INVENTIONS

16    THAT WENT INTO ITS PRODUCTS, AND IN RECOGNITION OF

17    APPLE'S CREATIVITY, THE U.S. PATENT AND TRADEMARK

18    OFFICE HAS AWARDED APPLE HUNDREDS OF PATENTS,

19    PATENTS THAT COVER ITS UNIQUE AND BEAUTIFUL

20    DESIGNS; PATENTS THAT COVER VARIOUS ASPECTS OF THE

21    HARDWARE OF ITS PRODUCTS; AND PATENTS THAT COVER

22    THE SOFTWARE THAT SUPPORT APPLE'S INSTANTLY

23    RECOGNIZED USER INTERFACE.

24              OBVIOUSLY WE CAN'T PURSUE THE HUNDREDS OF

25    PATENTS THAT COVERED THE IPHONE IN THIS -- AND THE
```

```
1    IPAD, I KNOW THIS WILL DISAPPOINT YOU, BUT WE CAN'T

2    DO 100 PATENTS IN THIS TRIAL.

3              SO WHAT WE HAVE DONE IS WE HAVE SELECTED

4    A SPECTRUM, A HANDFUL OF PATENTS BECAUSE WE WANT TO

5    CONVINCE YOU THAT SAMSUNG HAS COPIED THE ENTIRE

6    DESIGN USER EXPERIENCE.

7              SPECIFICALLY, IN THIS CASE WE WILL

8    PRESENT 12 CLAIMS FOR YOU TO CONSIDER.  FIRST IS

9    GOING TO BE THE DESIGN -- THE INFRINGEMENT OF FOUR

10   DESIGN PATENTS.

11             DESIGN PATENTS, AS JUDGE KOH JUST

12   EXPLAINED TO YOU, ARE PATENTS THE U.S. GOVERNMENT

13   AWARDS TO NEW AND NOVEL DESIGNS.

14             IN MAY 2009, APPLE WAS AWARDED A PATENT,

15   THE D'087 THAT COVERS THE DESIGN SHOWN IN THESE

16   FEATURES.

17             THE DESIGN INCLUDES THE FLAT FRONT FACE,

18   ALONG WITH THE BEZEL THAT SURROUNDS THE FRONT FACE

19   OF THE IPHONE.  THE BEZEL IS THE METAL PIECE THAT

20   SURROUNDS THE FACE THAT'S HIGHLIGHTED NOW IN THE

21   PICTURE.

22             LOOK AT THE SAMSUNG VIBRANT, WHICH IS

23   JUST ONE OF THE SAMSUNG PHONES THAT WE ACCUSE OF

24   INFRINGING.  IT HAS THE SAME FLAT FRONT SURFACE AND

25   A BEZEL SURROUNDING THE FRONT FACE.
```

```
 1          IN JUNE 2010, APPLE WAS AWARDED -- YOU
 2    WILL HAVE THESE, BY THE WAY.  YOU WILL HAVE THESE
 3    PHONES IN THE JURY ROOM.  YOU'LL HAVE THE PHYSICAL
 4    PHONES THEMSELVES SO THAT YOU CAN COMPARE THEM AND
 5    MAKE YOUR DETERMINATION AT THE END OF TRIAL.
 6          IN JUNE 2010, APPLE WAS AWARDED THE D'677
 7    PATENT THAT COVERS THE DESIGNS SHOWN IN THESE
 8    FIGURES.  THE DESIGN INCLUDES THE FLAT BLACK
 9    TRANSPARENT GLASS FRONT FACE OF THE IPHONE.
10          HERE'S A DIFFERENT SAMSUNG PHONE, THE
11    FASCINATE.  IT HAS THE SAME BLACK -- I CAN'T SAY
12    THIS -- SAME FLAT BLACK TRANSPARENT GLASS FRONT
13    FACE THAT RUNS EDGE TO EDGE ACROSS THE ENTIRE
14    SURFACE.
15          IN NOVEMBER 2009, APPLE WAS AWARDED A
16    PATENT THAT COVERS THE DESIGNS SHOWN IN THESE
17    FIGURES.  I ALREADY SHOWED YOU ONE OF THE SAMSUNG
18    INTERNAL DOCUMENTS THAT SHOWS SAMSUNG'S DECISION TO
19    COPY THIS DESIGN.
20          AND HERE IS ANOTHER SAMSUNG PHONE, THE
21    GALAXY S I9000.  IT HAS ROWS OF ICONS AND SQUARES
22    WITH ROUNDED CORNERS AND IT HAS THE BOTTOM ROW OF
23    ICONS THAT NEVER CHANGES -- IT'S CALLED A DOCK --
24    THAT IS OFFSET AGAINST A DIFFERENT BACKGROUND, JUST
25    LIKE THE D'305 DESIGN PATENT.
```

```
 1              AND FINALLY, IN MAY 2005, APPLE WAS
 2    AWARDED THE D'889 PATENT, A PATENT THAT COVERS THE
 3    TABLET DESIGN SHOWN IN THESE FIGURES.
 4              AND HERE IS THE GALAXY, SAMSUNG GALAXY
 5    TAB 10.1 WHICH HAS THE SAME RECTANGULAR SHAPE WITH
 6    FOUR EVENLY ROUNDED CORNERS AND AN EDGE TO EDGE
 7    TRANSPARENT FRONT SURFACE.
 8              OBVIOUSLY I CAN'T ANTICIPATE ALL OF THE
 9    ARGUMENTS SAMSUNG IS GOING TO RAISE TO EXPLAIN WHAT
10    IT HAS DONE, AND YOU WILL HEAR FROM SAMSUNG'S
11    LAWYER AS SOON AS I SIT DOWN -- WELL, AS SOON AS
12    WE'RE DONE.
13              BUT I DO KNOW ONE THING THAT THEY'RE
14    GOING TO SAY AND I WANT TO MENTION IT NOW.
15              SAMSUNG IS GOING TO TELL YOU THAT APPLE'S
16    DESIGNS ARE FUNCTIONAL, NOT ORNAMENTAL, AND THAT
17    EVERYONE WHO WANTS TO DESIGN A PHONE HAS TO DO IT
18    IN THE WAY THAT APPLE HAS CHOSEN TO DO IT.
19              I THINK OF THIS AS THE
20    DEVIL-MADE-ME-DO-IT DEFENSE.
21              FIRST, DON'T GET CONFUSED BY THE
22    LANGUAGE.  JUST BECAUSE A PRODUCT HAS A FUNCTION,
23    JUST BECAUSE YOU DO SOMETHING WITH IT DOESN'T MEAN
24    THAT THERE IS ONLY ONE WAY TO DESIGN IT.
25              YOU'VE ALREADY SEEN, AND YOU'VE -- YOU'VE
```

```
 1    ALREADY SEEN 20 DIFFERENT DESIGNS FOR IPHONES, CELL

 2    PHONES.  OBVIOUSLY THERE ARE MANY WAYS TO DO THAT.

 3           IT CANNOT BE TRUE THAT SAMSUNG HAD TO

 4    COPY APPLE'S DESIGNS.

 5           THE NEXT THREE PATENTS ARE UTILITY

 6    PATENTS, AND THEY COVER USER INTERFACE DESIGNS THAT

 7    HELP TO DEFINE A DISTINCTIVE WAY IN WHICH APPLE'S

 8    TOUCH SCREEN RESPONDS TO INPUTS FROM THE USER.

 9           THE FIRST IS THE '381 PATENT.  THE '381

10    PATENT COVERS WHAT WE'VE BEEN CALLING THE BOUNCE

11    BACK FEATURE.  EVERYONE WHO HAS EVER USED AN APPLE

12    DEVICE RECOGNIZES THAT WHEN THEY GET TO THE EDGE OF

13    AN ELECTRONIC DOCUMENT, THE IMAGE GETS PULLED OUT

14    AND THEN BOUNCES BACK TO ITS BORDER.  IT WORKS FOR

15    PICTURES, LISTS, WEB PAGES, AND OTHER TYPES OF

16    ELECTRONIC DOCUMENTS.

17           WE WILL PROVE THAT SAMSUNG IS INFRINGING

18    CLAIM 19 OF THE '381 PATENT.  CLAIM 19 SETS OUT IN

19    VERY PRECISE LANGUAGE THE USE OF A TOUCH SCREEN

20    DISPLAY TO SHOW WHEN SOMEONE HAS REACHED THE EDGE

21    OF AN ELECTRONIC DOCUMENT BY SHOWING THE AREA

22    BEYOND THE EDGE OF THE DOCUMENT AND THEN HAVING THE

23    DOCUMENT APPEAR TO BOUNCE BACK.

24           UNFORTUNATELY, PATENTS TEND TO BE WRITTEN

25    IN TECHNICAL LANGUAGE, BUT YOU'RE GOING TO GET HELP
```

1    UNDERSTANDING THE TERMS FROM TWO DIFFERENT SOURCES.

2            FIRST, AS SHE TOLD YOU YESTERDAY,

3    JUDGE KOH HAS DEFINED SEVERAL OF THE TERMS IN THE

4    CLAIMS THAT YOU JUST SAW FOR YOU AND YOU'LL FIND

5    THOSE DEFINITIONS IN YOUR JURY BINDER.

6            SECOND, WE'RE GOING TO CALL EXPERTS TO

7    WORK THROUGH THE CLAIMS WITH YOU.  FOR THIS PATENT,

8    WE'RE GOING TO CALL DR. RAVIN BALAKRISHNAN.  HE

9    WILL EXPLAIN THAT THE WORD, FOR EXAMPLE, THAT THE

10   WORD "TRANSLATE" IN THIS CLAIM MEANS "MOVE" IN

11   PLAIN ENGLISH.  SO THIS CLAIM COVERS MOVING AN

12   ELECTRONIC DOCUMENT.

13           LET ME SHOW YOU A VIDEO OF HOW THIS WORKS

14   ON THE IPHONE.

15           (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

16   OPEN COURT OFF THE RECORD.)

17           MR. MCELHINNY:  THE HISTORY OF THIS

18   FEATURE IS FASCINATING.  I THINK I TOLD YOU ABOUT

19   THIS A MINUTE AGO.  YOU'LL HEAR ABOUT THIS FROM

20   SCOTT FORSTALL, WHO IS THE HEAD OF THE OPERATING

21   SYSTEMS AT APPLE.

22           BUT WHEN THEY WERE PLAYING WITH THIS, IF

23   YOU DIDN'T DO THAT, IF IT JUST DIDN'T MOVE ANY

24   MORE, YOU WOULD THINK THAT YOUR SCREEN HAD STUCK OR

25   YOU WOULD THINK THAT YOUR COMPUTER -- THAT YOUR

```
 1    PHONE HAD BROKEN.
 2             SO THEY WANTED TO GIVE YOU A SIGN WHERE
 3    IT ENDS, PARTICULARLY IF YOU WERE SCROLLING THROUGH
 4    A LIST AND ALL OF A SUDDEN, IT COMES TO A DEAD
 5    HALT, IT WASN'T A NATURAL REACTION.
 6             BUT IF YOU DON'T DO THAT AND THE SCREEN
 7    DISAPPEARS OFF AND YOU'RE LEFT WITH JUST WHITE
 8    SPACE, THEY HAD WHAT THEY CALLED A
 9    LOST-IN-THE-DESERT EFFECT BECAUSE YOU DIDN'T KNOW
10    WHICH WAY THEN TO NAVIGATE.
11             AND SO COMING UP WITH AN ATTRACTIVE --
12    YOU SAW IT IN THE SURVEY, IT SAYS IT CAUGHT
13    PEOPLE'S ATTENTION, A WAY TO SIGNIFY, TO SHOW THAT
14    YOU'VE COME TO THE END OF A LIST WAS A SIGNIFICANT
15    IMPROVEMENT IN THIS TECHNOLOGY.
16             AS IT TURNS OUT, SAMSUNG'S INTERNAL
17    DOCUMENTS ACTUALLY DISCUSS THIS FEATURE IN GREAT
18    DETAIL.  LET'S SEE WHAT THEY SAY.
19             THIS IS EXHIBIT 46.  IT'S ANOTHER SAMSUNG
20    REPORT SIMILAR TO THE ONES I SHOWED YOU EARLIER, A
21    SERIES OF SIDE-BY-SIDE COMPARISONS BETWEEN THE
22    IPHONE AND A SAMSUNG PHONE.
23             PAGE 66 OF THIS REPORT MENTIONS THAT THE
24    IPHONE, THIS TIME ON THE RIGHT, HAS A FEATURE,
25    QUOTE, "WHERE IF A WEB PAGE IS DRAGGED TO THE EDGE
```

```
1     AND THE HAND IS RELEASED, A BOUNCING VISUAL EFFECT
2     IS PROVIDED."
3               ON THE OTHER HAND, TALKING ABOUT THEIR
4     OWN PHONE, ON THE LEFT THEY SAID IT'S PLAIN BECAUSE
5     IT HAS NO SPECIAL EFFECTS.
6               SO SAMSUNG'S DIRECTION OF IMPROVEMENT WAS
7     TO, QUOTE, "PROVIDE A FUN, VISUAL EFFECT WHEN
8     DRAGGING A WEB PAGE."
9               SO WHAT FUN, VISUAL EFFECT DID SAMSUNG
10    CHOOSE?  LET'S LOOK AT THE VIDEO AGAIN.  THIS IS
11    THE IPHONE.
12              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
13    OPEN COURT OFF THE RECORD.)
14              MR. MCELHINNY:  AND THIS IS THE BOUNCE
15    FEATURE USING THE SAME PICTURE ON A SAMSUNG VIBRANT
16    PHONE.
17              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
18    OPEN COURT OFF THE RECORD.)
19              MR. MCELHINNY:  LET'S LOOK AT THE NEXT
20    PATENT, THE '163 PATENT.
21              THE '163 PATENT COVERS MANY WAYS IN WHICH
22    A USER CAN USE A GESTURE TO ZOOM INTO A PICTURE OR
23    A DOCUMENT AND THEN USE A SECOND GESTURE TO CENTER
24    OR EXPAND THE IMAGE.
25              IN THIS PATENT, WE'LL BE TALKING ABOUT
```

1    CLAIM 50.

2              AGAIN, YOU CAN SEE THAT THE CLAIM TALKS

3    ABOUT USING A TOUCH SCREEN AND USING A FIRST

4    GESTURE -- IN THE CASE WE'RE TALKING ABOUT, THAT

5    FIRST GESTURE WILL BE WHAT'S CALLED A DOUBLE TAP --

6    TO ENLARGE AND CENTER THE PICTURE AND THEN USING A

7    SECOND GESTURE TO MOVE THE FOCUS TO A SECOND AREA

8    OF THE PICTURE.

9              THIS IS WHAT IT LOOKS LIKE ON THE IPHONE.

10             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

11   OPEN COURT OFF THE RECORD.)

12             MR. MCELHINNY:  THERE'S THE FIRST

13   GESTURE, DOUBLE TAP.  VERY USEFUL IF YOU'RE READING

14   WEB PAGES, NEWSPAPERS.  IT MAKES IT EASY SO THAT

15   YOU DON'T HAVE TO ZOOM BACK OUT, FIND A NEW

16   ARTICLE, AND MOVE.

17             IT'S -- AGAIN, I WANT TO GO BACK TO HOW

18   THESE PRODUCTS HAVE TO SELL THEMSELVES.  THEY HAD

19   TO BE INTUITIVE.

20             ONCE AGAIN, IN THIS LITIGATION, SAMSUNG

21   HAS PRODUCED DOCUMENTS THAT INESCAPABLY SHOW THEY

22   COPIED IT.

23             THIS IS ITEM 53 -- WE'RE STILL TALKING

24   ABOUT EXHIBIT 44 THAT I SHOWED YOU EARLIER -- AND

25   THE PROBLEM THAT'S IDENTIFIED IS THAT A SINGLE

1    DOUBLE TAP ONLY SUPPORTS ZOOM, BUT YOU COULD NOT

2    GET THE ZOOMED IN SCREEN TO MOVE.  YOU HAD TO GO

3    BACK OUT AGAIN TO MOVE INSIDE.

4           ON THE LEFT-HAND SIDE OF THIS CHART, THEY

5    NOTE THAT THE IPHONE ALLOWS THE USER TO ZOOM INTO A

6    PORTION OF THE SCREEN WHICH THE SAMSUNG GALAXY S I

7    ON THE RIGHT DIDN'T.

8           SO WHAT WAS THE SUGGESTED IMPROVEMENT?

9    "DOUBLE TAP ZOOM IN/OUT FUNCTION NEEDS TO BE

10   SUPPLEMENTED."

11          HERE'S ANOTHER SAMSUNG DOCUMENT THAT

12   ADDRESSES ZOOMING.  THIS ONE IS EXHIBIT 38.  THIS

13   DOCUMENT ACTUALLY IS IMPORTANT FOR A COUPLE OF

14   REASONS.

15          I DO KNOW THAT IN THIS TRIAL, SAMSUNG IS

16   GOING TO SAY, "HEY, WE DIDN'T COPY.  WE SIMPLY

17   BENCHMARKED.  WE SIMPLY COMPARED OUR PRODUCTS TO

18   APPLE'S PRODUCTS AND EVERYBODY IN THE ELECTRONICS

19   INDUSTRY BENCHMARKS."

20          THEY'RE GOING TO SAY EVEN APPLE

21   BENCHMARKS.

22          BUT SAMSUNG'S DOCUMENTS SHOW US THAT

23   BENCHMARKING HAD A VERY SPECIAL MEANING AT SAMSUNG.

24   HERE, AFTER VERY CAREFULLY COMPARING ITS PHONES TO

25   THE IPHONE, SAMSUNG ADOPTED THE FOLLOWING DESIGN

1    AND RESEARCH RECOMMENDATION CONCERNING BROWSER

2    ZOOMING METHODS.

3            IT SAYS "ADOPT DOUBLE TAP AS A

4    SUPPLEMENTARY ZOOMING METHOD."

5            IT SAYS, "THE USER EXPERIENCE OF THE

6    IPHONE CAN BE USED AS A DESIGN BENCHMARK."

7            THAT'S NOT A COMPARISON.  THAT IS A

8    DIRECTION.

9            LET'S LOOK AT THE IPHONE AGAIN.

10            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

11    OPEN COURT OFF THE RECORD.)

12            MR. MCELHINNY:  AND NOW WE'LL LOOK AT THE

13    DOUBLE TAP TO ZOOM FEATURE ON A GALAXY -- ON A

14    SAMSUNG GALAXY S II PHONE.

15            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

16    OPEN COURT OFF THE RECORD.)

17            MR. MCELHINNY:  THEN WE HAVE THE '915

18    PATENT.  YOU HAVE TO GO BACK AND REMEMBER, TOUCH

19    SCREEN TECHNOLOGY ON THESE PHONES, A COMPREHENSIVE

20    TOUCH SCREEN SYSTEM WAS ENTIRELY NEW.

21            SO THE TOUCH SCREEN HAD TO BE ABLE TO

22    TELL THE DIFFERENCE BETWEEN VARIOUS GESTURES.  IT

23    HAD TO BE ABLE TO INTERPRET WHAT PEOPLE WERE DOING

24    WITH THEIR FINGERS ON THE SCREEN.

25            THE '915 PATENT COVERS A UNIQUE FEATURE

```
1    THAT LETS THE DEVICE DISTINGUISH BETWEEN TWO

2    DIFFERENT GESTURES SO THAT THE DEVICE KNOWS WHEN

3    THE USER WANTS TO SCROLL TO THE NEXT DOCUMENT OR

4    SCROLL FASTER OR WHEN THE USER WANTS TO ZOOM IN ON

5    THE DOCUMENT IN FRONT OF IT.

6            IN THIS PATENT WE'RE ASSERTING CLAIM 8.

7            FORGIVE ME, BUT I THINK THIS CLAIM IS

8    ACTUALLY RELATIVELY EASY TO UNDERSTAND.  IT TALKS

9    ABOUT RECEIVING A USER INPUT AND THEN DETERMINING

10   WHETHER THE USER WANTS A SCROLL, WHICH WOULD BE A

11   SINGLE INPUT ON THE TOUCH SENSITIVE DISPLAY, OR A

12   GESTURE, WHICH IT WOULD BE CALLED IF THE USER

13   TOUCHED AT TWO OR MORE POINTS.

14           LET ME SAY THAT IN ENGLISH.  ONE FINGER

15   ON THE SCREEN GETS YOU A SCROLL.  TWO OR MORE

16   FINGERS ON THE SCREEN GETS YOU A GESTURE THAT DOES

17   SOMETHING DIFFERENT.

18           THIS IS THE PATENTED FEATURE AS SHOWN ON

19   THE IPHONE.  ONE FINGER, SCROLL.  TWO FINGER

20   EXPANDS THE PICTURE.

21           (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

22   OPEN COURT OFF THE RECORD.)

23           MR. MCELHINNY:  AND THIS IS THE SAME

24   FEATURE AS SHOWN ON THE SAMSUNG GALAXY S II PHONE.

25           (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
```

1    OPEN COURT OFF THE RECORD.)

2              MR. MCELHINNY:  AGAIN, WHAT IS SAMSUNG

3    GOING TO SAY ABOUT THIS?  AGAIN, I DON'T KNOW

4    EVERYTHING THEY'RE GOING TO SAY.  WE'LL HAVE TO

5    HEAR FROM THEM.

6              BUT I DO KNOW THAT IN THIS CASE THEY HAVE

7    DESCRIBED THESE INVENTIONS AS TRIVIAL.

8              LET'S THINK ABOUT THAT FOR A MINUTE.

9              FIRST, AND WE'LL ASK THEIR WITNESSES, IF

10   THESE WERE TRIVIAL, WHY DID THEY SHOW UP IN YOUR

11   CUSTOMER SURVEYS AND WHY DID YOU COPY THEM?

12             BUT, TWO, THE REAL ANSWER IS MUCH,

13   MUCH -- IT TIES TO WHAT I'M TALKING ABOUT ABOUT THE

14   IMPORTANCE OF PEOPLE INTUITIVELY BEING ABLE TO USE

15   THESE DEVICES.

16             THERE ARE NO CLASSES ON HOW TO USE AN

17   IPAD.  MY FOUR-YEAR-OLD GRANDDAUGHTER TAUGHT

18   HERSELF HOW TO USE AN IPAD BECAUSE IT JUST WORKS

19   NATURALLY.

20             WHEN YOU PUT YOUR FINGER ON THE SCREEN OF

21   AN IPAD TO SCROLL A LIST, IT'S AS THOUGH YOU'RE

22   PUTTING YOUR FINGER THROUGH THE SCREEN AND ACTUALLY

23   MOVING THE LIST ITSELF.

24             WHEN YOU PUT YOUR FINGERS ON TO EITHER

25   EXPAND OR CONTRACT A PICTURE, IT'S AS THOUGH YOU

1    WERE ACTUALLY MANIPULATING THE PICTURE ITSELF.

2            THESE WERE INVENTIONS.  THESE ARE

3    CRITICAL TO THE SUCCESS OF THESE PRODUCTS.  THEY

4    HAD NEVER BEEN SEEN BEFORE.  AND APPLE GOT PATENTS

5    ON THEM.

6            SO FAR, WE HAVE DISCUSSED DESIGN PATENTS

7    AND UTILITY PATENTS AND YOU'RE THINKING I SHOULD BE

8    DONE, BUT I HAVE ONE MORE GROUP THAT I HAVE TO TALK

9    ABOUT.

10           YOU'RE ALSO GOING TO FIND THAT SAMSUNG

11   HAS INFRINGED AND DILUTED WHAT THE LAW CALLS THE

12   TRADE DRESS OF CERTAIN APPLE PRODUCTS.

13           JUDGE KOH DEFINED IT FOR US YESTERDAY IN

14   HER PRELIMINARY INSTRUCTIONS.  IT'S JUST GENERALLY

15   THE WAY A PERSON PRESENTS THEIR PRODUCT TO THE

16   MARKETPLACE, EVEN WHEN THEY DON'T HAVE A SPECIFIC

17   PATENT, SO THAT THE MARKETPLACE RECOGNIZES THE

18   SOURCE OF THAT PRODUCT.

19           WE HAVE ASSERTED SEVERAL CLAIMS RELATED

20   TO THE IPHONE TRADE DRESS AND IPAD TRADE DRESS.

21           THESE ARE THE ELEMENTS OF THE TRADE DRESS

22   THAT ARE RELATED TO THE IPHONE.

23           IT IS A RECTANGULAR PRODUCT WITH FOUR

24   EVENLY ROUNDED CORNERS; IT HAS A FLAT CLEAR SURFACE

25   COVERING THE FRONT OF THE PRODUCT; IT HAS THE

1    APPEARANCE OF A METALLIC BEZEL AROUND THE FLAT

2    CLEAR SURFACE; IT HAS A DISPLAY SCREEN UNDER THE

3    CLEAR SURFACE; UNDER THE CLEAR SURFACE, SUBSTANTIAL

4    BLACK BORDERS ABOVE AND BELOW THE DISPLAY SCREEN

5    AND NARROW BLACK BORDERS ON EITHER SIDE OF THE

6    SCREEN; WHEN THE DEVICE IS ON, IT HAS A ROW OF

7    SMALL DOTS ON THE DISPLAY SCREEN; AND IT HAS A

8    MATRIX OF COLORFUL SQUARE ICONS WITH ROUNDED

9    CORNERS; AND AT THE BOTTOM, A DOCK OF COLORFUL

10   SQUARE ICONS SET OFF FROM OTHER ICONS THAT DOES NOT

11   CHANGE AS OTHER PAGES OF THE USER INTERFACE ARE

12   VIEWED.

13          WHENEVER A CUSTOMER SEES AN ELECTRONIC

14   DEVICE WITH THESE CHARACTERISTICS, THEY THINK THEY

15   ARE SEEING AN APPLE PRODUCT.

16          BUT ONCE AGAIN, SAMSUNG HAS SIMPLY

17   ADOPTED APPLE'S DISTINCTIVE WORK.  THIS IS THE

18   GALAXY S 4G USING APPLE'S IPHONE TRADE DRESS.

19          WE HAVE ALSO ASSERTED A CLAIM RELATED TO

20   THE IPAD TRADE DRESS.  THAT TRADE DRESS INCLUDES A

21   RECTANGULAR PRODUCT WITH FOUR EVENLY ROUNDED

22   CORNERS; A FLAT CLEAR SURFACE COVERING THE FRONT OF

23   THE PRODUCT; THE APPEARANCE OF A METALLIC RIM

24   AROUND THE FLAT CLEAR SURFACE; A DISPLAY SCREEN

25   UNDER THE CLEAR SURFACE; UNDER THE CLEAR SURFACE,

1    SUBSTANTIAL NEUTRAL BORDERS ON ALL SIDES OF THE

2    DISPLAY SCREEN; AND WHEN THE DEVICE IS ON, A MATRIX

3    OF COLORFUL SQUARE ICONS WITH ROUNDED CORNERS

4    WITHIN THE DISPLAY.

5              WHENEVER A CUSTOMER SEES AN ELECTRONIC

6    DEVICE WITH THESE CHARACTERISTICS, THEY THINK THEY

7    ARE LOOKING AT AN APPLE PRODUCT.

8              THIS, HOWEVER, IS A GALAXY, SAMSUNG

9    GALAXY TAB 10.1 USING EVERY ELEMENT OF APPLE'S

10   DISTINCTIVE IPAD TRADE DRESS.

11             YOU WILL HEAR THAT APPLE DID NOT SIT

12   QUIETLY BY WHEN SAMSUNG STARTED SELLING ITS

13   INFRINGING PRODUCTS.  WHEN THESE PRODUCTS STARTED

14   TO COME OUT --

15             REMEMBER, WE ARE A LARGE CUSTOMER.  AND

16   WHEN THESE PRODUCTS CAME OUT, APPLE MET WITH

17   SAMSUNG, AND YOU'LL HEAR ABOUT THIS, ON SEVERAL

18   OCCASIONS TO POINT OUT THAT SAMSUNG WAS ACTING

19   ILLEGALLY AND TO DEMAND THAT SAMSUNG DEVELOP ITS

20   OWN DESIGNS AND ITS OWN USER INTERFACE.

21             THAT IS, YOU CAN AND WILL SEE THESE

22   MEETINGS HAD NO POSITIVE EFFECT ON SAMSUNG.

23             AT THE CONCLUSION OF THIS TRIAL, WE'RE

24   GOING TO ASK YOU TO FIND THAT SAMSUNG HAS INFRINGED

25   OUR DESIGN PATENTS, INFRINGED OUR UTILITY PATENTS,

1    AND INFRINGED AND DILUTED OUR TRADE DRESS.

2            THEN, AS A SEPARATE QUESTION, WE ARE

3    GOING TO ASK YOU TO FIND THAT SAMSUNG'S

4    INFRINGEMENT WAS WHAT THE JUDGE WILL DEFINE FOR YOU

5    AS WILLFUL.

6            THE EVIDENCE WILL BE THAT EVEN THOUGH

7    SAMSUNG KNEW WE HAD THESE PATENTS, IT FAILED TO

8    TAKE REASONABLE STEPS TO MAKE SURE THAT IT DID NOT

9    INFRINGE.

10           WE ARE ABOUT TO START THIS TRIAL BECAUSE

11   SAMSUNG REFUSES TO STOP USING APPLE'S INTELLECTUAL

12   PROPERTY.

13           UNDER U.S. LAW, A PERSON WHO INFRINGES A

14   PATENT HAS TO PAY DAMAGES TO MAKE THE PATENT OWNER

15   WHOLE.  THESE DAMAGES CAN INCLUDE THE PROFITS THAT

16   SAMSUNG MADE USING APPLE'S DESIGNS, THE PROFITS

17   APPLE LOST BECAUSE SAMSUNG USED ITS UTILITY

18   PATENTS, WHAT THE LAW CALLS A REASONABLE ROYALTY,

19   OR SOME COMBINATION OF THREE.

20           NOW, I'LL BE HONEST WITH YOU THROUGHOUT

21   THE ENTIRE TRIAL, BUT I'LL START RIGHT NOW.

22   ACTUALLY, I STARTED A LITTLE WHILE EARLIER, BUT

23   I'LL START RIGHT NOW.

24           THERE ARE PEOPLE, PEOPLE WHO COMMONLY SAY

25   TO APPLE, "WE DON'T GET IT.  YOU'RE A VERY

```
 1     SUCCESSFUL COMPANY.  YOU'RE SELLING A LOT OF

 2     PRODUCTS.  YOU'RE MAKING A LOT OF MONEY.  WHAT DO

 3     YOU REALLY CARE IF SOMEBODY IS USING THESE DESIGNS?

 4     WHY DO YOU CARE ABOUT THAT?"

 5              TO PUT IT QUITE BLUNTLY, PEOPLE SAY, "WHY

 6     ARE YOU MAKING A FEDERAL CASE OUT OF IT?"

 7              AND YOU WILL HEAR THE EVIDENCE, YOU WILL

 8     HEAR THE ANSWERS TO THOSE QUESTIONS FROM THE PEOPLE

 9     WHO WORKED ON THESE DESIGNS.  AND THERE'S TWO.

10              FIRST, THE EVIDENCE WILL SHOW YOU EXACTLY

11     WHAT I SAID:  SAMSUNG HAS TAKEN OUR PROPERTY.

12              SOME PROPERTY IS PHYSICAL, LIKE A CAR.

13     WHEN SOMEBODY TAKES YOUR CAR, THERE'S NO QUESTION

14     THAT YOU USE IT.  IT DOESN'T MATTER HOW MUCH MONEY

15     YOU MAKE OR HOW SUCCESSFUL YOU ARE, YOU DON'T LAUGH

16     THAT OFF.

17              SOME PROPERTY IS ART, LIKE THE DESIGNS OF

18     THESE PRODUCTS.  AND AGAIN, I'LL TELL YOU THAT

19     ARTISTS DON'T LAUGH THAT OFF WHEN PEOPLE STEAL

20     THEIR DESIGNS.

21              AND SOME PRODUCTS, SOME INVENTIONS, ARE

22     NOT PHYSICAL.  THEY'RE SOFTWARE.  THEY'RE THE

23     DIRECTIONS THAT MAKE PRODUCTS WORK.  THEY'RE CLEVER

24     IDEAS THAT END UP MAKING PRODUCTS SUCCESSFUL IN

25     FIELDS WHERE OTHER PRODUCTS HAVE NOT BEEN
```

```
 1    SUCCESSFUL.

 2              AND IT DOES NOT MATTER WHETHER THE

 3    PROPERTY IS PHYSICAL OR ART, SOFTWARE OR AN IDEA.

 4    WE ALL KNOW, AND OUR WITNESSES WILL TELL YOU THEY

 5    FEEL THIS WAY, PEOPLE SHOULD NOT USE WHAT YOU

 6    INVENTED WITHOUT PERMISSION.

 7              BUT IN ADDITION, YOU WILL ALSO HEAR THAT

 8    SINCE SAMSUNG INTRODUCED THE GALAXY VIBRANT IN

 9    2010, SAMSUNG HAS SOLD OVER 22 MILLION INFRINGING

10    PHONES AND TABLETS IN THE UNITED STATES, PHONES AND

11    TABLETS THAT ARE USING APPLE'S INVENTIONS.

12              SAMSUNG'S SALES HAVE TAKEN SALES AWAY

13    FROM APPLE AND THEY HAVE GENERATED MORE THAN $2

14    BILLION WORTH OF PROFIT FOR SAMSUNG, PROFIT, AS THE

15    EVIDENCE WILL SHOW, THAT THEY MADE USING OUR

16    INTELLECTUAL PROPERTY.

17              AT THE END OF THIS TRIAL, WE WILL ASK YOU

18    TO AWARD TO APPLE THE DAMAGES TO WHICH IT IS

19    ENTITLED UNDER THE LAW.

20              SAMSUNG WILL TELL YOU THAT THEY DON'T --

21    THAT THEY SHOULDN'T HAVE TO PAY BECAUSE, IN

22    ADDITION TO THE OTHER THINGS I MENTIONED, THEY'RE

23    GOING TO SAY IN EVERY SINGLE CASE, IN THE CASE OF

24    EVERY SINGLE ONE OF THESE PATENTS, THE U.S. PATENT

25    AND TRADEMARK OFFICE MADE A MISTAKE AND ISSUED TO
```

1    APPLE A PATENT THAT SHOULDN'T HAVE ISSUED.

2         THEY WILL SAY OUR DESIGNS ARE FUNCTIONAL;

3    THEY WILL SAY THEY CAN'T UNDERSTAND SOME OF OUR

4    PATENTS; THEY'LL SAY THAT SOME OF OUR INVENTIONS

5    WERE OBVIOUS.

6         BUT THEY WILL CONCLUDE IN EVERY CASE THAT

7    THE ISSUANCE OF THIS PATENT WAS A MISTAKE.

8         YOU WILL HEAR CONTRARY EVIDENCE, AND AT

9    THE END OF THE TRIAL, WE DON'T THINK YOU WILL

10   REJECT THE DECISIONS THAT WERE MADE BY THE PATENT

11   AND TRADEMARK OFFICE.

12        SO, AT THE END, WE'LL ASK YOU TO FIND

13   THAT THERE WAS INFRINGEMENT AND WE WILL ASK YOU TO

14   AWARD US DAMAGES.

15        WHAT NOW SEEMS LIKE THREE YEARS AGO WHEN

16   I STARTED TALKING TO YOU, I TOLD YOU THAT THERE

17   WERE TWO QUESTIONS.

18        NOW I'M GOING TO MOVE -- NO.  I TOLD YOU

19   THAT THERE WERE TWO QUESTIONS, AND THE FIRST

20   QUESTION IS SIMPLY, HOW DID SAMSUNG GET FROM HERE

21   IN 2006 TO HERE IN 2011?

22        I'VE SHOWN YOU SOME OF THE EVIDENCE THAT

23   WILL ANSWER THAT QUESTION.  OVER THE NEXT FEW WEEKS

24   YOU WILL HEAR MORE.

25        BUT THE CASE DIDN'T END THERE BECAUSE, AS

```
 1    YOU NOW KNOW, WHEN APPLE FILED THIS LAWSUIT,

 2    SAMSUNG FILED ITS OWN PATENT INFRINGEMENT CASE

 3    AGAINST APPLE.

 4              SO THAT BRINGS US TO WHAT ACTUALLY IS THE

 5    SECOND QUESTION:  WHEN DID SAMSUNG FIRST ACCUSE

 6    APPLE OF INFRINGING SAMSUNG'S PATENTS?

 7              MY FRIEND BILL LEE IS GOING TO ANSWER

 8    THAT QUESTION.

 9              THE COURT:  ALL RIGHT.  THE TIME IS NOW

10    10:29.

11              LET'S TAKE A 15-MINUTE BIO BREAK.  OKAY?

12              AGAIN, PLEASE KEEP AN OPEN MIND.  DON'T

13    DISCUSS THE CASE WITH ANYONE.  PLEASE DON'T DO ANY

14    RESEARCH.

15              OKAY.  THANK YOU.

16              (WHEREUPON, A RECESS WAS TAKEN.)

17              (WHEREUPON, THE FOLLOWING PROCEEDINGS

18    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

19              MR. VERHOEVEN:  YOUR HONOR, ONE

20    HOUSEKEEPING MATTER REALLY BRIEFLY?

21              THE COURT:  YES.

22              MR. VERHOEVEN:  I DIDN'T KNOW EXACTLY

23    WHAT MR. MCELHINNY WAS GOING TO SAY ON HIS SLIDES,

24    YOUR HONOR, DURING OPENING.

25              BUT IF YOU TURN TO SLIDE 24 -- I DON'T
```

```
1    KNOW IF WE CAN PUT THAT UP -- 24, PLEASE -- YOUR
2    HONOR, THIS IS THE F700.
3              CAN WE GO TO 23?
4              WHAT MR. MCELHINNY SAID, YOUR HONOR, TO
5    THE JURY WAS THIS IS WHAT THE SAMSUNG PHONES LOOKED
6    LIKE BEFORE THE IPHONE WAS ANNOUNCED.
7              THE COURT:  WE'VE ALREADY RULED -- I'VE
8    ALREADY RULED ON MULTIPLE OBJECTIONS AS TO ALL OF
9    THESE SLIDES, SO IF THIS IS NOT SOMETHING NEW, I'M
10   GOING TO ASK THAT WE MOVE ON.
11             MR. VERHOEVEN:  IT'S A STATEMENT THAT WAS
12   MADE, YOUR HONOR.  I JUST WANT, FOR THE RECORD, TO
13   LODGE AN OBJECTION.
14             THE COURT:  OKAY, GO AHEAD.  WHAT IS IT?
15             MR. VERHOEVEN:  HE SAID, "THIS CHART
16   SHOWS WHAT SAMSUNG'S PHONES LOOKED LIKE BEFORE THE
17   IPHONE.  THERE'S A PHONE IN THERE THAT LOOKS LIKE
18   THE PALM, AND SEE THE ONE THAT LOOKS LIKE THE
19   BLACKBERRY?"
20             AND THEN HE WENT TO SLIDE 24.  "THIS
21   CHART SHOWS THE PHONES SAMSUNG INTRODUCED RIGHT
22   AFTER THE IPHONE CAME OUT," AND HE GOES TO THIS
23   SLIDE AND SHOWS THE F700.  "THE ONE THAT IS CALLED
24   AN F700 IS WHAT'S CALLED A SLIDER PHONE."
25             AND THE SUGGESTION HE MADE TO THE JURY,
```

```
1     YOUR HONOR, IS THAT THE F700 -- THAT SAMSUNG COPIED

2     THE IPHONE WITH THE F700.

3            THAT WAS MADE -- THAT WAS STATED TO THE

4     JURY, I READ IT, YOUR HONOR.

5            AND THE F700 IS THE PHONE THAT WAS

6     RELEASED BASED ON THE DEVELOPMENT DOCUMENTS YOUR

7     HONOR EXCLUDED US FROM USING.

8            SO I SUBMIT HE'S OPENED THE DOOR NOW.

9     HE'S ACCUSED THIS PHONE OF COPYING THE IPHONE IN

10    THIS SLIDE, YOUR HONOR.

11           AND THE DOCUMENTS THAT, THAT SHOW THE

12    DEVELOPMENT OF THIS VERY PHONE, THE F700, ARE THOSE

13    DOCUMENTS THAT PREDATE THE IPHONE THAT SHOW THAT

14    EXACT SAME FRONT FACE, YOUR HONOR.

15           SO I WOULD SUBMIT HE'S OPENED THIS DOOR

16    AND WE HAVE TO BE ABLE TO REBUT IT.

17           MR. MCELHINNY:  MAY I?

18           THAT'S A NICE TRY, BUT WHAT I SAID WAS

19    THESE WERE THE PHONES THAT WERE RELEASED AFTER THE

20    IPHONE.

21           I DIDN'T ACCUSE ANY OF THOSE BECAUSE I

22    SAID THEN WE GOT THE ONE, THE S900, THE NEXT SLIDE,

23    WHICH I SAID WAS THE IPHONE CLONE.

24           THAT'S WHERE WE STARTED ACCUSING THEM OF

25    INFRINGEMENT.
```

```
 1                    IF YOU GO BACK AGAIN -- WE HAVEN'T

 2       ACCUSED -- IF YOU GO BACK ONE, PLEASE.

 3                    NONE OF THOSE ARE INFRINGING.  WE SAID

 4       THEY CAME OUT AFTER AND THEN WE GOT TO THE

 5       INFRINGING PHONES.

 6                    MR. VERHOEVEN:  THE CLEAR IMPLICATION TO

 7       THE JURY, IF WE GO BACK TO SLIDE -- GO BACK,

 8       PLEASE, TO THE PREVIOUS SLIDE, 23.

 9                    THE TIMELINE OF SAMSUNG PHONES BEFORE THE

10       SMARTPHONE.  THEY SHOW A BUNCH OF DIFFERENT LOOKING

11       PHONES.

12                    NEXT SLIDE, PLEASE, 24.

13                    TIMELINE AFTER, THEY ALL HAVE THESE BIG

14       SCREENS.

15                    THE F700, YOUR HONOR, WAS DEVELOPED --

16       THE ONE THAT LOOKS THE MOST LIKE THIS PHONE, YOUR

17       HONOR, WAS DEVELOPED BEFORE THE IPHONE WAS EVER

18       ANNOUNCED AND WE SHOULD BE ABLE -- IN FAIRNESS --

19                    THE COURT:  ALL RIGHT.  I'VE ALREADY

20       RULED ON THIS OBJECTION.

21                    MR. VERHOEVEN:  OKAY.

22                    THE COURT:  YOU'VE MADE YOUR RECORD AND

23       THE OBJECTION IS OVERRULED.

24                    MR. JACOBS:  QUICK HOUSEKEEPING MATTER,

25       YOUR HONOR.
```

```
 1                THE COURT:  YES.
 2                MR. JACOBS:  WE HAVE THE -- I THINK YOU
 3     NOTICED, BUT JUST FOR THE RECORD, THE DESIGN PATENT
 4     CLAIM CONSTRUCTIONS WERE AGREED UPON BY THE PARTIES
 5     AND SO THEY'RE READY TO GO IN THE JUROR NOTEBOOKS.
 6                AND I'M LOOKING AT THE JURY NOTEBOOK AND
 7     I SEE THE TABLE OF CONTENTS SHOULD BE ADJUSTED,
 8     TOO.  WE'LL MEET AND CONFER WITH THE OTHER SIDE AND
 9     GET A CHANGED TABLE OF CONTENTS FOR THAT AS WELL.
10                THE COURT:  ALL RIGHT.  WELL, WHY DON'T
11     WE -- AFTER ALL OF THE OPENINGS, WE CAN JUST PLACE
12     THIS ON THEIR CHAIRS SO THEY CAN PUT IT IN THEIR
13     OWN BOOKS.
14                I DON'T WANT ANYONE TOUCHING THE JURY
15     NOTEBOOKS BECAUSE THEY MAY HAVE ALREADY STARTED
16     TAKING NOTES AND IT WOULDN'T BE APPROPRIATE FOR
17     ANYONE AT THIS TIME TO SEE THAT.
18                ALL RIGHT.  THERE WAS SO MUCH MOVING
19     AROUND, I'M GOING TO ASK, I THINK THERE MUST HAVE
20     BEEN SIX OR SEVEN QUINN PEOPLE GOING IN AND OUT, IN
21     AND OUT.
22                CAN I ASK, IF YOU NEED TO GO OUT, CAN YOU
23     STEP OUT NOW AND JUST NOT COME IN UNTIL THE OPENING
24     IS DONE?  BECAUSE IT'S VERY DISRUPTIVE, MULTIPLE
25     PEOPLE GOING IN AND OUT OF THE COURTROOM.
```

```
1            I'M GOING TO MAKE THE SAME REQUEST OF THE
2    APPLE ATTORNEYS, WHEN SAMSUNG IS MAKING THEIR
3    OPENING, WOULD YOU PLEASE NOT HAVE PEOPLE WALKING
4    AROUND AND TALKING TO EACH OTHER, JUST OUT OF
5    RESPECT FOR EACH OTHER'S OPENING.
6            IF ANYONE ON YOUR TEAM NEEDS TO STEP OUT,
7    PLEASE DO IT NOW, AND DON'T COME IN UNTIL THEY'RE
8    DONE.  OKAY?
9            SAME FOR, I KNOW YOU HAD A COUPLE OF GUYS
10   COMING IN AND OUT, IN AND OUT.  CAN YOU JUST LET
11   THEM KNOW THAT WHEN THEY'RE IN OPENING STATEMENT,
12   PLEASE NOT DO THAT.
13           IF SOMEONE NEEDS TO COME IN, JUST HAVE
14   THEM COME IN RIGHT NOW AND PASS WHATEVER NOTE OR
15   THUMB DRIVE OR ANYTHING, JUST HAVE THEM COME IN
16   RIGHT NOW.
17           MR. VERHOEVEN:  OUR PARALLEL IS IN THERE.
18           THE COURT:  ALL RIGHT.  THEN WHY DON'T WE
19   WAIT UNTIL SHE COMES OUT TO START THE OPENINGS?
20           MR. VERHOEVEN:  I'M NOT SURE WHERE SHE
21   IS, YOUR HONOR, SO IT MIGHT BE POSSIBLE THAT SHE
22   MIGHT WALK IN DURING THE OPENING.
23           CAN SOMEBODY GO OUT THERE?
24           THE COURT:  IF ANYONE IN THAT ROOM?
25   BECAUSE I WANT TO BE ABLE TO LET THEM COME OUT.
```

```
 1              MR. VERHOEVEN:  NO, THEY'RE NOT.

 2              THE COURT:  OKAY.  SO WHOEVER YOU NEED TO

 3     COME IN AND OUT, JUST HAVE THEM DO IT RIGHT NOW,

 4     PLEASE.

 5              DO YOU NEED ANYONE ELSE TO COME IN?

 6              MR. VERHOEVEN:  WE DO NOT, YOUR HONOR.

 7              THE COURT:  IF YOU CAN LET THEM KNOW,

 8     THERE HAVE BEEN A LOT OF PEOPLE COMING AND OUT, AND

 9     I'VE BEEN VERY LENIENT, BUT IT DOES GET VERY

10     DISRUPTIVE, ESPECIALLY WITH THIS MANY PEOPLE COMING

11     IN AND OUT.

12              ALL RIGHT.  ARE WE READY TO START?  YOU

13     HAVE USED ONE HOUR AND SIX MINUTES.  YOU HAVE 24

14     MINUTES LEFT.

15              ALL RIGHT.  BRING IN THE JURY, PLEASE.

16              MR. MCELHINNY:  YOUR HONOR, WE THINK YOU

17     MAY HAVE DONE A MATHEMATICAL -- WE THINK WE HAVE

18     TEN MINUTES MORE THAN THAT.

19              THE COURT:  NO.  IT'S 9:33 TO 10:29.

20              MR. MCELHINNY:  RIGHT.  THAT WOULD BE 34

21     MINUTES, YOUR HONOR.  I'M SORRY.

22              THE COURT:  OH, YOU'RE RIGHT.

23              (WHEREUPON, THE FOLLOWING PROCEEDINGS

24     WERE HELD IN THE PRESENCE OF THE JURY:)

25              THE CLERK:  THERE'S ONE STILL IN THE REST
```

```
 1    ROOM.
 2              THE COURT:  OKAY.
 3              (PAUSE IN PROCEEDINGS.)
 4              THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.
 5              IT IS NOW 10:52.
 6              MR. LEE:  YOUR HONOR, MIGHT I ASK FOR A
 7    TEN MINUTE WARNING WHEN I HAVE TEN MINUTES LEFT OF
 8    MY TIME?
 9              THE COURT:  OKAY.
10              MR. LEE:  THANK YOU.
11              (WHEREUPON, MR. LEE GAVE HIS OPENING
12    STATEMENT ON BEHALF OF APPLE.)
13              MR. LEE:  GOOD MORNING, LADIES AND
14    GENTLEMEN.  AS YOU KNOW FROM YESTERDAY, MY NAME IS
15    BILL LEE.
16              MR. MCELHINNY HAS JUST DISCUSSED WITH YOU
17    THE EVIDENCE THAT WILL DEMONSTRATE THAT SAMSUNG HAS
18    INTENTIONALLY COPIED APPLE'S INNOVATIONS AND
19    INVENTIONS.
20              BUT AS HER HONOR EXPLAINED TO YOU
21    YESTERDAY LATE IN THE DAY, SAMSUNG HAS ALREADY
22    ASSERTED FIVE PATENTS AGAINST APPLE.
23              IN THIS PORTION OF THE OPENING, WHICH
24    I'LL GET DONE IN THE 30 MINUTES OR SO THAT I HAVE,
25    I'M GOING TO DISCUSS THOSE CLAIMS BY SAMSUNG
```

1    AGAINST APPLE.

2              AND AS WE REVIEW THE EVIDENCE, THE

3    EVIDENCE THAT GOES TO THESE CLAIMS, I'D LIKE TO ASK

4    YOU TO KEEP IN MIND THE QUESTION, THE SECOND

5    QUESTION THAT MR. MCELHINNY ASKED OF YOU, AND THAT

6    IS THIS:  WHEN DID SAMSUNG FIRST ACCUSE APPLE OF

7    INFRINGING ITS PATENTS?

8              THE ANSWER, THE EVIDENCE WILL

9    DEMONSTRATE, IS THAT SAMSUNG NEVER SAID A WORD

10   ABOUT THESE PATENTS UNTIL APPLE, AS MR. MCELHINNY

11   TOLD YOU, WENT TO SAMSUNG, ITS BUSINESS PARTNER,

12   AND SAID, "STOP COPYING."  AND ONLY THEN WERE THESE

13   PATENTS ASSERTED.

14             NOW, I'M GOING TO COME BACK TO THAT

15   QUESTION AT THE END OF MY OPENING.

16             BUT NOW THAT SAMSUNG HAS SUED, NOW THAT

17   SAMSUNG HAS BROUGHT THESE PATENTS AGAINST APPLE,

18   LET'S TAKE A LOOK AT THE PATENTS THEMSELVES.

19             THE SLIDE ON THE SCREEN RIGHT NOW HAS

20   INFORMATION ON EACH OF THE FIVE ASSERTED PATENTS.

21             THERE'S A LOT OF INFORMATION THERE.  IT'S

22   INFORMATION THAT JUST SUMMARIZES WHAT'S IN YOUR

23   JUROR NOTEBOOKS.

24             FOR EACH PATENT YOU CAN SEE WHEN SAMSUNG

25   FILED THEIR ORIGINAL PATENT APPLICATION IN KOREA,

1    WHEN IT FILED ITS UNITED STATES APPLICATION, AND

2    WHEN THE UNITED STATES PATENTS WERE ISSUED.

3            NOW, YOU KNOW THAT SAMSUNG IS A KOREAN

4    COMPANY AND IT NATURALLY FILED ITS PATENTS FIRST IN

5    KOREA, AND THEN IT LATER FILED ITS PATENTS IN THE

6    UNITED STATES.

7            NOW, WHAT YOU CAN'T SEE FROM THE CHART

8    THAT'S ON THE SCREEN BEFORE YOU NOW IS EVERY KOREAN

9    APPLICATION, EVERY ONE OF THESE INVENTIONS WAS

10   FILED BEFORE THE END OF AUGUST 2005.

11           NOW, THE EVIDENCE WILL DEMONSTRATE THAT

12   TECHNOLOGY MOVES QUICKLY.  LIVING HERE IN NORTHERN

13   CALIFORNIA, YOU KNOW THAT WHAT IS TODAY'S

14   TECHNOLOGY MAY TOMORROW BE OLD NEWS.

15           WELL, THESE PATENTS, AS YOU WILL LEARN,

16   WERE FILED SEVEN YEARS AGO.  AND IN THIS PARTICULAR

17   CASE, THEY WERE FILED ON OLDER TECHNOLOGIES USED IN

18   PHONES BEFORE THE IPHONE REVOLUTIONIZED THE MARKET.

19           SO WHAT WILL THE EVIDENCE SAY ABOUT THESE

20   PATENTS?

21           YOU WILL LEARN THESE PATENTS DESCRIBE

22   OLDER TECHNOLOGIES THAT APPLE, APPLE'S ACCUSED

23   PRODUCTS, THE IPAD, THE IPOD TOUCH, THE IPHONE, DO

24   NOT USE.

25           YOU WILL LEARN THAT THERE IS NO EVIDENCE

1    OF COPYING BY APPLE OF THESE PATENTS OR THESE

2    FEATURES.

3              IN FACT, YOU WILL HEAR NO EVIDENCE THAT

4    ANYONE AT APPLE EVEN KNEW ABOUT THESE PATENTS AT

5    THE TIME THAT THEY WERE SITTING DOWN TO DESIGN THE

6    IPAD AND THE IPHONE.

7              YOU WILL NOT SEE ANY DOCUMENTS LIKE

8    MR. MCELHINNY JUST SHOWED YOU COMPARING THE IPHONE

9    WITH THE SAMSUNG PRODUCT AND SUGGESTING THAT IT BE

10   COPIED.

11             YOU WILL SEE NO APPLE DOCUMENTS SAYING,

12   LIKE THE ONE EXHIBIT SHOWN, "EASY TO COPY."

13             YOU WILL ALSO LEARN FROM THE EVIDENCE

14   THAT THESE INVENTIONS ARE NOT NEW AND IMPORTANT.

15             IN FACT, LADIES AND GENTLEMEN, YOU WILL

16   LEARN THAT IN AT LEAST TWO OF THE CASES, SAMSUNG

17   ITSELF DOES NOT EVEN USE THESE PATENTS IN THEIR OWN

18   PRODUCTS TODAY.

19             NOW, I'M GOING TO PUT THE SAMSUNG

20   PRODUCTS INTO TWO BUCKETS FOR YOU, OR TWO GROUPS.

21             THE FIRST ARE THE '941 AND '516, WHICH

22   ARE AT THE TOP OF THE CHART BEFORE YOU.

23             SAMSUNG WILL TELL YOU THAT THESE ARE

24   PATENTS CRUCIAL FOR MODERN PHONES, THAT PHONES WILL

25   NOT WORK WITHOUT THEM, AND SAMSUNG IS GOING TO

```
 1    REQUEST FROM YOU DAMAGES ON THESE TWO PATENTS THAT
 2    ARE TEN TIMES MORE THAN THEIR THREE OTHER PATENTS.
 3            SO WHAT WILL THE EVIDENCE SHOW?
 4            WELL, BOTH OF THESE PATENTS ARE -- RELATE
 5    TO SOMETHING CALLED A STANDARD.
 6            WHAT WILL THE EVIDENCE SHOW IS THE
 7    STANDARD?  SOME OF YOU MIGHT BE FAMILIAR WITH
 8    STANDARDS BASED UPON THE INFORMATION YOU GAVE US HE
 9    HAD WHY.
10            BUT A STANDARD IS A SET OF TECHNICAL
11    RULES THAT ARE DEVELOPED IN A COLLABORATIVE PROCESS
12    THAT INCLUDES MANY COMPANIES AND OTHER
13    PARTICIPANTS.
14            AND STANDARD SETTING ORGANIZATIONS HAVE
15    RULES.  THEY HAVE RULES THAT ARE DESIGNED TO MAKE
16    SURE THAT COMPANIES THAT WORK TOGETHER DO SO FAIRLY
17    AND SQUARELY AND THAT THE PRODUCTS THAT RESULT
18    BENEFIT THE PUBLIC AT LARGE AND ALL OF THE
19    PARTICIPANTS.
20            HERE'S A REALLY SIMPLE EXAMPLE OF A
21    STANDARD THAT IS FROM A LOWER TECHNOLOGY TIME.
22            IT IS AN ELECTRICAL OUTLET IN A WALL.
23    THERE IS A STANDARD THAT SAYS, IN AMERICA, OUR
24    OUTLETS HAVE A PARTICULAR SIZE AND SHAPE.  BECAUSE
25    WE HAVE THIS STANDARD, I CAN PLUG IN A LIGHT, A
```

1      TELEVISION, A MICROWAVE, ALL INTO THE SAME OUTLET

2      BECAUSE THERE'S A STANDARD.

3              NOW, IN WIRELESS COMMUNICATIONS THAT WE

4      BEGAN TALKING TO YOU ABOUT YESTERDAY AND WE'RE

5      GOING TO TALK TO YOU ABOUT IN THE NEXT COUPLE OF

6      WEEKS, THERE ARE STANDARDS, TOO, STANDARDS THAT

7      ALLOW PHONES TO CONNECT TO ONE ANOTHER, STANDARDS

8      THAT ALLOW PHONES TO CONNECT OVER A WIRELESS

9      NETWORK.

10             SO WHO SETS THESE STANDARDS?

11             THE EVIDENCE WILL PROVE THAT ONE STANDARD

12     ORGANIZATION IS SOMETHING CALLED ETSI, THE EUROPEAN

13     TELECOMMUNICATIONS STANDARDS INSTITUTE.  IT'S A BIG

14     DEAL STANDARDS BODY.  IT HELPED DEVELOP SOME OF THE

15     MOST POPULAR STANDARDS FOR WIRELESS COMMUNICATIONS

16     IN THE WORLD.

17             SAMSUNG IS A MEMBER, AND HAS BEEN.

18             APPLE IS A MEMBER.

19             MOST IMPORTANTLY, THE EVIDENCE WILL

20     ESTABLISH THAT THE MEMBERS AGREE TO A SET OF RULES,

21     RULES THAT THEY WILL ALL LIVE BY, RULES THAT THEY

22     WILL ABIDE BY, RULES THAT ARE DESIGNED TO ENSURE

23     THAT PEOPLE ACT FAIRLY AND SQUARELY.

24             NOW, ETSI HELPED DEVELOP A STANDARD YOU

25     WILL LEARN CALLED UMTS.  UMTS IS SOMETIMES REFERRED

1    TO, AND YOU MAY HAVE SEEN IT, AS 3GPP.  FOR OUR

2    PURPOSES, THEY ARE CLOSE TO THE SAME.

3              ENGINEERS FROM DIFFERENT COMPANIES CAME

4    TOGETHER.  THEY DISCUSSED DIFFERENT TECHNICAL

5    PROPOSALS.  THEY DECIDED WHAT TO INCLUDE IN THE

6    STANDARD, WHAT WAS GOING TO BE THEIR EQUIVALENT OF

7    THE SOCKET.

8              AND THE GOAL WAS TO COME UP WITH A

9    STANDARD THAT EVERYBODY COULD USE TOGETHER AND IT

10   WOULD PROMOTE COMPETITION.

11             NOW, SAMSUNG CLAIMS THAT THE TWO PATENTS,

12   THE '941 AND THE '516, ARE ESSENTIAL TO USING UMTS.

13   SAMSUNG IS GOING TO TELL YOU IN JUST A FEW MINUTES

14   THAT IF YOU USE UMTS, YOU USE THESE PATENTS AND YOU

15   INFRINGE.

16             WELL, WHAT'S THE EVIDENCE GOING TO SHOW

17   YOU ABOUT THIS ARGUMENT?

18             FIRST, THE EVIDENCE IS GOING TO SHOW THAT

19   "DECLARED ESSENTIAL" MEANS SIMPLY THAT SAMSUNG HAS

20   SAID SO.

21             THE EVIDENCE WILL ESTABLISH THAT NO ONE,

22   NOT ETSI, NOT ANYONE ELSE, HAS EVER DECIDED THAT

23   THAT'S, IN FACT, TRUE.

24             YOU WILL BE THE FIRST PEOPLE TO DECIDE

25   WHETHER SAMSUNG'S STATEMENT THAT ITS PATENTS WERE

1    ESSENTIAL IS TRUE.

2           WE WILL CALL PROFESSORS EDWARD KNIGHTLY

3    FROM RICE AND PROFESSOR HYONG KIM FROM CARNEGIE

4    MELLON UNIVERSITY, TWO VERY WELL KNOWN AND

5    REPUTABLE COMPUTER SCIENTISTS AND ENGINEERS, AND

6    THEY WILL EXPLAIN TO YOU THAT THEY HAVE LOOKED AT

7    SAMSUNG'S PATENTS AND THEY ARE, IN FACT, NOT

8    ESSENTIAL TO UMTS, THAT, IN FACT, APPLE DOES NOT

9    USE THEM.

10          BUT SECOND, YOU WILL ALSO LEARN THAT THE

11   ENTIRE UMTS STANDARD IS THOUSANDS OF PAGES LONG.

12   IF I HAD IT IN THIS COURTROOM, IT WOULD GO FROM

13   HERE TO THAT WALL AND PROBABLY BACK AGAIN.

14          OUT OF THAT ENTIRE SPECIFICATION, YOU

15   WILL LEARN, THESE TWO PATENTS, EVEN UNDER SAMSUNG'S

16   CONTENTIONS, RELATE TO TWO PAGES.

17          NOW, I'D LIKE TO SHOW YOU JUST WHAT IT IS

18   IN THE IPHONE THAT SAMSUNG SAYS INFRINGES THESE TWO

19   PATENTS THAT IS ESSENTIAL TO WIRELESS

20   COMMUNICATIONS.

21          I HAVE ANOTHER IPHONE.  MR. MCELHINNY HAD

22   ONE.  I'VE TAKEN OFF THE BACK AND WHAT YOU'LL

23   SEE -- YOU'LL SEE SEVERAL OF THESE DURING THE

24   COURSE OF THE TRIAL -- ARE THE INSIDES.

25          BUT UNDERNEATH THE BLACK THAT I'M SHOWING

```
1    YOU NOW IS A HOST OF A COMPUTER CHIP AND THE
2    CONNECTIONS AND THE COMPONENTS THAT MAKE THE IPHONE
3    THE MAGICAL DEVICE THAT IT IS (INDICATING).
4              IF I WERE TO PULL OFF THIS BLACK, YOU CAN
5    SEE AT THE TOP RIGHT HERE, IF I WERE TO PULL THAT
6    OFF, YOU WOULD GET WHAT'S CALLED THE MOTHERBOARD
7    (INDICATING).
8              AND YOU CAN SEE ON THE MOTHERBOARD A
9    SERIES OF CHIPS, A SERIES OF CONNECTIONS, ALL OF
10   WHICH CONTRIBUTE TO WHAT MR. MCELHINNY DESCRIBED TO
11   YOU.
12             NOW, YOU CAN'T SEE IT NOW -- WE'LL PASS
13   THIS TO YOU WHEN IT GOES INTO EVIDENCE -- BUT I
14   HAVE TWO LITTLE DOTS HERE, AND RIGHT ABOVE THOSE
15   TWO LITTLE DOTS, I'M PUTTING MY FINGER ON THIS
16   LITTLE SQUARE HERE, NOT EVEN AS BIG AS MY FINGER.
17             WHAT IS THAT?  THAT'S THE BASEBAND
18   PROCESSOR.  THAT IS SOMETHING THAT APPLE BUYS FROM
19   INTEL.  IT'S SOMETHING THAT INTEL MAKES FOR APPLE
20   AND A HOST OF OTHER DIFFERENT CUSTOMERS.  IT IS THE
21   DEVICE THAT ACTUALLY PERFORMS WHAT SAMSUNG SAYS IS
22   INFRINGING, THE INTEL CHIP.
23             IT IS A CHIP, IT IS A CHIP THAT APPLE
24   BUYS FOR AROUND $10 APIECE, AND I'D ASK YOU TO KEEP
25   THAT IN MIND BECAUSE I'M GOING TO COME BACK TO THE
```

1    AMOUNT OF MONEY THAT SAMSUNG IS ASKING ON THESE TWO

2    PATENTS.

3            NOW, I EXPECT THAT IN A FEW MINUTES, I'M

4    SURE IN A FEW MINUTES SAMSUNG IS GOING TO GET UP

5    AND SAY, "WE PLAYED AN IMPORTANT ROLE IN DEVELOPING

6    THIS CELLULAR TELECOMMUNICATION SYSTEM.  THESE

7    PATENTS THAT ARE IN THIS BASEBAND PROCESSOR YOU BUY

8    FROM INTEL WERE OURS AND CRITICAL TO THE

9    INFORMATION HIGHWAY."

10           WELL, LET ME SHOW YOU WHAT ONE OF THE

11   HEADS OF SAMSUNG'S LICENSING DEPARTMENT, A

12   GENTLEMAN NAMED DR. AHN, TESTIFIED UNDER OATH ON

13   THIS VERY ISSUE.

14           DR. AHN REPORTS DIRECTLY TO THE CHIEF

15   EXECUTIVE OFFICER OF SAMSUNG AND HERE'S WHAT HE

16   SAID.

17           "DO YOU HAVE ANY KNOWLEDGE AS TO WHETHER

18   OR NOT SAMSUNG PLAYED AN IMPORTANT ROLE IN

19   DEVELOPING THE CELLULAR TELECOMMUNICATION SYSTEM?

20           "ANSWER:  NO, I DO NOT REALLY KNOW."

21           THE DIRECT REPORT TO THE CEO WAS ASKED

22   THAT QUESTION WHEN THIS CASE BEGAN AND THE ANSWER

23   WAS I DON'T KNOW.

24           NOW, WHAT YOU'RE GOING TO LEARN IS THAT

25   SAMSUNG DID PARTICIPATE IN THIS RULE-BASED STANDARD

```
1    SETTING PROCESS, AND WHAT YOU'RE GOING TO LEARN IS

2    THAT IN DOING SO, SAMSUNG ACTUALLY BROKE THE RULES,

3    THE RULES THAT WERE ADOPTED TO ENSURE THE STANDARD

4    PROCESS WAS FAIR AND SQUARE.

5              NOW, WHAT WERE THOSE RULES?  THERE WERE

6    TWO.

7              THE FIRST RULE IS THE RULE THAT REQUIRES

8    EVERYONE WHO HAS A PATENT THAT THEY SAY MIGHT BE

9    ESSENTIAL TO THE STANDARD TO DISCLOSE IT.

10             WHAT WILL THE EVIDENCE SHOW IS THE

11   REASON?  THINK ABOUT MY SIMPLE EXAMPLE OF THE PLUG,

12   OF THE WALL SOCKET.

13             IF I HAD A PATENT APPLICATION, A SECRET

14   PATENT APPLICATION LIKE THE VIDEO TOLD YOU ON A

15   WALL SOCKET, AND I THEN WENT TO THE STANDARD AND

16   SAID, "LET'S ALL GET TOGETHER, THE TEN OF US, AND

17   ADOPT AS A STANDARD THIS PARTICULAR CONFIGURATION,"

18   AND WE ALL GOT TOGETHER, THE TEN OF US, AND WE

19   ADOPTED THIS CONFIGURATION, AND THEN EVERYBODY IN

20   THE WORLD MADE THEIR WALL SOCKETS THAT WAY, AND

21   THEN A FEW YEARS LATER, I SAID, "I FORGOT TO TELL

22   YOU.  I HAVE A PATENT AND NOW YOU ALL HAVE TO PAY

23   ME."

24             WELL, ETSI HAS RULES TO PREVENT JUST

25   THAT, AND YOU WILL SEE RULE 4.1, AND I'M GOING TO
```

1    FOCUS YOU JUST ON THE SECOND SENTENCE WHICH SAYS,

2    "IN PARTICULAR, A MEMBER SUBMITTING A TECHNICAL

3    PROPOSAL FOR A STANDARD SHALL, ON A BONA FIDE

4    BASIS, DRAW THE ATTENTION OF ETSI TO ANY OF THAT

5    MEMBER'S IPR WHICH MIGHT BE ESSENTIAL IF THAT

6    PROPOSAL IS ADOPTED."

7            THREE THINGS YOU'LL LEARN ABOUT THAT VERY

8    IMPORTANT SIMPLE SENTENCE.  THE FIRST IS IPR MEANS

9    PATENTS AND PATENT APPLICATIONS, INTELLECTUAL

10   PROPERTY RIGHTS.  IT INCLUDES BOTH.

11            THE SECOND IS IT SAYS IF THAT MIGHT BE

12   ESSENTIAL, AND THE THIRD IS IT SAYS IF THE PROPOSAL

13   IS ADOPTED.

14            SO IT MEANS BEFORE THE FOLKS HAVE SETTLED

15   ON THE WALL SOCKET.

16            THE EVIDENCE WILL DEMONSTRATE THAT

17   SAMSUNG IGNORED THIS RULE.  IT FILED PATENT

18   APPLICATIONS WHICH WERE KEPT SECRET.

19            IT THEN WENT TO STANDARDS BODY AND MADE

20   PROPOSALS THAT IT THOUGHT WERE COVERED BY ITS

21   PATENTS.  IT SAT IN THE ROOM WHEN THE CHAIR SAID,

22   "IF YOU HAVE PATENTS OR PATENT APPLICATIONS,

23   DISCLOSE THEM," AND THEY DID NOT.

24            THE CHRONOLOGY WILL BE UNDISPUTED -- I'M

25   GOING TO PUT IT ON THE SCREEN NOW -- FOR BOTH OF

1        THESE TWO PATENTS.

2                    LET ME JUST TAKE THE '941 PATENT.

3                    FOR THE '941 PATENT, SAMSUNG FILED A

4        PATENT APPLICATION ON MAY 4TH, 2005.

5                    FIVE DAYS LATER, LADIES AND GENTLEMEN,

6        FIVE DAYS LATER, THE THREE INVENTORS WENT TO THE

7        STANDARD SETTING BODY.  THEY SAT IN A ROOM WHILE

8        THE CHAIRMAN SAID, "IF YOU HAVE A PATENT OR PATENT

9        APPLICATION, DISCLOSE IT" AND NEVER SAID A WORD.

10                   THEN THE STANDARD IS FROZEN AND ADOPTED,

11       AND WHAT HAPPENS TWO YEARS LATER?  SAMSUNG SAYS,

12       "OH, WE HAVE A PATENT.  EVERYBODY SHOULD PAY US

13       NOW."

14                   NOW, YOU WILL LEARN THAT AS TO THE '516,

15       THE CHRONOLOGY WAS THE SAME.  I'M NOT GOING TO GO

16       THROUGH IT NOW.  IT'S ON SCREEN.

17                   BUT IT ACTUALLY HAPPENED TWICE.  IT

18       HAPPENED ONCE IN 2004 AND ONCE IN 2005.

19                   NOW, THIS WAS NOT, YOU WILL LEARN, AN

20       ACCIDENT.  THE EVIDENCE WILL SHOW THIS ACTUALLY WAS

21       A CONSCIOUS, CORPORATE POLICY ADOPTED AT THE

22       HIGHEST LEVELS OF SAMSUNG.

23                   NOW, WE'RE NOT SAYING, AND YOU WON'T HEAR

24       US SAY, THAT THOSE ENGINEERS BY THEMSELVES WENT

25       INTO THE MEETINGS AND HAD TO MAKE THE DISCLOSE BY

1    THEMSELVES.

2            BUT SOMEONE FROM SAMSUNG DID.

3            AND WHAT WILL THE EVIDENCE SHOW YOU?  THE

4    EVIDENCE WILL SHOW YOU THAT SAMSUNG ADOPTED A

5    CORPORATE POLICY OF SENDING EMPLOYEES TO THESE

6    MEETINGS.

7            SOME OF THESE EMPLOYEES, YOU WILL LEARN,

8    ARE INVENTORS ON THE TWO PATENTS YOU WILL LEARN

9    ABOUT.  THESE EMPLOYEES, YOU WILL LEARN, HAVE NEVER

10   DESIGNED A PRODUCT.  THEIR WHOLE PURPOSE, THEIR

11   JOB, WAS TO GO TO THE MEETINGS AND TRY TO GET

12   PATENTS ON WHAT THE STANDARDS FOLKS WERE

13   DISCUSSING.

14           YOU WILL, IN FACT, LEARN THAT SAMSUNG SET

15   TARGETS FOR THEM, GOALS, FOR THE NUMBER OF PATENTS

16   THEY HAD TO GET THAT COVERED THE STANDARD AND IT

17   AFFECTED THEIR COMPENSATION.

18           AND YOU WILL FIND THAT THESE GROUPS OF

19   SAMSUNG EMPLOYEES WENT TO THE MEETING, IT INCLUDED

20   MANY LAWYERS, THEY CAME HOME, AND THEY DRAFTED

21   PATENT APPLICATIONS OR TRIED TO AMEND PATENT

22   APPLICATIONS TO COVER THE STANDARDS.

23           NOW, BY FAILING TO TIMELY DISCLOSE,

24   SAMSUNG BROKE RULE 4.1.

25           SAMSUNG IS GOING TO SHOW YOU SOME OTHER

```
1    RULES.  THE FOCUS HERE IS RULE 4.1.
2                BUT YOU'RE NOT GOING TO HAVE TO TAKE OUR
3    WORD FOR IT.  SAMSUNG HIRED AN EXPERT IN THIS CASE,
4    THEIR EXPERT, SOMEONE THEY'RE GOING TO PAY, NAMED
5    KARL HEINZ ROSENBROCK.
6                HE WAS THE FORMER DIRECTOR GENERAL OF
7    ETSI.  THEIR EXPERT TESTIFIED UNDER OATH THAT
8    SAMSUNG FAILED TO ABIDE BY THE LETTER OF RULE 4.1.
9                THAT WILL BE CONFIRMED BY OUR EXPERT,
10   DR. MICHAEL WALKER, WHO ACTUALLY WAS THE CHAIRMAN
11   OF THE BOARD OF ETSI DURING THIS TIME PERIOD.
12               NOW, WHAT WILL THE EVIDENCE TELL YOU
13   ABOUT WHY SAMSUNG DIDN'T TELL PEOPLE ABOUT THE
14   PATENTS?  WHY DIDN'T THEY, IN ANSWER TO THE CALL,
15   SAY "WE HAVE THE PATENT APPLICATION"?
16               YOU WON'T HAVE TO WONDER.  HERE IS THE
17   TESTIMONY WHICH SAMSUNG OFFERED FROM A CORPORATE
18   REPRESENTATIVE ON THIS VERY ISSUE.
19               (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
20   OPEN COURT OFF THE RECORD.)
21               MR. LEE:  "A STUPID THING."
22               NOW, WHAT IS THE SECOND RULE THAT THE
23   EVIDENCE WILL DEMONSTRATE THAT SAMSUNG BROKE?
24               THERE'S ANOTHER RULE CALLED FRAND.  FRAND
25   IS AN ACRONYM.  IT MEANS FAIR, REASONABLE, AND
```

1    NON-DISCRIMINATORY.

2           WHAT'S THIS MEAN?  IT MEANS IF YOU'RE

3    GOING TO BE PART OF THIS GROUP, THE TEN OF US WHO

4    ARE COMING UP WITH THIS WALL SOCKET, WE'RE ALL

5    GOING TO AGREE THAT TO THE EXTENT WE HAVE PATENTS,

6    WE'RE GOING TO MAKE THEM AVAILABLE BECAUSE WE WANT

7    PEOPLE TO USE THEM, AND SO WE'LL PROMISE TO LICENSE

8    THEM, IF WE HAVE PATENTS, ON FAIR, REASONABLE, AND

9    NON-DISCRIMINATORY TERMS.

10           THIS IS IMPORTANT BECAUSE, AS YOU WILL

11    LEARN FROM THE EVIDENCE, THERE ARE LITERALLY

12    THOUSANDS OF PATENTS THAT PEOPLE HAVE DECLARED

13    ESSENTIAL.

14           AGAIN, AS I SAID, YOU WILL LEARN THAT

15    THOSE CLAIMS BY PEOPLE HAVE NOT BEEN TESTED FOR THE

16    MOST PART.

17           BUT FRAND IS ANOTHER RULE OF ETSI THAT IS

18    DESIGNED TO PREVENT PEOPLE FROM ENGAGED IN THE KIND

19    OF CONDUCT DESCRIBED AND, AT THE END, SAY, "I WANT

20    A LOT OF MONEY IF YOU'RE GOING TO USE MY PATENT."

21           NOW, MR. MCELHINNY TOLD YOU ABOUT SOME

22    APPLE PATENTS THAT COVER UNIQUE FEATURES OF THE

23    IPHONE AND IPAD.

24           THOSE YOU WILL LEARN ARE IDEAS AND

25    INVENTIONS THAT MADE THE IPHONE AND THE IPAD

```
 1     DIFFERENT FROM OTHERS.
 2              THE TWO PATENTS I'M TALKING ABOUT NOW ARE
 3     RELATED TO FEATURES THAT ARE THE SAME AMONG
 4     PRODUCTS.  THEY ARE FEATURES THAT ARE THE WIRELESS
 5     COMMUNICATION, ELECTRICAL PLUG.
 6              SO WHAT IS SAMSUNG SAYING?  ONCE SAMSUNG
 7     WAS ASKED TO STOP COPYING, ONCE IT ASSERTED THESE
 8     PATENTS, WHAT DID IT SAY AND WHAT WILL IT TELL YOU
 9     IT SHOULD BE PAID FOR THESE TWO PATENTS?
10              WELL, SAMSUNG IS GOING TO TRY TO CONVINCE
11     YOU THAT IT SHOULD GET 2.4 PERCENT OF EVERY IPHONE
12     AND IPAD FOR THESE TWO PATENTS.
13              NOW, LADIES AND GENTLEMEN, YOU WILL LEARN
14     THAT THAT'S ABOUT $12 FOR EVERY IPHONE AND IPAD.
15     IT'S HUNDREDS OF MILLIONS OF DOLLARS.
16              REMEMBER I SHOWED YOU THE BASEBAND
17     PROCESSOR THAT HAS ALL OF THESE FUNCTIONS?  $10?
18              SAMSUNG WANTS $12 FOR A COMPONENT THAT
19     APPLE PAYS $10 FOR.
20              NOW, YOU MAY BE ASKING YOURSELF, WELL,
21     HAS ANYBODY PAID SAMSUNG FOR THESE PATENTS BEFORE?
22              THE EVIDENCE WILL SHOW YOU THAT NO ONE
23     HAS.  NO ONE HAS PAID A PENNY FOR THESE PATENTS.
24              SOME COMPANIES HAVE ENGAGED IN
25     CROSS-LICENSES WITH SAMSUNG.  ONE COMPANY GIVES
```

1    SAMSUNG PATENTS, SAMSUNG GIVES THE OTHER COMPANY

2    PATENTS.

3              BUT SAMSUNG HAS NEVER BEEN PAID.

4              IN FACT, WHEN THE PAYMENT HAS BEEN MADE,

5    SAMSUNG HAS BEEN PAYING IT.

6              AND YOU'LL RECALL THE LAST TWO LETTERS OF

7    MY FRAND, NON-DISCRIMINATORY.  NON-DISCRIMINATORY

8    MEANS IN THIS CONTEXT JUST WHAT IT MEANS TO YOU ON

9    AN EVERY DAY BASIS.  IT MEANS EVERYBODY GETS

10   TREATED THE SAME.

11             WHAT WILL THE EVIDENCE SHOW ABOUT WHETHER

12   SAMSUNG HAS EVER MADE THIS DEMAND OF ANYONE ELSE?

13   THE DEMAND WAS ONLY MADE AFTER APPLE SAID "STOP

14   COPYING."  NOT MADE TO ONE OTHER PERSON, EVER.

15             THAT'S NOT FAIR, IT'S NOT REASONABLE, AND

16   IT'S NOT NON-DISCRIMINATORY.

17             AND WE WILL CALL A VERY EXPERIENCED

18   LICENSING EXECUTIVE, RICHARD DONALDSON, AN

19   ECONOMIST FROM NEW YORK UNIVERSITY WHO WILL EXPLAIN

20   TO YOU THE CONSEQUENCES OF THIS TYPE OF CONDUCT.

21             BUT IN THE END, IT WILL NOT BE, WE

22   SUBMIT, SURPRISING THAT SAMSUNG FAILED TO COMPLY

23   WITH FRAND, WITH THESE RULES.

24             WHY?  BECAUSE AS I TOLD YOU, SAMSUNG'S

25   STRATEGY IS AT THE VERY TOP OF THE COMPANY.

 1              LET ME SHOW YOU SOME MORE TESTIMONY FROM

 2      DR. AHN, WHO RUNS SAMSUNG'S INTELLECTUAL PROPERTY

 3      CENTER, THE I.P. CENTER AT SAMSUNG.

 4              "QUESTION:  DR. AHN, AS HEAD OF LICENSING

 5      AT SAMSUNG, HAVE YOU PERSONALLY TAKEN ANY STEPS TO

 6      ENSURE THAT SAMSUNG COMPLIES WITH ITS FRAND

 7      COMMITMENTS?"

 8              THOSE ARE THE RULES.

 9              "ANSWER:  I AM THE HEAD OF THE I.P.

10      CENTER AND I HAVE NOT TAKEN SUCH STEPS."

11              THE COURT:  NINE MINUTES.

12              MR. LEE:  THERE WAS ANOTHER QUESTION.

13              "ANSWER:  I HAVE NEVER VERIFIED WHETHER

14      SOMEBODY DOES."

15              LADIES AND GENTLEMEN, YOU CAN'T FOLLOW

16      THE RULES IF YOU DON'T TRY.

17              NOW, THE CONSEQUENCES OF THIS STANDARD

18      SETTING MISCONDUCT REALLY ARE THREE.

19              AT THE END, AFTER WE PUT THIS EVIDENCE

20      BEFORE YOU, WE WILL ASK YOU TO FIND THAT THESE

21      PATENTS ARE UNENFORCEABLE BECAUSE THEY DIDN'T ACT

22      FAIRLY AND SQUARELY.

23              WE WILL ASK YOU TO FIND THAT THEY

24      BREACHED THEIR CONTRACTUAL COMMITMENTS TO ETSI AND

25      THE OTHER PEOPLE PARTICIPATING IN ETSI.

```
 1              AND WE WILL ASK YOU TO FIND THAT THIS

 2      TYPE OF CONDUCT IS PRECISELY WHAT OUR ANTITRUST

 3      LAWS SAY THEY CAN'T DO.

 4              NOW, LET ME MOVE TO THE LATTER THREE

 5      PATENTS, THE ONES THAT, BY SAMSUNG'S OWN DAMAGES

 6      AWARDS, DAMAGES CLAIMS IS ABOUT A TENTH OR LESS IN

 7      IMPORTANCE.

 8              THERE ARE THREE OF THEM, THE '711, THE

 9      '893, AND THE '460.

10              TWO OF THESE, THE '893 AND THE '460, ARE

11      DIRECTED TO AN OLDER APPROACH OF DESIGNING PHONES.

12      THESE ARE THE OLDER PHONES THAT YOU SAW IN

13      MR. MCELHINNY'S SLIDES.

14              IN BOTH PATENTS, THE PHONES CAN BE PUT

15      INTO PARTICULAR MODES, PHOTO MODE AND CAMERA MODE.

16              WHEN THAT DEVICE IS IN THAT MODE, THAT'S

17      IT.  IT CAN'T BE ANYWHERE ELSE.

18              IT'S JUST LIKE THE OLD MODES ON YOUR

19      WASHING MACHINE.  YOU HAVE A HOT WATER MODE, WARM

20      WATER MODE, COLD WATER MODE.  YOU CAN PICK ONE, BUT

21      THAT'S WHERE YOU ARE.  YOU'RE IN THAT MODE.

22              YOUR RADIO, THE OLD RADIOS, F.M. MODE,

23      A.M. MODE, RIGHT?  TWO MODES.  BUT WHEN YOU PICKED

24      ONE, YOU WERE IN IT.  PICK ONE, THAT WAS IT.

25              THAT'S THE WAY THESE OLD PRODUCTS THAT
```

1    SAMSUNG DESIGNED OPERATED BECAUSE COMPUTING POWER

2    WAS NOT WHAT IT IS TODAY, AS YOU WILL LEARN.  YOU

3    HAD TO PICK ONE MODE OR THE OTHER, GO THERE, AND

4    THAT WAS IT.

5             THE IPHONE AND THE IPAD HAVE MUCH MORE

6    SOPHISTICATED COMPUTER SYSTEMS, COMPUTING POWER

7    AND, THEREFORE, THEY CAN DO MUCH MORE.  THEY CAN

8    RUN HUNDREDS OF THOUSANDS OF APPLICATIONS AND APPS

9    AT THE SAME TIME.

10            NOW, SOME OF THE APPS MAY HAVE MODES

11   WITHIN THEM, BUT THE APPLICATIONS ARE WHAT'S

12   DIFFERENT FROM THESE OLDER MODES.

13            YOU HAVE HEARD ABOUT APPLE'S APP STORE.

14   THIS IS WHERE USERS CAN CHOOSE FROM AMONG MANY OF

15   THE APPS AVAILABLE, RANGING FROM A SEARCH APP TO A

16   GAME APP TO A MUSIC APP.  AND THESE APPS ARE RUN AT

17   THE SAME TIME.

18            WHY?  YOU WILL LEARN IT'S BECAUSE APPLE

19   HAS INVENTED A DESIGN, A SYSTEM THAT ALLOWED FOR A

20   FLEXIBLE AND DYNAMIC APPROACH THAT USES THE

21   POWERFUL COMPUTING POWER OF TODAY, BUT USES THE

22   INVENTIONS THAT MR. MCELHINNY HAS DESCRIBED TO YOU

23   TO ALLOW PROCESSING CAPABILITY AND FEATURES THAT GO

24   SO FAR BEYOND WHAT WAS DEVELOPED A DECADE AGO.

25            SO LET ME SHOW YOU CLAIM 10 OF THE '893

1    PATENT.

2            YOU'LL REMEMBER THAT HER HONOR SAID THAT

3    THE CLAIMS ARE THE DESIGNED INVENTIONS.  I KNOW

4    HAVING THE INSTRUCTIONS, LONG INSTRUCTIONS FOR THE

5    FIRST TIME AT 4:00 O'CLOCK ON A MONDAY AFTERNOON IS

6    NOT EASY.  THE CLAIMS WILL BE COMING IN DURING THE

7    COURSE OF THE TRIAL.

8            I'M NOT GOING TO GO THROUGH THIS WHOLE

9    CLAIM, BUT WHAT I'M HIGHLIGHTING FOR YOU NOW IS ALL

10   THE DIFFERENT PLACES WHERE IT REQUIRES A MODE.

11           FIGURE 1 OF THE '893 PATENT ILLUSTRATES

12   THESE OLDER MODES.  IT'S A CAMERA.  THERE'S A MODE

13   DIAL.  YOU CAN DIAL BETWEEN TWO DIFFERENT MODES.

14           BUT WHEN YOU'RE IN ONE, IF YOU'RE F.M.,

15   YOU'RE F.M., AND IF YOU'RE A.M., YOU'RE A.M.  YOU

16   CAN'T DO BOTH.

17           NOW, LET'S LOOK AT THE IPHONE, AND LET'S

18   LOOK AT THE APPS OF THE IPHONE.

19           EVERY ICON REPRESENTS A DIFFERENT APP.

20   SOME OF THEM ARE IN YOUR IPHONE WHEN YOU BUY IT AND

21   OPEN IT UP FOR THE FIRST TIME.  THE CAMERA APP, YOU

22   WILL LEARN, IS.  THE PHOTO APP, YOU WILL LEARN, IS.

23           OTHERS CAN BE DOWNLOADED THROUGH THE APP

24   STORE FROM THE HUNDREDS OF THOUSANDS OF APPS THAT

25   PEOPLE ALL OVER THE WORLD HAVE DESIGNED.

1          AND USERS HAVE THE ABILITY TO USE MANY AS

2     THIS ANIMATION WILL SHOW YOU.

3          YOU CAN HAVE THE MUSIC APP PLAY MUSIC.

4     AT THE SAME TIME AS THE MUSIC APP IS PLAYING, WE

5     CAN SEND A TEXT MESSAGE, AND THE ANIMATION COULD GO

6     ON FOR THE OTHER THINGS YOU COULD DO.

7          THE '460 PATENT IS VERY MUCH THE SAME.

8     IF I GO TO THE NEXT SLIDE, THIS IS CLAIM 1 OF THE

9     '460, AND YOU WILL SEE IT'S ALL ABOUT MODE AND

10    SUB-MODE, MODES AND SUB-MODES THAT YOU WILL LEARN

11    ARE DIFFERENT FROM APPLE'S APPS.

12         YOU WILL HEAR FROM AN APPLE ENGINEER

13    NAMED EMILIE KIM.  SHE ACTUALLY WAS AN APPLE

14    ENGINEER, MOVED ON TO ANOTHER JOB, BUT SHE'S GOING

15    TO COME AND EXPLAIN TO YOU JUST HOW APPLE DEVELOPED

16    ITS CAMERA AND PHOTO APPS AND JUST HOW THEY WORK.

17         AND WE WILL THEN CALL TWO EXPERTS,

18    PROFESSOR PAUL DOURISH FROM U.C. IRVINE AND

19    PROFESSOR MANI SRIVASTAVA FROM UCLA, AND THEY WILL

20    COME AND EXPLAIN TO YOU THE DIFFERENCE BETWEEN THE

21    OLD APPS, THE OLD MODES, AND THE APPS OF THE IPHONE

22    FROM 2007 ON.

23         BUT THE BEST EVIDENCE THAT YOU WILL

24    RECEIVE ABOUT WHY THESE PATENTS -- THE BEST

25    EVIDENCE YOU WILL RECEIVE ABOUT WHY THESE PATENTS

```
 1    ARE NOT WHAT SAMSUNG SAYS IS THIS:  SAMSUNG DOES
 2    NOT USE THEM ITSELF.
 3             HER HONOR ESTABLISHED SOME RULES WHERE WE
 4    HAD TO TELL EACH OTHER FACTS AND CONTENTIONS.
 5    UNDER HER HONOR'S RULES, SAMSUNG HAD TO TELL US
 6    WHICH OF THEIR PRODUCTS HAD THESE INVENTIONS IN
 7    THEM.
 8             YOU WILL SEE THE SUBMISSION AND, FOR
 9    THOSE TWO PATENTS, IT'S ONE BIG BLANK.  THEY DON'T
10    EVEN USE IT THEMSELVES.
11             NOW, LET ME TURN TO THE LAST OF THE
12    SAMSUNG PATENTS, THE '711 PATENT.  THIS IS ALSO
13    SOMETHING THAT IS DIRECTED TO AN OLDER TECHNOLOGY.
14             I'M GOING TO PUT CLAIM 9 ON THE SCREEN --
15    AND FOR EACH OF THESE CLAIMS, YOU WILL HEAR MORE
16    ABOUT THE OTHER WORDS.  FOR EACH OF THE CLAIMS I'VE
17    SHOWN YOU, YOU WILL ACTUALLY LEARN THAT MUCH OF THE
18    WORDS DESCRIBE WHAT OTHERS HAD DONE BEFORE AND THAT
19    WAS NOT NEW, AND THE QUESTION WILL BECOME, WELL, IF
20    THAT'S ALL TRUE, WHAT IS IT THAT SAMSUNG SAYS IS
21    NEW?
22             NOW, THIS PATENT DESCRIBES PLAYING
23    BACKGROUND MUSIC WHILE MULTITASKING ON A MOBILE
24    DEVICE, JUST LIKE I SHOWED YOU THE APPLE PHONE
25    COULD DO.
```

```
 1              BUT THAT'S NOT WHAT THIS INVENTION IS,
 2    AND SAMSUNG CONCEDES THAT, BEFORE IT EVER MADE THIS
 3    INVENTION, OTHERS HAD MOBILE DEVICES THAT PLAYED
 4    BACKGROUND MUSIC AND MULTITASKED.
 5              SO WHAT DID SAMSUNG TELL THE PATENT
 6    OFFICE?  AND YOU'LL SEE THIS IN WORDS.
 7              THE CLAIM REFERS TO AN APPLET.  YOU SEE
 8    THAT ONE WORD I'VE HIGHLIGHTED THERE, APPLET.
 9              SAMSUNG SAID TO THE PATENT OFFICE, THIS
10    IS WHAT IS NEW.
11              NOW, YOU'RE GOING TO LEARN THAT APPLETS
12    ACTUALLY WERE PRETTY OLD THEMSELVES.  THEY WERE
13    INVENTED BY OTHERS.
14              YOU WILL ALSO LEARN THAT THE NAME HAS
15    NOTHING TO DO WITH APPLE, NOTHING TO DO WITH
16    APPLE'S APPS.
17              AND IN FACT, HER HONOR HAS GIVEN THIS
18    TERM, "APPLET," A VERY SPECIFIC DEFINITION.
19              THE COURT:  YOU HAVE ONE MINUTE.
20              MR. LEE:  THANK YOU.
21              "AN APPLICATION DESIGNED TO RUN WITHIN AN
22    APPLICATION MODULE."
23              THAT IS NOT -- THAT IS NOT WHAT APPLE
24    DOES.
25              NOW, I SAID AT THE BEGINNING THAT I WOULD
```

1    COME BACK TO THE QUESTION THAT MR. MCELHINNY POSED:

2    WHEN DID SAMSUNG FIRST ASSERT THESE PATENTS?

3            WE NOW KNOW THESE PATENTS WERE ALL FILED

4    BY 2007.

5            WHEN THE IPHONE CAME TO THE MARKET IN

6    2007, WHAT WILL THE EVIDENCE SHOW SAMSUNG DID?  DID

7    IT SAY, "APPLE, WE APPRECIATE YOUR BUSINESS.

8    APPLE, WE APPRECIATE THE BILLIONS OF DOLLARS YOU'RE

9    PAYING US.  BUT YOU SHOULD KNOW, WE'VE GOT PATENTS,

10   PATENTS THAT COVER YOUR IPHONE."

11           NOT A WORD.  NOT A WORD IN 2008.  NOT A

12   WORD IN 2009.  NOT A WORD IN THE FIRST HALF OF 2010

13   UNTIL APPLE SAID, "STOP COPYING."

14           AND ONLY THEN DID THESE PATENTS, WHICH

15   THE EVIDENCE WILL SHOW DESCRIBED OLD TECHNOLOGIES,

16   TECHNOLOGIES THAT APPLE DOESN'T USE, ONLY THEN WERE

17   THEY ASSERTED AGAINST APPLE.

18           NOW, I'M AT THE END OF OUR OPENING.

19   MR. MCELHINNY AND ME, WE KNOW THAT A LOT OF

20   INFORMATION HAS BEEN PROVIDED TO YOU.

21           I WANT TO END WHERE MR. MCELHINNY BEGAN,

22   WHICH IS BY THANKING YOU FOR YOUR JURY SERVICE.  WE

23   KNOW IT IMPOSES GREAT BURDENS ON YOU PERSONALLY.

24   AT TIMES YOU'RE GOING TO FEEL LIKE YOU'RE TAKING IN

25   INFORMATION LIKE YOU'RE DRINKING WATER FROM A FIRE

1    HOSE.  BUT IT'S OUR JOB TO MAKE IT UNDERSTANDABLE.

2              AT THE CONCLUSION OF THE CASE, HER HONOR

3    IS GOING TO PROVIDE YOU THE RULES AND THE LAW BOTH.

4    HER WORD IS THE FINAL WORD BECAUSE WE ARE A COUNTRY

5    OF LAWS AND RULES.

6              THE EVIDENCE WILL DEMONSTRATE THAT

7    SAMSUNG HAS REFUSED TO ABIDE BY THE RULES OF

8    UTILITY PATENTS.

9              THE EVIDENCE WILL DEMONSTRATE THAT

10   SAMSUNG HAS REFUSED TO ABIDE BY THE RULES OF DESIGN

11   PATENTS.

12             THE EVIDENCE WILL DEMONSTRATE THAT

13   SAMSUNG HAS REFUSED TO ABIDE BY THE RULES OF TRADE

14   DRESS.

15             AND THE EVIDENCE WILL DEMONSTRATE THAT

16   SAMSUNG BROKE ETSI'S RULES.

17             WE WILL COME BACK TO YOU AT THE

18   CONCLUSION OF THE EVIDENCE AND ASK YOU TO RETURN A

19   VERDICT FOR APPLE AGAINST SAMSUNG ON ALL OF THE

20   VARIOUS CLAIMS THAT ARE BEFORE YOU.

21             THANK YOU FOR YOUR TIME AND ATTENTION.

22             THE COURT:  ALL RIGHT.  IT'S 11:25.

23             ALL RIGHT.  LET'S GO FORWARD WITH

24   SAMSUNG'S OPENING.

25             MR. VERHOEVEN:  YOUR HONOR, MAY I

```
1    INQUIRE, ARE WE GOING TO BREAK FOR LUNCH AT NOON?

2              THE COURT:  AT NOON PLEASE.

3              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

4              THE COURT:  THANK YOU.

5              MR. VERHOEVEN:  MAY I PROCEED, YOUR

6    HONOR?

7              THE COURT:  PLEASE.

8              (WHEREUPON, MR. VERHOEVEN GAVE HIS

9    OPENING STATEMENT ON BEHALF OF SAMSUNG.)

10             MR. VERHOEVEN:  GOOD MORNING, MEMBERS OF

11   THE JURY.  MY NAME IS CHARLIE VERHOEVEN.  I'M

12   COUNSEL FOR THE APPLE DEFENDANTS AND

13   CROSS-CLAIMANTS IN THIS CASE, AND I'LL BE

14   PRESENTING OUR OPENING STATEMENT.

15             NOW, YESTERDAY YOU HEARD FROM THE JUDGE

16   THAT IT'S VERY IMPORTANT TO KEEP AN OPEN MIND IN

17   THIS CASE.  BOTH MR. MCELHINNY AND MR. LEE ARE VERY

18   GOOD TRIAL LAWYERS.  I'M SURE THAT THEY SOUNDED

19   QUITE PERSUASIVE TO YOU.

20             BUT YOUR JOB, AS THE JUDGE INSTRUCTED

21   YOU, IS TO KEEP AN OPEN MIND, AND I ASK YOU TO DO

22   THAT NOT JUST TO HEAR MY OPENING STATEMENT, BUT

23   THROUGHOUT ALL THE EVIDENCE AND UNTIL THE END OF

24   THE TRIAL BECAUSE, MEMBERS OF THE JURY, THERE'S

25   MORE TO THE STORY THAN WHAT YOU'VE JUST HEARD.
```

1        SO PLEASE KEEP AN OPEN MIND UNTIL YOU

2   HEAR THE WHOLE STORY.

3        FOR EXAMPLE -- IF WE CAN GO TO SLIDE 8.

4        YOU HEARD FROM MR. MCELHINNY THAT APPLE'S

5   DESIGN FOR THE IPHONE WAS REVOLUTIONARY; THERE WAS

6   NOTHING LIKE IT BEFORE; THAT IT HAD NEVER BEEN SEEN

7   BEFORE.

8        BUT WHAT YOU WEREN'T TOLD WAS THAT, IN

9   FACT, WE'RE TALKING ABOUT THE DESIGN OF THE IPHONE,

10  THERE WERE, IN PATENT PUBLICATIONS -- EXCUSE ME --

11  IN PATENT PUBLICATIONS THAT PRE-DATED THE IPHONE

12  MANY PATENTS THAT HAD LARGE RECTANGULAR SCREENS.

13       SO, FOR EXAMPLE, HERE IN 2005, BEFORE THE

14  IPHONE IS RELEASED, A JAPANESE PATENT, THE '383

15  PATENT.  LARGE, RECTANGULAR SCREEN, YOU SEE IT

16  RIGHT THERE, SIMILAR TO THE IPHONE SCREEN; BIG

17  RECTANGULAR FORM FACTOR, THE SCREEN TAKES UP MOST

18  OF THE, OF THE FORM FACTOR; ROUNDED, DEEPLY ROUNDED

19  CORNERS; AND MINIMALIST DESIGN.

20       APPLE DIDN'T INVENT THAT.  THAT WAS

21  ALREADY OUT THERE.

22       AND ANOTHER JAPANESE PATENT, JP368, YOU

23  SEE HERE AS WELL, VERY SIMILAR.  THE LARGE, REAL --

24  MOST OF THE REAL ESTATE IN THAT PHONE THERE, PHONE

25  DESIGN, IS THE SCREEN; IT'S GOT A LARGE RECTANGULAR

```
1     FORM FACTOR; IT'S GOT ROUNDED CORNERS; IT'S GOT A

2     VERY MINIMALIST DESIGN; JUST ONE LOZENGE-SHAPED EAR

3     HOLE THERE.

4             THERE'S ANOTHER, KR547, A DESIGN PATENT

5     FILED BEFORE ANY OF THE DESIGN PATENTS IN THIS

6     CASE.

7             AGAIN, LARGE RECTANGULAR SCREEN;

8     RECTANGULAR FORM FACTOR WITH ROUNDED CORNERS;

9     MINIMALIST DESIGN WITH JUST A LOZENGE-SHAPED EAR

10    HOLE.

11            AND THEN THE LG PRADA, THIS IS AN ACTUAL

12    PICTURE OF A PRODUCT FROM 2006, A SMARTPHONE, LARGE

13    RECTANGULAR SCREEN; SAME FORM FACTOR; ROUNDED

14    CORNERS; MINIMALIST DESIGN.

15            SO THE FACTS WILL SHOW THAT THERE'S A

16    DISTINCTION BETWEEN A PRODUCT WITH ALL OF ITS

17    ACCOUTREMENTS THAT BECOMES VERY POPULAR AND THE

18    QUESTION OF WHAT DID YOU INVENT?  WERE YOU THE

19    FIRST TO DO IT?  DID SOMEBODY ELSE DO IT BEFORE?

20            THERE'S A DISTINCTION, THE EVIDENCE WILL

21    SHOW, BETWEEN COMMERCIAL SUCCESS AND INVENTING

22    SOMETHING.

23            NOW, I'D LIKE TO SHOW YOU ALSO THE IPAD.

24            IF WE CAN GO TO THE NEXT SLIDE.

25            AGAIN, THE CLAIM WAS MADE, THE EVIDENCE
```

1    WILL SHOW THE IPAD REVOLUTIONIZED DESIGN.

2            BUT IF YOU LOOK AT THE EVIDENCE -- IF YOU

3    LOOK AT WHAT THE EVIDENCE IN THIS CASE WILL SHOW,

4    THESE HERE ARE PRIOR ART TABLETS THAT HAVE SIMILAR

5    FORM FACTORS.

6            HERE WE SEE THAT, IN 1994, THE FIDLER

7    TABLET.  YOU WEREN'T TOLD ABOUT THAT.  THAT WAS

8    YEARS BEFORE THE IPAD CAME OUT IN 2010.  THE FIDLER

9    PATENT HAD A LARGE SCREEN; RECTANGULAR SHAPE;

10   MINIMALIST DESIGN; ROUNDED CORNERS.

11           HEWLETT-PACKARD, TC1000 PRE-DATED THE

12   IPAD.  LARGE RECTANGULAR SCREEN; TAKES UP MOST OF

13   THE SPACE OR THE REAL ESTATE ON THE FRONT OF THE

14   IPAD -- EXCUSE ME -- ON THE TABLET; RECTANGULAR IN

15   SHAPE; ROUNDED CORNER; MINIMALIST DESIGN.

16           U.S. DESIGN PATENT '802, SIMILAR.

17           JAPANESE DESIGN PATENT, '127.

18           THE EVIDENCE IS GOING TO SHOW THAT APPLE

19   DIDN'T INVENT THE RECTANGULAR SHAPED FORM FACTOR

20   THAT YOU KEEP SEEING.  APPLE DIDN'T INVENT HAVING A

21   LARGE TOUCH SCREEN IN A RECTANGLE WITH ROUNDED

22   CORNERS.

23           THE EVIDENCE WILL SHOW THAT APPLE'S OWN

24   EXPERTS ADMIT THAT APPLE HAS NO RIGHT TO CLAIM A

25   MONOPOLY ON A RECTANGLE WITH ROUNDED CORNERS OR A

```
1    LARGE SCREEN.

2              NOW, ANOTHER THING YOU WEREN'T TOLD --

3    LET ME RESTATE THAT.

4              YOU WERE TOLD, OR AT LEAST IT WAS

5    IMPLICATED, THAT MY CLIENT, SAMSUNG, WAS PURSUING

6    ONE TYPE OF DESIGN FOR A PHONE AND THEN THE IPHONE

7    CAME OUT AND THEN THEY SWITCHED AND JUST COPIED THE

8    IPHONE.

9              WELL, THE EVIDENCE IS GOING TO SHOW THAT

10   YOU DIDN'T HEAR THE WHOLE STORY THERE, EITHER.

11             HERE, MEMBERS OF THE JURY, IS A

12   DEMONSTRATIVE SLIDE THAT DEPICTS THE SAMSUNG

13   PRE-IPHONE PHONES AND POST-IPHONE DESIGNS.

14             WE PUT A LINE RIGHT THROUGH THE MIDDLE OF

15   THIS SLIDE SO YOU CAN SEE THAT'S WHEN THE IPHONE

16   WAS ANNOUNCED, JANUARY 2007.

17             NOW, AS YOU CAN SEE, BEFORE THE IPHONE

18   WAS EVEN ANNOUNCED, SAMSUNG'S BUSINESS MODEL WAS TO

19   MAKE A NUMBER OF DIFFERENT TYPES OF PHONES.

20             UNLIKE APPLE, THE EVIDENCE WILL SHOW,

21   SAMSUNG MAKES MANY PHONES FOR MANY DIFFERENT TYPES

22   OF PEOPLE BECAUSE, AS WE HEARD DURING JURY

23   SELECTION, DIFFERENT PEOPLE HAVE DESIRES FOR

24   DIFFERENT TYPES OF PHONES.  SOME JUST WANT A PHONE

25   THAT DOES NOTHING ELSE.  SOME WANT TO BE ABLE TO
```

1    TYPE A LOT, SO THEY WANT A PHYSICAL KEYBOARD.  SOME

2    LIKE TO HAVE THE TOUCH SCREEN PHONE.

3              WELL, UNLIKE APPLE THAT JUST MAKES

4    BASICALLY ONE KIND OF PHONE, SAMSUNG MAKES ALL

5    KINDS OF PHONES FOR ALL KINDS OF PEOPLE.

6              AND SO THERE'S A FOLDER-TYPE PHONE THAT

7    SAMSUNG MADE BEFORE THE IPHONE AND MAKES NOW.

8              THERE'S THE BAR-TYPE IPHONE -- EXCUSE

9    ME -- BAR-TYPE PHONE THAT SAMSUNG MADE BEFORE THE

10   IPHONE.  SAMSUNG STILL MAKES THE BAR-TYPE PHONE.

11   IT DIDN'T SWITCH AND ONLY MAKE TOUCH SCREEN PHONES

12   AFTER THE IPHONE CAME OUT.

13             THERE'S THE SLIDE-TYPE IPHONE, THE SLIDER

14   PHONE.  SAMSUNG MADE THOSE BEFORE THE IPHONE.  IT

15   DIDN'T STOP MAKING THOSE WHEN THE IPHONE CAME OUT

16   AND SWITCH TO JUST TOUCH SCREENS.  IT STILL MAKES

17   SLIDER-TYPE PHONES.

18             AND IMPORTANTLY, BEFORE THE IPHONE CAME

19   OUT, SAMSUNG ALSO MADE PHONES THAT WERE RECTANGULAR

20   IN SHAPE WITH ROUNDED CORNERS THAT HAD LARGE TOUCH

21   SCREENS ON THEM, AND CONTINUED TO MAKE THOSE AFTER

22   THE IPHONE CAME OUT.

23             WHAT YOU SAW IN MR. MCELHINNY'S OPENING

24   WAS A LITTLE BIT UNFAIR.  WHAT YOU SAW WAS POINTING

25   TO A BAR-TYPE IPHONE AND SAYING, "WELL, THAT'S

```
 1    PRE-IPHONE," AND THEN POINTING TO ONE OF THESE

 2    TOUCH SCREEN PHONES AFTER THE IPHONE AND SAYING,

 3    "OH, WELL, THEY SWITCHED AND THEY STOPPED DOING

 4    THIS AND STARTED DOING THAT."

 5           BUT THAT'S NOT THE -- THAT'S NOT THE

 6    WHOLE STORY.  IF YOU LOOK AT THE PHONES THAT

 7    SAMSUNG MAKES, THAT'S A DISTORTION -- THE EVIDENCE

 8    WILL SHOW THIS -- OF WHAT HAPPENED.

 9           IN FACT, WHAT THE EVIDENCE WILL SHOW IS

10    THERE'S AN EVOLUTION IN TECHNOLOGY, IN SMARTPHONE

11    TECHNOLOGY, AND THE EVIDENCE WILL SHOW THAT AS THE

12    GUTS OF THESE PHONES GOT MORE SOPHISTICATED AND

13    MORE SOPHISTICATED, YOU COULD DO MORE THINGS.

14           IT USED TO BE YOU COULD JUST MAKE A PHONE

15    CALL.  THEN IT WAS YOU CAN MAKE A PHONE CALL AND

16    TEXT MESSAGE.

17           BUT THEN TECHNOLOGY GOT BETTER AND BETTER

18    AND THESE PHONES TURNED INTO MINICOMPUTERS AND YOU

19    COULD WATCH VIDEOS ON THEM, YOU COULD PLAY MOVIES,

20    YOU COULD LISTEN TO MUSIC, YOU COULD TALK TO

21    SOMEBODY ELSE VIA VIDEO, ALL KINDS OF DIFFERENT

22    THINGS.

23           AND AS THAT FUNCTIONALITY INCREASED, THE

24    ENTIRE INDUSTRY MOVED TOWARDS SCREENS THAT WERE

25    MUCH, MUCH LARGER BECAUSE NO ONE IS GOING TO WANT
```

```
 1    TO WATCH A MOVIE ON A TINY LITTLE SCREEN IN A

 2    PHONE.

 3              IT'S NOT JUST SAMSUNG.  THE EVIDENCE WILL

 4    SHOW THE ENTIRE INDUSTRY MOVED THIS WAY.

 5              IS THAT INFRINGEMENT?

 6              THE EVIDENCE IS GOING TO SHOW, NO, IT'S

 7    COMPETITION.  IT'S PROVIDING THE CONSUMER WHAT THE

 8    CONSUMER WANTS.

 9              AND THAT IS WHAT SAMSUNG HAS DONE.

10    SAMSUNG FOLLOWS ITS BUSINESS MODEL IS TO MEET ITS

11    CONSUMER'S DEMANDS.  IF THE CONSUMERS DESIRE TO

12    HAVE PHONES WITH TOUCH SCREENS THAT ARE LARGE ON

13    THE FRONT FACE, SAMSUNG PROVIDES THEM.

14              IF THE CONSUMERS WANT TO HAVE A

15    FOLDER-TYPE PHONE, SAMSUNG PROVIDES IT.

16              IT'S NOT OUT THERE, LIKE SOME

17    JOHNNY-COME-LATELY, JUST COPYING KNOCK-OFFS.  IT'S

18    DEVELOPING TECHNOLOGY FOR WHAT PEOPLE WANT.

19              NOW, WE'RE NOT STANDING HERE TELLING YOU,

20    MEMBERS OF THE JURY, THAT THE IPHONE WASN'T

21    COMMERCIALLY SUCCESSFUL.  WE'RE NOT SAYING THAT IT

22    WASN'T A GREAT PRODUCT.  IT WAS.  IT WAS AN

23    INSPIRING PRODUCT TO EVERYONE, INCLUDING THE

24    COMPETITION.

25              BUT BEING INSPIRED BY A GOOD PRODUCT AND
```

```
1     SEEKING TO MAKE EVEN BETTER PRODUCTS IS NOT -- IT'S
2     CALLED COMPETITION.  IT'S NOT COPYING.  IT'S NOT
3     INFRINGEMENT.
4               EVERYBODY DOES IT IN THE COMMERCIAL
5     MARKETPLACE.
6               THE QUESTION FOR YOU, MEMBERS OF THE
7     JURY, ARE THE INSTRUCTIONS HER HONOR IS GOING TO
8     GIVE YOU ON TRADE DRESS INFRINGEMENT, ON DESIGN
9     PATENT INFRINGEMENT, ON UTILITY PATENT INFRINGEMENT
10    WHERE YOU HAVE SPECIFIC RULES AND YOU APPLY THOSE
11    RULES.
12              IT'S NOT WHETHER OR NOT PEOPLE ARE
13    COMPETING AGAINST EACH OTHER.  THERE'S NOTHING
14    WRONG WITH THAT.
15              NOW, I'D LIKE TO SPEND JUST A MINUTE
16    TALKING ABOUT MY CLIENT, SAMSUNG, BEFORE I GET INTO
17    THESE TRADE DRESS AND DESIGN PATENT, UTILITY PATENT
18    ISSUES.
19              IF WE CAN GO BACK TO SLIDE 3, PLEASE.
20              SAMSUNG HAS BEEN IN THE MOBILE TECHNOLOGY
21    INDUSTRY SINCE 1991, WELL BEFORE APPLE DECIDED TO
22    ENTER THE INDUSTRY IN 2007.
23              SAMSUNG WAS ONE OF THE FOUNDATIONAL
24    TECHNOLOGY COMPANIES THAT BUILT THE STANDARDS THAT
25    ALLOW YOU TO LISTEN TO MUSIC AND DO ALL THESE GREAT
```

1    THINGS WITH YOUR SMARTPHONES.

2              SAMSUNG HAS INVESTED, JUST FROM 2005 TO

3    2010, $35 BILLION IN RESEARCH AND DEVELOPMENT TO

4    HELP BUILD THIS INFRASTRUCTURE, TO HELP BUILD THESE

5    SMARTPHONES.  THAT'S JUST FROM 2005 TO 2010.

6              THERE'S OVER 20,000 ENGINEERS DEDICATED

7    AT SAMSUNG TO TELECOMMUNICATIONS RESEARCH AND

8    DEVELOPMENT WORLDWIDE.  OVER 1,000 DESIGNERS

9    DESIGNING THOUSANDS OF ELECTRONIC PRODUCTS EACH

10   YEAR.

11             SAMSUNG IS NOT SOME COPYIST, SOME

12   JOHNNY-COME-LATELY WHO'S DOING KNOCK-OFFS.  SAMSUNG

13   IS A MAJOR TECHNOLOGY COMPANY THAT DEVELOPS ITS OWN

14   INNOVATIONS.

15             SAMSUNG ALSO HAS OFFICES RIGHT HERE IN

16   SAN JOSE.  SAMSUNG HAS ITS MOBILE COMMUNICATIONS

17   LAB WITH 90 ENGINEERS WHO WORK CLOSELY WITH GOOGLE

18   TO OPTIMIZE THE ANDROID OPERATING SYSTEM FOR

19   SAMSUNG'S PHONES.  SAMSUNG'S PHONES OPERATE ON THE

20   ANDROID OPERATING SYSTEM IN LARGE PART.

21             IN SAN JOSE ALSO IS THE SAMSUNG DESIGN

22   AMERICA GROUP WHERE DESIGNERS AND ENGINEERS WORK

23   CLOSELY WITH OTHER DIVISIONS CREATING THE DESIGN

24   AND USER INTERFACE OF SAMSUNG'S PHONES AND TABS.

25             FINALLY IN SAN JOSE IS THE MEDIA SOLUTION

1   CENTER-AMERICA WHICH DEVELOPS AND MANAGES THE

2   PLATFORMS THAT DELIVER CONTENT AND SERVICES TO

3   MOBILE DEVICES.

4           GO TO SLIDE 7, PLEASE.

5           NOW, MR. MCELHINNY AND MR. LEE ALLUDED TO

6   THIS, BUT I WANT TO -- I WANT TO PAUSE ON IT

7   BECAUSE IT'S IMPORTANT -- IT'S SOMEWHAT IMPORTANT.

8           THE EVIDENCE WILL SHOW THAT IT IS SAMSUNG

9   THAT SUPPLIES 20 PERCENT OF THE COMPONENT COSTS FOR

10  THE IPHONE.

11          THINK ABOUT THAT.  THE GUTS THAT MAKE

12  THIS PHONE WORK, THE FLASH MEMORY IN THE PHONE, THE

13  MAIN MEMORY IN THE PHONE, THE APPLICATION PROCESSOR

14  IN THE PHONE, THEY ARE ALL SUPPLIED BY SAMSUNG.

15          APPARENTLY APPLE THINGS THAT SAMSUNG HAS

16  INVENTED SOMETHING BECAUSE IT'S BUYING ITS PRODUCTS

17  FROM IT TO PUT IT IN ITS OWN PHONE.

18          WITH RESPECT TO THE IPAD, THE EVIDENCE

19  WILL SHOW THAT SAMSUNG MANUFACTURES THE A5X

20  PROCESSOR IN THE IPAD, AND IT IS THE SOLE AND ONLY

21  QUALIFIED SUPPLIER FOR APPLE FOR ITS MUCH VALUED

22  AND MARKETED RETINA DISPLAY ON THE NEWEST IPAD.

23          APPLE IS OUT THERE MARKETING ITSELF AS AN

24  INNOVATOR AND THE ONLY COMPANY TO ACTUALLY PROVIDE

25  THIS RETINA DISPLAY IS SAMSUNG.

1          WHO'S THE REAL INNOVATOR?  ASK YOURSELF

2     THAT QUESTION WHEN YOU HEAR THE EVIDENCE.

3          NOW, THE SUGGESTION WAS MADE THAT THERE'S

4     SOMETHING WRONG WITH LOOKING TO SOMEBODY ELSE TO BE

5     INSPIRED.  MR. MCELHINNY WENT THROUGH AND SHOWED

6     YOU SOME DOCUMENTS WHERE SOME SAMSUNG PEOPLE WHO

7     WERE DOING COMPETITIVE ANALYSIS WERE LOOKING AT THE

8     IPHONE.

9          I'LL GET TO WHAT THE EVIDENCE WILL SHOW

10    ABOUT APPLE DOING THAT IN A MINUTE, BUT THE

11    EVIDENCE IS GOING TO SHOW, MEMBERS OF THE JURY,

12    THERE'S NOTHING WRONG WITH THAT.  IT'S CALLED

13    COMPETITION.  ALL COMPETITORS DO THAT.

14          AND THERE'S NOTHING WRONG WITH BEING

15    INSPIRED BY SOMEBODY ELSE'S DESIGN.

16          COULD WE GO TO THE NEXT SLIDE HERE?

17    OOPS.

18          FOR EXAMPLE, IN THIS CASE -- IN THIS VERY

19    CASE WITH RESPECT TO THE CREATION OF THE DESIGN OF

20    THE IPHONE, THE INITIAL IPHONE, THE EVIDENCE WILL

21    SHOW THAT APPLE ITSELF WAS INSPIRED BY THE

22    FUNCTIONALITY OF ANOTHER COMPANY'S DESIGN, SONY.

23    THIS IS EXHIBIT 562 ON THE SCREEN.

24          YOU SEE THE PICTURE HERE, MEMBERS OF THE

25    JURY.  ON THE BOTTOM RIGHT, THAT'S -- THE EVIDENCE

```
1    IS GOING TO SHOW THAT WAS REFERRED TO AS THE

2    EXTRUDO SHAPE DESIGN.  YOU SEE HERE IT SAYS

3    "EXTRUDO SHAPE" IN THE E-MAIL.

4              ON THE LEFT-HAND SIDE IS A DIFFERENT

5    DESIGN, ONE THAT LOOKS A LOT MORE LIKE WHAT THE

6    ORIGINAL IPHONE, THE INITIAL IPHONE WHEN IT WAS

7    RELEASED LOOKED LIKE:  ROUNDED CORNERS, BLACK, AN

8    IPHONE SET UP VERY SIMILAR TO WHAT YOU SAW FOR THE

9    INITIAL IPHONE.

10             WELL, THE EVIDENCE IS GOING TO SHOW THAT

11   THAT DESIGN WAS -- AND ITS FUNCTIONALITY INSPIRED

12   APPLE TO CHANGE COURSE WITH THE DESIGN OF ITS

13   INITIAL IPHONE.  APPLE WAS INSPIRED BY SONY.

14             THIS E-MAIL IS DATED MARCH 8TH, 2006 FROM

15   RICHARD HOWARTH, WITHIN APPLE, TO JONATHAN IVE,

16   WHO'S THE HEAD OF THE DESIGN GROUP AT APPLE.  DATED

17   MARCH 8, 2006.

18             THEY'RE STILL WORKING -- THE EVIDENCE

19   WILL SHOW THEY WERE STILL WORKING ON THE DESIGN OF

20   THE IPHONE.  THEY HADN'T FINISHED IT.  THEY HADN'T

21   COMPLETED IT.

22             THE EVIDENCE IS GOING TO SHOW, MEMBERS OF

23   THE JURY, THIS EXTRUDO SHAPE IS WHAT THEY WERE

24   GOING WITH UNTIL IT BECAME INSPIRED BY THE

25   SONY-STYLE DESIGN FUNCTIONALITY.
```

1            AND HERE IT SAYS "HI JONY, I'M WORRIED

2      ABOUT THE EXTRUDO SHAPE WE'RE USING FOR P2."

3            P2, THE EVIDENCE WILL SHOW, IS CODE NAME,

4      THE INTERNAL CODE NAME THAT APPLE USED FOR ITS

5      INTERNAL PROJECT FOR DEVELOPING THE IPHONE.

6            "I'M WORRIED ABOUT THE EXTRUDO SHAPE

7      WE'RE USING FOR P2 ET CETERA LOOKING AT WHAT SHIN'S

8      DOING" -- AND THAT SHIN IS REFERRING TO SHIN

9      NISHIBORI, WHICH IS -- WHO WAS ANOTHER DESIGNER

10     WITHIN THE APPLE DEPARTMENT -- "LOOKING AT WHAT

11     SHIN'S DOING WITH THE SONY-STYLE CHAPPY, HE'S ABLE

12     TO ACHIEVE A MUCH SMALLER-LOOKING PRODUCT WITH A

13     MUCH NICER SHAPE TO HAVE NEXT TO YOUR EAR AND IN

14     YOUR POCKET.  ALSO NOTE THAT IT'S ONLY --" AND THEN

15     IT GOES ON.

16           SO RIGHT THERE IN APPLE'S OWN DOCUMENTS

17     WE SEE APPLE ITSELF WAS INSPIRED, AS PART OF ITS

18     DESIGN PROCESS, TO MOVE FROM THE EXTRUDO SHAPE TO

19     SOMETHING THAT WAS MORE SONY-LIKE.

20           THERE'S NOTHING WRONG WITH THAT.  THAT

21     DOESN'T MEAN THEY'VE INFRINGED SOME SONY PATENT OR

22     DESIGN PATENT.  IT JUST MEANS THAT THEY WERE

23     COMPETING AND THEY WERE INSPIRED BY A COMPETITOR.

24           POINTING TO DOCUMENTS THAT ARE SIMILAR

25     WITHIN THE SAMSUNG INTERNAL DOCUMENTS DOESN'T SHOW

```
1    ANYTHING MORE.  THERE'S NOTHING WRONG WITH BEING

2    INSPIRED -- THERE'S NOTHING WRONG WITH LOOKING AT

3    WHAT YOUR COMPETITORS DO OR SOMETHING INSPIRED BY

4    THEM.  THAT'S NOT WHAT WE'RE HERE FOR.

5            WE'RE HERE TO ASSESS THE SPECIFIC CLAIMS

6    MADE IN THIS CASE WITH RESPECT TO TRADE DRESS

7    INFRINGEMENT, DESIGN PATENT INFRINGEMENT, UTILITY

8    PATENT INFRINGEMENT.

9            THE EVIDENCE IS ALSO GOING TO SHOW THAT

10   APPLE -- DESPITE MR. MCELHINNY'S CLAIMS, APPLE

11   WASN'T FIRST.

12           THIS IS AN E-MAIL FROM APRIL 6TH, 2010

13   FROM STEVEN SINCLAIR, WHO WAS THE IPHONE PRODUCT

14   MARKETING MANAGER.  AND IN THIS E-MAIL, HE SAYS,

15   "IT'S TOUGH TO APPROACH THIS WITH THE CRITERIA OF

16   BEING THE 'FIRST.'  I DON'T KNOW HOW MANY THINGS WE

17   CAN COME UP WITH THAT YOU COULD LEGITIMATELY CLAIM

18   WE DID FIRST.  CERTAINLY WE HAVE THE FIRST

19   COMMERCIALLY SUCCESSFUL VERSIONS OF MANY FEATURES,

20   BUT THAT'S DIFFERENT THAN LAUNCHING SOMETHING TO

21   MARKET FIRST."

22           THAT POINT MADE BY APPLE'S OWN PRODUCT

23   MARKETING MANAGER, STEVEN SINCLAIR, IS VERY

24   IMPORTANT BECAUSE THERE IS A DIFFERENCE BETWEEN

25   INVENTING SOMETHING THAT'S NEW AND DOING IT FOR THE
```

```
1    FIRST TIME VERSUS MAKING SOMETHING POPULAR.

2              IF YOU MAKE SOMETHING POPULAR, THAT

3    DOESN'T GIVE YOU A RIGHT TO EXCLUDE EVERYONE ELSE

4    FROM DOING IT.

5              IN ORDER TO EXCLUDE PEOPLE, AS THE JUDGE

6    WILL INSTRUCT YOU AT THE END, YOU NEED TO HAVE A

7    PATENT OR A TRADE DRESS THAT'S INFRINGED.

8              HERE THE EVIDENCE IS GOING TO SHOW, THERE

9    ISN'T INFRINGEMENT OF THESE PATENTS THAT ARE BEING

10   ASSERTED.

11             AND WHETHER OR NOT THESE COMPETITORS WERE

12   INSPIRED BY EACH OTHER IS IRRELEVANT.

13             THE QUESTION IS WHETHER THERE'S

14   INFRINGEMENT.

15             NOW, AGAIN, YOU WERE SHOWN INTERNAL

16   DOCUMENTS THAT SAMSUNG -- WHERE SAMSUNG WAS LOOKING

17   AT THE IPHONE AND COMPARING IT AND THE SUGGESTION

18   WAS MADE THAT THAT MEANS THAT THEY'RE EVIL

19   COPYISTS.

20             BUT AS I SAID, THE EVIDENCE WILL SHOW

21   THAT EVERYBODY DOES THAT IN THE SMARTPHONE

22   BUSINESS.  EVERYONE BENCHMARKS AGAINST EACH OTHER.

23   THEY ALL DO COMPETITIVE ANALYSIS.

24             AND THE EVIDENCE WILL SHOW APPLE'S OWN

25   DOCUMENTS AND EMPLOYEES AGREE WITH ME.
```

1          HERE IS GREG JOSWIAK, VICE-PRESIDENT OF

2     IPHONE PRODUCT MARKETING IN A SWORN DEPOSITION

3     TAKEN IN THIS CASE.

4          "MY GROUP, FOR EXAMPLE, WOULD HAVE A

5     PRODUCT MANAGER WHEN A NEW PRODUCT COMES OUT,

6     PURCHASE IT, YOU KNOW, UNDERSTAND, YOU KNOW, HOW

7     MUCH OF A THREAT IT IS, ARE THEY BETTER AT

8     ANYTHING, ARE THEY BETTER AT ANYTHING THAN US TO

9     ASSESS THE THREAT."

10         AND THEN HE CONTINUES, "IF YOU'RE GOING

11    TO BE THE BEST AT SOMETHING, YOU HAVE TO KNOW WHAT

12    YOUR COMPETITION IS DOING."

13         THERE'S NOTHING WRONG WITH THAT, AND

14    THERE'S NOTHING WRONG WITH SAMSUNG DOING THAT AS

15    WELL.  IT'S CALLED COMPETITION.  THAT'S WHAT WE DO

16    IN AMERICA.

17         DUNCAN KERR, APPLE DESIGN INVENTOR, HIS

18    DEPOSITION WAS TAKEN IN THIS CASE.  HE TESTIFIED,

19    UNDER OATH, "I THINK FROM A DESIGN PERSPECTIVE IT'S

20    INTERESTING TO SEE WHAT OTHER COMPANIES ARE DOING."

21         AND THERE'S OTHER, MORE TESTIMONY THAT

22    WE'RE GOING TO SEE IN THE TRIAL THAT SUPPORTS THIS

23    FROM APPLE'S OWN WITNESSES.

24         AND THEN WE HAVE APPLE'S DOCUMENTS.  YOU

25    SAW A DOCUMENT OF SAMSUNG LOOKING AT THE APPLE

1     IPHONE.  APPLE DOES THE SAME THING.

2              HERE'S A TEARDOWN DOCUMENT, IT'S CALLED

3     MINI-TEARDOWN OF THE SAMSUNG GALAXY S PERFORMED ON

4     AUGUST 10TH, 2010, MEMBERS OF THE JURY.  THIS IS AN

5     ACCUSED PRODUCT IN THIS CASE.

6              WELL, THIS IS AN APPLE DOCUMENT FROM

7     APPLE'S INTERNAL FILES.  YOU SEE, MINI-TEARDOWN,

8     SAMSUNG GALAXY S.

9              AND WHAT ARE THEY DOING?  THEY'RE

10    CONDUCTING A DETAILED TEARDOWN OF THE DOCUMENT TO

11    DETERMINE THE PRODUCT SPECS, ITS FEATURES, THE

12    DISASSEMBLY, THE COMPONENTS, THE SOFTWARE, AND THE

13    ADDITIONAL COMPONENTS, AND THEY GO THROUGH IT

14    METICULOUSLY, JUST LIKE IN THE DOCUMENT THAT

15    MR. MCELHINNY SHOWED YOU.

16             DOES THAT MEAN THAT APPLE IS A COPYIST?

17    NO.  IT MEANS IT'S A COMPETITOR.  THAT'S NOTHING

18    WRONG WITH THAT.

19             SAME THING WITH THE TAB.  APPLE'S OWN

20    DOCUMENTS, SAMSUNG GALAXY -- THIS IS AN APPLE

21    DOCUMENT, EXHIBIT 717, DATED MAY 24TH, 2011 WHERE

22    APPLE DOES A TEARDOWN OF THE ACCUSED PRODUCT, TAB

23    PRODUCT IN THIS CASE, THE GALAXY TAB 10.1, AND IT'S

24    TITLED -- THE DOCUMENT IS TITLED "SAMSUNG GALAXY

25    TAB 10.1 TAKE-APART," AND THEY EVEN HAVE PICTURES

```
1    OF SOMEONE TAKING THE THING APART AND EXAMINING IT

2    AND STUDYING IT.

3              DOES THAT MEAN THAT APPLE DID SOMETHING

4    WRONG?  NO.

5              AND TO SUGGEST BY POINTING TO SIMILAR

6    DOCUMENTS WITHIN SAMSUNG THAT THAT MEANS WE'RE AN

7    INFRINGER IS IRRELEVANT.  IT'S A COMPETITIVE

8    ANALYSIS.  IT'S DONE ALL THE TIME.  THERE'S NOTHING

9    WRONG WITH IT.

10             NOW, WITH THAT I'D LIKE TO TURN TO THE

11   CLAIMS THAT ARE MADE IN THIS CASE AGAINST MY

12   CLIENT, AND THE FIRST IS TRADE DRESS INFRINGEMENT.

13             AND I HOPE YOU DON'T MIND, MEMBERS OF THE

14   JURY, BUT I HAVE A PROBLEM WITH MY BACK, SO I HAVE

15   A STOOL HERE.  I THINK I'M GOING TO HAVE TO SIT ON

16   THE STOOL WHILE I DO THIS.

17             IF THAT'S OKAY WITH YOUR HONOR?

18             THE COURT:  PLEASE, GO AHEAD.

19             MR. VERHOEVEN:  SO LET'S START WITH

20   APPLE'S TRADE DRESS, MEMBERS OF THE JURY.

21             NOW, HER HONOR ALREADY GAVE YOU A

22   PRELIMINARY INSTRUCTION ON TRADE DRESS AND I JUST

23   WANT TO GO OVER IT BEFORE WE LOOK AT THE EVIDENCE.

24             "'INFRINGEMENT' REFERS TO ANOTHER

25   COMPANY'S USE SIMILAR TO THE OWNER'S TRADE DRESS
```

1    THAT IS LIKELY TO CAUSE CONFUSION IN THE

2    MARKETPLACE."

3            MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.

4    I'M SORRY.  BUT I'VE BEEN LISTENING PATIENTLY, BUT

5    YOU HAVE A SPECIFIC ORDER THAT SAID THAT

6    INSTRUCTIONS WERE NOT SUPPOSED TO BE DEALT WITH IN

7    OPENING AND ARGUING THE LAW.  IT'S THE LAST

8    PARAGRAPH OF YOUR ORDER.

9            MR. VERHOEVEN:  YOUR HONOR, THIS SLIDE

10   WAS NOT OBJECTED TO.

11           THE COURT:  BUT MY ORDER DID SAY THAT

12   THERE SHOULDN'T BE ANY DISCUSSION OF THE LAW.

13           YOU KNOW, I'M GOING TO OVERRULE THE

14   OBJECTION.

15           PLEASE MAKE THIS SHORT.

16           MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

17   ALL I DID WAS THE PRELIMINARY INSTRUCTIONS.

18           THE COURT:  OKAY.

19           MR. VERHOEVEN:  SO THAT'S THE STANDARD

20   WHEN YOU'RE LOOKING AT THE ISSUE OF TRADE DRESS

21   INFRINGEMENT.

22           IN THIS CASE, APPLE HAS CLAIMED THAT

23   SAMSUNG'S TABLET PRODUCT INFRINGES APPLE'S TRADE

24   DRESS, AND SO THE STANDARD IS, IS THERE LIKELY --

25   ONE OF THE STANDARDS IS, IS THERE A LIKELIHOOD OF

1    CONFUSION AS TO THE SOURCE OF WHO MAKES IT?  IS

2    SOMEONE GOING TO BUY IT THINKING IT'S AN APPLE

3    TABLET?  OR ARE THEY GOING TO KNOW WHEN THEY BUY IT

4    THAT IT'S A SAMSUNG TABLET?

5            WELL, THE EVIDENCE IS GOING TO SHOW OF

6    COURSE EVERYONE'S GOING TO KNOW IT'S A SAMSUNG

7    TABLET.  IT'S A VERY EXPENSIVE PRODUCT.  PEOPLE

8    RESEARCH IT BEFORE THEY EVEN GO TO THE STORE.  THEY

9    GET ON-LINE AND THEY LOOK AT ALL THE DIFFERENT

10   TABLETS THAT ARE OUT THERE.  THEY COMPARE THEM,

11   THEY ASK QUESTIONS, WHAT KIND OF FUNCTIONALITY DO I

12   WANT IN THEM?

13           THEY HAVE DIFFERENT TYPES OF

14   FUNCTIONALITY, DIFFERENT TYPES OF FEATURES,

15   DIFFERENT TYPES OF FORM FACTORS.

16           SOME ARE LANDSCAPE, SOME HAVE STYLUSES,

17   SOME ARE DESIGNED SPECIFICALLY FOR READING.

18           IT'S NOT SOMETHING THAT A PERSON WALKS

19   INTO THE STORE AND JUST CASUALLY PICKS UP AND MAKES

20   A MISTAKE.

21           IN FACT, THE EVIDENCE IS GOING TO SHOW,

22   MEMBERS OF THE JURY, THAT APPLE'S OWN DESIGNERS AT

23   DEPOSITION ADMITTED THEY'RE NOT AWARE OF ANY

24   CONFUSION.

25           MATT ROHRBACH, APPLE DESIGN INVENTOR, SO

1    HE'S AN INVENTOR ON SOME OF THE DESIGN PATENTS IN

2    THIS CASE, WE TOOK HIS DEPOSITION.

3              "ARE YOU AWARE OF ANY INSTANCE WHERE A

4    CONSUMER HAS CONFUSED A SAMSUNG TABLET COMPUTER FOR

5    AN IPAD?

6              "ANSWER:  NO."

7              EUGENE WHANG, ANOTHER APPLE DESIGN

8    INVENTOR IN THIS CASE, HIS DEPOSITION WAS TAKEN.

9              "ARE YOU AWARE OF OR KNOW OF ANY

10   INSTANCES WHERE A CONSUMER CONFUSED A SAMSUNG AND

11   AN APPLE TABLET?

12             "NO."

13             ANOTHER APPLE DESIGN INVENTOR IN THIS

14   CASE, DANIEL -- I'LL PROBABLY MISPRONOUNCE HIS LAST

15   NAME -- BUT DANIEL DE IULIIS, I GUESS.  HIS

16   DEPOSITION WAS TAKEN.

17             "QUESTION:  HAVE YOU EVER HEARD OF ANY

18   CONSUMERS MISTAKENLY PURCHASING GALAXY TABS

19   THINKING THEY WERE IPADS?

20             "ANSWER:  I DON'T RECALL HEARING THAT."

21             THE EVIDENCE WILL SHOW THAT BASICALLY

22   THERE IS NO EVIDENCE.

23             REMEMBER, THIS IS APPLE'S CLAIM, APPLE'S

24   BURDEN OF PROOF BY A PREPONDERANCE OF EVIDENCE AS

25   THE COURT INSTRUCTED YOU DURING PRELIMINARY

1    INSTRUCTIONS.  THEY HAVE TO SHOW YOU BY A

2    PREPONDERANCE OF THE EVIDENCE THAT THERE IS A

3    LIKELIHOOD OF CONFUSION.

4           WELL, THE EVIDENCE IS GOING TO SHOW,

5    MEMBERS OF THE JURY, THAT THEY CAN'T MEET THAT

6    BURDEN.  THERE IS NO EVIDENCE THAT YOU'LL SEE IN

7    THIS CASE THAT MEETS THAT BURDEN.

8           NOW LET ME TURN TO THE ISSUE OF DILUTION,

9    TRADE DRESS DILUTION.  THAT'S ANOTHER CLAIM THAT

10   APPLE IS MAKING IN THIS CASE.

11          PART OF THEIR CLAIM IS BASED ON WHAT

12   WE'RE LOOKING AT ON THE SCREEN RIGHT HERE.  THIS IS

13   A TRADE DRESS REGISTRATION THAT WAS FILED BY APPLE.

14          AND AS YOU CAN SEE, WHEN YOU LOOK AT THIS

15   TRADE DRESS REGISTRATION -- I'M NOT GOING TO READ

16   THE WHOLE THING, IT'S KIND OF HARD TO READ -- BUT

17   IT'S VERY DETAILED.

18          IT SAYS -- IT TALKS ABOUT THE -- IT SHOWS

19   THE BOTTOM PORTION WITH THE BUTTON THERE.  IT SAYS

20   "THE MARK CONSISTS OF THE CONFIGURATION," AND IT

21   GOES THROUGH EACH OF 17 DIFFERENT ICONS AND

22   SPECIFICALLY DESCRIBES EACH OF THOSE 17 DIFFERENT

23   ICONS AND WHAT EACH OF THEM DOES.

24          YOU CAN SEE HERE, THE FIRST ICON, SECOND

25   ICON, THIRD ICON, FOURTH ICON, AND EACH OF THEM

1   SAYS WHAT IT DOES.  THE FOURTH ICON DEPICTS A

2   CAMERA LENS WITH A BLACK BARREL AND THE BLUE GLASS

3   ON A SILVER BACK.

4            AND EACH ONE OF THESE DIFFERENT CALL OUTS

5   IN THIS REGISTRATION TALKS ABOUT A SPECIFIC ICON

6   AND WHAT IT LOOKS LIKE, AND THIS IS A SPECIFIC

7   CONFIGURATION.

8            THAT IS THE REGISTRATION THAT THEY'RE

9   USING TO SAY, WITH RESPECT TO THE IPHONE, THAT

10  THERE IS DILUTION, TRADE DRESS DILUTION.

11           WHAT WILL THE EVIDENCE SHOW?  THE

12  EVIDENCE WILL SHOW THAT SAMSUNG'S PHONES ARE

13  DIFFERENT, THEY'RE DIFFERENT FROM THAT REGISTRATION

14  AND THEY'RE DIFFERENT FROM THE IPHONE.

15           HERE YOU CAN -- IN FACT, SAMSUNG MAKES SO

16  MANY DIFFERENT TYPES OF PHONES THAT THEY'RE

17  DIFFERENT AMONGST EACH OTHER.  HERE WE'VE GOT THE

18  CONTINUUM THAT'S GOT ONE SHAPE AND ONE LOOK; WE

19  HAVE GOT THE DROID CHARGE THAT'S SHAPED DIFFERENTLY

20  WITH A DIFFERENT HOME SCREEN; THE GALAXY S 4G

21  SHAPED DIFFERENTLY WITH A DIFFERENT SCREEN; AND THE

22  EPIC 4G.

23           LET'S TAKE THESE APART A LITTLE BIT AND

24  LOOK AT THEM.

25           IF YOU LOOK AT THE BOTTOMS, THE SAMSUNG

```
 1      PHONES ARE CLEARLY DIFFERENT.  YOU'VE GOT THESE

 2      FOUR DIFFERENT ICONS ON THERE.

 3              ON THE CONTINUUM HERE, YOU'VE EVEN GOT A

 4      MESSAGING WINDOW THAT YOU DON'T SEE ANYWHERE IN THE

 5      TRADE DRESS REGISTRATION OR IN THE INITIAL IPHONE.

 6              YOU'VE GOT VARIOUS INITIAL SHAPES AT THE

 7      BOTTOM.  LOOK AT THE DROID CHARGE HAS GOT A, ALMOST

 8      A V-SHAPE TO IT.

 9              THE EPIC 4G HAS A COMPLETELY DIFFERENT

10      ROUNDED SHAPE WITH FOUR DIFFERENT ICONS AND, OF

11      COURSE, BRANDED.

12              THE SAMSUNG PHONES ARE DIFFERENT FROM THE

13      IPHONE REGISTRATION.

14              LOOK AT THE HOME -- WHEN YOU PULL OUT THE

15      HOME SCREENS THAT YOU SEE WHEN YOU RAMP UP -- AND

16      BY THE WAY, REMEMBER, BEFORE A CONSUMER CAN EVEN

17      SEE THESE HOME SCREENS, WHAT DOES A CONSUMER DO?

18      TURN ON THE PHONE.

19              WHAT HAPPENS WHEN YOU TURN ON THE PHONE?

20      YOU GET A WHOLE MINI MOVIE ADVERTISING THE CARRIER,

21      ADVERTISING THE OEM MAKER, SAMSUNG.  YOU SEE ALL

22      THAT BEFORE YOU EVEN SEE THIS.

23              BUT IF YOU LOOK AT THE HOME SCREENS OF

24      THESE PHONES, THEY DON'T LOOK ANYTHING LIKE THE

25      HOME SCREEN OF THE IPHONE.
```

1          SAMSUNG PHONES ARE DIFFERENT.

2          SAME THING WHEN YOU LOOK AT THE TOPS OF

3   THESE PHONES.

4          NOW, DILUTION, ONE OF THE ISSUES OF

5   DILUTION IS TO ASSESS WHETHER THE PRESENCE OF THE

6   ACCUSED PRODUCT IN THE MARKETPLACE DILUTES THE

7   TRADE DRESS.  SO IT'S SORT OF LIKE JUST DILUTING A

8   LIQUID BY POURING WATER INTO IT.  IT TAKES AWAY

9   FROM THE BRAND.  AND THE JUDGE WILL STRUCK YOU ON

10  THAT.

11         BUT WHAT I WANT TO GET TO IS THE EVIDENCE

12  HERE WILL SHOW THERE IS NO DILUTION.  THERE IS NO

13  DILUTION OF THE MARKETPLACE.

14         THIS IS FROM APPLE -- THIS IS AN IMAGE

15  FROM APPLE'S OWN INTERNAL DOCUMENTATION FROM

16  JULY 7TH OF 2011, AND IF YOU LOOK HERE, YOU CAN

17  SEE, THERE'S THE ACCUSED PRODUCT, THE GALAXY TAB 10

18  ON THE LEFT.

19         BUT THE MARKETPLACE IS FULL OF TABLETS

20  THAT ARE RECTANGULAR IN SHAPE WITH ROUNDED CORNERS,

21  WITH LARGE TOUCH SCREENS, WITH MINIMALIST DESIGNS.

22         WHETHER THE GALAXY IS IN THAT MIX OR NOT

23  IS NOT GOING TO DILUTE APPLE'S TRADE DRESS BECAUSE

24  EVERYONE'S OUT THERE WITH PRODUCTS THAT HAVE THAT

25  BASIC FORM FACTOR.

```
1            SAME THING FOR SMARTPHONES.  YOU'RE GOING

2    TO BE ASKED TO ANSWER THE QUESTION, DOES THE

3    ACCUSED SAMSUNG PHONE CAUSE DILUTION OF APPLE'S

4    TRADE DRESS?

5            BUT WHEN YOU LOOK AT THE MARKETPLACE AND

6    YOU TAKE OUT THE APPLE, YOU STILL HAVE DOZENS AND

7    DOZENS AND DOZENS OF SMARTPHONES OUT THERE THAT

8    HAVE LARGE TOUCH SCREENS ON THEM, TAKE UP MOST OF

9    THE REAL ESTATE IN THE FRONT, THEY'RE RECTANGULAR

10   IN SHAPE WITH ROUNDED CORNERS, AND THEY HAVE

11   MINIMALIST DESIGN.

12           WHETHER SAMSUNG'S IN THERE OR NOT,

13   THEY'RE ALL OUT THERE.  THERE'S NO DILUTION.

14           BUT THE KICKER HERE, MEMBERS OF THE JURY,

15   IS THE EVIDENCE IS GOING TO SHOW THAT APPLE'S OWN

16   EXPERT WITNESS, ON THIS SUBJECT, ADMITTED, UNDER

17   OATH, THAT THERE'S NO DILUTION.  I'LL SHOW YOU.

18           THIS IS TESTIMONY OF APPLE'S WITNESS

19   REGARDING THE LACK OF DILUTION, RUSSELL WINER.

20   APPLE IS GOING TO CALL HIM TO TESTIFY ABOUT

21   DILUTION.

22           AND HE WAS ASKED AT HIS DEPOSITION, "MY

23   QUESTION IS, DO YOU HAVE ANY EMPIRICAL EVIDENCE OR

24   HARD DATA TO SHOW THAT SAMSUNG'S ACTIONS HAS

25   DILUTED APPLE'S BRAND?"
```

1            AND HIS ANSWER WAS, "NO."

2            REMEMBER, IT'S APPLE'S BURDEN OF PROOF.

3            HE WAS ALSO ASKED, "DO YOU HAVE ANY

4   QUANTIFICATION OF ANY HARM OR DILUTION OR LOSS OF

5   ANY KIND TO APPLE AS A RESULT OF SAMSUNG'S

6   ACTIONS?"

7            AND UNDER OATH, HE SAID, "NO."

8            SO APPLE'S OWN EXPERT ON TRADE DRESS

9   DILUTION HAS ADMITTED THERE ISN'T ANY.  THERE'S NO

10  HARM, THERE'S NO DILUTION, THERE'S NO LOSS OF ANY

11  KIND.

12            THE EVIDENCE WILL SHOW, MEMBERS OF THE

13  JURY, THAT APPLE'S TRADE DRESS CLAIMS FAIL AND

14  APPLE CANNOT MEET ITS BURDEN WITH RESPECT TO THOSE

15  CLAIMS.

16            IS NOW A GOOD TIME TO TAKE A BREAK?

17            THE COURT:  THAT'S GREAT.

18            IT'S NOW 12:02.  WE ARE GOING TO TAKE A

19  BREAK FOR LUNCH.

20            AGAIN, PLEASE DO NOT DISCUSS THE CASE

21  WITH ANYONE.  DO NOT READ ANY MEDIA ACCOUNTS OR DO

22  ANY RESEARCH AND KEEP AN OPEN MIND.

23            WE'LL SEE YOU -- IF YOU COULD PLEASE

24  REASSEMBLE BACK HERE AT 1:00 O'CLOCK IN THE JURY

25  ROOM.  ALL RIGHT?  THANK YOU ALL.

1              AND FOR FOLKS WHO GOT SEATS, YOU CAN

2    RESERVE YOUR SEATS OVER THE LUNCH HOUR SO YOU DON'T

3    HAVE TO STAND IN LINE AGAIN.  YOU CAN LEAVE SOME

4    PERSONAL ITEM ON THERE.

5              (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)

1    **AFTERNOON SESSION**

2    (WHEREUPON, THE FOLLOWING PROCEEDINGS

3    WERE HELD IN THE PRESENCE OF THE JURY:)

4    THE COURT:  WELCOME BACK.  WE'LL CONTINUE

5    WITH SAMSUNG'S OPENING STATEMENT.

6    IT IS NOW 1:06.

7    PLEASE GO AHEAD.

8    MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

9    CAN WE GO TO SLIDE 66, PLEASE.

10   GOOD AFTERNOON, MEMBERS OF THE JURY.

11   BEFORE LUNCH WE HAD LEFT OFF AND I WAS

12   TALKING ABOUT APPLE'S TRADE DRESS CLAIMS.

13   AND THERE'S, THERE'S TWO OTHER TYPES OF

14   CLAIMS THAT APPLE IS MAKING AGAINST SAMSUNG IN THIS

15   CASE.  THE SECOND ONE IS DESIGN PATENTS, AND THE

16   THIRD ONE IS WHAT HER HONOR MENTIONED AS UTILITY

17   PATENTS.

18   I'M NOW GOING TO SWITCH TO THE DESIGN

19   PATENT CLAIMS THAT APPLE HAS MADE AND ADDRESS

20   THOSE.

21   AND THE FIRST OF THOSE PATENTS THAT I'D

22   LIKE TO ADDRESS IS THE '889 DESIGN PATENT.

23   NOW, YOU HEARD HER HONOR REFER THIS

24   MORNING TO DESIGN PATENTS AND EXPLAIN HOW THEY'RE

25   DIFFERENT FROM UTILITY PATENTS.  FOR A UTILITY

410

```
1    PATENT, IT'S SOMETHING THAT IS USEFUL AND NEW AND

2    HAS UTILITY.  A DESIGN PATENT IS A NEW, ORIGINAL,

3    AND ORNAMENTAL DESIGN.  AND SO THAT'S WHAT WE'RE

4    TALKING ABOUT.

5              AND THIS IS THE '889 DESIGN PATENT THAT

6    APPLE'S ASSERTED AGAINST MY CLIENT IN THIS CASE.

7    AND AS YOU CAN SEE, IT'S A VERY SIMPLE DESIGN.

8    IT'S A RECTANGLE WITH ROUNDED CORNERS, AND IN THE

9    BACK, THERE'S NO ORNAMENTATION WHATSOEVER.

10              NOW, IN ORDER FOR APPLE TO ASSERT THIS

11    CLAIM, THE DESIGN PATENT HAS TO BE NEW AND

12    ORIGINAL.

13              THE EVIDENCE IS GOING TO SHOW IN THIS

14    CASE THAT IT'S NOT, THAT THERE WAS PRIOR ART OUT

15    THERE THAT SHOWED THIS.

16              FOR EXAMPLE, WE SAW EARLIER, IN 1994, A

17    TABLET DESIGN INVENTED BY ROGER FIDLER.  HE EVEN

18    CALLED IT THE TABLET.  AND YOU CAN SEE FOR

19    YOURSELF, IT'S A LARGE RECTANGLE IN A TABLET SHAPE,

20    ROUNDED CORNERS, AND A LARGE DISPLAY SCREEN.

21              WHEN WE TOGGLE BACK TO THE '889, THE SAME

22    THING:  LARGE RECTANGLE, ROUNDED CORNERS, MINIMAL

23    ORNAMENTATION, TABLET FORM FACTOR.

24              THE EVIDENCE IS ALSO GOING TO SHOW,

25    MEMBERS OF THE JURY, THAT THE ACCUSED TABLET, WHICH
```

1    IS THIS ONE RIGHT HERE (INDICATING), THE SAMSUNG

2    TABLET, THAT AN ORDINARY OBSERVER, LOOKING AT THE

3    ACCUSED TABLET, COULD TELL THE DIFFERENCE BETWEEN

4    THAT AND THIS '889 DESIGN PATENT.

5             IN PARTICULAR, THE EVIDENCE IN THIS CASE,

6    MEMBERS OF THE JURY, IS GOING TO SHOW THAT THERE

7    WAS A PHYSICAL MODEL THAT APPLE CREATED INTERNALLY

8    WITHIN APPLE.  IT'S REFERRED TO AS THE 035 MODEL,

9    AND I HAVE IT RIGHT HERE.  YOU CAN SEE IT FOR

10   YOURSELF (INDICATING).  THIS IS A MODEL CREATED BY

11   APPLE.

12             THE EVIDENCE IS GOING TO SHOW THAT THIS

13   EXACT PHYSICAL MODEL WAS USED TO DRAW THE PICTURES

14   THAT WERE SUBMITTED RIGHT HERE FOR THE '889 DESIGN

15   PATENT.

16             IF YOU GO BACK AND LOOK AT THESE

17   PICTURES, THE EVIDENCE IS GOING TO SHOW THESE

18   PICTURES WERE TAKEN OF THIS MODEL AND SUBMITTED TO

19   THE PATENT OFFICE AS PART OF THE APPLICATION FOR

20   THE '889 PATENT TO SHOW THAT THEY HAD A MODEL OF

21   IT.

22             AND, IN FACT, THE EVIDENCE WILL SHOW,

23   IT'S UNDISPUTED, THAT THIS MODEL WAS USED TO DRAW

24   THE PICTURES.

25             AND HERE ON THIS NEXT SLIDE, 71, THESE

1    ARE PICTURES ON THE LEFT OF THIS ACTUAL MODEL,

2    SOMEONE HOLDING IT; AND ON THE RIGHT, THESE ARE

3    IMAGES FROM THE ACTUAL '889 DESIGN PATENT.  YOU CAN

4    SEE THE CORRESPONDENCE BETWEEN THE PHYSICAL MODEL

5    AND THE DRAWINGS.  THIS IS THE PHYSICAL EMBODIMENT

6    OF THE PICTURE IN THE '889 PATENT.

7            NOW, I SUBMIT THE EVIDENCE WILL SHOW THAT

8    AN ORDINARY OBSERVER CAN TELL THE DIFFERENCE

9    BETWEEN THE 035 MODEL AND THIS MUCH DIFFERENT

10   ACCUSED TABLET.  YOU CAN SEE FOR YOURSELF

11   (INDICATING).  THESE ARE NOT SOMETHING THAT AN

12   ORDINARY OBSERVER COULDN'T TELL THE DIFFERENCE

13   BETWEEN.

14           AND THAT'S -- THAT'S GOING TO BE YOUR

15   CHARGE.  THE JUDGE WILL INSTRUCT YOU ON THE RULES

16   FOR HOW TO DO THAT, BUT I SUBMIT THE EVIDENCE WILL

17   SHOW THAT -- FOR EXAMPLE, HERE'S AN IMAGE THAT

18   WE'VE TAKEN OF THESE TWO PHYSICAL EXHIBITS AND YOU

19   CAN SEE THEY LOOK MUCH DIFFERENT.  ONE IS MUCH

20   THICKER.  ONE IS MUCH BIGGER.  THE ORDINARY

21   OBSERVER COULD TELL THE DIFFERENCE.

22           IN ADDITION TO THIS EVIDENCE, WE ALSO

23   HAVE TESTIMONY FROM CHRISTOPHER STRINGER, WHO WILL

24   BE THE FIRST WITNESS IN THIS CASE CALLED BY APPLE,

25   AND AT HIS DEPOSITION, MR. STRINGER WAS ASKED,

```
 1    QUESTION, "PLEASE TELL ME ALL THE WAYS IN WHICH THE
 2    DESIGN, THAT'S DEPICTED HERE IN EXHIBIT 8" -- AND
 3    I'LL REPRESENT EXHIBIT 8 IS THE DESIGN PATENT THAT
 4    WE JUST LOOKED AT, THE '889 PATENT -- "PLEASE TELL
 5    ME ALL THE WAYS IN WHICH THE DESIGN, THAT'S
 6    DEPICTED HERE IN EXHIBIT 8, WAS DIFFERENT FROM THE
 7    OTHER TABLET COMPUTER DESIGNS THAT EXISTED AS OF
 8    THE TIME IT WAS CONCEIVED.
 9             "ANSWER:  WE EXTENDED THE CLEAR BEZEL
10    ACROSS THE ENTIRETY OF THE FRONT FACE OF THE
11    PRODUCT," SO THAT'S THIS PART RIGHT HERE
12    (INDICATING), HE TESTIFIED, "WE EXTENDED THIS GLASS
13    BEZEL ALL THE WAY TO THE EDGES."  SO THAT'S ONE OF
14    THE THINGS THEY DID THAT HE THINKS MAKES IT
15    DIFFERENT FROM WHAT WAS ALREADY OUT THERE.
16             AND THEN THE SECOND THING HE SAYS IS
17    REALLY VERY IMPORTANT.  HE SAYS, "AND WE SIMPLIFIED
18    THE REAR HOUSE TO GO TO A SINGLE PIECE."
19             AND THEN HE CLARIFIED, "WE CHOSE TO HAVE
20    A COMPLETE HOUSING THAT WITHOUT ANY BREAKS IN
21    PRODUCT LINES EXTENDS UP TO THE TOP SURFACE OF THE
22    PRODUCT."
23             SO THERE'S ONLY TWO THINGS THAT HE
24    IDENTIFIED FOR THE '889 DESIGN THAT MADE IT NEW, IN
25    HIS VIEW, NEW AND UNIQUE.  ONE WAS EXTENDING THE
```

```
1    GLASS BEZEL ALL THE WAY ACROSS THE EDGES; AND THE

2    SECOND THING WAS TO HAVE A SIMPLIFIED REAR HOUSE

3    GOING TO A SINGLE PIECE WITHOUT ANY BREAKS IN

4    PRODUCT LINES.

5              WELL, IF YOU LOOK AT THE 035 MODEL, IT'S

6    CONSISTENT WITH THAT.  THE GLASS EXTENDS TO THE

7    EDGE.

8              LOOK AT THE BACK.  THERE'S A -- IT'S JUST

9    ONE PIECE.

10             NOW, IF YOU LOOK AT THE ACCUSED

11   PRODUCT --

12             YOUR HONOR, WOULD IT BE OKAY IF I TOOK A

13   COUPLE STEPS CLOSER FOR THEM TO SEE?

14             THE COURT:  WHY DON'T YOU STAY THERE,

15   PLEASE?

16             MR. VERHOEVEN:  OKAY.

17             IF YOU LOOK AT THE ACCUSED PRODUCT, YOU

18   CAN SEE CLEARLY, IT HAD MULTIPLE PIECES

19   (INDICATING).

20             I'VE GOT A SLIDE THAT PULLS THAT OUT.

21             BUT YOU CAN SEE, THERE'S A MULTIPLE PIECE

22   HOUSING.

23             SO THE SECOND OF THE ONLY TWO DESIGN

24   ELEMENTS THAT THE INVENTOR, WHO'S COMING TO

25   TESTIFY, SAYS MAKES IT NEW AND UNIQUE DOES NOT
```

1    EXIST IN THE ACCUSED PRODUCT.

2           THE EVIDENCE WILL SHOW THAT AN ORDINARY

3    OBSERVER CAN TELL THE DIFFERENCE.  AN ORDINARY

4    OBSERVER CAN TELL THE DIFFERENCE BETWEEN THIS AND

5    THIS (INDICATING).

6           THE EVIDENCE IS ALSO GOING TO SHOW THAT

7    APPLE'S OWN EXPERT ON THIS SUBJECT TESTIFIED UNDER

8    OATH THAT THE INITIAL IPAD, WHICH IS THIS PRODUCT

9    RIGHT HERE (INDICATING), IS NOT AN EMBODIMENT OF

10   THE '889 PATENT.  THEIR OWN EXPERT TESTIFIED UNDER

11   OATH, THIS IS DIFFERENT FROM THE '889 PATENT

12   (INDICATING).  THIS IS DIFFERENT.

13          BUT APPLE CLAIMS THAT THIS IS SIMILAR.

14   HOW CAN THIS BE DIFFERENT FROM THE 035 -- FROM THE

15   '889 PATENT WHILE THIS ONE, WHICH IS EVEN THINNER,

16   EVEN SMALLER WITH MULTIPLE PART HOUSING, IT'S

17   SIMILAR (INDICATING)?

18          THE EVIDENCE DOES NOT ADD UP.  AN

19   ORDINARY OBSERVER COULD TELL THE DIFFERENCE.

20          IN FACT, IF YOU GO TO SLIDE 78, APPLE'S

21   OWN DESIGNERS, THE INVENTORS LISTED ON THE '889

22   PATENT, MEMBERS OF THE JURY, TESTIFIED THAT THEY

23   WEREN'T AWARE OF ANY PRODUCTS THAT EMBODIED THE

24   '889.  THEY'RE NOT AWARE OF ANY PRODUCTS THAT APPLE

25   SELLS THAT EMBODY THIS.

1           MATTHEW ROHRBACH, APPLE DESIGN INVENTOR,

2     "DID APPLE EVER MANUFACTURE OR PRODUCE A PRODUCT

3     THAT LOOKS LIKE THE DESIGN THAT'S SHOWN HERE IN THE

4     '889 PATENT?

5               "ANSWER:  I DON'T KNOW."

6           EUGENE WHANG, APPLE'S DESIGN INVENTOR.

7               "QUESTION:  DID APPLE EVER MANUFACTURE AN

8     ELECTRONIC DEVICE THAT IN YOUR VIEW LOOKED LIKE THE

9     DRAWINGS SHOWN HERE IN THE '889 DESIGN PATENT?

10              "I CAN'T TELL."

11          THESE ARE THE SAME DESIGNERS WHO DESIGNED

12    THE IPAD AND THE IPAD 2 AND THEY TESTIFIED, UNDER

13    OATH, LOOKING AT THE '889, THAT THEY'RE NOT AWARE

14    OF ANY PRODUCTS THAT EMBODY IT.

15          YET APPLE NOW IS SAYING THAT THE SAMSUNG

16    PRODUCT EMBODIES IT.  IT DOESN'T ADD UP.

17          WE BELIEVE THE EVIDENCE WILL SHOW THE

18    '889 PATENT IS NOT INFRINGED.

19          NOW I'D LIKE TO TURN TO TWO OTHER DESIGN

20    PATENTS THAT HAVE BEEN ASSERTED.

21          IF WE CAN GO TO SLIDE 46, PLEASE.

22          APPLE'S ALSO ASSERTING TWO PATENTS FROM

23    THE IPHONE, THE '087, AND THE '677 PATENTS.

24    THEY'RE BOTH DESIGN PATENTS AND THEY BOTH RELATE TO

25    THE INITIAL IPHONE THAT WAS RELEASED IN 2007.

```
1            MR. MCELHINNY SHOWED YOU THE PICTURES OF
2     THESE.  THIS IS THE '087.  IT'S JUST CLAIMING THIS
3     RECTANGULAR ROUNDED CORNER IMAGE HERE WITH THE
4     LOZENGE SLOT AND THE DISPLAY SCREEN.
5            THE DOTTED LINES EVERYONE AGREES ARE NOT
6     BEING CLAIMED.  IT'S JUST THE FRONT OF THE PHONE
7     AND THE BEZEL IS WHAT'S BEING CLAIMED.
8            AND IN THE '677, IT'S JUST THIS FRONT
9     FACE RIGHT HERE.  THOSE ARE TWO OTHER DESIGN
10    PATENTS THAT APPLE IS ASSERTING AGAINST MY CLIENT.
11           AGAIN, IN ORDER FOR THERE TO BE
12    INFRINGEMENT, THESE PATENTS HAVE TO BE VALID.  THEY
13    HAVE TO BE NEW, ORIGINAL, AND ORNAMENTAL.
14           THE EVIDENCE IS GOING TO SHOW -- AND THIS
15    IS ANOTHER THING YOU WEREN'T TOLD BY APPLE'S
16    COUNSEL -- THAT THERE'S PRIOR ART OUT THERE, A LOT
17    OF OTHER DESIGN PATENTS OUT THERE THAT HAVE THIS
18    BASIC SAME SHAPE.  BIG SCREEN, ROUNDED CORNER,
19    RECTANGULAR FORM FACTOR WITH THE LOZENGE.
20           WE'VE ALREADY LOOKED AT THESE.  THE
21    JP1638, JP1383, KR547 AND THE LG PRADA ALL ARE
22    PHONES THAT HAVE THIS BASIC SHAPE.  THEY ALL
23    PRE-DATED THESE TWO VERY SIMPLISTIC DESIGN PATENTS.
24    THEY SHOW CONCLUSIVELY THAT THESE, THESE LIMITED
25    DESIGN PATENTS ARE NOT NEW, THEY'RE NOT UNIQUE IN
```

```
 1   ANY WAY.

 2           THE EVIDENCE IS ALSO GOING TO SHOW THAT

 3   AN ORDINARY OBSERVER, LOOKING AT THESE PATENTS,

 4   COULD TELL THE DIFFERENCE BETWEEN THE ACCUSED

 5   PRODUCTS AND THE DESIGN ELEMENTS OF THESE PATENTS.

 6           FOR EXAMPLE, APPLE'S FIRST WITNESS,

 7   MR. STRINGER, WILL TESTIFY AS TO WHAT THE DESIGN

 8   ELEMENTS OF THESE PATENTS ARE.  ONE OF THE DESIGN

 9   ELEMENTS WAS VERY IMPORTANT, ACCORDING TO APPLE, TO

10   HAVE A FLAT FRONT SURFACE.

11           IF YOU LOOK RIGHT HERE IN THE SIDE VIEW,

12   MEMBERS OF THE JURY, YOU'LL SEE IT'S FLAT ALL THE

13   WAY ACROSS FROM END TO END.

14           MR. STRINGER WILL TESTIFY THAT THEY

15   WANTED TO MAKE SURE THE BEZEL -- THAT'S THIS BAND,

16   THIS METAL BAND THAT GOES AROUND THE SIDE -- DID

17   NOT PROTRUDE BEYOND THE GLASS.

18           IT WAS A DESIGN ELEMENT TO MAKE THAT

19   BEZEL FLUSH WITH THE GLASS FOR AESTHETIC REASONS,

20   EVEN THOUGH FUNCTIONALLY, IT'S HARDER TO MAKE A

21   PHONE THAT HAS THAT; EVEN THOUGH, FUNCTIONALLY,

22   HAVING A PROTRUDED BEZEL WILL PROTECT THE GLASS IF

23   YOU PUT THE PHONE DOWN UPSIDE DOWN.

24           FOR DESIGN REASONS, ACCORDING TO

25   MR. STRINGER, THEY WANTED A GLASS TO HAVE A FLUSH
```

1    BEZEL.

2              WHAT HAPPENS WHEN YOU LOOKED AT THE

3    ACCUSED PRODUCTS?  WHEN YOU LOOK AT THE ACCUSED

4    PRODUCTS, MEMBERS OF THE JURY, YOU SEE THEY DON'T

5    HAVE THAT DESIGN ELEMENTS.

6              THESE ARE TWO EXAMPLES OF MANY ACCUSED

7    PRODUCTS IN THIS CASE, MEMBERS OF THE JURY.  THE

8    FIRST IS THE INFUSE 4G.

9              AND YOU'LL BE ABLE TO, DURING THE COURSE

10   OF THIS TRIAL, GET A PHYSICAL COPY OF THIS PHONE

11   AND RUN YOUR FINGERS ACROSS IT AND YOU'LL SEE THE

12   SURFACE IS NOT FLAT.  THE HOUSING PROTRUDES ABOVE

13   THE GLASS, THE OPPOSITE OF THE DESIGN ELEMENT THAT

14   THE INVENTOR ON THIS DESIGN PATENT SAYS MADE IT

15   NEW, MADE IT DIFFERENT FROM THE PRIOR ART.

16             SAME THING WITH THE VIBRANT.  THE BEZELS

17   PROTRUDE ABOVE THE GLASS.  THERE'S NOT A COMPLETELY

18   FRONT FLAT SURFACE.

19             ANOTHER DESIGN ELEMENT THAT MR. STRINGER

20   WILL TESTIFY TO IS -- IF YOU GO BACK TO SLIDE 46,

21   PLEASE -- IS THIS BEZEL ELEMENT OR RIM.  HE SAID

22   IT'S A VERY IMPORTANT DESIGN ELEMENT FOR THE

23   INITIAL IPHONE TO HAVE THIS UNIFORM BEZEL OR RIM

24   GOING AROUND THE FRONT OF THE PHONE.  YOU CAN SEE

25   IT RIGHT HERE (INDICATING).

1           AND HE TESTIFIED THAT UNIFORM MEANT IT

2      WAS THE SAME ALL THE WAY AROUND THE PHONE,

3      INCLUDING UNIFORM THICKNESS ALL THE WAY AROUND THE

4      PHONE, AND THAT WAS SOMETHING DIFFERENT, ACCORDING

5      TO THE INVENTOR, FROM THE PRIOR ART.

6           WELL, LET'S TAKE THAT DESIGN ELEMENT AND

7      COMPARE IT TO THE ACCUSED PHONES.

8           IF YOU GO TO 52, PLEASE.

9           HERE WE HAVE ON THE LEFT THE '087 PATENT.

10     THERE'S THE CONTINUOUS BEZEL.  YOU CAN SEE IT'S

11     EXACTLY AS DESCRIBED BY MR. STRINGER.  IT'S OF

12     UNIFORM THICKNESS.

13          NOW LET'S LOOK AT THE ACCUSED PRODUCTS.

14          WE'LL START WITH THE INFUSE 4G.  THERE'S

15     NO BEZEL.  THERE'S NO PIECE OF METAL THAT GOES

16     AROUND THE RIM AT ALL.

17          THIS IS A VERY SIMPLE DESIGN PATENT.  IT

18     DOESN'T HAVE VERY MUCH TO IT.  ONE OF THE THINGS IT

19     HAS TO IT IS A UNIFORM BEZEL.

20          APPLE ACCUSES THIS INFUSE 4G OF

21     INFRINGEMENT, BUT THE 4G DOESN'T EVEN HAVE A BEZEL.

22          APPLE ALSO ACCUSES SOME PHONES THAT DO

23     HAVE BEZELS, LIKE THE VIBRANT.

24          BUT WHEN YOU DO THE APPROPRIATE ANALYSIS,

25     THE EVIDENCE WILL SHOW, YOU CAN SEE THE BEZEL ON

1    THE VIBRANT IS NOT OF UNIFORM THICKNESS.  IT'S A

2    DIFFERENT DESIGN.

3         AN ORDINARY OBSERVER, LOOKING AT THIS,

4    CAN TELL THE DIFFERENCE.  THERE IS NO INFRINGEMENT.

5         THE '087 PATENT ALSO HAS VIRTUALLY NO

6    ORNAMENTATION.  THAT IS A DESIGN ELEMENT,

7    MINIMALISM.

8         WELL, IF YOU LOOK AT THE ACCUSED

9    PRODUCTS, THEY DON'T HAVE NO ORNAMENTATION.  THEY

10   HAVE LOTS OF ORNAMENTATION.  CAMERA INDICATORS,

11   SENSOR INDICATORS, YOU'VE GOT WRITING ON THE TOP,

12   YOU'VE GOT ICONS ON THE BOTTOM THAT YOU CAN SEE

13   WHEN THE PHONE IS OFF, THE MENU ICON, THE HOME

14   ICON, BACK ICON, SEARCH ICON.

15        VIBRANT, YOU ALSO SEE MANY DIFFERENCES

16   FROM THE '087 WHICH HAS VIRTUALLY NO ORNAMENTATION.

17        THE ONLY OTHER THING BESIDES THE BEZEL

18   AND THE FLAT SURFACE AND THE LACK OF ORNAMENTATION

19   THAT YOU EVEN SEE IN THE '087 PATENT IS YOU'VE GOT

20   THIS LOZENGE SHAPE, AND MR. STRINGER WILL TESTIFY

21   THAT WHAT WAS IMPORTANT ABOUT THIS DESIGN ELEMENT

22   WAS THAT IT BE CENTERED HORIZONTALLY.

23        WELL, WHEN YOU LOOK AT THE ACCUSED

24   PRODUCTS, THEY DO HAVE EAR HOLES SO THAT YOU CAN

25   HEAR.  THE EVIDENCE IS GOING TO SHOW SMARTPHONES

1    HAVE TO HAVE THAT.  THE EVIDENCE IS GOING TO SHOW

2    THAT'S A FUNCTIONAL ELEMENT SO THAT YOU CAN HEAR.

3                BUT THEY'RE DIFFERENT.  THEY DON'T LOOK

4    THE SAME.  ON THE INFUSE, IT'S FLATTER.  IT'S

5    LONGER.  IT HAS 41 SEPARATE SMALL HOLES AND IT'S

6    NOT CENTERED HORIZONTALLY.

7                WHEN YOU LOOK AT THE VIBRANT, AGAIN,

8    FLATTER, LONGER, 16 HOLES IN THE DESIGN, AND IT

9    ALSO IS NOT HORIZONTALLY CENTERED.

10               IF THESE DESIGN PATENTS ARE VALID, THAT

11   IS, IF THEY AREN'T -- IF THEY DO HAVE ANYTHING THAT

12   MAKES THEM NEW OR UNIQUE OVER THOSE OTHER PATENTS

13   WE LOOKED AT THAT ALSO HAD ROUNDED CORNERS AND

14   LARGE RECTANGLES, IT'S GOT TO BE SPECIFIC FEATURES:

15   THIS BAND THAT'S UNIFORM; THAT LOZENGE THAT'S

16   HORIZONTALLY ORIENTED; THE FLAT SURFACE WITH NO

17   BEZEL RAISING OVER IT.

18               BUT WHEN YOU ANALYZE IT WITH THAT LEVEL

19   OF APPROPRIATE CARE, MEMBERS OF JURY, THE EVIDENCE

20   WILL SHOW THERE ISN'T ANY INFRINGEMENT HERE.  THE

21   ORDINARY OBSERVER COULD TELL THE DIFFERENCE.

22               REALLY QUICKLY WE'LL GO TO THE LAST

23   DESIGN PATENT ASSERTED HERE, THE D'305 PATENT.

24               AND THIS PATENT -- MR. MCELHINNY SHOWED

25   YOU THIS -- CONCERNS AN IMAGE, IT'S ACTUALLY THE

1    HOME SCREEN FROM THE INITIAL IPHONE, AND THEY'RE

2    ASSERTING THIS IMAGE AGAINST THE SAMSUNG PHONES.

3              AGAIN, THE EVIDENCE IS GOING TO SHOW HERE

4    THAT AN ORDINARY OBSERVER COULD EASILY TELL THE

5    DIFFERENCE.

6              HERE'S FIGURE 1 OF THE '305.  IT'S THE

7    HOME SCREEN OF THE INITIAL IPHONE.

8              TAKE A LOOK AT THE HOME SCREENS OF THE

9    ACCUSED PHONES.  HERE'S THE CAPTIVE, DROID CHARGE,

10   THE VIBRANT, GEM, MESMERIZE, SHOWCASE.

11             EACH ONE OF THE PHONES IN AND OF

12   THEMSELVES HAS A DIFFERENT HOME SCREEN, AND

13   CERTAINLY AN ORDINARY OBSERVER COULD TELL THE

14   DIFFERENCE BETWEEN THE HOME SCREENS ON THESE PHONES

15   AND THE HOME SCREEN IDENTIFIED IN DESIGN PATENT

16   '305.

17             BUT APPLE SKIPS THESE HOME SCREENS AND

18   WHEN IT ACCUSES THAT IMAGE YOU SAW MR. MCELHINNY

19   SHOW YOU FOR THE EVIDENCE OF INFRINGEMENT, THAT

20   WASN'T THE HOME SCREENS.

21             WHAT WAS IT?  IT'S THE APPLICATION MENU.

22             I'M SURE THOSE OF YOU WHO HAVE

23   SMARTPHONES KNOW THERE'S AN APPLICATION ICON YOU

24   CAN HIT AND THEN THAT TAKES YOU TO ANOTHER SCREEN.

25             THAT'S WHAT THEY'RE ACCUSING.  THEY'RE

1    NOT EVEN ACCUSING THE EQUIVALENT HOME SCREEN FOR

2    THE ACCUSED PHONES.

3            SO A USER HAS GOT TO TURN ON THE PHONE,

4    SEE ALL THE ADVERTISING THAT COMES ON WHEN THE

5    PHONE COMES ON, SEE THE HOME SCREEN WHICH DOESN'T

6    LOOK THE SAME, HIT THE APPLICATION BUTTON, AND THEN

7    ONLY -- THEN AND ONLY THEN WILL THEY SEE THIS MENU

8    THAT APPLE IS ACCUSING, AND THEIR SUGGESTION IS AN

9    ORDINARY OBSERVER COULDN'T TELL THE DIFFERENCE.

10           WELL, AN ORDINARY OBSERVER COULD.  WE

11   THINK THE EVIDENCE WILL SHOW THAT.

12           SO I'D LIKE TO TURN NOW TO THE LAST OF

13   THE THREE CATEGORIES OF INTELLECTUAL PROPERTY THAT

14   APPLE HAS ASSERTED, AND THAT'S UTILITY PATENTS.

15           IF YOU GO TO SLIDE 80, PLEASE.

16           APPLE IS ASSERTING THREE UTILITY PATENTS

17   IN THIS CASE, THE '915, THE '163, AND THE '381.

18           IN THE INTERESTS OF TIME, I'M NOT GOING

19   TO BE ABLE TO ADDRESS ALL OF THE ISSUES WITH

20   RESPECT TO THESE PATENTS, BUT I'D LIKE TO COVER A

21   COUPLE OF POINTS IF I MAY.

22           FIRST, YOU HEARD FROM HER HONOR THIS

23   MORNING FROM THE PRELIMINARY REMARKS THAT THE FACT

24   THAT THE PATENT OFFICE GRANTS A PATENT DOES NOT

25   NECESSARILY MEAN THAT ANY INVENTION CLAIMED IN THE

```
1     PATENT, IN FACT, DESERVES --

2               MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.

3     AGAIN, YOU TOLD HIM BEFORE AND NOW WE'RE TALKING

4     ABOUT THE REMARKS, THE BURDEN OF PROOF IN EVIDENCE.

5               THE COURT:  ALL RIGHT.  PLEASE DON'T

6     ARGUE, MR. VERHOEVEN.

7               MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

8               THE POINT I WAS GOING TO MAKE IS THE

9     PATENT OFFICE IS PRESUMED -- WHEN A PATENT ISSUES,

10    IT'S PRESUMED TO BE VALID.

11              BUT THE PATENT OFFICE DOESN'T ALWAYS KNOW

12    EVERYTHING.  SOMETIMES THERE'S PRIOR ART OUT THERE

13    THAT THE PATENT OFFICE IS NOT AWARE OF.

14              THE EVIDENCE IS GOING TO SHOW, MEMBERS OF

15    THE JURY, THAT WITH RESPECT TO EACH OF THESE

16    PATENTS, THAT'S THE CASE.

17              I'D LIKE TO BRIEFLY GO THROUGH THAT, SO

18    LET'S GO TO THE '913 -- THE '915 PATENT.

19              THIS IS A PATENT THAT'S VERY SIMPLE.

20    HERE'S AN ILLUSTRATION OF WHAT APPLE IS CLAIMING

21    THEY INVENTED, A USER SCROLLING -- GO AHEAD -- AND

22    A USER USING TWO FINGERS TO CREATE A GESTURE.

23              IN A NUTSHELL, THAT IS WHAT APPLE CLAIMS

24    IT DESERVES A PATENT FOR IN THE '915 PATENT.

25              THE EVIDENCE IS GOING TO SHOW, MEMBERS OF
```

```
1    THE JURY, THAT OTHERS HAD ALREADY INVENTED THAT

2    BEFORE APPLE.  IN PARTICULAR, NOVEMBER 25 OF 1998,

3    THE NOMURA PATENT WAS FILED WHICH SHOWS THE EXACT

4    SAME THING.

5              IN 2004, MERL DEVELOPED AND DEMONSTRATED

6    A PRODUCT CALLED FRACTAL ZOOM THAT SHOWS THE SAME

7    THING.

8              AND IN FEBRUARY OF 2006, JEFFERSON HAN

9    DEMONSTRATED HIS SYSTEM THAT SHOWS THE SAME THING.

10             LET'S TAKE A LOOK AT THE FRACTAL ZOOM

11   PRIOR ART.

12             THIS IS A VIDEO -- CAN WE PAUSE HERE --

13   OF THE FRACTAL ZOOM.

14             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

15   OPEN COURT OFF THE RECORD.)

16             MR. VERHOEVEN:  AND HERE IT SAYS RIGHT ON

17   THE VIDEO, IT'S CALLED "DIAMONDTOUCH FRACTAL ZOOM

18   DEMO CONTROLS."

19             IT SAYS "TOUCH THE TABLE WITH TWO FINGERS

20   AND SPREAD THEM APART TO ZOOM IN.  TOUCH THE TABLET

21   WITH ONE FINGER OR GRAB THE IMAGE AND PULL TO PAN."

22             WELL, THAT'S EXACTLY WHAT THIS PATENT

23   CLAIMS YEARS LATER IT INVENTED.

24             LET'S CONTINUE.

25             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
```

```
 1        OPEN COURT OFF THE RECORD.)

 2             MR. VERHOEVEN:  THERE YOU SEE THE PERSON

 3        ZOOMING -- OR PANNING, EXCUSE ME, AND THEN USING

 4        TWO FINGERS TO DO WHAT'S CALLED A GESTURE IN THE

 5        '915 PATENT.

 6             THE SAME THING THAT APPLE SAYS IT'S

 7        ENTITLED TO A PATENT ON WAS ALREADY DONE BY OTHERS

 8        IN THE FRACTAL ZOOM PRIOR ART.

 9             SAME THING WITH THE NOMURA PRIOR ART.

10        THIS WAS A PATENT FILED IN 1998, YEARS BEFORE THE

11        APPLE PATENT.  YOU CAN SEE HERE IN ILLUSTRATIONS

12        FROM NOMURA, THIS IS ACTUAL PICTURES OUT OF THE

13        PATENT SHOWING PANNING AND THEN PINCHING AND

14        ZOOMING.  LET'S GO AHEAD AND PLAY THAT.

15             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

16        OPEN COURT OFF THE RECORD.)

17             MR. VERHOEVEN:  SO THE NOMURA PATENT ALSO

18        DISCLOSES USING ONE FINGER TO SCROLL OR PAN AND TWO

19        FINGERS -- PLAY THAT -- TWO FINGERS TO PINCH OR

20        ZOOM, A GESTURE.

21             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

22        OPEN COURT OFF THE RECORD.)

23             MR. VERHOEVEN:  AND FINALLY, JEFFERSON

24        HAN'S PRIOR ART.  THIS WAS PRESENTED IN FEBRUARY OF

25        2006, THE MULTITOUCH SYSTEM AT A TED CONFERENCE,
```

```
1    AND HE DEMONSTRATED THE EXACT SAME FUNCTIONALITY.

2             LET'S PLAY IT.

3             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

4    OPEN COURT OFF THE RECORD.)

5             MR. VERHOEVEN:  DO WE HAVE A TECHNICAL

6    PROBLEM?

7             I APOLOGIZE, YOUR HONOR.

8             THE COURT:  NO PROBLEM.

9             (PAUSE IN PROCEEDINGS.)

10            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

11   OPEN COURT OFF THE RECORD.)

12            MR. VERHOEVEN:  STOP RIGHT THERE.  PAUSE.

13            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

14   OPEN COURT OFF THE RECORD.)

15            MR. VERHOEVEN:  WELL, WE DIDN'T PAUSE

16   WHERE I WANTED TO.  I APOLOGIZE.

17            YOU SAW HE WAS MOVING VERY QUICKLY, BUT

18   HE MOVED HIS FINGER AND THE ENTIRE SCREEN MOVED,

19   AND THAT WAS THE PANNING OR SCROLLING.

20            GO AHEAD AND CONTINUE.

21            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

22   OPEN COURT OFF THE RECORD.)

23            MR. VERHOEVEN:  WELL, THAT WASN'T THE

24   MOST SOPHISTICATED VIDEO THERE, BUT HE ALSO SHOWED

25   THIS VERY SAME FUNCTIONALITY.  HE USED ONE FINGER,
```

1    HAND, TO SCROLL.  TWO FINGERS TO ZOOM.

2              THE PATENT THAT APPLE HAS ASSERTED IS NOT

3    VALID.  THE EVIDENCE IS GOING TO SHOW IT.

4              NOW LET'S GO TO THE '163 PATENT.

5              OKAY.  I'M GOING TO SHOW YOU A QUICK

6    SUMMARY.  THIS IS ANOTHER VERY SIMPLE PATENT THAT

7    APPLE IS ASSERTING AGAINST SAMSUNG IN THIS CASE,

8    AND HERE IS ESSENTIALLY WHAT IT IS.

9              TAKING YOUR FINGER, YOU HIT -- YOU HIT A

10   BLOCK AND IT BECOMES CENTERED.  LET'S SHOW IT ONE

11   MORE TIME.

12             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

13   OPEN COURT OFF THE RECORD.)

14             MR. VERHOEVEN:  THIS IS THE TECHNOLOGY.

15   YOU HIT A BLOCK, IT CENTERS.  YOU HIT A BLOCK, IT

16   CENTERS.

17             WELL, THAT VERY SIMPLE PATENT WAS ALSO

18   DONE YEARS BEFORE APPLE FILED FOR ITS PATENT

19   APPLICATION.

20             THE EVIDENCE IS GOING TO SHOW THAT IN

21   APRIL OF 2005, LAUNCHTILE DEMONSTRATED THAT EXACT

22   SAME FUNCTIONALITY AT A CHI CONFERENCE.

23             IN SEPTEMBER OF 2005, MICROSOFT FILED A

24   PATENT APPLICATION FOR TILE SPACE USER INTERFACE

25   WHICH ALSO DEMONSTRATED THAT SAME TECHNOLOGY.

```
 1              THE LAUNCHTILE TECHNOLOGY DEVELOPED BY

 2    DR. BENJAMIN BEDERSON IN 2004 WAS DEMONSTRATED AT A

 3    CONFERENCE, THE EVIDENCE WILL SHOW, IN 2005.

 4              AND IT SHOWED THREE DIFFERENT VIEWS FOR

 5    LAUNCHTILE.  WE START WITH THE WORLD VIEW, THAT'S

 6    THE FIRST BOX YOU SEE THERE, AND YOU CLICK THAT BOX

 7    AND WHAT HAPPENS IS THAT BOX EXPANDS INTO THE ZONE

 8    VIEW IN THAT MIDDLE SCREEN THAT YOU SEE THERE.

 9              AND THEN IF YOU GO -- AND YOU CAN HIT ANY

10    ONE OF THESE FOUR QUADRANTS, BUT IF YOU HIT THE TOP

11    RIGHT QUADRANT, WHICH I'VE LABELED THE SECOND BOX,

12    THAT WOULD BE CENTERED AND GO INTO THE APPLICATION

13    USE SCREEN.

14              THAT'S EXACTLY WHAT THE PATENT IS TALKING

15    ABOUT.

16              AND HERE WE'LL SHOW YOU, YOU CAN SEE IT

17    FOR YOURSELF BECAUSE WE HAVE THE SOFTWARE.

18              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

19    OPEN COURT OFF THE RECORD.)

20              MR. VERHOEVEN:  THE EVIDENCE IS GOING TO

21    SHOW THAT THIS IS EXACTLY WHAT THE '163 PATENT

22    CLAIMS, BUT IT WAS DONE BEFORE.

23              IN ADDITION TO THIS LAUNCHTILE PRIOR ART,

24    WE HAVE THE MICROSOFT PRIOR ART.  AGAIN, A PATENT

25    WAS FILED BEFORE THIS PATENT, AND THE MICROSOFT
```

1    PRIOR ART ALSO SHOWS CLICKING ON A BOX AND HAVING

2    THE BOX THEN BECOME ENLARGED AND CENTERED.

3              AND WE HAVE AN ILLUSTRATION OF THAT HERE,

4    TOO.

5              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

6    OPEN COURT OFF THE RECORD.)

7              MR. VERHOEVEN:  SO WE SEE HERE THAT, AS

8    WITH THE FIRST PATENT, THE SECOND PATENT ALSO HAS

9    ART THAT INVALIDATES IT.

10             LET'S TURN TO THE THIRD PATENT, THE '381

11   PATENT.

12             THIS PATENT AS WELL IS A VERY SIMPLE

13   PATENT.

14             GO TO SLIDE 105, PLEASE.

15             AND WE'LL SHOW YOU WHAT IT IS CLAIMING.

16             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

17   OPEN COURT OFF THE RECORD.)

18             MR. VERHOEVEN:  THIS IS WHAT WAS REFERRED

19   TO AS THE BOUNCE BACK PATENT BY MR. MCELHINNY, OR

20   THE SLIDE BACK.

21             SO YOU PULL TO THE EDGE OF A DOCUMENT AND

22   YOU LET GO AND THERE'S AN EMPTY SPACE.  YOU LET GO

23   AND IT BOUNCES BACK.  THAT'S, IN A NUTSHELL, A HIGH

24   LEVEL OF WHAT THE '381 PATENT IS TALKING ABOUT.

25             WELL, THE EVIDENCE IS GOING TO SHOW,

1    MEMBERS OF THE JURY, THAT OTHERS ALSO DID THIS,

2    ALSO DEVELOPED THIS TECHNOLOGY BEFORE APPLE FILED

3    ITS PATENT.

4              THE SAME LAUNCHTILE PROGRAM THAT WE

5    LOOKED AT IN NOVEMBER 19 -- NOVEMBER OF 2004

6    PERFORMED THAT FUNCTIONALITY.

7              THERE WAS A PRODUCT -- OR A TECHNOLOGY

8    CALLED TABLECLOTH THAT WAS CREATED IN 2005 THAT

9    ALSO PERFORMED THAT.  AND LET'S TAKE A LOOK BRIEFLY

10   AT TABLECLOTH.

11             IN THE INTERESTS OF TIME, WE'RE NOT GOING

12   TO RELOOK AT THAT LAUNCH PAD.

13             CAN WE PLAY IT?

14             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

15   OPEN COURT OFF THE RECORD.)

16             MR. VERHOEVEN:  HERE YOU SEE THE EXACT

17   SAME THING BOUNCING BACK.  GO PAST THE EDGE OF THE

18   DOCUMENT, YOU HAVE A BLANK SPACE, YOU LET GO, IT

19   BOUNCES BACK.

20             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

21   OPEN COURT OFF THE RECORD.)

22             MR. VERHOEVEN:  SO MEMBERS OF THE JURY,

23   EACH OF THESE THREE VERY SIMPLE PATENTS THAT APPLE

24   IS ASSERTING ON THE UTILITY PATENT SIDE, EACH ONE

25   OF THEM, THE EVIDENCE IS GOING TO SHOW THAT OTHERS

1    DID IT BEFORE, MULTIPLE OTHERS DID IT BEFORE.

2            AND IF OTHER PEOPLE HAVE DONE WHAT YOU

3    CLAIM YOU'VE INVENTED, YOU DON'T HAVE AN INVENTION.

4    IT'S NOT VALID.

5            AND THE EVIDENCE IS GOING TO SHOW THAT'S

6    THE CASE.

7            WE ALSO CONTEND THAT WE DON'T INFRINGE

8    THESE PATENTS.  I DON'T HAVE ENOUGH TIME TODAY TO

9    GO THROUGH ALL OF OUR ARGUMENTS WITH RESPECT TO

10   THAT, BUT THE EVIDENCE IS ALSO GOING TO SHOW THAT.

11           NOW, LET ME MOVE -- I'VE GOT ONE MORE

12   MODULE, I'M SURE YOU'RE ALL VERY TIRED, THAT I NEED

13   TO SWITCH TO AND THEN I'LL BE DONE, AND THAT IS MY

14   CLIENT, SAMSUNG'S, AFFIRMATIVE CASE, COUNTERCLAIM

15   AND CLAIM AGAINST APPLE FOR PATENT INFRINGEMENT.

16           NOW, I HEARD MR. MCELHINNY AND MR. LEE

17   SAY, "WELL, SAMSUNG DIDN'T SUE US ON THESE PATENTS

18   UNTIL WE SUED THEM," AS IF THAT MEANS OUR PATENTS

19   AREN'T ANY GOOD.

20           WELL, THAT'S TRUE.

21           IT'S ALSO TRUE THAT SAMSUNG HAD A MAJOR

22   BUSINESS RELATIONSHIP WITH APPLE.  YOU SAW AT THE

23   START OF MY OPENING STATEMENT WHEN I SHOWED YOU THE

24   EVIDENCE THAT OVER 20 PERCENT OF THE COMPONENT

25   PARTS THAT MAKE UP THE IPHONE IS TECHNOLOGY THAT'S

1    SUPPLIED BY SAMSUNG.

2              SAMSUNG ISN'T IN THE HABIT OF SUING ITS

3    BUSINESS PARTNERS, EVEN IF IT COULD.

4              BUT SAMSUNG ISN'T THE ONE WHO LAUNCHED

5    THIS LITIGATION.  SAMSUNG IS THE ONE WHO DECIDED TO

6    COMPETE IN THE COURTROOM INSTEAD OF THE

7    MARKETPLACE.

8              AND SAMSUNG HAS EVERY RIGHT, AFTER IT'S

9    BEEN ATTACKED BY APPLE, TO UTILIZE ITS OWN

10   INTELLECTUAL PROPERTY TO DEFEND ITSELF.  THERE'S

11   NOTHING WRONG WITH THAT, AND TO SUGGEST OTHERWISE

12   IS WITHOUT MERIT.

13             NOW, LET'S GO THROUGH QUICKLY SAMSUNG'S

14   CLAIMS AGAINST APPLE FOR INFRINGEMENT OF THE

15   UTILITY PATENTS.

16             HERE WE HAVE TWO CATEGORIES OF PATENTS

17   I'M GOING TO ADDRESS.  THE FIRST ARE WHAT I'LL CALL

18   HIGH SPEED DATA PATENTS, THE '516 AND THE '941

19   PATENTS.

20             IN ADDITION, SAMSUNG IS ASSERTING THREE

21   CAMERA AND MUSIC PATENTS, THE '460, '893, AND 711.

22             EACH OF THOSE PATENTS WAS FILED BEFORE

23   AND PRE-DATES THE INTRODUCTION OF THE IPHONE.

24             FIRST THE HIGH SPEED DATA PATENTS.

25             THE FIRST OF THOSE IS THE '516.  THE '516

1    PATENT IS A METHOD AND APPARATUS FOR ACHIEVING

2    ENHANCED DATA UPLINK TRANSMISSIONS.  THESE ARE THE

3    GUTS OF THE TRANSMISSIONS THAT GO BACK AND FORTH

4    WITH THE CELL TOWER.

5              THESE AREN'T MINOR FEATURES ON YOUR TOUCH

6    SCREEN.  THESE ARE CORE INNOVATIONS.

7              WITH THESE TYPES OF TECHNOLOGIES, MEMBERS

8    OF THE JURY, THAT ALLOWS COMPANIES LIKE APPLE TO

9    MAKE PRODUCTS WHERE YOU CAN SEND PICTURES AND YOU

10   CAN SURF THE INTERNET AND MAKE VIDEO CALLS.  YOU

11   WOULDN'T BE ABLE TO DO THAT UNLESS YOU WERE ABLE TO

12   ACHIEVE VERY HIGH SPEEDS.

13             IN A NUTSHELL -- THIS IS SOMEWHAT

14   COMPLEX, SO I CAN'T GET INTO TOO MUCH DETAIL IN THE

15   OPENING -- BUT IN THE A NUTSHELL, THERE WAS A

16   PROBLEM WITH THE 3G HIGH SPEED SYSTEMS IN TERMS OF

17   THEIR SPEED, AND THAT WAS YOU HAD SOMETHING CALLED

18   MAXIMUM POWER AND YOU COULDN'T -- YOU COULDN'T --

19   EVERY MOBILE UNIT, EVERY HANDSET HAD -- IT WAS

20   ASSIGNED A MAXIMUM POWER AND THEY CAN'T GO HIGHER

21   THAN THAT MAXIMUM POWER.

22             BUT SOMETIMES THE PHONE WANTS TO

23   COMMUNICATE SO MUCH INFORMATION THAT THEY EXCEED

24   THE MAXIMUM POWER, AND THAT'S WHAT YOU SEE HERE.

25   THIS PMAX IS THE MAXIMUM POWER.

1          AND IN THE PAST, THE WAY THAT THE

2     TECHNOLOGY DEALT WITH THIS WAS BY REDUCING THE

3     PACKET TRANSMISSIONS, AND THEY WOULD REDUCE ALL OF

4     THEM.  THEY WOULD REDUCE ENHANCED DATA CHANNELS

5     THAT WERE RETRANSMITTED, AND THEY WOULD ALSO REDUCE

6     VOICE DATA CHANNELS, WHICH WERE NOT RETRANSMITTED.

7          SO FOR VOICE IT'S A LITTLE BIT DIFFERENT

8     THE WAY THE TRANSMISSION WORKS THAN DATA, AND IN

9     VOICE, THE PHONE WILL TRANSMIT ONCE.  WITH DATA,

10    YOU HAVE THE ABILITY TO RETRANSMIT MANY TIMES.

11         THE WAY THE OLD SYSTEM WORKED IS IT WOULD

12    REDUCE EVERYTHING.  IT WOULDN'T MAKE A DISTINCTION.

13    AND THAT WAS A PROBLEM.

14         IT WAS A PROBLEM WHY?  BECAUSE THIS VOICE

15    DATA CHANNEL DOESN'T GET RETRANSMITTED AND IT GOT

16    LOST OCCASIONALLY AND YOU WOULD GET DROPPED CALLS

17    OR PROBLEMS WITH TRANSMISSION.

18         IT DIDN'T MATTER SO MUCH FOR THE ENHANCED

19    RETRANSMITTED DATA CHANNELS BECAUSE IT JUST

20    RETRANSMITS IF SOMETHING GETS LOST BECAUSE IT'S

21    DATA.

22         SAMSUNG CAME UP WITH A SOLUTION THAT

23    HELPED DEAL WITH THIS PROBLEM, AND THIS IS THE '516

24    PATENT.

25         THE SOLUTION WAS TO ONLY REDUCE CHANNELS

```
1    THAT ARE RETRANSMITTED, DATA CHANNELS, SO THEY CAME

2    UP WITH AN INVENTION THAT APPLIED INTELLIGENCE TO

3    THIS PROBLEM.

4         AND YOU SEE HOW I'VE HIGHLIGHTED THE

5    ORANGE BOX HERE, AND THE SOLUTION UNDER THE '516

6    PATENT, ONLY THE ENHANCED DATA CHANNELS THAT ARE

7    RETRANSMITTED GET REDUCED.

8         THE VOICE CHANNEL DOES NOT GET REDUCED

9    ANYMORE, AND THAT RESULTED IN A GREAT IMPROVEMENT

10   BECAUSE YOU HAD FEWER VOICE DROPPED CALLS OR

11   INTERRUPTIONS WITH YOUR VOICE TRANSMISSIONS THAT

12   YOU COULDN'T RECREATE BECAUSE THEY'RE NOT BEING

13   RETRANSMITTED, WHEREAS THE DROPPING THAT OCCURRED

14   BECAUSE OF THE REDUCTION THAT WOULD HAPPEN IN THESE

15   RETRANSMITTED CHANNELS WOULDN'T BE AS BIG OF A

16   PROBLEM BECAUSE THEY KEEP GETTING RETRANSMITTED.

17        IT'S A SIGNIFICANT INVENTION THAT THE

18   EVIDENCE IS GOING TO SHOW APPLE IS USING.

19        APPLE'S -- THIS INVENTION WAS SO USEFUL

20   THAT IT GOT ADOPTED INTO THE 3GPP STANDARD.

21        AND THIS JUST CITES THE EVIDENCE.

22   5.1.2.6 OF THE STANDARD WHICH INCORPORATES THIS

23   TECHNOLOGY.

24        WELL, THE EVIDENCE WILL SHOW, MEMBERS OF

25   THE JURY, THAT APPLE'S PRODUCTS PRACTICE THIS
```

```
 1    PATENT, AND YOU HEARD MR. LEE GET UP AND MAKE HIS
 2    PRESENTATION ABOUT APPLE'S DEFENSE TO THESE
 3    PATENTS.
 4          YOU DIDN'T HEAR ANYTHING ABOUT THE
 5    PATENTS OR WHAT THEY DID OR WHAT EVIDENCE WOULD
 6    SHOW NON-INFRINGEMENT.  HE DIDN'T TALK ABOUT THAT
 7    AT ALL.  THAT'S BECAUSE THE EVIDENCE SHOWS
 8    INFRINGEMENT.
 9          APPLE ADMITS IT PRACTICES THE STANDARD.
10          IN ADDITION, WE'VE GOT EVIDENCE WHICH
11    WE'LL SHOW YOU THAT THE INFINEON BASEBAND PROCESSOR
12    THAT'S USED IN THE APPLE PRODUCTS PERFORMS THE
13    STEPS THAT ARE CLAIMED IN THIS PATENT.
14          WE'LL PRESENT EVIDENCE FROM MARKUS
15    PALTIAN, AN INTEL ENGINEER, WHO WILL TESTIFY THAT
16    HE PROGRAMMED THE INTEL CHIPS TO PERFORM THE 3GPP
17    STANDARD, AND THAT THE CHIPS DO PERFORM THIS
18    REDUCTION THAT I TOLD YOU ABOUT.
19          LET'S GO TO THE SECOND HIGH SPEED DATA
20    PATENT.  THIS IS THE '941 PATENT.
21          THIS IS A PATENT -- THIS PATENT ALSO
22    DEALS WITH THE GUTS OF THE TRANSMISSION BETWEEN
23    HANDSETS AND CELL TOWERS, MUCH MORE FUNDAMENTAL
24    PATENT THAN LITTLE THINGS YOU CAN DO ON TOUCH
25    SCREENS.
```

1          THIS PATENT CONCERNS DATA TRANSMISSIONS

2     AS OPPOSED TO VOICE, AND DATA TRANSMISSION GETS

3     TRANSMITTED IN PACKETS.

4          AND I DON'T KNOW HOW FAMILIAR YOU ALL ARE

5     WITH, FOR EXAMPLE, TCP OR I.P. ON THE INTERNET OR

6     OTHER TYPES OF PROTOCOLS, BUT WHEN YOU'RE

7     TRANSMITTING DATA, IT'S SORT OF LIKE THE U.S. MAIL.

8     YOU BREAK THE DATA UP INTO PACKAGES AND THEN YOU

9     PUT A LABEL ON IT AND INFORMATION ABOUT IT SO THE

10    PACKAGE KNOWS WHERE TO GO.

11         AND IN THE PARLANCE AND THE TECHNOLOGY,

12    THAT'S OFTEN REFERRED TO AS A HEADER.  SO YOU HAVE

13    THE DATA IN THE PACKET AND THE PACKET HAS A HEADER.

14         AND WHEN YOU WANT TO SEND, FOR EXAMPLE, A

15    VIDEO, LIKE THIS VIDEO HERE OF A GIRL RIDING A

16    BIKE, WHAT THE PHONE DOES IS IT BREAKS IT UP INTO

17    PACKETS AND IT SENDS CHUNKS OF THAT DATA TO THE

18    CELL TOWER TO GET TRANSMITTED FURTHER.

19         THE PROBLEM WITH THE ART BEFORE THE '941

20    PATENT CAME ALONG IS THE HEADER -- AND THAT'S

21    REPRESENTED IN THIS BOX HERE WITH THE RED SUBBOXES

22    WITH THE BINARY NUMBERS, THAT'S THE HEADER -- THE

23    PROBLEM IS THE HEADER WAS TOO BIG AND IT TOOK SPACE

24    AWAY FROM THE DATA AND THE PACKET.

25         SO HERE WE'RE TRYING TO SEND AN IMAGE,

1   BUT THE WHOLE IMAGE WON'T FIT INTO ONE PACKET, SO

2   YOU HAVE TO BREAK IT UP, AND THEN YOU HAVE SOME

3   WASTED SPACE HERE BECAUSE OF HAVING TO BREAK IT UP

4   THIS WAY.

5   WELL, THE INVENTORS AT SAMSUNG CAME UP

6   WITH A SOLUTION WHERE THEY ELIMINATED THE NEED TO

7   HAVE SUCH A BIG HEADER.  THEY CAME UP WITH A MORE

8   EFFICIENT HEADER -- OOPS -- SO THAT YOU COULD FIT

9   MORE DATA INTO THE PACKAGES.

10   AND THIS RESULTED IN MUCH MORE EFFICIENT

11   TRANSMISSIONS.  IT RESULTED IN GETTING MORE DATA

12   ACROSS WITH FEWER PACKETS AND ALLOWED FOR HIGHER

13   SPEED DATA TRANSMISSION.

14   THIS INVENTION WAS ALSO SIGNIFICANT

15   ENOUGH THAT IT WAS INCORPORATED INTO THE 3GPP

16   STANDARD.

17   AND THE EVIDENCE WILL SHOW, MEMBERS OF

18   THE JURY, THAT APPLE PRACTICES THIS PATENT.  APPLE

19   PRACTICES THE STANDARD.

20   AND IN ADDITION TO THAT, WE WILL PRESENT

21   EVIDENCE FROM AN INTEL ENGINEER, ANDRE ZORN, THAT

22   HE PROGRAMMED INTEL CHIPS, WHICH ARE USED IN THE

23   APPLE PRODUCTS, TO PERFORM THE 3GPP STANDARD.

24   HE'LL TESTIFY THAT THE INTEL CHIPS HAVE THIS NEW

25   E-BIT SOLUTION, WHICH IS THE SMALLER HEADER THAT I

1    WAS TALKING ABOUT.

2              NOW, AGAIN, YOU DIDN'T HEAR ANYTHING

3    ABOUT THIS FROM MR. LEE WHEN HE WAS DESCRIBING THE

4    DEFENSE THAT APPLE HAD TO THESE PATENTS.  YOU

5    DIDN'T HEAR ANY NON-INFRINGEMENT ARGUMENTS --

6              MR. LEE:  YOUR HONOR, I OBJECT.

7              FIRST, THIS IS ARGUMENT; AND SECOND, I

8    DID ADDRESS IT.  I SAID THEY WEREN'T COVERED.

9              THIS IS THE THIRD TIME HE'S MADE A

10   REPRESENTATION ABOUT WHAT I SAID.

11             THE COURT:  OVERRULED.

12             GO AHEAD, PLEASE.

13             MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

14             WHAT YOU DID HEAR A LOT ABOUT WAS

15   SOMETHING CALLED FRAND AND ETSI.

16             THE ALLEGATION WAS MADE, AND I'M NOT

17   GOING TO GO INTO THE DETAILS OF IT, BUT THE

18   EVIDENCE WOULD SHOW THAT THERE WAS SOME SORT OF A

19   BREACH OF AN OBLIGATION TO THIS ORGANIZATION CALLED

20   ETSI.

21             WELL, MEMBERS OF THE JURY, THE EVIDENCE

22   IS NOT GOING TO BEAR THAT OUT.

23             IF WE CAN GO TO SLIDE 137, PLEASE.

24             WHAT YOU WERE NOT TOLD ABOUT WITH RESPECT

25   TO FRAND AND ETSI RULES IS THAT THE DUTY TO

1    DISCLOSE INTELLECTUAL PROPERTY RIGHTS DOES NOT

2    APPLY, UNDER ETSI RULES, FOR CONFIDENTIAL

3    INFORMATION, AND THE EVIDENCE IS GOING TO SHOW THAT

4    THE APPLICATIONS, THE PATENT APPLICATIONS THAT

5    APPLE IS POINTING TO WHICH THEY SAY SHOULD HAVE

6    BEEN DISCLOSED, WERE CONFIDENTIAL.  THEY'RE

7    CONFIDENTIAL KOREAN PATENT APPLICATIONS.

8          THE EVIDENCE IS GOING TO SHOW THERE WAS

9    NO DUTY.

10         ANOTHER THING YOU WEREN'T TOLD BY COUNSEL

11   FOR APPLE WAS THAT THEIR OWN EXPERT ON THIS

12   SUBJECT, DR. MICHAEL WALKER, TESTIFIED THAT THERE

13   WAS NO VIOLATION OF ETSI POLICY.

14         SECTION 14 OF THE ETSI RULES ENTITLED

15   "VIOLATION OF POLICY," "ANY VIOLATION OF THE POLICY

16   BY A MEMBER SHALL BE DEEMED TO BE A BREACH, BY THAT

17   MEMBER, OF ITS OBLIGATIONS TO ETSI," AND IT GOES

18   ON.

19         DR. WALKER WAS ASKED UNDER OATH,

20   "QUESTION:  JUST FOR THE RECORD, YOU HAVE NO

21   OPINION AS TO WHETHER OR NOT THERE HAS BEEN A

22   VIOLATION UNDER SECTION 14, CORRECT?

23         "ANSWER:  THAT IS CORRECT."

24         THAT'S THEIR EXPERT, APPLE'S EXPERT WHO

25   WAS HIRED TO PROVE TO YOU THAT THERE IS SOME SORT

443

```
 1    OF BREACH OF FRAND ADMITTED UNDER OATH THAT HE'S

 2    NOT AWARE OF WHETHER THERE'S BEEN ANY VIOLATION

 3    UNDER SECTION 14.

 4            SO THE EVIDENCE IS NOT GOING TO BEAR OUT

 5    THIS FRAND DEFENSE THAT APPLE IS MAKING ON THESE

 6    TWO PATENTS.

 7            VERY BRIEFLY -- TIME CHECK?

 8            THE COURT:  YOU HAVE EIGHT MINUTES.

 9            MR. VERHOEVEN:  EIGHT MINUTES, THANK YOU,

10    YOUR HONOR.

11            I'D LIKE TO ADDRESS THE CAMERA AND MUSIC

12    PATENTS.  THERE'S THREE OTHER PATENTS THAT SAMSUNG

13    IS ASSERTING IN THIS CASE.

14            THE FIRST IS THE '460 PATENT, WHICH IS A

15    PATENT CONCERNING SENDING AN E-MAIL WHILE YOU

16    DISPLAY A PHOTO IN THE PHOTO GALLERY.

17            SO THIS IS A UNIQUE WAY, AN IMPROVEMENT

18    ON BEING ABLE TO MANIPULATE YOUR PHONE TO USE TEXT

19    AND PHOTOS TOGETHER.

20            THE PATENT -- AND I'M SUMMARIZING HERE --

21    THE PATENT DESCRIBES THREE FUNCTIONS:  SENDING AN

22    E-MAIL WITH A MESSAGE ONLY; SENDING AN E-MAIL

23    DISPLAYING A PHOTO AND A MESSAGE FROM THE PHOTO

24    GALLERY; AND THEN ALSO GRAPHICALLY SCROLLING

25    THROUGH PHOTOS.
```

1            SO IT'S TALKING ABOUT A PHONE THAT HAS

2    MULTIPLE FUNCTIONALITIES THAT YOU CAN USE.  SO IT

3    IMPROVED ON PHONES PRIOR TO THAT TIME THAT YOU

4    COULDN'T DO ALL THESE THINGS TOGETHER.

5            THE EVIDENCE WILL SHOW THAT SAMSUNG

6    INVENTED THIS CAMERA PHONE TECHNOLOGY EIGHT YEARS

7    BEFORE THE RELEASE OF THE IPHONE.  IT WAS FIRST TO

8    IMPLEMENT THESE THREE CORE FUNCTIONS IN A CAMERA

9    PHONE, THE FIRST TO ENABLE SENDING A PHOTO IN A

10   MESSAGE IN THE BODY OF AN E-MAIL, AND FIRST TO

11   OFFER A SEPARATE MODE FOR SENDING E-MAIL FROM PHOTO

12   GALLERY ON A CAMERA PHONE.

13           THE APPLE ACCUSED PRODUCTS DO ALL OF

14   THIS, THE EVIDENCE WILL SHOW.  USING AN APPLE

15   PRODUCT, YOU CAN SEND AN E-MAIL WITH A MESSAGE

16   ONLY, YOU CAN SEND AN E-MAIL WITH A PHOTO AND A

17   MESSAGE, THERE'S A PICTURE OF IT RIGHT HERE FROM

18   THE IPHONE, AND GRAPHICALLY SCROLLING THROUGH

19   PHOTOS.

20           IN FACT, YEARS AFTER THIS PATENT WAS

21   FILED WHEN APPLE MARKETED ITS IPHONE, WHEN IT

22   LAUNCHED ITS IPHONE, THIS FUNCTIONALITY WAS

23   IMPORTANT ENOUGH THAT APPLE, IN LAUNCHING THE

24   IPHONE, IN ANNOUNCING THE IPHONE, HIGHLIGHTED IT.

25   LET'S PLAY.

```
 1                    (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

 2      OPEN COURT OFF THE RECORD.)

 3                    MR. VERHOEVEN:  THAT'S THE -- THAT IS

 4      COOL TECHNOLOGY.  I ADMIT IT.

 5                    THE ISSUE IS, SAMSUNG INVENTED IT YEARS

 6      BEFORE THE IPHONE WAS LAUNCHED.

 7                    IT WAS IMPORTANT ENOUGH THAT WHEN THEY

 8      LAUNCHED THE IPHONE, THEY HIGHLIGHTED IT AS A

 9      FEATURE.  THE EVIDENCE IS GOING TO SHOW THAT

10      PATENT'S INFRINGED.

11                    NOW, TURNING TO THE '711 PATENT -- EXCUSE

12      ME -- THE '893 PATENT, VERY BRIEFLY, THE '893

13      PATENT ALLOWS USERS TO BOOKMARK A PHOTO IN THE

14      PHOTO GALLERY WHILE CAPTURING A NEW PHOTO.

15                    SO IF YOU THINK ABOUT IT, YOU'RE GOING

16      THROUGH YOUR GALLERY OF PHOTOS, YOU GET HALFWAY

17      THROUGH, AND THIS ILLUSTRATION IS TRYING TO

18      ILLUSTRATE BY SHOWING SAY YOU'RE AT YOUR VACATION

19      PHOTOS HERE, AND SAY YOU'RE ON VACATION, AND ALL OF

20      A SUDDEN -- YOU'RE LOOKING THROUGH YOUR PHOTOS AND

21      ALL OF A SUDDEN YOU SEE SOMETHING YOU WANT TO TAKE

22      A PICTURE OF.

23                    WHAT THIS PATENT ALLOWS TO YOU DO IS GET

24      OUT OF YOUR GALLERY, TAKE THE PICTURE, GO BACK IN

25      YOUR GALLERY AND GO RIGHT BACK TO THE PLACE WHERE
```

1    YOU WERE BEFORE.

2           IN THIS ILLUSTRATION, SAY YOU'RE VIEWING

3    THE SUNSET WHILE YOU'RE ON THE BEACH THE NEXT DAY

4    AND YOU SEE YOUR DAUGHTER MAKING A SAND CASTLE,

5    IT'S REALLY CUTE.  YOU JUMP OUT, TAKE A PICTURE,

6    AND GO RIGHT BACK INTO YOUR GALLERY WHERE YOU WERE

7    WITHOUT HAVING LEFT OFF.  THAT'S A COOL LITTLE

8    FEATURE.

9           APPLE'S PRODUCTS DO THAT AS WELL.  IN

10   THIS EXAMPLE, AT THE OLYMPICS, WE TOOK A PICTURE OF

11   A HIGH JUMPER -- OR MAYBE THAT'S NOT A HIGH

12   JUMPER -- A GYMNAST AND YOU'RE GOING THROUGH YOUR

13   GALLERY THE NEXT DAY AND YOU WANT TO TAKE A PICTURE

14   OF MORE GYMNASTICS AND YOU GO RIGHT BACK, IN THE

15   APPLE PRODUCT, TO YOUR GALLERY.

16          FINALLY, VERY, VERY BRIEFLY, THE '711

17   PATENT.  THIS IS A MUSIC PATENT.  THIS COVERS

18   PLAYING MUSIC WHILE PERFORMING OTHER TASKS WITHOUT

19   A DEDICATED MUSIC PROCESSOR.  AN INDICATOR ON THE

20   DISPLAY LETS YOU KNOW YOU'RE PLAYING MUSIC IN THE

21   BACKGROUND.

22          HERE ALSO THE UNDISPUTED EVIDENCE SHOWS

23   APPLE PRACTICES THIS PATENT.

24          (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

25   OPEN COURT OFF THE RECORD.)

```
 1              MR. VERHOEVEN:  I APOLOGIZE FOR THE
 2    AUDIO, YOUR HONOR.
 3              SO WE PUT THAT IN REALLY QUICKLY, BUT
 4    THAT WAS -- YOU TURNED ON THE MUSIC, YOU'RE ABLE TO
 5    GO AND DO OTHER THINGS ON YOUR PHONE WHILE THE
 6    MUSIC IS PLAYING, AND THERE'S AN INDICATOR AT THE
 7    TOP THAT THE MUSIC IS PLAYING.
 8              CLEAR INFRINGEMENT WHICH THE EVIDENCE IS
 9    GOING TO SHOW.
10              IN SUMMARY, MEMBERS OF THE JURY, I THANK
11    YOU VERY MUCH FOR YOUR TIME.  I KNOW IT'S BEEN A
12    VERY LONG OPENING STATEMENT BY BOTH SIDES.
13              I THINK THE EVIDENCE IS GOING TO SHOW
14    HERE THAT SAMSUNG HASN'T DONE ANYTHING WRONG.
15    SAMSUNG IS AN INNOVATOR.  IT'S A COMPETITOR.  IF
16    ANYTHING, WHAT WE HAVE HERE IS INFRINGEMENT BY
17    APPLE OF CORE SAMSUNG PATENTS.
18              NOW, I'M NOT GOING TO GET TO SPEAK TO YOU
19    AGAIN UNTIL THE CLOSING STATEMENT, SO I WANT TO
20    THANK YOU VERY MUCH FOR YOUR TIME AND YOUR SERVICE.
21              THE COURT:  ALL RIGHT.  IT'S 1:59.
22              WHY DON'T WE TAKE A FIVE-MINUTE BREAK.
23              SO WHOEVER IS GOING TO LEAVE AFTER THE
24    OPENING STATEMENTS, IF YOU WOULD PLEASE, WE'LL TAKE
25    A BREAK SO THAT WHATEVER CHANGES NEED TO BE MADE TO
```

```
 1    THE COURTROOM CAN BE MADE.
 2              ALL RIGHT.  LET'S TAKE JUST A FIVE-MINUTE
 3    BREAK.
 4              AGAIN, PLEASE KEEP AN OPEN MIND, DON'T DO
 5    ANY OF YOUR OWN RESEARCH, AND PLEASE DON'T TALK
 6    ABOUT THE CASE WITH ANYONE.
 7              ALL RIGHT.  THANK YOU.
 8              (WHEREUPON, A RECESS WAS TAKEN.)
 9              (WHEREUPON, THE FOLLOWING PROCEEDINGS
10    WERE HELD OUT OF THE PRESENCE OF THE JURY:)
11              THE COURT:  ALL RIGHT.  PLEASE HAVE YOUR
12    FIRST WITNESS READY TO GO.
13              MR. MCELHINNY:  THANK YOU, YOUR HONOR.
14              THE COURT:  THANK YOU.
15              MR. MCELHINNY:  YOUR HONOR, I JUST HAVE
16    NOTED THIS EARLIER, THERE'S A NOTE FOR THE RECORD.
17    THE PARTIES HAVE STIPULATED AND INVOKED THE RULE SO
18    THAT POTENTIAL WITNESSES SHOULD NOT BE IN THE
19    COURTROOM.
20              THE COURT:  YES, YES.
21              MR. VERHOEVEN:  YES, YOUR HONOR.
22              THE COURT:  THERE'S AN EXCLUSION OF ALL
23    POTENTIAL WITNESSES.
24              MR. MCELHINNY:  OTHER THAN EXPERTS.
25              MR. VERHOEVEN:  YEAH, JUST PERCIPIENTS IS
```

```
1    WHAT WE AGREED.
2            THE COURT:  SORRY.
3            MR. VERHOEVEN:  PERCIPIENT WITNESSES.
4            THE COURT:  THAT'S FINE.  WHATEVER YOU
5    AGREED TO IS FINE.
6            SO ANYONE WHO IS NOT A PERCIPIENT WITNESS
7    WHO IS GOING TO TESTIFY CAN REMAIN IN THE
8    COURTROOM.  IS THAT RIGHT?
9            MR. MCELHINNY:  YES, YOUR HONOR.
10           MR. VERHOEVEN:  EXPERT WITNESSES, YES,
11   YOUR HONOR.
12           THE COURT:  ALL RIGHT.  THAT'S FINE.
13   LET'S TAKE A FEW MINUTE BREAK, PLEASE.
14           (WHEREUPON, A RECESS WAS TAKEN.)
15           (WHEREUPON, THE FOLLOWING PROCEEDINGS
16   WERE HELD OUT OF THE PRESENCE OF THE JURY:)
17           THE COURT:  I'VE LOOKED THROUGH THE
18   EXHIBITS THAT BOTH SIDES HAVE COLLATED FOR
19   CHRISTOPHER STRINGER.  I KNOW ONE OF THEM IS AN
20   APPLE DOCUMENT THAT I ORDERED EXCLUDED, SO YOU'RE
21   TAKING THAT OUT, RIGHT, 157?
22           MR. MCELHINNY:  IT JUST WON'T EVER COME
23   UP.  IT WON'T GET OFFERED, YOUR HONOR, THAT'S
24   RIGHT.
25           THE COURT:  ALL RIGHT.  AND THEN IN THE
```

```
 1   SAMSUNG, THERE'S 504, 623, 624, 628, 649, 678, AND
 2   690.  I'M ASSUMING THOSE ARE NOT GOING TO COME UP
 3   AS WELL.
 4               MR. VERHOEVEN:  I THINK SO, YOUR HONOR.
 5               I HAVE TO COMPARE THAT LIST YOU READ, BUT
 6   WE'RE TRYING TO TAKE YOUR ORDER AND THEN --
 7               THE COURT:  LET'S JUST GO THROUGH THEM
 8   RIGHT NOW.
 9               MR. VERHOEVEN:  OKAY.
10               THE COURT:  504, 623, 624, 628, 649,
11   '678, AND 690.  DO YOU WANT ME TO GO THROUGH THAT
12   LIST ONE MORE TIME?  504 --
13               MR. VERHOEVEN:  THE ONLY QUESTION I HAVE,
14   YOUR HONOR --
15               THE COURT:  YES.
16               MR. VERHOEVEN:  -- IS YOU DID PERMIT --
17   EXCUSE ME.  JUST A POINT OF CLARIFICATION.
18               YOU DID PERMIT -- 562 IS THE ONE THAT HAS
19   THIS (INDICATING).
20               THE COURT:  YES.
21               MR. VERHOEVEN:  THE ONLY CLARIFICATION
22   I'D REFER TO IS THE DOCUMENT, THAT SONY-STYLE
23   CHAPPY, AND THAT IS ACTUALLY A REFERENCE TO 523.
24               THE COURT:  YOU MEAN 623?
25               MR. VERHOEVEN:  623, I APOLOGIZE.
```

```
 1              THE COURT:  WHICH IS WHAT JUDGE GREWAL
 2   ALREADY EXCLUDED IN HIS ORDER WHICH I HAVE THEN
 3   AFFIRMED ON THE RECONSIDERATION AND I'VE LOOKED AT
 4   AGAIN.
 5              SO WE'VE GONE THROUGH THIS THREE TIMES.
 6   OKAY?
 7              MR. VERHOEVEN:  OKAY.  I JUST WANTED TO
 8   LET YOU KNOW THAT THAT'S WHAT THAT'S REFERRING TO.
 9   THAT'S ALL.
10              THE COURT:  I UNDERSTAND.  JUDGE GREWAL
11   EXPLICITLY EXCLUDED THIS, I AFFIRMED IT TWICE, AND
12   I DON'T WANT TO HAVE TO LITIGATE THIS FOUR TIMES,
13   FOUR TIMES, FIVE TIMES, SIX TIMES, SEVEN TIMES,
14   EIGHT TIMES.
15              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.
16              THE COURT:  ALL RIGHT.  THANK YOU.
17              SO THE EXCLUDED ITEMS ARE APPLE 157,
18   SAMSUNG 504, 623, 624, 628, 629, 678, AND 690.
19   OKAY?
20              NOW, I'M GOING TO MAKE A REQUEST IN THAT
21   WE ARE GETTING OBJECTIONS SOMETIMES AT MIDNIGHT.
22   WE'RE TRYING TO RESPOND TO THIS AS QUICKLY AS
23   POSSIBLE.  WE ISSUED THE ORDER ON THE MIDNIGHT
24   OBJECTIONS DURING THE BREAK THIS MORNING.
25              WHAT WOULD BE HELPFUL IS NOW THAT I SEE
```

```
1    THAT YOU HAVE COLLATED ALL OF THE EXHIBITS FOR EACH

2    WITNESS, IF WE COULD GET A COPY OF THIS WHEN YOU

3    FILE YOUR OBJECTIONS, THAT WOULD BE VERY HELPFUL.

4            BECAUSE OTHERWISE WE'RE TRYING TO FIND

5    THEM -- AND THIS ISN'T EVEN ALL THE BINDERS YOU'VE

6    GIVEN US -- BUT THEN WE'RE TRYING TO GO AND FIND

7    THEM, GETTING SOMETIMES OBJECTIONS AT MIDNIGHT,

8    TRYING TO GET YOU ORDERS BY THE NEXT MORNING.  IT'S

9    VERY DIFFICULT.

10           MR. VERHOEVEN:  ABSOLUTELY, YOUR HONOR.

11           THE COURT:  SO IS THERE A POSSIBILITY

12   THAT FOR YOUR DIRECT AND CROSS-EXAMINATION

13   EXHIBITS, YOU COULD PROVIDE THESE JUST TO OUR

14   CHAMBERS WHEN YOU FILE YOUR OBJECTIONS?

15           MR. JACOBS:  ABSOLUTELY.

16           THE COURT:  OKAY.

17           MR. JACOBS:  AS AN ASIDE, YOUR HONOR,

18   WE'VE TAKEN A LOOK AT THE SCHEDULE -- WE DON'T HAVE

19   TO DO THIS NOW, MAYBE RIGHT AFTER TODAY'S TRIAL --

20   WE THINK WE CAN TWEAK THIS TO MAKE IT EASIER FOR

21   THE COURT AND WORK BETTER FOR THE PARTIES.

22           THE COURT:  THAT WOULD BE GREAT.  THAT

23   WOULD BE GREAT.  WE'RE TRYING TO GET THROUGH THIS

24   AS QUICKLY AS POSSIBLE, BUT IT'S CHALLENGING.

25           MR. JACOBS:  YES.
```

```
 1              THE COURT:  OKAY.  SO IF YOU COULD

 2    PROVIDE US THESE -- I BELIEVE YOU'RE FILING YOUR

 3    OBJECTIONS BY 8:00 A.M. THE DAY BEFORE THE WITNESS

 4    TESTIFIES.  IS THAT RIGHT?

 5              MR. JACOBS:  ON THE DIRECT EXHIBITS, I

 6    THINK THAT'S CORRECT.

 7              BUT I THINK WHERE THE SYSTEM ISN'T

 8    WORKING WELL IS ON THE CROSS EXHIBITS.

 9              MS. MAROULIS:  YOUR HONOR, WE'VE BEEN

10    TRYING TO FILE THEM EITHER BY 8:00 P.M. THE DAY

11    BEFORE OR 8:00 A.M. THE NEXT DAY, BUT IT RESULTED

12    IN A ROLLING SERIES OF OBJECTIONS.

13              SO WE'VE BEEN DISCUSSING DOING ONE

14    DEADLINE FOR THE WITNESS RATHER THAN TWO SEPARATE

15    SETS.

16              THE COURT:  THAT ACTUALLY WOULD BE GREAT,

17    AND IF YOU COULD JUST MAKE SURE THAT -- THERE WERE

18    A FEW OBJECTIONS WHERE PEOPLE WERE SORT OF TALKING

19    PAST EACH OTHER WITH THE THINGS THAT WERE FILED

20    YESTERDAY.

21              IF THERE'S SOME WAY THAT THERE COULD BE

22    JUST A MEETING OF THE MINDS AS TO WHAT EACH SIDE'S

23    OBJECTIONS ARE AND WHAT EACH SIDE'S RESPONSES ARE,

24    THAT WOULD BE HELPFUL AS WELL.

25              MR. JACOBS:  YES.
```

```
1              MS. MAROULIS:  YES.

2              THE COURT:  OKAY.  SO PLEASE MAKE A

3    PROPOSAL AS TO THE SCHEDULING ON THIS BECAUSE THIS

4    IS -- THIS IS CHALLENGING AND IF IT'S GOING TO BE

5    FOUR WEEKS LIKE THIS, IT'S GOING TO BE VERY

6    DIFFICULT FOR US JUST BECAUSE WE'RE A SHOESTRING

7    OPERATION ON THIS END COMPARED TO Y'ALL.  OKAY?

8              ALL RIGHT.  SO THEN THE OTHER ISSUE IS --

9    AND I'M SORRY THIS IS --

10             MR. MCELHINNY:  EXCUSE ME.  WHEN YOU READ

11   THE LIST OF STRINGER OBJECTIONS, YOU DID NOT

12   MENTION 743, AND THAT'S THE -- THE OBJECTION WAS

13   SUSTAINED.  IT MAY JUST NOT BE IN THE BINDER, BUT

14   IT'S ON YOUR LIST OF SUSTAINED OBJECTIONS.

15             THE COURT:  IT'S NOT IN THIS BINDER.  IT

16   SKIPS FROM 740 TO 741 TO 1040, SO I ASSUME THAT

17   SAMSUNG DOES NOT ANTICIPATE USING THAT ONE.

18             OKAY.  AND WHY DON'T WE -- WE'LL DO THIS

19   BEFORE EACH WITNESS.  WE'LL JUST GO THROUGH AND

20   MAKE SURE EVERYONE IS IN AGREEMENT AS TO WHAT'S

21   BEEN EXCLUDED.  OKAY?

22             I JUST DON'T WANT THESE FIGHTS OCCURRING

23   IN FRONT OF THE JURY.

24             MR. MCELHINNY:  THE -- JUST --

25             THE COURT:  YES.
```

```
 1                MR. MCELHINNY:  I UNDERSTAND THAT.

 2                IN OPENING, I THOUGHT THAT THE QUESTION

 3      OF WHAT WAS ADMISSIBLE FOR FUNCTIONALITY KIND OF

 4      GOT ABUSED, AND I DIDN'T OBJECT BECAUSE IT WAS THE

 5      OPENING.

 6                BUT WE MAY -- IF HE TRIES TO USE IT FOR

 7      THE SAME PURPOSE THAT HE DID IN THE OPENING, GIVEN

 8      YOUR HONOR'S LIMITATION, WE'RE GOING TO HAVE SOME

 9      OBJECTIONS.

10                THE COURT:  I UNDERSTAND.  I THOUGHT THAT

11      CROSSED THE LINE AS WELL.

12                MR. MCELHINNY:  THANK YOU, YOUR HONOR.

13                THE COURT:  OKAY.  JUST A SMALL

14      HOUSEKEEPING ISSUE IS THAT I WOULD APPRECIATE IT IF

15      YOU COULD PROVIDE MORE CARTS BECAUSE I WILL HAVE A

16      SEPARATE ONE OF THE WITNESS SPECIFIC BINDERS

17      SEPARATE FROM THIS WHOLE LIST, WHICH IS NOT EVEN

18      ALL OF THEM.  THERE ARE MORE DOWN IN MY CHAMBERS

19      THAT WE NEED TO BRING UP.

20                MR. MCELHINNY:  MAY I -- DO YOU

21      UNDERSTAND WHAT THE JUDGE WANTS?

22                YES, YOUR HONOR.

23                THE COURT:  I'M SORRY.  WE JUST DON'T

24      HAVE, UNFORTUNATELY, THINGS AS SIMPLE AS THAT.

25                OKAY.  SO ARE WE ALL SET ON WHAT'S COMING
```

```
1    IN WITH MR. STRINGER?

2              MR. MCELHINNY:  WE ARE, YOUR HONOR.

3              THE COURT:  OKAY.  THEN ARE WE READY TO

4    PROCEED?

5              MR. MCELHINNY:  ONE -- I JUST -- SO

6    THERE'S NO SURPRISES, I'M GOING TO SHOW HIM A

7    NUMBER OF PHYSICAL MODELS.

8              THE COURT:  OKAY.

9              MR. MCELHINNY:  AND AT LEAST WITH ONE OF

10   THE PHYSICAL MODELS, BECAUSE IT'S ON MY TIME, I

11   WOULD LIKE TO ACTUALLY PASS IT AROUND THE JURY.

12             THE COURT:  ALL RIGHT.  IS THERE ANY

13   OBJECTION FROM SAMSUNG?

14             MR. VERHOEVEN:  I DON'T KNOW.  WHICH

15   MODEL IS IT?

16             THE COURT:  WHY DON'T YOU GO AHEAD AND

17   PLEASE SHOW MR. VERHOEVEN THE EXHIBIT?

18             MR. MCELHINNY:  IT'S ONE TO WHICH THERE'S

19   BEEN NO OBJECTION.

20             (PAUSE IN PROCEEDINGS.)

21             THE COURT:  OKAY.  IS THERE --

22             MR. VERHOEVEN:  JUST A SECOND, YOUR

23   HONOR.

24             THE COURT:  OH, PLEASE.

25             MR. VERHOEVEN:  THERE IS AN ISSUE.  WE'RE
```

```
 1    TRYING TO DETERMINE WHETHER THIS WAS EVER DISCLOSED

 2    TO US, YOUR HONOR.  WE JUST GOT IT HANDED TO US.

 3            MR. ZELLER:  THIS IS NEW TO US.

 4            MR. MCELHINNY:  HERE.  I'LL SHOW THE JURY

 5    THIS ONE (INDICATING).

 6            (PAUSE IN PROCEEDINGS.)

 7            MR. MCELHINNY:  THESE ARE --

 8            MS. MAROULIS:  MR. MCELHINNY, WHAT'S THE

 9    EXHIBIT NUMBER?

10            (DISCUSSION OFF THE RECORD BETWEEN

11    COUNSEL.)

12            MR. VERHOEVEN:  YOUR HONOR, I DON'T THINK

13    WE'VE RECEIVED NOTICE THAT THEY'RE GOING TO TRY TO

14    MARK PHYSICAL EXHIBITS FOR THIS WITNESS, AND THAT'S

15    WHY WE'RE HAVING THE HICCOUGH HERE.

16            THE COURT:  GO AHEAD.  TAKE YOUR TIME.

17            MR. VERHOEVEN:  THERE'S BEEN NO NOTICE IN

18    THE WITNESS EXHIBIT LIST.  THERE IS A DEMONSTRATIVE

19    THAT THEY IDENTIFIED THAT THEY WERE GOING TO SHOW,

20    BUT NO PHYSICAL EXHIBITS.

21            THE COURT:  WERE THESE PRODUCED IN

22    DISCOVERY?

23            MR. MCELHINNY:  OH, YES, YOUR HONOR, AND

24    THEY'VE BEEN EXAMINED THREE TIMES, AS RECENTLY AS

25    THREE DAYS AGO, IN TERMS OF -- AND IT WAS
```

```
 1    ORIGINALLY SET UP WHERE WE WERE GOING TO PUT IN
 2    PHOTOGRAPHS, BUT NOT PUT IN THE ACTUAL EXHIBIT
 3    BECAUSE WE DIDN'T WANT THEM TO BECOME PUBLIC.
 4              NOW WE'RE PUTTING IN THE PHOTOGRAPHS AND
 5    THE DEMONSTRATIVE ITSELF BECAUSE WE WANT THEM TO BE
 6    PART OF THE RECORD SO THAT THE JURY WILL HAVE THEM.
 7              THE COURT:  OH.  I -- WASN'T IT ALSO
 8    BECAUSE SAMSUNG OBJECTED TO THE PHOTOGRAPHS?
 9              MR. MCELHINNY:  THEY ALSO DID OBJECT TO
10    THE PHOTOGRAPHS.
11              THE COURT:  WELL, I MEAN, THIS IS A
12    CATCH-22, RIGHT?  IF YOU OBJECT TO THE PHOTOGRAPHS
13    BECAUSE YOU WANT THEM TO INTRODUCE THE ORIGINALS
14    AND NOW THEY'RE INTRODUCING THE ORIGINALS BECAUSE
15    YOU OBJECTED TO THE PHOTOGRAPHS, I'M KIND OF
16    CREATING A --
17              MR. VERHOEVEN:  WE DIDN'T HAVE NOTICE
18    THAT THEY WERE GOING TO INTRODUCE THE PHYSICAL
19    EXHIBITS.
20              WE'RE TRYING TO FIGURE IT OUT, YOUR
21    HONOR.
22              THE COURT:  OKAY.
23              (DISCUSSION OFF THE RECORD BETWEEN
24    COUNSEL.)
25              THE COURT:  OKAY.  DO WE HAVE A
```

```
1    RESOLUTION?

2            MR. MCELHINNY:  I BELIEVE WE HAVE A

3    RESOLUTION.  WE'RE PUTTING THE EXHIBIT STICKERS ON

4    THEM.

5            THE COURT:  OKAY.  AT THE END OF EACH

6    WITNESS, WHY DON'T YOU MOVE WHATEVER YOU'RE GOING

7    TO MOVE INTO EVIDENCE?  OKAY?

8            MR. MCELHINNY:  AT THE END OF EACH

9    WITNESS?

10           THE COURT:  YEAH.  OR I GUESS IF YOU WANT

11   TO DO IT AT THE END, THAT'S FINE.  I WANT TO MAKE

12   UP A SYSTEM --

13           MR. MCELHINNY:  I WAS GOING TO DO IT AS I

14   WENT ALONG.

15           THE COURT:  THAT'S FINE.

16           MR. MCELHINNY:  I HAD ONE OTHER QUESTION

17   ON THE EXHIBITS.

18           ON WHAT WAS AN ITC EXHIBIT, 442, YOUR

19   HONOR RESERVED RULING UNTIL YOU ACTUALLY SAW THE

20   PATENT.

21           ON THE ONES THAT YOU HAD, YOU SUSTAINED

22   OBJECTIONS.

23           THE COURT:  ITC 442.  AND WHICH --

24           MS. KREVANS:  IT'S THE '678 PATENT.

25           THE COURT:  I'M LOOKING THROUGH MY
```

```
1    DIFFERENT ORDERS.

2              WHAT'S THE NUMBER --

3              MR. VERHOEVEN:  CAN WE --

4              THE COURT:  TELL ME WHICH OF THE

5    ORDERS -- WHICH OF THE ORDERS ARE YOU REFERRING TO?

6              MR. MCELHINNY:  THIS IS THE JULY 30TH,

7    2012 ORDER, YOUR HONOR.

8              THE COURT:  DO YOU HAVE THE DOCKET

9    NUMBER -- IS THAT DOCKET NUMBER 1522?

10             MR. MCELHINNY:  1519.

11             MS. MAROULIS:  1522.

12             THE COURT:  1519, OKAY.  WHAT NUMBER ARE

13   YOU REFERRING TO?

14             MR. MCELHINNY:  IT IS --

15             MS. KREVANS:  IT DOESN'T HAVE THE EXHIBIT

16   NUMBER.

17             THE COURT:  OKAY.

18             MR. MCELHINNY:  ON THE LAST PAGE, IT'S

19   THE SECOND FROM THE TOP.

20             THE COURT:  OKAY.  APL-ITC-796?  THAT

21   ONE.

22             MR. MCELHINNY:  YES, YOUR HONOR.

23             THE COURT:  OKAY.  LET ME SEE IT.

24             MR. VERHOEVEN:  YOUR HONOR, MAY I ASK --

25   I CAN EXPLAIN EXACTLY WHAT, WHY THAT'S ON THE LIST,
```

```
 1   BUT I'D PREFER IF THE WITNESS WAS SEQUESTERED FOR

 2   THAT IF THAT'S OKAY.

 3              THE COURT:  ALL RIGHT.  CAN WE PLEASE

 4   HAVE MR. STRINGER STEP OUTSIDE, PLEASE.

 5              MR. VERHOEVEN:  I CAN TELL YOU EXACTLY

 6   WHAT THAT IS, YOUR HONOR.

 7              THE COURT:  SURE.  HE'S STILL IN HERE.

 8   LET'S WAIT UNTIL HE STEPS OUTSIDE.

 9              (MR. STRINGER NOT PRESENT.)

10              THE COURT:  OKAY.  LET ME JUST LOOK AT

11   THE BRIEFING.

12              MR. VERHOEVEN:  IT MIGHT BE HELPFUL FOR

13   ME TO TELL YOU WHY IT'S ON THE LIST.

14              THE COURT:  YES.  AND GIVE ME JUST ONE

15   SECOND SO I CAN LOOK AT WHAT THE BRIEFING WAS ON

16   THIS PARTICULAR ISSUE.

17              MR. VERHOEVEN:  SURE.

18              THE COURT:  THE OBJECTION WAS THAT THIS

19   WAS ALREADY EXCLUDED BY MOTION IN LIMINE NUMBER 2.

20              MR. MCELHINNY:  THAT'S CORRECT.  YOU

21   MADE -- ON THE EXACT PREVIOUS EXHIBIT, ANOTHER

22   PATENT, ON YOUR ORDER YOU SUSTAINED OUR OBJECTION,

23   BUT ON THIS ONE, YOU SAID YOU DIDN'T ACTUALLY HAVE

24   THE PATENT ITSELF.

25              THE COURT:  ALL RIGHT.  WELL, LET ME HEAR
```

```
 1      WHAT IT'S BEING REFERRED TO FOR.
 2              MR. VERHOEVEN:  YES.  IT'S PURELY -- IT
 3      MIGHT BE SOMETHING THAT I WOULD NEED FOR
 4      IMPEACHMENT, YOUR HONOR.  THAT'S THE ONLY THING.
 5              AND I'LL TELL YOU EXACTLY WHAT IT IS.
 6              I'M GOING TO ASK MR. STRINGER, ISN'T IT
 7      TRUE THAT ONE OF THE DESIGN ELEMENTS IN THE '087
 8      PATENT THAT WAS IMPORTANT IS THAT IT HAD FOUR
 9      CORNERS THAT WERE UNIFORM AND HAD EQUAL RADII?
10              AND AS YOU -- THE '757 PATENT, YOUR
11      HONOR, IS A DESIGN PATENT ON THE ORIGINAL, OR THE
12      INITIAL IPHONE, JUST LIKE THE '087.
13              AND IN PREVIOUS TESTIMONY HE TESTIFIED
14      THAT IT DID, THAT IN THE CONTEXT OF '757, THAT THE
15      INITIAL IPHONE HAD FOUR EVENLY RADIUS CORNERS.
16              I DON'T EXPECT HIM TO DEVIATE FROM THAT,
17      YOUR HONOR.  IT'S A CONTROL FOR ME.  IF HE WERE TO
18      SAY, "NO, THAT'S NOT NECESSARY," THIS WOULD BE
19      IMPEACHMENT FROM THE PRIOR PROCEEDING WHERE HE USED
20      THE SAME IMAGE BASICALLY, WITH THE FOUR ROUNDED
21      CORNERS, AND SAID AN IMPORTANT DESIGN
22      CHARACTERISTIC WAS EQUAL RADII.
23              SO IT'S SIMPLY -- BECAUSE WE HAD TO LIST
24      ALL POTENTIAL IMPEACHMENT EXHIBITS ON THE LIST,
25      THAT'S WHY IT'S ON THE LIST.  I WOULD NOT USE IT
```

```
1    FOR ANY OTHER PURPOSE, YOUR HONOR.
2              MR. MCELHINNY:  WELL, TO BE CLEAR,
3    IMPEACHMENT EXHIBITS DON'T HAVE TO BE LISTED ON THE
4    LIST.
5              MR. VERHOEVEN:  THEY DON'T?
6              MR. MCELHINNY:  BUT EVEN IF THEY'RE USED
7    JUST FOR IMPEACHMENT, THEY WOULDN'T COME INTO
8    EVIDENCE, YOUR HONOR.
9              THE COURT:  NO.  I THINK IMPEACHMENT
10   EXHIBITS NEED TO BE ON THE LIST.
11             MR. VERHOEVEN:  WE ARGUED THAT AND WE
12   LOST.
13             THE COURT:  YEAH.
14             MR. VERHOEVEN:  WE ARGUED THAT
15   EXTENSIVELY.
16             MR. MCELHINNY:  I GUESS I MAY BE WRONG.
17   I THOUGHT THAT WAS REBUTTAL, BUT --
18             THE COURT:  THE APPLE MOTION IN LIMINE
19   NUMBER 2 WAS TO EXCLUDE NON-PRIOR ART APPLE OR
20   SAMSUNG DESIGN PATENTS, AND I'M UNDERSTANDING THAT
21   THIS IS PRIOR TO --
22             MR. VERHOEVEN:  WELL, THIS DOESN'T EVEN
23   HAVE TO DO WITH OFFERING IT FOR THE TRUTH OR
24   ANYTHING.
25             IT'S SIMPLY TO CONTROL THE WITNESS IF THE
```

1    WITNESS ALL OF A SUDDEN, WITH '087 -- WHICH IS THE

2    SAME SHAPE, IT'S THE SAME PHONE -- SAYS, "NO,

3    THAT'S NOT AN IMPORTANT DESIGN ELEMENT."

4              I THINK THIS IS AN APPROPRIATE

5    IMPEACHMENT TO SHOW THAT THE WITNESS SAID, WITH

6    RESPECT TO THAT EXACT -- FOR THE SAME PHONE, THE

7    SALE THING, THAT IT WAS.

8              THE COURT:  I'M SORRY.  LET ME INTERRUPT

9    YOU A SECOND.

10             MOTION IN LIMINE NUMBER 2 WAS BASICALLY

11   FOR SUBSEQUENTLY FILED DESIGN PATENT APPLICATIONS,

12   AND THIS PARTICULAR ONE IS NOT A SUBSEQUENTLY FILED

13   ONE.

14             MR. VERHOEVEN:  THAT'S TRUE AS WELL.

15             THE COURT:  SO WHY DOES MOTION IN LIMINE

16   NUMBER 2 EVEN APPLY HERE?

17             MR. MCELHINNY:  BECAUSE IT COVERS PATENTS

18   THAT WERE FILED ON THE SAME DAY OR SUBSEQUENT, YOUR

19   HONOR, AND THIS ONE WAS EITHER FILED ON THE SAME

20   DAY OR SUBSEQUENT.

21             THE COURT:  WELL, THIS SAYS IT WAS FILED

22   PRIOR TO THE '677 AND THE '087, NOT AFTER.

23             MR. MCELHINNY:  THEY ALL CONTINUE BACK TO

24   THE SAME PRIORITY DATE, YOUR HONOR.

25             THE COURT:  GIVE ME THE DATES ON THE '677

```
 1   AND '087.
 2            MR. MCELHINNY:  WHICH WOULD YOU LIKE,
 3   YOUR HONOR?
 4            THE COURT:  I NEED TO GET THE ANSWER TO
 5   THE QUESTION OF DOES MOTION IN LIMINE NUMBER 2
 6   APPLY HERE?  IS THIS A SUBSEQUENT FILED PATENT, IN
 7   WHICH CASE IT WOULD BE EXCLUDED; AND IF IT'S NOT
 8   SUBSEQUENTLY FILED, IT WOULD BE COMING IN.
 9            MR. VERHOEVEN:  I'VE GOT THE DATES HERE,
10   YOUR HONOR.  THE '757 WAS FILED JANUARY 5, 2007.
11            THE '677 -- IS THAT THE ONE IN QUESTION,
12   YOUR HONOR?
13            THE COURT:  BOTH OF THEM, PLEASE.
14            MR. VERHOEVEN:  FILED NOVEMBER 18TH,
15   2008.
16            THE COURT:  OKAY.
17            MR. VERHOEVEN:  '087, FILED JANUARY --
18   JULY 30TH, 2007.
19            MR. MCELHINNY:  BUT, YOUR HONOR --
20            THE COURT:  OKAY.  I SEE YOUR POINT NOW.
21   THIS -- THIS PATENT IS A DIVISIONAL AND A
22   CONTINUATION OF AN APPLICATION THAT WAS GETTING A
23   PRIORITY DATE OF JANUARY 5TH, 2007.
24            MR. MCELHINNY:  EXACTLY THE SAME.
25            THE COURT:  THAT'S THE EARLIEST DATE THAT
```

```
1     YOUR DESIGN PATENT WAS FILED.

2               MR. MCELHINNY:  YES, YOUR HONOR.

3               THE COURT:  ALL RIGHT.  THEN I'M GOING TO

4     EXCLUDE THIS.

5               MR. VERHOEVEN:  FOR IMPEACHMENT PURPOSES

6     YOUR HONOR?  I'M NOT OFFERING -- I WOULD NEVER

7     OFFER -- I'M NOT OFFERING -- PROPOSING TO PUT THIS

8     INTO EVIDENCE.

9               BUT THE WITNESS -- WHAT I'M SAYING TO

10    YOUR HONOR IS IF I SHOW HIM '087 AND I SAY, "ISN'T

11    IT TRUE THAT ONE DESIGN ELEMENT ON THE '087 WAS

12    HAVING EQUAL RADII ON EACH OF THE FOUR CORNERS?"

13    AND HE SAYS NO AND HE TESTIFIED THE OPPOSITE ON THE

14    EXACT SAME FORM FACTOR, THE EXACT SAME PHONE,

15    THAT'S IMPEACHMENT.

16              MR. MCELHINNY:  THE --

17              MR. VERHOEVEN:  I'M NOT TALKING ABOUT --

18    EXCUSE ME.

19              I'M NOT TALKING ABOUT INTRODUCING IT INTO

20    EVIDENCE, BUT SHOWING A PRIOR INCONSISTENT

21    STATEMENT IN THE CONTEXT OF TALKING ABOUT THAT SAME

22    PATENT THAT HAS THE SAME PRIORITY, THE SAME EXACT

23    SHAPE.

24              IT GOES TO CREDIBILITY AND IMPEACHMENT,

25    YOUR HONOR, NOT -- I'M NOT PROPOSING TO INTRODUCE
```

```
 1    IT INTO EVIDENCE.
 2              MR. MCELHINNY:  IF HE NEEDS TO IMPEACH
 3    HIM, HE HAS THE TESTIMONY, YOUR HONOR.  I DON'T
 4    KNOW WHAT HE'S TALKING ABOUT, BUT IF HE'S GOT
 5    SOMETHING IN WHICH HE SAID, "YES, THE FOUR CORNERS
 6    WERE CRITICAL TO THE DESIGN," HE'S GOT THE
 7    TESTIMONY.
 8              THE COURT:  ALL RIGHT.  WELL, THE MOTION
 9    IN LIMINE IS GOING TO STAND.  OKAY?
10              ALL RIGHT.  ANY OTHER DISPUTES OR CAN WE
11    GO FORWARD?
12              MR. MCELHINNY:  WE NEED TO GET THE
13    WITNESS NOW, YOUR HONOR.
14              THE COURT:  OKAY.
15              (PAUSE IN PROCEEDINGS.)
16              (WHEREUPON, THE FOLLOWING PROCEEDINGS
17    WERE HELD IN THE PRESENCE OF THE JURY:)
18              THE COURT:  ALL RIGHT.  WELCOME BACK.
19              ON YOUR CHAIRS YOU HAVE TWO PIECES OF
20    PAPER.  ONE IS THE DESIGN CLAIM CONSTRUCTION THAT
21    WAS REFERENCED YESTERDAY.  THAT CAN JUST GO IN YOUR
22    JURY NOTEBOOKS UNDER CHART OF ASSERTED PATENT
23    CLAIMS WHICH IS, I GUESS, TAB NUMBER 4, THE BIG
24    ONE.
25              AND THEN YOU ALSO HAVE A PHOTOGRAPH OF
```

1    THE FIRST WITNESS WHO IS GOING TO TESTIFY, AND THAT

2    YOU CAN PLACE IN THE TAB THAT'S THIRD FROM THE BACK

3    WHICH SAYS WITNESS PHOTOS.

4            SO EVERY WITNESS WHO TESTIFIES DURING

5    THIS TRIAL IS GOING TO HAVE A PHOTOGRAPH TAKEN OF

6    WHAT THEY LOOK LIKE AT THE TIME THAT THEY TESTIFY

7    SO, DOWN THE ROAD, SEVERAL WEEKS FROM NOW, YOU CAN

8    GO BACK AND REFER TO WHAT EACH WITNESS SAID AND

9    WHAT THEY LOOKED LIKE BECAUSE YOU'LL REMIND

10   YOURSELF OF WHO IS WHO.

11           YOU CAN ALSO KEEP NOTES ON THE

12   PHOTOGRAPHS IF YOU'D LIKE.

13           AND IF YOU ALSO SAW, IN THE BACK OF THIS

14   NOTEBOOK, THE VERY LAST TAB IS JUST CLEAN LINED

15   PAPER IF YOU WOULD LIKE TO TAKE ANY NOTES.

16           ALL RIGHT.  WITH THAT, APPLE PLEASE CALL

17   YOUR FIRST WITNESS.

18           MR. MCELHINNY:  YOUR HONOR, WE CALL

19   CHRISTOPHER STRINGER.

20           THE CLERK:  PLEASE STEP RIGHT UP HERE,

21   PLEASE.

22           WOULD YOU RAISE YOUR RIGHT HAND.

23               **CHRISTOPHER STRINGER,**

24   BEING CALLED AS A WITNESS ON BEHALF OF THE

25   PLAINTIFF, HAVING BEEN FIRST DULY AFFIRMED, WAS

```
 1    EXAMINED AND TESTIFIED AS FOLLOWS:

 2               THE WITNESS:  I AFFIRM.

 3               THE CLERK:  WOULD YOU HAVE A SEAT,

 4    PLEASE.

 5               STATE YOUR NAME, PLEASE, AND SPELL IT.

 6               THE WITNESS:  CHRISTOPHER STRINGER,

 7    C-H-R-I-S-T-O-P-H-E-R, S-T-R-I-N-G-E-R.

 8                   DIRECT EXAMINATION

 9    BY MR. MCELHINNY:

10    Q    ARE YOU COMFORTABLE?

11    A    I AM.

12               THE COURT:  I'M SORRY.  THE TIME WAS

13    2:37.  GO AHEAD.

14               MR. MCELHINNY:  THANK YOU.

15    Q    WOULD YOU PLEASE STATE YOUR NAME FOR THE

16    RECORD.

17    A    CHRISTOPHER STRINGER.

18    Q    THANKS.  AND BY WHOM ARE YOU EMPLOYED?

19    A    APPLE.

20    Q    HOW LONG HAVE YOU WORKED AT APPLE?

21    A    SEVENTEEN YEARS IN SEPTEMBER.

22    Q    WHAT YEAR DID YOU START?

23    A    1995.

24    Q    WHAT IS YOUR CURRENT POSITION AT APPLE?

25    A    I'M AN INDUSTRIAL DESIGNER.
```

1    Q    SIR, CAN YOU TELL US JUST GENERALLY,

2    DEFINITIONALLY, WHAT DOES AN INDUSTRY DESIGNER DO?

3    A    WELL, AT APPLE, OUR ROLE IS TO IMAGINE OBJECTS

4    THAT DON'T EXIST AND TO GUIDE THE PROCESS THAT

5    BRINGS THEM TO LIFE.

6         AND SO THAT INCLUDES DEFINING THE

7    EXPERIENCE THAT A CUSTOMER HAS WHEN THEY TOUCH AND

8    FEEL OUR PRODUCTS.

9         SO IT'S MANAGING THE OVERALL FORM AND THE

10   MATERIALS, THE TEXTURES, THE COLORS.  IT'S MANAGING

11   THE DETAILS.

12        AND IT'S ALSO WORKING WITH ENGINEERING

13   GROUPS TO, AS I SAY, BRING IT TO LIFE, TO BRING IT

14   TO THE MARKET AND TO BUILDING THE CRAFTSMANSHIP

15   THAT IT ABSOLUTELY NEEDS TO HAVE TO HAVE THAT APPLE

16   QUALITY.

17   Q    TELL US A LITTLE BIT ABOUT YOUR PROFESSIONAL

18   BACKGROUND BEFORE YOU JOINED APPLE.

19   A    BEFORE I JOINED APPLE, I WORKED IN

20   CONSULTANCIES IN SAN FRANCISCO, IN SIDNEY, AND

21   LONDON.

22        AND PRIOR TO THAT, I -- MY EDUCATION WAS

23   COMPLETED AT THE ROYAL COLLEGE OF ART WHERE I HAD A

24   MASTER'S IN INDUSTRIAL DESIGN.

25   Q    WHAT IS A CONSULTANCY, SIR?

```
 1    A    A CONSULTANCY WOULD BE A HIRED HAND FOR

 2    INDUSTRIAL DESIGN.  SO WE WORK WITH MULTIPLE

 3    CORPORATIONS, BASICALLY PROJECT BY PROJECT.

 4    Q    TO WHOM DO YOU CURRENTLY REPORT AT APPLE?

 5    A    JONATHAN IVE.

 6    Q    WERE YOU INVOLVED IN THE DESIGN OF THE FIRST

 7    IPHONE THAT WAS RELEASED BY APPLE?

 8    A    YES, I WAS.

 9    Q    HAVE YOU WORKED ON OTHER APPLE PRODUCTS?

10    A    YES.  I'VE WORKED ON EVERY APPLE PRODUCT SINCE

11    I JOINED APPLE IN 1995.

12         WE WORK AS A TEAM.  WE TAKE THAT VERY

13    SERIOUSLY.  WE DEDICATE TIME EVERY WEEK TO MAKE

14    SURE THAT WE ALL GET TOGETHER AND WE ALL DISCUSS

15    EVERY SINGLE PROJECT.  SO EACH MEMBER OF THE DESIGN

16    TEAM CONTRIBUTES TO ALL PROJECTS, PRODUCTS, WHICH

17    IS WHY I'M CONFIDENT THAT I HAVE HAD INPUT IN EVERY

18    PRODUCT THAT WE'VE SHIPPED SINCE 1995.

19    Q    ARE YOU NAMED, SIR, AS AN INVENTOR ON ANY

20    PATENTS?

21    A    YES, MANY.  HUNDREDS.  I HAVE NO IDEA HOW

22    MANY.

23    Q    IF I'M LUCKY, YOU'LL HAVE A BINDER IN FRONT OF

24    YOURSELF THAT SAYS EXHIBITS.

25         DO YOU SEE THAT?
```

```
 1    A    YES.  IT DOESN'T SAY EXHIBITS, BUT I HAVE A
 2    BINDER.
 3    Q    OKAY.  DOES IT HAVE EXHIBITS IN IT?  CAN YOU
 4    FIND JX 1040, PLEASE?
 5    A    YES, I HAVE IT HERE.
 6    Q    WHAT IS THAT DOCUMENT?
 7    A    THIS IS A PATENT DOCUMENT THAT DEFINES THE
 8    IPAD.
 9    Q    AND CAN YOU TELL US THE LAST THREE NUMBERS OF
10    THE DOCUMENT, OF THE PATENT?
11    A    '889.
12    Q    ARE YOU A NAMED INVENTOR ON THAT PATENT?
13    A    YES, I AM.
14              MR. MCELHINNY:  YOUR HONOR, I'D MOVE JX
15    1040 INTO EVIDENCE.
16              THE COURT:  ANY OBJECTION.
17              MR. VERHOEVEN:  NO OBJECTION.
18              THE COURT:  SO ADMITTED.
19              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
20              1040, HAVING BEEN PREVIOUSLY MARKED FOR
21              IDENTIFICATION, WAS ADMITTED INTO
22              EVIDENCE.)
23    BY MR. MCELHINNY:
24    Q    SIR, DO ANY APPLE PRODUCTS INCORPORATE THE
25    DESIGN OF THE '889 PATENT?
```

1    A    YES, IPAD 2 AND IPAD 3.

2    Q    WOULD YOU LOOK IN YOUR BINDER, PLEASE, TO

3    EXHIBIT JX 1041.

4    A    YES, I SEE IT.

5    Q    WHAT IS THAT DOCUMENT?

6    A    THIS IS A PATENT DOCUMENT THAT DESCRIBES THE

7    IPHONE.

8    Q    AND CAN YOU TELL US THE LAST THREE NUMBERS OF

9    THAT DOCUMENT?

10   A    '087.

11   Q    ARE YOU A NAMED INVENTOR ON THIS PATENT?

12   A    YES, I AM.

13        MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE

14   EXHIBIT JX 1041 INTO EVIDENCE.

15        MR. VERHOEVEN:  NO OBJECTION.

16        THE COURT:  ALL RIGHT.  SO ADMITTED.

17        (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

18        1041, HAVING BEEN PREVIOUSLY MARKED FOR

19        IDENTIFICATION, WAS ADMITTED INTO

20        EVIDENCE.)

21        THE COURT:  GO AHEAD, PLEASE.

22   BY MR. MCELHINNY:

23   Q    DO ANY APPLE PRODUCTS INCORPORATE THIS DESIGN?

24   A    YES.  THE ORIGINAL IPHONE, THE IPHONE 3G, AND

25   THE 3GS.

```
1    Q    WOULD YOU LOOK, PLEASE, AT EXHIBIT JX 1043.

2    A    YES.

3    Q    WHAT IS THIS DOCUMENT?

4    A    THIS IS A PATENT DOCUMENT THAT DESCRIBES

5    IPHONE.

6    Q    I'M SORRY?

7    A    THIS IS A PATENT DOCUMENT THAT DESCRIBES

8    IPHONE.

9    Q    THANK YOU.  WHAT ARE THE LAST THREE NUMBERS OF

10   THE PATENT?

11   A    '677.

12   Q    AND ARE YOU A NAMED INVENTOR ON THIS PATENT?

13   A    YES, I AM.

14          MR. MCELHINNY:  YOUR HONOR, I MOVE JX

15   1043 INTO EVIDENCE.

16          MR. VERHOEVEN:  NO OBJECTION.

17          THE COURT:  SO ADMITTED.

18          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19          1043, HAVING BEEN PREVIOUSLY MARKED FOR

20          IDENTIFICATION, WAS ADMITTED INTO

21          EVIDENCE.)

22   BY MR. MCELHINNY:

23   Q    DO ANY APPLE PRODUCTS INCORPORATE THIS DESIGN?

24   A    YES, ALL -- ALL IPHONES TO DATE.

25   Q    CAN YOU TELL US A LITTLE BIT ABOUT HOW THE
```

1    DESIGN, THE INDUSTRIAL DESIGN GROUP AT APPLE WORKS?

2    A    WE -- FIRST LET ME EXPLAIN THE GROUP A LITTLE.

3    WE'RE A VERY SMALL GROUP, SOMETHING AROUND 15 OR 16

4    DESIGNERS.  AS I SAID EARLIER, WE WORK AROUND -- WE

5    WORK TOGETHER LIKE AROUND THE KITCHEN TABLE.

6          IT'S A VERY CULTURALLY DIVERSE GROUP.  WE

7    HAVE DESIGNERS FROM THE U.S., OF COURSE, BUT WE

8    ALSO HAVE AUSTRALIANS, JAPANESE, ENGLISH, I SHOULD

9    SAY BRITISH, GERMAN, AUSTRIAN.  YOU GET THE GIST.

10   IT'S A VERY DIVERSE GROUP.

11         WE'VE BEEN TOGETHER FOR AN AWFULLY LONG

12   TIME.  MANY OF US HAVE BEEN THERE FOR 15 TO 20

13   YEARS WORKING TOGETHER.

14         SO IT'S A VERY FAMILIAR, SMALL

15   ENVIRONMENT WHICH I THINK IS REMARKABLE ABOUT A

16   COMPANY THE SIZE OF APPLE.

17         WE REPORT DIRECTLY INTO THE HIGHEST

18   LEVELS OF LEADERSHIP AT APPLE.

19         AND WE HAVE OUR OWN, OUR ARMS AROUND ALL

20   OF THE PROJECTS THAT WE SHIP 100 PERCENT.

21         SO IN SOME WAYS, IT FEELS LIKE A SMALL

22   COMPANY.  IT'S A VERY COMFORTABLE WORKING

23   ENVIRONMENT AND WE WORK REALLY HARD.

24   Q    SIR, WE HEARD THIS MORNING IN SAMSUNG'S

25   OPENING THAT SAMSUNG HAS A THOUSAND DESIGNERS.

```
 1              AND HOW MANY DOES APPLE HAVE?
 2    A    15 OR 16.  I'M NOT QUITE SURE.  I'VE NEVER
 3    COUNTED.
 4    Q    YOU MENTIONED WORKING AROUND A TABLE.  IS
 5    THAT -- IS THAT -- ARE YOU USING THAT AS SORT OF A
 6    SYMBOL FOR SOMETHING, OR ARE YOU TALKING ABOUT
 7    SOMETHING LITERAL?
 8    A    THERE IS A TABLE IN THE KITCHEN.  IT'S WHERE
 9    WE'RE COMFORTABLE.  IT'S WHERE WE ARE MOST
10    FAMILIAL.  WE THROW IDEAS AROUND AND WE -- IT'S A
11    BRUTALLY HONEST CIRCLE OF DEBATE.  WE'RE JUST VERY
12    COMFORTABLE THERE.  THAT'S WHERE THE IDEAS HAPPEN.
13    Q    DOES THE INDUSTRIAL DESIGN GROUP AT APPLE
14    INTERACT WITH OTHER GROUPS AT APPLE?
15    A    YES, WE DO.  WE WORK WITH PRIMARILY TWO
16    GROUPS.  WE WORK WITH MANY GROUPS, OF COURSE, BUT
17    PRIMARILY TWO, ONE OF THEM BEING PRODUCT DESIGN,
18    WHICH IS OFTEN REFERRED TO AS PD.
19              THEY ARE RESPONSIBLE FOR PATENT DESIGN
20    AND BUILDING, MANUFACTURING THE PRODUCTS, OR
21    DESIGNING PATENT DESIGNS FOR MANUFACTURED PRODUCTS.
22              WE ALSO WORK WITH THE OPERATIONS GROUP
23    WHICH HAS MANY ENGINEERING ORGANIZATIONS UNDER ITS
24    ROOF, AND EACH OF THEM SPECIALIZE IN VARIOUS
25    ASPECTS OF MANUFACTURING ENGINEERING.
```

1            SO THAT MIGHT BE PROCURING EQUIPMENT FOR

2       FACTORIES.  IT MIGHT BE RUNNING MACHINE CENTERS,

3       DESIGNING MACHINE PROGRAMS, HOGGING OUT -- I'M

4       USING COLLOQUIAL TERMS -- HOGGING OUT AT AN

5       ALARMING RATE.

6            BASICALLY THE PEOPLE THAT REALLY PUT THE

7       SWEAT IN THE FACTORIES TO MAKE THIS HAPPEN.

8       Q    AND SO, JUST SO WE HAVE THE TERMINOLOGY, THE

9       INDUSTRY DESIGN GROUP IS DIFFERENT THAN THE PRODUCT

10      DESIGN GROUP?  IS THAT RIGHT?

11      A    YES.

12      Q    AT WHAT POINT IN THE DEVELOPMENT OF A

13      PARTICULAR PRODUCT DOES INDUSTRIAL DESIGN START

14      WORKING WITH PRODUCT DESIGN?

15      A    USUALLY WHEN WE GET SOME DEGREE OF CONFIDENCE

16      AROUND A GIVEN DESIGN DIRECTION.  IT COULD BE

17      REALLY EARLY.  WE MIGHT WORK WITH THEM TO COMPARE A

18      FEW DIRECTIONS AND SORT OF BRAINSTORM HOW TO BUILD

19      THE DEVICES.

20      Q    CAN YOU GIVE US SOME PICTURE OF, OF THE

21      PROCESS BY WHICH THE DESIGN PROCESS STARTS FOR

22      SOMETHING AT APPLE.

23      A    THERE ARE MANY INTERACTIONS OF SEVERAL

24      PROCESSES.  LET ME TRY TO BE CLEAR.

25            WE CAN DISCUSS OUR OBJECTIVES, AND SO WE

1    CAN JUST BE TALKING ABOUT WHAT WE WOULD WANT A

2    PRODUCT TO BE.

3          THAT ORDINARILY BECOMES SKETCHING, SO

4    WE'LL SIT THERE WITH OUR SKETCH BOOKS AND JUST

5    SKETCH IDEAS AND TRADE IDEAS AND GO BACK AND FORTH.

6          AS I WAS SAYING BEFORE, THAT'S WHERE THE

7    VERY HARD, BRUTAL, HONEST CRITICISM COMES IN AND WE

8    THRASH THROUGH IDEAS UNTIL WE REALLY FEEL LIKE

9    WE'RE GETTING SOMETHING THAT'S WORTH MODELING.

10          AND MODELING IN CAD IS WHAT WE TYPICALLY

11   DO NEXT, WHICH IS COMPUTER-AIDED DESIGN, WHICH IS

12   THE PROCESS OF INPUTTING INTO A COMPUTER SURFACES

13   TO REPRESENT OUR WORK.

14          THIS IS SOMETHING THAT WE DO NOT AT THE

15   KITCHEN TABLE, BUT WITH THE CAD SCULPTORS.  THERE'S

16   A CAD GROUP THAT ARE EMPLOYED SPECIFICALLY TO BE

17   MASTERS OF CAD SCULPTING AND WE WORK WITH THEM AND

18   WE MAKE SURE THAT OUR IDEAS ARE THOROUGHLY

19   REPRESENTED IN THE CAD FORM.

20          AND FROM THAT POINT WE WILL BRING THE

21   MODEL MAKERS THESE CAD FILES AND PRODUCE 3-D

22   PHYSICAL MANIFESTATIONS OF THESE IDEAS, WHICH COULD

23   BE SIMPLISTIC BLOCK FORMS OR THEY COULD BE HIGHLY

24   DETAILED, WHAT WE CALL SCRAP MODELS, WHICH MIGHT BE

25   JUST A LITTLE CORNER OF A PRODUCT JUST TO REALLY

```
 1    UNDERSTAND HOW YOU MIGHT WANT TO DETAIL A BUTTON,

 2    FOR EXAMPLE.

 3              SO THESE PROCESSES, THOUGH THEY SEEM VERY

 4    LINEAR, AND IN INSTANCES CAN BE, TYPICALLY AREN'T

 5    BECAUSE WE'LL GO BACK AND FORTH.

 6              WE'LL EVEN SKETCH ON MODELS.  WE'LL

 7    COMBINE A PART MODEL AND A SKETCH FROM ANOTHER

 8    SKETCH BOOK FROM A DIFFERENT DESIGN SESSION.

 9              IT'S BACK AND FORTH.  IT'S NON-LINEAR.

10    IT WEAVES AND KNITS ITS WAY ALONG THE DESIGN

11    PROCESS, ULTIMATELY TO A POINT WHERE WE FEEL REALLY

12    SATISFIED THAT WE HAVE SOMETHING SPECIAL.

13    Q    I WANT TO FOCUS ON SOMETHING YOU SAID.  YOU

14    USED THE EXPRESSION TO "DETAIL A BUTTON."  IS THAT

15    WHAT YOU JUST SAID?

16    A    YES.

17    Q    WHAT IS THAT -- FOR THOSE OF US WHO DON'T LIVE

18    WITH YOU, WHAT DOES IT MEAN TO DETAIL A BUTTON?

19    A    WE'RE A PRETTY MANIACAL GROUP OF PEOPLE.  WE

20    OBSESS OVER EVERY DETAIL.  IF WE DESIGN A BUTTON,

21    THERE MIGHT BE 50 MODELS OF THE HOME BUTTON OR A

22    VOLUME SWITCH.  WE LOOK AT THE EDGE DETAIL AND HOW

23    FAR OUT DOES IT PROTRUDE?  DOES IT HAVE A SHAFT?

24    IS IT ROUND?  IS IT METAL?  IS IT PLASTIC?  THE

25    SIZE, LENGTH, WIDTH, HEIGHT.  EVERY SINGLE DETAIL
```

```
 1    IS VERY CLEVERLY CRAFTED.

 2    Q    YOU ALSO MENTIONED -- YOU SAID THE PROCESS IS

 3    NOT LINEAR.  CAN YOU MAKE THAT REAL FOR US, PLEASE.

 4    A    YEAH.  IT DOESN'T GO FROM THOUGHT TO SKETCH TO

 5    MODEL TO PRODUCTION EVEN THOUGH, IN SIMPLISTIC

 6    TERMS, THAT IS THE GENERAL SEQUENCE OF EVENTS.

 7              WE'LL GO BACK AND FORTH.  WE'LL GO ALL

 8    THE WAY TO MODEL, WE'LL GO TO WORKING WITH THE PD

 9    AND OPERATIONS GROUPS ON THE ENGINEERING SIDE.

10    WE'LL JUMP STRAIGHT BACK TO AN IDEA IF A BETTER

11    IDEA IS CREATED.

12    Q    WOULD YOU LOOK IN YOUR BINDER, PLEASE, TO

13    EXHIBIT PX 163.

14    A    YES, I SEE IT.

15    Q    WHAT IS THIS DOCUMENT?

16    A    THIS IS ONE PAGE FROM ONE OF MY SKETCH BOOKS.

17    Q    AND DO YOU -- DO YOU TRADITIONALLY SKETCH IN

18    THE SKETCH BOOKS?

19    A    I TRY TO.  I END UP SKETCHING EVERYWHERE.

20              I'M NOT SO DISCIPLINED WITH REGARD TO MY

21    SKETCH BOOKS.  I'LL SKETCH ON LOOSELEAF PAPER.

22    I'LL SKETCH ON MODELS.  I'LL SKETCH ON, YOU KNOW,

23    ANYTHING I CAN PUT MY HANDS ON, QUITE OFTEN ON TOP

24    OF CAD OUTPUTS FOR WANT OF BETTER THINGS TO DO.

25              SO YOU'RE WORKING WITH SOMETHING THAT
```

```
 1    ALREADY HAS THE PERSPECTIVE SET UP AND THE VIEWS IN

 2    A WAY THAT YOU CAN SORT OF ADD IN LAVISH DETAIL

 3    UPON THEM.

 4    Q    AND WHAT DO THE SKETCHES ON THIS PARTICULAR

 5    DOCUMENT, PX 163, TO WHAT DO THEY RELATE?

 6    A    THESE ARE SKETCHES OF IPHONE IDEAS.

 7              MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE

 8    PX 163, PLEASE.

 9              MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.

10              THE COURT:  ALL RIGHT.  SO ADMITTED.

11              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

12              163, HAVING BEEN PREVIOUSLY MARKED FOR

13              IDENTIFICATION, WAS ADMITTED INTO

14              EVIDENCE.)

15    BY MR. MCELHINNY:

16    Q    SIR, IF YOU'D OPEN YOUR BINDER TO PX 164.

17    A    YES, I SEE IT.

18    Q    WHAT IS PX 164?

19    A    THE FIRST PAGE IS A SCREEN SHOT OF A

20    DIRECTORY, WHICH IS THE CAD FILE DATABASE.  IT

21    LISTS DATE MODIFIED, WHICH MEANS THE LAST DATE THAT

22    YOU WORKED ON THIS PARTICULAR FILE.

23              AND ALSO A CODE NAME, A THREAD.

24    BASICALLY, THAT HELPS YOU FIND IT IN THE DATABASE.

25              SUBSEQUENT PAGES ARE SCREEN SHOTS OF
```

1   THESE CAD MODELS.

2   Q    YOU MENTIONED IN AN EARLIER ANSWER, YOU SAID

3   SOMETHING ABOUT A CAD OUTPUT.  IS THIS WHAT YOU

4   WERE REFERRING TO AS A CAD OUTPUT?

5   A    YES.  THERE ARE VARYING DEGREES OF

6   SOPHISTICATION.  THIS IS A FAIRLY CRUDE SET OF WHAT

7   I WOULD CALL CAD OUTPUT.

8   Q    CAN YOU TELL, BY LOOKING AT THE DIRECTORY, THE

9   DATE OF THESE DRAWINGS?

10   A    MARCH 15TH, 2006.

11   Q    AND, SIR, DO YOU -- DO YOU WORK WITH THE --

12   LET ME ASK YOU THIS:  DO YOU PERSONALLY OPERATE THE

13   CAD SYSTEM?

14   A    NO, I DO NOT.

15   Q    WHO DOES THE CAD DRAWINGS AT APPLE?

16   A    WE HAVE A DEDICATED TEAM OF CAD SCULPTORS.

17   THERE ARE A FEW DESIGNERS THAT ARE CAPABLE OF

18   CREATING CAD THEMSELVES, BUT IT'S NOT A

19   REQUIREMENT.  IN FACT, MOST OF US DON'T.

20        IT'S -- IT REALLY IS A SKILL THAT YOU

21   NEED TO DEDICATE SIGNIFICANT TIME TO JUST TO

22   UNDERSTAND THE CRAFT OF CAD.

23        SO WE PREFER OUR DESIGNERS TO BE

24   THINKING, SO WE HAVE A DEDICATED TEAM FOR THIS.

25        MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE

```
 1     PX 164 INTO EVIDENCE.
 2              MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.
 3              THE COURT:  SO ADMITTED.
 4              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
 5              164, HAVING BEEN PREVIOUSLY MARKED FOR
 6              IDENTIFICATION, WAS ADMITTED INTO
 7              EVIDENCE.)
 8     BY MR. MCELHINNY:
 9     Q    SO AFTER CAD MODELS, WHAT COMES NEXT, SIR, IN
10     A DESIGN PROCESS, ASSUMING THAT YOU WERE GOING
11     LINEARLY AS OPPOSED TO JUMPING BACKWARDS?
12     A    IF WE FIND THAT WE AGREE, THAT WE WANT TO
13     PURSUE AN IDEA THAT WE SEE IN THE CAD SURFACES IN
14     PHYSICAL FORM, WE MODEL IT, WHICH IS TO CNC,
15     COMPUTER NUMERICALLY CONTROLLED.
16              THAT IS THREE OR FIVE MACHINING, WHICH
17     ESSENTIALLY CUTS FROM A SOLID BLOCK A PHYSICAL
18     LIKENESS OF WHAT WE BUILD IN CAD.
19     Q    THIS PROCESS THAT YOU'VE DESCRIBED FOR US, IS
20     THAT AN ACCURATE DESCRIPTION OF THE PROCESS THAT
21     LED TO THE ORIGINAL IPHONE?
22     A    YES.
23     Q    AND IS IT AN ACCURATE DESCRIPTION OF THE
24     PROCESS THAT LED TO THE IPAD?
25     A    YES.
```

```
1    Q    LET'S TALK ABOUT THE IPHONE FOR A MINUTE.

2              WHAT -- IF YOU CAN DESCRIBE IT FOR US,

3    WHAT, IF ANYTHING, WERE YOU TRYING TO ACHIEVE IN

4    DESIGNING THE IPHONE?

5    A    WE -- WE WERE LOOKING FOR A NEW, ORIGINAL, AND

6    BEAUTIFUL OBJECT, SOMETHING THAT WOULD REALLY WOW

7    THE WORLD.

8              WE WERE ENTERING A CATEGORY THAT WE'D

9    NEVER PARTICIPATED IN BEFORE, AND THE CATEGORY THAT

10   WE DID NOT ENJOY.  THERE WERE NO CELL PHONES THAT

11   WE LOVED.

12             SO THIS WAS SOMETHING THAT WE REALLY

13   CARED DEEPLY AND PASSIONATELY ABOUT, PRODUCING

14   SOMETHING FOR OURSELVES.

15             WE -- AS ALWAYS, WE WANTED TO CREATE

16   SOMETHING THAT SEEMED SO, SO WONDERFUL THAT YOU,

17   YOU CAN'T IMAGINE HOW YOU COULD FOLLOW IT.

18             OF COURSE, YOU CAN BECAUSE IF YOU LOOK AT

19   THE HISTORY OF OUR PRODUCTS, WE'VE DONE THAT TIME

20   AND TIME AGAIN.

21             BUT YOU WANT TO CREATE THE SIMPLEST,

22   PUREST MANIFESTATION OF WHAT THAT OBJECT CAN BE,

23   SOMETHING THAT PEOPLE CAN LOVE.

24   Q    DO YOU RECALL APPROXIMATELY HOW LONG YOU

25   WORKED ON THE DESIGN OF THE IPHONE?
```

```
 1   A    I HAVE NO IDEA.  I'D HAVE TO LOOK AT

 2   DOCUMENTATION FOR THIS.  BUT IT WAS A LONG TIME.

 3   Q    YEARS?

 4   A    I THINK SO.

 5   Q    LET ME SHOW YOU PX 165.

 6           MAY I APPROACH, YOUR HONOR?

 7           THE COURT:  YES.

 8           MR. MCELHINNY:  (HANDING).

 9           THE WITNESS:  THANK YOU.

10   BY MR. MCELHINNY:

11   Q    WHAT IS PX 165, SIR?

12   A    THIS IS ONE OF THE EARLY MODELS THAT WE BUILT

13   ON M68, WHICH WAS A CODE NAME THAT WE USED FOR THE

14   ORIGINAL IPHONE.

15   Q    I'M SORRY.  THAT'S M68?

16   A    THAT'S CORRECT.

17   Q    WHEN YOU SAY "WE BUILT THIS MODEL," WHO ARE

18   YOU TALKING ABOUT?

19   A    "WE" BEING THE INDUSTRIAL DESIGN GROUP, WHICH

20   WOULD INCLUDE THE CAD AND THE MODEL MAKING TEAMS.

21   Q    AND IS THIS MODEL THAT YOU'RE LOOKING AT, WAS

22   THIS ORIGINAL APPLE WORK?

23   A    ABSOLUTELY, YES.

24           MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE

25   EXHIBIT PX 165 INTO EVIDENCE.
```

```
 1              MR. VERHOEVEN:  I HAVE A POINT OF

 2    QUESTION.

 3              CAN I CONFER WITH COUNSEL?

 4              THE COURT:  YES, GO AHEAD, PLEASE.

 5              (DISCUSSION OFF THE RECORD BETWEEN

 6    COUNSEL.)

 7              MR. VERHOEVEN:  SUBJECT TO YOUR HONOR'S

 8    RULING, YOUR HONOR'S ALREADY RULED ON THESE

 9    DOCUMENTS -- I DON'T KNOW IF WE CAN HAVE A

10    SIDE-BAR, YOUR HONOR.  I JUST WANT TO MAKE SURE I

11    DON'T WAIVE ANYTHING.

12              THE COURT:  OKAY.  I THOUGHT THIS WAS

13    WORKED OUT BEFORE THE JURY CAME OUT.

14              LET'S DO THAT.  UNFORTUNATELY, THE

15    MICROPHONE IS NOT WORKING, SO WE'LL HAVE TO

16    MEMORIALIZE IT AFTER.

17              LET'S GO AHEAD.

18              MR. VERHOEVEN:  THAT'S OKAY.

19              (SIDE-BAR DISCUSSION OFF THE RECORD.)

20              THE COURT:  OKAY.  THE -- I UNDERSTAND

21    THAT THE SAME OBJECTION WAS RESERVED, BUT IT'S

22    OVERRULED.

23              THIS IS ADMITTED.

24              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

25              165, HAVING BEEN PREVIOUSLY MARKED FOR
```

```
 1              IDENTIFICATION, WAS ADMITTED INTO

 2              EVIDENCE.)

 3              THE COURT:  GO AHEAD.

 4              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

 5    MAY I PUBLISH THIS TO THE JURY?

 6              THE COURT:  GO AHEAD.

 7              (PAUSE IN PROCEEDINGS.)

 8    BY MR. MCELHINNY:

 9    Q    MR. STRINGER, LET ME SHOW YOU AN EXHIBIT

10    THAT'S BEEN MARKED AS PX 166 (HANDING).

11    A    YES.

12    Q    WHAT IS THAT DEVICE, SIR?

13    A    THIS IS ALSO AN EARLY IPHONE MODEL, ALSO UNDER

14    ITSELF CODE NAME M68.

15    Q    IS IT THE SAME OR DIFFERENT THAN THE 165?

16    A    SIMILAR, BUT DIFFERENT.

17    Q    OKAY.  AND WHAT DOES IT SAY ON THE BACK OF IT,

18    SIR?

19    A    APPLE PROTO 1015 -- OH, IPOD.

20    Q    AND WHY DOES IT SAY IPOD ON A PROTOTYPE OF AN

21    IPHONE, SIR?

22    A    ONE OF TWO REASONS.  EITHER WE HAD NOT YET

23    COINED THE TERM "IPHONE" AND WE WANTED TO SEE

24    SOMETHING GRAPHICALLY REPRESENTED ON THE BACK; OR

25    WE WERE TRYING TO DISGUISE ITS IPHONE IDENTITY.
```

```
 1                    MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE
 2          P166 INTO EVIDENCE.
 3                    MR. VERHOEVEN:  YOUR HONOR, YOUR HONOR'S
 4          ALREADY RULED ON THE EXHIBITS FOR THIS WITNESS AND
 5          WE RESERVE WITH RESPECT TO THAT.
 6                    AND IN GENERAL, GOING FORWARD WITH THAT
 7          RESERVATION, THERE'S NO OBJECTION.
 8                    AND I'LL JUST SAY, IF IT'S OKAY, THAT
 9          WE'LL MAKE THAT RESERVATION FOR ALL EXHIBITS WITH
10          THIS WITNESS.
11                    THE COURT:  THAT'S FINE.
12                    MR. VERHOEVEN:  THANK YOU, YOUR HONOR.
13                    THE COURT:  ALL RIGHT.  THAT'S ADMITTED.
14                    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
15                    166, HAVING BEEN PREVIOUSLY MARKED FOR
16                    IDENTIFICATION, WAS ADMITTED INTO
17                    EVIDENCE.)
18          BY MR. MCELHINNY:
19          Q    SIR, NOW, THIS, AS YOU TESTIFIED, 166 THAT
20          SAYS IPOD ON THE BACK, IS A MODEL THAT YOU MADE
21          WHILE YOU WERE DEVELOPING THE ORIGINAL IPHONE; IS
22          THAT CORRECT?
23          A    THAT IS CORRECT.
24          Q    AFTER THE IPHONE, THE ORIGINAL IPHONE CAME
25          OUT, DID YOU EVER COME BACK TO THIS MODEL?
```

```
1    A    WE COME BACK TO MODELS CONTINUALLY, ONES LIKE

2    THAT, CERTAINLY.  POSSIBLY THAT ONE SPECIFICALLY.

3    Q    AND WHAT WAS -- WHAT, IF ANYTHING, RESULTED

4    FROM GOING BACK AND REVISITING EARLIER IDEAS?

5    A    ULTIMATELY NOT THAT MODEL, BUT ANOTHER, WE

6    WERE GOING DOWN ONE PATH IN SOME DEPTH, BUT AS I

7    WAS EXPLAINING EARLIER, WE'RE ALWAYS DOUBTING,

8    WE'RE ALWAYS QUESTIONING.

9              WE, AT TIMES, LOOK THROUGH OUR STOCKPILE

10   OF MODELS -- AS I SAID EARLIER, WE MAKE SO MANY OF

11   THEM -- DID WE LEAVE ANYTHING ON THE TABLE?

12             AND WE DETERMINED THAT WE DID.  WE PULLED

13   OUT A MODEL THAT LOOKS VERY, VERY SIMILAR TO THE

14   PRODUCT THAT WE SHIPPED.

15   Q    AS WHAT, SIR?

16   A    WE PULLED OUT AN IPHONE, EARLY PROTOTYPE,

17   WHICH HAS, I THINK, EXACTLY THE SAME SURFACES, OR

18   SURFACES VERY SIMILAR TO THE ONES THAT WE SHIPPED

19   FOR THE IPHONE.

20   Q    THANK YOU.

21             IF YOU WOULD LOOK, PLEASE, AT EXHIBIT

22   P168 (HANDING).

23             WHAT IS THAT DEVICE, SIR?

24   A    THIS IS ANOTHER MODEL IN THE SAME PROJECT, FOR

25   IPHONE.
```

```
1    Q    CAN YOU HOLD IT UP AND SORT OF SHOW IT SO THE
2    JURY CAN SEE IT?
3    A    (INDICATING.)
4    Q    AND DID THAT PARTICULAR MODEL HAVE A
5    PARTICULAR NAME?
6    A    WE CALLED IT THE EXTRUDED LOZENGE, THE REASON
7    BEING FROM AN END VIEW, IT IS LOZENGE IN SHAPE AND
8    IT'S EXTRUDED, WHICH MEANS IT'S, IT'S BASICALLY
9    STRETCHED IN THE LONG AXIS.
10   Q    THE OTHER MODELS WE LOOKED AT FELT LIKE THEY
11   WERE MADE OUT OF PLASTIC.  WHAT IS THAT ONE MADE
12   OUT OF IT?
13   A    THIS ONE IS MADE OUT OF ALUMINUM.
14            MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE
15   PX 168 INTO EVIDENCE.
16            MR. VERHOEVEN:  NO OBJECTION.
17            THE COURT:  ALL RIGHT.  THAT'S ADMITTED.
18            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
19            168, HAVING BEEN PREVIOUSLY MARKED FOR
20            IDENTIFICATION, WAS ADMITTED INTO
21            EVIDENCE.)
22   BY MR. MCELHINNY:
23   Q    MR. STRINGER, LET ME SHOW YOU WHAT HAS BEEN
24   MARKED AS PX 167 (HANDING).
25            CAN YOU TELL ME WHAT THAT IS, PLEASE?
```

```
 1    A    THIS IS ANOTHER MODEL FROM THAT SAME PERIOD.

 2    IT'S ANOTHER SPIN ON THE IDEA OF EXTRUSIONS, NOT

 3    LOZENGE SHAPED IN THIS INSTANCE, BUT IT'S MORE OF A

 4    RECTANGULAR EXTRUSION, BUT IN THE SAME FAMILY OF

 5    IDEAS.

 6    Q    AND DID YOU ULTIMATELY PURSUE THAT TYPE OF

 7    MODEL?

 8    A    NO, WE DID NOT.

 9    Q    WHY NOT, SIR?

10    A    WE FOUND SOMETHING MORE BEAUTIFUL.  AS I WAS

11    EXPLAINING BEFORE, AS WE WENT THROUGH OUR ARCHIVES,

12    WE FOUND SOMETHING THAT WE'D OVERLOOKED, SOMETHING

13    THAT WE, ONCE ADDING DETAIL TO IT AND REALLY

14    SPENDING SOME TIME WITH IT, DECIDED THAT IT WAS THE

15    ABSOLUTE BEST CHOICE FOR US AT THAT TIME.

16            MR. MCELHINNY:  YOUR HONOR, I MOVE PX 167

17    INTO EVIDENCE.

18            MR. VERHOEVEN:  NO OBJECTION.

19            THE COURT:  THAT'S ADMITTED.

20            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

21            167, HAVING BEEN PREVIOUSLY MARKED FOR

22            IDENTIFICATION, WAS ADMITTED INTO

23            EVIDENCE.)

24    BY MR. MCELHINNY:

25    Q    SIR, AGAIN, BACK IN YOUR BINDER, COULD YOU
```

1    LOOK, PLEASE, AT EXHIBIT PX 162.

2    A    YES, I SEE IT.

3    Q    AND WHAT IS PX 162?

4    A    THESE ARE IMAGES FROM CAD, PRECEDED BY A

5    SNAPSHOT OF THE DIRECTORY WHICH IDENTIFIES IT AS

6    THE ORIGINAL IPHONE.

7    Q    CAN YOU TELL, SIR, FROM THIS CAD ANYTHING

8    ABOUT THE DATE ON WHICH YOU COMPLETED THE DESIGN OF

9    THE FRONT FACE AND BEZEL OF THE IPHONE?

10   A    APRIL 20, 2006.

11             MR. MCELHINNY:  YOUR HONOR, I MOVE PX 162

12   INTO EVIDENCE.  162.

13             MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.

14             THE COURT:  THAT'S ADMITTED.

15             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

16             162, HAVING BEEN PREVIOUSLY MARKED FOR

17             IDENTIFICATION, WAS ADMITTED INTO

18             EVIDENCE.)

19   BY MR. MCELHINNY:

20   Q    SIR, I'M GOING TO SHOW YOU AGAIN THE MODELS

21   THAT WERE MARKED AS 165 AND 166 (HANDING).

22   A    OKAY.

23   Q    CAN YOU TELL US WHETHER THE FORM OF THOSE

24   MODELS, THE DESIGN OF THOSE MODELS, ENDED UP IN THE

25   ORIGINAL IPHONE DESIGN?

1    A    NO.

2    Q    DID THEY END UP IN THE DESIGN OF ANY

3    SUBSEQUENT IPHONE?

4    A    IT'S MUCH CLOSER TO THE IPHONE 4.

5    Q    THANK YOU, SIR.

6          MR. STRINGER, LET ME HAND YOU WHAT HAS

7    BEEN MARKED AS EXHIBIT JX 1000 (HANDING).

8          CAN YOU TELL ME WHAT THAT IS, SIR?

9    A    THIS IS THE IPHONE, THE ORIGINAL.

10   Q    CAN YOU TELL US HOW, HOW OF THESE VARIOUS

11   MODELS AND PICTURES THAT WE'VE LOOKED AT, HOW DID

12   YOU COME ABOUT TO SELECT THAT DESIGN AS THE FINAL

13   DESIGN FOR THE IPHONE?

14   A    IT'S VERY SIMPLE.  IT WAS THE MOST BEAUTIFUL

15   OF OUR DESIGNS.  WE SOMETIMES DON'T RECOGNIZE IT

16   INSTANTLY.  IT MAY TAKE SOME ENERGY AND ADDING

17   DETAIL.  BUT WHEN WE REALIZED WHAT WE HAD, WE KNEW

18   IT.

19   Q    AT ANY TIME DURING THE DEVELOPMENT OF THE

20   IPHONE, DID -- WERE THERE ANY DOUBTS ABOUT WHETHER

21   OR NOT YOU WERE GOING TO BE SUCCESSFUL WITH THAT

22   PRODUCT?

23   A    ABSOLUTELY.  I'M AWARE THAT STEVE JOBS HIMSELF

24   HAD DOUBTS.

25          WE WERE DOING SOMETHING UNPRECEDENTED.

```
1    THE WORLD HAD NEVER SEEN ANYTHING LIKE THIS.  THERE
2    WAS LEGIONS OF PHONES AVAILABLE.  NONE WERE VERY
3    SATISFYING.
4              AND THIS BROKE NEW GROUND.  IT WAS MORE
5    THAN A PHONE.  SMARTPHONES EXISTED, BUT THEY WERE
6    MORE LIKE TINY LITTLE COMPUTERS.
7              WE CAME UP WITH SOMETHING THAT WAS
8    BREATHTAKING.  IT WAS A REVOLUTION.
9    Q    CAN YOU --
10   A    AND THE CHALLENGES IN TERMS OF PRODUCING THAT
11   PRODUCT WERE ENORMOUS.
12   Q    CAN YOU GIVE -- I'M SORRY.
13             CAN YOU GIVE US SOME EXAMPLES OF THE
14   PRODUCTION PROBLEMS?
15   A    PRODUCTION PROBLEMS, WE HAD MANY.  PRODUCING
16   THE GLASS WAS VERY CHALLENGING.  WE WERE PUTTING
17   GLASS IN CLOSE PROXIMITY TO HARDENED STEEL.  IF YOU
18   DROP THIS, YOU DON'T HAVE TO WORRY ABOUT THE GROUND
19   HITTING THE GLASS.  YOU HAVE TO WORRY ABOUT THE
20   BAND OF STEEL SURROUNDING THE GLASS HITTING THE
21   GLASS.
22             SO THERE WAS AN ENORMOUS AMOUNT OF ENERGY
23   PUT INTO THE ENGINEERING OF THAT INTERFACE.
24             SECONDLY, WE WERE PUTTING HOLES IN THE
25   GLASS.  I THINK WE -- PEOPLE THOUGHT WE WERE CRAZY.
```

```
 1              BUT WE, WE JUST SOLVED THE ENGINEERING

 2    ISSUES.  IT WAS A HUGE, HUGE AMOUNT OF WORK.

 3              THE BAND ITSELF WAS CHALLENGING.  WE

 4    INSISTED ON THIS HIGH POLISHED STEEL, CONTINUOUS

 5    BAND AROUND THE PRODUCT, AND IF WE IGNORE THE

 6    ANTENNA ISSUES OF THAT GENERATION, WHICH WERE

 7    ENORMOUS AT THAT POINT IN TIME, AND FOCUS ON THE

 8    MANUFACTURING ISSUES ALONE, THERE'S A LONG LIST OF

 9    CHALLENGES THERE.

10              IN ORDER TO, TO MAKE IT WORK, WE HAD TO

11    USE A VERY HIGH, HIGH GRADE OF STEEL BECAUSE WE

12    COULDN'T HAVE IT SORT OF DEFLECTING INTO THE GLASS.

13              THAT WAS INCREDIBLY HARD TO POLISH.  THAT

14    WAS ONCE YOU GOT THE SHAPE RIGHT.

15              IT WAS VERY, VERY DIFFICULT TO MACHINE,

16    AND MACHINING THESE VOLUMES WAS UNPRECEDENTED AT

17    THAT TIME.

18    Q    WERE ANY OF THE DESIGN DECISIONS THAT YOU MADE

19    ABOUT THE IPHONE, WERE THEY MADE IN ORDER TO MAKE

20    THE IPHONE CHEAPER OR EASIER TO MANUFACTURE?

21    A    NO.

22    Q    WERE YOU EVER TOLD BY ANYONE -- WERE ANY OF

23    THE DESIGN CHOICES THAT YOU MADE, MADE IN ORDER TO

24    MAKE IT WORK BETTER AS A TELEPHONE?

25    A    NO.
```

1    Q    WERE YOU EVER TOLD BY ANYONE THAT YOU HAD TO

2    PICK PARTICULAR DESIGNS BECAUSE OF REQUIREMENTS

3    FROM THE COMPONENTS OR THE INTERNAL ELEMENTS OF THE

4    PHONE?

5    A    NO.

6    Q    HOW -- WHO WAS IN CONTROL OF YOUR DESIGN

7    PROCESS ULTIMATELY?

8    A    WE WERE IN CONTROL OF OUR DESIGN PROCESS.

9    Q    IS THERE A REASON WHY YOU DIDN'T PUT THE APPLE

10   LOGO ON THE FRONT FACE -- ON THE FRONT FACE OF THE

11   FACE?

12   A    FIRST OF ALL, IT -- IT DIDN'T LOOK GOOD.

13          AND WE ALSO KNEW FROM OUR EXPERIENCE WITH

14   IPOD, IF YOU MAKE A STARTLINGLY BEAUTIFUL AND

15   ORIGINAL DESIGN, YOU DON'T NEED TO.  IT STANDS FOR

16   ITSELF.  IT BECOMES A CULTURAL ICON.

17   Q    WHAT DO YOU MEAN WHEN YOU USE THE WORD "ICON,"

18   SIR?

19   A    ICON, IT'S A HARD CREDENTIAL, REALLY.  I THINK

20   THAT BECOMES TRUE WITH ENORMOUS SUCCESS.

21          BUT IF YOU SEE SOMETHING ACROSS THE ROOM

22   AND YOU KNOW WHAT IT IS AND YOU CAN SIMPLY DESCRIBE

23   IT, IT'S AN ICON.

24          MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE

25   JX 1000 INTO EVIDENCE.

```
 1                MR. VERHOEVEN:  NO FURTHER OBJECTION.

 2                THE COURT:  OKAY.  IT'S ADMITTED.

 3                (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

 4                1000, HAVING BEEN PREVIOUSLY MARKED FOR

 5                IDENTIFICATION, WAS ADMITTED INTO

 6                EVIDENCE.)

 7                (PAUSE IN PROCEEDINGS.)

 8      BY MR. MCELHINNY:

 9      Q    SIR, I'VE HANDED YOU THREE EXHIBITS.

10                WOULD YOU LOOK AT THE ONE, PLEASE, THAT

11      HAS THE NUMBER ON THE BACK JX 1001.  CAN YOU TELL

12      ME WHAT THAT IS, PLEASE?

13      A    THIS IS IPHONE 3G.

14                MR. MCELHINNY:  YOUR HONOR, I MOVE 1001

15      INTO EVIDENCE.

16                MR. VERHOEVEN:  NO FURTHER OBJECTION.

17                THE COURT:  OKAY.  THAT'S ADMITTED.

18                (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19                1001, HAVING BEEN PREVIOUSLY MARKED FOR

20                IDENTIFICATION, WAS ADMITTED INTO

21                EVIDENCE.)

22      BY MR. MCELHINNY:

23      Q    WOULD YOU LOOK, PLEASE, AT THE ONE THAT'S BEEN

24      NUMBERED JX 1002?

25      A    YES.
```

```
1    Q    WHAT IS THAT PHONE, SIR?

2    A    I BELIEVE IT'S THE 3GS.

3              MR. MCELHINNY:  YOUR HONOR, I'D MOVE 1002

4    INTO EVIDENCE.

5              MR. VERHOEVEN:  NO FURTHER OBJECTION.

6              THE COURT:  IT'S ADMITTED.

7              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

8              1002, HAVING BEEN PREVIOUSLY MARKED FOR

9              IDENTIFICATION, WAS ADMITTED INTO

10             EVIDENCE.)

11   BY MR. MCELHINNY:

12   Q    WOULD YOU LOOK AT THE ONE THAT HAS 1003 ON IT,

13   PLEASE.

14   A    YES.

15   Q    AND WHAT IS THAT?

16   A    IPHONE 4.

17             MR. MCELHINNY:  YOUR HONOR, I'D MOVE 1003

18   INTO EVIDENCE.

19             MR. VERHOEVEN:  NO FURTHER OBJECTION.

20             THE COURT:  IT'S ADMITTED.

21             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

22             1003, HAVING BEEN PREVIOUSLY MARKED FOR

23             IDENTIFICATION, WAS ADMITTED INTO

24             EVIDENCE.)

25   BY MR. MCELHINNY:
```

```
1    Q    SIR, LET'S TALK ABOUT THE IPAD FOR A MOMENT.

2    A    OKAY.

3    Q    WHAT, IF ANYTHING, DID YOU WANT TO ACHIEVE IN

4    DESIGNING THE IPAD?

5    A    WE WANTED TO, AGAIN, MAKE A, A BREATHTAKINGLY

6    SIMPLE, BEAUTIFUL DEVICE, SOMETHING THAT YOU REALLY

7    WANT, AND SOMETHING THAT'S VERY EASILY

8    UNDERSTANDABLE.

9    Q    WHAT DOES THAT MEAN TO YOU?

10   A    SOMETHING THAT'S VERY IMMEDIATE.  YOU PICK IT

11   UP, YOU USE IT, SOMETHING THAT'S JUST -- IT NEEDS

12   NO EXPLANATION.

13   Q    DO YOU RECALL APPROXIMATELY HOW LONG THE

14   DESIGN PROCESS LASTED FOR THE IPAD BEFORE IT WAS

15   RELEASED?

16   A    IT WAS AN ENORMOUS AMOUNT OF TIME.  WE STARTED

17   THE IPAD BEFORE WE STARTED THE IPHONE.  THAT'S WHEN

18   WE FIRST STARTED ON THE MULTITOUCH TECHNOLOGY AND

19   PRODUCTS ASSOCIATED.

20   Q    WOULD YOU LOOK IN YOUR BINDER, PLEASE, AT

21   EXHIBIT PX 171.

22        OH, NEVER MIND.

23        LET ME HAND YOU THIS, WHICH IS PX 171

24   (HANDING).

25   A    YES.
```

```
1    Q    CAN YOU TELL ME WHAT THAT IS, PLEASE?

2    A    THIS IS, I WOULD THINK, A VERY, VERY EARLY

3    MODEL OF IPAD.

4    Q    AGAIN, WE DON'T HAVE TIME TO PASS IT AROUND,

5    BUT CAN YOU HOLD IT UP SO THAT PEOPLE CAN SEE IT?

6         CAN YOU HOLD THE BACK UP SO THAT PEOPLE

7    CAN SEE IT?

8    A    (INDICATING.)

9         MR. VERHOEVEN:  EXCUSE ME, COUNSEL.  I

10   DON'T THINK YOU SHOWED THAT TO ME PREVIOUSLY, IF

11   YOU DON'T MIND.

12        MR. MCELHINNY:  SORRY.

13        (PAUSE IN PROCEEDINGS.)

14        MR. VERHOEVEN:  THANK YOU.

15   BY MR. MCELHINNY:

16   Q    WAS THE DESIGN GROUP FAVORABLY IMPRESSED WITH

17   THIS DESIGN, SIR?

18   A    I DON'T RECALL US LOOKING AT IT FOR VERY LONG.

19        MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE

20   PX 171 INTO EVIDENCE.

21        MR. VERHOEVEN:  NO FURTHER OBJECTION.

22        THE COURT:  THAT'S ADMITTED.

23        (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

24        171, HAVING BEEN PREVIOUSLY MARKED FOR

25        IDENTIFICATION, WAS ADMITTED INTO
```

```
 1              EVIDENCE.)

 2              THE COURT:  WHY DON'T WE TAKE A BREAK AT

 3      ABOUT 3:30, SO ABOUT FIVE OR TEN MINUTES.

 4              MR. MCELHINNY:  PERFECT, YOUR HONOR.

 5              THE COURT:  AND IF FOLKS NEED

 6      CAFFEINATION, THERE ARE DRINKS IN THE FRIDGE IN THE

 7      JURY ROOM, AND YOU CAN GO TO THE BATHROOM.

 8      BY MR. MCELHINNY:

 9      Q    WHAT IS PX 170, SIR?

10      A    THIS IS A MODEL WE BUILT FOR IPAD.

11      Q    AGAIN, CAN YOU HOLD IT UP SO THE JURY CAN SEE

12      IT?

13      A    (INDICATING.)

14      Q    AND WHAT DOES IT SAY ON THE BACK?

15      A    IPOD.

16      Q    AND WHY DOES IT SAY IPOD, SIR?

17      A    I'M ASSUMING SIMILARLY TO THE DISCUSSION ABOUT

18      THE PHONE, WE EITHER HAD NOT COINED THE TERM YET

19      OR -- ACTUALLY, IT'S HARD TO BELIEVE WE WERE

20      CONSIDERING THIS IDENTITY, BUT MY STRONG SUSPICION

21      IS THAT WE WERE NOT AWARE OF THE NAME AND WE NEEDED

22      TO REPRESENT SOMETHING GRAPHICALLY.

23      Q    DOES APPLE HAVE A THING ABOUT SECRECY?

24      A    YES.

25      Q    OH, OKAY.
```

```
 1              LET ME SHOW YOU JX 1004.

 2              YOUR HONOR, I WOULD MOVE PX 170.

 3              MR. VERHOEVEN:  NO FURTHER OBJECTION.

 4              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

 5    THAT'S 170, IS THAT RIGHT?

 6              MR. MCELHINNY:  YES, YOUR HONOR.

 7              THE COURT:  OKAY.

 8              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

 9              170, HAVING BEEN PREVIOUSLY MARKED FOR

10              IDENTIFICATION, WAS ADMITTED INTO

11              EVIDENCE.)

12    BY MR. MCELHINNY:

13    Q    LET ME SHOW YOU PX 1004.

14              WHAT IS THAT, MR. STRINGER?

15    A    THIS IS THE IPAD.

16    Q    HOW DID YOUR GROUP SELECT THE FINAL DESIGN FOR

17    THE IPAD?

18    A    WE -- WE HAD TRIED SO MANY THINGS.  IT WAS A

19    LONG PROJECT AND IT TRACKED THE COURSE OF EVENTS OF

20    IPHONE.

21              DURING THE DESIGN OF IPHONE, AS WE WENT

22    THROUGH VARIOUS FORM FACTORS, WE WOULD MODEL IPADS

23    IN SIMILAR SORT OF FAMILY APPEARANCES.

24              YOU SEE, THIS IS KIND OF THE EXTRUDED

25    FORM.  WE DID THAT, I'M QUITE CONFIDENT, AT THE
```

1    SAME TIME THAT THE PHONE WAS GOING THROUGH ITS

2    EXTRUDED PHASE.

3    Q    I'M SORRY.  WHEN YOU SAID "THE EXTRUDED FORM,"

4    YOU'RE HOLDING UP PX 170?  IS THAT CORRECT?

5    A    EXCUSE ME.  YES.

6    Q    OKAY.

7    A    SO, YES, WE DID THIS WHILE WE WERE DOING THE

8    EXTRUDED PHONE.

9         THERE WERE OTHER MANIFESTATIONS OF THIS

10   DESIGN ALSO.

11        BUT AT THE END OF THE DAY, WE REALIZED IT

12   NEEDED TO BE ITS OWN SELF.  WE CAN'T COPY

13   OURSELVES.  WE WANTED A UNIQUE FORM OF THIS DEVICE.

14   IT DESERVED ITS OWN IDENTITY.

15        AND AS WE CHOSE THIS, WE LIKED THE

16   DESIGNS.  IT CAPTIVATED ALL OF THE FEATURES ON THIS

17   PERIMETER, WHICH LEFT THE REAR SURFACE ENTIRELY

18   CLEAN.

19        SO AS I WAS EXPLAINING EARLIER WITH THE

20   SIMPLIFICATION, IT WAS A VERY ANONYMOUS OBJECT, NOT

21   PLAYING ALONG WITH THE LINES OF CONSUMER

22   ELECTRONICS AT ALL.

23        IT FELT LIKE AN ENTIRELY NEW THING.  IT

24   DIDN'T FEEL LIKE A DEVICE.  IT FELT LIKE A NEW

25   OBJECT.

```
 1    Q    DID YOU PICK THE DESIGN FOR FUNCTIONAL REASONS

 2    BECAUSE YOU THOUGHT IT WOULD WORK BETTER AS A TAB?

 3    A    NO.

 4              MR. MCELHINNY:  YOUR HONOR, I'D MOVE JX

 5    1004 INTO EVIDENCE.

 6              MR. VERHOEVEN:  NO OBJECTION.

 7              THE COURT:  THAT'S ADMITTED.

 8              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

 9              1004, HAVING BEEN PREVIOUSLY MARKED FOR

10              IDENTIFICATION, WAS ADMITTED INTO

11              EVIDENCE.)

12    BY MR. MCELHINNY:

13    Q    SIR, I'M HANDING YOU EXHIBIT JX 1005

14    (HANDING).

15              LET ME CLEAN HOUSE HERE.

16              WHAT IS JX 1005?

17    A    THIS IS THE SECOND GENERATION OF IPAD.

18              MR. MCELHINNY:  YOUR HONOR, I MOVE JX

19    1005.

20              MR. VERHOEVEN:  NO OBJECTION.

21              THE COURT:  THAT'S ADMITTED.

22              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

23              1005, HAVING BEEN PREVIOUSLY MARKED FOR

24              IDENTIFICATION, WAS ADMITTED INTO

25              EVIDENCE.)
```

```
 1    BY MR. MCELHINNY:
 2    Q    AGAIN, WERE THERE PARTICULAR ENGINEERING
 3    CHALLENGES INVOLVED IN THE CONSTRUCTION OF THE
 4    IPAD 2?
 5    A    OF COURSE.  THERE WERE MANY.  ONE AREA THAT
 6    TOOK US A HUGE AMOUNT OF EFFORT IN THE FACTORIES
 7    WAS GETTING THE GAPS, OR THE REVEALS, TO BE AS
 8    TIGHT AS THEY ARE.
 9         IF YOU LOOK AROUND THE PERIMETER OF THE
10    PRODUCT, YOU'LL SEE WHERE THE GLASS MEETS THE
11    HOUSING, WE WANTED TO JUST REDUCE THAT AND MAKE IT
12    SEEM LIKE IT WAS SEALED TIGHT.
13    Q    WHERE THE GLASS MEETS THE HOUSING, IS THAT
14    WHAT YOU'RE CALLING A GAP OR A REVEAL?
15    A    YES.
16    Q    OKAY.
17         YOUR HONOR, I WOULD MOVE --
18         OH, WAS THE DESIGN OF THE IPAD 2 DRIVEN
19    IN ANY WAY TO MAKE IT CHEAPER OR EASIER TO
20    MANUFACTURE?
21    A    NO, ABSOLUTELY NOT.
22    Q    THANK YOU.
23         MR. STRINGER, WHERE WERE YOU PHYSICALLY
24    ON JANUARY 7TH WHEN THE ORIGINAL IPHONE WAS
25    RELEASED?
```

```
1    A    THE ENTIRE DESIGN TEAM, OR AT LEAST A

2    SUBSTANTIAL PORTION, THOSE THAT COULD BE THERE,

3    WERE AT THE APPLE STORE IN SAN FRANCISCO.

4    Q    AND WHY WERE YOU THERE?

5    A    WE WERE EXCITED.  WE HAD SOMETHING NEW.  THERE

6    WAS AN INCREDIBLE BUZZ.  PEOPLE WERE ANTICIPATING

7    SOMETHING, I THINK, STARTING WITH THE SEQUENCE OF

8    EVENTS.

9         BUT WE ANNOUNCED IT.  PEOPLE KNEW THAT

10   THERE WAS SOMETHING COMING THAT THEY WANTED.

11        AND THERE WAS AN ENORMOUS CROWD OUTSIDE.

12   WE WANTED TO FEEL THAT ENTHUSIASM AND SEE PEOPLE,

13   SEE THEIR EYES WHEN THEY GET THESE NEW PRODUCTS,

14   THE FIRST PEOPLE TO GET THEM.

15   Q    AND WHAT DID YOU OBSERVE WHEN THE DOORS

16   OPENED, SIR?

17   A    MAYHEM.  IT WAS LIKE A CARNIVAL.

18   Q    AND WHAT WAS YOUR REACTION TO THAT?

19   A    OVERWHELMED.  WE WERE OBVIOUSLY VERY, VERY

20   PROUD.  WE'D WORKED REALLY HARD.  IT WAS -- THERE

21   WAS AN ENORMOUS NUMBER OF PEOPLE THAT PUT IN

22   PERSONAL SACRIFICE AND IT WAS PAYING OFF IN SPADES.

23   IT WAS A BEAUTIFUL DAY.

24        MR. MCELHINNY:  WOULD THIS BE A GOOD

25   TIME, YOUR HONOR?
```

```
1              THE COURT:  THAT'S FINE.  IT'S 3:29.
2              JUST A TEN-MINUTE BREAK, SEVENTH INNING
3     STRETCH SO PEOPLE CAN STAND UP AND USE THE REST
4     ROOM.
5              OKAY.  THANK YOU.
6              (WHEREUPON, A RECESS WAS TAKEN.)
7              THE COURT:  ALL RIGHT.  THE TIME IS NOW
8     3:43.
9              PLEASE GO AHEAD.
10             MR. MCELHINNY:  THANK YOU, YOUR HONOR.
11             BOY, YOU TAKE A BREAK AND THE NITPICKERS
12    JUMP ALL OVER YOU.
13    Q    LET ME GO BACK TO SOMETHING TO MAKE SURE WE'VE
14    GOT IT RIGHT IN THE RECORD.  IF YOU WOULD LOOK,
15    PLEASE, AT JX 1043.
16    A    YES.
17    Q    THIS IS THE '677 PATENT?
18    A    THAT'S RIGHT.
19    Q    I ASKED YOU WHICH IPHONES INCORPORATED THIS
20    DESIGN, AND WHAT WAS YOUR ANSWER, SIR?
21    A    I BELIEVE MY ANSWER WAS ALL IPHONES.
22    Q    DID YOU SAY TODAY OR TO DATE?
23    A    TO DATE.
24    Q    TO DATE.  THANK YOU.
25             AND THEN MY MISTAKE.  WHEN YOU WENT TO
```

1     THE OPENING OF THE ORIGINAL IPHONE, WAS THAT IN THE

2     SUMMER OF 2007?

3     A     I DON'T RECALL THAT.

4     Q     OKAY.  HAS THE APPLE -- HAS THE DESIGN OF THE

5     IPHONE RECEIVED ANY PROFESSIONAL AWARDS FOR DESIGN?

6     A     IT'S RECEIVED MANY.  AWARDS ARE NOT OUR

7     MOTIVATION.  IT'S NOT WHY WE GET UP IN THE MORNING.

8     BUT IT'S CERTAINLY SOMETHING WE DON'T MIND.

9          THE ONLY ONE THAT REALLY WAS OF ANY REAL

10    IMPORTANCE TO MYSELF IS THE DNAD, AND WE RECEIVED A

11    GOLD PENCIL FOR THAT.

12    Q     WHAT IS DNAD?

13    A     DESIGNERS AND ART DIRECTORS.

14    Q     AND WHY IS THAT SIGNIFICANT TO YOU, SIR?

15    A     WE JUST HAVE A HIGH REGARD FOR THE JURY

16    SELECTION PROCESS FOR THAT.  WE HAVE A PEER JUDGING

17    COMMITTEE AND IT'S A VERY CREDIBLE AWARD.

18    Q     DO YOU KNOW WHETHER OR NOT YOUR DESIGNS FOR

19    YOUR PRODUCTS HAVE BEEN MADE PARTS OF DISPLAYS IN

20    MUSEUMS?

21    A     YEAH.  I'VE SEEN OUR PRODUCTS AT S.F. MOMA;

22    I'VE SEEN THEM AT THE SMITHSONIAN IN WASHINGTON.

23          I KNOW THERE'S NUMEROUS OTHERS.  I DON'T

24    SEEK THEM OUT, BUT IT'S FLATTERING TO KNOW THAT

25    THEY'RE THERE.

```
1    Q    HAS YOUR DESIGN GROUP RECEIVED AWARDS FOR THE
2    DESIGN OF THE IPAD?
3    A    YES, AGAIN, IT'S RECEIVED THE DNAD, AMONGST
4    OTHERS.
5    Q    SIR, HAVE YOU EVER BECOME AWARE THAT OTHER
6    PHONE MAKERS STARTED USING DESIGNS THAT WERE
7    SIMILAR TO YOURS?
8              MR. VERHOEVEN:  OBJECTION.  LEADING.
9              THE COURT:  SUSTAINED.
10   BY MR. MCELHINNY:
11   Q    SIR, TO YOUR KNOWLEDGE, DO YOU UNDERSTAND
12   WHETHER OR NOT OTHER PHONE MAKERS, AFTER THE IPHONE
13   WAS ISSUED, STARTED TO USE THAT DESIGN?
14             MR. VERHOEVEN:  OBJECTION.
15             THE COURT:  WHAT'S THE BASIS?
16             MR. VERHOEVEN:  IMPROPER OPINION
17   TESTIMONY FROM A PERCIPIENT WITNESS, YOUR HONOR.
18             THE COURT:  OVERRULED.
19             GO AHEAD.
20   BY MR. MCELHINNY:
21   Q    DO YOU HAVE THE QUESTION IN MIND?
22   A    COULD YOU REPEAT THE QUESTION?
23   Q    I CAN'T, BUT THE -- WELL, I'LL GIVE IT BACK TO
24   YOU.
25             AFTER THE IPHONE CAME OUT, DID YOU EVER
```

```
 1    COME TO A DETERMINATION, IN YOUR OWN HEAD, ABOUT

 2    WHETHER OR NOT OTHER COMPETITORS WERE USING YOUR

 3    DESIGNS?

 4    A    YES.  WE'VE BEEN RIPPED OFF.  IT'S PLAIN TO

 5    SEE.

 6    Q    BY WHOM, SIR?

 7    A    SAMSUNG IN PARTICULAR.

 8    Q    AND WHAT IS YOUR REACTION TO THAT AS AN

 9    ARTIST?

10    A    IT'S OFFENSIVE.  AS I WAS EXPLAINING, IT'S A

11    HUGE LEAP OF IMAGINATION TO COME UP WITH SOMETHING

12    ENTIRELY NEW.  THAT'S SOMETHING THAT WE DID.

13            IT'S A PROCESS BY WHICH YOU HAVE TO

14    DISMISS EVERYTHING YOU KNOW, TRY TO FORGET

15    EVERYTHING YOU KNOW, WHICH MAKES IT VERY DIFFICULT,

16    BECAUSE IF YOU PAY ATTENTION TO THE COMPETITION,

17    YOU END UP FOLLOWING.

18            AND THAT'S NOT WHAT WE DO.  WE WANTED TO

19    CREATE ORIGINALITY.  IT'S A VERY DIFFICULT PROCESS.

20    IT TAKES A HUGE AMOUNT OF TIME AND RESOURCES AND

21    CONVICTION TO DO SO.

22            SO WE -- WE WERE OFFENDED.

23            MR. MCELHINNY:  NOTHING FURTHER AT THIS

24    TIME, YOUR HONOR.

25            THE COURT:  ALL RIGHT.  IT'S NOW 3:48.
```

```
1                    CROSS-EXAMINATION, PLEASE.

2                    (PAUSE IN PROCEEDINGS.)

3                    MR. VERHOEVEN:  ONE SECOND, YOUR HONOR,

4      AS I GET ORGANIZED IF THAT'S OKAY.

5                    THE COURT:  ALL RIGHT.

6                    (PAUSE IN PROCEEDINGS.)

7                    MR. VERHOEVEN:  CAN I HAVE JUST ONE

8      SECOND, YOUR HONOR, AND I'LL BE READY.

9                    (DISCUSSION OFF THE RECORD BETWEEN

10     DEFENSE COUNSEL.)

11                   MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

12     MAY I PROCEED?

13                   THE COURT:  PLEASE.  IT'S 3:49.

14                   GO AHEAD.

15                   **CROSS-EXAMINATION**

16     BY MR. VERHOEVEN:

17     Q    GOOD AFTERNOON, MR. STRINGER.

18     A    GOOD AFTERNOON.

19     Q    GOOD TO SEE YOU AGAIN.

20                   I'D LIKE TO START BY PUTTING UP THE '087

21     PATENT, WHICH IS JX 1041.

22                   CAN WE HAND OUT THE CROSS BINDER?

23                   MAY I APPROACH, YOUR HONOR?

24                   THE COURT:  PLEASE, GO AHEAD.

25                   MR. VERHOEVEN:  THIS IS OUR EXHIBITS
```

```
1    (HANDING).

2    Q    IF WE COULD GO TO THE NEXT PAGE AND

3    HIGHLIGHT -- NO, NO, NO.  PLEASE GO BACK TO THE

4    PAGE, THE FRONT PAGE.  GO TO THE NEXT PAGE.  KEEP

5    GOING.  ONE MORE.  ONE MORE.

6              ALL RIGHT.  YOU TESTIFIED ON DIRECT ABOUT

7    THE '087 DESIGN PATENT, SIR; CORRECT?

8    A    YES.

9    Q    AND YOU ARE ONE OF THE INVENTORS LISTED ON

10   THAT PATENT; CORRECT?

11   A    YES.

12   Q    AND THE '087 DESIGN PATENT IS EMBODIED BY THE

13   INITIAL IPHONE; IS THAT RIGHT?

14   A    YES.

15   Q    OKAY.  AND DO YOU SEE HERE ON FIGURE 3 -- I'M

16   POINTING ON THE BIG SCREEN IF YOU WANT TO LOOK AT

17   MY POINTER.  LOOK AT FIGURE 3.

18   A    YES.

19   Q    THAT'S THE FRONT FACE OF THE DESIGN; IS THAT

20   CORRECT?

21   A    THAT IS CORRECT.

22   Q    AND I WANT TO MAKE SURE I GET THE RIGHT

23   FIGURE.  IT'S FIGURE 11, PLEASE, ON PAGE 433.

24             THIS IS ANOTHER DEPICTION, BUT THIS ONE

25   DOESN'T CLAIM THE CIRCULAR HOME BUTTON.  DO YOU SEE
```

1      THAT?

2      A    YES.

3      Q    DO YOU UNDERSTAND THAT THE LINES HERE MEANS

4      IT'S NOT BEING CLAIMED?

5      A    THAT'S CORRECT.

6      Q    AND THEN FIGURE 15 AND 16 ARE SIDE VIEWS OF

7      THAT SAME DESIGN PATENT; IS THAT RIGHT?

8      A    YES.

9      Q    OKAY.  NOW I'M GOING TO ASK YOU A FEW

10     QUESTIONS ABOUT THE DESIGN ELEMENTS WITH RESPECT TO

11     THE '087 PATENT.  OKAY?

12              IN YOUR VIEW, ONE IMPORTANT DESIGN ASPECT

13     OF THE '087 PATENT, AND THE INITIAL IPHONE, WAS

14     THAT IT HAD FOUR EVENLY RADIUS CORNERS; CORRECT?

15     A    YES.

16     Q    AND THAT'S DEPICTED RIGHT HERE ON EACH OF

17     THESE CORNERS IN FIGURE 11; CORRECT?

18     A    YES.

19     Q    ANOTHER IMPORTANT DESIGN FEATURE WITH RESPECT

20     TO THE INITIAL IPHONE AND THE '087 PATENT WAS THAT

21     IT HAD THIS CONTINUOUS RIM, OR BEZEL I THINK IS THE

22     WORD YOU USED.  IS THAT RIGHT?

23     A    YES.

24     Q    AND YOU AGREE WITH ME, THAT WAS AN IMPORTANT

25     ASPECT OF THIS DESIGN; RIGHT?

1    A    YES.

2    Q    AND THE -- IT WAS IMPORTANT THAT THE BEZEL GO

3    CONTINUOUSLY AND UNIFORMLY AROUND THE RIM OF THE

4    PHONE; RIGHT?

5    A    YES.

6    Q    AND IT WAS ALSO IMPORTANT THAT THE BEZEL BE OF

7    UNIFORM THICKNESS; CORRECT?

8    A    YES.

9    Q    ANOTHER DESIGN ASPECT -- OR AN ASPECT OF THE

10   DESIGN IN THE '087 PATENT THAT WAS IMPORTANT TO YOU

11   AND YOUR TEAM AS DESIGNERS WAS THAT THE FRONT

12   SURFACE, FOR EXAMPLE, IF YOU LOOK AT FIGURE 16 OR

13   FIGURE 15, YOU CAN SEE IT, THE FRONT SURFACE WAS

14   COMPLETELY FLAT ALL THE WAY ACROSS THE FRONT.  THAT

15   WAS AN IMPORTANT DESIGN ELEMENT; RIGHT?

16   A    YES.

17   Q    IN FACT, I BELIEVE YOU TESTIFIED TO THIS, BUT

18   ISN'T IT TRUE THAT THE DESIGN HERE INTENTIONALLY

19   WAS THAT THE BEZEL, OR THIS RIM, WAS INTENTIONALLY

20   DESIGNED TO BE NOMINALLY FLUSH WITH THE GLASS?  IS

21   THAT RIGHT?

22   A    YES.

23   Q    AND YOU COULD HAVE DESIGNED A PHONE WHERE THE

24   BEZEL PROTRUDED BEYOND THE GLASS, BUT YOU

25   INTENTIONALLY CHOSE NOT TO DO THAT; RIGHT?

```
1     A     YES.

2     Q     EVEN THOUGH IT WAS MORE EXPENSIVE TO DO IT

3     THAT WAY; RIGHT?

4           LET ME ASK YOU, WOULD YOU -- WOULD IT

5     HAVE BEEN MORE EXPENSIVE -- WOULD IT HAVE BEEN LESS

6     EXPENSIVE TO DO A BEZEL THAT PROTRUDED BEYOND THE

7     GLASS?

8     A     THAT'S -- I DON'T UNDERSTAND HOW YOU CAN

9     DETERMINE THE COST ASSOCIATED WITH THAT DETAIL.

10    Q     YOU DON'T UNDERSTAND HOW YOU COULD EXAMINE THE

11    COSTS?  YOU REMEMBER ON DIRECT YOU TESTIFIED ABOUT

12    HOW CERTAIN DESIGN ASPECTS COST MORE?  COULD YOU --

13    A     COULD YOU PLEASE REPEAT YOUR QUESTION?

14    Q     SURE.  SO ONE OF THE THINGS THAT WAS IMPORTANT

15    ABOUT THIS DESIGN PATENT, CORRECT ME IF I'M WRONG,

16    WAS THAT YOU WANTED TO HAVE COMPLETELY FLAT, ALL

17    THE WAY ACROSS THE FRONT SURFACE, AND THE BEZEL BE

18    FLUSH WITH THE GLASS FRONT SURFACE, WOULDN'T

19    PROTRUDE ABOVE IT.  FAIR?

20    A     THAT'S CORRECT.

21    Q     AND THAT WAS IMPORTANT TO YOUR DESIGN?

22    A     YES.

23    Q     SOMETHING THAT DISTINGUISHED IT FROM OTHER

24    DESIGNS PREVIOUSLY; RIGHT?

25    A     THIS -- THAT WAS OUR DESIGN.
```

1    Q    OKAY.  AND DOING THAT ACTUALLY WAS MORE

2    EXPENSIVE, WASN'T IT?

3    A    IT CREATED ISSUES WITH -- IN TERMS OF

4    ENGINEERING.

5         BUT I CANNOT SAY IT WAS MORE EXPENSIVE.

6    IT WAS MORE DIFFICULT.

7    Q    WOULD YOU SAY THAT IT'S FAIR TO SAY THAT

8    POSITIONING THE GLASS FLUSH WITH THE SURROUNDING

9    BEZEL PRESENTED MANUFACTURING DIFFICULTIES DUE TO

10   THE FRAGILE MATERIAL THAT YOU DECIDED TO USE,

11   NAMELY, THE GLASS?

12   A    NOT MANUFACTURING DETAILS.

13   Q    WELL, DO YOU REMEMBER YOU SUBMITTED A WITNESS

14   STATEMENT EARLIER WITH RESPECT TO THE INITIAL

15   IPHONE?

16   A    YES.

17   Q    CAN WE LOOK AT -- IS THAT IN THE BINDER?

18        DO YOU REMEMBER IN AN ITC CASE ON THE

19   '796 YOU SUBMITTED A WITNESS STATEMENT WITH RESPECT

20   TO THE INITIAL IPHONE?

21   A    YES, I DO.

22   Q    OKAY.  AND CAN WE --

23        MR. MCELHINNY:  DO YOU HAVE A COPY?  OH,

24   OKAY.

25        MR. VERHOEVEN:  CAN WE PUT UP --

```
1    Q    YOU WERE AT -- THE WITNESS STATEMENT HAD
2    QUESTIONS AND ANSWERS IN WRITTEN FORM.
3              DO YOU REMEMBER THAT?
4    A    YES.
5    Q    AND YOU SIGNED IT; RIGHT?
6    A    YES.
7    Q    YOU SWORE THAT WHAT WAS IN THERE WAS TRUE AND
8    CORRECT?
9    A    YES.
10   Q    OKAY.  I'D LIKE TO PUT UP QUESTION 76 IN AND
11   YOUR ANSWER FROM THAT WITNESS STATEMENT.
12             THE COURT:  IS THIS AN EXHIBIT?
13             MR. VERHOEVEN:  THIS WAS DESIGNATED, YOUR
14   HONOR.
15             MR. MCELHINNY:  IT'S NOT AN EXHIBIT
16   THAT'S BEING USED FOR IMPEACHMENT.  I THOUGHT
17   MR. VERHOEVEN JUST ESTABLISHED THAT RULE.
18             THE COURT:  OKAY.  SO IT'S NOT IN THIS
19   BINDER?
20             MR. MCELHINNY:  IT'S NOT, YOUR HONOR.
21             THE COURT:  OKAY.
22             MR. MCELHINNY:  AND WE OBJECT TO IT FOR
23   THAT REASON, YOUR HONOR.  IT VIOLATES THE RULES.
24             THE COURT:  WE'LL WORK THIS OUT LATER.
25   OVERRULED.
```

```
1              GO AHEAD.

2              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

3    Q    DO YOU SEE YOU WERE ASKED, "QUESTION:  DID YOU

4    FACE MANUFACTURING DIFFICULTIES IN DESIGNING THE

5    ORIGINAL IPHONE?  CAN YOU PLEASE PROVIDE SOME

6    EXAMPLES?"

7              AND YOU PROVIDED AN ANSWER?

8    A    YES.

9    Q    AND IT'S A MULTI-PART ANSWER AND I'M JUST

10   GOING TO DIRECT YOUR ATTENTION TO THE FOURTH PART

11   OF YOUR ANSWER WHERE IT SAYS FOURTH HERE.

12             DO YOU SEE THAT, SIR?

13   A    YES.

14   Q    I'LL READ IT INTO THE RECORD.  "FOURTH, WE

15   POSITIONED THE GLASS TO BE FLUSH WITH THE

16   SURROUNDING BEZEL.  EACH OF THESE DESIGN CHOICES

17   PRESENTED MANUFACTURING DIFFICULTIES DUE TO THE

18   FRAGILE NATURE OF THE MATERIAL THAT WE HAD DECIDED

19   TO USE, NAMELY, GLASS."

20             DO YOU SEE THAT?

21   A    YES.

22   Q    AND THAT'S AN ACCURATE STATEMENT; RIGHT?

23   A    YES.

24   Q    OKAY.  SO YOU WOULD AGREE WITH ME THAT

25   POSITION -- CAN WE GO BACK TO THE '087 FIGURES WE
```

1    WERE LOOKING AT, PLEASE.

2              AND AGAIN, LOOKING AT FIGURE 16 AND 15,

3    THE SIDE VIEWS, POSITIONING -- AN IMPORTANT DESIGN

4    ELEMENT HERE WAS POSITIONING THE GLASS FLUSH WITH

5    THE BEZEL; RIGHT?

6    A    YES.

7    Q    EVEN THOUGH THAT MIGHT PRESENT SOME

8    MANUFACTURING DIFFICULTIES; CORRECT?

9    A    I AGREE.

10   Q    OKAY.  NOW, LET'S TURN TO THE FRONT FACE --

11   ACTUALLY, CAN WE GO BACK A PAGE, PLEASE.  ONE MORE.

12             LET'S GO TO THE '677 PATENT, WHICH SHOULD

13   BE IN YOUR BINDER.  I'M SORRY, '678.

14             I APOLOGIZE, YOUR HONOR.

15             (PAUSE IN PROCEEDINGS.)

16             MR. VERHOEVEN:  HERE IT IS.  IT'S IN YOUR

17   BINDER AT 1043.

18             MR. MCELHINNY:  WHAT EXHIBIT ARE YOU ON?

19             MR. VERHOEVEN:  IT'S JOINT TRIAL EXHIBIT

20   1043.  AND LET'S GO TO -- A PAGE INTO THE FIGURE.

21   Q    THIS IS ANOTHER DESIGN PATENT THAT YOU

22   TESTIFIED ABOUT ON DIRECT.  DO YOU REMEMBER?

23   A    YES.

24   Q    AND THIS IS ALSO A DESIGN PATENT THAT

25   CORRESPONDS TO THE INITIAL IPHONE; IS THAT RIGHT?

1    A    YES.

2    Q    AND DO YOU SEE THERE'S THIS ELEMENT UP HERE,

3    I'M CIRCLING IT AT THE TOP OF THE PHONE THERE?

4    A    YES.

5    Q    CAN YOU DESCRIBE FOR THE JURY WHAT THAT IS?

6    A    THAT IS THE RECEIVER DETAIL.

7    Q    IS THAT THE LOZENGE SHAPE DESIGN ELEMENT ON

8    THE PHONE?

9    A    YES, THAT'S THE OPENING FOR THE RECEIVER.

10   Q    AND THAT'S ANOTHER DESIGN ELEMENT IN THE

11   MINIMALIST DESIGN FOR THE INITIAL IPHONE; CORRECT?

12   A    CORRECT.

13   Q    AND IT WAS IMPORTANT FOR YOUR DESIGN TEAM,

14   WITH RESPECT TO THAT DESIGN ELEMENT, TO MAKE SURE

15   IT WAS CENTERED HORIZONTALLY; IS THAT CORRECT?

16   A    CAN YOU BE MORE SPECIFIC OF WHAT YOU MEAN BY

17   "CENTERED HORIZONTALLY"?

18   Q    SURE.  SO IF THIS IS HORIZONTAL FROM THE

19   BOTTOM TO THE TOP OF THE PHONE, DO YOU FOLLOW ME?

20   A    THAT IS VERTICAL TO ME, BUT, YES, IT'S

21   CENTERED ON THAT AXIS.

22   Q    OKAY.  LET'S SAY CENTERED VERTICALLY THEN.

23   A    YES.

24   Q    CAN I ASK THE QUESTION ONE MORE TIME FOR THE

25   RECORD?

```
1    A    PLEASE DO.

2    Q    IT WAS IMPORTANT TO YOU, AS THE DESIGN TEAM,

3    THAT THAT LOZENGE SHAPED DESIGN ELEMENT BE CENTERED

4    VERTICALLY ON THE PHONE; RIGHT?

5    A    YES.

6    Q    AND THAT -- AND THAT'S BETWEEN THE TOP OF THE

7    DISPLAY ELEMENT, WHICH WE SEE RIGHT HERE, AND THE

8    TOP OF THE PHONE?  IS THAT CORRECT?

9    A    CENTERED THAT WAY ALSO, YES.

10   Q    OKAY.  SO IT'S CENTERED IN BOTH WAYS?

11   A    YES.

12   Q    OKAY.  AND THAT WAS AN IMPORTANT DESIGN

13   ELEMENT FOR THE INITIAL IPHONE; CORRECT?

14   A    YES.

15   Q    OKAY.  IT WAS ALSO IMPORTANT TO YOU AND THE

16   DESIGN TEAM OF THE INITIAL IPHONE THAT THE DESIGN

17   BE MINIMALISTCI.  FAIR?

18   A    THAT'S NOT THE WORD THAT I WOULD USE.

19   Q    NOT HAVE A LOT OF BUTTONS ON IT?  NOT HAVE A

20   LOT OF ORNAMENTATION ON IT?

21   A    TO BE SIMPLE.

22   Q    TO BE SIMPLE.

23         IN FACT, YOU WANTED TO CREATE A PRODUCT

24   THAT EMBODIED THE SIMPLEST OF ICONS, AND ONE KEY

25   IMAGE WAS THAT OF A DARK, OILY POND.  IS THAT
```

```
1    RIGHT?

2    A    YES.

3    Q    THAT WAS YOUR DESIGN GOAL; RIGHT?

4    A    THAT WAS ONE --

5    Q    GO AHEAD.

6    A    THAT WAS ONE DESCRIPTION OF A DESIGN GOAL,

7    YES.

8    Q    YOU DIDN'T WANT TO PUT MULTIPLE BUTTONS ON THE

9    FACE OF THE PHONE; CORRECT?

10   A    CORRECT.

11   Q    YOU WANTED IT TO BE AS SIMPLE AS POSSIBLE?

12   A    YES.

13   Q    ALL RIGHT.  LET'S TURN TO THE '889 DESIGN

14   PATENT, WHICH YOU'RE ALSO LISTED AS AN INVENTOR ON.

15            THIS IS JX 1040 IN YOUR WITNESS BINDER IF

16   YOU'D LIKE.

17            AND IF WE COULD GO TO PAGE 146 OF JX

18   1040.

19            JUST FOR THE RECORD, YOU'RE AN INVENTOR

20   ON THE '889 DESIGN PATENT; CORRECT?

21   A    YES.

22   Q    AND YOU'RE FAMILIAR WITH THIS DESIGN PATENT?

23   A    YES.

24   Q    NOW, WITH RESPECT TO THE '889 DESIGN PATENT,

25   ISN'T IT CORRECT THAT THE DESIGN TEAMS' OBJECTIVES
```

```
 1    WERE TO REDUCE THE PRODUCT TO WHAT WAS ESSENTIALLY
 2    A SINGLE, SEAMLESS VESSEL, WHICH WAS THE REAR
 3    HOUSING?
 4    A    THAT WAS THE INSPIRATION OF THIS DESIGN, YES.
 5    Q    AND ANOTHER IMPORTANT DESIGN GOAL WAS TO HAVE
 6    JUST ONE GAP IN THE PRODUCT BETWEEN THE BACK
 7    HOUSING AND WHAT YOU REFER TO AS THE CLEAR GLASS
 8    BEZEL THAT EXTENDS ALL THE WAY ACROSS THE FRONT;
 9    RIGHT?
10    A    YES.
11    Q    SORRY.  WAS THAT YES?
12    A    YES.
13    Q    YOU WANTED A SINGLE PIECE OF REAR HOUSING;
14    RIGHT?
15    A    THAT WAS THE INSPIRATION FOR THE DESIGN, YES.
16    Q    NOW --
17              MAY I APPROACH THE WITNESS WITH A
18    PHYSICAL EXHIBIT, YOUR HONOR?
19              THE COURT:  PLEASE, GO AHEAD.
20              MR. VERHOEVEN:  (HANDING.)
21              THE WITNESS:  THANK YOU.
22              MR. MCELHINNY:  I DON'T BELIEVE THAT
23    EXHIBIT HAS BEEN MARKED, YOUR HONOR.
24              MR. VERHOEVEN:  YOUR HONOR, THE EXHIBIT
25    HAS BEEN IN THE EXCLUSIVE CUSTODY OF APPLE AND
```

```
1    THEY'VE RETAINED POSSESSION OF IT.  WE'D BE HAPPY

2    TO MARK IT WITH THE NEXT APPROPRIATE NUMBER.

3            MR. MCELHINNY:  I'M NOT OBJECTING TO IT.

4    I'M TRYING TO GET MR. VERHOEVEN A CLEAR RECORD.

5            THE COURT:  WHAT NUMBER SHOULD IT BE?

6            MR. VERHOEVEN:  WELL, IT'S ACTUALLY BEEN

7    MARKED AS DX 741.

8            THE COURT:  DX?  I'M SORRY.  CAN YOU

9    REPEAT THAT, PLEASE?

10           MR. VERHOEVEN:  DX 741, YOUR HONOR.

11           THE COURT:  OKAY.

12           (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

13           741 WAS MARKED FOR IDENTIFICATION.)

14   BY MR. VERHOEVEN:

15   Q    NOW, YOU'VE SEEN THIS -- I'VE BEEN REFERRING

16   TO THIS AS APPLE MODEL 035.  WILL YOU UNDERSTAND

17   THAT'S WHAT I'M REFERRING TO?

18   A    YES.

19   Q    IT SAYS IT RIGHT ON THE BACK; RIGHT?

20   A    ABSOLUTELY.

21   Q    SO DX 741 IS APPLE MODEL 035.  FAIR?

22   A    EXCUSE ME.  WHAT WAS THE FIRST NUMBER AGAIN?

23   Q    THE EXHIBIT NUMBER WE JUST MARKED THAT AS, DX

24   741, CORRESPONDS TO APPLE MODEL 035?  FAIR?

25   A    I BELIEVE SO.
```

1    Q    AND YOU'VE SEEN THIS MODEL 035 BEFORE;

2    CORRECT?

3    A    YES.

4    Q    AND IF YOU LOOK AT -- IF WE CAN PUT ON THE

5    SCREEN DX 740, HERE WE HAVE -- AND THIS SHOULD BE

6    IN YOUR BINDER AS WELL IF YOU'D LIKE TO LOOK AT THE

7    HARD COPY IMAGES, SIR.

8    A    YES, I SEE IT.

9    Q    I DON'T HAVE MY HARD COPY YET, SO I'M GOING TO

10   GET MY HARD COPY, TOO.

11            MR. MCELHINNY:  YOUR HONOR, THIS EXHIBIT

12   HAS NOT BEEN MOVED INTO EVIDENCE.  I'M NOT SURE IT

13   SHOULD BE PUBLISHED.

14            THE COURT:  IS THERE GOING TO BE AN

15   OBJECTION?

16            MR. MCELHINNY:  IT DEPENDS ON WHETHER OR

17   NOT THERE'S A FOUNDATION THAT'S LAID, YOUR HONOR.

18            THE COURT:  ALL RIGHT.  LAY THE

19   FOUNDATION, PLEASE.

20            MR. VERHOEVEN:  OKAY.

21   Q    YOU'VE SEEN THESE IMAGES BEFORE, THESE PHOTOS;

22   RIGHT, SIR?

23   A    I BELIEVE I MAY HAVE SEEN THEM IN DEPOSITION.

24   Q    AND YOU'VE STUDIED THOSE PHOTOS AND YOU

25   COMPARED THEM TO THE APPLE MODEL 035, WHICH IS

1   MARKED AS DX 741; CORRECT?

2   A     I BELIEVE THAT IS TRUE.

3   Q     AND IT'S YOUR OPINION, IN FACT, YOU'RE

4   CONVINCED FROM STUDYING THEM BOTH THAT THEY ARE ONE

5   AND THE SAME?  IN OTHER WORDS, THE PHOTOS ARE

6   PICTURES OF APPLE MODEL 035; RIGHT?

7   A     I DO RECALL SUCH AN EXERCISE OF COMPARING THE

8   MODEL AND THE PHOTOS.  I THINK THESE ARE THOSE

9   PHOTOS, I THINK THIS IS THAT MODEL, SO IT FEELS

10  TRUE.

11  Q     OKAY.  AND YOU AGREE WITH ME THAT THE APPLE

12  MODEL 035 AND THE CORRESPONDING PICTURES ARE

13  EMBODIMENTS OF THE '889 DESIGN PATENT; RIGHT?

14          MR. MCELHINNY:  OBJECTION, YOUR HONOR.

15  CALLS FOR A LEGAL CONCLUSION FROM THIS WITNESS.

16          MR. VERHOEVEN:  YOUR HONOR, ON DIRECT THE

17  WITNESS TESTIFIED TO THE EXACT QUESTION WITH

18  RESPECT TO OTHER APPLE PHYSICAL EXHIBITS --

19          MR. MCELHINNY:  NO, WE'RE --

20          MR. VERHOEVEN:  -- IN TESTIMONY ELICITED

21  BY MR. MCELHINNY.

22          MR. MCELHINNY:  THE WORD "EMBODIMENT,"

23  WHICH IS A LEGAL WORD, WAS NEVER USED IN ANY

24  QUESTION THAT I ASKED.

25          THE COURT:  WHY DON'T YOU REPHRASE THE

```
 1    QUESTION, PLEASE?

 2    BY MR. VERHOEVEN:

 3    Q    THE SPECIFIC PHYSICAL MODEL, APPLE MODEL 035,

 4    IS THE SAME MODEL OR MOCK-UP APPEARS IN PHOTOGRAPHS

 5    THAT WERE SUBMITTED TO THE PATENT OFFICE TOGETHER

 6    WITH THE '889 PATENT APPLICATION?  ISN'T THAT TRUE,

 7    SIR?

 8              MR. MCELHINNY:  AGAIN, THAT LACKS

 9    FOUNDATION FROM THIS WITNESS, YOUR HONOR.

10              THE COURT:  IF YOU KNOW, SIR, GO AHEAD.

11              AND IF YOU COULD LAY THE FOUNDATION.

12              BUT IF YOU KNOW, SIR, YOU CAN ANSWER.

13              THE WITNESS:  YOU -- COULD YOU REPEAT THE

14    QUESTION?  YOU WERE ASKING ABOUT PHOTOGRAPHS WITH

15    THE PATENT APPLICATION?

16    BY MR. VERHOEVEN:

17    Q    YOU'RE AWARE THAT PHOTOGRAPHS WERE TAKEN OF

18    THE APPLE MODEL 035; RIGHT?

19    A    I SEE PHOTOGRAPHS OF 035.

20    Q    AND THOSE PHOTOGRAPHS WERE SUBMITTED TO THE

21    PATENT OFFICE AS PART OF THE PROSECUTION OF WHAT

22    BECAME THE '889 PATENT; ISN'T THAT TRUE, SIR?

23    A    I DON'T RECALL THE SPECIFICS OF SUCH AN

24    ATTACHMENT.

25    Q    WELL, YOU'RE AN INVENTOR ON THE PATENT; RIGHT?
```

```
 1                MR. MCELHINNY:  ARGUMENTATIVE, YOUR

 2     HONOR.

 3                THE COURT:  OVERRULED.

 4                YOU CAN ANSWER.  GO AHEAD.

 5                THE WITNESS:  YES, I AM.

 6     BY MR. VERHOEVEN:

 7     Q    IN YOUR --

 8                JUST ONE SECOND, YOUR HONOR.

 9                (DISCUSSION OFF THE RECORD BETWEEN

10     DEFENSE COUNSEL.)

11     BY MR. VERHOEVEN:

12     Q    ALL RIGHT.  WOULD YOU AGREE WITH ME, SIR, THAT

13     APPLE MODEL 035 INCORPORATES THE '889 DESIGN?

14     A    I BELIEVE THAT THE '889 PATENT REPRESENTS THIS

15     DESIGN.

16     Q    OKAY.  NOW, YOU TESTIFIED AT THE END OF YOUR

17     DIRECT TESTIMONY ABOUT SAMSUNG PHONES.

18     A    CORRECT.

19     Q    YOU'VE SEEN THE FOUR SOFT BUTTONS AT THE

20     BOTTOM OF SAMSUNG PHONES?

21     A    WOULD YOU LIKE TO SHOW ME WHAT YOU MEAN?

22     Q    WELL, YOU'RE THE ONE WHO TESTIFIED ON DIRECT

23     ALL ABOUT HOW IT WAS A RIP OFF.  DO YOU REMEMBER --

24                MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.

25     BY MR. VERHOEVEN:
```

```
1    Q    DO YOU REMEMBER, SIR, LOOKING AT SOFT BUTTONS

2    AT THE BOTTOM OF THE SAMSUNG PHONES?

3              MR. MCELHINNY:  OBJECTION, YOUR HONOR.

4    THAT'S NOT A QUESTION.  HE'S ARGUING WITH THE

5    WITNESS.

6              THE COURT:  OVERRULED.

7              YOU CAN ANSWER.

8              THE WITNESS:  COULD YOU REPEAT THE

9    QUESTION, PLEASE?

10   BY MR. VERHOEVEN:

11   Q    DO YOU REMEMBER, YES OR NO, WHEN YOU LOOKED AT

12   THE SAMSUNG PHONES TO FORM THE OPINION AND THE

13   TESTIMONY THAT YOU GAVE BEFORE THE JURY, WHETHER

14   THEY HAD FOUR SOFT BUTTONS AT THE BOTTOM?

15   A    I HAVE SEEN MANY SAMSUNG PHONES.  I DO NOT

16   REMEMBER THE EXACT DETAILS OF SOFTWARE BUTTONS.

17   Q    SO YOU DON'T REMEMBER WHETHER THEY HAD BUTTONS

18   ON THE BOTTOM?

19   A    I -- LIKE I SAID, I'VE SEEN MANY SAMSUNG

20   PHONES.  I DO NOT KNOW THAT THEY'RE ALL THE SAME IN

21   TERMS OF THEIR BUTTON ARRANGEMENTS AT THE BOTTOM.

22   Q    HAVE YOU EVER SEEN ANY SAMSUNG PHONES THAT

23   HAVE FOUR SOFT BUTTONS AT THE BOTTOM?

24   A    I WOULD LIKE YOU TO SHOW ME THE PHONE.  THIS

25   COULD BE A TRICK QUESTION.  I DON'T KNOW.
```

1     Q    I'M JUST ASKING YOU, HAVE YOU EVER SEEN A

2   SAMSUNG PHONE THAT HAD FOUR SOFT BUTTONS AT THE

3   BOTTOM?

4     A    IF YOU SHOWED ME THE PHONE, I COULD DETERMINE

5   THAT THERE ARE FOUR SOFT BUTTONS.

6     Q    THAT'S NOT MY QUESTION, SIR.  MY QUESTION IS,

7   HAVE YOU SEEN A SAMSUNG PHONE THAT HAD FOUR SOFT

8   BUTTONS AT THE BOTTOM?

9     A    I CANNOT RECALL IT IT'S THREE OR FOUR.  I

10  CANNOT RECALL.

11    Q    HAVE YOU SEEN ANY PHONE, ANY SMARTPHONE THAT

12  HAD FOUR SOFT BUTTONS AT THE BOTTOM?

13    A    QUITE POSSIBLY.

14    Q    DID YOU THINK THEY WERE BEAUTIFUL?

15    A    CLEARLY THEY DID NOT STICK IN MY MIND.

16    Q    NOW, YOU TESTIFIED ON DIRECT ABOUT BUTTONS AND

17  HOW SOMETIMES YOU MIGHT DO 50 DIFFERENT MODELS OF A

18  BUTTON.  DO YOU REMEMBER THAT?

19    A    THAT'S CORRECT.

20    Q    HOW MANY MODELS DID YOU DO OF THE HOME BUTTON?

21    A    I COULD NOT GIVE YOU AN EXACT NUMBER, BUT I'M

22  SURE THERE WERE MANY.

23    Q    OVER TEN?

24    A    VERY LIKELY.

25    Q    OVER 100?

```
 1    A    MAYBE NOT.

 2    Q    WHAT'S YOUR BEST ESTIMATE?

 3    A    I WILL NOT ESTIMATE BECAUSE I DO NOT KNOW.

 4    Q    DID YOU WORK ON THE DIFFERENT MODELS OF THE

 5    HOME BUTTON?

 6    A    YES.

 7    Q    AND WHY WERE THERE SO MANY MODELS OF THE HOME

 8    BUTTON DONE?

 9    A    TO GET IT EXACTLY RIGHT.

10    Q    BECAUSE SMALL DETAILS MATTER; RIGHT?

11    A    ABSOLUTELY.

12    Q    AS AN APPLE INDUSTRIAL DESIGNER, YOU TESTIFIED

13    ABOUT THE WORK YOU DID TO COME UP WITH YOUR DESIGNS

14    ON DIRECT.

15         DO YOU REMEMBER THAT?  YOU TESTIFIED

16    GENERALLY ABOUT SITTING AROUND THE KITCHEN TABLE

17    AND ALL THAT.

18    A    YES.

19    Q    ONE OF THE THINGS THAT YOU ALSO DO AS AN

20    INDUSTRIAL DESIGNER IS YOU PAY ATTENTION TO MOBILE

21    PHONES AND SMARTPHONES MANUFACTURED AND SOLD BY

22    YOUR COMPETITORS, DON'T YOU?

23    A    ON OCCASION WE PAY SOME ATTENTION.

24    Q    YOU ACTUALLY GET COMPETITIVE ANALYSES DONE AND

25    REVIEW THOSE OF YOUR COMPETITION, DON'T YOU?
```

```
 1    A    THERE IS A COMPETITIVE ANALYSIS EXERCISE

 2    THAT'S PERFORMED BY OUR PRODUCT DESIGN.

 3    Q    AND YOU OCCASIONALLY REQUEST THAT SO YOU CAN

 4    SEE WHAT THE COMPETITION IS DOING AS PART OF YOUR

 5    DESIGN WORK; RIGHT?

 6    A    VERY RARELY DO WE MAKE ANY SUCH REQUESTS.  WE

 7    ARE SHOWN THESE COMPETITIVE ANALYSIS.

 8    Q    WELL, LET'S LOOK AT DX 687.  AND IF WE COULD

 9    BLOW UP THE TOP PART OF THIS.

10          DO YOU SEE -- DO YOU SEE YOUR NAME IS UP

11    THERE, CHRIS STRINGER?

12    A    I SEE THAT.

13    Q    AND IF WE COULD GO TO PAGE 2 OF THIS DOCUMENT

14    AND ABOUT A THIRD OF THE WAY DOWN WHERE IT SAYS "ON

15    JANUARY 19TH, 2011," CAN WE BRING THAT UP?

16          THIS IS AN E-MAIL STRING, THIS DOCUMENT;

17    RIGHT?

18    A    YES, IT IS.

19    Q    SO THIS IS PART OF THE E-MAIL STRING?

20    A    YES, IT IS.

21    Q    AND THIS PART OF IT IS AN E-MAIL THAT YOU

22    WROTE ON JANUARY 19TH, 2011 AT 2:14 P.M.; CORRECT?

23    A    THAT IS CORRECT.

24    Q    AND YOU SENT IT TO PAUL.  WHO'S PAUL?

25    A    PAUL IS -- I BELIEVE HIS TITLE IS ENGINEERING
```

1    PROGRAM MANAGER.  HE WORKS IN THE IPAD DIVISION.

2    Q    AND YOU SAID TO PAUL, QUOTE, "I NEED YOUR

3    LATEST SUMMARY OF OUR ENEMIES FOR AN I.D.

4    BRAINSTORM ON FRIDAY."

5            DO YOU SEE THAT, SIR?

6    A    I SEE THAT.

7    Q    I.D. STANDS FOR?

8    A    INDUSTRIAL DESIGN.

9    Q    SO YOU HAD AN INDUSTRIAL DESIGN BRAINSTORMING

10   SESSION COMING UP ON FRIDAY; RIGHT?

11   A    THAT'S WHAT IT SAYS.

12   Q    AND YOU'RE ASKING PAUL TO GIVE YOU HIS LATEST

13   SUMMARY OF, QUOTE, "OUR ENEMIES," CLOSED QUOTE.  DO

14   YOU SEE THAT?

15   A    THAT'S CORRECT.

16   Q    IS THAT SAMSUNG?

17   A    IN THIS INSTANCE, YES.

18   Q    OKAY.  AND THE SUMMARY -- THIS IS IN YOUR

19   BINDER IF YOU WANT TO LOOK AT IT -- WE CAN GO TO

20   PAGE 9.

21   A    WHAT IS THE EXHIBIT NUMBER?

22   Q    687, SIR.

23           GO TO PAGE 9, PLEASE.  AND HIGHLIGHT THE

24   TOP PART, BRING IT OUT.  CAN YOU MOVE IT OVER A

25   LITTLE BIT?  THANK YOU.

```
 1              THIS SUMMARY LISTS A NUMBER OF YOUR

 2    COMPETITORS, DOESN'T IT?

 3    A    IT DOES.

 4    Q    THERE'S THE PLAYBOOK --

 5              WHY DON'T WE HAVE THIS ON THE SCREEN?

 6              MR. MCELHINNY:  BECAUSE IT'S NOT IN

 7    EVIDENCE.

 8              MR. VERHOEVEN:  OH, IT'S NOT IN EVIDENCE.

 9              YOUR HONOR, I MOVE THIS INTO EVIDENCE.

10    THE WITNESS HAS AUTHENTICATED IT.

11              THE COURT:  ANY OBJECTION.

12              MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

13              THE COURT:  I DIDN'T HEAR YOU.  WHAT?  NO

14    OBJECTION?

15              MR. MCELHINNY:  NO OBJECTION.

16              THE COURT:  IT'S ADMITTED.

17              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

18              687, HAVING BEEN PREVIOUSLY MARKED FOR

19              IDENTIFICATION, WAS ADMITTED INTO

20              EVIDENCE.)

21              MR. VERHOEVEN:  SO IT HASN'T BEEN ON THE

22    SCREEN YET?

23              OKAY.  LET'S GO BACK, JUST FOR

24    COMPLETENESS.

25              I APOLOGIZE, YOUR HONOR.  I THOUGHT IT
```

```
1    WAS ON THE SCREEN.

2              GO TO PAGE 2.  AND BRING OUT --

3    Q    THIS IS WHAT WE WERE JUST TALKING ABOUT FROM

4    PAGE 2; RIGHT?

5    A    YES.

6    Q    WHERE YOU SAID, "PAUL, I NEED YOUR LATEST

7    SUMMARY OF OUR ENEMIES FOR THE I.D. BRAINSTORM ON

8    FRIDAY."

9              DO YOU SEE THAT?

10   A    I DO.

11   Q    AND THEN IF WE GO TO 9, PAGE 9, AND HIGHLIGHT

12   THAT AGAIN ONE MORE TIME, PLEASE.

13             THAT'S A LITTLE BIT HARD TO READ.  MAYBE

14   WE COULD JUST HIGHLIGHT THE TOP FEW ROWS SO WE CAN

15   SEE BETTER.  THAT DOESN'T LOOK MUCH BETTER.

16             BUT YOU CAN SORT OF SEE THERE'S THE

17   PLAYBOOK.  DO YOU SEE THAT, MR. STRINGER?

18   A    YES.

19   Q    WHO MAKES THE PLAYBOOK?

20   A    COULD YOU ZOOM IN?  I CAN'T READ IT.

21   Q    YOU DON'T KNOW WHO MAKES THE PLAYBOOK?

22   A    NOT OFF THE TOP OF MY HEAD.

23   Q    OKAY.  AND THEN THERE'S THE GALAXY TAB.  DO

24   YOU SEE THAT?

25   A    YES.
```

1    Q    AND THAT'S ONE OF THE PRODUCTS THAT'S BEING

2    ACCUSED IN THIS CASE?

3    A    YES.

4    Q    RIGHT?  AND ON THE LEFT-HAND SIDE, IT SAYS OS,

5    PROCESSOR, RAM, AND A BUNCH OF OTHER DETAILS.

6            DO YOU SEE THAT?

7    A    YES.

8    Q    SO ISN'T IT TRUE THAT YOU WANTED THIS

9    INFORMATION FOR YOUR BRAINSTORMING SESSION SO YOU

10   COULD ASSESS AND YOU AND THE OTHER DESIGN TEAM

11   MEMBERS COULD ASSESS WHAT YOUR COMPETITORS ARE

12   DOING?

13   A    WE WERE INTERESTED IN UNDERSTANDING THE

14   FEATURE SETS AND OVERALL DIMENSIONS OF COMPETITIVE

15   PRODUCTS.

16   Q    YOU WERE INTERESTED IN KNOWING WHAT THEY WERE

17   DOING?

18   A    WE WERE INTERESTED IN UNDERSTANDING THOSE

19   FACTS.

20   Q    SO YOU ANALYZED THEIR PRODUCTS AND THE

21   PARAMETERS OF THEIR PRODUCTS, DIDN'T YOU?

22   A    WE PAID ATTENTION TO THE FEATURE SET AND WE

23   WERE VERY INTERESTED IN THE DIMENSIONS.

24   Q    IS THERE ANYTHING WRONG WITH DOING THAT?

25   A    NO.

```
 1              MR. VERHOEVEN:  PASS THE WITNESS, YOUR

 2    HONOR.

 3              THE COURT:  YOU'RE DONE?

 4              MR. VERHOEVEN:  PASS THE WITNESS.

 5              THE COURT:  OKAY.  ALL RIGHT.  IT IS NOW

 6    4:20.

 7              MR. MCELHINNY:  I HAVE ONE REDIRECT

 8    QUESTION, YOUR HONOR.

 9              THE COURT:  ALL RIGHT.  GO AHEAD.  IT'S

10    4:20.  IT'S ALL YOURS.

11              MR. MCELHINNY:  I'M ON THE CLOCK HERE.

12                    REDIRECT EXAMINATION

13    BY MR. MCELHINNY:

14    Q   SIR, THE LAST DOCUMENT THAT WAS VIEWED, WAS

15    THAT USED FOR DESIGN INSPIRATION ON HOW TO DESIGN

16    SOME NEW APPLE PRODUCT?

17    A   ABSOLUTELY NOT.

18              MR. MCELHINNY:  NOTHING FURTHER, YOUR

19    HONOR.

20              THE COURT:  ALL RIGHT.

21              ANY RECROSS, MR. VERHOEVEN?

22              MR. VERHOEVEN:  JUST ONE SECOND, YOUR

23    HONOR.  I'M SORRY.

24              (DISCUSSION OFF THE RECORD BETWEEN

25    DEFENSE COUNSEL.)
```

```
 1              MR. VERHOEVEN:  JUST SOME HOUSEKEEPING

 2     MATTERS.  I'VE BEEN INFORMED I FAILED TO MOVE IN

 3     EXHIBIT 740.

 4              THE COURT:  ANY OBJECTION?

 5              MR. MCELHINNY:  NO OBJECTION.

 6              THE COURT:  IT'S ADMITTED.

 7              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 8              740, HAVING BEEN PREVIOUSLY MARKED FOR

 9              IDENTIFICATION, WAS ADMITTED INTO

10              EVIDENCE.)

11              MR. VERHOEVEN:  AND 741.

12              THE COURT:  ANY OBJECTION?

13              MR. MCELHINNY:  NO OBJECTION.

14              THE COURT:  SO ADMITTED.

15              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

16              741, HAVING BEEN PREVIOUSLY MARKED FOR

17              IDENTIFICATION, WAS ADMITTED INTO

18              EVIDENCE.)

19              THE COURT:  IS THAT IT, MR. VERHOEVEN?

20              MR. VERHOEVEN:  WELL, THAT -- 741 IS A

21     STIPULATION ABOUT THE PHOTOGRAPHS FROM THE MODEL.

22              AT SOME POINT I'D LIKE TO READ IT INTO

23     THE RECORD.  I COULD DO THAT NOW.  IT'S ADMITTED

24     INTO EVIDENCE, YOUR HONOR.

25              THE COURT:  THAT'S FINE.
```

```
 1              MR. VERHOEVEN:  IT STATES, QUOTE, "APPLE,
 2    INC., THROUGH ITS COUNSEL, STIPULATES AS FOLLOWS:
 3              PARAGRAPH 1.  THE SPECIFIC PHYSICAL MODEL
 4    IDENTIFIED BY APPLE INDUSTRIAL DESIGNER
 5    CHRISTOPHER STRINGER DURING THE NOVEMBER 4TH, 2011
 6    DEPOSITION IDENTIFIES APPLE MODEL 035 IS THE SAME
 7    MODEL OR MOCK-UP APPEARING IN THE PHOTOGRAPHS OF
 8    THE D'889 PATENT PROSECUTION HISTORY PRODUCED BY
 9    APPLE.
10              PARAGRAPH 2.  THE PHOTOGRAPHS FROM THE
11    '889 PATENT PROSECUTION HISTORY PRODUCED BY APPLE
12    ARE THE HIGHEST QUALITY THAT IT HAS FOUND."
13              AND THAT CONCLUDES THE STIPULATION, YOUR
14    HONOR.
15              THE COURT:  ALL RIGHT.
16              ANYTHING FURTHER FOR MR. STRINGER OR IS
17    HE EXCUSED?  IS HE EXCUSED?
18              MR. MCELHINNY:  HE'S EXCUSED, YOUR HONOR.
19              THE COURT:  ALL RIGHT.  AND NOT WITH
20    ANY -- HE'S JUST EXCUSED, PERIOD?  NOT SUBJECT TO
21    RECALL?
22              MR. MCELHINNY:  HE'S EXCUSED.  WE ARE NOT
23    GOING TO HAVE HIM IN THE COURTROOM IN CASE THERE'S
24    A REBUTTAL ISSUE.
25              THE COURT:  ALL RIGHT.  YOU'RE EXCUSED.
```

```
 1              THE WITNESS:  THANK YOU.

 2              DO YOU HAVE YOUR NEXT WITNESS?

 3              MR. MCELHINNY:  I HAVE HIM READY.  IT'LL

 4    TAKE US A COUPLE MINUTES TO GET THE BINDERS OUT,

 5    YOUR HONOR.

 6              THE COURT:  ALL RIGHT.

 7              (PAUSE IN PROCEEDINGS.)

 8              THE COURT:  WHO'S YOUR NEXT WITNESS,

 9    PLEASE?

10              MR. MCELHINNY:  MR. PHILIP SCHILLER, YOUR

11    HONOR.

12              THE COURT:  OKAY.  WE'RE ONLY GOING TO GO

13    UNTIL 4:30, BUT I FIGURE EVEN IF THERE'S SOME

14    PRELIMINARY STUFF WE CAN DO TODAY, LET'S DO IT.

15              MR. MCELHINNY:  YOUR HONOR, APPLE CALLS

16    PHILIP SCHILLER.

17              THE COURT:  OKAY.  THE TIME IS 4:23.

18              THE CLERK:  RAISE YOUR RIGHT HAND,

19    PLEASE.

20                       PHILIP SCHILLER,

21    BEING CALLED AS A WITNESS ON BEHALF OF THE

22    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

23    EXAMINED AND TESTIFIED AS FOLLOWS:

24              THE WITNESS:  I DO.

25              THE COURT:  WOULD YOU HAVE A SEAT UP
```

```
 1     THERE, PLEASE.
 2               MR. MCELHINNY:  YOUR HONOR, WE'RE STILL
 3     PASSING OUT THE BINDERS.  IF I CAN HAVE THAT NOT BE
 4     ON MY TIME, PLEASE.
 5               (PAUSE IN PROCEEDINGS.)
 6               THE CLERK:  WOULD YOU STATE YOUR NAME,
 7     PLEASE, AND SPELL IT?
 8               THE WITNESS:  PHILIP WILLIAM SCHILLER,
 9     THAT'S P-H-I-L-I-P, W-I-L-L-I-A-M, S-C-H-I-L-L-E-R.
10               THE CLERK:  THANK YOU.
11                     DIRECT EXAMINATION
12     BY MR. MCELHINNY:
13     Q    GOOD AFTERNOON, MR. SCHILLER.
14     A    GOOD AFTERNOON.
15     Q    BY WHOM ARE YOU EMPLOYED?
16     A    APPLE.
17     Q    AND WHAT IS YOUR CURRENT POSITION AND TITLE,
18     SIR?
19     A    I AM THE SENIOR VICE-PRESIDENT OF WORLDWIDE
20     MARKETING.
21     Q    AND DOES APPLE HAVE SOMETHING THAT THEY CALL
22     THE EXECUTIVE TEAM?
23     A    YES, WE DO.
24     Q    AND WHAT IS THE EXECUTIVE TEAM?
25     A    IT IS THE GROUP OF EXECUTIVES AT APPLE THAT
```

```
 1    ARE THE MOST SENIOR PEOPLE WHO RUN THE COMPANY AND

 2    WORK FOR THE CEO DIRECTLY, AND WE MEET WEEKLY AND

 3    ARE RESPONSIBLE FOR THE BUSINESS OF THE COMPANY.

 4    Q    ARE YOU A MEMBER OF THE EXECUTIVE TEAM, SIR?

 5    A    YES, I AM.

 6    Q    TO WHOM DO YOU REPORT AT APPLE?

 7    A    TO THE CEO, TIM COOK.

 8    Q    SIR, JUST TO CONNECT VARIOUS LITTLE PIECES IN

 9    MIND.  TODAY SAMSUNG'S COUNSEL SHOWED US A VIDEO OF

10    THE INTRODUCTION AT MAC WORLD OF THE IPHONE AND IN

11    THAT VIDEO, IT SHOWED MR. JOBS SENDING A PICTURE, I

12    THINK OF A HAWAIIAN VACATION, TO SOME GUY NAMED

13    PHIL IN THE AUDIENCE.

14         DO YOU KNOW THAT MR. PHIL THAT WAS IN THE

15    AUDIENCE?

16    A    THAT WOULD BE ME.

17    Q    OKAY.  THANK YOU.

18         CAN YOU -- CAN YOU DESCRIBE FOR US,

19    PLEASE, WHAT YOU WERE -- WHAT YOUR JOB

20    RESPONSIBILITIES ARE AT APPLE?

21    A    SO I RUN THE MAJORITY OF MARKETING AT APPLE

22    COMPUTERS, SO FOR ME, THAT'S A PRETTY LARGE

23    ORGANIZATION.  IT'S MADE UP OF A NUMBER OF

24    MARKETING FUNCTIONS, SOMETHING WE CALL PRODUCT

25    MARKETING, THE MARKETING OF ALL OF OUR PRODUCTS;
```

```
 1    DEVELOPER PROGRAMS; MARKETING COMMUNICATIONS;

 2    INTERNATIONAL MARKETING; BUSINESS MARKETING;

 3    EDUCATION MARKETING; MARKETING FINANCE; LAUNCH,

 4    PRODUCT LAUNCH MARKETING; AND MANY OTHER FUNCTIONS.

 5    Q    DOES APPLE HAVE A SPECIFIC PROCESS BY WHICH IT

 6    DEVELOPS NEW PRODUCTS?

 7    A    YES, WE DO.  WE HAVE SOMETHING WE CALL,

 8    CONVENIENTLY, THE APPLE NEW PRODUCT PROCESS, OR

 9    ANPP, AND IT IS A WELL-DEFINED MANAGED PROCESS BY

10    WHICH WE WORK ON ALL OF THE PRODUCTS AT APPLE.

11          THE PROCESS IS MADE UP OF ALL THE KEY

12    FUNCTIONS AT APPLE THAT ARE RESPONSIBLE FOR MAKING

13    A PRODUCT, SO HARDWARE ENGINEERING, SOFTWARE

14    ENGINEERING, MARKETING, OPERATIONS, FINANCE, AND

15    SUPPORT.

16          AND TOGETHER THAT CROSS-FUNCTIONAL TEAM

17    OF PEOPLE WORK ON EVERY NEW PRODUCT AT APPLE

18    THROUGH A SERIES OF LOGICAL STEPS, STEPS LIKE

19    INVESTIGATION, CONCEPT, DESIGN, PRODUCTION, AND

20    THAT ALL WORKS TOGETHER.

21          AND I THINK THAT'S THE, THAT'S THE WAY

22    THE TEAM WORKS --

23          MR. PRICE:  YOUR HONOR, THIS IS BEYOND

24    THE SCOPE OF THE QUESTION AND A NARRATIVE AT THIS

25    POINT.
```

```
1              THE COURT:  OVERRULED.  BUT PLEASE LET'S

2     NOT HAVE THAT.

3     BY MR. MCELHINNY:

4     Q    LET ME BREAK IT UP, PLEASE.

5              IN THIS NEW PRODUCT PROCESS, COULD YOU

6     PLEASE TELL ME WHAT ROLE YOUR GROUP, THE MARKETING

7     GROUP, PLAYS IN THAT PROCESS?

8     A    MARKETING IS REPRESENTED AS ONE OF THE MEMBERS

9     OF THE TEAM ON EVERY NEW PRODUCT WE CREATE.  WE ARE

10    MEMBERS OF THE APPLE NEW PRODUCT PROCESS TEAM.

11    Q    WHY IS THAT?

12    A    IT'S VERY IMPORTANT AT APPLE THAT THE NEEDS OF

13    THE CUSTOMER AND NEEDS TO COMPETE IN THE

14    MARKETPLACE ARE CONSIDERED WHEN WE CREATE A PRODUCT

15    RIGHT FROM THE BEGINNING, AND SO MARKETING IS AN

16    EQUAL MEMBER OF THE TEAM CREATING OUR PRODUCTS,

17    ALONG WITH THE ENGINEERING AND OPERATIONS TEAM.

18    Q    HAVE YOU EVER HEARD, FROM ANY SOURCE, THE

19    SUGGESTION THAT APPLE DOESN'T LISTEN TO ITS

20    CUSTOMERS IN TERMS OF WHAT THE PRODUCTS SHOULD LOOK

21    LIKE IN THE FUTURE?

22    A    YES, I HAVE HEARD THAT QUITE FREQUENTLY.

23              MR. PRICE:  OBJECTION, YOUR HONOR.

24    RELEVANCE AND CALLS FOR HEARSAY.

25              THE COURT:  SUSTAINED.
```

```
 1    BY MR. MCELHINNY:
 2    Q    SIR, WHAT -- WHAT ROLE DOES CUSTOMER INTEREST
 3    AND DESIRE PLAY IN THIS NEW PRODUCT PROCESSING --
 4    PROCESS THAT YOU DISCUSSED?
 5    A    WE DON'T USE ANY CUSTOMER INPUT INTO THE
 6    CREATION OF OUR PRODUCTS.  WE DON'T USE SURVEYS OR
 7    FOCUS GROUPS OR TYPICAL THINGS OF THAT NATURE THAT
 8    I'VE HEARD MANY OF MY FRIENDS AT OTHER COMPANIES
 9    USE.
10          AT APPLE, THAT PLAYS NO PART IN THE
11    CREATION OR DESIGN OF THE PRODUCTS.
12    Q    SO WHEN YOU SAID YOU REPRESENT THE CUSTOMER'S
13    VIEW, WHAT DOES THAT MEAN?
14    A    THAT OVER OUR YEARS OF DOING MARKETING OF
15    PRODUCTS AT APPLE, WE HAVE A LOT OF OPPORTUNITY TO
16    HAVE CONTACT WITH CUSTOMERS, REVIEWERS, MANY IN OUR
17    INDUSTRY, AND YOU USE THAT ACCUMULATED KNOWLEDGE TO
18    FORMULATE YOUR OWN INSTINCTS, YOUR OWN GUT FEELING,
19    YOUR OWN BELIEF OF WHAT THE RIGHT THING TO DO IS.
20          BUT YOU NEVER GO AND ASK A CUSTOMER
21    DIRECTLY, "WHAT FEATURES DO YOU WANT IN THE NEXT
22    PRODUCT?"
23          IT'S NOT A CUSTOMER'S JOB TO KNOW THAT,
24    SO WE DON'T ASK THEM THAT.
25          WE NEED TO ACCUMULATE THAT KNOWLEDGE
```

```
 1    OURSELVES AND USE THAT TO THEN DEFINE THE PRODUCTS
 2    THAT WE'RE GOING TO CREATE.
 3              MR. MCELHINNY:  YOUR HONOR, I AM ABOUT TO
 4    START THE STORY OF THE DEVELOPMENT OF THE IPHONE
 5    AND WE ONLY HAVE THREE MINUTES LEFT.
 6              THE COURT:  ALL RIGHT.  WELL, I HAVE 4:29
 7    AS THE TIME.
 8              MR. MCELHINNY:  THANK YOU, YOUR HONOR.
 9              THE COURT:  ALL RIGHT.  THAT'S FINE.
10              OKAY.  SO THANK YOU FOR YOUR PATIENCE
11    TODAY.  YOU'RE GOING TO HAVE TWO DAYS OFF.  WE WILL
12    NOT BE IN SESSION TOMORROW OR THURSDAY, SO WE WILL
13    SEE YOU NEXT BACK ON FRIDAY MORNING, 9:00 O'CLOCK.
14    PLEASE REPORT TO THE JURY ROOM.
15              IF YOU WOULD, PLEASE, LEAVE YOUR JURY
16    NOTEBOOKS, YOU CAN LEAVE THEM IN THE JURY ROOM.
17    BUT PLEASE DO NOT TAKE THEM HOME.
18              AND SAME ADMONITION.  PLEASE DON'T DO ANY
19    RESEARCH, ANY READING ABOUT THE CASE, DON'T TALK TO
20    ANYONE ABOUT IT, AND PLEASE KEEP AN OPEN MIND UNTIL
21    THE VERY, VERY END AND UNTIL YOU START
22    DELIBERATING.
23              OVER THE NEXT FEW DAYS, WHEN PEOPLE FIND
24    OUT YOU'RE A JUROR ON THIS CASE, FAMILY MEMBERS,
25    FRIENDS, NEIGHBORS ARE GOING TO WANT TO GIVE YOU A
```

```
1    PIECE OF THEIR MIND.

2              I'M ASKING YOU AGAIN TO PLEASE TELL THEM,

3    "I'M SORRY.  I CAN'T LISTEN TO THIS.  I CAN TALK

4    WITH YOU WHEN THE CASE IS OVER."  ALL RIGHT?

5              OKAY.  THANK YOU SO MUCH.

6              (WHEREUPON, THE FOLLOWING PROCEEDINGS

7    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

8              THE COURT:  ALL RIGHT.  THE RECORD SHOULD

9    REFLECT THE JURORS HAVE LEFT THE COURTROOM.

10             THERE ARE A COUPLE OF ISSUES THAT WE NEED

11   TO RESOLVE AND THAT IS THE ISSUE OF IMPEACHMENT

12   EXHIBITS.

13             WHEN I ISSUED MY ORDER BACK ON JULY 24TH,

14   I DIDN'T MAKE ANY EXCLUSION FOR IMPEACHMENT

15   EXHIBITS AND I BELIEVE WE HAD A FULL ARGUMENT ON

16   THIS ISSUE.

17             SO -- AND I MADE A RULING ON THIS ISSUE.

18             SO WHAT'S GOING ON?  WHY ARE THEY NOT IN

19   THE BINDERS?

20             AND THIS IS A PROBLEM ON BOTH SIDES GOING

21   FORWARD.  LET'S FIX IT NOW.

22             LET ME ASK, MR. VERHOEVEN, YOU SAID THAT

23   YOU LOST THE ARGUMENT THAT IMPEACHMENT EXHIBITS HAD

24   TO BE DISCLOSED AND IN THE BINDERS.  WHY WASN'T

25   THAT IN THIS --
```

```
 1              MR. VERHOEVEN:  THAT WAS IN OUR BINDERS.
 2    I'M SORRY, YOUR HONOR.
 3              THE COURT:  OKAY.
 4              MR. VERHOEVEN:  IT'S ACTUALLY ITEM NUMBER
 5    5 -- IT'S IN YOUR RULINGS.  IT'S ON PAGE 3 OF YOUR
 6    JULY 30TH ORDER.
 7              I CAN HAND THIS UP TO YOU IF YOU WANT TO
 8    LOOK AT IT, BUT IT'S ITC 796, WITNESS STATEMENT,
 9    CHRIS STRINGER.
10              WE DISCLOSED IT TO THE OTHER SIDE.  THEY
11    OBJECTED.  YOU OVERRULED THE OBJECTION, YOUR HONOR.
12              AND THE ONLY REASON I DIDN'T HAVE IT IN
13    THE BINDER IS THAT WE KIND OF SCREWED UP WITH THE
14    BINDERS.
15              THE COURT:  ALL RIGHT.  WELL, THAT'S NO
16    PROBLEM.
17              BUT JUST GOING FORWARD, I WANT TO MAKE
18    SURE THERE'S AN UNDERSTANDING FROM BOTH PARTIES
19    THAT YOUR CROSS-EXAMINATION BINDERS ARE GOING TO BE
20    COMPLETE AND INCLUDE IMPEACHMENT.
21              I WANT TO MAKE SURE, MR. MCELHINNY, YOU
22    ARE IN AGREEMENT ON THAT ON AS WELL.
23              MR. MCELHINNY:  I AM IN AGREEMENT ON
24    THAT, YOUR HONOR.
25              THE COURT:  ALL RIGHT.
```

```
 1            MR. VERHOEVEN:  ONE QUICK THING.  I

 2   MISSPOKE AGAIN.  I APOLOGIZE, YOUR HONOR.  IT WAS

 3   IN THE WITNESS BINDER.  IT DOESN'T HAVE AN EXHIBIT

 4   NUMBER BECAUSE IT WAS IMPEACHMENT.

 5            SO I DON'T KNOW IF YOU WANT US TO ASSIGN

 6   EXHIBIT NUMBERS TO IMPEACHMENT DOCUMENTS.

 7            THE COURT:  I THINK THAT WOULD BE

 8   HELPFUL.  TELL ME WHERE IT IS.

 9            MR. VERHOEVEN:  SO IT'S IN -- CAN YOU

10   COME UP AND HELP ME.  WE'RE KIND OF PLAYING

11   TELEPHONE BECAUSE I DIDN'T ASSEMBLE THE BINDER,

12   YOUR HONOR, SO --

13            MR. HALL:  SCOTT HALL, H-A-L-L.

14            THERE ARE TWO BINDERS, THE

15   CROSS-EXAMINATION MATERIALS AND THE TESTIMONY

16   COLLECTION.

17            THE FOURTH TAB IN THE TESTIMONY

18   COLLECTION BINDER IS THE MAY 2ND, 2012 ITC WITNESS

19   STATEMENT OF CHRISTOPHER STRINGER, AND WE PASSED

20   THAT UP.

21            THE COURT:  OKAY.  DID YOU WANT THIS

22   MARKED FOR IDENTIFICATION?

23            MR. VERHOEVEN:  THAT WOULD BE GREAT.  HOW

24   ABOUT -- YEAH, THAT WOULD BE TERRIFIC, YOUR HONOR.

25            AND IN THE FUTURE WE'LL MARK FOR
```

```
1     IDENTIFICATION ON IMPEACHMENT IF THAT'S THE BEST

2     WAY TO GO.

3              (DISCUSSION OFF THE RECORD BETWEEN

4     COUNSEL.)

5              THE COURT:  OKAY.

6              MR. VERHOEVEN:  YOUR HONOR --

7              THE COURT:  ALL RIGHT.  CAN I HAVE THE

8     CROSS-EXAMINATION BINDERS FOR MR. SCHILLER?

9              MR. VERHOEVEN:  WHILE WE'RE GETTING THAT,

10    YOUR HONOR --

11             THE COURT:  YES.

12             MR. VERHOEVEN:  -- WOULD -- WOULD YOU

13    WANT US TO MARK FOR IDENTIFICATION THE IMPEACHMENT

14    MATERIALS GOING FORWARD AND JUST KEEP A RUNNING

15    LIST OF THEM?  OR DO YOU WANT TO DO IT IF AND WHEN

16    WE NEED TO USE THEM?

17             THE COURT:  IF AND WHEN WE NEED TO USE

18    THEM -- I MEAN, IT WOULD BE HELPFUL THAT I JUST

19    HAVE EVERYTHING.

20             MR. VERHOEVEN:  CORRECT.

21             THE COURT:  IN CASE THERE'S ANY

22    OBJECTION, I'D RATHER HASH IT ALL OUT IN ADVANCE

23    AND NOT IN FRONT OF THE JURY, SO I WOULD LIKE TO

24    HAVE IT.

25             SO IF YOU COULD IDENTIFY WHAT IT IS, AND
```

```
1    THEN WHEN WE ACTUALLY GO THROUGH AND USE IT, I

2    THINK IT WOULD BE HELPFUL TO AT LEAST MARK FOR

3    IDENTIFICATION EVEN IF IT'S NOT GOING TO BE

4    ADMITTED JUST SO THE RECORD IS CLEAN AS TO WHAT

5    DOCUMENT WAS USED.

6             MR. VERHOEVEN:  I TOTALLY UNDERSTAND,

7    YOUR HONOR.

8             THE COURT:  YEAH.

9             MR. VERHOEVEN:  DO YOU WANT TO MAINTAIN

10   THAT LIST, BECAUSE IT'S GOING TO -- WE'RE NOT GOING

11   TO KNOW WHAT WE'RE GOING TO USE DEPENDING UNTIL THE

12   WITNESS GIVES AN ANSWER THAT NEEDS TO BE IMPEACHED.

13            SO SHOULD WE, THE PARTIES, MAINTAIN THAT

14   LIST OR WOULD YOUR HONOR WANT TO DO THAT, THE

15   IDENTIFICATION LIST FOR IMPEACHMENT?

16            THE COURT:  YOU MEAN AFTER IT'S DONE?

17            MR. VERHOEVEN:  AFTER IT'S DONE.

18            THE COURT:  OH, I'M KEEPING MY OWN LIST.

19            I MEAN, WE CAN GO THROUGH IT.  I HAVE 18

20   EXHIBITS ADMITTED BY -- ON THE PLAINTIFF'S SIDE

21   TODAY.  I HAVE THREE EXHIBITS ADMITTED ON THE

22   DEFENSE SIDE TODAY, AND THEN THE ONE EXHIBIT THAT

23   WAS MARKED FOR IDENTIFICATION BUT NOT ADMITTED.

24            ARE YOU ALL IN AGREEMENT?

25            MR. VERHOEVEN:  YES.
```

```
 1              THE COURT:  OKAY.

 2              MR. VERHOEVEN:  SO HERE'S WHAT I WAS

 3    THINKING WE'D DO GOING FORWARD, JUST TO RUN IT BY

 4    EVERYONE --

 5              THE COURT:  OKAY.

 6              MR. VERHOEVEN:  -- IS WE'LL DO WHAT WE

 7    DID TODAY.  WE'LL HAVE THE BINDER, BUT IT WON'T

 8    HAVE THE EXHIBITS ON IT, BECAUSE WE'RE PROBABLY NOT

 9    GOING TO USE 90 PERCENT OF IT.

10              THE COURT:  THAT'S FINE.  JUST IDENTIFY

11    IT SO I CAN LOOK AT IT WHILE WE'RE GOING.

12              MR. VERHOEVEN:  AND THEN AFTER WE USE IT,

13    WE'LL ASSIGN THE IDENTIFICATION NUMBER IN REAL

14    TIME.  THE PARTIES WILL KEEP TRACK OF THAT.

15              THE COURT:  WELL, EVEN IF YOU USE IT --

16    WE CAN JUST SAY DEFENSE EXHIBIT 4 FOR

17    IDENTIFICATION WHILE YOU'RE USING IT.

18              MR. VERHOEVEN:  EXACTLY.

19              THE COURT:  AND THEN THE RECORD WILL BE

20    CLEAN.  WE'LL KNOW WHAT IT WAS THAT THE WITNESS

21    LOOKED AT.

22              MR. VERHOEVEN:  THAT WORKS FOR US, YOUR

23    HONOR.

24              THE COURT:  OKAY.  ALL RIGHT.

25              AND THEN YOU ALL ARE GOING TO WORK OUT A
```

```
 1    SYSTEM --
 2              MR. VERHOEVEN:  WE'RE GOING TO WORK ON
 3    THAT.
 4              THE COURT:  -- ON TIMING ON THE
 5    OBJECTIONS AND RESPONSES?
 6              MR. VERHOEVEN:  YES.
 7              THE COURT:  AND I WOULD LIKE COPIES OF
 8    THOSE.
 9              ALL RIGHT.  WHAT ELSE DO WE NEED TO DO
10    TODAY?  OTHERWISE WE'RE DONE FOR TODAY, TOMORROW,
11    AND THURSDAY AND I DON'T SEE YOU BACK HERE AGAIN
12    UNTIL 8:30 ON FRIDAY.
13              MR. MCELHINNY:  I WANT TO PUT ON THE
14    RECORD RIGHT NOW BECAUSE I JUST FOUND OUT ABOUT
15    THIS RIGHT NOW.
16              THE COURT:  WHAT'S THAT?
17              MR. MCELHINNY:  THIS MORNING WHEN
18    MR. QUINN DID HIS PRESENTATION, I WAS A LITTLE
19    TAKEN ABACK.  I COULDN'T FIGURE OUT WHAT WAS GOING
20    ON.
21              AS YOUR HONOR WILL LEARN, AND AS I JUST
22    LEARNED, IMMEDIATELY AFTER THAT, SAMSUNG ISSUED A
23    PRESS RELEASE IN SAN JOSE IN WHICH IT PUBLISHED ALL
24    OF THE INFORMATION AND ITS ARGUMENTS ABOUT THE
25    EVIDENCE WHICH YOUR HONOR HAS EXCLUDED FROM
```

```
 1    EVIDENCE, AND AN ARGUMENT THAT SAYS, "FUNDAMENTAL

 2    FAIRNESS REQUIRES THAT THE JURY DECIDE THE CASE

 3    BASED ON ALL THE EVIDENCE."

 4              THIS IS, ON PERCEPTION, AN INTENTIONAL

 5    ATTEMPT TO POLLUTE THIS JURY IN A WAY, FRANKLY,

 6    THAT I'VE NEVER -- I FORGET HOW MANY YEARS

 7    MR. QUINN SAID HE PRACTICED, BUT I'M FIVE MORE.

 8              THE COURT:  35.  WHERE IS HE?

 9              MR. MCELHINNY:  I DON'T KNOW.  I JUST GOT

10    THIS.

11              YOUR HONOR WILL SEE MOTION PRACTICE ON

12    IT.  I'M NOT SURE EXACTLY WHAT THE RIGHT REMEDY OR

13    PENALTY IS.

14              BUT THIS IS CONTEMPT OF COURT.  I'VE JUST

15    NEVER SEEN ANYTHING AS INTENTIONAL AS THIS IN MY

16    ENTIRE CAREER.

17              THE COURT:  CALL MR. QUINN.  I'D LIKE TO

18    SEE HIM TODAY.

19              MR. PRICE:  YOUR HONOR, IF I MAY.

20              THE COURT:  YEAH.  IS HE AT THE FAIRMONT

21    OR WHERE IS HE?

22              MR. PRICE:  I BELIEVE HE'S IN LOS ANGELES

23    ATTENDING A FUNCTION.  HE LEFT THIS MORNING.

24    THERE'S A FUNCTION WITH THE MOTION PICTURE ACADEMY

25    THAT HE HAD A BOARD OF DIRECTORS' MEETING THAT HE
```

```
1    HAD TO BE AT.
2              THE COURT:  ALL RIGHT.  I WANT HIM TO
3    FILE A DECLARATION TOMORROW ABOUT HOW THAT
4    HAPPENED.
5              MR. PRICE:  ALL RIGHT.
6              THE COURT:  TOMORROW MORNING BY 9:00
7    O'CLOCK.  I WANT TO KNOW WHO RELEASED IT, WHO
8    AUTHORIZED IT, WHO DRAFTED IT.
9              MR. PRICE:  I'M SORRY?
10             THE COURT:  I WANT TO KNOW WHO DRAFTED
11   THE PRESS RELEASE, WHO AUTHORIZED IT FROM YOUR
12   LEGAL TEAM.
13             MR. PRICE:  CERTAINLY.
14             THE COURT:  AND I WANT MR. QUINN'S
15   DECLARATION AS TO WHAT HIS ROLE WAS.
16             ALL RIGHT.  WHAT ELSE FOR TODAY?
17             MR. MCELHINNY:  NOTHING FURTHER FROM US,
18   YOUR HONOR.
19             THE COURT:  ANYTHING ELSE?
20             OKAY.  THANK YOU ALL.
21             (WHEREUPON, THE EVENING RECESS WAS
22   TAKEN.)
23
24
25
```

1

2

3

4                     CERTIFICATE OF REPORTER

5

6

7

8           I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13           THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21              /S/
                _____
22              LEE-ANNE SHORTRIDGE, CSR, CRR
                CERTIFICATE NUMBER 9595
23

24              DATED:  JULY 31, 2012

25