KARL OLSON (SBN 104760)
kolson@rocklawcal.com
XINYING VALERIAN (SBN 254890)
xvalerian@rocklawcal.com
RAM, OLSON, CEREGHINO & KOPCZYNSKI LLP
555 Montgomery Street, Suite 820
San Francisco, California  94111
Telephone:  (415) 433-4949
Facsimile:  (415) 433-7311

*Attorneys for Third-Party REUTERS AMERICA LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean Business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>        Defendants. | CASE NO.  11-cv-01846-LHK<br><br>**THIRD PARTY REUTERS AMERICA LLC'S OPPOSITION TO MOTIONS TO SEAL TRIAL AND PRETRIAL EVIDENCE**<br><br>Date:      No hearing set<br>Time:      N/A<br>Place:     Courtroom 1, 5th Floor<br>**Judge:    Hon. Lucy H. Koh** |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   THE STRONG PUBLIC INTEREST IN THIS CASE. ................................. 1

III.  THE BURDEN OF OVERCOMING THE STRONG PRESUMPTION IN
      FAVOR OF ACCESS IS ON THE PARTIES PROPOSING SEALING. .......... 2

      A.   The Undisputed Default Rule Is Public Access ................................... 2

      B.   "Trade Secrets" Enjoy No Automatic Exemption from the Public's Right
           of Access .............................................................................................. 3

      C.   The Trial Must Be Open ....................................................................... 7

      D.   Motions in Limine and Daubert Motions Are Subject to the Default
           "Compelling Reasons" Standard When Filed In Connection with
           Dispositive Motions ............................................................................. 8

      E.   The Parties' Summary Judgment & Preliminary Injunction Motions Are
           Indisputably Subject to the "Compelling Reasons" Standard ............... 9

IV.   THE PUBLIC INTEREST FAR OUTWEIGHS THE PARTIES' PREFERENCE
      FOR SECRECY. ............................................................................................ 9

V.    AS TO MOST CATEGORIES OF EVIDENCE AT ISSUE, THE PARTIES
      HAVE NOT SHOWN ANY NEED FOR SECRECY THAT OVERRIDES THE
      PUBLIC POLICIES FAVORING ACCESS ................................................. 14

      A.   Capacity, costs, prices, product-specific revenues, unit sales, profits, profit
           margins (Proponents: Apple and Samsung) ...................................... 14

      B.   Source Code And Technical Information (Proponents: Apple And
           Samsung) ............................................................................................. 17

      C.   Information Relating To Licensing Agreements (Proponents: Apple And
           3rd Parties, Dolby, Ericsson, IBM, Intel, Interdigital, Microsoft, Motorola
           Mobility, Nokia, Philips, Qualcomm, Research In Motion, Siemens,
           Toshiba) ............................................................................................... 18

      D.   Proprietary Market Research (Proponent: Apple) ............................... 20

           1.   Buyer surveys conducted by Apple should not be sealed because
                they do not qualify as trade secrets. ......................................... 20

           2.   IDC Market Research Report And Underlying Spreadsheet (DX
                526 and DX 537) ....................................................................... 21

      E.   Business Plans (Proponent: Samsung) ............................................... 22

VI.   EXHIBITS FROM PRIOR MOTIONS: MOTIONS IN LIMINE, DAUBERT
      MOTIONS, SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION
      MOTIONS ARE ALL SUBJECT TO THE COMPELLING REASONS
      STANDARD AND THE PARTIES HAVE NOT SHOWN COMPELLING
      REASONS TO SEAL. ................................................................................... 23

VII.    CONCLUSION ..................................................................................................... 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Apple, Inc. v. Motorola, Inc.*
    2012 U.S. Dist. LEXIS 89960 (N.D. Ill. June 22, 2012) ...........................................12, 18

*Apple, Inc. v. Psystar Corp.*
    2012 U.S. Dist. LEXIS 148 (Jan. 3, 2012, Alsup, J.).........................................................21

*Apple, Inc. v. Samsung Elecs. Co.*
    2012 U.S. Dist. LEXIS 99945 (N.D. Cal. July 18, 2012) ...................................................9

*Baxter Int'l, Inc. v. Abbott Laboratories*
    297 F.3d 544 (7th Cir. 2002)................................................................................................2

*Dish Network L.L.C. v. Sonicview USA, Inc.*
    2009 U.S. Dist. LEXIS 63429 (S.D.Cal. July 23, 2009)......................................................9

*Electronic Arts*
    298 Fed. Appex. 568 (9th Cir. 2008) ..............................................................................5, 7

*Flexmir, Inc. v. Herman*
    40 A. 2d 799 (N. J. Ch. 1945) .........................................................................................5, 6

*Hagestad v. Tragesser*
    49 F.3d 1430 (9th Cir. 1995)..............................................................................................16

*Kamakana v. City and County of Honolulu*
    447 F.3d 1172 (9th Cir. 2006)....................................................................................passim

*Nav N Go KFT v. Mio Technology USA, Ltd*
    2008 U.S. Dist. LEXIS 96178 (D. Nev. Nov. 14, 2008)....................................................22

*NBC Subsidiary v. Superior Court*
    20 Cal. 4th 1178 (1999)...........................................................................................2, 8, 23

*New York Times v. Sullivan*
    376 U. S. 254 (1964) ...........................................................................................................2

*Nixon v. Warner Commc'ns, Inc.*
    435 U.S. 589 (1978) .....................................................................................................2, 5, 6

*Richardson v. Mylan Inc.*
    2011 U.S. Dist. LEXIS 23969 (S.D. Cal. Mar. 9, 2011).....................................................8

*San Gabriel Tribune v. Superior Court*
    143 Cal. App. 3d 762 (1983)..........................................................................................5, 13

*San Jose Mercury News, Inc. v. U.S. Dist. Court*
    187 F.3d 1096 (9th Cir. 1999).............................................................................................2

*Schmedding v. May*
    85 Mich. 1 (1891)..........................................................................................................5, 6

*Selling Source, LLC v. Red River Ventures*, LLC
   2011 U.S. Dist. LEXIS 49664 (D. Nev. Apr. 29, 2011) ........................................9

*Times Mirror Co. v. United States*
   873 F.2d 1210 (9th Cir. 1989) ..............................................................................2

*Uribe v. Howie*
   19 Cal. App. 3d 194 (1971) ..................................................................................15

*Wong v. Thomson Reuters (Markets) LLC*
   2011 U.S. Dist. LEXIS 125666 (N.D. Cal., Oct. 31, 2011, Alsup, J.) ................8

**Statutes**

Bus. & Prof. § 17200 ...............................................................................................7

## I.      INTRODUCTION

The parties' third bite at the sealing apple (see Documents 1256, 1269, denying earlier motions) fares no better than their first two. Their conclusory declarations and nebulous assertions of harm from the disclosure of documents they have put forth in the so-called "Patent Trial of the Century" – some of which are already on the Internet – fall far short of meeting the "compelling reasons" standard for sealing.   The intense public interest in assessing the parties' competing and hotly-contested claims in this case – which is taking place in a public courtroom before a jury and the watchful eyes of the media, not in private arbitration which the parties could have invoked – far outweighs any reasons the parties have put forth in favor of sealing.  This is particularly true in light of the fact that Apple's profit margin on the iPhone and iPad – the most significant item Apple is trying to seal – has already been disclosed without any impact on the company and without any evidence that its Chicken Little predictions about the consequences of unsealing will come home to roost.  The parties' motions to seal should be denied.

## II.     THE STRONG PUBLIC INTEREST IN THIS CASE.

At the risk of stating the obvious, we point out some important facts that the parties, in their zeal to put a lid on documents they are putting forth in a public courtroom that they chose to use in a battle over billions of dollars and the future of the smartphone industry, have studiously attempted to ignore.  This is a hotly-contested case, with over 1,500 pleadings (and counting, of course) put forth since it was filed.  Business and technology reporters from many media organizations are closely following the case due to the widespread interest in the disputes between Apple and various companies, including Samsung, that use Google's operating system.  Mainstream business outlets like the Wall Street Journal, Bloomberg and Reuters tend to focus coverage on the case's strategic impact on the companies, including financial risks for shareholders; publications like *The Recorder* analyze legal tactics; and sites like *The Verge* dig into the technology.  Amy Stevens Declaration paragraph 3.

Nearly 50 years ago, when some of what is now Silicon Valley still was dotted with prune orchards and smartphones hadn't been invented, the United States Supreme Court spoke of the "profound national commitment to the principle that debate on public issues should be

uninhibited, robust, and wide-open." *New York Times v. Sullivan*, 376 U. S. 254, 270 (1964).

The technology, of course, has changed rapidly, but those timeless principles have not.  The

parties' attempts to enforce secrecy in this dispute defy both reality and those principles.  The

dispute unfolding in this courtroom, for better or for worse, is captivating nearly as much

attention as the dispute in Montgomery, Alabama which gave rise to the *Sullivan* case.  The

parties are hardly in a position to complain about the public scrutiny here since the widespread

interest in smartphones and tablets accounts for the massive fortunes the parties have amassed

and results from the billions of dollars they have spent to advertise the indispensability of these

devices to everyday life.

**III.   THE BURDEN OF OVERCOMING THE STRONG PRESUMPTION IN FAVOR OF ACCESS IS ON THE PARTIES PROPOSING SEALING.**

### A.   The Undisputed Default Rule Is Public Access

Any corporation that values secrecy yet takes its grievances to a public forum and

requests far-ranging relief from judge and jury presumably has done so for strategic advantage

and consequently has minimal claim "to keep a lid on its own documents."  *Baxter Int'l, Inc. v.

Abbott Laboratories*, 297 F.3d 544, 547-48 (7th Cir. 2002) (noting that "businesses that fear harm

from disclosure required by the rules for the conduct of litigation often agree to arbitrate.")  No

party or third party should have any expectation of privacy in this dispute.  As the California

Supreme Court observed in *NBC Subsidiary*, "'[a]n individual or corporate entity involved as a

party to a civil case is entitled to a fair trial, not a private one.'"  20 Cal.4th 1178, 1211.

One week ago, the Ninth Circuit reaffirmed the well-established standards and burdens on

motions to seal judicial documents.  In *In re Midland Nat'l Life Ins. Co. Annuity Sales Practices

Litigation*, ___ F.3d ____ , 2012 U.S. App. LEXIS 15334, 2012 WL 3024192 (9th Cir. July 25,

2012), the Court of Appeals reiterated:

> The public has a "general right to inspect and copy public records and documents, including judicial records and documents."  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978) (footnote omitted).  This right extends to pretrial documents filed in civil cases.  *San Jose Mercury News, Inc. v. U.S. Dist. Court*, 187 F.3d 1096, 1102 (9th Cir. 1999).  If, however, the documents are among those which have "traditionally been kept secret for important policy reasons," such as grand jury transcripts and pre-indictment warrant materials, they are not subject to the right of public access.  *Times Mirror Co. v. United States*, 873 F.2d 1210, 1219 (9th Cir. 1989).

1

2

3

4

5

6

7

   Although the common law right of access is not absolute, "we start with a strong presumption in favor of access to court records." *Foltz*, 331 F.3d at 1135. A party seeking to seal judicial records can overcome the strong presumption of access only by providing "sufficiently compelling reasons" that override the public policies favoring disclosure. Id. When ruling on a motion to seal court records, the district court must balance the competing interests of the public and the party seeking to seal judicial records. *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). To seal the records, the district court must articulate a factual basis for each compelling reason to seal. *Id*. Compelling reasons must continue to exist to keep judicial records sealed. *Foltz*, 331 F.3d at 1136.

8

9

10

11

   The central question on the various motions to seal is whether under the unique circumstances of this case the proponents of sealing have met their burdens of providing compelling reasons to seal that outweigh the public policies favoring disclosure.  The answer is that the parties have not met that burden.

12

13

  **B.**  **"Trade Secrets" Enjoy No Automatic Exemption from the Public's Right of Access**

14

15

16

17

18

   Both federal and state courts have taken a narrow view of claims of trade secrets in the context of access of court documents and public records, mindful of the "strong presumption of access to court records" enunciated by the Ninth Circuit.  *See, e.g., Foltz*, 331 F. 3d at 1135. For example, just this week Judge Seeborg stated that the parties had not justified sealing financial information in a class action involving Facebook.

19

20

21

22

23

24

25

26

27

   Judge Seeborg in *Fraley v. Facebook*, Case No. 11-cv-01726-RS, Document 217 at 2:19-25 (N. D. Cal. Aug. 1, 2012) noted that the parties had given lip service to the rules on sealing, but observed, "It is less clear, however, whether in all instances the parties have applied the principles cited by Facebook with sufficient rigor.  Particularly with respect to materials related to the motion for preliminary approval, the interest of putative class members, and the public in general, in having full access to all information bearing on the merits of the motion is especially high.  While personal information regarding minors may warrant sealing, it is far from apparent that any other material would, including relevant financial data and information relating to how 'Sponsored Stories' operates."

28

   Judge Seeborg's August 1 observations, which echo the rulings and comments this court

1   has made in this case and the rulings Judge Alsup made in the *Oracle v. Google* tussle, are apt.

2   Nothing that the companies want to seal has a scintilla of resemblance to "personal information

3   regarding minors."  The "relevant financial data" in this case should not be sealed.

4          This court, too, has twice in writing and twice orally (on July 18 and July 27) indicated in

5   this case that it would not seal the parties' financial information given the strong public interest in

6   this case.  (Document Nos. 1256, 1269; July 18 Transcript at 87-89.)

7          The California courts, too, have taken a dim view of assertions of trade secrets in the

8   context of access to court records. In *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292

9   (2002), the California Court of Appeal rejected an attempt to seal court documents, rejecting

10  declarations which asserted trade secrets as "conclusionary and lacking in helpful specifics."  (*Id*.

11  at 305.)  The declarations rejected there read very much like the ones offered by Apple and

12  Samsung here.  *Id.*

13         The Court in *Providian* rejected the declarations asserting trade secrets even though there

14  were no counter-declarations, holding, "in its capacity as the trier of fact, the trial court was not

15  obliged to base his decision on those statements just because there were no counter

16  declarations....As previously noted, given the fact that only defendants knew the contents of the

17  documents, Hearst could not be expected to produce any counter declarations."  (*Id*. at 307.)

18         Apple's declarations also completely ignore the fact that within the last week the profit

19  margins on its iPhone and iPad were publicly disclosed.  (See Declaration of Xinying Valerian

20  filed herewith paragraphs 2, 3, Exs. A, B.)  Needless to say, "Public disclosure, that is the

21  absence of secrecy, is fatal to the existence of a trade secret." *Providian*, 96 Cal. App. 4th at 304.

22  With the profit margin on the iPhone now very much public, it is a simple matter to reverse

23  engineer the other financial information Apple seeks to seal, all of which are the components of a

24  profit margin.  And even before last week's disclosure of the profit margin, much of Apple's

25  financial information was widely available on the Internet.    In short, the assertions made by

26  Apple's declarant (Bean Declaration paragraph 11) about its so-called secrets have no basis in

27  reality.

28         It also bears observation that Apple's and Samsung's interests are not the only ones at

1    stake.   When a party "voluntarily injects the data into the decision-making process of

2    government," as Apple has done by bringing a multi-billion dollar claim in a federal court, there

3    is a strong interest in keeping financial data "open to public scrutiny."   *San Gabriel Tribune v.*

4    *Superior Court*, 143 Cal. App. 3d 762, 778 (1983) [rejecting trade secret assertions in California

5    Public Records Act case].

6          Apple chides Reuters for suggesting that financial information has a second-class trade

7    secret status, citing *In re Electronic Arts*, 298 Fed. Appex. 568 (9th Cir. 2008) and the California

8    UTSA definition of trade secret.  (Doc. 1495, pp. 3-4.)

9          Reuters is not suggesting that financial information is *never* recognized as trade secrets.

10   Rather, Reuters' point is that in light of the question at hand, which is whether to create

11   exceptions in a particular case to the public right of access to the case, we need to distinguish

12   between the different types of "secrets" the companies are claiming.   Product-level financial data

13   are qualitatively different from secrets that flow directly from innovation, like source code, as

14   this Court indicated on July 18.  (July 18, 2012 Transcript at 87:15-89:20 ["other than some third

15   party source code, I don't really plan on sealing anything"].)

16         The parties rely on one paragraph of *dicta* from *Nixon v. Warner Communications*, 435

17   U.S. 589, 598 (1978).  The key paragraph in *Nixon* reads: "It is uncontested, however, that the

18   right to inspect and copy judicial records is not absolute.  Every court has supervisory power over

19   its own records and files, and access has been denied where court files might have become a

20   vehicle for improper purposes. For example, the common-law right of inspection has bowed

21   before the power of a court to insure that its records are not 'used to gratify private spite or

22   promote public scandal' through the publication of 'the painful and sometimes disgusting details

23   of a divorce case.'  [Citations.]  Similarly, courts have refused to permit their files to serve as

24   reservoirs of libelous statements for press consumption, [citations], or as sources of business

25   information that might harm a litigant's competitive standing, *see, e. g., Schmedding v. May*, 85

26   Mich. 1, 5-6, 48 N. W. 201, 202 (1891); *Flexmir, Inc. v. Herman*, 40 A. 2d 799, 800 (N. J. Ch.

27   1945)."

28         The very next paragraph of *Nixon*, however, should give pause to any party that seeks to

1   invoke "trade secret" as a guarantee against public access:  "It is difficult to distill from the

2   relatively few judicial decisions a comprehensive definition of what is referred to as the common-

3   law right of access or to identify all the factors to be weighed in determining whether access is

4   appropriate. The few cases that have recognized such a right do agree that the decision as to

5   access is one best left to the sound discretion of the trial court, *a discretion to be exercised in*

6   *light of the relevant facts and circumstances of the particular case*." *Nixon*, 435 U.S. at 598-599.

7   (Emphasis added).  To the extent that it matters what the Supreme Court was referring to as

8   examples of worrisome disclosure of "business information that might harm a litigant's

9   competitive standing," we note that *Schmedding v. May* dealt with "private dealings between

10  private parties" in lawsuits which "may never come to trial or hearing," and *Flexmir, Inc. v.*

11  *Herman* dealt with theft of "processes, secret formulae, machinery."

12          The Court in *Nixon* (a "concededly singular" case which eventually turned on the

13  Presidential Recordings Act, 435 U. S. at 603, 608) took pains to note that in the case "there is no

14  claim that the press was precluded from publishing or utilizing as it saw fit the testimony and

15  exhibits filed in evidence.  There simply were no restrictions upon press access to, or publication

16  of, any information in the public domain.  Indeed, the press – including reporters of the electronic

17  media – was permitted to listen to the tapes and report on what was heard.   Reporters were also

18  furnished transcripts of the tapes, which they were free to comment upon and publish.  The

19  contents of the tapes were given wide publicity by all elements of the media.    There is no

20  question of a truncated flow of information to the public." (*Id*. at 609.)  Thus, nothing in the

21  *Nixon* case justifies any restriction on public access to the trial exhibits in this case (something

22  which the parties have advocated) or any of the court filings by the parties.  If the parties are

23  looking for a Supreme Court case justifying their position, *Nixon* is *not* the one (and there are no

24  others).

25          The parties seem to think that their burden is simply to demonstrate that their sealing

26  requests are confined to specific information that qualifies as trade secrets under the broad

27  Restatement or California Uniform Trade Secrets Act definitions of trade secret.  There is no 9th

28  Circuit or other federal appellate case that so holds.

*In re Electronic Arts*, an unpublished case not to be considered as precedent, lacks persuasive value because it is materially distinguishable from the case here.  The Court of Appeals' decision was clearly confined to the facts before it.  (No briefs are available on PACER; the parties submitted rushed letter briefs in the middle of trial.)  That decision arose from *Parrish v. NFL*, a damages class action by NFL players against the NFL for breach of fiduciary duty in NFL's representation of the players in video game licensing deals.  The players claimed that NFL did not do what it was supposed to do to help the players make money from these deals.  Plaintiffs sought damages and an accounting.  *See Parrish v. National Football League Players Ass'n*, Third Amended Complaint for Breach of Contract, Breach of Fiduciary Duty, An Accounting, and Violation of California Business and Professions Code § 17200, Case No. 07-cv-00943-WHA, Doc. 192 (Nov. 27, 2007).  The players did not seek injunctive or other equitable relief.  Electronic Arts, a video game company, intervened to prevent the district court from allowing the licensing agreement – or parts thereof – to be introduced at trial without redaction or sealing.  It was not a patent case and although the licensing agreement was relevant to the plaintiffs' *prima facie* case, there was no apparent public interest at stake in the outcome.

### C.     The Trial Must Be Open

Reuters starts from the presumption that every exhibit entered into evidence at the trial should be open to the public.  There are exceptions to that:  For source code and technical schematics, Reuters recognizes that by themselves, outside of the context of expert testimony, they are incomprehensible and therefore by themselves have little value to the public.  *See Richardson v. Mylan*, 2011 U.S. Dist. LEXIS 23969, *7 (S.D. Cal. Mar. 9, 2011).

For everything else, the party must show not only that an exceptionally sensitive piece of information is at issue, but also that it is likely to suffer harm resulting from its disclosure.  And clearing those hurdles is not the end of it.  The parties must also demonstrate that their interests in maintaining the secrets outweigh the public interest in access.  *Kamakana,* 447 F.3d at 1185.

Apple prominently cites *Richardson v. Mylan Inc.*, a wrongful death case against a couple of pharmaceutical companies, because it involved redaction of a trial record.  That case is not very helpful, however, since the Defendant's motion to seal came *after* a presumably open trial

1  that resulted in a jury verdict in Defendant's favor.  Moreover, the proposed redactions were for

2  employee testimony about "[t]he method and manner by which the [Mylan patch] was invented,

3  is manufactured, and is maintained," – that is, akin to source code in this case.  *Richardson v.*

4  *Mylan Inc.*, 2011 U.S. Dist. LEXIS 23969 * 7 (S.D. Cal. Mar. 9, 2011).

5        **D.**    **Motions in Limine and Daubert Motions Are Subject to the Default**
        **"Compelling Reasons" Standard When Filed In Connection with Dispositive**

6        **Motions**

7  Exhibits submitted in support of motions in limine and Daubert motions, if those motions

8  are filed in connection with a dispositive motion, are subject to the regular standard of

9  "compelling reasons."  *In re Midland Nat'l Life Ins. Co. Annuity Sales Practices Litigation*, ___

10  F.3d ___, 2012 U.S. App. LEXIS 15334, 2012 WL 3024192 (9th Cir. July 25, 2012) (judicial

11  records attached to Daubert motion were filed "in connection" with pending summary judgment

12  motions); *accord Wong v. Thomson Reuters (Markets) LLC*, 2011 U.S. Dist. LEXIS 125666, *3

13  (N.D. Cal., Oct. 31, 2011, Alsup, J.) ("Motions *in limine* are also part of the trial and must

14  likewise be laid bare absent compelling reasons.")

15  The parties' attempt to argue that anything other than a "compelling reasons" standard

16  should apply to any of the material they are trying to seal fails.  *Kamakana* (447 F.3d at 1180)

17  makes clear that both trials and trial evidence as well as materials filed in connection with

18  "dispositive motions" are subject to the "compelling reasons" standard.  Motions *in limine*, too,

19  are subject to the "compelling reasons" standard because they relate to trials.  As the California

20  Supreme Court held in *NBC Subsidiary v. Superior Court*, 20 Cal. 4th 1178, 1219 (1999), after an

21  exhaustive review of the U. S. Supreme Court access authorities, "the closed and sealed hearings

22  concerned, among other things, motions for and arguments of counsel regarding nonsuit and

23  mistrial, evidentiary hearings . . . at which the court heard the testimony of proffered witnesses,

24  and other proceedings addressing the admissibility of testimony and documentary evidence.  We

25  are unaware of any authority holding or suggesting that such proceedings have not been

26  historically important, open, and public parts of civil trials."

27

28

1

### E.     The Parties' Summary Judgment & Preliminary Injunction Motions Are Indisputably Subject to the "Compelling Reasons" Standard

2

3      As the Court recently stated in allowing the parties to file renewed motions to seal, "the

4  exceptionally strong public interest in the preliminary injunction proceedings in this case merits

5  imposition of the heightened "compelling reasons" standard that governs the sealing of

6  documents attached to dispositive motions or submitted in trial. *Apple, Inc. v. Samsung Elecs.*

7  *Co.*, 2012 U.S. Dist. LEXIS 99945 (N.D. Cal. July 18, 2012); *accord see Dish Network L.L.C. v.*

8  *Sonicview USA, Inc*., 2009 U.S. Dist. LEXIS 63429, 2009 WL 2224596, *6 (S.D.Cal. July 23,

9  2009); *Selling Source, LLC v. Red River Ventures*, LLC, 2011 U.S. Dist. LEXIS 49664, 15-16

10  (D. Nev. Apr. 29, 2011).

### IV.     THE PUBLIC INTEREST FAR OUTWEIGHS THE PARTIES' PREFERENCE FOR SECRECY.

11

12      Apple, in its "Proposed Reply" brief submitted around the time of the July 27 hearing,

13  complains that "Reuters does not explain how the level of fine detail covered in Apple's

14  proposed redactions and sealing requests is of any value to the general public in terms of

15  understanding the judicial process, the parties' respective positions on the motions which they

16  were offered to support, or the Court's orders."  (Doc. 1412-1, p. 3:28-4:3.)

17      Ironically, that sentence sums up just how wrongly the parties, particularly Apple, have

18  conceived of their burdens with respect to secrecy issues.  The public is not required to justify the

19  public interest in every piece of information that the parties seek to conceal.  Nor is that the task

20  of the Court.  When the Court ordered the parties to lodge the unredacted documents, it did so in

21  order to assess whether the parties have met their burdens to overcome the presumption of

22  openness, not in order to perform a redaction-by-redaction assessment of the public interest.  The

23  burden is on the proponents of sealing to justify why their corporate needs for secrecy trumps the

24  public's right of access.  *See Kamakana*, 447 F.3d at 1181 ("Under our precedent, the City was

25  required to present 'articulable facts' identifying the interests favoring continued secrecy, . . . and

26  to show that these specific interests overcame the presumption of access by outweighing the

27  'public interest in understanding the judicial process.'" (internal citations omitted)).

28      That the entire burden to justify sealing is placed squarely on the proponent of sealing

reflects that no one can be expected to articulate and encapsulate the amorphous and diverse

public interest in any given case.  Reuters does not accept a burden that is not legally on it –

particularly when the case involves:

- 1500+ docket filings in 15 months, not counting the tandem case 12-CV-00630

- Multiple patents and products, and numerous types of potential relief (extremely broad preliminary and permanent injunctions, damages, reasonable royalties, treble damages, disgorgement of profits, accounting, corrective advertising).

- A slew of motions to seal that describe the documents at issue in extremely vague terms.  Apple is the worse of the two.  (E.g., Apple has referred to "third party market research" in past iterations of its motion to seal, when in its most recent filing it finally said it was talking about "a research report from IDC" and the underlying data spreadsheet from IDC).

- A slew of motions to seal, on the eve of trial, that fail to supply sufficiently specific declarations from the appropriate company personnel (again, Apple is the main culprit).

- Deep-pocketed litigants who agree on secrecy and demand multiple bites at the apple despite not having met their burdens the first or second time around.

The "public interest in understanding the judicial process" does not turn on "the level of fine detail covered in Apple's proposed redactions and sealing requests."  Simply put, there are two aspects to the public interest that give it great weight.  One, the public has the right to know the evidence that is presented to judge and jury, in order to understand the judicial process.  That principle underlies the general policy toward openness in judicial proceedings.

Two, unique to this case– and perhaps to a few others like *Microsoft v. Motorola* in the Western District of Washington *and Apple v. Motorola* in the Northern District of Illinois – the especially strong public interest stems from the fact that here the titans of high-tech have brought massive lawsuits that have the potential to have significant, broad impact on the lives of the public.  *See generally*, Declaration of Julie P. Samuels of Electronic Frontier Foundation ¶¶ 3-7; Amy Stevens Decl. filed herewith [veteran of over 20 years in journalism explains public interest

1   in this case].  The number of media outlets covering the case and the need for an overflow room

2   are undisputed facts of which the Court may take judicial notice.

3       If any exhibits that are sufficiently relevant to be introduced into evidence at any

4   dispositive stage are sealed, then the public will not know the evidentiary bases for the jury's and

5   judge's decisionmaking.  To deprive the public of that right would require a showing not only

6   that a company considers the material to be highly sensitive, but that harm to the company's

7   legitimate interests would follow and that such harm outweighs the public's interest.  The parties

8   cannot make that showing.

9       That is even more true here, where Apple alleges not only infringement, but willful

10  infringement, and seeks extremely broad injunctive relief and various types of monetary relief.

11  As the Court has recognized, injunctive relief could significant affect the products available to

12  consumers, given that Apple and Samsung are the market leaders in smartphones and tablets.

13  Indeed, there has already been a directly traceable link between what is available on the market to

14  consumers and the parties' redacted evidence on preliminary injunction filings in this case and

15  the related case, 12-CV-000630.  The Galaxy Nexus smartphone is still available in stores,

16  because the Federal Circuit has stayed the Court's injunction pending Samsung's appeal, but the

17  sale of Galaxy Tab 10.1 has been at least partially enjoined.  These appellate rulings rely on the

18  fact-finding at the trial level.  Why the Court issued preliminary injunctions on these products,

19  but not other at-issue products such as the Galaxy S 4G phone, will not be fully understood

20  without access to the evidence submitted to the Court.

21      The same questions that Judge Posner raised in Apple v. Motorola apply here.

22      Apple is not a "small company"; its market capitalization exceeds that of Google
        and Microsoft combined. To suggest that it has suffered loss of market share,
23      brand recognition, or customer goodwill as a result of Motorola's  alleged
        infringement of the patent claims still  [*65] in play in this case is wild conjecture.
24      And until about a week ago Apple had not suggested in this litigation that the
        losses it allegedly suffered or will suffer from the alleged infringement "defy
25      attempts at valuation." . . .

26      . . . Because there are such substantial grounds for skepticism concerning the
        harm that Apple is likely to incur from continued infringement, cf. Lucent
27      Technologies, Inc. v. Gateway, Inc., supra, 580 F.3d at 1333, it would not be
        proper even to consider ordering an injunction without evidence that would
28      enable me to compare the costs and benefits of an injunction with the costs and
        benefits of the substitute equitable remedy of a compulsory license with a

1    reasonable royalty, that is, a running (ongoing) royalty.

2    *Apple, Inc. v. Motorola, Inc.*, 2012 U.S. Dist. LEXIS 89960, 64-66 (N.D. Ill. June 22, 2012).

3         Product financial data, market surveys, and licensing terms, which are necessary for

4    determinations about the remedies in this case, have enormous public relevance.  How to

5    properly remedy infringement, in a high-tech world when one device can have hundreds of

6    patented features, is a legitimate question for anyone interested in high tech and intellectual

7    property rights – not just industry observers but individuals and companies who find themselves

8    on the receiving end of licensing demands or infringement complaints..  Samuels Decl. ¶ 5.

9    Financial data regarding the products relate directly to consumer interests in access to products.

10   Id. ¶ 6.  Increased transparency in licensing data is crucial to increasing the education of

11   policymakers and the public about the scope and costs of modern software patent litigation, not

12   just to the parties, but to society as a whole.  See id. ¶ 7; see also Declaration of Patent Professors

13   ¶¶ 2-6.  These issues are important for Reuters' readers, important for all the investors who have

14   a direct or indirect stake in these large public companies, important for people in the high tech

15   industries, and important for consumers.  See Stevens Decl. ¶ 3-9, Samuels Decl. ¶¶ 4-7.

16        This case is different from all the cases on which the parties rely.  Almost all of the cases

17   involved just the companies asserting trade secrets, or two corporate litigants in agreement on

18   secrecy, without the intervention of third parties requesting public access.  Many of those cases

19   involved smaller companies, for whom it would be easier to accept at face value their claims that

20   competitive harms would result from disclosure of confidential information.  None of those cases

21   involved the most valuable company in the world suing another humongous consumer electronics

22   company over millions of products and billions of dollars.  See Amy Stevens Decl. filed

23   herewith.

24        While proponents of sealing here, and in all of the cited cases, professed fear of

25   competitive harms from disclosure, such concerns must also be viewed in a real-world context.

26   All trade secret cases and IP cases are about competition.  This case is about Apple and Samsung

27   waging global competition through offensive and defensive uses of their patent arsenals in

28   courtroom battles around the world.  *See* Colleen V. Chien, *From Arms Race to Marketplace:*

*The Complex Patent Ecosystem and Its Implications for the Patent System*, 62 HASTINGS L. J. 297, 334 (reviewing the mixed success of defensive patenting as a deterrent to litigation and noting that there is a significant volume of high-tech patent suits between large companies). Although the pros and cons of our patent system are not directly on trial, that is another reason this case matters.  The public has a right to know the workings of public institutions, whether it be the courts or the PTO.    See Samuels Decl. ¶ 4 (noting that EFF works to protect the important public interests in intellectual property litigation through "oversight of the litigation process: monitoring how parties actually wield intellectual property law in court cases as a sword to stave off competition. ").  And because the parties have chosen to wage a very public battle to the bitter end, they cannot insist on the boundaries that exist within their own corporate campuses.  When a party "voluntarily injects the data into the decision-making process of government," as Apple has done by bringing a multi-billion dollar claim in a federal court, there is a strong public interest in keeping financial data "open to public scrutiny."  *San Gabriel Tribune v.  Superior Court* (1983) 143 Cal. App. 3d 762, 778 [rejecting trade secret assertions in California Public Records Act case].  *See also* Samuels Decl. ¶¶ 6-7 (discussing the public interest in the financial data that surfaces in patent litigation)

"This matter may be a private dispute, but it has wide-ranging public consequences."  Samuels Decl. ¶ 7.  The parties have acknowledged that much.  "As this Court has acknowledged, this is a case with genuine and substantial commercial and public interest and with enormous potential commercial impact."  Declaration of John B. Quinn ¶ 9 (Doc. 1533). See also Apple's Response to Declaration of John B. Quinn (Doc. 1539, p. 7) (asserting that "As the Supreme Court long ago recognized, 'every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it,")  Although the parties are quick to invoke the public interest when it suits their ends, we must not forget that Apple's and Samsung's interests are not the only ones at stake.

## V. AS TO MOST CATEGORIES OF EVIDENCE AT ISSUE, THE PARTIES HAVE NOT SHOWN ANY NEED FOR SECRECY THAT OVERRIDES THE PUBLIC POLICIES FAVORING ACCESS[1]

### A. Capacity, costs, prices, product-specific revenues, unit sales, profits, profit margins (Proponents: Apple and Samsung)

Apple has not established that the product information that it is trying to seal is different from what it has publicly disclosed in earnings reports, or that the difference is significant enough to overcome the presumptive public interest in seeing any product information that is relevant to Apple's case (see Valerian Decl., Ex. C, 3rd Quarter 2012 results from Apple's website).  Nor has either party explained the difference between some of the financial information they wish to seal in their trial exhibits, from that which they are willing to disclose.  What is "product-specific unit sales and revenue," which Apple proposes to seal (in Motion to Seal Trial Exhibits, Doc. 1495, 7:9-1) and "unit sales,"  as opposed to "number of units sold by product line, price data, sources of revenue (search engines, accessories, specific products)", which the parties claim they are now willing to disclose (see Joint Motion, Doc. 1414, p. 10:6-10:11)?

Apple's declarations also completely ignore the fact that within the last week the profit margins on its iPhone and iPad for quarters up to March 2012 were publicly disclosed.  (See Declaration of Xinying Valerian filed herewith paragraph 4 and Exhibit 2; http://www.appleinsider.com/articles/12/07/27/apples_iphone_twice_as_profitable_per_unit_than _ipad.html.  )  Needless to say, "Public disclosure, that is the absence of secrecy, is fatal to the existence of a trade secret." *Providian*, 96 Cal. App. 4th at 304.  With the profit margins on the iPhone and iPad now very much public, it is a simple matter to reverse engineer the other financial information Apple seeks to seal, all of which are the components of a profit margin. Apple's own declarant, Mr. Bean, states on July 30 (apparently in ignorance of the disclosure that transpired a few days before):  "Margins alone would allow competitors to approximate Apple's cost, as they could simply research Apple's prices or publicly available total revenue information, and calculate Apple's cost using that information in combination with the highly confidential

---

[1] Apple's and Samsung's Motions to Seal Trial Exhibits (Docs. 1414, 1488, 1495) and second batch of Renewed Motions to Seal Documents from Prior Motions (Docs. 1490, 1499)

1    margin information."  In short, the assertions made by Apple's declarant about its so-called

2    secrets have no basis in reality.

3        Apple attempts to show that disclosure of just one category of data to competitors could

4    be harmful.  But even before last week's disclosure of the profit margin, much of Apple's

5    financial information was widely available on the Internet.   The parade of horribles erected by

6    Apple is only theoretical, because the reality is that not only competitors but an entire industry

7    devoted to such analytics already approximate Apple's cost and already keep tabs on Apple's

8    prices and revenues.  See, e.g., Reuters' Opp., July 25, 2012, Olson Decl. ¶ 3, Ex. B (Dkt. 1331)

9    (iSuppli bill-of-materials teardowns on latest iPhone); Valerian Decl. ¶¶ 3-5, Exs. B and D (same

10   for latest iPad).

11       Despite the fact that close estimates of Apple's financials have been available all along,

12   and despite Apple's disclosure of various actual financials, Apple continues to insist that the

13   hypothetical, feared disclosure "could" lead to calculations of its costs and so on.  Bean Decl. ¶ 8.

14   However, due to the information already available, and Apple's guidance on its earnings calls,

15   analysts downgraded Apple stock based on concerns about narrowing margins.  As a result of the

16   information already available, the release of actual margins information from past quarters did

17   not seem to negatively impact the stock price.  Apple has not presented any real evidence that the

18   one-off disclosure of past data due to litigation would result in "an economic boon to Apple's

19   competitors."  Bean ¶ 8.

20       Apple's insistence that such things as "capacity" are trade secrets ignores the fact that its

21   capacity in the past at various times does not necessarily reveal its capacity in the future.  The

22   California Court of Appeal's decision in *Uribe v. Howie*, 19 Cal. App. 3d 194 (1971) is

23   instructive.  There, the court rejected an argument that pesticide spray reports were trade secrets,

24   observing, "The reports at issue here reveal only a past decision, based on transitory conditions,

25   as to the mixture and quantity of pesticide to be used. It appears from the evidence that various

26   compounds in various intensities could be used to combat a given pest, depending upon the

27   weather conditions, present and future, the condition of the crop to be sprayed and the soil upon

28   which it is growing, and intensity of the insect population.  Since the nature of the compound and

the intensity of its application are being varied on the basis of these other factors, the mixture and dosage elements cannot be said to have the continuity of use envisioned by the Restatement definition." (*Id.* at 209.) The court went on to require disclosure of the reports at issue (*id.* at 211) and to find, in a Public Records Act case involving a balancing of interests similar to that at issue here, that "disclosure best serves the public interest." (*Id.* at 213.) The same conclusion follows here given the fast-changing nature of the industry and the transitory nature of the records at issue.

The "substantial and unfair advantage" only exists in a hypothetical world in which there is not already a lot of information that is already factored into competitive decisionmaking. Some of that information comes from third party analysts, but some come from Apple's own guidance. As noted in Reuters's July 25 opposition, for example, Apple disclosed in its earnings call on July 24 that sales of the iPhone have slowed because many customers are apparently waiting for the next version to be rolled out. Unless Apple's guidance has been completely wrong (or the analytics industry disappeared leaving a large black hole, or Apple converted to a privately held company, or any other purely hypothetical scenarios transpire) it is difficult to see how the addition of past financial data would "wreak havoc" for Apple, as its counsel claimed at the last hearing. "Hypothesis or conjecture" is not enough. *Hagestad v. Tragesser,* 49 F.3d 1430, 1434 (9th Cir. 1995). Nor is hyperbole.

Apple also fails to explain why past data is still relevant if Apple is rolling out new products periodically, continues to change designs or features, and remains in control of product roll-out. If Apple determined that past design prototypes for its products could be disclosed on July 26 in its filings (notwithstanding the inevitable rumors that some designs might presage future products in the pipeline), why not other company information from the past? See Valerian Decl. ¶ 6, Ex. E (article regarding July 26 disclosure of dozens of Apple's past prototype designs).

In support of their cursory arguments regarding the public's supposed lack of interest, Apple and Samsung do not cite any case that squarely found that the public's interest in the litigants' financial information was outweighed by the litigants' interest in keeping such

information under wrap.

Rather, the parties quote misleadingly from *Network Appliance*, Magistrate Judge Laporte's decision, to give the impression that courts have previously ruled that the public has little interest in costs, product line information, and profit margins.  See Joint Motion, Doc. 1414, p. 6:18-27; Samsung's Motion, Doc. 1490, 4:25-5:1; Apple's Motion, Doc. 1499, p. 5:1-5:9.  The full quotation from Magistrate Judge Laporte's *Network Appliance, Inc.* decision is: "The portions of the document that NetApp requests the Court to seal contain *highly technical portions of Mr. Brandt's report* that would do little to aid the public's understanding of the judicial process, but have the potential to cause significant harm to NetApp's competitive and financial position within its industry" (emphasis added) (referring to "detailed information about proprietary procedures, the SnapMirror replication mechanism and Data ONTAP source code."). The other case that both parties cite, *Richardson v. Mylan*, dealt exclusively with technical information as well.

Samsung counsel Victoria Maroulis' statement at the July 27, 2012 hearing that "the public doesn't understand the financial information anyway" is not only wrong, but misses the point.  The consuming and investing public is able to understand the manufacturer costs for a product and the profit margin on a product.  But the test is not whether an ordinary member of the public grasps a particular data point, because we know most of the public is not going to directly access any of this information.  The question is whether there is a public interest on the whole to all information relevant enough to be in an exhibit, based on the claims and the types of relief at issue in the case.  This case is about Samsung allegedly copying the very specific products of Apple and thereby stealing market share and profits away from Apple.  Product-level financial information is essential to understanding any decision regarding the willfulness of infringement and what remedies are appropriate.

### B.       Source Code And Technical Information (Proponents: Apple And Samsung)

Reuters does not oppose the sealing of actual source code, technical schematics and similar technical information (but it would oppose the sealing of testimony referencing such content without reproducing the content).

C.   **Information Relating To Licensing Agreements (Proponents: Apple And 3rd Parties, Dolby, Ericsson, IBM, Intel, Interdigital, Microsoft, Motorola Mobility, Nokia, Philips, Qualcomm, Research In Motion, Siemens, Toshiba)**

Reuters believes that if Apple and Samsung find it necessary to submit specific licenses or license terms to the consideration of the judge or jury for factfinding, that such information should remain unsealed.   If there is a public interest in understanding how our patent system works, then certainly patent licensing is an essential and large part of how the system works.  It is important to understanding injunctive relief and claims of irreparable harm – royalties are indirect evidence of compensation offsetting harm.   They are also potentially important to understanding damages, as royalties are one measure of damages.[2]

Reuters recognizes that third parties have interests that must be weighed.  It appears that every major, and some minor, players in patent licensing has appeared in this action to assert its interest in secrecy.  On the one hand, in the aggregate the uniform preference of the third parties in keeping licensing terms under wraps could outweigh the public interest in disclosure.  On the other hand, across-the-board disclosure (as opposed to piecemeal disclosure) would increase everyone's access to information and minimize the competitive disadvantage caused by piecemeal "leaks."   Therefore, if licensing terms are presented to the jury and judge and the fact-finding takes licensing terms into account, then the Court should find that the public interest overall favors across-the-board disclosure.

In addition to Apple, third parties representing much of the world of technology patent licensing have moved the court to seal licensing terms, ranging from entire license agreements in some cases to specific terms such as pricing, duration, and scope of patent in other cases.  They intervened after Samsung sent each of them a letter outlining the Ninth Circuit's "compelling reasons" standard, indicating that Samsung "has not identified any compelling reasons, under that standard, to warrant a request for sealing of these documents" and inviting them to try to make their own showings.  *See, e.g.*, Emergency Motion by Nonparty Motorola Mobility LLC to Seal

---

[2] A reasonable royalty is a form of damages when awarded in the damages phase of an infringement  litigation, though it usually is a form of equitable relief, when it is imposed, in lieu of an injunction, to prevent future harm to the patentee.  *Apple, Inc. v. Motorola, Inc.*, 2012 U.S. Dist. LEXIS 89960, *32-33 (N.D. Ill. June 22, 2012).

1   Exhibits, Close Courtroom, and Seal Portions of Transcript (Dkt. 1400, 7/26/2012) and

2   Declaration of Thomas V. Miller, Ex. A (Dkt. 1400-1).

3        Thirteen parties, by our count, have intervened in favor of secrecy in licensing terms.

4   After the Court's July 27, 2012 hearing, some but not all of them submitted supplemental

5   declarations and/or briefs.

6        With respect to IBM and Qualcomm, their motions to seal are moot, because the licensing

7   terms involving them were disclosed in each of their initial filings.  On July 30, 2012, IBM

8   sought unsuccessfully to obtain a prior restraint order from Magistrate Judge Grewal enjoining

9   Reuter's publication of its licensing terms.

10       Although the specificity of the third parties' supporting declarations vary, their unified

11  position is that they all fear competitive harm in the event of disclosure.  They contend that

12  competitors would obtain negotiating advantages from what they consider to be information

13  asymmetry, or one negotiating party having information about the other side's licensing history

14  that it would not ordinarily have.

15       But none of the parties has addressed head-on the "elephant in the room" questions:  (a) If

16  information asymmetry in patent negotiations is the concern, don't some of them already stand to

17  gain at the expense of others from the IBM and Qualcomm disclosures that have already been

18  made, and (b) if some of the key terms they seek to conceal from the public, but are relevant to

19  this case, are disclosed in an exacting and even-handed manner, what information asymmetry

20  would there still be, and what real competitive harm would follow?

21       Reuters urges the court to consider the strong public interest in transparency in licensing

22  terms, as attested to in the joint declaration of Professors Colleen Chien, Brian Love, Michael

23  Risch, John Allison, and David Schwartz filed herewith.  See Declaration of Patent Professors In

24  Support of Reuters' Opposition to Motions to Seal Trial and Pretrial Evidence.  As explained in

25  more detail in their declaration, "the lack of a transparency about patent licenses is a well-

26  recognized problem."  *Id.* ¶ 4.  "The lack of information about the value of arms-length patent

27  transactions creates arbitrage opportunities for those who have access to proprietary data, while

28  shutting out the public, scholars, and others."  *Id.* ¶ 5.  Among other market inefficiencies, the

1   lack of licensing data prevents accurate determinations of patent damages.  *Id.*

2       As the professors' declaration makes clear, "making licensing data more widely available

3   can help reduce these market inefficiencies by providing credible, comparable, information to

4   parties, scholars, and courts wrestling with the difficult question of what a patent is worth."  *Id.* ¶

5   6.  The valuation information in the licensing agreements is not only at the heart of damages

6   calculations in this case, but is also desperately needed to enhance our understanding of how the

7   patent system is actually operating and how to improve it.

8       Reuters proposes that if Apple and Samsung find it necessary to enter specific license

9   terms into evidence for fact-finding, that the information that is actually relevant to the fact-

10   finding remain unsealed.  Thus, it would seem that pricing terms, as well as some very high-level

11   description of the patents or products to which the prices correspond, must remain unsealed.

12       **D.    Proprietary Market Research (Proponent: Apple)**

13       Surprisingly, Apple has *enlarged* the scope of the proposed sealing for the "market

14   research category" to include not just material generated by third parties, but its own market

15   research.  Previously, Apple requested sealing of "third-party confidential research from Apple's

16   business partners that would severely impact the market for the third-party's research reports."

17   (Renewed Motion to Seal, Dkt. 1317, p. 2.)  Apple had failed to describe what the research

18   reports were – apparently attempting to protect the identities of the third parties – instead vaguely

19   referring to third-party market research companies," and relying solely an a vague declaration,

20   not from the third parties, but from an attorney at Morrison & Foerster (Sabri Declaration, Dkt.

21   1317-3).  Now, Apple has finally admitted that the third party market research refers to a report

22   and a data spreadsheet generated by IDC, a well-known telecommunications/Internet research

23   firm whose reports are widely used by industry analysts.  And now, Apple seeks to seal not only

24   the IDC materials (in two exhibits, DX 536 and DX 537) in their entirety, but also seeks to seal

25   fourteen exhibits consisting of Apple's *own buyer surveys*.

26       **1.    Buyer surveys conducted by Apple should not be sealed because they
            do not qualify as trade secrets.**

27

28       Apple claims that the buyer surveys are on the whole not relevant to the merits and that

1   Samsung has been overinclusive in its selection of trial exhibits.  Yet Apple admits that the buyer

2   surveys it has conducted provide insight into its customers' purchasing decisions and preferences.

3   (Motion to Seal Confidential Trial Exhibits, Dkt. 1495, p. 10; Joswiak Decl. ¶¶ 3-.)  Such

4   information is essential for determining whether Apple suffers any irreparable harm absent an

5   injunction.  See Order Denying Motion for Preliminary Injunction, Dec. 2, 2011, Doc. 452 (a

6   section with many redactions in which the Court discusses what drives purchasing decisions).

7   Apple cannot seal information that would go to the heart of its request for an injunction,

8   especially when the information is generated by Apple itself and does not affect a third-party

9   researcher.

10          Even more astounding is that Apple seeks to seal buyer surveys that are Samsung's trial

11   exhibits, when Apple has disclosed at least a similar study – an "iPhone Owner Study" labeled

12   "Apple Market Research & Analysis, May 2011" – in its unredacted filings on July 26.  See

13   Valerian Decl. ¶ 7, Ex. F (Wall Street Journal, "Turns Out Apple Conducts Market Research

14   After All," July 26, 2012).  That study discusses the surveyed preferences of Apple iPhone

15   customers in multiple countries, including China, Japan, the U.K., France, Germany and South

16   Korea.  Despite that, Apple's Mr. Joswiak flatly declares that competitors do not have access to

17   any surveys of Apple customers, that competitors can only speculate about customer preferences,

18   and "they do not know how the preferences of customers in, for example, Japan differ from those

19   in Australia, Korea, France or the United States."  Joswiak Decl. ¶ 5 (Dkt. 1503).  Not only does

20   Apple ignore the disclosures that have been made already, it fails to consider the likelihood that

21   competitors and other research firms may in fact conduct their own surveys and obtain the same

22   data about Apple customers.   Again, Apple's position here is contrary to reality.  *See Apple, Inc.*

23   *v. Psystar Corp.*, 2012 U.S. Dist. LEXIS 148, *4 (Jan. 3, 2012, Alsup, J.) (denying motion to seal

24   technical information that was already in fact out in the public due to accurate "reverse

25   engineering," and rejecting Apple's argument that "trade secret protection will still exist if Apple

26   is not the source of that publicly available information, and has not endorsed or confirmed any of

27   that information.").

28                    **2.    IDC Market Research Report And Underlying Spreadsheet (DX 526**
                      **and DX 537)**

Apple has not made any credible showing of the need for secrecy as to the IDC market research contained in Samsung's trial exhibits. It continues to rely on past declarations by an outside counsel declarant who states that he "understand[s] that Apple is contractually obligated to defend the interests of third parties who sell Apple their proprietary consumer and market studies. . . " (Sabri Decl. ¶ 3, Dkt. 1408-2). It is well-established that the existence of a confidentiality agreement between two parties is not a "compelling reason" to seal a document. *See, e.g., Nav N Go KFT v. Mio Technology USA, Ltd,* 2008 U.S. Dist. LEXIS 96178, *3 (D. Nev. Nov. 14, 2008) (the "existence of a contractual confidentiality provision, standing alone, cannot constitute a 'compelling reason'" to seal a licensing agreement). Moreover, Apple fails to describe the report with any specificity.[3] Presumably, at issue is a past report on smartphone and/or tablet market. If so, Apple fails to address just how release of *past market research by IDC* would hurt IDC's business, when IDC publishes new and updated market research on a monthly and quarterly basis. See Valerian Decl. ¶ 8, Ex. G (IDC Press Release, "Strong Demand for Smartphones in Second Quarter Continues to Drive the Worldwide Mobile Phone Market, According to IDC," July 26, 2012). It might even help IDC to give away a past report as a sampler in order to entice future purchases.

E.      **Business Plans (Proponent: Samsung)**

Samsung states that it wishes to seal those pages of trial exhibits relating to its future business plans that are not shown to the jury and not entered into evidence (Dkt. 1488, p. 7). Reuters' position is that any exhibit that is entered into evidence at trial must be public, regardless if only a small portion was "shown" to the jury in open court. Reuters does not oppose Samsung's request to the extent it is limited to pages not entered into evidence.

---

[3] Reuters does not have any sufficiently helpful description of the IDC report or spreadsheet to directly rebut Apple's assertion that they are "largely irrelevant to the issues to be decided in this litigation." (Reuters does not have Samsung's Exhibit List.) However, if Apple has not managed to exclude this evidence in motions *in limine*, this evidence is presumably relevant.

**VI.  EXHIBITS FROM PRIOR MOTIONS: MOTIONS IN LIMINE, DAUBERT MOTIONS, SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION MOTIONS ARE ALL SUBJECT TO THE COMPELLING REASONS STANDARD AND THE PARTIES HAVE NOT SHOWN COMPELLING REASONS TO SEAL.**

The parties' attempt to argue that anything other than a "compelling reasons" standard should apply to any of the material they are trying to seal fails.  *Kamakana* makes clear that both trials and trial evidence as well as materials filed in connection with "dispositive motions" are subject to the "compelling reasons" standard.  (447 F.3d at 1179-1180.)  Motions *in limine*, too, are subject to the "compelling reasons" standard because they relate to trials.  As the California Supreme Court held in *NBC Subsidiary v. Superior Court*, 20 Cal. 4th 1178, 1219 (1999), after an exhaustive review of the U. S. Supreme Court access authorities, "the closed and sealed hearings concerned, among other things, motions for and arguments of counsel regarding nonsuit and mistrial, evidentiary hearings . . . at which the court heard the testimony of proffered witnesses, and other proceedings addressing the admissibility of testimony and documentary evidence.  We are unaware of any authority holding or suggesting that such proceedings have not been historically important, open, and public parts of civil trials."

For reasons set forth above, the parties have not shown compelling reasons to seal any of the material filed in connection with motions *in limine*, *Daubert* motions, summary judgment or preliminary injunction papers.

**VII.  CONCLUSION**

The parties are well-aware of the applicable standard and their heavy burden.  Although they have increased the specificity of some of their declarations in their second and third tries, they have not demonstrated a real and significant risk of concrete harm from disclosure of market research and financial information that would outweigh the public interest in access.  Apple and Samsung have had more than adequate opportunity to make their record on secrecy issues.  Their motions should be denied and the Court should not give them yet another bite at the apple.  The

/ / /

/ / /

/ / /

1   documents as to which the motions are denied should be ordered filed in unredacted form

2   forthwith.

3   Dated:  August 2, 2012                    By:  _____*/s/ Karl Olson*_____

4                                                Karl Olson (SBN 104760)
                                                 RAM, OLSON, CEREGHINO & KOPCZYNSKI

5                                                555 Montgomery Street, Suite 820
                                                 San Francisco, CA  94111

6                                                Tel: 415-433-4949; Fax:  415-433-7311
                                                 Email:  kolson@rocklawcal.com

7                                                *Attorneys for Reuters America LLC*

8

9
     N:\Docs\1273-02\OppMotsSeal4-FINAL.doc
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28