# EXHIBIT 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No.    11-cv-01846-LHK<br><br>**REBUTTAL EXPERT REPORT OF PETER W. BRESSLER, FIDSA** |

**\*\*CONFIDENTIAL – CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY PURSUANT TO A PROTECTIVE ORDER\*\***

The flatness of the front surface is communicated by additional D'677 patent figures, as shown below.[3]



FIG. 5

FIG. 6

FIG. 7    FIG. 8

58.    In particular, Figures 5-8 show that the D'677 patent depicts a completely flat front surface—as can be seen by the solid, unbroken line denoting the front surface, reproduced below with the solid line denoting the front surface in red.  Figures 5-8 without the red are shown elsewhere in my reports.

59.    Accordingly, in an analysis of alleged prior art, views other than the front view contain relevant—indeed, necessary—information because they are required to determine whether the front surfaces of the prior art designs are flat or have surface contour or topography. Without considering all figures of the D'677 patent and all views of the prior art, Mr. Sherman has improperly failed to take into account the design as a whole in arriving at his opinion that the D'677 patent is anticipated.

---

[3] In this report, I have scaled images of the patents, the prior art, and alternative designs so that they correspond with one another in height.  Care has been taken not to change the proportional relationship (i.e., aspect ratio) of the images.

106.    Therefore, even if one of the Fidler designs were considered a primary reference, it is my opinion that the ordinary designer, at the time the D'889 design was invented, would not have found it obvious to modify any of the Fidler designs to arrive at the D'889 design.

107.    **The D'037 Patent.**  Due to the same visual differences identified in my foregoing treatment of the D'037 patent, it is my opinion as a designer of ordinary skill in the art that the D'037 design does not present basically the same overall visual impression as the D'889 patent. Notably, the D'037 patent fails to disclose a tablet having a continuous transparent front surface through which a centered rectangular element is visible.  The differences between the D'037 design and the D'889 patent are significant enough that major modifications to the D'037 design would be required to make it substantially the same as the D'889 design.

108.    Even if the D'037 patent were considered a primary reference against the D'889 design, the unmodified design would not appear substantially the same to the ordinary observer, as I opined previously.

109.    Moreover, Mr. Sherman has not identified any secondary reference that he proposes to combine with the D'037 design.  Mr. Sherman suggests, however, that modifications "to have the identical profile as the D'889, as well as changes in aspect ratios and width of rims, would have been trivial to someone skilled in the art to produce the design of the D'889." (Sherman Report at 30.)  But Mr. Sherman fails to provide any explanation why the proposed modifications would have been obvious to the ordinary designer at the time the D'889 design was invented, or any suggestion that would have caused the ordinary designer to make the proposed modification.  Accordingly, Mr. Sherman's statement is unsupported and conclusory in my opinion.

110.    As discussed previously, I disagree that the differences between the D'037 design and the D'889 design are trivial.  The D'037 design merely discloses a continuous front surface, and not a transparent front surface with a viewable rectangular element marking an even border. Even if one changed the profiles, the aspect ratios, and the width of the rims of the D'037 patent, as suggested by Mr. Sherman, the resulting design would still not have a continuous transparent front surface with a viewable rectangular element as in the D'889 Patent.  Moreover, the D'037 is

1  also significantly thicker than the D'889 design, and has straight sides that form an angled edge

2  with the back surface that differs from the D'889 design.  It would not have been trivial or

3  obvious to the ordinary designer at the time the D'889 design was invented to change all these

4  features of the D'037 design to the exact features claimed in the D'889 patent.  This is evidenced

5  by the fact Mr. Sherman could not identify a single prior art reference having these design

6  features of the D'889 patent.

7      111.    Therefore, even if the D'037 patent were considered a primary reference, it is my

8  opinion that the ordinary designer, at the time the D'889 design was invented, would not have

9  found it obvious to modify the D'037 design to arrive at the D'889 design.

10     112.    **The D'157 Patent.**  Due to the same visual differences identified in my foregoing

11 treatment of the D'157 patent, it is my opinion as a designer of ordinary skill in the art that the

12 D'157 design does not present basically the same overall visual impression as the D'889 patent.

13 Notably, the D'157 patent fails to disclose a tablet having a continuous transparent front surface

14 through which a centered rectangular element is visible.  The differences between the D'157

15 design and the D'889 patent are such that major modifications to the D'157 design would be

16 required to make it look like the D'889 design.

17     113.    Even if the D'157 patent were considered a primary reference against the D'889

18 design, the unmodified design would not appear substantially the same to the ordinary observer,

19 as I opined previously.

20     114.    Moreover, Mr. Sherman has not identified any secondary reference that he

21 proposes to combine with the D'157 design.  Mr. Sherman suggests, however, that modifications

22 "to have the identical profile as the D'889, as well as changes in aspect ratios and width of rims,

23 would have been trivial to someone skilled in the art to produce the design of the D'889."

24 (Sherman Report at 30.)  But Mr. Sherman fails to provide any explanation why the proposed

25 modifications would have been obvious to the ordinary designer at the time the D'889 patent was

26 invented, or any suggestion that would have caused the ordinary designer to make the proposed

27 modification.  Accordingly, Mr. Sherman's statement is unsupported and conclusory in my

28 opinion.

115.   As discussed previously, I disagree that the differences between the D'157 design and the D'889 design are trivial.  At most, the D'157 design discloses an opaque frame surrounding a transparent surface.  It does not disclose a transparent front surface with a viewable rectangular element that marks an even border around the element.  Even if one changed the profiles, the aspect ratios, and the width of the rims of the D'157 patent, as suggested by Mr. Sherman, the resulting design would still not have a continuous transparent front surface with a viewable rectangular element as in the D'889 Patent.  That modification alone would not have been trivial or obvious to the ordinary designer at the time the D'889 patent was invented, as evidenced by Mr. Sherman's inability to identify a single prior art reference having this feature of the D'889 patent.

116.   Therefore, even if the D'157 patent were considered a primary reference, it is my opinion that the ordinary designer, at the time the D'889 design was invented, would not have found it obvious to modify the D'157 design to arrive at the D'889 design.

117.   **JP D1142127 ("the JP'127 patent").**  Mr. Sherman appears to assert that the JP'127 patent is a primary reference against the D'889 patent.  I disagree with any such opinion. The JP'127 design discloses an opaque frame around a center display area.  The opaque frame also includes patterns formed of circular holes on the left and right-hand sides.  The opaque frame is also raised above the front surface, such that it is visible in the profile views.  This visual appearance is distinctly different than that of the D'889 design.  Moreover, the JP'127 patent includes a visible notch on its top surface and various other visual elements on its back surface, which do not exist in the D'889 patent.  Due to these visual differences, it is my opinion as a designer of ordinary skill in the art that the JP'127 design does not present basically the same overall visual impression as the D'889 patent.  The differences between the JP'127 design and the D'889 patent are such that major modifications to the JP'127 design would be required to make it substantially the same as the D'889 design.

| JP'127 Patent | D'889 Patent |
|---|---|

| JP'127 Patent | D'889 Patent |
|---|---|
|  |  FIG. 1 |
| No corresponding view. |  FIG. 2 |
|  |  FIG. 3 |
|  |  FIG. 4 |
|  |  FIG. 5 <br> FIG. 6 |
|  | FIG. 7 <br> FIG. 8 |

118.    Even if the JP'127 patent were considered a primary reference against the D'889 design, the unmodified design would not appear substantially the same to the ordinary observer for reasons set forth above.

119.    Mr. Sherman suggests that the JP'127 reference can be combined with the D'037 patent, the D'157 patent, or Apple's "brain box" design to render the front face of the device "completely flush" and produce the design of the D'889 patent.  (Sherman Report at 30.) Mr. Sherman fails to provide any rationale for why the appearance of visual features in the D'037, D'157, and "brain box" references would have suggested to the ordinary observer their application to the D'889 patent.  Moreover, even the combined references would fail to produce the D'889 patent, as Mr. Sherman claims, or a design that would appear substantially the same in the eyes of the ordinary observer.

120.    In particular, even if the JP'127 reference front surface were made "completely flush" as suggested by Mr. Sherman, it would still lack a continuous transparent surface with a viewable rectangular element over the front face.  The other differences in the JP'127 reference would also remain, such as the prominent dotted design elements on the left and right of the device's front surface.  Such a design would not appear substantially the same to the ordinary observer.

121.    Furthermore, even if the JP'127 reference were combined with one of the three references suggested by Mr. Sherman, the resulting design would still lack a continuous transparent front surface with an underlying rectangular element, because none of these references discloses that visual feature.  Without that feature, none of these hypothetical combined designs would appear substantially the same to the ordinary observer.

122.    Accordingly, even if the JP'127 patent were considered a primary reference, it would not render the D'889 patent obvious, whether alone or in combination with the D'037, D'157, or "brain box" references.

123.    **D461,802 ("the D'802 patent").**  Mr. Sherman appears to assert that the D'802 patent is a primary reference against the D'889 patent.  I disagree with any such opinion.  The D'802 design discloses an opaque frame with textured patterns surrounding a center area that is

1

2   127.    Even if the D'802 patent were considered a primary reference against the D'889

3   design, the unmodified design would not appear substantially the same to the ordinary observer

4   for reasons set forth above.

5   128.    Mr. Sherman suggests that the D'802 patent can be combined with the D'037

6   patent or the D'157 patent to render its patterned borders flat and its overall shape completely

7   rectangular so as to produce the D'889 design.  (Sherman Report at 30.)  Mr. Sherman fails to

8   provide any rationale for why the appearance of visual features in the D'037 or D'157 patents

9   would have suggested to the designer of ordinary skill in the art their application to the D'889

10  patent.  Moreover, even the combined references would fail to produce the D'889 patent, as

11  Mr. Sherman claims, or a design that would appear substantially the same in the eyes of the

12  ordinary observer.

13  129.    In particular, even if the D'802 design were combined with the D'037 patent or

14  D'157 patent, the resulting design would still lack a continuous transparent front surface with a

15  viewable rectangular element, which is not disclosed in either the D'037 or D'157 patents.

16  Moreover, the resulting design would not come any closer to the D'889 patent in profile shape, as

17  the D'157 patent profile is more similar to the D'802 patent than to the D'889 patent, and the

18  D'037 has a thick, angled side profile, which looks nothing like the D'889 side profile.  None of

19  the resultant designs from Mr. Sherman's proposed combinations would appear substantially the

20  same to the ordinary observer.

21  130.    Accordingly, even if the D'802 patent were considered a primary reference, it

22  would not render the D'889 patent obvious, whether alone or in combination with the D'037 or

23  D'157 patents.

24  131.    **Unapplied References**.  Mr. Sherman lists a number of alleged prior art

25  references in his report that he does not assert as anticipatory references or references that render

26  the D'889 patent obvious.  In particular, Mr. Sherman generally describes the alleged designs for

27  the 1998 University of Illinois tablet, D'337,569, KR30-0304216, JP0921403, JP0887388, U.S.

28

1  Patent No. 6,919,678,[8] CDR 000048061-0001, HP Compaq TC1000, D464,344, D463,797,

2  pictures from the movie Space Odyssey 2001, and pictures from the TV series "Tomorrow

3  People."  I disagree with a number of Mr. Sherman's assertions regarding the visual appearance

4  of these references.  But as Mr. Sherman has not provided any specific opinions as to how these

5  references invalidate the D'889 patent, I am unable to rebut them.  I reserve the right, however, to

6  offer such rebuttals if Mr. Sherman later provides specific opinions on how these references

7  invalidate the D'889 patent.

**11.     Mr. Sherman Cannot Identify a Proper Primary Design Reference for the D'677 Patent**

132.     Given the importance of the flat, continuous, and edge-to-edge transparent front

surface for the overall appearance of the D'677 design, it is my opinion that any prior art design

without such a front surface cannot present basically the same visual impression as the D'677

design and thus cannot serve as a primary reference.  The few prior art designs identified by

Mr. Sherman as allegedly having this feature are so visually dissimilar from the D'677 design that

they cannot serve as primary references.

133.     **The JP'221 Patent.**  To the extent Mr. Sherman implies that the JP'221 patent

could be considered a primary reference against the D'677 patent, I disagree.  As discussed in

detail above, the overall appearance of the JP'221 design is significantly different from that of the

D'677 patent.  In particular, the JP'221 design lacks a flat, continuous, and edge-to-edge

transparent front surface, which is an integral visual element of the D'677 design.  The JP'221

design cannot be used as a primary reference, because in my opinion, it does not create basically

the same visual impression as the D'677 design to the designer of ordinary skill in the art.

_____

[8] Although Mr. Sherman does not provide any specific explanation for why U.S. 6,919,678 anticipates or renders obvious the D'889 patent, I concluded that U.S. Patent Application Publication No. 2004/0041504, which gave rise to U.S. 6,919,678, does not disclose a design that is substantially the same as the D'889 patent in my opening Expert Report at ¶¶ 109-117.  My analysis therein applies to U.S. 6,919,678, and I incorporate such analysis by reference.  Moreover, for the reasons that U.S. 6,919,678 does not invalidate the D'889 patent, it also does not invalidate the D'677 patent.  Mr. Sherman does not provide any explanation for why U.S. 6,919,678 does not invalidate the D'677 patent, and I reserve the right to rebut such opinions if he comes forward with them.

134.   Even if the JP'221 design were considered a primary reference for the D'677 patent, for the reasons discussed above, the JP'221 design would not appear substantially the same as the D'677 design to an ordinary observer and therefore would not render the D'677 patent obvious on its own.  Mr. Sherman does not suggest any modifications to the JP'221 design or identify any secondary references for combination with the JP'221 design, so I cannot further rebut his opinion that the JP'221 patent renders the D'677 patent obvious.

135.   **The D'889 Patent.**  To the extent Mr. Sherman implies that the D'889 patent could be considered a primary reference against the D'677 patent, I disagree.  As discussed in detail above, the overall appearance of the D'889 design is significantly different from that of the D'677 patent.  In particular, the D'889 patent has a different form factor, different proportions, lacks the unique border configuration of the D'677 design, and is missing a lozenge-shaped slot feature.  The D'889 design also lacks the D'677 patent's black color.  The D'889 design cannot be used as a primary reference, because in my opinion, it does not create basically the same visual impression as the D'677 design to the designer of ordinary skill in the art.

136.   Even if the D'889 design were considered a primary reference for the D'677 patent, for the reasons discussed above, the D'889 design would not appear substantially the same as the D'677 design to an ordinary observer and therefore would not render the D'677 patent obvious on its own.  Mr. Sherman does not suggest any modifications to the D'889 design or identify any secondary references for combination with the D'889 design, so I cannot further rebut his opinion that the JP'221 patent renders the D'677 patent obvious.

137.   **The JP'638 Patent.**  To the extent Mr. Sherman implies that the JP'638 patent could be considered a primary reference against the D'677 patent, I disagree.  As discussed in detail above, the overall appearance of the JP'638 design is significantly different from that of the D'677 patent.  In particular, the JP'638 design lacks a flat, continuous, and edge-to-edge transparent front surface, which is an integral visual element of the D'677 design.  The JP'638 design cannot be used as a primary reference, because in my opinion, it does not create basically the same visual impression as the D'677 design to the designer of ordinary skill in the art.  Major modifications are required to make the JP'638 design look like the D'677 patent.

- A *New York Times* review of the iPhone dated January 11, 2007, entitled "Apple Waves Its Wand at the Phone." The article notes that "[a]s you'd expect of Apple, the iPhone is gorgeous." It likens Apple's creation of the iPhone to the work of "the fairy godmother in 'Cinderella'": transformation of a "homely and utilitarian object, like a pumpkin or a mouse, into something glamorous and amazing . . ."[35]
- A *New York Times* article dated June 27, 2007, describes the iPhone as "a tiny, gorgeous hand-held computer," and notes that "[t]he phone is so sleek and thin, it makes Treos and Blackberrys look obese."[36]
- A *Korea JoonsAng Daily* Internet article dated February 18, 2008, entitled "Apple iPhone Tops List of Innovative Inventions," reporting the results of a survey of 599 Korean CEOs by Samsung Economic Research Institute, in which the CEOs indicated that the "iPhone's sleek design caught their eye."[37]
- A *Wall Street Journal* article, dated June 27, 2007, entitled "Testing Out the iPhone," which states that smartphone "designers have struggled to balance screen size, keyboard usability and battery life . . . . [T]he iPhone is, on balance, a beautiful and breakthrough handheld computer."[38]

255.    The iPhone is not merely an example of excellence in design. The purity of design expression pushes the iPhone into the realm of art. In recognition of the iPhone's aesthetic beauty, iPhones have been added to the permanent collections of museums including the Museum of Modern Art, the San Francisco Museum of Modern Art, and the Museum for Kunst und Gewerbe (Arts & Crafts) in Hamburg, Germany. The iPhone has been displayed in exhibitions including:

- *Less and More:  The Design Ethos of Dieter Rams*, San Francisco Museum of Modern Art, August 27, 2011, through February 20, 2012 and
- *Stylectrical*, Museum for Kunst und Gewerbe (Arts & Crafts), August 26, 2011, through January 15, 2012.

---

[35] David Pogue, "Apple Waves Its Wand at the Phone," NY Times, Jan. 11, 2007 http://www.nytimes.com/2007/01/11/technology/11pogue.html?sq=pogue.

[36] David Pogue, "The iPhone Matches Most of Its Hype," NY Times, June 27, 2007, http://www.nytimes.com/2007/06/27/technology/circuits/27pogue.html?pagewanted=1&_r=1&ref=iphone.

[37] Korea JoongAng Daily, "Apple's iPhone Tops List of Innovative Inventions," Feb. 18, 2008, http://joongangdaily.joins.com/article/view.asp?aid=2886322.

[38] Walter Mossberg & Katherine Boehret, "Testing Out the iPhone, The Wall Street Journal, June 27, 2007, http://online.wsj.com/articles/SB118289311361649057.html.

256.     Additionally, the United States Patent and Trademark office featured iPhone shaped displays in an exhibit showcasing Steve Jobs' numerous patents and trademarks.[39]

257.     **iPod touch.**  The iPod touch's design as embodied in the D'270 patent has also received much acclaim.  The iPod touch received a gold design award at the iF Product Design Awards at the CeBit 2008 show in Hanover, Germany.[40]  The iPod touch also received a "Yellow Pencil" design award in a 2008 Design and Art Direction design competition.[41]  Similarly, in part due to its distinctive design, Apple's iPod touch was named "Gadget of the Year" by T3, in a British awards competition.[42]  The iPod touch was also named one of the "Best Inventions of 2008" by *Time* magazine.[43]

258.     The distinctive design of the iPod touch has also received widespread praise from various media outlets.  For example, a *PC Magazine* article dated September 12, 2007, entitled "Apple iPod touch," calls the iPod touch a "thing of beauty" and explains that as an "elegant design, the iPod touch is simply the best portable media player ever made."[44]  Likewise, a *Guardian* (London) article notes "[w]ith its eye catching design, the iPod [touch] has become a landmark of 21st century living in just a few years."[45]

[39] Brian Chen, "Patent Office Highlights Jobs's Innovations," New York Times, Nov. 23, 2011, http://bits.blogs.nytimes.com/2011/11/23/patent-office-highlights-jobss-innovations; APL-ITC796-X0000003306 - APL-ITC796-X0000003666.

[40] MacNN, "Apple Wins Eight iF Design Awards at CeBIT," Mar. 8, 2008, http://www.macnn.com/articles/08/03/08/apple.wins.8.if.awards/.

[41] Palmer, Robert, "Apple Wins Two D&AD 'Black Pencil' Awards," TUAW, May 16, 2008, http://www.tuaw.com/2008/05/16/apple-wins-two-dandad-black-pencil-awards/.

[42] iPodNN, "iPod touch Voted Gadget of the Year," Oct. 10, 2008, http://www.ipodnn.com/articles/08/10/10/gadget.of.the.year.ipod/.

[43] Jeremy Caplan, "Gadget of the Year: iPod touch," Time, Oct. 29, 2008, http://www.time.com/time/specials/packages/article/0,28804,1852747_1852746_1852745,00.html.

[44] Tim Gideon, "Apple iPod touch," PC Mag, Sep. 12, 2007, http://www.pcmag.com/article2/0,2817,2179699,00.asp.

[45] Bobbie Johnson, "Farewell to a classic design as Jobs unveils the iPod touch: Apple ditches emblematic look with media player based on iPhone," Guardian, Sep. 6, 2007 at 13.

1

### c. Initial Skepticism

2     259.    **iPad 2.**  There was considerable of pre-launch initial skepticism of the iPad design

3  by industry experts.  For instance, one commentator criticized the iPad as "not so pretty,"

4  explaining:

5         A hallmark of all Apple products is design. More often than not, the devices the
          company releases are far more beautiful than any competing product. But the iPad
6         is different. The device's bezel is huge, making the screen look smaller than it
          really is. Worst of all, a quick comparison between the iPad and its competition
7         reveals that some products, especially HP's Slate, are actually on equal footing, if
          not better looking than Apple's iPad. Unfortunately for HP, few people know
8         that.[46]

9      260.    Another media report predicted failure of the iPad:

10        Like a moth to a hot trend, Apple (AAPL) will fly into the netbook flame and get
          burned. The company will unveil a 10-inch touchscreen tablet computer sometime
11        this year, say analysts. Not only does Apple want to showcase its design prowess,
          the company desperately needs a new hit to revitalize its computer line-up. . . .
12        [B]eyond the core fan base, Apple will discover what other PC makers have
          known for a while: Consumers find big tablets hard to swallow.[47]
13

14     261.    Others criticized the iPad's lack of physical keyboard.[48]  And others complained

15  that the "iPad is a heavy, bulky piece of gear and uncomfortable to hold for long periods."[49]

16     262.    The iPad 2 incorporated many of the design features of the iPad of which the

17  industry was skeptical.

18     263.    **iPhone.**  There was initial skepticism of the iPhone design around the time of its

19  release.  Many media reports predicted that the iPhone would fail.[50]  One industry observer

20  _____

21     [46] Don Reisinger, "10 Reasons Why the iPad Would Fail Without the Apple Logo," eWeek.com,
Jan. 28, 2010, http://www.eweek.com/c/a/Mobile-and-Wireless/10-Reasons-Why-the-iPad-Would-Fail-
Without-the-Apple-Logo-428320/1/ (**APLNDC-Y0000238570-72**).

22     [47] Scott Moritz, "Apple's Netbook Foray Will Flop," The Street, Mar. 24, 2009,
23  http://www.thestreet.com/print/story/10476593.html (**APLNDC-Y0000238577-79, APLNDC-
Y0000238580-82**).

24     [48] Jeremy Muncy, "5 Reasons Why the iPad Fails to Impress," WebProNews, Feb. 1, 2010,
http://www.webpronews.com/5-reasons-why-the-ipad-fails-to-impress-2010-02 (**APLNDC-
25  Y0000238554-69**).

26     [49] Rick Broida, "How to hold an iPad comfortably in one hand." CNET, Mar. 7, 2011,
http://reviews.cnet.com/8301-31747_7-20040287-243.html (APLNDC-Y0000238764-68).

27     [50] *See, e.g.,* Bill Ray, "Why the Apple Phone Will Fail, and Fail Badly," The Register, December
23, 2006, http://www.theregister.co.uk/2006/12/23/iphone_will_fail/page2.html; Matthew Lynn, Apple
28                                                          (Footnote continues on next page.)

1  available to Apple and that a variety of design factors were to be considered.  Other witnesses

2  testified that the design of the iPhone was ultimately determined based on aesthetic

3  considerations.

4         386.    Indeed, based on testimony of Apple product designers, it is my understanding

5  that there were manufacturing challenges associated with the splined (i.e., curved) surfaces of the

6  iPhone design.  (*See*, e.g., T. Tan Dep. at 56:10-61:18 (Mar. 2, 2012).)  This further undermines

7  Mr. Sherman's claim that the rounded corners of the D'677, D'087 or D'270 patents are purely

8  functional.

9         387.    Accordingly, it is my opinion that the rounded corners of a smartphone or media

10  player are not dictated by function.

11          **c.**      **The Display Screen on a Smartphone or Media Player**

12                  **Need Not Be an Elongated Rectangle**

13         388.    Mr. Sherman asserts that "[a]vailable display screen options [that might exist]

14  other than an elongated rectangle would be less efficient for use in a modern mobile electronic

15  device and would be considerably more expensive."  (Sherman Report at 98.)  However,

16  Mr. Sherman offers no factual basis for this assertion and, in fact, many commercialized

17  smartphones have screens that are more square than rectangular.  For example, the display

18  screens of the Nokia X5-01 and the Palm Centro (shown below) are more square than

19  rectangular.

 

## XXI.   SUPPLEMENTATION

370.   I reserve the right to supplement or amend this report if additional facts and information that affect my opinion become available.  In particular, I understand that Samsung may serve an expert report concerning one or more of the issues addressed by this report.  I may therefore supplement or amend my report or opinions in response to additional discovery or other events and may rebut the expert report submitted by Samsung.

## XXII.  EXHIBITS TO BE USED

371.   I anticipate using as Exhibits during trial certain documents and things referenced or cited in this report or accompanying this report.  I also anticipate using other demonstrative Exhibits or things at trial.

Dated:  March 22, 2012

PETER BRESSLER