# EXHIBIT 2

1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

SAN JOSE DIVISION

7

| APPLE INC., a California corporation, | Case No.   11-cv-01846-LHK |
|---|---|
| Plaintiff, | |
| v. | **REBUTTAL EXPERT REPORT OF PETER W. BRESSLER, FIDSA** |
| SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |

8

9

10

11

12

13

14

15

**\*\*CONFIDENTIAL – CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY PURSUANT TO A PROTECTIVE ORDER\*\***

16

17

18

19

20

21

22

23

24

25

26

27

28

83.     As is made apparent from the side views, the JP'638 patent shows a significantly cambered, non-flat front surface.  The JP'638 surface is surrounded by an enclosure part that tapers toward the top and bottom of the device.  The effect of the cambered surface and tapered enclosure part in the JP'638 can be distinctly seen in its profile views, which markedly contrast with the profile views of the D'087 patent.  Not only does the cambered surface in the JP'638 design produce a very different visual impression than the iPhone design, the thin uniform bezel of the iPhone also starkly contrasts with the thick, tapered enclosure part of the JP'638 design.  Moreover, the JP'638 design has a smaller speaker slot that is shifted noticeably higher than the D'087 design.

84.     Accordingly, it is my opinion that the ordinary observer would not find the overall visual impression of the JP'638 patent substantially the same as that of the D'087 patent.

85.     **JP D1241383 ("the JP'383 patent")**.  Mr. Sherman alleges that the JP'383 design anticipates the D'087 patent.  I disagree.  The JP'383 reference includes a number of confusing and inconsistent drawings purportedly disclosing an electronic device inside a transparent cover.  Due to the overlapping lines introduced by this design, and apparent contradictions within different figures, an ordinary observer would not be able to ascertain a single design from the JP'383 figures that is substantially the same as the D'087 design.

| JP'383 Patent | D'087 Patent (Selected Embodiments) |
|---|---|
|  | \n\nFIG. 9\n\n\n\nFIG. 17 |

| JP'383 Patent | D'087 Patent (Selected Embodiments) |
|---|---|
|  |  FIG. 11   FIG. 19 |
|  |  FIG. 7   FIG. 8 |
|  |  FIG. 5 / FIG. 6 |

86.    Mr. Sherman presents only the front view of the JP'383 Design and concludes that "[a] bezel or casing surrounds a screen inset between two very narrow side borders and two more substantial borders on top and bottom." (Sherman Report at 67.) However, other views of the JP'383 Design call into question Mr. Sherman's interpretation of that single view of the design. Specifically, side profile views, such as the view below that also depicts the transparent cover surrounding the device, does not show a bezel, which would leave the ordinary observer to believe a bezel is not part of the design.



87.     Similarly, the perspective view below does not disclose any borders on the lateral sides of the display screen.  From the perspective views of the JP'383 design, it is clear that the screen effectively cuts across the entire front surface, and that no border is left on the lateral edges of the display.  I believe that an ordinary observer would not understand narrow lateral borders to be part of the JP'383 design.



88.     Accordingly, the JP'383 reference fails to disclose a single consistent design to the ordinary observer.  To the extent some figures appear to show a design that Mr. Sherman claims is anticipatory, this position is not corroborated by the other views, and therefore the JP'383 reference constitutes an incomplete disclosure that cannot be used to compare against the D'087

1    reference.  As a result, an ordinary observer would not be able to ascertain a single design from

2    the JP'383 figures that is substantially the same as the D'087 design.

3                **D.      The D'270 Patent Is Not Anticipated**

4           89.     Mr. Sherman does not allege that the D'270 patent is anticipated.[7]  Rather, he

5    states that "the prior art analysis performed for the D'087 and D'677 [patents] is also applicable

6    to [the D'270] design."  (Sherman Report at 77.)  As that statement by itself does not provide any

7    analysis or opinions as to prior art against the D'270 patent, I am unable to understand what

8    assertions are contained in Mr. Sherman's statement, nor rebut those assertions.  Should

9    Mr. Sherman come forward with specific opinions regarding prior art that he failed to specifically

10   analyze specifically against the D'270 patent in his report, I reserve the right to rebut those

11   opinions.  For the avoidance of doubt, it is my opinion that none of the prior art references cited

12   in Mr. Sherman's report anticipates the D'270 patent.

13          90.     Mr. Sherman also alleges that this incorporation by reference "includes,

14   specifically, a conclusion that the D'270 front face design is anticipated by JP383 as discussed

15   above."  (Sherman Report at 77.)  To the best of my understanding, Mr. Sherman is not alleging

16   that the JP'383 design anticipates the D'270 patent, but rather that the JP'383 design discloses the

17   "front face design" of the D'270 patent.  As this appears to be a part of Mr. Sherman's

18   obviousness analysis, I will treat this issue later in this report.

19               **E.      The Asserted Patents Are Not Obvious**

20                    **6.      Mr. Sherman Is Not a Designer of Ordinary Skill in the Art**

21          91.     In my opinion, the designer of ordinary skill in the art is a person who holds a

22   Bachelor of Science or its equivalent in industrial or product design, and has at least two years of

23   work experience as an industrial designer, including experience in the design of electronic

24   devices.

25

26

27          ───────────────────

            [7] If Mr. Sherman were to so allege, it would be my opinion—as detailed earlier—that he is not

28   qualified to speak to the perceptions of the ordinary observer.

115.    As discussed previously, I disagree that the differences between the D'157 design and the D'889 design are trivial.  At most, the D'157 design discloses an opaque frame surrounding a transparent surface.  It does not disclose a transparent front surface with a viewable rectangular element that marks an even border around the element.  Even if one changed the profiles, the aspect ratios, and the width of the rims of the D'157 patent, as suggested by Mr. Sherman, the resulting design would still not have a continuous transparent front surface with a viewable rectangular element as in the D'889 Patent.  That modification alone would not have been trivial or obvious to the ordinary designer at the time the D'889 patent was invented, as evidenced by Mr. Sherman's inability to identify a single prior art reference having this feature of the D'889 patent.

116.    Therefore, even if the D'157 patent were considered a primary reference, it is my opinion that the ordinary designer, at the time the D'889 design was invented, would not have found it obvious to modify the D'157 design to arrive at the D'889 design.

117.    **JP D1142127 ("the JP'127 patent").**  Mr. Sherman appears to assert that the JP'127 patent is a primary reference against the D'889 patent.  I disagree with any such opinion.  The JP'127 design discloses an opaque frame around a center display area.  The opaque frame also includes patterns formed of circular holes on the left and right-hand sides.  The opaque frame is also raised above the front surface, such that it is visible in the profile views.  This visual appearance is distinctly different than that of the D'889 design.  Moreover, the JP'127 patent includes a visible notch on its top surface and various other visual elements on its back surface, which do not exist in the D'889 patent.  Due to these visual differences, it is my opinion as a designer of ordinary skill in the art that the JP'127 design does not present basically the same overall visual impression as the D'889 patent.  The differences between the JP'127 design and the D'889 patent are such that major modifications to the JP'127 design would be required to make it substantially the same as the D'889 design.

| JP'127 Patent | D'889 Patent |
| --- | --- |

| JP'127 Patent | D'889 Patent |
|---|---|
|  | \n\n*FIG. 1* |
| **No corresponding view.** | \n\n*FIG. 2* |
|  | \n\n*FIG.  3* |
|  | \n\n*FIG.  4* |
|  | \n\n*FIG. 5*\n\n\n\n*FIG. 6* |
|  | \n\n*FIG. 7*\n\n\n\n*FIG. 8* |

118.     Even if the JP'127 patent were considered a primary reference against the D'889 design, the unmodified design would not appear substantially the same to the ordinary observer for reasons set forth above.

119.     Mr. Sherman suggests that the JP'127 reference can be combined with the D'037 patent, the D'157 patent, or Apple's "brain box" design to render the front face of the device "completely flush" and produce the design of the D'889 patent.  (Sherman Report at 30.) Mr. Sherman fails to provide any rationale for why the appearance of visual features in the D'037, D'157, and "brain box" references would have suggested to the ordinary observer their application to the D'889 patent.  Moreover, even the combined references would fail to produce the D'889 patent, as Mr. Sherman claims, or a design that would appear substantially the same in the eyes of the ordinary observer.

120.     In particular, even if the JP'127 reference front surface were made "completely flush" as suggested by Mr. Sherman, it would still lack a continuous transparent surface with a viewable rectangular element over the front face.  The other differences in the JP'127 reference would also remain, such as the prominent dotted design elements on the left and right of the device's front surface.  Such a design would not appear substantially the same to the ordinary observer.

121.     Furthermore, even if the JP'127 reference were combined with one of the three references suggested by Mr. Sherman, the resulting design would still lack a continuous transparent front surface with an underlying rectangular element, because none of these references discloses that visual feature.  Without that feature, none of these hypothetical combined designs would appear substantially the same to the ordinary observer.

122.     Accordingly, even if the JP'127 patent were considered a primary reference, it would not render the D'889 patent obvious, whether alone or in combination with the D'037, D'157, or "brain box" references.

123.     **D461,802 ("the D'802 patent").**  Mr. Sherman appears to assert that the D'802 patent is a primary reference against the D'889 patent.  I disagree with any such opinion.  The D'802 design discloses an opaque frame with textured patterns surrounding a center area that is

168.   **Additional References**.  Mr. Sherman cites several more references under the heading "Additional References That Reinforce The Obviousness of D'677."  (Sherman Report at 57-65.)  Many of these references are not prior art based on Apple's January 5, 2007 patent filing date or its April 20, 2006 invention date, facts that Mr. Sherman do not dispute. (APLNDC00014230-31; APLNDC00014237-44.)  The remaining references in this section in fact underscore the non-obviousness of Apple's designs.

169.   **F700, Korean design patent KR30-0452985, and D560,192**.  The application for the KR'985 Patent was not published until August 27, 2007.  The D'192 patent was not filed until December 22, 2006.  Accordingly, neither reference is prior art to the D'677 patent.  Regardless, neither reference discloses a continuous, transparent, and black-colored front surface. Mr. Sherman does not allege a public release date for the supposed embodiment of the KR'986 patent—the Samsung F700—but I have been informed that this phone was not announced until February 2007.[10]  Accordingly, the F700 is also not prior art to Apple's D'677 patent.[11]

170.   **Korean design patent KR30-0418547**.  The KR'547 Patent was first published in July 2006 and thus is not prior art to the D'677 patent.  It is therefore inappropriate to factor this patent into an obviousness analysis.  But regardless, the KR'547 patent presents a drastically different visual impression than the D'677 patent, with its much squarer form factor, much smaller display area, and wider lateral borders.  There is also no black color designation in the KR'547 patent.

171.   **JP D1241383**.  To the extent Mr. Sherman implies that the JP'383 Patent could be considered a primary reference against the D'677 patent, I disagree.  As discussed earlier, the JP'383 patent includes a number of confusing and inconsistent drawings purportedly disclosing an electronic device inside a transparent case.  Due to the overlapping lines introduced by this design, and apparent contradictions within different figures, a single design cannot be ascertained

---

[10] http://www.phonearena.com/news/Samsung-announces-iPhone-rival---F700-is-5-megapixel-beast_id1768 (APLNDC-Y0000238813-18).

[11] Mr. Sherman also cites to Samsung internal documents (SAMNDCA00321457-656) in his report.  (Sherman Report at 39-40).  These documents are not prior art (allegedly dated July - September 2006) and were not public (marked "Highly Confidential – Attorneys' Eyes Only").

from the JP'383 patent's figures—let alone a design that is basically the same as the D'677 design.



| JP'383 | D'677 Patent |
|--------|--------------|

| JP'383 | D'677 Patent |
|--------|--------------|
|  |  |

172.    To the extent portions of a design can be discerned, the JP'383 patent includes distinctive visual differences from the D'677 patent and therefore cannot be considered a primary reference.  In particular, the design of the electronic device when it is in the case does not disclose a continuous flat front surface.  Rather, the sides of the case appear to protrude above the perimeter of the front face of the electronic device, forming a separation from the front face of the electronic device.  Given the separation between the front of the device and the front surface of the case, the overall visual impression of the design claimed in the JP'383 patent is decidedly different from the overall visual impression of the flat, continuous, transparent front face of the electronic device depicted in the D'677 patent.  If the electronic device depicted in the JP'383 patent is removed from the case and considered on its own, it lacks the continuous black transparent front face that is integral to the D'677 design.  Furthermore, Mr. Sherman admits that the JP'383 design is entirely missing the speaker slot shown in the D'677 design.  (Sherman Report at 60). This is true regardless of whether the electronic device is considered on its own or inside the case.

173.    Thus, due to the differences that can be ascertained, in particular the lack of a fully transparent black-colored front surface and a lozenge-shaped speaker slot, it would not appear basically the same as the D'677 patent to the ordinary designer.

174.     Even if the JP'383 Patent were considered a primary reference, for the reasons discussed above, the JP'383 design would not appear substantially the same as the D'677 design to an ordinary observer and therefore would not render the D'677 patent obvious on its own.

175.     The only modification Mr. Sherman proposes for the JP'383 design is the addition of an "earpiece slot."  But Mr. Sherman fails to provide any rationale for why the ordinary designer would modify the JP'383 reference in this manner.  Moreover, because Mr. Sherman fails to identify any secondary reference that he proposes to use to modify the JP'383 design to add this feature, I am unable to opine on whether the two designs of the alleged combination would be so related as to suggest a modification of the JP'383 design.  I am also unable to opine on the exact appearance of the design that would result from this modification.

176.     Even if this hypothetical modification to the JP'383 design were made to add a speaker slot exactly like the D'677 design, it is my opinion that the resulting design would not be viewed by the ordinary observer as substantially the same as the D'677 design.  In particular, the lack of an edge-to-edge transparent and black-colored front surface would render the visual appearance of the modified design not substantially the same as the D'677 design in the eyes of the ordinary observer.

177.     **European Union design rights registration 000569157-0005 & LG Prada** (EU Registration 000569157-0005).  I am informed that EU Registration 000569157-0005 is not prior art to the D'677 patent.  EU Registration 000569157-0005 was not submitted until September 2006, five months after the invention date of the design claimed in the D'677 patent.  Although Mr. Sherman does not allege a public disclosure date for the LG Prada, I have been informed that the LG Prada was not made public until after Apple's invention date.

178.     Regardless, the Prada design presents a very different visual appearance than the D'677 patent.  In particular, the Prada's side borders are wider and contrast with the "big screen" impression given by the D'677 patent.  Also, the Prada includes a complicated button arrangement along its bottom that is raised from the front surface and runs the full extent of the bottom border.  In contrast, the D'677 patent presents a simple, flat appearance along its bottom border.  Moreover, the Prada's black borders are made of an opaque plastic material that presents

1   Accordingly, it is my opinion that the designer of ordinary skill would not find the KR'307

2   design basically the same as the D'087 design.

3   205.    Even if the KR'307 design were considered a primary reference, it is my opinion

4   that due to the aforementioned differences the ordinary observer would not find the unmodified

5   KR'307 design to be substantially similar to the D'087 design.  Moreover, Mr. Sherman does not

6   identify any references that he proposes to combine with the KR'307 design to arrive at the

7   D'087 design, nor does he identify any rationale for why the ordinary designer would modify the

8   KR'307 design to be more like the D'087 design.  Accordingly, it is my opinion that it would not

9   have been obvious for the ordinary designer to modify the KR'307 design to arrive at the D'087

10  design.

11  206.    **Korean design patent KR30-0452985**.  The application for the KR'985 Patent

12  was not published until August 27, 2007.  Accordingly, the KR'985 Patent is not prior art to the

13  D'677 patent and it is improper to consider the KR'985 Patent in determining whether the D'677

14  design is obvious.  Regardless, the KR'985 design's narrow form factor, asymmetrical bezel and

15  off-center screen contribute to an overall impression that is distinctly unlike the D'087 patent.

16  207.    **Korean design patent KR30-0418547**.  The KR'547 Patent was first published in

17  July 2006 and thus is not prior art to the D'677 patent.  Regardless, the KR'547 patent presents a

18  very different visual impression than the D'087 patent, with its complex, stepped bezel design,

19  concentric rings around the front surface where it meets the bezel, much smaller display area, and

20  much wider borders around the display.  Accordingly, it is my opinion that the ordinary designer

21  would not find the KR'547 patent to be basically the same in overall visual appearance as the

22  D'087 patent.

23  208.    Even if the KR'547 patent were considered a primary reference, the ordinary

24  observer would not find the unmodified KR'547 design substantially the same as the D'087

25  patent.  Therefore, it would not render obvious the D'087 patent by itself.  Mr. Sherman does not

26  identify any references that he proposes to combine with the KR'547 design to produce the D'087

27  design, nor does not he provide any rationale for why the ordinary designer would modify the

28

KR'547 design in such a manner.  Accordingly, it is my opinion that it would not have been obvious to the ordinary observer to modify the KR'547 patent to arrive at the D'087 design.

### 13.   Mr. Sherman Cannot Identify a Proper Primary Design Reference for the D'270 Patent

209.     Mr. Sherman's approach to the obviousness analysis is to identify portions of the D'270 design that exist in the prior art, rather than to identify a single primary reference.  As none of the references cited by Mr. Sherman would appears basically the same in overall visual impression to the ordinary designer, I disagree with Mr. Sherman's opinion that the D'270 patent is invalid for obviousness.

210.     Mr. Sherman states that "the prior art analysis performed for the D'087 and D'677 [patents] is also applicable to [the D'270] design."  (Sherman Report at 77.)  As that statement by itself does not provide any analysis or opinions applying prior art specifically against the D'270 patent, I am unable to understand what assertions are contained in Mr. Sherman's statement, nor rebut those assertions.  Should Mr. Sherman come forward with specific opinions regarding prior art that he fails to specifically analyze against the D'270 patent in his report, I reserve the right to rebut those opinions.  For the avoidance of doubt, it is my opinion that none of the prior art references cited in Mr. Sherman's report, whether alone or in combination, renders obvious the D'270 patent.

211.     **JP'383.**  Mr. Sherman's approach to the obviousness analysis for the D'270 patent is exemplified by his statement that "the *D'270 front face design* is anticipated by the JP383."  (Sherman Report at 77 (emphasis added).)  I disagree with this assertion due to numerous differences in the front face of the JP'383 design.  Moreover, the D'270 patent covers more than just a front face, but rather an entire electronic device.  To the extent Mr. Sherman asserts the JP'383 patent as a primary reference against the D'270 patent, I disagree.

212.     As discussed earlier, the JP'383 patent includes a number of confusing and inconsistent drawings purportedly disclosing an electronic device inside a transparent case.  Due to the overlapping lines introduced by this design, and apparent contradictions within different

1    figures, a single design cannot be ascertained from the JP'383 patent's figures—let alone a design

2    that is basically the same as the D'270 design.



| JP'383 | D'270 Patent |
|---|---|

| JP'383 | D'270 Patent |
|--------|--------------|



213.    To the extent parts of a design can be discerned, the JP'383 design is completely different than the D'270 patent.  In particular, the JP'383 design is much thicker in profile than the D'270 patent.  Its profile shape is completely different than the D'270 design, which has a rounded profile that ends in a flat back surface.  It has large protruding buttons on its left side that are visible from the front, unlike the D'270 design.  The JP'383 design also fails to disclose a continuous transparent surface over its entire front face.  Based on these differences alone, it is my opinion that the JP'383 reference could not appear basically the same in overall impression as the D'270 patent to the ordinary designer.

214.    Moreover, as previously discussed, the confusing and contradictory figures of the JP'383 patent fail to disclose very narrow borders on the lateral sides of the display element and wider borders above and below the display.

215.    Accordingly, it is my opinion that the JP'383 design would appear ambiguous to the ordinary designer, and due to the differences that can be ascertained, it would not appear basically the same as the D'270 patent to the ordinary designer.

216.    Even if the JP'383 Patent were considered a primary reference, for the reasons discussed above, the unmodified JP'383 design would not appear substantially the same as the D'270 design to an ordinary observer.

217.    Mr. Sherman does not suggest any modifications for the JP'383 patent or any secondary references for combination with the JP'383 patent to arrive at the D'270 patent.

218.    **KR30-0418547.**  Mr. Sherman's also alleges that the D'270 front face design is rendered obvious in light of the KR'547 design.  I disagree with that assertion.  Moreover, the D'270 patent covers an entire electronic device.  To the extent Mr. Sherman asserts the KR'547 design as a primary reference against the D'270 patent, I disagree.

| LG Prada | D'270 Patent |
|---|---|



232.     Starting with the front face, the Prada has a prominent row of raised, complex buttons running across the entire bottom of the design.  The Prada is entirely missing the angled bezel that surrounds the front surface of the D'270 design.  In profile, the Prada has a large metallic band that runs down the middle of its body, and has a thicker, boxier form factor, unlike the thin and smoothly rounded profile of the D'270 patent.  Based on the contrasting visual impressions, it is my opinion that the Prada would not appear basically the same in overall impression as the D'270 patent to the ordinary designer.

233.     Even if the Prada were considered a primary reference, for the reasons discussed above, the unmodified Prada design would not appear substantially the same as the D'270 design to an ordinary observer.  Mr. Sherman does not suggest any modifications for the Prada or any secondary references for combination with the Prada to arrive at the D'270 patent.

234.     **JP 1142127.**  To the extent Mr. Sherman asserts the JP'127 design as a primary reference against the D'270 patent, I disagree.

| JP'127 Patent | D'270 Patent |
|---|---|
|  |  |
| **No corresponding view.** |  |
|  |  |

| JP'127 Patent | D'270 Patent |
|---|---|



235.    Starting with the front face, the JP'127 design has opaque borders that run all the way around the front face.  The borders are not narrower on the lateral sides like the D'270.  The

1   JP'127 design does not have an edge-to-edge transparent front surface.  The JP'127 design has

2   prominent circle designs on either side of the display and also appears to have a raised frame

3   around the periphery of the display.  The JP'127 design is entirely lacking a bezel around its front

4   surface, much less an angled bezel like the D'270 patent.  In the body portion, the JP'127 design

5   has a prominent visual element along one of its long sides.  It also has a frame that is raised above

6   the level of the body.  If viewed in profile alone, this may be misunderstood to be a bezel.  But in

7   fact, the layer on top of the body portion is formed by the opaque frame of the JP'127 design and

8   is not a bezel element.  Based on the contrasting visual impressions, it is my opinion that the

9   JP'127 reference would not appear basically the same in overall impression as the D'270 patent to

10  the ordinary designer.

11          236.    Even if the JP'127 patent were considered a primary reference, for the reasons

12  discussed above, the unmodified JP'127 design would not appear substantially the same as the

13  D'270 design to an ordinary observer.

14          237.    Mr. Sherman suggests that the JP'127 patent can be combined with the JP'383,

15  KR'547, KR'985, or JP'638 designs to produce the D'270 design.  But Mr. Sherman fails to

16  provide any rationale for the ordinary designer to make these proposed combinations that is based

17  on visual appearance, and not function.  Rather, Mr. Sherman merely states that "[t]hese

18  combinations are reasonable as they combine prior arts [sic] that all electronic mobile devices

19  with large displays and include expected adaptations to match the specific functionality of the

20  design in hand (a media player as opposed to a mobile cellular handset)."  (Sherman at 78-79.)

21          238.    Even if each of these proposed combinations were made, they would not result in

22  the D'270 design, or in a design that is substantially the same to the ordinary observer.  As

23  described in the foregoing, the JP'383, KR'547, KR'985, and JP'638 designs are each drastically

24  different in visual impression from the D'270 patent and cannot remedy the failings of the JP'127

25  patent.  For example, (1) none of these designs includes the continuous, edge-to-edge transparent

26  front surface of the D'270 patent; (2) none of these designs includes a continuous, uniform, and

27  angled bezel like the D'270 patent; and (3) none of these designs includes a thin, rounded profile

28

like the D'270 patent.  Accordingly, even if the proposed combinations were made, the resultant

design would not appear substantially the same as the D'270 design to the ordinary observer.

239.   **JP D1302929.**  To the extent Mr. Sherman asserts the JP'929 design as a primary

reference against the D'270 patent, I disagree.

| JP'929 Patent | D'270 Patent |
|---|---|
|  |  |
| **No corresponding view.** |  |
|  |  |

one of the best-looking Android tablets around" with its "[c]omfortable, ergonomic design," and that as compared to the iPad 2, which "tires [the] wrist very quickly, . . . the Tablet S feels like it weighs much less than its 21.2 ounces."[71]



304.     Moreover, the alleged prior art cited by Samsung against the D'889 design in its Mr. Sherman's opening report constitute alternative designs.  For example, JP1142127, JP0887388, JP0921403, U.S. Patent No. D461,802, the TC 1000, and the Fidler Mock-up are all far afield from the D'889 Design aesthetically.

305.     Furthermore, Samsung's own commercially released tablet prior to the iPad – the Samsung Q1 – constituted an alternative design to the D'889 Design.  The Samsung Q1 has a raised opaque black housing surrounding the recessed display on the front surface.  The housing on the front surface had a variety of different physical buttons.  The Q1 was praised for its "beautiful, featherweight design" with a "sleek case" and that the "[b]uttons around the screen also help [the user] navigate."[72]

 

306.     The alternative designs discussed in the foregoing are in no way comprehensive. The tablet computer field is filled with alternative, commercially viable designs that illustrate the

---

[71] Sascha Segan, "Sony Tablet S," PCMag, Dec. 5, 2011, http://www.pcmag.com/article2/0,2817,2397089,00.asp

[72] CNET, "Samsung Q1 Ultramobile PC," http://reviews.cnet.com/laptops/samsung-q1-ultramobile-pc/4505-3121_7-31781057.html#reviewPage1.

1  nonfunctionality of the D'889 Design.  Other available alternative designs include, for instance,

2  the Panasonic Toughbook tablet, the Sony Reader, or the Sony Tablet P, as shown below, or the

3  GriDPAD 2050, Compaq TC1000, Fusion Garage Grid 10, the Motion Computing LS800, and

4  the Freescale smartbook concept.[73]  *See, e.g.,* Exhibit 3; Ex. 13 to Opening Report.

  

11  The fact that Samsung and other manufacturers have commercially released tablets with

12  alternative designs suggests that Samsung could have successfully manufactured the designs with

13  equivalent functionality for the end user.  There are many alternative designs by Samsung and

14  third-party competitors that serve equivalent functionality as the D'889 Design.

        **d.**      **Mr. Sherman's Rejection of Alternative Designs on Functional Grounds is Improper**

307.      Although Mr. Sherman states generally that the "alternative designs identified by Apple do not have comparable functionality as the accused devices," Mr. Sherman does not provide any specific arguments to show why Apple's design tablet alternatives are not proper alternatives.  (Sherman Report at 104.)  Nonetheless, for all the reasons above and below, Mr. Sherman's rejection of any alternative designs is improper as the alternatives either provide the same or better functionality than the asserted tablet design.

        **4.**      **The Individual Elements of the Design in the D'889 are Not Dictated by Function**

308.      I have been informed by counsel that for purposes of an obviousness analysis, determining whether a design is primarily functional or primarily ornamental requires that the

---

[73] These tablets do not constitute an exhaustive list of alternative designs that may be relevant; they are merely representative of some alternatives that have been commercialized.

## V.    SUPPLEMENTATION

426.    I reserve the right to supplement this report with new information and/or documents that may be discovered or produced in this case, or to address any new arguments offered by Samsung.

Dated:  April 16, 2012

_____
Peter W. Bressler