# EXHIBIT A

1          IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

   APPLE, INC., a California
5  corporation,

6

7                          Plaintiff,

8

       -vs-                        No. 11-CV-01846-LHK
9

   SAMSUNG ELECTRONICS CO., LTD.,
10 a Korean business entity; et al.,

11                      Defendants.
                              /

12

13        VIDEOTAPED DEPOSITION OF HAL PORET

14                   CONFIDENTIAL

15            SAN FRANCISCO, CALIFORNIA

16            THURSDAY, APRIL 19, 2012

17

18

19

20

21 Reported by: LOUISE MARIE SOUSOURES, CSR NO. 3575

22            Certified LiveNote Reporter

23 JOb 48723

24

25

Confidential

1

2          THURSDAY, APRIL 19, 2012

3            8:56 A.M.

4

5

6

7    Deposition of HAL PORET,

8  held at the offices of Quinn Emanuel, 50 California

9  Street, San Francisco, California, before Louise Marie

10  Sousoures, a Certified Shorthand Reporter and a

11  Certified LiveNote Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential

1                      A P P E A R A N C E S

2

3       FOR THE PLAINTIFF:

4               MORRISON & FOERSTER LLP

5               425 MARKET STREET

6               SAN FRANCISCO, CA  94105

7               BY:  BROOKS M. BEARD,

8                    TARYN RAWSON,

9                    ATTORNEYS AT LAW

10

11

12

13      FOR THE DEFENDANT:

14              QUINN EMANUEL URQUHART & SULLIVAN, LLP

15              865 SOUTH FIGUEROA STREET, 10TH FLOOR

16              LOS ANGELES, CA  90017

17              BY:  DAIVD W. QUINTO,

18                   ATTORNEY AT LAW

19

20

21

22

23      THE VIDEOGRAPHER:

24              PETE SAIS

25

Confidential

1

2          IT IS HEREBY STIPULATED AND AGREED

3    by and between the attorneys for the

4    respective parties herein, that filing and

5    sealing be and the same are hereby waived.

6          IT IS FURTHER STIPULATED AND AGREED

7    that all objections, except as to the form

8    of the question, shall be reserved to the

9    time of the trial.

10          IT IS FURTHER STIPULATED AND AGREED

11   that the within deposition may be sworn to

12   and signed before any officer authorized

13   to administer an oath, with the same

14   force and effect as if signed and sworn

15   to before the Court.

16

17

18

19                    - oOo -

20

21

22

23

24

25

Confidential

Page 5

```
 1              P R O C E E D I N G S

 2                      -oOo-

 3                                                    08:29

 4        THE VIDEOGRAPHER:  Good morning.  This is the    08:56

 5   start of disk labeled number 1 for the videotaped     08:56

 6   deposition of Hal Poret in the matter of Apple,       08:56

 7   Incorporated versus Samsung Electronics Company,      08:56

 8   Limited et al. in the United States District Court,   08:56

 9   Northern District of California, San Jose Division,   08:56

10   civil action 11-CV-01846-LHK.                         08:56

11        This deposition is being held at 50             08:56

12   California Street in San Francisco, California on     08:56

13   April 19th, 2012 at approximately 8:56 a.m.          08:56

14        My name is Pete Sais from TSG Reporting Inc.    08:56

15   and I'm the legal video specialist.                  08:56

16        The court reporter is Louise Sousoures in       08:57

17   association with TSG Reporting.                       08:57

18        Will counsel introduce yourself and the court   08:57

19   reporter can swear in the witness.                    08:57

20        MR. QUINTO:  David Quinto, Quinn Emanuel for     08:57

21   defendants.                                           08:57

22        MR. BEARD:  Brooks Beard with Morrison &        08:57

23   Foerster for Apple.                                   08:57

24        MS. RAWSON:  Taryn Rawson for Morrison &        08:57

25   Foerster for Apple.                                   08:57
```

Confidential

Page 106

1    Q.  What all would you need to think about --        12:38

2    let's focus on the first one which is the LG 2X --    12:38

3    G2x.                                                  12:38

4        What would you need to think about in            12:38

5    deciding whether this is too similar to be used as a  12:38

6    control?                                              12:38

7    A.  A lot.  I'd have to sit down with the             12:38

8    complaint and look at the trade dress elements again. 12:38

9    I'd want to get a good picture of this that I can     12:38

10   actually get a fair sense of it that doesn't have all 12:38

11   these other images blocking you from seeing it        12:38

12   cleanly.                                              12:38

13       I'd have to think about, you know, how it        12:38

14   would appear with the icons blurred and it's just not 12:38

15   the kind of thing I make a snap judgment about.       12:39

16   Q.  As you sit here, are there any that you think     12:39

17   strike you immediately as something that -- as being  12:39

18   sufficiently dissimilar it could be used as a control? 12:39

19       MR. BEARD:  Objection, incomplete                12:39

20   hypothetical.                                         12:39

21       THE WITNESS:  There's nothing here that I        12:39

22   have a quick judgment on one way or the other.        12:39

23   BY MR. QUINTO:                                        12:39

24   Q.  Something I forgot to ask you earlier, apart      12:39

25   from preparing for today's deposition and apart from  12:39

Confidential

Page 107

1   preparing the rebuttal report in response to Mazis's   12:40

2   survey regarding whether Apple icons required a   12:40

3   secondary meaning, have you done any work in relation   12:40

4   to this case since last August?   12:40

5       A.  The only other thing that I've done is after   12:40

6   reading Dr. Jacoby's report I went back into my data   12:40

7   and looked at a number of things just to confirm for   12:40

8   myself these points he's raising are -- actually have   12:40

9   no impact on the survey results, but that's really the   12:40

10  only additional work that I've done.   12:40

11      Q.  So it's your opinion that not one of his   12:40

12  criticisms has any bearing on the survey results?   12:40

13      A.  Well, it's my -- what I'm saying is that of   12:40

14  the criticisms where you can actually go into the data   12:40

15  and confirm yes or no this criticism has any merit,   12:41

16  they don't.   12:41

17          There are other ones that I, you know,   12:41

18  disagree with, but they're not really ones that it's a   12:41

19  matter of looking at data or not.   12:41

20      Q.  Were there any criticisms that you took to   12:41

21  heart?   12:41

22      A.  I need to go through it and remember what   12:41

23  they were specifically.   12:41

24          The only thing he says that I basically --   12:41

25  that comes to mind that I agree with is that it is   12:41

Confidential

Page 108

1   difficult for people to remember exactly when they          12:41

2   formed a mental impression of something, such as when       12:41

3   they came to associate the look of a smartphone with        12:41

4   Apple.                                                       12:41

5           However, while I agree with that as a general       12:41

6   proposition, I disagree with his whole take on it           12:42

7   because first of all, everything -- he's                     12:42

8   misunderstanding the whole purpose and the way that         12:42

9   question was used and just using it for purposes that       12:42

10  don't make any sense and I think he's also missing the      12:42

11  point that it doesn't matter whether somebody can           12:42

12  accurately remember whether it was 2006 or 2007 or          12:42

13  what month it was in that time period, it's -- the          12:42

14  broad point is whether there was a meaningful trend of      12:42

15  people associating something with Apple before a            12:42

16  certain period of time and people did not need to have      12:42

17  a precise memory of when they formed their impression       12:42

18  for the survey to measure that.                             12:43

19      Q.  You said that you think that Dr. Jacoby's           12:43

20  missing the point, which is that it doesn't matter          12:43

21  whether somebody can accurately remember whether it         12:43

22  was 2006 or 2007 or what month it was and what time         12:43

23  period.                                                     12:43

24          And yet your report attempts to pin it down         12:43

25  in relation to a particular month, does it not?             12:43

Confidential

Page 133

1   meaning.                                              13:30

2        So including people who owned mobile phones      13:30

3   but don't fall within the narrower category of        13:30

4   secondary meaning universe being the recent purchasers 13:30

5   or the likely future purchasers gave us a broader base 13:30

6   of relevant consumers to see what the recognition     13:30

7   level of the trade dress was there.                   13:30

8        Q.  Is it your testimony that the cellular        13:30

9   telephone survey you performed could be used both to   13:31

10  measure secondary meaning and in a dilution analysis?  13:31

11       A.  No, that's not what I was saying.             13:31

12       What I mean is this -- by including somewhat       13:31

13  of a broader audience at least there are some results  13:31

14  just as you were asking me before what would the       13:31

15  results have been among people who bought a phone more 13:31

16  than 12 months ago, we have those results.             13:31

17       So if somebody is interested in getting a         13:31

18  sense of is the iPhone trade dress recognized amongst  13:31

19  a broader audience there's data on that.               13:31

20       Q.  Anywhere in your report do you break out your 13:32

21  findings with respect to secondary meaning among just  13:32

22  the group of respondents who were likely to purchase a 13:32

23  cellular telephone in the coming 12 months?           13:32

24       A.  I don't think so.  I mean it's in the data    13:32

25  that's produced along with the report, but it's not    13:32

Confidential

Page 134

1   laid out like that in the body of the report.          13:32

2       Q.  Why not?                                        13:32

3       A.  Because I don't see the relevance of breaking  13:32

4   that out as a separate group to look at when that's    13:32

5   just one piece of the relevant universe.               13:32

6       Q.  So in your view, looking at secondary meaning  13:33

7   among prospective purchasers is not relevant?          13:33

8          MR. BEARD:  Objection, misstates and            13:33

9   mischaracterizes prior testimony.                      13:33

10         THE WITNESS:  No, that's not what I said.        13:33

11  BY MR. QUINTO:                                          13:33

12      Q.  I'm sorry, would you explain it again,         13:33

13  please?                                                13:33

14      A.  I just said the universe as I see it is --     13:33

15  consists of recent and likely future purchasers.       13:33

16         So I don't see the reason for breaking out      13:33

17  the results based on only part of that being just the  13:33

18  future purchasers, but anybody who wants to do that,   13:33

19  it's in the data.                                      13:33

20      Q.  Do you intend to analyze your data further     13:33

21  between now and trial, your data for either the cell   13:34

22  phone or the tablet computer surveys?                  13:34

23      A.  I don't know.  Only if there's some reason     13:34

24  to.                                                    13:34

25      Q.  As you sit here today, you have no such        13:34

Confidential

Page  135

1    intention?                                             13:34

2        A.   The only intention that I might have is, as I    13:34

3    said, I went back and looked at certain aspects in    13:34

4    response to the Jacoby report to check for myself is    13:34

5    there any merit to any of this.                       13:35

6            As I said, I've looked at the data and found    13:35

7    there's not and I don't know if at some point I will    13:35

8    be -- I'll be asked to sort of put that data forward    13:35

9    to show how those points that he is raising have no    13:35

10   impact on the reliability of the results, but that's    13:35

11   not the only thing that comes to mind that I could end    13:35

12   up doing with the data.                               13:35

13       Q.   How many hours did you devote to considering    13:35

14   Dr. Jacoby's report and re-examining your data?       13:35

15       A.   I'd have to check.   I don't know, maybe six    13:35

16   to eight hours, maybe ten hours.                      13:36

17       Q.   Was that this week?                           13:36

18       A.   Yes.                                          13:36

19       Q.   And as you sit here, there's no further work    13:36

20   that you intend to do as a result of looking at       13:36

21   Dr. Jacoby's report?                                  13:36

22       A.   The only other thing is, as I mentioned, I    13:36

23   may be able to go and confirm through some            13:36

24   nonconfidential route that the respondents from the    13:36

25   Toluna and e-Rewards panels were not overlapping at    13:36

Page 136

| | | |
|---|---|---|
| 1 | anything more than a negligible level and, again, I | 13:36 |
| 2 | don't know how things will transpire, but if I'm asked | 13:37 |
| 3 | to do a more formal response to the Jacoby report or | 13:37 |
| 4 | if there are motions related to the surveys, I need to | 13:37 |
| 5 | do a more formal analysis of data on certain points to | 13:37 |
| 6 | address some of these criticisms that really have no | 13:37 |
| 7 | merit, then I would do that, but I don't know if that | 13:37 |
| 8 | will be necessary. | 13:37 |
| 9 | Q.  In the cellular telephone survey, what | 13:37 |
| 10 | percentage of respondents were likely to purchase a | 13:37 |
| 11 | cellular telephone within the next 12 months? | 13:37 |
| 12 | A.  I'd have to check the data. | 13:37 |
| 13 | Q.  Can you tell from looking at the report? | 13:37 |
| 14 | A.  I don't think so. | 13:38 |
| 15 | No, I can't tell that specifically. | 13:38 |
| 16 | Q.  With respect to the tablet -- strike that. | 13:38 |
| 17 | With respect to the tablet computer report, | 13:38 |
| 18 | were all the respondents likely purchasers of tablet | 13:38 |
| 19 | computers in the next 12 months? | 13:38 |
| 20 | A.  All of them? | 13:38 |
| 21 | Q.  Right. | 13:38 |
| 22 | A.  No, some of them would have been recent | 13:38 |
| 23 | purchasers. | 13:38 |
| 24 | Q.  Do you know what percentage were likely | 13:38 |
| 25 | purchasers in the next 12 months? | 13:38 |

Confidential

Page 162

1    So if anybody is interested in seeing who          14:33

2    composes any of these categories they can see that for  14:33

3    themselves in the data.                               14:34

4    I did go out of my way to list respondent         14:34

5    numbers in the body of the report to be helpful in the  14:34

6    instances where I thought that was most significant,  14:34

7    but it would be a pretty tedious, long, absurd report  14:34

8    if I was calling out respondent ID numbers for       14:34

9    everything that was discussed throughout the report.  14:34

10   Q.  Looking at paragraph 77 on page 50, the first  14:34

11   sentence refers to a particular group of 16           14:34

12   respondents.                                          14:34

13   If I wanted to look them up in the data,          14:34

14   would they be identified?                             14:34

15   A.  Yes.                                           14:34

16   Q.  Turning to paragraph 91, are the control       14:34

17   percentages subtracted from the data here?            14:35

18   A.  No.                                            14:35

19   Q.  Why is that?                                   14:35

20   A.  Because it would make no sense to do that.     14:35

21   Q.  Why do you say that?                           14:35

22   A.  Because these numbers are not stating          14:36

23   secondary meaning percentages.                        14:36

24   I can tell -- I can tell what you're thinking    14:36

25   because Dr. Jacoby was confused about this, but these  14:36

Confidential

Page 163

1    numbers are not stating that this was the secondary          14:36
2    meaning percentage at a certain time.                        14:36
3             So the control has no applicability to what         14:36
4    these numbers mean and it would make no sense.               14:36
5        Q.  So explain to Dr. Jacoby and to me what              14:36
6    you're doing here and why it would make no sense.            14:36
7        A.  So Dr. Jacoby seems to think I'm stating here        14:36
8    that the secondary meaning level is 84.4 percent and         14:36
9    he is then saying no, that shouldn't be right.  That         14:36
10   isn't what I'm saying here.                                  14:36
11            I'm literally reporting there were 270 people       14:36
12   who associated the trade dress with Apple and gave a         14:36
13   time period when they thought that happened and 84.4         14:37
14   percent of those people said it was before July 2010.        14:37
15            So that -- all this means is if one were to         14:37
16   look at the secondary meaning level of the survey,           14:37
17   which shows secondary meaning, let's say well, isn't         14:37
18   it possible that that really just happened later in          14:37
19   2010 or after the Samsung products already came out,         14:37
20   this tends to suggest no, that is a very far-fetched         14:37
21   scenario because the large majority of people said           14:37
22   that they associated this with Apple before that.            14:37
23       Q.  If you were to consider only the responses of        14:37
24   people planning to buy within the next 12 months, and        14:38
25   subtract out the control percentages, would the              14:38

Confidential

Page 164

1    secondary meaning percentages here be in the 30s?          14:38

2            MR. BEARD:   Objection, misstates,                 14:38

3    mischaracterizes prior testimony and the report.           14:38

4            THE WITNESS:   So the first answer has to be,       14:38

5    again, these are not secondary meaning percentages.        14:38

6            So the whole question is based on an               14:38

7    incorrect understanding.                                   14:38

8            None of these numbers are secondary meaning        14:38

9    percentages.   So the whole idea of subtracting            14:38

10   anything out or comparing it to the control to arrive      14:38

11   at a secondary meaning level makes no sense.               14:38

12   BY MR. QUINTO:                                             14:38

13       Q.   So using these numbers you cannot -- you          14:38

14   cannot get to secondary meaning; is that what you're       14:38

15   saying?                                                    14:38

16       A.   Yes, these numbers are not -- they are not        14:38

17   usable to tell you -- well, let's back up.                 14:39

18           So we came out with an iPhone secondary            14:39

19   meaning level something like 64 percent as of the time     14:39

20   of the survey and the question is well, what was it as     14:39

21   of July 2010.                                              14:39

22           These numbers here on page 57 do not in any        14:39

23   way allow you to say here's what the exact percentage      14:39

24   would have been in July 2010, it's just telling you a      14:39

25   fairly broad common sense point that is there any          14:39

Confidential

Page 165

1  reason to question that this 64 percent secondary                14:39

2  meaning level is a new phenomenon or is it likely at              14:39

3  least a substantial portion of that already existed              14:39

4  and these numbers are telling you there's no evidence            14:39

5  that this high level of secondary meaning is just a              14:39

6  very recent phenomenon.                                          14:39

7          The evidence shows the opposite, it's likely            14:39

8  an older phenomenon.                                             14:40

9      Q.   Okay.  So you cannot get from the chart in             14:40

10 paragraph 91 to secondary meaning; is that right?               14:40

11     A.   You cannot get -- you cannot use that chart            14:40

12 to say what the secondary meaning level was in July of          14:40

13 2010 nor can you do anything that Dr. Jacoby did with           14:40

14 these numbers in his report.                                    14:40

15          It's just a broad brush common sense look at           14:40

16 the pattern.                                                     14:40

17     Q.   Let me ask you to look at paragraph 95 of             14:41

18 your report.                                                    14:41

19     A.   Okay.                                                  14:41

20     Q.   Where you state the 55.0 percent result is on        14:41

21 its own sufficient to establish that the overall               14:41

22 appearance of the iPad has acquired secondary meaning.         14:41

23          Has the 55 percent there been adjusted to             14:41

24 reflect the control group percentage?                          14:41

25     A.   Not yet, which is why I put that footnote            14:41

Confidential

Page 166

1  there noting that that is going to happen once you get  14:42

2  to the control and I show what the net figure is  14:42

3  there, but at this point, I'm just discussing the test  14:42

4  group results and I'm in no way suggesting you don't  14:42

5  need to use the control group.  14:42

6      Q.  Your footnote indicates that the true figure  14:42

7  is 38 percent.  14:42

8          Dr. Jacoby came up with 36.4 percent.  14:42

9          Do you understand why there's a discrepancy?  14:42

10     A.  I don't know where you're getting that 36.4  14:42

11 percent.  What exactly does he say?  14:42

12     Q.  Well, when he attempted to adjust this for  14:42

13 the control group data his result was 36.4 percent.  14:42

14         Did you review his figures when you went  14:43

15 through his report?  14:43

16     A.  I reviewed everything in his report, but I  14:43

17 can't remember where he got -- there were lots of  14:43

18 numbers in his report that, you know, were based on  14:43

19 misunderstandings, the wrong data, incorrect analyses.  14:43

20         So I can't remember where every random number  14:43

21 in his report came from.  14:43

22     Q.  Okay.  Let me ask you to look at paragraph  14:43

23 117.  14:44

24     A.  Okay.  14:44

25     Q.  Does the chart here reflect any adjustment  14:44

Confidential

Page 167

1   for the control percentages?                        14:44

2        A.   This is the same discussion we just had for   14:45

3   the iPhone chart.                                    14:45

4        These are not showing secondary meaning        14:45

5   levels at all.                                       14:45

6        Q.   I was afraid you were going to tell me that.   14:45

7        Have you ever had an expert report rejected    14:45

8   in whole or in part by a court on Daubert grounds?   14:46

9        A.   No.                                        14:46

10       Q.   Have you ever had an expert report held    14:46

11   inadmissible for any reason in whole or in part by a   14:46

12   court?                                              14:46

13       A.   The only thing that might qualify for that,   14:46

14   I'm not sure, is I had a case where I did one survey   14:46

15   at the beginning of a case in a reverse confusion case   14:46

16   where I couldn't really do it the way I would want to   14:46

17   because in a reverse confusion situation when the mark   14:47

18   has just started being used it hasn't been out there   14:47

19   long enough to test whether reverse confusion has    14:47

20   happened.                                           14:47

21       So I then did a second survey later in the     14:47

22   case after the mark had been out for a couple of years   14:47

23   and the judge accepted my survey and, in fact, gave   14:47

24   summary judgment to the defendant who my survey had   14:47

25   been for which showed a lack of confusion, but the   14:47

Confidential

Page 245

1        I, LOUISE MARIE SOUSOURES, duly

2   authorized to administer oaths pursuant to Section

3   2093(b) of the California Code of Civil Procedure, do

4   hereby certify: That the witness in the foregoing

5   deposition was by me duly sworn to testify the truth

6   in the within-entitled cause; that said deposition was

7   taken at the time and place therein cited; that the

8   testimony of the said witness was reported by me and

9   was hereafter transcribed under my direction into

10  typewriting; that the foregoing is a complete and

11  accurate record of said testimony; and that the

12  witness was given an opportunity to read and correct

13  said deposition and to subscribe the same.

14     Should the signature of the witness not be affixed

15  to the deposition, the witness shall not have availed

16  himself or herself of the opportunity to sign or the

17  signature has been waived.

18     I further certify that I am not of counsel, nor

19  attorney for any of the parties in the foregoing

20  deposition and caption named, nor in any way

21  interested in the outcome of the cause named in said

22  caption.

23  DATE:4-19-12

24              LOUISE MARIE SOUSOURES, CSR. #3575

25

Confidential

Page 246

1

2                        INDEX OF EXAMINATIONS

3                                                    PAGE

4    BY MR. QUINTO                                        6

5

6

7

8

9                        INDEX OF EXHIBITS

10

11    NUMBER          DESCRIPTION                    PAGE

12    Exhibit 1       Five-page printout from Internet   105

13    Exhibit 2       Expert report of Hal Poret in      129

14                    the matter of Apple, Inc.

15                    versus Samsung Electronics

16                    Company Limited et al.

17    Exhibit 3       Document entitled "Mobile phone    146

18                    secondary meaning survey"

19                    dated May 2011

20    Exhibit 4       Expert rebuttal report of Hal      169

21                    Poret in the matter of Apple

22                    Inc. versus Samsung Electronics

23                    Company Limited et al.

24

25

Confidential

Page 247

1          ERRATA SHEET FOR THE TRANSCRIPT OF:

2    Case Name: Apple vs Samsung

3    Dep. Date: THURSDAY, APRIL 19, 2012

4    Deponent: HAL PORET

5    CORRECTIONS:

6     Pg. Ln. Now Reads        Should Read     Reason

7     ___ ___ _____  _____ _____

8     ___ ___ _____  _____ _____

9     ___ ___ _____  _____ _____

10    ___ ___ _____  _____ _____

11    ___ ___ _____  _____ _____

12    ___ ___ _____  _____ _____

13    ___ ___ _____  _____ _____

14    ___ ___ _____  _____ _____

15    ___ ___ _____  _____ _____

16    ___ ___ _____  _____ _____

17    ___ ___ _____  _____ _____

18    _____

19    Signature of Deponent

20    SUBSCRIBED AND SWORN BEFORE ME

      THIS_____DAY OF_____, 2011.

21

      _____

22    (Notary Public) MY COMMISSION EXPIRES:_____

23

                    HAL PORET                    17:23

24                                               17:23

                                                 17:24

25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| APPLE INC., a California corporation | : | |
| | : | |
| Plaintiff, | : | Case No. 11-cv-01846-LHK |
| | : | |
| v. | : | |
| | : | |
| SAMSUNG ELECTRONICS CO., LTD., a | : | |
| Korean business entity; SAMSUNG | : | |
| ELECTRONICS AMERICAN, INC., A New York | : | |
| Corporation; SAMSUNG | : | |
| TELECOMMUNICATIONS AMERICA, LLC, a | : | |
| Delaware limited liability company | : | |
| | : | |
| Defendants. | : | |
| | : | |

**CORRECTED REBUTTAL REPORT OF DEFENDANT'S EXPERT,
JACOB JACOBY, Ph.D.**

1

# I. PERSONAL INFORMATION

1.      My full name is Jacob Jacoby.  I am the Merchants Council Professor of Consumer Behavior and Retail Management at New York University's Leonard Stern School of Business and also President of Jacob Jacoby Research, Inc.  A description of my qualifications and credentials is attached hereto as Appendix A1.  My Curriculum Vita is attached hereto as Appendix A2.  Identification of my trial and deposition testimony during the past four years is attached hereto as Appendix A3.  At the invitation of the American Bar Association, I recently completed a treatise entitled *Trademark Surveys* that is expected to be published later this year by Thomson Reuters.

## II.      CIRCUMSTANCES LEADING TO THIS REBUTTAL REPORT

2.      On March 28, 2012, counsel for defendant e-mailed a copy of the "Expert Report of Hal Poret in the Matter of Apple Inc. v. Samsung Electronics Co., Ltd. et al." with the request that I evaluate said report.  Additionally, I was provided with the following materials:

*       The Amended Complaint For Federal False Designation Of Origin And Unfair Competition, Federal Trademark Infringement, Federal Trade Dress Dilution, State Unfair Business Practices, Common Law Trademark Infringement, Unjust Enrichment, And Patent Infringement.

*       Samsung Entities' Answer, Affirmative Defenses, And Counterclaims To Apple Inc.'s Amended Complaint.

*       Various data sets that resulted from Mr. Poret's survey

3.      I am being compensated at the rate of $900 per hour, which is my standard rate for such services.  This compensation is my customary current rate; it is in no way related to the outcome of this matter.

## III.      PRELIMINARY CONSIDERATIONS

2

4.      Among other items, my review of Mr. Poret's survey and report relies upon the seven factors cited in the Federal Judicial Center's *Manual for Complex Litigation* (4th, Section 11.493). These factors are quoted verbatim below in an order that corresponds, generally, to the sequence followed by the research process itself.   According to the *Manual for Complex Litigation*, a properly conducted survey would contain and conform to the following:

a. The population was properly chosen and defined.

b. The sample chosen was representative of that population.

c. The questions asked were clear and not leading.

d. The survey was conducted by qualified persons following proper interview procedures.

e. The data gathered were accurately reported.

f. The data were analyzed in accordance with accepted statistical principles.

g. The process was conducted so as to ensure objectivity.

5.      Having just cited portions from the Federal Judicial Center's *Manual for Complex Litigation*, the following disclosure is important.   While at some points I refer to or cite case law, legal treatises or other legal authority, I am a social scientist, not an attorney.   However, being tasked with designing and critiquing surveys proffered as evidence in litigated matters, it would be irresponsible of me to fail to study, understand, and be mindful of what courts[1] and other authorities[2] have said regarding what is required for survey research to be considered acceptable

---

[1]Including *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *General Electric Co. v. Joiner*, 118 S. Ct. 512 (1997); *Kumho Tire Co., Ltd. et al. v. Carmichael et al.*, 526 U.S 137 (1999); *Weisgram v. Marley Co.*, 528 U.S. 440, 120 S. Ct. 1011, at 1021, 145 L. Ed. 2d 958, 972-73 (2000).

[2] Including the "Reference Guide on Survey Research" that appears in the Federal Judicial Center's *Reference Manual on Scientific Evidence* (disclosure: Jacob Jacoby served as a peer reviewer for both the 1994 and 2000 editions of this guide), and Professor J. Thomas McCarthy's treatise, *McCarthy on Trademarks and Unfair Competition.*

and accorded weight in litigated disputes.  Similarly, having been invited by the American Bar Association to write the *Trademark Surveys* treatise, it also stands to reason that I would need to familiarize myself with what case law and other authorities have to say regarding this subject.

## IV.   EVALUATION OF MR. PORET'S SURVEY AND REPORT

6.      The purpose of Mr. Poret's survey was "to determine whether the iPhone and iPad trade dress have acquired secondary meaning" (Poret Report, Paragraph 3). For the reasons discussed in this Section, Mr. Poret's survey is incapable of providing any reliable or scientifically valid data to answer this stated objective, as it contains numerous methodological flaws – including, but not limited to, defining and measuring the proper universe,  constructing the questionnaire, administering the study,  validating the responses, and analyzing and reporting the data. The flaws in Mr. Poret's survey and report are discussed below in a sequence that generally corresponds to the seven factors identified in Paragraph 5, *supra*, not in any order of implied importance.

7.      **Problems with the Universe Definitions.**  With respect to the iPhone survey, the universe defined by Mr. Poret is impermissibly overbroad.  While the iPhone is a smart phone, not all mobile phones are smart phones; the market for smart phones is not one and the same as the market for mobile phones.  Defining the market as prospective purchasers/owners of all mobile phones rather than as prospective purchasers of smart phones renders the universe too broad.

4

8.      Mr. Poret is inconsistent in defining the universes for his iPhone and iPad surveys.   While individuals were allowed to complete the iPhone survey merely based on currently owning a mobile phone, "[r]espondents were not allowed to complete the [iPad] survey merely based on currently <u>owning</u> a tablet computer" (Poret Report, Paragraph 51).   No explanation is provided for this inconsistency.

9.      Instead, Mr. Poret inexplicably and improperly expanded his iPad universe to include individuals who had purchased a mobile phone or notebook or laptop computer in the past 12 months or were likely to do so in the next 12 months.  He goes on to describe such ***non-tablet*** devices as "products related to tablet computers," (Poret Report, Paragraph 52), yet nowhere provides a rationale for not using ***tablet*** owners, as would have paralleled his iPhone universe.  Even stranger is that this impermissibly overbroad universe was chosen for only half the cells in the iPad study (those in Cells 4 and 5, who were exposed to the angled, exposed-button view).

10.     As a further inconsistency and in direct contradiction to his assertion in Paragraph 51, Mr. Poret states in Footnote 45 that the iPad data "***includes results*** among 36 Test Cell respondents and 34 Control Cell respondents who answered that they currently owned a tablet computer but had not personally purchased a tablet computer and were not likely to personally purchase a tablet computer in the next 12 months."   (Poret Report, page 61, footnote 45 (emphasis supplied).)   How did these current tablet owners find their way into the study?[3]

---

[3] Mr. Geoff Huntington, President of Phi Power Communications, who ran the computer analyses for me, commented as follows: "I don't know how Poret got those numbers.  When I look in the crosstabs, Banner 1 for all respondents, I see 167 respondents in the Test conditions who own a tablet, and 128 in the Control conditions. Looking at the narrower universe of Total Buyers (Banner 2), the numbers are 113 and 83, respectively.   The difference (54 and 45, respectively) would be the non-buyers who currently own a tablet but did not buy one in the

36.    Even if one were to disregard the problem noted in Paragraphs 19 and 35, *supra*, it can be shown that the 84.4% figure reported in the table within Paragraph 91 is grossly inflated for two reasons.  First, the calculations were based upon the wrong base.  Second, the findings were never adjusted by subtracting the corresponding control percentage.  When one takes these two factors into consideration, one finds that the correct percentage is not 84.4%, as claimed, but 21.9%, as discussed in the following paragraphs.

37.    *Mr. Poret's Calculations were Based Upon the Wrong Base*.  In all, Mr. Poret reports there were 582 respondents across the various iPhone Test groups.  In response to Question 215, 335 of these respondents said they associated the iPhone stimulus with a single company.  When asked in Question 220 to identify that company, 317 answered Apple/iPhone.  When these 317 respondents were asked (in Q270/275) when they first came to associate the appearance of the tablet with Apple/iPhone, 295 were able to provide a time when they formed their association.  Of these 295 respondents, 172 gave a date between January 2007, when publicity regarding the iPhone commenced, and July 2010, when Samsung introduced its contested phone.  These 172 respondents represent 29.6% of all 582 Test respondents.

38.    It is important to recognize that secondary meaning percentages need to be based upon **all** qualified respondents who pass the Screener questions and who complete the Main questionnaire, not upon some whittled down fraction thereof.  To illustrate the problem with using a whittled down base, consider the following hypothetical example.  Suppose Mr. Poret's survey had obtained the following findings: Of a total of 582 respondents in the various iPhone Test groups, 15 had said they associated the iPhone stimulus with a single company.  When asked to identify that company, 12 answered Apple/iPhone.  When asked when they first came to associate the appearance of the phone with Apple/iPhone, 10 respondents across all iPhone Test

18

Cells were able to provide a time when they formed their association. Of these 10 respondents, 9 gave a date between January 2007 and July 2010. Given such findings, it would be ludicrous to claim that 90% (9/10) of the relevant sample "indicate that the iPhone trade dress had already become widely associated with Apple/iPhone prior to July 2010" – which essentially is the claim made for the 84.4% figure in Paragraph 91. The correct base is all 582 Test respondents who were properly qualified by the Screener questions and who participated in the study. When this base is used, we find that the correct percentage for the Test groups is not 84.4%, but 29.6% (172/582).

39. *Mr. Poret's Calculations Were Not Adjusted By the Control Group Data.* Because it has not been adjusted by the corresponding Control percentage, even the 29.6% noted at the bottom of Paragraph 38, *supra*, is inflated. The corresponding percentage for all 299 Control group respondents is 7.7% (23/299). Subtracting this 7.7% from the 29.6% found for the Test groups, we arrive at a percentage of 21.9%, this being the correct adjusted percentage. A summary of these findings is provided in Table 1, below.

**TABLE 1: Secondary Meaning for the iPhone.**

| | Phone Survey Poret's Universe | | | | |
|---|---|---|---|---|---|
| | Test Ns | Test %s | Control Ns | Control %s | |
| Total n (completed survey) | 582 | 100.0% | 299 | 100.0% | |
| Q215 Associated stimulus with only one company | 335 | 57.6% | 54 | 18.1% | |
| Q220 Associated stimulus with Apple/Mac/"i"(device | 317 | 54.5% | 13 | 4.3% | Includes respondents who said iPhone in conjunction with a service provider. |
| Q270/275 Answered question | 295 | 50.7% | 13 | 4.3% | Accepted if answered one of the questions |
| Using date range: | January 2007-July 2010 | | | | Test minus Control % |
| Made during this time-frame | 172 | 29.6% | 23 | 7.7% | 21.9% |

Universe includes past-12-month and next-12-month buyers, and current owners (who may or may not be 12-month buyers).

Source: iPhone_04162012, Banner 1, Columns 2 and 3

Note that the Mr. Poret did not provide cross-tabs along with his report. Obtaining his data, we were able to create what should have been provided. This source is identified at the bottom of Table 1 as "iPad_04162012" and is provided as Appendix B to this report.

**40.      Problems with the Reporting and Analyses for the iPad Trade Dress Survey.**
In Paragraph 95 of his Report, Mr. Poret misleadingly asserts: "The 55% result is on its own sufficient to establish secondary meaning." But, for two reasons, the 55% cannot stand on its own with any degree of scientific accuracy. First, this 55% percentage was not adjusted by subtracting the control group percentage. The adjusted percentage is buried in Footnote 41: "[A]fter subtracting the parallel Control Cell result, the net figure is 38%;" in Paragraph 102, Mr. Poret states that this net percentage of 38% supports a finding of secondary meaning. As is described below, even this 38% figure is inflated.

41.      The second reason why the 55% (and even the adjusted 38%) figure cannot be relied upon is because it has been inflated by including three types of respondents (in the

20

numerator) who should not have been included. First, the 55% figure is arrived at by including individuals who answered Question 215 "more than one company or brand" and then when asked Q235 ("with what companies or brands do you associate the overall appearance of this mobile phone?") provided the name of only a single company or brand, namely, Apple/iPad/iPhone. There is no justification for including individuals who answered Question 215 "more than one company or brand" but could only remember the name of one company or brand. Given that they had answered "more than one company or brand," simply because they could not remember the name of a second or third company provides no scientifically sound basis for concluding that they believed the appearance was associated with one company or brand. Second, the 55% figure is arrived at by including individuals who say they have not purchased a tablet, nor are likely to purchase a tablet. Third, it includes respondents who work in the industry or say they live with someone who does (see Question 340). Removing these three types of respondents yields a sample of 369 Test respondents and 275 Control respondents.

43.     The 55% figure is improperly inflated in yet another way. As Mr. Poret writes in Paragraph 94: "When the respondents who answered 'yes' *or don't know* were asked whether they associate the overall appearance of the tablet computer with any particular company or companies or brand(s), 205 ... answered yes" (Italics supplied). In the very next sentence, Mr. Poret writes: "When the 205 respondents who answered 'yes' ...,"; this mischaracterization slides over the fact that some of these respondents did not answer "yes" but answered "don't know." For anyone operating conservatively, if a respondent answers *don't know,* that would be the end of the inquiry. There is no justification for pushing any further by converting the respondent's "don't know" into an "unsure," as in Question 255 ("What makes you *unsure* about whether you associate the overall appearance of this mobile phone with any particular

company/companies or brand(s)?"). As discussed in Paragraph 17, *supra*, Question 210 is unorthodox and, to the best of my recollection, has never been used in any other of the more than 100 secondary meaning studies I have conducted or reviewed. As used in Mr. Poret's study, the only purpose served by this question is to generate additional -- but unreliable -- answers of Apple/iPad/iPhone so as to inflate the estimated level of secondary meaning. Given the attendant publicity that comes with being the first to market, it is not surprising that, when pushed to provide an answer, respondents would answer Apple/iPad/iPhone, as that would be the brand name uppermost in their minds.

44.     Although Mr. Poret understands that individuals who associate the trade dress with two or more entities cannot be counted as reflecting secondary meaning even if they mention that one of these was the plaintiff (see Paragraph 80 on page 51 of his report and Paragraph 98 on page 60), and in spite of such non-exclusive mentions being irrelevant, he nonetheless boosts "the total level of association with Apple/iPad to 65%" for Cells 1 and 2 (Paragraph 98) and for Cells 4 and 5, "the total level of association with Apple/iPad to … 78.1% among tablet purchasers," (Paragraph 112) by *including* such respondents. Because secondary meaning is measured only by referencing a single source, the 65% and 78.1% gross figures are meaningless and serve only to cloud and confuse the issue. They also do not reflect any adjustment by the corresponding control data. Mr. Poret has not reported net percentages based on correct responses for determining secondary meaning.

45.     In Paragraph 116, Mr. Poret acknowledges: "The results did vary significantly depending upon the differing presentations of the tablets in Cells 1-3 versus Cells 4-7" He attributes this to viewing the tablets at an angle rather than frontally. Other explanations that would have to be considered and ruled out are any source-identifying properties in the button

22

(which was covered in the head-on-view of Test Cells 1 and 2 but exposed in the angled-view of Test Cells 4 and 5), as well as differences across the panels and panel providers.

46.   In a section entitled "Timing of Secondary Meaning," Mr. Poret concludes that his "results indicate that the iPad trade dress had already become widely associated with Apple/iPad prior to November of 2010" (Paragraph 117).   For reasons discussed in Paragraph 19, *supra,* the question (Q270) and data upon which he predicates this conclusion are scientifically invalid and cannot be relied upon.   Hence, the data cannot and do not "indicate" what Mr. Poret claims they indicate.

47.   Even if one were to disregard the problem noted in Paragraphs 19 and 46, *supra,* it can be shown that the 65.5% figure reported in the table within Paragraph 117 is grossly inflated for three reasons.   First, the calculations are based upon the wrong base.   Second, the findings were never adjusted by subtracting the corresponding control percentage.   Third, the sample inappropriately included 15 respondents who freely indicated (in response to Q.340) that they, or someone living in their household, works for a tablet manufacturer, distributor, or wireless provider (including Amazon, 3;  Apple, 4;  AT&T, 2;  Barnes & Noble, 1;  IBM, 4; Motorola, 1; Samsung, 1; Sony, 2; Sprint, 2; and Verizon).   In a very curious pattern, all of them were found in the Control conditions, but none were in the Test conditions.   They should have been removed from the sample entirely, and that was done as part of this re-analysis.   But this raises questions about (a) why they were not removed from the Control conditions, (b) whether cases were selectively removed from the Test conditions that were not reported (none were listed as removed due to company affiliation), and (c) whether other cases were selectively removed and not documented.   When one takes these three factors into consideration, one finds that the correct percentage is not 65.5%, as claimed, but 24.4% for those who qualified as past or

23

prospective tablet purchasers who do not work for, or live with someone who works in the tablet industry.

48.     *Mr. Poret's Calculations Were Based Upon the Wrong Base*.  In all, there were 700 respondents across the various iPad Test groups.  In response to Question 215, 455 of these 700 respondents said they associated the iPad stimulus with a single company.  When asked to identify that company (Q220), 443 answered Apple/iPad.  When these 443 respondents were asked when they first came to associate the appearance of the tablet with Apple/iPad (Q270/275), there were 377 respondents across all iPad Test Cells who were able to provide a time when they formed their association.  Of these 377 respondents, 247 gave a date before July 2010.

49.     It is important to recognize that secondary meaning percentages are based upon **all** qualified respondents who complete the Main questionnaire, not upon some whittled down fraction thereof.  To illustrate this fundamental fact, consider the following hypothetical.  Suppose Mr. Poret's survey had obtained the following findings: Of the 700 respondents across the various Test groups, 15 said they associated the iPad stimulus with a single company.  When asked to identify that company, 12 answered Apple/iPad/iPhone.  When asked when they first came to associate the appearance of the tablet with Apple/iPad/iPhone, 10 respondents across all iPad Test Cells were able to provide a time when they formed their association.  Of these 10 respondents, 9 gave a date before November 2010.  Given such findings, it would be ludicrous to claim that 90% (9/10) "indicate[s] that the iPad trade dress had already become widely associated with Apple/iPad prior to November 2010" – which essentially is the claim made for the 65.5% figure in Paragraph 117.  The correct base is all 369 respondents who, in answer to Q.135 and Q.140, said they had purchased a tablet computer in the past 12 months or were likely to purchase a tablet computer in the next 12 months.  When this correct base is used, and when

24

respondents who work in the industry of live in households where others work in the industry, we find that the correct percentage for the Test groups is not 65.5%, but 31.7% if we rely on respondents who said they became familiar with the appearance of the iPad during the expanded date range of January 2007 through November 2010 (which includes years before the iPad was even publicized or released), or 16.8% if we rely on respondents who said they became familiar with the appearance of the iPad during the date range of January 2010 through November 2010 (which represents the time period between when the iPad was publicized and when the Samsung tablet was released).  These findings are summarized in Table 2, below.

## TABLE 2: Secondary Meaning for the iPad.

| | Tablet Survey Buyer Universe Cleaned ** | | | | |
|---|---|---|---|---|---|
| | Test Ns | Test %s | Control Ns | Control %s | |
| Total n (completed survey) | 369 | 100.0% | 275 | 100.0% | |
| Q215 Associated stimulus with only one company | 227 | 61.5% | 60 | 21.8% | |
| Q220 Associated stimulus with Apple/Mac/"i"(device | 223 | 60.4% | 39 | 14.2% | |
| Q270/275 Answered question | 221 | 59.9% | 14 | 5.1% | |
| Using date range: | January 2010-November 2010 | | | | Test minus Control % |
| Made during this time-frame | 62 | 16.8% | 10 | 3.6% | 13.2% |
| Using date range: | January 2007-November 2010 | | | | Test minus Control |
| Made during this time-frame | 117 | 31.7% | 20 | 7.3% | 24.4% |

** Removed respondents who work in the industry, or live with someone who does.
Includes only respondents who have purchased a tablet and/or are likely to buy a tablet.

Source: iPad_04162012 (COMPANYOUT) Banner 2, Columns 2 & 3

50.     *Mr. Poret's Calculations Were Not Adjusted By the Control Group Data.*
Because it has not been adjusted by the corresponding Control percentage, even the 31.7% and
16.8% figures noted at the end of Paragraph 49 are inflated estimates of secondary meaning.
When the corresponding control group percentages are subtracted, we see that the secondary
meaning estimates are 24.4% if we rely on respondents who said they became familiar with the
appearance of the iPad during the expanded date range of January 2007 through November 2010
(which includes years before the iPad was even publicized or released), or 13.2% if we rely on
respondents who said they became familiar with the appearance of the iPad during the date range
of January 2010 through November 2010 (which represents the time period between when the
iPad was publicized and when the Samsung tablet was released).

## V.    CONCLUSION AND OPINION

51.    For the reasons set forth above, in my opinion, Mr. Poret's Survey and Report cannot be relied upon as providing scientifically acceptable support for the conclusions and opinions being proffered therein.

52.    I reserve the right to supplement or revise this report based on additional materials that may be forthcoming.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that, based upon the information available to me, to the best of my knowledge, the foregoing is true and correct.

23 April 2012
Date                                    Jacob Jacoby, Ph.D.