1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4

5

        APPLE INC., A CALIFORNIA      )  C-11-01846 LHK
6       CORPORATION,                  )
                                      )  SAN JOSE, CALIFORNIA
7                    PLAINTIFF,       )
                                      )  AUGUST 3, 2012
8              VS.                    )
                                      )  VOLUME
9       SAMSUNG ELECTRONICS CO.,      )
        LTD., A KOREAN BUSINESS       )  PAGES 556-930
10      ENTITY; SAMSUNG               )
        ELECTRONICS AMERICA,          )
11      INC., A NEW YORK              )
        CORPORATION; SAMSUNG          )
12      TELECOMMUNICATIONS            )
        AMERICA, LLC, A DELAWARE      )
13      LIMITED LIABILITY             )
        COMPANY,                      )
14                                    )
                     DEFENDANTS.      )
15      _____

16               TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE LUCY H. KOH
17             UNITED STATES DISTRICT JUDGE

18

19

20             APPEARANCES ON NEXT PAGE

21

22

23    OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                      CERTIFICATE NUMBER 9595
24

25

```
 1    A P P E A R A N C E S:

 2    FOR PLAINTIFF         MORRISON & FOERSTER
      APPLE:                   BY:  HAROLD J. MCELHINNY
 3                                  MICHAEL A. JACOBS
                                    RACHEL KREVANS
 4                            425 MARKET STREET
                             SAN FRANCISCO, CALIFORNIA  94105
 5

 6    FOR COUNTERCLAIMANT   WILMER, CUTLER, PICKERING,
      APPLE:                  HALE AND DORR
 7                            BY:  WILLIAM F. LEE
                             60 STATE STREET
 8                            BOSTON, MASSACHUSETTS  02109

 9                            BY:  MARK D. SELWYN
                             950 PAGE MILL ROAD
10                            PALO ALTO, CALIFORNIA  94304

11    FOR THE DEFENDANT:     QUINN, EMANUEL, URQUHART,
                               OLIVER & HEDGES
12                            BY:  CHARLES K. VERHOEVEN
                             50 CALIFORNIA STREET, 22ND FLOOR
13                            SAN FRANCISCO, CALIFORNIA  94111

14                            BY:  VICTORIA F. MAROULIS
                                    KEVIN P.B. JOHNSON
15                            555 TWIN DOLPHIN DRIVE
                             SUITE 560
16                            REDWOOD SHORES, CALIFORNIA  94065

17                            BY:  MICHAEL T. ZELLER
                                    WILLIAM C. PRICE
18                                  JOHN B. QUINN
                             865 SOUTH FIGUEROA STREET
19                            10TH FLOOR
                             LOS ANGELES, CALIFORNIA  90017
20

21

22

23

24

25
```

1                        INDEX OF WITNESSES

2      PLAINTIFF'S

3      **PHILIP SCHILLER**
            DIRECT EXAM BY MR. MCELHINNY      P. 594
4           (RES.)
            CROSS-EXAM BY MR. PRICE           P. 666
5           REDIRECT EXAM BY MR. MCELHINNY    P. 717
            RECROSS-EXAM BY MR. PRICE         P. 721
6

7      **SCOTT FORSTALL**
            DIRECT EXAM BY MR. MCELHINNY      P. 724
8           CROSS-EXAM BY MR. JOHNSON         P. 760
            REDIRECT EXAM BY MR. MCELHINNY    P. 784
9           RECROSS-EXAM BY MR. JOHNSON       P. 787

10

11     **JUSTIN DENISON**
            AS-ON CROSS-EXAM BY MR. LEE       P. 790
12          AS-ON DIRECT EXAM BY MR. QUINN    P. 839

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                         <u>INDEX OF EXHIBITS</u>

3                                    <u>MARKED</u>          <u>ADMITTED</u>

4       <u>PLAINTIFF'S</u>

5       133                                              600
        17                                               604
6       134                                              606
        135                                              607
7       142                                              609
        15                                               611
8       138                                              618
        141                                              621
9       140                                              622
        143                                              629
10      144                                              629
        145                                              630
11      146                                              631
        127                                              641
12      12                                               643
        128                                              644
13      13, CHARTS                                       647
        11                                               648
14      14, CHARTS                                       651
        16 & 33                                          652
15      1046                                             751
        58                                               809
16      54                                               813
        62                                               815
17      60                                               817

18

19

20

21

22

23

24

25

1

2                          INDEX OF EXHIBITS

3                                   MARKED        ADMITTED

4        DEFENDANT'S:

5        578                                      671
         1093                                     673
6        1016                                     691
         1027                                     692
7        1025                                     693
         143.22                                   700
8        592                                      702
         143.82                                   705
9        109                                      710
         143.4, 143.12, 143.6, 143.16            714
10       143.22 & 143.25                          714
         2524                                     762
11       2525                                     765
         2517                                     768
12       2519                                     770
         2522                                     775
13       1007                                     862
         1019                                     864
14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA              AUGUST 3, 2012
 2                  P R O C E E D I N G S
 3              (WHEREUPON, THE FOLLOWING PROCEEDINGS
 4    WERE HELD OUT OF THE PRESENCE OF THE JURY:)
 5              THE COURT:  ALL RIGHT.  WELCOME BACK.  WE
 6    HAVE QUITE A FEW HOUSEKEEPING MATTERS TO COVER.
 7    LET ME JUST START WITH VERY MINOR HOUSEKEEPING
 8    MATTERS.
 9              JUST IN TERMS OF TIME, I HAVE APPLE
10    HAVING USED 67 MINUTES AND SAMSUNG HAVING USED 34
11    MINUTES.
12              DOES THAT MATCH WITH YOUR UNDERSTANDING?
13              MS. MAROULIS:  YOUR HONOR, WE HAVE 32
14    MINUTES FOR SAMSUNG.
15              THE COURT:  NO, THAT'S NOT CORRECT.
16              MS. MAROULIS:  WE WILL CHECK WITH APPLE
17    AS WELL.
18              MR. JACOBS:  WELL, IT DOESN'T MATTER
19    BECAUSE I'VE KEPT THIS TIME AND IT'S IN THE
20    TRANSCRIPT, SO IT IS WHAT IT IS.
21              NOW, I GOT AN ODD E-MAIL YESTERDAY.  WE
22    HAVE A PROCESS WHEREBY THE PARTIES ACCESS THIS
23    COURTROOM, AND THAT IS THAT IT'S SIMULTANEOUS AND
24    IT'S EQUAL AND WE NOTIFY BOTH SIDES THAT THE OTHER
25    SIDE IS COMING IN.
```

```
 1              BUT I RECEIVED THIS E-MAIL FROM

 2    JUDGE FOGEL'S CLERK THAT A MR. STRETCH, WHO

 3    IDENTIFIED HIMSELF AS COUNSEL FOR SAMSUNG -- HE IS

 4    NOT ATTORNEY OF RECORD IN THE CASE, HE'S NOT MADE

 5    AN APPEARANCE IN THIS CASE -- CALLED JUDGE FOGEL'S

 6    CLERK SAYING HE WAS A PERSONAL FRIEND OF

 7    JUDGE BREYER AND JUDGE BREYER HAD TOLD HIM TO ASK

 8    JUDGE FOGEL TO OPEN UP THIS CEREMONIAL COURTROOM

 9    FOR HIM SO HE COULD COME WITH INDIVIDUALS WHO WOULD

10    BE TESTIFYING IN THE SAMSUNG CASE.

11              NOW, WE HAVE AN ESTABLISHED PROCEDURE FOR

12    HOW THIS COURT IS ACCESSED BY EITHER PARTY, SO LET

13    ME HEAR FROM SAMSUNG AS TO WHY YOU CIRCUMVENTED OUR

14    ESTABLISHED PROCEDURE, WHICH IS THAT YOU CONTACT

15    MS. PARKER BROWN OR CONTACT SNOOKI PULI FROM THE

16    CLERK'S OFFICE.

17              WHY DID YOU CIRCUMVENT THIS AND GO TO

18    JUDGE FOGEL, WHO'S NOT EVEN IN THE COURTHOUSE?

19              NOW, I UNDERSTAND THAT MR. STRETCH CAME

20    WITH TEN INDIVIDUALS INTO THE COURTROOM YESTERDAY

21    AFTERNOON.

22              ONE OF THEM ASKED TO TAKE A PHOTOGRAPH,

23    WHICH IN MY ORDER IT'S VERY CLEAR THAT IT IS

24    ACTUALLY AGAINST THE LAW, PER UNITED STATES

25    MARSHAL'S RULES, TO TAKE A PHOTOGRAPH INSIDE THIS
```

1    COURTHOUSE FOR SECURITY REASONS.

2           SO WHY IS THIS HAPPENING?  APPARENTLY

3    MR. STRETCH ARRIVED WITH TEN INDIVIDUALS, SEVERAL

4    OF WHOM DID NOT SPEAK ENGLISH AND WERE AIDED BY AN

5    INTERPRETER, AND HE WAS SHOWING THEM AROUND THE

6    COURTROOM.

7           SO WHY IS THIS HAPPENING IN CIRCUMVENTION

8    OF OUR VERY ESTABLISHED PROCEDURES OVER THE LAST

9    FEW WEEKS ABOUT HOW A PARTY ACCESSES THIS COURTROOM

10   AND THAT ANY ACCESS, AT LEAST THE OTHER SIDE BE

11   GIVEN NOTICE, AND IF THEY DON'T WANT TO SHOW UP,

12   THAT'S TOTALLY THEIR CALL.

13          SO WHAT'S GOING ON HERE?

14          MR. VERHOEVEN:  YOUR HONOR, THIS IS

15   MR. VERHOEVEN.

16          I DON'T KNOW ANYTHING ABOUT THIS, AND

17   MR. -- I'M LOOKING AROUND FOR MR. STRETCH.  I DON'T

18   SEE HIM IN THE COURTROOM.

19          I CAN ASSURE YOU I WILL LOOK INTO THIS

20   RIGHT AWAY AND, OVER THE -- AS SOON AS I CAN GET

21   AHOLD OF HIM, WE'LL REPORT BACK TO YOU.

22          THE COURT:  ALL RIGHT.  I WANT YOU TO

23   FILE THIS AFTERNOON THE NAMES OF THE INDIVIDUALS

24   THAT WERE IN THE COURTHOUSE, IN THIS COURTROOM

25   YESTERDAY.

```
 1              MR. VERHOEVEN:  YES, YOUR HONOR.

 2              THE COURT:  OKAY.  I'M NOT SURE WHY

 3    THAT'S HAPPENING WITHOUT OUR CLERK'S OFFICE AND

 4    WITHOUT MY CHAMBERS KNOWING.

 5              WE ARE ALL HERE.  JUDGE FOGEL IS NOT

 6    HERE, SO THE FACT THAT QUINN, EMANUEL WOULD CONTACT

 7    THE CHAMBERS OF JUDGE WHO'S NOT EVEN HERE AND IS IN

 8    WASHINGTON D.C. IS A LITTLE BIT CURIOUS.

 9              MR. VERHOEVEN:  AS I SAID, YOUR HONOR, I

10    DON'T KNOW ANYTHING ABOUT IT, BUT I WILL

11    INVESTIGATE IMMEDIATELY.

12              THE COURT:  NOW, THAT IS ANOTHER POINT

13    THAT, FOR SECURITY REASONS, THERE SHOULD BE NO

14    PHOTOS IN THIS COURTHOUSE OR OF THIS COURTHOUSE,

15    BUT APPARENTLY I'VE BEEN TOLD BY THE MARSHAL'S

16    SERVICE THAT MANY PHOTOS OF THIS COURTHOUSE ARE

17    SHOWING UP ON-LINE, THE INSIDE OF THE COURTHOUSE.

18              SO I'M NOT SURE WHO IS DOING THAT, BUT

19    PLEASE, FOR SECURITY REASONS, WE ASK THAT NO

20    PHOTOGRAPHS BE TAKEN INSIDE THE COURTHOUSE.

21              NOW, LET'S HANDLE -- APPLE'S REQUEST TO

22    SEAL IS DENIED.  THAT DOES NOT MEET THE COMPELLING

23    REASONS BASIS FOR SEALING INFORMATION.

24              AND I'VE ALREADY RULED ON THE MARKETING

25    DOCUMENTS, SO WHY THERE'S ANOTHER REQUEST TO SEAL
```

```
1     THE MARKING SURVEY DOCUMENTS IS PERPLEXING.

2            MR. JACOBS:  SO YOUR HONOR HAD INDICATED

3     A PREDILECTION NOT TO SEAL THOSE PARTICULAR

4     DOCUMENTS, AND THEN WE FILED OUR PAPERS ON MONDAY,

5     BOTH OUR RETROSPECTIVE MOTION AND OUR PROSPECTIVE

6     MOTION, AND THE PROSPECTIVE MOTION EXPLAINS THAT

7     THESE ARE VERY DISTINCTIVE -- TO CALL THEM

8     MARKETING DOCUMENTS REALLY DOESN'T ACCURATELY

9     CHARACTERIZE THEM -- AND WE MADE A DETAILED SHOWING

10    IN THAT MOTION OF WHY THESE PARTICULAR SURVEYS,

11    WHICH ARE SURVEYS OF APPLE CUSTOMERS CONDUCTED BY

12    APPLE AT GREAT EXPENSE AND MAINTAINED UNDER LOCK

13    AND KEY, BOTH IN SPIRIT -- IN FACT AND IN SPIRIT,

14    ARE REALLY, REALLY VITAL, AND TO JUST DISPLAY THEM

15    TO COMPETITORS WOULD GIVE COMPETITORS ACCESS THAT

16    THERE'S NO WAY THEY COULD GET OTHERWISE TO WHAT THE

17    APPLE CUSTOMERS LIKE AND WHY THEY MAKE THEIR

18    PURCHASING DECISIONS.

19            SO WHAT WE WERE DOING IN THIS, IN THIS

20    PAPER THAT WE FILED LATE LAST NIGHT WAS SAYING,

21    LOOK, WE HAVE THIS MOTION ON FILE, WE'VE MADE A

22    SHOWING UNDER THE APPLICABLE LAW.

23            IT'S PLAINLY A TRADE SECRET.  IF SOMEBODY

24    TOOK THESE FROM APPLE, THEY WOULD BE SUBJECT TO A

25    TRADE SECRET MISAPPROPRIATION CLAIM, AND WE
```

```
1     DETAILED ELEMENT BY ELEMENT UNDER THE TRADE SECRET

2     STATUTE WHY THESE MEET THAT STANDARD AND,

3     THEREFORE, MEET THE COMPELLING NEEDS OF ELECTRONIC

4     ART AND THE DISCUSSION WE HAD LAST WEEK.

5               WHAT THIS PAPER SAYS IS, LOOK, YOU

6     HAVEN'T RULED ON THAT MOTION YET.  HERE'S WHAT WE

7     SHOULD DO TODAY.  WHAT WE SHOULD DO TODAY IS THE

8     PARTICULAR PAGES THAT MR. SCHILLER IS GOING TO BE

9     EXAMINED ON, THOSE COME INTO EVIDENCE.

10              THAT'S OUR BASIC DEFAULT, BARRING

11    EXCEPTIONAL CIRCUMSTANCES ANYWAY, THAT A PARTICULAR

12    PAGE A WITNESS IS EXAMINED ON, THAT CAN COME INTO

13    EVIDENCE.

14              THIS IS A REALLY THICK DOCUMENT.  IT

15    COVERS COUNTRIES AROUND THE WORLD, YOUR HONOR.  IT

16    TELLS COMPETITORS WHAT THE DIFFERENCES AMONG APPLE

17    CUSTOMERS BETWEEN JAPAN, GERMANY, FRANCE, THE

18    UNITED STATES.  THERE'S NO REASON FOR A DOCUMENT

19    LIKE THAT TO COME IN IN ITS ENTIRETY.

20              SO THAT'S OUR PROPOSAL TO YOUR HONOR.

21    IT'S VERY IMPORTANT THAT WE PROTECT THIS

22    INFORMATION FROM COMPETITORS, AND THAT'S WHY WE'RE

23    MAKING THIS PROPOSAL TO YOU, THIS URGING, AND WHY

24    AT THE END, WE JUST HAVE TO ASK YOU THAT IF YOU

25    DON'T GRANT THIS, WE ASK FOR A STAY SO WE CAN SEEK
```

```
 1    RELIEF, BECAUSE WE BELIEVE WE'VE MET THE RELEVANT

 2    STANDARD IN THIS.

 3              THE COURT:  ALL RIGHT.  WHY DON'T YOU

 4    SEEK RELIEF THEN?  SO WHAT DO YOU NEED TO DO?  YOU

 5    NEED TO CALL MR. SCHILLER AT A LATER TIME, OR WHAT

 6    DO YOU WANT TO DO?

 7              MR. MCELHINNY:  WHAT WE WOULD LIKE TO DO,

 8    YOUR HONOR, IS CALL MR. SCHILLER, PUT IN THE PAGES

 9    THAT I SHOW HIM, AND THEN HAVE YOUR ORDER DENYING

10    OUR MOTION TO SEAL TAKE EFFECT NEXT FRIDAY.

11              THE COURT:  WHY NEXT FRIDAY?

12              MR. MCELHINNY:  WELL --

13              THE COURT:  IT TAKES EFFECT TODAY.  I'M

14    DENYING YOUR REQUEST TO SEAL TODAY, SO TAKE IT UP

15    ON APPEAL.

16              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

17              WHAT WE WERE REQUESTING IS A STAY IN

18    ORDER TO PERMIT US TO TAKE IT UP ON APPEAL.

19              MR. SCHILLER IS COMING ON TODAY.  IF THE

20    DOCUMENTS ARE REVEALED TODAY, WE DON'T HAVE A

21    CHANCE TO TAKE IT UP ON APPEAL.

22              SO WE WOULD LIKE JUST -- IT'S JUST A

23    QUESTION OF WHETHER THE EXHIBIT CAME IN TODAY OR IT

24    CAME IN NEXT WEEK, AND WE WOULD JUST LIKE A COUPLE

25    OF DAYS IN ORDER TO BE ABLE TO SEEK A STAY.
```

```
 1              (DISCUSSION OFF THE RECORD BETWEEN THE

 2    COURT AND THE CLERK.)

 3              THE COURT:  OKAY.  APPARENTLY

 4    RUSSELL WINER AND WOODWARD YANG, WHO ARE WITNESSES

 5    FOR EACH SIDE, ARE WAITING OUTSIDE THE COURTROOM

 6    AND THEY THINK THEY'RE SUPPOSED TO COME IN.

 7              SO YOU SHOULD SEND SOMEONE OUT TO LET

 8    THEM KNOW THEY SHOULD WAIT AND WHAT THEY SHOULD DO.

 9    THEY'VE BEEN EXCLUDED SINCE THEY'RE WITNESSES.

10              MS. MAROULIS:  YOUR HONOR, THEY'RE BOTH

11    EXPERT WITNESSES.

12              THE COURT:  OH, OKAY.

13              MR. MCELHINNY:  THEY ARE BOTH EXPERTS,

14    YOUR HONOR.

15              THE COURT:  THAT'S FINE.

16              ALL RIGHT.  SO YOU ARE REQUESTING THAT I

17    GRANT A STAY UNTIL NEXT FRIDAY SO YOU CAN SEEK AN

18    APPEAL?

19              MR. MCELHINNY:  LET ME BE VERY CLEAR.

20              THE COURT:  YES.

21              MR. MCELHINNY:  I'M NOT GOING TO PUT

22    THESE EXHIBITS IN.  SAMSUNG IS GOING TO PUT THE

23    EXHIBITS IN, WE'VE BEEN TOLD.  THEY'RE IN THEIR

24    CROSS-EXAMINATION BINDER.

25              AND WHAT I'M ASKING IS IF THEY DO THAT,
```

```
 1    IF THEY OFFER THE ENTIRE DOCUMENT, THAT THE EFFECT

 2    OF YOUR HONOR'S RULING IS WE PROVIDE COPIES OF THE

 3    EXHIBITS AT THE END OF THE DAY TO THE PRESS AND

 4    THEY BECOME PUBLIC IMMEDIATELY.

 5            FOR THOSE DOCUMENTS, IF THEY COME IN,

 6    THAT THE EFFECT OF THAT PUBLICITY WOULD BE TAKE

 7    EFFECT A WEEK FROM TODAY.  SO THOSE WOULD BE MADE

 8    PUBLIC A WEEK FROM TODAY.

 9            THE COURT:  THAT'S FINE.

10            MR. MCELHINNY:  THANK YOU.

11            MR. PRICE:  YOUR HONOR, THERE'S A TWIST

12    HERE, AND THAT IS, THESE FULL EXHIBITS WERE IN

13    THEIR INITIAL DISCLOSURES THAT WERE EXCHANGED.

14    THEY PLAN TO ASK MR. SCHILLER ABOUT SOME OF THE

15    PAGES IN THAT EXHIBIT.

16            FOR OUR CROSS-EXAMINATION, WE WANT TO ASK

17    HIM ABOUT OTHER PAGES, AND BECAUSE WE'RE ON THE

18    CLOCK, I DON'T PLAN TO ASK HIM ABOUT EVERY PAGE

19    THAT IS RELEVANT AND THAT WE WOULD THEN --

20            THE COURT:  SO THEN WHY DO YOU NEED TO

21    GET THE WHOLE DOCUMENT IN?

22            MR. PRICE:  WE DON'T NEED THE WHOLE

23    DOCUMENT IN.  WHAT I WOULD SUGGEST IS THAT I BE

24    PERMITTED TO CROSS-EXAMINE ON THE PAGES THAT ARE

25    RELEVANT TO HIS TESTIMONY, AND --
```

```
 1              THE COURT:  YOU DON'T HAVE ANY OBJECTION
 2   IF HE CROSSES HIM ON THE PAGES THAT YOU'RE GETTING
 3   IN?
 4              MR. MCELHINNY:  OR EVEN HIS OWN PAGES.
 5   ANY PAGE THAT GETS DISPLAYED TO THE JURY SHOULD
 6   BECOME PUBLIC.  WE'RE AGREEING TO THAT.
 7              IT'S THE PARTS OF THE DOCUMENT WHICH THE
 8   JURY --
 9              THE COURT:  IF YOU'RE SEEKING TO HAVE THE
10   WHOLE DOCUMENT IN, I'M GOING TO STAY IT UNTIL NEXT
11   FRIDAY.
12              MR. PRICE:  AND WHAT I WOULD LIKE --
13   THAT'S FINE, YOUR HONOR.
14              WHAT I WOULD LIKE TO BE ABLE TO DO AS
15   WELL, AND MAYBE WE CAN REACH AGREEMENT ON THIS, IS
16   THERE ARE SOME PAGES I JUST WON'T HAVE TIME TO
17   CROSS HIM ON, WHICH I CAN PERHAPS GIVE THOSE PAGES
18   TO APPLE'S COUNSEL AND SEE IF THEY AGREE THAT THEY
19   CAN ALSO BE PART OF THE RECORD.
20              BUT OBVIOUSLY WHAT APPLE HAS DONE, AND
21   THIS IS GOING TO BE A PROBLEM --
22              THE COURT:  I'M SORRY.  WE JUST DON'T
23   HAVE A LOT OF TIME.  THE JURY IS GOING TO COME OUT
24   AT 9:00.  IF YOU CAN GET AGREEMENT, THEN FINE.
25              IT SOUNDS LIKE THERE IS ROOM FOR AN
```

```
 1    AGREEMENT HERE ON LIMITED NUMBER OF PAGES.  SO THIS

 2    REALLY SHOULD BECOME A NONISSUE.

 3              IF YOU'RE GOING TO INSIST ON THE WHOLE

 4    THING, I'M GRANTING A STAY UNTIL NEXT FRIDAY SO

 5    THEY CAN TAKE IT UP ON APPEAL.

 6              MR. PRICE:  WE'RE NOT INSISTING ON THAT.

 7              THE COURT:  ALL RIGHT.  WHY DON'T YOU

 8    WORK IT OUT?  IT SOUNDS LIKE THERE'S AGREEMENT

 9    HERE.

10              ALL RIGHT.  NOW, THE OBJECTION PROCESS IS

11    NOT WORKING.  THE OBJECTIONS TO THESE WITNESSES

12    HAVE BEEN BRIEFED FIVE TIMES.  OKAY?  AND WE FILED

13    OUR ORDER AT 11:00 O'CLOCK LAST NIGHT AND THIS

14    MORNING THERE ARE RECONSIDERATIONS OF OUR ORDERS.

15              SO THIS IS WHAT I'M GOING TO DO.  FROM

16    NOW ON, NONE OF THIS IS GOING TO BE DONE ON PAPER.

17              YOU'RE GOING TO DO IT IN FRONT OF THE

18    JURY AND IT'S GOING TO COUNT TOWARDS YOUR TRIAL

19    TIME, OKAY?

20              BECAUSE SOME OF THESE OBJECTIONS ARE

21    RIDICULOUS.  THEY'RE LIKE FOUR OR FIVE PARAGRAPHS

22    LONG SAYING 403, 401, 402.  NO EXPLANATION, NO

23    DESCRIPTION.

24              IF YOU WANT TO DO THAT KIND OF MESSY

25    OBJECTION, YOU'RE GOING TO DO IT RIGHT IN FRONT OF
```

```
1    THE JURY AND THE TIME CLOCK WILL BE TICKING.  I'M

2    GOING TO KEEP A RECORD.  IT'S ALL ON YOUR TIME.

3    OKAY?

4              SO FROM NOW ON, NO OBJECTIONS BEFORE.

5    YOU DO IT ALL RIGHT IN FRONT OF THE JURY.  AND IF

6    YOU CAN'T EXPLAIN IT TO ME, THEN I'M JUST GOING TO

7    OVERRULE IT.  OKAY?

8              SO YOU NEED TO POINT -- IF YOU'RE GOING

9    TO SAY "THIS IS EXCLUDED" OR "THIS IS IRRELEVANT

10   FOR X, Y, Z PURPOSE," YOU BETTER HAVE ALL THE

11   EXHIBITS YOU NEED TO PERSUADE ME RIGHT ON THE SPOT.

12   OKAY?  SO NO MORE OBJECTIONS.

13             NOW, ALSO, THE RECONSIDERATION SITUATION

14   HAS GOTTEN OUT OF CONTROL.  EVERYTHING IS BEING

15   RECONSIDERED MULTIPLE TIMES.

16             SO FROM NOW ON, ANY TIME YOU MOVE FOR

17   RECONSIDERATION, MY TIME ON REVIEWING YOUR

18   RECONSIDERATION MOTIONS IS GOING TO COUNT TOWARDS

19   YOUR 25 HOURS OF TRIAL TIME.  ALL RIGHT?

20             SO IF THERE IS NO DISCIPLINE IN THIS

21   CASE, IT'S JUST GOING TO BE OUT OF YOUR TIME SO

22   YOU'LL HAVE LESS THAN 25 HOURS BEFORE THE JURY.

23             NOW, HAVING SAID THAT, THE

24   RECONSIDERATIONS THAT HAVE BEEN FILED TODAY, ARE

25   THERE ANY THAT YOU WANT ME TO RULE ON?  BECAUSE I
```

1    WILL DO THAT IN FRONT OF THE JURY.  WE WILL HAVE

2    THE FULL DISCUSSION IN FRONT OF THE JURY AND IT

3    WILL COUNT TOWARDS YOUR TRIAL TIME.

4            SO WHO WANTS TO GO FORWARD WITH ALL THE

5    RECONSIDERATIONS THAT WERE FILED BETWEEN MIDNIGHT

6    AND THIS MORNING?  WHO WANTS TO DO THAT?

7            MR. JACOBS:  I THINK WE DO, YOUR HONOR.

8            THE COURT:  ALL RIGHT.  THAT'S FINE.

9    WE'LL BRING IN THE JURY AND WE'LL ARGUE IT IN FRONT

10   OF THEM.  OKAY?

11           NOW, LET'S GO TO THE OTHER ISSUE, AND

12   THAT IS WITH REGARD TO THE SAMSUNG PRESS RELEASE

13   AND MR. QUINN.

14           SO MY SOLE CONCERN IS TO PRESERVE THE

15   IMPARTIALITY OF THE JURY IN ORDER TO HAVE A FAIR

16   TRIAL.

17           SO THIS MORNING I'M GOING TO POLL THEM TO

18   SEE IF THEY'VE READ OR SEEN ANYTHING ABOUT THE CASE

19   SINCE LAST TUESDAY AFTERNOON, WHETHER THAT HAS

20   CAUSED THEM TO FORM AN IMPRESSION OR OPINION ABOUT

21   THE CASE, WHETHER THEY CAN DECIDE THIS CASE BASED

22   SOLELY ON THE EVIDENCE THAT'S ADMITTED AT THE

23   TRIAL, AND WHETHER THEY WILL FOLLOW THE LAW AS I

24   INSTRUCT THEM, AND WHETHER THEY CAN BE FAIR AND

25   IMPARTIAL TO BOTH SIDES.

1      BASED ON HOW A JUROR ANSWERS THAT

2  QUESTION, WE'LL HAVE TO SEE WHETHER THEY REMAIN ON

3  THIS JURY.

4      BASED ON THE CURRENT RECORD, I DENY

5  APPLE'S REQUEST FOR JUDGMENT ON THE PHONE DESIGN

6  PATENTS, FOR FURTHER EXCLUSION OF EVIDENCE, AND FOR

7  AN ADVERSE JURY INSTRUCTION REGARDING THE SAMSUNG

8  PRESS RELEASE.  THOSE REMEDIES ARE NOT WARRANTED BY

9  CURRENT RECORD.

10      BUT I DO RESERVE FOR AFTER THE TRIAL THE

11  QUESTION AS TO WHETHER A FURTHER INVESTIGATION AS

12  TO EXACTLY WHAT HAPPENED AND WHAT OTHER

13  CONSEQUENCES MAY BE APPROPRIATE.

14      I WILL TELL YOU WHAT ASPECTS OF WHAT HAS

15  OCCURRED CAUSE ME THE MOST CONCERN, OR AT LEAST

16  SOME CONCERN.  I'M SURE THERE ARE WILL BE OTHERS

17  THE MORE I THINK ABOUT IT.

18      BUT AT THE TIME THAT SAMSUNG RELEASED ITS

19  PRESS RELEASE WITH THE LINK TO EXCLUDED

20  DEMONSTRATIVES, THE COURT HAD ALREADY SELECTED AND

21  SEATED A JURY, TRIAL HAD ALREADY BEGUN, AND THE

22  PRESS RELEASE REFERS MORE THAN ONCE TO WHAT

23  EXCLUDED EVIDENCE THE JURY SHOULD CONSIDER.

24      MOREOVER, BOTH SAMSUNG AND QUINN, EMANUEL

25  WERE ON NOTICE THAT THE POSSIBILITY OF JURY TAINT

1    IS REAL.  OF OUR 34 POTENTIAL JURORS WHO WERE VOIR

2    DIRED ON MONDAY, 18 ADMITTED SOME EXPOSURE TO

3    PRETRIAL PUBLICITY.

4             OF OUR NINE SEATED JURORS, FOUR ADMITTED

5    TO EXPOSURE TO SOME PRETRIAL PUBLICITY.

6             SO THIS WAS A REAL AND POSSIBLE DANGER

7    THAT SAMSUNG AND QUINN, EMANUEL MADE THE DECISION

8    TO TAKE THE RISK OF TAINTING THE JURY.

9             AT THE TIME THAT MR. QUINN REQUESTED YET

10   ANOTHER RECONSIDERATION OF THE MULTIPLE RULINGS OF

11   THE COURT, THE PARTIES HAD BRIEFED AT LEAST THE

12   SONY-STYLE ISSUE NO LESS THAN SIX TIMES, SIX TIMES,

13   AND ON TUESDAY MORNING, I MADE IT ABSOLUTELY CLEAR

14   THAT I WAS NOT GOING TO RECONSIDER THAT RULING.

15            YET MR. QUINN LEFT THIS COURTROOM AND

16   DELIBERATELY AND WILLFULLY, WITH SAMSUNG, ISSUED A

17   PRESS RELEASE TO HIGHLIGHT EVIDENCE THAT THEY BOTH

18   KNEW WAS EXCLUDED AND WAS INADMISSIBLE IN THIS

19   TRIAL.

20            AND THE LINK TO THE EXCLUDED

21   DEMONSTRATIVES IN THE PRESS RELEASE WAS A WILLFUL

22   AND DELIBERATE ATTEMPT TO FURTHER PROPAGATE THAT

23   EXCLUDED EVIDENCE THE DAY AFTER A JURY HAD BEEN

24   IMPANELED.

25            THIS IS AN UNFORTUNATE SITUATION, BUT I

1     DON'T WANT ANYONE TO LOSE SIGHT OF THE FACT THAT

2     THIS IS A SITUATION OF SAMSUNG AND QUINN, EMANUEL'S

3     OWN MAKING.

4              HAD SAMSUNG TIMELY COMPLIED WITH ITS

5     DISCOVERY OBLIGATIONS, THERE WOULD BE NO EXCLUSION.

6              BOTH JUDGE GREWAL AND I HAVE HELD BOTH

7     PARTIES TO THE SAME STANDARD.  APPLE'S UNTIMELY

8     DISCOVERY AND THEORIES HAVE EQUALLY BEEN EXCLUDED

9     FROM THIS TRIAL.

10             I WILL NOT LET ANY THEATRICS OR ANY SIDE

11    SHOW DISTRACT US FROM WHAT WE ARE HERE TO DO, WHICH

12    IS TO FAIRLY AND EFFICIENTLY TRY THIS CASE.

13             WHEN THE JURY IS HERE, WE'RE GOING TO DO

14    OUR BEST TO MAKE THE MOST OF THEIR TIME, WHETHER

15    THAT MEANS READING JURY INSTRUCTIONS AT 4:30 ON

16    MONDAY AFTERNOON OR CALLING A WITNESS DURING THE

17    LAST FEW MINUTES OF THE DAY ON TUESDAY.

18             NOW, I HOPE THAT ALL PARTIES AND LAWYERS

19    IN THIS CASE WHO ARE SUPPOSED TO BE OFFICERS OF THE

20    COURT WILL RESPECT THE UNITED STATES JUSTICE SYSTEM

21    AND OUR JURY TRIAL PROCESS.

22             NOW, WOULD YOU PLEASE BRING IN THE JURY,

23    AND WHATEVER RECONSIDERATIONS AND OBJECTIONS TO

24    EVIDENCE, WE'RE GOING TO DO IT ON YOUR TIME.

25             MR. LEE:  YOUR HONOR, BEFORE THE JURY IS

1    BROUGHT IN, CAN I JUST ADDRESS THE LAST POINT THAT

2    YOUR HONOR ADDRESSED AND JUST RAISED TWO POINTS,

3    NOT TO REARGUE --

4            THE COURT:  I'LL GIVE YOU 30 SECONDS.

5            MR. LEE:  ALL RIGHT.  I'LL DO IT 30

6    SECONDS.

7            WE WOULD ASK THAT THE JURY BE POLLED

8    INDIVIDUALLY OUTSIDE THE COURTROOM.  I THINK WITH

9    ALL THE PRESS HERE, ASKING THESE NINE FOLKS THE

10   QUESTIONS YOU'VE ASKED IS GOING TO GET A PARTICULAR

11   RESPONSE.

12           I THINK THIS IS UNUSUAL ENOUGH, IT'S

13   IMPORTANT ENOUGH AND DIFFERENT ENOUGH TO HAVE YOU

14   TALK TO THEM INDIVIDUALLY, WITH OR WITHOUT COUNSEL

15   THERE, IS IMPORTANT.

16           THAT'S WHAT HAPPENS IN OTHER

17   CIRCUMSTANCES AND WE'D ASK YOUR HONOR TO DO THAT.

18           THE SECOND THING, YOUR HONOR, IS YOU ARE

19   CORRECT THAT THERE ARE UNANSWERED QUESTIONS,

20   INCLUDING --

21           THE COURT:  ALL RIGHT.  I THINK YOUR 30

22   SECONDS ARE UP.  I WILL TAKE YOUR SUGGESTION AND

23   POLL THEM INDIVIDUALLY.

24           MR. LEE:  ALL RIGHT.  THANK YOU.

25           THE COURT:  I THINK MS. PARKER BROWN JUST

```
1    LEFT.  JUST BRING THEM IN ONE BY ONE.

2              MR. LEE:  YOUR HONOR, WE THOUGHT -- I

3    KNOW I'M OFF MY 30 SECONDS -- ONE BY ONE IN YOUR

4    HONOR'S CHAMBERS, NOT IN FRONT OF EVERYBODY HERE

5    SITTING IN THE COURTROOM.

6              THE COURT:  NO, THAT'S DENIED.

7              BRING THEM IN, PLEASE.

8              (WHEREUPON, THE FOLLOWING PROCEEDINGS

9    WERE HELD IN THE PRESENCE OF JUROR NUMBER 9:)

10             THE COURT:  ALL RIGHT.  GOOD MORNING.

11             I JUST HAD A FEW QUESTIONS TO ASK, AND

12   I'M JUST GOING TO CALL YOU JUROR NUMBER 9, IF

13   THAT'S OKAY --

14             JUROR 9:  SURE.

15             THE COURT:  -- JUST FOR YOUR OWN PRIVACY

16   AT THIS POINT.

17             SINCE WE WERE LAST HERE ON TUESDAY

18   AFTERNOON, DID YOU READ OR HEAR ANYTHING ABOUT THE

19   CASE?

20             JUROR 9:  NO.

21             THE COURT:  OKAY.  CAN YOU STILL DECIDE

22   THIS CASE BASED SOLELY ON THE EVIDENCE THAT'S

23   ADMITTED AT THE TRIAL AND BASED SOLELY ON THE LAW

24   AS I INSTRUCT YOU?

25             JUROR 9:  YES.
```

1           THE COURT:  CAN YOU GIVE BOTH SIDES IN

2     THIS CASE -- CAN YOU BE FAIR AND IMPARTIAL TO BOTH

3     SIDES IN THIS CASE?

4           JUROR 9:  ABSOLUTELY.

5           THE COURT:  ALL RIGHT.  THANK YOU.

6           IF YOU WOULDN'T MIND, PLEASE, WHEN YOU GO

7     BACK IN THERE, EVERYONE IS GOING TO ASK YOU WHAT

8     HAPPENED.  IF YOU JUST SAY YOU CAN'T TALK ABOUT IT,

9     BUT THE JUDGE IS GOING TO ASK EVERYONE TO COME OUT

10    INDIVIDUALLY, SO THEY'LL ALL FIND OUT SOON ENOUGH.

11          JUROR 9:  SURE.

12          (WHEREUPON, THE FOLLOWING PROCEEDINGS

13    WERE HELD IN THE PRESENCE OF JUROR NUMBER 6:)

14          THE COURT:  ALL RIGHT.  GOOD MORNING.

15          JUROR 6:  GOOD MORNING.

16          THE COURT:  ALL RIGHT.  WELCOME BACK.

17          FOR YOUR PRIVACY, I'M JUST GOING TO REFER

18    TO YOU AS JUROR NUMBER 6.  IS THAT OKAY?

19          JUROR 6:  YES.

20          THE COURT:  ALL RIGHT.  I JUST WANT TO

21    FIND OUT WHETHER, SINCE WE WERE TOGETHER ON TUESDAY

22    AFTERNOON, HAVE YOU READ OR HEARD ANYTHING ABOUT

23    THIS CASE?

24          JUROR 6:  NO.

25          THE COURT:  ALL RIGHT.  WILL YOU DECIDE

1    THIS CASE BASED SOLELY ON THE EVIDENCE THAT'S

2    ADMITTED DURING THE TRIAL AND APPLY ONLY THE LAW

3    THAT I INSTRUCT YOU?

4              JUROR 6:  YES.

5              THE COURT:  WILL YOU BE FAIR AND

6    IMPARTIAL TO BOTH SIDES IN THIS CASE?

7              JUROR 6:  YES.

8              THE COURT:  ALL RIGHT.  THANK YOU.

9              NOW, WHEN YOU GO BACK IN THERE, PEOPLE

10   MAY ASK WHAT'S GOING ON.  IF YOU COULD JUST LET

11   THEM KNOW, THE COURT ASKED YOU NOT TO SAY.

12   EVERYONE IS GOING TO BE COMING IN INDIVIDUALLY, SO

13   THEY'LL FIND OUT SOON ENOUGH.  OKAY?

14             JUROR 6:  SURE.

15             THE COURT:  THANK YOU.

16             (WHEREUPON, THE FOLLOWING PROCEEDINGS

17   WERE HELD IN THE PRESENCE OF JUROR NUMBER 2:)

18             THE COURT:  GOOD MORNING.  WELCOME BACK.

19             FOR YOUR PRIVACY, I'M JUST GOING TO REFER

20   TO YOU AS JUROR NUMBER 2.  IS THAT ALL RIGHT?

21             JUROR 2:  YES.

22             THE COURT:  OKAY.  I JUST HAVE A COUPLE

23   OF QUESTIONS.

24             SINCE WE WERE LAST TOGETHER ON TUESDAY

25   AFTERNOON, DID YOU READ OR HEAR ANYTHING ABOUT THIS

1    CASE?

2              JUROR 2:  NO.

3              THE COURT:  ALL RIGHT.  WILL YOU DECIDE

4    THIS CASE BASED SOLELY ON THE EVIDENCE THAT'S

5    ADMITTED DURING THIS TRIAL AND APPLY THE LAW AS I

6    INSTRUCT YOU?

7              JUROR 2:  YES.

8              THE COURT:  WILL YOU BE FAIR AND

9    IMPARTIAL TO BOTH SIDES IN THIS CASE?

10             JUROR 2:  YES.

11             THE COURT:  ALL RIGHT.  WELL, THANK YOU

12   SO MUCH.

13             THE OTHER JURORS MAY ASK YOU WHAT'S GOING

14   ON.  IF YOU COULD JUST LET THEM KNOW THAT I ASKED

15   YOU NOT TO SAY ANYTHING.  THEY'RE ALL GOING TO BE

16   COMING IN HERE IN JUST A SECOND, SO THEY'LL FIND

17   OUT SOON ENOUGH.

18             JUROR 2:  ALL RIGHT.

19             THE COURT:  ALL RIGHT.  THANK YOU.

20             (WHEREUPON, THE FOLLOWING PROCEEDINGS

21   WERE HELD IN THE PRESENCE OF JUROR NUMBER 8:)

22             THE COURT:  GOOD MORNING AND WELCOME

23   BACK.

24             IF YOU DON'T MIND, I'M GOING TO CALL YOU

25   JUROR NUMBER 8.

```
1              JUROR 8:  OKAY.

2              THE COURT:  JUST FOR YOUR PRIVACY.

3              SINCE WE WERE LAST TOGETHER HERE ON

4    TUESDAY AFTERNOON, DID YOU READ OR HEAR ANYTHING

5    ABOUT THIS CASE?

6              JUROR 8:  NO, I DID NOT.

7              THE COURT:  ALL RIGHT.  WILL YOU DECIDE

8    THIS CASE BASED SOLELY ON THE LAW THAT I INSTRUCT

9    YOU AND THE EVIDENCE THAT'S ADMITTED HERE IN OPEN

10   COURT DURING THIS TRIAL?

11             JUROR 8:  YES, I WILL.

12             THE COURT:  WILL YOU BE FAIR AND

13   IMPARTIAL TO BOTH SIDES IN THIS CASE?

14             JUROR 8:  YES.

15             THE COURT:  ALL RIGHT.  WELL, THANK YOU

16   SO MUCH.

17             IF THE OTHER JURORS ASK YOU WHAT'S

18   HAPPENING, CAN YOU JUST LET THEM KNOW THAT I ASKED

19   YOU NOT TO SAY AND THAT EVERYONE IS GOING TO BE

20   BROUGHT IN ONE BY ONE, SO THEY'LL FIND OUT SOON

21   ENOUGH.  OKAY?

22             JUROR 8:  YES.

23             THE COURT:  ALL RIGHT.  THANK YOU.

24             (WHEREUPON, THE FOLLOWING PROCEEDINGS

25   WERE HELD IN THE PRESENCE OF JUROR NUMBER 3:)
```

1           THE COURT:  ALL RIGHT.  GOOD MORNING.

2           JUROR 3:  GOOD MORNING.

3           THE COURT:  AND WELCOME BACK.  FOR YOUR

4    PRIVACY, I'M JUST GOING TO CALL YOU JUROR NUMBER 3

5    IF THAT'S OKAY.

6           JUROR 3:  OKAY.

7           THE COURT:  ALL RIGHT.  SINCE WE WERE

8    LAST HERE ON TUESDAY AFTERNOON, DID YOU READ OR

9    HEAR ANYTHING ABOUT THE CASE?

10          JUROR 3:  NO, I HAVEN'T.

11          THE COURT:  ALL RIGHT.  WILL YOU DECIDE

12   THIS CASE BASED SOLELY ON THE EVIDENCE THAT'S

13   ADMITTED DURING THIS TRIAL AND APPLY THE LAW AS I

14   INSTRUCT YOU?

15          JUROR 3:  YES.

16          THE COURT:  ALL RIGHT.  WILL YOU BE FAIR

17   AND IMPARTIAL TO BOTH SIDES IN THIS CASE?

18          JUROR 3:  YES.

19          THE COURT:  ALL RIGHT.  THANK YOU.

20          WHEN YOU GO BACK, IF YOU WOULD -- IF

21   FOLKS ASK YOU WHAT'S GOING ON, IF YOU COULD JUST

22   LET THEM KNOW, THE JUDGE ASKED ME NOT TO SAY, AND

23   EVERYONE IS GOING TO BE CALLED IN, SO THEY'LL FIND

24   OUT IN JUST A MINUTE OR TWO.

25          JUROR 3:  NO PROBLEM.

```
 1                  THE COURT:  OKAY.  THANK YOU.

 2                  JUROR 3:  UM-HUM.

 3                  (WHEREUPON, THE FOLLOWING PROCEEDINGS

 4     WERE HELD IN THE PRESENCE OF JUROR NUMBER 4:)

 5                  THE COURT:  ANYWHERE YOU'D LIKE.  THIS IS

 6     GOING TO BE PRETTY SHORT, I THINK.

 7                  JUROR 4:  OKAY.

 8                  THE COURT:  GOOD MORNING AND WELCOME

 9     BACK.

10                  JUROR 4:  THANK YOU.

11                  THE COURT:  FOR YOUR PRIVACY, I'M GOING

12     TO REFER TO YOU AS JUROR NUMBER 4.  IS THAT ALL

13     RIGHT?

14                  JUROR 4:  OKAY.

15                  THE COURT:  OKAY.  SINCE WE WERE LAST

16     TOGETHER ON TUESDAY AFTERNOON, DID YOU READ OR HEAR

17     ANYTHING ABOUT THIS CASE?

18                  JUROR 4:  NO.

19                  THE COURT:  WILL YOU DECIDE THIS CASE

20     BASED SOLELY ON THE EVIDENCE THAT'S ADMITTED DURING

21     THE TRIAL AND APPLY THE LAW AS I INSTRUCT YOU?

22                  JUROR 4:  YES.

23                  THE COURT:  ALL RIGHT.  WILL YOU BE FAIR

24     AND IMPARTIAL TO BOTH SIDES IN THIS CASE?

25                  JUROR 4:  YES.
```

```
 1              THE COURT:  ALL RIGHT.  WELL, THANK YOU.

 2              IF YOU WOULDN'T MIND, WHEN YOU GO BACK IN

 3     THERE, IF SOMEONE ASKS YOU WHAT'S GOING ON, JUST

 4     LET THEM KNOW, THE JUDGE ASKED ME NOT TO SAY, THAT

 5     THEY'RE ALL GOING TO BE CALLED IN.  OKAY?

 6              JUROR 4:  ALL RIGHT.

 7              THE COURT:  ALL RIGHT.  THANK YOU.

 8              (WHEREUPON, THE FOLLOWING PROCEEDINGS

 9     WERE HELD IN THE PRESENCE OF JUROR NUMBER 1:)

10              THE COURT:  ALL RIGHT.  GOOD MORNING AND

11     WELCOME BACK.  PLEASE TAKE A SEAT ANYWHERE THAT YOU

12     WOULD LIKE.

13              JUROR 1:  OKAY.

14              THE COURT:  ALL RIGHT.  FOR YOUR PRIVACY,

15     I'M JUST GOING TO REFER TO YOU AS JUROR NUMBER 1.

16     IS THAT ALL RIGHT?

17              JUROR 1:  SURE.

18              THE COURT:  OKAY.  SO SINCE WE WERE LAST

19     TOGETHER HERE ON TUESDAY AFTERNOON, DID YOU READ OR

20     HEAR ANYTHING ABOUT THIS CASE?

21              JUROR 1:  NO, YOUR HONOR.

22              THE COURT:  ALL RIGHT.  WILL YOU DECIDE

23     THIS CASE BASED SOLELY ON THE EVIDENCE THAT'S

24     ADMITTED DURING THIS TRIAL AND APPLY THE LAW AS I

25     INSTRUCT YOU?
```

```
 1                    JUROR 1:  YES, YOUR HONOR.

 2                    THE COURT:  OKAY.  WILL YOU BE FAIR AND

 3       IMPARTIAL TO BOTH SIDES IN THIS CASE?

 4                    JUROR 1:  YES.

 5                    THE COURT:  ALL RIGHT.  THANK YOU.

 6                    IF YOU -- I'M GOING TO ASK YOU TO STEP

 7       BACK IN THE JURY ROOM, BUT IF YOU WOULD PLEASE NOT

 8       EXPLAIN TO ANYONE ELSE WHAT'S GOING ON, JUST LET

 9       THEM KNOW THAT THEY'RE ALL GOING TO COME IN IN A

10       MINUTE.

11                    JUROR 1:  YES.

12                    THE COURT:  ALL RIGHT.  THANK YOU.

13                    (WHEREUPON, THE FOLLOWING PROCEEDINGS

14       WERE HELD IN THE PRESENCE OF JUROR NUMBER 7:)

15                    THE COURT:  ALL RIGHT.  PLEASE TAKE A

16       SEAT.

17                    WELCOME BACK.  GOOD MORNING.

18                    I JUST HAVE A FEW QUESTIONS TO ASK YOU,

19       AND FOR YOUR PRIVACY, I'M GOING TO CALL YOU JUROR

20       NUMBER 7.  IS THAT ALL RIGHT?

21                    JUROR 7:  YES.

22                    THE COURT:  SINCE WE WERE LAST HERE ON

23       TUESDAY, DID YOU READ OR HEAR ANYTHING ABOUT THIS

24       CASE?

25                    JUROR 7:  HEADLINES ON THE INTERNET.
```

```
 1              THE COURT:  HEADLINES.  OKAY.  CAN YOU
 2    TELL ME WHAT HEADLINES YOU READ?
 3              JUROR 7:  IT SAYS 15 KITCHEN TABLE
 4    SOMETHING.  IT WAS ABOUT THE, WHAT THE FIRST
 5    WITNESS WAS TALKING ABOUT.
 6              THE COURT:  OH, 15 PEOPLE AT THE KITCHEN
 7    TABLE, YOU MEAN THE INDUSTRIAL DESIGNERS?
 8              JUROR 7:  YEAH.
 9              THE COURT:  OKAY.  ANYTHING ELSE?  NO,
10    NOTHING ELSE?
11              JUROR 7:  I TRIED TO AVOID IT.
12              THE COURT:  OKAY.  THANK YOU.
13              NOW, BASED ON ANYTHING THAT YOU READ, DID
14    YOU FORM AN IMPRESSION OR AN OPINION ABOUT THIS
15    CASE?
16              JUROR 7:  NO.  I DIDN'T READ THE ARTICLE.
17    I JUST SAW THE HEADLINE.
18              THE COURT:  OKAY.  ANY OTHER HEADLINES
19    THAT YOU CAN RECALL OTHER THAN THE KITCHEN TABLE
20    ONE?
21              JUROR 7:  NO.
22              THE COURT:  ALL RIGHT.  BASED ON THE
23    HEADLINES THAT YOU SAW AND ANYTHING ELSE YOU MAY
24    HAVE SEEN OR HEARD, HAVE YOU FORMED ANY LIKES,
25    DISLIKES, BIASES TOWARDS ONE SIDE OR THE OTHER OR
```

1    ANYTHING IN PARTICULAR?

2              JUROR 7:  NO.

3              THE COURT:  NO.  OKAY.  WILL YOU DECIDE

4    THIS CASE SOLELY ON THE EVIDENCE THAT'S ADMITTED

5    DURING THIS TRIAL?

6              JUROR 7:  ABSOLUTELY.

7              THE COURT:  OKAY.  WILL YOU APPLY THE LAW

8    AS I INSTRUCT YOU?

9              JUROR 7:  YES.

10             THE COURT:  WILL YOU BE FAIR AND

11   IMPARTIAL TO BOTH SIDES?

12             JUROR 7:  YES.

13             THE COURT:  ALL RIGHT.  I KNOW WE'RE

14   ASKING YOU TO DO SOMETHING THAT'S DIFFICULT, NOT

15   LOOKING AT ANY OF THIS, BUT I'M GOING TO MAKE THIS

16   OFFER TO YOU, AND I'M GOING TO TELL ALL THE OTHER

17   JURORS WHEN THEY COME BACK, THAT WE ARE GOING TO

18   COLLATE ALL OF THE ARTICLES ON THIS CASE AND WHEN

19   YOU ARE COMPLETELY DONE WITH YOUR ROLE AS A JUROR,

20   WE'LL GIVE YOU A FULL COMPILATION.

21             SO I DON'T WANT YOU TO FEEL LIKE YOU'RE

22   BEING LEFT OUT, THAT THERE'S SOMETHING EXCITING

23   ABOUT WHAT'S GOING ON THAT YOU DON'T KNOW ABOUT.

24   AT THE VERY END OF THIS CASE, YOU'RE GOING TO GET

25   IT ALL.  OKAY?

```
1              SO I'M GOING TO MAKE THAT OFFER TO ALL

2     THE OTHER JURORS, SO DON'T FEEL LIKE YOU'RE BEING

3     LEFT OUT AT ALL.  WE'RE GOING TO COMPILE EVERYTHING

4     FOR YOU AND WE'RE GOING TO GIVE IT TO YOU AT THE

5     END.  SO YOU'LL BE ABLE TO LEARN EVERYTHING AT THE

6     END, BUT WE JUST NEED YOU TO SHUT OFF ANY OTHER

7     COMMENTS, READING, OR HEARING ABOUT THE CASE.

8              CAN YOU DO THAT?

9              JUROR 7:  YES.

10             THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

11             (WHEREUPON, THE FOLLOWING PROCEEDINGS

12    WERE HELD IN THE PRESENCE OF JUROR NUMBER 5:)

13             THE COURT:  TAKE A SEAT ANYWHERE, PLEASE.

14             ALL RIGHT.  THIS IS JUROR NUMBER 5.

15             WELL, WELCOME BACK.

16             JUROR 5:  THANKS.

17             THE COURT:  AND GOOD MORNING.

18             SINCE WE WERE LAST HERE ON TUESDAY

19    AFTERNOON, DID YOU READ OR HEAR ANYTHING ABOUT THIS

20    CASE?

21             JUROR 5:  NO.

22             THE COURT:  WILL YOU DECIDE THIS CASE

23    BASED SOLELY ON THE EVIDENCE THAT'S ADMITTED DURING

24    THE TRIAL?

25             JUROR 5:  YES.
```

1          THE COURT:  WILL YOU APPLY THE LAW THAT I

2     INSTRUCT YOU?

3          JUROR 5:  YES.

4          THE COURT:  OKAY.  WILL YOU BE FAIR AND

5     IMPARTIAL TO BOTH SIDES?

6          JUROR 5:  YES.

7          THE COURT:  ALL RIGHT.  THANK YOU.

8          JUROR 5:  IS THAT IT?

9          THE COURT:  YES.

10          (WHEREUPON, THE FOLLOWING PROCEEDINGS

11     WERE HELD OUT OF THE PRESENCE OF THE JURY:)

12          THE COURT:  I DON'T BELIEVE ANY FURTHER

13     VOIR DIRE IS NECESSARY.  I'M SATISFIED THAT THIS

14     JURY IS CREDIBLE, THAT THEY'RE GOING TO BE FAIR AND

15     IMPARTIAL TO BOTH SIDES, BUT I'LL GIVE YOU HALF A

16     SECOND TO RESPOND.

17          MR. LEE:  NO FURTHER VOIR DIRE FOR APPLE,

18     YOUR HONOR.

19          THE COURT:  ALL RIGHT.  ANY FURTHER VOIR

20     DIRE FOR SAMSUNG?

21          MR. VERHOEVEN:  NO, YOUR HONOR.

22          THE COURT:  ALL RIGHT.  OKAY.  THEN LET'S

23     GO TO MR. SCHILLER, AND WHAT I HAVE AS BEING

24     EXCLUDED ARE PLAINTIFF'S EXHIBIT 126, THE PILLOW

25     ADS, AND THEN THE DEFENSE EXHIBIT 649.

```
 1              NOW, IF YOU HAVE ANY OTHER FIGHTS ABOUT
 2    MR. SCHILLER'S EXHIBITS, WE'RE GOING TO DO IT RIGHT
 3    HERE IN OPEN COURT ON THE CLOCK.  OKAY?
 4              SO --
 5              MR. PRICE:  YOUR HONOR, IF I MAY?
 6    BILL PRICE.
 7              TWO THINGS:  CAN WE HAVE THIS MOVED JUST
 8    A LITTLE BIT OVER, BECAUSE I CAN'T SEE THE WITNESS?
 9              THE COURT:  SURE, ABSOLUTELY.
10              MR. PRICE:  AND THE SECOND THING IS WHEN
11    WE MAKE ARGUMENTS IN OPEN COURT, I WOULD,
12    OBVIOUSLY, REQUEST THAT THEY'RE GOING TO BE MADE AT
13    SIDE-BAR, BECAUSE OBJECTIONS TEND TO BE VIOLATION
14    OF ORDERS, THINGS LIKE THAT, AND IF WE'RE GOING TO
15    GET INTO THAT, OBVIOUSLY I DON'T THINK THAT SHOULD
16    BE DONE IN FRONT OF THE JURY.
17              THE COURT:  OKAY.  UNFORTUNATELY, OUR
18    MICROPHONE HERE IS STILL BROKEN.
19              WELL, WE CAN TRY TO DO THAT ON THE SIDE.
20              MR. PRICE:  MAY I APPROACH AND MOVE THIS?
21              THE COURT:  PLEASE, MOVE IT HOWEVER YOU'D
22    LIKE.
23              NOW, I DON'T WANT ANY SPEAKING
24    OBJECTIONS, SO -- ALL RIGHT.
25              NOW, 9:11.  WE'RE ON THE CLOCK.  GO
```

```
 1    AHEAD.

 2              MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.

 3    I'VE GOT TO UNDO THE -- ARE WE OKAY?

 4              ALL RIGHT.  WE RECALL MR. SCHILLER.

 5              I DON'T HAVE A JURY HERE TO BE ON THE

 6    CLOCK, YOUR HONOR.

 7              THE COURT:  ALL RIGHT.  WE'LL BRING IN

 8    THE JURY.

 9              (WHEREUPON, THE FOLLOWING PROCEEDINGS

10    WERE HELD IN THE PRESENCE OF THE JURY:)

11              THE COURT:  ALL RIGHT.  WELCOME BACK AND

12    GOOD MORNING.

13              I DO NEED TO MAKE EVERYONE THE OFFER.  WE

14    GREATLY APPRECIATE YOUR PATIENCE AND YOUR SERVICE

15    AS JURORS AND ALL OF YOUR ATTEMPTS TO PRESERVE THE

16    INTEGRITY OF THE JURY BY NOT READING OR HEARING OR

17    DISCUSSING THE CASE WITH ANYONE.

18              I JUST WANTED TO LET ALL OF YOU KNOW THAT

19    WE'RE GOING TO COMPILE ALL THE ARTICLES ABOUT THIS

20    CASE, AND WHEN YOU CONCLUDE YOUR SERVICE AS JURORS,

21    WE'RE GOING TO GIVE YOU THE WHOLE STACK, SO DON'T

22    FEEL LIKE YOU'RE MISSING OUT ON ANYTHING.  WE CAN

23    SCRAPBOOK IT FOR YOU, WHATEVER YOU'D LIKE.  BUT YOU

24    ARE NOT GOING TO BE LEFT OUT.

25              SO WE'RE ASKING YOU TO HOLD ON AND NOT
```

1    LISTEN OR READ OR TALK ABOUT THE CASE.

2            BUT THERE WILL BE TIME ENOUGH, AND WE'RE

3    GOING TO GIVE YOU EVERYTHING.  OKAY?  SO WE'LL

4    COLLATE IT ALL AND YOU WILL HAVE IT AT THE END OF

5    THE DAY CASE.

6            SO DON'T FEEL LIKE YOU'RE MISSING OUT ON

7    ANYTHING THAT YOU WON'T BE ABLE TO FIND OUT

8    ULTIMATELY WHAT'S GOING ON.  IT'S ALL GOING TO BE

9    TOGETHER FOR YOU, OKAY?

10           WE'LL JUST GIVE IT TO YOU WHEN YOUR

11   SERVICE IS DONE, WHEN THE INTEGRITY OF THE JURY IS

12   NO LONGER AT ISSUE.

13           OKAY?  ALL RIGHT.  SO THAT'S WHAT WE'RE

14   GOING TO DO.

15           NOW, I'M GOING TO TELL YOU THAT WE ARE

16   GOING TO DO A SLIGHTLY DIFFERENT PROCESS.  WE HAVE

17   TRIED AND TRIED OF HAVING ALL OF THE OBJECTIONS OF

18   THE PARTIES RULED ON OUTSIDE YOUR PRESENCE AND IT'S

19   GOTTEN OUT OF HAND, OKAY?

20           SOME OF THESE HAVE BEEN BRIEFED AND

21   BRIEFED SIX TIMES, AND SO WE'RE -- I'M SORRY TO

22   TELL YOU THIS, BUT WE'RE GOING TO DO IT HERE IN

23   COURT.  THERE WILL BE CONVERSATIONS THAT YOU CANNOT

24   HEAR, SO WE WILL GO TO THE SIDE.

25           BUT THE GOOD NEWS IS THIS IS GOING TO BE

1    ON THE CLOCK, SO YOU'RE NOT GETTING -- THEY'RE

2    GOING TO GET DOCKED THEIR TIME.  IF THEY WANT TO

3    FIGHT IN FRONT OF YOU, THAT'S THEIR CHOICE.

4              OKAY.  LET ME GO -- WE'RE GOING FORWARD

5    WITH MR. SCHILLER, WHO WAS HERE ON TUESDAY.

6              AND YOU'RE STILL UNDER OATH, SIR.

7              THE WITNESS:  YES.

8              THE COURT:  OKAY.  THE TIME IS NOW 9:15.

9    GO AHEAD.

10                     **PHILIP SCHILLER,**

11    BEING RECALLED AS A WITNESS ON BEHALF OF THE

12    PLAINTIFF, HAVING BEEN PREVIOUSLY DULY SWORN, WAS

13    FURTHER EXAMINED AND TESTIFIED AS FOLLOWS:

14              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

15              GOOD MORNING, LADIES AND GENTLEMEN.

16            **DIRECT EXAMINATION (RESUMED)**

17    BY MR. MCELHINNY:

18    Q    GOOD MORNING, MR. SCHILLER.

19    A    GOOD MORNING.

20    Q    WHEN WE LEFT HERE TUESDAY AFTERNOON, YOU WERE

21    THE SENIOR VICE-PRESIDENT OF WORLDWIDE MARKETING

22    PRODUCTS -- PRODUCT MARKETING AT APPLE; IS THAT

23    CORRECT?

24    A    YES.

25    Q    AND DO YOU STILL HAVE THAT JOB?

1    A    I DO.

2    Q    OKAY, GOOD.  AND YOU WERE ON THE EXECUTIVE

3    TEAM AT APPLE; IS THAT CORRECT?

4    A    I AM.

5    Q    AND DO YOU STILL HAVE THAT JOB?

6    A    I DO.

7    Q    VERY GOOD.  THIS CASE INVOLVES TWO PRODUCT

8    LINES, THE IPHONE AND THE IPAD.  I WANT TO START

9    WITH THE IPHONE.

10            CAN YOU TELL US HOW APPLE CAME TO DEVELOP

11   AN IPHONE, BRIEFLY.

12   A    YES.  THERE WERE MANY THINGS THAT LED TO THE

13   DEVELOPMENT OF THE IPHONE AT APPLE.  I'LL JUST

14   MENTION A COUPLE BRIEFLY.

15            FIRST, APPLE HAD BEEN KNOWN FOR YEARS FOR

16   BEING THE CREATOR OF THE MAC, THE COMPUTER, AND IT

17   WAS GREAT, BUT IT HAD SMALL MARKET SHARE.

18            AND THEN WE HAD A BIG HIT CALLED THE

19   IPOD.  IT WAS THE IPOD HARDWARE AND THE ITUNES

20   SOFTWARE.  AND THIS REALLY CHANGED EVERYBODY'S VIEW

21   OF APPLE, BOTH INSIDE AND OUTSIDE THE COMPANY.

22            AND PEOPLE STARTED ASKING, WELL, IF YOU

23   CAN HAVE A BIG HIT WITH THE IPOD, WHAT ELSE CAN YOU

24   DO?  AND PEOPLE WERE SUGGESTING EVERY IDEA, MAKE A

25   CAMERA, MAKE A CAR, CRAZY STUFF.

1           AND SO WE WERE SEARCHING FOR WHAT TO DO

2    AFTER THE IPOD AND WHAT WOULD MAKE SENSE.

3           AND WITH THE IPOD, WE REALIZED THAT IF

4    ANYTHING WERE EVER TO CHALLENGE THE IDEA THAT YOU

5    HAVE ALL YOUR ENTERTAINMENT IN YOUR POCKET, YOUR

6    MOVIES, YOUR PHOTOS, YOUR MUSIC, IT MIGHT BE THE

7    CELL PHONE.

8           SO WE STARTED TO LOOK AT, COULD YOU PUT

9    ENTERTAINMENT CONTENT ON CELL PHONES, MOVE OUR

10   ITUNES SOFTWARE INTO OTHER DEVICES, AND WE REALIZED

11   THAT AT THE TIME, CELL PHONES WEREN'T ANY GOOD AS

12   ENTERTAINMENT DEVICES, SO THEY WEREN'T GOOD FOR

13   THOSE THINGS.

14          SO THAT WAS ONE OF THE THINGS THAT LED US

15   TO REALIZE THAT MAYBE WE SHOULD MAKE OUR OWN PHONE.

16          AND IN ADDITION, AT THE SAME TIME, WE HAD

17   ALREADY STARTED WORKING ON A TABLET DEVICE THAT

18   WOULD EVENTUALLY BECOME THE IPAD, AND IN WORKING ON

19   THAT, WE KNEW THAT WE WANTED SOMETHING AFFORDABLE

20   AND EASY TO USE AND YOU COULD TYPE RIGHT ON THE

21   SCREEN SO IT WOULD WORK ON MULTITOUCH ON A GLASS

22   SURFACE.

23          SO THE COMBINATION OF WHAT SHOULD COME

24   AFTER THE IPOD AND DECIDING TO MAKE A CELL PHONE

25   AND HAVING THIS MULTITOUCH GLASS TECHNOLOGY WITH

1    IPAD ALL CAME TOGETHER AROUND THE SAME TIME TO GIVE

2    US THE VISION, THE IDEA OF CREATING THE IPHONE.

3    Q    JUST SO THAT WE'RE ALL USING THE SAME

4    TECHNOLOGY, WHAT DO YOU MEAN WHEN YOU TALK ABOUT

5    MULTITOUCH?  WHAT IS MULTITOUCH?

6    A    THE ABILITY ON A SURFACE TO USE MORE THAN ONE

7    FINGER.  WE THOUGHT THAT IF YOU WANTED TO TYPE, IF

8    YOU WANTED TO TYPE REALLY FAST, YOU'RE GOING TO BE

9    TOUCHING THAT SURFACE WITH MORE THAN ONE FINGER,

10   AND AT THE TIME PEOPLE WERE TRYING DIFFERENT KINDS

11   OF TOUCH TECHNOLOGIES AND NO ONE HAD REALLY DONE

12   ANYTHING WITH MULTITOUCH, AND WE KNEW THAT WAS

13   REALLY IMPORTANT OR YOU WOULDN'T HAVE A GOOD TYPING

14   EXPERIENCE, A GOOD EXPERIENCE CREATING GESTURES AND

15   OTHER ACTIONS.

16   Q    WERE YOU PERSONALLY INVOLVED IN THE

17   DEVELOPMENT OF THE IPHONE?

18   A    YES, I WAS.

19   Q    WHEN WAS THE IPHONE ANNOUNCED TO THE WORLD?

20   A    WE FIRST ANNOUNCED THE IPHONE AT MAC WORLD IN

21   JANUARY OF 2007.

22   Q    WERE YOU PERSONALLY INVOLVING IN PLANNING THAT

23   ANNOUNCEMENT?

24   A    OH, YES, A GREAT DEAL.

25   Q    AND I THINK WE ESTABLISHED ACTUALLY THAT YOU

1    PARTICIPATED IN THE ANNOUNCEMENT.  YOU TOOK A

2    TELEPHONE CALL; IS THAT RIGHT?

3    A    I DID.

4    Q    WHAT WAS THE THEME OF THE EVENT?  WHAT WERE

5    YOU TRYING TO SAY ABOUT THE IPHONE AT IN THE MAC

6    WORLD ANNOUNCEMENT?

7    A    THE IPHONE WAS A BRAND NEW CONCEPT, THIS NEW

8    GENERATION OF SMARTPHONE, AND THE WAY WE ENDED UP

9    HELPING PEOPLE TO UNDERSTAND ITS CAPABILITIES WAS

10   TO BREAK IT INTO THREE CATEGORIES OF USES.

11         ONE USE WAS AS THE BEST PHONE YOU'VE EVER

12   SEEN, THE REINVENTION OF THE PHONE; THE SECOND WAS

13   AS A COMMUNICATION DEVICE, SOMETHING YOU COULD DO

14   FOR E-MAIL, WEB SURFING, MANAGING YOUR CONTACTS,

15   YOUR CALENDAR; AND THEN THE THIRD AREA WAS AS AN

16   ENTERTAINMENT DEVICE, THE BEST IPOD WE EVER MADE

17   FOR YOUR MUSIC AND PHOTOS AND VIDEOS.

18         SO WE WERE TRYING TO HELP PEOPLE

19   UNDERSTAND THAT IT WAS MORE THAN JUST A CELL PHONE

20   AS THEY KNEW IT BEFORE.  THIS WAS THIS ENTIRELY NEW

21   KIND OF DEVICE.

22   Q    CAN YOU DESCRIBE FOR US, PLEASE, WHAT THE

23   ATMOSPHERE WAS LIKE AT THIS MAC WORLD WHEN THE

24   ANNOUNCEMENT WAS MADE?

25   A    ELECTRIC IS WHAT I WOULD CALL IT.  THE ENERGY

1    WAS AMAZING.  PEOPLE HAD BEEN WAITING SO LONG AND

2    WERE SO EXCITED ABOUT THIS UPCOMING EVENT AT MAC

3    WORLD.

4    Q    WHAT WAS THE INITIAL REACTION TO THE

5    ANNOUNCEMENT?

6              MR. PRICE:  I'M GOING TO OBJECT, YOUR

7    HONOR.  VAGUE, BY WHOM, WHEN?

8              THE COURT:  SUSTAINED.

9    BY MR. MCELHINNY:

10   Q    WHAT WAS THE MEDIA REACTION TO THE

11   ANNOUNCEMENT?

12   A    WE HAD A HUGE AMOUNT OF PRESS, AND AS YOU

13   WOULD EXPECT, THE RANGE OF THE REACTION WAS

14   EVERYTHING YOU COULD IMAGINE FROM EXCITEMENT ABOUT

15   THIS BREAKTHROUGH PRODUCT TO DOUBT THAT APPLE COULD

16   SUCCEED AT THIS OR DO A GOOD JOB AT IT.

17   Q    CAN YOU GIVE US EXAMPLES OF PEOPLE WHO SAID

18   THAT YOU -- AFTER SEEING THE ANNOUNCEMENTS,

19   EXPRESSED DOUBT ABOUT WHETHER OR NOT IT WOULD BE --

20   THE IPHONE WOULD BE A SUCCESSFUL PRODUCT?

21             MR. PRICE:  OBJECT TO RELEVANCE AND

22   HEARSAY.

23             THE COURT:  WHAT WAS THE QUESTION AGAIN?

24   BY MR. MCELHINNY:

25   Q    CAN YOU GIVE US EXAMPLES OF PEOPLE WHO

```
 1    EXPRESSED DOUBT ABOUT WHETHER THE IPHONE WOULD BE A

 2    SUCCESSFUL PRODUCT.

 3              IT'S A SECONDARY CONSIDERATION.

 4              THE COURT:  I UNDERSTAND.  YOU NEED TO

 5    LAY A FOUNDATION.  OTHERWISE IT IS ELICITING

 6    HEARSAY.

 7              GO AHEAD, PLEASE.  REPHRASE YOUR

 8    QUESTION.

 9    BY MR. MCELHINNY:

10    Q    AS THE HEAD OF MARKETING, DID YOU BECOME AWARE

11    THAT PEOPLE EXPRESSED DOUBT AS TO THE SUCCESS OF

12    THE IPHONE PRODUCT?

13    A    YES, ABSOLUTELY.

14    Q    CAN YOU GIVE US AN EXAMPLE?

15    A    WE HAD MANY PRESS REPORTS, FROM THE PRESS,

16    FROM ANALYSTS, EVEN FROM COMPETITORS WHO SPOKE OUT

17    AGAINST OUR ANNOUNCEMENT AND SAID THAT WE'RE GOING

18    TO FAIL.  EVEN MICROSOFT SAID WE WERE GOING TO

19    FAIL.  THE HEAD OF PALM SAID WE WERE GOING TO FAIL.

20    THERE WERE MANY PEOPLE EXPRESSING DOUBT.

21    Q    AND DID THEY GIVE REASONS WHY THEY THOUGHT IT

22    WOULD FAIL?

23    A    YES, ABSOLUTELY.

24    Q    AND DO YOU RECALL ANY OF THE REASONS THAT WERE

25    GIVEN AT THE TIME?
```

1    A    PROBABLY THE BIGGEST REASON WAS THAT APPLE HAD

2    NEVER HAD A PHONE BEFORE AND WAS NEW INTO THE PHONE

3    BUSINESS AND THEY EXPECTED THAT WE WOULD FALL ON TO

4    OUR FACE AND DO A BAD JOB OF IT.

5    Q    SIR, IF YOU LOOK AT EXHIBIT 133 IN YOUR

6    EXHIBIT BINDER THERE, PX 133.

7    A    YES.

8    Q    CAN YOU TELL ME WHAT THAT DOCUMENT IS, PLEASE?

9    A    THIS IS AN ARTICLE FROM THE NEW YORK TIMES

10   THAT APPEARED THE DAY AFTER THE LAUNCH OF THE

11   IPHONE WRITTEN BY DAVID POGUE, ONE OF THE

12   PREEMINENT --

13            MR. MCELHINNY:  YOUR HONOR, I MOVE PX

14   133.

15            THE COURT:  ANY OBJECTION?

16            MR. PRICE:  WE HAVE NO FURTHER OBJECTION

17   TO THAT.

18            WE WOULD REQUEST A LIMITING INSTRUCTION

19   TO THE JURY THAT THIS IS NOT FOR THE TRUTH OF

20   ANYTHING THAT'S IN THE ARTICLE.

21            THE COURT:  THAT'S FINE.  THAT'S FINE.

22   IT'S ADMITTED, AND THIS IS NOT FOR THE TRUTH OF

23   WHAT IS STATED IN THE ARTICLE.

24            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

25            133, HAVING BEEN PREVIOUSLY MARKED FOR

```
 1              IDENTIFICATION, WAS ADMITTED INTO
 2              EVIDENCE.)
 3              THE COURT:  YOU MAY CONSIDER IT
 4     OTHERWISE.
 5              GO AHEAD.
 6     BY MR. MCELHINNY:
 7     Q    WOULD YOU PLEASE PUT UP PDX 1, PLEASE.
 8              CAN YOU TELL US BRIEFLY WHAT MR. POGUE
 9     SAID IN THIS ARTICLE?
10     A    YES.  MR. POGUE WROTE THAT APPLE HAD WAVED OUR
11     WAND, THE IPHONE, AT THE PHONE, AND HE CALLED IT
12     BEAUTIFUL AND THAT THAT ALONE WOULD BE ENOUGH TO
13     EXCITE PEOPLE AND MAKE PEOPLE WANT TO BUY IT.
14              HE ALSO CALLED IT GORGEOUS AND HE SPOKE
15     ABOUT ITS SHINY BLACK FACE AND STAINLESS STEEL
16     MIRRORED FINISHED RIM THAT WENT AROUND IT, THE LOOK
17     OF IT.
18              SO HE TALKED ABOUT HOW IT LOOKED AND HOW
19     BEAUTIFUL IT LOOKED.
20     Q    WHEN WAS THE IPHONE ACTUALLY PHYSICALLY
21     RELEASED, SIR?
22     A    WE SHIPPED THE FIRST IPHONES IN JUNE OF THAT
23     YEAR, JUNE 19TH, 2007.
24     Q    DID APPLE DO ANYTHING BETWEEN JANUARY AND JUNE
25     TO PROMOTE THE IPHONE ITSELF?
```

1    A    YES, WE DID.

2    Q    CAN YOU GIVE US EXAMPLES OF WHAT YOU DID?

3    A    WELL, IN THAT PERIOD FROM JANUARY UNTIL JUNE,

4    WE HAD A FEW MARKETING STRATEGIES.

5         THE BEGINNING WAS FIRST WE CALLED IT GO

6    QUIET.  SO RIGHT AFTER THE LAUNCH IN JANUARY, THERE

7    WAS SO MUCH EXCITEMENT, SO MUCH PRESS COVERAGE, WE

8    DIDN'T NEED TO DO OTHER MARKETING.  THE BEST THING

9    TO DO WAS LET THE PRESS WRITE AND TALK ABOUT THE

10   IPHONE.  SOME TALKED ABOUT THAT AS THE BIGGEST P.R.

11   LAUNCH OF A PRODUCT IN HISTORY.

12        AND THEN LEADING TOWARDS JUNE, WE BEGAN

13   TO CAREFULLY TURN ON THE MARKETING.  FIRST WE HELD

14   A TV AD DURING THE ACADEMY AWARDS IN EARLY MARCH.

15   IT WAS CALLED THE HELLO TV AD WHERE WE HAD FAMOUS

16   SCENES OF PEOPLE MAKING PHONE CALLS, AND THEN AT

17   THE END OF THAT AD, IT ANNOUNCED THAT THE IPHONE

18   WAS COMING IN JUNE, AT THE END OF JUNE.

19        AND THEN AS WE GOT CLOSER TO THE LAUNCH

20   IN JUNE, WE STARTED TO BRING ON ADDITIONAL TV ADS

21   SPECIFICALLY ABOUT THE IPHONE, SHOWCASING IT, AS

22   WELL AS DOING A TREMENDOUS AMOUNT OF MARKETING WITH

23   DIRECT MAIL, WEBSITES, HELPING THE WHOLE WORLD GET

24   READY FOR THE ARRIVAL OF THE IPHONE.

25   Q    WHERE WERE YOU PHYSICALLY WHEN THE IPHONE WAS

1   RELEASED, SIR?

2   A    I WAS AT OUR APPLE STORE IN CHICAGO ON

3   MICHIGAN AVENUE.

4   Q    AND WHY WERE YOU THERE?

5   A    WE REALIZED THAT THIS WAS A VERY, VERY BIG DAY

6   FOR APPLE, THE LAUNCH OF THE IPHONE, AND SO MUCH

7   EXCITEMENT HAD BUILT UP THAT I SENT MY TEAM,

8   INCLUDING MYSELF, AROUND THE COUNTRY TO DIFFERENT

9   LOCATIONS TO BE EVERYWHERE WE COULD.

10        AND SO I CHOSE TO GO TO CHICAGO, AND I

11  ACTUALLY EVEN BROUGHT MY SON WITH ME BECAUSE THIS

12  WAS SUCH A HUGE DAY AND I WANTED HIM TO BE PART OF

13  THAT.

14  Q    AFTER THE IPHONE WAS PHYSICALLY RELEASED, DID

15  YOU SEE ADDITIONAL REVIEWS IN THE PRESS CONCERNING

16  ITS FEATURES?

17  A    YES.

18  Q    DID ANY OF THE ARTICLES OR REVIEWS TALK ABOUT

19  THE DESIGN OF THE IPHONE?

20  A    OH, I THINK MANY, MANY OF THE ARTICLES TALKED

21  ABOUT THE DESIGN AND SPOKE ABOUT IT, EVEN SHOWED IT

22  IN THEIR STORIES.

23  Q    CAN YOU LOOK IN YOUR BINDER, PLEASE, AT

24  EXHIBIT PX 17, 17.

25  A    YES.

```
 1    Q    CAN YOU TELL ME WHAT THIS DOCUMENT IS, PLEASE?
 2    A    THIS IS A SUMMARY OF SOME OF THE NEWS COVERAGE
 3    ABOUT THE IPHONE.
 4              MR. MCELHINNY:  YOUR HONOR, I MOVE PX 17.
 5              THE COURT:  ALL RIGHT.  ANY OBJECTION?
 6              MR. PRICE:  NO FURTHER OBJECTIONS, AGAIN,
 7    YOUR HONOR, WITH THE LIMITING INSTRUCTION THAT
 8    NOTHING IN THESE ARTICLES IS TO BE TAKEN FOR THE
 9    TRUTH OF THE MATTER ASSERTED.
10              THE COURT:  ALL RIGHT.  SO THIS IS
11    ADMITTED AND YOU ARE NOT TO CONSIDER THIS FOR THE
12    TRUTH OF WHAT'S ASSERTED IN THIS EXHIBIT.  YOU CAN
13    CONSIDER IT OTHERWISE.
14              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
15              17, HAVING BEEN PREVIOUSLY MARKED FOR
16              IDENTIFICATION, WAS ADMITTED INTO
17              EVIDENCE.)
18              THE COURT:  GO AHEAD, PLEASE.
19              MR. MCELHINNY:  THANK YOU, YOUR HONOR.
20    Q    IS THIS THE FIRST PAGE OF PX 17?
21    A    YES, IT IS.
22    Q    AND, AGAIN, JUST WHAT ARE EACH OF THESE
23    PHOTOGRAPHS THAT GO THROUGH THESE PAGES?
24    A    THESE ARE ALL EXCERPTS AND SUMMARIES OF
25    DIFFERENT NEWS COVERAGE THAT WAS WRITTEN ABOUT THE
```

```
1    IPHONE, STARTING AT THE LAUNCH.

2    Q    AND THE JURY WILL HAVE THIS EXHIBIT IN THE

3    JURY ROOM.  IS THAT YOUR UNDERSTANDING?

4    A    YES.

5    Q    CAN YOU SHOW ME, PLEASE -- CAN YOU TURN IN

6    YOUR BINDER, PLEASE, TO EXHIBIT PX 134.

7    A    YES.

8    Q    WHAT IS EXHIBIT PX 134?

9    A    IT IS AN ARTICLE FROM THE WALL STREET JOURNAL

10   IN JUNE OF 2007.

11   Q    AND WHO'S THE AUTHOR OF THIS ARTICLE?

12   A    IT IS BY WALT MOSSBERG AND KATIE BOEHRET.

13   Q    AND WHO IS MR. MOSSBERG?

14   A    HE IS ONE OF THE EMINENT AUTHORS OR REVIEWERS

15   IN THE TECH INDUSTRY.

16        MR. MCELHINNY:  YOUR HONOR, I MOVE

17   PX 134.

18        THE COURT:  SAME LIMITING INSTRUCTION,

19   MR. PRICE?

20        MR. PRICE:  YES, YOUR HONOR.

21        THE COURT:  ALL RIGHT.  SO THIS IS

22   ADMITTED, BUT YOU ARE NOT TO CONSIDER THE CONTENTS

23   OF THIS EXHIBIT FOR THEIR TRUTH.  YOU CAN CONSIDER

24   IT OTHERWISE.

25        GO AHEAD.
```

```
 1              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

 2              134, HAVING BEEN PREVIOUSLY MARKED FOR

 3              IDENTIFICATION, WAS ADMITTED INTO

 4              EVIDENCE.)

 5              MR. MCELHINNY:  CAN WE SEE DEMONSTRATIVE

 6    PX 134, PLEASE.  CAN YOU EXPLAIN WHAT THIS

 7    DEMONSTRATIVE IS TELLING US, SIR?

 8    A    THIS IS A SUMMARY OF THAT ARTICLE WE WERE JUST

 9    SPEAKING ABOUT IN THE WALL STREET JOURNAL.

10    Q    WHAT WAS YOUR PERSONAL REACTION TO THIS

11    REVIEW?

12    A    THIS WAS, THIS WAS A GREAT REVIEW.  WE WERE SO

13    HAPPY TO GET IT.

14              WE -- AS WE LAUNCHED A PRODUCT AS

15    IMPORTANT AS THE IPHONE, WE HAD A FEW PRESS THAT WE

16    GIVE EARLY UNITS TO JUST BEFORE THE LAUNCH SO THEY

17    CAN TRY IT OUT AND HAVE PERSONAL EXPERIENCE WITH IT

18    AND THEN WRITE ABOUT THAT TO TELL THE USERS IN THE

19    COUNTRY WHAT THEY THINK ABOUT IT.  THEY BECOME A

20    MEASURE OF WHAT THE REACTION WILL BE.

21              AND THIS WAS AN OVER-THE-TOP POSITIVE

22    REACTION.

23    Q    SIR, IF YOU LOOK IN YOUR BINDER AT PX 135.

24    CAN YOU TELL ME WHAT THAT EXHIBIT IS?

25    A    YES.  THIS IS A STORY, IN FACT, COVER STORY
```

```
 1    FROM TIME MAGAZINE IN 2007.
 2    Q    AND WHAT IS SIGNIFICANT ABOUT --
 3                    WELL, FIRST OF ALL, YOUR HONOR, I'D
 4    MOVE PX 135?
 5              THE COURT:  ALL RIGHT.  SAME LIMITING
 6    INSTRUCTION, MR. PRICE?
 7                  MR. PRICE:  YES, YOUR HONOR.
 8              THE COURT:  OKAY.  THIS IS ADMITTED, BUT
 9    YOU'RE NOT TO CONSIDER IT FOR THE TRUTH OF WHAT'S
10    ASSERTED IN THIS EXHIBIT.  YOU MAY CONSIDER IT
11    OTHERWISE.  GO AHEAD, PLEASE.
12                  (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
13                  135, HAVING BEEN PREVIOUSLY MARKED FOR
14                  IDENTIFICATION, WAS ADMITTED INTO
15                  EVIDENCE.)
16    BY MR. MCELHINNY:
17    Q    IF YOU WOULD PUBLISH, PLEASE, PX 3.  WHAT IS
18    THIS DEMONSTRATIVE, SIR?
19    A    THIS IS A SUMMARY OF THAT TIME TIME MAGAZINE
20    ARTICLE.
21    Q    AND WHAT WAS SIGNIFICANT ABOUT THIS ARTICLE,
22    SIR?
23    A    THIS WAS GREAT.  IT'S NOT OFTEN THAT A PRODUCT
24    GETS THE COVER OF TIME MAGAZINE AND TIME VOTED FOR
25    THEIR INVENTIONS OF THE YEAR AND NAMED THE IPHONE
```

```
1    THE NUMBER ONE INVENTION OF THE YEAR IN 2007 AND

2    PLACED IT ON THE COVER.

3    Q    WAS THIS THE ACTUAL COVER OF THE MAGAZINE?

4    A    YES.

5    Q    AND CAN YOU READ FOR US WHAT IT SAYS ON THE

6    ICONS ON THE IPHONE THAT'S SHOWN THERE?

7    A    THEY HAD FUN PLAYING WITH THE ICONIC

8    APPLICATION ICONS ON THE FRONT OF THE IPHONE AND

9    SPELLED OUT "BEST INVENTIONS OF 2007."

10   Q    WOULD YOU LOOK IN YOUR BINDER, PLEASE, AT

11   EXHIBIT PX 142.

12   A    YES.

13   Q    WHAT IS THIS DOCUMENT, SIR?

14   A    THIS IS A NEW YORK TIMES ARTICLE FROM THEIR

15   BITS TECHNOLOGY SECTION IN NOVEMBER OF 2011.

16            MR. MCELHINNY:  YOUR HONOR, I MOVE

17   EXHIBIT PX 142.

18            MR. PRICE:  I DON'T HAVE MY BINDER.  IF I

19   CAN JUST PEEK?

20            THE COURT:  PLEASE, PLEASE, YOU SHOULD.

21            (PAUSE IN PROCEEDINGS.)

22            THE COURT:  SAME LIMITING INSTRUCTION,

23   MR. PRICE?

24            MR. PRICE:  YES.  NO FURTHER OBJECTIONS

25   AND ASK FOR THE INSTRUCTION.
```

```
 1              THE COURT:  ALL RIGHT.  SO YOU CANNOT
 2    CONSIDER THIS EXHIBIT FOR THE TRUTH OF WHAT'S
 3    ASSERTED IN THE ARTICLE ITSELF, BUT YOU CAN
 4    CONSIDER IT OTHERWISE.
 5                   (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
 6                   142, HAVING BEEN PREVIOUSLY MARKED FOR
 7                   IDENTIFICATION, WAS ADMITTED INTO
 8                   EVIDENCE.)
 9              THE COURT:  GO AHEAD, PLEASE.
10    BY MR. MCELHINNY:
11    Q    WOULD YOU PUT UP, PLEASE, DEMONSTRATIVE PDX
12    16.
13              WHAT IS THIS DEMONSTRATIVE, SIR?
14    A    THIS IS A SUMMARY OF THAT NEW YORK TIMES BITS
15    ARTICLE.
16    Q    AND WHAT WAS SIGNIFICANT ABOUT THIS PARTICULAR
17    SHOW THAT THE PATENT AND TRADEMARK OFFICE PUT UP?
18    A    THIS WAS PRETTY INCREDIBLE.  THE U.S. PATENT
19    AND TRADEMARK OFFICE ACTUALLY HAS A --
20              MR. PRICE:  I'M GOING TO OBJECT TO THIS
21    WITNESS'S OPINION AS EVIDENCE.
22              MR. MCELHINNY:  HE'S HEAD OF MARKETING.
23    HE CAN TALK --
24              THE COURT:  I'LL ALLOW LIMITED
25    QUESTIONING ON THIS.
```

1          MR. MCELHINNY:   THANK YOU.

2     Q    WHAT WAS SIGNIFICANT ABOUT THE DECISION OF THE

3     PATENT AND TRADEMARK OFFICE TO PUT ON THIS

4     PARTICULAR SHOW, SIR, TO YOU FROM A MARKETING

5     PERSPECTIVE?

6     A    I THOUGHT THIS WAS REALLY GREAT THAT A GROUP

7     WITHIN THE PATENT AND TRADEMARK OFFICE CALLED THE

8     NATIONAL INVENTOR'S HALL OF FAME HAD SELECTED,

9     AFTER THE PASSING OF STEVE JOBS, TO CREATE AN

10    EXHIBIT FOR PEOPLE TO SEE HIS PATENTS AND DESIGN

11    INVENTIONS THAT HE WAS NAMED ON AND SET THAT UP FOR

12    PEOPLE JUST TO GO AND READ AND SEE.

13             AND THEY DID IT BY USING THE IPHONE

14    ACTUALLY AS THE DISPLAYS FOR THOSE PATENTS.

15    Q    AND YOU -- HOW DO YOU KNOW THOSE ARE THE

16    IPHONES?

17    A    I THINK IT'S VERY DISTINCTIVE AND OBVIOUSLY

18    THAT THAT WAS THE IPHONE AND EVERY STORY WRITTEN

19    ABOUT IT MADE THE SAME CONCLUSION, THAT THOSE WERE

20    IPHONES.

21    Q    SIR, LET'S MOVE ON TO A SLIGHTLY DIFFERENT

22    SUBJECT.

23             WHAT WERE THE ORIGINAL SALES NUMBERS,

24    WHAT WERE THE SALES NUMBERS FOR THE ORIGINAL

25    IPHONE?

1    A    THE SALES WERE, WERE EXTREMELY GOOD.  THEY

2    EXCEEDED OUR EXPECTATION.

3    Q    DID YOU PREPARE A SUMMARY OF THOSE SALES

4    NUMBERS SO THAT THE JURY WOULD HAVE IT AVAILABLE?

5    A    YES, I DID.

6    Q    IF YOU WOULD LOOK IN YOUR BINDER, PLEASE, AT

7    PX 15.

8    A    YES.

9    Q    WHAT IS THIS DOCUMENT?

10   A    THIS IS A CHART THAT HAS A LINE FOR BOTH THE

11   IPHONE AND IPAD UNIT SALES.

12            MR. MCELHINNY:  YOUR HONOR, I MOVE PX 15.

13            MR. PRICE:  NO FURTHER OBJECTIONS.

14            THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

15            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

16            15, HAVING BEEN PREVIOUSLY MARKED FOR

17            IDENTIFICATION, WAS ADMITTED INTO

18            EVIDENCE.)

19   BY MR. MCELHINNY:

20   Q    CAN YOU CAPTURE FOR US, PLEASE, WHAT THIS

21   CHART TELLS US ABOUT IPHONE SALES?

22   A    YES.  THE IPHONE SALES START WHEN IT BEGAN TO

23   SHIP IN MID-2007.  THE CHART GOES UP UNTIL NOW IN

24   2002.

25            THE IPHONE IS REPRESENTED BY THE BLUE

1    LINE, AND THIS IS THE CUMULATIVE OR TOTAL SALES TO

2    DATE.

3            AND ALONG THE LEFT-HAND SIDE YOU SEE

4    QUANTITIES GOING ALL THE WAY UP TO OVER 80 MILLION,

5    AND ON THE BOTTOM RIGHT-HAND SIDE YOU SEE THE TIME.

6    Q    HOW DID SUBSEQUENT MOLDS OF THE IPHONE SELL IN

7    COMPARISON TO THE ORIGINAL IPHONE?

8    A    EXTREMELY WELL.  WE USED TO JOKE INTERNALLY

9    WHEN WE WERE DOING FORECASTING THAT ONE OF THE WAYS

10   TO ESTIMATE THE POTENTIAL SALES OF EACH IPHONE WAS

11   THAT EACH NEW GENERATION SOLD APPROXIMATELY EQUAL

12   TO ALL THE PREVIOUS GENERATIONS COMBINED.

13   Q    FROM YOUR VANTAGE POINT AS THE HEAD OF

14   MARKETING OF WHAT IS NOW A PHONE COMPANY, DID YOU

15   OBSERVE ANY EFFECTS ON THE PHONE MARKETPLACE AS A

16   RESULT OF THE INTRODUCTION OF THE IPHONE?

17   A    YES, I DID.

18   Q    AND CAN YOU TELL US WHAT YOUR OBSERVATIONS

19   WERE.

20            MR. PRICE:  OBJECT.  THAT'S VAGUE AND

21   IMPROPER EXPERT TESTIMONY.  NO IDEA THIS WAS

22   COMING.

23            MR. MCELHINNY:  IT'S NEITHER VAGUE NOR IS

24   IT EXPERT TESTIMONY.

25            THE COURT:  YOU'LL HAVE TO REPHRASE THE

1    QUESTION, PLEASE.

2    BY MR. MCELHINNY:

3    Q    AS THE HEAD OF MARKETING, DO YOU KEEP TRACK OF

4    WHAT -- OF TRENDS AND WHAT'S HAPPENING IN THE PHONE

5    MARKETPLACE?

6    A    OF COURSE.

7    Q    DID YOU OBSERVE CHANGES IN THE PHONE

8    MARKETPLACE AS A RESULT OF THE INTRODUCTION OF THE

9    IPHONE?

10   A    YES, I DID.

11   Q    AND WHAT CHANGES DID YOU OBSERVE, SIR?

12              MR. PRICE:  SAME OBJECTION.

13              THE COURT:  OVERRULED.  GO AHEAD.

14              THE WITNESS:  WE CONSIDERED THE IPHONE A

15   NEW GENERATION OF SMARTPHONE, AND WE LOOKED AT THE

16   MARKET AS BECOMING DIVIDED INTO TWO LARGE

17   CATEGORIES OF CUSTOMERS.

18              THERE ARE CUSTOMERS WHO HAVE NOT YET

19   BOUGHT INTO THESE NEW SMARTPHONES.  THEY WERE

20   HAVING PREVIOUS GENERATION DEVICES, SOME CALLED

21   THEM FEATURE PHONES, LIKE FLIP PHONES WITH

22   CHARACTER DISPLAYS; AND CUSTOMERS THAT HAVE

23   PURCHASED THESE NEW SMARTPHONES AND NOW WERE INTO

24   THIS ECOSYSTEM OF ALL THAT THAT MEANS, THE

25   SMARTPHONE AND THE APPLICATIONS AND HOW ALL THOSE

1    THINGS WORK.

2    BY MR. MCELHINNY:

3    Q    AND DID THE INTRODUCTION OF THE IPHONE CHANGE

4    THE DYNAMICS OF THAT TWO-PART MARKET AS YOU'VE JUST

5    DESCRIBED IT?

6    A    YES.  THE IPHONE CREATED THAT SECOND CATEGORY

7    OF NEW SMARTPHONES AS NOW STARTED TO CREATE A

8    MARKET WHERE, EITHER SOMEONE DOESN'T HAVE A NEW

9    GENERATION PHONE YET OR THEY DO, AND ONCE THEY DO,

10   WE SEE OTHER DYNAMICS THAT OCCUR BECAUSE THEY'RE IN

11   THE SMARTPHONE MARKETPLACE.

12   Q    LET'S FOCUS -- SAME KIND OF QUESTION BUT ON

13   THE CURRENT TIME FRAME.

14        WHAT ARE THE CURRENT DYNAMICS OF THE CELL

15   PHONE MARKETPLACE AS YOU OBSERVED THEM FROM THE

16   HEAD OF MARKETING.

17        MR. PRICE:  OBJECTION, VAGUE AND

18   AMBIGUOUS AND CALLS FOR EXPERT OPINION UNDISCLOSED.

19        THE COURT:  OVERRULED.

20        GO AHEAD.

21        THE WITNESS:  SO AS MORE AND MORE

22   CUSTOMERS START TO GET THESE SMARTPHONES, LIKE THE

23   IPHONE, THEN YOU, AGAIN, AS WE SEE THESE TWO

24   CATEGORIES, YOU'RE EITHER TRYING TO SELL TO A NEW

25   USER WHO DOESN'T HAVE ONE OR YOU'RE SELLING TO AN

```
 1    UPGRADE USER.

 2              AND WE KNOW FROM ALL OF OUR PRODUCTS AND

 3    EXPERIENCES WE'VE HAD SELLING TO CUSTOMERS THAT A

 4    CUSTOMER WHO ALREADY HAS ONE IS USED TO THAT ONE,

 5    THAT WHOLE ECOSYSTEM.

 6              IF I HAVE AN IPHONE, I'M USED TO HOW THE

 7    IPHONE WORKS, AND I'VE INVESTED IN THE

 8    APPLICATIONS, AND I'VE INVESTED IN THE ACCESSORIES,

 9              SO I'M MORE INVESTED IN THAT PRODUCT, AND

10    I'M MORE LIKELY TO STICK WITH THAT PRODUCT LINE

11    ONCE I HAVE IT.

12              SO WE'RE AT THIS REALLY CRITICAL JUNCTURE

13    WHERE CUSTOMERS ARE EITHER GETTING INTO AN

14    ECOSYSTEM FOR THE FIRST TIME OR THEY'RE STAYING

15    WITH THAT ECOSYSTEM AND MOST OFTEN UPGRADING AND

16    STAYING WITHIN IT.

17    BY MR. MCELHINNY:

18    Q    DO YOU FIND THAT WHEN A CUSTOMER BUYS AN

19    IPHONE THEY TEND TO BUY ADDITIONAL APPLE PRODUCTS

20    OR SERVICES?

21    A    YES.  THIS IS VERY WELL-KNOWN IN THE INDUSTRY.

22    IT'S OFTEN CALLED THE HALO EFFECT, THE IDEA THAT

23    ONCE YOU BUY A PRODUCT FROM A COMPANY, IF YOU HAVE

24    A GOOD EXPERIENCE WITH THAT PRODUCT, THAT YOU'RE

25    MORE LIKELY TO CONSIDER OTHER PRODUCTS FROM THAT
```

```
1    COMPANY AND ESPECIALLY IF THOSE PRODUCTS DO A GOOD
2    JOB WORKING WELL TOGETHER.
3              SO THAT WILL MAKE YOU WANT TO BUY MORE
4    PRODUCTS FROM THAT COMPANY, AS WELL AS THE OTHER
5    PEOPLE AROUND YOU WHO YOU WORK WITH OR IN YOUR
6    FAMILY.
7    Q    LET'S CHANGE SUBJECTS NOW AND GO BACK IN TIME,
8    BACK TO THE IPAD.  OKAY?
9    A    YES.
10   Q    CAN YOU TELL US, AGAIN BRIEFLY, DESCRIBE FOR
11   US THE GENESIS, HOW THE IPAD CAME ABOUT.
12   A    THE IPAD ACTUALLY STARTED BEFORE THE IPHONE.
13   WE HAVE, AS EXPLAINED BEFORE, A COMPUTER BUSINESS,
14   THE MACINTOSH BUSINESS, AND INCREASINGLY PEOPLE
15   WERE BUYING NOTEBOOKS IN THIS BUSINESS.
16             AND NOTEBOOKS WERE GETTING MORE AND MORE
17   AFFORDABLE, LOWER PRICE POINTS.
18             BUT MANY OF OUR COMPETITORS WERE MAKING
19   NOTEBOOKS THAT WERE OF A CHEAPER QUALITY THAN WE
20   WOULD BE WILLING TO MAKE TO GET TO REALLY
21   AFFORDABLE PRICE POINTS.
22             SO WE DECIDED WE NEED TO CREATE A NEW
23   CATEGORY OF DEVICE, SOMETHING BELOW THE PRICE POINT
24   OF A NOTEBOOK, SOMETHING BEAUTIFUL, EASY TO USE,
25   EVERYONE MORE PORTABLE, LONGER BATTERY LIFE, AND WE
```

```
 1     HAD TO INVENT A NEW CATEGORY OF DEVICE FOR THAT.

 2               AND THAT'S WHAT LED TO THE WHOLE CONCEPT

 3     OF CREATING AN IPAD.

 4     Q    WHEN WAS THE IPAD INTRODUCED?

 5     A    WE PUT ASIDE THAT EARLY WORK ON THE IPAD TO

 6     SHIP THE IPHONE, AND THEN GOT BACK TO IT AFTER THE

 7     IPHONE WAS NOW IN THE MARKETPLACE.

 8               EVENTUALLY WE SHIPPED OUR FIRST, OR

 9     INTRODUCED OUR FIRST IPAD, EXCUSE ME, IN 2010.

10     Q    AND WHEN DID YOU SHIP YOUR FIRST IPAD?

11     A    WE ALSO SHIPPED OUR FIRST IPAD IN EARLY APRIL

12     OF 2010.

13     Q    AGAIN, SO WE'RE ALL USING THE SAME LANGUAGE,

14     WHAT IS THE DIFFERENCE FROM, IN THE INDUSTRY

15     BETWEEN AN INTRODUCTION AND A SHIPMENT?

16     A    THE WAY WE TALK ABOUT IT AT APPLE IS AN

17     INTRODUCTION IS A LAUNCH OF THAT, THE FIRST TIME WE

18     TELL THE WORLD ABOUT A PRODUCT.

19               AND THEN THE PRODUCT MAY EITHER SHIP AT

20     THAT SAME TIME OR WITH REALLY BIG BRAND NEW

21     GENERATION PRODUCTS LIKE IPHONE AND IPAD, SOME TIME

22     AFTERWARDS, AND THAT'S THE AVAILABILITY OR SHIP

23     DATE OF THAT PRODUCT.

24     Q    SIR, WAS THERE, AGAIN, PUBLIC MEDIA REACTION

25     TO THE INTRODUCTION OF THE IPAD?
```

1    A    YES, THERE WAS HUGE COVERAGE OF THE IPAD.

2    Q    IF YOU LOOK IN YOUR BINDER AT EXHIBIT PX 138.

3              CAN YOU TELL ME WHAT THAT DOCUMENT IS,

4    PLEASE?

5    A    YES.  THIS IS AN ARTICLE FROM THE WALL STREET

6    JOURNAL.

7    Q    WHAT'S THE DATE OF IT, SIR?

8    A    THIS WAS WRITTEN IN JANUARY OF 2010, RIGHT

9    AFTER THE INTRODUCTION OF THE IPAD.

10             MR. MCELHINNY:  YOUR HONOR, I MOVE PX

11   138.

12             THE COURT:  SAME LIMITING INSTRUCTION,

13   MR. PRICE?

14             MR. PRICE:  YES, YOUR HONOR.  NO FURTHER

15   OBJECTIONS.

16             THE COURT:  ALL RIGHT.  YOU CANNOT

17   CONSIDER THIS FOR THE TRUTH OF WHAT'S IN THE

18   ARTICLE, BUT YOU CAN CONSIDER IT OTHERWISE.

19             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

20             138, HAVING BEEN PREVIOUSLY MARKED FOR

21             IDENTIFICATION, WAS ADMITTED INTO

22             EVIDENCE.)

23             THE COURT:  GO AHEAD, PLEASE.

24             MR. MCELHINNY:  PLEASE PUBLISH

25   DEMONSTRATIVE PDX 5.

1   Q    SIR, WHAT IS THIS?

2   A    THIS IS A SUMMARY OF THAT SAME WALL STREET

3   JOURNAL ARTICLE FROM JANUARY 25TH, 2010.

4   Q    YOU SEE THE TITLE OF THIS ARTICLE IS "APPLE

5   TAKES A BIG GAMBLE ON THE" -- I'M SORRY.  "APPLE

6   TAKES BIG GAMBLE ON NEW IPAD."

7        DO YOU SEE THAT?

8   A    YES.

9   Q    DID APPLE'S EXECUTIVES AGREE WITH THAT

10  CHARACTERIZATION THAT THE WALL STREET JOURNAL MADE?

11  A    ABSOLUTELY.

12  Q    AND WHY, WHY DID YOU CONSIDER THE IPAD A

13  GAMBLE?

14  A    IT WAS A BIG GAMBLE TO INTRODUCE THE IPAD FOR

15  A COUPLE REASONS.

16       FIRST, THIS WAS A NEW CATEGORY DEVICE.

17  THE IPHONE WE WERE INVENTING, REINVENTING THE

18  PHONE.  PEOPLE WERE ALREADY BUYING OVER A BILLION

19  PHONES A YEAR.

20       PEOPLE HAD TRIED TO MAKE TABLET --

21  COMPANIES HAD TRIED TO MAKE TABLET PRODUCTS BEFORE

22  AND FAILED MISERABLY AND THERE WAS NO CATEGORY OF

23  TABLET COMPUTERS SELLING IN ANY QUANTITY THAT

24  MATTERED.

25       SO IT WAS CONSIDERED A, PRETTY MUCH A

1    DEAD CATEGORY AND NOT LIKELY TO SUCCEED.

2              AND IN ADDITION TO THAT, HERE APPLE NOW

3    HAD RISEN UP FROM PAST TROUBLES AND HAD A HUGE HIT

4    WITH THE IPOD, HAD A SECOND HUGE HIT WITH THE

5    IPHONE.  WE WERE ROLLING AND DOING WELL.

6              SO TO TAKE ON A NEW CATEGORY OF PRODUCT

7    THAT MOST ASSUMED WAS NOT GOING TO SUCCEED WAS A

8    RISK TO OUR OWN IMAGE, OUR MARKETING, HOW PEOPLE

9    PERCEIVED US.  SO IT WAS A BIG GAMBLE, BOTH FROM

10   THE PRODUCT AND MARKETING PERCEPTION OF APPLE.

11   Q    WHAT WAS THE PUBLIC PERCEPTION FOR THE IPAD?

12   A    IT WAS FANTASTIC.

13   Q    IF YOU LOOK IN YOUR BINDER, PLEASE, AT EXHIBIT

14   PX 141.

15   A    YES.

16   Q    WHAT IS THAT DOCUMENT?

17   A    THIS IS A REVIEW OF THE IPAD FROM THE WALL

18   STREET JOURNAL.

19             MR. MCELHINNY:  YOUR HONOR, I MOVE

20   EXHIBIT 141.

21             MR. PRICE:  SAME OBJECTION.  NO FURTHER

22   OBJECTIONS, YOUR HONOR, MEANING FURTHER TO THE ONES

23   WE MADE AND ASK FOR A LIMITING INSTRUCTION.

24             THE COURT:  ALL RIGHT.  YOU CANNOT

25   CONSIDER THIS EXHIBIT FOR THE TRUTH OF WHAT'S

```
1    STATED IN THE ARTICLE, BUT YOU CAN CONSIDER IT

2    OTHERWISE.

3              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

4              141, HAVING BEEN PREVIOUSLY MARKED FOR

5              IDENTIFICATION, WAS ADMITTED INTO

6              EVIDENCE.)

7              THE COURT:  GO AHEAD, PLEASE.

8              MR. MCELHINNY:  WOULD YOU SHOW, PLEASE,

9    DEMONSTRATIVE PDX 6.

10   Q    WHAT IS THIS DEMONSTRATIVE, SIR?

11   A    THIS IS A SUMMARY OF THAT SAME WALL STREET

12   JOURNAL REVIEW OF THE IPAD.

13   Q    NOW, AGAIN, REMIND US WHO MR. MOSSBERG IS?

14   A    MR. MOSSBERG IS A WRITER FOR THE WALL STREET

15   JOURNAL AND CONSIDERED ONE OF THE TOP TECH

16   JOURNALISTS IN OUR INDUSTRY.

17   Q    IF YOU LOOK AT PX 140, WHAT IS THIS DOCUMENT?

18   A    THIS IS A PRODUCT REVIEW, ALSO OF THE IPAD, BY

19   THE U.S.A. TODAY NEWSPAPER.

20             MR. MCELHINNY:  YOUR HONOR, I MOVE PX

21   140.

22             THE COURT:  SAME LIMITING INSTRUCTION?

23             MR. PRICE:  YES, YOUR HONOR.

24             THE COURT:  ALL RIGHT.  YOU CANNOT

25   CONSIDER THIS EXHIBIT FOR THE TRUTH OF WHAT'S
```

1    STATED IN THE EXHIBIT, BUT YOU CAN CONSIDER IT

2    OTHERWISE.

3                (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

4                140, HAVING BEEN PREVIOUSLY MARKED FOR

5                IDENTIFICATION, WAS ADMITTED INTO

6                EVIDENCE.)

7                THE COURT:  GO AHEAD, PLEASE.

8                MR. MCELHINNY:  PLEASE SHOW DEMONSTRATIVE

9    PDX 7.

10   Q    AND WHAT IS THIS DEMONSTRATIVE, SIR?

11   A    THIS IS A SUMMARY OF THAT SAME U.S.A. TODAY

12   REVIEW OF THE IPAD AND SOME OF THE COMMENTS THE

13   WRITER WROTE.

14   Q    SIR, WAS THE EARLY PRESS FOR THE IPAD ALL

15   POSITIVE?

16   A    NO.

17   Q    AND WHAT WERE THE -- CAN YOU TELL US, JUST

18   GENERALLY, WHAT THE NEGATIVE COMMENTS WERE.

19   A    THERE WERE STILL MANY IN THE INDUSTRY AFTER WE

20   LAUNCHED THE IPAD WHO QUESTIONED WHETHER IT WOULD

21   SUCCEED AT ALL.

22        THEY QUESTIONED THE VALUE OF A PRODUCT

23   THAT PEOPLE MIGHT USE TO CREATE CONTENT LIKE THEY

24   DO ON A PERSONAL COMPUTER AND WHETHER THEY WOULD

25   USE A TABLET TO DO THOSE SAME ACTIONS.

1              THEY QUESTIONED THE NEED FOR SOMETHING

2    LARGER THAN AN IPHONE TO DO SOME OF THE SAME TASKS

3    AN IPHONE CAN DO.

4              THERE WAS GREAT DOUBT ON WHETHER IT WOULD

5    BE SUCCESSFUL TO ANYONE.

6    Q    DID THE IPAD HAVE A KEYBOARD?

7    A    IT HAD A SOFT SCREEN KEYBOARD, TOUCH KEYBOARD,

8    NO PHYSICAL KEYBOARD ATTACHED TO IT.

9    Q    WAS THERE REACTION TO THE FACT OF IT

10   ELIMINATED A PHYSICAL KEYBOARD?

11   A    OF COURSE.

12   Q    WHAT WAS THE NATURE OF THAT REACTION, SIR?

13   A    MANY IN THE INDUSTRY DOUBTED THAT A DEVICE

14   THAT DIDN'T HAVE A PHYSICAL KEYBOARD ATTACHED TO IT

15   COULD SUCCEED IN ANY MEANINGFUL NUMBERS.

16   Q    LET'S GO BACK TO PLAINTIFF'S EXHIBIT 15 IN

17   EVIDENCE.  DOES THIS CHART TELL US ABOUT SALES FOR

18   THE IPAD?

19   A    YES, IT DOES.

20   Q    AND CAN YOU SUMMARIZE THAT FOR US, PLEASE?

21   A    YES.  THE ORANGE LINE ON THE BOTTOM RIGHT THAT

22   STARTS IN MID-2010 AND GOES UNTIL 2012 SHOWS THE

23   CUMULATIVE SALES OF THE IPAD.

24   Q    SIR, I'M GOING TO CHANGE SUBJECTS A LITTLE

25   BIT.

1              AS THE HEAD OF MARKETING, IN APPLE'S

2      VIEW, HAS THE IPHONE BEEN A SUCCESSFUL PRODUCT?

3      A    YES, IT'S BEEN VERY SUCCESSFUL.

4      Q    AND WHAT IS YOUR UNDERSTANDING OF THE REASONS

5      FOR ITS SUCCESS?

6      A    WELL, I THINK THERE ARE --

7              MR. PRICE:  I'LL OBJECT.  IT'S

8      UNDISCLOSED OPINION.

9              THE COURT:  OVERRULED.

10             GO AHEAD.

11             THE WITNESS:  I THINK THERE ARE MANY

12     REASONS FOR THE IPHONE SUCCESS.

13             FOR ME, WHAT I BELIEVE IS VERY PREVALENT

14     IS, NUMBER ONE, PEOPLE FIND THE IPHONE DESIGNS

15     BEAUTIFUL.

16             NUMBER TWO, IT'S AN INCREDIBLY

17     EASY-TO-USE DEVICE WITH ALL OF OUR SOFTWARE

18     INVENTIONS TO MAKE IT INTUITIVE AND SIMPLE AND WELL

19     INTEGRATED.

20             I THINK, THIRD, THE FACT THAT WE DO SUCH

21     A GOOD JOB INTEGRATING HARDWARE AND SOFTWARE

22     TOGETHER TO MAKE ONE EXPERIENCE.

23             AND, FOURTH, I THINK BECAUSE IT HAS --

24     WE'VE REALLY TAKEN THE ENTIRE EXPERIENCE, EVERY

25     ELEMENT OF IT, HARDWARE, SOFTWARE, APPLICATIONS,

```
 1    INTERNET SERVICES AND TAKEN RESPONSIBILITY TO MAKE
 2    ALL THOSE THINGS WORK WELL FOR THE CUSTOMER.  I
 3    THINK THAT'S SORT OF MY LIST OF WHAT'S MADE IT
 4    SUCCESSFUL.
 5    Q    HAS THE IPAD BEEN A SUCCESSFUL DEVICE?
 6    A    ABSOLUTELY.
 7    Q    AND WHAT ARE YOUR UNDERSTANDINGS FOR THE
 8    REASONS OF ITS SUCCESS?
 9    A    WELL, FIRST I WOULD REPEAT SIMILAR ITEMS AS
10    WITH THE IPHONE, THAT IT'S ABSOLUTELY BEAUTIFUL;
11    THAT IT'S VERY EASY TO USE WITH ITS SOFTWARE; THAT
12    IT'S INTEGRATED TOGETHER HARDWARE AND SOFTWARE; AND
13    THE RESPONSIBILITY WE TAKE FOR ALL THOSE SERVICES.
14         BUT I WOULD ADD ONE MORE IN ADDITION TO
15    THE IPHONE, WHICH IS WE'VE ACTUALLY SHOWN PEOPLE
16    THE VALUE THAT THIS INCREDIBLY BEAUTIFUL PRODUCT
17    CAN HAVE IN THEIR LIVES AND WHY THEY WANT ONE WHEN
18    THEY NEVER HAD BEFORE.  THAT WAS ONE OF THE BIGGEST
19    CHALLENGES.
20    Q    COULD YOU PLEASE PUBLISH PDX 8.
21         SIR, THESE ARE PHOTOGRAPHS OF THE PHONES
22    THAT ARE ALREADY IN EVIDENCE IN THIS CASE.
23         I NOTICE THAT WHEN YOU LOOKED AT THE PTO
24    DISPLAY, YOU IMMEDIATELY RECOGNIZED, YOU TALKED
25    ABOUT THE DISTINCTIVE NATURE OF THE IPHONE.
```

```
1              WHAT IS IT ABOUT THESE DESIGNS THAT
2    CAUSES YOU TO CALL THEM DISTINCTIVE?
3    A    WELL, AS A MARKETING PERSON, IT'S IMPORTANT TO
4    ME THAT A PRODUCT BE UNIQUE, BE DISTINCTIVE, BE
5    CONSISTENT OVER TIME.
6              WHAT YOU'RE SEEING UP HERE, YOU MAY THINK
7    IT'S JUST FOUR PICTURES OF PHONES, BUT IT ACTUALLY
8    REPRESENTS MANY YEARS OF IPHONE TO APPLE.  WE DON'T
9    BRING OUT NEW VERSIONS EVERY MONTH.  WE BRING THEM
10   OUT ABOUT ONCE A YEAR.
11             AND YOU SEE THE VERY CONSISTENT SHAPE OF
12   IT.  IT'S ROUNDED CORNERS, IT'S RECTANGULAR SHAPE,
13   ITS FULL GLASS FACE WITH THE BLACK SCREEN AND BLACK
14   AREA AROUND THE SCREEN JUST SEEN AS ONE.  YOU SEE
15   THE COLORFUL ICONS, THE APPLICATIONS, THE SQUARES
16   WITH THEIR ROUNDED CORNERS.
17             YOU SEE THE BOX ALONG THE BOTTOM WHICH
18   WE'RE KNOWN FOR.  I THINK THERE ARE A NUMBER OF
19   FACTS ALTOGETHER THAT MAKE IT VERY OBVIOUS THAT
20   IT'S AN IPHONE.
21             THE COURT:  MR. MCELHINNY, I DON'T HAVE
22   IT IN MY NOTES AS HAVING BEEN ADMITTED.  WHICH
23   WITNESS WAS THIS?
24             MR. MCELHINNY:  I'M SORRY, YOUR HONOR.
25   THE PHONES WERE ADMITTED THROUGH MR. SCHILLER, I
```

```
 1    BELIEVE -- THROUGH MR. STRINGER, I BELIEVE, AND

 2    THIS IS SIMPLY A PICTURE OF THE PHONES THAT ARE IN

 3    EVIDENCE.

 4              THE COURT:  OH, ALL RIGHT.

 5    BY MR. MCELHINNY:

 6    Q    WHICH IPHONES INCORPORATE THE DESIGN FEATURES

 7    THAT YOU JUST DISCUSSED?

 8    A    THEY ALL DO.

 9    Q    IF YOU WOULD PUT UP, PLEASE, PDX 9.

10              THESE ARE PICTURES OF THE IPAD IN

11    EVIDENCE.

12              AGAIN, WHAT IS IT ABOUT THESE, THE SHAPE

13    OF THESE DEVICES THAT MAKES YOU THINK THAT THEY'RE

14    DISTINCTIVE?

15    A    AS A MARKETING PERSON, IT'S IMPORTANT TO ME

16    THAT THE IMAGE OF THE PRODUCT BE SIMPLE, CLEAR,

17    CONSISTENT OVER TIME AND WHAT YOU'RE SEEING IS THE

18    IPAD HAS HAD A CONSISTENT DESIGN OF THE LARGE

19    RECTANGLE WITH FOUR ROUNDED CORNERS, A FULL GLASS

20    FACE WITH A SCREEN AND THE AREA AROUND THE SCREEN

21    JUST BECOME ONE SURFACE.  THAT WE HAVE A BEAUTIFUL

22    SET OF ICONS THAT ARE COLORFUL, SQUARES WITH

23    ROUNDED CORNERS.  A DOCK FOR THE MOST COMMONLY USED

24    ICONS ALL ON THE BOTTOM.

25              AND ALTOGETHER IT'S A SIMPLE, BEAUTIFUL
```

1    LOOK THAT HAS STAYED CONSISTENT WITH ACROSS THE

2    PRODUCT LINE.

3    Q    IN YOUR EXPERIENCE, DOES THE DESIGN OF THESE

4    PRODUCTS CONTRIBUTE TO THEIR SUCCESS?

5    A    ABSOLUTELY.

6    Q    AND WHY DO YOU SAY THAT?

7    A    BECAUSE I BELIEVE CUSTOMERS VALUE BEAUTIFUL

8    PRODUCTS AND PRODUCTS THEY CAN ASSOCIATE AND

9    IDENTIFY WITH THE COMPANY WHO'S MADE THEM.

10   Q    SIR, IF YOU LOOK IN YOUR BINDER AT EXHIBIT

11   1 -- PX 143.

12   A    YES.

13   Q    WHAT IS EXHIBIT PX 143?

14   A    THIS IS AN APPLE CUSTOMER OR BUYER SURVEY OF

15   PEOPLE WHO PURCHASED IPHONES.

16   Q    CAN YOU TELL ME THE DATES OF IT, PLEASE?

17   A    THIS WAS FROM THE FOURTH FISCAL QUARTER IN

18   FISCAL YEAR 2010.

19   Q    ALL RIGHT.  WOULD YOU LOOK AT THE PAGES THAT

20   YOU'VE GOT THERE, PLEASE, AND TELL ME WHETHER YOU

21   HAVE THE ENTIRE SURVEY OR EXCERPTS FROM THE SURVEY?

22   A    THIS IS JUST A BRIEF EXCERPT OF A LARGER

23   SURVEY.

24            MR. MCELHINNY:  THANK YOU.  YOUR HONOR, I

25   MOVE PX 143.

```
1                THE COURT:  ANY OBJECTION, MR. PRICE?

2                MR. PRICE:  NO FURTHER OBJECTIONS.

3                THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

4                (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

5                143, HAVING BEEN PREVIOUSLY MARKED FOR

6                IDENTIFICATION, WAS ADMITTED INTO

7                EVIDENCE.)

8     BY MR. MCELHINNY:

9     Q    SIR, IF YOU WOULD LOOK IN YOUR BINDER AT PX

10    144, WHAT IS 144?

11    A    THIS IS ANOTHER IPHONE BUYER SURVEY PERFORMED

12    BY APPLE.

13    Q    IS IT THE ENTIRE SURVEY OR EXCERPTS, SIR?

14    A    THIS ALSO IS AN EXCERPT OF THAT SURVEY.

15    Q    FOR WHAT TIME PERIOD, SIR?

16    A    FOR THE FIRST QUARTER OF FISCAL YEAR 2011.

17                MR. MCELHINNY:  YOUR HONOR, I MOVE PX

18    144.

19                THE COURT:  MR. PRICE?

20                MR. PRICE:  NO FURTHER OBJECTION.

21                THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

22                (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

23                144, HAVING BEEN PREVIOUSLY MARKED FOR

24                IDENTIFICATION, WAS ADMITTED INTO

25                EVIDENCE.)
```

```
1     BY MR. MCELHINNY:

2     Q    IF YOU WOULD LOOK IN YOUR BINDER, PLEASE, AT

3     PX 145, WHAT IS 145?

4     A    THIS IS ALSO AN IPHONE BUYER SURVEY.

5     Q    IS IT THE ENTIRE SURVEY OR EXCERPTS, SIR?

6     A    THIS IS ALSO AN EXCERPT OF THAT SURVEY.

7     Q    FOR WHAT TIME PERIOD?

8     A    THIS IS FOR THE SECOND QUARTER OF FISCAL YEAR

9     2011.

10              MR. MCELHINNY:  YOUR HONOR, I MOVE PX

11    145.

12              MR. PRICE:  NO ADDITIONAL OBJECTIONS.

13              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

14              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

15               145, HAVING BEEN PREVIOUSLY MARKED FOR

16               IDENTIFICATION, WAS ADMITTED INTO

17               EVIDENCE.)

18    BY MR. MCELHINNY:

19    Q    IF YOU WOULD LOOK IN YOUR BINDER, PLEASE, AT

20    PX 146.  WHAT IS 146, SIR?

21    A    THIS IS AN IPHONE BUYER SURVEY.

22    Q    THE WHOLE SURVEY, SIR, OR EXCERPTS?

23    A    IT IS AN EXCERPT OF THAT SURVEY.

24    Q    FROM WHAT TIME PERIOD?

25    A    THAT IS FROM THE THIRD QUARTER OF FISCAL YEAR
```

1    2011.

2              MR. MCELHINNY:  YOUR HONOR, I MOVE PX

3    146.

4              MR. PRICE:  NO ADDITIONAL OBJECTION.

5              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

6              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

7              146, HAVING BEEN PREVIOUSLY MARKED FOR

8              IDENTIFICATION, WAS ADMITTED INTO

9              EVIDENCE.)

10   BY MR. MCELHINNY:

11   Q    WHAT IS AN IPHONE BUYER SURVEY?

12   A    PERIODICALLY MY MARKET RESEARCH TEAM WILL DO

13   SURVEYS OF CUSTOMERS WHO HAVE ALREADY PURCHASED OUR

14   PRODUCT TO ASK THEM QUESTIONS.  WE'RE CURIOUS ABOUT

15   THEM.

16   Q    WHAT IS A MARKET RESEARCH TEAM, SIR?

17   A     I HAVE A SMALL GROUP OF PEOPLE WHO REPORT TO

18   ME WHO DO PRIMARILY TWO FUNCTIONS.  ONE IS TO

19   PURCHASE THIRD PARTY REPORTS THAT EXIST IN THE

20   MARKETPLACE, USUALLY ANALYSIS OF MARKET TRENDS OR

21   DATA.

22              AND THEN ALSO TO PERFORM A LIMITED NUMBER

23   OF RESEARCH PROJECTS ON EXISTING CUSTOMERS SO WE

24   CAN HEAR WHAT THEY HAVE TO SAY ABOUT THE PRODUCTS

25   THEY'VE PURCHASED.

```
 1    Q    WHO DETERMINES WHAT QUESTIONS SHOULD BE ASKED

 2    IN YOUR IPHONE BUYER SURVEY?

 3    A    MY TEAM DOES.

 4    Q    AND HOW ARE THE ANSWERS COMPILED?

 5    A    THEY USUALLY ARE DONE BY GATHERING ANSWERS

 6    FROM WEB SURVEYS AND SOMETIMES ALSO CERTAIN PHONE

 7    SURVEYS, AND THOSE ARE COMPILED TOGETHER IN A

 8    DATABASE AND THEN REPORTED IN A DOCUMENT SUCH AS

 9    THESE.

10    Q    AND ARE THE BUYER SURVEYS THAT I'VE JUST SHOWN

11    YOU, ARE THEY CONSIDERED CONFIDENTIAL DOCUMENTS AT

12    APPLE?

13    A    YES, THEY ARE.

14    Q    WHY?

15    A    ONE OF THE TOUGH THINGS IN OUR INDUSTRY, AND

16    IN MARKETING PRODUCTS, IS YOU CAN RESEARCH YOUR OWN

17    CUSTOMERS BECAUSE YOU HAVE A DATABASE OF YOUR

18    CUSTOMERS.  THEY'VE BOUGHT A PRODUCT FROM YOU, SO

19    YOU KNOW HOW TO REACH THEM.

20         IT'S DIFFICULT TO RESEARCH SOMEONE ELSE'S

21    CUSTOMERS, A COMPETITOR'S CUSTOMERS.  SO A

22    COMPETITOR CAN EASILY RESEARCH THEIR OWN CUSTOMERS,

23    BUT TO RESEARCH OUR CUSTOMERS ARE MUCH MORE

24    DIFFICULT.

25         SO OUR DATA THAT WE'VE GATHERED ON OUR
```

```
 1    CUSTOMERS IS VERY DIFFICULT TO GATHER, AND,

 2    THEREFORE, IT'S VERY CONFIDENTIAL AND WE PREFER NOT

 3    TO SHARE IT WITH OUR COMPETITORS.

 4    Q    HAVE YOU PREPARED A SUMMARY OF THE INFORMATION

 5    THAT'S CONTAINED IN THE FOUR SURVEYS THAT I JUST

 6    SHOWED YOU?

 7    A    YES.

 8    Q    IF YOU LOOK IN YOUR BINDER, PLEASE, AT PDX 10.

 9    A    YES.

10    Q    IS THIS THE SUMMARY THAT YOU HAVE PREPARED?

11    A    YES, IT IS.

12    Q    CAN YOU WALK US THROUGH IT, PLEASE?

13    A    SO THIS IS A SUMMARY WHERE, ACROSS THE SURVEYS

14    WE'VE JUST BEEN SPEAKING ABOUT, WE TOOK ONE OF THE

15    QUESTIONS AND JUST SHOWED WHAT THE RESULTS WERE

16    ACROSS EACH OF THOSE SURVEYS TOGETHER.

17             AND IN THIS CASE, IN THE IPHONE BUYER

18    SURVEY, THE QUESTION WAS FOR THE CUSTOMER TO RATE

19    THE IMPORTANCE OF THE ATTRACTIVE APPEARANCE AND

20    DESIGN INTO THEIR DECISION TO PURCHASE THE IPHONE.

21    Q    AND WHAT WAS THE QUESTION THAT WAS ASKED IN

22    THIS PARTICULAR, BEHIND THIS -- THAT IS BEHIND THIS

23    PARTICULAR SUMMARY?

24    A    SPECIFICALLY, THE EXACT QUESTION WAS, "HOW

25    IMPORTANT WERE EACH OF THE FOLLOWING ATTRIBUTES,
```

1    "AND THE QUESTION, OF COURSE, THERE WAS MORE THAN

2    ONE, THIS ONE WAS "HOW IMPORTANT IS ATTRACTIVE

3    APPEARANCE AND DESIGN?"

4                AND THEN WHAT YOU SEE THERE IN THE BARS

5    IS THE RESULTS.

6    Q    I'M SORRY.  SO WE'RE ON TRACK.  WHAT DOES

7    ATTRACTIVE APPEARANCE AND DESIGN MEAN IN YOUR

8    BUSINESS?

9    A    WE'RE SIMPLY TRYING TO UNDERSTAND FROM THE

10   CUSTOMER'S PERSPECTIVE THE ACTUAL PHYSICAL

11   APPEARANCE, THE LOOK OF THE PRODUCT, THE IPHONE,

12   AND WHAT THEY FELT ABOUT HOW IMPORTANT THAT

13   APPEARANCE OR LOOK WAS IN THEIR OWN DECISION TO BUY

14   IT.

15   Q    ALL RIGHT.  LET ME HAMMER THE OBVIOUS LATER.

16   THIS IS NOT JUST THE RESULT OF A SINGLE SURVEY; IS

17   THAT RIGHT?

18   A    NO, IT IS NOT.

19   Q    IT COVERS A PERIOD OF TIME?

20   A    YES, IT DOES.

21   Q    A NUMBER OF SURVEYS?

22   A    YES, IT DOES.

23   Q    AND WHAT, WHAT DOES THIS SUMMARY TELL US ABOUT

24   THE IMPORTANCE OF DESIGN TO YOUR CUSTOMERS?

25   A    THIS SURVEY RESULT, ACROSS TIME, ACROSS MANY

1    CUSTOMERS, AFFIRMS FOR ME THE PERSPECTIVE THAT,

2    THAT MOST CUSTOMERS BELIEVE THAT ATTRACTIVE

3    APPEARANCE AND DESIGN IS VERY IMPORTANT TO THEIR

4    CHOICE OF BUYING A PRODUCT, AND SPECIFICALLY OUR

5    PRODUCT.

6    Q    AND HOW DO YOU GET THAT CONCLUSION FROM THESE

7    NUMBERS?

8    A    WE ASKED THE CUSTOMERS, IN THIS QUESTION, TO

9    RATE THIS IMPORTANCE ON A SCALE OF 1 TO 5, WITH THE

10   TOP TWO IN THAT SCALE BEING THE ATTRACTIVE

11   APPEARANCE AND DESIGN IS EITHER SOMEWHAT IMPORTANCE

12   TO THE PURCHASE OR VERY IMPORTANT TO THE PURCHASE.

13              AND IN MARKETING LINGO, WE CALL THAT THE

14   TOP TWO BOX, THOSE TOP TWO CHOICES.

15              AND YOU USUALLY COMBINE THOSE FOR YOUR

16   MEASURE OF WHAT CUSTOMERS THINK WHETHER SOMETHING

17   IS IMPORTANT OR NOT.

18              AND -- NOW I APOLOGIZE THE WAY YOU

19   USUALLY SHOW A CHART LIKE THIS --

20   Q    SO WHEN YOU TALK ABOUT TOP TWO BOXES, YOU'RE

21   TALKING ABOUT THE BOTTOM TWO BOXES?

22   A    ONE OF THE FUNNY THINGS IN MARKETING IS WE

23   CALL THEM THE TOP TWO, BUT IN A CHART, THEY'RE

24   USUALLY THE BOTTOM COLORS IN THAT, SO IT'S THE DARK

25   BLUE AND MEDIUM BLUE THAT YOU SEE THERE.

1          SO THE WAY I LOOK AT THESE WHEN I SEE

2     THESE REPORTS IS YOU COMBINE THOSE TWO.

3          SO, FOR EXAMPLE, THE FIRST BAR SHOWS 46

4     PERCENT, PLUS 35 PERCENT OF THE TOP TWO BOXES, OR

5     85 PERCENT OF THOSE CUSTOMERS BELIEVED THAT IT WAS,

6     THE APPEARANCE AND DESIGN WAS IMPORTANT TO THEIR

7     PURCHASE OF THE IPHONE.

8     Q    DOES APPLE TAKE PRODUCT DESIGN SERIOUSLY?

9     A    EXTREMELY.

10    Q    WHY?

11    A    I BELIEVE ONE OF THE THINGS THE MARKET LOOKS

12    AT FROM APPLE IS BEAUTIFUL PRODUCTS.  IT'S ONE OF

13    THE THINGS WE'RE KNOWN FOR.  IT'S ONE OF THE THINGS

14    WE STRIVE TO CREATE, AND I THINK IT'S PART OF WHO

15    APPLE IS.  WE CREATE BEAUTIFUL PRODUCTS.

16    Q    DOES, SIR, THIS SUMMARY THAT YOU PREPARED,

17    DOES IT HAVE A SECOND PAGE?

18    A    YES, IT DOES.

19    Q    LET'S LOOK AT THE SECOND PAGE.  AND WHAT DOES

20    THIS PAGE REPRESENT?

21    A    FROM THE SAME IPHONE BUYER SURVEYS, WE ALSO

22    ASKED THE QUESTION OF HOW IMPORTANT EASE OF USE WAS

23    TO THEIR PURCHASE DECISION, AND THIS REPRESENTS THE

24    RESULTS OF THAT QUESTION OVERALL OF THESE SURVEYS.

25    Q    AND, AGAIN, THE WAY THAT YOU USED THE PHRASE,

```
1    WHAT DOES "EASE OF USE" REFER TO?

2    A    EASE OF USE IS A WAY TO GET AT THE CUSTOMER'S

3    UNDERSTANDING OF JUST HOW EASY IT IS TO USE OUR

4    PRODUCTS.

5              AND USUALLY THAT, IT STANDS FOR BOTH THE

6    PHYSICAL DESIGN, IS IT SIMPLE TO UNDERSTAND, BUT

7    EVEN MORE SO, THE SOFTWARE AND HOW EASY IT IS TO

8    USE ALL THAT SOFTWARE.

9    Q    I'M GOING TO CHANGE SUBJECTS AGAIN.

10             SINCE THE RELEASE OF THESE PRODUCTS, HAS

11   APPLE SPENT -- MADE EFFORTS TO PROMOTE THE

12   PRODUCTS?

13   A    OH, YES, A GREAT DEAL.

14   Q    AND WHAT KINDS OF EFFORTS JUST GENERALLY HAVE

15   YOU MADE?

16   A    WE USE EVERYTHING THAT MARKETING HAS AT OUR

17   DISPOSAL TO USE.  THE LARGEST FORM OF COMMUNICATION

18   IS ADVERTISING.  THERE'S ALSO PUBLIC RELATIONS.

19   THERE'S DIRECT MAIL.  THERE'S EVENTS.  OUR

20   WEBSITES, OUR STORES AND ALL THE CONTENT IN THOSE

21   STORES, ON AND ON, MANY THINGS.

22   Q    IS ADVERTISING IMPORTANT TO, TO WHAT YOU DO?

23   A    AT APPLE, ADVERTISING IS ONE OF THE MOST

24   IMPORTANT MARKETING TOOLS WE HAVE.

25   Q    AND WHY IS THAT?
```

```
 1    A    ADVERTISING IS A WAY TO REACH MANY PEOPLE
 2    INSTANTLY WITH A SINGLE COMMUNICATION.  YOU CAN
 3    CREATE AN AD AND REACH MILLIONS OF CUSTOMERS AND
 4    SPEAK DIRECTLY TO THEM FROM OUR COMPANY.
 5    Q    ARE YOU INVOLVED IN HELPING TO SHAPE THE APPLE
 6    ADVERTISING CAMPAIGNS?
 7    A    YES, I AM.
 8    Q    DOES APPLE HAVE A PARTICULAR APPROACH THAT IT
 9    USES TO MARKET THE IPHONE AND THE IPAD?
10    A    YES.  I THINK WE HAVE A VERY DISTINCTIVE,
11    UNIQUE APPROACH.
12    Q    AND WHAT IS THAT APPROACH, SIR?
13    A    AT APPLE IN MARKETING, WE CALL THIS APPROACH
14    TO ADVERTISING PRODUCT AS HERO.  THAT'S THE TERM WE
15    USE.
16    Q    PRODUCT AS HERO?
17    A    YES.
18    Q    AND WHAT DOES THAT MEAN?
19    A    THAT MEANS -- THE MOST IMPORTANT WE DO AT
20    APPLE IS TO CREATE A PRODUCT.  THAT'S WHY WE'RE ALL
21    THERE, TO CREATE AMAZING PRODUCTS, AND WE WANT TO
22    SHOWCASE THOSE PRODUCTS AS PREDOMINANTLY AS WE CAN.
23         SO OUR MARKETING STRATEGY IS TO MAKE THE
24    PRODUCT THE BIGGEST, CLEAREST, MOST OBVIOUS THING
25    IN OUR ADVERTISEMENTS, OFTEN AT THE EXPENSE OF
```

```
 1     ANYTHING ELSE AROUND IT, TO REMOVE ALL THE OTHER
 2     ELEMENTS OF COMMUNICATION SO YOU SEE THE PRODUCT
 3     MOST PREDOMINANTLY IN THE MARKETING.
 4     Q    WAS THERE ANYTHING ESPECIALLY CHALLENGING TO
 5     MARKETING THE IPHONE?
 6     A    OH, YES, A GREAT --
 7             MR. PRICE:  OBJECT TO RELEVANCE TO THE
 8     ISSUES IN THIS CASE.
 9             MR. MCELHINNY:  ADVERTISING IS ONE OF THE
10     CRITICAL ISSUES ON DILUTION.
11             THE COURT:  OVERRULED.
12             GO AHEAD.
13     BY MR. MCELHINNY:
14     Q    WERE THERE ANY SPECIAL CHALLENGES TO MARKETING
15     THE IPHONE?
16     A    YES, THERE WERE.
17     Q    AND CAN YOU TELL US WHAT THOSE WERE?
18     A    BECAUSE THE IPHONE WAS SUCH A NEW KIND OF
19     DEVICE AND PEOPLE HAD NO IDEA HOW IT WORKED, THE
20     EASIEST WAY TO UNDERSTAND THE IPHONE WOULD BE TO
21     ACTUALLY PICK IT UP AND USE IT.
22             AND WHILE WE WANTED PEOPLE TO GO TO
23     STORES AND DO THAT, OUR TV ADVERTISEMENT CREATES AN
24     EXTRA CHALLENGE, HOW DO YOU SHOW THIS HERO PRODUCT,
25     AND HOW IT WILL WORK IF YOU HAVE NO FOUNDATION FOR
```

```
 1    UNDERSTANDING HOW THAT IS?  SO THAT WAS A BIG
 2    CHALLENGE CREATED IN OUR MARKETING.
 3    Q    SIR, IF YOU LOOK IN YOUR BINDER AT EXHIBIT PX
 4    127.
 5    A    YES.
 6    Q    CAN YOU TELL ME WHAT EXHIBIT PX 127 IS?
 7    A    IT'S A VIDEO.
 8    Q    AND IS IT A VIDEO OF ONE OF THE ADS THAT YOU
 9    PRODUCED ABOUT HOW TO USE THE IPHONE?
10    A    YES.
11              MR. MCELHINNY:  YOUR HONOR, I MOVE PX 127
12    IN.
13              THE COURT:  ANY OBJECTION.
14              MR. PRICE:  NO ADDITIONAL OBJECTIONS.
15    AGAIN, CAN WE HAVE AN INSTRUCTION THAT WHAT'S SAID
16    IN THE VIDEO IS NOT RELEVANT MATERIAL.
17              MR. MCELHINNY:  THIS IS NOT HEARSAY.
18              THE COURT:  THAT OBJECTION IS OVERRULED.
19              ARE YOU GOING TO SHOW THIS OR WHAT?
20              MR. MCELHINNY:  I'M GOING TO SHOW IT,
21    YOUR HONOR.
22              THE COURT:  OKAY.  I THINK SINCE WE
23    STARTED EARLIER TODAY, I'D LIKE TO TAKE THE BREAK A
24    LITTLE EARLIER, MAYBE 10:15.  OKAY.
25              MR. MCELHINNY:  FINE, YOUR HONOR.
```

```
 1              THE COURT:  GO AHEAD.
 2              MR. MCELHINNY:  WOULD YOU SHOW EXHIBIT --
 3    DO WE NEED HELP WITH THAT?
 4              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
 5              127, HAVING BEEN PREVIOUSLY MARKED FOR
 6              IDENTIFICATION, WAS ADMITTED INTO
 7              EVIDENCE.)
 8              MR. MCELHINNY:  CAN YOU SHOW EXHIBIT PX
 9    127, PLEASE.
10              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
11    OPEN COURT OFF THE RECORD.)
12    BY MR. MCELHINNY:
13    Q    THAT WAS ONE OF THE EARLY ADS FOR THE IPHONE;
14    IS THAT CORRECT?
15    A    YES, IT WAS.
16    Q    EXPLAIN TO US THE LOGIC.  WHAT DID WE JUST SEE
17    FROM AN ADVERTISING PERSPECTIVE?
18    A    ADVERTISING IS ALWAYS CHALLENGING BECAUSE YOU
19    ONLY HAVE 30 SECONDS TO GET AN IDEA ACROSS, AND IN
20    THAT 30 SECONDS, WHAT YOU SAW FIRST WAS, WHAT I
21    SPOKE ABOUT EARLIER, THE PRODUCT WAS THE HERO.  YOU
22    SAW THE DISTINCTIVE DESIGN VERY CLEARLY.
23              SECONDLY, WE GAVE YOU THE ABILITY TO SEE
24    A BIT ABOUT HOW IT MIGHT WORK.  SINCE YOU'VE NEVER
25    USED THIS PRODUCT BEFORE AS A CUSTOMER, YOU SAW HOW
```

1    FLICKING AND SCROLLING AND TAPPING AND ALL THESE

2    MULTITOUCH IDEAS SIMPLY.

3              AND THEN THE THIRD THING I THINK THE AD

4    DID VERY WELL WAS EXPRESS WHAT WE SPOKE ABOUT

5    EARLIER FROM THE ORIGINAL LAUNCH, THAT THE IPHONE

6    WAS A BREAKTHROUGH OF THREE THINGS:

7              IT WAS A GREAT PHONE; IT WAS A PERSONAL

8    COMMUNICATION DEVICE; AND IT WAS THE BEST IPOD YOU

9    EVER HAD.

10             ALL THREE OF THOSE WERE USED IN THAT

11   ADVERTISEMENT.

12   Q    CAN YOU LOOK IN YOUR BINDER, PLEASE, TO

13   EXHIBIT PX 12.

14   A    YES.

15   Q    I THINK YOU'RE GOING TO FIND TWO THINGS THERE.

16   I THINK YOU'RE GOING TO FIND A CHART AND ANOTHER

17   CD.  IS THAT CORRECT?

18   A    CORRECT.

19   Q    WHAT IS THE CHART?

20   A    THIS IS A, A TABLE REPRESENTING ALL OF THE ADS

21   ABOUT IPHONE THAT WE'VE PUT ON A DVD.

22   Q    AND WHAT IS THE DVD?

23   A    THE DVD HAS ALL OF THESE ADS.  IT SHOWS THE

24   ORIGINAL IPHONE ADS, AS WELL AS FOLLOW-ON VERSIONS

25   OF THE IPHONE, ALL AS INDIVIDUAL VIDEOS.

1    Q    DOES IT INCLUDE THE AD WE JUST SAW.

2    A    YES, IT DOES.

3              MR. MCELHINNY:  YOUR HONOR, I MOVE PX 12.

4              MR. PRICE:  ONE MOMENT, PLEASE.

5              (PAUSE IN PROCEEDINGS.)

6              MR. PRICE:  NO ADDITIONAL OBJECTIONS,

7    JUDGE.

8              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

9              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

10             12, HAVING BEEN PREVIOUSLY MARKED FOR

11             IDENTIFICATION, WAS ADMITTED INTO

12             EVIDENCE.)

13   BY MR. MCELHINNY:

14   Q    AND THIS IS THE CHART THAT YOU WERE TALKING

15   ABOUT WITH THE ADS?

16   A    YES, IT IS.

17   Q    AND YOU'VE GIVEN EACH ONE OF THESE ADS AN

18   INDIVIDUAL NAME?

19   A    WE DO.

20   Q    ALL RIGHT.  AND JURY WILL HAVE THE DVD IN THE

21   COURTROOM?

22   A    THEY WILL.

23   Q    DO YOU KNOW, DID THESE ADS ACTUALLY AIR IN THE

24   UNITED STATES?

25   A    YES.  ALL OF THESE WERE ADS THAT WE RAN ON TV.

1    Q    THANK YOU.  WERE THERE ANY SPECIAL CHALLENGES

2    TO MARKETING THE IPAD?

3    A    OH, YES.

4    Q    AND CAN YOU GIVE US EXAMPLES OF WHAT THOSE

5    CHALLENGES WERE?

6    A    AGAIN, LIKE WITH THE IPHONE, THE IPAD IS A

7    DEVICE THAT WAS BRAND NEW AND PEOPLE HAD NO

8    EXPERIENCE WITH ANYTHING LIKE THE IPAD.

9            AND SO THE CHALLENGE IN MARKETING IS TO,

10   AGAIN, NOT ONLY SHOW IT AS THIS HERO, BEAUTIFUL

11   PRODUCT BUT GIVE YOU A SENSE OF HOW IT MIGHT WORK

12   AND WHAT IT MIGHT DO FOR YOU BEFORE YOU EVEN GET A

13   CHANCE TO GO TO THE STORE AND TRY ONE YOURSELF.

14   Q    IF YOU OPEN YOUR BINDER TO EXHIBIT PX 128.

15   WHAT IS THIS, SIR?

16   A    THIS IS A VIDEO.

17   Q    AND IS IT AN AD FOR THE IPAD AGAIN?

18   A    YES, IT IS.

19            MR. MCELHINNY:  YOUR HONOR, I MOVE PX

20   128.

21            MR. PRICE:  NO FURTHER OBJECTION TO THIS

22   VIDEO.

23            THE COURT:  ALL RIGHT.  IT'S ADMITTED.

24            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

25            128, HAVING BEEN PREVIOUSLY MARKED FOR

```
 1                    IDENTIFICATION, WAS ADMITTED INTO

 2                    EVIDENCE.)

 3                    MR. MCELHINNY:  WE'D LIKE TO PUBLISH THIS

 4      ONE, TOO, YOUR HONOR.

 5                    THE COURT:  GO AHEAD, PLEASE.

 6                    (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

 7      OPEN COURT OFF THE RECORD.)

 8      BY MR. MCELHINNY:

 9      Q    AGAIN, WHAT WERE THE MESSAGES THAT WE TAKE

10      FROM -- THAT WE SHOULD HAVE TAKEN FROM THAT?

11      A    SO IN THAT BRIEF AD, WE WANTED YOU TO SEE THE

12      BEAUTIFUL DESIGN; GET A SENSE OF HOW EASY IT IS TO

13      USE; REALIZE THAT IT WAS MEANT FOR A WIDE RANGE OF

14      USERS.  IT'S REALLY FOR EVERYBODY, AND IT SHOWED

15      STUDENTS AND BUSY PEOPLE AND MANY OTHER EXAMPLES.

16                    AND THEN TO GIVE YOU A TASTE OF THE RICH

17      DEPTH OF THE SOFTWARE THAT COULD BE USED ON THIS

18      AND HOW APPLICABLE IT IS TO THE THINGS YOU MIGHT DO

19      IN YOUR LIFE, TO CREATE A REASON THAT YOU MIGHT

20      WANT A TABLET DEVICE LIKE AN IPAD IN YOUR LIFE.

21      Q    WOULD YOU LOOK AT EXHIBIT PX 13, PLEASE.

22      A    YES.

23      Q    WHAT IS PX 13?

24      A    IT IS A TABLE OF A LIST OF OUR ADS FOR IPAD.

25      Q    FOR IPAD.
```

```
1              YOUR HONOR, I MOVE -- AND IS THERE A CD
2      THAT ACTUALLY HAS THOSE?
3              THE WITNESS:  THERE'S ALSO A DISK THAT
4      HAS THESE ON IT AS WELL.
5              MR. MCELHINNY:  YOUR HONOR, I MOVE PX 13.
6              MR. PRICE:  IF YOU'RE TALKING ABOUT THE
7      SUMMARY, THERE'S NO ADDITIONAL OBJECTION.
8              THE COURT:  YOU'RE TALKING ABOUT THE
9      SUMMARY; CORRECT?
10             MR. MCELHINNY:  THE SUMMARY AND THE DVD.
11             MR. PRICE:  NO, NO, THOSE ARE DIFFERENT
12     ISSUES.  EARLIER --
13             THE COURT:  WHICH ONE IS THE CD?  DOES IT
14     HAVE A DIFFERENT NUMBER?  BECAUSE I ONLY HAVE PX 13
15     AS BEING A ONE-PAGE CHART.
16             MR. MCELHINNY:  THEY'RE NUMBERED THE
17     SAME, YOUR HONOR.  THE CHART IS THE LIST OF THE
18     CONTENTS OF THE DVD, AND THE DVD IS PART OF THE
19     EXHIBIT.
20             THE COURT:  ALL RIGHT.  WHAT'S THE
21     OBJECTION?
22             MR. PRICE:  WELL, YOUR HONOR, THERE'S NO
23     OBJECTION TO THE SUMMARY.  WE OBJECT TO THE ACTUAL
24     DVD'S.  THAT'S THE PURPOSE OF THE SUMMARY GETTING
25     INTO EVIDENCE.
```

```
 1              AND, SECOND, WITH RESPECT TO THE PRIOR

 2    SUMMARY, I DIDN'T OBJECT TO ANY OF THE DETAILED

 3    DVD'S ALTHOUGH, FOR EXAMPLE, THERE'S ONE AD ON

 4    THERE WHICH YOUR HONOR HAS ALREADY EXCLUDED.  SO --

 5    THE ISSUE OF THE DVD'S ACTUALLY GETTING IN IS THE

 6    OBJECTION.

 7              THE COURT:  ALL RIGHT.  WELL, WHY DON'T

 8    WE DO THIS.  I'M GOING TO, OVER THE BREAK, LOOK AT

 9    THE DVD'S, OKAY?

10              BUT THE CHARTS, THE CHART YOU HAVE NO

11    OBJECTION TO?

12              MR. PRICE:  THE SUMMARY CHART, WE HAVE NO

13    ADDITIONAL OBJECTIONS.

14              THE COURT:  ALL RIGHT.  SO THE CHART

15    ITSELF IS ADMITTED, AND WHY DON'T WE RESERVE UNTIL

16    AFTER THE BREAK THE TWO DVD'S.

17              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

18              THE COURT:  ALL RIGHT.

19              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

20              13, CHARTS, HAVING BEEN PREVIOUSLY MARKED

21              FOR IDENTIFICATION, WAS ADMITTED INTO

22              EVIDENCE.)

23    BY MR. MCELHINNY:

24    Q    OTHER THAN TV COMMERCIALS, SIR, WHAT OTHER

25    KINDS OF ADVERTISING HAVE YOU DONE FOR THE IPHONE
```

1    AND THE IPAD?

2    A    WE DO A LOT OF ADVERTISING.  WE ADVERTISE ON

3    MAGAZINES, NEWSPAPERS, OUTDOORS ON BILLBOARDS AND

4    BUS SHELTERS, MANY PLACES.

5    Q    WHAT KINDS OF MAGAZINES DO YOU -- IN WHAT KIND

6    OF MAGAZINES DO YOU ADVERTISE?

7    A    WELL, IT'S IMPORTANT WHEN WE PICK MEDIA, BE IT

8    TV SHOWS OR MAGAZINES, WE TRY TO PICK PUBLICATIONS

9    THAT FIT WELL WITH APPLE'S IMAGE, REALLY HIGH, WHAT

10   WE DO OF OUR HIGH QUALITY AND BEST OF CLASS.

11           AND WE ALSO TRY TO PICK NATIONWIDE,

12   LARGEST REACH PUBLICATIONS.  SO SOMETHING THAT'S A

13   NATIONAL TOP NEWSPAPER MAGAZINE WOULD BE THE

14   TYPICAL PLACE YOU WOULD FIND OUR ADS.

15   Q    IF YOU WOULD LOOK, PLEASE, AT EXHIBIT PX 11,

16   WHAT IS THAT?

17   A    PX 11 IS A DOCUMENT THAT SHOWS EXAMPLES OF

18   SOME OF OUR PRINT AND OUTDOOR ADVERTISEMENTS.

19           MR. MCELHINNY:  YOUR HONOR, I'D MOVE PX

20   11.

21           THE COURT:  ANY OBJECTION, MR. PRICE?

22           MR. PRICE:  NO ADDITIONAL OBJECTIONS.

23           THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

24           (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

25           11, HAVING BEEN PREVIOUSLY MARKED FOR

1          IDENTIFICATION, WAS ADMITTED INTO

2          EVIDENCE.)

3     BY MR. MCELHINNY:

4     Q    ARE YOU FAMILIAR WITH THE EXPRESSION "PRODUCT

5     PLACEMENT"?

6     A    YES.

7     Q    WHAT IS "PRODUCT PLACEMENT"?

8     A    IT IS QUITE COMMON IN OUR INDUSTRY TO, AS

9     MARKETING, TO TRY TO GET YOUR PRODUCT PLACED ON A

10    TV SHOW, MOVIE, ANYTHING THAT COULD HELP GET

11    ATTENTION ON IT AND VISIBILITY TO IT.

12    Q    AND DOES YOUR DEPARTMENT WORK IN THE FIELD OF

13    PRODUCT PLACEMENT?

14    A    YES, WE DO.

15    Q    WHAT KINDS OF THINGS DO YOU DO?

16    A    WE WOULD LOVE TO SEE OUR PRODUCT USED BY STARS

17    ON MOVIES, ON TV SHOWS, AND WE HAVE A PERSON WHO

18    HELPS PROVIDE PRODUCTS TO PEOPLE WHO WANT TO DO

19    THAT.

20    Q    ARE YOU FAMILIAR WITH THE EXPRESSION "BUZZ

21    MARKETING"?

22    A    YES, I AM.

23    Q    AND WHAT IS "BUZZ MARKETING"?

24    A    BUZZ MARKETING IS A TERM FOR GRASSROOTS

25    MARKETING DESIGNED TO CREATE EXCITEMENT AROUND A

1    PRODUCT OUTSIDE OF THE NORMAL METHODS OF

2    ADVERTISEMENT AND DIRECT MAIL, AND WE HAVE A PERSON

3    WHO DOES THAT AT APPLE AS WELL.

4    Q    AND GIVE US EXAMPLES.  I MEAN, WHAT DOES --

5    HOW DOES THAT HAPPEN IN THE REAL WORLD?

6    A    WHAT OFTEN HAPPENS IS THESE PRODUCT PLACEMENTS

7    WILL HAVE AN ACTOR OR A DIRECTOR WHO WILL CONTACT

8    THE PERSON AT APPLE WHO DOES BUZZ MARKETING AND ASK

9    IF THEY CAN GET A DEVICE OR A PRODUCT TO USE IN

10   THEIR SHOW OR THEIR MOVIE.

11   Q    IF YOU LOOK, PLEASE, AT TAB PX 14.  WHAT IS PX

12   14, SIR?

13   A    IT IS A DVD AND A LIST OF ACTUAL CLIPS FROM

14   POPULAR NEWS AND TV SHOWS THAT INCLUDE SOME OF OUR

15   PRODUCTS.

16   Q    SO IT'S A DVD THAT SHOWS CLIPS FROM TV SHOWS

17   IN WHICH APPLE PRODUCTS HAVE APPEARED; IS THAT

18   CORRECT?

19   A    YES.

20   Q    AND THEN A SUMMARY CHART THAT TELL US WHAT'S

21   ON THE DVD; IS THAT CORRECT?

22   A    YES.

23            MR. MCELHINNY:  YOUR HONOR, I'D MOVE PX

24   14 BOTH AS TO THE CHART AND THE DVD.

25            MR. PRICE:  NO ADDITIONAL OBJECTIONS AS

1    TO THE CHART.  BUT I DO AS TO THE DVD.

2              THE COURT:  UNDERSTOOD.  SO THE CHART IS

3    COMING IN.  I WILL RESERVE ON THE DVD UNTIL AFTER

4    THE BREAK.

5              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

6              14, CHART, HAVING BEEN PREVIOUSLY MARKED

7              FOR IDENTIFICATION, WAS ADMITTED INTO

8              EVIDENCE.)

9              THE COURT:  GO AHEAD, PLEASE.

10   BY MR. MCELHINNY:

11   Q    CAN YOU LOOK AT EXHIBIT PX 16?

12   A    YES.

13   Q    WHAT IS PX 16, SIR?

14   A    THIS IS A CHART THAT SHOWS APPLE'S U.S.

15   EXPENSES FOR IPHONE AND IPAD ADVERTISING.

16   Q    WHAT INFORMATION IS THIS CHART BASED ON?

17   A    MY TEAM COMPILED THIS FROM OUR OWN FINANCIAL

18   TRACKING OF ADVERTISING DOLLARS THAT WE SPENT.

19   Q    AND IF YOU LOOK AT PX 33, WHAT IS THAT

20   DOCUMENT?

21   A    THIS IS THE ACTUAL TABLE OF DATA THAT WENT

22   INTO CREATING THAT CHART.

23              MR. MCELHINNY:  YOUR HONOR, I MOVE PX 16

24   AND PX 33.

25              THE COURT:  ANY OBJECTION?

```
 1            MR. PRICE:  NO ADDITIONAL OBJECTION.
 2            THE COURT:  ALL RIGHT.  THEY'RE ADMITTED.
 3            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBERS
 4            16 AND 33, HAVING BEEN PREVIOUSLY MARKED
 5            FOR IDENTIFICATION, WERE ADMITTED INTO
 6            EVIDENCE.)
 7            MR. MCELHINNY:  CAN WE SEE PX 16, PLEASE.
 8   Q    HOW MUCH DID APPLE SPEND IN THE YEAR 2008 ON
 9   IPHONE ADVERTISING?
10   A    $97.5 MILLION IN THE UNITED STATES.
11   Q    AND HOW MUCH IN 2009, SIR?
12   A    $149.6 MILLION.
13   Q    JUST BASED ON THIS CHART, CAN YOU GIVE US SOME
14   SORT OF AN ESTIMATE OF HOW MUCH YOU SPENT ON
15   ADVERTISING -- IPHONE ADVERTISING IN THE
16   UNITED STATES THROUGH JUNE OF 2010?
17   A    LET'S SEE.  WELL, IN JUNE OF 2010, WE SPENT
18   173.3 MILLION -- EXCUSE ME -- IN ALL OF 2010, 173.3
19   MILLION.
20            OUR FISCAL YEAR STARTS IN OCTOBER, SO BY
21   JUNE WE'RE THREE-QUARTERS THROUGH THE YEAR, AND
22   ALSO PAST THE BIGGEST PART OF THE YEAR, WHICH IS
23   THE HOLIDAY SEASON.
24            SO WE CERTAINLY WOULD HAVE SPENT
25   THREE-QUARTERS OF THAT MONEY, OR AT LEAST 120, 130
```

1    MILLION BY THEN.

2    Q    CAN YOU GIVE US THE SAME ESTIMATE FOR THE

3    IPAD, SIR?

4    A    THE IPAD, IN 2010, AT THAT POINT WE HAD SPENT

5    149.5 MILLION.  SO, AGAIN, WE WOULD HAVE SPENT

6    ABOUT THREE-QUARTERS OF THAT AT THAT POINT OF THE

7    YEAR IN JUNE AS WELL.

8    Q    AND BASED ON -- THIS IS A QUESTION THAT MIGHT

9    GET YOU FIRED, OKAY?  ARE YOU READY FOR THIS ONE?

10            HAS YOUR ADVERTISING CAMPAIGN BEEN

11   SUCCESSFUL?

12   A    I BELIEVE SO.

13   Q    AND WHAT'S YOUR BASIS FOR THAT?

14   A    WELL, I THINK BOTH THE IPHONE AND THE IPAD

15   HAVE BECOME FAMOUS, WELL KNOWN, RECOGNIZED BY

16   PEOPLE ALL AROUND THE WORLD, AND CERTAINLY HERE IN

17   THE U.S.

18            I THINK THEY'RE VERY SOUGHT AFTER,

19   DESIRED, AND VERY WELL IDENTIFIED.

20   Q    OKAY.  AND IN YOUR -- BASED ON YOUR

21   EXPERIENCE, HAS THIS PRODUCT AS HERO APPROACH

22   PLAYED ANY PART IN THAT SUCCESS THAT YOU JUST TOLD

23   US ABOUT?

24   A    YES.  I BELIEVE OUR MARKETING STRATEGY, THE

25   WAY WE DO ADVERTISING, THE PRODUCT AS HERO HAS

1   CREATED THAT IDENTITY, THAT VISUAL IMPACT OF THAT

2   FAMOUS PRODUCT FROM APPLE.

3               MR. MCELHINNY:  IS THIS A GOOD TIME, YOUR

4   HONOR?

5               THE COURT:  YES, PLEASE.

6               LET'S GO AHEAD AND TAKE A 15-MINUTE BREAK

7   UNTIL 10:30.  AGAIN, PLEASE KEEP AN OPEN MIND.

8   PLEASE DON'T DISCUSS THE CASE WITH ANYONE.  DON'T

9   DO ANY RESEARCH.  DON'T READ ANY NEWS ACCOUNTS OR

10  ANYTHING ELSE.

11              ALL RIGHT.  THANK YOU FOR YOUR PATIENCE

12  AND YOUR SERVICE.  WE'LL SEE EVERYBODY BACK AT

13  10:30.

14              (WHEREUPON, A RECESS WAS TAKEN.)

15              (WHEREUPON, THE FOLLOWING PROCEEDINGS

16  WERE HELD OUT OF THE PRESENCE OF THE JURY:)

17              THE COURT:  YES.  LET'S BRING IN THE

18  JURY.

19              (WHEREUPON, THE FOLLOWING PROCEEDINGS

20  WERE HELD IN THE PRESENCE OF THE JURY:)

21              THE COURT:  ALL RIGHT.  THE TIME IS NOW

22  10:36, AND THE OBJECTION TO EXHIBITS 12 AND 13 AND

23  14, THE CD'S THAT ACCOMPANY THE CHARTS, IS

24  SUSTAINED AS CUMULATIVE UNDER 403.  SO THEY'RE NOT

25  COMING IN.

```
 1              GO AHEAD, PLEASE.

 2              MR. MCELHINNY:  CAN I HAVE PX 16 UP,

 3    PLEASE.

 4    Q    SIR, CAN YOU GIVE US, AGAIN, ONE OF THESE

 5    ESTIMATES ABOUT WHAT -- HOW MUCH APPLE SPENT ON

 6    IPAD ADVERTISING THROUGH THE BEGINNING OF JUNE,

 7    2011?

 8    A    BY JUNE -- BY 2011, WE HAD SPENT A TOTAL OF

 9    307 MILLION, SO BY JUNE, WHICH IS JUST A FEW MONTHS

10    BEFORE THAT, WE WOULD HAVE SPENT -- AND THIS IS

11    ABOUT THREE-QUARTERS OF THE YEAR AND PAST THE

12    BIGGEST SEASON OF THE HOLIDAYS, SO THREE-QUARTERS

13    OF THAT AT LEAST, IF NOT MORE.

14              SO I WOULD SAY AT LEAST 230 MILLION OR

15    MORE DOLLARS IN U.S. ADVERTISING.

16    Q    SIR, I WANT TO ASK YOU ABOUT A DIFFERENT

17    SUBJECT MATTER.

18              IS SAMSUNG ONE OF APPLE'S COMPETITORS IN

19    THE SMARTPHONE MARKET?

20    A    YES.

21    Q    CAN YOU IDENTIFY FOR US ANY SAMSUNG PRODUCTS

22    THAT HAVE COMPETED WITH APPLE'S SMARTPHONES?

23    A    THEY HAVE MANY SMARTPHONES THAT COMPETE WITH

24    US.  PROBABLY THE BEST KNOWN LINE OF THEIRS IS THE

25    GALAXY LINE, WHICH THERE'S ACTUALLY MANY MODEL, THE
```

```
1    GALAXY S, S II, S III.  THERE'S A BUNCH OF VARYING

2    SUBBRAND NAMES UNDER THOSE.  I DON'T KNOW ALL OF

3    THEM.

4    Q    DOES APPLE COMPETE WITH SAMSUNG IN THE TABLET

5    MARKET?

6    A    YES, WE DO.

7    Q    IN WHICH, IF ANY, RETAIL CHANNELS DO APPLE AND

8    SAMSUNG SELL THEIR PHONES AND TABLETS?

9              MR. PRICE:  OBJECT.  THAT'S VAGUE AS TO

10   TIME, YOUR HONOR.

11             THE COURT:  SUSTAINED.

12   BY MR. MCELHINNY:

13   Q    SINCE THE IPHONE WAS RELEASED, HAVE APPLE AND

14   SAMSUNG SOLD THEIR PHONES THROUGH THE SAME RETAIL

15   CHANNELS?

16             MR. PRICE:  I'LL OBJECT.  IT'S VAGUE.  IS

17   HE ASKING FOR THE ENTIRE TIME?

18             THE COURT:  CAN YOU JUST CLARIFY YOUR

19   QUESTION, PLEASE?

20             MR. MCELHINNY:  SURE.

21   Q    WOULD YOU LOOK, PLEASE, AS EXHIBIT PX -- PDX

22   13.

23   A    YES.

24   Q    WHAT IS PDX 13, SIR?

25   A    IT IS A CHART THAT SHOWS A NUMBER OF THE SALES
```

```
 1    CHANNELS THAT BOTH APPLE AND SAMSUNG SELL OUR
 2    PRODUCTS THROUGH IN THE U.S.
 3              MR. MCELHINNY:  YOUR HONOR, I'D LIKE TO
 4    PUBLISH PDX 13.
 5              MR. PRICE:  MY OBJECTION IS THAT THE
 6    CHART ALSO IS VAGUE AS TO TIME.
 7              MR. MCELHINNY:  I'VE GIVEN THEM SPECIFIC
 8    TIMES, SINCE THE PRODUCTS WERE RELEASED, WHEN THEY
 9    COMPETED IN THESE SPECIFIC CHANNELS.
10              THE COURT:  ALL RIGHT.  OVERRULED.
11              WHAT ABOUT TO THE EXHIBIT, MR. PRICE, PDX
12    13?
13              MR. MCELHINNY:  IT'S A DEMONSTRATIVE,
14    YOUR HONOR.
15              THE COURT:  OKAY.  GO AHEAD.
16    BY MR. MCELHINNY:
17    Q    WHAT DOES THIS DEMONSTRATIVE TELL US, SIR?
18    A    THIS SHOWS A LIST OF APPLE'S SALES CHANNELS
19    THAT YOU WOULD FIND OUR PRODUCTS SOLD IN THE U.S.,
20    AS WELL AS A LIST OF SAMSUNG'S SALES CHANNELS.
21    Q    AND IS THERE AN OVERLAP WHERE ONE CHANNEL IS
22    SELLING BOTH PRODUCTS AT THE SAME TIME?
23    A    YES.  YOU WILL SEE ACROSS THE MAJORITY OF ALL
24    APPLE SALES CHANNELS, THERE ARE ALSO SAMSUNG
25    PRODUCTS SOLD IN MOST OF ALL OF THOSE CHANNELS AND
```

```
 1    STORES AS WELL.
 2    Q     DO YOU REMEMBER, SIR, THE FIRST TIME THAT YOU
 3    SAW A GALAXY S PHONE OR THE IMAGE OF ONE?
 4    A     I RECALL HAVING FIRST SEEN THE GALAXY S PHONE
 5    WHEN IT WAS ANNOUNCED.
 6    Q     AND AS THE HEAD OF MARKETING, DO YOU KEEP
 7    TRACK OF WHAT'S GOING ON AND WHAT'S THE COMPETITION
 8    IN THOSE MARKETS?
 9    A     BY KEEPING TRACK, OF COURSE I READ EVERYTHING
10    I CAN I AND JUST REALLY TRY TO KEEP TRACK OF THOSE
11    MARKETS, YES.
12    Q     WHAT WAS YOUR REACTION WHEN YOU SAW THE
13    GALAXY S PHONE FOR THE FIRST TIME?
14              MR. PRICE:  YOUR HONOR, I OBJECT.  IT'S
15    IMPROPER -- OBJECTION.  IT'S IMPROPER LAY OPINION.
16              MR. MCELHINNY:  THIS IS THE HEAD OF
17    MARKETING WHO MARKETS IN COMPETITION, YOUR HONOR,
18    AND THIS IS -- THIS IS CLASSIC LAY OPINION.
19              THE COURT:  ALL RIGHT.  OVERRULED.
20              GO AHEAD.
21              THE WITNESS:  YES, I RECALL HOW I FELT
22    WHEN I FIRST SAW THE GALAXY S SMARTPHONE.
23    BY MR. MCELHINNY:
24    Q     AND WHAT WAS YOUR REACTION AS A MARKETER?
25    A     I WAS PRETTY SHOCKED AT THE APPEARANCE OF THE
```

1    GALAXY S PHONE AND THE EXTENT TO WHICH IT APPEARED

2    TO COPY APPLE'S PRODUCT AND THE PROBLEMS THAT WOULD

3    CREATE FOR US AS A MARKETING TEAM.

4    Q    WHAT KIND OF PROBLEMS DOES COPYING CAUSE FOR

5    APPLE IN THE MARKETPLACE?

6            MR. PRICE:  I'LL OBJECT.  THAT'S VAGUE

7    AND AMBIGUOUS AND NOT RELEVANT TO THIS TRIAL UNLESS

8    HE'S TALKING ABOUT THESE PRODUCTS.

9            MR. MCELHINNY:  YOUR HONOR, THIS IS THE

10   EFFECT ON COMPETITION.  THIS IS THE HEAD OF OUR

11   MARKETING.  I KNOW THEY DON'T WANT TO HEAR THE

12   TESTIMONY, BUT --

13           THE COURT:  ALL RIGHT.  I'M GOING TO

14   OVERRULE IT.

15           GO AHEAD.

16   BY MR. MCELHINNY:

17   Q    WHY IS COPYING A PROBLEM FOR APPLE, SIR?

18   A    IT'S A -- IT CREATES A HUGE PROBLEM IN

19   MARKETING ON MANY LEVELS.  WHEN WE CREATE

20   MARKETING -- WE TALKED ABOUT HOW WE MARKET OUR

21   PRODUCT AS THE HERO AND HOW DISTINCTIVE IT IS AND

22   WHAT CUSTOMERS SEE WHEN THEY LOOK AT THAT PRODUCT

23   AND HOW CONSISTENT WE'VE KEPT IT OVER TIME.

24           NOW, WHEN SOMEONE COMES UP WITH A PRODUCT

25   THAT COPIES, THAT COPIES THAT DESIGN AND COPIES

1    THAT MARKING, THEN CUSTOMERS CAN GET CONFUSED ON

2    WHOSE PRODUCT IS WHOSE.

3         A SIMPLE EXAMPLE.  WE HAVE SHOWN OUR

4    OUTDOOR BILLBOARDS.  IF YOU'RE DRIVING DOWN THE

5    HIGHWAY 55 MILES AN HOUR, YOU HAVE A SPLIT SECOND

6    TO SEE A PHONE ON A BILLBOARD.  IF IT LOOKS VERY,

7    VERY SIMILAR AND IS COPIED, WHOSE PHONE WAS THAT?

8    DO YOU HAVE TIME TO REALIZE?

9         IT ABSOLUTELY IMPACTS THE ABILITY TO

10   MARKET OUR DISTINCTIVE PRODUCT.

11        SAME THING WITH TV ADVERTISING.  IF

12   YOU'RE WATCHING A FOOTBALL GAME AND YOU GO TO GET

13   UP DURING THE ADS FOR A SECOND AND GET SOMETHING TO

14   EAT AND YOU CATCH OUT OF THE CORNER OF YOUR EYE A

15   TV AD THAT COMES ON FOR A PHONE, WHOSE PHONE WAS

16   THAT?  IF IT LOOKS THE SAME, YOU CAN'T TELL ANY

17   LONGER.

18        SO WE WENT FROM HAVING SOMETHING EASY TO

19   MARKET BECAUSE IT WAS SO DISTINCTIVE AND SO FAMOUS

20   TO NOW BEING MORE CHALLENGING TO MARKET BECAUSE

21   SOMETHING LOOKS A LOT LIKE IT AND CAN CONFUSE

22   CUSTOMERS.

23   Q    SIR, YOU WEREN'T HERE DURING THE OPENING

24   STATEMENTS BY THE LAWYERS, BUT THERE WAS A LOT OF

25   DISCUSSION ABOUT COMPETITION.  AND I WANT TO ASK

```
 1    YOU, AS THE HEAD OF MARKETING, ARE YOU OPPOSED TO

 2    COMPETITION, SIR?

 3    A    NO.  COMPETITION IS GREAT.

 4    Q    ARE YOU -- CAN YOU GIVE US EXAMPLES OF WHAT

 5    YOU CONSIDER TO BE FAIR COMPETITION?

 6    A    EVERY DAY THERE ARE COMPANIES CREATING

 7    PRODUCTS TO COMPETE WITH US, AND THEY CREATE THEIR

 8    OWN PRODUCTS, THEIR OWN UNIQUE DESIGNS, THEIR OWN

 9    UNIQUE FEATURES TO LOOK DISTINCTIVE AS WE DO, AND

10    WE LET THE CUSTOMER DECIDE WHO'S RIGHT, WHO'S MADE

11    THE BETTER PRODUCT, WHO'S GOT THE DESIGN THAT THEY

12    LIKE, CAME UP WITH THE IDEAS THEY BEST LIKE, AND

13    THAT'S FAIR, OPEN COMPETITION.

14    Q    AS YOU DEFINED "FAIR COMPETITION," IS COPYING

15    FAIR COMPETITION?

16    A    NOT AT ALL.

17    Q    AND WHY NOT?

18    A    BECAUSE WHEN YOU COPY OR STEAL THE IDEA OF ONE

19    COMPANY'S PRODUCT, NOW YOU'RE TRADING OFF OF ALL

20    THAT INVESTMENT IN MARKETING, ALL THAT GOOD WILL

21    WE'VE CREATED WITH CUSTOMERS TO SAY THIS IS THE

22    BEST PRODUCT, THIS IS WHAT IT LOOKS LIKE, THIS IS

23    WHAT IT DOES.

24         AND WHEN YOU RIP THAT OFF, YOU'RE TRYING

25    TO GET ALL OF THAT BENEFIT ONTO YOURSELF.  YOU'RE
```

```
 1     TAKING ALL OF OUR INVESTMENT.  WE'VE SHOWN THE

 2     CHARTS OF THE HUNDREDS OF MILLIONS OF DOLLARS WE'VE

 3     SPENT MARKETING THE IPHONE AND THE WAY IT LOOKS,

 4     AND IF YOU STEAL THAT, WELL, NOW YOU'RE TRYING TO

 5     STEAL ON THAT TOTAL INVESTMENT AND ALL THE VALUE

 6     WE'VE CREATED.

 7     Q    DO YOU RECALL THE FIRST TIME THAT YOU SAW A

 8     GALAXY TABLET PRODUCT?

 9     A    I SURE DO.

10     Q    AND WHAT WAS YOUR REACTION AT THAT POINT AS A

11     MARKETER?

12            MR. PRICE:  OBJECTION, YOUR HONOR, FOR

13     THE RECORD.

14            THE COURT:  OVERRULED.

15            GO AHEAD.

16            THE WITNESS:  EVEN MORE SHOCKED.  MY

17     FIRST THOUGHT WAS, "WOW, THEY'VE DONE IT AGAIN.

18     THEY'RE JUST GOING TO COPY OUR WHOLE PRODUCT LINE."

19     BY MR. MCELHINNY:

20     Q    SIR, AGAIN, BASED ON YOUR EXPERIENCE AND WHAT

21     YOU DO EVERYDAY, IS THE CONDUCT THAT WE'RE TALKING

22     ABOUT IN THIS CASE, IS IT HAVING AN EFFECT ON APPLE

23     IN THE MARKETPLACE?

24            MR. PRICE:  OBJECTION.  THIS IS

25     INAPPROPRIATE LAY OPINION.  UNDISCLOSED.
```

```
1              MR. MCELHINNY:  THIS IS PERCIPIENT

2    TESTIMONY, YOUR HONOR.

3              THE COURT:  IT'S OVERRULED.

4              GO AHEAD.

5              THE WITNESS:  I BELIEVE IT'S HAVING A

6    LARGE IMPACT ON THE MARKETPLACE.

7    BY MR. MCELHINNY:

8    Q    AND CAN YOU TELL US THE KINDS OF IMPACTS THAT

9    IT IS HAVING?

10   A    I THINK HAVING COPYCAT PRODUCTS IN THE

11   MARKETPLACE MAKES OUR JOB AS A MARKETING TEAM MUCH

12   MORE DIFFICULT.  IT CONFUSES THE CUSTOMER ON WHO'S

13   THE CREATOR OF THESE PRODUCTS.

14             IT DIMINISHES THE VALUE THAT WE'VE

15   INVESTED IN AND BUILT OR THAT CUSTOMERS SEE APPLE

16   AS THE INVENTOR OF THESE PRODUCTS, THE DESIGNER OF

17   THESE BEAUTIFUL THINGS.

18             AND IT CREATES NOW -- IT DIMINISHES THAT

19   VALUE AND IT DILUTES THE WAY CUSTOMERS SEE APPLE.

20   Q    HAS THIS -- IN YOUR VIEW AS THE HEAD OF

21   MARKETING, HAS THIS CONDUCT THAT WE'RE TALKING

22   ABOUT HAD AN EFFECT ON APPLE'S SALES?

23             MR. PRICE:  OBJECTION, YOUR HONOR.

24   THAT'S IMPROPER LAY OPINION.

25             THE COURT:  OVERRULED.
```

```
 1              THE WITNESS:  I ABSOLUTELY BELIEVE IT'S
 2    HAD AN IMPACT ON OUR SALES.
 3    BY MR. MCELHINNY:
 4    Q    AND WE'LL HAVE EXPERTS COME IN TO TALK ABOUT
 5    THE NUMBERS LATER, BUT WHAT IS THE OVERALL EFFECT,
 6    SIR?
 7    A    ONE OF THE JOBS OF MY TEAM IS THE FORECASTING
 8    PROCESS AND UNDERSTANDING IMPACTS OF THESE THINGS,
 9    AND WE HAVE TO GUESS AT THIS EVERY DAY.
10              AND IT IS OUR BELIEF THAT CUSTOMERS, SOME
11    CUSTOMERS ARE CHOOSING TO BUY A SAMSUNG PRODUCT
12    BECAUSE ONE OF THE THINGS IT DOES IS LOOK A LOT
13    LIKE THE IPHONE, A LOT LIKE THE IPAD.
14              I ALSO THINK IT HAS AN EFFECT AROUND
15    THOSE FIRST PURCHASES WHERE SUBSEQUENT PURCHASES
16    THEN ARE AFFECTED BECAUSE YOU'RE USED TO AN
17    ECOSYSTEM THAT YOU'VE STARTED ON, AND THE PEOPLE
18    AROUND YOU ARE AFFECTED BECAUSE IF ONE PERSON IN
19    YOUR FAMILY HAS A CERTAIN PRODUCT THAT RUNS A
20    CERTAIN OPERATING SYSTEM AND USES CERTAIN
21    APPLICATIONS, OTHERS ARE MORE LIKELY IN THAT FAMILY
22    TO CHOOSE A SIMILAR PRODUCT.
23              SO I THINK IT HAS EFFECTS IN THE INITIAL
24    SALES, AS WELL AS ON RELATED SALES.
25              MR. MCELHINNY:  THANK YOU, MR. SCHILLER.
```

```
 1                    I HAVE NO FURTHER QUESTIONS AT THIS TIME.

 2                    THE COURT:  ALL RIGHT.  THE TIME IS NOW

 3       10:47.

 4                    GO AHEAD, PLEASE, MR. PRICE.

 5                         CROSS-EXAMINATION

 6       BY MR. PRICE:

 7       Q    GOOD MORNING.  IT'S GOOD MORNING.  GOOD

 8       MORNING, MR. SCHILLER.

 9                    WHILE THE BINDERS ARE BEING DISTRIBUTED,

10       I'LL TRY TO ASK YOU SOME QUESTIONS THAT DON'T

11       CONCERN THEM.

12                    AND YOU WERE TESTIFYING ABOUT, OBVIOUSLY,

13       THAT IPHONE, IPAD MADE A SPLASH WHEN THEY WERE

14       LAUNCHED; RIGHT?

15       A    YES.

16       Q    AND I'M GOING TO TALK ABOUT THE IPHONE FIRST.

17                    NOW, THERE WERE SOME PHONES IN THE MARKET

18       IN 2007 THAT HAD THE HARD KEYBOARDS; CORRECT?

19       A    HARD?  I DON'T KNOW WHAT YOU MEAN BY "HARD

20       KEYBOARDS."

21       Q    THE ONES THAT YOU ACTUALLY HAD TO PUSH A

22       BUTTON INSTEAD OF BEING ON THE SCREEN?

23       A    A PHYSICAL KEYBOARD, YES, MOST PHONES AT THE

24       TIME HAD THAT.

25       Q    BEING ABLE TO PUT A KEYBOARD ON A PHONE ON A
```

1    SCREEN WAS SOMETHING THAT RESULTED BECAUSE OF

2    ADVANCED IN TECHNOLOGY; CORRECT?

3    A    I CAN'T SPEAK FOR OTHER COMPANIES.  I CAN ONLY

4    SAY THAT AT APPLE, WE WORKED REALLY HARD TO CREATE

5    A SOFT KEYBOARD ON THE SCREEN OF THE IPHONE.

6    Q    OKAY.  AND APPLE IN THIS CASE, YOUR

7    UNDERSTANDING, AS A MEMBER OF THE EXECUTIVE TEAM,

8    ISN'T SAYING THAT, YOU KNOW, OTHER COMPANIES CAN'T

9    PUT A SOFT KEYBOARD ON A SCREEN; RIGHT?

10   A    I DON'T KNOW THAT ANYONE HAS SAID THAT.

11   Q    SO ONCE THAT TECHNOLOGY IS AVAILABLE TO PUT,

12   YOU KNOW, A SOFT KEYBOARD ON A SCREEN, THAT WOULD

13   MEAN THAT YOU CAN MAKE THE SCREEN LARGER ON THE

14   PHONE; RIGHT?

15   A    I DON'T THINK THERE'S A DIRECT CORRELATION

16   THAT YOU HAVE TO MAKE A SCREEN LARGER FOR A

17   KEYBOARD OR SMALLER FOR NOT A KEYBOARD.  I THINK

18   THESE ARE TWO FACTORS THAT HAVE SOME RELATIONSHIP,

19   BUT THERE'S NOT A CAUSE AND EFFECT THAT ONE MUST BE

20   THE OTHER.

21   Q    WELL, MY QUESTION IS THIS:  IF YOU HAVE A

22   PHONE AND YOU HAVE A HARD KEYBOARD ON HALF OF IT,

23   WHICH YOU KIND OF HAVE TO HAVE SOME KIND OF

24   KEYBOARD IF YOU'RE GOING TO SEND MESSAGES AND

25   STUFF; RIGHT?

1   A    MANY PHONES WERE CREATED WITHOUT A KEYBOARD ON

2   THEM BEFORE THE IPHONE.  THEY HAD A TEN-KEY KEYPAD

3   WITH NUMBERS AND PEOPLE -- I USED TO DO A LOT OF

4   TEXTING WHERE I WOULD HIT A NUMBER TWICE AND THAT

5   BECAME A LETTER, AND THIS WAS A POPULAR WAY TO DO

6   TEXTING ON KEYBOARDS BEFORE LARGER QWERTY

7   KEYBOARDS.

8   Q    THE POINT IS THAT ONCE YOU CAN PUT EVERYTHING

9   ON THE SCREEN BY HAVING A TOUCHSCREEN, YOU CAN MAKE

10  THAT SCREEN LARGER ON THE PHONE; RIGHT?

11  A    I THINK YOU CAN ALWAYS MAKE THE SCREEN LARGER

12  ON A PHONE.  I'M NOT SURE OF THE DIRECT CORRELATION

13  BETWEEN KEYBOARDS AND SCREEN SIZE.

14  Q    OKAY.  SO IF SOMEONE HAD AN OLD PHONE THAT HAD

15  KEYS LIKE THIS, IF YOU REMOVE THOSE, YOU CAN MAKE

16  THE SCREEN LARGER; RIGHT?

17              MR. MCELHINNY:  YOUR HONOR, I'M NOT SURE

18  THE RECORD IS CLEAR WHAT MR. PRICE IS POINTING TO

19  IN HIS HAND.

20              MR. PRICE:  IT'S A DEMONSTRATIVE.  IT'S

21  MY PHONE, ON OLD ONE.  I'D RATHER NOT PUT IT INTO

22  EVIDENCE.

23              MR. MCELHINNY:  WE DON'T WANT IT IN

24  EVIDENCE.  WE'D LIKE THE RECORD TO REFLECT WHAT

25  HE'S USING.

```
 1              MR. PRICE:  THANK YOU.  IT'S AN ANCIENT

 2    BLACKBERRY SOMEWHERE OUT OF THE CLOSET.

 3    Q    IN OTHER WORDS, IF YOU HAVE A HARD SCREEN, IF

 4    THE TECHNOLOGY ALLOWS YOU TO USE A TOUCHSCREEN,

 5    THAT YOU CAN REMOVE THIS; RIGHT?  THAT'S ALL?

 6    A    A TOUCHSCREEN ALLOWS YOU TO REMOVE A PHYSICAL

 7    KEYBOARD, SURE.

 8    Q    OKAY.  AND THERE WERE PHONES, OR YOU WERE AT

 9    LEAST AWARE OF ONE, THAT HAD A FULL TOUCHSCREEN

10    BEFORE THE IPHONE WENT INTO THE MARKET; CORRECT?

11    A    I'M NOT SURE WHAT YOU'RE REFERRING TO WHEN YOU

12    SAY I'M AWARE OF ONE.

13    Q    YOU WERE HEAD OF MARKETING, SO YOU WERE AWARE

14    OF THE MARKET; CORRECT?

15    A    YES.

16    Q    AND YOU WERE AWARE OF THE LG PRADA PHONE?

17    A    I'VE HEARD OF THE PRADA PHONE, YES.

18              MR. PRICE:  LET ME SHOW YOU WHAT'S BEEN

19    MARKETED AS 1093 FOR IDENTIFICATION.  IT'S JOINT

20    EXHIBIT 1093.

21              MAY I APPROACH, YOUR HONOR?

22              THE COURT:  GO AHEAD, PLEASE.

23    BY MR. PRICE:

24    Q    SO YOU SEE THAT PHONE HAS, YOU KNOW, A FULL --

25    IT LOOKS LIKE A FULL TOUCHSCREEN ON IT.  DO YOU SEE
```

1    THAT?

2    A    IT HAS A SCREEN ON IT.  IT'S -- I WOULDN'T

3    CONSIDER IT A TOUCH LIKE TODAY'S PRODUCTS, BUT IT

4    HAS A SCREEN ON IT.

5    Q    AND, AGAIN, THAT MEANS THAT YOU CAN HAVE MORE

6    REAL ESTATE SPACE ON THAT PHONE DEVOTED TO THAT

7    SCREEN IF YOU CAN TOUCH IT TO TYPE?

8    A    AGAIN, I THINK THESE ARE UNRELATED FACTORS.

9    THERE ARE OTHER PHONES THAT HAVE LARGE SCREENS THAT

10   PUT THE KEYBOARD BEHIND THE SCREEN.  I'M POINTING

11   OUT THERE ARE MANY WAYS TO GET THERE.

12   Q    THERE ARE OTHER WAYS TO MAKE IT LARGE AS WELL,

13   BUT I'M SAYING IF YOU CAN DO THE TOUCHSCREEN

14   TECHNOLOGY, WHICH YOU'RE NOT CLAIMING APPLE

15   EXCLUSIVELY OWNS, YOU CAN MAKE THE SCREEN BIGGER;

16   RIGHT?

17   A    THAT'S ONE OF THE WAYS.

18   Q    AND IF YOU LOOK AT EXHIBIT 578 FOR

19   IDENTIFICATION, IT SHOULD BE IN THE BINDER WHICH

20   HOPEFULLY HAS APPEARED IN FRONT OF YOU NOW.

21   A    YES.

22   Q    AND DOES THIS APPEAR TO YOU TO BE AN E-MAIL

23   WITHIN APPLE FROM A MR. SINCLAIR AND AN ERIC JUE TO

24   A KELLY ALTICK?

25   A    THIS IS AN E MEAL FROM KELLY ALTICK TO

1    MR. SINCLAIR.

2    Q    THANK YOU VERY MUCH.  WHO IS MR. SINCLAIR?

3    A    HE IS A PRODUCT MANAGER ON MY TEAM.

4    Q    IT'S ACTUALLY A STRING OF E-MAILS.  DO YOU SEE

5    THAT?

6    A    YES, THERE ARE A NUMBER OF E-MAILS REFERENCED

7    IN HERE.

8    Q    AND ON THE SECOND PAGE, DO YOU SEE IT SAYS ON

9    APRIL 6TH, 2010, STEVE SINCLAIR WROTE; CORRECT?

10   A    YES, I SEE THAT.

11            MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 578

12   INTO EVIDENCE.

13            THE COURT:  ANY OBJECTION?

14            MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

15            THE COURT:  IT'S ADMITTED.

16            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

17            578, HAVING BEEN PREVIOUSLY MARKED FOR

18            IDENTIFICATION, WAS ADMITTED INTO

19            EVIDENCE.)

20            MR. PRICE:  AND IF WE COULD PUT UP THAT

21   SECOND PAGE AND JUST BLOW UP THE PART THAT STARTS

22   HERE WITH STEVE SINCLAIR, RIGHT HERE ON DOWN, THERE

23   WE GO.

24   Q    AND DO YOU SEE MR. SINCLAIR WRITES, "IT'S

25   TOUCH TO APPROACH THIS WITH THE CRITERIA BEING

```
1    'FIRST,'" AND THIS WAS IN CONNECTION WITH A

2    MARKETING APPROACH THAT WAS BEING DISCUSSED; RIGHT?

3    A    THIS WAS A DISCUSSION BETWEEN STEVE SINCLAIR

4    AND THE AD TEAM ON SOME CLAIMS.

5    Q    "AD" BEING ADVERTISING?

6    A    YES.

7    Q    OKAY.  AND HE SAYS, "I DON'T KNOW HOW MANY

8    THINGS WE CAN COME UP WITH THAT YOU COULD

9    LEGITIMATELY CLAIM WE DID FIRST.  CERTAINLY WE HAVE

10   THE FIRST COMMERCIALLY SUCCESSFUL VERSIONS OF MANY

11   FEATURES."

12             AND I JUST WANT TO GO, "THE FIRST PHONE

13   TO INCORPORATE A FULL TOUCHSCREEN FACE," AND IT

14   SAYS, "NOT TRUE," AND YOU SEE THERE'S THAT

15   WIKIPEDIA SITE TO A PRODUCT, THE LG PRADA.

16             DO YOU SEE THAT?

17   A    I SEE THAT.

18             MR. PRICE:  AND BY THE WAY, YOUR HONOR, I

19   MOVE THE PRADA INTO EVIDENCE, IF I CAN REMEMBER THE

20   EXHIBIT NUMBER.  DOES IT HAVE A NUMBER ON THE BACK?

21   1093.

22             THE COURT:  OKAY.  ANY OBJECTION?

23             MR. MCELHINNY:  THIS IS NOT SUPPOSED TO

24   COME IN, YOUR HONOR, PURSUANT TO YOUR ORDER ABOUT

25   THE SPECIFIC LIMITING INSTRUCTION WHICH HAS NOT
```

1    BEEN PREPARED YET.  BUT IT IS NOT PRIOR ART AS THAT

2    TERM IS USED AND WILL BE USED BY THE JURY.

3              MR. PRICE:  AND WE'RE NOT -- THIS

4    EXAMINATION IS NOT TALKING ABOUT PRIOR ART.

5              MR. MCELHINNY:  SO IT'S NOT RELEVANT TO

6    THE VALIDITY OF ANY OF OUR PATENTS AT ISSUE, YOUR

7    HONOR.

8              THE COURT:  ALL RIGHT.  SO WHAT -- IT'S

9    1093?

10             MR. PRICE:  YES, YOUR HONOR.

11             THE COURT:  ALL RIGHT.  SO THE LIMITING

12   INSTRUCTION IS THAT THIS EXHIBIT, OR I GUESS THIS

13   PHONE, IS ADMITTED, BUT IT IS NOT PRIOR ART FOR

14   PURPOSES OF ANY INVALIDITY OF THE PATENTS.  OKAY?

15             SO YOU CAN CONSIDER IT.

16             MR. PRICE:  THANK YOU, YOUR HONOR.

17             THE COURT:  IT'S IN EVIDENCE.

18             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

19             1093, HAVING BEEN PREVIOUSLY MARKED FOR

20             IDENTIFICATION, WAS ADMITTED INTO

21             EVIDENCE.)

22             THE COURT:  GO AHEAD.

23   BY MR. PRICE:

24   Q    TO BE CLEAR, THERE'S NO PATENT THAT HAS BEEN

25   ASSERTED HERE THAT SAYS THAT THE TOUCHSCREEN, THAT

1    APPLE OWNS THAT EXCLUSIVELY; RIGHT?

2    A    I'M NOT CERTAIN.  I KNOW THERE'S SOME

3    TOUCHSCREEN PATENTS INVOLVED.  I DON'T KNOW EXACTLY

4    WHICH ONES AND HOW TO SUMMARIZE THAT.

5    Q    OKAY.  WELL, IF -- YOU UNDERSTAND, AS SOMEONE

6    WHO'S IN MARKETING, THAT THERE IS AN ADVANTAGE TO

7    HAVING A LARGER SCREEN ON THE PHONE?

8    A    TO AN EXTENT OF THE THERE ARE TIMES WHEN IT IS

9    AND TIMES WHEN IT CAN BECOME A DISADVANTAGE.

10   Q    SO IT'S A FUNCTIONAL ADVANTAGE IF, FOR

11   EXAMPLE, YOU WANT TO WATCH MOVIES; RIGHT?

12             MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.

13   IF YOU THINK IT IS A TERM OF ART AND IT'S A LEGAL

14   EXPRESS WHICH HE JUST SUBSTITUTED INTO HIS

15   QUESTION.  WE DON'T HAVE A DEFINITION OF FUNCTIONAL

16   AS HE'S USING IT.

17             THE COURT:  WHY DON'T YOU REPHRASE YOUR

18   QUESTION.

19             MR. PRICE:  SURE.

20   Q    YOU BELIEVE THAT A LARGER SCREEN PROVIDES

21   ADVANTAGES TO A CONSUMER IF THE CONSUMER WANTS TO

22   WATCH A MOVIE?

23   A    THERE ARE TIMES WHEN A LARGER SCREEN IS A

24   BENEFIT AND ONE OF THOSE WOULD BE WATCHING A MOVIE.

25   Q    OKAY.  AND THAT IT'S AN ADVANTAGE BECAUSE YOU

1    CAN VIEW A LARGER SECTION, FOR EXAMPLE, OF A WEB

2    PAGE?

3    A    DEPENDING ON THE SCREEN RESOLUTION, IT CAN BE

4    AN ADVANTAGE FOR THAT.

5    Q    AND IT'S YOUR EXPERIENCE THAT THESE ARE THINGS

6    WHICH CONSUMERS WANT, THAT THEY WANT SCREENS THAT

7    ARE LARGER SO THEY CAN SEE WEB PAGES, MOVIES, YOU

8    KNOW, WITHIN THE LIMIT OF THE, YOU KNOW, BEING

9    USEFUL IN YOUR HAND?

10   A    LARGER SCREENS ARE -- CAN BE A BENEFIT TO

11   USERS.  IT'S NOT THE ONLY THING THEY WANT, BUT IT'S

12   ONE THING THAT THEY WANT.

13   Q    AND WHEN, WHEN YOU -- WHEN APPLE RELEASED THE

14   IPHONE IN 2007, IT EXPECTED COMPETITION IN THE

15   SMARTPHONE INDUSTRY WITH PHONES THAT YOU COULD

16   WATCH MOVIES ON OR VIEW WEB PAGES; CORRECT?

17   A    WE EXPECTED COMPETITION IN THE SMARTPHONE

18   SPACE, YES.

19   Q    BECAUSE YOU DIDN'T THINK THAT APPLE -- APPLE

20   DIDN'T THINK THAT IT HAD THE EXCLUSIVE RIGHT TO

21   GIVE THE CONSUMER A SMARTPHONE WITH A SCREEN THAT

22   COULD EXHIBIT WEB PAGES, MOVIES, MUSIC; RIGHT?

23   A    WE DID NOT HAVE EXCLUSIVITY ON PLAYING MOVIES

24   OR MUSIC ON PHONES.

25   Q    SO LET'S TALK THEN NOW ABOUT, ABOUT OTHER

1    THINGS ABOUT THE WAY THE PHONE WORKS.

2            IF -- LET ME ASK YOU, YOU'VE HEARD THE

3    PHRASE THAT EVERYTHING DEFERS TO THE SCREEN?

4    A    NO, ACTUALLY, I DON'T RECALL THAT PHRASE.

5    Q    DO YOU REMEMBER MR. IVE SAYING SOME PHRASE

6    LIKE THAT, THAT EVERYTHING DEFERS TO THE SCREEN?

7    A    YOU MEAN JONATHAN IVE?

8    Q    YES, IVE, THANK YOU.

9    A    I DON'T RECALL THAT SAYING.

10   Q    BUT THAT'S THE IDEA FOR APPLE'S PHONES, FOR

11   EXAMPLE, IS THAT THE SCREEN KIND OF DOMINANTS THE

12   PHONE?

13           MR. MCELHINNY:  THIS IS BEYOND THE SCOPE

14   OF DIRECT EXAMINATION, YOUR HONOR, TALKING ABOUT

15   THE ELEMENTS OF THE DESIGN.

16           MR. PRICE:  HE TALKED ABOUT THE DESIGN AT

17   LENGTH.

18           THE COURT:  GO AHEAD.  OVERRULED.

19   BY MR. PRICE:

20   Q    CORRECT?

21   A    I'M SORRY.  COULD YOU REPEAT THE QUESTION.

22   Q    THE SCREEN DOMINANTS THE APPLE IPHONE;

23   CORRECT?

24   A    THE SCREEN IS ONE OF THE DOMINANT FEATURES OF

25   THE PHONE.

1    Q    AND I'M GOING TO -- WE WERE TALKING ABOUT

2    EXHIBIT 1000, WHICH WAS THE FIRST PHONE, AND YOU

3    WERE ASKED BY YOUR COUNSEL ABOUT THAT, SO WHEN THE

4    SCREEN DOMINANTS, THEN, FOR EXAMPLE, ON THE IPHONE,

5    THERE'S THESE TWO AREAS AT THE TOP AND BOTTOM,

6    FAIRLY SMALL AREAS COMPARED TO THE SCREEN; CORRECT?

7    A    YEAH, THERE ARE AREAS ON THE TOP AND BOTTOM OF

8    THE PHONE AND THE SCREEN AS WELL.

9    Q    AND IN THAT REGARD, APPLE'S PHILOSOPHY HAS

10   BEEN LET'S MAKE THIS REALLY CLEAN AND NOT HAVE

11   APPLE ON IT AND JUST HAVE A SPEAKER AND HAVE WHAT

12   IS CALLED THE HOME BUTTON; CORRECT?

13   A    OUR PHILOSOPHY IS TO CREATE ONE SEAMLESS FACE

14   ON THE FRONT FOR THE SCREEN AND THE AREA ABOVE AND

15   BELOW IT.  THAT'S OUR PHILOSOPHY ON THAT.

16   Q    SO IF YOU'VE GOT A TOUCHSCREEN, AND MOST

17   PEOPLE HOLD THEIR PHONES LIKE I'M HOLDING THIS IN

18   MY HAND NOW, RIGHT (INDICATING)?

19   A    THAT'S ONE WAY TO HOLD IT.

20   Q    VERY RARELY, WHEN MAKING A CALL, FOR EXAMPLE,

21   DO PEOPLE HOLD PHONES LIKE THIS WITH ONE FINGER,

22   RIGHT (INDICATING)?

23   A    I HOLD IT LIKE THAT WHEN I MAKE A CALL

24   (INDICATING).

25   Q    NOW, WHEN YOU HAVE A TOUCHSCREEN, YOU HAVE TO

1    DO SOMETHING ON THE EDGES HERE SO THAT YOUR FINGERS

2    AREN'T TOUCHING THAT SCREEN AND, AND DOING

3    SOMETHING THAT YOU DON'T WANT IT TO DO; RIGHT?

4    A    NO.  IT'S MUCH MORE COMPLICATED THAN THAT.

5    Q    WELL, YOU DON'T WANT TO HAVE SOMEONE

6    ACCIDENTALLY TOUCHING THE PHONE WHEN THEY'RE

7    HOLDING IT THE WAY THAT THEY WOULD NORMALLY HOLD IT

8    FOR A CALL; CORRECT?

9    A    AGAIN, I'M NOT SURE WHAT YOU MEAN.  YOU DO

10   WANT PEOPLE TO TOUCH THEIR PHONE WHEN THEY'RE

11   HOLDING IT TO MAKE A CALL AND IT WILL TOUCH THE

12   SCREEN.

13   Q    THE SCREEN.  YOU DON'T WANT PEOPLE TO -- IF

14   IT'S AN INTERACTIVE TOUCHSCREEN, YOU DON'T WANT

15   PEOPLE TO ACCIDENTALLY TOUCH IT WHILE THEY'RE

16   MAKING A CALL.  THAT WOULD BE A PROBLEM THAT WOULD

17   BE KIND OF AN INCONVENIENCE?

18   A    WELL, THEY WILL FROM TIME TO TIME TOUCH IT, SO

19   WE'VE INVENTED WAYS TO, TO KEEP THAT FROM CREATING

20   CONTACTS THAT YOU DON'T WANT OR SIGNALS THAT YOU

21   DON'T WANT TO HAPPEN ON YOUR CALL, YES.

22   Q    AND WHAT APPLE HAS DONE HERE, AT LEAST ON THE

23   FIRST IPHONE, IT HAS THIS METAL BEZEL AND IT HAS

24   THESE VERY SMALL DARK LINES DOWN THE SIDE WHICH ARE

25   NOT PART OF THE ACTUAL INTERACTIVE SCREEN; RIGHT?

1    A    THERE ARE -- THERE IS A BORDER AROUND THE

2    SCREEN THAT'S VERY SMALL, YES.

3    Q    AND THAT BORDER, IF YOU TOUCH IT, IT WON'T DO

4    ANYTHING TO MAKE THE PHONE FUNCTION; RIGHT?

5    A    IF YOU'RE NOT TOUCHING THE TOUCHSCREEN, YOU'RE

6    NOT -- EXCEPT FOR, OF COURSE, THE HOME BUTTON AND

7    THE BUTTONS ON THE SIDE, YOU'RE NOT INTERACTING

8    WITH IT; CORRECT.

9    Q    AND YOU NEED A SPEAKER AT THE TOP TO HEAR?

10   A    YOU NEED A SPEAKER TO HEAR, UNLESS YOU'RE

11   USING A HEAD SET.

12   Q    AND IF YOU'RE GOING TO HAVE A CAMERA, YOU NEED

13   SOMETHING ON THE TOP FOR A CAMERA; CORRECT?

14   A    FOR A FRONT FACING CAMERA, YES.

15   Q    AND THESE AREAS THAT ARE DARK, YOU KNOW, ABOVE

16   AND BELOW THE SCREEN, DO THEY HIDE INTERNAL WIRING

17   AND COMPONENTS?

18   A    THERE ARE COMPONENTS BEHIND EVERY PART OF THE

19   IPHONE, THE SCREEN AND THE TOP AND BOTTOM, AND

20   ALONG THE BOTTOM AS WELL.

21   Q    NOW, ANOTHER THING, THESE ARE ROUNDED.  I

22   ASSUME YOU THOUGHT THAT CUSTOMERS MIGHT PUT THESE

23   PHONES IN THEIR POCKETS.

24   A    WE CERTAINLY ASSUME CUSTOMERS PUT THEIR PHONE

25   IN THEIR POCKET.  I WOULDN'T SAY THAT'S WHY IT'S

1      ROUNDED.  THAT'S NOT THE ONLY REASON.

2      Q    IT MAY NOT BE THE ONLY REASON, BUT IF IT'S

3      SQUARE, THAT WOULD MAKE IT MORE DIFFICULT FOR A

4      CUSTOMER TO TAKE THEIR PHONE OUT OF THEIR POCKET?

5      A    IT DEPENDS.  THERE ARE WAYS TO HANDLE THAT NO

6      MATTER WHAT THE SHAPE IS.  SO I WOULDN'T SAY THAT'S

7      A GUARANTEED RULE.  I'VE SEEN SQUARE PHONES THAT

8      WORK JUST FINE IN YOUR POCKETS.

9      Q    YOU THINK THAT JUST GENERALLY, USING YOUR

10     COMMON SENSE, IT WOULD BE MORE DIFFICULT TO TAKE A

11     SQUARE PHONE OUT OF YOUR POCKET BECAUSE IT MIGHT

12     CATCH ON SOMETHING?

13     A    I THINK IT DEPENDS ON THE SIZE, BUT ROUNDED

14     CORNERS CERTAINLY HELP YOU MOVE THINGS IN AND OUT

15     OF YOUR POCKET.

16     Q    NOW, YOU SAID THAT YOU WERE INVOLVED IN THE

17     DEVELOPMENT OF THE IPHONE; RIGHT?

18     A    YES.

19     Q    AND YOU SAID THAT YOU THOUGHT IT WAS, I THINK,

20     BEAUTIFUL, UNIQUE, DISTINCTIVE; CORRECT?

21     A    YES.

22     Q    AND WE SHOWED THAT PICTURE IN 2011, AFTER

23     MR. JOBS PASSED AWAY, AND THEY HAD THE IPHONES AND

24     YOU SAID YOU COULD IMMEDIATELY RECOGNIZE THOSE AS

25     IPHONES; CORRECT?

1   A    YES, I DID.

2   Q    BECAUSE THEY WERE SO UNIQUE; RIGHT?

3   A    YES.

4   Q    SO I THEN HEARD YOU TESTIFY FROM, I GUESS,

5   MR. MCELHINNY SAYING THAT YOU BELIEVED THERE WAS

6   CONSUMER CONFUSION REGARDING THE IPHONE AND

7   SAMSUNG'S PRODUCTS; RIGHT?

8   A    I SAID -- I EXPLAINED AN EXAMPLE BOTH WITH TV

9   ADS AND OUTDOOR ADVERTISING HOW IT WOULD CREATE

10  CONFUSION AND IF THE USER SEES EITHER A SAMSUNG OR

11  AN APPLE PHONE, THE MORE THAT A SAMSUNG PHONE

12  COPIES AN APPLE PHONE, THE HARDER IT IS TO TELL

13  WHICH IS WHICH IN SITUATIONS LIKE I DESCRIBED,

14  DRIVING BY A BILLBOARD OR WATCHING TV AND MOVING

15  OUT OF THE ROOM.

16  Q    LET'S TALK ABOUT HOW, ABOUT HOW -- YOUR

17  UNDERSTANDING OF HOW CONSUMERS OVER THE YEARS HAVE

18  BUILT THESE SMARTPHONES.

19         THEY'RE FAIRLY EXPENSIVE COMPARED TO

20  OTHER PHONES; CORRECT?

21  A    NOT NECESSARILY.

22  Q    OKAY.  WOULD YOU SAY $500, $600 IS EXPENSIVE?

23  A    THE IPHONE STARTS AT FREE WHEN YOU PURCHASE

24  IT -- IN THE U.S., THE PREDOMINANT NUMBER OF

25  CUSTOMERS BUY IT WITH A CONTRACT AND IT'S FREE.

682

1    Q    THE CURRENT IPHONE ALSO?  MODELS?

2    A    THE IPHONE 3GS STARTS AT FREE, YES.

3    Q    I'M TALKING ABOUT THE LATEST AND GREATEST

4    MODELS THAT YOU COME OUT WITH AND THERE'S A BIG

5    SPLASH OF MEDIA, THEY'RE KIND OF EXPENSIVE?  SOME

6    PEOPLE DON'T BUY THEM BECAUSE THEY'RE EXPENSIVE?

7    A    SOME PEOPLE DO, SOME DON'T.  THEY

8    TRADITIONALLY START AT ABOUT $199 UNDER A CONTRACT.

9    SO DEPENDING ON YOUR PERSPECTIVE WHETHER THAT'S

10   EXPENSIVE OR NOT.

11   Q    AND YOUR RESEARCH TELLS YOU THAT PEOPLE

12   USUALLY CONSIDER THEIR PHONE PURCHASE CAREFULLY

13   WHEN THEY'RE BUYING SUCH A PERSONAL AND PRICED

14   ITEM?

15   A    I DON'T RECALL ANY SPECIFIC RESEARCH ABOUT THE

16   CARE SOMEONE TAKES IN AN INDIVIDUAL PURCHASE.

17   Q    YOU'VE HAD EXPERIENCE GOING INTO STORES;

18   CORRECT?

19   A    I HAVE GONE INTO STORES.

20   Q    AND IN THE STORES, THE IPHONE PRODUCTS ARE

21   SEGREGATED, AT THE CARRIERS, FROM SAMSUNG PRODUCTS;

22   RIGHT?

23   A    IT DEPENDS ON THE STORE AND THE SETUP, BUT

24   THEY'RE NOT ALWAYS NEXT TO EACH OTHER.

25   Q    THAT'S A LITTLE BIT DIFFERENT.  EVERY STORE

```
1    YOU'VE BEEN INTO THAT'S A CARRIER, THE IPHONE

2    PRODUCTS ARE SEGREGATED FROM THE SAMSUNG PRODUCTS;

3    RIGHT?

4    A    AGAIN, I'M NOT SURE BY SEGREGATED WHAT YOU

5    MEAN, BUT USUALLY THEY'RE DISPLAYED SEPARATELY FROM

6    EACH OTHER.

7    Q    AND YOU ARE SAYING THAT THE IPHONE IS CONFUSED

8    WITH SAMSUNG PHONES.  YOU KNOW THERE ARE A NUMBER

9    OF PHONES THAT ARE, THAT ARE ACCUSED IN THIS CASE;

10   RIGHT?

11   A    YES, I BELIEVE THERE ARE A NUMBER OF PHONES

12   THAT HAVE COPIED THE IPHONE, YES.

13   Q    AND SO IS IT YOUR TESTIMONY THAT IF YOU LOOK

14   AT THESE PHONES, THEN CUSTOMERS ARE GOING TO BE

15   CONFUSED ABOUT ALL THE PHONES THAT ARE ACCUSED IN

16   THIS CASE?

17   A    I BELIEVE CUSTOMERS CAN BE CONFUSED.

18          AND, AGAIN, I WAS SPEAKING SPECIFICALLY

19   ABOUT ALL THE MARKETING EFFORT AND I BELIEVE

20   THEY'RE CREATING CONFUSION THERE.

21   Q    WELL, LET ME SHOW YOU WHAT HAS BEEN MARKED AS

22   EXHIBIT 1016.  THIS IS A, A JOINT EXHIBIT.  IT'S

23   ONE OF THE ACCUSED PRODUCTS.  IT'S THE CONTINUUM.

24          IF I MAY APPROACH, YOUR HONOR?

25          THE COURT:  GO AHEAD, PLEASE.
```

```
 1    BY MR. PRICE:
 2    Q    SO THAT'S ONE OF THE PHONES YOU BELIEVE PEOPLE
 3    WOULD CONFUSE FOR AN IPHONE (HANDING)?
 4    A    YES.
 5    Q    AND I'D LIKE YOU TO LOOK IN YOUR BINDER,
 6    THERE'S A DEMONSTRATIVE --
 7              MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.
 8    I'D LIKE TO CORRECT THE RECORD.  THIS PHONE IS
 9    ACTUALLY NOT ACCUSED OF INFRINGING THE DESIGN
10    PATENTS.  IT'S ACCUSED OF INFRINGING THE UTILITY
11    PATENTS.
12              MR. PRICE:  AND TRADE DRESS.
13              THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.
14    BY MR. PRICE:
15    Q    SO IF YOU LOOK IN THE BINDER, THERE'S SDX
16    3557, WHICH IS A DEMONSTRATIVE.  IT'S AT THE FRONT
17    OF THE BINDER.  IT SHOULD BE UNDER DEMONSTRATIVES.
18    A    I'M SORRY.
19              MR. MCELHINNY:  WHAT'S THE NUMBER?
20              MR. PRICE:  IT'S 3557.  YOUR HONOR, IF I
21    MAY ASSIST THE WITNESS?
22              THE COURT:  GO AHEAD, PLEASE.
23              MR. PRICE:  IT SHOULD BE RIGHT AT THE
24    FRONT WHERE IT SAYS DEMONSTRATIVES, MEANING THESE
25    DON'T GO INTO EVIDENCE.
```

```
 1              MR. MCELHINNY:  YOUR HONOR, THERE IS AN

 2    OBJECTION PENDING ON THIS WHICH YOU HAVE NOT RULED

 3    ON AND IT SHOULDN'T BE PUBLISHED.

 4              MR. PRICE:  TAKE IT DOWN, PLEASE.

 5              AND SO OUR REQUEST OF MR. MCELHINNY CAN

 6    STATE THAT, THAT WE SHOW DEMONSTRATIVE 3557.

 7              THE COURT:  ALL RIGHT.  WHAT'S THE

 8    OBJECTION?

 9              MR. MCELHINNY:  COUNSEL JUST AGREED, THIS

10    IS RELEVANT TO THE TRADE DRESS ISSUES.  IT DOESN'T

11    SHOW THE TRADE DRESS, YOUR HONOR.  THEY BLANKED OUT

12    THE SCREEN.

13              MR. PRICE:  WE CAN DO DIFFERENT ELEMENTS,

14    YOUR HONOR.  THIS IS THE --

15              MR. MCELHINNY:  AH, THE

16    ELEMENT-BY-ELEMENT ARGUMENT, WHICH IS ABSOLUTELY

17    INCORRECT AS A MATTER OF LAW BECAUSE AS YOUR HONOR

18    HAS SAID, MANY TIMES YOU HAVE TO LOOK AT THE

19    OVERALL APPEARANCE OF A PRODUCT.

20              THE COURT:  UNDERSTOOD.  BUT I'M GOING TO

21    OVERRULE THE OBJECTION.

22              GO AHEAD, MR. PRICE.

23              MR. PRICE:  NOW, IF YOU CAN PUT 3557 UP.

24    Q    NOW, FIRST, YOU'VE SAID THAT -- WELL, YOU CAN

25    SEE THE SCREENS ARE DIFFERENT SHAPES?  RIGHT?
```

```
 1    A    THEY'RE BOTH RECTANGLES BUT OF DIFFERENT

 2    SIZES.

 3    Q    OKAY.  SO HERE'S WHAT I WANT TO ASK YOU ABOUT

 4    THEN.  DO YOU SEE ON THE, ON THE SAMSUNG PHONE, IT

 5    HAS THESE FOUR, IT LOOKS LIKE FOUR BUTTONS HERE?

 6    A    THE ONE YOU HANDED ME DOES NOT.

 7    Q    BUT WHEN YOU TURN IT ON IT DOES.  IT'S A SOFT

 8    BUTTON THAT HIGHLIGHTS WHEN IT'S ON.

 9    A    WHEN IT'S ON I SEE THOSE, YES.

10         MR. MCELHINNY:  AGAIN, YOUR HONOR, NOW

11    THEY'VE TURNED ON THE PARTS THEY WANT AND TURNED

12    OFF THE PARTS THEY DON'T WANT.  IT'S NOT EVEN A

13    FAIR PICTURE.  IT'S PART ON AND PART OFF.

14         MR. PRICE:  NO, YOUR HONOR, IF YOU IGNORE

15    THE SCREEN, WHICH HE'S SAYING THEY DON'T HAVE.

16         MR. MCELHINNY:  IT'S TRADE DRESS.

17         THE COURT:  WHY IS THIS SCREEN WHITED

18    OUT?

19         MR. PRICE:  WE COULD MAKE IT BLACK.  I

20    MEAN, IT'S WHITED OUT --

21         THE COURT:  BUT FOR TRADE DRESS, WHY IS

22    THE SCREEN MISSING IF THIS IS FOR THE TRADE DRESS

23    CLAIM?

24         MR. PRICE:  BECAUSE I'M FOCUSSING ON

25    SPECIFIC AREAS OF THE PHONE, AND ONE CAN DO THAT TO
```

1    GO WITH AN OVERALL IMPRESSION AS TO WHETHER OR NOT

2    IT'S CONFUSING.

3            THE COURT:  ALL RIGHT.  GO AHEAD.

4            MR. PRICE:  POINT OUT DISTINGUISHING

5    CHARACTERISTICS.

6            THE COURT:  GO AHEAD, PLEASE.

7    BY MR. PRICE:

8    Q    HERE WE GO.  THESE ARE SOFT BUTTONS.  SO MY

9    QUESTION IS YOU SAID YOU WERE INVOLVED IN THE

10   DEVELOPMENT OF THE IPHONE; RIGHT?

11   A    YES.

12   Q    WHY DIDN'T APPLE PUT FOUR BUTTONS LIKE THIS AT

13   THE BOTTOM OF ITS PHONE?

14   A    OF THIS PHONE, I'M SORRY -- WELL, WE DIDN'T

15   MAKE THAT PHONE.

16   Q    I'M SORRY.  I SHOULD HAVE SAID FOR THE RECORD,

17   WHY DIDN'T APPLE PUT FOUR BUTTONS AT THE BOTTOM OF

18   ANY OF ITS IPHONES?

19   A    BECAUSE WE BELIEVED THE EASIEST DESIGN FOR THE

20   IPHONE IS A SINGLE HOME BUTTON UNDER THE SCREEN.

21   Q    AND THAT SINGLE HOME BUTTON THE SCREEN IS ON

22   EVERY IPHONE AND IPAD PRODUCT THAT HAS EVER BEEN

23   RELEASED; CORRECT?

24   A    THE HOME BUTTON IS ON EVERY IPHONE AND IPAD.

25   Q    AND KIDS REFER TO IT AS THE BELLYBUTTON.  HAVE

1    YOU HEARD THAT?

2    A    NO, I HAVE NOT.

3    Q    IT'S AN INNIE.  IT'S RECESSED.  DO YOU SEE

4    THAT?

5              AND IT'S THE ONLY COMMON ELEMENT ON, ON

6    ALL THE APPLE PRODUCTS; CORRECT?

7    A    NO.

8    Q    EVERY ONE?

9    A    NO.  I DON'T KNOW WHY YOU SAY THAT'S THE ONLY.

10   IT'S A COMMON ELEMENT.  I WOULDN'T SAY IT'S THE

11   ONLY COMMON ELEMENT.

12   Q    SO IS ONE OF THE REASONS YOU DIDN'T PUT THESE

13   FOUR BUTTONS AT THE BOTTOM, IS YOUR THOUGHT IT

14   WOULD BE UNATTRACTIVE, NOT AS BEAUTIFUL?

15   A    WE PUT IT THERE BECAUSE THAT ISN'T HOW OUR

16   SYSTEM WORKS.  THAT'S HOW ANDROID WORKS.  NOT HOW

17   OUR IOS WORKS.

18   Q    I'M SORRY?

19   A    THAT'S HOW ANDROID WORKS.  NOT PART OF OUR

20   INTERFACE.

21   Q    AS PART OF THE DESIGN, YOU CAN PUT BUTTONS ON

22   THE BOTTOM OF THE IPHONE?

23   A    YOU ASKED WHY WE DIDN'T, AND MY ANSWER IS

24   BECAUSE THAT'S NOT HOW IT WORKS ON IOS.  THAT'S HOW

25   ANDROID WORKS.

1    Q    OKAY.  SO IF YOU WOULD -- YOU COULD HAVE, YOU

2    WOULD HAVE PUT FOUR BUTTONS ON THE BOTTOM OF THE

3    IPHONE?

4    A    WE CHOSE TO HAVE ONE BUTTON ON THE SCREEN

5    UNDER THE IPHONE, SIR.

6    Q    AND THAT WAS A DESIGN CHOICE?

7    A    THAT WAS A CHOICE WE MADE BECAUSE WE THOUGHT

8    IT WAS THE EASIEST TO USE WAY FOR THE IPHONE TO

9    WORK.

10   Q    WAS IT A -- SO WAS IT A FUNCTIONAL CHOICE OR A

11   DESIGN CHOICE?

12   A    IT'S ACTUALLY RELATED TO BOTH.  IT'S IN THE

13   DESIGN AND IT'S HOW THE SYSTEM WORKS.

14   Q    HOW ABOUT UP HERE, DO YOU SEE THAT THERE'S,

15   THERE'S NOTHING EXCEPT FOR THE SPEAKER, THERE'S NO

16   LABEL LIKE HERE IT SAYS VERIZON, WHY DIDN'T YOU PUT

17   APPLE OR SOMETHING AT THE TOP THERE?

18   A    TWO REASONS.  FIRST, I BELIEVE THE DESIGN OF

19   THE IPHONE IS DISTINCT AND UNIQUE AND PEOPLE DO

20   RECOGNIZE IT AS APPLE'S, AND ON THE BACK IS A

21   REALLY LARGE APPLE LOGO ON THE BACK OF THE IPHONE.

22   Q    BUT THE REASON YOU DIDN'T PUT IT ON THE FRONT

23   IS BECAUSE YOU AND MR. STRINGER THOUGHT THIS WOULD

24   KIND OF RUIN THE UNIQUE LOOK THAT APPLE WAS GOING

25   FOR; RIGHT?

```
 1    A    NO, I THINK WE CHOSE NOT TO BECAUSE IT'S A
 2    SMALL DEVICE AND THERE WAS ALREADY A LARGE LOGO ON
 3    THE BACK.
 4    Q    IF MR. STRINGER SAID THIS WAS A DESIGN CHOICE
 5    AND YOU DIDN'T WANT AN UGLY APPLE AT THE TOP, WOULD
 6    YOU DISAGREE WITH HIM?
 7    A    I DON'T KNOW WHAT HE SAID, SO I DON'T WANT TO
 8    HYPOTHESIZE ON WHAT HE MAY OR MAY NOT HAVE SAID.
 9    Q    OKAY.  WELL, YOU'LL CERTAINLY -- IF WE LOOK AT
10    THE REAL ESTATE ON THE PHONE THAT'S NOT THE SCREEN,
11    YOU CAN CERTAINLY SAY THAT THERE'S A DIFFERENT
12    DESIGN ON THIS REAL ESTATE, THAT IS, THE TOP WHERE
13    YOU HAVE THE VERIZON AND THE BOTTOM WHERE APPLE
14    JUST HAS THE HOME BUTTON?
15    A    WHAT YOU CALL THE SCREEN AND THE FRONT OF THE
16    PHONE, I CONSIDER TO BE THE WHOLE FACE OF THE
17    PHONE, AND SO BY SHOWING THE SCREEN FAKED OUT WITH,
18    WHITED OUT LIKE THIS, YOU GIVE THE IMPRESSION THAT
19    SOMEHOW THEY'RE DIFFERENT SURFACES.
20         BUT TO ME, THE FRONT OF THE IPHONE IS ONE
21    SURFACE.  THE SCREEN IS, IS PART OF THAT ENTIRE
22    FRONT FACE.
23         AND SO THE WAY YOU DESCRIBED IT ISN'T THE
24    WAY I WOULD DESCRIBE IT.  I LOOK AT THAT AS THE
25    ENTIRE FRONT FACE OF THE PHONE.
```

1   Q    WHEN A BUYER BUYS THE PHONE, OF COURSE IT

2   LOOKS AT THE ENTIRE PHONE; RIGHT?

3   A    YES, THEY LOOK AT THE WHOLE PHONE.

4   Q    THAT'S FAIR?  AND YOUR VIEW IS THE BUYER WOULD

5   CONFUSE THE CONTINUUM FOR AN IPHONE?

6   A    I THINK IT'S POSSIBLE FOR BUYERS TO GET

7   CONFUSED AS THEY'RE STARTING TO COPY AND LOOK A LOT

8   MORE LIKE AN IPHONE AND COPY OUR DESIGN.

9   Q    AND AS A MEMBER OF THE EXECUTIVE COMMITTEE

10  TEAM, YOU -- IS IT YOUR UNDERSTANDING THAT APPLE IS

11  ASKING FOR ABOUT $45 MILLION ON THIS ALONE, JUST

12  THIS PHONE?

13  A    I DON'T KNOW THE FINANCES OF EACH DEVICE AND

14  WHAT'S BEING ARGUED HERE.

15  Q    LET ME SHOW YOU WHAT'S BEEN MARKED AS EXHIBIT

16  1027.  THIS IS A JOINT EXHIBIT.  THIS IS THE

17  INFUSE 4G.

18          AND I WOULD MOVE INTO EVIDENCE EXHIBIT

19  1016, WHICH IS THE JOINT EXHIBIT, THE CONTINUUM

20  PHONE.

21          MR. MCELHINNY:  NO OBJECTION.

22          THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

23          (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

24          1016, HAVING BEEN PREVIOUSLY MARKED FOR

25          IDENTIFICATION, WAS ADMITTED INTO

```
 1                    EVIDENCE.)
 2      BY MR. PRICE:
 3      Q     AND DO YOU HAVE 1027 IN FRONT OF YOU?
 4      A     THE DEVICE, YES.
 5                    THE COURT:  YOU WANT TO MOVE 1016 AND
 6      1027?
 7                    MR. PRICE:  YES, YOUR HONOR.
 8                    THE COURT:  OKAY.  NO OBJECTION, RIGHT?
 9                    MR. MCELHINNY:  NO OBJECTION.
10                    THE COURT:  THEY'RE BOTH ADMITTED.
11                    (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
12                    1027, HAVING BEEN PREVIOUSLY MARKED FOR
13                    IDENTIFICATION, WAS ADMITTED INTO
14                    EVIDENCE.)
15                    THE COURT:  GO AHEAD, PLEASE.
16      BY MR. PRICE:
17      Q     AND IF YOU LOOK AT THAT PHONE, AND ALSO LOOK,
18      WE'RE STILL AT THE DEMONSTRATIVES THERE, A COUPLE
19      PAGES IN THERE'S A 3559.
20                    IF WE CAN DISPLAY THAT, YOUR HONOR?
21                    THE COURT:  DO YOU WANT THE INFUSE 4?  DO
22      YOU WANT 3561?
23                    MR. PRICE:  IT WOULD BE 3559, 3560 --
24      YOU'RE RIGHT, YOUR HONOR.  I'M SORRY.  YOU'RE
25      ABSOLUTELY RIGHT.  3561.
```

```
 1            THE COURT:  OKAY.

 2            MR. MCELHINNY:  AGAIN, YOUR HONOR, THERE

 3   ARE OBJECTIONS PENDING FOR THE SAME REASON.  AGAIN,

 4   THEY'VE BLACKED OUT THE ENTIRE SCREEN.

 5            THE COURT:  UNDERSTOOD.  OVERRULED.

 6            KEEP GOING, PLEASE.

 7            MR. PRICE:  THANK YOU.

 8   Q    SO THIS PHONE ACTUALLY HAS FOUR HARD BUTTONS

 9   AT THE BOTTOM; RIGHT?

10   A    THE ONE ON THE SLIDE?

11   Q    YEAH, AND THE ONE YOU HAVE, THE INFUSE 4G.

12   A    THIS -- THE DEVICE YOU'VE HANDED ME IS

13   DIFFERENT THAN THE DEVICE UP ON THE SLIDE.

14   Q    YOU MAY BE RIGHT.  IS THAT THE DROID -- WHAT'S

15   THE NUMBER ON THAT?

16   A    ANOTHER CONFUSION.  1025.

17   Q    I APOLOGIZE.  THAT'S THE DROID CHARGE.

18            IF I CAN MOVE THAT INTO EVIDENCE, YOUR

19   HONOR?

20            THE COURT:  ALL RIGHT.  THAT'S 1025.  ANY

21   OBJECTION?

22            MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

23            THE COURT:  THAT'S ADMITTED.

24            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

25            1025, HAVING BEEN PREVIOUSLY MARKED FOR
```

```
1              IDENTIFICATION, WAS ADMITTED INTO

2         EVICENCE.)

3              MR. PRICE:  AND I WOULD ASK THAT WE

4    DISPLAY 3559, YOUR HONOR.

5              THE COURT:  ALL RIGHT.

6              MR. MCELHINNY:  AGAIN, YOUR HONOR, SAME

7    OBJECTIONS.  THESE SLIDES ARE MISLEADING.

8              THE COURT:  UNDERSTOOD.

9              GO AHEAD, PLEASE.

10             THAT'S OVERRULED.

11   BY MR. PRICE:

12   Q    AND SO THE ONE YOU HAVE, THERE ARE THESE THREE

13   HARD BUTTONS AT THE BOTTOM?

14   A    THERE ARE FOUR.

15   Q    FOUR, SORRY.  AND IT'S KIND OF CURVED?

16   A    THERE'S A POINT SORT OF TO THE BOTTOM OF THE

17   DEVICE.

18   Q    AND AT THE TOP IT SAYS VERIZON?

19   A    YES, IT DOES.

20   Q    AND IT'S YOUR UNDERSTANDING THAT IN THIS CASE

21   APPLE IS ASKING FOR ABOUT $143 MILLION ON THE BASIS

22   OF THIS PHONE?

23   A    I DON'T KNOW THE FINANCIAL CLAIMS AND

24   ARGUMENTS IN THE CASE, NO.

25   Q    I GUESS MY QUESTION, HAVE YOU ACTUALLY LOOKED
```

```
 1    AT ALL THE PHONES TO DETERMINE -- BECAUSE YOU GAVE

 2    YOUR OPINION -- WHETHER OR NOT YOU THINK THE

 3    AVERAGE CONSUMER WOULD GO TO A STORE AND BE

 4    CONFUSED AND ACCIDENTLY BUY A SAMSUNG PHONE INSTEAD

 5    OF AN IPHONE?

 6    A   YES, I DO BELIEVE THAT SOME CONFUSED --

 7    CONSUMERS CAN BE CONFUSED, AND AS I SAID, I THINK

 8    IT'S MADE THE MARKETING VERY CONFUSING AND

 9    DIFFICULT TO DO.

10    Q   MY QUESTION IS, HAVE YOU LOOKED AT ALL THE

11    PHONES THAT ARE IN THIS CASE AND ARRIVED AT THE

12    OPINION THAT ALL OF THESE PHONES WOULD BE

13    CONFUSING?

14    A   I'VE LOOKED AT THE PHONES THAT ARE INVOLVED IN

15    THIS CASE, AND I DO BELIEVE THEY CAN BE CONFUSED.

16    Q   SO THIS PHONE IS ONE OF THE ONES YOU LOOKED

17    AT, THIS SUPPORTS YOUR OPINION THAT AN AVERAGE

18    CONSUMER WOULD BE CONFUSED AND ACCIDENTALLY BUY THE

19    DROID CHARGE AND THINK IT WAS AN IPHONE?

20    A   I LOOKED AT THIS PHONE, AND IT WAS MY OPINION

21    THAT SAMSUNG HAS RIPPED OFF A NUMBER OF OUR DESIGN

22    ELEMENTS AND BY DOING THAT IS MAKING IT LOOK MORE

23    LIKE AN IPHONE AND CAUSING CONFUSION.

24    Q   MY QUESTION IS, DID YOU COME TO THE CONCLUSION

25    THAT CUSTOMERS ACCIDENTALLY BUY THE DROID CHARGE
```

1    BECAUSE THEY THINK IT'S AN IPHONE?

2    A    I BELIEVE THEY MAY GET CONFUSED WITH THE

3    DEVICES.

4    Q    AND IT'S THE "MAY" THAT HAS CAUSED APPLE TO

5    ASK FOR $143 MILLION IN DAMAGES.

6            MR. MCELHINNY:  THAT'S ARGUMENTATIVE,

7    YOUR HONOR.  THIS IS CHARGED UNDER SEVERAL PATENTS.

8    IT'S NOT 143 FOR THIS PARTICULAR CLAIM.

9            THE COURT:  OVERRULED.

10           ANSWER THE QUESTION, PLEASE.

11           THE WITNESS:  I DON'T KNOW OF THE AMOUNTS

12   BEING CLAIMED ON EACH INDIVIDUAL DEVICE.

13   BY MR. PRICE:

14   Q    LET ME ASK YOU, THEN, ABOUT WHY CUSTOMERS BUY

15   PHONES, AND YOU HAD LOOKED AT EXHIBIT 143, I

16   BELIEVE IT WAS, AND THERE ARE DOCUMENTS, AND THIS

17   IS ONE OF THE APPLE SURVEYS?

18   A    THIS IS, AS WE DISCUSSED EARLIER, AN IPHONE

19   BUYER SURVEY.

20   Q    SO THESE ARE PEOPLE WHO ARE ALREADY APPLE

21   CUSTOMERS; RIGHT?

22   A    YES.

23   Q    SO IF YOU LOOK AT THIS SURVEY, IT DOESN'T TELL

24   YOU ANYTHING ABOUT WHY APPLE LOST A SALE BECAUSE

25   THESE ARE SALES THAT APPLE WON; RIGHT?

1    A    CORRECT.  THESE ARE CUSTOMERS WHO PURCHASED

2    OUR PRODUCT.

3    Q    SO, FOR EXAMPLE, YOU WOULDN'T EXPECT TO SEE IN

4    HERE SOMEONE SAY I BOUGHT AN APPLE BECAUSE IT

5    ALLOWS ME TO LOOK AT FLASH, THE VIDEOS; RIGHT?  YOU

6    WOULDN'T EXPECT THAT?

7    A    I'M SORRY.  THAT'S NOT HOW WE RUN THE SURVEYS.

8    Q    PARDON?

9    A    WE ASK SPECIFIC QUESTIONS ON THE SURVEY, WHAT

10   YOU DESCRIBE IS MORE OF AN OPEN-ENDED DISCUSSION.

11   THAT'S NOT HOW WE RUN OUR SURVEY.

12   Q    BUT YOU WOULDN'T ASK THEM DID YOU BUY THE

13   IPHONE BECAUSE IT'S SO GOOD AT LOOKING AT VIDEOS

14   AND THE USE OF FLASH?

15   A    I WOULD NOT ASK THEM ABOUT THE USE OF FLASH ON

16   THE IPHONE.

17   Q    BECAUSE THE IPHONES DON'T DO THAT?

18   A    WE DON'T RUN FLASH PLUG INS.

19   Q    AND YOU COULDN'T ASK THEM WHETHER OR NOT THEY

20   BOUGHT THE IPHONE BECAUSE IT HAS A REPLACEABLE

21   BATTERY BECAUSE IT DOESN'T.

22          MR. MCELHINNY:  THIS IS BEYOND THE SCOPE,

23   YOUR HONOR, AND IRRELEVANT TO ANY OF THE ISSUES IN

24   THIS CASE.

25          THE COURT:  OVERRULED.

```
 1              THE WITNESS:  WE DO NOT ASK IF THEY
 2   PURCHASED THE IPHONE FOR THE FEATURE OF A REMOVAL
 3   BATTERY.
 4   BY MR. PRICE:
 5   Q    BECAUSE IT DOESN'T HAVE ONE?
 6   A    IT DOES NOT HAVE A REMOVABLE BATTERY.
 7   Q    AND YOU DIDN'T ASK THEM WHETHER THEY BOUGHT
 8   THE IPHONE BECAUSE IT HAD A BIGGER -- A 4.5 INCH
 9   SCREEN, OR EVEN A 4 INCH SCREEN?
10   A    WE DO NOT ASK THEM IF THEY BOUGHT ONE FOR
11   THOSE REASONS.
12   Q    AND THOSE MIGHT BE QUESTIONS THAT ARE RELEVANT
13   TO SOMEONE BUYING A SAMSUNG PHONE; IS THAT CORRECT?
14   A    YOU WOULD HAVE TO ASK THEM.  I DON'T DO MARKET
15   RESEARCH FOR SAMSUNG.
16   Q    THAT'S FAIR ENOUGH.
17              SO BASICALLY FROM THESE DOCUMENTS HERE,
18   YOU CAN'T MAKE ANY CONCLUSIONS AS TO WHY A SAMSUNG
19   PURCHASER BOUGHT A SAMSUNG PHONE; CORRECT?  THIS IS
20   JUST WHAT APPLE PEOPLE, THE REASON THEY -- THE
21   REASON YOU WON, THE REASON THEY BOUGHT YOUR PHONE?
22   A    THESE ARE APPLE SURVEYS, YES.
23   Q    AND THERE'S A SECTION ON EASE OF USE, AND YOU
24   DON'T ASK SPECIFICALLY WHAT -- I MEAN, YOU DON'T
25   IDENTIFY WHAT "EASE OF USE" IS IN THE SURVEY;
```

1    CORRECT?

2    A    WE ASK ABOUT EASE OF USE.  WE DON'T FURTHER

3    DEFINE IT INTO SUBCATEGORIES, NO.

4    Q    AND YOU BELIEVE THAT APPLE -- THE IPHONE HAS

5    HUNDREDS OF FEATURES THAT GO TO EASE OF USE;

6    CORRECT?

7    A    THERE ARE MANY FEATURES THAT CONTRIBUTE TO

8    EASE OF USE.

9    Q    AND THIS DOESN'T DEMONSTRATE THAT YOU LOST A

10   SINGLE CUSTOMER TO SAMSUNG BECAUSE OF THE SAMSUNG

11   APPEARANCE; CORRECT?

12   A    THIS SURVEY DOES NOT ASK THAT QUESTION OF A

13   CUSTOMER IF THEY BOUGHT A SAMSUNG DEVICE DUE TO

14   SAMSUNG APPEARANCE.

15   Q    AND IT DOESN'T TELL YOU WHETHER A PURCHASER

16   BOUGHT A SAMSUNG DEVICE OVER A -- OVER AN IPHONE

17   BECAUSE SAMSUNG HAD THREE OF HUNDREDS OF FEATURES

18   THAT THE IPHONE ALSO HAS?

19   A    THIS IS NOT A SURVEY OF SAMSUNG CUSTOMERS.

20   Q    NOW, AND IN YOUR OWN SURVEYS, YOU ASK ABOUT A

21   NUMBER OF FEATURES; THIS SOMETHING THAT'S VERY

22   IMPORTANT, YOU HAD THOSE TOP TWO CATEGORIES.  DO

23   YOU REMEMBER?

24   A    WE ASK ABOUT A NUMBER OF FEATURES AND THE

25   IMPORTANCE INTO THE BUYING DECISION.

1    Q    AND WHEN YOU ASKED THEM AND LOOKED AT THOSE

2    RELATIVELY, THOUGH, EASE OF USE, EVERYONE FOR

3    IPHONE CUSTOMERS COMPARED TO OTHERS, YOU FOUND THAT

4    THE, THE -- I'M SORRY -- THAT THE DESIGN WAS RANKED

5    RELATIVELY LOWER COMPARED TO THE OTHER QUESTIONS

6    YOU ASKED?

7    A    IT WAS LOWER THAN SOME AND HIGHER THAN OTHERS.

8    Q    SO IF YOU LOOK AT 143.22, FOR EXAMPLE, THAT'S

9    A PAGE --

10           AND I MOVE THAT INTO EVIDENCE, YOUR

11   HONOR.

12           THE COURT:  IS THAT IN YOUR BINDER?

13           MR. PRICE:  IT'S UNDER 143, WE HAVE THE

14   COMPLETE EXHIBIT, AND AT THIS POINT I'LL BE

15   OFFERING PAGES IN.  THIS IS A COMPLETE EXHIBIT OF

16   THE ONE APPLE SHOWED HIM.

17           THE COURT:  DO YOU WANT JUST 143.22?

18           MR. PRICE:  YES, RIGHT NOW.

19           THE COURT:  OKAY.  ANY OBJECTION?

20           MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

21           THE COURT:  IT'S ADMITTED.

22           (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

23           143.22 HAVING BEEN PREVIOUSLY MARKED FOR

24           IDENTIFICATION, WAS ADMITTED INTO

25           EVIDENCE.)

1    BY MR. PRICE:

2    Q    AND WHEN YOU LOOKED AT ALL OF THIS, YOU FOUND

3    THAT THE IMPORTANCE OF ATTRACTIVE APPEARANCE AND

4    DESIGN IS RATED RELATIVELY LOWER THAN THE OTHER

5    QUESTIONS YOU ASKED?

6    A    AGAIN, NOT APPARENTLY YOU WILL THE OTHER

7    QUESTIONS.  JUST SOME.

8    Q    WHAT QUESTIONS?

9    A    SPECIFICALLY, EASE OF USE RATED HIGHER THAN

10   APPEARANCE.

11   Q    OTHERS?

12   A    THERE LOOKS LIKE -- I WOULD HAVE TO TAKE A

13   MINUTE TO LOOK THROUGH.

14   Q    LIKE MULTITASKING, PRICE, ABILITY TO DOWNLOAD

15   APPS?

16   A    WELL, IT DEPENDS ON COUNTRY BY COUNTRY.  IT

17   VARIES.  BUT THOSE ARE SOMETIMES RATED HIGHER.

18   Q    AND ACTUALLY ON EASE OF USE, IF YOU LOOK AT --

19   IF YOU -- LET ME BACK UP HERE.

20        LOOKING ON THE DESIGN, YOU ALSO SUBSCRIBE

21   AND PAY FOR A SURVEY DONE BY A COMPANY CALLED

22   COM-TECH?

23   A    I'M FAMILIAR WITH THAT.

24   Q    AND IF WE CAN PUT EXHIBIT 592 IN FRONT OF YOU.

25   DO YOU SEE ON THE FRONT PAGE IT HAS THE APPLE LOGO

1    ON IT, AND ON THE SECOND PAGE, IT SAYS CONTENTS

2    UNITED STATES, AND IT HAS APPLE MARKET RESEARCH AND

3    ANALYSIS, FEBRUARY 11TH, 2011.

4              DO YOU SEE THAT?

5    A    I SEE THAT PAGE.

6    Q    SO THIS IS A SURVEY WHICH A THIRD PARTY DOES

7    AT APPLE'S -- AND APPLE BUYS THE RESULT?

8    A    CORRECT, WE BUY THE RESULTS FROM THIS COMPANY.

9    Q    AND YOU DO THAT ON A QUARTERLY BASIS?

10   A    I DON'T KNOW THAT THIS IS DONE QUARTERLY.  I

11   DON'T KNOW THE FREQUENCY OF THIS REPORT, BUT WE

12   HAVE MORE THAN ONE THAT WE'VE PURCHASED.

13             MR. PRICE:  I MOVE EXHIBIT 592 INTO

14   EVIDENCE.

15             MR. MCELHINNY:  NO OBJECTION.

16             THE COURT:  ALL RIGHT.  IT'S ADMITTED.

17             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

18             592, HAVING BEEN PREVIOUSLY MARKED FOR

19             IDENTIFICATION, WAS ADMITTED INTO

20             EVIDENCE.)

21   BY MR. PRICE:

22   Q    AND IF WE LOOK AT PAGE 23, YOU SEE THERE'S A,

23   A SECTION ON REASONS FOR PURCHASE.  DO YOU SEE

24   THAT?

25   A    I SEE THAT PAGE.

1   Q    AND WHEN WE GO ON THE LEFT, THIS IS KIND OF

2   HARD TO SEE, BUT -- BUT IF YOU GO TO THE LEFT, YOU

3   SEE IOS.  IOS IS APPLE?

4   A    YES.

5   Q    AND THE BLUE PART THERE IS THE PART THAT SAYS

6   DESIGN/COLOR.  DO YOU SEE THAT?

7   A    I SEE THAT.

8   Q    OKAY.  AND THERE ARE ABOUT 67,000 PEOPLE

9   INTERVIEWED IN THIS STUDY?  THAT'S AT 592.4.

10  A    YES, THAT'S THE NUMBER OF INTERVIEWS THEY DID.

11  Q    AND SO THEIR STUDY OF THAT LARGE POPULATION IS

12  THAT 1 PERCENT CHECKED EASY TO USE --

13  A    NO.

14  Q    -- I'M SORRY, CHECKED DESIGN/COLOR?

15  A    NO, I DON'T AGREE WITH THAT.

16  Q    THIS IS DESIGN/COLOR AND THIS IS -- DOES THAT

17  LOOK LIKE 1 PERCENT TO YOU?

18  A    SEE, I THINK WHAT'S IMPORTANT IN LOOKING AT

19  RESEARCH LIKE THIS IS UNDERSTANDING THE QUESTION

20  AND THE METHODOLOGY, AND I THINK YOU'RE COMPARING

21  IT TO THE PREVIOUS SLIDES WE'VE BEEN LOOKING AT,

22  AND THIS IS A VERY DIFFERENT METHODOLOGY THAN THE

23  TOP BOX EXAMPLE.

24  Q    WELL, SINCE I'M ON THE CLOCK, AS THE JURY

25  KNOWS, MY QUESTION WAS SIMPLY, THIS STUDY, 1

```
1    PERCENT CHOSE DESIGN COLOR AS THE REASON FOR

2    PURCHASING ON IOS; RIGHT?

3    A    AGAIN, THE ONLY -- ONLY IF YOU UNDERSTOOD WHAT

4    WAS ASKED.

5    Q    AND IF YOU LOOK AT EXHIBIT 60 -- LET'S SEE.

6    EXHIBIT 605.

7              BEFORE WE GO FROM THERE, THAT'S LESS

8    THAN -- RIM IS THE BLACKBERRY AREA; CORRECT?

9    A    I'M SORRY.

10   Q    RIM WOULD BE BLACKBERRY?

11   A    I THINK YOU'RE TOTALLY MISINTERPRETING WHAT

12   THIS CHART SAYS BY NOT EXPLAINING WHAT WAS ASKED.

13   Q    I'M ASKING WHETHER RIM IS BLACKBERRY?

14   A    SORRY, YES.  THE BLACKBERRY IS A PRODUCT MADE

15   BY RIM.

16   Q    AND THIS IS LESS THAN BLACKBERRY, 1 PERCENT

17   VERSUS 4 PERCENT?

18   A    1 PERCENT IS A LOWER NUMBER THAN 4 PERCENT.

19   Q    SO LET ME ASK YOU ABOUT THE DESIGN ITSELF.

20             AND YOU TALKED ABOUT POINT OF PURCHASE.

21   I WANT TO SWITCH TO WHEN PEOPLE ARE ACTUALLY IN THE

22   MARKET, LIKE IN NATURE WITH THEIR IPHONE, AND ASK

23   YOU, WHEN PEOPLE BUY IPHONES, WHAT YOU FOUND IS

24   THAT, IN YOUR SURVEYS, IS THAT, LIKE, 78 PERCENT,

25   70, 78 PERCENT BUY A CASE WITH IT AT THE SAME TIME?
```

```
1    A    I DON'T RECALL THAT SURVEY RESULT.

2    Q    OKAY.  IF YOU LOOK AT 143, WHICH WAS THE APPLE

3    SURVEY, AT PAGE 82, 143.82.

4              AND YOUR HONOR, I MOVE 143.82 INTO

5    EVIDENCE.

6              THE COURT:  IS THIS IN YOUR BINDER?

7              MR. PRICE:  IT IS, YOUR HONOR.  THE FULL

8    EXHIBIT, 14.

9              THE COURT:  AND YOU'RE MOVING THE WHOLE

10   THING IN?

11             MR. PRICE:  NO, JUST 143.82 BECAUSE OF

12   CONCERNS ABOUT CONFIDENTIALITY.

13             THE COURT:  ALL RIGHT.

14             MR. MCELHINNY:  NO OBJECTION.

15             THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

16             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

17             143.82, HAVING BEEN PREVIOUSLY MARKED FOR

18             IDENTIFICATION, WAS ADMITTED INTO

19             EVIDENCE.)

20   BY MR. PRICE:

21   Q    SO YOU FOUND THAT 78 PERCENT USED A CASE OR A

22   BUMPER WITH THEIR IPHONE; CORRECT?

23   A    YES, THIS SURVEY FOUND THAT, YES.

24   Q    SO ASSUMING THEY BUY IT FOR A PURPOSE, THEN

25   YOU'D HAVE, LIKE, FOUR OUT OF FIVE PEOPLE HAVE
```

1    SOMETHING AROUND THEIR IPHONE, SOME KIND OF CASE OR

2    COVER; RIGHT?

3    A    ALMOST THAT MANY, YES.

4    Q    AND SO THOSE CASES USUALLY COVER UP THE BEZEL

5    AND THE TOP, EXCEPT FOR THE USEFUL PARTS; CORRECT?

6    A    IT DEPENDS ON THE CASE.  THE BUMPER DOES.

7    SOME CASES DO.  SOME DON'T.

8    Q    AND SO IF YOU ARE COVERING UP THIS OUTSIDE OF

9    THE CASE, YOU KNOW, AND EVERYONE THE BACK, THEN

10   KIND OF WHAT YOU'RE LEFT WITH, WHEN YOU ACTUALLY

11   SEE IT IN USE MUCH OF THE TIME, IS THE FRONT FACE

12   WITH THE HOME BUTTON AND THE SPEAKER AND THE

13   SCREEN; CORRECT?

14   A    SOME CASES DO THAT, SHOW JUST THAT MUCH, YES.

15   Q    AND THE -- YOU HAVE -- YOU AGREE THAT THIS

16   HOME BUTTON IS PROMINENT, CONSISTENT, AND AN

17   UNMISTAKABLE FEATURE OF APPLE DESIGN?  THE HOME

18   BUTTON?

19   A    I AGREE THAT THE HOME BUTTON IS ON EVERY PHONE

20   AND PROMINENT, YES.

21   Q    WELL, YOU ALSO BELIEVE THAT IT IS AN

22   UNMISTAKABLE AND UNIQUE PART OF THE APPLE DESIGN;

23   CORRECT?

24   A    I THINK IT'S VERY UNIQUE TO HAVE A SINGLE

25   APPLE HOME BUTTON ONLY THE SCREEN, YES.

1    Q    AND THERE'S NOT A SINGLE SAMSUNG PHONE THAT

2    YOU'RE AWARE OF THAT HAS THE HOME BUTTON LIKE THE

3    ONE THAT APPLE HAS?

4    A    I'M NOT AWARE OF SAMSUNG PHONES WITH THE SAME

5    HOME BUTTON AS APPLE'S.

6    Q    NOW, WHEN YOU SHOWED THOSE -- YOU SHOWED A

7    DEMONSTRATIVE ABOUT WHERE APPLE IS SOLD, OR THE

8    CHAINS OF -- DISTRIBUTION CHAINS.  AM I RIGHT ON

9    THAT?

10   A    THERE WAS A CHART OF CHANNELS, CHANNELS THAT

11   THE PRODUCTS ARE SOLD THROUGH.

12   Q    CHANNELS.  AND IF YOU LOOK AT THAT, THOSE HAVE

13   NOT ALWAYS BEEN THE CHANNELS OF DISTRIBUTION FOR

14   APPLE PHONES; RIGHT?

15   A    THERE ARE TIMES WHEN WE HAVE SOLD THROUGH

16   ADDITIONAL CHANNELS OR STARTED AT THE VERY

17   BEGINNING WITH, WITH A SMALLER LIST OF CHANNELS.

18   Q    WELL, LET'S PUT UP PDX 13.

19        AND HERE ARE THE APPLE SALES CHANNELS AND

20   YOU'VE GOT VERIZON THERE.  THE IPHONE HAS BEEN OUT

21   SINCE 2007; IS THAT RIGHT?

22   A    YES.

23   Q    AND THIS VERIZON CHANNEL DIDN'T EXIST UNTIL

24   FEBRUARY 10TH, 2011; RIGHT?

25   A    CORRECT.

1    Q    AND THE SPRINT CHANNEL THAT YOU TOLD THE JURY

2    ABOUT DID NOT EXIST UNTIL OCTOBER 14TH, 2011;

3    CORRECT?

4    A    CORRECT.

5    Q    SO YOU WEREN'T INTENDING TO SAY THAT, SINCE

6    2007, THAT APPLE HAS BEEN IN ALL OF THESE CHANNELS;

7    RIGHT?

8    A    I DID NOT SAY THAT.

9    Q    AND YOU DIDN'T INTEND TO CONVEY THAT; CORRECT?

10   A    I JUST SHOWED THE LIST OF SIMILAR CHANNELS

11   THAT WE SELL OUR PRODUCTS AT.

12   Q    AND SO YOU HAVEN'T GIVEN INFORMATION ON

13   EXACTLY WHEN APPLE GOT INTO THESE CHANNELS;

14   CORRECT?

15   A    WE HAVE NOT SHOWN THAT, NO.

16   Q    IN FACT, T-MOBILE STILL DOESN'T EXIST AS AN

17   APPLE SALES CHANNEL; RIGHT?

18   A    CORRECT.

19   Q    AND HERE WE'VE GOT TARGET, FOR EXAMPLE, TARGET

20   WASN'T A SALES CHANNEL UNTIL NOVEMBER 7 OF 2010?

21   A    I DON'T RECALL THE EXACT DATE WHEN WE STARTED

22   AT TARGET.

23   Q    SO IF SOMEONE REALLY WANTED TO KNOW ON A

24   YEAR-BY-YEAR BASIS WHAT YOUR SALES CHANNELS WERE

25   AND WHETHER THEY WERE COMPARABLE TO SAMSUNG'S, YOUR

```
1    DIRECT TESTIMONY WOULD NOT HAVE BEEN ANY HELP TO
2    THEM?
3    A    I DID NOT TESTIFY TO THE EXACT TIME OF EACH OF
4    THESE CHANNELS, NO.
5    Q    IN FACT, IT MIGHT HAVE BEEN A LITTLE
6    MISLEADING --
7              MR. MCELHINNY:  OBJECTION, YOUR HONOR.
8    BY MR. PRICE:
9    Q    -- TO LIST ALL THOSE AND NOT EXPLAIN, EVERY
10   YEAR WE HAVEN'T BEEN IN THOSE CHANNELS.
11             MR. MCELHINNY:  OBJECTION.  THAT'S
12   ARGUMENTATIVE.
13             THE COURT:  OVERRULED.
14             GO AHEAD, PLEASE.
15             THE WITNESS:  SIMPLY SOLD THE LIST OF
16   CHANNELS.  THERE WAS NOTHING SAID ABOUT INDIVIDUAL
17   TIMES FOR EACH ONE OF THEM.  SO THERE WAS CERTAINLY
18   NO ATTEMPT TO MISLEAD ANY OF THEM.
19   BY MR. PRICE:
20   Q    OKAY.  YOU MENTIONED THAT YOU'RE -- DO YOU
21   REMEMBER, MR. SCHILLER, THAT VIDEO.
22   A    I'M SORRY, WHICH?
23   Q    THE VIDEO OF THE MAC WORLD WHICH HAD MR. JOBS
24   GETTING THE PHOTO AND THEN E-MAILING YOU WITH THE
25   PHOTO, YOU'RE THAT GUY?
```

```
1    A    I WAS IN THE DEMO OF THE LAUNCH, YES, OF THE

2    ORIGINAL IPHONE IN 2007.

3    Q    AND THAT'S EXHIBIT 1091.

4              AND, YOUR HONOR, WOULD IT BE OKAY TO PLAY

5    A SECTION OF THAT FROM 1:24:52 TO 1:25:46?  IT'S

6    WHAT WAS PLAYED IN THE OPENING.

7              THE COURT:  PLEASE, GO AHEAD.

8              CAN I ASK, HAS THAT ALREADY COME IN?

9              MR. PRICE:  NO.  WE MOVE THAT INTO

10   EVIDENCE NOW, YOUR HONOR.  EXHIBIT 109.

11             THE COURT:  ALL RIGHT.  ANY OBJECTION?

12             MR. MCELHINNY:  NO OBJECTION.

13             THE COURT:  IT'S ADMITTED.

14             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

15             109, HAVING BEEN PREVIOUSLY MARKED FOR

16             IDENTIFICATION, WAS ADMITTED INTO

17             EVIDENCE.)

18             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

19   OPEN COURT OFF THE RECORD.)

20   BY MR. PRICE:

21   Q    I WOULDN'T HAVE RECOGNIZED YOU.

22             BUT WHAT HAPPENS IS -- AND I SEE YOU'VE

23   DONE THIS, THAT YOU'VE SCROLLED TO A PHOTO, TOUCHED

24   IT, WRITTEN AN E-MAIL AND ACCEPT THE PHOTO; RIGHT?

25   A    SURE, I'VE SENT PHOTOS.
```

711

```
 1    Q    AND IT'S YOUR UNDERSTANDING THAT CUSTOMERS OF

 2    APPLE, WITH THE IPHONES, DO THE SAME THING, WHERE

 3    THEY SCROLL TO A PICTURE, TOUCHED IT AND THEN SENT

 4    IT WITH A TEXT?

 5              MR. MCELHINNY:  LACKS FOUNDATION, YOUR

 6    HONOR.

 7              MR. PRICE:  HE'S HEAD OF MARKETING.

 8              THE COURT:  OVERRULED.

 9              GO AHEAD.

10              THE WITNESS:  I'M SORRY.  YOU STARTED BY

11    TALKING ABOUT E-MAIL AND THEN YOU JUST SAID TEXT.

12    SO THEY'RE DIFFERENT THINGS.

13    BY MR. PRICE:

14    Q    OKAY.  YOU BELIEVE THAT THE APPLE CUSTOMERS,

15    IPHONE CUSTOMERS, HAVE HAD THE EXPERIENCE OF

16    SCROLLING TO A PHOTO, TOUCHING IT, WRITING AN

17    E-MAIL, AND SENDING THAT PHOTO WITH THE E-MAIL?

18    A    YES, OUR CUSTOMERS HAVE OFTEN SENT PHOTOS WITH

19    E-MAIL AND DO.

20    Q    NOW, I'D LIKE YOU TO LOOK, IF YOU COULD, AT

21    EXHIBIT 715.  DO YOU HAVE THAT IN FRONT OF YOU,

22    SIR?

23    A    YES.

24    Q    AND YOU RECOGNIZE THIS AS A DOCUMENTATION OF A

25    TEAR-DOWN THAT APPLE DID ON THE SAMSUNG GALAXY S?
```

1    A    NO, I'M NOT FAMILIAR WITH THIS DOCUMENT.

2    Q    WELL, DO YOU SEE IT IS -- IT DOES COME FROM

3    APPLE, YOU CAN TELL THAT; CORRECT?

4    A    I SEE IT'S STAMPED WITH APPLE, YES.

5    Q    AND IT HAS THE APPLE LOGO; CORRECT?

6    A    YES.

7    Q    AND YOU'RE ON THE EXECUTIVE COMMITTEE, YOU

8    SAID, ONE OF THE FEW PEOPLE WHO TALK TO MR. COOK

9    DIRECTLY?

10   A    YES, I'M ON THE COMMITTEE.

11   Q    SO CERTAINLY YOU HAVE NO REASON TO THINK THIS

12   IS NOT AN APPLE DOCUMENT?

13   A    I HAVE NO REASON TO THINK OF IT.  I'VE JUST

14   NEVER SEEN IT BEFORE.

15           MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 715

16   INTO EVIDENCE.

17           MR. MCELHINNY:  THIS IS ONE WE RESERVED

18   OBJECTIONS PENDING A FOUNDATION, YOUR HONOR.  HE'S

19   NOT LAID THAT.

20           THE COURT:  THAT'S SUSTAINED.  THAT'S NOT

21   COMING IN RIGHT NOW.  GET SOMEONE ELSE WHO HAS

22   PERSONAL KNOWLEDGE.

23           GO AHEAD, PLEASE.

24           MR. PRICE:  OKAY.  YOUR HONOR, I WOULD

25   LIKE TO -- AS WE DISCUSSED EARLIER, I WOULD LIKE TO

```
 1    MOVE INTO EVIDENCE PAGES LATER OF THESE APPLE

 2    MARKETING SURVEYS, BUT NOT THE WHOLE THING

 3    BECAUSE --

 4              THE COURT:  THAT'S FINE.  WHICH PAGES

 5    WOULD YOU LIKE.

 6              MR. PRICE:  WHAT I'D LIKE TO DO NOW, YOUR

 7    HONOR, IS THAT I WILL BE MOVING IN PAGES FROM 143,

 8    144, 145 --

 9              THE COURT:  WHY DON'T WE DO THAT RIGHT

10    NOW.  SO JUST GIVE ME THE NUMBERS AGAIN, PLEASE.

11    143?

12              MR. PRICE:  143.

13              THE COURT:  OKAY.  NOT THE WHOLE THING

14    THOUGH, YOU WANTED SPECIFIC PAGES?

15              MR. PRICE:  NOT THE WHOLE THING, THAT'S

16    RIGHT.

17              THE COURT:  OKAY.

18              MR. PRICE:  SPECIFIC PAGES.  IT WOULD BE

19    143.4, WHICH THAT MAY ALREADY BE IN.

20              THE COURT:  I DON'T HAVE IT IN.

21              MR. PRICE:  OKAY.  143.4.

22              THE COURT:  OKAY.

23              MR. PRICE:  143.12.

24              THE COURT:  OKAY.

25              MR. PRICE:  143.6.
```

```
1            THE COURT:  OKAY.

2            MR. PRICE:  143.16.

3            THE COURT:  ALL RIGHT.

4            MR. PRICE:  143.25; 143.22.

5            THE COURT:  ALL RIGHT.  ANY OBJECTIONS?

6            MR. MCELHINNY:  NO OBJECTIONS, YOUR

7    HONOR.

8            THE COURT:  ALL RIGHT.  THEY'RE ALL

9    ADMITTED.

10           (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS

11           143.4, 143.12, 143.6, 143.16, 143.22,

12           143.25, BEEN PREVIOUSLY MARKED FOR

13           IDENTIFICATION, WERE ADMITTED INTO

14           EVIDENCE.)

15   BY MR. PRICE:

16   Q    AND FINALLY, SIR, BECAUSE I USED WAY MORE OF

17   THE CLOCK THAN I SHOULD HAVE, I JUST WANT TO ASK

18   YOU, ON THESE APPLE PHONES THAT WE'VE SEEN FROM THE

19   3G TO THE 4, APPLE CHANGES THE DESIGN EVERY COUPLE

20   OF YEARS; CORRECT?

21   A    WE UPDATE THE DESIGN OF NEW MODELS, YES.

22   Q    AND THE -- IN FACT, WHEN YOU CAME OUT WITH THE

23   IPHONE 4S, THERE WAS SOME CRITICISM IN THE MARKET

24   THAT THE DESIGN WASN'T CHANGED; RIGHT?

25   A    THAT WAS ONE OF THE THINGS WE HEARD, YES.
```

1    Q    AND, IN FACT, YOU'RE GOING TO CHANGE THE

2    DESIGN AGAIN WITH THE IPHONE 5?

3             MR. MCELHINNY:  OBJECTION, YOUR HONOR.

4    THE IPHONE 5 IS NOT IN THIS CASE.  IT'S NOT PUBLIC.

5    NO ONE KNOWS WHAT THE DESIGN OF IT WILL LOOK LIKE.

6    IT'S ONE OF THE MOST CLOSELY GUARDED, CONFIDENTIAL

7    SECRETS OF APPLE.

8             MR. PRICE:  IT'S RELEVANT.  THEY KEEP

9    CHANGING THEIR DESIGNS.

10             MR. MCELHINNY:  THAT IS ARGUMENTATIVE,

11    AND IT'S NOT RELEVANT TO WHY FUTURE DESIGNS --

12    THERE'S NO EVIDENCE, NEVER BEEN DISCOVERED, NO

13    DISCOVERY HAS BEEN TAKEN ON IT.

14             THE COURT:  ALL RIGHT.  I'M GOING TO

15    OVERRULE THE OBJECTION.

16             GO AHEAD.

17    BY MR. PRICE:

18    Q    SO THAT'S GOING TO BE A DIFFERENT DESIGN, TOO?

19    A    SO I JUST WANT TO MAKE SURE I UNDERSTAND.

20             I'M SORRY, JUDGE.  AM I BEING ASKED TO

21    TELL CONFIDENTIAL INFORMATION ABOUT FUTURE

22    PRODUCTS?

23             THE COURT:  NO.  YOU DON'T HAVE TO.  TO

24    THE EXTENT THAT YOU CAN, AND IF YOU CAN'T, THEN YOU

25    CAN'T.

1    BY MR. PRICE:

2    Q    IF YOU THINK YOU CAN'T TELL US ABOUT THE

3    DESIGN CHANGES FOR THE IPHONE 5, JUST TELL US AND

4    WE'LL GO ON?

5    A    I PREFER NOT TO TELL CONFIDENTIAL INFORMATION

6    ABOUT FUTURE PRODUCTS IF I DON'T HAVE TO.

7    Q    SURE, OKAY.  AND THE IPAD, WE'VE LOOKED AT THE

8    FRONT A LOT.  THERE'S ALSO A BACK TO THE IPAD;

9    CORRECT?

10   A    THERE IS A BACK TO THE IPAD.

11   Q    IT'S A SILVER WITH A BIG APPLE ON IT; RIGHT?

12   A    YES.

13   Q    AND IF SOMEONE IS USING THIS IN THE REAL WORLD

14   AGAIN AND SOMEONE WALKS IN FRONT OF THEM, THERE'S A

15   CHANCE THAT THEY'RE GOING TO SEE THE BACK?

16   A    PEOPLE CAN SEE THE IPAD, YES.

17   Q    AND THE BACK OF THE IPAD AS WELL?

18   A    YES.

19           MR. PRICE:  THANK YOU, MR. SCHILLER.

20           THE WITNESS:  THANK YOU.

21           THE COURT:  ALL RIGHT.  THE TIME IS NOW

22   11:41.  DOES ANYONE NEED BIO BREAK OR DO YOU WANT

23   TO KEEP GOING UNTIL NOON?

24           YOU NEED A BATHROOM BREAK?

25           OKAY.  LET'S JUST TAKE FIVE MINUTES AND

1       THEN WE'LL GO UNTIL NOON.  ALL RIGHT.

2                  THANK YOU.  JUST A FEW MINUTES, PLEASE.

3                  (WHEREUPON, A RECESS WAS TAKEN.)

4                  THE COURT:  ALL RIGHT.  WE'RE BACK IN

5       SESSION.  PLEASE TAKE A SEAT.

6                  AND IT IS NOW 11:45.  DO YOUR RECROSS,

7       PLEASE.  I'M SORRY, REDIRECT.

8                          **REDIRECT EXAMINATION**

9       BY MR. MCELHINNY:

10      Q    MR. SCHILLER, I THINK THE QUESTION THAT

11      EVERYONE REALLY WANTS TO KNOW, THE FOCUS, TO JUST

12      GET THE FACTS STRAIGHT, DID YOU HAVE DARK HAIR IN

13      2007?

14      A    YES, I DID.

15      Q    OKAY.

16      A    THANK YOU FOR REMINDING ME.

17      Q    I GUESS WE RESOLVED THAT ISSUE.

18                  COUNSEL STARTED OFF BY SHOWING YOU A

19      PHONE THAT HE TOLD YOU WAS CALLED THE LG PRADA.  DO

20      YOU REMEMBER SEEING THAT PHONE?

21      A    YES, I DO.

22      Q    DO YOU KNOW WHETHER OR NOT THE LG PRADA WAS

23      EVER SOLD IN THE UNITED STATES?

24      A    NO, I DO NOT THINK IT WAS.

25      Q    COUNSEL SHOWED YOU EXHIBIT 592, WHICH WAS

1    CALLED THE COM-TECH SURVEY, AND HE SHOWED YOU PAGE

2    23, AND HE SHOWED YOU THE CHART UP IN THE UPPER

3    RIGHT-HAND CORNER, WHICH IF I UNDERSTAND IT

4    CORRECTLY, SHOWED THAT FOUR TIMES MORE PEOPLE LIKED

5    THE DESIGN OF THE BLACKBERRY PHONE THAN LIKED THE

6    DESIGN OF THE APPLE PHONE.  IS THAT WHAT THAT

7    PURPORTS TO SHOW?

8    A    NO, I DON'T AGREE IT SHOWS THAT.

9    Q    YOU WERE GOING TO -- YOU WERE GOING TO TRY TO

10   EXPLAIN HOW TO INTERPRET THIS CORRECTLY, AND I'D

11   LIKE TO GIVE YOU THE OPPORTUNITY TO DO THAT?

12   A    YES, AS I UNDERSTAND WHAT THIS COMPANY DID

13   WITH THIS DATA WAS THEY ASKED CUSTOMERS A SPECIFIC

14   QUESTION AND THAT QUESTION WAS, OTHER THAN PRICE,

15   SO YOU'VE ALREADY SET THE MINDSET TO START THEM

16   THINKING ABOUT WHAT MATTERS TO THEM, WHAT ONE OTHER

17   THING WOULD YOU RATE AS IMPORTANT IN YOUR PURCHASE?

18            AND THEY WERE ALLOWED TO ONLY PICK ONE

19   THING.

20            AND THAT'S THE UNDERSTANDING OF THE

21   METHODOLOGY I HAD HERE.  SO UNLIKE THE DATA WE

22   COLLECT WHERE WE ASK EACH ITEM AND CHECK WHICH IS

23   THE TOP BOXES OF PREFERENCE, THIS YOU WERE LIMITED

24   IN YOUR CHOICE.

25            AND TO FURTHER ADD CONFUSION, ONE OF

1   THOSE CHOICES IS BRAND, WHICH AS YOU SEE, APPLE

2   RANKS THE HIGHEST OF.

3           AND I BELIEVE THAT CUSTOMERS AT THIS

4   LEVEL AREN'T CLEAR ON BRAND AND DESIGN AND WHAT

5   THAT MEANS.

6           SO YOU WEREN'T GIVEN MORE THAN ONE

7   CHOICE, AND IT WAS CONFUSED WITH OTHER CHOICES THAT

8   HAD RATED VERY HIGHLY.  SO IF YOU LIKED BRAND AND

9   DESIGN, YOU COULDN'T SELECT THAT.

10  Q   SO THAT WE'RE, AGAIN, USING THE SAME

11  TERMINOLOGY, WHAT DOES BRAND, AS IS USED ON THIS

12  CHART WHICH COUNSEL PUT INTO EVIDENCE, WHAT DOES

13  BRAND MEAN?

14  A   ON THIS QUESTION IT'S CONFUSED BECAUSE THEY

15  SAY BRAND/MODEL.  SOME PEOPLE THINK BRAND MEANS THE

16  BRAND OF THE COMPANY, BUT MODEL MEANS MODEL OF

17  PHONES.  SO IN THIS CASE, IT MIGHT MEAN APPLE AND

18  IPHONE.

19          SO IN THIS CASE, I CAN ONLY ASSUME,

20  BECAUSE IT'S UP TO THE USER'S INTERPRETATION OF

21  WHAT THEY'RE ASKED, THAT 44 PERCENT OF APPLE IOS

22  CUSTOMERS SELECTED APPLE/IPHONE AS A PRIMARY REASON

23  TO PURCHASE, OTHER THAN PRICE.  AND THEN THEY

24  COULDN'T EXPECT ANYTHING ELSE.

25  Q   BASED ON YOUR EXPERIENCE IN MARKETING, IS

```
 1    THERE AN OVERLAP OR A CONNECTION BETWEEN THE DESIGN

 2    OF THE APPLE PHONES AND THE APPLE BRAND?

 3    A    YES, I THINK THERE'S A STRONG CORRELATION.

 4    Q    AND WHAT IS THAT CORRELATION?

 5    A    IT IS THAT PEOPLE ASSOCIATE THE APPLE BRAND

 6    WITH GREAT DESIGN, AND THEY HAVE INTRINSIC MEANING

 7    TOGETHER.

 8    Q    SIR, AGAIN, I THINK YOU TESTIFIED THAT YOU

 9    WERE INVOLVED IN THE ORIGINAL IPHONE PRODUCT; IS

10    THAT CORRECT?

11    A    YES.

12    Q    AND WE'VE TALKED A LOT ABOUT WHAT THE IPHONE

13    LOOKS LIKE AND THE DESIGN AND THE ELEMENTS OF THAT

14    DESIGN; IS THAT CORRECT?

15    A    YES.

16    Q    WAS THAT DESIGN CHOSEN SO THAT IT WOULDN'T

17    MATCH ON SOMEBODY'S POCKET?

18    A    NO.

19    Q    WHAT WAS THE THEME OF THE OVERALL DESIGN OF

20    THE IPHONE?

21    A    WE WERE TRYING TO CREATE A NEW BREAKTHROUGH

22    DESIGN FOR A PHONE THAT WAS BEAUTIFUL AND SIMPLE

23    AND EASY TO USE AND CREATED A BEAUTIFUL, SMOOTH

24    SURFACE THAT HAD A TOUCHSCREEN AND WENT RIGHT TO

25    THE RIM WITH THE BEZEL AROUND IT AND LOOKING FOR A
```

1    LOOK THAT WE FOUND WAS BEAUTIFUL AND EASY TO USE

2    AND APPEALING.

3             WE HAD A TERM AT APPLE, IN MARKETING,

4    THAT WE CALLED THE LUST FACTOR.  DOES THIS IPHONE

5    HAVE APPEAL TO PEOPLE THAT THEY LUST AFTER IT

6    BECAUSE IT'S SO GORGEOUS.  THAT'S ONE OF THE THINGS

7    WE WERE GOING FOR, A HIGH LUST FACTOR.

8    Q    DURING THE FOUR YEARS THAT THE IPHONE WAS

9    UNDER DEVELOPMENT, WERE OTHER DESIGNS CONSIDERED AT

10   ANY TIMES?

11   A    YES, THERE WERE MANY DESIGNS.

12   Q    WOULD THOSE OTHER DESIGNS HAVE CUT ON PEOPLE'S

13   POCKETS.

14   A    I DON'T BELIEVE SO.

15            MR. MCELHINNY:  THANK YOU.  I HAVE

16   NOTHING FURTHER.

17            THE COURT:  ALL RIGHT.  TIME IS NOW

18   11:50.

19            ANY RECROSS, MR. PRICE?

20            MR. PRICE:  NOT MUCH.

21                   **RECROSS-EXAMINATION**

22   BY MR. PRICE:

23   Q    I WANTED TO ASK YOU, YOU WANTED TO CREATE THIS

24   LUST FACTOR WITH THE IPHONE.  THE SAMSUNG PHONES I

25   SHOWED YOU WITH THE FOUR HARD BUTTONS AND THE

```
1    SIGNAGE AT THE TOP, DO YOU THINK THAT'S BEAUTIFUL?

2    A    I DON'T THINK THEY'RE AS BEAUTIFUL AS THE

3    IPHONE, BUT I THINK THEY'RE TRYING TO BE AS

4    BEAUTIFUL AS THE IPHONE.

5    Q    AND IN YOUR OPINION, THEY DON'T QUITE CUT IT

6    ON THAT REGARD; RIGHT?  IN YOUR OPINION?

7    A    NOT FOR ME.

8    Q    OKAY.  AND THAT'S ONE OF THE REASONS APPLE HAS

9    THAT ICONIC HOME BUTTON WITH NOTHING ELSE ON THE

10   BOTTOM BECAUSE THAT WAS AN IMPORTANT PART OF WHAT

11   YOU THOUGHT WAS A BEAUTIFUL, UNIQUE DESIGN?

12           MR. MCELHINNY:  BEYOND THE SCOPE.  ASKED

13   AND ANSWERED.

14           THE COURT:  OVERRULED.

15           GO AHEAD.  GO AHEAD, PLEASE.

16           THE WITNESS:  I THINK WE HAVE A LUSTFUL,

17   GORGEOUS DESIGN IN TOTAL AND I THINK THE HOME

18   BUTTON IS ONE OF THE FEATURES ON THE PHONE.

19           MR. PRICE:  NOTHING FURTHER.

20           THE COURT:  ALL RIGHT.  SO IT'S 11:51.

21           MAY THIS WITNESS BE EXCUSED AND IS HE

22   SUBJECT TO RECALL OR NOT?

23           MR. MCELHINNY:  I WOULD LIKE HIM EXCUSED,

24   NOT SUBJECT TO RECALL, ALTHOUGH WE MAY CHOOSE TO

25   USE HIM IN REBUTTAL, SO HE WON'T BE IN THE
```

```
1    COURTROOM.

2              THE COURT:  ALL RIGHT.  WELL, YOU'RE

3    EXCUSED.

4              THE WITNESS:  THANK YOU.

5              THE COURT:  ALL RIGHT.  CALL YOUR NEXT

6    WITNESS, PLEASE.

7              MR. MCELHINNY:  YOUR HONOR, ON BEHALF OF

8    APPLE, WE CALL MR. SCOTT FORSTALL.

9              THE CLERK:  WOULD YOU RAISE YOUR RIGHT

10   HAND, PLEASE.

11                       SCOTT FORSTALL,

12   BEING CALLED AS A WITNESS ON BEHALF OF THE

13   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

14   EXAMINED AND TESTIFIED AS FOLLOWS:

15             THE WITNESS:  I DO.

16             THE CLERK:  WOULD YOU HAVE A SEAT,

17   PLEASE.

18             WOULD YOU STATE YOUR NAME, PLEASE, AND

19   SPELL IT?

20             THE WITNESS:  SCOTT FORSTALL, S-C-O-T-T

21   FIRST NAME, LAST NAME FORSTALL, F, AS IN FRANK,

22   O-R-S-T-A-L-L.

23             THE CLERK:  THANK YOU.

24             MR. MCELHINNY:  MAY I PROCEED, YOUR

25   HONOR?
```

```
 1              THE COURT:  PLEASE, GO AHEAD.
 2                   DIRECT EXAMINATION
 3   BY MR. MCELHINNY:
 4   Q    GOOD MORNING, MR. FORSTALL.
 5   A    GOOD MORNING.
 6   Q    I'M GOING TO HAVE YOU ON THE STAND HERE FOR
 7   EIGHT MINUTES.
 8              BY WHOM ARE YOU EMPLOYED?
 9   A    APPLE.
10   Q    AND WHAT IS YOUR CURRENT JOB TITLE, SIR?
11   A    I'M SENIOR VICE-PRESIDENT OF IOS.
12   Q    AND WE'RE GOING TO DO SOME -- I'M GOING TO
13   DEFINE TERMS AS WE GO ALONG.  WHAT IS IOS?
14   A    IOS IS THE OPERATING SYSTEM THAT RUNS ALL
15   IPHONES, IPADS, AND IPOD TOUCH.
16   Q    AND JUST GENERALLY, WHAT IS YOUR GROUP
17   RESPONSIBLE FOR AT APPLE?
18   A    SO IN ADDITION TO ALL THE SOFTWARE THAT RUNS
19   ON ALL THOSE PLATFORMS, IPHONE, IPADS AND IPOD
20   TOUCH, MY GROUP ALSO DOES USER INTERFACE DESIGN,
21   BOTH FOR THOSE PRODUCTS AND FOR THE MACINTOSH.
22   Q    MR. FORSTALL, THIS WOMAN IN FRONT OF ME IS A
23   COURT REPORTER AND SO SHE'S TRYING TO TAKE DOWN
24   WHAT YOU SAY.  SO IF YOU WOULD SLOW DOWN JUST A
25   LITTLE BIT, THAT WOULD BE GREAT.
```

```
 1              TO WHOM DO YOU REPORT AT APPLE?

 2     A    I REPORT DIRECTLY TO TIM COOK, WHO IS OUR CEO.

 3     Q    AND ARE YOU FAMILIAR WITH THE EXPRESSION, THE

 4     EXECUTIVE TEAM?

 5     A    I AM.

 6     Q    HOW -- ARE YOU ON APPLE'S EXECUTIVE TEAM?

 7     A    YES, I AM.

 8     Q    HOW MANY PEOPLE ARE ON APPLE'S EXECUTIVE TEAM?

 9     A    I THINK THERE'S AROUND TEN OF US.

10     Q    HOW MANY PEOPLE REPORT TO YOU, MR. FORSTALL?

11     A    SO WE HAVE A SORT OF MATRIX FUNCTIONAL GROUP.

12     I HAVE AROUND A THOUSAND PEOPLE REPORTING DIRECTLY

13     TO ME.

14              AND AT MY STAFF MEETING, IF YOU LOOK AT

15     ALL THE PEOPLE REPRESENTED BY PEOPLE THAT COME TO

16     MY STAFF MEETING, IT'S AROUND 2,000 PEOPLE.

17     Q    CAN YOU TELL US A LITTLE BIT ABOUT YOUR

18     EDUCATION, PLEASE?

19     A    YEAH.  I WENT TO STANFORD UNIVERSITY FOR AN

20     UNDERGRADUATE DEGREE, AS WELL AS STANFORD FOR A

21     MASTER'S DEGREE.

22     Q    AND WHAT WAS YOUR UNDERGRADUATE DEGREE FROM

23     STANFORD?

24     A    MY UNDERGRADUATE DEGREE WAS SOMETHING CALLED

25     SYMBOLIC SYSTEMS.
```

```
1    Q    WHAT IS SYMBOLIC SYSTEMS?

2    A    THAT'S THE QUESTION I GET EVERY TIME.

3    Q    I DIDN'T WANT TO DISAPPOINT YOU IN THIS CASE.

4    A    SYMBOLICS SYSTEM IS ACTUALLY A MAJOR THAT WAS

5    CREATED RIGHT AROUND THE TIME I GOT TO STANFORD.

6    IT'S AN INTERDISCIPLINARY MAJOR BETWEEN PHILOSOPHY,

7    PSYCHOLOGY, LINGUISTICS, AND COMPUTER SCIENCE.

8              AND -- IT'S A FASCINATING MAJOR, AND I

9    ACTUALLY DID AN EMPHASIS IN ARTIFICIAL

10   INTELLIGENCE.

11             SO I GOT TO STUDY HOW THE MIND WORKS AND

12   THINKS, HOW TO REPRESENT INFORMATION IN A COMPUTER,

13   AND SORT OF HUMAN COMPUTER INTERACTION.

14   Q    AND IN WHAT FIELD IS YOUR MASTER'S DEGREE,

15   SIR?

16   A    MY MASTER'S IS IN COMPUTER SCIENCE, ALSO WITH

17   AN EMPHASIS IN ARTIFICIAL INTELLIGENCE.

18   Q    SIR, WHEN DID YOU FIRST MEET STEVE JOBS?

19   A    WHEN I WAS IN GRAD SCHOOL GETTING MY MASTER'S,

20   I STARTED INTERVIEWING FOR FULL-TIME POSITIONS.

21             AND ONE OF THE PLACES I WENT AND

22   INTERVIEWED WAS AT NEXT COMPUTER, WHICH IS THE

23   COMPANY STEVEN STARTED AFTER HE LEFT APPLE.

24             AND I WAS IN AN INTERVIEW ROOM AND

25   SUDDENLY STEVE BURST INTO THE ROOM, GRABBED THE
```

```
 1    PERSON WHO WAS INTERVIEWING ME AND PULLED THEM OUT

 2    AND ASKED HIM A SET OF QUESTIONS IN THE HALLWAY.

 3             A FEW MINUTES LATER, STEVE RETURNED, NOT

 4    THE GUY WHO'S INTERVIEWING ME, AND ASKED ME A FEW

 5    QUESTIONS AND THEN TOLD ME HE EXPECTED I WOULD GET

 6    AN OFFER FROM NEXT, AND HE ALSO EXPECTED I WOULD

 7    ACCEPT THE OFFER.

 8             AND THEN HE LEFT AND THE INTERVIEWER CAME

 9    BACK AND SAID IN CASE THERE'S ANY QUESTION WHETHER

10    STEVE IS HANDS ON, THE ANSWER IS YES.

11    Q    DID YOU GET AN OFFER FROM NEXT COMPUTER?

12    A    I WAS LUCKY ENOUGH TO GET AN OFFER, YES.

13    Q    DID YOU ACCEPT THE OFFER?

14    A    I DID.

15    Q    HOW LONG DID YOU WORK AT NEXT COMPUTER?

16    A    SO THAT WAS IN 1992, AND IN 1997 NEXT WAS

17    ACQUIRED BY APPLE.  AND SO IT WAS, IT WAS AGREED TO

18    IN '96, IT CLOSED IN '97.  SO IN 1997, ALONG WITH

19    NEXT, I WENT TO APPLE.

20    Q    WHAT WERE YOUR -- WHAT WORK WERE YOU DOING AT

21    NEXT BEFORE IT WAS ACQUIRED BY APPLE?

22    A    YEAH.  I WAS AN ENGINEER.  SO I WAS DESIGNING

23    AND WRITING THE CODE THAT MADE UP THE OPERATING

24    SYSTEM FROM NEXT AT THE TIME, AND WHEN WE GOT TO

25    APPLE, I CONTINUED DOING SIMILAR WORK.
```

1    Q    I'M SORRY.  I FORGOT WHETHER I'VE ASKED THIS

2    OR WHETHER YOU ANSWERED IT, BUT DID YOU THEN MOVE

3    TO APPLE WHEN APPLE ACQUIRED NEXT?

4    A    I DID.

5    Q    CAN YOU TELL US, JUST GENERALLY SO WE

6    UNDERSTAND YOUR BACKGROUND, WHAT YOU DID AT APPLE

7    BETWEEN 1997 AND 2004?

8    A    I MANAGED THE OPERATING SYSTEM SOFTWARE.  SO

9    ONE REASON THAT APPLE PURCHASED NEXT WAS TO HAVE AN

10   OPERATING SYSTEM STRATEGY.  APPLE HAD MAC OS 7 AT

11   THE TIME, COMING INTO MAC OS 8 RIGHT AT THAT SAME

12   TIME, AND APPLE WANTED A STRATEGY FOR THE FUTURE.

13        SO I WAS MANAGING WHAT BECAME MAC OS 10,

14   STEVE ASKED FOR US TO COME UP WITH A GOOD SOLUTION

15   FOR A FUTURE OPERATING SYSTEM.  A SET OF US SAT

16   DOWN AND CAME UP WITH MAC OS 10.  SO I MANAGED A

17   PART OF IT AND EVENTUALLY ALL OF MAC OS 10.

18   Q    AND, AGAIN, SO WE UNDERSTAND, WHAT IS MAC OS

19   10?

20   A    SO MAC OS 10 IS THE OPERATING SYSTEM THAT RUNS

21   ALL MACINTOSHES TODAY, SO ALL THE LAPTOPS, I MANAGE

22   ALL OF THEM TODAY RUN MAC OS 10.

23   Q    AND WHAT WAS YOUR RESPONSIBILITY IN TERMS OF

24   THE OVERALL DEVELOPMENT OF MAC OS 10?

25   A    I WAS ONE OF THE PEOPLE WHO STARTED THE

```
1    PROJECT AND CREATED A PIECE OF IT, AND THEN OVER

2    TIME, I WAS RESPONSIBLE FOR MORE AND MORE PIECES,

3    THINGS LIKE CREATING VIDEO CONFERENCING, CREATING

4    SAFARI, THE WEB BROWSER, AND EVENTUALLY WAS

5    RESPONSIBLE FOR THE ENTIRE OPERATING SYSTEM.

6    Q    AND CAN YOU TELL US WHAT YOU MEANT BY AN

7    OPERATING SYSTEM STRATEGY?

8    A    SO THE GOAL OF AN OPERATING SYSTEM IS TO RUN

9    ALL OF THE MACHINE, BASICALLY DRIVE THE MACHINE,

10   AND WE WANTED AN OPERATING SYSTEM THAT COULD LAST

11   FOR ANOTHER 20 YEARS.

12          AND THE OPERATING SYSTEM THAT APPLE HAD

13   AT THE TIME DIDN'T HAVE THOSE LEGS, AND SO WE CAME

14   UP WITH A STRATEGY THAT WORKED REALLY WELL FOR

15   APPLICATIONS, YOU COULD BUY FROM SOMEONE ELSE AND,

16   AS WELL AS ALL THE BUILT-IN APPLICATIONS.  SO

17   STRATEGY WAS A MODERN OPERATING SYSTEM.

18          MR. MCELHINNY:  YOUR HONOR, I'M ABOUT TO

19   CHANGE SUBJECTS.  I KNOW IT'S TWO MINUTES BEFORE

20   YOU WANT TO QUIT.

21          THE COURT:  THIS ONE SAYS IT'S NOON, SO

22   THAT'S FINE.

23          MR. MCELHINNY:  GOOD.

24          THE COURT:  OKAY.  SO WE ARE GOING TO

25   BREAK FOR ONE HOUR FOR LUNCH.  AGAIN, PLEASE KEEP
```

1     AN OPEN MIND.  PLEASE DON'T TALK TO ANYONE ABOUT

2     THE CASE, AND PLEASE DON'T READ ABOUT IT, YOU KNOW,

3     PLEASE DON'T READ OR DO YOUR OWN RESEARCH.  OKAY?

4              ALL RIGHT.  THANK YOU SO MUCH, AND WE'LL

5     SEE YOU BACK HERE AT 1:00 O'CLOCK.

6              (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **AFTERNOON SESSION**

2                   (WHEREUPON, THE FOLLOWING PROCEEDINGS

3       WERE HELD OUT OF THE PRESENCE OF THE JURY:)

4                   THE COURT:  OKAY.  WELCOME BACK.

5                   PLEASE, TAKE A SEAT.

6                   I LOOKED AT THE DEPOSITION EXCERPTS OF

7       MR. FORSTALL ON THE '915, THE '381, AND THE DESIGN

8       '305.  IS THERE ANYTHING THAT SAMSUNG WANTS TO SAY?

9                   I, FRANKLY, FOUND YOUR OBJECTION A LITTLE

10      MISLEADING AFTER I SAW THAT.

11                  MR. JOHNSON:  YOUR HONOR, YES.  WITH

12      RESPECT TO DEPOSITION EXCERPT THAT THEY SUBMITTED,

13      THE FIRST EXCERPT FROM PAGE 8, THERE'S A QUESTION

14      THAT I ASKED MR. FORSTALL DURING HIS DEPOSITION

15      WHERE I SIMPLY ASKED HIM WHAT DID HE LOOK AT TO

16      PREPARE FOR HIS DEPOSITION, WHAT DID HIS COUNSEL

17      SHOW HIM?

18                  AND HE LISTED A FEW DOCUMENTS THAT HE

19      LOOKED AT.

20                  THE COURT:  ON THE INITIAL DISCLOSURES,

21      WAS HE LISTED ON THE TOPIC ABOUT THE

22      PATENTS-IN-SUIT?

23                  MR. JOHNSON:  NO, YOUR HONOR, HE WAS NOT.

24                  THE COURT:  ALL RIGHT.  LET ME SEE THE

25      INTERROGATORY RESPONSE.

```
1              MR. JOHNSON:  WELL, THE INITIAL
2   DISCLOSURES THAT THEY SUBMITTED REFERS ONLY TO THE
3   '163 PATENT, AND THEY AMENDED IT TWICE.  BOTH
4   TIMES --
5              THE COURT:  WELL, LET ME SEE THEM.  I
6   WANT TO SEE THEM.  I'M GETTING TO THE POINT NOW
7   WHERE I WANT TO SEE THE ACTUAL DOCUMENTS.  I DON'T
8   WANT TO TAKE ANY --
9              MR. JOHNSON:  SORRY.  THE PATEL EXHIBIT
10  D, WHICH WE SUBMITTED --
11             THE COURT:  I NEED TO SEE IT.  WE'RE
12  GOING TO DO ALL THESE IN OPEN COURT.  YOU NEED TO
13  HAVE ALL THE DOCUMENTS READY TO GO.
14             LET ME SEE THE ACTUAL INITIAL DISCLOSURE.
15  WHO'S GOT IT?  SHOW ME WHERE IT SAYS
16  PATENTS-IN-SUIT.
17             MR. JOHNSON:  YOUR HONOR, THIS IS --
18  YOU'VE ALREADY SUSTAINED OUR OBJECTIONS, SO THIS
19  IS --
20             THE COURT:  RIGHT.  BUT I WAS NOT AWARE
21  OF THIS DEPOSITION TESTIMONY.  YOUR OBJECTION SAID
22  THAT YOU HAD NO OPPORTUNITY DEPOSE HIM ON ANY
23  TOPIC, OTHER THAN ON THE ONE PATENT THAT HE WAS
24  LISTED, WHICH I BELIEVE WAS THE '135.
25             MR. JOHNSON:  IF I MAY APPROACH, YOUR
```

```
1     HONOR?  I'LL SHOW YOU THE --

2              THE COURT:  ALL RIGHT.  LET ME SEE IT.

3              MR. JOHNSON:  RIGHT WHERE THE BLUE FLAGS

4     ARE (HANDING).

5              THE COURT:  OKAY.  WELL, IF YOU LOOK AT

6     SCOTT FORSTALL, IT SAYS '163 NEXT TO HIS NAME, BUT

7     IT SAYS "POTENTIAL AREA OF KNOWLEDGE."  IT SAYS

8     "APPLE PATENTS-IN-SUIT."

9              MR. JOHNSON:  WELL, IT SAYS "PERTINENT

10    PATENTS," AND IF YOU LOOK DOWN THE LEFT-HAND SIDE,

11    INDIVIDUALLY FOR EACH WITNESS IT IDENTIFIES THE

12    PATENTS THAT ARE PERTINENT FOR THAT PARTICULAR

13    WITNESS.

14             AND WHEN YOU LOOK AT INTERROGATORY NUMBER

15    1, IN APPLE'S RESPONSE, FIVE TIMES WE ASKED THEM TO

16    IDENTIFY THE PEOPLE THAT WERE RESPONSIBLE OR

17    INVOLVED IN THE PATENTS IN THE CASE.

18             NOWHERE DO THEY IDENTIFY MR. FORSTALL AS

19    HAVING ANY KNOWLEDGE RELEVANT TO THE '381, THE

20    '915, OR THE '305 PATENT, NOT A SINGLE TIME.

21             THEY AMENDED THAT FIVE TIMES, INCLUDING

22    THREE DAYS BEFORE THE CLOSE OF DISCOVERY.

23             MR. MCELHINNY:  MAY I SAY SOMETHING

24    BRIEFLY THAT MAY BE OF ASSISTANCE, YOUR HONOR?

25             THE COURT:  WHAT'S THAT?
```

```
 1              MR. MCELHINNY:  ALL I INTENDED TO DO WITH
 2    MR. FORSTALL WAS TO PUT THE PATENT INTO EVIDENCE
 3    AND HAVE HIM DESCRIBE, IN THE MOST GENERAL TERMS,
 4    WHAT IT COVERS.  THAT'S ALL I WAS GOING TO DO WITH
 5    HIM IN HIS DIRECT.
 6              HE'S THE SUPERVISOR OF THE ENTIRE GROUP.
 7    IT SAID ALL PERTINENT PATENTS.  IT --
 8              THE COURT:  WELL --
 9              MR. JOHNSON:  IT SAYS --
10              THE COURT:  IT SAYS PERTINENT PATENTS AND
11    NEXT TO HIS NAME, IT SAYS '163.
12              MR. JOHNSON:  AND IT SAYS IT TWICE.  THEY
13    AMENDED IT.  THEY SUPPLEMENTED IT.  EACH TIME IT
14    SAYS '163.  NOWHERE, EVEN IN THE WITNESS STATEMENT,
15    DO THEY IDENTIFY THE '305 PATENT.
16              THE COURT:  ALL RIGHT.  GIVE ME JUST ONE
17    SECOND, PLEASE.
18              (PAUSE IN PROCEEDINGS.)
19              MR. JOHNSON:  AND YOUR HONOR, I HAVE THE
20    INTERROGATORY RESPONSES AS WELL.
21              THE COURT:  NOW, THIS QUESTION ABOUT THE
22    ICONS, HOW DID THAT COME UP?
23              MR. JOHNSON:  I'M SORRY, WHICH QUESTION?
24              THE COURT:  I'M LOOKING AT APPLE'S MOTION
25    FOR RECONSIDERATION.  IT'S PAGE 4, LINE 3.
```

```
 1              MR. JOHNSON:  IS THERE A DEPOSITION CITE?

 2    I DON'T HAVE THAT SINCE --

 3              THE COURT:  IT'S HUNG DECLARATION EXHIBIT

 4    G, PAGE 216, LINES 17 THROUGH 23.  IT'S A

 5    DISCUSSION ABOUT THE ICONS.  IT TALKS ABOUT THE

 6    PINCH TO ZOOM AND THE RUBBER BANDING.

 7              MR. JOHNSON:  YOUR HONOR, IN THIS

 8    INSTANCE, MR. FORSTALL WAS REFERRING SPECIFICALLY

 9    TO A MEETING THAT OCCURRED BETWEEN APPLE AND GOOGLE

10    AND I HAD ASKED HIM WHAT WAS DISCUSSED IN THAT

11    MEETING.  THAT'S ALL I ASKED HIM.

12              I DIDN'T ASK HIM ABOUT --

13              THE COURT:  ALL RIGHT.  LET'S STOP A

14    SECOND HERE.

15              SO WE HAVE THINGS LIKE PINCH TO ZOOM AND

16    PUT TWO FINGERS DOWN AND I GUESS WE CALL THIS A

17    DEPINCH.  IN CREATING THE IPHONE, THERE WERE SO

18    MANY COMPLETELY UNSOLVED PROBLEMS.

19              LET'S ADDRESS THAT ONE.

20              MR. JOHNSON:  CAN YOU TELL ME WHERE

21    YOU'RE READING FROM?  WHAT PAGE?

22              THE COURT:  PAGE 5 OF THE MOTION FOR

23    RECONSIDERATION.  DO YOU HAVE THAT?  IT'S DOCUMENT

24    NUMBER 1569.

25              MR. JOHNSON:  I HAVE THE DEPOSITION
```

```
 1   TESTIMONY, YOUR HONOR.  I DON'T HAVE THEIR MOTION.

 2             THE COURT:  OKAY.  PAGE 28, LINES 19

 3   THROUGH 22, PAGE 23, LINE 24 THROUGH PAGE 24, LINE

 4   17.

 5             MR. JOHNSON:  YOUR HONOR, CAN YOU GIVE ME

 6   THE PAGES AGAIN?

 7             THE COURT:  SURE, PAGE 28.

 8             MR. JOHNSON:  THIS IS FROM WHICH

 9   DEPOSITION, OCTOBER 27TH?

10             THE COURT:  WHAT DOES THE HUNG

11   DECLARATION, EXHIBIT G --

12             MR. JACOBS:  YOUR HONOR IS EXACTLY RIGHT.

13   IT'S OCTOBER 27TH, PAGE 28, AND MR. FORSTALL IS

14   EXPLAINING, REALLY IN THE WAY HE WOULD DO IN HIS

15   TESTIMONY IN A FEW MINUTES, HOW THE '163 FIT INTO

16   THE OVERALL INVENTION AND DEVELOPMENT OF IOS AS IT

17   RELATED TO THE IPHONE.

18             MR. JOHNSON:  THERE HE'S TALKING ABOUT

19   THE '163 PATENT, AND I'M NOT OBJECTING TO

20   SPECIFICALLY THE FACTS ASSOCIATED WITH THE '163

21   PATENT.

22             HE SAID AT DIFFERENT TIMES HE WASN'T A

23   LAWYER AND HE WASN'T ABLE TO CONSTRUE THE DIFFERENT

24   TERMS THAT ARE IN THE '163 PATENT.

25             BUT HE IS THE INVENTOR ON THE '163
```

```
1    PATENT, AND I'M NOT OBJECTING TO THE PERCIPIENT

2    TESTIMONY WITH RESPECT TO THE '163.

3              I'M OBJECTING TO HIS TESTIMONY ABOUT THE

4    '381 PATENT, THE '915, AND THE --

5              THE COURT:  LET ME ASK MR. JACOBS, WHY DO

6    YOU HAVE THIS LABELED AS THE '915 PATENT?

7              MR. JACOBS:  WHY DO I HAVE --

8              THE COURT:  THIS DESCRIPTION ABOUT THE

9    PINCH TO ZOOM AND THE TWO FINGERS DOWN AND THE

10   DEPINCH AND --

11             MR. JACOBS:  THAT'S THE OVERALL SUBJECT,

12   PART OF THE SUBJECT OF THE '915 PATENT AND THOSE

13   TOPICS, YOUR HONOR.

14             MR. JOHNSON:  YOUR HONOR, IF YOU LOOK AT

15   LINE 7, I WAS ASKING ABOUT CLAIM 2 OF THE '163

16   PATENT.  I WAS NOT ASKING ABOUT THE '915 PATENT.

17             MR. JACOBS:  BUT HE EXPLAINED HIS

18   KNOWLEDGE OF THE OVERALL DEVELOPMENT OF THE IOS AND

19   HOW THESE INVENTIONS FIT TOGETHER IN THE

20   DEVELOPMENT OF IOS.

21             THE COURT:  ALL RIGHT.  THE OBJECTION IS

22   SUSTAINED.

23             MR. JOHNSON:  THANK YOU, YOUR HONOR.

24             THE COURT:  OKAY.  LET'S BRING THEM IN,

25   PLEASE.
```

```
 1                (WHEREUPON, THE FOLLOWING PROCEEDINGS
 2     WERE HELD IN THE PRESENCE OF THE JURY:)
 3                THE COURT:  ALL RIGHT.  THE TIME IS 1:12.
 4     PLEASE GO AHEAD.
 5                MR. MCELHINNY:  THANK YOU.
 6     Q    MR. FORSTALL, BEFORE WE BROKE FOR LUNCH, I HAD
 7     BROUGHT YOU UP TO 2004, AND MY NEXT QUESTION IS,
 8     HOW DID YOU GET INVOLVED IN WHAT BECAME THE
 9     DEVELOPMENT OF THE IPHONE?
10     A    SO I THINK YOU ACTUALLY BROUGHT ME UP TO 2003.
11     Q    ALL RIGHT.  LET'S GO TO 2003, THEN.
12     A    IN 2003, WE BUILT ALL THESE GREAT MACS AND
13     LAPTOPS AND WE STARTED ASKING OURSELVES, WHAT COMES
14     NEXT?
15                AND ONE THOUGHT WAS A TABLET, SO WE
16     SETTLED ON THIS IDEA OF COULD WE MAKE A BEAUTIFUL
17     TABLET WITHOUT A KEYBOARD, WITHOUT A HINGE WHERE
18     YOU HAVE TO FOLD IT LIKE YOU DO FOR A LAPTOP.
19                AND WE SETTLED PRETTY QUICKLY AT
20     INVESTIGATING WHETHER WE COULD DO THAT USING A
21     TOUCHSCREEN, AND NOT ONE WITH A STYLUS, BUT
22     LITERALLY MAKE IT SO YOUR FINGER OR FINGERS COULD
23     BE THE STYLUS OR STYLII.
24                SO WE STARTED INVESTIGATING AND BUILDING
25     PROTOTYPES AND DEMOS TO SEE IF WE COULD BUILD A
```

1    TABLET.  THAT WAS 2003.

2              IN 2004, WE WERE SITTING AROUND AND WE

3    ALL HAD CELL PHONES, AND I REMEMBER SITTING WITH

4    STEVE AND SOME OTHERS SAYING WE ALL HAD CELL PHONES

5    AND WE ALL HATED OUR CELL PHONES.  I THINK WE HAD

6    THESE FLIP PHONES AT THE TIME.

7              AND WE WERE ASKING OURSELVES, COULD WE

8    USE THE TECHNOLOGY WE WERE DOING WITH TOUCH THAT

9    WE'D BEEN PROTOTYPING FOR THIS TABLET AND COULD WE

10   USE THAT SAME TECHNOLOGY TO BUILD A PHONE,

11   SOMETHING THE SIZE THAT COULD FIT IN YOUR POCKET,

12   BUT GIVE IT ALL THE SAME POWER THAT WE WERE LOOKING

13   AT GIVING TO THE TABLET?

14             AND SO WE, WE PROTOTYPED THIS THING,

15   WHICH I'LL NEVER FORGET.  WE TOOK THAT TABLET AND

16   WE BUILT A SMALL SCROLLING LIST.

17             NOW, ON A TABLET WE WERE DOING PINCH AND

18   ZOOM AND SCROLLS AND ALL THOSE THINGS, AND WE

19   WANTED IT TO FIT IN THE POCKET, SO WE BUILT A SMALL

20   CORNER OF IT AS A LIST OF CONTACTS.

21             AND YOU WOULD SIT THERE AND YOU'D SCROLL

22   ON THIS LIST OF CONTACTS, YOU COULD TAP ON THE

23   CONTACT, IT WOULD SLIDE OVER AND SHOW YOU THE

24   CONTACT INFORMATION, AND YOU COULD TAP ON THE PHONE

25   NUMBER AND IT WOULD SAY CALLING.  IT WASN'T

1    CALLING, BUT IT WOULD SAY IT WAS CALLING.

2              AND IT WAS JUST AMAZING.  AND WE REALIZED

3    THAT A TOUCHSCREEN THAT WAS SIZED THAT COULD FIT

4    INTO YOUR POCKET WOULD WORK PERFECTLY AS ONE OF

5    THESE PHONES.

6              SO WE TOOK AND SHELVED THE IDEA OF THE

7    TABLET FOR YEARS -- WE LATER STARTED UP AGAIN AND

8    THAT WAS THE IPAD -- BUT WE SWITCHED OVER IN 2004

9    TO BUILDING WHAT BECAME THE IPHONE.

10   Q    LET'S DEFINE SOME TERMS.  YOU MENTIONED THE

11   TERM "PINCH."  WHAT DO YOU MEAN BY "PINCH"?

12   A    YEAH.  THE WHOLE ILLUSION WE WERE TRYING TO

13   CREATE WITH THE TOUCHSCREEN WAS THAT YOU -- THAT

14   YOUR FINGERS WERE LITERALLY REACHING THROUGH THE

15   SCREEN TO THE CONTENT YOU SAW BEHIND IT.

16             AND SO IF YOU HAD TWO FINGERS, YOU WANTED

17   THE CONTENT BEHIND THOSE TWO FINGERS TO STAY THE

18   SAME, AND AS YOU PINCHED -- IMAGINE THERE WAS A

19   PICTURE OF A BICYCLE ON THE SCREEN AND YOU TOOK AND

20   YOU PUT ONE FINGER ON ONE WHEEL OF THE BICYCLE AND

21   THE ONE FINGER ON THE OTHER WHEEL.

22             AS YOU MOVED YOUR FINGERS APART, THE

23   WHEELS OF THE BICYCLE SHOULD STAY UNDERNEATH YOUR

24   FINGERS AND YOU ARE ZOOMING INTO THE PHOTO, THE

25   ENTIRE BICYCLE IS GETTING BIGGER.

```
1              CONVERSELY, IF YOU TAKE AND PINCH INWARD,
2    AGAIN, THE WHEELS OF THE BICYCLE ARE STAYING UNDER
3    YOUR FINGER AND THE BICYCLE WAS GETTING SMALLER.
4    SO THAT WAS DEPINCH OR REVERSE PINCH.
5    Q    THE OTHER TERM YOU USED THAT I WANT TO MAKE
6    SURE WE HAVE A DEFINITION FOR IS "SCROLL."  WHAT DO
7    YOU MEAN BY "SCROLL"?
8    A    AGAIN, THE ILLUSION IS THAT YOUR FINGER IS
9    PHYSICALLY MOVING THE CONTENT ON THE SCREEN.
10             SO WHEN YOU WOULD PUT A SINGLE FINGER
11   DOWN AND MOVE THAT FINGER ALONG, YOU WERE SCROLLING
12   THE CONTENTS.
13             SO IF THERE WAS A DOCUMENT AND YOU PUT
14   YOUR FINGER DOWN, YOU'RE PHYSICALLY HOLDING THE
15   DOCUMENT UP AND DOWN AND SCROLLING IT.
16             IF THERE'S A LIST OF MUSIC, YOU'RE
17   PHYSICALLY MOVING THAT LIST OF MUSIC AS YOU SCROLL.
18   Q    WHAT WAS YOUR PERSONAL ROLE, THEN, JUST IN
19   GENERAL, IN TERMS OF THE DEVELOPMENT OF THE IPHONE?
20   A    IN 2004 WHEN WE DECIDED TO, TO BUILD THE
21   IPHONE, STEVE KNEW THERE WERE A LOT OF PEOPLE THAT
22   WERE GOING TO HAVE TO BE INVOLVED, A LOT OF GROUPS,
23   SO HE PUT DIFFERENT PEOPLE IN CHARGE OF EACH OF THE
24   GROUPS.
25             I WAS PUT IN CHARGE OF ALL OF THE
```

```
1     SOFTWARE, SO I STARTED AND BUILT A TEAM.
2              AND THERE WAS A HARDWARE TEAM, THERE WAS
3     AN INDUSTRIAL DESIGN TEAM.  SO THERE WERE MANY
4     TEAMS AND I WAS RESPONSIBLE FOR BUILDING THE
5     SOFTWARE TEAM.
6     Q    HOW DID YOU GO ABOUT RECRUITING THE TEAM THAT
7     YOU USED FOR THE IPHONE PROJECT?
8     A    SO THIS WAS -- THIS WAS A REAL CHALLENGE.
9     STEVE GAVE ME A, A DIFFICULT CONSTRAINT, AND THAT
10    CONSTRAINTS WAS HE DIDN'T WANT, FOR SECRECY
11    REASONS, FOR ME TO HIRE ANYONE OUTSIDE OF APPLE TO
12    WORK ON THE USER INTERFACE, MEANING ANYTHING YOU
13    WERE GOING TO SEE ON THE SCREEN, HE DIDN'T WANT ME
14    TO HIRE ANYONE FROM OUTSIDE OF APPLE TO WORK ON
15    THAT.  SO I HAD TO FIND PEOPLE FROM WITHIN APPLE TO
16    WORK ON THAT.
17             BUT HE TOLD ME I COULD HIRE ANYONE IN THE
18    COMPANY, I COULD MOVE ANYONE IN THE COMPANY INTO
19    THIS TEAM TO BUILD THE IPHONE TEAM.
20             AND THAT WAS QUITE A CHALLENGE.  THE WAY
21    I DID IT IS I WOULD, I WOULD FIND PEOPLE WHO WERE
22    TRUE SUPERSTARS AT THE COMPANY, JUST AMAZING
23    ENGINEERS, AND I WOULD BRING THEM TO MY OFFICE AND
24    I WOULD SIT THEM DOWN AND I WOULD SAY, "YOU ARE A
25    SUPERSTAR IN YOUR CURRENT ROLE.  YOUR MANAGER LOVES
```

```
1    YOU.  YOU'RE GOING TO BE INCREDIBLY SUCCESSFUL AT

2    APPLE IF YOU JUST STAY IN YOUR CURRENT ROLE AND

3    KEEP ON DOING WHAT YOU WANT TO DO.

4             "I HAVE ANOTHER OFFER FOR YOU, ANOTHER

5    OPTION.  WE'RE STARTING A NEW PROJECT.  IT'S SO

6    SECRET, I CAN EVEN TELL YOU WHAT THAT NEW PROJECT

7    IS.  I CANNOT TELL YOU WHO YOU WILL WORK FOR.

8             "WHAT I CAN TELL YOU IS IF YOU CHOSE TO

9    ACCEPT THIS ROLE, YOU'RE GOING TO WORK HARDER THAN

10   YOU EVER HAVE IN YOUR ENTIRE LIFE.  YOU'RE GOING TO

11   HAVE TO GIVE UP NIGHTS AND WEEKENDS PROBABLY FOR A

12   COUPLE YEARS AS WE MAKE THIS PRODUCT."

13            AND AMAZINGLY, SOME TREMENDOUSLY TALENTED

14   PEOPLE ACCEPTED THAT CHALLENGE AND THAT'S HOW I PUT

15   TOGETHER THE IPHONE TEAM.

16   Q    WHY WAS THIS PROJECT SO SUPER SECRET?

17   A    WE -- WE WANTED TO BUILD A PHONE FOR

18   OURSELVES.  WE WANTED TO BUILD A PHONE THAT WE

19   LOVED, THAT REALLY WAS, YOU KNOW, A COMPUTER IN

20   YOUR POCKET IN SOME WAYS.

21            YOU KNOW, IT WAS THE ENTIRE INTERNET.  IT

22   WAS AN IPOD, SO IT HAD MUSIC.

23            WE WANTED SOMETHING THAT REALLY, YOU

24   KNOW, WAS A GREAT PHONE.

25            AND WE WANTED TO DO IT FROM WHOLE CLOTH.
```

```
 1    WE WANTED TO FIGURE OUT HOW TO BUILD SOMETHING

 2    GREAT WITHOUT ANYONE ELSE FINDING OUT WHAT WE WERE

 3    DOING AND LEAKING IT.

 4            SO WE TRIED KEEPING IT INCREDIBLY SECRET

 5    SO IT WOULD NOT LEAK OUT BEFORE WE ANNOUNCED IT.

 6    Q   AT THE BEGINNING OF THE PROJECT, WERE YOU

 7    CONFIDENT THAT YOU COULD DO THIS, DEVELOP A NEW

 8    PHONE?

 9    A   NOT AT ALL.

10    Q   WERE THERE -- IF YOU HAD NOT SUCCEEDED --

11    LET'S CHANGE HISTORY AND GO BACK TO THE PERSON WHO

12    DIDN'T CROSS THE STREET AND ALL OF HISTORY CHANGES.

13            IF YOU HAD NOT SUCCEEDED, WOULD THERE

14    HAVE BEEN NEGATIVE CONSEQUENCES FOR APPLE?

15    A   ABSOLUTELY.

16    Q   FOR EXAMPLE?

17    A   WE WERE TAKING MANY OF THE KEY PEOPLE AT THE

18    COMPANY AND MOVING THEM ON TO THIS PROJECT.  WE

19    ACTUALLY MOVED OUT OTHER RELEASES OF OUR PRODUCTS

20    BECAUSE OF THE PEOPLE THAT WE TOOK OFF THOSE

21    PROJECTS AND PUT ON TO THIS.

22            AND SO HAD IT NOT SUCCEEDED, NOT ONLY

23    WOULD WE HAVE HAD THE DETRIMENT OF THE LACK OF

24    THOSE PRODUCTS SHIPPING, WE WOULDN'T HAVE HAD

25    SOMETHING ELSE TO FILL IN AT THE SAME TIME.
```

```
 1          AND HAD WE NOT SUCCEEDED, SOME OF THESE

 2     GREAT PEOPLE WOULD HAVE BURNED OUT AND PROBABLY

 3     LEFT.

 4     Q    WHERE DID THIS DEVELOPMENT PROJECT TAKE PLACE

 5     PHYSICALLY?

 6     A    WE TOOK A -- ONE OF THE BUILDINGS WE HAVE UP

 7     IN CUPERTINO AND WE, WE LOCKED IT DOWN.  WE STARTED

 8     WITH ONE FLOOR.  WE LOCKED THE ENTIRE FLOOR DOWN.

 9     WE PUT DOORS WITH BADGE READERS, THERE WERE

10     CAMERAS, I THINK TO GET TO SOME OF OUR LABS, YOU

11     HAD TO BADGE IN FOUR TIMES TO GET THERE.

12          AND AT THE TIME, WE CALLED PROJECTS BY

13     CODE NAMES.  THEY WERE COLORS.  THE ORIGINAL IPHONE

14     WAS CALLED THE PURPLE PROJECT.

15          AND SO I REFERRED TO THIS, THIS BUILDING

16     AS THE PURPLE DORM BECAUSE --

17     Q    WHERE DID THAT NAME COME FROM?

18     A    WELL, VERY MUCH LIKE A DORM, PEOPLE WERE THERE

19     ALL THE TIME.  THEY WERE THERE AT NIGHT.  THEY WERE

20     THERE ON WEEKENDS.  YOU KNOW, IT SMELLED SOMETHING

21     LIKE PIZZA.

22          AND, IN FACT, ON THE FRONT DOOR OF THE

23     PURPLE DORM, WE PUT A SIGN UP THAT SAID "FIGHT

24     CLUB" BECAUSE THE FIRST RULE OF FIGHT CLUB IN THE

25     MOVIE IS YOU DON'T TALK ABOUT FIGHT CLUB, AND THE
```

```
1     FIRST RULE ABOUT THE PURPLE PROJECT IS YOU DO NOT

2     TALK ABOUT THAT OUTSIDE OF THOSE DOORS.

3     Q    THE PEOPLE ON THE SOFTWARE -- SO YOU'RE DOING

4     THE SOFTWARE AND THE USER INTERFACE.

5              WHAT HARDWARE WERE YOU USING DURING THE

6     DEVELOPMENT PHASE?

7     A    AS WE WERE BUILDING THE SOFTWARE, THE HARDWARE

8     TEAM WAS MOVING EQUALLY FAST TO BUILD A WHOLE SET

9     OF INCREDIBLE HARDWARE, AND AS THEY WOULD BUILD

10    SOMETHING, THEY WOULD GIVE IT TO US; WE WOULD

11    IMMEDIATELY PUT OUR SOFTWARE ON TOP OF THAT, FIND

12    ANY ISSUES, FIND THINGS THAT HAD BEEN FIXED, GIVE

13    FEEDBACK, AND THEN THEY WOULD ITERATE.

14             AND THE KEY REALLY WAS THE TOUCHSCREEN

15    DISPLAY.  AND THAT WAS A HUGE CHALLENGE.

16    Q    AND WHAT KIND OF TOUCHSCREEN?  WHAT WERE YOU

17    USING FOR A TOUCHSCREEN?

18    A    WHEN WE STARTED THE PROJECT, MOST TOUCHSCREENS

19    OUT THERE THAT PEOPLE HAD IN THEIR DEVICES WERE

20    CALLED RESISTIVE TOUCH, AND WHAT THAT MEANS IS WHEN

21    YOU TAKE YOUR FINGER AND YOU PRESS DOWN ON THE

22    SCREEN, IT ACTUALLY DEFORMS THE SCREEN AND CHANGES

23    THE RESISTANCE SO THAT THE SCREEN CAN TELL THAT

24    YOU'RE PHYSICALLY TOUCHING IT.

25             BUT THIS HAD TWO PRETTY LARGE PROBLEMS IN
```

```
1    OUR EYES.  ONE IS IT PHYSICALLY DEFORMS THE SCREEN,

2    SO IF YOU'RE LOOKING AT AN IMAGE OR A LIST OF MUSIC

3    ON THE SCREEN, YOU SEE THIS WARPING OF THE TEXT OR

4    THE IMAGE.  AND SO WE DIDN'T LIKE THE WARPING PART.

5             THE SECOND IS WHEN YOU MOVE YOUR FINGER

6    ALONG, YOU HAVE TO PRESS PRETTY HARD, SO YOUR

7    FINGER STARTS TO FATIGUE OVER TIME AS YOU'RE TRYING

8    TO SCROLL.  AND WE WERE TRYING TO CREATE THIS

9    ILLUSION THAT YOU'RE LITERALLY TOUCHING THE CONTENT

10   AND MOVING IT WITH YOUR FINGER, AND YOU SHOULD BE

11   ABLE TO TOUCH IT REALLY LIGHTLY.

12            SO THE HARDWARE TEAM SET OUT TO BUILD

13   SOMETHING CALLED CAPACITIVE TOUCH, AND CAPACITIVE

14   TOUCH ALLOWS YOU TO GET YOUR FINGER VERY CLOSE OR

15   EVEN LIGHTLY TOUCH THE SCREEN, IT CHANGES THE

16   CAPACITANCE AND NOTICES YOUR FINGER THERE.

17            SO THE HARDWARE TEAM WAS BUILDING THESE

18   EARLY PROTOTYPES AND LATER PROTOTYPES OF A

19   CAPACITIVE TOUCH SCREEN AND WE WERE TAKING

20   ADVANTAGE OF THAT WITH OUR SOFTWARE.

21   Q    NOW, YOU'VE DONE OPERATING SYSTEMS AND USER

22   INTERFACES FOR BOTH COMPUTERS AND PHONES, AND I

23   WANT TO ASK YOU, WHAT UNIQUE CHALLENGES WERE YOU

24   FACING TO TRY TO DO THIS OPERATING SYSTEM, AND THE

25   USER INTERFACE PARTICULARLY, ON A SMALL
```

```
1    TOUCHSCREEN?

2    A    THERE WERE A NUMBER OF CHALLENGES.  ONE OF

3    THEM WAS EVERYTHING WE DEALT WITH BEFORE WAS BASED

4    ON A MOUSE AND A KEYBOARD, AND HERE WE WERE

5    CHANGING THE ENTIRE USER INTERFACE TO BE BASED

6    AROUND TOUCH.

7              SO WE HAD TO RETHINK EVERYTHING ABOUT HOW

8    BIG CONTROLS SHOULD BE, WHAT SHOULD HAPPEN WHEN YOU

9    TOUCH, HOW DO YOU SCROLL, HOW DO YOU KNOW WHERE YOU

10   ARE IN A DOCUMENT, HOW DO YOU KNOW IF YOU'RE AT THE

11   END OF A LIST OR THE END OF A DOCUMENT?

12             EVERY SINGLE PART OF THE ENTIRE DEVICE

13   HAD TO BE RETHOUGHT FOR DOING TOUCH.  SO WE STARTED

14   WITH A BRAND NEW U/I, A BRAND NEW USER INTERFACE,

15   INSTEAD OF SOMETHING THAT WAS EXISTING.  SO THAT'S

16   ONE.

17             SECOND IS WE DIDN'T WANT TO HAVE A

18   PHYSICAL KEYBOARD ON HERE.  I MEAN, IF YOU LOOK

19   BACK TO, YOU KNOW, EVEN 2005 WHEN THE ENGINEERING

20   TEAM STARTED ON THIS, SMARTPHONES ALL HAD PHYSICAL

21   KEYBOARDS.  YOU KNOW, THE MOST POPULAR AT THE TIME

22   PROBABLY WAS A BLACKBERRY AND IT HAD A PHYSICAL

23   KEYBOARD.

24             AND MANY PEOPLE THOUGHT WE WERE ACTUALLY

25   CRAZY TO TRY TO BUILD SOMETHING WITHOUT ANY FORM OF
```

1    PHYSICAL KEYBOARD, NOT A SLIDE OUT ONE, NOT ONE ON

2    THE FRONT SCREEN, NOTHING.

3            AND SO THAT WAS, IN LARGE PART, A SCIENCE

4    PROJECT FOR US TO BE ABLE TO CREATE A, AN ON SCREEN

5    TOUCH KEYBOARD THAT COULD WORK REALLY WELL AND THEN

6    GET OUT OF THE WAY WHEN YOU WEREN'T USING IT.

7            AND THEN WHEN YOU SWITCHED TO A DIFFERENT

8    LANGUAGE, YOU COULD ADD DIFFERENT KEYS.

9            SO THERE'S LOTS OF ADVANTAGES.  BUT IT

10   WAS REALLY DIFFICULT.

11           ONE OTHER ONE WAS WE WANTED TO GIVE

12   PEOPLE THE ENTIRE WEB, THE ENTIRE INTERNET

13   EXPERIENCE, AND THE INTERNET IS DESIGNED FOR A MUCH

14   LARGER SCREEN.  WHEN A WEB DEVELOPER IS BUILDING A

15   SITE FOR THE INTERNET, THEY DESIGN IT EXPECTING A

16   WINDOW LIKE THIS ON A COMPUTER.

17           AND, YET, WE HAVE THIS VERY, YOU KNOW,

18   COMPARED TO THAT, SMALL WINDOW, SMALL SCREEN, INTO

19   THAT WEB WORLD.

20           SO WE WANTED TO SOLVE THE PROBLEM OF

21   GIVING PEOPLE THE ENTIRE REAL INTERNET ON THIS

22   DEVICE.

23   Q    WHERE THERE INTERNET BROWSERS AVAILABLE AT THE

24   TIME ON PHONES?

25   A    THERE WERE.  THERE WAS A TECHNOLOGY CALLED

```
1    WAP, W-A-P, AND IT REALLY GAVE YOU THIS BABY WEB,

2    THIS DUMBED DOWN WEB.

3         YOU CAN IMAGINE A WEB DEVELOPER WHO'S

4    BUILDING A WEBSITE, SAY THE NEW YORK TIMES.  IF

5    THEY WANTED TO PROVIDE THAT FOR A MOBILE DEVICE,

6    THEY HAD TO REWRITE THE ENTIRE WEB PAGE, THE HOME

7    PAGE AND ALL OF THE OTHER PAGES, SPECIFICALLY TO

8    APPEAR IN THIS OTHER FORMAT FOR THESE DUMBED DOWN

9    BROWSERS.

10   Q    WHEN YOU'RE PUTTING A WEB PAGE ON A SMALL

11   SCREEN, IS PRINT SIZE AN ISSUE?

12   A    ABSOLUTELY.  IF YOU'RE LOOKING AT, SAY, AGAIN,

13   THE NEW YORK TIMES, THE ENTIRE WEB PAGE AND IT'S

14   FITTING ON A THREE AND A HALF INCH SCREEN, THEN THE

15   TEXT SIZE IS FAR TOO SMALL FOR MOST THINGS TO READ

16   IT.

17        SO YOU HAVE TO BE ABLE TO ZOOM AROUND TO

18   BE ABLE TO SEE IT.

19   Q    YOU HAVEN'T BEEN HERE FOR SOME OF THE

20   ARGUMENTS, BUT THERE'S BEEN SOME DISCUSSIONS OF

21   WHETHER SOME OF THE USER INTERFACE INVENTIONS THAT

22   WE ARE GOING TO BE TALKING ABOUT ARE SMALL THINGS

23   OR TRIVIAL THINGS OR LESS IMPORTANT THAN OTHER

24   STUFF.

25        FROM YOUR OWN EXPERIENCE, HOW DO YOU
```

```
1    CAPTURE THE AMOUNT OF THE INVESTMENT THAT WENT INTO

2    CREATING THESE USER INTERFACE FEATURES THAT YOU'RE

3    TALKING ABOUT?

4           MR. JOHNSON:  OBJECTION, VAGUE.

5           THE COURT:  OVERRULED.

6           THE WITNESS:  THE INVESTMENT IN BUILDING

7    A USER INTERFACE THAT COULD WORK ON THIS SIZE

8    DEVICE WITH YOUR FINGERS AND TOUCH WAS IMMENSE.  I

9    KNOW I PERSONALLY DEDICATED YEARS OF MY LIFE TO

10   THIS, AS DID HUNDREDS OF PEOPLE ON THIS TEAM.

11          AND IT WAS VERY, VERY DIFFICULT.

12   BY MR. MCELHINNY:

13   Q   SIR, IF YOU WOULD OPEN YOUR BINDER, PLEASE, TO

14   EXHIBIT 163.  I'M SORRY, EXHIBIT 1046.

15          WHAT IS EXHIBIT 1046, SIR?

16   A   IT IS U.S. PATENT 7,864,163.

17   Q   AND ARE YOU ONE OF THE NAMED INVENTORS ON THIS

18   PATENT?

19   A   I AM.

20          MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE

21   EXHIBIT 1046.

22          THE COURT:  ANY OBJECTION?

23          MR. JOHNSON:  NO, YOUR HONOR.

24          THE COURT:  IT'S ADMITTED.

25   ///
```

```
 1              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
 2              1046, HAVING BEEN PREVIOUSLY MARKED FOR
 3              IDENTIFICATION, WAS ADMITTED INTO
 4              EVIDENCE.)
 5    BY MR. MCELHINNY:
 6    Q    SIR, CAN YOU TELL US, AT A GENERAL LEVEL, WHAT
 7    YOUR INVENTION DEALT WITH?
 8    A    SO THIS INCLUDES A LOT OF THINGS.  LET ME
 9    DESCRIBE ONE EXAMPLE THAT'S COVERED BY THIS
10    INVENTION.
11              WHEN YOU'RE BROWSING THE WEB IN A WEB
12    BROWSER, LIKE SAFARI, THERE ARE A LOT OF DIFFERENT
13    STORIES AND SO, AGAIN, IMAGINE THE NEW YORK TIMES
14    HOME PAGE.  YOU GO THERE AND THERE'S COLUMNS OF
15    STORIES, THERE'S HORIZONTAL STORIES, THERE MIGHT BE
16    AN IMAGE OF A DIFFERENT SIZE, MAYBE A MOVIE, ALL
17    THESE DIFFERENT PIECES OF CONTENT ON THE WEB PAGE.
18              AND THE ISSUE IS -- WELL, WHAT THIS TRIES
19    TO SOLVE IS TO MAKE A REALLY EASY WAY FOR YOU TO
20    NAVIGATE BETWEEN THOSE DIFFERENT STORIES, THOSE
21    DIFFERENT PIECES OF CONTENT ON THE WEB PAGE.
22    Q    AND HOW -- CAN YOU TELL US HOW IT DOES THAT?
23    A    YES.  SO IN THAT EXAMPLE, YOU CAN JUST -- WHAT
24    WE IMPLEMENTED WAS YOU CAN DOUBLE TAP ON ONE OF THE
25    STORIES, AND JUST BY DOUBLE TAPPING ON THE STORY,
```

1    THE IPHONE ITSELF WILL FIGURE OUT WHICH STORY YOU

2    MEAN AND THEN ZOOM IT UP SO IT SETS THE FONT SIZE

3    RIGHT AND POSITIONS IT AS BEST IT CAN FOR YOU TO

4    READ THAT STORY.

5              AND THEN YOU CAN TAP, DOUBLE TAP ON

6    ANOTHER STORY NEXT TO IT, AND IT'LL AUTOMATICALLY

7    CHANGE THE SCALING AND MOVE THAT PART OF THE STORY

8    SO YOU CAN READ THAT ONE REALLY WELL ALSO.

9              SO IT ALLOWS YOU TO REALLY EASILY

10   NAVIGATE THROUGH A WEBSITE JUST BY TAPPING AROUND,

11   OR DOUBLE TAPPING AROUND.

12   Q    CAN WE PLEASE HAVE PLAINTIFF'S DEMONSTRATIVE

13   EXHIBIT 25?

14             CAN YOU -- CAN YOU TELL US WHAT THIS IS

15   SHOWING, PLEASE?

16   A    SO I THINK THIS MIGHT BE THE NEW YORK TIMES

17   WEBSITE, I CAN'T SEE THE TOP OF IT HERE, BUT IT

18   LOOKS LIKE A WEBSITE WITH A NUMBER OF NEWS STORIES.

19             CAN WE PLAY IT?

20             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

21   OPEN COURT OFF THE RECORD.)

22             THE WITNESS:  SO YOU SEE THERE, HE DOUBLE

23   TAPPED, IT FIGURED OUT THE STORY THE PERSON WANTED

24   TO READ, ZOOMED IN TO SHOW THAT STORY, SO THE STORY

25   LOOKS GREAT.

754

```
1              NOW IF HE DOUBLE TAPS SOMEWHERE ELSE, IT
2    AUTOMATICALLY ZOOMS AND MOVES THAT OTHER STORY OR
3    INFORMATION -- THIS IS SOME STOCK PRICES -- INTO
4    VIEW.
5              SO IT MAKES IT REALLY SIMPLE FOR YOU TO
6    MOVE AROUND, NAVIGATE AROUND THE WEBSITE JUST BY
7    DOUBLE TAPPING ON WHAT YOU WANT TO SEE.
8    BY MR. MCELHINNY:
9    Q    HOW DID YOU COME UP WITH THIS INVENTION?
10   A    I REMEMBER AS WE BUILT THE IPHONE, I SPENT A
11   LOT OF TIME USING THE EARLY PROTOTYPES MYSELF.  AND
12   I WOULD USE THEM TO SEND ALL MY E-MAIL, TO BROWSE
13   THE WEB, BASICALLY ANYTHING I COULD DO ON THE
14   PROTOTYPE I WOULD DO ON THE PROTOTYPE INSTEAD OF ON
15   A COMPUTER.
16             AND SO I SPENT A LOT OF TIME BROWSING THE
17   WEB ON THE EARLY PROTOTYPE.  IT WAS REALLY COOL,
18   BECAUSE YOU COULD PINCH IN TO STORIES, YOU COULD
19   USE YOUR FINGER TO SCROLL THROUGH THE STORY, MOVE
20   TO ANOTHER STORY AND YOU COULD PINCH OUT.
21             BUT I FOUND I SPENT A LOT OF TIME
22   CAREFULLY PINCHING A STORY TO BE JUST RIGHT, SO IT
23   WOULD FIT JUST RIGHT WITH THE RIGHT FONT SIZE, AND
24   THEN SCROLLING IT, AND THEN PINCHING THE NEXT STORY
25   TO BE JUST RIGHT, SITUATED EXACTLY WHERE I WANTED
```

1    IT ON THE PHONE.

2              AND I THOUGHT, I'M HOLDING THIS

3    INCREDIBLY POWERFUL DEVICE IN MY HAND, WHY CAN'T IT

4    FIGURE OUT WHAT I KEEP ON DOING OVER AND OVER AGAIN

5    AND JUST DO IT FOR ME?

6              AND SO I CHALLENGED THE TEAM TO ENABLE

7    YOU TO JUST DOUBLE TAP ON A STORY AND THEN HAVE IT

8    DO THE ZOOM UP AND CENTER IT, SUBSTANTIALLY IN THIS

9    CASE, CENTER IT FOR ME TO READ THAT STORY.

10             AND THE TEAM AT FIRST THOUGHT THIS IS

11   GOING TO BE SUPER HARD, MAYBE NOT POSSIBLE, AND

12   THEY WENT BACK AND WORKED REALLY HARD AND MADE IT

13   POSSIBLE.

14   Q   IS THERE ANY RELATIONSHIP BETWEEN THE FEATURES

15   THAT WE'RE SHOWING AND THE ACTUAL STRUCTURE OF THE

16   WEB PAGE ITSELF?

17   A   YES.  THE WEB PAGE, BY ITS NATURE, IS -- IT'S

18   AN ELECTRONIC DOCUMENT, THE WEB PAGE IS, AND WEB

19   PAGES ARE GENERALLY MADE WITH THIS LANGUAGE CALLED

20   HTML, AND HTML DEFINES PIECES OF STRUCTURE.

21             AND SO WHAT WE IMPLEMENTED WAS WHEN THE

22   USER DOUBLE TAPS ON AN AREA, IT FIGURES OUT THE

23   PIECE OF STRUCTURE THAT IS DEFINED BY THE HTML AND

24   DEFINED BY THE APPEARANCE ON THE SCREEN, DETERMINES

25   THE SORT OF BOX OF STRUCTURE YOU CARE ABOUT, AND

1    THAT'S THE ONE THAT IT ZOOMS UP FOR YOU.

2    Q    PHYSICALLY, HOW IS THIS FEATURE IMPLEMENTED?

3    HOW DO YOU PUT IT INTO THE PHONE SYSTEM?  IS IT A

4    SOFTWARE STRUCTURE?

5    A    IT IS -- THE WHOLE THING IS A PIECE OF

6    SOFTWARE.  IT'S BUILT RIGHT INTO THE OS, AND BUILT

7    INTO A NUMBER OF PLACES IN THE OS.

8              SO YOU CAN USE IT, YOU KNOW, IN THIS

9    EXAMPLE IN A BROWSER.  YOU CAN USE IT IN MAIL, SAY

10   YOU RECEIVE DOCUMENTS.

11             YOU CAN DO IT, I THINK, TO PREVIEW OTHER

12   SORTS OF DOCUMENTS, LIKE PDF'S.

13             SO IT'S SORT OF BUILT THROUGHOUT THE OS

14   TO NAVIGATE THROUGH STRUCTURED DOCUMENTS.

15   Q    ARE THERE ANY CHALLENGES TO CODING OR PUTTING

16   THIS FEATURE INTO SOFTWARE?

17   A    YEAH, THERE WERE.

18             UNDERSTANDING THAT STRUCTURE AND, IN

19   FACT, THE STRUCTURE THAT THE USER CARES ABOUT,

20   THAT'S THE CHALLENGE.  THAT'S A LOT OF THE

21   CHALLENGE.

22             YOU CAN IMAGINE A STORY ON THE WEBSITE

23   WHERE THE FIRST LETTER OF THE FIRST WORD OF A STORY

24   IS A BIG CAPITAL LETTER, A GIANT LETTER, AND THE

25   REST OF THE STORY IS SMALLER.

```
 1          WHEN YOU DOUBLE TAP AROUND THAT FIRST
 2   LETTER, THE USER PROBABLY DOESN'T MEAN TO ZOOM INTO
 3   ONE LETTER.  THEY PROBABLY MEAN TO ZOOM INTO THE
 4   COLUMN OF THAT STORY.
 5          SO THERE WAS A LOT OF WORK TO FIGURE OUT
 6   WHAT WAS THE CORRECT STRUCTURE AND THE CORRECT BOX
 7   THAT THE USER CARED ABOUT AND ZOOM UP THAT CORRECT
 8   ONE.
 9   Q    IS IT THE GOAL HERE TO MOVE EACH THING THAT
10   THE PERSON WANTS INTO THE EXACT CENTER OF THE
11   SCREEN?
12          MR. JOHNSON:  OBJECTION.  LEADING.
13          THE COURT:  SUSTAINED.
14   BY MR. MCELHINNY:
15   Q    CAN YOU TELL US WHETHER OR NOT IT IS THE GOAL
16   OF THIS TO MOVE THE BOX DIRECTLY INTO THE CENTER OF
17   THE STRUCTURE?
18   A    SO THE GOAL IS TO -- WE CALL IT SUBSTANTIALLY
19   CENTER IT, BUT THE GOAL IS TO MOVE IT TO THE BEST
20   VIEWING PLACE FOR YOU.
21          IF YOU HAVE A PICTURE WHICH IS SURROUNDED
22   BY A LOT OF OTHER TEXT OR PICTURES AND THAT PICTURE
23   IS IN THE CENTER, WHEN YOU DOUBLE TAP ON THAT
24   PICTURE, IT'LL LIKELY END UP EXACTLY CENTERED ON
25   THE PHONE.
```

1          BUT IF YOU HAVE A, A COLUMN OF

2     INFORMATION, LET'S SAY IT'S A COLUMN OF FIRST NAMES

3     AND THEY'RE VERY SHORT NAMES AND IT'S ON THE VERY

4     LEFT-HAND SIDE OF A WEB PAGE, IF YOU DOUBLE TAP ON

5     THAT COLUMN, IT WOULD BE FOOLISH TO CENTER THAT

6     COLUMN IN THE MIDDLE OF THE PHONE BECAUSE YOU LEAVE

7     ALL THIS EMPTY SPACE BEYOND IT TO THE LEFT.  YOU'RE

8     JUST WASTING SPACE.

9          YOU CAN STILL PERFECTLY READ THOSE NAMES

10     LINED UP ON THE EDGE OF THE PHONE AND SEE MORE OF

11     THE WEB PAGE TO THE RIGHT.

12          SO WE TALKED ABOUT IT AS BEING

13     SUBSTANTIALLY CENTERED, MEANING CENTER IT WHERE IT

14     MAKES SENSE, BUT DON'T GO BEYOND THE EDGE OF A

15     DOCUMENT BECAUSE THERE'S NO REASON TO DO THAT.

16     Q     SIR, AS THE DEVELOPER OF ALL OF THE IOS

17     SYSTEM, DO YOU CONSIDER THIS A SIGNIFICANT FEATURE

18     IN THE IPHONE?

19     A     ABSOLUTELY.

20     Q     AND WHAT IS THE SIGNIFICANCE OF IT?

21     A     I REMEMBER WHAT IT WAS LIKE TO USE BEFORE WE

22     HAD THIS, WHILE WE WERE DEVELOPING IT, AND AFTER WE

23     IMPLEMENTED THE FEATURE, AND IT DRAMATICALLY

24     CHANGED HOW I USED THE WEB.  FOR ME PERSONALLY, IT

25     ENABLED ME TO BROWSE THE WEB MUCH MORE QUICKLY,

```
1    MUCH MORE FLUIDLY, AND I WOULD THINK TO GO AND
2    BROWSE CERTAIN WEBSITES ON MY PHONE WHERE, BEFORE,
3    I MIGHT HAVE THOUGHT I HAVE TO GO TO A COMPUTER FOR
4    THAT.
5              AND WE KNOW FROM OUR USERS THAT BROWSING
6    THE WEB IS ONE OF THE MORE POPULAR THINGS THEY DO
7    ON OUR IPHONES, AND ESPECIALLY ON OUR IPADS.
8              AND SO THIS, I THINK, ENABLES YOU TO HAVE
9    A, A DRAMATICALLY BETTER EXPERIENCE BROWSING THE
10   WEB ON OUR DEVICES.
11   Q    SIR, WAS THE FEATURE THAT'S COVERED BY THIS
12   PATENT, YOUR INVENTION, WAS IT EVER THE SUBJECT OF
13   A SPECIFIC AD THAT APPLE DID FOR ITS PRODUCTS?
14   A    YES.  WE MADE A TELEVISION AD SPECIFICALLY TO
15   HIGHLIGHT THIS.
16             MR. MCELHINNY:  YOUR HONOR, AT THIS POINT
17   I WOULD LIKE TO SHOW THAT AD, WHICH IS PART OF
18   PLAINTIFF'S EXHIBIT 12, WHICH IS IN EVIDENCE.
19             THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.
20             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
21   OPEN COURT OFF THE RECORD.)
22             MR. MCELHINNY:  THANK YOU, MR. FORSTALL.
23             I HAVE NO FURTHER QUESTIONS.
24             THE COURT:  ALL RIGHT.  THE TIME IS NOW
25   1:40.
```

**CROSS-EXAMINATION**

1
2    BY MR. JOHNSON:

3    Q    GOOD AFTERNOON, MR. FORSTALL.

4    A    GOOD AFTERNOON.

5    Q    MY NAME IS KEVIN JOHNSON.  WE'VE SEEN EACH

6    OTHER BEFORE; RIGHT?

7    A    SEVERAL DEPOSITIONS.

8    Q    OKAY.

9          SO IF I MAY APPROACH, YOUR HONOR, WE'RE

10   GOING TO HAND OUT SOME BINDERS.

11          (PAUSE IN PROCEEDINGS.)

12          MR. JOHNSON:  I THINK I'M JUST GOING TO

13   REFER TO THE LAST ONE.

14   Q    NOW, THE ORIGINAL IPHONE WAS INTRODUCED,

15   MR. FORSTALL, IN JANUARY 2007; RIGHT?

16   A    CORRECT.

17   Q    AND LET'S GO BACK A LITTLE BIT FURTHER AND

18   TALK ABOUT THE DEVELOPMENT OF THE IPHONE.

19          IN 2006, YOUR TEAM WAS CONCERNED THAT THE

20   SPEED OF THE PROCESSOR THAT WAS GOING TO BE USED IN

21   THE IPHONE WAS TOO SLOW COMPARED TO THE SPEED OF

22   THE PROCESSORS USED IN OTHER SMARTPHONES, INCLUDING

23   SAMSUNG'S SMARTPHONES; RIGHT?

24   A    I HAD CONCERNS THAT I WANTED IT TO BE AS FAST

25   AS POSSIBLE, YES.

1    Q    AND IN FACT, YOU LOOKED AT WHAT SAMSUNG'S

2    PHONE DID AND WHAT KIND OF PROCESSOR IT HAD; RIGHT?

3    DO YOU REMEMBER DOING THAT?

4    A    YES.

5    Q    OKAY.  AND THE IDEA THERE WAS THAT, BY LOOKING

6    AT WHAT YOUR COMPETITORS WERE DOING, POTENTIALLY,

7    THAT WAS OKAY; RIGHT?

8    A    YES.

9    Q    NOW, THERE WERE OTHER INSTANCES WHEN

10   EXECUTIVES AT APPLE LOOKED AT WHAT COMPETITORS WERE

11   DOING DURING THE DEVELOPMENT OF THE IPHONE; RIGHT?

12   A    YES.

13   Q    AND THERE WERE OTHER EXAMPLES WHEN APPLE

14   EXECUTIVES LOOKED SPECIFICALLY AT WHAT SAMSUNG WAS

15   DOING IN DEVELOPMENT OF THE IPHONE; RIGHT?  DURING

16   THE DEVELOPMENT OF THE IPHONE?

17   A    YES.

18   Q    NOW, DO YOU RECALL LOOKING AT A SAMSUNG PHONE

19   CALLED THE SGH-E910, A BANG & OLUFSEN FASHION

20   PHONE?

21   A    I DO NOT.

22   Q    DO YOU REMEMBER THAT IT HAD A CLICKWHEEL-LIKE

23   CONTROL?

24   A    I DO NOT.

25   Q    IF I CAN DIRECT YOUR ATTENTION TO EXHIBIT,

```
 1    DEFENDANT'S EXHIBIT 2524 THERE, PLEASE.

 2              LET ME KNOW WHEN YOU'RE THERE.

 3              DO YOU SEE IT?

 4    A    YEP.

 5    Q    OKAY.  DO YOU SEE IN THE MIDDLE THERE'S A --

 6    THERE'S AN E-MAIL FROM TONY FADELL TO STEVE JOBS,

 7    JONATHAN IVE, AND YOUR NAME IS LISTED AS A

 8    RECIPIENT?

 9    A    YES.

10    Q    AND THE E-MAIL IS DATED OCTOBER 5TH, 2005.  DO

11    YOU SEE THAT?

12    A    YES.

13    Q    AND THAT WAS OBVIOUSLY DURING THE DEVELOPMENT

14    OF THE IPHONE?

15    A    YES.

16              MR. JOHNSON:  YOUR HONOR, I'D ASK THAT

17    THIS EXHIBIT BE ADMITTED.

18              THE COURT:  ANY OBJECTION?

19              MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

20              THE COURT:  IT'S ADMITTED.

21              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

22              2524, HAVING BEEN PREVIOUSLY MARKED FOR

23              IDENTIFICATION, WAS ADMITTED INTO

24              EVIDENCE.)

25    BY MR. JOHNSON:
```

```
1     Q     AND DO YOU SEE THAT IN THIS EXHIBIT,

2     MR. FADELL -- BY THE WAY, MR. FADELL IS, WHAT, HE

3     WAS IN CHARGE OF HARDWARE FOR THE DEVELOPMENT OF

4     THE IPHONE?

5     A     YES, MOST OF THE HARDWARE.

6     Q     AND WE OBVIOUSLY KNOW WHO STEVE JOBS IS.

7           WHO'S JOHN RUBENSTEIN?

8     A     TONY FADELL REPORTED TO JOHN RUBENSTEIN, I

9     BELIEVE.

10    Q     SO WAS MR. RUBENSTEIN IN CHARGE OF, ULTIMATELY

11    IN CHARGE OF HARDWARE FOR THE IPHONE AT THE TIME?

12    A     YES.

13    Q     AND JEFF WILLIAMS IS ANOTHER SENIOR APPLE

14    EXECUTIVE; RIGHT?

15    A     YES.

16    Q     IS HE A MEMBER OF THE APPLE EXECUTIVE TEAM,

17    ONE OF THE TEN PEOPLE YOU TALKED ABOUT?

18    A     HE IS NOW.  HE WASN'T AT THE TIME.  BUT HE IS

19    NOW, YES.

20    Q     OKAY.  AND HOW ABOUT JOHNNY IVE?  JOHNNY IVE

21    IS THE LEAD INDUSTRIAL DESIGNER AT APPLE; RIGHT?

22    A     YES.

23    Q     AND IS HE A MEMBER OF THE EXECUTIVE TEAM?

24    A     YES, HE IS.

25    Q     AND DO YOU SEE THAT MR. FADELL FORWARDS
```

1    ULTIMATELY THIS E-MAIL ALONG TO MEMBERS WHO ARE NOW

2    ON THE EXECUTIVE TEAM AT APPLE, AND DO YOU SEE THAT

3    ULTIMATELY ABOVE THERE, STEVE JOBS FORWARDS THAT

4    E-MAIL TO MR. IVE AND SAYS, QUOTE, "THIS MAY BE OUR

5    ANSWER -- WE COULD PUT THE NUMBER PAD AROUND OUR

6    CLICKWHEEL."

7              DO YOU SEE THAT?

8    A    YES.

9    Q    AND DO YOU SEE THAT HE THEN, MR. JOBS, IS

10   ASKING FOR THOUGHTS FROM MR. IVE AND FROM

11   MR. ORDING ABOUT WHETHER THAT WOULD WORK OR NOT?

12   A    YES.

13   Q    THIS IS AN EXAMPLE OF APPLE EXECUTIVES LOOKING

14   AT THE SAMSUNG, IN THIS CASE, THE SGH-E910, FOR

15   INSPIRATION, RIGHT, DURING THE DEVELOPMENT OF THE

16   IPHONE.  THAT'S WHAT MR. JOBS SAYS THERE; RIGHT?

17   "THIS MAY BE OUR ANSWER"?

18   A    SO I CAN'T TELL FROM THIS WHETHER OR NOT IT

19   WAS FOR INSPIRATION.  WHEN HE SAYS "THIS MAY BE OUR

20   ANSWER," I CAN'T, READING THIS ONE, SAY BECAUSE I

21   DON'T REMEMBER WHAT THIS BANG & OLUFSEN PHONE WAS,

22   WHETHER HE'S SAYING THAT THAT ONE DOES SOMETHING,

23   OR HE'S SAYING "THIS MIGHT BE OUR ANSWER, WE CAN

24   PUT THE NUMBER PAD AROUND THE CLICKWHEEL."  SO I'M

25   NOT SURE HOW TO READ THIS ONE.

```
 1    Q    ALL RIGHT.  LET'S LOOK AT EXHIBIT 2525,

 2    PLEASE.  THIS IS AGAIN ANOTHER E-MAIL FROM

 3    MR. FADELL TO MR. IVE, MR. JOBS, MR. SCHILLER, WHO

 4    JUST TESTIFIED, AND TO YOU; RIGHT?

 5    A    YES.

 6    Q    AND THIS IS DATED NOVEMBER 7TH, 2006?

 7    A    YES.

 8              MR. JOHNSON:  YOUR HONOR, WE ASK THAT

 9    THIS BE ADMITTED AS WELL.

10              THE COURT:  ANY OBJECTION?

11              MR. MCELHINNY:  NO, YOUR HONOR.

12              THE COURT:  IT'S ADMITTED.

13              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

14              2525, HAVING BEEN PREVIOUSLY MARKED FOR

15              IDENTIFICATION, WAS ADMITTED INTO

16              EVIDENCE.)

17    BY MR. JOHNSON:

18    Q    THIS IS ANOTHER EXAMPLE OF APPLE EXECUTIVES

19    LOOKING AT ANOTHER SAMSUNG PRODUCT DURING THE

20    DEVELOPMENT OF THE IPHONE; RIGHT?

21    A    YES.

22    Q    AND THIS REFERENCE HERE REFERS TO WHAT'S

23    CALLED A NEW THREE-WAY FOLDABLE COMBINATION OF

24    PHONE, PERSONAL COMPUTER, AND MUSIC PLAYER.

25              DO YOU SEE THAT?
```

```
1    A    YES.

2    Q    DO YOU REMEMBER WHAT THIS PHONE LOOKED LIKE?

3    A    I DO NOT, NO.

4    Q    LET ME DIRECT YOUR ATTENTION TO EXHIBIT 2517.

5              NOW, ISN'T IT TRUE THAT APPLE EMPLOYEES

6    EVEN STARTED A COMPETITIVE ANALYSIS --

7    A    HOLD ON A SECOND.

8    Q    SURE.

9    A    2517.  OKAY.

10   Q    ARE YOU WITH ME?

11   A    YES.

12   Q    OKAY.  SO ISN'T IT TRUE THAT APPLE EMPLOYEES

13   STARTED A COMPETITIVE ANALYSIS INITIALLY IN 2008 TO

14   DETERMINE THE AREAS THAT THE IPHONE WAS LAGGING

15   BEHIND THE COMPETITION, INCLUDING SAMSUNG IN THIS

16   EXAMPLE?

17   A    NO, THAT'S NOT NECESSARILY WHAT THIS ONE

18   REFERS TO.

19             WE ARE ASKED TO BENCHMARK AGAINST THE

20   CALL PERFORMANCE OF OTHER CARRIERS, WHICH MEANS THE

21   NUMBER OF CALLS DROPPED.

22             WHEN YOU HAVE A PHONE, IT MAY DROP A CALL

23   AND THAT COULD BE DUE TO THE PHONE ITSELF, BUT IT

24   ALSO COULD BE DUE TO THE NETWORK.

25             AND SO THE LITMUS TEST THAT CARRIERS ASK
```

1    US TO DO IS TO TAKE CERTAIN OTHER PHONES, DRIVE

2    THESE DRIVE ROUTES WHERE WE'RE ON A PHONE CALL ON

3    MULTIPLE PHONES, OUR OWN AND OTHERS, AND SO -- AND

4    SEE WHERE IT DROPS.

5            AND IF WE DROP LESS PHONES THAN WHAT THEY

6    WOULD CONSIDER TO BE THEIR GOLDEN HANDSET, THEN THE

7    PHONE MIGHT BE GREAT AND BE DOING THE RIGHT THING

8    WITH ITS SOFTWARE, BUT THE NETWORK MIGHT HAVE A, A

9    LOW COVERAGE IN THAT AREA.

10           AND SO THIS RIGHT HERE -- AND THE PERSON

11   WHO'S RESPONSIBLE FOR SENDING THIS IS THE ONE WHO'S

12   RESPONSIBLE FOR THESE KIND OF DRIVE TESTS THEY WERE

13   REQUESTING TO COMPARE THE CALL DROP PERFORMANCE.

14   Q    AND IN THIS INSTANCE, THEY WERE COMPARING THE

15   PERFORMANCE OF THE IPHONE TO EVERY MAJOR SMARTPHONE

16   VENDOR, INCLUDING SAMSUNG; RIGHT?

17   A    YES.

18   Q    AND IN FACT, IN THIS INSTANCE, AND THIS IS --

19   YOU SEE THAT THIS IS AN APPLE INTERNAL E-MAIL DATED

20   NOVEMBER 18TH, 2008?

21   A    YES.

22   Q    AND DO YOU SEE THAT TOWARDS THE END, IT REFERS

23   SPECIFICALLY TO THE FACT THAT EACH FUNCTIONAL TEAM

24   WILL NEED TO ANALYZE THE AREA THAT WE ARE LAGGING

25   IN COMPETITION?

```
1    A    YES.
2              MR. JOHNSON:  YOUR HONOR, WE HAD ASK AT
3    THIS POINT THAT EXHIBIT 2517 BE MOVED INTO
4    EVIDENCE.
5              THE COURT:  ANY OBJECTION?
6              MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.
7              THE COURT:  SO ADMITTED.
8              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
9              2517, HAVING BEEN PREVIOUSLY MARKED FOR
10             IDENTIFICATION, WAS ADMITTED INTO
11             EVIDENCE.)
12   BY MR. JOHNSON:
13   Q    DO YOU SEE THAT THERE'S ALSO A REFERENCE AT
14   THE END OF THE FIRST PARAGRAPH THAT SAYS "WE'RE IN
15   THE PROCESS OF PURCHASING THESE DEVICES"?  DO YOU
16   SEE THAT?
17   A    YES.
18   Q    AND THAT "ONCE THEY ARRIVE, WE'LL START
19   VERIFYING THEIR FEATURE SETS IN EACH AREA."  RIGHT?
20   A    YES.
21             NOW, THIS TEAM IS THE TEAM THAT DOES
22   BASEBAND, WHICH IS THE CELL CONNECTIVITY TO THE
23   CELL TOWERS.
24             SO WHAT THEY WOULD BE REFERRING TO IS
25   FEATURES HERE, AND EVEN IN THE PART BELOW,
```

769

```
 1    FUNCTIONAL TEAMS, OUR FUNCTIONAL TEAMS RELATED TO

 2    PROTOCOLS BETWEEN THE PHONE AND THE CELL TOWER.

 3              THIS HAS NOTHING TO DO WITH USER

 4    INTERFACE OR TOUCH AT ALL.  THIS IS SPECIFICALLY TO

 5    DO WITH MAKING PHONE CALLS.

 6    Q    THIS SAYS THEY'RE GOING TO BE EVALUATING THE

 7    FEATURE SET IN EACH AREA; RIGHT?

 8    A    IT SAYS EACH AREA, AND FOR HYNENG, EACH AREA

 9    WOULD MEAN HIS AREA, WHICH IS THE PROTOCOLS FOR

10    MAKING A PHONE CALL.

11    Q    AND MR. HYNENG IS A SENIOR MANAGER IN THE

12    SOFTWARE?  HE REPORTS ULTIMATELY AS PART OF YOUR

13    GROUP?

14    A    HE'S IN THE RADIO TEAM.

15    Q    BUT HE'S PART OF YOUR GROUP; RIGHT?

16    A    YES.

17    Q    HE'S PART OF THE 1,000 OR 2,000 PEOPLE YOU

18    MENTIONED THAT ULTIMATELY YOU HAVE SUPERVISION FOR,

19    HE'S PART OF THAT; RIGHT?

20    A    YES.

21    Q    ARE YOU AWARE THAT APPLE HAS DONE VERY

22    DETAILED TEAR-DOWN ANALYSES OF COMPETITORS'

23    PRODUCTS, INCLUDING SAMSUNG'S?

24    A    YES.

25    Q    LET ME DIRECT YOUR ATTENTION TO EXHIBIT 2519.
```

1    LET ME KNOW WHEN YOU HAVE THAT.

2    A    GOT IT.

3    Q    OKAY.  THIS IS AN EXAMPLE OF ONE OF THOSE

4    TEAR-DOWNS; RIGHT?  IN THIS INSTANCE, THERE'S A

5    TEAR-DOWN OF THE SAMSUNG GALAXY S; RIGHT?

6    A    YES.

7              MR. JOHNSON:  YOUR HONOR, WE'D MOVE 2519

8    INTO EVIDENCE.

9              MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

10             THE COURT:  IT'S ADMITTED.

11             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

12             2519, HAVING BEEN PREVIOUSLY MARKED FOR

13             IDENTIFICATION, WAS ADMITTED INTO

14             EVIDENCE.)

15   BY MR. JOHNSON:

16   Q    AND I THINK YOU SAID, LOOKING AT THE OTHER

17   REFERENCE THAT WE JUST LOOKED AT, THAT THAT RELATED

18   TO DROPPED CALLS.

19             THIS IS A TEAR-DOWN THAT WE'RE LOOKING AT

20   NOW, 2519, THAT SPECIFICALLY REFERS TO EXAMINING

21   THE SOFTWARE FEATURES AND USER INTERFACE FOR THE

22   GALAXY S.  RIGHT?  DO YOU SEE ON THE SECOND PAGE AT

23   THE TOP, "EXAMINE SOFTWARE FEATURES AND U/I"?

24   A    I SEE THAT.  I'VE NEVER SEEN THIS BEFORE, AND

25   THIS WAS NOT DONE BY THE SOFTWARE TEAM.

1    Q    BUT IF YOU THUMB THROUGH THE PAGES, IF YOU

2    LOOK, FOR EXAMPLE, AT THE PAGE THAT ENDS IN 984,

3    YOU'LL SEE THERE A REFERENCE TO THE SAMSUNG

4    GALAXY S PHONE; RIGHT?

5    A    YES.

6    Q    AND IT SHOWS THE TOUCH BUTTONS THAT WE SEE AT

7    THE BOTTOM?

8    A    YEP.

9    Q    NOW, THESE ARE DIFFERENT FROM THE SINGLE HOME

10   BUTTON THAT'S USED ON AN IPHONE OR ON THE IPAD;

11   RIGHT?

12   A    YES.

13   Q    AND YOU'LL SEE THAT IT ALSO REFERS TO THE

14   SAMSUNG TOUCHWIZ U/I 3.0; RIGHT?

15   A    YES.

16   Q    AND ANDROID 2.1 IS A REFERENCE TO THE GOOGLE

17   ANDROID OPERATING SYSTEM; RIGHT?

18   A    CORRECT.

19   Q    AND IF YOU GO TO THE NEXT PAGE, 985, YOU'LL

20   SEE A FURTHER TEAR-DOWN OF THE DEVICE.  YOU'LL SEE

21   THE FACT THAT IT REFERS TO A, A -- THERE'S A BACK

22   COVER THAT'S REMOVED?

23   A    YEP.

24   Q    RIGHT?  AND THE -- AND HAVE YOU SEEN -- STRIKE

25   THAT.

1          THE -- THE BATTERY IN AN IPHONE CAN'T BE

2     REMOVED, RIGHT, BY A CONSUMER?

3     A    CORRECT.

4     Q    OKAY.  IF YOU GO TO THE NEXT PAGES, 986, 987,

5     YOU'LL SEE FURTHER DETAILED TEAR-DOWN ANALYSES,

6     RIGHT, BREAKING OUT EACH COMPONENT AND LOOKING BOTH

7     AT HARDWARE COMPONENTS AND THE ACTUAL BOARDS THAT

8     ARE USED, FOR EXAMPLE, ON 991?

9     A    ON 991?  WHERE IS THAT?

10    Q    THE LAST THREE NUMBERS ARE 991.  DO YOU SEE

11    THE LETTERS AT THE BOTTOM, PCB, THAT'S THE PRINTED

12    CIRCUIT BOARD ON THE GALAXY S?

13    A    SORRY.  YOU FLIPPED SEVERAL PAGES DOWN.

14          OKAY, YEAH, I SEE IT.

15    Q    OKAY.  AND THEN ON THE NEXT PAGE THERE'S AN

16    EVALUATION OF THE SOFTWARE FEATURES.

17          DO YOU SEE THAT?

18    A    I DON'T KNOW IF I'D CALL IT AN EVALUATION OF

19    SOFTWARE FEATURES, BUT IT'S A LIST OF A FEW

20    SOFTWARE FEATURES, YES.

21    Q    WELL, EARLIER IN THE DOCUMENT, WE SAW "EXAMINE

22    SOFTWARE FEATURES AND U/I."  THAT'S WHAT THIS PAGE

23    AT LEAST IS REFERRING TO; RIGHT?

24    A    YEAH.  I GUESS I JUST DON'T -- IT SAYS SAMSUNG

25    TOUCHWIZ.  IT'S DESCRIBING IT.  THERE'S NO

1    EVALUATION ON THAT.

2    Q    AT LEAST, FOR EXAMPLE, IN THE SOCIAL HUB, IT

3    TALKS ABOUT INTEGRATING ALL MESSAGING STREAMS INTO

4    ONE; UNDER SWIPE, IT TALKS ABOUT THE FACT THAT YOU

5    CAN TYPE UP TO 40 WORDS PER MINUTE; RIGHT?

6    A    YES.

7    Q    NOW, THERE'S NO SWIPE ON THE IPHONE, IS THERE?

8    A    THERE IS NOT.

9    Q    THERE'S NO SOCIAL HUB WIDGET ON THE IPHONE;

10   RIGHT?

11   A    THERE IS NOT.

12   Q    MR. FORSTALL, ARE YOU AWARE OF APPLE'S SENIOR

13   EXECUTIVES LOOKING AT SAMSUNG'S GALAXY TAB, IN THIS

14   INSTANCE A SEVEN-INCH TAB, TABLET COMPUTER, AND

15   LOOKING AT IT FOR THE PURPOSE OF EVALUATING WHETHER

16   IT MADE SENSE FOR APPLE TO MAKE A SEVEN-INCH IPAD?

17   A    I DON'T KNOW IF IT WAS LOOKED AT FOR THAT

18   REASON.  I DO KNOW THAT EDDIE CUE ONCE LOOKED AT,

19   USED IT FOR A LITTLE WHILE.

20        BUT I DON'T REMEMBER IF IT WAS DONE AS,

21   YOU KNOW, TO THE EXTENT, THE REASON THAT YOU SAID.

22   HE MIGHT HAVE COME TO A CONCLUSION, BUT I DON'T

23   REMEMBER HIM SAYING "I'M GOING TO LOOK AT THIS TO

24   SEE IF THIS IS SOMETHING WE SHOULD DO."

25   Q    WHO'S EDDIE CUE?

```
1    A    HE RUNS ITUNES AND A NUMBER OF THE APPS AT
2    APPLE.
3    Q    OKAY.  LET ME DIRECT YOUR ATTENTION TO EXHIBIT
4    2522, PLEASE.  THIS IS AN E-MAIL FROM MR. CUE TO
5    YOU, AS WELL AS TO MR. SCHILLER AND TIM COOK.  DO
6    YOU SEE THAT?
7    A    YEAH.  THERE'S SOMETHING ODD ABOUT THE
8    PRINTER, THE PRINTOUT YOU GAVE ME HERE.
9    Q    THIS IS A DOCUMENT -- THIS IS AN INTERNAL --
10   A    HOLD ON A SECOND.  WHAT I HAVE ON HERE LOOKS
11   DIFFERENT FROM WHAT YOU'RE SHOWING ON THE SCREEN
12   HERE.
13   Q    THERE MAY NOT HAVE -- IT'S THE SAME DOCUMENT.
14   IT JUST MAY NOT HAVE THE EXHIBIT?
15   A    IT'S NOT JUST THAT.  IT ACTUALLY SAYS, I DON'T
16   KNOW, I-G-A-D-S-A-L.  IT HAS NONSENSICAL WORDS ON
17   HERE.
18   Q    OKAY.  LET'S LOOK AT EXHIBIT 2522 AND I'LL
19   HAND UP -- I'LL HAND YOU A SEPARATE COPY DURING THE
20   INTERIM.
21            CAN WE GET THAT PLEASE?
22            IF WE LOOK AT WHAT'S ON THE SCREEN IN
23   FRONT OF YOU, CAN YOU SEE THAT?
24   A    I CAN.  IT'S A LITTLE BLURRY, BUT YES.
25            (PAUSE IN PROCEEDINGS.)
```

```
 1              (DISCUSSION OFF THE RECORD.)

 2              THE COURT:  I DON'T THINK THIS IS

 3    APPROPRIATE FOR YOU ALL TO BE HAVING A

 4    CONVERSATION, OKAY?

 5              MR. JOHNSON:  YEAH.

 6              THE COURT:  JUST ASK HIM.

 7    BY MR. JOHNSON:

 8    Q    LET'S GO BACK.  2522 IN FRONT OF YOU, DO YOU

 9    RECOGNIZE THAT AS AN E-MAIL FROM MR. CUE TO YOU, TO

10    MR. COOK, AND TO MR. SCHILLER?

11    A    YES.

12    Q    AND IT'S DATED NOVEMBER -- IT'S DATED

13    JANUARY 24TH, 2011?

14    A    YES.

15    Q    AND THIS IS AN APPLE INTERNAL E-MAIL; RIGHT?

16    A    YES.

17              MR. JOHNSON:  WE ASK THAT IT BE ADMITTED,

18    YOUR HONOR, PLEASE.

19              THE COURT:  ANY OBJECTION?

20              MR. MCELHINNY:  NO OBJECTION.

21              THE COURT:  IT'S ADMITTED.

22              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

23              2522, HAVING BEEN PREVIOUSLY MARKED FOR

24              IDENTIFICATION, WAS ADMITTED INTO

25              EVIDENCE.)
```

```
 1    BY MR. JOHNSON:

 2    Q    NOW, IN THIS INSTANCE, THIS IS AN EXAMPLE OF

 3    AN APPLE EXECUTIVE LOOKING AT THE GALAXY TAB HERE,

 4    AND HE SAYS THAT HE TENDS TO AGREE WITH MANY OF THE

 5    COMMENTS BELOW, AND, QUOTE, "I BELIEVE THERE WILL

 6    BE A SEVEN-INCH MARKET AND WE SHOULD DO ONE."

 7              DO YOU SEE THAT?

 8    A    I DO.

 9    Q    ALL RIGHT.  TO GO BACK, THERE'S NOTHING WRONG

10    WITH COMPETITORS LOOKING AT OTHER COMPETITORS'

11    PRODUCTS FOR PURPOSES OF BENCHMARKING, IS THERE?

12    A    NO.

13    Q    NOW, YOU ARE THE INVENTOR ON -- ONE OF THE

14    INVENTORS ON THE '163 PATENT; RIGHT?

15    A    YES.

16    Q    AND I THINK YOU TALKED ABOUT HOW THE WORK THAT

17    WAS DONE WITH RESPECT TO THAT WAS DONE IN SECRECY;

18    RIGHT?

19    A    AS SECRET AS WE COULD MAKE IT, YES.

20    Q    AS SECRET AS YOU COULD MAKE IT.  OKAY.

21              SO THE WORK THAT STARTED ON THE IPHONE

22    STARTED IN ABOUT 2004; RIGHT?

23    A    YEAH, 2004.

24    Q    AND IT'S AFTER YOU GOT TO APPLE?

25    A    IT -- YEAH.  I GOT TO APPLE IN 1997 AND WE
```

1    STARTED, AS I SAID, THE TABLET PIECE IN 2003.

2    Q    RIGHT.

3    A    AND THEN MOVED TO THE IPHONE PIECE IN 2004.

4    Q    OKAY.  SO WITH RESPECT TO YOUR PATENT, YOU'RE

5    AWARE, SIR, THAT A CLAIM -- THE CLAIMS THAT COME AT

6    THE END OF THE PATENT ARE WHAT DEFINE THE SCOPE OF

7    THE INVENTION; RIGHT?

8    A    YES.

9    Q    AND YOU'RE AWARE THAT IN ORDER FOR THERE TO BE

10   INFRINGEMENT, EACH AND EVERY LIMITATION, EVERY WORD

11   THAT'S IN THOSE CLAIMS HAS TO BE FOUND IN THE

12   ACCUSED PRODUCTS?

13   A    SO I'M NOT A LAWYER, SO I CAN'T EXPLAIN TO YOU

14   WHAT THE LAW IS AROUND EXACTLY EACH WORD.  I DON'T

15   KNOW THAT.

16   Q    RIGHT.  BUT THAT'S YOUR GENERAL UNDERSTAND;

17   RIGHT?

18   A    MY UNDERSTANDING IS THE CLAIMS DESCRIBE THE

19   PATENT AND INFRINGEMENT IS BASED ON THOSE CLAIMS.

20   Q    IT -- YOU TALKED GENERALLY ABOUT THE SUBJECT

21   MATTER OF THE '163.

22         NOW, ARE YOU AWARE THAT IN DECIDING TO

23   ISSUE A PATENT, THE U.S. PATENT OFFICE LOOKS AT

24   WHAT OTHER INVENTIONS THAT IT CAN FIND WERE IN THE

25   FIELD PREVIOUSLY?

```
1              MR. MCELHINNY:  OBJECTION, YOUR HONOR.

2     THIS IS BEYOND THE SCOPE AND, GIVEN THE LIMITATIONS

3     ON DIRECT, I THINK THE CROSS SHOULD BE LIMITED TO

4     THE SCOPE THAT I WAS ALLOWED TO GO INTO.

5              MR. JOHNSON:  YOUR HONOR, HE TALKED ABOUT

6     THE DEVELOPMENT OF THIS AND ALL I'M TRYING TO DO IS

7     VERY BRIEFLY GO INTO A LITTLE BIT OF BACKGROUND.

8              THE COURT:  YOU'RE GOING INTO HOW YOU GET

9     A PATENT, WHICH IS NOT REALLY RELEVANT.

10             I'M GOING TO SUSTAIN THE OBJECTION.  GO

11    TO SOMETHING ELSE.

12    BY MR. JOHNSON:

13    Q    LET ME ASK YOU, ARE YOU AWARE -- YOU'RE THE

14    INVENTOR ON THE PATENT.  WERE YOU INVOLVED IN THE

15    PROSECUTION OF THE PATENT AT ALL?

16    A    I DON'T REMEMBER THE PATENT LAWYERS COMING

17    BACK TO ME DURING THE PROSECUTION.

18    Q    ARE YOU AWARE THAT THE CLAIMS OF THE '163

19    PATENT WERE NARROWED DURING THE PROSECUTION?

20             MR. MCELHINNY:  SAME OBJECTION, YOUR

21    HONOR.  THIS IS WAY BEYOND WHAT I WAS ALLOWED TO

22    ADDRESS AND WHAT HE'S ADDRESSED.

23             THE COURT:  OVERRULED.

24             THE WITNESS:  COULD YOU REPEAT THE

25    QUESTION?
```

```
 1    BY MR. JOHNSON:

 2    Q    ARE YOU AWARE THAT DURING THE PROSECUTION OF

 3    THE PATENT, THE CLAIMS WERE NARROWED BY APPLE?

 4    A    I AM NOT.

 5    Q    ARE YOU AWARE THAT CERTAIN PRIOR ART WAS

 6    LOCATED WITH RESPECT TO THE '163 PATENT AND, AS A

 7    RESULT OF THAT PRIOR ART, THE CLAIMS WERE NARROWED

 8    DURING THE PROSECUTION?

 9    A    I WAS NOT AWARE OF THAT.  I THINK YOU

10    MENTIONED THAT DURING MY DEPOSITION, BUT OTHER THAN

11    THAT, I WAS NOT AWARE OF IT.

12    Q    I THINK YOU -- YOU MENTIONED ELECTRONIC

13    DOCUMENT DURING YOUR DIRECT TESTIMONY.  DO YOU

14    REMEMBER TALKING ABOUT THAT?

15            MR. MCELHINNY:  HE DID NOT MENTION

16    ELECTRONIC DOCUMENT, YOUR HONOR.

17            MR. JOHNSON:  HE DID IN THE CONTEXT OF

18    THE NEW YORK TIMES WEB PAGE.  I LISTENED VERY

19    CAREFULLY, BECAUSE THAT'S OBVIOUSLY ONE OF THE

20    ISSUES INVOLVED IN THIS CASE.

21            SO LET ME REPHRASE IT.

22    Q    IN -- WHEN YOU WERE TESTIFYING ON DIRECT, YOU

23    MENTIONED THE NEW YORK TIMES WEB PAGE AS AN EXAMPLE

24    OF AN ELECTRONIC DOCUMENT THAT'S SORT OF COVERED BY

25    YOUR '163 PATENT; RIGHT?
```

```
 1                MR. MCELHINNY:  OBJECTION, YOUR HONOR.
 2     THIS IS A CLAIM TERM THAT YOUR HONOR IS GOING TO
 3     CONSTRUE.  WE'RE NOW GETTING INTO THE CONSTRUCTION
 4     OF THIS ARGUMENT.
 5                I DID NOT GO INTO THIS ON DIRECT.  THE
 6     CONSTRUCTION IS THE LIMITATION --
 7                MR. JOHNSON:  HIS TESTIMONY --
 8                THE COURT:  I'M GOING TO OVERRULE THE
 9     OBJECTION.
10                BUT IF IT GOES TOO FAR, I'LL START
11     SUSTAINING THE OBJECTIONS.
12                GO AHEAD, PLEASE.
13     BY MR. JOHNSON:
14     Q    IS THE NEW YORK TIMES WEB PAGE THAT YOU LOOKED
15     AT AN EXAMPLE OF AN ELECTRONIC DOCUMENT?
16     A    YES, I THINK OF THE NEW YORK TIMES, AN HTML
17     WEB PAGE, AS AN ELECTRONIC DOCUMENT.
18     Q    AND YOU CAN HAVE ELECTRONIC DOCUMENTS EMBEDDED
19     WITHIN OTHER ELECTRONIC DOCUMENTS; RIGHT?
20     A    YOU CAN.  I MEAN, THERE'S A QUESTION OF
21     DEFINITION THERE OF WHAT IT MEANS FOR THE EMBEDDED
22     DOCUMENT TO BE A DOCUMENT IN AND OF ITSELF AS
23     OPPOSED TO A PIECE OF THE OUTER DOCUMENT.
24                AND SO IT KIND OF DEPENDS ON WHAT YOUR
25     DEFINITION IS HERE, LIKE WHAT -- I'M NOT SURE WHAT
```

1    YOU'RE TRYING TO GET AT.

2    Q    I'M TRYING TO ASK, WHEN YOU LOOK AT THE WEB

3    PAGE, THE NEW YORK TIMES WEB PAGE, IT'S GOT THE

4    OVERALL WEB PAGE, AND THEN IT'S GOT ARTICLES WITHIN

5    THE WEB PAGE, RIGHT, AND PHOTOGRAPHS?

6            MR. MCELHINNY:  YOUR HONOR, WE'RE ARGUING

7    AGAINST YOUR CLAIM CONSTRUCTION AND WE'RE TRYING TO

8    GET THE SAME TERMS USED IN A WAY THAT CAN BE QUOTED

9    OUT OF CONTEXT LATER AND I DID NOT GO INTO ANY OF

10   THIS.

11           MR. JOHNSON:  HE PLAYED THE VIDEO.

12           THE COURT:  OVERRULED.

13           GO AHEAD, PLEASE.

14           THE WITNESS:  SORRY.  WHAT'S THE

15   QUESTION?

16   BY MR. JOHNSON:

17   Q    YOU CAN ANSWER -- LET ME GO BACK.

18           IF YOU LOOK AT THE NEW YORK TIMES WEB

19   PAGE, IT'S GOT -- THAT IS AN ELECTRONIC DOCUMENT,

20   AND IT CONSISTS OF OTHER ELECTRONIC DOCUMENTS

21   EMBEDDED WITHIN THERE; RIGHT?

22           LIKE THERE'S AN ARTICLE OR A PHOTOGRAPH,

23   THEY'RE ALL PART OF THE WEB PAGE, THOSE ARE ALL

24   ELECTRONIC DOCUMENTS EMBEDDED WITHIN THE OVERALL

25   WEB PAGE; RIGHT?

```
 1    A     WELL, THE WAY HTML WORKS AND FOR THOSE
 2    STORIES, THEY --
 3    Q     IS THAT RIGHT?
 4    A     THEY THEMSELVES ARE PART OF THE ELECTRONIC
 5    DOCUMENT, THE DOCUMENT, THE ELECTRONIC DOCUMENT
 6    DOCUMENT OF THE WEB PAGE, AND THERE'S A STRUCTURE
 7    IN THERE WHICH TELLS YOU ABOUT A GIVEN STORY OR A
 8    GIVEN IMAGE.
 9          IT'S NOT THAT YOU HAD ANOTHER DOCUMENT IN
10    THE NEW YORK TIMES EMBEDDED WITHIN THE FIRST ONE.
11    YOU ACTUALLY HAVE STRUCTURE WITHIN THE HTML, WITHIN
12    THAT DOCUMENT.
13          SO I DON'T THINK OF, YOU KNOW, A STORY --
14    SO LET'S SAY THERE'S FIVE STORIES IN THE NEW YORK
15    TIMES AND THERE'S THREE IMAGES.  I DON'T THINK OF
16    THOSE FIVE STORIES AS EACH BEING INDEPENDENT, YOU
17    KNOW, SEPARATE DOCUMENTS IN THAT EXAMPLE.
18    Q     YOU TALKED ABOUT -- IN YOUR DIRECT TESTIMONY,
19    YOU TALKED ABOUT THE FACT THAT YOU COULD TAKE -- I
20    THINK THE EXAMPLE YOU GAVE WAS PUTTING YOUR FINGER
21    ON EACH WHEEL OF THE BICYCLE AND ZOOMING IN AND
22    ZOOMING OUT.
23          DO YOU REMEMBER TALKING ABOUT THAT?
24    A     YES.
25    Q     APPLE DIDN'T INVENT ZOOMING IN OR ZOOMING OUT
```

```
1    OF THE BICYCLE; RIGHT?  THAT EXISTED BEFORE APPLE'S
2    IPHONE?
3    A    I CAN'T SPEAK TO APPLE'S ENTIRE PATENT
4    PORTFOLIO.  I DON'T KNOW WHETHER OR NOT WE HAVE
5    PATENTS AROUND THAT OR NOT.
6    Q    BUT BASED ON -- BASED ON YOUR, ON YOUR
7    FAMILIARITY, YOU'RE THE HEAD OF IOS, YOUR SOFTWARE
8    EXPERIENCE, I'M ASKING YOU, APPLE DIDN'T INVENT
9    ZOOMING IN OR ZOOMING OUT ON A TOUCHSCREEN?
10            MR. MCELHINNY:  THIS QUESTION GOES INTO
11   THE AREA THAT I WAS NOT ALLOWED TO GO INTO ON
12   DIRECT ABOUT OTHER PATENTS THAT ARE AT ISSUE.
13            MR. JOHNSON:  I'M ASKING IT SOLELY IN THE
14   CONTEXT OF THE '163.  HE TALKED ABOUT IT IN THE
15   CONTEXT OF THE '163.
16            THE COURT:  THAT'S SUSTAINED.  I EXCLUDED
17   IN THE '915.
18            SO GO AHEAD.
19            THE TESTIMONY THAT WAS IN THE DEPOSITION
20   HAD TO DO WITH THIS TOPIC AND IT'S BEEN EXCLUDED,
21   SO PLEASE DON'T GO THERE.
22   BY MR. JOHNSON:
23   Q    NOW YOU TALKED ABOUT TOUCHSCREENS AS WELL,
24   MR. FORSTALL.  APPLE DIDN'T INVENT TOUCHSCREENS,
25   DID IT?
```

```
 1    A    AGAIN, I DON'T KNOW THE EXTENT OF APPLE'S

 2    PATENT PORTFOLIO AROUND TOUCHSCREENS.

 3    Q    SO YOUR ANSWER IS?

 4    A    I DON'T KNOW.

 5            MR. JOHNSON:  YOUR HONOR, NO FURTHER

 6    QUESTIONS.

 7            THE COURT:  ANY REDIRECT?  THE TIME IS

 8    NOW 2:07.

 9            MR. MCELHINNY:  MAY I HAVE DEFENDANT'S

10    EXHIBIT 2524.

11                REDIRECT EXAMINATION

12    BY MR. MCELHINNY:

13    Q    AND CAN WE FOCUS ON THE TOP E-MAIL, PLEASE,

14    FROM MR. JOBS.

15            WHEN MR. JOBS SAID "THEY REALLY SCREWED

16    THIS UP IN THAT RESPECT," DID YOU UNDERSTAND HIM AS

17    TO BE SAYING "WE SHOULD COPY SAMSUNG"?

18    A    ABSOLUTELY NOT.

19            MR. JOHNSON:  YOUR HONOR, LEADING.

20    OBJECTION.

21            MR. MCELHINNY:  MAY I HAVE --

22            THE COURT:  SUSTAINED.  YOU NEED TO ASK

23    THAT ANOTHER WAY.

24    BY MR. MCELHINNY:

25    Q    AS YOU SEE THIS, DO YOU UNDERSTAND THIS TO BE
```

```
 1    A DIRECTION TO COPY?

 2    A    I SEE THIS AS A DIRECTION FROM STEVE THAT WE

 3    SHOULD NOT COPY.  WE SHOULD DO SOMETHING DIFFERENT.

 4    HE SAID "THEY REALLY SCREWED THIS UP."

 5    Q    MAY I HAVE EXHIBIT 2519, PLEASE.

 6          CAN YOU TELL, SIR -- GO AHEAD AND GET

 7    THAT.

 8    A    YEAH.

 9    Q    WHAT WAS THE DATE ON THIS DOCUMENT?

10    A    IT LOOKS LIKE AUGUST 10TH OF 2010.

11    Q    HOW MANY YEARS AFTER THE IPHONE CAME OUT WAS

12    THIS DOCUMENT PREPARED?

13    A    MORE THAN THREE.

14    Q    THANK YOU.

15          YOU MENTIONED ON YOUR CROSS-EXAMINATION

16    THAT THERE'S NOTHING WRONG WITH BENCHMARKING.

17    A    CORRECT.

18    Q    IS THERE A POINT WHERE BENCHMARKING BECOMES

19    SOMETHING THAT YOU DO THINK IS INAPPROPRIATE?

20          MR. JOHNSON:  OBJECTION.  LEADING.

21          MR. MCELHINNY:  THAT'S NOT --

22          THE COURT:  OVERRULED.

23          GO AHEAD.

24          THE WITNESS:  ABSOLUTELY.  IT'S FINE TO

25    BENCHMARK, YOU KNOW, FOR PERFORMANCE REASONS.
```

1          IT'S NOT OKAY WHEN YOU THEN GO AND COPY

2     AND RIP SOMETHING OFF.  SO THERE'S A VERY, YOU

3     KNOW, STRONG DISTINCTION BETWEEN BENCHMARKING AND

4     COPYING.

5     BY MR. MCELHINNY:

6     Q    IN THE IOS AREA, ARE WE GOING TO SEE ANY

7     DOCUMENTS IN THIS CASE WITH SIDE-BY-SIDE

8     COMPARISONS BETWEEN APPLE AND SAMSUNG PRODUCTS

9     WHERE YOU OR ANY OTHER MANAGER AT SAMSUNG -- AT

10    APPLE HAVE DIRECTED YOUR PEOPLE TO COPY A SAMSUNG

11    PHONE?

12    A    I --

13          MR. JOHNSON:  YOUR HONOR, OBJECTION.

14    OUTSIDE THE SCOPE OF MY CROSS.  IT'S ALSO LEADING.

15          THE COURT:  OVERRULED.

16          GO AHEAD.

17          THE WITNESS:  I NEVER DIRECTED ANYONE TO

18    GO AND COPY ANYTHING FROM SAMSUNG.

19    BY MR. MCELHINNY:

20    Q    WHY NOT?

21    A    WE WANTED TO BUILD SOMETHING GREAT AND WE

22    THOUGHT WE COULD BUILD SOMETHING BETTER THAN ANYONE

23    ELSE HAD EVER BUILT ON THIS.  SO THERE WAS NO

24    REASON TO LOOK AT WHAT THEY DID.

25          MR. MCELHINNY:  NOTHING FURTHER, YOUR

```
 1    HONOR.
 2               THE COURT:  ALL RIGHT.  MAY THIS WITNESS
 3    BE EXCUSED?
 4               MR. JOHNSON:  YOUR HONOR, JUST BRIEFLY,
 5    JUST A COUPLE OF QUESTIONS JUST TO FOLLOW UP ON
 6    MR. MCELHINNY'S STATEMENT ABOUT EXHIBIT 2524,
 7    LITERALLY JUST A COUPLE QUESTIONS.
 8               THE COURT:  GO AHEAD.  IT'S 2:10.
 9                    RECROSS-EXAMINATION
10    BY MR. JOHNSON:
11    Q    IF WE COULD PULL THAT UP AGAIN, PLEASE, FRANK.
12               MR. MCELHINNY POINTED YOU TO THE PART
13    THAT TALKS ABOUT -- IT SAYS, "OF COURSE WE SHOULD
14    ORIENT IT LIKE A WATCH WITH 3, 6, 9, ASTERISK IN
15    THE HORIZONTAL AND VERTICAL POSITIONS, JUST LIKE
16    ANY CLOCK.  THEY REALLY SCREWED THIS UP IN THAT
17    RESPECT."
18               MR. JOBS STILL LIKED THE CONCEPT HERE, HE
19    WAS SAYING MAKE IT MORE LIKE A WATCH, RIGHT?
20               MR. MCELHINNY:  TO REPEAT MR. JOHNSON'S
21    OBJECTION, HE'S ASKING HIM TO SPECULATE ABOUT WHAT
22    MR. JOBS WAS SAYING.
23               THE COURT:  OVERRULED.
24               GO AHEAD, PLEASE.
25               THE WITNESS:  SO I, I DON'T KNOW WHAT
```

```
 1    THIS BANG & OLUFSEN PHONE HAD.  READING STEVE'S

 2    THING ALONE, HE'S RECOMMENDING THIS ACTUALLY ISN'T

 3    FOR THE IPHONE.  THIS IS FOR SOMETHING ELSE HE'S

 4    TALKING ABOUT.  SO IT REALLY HAS NOTHING TO DO WITH

 5    THE IPHONE.

 6              BUT HE'S SAYING, "HEY, HERE'S AN IDEA FOR

 7    THIS OTHER PRODUCT, HOW WOULD THEY DO SOMETHING,"

 8    AND THEN SAYING THAT SAMSUNG REALLY SCREWED IT UP.

 9    BY MR. JOHNSON:

10    Q    YEAH, BUT HE SAID AT THE VERY BEGINNING, THE

11    VERY FIRST PHRASE SAYS, "THIS MAY BE OUR ANSWER."

12    RIGHT?

13    A    BUT HE DOES NOT SAY THE BANG & OLUFSEN FASHION

14    PHONE MIGHT BE THE ANSWER.  HE SAYS "THIS MIGHT BE

15    THE ANSWER," DASH, "WE COULD PUT OUR NUMBER PAD

16    AROUND OUR CLICKWHEEL," AND WE HAD A CLICKWHEEL AT

17    THE TIME, SO WE WERE WORKING WITH THE IPOD, OUR

18    IPOD WHEEL, AND HE'S SAYING, "HEY, THIS MIGHT BE

19    OUR ANSWER.  WE CAN PUT A NUMBER PAD AROUND OUR

20    CLICKWHEEL."

21    Q    MR. FORSTALL, ALL I ASKED YOU WAS THE VERY

22    FIRST PHRASE HERE, IT SAYS "THIS MAY BE OUR

23    ANSWER."  RIGHT?

24    A    THAT IS WHAT IT SAYS.

25              MR. JOHNSON:  OKAY.  THANK YOU.  NO
```

```
1    FURTHER QUESTIONS.

2              THE COURT:  THE TIME IS NOW 2:11.  IS

3    THIS WITNESS EXCUSED?

4              MR. MCELHINNY:  HE IS FROM OUR SIDE, YOUR

5    HONOR.

6              THE COURT:  SUBJECT TO RECALL, OR CAN I

7    JUST EXCUSE HIM?

8              MR. MCELHINNY:  I PREFER TO HAVE HIM

9    COMPLETELY EXCUSED.  WE MAY CALL HIM ON REBUTTAL.

10   WE WILL NOT HAVE HIM IN THE COURTROOM.

11             THE COURT:  ALL RIGHT.  HE IS EXCUSED.

12             CALL YOUR NEXT WITNESS, PLEASE.

13             MR. LEE:  YOUR HONOR, APPLE CALLS

14   JUSTIN DENISON, WHO IS A SAMSUNG REPRESENTATIVE.

15   WE'RE GOING TO CALL HIM UNDER RULE 611 AND WE'D ASK

16   YOUR HONOR TO EXPLAIN THAT WE'RE CALLING HIM

17   ADVERSELY.

18             THE CLERK:  WOULD YOU RAISE YOUR RIGHT

19   HAND, PLEASE.

20                    JUSTIN DENISON,

21   BEING CALLED AS AN ADVERSE WITNESS ON BEHALF OF THE

22   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

23   EXAMINED AND TESTIFIED AS FOLLOWS:

24             THE WITNESS:  I DO.

25             THE CLERK:  HAVE A SEAT, PLEASE.  PAR.
```

```
 1              MR. LEE:  YOUR HONOR, I THINK -- CAN WE
 2    RETRIEVE THE NOTEBOOK FROM THE LAST WITNESS AND PUT
 3    THE RIGHT NOTEBOOKS UP?
 4              THE COURT:  YEAH, OF COURSE.
 5              THE CLERK:  STATE YOUR NAME, PLEASE, AND
 6    SPELL IT.
 7              THE WITNESS:  JUSTIN DENISON,
 8    J-U-S-T-I-N, D-E-N-I-S-O-N.
 9              MR. LEE:  YOUR HONOR, MAY I PROCEED, AND
10    MAY I PROCEED UNDER RULE 611?
11              THE COURT:  YES.  LET ME -- IT'S 2:14.
12    GO AHEAD, PLEASE.
13                    AS-ON CROSS-EXAMINATION
14    BY MR. LEE:
15    Q    GOOD AFTERNOON, MR. DENISON.
16    A    GOOD AFTERNOON.
17    Q    YOU WORK FORK SAMSUNG TELECOMMUNICATIONS
18    AMERICA; CORRECT?
19    A    YES, I DO.
20    Q    SOMETIMES REFERRED AS TO STA; CORRECT?
21    A    YES.
22    Q    SOMETIMES REFERRED AS SAMSUNG MOBILE; CORRECT?
23    A    SAMSUNG MOBILE U.S.A.
24    Q    YOU'VE WORKED FOR STA SINCE MAY OF 2008;
25    CORRECT?
```

```
1    A    CORRECT.

2    Q    AND YOU'RE THE CHIEF STRATEGY OFFICER;

3    CORRECT?

4    A    YES.

5    Q    AND IN THAT POSITION, YOU'RE CHARGED WITH

6    FACILITATING THE STRATEGY DEVELOPMENT OF STA;

7    CORRECT?

8    A    YES.

9    Q    IN THE NOTEBOOK BEFORE YOU THERE ARE SOME

10   EXHIBITS.

11           YOUR HONOR, MAY I APPROACH TO RETRIEVE

12   THE LAST ONE?

13           THE COURT:  PLEASE, GO AHEAD.

14   BY MR. LEE:

15   Q    SO MR. DENISON, IF YOU'D USE THE TWO WHITE

16   NOTEBOOKS.

17           SO IF YOU WOULD TURN IN VOLUME 1 TO TAB

18   6.  TELL ME WHEN YOU'RE THERE.

19   A    I'M THERE.

20   Q    ALL RIGHT.  AND I'M PUTTING PDX 15 ON THE

21   SCREEN.

22           AND LET'S SEE IF YOU CAN HELP US

23   UNDERSTAND JUST WHAT THE ORGANIZATION IS OF

24   SAMSUNG, OKAY?

25           AT THE BOTTOM IS STA; CORRECT?
```

1    A    YES, I SEE THAT.

2    Q    THAT'S THE COMPANY YOU WORK FOR; CORRECT?

3    A    YES, IT IS.

4    Q    IT'S LOCATED IN RICHARDSON, TEXAS; CORRECT?

5    A    THAT'S WHERE ITS HEADQUARTERS ARE.

6    Q    IT SELLS MOBILE PHONES IN THE UNITED STATES;

7    CORRECT?

8    A    MOBILE PHONES AND OTHER EQUIPMENT.

9    Q    AND INCLUDED AMONG THE OTHER EQUIPMENT ARE

10   TABLETS THAT CONNECT TO THE CELLULAR NETWORK;

11   CORRECT?

12   A    CORRECT.

13   Q    STA, AT THE BOTTOM OF THIS CHART, SELLS MOBILE

14   DEVICES TO PHONE CARRIERS WHO THEN SELL THEM TO

15   CUSTOMERS, LIKE THE FOLKS IN THE ROOM; CORRECT?

16   A    THAT'S RIGHT.

17   Q    NOW, IF WE LOOK AT THE GRAPHIC, STA IS OWNED

18   BY SOMEONE CALLED SEA; CORRECT?

19   A    YES.

20   Q    THAT'S SAMSUNG ELECTRONICS AMERICA?

21   A    YES, THAT'S MY UNDERSTANDING.

22   Q    LOCATED IN RICHFIELD, NEW JERSEY; CORRECT?

23   A    RICHFIELD PARK, NEW JERSEY, YES.

24   Q    AND SEA SELLS ALL SORTS OF DIFFERENT SAMSUNG

25   PRODUCTS; CORRECT?

1    A    SURE.

2    Q    TELEVISIONS?

3    A    YES.

4    Q    LAPTOP COMPUTERS?

5    A    YES.

6    Q    TABLETS?

7    A    I GUESS WHAT WE CALL WI-FI ONLY TABLETS, YES.

8    Q    CAMERAS?

9    A    YES.

10   Q    ALL RIGHT.  NOW, THAT COMPANY IS, IN TURN,

11   OWNED BY SOMETHING CALLED SAMSUNG ELECTRONICS

12   CORPORATION; CORRECT?

13   A    THAT'S MY UNDERSTANDING.

14   Q    THAT'S THE PARENT; CORRECT?

15   A    I GUESS IF THAT'S WHAT YOU MEAN BY OWNING

16   THEM, YES.

17   Q    AND THAT COMPANY IS SOMETIMES CALLED SEC;

18   CORRECT?

19   A    YES.

20   Q    IT'S LOCATED IN SEOUL, KOREA; CORRECT?

21   A    CORRECT.

22   Q    AND IT'S SOMETIMES CALLED HQ OR HEADQUARTERS;

23   CORRECT?

24   A    SURE.

25   Q    NOW, YOU REPORT TO A MAN NAMED DALE SOHN, THE

1    VICE-PRESIDENT OF STA; CORRECT?

2    A    YES.

3    Q    AND I WANT TO FOCUS ON STA BECAUSE THAT'S THE

4    COMPANY YOU WORK FOR; CORRECT?

5    A    YES.

6    Q    IT SELLS MOBILE PHONES AND TABLETS IN THE

7    UNITED STATES; RIGHT?

8    A    YES.

9    Q    IT TAKES PURCHASE ORDERS FROM CARRIERS;

10   CORRECT?

11   A    YES.

12   Q    YOU THEN TRANSFER THOSE PURCHASE ORDERS TO

13   KOREA, TO SEC; CORRECT?

14   A    I'M NOT ACTUALLY SURE HOW THAT PROCESS WORKS,

15   SO, NO, I'M NOT SURE WHETHER THAT'S CORRECT.

16   Q    YOU KNOW THAT STA IS NOT MAKING THE PHONES;

17   CORRECT?

18   A    CORRECT.

19   Q    YOU KNOW THE PHONES ARE BEING MADE BY SEC;

20   CORRECT?

21   A    IF BY "MADE" YOU MEAN MANUFACTURING,

22   MANUFACTURED, YES.

23   Q    SURE.  MAKE, MANUFACTURE, THEY MEAN THE SAME

24   THING; CORRECT?

25   A    THEY CAN, YES.

1    Q    OKAY.  NOW, SEC, THE KOREAN PARENT, THEN SHIPS

2    THE PRODUCTS TO LOCATIONS IN THE UNITED STATES;

3    CORRECT?

4    A    YES, TWO LOCATIONS.

5    Q    ALL RIGHT.  ONE IN CHICAGO; CORRECT?

6    A    YES.

7    Q    ONE IS DALLAS; CORRECT?

8    A    YES.

9    Q    AND THE PRODUCTS ARE THEN TRANSFERRED BY TRUCK

10   TO THE PLACES WHERE THE CUSTOMERS ARE LOCATED;

11   CORRECT?

12   A    YES.

13   Q    AND IF THE PARENT, SEC, PROVIDES YOU AN

14   INSTRUCTION ON A PRODUCT, ON A SALE, ON A CUSTOMER,

15   YOU'RE OBLIGATED TO FOLLOW THAT INSTRUCTION;

16   CORRECT?

17   A    I'M SORRY.  I'M NOT SURE I UNDERSTOOD THE

18   QUESTION.

19   Q    ALL RIGHT.  I'LL RESTATE IT AGAIN.

20   A    OKAY.

21   Q    I'M FOCUSSING ON SEC, THE PARENT COMPANY.  DO

22   YOU HAVE THAT IN MIND?

23   A    YES.

24   Q    OKAY.  IF THE PARENT COMPANY GIVES YOU AN

25   INSTRUCTION, A DIRECTION ABOUT A CUSTOMER, YOU'RE

1    OBLIGATED TO FOLLOW IT; CORRECT?

2    A    CAN YOU GIVE ME AN EXAMPLE, PLEASE, OF AN

3    INSTRUCTION --

4    Q    SURE.

5    A    -- ABOUT A CUSTOMER?

6    Q    IF THEY SAY TO YOU, "MR. DENISON, SHIP THIS

7    PRODUCT TO AT&T IN TEXAS," YOU FOLLOW THAT

8    INSTRUCTION; CORRECT?

9            MR. QUINN:  ASSUMES FACT, YOUR HONOR.

10   BY MR. LEE:

11   Q    GO AHEAD.

12   A    I'M NOT SURE THAT'S THE WAY IT WORKS.  I'M NOT

13   SURE THAT'S WHAT WOULD HAPPEN.

14   Q    DOES SEC PROVIDE YOU ANY DIRECTIONS AT ALL

15   ABOUT YOUR MOBILE PHONE PRODUCTS?

16   A    I WOULD SAY THAT THERE'S A LOT OF

17   CONVERSATIONS BACK AND FORTH.  COULD BE CONSTRUED

18   AS DIRECTIONS.

19   Q    NOW, MR. DENISON, YOU'VE BEEN DEPOSED IN THIS

20   CASE; CORRECT?

21   A    YES.

22   Q    ONE TIME WAS SEPTEMBER 21, 2011; CORRECT?

23   A    SEPTEMBER, YES, 2011.

24   Q    NOW, SO THE LADIES AND GENTLEMEN OF THE JURY

25   UNDERSTAND, YOU ACTUALLY APPEARED AS THE CORPORATE

```
1    REPRESENTATIVE OF SAMSUNG; CORRECT?

2    A    I DID.

3    Q    RIGHT.  YOU APPEARED ON BEHALF OF ALL THREE OF

4    THESE COMPANIES; CORRECT?

5    A    I DID.

6    Q    SO YOU WERE SPEAKING FOR ALL THREE OF THE

7    FOLKS THAT I HAD ON THAT SCREEN; CORRECT?

8    A    I WAS WITH RESPECT TO SOME CERTAIN TOPICS.

9    Q    AND I'M GOING TO COME TO THOSE TOPICS IN A

10   SECOND.

11          BUT SO THE LADIES AND GENTLEMEN OF THE

12   JURY UNDERSTAND, AS THE CORPORATE REPRESENTATIVE

13   FOR ALL THREE COMPANIES, YOU CAME TO A CONFERENCE

14   ROOM; CORRECT?

15   A    YES.

16   Q    THERE WAS A REPORTER, JUST LIKE OUR REPORTER

17   HERE, WHO WAS TAKING DOWN EVERYTHING YOU SAID;

18   CORRECT?

19   A    CORRECT.

20   Q    YOU WERE REPRESENTED BY LAWYERS; CORRECT?

21   A    YES.

22   Q    AND YOU WERE ASKED SOME QUESTIONS AS THE

23   CORPORATE REPRESENTATIVE FOR ALL THREE SAMSUNG

24   ENTITIES; CORRECT?

25   A    YES.
```

1    Q    NOW, AMONG THE TOPICS THAT YOU WERE ASKED TO

2    TESTIFY ABOUT WAS SAMSUNG'S IMITATION, COPYING, OR

3    EMULATION OF ANY PRODUCT, ANY APPLE PRODUCT IN

4    DEVELOPING, CREATING OR DESIGNING CERTAIN SAMSUNG

5    PRODUCTS; CORRECT?

6    A    THAT WAS TRUE WITH CERTAIN LIMITATIONS PLACED

7    BY THE LAWYERS.

8    Q    BUT WHEN YOU SAID JUST A FEW MINUTES AGO YOU

9    CAME INTO THIS ROOM ON BEHALF OF ALL OF THE SAMSUNG

10   ENTITIES TO TESTIFY, THAT WAS ONE OF THE ISSUES YOU

11   WERE TESTIFYING ABOUT; CORRECT?

12             MR. QUINN:  YOUR HONOR, ASKED AND

13   ANSWERED.  THERE WERE CERTAIN LIMITATIONS.

14             THE COURT:  OVERRULED.

15             GO AHEAD.

16             THE WITNESS:  I DID REPRESENT SAMSUNG ON

17   THAT TOPIC WITH REGARDS TO CERTAIN LIMITATIONS THAT

18   WERE PUT AROUND THAT TOPIC.

19   BY MR. LEE:

20   Q    NOW, YOU WERE ALSO PRESENTED BY SAMSUNG, ALL

21   THREE SAMSUNGS, TO TESTIFY ABOUT ANY REFERENCE TO

22   OR CONSIDERATION OF AN APPLE PRODUCT DURING THE

23   DESIGN OF THE PRODUCTS AT ISSUE, AND THAT WAS

24   CERTAIN PRODUCTS AT THE TIME; CORRECT?

25   A    IT WOULD ACTUALLY BE HELPFUL IF I HAD THE

1    LANGUAGE IN FRONT OF ME.  BUT I'M ASSUMING YOU'RE

2    READING WHAT THAT LANGUAGE WAS.

3    Q    SURE.  IT'S AT -- IT'S IN THE NOTEBOOK AT TAB

4    11, TOPIC 9 IF YOU WANT TO TAKE A LOOK AT IT.

5    A    OKAY.  I'M SORRY.  COULD YOU REPEAT THE

6    QUESTION?

7    Q    ALL RIGHT.  IF YOU LOOK AT TOPIC 9, IT SAYS,

8    QUOTE, "ANY REFERENCE TO OR CONSIDERATION OF AN

9    APPLE PRODUCT DURING THE DESIGN OF THE PRODUCTS AT

10   ISSUE."  CORRECT?

11   A    THAT'S WHAT IT SAYS.

12   Q    THAT'S ONE OF THE OTHER TOPICS YOU WERE

13   DESIGNATED TO TESTIFY ABOUT; CORRECT?

14   A    YES, WITH THE SAME LIMITATIONS PLACED ON THE

15   OTHER TOPIC.

16   Q    NOW, LET'S TALK ABOUT WHAT YOU DID TO GET

17   YOURSELF READY TO TESTIFY ON BEHALF OF SAMSUNG.

18        YOU ACTUALLY REVIEWED MANY DOCUMENTS;

19   CORRECT?

20   A    THERE WERE DOCUMENTS REVIEWED, YES.

21   Q    AND ACTUALLY, THERE WERE MANY.  THAT'S WHAT

22   YOU TOLD US IN YOUR DEPOSITION; CORRECT?

23   A    I MUST HAVE SAID --

24        MR. QUINN:  YOUR HONOR, I OBJECT.  IF

25   WE'RE REFERRING TO THE DEPOSITION, I THINK WE

1    SHOULD LOOK AT THE TESTIMONY.

2    BY MR. LEE:

3    Q    FAIR ENOUGH.  CAN YOU TELL ME, DID YOU REVIEW

4    MANY DOCUMENTS OR NOT?

5    A    I DON'T ACTUALLY REMEMBER HOW MANY DOCUMENTS I

6    REVIEWED.

7    Q    ALL RIGHT.  TURN IF YOU WOULD, PLEASE, TO YOUR

8    DEPOSITION, WHICH IS IN VOLUME 1, TAB 7.

9              AND YOUR HONOR, I THINK IN ACCORDANCE

10   WITH THE PROCEDURE WE GAVE IT A PX NUMBER, BUT IT'S

11   JUST AN IMPEACHMENT EXHIBIT.  IT'S PX 2001.

12             THE COURT:  OKAY.

13   BY MR. LEE:

14   Q    DO YOU HAVE THAT BEFORE YOU?

15   A    I DO.

16   Q    TURN TO PAGE 35, LINE 15.

17             "QUESTION:  DID YOU REVIEW ANY DOCUMENTS

18   FOR THE SPECIFIC PURPOSE OF TESTIFYING AS SAMSUNG'S

19   CORPORATION DESIGNEE TODAY?

20             "ANSWER:  YES, I REFERRED TO DOCUMENTS

21   FOR THE PURPOSE --

22             "QUESTION:  WHAT ARE THOSE DOCUMENTS?

23             "ANSWER:  WELL, AS YOU'VE HIGHLIGHTED AND

24   AS I'VE CONFIRMED, I REVIEWED MANY DOCUMENTS, ALL

25   OF WHICH I BELIEVE HAVE BEEN PRODUCED AS PART OF

1    THIS DISCUSSION, AND SPECIFICALLY AS PART OF THE

2    RESEARCH FOR THIS DEPOSITION, WE ASKED FOR AND

3    RECEIVED DOCUMENTS RELATED TO POTENTIAL DESIGN

4    ALTERNATIVES, FOR INSTANCE."

5    A    YES.

6    Q    I READ THAT CORRECTLY?

7    A    YES.

8    Q    NOW, I WANT TO HELP THE LADIES AND GENTLEMEN

9    OF THE JURY UNDERSTAND WHERE YOU GOT THESE MANY

10   DOCUMENTS.

11             AMONG THESE MANY DOCUMENTS WERE E-MAILS;

12   CORRECT?

13   A    YES.

14   Q    PRESENTATIONS; CORRECT?

15   A    YES.

16   Q    DESIGN DOCUMENTS; CORRECT?

17   A    YES, AS I RECALL.

18   Q    INTERNAL SAMSUNG DOCUMENTS; CORRECT?

19   A    YES.

20   Q    NOW, YOU DIDN'T GO FIND THESE DOCUMENTS

21   YOURSELF, DID YOU, SIR?

22   A    I'M NOT SURE THAT'S CORRECT.

23   Q    DID YOU GO SEARCH FOR THESE DOCUMENTS ON YOUR

24   OWN?

25   A    I ACTUALLY PERFORMED AN INVESTIGATION IN

802

1    PREPARATION FOR MY TESTIMONY THAT DAY.

2    Q    MY QUESTION, SIR, WAS, WHO WENT AND LOCATED

3    THE DOCUMENTS?  YOU OR SOMEONE ELSE?

4    A    THERE WERE MANY DOCUMENTS THAT WERE PROVIDED

5    TO ME.  THERE WERE SOME DOCUMENTS THAT I UNCOVERED

6    AS PART OF MY INVESTIGATION.

7    Q    AND THE DOCUMENTS THAT WERE PROVIDED TO YOU

8    WERE PROVIDED TO YOU BY SAMSUNG'S LAWYERS; CORRECT?

9    A    I BELIEVE SO.

10   Q    OKAY.  SO YOU HAD TWO SETS OF DOCUMENTS, SOME

11   THAT YOU FOUND ON YOUR OWN, AND ANOTHER GROUP OF

12   DOCUMENTS THAT SAMSUNG'S LAWYERS PROVIDED TO YOU;

13   CORRECT?

14   A    YES, THAT'S MY RECOLLECTION.

15   Q    AND THOSE DOCUMENTS INCLUDED SOME TRANSLATIONS

16   OF KOREAN DOCUMENTS; CORRECT?

17   A    YES, THAT SEEMS RIGHT.

18   Q    NOW, YOU DON'T SPEAK KOREAN YOURSELF; CORRECT?

19   A    NO.

20   Q    YOU DON'T READ KOREAN YOURSELF; CORRECT?

21   A    NO.

22   Q    IN FACT, YOU'VE BEEN BACK TO SEOUL TO THE

23   PARENT ONLY ONCE SINCE YOU JOINED THE COMPANY IN

24   2008; CORRECT?

25   A    THAT'S NOT QUITE RIGHT.

1    Q    HOW MANY TIMES?

2    A    I JUST RECENTLY GOT BACK FROM KOREA.

3    Q    OKAY.  SO TWICE?

4    A    YES.

5    Q    TWO TIMES SINCE 2008, BUT YOU'RE THE

6    DESIGNATED SPOKESPERSON ON COPYING; CORRECT?

7    A    YES, THAT'S CORRECT.

8    Q    NOW, YOU ALSO TALKED TO A NUMBER OF PEOPLE --

9         MR. QUINN:  YOUR HONOR, I'M SORRY.  I WAS

10   SLOW.  I OBJECT TO THAT LAST COMMENT.  IT'S

11   CONTRARY TO THE WITNESS'S TESTIMONY.

12        THE COURT:  OVERRULED.

13   BY MR. LEE:

14   Q    YOU ALSO TALKED TO SEVERAL SAMSUNG PRODUCT

15   DESIGNERS; CORRECT?

16   A    YES.

17   Q    NOW, JUST TO BE CLEAR, THESE PRODUCT DESIGNERS

18   WERE IN KOREA; CORRECT?

19   A    YES.

20   Q    THEY SPOKE KOREAN; CORRECT?

21   A    YES, THEY SPOKE KOREAN.  SOME OF THEM ALSO

22   SPOKE ENGLISH.

23   Q    YOU HAD AN INTERPRETER; CORRECT?

24   A    IN SOME CASES AN INTERPRETER WAS USED, YES.

25   Q    PROVIDED BY THE LAWYERS; CORRECT?

```
1    A    SURE.
2    Q    NOW, AFTER YOU LOOKED AT ALL THESE DOCUMENTS,
3    AFTER YOU SPOKE TO THESE DIFFERENT PEOPLE, YOU
4    APPEARED AND TESTIFIED ON THE ISSUE OF COPYING;
5    CORRECT?
6              MR. QUINN:  OBJECTION.  MISSTATES THE
7    TESTIMONY, YOUR HONOR.
8              MR. LEE:  I'LL --
9              MR. QUINN:  HE'S CONSISTENTLY SAID THERE
10   WERE LIMITATIONS.
11             THE COURT:  GO AHEAD, PLEASE.
12             MR. LEE:  YES.
13   Q    MR. DENISON, AFTER REVIEWING ALL THESE
14   DOCUMENTS, AFTER TALKING TO ALL THESE PEOPLE, SOME
15   DOCUMENTS YOU FOUND ON YOUR OWN, SOME DOCUMENTS
16   OTHER FOUNDS FOR YOU, YOU APPEARED AT THE
17   DEPOSITION AND TESTIFIED; CORRECT?
18   A    YES, THAT'S RIGHT.
19   Q    NOW, LET'S SEE WHAT YOU SAID AT YOUR
20   DEPOSITION.
21             CAN WE HAVE PLAYED ON THE VIDEO PAGE 135,
22   LINES 3 TO 17.
23             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
24   OPEN COURT OFF THE RECORD.)
25             MR. QUINN:  MAY I HAVE A MOMENT, YOUR
```

805

1    HONOR, JUST TO READ THE TRANSCRIPT?

2            MR. LEE:  VOLUME 1, TAB 7 AT PAGE 135.

3            (PAUSE IN PROCEEDINGS.)

4            MR. QUINN:  YOUR HONOR, UNDER THE RULE OF

5    COMPLETENESS, I THINK --

6            THE COURT:  YOU'LL HAVE AN OPPORTUNITY TO

7    CROSS HIM AND GET IT IN, SO LET'S GO AHEAD.

8            MR. QUINN:  ALL RIGHT.

9            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

10   OPEN COURT OFF THE RECORD.)

11   BY MR. LEE:

12   Q    NOW, MR. DENISON, THE QUESTION SPECIFICALLY

13   ASKED YOU ABOUT COPYING.  DO YOU RECALL THAT?

14   A    YES, AND I SEE THAT IN THE TRANSCRIPT.

15   Q    THERE'S A DIFFERENCE BETWEEN BENCHMARKING AND

16   COPYING; ISN'T THERE?

17   A    SURE.

18   Q    RIGHT.  BIG DIFFERENCE, ISN'T THERE?

19   A    I THINK SO.

20   Q    RIGHT.  BENCHMARKING IS LOOKING AT SOMEONE

21   ELSE'S PRODUCT; CORRECT?

22   A    PART OF THAT, YES.

23   Q    COPYING IS RIPPING IT OFF; RIGHT?

24   A    I SUPPOSE THAT'S ONE DEFINITION OF IT.

25   Q    IT'S A FAIR DEFINITION BASED UPON YOUR

1    EXPERIENCE IN THE FIELD; CORRECT?

2    A    THAT'S NOT THE DEFINITION I WOULD OFFER.

3    Q    RIGHT.  BUT THERE'S A BIG DIFFERENCE BETWEEN

4    THE TWO; CORRECT?

5    A    YES.

6    Q    ALL RIGHT.  NOW, MR. DENISON, DO YOU STAND BY

7    THAT TESTIMONY TODAY?

8    A    I DO.

9    Q    OKAY.  SO BASED UPON EVERYTHING YOU KNOW

10   TODAY, NO INDICATION THAT THE DESIGNERS OF THE

11   SAMSUNG PRODUCTS -- AND LET ME GET YOUR QUOTE

12   RIGHT -- "CONSIDERED OR STUDIED OR DREW DIRECT

13   COMPARISONS OR WHAT HAVE YOU VERSUS THE RELEVANT

14   APPLE PRODUCTS."

15         YOU STAND BY THAT TESTIMONY; CORRECT?

16   A    YEAH.  MY TESTIMONY WAS GIVEN WITH REGARDS TO

17   CERTAIN SPECIFIC PRODUCTS AND CERTAIN FEATURES, AND

18   WITH RESPECT TO THAT LIMITATION, YES, I STAND BY

19   THAT TESTIMONY.

20   Q    WELL, IF WE BROADEN IT OUT TO THE PRODUCTS

21   THAT ARE AT ISSUE IN THIS CASE NOW, DO YOU STAND BY

22   THAT TESTIMONY OR NOT?

23         MR. QUINN:  YOUR HONOR, THIS NOW LACKS

24   FOUNDATION.  IT'S BEYOND THE SCOPE OF HIS

25   DESIGNATION.  HE WAS DESIGNATED --

```
 1                  THE COURT:  OVERRULED.

 2                  PLEASE SIT DOWN.  PLEASE.

 3                  THE WITNESS:  CAN YOU REPEAT THE

 4      QUESTION?

 5      BY MR. LEE:

 6      Q    SURE.  DO YOU HAVE IT IN MIND?  YOU KEEP

 7      TELLING ME THAT YOUR TESTIMONY WAS LIMITED TO

 8      CERTAIN PRODUCTS.  OKAY.

 9                  BUT NOW WE'RE IN THIS TRIAL, THERE ARE

10      PRODUCTS THAT ARE ACCUSED.  THERE ARE APPLE

11      PRODUCTS AT ISSUE.

12                  DO YOU STAND BY YOUR TESTIMONY OR NOT?

13      THERE WAS NO CONSIDERATION, NO REVIEW, NO

14      COMPARISON OF THE APPLE AND SAMSUNG PRODUCTS?  YES

15      OR NO?

16      A    YES WITH RESPECT TO THOSE PRODUCTS AND

17      FEATURES.

18      Q    NO.  I ASKED YOU A DIFFERENT QUESTION, SIR.

19      A    OH.

20      Q    WITH RESPECT TO THE PRODUCTS AND FEATURES AT

21      ISSUE IN THIS CASE NOW, DO YOU STAND BY YOUR

22      TESTIMONY?

23                  MR. QUINN:  YOUR HONOR, LACKS FOUNDATION.

24                  THE COURT:  OVERRULED.

25                  MR. QUINN:  MAY WE HAVE A SIDE-BAR, YOUR
```

1    HONOR?  THERE IS A SIGNIFICANT ISSUE.

2              THE COURT:  OVERRULED.

3              GO AHEAD, PLEASE.

4    BY MR. LEE:

5    Q    DO YOU STAND BY YOUR TESTIMONY OR NOT?

6    A    SO THAT WOULD NOT BE MY TESTIMONY IN THAT

7    CASE.

8    Q    RIGHT.  IN FACT, YOUR TESTIMONY WOULD BE THE

9    OPPOSITE?  YOU NOW KNOW FOR THE PRODUCTS AT ISSUE

10   IN THIS CASE, OR THE FEATURES AT ISSUE IN THIS

11   CASE, SAMSUNG ENGINEERS, IN FACT, CONSIDERED,

12   REVIEWED AND COMPARED THEMSELVES TO APPLE PRODUCTS,

13   DON'T YOU, SIR?

14   A    SO I'M SORRY.  YOU'RE NOT ASKING ME -- YOU'RE

15   ASKING ME IF THEY CONSIDERED, REVIEWED AND

16   COMPARED, WHICH I BELIEVE ARE ELEMENTS OF

17   BENCHMARKING --

18   Q    YES, FOR THE PRODUCTS THAT ARE AT ISSUE IN

19   THIS CASE TODAY, THE PRODUCTS THE JURY HAS TO --

20   THE ANSWER IS YOUR TESTIMONY WOULD BE DIFFERENT;

21   CORRECT?

22   A    MY TESTIMONY WOULD STILL BE NO BECAUSE I

23   DIDN'T UNDERTAKE AN INVESTIGATION OF ALL PRODUCTS

24   AT ISSUE IN THIS CASE.

25   Q    OH.  SO YOU REALLY CAN'T SAY?

```
 1    A    CORRECT.

 2    Q    OKAY.  SO LET'S -- LET ME ASK YOU A FEW

 3    QUESTIONS ABOUT WHAT YOU DID DO.

 4           ONE OF THE ENGINEERS YOU TALKED TO WOULD

 5    A GENTLEMAN NAMED WOOKYUN KHO, K-H-O; CORRECT?

 6    A    YES.

 7    Q    AND IT'S YOUR TESTIMONY THAT HE SAID THAT HE

 8    DIDN'T LOOK AT OR COMPARE ANY SAMSUNG PRODUCT TO

 9    ANY APPLE PRODUCTS; CORRECT?

10    A    I'M SORRY.  CAN YOU POINT -- CAN YOU POINT TO

11    THAT IN MY DEPOSITION?  I DON'T RECALL SAYING THAT.

12    Q    WHAT YOU SAID WAS WHAT I JUST SHOWED YOU ON

13    THE SCREEN, AND MR. KOH WAS ONE OF THE PEOPLE YOU

14    TALKED TO, WASN'T HE?

15    A    IT'S MY RECOLLECTION THAT AS PART OF THAT

16    PORTION OF THE DISCUSSION, WE WERE REFERRING TO THE

17    INDUSTRIAL DESIGNERS.

18    Q    RIGHT.  AND MR. KHO WAS ONE OF THEM; CORRECT?

19    A    MY UNDERSTANDING IS THAT MR. KHO IS NOT AN

20    INDUSTRIAL DESIGNER.

21    Q    WAS MR. KHO ONE OF THE PEOPLE YOU TALKED TO OR

22    NOT?

23    A    HE IS, YES.

24    Q    NOW, TURN IF YOU WOULD, IN THE NOTEBOOK, TO

25    VOLUME 1, TAB 3, WHICH IS PLAINTIFF'S EXHIBIT 58.
```

```
 1              AND I NOW WANT TO TALK TO YOU SO YOU CAN

 2    HELP THE LADIES AND GENTLEMEN OF THE JURY WITH THE

 3    DOCUMENTS YOU ACTUALLY FOUND ON YOUR OWN AND SOME

 4    DOCUMENTS THAT YOU DIDN'T FIND ON YOUR OWN.  OKAY?

 5    A    OKAY.

 6    Q    NOW, YOU HAVE PLAINTIFF'S EXHIBIT 58; CORRECT?

 7    A    I DO.

 8    Q    THIS IS AN E-MAIL YOU SENT TO SOME FOLKS AT

 9    SAMSUNG; CORRECT?

10    A    IT IS FROM ME TO A COLLECTION OF STA

11    EMPLOYEES, YES.

12    Q    AND IT'S AN E-MAIL WHICH YOU DESIGNATED "HIGH

13    IMPORTANCE."  CORRECT?

14    A    YES, IT LOOKS THAT WAY.

15              MR. LEE:  WE OFFER PX 58, YOUR HONOR.

16              MR. QUINN:  NO OBJECTION.

17              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

18              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19              58, HAVING BEEN PREVIOUSLY MARKED FOR

20              IDENTIFICATION, WAS ADMITTED INTO

21              EVIDENCE.)

22    BY MR. LEE:

23    Q    NOW, I'M GOING TO MOVE THROUGH THESE PROMPTLY

24    BECAUSE WE'RE ALL OPERATING UNDER SOME TIME

25    CONSTRAINTS.  THE SUBJECT LINE OF YOUR E-MAIL SAYS,
```

```
1     QUOTE, "GS CHOI'S DIRECTION AND REQUEST TO STA."

2              DO YOU SEE THAT?

3     A    I DO.

4     Q    MR. CHOI, IN 2011, WAS THE CHAIRMAN OF SAMSUNG

5     ELECTRONICS, THE KOREAN PARENT; CORRECT?

6     A    HE WAS -- I'M NOT SURE OF HIS EXACT TITLE.  I

7     DON'T THINK CHAIRMAN IS QUITE ACCURATE.

8     Q    HE WAS THE NUMBER ONE OR NUMBER TWO GUY IN THE

9     WHOLE COMPANY?

10    A    HE WAS THE CEO, AS I RECALL, OF SAMSUNG

11    ELECTRONICS.

12    Q    NOW, TURN, IF YOU WOULD, IN PX 58 TO THE PAGE

13    THAT SAYS 640 IN THE BOTTOM RIGHT-HAND CORNER, AND

14    WE'LL BRING IT UP ON THE SCREEN IF THAT'S EASIER

15    FOR YOU TO SEE.

16              "PLEASE FIND ATTACHED UPDATED

17    PRESENTATIONS WE'RE SHOWING FOR THE PURPOSES OF

18    DISCUSSION TODAY RE: BEAT APPLE STRATEGY UPDATE."

19    CORRECT?

20    A    YES.

21    Q    THAT'S WHAT YOU SENT OUT; CORRECT?

22    A    YES.

23    Q    SO LET'S LOOK AT THE PRESENTATION YOU SENT ON.

24              NOW, THIS IS 2011?

25    A    IT APPEARS SO.
```

1    Q    FOUR YEARS AFTER THE IPHONE WAS INTRODUCED TO

2    THE MARKET; CORRECT?

3    A    THAT'S ABOUT RIGHT.

4    Q    ALL RIGHT.  SO LET'S LOOK AT PAGE 3 OF THE

5    PRESENTATION, AND YOU'LL FIND AN EXECUTIVE SUMMARY.

6    TELL ME WHEN YOU'RE THERE.

7    A    I'M THERE.

8    Q    AND IN THE EXECUTIVE SUMMARY, YOU SAY "THE

9    CHAIRMAN HAS ASKED US" -- WELL, LET ME STATE IT

10   DIFFERENTLY.

11        YOU SAY "GS CHOI REQUEST."  CORRECT?

12   A    YES.

13   Q    AND THAT IS THE PERSON WE JUST REFERRED TO AS

14   ONE OF THE NUMBER ONE OR NUMBER TWO GUY IN THE

15   COMPANY; CORRECT?

16   A    SURE.

17   Q    AND IT'S -- HE'S ASKED YOU TO RESPOND WITH A

18   PLAN IN 2011 WITH A BEAT APPLE BY Q3'11; CORRECT?

19   A    THAT'S NOT QUITE RIGHT.

20   Q    WELL, LET ME JUST READ IT.  "STA MUST RESPOND

21   WITH A PLAN TO BEAT APPLE BY Q3'11 OR Q4'11 WITH A

22   LONGER-TERM GOAL OF GROWING SUPER PREMIUM ASP'S TO

23   MATCH APPLE IN 2012."

24        DID I READ THAT CORRECTLY?

25   A    YES.

```
1    Q    THAT'S A SLIDE YOU WROTE; CORRECT?

2    A    YES.

3    Q    ALL RIGHT.  NOW, AT PAGE 5 OF THE SAME

4    PRESENTATION, YOU REFER TO A PRESENTATION MADE BY

5    SOMETHING CALLED THE BOSTON CONSULTING GROUP;

6    CORRECT?

7    A    YES.

8    Q    NOW, THAT'S A GROUP THAT YOU INVITED IN TO

9    HELP DEVELOP A STRATEGY TO COMPETE WITH APPLE;

10   CORRECT?

11   A    NO, NOT EXACTLY.

12   Q    WELL, IT SAYS, "STA INVITED BOSTON CONSULTING

13   GROUP TO PRESENT AT THE NOVEMBER 2010 STRATEGY

14   WORKSHOP."

15            DID I READ THAT CORRECTLY?

16   A    YOU DID.

17   Q    AND THAT WAS THREE YEARS AFTER THE IPHONE WAS

18   INTRODUCED TO THE MARKET; CORRECT?

19   A    ABOUT THAT, YES.

20   Q    AND YOU HIRED BOSTON CONSULTING GROUP;

21   CORRECT?

22   A    NO, WE DID NOT.

23   Q    WELL, LET'S SEE.  WHAT YOU DID DO IS YOU

24   INVITED THEM TO COME MAKE A PRESENTATION, AND THEN

25   IF YOU LOOK AT THE LOWER RIGHT-HAND CORNER OF SLIDE
```

1   5, IT SAYS, "DOUBLE CLICK TO LAUNCH PDF FILE."

2        DO YOU SEE THAT?

3   A    YES.

4   Q    AND IF I WERE TO DOUBLE CLICK THERE, WHAT I'D

5   GET IS THE BOSTON CONSULTING GROUP PRESENTATION;

6   CORRECT?

7   A    I THINK SO.

8   Q    YEAH.  SO LET'S TURN, IF YOU WOULD, TO VOLUME

9   1, TAB 2, WHICH IS PLAINTIFF'S EXHIBIT 54.

10        DO YOU HAVE THAT?

11  A    I DO.

12  Q    NOW, THIS IS THE BOSTON CONSULTING GROUP

13  REPORT IN 2010 THAT YOU WOULD GET IF YOU CLICKED ON

14  YOUR PRESENTATION; CORRECT?

15  A    I BELIEVE SO.

16  Q    AND IN 2010, WHAT YOU WERE GETTING FROM BOSTON

17  CONSULTING GROUP IS "LESSONS FROM APPLE."  CORRECT?

18  A    THAT'S WHAT IT SAYS, YES.

19        MR. LEE:  WE MOVE -- WE OFFER PX 54, YOUR

20  HONOR.

21        MR. QUINN:  NO ADDITIONAL OBJECTIONS,

22  YOUR HONOR.

23        THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

24        (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

25        54, HAVING BEEN PREVIOUSLY MARKED FOR

```
 1              IDENTIFICATION, WAS ADMITTED INTO

 2              EVIDENCE.)

 3    BY MR. LEE:

 4    Q    NOW, IN 2010, IN PX 54, IF YOU TURN TO PAGE 1

 5    OF THE PRESENTATION, THE CONTEXT STATES, "THIS

 6    PRESENTATION WAS PRESENTED TO SAMSUNG STA IN

 7    DALLAS, TEXAS IN NOVEMBER 2010."

 8              CORRECT?

 9    A    YES.

10    Q    AND IF I THEN TURN YOU TO PAGE 2, WHAT THEY

11    TELL YOU IS, "WHY YOU SHOULD CARE ABOUT APPLE."

12              CORRECT?

13    A    YES.

14    Q    ALL RIGHT.  NOW, TURN, IF YOU WOULD, TO TAB --

15    VOLUME 1, TAB 3, PX 62.

16    A    I'M SORRY.  WHICH TAB AGAIN?

17    Q    ACTUALLY, GO TO VOLUME 1, TAB 3, WHICH IS PX

18    58.  I APOLOGIZE.

19              MR. QUINN:  I'M SORRY?

20              MR. LEE:  VOLUME 1, TAB 3, PX 58, AND

21    WE'RE GOING TO PAGE 8.

22    Q    DO YOU HAVE THAT BEFORE YOU?

23    A    I DO.

24    Q    ALL RIGHT.  NOW, WE'LL PUT IT UP ON THE

25    SCREEN.  AND YOU TALK ABOUT RECENT APPLE ANALYSIS
```

```
1    PROJECTS.
2            NOW, THIS IS 2011; CORRECT?
3    A    YES, I BELIEVE SO.
4    Q    AND ONE OF THEM IS "STA PRODUCT PLANNING AND
5    STRATEGY ISSUED BELOW, COUNTER IPHONE 5 STRATEGY IN
6    MARCH, UPDATE REQUIRED."
7            CORRECT?
8    A    YES.
9    Q    ALL RIGHT.  NOW, LET ME ASK YOU TO LOOK AT
10   VOLUME 1, TAB 5, WHICH IS PX 62.  DO YOU HAVE IT
11   BEFORE YOU?
12   A    I DO.
13   Q    THIS IS THE IPHONE COUNTER STRATEGY THAT YOU
14   JUST REFERRED TO; CORRECT?
15   A    I BELIEVE SO.
16   Q    AND IT'S DATED MARCH 2011, ABOUT FOUR YEARS
17   AFTER THE IPHONE WAS INTRODUCED; CORRECT?
18   A    JUST A LITTLE LESS THAN THAT, YES.
19           MR. LEE:  ALL RIGHT.  YOUR HONOR, WE
20   OFFER PX 62.
21           MR. QUINN:  NO OBJECTION, YOUR HONOR.
22           THE COURT:  ALL RIGHT.  IT'S ADMITTED.
23           (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
24            62, HAVING BEEN PREVIOUSLY MARKED FOR
25            IDENTIFICATION, WAS ADMITTED INTO
```

```
 1              EVIDENCE.)

 2      BY MR. LEE:

 3      Q    NOW, THIS WILL BE IN EVIDENCE AND THE JURY CAN

 4      LOOK AT IT.  I'M JUST GOING TO ASK YOU ABOUT ONE OF

 5      THE RECOMMENDATIONS FOUR YEARS AFTER THE IPHONE WAS

 6      INTRODUCED.

 7              TURN, IF YOU WOULD, TO PAGE 13.  DO YOU

 8      HAVE THAT BEFORE YOU?

 9      A    I DO.

10      Q    AND ONE OF THE RECOMMENDATIONS MADE IS

11      "SAMSUNG 4G PRODUCTS TO UNDERCUT IPHONE 5."

12              CORRECT?

13      A    THAT'S WHAT IT SAYS, YES.

14      Q    AND THAT WAS PART OF YOUR STRATEGY IN 2011;

15      CORRECT?

16      A    NOT EXACTLY, NO.

17      Q    THIS IS YOUR DOCUMENT, ISN'T IT, SIR?

18      A    I DID NOT AUTHOR THIS DOCUMENT.  I'M AWARE OF

19      THE DOCUMENT.

20      Q    OKAY.  YOU PRESENTED IT?

21      A    NO, I DON'T RECALL PRESENTING THIS DOCUMENT.

22      Q    ALL RIGHT.  SO IT'S A SAMSUNG DOCUMENT; RIGHT?

23      YOU RECOGNIZE THAT; CORRECT?

24      A    IT APPEARS TO BE.

25      Q    YEAH.  AND YOU KNOW THAT WAS PART OF THE
```

1    STRATEGY; CORRECT?

2    A    NO.   AGAIN, THAT'S THE PART THAT I DON'T THINK

3    IS EXACTLY CORRECT.

4    Q    OKAY.   LET'S GO, IF YOU WOULD, TO VOLUME 1,

5    TAB 4, WHICH IS PX 60.   NOW, THIS -- NOW WE'RE INTO

6    FEBRUARY OF 2012.   DO YOU HAVE THAT BEFORE YOU?

7    A    I DO.

8    Q    WE'RE FIVE YEARS AFTER THE IPHONE HAS BEEN

9    INTRODUCED; CORRECT?

10   A    A LITTLE LESS THAN THAT, YES.

11   Q    YOU'RE THE OWNER OF THIS PRESENTATION, AND IF

12   WE CAN -- LET ME DO THIS.

13        YOU RECOGNIZE THIS PRESENTATION; CORRECT?

14   A    I BELIEVE SO, YES.

15   Q    YOU'RE THE OWNER?

16   A    I AM.

17   Q    YOU MARKED IT "TOP SECRET."   CORRECT?

18   A    YES.

19        MR. LEE:   WE OFFER PX 60, YOUR HONOR.

20        MR. QUINN:   NO OBJECTION.

21        THE COURT:   IT'S ADMITTED.

22        (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

23        60, HAVING BEEN PREVIOUSLY MARKED FOR

24        IDENTIFICATION, WAS ADMITTED INTO

25        EVIDENCE.)

```
 1    BY MR. LEE:

 2    Q    TURN, IF YOU WOULD, TO SLIDE 8.

 3    A    I SEE THAT.

 4    Q    ONE OF THE THINGS YOU STATE ON SLIDE 8 IS, IN

 5    2012, "THREE HORSE RACE BECOMING A TWO HORSE RACE

 6    BETWEEN APPLE AND SAMSUNG."

 7              CORRECT?

 8    A    THAT'S WHAT IT SAYS, YES.

 9    Q    ALL RIGHT.  NOW, I WANT TO GO BACK TO YOUR

10    DEPOSITION TESTIMONY THAT WE SHOWED ON THE SCREEN A

11    FEW MINUTES AGO.

12              AND YOU TOLD THE JURY THAT YOU FOUND SOME

13    DOCUMENTS ON YOUR OWN AND SOME OF THOSE WERE GIVEN

14    TO YOU; CORRECT?

15    A    CORRECT.

16    Q    BUT YOU UNDERSTAND THAT YOU WERE THERE TO TALK

17    ON BEHALF OF ALL THREE SAMSUNG ENTITIES; CORRECT?

18    A    YES, AGAIN, WITH THOSE LIMITATIONS THAT WE

19    TALKED ABOUT.

20    Q    AND YOU WERE GOING TO TALK ABOUT ALL OF THE

21    DOCUMENTS THAT MIGHT RELATE TO THOSE ISSUES WITH

22    THOSE LIMITATIONS; CORRECT?

23    A    I WAS THERE TO UNDERTAKE AN INVESTIGATION AND

24    REPORT BACK TO THE COMPANY, SO --

25    Q    ALL RIGHT.  SO TURN, IF YOU WOULD, IN YOUR
```

```
 1    NOTEBOOK TO VOLUME 1, TAB 1, WHICH IS PX 44.

 2              DON'T PUT IT ON THE SCREEN YET.

 3              DO YOU HAVE IT?

 4    A    I DO.

 5    Q    NOW, YOU RECOGNIZE -- YOU SEE THIS IS A

 6    SAMSUNG DOCUMENT; CORRECT?

 7    A    I'M NOT -- I'M NOT ENTIRELY SURE IT'S A

 8    SAMSUNG DOCUMENT.

 9    Q    WELL, YOU SEE ON THE FRONT WHERE IT SAYS

10    "RELATIVE EVALUATION REPORT ON S1, IPHONE, PRODUCT

11    ENGINEERING TEAM, SW VERIFICATION GROUP"?

12    A    I DO.

13    Q    WAS THIS ONE OF THE DOCUMENTS THAT YOU FOUND

14    OR WAS GIVEN TO YOU DURING THE TIME YOU WERE MAKING

15    YOUR INVESTIGATION?

16    A    NO.  IN FACT, I'VE NEVER SEEN THIS DOCUMENT

17    PRIOR TO PREPARING FOR THIS TESTIMONY.

18    Q    ALL RIGHT.

19              YOUR HONOR, WE WOULD OFFER PX 44 AS AN

20    ADMISSION BY SAMSUNG.

21              MR. QUINN:  LACKS FOUNDATION, YOUR HONOR.

22              MR. LEE:  YOUR HONOR, HE'S A 30(B)(6)

23    WITNESS.  YOU CAN'T GIVE A 30(B)(6) WITNESS SOME

24    DOCUMENTS BUT NOT OTHERS AND THEN SAY OTHERS CAN'T

25    COME IN.
```

1          MR. QUINN:  YOUR HONOR, HE HAS NOT

2     ESTABLISHED THAT THIS HAS ANYTHING TO DO WITH THE

3     SCOPE OF HIS 30(B)(6) TESTIMONY, YOUR HONOR.

4          THE WITNESS HAS SAID SEVERAL TIMES THAT

5     THERE WERE LIMITATIONS.  THE WITNESS HAS NOT SEEN

6     THIS DOCUMENT.

7          THE COURT:  ALL RIGHT.  TELL ME WHERE,

8     WITH THE LIMITATIONS OF THE PATENTS AT ISSUE AND

9     THE PRODUCTS AT ISSUE, IT'S IN THIS EXHIBIT.

10          MR. LEE:  IF YOUR HONOR GOES TO --

11          MR. QUINN:  YOUR HONOR, THAT WAS -- THE

12     LIMITATIONS OF THE 30(B)(6) TESTIMONY WERE NARROWER

13     THAN THAT.

14          THE COURT:  I KNOW.  BUT LET'S HAVE HIM

15     MAKE A PROFFER AND THEN I'LL LET YOU RESPOND TO

16     THAT.  OKAY?

17          MR. LEE:  YOUR HONOR, IF YOU GO IN

18     EXHIBIT 44 TO PAGE 58, PAGE 122, PAGE 131, I'M NOT

19     GOING TO SUMMARIZE THEM IN FRONT OF THE JURY, BUT

20     THEY ALL DEAL WITH FEATURES AT ISSUE.

21          MR. QUINN:  YOUR HONOR, COULD I HEAR

22     THOSE PAGE NUMBERS AGAIN, PLEASE?

23          MR. LEE:  58, 122, 131.

24          (PAUSE IN PROCEEDINGS.)

25          MR. LEE:  YOUR HONOR, CAN I SAY ONE

```
 1      THING?
 2                  THERE'S A STIPULATION AS TO AUTHENTICITY,
 3      SO MY ONLY QUESTION IS THE HEARSAY OBJECTION, OR
 4      THE HEARSAY QUESTION.
 5                  (PAUSE IN PROCEEDINGS.)
 6                  THE COURT:  WELL, 58 IS RELEVANT TO THE
 7      ISSUE IN SEPTEMBER.
 8                  MR. QUINN:  YOUR HONOR, AT THE TIME OF
 9      THE PRELIMINARY INJUNCTION, DOUBLE TAP --
10                  THE COURT:  ALL RIGHT.  THAT WAS
11      IMPROPER.
12                  MR. QUINN:  I APOLOGIZE, YOUR HONOR.
13                  THE COURT:  YOU'RE THE PARTY THAT
14      REQUESTED THAT THAT NOT BE MENTIONED AND YOU
15      INTENTIONALLY BROUGHT IT IN.
16                  MR. QUINN:  I APOLOGIZE, YOUR HONOR.
17                  THE COURT:  I HAVE A DIFFICULTY BELIEVING
18      THAT WAS NOT INTENTIONAL.
19                  BUT WHAT ELSE DO YOU WANT TO SAY?
20                  MR. QUINN:  YOUR HONOR, AT THE TIME THE
21      DEPOSITION WAS TAKEN, THAT WAS NOT AN ISSUE.
22      DOUBLE TAP WAS NOT AN ISSUE AT THE TIME.
23                  HE WAS DESIGNATED TO TESTIFY ABOUT THE
24      PATENTS THEN AT ISSUE --
25                  MR. LEE:  YOUR HONOR --
```

```
 1              MR. QUINN:  -- WHICH WAS --

 2              MR. LEE:  THIS WAS IN HIS DEPOSITION.

 3              I ASKED HIM IF HE STOOD BY HIS TESTIMONY

 4      AS TO THE PRODUCTS THAT ARE BEFORE THIS JURY AND HE

 5      SAID THAT HE DID.  HE SAID BOTH.  HE SAID HE DID

 6      AND HE SAID HE DIDN'T.

 7              THE QUESTION IS NOT WHATEVER THEY THOUGHT

 8      THEY LIMITED THE DEPOSITION TO.

 9              THE QUESTION IS HIS TESTIMONY TODAY.

10              THE COURT:  OKAY.  58 IS COMING IN.

11              GO AHEAD.

12              WHAT ABOUT 122?

13              MR. LEE:  IT'S 44, YOUR HONOR.  I'M

14      SORRY.  THE OTHER PAGES WERE 122.

15              THE COURT:  IT'S PAGE 58 OUT OF 132;

16      CORRECT?

17              MR. LEE:  IT'S PAGE 58 OF EXHIBIT 44, AND

18      THE OTHER PAGES ARE 122 AND 131.

19              MR. QUINN:  YOUR HONOR, WITH RESPECT TO

20      PAGE 122, THERE WAS NOTHING --

21              THE COURT:  OKAY.  WE'RE NOT LIMITED TO

22      HIS DEPOSITION TOPICS.  HE IS A WITNESS AT TRIAL.

23              MR. QUINN:  I KNOW, YOUR HONOR.

24              THE COURT:  SO HE'S NOT LIMITED TO HIS

25      DEPOSITION TOPICS.
```

```
1              MR. QUINN:  I KNOW, YOUR HONOR.

2              BUT MY UNDERSTANDING IS THE BASIS FOR

3    LAYING THE FOUNDATION IS HE WAS A 30(B)(6) WITNESS

4    DESIGNATED ON CERTAIN TOPICS, AND MY POINT IS THAT

5    WE HAVE TO FOCUS ON WHAT THOSE TOPICS WERE, AND AT

6    THAT TIME THERE WAS NOTHING ABOUT UX THAT WAS AN

7    ISSUE.  HE WAS NOT DESIGNATED ON THAT.  THAT'S WHAT

8    THIS PAGE REFERS TO.

9              MR. LEE:  YOUR HONOR, I THINK WE'RE

10   FIGHTING TWO DIFFERENT WARS HERE.

11             I SPECIFICALLY ASKED HIM THE BROADER

12   QUESTION.  WE'VE CALLED HIM ADVERSELY.  HE'S A

13   REPRESENTATIVE OF SAMSUNG.  I ASKED HIM THE

14   QUESTION WHETHER HE STOOD BY THE CONCLUSION FOR THE

15   PRODUCTS AND FEATURES THAT ARE AT ISSUE IN THIS

16   LITIGATION.

17             MR. QUINN:  YOUR HONOR --

18             MR. LEE:  THAT'S THE PREDICATE FOR THIS.

19             MR. QUINN:  YOUR HONOR, I WOULD REALLY

20   RESPECTFULLY REQUEST, YOUR HONOR, THAT WE TAKE A

21   LOOK AT ACTUALLY WHAT HE WAS DESIGNATED ON, BECAUSE

22   THAT'S THE BASIS FOR LAYING THE FOUNDATION, AND --

23             THE COURT:  NO.  122 IS COMING IN.

24             LET'S SEE 131.

25             THIS IS IMPEACHMENT OF A HOSTILE WITNESS,
```

```
 1    SO IT'S CROSS.  IT'S NOT DIRECT.
 2              MR. QUINN:  AGAIN, YOUR HONOR, THIS IS --
 3    THIS DOES NOT RELATE TO ANYTHING THAT WAS AT ISSUE
 4    AT THE TIME AND HE WASN'T DESIGNATED ON THIS.
 5              MR. LEE:  IT'S THE SAME ISSUE.  IT'S
 6    RELEVANT.  IT'S RELEVANT TO --
 7              MR. QUINN:  THERE'S A FOUNDATION ISSUE.
 8    I'M NOT ARGUING WITH RESPECT TO RELEVANCE
 9    GENERALLY, YOUR HONOR.
10              I'M ARGUING ABOUT WHETHER IT'S PROPER TO
11    ASK THIS WITNESS, BASED ON THE FOUNDATION THAT HE
12    WAS A 30(B)(6) WITNESS, WITHOUT TAKING INTO ACCOUNT
13    WHAT HE WAS DESIGNATED ON.
14              MR. LEE:  AND, AGAIN, YOUR HONOR, THAT'S
15    A BROADER QUESTION.
16              MR. QUINN:  THERE WAS A PROCEEDING THEN
17    WHICH DEALT WITH --
18              THE COURT:  ALL RIGHT.  IT'S IMPEACHMENT.
19              GO AHEAD.
20              MR. LEE:  ALL RIGHT.
21    Q    DO YOU HAVE EXHIBIT 44 BEFORE YOU IN YOUR
22    BINDER?
23    A    I DO.
24    Q    OKAY.  NOW, THIS IS A DOCUMENT THAT REFERS TO
25    THE SAMSUNG PRODUCT ENGINEERING TEAM; CORRECT?
```

1    A    AGAIN, I DON'T NECESSARILY KNOW THAT THIS

2    REFERS TO THE SAMSUNG PRODUCT ENGINEERING TEAM.

3    Q    ALL RIGHT.  WELL, WE'LL TAKE A LOOK.  IT SAYS

4    "SW VERIFICATION GROUP."  CORRECT?

5    A    CORRECT.

6    Q    "PRODUCT ENGINEERING TEAM."  CORRECT?

7    A    CORRECT.

8    Q    "2010."  CORRECT?

9    A    YES.

10   Q    NOW, JUST SO THE JURY IS CLEAR, IN 2010, THE

11   SAMSUNG GALAXY PHONE THAT'S ACCUSED OF INFRINGING

12   HERE WAS IN DEVELOPMENT; CORRECT?

13   A    IN PARTS OF 2010 IT WAS UNDER DEVELOPMENT.

14   Q    RIGHT.  AND IN MARCH OF 2010, IT WAS UNDER

15   DEVELOPMENT; CORRECT?

16   A    AGAIN, ARE WE TALKING -- CAN WE BE SPECIFIC

17   ABOUT WHICH PRODUCT WE'RE TALKING ABOUT SO I CAN BE

18   SURE?

19   Q    THE SAMSUNG GALAXY PHONE WAS IN DEVELOPMENT IN

20   2010; CORRECT, SIR?

21   A    I'M SORRY.  THERE'S A LOT OF GALAXY PHONES.

22   SO CAN YOU --

23   Q    THE FIRST ONE?

24   A    THE GALAXY S I?

25   Q    YEAH.

1    A    AS I RECALL, IT HAD NOT LAUNCHED YET IN MARCH

2    OF 2010.

3    Q    ALL RIGHT.  TURN, IF YOU WILL -- AND WE'LL PUT

4    IT ON THE SCREEN -- TO EXHIBIT 44, PAGE 58.

5              NOW, DO YOU SEE THAT BEFORE YOU?

6    A    I DO.

7    Q    AND I WANT YOU TO HAVE IN MIND YOUR TESTIMONY

8    ABOUT COMPARING APPLE PRODUCTS AND SAMSUNG

9    PRODUCTS.

10             DO YOU REMEMBER THAT?

11   A    YES.

12   Q    NOW, ON THE LEFT-HAND SIDE WE HAVE THE IPHONE;

13   CORRECT?

14   A    YES.

15   Q    ON THE RIGHT-HAND SIDE WE HAVE THE S 1;

16   CORRECT?

17   A    CORRECT.

18   Q    THAT'S THE GALAXY S I AS YOU JUST TOLD ME;

19   CORRECT?

20   A    I THINK THAT'S PERHAPS WHAT IT IS

21   REPRESENTING.

22   Q    AND WHAT IT SAYS AT THE TOP IS, "BROWSING, WEB

23   BROWSER."

24             YOU KNOW WHAT THAT REFERS TO; CORRECT?

25   A    I UNDERSTAND WHAT A WEB BROWSER IS, YES.

```
1    Q    RIGHT.  "DOUBLE TAP ONLY SUPPORTS

2    EXPANSION/REDUCTION THEREFORE IT'S NOT POSSIBLE TO

3    MOVE QUICKLY FROM THE EXPANDED SCREEN MODE."

4              DO YOU SEE THAT?

5    A    I DO.

6    Q    AND THERE'S SOME -- A DESCRIPTION OF THE

7    IPHONE; CORRECT?

8    A    YES.

9    Q    AND THERE'S A DESCRIPTION OF THE S 1; CORRECT?

10   A    YES.

11   Q    AND AFTER COMPARING THE TWO, THERE'S SOMETHING

12   CALLED IMPROVEMENT; CORRECT?

13   A    I SEE THAT.

14   Q    AND THE RECOMMENDED IMPROVEMENT IS "DOUBLE TAP

15   ZOOM IN/OUT FUNCTION NEEDS TO BE SUPPLEMENTED."

16   CORRECT?

17   A    I SEE THAT.

18   Q    TURN, IF YOU WOULD, TO PAGE 122.  DO YOU HAVE

19   THAT BEFORE YOU?

20   A    I DO.

21   Q    "VISUAL INTERACTION EFFECT, ICON."

22              DO YOU SEE THAT?

23   A    I DO.

24   Q    IPHONE ON THE LEFT?

25   A    YES.
```

1    Q    GALAXY ON THE RIGHT?

2    A    YES.

3    Q    AND AT THE TOP, A DESCRIPTION OF THE IPHONE?

4    A    YES.

5    Q    AND THEN A DESCRIPTION OF THE GALAXY S I;

6    CORRECT?

7    A    YES.

8    Q    AND THEN THERE'S DIRECTIONS FOR IMPROVEMENT.

9    "EITHER CHANGE THE COLORS OF BORDERING RECTANGULAR

10   FRAMES POINTING TO A CONSISTENT PATTERN FOR A

11   UNIFORM FIELD, OR REMOVE THE RECTANGULAR FRAME AND

12   USE THE ICONS ONLY FOR A CLEAN AND UNIFORM FEEL."

13        CORRECT?

14   A    I SEE THAT.

15   Q    THAT'S THE CLEAN AND UNIFORM FEEL OF THE

16   IPHONE; CORRECT?

17   A    THAT'S NOT NECESSARILY RIGHT.

18   Q    TURN TO THE PAGE 131, THE LAST PAGE WE WERE

19   ON.  DO YOU HAVE THAT BEFORE YOU?

20   A    I'M SORRY.  131?

21   Q    YES, SIR, 131.  AND WE'LL PUT IT ON THE SCREEN

22   TOO.

23   A    YES, I'M THERE.

24   Q    THIS ONE REFERS TO GRAPHICAL U/I OF THE MENU

25   ICONS.  DO YOU SEE THAT?

1    A    I DO.

2    Q    AND YOU UNDERSTAND THAT U/I IS USER INTERFACE;

3    CORRECT?

4    A    THAT'S MY GUESS.

5    Q    AND WE HAVE THE IPHONE ON THE LEFT; CORRECT?

6    A    YES.

7    Q    GALAXY ON THE RIGHT; CORRECT?

8    A    CORRECT.

9    Q    AND THEN IT LOOKS -- LET'S -- THERE'S, AT THE

10   TOP, A DESCRIPTION OF THE IPHONE; CORRECT?

11   A    I SEE THAT.

12   Q    AND A DESCRIPTION OF THE S 1; CORRECT?

13   A    YES, I SEE THAT.

14   Q    DIRECTIONS FOR IMPROVEMENT.  "INSERT EFFECTS

15   OF LIGHT FOR A SOFTER, MORE LUXURIOUS ICON

16   IMPLEMENTATION.  MAKE THE EDGE OF THE CURVE MORE

17   SMOOTH TO ERASE THE HARD FEEL.  REMOVE A FEELING

18   THAT THE IPHONE'S MENU ICONS ARE COPYING BY

19   DIFFERENTIATING DESIGN."

20          DO YOU SEE THAT?

21   A    I SEE.

22   Q    IS THAT BENCHMARKING OR COPYING BY YOUR

23   DEFINITION?

24   A    THIS IS SIMPLY A COMPARISON.

25   Q    THIS IS JUST A COMPARISON.

```
1              NOW, I ASKED YOU A LITTLE EARLIER WHETHER
2    YOU STOOD BY YOUR TESTIMONY, DO YOU REMEMBER YOU
3    ASKED ABOUT COMPARISONS MADE BY DESIGN ENGINEERS AT
4    THE TIME THE GALAXY WAS BEING DEVELOPED?  DO YOU
5    REMEMBER THAT?
6    A    AGAIN, AS LIMITED AS WE DISCUSSED, YES.
7    Q    I'M ASKING YOU ABOUT IT TODAY.
8    A    OKAY.
9    Q    DO YOU STAND BY THE CONCLUSION YOU GAVE THAT
10   THERE'S NO EVIDENCE THAT THEY EVER COMPARED THE
11   PHONES SIDE-BY-SIDE AND COPIED FEATURES AFTER
12   HAVING SEEN THIS DOCUMENT?
13              MR. QUINN:  OBJECTION.  IMPROPER OPINION.
14   LACKS FOUNDATION, YOUR HONOR.
15              THE WITNESS:  AGAIN, THAT WASN'T MY
16   TESTIMONY.
17              THE COURT:  OVERRULED.
18   BY MR. LEE:
19   Q    MY QUESTION IS, DO YOU STAND BY YOUR
20   TESTIMONY, SIR?
21   A    THERE'S TWO DIFFERENT QUESTIONS.  AS LIMITED,
22   YES.
23   Q    NO.  THE LADIES AND GENTLEMEN OF THE JURY ARE
24   ONLY CONCERNED ABOUT WHAT'S AT ISSUE IN THIS CASE.
25              MR. QUINN:  YOUR HONOR, I OBJECT TO THE
```

1    PREAMBLE QUESTION.

2              MR. LEE:  WITHDRAWN.

3    Q    DO YOU STAND BY YOUR TESTIMONY AS TO THE

4    PRODUCTS AND FEATURES AT ISSUE IN THIS CASE?

5    A    I NEVER TESTIFIED TO THE PRODUCTS AND

6    FEATURES, ALL PRODUCTS AND FEATURES AT ISSUE IN

7    THIS CASE.

8    Q    SO THE ANSWER IS YOU DO NOT; CORRECT?

9    A    CORRECT.

10   Q    ALL RIGHT.  NOW, LET'S LOOK AT PX 34, VOLUME

11   2, TAB 15.  DO YOU HAVE THAT BEFORE YOU?

12   A    I DO.

13             THE COURT:  THIS IS A SAMSUNG FEASIBILITY

14   REVIEW; CORRECT?

15   A    IT'S NOT CLEAR TO ME THAT THIS IS A SAMSUNG

16   DOCUMENT.

17   Q    YOU DON'T KNOW ONE WAY OR ANOTHER?

18   A    NO, I DON'T.

19   Q    DO YOU SEE IT WAS PRODUCED BY SAMSUNG IN THIS

20   CASE?

21   A    I'LL TAKE YOUR WORD FOR THAT.  I DON'T KNOW

22   HOW TO TELL.  I'M SORRY.

23   Q    MR. DENISON, IT SAYS SYSTEM LSI.  DO YOU SEE

24   THAT?

25   A    I DO.

1    Q    YOU KNOW WHAT THAT IS, DON'T YOU, SIR?

2    A    I KNOW WHAT THOSE WORDS ARE.

3    Q    YEAH.  IT'S A GROUP WITHIN SAMSUNG; CORRECT?

4    A    AS BEST AS I KNOW, IT'S ONE GROUP THAT IS --

5    OR THIS IS A NAME THAT'S USED BY ONE GROUP WITHIN

6    SAMSUNG.

7    Q    RIGHT.  SO IT SAYS "FEASIBILITY REVIEW ON

8    STANDALONE AP BUSINESS FOR SMARTPHONE MARKET,"

9    SEPTEMBER 2007 NOW, "SYSTEM LSI."

10             CORRECT?

11   A    YES, THAT'S WHAT IT SAYS.

12             MR. LEE:  YOUR HONOR, WE OFFER PX 34.

13             MR. QUINN:  LACKS FOUNDATION.

14             THE COURT:  SUSTAINED.

15   BY MR. LEE:

16   Q    LET'S LOOK AT PX 38 IF WE COULD.

17   A    I'M SORRY.  WHICH TAB IS THAT?

18   Q    I'M SORRY.  IT'S AT VOLUME 2, TAB 17, AND IT'S

19   PX 38.  TELL ME WHEN YOU GET THERE.

20   A    I'M THERE.

21   Q    ALL RIGHT.  NOW, THIS DOCUMENT HAS THE SAMSUNG

22   LOGO ON IT; CORRECT?

23   A    IT DOES.

24   Q    YOU RECOGNIZE THAT?

25   A    YES.

1    Q    CORRECT?  IT SAYS "BROWSER ZOOMING METHODS UX

2    EXPLORATION STUDY."  CORRECT?

3    A    YES.

4    Q    IT SAYS "SAMSUNG TELECOMMUNICATIONS AMERICA."

5    CORRECT?

6    A    CORRECT.

7    Q    APRIL 17TH, 2009; CORRECT?

8    A    CORRECT.

9         MR. LEE:  YOUR HONOR, WE'D OFFER IT.

10        MR. QUINN:  LACKS FOUNDATION, YOUR HONOR.

11        THE COURT:  SUSTAINED.

12   BY MR. LEE:

13   Q    NOW, LET ME ASK YOU JUST A COUPLE MORE

14   QUESTIONS.

15        MR. DENISON, YOU'RE NOT A DESIGN

16   ENGINEER, ARE YOU?

17   A    NO, I'M NOT.

18   Q    YOU HAVEN'T PARTICIPATED IN DESIGNING ANY OF

19   THE PRODUCTS THAT ARE AT ISSUE IN THIS CASE;

20   CORRECT?

21   A    THAT'S CORRECT.

22   Q    YOU HAVEN'T PARTICIPATED IN DESIGNING ANY OF

23   THE THINGS THAT ARE CLAIMED IN ANY OF THE SAMSUNG

24   PATENTS IN THIS CASE; CORRECT?

25   A    I WOULD SAY THAT'S CORRECT.

835

```
1    Q    YOUR JOB IS AS A MARKETING STRATEGY GUY FOR
2    STA; CORRECT?
3    A    I GUESS YOU COULD SAY THAT, YES.
4    Q    IS THAT FAIR?
5    A    YEAH.  I THINK YOU DESCRIBED MY ROLE EARLIER
6    IN THE DISCUSSION, SO YES.
7    Q    THAT'S FAIR?
8    A    SURE.
9              MR. LEE:  OKAY.  NOTHING FURTHER, YOUR
10   HONOR.
11             THE COURT:  ALL RIGHT.  THE TIME IS NOW
12   2:58.  WHY DON'T WE GO AHEAD AND TAKE A -- DO YOU
13   WANT TO GET STARTED?
14             MR. QUINN:  WE CAN TAKE A BREAK.  THAT'S
15   FINE.
16             THE COURT:  IT'S ALMOST 3:00 O'CLOCK.
17   WHY DON'T WE TAKE, SINCE WE'VE BEEN GOING SINCE
18   1:00, JUST A 15 MINUTE BREAK UNTIL 3:15.  OKAY?
19             THANK YOU.
20             (WHEREUPON, A RECESS WAS TAKEN.)
21             (WHEREUPON, THE FOLLOWING PROCEEDINGS
22   WERE HELD OUT OF THE PRESENCE OF THE JURY:)
23             THE COURT:  OKAY.  WELCOME BACK.  PLEASE
24   TAKE A SEAT.
25             MR. LEE:  YOUR HONOR, BEFORE THE JURY
```

1    COMES IN, MR. QUINN IS BOTH GOING TO DO THE CROSS,

2    OR THE DIRECT OF MY CROSS-EXAMINATION, PLUS CALL

3    THIS WITNESS OUT OF ORDER FOR HIS CASE.

4            SO WE'LL DO BOTH, AND WE JUST WANTED TO

5    LET YOUR HONOR KNOW.

6            THE COURT:  THAT'S FINE.

7            MR. QUINN:  YOUR HONOR, I'D REQUEST THAT

8    THE JURY BE INSTRUCTED THAT YOU CAN'T IMPEACH A

9    30(B)(6) WITNESS ON QUESTIONS THAT HE WASN'T

10   DESIGNATED ON 30(B)(6), ON SUBJECTS THAT HE WASN'T

11   DESIGNATED ON 30(B)(6) ON.

12           THE COURT:  HE WAS DESIGNATED ON COPYING

13   AND THAT DOCUMENT IS APPLE'S EVIDENCE OF COPYING.

14   I THINK IT WAS FAIR.

15           MR. QUINN:  WITH RESPECT, HE WAS, YOUR

16   HONOR NOT DESIGNATED SIMPLY ON COPYING.  HE WAS

17   DESIGNATED ON THOSE SUBJECTS AS TO THE PRODUCTS

18   THAT WERE ISSUED ON THE PRELIMINARY INJUNCTION AND

19   THOSE FEATURES OF THOSE PRODUCTS.

20           I MEAN, THERE WERE FOUR DESIGN PATENTS

21   AND THE BOUNCE BACK PATENT, AND FOUR DEVICES, AND

22   HE WAS DESIGNATED ON COPYING, EMULATION, AND

23   COMPARING ONLY AS TO THOSE.

24           BUT THE EXAMINATION WENT BEYOND THAT.  HE

25   WAS NEVER DESIGNATED ON COPYING GENERALLY.

```
 1              AND THEN THEY ELICITED -- BLESS MR. LEE'S

 2    HEART, HE ELICITED A, YOU KNOW, AN ANSWER ABOUT

 3    WHETHER HE STOOD BY HIS TESTIMONY AND THEN

 4    PURPORTED TO IMPEACH HIM WHEN IT WAS A SUBJECT THAT

 5    WASN'T WITHIN THE SCOPE OF HIS DESIGNATION.  IT

 6    DIDN'T RELATE TO THOSE PRODUCTS THAT WERE THE

 7    SUBJECT OF THE PRELIMINARY INJUNCTION MOTION.

 8    THAT'S WHEN THIS WAS DONE.

 9              MR. LEE:  YOUR HONOR, LET ME SAY THREE

10    THINGS AND THEN WE'LL GET THE JURY IN.

11              THE FIRST THING IS I INTENTIONALLY

12    WENT -- HE'S AN STA EXECUTIVE -- I INTENTIONALLY

13    WENT BEYOND THE 30(B)(6) AND ASKED HIM MORE

14    BROADLY, AND WE'RE NOT LIMITED BY WHAT HE SAID IN

15    30(B)(6), AND HE TESTIFIED MORE BROADLY, AND WE

16    IMPEACHED HIM.

17              THE SECOND THING, YOUR HONOR, IS THESE

18    DOCUMENTS, ONE OF WHICH YOU ALLOWED, TWO OF WHICH

19    YOU EXCLUDED, THESE ARE THE DOCUMENTS THAT WE HAD

20    TO MOVE TO COMPEL TWICE ON AFTER HIS DEPOSITION.

21    THESE ARE THE DOCUMENTS THAT SAMSUNG GOT SANCTIONED

22    ON FOR REFUSING TO PRODUCE.

23              WE COULDN'T HAVE ASKED HIM ABOUT THEM AT

24    HIS DEPOSITION, THAT TIME OR ANY OTHER TIME,

25    BECAUSE WE HAD TO GO TO THE COURT THREE TIMES TO
```

838

```
 1    GET THE DOCUMENTS.

 2              THE THIRD THING IS, WHEN WE CALL HIM

 3    ADVERSELY, WE'RE NOT LIMITED TO WHAT HE TESTIFIED

 4    AS A 30(B)(6) WITNESS.  HE'S HERE.  HE'S A WITNESS.

 5              THE COURT:  I KNOW.

 6              MR. QUINN:  OF COURSE.  BUT THE RULES OF

 7    FOUNDATION ARE NOT WAIVED JUST BECAUSE HE'S AN

 8    ADVERSE WITNESS AND A 30(B)(6) WITNESS.

 9              I THINK MR. LEE HAS A VERY GOOD ARGUMENT

10    ON FOUNDATION WITHIN THE SCOPE OF WHAT HE WAS

11    DESIGNATED AS A 30(B)(6) WITNESS.

12              I THINK HE HAS NO ARGUMENT THAT THE FACT

13    THAT HE WAS A 30(B)(6) WITNESS AUTOMATICALLY GIVES

14    HIM FOUNDATION TO ASK ABOUT COPYING ON SUBJECTS

15    THAT WERE OUTSIDE THAT DESIGNATION, EVEN IF HE'S AN

16    EXECUTIVE OF STA, WHICH HE IS.  YOU STILL HAVE TO

17    LAY SOME FOUNDATION.

18              THE COURT:  WELL, I DISAGREE.  YOU CAN

19    CERTAINLY, ON YOUR TIME WITH HIM, DO AS MUCH

20    REPRESENTATION AS YOU LIKE, BUT I DISAGREE WITH

21    YOU.  ALL RIGHT.

22              MR. QUINN:  THANK YOU, YOUR HONOR.

23              THE COURT:  ALL RIGHT.  SO LET'S BRING IN

24    OUR JURORS.  WE'LL GO UNTIL ABOUT 4:30 TODAY.

25              MR. QUINN:  4:30?
```

```
 1              THE COURT:  YEAH.  SO WE HAVE ABOUT AN
 2   HOUR AND TEN MINUTES.
 3              (WHEREUPON, THE FOLLOWING PROCEEDINGS
 4   WERE HELD IN THE PRESENCE OF THE JURY:)
 5              THE COURT:  ALL RIGHT.  WELCOME BACK.
 6              THE TIME IS 3:23.  GO AHEAD PLEASE,
 7   MR. QUINN.
 8              MR. QUINN:  THANK YOU, YOUR HONOR.
 9                 AS-ON DIRECT EXAMINATION
10   BY MR. QUINN:
11   Q    GOOD AFTERNOON, SIR.
12              GOOD AFTERNOON, LADIES AND GENTLEMEN.
13              IN RESPONSE TO MR. LEE'S QUESTIONS, YOU
14   INDICATED THAT YOU HAD BEEN DESIGNATED TO TESTIFY
15   ON BEHALF OF VARIOUS SAMSUNG ENTITIES IN YOUR
16   DEPOSITION BACK IN, WHEN WAS IT, OCTOBER OF LAST
17   YEAR.
18   A    SEPTEMBER OF 2011.
19   Q    ALL RIGHT.  AND YOU INDICATED IN RESPONSE TO A
20   COUPLE OF MR. LEE'S QUESTIONS THAT YOU WERE
21   DESIGNATED ON CERTAIN SUBJECTS WITH LIMITATIONS.
22              DO YOU RECALL SAYING THAT?
23   A    YES, I DO.
24   Q    WERE YOU DESIGNATED TO BE THE EXPERT AND TO
25   SPEAK ON BEHALF OF ALL THE SAMSUNG ENTITIES WITH
```

```
 1    RESPECT TO ANY COMPARISON THAT EVER TOOK PLACE
 2    CONCERNING SAMSUNG PRODUCTS AND APPLE PRODUCTS?
 3    A    NO, I WAS NOT.
 4    Q    OR ANY EMULATION OR ANY COPYING OF ANY SAMSUNG
 5    PRODUCT AND ANY APPLE PRODUCT?
 6    A    NO.
 7    Q    WHAT WAS IT THAT YOU WERE DESIGNATED TO
 8    TESTIFY ABOUT?
 9    A    I WAS ASKED TO TESTIFY -- WELL, FIRST, TO
10    UNDERTAKE RESEARCH AND THEN TESTIFY ON BEHALF OF
11    THE COMPANY FOR FOUR PRODUCTS AT ISSUE, SO FOUR
12    DISTINCT SAMSUNG PRODUCTS.
13    Q    COULD YOU TELL THE JURY WHAT THOSE FOUR
14    PRODUCTS WERE?
15    A    YES.  THAT WAS THE INFUSE 4G; THE GALAXY S 4G;
16    THE DROID CHARGE; AND THE GALAXY TAB 10.1.
17    Q    AND AS TO THOSE FOUR PRODUCTS, WERE YOU
18    DESIGNATED TO DO RESEARCH AND TESTIFY CONCERNING
19    PARTICULAR FEATURES OR INTELLECTUAL PROPERTY
20    CONCERNING THOSE PRODUCTS?
21    A    I WAS.
22    Q    AND WHAT WAS THAT?
23    A    TO THE BEST OF MY RECOLLECTION, THERE WAS
24    THREE DESIGN PATENTS AND ONE SOFTWARE PATENT, OR
25    UTILITY PATENT AS IT'S CALLED.
```

1   Q    AND THAT UTILITY PATENT, THAT SOFTWARE PATENT,

2   WAS WHAT?

3   A    THAT WAS KNOWN AS THE BOUNCE BACK FEATURE.

4   Q    ALL RIGHT.  AND OTHER THREE WERE DESIGN

5   PATENTS DID YOU SAY?

6   A    CORRECT.

7   Q    AND SO IS IT TRUE THAT YOUR INVESTIGATION,

8   THEN, WAS YOU WERE DESIGNATED TO RESEARCH AS TO

9   THOSE FOUR PRODUCTS, AND THOSE FEATURES, WHETHER

10  THERE HAD BEEN A COMPARISON -- COMPARISONS,

11  EMULATION, OR COPYING?

12  A    CORRECT.

13  Q    WAS THAT A SECRET THAT THOSE WERE THE

14  LIMITATIONS ON YOUR ASSIGNMENT?

15  A    NO.

16  Q    DO YOU RECALL IN YOUR DEPOSITION THAT THOSE

17  LIMITATIONS WERE CALLED TO THE ATTENTION OF APPLE'S

18  COUNSEL?

19  A    YES.

20  Q    MR. LEE READ YOUR TESTIMONY.  DO YOU HAVE YOUR

21  DEPOSITION THERE BEFORE YOU?

22  A    IS IT IN THE BINDER?

23  Q    IT IS.  I DON'T KNOW THE TAB NUMBER.

24  A    I DON'T KNOW.

25  Q    PERHAPS MS. KHAN CAN HELP YOU FIND THAT.

```
1              BUT MR. LEE READ A COUPLE OF TIMES YOUR
2    TESTIMONY AND ASKED YOU WHETHER YOU STOOD BY IT.
3              DO YOU RECALL THAT?
4    A    I DO.
5    Q    AND YOU SAID THAT, "WHEN CONFERRING WITH THE
6    DESIGNERS FOR THE PRODUCTS AT ISSUE, IN ALL CASES I
7    SPECIFICALLY ASKED THEM IF THEY HAD CONSIDERED OR
8    STUDIED OR DRAWN DIRECT COMPARISONS OR WHAT HAVE
9    YOU VERSUS THE RELEVANT APPLE PRODUCTS, WHETHER IT
10   BE TABLET OR SMARTPHONE IN EITHER CASE, AND IN EACH
11   CASE THE DESIGNERS SAID THAT THEY HAD NOT."
12             DO YOU RECALL THAT TESTIMONY?
13   A    YES.
14   Q    AT THAT POINT IN THE DEPOSITION, WHAT WERE
15   APPLE'S ATTORNEYS ASKING YOU ABOUT?
16   A    THEY WERE ASKING ME ABOUT THE INDUSTRIAL
17   DESIGN OF THREE DIFFERENT PRODUCTS AT ISSUE.
18   Q    WOULD YOU EXPLAIN TO THE JURY, PLEASE, WHAT
19   YOU MEAN BY THE "INDUSTRIAL DESIGN."  WHEN YOU SAID
20   THAT "IN EACH CASE THE DESIGNERS SAID THAT THEY HAD
21   NOT MADE DIRECT COMPARISONS OR STUDIED OR DRAWN ON
22   THOSE DESIGNS," COULD YOU TELL THE JURY WHAT THOSE
23   INDUSTRIAL DESIGNS ARE?
24   A    THEY JUST MEAN THE OUTER PHYSICAL APPEARANCE
25   OF THE DEVICE.
```

1    Q    AT THAT POINT, WAS HE QUESTIONING YOU ABOUT

2    THAT ONE UTILITY PATENT, THE BOUNCE BACK PATENT?

3    A    NO.

4    Q    DID HE THEN TURN -- A FEW PAGES LATER IN YOUR

5    DEPOSITION, DID HE TURN TO THAT SUBJECT, GO FROM

6    TALKING ABOUT THE DESIGN PATENTS TO THE UTILITY

7    PATENTS?

8    A    THAT'S WHAT I REMEMBER.

9    Q    AND IF WE COULD TAKE A LOOK AT YOUR DEPOSITION

10   ON PAGE -- DO WE HAVE THAT THERE?  PAGE 147, LINE

11   19 TO 24.  IT'S A COUPLE OF PAGES LATER.

12             DID THE APPLE LAWYERS SAY -- YOU WERE

13   ASKED THIS QUESTION AND GAVE THIS ANSWER:

14             "SO LET ME TURN NOW TO THE '381 PATENT.

15   HAVE YOU HEARD OF THAT REFERENCE BEFORE, THE '381

16   PATENT?  IT'S A UTILITY PATENT, IF THAT'S HELPFUL.

17             "ANSWER:  I BELIEVE YOU'RE REFERRING TO

18   THE SO-CALLED BOUNCE-BACK PATENT?"

19             "YES, I'LL REFER TO IT AS THE BOUNCE-BACK

20   PATENT FOR SIMPLICITY.  IS THAT OKAY?

21             "ANSWER:  THAT'S FINE."

22             DO YOU SEE THAT?

23   A    I DO.

24   Q    SO DO YOU RECALL THAT WHEN YOU GAVE THIS

25   TESTIMONY WHERE YOU SAID THAT YOU SPOKE TO THE

1    DESIGNERS AND IN EACH CASE THEY HAD NOT STUDIED OR

2    DRAWN ON OR MADE COMPARISONS, THAT YOU WERE

3    TESTIFYING THEN ABOUT THE INDUSTRIAL DESIGNERS; AND

4    THEN AFTER THAT, APPLE'S LAWYER THEN TURNED TO THE

5    OTHER SUBJECT ON WHICH YOU HAD BEEN DESIGNATED AS

6    AN EXPERT, AND THAT'S THIS BOUNCE BACK UTILITY

7    PATENT.

8              MR. LEE:  YOUR HONOR, I OBJECT TO THE

9    LEADING.

10             THE COURT:  OVERRULED.

11             THE WITNESS:  THAT'S WHAT I REMEMBER.

12   BY MR. QUINN:

13   Q    AND SO LET'S TALK ABOUT THAT BOUNCE BACK

14   UTILITY PATENT.

15             WOULD IT BE TRUE TO SAY THAT IN YOUR

16   DEPOSITION, YOU TOLD APPLE'S LAWYERS THAT THE

17   SOFTWARE ENGINEERS YOU SPOKE TO REGARDING THAT

18   BOUNCE BACK UTILITY PATENT TOLD YOU THEY HAD NEVER

19   LOOKED AT THE APPLE BOUNCE BACK?  WOULD THAT BE

20   TRUE TO SAY?

21   A    NO, THAT'S NOT TRUE, SIR.

22   Q    IN YOUR DEPOSITION, CAN YOU TELL US WHETHER OR

23   NOT YOU TOLD APPLE'S LAWYERS THAT YOU LEARNED IN

24   YOUR INVESTIGATION THAT, IN FACT, THEY HAD LOOKED

25   AT IT?

```
 1    A    YES, I DID.

 2             MR. QUINN:  AND, YOUR HONOR, I'D REQUEST,

 3    UNDER COMPLETENESS, I'D REQUEST PERMISSION TO READ

 4    A FEW PAGES LATER IN THE DEPOSITION, PAGE 188, LINE

 5    1 TO LINE 24.

 6             THE COURT:  THIS IS IN?

 7             MR. QUINN:  IT'S IN THE DEPOSITION -- I

 8    DON'T KNOW THE --

 9             THE WITNESS:  IT'S TAB 7 IN VOLUME 1.

10             THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

11             MR. QUINN:  "QUESTION:  IF YOU LOOK AT

12    THE FOURTH PAGE OF THIS DOCUMENT, WHICH ARE

13    SAMSUNG'S RESPONSES TO APPLE'S INTERROGATORY NUMBER

14    1 RELATING TO ITS MOTION FOR A PRELIMINARY

15    INJUNCTION, THERE IS A STATEMENT, 'IN CONNECTION

16    WITH THE DEVELOPMENT OF THE BOUNCE-BACK FEATURE OF

17    THE CONTACTS APPLICATION, WOOKYUN KHO CONSIDERED

18    SIMILAR OR ANALOGOUS FEATURES IMPLEMENTED IN

19    PRODUCTS OF VARIOUS COMPETITORS, INCLUDING APPLE.'

20             'DO YOU SEE THAT SENTENCE?

21             "ANSWER:  I DO SEE IT.

22             "QUESTION:  DO YOU HAVE ANY TESTIMONY TO

23    OFFER WITH RESPECT TO THAT STATEMENT?

24             "ANSWER:  WITH REGARDS TO MY CONVERSATION

25    WITH MR. KHO, WHO I BELIEVE IS WOOKYUN KHO, I
```

```
1      SPECIFICALLY ASKED MR. KHO WHETHER HE HAD LOOKED AT

2      OR EVALUATED BOUNCE-BACK FUNCTIONALITY IN ANY OTHER

3      DEVICE THAT WAS IN THE MARKET, AND HE INDICATED

4      THAT HE HAD SEEN AND DID LOOK AT THE BOUNCE-BACK

5      FUNCTIONALITY INSIDE THE IPHONE AS WELL AS HTC

6      DEVICES THAT WERE RUNNING THE ECLAIR VERSION OF

7      ANDROID OS."

8             DO YOU SEE THAT?

9      A    I DO.

10     Q    SO WOULD IT BE TRUE TO -- WOULD IT BE FAIR TO

11     LEAVE THE JURY WITH THE IMPRESSION THAT IN YOUR

12     TESTIMONY, YOU DENIED THAT, IN YOUR INVESTIGATION,

13     YOU HAD -- THAT ANY SAMSUNG EMPLOYEE HAD EVER

14     LOOKED AT ANY OF THE ACCUSED FEATURES IN CONNECTION

15     WITH THEIR WORK DESIGNING SAMSUNG PRODUCTS?

16            MR. LEE:  I OBJECT, YOUR HONOR.  IT'S

17     LEADING AND ARGUMENTATIVE.  IT'S HIS WITNESS ON

18     DIRECT EXAMINATION.

19            THE COURT:  SUSTAINED.

20     BY MR. QUINN:

21     Q    WAS THAT YOUR TESTIMONY THAT YOU GAVE TO

22     APPLE'S LAWYERS?

23            THE COURT:  PLEASE.  I SUSTAINED THE

24     OBJECTION.  YOU NEED TO REASK ANOTHER QUESTION.

25     BY MR. QUINN:
```

1    Q    DID I ACCURATELY READ THE TESTIMONY THAT YOU

2    GAVE APPLE'S LAWYERS?

3    A    YOU DID.

4    Q    NOW, I WANT TO COME -- I WILL COME BACK AND

5    TALK ABOUT THE INVESTIGATION THAT YOU DID AND WHO

6    YOU SPOKE TO, BUT FIRST I'D LIKE TO ADDRESS SOME OF

7    THE DOCUMENTS THAT MR. LEE SHOWED YOU.

8              FIRST IF WE COULD LOOK AT EXHIBIT 44.

9              AND PRIOR TO YOUR INVOLVEMENT IN THIS

10   CASE, HAD YOU EVER SEEN THIS EXHIBIT BEFORE?

11   A    I HAVE NOT.

12   Q    DO YOU KNOW, IN CONNECTION WITH, YOU KNOW,

13   PREPARING TO TESTIFY WHETHER THE ORIGINAL OF THIS

14   DOCUMENT IS IN THE KOREAN LANGUAGE?

15   A    IN PREPARATION FOR THIS TESTIMONY, I WAS TOLD

16   IT WAS TRANSLATED AND THERE'S A TRANSLATION LABEL

17   ON TOP OF IT.

18   Q    AND THIS IS, OBVIOUSLY, AN ENGLISH LANGUAGE

19   TRANSLATION OF THE DOCUMENT THAT WE'RE LOOKING AT?

20   A    CORRECT.

21   Q    NOW, MR. LEE CALLED YOUR ATTENTION TO PAGE

22   44.122, WHICH TALKS ABOUT -- THE TITLE IS "VISUAL

23   INTERACTION EFFECT-ICON."

24              DO YOU SEE THAT?

25   A    I DO.

1    Q    AND WAS THIS WITHIN THE -- THIS IS -- IS THIS

2    WHEN YOU WOULD CALL A FEATURE RELATING TO THE

3    GRAPHICAL USER INTERFACE, GUI?

4    A    I'M NOT SURE WHAT ALL CONSTITUTES A GUI, BUT I

5    GUESS THIS MIGHT BE PART OF THE GUI.

6    Q    BUT WAS THIS WITHIN THE SCOPE OF YOUR

7    INVESTIGATION, THIS FEATURE THAT IS TALKED ABOUT

8    HERE?

9    A    NO, IT'S NOT.

10    Q    SO IT'S NOT ONE OF THE DESIGN PATENTS?

11    A    CORRECT.

12    Q    AND DOES THIS RELATE TO BOUNCE BACK?

13    A    AS BEST AS I UNDERSTAND IT, NO.

14    Q    THERE'S A RECOMMENDATION DOWN THERE AT THE

15    BOTTOM.  DO YOU SEE THAT?

16    A    I DO.

17    Q    AND IT RELATES TO "EITHER CHANGE THE COLORS OF

18    THE BORDERING RECTANGULAR FRAMES ACCORDING TO A

19    CONSISTENT PATTERN FOR A UNIFORM FEEL OR REMOVE THE

20    RECTANGULAR FRAME AND USE THE ICONS ONLY FOR A

21    CLEAN AND UNIFORM FEEL."

22            DO YOU SEE THAT?

23    A    I DO.

24    Q    DO YOU KNOW WHETHER, IN FACT -- WELL, WHAT ARE

25    CONTAINERS?  DO YOU SEE A REFERENCE -- YOU KNOW,

```
1    WE'VE HEARD OF THE CONCEPT OF CONTAINERS AROUND

2    ICONS.

3    A    SO MY UNDERSTANDING OF CONTAINERS ARE THE, I

4    GUESS, SQUARES OR MAYBE RECTANGLES THAT SURROUND

5    THE ACTUAL ICON THAT MAY BE IN THE MIDDLE, SO TO

6    MAKES IT LOOK LIKE THEY'RE ALL THE SAME SIZE MAYBE

7    IS THE WAY TO DESCRIBE IT.

8    Q    ALL RIGHT.  AND DO YOU KNOW WHETHER, YOU KNOW,

9    SAMSUNG EVER IMPLEMENTED A RECOMMENDATION THAT ALL

10   THE CONTAINERS AROUND ICONS BE ELIMINATED?

11   A    I'M NOT AWARE OF ANY -- I'M SORRY.  CAN YOU

12   REPEAT?

13   Q    YEAH.  ARE YOU AWARE OF WHETHER THERE WAS SOME

14   RECOMMENDATION THAT WAS IMPLEMENTED THAT, ON ALL

15   THE GALAXY S PHONES, CONTAINERS AROUND ICONS SHOULD

16   BE ELIMINATED?

17   A    NO, I'M NOT AWARE OF THAT.

18   Q    DO YOU KNOW WHETHER, ON THE GALAXY S PHONES,

19   THIS RECOMMENDATION HERE WAS ACTUALLY IMPLEMENTED

20   ACROSS THE BOARD?

21   A    I'M NOT AWARE OF THAT.

22   Q    AND THEN IF -- ANOTHER PAGE THAT MR. LEE

23   SHOWED YOU, PAGE 131, IF WE COULD TAKE A LOOK AT

24   THAT, AND THIS RELATES AGAIN TO ICONS, AND WAS THIS

25   WITHIN THE SCOPE OF WHAT YOU TOLD APPLE YOU HAD
```

```
1    RESEARCHED AND WERE PREPARED TO TESTIFY ON?

2    A    NO, IT WAS NOT.

3    Q    AND THEN THE LAST LINE OF THE RECOMMENDATION

4    THERE IS "REMOVE THE FEELING THAT IPHONE'S MENU

5    ICONS ARE COPIED BY DIFFERENTIATING DESIGN."

6              DO YOU SEE THAT?

7    A    I DO.

8    Q    AND WHAT IS THE CONCEPT OF DIFFERENTIATING

9    DESIGN?  WHAT DOES THAT MEAN TO YOU?

10   A    IT'S FOUR DIFFERENT -- TO THAT WOULD MEAN

11   DIFFERENT AND/OR BETTER.

12   Q    ALL RIGHT.  I'D LIKE TO TURN NOW TO ACTUALLY,

13   YOU KNOW, YOUR INVESTIGATION AND WHAT IT WAS THAT

14   YOU DID.

15             AND AT THE BEGINNING, I'D ASK YOU IF I

16   COULD -- IF I COULD SHOW YOU TWO PHONE DEVICES

17   WHICH ARE IN EVIDENCE, FIRST THE JX 1000 -- AND I'M

18   GOING TO GET SOME HELP, I HOPE, FROM MS. KHAN --

19   THE IPHONE, WHICH IS IN EVIDENCE, THE JOINT EXHIBIT

20   1000, AND THE INFUSE 4G, JOINT EXHIBIT 1027, WHICH

21   IS ONE OF THE ACCUSED PHONES.

22             IF WE COULD HAND THOSE -- DO WE HAVE THE

23   IPHONE THERE, JX 1000?

24             THE COURT:  SO I'M GOING TO START

25   COUNTING THIS TIME AS YOUR DIRECT.  OKAY?
```

```
1              MR. QUINN:  OKAY.  THANK YOU, YOUR HONOR.

2              THE COURT:  FOR YOUR CASE.  OKAY.

3    BY MR. QUINN:

4    Q    DO YOU HAVE THOSE, SIR, THOSE TWO?

5    A    I HAVE THE INFUSE 4G AND THE ORIGINAL IPHONE,

6    I BELIEVE.

7    Q    CAN YOU TELL US, CAN YOU SEE DIFFERENCES

8    BETWEEN THOSE TWO?

9              MR. LEE:  I OBJECT.  YOUR HONOR, THIS IS

10   GETTING IN EVIDENCE -- THEY HAD AN EXPERT ON IT.

11   THE EXPERT IS OUT.  NOW THEY'RE TRYING TO GET THIS

12   IN.

13             MR. QUINN:  IT'S JUST HIS OBSERVATION,

14   YOUR HONOR.  HE'S LOOKING AT THEM AND IT'S A

15   PERCIPIENT ACTIVITY, WHAT HE SEES LOOKING AT THESE,

16   LOOKING AT THE PHYSICAL OBJECTS.

17             MR. LEE:  YOUR HONOR, THIS IS AN EFFORT

18   TO GET IN, THROUGH HIM, TESTIMONY THAT HAS BEEN

19   EXCLUDED.

20             THE COURT:  ALL RIGHT.  SUSTAINED.

21   BY MR. QUINN:

22   Q    WELL, IF WE COULD LOOK AT THE INFUSE, THE

23   JOINT EXHIBIT 1027, DOES IT HAVE, DOWN AT THE

24   BOTTOM, DOES IT HAVE SOME, WHAT LOOK LIKE SOFT

25   BUTTONS?
```

1    A    AT THE BOTTOM, THERE'S WHAT I CALL CAPACITIVE

2    KEYS.

3    Q    CAPACITIVE KEYS.  WHAT MIGHT THE REST OF US

4    CALL THOSE?

5    A    I'M NOT SURE.  IT'S THE OPPOSITE OF AN ACTUAL

6    PHYSICAL BUTTON.

7    Q    ALL RIGHT.

8    A    IT'S SOMETHING THAT SENSES YOUR FINGER AND

9    PERFORMS AN ACTION AS IF YOU TOUCHED A BUTTON.

10   Q    AND DOES THE INFUSE HAVE A BEZEL AROUND IT?

11   A    THE INFUSE, I DON'T THINK IT HAS A BEZEL, PER

12   SE.  IT'S KIND OF A UNIBODY DESIGN.

13   Q    AND IT'S A UNIBODY DESIGN.  IT DOES NOT HAVE A

14   BEZEL?

15   A    CORRECT.

16   Q    IS THAT UNIBODY, IS THAT FLAT AND LEVEL WITH

17   THE SCREEN OR NOT?

18   A    THE EDGES OF THE UNIBODY PROTRUDE ABOVE THE

19   SCREEN.  SO IT'S NOT FLAT, AS IT WERE.

20   Q    DOES IT HAVE WHAT'S BEEN REFERRED TO AS THE,

21   AS THE, WHAT DO YOU CALL IT, INNIE, THE HOME

22   BUTTON?  THE BELLY BUTTON?  THE HOME BUTTON.

23            DOES IT HAVE A HOME BUTTON ON IT?

24   A    IT JUST HAS A CAPACITIVE BUTTON FOR HOME, BUT

25   NOT A PHYSICAL HOME KEY AS SUCH.

```
 1              MR. QUINN:  YOUR HONOR, WITH THE

 2    PERMISSION OF THE COURT, I WOULD REQUEST, IF WE

 3    COULD, TO HAND TO THE JURY THESE TWO EXHIBITS SO

 4    THAT THEY CAN ACTUALLY HANDLE THEM AND SEE THEM IF

 5    THAT WOULD BE ACCEPTABLE.

 6              MR. LEE:  NO OBJECTION.

 7              THE COURT:  GO AHEAD, PLEASE.  AND LET ME

 8    JUST MAKE SURE I HAVE IT.  IT IS THE INFUSE 4,

 9    WHICH IS 1027.

10              MR. QUINN:  YES, YOUR HONOR.

11              THE COURT:  4G, EXCUSE ME.

12              AND WHAT IS THE OTHER NUMBER?

13              MR. QUINN:  THE JX 1000, WHICH IS THE

14    IPHONE.

15              THE COURT:  OKAY.  AND THE JX 1000 HAS

16    ALREADY BEEN -- I DON'T SEE THAT COMING IN, SO

17    THAT'S COMING IN NOW.

18              MR. QUINN:  I WOULD OFFER JX 1000, YOUR

19    HONOR.

20              THE COURT:  OKAY.

21              THE CLERK:  IT CAME IN YESTERDAY.

22    BY MR. QUINN:

23    Q    SO IF I COULD ASK YOU NOW ABOUT YOUR

24    ASSIGNMENT THAT LED TO YOUR TESTIMONY THAT YOU

25    REFERRED TO.  WHAT WAS IT THAT YOU WERE ASKED TO
```

1    DO?

2    A    I WAS ASKED TO REPRESENT SAMSUNG IN A LEGAL

3    MATTER AS A CORPORATE REPRESENTATIVE.  MY JOB WAS

4    TO BECOME THE PERSON MOST KNOWLEDGEABLE ON CERTAIN

5    SUBJECTS, AND WE'VE TALKED ABOUT HOW IT WAS FOUR

6    PRODUCTS AND FOUR FEATURES OF PATENTS.

7    Q    AND WHAT DID YOU DO TO FULFILL THAT

8    ASSIGNMENT?

9    A    I UNDERTOOK RESEARCH, I SPOKE TO THE RELEVANT

10   DESIGNERS AND ENGINEERS FOR THE PRODUCTS AND THE

11   FEATURES IN QUESTION, INTERVIEWED THEM, AND THAT

12   WAS MY INVESTIGATION.

13   Q    ALL RIGHT.  AND LET ME -- WHEN YOU SAY "I

14   SPOKE TO THE DESIGNERS AND ENGINEERS," WHY WAS

15   IT -- WHICH WERE THE DESIGNERS AND ENGINEERS?  LET

16   ME WITHDRAW THAT.  BAD QUESTION.

17        HOW DID YOU GO ABOUT DECIDING WHAT

18   DESIGNERS AND ENGINEERS YOU WANTED TO TALK TO?

19   A    SO I LOCATED THE PRINCIPAL DESIGNERS AND

20   ENGINEERS THAT WERE IN CHARGE OF THE FINAL

21   PRODUCTION, IF YOU WILL, OF EITHER THE INDUSTRIAL

22   DESIGN IN THE CASE OF THE INDUSTRIAL DESIGN ISSUES,

23   AND THE -- WHO WERE IN CHARGE OF THE SOFTWARE

24   ENGINEERS FOR THE ACTUAL SOFTWARE FEATURES IN

25   QUESTION.

1    Q    AND DID YOU -- CAN YOU TELL US WHETHER OR NOT

2    YOU SPOKE TO THE ACTUAL DESIGNERS WHO WERE

3    RESPONSIBLE FOR THE DESIGN OF THOSE PRODUCTS THAT

4    WERE AT ISSUE?

5    A    I DID.

6    Q    AND IN THE CASE OF THE -- THE INFUSE THAT THE

7    JURY IS LOOKING AT NOW, WAS THAT ONE OF THE

8    PRODUCTS THAT YOU -- THAT WAS AT ISSUE AND YOU

9    SPOKE TO THE DESIGNERS?

10   A    YES.

11   Q    AND CAN YOU RECALL THE NAMES OF THE FOLKS YOU

12   SPOKE TO?

13   A    I RECALL THE NAMES OF SOME OF THEM.  IT MIGHT

14   HELP IF I REFERRED TO A REFERENCE.  BUT, YES, I

15   REMEMBER THE NAMES OF SOME.

16   Q    WELL, DO YOU REMEMBER THE NAMES OF THE

17   DESIGNERS OF THE INFUSE THAT YOU SPOKE TO?

18   A    THE INFUSE DESIGNERS, AS I RECALL, WERE, I

19   BELIEVE THAT WAS YONGSEOK BANK, I BELIEVE THAT WAS

20   BORA KIM, AND I BELIEVE THE LAST ONE WAS

21   MIN-HYOUK LEE IF I REMEMBER CORRECTLY.

22   Q    AND IN SOME CASE -- IN THE CASES -- WERE THERE

23   SOME CASES WHERE THE DESIGNER WASN'T FLUENT IN

24   ENGLISH?

25   A    THERE WERE SOME CONVERSATIONS THAT WERE

1    TRANSLATED.  I DON'T REMEMBER EXACTLY WHICH ONES

2    WERE.

3    Q    AND CAN YOU TELL US ROUGHLY HOW LONG EACH OF

4    THOSE CONVERSATIONS TOOK?

5    A    EACH ONE OF THE CONVERSATIONS TOOK PROBABLY

6    TWO OR THREE HOURS WITH RESPECT TO EACH PRODUCT AND

7    EACH FEATURE.

8    Q    DID YOU ASK THESE DESIGNERS FOR THE INFUSE,

9    THOSE INDIVIDUALS THAT YOU IDENTIFIED, HOW THEY

10   CAME UP WITH THE DESIGN FOR THE INFUSE?

11   A    I DID.

12   Q    AND WHAT DID THEY TELL YOU?

13   A    WELL, WHEN I SPECIFICALLY SPOKE TO, I BELIEVE

14   HIS NAME, AGAIN, WAS YONGSEOK BANG -- HOPEFULLY I

15   HAVE THAT CORRECT -- I ASKED HIM WHAT HIS

16   INSPIRATION WAS FOR THE INFUSE 4G.

17   Q    AND WHAT DID HE TELL YOU?

18        MR. LEE:  I OBJECT.  THIS IS HEARSAY,

19   YOUR HONOR.

20        THE COURT:  SUSTAINED.

21        MR. QUINN:  THEY HAVE CHALLENGED HIS

22   INVESTIGATION.  I THINK I'M ENTITLED TO SHOW WHAT

23   HE DID.

24        THE COURT:  WELL, YOU HAVE TO REPHRASE

25   THE QUESTION AND SEE IF YOU CAN GET IT IN ANOTHER

```
 1    WAY.

 2    BY MR. QUINN:

 3    Q    SO DID YOU -- DID YOU ASK, YOU KNOW, HOW THEY

 4    ARRIVED AT THESE DESIGNS?

 5    A    I DID.

 6    Q    AND DID YOU ASK WHETHER THEY HAD REFERRED TO

 7    THE IPHONE IN ARRIVING AT THESE DESIGNS?

 8    A    I DID.

 9    Q    AND WHAT DID THEY TELL YOU?

10         MR. LEE:  I OBJECT, YOUR HONOR.  IT'S

11    HEARSAY.

12         MR. QUINN:  YOUR HONOR, THEY PUT THIS AT

13    ISSUE.

14         THE COURT:  I'M GOING TO SUSTAIN IT.

15         ASK IT ANOTHER WAY, PLEASE.

16    BY MR. QUINN:

17    Q    YOU KNOW, BASED ON WHAT YOU LEARNED IN GETTING

18    READY TO TESTIFY AND BASED ON TALKING TO THESE

19    INDIVIDUALS, DID YOU LEARN WHETHER OR NOT THE

20    DESIGNERS HAD BASED THEIR DESIGNS ON THE IPHONE?

21         MR. LEE:  YOUR HONOR, STILL HEARSAY.

22    "DID YOU LEARN?"  HE'S STATING CONCLUSIONS.

23         MR. QUINN:  YOUR HONOR, THEY HAVE

24    CHALLENGED HIS INVESTIGATION.  THEY HAVE --

25         THE COURT:  I'M GOING TO ALLOW THE
```

```
 1    QUESTION.  OVERRULED.
 2               GO AHEAD, PLEASE.
 3               THE WITNESS:  I'M SORRY.  CAN YOU REPEAT
 4    THE QUESTION?
 5               MR. QUINN:  I'LL TRY.
 6    Q    DID YOU LEARN WHETHER OR NOT, BASED ON
 7    SPEAKING TO THEM, WHETHER OR NOT THEY HAD BASED
 8    THEIR DESIGNS ON THE IPHONE?
 9    A    I DID.
10    Q    AND WHAT DID YOU LEARN IN THAT REGARD?
11    A    THE DESIGNERS, IN PARTICULAR THE MAIN DESIGNER
12    OF THE INFUSE, OR THE ORIGINAL DESIGNER, TOLD ME
13    THAT HIS INSPIRATION WAS ONE OF A FUTURISTIC
14    DESIGN, SOMETHING VERY THIN, HE WANTED TO GO FOR
15    UNIBODY, AND HE WANTED SOMETHING THAT WAS KIND OF,
16    I THINK HE MADE HAVE EVEN USED THE WORD EDGIER,
17    HAVING SHARPER CORNERS THAN MANY OF THE OTHER
18    PHONES IN THE MARKET.
19    Q    DID -- BASED ON YOUR INVESTIGATION, DID YOU
20    LEARN WHETHER OR NOT THERE WERE SOME EXISTING, YOU
21    KNOW, PRECEDENTS OR EXISTING CAD DESIGNS THAT WERE
22    ON THE SHELF THERE AT SAMSUNG?
23               MR. LEE:  YOUR HONOR, THIS IS HEARSAY
24    AGAIN.  "DID YOU LEARN" IS JUST ANOTHER WAY OF
25    SAYING "WHAT DID THEY TELL YOU?"
```

```
 1              THE COURT:  ALL RIGHT.  LAY THE
 2    FOUNDATION OF IF HE KNEW IT IN A WAY OTHER THAN
 3    FROM HEARING SOMEONE'S ELSE'S STATEMENT, OUT OF
 4    COURT STATEMENT.
 5              MR. QUINN:  YOUR HONOR, HE'S NOT A
 6    DESIGNER.  HE LEARNED WHAT HE KNOWS THROUGH THIS
 7    INVESTIGATION.
 8              THE COURT:  BUT DID HE SEE THEM?  HE
 9    COULD HAVE FIRST-HAND KNOWLEDGE.
10    BY MR. QUINN:
11    Q    DID YOU SEE OTHER DESIGNS WHICH THEY SAID
12    THESE HAD BEEN BASED ON?
13              MR. LEE:  YOUR HONOR, THIS IS AN EFFORT
14    TO GET IN THIS, PRECISELY THE ISSUE WE HAD ABOUT
15    EARLIER DEVELOPMENT.  I DON'T WANT TO SAY ANY MORE
16    THAN THAT.  THAT'S WHAT WE'RE GETTING INTO HERE
17    NOW.  IT'S COMING IN BY HEARSAY.
18              MR. QUINN:  YOUR HONOR, THEY --
19              MR. LEE:  AND THE SUGGESTION THAT I
20    CHALLENGED HIS INVESTIGATION, ALL I DID WAS ASK HIM
21    WHAT HE DID AND WHETHER HE STOOD BY IT TODAY WITH
22    THE PRODUCTS THAT ARE AT ISSUE IN THIS CASE.  I
23    DIDN'T CHALLENGE WHO HE TALKED TO.
24              BUT, YOUR HONOR, THIS IS HIS TELLING US
25    WHAT HE LEARNED FROM SOMEONE WITHIN THEIR CONTROL,
```

```
 1     RIGHT, ON A SUBSTANTIVE ISSUE.

 2               MR. QUINN:  YOUR HONOR, HE WAS ASKED

 3     WHETHER HE STOOD BY HIS TESTIMONY THAT THERE HAD

 4     NOT BEEN COPYING, THAT THEY HADN'T REFERRED TO

 5     APPLE PRODUCTS, AND, YOU KNOW, AN EFFORT WAS MADE

 6     TO CHALLENGE THAT.

 7               SO I THINK HE'S ENTITLED TO RESPOND TO

 8     THAT AND SAY WHY AND WHAT HE DID AND WHAT HE KNEW

 9     BASED ON THAT INVESTIGATION.

10               MR. LEE:  YOUR HONOR, HE DOESN'T -- THIS

11     IS NOT A DOOR-OPENER FOR HEARSAY.

12               AND WHAT WE ASKED HIM WAS WHAT HIS

13     CONCLUSION WAS, AND I ONLY ASKED HIM WHETHER HE

14     STOOD BY IT AS TO WHAT'S BEFORE THIS JURY TODAY.

15               THAT DOESN'T OPEN THE DOOR FOR HIM TO NOW

16     TALK ABOUT WHAT THE SAMSUNG EMPLOYEES WHO THEY

17     COULD BRING HERE --

18               THE COURT:  ARE NONE OF THESE EMPLOYEES

19     COMING TO TESTIFY DURING THIS TRIAL?  ARE THEY ALL

20     COMING IN THROUGH MR. DENISON?

21               BECAUSE IF THEY'RE GOING TO COME TO

22     TESTIFY, I THINK IT DOES MAKE SENSE FOR IT TO COME

23     DIRECTLY FROM THE HORSE'S MOUTH RATHER THAN FROM

24     MR. DENISON.

25               MR. QUINN:  SOME OF THESE EMPLOYEES WILL
```

861

1    LIKELY TESTIFY.

2              THE COURT:  OKAY.

3              MR. QUINN:  BUT I CAN'T SAY ALL OF THEM

4    WILL.

5              THE COURT:  I'M NOT GOING TO LET THEM

6    TESTIFY THROUGH HIM.  SO I'M SUSTAINING THE

7    OBJECTION.

8              MR. QUINN:  ALL RIGHT.

9    Q    ANOTHER PHONE THAT YOU INVESTIGATED WAS THE --

10   THAT WAS -- YOU SAID THAT WAS AT ISSUE WAS THE

11   GALAXY S, WHICH I THINK IS EXHIBIT 1007.

12   A    YES, I THINK THE GALAXY S 4G SPECIFICALLY.

13   Q    AND IF WE CAN -- IF I COULD ASK MS. KHAN TO

14   PLACE THAT BEFORE THE WITNESS.

15             THE CLERK:  I DON'T THINK THAT'S BEEN

16   ADMITTED.

17             MR. QUINN:  IT HAS NOT YET BEEN RECEIVED,

18   I DON'T BELIEVE.

19             THE COURT:  I DON'T SEE IT.

20   BY MR. QUINN:

21   Q    HOPEFULLY WE'VE GOT ONE IN THE COLLECTION.

22   A    I'VE GOT ONE.

23   Q    DO YOU HAVE EXHIBIT 1007 BEFORE YOU, SIR?

24   A    I DO.

25   Q    AND COULD YOU IDENTIFY THAT FOR US, PLEASE?

1    A    IT LOOKS TO BE A GALAXY S 4G.

2              MR. QUINN:  AND WE'D OFFER THAT, YOUR

3    HONOR.

4              THE COURT:  ALL RIGHT.  ANY OBJECTION.

5              MR. LEE:  NO OBJECTION.

6              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

7              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

8              1007, HAVING BEEN PREVIOUSLY MARKED FOR

9              IDENTIFICATION, WAS ADMITTED INTO

10             EVIDENCE.)

11             THE WITNESS:  I APOLOGIZE.  THIS

12   PARTICULAR DEVICE LOOKS TO BE THE GLOBAL VARIANT OF

13   THE ORIGINAL GALAXY S.  THAT'S KNOWN AS THE I9000.

14             MR. QUINN:  WE OFFER THAT IN EVIDENCE,

15   YOUR HONOR, THE GLOBAL VARIANT OF THE GALAXY 4S.

16   Q    IS THAT ONE OF THE ACCUSED PHONES, THE ORIGINS

17   OF THE DESIGN THAT YOU INVESTIGATED?

18   A    NO, IT WAS NOT.

19             MR. QUINN:  NO.  SO WE NEED EXHIBIT 1007,

20   THE GALAXY S.

21             MR. LEE:  WHATEVER IT IS HE'S IDENTIFIED,

22   I HAVE NO OBJECTION TO IT.

23             THE COURT:  ALL RIGHT.  SO THE I9000 IS

24   ADMITTED.

25             THE CLERK:  DOES THAT HAVE A NUMBER,

863

```
 1     COUNSEL?

 2               MR. QUINN:  IT'S EXHIBIT 1007.

 3               THE CLERK:  I THOUGHT HE SAID THAT WAS --

 4               MR. QUINN:  1007.

 5               THE CLERK:  I THOUGHT THEY SAID THAT

 6     WASN'T --

 7               THE COURT:  I THINK THEY WANT TO DO

 8     ANOTHER ONE THAT'S GOING TO HAVE A DIFFERENT

 9     NUMBER.

10               RIGHT?  IT'S ANOTHER ONE THAT HAS A

11     DIFFERENT NUMBER?  IS THAT RIGHT?

12               THE CLERK:  YOU CALLED IT 1007 AND THEN

13     IT DIDN'T TURN OUT TO BE WHAT YOU THOUGHT IT WAS.

14     SO WHAT IS THAT?

15               MR. QUINN:  I'M GOING TO ASK HIM.

16               THE CLERK:  OKAY.

17     BY MR. QUINN:

18     Q    WHAT ARE YOU HOLDING IN YOUR HAND?

19     A    RIGHT NOW I'M HOLDING THE GALAXY S 4G.  IT'S

20     EXHIBIT 1019.

21               MR. QUINN:  1019.  AND WE'D OFFER THAT

22     EXHIBIT.

23               THE COURT:  ALL RIGHT.

24               MR. LEE:  JUST SO I'M CLEAR, THIS IS THE

25     GALAXY S 4G, 1019.
```

```
 1                 THE WITNESS:  1019.

 2                 THE COURT:  ALL RIGHT.

 3                 MR. LEE:  OKAY.  NO OBJECTION.

 4                 THE COURT:  NO OBJECTION.  SO THAT'S

 5     ADMITTED.

 6                 (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 7                 1019, HAVING BEEN PREVIOUSLY MARKED FOR

 8                 IDENTIFICATION, WAS ADMITTED INTO

 9                 EVIDENCE.)

10                 MR. QUINN:  AND YOUR HONOR, WITH THE

11     COURT'S PERMISSION, I'D REQUEST THAT THE JURY HAVE

12     AN OPPORTUNITY TO SEE THIS AS WELL, IF WE CAN HAND

13     THIS TO THE JURORS.

14                 THE COURT:  ALL RIGHT.

15                 ANY OBJECTION, MR. LEE?

16                 MR. LEE:  NONE, YOUR HONOR.

17                 THE COURT:  ALL RIGHT.  PLEASE GO AHEAD.

18     BY MR. QUINN:

19     Q    THIS IS ANOTHER ONE OF THE ACCUSED PHONES IN

20     THIS CASE?

21                 THE WITNESS:  I BELIEVE SO.

22                 MR. LEE:  SO I KNOW WHAT THIS IS, SINCE

23     WE'VE HAD THE TWO, WHICH ONE IS GOING TO THE JURY?

24                 MR. QUINN:  1019.

25     Q    AND THIS IS ANOTHER ONE THAT YOU INVESTIGATED
```

```
1    THE ORIGINS OF THE DESIGN?

2    A    CORRECT.

3    Q    AND WHO DID YOU SPEAK TO?

4    A    FOR THIS PARTICULAR DEVICE, I BELIEVE I SPOKE

5    TO MIN-HYOUK LEE.  I MAY HAVE MISPRONOUNCED THAT

6    SLIGHTLY.

7    Q    AND DID YOU SPEAK TO ANYONE ELSE, AN

8    INDIVIDUAL NAME JIYOUNG HUI AS WELL?

9    A    CORRECT.

10   Q    AND DID YOU TALK TO THEM ABOUT HOW THEY CAME

11   UP WITH THE DESIGN?

12   A    I DID.

13   Q    AND BASED ON THAT, DID YOU LEARN WHETHER OR

14   NOT THEY HAD BASED THE DESIGN ON THE IPHONE?

15          MR. LEE:  SAME OBJECTION.

16          THE COURT:  SUSTAINED.

17          I'M NOT GOING TO LET YOU HAVE PEOPLE WHO

18   ARE NOT TESTIFYING TESTIFY THROUGH MR. DENISON.  SO

19   PLEASE GO TO YOUR NEXT TOPIC.

20          MR. QUINN:  ALL RIGHT.

21   Q    LET ME JUST ASK YOU ABOUT SOME OF THESE

22   FEATURES THAT WE'VE TALKED ABOUT ON THE PHONES.

23          DID YOU ASK -- WHEN YOU TALKED TO THE

24   DESIGNERS, DID YOU ASK THEM WHY THERE WERE ROUNDED

25   CORNERS?
```

```
1    A    YES.

2              MR. LEE:  I OBJECT, YOUR HONOR.  THIS IS

3    HEARSAY AGAIN.  IT'S THE DESIGNERS TELLING HIM.

4              THE COURT:  SUSTAINED.

5    BY MR. QUINN:

6    Q    DO YOU -- DO YOU HAVE ANY UNDERSTANDING ABOUT

7    WHY THERE ARE ROUNDED CORNERS ON THESE PHONES?

8    A    I DO.

9    Q    AND WHAT IS THAT?

10             MR. LEE:  YOUR HONOR --

11             THE COURT:  WHAT'S THAT BASED ON?  IS

12   THAT BASED ON YOU TALKING TO THE DESIGNERS, OR IS

13   THAT -- WHAT IS THAT BASED ON KNOWING, YOU

14   YOURSELF?

15             THE WITNESS:  THAT'S BASED ON INDUSTRY

16   EXPERIENCE.

17             MR. QUINN:  MAYBE I COULD LAY SOME

18   FOUNDATION ON THAT, YOUR HONOR?

19             THE COURT:  PLEASE, GO AHEAD.

20   BY MR. QUINN:

21   Q    HOW LONG HAVE YOU BEEN IN THE MOBILE

22   TELECOMMUNICATIONS INDUSTRY AND RELATED INDUSTRIES?

23   A    I'VE BEEN IN AND AROUND IT FOR ABOUT 16 YEARS

24   NOW.

25   Q    HOW LONG HAVE YOU WORKED FOR STA, SAMSUNG
```

1    AMERICA?

2    A    JUST OVER FOUR YEARS.

3    Q    AND PRIOR TO THAT, DID YOU WORK FOR ANY OTHER

4    TELECOMMUNICATIONS COMPANIES?

5    A    I WORKED FOR NOKIA CORPORATION PRIOR TO

6    SAMSUNG.

7    Q    HAVE YOU DONE WORK -- HAVE YOU HAD ANY OTHER

8    EMPLOYMENT IN THE TELECOMMUNICATIONS RELATED FIELD?

9    A    SURE.  I WORKED ON THE CHIP SIDE AT TEXAS

10   INSTRUMENTS IN THEIR MOBILE BUSINESS; AND THEN

11   BEFORE THAT, I WORKED FOR MANY YEARS AT MOTOROLA IN

12   THEIR HANDSET AND CHIP BUSINESSES.

13   Q    ALL RIGHT.  SO BASED ON YOUR INDUSTRY

14   EXPERIENCE, WHAT IS YOUR UNDERSTANDING AS TO WHY

15   THERE ARE ROUNDED CORNERS ON THESE PHONES?

16   A    WELL, MY SIMPLE UNDERSTANDING IS THAT IT'S

17   REALLY FOR SEVERAL REASONS.  ONE, IT FEELS BETTER

18   IN THE HAND.  POINTY CORNERS CERTAINLY CREATE

19   STRESS ON YOUR HAND.

20         IT'S MORE DIFFICULT TO ACTUALLY PUT A

21   DEVICE IN YOUR POCKET IF IT HAS SHARP CORNERS WHEN

22   YOU'RE TRYING TO PUT IT IN YOUR POCKET, AND

23   POCKETABILITY IS AN IMPORTANT ASPECT OF MOBILE

24   DEVICES.

25         IT ALSO AFFECTS DURABILITY.  SO IF YOU

1    WERE TO DROP A DEVICE AND IT WERE TO LAND ON A

2    SHARP CORNER, IT WOULD BE MUCH MORE LIKELY TO CRACK

3    THAN IT WOULD BE IF IT WERE ROUNDED, LET'S SAY.

4    Q    DO YOU HAVE A TECHNICAL BACKGROUND YOURSELF,

5    SIR, IN TERMS OF YOUR EDUCATION?

6    A    MY EDUCATION ORIGINALLY WAS IN ENGINEERING.

7    Q    COULD YOU PLEASE TELL THE JURY WHAT EDUCATION

8    YOU HAVE?

9    A    SO I HAVE A BACHELOR'S OF SCIENCE IN COMPUTER

10   AND ELECTRICAL ENGINEERING FROM RICE UNIVERSITY; A

11   MASTER'S OF SCIENCE AND ENGINEERING FROM THE

12   UNIVERSITY OF TEXAS AT AUSTIN; AND THEN I HAVE A

13   MASTER'S IN BUSINESS ADMINISTRATION FROM NORTH

14   WESTERN UNIVERSITY.

15   Q    WE'VE HEARD TESTIMONY ABOUT THESE PHONES

16   HAVING FLAT SCREENS.  BASED UPON YOUR INDUSTRY

17   EXPERIENCE, DO YOU HAVE AN UNDERSTANDING ABOUT WHY

18   THESE PHONES HAVE FLAT SCREENS?

19   A    I DO.

20   Q    AND WHAT IS THAT?

21   A    WELL, FIRST, SINCE WE INVESTIGATED, WE

22   DEVELOPED ONE PHONE THAT HAD A CURVED SCREEN AND

23   ONE OF THE KEY ISSUES OF IT IS IT MANUFACTURABILITY

24   AND COST.

25            TO ACTUALLY CREATE A CURVED GLASS FRONT,

1    LET'S SAY, YOU HAVE TO START WITH A BIG PIECE OF

2    GLASS AND CARVE IT DOWN TO CREATE A CURVED PORTION

3    OF GLASS, AND THAT COSTS MORE MONEY.  YOU START

4    WITH MORE MATERIAL AND ACTUALLY USE -- IT RESULTS

5    IN LOWER YIELD.

6            IN ADDITION TO THAT, YOU HAD PROBLEMS

7    WITH REGARDS TO THE TOUCH SENSITIVITY OF A CURVED

8    GLASS FRONT.  SO THE ACTUAL INCREASED THICKNESS OF

9    THE DISPLAY AT THE EDGES, THAT'S HOW IT WAS SHAPED,

10   INTERFERED WITH THE TOUCH SENSITIVITY OF THE

11   DISPLAY IN THOSE AREAS AND INTRODUCED SOME, YOU

12   KNOW, VISUAL DEFECTS, LET'S SAY, OF THE UNDERLYING

13   SCREEN UNDERNEATH.

14   Q    ALL RIGHT.  DOES -- YOU KNOW, DOES HAVING A

15   SCREEN THAT IS NOT FLAT HAVE ANY OPTICAL EFFECTS IN

16   TERMS OF THE EFFECT ON THE IMAGE?

17   A    YES.  I TRIED TO TALK ABOUT THAT IN MY ANSWER.

18   IT DOES CREATE SOME DISTORTION, IF YOU WILL.  I

19   THINK IT'S DUE TO REFRACTION THROUGH THE GLASS AS

20   THE IMAGE COMES OUT.

21   Q    WE'VE HEARD THAT THE SCREENS ON THESE PHONES

22   TEND TO BE MORE OR LESS KIND OF CENTERED ON THE

23   DEVICE.  DO YOU HAVE ANY UNDERSTANDING ABOUT WHY

24   THAT'S THE CASE?

25   A    I DO.

1    Q    WHAT IS THAT?

2    A    IT SIMPLY -- AGAIN, THEY'RE MAIN COMPONENTS IN

3    A PHONE, AND THEY'RE NOT ALL PUT BEHIND THE GLASS,

4    IF YOU WILL, BEHIND THE DISPLAY FOR MANY REASONS.

5            SO YOU HAVE TO PUT THEM ON THE TOP AND/OR

6    ON THE BOTTOM OF THE DISPLAY, WHICH, OF COURSE,

7    MEANS THAT THERE HAS TO BE SPACE ABOVE AND BELOW

8    THIS WAY.

9            FOR INSTANCE, THE SPEAKER TYPICALLY IS

10   ABOVE THE DISPLAY.  THE MICROPHONE IS TYPICALLY

11   BELOW THE DISPLAY.

12           THERE'S KEYS, WHETHER THEY'RE HARD KEYS

13   OR CAPACITIVE KEYS, THAT ARE BELOW THE DISPLAY, FOR

14   INSTANCE.

15           AND THERE'S MANY OTHER I/C COMPONENTS

16   THAT YOU EITHER WOULD CHOOSE NOT TO PUT BEHIND THE

17   DISPLAY OR YOU NECESSARILY HAVE TO PUT ABOVE OR

18   BELOW JUST FOR REASONS OF EVEN DEVICE THINNESS.

19   Q    WE'VE HEARD SOME TESTIMONY ABOUT THE LOCATION

20   OF THE SPEAKER UP NEAR THE TOP.  DO YOU HAVE ANY

21   UNDERSTANDING ABOUT WHY SPEAKERS TEND TO BE PUT AT

22   THE TOP OF THE DEVICE?

23   A    IT'S JUST CLOSER TO THE EAR THAT WAY.

24   Q    AND THEN WE'VE HEARD ABOUT THIS, THE SPACING,

25   YOU KNOW, THE METAL OR PLASTIC ALONG THE SIDE OF

```
 1    THE SCREEN.  IS THERE A TERM FOR THAT THAT'S USED
 2    IN THE BUSINESS?
 3    A    THE TERM I'VE HEARD IS CALLED THE BLACK MASK.
 4    Q    AND THAT'S -- WHERE IS THAT ON THE PHONE?
 5    A    THAT IS KIND OF, AS YOU WERE GESTURING, ALONG
 6    THE SIDES OF THE SCREEN, LET'S SAY, IN BETWEEN WHAT
 7    YOU WOULD SEE AS THE EDGE OF THE SCREEN TO THE EDGE
 8    OF THE SORT OF OUTER EDGE OF EITHER THE BEZEL, IF
 9    THERE'S A BEZEL, OR THE FRAME IF THERE'S A UNIBODY
10    FRAME, FOR INSTANCE.
11    Q    IS THERE A REASON WHY THESE PHONES ALL TEND TO
12    HAVE THESE BLACK MASKS ON EITHER SIDE OF THE
13    SCREEN?
14    A    THERE IS.
15    Q    AND WHAT IS THAT?
16    A    AGAIN, IN MY EXPERIENCE IN THE INDUSTRY,
17    ACTUALLY PEOPLE HAVE TRIED TO GET RID OF THAT, YOU
18    KNOW, BECAUSE YOU ACTUALLY WANT -- YOU REALLY DO
19    JUST WANT THE DEVICE TO BE JUST ONE GIANT SCREEN.
20    THAT'S WHAT WE THINK CONSUMERS ULTIMATELY WILL
21    WANT.
22         BUT YOU HAVE TO HAVE THAT FOR
23    MANUFACTURABILITY REASONS, AS WELL AS QUALITY
24    REASONS.  SO MANUFACTURABILITY BECAUSE YOU
25    ACTUALLY -- THERE'S NOTHING TO HOLD THE GLASS, PER
```

```
1    SE, ON TOP OF THE DEVICE.

2              AND SO WHAT ENDS UP HAPPENING IS YOU

3    ACTUALLY GLUE OR TAPE THE ACTUAL GLASS USING THOSE

4    THIN BORDERS ON TOP OF THE ACTUAL UNDERLYING

5    DISPLAY, BECAUSE THERE'S A PIECE OF GLASS AND THEN

6    UNDERNEATH THAT IS A DISPLAY AND YOU HAVE TO GLUE

7    THAT ON TOP.

8              MANUFACTURABILITY -- OR I'M SORRY.

9    QUALITY REASONS BECAUSE IF YOU WERE TO DROP A PHONE

10   ON ITS SIDE, LET'S SAY, AND THERE WERE NO, YOU

11   KNOW, DISTANCE LET'S SAY, OR NOTHING BETWEEN THE

12   EDGE OF THE DISPLAY AND THE EDGE OF THE PHONE,

13   THERE WOULD BE A VERY SIGNIFICANT IMPACT ON THE

14   DISPLAYS.

15             DISPLAYS CAN BE FRAGILE.  THEY'RE

16   EXTREMELY EXPENSIVE TO REPLACE.  THEY'RE ONE OF THE

17   MOST EXPENSIVE COMPONENTS ON THE DEVICE.

18             SO THAT'S WHY THAT EXISTS.

19   Q    NOW, WE'VE HEARD TESTIMONY ABOUT HOW THESE

20   SCREENS ON SMARTPHONES HAVE GOTTEN LARGER AND TEND

21   TO BE RECTANGULAR AND TEND TO TAKE UP MOST OF THE

22   REAL ESTATE ON THE SURFACE OF THE PHONE.

23             DO YOU HAVE AN UNDERSTANDING ABOUT WHY

24   THAT'S HAPPENING?

25   A    YES, I DO.
```

```
 1    Q    WHY IS THAT?

 2    A    WELL, TWO PARTS.  SO THE SCREENS ARE

 3    RECTANGULAR BECAUSE THEY'RE RECTANGULAR.  THAT'S

 4    HOW WE DEVELOPED TECHNOLOGY.  TV'S ARE RECTANGULAR.

 5    SO THAT'S KIND OF APPEARANCE.

 6              IN TERMS OF WHY THE SCREEN TAKES UP THE

 7    MAJORITY OF THE DEVICE, AGAIN, IT GOES TO THIS

 8    DESIGN IDEAL, WHAT WE THINK CONSUMERS WANT AT THE

 9    END OF THE DAY, WHAT I WOULD WANT AS A CONSUMER,

10    WHICH IS A GIANT SCREEN, THE GIANT WINDOW INTO MY

11    CONTENT AND TO MY, YOU KNOW, MOBILE WEB

12    ENVIRONMENT, THINGS LIKE THAT.

13    Q    AND I THINK YOU MAY HAVE SUGGESTED THIS, BUT

14    DOES THAT HAVE SOMETHING TO DO WITH BEING ABLE TO

15    SEE MOVIES BETTER, PHOTOGRAPHS BETTER, THINGS LIKE

16    THAT?

17    A    YES, IT DOES.

18    Q    AND SO THESE VARIOUS FEATURES THAT YOU'VE

19    TALKED ABOUT, DID THESE TEND TO BECOME COMMON

20    ACROSS MOST ALL SMARTPHONES?

21    A    I WOULD SAY THAT AS THE TECHNOLOGY BECOMES

22    AVAILABLE TO DO THESE THINGS, THAT'S WHEN YOU SEE

23    PEOPLE INTRODUCING IT INTO THE MARKET, YES.

24    Q    AND CAN YOU TELL US, THESE VARIOUS FEATURES

25    WE'VE IDENTIFIED, IS IT JUST APPLE THAT DOES THIS,
```

```
 1    OR JUST SAMSUNG THAT DOES THIS, OR JUST NOKIA THAT

 2    DOES THIS?  PRETTY MUCH IN THE SMARTPHONE BUSINESS,

 3    CAN YOU TELL US WHETHER OR NOT ALL SMARTPHONE

 4    MANUFACTURERS HAVE ADOPTED THIS TECHNOLOGY AS IT

 5    BECAME AVAILABLE?

 6    A    I WOULD SAY THIS IS THE GENERAL DIRECTION THAT

 7    THE INDUSTRY IS GOING, YES.

 8    Q    CHANGING GEARS NOW.

 9              YOU WERE SHOWED SOME DOCUMENTS WHERE

10    YOU -- YOU AUTHORED A DOCUMENT.  IT'S EXHIBIT 58.

11              IF WE COULD PUT UP ON THE SCREEN THE

12    FIRST PAGE OF THAT.

13              AND YOU WROTE THIS AND YOU SAID, "PLEASE

14    FIND ATTACHED UPDATED PRESENTATION RE:  BEAT APPLE

15    STRATEGY UPDATE."

16              DO YOU SEE THAT THERE?

17    A    I DO.

18    Q    AND CAN YOU JUST -- DOES SAMSUNG WANT TO BEAT

19    APPLE?

20    A    SAMSUNG ABSOLUTELY WANTS TO SELL MORE DEVICES

21    THAN APPLE, HTC, MOTOROLA, LG, EVERYBODY IN THE

22    MARKET.

23    Q    DO YOU APOLOGIZE FOR THAT?

24    A    I DON'T.

25    Q    IN THIS SAME DOCUMENT, IF WE LOOK AT THE BACK,
```

1    STARTING ON PAGE BATES NUMBER 659, INTERNALLY IT'S

2    PAGE 18 OF THE DOCUMENT.

3              THIS IS ABOUT YOUR ASSESSMENT OF LG.

4              GO FORWARD TWO MORE PAGES.  IF WE CAN

5    ENLARGE THAT IN THE UPPER LEFT.

6              LG?

7    A    YES.  THIS SHOWS OUR, OUR ROAD MAP ANALYSIS,

8    COMPETITIVE ANALYSIS OF THEM.

9    Q    ALL RIGHT.  SO IS -- I MEAN, DOES SAMSUNG ONLY

10   WANT TO BEAT APPLE?

11   A    NO, ABSOLUTELY NOT.

12   Q    CAN YOU TELL US WHETHER OR NOT SAMSUNG ALSO

13   MONITORS ITS OTHER COMPETITORS AND SEEKS TO BEAT

14   THEM AS WELL?

15   A    WE DO.  WE MONITOR ALL THE COMPETITION IN THE

16   MARKET.

17   Q    AND THE NEXT PAGE, YOU SEE RIM IN THE UPPER

18   LEFT?  THAT'S -- RIM IS RESEARCH IN MOTION,

19   BLACKBERRY?

20   A    YES, IT IS.

21   Q    AND ON THE NEXT PAGE, HTC?

22   A    YES.

23   Q    WHO'S HTC?

24   A    HTC IS A COMPETITOR.  I FORGET WHAT THE

25   ACRONYM STANDS FOR.

1    Q    HIGH TECH CORPORATION, SOMETHING LIKE THAT?

2    A    THAT RINGS A BELL.

3    Q    AND THE NEXT PAGE, IS THAT MOTOROLA?

4    A    YES.

5    Q    OKAY.  DOES -- THANK YOU VERY MUCH.

6         DOES SAMSUNG, AT ANY GIVEN TIME, TEND TO

7    FOCUS ONLY ON ONE COMPETITOR OR ON ONE COMPETITOR

8    MORE THAN OTHERS?

9    A    I WOULD SAY IT'S FAIR TO SAY THAT SAMSUNG

10   LOOKS AT ALL THE COMPETITION.  WE MAY FOCUS ON ONE

11   COMPETITOR VERSUS THE OTHER DEPENDING ON THE MARKET

12   THAT WE'RE LOOKING AT DURING THAT TIME.

13   Q    COULD YOU EXPLAIN TO THE JURY WHAT YOU MEAN?

14   A    THERE'S DIFFERENT WAYS TO SEGMENT THE MARKET.

15   ONE WAY WOULD BE TO LOOK AT IT ON A CARRIER BY

16   CARRIER BASIS.  ANOTHER WAY TO LOOK AT IT IS

17   PREPAID VERSUS POST PAID.  SO THOSE ARE WAYS TO

18   SEGMENT THE MARKET.

19   Q    ALL RIGHT.  WHAT EXACTLY IS YOUR JOB AT

20   SAMSUNG?  I HAVEN'T ASKED YOU THAT.  WHAT ARE YOUR

21   RESPONSIBILITIES?

22   A    SO I'M THE HEAD OF CORPORATE PLANNING STRATEGY

23   FOR STA, SO MY JOB IS TO CHART THE LONG-RANGE

24   STRATEGIC PLAN FOR STA, OR AT LEAST TO FACILITATE

25   THE CREATION OF THAT PLAN.

```
 1              THAT INCLUDES A MULTI-YEAR PLAN; THAT
 2    INCLUDES A SINGLE YEAR PLAN, I.E., THE NEXT YEAR;
 3    IT INCLUDES TRACKING OUR PROGRESS AGAINST THOSE
 4    PLANS THROUGHOUT THE YEAR.
 5    Q    ALL RIGHT.  SO YOU SAID THAT MARKETS MAY
 6    INCLUDE CARRIER MARKETS?
 7    A    CORRECT.
 8    Q    CAN YOU EXPLAIN TO US HOW IT IS THAT A CARRIER
 9    CAN BE A MARKET?
10    A    WELL, CARRIERS CARRY A FINITE SET OF DEVICES
11    IN THEIR PORTFOLIO.  THEY THEMSELVES CAN'T MANAGE A
12    THOUSAND DEVICES, LET'S SAY, IN THEIR SUPPLY CHAIN.
13              THEY CHOSE TO OFFER A SELECT NUMBER OF
14    DEVICES TO THEIR CONSUMERS, AND EACH CARRIER HAS
15    VERY SPECIFIC REQUIREMENTS WITH REGARD TO NETWORK
16    TECHNOLOGY, FREQUENCIES THEY USE, THEY HAVE THEIR
17    OWN PROPRIETARY SOFTWARE AND SERVICES THEY WANT YOU
18    TO PUT ON THEIR DEVICE.
19              SO YOU BRING ALL THIS TOGETHER AND YOU
20    HAVE JUST A, A FINITE NUMBER OF DEVICES OF
21    COMPANIES COMPETING WITHIN THAT CARRIER.
22    Q    SO IS IT -- CAN YOU TELL US WHETHER OR NOT
23    YOUR COMPETITORS WITH ONE CARRIER MAY BE DIFFERENT
24    THAN YOUR COMPETITORS WITH ANOTHER CARRIER?
25    A    THAT'S RIGHT.  NOT ALL COMPETITORS ARE
```

```
1    PRESENT, LET'S SAY, AT ALL CARRIERS.

2    Q    BUT YOU SAID THAT SAMSUNG'S STRATEGY IS TO

3    BEAT APPLE, BEAT HTC, BEAT, YOU KNOW, ALL YOUR

4    COMPETITORS, TO BE NUMBER ONE.

5         YOU'RE THE HEAD STRATEGY GUY AT SAMSUNG.

6    CAN YOU EXPLAIN TO US, IN GENERAL, WHAT IS

7    SAMSUNG'S STRATEGY FOR BECOMING NUMBER ONE?

8    A    SAMSUNG'S STRATEGY TO BECOME NUMBER ONE IS

9    BASED ON I GUESS WHAT I WOULD SUMMARIZE AS A RECIPE

10   FOR OUR SUSTAINABLE ADVANTAGE IN THE MARKET.

11        THE --

12   Q    WHAT'S A SUSTAINABLE ADVANTAGE?

13   A    SO ANY TIME YOU'RE CHARTING A STRATEGY, LET'S

14   SAY FOR A COMPANY OR ENTITY, I GUESS WHEN YOU'RE

15   SOMEONE LIKE ME THINKING ABOUT THE STRATEGY, WHAT

16   YOU'RE TRYING TO FIND IS YOU'RE TRYING TO FIND SOME

17   UNIQUE CAPABILITIES AND COMPETENCIES THAT YOUR

18   COMPANY HAS THAT THEY CAN LEVERAGE THAT YOUR

19   COMPETITORS MAY NOT HAVE.  SO ASSETS, LET'S SAY

20   THAT YOU CAN DEVELOP, INCUBATE AND LEVERAGE AS A

21   WIN.

22        AND THAT'S WHAT WE DO AT SAMSUNG.

23   Q    AND BASED ON YOUR EXPERIENCE AND YOUR

24   BACKGROUND, CAN YOU OBTAIN A COMPETITIVE ADVANTAGE

25   JUST BY COPYING WHAT SOMEBODY ELSE DOES IN THE
```

1    MARKET?

2    A    NO.   THAT WOULD NOT REPRESENT A SUSTAINABLE

3    ADVANTAGE.

4    Q    HOW IS IT THAT SAMSUNG GOES ABOUT TRYING TO

5    MAINTAIN A COMPETITIVE ADVANTAGE?

6    A    SAMSUNG'S STRATEGY, I GUESS IN SHORT, IS TO

7    DELIVER THE LATEST AND GREATEST TECHNOLOGY TO

8    CONSUMERS, MORE FREQUENTLY THAN THE COMPETITION, AT

9    AS MANY POINTS OF DISTRIBUTION AS POSSIBLE --

10   AGAIN, THE CARRIER IS AN EXAMPLE OF DISTRIBUTION

11   POINT -- LEVERAGING MULTIPLE UNDERLYING

12   TECHNOLOGIES, INCLUDING MULTIPLE OPERATING SYSTEMS,

13   AND AT AS MANY DIFFERENT PRICE POINTS AS POSSIBLE,

14   I.E., PREMIUM, HIGH PRICE POINTS, AS WELL AS LOWER

15   END PRICE POINTS, SO THAT OUR DEVICES ARE AS

16   ACCESSIBLE AS POSSIBLE TO ALL CONSUMERS WHEN THEY

17   WANT TO PURCHASE.

18            SOMETIMES WE REFER TO THAT AS THE

19   DEMOCRATIZATION OF THE CELL PHONE.

20   Q    AND HOW IS THAT STRATEGY THAT YOU'VE JUST

21   DESCRIBED DIFFERENT FROM APPLE'S STRATEGY IN TERMS

22   OF THE PRODUCTS IT BRINGS TO MARKET?

23            MR. LEE:  I OBJECT.  NO FOUNDATION FOR

24   HIM TO KNOW WHAT APPLE'S STRATEGY IS.

25            MR. QUINN:  BASED ON HIS COMPETITIVE --

1    HIS JOB.  I CAN LAY SOME FOUNDATION, YOUR HONOR.

2              THE COURT:  PLEASE DO THAT.

3              MR. QUINN:  ALL RIGHT.

4    Q    IN YOUR JOB, ARE YOU REQUIRED TO UNDERSTAND

5    WHAT APPLE'S PRODUCT STRATEGY IS IN TERMS OF WHAT

6    PRODUCTS IT'S BRINGING TO MARKET?

7    A    WE ABSOLUTELY TRY TO UNDERSTAND WHAT OUR

8    COMPETITORS ARE GOING TO BRING TO MARKET.

9    Q    WOULD THAT INCLUDE APPLE?

10   A    YES.

11   Q    HTC AND ALL THE OTHERS?

12   A    YES.

13   Q    OKAY.  BASED ON WHAT YOU SEE IN TERMS OF THE

14   PRODUCTS APPLE BRINGS TO MARKET, WHAT IS YOUR

15   UNDERSTANDING ABOUT WHAT APPLE'S STRATEGY IS?

16   A    WELL, FROM MY VIEW, APPLE IS LAUNCHING, OR HAS

17   BEEN LAUNCHING, THE PRODUCTS AT ABOUT ONE

18   SMARTPHONE A YEAR, OKAY, AND THEY HAVE CHARTED A

19   VERY SPECIFIC PATH, STARTING IN 2007, WHEREBY THEY

20   LAUNCHED THAT WITH ONE PARTICULAR CARRIER ON AN

21   EXCLUSIVE BASIS.

22             THEY'VE CONTINUED TO LAUNCH AN UNDATED

23   PRODUCT EVERY SUBSEQUENT YEAR, AS WELL AS STARTED

24   TO SLOWLY EXPAND THEIR DISTRIBUTION TO MORE

25   CARRIERS.

1    Q    WELL, SO APPLE, BASED ON YOUR OBSERVATION,

2    BRINGS OUT ROUGHLY ONE NEW PHONE A YEAR.

3         APPROXIMATELY HOW MANY NEW PHONES DOES

4    SAMSUNG BRING OUT EVERY YEAR?

5    A    WE LAUNCH APPROXIMATELY 50-ISH DEVICES A YEAR.

6    I THINK IN 2011, IT WAS A LITTLE BIT MORE THAN 50

7    DEVICES.

8    Q    AND WHY IS -- WHY DOES SAMSUNG DO THAT, BRING

9    OUT SO MANY DIFFERENT PHONES?

10   A    IN PART IT GOES TO WHAT I DESCRIBED AS OUR

11   DESIRE TO BRING OUT THE LATEST TECHNOLOGY WHEN IT'S

12   AVAILABLE, MORE FREQUENTLY THAN THE COMPETITION.

13         IT ALSO HAS TO DO WITH SOME OF THE

14   UNIQUENESS THAT WE CHOSE TO BRING TO THE CARRIERS

15   IN TERMS OF THE PORTFOLIO.

16   Q    DOES SAMSUNG INVEST IN ITS BRAND AND ITS NAME,

17   SAMSUNG?

18   A    WE INVEST QUITE A BIT IN THE U.S. ON BEHALF OF

19   SAMSUNG.

20   Q    DO YOU KNOW HOW MUCH SAMSUNG INVESTED IN ITS

21   BRAND?

22   A    SAMSUNG, STA I SHOULD SAY SPECIFICALLY, HAS

23   INVESTED, LET'S SAY, ABOUT A BILLION DOLLARS LAST

24   YEAR, 2011, ON MARKETING THEIR BRAND.

25   Q    IN THE U.S.?

```
1    A    IN THE U.S.

2    Q    THAT WAS ONE BILLION WITH A "B"?

3    A    YES, IT WAS.

4    Q    ALL RIGHT.  DOES -- IS SAMSUNG PROUD OF ITS

5    NAME?

6    A    ABSOLUTELY.

7    Q    DOES SAMSUNG PUT ITS NAME ON ITS PRODUCTS?

8    A    IT'S ON EVERY PRODUCT.

9    Q    WAS THERE A TIME PERIOD WHERE THERE WAS A

10   TABLET THAT SAMSUNG BROUGHT WHERE THE NAME WASN'T

11   ON THE FRONT, IT WAS ON THE BACK?

12   A    THERE WAS, YES.

13   Q    AND CAN YOU EXPLAIN WHY THAT WAS?

14   A    SO THAT -- I BELIEVE YOU'RE REFERRING TO THE

15   ORIGINAL GALAXY TAB 10.1.

16   Q    YOU TELL ME.

17   A    OKAY.  THAT'S THE WAY I REMEMBER IT, ANYWAY.

18          SO WE DID NOT ORIGINALLY PUT THE SAMSUNG

19   BRAND ON THE FACADE, THE FRONT FACE OF THAT

20   PRODUCT, BECAUSE THE PROCESS BY WHICH YOU, I GUESS

21   YOU ETCH, I THINK IT'S SOME KIND OF LASER ETCHING,

22   YOU ETCH THE ACTUAL BRAND INTO THE DISPLAY WAS

23   CAUSING THE GLASS TO INTERFERE WITH THE ACTUAL, YOU

24   KNOW, KIND OF HIDDEN WIRES, IF YOU WILL, FOR THE

25   TOUCH SENSITIVITY ON THE DISPLAY.  SO IT WAS
```

1    CREATING MANUFACTURING PROBLEMS IN SHORT.

2    Q    AND WERE THOSE FIXED?

3    A    THEY WERE.

4    Q    AND AFTER THAT, WAS THE SAMSUNG NAME PUT ON

5    THE FRONT?

6    A    IT WAS.

7    Q    LET'S TURN NOW TO RESEARCH AND DEVELOPMENT.

8              DOES -- DO YOU KNOW HOW MUCH SAMSUNG

9    SPENT ON RESEARCH AND DEVELOPMENT BETWEEN 2005 AND

10   2010?

11   A    SAMSUNG SPENT, AND THIS IS SEC, SO SAMSUNG

12   ELECTRONICS CORP., SPENT APPROXIMATELY $35 BILLION

13   OVER THE COURSE OF THOSE YEARS ON RESEARCH AND

14   DEVELOPMENT.

15   Q    AND DO YOU KNOW HOW MANY ENGINEERS ARE

16   EMPLOYED AT SAMSUNG?

17   A    THERE'S APPROXIMATELY -- I THINK THERE'S MORE

18   THAN 50,000.  I'LL JUST SAY APPROXIMATELY 50,000

19   ENGINEERS GLOBALLY.

20   Q    AND HOW MANY OF THOSE WORK IN RESEARCH AND

21   DEVELOPMENT?

22   A    OH, I WOULD SAY THEY ALL WORK IN RESEARCH AND

23   DEVELOPMENT.

24   Q    AND DO YOU KNOW HOW MANY DESIGNERS ARE

25   EMPLOYED AT SAMSUNG?

1    A    I BELIEVE THERE'S UPWARDS OF 1,200 DESIGNERS

2    AT SAMSUNG.

3    Q    DOES SAMSUNG MAKE THAT INVESTMENT IN MARKETING

4    AND RESEARCH AND DEVELOPMENT AND EMPLOY THOSE

5    DESIGNERS AND EMPLOY THOSE ENGINEERS ALL SO IT WILL

6    BE EASIER TO COPY ITS COMPETITORS?

7    A    NO.

8              MR. LEE:  WELL --

9    BY MR. QUINN:

10   Q    DO YOU KNOW WHERE SAMSUNG RANKS ANNUALLY IN

11   THE U.S. IN TERMS OF PATENTS ISSUED BY THE

12   UNITED STATES PATENT AND TRADEMARK OFFICE?

13   A    I DO.

14             MR. LEE:  THAT'S IRRELEVANT.

15             THE COURT:  OVERRULED.

16             GO AHEAD, PLEASE.

17   BY MR. QUINN:

18   Q    WHERE DOES SAMSUNG RANK?

19   A    SAMSUNG HAS BEEN RANKED NUMBER TWO PATENT

20   AWARDEE IN THE UNITED STATES EVERY YEAR SINCE I'VE

21   BEEN AT SAMSUNG.

22   Q    SO -- AND THAT WOULD BE?  REMIND US WHAT YEAR

23   IT WAS.

24   A    I STARTED AT SAMSUNG IN 2008.

25   Q    AND HAS -- YOU KNOW, IN YOUR WORK AT SAMSUNG,

1    AND INDEED WORKING FOR COMPETITORS BEFORE, DID YOU

2    BECOME -- DID YOU COME TO LEARN ABOUT INNOVATIONS

3    THAT SAMSUNG BROUGHT TO, TO MOBILE

4    TELECOMMUNICATIONS, YOU KNOW, FIRSTS, THINGS THAT

5    SAMSUNG DID FIRST IN THE INDUSTRY?

6    A    SURE I DID.

7    Q    AND CAN YOU TELL THE JURY WHAT SOME OF THOSE

8    ARE?

9    A    CERTAINLY.  FOR INSTANCE, SAMSUNG -- AND THIS

10   WAS WHEN I WAS, AS YOU SAID, AT OTHER COMPETITORS,

11   BUT I SAW THAT FROM A COMPETITOR'S POINT OF VIEW --

12   SAMSUNG LAUNCHED THE FIRST MP3 PHONE IN

13   APPROXIMATELY THE YEAR 2000, AS I RECALL.

14          SAMSUNG LAUNCHED THE FIRST DEVICE TO BE

15   SUB-TEN MILLIMETERS THICK.  OKAY, THAT'S KIND OF AN

16   IMPORTANT MILESTONE, LET'S SAY.  I THINK SOME

17   PEOPLE CALLED IT THE FIRST WAVE OF ULTRATHIN

18   DEVICES IN THE MARKET.  THAT WAS AROUND 2001, I

19   BELIEVE.

20          SAMSUNG WAS THE FIRST COMPANY TO LAUNCH A

21   DEVICE WITH VOICE RECOGNITION.  THAT, I BELIEVE,

22   WAS IN 2007 IF I'M NOT MISTAKEN.

23          SAMSUNG ALSO LAUNCHED THE FIRST CAMERA

24   PHONE GLOBALLY.  THAT WAS DONE AROUND THE YEAR

25   2001.

1              AND THEN MORE RECENTLY, SAMSUNG WAS ALSO

2    THE FIRST MANUFACTURER TO LAUNCH DEVICES WITH THE

3    SUPER AMOLED, A-M-O-L-E-D, SUPER AMOLED TECHNOLOGY

4    WITH THE FIRST FAMILY OF GALAXY S DEVICES, AND THAT

5    WAS IN 2010.

6    Q    WHAT IS AMOLED TECHNOLOGY?

7    A    AMOLED TECHNOLOGY, I THINK IT STANDS FOR

8    ACTIVE MATRIX ORGANIC LIGHT EMITTING DIODE,

9    SOMETHING TO THAT EFFECT.

10             IT'S A TYPE OF SCREEN TECHNOLOGY THAT

11   SAMSUNG HAS DEVELOPED AND EMPLOYED IN ITS OWN

12   PRODUCTS AND IT, SIMPLY SPEAKING, ALLOWS FOR A MUCH

13   FASTER RESPONSE TIME.

14             SO IMAGES CAN APPEAR WITH LESS BLUR.  IT

15   ALLOWS FOR MORE CONTRAST IN BRIGHTNESS.

16             AND IT ALSO ALLOWS FOR BETTER THINNESS OF

17   THE DEVICE BECAUSE THE ORIGINAL SUPER AMOLED

18   TECHNOLOGY INCLUDED THE -- THIS WAS, I GUESS, A

19   BREAKTHROUGH OF SORTS.  IT TOOK THE TOUCH

20   SENSITIVITY OF A DISPLAY, WHICH IS NORMALLY

21   SEPARATE FROM THE ACTUAL DISPLAY IN PAST PHONES,

22   AND ACTUALLY COMBINED THE TWO.

23             SO IT ESSENTIALLY ELIMINATED A LAYER OF

24   DISPLAY SO IT ALLOWED PHONES TO BE THINNER BECAUSE

25   THE DISPLAYS WERE THINNER.

```
 1    Q    LET'S -- WE'VE HEARD SOME TESTIMONY FROM

 2   APPLE'S POINT OF VIEW ABOUT ADVERTISING AND

 3   MARKETING OF APPLE PRODUCTS.

 4         ARE YOU FAMILIAR WITH HOW STA ADVERTISES

 5   AND MARKETS FROM A STRATEGIC STANDPOINT, PROMOTES

 6   ITS PRODUCTS IN THE UNITED STATES?

 7    A    YES, GENERALLY SPEAKING, I AM.

 8    Q    AND WHAT IS SAMSUNG'S STRATEGY IN TERMS OF

 9   ADVERTISING ITS PRODUCTS?

10    A    WELL, REALLY ALL WE'RE TRYING TO POINT OUT TO

11   CONSUMERS IS I GUESS WHAT YOU WOULD CALL A BRAND

12   PROMISE OR A BRAND MESSAGE, AND IT'S TIED BACK TO

13   THAT STRATEGY I TALKED TO YOU ABOUT.

14         SO IT ONLY WORKS WHEN EVERYTHING IS

15   LINKED TOGETHER.  SO WE TRY AND SHOW CONSUMERS IN

16   OUR ADVERTISING THAT WE'VE BROUGHT THEM THE LATEST

17   AND GREATEST TECHNOLOGY, THAT WE'RE BRINGING IT TO

18   THEM FASTER THAN THE COMPETITION, THAT YOU CAN

19   COUNT ON SAMSUNG TO DO THAT CONTINUOUSLY.  YOU CAN

20   TRUST US.

21    Q    FOR DIFFERENT PRODUCTS, DOES SAMSUNG HAVE, YOU

22   KNOW, DIFFERENT LAUNCH MESSAGES THAT THEY ASSOCIATE

23   WITH THOSE PRODUCTS?

24    A    AT TIMES WE'LL TWEAK THE LAUNCH MESSAGE

25   DEPENDING ON THE PRODUCT, YES.
```

1    Q    CAN YOU GIVE THE JURY AN EXAMPLE OF THAT?

2    A    FOR INSTANCE, FOR THE GALAXY S 2 LAUNCH IN THE

3    UNITED STATES, I THINK THE TAG LINE WAS SOMETHING

4    LIKE "THE NEXT BIG THING."

5    Q    I MEAN, DOES -- DOES SAMSUNG EVER SEEK TO SELL

6    ITS PRODUCTS BY CAUSING CONSUMERS TO BE CONFUSED

7    INTO THINKING THAT, YOU KNOW, YOU'RE -- YOU THINK

8    YOU'RE BUYING AN APPLE PRODUCT BUT YOU'RE ACTUALLY

9    GETTING A SAMSUNG PRODUCT?

10   A    NO.  WE WANT CONSUMERS TO HEAR OUR MESSAGE,

11   UNDERSTAND THAT OUR MESSAGE IS OURS, AND GO OUT AND

12   BUY OUR DEVICE.

13              MR. QUINN:  AND, YOUR HONOR, I'D REQUEST

14   PERMISSION -- THE COURT HAS RULED ON THIS ALREADY,

15   BUT IN LIGHT OF THE TESTIMONY ABOUT COPYING AND

16   MARKETING AND THE ADVERTISING, I'D REQUEST

17   PERMISSION TO PLAY A 30 SECOND SAMSUNG TELEVISION

18   ADVERTISEMENT CALLED URBAN CAMPING.  IT'S DX 629.

19   IT'S 30 SECONDS.

20              MR. LEE:  YOUR HONOR --

21              THE COURT:  THAT WAS FOR EVIDENCE ABOUT

22   WILLFULNESS, RIGHT, AND I JUST DIDN'T SEE THE

23   CONNECTION.

24              MR. QUINN:  THIS WOULD BE OFFERED TO SHOW

25   HOW WE TRY TO SET OURSELVES APART.  FAR FROM TRYING

```
1    TO CREATE CONFUSION OR DECEPTION, WE TRY TO SET

2    OURSELVES APART IN OUR ADVERTISING.

3              MR. LEE:  YOUR HONOR HAS RULED THIS

4    INADMISSIBLE.  IT IS INADMISSIBLE.

5              ACTUALLY, ALL OF THEIR BRANDING IS OUR

6    TRADE DRESS, OUR TRADE DILUTION THAT'S AT ISSUE,

7    NOT THEIRS.

8              MR. QUINN:  THEY'RE ALLEGING CONFUSION,

9    YOUR HONOR, AND DECEPTION.

10             MR. LEE:  WELL, MR. QUINN KNOWS THAT THE

11   QUESTION OF CONFUSION ONLY GOES TO SOME CLAIMS, NOT

12   TO OTHERS.

13             MR. QUINN:  SO THEY'RE DISMISSING THOSE?

14             MR. LEE:  I'M SORRY.  GO AHEAD.  YOU GO

15   AHEAD.

16             MR. QUINN:  I'D REQUEST PERMISSION TO

17   PLAY THAT ADVERTISEMENT.

18             MR. LEE:  YOUR HONOR HAS RULED IT OUT AND

19   IT OUGHT TO STAY OUT.

20             THE COURT:  OKAY.  IT'S -- THE OBJECTION

21   IS STILL SUSTAINED.

22             GO AHEAD AND GO TO SOMETHING ELSE.

23             MR. QUINN:  ALL RIGHT.

24   Q   DO YOU HAVE ANY -- DO YOU HAVE ANY INFORMATION

25   ABOUT THE VALUE OF THE SAMSUNG BRAND?
```

```
1    A    YES, I DO.

2    Q    AND WHAT DO YOU KNOW IN THAT REGARD?

3              MR. LEE:  YOUR HONOR, CAN WE HAVE A

4    FOUNDATION?  AND THE SAMSUNG BRAND IS IRRELEVANT TO

5    OUR TRADE DRESS AND TRADE DILUTION.  I DON'T KNOW

6    WHAT HIS BASIS IS.

7              THE COURT:  WELL, JUST LAY A FOUNDATION.

8              I'M GOING TO OVERRULE THE OBJECTION.

9              GO AHEAD, PLEASE.

10   BY MR. QUINN:

11   Q    SO WHAT YOU KNOW ABOUT THE VALUE OF THE

12   SAMSUNG BRAND, IS IT -- CAN YOU TELL US WHETHER OR

13   NOT THAT'S SOMETHING YOU LEARNED IN THE COURSE OF

14   YOUR WORK?

15   A    YES, IT'S SOMETHING I'VE COME ACROSS OVER THE

16   COURSE OF MY JOB.

17   Q    AND IN DOING YOUR JOB IN TERMS OF PLANNING AND

18   STRATEGY, IS THAT SOMETHING THAT YOU NEED TO BE

19   AWARE OF?

20   A    YES, IT IS.

21   Q    AND WHAT IS IT THAT YOU KNOW ABOUT THE VALUE

22   OF THE SAMSUNG BRAND?

23   A    ONE OF THE WAYS WE TRACK OUR BRAND IS USING A

24   SURVEY OR A REPORT FROM A COMPANY CALLED

25   INTERBRAND.  THEY DO A RANKING OF GLOBAL BRANDS.
```

```
 1              AND IN THE LAST REPORT, ANNUAL RELEASE,
 2     THIS ONE WAS 2011, WE WERE RANKED IN THE TOP 20 OF
 3     GLOBAL BRANDS IN TERMS OF BRAND VALUE OR BRAND
 4     EQUITY.
 5     Q    AS PART OF YOUR JOB, IS IT -- CAN YOU TELL US
 6     WHETHER OR NOT IT'S IMPORTANT FOR YOU TO UNDERSTAND
 7     HOW CONSUMERS GO ABOUT MAKING DECISIONS TO BUY
 8     PHONES AND OTHER DEVICES?
 9     A    YES.
10     Q    AND HOW IS IT -- HOW CAN CONSUMERS PURCHASE
11     SAMSUNG DEVICES IN THE UNITED STATES?
12     A    SO SAMSUNG CONSUMERS CAN PURCHASE IN ANY
13     NUMBER OF PHYSICAL POINTS OF SALE.  SO CARRIER
14     STORES, FOR INSTANCE, OR NATIONAL --
15     Q    WHAT DO YOU MEAN BY "CARRIER STORES"?
16     A    SO CARRIER STORES ARE STORES THAT ARE, I
17     GUESS, OWNED AND OPERATED BY THE U.S. WIRELESS
18     CARRIERS.  SO AN EXAMPLE WOULD BE A STORE OWNED BY
19     AT&T, IT SAYS AT&T ON THE OUTSIDE.
20              ANOTHER EXAMPLE WOULD BE A NATIONAL
21     RETAILER.  THAT'S NOT AN EXAMPLE OF A CARRIER
22     STORE.  THAT'S AN EXAMPLE OF ANOTHER TYPE OF RETAIL
23     ENVIRONMENT.
24     Q    AND OTHER THAN CARRIER STORES, ARE THERE OTHER
25     STORES WHERE CONSUMERS CAN BUY SAMSUNG PRODUCTS?
```

```
 1    A    THERE ARE.

 2    Q    AND WHAT ARE THOSE?

 3    A    THERE'S MULTIPLE DIFFERENT TYPES.  SOMETHING

 4    THAT WE CALL DEALERS, SO THESE ARE TYPICALLY

 5    EXCLUSIVE DEALERS, PEOPLE THAT OWN STORES THAT

 6    LICENSE A CARRIER BRAND AND OFFER THOSE CARRIER

 7    BRANDED SERVICES AND PRODUCTS IN THEIR STORES.  SO

 8    THEY STILL MAY APPEAR LIKE A CARRIER OWNED STORE,

 9    BUT THEY'RE NOT.  THEY'RE INDEPENDENTLY OWNED AND

10    OPERATED.

11              ANOTHER EXAMPLE WOULD BE A NATIONAL

12    RETAILER, SUCH AS BEST BUY OR WAL-MART OR RADIO

13    SHACK.  WE CALL THOSE NATIONAL RETAILERS.

14              ANOTHER EXAMPLE WOULD BE ON-LINE, SO

15    ON-LINE RETAILERS, LIKE AMAZON.COM, WHO WOULD SELL

16    THESE AS WELL.

17    Q    DO THESE STORES SOMETIMES SELL SAMSUNG PHONES

18    THAT THEY DID NOT OBTAIN FROM SAMSUNG IN THE

19    UNITED STATES?

20    A    IT'S POSSIBLE THAT THEY COULD SELL DEVICES

21    THAT THEY DID NOT OBTAIN FROM STA.

22    Q    AND HOW MIGHT THEY ACQUIRE THEM?

23    A    THEY CAN -- THEY CAN ACTUALLY BUY DEVICES FROM

24    INTERNATIONAL DISTRIBUTORS.

25    Q    BUT NOT FROM SAMSUNG?
```

```
1    A    THE DEVICES THAT THEY WOULD BUY FROM, FROM I
2    GUESS WHAT I'M CALLING INTERNATIONAL DISTRIBUTORS
3    WOULD NOT HAVE BEEN -- WOULD NOT HAVE BEEN PROVIDED
4    BY STA.
5    Q    AND BY THE WAY, DO YOU KNOW WHETHER -- WHERE
6    TITLE TO THE PRODUCTS, THE DEVICE -- WE HAD
7    TESTIMONY ABOUT HOW, YOU KNOW, STA, SAMSUNG AMERICA
8    INVOICES, YOU KNOW, BIG SAMSUNG BACK IN SEOUL.
9          DO YOU HAPPEN TO KNOW WHERE TITLE TO
10   THOSE DEVICES PASSES?
11   A    MY UNDERSTANDING IS TITLE -- STA TAKES TITLE
12   OR OWNERSHIP WHEN THE DEVICE ACTUALLY LEAVES THE
13   PORT HEADED TOWARDS THE UNITED STATES.
14   Q    SO OUTSIDE OF THE UNITED STATES?
15   A    CORRECT.
16   Q    NOW, ARE CONSUMERS -- IF WE COULD TAKE A LOOK,
17   WE HAVE A DEMONSTRATIVE EXHIBIT, SDX 3586.  SDX
18   3586.  AND WHEN --
19          MR. LEE:  BEFORE WE PUT IT UP --
20          THE COURT:  DO I HAVE THAT?  I ONLY HAVE
21   ALL THE OBJECTIONS.
22          (PAUSE IN PROCEEDINGS.)
23          THE COURT:  OKAY.  WHAT'S THE NUMBER,
24   PLEASE?
25          MR. QUINN:  IT'S 3586.
```

```
1              THE COURT:  OKAY.
2              MR. LEE:  AND, YOUR HONOR, WE OBJECT.  IF
3    YOU LOOK AT THE BOTTOM OF THE DOCUMENT, THIS IS AN
4    APPLE -- THIS IS AN EXCERPT FROM AN APPLE
5    PRESENTATION DOCUMENT.  HAVING HIM COMMENTING UPON
6    ON APPLE DOCUMENT, DEMONSTRATIVE --
7              MR. QUINN:  YOUR HONOR, I WOULD LAY A
8    FOUNDATION THAT HE'S FAMILIAR WITH THESE PHONES.
9              MR. LEE:  BUT THIS IS AN APPLE DOCUMENT
10   THAT I THINK HE'S NOT SEEN BEFORE.
11             MR. QUINN:  IT SAYS THAT THE IMAGES ARE
12   FROM AN APPLE DOCUMENT.
13             THE COURT:  YOU CAN LAY A FOUNDATION.
14             GO AHEAD, PLEASE.
15   BY MR. QUINN:
16   Q    DO YOU HAVE BEFORE YOU SOME IMAGES OF PHONES?
17   A    I DO.
18   Q    ALL RIGHT.  AND ARE YOU FAMILIAR WITH THOSE
19   PHONES THAT ARE DISPLAYED THERE?
20   A    LET ME LOOK AT THEM ONE-BY-ONE BRIEFLY.
21             (PAUSE IN PROCEEDINGS.)
22             THE WITNESS:  I'M FAMILIAR WITH THESE
23   PHONES.
24             MR. QUINN:  SO WE WOULD OFFER THIS, YOUR
25   HONOR, JUST AS A DEMONSTRATIVE.
```

```
 1              THE COURT:  ANY OBJECTION, MR. LEE?

 2              MR. LEE:  JUST THE SAME OBJECTION.  YOUR

 3      HONOR, ACTUALLY, IF THEY WANT TO OFFER A SUBSTITUTE

 4      WITHOUT THE LEGEND AT THE BOTTOM, THAT WOULD BE

 5      FINE AND I THINK MORE APPROPRIATE.

 6              MR. QUINN:  WE CAN REPLACE IT, YOUR

 7      HONOR.

 8              THE COURT:  THAT'S FINE.

 9              GO AHEAD, PLEASE.

10              MR. QUINN:  ALL RIGHT.  IF WE CAN PUT

11      THAT UP ON THE SCREEN.

12      Q    WHEN CONSUMERS ARE -- CAN YOU TELL US WHETHER

13      OR NOT IT'S FAIR TO SAY THAT WHEN CONSUMERS ARE

14      DECIDING WHAT PHONE DEVICE TO BUY, THEY'VE GOT A

15      LOT OF DIFFERENT CHOICES?

16      A    YES, THAT'S RIGHT.

17      Q    AND WOULD IT BE FAIR TO SAY THAT A LOT OF THEM

18      LOOK KIND OF ALIKE?

19      A    I WOULD SAY THAT GENERALLY SPEAKING, YEAH,

20      THEY CAN LOOK ALIKE.

21      Q    AND WHEN THEY GO TO THE STORE -- THANKS VERY

22      MUCH -- WHEN THEY GO TO ONE OF THESE STORES WHERE

23      SAMSUNG PRODUCTS CAN BE FOUND -- YOU KNOW, BY THE

24      WAY, DO YOU VISIT STORES YOURSELF?

25      A    I DO.
```

1    Q    AS PART OF YOUR JOB?

2    A    ACTUALLY, WE'RE ALL EXPECTED TO GO VISIT

3    STORES SO WE CAN UNDERSTAND THE CONSUMER BUYING

4    ENVIRONMENT.

5    Q    AND HOW OFTEN DO YOU GO TO STORES TO TRY TO

6    UNDERSTAND, TRY TO UNDERSTAND THE CONSUMER BUYING

7    ENVIRONMENT?

8    A    I'LL GO IN SEVERAL TIMES A MONTH.

9    Q    SEVERAL TIMES A MONTH?

10   A    YES.

11   Q    AND CAN YOU TELL US WHETHER OR NOT IT'S

12   TYPICAL THAT -- I MEAN, DO YOU SEE APPLE PHONES

13   THAT ARE FOR SALE IN STORES WHEN YOU GO VISIT?

14   A    SURE.

15   Q    CAN YOU TELL US WHETHER OR NOT IT'S TYPICAL

16   THAT, YOU KNOW, APPLE PHONES AND DEVICES ARE MIXED

17   IN WITH OTHER COMPANIES' DEVICES OR WHETHER THEY'RE

18   SEGREGATED IN A SEPARATE AREA?

19   A    IN MY GENERAL EXPERIENCE, IT'S ALMOST ALWAYS

20   THIS CASE, APPLE DEVICES ARE BY THEMSELVES ON A

21   SEPARATE DISPLAY.

22   Q    ALL RIGHT.  IF WE COULD TAKE A LOOK AT EXHIBIT

23   60 IN EVIDENCE, PAGE 60.11.

24            AND UP ON THE RIGHT-HAND -- CAN YOU --

25   WE'VE GOT PICTURES ON THE LEFT-HAND SIDE.  DO YOU

```
 1     KNOW WHAT THAT IS ON THE LEFT-HAND SIDE?

 2     A    THAT IS AN APPLE RETAIL STORE.

 3     Q    AND THEN IN THE MIDDLE, WHAT IS THAT PICTURE?

 4     A    AS IT'S LABELED AND AS I'LL DESCRIBE, IT'S

 5     WHAT WE CALL A STORE IN A STORE.  SO IT'S

 6     ACTUALLY -- IT'S ACTUALLY A SMALL PIECE OF REAL

 7     ESTATE, IF YOU WILL, INSIDE A STORE THAT IS

 8     DISTINCTLY APPLE.

 9     Q    OKAY.  AND WHEN YOU TOLD US EARLIER THAT APPLE

10     PRODUCTS ARE ALWAYS SEGREGATED IN STORES, IS THIS

11     AN EXAMPLE OF THAT?

12     A    THAT IS ONE EXAMPLE OF IT, YES.

13     Q    IF YOU GO TO A, AN AT&T STORE, IS A CONSUMER

14     LIKELY TO ENCOUNTER A GALAXY S 2 PHONE SIDE-BY-SIDE

15     WITH AN IPHONE?

16     A    YOU CERTAINLY WILL NOT ENCOUNTER ANY GALAXY

17     PHONES ON THE APPLE DISPLAY.

18     Q    IN TERMS OF -- ARE THERE SOME CARRIERS,

19     EACH -- FOR EXAMPLE, WOULD IT BE TRUE TO SAY AT A

20     T-MOBILE STORE, YOU'RE NOT GOING TO FIND ANY AT&T

21     PHONES?

22     A    THAT'S RIGHT.

23     Q    DOES T-MOBILE SELL THE IPHONE?

24     A    T-MOBILE DOES NOT SELL THE IPHONE.

25     Q    EVER?
```

898

1    A    THEY HAVE NOT EVER SOLD THE IPHONE.

2    Q    SO WOULD A CONSUMER EVER ENCOUNTER A SAMSUNG

3    PHONE FOR SALE IN THE SAME STORE AS AN IPHONE IN A

4    T-MOBILE STORE?

5    A    THEY WOULD NOT.

6    Q    DOES SPRINT CARRY THE IPHONE?

7    A    THEY DO.

8    Q    AND FOR HOW LONG HAS SPRINT CARRIED THE

9    IPHONE?

10   A    SINCE I THINK IT WAS OCTOBER OF LAST YEAR.

11   Q    AND HOW ABOUT VERIZON?

12   A    VERIZON HAS CARRIED IT SINCE, I BELIEVE,

13   FEBRUARY OF LAST YEAR.

14   Q    SO BEFORE THOSE DATES WHEN THOSE CARRIERS

15   STARTED CARRYING THE IPHONE, CONSUMERS WHO WANTED

16   TO USE THOSE CARRIERS, WOULD THEY HAVE BEEN ABLE TO

17   BUY AN IPHONE THERE?

18   A    YES.

19   Q    BEFORE THOSE DATES?

20   A    OH, NO, I'M SORRY.  NOT BEFORE THOSE DATES,

21   NO.

22   Q    I MEAN, DO YOU HAVE ANY INFORMATION ABOUT HOW,

23   YOU KNOW, WHAT CONSUMERS DO OR -- LET ME ASK IT

24   THIS WAY.

25           AS THE CHIEF STRATEGY OFFICER, IS IT

```
 1    IMPORTANT FOR YOU TO UNDERSTAND HOW A CONSUMER GOES

 2    ABOUT MAKING A DECISION TO BUY A SMARTPHONE?

 3    A    SURE, YES.

 4    Q    AND IS THAT SOMETHING THAT YOU'VE STUDIED AND

 5    COLLECTED INFORMATION ON?

 6    A    YES.

 7    Q    IS THE DECISION -- BASED ON WHAT YOU'VE

 8    LEARNED, IS THE DECISION TO MAKE AN INVESTMENT IN

 9    BUYING A PHONE, IS THAT TYPICALLY SOMETHING THAT'S

10    DONE, YOU KNOW, ON THE SPUR OF THE MOMENT?  OR

11    WITHOUT A LOT OF STUDY AND ASSESSMENT?

12    A    NO.  IN FACT, WE FIND CONSUMERS DO A

13    CONSIDERABLE AMOUNT OF STUDYING.  THEY TAKE A

14    CONSIDERABLE AMOUNT OF TIME, ACTUALLY, TO MAKE

15    THEIR PHONE CHOICE.

16    Q    DO YOU HAVE ANY INFORMATION ABOUT HOW MUCH

17    TIME, IN AVERAGE, A CONSUMER SPENDS IN DECIDING

18    WHAT TYPE OF PHONE TO PURCHASE?

19    A    WE FIND THE AVERAGE CONSUMER TAKES

20    APPROXIMATELY SIX WEEKS, ABOUT ONE AND A HALF

21    MONTHS, TO MAKE THEIR PHONE PURCHASE DECISION.

22    Q    SO, I MEAN, BASED ON EVERYTHING THAT YOU KNOW

23    ABOUT HOW PHONES ARE SOLD, HOW IPHONES ARE SOLD,

24    THE DIFFERENT CHANNELS AND HOW CONSUMERS GO ABOUT

25    MAKING THESE DECISIONS, DO YOU HAVE ANY -- DO YOU
```

1    BELIEVE THAT ANY REASONABLE CONSUMER WOULD BUY A

2    SAMSUNG PHONE THINKING IT WAS AN IPHONE?

3            MR. LEE:  YOUR HONOR, THIS IS NOW OPINION

4    AND THIS IS THEIR EFFORT TO SUBSTITUTE HIM FOR

5    THEIR STRICKEN EXPERT.

6            THE COURT:  IT'S SUSTAINED.

7    BY MR. QUINN:

8    Q    WELL, I MEAN, HAVE YOU PERSONALLY HEARD OF

9    INSTANCES WHERE CONSUMERS BOUGHT A, A SAMSUNG PHONE

10   THINKING IT WAS AN IPHONE, AN APPLE PRODUCT?

11   A    I'M NOT AWARE OF ANY EXAMPLES OF THAT.

12   Q    YOU WERE ASKED SOME QUESTIONS ABOUT THE THREE

13   SAMSUNG ENTITIES, STA, SEA, AND SEC.

14           DO THOSE THREE COMPANIES EACH HAVE -- CAN

15   YOU TELL US WHETHER OR NOT THEY EACH HAVE DIFFERENT

16   MANAGEMENT?

17   A    THEY DO.

18   Q    DO THEY HAVE DIFFERENT EMPLOYEES?

19   A    YES, THEY DO.

20   Q    DO THEY HAVE DIFFERENT LOCATIONS?

21   A    YES, THEY DO.

22   Q    AND DOES STA, IN ITS BUSINESS HERE IN AMERICA,

23   MAKE ITS OWN BUSINESS DECISIONS?

24   A    WE DO.

25   Q    YOU WERE SHOWN EXHIBIT 62, AND IF WE COULD GO

1    TO PAGE 62.13.

2              MR. LEE SHOWED YOU THIS.  AND THE

3    RECOMMENDATION AT THE TOP, "RECOMMENDATION, SAMSUNG

4    4G PRODUCTS TO UNDERCUT IPHONE 5, GAP POTENTIALLY

5    REMAINS AT $49."

6              DO YOU SEE THAT?

7    A    I DO.

8    Q    AND I THOUGHT I HEARD YOU SAY, WHEN MR. LEE

9    WAS ASKING YOU ABOUT THIS, THAT THIS NEVER

10   HAPPENED.

11             IS THAT WHAT YOU SAID?  I WAS JUST GOING

12   TO GIVE YOU A CHANCE TO EXPLAIN WHAT YOU MEANT IF I

13   HEARD YOU RIGHT.

14   A    YEAH.  THERE ARE SEVERAL THINGS WRONG WITH

15   THIS, IF I MAY.

16             FIRST, THE ACTUAL DOCUMENT, IF I REMEMBER

17   CORRECTLY, WAS CREATED IN MARCH.

18             AND IT'S -- IT'S ATTEMPTING TO PROJECT

19   FORWARD THINGS THAT MAY OR MAY NOT HAPPEN.  SO, FOR

20   INSTANCE, THERE WAS NO IPHONE 5 THAT CAME OUT IN

21   2011.

22             IN TERMS OF THE PRICING, IT'S ACTUALLY --

23   IF YOU LOOK AT THIS CHART, IT'S -- WHAT IT'S TRYING

24   TO SAY IS THAT THERE'S ACTUALLY GOING TO BE A GAP

25   BETWEEN OUR FLAGSHIP SMARTPHONE, WHICH WAS SHOWN AS

1    CELOX, C-E-L-O-X, AT THE TOP, AND WHAT WE'RE

2    DEPICTING IS THE, I GUESS, FIGURATIVE IPHONE 5 AT

3    199.

4            OKAY.  SO AT THE 199 PRICE BAND, THAT'S

5    SHOWING THE IPHONE 5, AND THAT'S THE DEVICE THAT WE

6    THOUGHT CONSUMERS WOULD COMPARE OUR CELOX TO.

7            ACTUALLY WHAT WE'RE POINTING OUT IS THAT

8    WE'RE GOING TO BE PRICED, WE THOUGHT AT THE TIME AT

9    LEAST, $49 ABOVE THE IPHONE 5.

10           THE AUTHOR FURTHER GOES TO COMPARE TO

11   ANOTHER VERSION, A MORE EXPENSIVE VERSION OF THE

12   IPHONE 5 AT 32 GIGABYTES AT 299 RETAIL PRICE POINT

13   ABOVE, AND SO THAT'S AN ERRONEOUS COMPARISON.

14   Q    I MEAN, THESE PHONES, EXCEPT FOR THE REFERENCE

15   TO THE IPHONE 5 AND THE IPHONE 4 AND THE IPHONE

16   NANA AND THE SGS, THESE OTHER PHONES, CAN YOU TELL

17   US WHETHER OR NOT THOSE ARE ALL SAMSUNG PHONES?

18   A    THE ONES THAT ARE LABELED SAMSUNG ARE

19   DEFINITELY SAMSUNG.

20           I CAN'T ACTUALLY BE SURE WHETHER ALL OF

21   THEM ACTUALLY EVER CAME TO MARKET.  FOR INSTANCE,

22   HANOVERQ, I DON'T REMEMBER THAT IN PARTICULAR.

23   Q    WOULD THIS BE WHAT WAS REFERRED TO AS SAMSUNG

24   STRATEGY, DIFFERENT POINTS, DIFFERENT PRICE POINTS,

25   THE DEMOCRATIZATION OF THE CELL PHONE?

```
 1    A    YES, IT IS AN EXAMPLE OF A PORTFOLIO THAT

 2    SPANS WHAT WE HOPE IS MULTI-RETAIL PRICE POINTS AND

 3    YOU'RE SIMPLY SEEING A NORMAL, I GUESS, PRODUCT

 4    LIFECYCLE MANAGEMENT WHERE, WHEN YOU LAUNCH A NEW

 5    PHONE, LIKE THE CELOX, YOU HAVE TO DO OTHER THINGS

 6    TO OTHER DEVICES SO THAT THEY'RE NOT PRICED ON TOP

 7    OF EACH OTHER IN THE MARKET.

 8              MR. QUINN:  YOUR HONOR, I WAS GOING TO GO

 9    INTO A NEW AREA, BUT IT LOOKS LIKE WE'RE CLOSE TO

10    THE TIME --

11              THE COURT:  OH, I'M SORRY.  IT IS 4:32.

12    WHY DON'T WE END FOR THE DAY?

13              MR. DENISON WILL RESUME ON MONDAY.

14              SO I'M SORRY TO SOUND LIKE A BROKEN

15    RECORD, BUT LET ME JUST REITERATE, SINCE WE'RE

16    ABOUT TO HAVE A LONG WEEKEND, THAT BECAUSE YOU HAVE

17    TO BASE YOUR DECISION SOLELY ON THE EVIDENCE THAT'S

18    ADMITTED DURING THIS TRIAL AND APPLY THE LAW AS I

19    INSTRUCT YOU, YOU MUST NOT BE EXPOSED TO ANY OTHER

20    INFORMATION.

21              SO PLEASE, OVER THE WEEKEND, DON'T SPEAK

22    WITH ANYONE ABOUT THIS CASE, DON'T DO ANY OF YOUR

23    OWN RESEARCH, DON'T READ, WATCH, OR LISTEN TO ANY

24    NEWS OR MEDIA ACCOUNTS.

25              AND HAVE A GOOD EVENING.  ALL RIGHT.
```

1    THANK YOU VERY MUCH FOR YOUR PATIENCE AND YOUR

2    SERVICE.  WE'LL SEE YOU MONDAY MORNING AT

3    9:00 A.M., OKAY?  THANK YOU.

4              AND IF YOU WOULD PLEASE LEAVE YOUR JURY

5    NOTEBOOKS IN THE JURY ROOM.

6              (WHEREUPON, THE FOLLOWING PROCEEDINGS

7    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

8              THE COURT:  YOU CAN STEP DOWN, SIR.

9              THE WITNESS:  THANK YOU.

10             THE COURT:  ALL RIGHT.  THE RECORD SHOULD

11   REFLECT THE JURORS HAVE LEFT THE COURTROOM.

12             SO I NEED TO GET YOUR PROPOSAL ON -- I

13   CAN FORESEE THAT THERE MIGHT BE A FEW EXHIBITS THAT

14   IT WOULD BE HELPFUL TO KNOW WHAT YOUR OBJECTIONS

15   ARE IN ADVANCE AND NOT HAVE TO MAKE SAUSAGE IN

16   FRONT OF THE JURY.

17             BUT ON THE OTHER HAND, I MEAN, THIS HAS

18   GOTTEN OUT OF CONTROL.  I MEAN, SIX TIMES BRIEFING

19   THE SAME WITNESSES?  I MEAN, THAT IS, THAT IS --

20   THAT'S CRUEL AND UNUSUAL PUNISHMENT TO ME AND TO MY

21   CHAMBERS, OKAY?

22             SO LET ME HEAR WHAT A PROPOSAL IS.  MAYBE

23   WHAT IF I SAY YOU'RE ONLY ALLOWED TO OBJECT TO

24   THREE EXHIBITS AND THAT'S IT PER DAY, SO YOU REALLY

25   NEED TO TAKE YOUR BEST SHOT AND PREFERABLY ONE

```
 1   THAT, IF IT REQUIRES FURTHER INVESTIGATION, GIVE ME

 2   THE TIME TO DO THAT.

 3            SO SOMETHING LIKE A RELEVANCE OBJECTION,

 4   WE CAN JUST HANDLE THAT HERE AND ACTUALLY IT'S

 5   PROBABLY BETTER IF WE DO IT IN TRIAL BECAUSE THEN I

 6   CAN REALLY UNDERSTAND THE CONTEXT OF WHY IT'S, YOU

 7   KNOW, BEING BROUGHT IN.

 8            SO WHAT'S THE PROPOSAL?  BECAUSE THIS IS

 9   CRAZY.  I CAN'T DO THIS.

10            MR. VERHOEVEN:  I AGREE WITH THAT.

11            THE COURT:  YEAH.

12            MR. VERHOEVEN:  AND IN THE PAST, IN OTHER

13   TRIALS, ONE WAY WE'VE DEALT WITH THE ISSUE IS WHAT

14   WE CALL HIGH PRIORITY OBJECTIONS --

15            THE COURT:  OKAY.

16            MR. VERHOEVEN:  -- WHICH WE COULD

17   ESTABLISH A LIMIT ON AND THOSE WOULD -- YOU KNOW,

18   IT WOULD BE UNDERSTOOD THAT IT WOULDN'T BE EVERY

19   OBJECTION, BUT IT WOULD BE THE SORT OF THING THAT

20   YOU'RE TALKING ABOUT, THAT MAYBE WE TAKE A LITTLE

21   BIT MORE TIME AND ALLOW THE COURT TO LOOK AT THOSE,

22   BUT THEY WOULD BE LIMITED.

23            THE ONLY OTHER THING I WOULD SAY IS IF WE

24   COULD GET THE SIDE-BAR MIKE FIXED, THAT WOULD ALSO

25   HELP.
```

```
 1              WE'VE GOT TECHNICAL PEOPLE HERE.  THEY

 2      WOULD BE HAPPY TO HELP WORK ON THAT.

 3              THE COURT:  I KNOW.  THE PROBLEM IS I

 4      DON'T THINK, AS A COURT, WE CAN ACCEPT.  I KNOW YOU

 5      ALL HAVE FAR SUPERIOR TECHNOLOGY, BUT I JUST DON'T

 6      THINK WE CAN ACCEPT IT, UNFORTUNATELY, AS MUCH AS I

 7      WOULD LIKE TO.

 8              MR. VERHOEVEN:  ARE YOU SURE, YOUR HONOR?

 9      BECAUSE I HAD A TRIAL ONCE IN THE -- IN ARIZONA

10      WHERE THE PARTIES STIPULATED TO ACTUALLY REMODEL

11      THE WHOLE COURTROOM BECAUSE EVERYTHING WAS --

12      BECAUSE EVERYTHING WAS -- THE COURTROOM WAS

13      INSUFFICIENT FOR THE SIZE OF THE CASE.

14              SO IF THERE'S A STIPULATION, I'M NOT SURE

15      THERE WOULD BE ANY ISSUE.

16              BUT I'M NOT AS FAMILIAR, OBVIOUSLY, AS

17      YOU ARE, YOUR HONOR.

18              THE COURT:  OUR I.T. PERSON HAS INFORMED

19      ME THAT ON MONDAY THAT THE PERSON, OR THE -- WELL,

20      WAS THAT THE 6TH?  IS THE 6TH MONDAY?

21              THE CLERK:  YES.

22              THE COURT:  OKAY.  THEY WERE COMING ON

23      THE 6TH.

24              MR. JACOBS:  YOUR HONOR, IF I MAY?

25              THE COURT:  I JUST FEEL -- YOU KNOW, I --
```

1    I DON'T WANT ANY APPEARANCE THAT COMPANIES THAT

2    HAVE A LOT OF MONEY CAN PAY FOR PUBLIC

3    INSTITUTIONS.  DO YOU SEE WHAT I'M SAYING?

4              IS THERE A TEMPORARY ONE THAT MAYBE WE

5    COULD JUST USE FOR --

6              MR. VERHOEVEN:  ALL I WAS SUGGESTING --

7              THE COURT:  I APPRECIATE THE OFFER, AND I

8    WISH WE COULD TAKE IT, BUT I JUST FEEL --

9              MR. VERHOEVEN:  WE BOTH HAVE OUR OWN

10   TECHNICIANS.

11             THE COURT:  YES.

12             MR. VERHOEVEN:  SO WHAT I WAS THINKING

13   WAS IF THEY COULD BOTH TOGETHER TRY TO TAKE A LOOK

14   AT IT AND FIX IT.

15             THE COURT:  THAT WOULD BE EVEN BETTER.

16             MR. VERHOEVEN:  THAT WOULD BE GREAT.

17             THE COURT:  OKAY.  BUT LET ME HEAR,

18   BECAUSE I ONLY WANT TO DO THE HIGH PRIORITY

19   OBJECTIONS IN ADVANCE.  EVERYTHING ELSE, I MEAN,

20   IT'S NOT IDEAL, BUT I THINK WE CAN DO IT AS WE'RE

21   GOING ALONG.

22             SO I WANT TO LIMIT IT.  AND I'M ALSO

23   GOING TO ASK, BECAUSE I HAD DIFFICULTY READING

24   THESE, THEY ARE SO DENSE, AND BECAUSE EVERYONE IS

25   TRYING TO SQUEEZE IN SO MUCH, IT'S IMPOSSIBLE TO

1    FIGURE OUT WHAT THE OBJECTION IS BECAUSE IT'S JUST

2    A CATCH PHRASE.

3         SO THIS IS REALLY HARD TO READ, AND I

4    CAN'T GIVE YOU AN ORDER BECAUSE I DON'T EXACTLY

5    KNOW WHAT IS COMING IN AND FOR WHAT REASON.

6         SO DID I SAY THREE?  THREE WAS WHAT I WAS

7    THINKING OF.

8         MR. VERHOEVEN:  HOW ABOUT, WITH YOUR

9    HONOR'S INDULGENCE, HOW ABOUT THREE PER WITNESS?

10   BECAUSE ONE OF THE ISSUES WE'RE RUNNING INTO, YOUR

11   HONOR, AND IT'S JUST A MATTER OF PROCESS THAT WE'RE

12   DISCLOSING SEVEN WITNESSES AT A TIME, AND THEN SO

13   WHAT WE'RE DOING IS THEN WE'RE MAKING -- THE

14   REASON, I THINK, YOU'RE GETTING THESE MULTIPLES IS

15   BECAUSE THE WITNESSES DON'T APPEAR FOR SEVERAL DAYS

16   AND THEN THE LAWYERS, BEING LAWYERS, DO MORE.

17        THE COURT:  SURE, OKAY.  WHAT IF WE DID

18   SOMETHING ELSE?  THEN WHAT IF -- I MEAN, DO YOU ALL

19   THINK THIS WILL BE TYPICAL, THAT WE CAN DO ABOUT

20   THREE WITNESSES A DAY?

21        MR. JACOBS:  I THINK THESE HAVE GONE ON A

22   LONG -- LET ME STEP BACK A LITTLE BIT.

23        WE TOTALLY -- WE COMPLETELY UNDERSTAND

24   THE PRESSURES ON THE COURT.  THERE IS A LOT OF

25   WISDOM IN YOUR DIRECTION THIS MORNING THAT THESE

```
 1    HAVE TO BE WORKED OUT AND STATED AND DONE IN FRONT

 2    OF THE JURY, BECAUSE THAT HAS A HUGE DISCIPLINING

 3    VALUE, AND WE HAVE A PROBLEM IN THIS CASE WITH

 4    DISCIPLINE.

 5              ONE OF THE PROBLEMS IS THAT THERE'S KIND

 6    OF A FLOODING THAT GOES ON -- AND WE'LL JUST TELL

 7    YOU IT FROM OUR PERSPECTIVE, THAT THAT'S THE WAY WE

 8    SEE IT -- THERE'S A KIND OF FLOODING THAT'S GOING

 9    ON OF OBJECTIONS AND FLOODING OF DOCUMENTS BEING

10    DESIGNATED.

11              SO THAT'S POINT NUMBER ONE.  A LOT OF

12    WISDOM IN YOUR RULING THIS MORNING.

13              SECONDLY, MEANWHILE, THE PARTIES HAVE

14    REACHED A STIPULATION ON A BETTER SCHEDULE.

15              THE COURT:  OKAY.

16              MR. JACOBS:  AND WE'RE READY TO -- THERE

17    WAS ONE LAST REQUEST FROM US LAST NIGHT AND WE'VE

18    AGREED TO IT.

19              AND MAYBE THEY'RE NOT.  I'M GOING TO FIND

20    OUT HERE.

21              THE COURT:  OKAY.

22              MR. VERHOEVEN:  ONE OF THE PROBLEMS IS I

23    HAVE TO SLEEP AT NIGHT AND SOME OF THESE DEALS,

24    SOME OF THESE NEGOTIATIONS HAPPEN AT TWO 2:00 OR

25    3:00 IN THE MORNING, YOUR HONOR, AND SO WE'RE
```

1    HAVING THE SAME ISSUES YOU ARE, YOUR HONOR, IS

2    THINGS ARE HAPPENING, WE WAKE UP --

3            THE COURT:  COMING IN THE MIDDLE OF THE

4    NIGHT, YEAH.

5            MR. VERHOEVEN:  SO I WOULD SUGGEST THREE

6    PER WITNESS, NO MORE, THAT'S IT, YOU CAN'T

7    SUPPLEMENT, AND THEN THE REST WE HANDLE LIVE IN

8    COURT.

9            MR. JACOBS:  I THINK -- SO PART OF THE

10   PROBLEM IS THAT THE WAY THE PROCESS IS WORKING NOW,

11   THERE'S A KIND OF STATEMENT OF THE OBJECTION AND

12   THEN THE PARTIES, AS YOU KNOW -- THE COURT OBSERVED

13   THIS EARLIER -- THE PARTIES GO PAST EACH OTHER IN

14   THEIR BRIEFING BECAUSE THEY DON'T REALLY KNOW WHAT

15   THE BASIS OF THE OBJECTION IS.

16           IN THE OTHER TRIALS THAT I'VE DONE, THERE

17   IS A SET OF OBJECTIONS FILED AND THEN WE SHOW UP

18   THE NEXT MORNING AT THE HALF HOUR BEFORE AND WE

19   ARGUE THOSE, AND IT WOULD BE LIMITED TO THE FEW

20   THAT YOU THOUGHT YOU COULD REALLY PERSUADE THE

21   COURT WERE WORTH BRINGING UP IN ADVANCE.

22           MR. MCELHINNY:  THE REASON THAT THREE

23   DOESN'T WORK, YOUR HONOR, IS BECAUSE FOR EACH

24   WITNESS, WE ARE GETTING A DESIGNATION OF BOXES OF

25   DOCUMENTS WHEN THEY ONLY INTEND TO USE FOUR OR

1    FIVE.

2              I GOT EIGHT BINDERS OF FORSTALL CROSS,

3    POTENTIAL CROSS BEFORE THEY PUT -- BEFORE THEY DID

4    THE CROSS, AND IF WE ONLY HAVE THREE, WE'RE TRYING

5    TO GUESS, OUT OF THE 50 DOCUMENTS THAT THEY'VE SAID

6    THEY MIGHT USE, WHICH ONES WE'RE GOING TO USE OUR

7    OBJECTIONS ON AND IT JUST DOESN'T WORK.

8              THE COURT:  WELL, I MYSELF HAVE SIX

9    FORSTALL BINDERS AND ONLY VOLUME 5 WAS USED.

10             MR. MCELHINNY:  AND HE WAS ON CROSS FOR

11   TEN MINUTES, YOUR HONOR.

12             THE COURT:  YEAH.

13             MR. VERHOEVEN:  RATHER THAN CAST

14   ASPERSIONS, BECAUSE WE COULD SAY THE SAME THING

15   ABOUT THE VOLUMES OF EXHIBITS WE GET FROM THEM --

16             THE COURT:  YEAH.

17             MR. VERHOEVEN:  I AGREE THAT, WITH

18   OPPOSING COUNSEL HERE, THAT HIGH PRIORITY,

19   ARGUED -- NO MORE THAN -- I THINK NO MORE THAN

20   THREE, MAYBE NO MORE THAN FIVE PER WITNESS, NO MORE

21   THAN THAT OR ELSE WE'RE GOING TO BE BACK TO WHERE

22   WE WERE.

23             AND THEN I TOTALLY AGREE THAT THE BEST

24   WAY TO DEAL WITH IT, YOUR HONOR, IS TO ARGUE IT AT

25   8:30 IN THE MORNING SO WE CAN HAVE CONTEXT AND

1    FLUSH IT OUT.

2              THE COURT:  WELL, NO.  THE PROBLEM I SEE

3    WITH THAT IS IF WE DO IT ALL IN FRONT OF THE JURY,

4    YOU'RE PROBABLY NOT GOING TO MAKE ALL THOSE

5    OBJECTIONS.

6              BUT IF WE HAVE THE WHOLE PROCESS OF

7    HAVING IT DECIDED ON PAPER AND HAVE IT ARGUED,

8    YOU'RE GOING TO EXPLORE ALL OF THEM WHEN YOU'RE

9    REALLY GOING TO BE MORE DISCIPLINED WHEN THE

10   WITNESS IS ON THE STAND.

11             SO I THINK THAT'S A LOT OF MAKEWORK FOR

12   ALL OF US.

13             MR. VERHOEVEN:  I'M JUST TALKING ABOUT

14   THE HIGH PRIORITY, NOT ANYTHING ELSE.  JUST THE

15   THREE.

16             SO THE THREE -- PRESUMABLY, IF THEY'RE

17   HIGH PRIORITY, WE ARE GOING TO MAKE THEM.  AND WHAT

18   I WAS SUGGESTING IS, JUST WITH RESPECT TO THOSE,

19   THAT THE BEST WAY WE COULD DEAL WITH THOSE WOULD BE

20   8:30 IN THE MORNING HASHING THEM OUT.

21             THE COURT:  WELL, LET ME ASK, HOW LONG --

22   LET'S FIGURE OUT, FOR THE WITNESSES FOR MONDAY, I

23   ASSUME THE DEPOS ARE PRETTY SHORT; RIGHT?  AREN'T

24   THE THREE --

25             MR. JACOBS:  THAT WHAT IS SHORT?

```
 1              THE COURT:  THE DEPO DESIGNATIONS ARE
 2    FAIRLY SHORT, IS THAT RIGHT?
 3              MS. MAROULIS:  YOUR HONOR, IT'S ONLY ONE.
 4    YOU OVERRULED THE OTHER TWO.  YOU SUSTAINED THE
 5    OBJECTIONS TO THE OTHER TWO DEPOSITIONS.
 6              THE COURT:  OH, OKAY.
 7              SO HOW MANY, REALISTICALLY, DO YOU THINK
 8    WE'LL DO ON MONDAY?  BECAUSE THAT COULD BE ANOTHER,
 9    YOU KNOW, IF YOU NEED IT SORT OF CLOSER TO THE TIME
10    TO MAKE YOUR OBJECTIONS, THEN THE MORE REALISTIC WE
11    CAN BE, RATHER THAN JUST DOING THIS ROLLING SEVEN
12    EVERY DAY.
13              MR. JACOBS:  WE'RE AHEAD, YOUR HONOR.  IF
14    WE JUST FREEZE WHERE WE ARE NOW, YOU WOULD GET NO
15    WORK ON MONDAY MORNING.  WE HAVE BRIEFED IT.  YOU
16    HAVE OUR MOTION FOR -- YOU HAVE OUR RECONSIDERATION
17    PAPERS.
18              THE COURT:  YES, NO.  EVERYTHING THAT'S
19    BEEN -- THE SIX VERSIONS THAT YOU FILED ON THE
20    SEVEN WITNESSES, I'M RECYCLING ALL OF THOSE.
21    THAT'S NOT FAIR.
22              MR. JACOBS:  I UNDERSTAND.  HOW WOULD YOU
23    LIKE US TO HANDLE THOSE WITNESSES?
24              THE COURT:  SO WHO IS LEFT THEN?  IT'S
25    JUST --
```

```
1              MR. JACOBS:  WE HAVE BRESSLER.

2              THE COURT:  -- MR. KHO, BRESSLER.

3              MR. JACOBS:  MS. KARE.

4              THE COURT:  KARE, AND THEN

5    MR. BALAKRISHNAN?

6              MR. VERHOEVEN:  MY GUESS IS THAT WOULD

7    BALANCE OUT THE DAY, YOUR HONOR.

8              THE COURT:  DO YOU THINK WE'LL GET TO ALL

9    OF THOSE IN ONE DAY?

10             MR. JACOBS:  MAYBE --

11             MR. VERHOEVEN:  YOU'D HAVE TO ASK COUNSEL

12   FOR APPLE BECAUSE I DON'T KNOW HOW LONG THE DIRECTS

13   ARE GOING TO BE.

14             MR. JACOBS:  I WOULD BE SURPRISED IF WE

15   GET THROUGH ALL OF THOSE, YOUR HONOR.

16             THE COURT:  I WOULD, TOO.

17             ALL RIGHT.  WELL, I DON'T WANT ANY MORE

18   OBJECTIONS AS TO THESE FOUR.  IT'S DONE.  OKAY?  IF

19   YOU HAVEN'T MADE YOUR OBJECTION, YOU'VE WAIVED IT

20   AT THIS POINT.

21             GOING FORWARD, I GUESS YOU WILL BE

22   IDENTIFYING THREE MORE PEOPLE, RIGHT?  YOU'RE

23   IDENTIFYING THREE MORE WITNESSES?

24             MR. JACOBS:  YES.

25             THE COURT:  OKAY.  DO YOU KNOW WHO THOSE
```

```
1    ARE.  I GUESS YOU HAVE UNTIL 7:00 O'CLOCK TONIGHT.
2              MR. JACOBS:  RIGHT.  WE'D LIKE TO GO BACK
3    AND CONSIDER.
4              MR. VERHOEVEN:  THE ONE THING I'D SAY --
5    SORRY TO INTERRUPT, YOUR HONOR.  POINT OF
6    CLARIFICATION.
7              DR. BALAKRISHNAN HAS -- THEIR EXHIBITS
8    HAVEN'T YET BEEN DISCLOSED TO US UNDER THE TWO DAY
9    RULE, I DON'T THINK.
10             AND SO I AGREE WITH YOU FOR EVERYONE
11   ELSE, EXCEPT DR. BALAKRISHNAN, WE'VE ALREADY DONE
12   EVERYTHING.
13             BUT I'M BEING TOLD THAT WE HAVEN'T YET
14   DONE THAT PROCESS.
15             SO MY SUGGESTION WOULD BE, IF THAT'S
16   INACCURATE, WOULD BE THAT WE START THE HIGH
17   PRIORITY WITH HIM, LIMIT US TO HOWEVER MANY YOUR
18   HONOR THINKS WE SHOULD BE LIMITED TO, AND THEN ANY
19   OTHER OBJECTIONS WOULD THEN JUST BE IN OPEN COURT
20   AND, YOU KNOW, THE WAY WE'RE HANDLING IT TODAY.
21             THE COURT:  ALL RIGHT.  WELL, I'M GOING
22   TO ALLOW TWO OBJECTIONS PER WITNESS, AND I DON'T
23   WANT THESE -- YOU KNOW, SOME OF THESE OBJECTIONS
24   BASICALLY TAKE UP THREE-QUARTERS OF THE PAGE, ALL
25   RIGHT, AND IT'S EVERYTHING IN THE KITCHEN SINK, AND
```

916

1    I KNOW THAT IF YOU HAD TO DO THIS IN FRONT OF A

2    JURY, YOU WOULDN'T BE DUMPING ALL THIS IN THERE.

3              SO I REALLY AM GOING TO ASK YOU, PLEASE,

4    TO REALLY HONE IN ON WHAT YOUR REAL OBJECTION IS,

5    AND TO THE EXTENT YOU CAN GIVE MORE EXPLANATION OF

6    WHAT IT IS, THAT WILL JUST HELP IN GETTING A BETTER

7    RULING.

8              MR. VERHOEVEN:  ABSOLUTELY, YOUR HONOR.

9              THE COURT:  BECAUSE SOMETIMES WE'RE

10   REALLY JUST KIND OF THROWING IN THE DARK HERE

11   BECAUSE THERE'S FIVE MILLION OBJECTIONS, NO

12   EXPLANATION.

13             MR. VERHOEVEN:  I UNDERSTAND, YOUR HONOR.

14             THE COURT:  AND WE DON'T KNOW WHAT THE

15   EXHIBIT IS COMING IN FOR AND IT'S VERY, VERY

16   DIFFICULT.

17             MR. VERHOEVEN:  I AGREE WITH THAT, YOUR

18   HONOR.

19             ONE POINT OF CLARIFICATION, JUST SO I

20   DON'T MISUNDERSTANDING YOUR HONOR'S DIRECTION.

21             IF THERE'S, SAY, TEN EXHIBITS AND THE

22   OBJECTION IS EXACTLY THE SAME AND THE BRIEFING

23   WOULD BE EXACTLY THE SAME, CAN WE DO A CATEGORY OF

24   OBJECTIONS?

25             THE COURT:  NO, NO.

```
 1              MR. VERHOEVEN:  SO HOW SHOULD -- THAT'S

 2    WHAT I WANTED TO ASK.  PICK ONE OF THEM AND WE'LL

 3    JUST LEARN FROM THAT ON YOUR HONOR'S RULING.

 4              THE COURT:  YEAH.

 5              MR. VERHOEVEN:  OKAY.

 6              THE COURT:  SO TWO OBJECTIONS PER

 7    WITNESS.  I ALREADY HAVE MY LIST.  I'M NOT GOING TO

 8    DO ANYTHING MORE.

 9              BASED ON THE ORDER THAT WAS FILED LAST

10    NIGHT AT 11:00 O'CLOCK, THAT'S IT FOR BRESSLER AND

11    FOR KARE.  I'M NOT GOING TO LOOK AT ANYTHING ELSE

12    THAT YOU ALL HAVE FILED, ALL THE RECONSIDERATIONS.

13    OKAY?

14              BUT I GUESS FOR THEN MR. BALAKRISHNAN,

15    YOU CAN DO YOUR TWO.

16              MR. VERHOEVEN:  THE TWO.

17              THE COURT:  AND THEN WE'LL SEE HOW THAT

18    GOES.  IF THAT'S NOT WORKING, THEN WE'RE JUST GOING

19    TO GO BACK TO DOING EVERYTHING IN FRONT OF THE

20    JURY.

21              MR. VERHOEVEN:  YES, YOUR HONOR.

22              THE COURT:  SO WHEN ARE YOU GOING TO FILE

23    THE BALAKRISHNAN ONES?  AND IT'S ONLY GOING TO BE

24    ONE.  I'M NOT GOING TO ENTERTAIN THIS THREE, FOUR,

25    FIVE, SIX CORRECTED AND RECONSIDERATION AND WHATNOT
```

```
 1    VERSIONS.
 2              MR. VERHOEVEN:  I THINK WE MIGHT BE ABLE
 3    TO REACH A STIPULATION ON THAT, YOUR HONOR, WITH
 4    YOUR GUIDANCE ON THE LIMIT ON TWO OBJECTIONS.
 5              MY SUGGESTION IS THAT WE MEET AND CONFER
 6    AND SEND YOUR HONOR A JOINT PROPOSAL.  I THINK
 7    WE'LL BE ABLE TO REACH AGREEMENT ON THAT.
 8              THE COURT:  WELL, I GUESS YOU COULD STILL
 9    DO IT 8:00 A.M. THE DAY BEFORE THE WITNESS IS GOING
10    TO TESTIFY.
11              MR. JACOBS:  WE HAVE A NEW SCHEDULE IN
12    MIND THAT WILL AVOID -- THAT WOULD GET IT TO YOU.
13              MR. VERHOEVEN:  IT'S ONE DOCUMENT.
14              MR. JACOBS:  YES.  THAT WE'LL GET IT TO
15    YOU NOT AT 8:00 O'CLOCK, BUT ACTUALLY EARLIER.
16              THE COURT:  OKAY.
17              MR. JACOBS:  SO YOU WOULD HAVE IT
18    EARLIER, AND WE, OUR TEAMS, HOPEFULLY WON'T BE
19    WORKING THROUGH THE NIGHT.  SO WE WILL SEND YOU
20    THAT PROPOSAL AND WE WOULD RECORD THE TWO
21    OBJECTIONS PER WITNESS AND YOU CAN LOOK AT THE
22    PROPOSAL AND SEE IF THAT WORKS FOR YOU.
23              THE COURT:  ALL RIGHT.  THAT'S GREAT.  SO
24    WE'LL JUST ASSUME TWO OBJECTIONS, YOU KNOW, EACH
25    PARTY WILL MAKE TWO OBJECTIONS TO MR. BALAKRISHNAN,
```

```
 1    AND THEN SINCE HE'S NOT LIKELY TO COME ON ON MONDAY

 2    ANYWAY, YOU KNOW, YOU CAN --

 3              MR. VERHOEVEN:  I THINK HE PROBABLY WILL

 4    COME ON MONDAY.  HE JUST WON'T BE COMPLETED.  HE'S

 5    THE EXPERT WITNESS FOR APPLE.

 6              MR. JACOBS:  WE SHOULD SHOOT FOR GETTING

 7    THOSE WRAPPED UP FOR HIM.  BUT WE WILL INCLUDE THIS

 8    IN THE UPDATE TO YOU EXACTLY WHAT'S GOING TO HAPPEN

 9    WITH THE WITNESSES.

10              THE COURT:  OKAY.  WELL, IF YOU NEED

11    RULINGS ON MR. BALAKRISHNAN BY MONDAY MORNING, THEN

12    I NEED THE OBJECTIONS SOMETIMES OTHER THAN SUNDAY.

13    OKAY?

14              MR. VERHOEVEN:  WHEN WOULD YOU LIKE THEM,

15    YOUR HONOR.

16              THE COURT:  CAN YOU FILE THOSE TODAY?

17              MR. VERHOEVEN:  I DON'T KNOW IF WE'VE

18    GOTTEN THEIR EXHIBITS YET.

19              THE COURT:  OH, OKAY.  YOU'LL GET THE

20    EXHIBITS TOMORROW?

21              MR. VERHOEVEN:  I THINK WE'RE GETTING

22    THEM TONIGHT.

23              THE COURT:  OKAY.

24              MR. VERHOEVEN:  THE PROCEDURE THEN IS WE

25    WERE SUPPOSED TO DESIGNATE CROSS AND --
```

```
1                THE COURT:  SWITCH.  CAN YOU FILE THEM ON

2       SATURDAY?

3                MR. VERHOEVEN:  WE CAN DO IT ON SATURDAY

4       PROBABLY.

5                MR. JACOBS:  OUR EXHIBITS WILL GO OVER TO

6       THEM -- OUR EXHIBITS WILL GO OVER TO THEM TOMORROW

7       PER THE AGREED UPON SCHEDULE.

8                THE COURT:  ALL RIGHT.

9                MR. JACOBS:  AND WE HAVE A SCHEDULE FOR

10      BRIEFING IT.

11               BUT IF YOU WANT NOT TO GET IT ON SUNDAY,

12      THEN WE'RE GOING TO HAVE TO ACCELERATE THE

13      OBJECTIONS AND RESPONSE.

14               MR. VERHOEVEN:  I DON'T SEE ANY REASON

15      WHY WE COULDN'T GET EXHIBITS TONIGHT.  WE'D BE

16      FLEXIBLE ON GETTING THEM LATER TONIGHT THAN 7:00

17      O'CLOCK.

18               BUT IF YOUR HONOR WOULD LIKE TO BE ABLE

19      TO LOOK AT THIS ON SATURDAY, OBVIOUSLY IF WE DON'T

20      GET THE EXHIBITS, THEIR DIRECT EXHIBITS UNTIL

21      SATURDAY, WE WON'T BE ABLE TO, YOU KNOW.  DO YOU

22      SEE WHAT I'M SAYING, YOUR HONOR?

23               MR. JACOBS:  THERE WILL BE TIME ON MONDAY

24      AND THERE WILL BE ONLY TWO OBJECTIONS, SO I THINK

25      IF WE STICK TO THE SCHEDULE WE HAVE IN MIND, EVEN
```

1    IF WE GET YOU THEM ON THE SCHEDULE.

2                THE COURT:  SUNDAY MORNING AT 8:00

3    O'CLOCK.

4                MR. JACOBS:  WHATEVER THAT PROPOSAL IS.

5                THE COURT:  ALL RIGHT.  WELL, I'LL ACCEPT

6    THAT FOR MR. BALAKRISHNAN.

7                BUT, YEAH, LET ME SEE WHAT YOU'RE ALL

8    PLANNING TO DO, BECAUSE I DON'T WANT YOUR TEAMS

9    WORKING THROUGH THE NIGHT, EITHER, AND THIS SYSTEM

10   IS JUST NOT WORKING.

11               MR. JACOBS:  CAN I RAISE AN ISSUE THAT

12   COMES -- THAT TIES BACK TO A TOPIC YOU ASKED ABOUT

13   A MINUTE AGO?

14               THE COURT:  OKAY.

15               MR. JACOBS:  HOW ARE WE GOING TO PLAY THE

16   DEPOSITION VIDEO OF KOREAN LANGUAGE SPEAKING

17   WITNESSES GIVEN THE TIGHT TIME CONSTRAINTS ON THIS

18   TRIAL?

19               WE HAD ORIGINALLY PROPOSED THAT WE

20   OVERDUB THE TRANSLATIONS SO THAT THE WITNESS IS

21   SPEAKING IN KOREAN, BUT THE TRANSLATION OVERDUBS.

22               THAT IS THE MOST EFFICIENT WAY TO USE THE

23   TIME OF THIS JURY, THE LEAST BORING.  IT'S THE WAY

24   IT'S DONE ON THE RADIO.  WHEN YOU HEAR SOMEBODY

25   TALKING ON THE RADIO, THEY'RE SIMULTANEOUSLY

```
 1    INTERPRETED AND YOU KIND OF HEAR THE ORIGINAL

 2    LANGUAGE IN THE BACKGROUND.

 3              MR. VERHOEVEN:  WE WOULD --

 4              MR. JACOBS:  EXCUSE ME.

 5              SAMSUNG REJECTED THAT.

 6              THEN WE PROPOSED THAT WE DELETE THE

 7    INTERPRETATION INTO KOREAN OF THE QUESTION SO AT

 8    LEAST ALL WE'RE HEARING IN EXTRA SLOW TIME IS THE

 9    ANSWER IN KOREAN, FOLLOWED BY THE INTERPRETER IN

10    ENGLISH.

11              SAMSUNG REJECTED THAT.

12              SO WHEN WE PLAY DEPOSITION VIDEO IN THIS

13    TRIAL, EVERYTHING IS GOING TO TAKE TWICE AS LONG,

14    IF NOT MORE, BECAUSE TRANSLATION IS SLOW.

15              WE WOULD ASK THAT OUR ORIGINAL PROPOSAL

16    BE ADOPTED.  WE THINK THIS JURY IS ENTITLED TO GET

17    THIS TRIAL IN THE MOST EFFICIENT WAY POSSIBLE, AND

18    THE WAY THEY'RE USED TO IT IS WITH AN OVERDUBBING

19    OF A TRANSLATION OF AN INTERPRETATION ON TOP OF A

20    WITNESS SPEAKING IN A LOWER VOLUME IN A NATIVE

21    LANGUAGE.

22              THE COURT:  WELL, I THINK THAT HINDERS

23    THE JURY'S ABILITY TO ASSESS WITNESS'S CREDIBILITY.

24    YOU NEED TO HEAR THE INFLECTION, EVEN IF YOU DON'T

25    UNDERSTAND THE LANGUAGE.  YOU NEED TO HEAR THE
```

```
1    PAUSES.  YOU NEED TO HEAR THE AUTHENTIC VOICE.

2              SO I'M DENYING THAT REQUEST.

3              MR. JACOBS:  AND HOW ABOUT ON THE

4    QUESTION SIDE OF THINGS?  DO WE REALLY NEED TO

5    PLAY, FOR THE JURY, THE INTERPRETATION INTO KOREAN

6    OF AN ENGLISH LANGUAGE QUESTION?

7              THE COURT:  HOW MUCH DIFFERENCE DOES THIS

8    MAKE?

9              MR. JACOBS:  WELL, THE INTERPRETER SITS

10   THERE FOR A MINUTE --

11             THE COURT:  I'M SORRY TO INTERRUPT YOU.

12   HOW MANY WITNESSES ARE GOING TO BE BROUGHT IN

13   THROUGH TRANSLATION AND VIDEO?

14             MR. JACOBS:  WELL, THERE ARE THE TWO

15   USES, RIGHT?  ONE IS TO ACTUALLY BRING IN THE

16   WITNESS, AND WE HAVE ONE CUED UP FOR TODAY IS WHY

17   THIS ISSUE HAS SOME URGENCY; BUT THEN ALSO FOR

18   IMPEACHING A KOREAN WITNESS.

19             THEY'VE TOLD US THEY'RE BRINGING THESE

20   WITNESSES TO TRIAL.  ARE WE REALLY GOING TO BE

21   HINDERED IN OUR ABILITY TO USE THE VIDEO TO

22   IMPEACH, OR THE TRANSCRIPT TO IMPEACH, THE VIDEO TO

23   IMPEACH, BECAUSE IT'S GOING TO TAKE TWICE AS LONG

24   OFF OUR TIME?

25             THE COURT:  WELL, RIGHT NOW THE REQUEST
```

924

```
 1    IS DENIED.  I MEAN, WE CAN TRY TO SEE, AS IT GOES

 2    ALONG, IF IT LOOKS LIKE IT'S REALLY CREATING SOME

 3    UNDUE BURDEN, WE CAN RE ASSESS.

 4              BUT AT THIS POINT, IT IS WHAT IT IS.

 5    SO --

 6              MR. JACOBS:  THANK YOU, YOUR HONOR.

 7              THE COURT:  OKAY.  ANYTHING ELSE THAT WE

 8    NEED TO TALK ABOUT TODAY?

 9              OTHERWISE -- LET ME RETURN -- SO THIS BOX

10    OF FORSTALL CROSS-EXAMINATION, DO I NEED TO KEEP

11    THESE EXTRA BINDERS OR NO?

12              MR. JOHNSON:  NO.  NO, YOUR HONOR.

13              THE COURT:  IT'S PROBABLY NOT GOING TO

14    COME UP, RIGHT?

15              MR. JOHNSON:  NO, YOUR HONOR.  THEY WERE

16    ONLY THERE IN CASE YOUR HONOR ALLOWED MR. FORSTALL

17    TO TESTIFY ABOUT SUBJECTS THAT YOU DENIED.

18              THE COURT:  OKAY.  SO I'M GOING TO RETURN

19    THOSE.

20              WHAT ABOUT -- I GOT A BOX OF ALL OF THE

21    OBJECTIONS THIS MORNING.  I ASSUME I CAN RETURN

22    THAT, OR -- IT'S SAMSUNG'S OBJECTIONS TO THE

23    VARIOUS WITNESSES.  I'M NOT --

24              MR. VERHOEVEN:  IT SOUNDS LIKE THOSE HAVE

25    ALREADY BEEN RULED ON, YOUR HONOR.
```

```
 1                THE COURT:  OKAY.  SO I'M GOING TO RETURN

 2    BOTH BOXES THEN TODAY.  OKAY.

 3                NOW, YOU KNOW, IT BECAME A PROBLEM LAST

 4    NIGHT IN THAT WE DIDN'T HAVE THE ACTUAL EXHIBITS

 5    FOR AT LEAST ONE OF THE WITNESSES, SO HOW CAN WE

 6    MAKE SURE THAT WE ACTUALLY GET THE EXHIBITS?

 7    BECAUSE IT'S VERY HELPFUL FOR US.

 8                MR. VERHOEVEN:  FOR THE TWO HIGH

 9    PRIORITIES?

10                THE COURT:  PLEASE, YEAH.

11                MR. VERHOEVEN:  WE'LL JUST SUBMIT THEM

12    WITH THE OBJECTIONS.  YEAH?

13                MR. JACOBS:  YES.

14                THE COURT:  SO CAN YOU E-FILE THEM?

15                MR. JACOBS:  CAN WE LODGE THEM, YOUR

16    HONOR?

17                THE COURT:  YES.  I'M JUST THINKING OF

18    HOW WE'RE GOING TO DO THIS ON SUNDAY.

19                MR. JACOBS:  WE COULD E-MAIL THEM TO

20    YOUR -- TO THAT E-MAIL ADDRESS WE HAVE.

21                THE COURT:  WHY DON'T YOU DO THAT,

22    PLEASE.

23                MR. JACOBS:  ONE OTHER HOUSEKEEPING

24    ISSUE.

25                THE COURT:  WHAT'S THAT?
```

1              MR. JACOBS:  WE DON'T HAVE A MECHANISM TO

2      KEEP TRACK IN THE OFFICIAL COURT RECORDS OF

3      DEMONSTRATIVES, UNDERSTANDING THAT THEY'RE NOT

4      GOING TO GO BACK TO THE JURY ROOM.

5              BUT IT CAN BE HELPFUL TO THE COURT, IT

6      CAN BE HELPFUL FOR REVIEW PURPOSES TO HAVE THE

7      DEMONSTRATIVES IN THE OFFICIAL RECORD.

8              WHAT WE'VE DONE IN OTHER CASES IS AT THE

9      END OF THE DAY, DEMONSTRATIVES THAT ARE ACTUALLY

10     DISPLAYED ARE SUBMITTED UNDER A NOTICE SO THEY GO

11     INTO THE RECORD.

12             WOULD SOMETHING LIKE THAT WORK FOR THE

13     COURT?

14             MR. VERHOEVEN:  MY SUGGESTION, YOUR

15     HONOR, THE WAY I'VE DONE IT IS WE MARK THE

16     DEMONSTRATIVES WITH DEMONSTRATIVE NUMBERS AND WE

17     IDENTIFY THEM FOR THE RECORD AS WE'RE GOING ALONG

18     SO IT'S CLEAR FOR THE RECORD WHAT SLIDE THEY'RE ON.

19             AND YES, WE SUBMIT THEM TO THE COURT.

20             THEY DON'T GO TO THE JURORS.

21             BUT WE SHOULD BE MARKING THEM FOR

22     IDENTIFICATION.

23             THE COURT:  AND I'M TRYING TO KEEP A

24     RECORD OF ALL OF THOSE AS WELL.  SO I'M KEEPING A

25     RECORD OF ALL THE DEMONSTRATIVES AS WELL.  THAT'S

```
 1    FINE.  WHAT YOU PROPOSE SOUNDS GREAT.

 2              MR. JACOBS:  GREAT.

 3              THE COURT:  ALL RIGHT.  WHAT ELSE?

 4    ANYTHING ELSE?

 5              AND I THINK WE SHOULD SET ASIDE, TOWARDS

 6    THE END, ENOUGH TIME FOR THE JURY INSTRUCTION

 7    CONFERENCE, BECAUSE I SUSPECT THAT'S GOING TO BE

 8    PRETTY TIME CONSUMING.

 9              BUT ALSO A TIME FOR BOTH SIDES TO GO

10    THROUGH ALL OF THE EXHIBITS AND MAKE SURE YOU'RE IN

11    ABSOLUTE AGREEMENT ABOUT WHICH ONES WILL GO TO THE

12    JURY ROOM.  OKAY?

13              MR. VERHOEVEN:  THAT'S FINE, YOUR HONOR.

14              THE COURT:  SO WE'LL JUST NEED TO MAKE

15    SOME TIME FOR THAT.

16              MR. MCELHINNY:  NOTHING FURTHER TONIGHT.

17              BUT JUST BECAUSE YOUR HONOR LIKES TO

18    KNOW, WE'RE GOING TO LOOK AT THE TRANSCRIPT PRETTY

19    CAREFULLY TODAY, AND WE MAY BE SEEKING RELIEF ABOUT

20    THE INTRODUCTION OF THE PRELIMINARY INJUNCTION

21    WHICH YOUR HONOR TALKED ABOUT.

22              THE COURT:  WELL, I'M GOING TO DENY THAT.

23    YOU'RE GOING TO TRY TO GET IN THE PREVIOUS ORDERS?

24              MR. MCELHINNY:  WE ARE, YOUR HONOR.

25              THE COURT:  WELL, I'M --
```

```
 1            MR. MCELHINNY:  IF YOUR HONOR -- I MEAN,
 2   I -- ALL I'M GOING TO ASK IS FOR A CHANCE TO ARGUE
 3   IT.  YOUR HONOR ORIGINALLY SAID IT WOULD COME IN,
 4   THEN THERE WAS A 403 DETERMINATION, THAT WAS THE
 5   BASIS, ON THEIR MOTION, AND NOW THEY'VE INTRODUCED
 6   THE ISSUE AND --
 7            THE COURT:  I DON'T THINK AT THE HEARING
 8   I SAID I WAS GOING TO BRING IT IN.  I ASKED
 9   QUESTIONS.  I ACTUALLY HADN'T DECIDED.
10            MR. VERHOEVEN:  WHAT'S THAT YOU SAID,
11   YOUR HONOR.
12            THE COURT:  I HADN'T MADE A DECISION.
13            MR. MCELHINNY:  WELL, I MAY -- I'M
14   DEALING FROM RECOLLECTION ON FRIDAY AFTERNOON.
15            BUT THE BASIS OF THE RULING WAS A 403
16   OBJECTION FROM THEIRS.  THAT'S WHAT YOUR HONOR
17   GRANTED.
18            MR. QUINN RAISED THE ISSUE IN FRONT OF
19   THE JURY TODAY.
20            PEOPLE KNOW WHAT A PRELIMINARY INJUNCTION
21   IS.
22            WE JUST WANT TO FILE A TWO-PAGE REQUEST
23   THAT YOUR HONOR --
24            THE COURT:  NO, BECAUSE YOU'VE GIVEN ME
25   ENOUGH PAPER TO CHEW ON.  I'M TELLING YOU THAT
```

```
 1    MY -- EVEN THOUGH IT WAS RAISED, IT WAS NOT RAISED

 2    AS TO WHETHER IT WAS GRANTED OR DENIED.  THIS JURY

 3    DOESN'T KNOW WHAT ANY FINDINGS WERE IN THAT PROCESS

 4    AND DOESN'T KNOW WHETHER IT WAS A GRANTED

 5    INJUNCTION OR A DENIED INJUNCTION.

 6            SO I THINK IT WAS UNFORTUNATE THAT IT WAS

 7    RAISED, BUT I'M NOT GOING TO ALLOW ALL THAT TO COME

 8    IN, BECAUSE THEN WE WILL REALLY HAVE A LITIGATION

 9    WITHIN A LITIGATION SIMILAR TO WHAT WE HAD WITH

10    MR. DENISON ABOUT EXACTLY WHAT EVIDENCE WAS BEFORE

11    THE, WHOEVER COURT DECIDED WHAT MOTION AND THE

12    DIFFERENT STANDARDS.

13            I'M NOT GOING TO ALLOW IT.  SO I -- CAN

14    WE JUST SAY, FOR THE RECORD, YOU HAVE MADE YOUR

15    RECORD FOR APPEAL, THAT YOU HAVE MADE THIS REQUEST,

16    BUT IT'S BEING DENIED ON THE SAME 403 BASIS.

17            MR. MCELHINNY:  WHAT I WOULD PREFER TO

18    SAY WAS I WAS NOT MAKING A RECORD FOR APPEAL.  I

19    WAS TRYING TO CONVINCE YOUR HONOR IT WAS THE RIGHT

20    THING TO DO.  BUT I HAVEN'T, SO WE'LL ACCEPT THAT.

21            THE COURT:  THANK YOU.  I APPRECIATE

22    THAT.

23            OKAY.  WHAT ELSE?  ANYTHING ELSE?

24            MR. VERHOEVEN:  NOTHING FURTHER FROM

25    SAMSUNG.
```

930

1                    MR. JACOBS:  NOTHING FROM US, YOUR HONOR.

2                    THE COURT:  NO?  ALL RIGHT.  I WILL SEE

3      YOU ALL AT 8:30 ON MONDAY.

4                    MR. VERHOEVEN:  OKAY.  THANK YOU.

5                    (WHEREUPON, THE EVENING RECESS WAS

6      TAKEN.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                      CERTIFICATE OF REPORTER

5

6

7

8            I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21                    /S/

                       _____
22                    LEE-ANNE SHORTRIDGE, CSR, CRR
                      CERTIFICATE NUMBER 9595
23

24                    DATED:  AUGUST 3, 2012

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25