1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4

5

     APPLE INC., A CALIFORNIA     )  C-11-01846 LHK
6    CORPORATION,                 )
                                  )  SAN JOSE, CALIFORNIA
7                 PLAINTIFF,      )
                                  )  AUGUST 7, 2012
8            VS.                  )
                                  )  VOLUME 5
9    SAMSUNG ELECTRONICS CO.,     )
     LTD., A KOREAN BUSINESS      )  PAGES 1297-1637
10   ENTITY; SAMSUNG              )
     ELECTRONICS AMERICA,         )
11   INC., A NEW YORK             )
     CORPORATION; SAMSUNG         )
12   TELECOMMUNICATIONS           )
     AMERICA, LLC, A DELAWARE     )
13   LIMITED LIABILITY            )
     COMPANY,                     )
14                                )
                  DEFENDANTS.     )
15   _____

16              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20            APPEARANCES ON NEXT PAGE

21

22

23   OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                              CERTIFICATE NUMBER 9595
24                            IRENE RODRIGUEZ, CSR, CRR
                              CERTIFICATE NUMBER 8074
25

```
 1   A P P E A R A N C E S:

 2   FOR PLAINTIFF          MORRISON & FOERSTER
     APPLE:                 BY:  HAROLD J. MCELHINNY
 3                               MICHAEL A. JACOBS
                                 RACHEL KREVANS
 4                          425 MARKET STREET
                            SAN FRANCISCO, CALIFORNIA  94105
 5

 6   FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
     APPLE:                 HALE AND DORR
 7                          BY:  WILLIAM F. LEE
                            60 STATE STREET
 8                          BOSTON, MASSACHUSETTS  02109

 9                          BY:  MARK D. SELWYN
                            950 PAGE MILL ROAD
10                          PALO ALTO, CALIFORNIA  94304

11   FOR THE DEFENDANT:     QUINN, EMANUEL, URQUHART,
                            OLIVER & HEDGES
12                          BY:  CHARLES K. VERHOEVEN
                                 ANNE ABRAMOWITZ
13                          50 CALIFORNIA STREET, 22ND FLOOR
                            SAN FRANCISCO, CALIFORNIA  94111
14
                            BY:  VICTORIA F. MAROULIS
15                               KEVIN P.B. JOHNSON
                            555 TWIN DOLPHIN DRIVE
16                          SUITE 560
                            REDWOOD SHORES, CALIFORNIA  94065
17
                            BY:  MICHAEL T. ZELLER
18                               WILLIAM C. PRICE
                            865 SOUTH FIGUEROA STREET
19                          10TH FLOOR
                            LOS ANGELES, CALIFORNIA  90017
20

21

22

23

24

25
```

INDEX OF WITNESSES

PLAINTIFF'S

**PETER BRESSLER**
     REDIRECT EXAM BY MS. KREVANS (RES.)P. 1336
     RECROSS-EXAM BY MR. VERHOEVEN      P. 1349
     FURTHER REDIRECT BY MS. KREVANS    P. 1354


**SUSAN KARE**
     DIRECT EXAM BY MS. KREVANS         P. 1356
     CROSS-EXAM BY MR. VERHOEVEN        P. 1414
     REDIRECT EXAM BY MS. KREVANS       P. 1478
     RECROSS-EXAM BY MR. VERHOEVEN      P. 1489
     FURTHER REDIRECT BY MS. KREVANS    P. 1492
     FURTHER RECROSS BY MR. VERHOEVEN   P. 1493


**RUSSELL WINER**
     DIRECT EXAM BY MR. JACOBS          P. 1496
     CROSS-EXAM BY MR. VERHOEVEN        P. 1529
     REDIRECT EXAM BY MR. JACOBS        P. 1565
     RECROSS-EXAM BY MR. VERHOEVEN      P. 1572
     FURTHER REDIRECT BY MR. JACOBS     P. 1576

**HAL PORET**
     DIRECT EXAM BY MR. JACOBS          P. 1577
     CROSS-EXAM BY MR. PRICE            P. 1591

INDEX OF EXHIBITS

                              MARKED          ADMITTED

PLAINTIFF'S

1042                                          1365
158-A                                         1478
1039                                          1499
56                                            1515
5 AND 6                                       1525
5636                                          1526
158-A                                         1578
23                                            1579

```
 1    SAN JOSE, CALIFORNIA                    AUGUST 7, 2012
 2                    P R O C E E D I N G S
 3               (WHEREUPON, THE FOLLOWING PROCEEDINGS
 4    WERE HELD OUT OF THE PRESENCE OF THE JURY:)
 5               THE COURT:  ALL RIGHT.  LET'S DISCUSS THE
 6    THINGS THAT SAMSUNG JUST FILED.  LET'S TALK ABOUT
 7    THE ANDROID SOURCE CODE.
 8               I STILL DON'T SEE WHY THAT'S RELEVANT FOR
 9    ANYTHING OTHER THAN DESIGN AROUND, WHICH HAS BEEN
10    EXCLUDED.  SO IF YOU COULD EXPLAIN?
11               MR. JOHNSON:  YOUR HONOR, YES.  THIS IS
12    KEVIN JOHNSON.
13               JUST BRIEFLY, IT IS SIMPLY THERE FOR
14    IMPEACHMENT BECAUSE DR. BALAKRISHNAN, AS PUT IN HIS
15    EXHIBIT BINDER THAT THEY INTEND TO USE ON DIRECT,
16    PX 31, WHICH IS SOURCE CODE FOR SOME OF THE PHONES.
17               AND I DON'T KNOW WHAT HE'S GOING TO SAY
18    ABOUT THEM.  I THINK I HAVE AN IDEA.  IT'S SIMPLY
19    THERE TO THE EXTENT THAT HE STARTS TO SEVER OFF THE
20    INFRINGEMENT THEORY, IT'S THERE IMPEACH HIM.  I
21    DON'T INTEND TO REFER TO IT.  IT DOESN'T HAVE ANY
22    DESIGN AROUNDS THAT WERE WEREN'T DISCLOSED OR
23    PROHIBITED BY JUDGE GREWAL.
24               THE COURT:  BUT WHAT'S THE IMPEACHMENT,
25    YOU DON'T KNOW THE DIFFERENT VERSIONS OF ANDROID,
```

```
 1    THEREFORE, YOU DON'T KNOW THAT CERTAIN VERSIONS

 2    DON'T DO THAT AND CERTAIN VERSIONS DO.

 3              MR. JOHNSON:  ONE OF THE REAL ISSUES IN

 4    THIS CASE IS YOU MAY HAVE ONE PHONE, LIKE THE

 5    CAPTIVATE, WHICH RUNS DIFFERENT VERSIONS OF ANDROID

 6    ON IT.  AND HE'S DONE THE ANALYSIS FOR ONE VERSION

 7    OF ANDROID.  I'M NOT TALKING ABOUT THE DESIGN

 8    AROUND.

 9              THE COURT:  WHY DO THE DIFFERENT VERSIONS

10    MATTER.  SOME OF THEM DON'T PRACTICE THE '381 AND

11    SOME DO, RIGHT?  SO THAT --

12              MR. JOHNSON:  THAT'S THE POINT.

13              THE COURT:  I FIND THAT TO BE THE DESIGN

14    AROUND ISSUE.  THAT'S WHY I'M HAVING A LITTLE BIT

15    OF DIFFICULTY UNDERSTANDING DEVELOPMENTS.

16              MR. JOHNSON:  IT'S NOT THE BLUE GLOW.

17    IT'S NOT ANY OF THE DESIGN AROUNDS.  THESE PRODUCTS

18    OPERATED IN A CERTAIN WAY BEFORE -- IN EARLIER

19    VERSIONS OF ANDROID.  FOR EXAMPLE, THEY DON'T

20    BOUNCE AT ALL.  THEY DO A HARD STOP.

21              THE COURT:  I KNOW.  BUT THE JURY IS

22    GOING TO HAVE THE ACTUAL PHONES IN THE JURY ROOM.

23    THEY CAN SEE WHAT BOUNCES.

24              MR. JOHNSON:  THAT'S PART OF THE ISSUE.

25    THEY'RE GOING TO HAVE ONE PHONE THAT HAS ONE
```

1     VERSION OF ANDROID.  IN DIFFERENT INSTANCES, THERE

2     ARE DIFFERENT VERSIONS OF ANDROID THAT EXHIBIT

3     DIFFERENT BEHAVIOR AND SOME OF IT DOESN'T DO WHAT

4     DR. BALAKRISHNAN SAYS.  IT HAS NOTHING TO DO WITH

5     THE DESIGN AROUND.

6              SO WE'RE ENTITLED TO BRING OUT THE FACT

7     THAT FROM HIS STANDPOINT, HE DIDN'T PUT IN THE

8     REQUISITE -- HE DIDN'T DO THE REQUISITE ANALYSIS TO

9     ESTABLISH THAT EACH VERSION OF THESE ANDROID BASED

10    PHONES OPERATE THE SAME WAY.

11             THE COURT:  WELL, WE STILL RUN INTO THE

12    SAME ISSUE THAT JUDGE GREWAL RAISED, THAT SINCE YOU

13    DIDN'T PRODUCE ALL THE SOURCE CODE, THEN IT'S NOT

14    FAIR TO THEN CROSS THESE EXPERTS WHEN THEY HAD AN

15    INCOMPLETE PRODUCTION OF SOURCE CODE THAT WAS

16    UNTIMELY AND THEN TO SAY, BUT YOU DIDN'T LOOK AT

17    ALL OF IT.  WHY DIDN'T THEY LOOK AT ALL OF IT

18    BECAUSE YOU DIDN'T PRODUCE ALL OF IT, EVEN THOUGH

19    THERE WAS AN ORDER.

20             MR. JOHNSON:  HE SAYS HE DOESN'T NEED THE

21    SOURCE CODE.  LET'S STEP BACK.  HE DIDN'T NEED THE

22    SOURCE CODE TO ESTABLISH INFRINGEMENT.

23             THE COURT:  SO THEN IT'S EVEN MORE, WHY

24    IS IT RELEVANT, IF HE'S SAYING YOU CAN LOOK AT IT

25    AND YOU CAN SEE IF IT BOUNCES BACK BY LOOKING AT

1    THE DEVICE, I THINK IT'S EVEN MORE --

2              MR. JOHNSON:  BECAUSE HE HASN'T DONE IT

3    FOR THE DIFFERENT VERSIONS -- FORGET ABOUT THE

4    SOURCE CODE FOR A SECOND.  HE HASN'T ESTABLISHED

5    THAT THE PHONES, THAT THE VERSION OF SOURCE CODE,

6    THE 2.0 OR 2.1 OR 2.3 OF THE CAPTIVATE INFRINGES.

7    HE MAY HAVE ESTABLISHED THAT THE 2.3 DOES, BUT HE

8    DIDN'T DO THE ANALYSIS ON ANY OF THE OTHER PHONES

9    THAT OPERATE DIFFERENTLY.

10             AND I'M NOT TALKING ABOUT THE SOURCE

11   CODE.  I'M TALKING ABOUT THE ACTUAL PHONE.  HE SAYS

12   HE DOESN'T NEED THE SOURCE CODE TO ESTABLISH

13   INFRINGEMENT.  HE CAN SIMPLY LOOK AT IT AND IF IT

14   BOUNCES, IT BOUNCES.

15             THE COURT:  THEN WHY HAVEN'T YOU SOUGHT

16   TO INTRODUCE THE DIFFERENCE VERSIONS OF THE

17   PRODUCTS THEN.

18             MR. JOHNSON:  WE HAVE.  THAT TAKES ME TO

19   A DIFFERENT POINT, YOUR HONOR.  YESTERDAY WE SAW

20   SOME ISSUES ON THE STAND WITH SOME OF THE WITNESSES

21   TESTIFYING ABOUT THE HOME SCREEN VERSUS THE

22   APPLICATION SCREEN, AND IT BECAME APPARENT, WHEN A

23   JOINT EXHIBIT WAS PUT IN FRONT OF THE WITNESS,

24   WHICH THE JOINT EXHIBIT WHICH HAS REMAINED IN

25   APPLE'S CUSTODY, THE PARTIES HAVE SPLIT UP THE

1    EXHIBIT AND APPLE TAKES HOME SAMSUNG PRODUCTS THAT

2    ARE JOINT EXHIBITS, THAT THERE'S A DIFFERENCE

3    BETWEEN THE JOINT EXHIBIT THAT WAS PUT IN FRONT OF

4    THE WITNESS AND THE EXHIBIT -- AND BASICALLY THE

5    PHONES AS THEY APPEAR OUT OF THE BOX.  AND I JUST

6    WANT TO SHOW YOUR HONOR --

7              THE COURT:  ARE YOU TALKING ABOUT 2019,

8    HAT PHONE?

9              MR. JOHNSON:  IF WE CAN PUT UP --

10             THE COURT:  HOLD IT.  LET'S DO ONE AT A

11   TIME BECAUSE OTHERWISE I'M GOING TO GET CONFUSED.

12             WHAT DOES APPLE WANT TO SAY ON THE

13   ANDROID SOURCE CODE?  ANYTHING?

14             MR. JACOBS:  I DON'T THINK THEY'VE

15   ANSWERED THE COURT'S QUESTION.  THE ISSUE HERE IS

16   WHETHER -- WHETHER THE SOURCE CODE THAT THEY HAVE

17   PRODUCED AND INTEND TO USE IN CROSS-EXAMINING

18   DR. BALAKRISHNAN IS WITHIN THE SCOPE OF

19   JUDGE GREWAL'S ORDER ALLOWING THEM TO DO THAT KIND

20   OF -- TO USE ANY KIND OF SOURCE CODE FOR ANY KIND

21   OF PURPOSE, AND I STILL DON'T THINK THEY'VE

22   ANSWERED THAT QUESTION.

23             WHAT THEY'VE SAID IS THAT HE RELIES ON

24   078 FOUR VERSIONS OF SOURCE CODE BUT IS ACCUSING 21

25   PRODUCTS.  THAT'S EXACTLY YOUR HONOR'S POINT.

1306

1       HE WILL SAY THAT HE REVIEWED ALL OF THE

2   SOURCE CODE THAT SAMSUNG PRODUCED, AND HE WILL

3   TESTIFY TO THE COURT, AND HE WILL TESTIFY TO THE

4   SOURCE CODE ANALYSIS OF THE SOURCE CODE THAT

5   SAMSUNG PRODUCED, AND HE WILL SAY THAT AS BETWEEN

6   THOSE VERSIONS THAT THEY PRODUCED, NOTHING IMPACTED

7   HIS INFRINGEMENT ANALYSIS.  IT WAS ALL MATERIALLY

8   THE SAME.

9       SO THEY HAVEN'T ANSWERED THE QUESTION,

10  WHY IS THIS SOURCE CODE BEING USED TO CROSS-EXAMINE

11  DR. BALAKRISHNAN?

12      MR. JOHNSON:  AND WE HAVE A DIFFERENCE OF

13  OPINION IN THAT RESPECT.  THE SOURCE CODE, EVEN THE

14  SOURCE CODE THAT DR. BALAKRISHNAN RELIES UPON, PX

15  31, EXHIBITS NON-INFRINGEMENT BEHAVIOR AND IT'S NOT

16  THE DESIGN AROUND.  IT'S THE HOLD STILL.  AND THEY

17  KNOW ABOUT THIS ISSUE.  IT'S A NON-INFRINGEMENT

18  THEORY.

19      THE COURT:  WELL, YOU CAN CROSS HIM ON

20  THAT.

21      MR. JOHNSON:  AND I INTEND TO CROSS HIM

22  ON THAT.

23      THE COURT:  ABSOLUTELY.  I EXPECT YOU TO.

24      MR. JOHNSON:  FROM MY STANDPOINT, HE

25  STILL HASN'T DONE THE PROPER ANALYSIS OF

1307

1    ESTABLISHING THAT EACH VERSION OF THE PHONE, TAKING

2    THE CAPTIVATE AS AN EXAMPLE, INFRINGES.

3           NOW, HE'S GOING TO GET UP THERE AND SAY

4    THAT HE THINKS ALL OF THEM OPERATE THE SAME WAY,

5    AND I SHOULD BE ENTITLED TO CROSS HIM ON THE FACT

6    THAT IT DOESN'T, AND IT HAS NOTHING TO DO WITH THE

7    FACT THAT THERE'S A DESIGN AROUND FOR BLUE GLOW OR

8    ANYTHING ELSE.  IT'S NOT THAT POINT.  IT'S THE FACT

9    THAT SOME OF THE EARLIER --

10          THE COURT:  ARE ALL OF -- GO AHEAD.

11   THESE ARE EARLIER PRODUCTS SOURCE CODE OR

12   SUBSEQUENT?

13          MR. JOHNSON:  NO.  THEY'RE -- SOMETIMES

14   IT DEPENDS ON THE VERSION.  SOMETIMES IT'S EARLIER.

15   SOMETIMES IT'S SUBSEQUENT.  IT WAS ALL PRODUCED BY

16   DECEMBER 30TH.  I DON'T INTEND ON ASKING HIM

17   ANYTHING OTHER THAN --

18          THE COURT:  NO, IT WAS NOT PRODUCED

19   BEFORE DECEMBER 30TH.  THAT IS FACTUALLY INCORRECT.

20   YOU PRODUCED SOME BEFORE DECEMBER 30TH, BUT YOU DID

21   NOT PRODUCE ALL.

22          MR. JOHNSON:  THE SOURCE CODE THAT I

23   INTEND TO ASK HIM ABOUT WAS PRODUCED BEFORE

24   DECEMBER 30TH.

25          THE COURT:  MY RULING IS NOT GOING TO

1    CHANGE ON THAT.  IT'S OVERRULED.

2              MR. JACOBS:  THE SAME MEANS SUSTAINED?

3              THE COURT:  WHAT?

4              MR. JACOBS:  YOU'RE SUSTAINING THE

5    OBJECTION.  CORRECT?  I THINK YOU JUST SAID --

6              THE COURT:  NO.  SAMSUNG OBJECTS TO

7    PLAINTIFF'S DEMONSTRATIVE 27 ON THE BASIS THAT THE

8    PHONES ALLEGEDLY INFRINGE THE '381 WITHOUT

9    SPECIFYING WHICH VERSION OF ANDROID PHONES THAT

10   ARE USED.  I DON'T KNOW WHAT EXHIBIT YOU'RE

11   REFERRING TO.

12             MR. JACOBS:  I'M SORRY.  THANK YOU, YOUR

13   HONOR.

14             THE COURT:  NOW, I AM GOING TO -- I DO

15   FIND WITH REGARD TO MR., IS IT JACOBY, OR JACOBY?

16             MR. BEDECARRE:  JACOBY, YOUR HONOR.

17             THE COURT:  OKAY.  WITH REGARD TO

18   MR. JACOBY AND MR. PORET, I DO FIND THAT

19   MR. JACOBY'S REBUTTAL REPORT DISCLOSES HOW HE USED

20   THE PORET SURVEY TO COME TO HIS CONSUMER

21   RECOGNITION, DATE RESTRICTION NUMBERS, AND THAT

22   MR. PORET WAS CROSSED ON IT DURING HIS DEPOSITION.

23             HE SAID HE TOOK A LOOK AT MR. JACOBY'S

24   PUBS AND WENT BACK AND REVIEWED THE DATA AND SEE IF

25   HE AGREED WITH THE CRITICISM OR NOT.  SO I'M GOING

```
 1    TO OVERRULE APPLE'S OBJECTION WITH REGARD TO THAT

 2    ISSUE.

 3              DO YOU WANT TO ADDRESS THIS?

 4              MR. JACOBS:  NO.  THANK YOU, YOUR HONOR.

 5              THE COURT:  ALL RIGHT.  SO THAT'S

 6    OVERRULED.

 7              MR. BEDECARRE:  ONE LAST POINT ON THAT,

 8    YOUR HONOR.

 9              THE COURT:  YES.

10              MR. BEDECARRE:  WE WOULD LIKE THE

11    LIMITING INSTRUCTION, THOUGH, ON -- THAT YOU RULED

12    IN PART TO PX 23 AND SOME OF THE PDX DEMONSTRATIVE

13    SLIDES, 30.2 THROUGH 30.5, JUST THAT DR. PORET'S

14    SURVEY CANNOT BE USED TO ESTABLISH FAME.

15              THE COURT:  OKAY.  LET ME HIGHLIGHT THAT

16    FOR MYSELF, TO DO THAT.

17              MR. BEDECARRE:  THANK YOU, YOUR HONOR.

18              THE COURT:  OKAY.  I THINK THAT WAS IT AS

19    FAR AS THE OBJECTIONS THAT WERE FILED LAST NIGHT.

20              BUT I THINK, MR. JOHNSON, YOU WERE GOING

21    TO RAISE SOMETHING ELSE.

22              NOW, I TRIED TO ADDRESS THE HOME SCREEN

23    VERSUS THE APPLICATION SCREEN ISSUE WITH RESPECT TO

24    WINER SDX 1317.119 IN THAT THE HOME SCREEN IS

25    RELEVANT TO TRADE DRESS.
```

```
1              MR. JOHNSON:  THIS IS A LITTLE BIT
2       DIFFERENT ISSUE.
3              THE COURT:  BUT I DON'T THINK IT FELL
4       INTO THE D'305.
5              MR. JOHNSON:  LET ME SHOW YOU WHAT'S
6       GOING ON.  IF WE COULD PUT UP 3921.
7              WHAT WE HAVE HERE, YOUR HONOR, IS AN
8       IMAGE FROM APPLE'S OPENING STATEMENT SLIDE A, WHICH
9       IS THE IPHONE AND IT SHOWS THE ICON LAYOUT.
10             AND WHAT WE HAVE IN THE MIDDLE IS JOINT
11      EXHIBIT 1034.  AND WE WENT OVER LAST NIGHT, AFTER
12      THERE WAS SOME ISSUES ABOUT THE JOINT EXHIBITS AND
13      WHAT WAS -- WHAT WE WERE SEEING ON THE STAND, AND
14      WE TOOK SOME PHOTOGRAPHS OF THE HOME SCREEN JUST TO
15      COMPARE.
16             AND WE NOTICED DIFFERENCES BETWEEN JX
17      1034, WHICH HAS BEEN IN APPLE'S POSSESSION, AND --
18             THE COURT:  AND WHAT IS JX 1034?  IS THAT
19      THE ACTUAL PHONE?  OR IS THAT THE PHOTO OF THE HOME
20      SCREEN?
21             MR. JOHNSON:  IT'S THE ACTUAL -- IT'S A
22      PHOTO OF THE ACTUAL PHONE THAT WAS TAKEN LAST
23      NIGHT.
24             THE COURT:  OKAY.
25             MR. JOHNSON:  AND WHAT WE SEE ON THE
```

1    RIGHT-HAND SIDE IS AN EPIC 4G THAT COMES RIGHT OUT

2    OF THE BOX, AND I'VE GOT IT RIGHT HERE.  THE SEAL

3    WAS BROKEN AND TAKEN OUT.

4          AND WHAT WE SEE IS THERE ARE DIFFERENCES

5    BETWEEN THE HOME SCREENS, AND WE SEE THAT THE JX

6    1034, THE IMAGES, THE ICONS ARE DIFFERENT FROM WHAT

7    COMES OUT -- AS THE PRODUCT COMES RIGHT OUT OF THE

8    BOX.

9          AND YOU'LL SEE ON THE LEFT-HAND SIDE THE

10   IPHONE, THE IMAGES OBVIOUSLY HAVE THREE ROWS AND

11   HAVE THIS ONE DANGLING DOWN BELOW OF SETTINGS, AND

12   THEN IT SAYS PHONE, AND YOU SEE HERE IT SAYS PHONE

13   AND YOU SEE HERE IT SAYS MAIL ON THE IPHONE,

14   MESSAGING OVER ON JX 1034, SAFARI, WHEN IS THE WEB

15   BROWSER.

16          THE COURT:  SO, WAIT.  ARE YOU SAYING

17   THAT JX 1034 IS A PHOTO OF THE EPIC 4G TOUCH?

18          MR. JOHNSON:  YES, I AM, AND IT'S THE

19   JOINT EXHIBIT THAT APPLE'S KEPT, AND I DON'T KNOW

20   WHY THERE ARE DIFFERENCES.  WE DON'T KNOW WHY THERE

21   ARE DIFFERENCES.  BUT THERE ARE DIFFERENCES BETWEEN

22   WHAT'S?  JX 1034 AND --

23          THE COURT:  WELL, WHAT'S THE DATE OF

24   MANUFACTURE AND THE DATE OF RELEASE OF THESE TWO?

25   THERE MUST BE MULTIPLE VERSIONS AND MULTIPLE

```
1     RELEASES.  WHY DON'T WE JUST DO A COMPARISON.

2              MR. JOHNSON:  WE CAN.

3              THE COURT:  HUH?

4              MR. JOHNSON:  WE CAN DO THAT.  BUT THE

5     POINT IS THERE ARE DIFFERENCES, AND WE'D LIKE TO

6     UNDERSTAND WHAT THOSE DIFFERENCES ARE AND WHY THERE

7     ARE DIFFERENCES, BECAUSE THEY'RE NOT HOW WE'RE

8     SEEING THEM AS THEY COME OUT OF THE BOX, AND THE

9     JURY'S ENTITLED TO SEE THEM AS THEY COME OUT OF THE

10    BOX BECAUSE THE LAYOUT OF THE IMAGE AND THE ICONS

11    HERE IS OBVIOUSLY VERY IMPORTANT, AND THAT'S THE

12    ISSUE --

13             THE COURT:  SO WHAT'S YOUR ALLEGATION?

14    THAT APPLE SOMEHOW CHANGED THE HOME SCREEN ON THE

15    JOINT EXHIBIT EPIC 4G TOUCH?

16             MR. JOHNSON:  WE'D LIKE YOU TO ASK

17    APPLE'S COUNSEL WHETHER ANYTHING WAS DONE --

18             THE COURT:  ALL RIGHT.  HAS THERE BEEN

19    ANY TAMPERING WITH ANY OF THE JOINT EXHIBIT PHONES?

20             MR. JACOBS:  NO, YOUR HONOR.  WE HAVE

21    BEING QUITE RIGOROUS ABOUT THIS.  I WOULD NOTE,

22    JUST TO BEGIN WITH, THAT THERE'S A -- THERE'S A,

23    I'M GOING TO CHANGE THE FRUIT, THERE'S A

24    PEAR-AND-AN-APRICOT COMPARISON GOING ON HERE.

25             ON THE RIGHT, YOU'RE LOOKING AT AN
```

1313

```
1    EPIC 4G TOUCH OUT OF THE BOX, I ASSUME THE LATEST

2    SHIPMENT OF IT WITHOUT THE GOOGLE SEARCH TOOL ON

3    THE TOP.

4              AND IN THE MIDDLE, LOOKING AT JX 1034,

5    THERE'S THE MODEL SEARCH TOOL.  SO THAT'S A

6    DIFFERENT --

7              MR. JOHNSON:  THIS HAS THE GOOGLE SEARCH

8    TOOL.

9              THE COURT:  SO WHY DID YOU REMOVE THE

10   GOOGLE SEARCH SCREEN FROM THE HOME SCREEN IF HE

11   WANTED ME TO DO A COMPARISON OF THE TWO HOME

12   SCREENS?

13             MR. JOHNSON:  IT ISN'T REMOVED.

14             THE COURT:  BUT WHY ISN'T IT IN YOUR

15   PHOTO OUT OF THE BOX?  WHY ISN'T THE GOOGLE SEARCH

16   BOX ON YOURS OUT OF THE BOX?

17             I MEAN, YOU'RE TELLING ME IT IS BUT YOU

18   DIDN'T CAPTURE IT IN YOUR PHOTO?

19             MR. JOHNSON:  THIS WAS DONE AS WE WERE

20   WALKING OVER HERE, YOUR HONOR, AND I BROUGHT THE

21   PHONE.  IF YOU LOOK AT THE PHONE --

22             THE COURT:  WHY DON'T SLIGHTLY DIFFERENT

23   YOUR HOME SCREEN NOT SHOW THE GOOGLE SEARCH BOX IF

24   YOU'RE TELLING ME THAT THE HOME SCREEN WAS A GOOGLE

25   SEARCH BOX.
```

```
 1              MR. JOHNSON:  WHAT I'M SAYING IS IT DOES

 2   HAVE A GOOGLE SEARCH BOX ON THE PHONE OUT OF THE

 3   BOX.  AND I'M SHOWING YOU -- IF YOU SEE DOWN BLOW,

 4   THERE ARE SEVERAL PAGES HERE.  SO WHAT WAS CAPTURED

 5   WAS ONE PAGE.

 6              AND I'M HAPPY TO HAND YOUR HONOR THE

 7   PHONE TO SEE IT --

 8              THE COURT:  OKAY, YOU KNOW WHAT?  WHY

 9   DOES YOUR VERSION NOT INCLUDE A GOOGLE SEARCH BOX

10   ON THE TOP IF YOU'RE TELLING ME THAT THAT VERY

11   EPIC 4G TOUCH OUT OF THE BOX HAS A GOOGLE SEARCH

12   BOX ON THE TOP ON THE HOME SCREEN?

13              MR. JOHNSON:  I'M TELLING YOU --

14              THE COURT:  WHY DOESN'T THAT PHOTO HAVE

15   THAT?

16              MR. JOHNSON:  BECAUSE THIS IS, THIS IS

17   THE ONE THAT THEY TOOK, YOUR HONOR, AND THAT'S,

18   THAT'S THE REASON, AND THAT'S WHY I BROUGHT THE

19   PHONE.

20              THE COURT:  AND SO YOU'RE SAYING APPLE

21   TAMPERED BECAUSE ON SUNDAY WE TOOK A PHOTO OF THIS

22   AT 10:35 IN THE MORNING ON AUGUST 5TH, AND WE

23   DIDN'T HAPPEN TO TAKE ONE WHEN IT'S GOT THE GOOGLE

24   SEARCH BOX ON THE TOP.

25              MR. JOHNSON:  BECAUSE, YOUR HONOR, WHEN
```

1    WE WENT OVER THERE LAST NIGHT AND TOOK A PHOTO,

2    THIS IS WHAT THEY CAPTURED.  THIS CAPTURED THIS

3    ONE.  MR. PATEL IS HERE.  HE WAS INVOLVED IN THE --

4              THE COURT:  OKAY.  LET ME SEE YOUR

5    EPIC 4G TOUCH OUT OF THE BOX.  DOES IT HAVE THE

6    GOOGLE SEARCH BOX?

7              MR. JOHNSON:  YES, AND IT'S STILL

8    DIFFERENT.  THAT'S THE POINT.

9              MR. JACOBS:  LET ME POINT OUT ONE OTHER

10   VISUAL CUE TO WHAT MIGHT BE GOING ON HERE.  IF YOU

11   LOOK AT JX 1034, YOU'LL SEE THAT IN THE -- THERE

12   MUST BE A TERM FOR THIS, THE DOTS THAT SHOW YOU

13   WHICH SCREEN YOU'RE ON, IN JX 1034, THE ONE

14   POSITION IS HIGHLIGHTED, SO WE'RE IN THE ONE

15   POSITION ON THE SCREEN.

16             IN THE EPIC 4G SUCH SLIDE ON THE RIGHT ON

17   SDX 3921.001, WE'RE LOOKING AT A SINGLE HIGHLIGHT

18   DOT.

19             MR. JOHNSON:  IN NO SITUATION WHEN YOU

20   MOVE TO ANY OF THOSE PAGES WILL YOU FIND A PAGE

21   THAT LOOKS LIKE WHAT'S ON JX 1034, AND THAT'S MY

22   POINT.

23             THE GOOGLE SEARCH BAR CAN BE MOVED FROM

24   ONE SCREEN TO THE OTHER.  AS ANY OF THESE ICONS

25   CAN, AND ALL WE WERE ASKING WAS THAT YOUR HONOR --

1316

1    IF THEY -- I GUESS THE QUESTION IS, ARE THEY

2    WILLING TO REPRESENT THAT THEY DON'T MOVE ANY OF

3    THE ICONS ON ANY OF THE JOINT EXHIBITS, BECAUSE

4    THAT'S, THAT'S THE ISSUE.

5              WHEN WE COMPARE IT TO WHAT COMES OUT OF

6    THE BOX, IT LOOKS DIFFERENT FROM WHAT'S ON THE

7    JOINT EXHIBIT.

8              THE COURT:  OKAY.  PUT THIS IN THE

9    FIRST -- I MEAN, ALL RIGHT.  GIVE ME THE TWO BOXES.

10   GIVE ME THE TWO BOXES.  I WANT TO LOOK AT THE SKU

11   NUMBER.  I WANT TO LOOK AT THE NUMBERS.  I WANT TO

12   SEE THE RELEASE DATES.  I WANT TO SEE THE

13   MANUFACTURE DATES BECAUSE THIS IS SOUNDING A LITTLE

14   BIT ABSURD TO ME.

15             I MEAN, HOW MANY VERSIONS AND REVISIONS

16   GET PRODUCED OF THESE PHONES?  GIVE ME A BREAK.

17   YOU YOURSELF TELL ME THAT THERE ARE MULTIPLE

18   VERSIONS THAT GO ON WITH THE PHONES, THAT THERE ARE

19   EARLIER VERSIONS, LATER VERSIONS, YOU PROBABLY HAVE

20   APPLICATION ENGINEERS THAT ARE MAKING LITTLE KNITS

21   CONSTANTLY, FIXING BUGS CONSTANTLY.  SO TO SAY

22   THAT -- ANYWAY.

23             MR. JOHNSON:  WE'D LIKE TO GET TOGETHER

24   WITH APPLE AND FIGURE OUT WHICH ARE THE JOINT

25   EXHIBITS THAT GO TO THE JURY.

1          THE COURT:  I MEAN, YOUR PHOTO IS

2     MISLEADING.  YOU SAID THE GOOGLE INTERNET SEARCH

3     BOX IS ON THE TOP OF THE PHONE THAT YOU HAVE, THE

4     EPIC 4G TOUCH OUT OF THE BOX, AND YOU JUST CHOSE TO

5     TAKE A PICTURE WITHOUT IT ON SUNDAY BEFORE THIS

6     ISSUE EVEN CAME UP.  RIGHT?  I DON'T KNOW WHAT

7     YOU'RE TALKING ABOUT.  YOU SAID WE FOUND OUT THAT

8     THEY WERE TAMPERING WITH THESE THINGS YESTERDAY AND

9     WE TOOK A PICTURE YESTERDAY.  THAT PHOTO WAS TAKEN

10    ON SUNDAY, AUGUST 5TH, YESTERDAY WAS MONDAY,

11    AUGUST 6TH.

12          SO I DON'T BUY YOUR STORY THAT YOU

13    THOUGHT THAT APPLE WAS TAMPERING YESTERDAY AND YOU

14    HAD TO TAKE THIS PHOTO OUT OF THE BOX.  THAT WAS

15    TAKEN ON SUNDAY, THE DAY BEFORE YESTERDAY.

16          MR. JOHNSON:  YOUR HONOR --

17          THE COURT:  ANYWAY.

18          MR. JOHNSON:  AT THE END OF THE DAY, WE

19    DON'T HAVE A PHONE THAT HAS THIS ICON LAYOUT THAT'S

20    IN JX 1034.

21          THE COURT:  WELL, I OPEN UP YOURS AND I

22    DON'T SEE WHAT YOU HAVE EITHER.  SO YOU'RE TELLING

23    ME YOU TOOK THAT PHOTO YESTERDAY AFTER YOU FOUND

24    OUT THAT THERE WAS TAMPERING BY APPLE OF THESE

25    JOINT EXHIBITS?

```
 1              ARE YOU TELLING ME THAT WHERE IT SAYS

 2    SUNDAY, AUGUST 5TH, AT 1035 A.M. IS FALSE ON THE

 3    PHONE, THAT THAT TIME IS WRONG AND THAT DATE IS

 4    WRONG?

 5              MR. JOHNSON:  I'M TOLD THE PHONE WE HAVE

 6    ON THE RIGHT IS A SOFT PHOTO OF THIS PHONE.

 7              THE COURT:  AND IT WAS TAKEN WHEN, SUNDAY

 8    OR MONDAY.

 9              MR. JOHNSON:  IT WAS TAKEN ON SUNDAY.

10              THE COURT:  SO WHY DID YOU REPRESENT TO

11    ME THAT THIS WAS TAKEN YESTERDAY OUT OF THE BOX

12    BECAUSE YOU WERE SO CONCERNED THAT THERE HAS BEEN

13    TAMPERING WITH THE HOME SCREENS ON THE JOINT

14    EXHIBITS, BECAUSE THAT'S NOT TRUE.

15              MR. JOHNSON:  YOUR HONOR, WHAT I SAID WAS

16    THE ONE IN THE MIDDLE WAS TAKEN YESTERDAY, LAST

17    NIGHT, OUT OF THE -- AND THAT'S THE JOINT EXHIBIT.

18              THE COURT:  NO.  YOU SAID YOU TOOK IT OUT

19    OF THE BOX, AND THIS IS WHAT IT LOOKS LIKE.

20              MR. JOHNSON:  THEN I'M SORRY, I MISSPOKE.

21    I SAID 1034 WAS TAKEN LAST NIGHT AFTER WE INSPECTED

22    THE JOINT EXHIBITS.

23              THE COURT:  SO WHAT IS YOUR

24    RECOMMENDATION?

25              MR. JOHNSON:  OUR RECOMMENDATION IS THAT
```

1319

1    WE LOOK AT ALL THE JOINT EXHIBITS OR THE OTHER SIDE

2    AND FIGURE OUT WHAT ARE THE JOINT EXHIBITS THAT

3    ACTUALLY GO INTO THE JURY BOX, BECAUSE THAT'S -- AS

4    YOUR HONOR POINTS OUT, THAT'S WHAT THEY'RE GOING TO

5    BE COMPARING.

6         THE COURT:  I THOUGHT THAT YOU ALL DID.

7    THE WHOLE POINT OF HAVING THE JOINT EXHIBITS WAS

8    THAT YOU ALL WOULD GO THROUGH THEM AND AGREE THAT

9    THEY'RE JOINT AND AGREE UPON THEM.

10        MR. JOHNSON:  WE DIDN'T REALIZE THAT

11   THERE WERE GOING TO BE DIFFERENCES, DIFFERENCES IN

12   THE HOME SCREENS BETWEEN THE PHONES.

13        THE COURT:  OKAY.  WHO, WHO CREATED THAT

14   ONE THAT HAD 1019 ON IT YESTERDAY THAT WASN'T AN

15   OFFICIAL EXHIBIT?  WHO CREATED THAT ONE?  WHO PUT

16   THAT 1019 STICKER ON THE SIDE.

17        MR. JACOBS:  THIS IS THE ONE WITH THE

18   LITTLE STICKER.

19        MR. JOHNSON:  I THINK, AGAIN, THAT WAS ON

20   OUR SIDE.  THAT WAS -- WHAT WE THOUGHT THE SAME

21   EXACT PHONE.  THAT'S WHY WE GOT TO THIS POINT

22   BECAUSE SOMEONE ON OUR SIDE HAS THE SAME PHONE,

23   IT'S HANDED TO THE WITNESS AND IT LOOKS DIFFERENT

24   FROM WHAT THE JOINT EXHIBIT IS, AND THAT'S WHAT

25   RAISED THE ISSUE IN OUR MINDS .

```
1              THE COURT:  SO HOW MANY OF THE EXHIBITS

2      HAVE YOU BEEN DUPLICATING WITH YOUR OWN COPIES OF

3      THE EXHIBITS?

4              MR. JOHNSON:  WELL, THROUGHOUT THE

5      CASE --

6              THE COURT:  WAS 1019 THE ONLY ONE OR WERE

7      ALL THE OTHER ONES THAT YOU ARE GOING THROUGH YOU

8      WERE WORKING ON?

9              MR. JOHNSON:  NO, I BELIEVE THEY'RE ALL

10     THE JOINT EXHIBITS, EXCEPT FOR THAT ONE.

11             THE COURT:  EXCEPT FOR 1019.

12             MR. JACOBS:  YOUR HONOR, IT IS A SYMMETRY

13     IN INFORMATION HERE, WHICH SAMSUNG KNOWS WHEN IT IS

14     SENDING OUT PATCH AND UPDATES TO THE PHONES.

15     THERE'S BEEN NO DISCLOSURE TO US ALONG THE WAY OF

16     THOSE PATCHES AND CHANGES.

17             YOU DO HAVE TO TRY TO MAKE SURE THAT

18     PHONES ARE NOT UPDATED IN ORDER TO AVOID THE

19     PATCHES AND CHANGES.

20             BUT WE HAVE DONE EVERYTHING WE CAN TO

21     PRESERVE THE INTEGRITY OF THE EXHIBITS WE'VE USED

22     IN THE CASE, BECAUSE OBVIOUSLY, AS YOUR HONOR HAS

23     NOTED, THE SHEER NUMBER OF PHONES ITSELF HAS BEEN A

24     HUGE CHALLENGE FOR US IN MANAGING THIS CASE, AND

25     NOW WE KNOW THAT THAT'S SAMSUNG'S BUSINESS
```

```
 1      STRATEGY.

 2              SO I THINK ALL THE, ALL THE PRESUMPTIONS

 3      TILT OUR WAY ON THIS ISSUE.

 4              THE COURT:  WELL, I DON'T SEE WHAT THE

 5      REQUEST IS FOR TODAY.

 6              MR. JOHNSON:  THE REQUEST --

 7              THE COURT:  WHAT'S THE REQUEST FOR TODAY.

 8              MR. JOHNSON:  THE REQUEST IS AT THIS

 9      POINT THE PARTIES GET TOGETHER, FIGURE OUT WHAT THE

10      ACTUAL PHONES SHOULD BE THAT GO BACK INTO THE JURY

11      ROOM ULTIMATELY SO THAT THERE --

12              THE COURT:  LET ME ASK YOU SOMETHING.  IF

13      YOU AGREED TO A JOINT EXHIBIT, WHY ARE YOU

14      INTRODUCING YOUR OWN EXHIBIT?  AND I DON'T EVEN

15      KNOW IF IT'S THE SAME PHONE, RIGHT?  I DON'T KNOW

16      WHAT REVERSIONS IT IS.  I DON'T KNOW WHAT BUG FIXES

17      ARE IN THAT VERSION VERSUS WHAT YOU AGREED TO BE A

18      JOINT EXHIBIT.

19              MR. JOHNSON:  WHEN WE AGREED TO AN

20      EPIC 4G AS BEING A JOINT EXHIBIT, THERE WASN'T A

21      BELIEF ON OUR SIDE THAT THEY WERE DIFFERENT, AND IT

22      WAS ONLY WHEN WE GOT INTO THE TESTIMONY FROM THE

23      LAYOUT OF THE ICONS THAT WE NOTICED THAT THERE ARE

24      DIFFERENCES, AND THAT BEGGED THE QUESTION ON OUR

25      SIDE, WHY DOES THIS ONE LOOK -- WHY IS THIS LATE
```

```
 1    OUTLOOK LIKE THIS AND NOT LIKE THIS?  THAT WAS THE
 2    ISSUE FOR US.
 3              MR. JACOBS:  YOUR HONOR, THERE HAVE BEEN
 4    INNUMERABLE INSPECTIONS OF THESE PHONES.  WE'VE
 5    GOTTEN E-MAIL AFTER E-MAIL AFTER E-MAIL, WE'LL
 6    COLLECT THEM AND PROVIDE THEM TO YOU, WHERE SAMSUNG
 7    REPRESENTATIVES CAME OVER AND INSPECTED THE JOINT
 8    EXHIBITS.  WE HAVE MADE THEM AVAILABLE AT A
 9    MOMENT'S NOTICE ON THEIR REQUEST, AND THAT IS THE
10    SET OF THE JOINT EXHIBITS.
11              THIS WAS ALL DONE IN ADVANCE AND TO HAVE
12    THE SUDDEN DISCOVERY, MAYBE THEY HAVE COME UP NOW
13    WITH AN EPIC 4G TOUCH THAT THEY'VE PATCHED AND NOW
14    THEY'RE TRYING TO --
15              MR. JOHNSON:  THERE'S NO PATCH.  THERE'S
16    NO PATCH.  THERE ARE DIFFERENCES HERE THAT ARE
17    IMPORTANT.
18              THE COURT:  WHERE IS THAT 1019 THAT YOU
19    INTRODUCED THAT WAS NOT A JOINT EXHIBIT?  WHERE IS
20    IT?
21              MR. BEDECARRE:  WE'LL GET IT, YOUR HONOR.
22    JUST SO THE RECORD IS CLEAR, MS. KHAN WAS SITTING
23    THERE TO HAND DEMONSTRATIVES EITHER TO THE JURY OR
24    TO THE WITNESS.  AND SHE DIDN'T KNOW THAT ALL THE
25    PHONES WERE ON THE STAND ALREADY.  SO SHE JUST HAD
```

```
1    THAT 1019 ONE THAT'S OUR COPY, THE PARTIES EACH

2    HAVE LOTS OF COPIES OF THESE PHONES, SHE JUST

3    HANDED THE WRONG ONE TO THE WITNESS.  THAT'S ALL.

4              IT WASN'T TRYING TO SUBMIT A DIFFERENT

5    EXHIBIT.  IT WAS MERELY TO HAND HIM ONE TO LOOK AT.

6    AND SHE DIDN'T REALIZE THAT HE ALREADY HAD THE ONE

7    WITH THE EXHIBIT STICKER ON IT.

8              THE COURT:  ALL RIGHT.  FROM NOW ON, WITH

9    ANY PHONE, IT NEEDS TO BE SHOWN TO BOTH SIDES AND I

10   NEED TO HAVE AN AGREEMENT THAT THAT IS THE ACTUAL

11   JOINT EXHIBIT THAT WAS AGREED TO.  OKAY?

12             I DON'T EVEN THINK MS. KHAN NEEDS TO SIT

13   THERE.  WHY DOES SHE NEED TO SIT THERE?

14             MR. BEDECARRE:  SO SHE DIDN'T HAVE TO GO

15   ALL THE WAY ACROSS THE FRONT OF THE JURY BOX.

16             THE COURT:  I THINK THEY NEED TO SHOW THE

17   OTHER SIDE, JUST CONFIRM.  SINCE WE'VE HAD THIS

18   HAPPEN NOW, IT'S IMPORTANT TO HAVE BOTH SIDES

19   CONFIRM THAT WHATEVER IS BEING SHOWN TO THE WITNESS

20   OR TO THE JURY IS THE JOINT EXHIBIT THAT BOTH

21   PARTIES HAVE STIPULATED TO.

22             MR. BEDECARRE:  SURE, YOUR HONOR.

23             THE COURT:  OKAY.  BECAUSE I'M NOT GOING

24   TO HAVE THIS HAPPEN AGAIN.

25             MR. BEDECARRE:  WE'LL MAKE SURE.
```

```
1              THE COURT:  SO I GUESS I'M NOT CLEAR.
2    WHAT IS IT THAT YOU'RE ASKING FOR, MR. JOHNSON?
3    YOU DON'T WANT MS. KARE TO BE ABLE TO TAKE ABOUT
4    ICONS TODAY?  IS THAT IT?
5              MR. JOHNSON:  NO, I'M NOT ASKING THAT.
6              THE COURT:  OKAY.
7              MR. JOHNSON:  I'M ASKING SIMPLY THAT YOUR
8    HONOR BE -- YOUR HONOR ASK THE PARTIES TO GO
9    THROUGH AND SIT DOWN AND ESTABLISH -- LOOK AT THE
10   JOINT EXHIBITS AND AGREE UPON WHAT GOES INTO THE
11   JURY BOX, BECAUSE I THINK THERE MAY BE
12   DISAGREEMENT.  1034 REFLECTS A DISAGREEMENT AND
13   WHAT THEY'RE --
14             THE COURT:  WE WILL DO THAT, BUT IT WILL
15   BE CHARGED TO YOUR TRIAL TIME, BECAUSE YOU
16   STIPULATED TO THESE EXHIBITS IN ADVANCE.  OKAY.
17             IT WILL BE CHARGED TO YOUR TRIAL TIME.
18             MR. JOHNSON:  UNDERSTOOD.
19             THE COURT:  TAKE AS MUCH TIME AS YOU
20   WANT, BUT IT'S GETTING DEDUCTED FROM YOUR 25 HOURS.
21             I REALLY DON'T THINK THAT THIS IS -- I
22   DON'T FIND THIS TO BE A GOOD FAITH OBJECTION.  IF
23   YOU HAVE STIPULATED TO THESE EXHIBITS IN ADVANCE,
24   AND YOU NOW TO COME IN AND SAY, NO, NO, HOLD, HOLD
25   IT, HOLD IT, I WANT TO REDO EVERYTHING THAT'S DONE,
```

1    SO WHAT ARE YOU SAYING NOW, WE'RE GOING TO HAVE TO

2    REDO EVERYTHING THAT WE'VE DONE WITH THE WITNESSES

3    BECAUSE THAT DOESN'T HAPPEN TO BE THE EXACT VERSION

4    OF THE PHONE?  ARE YOU NOW SAYING WE NEED TO REDO

5    ALL OF THAT TESTIMONY?

6            MR. JOHNSON:  I'M NOT SAYING THAT, YOUR

7    HONOR.  WHAT I'M SAYING --

8            THE COURT:  IF YOU AT THE END OF THE

9    TRIAL SUDDENLY HAVE OBJECTIONS TO JOINT EXHIBITS

10   THAT HAVE GONE TO THE JURY AND THAT THE JURY HAS

11   ALREADY BEEN SHOWN AT YOUR REQUEST AND THE

12   WITNESSES HAVE ALREADY SEEN, SO THEN WHAT'S THE

13   RESULT?

14           MR. JOHNSON:  THE RESULT ULTIMATELY

15   SHOULD BE WHAT GOES INTO THE JURY BOX IS REFLECTIVE

16   OF THE PHONES AS THEY COME OUT OF THE BOX.  THAT'S

17   ALL I CARE ABOUT.

18           MR. JACOBS:  YOUR HONOR, THIS IS EXACTLY

19   THE PROBLEM.  WE CAN'T HAVE A REDO OF THE JOINT

20   EXHIBITS AT THIS STAGE.  THEY'RE IN EVIDENCE.

21           THE COURT:  I FIND IT NOT CREDIBLE THAT

22   APPLE TAMPERED WITH THESE JOINTS.  THOSE ARE JOINT

23   EXHIBITS THAT BOTH SIDES STIPULATED TO IN ADVANCE.

24           MR. JACOBS:  YOUR HONOR, WE'RE CONFIDENT

25   THAT THE RECORD WILL SUPPORT A VERDICT IF THE JOINT

```
 1    EXHIBITS THAT HAVE ALREADY BEEN STIPULATED TO

 2    REMAIN THE JOINT EXHIBITS.  TO NOW DO A REDO OF

 3    THIS IN THE MIDDLE OF TRIAL WOULD CREATE THE

 4    POTENTIAL FOR SERIOUS ERROR.

 5              MR. JOHNSON:  YOUR HONOR, IF APPLE IS

 6    WILLING TO REPRESENT THAT THERE'S BEEN NO

 7    MANIPULATION OF ANY OF THE ICONS IN ANY OF THE

 8    JOINT EXHIBITS, WE'RE FINE.

 9              MR. JACOBS:  ABSOLUTELY, YOUR HONOR.

10              THE COURT:  HAS THERE BEEN ANY

11    MANIPULATION BY ANYONE ON YOUR TEAM, ANYONE,

12    PARALEGAL --

13              MR. JACOBS:  THERE HAS BEEN NO

14    MANIPULATION.  THERE HAS BEEN USE.  THERE HAS BEEN

15    USE BECAUSE, OF COURSE, WE HAVE TURNED THEM ON

16    BECAUSE THEY'VE BEEN IMAGED AND EXERCISED AND

17    TESTED AND SO THERE'S BEEN USE.  BUT THERE'S BEEN

18    NO MANIPULATION DESIGNED TO CREATE ANY APPEARANCE

19    OF THE PHONES.  WE'VE BEEN -- WE'VE BEEN RIGOROUS

20    ABOUT THAT IN MAINTAINING THE INTEGRITY OF THE

21    PHONES.

22              THE COURT:  HAS ANYONE MOVED ANY ICONS

23    FROM ANY OF THESE PHONES?

24              MR. JACOBS:  NO.

25              THE COURT:  ALL RIGHT.  WELL, I'M
```

```
 1    SATISFIED WITH THAT.  IF YOU HAVE A SPECIFIC

 2    OBJECTION, YOU CAN RAISE IT AT THE TIME.

 3              NOW, I THINK THIS IS THE ACTUAL JOINT

 4    TRIAL EXHIBIT BECAUSE IT HAS THE JOINT TRIAL

 5    EXHIBIT NUMBER.

 6              MR. JACOBS:  LET ME JUST SAY ONE OTHER

 7    THING.

 8              THE COURT:  WELL, YOU ALL WILL NEED TO

 9    TAKE A LOOK AT IT.  THIS ONE HAS THE JOINT TRIAL

10    EXHIBIT NUMBER, WHICH I ASSUME IS A S 123.  IS THAT

11    RIGHT?

12              MR. JOHNSON:  YES.

13              THE COURT:  I'M JUST GOING TO RETURN

14    THESE TWO.

15              MR. JACOBS:  IT SHOULD BE A JX NUMBER.

16              THE COURT:  I KNOW, BUT IT ALSO HAS AN

17    A S 123 NUMBER.

18              MR. JOHNSON:  THAT'S THE JOINT EXHIBIT.

19              MR. JACOBS:  THAT'S WHAT I WANTED TO

20    AVERT TO.  AS YOU CAN SEE, THERE HAVE BEEN CONTROL

21    NUMBERS ON THESE PHONES ALL ALONG BEFORE THEY WERE

22    SUBMITTED AS JOINT EXHIBITS, AND OUR INSURANCE, IF

23    YOU WILL, AGAINST A CHARGE OF MANIPULATION WAS THE

24    REPEATED MAKING AVAILABILITY OF THESE PHONES FOR

25    SAMSUNG TO INSPECT.
```

```
 1              SO HAVING INSPECTED THEM OVER AND OVER

 2    AGAIN BEFORE THEY BECAME JOINT EXHIBITS, ANY

 3    OBJECTION TO MANIPULATION, BASED ON MANIPULATION,

 4    SHOULD HAVE SURFACED BASED ON THAT INSPECTION.

 5              THE COURT:  ANYWAY, I'M GOING TO RETURN

 6    THESE TO YOU.  WHY WAS APPLE HOLDING ON TO ALL THE

 7    JOINT EXHIBITS?

 8              MR. JACOBS:  I THINK WE'VE BEEN HOLDING

 9    SOME AND SAMSUNG HAS BEEN HOLDING SOME JUST TO

10    BRING THIS BACK AND FORTH.

11              THE COURT:  I'M GOING TO GIVE THIS BACK

12    TO YOU.

13              MR. JACOBS:  MAY I APPROACH, YOUR HONOR?

14              THE COURT:  YOU FIGURE IT OUT IN WHICH

15    BOX.  THEY DO HAVE THE A S 123 NUMBER ON THEM, SO I

16    THINK THAT SHOULD BE --

17              ALL RIGHT.  WHAT ELSE?

18              MR. VERHOEVEN:  GOOD MORNING, YOUR HONOR.

19    MR. VERHOEVEN.

20              AT THE END OF THE DAY YESTERDAY,

21    MS. KREVANS RAISED SEVERAL OBJECTIONS TO THE

22    DEMONSTRATIVE SLIDE, CROSS-SLIDES FOR MS. KARE, AND

23    BEFORE WE GET INTO HER TESTIMONY, I JUST WANT TO

24    ALERT THE COURT THAT WITH RESPECT TO MS. SUSAN

25    KARE'S DIRECT DEMONSTRATIVE SLIDES, WE SEE THE SAME
```

```
1    THING, EVEN MORE DISTORTED.  SO --

2                THE COURT:  CAN YOU GIVE ME A NUMBER,

3    PLEASE?

4                MR. VERHOEVEN:  YES.  FOR EXAMPLE, PX

5    14.4.

6                NOT ONLY -- YOU RECALL THE OBJECTION WAS,

7    WELL, IT'S NOT A FAIR DESCRIPTION BECAUSE OF THE

8    PHONE AROUND THE SCREEN.

9                WELL, HERE THEY'VE TAKEN SPECIFIC ICONS

10   AND PULLED THEM OUT AND TAKEN THEM OUT OF CONTEXT,

11   OUT OF HOW THEY APPEAR WITH THE OTHER SCREENS, AND

12   MANIPULATED THEM IN A WAY THAT'S TEN TIMES MORE

13   DISTORTING THAN WHAT WE HAD ON OUR SLIDES.

14               IN ADDITION, THE THEORY OF INFRINGEMENT

15   BASED ON A MIX OF ICON STYLES WAS NOT DISCLOSED AND

16   IN RESPONSE TO SAMSUNG'S TRADE SECRET DILUTION

17   CONTENTION ROG OR TRADE DRESS ROGS OR PATENT

18   INFRINGEMENT ROGS.

19               SO THIS IS OBJECTIONABLE BY THE SAME

20   TOKEN.

21               AND IF YOU GO TO THE NEXT SLIDE, YOUR

22   HONOR, PX 14.5, YOU'LL SEE THE SAME THING WHERE

23   THEY'RE MANIPULATING AND PULLING OUT ICONS INSTEAD

24   OF USING THE ACTUAL TRADE DRESS, WHICH YOUR HONOR

25   HAS DIRECTED ME TO DO ON CROSS.
```

```
 1              AGAIN, I'M NOT SURE EXACTLY WHAT THEY ARE

 2    GOING TO ASK HERE, BUT THEY'RE GOING TO TALK ABOUT

 3    ROUNDED RECTANGLES BEING AN IMPORTANT DESIGN

 4    ELEMENT, THAT WAS NOT DISCLOSED IN THEIR

 5    INTERROGATORY RESPONSE -- OR THEIR RESPONSE TO A

 6    CONTENTION.

 7              THE COURT:  OKAY.  LET ME -- I'D LIKE TO

 8    START AT 9:00, SO I THINK IT'S FAIR TO ALL

 9    COMPARISONS BE SCREEN-TO-SCREEN SHOTS.

10              MR. VERHOEVEN:  THANK YOU.

11              THE COURT:  WHICH IS WHAT HAS BEEN -- IS

12    MY UNDERSTANDING OF WHAT'S COVERED.

13              MR. VERHOEVEN:  WHAT YOU TOLD ME TO DO.

14              THE COURT:  I THINK THAT'S WHAT'S COVERED

15    BY '305.  SO 14.4, YOU'RE GOING TO HAVE TO CHANGE

16    THAT, ALL RIGHT, MS. KREVANS?

17              MS. KREVANS:  YES, YOUR HONOR.

18              THE COURT:  OKAY.  NOW, WITH REGARD TO

19    WHATEVER WAS OR WAS NOT DISCLOSED, I CAN'T HANDLE

20    THAT RIGHT NOW.

21              MR. VERHOEVEN:  I UNDERSTAND, YOUR HONOR.

22              THE COURT:  BUT WHAT I WOULD LIKE IS IF

23    YOU CAN HAVE YOUR -- PROBABLY THE EASIEST THING IS

24    LET'S GO AHEAD WITH BRESSLER THIS MORNING, BUT IF

25    YOU CAN HAVE -- I SAID TWO OBJECTIONS MAX, BUT --
```

```
 1     IT WASN'T BRIEFED IN WHAT WAS FILED YESTERDAY.

 2               IS THERE ANY REASON WHY YOU DIDN'T

 3     INCLUDE THAT IN YOUR OBJECTIONS TO MS. KARE

 4     YESTERDAY?

 5               MR. VERHOEVEN:  I THOUGHT THAT THE

 6     PROCESS WITH MS. KARE HAD ALREADY BEEN DONE,

 7     ACTUALLY, BEFORE MS. KREVANS GOT UP AND RAISED

 8     ADDITIONAL OBJECTIONS.

 9               KARE WAS PART OF THE PROCESS BEFORE WE

10     WENT TO THE TWO OBJECTIONS.  WE STARTED WITH WINER

11     WITH THE TWO OBJECTIONS, AND I'M SIMPLY -- YOUR

12     HONOR, MS. KREVANS RAISED A BUNCH OF OBJECTIONS TO

13     MY SLIDES WITHOUT NOTICE YESTERDAY AND YOUR HONOR

14     RULED ON THOSE, AND I JUST WANT A LEVEL PLAYING

15     FIELD, THAT'S ALL.  AND I'M LOOKING AT HER SLIDES,

16     AND I SEE THAT THEY HAVE -- SHE'S GOT, YOU KNOW,

17     WORSE OF TAKING OUT IMAGES AND MANIPULATING THEM.

18               THE COURT:  I KNOW.  IT JUST WOULD HAVE

19     BEEN BETTER IF THIS HAD BEEN FILED YESTERDAY, AND I

20     COULD HAVE HANDLED IT LAST NIGHT.

21               MR. VERHOEVEN:  I APOLOGIZE, YOUR HONOR.

22     I'M TRYING TO FIGURE OUT HOW TO DO THIS.

23               THE COURT:  ALL RIGHT.  SO 14.4, THE

24     OBJECTION IS SUSTAINED.  YOU NEED TO MAKE IT A

25     SCREEN-BY-SCREEN COMPARISON.
```

```
 1              AND THEN WHY DON'T YOU ALL BRIEF, WHAT,

 2    THE MIX OF ICON STYLES AND THE ROUNDED RECTANGLE,

 3    WAS THERE ANY OTHER --

 4              MR. VERHOEVEN:  IF YOU GO THROUGH THESE,

 5    YOU KNOW, WHAT WE'VE GOT, FOR EXAMPLE, ARE 14.8,

 6    YOUR HONOR, SAME THING HERE.

 7              THE COURT:  ALL RIGHT.  WELL, THIS IS

 8    WHAT I WANT THEN.  I WANT YOU ALL TO SUBMIT THE

 9    ACTUAL WHATEVER IS AT ISSUE, THE CONTENTION

10    INTERROGATORY, THE EXPERT REPORT, WHATEVER IT IS

11    THAT YOU THINK DIDN'T DISCLOSE IT.  I WANT THE

12    ACTUAL DOCUMENT.

13              MR. VERHOEVEN:  YES, YOUR HONOR.

14              THE COURT:  OKAY.  SO WHEN CAN YOU ALL

15    SUBMIT THAT?

16              MS. KREVANS:  YOUR HONOR, MS. KARE IS THE

17    NEXT WITNESS.  SHE'S GOING TO BE GOING ON IN ABOUT

18    TEN MINUTES.  THIS IS, I THINK, THE FOURTH ROUND OF

19    THEIR OBJECTIONS TO THIS.

20              AND I WOULD JUST SAY, WE'RE GOING TO USE

21    SLIDE 14.39 RATHER THAN 14.4 IN RESPONSE TO THIS

22    OBJECTION.

23              ALL IT DOES IS SHOW A CLOSE-UP OF SOME OF

24    THE ICONS.

25              THE COURT:  I DON'T HAVE .39, I DON'T
```

1333

```
 1    BELIEVE.  OH, IT'S AT THE END.
 2              MS. KREVANS:  IT'S AT THE END.
 3              MR. VERHOEVEN:  AGAIN, THIS IS A
 4    MANIPULATION, YOUR HONOR, BY PULLING OUT SPECIFIC
 5    ICONS.
 6              THE COURT:  BUT THIS IS THEIR OWN PATENT.
 7              MS. KREVANS:  YOUR HONOR, ALL THIS IS
 8    RIGHT AFTER WE SHOW THE FULL SCREEN OF D'305, IT'S
 9    JUST A CLOSE-UP OF SOME OF THE ICONS.
10              MR. VERHOEVEN:  THIS IS EXACTLY WHAT THEY
11    EXPLAINED ABOUT, BUT MORE EGREGIOUS.  THEY'RE
12    PULLING OUT THINGS THAT THEY THINK ARE MOST
13    SIMILAR, YOUR HONOR, AND INSTEAD OF LOOKING AT THE
14    WHOLE THING IN ITS ENTIRETY AND TRYING TO DISTORT
15    THE JURORS' VIEWS ON JUST A FEW OF THE ICONS.  I'M
16    SORRY TO SAY THIS, YOUR HONOR, IT'S NOT JUST --
17              THE COURT:  OKAY.  JUST SCREEN-TO-SCREEN
18    SHOTS.  OKAY.  SCREEN-TO-SCREEN SHOTS.
19              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.
20              MS. KREVANS:  YOUR HONOR, SO WE CAN'T
21    SHOW THE JURY CLOSE-UPS OF ANYTHING.  YOU PERMITTED
22    THEM YESTERDAY TO SHOW THE JURY VERY MUCH BLOWN UP
23    MAGNIFIED CLOSE-UPS OF THE SPEAKER SLOT IN PHONES.
24              THE COURT:  YOU CAN SHOW IT BLOWN UP ON
25    THE SCREEN, BUT YOU NEED TO HAVE THE SCREEN UP
```

1    THERE.  I'M NOT GOING TO LET YOU EXCISE IT OUT AND

2    SHOW IT IN ISOLATION.  OKAY.  SO IF YOU CAN BLOW IT

3    UP AND YOU SHOW THAT IT'S THE WHOLE SCREEN, THAT'S

4    FINE.

5            MR. VERHOEVEN:  WELL, WOULD THAT APPLY --

6            THE COURT:  WHAT ELSE?  WHY DON'T YOU

7    TELL ME --

8            MR. VERHOEVEN:  ALL RIGHT, YOUR HONOR.

9            THE COURT:  LET'S HANDLE IT RIGHT NOW.

10    I'M GOING TO CHARGE SAMSUNG'S TIME.  LET'S DO IT.

11            MR. VERHOEVEN:  JUST ONE --

12            THE COURT:  I'M CHARGING YOU TRIAL TIME

13    BECAUSE THIS KARE, KARE OBJECTIONS HAVE BEEN

14    BRIEFED SIX TIMES.  ALL RIGHT?  SO IF YOU WANT TO

15    DO IT NOW, WE'LL DO IT NOW, BUT I AM CHARGING YOUR

16    TIME.

17            SO IT IS NOW 9:09.  I GOT THE KARE EXPERT

18    REPORT RIGHT HERE.  YOU TELL ME WHAT YOUR OBJECTION

19    IS AS TO HER REPORTS.  I'VE GOT THEM RIGHT HERE.

20            MR. VERHOEVEN:  BEYOND WHAT I JUST SAID,

21    YOUR HONOR, I JUST HAD ONE QUESTION.

22            THE COURT:  YEAH.

23            MR. VERHOEVEN:  AND THAT IS, I ASSUME IF

24    COUNSEL FOR APPLE IS PERMITTED TO SHOW, FOR

25    EXAMPLE, IF WE LOOK AT SLIDE PDX 14.21 RIGHT HERE,

```
 1    WHICH IS SCREEN-TO-SCREEN SHOTS --
 2              THE COURT:  WHAT ABOUT IT?
 3              MR. VERHOEVEN:  -- THE ONLY THING IS JUST
 4    A POINT OF CLARIFICATION.  IF THAT'S FAIR GAME FOR
 5    THEM TO DO ON DIRECT, I WOULD JUST REQUEST THAT I
 6    BE ABLE TO USE SCREEN-TO-SCREEN SHOTS EXACTLY LIKE
 7    THIS, WITHOUT THE PHONE AROUND THEM, IN THE CROSS.
 8              THE COURT:  THAT'S FINE.
 9              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.
10    THAT'S ALL I HAVE.
11              THE COURT:  SURE.  I'VE GOT THE KARE
12    REPORTS RIGHT HERE.
13              DO YOU WANT TO GO FOR IT ON ROUNDED MIX
14    OF RECTANGLES AND ROUNDED CORNERS, LET'S DO IT
15    RIGHT NOW.
16              MR. VERHOEVEN:  NO.
17              THE COURT:  IT'S 9:10.
18              MR. VERHOEVEN:  I THINK I'VE GOT YOUR
19    GUIDANCE ON THE SCREEN.
20              THE COURT:  ALL RIGHT.  9:10.  THAT'S
21    ONLY TWO MINUTES.
22              NOW, ARE WE READY WITH MR. BRESSLER?
23              MS. KREVANS:  WE ARE, YOUR HONOR.
24              THE COURT:  ALL RIGHT.
25              MR. MCELHINNY:  YOUR HONOR, ONE -- YOUR
```

1    HONOR --

2              THE COURT:  WHAT'S THAT?

3              MR. MCELHINNY:  MAY WE HAVE YOUR RUNNING

4    TIME TOTALS, PLEASE?

5              THE COURT:  YES.  APPLE, WITH THE 19

6    MINUTES THAT WERE DEDUCTED FOR YOUR RECONSIDERATION

7    OF DISCOVERY MOTIONS, HAS USED 6 HOURS AND 9

8    MINUTES.  SAMSUNG HAS USED 6 HOURS AND 27 MINUTES.

9    WELL, LESS THE 2 TODAY.  29 MINUTES.

10              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

11              THE COURT:  OKAY.  IF WE CAN BRING IN THE

12    JURY.

13              (WHEREUPON, THE FOLLOWING PROCEEDINGS

14    WERE HELD IN THE PRESENCE OF THE JURY:)

15              THE COURT:  OKAY.  WELCOME BACK.  IT IS

16    NOW 9:12 AND WE'RE CONTINUING WITH MR. BRESSLER'S

17    REDIRECT.

18              AND, SIR, YOU ARE STILL UNDER OATH.

19    OKAY.

20                     **PETER BRESSLER,**

21    BEING RECALLED AS A WITNESS ON BEHALF OF THE

22    PLAINTIFF, HAVING BEEN PREVIOUSLY SWORN, WAS

23    FURTHER EXAMINED AND TESTIFIED AS FOLLOWS:

24              THE COURT:  GO AHEAD, PLEASE.

25              **REDIRECT EXAMINATION** (RESUMED)

```
 1    BY MS. KREVANS:

 2    Q    GOOD MORNING, MR. BRESSLER.

 3    A    GOOD MORNING.

 4    Q    DO YOU REMEMBER THAT YESTERDAY WHEN WE LEFT

 5    OFF, I WAS JUST ASKING YOU SOME FOLLOW-UP QUESTIONS

 6    ABOUT THE LEGAL STANDARDS THAT YOU APPLIED IN

 7    FORMING YOUR OPINIONS.

 8    A    I BELIEVE SO.

 9    Q    AND I WANT TO ASK YOU ONE LAST QUESTION ABOUT

10    THAT.

11             IF WE COULD SEE PAGES -- PAGE 7 AND THEN

12    PAGE 8 OF MR. BRESSLER'S REPORT THAT WE WERE

13    LOOKING AT YESTERDAY AFTERNOON.  SO STARTING ON

14    PAGE 7 WAS WHERE YOU STARTED TO SET OUT THE LAW, I

15    THINK YOU SAID AT PARAGRAPH 22.

16    A    YES.

17    Q    LET'S GO TO THE NEXT PAGE, PAGE 8, AND LOOK AT

18    PARAGRAPH 25, WHICH WAS THE PARAGRAPH MR. VERHOEVEN

19    ASKED YOU SOME QUESTIONS ABOUT.

20             I WANT TO ASK YOU ABOUT ONE SENTENCE FROM

21    PARAGRAPH 25 THAT MR. VERHOEVEN MENTIONED.

22             DO YOU SEE IN THE MIDDLE OF THE

23    PARAGRAPH, IT SAYS, "IF THE ACCUSED DESIGN HAS

24    COPIED A PARTICULAR FEATURE OF THE CLAIMED DESIGN

25    THAT PARTS CONSPICUOUSLY IDENTIFY THE PRIOR ART,
```

1    THE ACCUSED DESIGN IS NATURALLY MORE LIKELY TO BE

2    REGARDED AS DECEPTIVELY SIMILAR TO THE CLAIMED

3    DESIGN, AND THUS INFRINGING."

4         WAS THAT PART OF THE LEGAL TEST THAT YOU

5    APPLIED IN FORMING YOUR OPINIONS?

6    A    ABSOLUTELY.

7    Q    OKAY.  DO YOU RECALL THAT MR. VERHOEVEN ASKED

8    YOU SOME QUESTIONS ABOUT WHETHER, ON THE SAMSUNG

9    PHONES, AND HE HAD A SLIDE ABOUT THIS WITH A BLUE

10   LINE THAT WENT ACROSS THE FACE, IF YOU RAN YOUR

11   FINGER ACROSS THE PHONE, YOU COULD FEEL THAT BEZEL

12   PROTRUDED A LITTLE BIT ABOVE THE GLASS SURFACE OF

13   THE PHONE.

14   A    YES.

15   Q    DO YOU RECALL THAT?

16   A    I DO.

17   Q    OKAY.  IS THE TEST FOR DESIGN INFRINGEMENT A

18   TEST ABOUT WHAT A PRODUCT FEELS LIKE IF YOU RUN

19   YOUR FINGERS OVER IT, OR IS IT A TEST OF THE VISUAL

20   IMPRESSION THE PRODUCT MAKES.

21        MR. VERHOEVEN:  OBJECTION.  LEADING.

22        THE COURT:  SUSTAINED.

23   BY MS. KREVANS:

24   Q    WHAT IS THE TEST FOR WHETHER A DESIGN IS

25   SUBSTANTIALLY SIMILAR TO A DESIGN OF A PATENT,

```
 1    MR. BRESSLER?

 2              MR. VERHOEVEN:  OBJECTION.  CALLS FOR

 3    LEGAL CONCLUSION.

 4              THE COURT:  SUSTAINED.

 5    BY MS. KREVANS:

 6    Q    WHAT'S THE TEST THAT YOU APPLIED,

 7    MR. BRESSLER, TO DETERMINE WHETHER THE DESIGN OF

 8    THE SAMSUNG PHONES APPLIED -- WAS THE DESIGN OF THE

 9    IPHONE PATENTS?

10              MR. VERHOEVEN:  ASKED AND ANSWERED.

11              THE COURT:  I'LL ALLOW IT.

12              GO AHEAD.  OVERRULED.

13              THE WITNESS:  COULD YOU REPEAT IT,

14    PLEASE?  SORRY.

15    BY MS. KREVANS:

16    Q    WHAT WAS THE TEST, BRIEFLY, THAT YOU APPLIED

17    IN DETERMINING WHETHER THE SAMSUNG PHONES INFRINGED

18    THE APPLE DESIGN PATENTS?

19    A    THE TEST THAT I APPLIED, BRIEFLY, WAS THAT THE

20    APPEARANCE OF THE ACCUSED PHONES SHOULD LOOK LIKE

21    THE APPEARANCE THAT AN ORDINARY OBSERVER WOULD --

22    OR AN ORDINARY OBSERVER WOULD THINK THE APPEARANCE

23    OF THE ACCUSED PHONES LOOKED LIKE THE APPEARANCE

24    DEPICTED IN THE DESIGN PATENT.

25    Q    OKAY.  NOW, DO YOU RECALL THAT MR. VERHOEVEN
```

1    ACTUALLY SHOWED YOU, DURING YOUR CROSS-EXAMINATION,

2    THE FRONT FACES OF A NUMBER OF PHONES UP ON THE

3    SCREEN?

4    A    YES.

5    Q    AND ONE OF THOSE WAS THE PRADA?

6    A    YES.

7    Q    IS THE PRADA IN FRONT OF YOU RIGHT NOW,

8    MR. BRESSLER?

9    A    YES, THERE IS ONE HERE.

10   Q    IS, IS THE PRADA A PHONE THAT IS PRIOR ART TO

11   THE APPLE DESIGN PATENTS?

12           MR. VERHOEVEN:  OBJECTION.  CALLS FOR A

13   LEGAL CONCLUSION.

14           THE COURT:  SUSTAINED.

15   BY MS. KREVANS:

16   Q    MR. BRESSLER, BASED ON THE INFORMATION

17   AVAILABLE TO YOU, MR. BRESSLER, WAS THE PRADA

18   PUBLICLY DISPLAYED OR SOLD IN THE UNITED STATES

19   BEFORE THE APPLICATION DATE OF THE APPLE IPHONE

20   DESIGN PATENTS?

21   A    I HAVE BEEN INFORMED THAT IT WAS NOT.

22   Q    OKAY.  DO YOU THINK, IN YOUR OPINION, THAT THE

23   DESIGN OF THE PRADA THAT YOU'RE HOLDING IN YOUR

24   HAND IS SUBSTANTIALLY SIMILAR TO THE DESIGN OF THE

25   APPLE IPHONE PATENT?

1      A     I DO NOT.

2             MS. KREVANS:  YOUR HONOR, MAY I PASS THE

3      PRADA AROUND TO THE JURY?

4             THE COURT:  ANY OBJECTION?

5             MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.

6             THE COURT:  GO AHEAD, PLEASE.

7             DO YOU WANT TO SEE THIS PRADA?

8             MR. VERHOEVEN:  SHE HAS SHOWED IT TO ME.

9             MS. KREVANS:  I SHOWED IT TO HIM IN

10     ADVANCE.

11            AND MAY I ALSO PASS OUT THE IPHONE?

12            THE COURT:  SHOW IT TO MR. VERHOEVEN.

13            MR. VERHOEVEN:  NO OBJECTION.

14            MS. KREVANS:  I SHOWED IT TO HIM.

15            THE COURT:  GO AHEAD.

16     BY MS. KREVANS:

17     Q     DO YOU RECALL WHEN MR. VERHOEVEN WAS SHOWING

18     YOU THE SLIDES OF THOSE FRONT FACES, YOU TOLD HIM

19     YOU DIDN'T THINK IT WAS PROPER JUST TO LOOK AT THE

20     FRONT VIEW.

21            WHY DID YOU SAY THAT?

22     A     IT'S MY UNDERSTANDING THAT THE ANALYSIS IS

23     CONDUCTED WITH ALL OF THE VIEWS OF THE PATENT IN

24     EACH INDIVIDUAL CASE, NOT USING A SINGLE VIEW,

25     ACTUALLY VIEWING A SINGLE VIEW DISTORTS ONE'S

 1   UNDERSTANDING OF THE DESIGN.

 2   Q    OKAY.  LET'S LOOK AT ONE OF THE PHONES, ONE OF

 3   THE DESIGNS THAT MR. VERHOEVEN SHOWED YOU.  THIS

 4   WAS DX 511.

 5           COULD WE SEE THAT?  IT'S ALSO IN YOUR

 6   BINDER, MR. BRESSLER.

 7           IF YOU START AT THE FIRST PAGE, PLEASE,

 8   THOMAS, AND LET'S JUST WALK THROUGH THE VIEWS.

 9   DON'T BLOW IT UP BECAUSE THEN IT'LL -- WE BEGIN

10   SEEING EXACTLY WHAT'S THERE.

11           JUST FOLLOWING ALONG ON THE SCREEN,

12   MR. BRESSLER, COULD YOU JUST BRIEFLY TELL US, AS WE

13   GO THROUGH THESE PAGES, WHAT WE'RE LOOKING AT HERE.

14   THIS IS THE JAPANESE '638 PATENT FOR THE RECORD.

15   A    YES.  AND THIS IS THE JAPANESE NON-TRANSLATED

16   VERSION.

17   Q    IT'S PICTURES, SO WE CAN LOOK AT THEM IN

18   JAPANESE, RIGHT?

19   A    EXACTLY.

20   Q    OKAY.

21   A    THIS IS ACTUALLY TWO THREE-QUARTER FRONT

22   VIEWS.  THE UPPER ONE IS SHOWING IT IN A DEPLOYED

23   MODE BECAUSE THIS IS A SLIDER PHONE.

24           THE SECOND ONE SHOWING IT IN THE CLOSED

25   MODE.

1343

```
1    Q    OKAY.  LET'S SEE THE NEXT PAGE, THOMAS.

2              WHAT DO WE SEE HERE?

3    A    THIS IS A DEAD-ON FRONT VIEW OF THE PHONE.

4    Q    OKAY.

5    A    AND A DEAD-ON BACK VIEW OF THE PHONE.

6    Q    UM-HUM.

7    A    AND THEN IT APPEARS IT IS A DEAD-ON TOP VIEW

8    OF THE PAGE.

9    Q    OKAY.  NEXT PAGE, PLEASE, THOMAS.

10             WHAT DO WE HAVE HERE?

11   A    THE NEXT FIGURE WOULD BE THE BOTTOM VIEW, AND

12   LET ME GET MY ORIENTATION CORRECT, BUT I BELIEVE

13   THIS IS THE LEFT-HAND VIEW, DEPENDING ON WHICH WAY

14   YOU ARE FACING.  AND THE OTHER ONE IS THE

15   RIGHT-HAND VIEW.

16   Q    AND WHAT DO YOU SEE IN THESE EIGHT VIEWS, IF

17   ANYTHING, THAT YOU COULD NOT SEE IN JUST THE FRONT

18   VIEW?

19   A    IMMEDIATELY WHAT YOU SEE IS THE DIMENSIONALITY

20   OF THE PHONE, MEANING THAT THE PHONE CAN BE SEEN TO

21   NOT BE A DEVICE THAT'S ABSOLUTELY FLAT.

22             YOU CAN SEE THAT THE FRONT END -- AND IF

23   YOU CAN GO BACK TO THE THREE-QUARTER VIEW, I THINK

24   IT'S MOST EASILY DEMONSTRATED VIEW.

25   Q    THOMAS, CAN YOU GO BACK TO THE THREE-QUARTER
```

1    VIEW.  ONE BEFORE THAT.

2    A    RIGHT.  I THINK YOU CAN SEE THAT IN THESE

3    VIEWS THAT LOOKING AT IT FACE ON, ONE COULD

4    MISUNDERSTAND WHAT THIS DESIGN IS, AND NOT

5    UNDERSTAND THAT IT IS A DIMENSIONAL FACE THAT, IN

6    FACT, IS NOT CONTINUOUS FLAT ALL THE WAY ACROSS THE

7    FRONT, THAT THERE ARE NO INDICATIONS THAT IT'S

8    EITHER REFLECTIVE OR GLASSY OR TRANSPARENT; AND

9    THAT IT'S NOT BLACK OR NOT SPECIFIED TO BE BLACK.

10            AND IF YOU LOOK CLOSELY AT THE PIECE OF

11   MATERIAL AROUND IT, ONE CAN HAVE A DEBATE WHETHER

12   THAT'S, IN FACT, A BEZEL OR A FRONT COVER OF THE

13   FRONT PART OF THE PHONE.

14   Q    OKAY.  LET'S LOOK AT ONE MORE EXAMPLE OF THE

15   PHONE, THE PICTURES THAT MR. VERHOEVEN SHOWED YOU.

16            COULD WE SEE DX 728.  AND, AGAIN, LET'S

17   WALK QUICKLY THROUGH THE VIEWS.  THIS IS, FOR THE

18   RECORD, THE JAPANESE '383 PATENT.

19            BRIEFLY, COULD YOU WALK US THREE THESE

20   VIEWS, MR. BRESSLER?

21   A    YES.  THE FIRST PAGE HERE SHOWS THE FRONT

22   THREE-QUARTER VIEW AND THE FRONT HEAD-ON VIEW OF

23   THIS PHONE, WHICH IS ACTUALLY IN THE SPECIFICATION,

24   THIS IS DESCRIBED AS TWO SEPARATE PARTS.  THERE'S

25   AN INTERNAL PHONE COMPONENT THAT THERE'S AN

1    EXTERNAL COVER COMPONENT.

2    Q    OKAY.

3    A    THAT'S TRANSPARENT.

4    Q    LET'S SEE THE NEXT VIEW.

5           WHAT'S HERE?

6    A    THIS VIEW, I BELIEVE, IS A BACK VIEW AND A TOP

7    VIEW.

8    Q    OKAY.  LET'S SEE THE NEXT PAGE, THOMAS.

9           WHAT IS THIS?

10   A    THIS, I BELIEVE, IS A BOTTOM VIEW AND A

11   SIDE -- AND A LEFT SIDE VIEW, RIGHT SIDE VIEW.

12   Q    OKAY.  AND THE NEXT PAGE, THOMAS?

13   A    IS THE OTHER SIDE VIEW.

14          AND THE NEXT PART IS A SECTION.  NOW, A

15   SECTION IS WHERE YOU SLICE THE OBJECT IN THE PATH

16   POTENTIALLY AND YOU CAN GET TO LOOK AT WHAT IT

17   LOOKS LIKE FROM THE END OF THE SLICE OF BOLOGNA, IF

18   YOU WILL.

19   Q    OKAY.  SO THAT'S NOT WHAT AN ORDINARY OBSERVER

20   WOULD SEE?

21   A    USUALLY, NO.

22   Q    UNLESS WE CUT OUR PHONES IN HALF?

23   A    RIGHT.

24   Q    OKAY.  LET'S LOOK AT THE NEXT PAGE.  WHAT DO

25   WE SEE HERE?

```
1    A     THIS IS A THREE-QUARTER FRONT VIEW, THE TOP IS
2    A THREE-QUARTER FRONT VIEW OF THE CORNER, AND THE
3    TOP IS THE THREE-QUARTER FRONT VIEW OF THE ACTUAL
4    ELECTRONIC DEVICE ITSELF.
5    Q     OKAY.  SO IN THAT ONE, THAT'S THE ONE WE'RE
6    SEEING THE ACTUAL ELECTRONIC DEVICE?
7    A     CORRECT.
8    Q     AND COULD YOU TELL US ABOUT THAT?
9    A     YES.  IN MY REVIEW OF THIS PATENT, I
10   DETERMINED THAT THE ELECTRONIC DEVICE ITSELF HAD A
11   TRANSPARENT AREA OVER THE DISPLAY WHICH RAN EDGE TO
12   EDGE ALL THE WAY ACROSS THAT WAS BALANCED IN THE
13   MIDDLE.
14         BUT IF YOU LOOK AT THE EDGE, WHICH IS AN
15   INTERESTING DEPICTION BECAUSE WHAT THOSE LINES ARE
16   ACTUALLY SHOWING -- I'M SORRY.  IT'S HARD TO
17   DESCRIBE THIS WITH LOOKING WITHOUT A POINTER, BUT
18   THERE ARE LINES THAT SURROUND THE CIRCUMFERENCE OF
19   THE FACE AND THERE ARE ACTUALLY TWO LINES.  THERE'S
20   AN INNER LINE AND THERE'S AN OUTER LINE.
21         ONE COULD MISTAKE THOSE FOR A BEZEL.
22   Q     WHAT ARE THEY, IN FACT, IN YOUR VIEW?
23   A     IN MY VIEW, THOSE ARE THE POINTS WHERE THE
24   CURVED CORNER MEETS THE FLAT SURFACE AND WHEN
25   YOU'RE CREATING A DIAGRAM LIKE THIS WITH A
```

1    COMPUTER, THE COMPUTER SHOWS THOSE LINES AS THE

2    TANGENCY OF WHERE THE RADIUS MEETS THE FLAT

3    SURFACE, THE TANGENCY IS THAT POINT WHERE RADIUS

4    TURNS INTO THE FLAT.

5             SO IT'S SHOWING BOTH ENDS OF THE RADIUS

6    IS BASICALLY WHAT THAT'S SHOWING, AND THAT CAN BE

7    SEEN IF YOU GO BACK TO A PRIOR VIEW.

8    Q    OKAY.

9    A    IF YOU WILL.

10   Q    WHICH VIEW DO YOU WANT TO LOOK AT?

11   A    THAT ONE IS FINE.

12            THE TOP VIEW AND/OR BOTTOM VIEW, YOU CAN

13   SEE THAT THE SHAPE OF THE INSIDE BOX ACTUALLY HAS A

14   RADIUS IN THE TOP LEFT CORNER IF YOU'RE LOOKING AT

15   THE TOP ONE OR THE TOP LEFT CORNER IF YOU'RE

16   LOOKING AT THE BOTTOM ONE.  SO MY READ IS THAT'S A

17   RADIANT CORNER, NOT A BEZEL.

18   Q    OKAY.  LET'S GO BACK TO THE OTHER VIEW.

19   LOOKING AT THE ACTUAL DEVICE THAT'S SHOWN BY ITSELF

20   IN THE BOTTOM THERE.  DOES THAT HAVE A SURFACE

21   THAT'S CONTINUOUS ACROSS THE ENTIRE FACE, EDGE TO

22   EDGE EVERYWHERE?

23   A    IT HAS A FLAT FRONT SURFACE, BUT IT IS NOT

24   CONTINUOUS.  THERE IS A TRANSPARENT DISPLAY AREA

25   AND AN AREA ABOVE AND BELOW THAT ARE NOT INDICATED

1    TO BE TRANSPARENT; THEREFORE, ONE WOULD EXPECT THEM

2    TO BE ANYTHING, AND IT COULD BE OPAQUE.

3    Q    OKAY.  ONE QUESTION ABOUT THE '889 PATENT.

4    COULD WE SEE PDX 26.6, PLEASE.  IS THIS ALL OF THE

5    FIGURES SHOWN IN THE DESIGN OF THE '889 PATENT,

6    MR. BRESSLER?

7    A    YES.

8    Q    IN YOUR VIEW, AS A DESIGNER WHAT HAS WORKED

9    WITH CONSUMERS, WOULD ALL NINE OF THESE VIEWS OF

10   THE DEVICE, BECAUSE WE'RE IGNORING THE MAN, WOULD

11   ALL NINE OF THESE VIEWS BE EQUALLY IMPORTANT IN

12   FORMING AN OVERALL VISUAL IMPRESSION?

13              MR. VERHOEVEN:  OBJECTION.  LEADING.

14              THE COURT:  OVERRULED.

15              THE WITNESS:  ALL OF THESE VIEWS ARE

16   EQUALLY IMPORTANT IN THE DESIGNER'S ANALYSIS OF THE

17   PATENT.

18              THEY ARE, HOWEVER, IN MY OPINION NOT

19   EQUALLY IMPORTANT IN FORMING THE OVERALL IMPRESSION

20   HELD BY THE ORDINARY OBSERVER.

21              IT'S -- WOULD YOU LIKE IT BRIEF OR --

22   BY MS. KREVANS:

23   Q    A BRIEF EXPLANATION OF WHY PLEASE.

24   A    OKAY.  I BELIEVE THAT THE DEPARTURE, THE

25   DESIGN DEPARTURE THAT'S DEPICTED IN THIS PATENT,

```
 1    WHICH IS THE CONTINUOUS FLAT, CLEAR, EDGE-TO-EDGE
 2    GLASS FRONT SURFACE, AT THE TIME OF THIS PATENT,
 3    WAS SUCH A VISUAL DEPARTURE, AND I BELIEVE EVEN NOW
 4    IN THE PRODUCTS THAT ARE AVAILABLE IN THE MARKET,
 5    THE FACT THAT THAT'S A CONTINUOUS SHEET OF GLASS
 6    ACROSS THE WHOLE FRONT OF THE SURFACE I BELIEVE IS
 7    SUCH A DESIGN DEPARTURE THAT IT IS THE MAJOR DRIVER
 8    OF THE OVERALL IMPRESSION, SUCH THAT THE OTHER
 9    VIEWS, THOUGH THEY'RE PART OF THE IMPRESSION, I
10    BELIEVE THEY ASSUME LESS IMPORTANCE IN ONE'S MIND
11    WHEN ONE'S VIEWING THAT PRODUCT.
12              MS. KREVANS:  THANK YOU, MR. BRESSLER.
13              PASS THE WITNESS.
14              THE COURT:  ALL RIGHT.  IT'S NOW 9:27.
15              ANY RECROSS?
16              MR. VERHOEVEN:  JUST A FEW MINUTES, YOUR
17    HONOR.
18              THE COURT:  OKAY.  GO AHEAD, PLEASE.
19              MR. VERHOEVEN:  CAN WE PUT UP DX 511,
20    PLEASE.
21                      RECROSS-EXAMINATION
22    BY MR. VERHOEVEN:
23    Q    GOOD MORNING, MR. BRESSLER.
24    A    GOOD MORNING.
25    Q    WE JUST LOOKED AT THIS.  I THINK WE LOOK ADD,
```

1350

```
1    OR COUNSEL FOR APPLE DIRECTED TO YOU PAGE 2; IS
2    THAT RIGHT?
3    A    YES.
4    Q    AND CAN WE -- MR. FISHER, CAN WE PULL UP THE
5    BOTTOM IMAGE AND BLOW IT UP AND MAKE IT BIG?
6              AND IF IT'S POSSIBLE, MR. FISHER, CAN WE
7    SHOW THE '087 PATENT, JX 1041, AND PULL OUT AN
8    IMAGE FROM THERE OF THE FRONT SCREEN?  ACTUALLY,
9    LET'S GO BACK ONE, PLEASE.
10              LET'S TAKE FIGURE 1 BECAUSE THAT'S
11   SLIGHTLY ORIENTED IN THE WAY THAT IT'S SLIGHTLY
12   TILTED AS WELL.
13              I DON'T KNOW IF WE CAN PUT THOSE TWO ON
14   THE SAME SCREEN.  THERE WE GO.
15              NOW, YOU JUST TESTIFIED THAT IT WAS
16   IMPORTANT TO LOOK AT OTHER ANGLES BESIDES THE FRONT
17   ANGLE; CORRECT?
18   A    YES.
19   Q    NOW, WE CAN SEE IN THE '087 PATENT -- AND I
20   BELIEVE YOU TESTIFIED TO THIS -- BUT THERE'S DOTTED
21   LINES AROUND THE BACK OF THE PHONE.
22   A    THAT'S CORRECT.
23   Q    AND SO YOU'RE NOT SAYING WE SHOULD LOOK AT
24   THE, AT ANYTHING BELOW THE BEZEL IN THE '087;
25   RIGHT?
```

1    A    THAT'S CORRECT.

2    Q    ALL THOSE DOTTED LINES WE SHOULD IGNORE;

3    RIGHT?

4    A    YES.

5    Q    THAT'S NOT BEING CLAIMED; RIGHT?

6    A    CORRECT.  THEY WERE THERE ONLY FOR REFERENCE.

7    Q    SO IT'S JUST THE FRONT AND THE BEZEL

8    SURROUNDING IT THAT'S BEING CLAIMED; RIGHT?

9    A    CORRECT.

10   Q    AND THAT'S WHAT WE SHOULD LOOK AT?

11   A    YES.

12   Q    SO IF WE LOOK AT THE DX 511, THE PRIOR ART

13   DESIGN PATENT, THE FACT THAT IT'S THICKER AND HAS A

14   DIFFERENT SHAPE ON THE DOWNWARD SIDES AND BACK IS

15   IRRELEVANT; RIGHT?

16   A    THAT'S CORRECT.

17   Q    OKAY.  SO YOUR POINT IS JUST LOOKING AT THE

18   FRONT, IF YOU LOOK AT DX 511, THE DESIGN PATENT,

19   THE PRIOR ART DESIGN PATENT, IT'S NOT ABSOLUTELY

20   FLAT ALL THE WAY ACROSS THE FRONT; RIGHT?

21   A    THAT'S CORRECT.

22   Q    SO WE'RE TALKING ABOUT RIGHT HERE

23   (INDICATING), RIGHT?

24   A    AND BELOW.

25   Q    THE TOP AND BOTTOM THERE, RIGHT?

1    A    CORRECT.

2    Q    SO THAT LITTLE DIFFERENCE, IN YOUR OPINION,

3    MAKES THIS JAPANESE DESIGN PATENT NOT SUBSTANTIALLY

4    SIMILAR TO THE '087; RIGHT?

5    A    I BELIEVE THAT THE OVERALL IMPRESSION THAT

6    THAT CHANGE IN SURFACE WILL CREATE IN THE CONTEXT

7    OF THOSE PATENTS WILL BE SIGNIFICANT.

8    Q    SUCH THAT THE ORDINARY OBSERVER WILL SAY THESE

9    TWO AREN'T SUBSTANTIALLY SIMILAR?

10   A    CORRECT.

11   Q    OKAY.  NOW, CAN WE GO TO DX 728.

12            THIS IS THE SECOND DESIGN PATENT THAT

13   COUNSEL FOR APPLE JUST SHOWED YOU.

14            GO TO PAGE 6, PLEASE.

15            DO YOU REMEMBER LOOKING AT THIS?

16   A    YES.

17   Q    AND CAN WE BLOW UP THE BOTTOM IMAGE AND PUT UP

18   AN IMAGE FROM THE '087, JX 1041 NEXT TO IT.

19            WHY DON'T WE DO THIS ONE, FIGURE 9,

20   BECAUSE IT'S ORIENTED SOMEWHAT SIMILARLY.

21            OKAY.  NOW, YOU SAID -- DO YOU SEE THAT

22   IN PAGE 6, THE FIGURE WE'VE BLOWN UP HERE, HAS TWO

23   LINES THAT GO ALL THE WAY AROUND THE EDGE OF THE

24   FRONT SURFACE?  DO YOU SEE THAT?

25   A    I DO.

```
1    Q    AND IF YOU LOOK AT FIGURE 9, YOU ALSO SEE TWO

2    LINES THAT GO ALL THE WAY AROUND THE EDGE OF THE

3    FRONT SURFACE.  DO YOU SEE THAT, SIR?

4    A    I DO.

5    Q    NOW, YOU'RE SAYING, WELL, I INTERPRET THESE

6    TWO LINES AS NOT BEING A BEZEL, BUT, IN FACT, THEY

7    BOTH DEPICT TWO LINES IN PARALLEL, EQUAL LENGTH

8    GOING ALL THE WAY AROUND THE FRONT SURFACE, DON'T

9    THEY, SIR?

10   A    ONE DOES NOT INTERPRET THE PATENT USING SINGLE

11   VIEWS.

12   Q    SIR, YES OR NO?  DO THEY BOTH DEPICT TWO LINES

13   IN PARALLEL OF EQUAL DISTANCE APART GOING ALL THE

14   WAY AROUND THE EDGE OF THE FRONT SURFACE?  YES OR

15   NO?

16   A    IF YOU'RE ASKING ME IF THE TWO LINES ARE

17   PARALLEL AROUND THE FRONT SURFACE, THE ANSWER IS

18   YES.

19   Q    NOW, YOU TESTIFIED THAT YOU INTERPRET THIS,

20   AND I'M POINTING TO PAGE 6 OF EXHIBIT 729, THE

21   FIGURE WE'VE BLOWN UP, YOU'VE INTERPRETED THIS AS

22   NOT BEING A BEZEL; RIGHT?

23   A    THAT'S CORRECT.

24   Q    AND IN YOUR OPINION, IF THIS ISN'T A BEZEL,

25   THAT TAKES IT OUT FROM BEING SUBSTANTIALLY SIMILAR;
```

1    RIGHT?

2    A    CORRECT.

3              MR. VERHOEVEN:  OKAY.  NO FURTHER

4    QUESTIONS, YOUR HONOR.

5              THE COURT:  ALL RIGHT.  THE TIME IS NOW

6    9:32.  MAY THIS WITNESS BE EXCUSED?

7              MR. VERHOEVEN:  SUBJECT TO RECALL, YOUR

8    HONOR.

9              THE COURT:  SUBJECT TO RECALL, YOU ARE

10   EXCUSED.

11             MS. KREVANS:  YOUR HONOR, I HAD ONE

12   FURTHER QUESTION FOR THE WITNESS.

13             THE COURT:  OKAY.  GO AHEAD.  IT'S NOW

14   9:32.

15             MS. KREVANS:  CAN WE PUT THAT SLIDE BACK

16   UP, THE ONE THAT WE JUST HAD ON THE SCREEN.

17                **FURTHER REDIRECT EXAMINATION**

18   BY MS. KREVANS:

19   Q    MR. BRESSLER, ARE YOUR VIEWS ABOUT THE BEZEL

20   IN THE PATENT THAT WE'RE LOOKING AT RIGHT NOW THE

21   ONLY REASON THAT YOU THINK IT'S NOT SUBSTANTIALLY

22   SIMILAR TO THE '087 DESIGN?

23             MR. VERHOEVEN:  OBJECTION.  LEADING.

24             THE COURT:  SUSTAINED.

25   BY MS. KREVANS:

1    Q    MR. BRESSLER, CAN YOU TELL US WHETHER THERE

2    ARE ANY REASONS, OTHER THAN THE OPINION YOU JUST

3    GAVE ABOUT THE ABSENCE OF A BEZEL, THAT YOU DO NOT

4    THINK THE PATENT WE'RE LOOKING AT RIGHT NOW ON THE

5    SCREEN IS SUBSTANTIALLY SIMILAR TO THE IPHONE '087

6    PATENT?

7    A    YES.  THERE ARE A COUPLE OF OTHERS.

8    Q    BRIEFLY, WHAT ARE THEY?

9    A    ONE IS THIS DOES NOT HAVE A LOZENGE EAR SLOT

10   AS THE '087 DOES; AND -- WHAT WAS THE OTHER ONE I

11   WAS JUST THINKING OF?  OH, AND THE '087 IS NOT

12   SPECIFIED TO BE TRANSPARENT ACROSS THE DISPLAY

13   AREA.

14   Q    AND IS THAT WHAT'S SPECIFIED HERE?

15   A    YES.

16            MS. KREVANS:  THANK YOU.

17            THE COURT:  ALL RIGHT.  IT'S NOW 9:33.

18   ANY FURTHER RECROSS?

19            MR. VERHOEVEN:  NO, YOUR HONOR.

20            THE COURT:  OKAY.  SO YOU ARE EXCUSED

21   SUBJECT TO RECALL.  YOU MAY STEP DOWN.

22            THE WITNESS:  THANK YOU.

23            THE COURT:  IF YOU WOULD, PLEASE, CALL

24   YOUR NEXT WITNESS.

25            MS. KREVANS:  APPLE CALLS DR. SUSAN KARE,

```
 1      YOUR HONOR.

 2              THE CLERK:  RAISE YOUR RIGHT HAND,

 3      PLEASE.

 4                      SUSAN KARE,

 5      BEING CALLED AS A WITNESS ON BEHALF OF THE

 6      PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

 7      EXAMINED AND TESTIFIED AS FOLLOWS:

 8              THE WITNESS:  YES.

 9              THE CLERK:  WOULD YOU HAVE A SEAT,

10      PLEASE.

11              THE COURT:  IT'S 9:35.

12              THE CLERK:  STATE YOUR NAME, PLEASE, AND

13      SPELL IT.

14              THE WITNESS:  SUSAN KARE, S-U-S-A-N,

15      K-A-R-E.

16                   DIRECT EXAMINATION

17      BY MS. KREVANS:

18      Q    GOOD MORNING, DR. KARE.

19      A    GOOD MORNING.

20      Q    WHAT DO YOU DO FOR A LIVING, DR. KARE?

21      A    I'M A GRAPHIC DESIGNER, AND I SPECIALIZE IN

22      USER INTERFACE SCREEN GRAPHICS AND ICONS.

23      Q    AND WHAT DO YOU MEAN BY "ICONS"?

24      A    I MEAN SMALL PICTORIAL ELEMENTS THAT SYMBOLIZE

25      CONCEPTS, FREQUENTLY USED ON DIFFERENT KINDS OF
```

1    DISPLAY SCREENS.

2    Q    COULD YOU DESCRIBE YOUR EDUCATION FOR US?

3    A    I HAVE AN UNDERGRADUATE DEGREE FROM MT. HOLY

4    OKE COLLEGE AND A MASTER'S AND PH.D. FROM NEW YORK

5    UNIVERSITY.

6    Q    AND WHAT FIELD WAS YOUR PH.D. IN?

7    A    IT WAS IN ART HISTORY IN A FINE ARTS

8    DEPARTMENT.

9    Q    WHEN DID YOU START WORK IN THE FIELD OF ICONS

10   AND GRAPHICS?

11   A    WHEN I WAS HIRED AT APPLE IN 1982.

12   Q    AND COULD YOU TELL US ABOUT YOUR CAREER, JUST

13   BRIEFLY JUST US AN OVERVIEW, STARTING WHEN YOU

14   STARTED WITH APPLE IN 1982, 30 YEARS AGO.

15   A    I STARTED AT APPLE IN '82.  I LEFT IN '86.  I

16   WORKED FOR A COUPLE YEARS AT NEXT COMPUTER.

17          AND THEN I STARTED MY OWN USER INTERFACE

18   GRAPHIC DESIGN PRACTICE WHERE I STILL WORK TODAY.

19   Q    OKAY.  WHAT DID YOU DO WHEN -- IN THE 30-SOME

20   YEARS YOU WERE AT APPLE?

21   A    I WORKED IN THE MACINTOSH SOFTWARE GROUP, AND

22   MY CARD WAS MACINTOSH ARTIST.

23   Q    OKAY.  AND WHAT DID YOU ACTUALLY DO, WHAT

24   KINDS OF THINGS DID YOU DO IN THAT JOB?

25   A    I DESIGNED MAC GRAPHICS, MADE UP OF SQUARE

```
 1    PIXELS FOR THE FIRST MACINTOSH COMPUTER AND TYPE

 2    FACES.

 3    Q    AND WHAT DID YOU DO AFTER YOU LEFT APPLE IN

 4    1986?

 5    A    I WORKED AT NEXT COMPUTER AS THE CREATIVE

 6    DIRECTOR.  I FOCUSSED MOSTLY ON THE LOGO AND

 7    MATERIALS.

 8    Q    OKAY.  AND --

 9    A    PRINTED MATERIALS AND THAT KIND OF

10    COMMUNICATIONS.

11    Q    AND SINCE 1986 WHEN YOU LEFT NEXT, HAVE YOU

12    BEEN SOLELY WITH YOUR OWN CONSULTING FIRM?

13    A    YES.

14    Q    AND WHAT KINDS OF -- I KNOW THIS IS A LONG

15    PERIOD BECAUSE '86 TO TODAY IS 20-SOME YEARS.  WHAT

16    KINDS OF THINGS DOES YOUR CONSULTING FIRM DO?

17    A    ALL KINDS OF SCREEN GRAPHICS.  WE DO ICON

18    WORK, A LOT OF ICON WORK, SCREEN-TYPE FACES,

19    WEBSITES, WATCHES, ALL KINDS OF DIFFERENT PROJECTS

20    FOR ALL KINDS OF CLIENTS.  LOGOS, TOO.

21    Q    WHAT -- AGAIN, I KNOW IT'S A LONG PERIOD.  CAN

22    YOU GIVE US AN EXAMPLE OF THE KINDS OF CLIENTS

23    YOU'VE WORKED FOR?

24    A    I'VE WORKED FOR MANY LARGE AND SMALL CLIENTS:

25    MICROSOFT; IBM, AUTO DESK; THOMPSON ROUTERS,
```

1    GLAM.COM, PAYPAL, FOSSIL.

2    Q    HAVE YOU DONE ANY WORK FOR APPLE?

3    A    NO.

4    Q    OKAY.  NOW, CAN YOU TELL US WHAT KINDS OF

5    PROJECTS YOU DO FOR YOUR CLIENTS IN YOUR DESIGN

6    FIRM?

7    A    TYPICALLY, BECAUSE OF OUR REPUTATION, WE DO A

8    LOT OF ICON DESIGN FOR ALL KINDS OF DIFFERENT

9    PRODUCTS, AND AS I MENTIONED, ALSO OTHER SCREEN

10   GRAPHICS, SAY, FOR WEBSITES OR DIFFERENT KINDS

11   OF -- ALL DIFFERENT KINDS OF DEVICES AND TYPE FACES

12   AND MANY ELEMENTS.

13   Q    IS THERE ANY WAY TO ESTIMATE HOW MANY ICONS

14   AND -- THAT YOU'VE DESIGNED OVER THE YEARS?

15   A    USUALLY, I WOULD SAY THOUSANDS OF ICONS FOR

16   HUNDREDS OF CLIENTS, BUT HAVEN'T KEPT A CAREFUL

17   LOG.

18   Q    OKAY.  IS THERE ANY WAY TO ESTIMATE HOW MANY

19   USER INTERFACES FOR ELECTRONIC DEVICE DISPLAY

20   SCREENS YOU'VE WORKED ON OVER THE YEARS?

21   A    YOU KNOW, I DON'T KNOW EXACTLY.  I MEAN, MORE

22   THAN TENS, LESS THAN HUNDREDS PROBABLY.

23   Q    DID YOU BRING US SOME EXAMPLES OF ICONS YOU'VE

24   DESIGNED?

25   A    I DID.  I HAVE ONE SLIDE JUST OF A FEW

1    REPRESENTATIVE SAMPLES.

2    Q    OKAY.  COULD WE SEE PDX 14.1, PLEASE.

3              ARE THESE ALL ICONS THAT YOU HAVE

4    DESIGNED?

5    A    YES.  AND SOME PLAYING CARDS.

6    Q    THOSE PLAYING CARDS LOOK FAMILIAR.  CAN YOU

7    TELL US WHAT THOSE ARE?

8    A    I DESIGNED THOSE FOR MICROSOFT IN THE '80S FOR

9    A SOLITAIRE DECK.  SO I KNOW THAT SOME NUMBER OF

10   PEOPLE HAVE SPENT SOME TIME WITH MY WORK.

11   Q    TOP LEFT, TOP ROW ON THE LEFT, WHAT ARE THOSE

12   ICONS?

13   A    THOSE WERE -- THOSE ARE FIVE FACEBOOK GIFT

14   ICONS.  I DESIGNED ABOUT A THOUSAND OF THOSE OVER

15   FOUR YEARS THAT PEOPLE SPENT A DOLLAR TO SEND TO

16   EACH OTHER.

17   Q    HAVE YOU RECEIVED ANY AWARDS OR RECOGNITION

18   FOR YOUR WORK IN THE ICON OR USER INTERFACE DESIGN

19   FIELD?

20   A    YES.  I RECEIVED A ROCKEFELLER FELLOWSHIP; I

21   RECEIVED THE CHRYSLER DESIGN AWARD; AND I RECEIVED

22   A CONGRESSIONAL APPOINTMENT TO THE CITIZEN'S

23   COINAGE ADVISORY COMMISSION.

24   Q    LET'S START WITH THE LAST ONE.  WHAT'S THE

25   CITIZEN'S COINAGE ADVISORY COMMITTEE?

```
 1     A    IT MET, WHEN I WAS A MEMBER, EVERY OTHER MONTH

 2     IN WASHINGTON, AND WE REVIEWED NEW DESIGNS FOR

 3     COINS, INCLUDING A LOT OF THE STATE QUARTERS.

 4     Q    AND WHAT WAS THE CHRYSLER AWARD?

 5     A    THAT WAS AN AWARD GIVEN TO SIX PEOPLE ANNUALLY

 6     BY THE CHRYSLER CORPORATION TO HONOR SIGNIFICANT

 7     CONTRIBUTIONS TO MODERN ARTS AND CULTURE, AND IT

 8     WAS AN HONOR BECAUSE A NUMBER OF MY DESIGN HEROS

 9     HAD RECEIVED THAT, PEOPLE LIKE FRANK GEARY, THE

10     ARCHITECT, AND THE INDUSTRIAL DESIGNER THAT LED THE

11     MARS PATHFINDER TEAM.  SO -- I KNOW, THAT WAS NICE

12     COMPANY TO BE ASSOCIATED WITH, AND I WAS GRATEFUL.

13     Q    NOW, YOU -- IF CHRYSLER GIVES THIS AWARD, YOU

14     HAVEN'T DESIGNED CARS, HAVE YOU?

15     A    NO, NOT YET.

16     Q    FOR WHAT DID YOU GET THE AWARD?

17     A    JUST FOR AN ENTIRE BODY OF WORK.  I ACTUALLY

18     SUBMITTED -- I MADE A BIG BOOK AND PUT ALL KINDS OF

19     WORK IN IT AND LOTS OF ICONS.

20     Q    IS YOUR DESIGN WORK FEATURES IN ANY TEXTBOOKS?

21     A    PROBABLY ABOUT HALF A DOZEN PHOTOGRAPHIC

22     DESIGN COLLEGE TEXTS, AND I KNOW ONE HISTORY OF

23     TYPOGRAPHY.

24     Q    OKAY.  HAS YOUR WORK BEEN FEATURED IN ANY

25     OTHER KINDS OF PUBLICATIONS?
```

1   A    MANY, MANY NEWSPAPERS AND MAGAZINES.  THE

2   NEW YORK TIMES REFERRED TO ME AS THE BETSY ROSS OF

3   THE PERSONAL COMPUTER.

4            AND P.C. WORLD CALLED ME ONE OF THE TOP

5   50 TECH VISIONARIES.

6            AND THERE HAVE BEEN ARTICLES ABOUT MY

7   WORK IN TIME, NEWSWEEK, FORBES, FORTUNE, PEOPLE.

8   MANY ART PUBLICATIONS.

9   Q    OVER THE --

10  A    OTHER INDUSTRIAL DESIGN MAGAZINES.

11  Q    SURE.  OVER THE COURSE OF YOUR CAREER, HAVE

12  YOU HAD EXPERIENCES THAT HAVE HELPED YOU LEARN HOW

13  ICONS AND SCREEN GRAPHICS WILL BE PERCEIVED BY

14  USERS, CONSUMERS?

15  A    YES, YES.

16  Q    CAN YOU TELL US ABOUT THAT EXPERIENCE?

17  A    BECAUSE I'VE WORKED WITH MANY, MANY CLIENTS,

18  I'M USUALLY PRIVY, IN THE ITERATION PROCESS, TO

19  DESIGNING A SET OF, SAY, ICONS TO WHATEVER KIND OF

20  DECISION MAKING PROCESS OR TESTING THEY DO.

21            FACEBOOK ACTUALLY WROTE A TOOL, WHEN WE

22  WERE DOING THE GIFTS, SO THAT I COULD LOOK REAL

23  TIME AT WHO WAS BUYING WHAT, YOU KNOW, STARTING --

24  BECAUSE THEY LAUNCHED A NEW ICON EVERY DAY.  SO

25  THAT WAS INTERESTING.

1    Q    DO YOU DO CONSUMER RESEARCH YOURSELF?

2    A    NO.

3    Q    SO HOW IS IT THAT YOU FIND OUT ABOUT CONSUMER

4    REACTIONS, IN ADDITION TO THE FACEBOOK EXPERIENCE?

5    HOW WOULD YOU KNOW WHAT THE CONSUMERS THINK OF

6    ICONS AND USER INTERFACES THAT YOU DESIGN FOR YOUR

7    CLIENTS?

8    A    WHAT, WHAT A PERSON THINKS OF A SYMBOL IS THE

9    HEART OF WHAT I DO, TRYING TO DEVELOP GOOD SYMBOLS

10   THAT ARE EASILY UNDERSTOOD, AND I HAVE SOME

11   PRACTICAL EXPERIENCE SEEING THINGS OUT IN THE WORLD

12   THAT I'VE DONE, BUT ALSO, AS I SAID, SOME OF MY

13   CLIENTS DO FORMAL RESEARCH, FOCUS GROUPS OR

14   INTERVIEWS AND WATCH USERS AND THEY SHARE THOSE

15   RESULTS WITH ME.

16   Q    AND IS THAT A REGULAR PART OF THE DESIGN

17   PROCESS?

18   A    WHEN THE -- IT DEPENDS ON THE CLIENT, BUT OUT

19   OF THE HUNDREDS OF CLIENTS I'VE WORKED WITH, SOME

20   OF THEM DO THAT KIND OF TESTING AND SOME OF THEM

21   DON'T.

22   Q    OKAY.

23        MS. KREVANS:  YOUR HONOR, WE WOULD TENDER

24   DR. KARE AS AN EXPERT IN THE DESIGN OF ICONS AND

25   SCREEN GRAPHICS.

```
 1            THE COURT:  ANY OBJECTION?
 2            MR. VERHOEVEN:  NO.  RESERVING OUR
 3   DAUBERT OBJECTION, NO FURTHER OBJECTIONS, YOUR
 4   HONOR.
 5            THE COURT:  ALL RIGHT.  SHE'S CERTIFIED.
 6            MS. KREVANS:  AND YOUR HONOR, I WOULD
 7   NOTE FOR THE RECORD, THERE WAS A DAUBERT MOTION
 8   WHICH WAS DENIED.
 9            THE COURT:  WE DON'T NEED TO GO INTO
10   THAT.
11            GO AHEAD WITH YOUR NEXT QUESTION, PLEASE.
12   BY MS. KREVANS:
13   Q    WHAT WERE YOU ASKED TO DO FOR THIS CASE,
14   DR. KARE?
15   A    I WAS ASKED MY OPINION ABOUT FOUR THINGS.
16   Q    AND WHAT WERE THOSE FOUR THINGS?
17   A    APPLE'S D'305 DESIGN PATENT; APPLE'S TRADE
18   DRESS FOR THE IPHONE; WHETHER I THOUGHT THERE WERE
19   VIABLE ALTERNATIVES TO IPHONE SCREEN GRAPHICS; AND
20   WHETHER I THOUGHT SAMSUNG COPIED APPLE'S SCREEN
21   GRAPHICS.
22   Q    ALL RIGHT.  LET'S TURN FIRST TO THE D'305
23   PORTION OF YOUR ANALYSIS.
24            AND IF YOU COULD LOOK AT EXHIBIT JX 1042
25   IN THE BINDER IN FRONT OF YOU.  WHAT IS JX 1042?
```

1    A    IT'S A UNITED STATES DESIGN PATENT, U.S.D.

2    604,305 S, FOR A GRAPHICAL USER INTERFACE FOR A

3    DISPLAY SCREEN OR PORTION THEREOF.

4              MS. KREVANS:  YOUR HONOR, WE'D MOVE JX

5    1042.

6              THE COURT:  ANY OBJECTION?

7              MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.

8              THE COURT:  IT'S ADMITTED.

9              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

10             1042, HAVING BEEN PREVIOUSLY MARKED FOR

11             IDENTIFICATION, WAS ADMITTED INTO

12             EVIDENCE.)

13   BY MS. KREVANS:

14   Q    OKAY.  IS THIS AN APPLE PATENT, MS. KARE?

15   A    YES.

16   Q    OKAY.  LOOKING AT THE RIGHT-HAND SIDE, ABOUT

17   THE MIDDLE OF THE FIRST PAGE WHERE IT SAYS CLAIM,

18   WHAT IS THE CLAIM IN THE D'305 APPLE DESIGN PATENT?

19   A    "THE ORNAMENTAL DESIGN FOR A GRAPHICAL USER

20   INTERFACE FOR A DISPLAY SCREEN OR PORTION THEREOF,

21   AS SHOWN AND DESCRIBED."

22   Q    IS THIS CLAIM SPECIFIC TO A PARTICULAR KIND OF

23   DISPLAY SCREEN?

24             THE COURT:  EXCUSE ME.  DOES ANYONE NEED

25   ANY CAFFEINE?  BECAUSE I NEED EVERYONE TO STAY

1    ALERT AND AWAKE.  ANYONE NEED ANY CAFFEINE?

2              WE'VE GOT CAFFEINATED DRINKS IN THE

3    REFRIGERATOR.  WE'RE NOT SUPPOSED TO DRINK THEM,

4    BUT I'M OKAY IF YOU NEED ONE.  ANYBODY?  NO.  OKAY.

5    GO AHEAD.

6    BY MS. KREVANS:

7    Q    LET ME STRIKE THAT AND ASK A NEW QUESTIONS SO

8    YOU HAVE IT IN MIND.

9              IS THIS CLAIM LIMITED TO ANY PARTICULAR

10   KIND OF GRAPHICAL USER INTERFACE FOR A DISPLAY

11   SCREEN?

12   A    IT DOESN'T SAY.  IT SAYS ORNAMENTAL DESIGN FOR

13   A DISPLAY SCREEN.

14   Q    OKAY.  UNDERNEATH THE CLAIM WHERE IT SAYS "AS

15   SHOWN AND DESCRIBED," IT HAS A LIST OF FIGURES.

16             DID YOU REVIEW THE FIGURES IN THIS

17   PATENT?

18   A    YES.

19   Q    OKAY.  COULD WE LOOK AT FIGURE 1 OF THE

20   PATENT, THOMAS?

21             IS FIGURE 1A -- WELL, WHAT ARE WE SEEING

22   ON THE SCREEN HERE, DR. KARE?

23   A    FIGURE 1 IS THE IMAGE THAT IS THE D'305

24   PATENT.  THAT'S THE GRAPHICAL USER INTERFACE

25   ORNAMENTAL DESIGN.

1    Q    OKAY.  WE JUST SAW ON THE SCREEN BOTH A BLACK

2    AND WHITE AND A COLOR VERSION OF FIGURE 1.  ARE

3    BOTH OF THOSE IN THE PATENT?

4    A    YES.

5    Q    OKAY.  LOOKING AT THE COLOR VERSION OF FIGURE

6    1, COULD YOU EXPLAIN TO THE JURY WHAT ARE THE

7    FEATURES IN FIGURE 1 THAT CONTRIBUTE TO THE OVERALL

8    VISUAL IMPRESSION IT CREATES?

9    A    YES.  WE'RE LOOKING AT THE RECTANGULAR AREA

10   THAT'S WITHIN THE DOTTED LINE THAT GOES AROUND THE

11   OUTSIDE.

12        AND I SEE THERE'S A REGULAR GRID OF ICONS

13   THAT ARE SQUARE WITH ROUNDED CORNERS, THEY'RE ABOUT

14   THE SAME DISTANCE APART, THEY'RE COLORFUL, THERE'S

15   A MIX OF DESIGN STYLES, THERE'S A LABEL UNDERNEATH

16   EACH ICON THAT'S UPPER AND LOWER CASE, SANS SERIF,

17   LIGHT AGAINST THE DARK BACKGROUND.

18        AND AT THE BOTTOM OF THE SCREEN THERE ARE

19   FOUR ICONS AND THERE'S A GRAPHIC BEHIND THEM THAT

20   SERVES TO SEPARATE THEM FROM THE ROWS AND COLUMNS

21   OF ICONS ABOVE.

22   Q    AND IN THIS DESIGN, WHAT IS THE GRAPHIC THAT

23   IS BEHIND THE BOTTOM FOUR ICONS THAT SERVES, AS YOU

24   SAID, TO SEPARATE THEM?

25   A    IT LOOKS LIKE A LIGHT GRAY RECTANGLE THAT

1    LOOKS A LITTLE BIT PERFORATED.

2    Q    OKAY.  YOU MENTIONED A MIX OF ICON STYLES.

3    CAN YOU EXPLAIN TO THE JURY WHAT YOU MEAN BY THAT?

4    A    I THINK I HAVE A SLIDE.

5    Q    LET'S JUST GO AHEAD AND USE THIS FIGURE.

6    A    OKAY.  TYPICALLY WHEN I WOULD WORK ON AN ICON

7    JOB, I MIGHT DISCUSS WITH THE CLIENT OR DEVELOP A

8    FEW STYLES AND THEN WE'D PICK A STYLE SO THAT WE

9    COULD HAVE SOME CONSISTENCY VISUALLY BETWEEN --

10    AMONG THE ICONS IN A PROJECT.

11         SO THIS IS INTERESTING BECAUSE THERE ARE

12    A FEW DIFFERENT STYLES.  YOU CAN SEE THE PHONE IN

13    THE LOWER-LEFT IS VERY PLAIN COMPARED TO, SAY, THE

14    LENS OF THE CAMERA IN THE UPPER RIGHT THAT IS MUCH

15    MORE DETAILED.

16    Q    HAVE YOU LOOKED AT ANY APPLE PHONES IN FORMING

17    YOUR OPINIONS IN THIS CASE?

18    A    YES.

19    Q    AND DID YOU -- WELL, LET'S START WITH WHAT

20    APPLE PHONES DID YOU LOOK AT?

21    A    I LOOKED AT SEVERAL IPHONES.

22    Q    OKAY.  DID YOU DRAW ANY CONCLUSIONS AS TO

23    WHETHER ANY OF THEM HAVE A USER INTERFACE THAT USES

24    THE DESIGN OF THE D'305 PATENT?

25    A    YES.

1    Q    OKAY.  COULD WE SEE PDX 14.6.

2             COULD YOU EXPLAIN TO THE JURY WHAT YOU'VE

3    DEPICTED ON YOUR SLIDE 14.6?

4    A    ON THE LEFT IS THE D'305 PATENT THAT WE'VE

5    JUST LOOKED AT, THAT IMAGE, AND ON THE RIGHT ARE

6    SCREEN SHOTS OF THE IPHONE, THE IPHONE 3G, THE

7    IPHONE 3GS, AND THE IPHONE 4.

8    Q    AND WHAT WAS THE CONCLUSION YOU DREW AS TO

9    WHETHER THESE IPHONES HAVE USER INTERFACES, ANY

10   USER INTERFACES THAT USE THE DESIGN OF THE D'305

11   PATENT?

12   A    I CONCLUDED THAT THEY ALL REFLECT A COLLECTION

13   OF DESIGN FEATURES THAT IS PRESENT IN THE D'305

14   PATENT.

15   Q    OKAY.  IS THE BACKGROUND COLOR OF THE USER

16   INTERFACE YOU'RE SHOWING US FROM EACH OF THESE

17   IPHONES THE SAME?

18   A    NO.

19   Q    HOW DID THAT ENTER INTO THE CONCLUSIONS THAT

20   YOU DREW?

21   A    IT'S DEFINITELY SOMETHING THAT'S DIFFERENT

22   ABOUT THE IPHONE 3GS AND THE IPHONE 4, BUT WHEN I

23   LOOKED AT THE D'305 PATENT AND I METHODICALLY

24   COMPARED THE SET OF FEATURES, THE OVERALL GRID, THE

25   ROWS OF FOUR ICONS, THE SHAPE OF THE ICONS, THE

```
 1    SQUARE WITH ROUNDED CORNERS, THE MIX OF ICON STYLES

 2    FROM VERY SYMBOLIZED TO STYLIZED TO VERY DETAILED,

 3    I COULD -- THE SEPARATE LITTLE ICONS AT THE BOTTOM

 4    AND THE LIGHT TYPE REVERSED OUT, I COULD SEE ALL OF

 5    THAT COLLECTION OF FEATURES THAT OVERALL VISUAL

 6    IMPRESSION IN ALL THE PHONES.

 7    Q    OKAY.  WERE YOU ASKED TO OFFER AN OPINION AS

 8    TO WHETHER ANY SAMSUNG PHONE HAD ANY GRAPHICAL USER

 9    INTERFACE SCREENS THAT WERE USING THE -- THAT HAD A

10    DESIGN THAT WAS THE SAME AS THE DESIGN IN THE D'305

11    PATENT?

12    A    YES.

13    Q    OKAY.  WHAT WAS THE TEST THAT YOU USED IN

14    MAKING THAT ANALYSIS?

15    A    IT WAS THE SAME KIND OF METHODICAL, VISUAL

16    ANALYSIS BECAUSE I'M SO USED TO LOOKING AT PIXELS

17    AND WHAT I CAN DO WITH THEM, THAT I LOOKED AT THE

18    GRID, HOW CLOSE ICONS WERE TO EACH OTHER

19    PROPORTIONALLY, ROUNDED CORNERS, ICON STYLE, THE

20    FAIRLY SIGNIFICANT AREA OF THE BOTTOM OF FOUR

21    CORRALLED ICONS.  THOSE WERE THE KINDS OF FEATURES

22    I LOOKED AT TO DO MY VISUAL COMPARISON FROM THE

23    SCREEN TO THE D'305 ART.

24    Q    OKAY.  DID YOU FORM ANY CONCLUSION AS TO

25    WHETHER ANY SAMSUNG PHONE HAD A USER INTERFACE
```

1    DISPLAY SCREEN THAT WAS SUBSTANTIALLY SIMILAR IN

2    DESIGN TO THE D'305 DESIGN?

3           MR. VERHOEVEN:  OBJECTION, YOUR HONOR.

4    NOWHERE IN THIS WITNESS'S EXPERT REPORT IS THERE

5    ANY OPINION USING THOSE WORDS, "SUBSTANTIALLY

6    SIMILAR," AND NOW THE -- COUNSEL IS ASKING HER --

7           THE COURT:  I'M SORRY.  CAN YOU REPEAT

8    MY -- MY SCREEN IS NOT WORKING.  REPEAT THE

9    QUESTION, PLEASE.

10          MS. KREVANS:  ALL RIGHT.  DID YOU FORM --

11          THE COURT:  I'M SORRY.  I'M ASKING

12   MS. SHORTRIDGE.  ARE YOU GOING TO --

13          MS. KREVANS:  I'M GOING TO REPHRASE IT.

14   I MAY HAVE MISSPOKEN.

15          THE COURT:  GO AHEAD.

16          MS. KREVANS:  AND I DON'T REMEMBER THE

17   QUESTION MYSELF.

18   Q   DID YOU FORM ANY CONCLUSIONS AS TO WHETHER

19   THERE WERE, IN THE SAMSUNG PHONES YOU LOOKED AT,

20   ANY DISPLAY SCREENS THAT HAD A DESIGN THAT WAS

21   SUBSTANTIALLY THE SAME AS THE DESIGN OF THE D'305

22   PATENT?

23          MR. VERHOEVEN:  OBJECTION, YOUR HONOR.

24   THE WITNESS NOWHERE IN HER EXPERT REPORT SUBMITS AN

25   OPINION ON "SUBSTANTIAL SIMILARITY."  THE WORDS

```
 1    "SUBSTANTIAL SIMILARITY" DO NOT APPEAR.

 2              MS. KREVANS:  ALL RIGHT.  LET ME PAUSE

 3    ONE MORE TIME, YOUR HONOR, SO WE CAN SHORTCUT THIS

 4    AND MOVE THIS ALONG.

 5    Q    DID YOU FORM ANY CONCLUSIONS, DR. KARE, ABOUT

 6    WHETHER ANY SAMSUNG PHONE HAD A DISPLAY SCREEN

 7    WHICH HAD A DESIGN THAT PRODUCED THE SAME OVERALL

 8    VISUAL IMPRESSION AS THE D'305 PATENT?

 9    A    YES.

10    Q    OKAY.  DID YOU FORM THAT CONCLUSION AS TO

11    EVERY SAMSUNG PHONE THAT YOU LOOKED AT?

12    A    NO.

13    Q    COULD YOU LOOK AT PX 21 THAT'S IN THE BINDER

14    IN FRONT OF YOU?

15              MR. VERHOEVEN:  YOUR HONOR, WE HAVE AN

16    OBJECTION TO THIS EXHIBIT FOR THE SAME REASONS THAT

17    CROSS-EXHIBITS WERE OBJECTED TO YESTERDAY BECAUSE

18    IT DEPICTS NOT JUST SCREEN-TO-SCREEN SHOTS.  IT'S

19    THE OVERALL PHONE.

20              THE COURT:  SUSTAINED.

21              MS. KREVANS:  YOUR HONOR, THERE'S NO

22    COMPARISON IN THESE PICTURES.  THEY'RE ALL JUST THE

23    SAMSUNG PHONES.

24              THE COURT:  YOU ASKED THAT BODY STYLE NOT

25    BE INCLUDED.  THAT WAS THE RECORD.  YOU NEED TO
```

1373

```
 1    TAKE THAT DOWN, PLEASE.  YOU ASKED FOR THE

 2    OBJECTION.  IT APPLIES BOTH WAYS.

 3              GO AHEAD.

 4    BY MS. KREVANS:

 5    Q    COULD WE SEE SLIDE PDX 14.7, PLEASE.  WHAT IS

 6    SET OUT ON SLIDE PDX 14.7, DR. KARE?

 7    A    IT IS THE IMAGE FROM THE D'305 PATENT NEXT TO

 8    THE FIRST OF THE APPLICATION SCREENS, A PHOTO, ON

 9    THE SAMSUNG FASCINATE.

10    Q    WHEN YOU SAY, "THE FIRST," WHAT DO YOU MEAN?

11    A    I CAN SEE FROM THE PAGE INDICATOR THAT THERE

12    ARE THREE SCREENS FULL, OR PARTIALLY FULL, OF

13    APPLICATION ICONS, AND I CAN SEE FROM THE ONE ABOVE

14    THE ICONS THAT THIS IS THE FIRST.

15              SO WHEN YOU BRING UP APPLICATION SCREENS,

16    THIS IS WHAT YOU'D SEE FIRST.

17    Q    OKAY.  DID YOU DRAW ANY CONCLUSION AS TO

18    WHETHER THIS PARTICULAR PHONE, THE FASCINATE, HAD

19    AN APPLICATION SCREEN FOR WHICH THE OVERALL VISUAL

20    APPEARANCE IS SUBSTANTIALLY THE SAME AS THE OVERALL

21    VISUAL APPEARANCE AS THE DESIGNS DEPICTED IN THE

22    D'305 PATENT?

23    A    YES.

24    Q    AND WHAT WAS YOUR CONCLUSION?

25    A    MY CONCLUSION IS THAT THIS APPLICATION SCREEN
```

```
1    SHOWN ON THE RIGHT IS SUBSTANTIALLY SIMILAR TO THE

2    D'305 PATENT.

3              MR. VERHOEVEN:  OBJECTION, YOUR HONOR.

4    THIS IS NOWHERE IN HER EXPERT REPORT.

5              THE COURT:  SUSTAINED UNLESS YOU CAN.

6              MS. KREVANS:  YOUR HONOR, ON PAGE 42 OF

7    THE EXPERT REPORT, PARAGRAPH 66 --

8              THE COURT:  OKAY.  GIVE ME ONE SECOND,

9    PLEASE.

10             MS. KREVANS:  THIS IS A SUMMARY IN WHICH

11   THE WITNESS SETS OUT THE TEST AND HER CONCLUSIONS.

12             THE COURT:  ALL RIGHT.  OVERRULED.

13   BY MS. KREVANS:

14   Q    I'M SORRY.  DID YOU HAVE A CHANCE TO ANSWER

15   THE QUESTION, DR. KARE?

16   A    UM --

17   Q    I THINK YOU DID, ACTUALLY.

18   A    YES.  AND I WAS TALKING -- I WAS SPEAKING TO

19   OVERALL VISUAL IMPRESSION.

20   Q    OKAY.

21   A    THAT'S WHAT I WAS COMPARING.

22   Q    COULD YOU BRIEFLY DESCRIBE FOR US WHAT LED YOU

23   TO THE CONCLUSION THAT THE APPLICATION SCREEN THAT

24   WE'RE SEEING HERE FROM THE FASCINATE HAD

25   SUBSTANTIALLY THE SAME OVERALL VISUAL IMPRESSION,
```

```
 1    APPEARANCE, AS THE OVERALL VISUAL APPEARANCE OF THE

 2    D'305 PATENT DESIGN?

 3    A    YES.  I LOOKED AT THE SIMILAR -- THE

 4    SIMILARITIES I SAW WERE THE REGULAR GRID, THE ROSE

 5    OF FOUR ICONS, THE COLORFUL MIX OF ICONS THAT ARE

 6    SQUARE WITH ROUNDED CORNERS, THE SIMILARITY OF THE

 7    MIX OF ICON STYLES, LET'S SAY CLOCK TO CLOCK IS

 8    REALISTIC, BUT ALSO STYLIZED BECAUSE IT'S KIND OF A

 9    SIMPLE DESIGN THAT READS EASILY, THE PHONES ARE

10    BOTH THAT SIMPLE STYLE THAT LOOKS AS IF THE WHITE

11    RETRO HANDSET COULD HAVE BEEN CUT OUT OF WHITE

12    PAPER, THE MORE MODELLED KIND OF ICON STYLES THAT

13    ARE PRESENT ON BOTH THE CAMERA AND THE SUNFLOWER ON

14    THE D'305 THAT LOOK PHOTO REALISTIC, I CAN SEE THAT

15    KIND OF ICON ON THE RIGHT AS WELL.

16           AND --

17    Q   CAN YOU JUST POINT OUT FOR US, BY DESCRIBING

18    THE ROW AND THE COLUMN, WHERE THE SUNFLOWER IS THAT

19    YOU'RE TALKING ABOUT ON EACH OF THESE DESIGNS?

20    A    IN THE TOP ROW ON THE D'305, THE THIRD FROM

21    THE LEFT IS A KIND OF A PHOTO REALISTIC SUNFLOWER .

22           AND ON THE FASCINATE IN THE BOTTOM ROW,

23    30 FROM THE LEFT, IS A CLOSE-UP OF WHAT APPEARS TO

24    BE SUNFLOWER PETALS, AND THEY BOTH FIGURE THE

25    USER'S COLLECTION OF PHOTOS THAT THEY TOOK.
```

1    Q    OKAY.

2    A    AND, ADDITIONALLY, THEY EACH HAVE FOUR ICONS

3    AT THE BOTTOM SET OFF WITH A GRAPHIC.  ON THE LEFT

4    IS THE GRAY AREA, ON THE RIGHT, THERE'S A -- IT'S A

5    SLIGHTLY LIGHTER GRAY AREA WITH A BOUNDING LINE

6    OVER THE ICONS.

7              AND THEY BOTH HAVE LIGHT COLORED MIXED

8    CASE LABELS IN A SANS SERIF FONT.

9    Q    WHEN YOU SAY MIXED CASE LABELS IN SANS SERIF,

10   ARE YOU TALKING ABOUT THE TEXT UNDER THE GRAPHICS?

11   A    UNDER THE GRAPHICS.  SANS SERIF IS THE NAME OF

12   A FONT.  IT IS, ACTUALLY, IT MEANS THAT IT'S PLAIN,

13   AND IT DOESN'T HAVE THE LITTLE HORIZONTAL LINES

14   THAT MAKE THE FONT LOOK A LITTLE BIT LIKE IT WAS

15   CARVED IN STONE.  IT'S A MORE MODERN KIND OF A

16   FONT.

17   Q    OKAY.  CAN WE LOOK AT YOUR SLIDE 14.12.  WHAT

18   DO YOU SHOW ON 14.12, DR. KARE?

19   A    THIS IS ANOTHER SAMSUNG PHONE CALLED THE

20   CAPTIVATE WHERE I FOUND SIMILARLY THAT THE OVERALL

21   VISUAL IMPRESSION WAS SUBSTANTIALLY SIMILAR TO THE

22   D'305 FOR THE SAME, USING THE SAME KIND OF

23   ANALYSIS.

24   Q    OKAY.  WHAT ABOUT 14.13?  COULD WE SEE THAT

25   ONE?

```
 1              WHAT'S THIS, DR. KARE?

 2     A    THIS IS THE CONTINUUM.  THIS IS ANOTHER ONE OF

 3     THE GROUP OF PHONES THAT I THOUGHT WAS

 4     SUBSTANTIALLY SIMILAR TO THE D'305.

 5     Q    OKAY.  AND 14.14?

 6     A    THIS IS THE DROID CHARGE, WHICH I ALSO FOUND

 7     TO BE SUBSTANTIALLY SIMILAR OVERALL VISUAL

 8     IMPRESSION, SAME KIND OF ANALYSIS.

 9     Q    OKAY.  14.15?

10     A    THIS IS --

11     Q    WHAT PHONE IS THIS?

12     A    THIS IS THE EPIC 4G, ANOTHER SAMSUNG PHONE

13     WHERE THE PATTERN OF SIMILARITIES WAS SUBSTANTIALLY

14     THE SAME.

15     Q    AND WHAT WAS THE BASIS FOR YOUR CONCLUSIONS

16     ABOUT THE EPIC 4G?

17     A    IT WAS THE RESULT OF THE SAME KIND OF

18     METHODICAL VISUAL ANALYSIS OF THE FEATURE SET OF

19     THE D'305.

20     Q    OKAY.  LET'S LOOK AT YOUR SLIDE 14.16.

21              WHAT HAVE YOU SHOWN HERE?

22     A    THIS IS THE GALAXY S 4G, AND --

23     Q    DID YOU DRAW CONCLUSIONS ABOUT THE GALAXY S

24     4G?

25     A    YES.
```

1378

```
1    Q    WHAT WERE THEY?

2    A    THAT THE OVERALL VISUAL IMPRESSION WAS

3    SUBSTANTIALLY SIMILAR TO THE DESIGN OF THE D'305

4    PATENT.

5    Q    FOR THE SAME REASONS?

6    A    YES.

7    Q    OKAY.  14.17?  THE GALAXY S I9000.

8            WHAT CONCLUSIONS DID YOU DRAW ABOUT THIS

9    DESIGN?

10   A    THAT, AGAIN, THE OVERALL VISUAL IMPRESSION WAS

11   SUBSTANTIALLY THE SAME TO THE DESIGN OF THE D'305.

12   Q    OKAY.  14.18, THE SAMSUNG GEM.

13            WHAT CONCLUSIONS, IF ANY, DID YOU DRAW

14   ABOUT THIS PHONE?

15   A    THAT THE SAME VISUAL FEATURES IN THE D'305 ARE

16   REFLECTED IN THE GEM AND THAT THEY LOOK

17   SUBSTANTIALLY THE SAME.

18   Q    OKAY.  LET'S SEE 14.19.  THIS IS THE SAMSUNG

19   INDULGE.

20            WHAT CONCLUSIONS DID YOU DRAW ABOUT THIS

21   DESIGN?

22   A    THAT THE OVERALL VISUAL IMPRESSION IS THE SAME

23   AS THE D'305 BY THE SAME METHOD.

24   Q    OKAY.  14.20, PLEASE.  THIS IS THE INFUSE 4G.

25   WHAT CONCLUSIONS DID YOU DRAW ABOUT THE DESIGN OF
```

1    THE APPLICATION SCREEN OF THE INFUSE 4G?

2    A    THAT THE OVERALL VISUAL IMPRESSION IS LIKE THE

3    DESIGN OF THE D'305 PATENT.

4    Q    DID YOU APPLY THE SAME OVERALL VISUAL

5    IMPRESSION, SUBSTANTIALLY SIMILAR TEST?

6    A    I, I FOUND THAT THE OVERALL VISUAL IMPRESSION

7    WAS SUBSTANTIALLY THE SAME.

8    Q    OKAY.  LET'S LOOK AT 14.21.  THIS IS THE

9    SAMSUNG MESMERIZE.  DID YOU DRAW ANY CONCLUSIONS

10   ABOUT THIS DESIGN?

11   A    YES.  THAT, AGAIN, THAT THE OVERALL VISUAL

12   IMPRESSION IS SUBSTANTIALLY THE SAME AS THE DESIGN

13   OF THE D'305 PATENT.

14   Q    OKAY.  LET'S LOOK AT 14.22, THE SAMSUNG

15   GALAXY S SHOWCASE.

16        CAN YOU DRAW ANY CONCLUSIONS ABOUT THIS

17   DESIGN?

18   A    YES.  THAT -- THAT THE OVERALL VISUAL

19   IMPRESSION IS SUBSTANTIALLY SIMILAR TO THE D'305

20   PATENT FIGURE ON THE LEFT.

21   Q    LET ME ASK YOU A QUESTION ABOUT THE SHOWCASE.

22   DO YOU SEE AT THE TOP THERE'S A, IT'S LIKE IT'S A

23   BLUE-ISH BAR ACROSS THE TOP.

24        DID YOU TAKE THAT INTO ACCOUNT IN YOUR

25   OPINION?

```
1    A    YES.

2    Q    IS THAT PRESENT IN THE D'305?

3    A    NO.

4    Q    COULD YOU EXPLAIN, THEN, WHY YOU STILL

5    CONCLUDED THAT THESE TWO ARE SUBSTANTIALLY THE

6    SAME, OVERALL VISUAL IMPRESSION?

7    A    WELL, I WOULD SAY THAT FEATURE, ALONG WITH A

8    FEW OTHERS OCCASIONALLY IN THE SET OF PHONES WE

9    LOOKED AT, THERE WAS ONE ROUND ICON AT THE BOTTOM,

10   OR A BLUE BAR AT THE TOP, AND THEY'RE DIFFERENT,

11   BUT I, I FELT THAT THE OVERALL IMPRESSION CAME FROM

12   THE SALIENT SET OF FEATURES THAT WAS THE

13   PREDOMINANT OVERALL VISUAL IMPRESSION THAT MOST

14   PEOPLE AREN'T GOING TO STOP AND ANALYZE, OH, THIS

15   FEATURE IS THE SAME.

16        SO I FOUND THAT DESPITE SOME MINOR

17   DIFFERENCES, I WAS LOOKING AT OVERALL VISUAL

18   IMPRESSION.  I MIGHT HAVE LOOKED -- I DIDN'T MISS

19   THAT.  I LOOKED AT EVERYTHING.

20        BUT I CONCLUDED THAT THE OVERALL VISUAL

21   IMPRESSION WAS SUBSTANTIALLY THE SAME.

22   Q    OKAY.  ANOTHER QUESTION ABOUT THE SHOWCASE.

23   DO YOU SEE THAT AT THE TOP OF THE SCREEN THERE'S

24   THREE DOTS, ONE IS A LITTLE BIGGER AND IT HAS A 1

25   AND THERE'S TWO DOTS TO THE RIGHT?
```

1381

1     A     YES.

2     Q     THOSE AREN'T PRESENT IN THE D'305 DESIGN?

3     A     NO.

4     Q     OKAY.  DID THAT AFFECT YOUR ANALYSIS OF

5     WHETHER THE DESIGN OF THE SHOWCASE, OR THE OTHER

6     SAMSUNG PHONES, HAD SUBSTANTIALLY THE SAME DESIGN

7     AS THE D'305 DESIGN?

8     A     YES, IT AFFECTED MY ANALYSIS IN THAT I NOTICED

9     IT, BUT, NO, IT DIDN'T AFFECT MY CONCLUSION.

10    Q     AND WHY WAS THAT?

11    A     BECAUSE I THOUGHT IT WAS FAIRLY MINOR COMPARED

12    TO THE KIND OF EXCITING MIX OF COLORFUL ICONS ARE

13    WHAT GRAB YOU.

14    Q     OKAY.

15    A     AND THE GRID AND THE SHAPE AND THE WAY THE

16    ICONS FILL THE SCREEN IS WHAT YOU REALLY NOTICE

17    PRIMARILY IN THE OVERALL IMPRESSION.

18    Q     OKAY.  ONE MORE PHONE.

19          SLIDE 14.23.  THIS IS THE SAMSUNG

20    VIBRANT.  DID YOU FORM ANY CONCLUSIONS ABOUT THIS

21    DESIGN?

22    A     YES.  I THOUGHT THIS APPLICATION SCREEN WAS

23    SUBSTANTIALLY SIMILAR OVERALL TO THE D'305 DESIGN.

24    Q     OKAY.  LET'S TURN TO ANOTHER TOPIC YOU SAID

25    YOU ADDRESSED, WHICH WAS IPHONE TRADE DRESS.  WHAT

```
 1   TOPICS WERE YOU ASKED TO LOOK AT WITH RESPECT TO

 2   IPHONE TRADE DRESS?

 3   A    I WAS ASKED TO LOOK AT THE SCREEN, THE HOME

 4   SCREEN OF THE IPHONE, AND COMPARE THAT TO THE -- TO

 5   A SERIES OF APPLICATION SCREENS ON SAMSUNG PHONES

 6   AND GIVE MY OPINION ABOUT WHETHER A CONSUMER WOULD

 7   FIND THEM CONFUSINGLY SIMILAR.

 8   Q    OKAY.  COULD WE LOOK AT PDX 14.26.  DID YOU

 9   DRAW ANY CONCLUSIONS -- ACTUALLY, FIRST, WHY DON'T

10   YOU TELL US WHAT WE'RE LOOKING AT IN 14.26.

11   A    WE'RE --

12            MR. VERHOEVEN:  YOUR HONOR, I'M SORRY.

13   I'M NOT FAST ENOUGH.  YOUR HONOR, WE OBJECT TO THIS

14   SLIDE AND REQUEST THAT IT BE PULLED DOWN.  SAME

15   REASONS.

16            MS. KREVANS:  YOUR HONOR, THEY HAD A

17   PREVIOUS OBJECTION TO THIS SLIDE IN THAT --

18            MR. VERHOEVEN:  IT WAS JUST -- I DON'T

19   KNOW IF YOU SAW THE SCREEN, BUT WHAT WAS ON THE

20   SCREEN WAS THE DEVICES IN THEIR ENTIRETY, NOT WHAT

21   WE'RE SEEING, YOU MAY BE SEEING ON YOUR SLIDE.

22   OKAY, THAT'S GOOD.  THAT'S DIFFERENT.

23            THE COURT:  ALL RIGHT.

24            MS. KREVANS:  YOUR HONOR --

25            MR. VERHOEVEN:  THERE'S A DIFFERENT IMAGE
```

```
 1    ON THE SCREEN.
 2             MS. KREVANS:  WE HAVE TWO VERSIONS.
 3    WE'RE HAPPY TO USE WHATEVER ONES.
 4             THE COURT:  THE ONES THAT ARE JUST
 5    SCREEN-TO-SCREEN SHOTS COMPARISONS, GO AHEAD.
 6             MS. KREVANS:  OKAY.
 7    Q    ALL RIGHT.  ARE YOU LOOKING AT 14.26?
 8    A    YES.
 9    Q    OKAY.  WHAT IS DEPICTED ON -- FIRST, JUST TELL
10    US WHAT WE'RE LOOKING AT HERE ON 14.26.
11    A    WE'RE LOOKING AT, ON THE LEFT, A SCREEN SHOT
12    OF THE IPHONE 3G, AND ON THE RIGHT A SERIES OF
13    SCREEN SHOTS OF THE FIRST APPLICATION SCREENS ON A
14    NUMBER OF SAMSUNG PHONES.
15    Q    OKAY.  AND JUST SO WE'RE CLEAR, THE PARTICULAR
16    DISPLAY THAT YOU'RE SHOWING FROM THE IPHONE 3G,
17    WHAT SCREEN IS THAT FROM THE IPHONE 3G?
18    A    IT IS THE HOME SCREEN.
19    Q    OKAY.  AND I THINK YOU SAID ON THE RIGHT YOU
20    HAVE APPLICATION SCREENS FROM SAMSUNG PHONES?
21    A    YES.
22    Q    OKAY.  DID YOU DRAW ANY CONCLUSIONS ABOUT
23    WHETHER THE OVERALL IMPRESSION OF THE APPLICATION
24    SCREEN OF ANY SAMSUNG PHONES WOULD BE CONFUSINGLY
25    SIMILAR TO THE IPHONE HOME SCREEN TO A CONSUMER ?
```

1    A    YES.

2    Q    AND WHAT CONCLUSION DID YOU DRAW?

3    A    I CONCLUDED THAT THIS SET OF SCREENS, 11, THAT

4    THE OVERALL VISUAL IMPRESSION FROM ALL OF THESE

5    SCREENS, COMPARING EACH ONE, ONE BY ONE, COMPARED

6    TO THE SCREEN SHOT FROM THE IPHONE 3G WERE

7    CONFUSINGLY SIMILAR.

8    Q    AND WHAT WAS THE PROCESS YOU USED AS YOU

9    EXAMINED EACH --

10         MR. VERHOEVEN:  YOUR HONOR, I'M SORRY.

11   I'M A LITTLE SLOW ON THE UPTAKE, BUT I OBJECT TO

12   THAT ANSWER AND MOVE TO STRIKE AS NOT BEING --

13   QUESTION AND ANSWER AS NOT BEING IN THE EXPERT

14   REPORT.

15         THE COURT:  I'M LOOKING AT PARAGRAPH 66

16   ON PAGE 42.

17         MS. KREVANS:  YES.  WE'VE NOW MOVED TO

18   TRADE DRESS, YOUR HONOR, SO WE WOULD --

19         THE COURT:  I'M SORRY, EXCUSE ME.

20         MS. KREVANS:  SO IT WOULD BE PARAGRAPH 71

21   ON PAGE 44.

22         MR. VERHOEVEN:  YOUR HONOR, I DON'T KNOW

23   ABOUT YOU, BUT MY REALTIME IS NOT WORKING.

24         THE COURT:  MINE IS NOT EITHER,

25   UNFORTUNATELY.

 1              MR. VERHOEVEN:  SO JUST SO I CAN REMIND

 2     YOUR HONOR, I BELIEVE THE QUESTION AND ANSWER WENT

 3     TO LIKELIHOOD OF CONFUSION.

 4              THE COURT:  AND CAN I HAVE THE ANSWER,

 5     THE QUESTION, PLEASE.

 6              (WHEREUPON, THE RECORD WAS READ BY THE

 7     COURT REPORTER.)

 8              MR. VERHOEVEN:  YOUR HONOR, MY

 9     RECOLLECTION IS THERE'S NOTHING IN THIS EXPERT'S

10     REPORT ON THE ISSUE OF LIKELIHOOD OF CONFUSION.

11              MS. KREVANS:  AND I WOULD DRAW YOUR

12     HONOR'S ATTENTION TO THE LAST SENTENCE OF

13     PHOTOGRAPH 71.

14              MR. VERHOEVEN:  AND IN ADDITION TO THAT,

15     YOUR HONOR --

16              THE COURT:  OKAY.  HANG ON ONE SECOND,

17     PLEASE.  LET ME GET ONE MINUTE TO READ THAT LAST

18     SENTENCE.

19              MR. VERHOEVEN:  YES, YOUR HONOR.

20              (PAUSE IN PROCEEDINGS.)

21              THE COURT:  I'M GOING TO OVERRULE THE

22     OBJECTION BASED ON THAT, LINES 11 THROUGH 14 ON

23     PAGE 44.

24              MR. VERHOEVEN:  YOUR HONOR, THAT'S THE

25     DESIGN STANDARD.  OVERALL VISUAL IMPRESSION.

1           THE COURT:  THE QUESTION WAS CONFUSION.

2    AND THIS SPECIFICALLY SAYS USERS CAN SEE THE

3    DESIGNS AS COMING FROM THE SAME COMPANY OR HAVING

4    THE SAME BRAND.

5           GO AHEAD, PLEASE.

6    BY MS. KREVANS:

7    Q    THANK YOU.  I THINK THE QUESTION ON THE TABLE,

8    DR. KARE, IS ON WHAT DID YOU BASE THE CONCLUSION

9    THAT A CONSUMER, LOOKING AT THE OVERALL VISUAL

10   IMPRESSION OF THE APPLICATION SCREEN OF THE SAMSUNG

11   PHONES ON THIS SLIDE, COULD SEE THEM AS CONFUSINGLY

12   SIMILAR TO THE IPHONE HOME SCREEN?

13          MR. VERHOEVEN:  YOUR HONOR, I ALSO OBJECT

14   ON THE GROUNDS THAT CERTAIN CLAIMS HAVE BEEN

15   DROPPED -- I DON'T WANT TO GO INTO IT, YOUR

16   HONOR -- BUT CERTAIN CLAIMS HAVE BEEN DROPPED WITH

17   RESPECT TO TRADE DRESS INFRINGEMENT, AND CERTAIN OF

18   OUR SLIDES ON THIS SAME ISSUE WERE STRICKEN IN THE

19   OPENING BECAUSE THOSE CLAIMS WERE DROPPED.

20          MS. KREVANS:  THIS SLIDE --

21          MR. VERHOEVEN:  I'D BE HAPPY TO EXPLAIN

22   FURTHER IF YOU LIKE.

23          THE COURT:  YOU MEAN INFRINGEMENT VERSUS

24   THE DILUTION, RIGHT?

25          MR. VERHOEVEN:  YES.

1387

```
 1           THE COURT:  WHY DON'T YOU REPHRASE YOUR

 2    QUESTION, PLEASE.

 3           MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

 4    BY MS. KREVANS:

 5    Q    DR. KARE, DID YOU FORM ANY CONCLUSIONS ABOUT

 6    WHETHER THE SIMILARITIES BETWEEN THE OVERALL VISUAL

 7    IMPRESSION OF THE SAMSUNG DESIGNS DEPICTED ON THIS

 8    PAGE AND THE IPHONE 3G DESIGN WERE SUCH THAT

 9    CONSUMERS WOULD ASSOCIATE THESE DESIGNS WITH THE

10    APPLE DESIGN?

11    A    YES.

12    Q    AND WHAT CONCLUSION DID YOU DRAW?

13    A    I -- I -- IT IS MY OPINION THAT THE OVERALL

14    COLLECTION OF GRAPHIC FEATURES THAT MAKES THE

15    OVERALL VISUAL IMPRESSION CONFUSING TO A CONSUMER.

16           AND PARTLY I BASE THAT FROM MY VISUAL

17    ANALYSIS.  PARTLY I REMEMBER THAT WHEN I VISITED

18    THE LAW FIRM TO SEE ABOUT BEING AN EXPERT WITNESS

19    IN THIS CASE, THERE WAS A BIG CONFERENCE TABLE AND

20    THERE WERE MANY PHONES ON IT, AND A NUMBER OF THEM

21    WERE ON, AND I REACHED FOR AN IPHONE BECAUSE I

22    COULD SEE THE SCREEN --

23           MR. VERHOEVEN:  YOUR HONOR, I OBJECT TO

24    THIS AGAIN AS NOT BEING WITHIN THE REPORT AT ALL.

25           MS. KREVANS:  YOUR HONOR, SHE'S GOING TO
```

```
 1    EXPLAIN --
 2               THE COURT:  OVERRULED.  GO AHEAD.
 3               THE WITNESS:  I COULD SEE THE SCREEN.  I
 4    WENT TO PICK UP THE IPHONE TO MAKE A POINT ABOUT
 5    THE U/I, ABOUT THE U/I GRAPHICS, AND I WAS HOLDING
 6    A SAMSUNG PHONE.
 7               SO I, I WOULD USUALLY THINK OF MYSELF AS
 8    SOMEONE WHO'S PRETTY GRANULAR IN LOOKING AT
 9    GRAPHICS, AND I MISTOOK ONE FOR THE OTHER.
10               SO I, I GUESS IN ADDITION TO MY FORMAL
11    ANALYSIS, I HAD THE EXPERIENCE OF BEING CONFUSED.
12    BY MS. KREVANS:
13    Q    OKAY.  ARE EACH OF THE SAMSUNG PHONES THAT ARE
14    REPRESENTED ON YOUR SLIDE 14.26 PHONES FOR WHICH
15    YOU CAME TO THIS SAME CONCLUSION, THAT IS, THAT A
16    CONSUMER LOOKING AT THIS APPLICATION SCREEN WOULD
17    ASSOCIATE THAT DESIGN WITH THE APPLE DESIGN?
18               MR. VERHOEVEN:  OBJECTION.  LEADING.
19               THE WITNESS:  YES.
20    BY MS. KREVANS:
21    Q    COULD YOU TELL THE JURY --
22               THE COURT:  CAN YOU LET ME RULE ON THE
23    QUESTION.  CAN YOU READ BACK THE QUESTION.
24               (WHEREUPON, THE RECORD WAS READ BY THE
25    COURT REPORTER.)
```

```
 1              THE COURT:  I'M GOING TO OVERRULE THAT.

 2    GO AHEAD, PLEASE.

 3    BY MS. KREVANS:

 4    Q    COULD YOU ANSWER, DR. KARE?

 5    A    YES.

 6    Q    CAN YOU TELL THE JURY WHICH PHONES THAT IS?

 7    A    THE FASCINATE, THE DROID CHARGE, THE

 8    MESMERIZE, THE EPIC 4G, THE VIBRANT, THE INFUSE 4G,

 9    THE GALAXY S SHOWCASE, I 500, THE CAPTIVATE, THE

10    GALAXY S I9000, THE GALAXY S 4G, AND THE CONTINUUM.

11    Q    OKAY.  DID YOU DO THE SAME TYPE OF ANALYSIS

12    WITH RESPECT TO APPLE'S REGISTERED IPHONE TRADE

13    DRESS?

14    A    YES.  SIMILAR TO THE D'305, BUT ADDITIONALLY,

15    IN THE IPHONE 3G, THERE ARE -- IT'S HARD TO SEE IT

16    ON MY SCREEN, THERE ARE THREE DOTS, OR THERE'S A

17    SERIES OF DOTS, GRAY AND ONE THAT'S LIGHT ABOVE THE

18    FOUR ICONS AT THE BOTTOM.

19    Q    OKAY.  SO WHAT WE'RE LOOKING AT RIGHT NOW ON

20    THE SCREEN IN 14.26 IS THE IPHONE 3G TRADE DRESS.

21              I'D LIKE NOW TO TURN TO A SECOND TRADE

22    DRESS ISSUE, WHICH IS THE REGISTER IPHONE TRADE

23    DRESS.

24              COULD WE SEE -- LET ME JUST -- CAN YOU

25    FOCUS ME ON MY SCREEN, 14.27, THOMAS?
```

```
 1              I'M SORRY, YOUR HONOR.  I JUST HAVE AN

 2      ISSUE.

 3              (PAUSE IN PROCEEDINGS.)

 4      BY MS. KREVANS:

 5      Q    OKAY.  COULD WE GO TO -- COULD WE GO BACK TO

 6      SLIDE -- SORRY FOR THE DELAY, YOUR HONOR, OF THE --

 7      I JUST HAVE TO FIND THE SLIDE NUMBER.

 8              THE COURT:  NOT A PROBLEM.

 9              MS. KREVANS:  CAN WE HAVE THE SLIDE WITH

10      THE FOUR IPHONE HOME SCREENS?

11              (PAUSE IN PROCEEDINGS.)

12              MS. KREVANS:  YES, PERFECT.  CAN WE SHOW

13      THE JURY 14.6.

14      Q    OKAY.  LOOKING AT THE FOUR IPHONE HOME SCREENS

15      THAT ARE SHOWN ON 14.6, CAN YOU TELL US, DID YOU --

16      WHETHER YOU ANALYZED WHETHER OR NOT THERE WERE

17      CONSISTENT DESIGN ELEMENTS ACROSS THESE FOUR IPHONE

18      HOME SCREENS ON THE RIGHT-HAND SLIDE OF THIS SLIDE?

19      A    YES.

20      Q    AND WHAT WERE THE CONSISTENT ELEMENTS THAT YOU

21      SAW?

22      A    THE REGULAR GRID; THE OVERALL SQUARE SHAPE

23      WITH ROUNDED CORNERS OF THE GRID OF ICONS; THAT THE

24      ICONS ARE BRIGHT AND COLORFUL; THAT THERE'S A MIX

25      OF STYLES; THAT THERE'S TEXT LABEL UNDER EACH ICON;
```

1391

```
1    THAT THERE'S A SEPARATE ROW OF ICONS AT THE BOTTOM

2    INDICATED BY SOME KIND OF GRAPHIC; AND IN THE CASE

3    OF THESE FOUR, THAT THERE'S A ROW OF SMALL DOTS

4    ABOVE THE BOTTOM ROW OF ICONS.

5    Q    OKAY.  THOMAS, CAN YOU SHOW, JUST ME FOR A

6    MOMENT, 14.29.  JUST -- GREAT.

7              CAN YOU PUT THAT UP ON THE SCREEN FOR THE

8    COURTROOM, PLEASE.

9              OKAY.  DID YOU COMPARE THE ELEMENTS

10   YOU'VE JUST LISTED AS BEING CONSISTENT ACROSS THESE

11   FOUR IPHONES SHOWN ON THE LEFT SIDE OF 14.29 TO THE

12   APPLICATION SCREENS OF ANY SAMSUNG PHONES?

13   A    YES.

14   Q    AND DID YOU DO AN ANALYSIS TO DETERMINE

15   WHETHER CONSUMERS, LOOKING AT THE APPLICATION

16   SCREENS OF THE SAMSUNG PHONES SHOWN ON 14.29, WOULD

17   ASSOCIATE THEIR DESIGNS WITH THE ELEMENTS YOU'VE

18   JUST DESCRIBED AS BEING CONSISTENT ACROSS THE

19   DESIGNS OF THE FOUR IPHONES?

20   A    YES.

21   Q    WHAT CONCLUSIONS DID YOU DRAW?

22   A    I FOUND THAT THE COLLECTION OF FEATURES

23   THAT -- GRAPHICAL FEATURES THAT WE HAVE JUST

24   DISCUSSED WAS PRESENT ACROSS ALL THESE PHONES TO

25   CREATE, IN THIS SET OF SCREENS, SIMILAR OVERALL
```

1    LOOKS THAT IS CONFUSINGLY SIMILAR TO THE IPHONES ON

2    THE LEFT.

3            HOWEVER, I DO THINK THAT THE GRAY

4    BACKGROUND, OR THE NOT BLACK BACKGROUND OF THE

5    IPHONE 3GS AND THE IPHONE 4, MAKES THOSE SLIGHTLY

6    LESS SIMILAR OVERALL, BUT I STILL FOUND THE OVERALL

7    SET OF FEATURES CONSISTENT.

8    Q    OKAY.  COULD YOU TELL THE JURY WHICH SAMSUNG

9    PHONES YOU FORMED THAT CONCLUSION FOR AS SET OUT

10   HERE ON 14.29.  JUST TELL US THE NAMES.

11   A    THE FASCINATE; THE DROID CHARGE; THE

12   MESMERIZE; THE EPIC 4G, THE VIBRANT, THE INFUSE 4G,

13   THE GALAXY S SHOWCASE, I 500, THE CAPTIVATE, THE

14   GALAXY S I9000, AND THE GALAXY S 4G AND THE

15   CONTINUUM.

16   Q    OKAY.  LET'S GO BACK NOW TO THE QUESTION I

17   STARTED TO ASK YOU ABOUT EARLIER, THE IPHONE

18   REGISTER TRADE DRESS.

19            COULD WE PUT UP -- THANK YOU, THOMAS,

20   14 -- WHAT'S THE SLIDE NUMBER?  14.27?

21            OKAY.  DID YOU DO AN ANALYSIS AS TO

22   WHETHER THE ELEMENTS OF APPLE'S REGISTERED IPHONE

23   TRADE DRESS SHOWN ON THE LEFT-HAND SIDE OF THE

24   SCREEN --

25            MR. VERHOEVEN:  I'M SORRY TO INTERRUPT,

1    BUT WE OBJECT TO THIS.  THIS ISN'T THE REGISTERED

2    ICON TRADE DRESS BEING DEPICTED THERE.

3             MS. KREVANS:  THOMAS, COULD YOU SHOW, NOT

4    TO THE JURY, BUT JUST TO THE COURT THE ORIGINAL

5    SLIDE THAT WE HAD, PLEASE.

6             THE COURT:  IT HAD THE BODY.

7             MS. KREVANS:  IT HAD THE BODY.  WE TOOK

8    IT DOWN BECAUSE OF YOUR HONOR'S EARLIER RULING.

9             MR. VERHOEVEN:  YOUR HONOR, IT SAYS

10   REGISTERED IPHONE TRADE DRESS.  THERE IS A

11   REGISTRATION THAT IS THE REGISTERED TRADE DRESS.

12            THE COURT:  WELL, DO YOU HAVE ANY

13   OBJECTION TO THEM USING THE ORIGINAL 14.27?  IF

14   THAT'S THE ISSUE.

15            MR. VERHOEVEN:  YOUR HONOR, WE WOULD

16   PREFER THAT THEY USE THE ACTUAL REGISTERED TRADE

17   DRESS, WHICH IS AN EXHIBIT 96, WHICH THEY COULD

18   EASILY PUT UP.

19            MS. KREVANS:  YOUR HONOR, IN ORDER TO

20   SHOW THIS PICTORIALLY, WE HAVE THE SLIDE THAT HAS

21   THE PICTURE FROM THE REGISTERED TRADE DRESS, THE

22   COMPLETE ONE.  THAT'S THE SLIDE WE ORIGINALLY

23   INTENDED TO USE.  WE'RE HAPPY TO USE THAT ONE.

24            THE COURT:  OKAY.  GO AHEAD.

25            MS. KREVANS:  OKAY.  THE ORIGINAL.  THANK

1   YOU, THOMAS.

2   Q    OKAY.  DR. KARE, DID YOU CONSIDER, IN LOOKING

3   ON THE LEFT AT THE PICTURE FROM THE REGISTERED

4   IPHONE DRESS, TRADE DRESS, WHAT ASPECTS OF THIS

5   IMAGE DID YOU FORM OPINIONS ABOUT?

6   A    I WAS ONLY ASKED TO COMPARE THE SCREEN

7   GRAPHIC, WHICH I REALIZE IS PART OF THE REGISTERED

8   TRADE DRESS, BUT THAT'S THE PART THAT I WAS ASKED

9   TO COMPARE TO THE KOREANS, APPLICATION SCREENS FROM

10  A SERIES OF SAMSUNG PHONES.

11  Q    OKAY.  WITH RESPECT TO THAT PORTION OF THE

12  REGISTERED IPHONE TRADE DRESS, DID YOU DRAW ANY

13  CONCLUSIONS AS TO WHETHER A CONSUMER, LOOKING AT

14  ANY SAMSUNG PHONE APPLICATION SCREENS, WOULD

15  ASSOCIATE THE SAMSUNG PHONE APPLICATION SCREENS

16  WITH THE USER INTERFACE PORTION OF THE IPHONE

17  REGISTERED TRADE DRESS?

18  A    YES.

19  Q    WHAT CONCLUSION DID YOU DRAW?

20  A    I CONCLUDED THAT THE VISUAL IMPRESSION OVERALL

21  OF THESE 11 SCREENS WAS CONFUSINGLY SIMILAR TO JUST

22  THE SCREEN PORTION, THE DISPLAY SCREEN, HOME

23  SCREEN, IN THE ILLUSTRATION ON THE LEFT.

24  Q    AND FOR WHICH SAMSUNG PHONES DID YOU DRAW THAT

25  CONCLUSION?

1    A    THE FASCINATE, THE DROID CHARGE, THE

2    MESMERIZE, THE EPIC 4G, THE VIBRANT, THE INFUSE 4G,

3    THE GALAXY S SHOWCASE I500, THE CAPTIVATE, THE

4    GALAXY S I9000, THE GALAXY S 4G, AND THE CONTINUUM.

5    Q    OKAY.  NOW, LET'S TURN TO ANOTHER TOPIC YOU

6    SAID THAT YOU DREW SOME CONCLUSIONS ABOUT FOR THIS

7    CASE.

8            I'M SORRY, YOUR HONOR.  IT'S 10:30.  DO

9    YOU WANT TO -- I'M ABOUT TO DO A NEW TOPIC.  DO YOU

10   WANT TO TAKE A BREAK OR SHOULD I KEEP GOING?

11           THE COURT:  THAT'S FINE.  THAT'S FINE.

12   WE CAN TAKE OUR BREAK NOW.  AGAIN, PLEASE KEEP AN

13   OPEN MIND.  DON'T DISCUSS THE CASE WITH ANYONE, AND

14   PLEASE DON'T READ OR RESEARCH THE CASE.

15           ALL RIGHT.  THANK YOU.  YOU CAN LEAVE

16   YOUR JUROR NOTEBOOKS ON YOUR CHAIRS DURING THE

17   BREAK.  WE'LL TAKE A 15-MINUTE BREAK.  THANK YOU.

18           YOU CAN STEP DOWN, BUT PLEASE WAIT UNTIL

19   OUR JURORS LEAVE THE COURTROOM.

20           (WHEREUPON, THE FOLLOWING PROCEEDINGS

21   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

22           THE COURT:  ALL RIGHT.  YOU CAN STEP

23   DOWN.  THANK YOU.  WE'RE ON OUR BREAK NOW .

24           THE COURT:  ACTUALLY, CAN WE GO ON THE

25   RECORD A SECOND?  IN APPLE'S SLIDE, YOU COMPARED

```
 1    HOME SCREENS TO APPLICATION SCREENS, SO I DON'T SEE
 2    WHY YOU'RE OBJECTING TO SAMSUNG ALSO COMPARES HOME
 3    SCREENS TO APPLICATION SCREENS.
 4          YOUR OWN DEMONSTRATIVE HAS THAT
 5    COMPARATIVE.  SO WHY WERE YOU OBJECTING TO THAT?
 6          MS. KREVANS:  I'M SORRY, YOUR HONOR.  MY
 7    HEAD WAS IN THE FOG THERE.
 8          THE COURT:  YOU HAD MADE AN OBJECTION
 9    THAT HOME SCREENS ARE BEING COMPARED TO APPLICATION
10    SCREENS AND THAT WHAT'S CLAIMED IN THE D'305 IS
11    JUST THE APPLICATION SCREEN, ALL RIGHT.
12          BUT THEN YOU MAKE YOUR OWN COMPARISONS OF
13    THE DIFFERENT SCREENS --
14          MS. KREVANS:  MY OBJECTION YESTERDAY,
15    YOUR HONOR, WAS THEY HAD SLIDES WITH THE D'305
16    PATENT ON IT COMPARED TO THE HOME SCREEN.
17          WE'RE NOT ACCUSING THE HOME SCREEN OF
18    INFRINGEMENT OF THE D'305 PATENT.  WE'RE ONLY
19    ACCUSING THE APPLICATION SCREENS.
20          AND THE D'305 PATENT ITSELF DOESN'T SAY
21    ANYTHING ABOUT HOME SCREEN, APPLICATION SCREEN,
22    ANYTHING LIKE THAT IN ITS CLAIM.  IT JUST SAYS A
23    DISPLAY SCREEN, GRAPHICAL INTERFACE DISPLAY SCREEN.
24    -     WE DON'T HAVE ANY ISSUES ABOUT THAT
25    RELATING TO TRADE DRESS.  MY ISSUE WAS JUST WHERE
```

1    THEY HAD THE PATENT COMPARED TO THE HOME SCREEN

2    BECAUSE IT SUGGESTED THAT WE WERE ACCUSING THE HOME

3    SCREEN WHICH DOESN'T, IN FACT, LOOK LIKE THE

4    PATENT.

5              MR. VERHOEVEN:  YOUR HONOR, IT'S NEVER

6    BEEN SUGGESTED THAT THEY'RE ACCUSING THE HOME

7    SCREEN.  I THINK WE WORKED THIS OUT, THOUGH.  I

8    THINK, YOUR HONOR, AS LONG AS I CLARIFY IT, THAT

9    THEY'RE NOT ACCUSING THE HOME SCREEN, IT'S OKAY FOR

10   US TO SHOW IT AND MOVE ON TO SHOW THAT THEY HAVE

11   THE HOME SCREENS AND THE APPLICATION SCREENS.

12             THAT'S FINE FOR US, YOUR HONOR.

13             MS. KREVANS:  I THINK YOUR HONOR'S RULING

14   WAS THEY SHOULD USE THE ACTUAL PHONES.

15             THE COURT:  YEAH.  IS EVERYONE SET ON

16   THAT?

17             MR. VERHOEVEN:  WELL, NO, YOUR HONOR.

18             THE COURT:  OR DO YOU WANT TO JUST DO THE

19   SCREEN-TO-SCREEN SHOTS?

20             MR. VERHOEVEN:  WELL, YES.  YOUR HONOR,

21   YOU MAY RECALL THIS MORNING BEFORE WE STARTED OUT,

22   I POINTED OUT THEY HAVE SCREEN-TO-SCREEN SHOTS, AND

23   I SAID AS LONG AS WE'RE ABLE TO DO SCREEN-TO-SCREEN

24   SHOTS AS WELL, WE HAVE NO OBJECTION.

25             SO WE WOULD INTEND TO JUST DO

```
 1     SCREEN-TO-SCREEN SHOTS, PROBABLY MOSTLY ON THE
 2     SLIDE THEY ALREADY HAVE.
 3               THE COURT:  THAT'S FINE.
 4               MS. KREVANS:  YOUR HONOR, IF HE WANTS TO
 5     SHOW THE D'305 PATENT COMPARED TO A HOME SCREEN, I
 6     THINK HE WOULD HAVE TO SAY THEY'RE NOT ACCUSING
 7     THIS HOME SCREEN.
 8               MR. VERHOEVEN:  I WILL SAY THAT.
 9               THE COURT:  THAT'S FINE.  ALL RIGHT.
10               MR. VERHOEVEN:  THANK YOU, YOUR HONOR.
11               THE COURT:  ALL RIGHT.  HAS YOUR,
12     MR. VERHOEVEN, IS YOUR LIVE NOTE WORKING NOW, OR
13     NOT?
14               THE COURT:  MINE IS NOT EITHER.
15               (WHEREUPON, A RECESS WAS TAKEN.)
16               (WHEREUPON, THE FOLLOWING PROCEEDINGS
17     WERE HELD IN THE PRESENCE OF THE JURY:)
18               MS. KREVANS:  YOUR HONOR, WHILE WE'RE
19     WAITING, THIS IS PX 21 TO RESPOND TO THE OBJECTION.
20               THE COURT:  OH, OKAY, PLEASE.
21               THE CLERK:  YOU MAY BE SEATED.
22               THE COURT:  OKAY.  IT'S 10:47.  GO AHEAD,
23     PLEASE.
24               MS. KREVANS:  THANK YOU, YOUR HONOR.  I
25     PROVIDED COUNSEL AN AMENDED 14.21.  I WOULD NOW
```

1    MOVE FOR ITS ADMISSION.

2              MR. VERHOEVEN:  POINT OF PROCEDURE, YOUR

3    HONOR.  I DON'T WANT TO HAVE ANY CONFUSION.  IT'S

4    BEEN ALTERED NOW.  IT HAS THE SAME EXHIBIT NUMBER,

5    SO PERHAPS WE SHOULD GIVE IT A DIFFERENT NUMBER.

6              MS. KREVANS:  WE'RE HAPPY TO REPLACE IT,

7    BUT WE'RE HAPPY TO GIVE IT A DIFFERENT NUMBER.

8              THE COURT:  DO YOU WANT TO SAY 21-A?

9              MS. KREVANS:  21-A WOULD BE FINE, YOUR

10   HONOR.

11             MR. VERHOEVEN:  THAT'S FINE, YOUR HONOR.

12             THE COURT:  OKAY.  SO THIS IS IN LIEU

13   OF -- IN LIEU OF ORIGINALLY OFFERED PX 21.

14             THE COURT:  OKAY.

15             MR. VERHOEVEN:  AND FOR THE RECORD, WE

16   OBJECT TO THIS DEMONSTRATIVE, AGAIN, BUT YOUR HONOR

17   OVERRULED THAT.  WE HAVE NO FURTHER OBJECTIONS.

18             MS. KREVANS:  THE DEMONSTRATIVE WAS

19   PREVIOUSLY OVERRULED, YOUR HONOR.

20             THE COURT:  GO AHEAD.

21             MS. KREVANS:  OKAY.

22   Q    TURNING TO A NEW TOPIC WITH YOU, DR. KARE.

23   ALTERNATIVE DESIGNS.

24             DID YOU DO ANY ANALYSIS AS TO WHETHER OR

25   NOT THERE ARE ALTERNATIVE DESIGNS, THAT IS, DESIGNS

1400

```
 1   THAT ARE NOT THE SAME DESIGN AS THE D'305 PATENT
 2   AND THE IPHONE HOME SCREENS, THAT COULD BE USED FOR
 3   APPLICATION SCREENS IN ELECTRONIC DEVICES?
 4   A    YES.
 5   Q    WHAT WAS YOUR CONCLUSION?
 6   A    WELL, IN GENERAL, WHEN ASKED ABOUT THIS, I
 7   THINK, OF COURSE, THERE'S ALTERNATIVE DESIGNS.
 8            AND I SAY THIS BECAUSE THIS IS WHAT I DO
 9   ALL THE TIME IS COME UP WITH A VARIETY OF IDEAS TO
10   SOLVE A PARTICULAR SCREEN DESIGN PROBLEM.  IT'S NOT
11   AN EXACT SCIENCE.  YOU -- IT'S WHAT MAKES IT FUN TO
12   JUST THINK ABOUT A PROBLEM AND TRY TO SOLVE IT IN A
13   NEW AND BETTER WAY.
14            SO I DID LOOK FOR BETTER ALTERNATIVES,
15   BUT I THOUGHT, WELL, THIS WOULDN'T BE ANY DIFFERENT
16   THAN ANY OTHER, THAN ANY OTHER DESIGN, GRAPHIC
17   DESIGN PROBLEM OF, YOU KNOW, YOU WORK WITH THE
18   CLIENT, YOU FIND OUT WHAT THE GOAL IS AND THE
19   TECHNICAL INPUT IS AND THE MARKETING OBJECTIVES AND
20   THEN YOU JUST, YOU'RE ONLY LIMITED BY YOUR
21   IMAGINATION AND YOUR ABILITY TO THINK ABOUT HOW TO
22   DO IT.  AND HOW TO DO IT IN A WAY -- YOU KNOW, I
23   USUALLY THINK HOW TO DO IT BETTER THAN IT'S BEEN
24   DONE BEFORE.
25            SO I -- BUT I -- YES, I FOUND SOME
```

1    ALTERNATIVES THAT I THOUGHT WOULD BE VALID.

2    Q    OKAY.  DID YOU BRING US SOME EXAMPLES OF SOME

3    ALTERNATIVE DESIGNS THAT YOU FOUND?

4    A    YES.

5    Q    OKAY.  COULD WE LOOK AT PX 22, WHICH IS IN

6    YOUR BINDER IN FRONT OF YOU, DR. KARE.

7              WHAT IS PX 22?

8    A    IT'S A PHOTO OF TWO SCREENS FROM THE

9    BLACKBERRY TORCH 9850.

10   Q    IS THIS BLACKBERRY TORCH, IS THAT A DEVICE

11   THAT'S ACTUALLY SOLD?

12   A    WELL, I SAW ONE, SO I ASSUME SO.

13   Q    OKAY.  WHAT -- ARE THERE ANY OTHER DEVICES

14   PICTURED IN PX 22?

15   A    NO.

16   Q    OKAY.  CAN YOU LOOK AT THE SECOND PAGE?

17   A    YES.  SO SORRY.

18              THESE ARE TWO SCREENS FROM THE NOKIA N9.

19              MR. VERHOEVEN:  YOUR HONOR, I BELIEVE

20   WE'RE GOING TO OBJECT TO THIS TESTIMONY.  YOU CAN

21   SEE IT ON YOUR SCREEN, BUT NOT ON THE BIG SCREEN.

22   THIS PARTICULAR ALTERNATIVE DESIGN IS NOT DISCLOSED

23   IN TRADE DRESS RESPONSES TO INTERROG 71 AND 72,

24   CONTENTION INTERROGATORIES CONCERNING TRADE DRESS.

25              THE COURT:  THE WHOLE EXHIBIT, OR JUST

THE --

          MR. VERHOEVEN:  WELL, THIS EXHIBIT IS

OBJECTIONABLE AND HASN'T BEEN OFFERED YET BECAUSE

OF THE OTHER REASONS WE'VE BEEN TALKING ABOUT.

          BUT THE SUBJECT THAT THE WITNESS IS

TESTIFYING ABOUT, THE NOKIA N9, WAS NOT DISCLOSED.

          MS. KREVANS:  THE FIRST PHONE THAT SHE

DISCUSSED WAS IN THE ROG RESPONSE, THE SECOND WAS

NOT.  BOTH ARE IN THE ROG REPORT.

          MR. VERHOEVEN:  WE DIDN'T OBJECT TO THE

FIRST ONE, YOUR HONOR.

          THE COURT:  ALL RIGHT.  WHY DON'T YOU

POINT OUT WHAT PAGE AND LINE NUMBER, PLEASE.

          MS. KREVANS:  IN THE ROG RESPONSE?  IT

IS --

          THE COURT:  IN THE EXPERT REPORT.

          MS. KREVANS:  OH.  IN THE EXPERT REPORT,

IT IS --

          MR. VERHOEVEN:  YOUR HONOR, WE DON'T NEED

TO DO THAT.  I'M NOT DISPUTING IT'S IN THE EXPERT

REPORT.

          THE COURT:  OKAY.  I SEE NOKIA N9.

          MR. VERHOEVEN:  THE OBJECTION IS IT'S NOT

IN RESPONSE TO CONTENTION INTERROGATORIES 71 AND

72.

1          MS. KREVANS:  THIS PARTICULAR DESIGN IS

2    NOT IN THE INTERROGATORY RESPONSE, THAT'S CORRECT.

3          YOUR HONOR, WE SAID THERE WERE MANY

4    EXAMPLES.  WE GAVE SOME, BUT WE SAID THERE WERE

5    MANY.  BUT IT WAS CERTAINLY IN THE EXPERT REPORT.

6          THE COURT:  IT'S EXCLUDED.  GO ON TO YOUR

7    NEXT EXHIBIT.

8    BY MS. KREVANS:

9    Q    COULD WE LOOK AT EXHIBIT PX --

10          (PAUSE IN PROCEEDINGS.)

11          MS. KREVANS:  CAN WE LOOK AT PX 158

12    PLEASE.  AND, AGAIN, JUST ON OUR SCREEN, THOMAS.

13          THIS IS THE FIRST -- THIS EXHIBIT IS THE

14    SAME AS THE FIRST PAGE TO WHICH MR. VERHOEVEN SAID

15    HE DID NOT OBJECT.  WE OFFER IT INTO EVIDENCE.

16          MR. VERHOEVEN:  WE OBJECT TO THIS SLIDE,

17    YOUR HONOR.  I DIDN'T OBJECT TO THE SUBJECT MATTER

18    ON THE OTHER SLIDE.  I OBJECT TO THIS SLIDE BECAUSE

19    IT DEPICTS THE -- IT'S NOT THE SCREEN-TO-SCREEN

20    SHOTS WE TALKED ABOUT.

21          MS. KREVANS:  WE WILL MAKE A REPLACEMENT

22    IN WHICH WE TAKE OUT THE PHONE AND SHOW ONLY THE

23    SCREEN AND WE'LL CALL IT 158-A.

24          THE COURT:  THAT'S FINE.

25          MS. KREVANS:  THEN, YOUR HONOR, WE'LL

```
 1    MOVE THE ADMISSION OF 158-A, AND WE'LL PROVIDE IT

 2    TO THE COURT AND COUNSEL.

 3              THE COURT:  NO, I NEED TO SEE IT FIRST.

 4    I'M NOT GOING TO ADMIT IT BEFORE I'VE SEEN IT AND

 5    MR. VERHOEVEN HAS SEEN IT.

 6              MS. KREVANS:  OKAY.  CAN WE LOOK AT.

 7              CAN WE LOOK AT EXHIBIT 160, PLEASE,

 8    THOMAS.

 9    Q    WHAT IS EXHIBIT 160, DR. KARE?

10              MR. VERHOEVEN:  OBJECTION, NOT DISCLOSED

11    IN RESPONSE TO CONFIDENTIAL INTERROGATORIES 71 AND

12    72.

13              MS. KREVANS:  OKAY.  WE'LL WITHDRAW THAT.

14              THE COURT:  OKAY.

15    BY MS. KREVANS:

16    Q    COULD YOU LOOK AT SLIDE 14.30.  WHAT IS SHOWN

17    ON SLIDE 14.30, DR. KARE?

18    A    IT'S THE, A SCREEN SHOT OF THE IPHONE HOME

19    SCREEN AND A BLACKBERRY TORCH SCREEN.

20    Q    AND COULD YOU, FOR THE JURY, COMPARE THESE TWO

21    DESIGNS?

22    A    I JUST WANTED TO SHOW THAT YOU COULD -- I

23    LOOKED FOR SCREENS THAT HAD ABOUT THE SAME NUMBER

24    OF THINGS ON THEM, THAT PERFORMED APPROXIMATELY THE

25    SAME FUNCTIONALITY, AND JUST SHOW THAT BY -- THAT
```

```
1     YOU COULD DO A DESIGN THAT DOESN'T LOOK CONFUSINGLY

2     SIMILAR OR THAT PROVIDES AN ALTERNATIVE THAT'S

3     DIFFERENT.

4              AND IN THIS SCREEN, YOU CAN SEE THAT JUST

5     BY HAVING THE BATCH OF ICONS NOT ON A CONSISTENT

6     SHAPE, IT JUST -- IT LOOKS DIFFERENT.  YOU SEE MORE

7     BACKGROUND.

8              THERE'S ALSO A BIG RED AREA, IT LOOKS RED

9     IN THE SLIDE, BUT IT'S KIND OF A DEEP CRIMSON COLOR

10    WITH A BLUE BAND UNDERNEATH THAT.

11             IT JUST GIVES A DIFFERENT OVERALL

12    IMPRESSION.

13    Q    NOW, YOU MENTIONED THAT THERE WAS A FOURTH

14    TOPIC THAT YOU WERE ASKED TO STUDY, AND THAT WAS

15    WHETHER THERE WERE THINGS THAT SUGGESTED TO YOU

16    THAT SAMSUNG MAY HAVE COPIED THE IPHONE HOME SCREEN

17    GRAPHICS.

18             WHAT DID YOU DO TO LOOK AT THAT TOPIC?

19    A    I -- THERE WERE TWO, TWO PHASES TO THIS.

20             THE FIRST IS I WENT BACK AND I LOOKED AT

21    IMAGES OF EVERY SCREEN I LOOKED AT AND I THOUGHT

22    ABOUT HOW MANY SIMILARITIES RECURRED OVER AND OVER

23    AS A PATTERN THAT SEEMED TO ME THAT ALL THESE

24    SIMILARITIES FROM PHONE TO PHONE WAS BEYOND

25    COINCIDENTAL .
```

```
 1              AND JUST -- YOU WOULDN'T BE LIKELY TO
 2   HAVE SO MANY THINGS BE THE SAME IF ONE THING WERE
 3   DEVELOPED WITHOUT USING THE OTHER AS A GUIDE.
 4              SO IT SEEMED LIKELY TO ME THAT SAMSUNG
 5   USED THE IPHONE SCREEN GRAPHICS AS A GUIDE.
 6   Q    AND YOU MENTIONED THERE WERE TWO PHASES.  WHAT
 7   WAS THE OTHER PHASE?
 8   A    THE OTHER PHASE WAS A DOCUMENT I WAS SHOWN.
 9   Q    OKAY.  COULD YOU LOOK AT EXHIBIT PX 44 IN YOUR
10   BINDER.
11              WHAT IS EXHIBIT PX 44, JUST GENERALLY?
12   A    IT'S A SAMSUNG DOCUMENT I WAS SHOWN BY APPLE
13   COUNSEL.
14   Q    OKAY.  DID YOU CONSIDER THIS DOCUMENT IN
15   FORMING YOUR OPINIONS?
16   A    I, AS I SAID, FROM MY OWN -- BASED ON MY OWN
17   EXPERIENCE, BASED ON MY OWN ANALYSIS, I THOUGHT
18   THERE WAS A LIKELIHOOD THAT THE IPHONE COULD HAVE
19   BEEN USED AS A GUIDE FOR THE GRAPHICS IN THE
20   SAMSUNG PHONES I SAW.
21              BUT THERE WAS INFORMATION IN THIS
22   DOCUMENT THAT SUPPORTED MY OWN OPINION.
23   Q    OKAY.  COULD YOU LOOK SPECIFICALLY AT THE
24   FIRST PAGE, AND THEN PAGE 43, 51, 122, 127, AND 131
25   OF PX 44.
```

```
 1            ARE THOSE ALL PAGES OF THIS DOCUMENT THAT

 2    YOU CONSIDERED IN FORMING YOUR OPINIONS?

 3    A    YES.

 4            MS. KREVANS:  YOUR HONOR, WE WOULD --

 5    THERE ARE SOME PAGES FROM THIS DOCUMENT THAT ARE

 6    ALREADY IN HE HAVE.  ADDITIONALLY, WE WOULD MOVE

 7    THE COVER PAGE, WHICH I THINK HAS NOT BEEN MOVED IN

 8    YET, AND PAGES 43, 51, 122, 127, AND 131.

 9            MR. VERHOEVEN:  I'M GOING TO HAVE TO

10    WRITE THIS DOWN AND LOOK AT EACH OF THE PAGES.

11    SORRY, YOUR HONOR.  WE'RE GOING TO HAVE TO WRITE

12    THIS DOWN AND LOOK AT EACH OF THE PAGES.

13            I CAN TELL YOU RIGHT NOW THAT SEVERAL OF

14    THOSE PAGES ARE NOT ADDRESSED AT ALL IN HER REPORT.

15            MS. KREVANS:  YOUR HONOR, I'M ON THE

16    CLOCK, AND I OBJECT TO SLOWDOWN TACTICS.  THESE

17    PAGES ARE ALL EXPRESSLY DISCLOSED IN OUR REPORT BY

18    BATES NUMBER.  THE ONLY BATES NUMBER THAT'S NOT IS

19    THE COVER AND THE COVER IS OBVIOUS.

20            MR. VERHOEVEN:  THEN WE OBJECT, YOUR

21    HONOR.

22            THE COURT:  ON WHAT BASIS?

23            MR. VERHOEVEN:  THOSE PAGES ARE NOT IN

24    EVIDENCE.  THERE'S NO FOUNDATION LAID FOR THOSE

25    PAGES, YOUR HONOR.  AND IT'S INAPPROPRIATE TO TRY
```

```
1    TO GET IN PAGES FOR WHICH THERE'S NO FOUNDATION

2    THROUGH AN EXPERT WITNESS.

3              MS. KREVANS:  YOUR HONOR, THE WITNESS HAS

4    JUST LAID A FOUNDATION FOR HOW THESE ARE RELEVANT

5    TO HER REPORT.  THE DOCUMENTS HAVE PREVIOUSLY BEEN

6    ADMITTED IN PART BECAUSE IT IS A SAMSUNG ADMISSION.

7    THERE'S NO QUESTION AS TO AUTHENTICITY.

8              ACTUALLY, NOW THAT I LOOK AT THE REPORT,

9    I SEE SHE DOES REFERENCE THE TITLE PAGE.

10             THE COURT:  122 AND 131 WERE ADMITTED

11   WITH MR. DENISON BACK ON AUGUST 3RD, SO THOSE ARE

12   IN.

13             SO THE ONLY QUESTION IS 43, 51, AND 127.

14             MS. KREVANS:  AND THE COVER AS WELL, YOUR

15   HONOR, AND THESE ARE EXPLICITLY DISCUSSED IN THE

16   REPORT AND THE DOCUMENT WAS IDENTIFIED IN

17   INTERROGATORY RESPONSES.

18             MR. VERHOEVEN:  NO FOUNDATION HAS BEEN

19   LAID FOR ANY OF THESE PAGES, AND SO WE OBJECT ON

20   THAT GROUND.  IT'S NOT APPROPRIATE TO PUT IN --

21             THE COURT:  YOU'VE MADE YOUR OBJECTION.

22             MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

23             THE COURT:  122 AND 131 WERE ALREADY

24   ADMITTED THROUGH MR. DENISON, BUT THE REST YOU NEED

25   TO LAY A FOUNDATION.
```

1          MS. KREVANS:  OKAY.

2    Q    DID YOU LOOK AT THE FRONT COVER AND PAGES 43,

3    51, AND 127 IN FORMING YOUR OPINIONS, DR. KARE?

4    A    YES.

5    Q    HOW DID THOSE PAGES AND THE CONTENT OF THEM

6    RELATE TO THE OPINIONS THAT YOU FORMED?

7    A    I'M TALKING ABOUT WHETHER THERE WAS EVIDENCE

8    THAT SAMSUNG MAY HAVE USED APPLE GRAPHICS FROM THE

9    IPHONE AS A GUIDE, AND ALL THESE PAGES IN THIS

10   RELATIVE EVALUATION REPORT ON THE S 1 AND THE

11   IPHONE SHOW A PICTURE OF THE IPHONE HOME SCREEN ON

12   THE LEFT AND A PICTURE --

13          MR. VERHOEVEN:  YOUR HONOR, I'M GOING TO

14   OBJECT AT THIS POINT --

15          THE WITNESS:  OF SAMSUNG.

16          MR. VERHOEVEN:  THERE'S NO FOUNDATION

17   LAID FOR THIS DOCUMENT AND NOW THE WITNESS IS

18   DESCRIBING A DOCUMENT THAT'S NOT IN EVIDENCE FOR

19   WHICH NO FOUNDATION WAS LAID.  IT'S INAPPROPRIATE

20   TO PUT IN --

21          THE COURT:  ALL RIGHT.  THANK YOU.  PAGE

22   122, 58, AND 131 ARE ALREADY IN EVIDENCE.

23          MR. VERHOEVEN:  I'M JUST REFERRING TO THE

24   THREE THAT SHE ASKED ABOUT, 43, 51, AND 127 IN THE

25   SUBSTANTIVE QUESTION, YOUR HONOR.

```
1              MS. KREVANS:  AND, YOUR HONOR, IT'S AN

2    ADMISSION.  IT'S A SAMSUNG DOCUMENT.  THE WITNESS

3    REVIEWED THE DOCUMENT, AND THERE IS NO REASON WHY

4    IT IS IMPROPER FOR HER TO TESTIFY ABOUT WHAT THE

5    DOCUMENT SHOWS.

6              THE COURT:  AS AN EXPERT?

7              MS. KREVANS:  AS AN EXPERT.

8              THE COURT:  GO AHEAD.

9              MS. KREVANS:  THANK YOU.

10   Q    OKAY.  COULD YOU -- SO, YOUR HONOR, I THINK

11   WHAT WE NOW HAVE IN IS, JUST FOR THE RECORD, THE

12   COVER AND PAGES, IN TOTAL, 43, 51, 122, 127, AND

13   131.

14             THE COURT:  NO.  I DIDN'T SAY THAT THEY

15   WERE ADMITTED.  AND I'M NOT GOING TO LET YOU

16   PUBLISH THEM TO THE JURY UNLESS IT'S ADMITTED.  IF

17   YOU WANT TO SHOW THEM, PAGES 58, 122, AND 131, YOU

18   CAN.

19   BY MS. KREVANS:

20   Q    DR. KARE, DID THE CONTENTS OF EXHIBIT 44

21   CONFIRM IN ANY WAY -- STRIKE THAT.

22             CAN YOU TELL US WHETHER -- WHAT

23   CONCLUSIONS YOU DREW FROM THE CONTENTS OF EXHIBIT

24   44, BUT REFERENCE, PLEASE, IN YOUR TESTIMONY IF YOU

25   TALK SPECIFICALLY, ONLY THE CONTENTS OF PAGES 122
```

```
 1    AND 131.
 2    A    I'M SORRY.  CAN I EXPLAIN WHAT WAS ON ANOTHER
 3    PAGE AND HOW IT AFFECTED ME WITHOUT SHOWING IT?
 4              MS. KREVANS:  YOUR HONOR, I THINK THIS
 5    WOULD BE --
 6              THE COURT:  I'M GOING TO ALLOW THAT.  GO
 7    AHEAD.
 8              THE WITNESS:  CAN I READ FROM IT AND
 9    DESCRIBE THE ILLUSTRATION?
10              MR. VERHOEVEN:  WE WOULD OBJECT TO THAT,
11    YOUR HONOR.
12              THE COURT:  WHY DON'T YOU JUST DESCRIBE
13    THE ILLUSTRATION.
14    BY MS. KREVANS:
15    Q    WHY DON'T YOU JUST DESCRIBE IT, DR. KARE?
16    A    OKAY.  I SAW, ON A SERIES OF PAGES, WHERE
17    THE -- AT THE TOP OF THE PAGE, IT TALKS ABOUT SOME
18    ASPECT OF ICON DESIGN, AND THEN ON THE LEFT,
19    THERE'S A PICTURE OF THE IPHONE HOME SCREEN, ON THE
20    RIGHT THERE'S A PICTURE OF THE GT I9000, SAME SIZE,
21    SIDE BY SIDE, AND THEN THERE'S BULLET POINTS BESIDE
22    EACH ONE.
23              AND, TYPICALLY, IN ONE OF THESE SCREENS,
24    IT TALKS ABOUT THAT THERE'S CONFUSION ABOUT THE
25    SIMILARITY OF ICONS ON THE SAMSUNG SCREEN.
```

1412

```
1            AND THEN THE DOCUMENT TALKS ABOUT HOW

2    APPLE DOES IT BETTER, HOW THEY DIFFERENTIATE, A

3    LITTLE BIT ABOUT THE ICON STYLE.

4            AND THEN AT THE BOTTOM OF EVERY ONE OF

5    THESE PAGES, THERE'S A PINK BOX AND IT SAYS,

6    "DIRECTIONS FOR IMPROVEMENT," AND THEN IT SUGGESTS

7    WHAT SAMSUNG DESIGNERS OUGHT TO DO TO MAKE THEIR

8    PHONE BETTER, CHANGES OR, YOU KNOW, NOTE THIS AND

9    TRY TO DO THIS.

10            AND THERE ARE RED RINGS AROUND PARTICULAR

11   ICONS ON THE APPLE SCREEN AND ON THE SAMSUNG

12   SCREEN, AND I CAN SEE HOW, BY LOOKING AT WHAT

13   ULTIMATELY HAPPENED, HOW CONCRETE ASPECTS OF THE

14   APPLE ICONS AFFECTED WHAT ULTIMATELY WERE IN THE

15   PHONES THAT I LOOKED AT.

16            SO IT DID HAVE -- IT'S HARD TO -- NOT TO

17   SEE FROM WHAT WAS SHOWN TO ME AS AN INTERNAL

18   SAMSUNG DESIGN DOCUMENT, HOW -- WHAT HAPPENED.

19            MS. KREVANS:  NOTHING FURTHER, YOUR

20   HONOR.

21            MR. VERHOEVEN:  I'M GOING TO OBJECT AND

22   MOVE TO STRIKE THAT LAST ANSWER.

23            THE COURT:  OVERRULED.  OVERRULED.

24            NOW, THE TIME IS 11:06.  GO AHEAD WITH

25   YOUR CROSS, PLEASE.
```

1      THE COURT:  ARE THESE NEW KARE CROSS --

2  WHY AM I GETTING NEW CROSS-EXHIBITS RIGHT NOW?  ARE

3  THESE DIFFERENT THAN THE ONES I GOT YESTERDAY?  ARE

4  THESE DIFFERENT THAN THE ONES I GOT YESTERDAY?

5      MR. VERHOEVEN:  THE DEMONSTRATIVES WERE

6  UPDATED TO ADDRESS THE CONCERNS THAT WERE MADE

7  ABOUT SCREEN-TO-SCREEN SHOTS.

8      THE COURT:  OKAY.  BUT WHY DIDN'T YOU

9  JUST GIVE ME THAT NEW EXHIBIT?  ALL RIGHT.

10      MS. KREVANS:  YOUR HONOR, WE HAVE NOT

11  BEEN PROVIDED WITH ANY NEW UPDATED DEMONSTRATIVES.

12      IF THEY'RE NEW DEMONSTRATIVES THAT WERE

13  CREATED LAST NIGHT, YOUR HONOR, WE HAVEN'T SEEN

14  THEM.

15      (PAUSE IN PROCEEDINGS.)

16      THE COURT:  ALL RIGHT.  WELL, THIS IS --

17  THIS IS COUNTING TO THE TRIAL TIME.  IN THE FUTURE,

18  WE NEED THIS DONE IN ADVANCE.

19      IT'S 11:08.

20      (PAUSE IN PROCEEDINGS.)

21      MR. VERHOEVEN:  MAY I PROCEED, YOUR

22  HONOR?

23      THE COURT:  PLEASE.

24      **CROSS-EXAMINATION**

25  BY MR. VERHOEVEN:

1    Q    GOOD MORNING, DR. KARE.

2    A    GOOD MORNING.

3    Q    MY NAMES IS CHARLES VERHOEVEN, COUNSEL FOR

4    SAMSUNG.

5          NOW, ON YOUR DIRECT EXAMINATION, YOU

6    PROVIDED SOME TESTIMONY WITH RESPECT TO THE DESIGN

7    '305 PATENT.  DO YOU REMEMBER THAT?

8    A    YES.

9    Q    AND I BELIEVE YOU SAID, YOU WERE ASKED TO

10   COMPARE THAT DESIGN PATENT TO THE APPLICATION

11   SCREEN OF CERTAIN ACCUSED SAMSUNG PHONES.

12   A    YES.

13   Q    AND YOU CONSIDERED THOSE PHONES IN FORMING

14   YOUR OPINION; CORRECT?

15   A    I CONSIDERED THE SCREEN -- THE IMAGES OF THE

16   SCREENS, JUST LOOKING AT THEM ON THE PHONE, AND

17   PHOTOS, YES.

18   Q    IS IT CORRECT THAT YOU WERE NOT ASKED TO FORM

19   ANY OPINIONS ABOUT THE HOME SCREENS ON THOSE

20   ACCUSED SAMSUNG PHONES?

21   A    YES.

22   Q    SO YOU DIDN'T LOOK AT THE HOME SCREENS AND ASK

23   THE QUESTION OF WHETHER THOSE WERE SUBSTANTIALLY

24   SIMILAR TO THE '305?

25   A    I SAW THE HOME SCREENS IN ORDER TO GET TO THE

1    APPLICATION SCREENS, BUT I CONSIDERED THE

2    APPLICATION SCREENS.

3    Q    SO WHEN YOU LOOK AT THE ACCUSED PHONES, IN

4    ORDER TO GET TO THE APPLICATION SCREEN, WHICH IS

5    WHAT YOU OFFERED AN OPINION OF, FIRST YOU HAVE TO

6    TURN ON THE PHONE; RIGHT?

7    A    YES.

8    Q    AND THEN WHAT DO YOU SEE?

9    A    YOU KNOW, FUNDAMENTALLY, I FOCUSSED ON YOU SEE

10   AN ARRAY OF ICONS AND --

11   Q    NO.  WHEN YOU TURN ON THE PHONE, WHAT DO YOU

12   SEE?

13   A    YOU SEE THE HOME SCREEN.

14   Q    OKAY.  AND SO A CONSUMER WHO TURNS ON THE

15   PHONE, THE FIRST THING THEY'RE GOING TO SEE IS THE

16   HOME SCREEN?

17   A    YES.

18   Q    OKAY.  AND IS IT CORRECT THAT IN ORDER TO GET

19   TO AN APPLICATION SCREEN, THE USER WILL HAVE TO

20   ACTUALLY MANIPULATE THE PHONE IN SOME WAY?

21   A    YES.

22   Q    WHAT DO THEY HAVE TO DO?

23   A    PRESS A BUTTON ON THE FAR RIGHT THAT HAS A

24   GRID OF SQUARES.

25   Q    OKAY.  AND THAT'LL BRING UP AN APPLICATIONS

1    MENU?

2    A    IT BRINGS UP AN APPLICATION SCREEN.

3    Q    OKAY.  SO IF WE COULD PUT UP SDX 3705, LET'S

4    PUT IT ON THE LOCAL SCREEN, NOT THE BIG SCREEN TO

5    MAKE SURE THERE'S NO OBJECTION.

6         MS. KREVANS:  YOUR HONOR, THAT'S STILL --

7    I'VE TURNED ON JX 1025 AND TURNED ON HOME SCREEN,

8    AND THAT STILL DOESN'T LOOK LIKE IT TO ME.

9         MR. VERHOEVEN:  LET ME DO IT THIS WAY,

10   YOUR HONOR, IN THE INTEREST OF TIME.  I'VE GOT AN

11   ACTUAL PHONE.  WHY DON'T I TURN IT ON AND USE THAT.

12        THE COURT:  THAT'S FINE.

13        MS. KREVANS:  IS IT THE JX 1025.

14        MR. VERHOEVEN:  IT IS THE JX 1025.

15        MS. KREVANS:  YOU HAVEN'T SHOWN IT TO ME,

16   COUNSEL.

17        MR. VERHOEVEN:  MAY I DO THAT, YOUR

18   HONOR.

19        THE COURT:  PLEASE, GO AHEAD.  SINCE

20   WE'VE HAD A PROBLEM WITH THE PHONES, LET'S DO THAT

21   WITH EVERY PHONE IN THE CASE.

22        MS. KREVANS:  IS THAT THE REPLACEMENT

23   STICKER?

24        I'M SORRY.  IT DOESN'T LOOK LIKE THE SAME

25   STICKERS THAT --

```
 1              MR. VERHOEVEN:  YOU CAN TELL ME WHAT YOU

 2     PREFER TO USE FOR JX 1025.  I'LL USE WHATEVER YOU

 3     WANT.

 4              THE COURT:  WAIT.  WHAT'S THE NUMBER?

 5     HAS IT BEEN ADMITTED?

 6              MS. KREVANS:  THIS PHONE HAS BEEN

 7     ADMITTED, AND I'M A LITTLE CONFUSED BECAUSE THE

 8     LABEL ON HERE IS THAT THE EXHIBIT STICKER LABEL

 9     FROM YESTERDAY BUT IT MAY HAVE BEEN THAT THEY WERE

10     RELABELED YESTERDAY WHEN THEY WERE PHOTOGRAPHED.  I

11     DON'T KNOW.

12              THE COURT:  WHAT IS THE NUMBER?

13              MR. VERHOEVEN:  IT'S JX 1025, YOUR HONOR.

14              THE COURT:  OKAY.

15              MS. KREVANS:  YESTERDAY --

16              THE COURT:  THAT'S THE DROID CHARGE

17     THAT'S BEEN ADMITTED SINCE AUGUST 3RD.  WHERE ARE

18     ALL THE ADMITTED EXHIBITS?

19              MR. VERHOEVEN:  WELL, THERE'S A BUNCH

20     HERE, YOUR HONOR, AND THIS IS WHAT I THINK IS AN

21     ADMITTED EXHIBIT.  I DON'T KNOW WHAT COUNSEL'S

22     ISSUE IS.

23              MS. KREVANS:  SO THERE WAS A STICKER ON

24     IT YESTERDAY THAT LOOKED JUST LIKE THE STICKER

25     THAT'S ON THE BOX AND NOW IT'S DIFFERENT.
```

1          IT MAY BE THAT SAMSUNG WANTED TO

2     PHOTOGRAPH THE PHONES LAST NIGHT AND MAY HAVE TAKEN

3     THE STICKER OFF AND MAY HAVE PUT A NEW LABEL ON IT.

4     I DON'T KNOW BECAUSE I WASN'T THERE.

5          AS LONG AS THEY CAN REPRESENT TO US THAT

6     IT'S THE SAME ONE THAT YESTERDAY HAD THIS EXHIBIT

7     STICKER ON IT, I'M FINE WITH IT, YOUR HONOR.

8          THE COURT:  DO ALL OF THE EXHIBITS HAVE

9     THE EXHIBIT STICKER, THE NORTHERN DISTRICT OF

10    CALIFORNIA STICKER.

11         MS. KREVANS:  BOTH THE BOXES AND THE

12    PHONES DID.  I KNOW SAMSUNG REQUESTED THEY WANTED

13    TO TAKE MORE PICTURES, AND WE PROVIDED -- WE

14    HAPPENED TO HAVE CUSTODY OF THESE PHONES, WE

15    PROVIDED THESE TO THEM, AND I THINK THERE WAS AN

16    ISSUE OF TAKING THE STICKERS OFF SO THE BACKS WOULD

17    BE PHOTOGRAPHED PRISTINE AND THEY REPLACED THEM.

18         THE COURT:  OKAY.  HOW COME THE PHONES

19    DON'T HAVE THE NORTHERN DISTRICT COURT STICKER ON

20    THEM?

21         MS. KREVANS:  THEY DID.  I THINK IT MAY

22    HAVE BEEN A REPLACEMENT.

23         MS. ABRAMOWITZ:  MY NAME IS ANNE

24    ABRAMOWITZ.  I REPRESENT SAMSUNG.

25         YOUR HONOR, LAST NIGHT WE WENT TO INSPECT

```
 1    THE PHONES AND THE EXHIBIT LABELS WERE -- COVERS

 2    THE BACKS OF THE PHONES AND IN SOME CASES COVERING

 3    BRANDING ON THE BACKS OF THE PHONES.

 4         SO WE SPOKE WITH COUNSEL FOR APPLE AND

 5    THEY AGREED THAT WE COULD REMOVE THE STICKERS FROM

 6    THE BACKS OF THE PHONES AND THAT AN ALTERNATIVE

 7    LABEL WOULD BE PUT IN PLACE.

 8         MS. KREVANS:  SO IS THIS THE SAME ONE

 9    THAT USED TO HAVE THE EXHIBIT STICKER IS MY

10    QUESTION.

11         MS. ABRAMOWITZ:  YES.  YOU CAN SEE THE

12    GUMMY RESIDUE FROM WHERE THE EXHIBIT LABEL WAS.

13         MS. KREVANS:  OKAY.  I THINK THE MYSTERY

14    HAS BEEN RESOLVED YOUR HONOR.  IT DOESN'T HAVE THE

15    COURT'S OFFICIAL LABEL, BUT PEOPLE HERE FROM

16    COUNSEL SAID IT IS.

17         THE COURT:  SO HOW MANY EXHIBITS HAVE THE

18    COURT'S OFFICIAL LABEL BEEN REMOVED?  HOW MANY?

19         MS. ABRAMOWITZ:  YOUR HONOR, WE TOOK THEM

20    OFF OF ALL OF THE DROID EXHIBITS SO THAT WE CAN

21    PHOTOGRAPH THE BACKS OF THE SAMSUNG PHONES.

22         THE COURT:  SO HOW MANY WOULD THAT BE?

23    ALL OF THE JOINT EXHIBITS?  NOT ALL OF THE JOINT

24    EXHIBITS?

25         MS. ABRAMOWITZ:  ALL OF THE SAMSUNG.
```

```
 1              THE COURT:  THAT'S 175 EXHIBITS.

 2              MS. ABRAMOWITZ:  SORRY.  I BELIEVE IT'S

 3     JX 1007 THROUGH, I THINK, 31.  I WOULD HAVE TO

 4     CONFIRM.

 5              THE COURT:  OKAY.

 6              MS. ABRAMOWITZ:  BUT COUNSEL FOR APPLE

 7     REPRESENTED THAT THEY WOULD LABEL PERHAPS THE SIDE

 8     OF THE PHONE.  WE DIDN'T COME TO AN OFFICIAL

 9     AGREEMENT ON WHERE THE LABEL WOULD GO.

10              MS. KREVANS:  I THINK, YOUR HONOR, IT

11     SOUNDS LIKE THEY'RE JUST REPLACEMENT LABELS, BUT

12     IT'S STILL THE SAME PHONE, IT JUST DOESN'T HAVE THE

13     EXHIBIT STICKER ON IT.

14              MS. ABRAMOWITZ:  I RECOGNIZE TRYING TO

15     SCRATCH THE GUMMY STUFF OFF THE BACK.

16              THE COURT:  ALL RIGHT.  NEXT TIME

17     ANYTHING IS GOING TO BE DONE WITH ACTUAL EXHIBITS

18     THAT HAVE ALREADY BEEN ADMITTED, COULD YOU ALL JUST

19     FILE A STATEMENT?  JUST FILE ONE SAYING THAT'S

20     HAPPENED.

21              MR. VERHOEVEN:  ABSOLUTELY, YOUR HONOR.

22              THE COURT:  BECAUSE IF ONE SIDE RAISES

23     SOMETHING, THE OTHER SIDE NEEDS TO KNOW.

24              MS. KREVANS:  YES, YOUR HONOR.

25     BY MR. VERHOEVEN:
```

1    Q    OKAY.  WHERE WERE WE?

2         WE WERE TALKING ABOUT YOU PROVIDED THE

3    TESTIMONY ABOUT HOW A CONSUMER MIGHT MAKE A MISTAKE

4    OR BE CONFUSED ABOUT THESE APPLICATION SCREENS

5    THINKING THAT, ONE, THAT IT'S A SAMSUNG APPLICATION

6    SCREEN AND MIGHT BE AN APPLE PHONE, RIGHT, OR AN

7    APPLE APPLICATION SCREEN.  DO YOU REMEMBER THAT?

8    A    THAT A SAMSUNG APPLICATION SCREEN WOULD LOOK

9    LIKE THE DESIGN OF THE D'305 PATENT.

10   Q    DIDN'T YOU -- DIDN'T I HEAR YOU SAY THAT YOU

11   THOUGHT THAT A CONSUMER WOULD BE CONFUSED AS TO THE

12   SOURCE?

13   A    WHEN WE TALKED ABOUT TRADE DRESS.

14   Q    RIGHT?

15   A    WHEN WE TALKED ABOUT -- EXCUSE ME.  I THOUGHT

16   YOU WERE ASKING ME ABOUT THE D'305.

17   Q    OKAY.  BUT YOU DID TALK ABOUT CONSUMERS

18   BEING -- WHETHER OR NOT CONSUMERS MIGHT BE CONFUSED

19   BY THE SAMSUNG APPLICATION SCREENS.

20        DO YOU REMEMBER THAT?

21   A    YES.

22   Q    OKAY.  AND YOU THOUGHT THAT THERE'S -- THAT

23   THEY MIGHT BE?

24   A    YES.

25   Q    OKAY.  SO LET'S LOOK AT WHAT A CONSUMER WOULD

1422

```
 1    SEE WHEN THEY TURN ON THE PHONE BETWEEN THE TIME

 2    THEY HAVE A PHONE LIKE THIS IN THEIR HANDS THAT'S

 3    TURNED OFF AND THE TIME THAT THEY ACTUALLY GET TO

 4    THE APPLICATION SCREEN.

 5              I'LL TRY TO DO THIS, YOUR HONOR, ON THE

 6    ELMO.

 7              DO WE HAVE A MICROPHONE?

 8              THE CLERK:  A MICROPHONE?

 9              MR. VERHOEVEN:  YEAH.  I THOUGHT THERE

10    WAS A LITTLE HAND MIKE.  THERE WE GO.

11              DOES THIS WORK?

12              I'M GOING TO PUT THIS CLOSE TO THE PHONE

13    SO THAT -- OKAY.

14    Q    SO NOW I'M THE CONSUMER, AND I'M TURNING ON

15    THE PHONE.  WHAT DOES THE CONSUMER SEE?

16    A    THE START-UP SCREEN WITH THE --

17    Q    WHAT DOES IT SAY?

18    A    IT SAYS, "SAMSUNG."

19    Q    STILL SAYS SAMSUNG.

20              WHAT'S DROID?  IS THAT SHORT FOR ANDROID?

21    A    I DON'T KNOW I KNOW IT'S THIS, THE DROID PHONE

22    HAS THE CHIN.

23    Q    AND NOW WHAT IS THE CONSUMER LOOKING AT NOW?

24    A    THE UNLOCK SCREEN.

25    Q    SO THE CONSUMER HAS TO DO SOMETHING HERE;
```

1   RIGHT?

2   A    YES.

3   Q    WHAT DO THEY HAVE TO DO?

4   A    MOVE THE PUZZLE PIECE TO THE RIGHT TO UNLOCK

5   IT.

6   Q    OKAY.  NOW, WHAT IS THE CONSUMER LOOKING AT?

7   A    THE HOME SCREEN OF THE SAMSUNG PHONE.

8   Q    OKAY.  AND SO WHAT DOES A CONSUMER NEED TO

9   DO -- THIS IS -- THIS SCREEN HERE IS NOT ACCUSED;

10  RIGHT?

11  A    NO.

12  Q    YOU WEREN'T EVEN ASKED TO LOOK AT THIS SCREEN;

13  RIGHT?

14  A    I WOULD SAY -- I WAS NOT ASKED TO CONSIDER

15  THIS SCREEN.

16  Q    OKAY.  SO IT'S JUST THE APPLICATION SCREEN;

17  RIGHT?

18  A    YES.

19  Q    OKAY.  AND REMIND US, WHAT DOES THE USER HAVE

20  TO DO -- WHAT DOES THE CONSUMER HAVE TO DO TO GET

21  TO THE APPLICATION SCREEN?

22  A    TOUCH THE BLUE BUTTON ON THE LOWER RIGHT WITH

23  THE GRID OF SQUARES.

24  Q    OKAY.  SO IT'S ONLY AFTER ALL OF THOSE STEPS

25  THAT A CONSUMER GETS TO THE APPLICATION SCREEN.

1    FAIR?

2    A    YES.

3    Q    NOW, DR. KARE, WOULDN'T YOU AGREE THAT BY THE

4    TIME A CONSUMER GOES THROUGH ALL THOSE STEPS TO GET

5    TO THE APPLICATION SCREEN, THAT CONSUMER KNOWS THAT

6    THIS IS A SAMSUNG PHONE?

7    A    I WAS ONLY ASKED TO CONSIDER THIS APPLICATION

8    SCREEN COMPARED TO THE APPLE HOME SCREEN.

9    Q    I UNDERSTAND THAT.

10   A    BECAUSE --

11   Q    BUT I HAVE A DIFFERENT QUESTION FOR YOU.

12        WOULDN'T YOU AGREE THAT BY THE TIME THAT

13   A CONSUMER TURNS ON THE PHONE AND GOES THROUGH

14   THOSE STEPS WE LOOKED AT, WHERE THEY SEE THE

15   SAMSUNG NAME PROMINENTLY FOR SEVERAL SECONDS, WHERE

16   THEY SEE THE GRAPHIC FOR DROID, WHERE THEY HAVE TO

17   GO PAST THE HOME SCREEN TO THE APPLICATION SCREEN,

18   BY THE TIME THEY GET TO THAT APPLICATION SCREEN,

19   WOULDN'T YOU AGREE THAT A CONSUMER KNOWS THAT

20   THEY'RE USING A SAMSUNG PHONE?

21   A    I'M NOT AN EXPERT IN CONSUMER BEHAVIOR AND

22   THAT KIND OF USER EXPERIENCE.

23        I'M REALLY FOCUSSED ON GRAPHIC U/I.  SO I

24   DON'T KNOW THAT I'M QUALIFIED TO ANSWER THAT.

25   Q    WELL, QUALIFIED OR NOT, WOULD YOU AGREE WITH

1    ME?  A CONSUMER, BY THIS POINT, GOING THROUGH THE

2    START-UP AND ALL OF THAT, SEEING ALL THAT

3    ADVERTISING, THEY KNOW THEY HAVE A SAMSUNG PHONE,

4    DON'T THEY?

5    A    I JUST CAN'T SPEAK TO THAT BECAUSE I DON'T --

6    I DON'T KNOW.

7    Q    YOU'RE NOT QUALIFIED?

8    A    I HAVEN'T STUDIED START-UP EXPERIENCE FROM

9    PHONE TO PHONE.  I -- I COMPLETELY -- I KNOW THAT

10   THIS IS THE APPLICATION SCREEN, NOT THE HOME

11   SCREEN.

12   Q    BY THE TIME THAT THE CONSUMER TURNS ON THE

13   PHONE, SEES THE SAMSUNG NAME PROMINENTLY DISPLAYED,

14   SEES THE DROID ADVERTISEMENT AND ANIMATION,

15   WOULDN'T YOU AGREE THAT NO CONSUMER WOULD BE

16   CONFUSED AS TO WHICH PHONE THEY HAVE BY THAT TIME?

17   A    I CAN'T AGREE BECAUSE I HAVEN'T -- I DON'T --

18   I DON'T KNOW ABOUT CONSUMER BEHAVIOR STARTING -- I

19   DON'T KNOW ABOUT THE QUESTION YOU'RE ASKING ME.

20   THAT'S OUTSIDE MY FOCUS.

21   Q    IT'S OUTSIDE YOUR EXPERTISE?

22   A    YES, AS A GRAPHIC U/I DESIGNER.

23   Q    NOW, THERE WAS ONE SLIDE -- I'LL TURN THIS OFF

24   NOW, YOUR HONOR, IF THAT'S OKAY.

25            THE COURT:  GO AHEAD, PLEASE.

```
 1    BY MR. VERHOEVEN:

 2    Q    THERE'S ONE SLIDE THAT YOU FOCUSSED ON WITH

 3    RESPECT TO YOUR TESTIMONY MORE THAN OTHERS WHEN YOU

 4    WERE TESTIFYING ABOUT YOUR OPINIONS WITH RESPECT TO

 5    THE DESIGN '305 PATENT, AND THAT WAS PDX 14.7.

 6              CAN WE PUT THAT ON THE SCREEN.  THIS IS A

 7    SLIDE THAT COUNSEL FOR APPLE SHOWED YOU.  DO YOU

 8    REMEMBER THAT?

 9    A    YES.

10    Q    AND DO YOU REMEMBER YOU SPENT MOST OF YOUR

11    TIME EXPLAINING THIS SLIDE, AND FOR THE OTHER

12    SLIDES SHE SHOWED YOU, YOU SAID SAME REASONS?

13    A    YES.

14    Q    SO LET'S FOCUS ON THIS SLIDE.

15              NOW, IF WE LOOK AT THE DESIGN '305 PATENT

16    COMPARED TO THE FASCINATE, DO YOU SEE IN THE DESIGN

17    '305 PATENT THE FIRST BOX IN THE UPPER LEFT SAYS

18    SMS?

19    A    YES.

20    Q    WHERE IS THAT ICON IN THE FASCINATE?

21    A    I BELIEVE THAT THE ANALOGOUS ICON IS IN THE

22    BOTTOM ROW ON THE RIGHT, THREE FROM THE LEFT.

23    Q    I HAVE A LASER POINTER, YOUR HONOR.

24              DO YOU MIND IF I HAND THIS TO THE WITNESS

25    SO SHE CAN INDICATE ON THE BIG SCREEN?
```

1    A    GO AHEAD, PLEASE.

2    Q    DO YOU KNOW HOW TO USE THESE?

3    A    I'M NOT A LASER POINTER EXPERT, EITHER.

4    Q    JUST PUT THIS BUTTON.  DON'T POINT IT IN

5    ANYBODY'S EYES.

6    A    OKAY.

7    Q    SO THE SMS IS ON THE TOP LEFT, RIGHT, IN THE

8    D'305?

9    A    YES.

10   Q    AND WHERE IS IT IN THE FASCINATE?

11   A    (INDICATING).

12   Q    RIGHT DOWN HERE?

13   A    I BELIEVE THAT THOSE ARE ANALOGOUS.

14   Q    OKAY.  SO IT'S IN A DIFFERENT PLACE; RIGHT?

15   A    YES.

16   Q    IN THE '305, THERE'S A DOCK OR -- WHAT WOULD

17   YOU CALL THIS BOTTOM ROW ON THE '305?

18   A    YOU KNOW, IT DOESN'T REALLY SAY IN THE '305

19   BECAUSE IT'S JUST A DESIGN, ORNAMENTAL DESIGN.  SO

20   I JUST HAVE BEEN CALLING IT AN AREA AT THE BOTTOM,

21   A SEPARATED AREA AT THE BOTTOM, BECAUSE IT

22   DOESN'T -- THE '305 DOESN'T TALK ABOUT

23   FUNCTIONALITY.

24   Q    OKAY.  WELL, IN THE D'305, THE SMS ICON IS NOT

25   IN THE BOTTOM ROW THAT'S SET OFF SEPARATELY; RIGHT?

1    A    RIGHT.

2    Q    BUT IN THE FASCINATE, IT IS IN THE BOTTOM ROW.

3    IS THAT BOTTOM ROW SET OFF SEPARATELY?

4    A    YES.

5    Q    SO YOU WOULD AGREE THAT'S A DIFFERENCE?

6    A    YES.

7    Q    NOW, YOU TALKED ABOUT ROUNDED RECTANGLES FOR

8    THE IPHONES.  DO YOU REMEMBER THAT?

9    A    YES.

10    Q    AND DO YOU REMEMBER YOU TESTIFIED WITH RESPECT

11    TO ALTERNATIVE DESIGNS THAT, GEE, SAMSUNG COULD

12    HAVE USED SOMETHING BESIDES ROUNDED RECTANGLES,

13    RIGHT?  THEY COULD HAVE PICKED A DIFFERENT SHAPE?

14    A    YES.

15    Q    WELL, THIS ICON SHEER NOT JUST A ROUNDED

16    RECTANGLE.  IT'S GOT A LITTLE -- IT'S ALMOST LIKE A

17    SPEECH BOX THAT YOU SEE IN CARTOONS; RIGHT?

18    A    RIGHT.

19    Q    DO YOU AGREE WITH THAT?

20    A    YES.  I WOULD SAY IT IS A SPEECH BALLOON THAT

21    HAS, HAS ROUNDED RECTANGULAR ELEMENTS, BUT IT'S NOT

22    A SQUARE.

23    Q    IT'S A DIFFERENT SHAPE?  RIGHT?

24    A    IT'S NOT A SQUARE.  IT HAS -- IT HAS STRAIGHT

25    EDGES ON TOP AND BOTTOM, BUT IT'S NOT -- AND

1    ROUNDED CORNERS, BUT IT'S NOT A SQUARE.

2    Q    AND THE D'305 PATENT SAYS SMS, BUT THE

3    FASCINATE JUST HAS A HAPPY FACE; RIGHT?

4    A    YES.

5    Q    IS IT YOUR TESTIMONY -- IT'S NOT YOUR

6    TESTIMONY THAT THOSE ARE SUBSTANTIALLY SIMILAR

7    ICONS, IS IT?

8    A    MY TESTIMONY DIDN'T COMPARE SPECIFICALLY

9    THOSE.  THEY HAVE FEATURES IN COMMON AND THEY HAVE

10   DIFFERENCES.

11   Q    DR. KARE, IS IT KARE OR KARE?

12   A    KARE.

13   Q    KARE, THANK YOU.

14        DR. KARE, YOU'RE NOT TESTIFYING TO THIS

15   JURY THAT THIS SMS ICON IS SUBSTANTIALLY SIMILAR TO

16   THIS OTHER ICON THAT SAYS, "MESSAGES," ARE YOU?

17   A    NO.

18   Q    IT'S NOT, IS IT?

19   A    IT HAS SOME SIMILARITIES.  IT USES THE SPEECH

20   BALLOON AS A METAPHOR AND IT HAS, AS I MENTIONED,

21   THE HORIZONTAL AND VERTICAL EDGES THAT ARE STRAIGHT

22   AND IT HAS ROUNDED CORNERS.  THOSE WOULD BE WHAT IT

23   HAS IN COMMON.

24        AND IT OBVIOUSLY HAS DIFFERENCES, LIKE

25   THE FACE AND THE POINT.

1    Q    IT'S NOT SUBSTANTIALLY SIMILAR, IS IT?

2    A    NO.

3    Q    THEN IF YOU LOOK AT THE NEXT ICON, IT SAYS

4    "CALENDAR."  AND YOU SEE IT'S GOT A 6, AND IT'S --

5    IT'S GOT WHITE AND A TOP BORDER THAT'S RED?

6    A    YES.

7    Q    AND I BELIEVE IT'S HARD TO SEE ON THE SCREEN.

8    IT SAYS WEDNESDAY IN THE BORDER?

9    A    MY EYES AREN'T THAT GOOD, BUT YES.

10   Q    OKAY.  WHERE IS THE CALENDAR ICON IN THE

11   FASCINATE?

12   A    (INDICATING).

13   Q    RIGHT THERE?

14   A    YES.

15   Q    OKAY.  SO IT'S NOT THE SECOND ICON, SECOND

16   COLUMN IN THE TOP ROW, RIGHT?

17   A    RIGHT.

18   Q    IT'S IN A DIFFERENT PLACE?

19   A    YES.

20   Q    AND IT'S A COMPLETELY DIFFERENT PICTURE, ISN'T

21   IT?

22   A    YES.

23   Q    THAT CALENDAR ICON IS NOT SUBSTANTIALLY

24   SIMILAR TO THE CALENDAR ICON IN THE D'305; RIGHT?

25   A    NO.

```
 1    Q    YOU AGREE WITH ME?

 2    A    YES.

 3    Q    IF YOU LOOK AT THIS SECOND ROW HERE, THE LEFT

 4    ICON, IT SAYS, "YOUTUBE."  DO YOU SEE THAT?

 5    A    YES.

 6    Q    YOUTUBE IS A REFERENCE TO WHAT?

 7    A    THE D'305 DESIGN DOESN'T INCLUDE, YOU KNOW, A

 8    DEFINITION OF EVERYTHING.  I ASSUME IT'S THE

 9    YOUTUBE.COM APPLICATION.

10              BUT --

11    Q    AND WHAT COMPANY --

12    A    I DON'T KNOW THAT FROM THE D'305.

13    Q    DO YOU KNOW WHAT COMPANY PROVIDES YOUTUBE?

14    A    I THINK GOOGLE BOUGHT THEM.

15    Q    IT'S A GOOGLE ICON, ISN'T IT?

16    A    I DON'T KNOW.  I DON'T KNOW THE ORIGIN OF THAT

17    ICON.

18    Q    CAN YOU TELL THE JURY, WHERE IS THE YOUTUBE

19    ICON IN THE FASCINATE?

20    A    IN THIS APPLICATION SCREEN, I DON'T THINK

21    THERE IS ONE.

22    Q    IT'S NOT THERE, IS RIGHT?

23    A    CORRECT.

24    Q    THEN THIS NEXT ICON, THE NEXT ROW, SECOND

25    COLUMN, IT SAYS, "STOCKS."  AND IT'S GOT A TICKER
```

1     SYMBOL.  DO YOU SEE THAT?

2     A    YES.

3     Q    WHERE IS THAT IN THE FASCINATE?

4     A    ON THIS APPLICATION SCREEN, THERE ISN'T ONE.

5     Q    IT'S NOT THERE; RIGHT?

6     A    YES.

7     Q    AND THEN THIS NEXT ICON, IT SAYS, "MAPS."

8          DO YOU SEE THAT?

9     A    YES.

10    Q    WHO PROVIDES THE MAP FUNCTIONALITY ON APPLE'S

11    PHONES?

12    A    I DON'T KNOW.

13    Q    YOU DON'T KNOW THAT GOOGLE PROVIDE IT IS?

14    A    I DON'T KNOW.

15    Q    DO YOU KNOW WHETHER OR NOT THIS IS A GOOGLE

16    ICON?

17    A    I DON'T KNOW.

18    Q    WHERE IS THE MAPS ICON ON THE FASCINATE?

19    A    IT -- ON THIS SCREEN, I DON'T SEE ONE.

20    Q    IT'S NOT THERE; RIGHT?

21    A    YES.

22    Q    WHAT ABOUT WEATHER?  SECOND ROW, FOURTH

23    COLUMN, A PICTURE OF THE SUN AND 73 DEGREES.

24         WHERE IS THAT IN THE FASCINATE?

25    A    I DON'T SEE IT ON THIS SCREEN.

```
 1    Q    IF WE GO TO THE FOURTH ROW, SECOND COLUMN, DO

 2    YOU SEE THAT ICON FOR CALCULATOR?

 3    A    YES.

 4    Q    WHERE IS THE CALCULATOR ICON IN THE FASCINATE?

 5    A    IN THE SECOND ROW.

 6    Q    RIGHT THERE?  SO IT'S IN A DIFFERENT ROW;

 7    RIGHT?

 8    A    YES.

 9    Q    AND IF WE LOOK AT THE CALCULATOR ICON ON THE

10    D'305, IT'S GOT A GRAY BACKGROUND, GRAY-WHITE-ISH

11    BACKGROUND; RIGHT?

12    A    YES.

13    Q    AND IT'S GOT THREE CIRCLES, FOUR CIRCLES,

14    RIGHT?

15    A    YES.

16    Q    PLUS NOTICE EACH OF THE FOUR CIRCLES

17    RESPECTIVELY ARE THE PLUS, THE MINUS, THE TIMES,

18    AND THE DIVISION SYMBOLS; RIGHT?

19    A    YES.

20    Q    NOW, IF YOU LOOK AT THE CALCULATOR IN THE

21    FASCINATE, IT DOESN'T HAVE A WHITE-GRAY BACKGROUND,

22    DOES IT?

23    A    NO.

24    Q    IT HAS A YELLOW ORANGE BACKGROUND; RIGHT?

25    A    YES.
```

1   Q    AND IT DOESN'T JUST HAVE FOUR CIRCLES, DOES
2   IT?
3   A    NO.
4   Q    IT HAS A PICTURE OF AN ENTIRE CALCULATOR;
5   RIGHT?
6   A    YES.
7   Q    DR. KARE, YOU WOULD AGREE WITH ME THAT THE
8   CALCULATOR ICON IN THE FASCINATE IS NOT
9   SUBSTANTIALLY SIMILAR TO THE CALCULATOR ICON IN THE
10  D'305?
11  A    YES.
12  Q    AND THE NEXT ICON ON THE FOURTH ROW, THIRD
13  COLUMN, NOTES, WHERE IS THAT FOUND IN THE
14  FASCINATE?
15  A    IT'S NOT ON THIS SCREEN.
16  Q    IT'S NOT THERE?
17  A    NO.
18  Q    WHAT ABOUT THE LAST ICON THAT SAYS SETTINGS?
19  IT'S THE FOURTH COLUMN, FOURTH ROW, BOTTOM RIGHT.
20  WHERE IS THAT FOUND IN THE FASCINATE?
21  A    IT'S NOT IN THIS SCREEN.
22  Q    WELL, THERE'S A GEAR UP HERE.  DO YOU SEE
23  THAT?
24  A    I SEE THAT.
25  Q    DO YOU KNOW IF THAT'S AN ICON?

```
 1    A    I KNOW THAT THAT'S A STATUS BAR, BUT I DIDN'T

 2   KNOW -- I GUESS THAT COULD BE A SETTINGS ICON.

 3   Q    IT COULD BE.

 4         YOU WOULD AGREE WITH ME THAT THAT GEAR IN

 5   THE TOP-LEFT QUADRANT OF THE FASCINATE DEPICTED ON

 6   PDX 14.7 IS NOT SUBSTANTIALLY SIMILAR TO THE

 7   SETTINGS ICON IN THE D'305 PATENT?

 8   A    NO.

 9   Q    YOU WOULD AGREE WITH ME?

10   A    YES.

11   Q    OKAY.  FOR THE RECORD, THEN, YOU AGREE --

12   BECAUSE YOU SAID NO AND YES, I JUST WANT TO MAKE

13   SURE --

14   A    WELL, IT'S THE SAME METAPHOR, SO I HADN'T

15   REALLY THOUGHT ABOUT THAT BEFORE.  AND IT'S GOT A

16   BIT OF A SIMILAR FORM FACTOR, DIFFERENT SIZE.  SO

17   IT'S NOT 100 PERCENT DIFFERENT, BUT --

18   Q    IS IT YOUR TESTIMONY THAT THAT TINY LITTLE

19   GEAR IS SUBSTANTIALLY SIMILAR TO THIS LARGER ICON

20   THAT'S GOT A RECTANGLE WITH A BORDER AROUND IT,

21   THREE GEARS, AND SHADING?

22   A    NO.

23   Q    IT'S NOT SUBSTANTIALLY SIMILAR, IS IT?

24   A    NO.

25   Q    YOU DID TESTIFY ABOUT A COUPLE OF THESE ICONS
```

1    THAT YOU WANTED TO POINT THE JURY TO.

2              ONE WAS THE PHONE ICON ON THE BOTTOM

3    LEFT, OR LET'S CALL IT THE BOTTOM -- WELL, FOR THE

4    RECORD, WHY DON'T YOU USE YOUR WORDS.  HOW WOULD

5    YOU DESCRIBE THIS, THIS GRAY AREA WITH THE FOUR

6    ICONS IN THE VERY BOTTOM OF THE D'305?

7    A    JUST THE SEPARATE AREA AT THE BOTTOM.

8    Q    OKAY.  SO I'LL JUST USE THAT TO DESCRIBE IT.

9    OKAY?

10   A    UM-HUM, THANKS.

11   Q    SO THE SEPARATE AREA AT THE BOTTOM HAS, IN THE

12   D'305, HAS THE FINE ICON; RIGHT?

13   A    YES.

14   Q    AND YOU POINT TO THE FACT THAT THE FASCINATE

15   HAS A PHONE ICON AND IT'S ALSO GREEN AND HAS A

16   PICTURE OF A PHONE; RIGHT?

17   A    YES.

18   Q    NOW, THAT PICTURE OF THAT PHONE, YOU HAVEN'T

19   SEEN A PHONE RECEIVER LIKE THAT IN ABOUT 25 YEARS,

20   HAVE YOU?

21   A    I KNOW THAT IT WAS DESIGNED IN 1938, AND IT

22   WAS BY HENRY DREYFUS AND IT WAS USED, YOU KNOW,

23   THROUGH THE '60S, '70S.

24              BUT I --

25   Q    THOSE WERE MA BELL PHONES?

```
 1    A    I THINK OF IT AS RETRO.

 2    Q    SO THAT'S A PICTURE OF A MA BELL PHONE

 3    RECEIVER; RIGHT?

 4    A    I DON'T KNOW WHETHER IT'S A MA BELL PHONE, BUT

 5    I KNOW THAT IT'S RETRO.

 6    Q    DO YOU REMEMBER IN THE OLD DAYS WHEN THERE WAS

 7    PHONE BOOTHS ON THE STREETS?

 8    A    YES.

 9    Q    BEFORE CELL PHONES?

10    A    YES.

11    Q    AND DO YOU REMEMBER THEY HAD THAT SAME PICTURE

12    OF THE PHONE ON THE SIDE OF A PHONE BOOTH?

13    A    A LOT OF THEM HAD BLUE ONES WITH A RECEIVER

14    THAT WAS VERTICAL.

15    Q    AND IT'S THE SAME RECEIVER, RIGHT?

16    A    SIMILAR.

17    Q    IT'S THE OLD ICONIC MA BELL RECEIVER; RIGHT?

18    A    IT'S, IT'S A RETRO VERSION OF A RETRO PHONE

19    RECEIVER.

20    Q    THE OLD MA BELL PHONES.  DO YOU REMEMBER WHEN

21    YOU GREW UP, YOU HAD TO DIAL PHONES AND YOU PICKED

22    THE RECEIVER UP, THAT'S A PICTURE OF THAT RECEIVER,

23    RIGHT?

24    A    YEAH.  I JUST DON'T -- I NEVER KNEW ABOUT

25    ASSOCIATING IT WITH THE TERM MA BELL, SO --
```

1    Q    WELL, CERTAINLY APPLE DOESN'T OWN THE IMAGE

2    AFTER THAT PHONE RECEIVER, DOES IT?

3    A    I DON'T KNOW.

4    Q    DO YOU BELIEVE IT DOES?

5    A    I BELIEVE THAT SEEING THAT WHITE PHONE ON AN

6    ANGLE ON A SCREEN BACKGROUND --

7    Q    THAT'S NOT WHAT I ASKED YOU.

8    A    -- IS DISTINCTIVE.

9    Q    THAT'S NOT WHAT I ASKED YOU.  DO YOU BELIEVE

10   THAT APPLE OWNS THE IMAGE OF THE OLD RETRO PHONE

11   RECEIVER?

12   A    I DON'T KNOW.

13   Q    OKAY.  WHAT ABOUT THE COLOR GREEN?  WHEN

14   PEOPLE SEE THE COLOR GREEN, THAT MEANS GO; RIGHT?

15   A    SOMETIMES.

16   Q    APPLE DOESN'T OWN THE COLOR GREEN FOR GO, DOES

17   IT?

18   A    NO.  I DON'T -- I DON'T KNOW, BUT I WOULD

19   ASSUME NO.

20   Q    YOU'VE WORKED WITH ICONS A LOT.  YOU'VE SEEN

21   DOZENS OF ICONS THAT HAVE GREEN WITH TELEPHONE

22   RECEIVERS ON THEM IN THE PAST, HAVEN'T YOU?

23   A    I -- WHEN I WAS LOOKING AT THIS DESIGN, I

24   LOOKED SPECIFICALLY AT THAT INCARNATION OF A PHONE

25   ICON, GREEN, ROUNDED CORNERS, TILTED, POINTING UP,

```
 1    BIT OF A GRADIENT.

 2              SO I SEE IT -- I SEE THE PARTS THAT MAKE

 3    A WHOLE VERSUS THE INGREDIENTS THAT MAKE A COOKIE.

 4    Q    THAT WASN'T MY QUESTION.

 5              SO MY QUESTION WAS, IN THE WORK YOU'VE

 6    DONE FOR THIS CASE, YOU'VE SEEN DOZENS OF ICONS

 7    THAT HAVE, FOR THE PHONE, FOR THE PHONE

 8    FUNCTIONALITY --

 9    A    YES.

10    Q    -- THAT HAVE A PICTURE OF A RECEIVER ON THEM

11    THAT ARE GREEN.  THAT'S WHAT IT INDICATES TO THE

12    USER IF YOU HIT THIS, YOU'LL LAUNCH THE PHONE

13    APPLICATION; RIGHT?

14    A    I DON'T KNOW THAT I'VE SEEN, IN YOUR WORDS,

15    DOZENS THAT ARE THAT COMBINATION OF ELEMENTS.

16    Q    WELL, YOU'VE SEEN --

17    A    THAT EXACT COMBINATION OF ELEMENTS.

18    Q    OF COURSE, THAT WASN'T MY QUESTION.  SO MY

19    QUESTION IS, PRIOR TO YOUR RETENTION IN THIS CASE,

20    YOU DON'T DISPUTE THAT YOU'VE SEEN GREEN -- ICONS

21    FOR THE PHONE, THE PHONE APPLICATIONS, THAT ARE

22    GREEN AND HAVE A PICTURE OF A RECEIVER ON THEM.

23    A    I'VE SEEN ALL KINDS OF ICONS FOR PHONES, ALL

24    KINDS OF COLORS, ALL KINDS OF IMAGES, PHONE

25    RECEIVERS, CELL PHONES, DIFFERENT ANGLES, DIFFERENT
```

1    SIZES, DIFFERENT PROPORTIONS.

2         SO IT'S HARD TO CHARACTERIZE EXACTLY WHAT

3    I'VE SEEN TO ANSWER YOUR QUESTION YES OR NO.

4    Q    YOU ALSO POINT TO THIS CLOCK ICON.  THIS IS A

5    PICTURE OF THE FRONT FACE OF A CLOCK; RIGHT?

6    A    YES.

7    Q    AND WHEN YOU HIT THE CLOCK ICON, YOU LAUNCH

8    THE CLOCK APPLICATION; RIGHT?

9    A    YES.  YES.

10   Q    APPLE DOESN'T OWN THE PICTURE OF THE CLOCK,

11   DOES IT?

12   A    I DON'T KNOW.

13   Q    YOU ALSO POINTED TO THIS FLOWER ICON, AND TELL

14   ME AGAIN, WHERE IS THE FLOWER ICON ON THE

15   FASCINATE?

16   A    IT'S PART OF -- A VIEW OF IT IS IN THE GALLERY

17   ICON.

18   Q    OKAY.  RIGHT THERE (INDICATING)?

19         SO THIS ONE SAYS PHOTOS, THIS ONE DOESN'T

20   SAY PHOTOS, DOES IT?

21   A    NO.

22   Q    AND JUST FOR THE RECORD, IN THE D'305 PATENT

23   WE'RE LOOKING AT IS THE ICON THAT'S IN THE TOP ROW

24   AND THE THIRD COLUMN; CORRECT?

25   A    YES.

```
 1    Q     AND THE ICON THAT YOU IDENTIFIED FOR THE

 2    FASCINATE IS IN THE FOURTH ROW, THIRD COLUMN;

 3    RIGHT?

 4    A     YES.

 5    Q     SO IN THE D'305 IT SAYS, "PHOTOS."  IN THE

 6    FASCINATE IT SAYS, "GALLERY," RIGHT?  THOSE ARE

 7    DIFFERENT WORDS; RIGHT?

 8    A     YES.

 9    Q     GALLERY, IF YOU LOOK AT THE FASCINATE, YOU SEE

10    THAT THERE'S TWO SQUARES WITHIN THE BIG, THE

11    RECTANGLE?

12    A     YES.

13    Q     AND THEN IN THE TOP OVERLAY SQUARE, THERE'S A

14    CIRCLE?

15    A     YES.

16    Q     AND IN THE MIDDLE OF THE CIRCLE, IT LOOKS LIKE

17    THERE'S AN ARROW.

18    A     YES.

19    Q     AND WHAT DOES THAT ARROW REPRESENT?

20    A     IT'S TYPICALLY THAT ARROW MEANS VIDEO.

21    Q     VIDEO.  SO IN THE D'305, WE'RE TALKING ABOUT

22    PHOTOS, BUT THE FASCINATE, FOR THIS ICON, WE'RE

23    TALKING ABOUT VIDEO, AT LEAST PARTIALLY VIDEO;

24    RIGHT?

25    A     GALLERY IS, AS I UNDERSTAND IT, A COLLECTION
```

1    OF THE USER'S IMAGES, WHETHER THEY'RE STILL OR

2    VIDEO.

3             AND SAME WITH PHOTOS.  SAME SIMILAR COMBO

4    COLLECTION.

5    Q    THIS ICON IN THE D'305, TOP ROW, THIRD COLUMN,

6    HAS NO INDICATION IN THE ICON THAT YOU CAN GET YOUR

7    VIDEOS THERE.  THERE'S NO CIRCLE WITH A TRIANGLE,

8    IS THERE?

9    A    NO.

10   Q    AND IT JUST SAYS, "PHOTOS," RIGHT?

11   A    YES.

12   Q    SO THE FASCINATE CONVEYS DIFFERENT INFORMATION

13   IN ITS GALLERY ICON.  IT TELLS THE USER THAT

14   INCLUDED WITHIN THAT, IF YOU LAUNCH THAT, YOU'RE

15   GOING TO GET TO YOUR VIDEOS; RIGHT?

16   A    AND, AGAIN, THE D'305 IS AN ILLUSTRATION AND

17   THE SCREEN FOR THE FASCINATE IS A WORKING PHONE,

18   SO --

19   Q    WELL, THAT'S ANOTHER THING I WANT TO TALK

20   ABOUT, SO LET'S TALK ABOUT THAT FOR A SECOND.

21             THE FASCINATE IS A WORKING PHONE, JUST

22   LIKE YOU SAID; RIGHT?

23   A    YES.

24   Q    AND THIS IS A LIST, WHEN YOU GO TO YOUR

25   APPLICATION MENU, THIS IS A LIST OF WHAT?

1    A    DIFFERENT APPLICATIONS.

2    Q    THAT'S RIGHT?

3    A    A COLLECTION OF APPLICATIONS.

4    Q    RIGHT.  AND YOU KNOW THAT WHEN A USER BUYS A

5    PHONE, THEY CAN GO TO AN APPLICATION STORE ON-LINE

6    AND DOWNLOAD GAMES, VIDEOS, PROGRAMS, ALL KINDS OF

7    DIFFERENT APPLICATIONS; RIGHT?

8    A    THAT IS SOMETHING I UNDERSTAND.  BUT THAT

9    ISN'T SOMETHING THAT IS SPECIFIC TO MY EXAMINATION

10   OF THE ICONS.

11   Q    AND YOU KNOW A USER CAN JUST SIMPLY DELETE ANY

12   OF THESE APPLICATIONS OFF THE PHONE; RIGHT?

13   A    NO.  I'M SORRY TO BE REPETITIVE.  IT'S -- MY

14   CONSIDERATION WAS THE SCREEN, WHAT IT SHOWS, AND

15   FUNCTIONALITY IN TERMS OF A CERTAIN NUMBER OF

16   THINGS THAT ALLOW YOU TO DO SOMETHING.

17             BUT I WASN'T FOCUSSED ON EXACTLY HOW

18   EVERYTHING BEHAVES.

19   Q    WHY DON'T WE DO THIS.  LET'S GET TO

20   FUNCTIONALITY IN A SECOND, AND LET ME JUST FINISH

21   OFF WITH THIS SLIDE.

22             GOING BACK TO THIS FLOWER ICON IN THE

23   D'305 PATENT, DID YOU SAY YOU USED TO DO WORK FOR

24   MICROSOFT ON THEIR ICONS?

25   A    ON MICROSOFT WINDOWS 3.0.

```
1    Q    DO YOU KNOW THAT MICROSOFT, WELL BEFORE THE

2    D'305, USED THE IMAGE OF A FLOWER TO DENOTE THAT

3    WHEN YOU HIT THAT ICON, YOU GET TO PHOTOS?

4    A    NO.

5    Q    YOU WEREN'T AWARE OF THAT?

6    A    NO.

7    Q    IN ANY EVENT, IF YOU LOOK AT THE FASCINATE AND

8    THE GALLERY ICON, THAT DOESN'T LOOK THE SAME AS THE

9    FLOWER PHOTO, DOES IT?

10   A    IT HAS SIMILARITIES AND IT'S A DIFFERENT VIEW.

11              BUT IT LOOKS LIKE THE SAME KIND OF FLOWER

12   IN A CLOSE-UP.

13   Q    IT LOOKS LIKE THE SAME KIND OF FLOWER?  YOU

14   CAN TELL THAT IT'S THE SAME KIND OF FLOWER?

15   A    WELL, YOU CAN SEE THAT THERE'S AN OBLONG

16   YELLOW PETAL THAT'S ABOUT THE SAME SHAPE AS A

17   SUNFLOWER PETAL.

18              I DON'T -- I'M NOT A BOTANY EXPERT, BUT

19   IT LOOKS -- IT'S OBVIOUSLY ISN'T A ROSE OR AN IRIS

20   OR -- IT'S A DIFFERENT KIND OF FLOWER.

21   Q    IT'S OBVIOUSLY A DIFFERENT IMAGE THAN THE

22   PICTURE OF THE FLOWER IN THE D'305; RIGHT?

23   A    YES.

24   Q    IF YOU LOOK AT THE D'305 ON THIS BOTTOM AREA,

25   GRAY AREA THAT I THINK YOU SAY IS SEPARATED FROM
```

```
1     THE OTHERS --

2     A    YES.

3     Q    -- ON THE BOTTOM RIGHT, DO YOU SEE THE ICON

4     FOR THE IPOD?

5     A    YES.

6     Q    WHERE IS THAT ON THE FASCINATE?

7     A    THERE ISN'T ONE.

8     Q    WHAT DO WE FIND ON THE FASCINATE IN THE SAME

9     PLACE, THE BOTTOM ROW ON THE -- THE VERY BOTTOM ROW

10    IN THE SEPARATED PART ON THE RIGHT?  WHAT DO WE

11    FIND?

12    A    A HOME ICON.

13    Q    A HOME ICON.  THERE'S NO HOME ICON ON THE

14    D'305; RIGHT?

15    A    NO.

16    Q    AND THAT'S BECAUSE IN THE APPLE PRODUCTS,

17    THERE'S A HOME PHYSICAL BUTTON; RIGHT?

18    A    THERE'S NOT A HOME IMAGE ON THE D'305 DESIGN.

19            MR. VERHOEVEN:  YOUR HONOR, I'M GOING TO

20    TRY TO GET PX 001, THE PHYSICAL EXHIBIT OF THE

21    INITIAL IPHONE.

22            MS. KREVANS:  MR. VERHOEVEN, IT MIGHT BE

23    UP THERE ALREADY.

24            MR. VERHOEVEN:  MAY I APPROACH, YOUR

25    HONOR?  I'M TOLD IT MIGHT BE ON THE STAND ALREADY.
```

```
 1                    THE COURT:  OKAY.

 2                    THE WITNESS:  I SWEAR I DIDN'T TAKE IT.

 3                    THE COURT:  YOU MEAN THE ACTUAL IPHONE,

 4      JX 1000?

 5                    MR. VERHOEVEN:  YES.  I'M SORRY, YOUR

 6      HONOR.  I MISSPOKE.  JX 1000.

 7                    THE COURT:  ARE WE MISSING IT?

 8                    MS. KREVANS:  NO, YOUR HONOR.  IT MAY

 9      HAVE BEEN PUT BACK IN ITS PROPER BOX.

10                    MR. VERHOEVEN:  WE DON'T RETAIN CUSTODY

11      OF IT.  COUNSEL FOR APPLE DOES, YOUR HONOR.

12                    MS. KREVANS:  WE'VE AGREED WHEN THEY'RE

13      IN COURT THEY'LL ALL HERE IN THESE RACKS.

14                    MR. VERHOEVEN:  CAN WE SWITCH OVER TO THE

15      ELMO FOR A SECOND, PLEASE?

16      Q    I'LL DO THE SAME THING HERE WITH THE INITIAL

17      IPHONE.  I'LL TURN IT ON.  WHAT DO WE SEE?  WHAT

18      DOES THE CONSUMER SEE WHEN THEY TURN ON THE PHONE?

19      A    APPLE LOGO.

20      Q    ARE WE STILL LOOKING AT IT?  YES.

21      A    YES.

22      Q    IT'S ON THERE FOR A LONG TIME.

23                    OKAY.  SO THIS IS THE APPLE HOME SCREEN;

24      RIGHT?

25      A    YES.
```

```
 1    Q    IT LOOKS SIMILAR TO D'305?  THAT'S YOUR

 2    TESTIMONY; RIGHT?

 3    A    YES.

 4    Q    AND AS WE SEE, HERE'S THE IPOD ICON, AND IN

 5    THE FASCINATE, THAT PLACE HAS A HOME ICON; RIGHT?

 6    A    YES.

 7    Q    BUT IT'S HARD TO SEE ON THE ELMO, BUT DO YOU

 8    SEE THERE'S THAT PHYSICAL BUTTON RIGHT HERE

 9    (INDICATING)?

10    A    YES.

11    Q    THAT'S PART OF APPLE'S TRADE DRESS?

12    A    I KNOW THAT THE GRAPHICS THAT I CONSIDERED ARE

13    ONLY PART OF THE TRADE DRESS.

14         BUT I CAN'T SPEAK TO THE REST OF THE

15    TRADE DRESS.

16    Q    DO YOU HAVE A -- DO YOU HAVE AN OPINION ONE

17    WAY OR ANOTHER AS TO WHETHER THIS PHYSICAL HOME

18    BUTTON IS PART OF APPLE'S TRADE DRESS?

19    A    NO, I DON'T HAVE AN OPINION.

20    Q    BUT IN ANY EVENT, A CONSUMER WOULD KNOW THAT

21    THE APPLE PHONE HAS A PHYSICAL HOME BUTTON; RIGHT?

22    A    AS I SAID, I -- MY TASK IN BEING AN EXPERT IN

23    THIS CASE WAS JUST ABOUT THE DISPLAY SCREEN, NOT

24    ABOUT THE PHYSICAL PHONE.

25    Q    WELL, YOU KNOW A CONSUMER -- YOU'D AGREE WITH
```

```
 1    ME THAT A CONSUMER, IF THEY'RE GOING TO BUY AN

 2    EXPENSIVE ITEM LIKE AN I -- A SMARTPHONE, THEY GO

 3    TO THE STORE AND THEY FIDDLE WITH IT FOR A WHILE

 4    AND THEY FIGURE OUT IF THEY WANT TO BUY IT; RIGHT?

 5    A    I CAN'T SPEAK TO CONSUMER BEHAVIOR, YOU KNOW,

 6    EXCEPT MY OWN ANECDOTALLY.  BUT IT'S NOT MY AREA.

 7    Q    SO YOU DON'T HAVE AN OPINION AS TO WHETHER --

 8    GO BACK TO THE SLIDE AGAIN -- AS TO WHETHER A

 9    CONSUMER WOULD KNOW FROM ALL OF THE APPLE

10    ADVERTISING AND MARKETING THAT, WITH RESPECT TO THE

11    IPHONE, THE HOME BUTTON IS NOT AN ICON, IT'S A

12    PHYSICAL BUTTON?

13    A    NO.

14    Q    OKAY.  NOW, DO YOU SEE UP AT THE TOP HERE

15    THERE'S THESE LITTLE DOTS?

16    A    YES.

17    Q    THERE'S ONE BIG CIRCLE -- OR ONE RELATIVE TO

18    THE OTHER DOTS, IT'S A BIGGER CIRCLE THAT HAS A 1

19    ON IT?

20    A    YES.

21    Q    AND TWO OTHER DOTS?

22    A    YES.

23    Q    WHERE IS THAT ON THE D'305?

24    A    THERE ISN'T CORRESPONDING DOTS ON THE D'305.

25    Q    THOSE DOTS INDICATE TO A CONSUMER THAT THERE'S
```

1    THREE PAGES WORTH OF APPLICATION; RIGHT?

2    A    YES.

3    Q    THERE'S NOTHING INDICATING PAGES OF

4    APPLICATIONS IN THE D'305; CORRECT?

5    A    YES.

6    Q    AND CAN YOU TELL, BY LOOKING AT THIS, WHETHER

7    OR NOT THE ICONS ARRANGED IN THE FASCINATE ARE IN

8    ALPHABETICAL ORDER?  DO YOU SEE THE FIRST ONE IS

9    THREE, THEN A, THEN B, B-I, B-L, B-R, C-A, C-A,

10   C-A.  DO YOU SEE THAT?

11   A    LOOKS ALPHABETIC.

12   Q    IT'S ALPHABETICAL; RIGHT?

13   A    YES.

14   Q    LOOK AT THE D'305.  TEXT, CALENDAR.  WELL, T

15   COMES AFTER C IN THE ALPHABET; RIGHT?

16   A    YES.

17   Q    AND THEN PHOTOS AND BACK TO CAMERA AND THEN TO

18   YOUTUBE, THAT'S WITH A Y, AND THEN STOCKS.

19        SO THE D'305, THE ICONS ARE NOT ARRANGED

20   ALPHABETICAL ORDER; RIGHT?

21   A    RIGHT.

22   Q    SO BEING ARRANGED IN ALPHABETICAL ORDER IS

23   KIND OF USEFUL, ISN'T IT?

24   A    SOMETIMES.

25   Q    YEAH, ESPECIALLY IF YOU HAVE THREE PAGES OF

1    ICONS.  IT'S EASIER TO FIND THE APPLICATION PROGRAM

2    YOU WANT IF IT'S ARRANGED IN ALPHABETICAL ORDER;

3    RIGHT?

4    A    I WOULD PROBABLY, IF I WERE DESIGNING IT, I

5    WOULD ARRANGE THINGS IN ORDER THAT I THOUGHT WOULD

6    BE THE MOST FREQUENTLY USED.

7         BUT I THINK IT'S A -- THAT, WHAT YOU SAY,

8    SOMETIMES ALPHABETICAL MAKES TOTAL SENSE.

9         IT OFTEN MAKES SENSE, YOU KNOW, TYPE

10   FACES, YOU'VE GOT A SUPER LONG LIST OF 50 NAMES,

11   SCREEN ELEMENTS TENDS TO DEPEND HOW MANY YOU'RE

12   TALKING ABOUT, AND HOW THEY'RE DISPLAYED.

13        SO I WOULDN'T CATEGORICALLY SAY THAT

14   ALPHABETICAL IS PREFERRED TO NOT ALPHABETICAL.

15   Q    WELL, LET'S TALK ABOUT A HOME SCREEN.

16        THAT'S WHERE YOU COULD PUT -- A USER CAN

17   ACTUALLY TOUCH AND DRAG THEIR FAVORITE APPLICATIONS

18   TO THEIR HOME SCREEN WHERE THEY CAN SEE THEM FAST

19   AS SOON AS THEY PICK UP THEIR PHONE; RIGHT?

20   A    YES.

21   Q    WHEREAS AN APPLICATIONS SCREEN IS SIMPLY A

22   LIST OF ALL OF YOUR APPLICATIONS; RIGHT?

23   A    RIGHT.

24   Q    AND SO FOR AN APPLICATION SCREEN, IT MAKES

25   SENSE THAT YOUR ICONS ARE IN ALPHABETICAL ORDER SO

1    YOU CAN FIND THEM; RIGHT?

2    A    I WOULDN'T -- I WOULDN'T SAY THAT BECAUSE YOU

3    MIGHT WANT YOUR GAMES TOGETHER AND YOUR ART

4    PROGRAMS TOGETHER AND YOUR CAMERA STUFF TOGETHER,

5    AND THAT MIGHT BE A BETTER SPACIAL WAY TO FIND

6    THINGS.

7         YOU KNOW, IT DEPENDS ON THE PERSON.

8    Q    AND YOU MIGHT WANT A PLACE YOU CAN GO TO SEE

9    AN ENTIRE LIST OF YOUR APPLICATIONS TO SEE IF YOU

10   DOWNLOADED SOMETHING OR NOT, RIGHT?

11   A    I DON'T DISPUTE ALPHABETICAL CAN BE USEFUL,

12   BUT I WOULDN'T SAY THAT IS IT FOR EASE OF USE.

13   Q    NOW, YOU MENTIONED IN YOUR ANSWER A FEW

14   MINUTES AGO, YOU REFERENCED FUNCTIONALITY.

15        DO YOU REMEMBER THAT GENERALLY?

16   A    YES.

17   Q    WOULD YOU AGREE WITH ME THAT THE ICONS ON THE

18   D'305 DESIGN ARE AT LEAST IN PART FUNCTIONAL?

19   A    ICONS IN GENERAL HAVE A PURPOSE.

20        THE D'305, AS I UNDERSTAND IT, IS AN

21   ORNAMENTAL DESIGN, SO IT'S, IT'S A PICTURE.

22   Q    WHEN YOU SAY ICONS HAVE A PURPOSE, WHAT DO YOU

23   MEAN?

24   A    I MEAN THAT TO GENERALIZE, YOU INTERACT WITH

25   ONE AND SOMETHING HAPPENS.

1    Q    THE PURPOSE OF ICONS IS TO COMMUNICATE

2    INFORMATION TO THE USER; RIGHT?

3    A    YES.

4    Q    ICONS ARE SORT OF LIKE TRAFFIC SIGNS?

5    A    YES.

6    Q    THEY HELP USERS MAKE CHOICES AMONG OPTIONS?

7    A    YES.

8    Q    ICONS CAN ALSO BE USED ON TOUCHSCREENS WHERE

9    YOU DON'T HAVE A LOT OF SPACE TO SAVE SPACE; RIGHT?

10   A    THAT IS AN OPTION.  THERE ARE -- AGAIN,

11   THERE'S -- THERE ARE NO HARD AND FAST RULES.

12   Q    ICONS ARE ALSO USEFUL BECAUSE IT CAN BE

13   UNDERSTOOD BY DIFFERENT PEOPLE WHO SPEAK DIFFERENT

14   LANGUAGES; RIGHT?

15   A    AS OPPOSED TO TEXT, SOMETIMES A PICTURE IS

16   UNIVERSAL.

17   Q    I CAN LOOK AT THIS CLOCK AND IT DOESN'T MATTER

18   WHAT COUNTRY I'M FROM, I DON'T HAVE TO SPEAK

19   ENGLISH, I CAN SEE THE CLOCK AND THAT WOULD

20   COMMUNICATE TO ME AS A USER THAT IF I HIT THAT

21   ICON, I'LL LAUNCH THE CLOCK APPLICATION; RIGHT?

22   A    YES.

23   Q    SAME THING WITH THIS ICONIC PHONE SYMBOL FROM,

24   WHAT DID YOU SAY, THE '50S, '40S?

25   A    '38.

1    Q    '38?

2    A    BUT IT EVOLVED OVER TIME.

3    Q    EVERYBODY SEEING THAT KNOWS, HEY, THAT'S

4    COMMUNICATING TO ME IF I HIT THAT BUTTON, I'LL

5    LAUNCH THE PHONE APPLICATION; RIGHT?

6    A    GENERALLY, YES.

7    Q    PEOPLE FROM DIFFERENT COUNTRIES WHO SPEAK

8    DIFFERENT LANGUAGES WOULD UNDERSTAND THAT?

9    A    YES.

10   Q    YOU AGREE THAT FAMILIAR REAL WORLD OBJECTS

11   MAKE GOOD ICONS; RIGHT?

12   A    YES AND NO.  SOMETIMES USING A REAL WORLD

13   OBJECT WHERE, LET'S SAY, A PRINTER, A PRINTER LOOKS

14   SO MUCH DIFFERENT TEN YEARS LATER THAT SOMETIMES WE

15   FIND VESTIGES OF THINGS THAT LOOK ODD BECAUSE THE

16   INDUSTRIAL DESIGN CHANGES.  SO SOMETIMES USING --

17   SOMETIMES A METAPHOR IS STRONGER BECAUSE YOU'RE NOT

18   TIED TO A PARTICULAR WAY SOMETHING LOOKS IN TIME.

19   Q    OKAY.  YOU DON'T DISPUTE THAT THE ICONS USED

20   IN THE D'305 HERE WERE CHOSEN TO COMMUNICATE THE

21   VARIOUS FUNCTIONS OF THE APPLICATIONS ON THE

22   DEVICE, DO YOU?

23   A    THE D'305 DOESN'T SAY ANYTHING IN THE PATENT

24   ABOUT THOSE PARTICULAR DESIGNS.  I'M -- I CAN --

25   AND I WASN'T INVOLVED IN THE DESIGN OF THOSE, SO I

1    CAN SPECULATE.

2    Q    ISN'T IT TRUE THAT IN YOUR OPINION, THE WAY

3    THE D'305 IS SET UP IS THE MOST EFFECTIVE VISUAL

4    WAY TO COMMUNICATE THE FUNCTIONS ON THE PHONE?

5    A    ON A PHONE?

6    Q    YES.

7    A    WELL, NO.  I MEAN, THE D'305 PATENT DOESN'T

8    SAY IT'S A PHONE.  IT JUST SAYS IT'S A DEVICE.

9    Q    WHEN YOU LOOK AT THE D'305, YOU DON'T DISPUTE

10   THAT THE CLOCK ICON COMMUNICATES TO A CONSUMER THAT

11   IF THEY PUSH THAT BUTTON, IT'LL LAUNCH THE CLOCK

12   APPLICATION FUNCTION?

13   A    YES.

14   Q    AND THE SAME IS TRUE FOR THE CALCULATOR;

15   RIGHT?  IT INDICATES TO THE CONSUMER, IT

16   COMMUNICATES TO THE CONSUMER FUNCTIONAL

17   INFORMATION, I.E., IF YOU HIT THAT ICON, THE

18   CALCULATOR ICON, IT'LL LAUNCH THE CALCULATOR

19   APPLICATION; RIGHT?

20   A    WELL, AGAIN, THERE ISN'T ANYTHING THAT I SAW

21   IN THE D'305 THAT TALKS ABOUT WHAT ANY OF THOSE

22   THINGS DO.  YOU KNOW, YOU READ THE WORD AND I'M

23   ASSUMING THOSE ARE ALL ILLUSTRATIONS OF POSSIBLE

24   ICONS.

25   Q    THAT'S THE WHOLE POINT OF AN ICON IS TO

1    COMMUNICATE TO THE USER -- WITHDRAW THE QUESTION.

2          ISN'T IT TRUE THE WHOLE POINT OF AN ICON

3    ON A SMARTPHONE IS TO COMMUNICATE TO THE CONSUMER

4    USING THAT PRODUCT, THAT IF THEY HIT THAT ICON,

5    CERTAIN FUNCTIONALITY WILL OCCUR ON THE PHONE?

6    A    GENERALLY, YES.

7          BUT THAT'S NOT SPELLED OUT, IN MY

8    UNDERSTANDING, IN THE D'305 DESIGN.

9    Q    OKAY.  GIVEN THAT IT'S NOT SPELLED OUT, YOU

10   AGREE GENERALLY THAT, AS AN EXPERT ON ICONS --

11   A    YEAH.

12   Q    -- THAT THAT'S THE WAY ICONS ARE FOR, RIGHT?

13   ON SMARTPHONES AT LEAST?

14   A    UM --

15   Q    TO COMMUNICATE TO THE CONSUMERS, HEY, IF YOU

16   HIT THIS BUTTON, CERTAIN FUNCTIONS WILL HAPPEN.  IF

17   YOU HIT THIS OTHER BUTTON, OTHER DIFFERENT

18   FUNCTIONS WILL HAPPEN; RIGHT?

19   A    AGREED.  VISUAL SHORTHAND FOR SOMETHING.

20   Q    AND THE BEST ICONS ARE THE ONES THAT CAN

21   COMMUNICATE THAT FUNCTIONALITY THE BEST SO THE USER

22   ISN'T CONFUSED ABOUT WHICH BUTTONS WILL DO WHAT;

23   RIGHT?

24   A    GOOD ICONS COMMUNICATE CLEARLY AND

25   CONSISTENTLY.

1    Q    AND THEY -- ON SMARTPHONES, THEY COMMUNICATE

2    TO THE CONSUMER WHAT THE FUNCTIONALITY OF THE PHONE

3    IS?  IN OTHER WORDS, IF YOU HIT THIS BUTTON, YOU'LL

4    LAUNCH THE PHONE APPLICATION.  IF YOU HIT THIS

5    OTHER BUTTON, YOU'LL LAUNCH THE CAMERA APPLICATION.

6    FAIR?

7    A    IF SOMEONE HAD GENERAL KNOWLEDGE THAT THEY

8    BRING TO IT, YES.

9              MR. VERHOEVEN:  YOUR HONOR, I'M ABOUT TO

10   CHANGE SUBJECTS.  DO YOU WANT TO TAKE THE LUNCH

11   NOW?

12             THE COURT:  SURE.  IT'S 1202.  AGAIN,

13   PLEASE KEEP AN OPEN MIND.  DON'T DISCUSS THE CASE

14   WITH ANYONE AND PLEASE DON'T DO ANY OF YOUR OWN

15   RESEARCH.

16             GO AHEAD -- ACTUALLY, IF YOU COULD JUST

17   LEAVE YOUR NOTEBOOKS IN THE JURY ROOM.  THANK YOU.

18   WE'LL SEE YOU BACK AT 1:00 O'CLOCK.

19             (WHEREUPON, THE FOLLOWING PROCEEDINGS

20   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

21             THE COURT:  OKAY.  THANK YOU ALL.

22             (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)

23

24

25

1          **AFTERNOON SESSION**

2              (WHEREUPON, THE FOLLOWING PROCEEDINGS

3      WERE HELD OUT OF THE PRESENCE OF THE JURY:)

4              THE COURT:  ALL RIGHT.  LET ME ASK ONE

5      QUICK QUESTION, BECAUSE THIS IS COMING UP WITH

6      MR. DENISON AND WITH MS. KARE.

7              THANK YOU, PLEASE TAKE A SEAT.

8              EXHIBIT 44, LET ME HEAR, BECAUSE I THINK

9      MAYBE I'VE BEEN TOO HARD WITH THE FOUNDATION, I'M

10     ASSUMING THAT SAMSUNG IS NOT GOING TO ARGUE THAT

11     THIS IS NOT A SAMSUNG DOCUMENT.  OR ARE YOU?

12             ARE YOU GOING TO SAY IT WAS FABRICATED?

13     IT'S NOT YOUR DOCUMENT OR ANYTHING ELSE WITH THE

14     COMPARISON?  I THINK IT'S HIGHLY RELEVANT.  I THINK

15     IT WAS UNFORTUNATE IF IT WASN'T PRODUCED BEFORE

16     MR. DENISON WAS DEPOSED FOR THE PRELIMINARY

17     INJUNCTION.

18             LET ME HEAR, WHAT'S YOUR POSITION ON

19     THAT, BECAUSE THIS KEEPS COMING UP, AND I'D LIKE TO

20     GET IT ADDRESSED.

21             MR. VERHOEVEN:  OUR POSITION?

22             THE COURT:  YEAH.

23             MR. VERHOEVEN:  WE'RE NOT CHALLENGING

24     THAT IT'S A SAMSUNG DOCUMENT, YOUR HONOR, BUT

25     THERE'S BEEN NO FOUNDATION LAID FOR ADMISSION, FOR

1    ADMISSIBILITY.

2              THE COURT:  SO WHAT IS YOUR REQUIREMENT,

3    THAT THEY BRING IN A SAMSUNG EMPLOYEE FROM KOREA

4    WHO CAN SAY THAT, YES, HE/SHE WORKED ON THAT

5    DOCUMENT?

6              MR. VERHOEVEN:  IF THEY HAVE DEPOSITION

7    TESTIMONY THAT LAYS THE FOUNDATION OF THE DOCUMENT,

8    WE CAN PUT IF IN THAT WAY, YOUR HONOR.

9              BUT AS WITH ALL OF THESE EXHIBITS, YOU

10   NEED TO LAY A FOUNDATION BEFORE THEY COME IN.  AND

11   THE OBJECTION I HAD THIS MORNING, YOUR HONOR, WAS

12   THAT WE DON'T BELIEVE THAT AN EXPERT WITNESS IS

13   SOMEBODY WHO CAN LAY A FOUNDATION --

14             THE COURT:  I'M NOT GOING TO ALLOW THAT

15   IT COME IN THROUGH HER.  I JUST WANT TO RESOLVE

16   THIS ISSUE.

17             MR. VERHOEVEN:  I'M SORRY.  WHAT WE'RE

18   SAYING IS THEY NEED TO DO IT THE RIGHT WAY, HAVE A

19   WITNESS WHO THEY'VE HAD OVER A ONE DEPOSITION, I

20   THINK IN THIS CASE, SAMPLE WITNESSES, AND THIS WAS

21   THEIR JOB TO SHOW THIS TO A WITNESS AND GET THE

22   FOUNDATION SO THAT THEY CAN MOVE IT INTO EVIDENCE.

23   AND --

24             THE COURT:  RIGHT.  BUT I DON'T THINK IT

25   SHOULD BE -- YOU KNOW, SAMSUNG SHOULD HAVE PRODUCED

1    THAT DOCUMENT FOR THE PRELIMINARY INJUNCTION.

2              MR. DENISON SHOULD HAVE COLLECTED THAT

3    DOCUMENT FOR HIS 30(B)(6) DEPOSITION.

4              SO I DON'T THINK IT'S FAIR TO REWARD

5    SAMSUNG FOR NOT DISCLOSING THAT DOCUMENT, NOT

6    HAVING THEIR CORPORATE REPRESENTATIVE AWARE OF THAT

7    DOCUMENT AND THEN USE THAT TO SAY, LOOK, OUR

8    CORPORATE REPRESENTATIVE DOESN'T KNOW ABOUT THIS

9    DOCUMENT, WHEN HE SHOULD HAVE PRODUCED IT, HE

10   SHOULD HAVE COLLECTED IT, IT SHOULD HAVE BEEN PART

11   OF HIS TESTIMONY FOR THE P.I.

12             BUT LET ME HEAR FROM APPLE ON THIS ISSUE.

13             MR. MCELHINNY:  OUR VIEW, YOUR HONOR, IS

14   THAT, IN FACT, WE'RE MERGING TWO DIFFERENT ISSUES.

15             WE HAVE A DOCUMENT.  THE QUESTION IS

16   WHETHER OR NOT THE DOCUMENT COMES INTO EVIDENCE.

17             IN ORDER TO GET THE DOCUMENT INTO

18   EVIDENCE, WE HAVE TO PROVE THAT IT'S AUTHENTIC,

19   THAT HAS BEEN STIPULATED; AND WE HAVE TO PROVE THAT

20   IT'S A BUSINESS RECORD.

21             AND YOUR HONOR HAS ALREADY RULED THAT IT

22   IS AN ADMISSION AGAINST INTEREST BECAUSE OF THE

23   CONTENTS AND THAT, IN OUR VIEW, SHOULD BE ENOUGH TO

24   GET THE DOCUMENT INTO EVIDENCE.

25             ONCE THE DOCUMENT COMES INTO EVIDENCE,

1    THEN THE FOUNDATIONAL ISSUE, IT DOESN'T GO TO A

2    DOCUMENT, THE FOUNDATIONAL ISSUE GOES TO THE

3    ABILITY OF ANY PARTICULAR WITNESS TO SPEAK ABOUT

4    THE DOCUMENT, WHETHER OR NOT THERE'S A FOUNDATION

5    FOR THAT WITNESS'S TESTIMONY.

6          AND YOUR HONOR RULED THAT THERE WAS

7    FOUNDATION FOR MR. DENISON BECAUSE IT SHOULD HAVE

8    COME IN, IT WAS WITHIN THE SCOPE OF HIS 30(B)(6),

9    SO HE SHOULD HAVE BEEN ABLE TO TESTIFY ABOUT IT.

10          BUT, OF COURSE, LIKE MANY OF THE SAMSUNG

11   WITNESSES, THEY'VE NEVER SEEN ANY OF THESE

12   DOCUMENTS BEFORE.

13          BUT WE DO THINK THAT ONCE THE DOCUMENT

14   COMES IN, WE THINK THE DOCUMENT SHOULD BE IN, THAT

15   IT IS APPROPRIATE FOR AN EXPERT TO BE ABLE TO SAY

16   THIS IS WHAT IT MEANS AND THIS IS WHAT IT SAYS AND

17   THIS IS WHAT IT TEACHES BECAUSE THAT IS APPLYING

18   EXPERTISE TO AN ADMISSION OF A PARTY OPPONENT.

19          WE DISAGREE THAT IN ORDER TO USE AN

20   ADMISSION, WE HAVE TO GET SOME SAMSUNG WITNESS ON

21   THE STAND AND SAY, OH, YES, THIS IS AN ADMISSION.

22          WE'RE PAST THAT.  THE DOCUMENT IS 99

23   ADMISSION, AND THE DOCUMENT SHOULD BE IN EVIDENCE,

24   THE ENTIRE -- IN OUR VIEW, THE ENTIRE DOCUMENT

25   SHOULD BE IN EVIDENCE FOR ALL PURPOSES.

```
 1              THE COURT:  ALL RIGHT.  WELL, I'M GOING
 2     TO ADMIT THIS DOCUMENT, AND IT WILL BE THE SAME
 3     POLICY FOR BOTH.  APPLE WILL NOT BE ABLE TO HIDE
 4     BEHIND, OH, OUR WITNESS HAS NEVER SEEN THIS
 5     DOCUMENT BEFORE.
 6              IF IT'S A RELEVANT DOCUMENT AND MEETS THE
 7     BALANCING TEST OF 403, IT'S COMING IN.
 8              MR. MCELHINNY:  THANK YOU, YOUR HONOR.
 9              AND TO BE CLEAR, BECAUSE I DON'T WANT TO
10     BE -- AND THEN ONCE IT IS IN EVIDENCE, THE QUESTION
11     IS WHETHER OR NOT A PARTICULAR WITNESS HAS
12     LEGITIMATE TESTIMONY THAT THEY CAN BRING TO BEAR ON
13     THAT, ON THAT DOCUMENT WHICH IS IN EVIDENCE.
14              AND SO EXPERTS SHOULD BE ABLE TO SAY,
15     THIS IS WHAT THIS DOCUMENT IS SAYING, THIS IS WHAT
16     IT'S TEACHING, AND THESE ARE THE CONCLUSIONS -- IF
17     IT'S WITHIN THE SCOPE OF THE -- IF IT'S SUBJECT TO
18     THE LIMITATIONS ON THE WITNESS'S TESTIMONY, THEN
19     THE WITNESS SHOULD BE ABLE TO TESTIFY ABOUT.
20              MR. VERHOEVEN:  YOUR HONOR, WHAT --
21     SORRY.
22              THIS IS A SLIGHTLY DIFFERENT POINT,
23     BUT -- BECAUSE WE HAVE A WITNESS ON THE STAND WHO
24     IS AN EXPERT WITH RESPECT TO THE ISSUES OF DESIGN
25     INFRINGEMENT AND TRADE DRESS.
```

1           I WANT TO POINT OUT THAT IN RESPONSE TO

2      OUR INTERROGATORY ASKING THEM FOR THEIR BASIS, FOR

3      EXAMPLE, FOR TRADE DRESS OR TRADEMARK INFRINGEMENT,

4      INTERROGATORY NUMBER 71, THIS DOCUMENT WAS NEVER

5      IDENTIFIED.

6           AND SO THAT'S A SEPARATE BASIS FOR THIS

7      WITNESS, AND THAT'S WHY I WAS TRYING TO CONVEY,

8      WHEN I WAS OBJECTING EARLIER, IN ADDITION --

9           THE COURT:  I'M GOING TO CHARGE THIS TIME

10     TO BOTH PARTIES.  OKAY.  IT'S 1:07.  GO AHEAD.

11          MR. VERHOEVEN:  THAT'S IT.  I JUST WANTED

12     TO POINT OUT IT WASN'T DISCLOSED IN RESPONSE TO

13     CONTENTION INTERROGATORIES.

14          THE COURT:  OKAY.  AND WHAT SPECIFIC

15     ISSUE WASN'T DISCLOSED?  BECAUSE UNFORTUNATELY, WE

16     HAVE A LOT GOING ON HERE.  WE HAVE THE DESIGN

17     PATENT, TRADE DRESS, INFRINGEMENT AND DILUTION ON

18     THE TABLETS.  WE'VE GOT JUST DILUTION ON THE

19     PHONES.

20          SO I JUST NEED A LITTLE BIT MORE

21     SPECIFICITY.

22          MS. KREVANS:  IN RESPONSE TO

23     INTERROGATORY NUMBER 7 FROM SAMSUNG, YOUR HONOR,

24     WHICH ASKED US TO STATE ALL FACTS SUPPORTING ANY

25     CONTENTION BY APPLE THAT SAMSUNG HAS WILLFULLY

1463

```
 1    INFRINGED, DILUTED OR FALSELY DESIGNATED THE ORIGIN

 2    OF ITS PRODUCTS FOR EACH PATENT, TRADE DRESS, AND

 3    TRADEMARK, WE GAVE, AS PART OF OUR RESPONSE, A LIST

 4    OF DOCUMENTS WHICH INCLUDE THIS DOCUMENT, AND IT'S

 5    RIGHT IN THE RESPONSE.

 6              AND IT'S IN THE RESPONSE AT PAGE 9 -- IS

 7    THIS IT, MS. TAYLOR, ON LINE 14?

 8              PAGE 9, LINE 14.

 9         THE COURT:  LET ME SEE THAT, PLEASE.

10         MS. KREVANS:  IT'S A LONG RESPONSE, YOUR

11    HONOR, YOU HAVE TO FLIP BACK A FEW PAGES TO SEE THE

12    START OF THE INTERROGATORY.

13         THE COURT:  WHAT IS THIS HIGHLIGHTED,

14    MM --

15         MS. KREVANS:  THAT'S THE BEGINNING BATES

16    NUMBER OF THE DOCUMENT, EXHIBIT 44.

17         (PAUSE IN PROCEEDINGS.)

18         THE COURT:  ALL RIGHT.  SO WHAT'S YOUR

19    OBJECTION TO THIS?

20         MR. VERHOEVEN:  THERE'S TWO THINGS, YOUR

21    HONOR.

22         THE COURT:  UM-HUM.

23         MR. VERHOEVEN:  THIS WITNESS WAS -- THE

24    DOCUMENT WAS SHOWN IN THE TESTIMONY IS TRYING TO BE

25    ELICITED FOR THE TRUTH OF THE MATTER AS TO
```

```
1    CONFUSION, LIKELIHOOD OF CONFUSION.

2            THAT WAS OUR INTERROGATORY 71.  THAT'S A

3    DIFFERENT CONTENTION INTERROGATORY.  IT WAS NOT

4    LISTED FOR THAT PURPOSE.

5            THIS INTERROGATORY THAT COUNSEL IS

6    SHOWING YOU HAS TO DO WITH THE ISSUE OF

7    WILLFULNESS, I BELIEVE.  LET ME DOUBLE-CHECK.

8            THE COURT:  WILLFUL INFRINGEMENT,

9    DILUTION, FALSE DESIGNATION.

10           BUT CONFUSION IS RELEVANT TO ASSOCIATION

11   FOR DILUTION, SO IT'S PROBATIVE.  CONFUSION IS

12   STILL PROBATIVE FOR ASSOCIATION, WHICH YOU NEED FOR

13   DILUTION.

14           MR. VERHOEVEN:  THAT'S WHAT I'M SAYING.

15   I'M SORRY.  I WASN'T CLEAR.

16           THE COURT:  OKAY.

17           MR. VERHOEVEN:  WHAT I'M SAYING IS WE

18   PROPOUNDED AN INTERROGATORY, 71, WHERE WE SAID TELL

19   US WHAT YOUR CONTENTIONS ARE WITH RESPECT TO

20   CONFUSION, AFFILIATION.  I CAN READ THE WHOLE THING

21   IN THE RECORD IF YOU'D LIKE.

22           AND IN RESPONSE TO THAT, THIS WAS NEVER

23   IDENTIFIED.

24           WHAT COUNSEL IS POINTING YOU TO IS

25   WILLFULNESS CONTENTION INTERROG, AND SHE'S ALSO
```

1    POINTING TO A LIST OF I DON'T KNOW HOW MANY, IT

2    LOOKS LIKE OVER 100 DOCUMENTS THAT ARE JUST ON A

3    LIST WHICH MAGISTRATE JUDGE GREWAL HAS TOLD US IS

4    INSUFFICIENT, INSUFFICIENT RESPONSE IN CONTENTION

5    INTERROGATORIES IN RESPONSE TO OUR POINTING THAT

6    OUT.

7            SO I GUESS THERE'S TWO POINTS, YOUR

8    HONOR.  ONE, THAT WITH RESPECT TO THE TESTIMONY I

9    OBJECTED TO ON DIRECT FOR THIS WITNESS TODAY, THE

10   TESTIMONY THE WITNESS WAS GIVING WAS POINTING TO

11   THIS DOCUMENT FOR THE TRUTH OF THE MATTER AS TO

12   CONCLUSION, AND THAT'S OBJECTIONABLE TO US BECAUSE

13   THIS DOCUMENT WAS NEVER IDENTIFIED.

14           AND, SECONDLY, EVEN IF YOU CONSIDER THE

15   WILLFULNESS CONTENTION INTERROG, ALL WE'VE GOT IS A

16   LIST OF OVER 100 DOCUMENTS.

17           THE COURT:  NO.  I JUST COUNTED.  THERE

18   ARE 62 DOCUMENTS.  IT'S ON PAGE 9, LINES 11 THROUGH

19   26.  IT'S 62 DOCUMENTS SPECIFYING THE BATES

20   NUMBERS.

21           BUT THE INTERROGATORY NUMBER 7 ASKS FOR

22   ALL FACTS SUPPORTING ANY CONTENTION BY APPLE THAT

23   SAMSUNG HAS WILLFULLY INFRINGED, DILUTED OR FALSELY

24   DESIGNATED THE ORIGIN OF ITS PRODUCTS FOR EACH

25   PATENT, TRADE DRESS, AND TRADEMARK, INCLUDING WHEN

```
1    AND HOW APPLE AND SAMSUNG HAD ACTUAL NOTICE OF THE

2    APPLE PATENTS-IN-SUIT, APPLE TRADE DRESS, AND APPLE

3    TRADEMARK.

4              SO I'M GOING TO OVERRULE THE OBJECTION

5    ABOUT DISCLOSURE BECAUSE I FIND THAT THIS IS

6    SUFFICIENT.

7              SO IF YOU WANT TO KEEP ARGUING IT, IT'S

8    NOW JUST GOING TO BE BILLED STRAIGHT TO SAMSUNG'S

9    TIME.

10             MR. VERHOEVEN:  I THINK THAT COMPLETES

11   OUR ARGUMENT, YOUR HONOR.

12             THE COURT:  OKAY.  ALL RIGHT.  I'M GOING

13   TO RETURN THIS -- THAT WAS FROM THE APPLE'S

14   CORRECTED AMENDED OBJECTIONS AND RESPONSES TO

15   SAMSUNG ELECTRONICS' LIMITED INTERROGATORIES NUMBER

16   4, 6, 7, 16, 17, 18 TO APPLE, INC.

17             ALL RIGHT.

18             (WHEREUPON, THE FOLLOWING PROCEEDINGS

19   WERE HELD IN THE PRESENCE OF THE JURY:)

20             THE COURT:  ALL RIGHT.  WELCOME BACK.

21             OH, PLEASE TAKE A SEAT.  SORRY.  I FORGET

22   THAT.

23             ALL RIGHT.  GO AHEAD, PLEASE.

24             IT'S 1:13.

25             MR. VERHOEVEN:  THANK YOU, YOUR HONOR.
```

1   Q     GOOD AFTERNOON, DR. KARE.

2   A     GOOD AFTERNOON.

3   Q     I'D LIKE TO SWITCH SUBJECTS AND TALK A LITTLE

4   BIT ABOUT THE PLACEMENT OF ICONS ON THE USER

5   INTERFACE.

6         WOULD YOU AGREE THAT THERE ARE PRACTICAL

7   ENGINEERING CONSIDERATIONS INVOLVED IN THE SPACING

8   FOR THE ICONS ON A GRAPHICAL USER INTERFACE?

9   A     GENERALLY, YES.

10  Q     THE USER INTERFACE SHOULD BE ORGANIZED OR MUST

11  BE ORGANIZED SO THAT THERE'S ENOUGH SPACE FOR THE

12  ICON SO THE USER CAN ACTUALLY SELECT THE ICON;

13  RIGHT?

14  A     YES.

15  Q     SO A DESIGNER HAS TO TAKE INTO ACCOUNT THE

16  SPACE REQUIRED ON THE TOUCHSCREEN TO EFFECTIVELY

17  SELECT AN ICON IN DECIDING HOW TO POSITION ICONS ON

18  THE SCREEN?

19  A     IT'S FAIR TO SAY THAT IF IT'S A TOUCHSCREEN

20  AND YOU'RE USING YOUR FINGER AND NOT A STYLUS, THEN

21  THERE'S SOME PRACTICAL CONSIDERATION OF HOW CLOSE

22  THINGS -- HOW CLOSE AREAS COULD BE TOGETHER AND HOW

23  BIG THEY ARE.

24  Q     RIGHT.  SO IF YOU HAD, FOR EXAMPLE, A COMPUTER

25  SCREEN AND YOU'RE USING A MOUSE, YOU CAN USE -- YOU

```
 1    CAN HAVE SMALLER ICONS IF YOU WANTED TO AND JUST
 2    CLICK ON THE POINT; RIGHT?
 3    A    YOU HAVE A ONE PIXEL POINTER.
 4    Q    RIGHT.
 5    A    EASY TO BE PRECISE.
 6    Q    NOW, IF YOU HAD ONE OF THOSE OUGHT PALM PILOTS
 7    WHERE YOU HAD A STYLUS -- DO YOU REMEMBER THOSE?
 8    A    YES.
 9    Q    THAT WOULD BE A TIGHT LITTLE POINT THAT YOU
10    PUSH; RIGHT?
11    A    YES.
12    Q    AND THAT'S ALL THE SPACE YOU'D NEED?
13    A    YOU KNOW, MAYBE THERE'S OTHER -- YOU KNOW,
14    VISUAL DESIGN.
15    Q    OF COURSE.
16    A    BUT, YES.
17    Q    SO -- BUT IF YOU HAVE ONE OF THESE NEWER
18    SMARTPHONES THAT ARE DESIGNED TO HAVE A TOUCHSCREEN
19    WITH JUST YOUR FINGER, YOU DON'T NEED A STYLUS,
20    THEN YOU NEED A LARGER AREA BECAUSE THE FINGER
21    TOUCH IS LARGER; RIGHT?
22    A    YES.
23    Q    SO THAT CAN AFFECT THE NUMBER OF OR HOW BIG
24    THE ICONS NEED TO BE?
25    A    IT WOULD AFFECT HOW BIG THE HIT AREA NEEDS TO
```

```
1    BE, THE ICON AND THE HIT AREA THAT ARE SENSITIVE TO

2    THE FINGER DON'T NEED TO BE EXACTLY THE SAME SIZE.

3    Q    WELL, THEY NEED TO BE ABOUT THE SAME SIZE,

4    DON'T THEY?

5    A    YOU CAN HAVE THE ICON IS THE TARGET AND THE

6    HIT AREA COULD BE A HALO AROUND IT SO THAT YOU

7    DON'T NEED TO HAVE EVERY PIXEL THAT'S SENSITIVE TO

8    YOUR FINGER BE PART OF THE ICON.

9    Q    IS ONE REASON WHY THE DOCK OR FAVORITES GROUP

10   THAT WAS AT THE BOTTOM OF THE D'305 DESIGN

11   PATENT -- D'305 DESIGN PATENT IS PUT DOWN THERE

12   BECAUSE, BY DESIGN FUNCTIONALLY, YOU WANT THE

13   USER'S THUMB TO BE ABLE TO TOUCH THE ICON WHILE

14   STILL HOLDING THE PHONE WITH THE REST OF THE HAND?

15   A    I THINK OF THE D'305 PATENT AS JUST A PICTURE.

16   IT DOESN'T REALLY SAY ANYTHING ABOUT HOW ANYTHING

17   WORKS.

18        SO ALL I CAN REALLY SEE IN THAT PATENT --

19   IN THAT ORNAMENTAL DESIGN IS THAT THERE ARE FOUR

20   ICONS AT THE BOTTOM.

21   Q    WELL, YOU ALSO TALKED ABOUT TRADE DRESS.

22        DO YOU REMEMBER THAT?

23   A    YES.

24   Q    AND DID YOU CONSIDER ANY FUNCTIONAL

25   CONSIDERATIONS WHEN YOU WERE TALKING ABOUT TRADE
```

1    DRESS -- WHEN YOU WERE FORMING YOUR OPINIONS ABOUT

2    TRADE DRESS?

3    A    BECAUSE I WAS ASKED ABOUT THE OVERALL VISUAL

4    IMPRESSION, TO THE EXTENT THAT THE OVERALL VISUAL

5    IMPRESSION INCLUDES, YOU KNOW, ABOUT 20 THINGS, I

6    ASSUMED FROM THAT THAT YOU NEED TO HAVE AN

7    AFFORDANCE TO MAKE THOSE THINGS HAPPEN.

8              BUT I DIDN'T CONSIDER REALLY THE

9    MECHANICS OF, YOU KNOW -- IT WAS MUCH MORE FOCUSSED

10   ON HOW THINGS LOOKED VERSUS HOW THINGS WORKS, MY

11   PARTICULAR ANALYSIS FOR WHAT I WAS ASKED TO DO.

12   Q    IS IT FAIR TO SAY THAT YOU DIDN'T INVESTIGATE

13   THE FUNCTIONALITY OF THE ICONS AND HOW THEY WORK

14   AND HOW A USER WOULD INTERACT WITH THEM AS PART OF

15   YOUR ANALYSIS?

16   A    YES.

17   Q    NOW, ISN'T IT -- I THINK YOU TALKED A LITTLE

18   BIT ABOUT THE SHAPE OF THE ICON BEING A RECTANGLE.

19              DO YOU REMEMBER THAT?

20   A    YES.

21   Q    THERE'S A REASON PEOPLE DON'T HAVE TRIANGULAR

22   SHAPED ICONS ON SMARTPHONES, ISN'T THERE?

23   A    THERE'S NO REASON YOU COULDN'T.

24   Q    HAVE YOU EVER SEEN ANY?

25   A    NO.  BUT I WOULDN'T SAY THAT BECAUSE YOU

```
1    HAVEN'T SEEN SOMETHING DOESN'T MEAN IT'S NOT A

2    REASONABLY -- IT COULDN'T WORK.

3    Q    WELL, YOU WOULD AGREE WITH ME THAT TRIANGULAR

4    ICONS WOULD NOT WORK AS WELL AS RECTANGULAR ICONS

5    ON A SMARTPHONE?

6    A    I WOULDN'T AGREE WITH YOU THAT THAT IS A

7    TRUISM.

8    Q    SO YOU THINK TRIANGULAR CONTAINERS WORK JUST

9    AS WELL AS RECTANGULAR CONTAINER S?

10   A    I THINK YOU NEED TO UNDERSTAND THE DESIGN

11   PROBLEM AND, YOU KNOW, SOMETIMES IF YOU HAVE A

12   SQUARE, IT COULD BE DIVIDED INTO TWO TRIANGLES.  SO

13   IF YOU NEEDED TO GET COURT THINGS ON THAT SCREEN, A

14   SCREEN, MAYBE THAT WOULD BE A GOOD WAY TO DO IT.

15             BUT IT ALSO WOULD -- IF YOU USE

16   TRIANGLES, THERE WOULD BE A LOT MORE BACKGROUND

17   SPACE BETWEEN THEM AND MAYBE THAT COULD BE A GOOD

18   DIFFERENTIATING FACTOR.  I WOULDN'T RULE IT OUT.

19   Q    WELL, YOU HAD YOUR DEPOSITION TAKEN IN APRIL

20   OF THIS YEAR; RIGHT?

21   A    YES.

22   Q    DO YOU REMEMBER THAT?

23   A    YES.

24   Q    AND YOUR DEPOSITION WAS TAKEN, YOU WERE UNDER

25   OATH JUST LIKE TODAY; RIGHT?
```

```
 1    A    YES.

 2    Q    I'D LIKE TO SHOW YOU AN EXCERPT FROM YOUR

 3    TRANSCRIPT.

 4         IF WE CAN JUST PUT UP THE WRITTEN

 5    TRANSCRIPT, MR. FISHER, PAGE 117, LINE 18, AND IT

 6    GOES THROUGH 118, LINE 14.

 7         LOOK UP HERE, DOCTOR.

 8         "QUESTION:  DO YOU THINK THAT TRIANGULAR

 9    CONTAINERS WOULD WORK JUST AS WELL AS RECTANGULAR

10    CONTAINERS?

11         "ANSWER:  NO.

12         "QUESTION:  AND WHY IS THAT?

13         "ANSWER:  BECAUSE A TRIANGLE, EXCEPT

14    FOR -- IT'S HARD TO FIT A LOT OF IMAGES.  IF YOU'RE

15    TRYING TO USE A TRIANGLE AS A BACKGROUND SHAPE,

16    YOU'D BE A LOT MORE LIMITED AS TO WHAT YOU COULD

17    FIT IN IT TO MODIFY IT BECAUSE YOU'D BE GIVING UP

18    ESSENTIALLY HALF OF YOUR REAL ESTATE."

19         DO YOU MEAN REMEMBER THAT TESTIMONY?

20    A    I DO.

21    Q    YOU AGREE WITH THAT, RIGHT?

22         MS. KREVANS:  YOUR HONOR, COULD I ASK

23    THAT MR. VERHOEVEN READ THE ENTIRE QUESTION?

24         THE COURT:  NO.  YOU'LL HAVE AN

25    OPPORTUNITY IN REDIRECT.
```

```
 1          THE WITNESS:  THAT'S SOMETHING, BECAUSE I

 2   REVIEWED MY DEPOSITION TESTIMONY FOR THIS EVENT,

 3   THAT I WOULD SAY I THOUGHT MORE ABOUT IT, AND I

 4   COULD ALSO EXPLAIN WHAT I MEANT.

 5          A SQUARE DOES HAVE MORE REAL ESTATE.

 6   BY MR. VERHOEVEN:

 7   Q    MY QUESTION IS WHETHER YOU STAND BY YOUR

 8   TESTIMONY UNDER OATH AT YOUR DEPOSITION.

 9   A    I HAVE RETHOUGHT ABOUT THAT, AND IF I HAD THE

10   OPPORTUNITY TO ANSWER THAT QUESTION, I WOULD GIVE A

11   BIT OF A DIFFERENT ANSWER.

12   Q    YOU DON'T STAND BY IT?

13   A    I HAVE THOUGHT -- I HAVE HAD MORE THOUGHTS

14   ABOUT WHEN I WENT BACK AND RECONSIDERED IT.

15   Q    OKAY.  SO THE ANSWER TO MY QUESTION IS YOU

16   DON'T STAND BY IT?  YOU WOULD RATHER HAVE A

17   DIFFERENT ANSWER?

18   A    YES.  OR THE REST OF MY ANSWER GOES ON TO

19   EXPLAIN WHAT I WAS TRYING TO SAY.

20   Q    OKAY.  LET'S LOOK AT THAT.  "AND AT THE SAME

21   TIME, MAYBE THERE'S A -- HOW BIG ARE THEY?  YOU

22   KNOW, HOW ARE YOU ARRANGING THEM?  TRIANGLES ARE A

23   GOOD WAY TO GET MAYBE FOUR SHAPES IN A COMPACT

24   SPACE.  MAYBE IF IT WAS SOMETHING THAT DIDN'T NEED

25   LABELS, IT COULD BE POSSIBLE.  BUT IN GENERAL, A
```

1    TRIANGLE IS TOUGH.  CIRCLES, EASIER.  YOU DON'T

2    NEED A BACKGROUND SHAPE."

3              DO YOU STAND BY THAT TESTIMONY?

4    A    YES.

5    Q    OKAY.  LET'S GO TO PDX 14.30, WHICH YOU WERE

6    SHOWN ON YOUR DIRECT EXAMINATION.  DO YOU REMEMBER

7    YOU TALKED ABOUT THIS ON YOUR DIRECT EXAM?

8    A    YES.

9    Q    AND THIS IS THE BLACKBERRY TORCH SCREEN

10   CAPTURE; IS THAT RIGHT?

11   A    YES.

12   Q    AND YOU POINTED TO THIS AS AN EXAMPLE OF A

13   SCREEN DEPICTING ICONS THAT IS NOT SUBSTANTIALLY

14   SIMILAR TO THE D'305; RIGHT?

15   A    YES.

16   Q    BUT YOU SEE THERE'S A COLORFUL MATRIX OF ICONS

17   HERE; RIGHT?

18   A    THEY ARE ARRANGED IN A GRID.  THEY'RE NOT

19   QUITE AS COLORFUL, THESE PARTICULAR ICONS.

20   Q    THEY'RE COLORFUL, AREN'T THEY?  DO YOU SEE THE

21   DIFFERENT COLORS?

22   A    THEY AREN'T MONOCHROME, BUT THE OVERALL EFFECT

23   OF THE WHOLE SCREEN ISN'T AS COLOR-INFUSED AS THE

24   IPHONE SCREEN, PARTLY BECAUSE THE ICONS ARE SMALLER

25   AND PARTLY BECAUSE MORE OF THEM TEND TOWARD THE

1    MONOCHROMATIC.

2    Q    DO YOU SEE THIS RED ONE HERE?

3    A    YES.

4    Q    YOUTUBE?

5    A    YES.

6    Q    DO YOU SEE THIS BLUE ONE HERE, IT SAYS MEDIA,

7    THAT'S A GREEN ONE, RIGHT, IT SAYS CALENDAR?  DO

8    YOU SEE THAT?

9    A    YES.

10   Q    AND YOU SEE THE YELLOW ONE DOWN AT THE BOTTOM

11   LEFT?

12   A    YES.

13   Q    AND YOU SEE, IS THAT VIOLET, THE ONE THAT SAYS

14   GAMES?

15   A    YES, CLOSE ENOUGH.

16   Q    THOSE ARE ALL DIFFERENT COLORS; RIGHT?

17   A    YES.

18   Q    AND THEY'RE COLORFUL, AREN'T THEY?

19   A    I DIDN'T SAY THAT THERE WEREN'T COLORED.

20         BUT I STILL BELIEVE THE OVERALL IMPACT OF

21   THE SCREEN ON THE LEFT IS THAT MORE PIXELS

22   PROPORTIONALLY ON THAT SCREEN ARE BRIGHTLY COLORED

23   THAN ON THE SCREEN ON THE RIGHT.

24         BUT THERE DEFINITELY ARE COLORS.

25   Q    YOU'RE NOT TELLING THE JURY THAT APPLE OWNS

1    THE RIGHT TO HAVE A COLORFUL MATRIX OF ICONS, ARE

2    YOU?

3    A    NO.

4    Q    AND YOU'RE NOT TELLING THE JURY THAT APPLE

5    OWNS THE EXCLUSIVE RIGHT TO HAVE THE ICONS ARRANGED

6    IN ROWS AND COLUMNS IN A GRID MATRIX, ARE YOU?

7    A    NO.

8    Q    TAKE THAT DOWN.

9         I THINK YOU TESTIFIED ON DIRECT THAT YOU

10   DID WORK FOR APPLE BEFORE; IS THAT RIGHT?

11   A    YES.

12   Q    AND THAT WAS BACK IN 1982?

13   A    FROM 1982 THROUGH SOME POINT IN 1986, THE VERY

14   END OF 1982.

15   Q    YOU WERE A GRAPHIC ARTIST IN THE MACINTOSH

16   SOFTWARE GROUP?

17   A    YES.

18   Q    AND THEN YOU WERE A CREATIVE DIRECTOR AT

19   APPLE?

20   A    BRIEFLY, YES.

21   Q    AND THEN YOU LEFT APPLE IN 1986 TO GO TO WORK

22   AT A COMPANY CALLED NEXT?

23   A    YES.

24   Q    IS IT CORRECT THAT A GROUP OF SENIOR

25   EXECUTIVES FROM APPLE LEFT IN 1986 AND JOINED AND

1   FORMED THE COMPANY CALLED NEXT?

2   A    YES.

3   Q    AND YOU WENT ALONG WITH THAT?

4   A    NO.  I WAS NOT IN THE -- I WASN'T A FOUNDER OF

5   NEXT.

6   Q    BUT YOU LEFT APPLE TO GO JOIN NEXT WITH THAT

7   GROUP OF EXECUTIVES, RIGHT?

8   A    I WAS HIRED.  I WAS AN EARLY EMPLOYEE ONCE

9   NEXT WAS STARTED.

10  Q    AND NEXT WAS STARTED BY A GROUP OF FORMER

11  APPLE EXECUTIVES; RIGHT?

12  A    PEOPLE FROM APPLE.  I DON'T KNOW IF THEY WERE

13  ALL EXECUTIVES.

14  Q    AND YOU WORKED WITH THOSE PEOPLE UNTIL 1989?

15  A    YEAH, I THINK I LEFT IN EARLY '89.

16  Q    NOW, I DON'T KNOW IF YOU MENTIONED ON YOUR

17  DIRECT, BUT YOU'RE CHARGING APPLE FOR YOUR TIME ON

18  THIS CASE; IS THAT RIGHT?

19  A    YES.

20  Q    AND HOW MUCH ARE YOU CHARGING APPLE?

21  A    FIVE HUNDRED FIFTY AN HOUR.

22  Q    AND HOW MUCH MONEY HAS APPLE PAID YOU TO DATE?

23  A    SO FAR, PROBABLY ABOUT 80K.

24  Q    EIGHTY THOUSAND DOLLARS?

25  A    YES.

```
 1                    MR. VERHOEVEN:  THANK YOU, DR. KARE.  I
 2      PASS THE WITNESS, YOUR HONOR.
 3                    THE COURT:  OKAY.  THE TIME IS NOW 1:26.
 4               ANY REDIRECT?
 5                    MS. KREVANS:  YES, YOUR HONOR.
 6                    THE COURT:  OKAY.  REDIRECT.
 7                    MS. KREVANS:  FIRST, YOUR HONOR, JUST A
 8      HOUSEKEEPING MATTER, I HAVE REPLACEMENT FOR 15.  I
 9      HAVE 158-A.  I GAVE A COPY TO COUNSEL, AND I WOULD
10      PROVIDE ONE TO THE COURT.  I WOULD MOVE FOR ITS
11      ADMISSION AT THIS POINT.
12                    THE COURT:  ALL RIGHT.  ANY OBJECTION?
13                    MR. VERHOEVEN:  SUBJECT TO THE
14      DEMONSTRATIVE OBJECTION, NO FURTHER OBJECTION.
15                    THE COURT:  THAT'S ADMITTED.  AND I'M
16      SORRY, CAN YOU REPEAT.
17                    MS. KREVANS:  158-A, YOUR HONOR.
18                    THE COURT:  ALL RIGHT.  THANK YOU.
19                    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
20                    158-A, HAVING BEEN PREVIOUSLY MARKED FOR
21                    IDENTIFICATION, WAS ADMITTED INTO
22                    EVIDENCE.)
23                    REDIRECT EXAMINATION
24      BY MS. KREVANS:
25      Q   DR. KARE, WERE YOU ASKED TO GIVE OPINIONS IN
```

1    THIS CASE ABOUT WHETHER INDIVIDUAL ICONS, TAKEN OUT

2    OF THE CONTEXT APPLICATION SCREEN OF SAMSUNG

3    PHONES, WERE SUBSTANTIALLY SIMILAR TO INDIVIDUAL

4    ICONS TAKEN OUT OF THE CONTEXT OF THE IPHONE

5    DESIGN?

6    A    NO.

7    Q    OKAY.  LET ME ASK YOU A COUPLE OF FOLLOW-UPS

8    TO THE QUESTIONS THAT MR. VERHOEVEN DID ASK YOU

9    ABOUT INDIVIDUAL ICONS.

10               FIRST, COULD WE SEE EXHIBIT PX 44 AT PAGE

11   127.

12               ACTUALLY, LET ME STOP ON THE FIRST PAGE.

13   PX 44, THE COVER PAGE, WHAT IS THE DATE OF THIS

14   SAMSUNG DOCUMENT, DR. KARE?

15               MR. VERHOEVEN:  BEYOND THE SCOPE OF

16   CROSS.

17               MS. KREVANS:  YOUR HONOR, I'M JUST

18   ESTABLISHING THE DATE OF THE DOCUMENT AND THEN I'M

19   GOING TO ASK QUESTIONS ABOUT THE SPECIFIC ICONS

20   THAT MR. VERHOEVEN ASKED QUESTIONS ABOUT.

21               THE COURT:  SINCE I'VE JUST ADMITTED THIS

22   DOCUMENT, GO AHEAD.  OVERRULED.

23   BY MS. KREVANS:

24   Q    WAS THE DATE OF EXHIBIT PX 44?

25   A    MARCH 2ND, 2010.

1    Q    OKAY.  NOW, COULD WE SEE FIRST P -- SORRY, OUR

2    SLIDE 14.25.  DO YOU RECALL THAT MR. VERHOEVEN

3    ASKED YOU SOME QUESTIONS ABOUT THE CLOCK ICON THAT

4    IS THE, IN THE THIRD ROW DOWN, THIRD FROM THE LEFT

5    IN THE FASCINATE SCREEN?

6    A    YES.

7    Q    OKAY.  COULD WE SEE PX 44, PAGE 127.

8              FIRST, COULD YOU JUST TELL THE JURY, YOU

9    TALKED ABOUT THIS GENERALLY BEFORE.  COULD YOU TELL

10   THE JURY WHAT IS SET OUT ON THIS PAGE?

11   A    WELL, IT'S CALLED VISUAL INTERACTION EFFECT,

12   ICON.

13             IT SAYS, "USAGE OF INDISTINGUISHABLE

14   ICONS FOR DIFFERENT FUNCTIONS MAKES FOR DIFFERENT

15   DIFFERENTIATION," AND IT SAYS ON THE IPHONE,

16   "INSTANT RECOGNIZABILITY DUE TO HIGHLY INTUITIVE

17   ICON USAGE."

18   Q    AND IS THE IPHONE SHOWN ON THIS PAGE?

19   A    I'M SORRY.

20   Q    IS THE IPHONE ACTUALLY SHOWN ON THIS PAGE?

21   A    YES, IT IS, IT'S ON THE LEFT, THE HOME SCREEN

22   OF THE IPHONE.

23   Q    OKAY.  AND THEN WHAT DOES IT SAY ABOUT THE

24   SAMSUNG ICONS UP ABOVE.

25   A    THERE'S AN IMAGE OF AN ICON THAT LOOKS LIKE A

1    HOME SCREEN, APPROXIMATELY.

2    Q    OKAY.

3    A    AND ON THE RIGHT-HAND SIDE IS A CORRESPONDING

4    APPLICATION SCREEN FROM THE SAMSUNG PHONE.

5    Q    OKAY.  AND WHAT DOES IT SAY UP ABOVE WHERE IT

6    SAYS S1?

7    A    IT SAYS DIFFICULT DIFFERENTIATION DUE TO ICONS

8    THAT ARE DUPLICATIVE OR INTUITIVELY DEFICIENT.

9    Q    OKAY.  YOU TESTIFIED EARLIER THAT THE FORMAT

10   OF THIS DOCUMENT WAS COMMENTS ON EACH SCREEN AND

11   THEN A DIRECTION FOR IMPROVEMENT.

12            CAN YOU BRIEFLY SUMMARIZE FOR US WHAT

13   THOSE COMMENTS AND DIRECTIONS ARE ON THIS PAGE OF

14   PX 44?

15   A    ON THE RIGHT IT SAYS CONFUSION CAN RESULT FROM

16   INDISTINGUISHABLE ICONS, AND ON THE LEFT IT SAYS

17   MINIMIZE REPLICATE ICONS, CAN FEEL ICONS WERE MADE

18   IN CONSIDERATION OF THE USER, FOR INSTANCE,

19   RECOGNITION AND EASE OF USE.

20            SO IT'S BASICALLY CONFUSING ON THE RIGHT

21   FROM A PAIR OF IPHONES, AND LESS REPLICATE SOLUTION

22   ON THE LEFT.

23   Q    WHAT IS THE DIRECTION FOR IMPROVEMENT?

24   A    IT SAYS CHANGE REPLICATE ICONS AND SELECT AND

25   USE HIGHLY INTUITIVE ICONS.

```
1     Q    OKAY.  LET'S LOOK AT THE INDIVIDUAL ICONS ON

2     THE SAMSUNG ICON SCREEN ON THIS PAGE THAT ARE ON

3     THE APPLICATION THAT MR. VERHOEVEN ASKED YOU ABOUT.

4               LET'S START WITH THE CLOCK.

5               COULD YOU, IN THE UPPER LEFT HAND CORNER,

6     COULD YOU BLOW UP THE CLOCK FOR US A LITTLE BIT,

7     MR. LEE.  MAKE IT A LITTLE LESS BLURRY.

8               MR. VERHOEVEN:  YOUR HONOR, I'VE NEVER

9     SEEN THIS BEFORE.  AND WE OBJECT TO IT BEING PUT ON

10    THE SCREEN AND PULLING OUT ICONS LIKE THIS.  YOU

11    DIDN'T LET US DO IT, AND --

12              THE COURT:  WELL, YOU WERE ACTUALLY

13    ALLOWED TO TAKE THE LOZENGE AND BLOW IT UP AND

14    MAGNIFY IT, SO I'M NOT SURE HOW THIS IS DIFFERENT

15    FROM BLOWING UP THE LOZENGES FROM THE PHONES THAT

16    YOU SHOWED YESTERDAY.  HOW IS THIS DIFFERENT?

17              MR. VERHOEVEN:  WELL, MY UNDERSTANDING,

18    YOUR HONOR, FROM THE DISCUSSION THAT WE HAD LAST

19    NIGHT WITH RESPECT TO THIS WITNESS WAS IT WAS GOING

20    TO BE SCREEN-TO-SCREEN SHOTS.  THERE WERE

21    OBJECTIONS TO US PULLING OUT THE ELEMENTS --

22              THE COURT:  NO, IT WAS THAT YOU HAD THE

23    BODY STYLE IN THE PHOTOS.

24              BUT THAT'S FINE.  JUST DO IT LIKE THIS.

25              MS. KREVANS:  OKAY.
```

1    Q    CAN YOU POINT US TO THE CLOCK ICON IN THE

2    SAMSUNG DESIGN CONCEPT APPLICATION SCREEN THAT'S

3    SHOWN ON THIS PAGE OF PX 44?

4    A    YES, IT'S IN THE UPPER LEFT.

5    Q    CAN WE GO BACK TO PDX 14.25, THE GRAPHIC WITH

6    THE FASCINATE.  CAN WE SEE THE WHOLE GRAPHIC,

7    PLEASE.

8          OKAY.  WHERE IS THE CLOCK ICON IN THE

9    FASCINATE?

10   A    IT'S ON THE THIRD ROW AND THIRD COLUMN.  IT'S

11   THE THIRD FROM THE LEFT IN THE THIRD ROW DOWN ON

12   THE FASCINATE.

13   Q    OKAY.  COULD WE LOOK AT EXHIBIT 14 -- PDX

14   14.7, PLEASE, MR. LEE.

15          OKAY.  I'M SORRY.  I THINK THIS IS THE

16   ONE THAT MR. VERHOEVEN SHOWED YOU.

17          COULD YOU TELL US HOW THE CLOCK ICON IN

18   THE IMAGE THAT WE JUST SAW FROM PDX 44 THAT YOU

19   STILL HAVE IN FRONT OF YOU IN YOUR BINDER, IF YOU

20   LOOK, COMPARES TO THE CLOCK ICON IN THE FASCINATE,

21   AND WE NOW SEE IT ON THE SCREEN, AND THE CLOCK ICON

22   ON THE D'305 PATENT?

23   A    WELL --

24          MR. VERHOEVEN:  OBJECTION, YOUR HONOR.

25   NONE OF THIS WAS IN THE EXPERT REPORT.

1          MS. KREVANS:  THIS IS REDIRECT AFTER

2     CROSS ON THIS EXACT TOPIC, YOUR HONOR.

3          MR. VERHOEVEN:  YOUR HONOR, I DID NOT USE

4     THIS EXHIBIT.

5          THE COURT:  YOU WERE GIVEN AN OPPORTUNITY

6     TO.  I PLACED YOU ON NOTICE THAT EXHIBIT 44 WAS

7     COMING IN DURING THE BREAK.  IT WAS YOUR DECISION

8     NOT TO USE IT.  WE'RE TALKING ABOUT 44.

9          MR. VERHOEVEN:  MY OBJECTION, YOUR HONOR,

10    IS THAT THIS, THE SUBSTANCE OF THE WITNESS'S

11    TESTIMONY IS NOT DISCLOSED IN THE RULE 26 REPORT.

12         MS. KREVANS:  YOUR HONOR, THIS WITNESS

13    WAS CROSSED EXTENSIVELY ON SUPPOSED DIFFERENCES

14    BETWEEN THE CLOCK ICON, THE IMAGES, THE PHOTO ICON,

15    AND THE PHONE ICON BY MR. VERHOEVEN.

16         I AM NOW GIVING THE WITNESS AN

17    OPPORTUNITY TO SHOW WHAT THE CLOCK ICON LOOKED LIKE

18    IN THE SAMSUNG DESIGN PX 44 BEFORE STEPS WERE

19    TAKEN, ACCORDING TO THE DOCUMENT, AND WHAT IT ENDED

20    UP LOOKING LIKE, WHICH IS, OF COURSE, WHAT WE CAN

21    SEE ON THE SCREEN, DIFFERENT FROM PX 44 AND CLOSER

22    TO THE --

23         THE COURT:  SHOW ME WHERE EXHIBIT 44 IS

24    REFERENCED IN HER EXPERT REPORT.

25         MS. KREVANS:  IT IS ON PAGE -- IT IS ON

```
 1    PAGE 89, YOUR HONOR.

 2              THE COURT:  YOU MEAN PARAGRAPH 89?

 3              MS. KREVANS:  I'M SORRY, PARAGRAPH 89,

 4    PAGE 50.

 5              (PAUSE IN PROCEEDINGS.)

 6              THE COURT:  ALL RIGHT.  GO AHEAD.

 7              MS. KREVANS:  OKAY.

 8    Q    CAN YOU COMPARE FOR US THE CLOCK ICON ON PAGE

 9    44 -- LET ME KNOW IF YOU NEED TO SEE IT AGAIN --

10    AND THE CLOCK ICONS IN THE FASCINATE AND THE D'305

11    PATENT ON THE SLIDE THAT'S ON THE SCREEN?

12    A    IN THE DOCUMENT FROM MARCH 2010, THE SAMSUNG

13    SCREEN SHOWN FOR APPLICATIONS USED A GREEN SQUARE,

14    ROUNDED REC'D, WITH A GREEN ALARM CLOCK, KIND OF A

15    RETRO ALARM CLOCK WITH GREEN BELLS AND FEET.

16              BUT IN THE SHIPPING PRODUCT, THE CLOCK

17    ISN'T AN ALARM CLOCK AND IT'S PRETTY CLOSE TO

18    APPLE'S CLOCK.

19    Q    OKAY.  LET'S GO BACK TO PX 44, PAGE 127.  SHOW

20    US THE WHOLE PAGE FIRST, MR. LEE, SO THAT WE CAN BE

21    CLEAR WHAT WE'RE LOOKING AT.

22              AND NOW CAN YOU JUST BLOW UP THE SAMSUNG

23    ICON SCREEN AND SHOW THAT.

24              CAN YOU POINT US TO THE ICON IN THIS

25    SCREEN THAT CORRESPONDS TO THE GALLERY OR PHOTOS
```

1    APPLICATION?

2    A    IT'S IN THE THIRD ROW IN THE SECOND COLUMN.

3    SO IT'S ONE FROM THE LEFT.  IT LOOKS LOOK A

4    MOUNTAIN WITH A YELLOW GLOW BEHIND IT.

5    Q    SO IT'S A MOUNTAIN AT EITHER SUNRISE OR

6    SUNSET?

7    A    YES.  AND THAT'S TYPICAL FOR PHOTO GALLERIES

8    TO HAVE LANDSCAPES.

9    Q    OKAY.  CAN WE LOOK AT PDX 14.7 AGAIN.

10         CAN YOU TELL US HOW THE PHOTO APPLICATION

11   ICON THAT WAS ORIGINALLY IN THE SAMSUNG

12   APPLICATIONS PAGE IN THE MARCH DOCUMENT COMPARES TO

13   THE PHOTO IMAGE, THE GALLERY, IN THE FASCINATE

14   PHONE AND THE D'305 PATENT?

15   A    IT EVOLVED TO WHAT LOOKS LIKE A CLOSE-UP OF A

16   YELLOW FLOWER PETAL THAT'S ELONGATED, THAT IS

17   EVOCATIVE OF THE SUNFLOWER PETAL.

18   Q    OKAY.  LET'S GO TO THE PHONE, THE LAST ONE --

19   I THINK THAT WAS THE FIRST ONE THAT MR. VERHOEVEN

20   ASKED YOU ABOUT.

21         BACK TO THE PAGE IN PX 44, PAGE 1 THROUGH

22   7.

23         IF WE CAN BLOW UP THE MARCH VERSION OF

24   THE SAMSUNG APPLICATION SCREEN.

25         CAN YOU SHOW US WHERE THE PHONE IS AND

```
 1      IT'S IN THE SAME ANCHOR POSITION IN THE LOWER LEFT.
 2               OKAY.  JUST SO WE'RE REALLY CLEAR, I KNOW
 3      YOU DON'T REALLY LIKE --
 4      A    OH, THERE IT IS.
 5      Q    AND WHAT DOES IT LOOK LIKE?
 6      A    IT LOOKS LIKE, IT SAYS 1, 2, 3, 4 AND IT LOOKS
 7      LIKE BUTTONS FROM A PHONE OR A CALCULATOR.  I'M
 8      ASSUMING A PUSH BUTTON PHONE.
 9      Q    OKAY.
10      A    A SEGMENT.
11      Q    NOW LET'S GO TO PDX 14.7.
12               CAN YOU COMPARE FOR THE JURY THAT PHONE
13      ICON WE JUST SAW IN THE MARCH VERSION OF THE
14      SAMSUNG APPLICATION SCREEN, MARCH 2010, TO THE
15      SAMSUNG PHONE ICON IN THE ACTUAL FASCINATE PHONE
16      AND THE APPLE PHONE ICON IN THE D'305 PATENT?
17      A    YOU DON'T NEED ME TO EXPLAIN THIS, BUT THEY'RE
18      BOTH GREEN SQUARES, ROUNDED CORNER, ONE IS A LITTLE
19      SMALLER BUT THE SAME RETRO HANDSET AT AN ANGLE
20      FACING UP, A LITTLE BIT OF GRADIENT BEHIND IT, AND
21      A COLOR OF GRASS GREEN.
22      Q    SO IN PX 44, THE DEVELOPMENT DOCUMENT, THE
23      PHONE ICON WAS LIKE A LITTLE KEY PAD?
24      A    YES.
25      Q    A MODERN PHONE?
```

```
 1    A    YES.

 2    Q    AND NOW WHAT IS IT IN THE FASCINATE?

 3    A    A HANDSET, A WHITE HANDSET ON A SCREEN,

 4    REVERSED THAT AGAINST A GREEN BACKGROUND.

 5              MS. KREVANS:  OKAY.  NOTHING FURTHER,

 6    YOUR HONOR.

 7              THE COURT:  ALL RIGHT.  ANY REDIRECT?

 8              IT'S 1:40.  OR RECROSS-EXAMINATION, I'M

 9    SORRY.

10              MR. VERHOEVEN:  JUST LIKE ONE MINUTE,

11    YOUR HONOR.

12              THE COURT:  PLEASE, GO AHEAD.

13              MR. VERHOEVEN:  CAN WE PUT UP THE IMAGE

14    YOU HAD EXCERPTED OUT OF EXHIBIT 44.122 JUST ON THE

15    SCREEN?  NO, NO.  THE ONE THAT WAS JUST ON THE

16    SCREEN.  COUNSEL WAS USING IT.  IT PULLED OUT THE

17    IMAGE.

18              MR. FISHER, I BELIEVE WE HAVE TO SWITCH

19    OVER TO THE OTHER SIDE BECAUSE THEY CREATED THIS

20    OVER THE BREAK, AND WE HADN'T SEEN IT.

21              MS. KREVANS:  WE WERE SHOWING THE ACTUAL

22    PAGE.

23              MR. VERHOEVEN:  THE IMAGE, YOU JUST

24    EXCERPTED IT OUT?

25              MS. KREVANS:  YES.
```

```
 1            MR. VERHOEVEN:  GREAT, THANK YOU.

 2                   RECROSS-EXAMINATION

 3    BY MR. VERHOEVEN:

 4    Q    NOW, THIS DOCUMENT, IT SAYS CONFUSION CAN

 5    RESULT FROM INDISTINGUISHABLE ICONS LIKE MESSAGE

 6    AND E-MAIL.

 7             DO YOU SEE THAT?

 8    A    YES.

 9    Q    AND THE DOCUMENT HIGHLIGHTS THE ICONS THAT

10    THAT SENTENCE IS TALKING ABOUT.  FAIR?

11    A    YES.

12    Q    AND IT HIGHLIGHTS AN ICON ON THE FOURTH

13    COLUMN, SECOND ROW; RIGHT?

14    A    YES.

15    Q    AND THAT SAYS E-MAIL; RIGHT?

16    A    YES.

17    Q    AND WHEN I SAY, "HIGHLIGHTS," I MEAN IT DRAWS

18    A RED, RECTANGULAR SHAPE AROUND IT WITH ROUNDED

19    CORNERS; RIGHT?

20    A    YES.

21    Q    AND IT ALSO HIGHLIGHTS ANOTHER ICON; RIGHT?

22    A    YES.

23    Q    AND THAT IS ON THE BOTTOM ROW, BOTTOM-MOST ROW

24    OF THE IMAGE, AND THE THIRD COLUMN; CORRECT?

25    A    YES.
```

1    Q    AND THAT SAYS MESSAGING?

2    A    YES.

3    Q    RIGHT?

4    A    YES.

5    Q    AND ISN'T IT TRUE, FROM READING THIS, WHAT

6    THIS DOCUMENT IS SAYING IS THIS E-MAIL ICON IS TOO

7    SIMILAR TO THIS MESSAGING ICON AND IT MAY CREATE

8    CONFUSION TO THE USER AS TO WHICH ONE THEY HIT TO

9    GET WHAT.  ISN'T THAT WHAT THAT'S SAYING?

10   A    YES.

11   Q    AND THE DOCUMENT SAYS, LOOK, WE WANT TO MAKE

12   THESE CLEARER SO THAT WHEN THE USER IS USING THE

13   INTERFACE, THEY DON'T GET CONFUSED BY HITTING THE

14   MESSAGING ICON THINKING THEY'RE GETTING E-MAIL, OR

15   HITTING THE E-MAIL ICON THINKING THEY'RE GETTING

16   THEIR SMS MESSAGE.

17            ISN'T THAT TRUE, SIR?  OR MA'AM.  I'M

18   SORRY.  LONG DAY?

19   A    YES, BECAUSE THEY BOTH USE WHITE ENVELOPES

20   FROM THE BACK WITH SOME YELLOW INSIDE.

21   Q    AND THE RECOMMENDATION IN THE DOCUMENT IS MAKE

22   IT CLEARER SO THAT THE USER DOESN'T GET CONFUSED

23   BETWEEN ICONS WITHIN THE USER INTERFACE; RIGHT?

24   A    IT CHANGES REPLICATE ICONS AND SELECT AND USE

25   HIGHLY INTUITIVE ICONS.

```
 1    Q    AND BY THAT, THEY MEAN ICONS THAT A USER OR

 2    CONSUMER WOULD LOOK AT AND INTUITIVELY KNOW, IF I

 3    HIT THAT ICON, IT'S GOING TO PROVIDE A CERTAIN

 4    APPLICATION; RIGHT?

 5    A    PRESUMABLY, YES.

 6    Q    AND THAT'S A FUNCTIONAL MESSAGE TO THE USER;

 7    RIGHT?  IT'S A COMMUNICATION TO THE USER IN A CLEAR

 8    WAY?

 9    A    YES.

10    Q    NOW, THIS DOCUMENT DOESN'T TALK ABOUT, DOESN'T

11    HIGHLIGHT THE ALARM CLOCK, DOES IT?

12    A    NO.

13    Q    IT DOESN'T HIGHLIGHT THE PHONE ICON, DOES IT?

14    A    NO.

15    Q    AND IT DOESN'T HIGHLIGHT ANYTHING ELSE, EXCEPT

16    THESE MESSAGES ICONS AND E-MAIL ICONS; RIGHT?

17    A    YES.

18              MR. VERHOEVEN:  THANK YOU, DR. KARE.

19              THE COURT:  ALL RIGHT.  IT'S 1:44.  ANY

20    MORE REDIRECT?

21              MS. KREVANS:  I DO HAVE ONE LAST

22    QUESTION.

23              I'M SORRY, DR. KARE.  YOU HAVE TO SIT

24    BACK DOWN.

25              THE COURT:  ALL RIGHT.  1:44.  GO AHEAD.
```

**FURTHER REDIRECT EXAMINATION**

1

2    BY MS. KREVANS:

3    Q    OKAY.  ONE MORE TIME, MR. LEE, WITH PX 44,

4    PAGE 127.

5              OKAY.  MR. VERHOEVEN JUST ASKED YOU ABOUT

6    THE MESSAGES AND E-MAIL ICONS.

7    A    YES.

8    Q    DO YOU SEE THAT MESSAGES ONE DOWN THERE IN THE

9    BOTTOM ON THE THIRD FROM THE LEFT?

10   A    YES.

11   Q    OKAY.  LET'S JUST KEEP THAT IN YOUR MIND, IF

12   YOU CAN, THAT IMAGE.  AND LET'S GO TO PX -- PDX

13   14.7, AND THAT'S THE -- THERE WE GO.

14             OKAY.  --

15             MR. VERHOEVEN:  YOUR HONOR, THIS IS

16   BEYOND THE SCOPE OF CROSS.

17             MS. KREVANS:  THIS IS EXACTLY -- I'M

18   ASKING EXACTLY WHAT HAPPENED TO THE ICON HE JUST

19   DREW HER ATTENTION TO.

20   Q    WHEN, WHEN SAMSUNG CHANGED THE MESSAGES ICON

21   SO THAT IT NO LONGER LOOKED LIKE AN ENVELOPE, A

22   WHITE ENVELOPE, WHAT DID THEY CHANGE IT TO?

23   A    A SPEECH BALLOON WITH A FACE.

24   Q    WHAT COLOR IS IT?

25   A    GREEN.

```
 1     Q    DOES IT HAVE A LITTLE QUESTION COMING DOWN

 2     FROM IT?

 3     A    YES.

 4     Q    COULD YOU POINT US TO THE CORRESPONDING ICON

 5     ON THE D'305 PATENT?  MAYBE ALSO GIVE A VERBAL

 6     DESCRIPTION FOR US, ROW AND POSITION?

 7     A    IT'S IN THE TOP ROW, UPPER LEFT.

 8     Q    THE GREEN ONE?

 9     A    YES.  IT'S GREEN WITH -- IT'S GREEN AND WHITE

10     AND IT'S A SPEECH BALLOON.

11              MS. KREVANS:  OKAY.

12              NOTHING FURTHER, YOUR HONOR.

13              THE COURT:  ALL RIGHT.  ANY RECROSS?

14              MR. VERHOEVEN:  YEAH, I HAVE TWO

15     QUESTIONS, YOUR HONOR.

16              THE COURT:  GO AHEAD, PLEASE.

17              MR. VERHOEVEN:  PDX 14.7, PLEASE.

18              THE COURT:  1:46.  GO AHEAD, PLEASE.

19                  FURTHER RECROSS-EXAMINATION

20     BY MR. VERHOEVEN:

21     Q    DOCTOR, I THOUGHT WE WERE DONE, BUT I HAVE ONE

22     MORE QUESTION.  THE FASCINATE, WHICH IS IN THE

23     BOTTOM ROW, AND THE THIRD COLUMN, DO YOU SEE IT?

24     A    YES.

25     Q    AND THE SMS TEXT ICON IN THE D'305 DESIGN
```

1    PATENT, WHICH IS IN THE TOP ROW, FIRST COLUMN.  DO

2    YOU SEE THAT?

3    A    YES.

4    Q    DO YOU REMEMBER WE TALKED ABOUT THOSE TWO

5    ICONS?

6    A    YES.

7    Q    AND DO YOU REMEMBER THAT YOU TESTIFIED TO THE

8    JURY THAT THEY WERE NOT SUBSTANTIALLY SIMILAR?

9    A    I REMEMBER THAT I SAID THEY WERE NOT

10   SUBSTANTIALLY SIMILAR, BUT THEY HAD A NUMBER OF

11   ELEMENTS IN COMMON.

12   Q    BUT YOU SAID THEY WERE NOT SUBSTANTIALLY

13   SIMILAR IN YOUR OPINION; RIGHT?  YOU DON'T REMEMBER

14   THAT?

15   A    IT WASN'T VERY LONG AGO.  I REMEMBER TALKING

16   FEATURE BY FEATURE ABOUT WHAT THEY HAD IN COMMON,

17   AND THEN YOU ASKED ME IF THEY WERE SUBSTANTIALLY

18   SIMILAR AND I THINK THAT THEY, THEY DO HAVE A LOT

19   IN COMMON, BUT MAYBE I WOULDN'T CHARACTERIZE THEM

20   AS SUBSTANTIALLY SIMILAR BECAUSE THE OVERALL

21   FOOTPRINT IS DIFFERENT.

22   Q    SO IT'S NOW YOUR TESTIMONY THEY'RE NOT

23   SUBSTANTIALLY SIMILAR?

24   A    I, I ALWAYS SAID, WHEN YOU ASKED ME IF THEY

25   WERE SUBSTANTIALLY SIMILAR, I SAID NO BECAUSE THE

1    OVERALL FOOTPRINT ISN'T IDENTICAL.

2         BUT THEY HAVE MANY FEATURES IN COMMON.

3    Q    OKAY.  SO JUST FOR THE RECORD, DR. KARE, IS IT

4    CORRECT THAT YOUR OPINION THAT THOSE TWO ICONS ARE

5    NOT SUBSTANTIALLY SIMILAR AS YOU TESTIFIED TO

6    EARLIER TODAY?

7    A    YES.

8         MR. VERHOEVEN:  THANK YOU.

9         NOTHING FURTHER.

10        MS. KREVANS:  NOTHING FURTHER, YOUR

11   HONOR.

12        THE COURT:  ALL RIGHT.  IT'S 1:47.

13        IS MS. KARE --

14        MS. KREVANS:  SHE'S EXCUSED SUBJECT TO

15   RECALL ON OUR REBUTTAL CASE.

16        THE COURT:  SUBJECT TO RECALL.

17        MS. KREVANS:  YES.

18        THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

19        CALL YOUR NEXT WITNESS, PLEASE.

20        MR. JACOBS:  YOUR HONOR, APPLE CALLS

21   DR. RUSSELL WINER.

22        THE COURT:  OKAY.

23        (PAUSE IN PROCEEDINGS.)

24        THE CLERK:  WOULD YOU RAISE YOUR RIGHT

25   HAND, PLEASE.

1                        **RUSSELL WINER,**

2        BEING CALLED AS A WITNESS ON BEHALF OF THE

3        PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

4        EXAMINED AND TESTIFIED AS FOLLOWS:

5                    THE WITNESS:  I DO.

6                    THE CLERK:  WOULD YOU STATE YOUR NAME,

7        PLEASE, AND SPELL IT.

8                    THE WITNESS:  MY NAME IS RUSSELL S.

9        WINER.

10                      **DIRECT EXAMINATION**

11       BY MR. JACOBS:

12       Q    AND COULD YOU SPELL IT, SIR?

13       A    SORRY.  R-U-S-S-E-L-L, W-I-N-E-R.

14       Q    DR. WINER, WOULD YOU INTRODUCE YOURSELF TO THE

15       JURY, PLEASE, BY EXPLAINING WHAT YOU DO?

16       A    YES.  I'M A PROFESSOR OF MARKETING AND CHAIR

17       OF THE DEPARTMENT OF MARKETING AT THE STERN SCHOOL

18       OF BUSINESS IN NEW YORK UNIVERSITY.

19       Q    DOES YOUR PROFESSIONAL WORK HAVE A PARTICULAR

20       FOCUS?

21       A    MY PROFESSIONAL WORK HAS TWO COMPONENTS.  ONE

22       IS I TEACH M.B.A.'S AND EXECUTIVE M.B.A. STUDENTS.

23                    MY RESEARCH AREAS ARE IN MARKETING

24       STRATEGY, INTERNET MARKETING, PRICING, BRANDING, A

25       WHOLE RANGE OF AREAS.

1497

```
1    Q    HAVE YOU PUBLISHED ANY PAPERS IN THE MARKETING

2    AREA?

3    A    YES.  I PUBLISHED OVER 70 PEER REVIEWED

4    PAPERS, MANY OF WHICH ARE IN TOP ACADEMIC JOURNALS.

5    Q    HAVE YOU WRITTEN BOOKS IN MARKETING?

6    A    I PUBLISHED THREE BOOKS, ONE ON MARKETING

7    MANAGEMENT, WHICH IS USED IN MANY M.B.A. PROGRAMS

8    AROUND THE WORLD, AND A RESEARCH MONOGRAPH ON

9    PRICING.

10   Q    WHAT RECOGNITION FOR YOUR WORK IN MARKETING

11   ARE YOU MOST PROUD OF?

12   A    WELL, I'VE RECEIVED TWO LIFETIME ACHIEVEMENT

13   AWARDS FOR MY RESEARCH.  ONE IS IN AN AREA OF

14   PRICING AND THE OTHER I RECEIVED IN 2011 FROM THE

15   AMERICAN MARKETING ASSOCIATION FOR LIFETIME

16   ACHIEVEMENT IN THE FIELD OF MARKETING.

17   Q    WHAT DID WE ASK YOU TO DO IN THIS CASE?

18   A    I WAS ASKED TO COMMENT FROM A MARKETING

19   PERSPECTIVE ON THE DISTINCTIVENESS AND FAME OF THE

20   APPLE TRADE DRESS ELEMENTS, AND ADDITIONALLY ON THE

21   INFRINGEMENT AND DILUTION ON THE APPLE BRANDS FROM

22   THE INFRINGED PRODUCTS.

23   Q    WHAT DID YOU DO TO CONDUCT YOUR ANALYSIS IN

24   THIS CASE?

25   A    WELL, I READ THE DOCUMENTS, MANY OF THE
```

1    DOCUMENTS THAT WERE PRODUCED DURING THE DISCOVERY

2    PHASE OF THE TRIAL.

3             I ALSO READ SOME OTHER RESEARCH REPORTS

4    THAT WERE GENERATED.

5             AND I USED MY EXPERTISE IN MARKETING TO

6    PUT ALL THAT TOGETHER, AND I WROTE A 70-ODD PAGE

7    REPORT.

8             MR. JACOBS:  YOUR HONOR, WE TENDER

9    DR. WINER AS AN EXPERT IN THE FIELD OF MARKETING

10   WITH EXPERTISE SUFFICIENT TO QUALIFY HIM TO TESTIFY

11   ON THE ISSUES THAT HE'S JUST ENUMERATED.

12            THE COURT:  ANY OBJECTION?

13            MR. VERHOEVEN:  NO OBJECTION.

14            THE COURT:  ALL RIGHT.  I DON'T HAVE HIS

15   EXPERT REPORT.  IS IT IN THE EXHIBITS?  IT WASN'T

16   IN THE RED WELL THAT I RECEIVED.  OKAY.  I SEE IT.

17   IT'S IN THIS BINDER.

18   BY MR. JACOBS:

19   Q    CAN YOU EXPLAIN TO THE JURY WHAT DILUTION

20   MEANS FROM THE STANDPOINT OF A MARKETING EXPERT?

21   A    WELL, DILUTION MEANS, TO ME, THE BLURRING OF A

22   PRODUCT OR A BRAND NAME FROM, SAY, COPYCAT PRODUCTS

23   OR THE PRODUCTS THAT HAVE BEEN DEVELOPED THAT ARE

24   VERY SIMILAR.  SO CONSUMERS CAN BE CONFUSED WHEN

25   THEY GET TO POINT OF PURCHASE WHEN MAKING A CHOICE.

```
 1    Q    ARE YOU AWARE THAT APPLE HAS ASSERTED TRADE

 2    DRESSES IN THIS CASE?

 3    A    YES, I AM.

 4    Q    WHAT PRODUCTS DO THESE TRADE DRESSES COVER?

 5    A    THEY COVER THE IPHONE MODELS, AS WELL AS THE

 6    IPAD.

 7    Q    LET ME SHOW YOU JOINT EXHIBIT 1039.  IT SHOULD

 8    BE IN YOUR BINDER, BUT IT'S ALSO ON THE SCREEN?

 9    A    YES, I CAN SEE IT ON THE SCREEN.

10    Q    CAN YOU TELL US WHAT THIS IS, PLEASE?

11    A    THIS IS THE REGISTRATION WITH THE U.S. PATENT

12    AND TRADEMARK OFFICE OF THE ORIGINAL IPHONE TRADE

13    DRESS.

14              MR. JACOBS:  YOUR HONOR, WE OFFER JX

15    1039.

16              MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.

17              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

18              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19              1039, HAVING BEEN PREVIOUSLY MARKED FOR

20              IDENTIFICATION, WAS ADMITTED INTO

21              EVIDENCE.)

22    BY MR. JACOBS:

23    Q    YOU MENTIONED SOME OTHER TRADE DRESSES THAT

24    ARE ASSERTED IN THE CASE.

25              LET'S TAKE A LOOK AT PDX 28.2.  AND CAN
```

1    YOU SCROLL THROUGH, MR. LEE.

2              WHAT IS PDX 28.2, DR. WINER?

3    A    THIS IS A LISTING OF THE ELEMENTS OF THE

4    IPHONE TRADE DRESS FOR THE IPHONE 3G.

5    Q    AND THE JURY HAS THESE IN ITS NOTEBOOKS, SO I

6    THINK WE'LL GO THROUGH THESE SLIDES FAIRLY QUICKLY.

7              WHAT IS -- TAKE A LOOK AT 28.3, PLEASE.

8    WHAT IS 28.3?

9    A    THESE ARE THE TRADE DRESS ELEMENTS THAT ARE --

10   EXCUSE ME -- COMMON ELEMENTS TO ALL OF THE IPHONE

11   PRODUCTS.

12   Q    AND 28.4?

13   A    THESE ARE THE TRADE DRESS ELEMENTS FOR THE

14   IPAD AND THE IPAD 2.

15   Q    NOW, AS A MARKETING PROFESSOR, DO YOU STUDY

16   HOW A COMPANY SETS ITSELF APART FROM ITS

17   COMPETITORS?

18   A    YES, I DO.  THAT'S AN EXTREMELY IMPORTANT

19   TOPIC IN MARKETING STRATEGY, HOW TO OBTAIN THE

20   DISTINCTIVE OR COMPETITIVE ADVANTAGE.

21             THERE ARE A NUMBER OF WAYS COMPANIES TRY

22   TO DO THIS.  FOR EXAMPLE, THEY MIGHT DO IT THROUGH

23   PRICE, THEY MIGHT DO IT THROUGH TECHNOLOGICAL

24   FEATURES.  SOME COMPANIES DO IT THROUGH APPEARANCE

25   OF A PRODUCT, WHAT WE CALL A LOOK AND FEEL AS THEIR

1    MAIN WAY OF DIFFERENTIATION.

2    Q    AND WHAT DO YOU MEAN BY THE LOOK AND FEEL OF A

3    PRODUCT?

4    A    WELL, LOOK IS FAIRLY OBVIOUS.  LOOK THE

5    APPEARANCE, WHAT THE PRODUCT LOOKS LIKE TO A

6    CONSUMER.

7         FEEL IS NOT THE TACTILE DEFINITION OF

8    FEEL.  IT'S SORT OF THE EMOTIONAL, EXPERIENTIALLY

9    RESPONSE THAT PEOPLE GET WHEN THEY LOOK OR USE A

10   PRODUCT.

11   Q    SO WE NEED TO DO A BIT OF A TRANSLATION FROM

12   YOUR MARKETING EXPERTISE TO THE WORLD OF THIS TRADE

13   DRESS LITIGATION.

14        CAN YOU EXPLAIN HOW WHAT YOU JUST SAID

15   ABOUT LOOK AND FEEL RELATES TO A PRODUCT'S TRADE

16   DRESS?

17   A    WELL, THE TRADE DRESS ELEMENTS ARE THE

18   COMPONENTS OF THE LOOK AND FEEL, OR, IN SOME CASES,

19   IT COULD BE A SUBSET OF ALL OF THE THINGS PEOPLE

20   ARE LOOKING AT, BUT CERTAINLY THEY'RE IMPORTANT

21   PARTS OF THE LOOK AND FEEL OF PRODUCTS.

22   Q    NOW, AS A MARKETING PROFESSOR, HAVE YOU

23   STUDIED APPLE?

24   A    WELL, APPLE IS USED IN MANY CLASSROOMS, NOT

25   ONLY MINE.  I USE -- I GIVE SPECIAL STUDENT

1    ASSIGNMENTS WITH APPLE, AND I'M CERTAINLY VERY

2    FAMILIAR WITH THE COMPANY AND ITS PRODUCTS.

3    Q    AND WHY IS THAT?  WHY IS APPLE FEATURED SO

4    PROMINENTLY IN YOUR COURSE?

5    A    I THINK THERE'S PROBABLY FEW COMPANIES IN THE

6    WORLD THAT HAVE BEEN AS SUCCESSFUL AS APPLE IN

7    DIFFERENTIATING ITSELF IN THE MARKETPLACE THROUGH

8    LOOK AND FEEL AND SELLING SO MANY PRODUCTS,

9    DEVELOPING REALLY COOL PRODUCTS THAT ARE MUST-HAVES

10   FROM CONSUMERS'S PERSPECTIVES.

11   Q    SO WHAT'S THE RELATIONSHIP BETWEEN THE LOOK

12   AND FEEL AND TRADE DRESS OF APPLE PRODUCTS AND

13   APPLE AS A COMPANY?

14   A    WELL, THE COMPANY IS RESPONSIBLE FOR

15   DEVELOPING, OBVIOUSLY, THE LOOK AND FEEL OF THESE

16   PRODUCTS.

17           AND ANY BENEFITS THAT ACCRUE FROM

18   CONSUMERS HAVING VERY POSITIVE FEELINGS TOWARDS

19   APPLE PRODUCTS, THEY ACCRUE TO THE APPLE COMPANY AS

20   A WHOLE.

21           SO THEY'RE VERY INTIMATELY TIED TOGETHER.

22   Q    WHAT IS YOUR OPINION AS TO THE DISTINCTIVENESS

23   OF APPLE'S ASSERTED TRADE DRESSES IN THIS CASE?

24   A    I THINK THAT THEY'RE HIGHLY DISTINCTIVE.

25   Q    AND WHY DO YOU BELIEVE THAT?

1    A    WELL, I THINK THAT WE HAVE A NUMBER OF PIECES

2    OF EVIDENCE THAT SUPPORT THAT DISTINCTIVENESS.

3    Q    EXPLAIN, PLEASE.

4    A    WELL, I DEVELOPED A LIST OF SOME OF THESE

5    ELEMENTS THAT, THAT I THINK CONTRIBUTE TO THE

6    DISTINCTIVENESS.

7    Q    LET'S TAKE A LOOK AT PDX 28.5, PLEASE.

8         NOW, THIS IS LABELED "ACQUIRED

9    DISTINCTIVENESS FACTORS AND SECONDARY MEANING,"

10   DR. WINER.

11        CAN YOU GIVE A BIT OF AN EXPLANATION OF

12   WHAT THIS SLIDE IS SHOWING?

13   A    WELL, THESE ARE PARTICULARLY IMPORTANT FOR, AS

14   YOU CAN SEE, THE SLIDE IS TITLED "SECONDARY

15   MEANING."  A WAY OF INTERPRETING SECONDARY MEANING

16   IS RECOGNITION, ALL RIGHT?  THESE ARE THE FACTORS

17   THAT MAKE APPLE DISTINCTIVE BY THE WAY THAT THEY'VE

18   BEEN ABLE TO CREATE A HIGH DEGREE OF RECOGNITION OF

19   THE APPLE TRADE DRESS ELEMENTS AMONG THE CONSUMER

20   POPULATION.

21   Q    DID YOU EXAMINE THE PARTICULAR FACTORS LISTED

22   ON HERE TO DETERMINE, TO INFORM YOUR VIEW AS TO

23   WHETHER THE APPLE PRODUCTS WERE HIGHLY DISTINCTIVE?

24   A    YES, I DID.

25   Q    SO CAN YOU JUST MARCH THROUGH THESE AND

1    EXPLAIN TO THE JURY HOW THESE FACTORS RELATE TO THE

2    BODY OF EVIDENCE YOU LOOKED AT?

3    A    WELL, FIRST OF ALL, AS YOU CAN SEE, THE EXTENT

4    AND APPLE'S ADVERTISING FOR THE TRADE DRESSES HAS

5    BEEN EXTREMELY IMPORTANT.

6         I'M NOT GOING TO GO INTO DETAIL ABOUT

7    THEIR PRODUCT AS HERO APPROACH.  MR. SCHILLER

8    TESTIFIED ABOUT THAT THE OTHER DAY.

9         BUT IT'S CLEAR THAT THEY'VE HAD A VERY

10   FOCUSSED ADVERTISING STRATEGY.  THEY DO A GREAT JOB

11   INTEGRATING ALL THE ELEMENTS OF THEIR

12   COMMUNICATIONS APPROACH, WHETHER IT'S PRODUCT

13   PLACEMENTS OR BUZZ MARKETING CAMPAIGNS, PRINT

14   ADVERTISING, TV ADVERTISING.  IT'S ALL VERY WELL

15   ORCHESTRATED TO CREATE A HIGH DEGREE OF

16   DISTINCTIVENESS OF THE TRADE DRESS ELEMENTS.

17   Q    HOW ABOUT THE SECOND ELEMENT?

18   A    WELL, OBVIOUSLY, THE PRODUCTS HAVE BEEN VERY

19   SUCCESSFUL.

20        WHAT I MEAN BY LENGTH AND MANNER OF THE

21   USE OF THE TRADE DRESSES IS THAT OVER THE PERIOD OF

22   TIME, THE SALES OF THESE PRODUCTS HAVE BEEN

23   ASTOUNDING, AND IT'S NOT ONLY THE FACT THAT THERE

24   ARE MORE PRODUCTS SOLD THAT SORT OF REPRESENT HOW

25   DISTINCTIVE AND HOW RECOGNIZED THE BRAND IS, BUT

```
 1    THE FACT THAT MORE PEOPLE THAT BUY PRODUCTS, THE

 2    MORE WORD OF MOUTH THERE IS, AND WHAT WE KNOW FROM

 3    RESEARCH IS THAT WORD OF MOUTH IS THE NUMBER ONE

 4    SOURCE OF INFORMATION THAT CONSUMERS USE IN MAKING

 5    PRODUCT CHOICES.

 6            SO THE CUMULATIVE INCREASE IN SALES TO

 7    INCREASE WORD OF MOUTH INCREASES THE RECOGNITION

 8    AND, IN THIS CASE, DISTINCTIVENESS OF THE

 9    APPEARANCE OF THE PRODUCTS, THE LOOK AND FEEL OF

10    THE PRODUCTS.

11    Q    NOW, FOR THE NEXT BULLET, YOU REVIEWED A

12    SURVEY, AND I DON'T WANT YOU TO COMMENT ON THE

13    DETAILS OF THE SURVEY, BUT CAN YOU SAY VERY BRIEFLY

14    HOW THE SURVEY INFORMED YOUR VIEW?

15    A    WELL, THE SURVEY I WAS REFERRING TO WAS

16    CONDUCTED BY HAL PORET, AND BASICALLY WHAT HE DID

17    IS HE FOUND --

18            MR. VERHOEVEN:  OBJECTION, YOUR HONOR.

19            MR. JACOBS:  JUST EXPLAIN VERY BRIEFLY,

20    THE BOTTOM LINE --

21            THE COURT:  IT'S SUSTAINED.  YOU DO NEED

22    TO BRING IN MR. PORET.

23            MR. JACOBS:  AND MR. PORET WILL BE HERE

24    TO EXPLAIN HIS SURVEY.

25    Q    THAT'S WHY I JUST NEED YOUR TAKE AWAY FROM THE
```

```
 1    SURVEY?

 2    A    MY TAKE AWAY FROM THE SURVEY IS THAT THE

 3    DEGREE OF RECOGNITION.

 4              MR. VERHOEVEN:  SAME OBJECTION.

 5              THE WITNESS:  CAN I FINISH MY SENTENCE?

 6              THE COURT:  NO, PLEASE WAIT.

 7              MR. JACOBS:  HE'LL BE HERE AS THE NEXT

 8    WITNESS, YOUR HONOR, BUT THIS WITNESS'S OPINION WAS

 9    INFORMED BY THE SURVEY, AND THAT'S ALL HE'LL

10    TESTIFY TO.

11              THE COURT:  ALL RIGHT.  OVERRULED.

12              THE WITNESS:  MY CONCLUSION FROM THE

13    SURVEY WAS THAT THERE'S A HIGH DEGREE OF

14    RECOGNITION OF THE APPLE TRADE DRESSES.

15    BY MR. JACOBS:

16    Q    NOW, THE LAST FACTOR ON THIS LIST IS THE

17    QUESTION OF COPYING.  AND, AGAIN, WITHOUT GOING

18    INTO DETAIL AT THIS STAGE, CAN YOU EXPLAIN TO THE

19    JURY HOW THIS QUESTION OF WHETHER SAMSUNG COPIED

20    APPLE'S TRADE DRESSES INFORMED YOUR VIEW AS TO THE

21    DISTINCTIVENESS OR SECONDARY MEANING OF APPLE'S

22    TRADE DRESSES?

23    A    WELL, THERE WERE DOCUMENTS THAT I READ THAT

24    INDICATED THAT SAMSUNG HELD APPLE'S PRODUCTS UP AS,

25    AS TARGETS AND TRIED TO EMULATE THEM, AND SO THAT
```

```
 1    LED ME TO BELIEVE THAT THERE WAS, IN FACT, COPYING
 2    GOING ON.
 3    Q    AND BOTTOM LINE, SIR, HOW DID THESE FACTORS,
 4    TAKEN TOGETHER, NET IN TERMS OF YOUR OPINION AS TO
 5    WHETHER THE APPLE PRODUCTS, THE ASSERTED TRADE
 6    DRESSES ARE DISTINCTIVE?
 7    A    I THINK APPLE TRADE DRESSES ARE AMONG THE MOST
 8    DISTINCTIVE IN THE WORLD, AND PARTICULARLY IN THE
 9    U.S., AND HAVE A VERY HIGH DEGREE OF RECOGNITION.
10    Q    CAN WE SEE PDX 28.6, PLEASE, MR. LEE.
11            NOW, DR. WINER, THIS IS A SOMEWHAT
12    DIFFERENT SET OF FACTORS ASSOCIATED WITH THE
13    CONCEPT OF DILUTION.  IS THERE -- CAN YOU COMMENT
14    ON THE DEGREE OF OVERLAP BETWEEN THIS SET OF FAME
15    FACTORS FOR DILUTION AND THE FACTORS YOU JUST
16    LOOKED AT FOR SECONDARY MEANING?
17    A    EVEN THOUGH THE LANGUAGE IS SOMEWHAT
18    DIFFERENT, THEY'RE MOSTLY THE SAME.
19            THE FIRST ONE RELATED TO ADVERTISING THAT
20    I MENTIONED BEFORE; THE SECOND ONE IS THE SALES
21    PERFORMANCE THAT THEY'VE HAD AND SUBSEQUENT WORD OF
22    MOUTH; THE THIRD BULLET I MENTIONED ABOUT THE
23    RECOGNITION AND THEY WERE REGISTERED.  SO PRETTY
24    MUCH THE SAME.
25    Q    AND THE FOURTH BULLET REACHES TO THE
```

1    REGISTRATION WE SAW EARLIER; CORRECT?

2    A    CORRECT.

3    Q    AND IN YOUR OPINION, IS THE -- ARE THE

4    ASSERTED IPHONE AND IPAD TRADE DRESSES AMONG THE

5    GENERAL CONSUMING PUBLIC?

6    A    THERE'S NO QUESTION IN MY MIND THAT THEY'RE

7    FAMOUS AMONG THE GENERAL CONSUMING PUBLIC, AND

8    PARTICULARLY FAMOUS AMONG SOMEWHAT YOUNGER

9    AUDIENCES THAT ARE PARTICULARLY INTERESTED IN THE

10   LOOK AND FEEL AND COOLNESS OF APPLE PRODUCTS.

11   Q    AND WAS THAT FAME ESTABLISHED FOR THE IPHONE

12   AS OF JULY 2010?

13   A    YES, MOST DEFINITELY.

14   Q    AND HOW ABOUT FOR THE IPAD TRADE DRESS AS OF

15   JUNE OF 2010?

16   A    YES, I BELIEVE SO, YES.

17   Q    NOW, ARE YOU FAMILIAR WITH THE LIKELIHOOD OF

18   CONFUSION TEST IN TRADE DRESS LAW.

19   A    YES.  I NEVER CALLED THEM LIKELIHOOD OF

20   CONFUSION, BUT CERTAINLY THE ELEMENTS THAT WE'LL

21   LOOK AT IN A FEW MINUTES ARE THE KINDS OF THINGS

22   THAT I TALK ABOUT IN CLASS WHEN WE DISCUSSED WHAT

23   WERE THE NEW PRODUCTS AND LOOK VERY SIMILAR TO

24   OTHER COMMON PRODUCTS.

25   Q    CAN WE HAVE PDX 28.17, PLEASE.

```
 1              SO THERE'S THIS WORD UP HERE
 2    "SLEEKCRAFT."  WHAT IS YOUR UNDERSTANDING OF WHAT
 3    THIS SLIDE IS SHOWING?
 4    A    WELL, AS I SAID BEFORE, I WAS ASKED TO TALK
 5    ABOUT THIS, OR DEVELOP AN OPINION ON THIS
 6    LIKELIHOOD OF CONFUSION, AND THESE ARE THE KINDS OF
 7    THINGS THAT I CERTAINLY THINK ABOUT, AND I WAS OF
 8    INFORMED THAT DUE TO A CASE CALLED THE SLEEKCRAFT
 9    CASE, THAT ACTUALLY THERE IS A SET OF ELEMENTS THAT
10    YOU CAN FIND IN THE LAW, AND SO THIS IS WHAT I
11    DRAFTED IN MY REPORT.
12              MR. VERHOEVEN:  YOUR HONOR, I OBJECT TO
13    THIS SLIDE.  IT DOES NOT LIST -- FIRST OF ALL, IT'S
14    PURPORTING TO TALK ABOUT WHAT THE LAW IS WITH THE
15    SLEEKCRAFT CASE, AND, SECONDLY, IT DIDN'T LIST ALL
16    THE FACTORS.
17              MR. JACOBS:  MR. VERHOEVEN IS RIGHT.  I
18    SHOULD MAKE THAT CLEAR.  IT IS A SUBSET OF THE
19    SLEEKCRAFT FACTORS.
20              THE COURT:  WELL, YOU SHOULD TAKE THAT
21    SLIDE DOWN.
22              MR. JACOBS:  FINE.
23              THE COURT:  SUSTAINED.
24    BY MR. JACOBS:
25    Q    WHAT IS YOUR OPINION ABOUT THE STRENGTH OF
```

1    APPLE'S ASSERTED TRADE DRESS ASSERTED?

2    A    I THINK THE STRENGTH OF THE TRADE DRESS IS

3    EXTREMELY HIGH.  I THINK I'VE ALREADY COMMENTED

4    ABOUT THAT BEFORE.

5    Q    NOW, HOW ABOUT PROXIMITY OF THE GOODS?

6    A    WELL, IN THIS CASE, PROXIMITY DOES NOT MEAN

7    PHYSICAL PROXIMITY.  IT MEANS HOW MUCH THE PRODUCTS

8    COMPETE AGAINST EACH OTHER IN THE MARKETPLACE.

9         IT'S CLEAR TO ME THAT NO MATTER HOW YOU

10   DEFINE COMPETITION, THE PRODUCTS DO COMPETE AND

11   COMPETE HEAVILY IN THE MARKETPLACE.

12   Q    AND HOW ABOUT SIMILARITY OF THE TRADE DRESSES?

13   A    SIMILARITY OF THE TRADE DRESS I THINK HAS BEEN

14   WELL ESTABLISHED CERTAINLY BY THE NUMBER OF

15   COMMENTS THAT HAVE BEEN MADE IN THE TRADE PRESS

16   THAT CONSISTENTLY TALK ABOUT HOW THE SAMSUNG

17   PRODUCTS, BOTH THE GALAXY PAD AND THE PHONES WERE

18   VERY SIMILAR TO THE IPHONE AND THE IPAD.

19        AND, IN ADDITION, I LOOK AT PRODUCTS A

20   LOT.  OBVIOUSLY IT'S PART OF MY PROFESSION.

21        AND TO ME, THE INFRINGED PRODUCTS, FROM A

22   TRADE DRESS PERSPECTIVE, DO LOOK SIMILAR TO THE

23   APPLE IPHONE AND IPAD TRADE DRESSES.

24   Q    COULD YOU TAKE A LOOK AT PX 5, PLEASE, IN YOUR

25   BINDER.  WHAT IS PX 5, SIR?

1    A    PX 5 ARE VERY BRIEF SUMMARIES OF SOME PRESS

2    REPORTS ON THE SAMSUNG TABLET DESIGNS.

3            MR. VERHOEVEN:  YOUR HONOR, WE OBJECT TO

4    THIS PX 5 AND TO THE WITNESS TALKING ABOUT ANYTHING

5    FROM PX 5.  IF YOUR HONOR WILL TAKE A LOOK AT PX 5,

6    YOU'LL SEE THAT THESE ARE THIRD PARTY ARTICLES, AND

7    YOUR HONOR HAS NOT ADMITTED THOSE FOR PURPOSES OF

8    THE TRUTH.

9            THE ONLY BASIS ON WHICH THESE CAN BE USED

10   BY THIS WITNESS IS IN VIOLATION OF THAT LIMITING

11   INSTRUCTION.  AND WE STRONGLY OBJECT.

12           MR. JACOBS:  YOUR HONOR, WE OFFER THESE

13   FOR THE, FOR THE VIEWPOINT, THE STATE OF MIND OF

14   THE COMMENTATORS.

15           YOUR HONOR ADDRESSED THIS EXHIBIT IN THE

16   AMENDED ORDER ON SAMSUNG'S OBJECTIONS, DOCUMENT

17   1520.

18           IN THAT ORDER, YOUR HONOR WROTE, "THE

19   COURT HAS PREVIOUSLY RULED THAT MEDIA ARTICLES ARE

20   RELEVANT AT LEAST TO ISSUES OF INFRINGEMENT,

21   CONSUMER CONFUSION, WILLFULNESS, AND SECONDARY

22   CONSIDERATIONS OF NON-OBVIOUSNESS.  PX 5 AND PX 6,"

23   WHICH WE'LL GET TO, "ARE COMPILATIONS," ET CETERA.

24   SAMSUNG DOES NOT DISPUTE THAT THE UNDERLYING

25   MATERIALS ARE ADMISSIBLE.

```
 1              MR. VERHOEVEN:  YOUR HONOR, THIS WITNESS

 2     IS -- HE'S ON THE FACTOR OF SIMILARITY OF THE TRADE

 3     DRESSES.  THAT'S THE FACTOR HE'S ON AND COUNSEL

 4     TURNED TO THIS EXHIBIT FOR PURPOSES OF GETTING HIS

 5     OPINION ON THAT FACTOR, WHICH IS OBVIOUSLY GOING TO

 6     BE OFFERED FOR THE TRUTH WHICH YOUR HONOR HAS

 7     LIMITED THESE DOCUMENTS NOT BEING ADMISSIBLE FOR

 8     THAT REASON.

 9              MR. JACOBS:  YOUR HONOR, THIS WITNESS IS

10     USING THESE ARTICLES TO CORROBORATE THAT THE STATE

11     OF MIND OF THESE THIRD PARTY COMMENTATORS

12     CORRESPONDS TO HIS STATE OF MIND AND THAT HIS

13     VIEWPOINT IS NOT UNIQUE.

14              MR. VERHOEVEN:  THE STATE OF MIND OF

15     THIRD PARTY --

16              THE COURT:  WELL, OKAY.  WHY DON'T YOU

17     MOVE ON TO SOMETHING ELSE.  I NEED TO REVIEW MY

18     ORDER ON THE MOTION IN LIMINE WHERE THE STATE OF

19     MIND ISSUE WAS RAISED.

20              TAKE IT DOWN, PLEASE.

21     BY MR. JACOBS:

22     Q    SIR, DID YOU SEE EVIDENCE IN SAMSUNG'S

23     DOCUMENTS THAT SAMSUNG RECOGNIZED THE

24     DISTINCTIVENESS OF THE IPAD TRADE DRESS?

25              MR. VERHOEVEN:  OBJECTION.  LEADING.
```

```
 1              THE WITNESS:  YES, I DID.

 2              THE COURT:  SUSTAINED.  ASK ANOTHER

 3    QUESTION, PLEASE.

 4    BY MR. JACOBS:

 5    Q    DID THE SAMSUNG DOCUMENTS INFORM YOUR

 6    VIEWPOINT WHETHER OR NOT SAMSUNG ACKNOWLEDGED THE

 7    DISTINCTIVENESS OF THE IPAD TRADE DRESS?

 8              MR. VERHOEVEN:  THIS IS ALSO LEADING.

 9    OBJECTION.

10              MR. JACOBS:  WHETHER OR NOT, YOUR HONOR.

11              THE COURT:  OVERRULED.

12              THE WITNESS:  COULD YOU RESTATE THE

13    QUESTION, PLEASE.

14              MR. JACOBS:  SINCE IT WAS OVERRULED,

15    LET'S READ IT BACK.

16              (WHEREUPON, THE RECORD WAS READ BY THE

17    COURT REPORTER.)

18              THE WITNESS:  YES, THEY DID.

19    BY MR. JACOBS:

20    Q    AND COULD YOU LOOK AT EXHIBIT --

21    A    I'M SORRY.  THE MIKE WAS OFF.

22    Q    AND COULD YOU LOOK AT EXHIBIT 56, PLEASE.

23    WHAT IS EXHIBIT 56, MR. -- DR. WINER?

24    A    EXHIBIT 56 IS TITLED SAMSUNG Q 42010 DEEP

25    DIVE, CONTINUOUS TRACKING FROM MAY 16TH, 2008, TO
```

1    JANUARY 2ND, 2011.  SO IT'S INTERNAL MARKET

2    RESEARCH DOCUMENT AT SAMSUNG.

3    Q    AND DID THIS DOCUMENT INFORM YOUR VIEW OR

4    CORROBORATE YOUR VIEW THAT THE IPAD HAD ACQUIRED

5    DISTINCTIVENESS?

6              MR. VERHOEVEN:  OBJECTION, YOUR HONOR.

7    THIS DOCUMENT WAS NOT DISCLOSED IN RESPONSE TO

8    INTERROGATORY NUMBER 7 OR 71.

9              MR. JACOBS:  THIS DOCUMENT IS CITED AND

10   DISCUSSED IN DR. WINER'S REPORT IN SEVERAL

11   PARAGRAPHS, AND IT WAS DISCLOSED IN INTERROGATORY

12   17, CONFUSION, WHICH IS THE PURPOSE FOR WHICH THIS

13   DOCUMENT IS BEING OFFERED, THE STRENGTH OF THE

14   TRADE DRESS IN QUESTION.

15             THE COURT:  OVERRULED.

16             GO AHEAD.

17             THE WITNESS:  COULD YOU PLEASE REPEAT THE

18   QUESTION.

19             MR. JACOBS:  PLEASE READ IT BACK.

20             (WHEREUPON, THE RECORD WAS READ BY THE

21   COURT REPORTER.)

22             THE WITNESS:  YES, IT DID.

23             MR. JACOBS:  I OFFER PX 56 INTO EVIDENCE,

24   YOUR HONOR.

25             MR. VERHOEVEN:  AGAIN, OBJECTION, YOUR

```
 1    HONOR.  IN YOUR MOTION IN LIMINE ORDER NUMBER 2,

 2    YOUR HONOR, I BELIEVE, AND THIS IS MY NOTES, HELD

 3    THIS DOCUMENT, THIS PARTICULAR DOCUMENT CANNOT BE

 4    USED FOR THE PURPOSE OF CONFUSION ISSUE.

 5              MR. JACOBS:  YOUR HONOR --

 6              ARE YOU DONE?

 7              YOUR HONOR, THE ORDER ON MOTION IN

 8    LIMINE --

 9              THE COURT:  SAMSUNG MOTION IN LIMINE TO

10    EXCLUDE THIRD PARTY STATEMENTS ABOUT PURPORTED

11    SIMILARITIES OR PURPORTED CONFUSION -- THAT WAS

12    DENIED.

13              MOTION IN LIMINE NUMBER 2 TO EXCLUDE

14    OUT-OF-COURT THIRD PARTY STATEMENTS ABOUT PURPORTED

15    SIMILARITIES OR PURPORTED CONFUSION WAS DENIED.

16              SO THE OBJECTION'S OVERRULED.

17              MR. JACOBS:  AND IT'S ADMITTED, YOUR

18    HONOR?

19              THE COURT:  YES.

20              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

21              56, HAVING BEEN PREVIOUSLY MARKED FOR

22              IDENTIFICATION, WAS ADMITTED INTO

23              EVIDENCE.)

24    BY MR. JACOBS:

25    Q    COULD YOU TURN -- WE HAVE AN EXCERPT FROM
```

1    THIS.  CAN WE SEE PX 56 -- SORRY.  CAN WE SEE PDX

2    28.18, WHICH IS ABOUT PAGE 30 OF EXHIBIT 56.

3              AND WHAT DID THIS PAGE INDICATE TO YOU AS

4    A MARKETING EXPERT, DR. WINER?

5    A    WELL, THE CALL OUGHT, AS YOU CAN SEE, SAYS THE

6    IPAD IS BY FAR STILL THE MOST RECOGNIZED PRODUCT ON

7    THE MARKET.

8              SO THIS IS CERTAINLY JUST ONE PIECE OF A

9    NUMBER OF, OF DISPLAYS IN THE PUBLICATION THAT

10   SEEMS TO SUPPORT MY CONTENTION.

11   Q    NOW, GOING BACK TO THE SLEEK -- ACTUALLY, WE

12   CAN'T GO BACK TO THAT, SORRY, WE CAN'T PUT THAT

13   SLIDE UP AGAIN.

14             BUT I DO WANT TO ASK YOU ABOUT, JUST VERY

15   BRIEFLY, DID YOU LOOK AT A SURVEY THAT INFORMED

16   YOUR VIEW AS TO THE LIKELIHOOD OF CONFUSION ON THE

17   TABS?

18   A    YES, I DID.

19   Q    IS THAT THE VAN LIERE SURVEY THAT THE JURY

20   WILL BE HEARING ABOUT SHORTLY?

21   A    YES, THAT WAS THE VAN LIERE REPORT THAT

22   DISCUSSED CONFUSION.

23   Q    NOW, ONE OF THE OTHER FACTORS THAT YOU LOOKED

24   AT WAS THE QUESTION OF RETAIL CHANNELS; CORRECT,

25   SIR?

1    A    CORRECT.

2    Q    AND CAN YOU COMMENT BRIEFLY ABOUT THE RETAIL

3    CHANNELS THAT ARE USED BY SAMSUNG AND APPLE WITH

4    RESPECT TO THESE PRODUCTS?

5    A    WELL, EXCEPT, OF COURSE, FOR THE APPLE STORE,

6    THE PRODUCTS, THE TABLETS COMPETE AND ARE AVAILABLE

7    IN ALL THE MAJOR RETAIL ELECTRONICS CHAINS.  JUST

8    TO VERIFY THAT, I VISITED A NUMBER OF BEST BUY

9    STORES, RADIO SHACKS, ET CETERA, TO SEE THAT AND,

10   IN FACT, IT'S TRUE THAT BOTH BRANDS ARE AVAILABLE

11   IN ALL THOSE STORES.

12   Q    AND HOW ABOUT ADVERTISING CHANNELS?  IS THAT

13   SOMETHING THAT YOU LOOKED AT?

14   A    IN ADDITION, BOTH PRODUCTS HAVE A FAIRLY

15   SIMILAR ADVERTISING STRATEGY ON -- I WON'T SAY THEY

16   DON'T ADVERTISE ON THE SAME SHOW ON THE SAME NIGHT,

17   BUT THEY HAVE FAIRLY SIMILAR DEMOGRAPHICS, FAIRLY

18   SIMILAR SHOWS THAT THEY'RE USING FOR THEIR MEDIA

19   PLAN.

20   Q    NOW, ONE OF THE OTHER FACTORS TO LOOK AT IS

21   THE SOPHISTICATION OF CUSTOMERS OF TABLETS; RIGHT?

22   A    CORRECT.

23   Q    AND WHAT DID YOU CONCLUDE ABOUT THAT QUESTION?

24   A    WELL, I THINK THAT ON THE SURFACE, IT'S PRETTY

25   RATIONAL TO ASSUME THAT ANY BUYER FOR A PRODUCT

```
 1    THAT'S, SAY, $500 OR $600 IS GOING TO PRESENT A LOT

 2    OF TIME INTO THAT PURCHASE.

 3              HOWEVER, IN OUR STUDIES OF CONSUMER

 4    BEHAVIOR, THAT'S NOT ALWAYS THE CASE.  THERE ARE A

 5    NUMBER OF FACTORS, SUCH AS PERHAPS BUYING A GIFT

 6    FOR SOMEONE, A TIME PRESSURE, INFORMATION BEING

 7    GIVEN BY A SALESPERSON, THERE CAN BE A NUMBER OF

 8    REASONS WHY A CONSUMER DOESN'T SPEND AS MUCH TIME

 9    AS YOU WOULD EXPECT MAKING WHAT LOOKS TO BE AN

10    EXPENSIVE DECISION.

11    Q    WHAT IS YOUR OPINION REGARDING SAMSUNG'S

12    INTENT IN SELECTING THE DESIGN OR TRADE DRESS FOR

13    ITS GALAXY TAB 10.1 DEVICE?

14    A    WELL, AGAIN, SIMILAR TO WHAT WE MENTIONED

15    BEFORE, THAT THERE WAS SOME SAMSUNG DOCUMENTS THAT

16    I SAW THAT INDICATED THAT THEY VIEWED THE IPAD AS A

17    TARGET, A PRODUCT TO BE EMULATED AND ONE THAT THEY

18    STUDIED CAREFULLY FOR FUTURE REFINEMENTS OR

19    DEVELOPMENT IN THIS CASE OF THE PRODUCT.

20    Q    AND WHAT IS YOUR OVERALL OPINION AS TO WHETHER

21    THERE'S A LIKELIHOOD OF CONFUSION BETWEEN THE

22    GALAXY TAB 10.1 AND THE IPAD TRADE DRESS?

23    A    WELL, I THINK BECAUSE THE TRADE DRESSES ARE SO

24    SIMILAR, YOU HAVE TO AN IMPORTANT FACTOR HERE THAT

25    THESE PRODUCTS ARE USED OUT IN PUBLIC.  THEY'RE NOT
```

```
1    ITEMS THAT ARE CONSUMED AT HOME WHERE A LOT OF

2    PEOPLE DON'T SEE THEM.

3           SO LIKE AUTOMOBILES, THESE PRODUCTS ARE

4    VISIBLE, AND, THEREFORE, IF THE TRADE DRESS IS

5    VISIBLE ON A SAMSUNG GALAXY TABLET THAT PEOPLE

6    LIKE, THEY MAY CAUSE SOMEONE ELSE TO BUY A GALAXY

7    TABLET WHEN, IN FACT, IT IS AN INFRINGEMENT ON THE

8    APPLE TRADE DRESS.

9           SO THIS IS ONE FORM OF WHAT I CALLED AN

10   IMITATIVE SCENARIO.

11   Q    NOW, LET'S TALK ABOUT THE RELATED CONCEPT, BUT

12   SLIGHTLY DIFFERENT FACTORS THAT WE TALKED ABOUT,

13   DILUTION.

14          DO YOU HAVE AN OPINION AS TO WHETHER

15   SAMSUNG'S GALAXY TAB 10.1 AND SALES ARE LIKELY TO

16   DILUTE APPLE'S ASSERT IPAD TRADE DRESS?

17   A    YES, I DO.

18   Q    AND WHY DO YOU BELIEVE THAT, SIR?

19   A    WELL, I THINK WHERE THERE'S CONFUSION, THERE'S

20   GOING TO BE DILUTION OR MAYBE A BETTER TERM FOR IT

21   IS BLURRING, THAT IS, THE TRADE DRESS OR THE

22   DISTINCTIVENESS OF THE APPLE TRADE DRESS IS GOING

23   TO BE BLURRED BY COMPETITORS THAT EMULATE AND COPY

24   THAT TRADE DRESS.  THERE'S JUST NO DOUBT ABOUT IT.

25   Q    NOW, YOU LOOKED AT SOME FACTORS AGAIN?
```

1    A    YES, I DID.

2    Q    LET'S LOOK AT PDX 28.28.

3              SO THESE ARE THE FACTORS YOU LOOKED AT

4    FOR WHAT YOU CALLED "DILUTION BY BLURRING"?

5    A    YES, I DID.

6    Q    SO LET'S TALK FIRST ABOUT THE DEGREE OF

7    SIMILARITY.  IS YOUR ANALYSIS THERE THE SAME AS THE

8    ANALYSIS YOU GAVE UNDER THE CONFUSION PORTION OF

9    YOUR OPINION?

10   A    YES.  I DON'T HAVE A LOT TO ADD ON THAT

11   BULLET.

12   Q    AND HOW ABOUT THE DEGREE OF INHERIT OR

13   ACQUIRED DISTINCTIVENESS OF THE TRADE DRESS FOR THE

14   IPAD?

15   A    THE SAME.  I THINK I'VE ALREADY DISCUSSED THAT

16   I BELIEVE THAT THE TRADE DRESS IS, IN FACT, BOTH

17   DISTINCTIVE AND FAMOUS.

18   Q    AND HOW ABOUT THE DEGREE OF RECOGNITION OF THE

19   TRADE DRESS?

20   A    AGAIN, RELYING ON MY PREVIOUS TESTIMONY, I

21   THINK THE DEGREE OF RECOGNITION IS ALSO EXTREMELY

22   HIGH.

23   Q    AND WHETHER THE JUNIOR USER, MEANING THE

24   COMPANY THAT CAME AFTER THE FIRST COMPANY, HERE

25   SAMSUNG AFTER APPLE, INTENDED TO CREATE AN

1    ASSOCIATION WITH THE FAMOUS TRADE DRESS?

2    A    WELL, I DON'T WANT TO USE THE WORD "INTENT,"

3    BUT I -- THERE SEEMS TO BE PLENTY OF EVIDENCE THAT

4    THEY'RE WELL AWARE OF THEIR DEFICIENCIES IN THEIR

5    PRODUCTS AND USE THAT INFORMATION TO DEVELOP

6    THEIRS.

7    Q    AND THEN WITH ANY ACTUAL ASSOCIATION BETWEEN

8    THE TRADE DRESSES.

9    A    IN THIS CASE, I USED THE VAN LIERE REPORT TO,

10   IN FACT, DRAW CONCLUSIONS ABOUT A HIGH DEGREE OF

11   ASSOCIATION.

12   Q    AND THAT WAS YOUR CONCLUSION?

13   A    THAT WAS MY CONCLUSION, YES.

14   Q    NOW, DID YOU OFFER AN OPINION AS TO WHETHER

15   SAMSUNG'S SALES OF CERTAIN GALAXY S PHONES IS

16   LIKELY TO DILUTE APPLE'S ASSERTED IPHONE TRADE

17   DRESSES?

18   A    YES, I DID.

19   Q    AND WHAT IS THAT OPINION?

20   A    VERY SIMILAR TO THE DISCUSSION OF THE IPAD AND

21   THE GALAXY TAB.

22        MY BELIEF IS THAT THERE IS A HIGH DEGREE

23   OF DILUTION, AND, THEREFORE, BLURRING BETWEEN THE

24   TRADE DRESSES.

25   Q    AND IN TERMS OF THE SIMILARITY OF THE

1    PRODUCTS, ANYTHING NEW TO SAY ABOUT THAT, OTHER

2    THAN WHAT YOU SAID BEFORE WHEN YOU WERE ANALYZING

3    THE CONFUSION FACTORS?

4    A    NO.  I THINK IT'S THE SAME EVIDENCE.  THE

5    QUOTES FROM THE BUSINESS PRESS --

6    Q    I'M SORRY?

7    A    THE QUOTES OR REVIEWS OF THE PRODUCTS IN THE

8    BUSINESS PRESS, AS WELL AS MY OWN OPINION.

9              MR. JACOBS:  I'M SORRY.  I'M GOING TOO

10   FAST.

11             YOUR HONOR, AT THIS POINT WE WOULD OFFER

12   PX 6, WHICH IS ANALOGOUS TO PX 5, BUT COVERS THE

13   PHONES AND SIMILARITY OF THE PHONES.

14             THE COURT:  ALL RIGHT.  NOW, I HAD RULED

15   ON THESE SUMMARIES.

16             WERE THESE EXHIBITS TO MR. WINER'S EXPERT

17   REPORT?  I RECALL RULING ON A COMPILATION OF NEWS

18   STORIES FOR FAME AND OVERRULING SAMSUNG'S

19   OBJECTION.

20             I DON'T RECALL A SPECIFIC OBJECTION AS TO

21   THESE PRESS REPORTS ON CONFUSION, SO REMIND ME.

22             MR. JACOBS:  SO YOU RULED ON PX 5 AND PX

23   6 IN CONNECTION WITH BRESSLER.  THE SAME UNDERLYING

24   ARTICLES THAT ARE REPORTED HERE IN THE SUMMARY ARE

25   IN EXHIBITS, RESPECTIVELY, FOR PX 5 AND PX 6, IN

1    EXHIBIT 8 TO WINER AND EXHIBIT 7 TO WINER.

2              I'M NOT SURE YOU HAVE IN YOUR FOLDER UP

3    THERE ALL THE EXHIBITS TO DR. WINER'S REPORT.

4              THE COURT:  WELL, ON BRESSLER, PX 5 AND

5    PX 6, I SUSTAINED IT AS TO ANY ARTICLES THAT WERE

6    NOT PART OF HIS REPORT.  IT LOOKS LIKE THREE OF THE

7    NINE ARTICLES WERE NOT IN HIS REPORT.

8              SO ARE YOU SAYING PX 5 AND PX 6, THE

9    WINER EXHIBITS ARE THE SAME AS PX 5 AND PX 6 ON

10   BRESSLER?

11             MR. JACOBS:  NO.  THE EXHIBITS ARE

12   DIFFERENT AND ALL OF THE ARTICLES CITED ARE IN THE

13   EXHIBITS TO WINER.

14             THE COURT:  I'M SORRY.  SAY THAT AGAIN.

15             MR. JACOBS:  ALL OF THE ARTICLES IN PX 5

16   AND PX 6, TO BE PRECISE, ALL OF THE ARTICLES

17   SUMMARIZED IN PX 5 AND PX 6 ARE REFERRED TO IN,

18   RESPECTIVELY, EXHIBITS 8 AND 7 OF WINER'S OPENING

19   REPORT.

20             MR. VERHOEVEN:  YOUR HONOR, THIS IS

21   MR. VERHOEVEN.  IF I MAY SAY ONE THING?

22             THE COURT:  UM-HUM.  YOU KNOW, I GUESS

23   I'M NOT CLEAR WHY SOME OF THIS WASN'T RAISED DURING

24   OUR 8:30 MEETING THIS MORNING.  I UNDERSTAND THAT I

25   HAVE LIMITED YOUR OBJECTIONS TO TWO, BUT WHEN I

1     ASKED IN THE MORNING IF THERE ARE ANY OBJECTIONS,

2     I'D LIKE PEOPLE TO SAY THIS SO WE DON'T HAVE TO

3     WASTE THE JURY'S TIME.

4                 MR. VERHOEVEN:  YOUR HONOR, JUST BY WAY

5     OF EXPLANATION.

6                 THE COURT:  YEAH.

7                 MR. VERHOEVEN:  THERE'S A LIMITING

8     INSTRUCTION, I BELIEVE, ASSOCIATED WITH THESE AND

9     THEY ACTUALLY, WITH MR. BRESSLER --

10                THE COURT:  BECAUSE IT'S NOT --

11                MR. VERHOEVEN:  WE OBJECTED TO THE USE OF

12    THEM FOR THE TRUTH AND YOUR HONOR SUSTAINED THAT

13    DURING THE EXAMINATION.

14                THE COURT:  BUT YOU'RE NOW SAYING YOU'RE

15    OBJECTING EVEN WITH THE LIMITING INSTRUCTION?

16                MR. VERHOEVEN:  NO.  I -- I'M ALERTING

17    THE COURT THAT, IN FACT, WHEN THESE WERE PROVIDED

18    THE FIRST TIME, THEY WERE WHILE THE WITNESS WAS

19    TALKING ABOUT SIMILARLY OF ADDRESS, AND THERE'S NO

20    OTHER USE FOR THEM BUT FOR THE TRUTH, WHICH WOULD

21    VIOLATE YOUR HONOR'S LIMITING INSTRUCTION.

22                THE COURT:  OVERRULED.  AS LONG AS A

23    LIMITING INSTRUCTION IS THAT THEY'RE NOT OFFERED

24    AND THEY SHOULD NOT BE CONSIDERED, THE CONTENTS

25    SHOULD NOT BE CONSIDERED FOR THE TRUTH, THEY'RE

```
 1    ADMITTED.  THE OBJECTION'S OVERRULED.
 2              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBERS 5
 3              AND 6, HAVING BEEN PREVIOUSLY MARKED FOR
 4              IDENTIFICATION, WAS ADMITTED INTO
 5              EVIDENCE.)
 6         MR. JACOBS:  THANK YOU, YOUR HONOR.
 7    Q    DID YOU LOOK AT SAMSUNG'S INTERNAL DOCUMENTS
 8    WITH RESPECT TO THE PHONES TO DETERMINE WHETHER
 9    SAMSUNG HAD INTENDED TO ASSOCIATE ITSELF WITH THE
10    IPHONE TRADE DRESS?
11    A    YES, I DID.
12    Q    AND CAN WE LOOK AT -- CAN YOU TAKE A LOOK,
13    PLEASE, AT PX 36.  WHAT IS PX 36?
14    A    THIS IS A REPORT BY A CONSULTING FIRM CALLED
15    GRAVITY TANK TITLED "TOUCH PORTFOLIO," ROLL OUT
16    STRATEGY, RECOMMENDATION BASED ON CONSUMER INSIGHT
17    DATED DECEMBER 17TH, 2008.
18    Q    AND DID YOU LOOK AT THIS DOCUMENT IN
19    CONNECTION WITH YOUR ANALYSIS?
20    A    YES, I DID.
21              MR. JACOBS:  YOUR HONOR, WE WOULD OFFER
22    PX 36 INTO EVIDENCE.
23              MR. VERHOEVEN:  OBJECTION, YOUR HONOR.
24    FIRST OF ALL, RELEVANCE.
25              THIS DOCUMENT CONCERNS RECOMMENDATIONS
```

```
 1     RELATING TO FUNCTIONALITY OF TOUCHSCREENS, WHICH IS

 2     NOT RELEVANT TO APPLE'S TRADE DRESS CLAIMS, SO IT'S

 3     NOT RELEVANT TO -- TO THIS WITNESS'S SCOPE OF

 4     TESTIMONY.

 5               THERE'S ALSO NO FOUNDATION.

 6               THE COURT:  IT'S A SAMSUNG DOCUMENT.

 7               OVERRULED.

 8               (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

 9               5636, HAVING BEEN PREVIOUSLY MARKED FOR

10               IDENTIFICATION, WAS ADMITTED INTO

11               EVIDENCE.)

12     BY MR. JACOBS:

13     Q    5636 IS ON THE SCREEN NOW AS AN ADMITTED

14     DOCUMENT, DR. WINER.

15               AND WE SHOULD TURN TO PX -- ACTUALLY,

16     LET'S GET TO THE SLIDE PDX 2811.  AND AMONG THE

17     THINGS, AMONG THE ITEMS IN THIS DOCUMENT THAT YOU

18     NOTED, WHAT JUMPED OUT AT YOU ABOUT THIS PARTICULAR

19     PAGE?

20     A    WELL, I THINK THAT THIS IS A COMPARISON OF

21     DIFFERENT PRODUCTS, NOKIA, AS YOU CAN SEE, APPLE,

22     SAMSUNG, AND ON A NUMBER OF DIMENSIONS, INCLUDING

23     USER INTERFACE, ET CETERA.

24               AND THE CALL OUT SAYS APPLE SETS THE

25     STANDARD FOR SCREEN CENTRIC DESIGN.
```

1          AGAIN, THAT SUPPORTS MY POSITION THAT

2     SAMSUNG EXECUTIVES VIEWED APPLE, IPHONE IN THIS

3     CASE, AS A TARGET PRODUCT AGAINST WHICH THEY WERE

4     TRYING TO COMPARE THEMSELVES AND EMULATE.

5     Q    AND NOW IF WE TURN -- IF WE GET TO SLIDE PDX

6     28.12 UP, PLEASE.

7               MR. VERHOEVEN:  YOUR HONOR, THIS HAS GOT

8     SOME SORT OF BRACKETED INFORMATION PULLED OUT.  I

9     NEED TO VERIFY, BEFORE THIS GOES UP, THIS IS THE

10    ACTUAL DOCUMENT.

11              MR. JACOBS:  YOUR HONOR, THEY'VE HAD

12    THESE DEMONSTRATIVES SINCE OUR DISCLOSURE OF THE

13    DEMONSTRATIVES.

14              THE COURT:  I KNOW.  OVERRULED.  LET'S

15    KEEP GOING.

16    BY MR. JACOBS:

17    Q    SO WHAT JUMPED OUT AT YOU ABOUT THIS

18    PARTICULAR PAGE?

19    A     IT SAYS, "PEOPLE DON'T THINK THAT THE

20    INDUSTRIAL DESIGN OF SAMSUNG TOUCH PHONES ARE

21    GROUNDBREAKING.  NOTHING STANDS OUT AS SOMETHING

22    CONSUMERS HAVE NEVER SEEN."

23    Q    AND IF YOU LOOK ON THE PORTION THAT'S NOT

24    HIGHLIGHTED, CAN YOU JUST READ, WHILE LIKED, NO

25    PHONE MAKES A DESIGN STATEMENT, UNDER THAT HEADING,

1    PLEASE?

2    A    IT SAYS, "PEOPLE GENERALLY HAVE POSITIVE

3    COMMENTS ABOUT THE INDUSTRIAL DESIGN OF SAMSUNG

4    TOUCH PHONES, BUT DON'T THINK THEY ARE

5    GROUNDBREAKING.  NOTHING STANDS OUT AS SOMETHING

6    CONSUMERS HAVE NEVER SEEN.  CONSUMERS FEEL THEY

7    LOOK TOO PLAIN, TOO EXTREME, OR TOO MUCH LIKE OTHER

8    SAMSUNG PHONES."

9    Q    AND WHAT STRUCK YOU ABOUT THIS DISCUSSION OF

10   THE INDUSTRIAL DESIGN OF SAMSUNG SMARTPHONES?

11   A    SIMILARLY, THEY ARE VIEWING THE IPHONE AS A

12   TARGET AND SOMETHING TO EMULATE AND ACKNOWLEDGING

13   SOME ISSUES THEY HAD WITH THEIR OWN PHONES.

14            AND SO MY CONCLUSION IS THAT THEY ARE

15   GOING TO USE THIS KIND OF ANALYSIS TO IMPROVE THEIR

16   OWN PRODUCTS.

17   Q    THE BOTTOM LINE, DR. WINER, DO YOU BELIEVE

18   THAT THE SALE OF SAMSUNG'S GALAXY S PHONES IS

19   LIKELY TO DILUTE THE DISTINCTIVENESS OF APPLE'S

20   IPHONE TRADE DRESSES?

21   A    YES, I DO.

22            MR. JACOBS:  THANK YOU VERY MUCH,

23   DR. WINER.

24            THE COURT:  ALL RIGHT.  IT'S 2:24.

25   PLEASE GO AHEAD WITH THE CROSS.

```
 1              MR. VERHOEVEN:  YOUR HONOR, IF I CAN HAVE
 2    JUST TEN MINUTES, I CAN REALLY SHORTEN IT.  I
 3    WASN'T SURE HOW MUCH -- HOW LONG THE DIRECT WOULD
 4    BE.  I THINK IT WOULD BE USEFUL.  SO I WOULD
 5    SUGGEST WE TAKE OUR AFTERNOON BREAK NOW IF YOUR
 6    HONOR IS WILLING TO.  OTHERWISE I CAN GO, BUT
 7    OTHERWISE --
 8              THE COURT:  WE'RE GOING TO GO NOW.  WE'RE
 9    GOING TO GO UNTIL 2:45 AND TAKE OUR BREAK.
10              MR. VERHOEVEN:  YES, YOUR HONOR.
11              (PAUSE IN PROCEEDINGS.)
12              THE COURT:  HOW IS THIS DIFFERENT FROM
13    THE WINER CROSS I GOT YESTERDAY?  IS THAT THE SAME
14    OR DIFFERENT?
15                   CROSS-EXAMINATION
16    BY MR. VERHOEVEN:
17    Q    GOOD AFTERNOON, DR. WINER.
18    A    GOOD AFTERNOON, COUNSEL.
19    Q    MY NAME IS CHARLES VERHOEVEN, AND I'LL BE
20    EXAMINING YOU.
21              NOW, YOU'VE BEEN -- YOU WERE ENGAGED,
22    HIRED TO WORK ON THIS CASE FOR APPLE THROUGH A
23    COMPANY CALLED CORNERSTONE RESEARCH?
24    A    THAT'S CORRECT.
25    Q    AND CORNERSTONE RESEARCH IS A LITIGATION
```

1    SUPPORT COMPANY; RIGHT?

2    A    THAT'S CORRECT.

3    Q    THEY CONSULT DIRECTLY WITH ATTORNEYS ON

4    LITIGATION MATTERS?

5    A    YES, THEY DO.

6    Q    AND THEY HELP FACILITATE CLIENTS TO FIND

7    EXPERT WITNESSES FOR LITIGATION; RIGHT?

8    A    THAT'S CORRECT.

9    Q    AND THAT'S HOW YOU BECAME INVOLVED IN THIS

10   CASE?

11   A    YES.  I WAS CONTACTED BY SOMEONE AT

12   CORNERSTONE.

13   Q    NOW, AND YOU ACCEPTED THE ASSIGNMENT?

14   A    I SURE DID.

15   Q    OKAY.  AND WHEN YOU WERE HIRED AS AN EXPERT ON

16   THIS CASE, THERE WERE -- CORNERSTONE HAD A STAFF OF

17   FOLKS THAT ASSISTED YOU WITH THE PREPARATION OF

18   YOUR EXPERT REPORT?

19   A    THAT'S CORRECT.

20   Q    AND, IN FACT, CORNERSTONE -- THE FOLKS AT

21   CORNERSTONE SUBSTANTIALLY WROTE THE FIRST DRAFT OF

22   YOUR REPORT; RIGHT?

23   A    I GAVE SUBSTANTIAL INPUT AND APPROVED

24   EVERYTHING IN IT, BUT THEY WROTE THE FIRST DRAFT.

25   Q    OKAY.  SO WHO WAS IT?

1    A    THE LEAD PERSON AT CORNERSTONE.  HIS NAME IS

2    SHANKAR, S-H-A-N-K-A-R, IYER, I-Y-E-R.

3    Q    SINCE 2000 -- SINCE THE YEAR 2000, YOU'VE

4    SERVED AS AN EXPERT WITNESS ON AT LEAST 14 OTHER

5    LITIGATION MATTERS; RIGHT?

6    A    THAT MIGHT BE CORRECT.  I HAVEN'T COUNTED.

7    Q    AND YOU'RE BEING PAID FOR YOUR TIME IN THIS

8    CASE; RIGHT?

9    A    CORRECT.

10   Q    TELL THE JURY HOW MUCH YOU'RE BEING PAID?

11   A    SIX HUNDRED AND TWENTY-FIVE DOLLARS AN HOUR.

12   Q    AND HOW MUCH MONEY HAS APPLE PAID YOU SO FAR?

13   A    APPROXIMATELY $50,000.

14   Q    AND HOW MUCH TOTAL HAS IT PAID CORNERSTONE?

15   A    I HAVE NO IDEA.

16   Q    NOW, IN REACHING YOUR OPINIONS IN YOUR EXPERT

17   REPORT, YOU DID NOT DO ANY SYSTEMATIC CONSUMER

18   RESEARCH, DID YOU, SIR?

19   A    I DID NOT CONDUCT ANY NEW STUDIES BEYOND WHAT

20   WAS ALREADY DONE FOR THE CASE.

21   Q    YOU, YOURSELF, DID NOT PERSONALLY CONDUCT ANY

22   SYSTEMATIC CONSUMER RESEARCH; FAIR?

23   A    THAT'S CORRECT.

24   Q    YOU DIDN'T DO ANY FORMAL INTERVIEWS WITH

25   CONSUMERS ABOUT THEIR PURCHASING EXPERIENCES;

```
 1    RIGHT?

 2    A    THAT'S CORRECT.

 3    Q    AND YOU HAVE NO EVIDENCE THAT CONSUMERS IN THE

 4    REAL WORLD HAVE ACTUALLY BOUGHT APPLE DEVICES

 5    THINKING THEY ARE SAMSUNG DEVICES; RIGHT?

 6            MR. JACOBS:  YOUR HONOR, OPENING THE

 7    DOOR.  MR. LEE'S TESTIMONY THAT YOUR HONOR EXCLUDED

 8    THIS MORNING, MR. VERHOEVEN HAS JUST ASKED THIS

 9    WITNESS WHETHER HE HAS ANY ACTUAL EVIDENCE OF

10    CONSUMER CONFUSION AND THIS WITNESS DOES.

11            MR. VERHOEVEN:  LET ME, LET ME ASK YOU --

12    Q    AT YOUR DEPOSITION -- DO YOU REMEMBER YOUR

13    DEPOSITION WAS TAKEN ON APRIL 27TH?

14    A    I REMEMBER BEING DEPOSED.  I DON'T REMEMBER

15    THAT DATE, BUT I'LL ASSUME YOU'RE CORRECT.

16    Q    AND DO YOU REMEMBER TESTIFYING THAT YOU HAVE

17    NO EVIDENCE THAT CONSUMERS OUT THERE IN THE REAL

18    WORLD HAVE ACTUALLY BOUGHT APPLE DEVICES THINKING

19    THEY WERE SAMSUNG DEVICES?

20    A    I THINK THAT MY REPLY WAS IN THE CONTEXT OF I

21    DID NOT DO ANY RESEARCH MYSELF THAT PROVED THAT.

22    Q    WELL, LET'S LOOK AT WHAT YOU SAID.

23            CAN WE PLAY DR. WINER'S DEPOSITION

24    TESTIMONY FROM APRIL 27TH, 2012, PAGE 35, LINES 7

25    THROUGH 15.
```

```
 1              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

 2     OPEN COURT OFF THE RECORD.)

 3              MR. VERHOEVEN:  ALL RIGHT.  LET'S PAUSE

 4     IT AND GET THE VOLUME WORKING.  I APOLOGIZE, YOUR

 5     HONOR.

 6              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

 7     OPEN COURT OFF THE RECORD.)

 8     BY MR. VERHOEVEN:

 9     Q    THAT WAS YOUR TESTIMONY YOU GAVE UNDER OATH IN

10     APRIL, SIR?

11              MR. JACOBS:  YOUR HONOR, UNDER THE RULE

12     OF COMPLETENESS, I BELIEVE WE SHOULD READ A COUPLE

13     MORE PASSAGES DOWN, AND MR. VERHOEVEN HAS OPENED

14     THE DOOR.

15              THE COURT:  I THINK HE'S OPENED THE DOOR,

16     BUT YOU'RE NOT GOING TO DO IT DURING HIS CROSS.

17              THE WITNESS:  I BELIEVE I RESPONDED TO

18     THAT IN THE CONTEXT OF WHETHER I HAD DONE ANY

19     RESEARCH MYSELF.

20              I CERTAINLY HAD READ DOCUMENTS, AND I

21     ALLUDED TO THEM IN MY DEPOSITION, AND MY REPORT,

22     THAT THERE WERE INTERNAL SAMSUNG DOCUMENTS

23     INDICATING REAL CASES OF CONFUSION IN THE

24     MARKETPLACE.

25     BY MR. VERHOEVEN:
```

1534

```
1    Q    DO YOU STAND BY THE TESTIMONY WE JUST SAW,

2    SIR?

3    A    SURE I DO.

4    Q    OKAY.  THANK YOU.

5         YOU HAVE NO IDEA WHETHER CONSUMERS HAVE

6    ACTUALLY BOUGHT APPLE DEVICES THINKING THEY WERE

7    SAMSUNG DEVICES, HAVE YOU?

8         MR. JACOBS:  YOUR HONOR, I'M SORRY.  THE

9    WITNESS HAS BEEN INSTRUCTED NOT TO -- TO FOLLOW AN

10   EARLIER ORDER OF THE COURT AND MR. VERHOEVEN IS

11   OPENING THE DOOR.  THE WITNESS SHOULD BE INFORMED

12   THAT HE CAN ANSWER THAT QUESTION TRUTHFULLY.

13        MR. VERHOEVEN:  I'LL MOVE ON, YOUR HONOR.

14   Q    DR. WINER, YOU HAVE NO EMPIRICAL EVIDENCE TO

15   SHOW THAT SAMSUNG'S ACTIONS HAVE DILUTED APPLE'S

16   BRAND; RIGHT?

17   A    CORRECT.

18   Q    AND YOU HAVE NO HARD DATA TO SHOW THAT

19   SAMSUNG'S ACTIONS HAVE DILUTED APPLE'S BRAND;

20   RIGHT?

21   A    I WAS NOT ASKED TO DO THAT.

22   Q    YOU HAVE NEVER QUANTIFIED THE AMOUNT OF ANY

23   ALLEGED HARM FROM DILUTION OR LOSS OF ANY KIND TO

24   APPLE AS A RESULT OF SAMSUNG'S ACTIONS; RIGHT?

25   A    CORRECT.
```

1    Q    YOU HAVE NO EMPIRICAL EVIDENCE THAT SHOWS THAT

2    APPLE HAS ACTUALLY LOST ANY MARKET SHARE AS A

3    RESULT OF SAMSUNG'S SALES OF ITS DEVICES; RIGHT?

4    A    NO.

5    Q    THAT ANSWER IS YOU DON'T HAVE ANY EMPIRICAL

6    EVIDENCE; CORRECT?

7    A    CORRECT.

8    Q    AND YOU DON'T HAVE ANY EVIDENCE THAT

9    QUANTIFIES THE AMOUNT OF ANY LOST MARKET SHARE;

10   CORRECT?

11   A    THAT'S CORRECT.

12   Q    YOU HAVE NO EVIDENCE QUANTIFYING THE NUMBER OF

13   PURCHASERS WHO BOUGHT A SAMSUNG DEVICE IN LIEU OF

14   BUYING AN APPLE DEVICE; RIGHT?

15   A    I KNOW OF AT LEAST ONE.

16   Q    YOU CAN'T QUANTIFY THE NUMBER OF PURCHASERS

17   WHO BOUGHT A SAMSUNG DEVICE IN LIEU OF BUYING AN

18   APPLE DEVICE; RIGHT?

19   A    AS FAR AS I KNOW, ONE IS A QUANTIFICATION,

20   COUNSELOR.

21   Q    OKAY.  LET'S SEE WHAT YOU SAID IN RESPONSE TO

22   THAT AT YOUR DEPOSITION, SIR.  PAGE NOTE NOTE LINE

23   CITE.

24          (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

25   OPEN COURT OFF THE RECORD.)

```
 1    BY MR. VERHOEVEN:

 2    Q    YOU WERE ASKED THAT QUESTION AND YOU GAVE THAT

 3    ANSWER AT YOUR DEPOSITION; RIGHT, SIR?

 4    A    APPARENTLY SO.

 5    Q    DO YOU STAND BY THAT TESTIMONY?

 6    A    YES.

 7    Q    WILL HE ME SWITCH SUBJECTS NOW.

 8         IN YOUR MARCH 22ND, 2012 EXPERT REPORT AT

 9    PAGE 160, YOU REFER TO WHAT YOU CALL A SLEEKCRAFT

10    FACTOR, NUMBER 6, DEGREE OF CARE WITH RESPECT TO

11    THE IPAD.

12         CAN WE PUT UP PARAGRAPH 160 FROM

13    DR. WINER'S EXPERT REPORT FROM MARCH 22, PLEASE.

14         CAN YOU PUSH THAT DOWN SO I CAN SEE WHERE

15    IT WAS PULLED OUT FROM, MR. FISHER?  GO BACK.

16         OKAY.  SO CAN WE -- THAT'S WHAT I'M

17    LOOKING FOR, 160.

18         DO YOU SEE IT SAYS SLEEK, SLEEK -- YOU

19    HAVE IT IN YOUR BINDER AS WELL, SIR?

20    A    YES, I DO HAVE IT.

21    Q    SLEEK -- SLEEKCRAFT FACTOR SAYS, "TYPES OF

22    GOODS AND," THIS IS WHAT I'M GOING TO FOCUS ON

23    HERE, THE REST OF THIS, "AND THE DEGREE OF CARE

24    LIKELY TO BE EXERCISED BY THE PURCHASER."

25         DO YOU SEE THAT?
```

1537

1    A    I DO.

2    Q    AND SO THE DEGREE OF CARE, YOU'D AGREE WITH

3    ME, THAT THE HIGHER THE DEGREE OF CARE EXERCISED BY

4    THE CONSUMER, THE LESS CHANCE THERE IS GOING TO BE

5    THAT THERE'S CONFUSION OR DILUTION; RIGHT?

6    A    FOR ANY INDIVIDUAL CONSUMER, THAT WOULD BE

7    TRUE.

8    Q    SO IF IT'S LIKE A 50 CENTS DOODAD IN THE

9    GROCERY STORE THAT PEOPLE MIGHT PICK UP, THE DEGREE

10   OF CARE WOULD BE REALLY LOW, RIGHT?

11   A    YOU WOULD BE SURPRISED, BUT I WOULD AGREE THAT

12   IT WOULD BE, OVERALL, LOWER THAN FOR A $600 ITEM OR

13   $300 ITEM.

14   Q    OR TO GET REALLY CONTRASTING, A NEW CAR WOULD

15   BE SOMETHING THAT WOULD BE VERY EXPENSIVE FOR A LOT

16   OF PEOPLE, YOU'LL HAVE TO PAY FOR IT OVER A NUMBER

17   OF YEARS, SO THEY'LL BE REALLY CAREFUL WHEN THEY

18   BUY THAT, RIGHT?

19   A    I JUST DON'T WANT TO USE GENERALITIES.  I

20   WOULD SAY THAT THERE ARE ALWAYS SEGMENTS OF

21   CONSUMERS WHO TAKE MORE OR LESS CARE IN MAKING

22   PURCHASES OF PRODUCTS.

23            SOME MARKETING, WE DON'T WORK WITH THE

24   NOTION OF THERE BEING A MARKET.  WE WORK WITH THE

25   IDEA THAT THERE ARE SEGMENTS AND DIFFERENT KINDS OF

1    CUSTOMERS.

2            SO WHILE THE RATIONAL -- YOU KNOW,

3    EXPLANATION OF PURCHASING WOULD BE, YES, PEOPLE

4    TAKE A LOT OF CARE EVEN IN BUYING CARS.  THE FACT

5    IS THAT EVEN THAT WILL VARY OVER CONSUMERS IN TERMS

6    OF HOW MUCH INFORMATION THEY USE, HOW MANY

7    DEALERSHIPS THEY VISIT AND THE WHOLE RANGE OF

8    INFORMATION AND COLLECTION ACTIVITIES.

9    Q    FAIR ENOUGH.  DIFFERENT CONSUMERS EXHIBIT

10   DIFFERENT BEHAVIORS; RIGHT?

11   A    THAT'S WHAT I'M SAYING.

12   Q    BUT SETTING THAT ASIDE, GENERALLY SPEAKING,

13   WHEN WE'RE TALKING ABOUT THIS FACTOR HERE, IF IT'S

14   A MORE EXPENSIVE ITEM, ON AVERAGE, CONSUMER WILL

15   EXERCISE MORE CARE; RIGHT?

16   A    ONE WOULD EXPECT THAT.

17   Q    THAT MEANS THERE'S LESS CHANCE OF CONFUSION,

18   RIGHT?

19   A    LESS, BUT NOT ZERO.

20   Q    SO IF WE SWITCH TO WHAT WE'RE TALKING ABOUT

21   HERE, I'M HOLDING IN MY HAND ACCUSED SAMSUNG

22   TAB 10.1, WHICH IS EXHIBIT, TRIAL JOINT EXHIBIT

23   1037, YOU'VE SEEN THIS DOCUMENT, THIS --

24   A    IT'S NOT TURNED ON, BUT I'LL ASSUME THAT

25   YOU'RE CORRECT.

1    Q    DO YOU WANT TO TAKE A LOOK AT IT?

2    A    NO, I BELIEVE YOU.

3    Q    OKAY.  SO IF A CONSUMER IF WE'RE TALKING ABOUT

4    A CONSUMER PURCHASING AN ELECTRONIC DEVICE LIKE

5    THIS TABLET, THEY'RE GOING TO EXERCISE MORE CARE

6    THAN IF THEY'RE BUYING SOME SERIAL AT THE GROCERY

7    STORE, RIGHT, ON AVERAGE?

8    A    LET ME BE CLEAR.  ON AVERAGE.

9    Q    TABLET IS A PRETTY EXPENSIVE PRODUCT; RIGHT?

10   A    DEPENDS ON WHAT'S RELATIVE TO YOU.  NOT TO A

11   NEW HOUSE.  BUT TO A TUBE OF TOOTHPASTE, YES.

12   Q    TO AN AVERAGE CONSUMER IT'S NOT A TRIVIAL

13   PURCHASE, IS IT?

14   A    IT'S A CONSUMER DURABLE GOOD THAT'S REASONABLY

15   EXPENSIVE, I'LL AGREE.

16   Q    AND CONSUMERS ACTUALLY RESEARCH VARIOUS

17   TABLETS BEFORE THEY GO BUY THEM.  WOULD YOU AGREE

18   WITH THAT?

19   A    NO, I DON'T.

20   Q    YOU DON'T AGREE THAT CONSUMERS CONSIDER THE

21   VARIOUS FUNCTION AS AVAILABLE ON ALL THE DIFFERENT

22   TABLETS AVAILABLE?

23   A    IT DEPENDS ON HOW YOU DEFINE "RESEARCH."  SOME

24   CONSUMERS WILL MAKE A DECISION BASED ON INFORMATION

25   THEY GET IN A RETAIL STORE, WHICH CAN BE AFFECTED

```
 1    BY A SALESPERSON.  THE QUALITY OF THE DISPLAY.

 2              OTHERS WILL SEARCH TEN DIFFERENT SOURCES

 3    ON THE INTERNET TO FIND OUT INFORMATION.

 4    Q    YOU DON'T AGREE THAT CONSUMERS WILL, IF

 5    THEY'RE THINKING ABOUT BUYING A TABLET THAT HAS A

 6    PHONE FUNCTIONALITY, WILL EVALUATE WHAT THE

 7    DIFFERENT CARRIER PLANS THAT THE CARRIERS OFFER

 8    THAT ARE AVAILABLE FOR VARIOUS DIFFERENT TABLETS?

 9    A    THAT'S NOT THE SAME AS EVALUATING THE PRODUCT

10    ITSELF.

11              BUT I ASSUME THAT THEY WILL TRY TO

12    UNDERSTAND WHAT THE COST IS OF THE -- ASSOCIATED

13    COST WITH USING THE PRODUCT.

14    Q    THE PRODUCTS ARE BUNDLED WITH LONG-TERM

15    CONTRACTS IN SOME CASES; RIGHT?

16    A    IN SOME CASES, CORRECT.

17    Q    TWO YEARS LONG; RIGHT?

18    A    I'M NOT AS FAMILIAR WITH THE CONTRACT NATIVE,

19    BUT, YES, MINE IS TWO YEARS, FOR EXAMPLE.

20    Q    IF YOU WERE GOING TO SIGN A TWO-YEAR CONTRACT,

21    YOU'D WANT TO KNOW WHAT THE TERMS OF THE CONTRACT

22    ARE AND WHAT YOU'RE GETTING INTO FOR TWO YEARS;

23    RIGHT?

24    A    YES.  BUT MY FOCUS WAS ON TRADE DRESS OF THE

25    PRODUCTS, NOT ON THE DETAILS OF THE CONTRACTS THAT
```

1    PEOPLE ARE SIGNING WITH AT&T.

2    Q    I'M ASKING YOU ABOUT THE DEGREE OF CARE FACTOR

3    HERE.  RIGHT?

4    A    RESTATE YOUR QUESTION, PLEASE.

5    Q    WELL, CONSUMERS -- TYPICALLY A CUSTOMER

6    INTERESTED IN A TABLET WILL ACTUALLY WANT TO GO IN

7    A STORE AND PLAY AROUND WITH IT TO SEE HOW IT

8    WORKS; RIGHT?

9    A    IN MOST CASES.

10   Q    SO YOU'D AGREE THAT BEFORE BUYING A TABLET,

11   MOST CONSUMERS WOULD TURN IT ON AND PLAY WITH IT A

12   LITTLE BIT?

13   A    I WOULD AGREE WITH THAT.

14   Q    OKAY.  LET'S DO THAT WITH THIS JX 103 SEARCH.

15            NOW, BEFORE I TURN THIS ON -- IS THAT

16   GOING TO AUTOMATICALLY FOCUS?

17            CAN YOU HELP ME OUT?

18            BEFORE I TURN THIS ON, THE TRADE DRESS

19   THAT YOU'RE EVALUATING INCLUDES THE APPLICATION

20   SCREEN; RIGHT?

21   A    YES, YES, IT DOES.

22   Q    THAT'S AN ACCUSED FEATURE THAT YOU SAY IS

23   INFRINGING ON THE TABLET; RIGHT?

24   A    THAT'S PART OF THE OVERALL TRADE DRESS.

25   Q    OKAY.  IS THERE A WAY TO DIM THE LIGHTS?

```
 1              THAT'S A LITTLE BETTER.  SO I'M A

 2   CONSUMER AND I GO INTO THE STORE TO SEE HOW THIS

 3   TABLET WORKS.

 4              I TURN IT ON.

 5   A    IF YOU'RE LUCKY, SOMETHING COMES UP ACTUALLY.

 6   MOST STORES IT DOESN'T.  NOT JUST FOR THE GALAXY

 7   TAB.

 8   Q    THAT'S RIGHT.  THIS IS SET UP FOR LANDSCAPE.

 9              DO YOU SEE THE GALAXY TAB NAME, AND THE

10   BIG SWIRLING SAMSUNG.  DO YOU SEE THAT?

11   A    I DO.

12   Q    AND THEN IT GLOWS A COUPLE TIMES AT YOU.  DO

13   YOU SEE THAT?

14              AND THEN YOU GET A LOCKED SCREEN; RIGHT?

15              AND YOU HAVE TO MOVE YOUR FINGER OUTSIDE

16   THE CIRCLE TO UNLOCK IT.

17              AND THEN THIS IS NOT THE ACCUSED TRADE

18   DRESS; CORRECT?

19   A    NO, IT'S NOT.

20   Q    THIS IS THE HOME SCREEN; RIGHT?

21   A    IT'S THE HOME SCREEN.

22   Q    RIGHT.  SO A CONSUMER HAS TO BE ABLE TO FIGURE

23   OUT, HOW DO I GET TO THE APPLICATION SCREEN?

24              AND UP HERE ON THE TOP RIGHT, IF THEY CAN

25   FIGURE IT OUT, IT SAYS APPS, AND THEY HIT THAT
```

1    BUTTON, AND THAT'S THE SCREEN THAT YOU SAY CAUSES

2    CONFUSION AMONG CONSUMERS; RIGHT?

3    A    CORRECT.

4    Q    SO IT'S YOUR TESTIMONY TO THIS JUROR THAT

5    CONSUMERS, USING THE DEGREE OF CARE THAT THEY WOULD

6    NORMALLY USE, TURNING ON THIS PHONE, SEEING THE

7    SAMSUNG, SEEING THE SWIRL THAT TURNS INTO THE

8    SAMSUNG, SEEING IT GLOW TWO TIMES, HAVING TO

9    NAVIGATE BEYOND THE HOME SCREEN TO THE APPLICATION

10   SCREEN, THAT THOSE CONSUMERS WOULD BE CONFUSED AND

11   WOULDN'T KNOW THAT THIS IS A SAMSUNG SOURCED

12   PRODUCT?  IS THAT YOUR TESTIMONY?

13   A    NO, I DON'T AGREE WITH THAT.

14   Q    OKAY.  LET'S MOVE ON TO ANOTHER SUBJECT.  I'D

15   LIKE TO GO TO ANOTHER PORTION OF YOUR REPORT, SIR.

16            THIS IS WITH RELATIONSHIP -- EXCUSE ME.

17   LET ME START OVER.

18            THIS RELATES TO THE PORTION OF YOUR

19   REPORT CONCERNING WHAT YOU CALL DILUTION FACTOR 3,

20   SUBSTANTIAL EXCLUSIVE USE.

21            AND YOU CAN FIND THIS, FOR THE IPHONE, AT

22   PARAGRAPH 173 AND -- OF YOUR MARCH 22ND EXPERT

23   REPORT; AND FOR THE IPAD AT PARAGRAPH 183 OF YOUR

24   MARCH 22ND, 2012 REPORT.

25            AND, MR. FISHER, IF IT'S POSSIBLE TO TAKE

```
 1    THOSE TWO PARAGRAPHS AND PUT THEM ONE ON THE TOP

 2    AND ONE AT THE BOTTOM.

 3              MR. JACOBS:  YOUR HONOR, THIS IS BEYOND

 4    THE SCOPE.

 5              I DID NOT ASK THIS WITNESS ABOUT THIS

 6    FACTOR, AND AS YOU'LL SEE IN THE REPORT, HE RELIES

 7    ON DR. BRESSLER'S TESTIMONY, MR. BRESSLER'S

 8    TESTIMONY.

 9              THE COURT:  OVERRULED.

10              GO AHEAD.

11              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

12    Q    AND YOU HAVE THE ACTUAL DOCUMENT IF YOU'D LIKE

13    TO LOOK AT IT, SIR.

14              SO THIS IS THE SAME FACTOR, ONE FOR THE

15    PHONE -- THE IPHONE.  DO YOU SEE UP THERE, IPHONE?

16    A    YES.

17    Q    AND THEN YOU'VE GOT IT HERE AGAIN, DILUTION

18    FACTOR, SUBSTANTIALLY EXCLUSIVE USE OF TRADE DRESS

19    FOR THE IPAD?

20    A    I SEE THAT.

21    Q    AND YOU'RE RELYING ON MR. BRESSLER; IS THAT

22    RIGHT?

23    A    YES.  I HAVE NO OPINION ON THE DILUTION FACTOR

24    3 ON THE EXCLUSIVE USE OF THE TRADE DRESS AS MY --

25    AS COUNSEL MENTIONED, I REFERRED TO MR. BRESSLER ON
```

1    THIS.

2    Q   OKAY.  DO YOU KNOW WHAT THIS FACTOR CONCERNS,

3    EXCLUSIVE USE OF TRADE DRESS?

4    A   I'M SORRY.  COULD YOU RESTATE THE QUESTION?

5    Q   DO YOU KNOW WHAT THIS FACTOR CONCERNS?

6    A   NO, I DON'T.

7         MR. VERHOEVEN:  YOUR HONOR, IT IS ONE

8    MINUTE BEFORE, BUT I'M GETTING CLOSE TO BEING DONE.

9         THE COURT:  THAT'S FINE.  IT'S 2:46.

10   WE'LL TAKE OUR BREAK NOW.

11        THIS IS WHAT WE'RE GOING TO DO FROM NOW

12   ON:  IF THERE IS AN OBJECTION THAT REQUIRES ME TO

13   DO SOME RESEARCH, WE'RE GOING TO JUST HAVE YOU WAIT

14   PATIENTLY AND I'M GOING TO START CHARGING TIME TO

15   THE OBJECTING PARTY AND YOU WILL THEN HAVE AN

16   OPPORTUNITY TO GIVE ME WHATEVER SPECIFIC DOCUMENTS

17   YOU WANT ME TO LOOK AT, EITHER ORDERS ON MOTIONS IN

18   LIMINE, WHETHER IT'S CONTENTION INTERROGATORY

19   RESPONSES.

20        BUT THE TIME THAT IT TAKES ME TO RULE

21   WILL BE CHARGED TO THE OBJECTING PARTY, AND WE'LL

22   JUST DO IT RIGHT HERE IN COURT, AND WE'LL JUST TAKE

23   A BRIEF PAUSE SO THAT OBJECTION CAN BE DEALT WITH.

24        NOW, IF IT'S AN OBJECTION THAT CAN BE

25   DEALT WITH QUICKLY, THEN THAT WILL STILL BE CHARGED

1    TO THE TIME OF THE NON-OBJECTING PARTY.  OKAY.

2              THAT'S THE PROCEDURE WE'RE GOING TO DO

3    FROM NOW ON.  I'M SORRY TO OUR JURY THAT YOU'RE

4    GOING TO HAVE TO SIT AND WATCH US DO THAT, BUT I

5    DON'T SEE THAT MUCH OTHER WAY TO GET AROUND THAT.

6    OKAY?

7              ANYWAY, KEEP AN OPEN MIND AND PLEASE

8    DON'T DO ANY RESEARCH OR READ ABOUT THE CASE.

9    PLEASE DON'T DISCUSS THE CASE WITH ANYONE.

10             YOU CAN GO AHEAD AND LEAVE YOUR JURY

11   NOTEBOOKS ON YOUR CHAIR.  WE'RE GOING TO TAKE A

12   15-MINUTE BREAK.  IT'S 2:45 -- THIS CLOCK SAYS

13   2:47.  WE'LL SEE YOU BACK HERE AT 3:00.  OKAY?

14             (WHEREUPON, THE FOLLOWING PROCEEDINGS

15   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

16             THE COURT:  YOU CAN STEP DOWN.

17             ALL RIGHT.  THE RECORD SHOULD REFLECT THE

18   JURORS HAVE LEFT THE COURTROOM.

19             SO LET'S GET A CLEAR AGREEMENT NOW AS

20   TO -- I BELIEVE THE DOOR HAS BEEN OPENED AS TO

21   MR. LEE, WHO I EXCLUDED THIS MORNING.  I SUSTAINED

22   SAMSUNG'S OBJECTION, BUT OTHERWISE I THINK IT'S

23   MISLEADING TO THE JURY TO LEAVE IT OTHERWISE.

24             ANYTHING ELSE?  LET'S GET -- LET'S HASH

25   THEM OUT NOW.  ANY OTHER ISSUES?

```
 1              MR. JACOBS:  NOT FROM US, YOUR HONOR.

 2              THE COURT:  ANYTHING ELSE?  I'D LIKE TO

 3    JUST HASH THIS --

 4              MR. VERHOEVEN:  THE WITNESS HAS

 5    TESTIFIED, YOUR HONOR, AS TO CONFUSION ON HIS

 6    DIRECT EXAMINATION, AND I WAS SIMPLY CROSSING HIM

 7    ON THAT SUBJECT.

 8              MR. JACOBS:  YOUR HONOR, I EXPECT --

 9              THE COURT:  I --

10              MR. VERHOEVEN:  HE GAVE THE OPINION THAT

11    IT'S LIKELY --

12              THE COURT:  I THINK THAT BY -- BY

13    OBJECTING -- I'M SORRY.  EVERYONE PLEASE TAKE A

14    SEAT.

15              BY OBJECTING AND GETTING AN ORDER

16    EXCLUDING ANY BASIS FOR HIS OPINION AND THEN SAYING

17    YOU HAVE NO BASIS FOR YOUR OPINION, YOU HAVE NO

18    BASIS FOR YOUR OPINION I THINK IS MISLEADING TO THE

19    JURY.  HE DOES HAVE A BASIS FOR AN OPINION.

20              YOU WERE SUCCESSFUL IN EXCLUDING IT.  SO

21    I'M OVERRULING THIS.  IF YOU WANT ME TO RECONSIDER,

22    I'M CHARGING YOU ON TIME.  IT'S 2:14 NOW.  GO

23    AHEAD.  GO AHEAD ON YOUR RECONSIDERATION ARGUMENT.

24              MR. VERHOEVEN:  I'M NOT GOING TO USE MY

25    TIME, YOUR HONOR.  I DON'T HAVE TIME TO USE.
```

1548

```
1              THE COURT:  ALL RIGHT.  WELL, THAT'S MY
2     RULING.  YOU'VE OWNED THE DOOR, SO THAT'S COMING IN
3     DURING REDIRECT, BUT IT'S NOT COMING IN DURING
4     CROSS.  NOTE NOTE 2:49, NOT 2:14.
5              OKAY?  ALL RIGHT.  THANK YOU ALL.
6              (WHEREUPON, A RECESS WAS TAKEN.)
7              (WHEREUPON, THE FOLLOWING PROCEEDINGS
8     WERE HELD OUT OF THE PRESENCE OF THE JURY:)
9              THE COURT:  OKAY.  PLEASE TAKE A SEAT.
10             I'M GOING TO REVERSE MYSELF, AND I'LL DO
11    THIS IN FRONT OF JURY, ON PX 5 AND PX 6.
12             THE CONFUSION WAS THAT MOTION IN LIMINE
13    NUMBER 2 HAD TO DO WITH THE BEST BUY SURVEY AND I
14    DENIED THE MOTION AS TO THE BEST BUY SURVEY BECAUSE
15    THERE IS CASE LAW THAT A CUSTOMER WHO GENERALLY
16    GETS CONFUSED, THAT THAT'S NOT HEARSAY AND THE
17    STATE OF MIND EXCEPTION DOES APPLY THERE.
18             I DON'T BELIEVE, AND THE ONLY OTHER
19    OBJECTION THAT I RULED ON THAT HAS TO DO WITH THESE
20    COMPILATIONS, I BELIEVE, WAS IN THE OPENING
21    STATEMENTS AND THOSE WERE AS TO FAME, AND I SAID
22    THAT THEY WERE NOT ADMITTED FOR THE TRUTH, AND WE
23    WENT THROUGH MULTIPLE OF THOSE EXHIBITS DURING ONE
24    OF THE WITNESSES, I THINK IT WAS, I THINK,
25    MR. SCHILLER.
```

```
 1                    BUT WE HAD NOT ACTUALLY RULED ON ONE
 2      REGARDING CONFUSION.
 3                    SO I THINK IN THIS INSTANCE, SAYING THAT
 4      IT'S NOT FOR THE TRUTH WHEN IT'S COMPLETE, I THINK
 5      I WOULD AGREE WITH MR. VERHOEVEN.
 6                    MR. JACOBS:  I GAVE YOUR COURT REPORTER
 7      1520, YOUR HONOR.
 8                    THE COURT:  IS THAT THE ECF NUMBER?
 9                    MR. JACOBS:  YES.
10                    THE COURT:  OKAY.  CAN I SEE THAT,
11      PLEASE.
12                    MR. JACOBS:  SURE.
13                    THE COURT:  ACTUALLY, I HAVE IT.  IF IT'S
14      ECF 1520, I'VE GOT IT.
15                    MR. JACOBS:  THAT'S WHAT I WAS RELYING
16      ON.
17                    THE COURT:  OKAY.  GIVE ME A SECOND.
18                    AND WHICH -- TELL ME SPECIFICALLY --
19                    MR. JACOBS:  MIDDLE OF PAGE 2, YOUR
20      HONOR, BRESSLER, PX 5, PX 6.
21                    THE COURT:  OKAY.
22                    MR. VERHOEVEN:  I'M NOT SURE, YOUR HONOR,
23      I'M NOT SURE WHAT COUNSEL HANDED YOU.
24                    THE COURT:  IT'S DOCKET NUMBER 1520.
25                    MR. VERHOEVEN:  OH.  OBJECTIONS?
```

```
 1            THE COURT:  FILED ON JULY 31ST, 2012.
 2     ALL RIGHT.  WELL, LET ME CHECK PX 5 AND 6.
 3            I DON'T HAVE THAT IN MY BRESSLER DIRECT
 4     BINDER.  IT GOES FROM PX 3, PX 4, PX 7, PX 10.
 5            MR. JACOBS:  NO.  IT SHOULD BE IN -- THE
 6     EXHIBITS HAVEN'T CHANGED, YOUR HONOR, PX 5 AND PX 6
 7     ARE STILL PX 5 AND PX 6.  BUT THEY SHOULD BE IN
 8     YOUR WINER BINDER.
 9            THE COURT:  WELL, BUT THIS WAS A RULING
10     AS TO BRESSLER?
11            MR. JACOBS:  YES.
12            THE COURT:  HOW COME PX 5 AND PX 6 AREN'T
13     IN HERE?  WERE THEY IN AN EARLIER VERSION?
14            MR. JACOBS:  AREN'T IN THE BRESSLER
15     BINDER.
16            THE COURT:  UH-HUH.
17            MR. JACOBS:  I'M SORRY, YOUR HONOR.
18            THE COURT:  LET ME SEE PX 5 AND PX 6.
19            (PAUSE IN PROCEEDINGS.)
20            THE COURT:  ALL RIGHT.  THAT DOES LOOK
21     CORRECT.  NOW, LET ME JUST DOUBLE-CHECK.
22            WAS THAT ORDER EVER REVERSED?  WAS THAT
23     THE ONLY ORDER ON PX 5 AND PX 6?
24            MR. JACOBS:  YOUR HONOR, WE'VE BEEN
25     TRYING TO KEEP TRACK --
```

```
 1                    THE COURT:  THIS IS WHY I'M CONFUSED.  IF
 2      YOU LOOK AT DOCUMENT NUMBER 1563, WHICH WAS FILED
 3      AUGUST 2ND, IT SAYS SUSTAINED AND THAT'S WHAT I WAS
 4      LOOKING AT WHEN WE WERE DISCUSSING THIS EARLIER.
 5                    MR. JACOBS:  YES.  THAT WAS A BRESSLER
 6      FOCUSSED ISSUE, YOUR HONOR, ON WHETHER IT WAS IN
 7      HIS REPORT.  PX 5 AND PX 6, THE ARTICLES IN PX 5
 8      AND PX 6 ARE IN THE APPENDICES, OR THE BODY, OF
 9      DR. WINER'S REPORT.
10                    AND, OF COURSE, THESE EXHIBITS WERE
11      DISCLOSED IN CONNECTION WITH DR. WINER'S SYSTEM.
12      SO SAMSUNG'S COUNSEL HAD AN OPPORTUNITY TO
13      DOUBLE-CHECK THAT.
14                    MR. VERHOEVEN:  IF I MAY MAKE A COMMENT,
15      YOUR HONOR.
16                    THE COURT:  GO AHEAD.
17                    MR. VERHOEVEN:  MY RECOLLECTION IS WITH
18      RESPECT TO MR. BRESSLER, AND YOU CAN SORT OF SEE
19      THIS IN THE ORDER, IT'S DOCUMENT 1520, YOUR HONOR,
20      PAGE 2, THE LAST TWO SENTENCES, SECOND TO LAST
21      SENTENCE IN THE CELL FOR BRESSLER PX 5, PX 6, YOU
22      SAY, THESE EXHIBITS ARE NOT OFFERED FOR THE TRUTH
23      OF THE MATTER ASSERTED, THEY ARE NOT HEARSAY.
24                    AND I HAVE A RECOLLECTION, YOUR HONOR,
25      AND I'M JUST GOING OFF MY MEMORY THAT WHEN
```

```
 1    MR. BRESSLER WAS PROVIDING HIS DIRECT EXAMINATION

 2    TESTIMONY, ARTICLES WERE SHOWN AND I -- AND

 3    QUESTIONS WERE ASKED ON THOSE ARTICLES, AND I

 4    OBJECTED BECAUSE THOSE QUESTIONS WERE ASKING

 5    MR. BRESSLER WHETHER, READING THE ARTICLES FOR THE

 6    TRUTH, THAT THEY SUPPORTED OR CONFORMED WITH HIS

 7    OPINIONS.

 8              AND MY RECOLLECTION IS YOUR HONOR

 9    SUSTAINED EACH OF THOSE OBJECTIONS, AND THAT WAS

10    THE SAME TYPE OF OBJECTION THAT I WAS MAKING HERE

11    BECAUSE THE -- AS I STATED EARLIER, YOUR HONOR,

12    THESE ARTICLES WERE BROUGHT UP IN THE CONTEXT OF

13    SIMILARITY OF THE TRADE DRESS, AND SO THE ONLY

14    PROBATIVE VALUE OF THOSE ARTICLES WOULD HAVE BEEN

15    IS FOR THE TRUTH, AND THAT WOULD VIOLATE THE

16    LIMITING INSTRUCTION THAT YOUR HONOR HAD INDICATED

17    EARLIER WITH MR. BRESSLER.

18              I ALSO OBJECTED BASED ON INTERROGATORY --

19    CONTENTION INTERROGATORIES.

20              BUT SETTING THAT ASIDE, MY UNDERSTANDING

21    WAS THESE ARE NOT IN FOR THE TRUTH.

22              THE COURT:  BUT TELL ME THE RELATIONSHIP

23    BETWEEN SIMILARITY OF TRADE DRESS AND CONFUSION.

24    AREN'T THOSE INTERTWINED?

25              MR. VERHOEVEN:  WELL, YOUR HONOR --
```

1553

```
1              THE COURT:  ISN'T THAT WHY WE LOOK AT

2    SIMILARITY?  IT'S FOR THAT ISSUE, AND THEN THAT

3    WILL GO TO ASSOCIATION FOR DILUTION OR IT'LL GO TO

4    CONFUSION FOR INFRINGEMENT.

5              MR. VERHOEVEN:  THE OBJECTION IS YOU'VE

6    GOT THIRD PARTIES, WHO ARE EITHER BLOGGERS OR

7    REPORTERS WITH NO QUALIFICATIONS TO PROVIDE

8    OPINIONS AS TO SIMILARITY OF TRADE DRESS.  WE DON'T

9    HAVE A RELATIONSHIP OF ANY OF THESE PEOPLE TO

10   APPLE.  WE DON'T KNOW WHETHER THE BLOGGERS WORK FOR

11   APPLE.  WE DON'T KNOW THE RELATIONSHIPS BETWEEN THE

12   REPORTERS AND APPLE.

13             AND THERE'S NO RELIABILITY IN THESE

14   DOCUMENTS.  THEY'RE THIRD PARTY HEARSAY IF YOU'RE

15   TALKING ABOUT THE TRUTH OF THE MATTER ASSERTED.

16             NOW, I THINK YOUR HONOR SAID THEY CAN

17   COME IN FOR THINGS LIKE NOTICE AND TO SHOW THAT

18   APPLE SHOULD HAVE KNOWN THAT OTHERS THOUGHT THEY

19   WERE SIMILAR AND WHATNOT.

20             BUT YOUR HONOR CLEARLY SAID THEY'RE NOT

21   IN FOR THE TRUTH OF THE STATEMENTS CONTAINED

22   THEREIN.

23             AND SO THE OBJECTION, YOUR HONOR, IS TO

24   USE THESE ARTICLES AS ADDITIONAL EVIDENCE FOR THE

25   TRUTH THAT THESE TRADE DRESSES ARE CONFUSING, THAT
```

1    THESE TRADE DRESSES ARE COPIES, THAT THESE TRADE

2    DRESSES ARE SUBSTANTIALLY SIMILAR OR WHATNOT.

3         THAT WOULD BE FOR THE TRUTH.

4         AND IT WOULD BE INCREDIBLY IMPROPER, IN

5    OUR VIEW, TO -- FOR -- ESPECIALLY WHEN THERE'S A

6    DEARTH OF ACTUAL ANALYSIS DONE BY THESE EXPERTS ON

7    THEIR OWN TO SIMPLY RELY ON BLOGS AND TECH INDUSTRY

8    PERIODICALS WHERE PEOPLE COMPLETELY BEYOND OUR

9    CONTROL, WHO ARE REPORTERS OR BLOGGERS, JUST DECIDE

10   THEY'RE GOING TO MAKE SOME COMMENT AND THEN FUNNEL

11   THAT THROUGH AN EXPERT WITNESS TO SAY THIS IS

12   EVIDENCE OF CONFUSION, THIS IS EVIDENCE OF

13   SIMILARITY.

14        IT'S NOT -- IT'S NOT PROPER EVIDENCE AND

15   IT'S HIGHLY PREJUDICIAL FOR THE TRUTH, AND THAT'S

16   WHY WE HAVE THE OBJECTION.

17        THE COURT:  ALL RIGHT.  DO YOU WANT TO

18   RESPOND TO THAT?

19        MR. JACOBS:  YES, YOUR HONOR.  NUMBER

20   ONE, I THINK WE NEED TO DO SOMETHING ABOUT

21   OCCUPYING AIR TIME IN THESE DISCUSSIONS BECAUSE I'M

22   TRYING VERY HARD TO BE CONCISE.

23        NUMBER TWO, YOUR HONOR HAS RULED ON THIS

24   SEVERAL TIMES.

25        THE COURT:  YEAH.

```
 1              MR. JACOBS:  NUMBER THREE, IT IS TRUE

 2   THAT YOUR HONOR HAS SAID THESE DON'T COME IN FOR

 3   THE TRUTH OF THE MATTER ASSERTED AND I ASKED THE

 4   QUESTION VERY CAREFULLY OF DR. WINER, HOW HE USED

 5   THESE, AND HE USED THESE TO TEST THAT HIS JUDGMENT

 6   OF SIMILARITY, WHICH HE REACHED ON HIS OWN, WAS NOT

 7   UNIQUE TO HIM.

 8              AND I SAID DOES THIS HAVE SOMETHING TO DO

 9   WITH THE STATE OF MIND OF THESE AUTHORS?

10              AND BOTH OF THOSE ARE BASES FOR THESE TO

11   COME IN.

12              I DON'T THINK THERE'S ANY NEED FOR A

13   LIMITING INSTRUCTION --

14              THE COURT:  WELL, ONE HAS ALREADY BEEN

15   GIVEN.

16              MR. VERHOEVEN:  REALLY BRIEFLY, YOUR

17   HONOR, TO THOSE TWO POINTS, IF I MAY.

18              THE COURT:  GO AHEAD.

19              MR. VERHOEVEN:  FIRST, IN CONFORMING --

20   IN CORROBORATING HIS OPINION AS TO THE TRUTH OF THE

21   MATTER IS OFFERING IT FOR THE TRUTH.

22              AND THE SECOND POINT THAT WAS MADE, THE

23   STATE OF MIND OF A THIRD PARTY BLOGGER OR REPORTER

24   IS 100 PERCENT IRRELEVANT IN THIS CASE.

25              IT COULD GO TO THE STATE OF MIND OF
```

1    SAMSUNG IF THEY CAN PROVE THAT SAMSUNG KNEW ABOUT

2    THESE ARTICLES.

3              THAT'S WHY YOUR HONOR LET IT IN.  THERE'S

4    ABSOLUTELY NO RELEVANCE TO WHAT SOME THIRD PARTY

5    REPORTER OR BLOGGER THOUGHT.

6              I GET TEN -- 100, PROBABLY 20 E-MAILS A

7    DAY OF THIRD PARTIES THAT JUST DECIDE TO SEND ME

8    E-MAILS ABOUT THIS CASE, EXPRESSING --

9              THE COURT:  I THINK WE ALL DO.

10             MR. VERHOEVEN:  EXPRESSING THEIR

11   OPINIONS, AND NONE OF THAT, NONE OF THAT SHOULD

12   COME IN FOR THE TRUTH.

13             MR. JACOBS:  YOUR HONOR, YOU'VE LOOKED AT

14   THIS CLOSELY TWICE, IN 1520 AND 1563, AND BOTH

15   TIMES YOU'VE COME TO THE SAME OUTCOME.  THAT'S WHY

16   I REALLY WOULD LIKE MR. VERHOEVEN'S AIR TIME

17   CHARGED TO HIM AT THIS STAGE.

18             THE COURT:  NO, I'M NOT GOING TO FOR

19   THIS.

20             (PAUSE IN PROCEEDINGS.)

21             THE COURT:  ALL RIGHT.  THE OBJECTIONS'S

22   OVERRULED.  BUT I'M NOT GOING TO CHARGE

23   MR. VERHOEVEN'S TIME ON THAT.

24             MR. JACOBS:  THANK YOU, YOUR HONOR.

25             MR. VERHOEVEN:  YOUR HONOR, IF IT'S

1    PERMISSIBLE WITH YOU, I WOULD LIKE TO BE CHARGED A

2    MINUTE OF MY TIME JUST TO ADDRESS THE OPENING THE

3    DOOR.  I'VE HAD AN OPPORTUNITY TO ORGANIZE MY

4    THOUGHTS.

5              THE COURT:  SURE.

6              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

7              THE COURT:  WHAT WOULD YOU LIKE TO --

8              MR. VERHOEVEN:  OVER THE BREAK, I GOT THE

9    TRANSCRIPT, YOUR HONOR, OF THE REALTIME FEED.

10             THE COURT:  OKAY.  IT'S 3:19.  GO AHEAD.

11             MR. VERHOEVEN:  LET ME START BY SAYING I

12   DON'T THINK THE -- THE CLAIM I'VE OPENED THE DOOR

13   IS A RELEVANT CLAIM HERE.

14             DR. WINER KNEW ABOUT MR. LEE'S TESTIMONY

15   BEFORE HIS DEPOSITION AND IT'S IN HIS REPORT, YOUR

16   HONOR.  THAT WASN'T WHY IT WAS EXCLUDED.  IT WAS

17   KIND OF LIKE IT'S NOT IN HIS REPORT, AND IT'S NOT

18   LIKE IT ALSO CAME OUT LATER IN TIME.  SO HE KNEW

19   ABOUT IT, IT WAS IN HIS REPORT.

20             OUR OBJECTION WAS THAT, I THINK -- I

21   BELIEVE OUR OBJECTION EARLIER TODAY WAS THAT THAT

22   IS NOT -- THAT EVIDENCE WAS NOT DISCLOSED IN

23   RESPONSE TO A CONTENTION INTERROGATORY, AND THAT'S

24   WHY YOUR HONOR KEPT IT OUT.  SO IT'S NOT A QUESTION

25   OF OPENING THE DOOR.  IT'S A QUESTION OF WHAT

1    EVIDENCE IS AVAILABLE TO THESE -- TO BE USED EITHER

2    ON DIRECT OR CROSS AS A RESULT OF THE

3    INTERROGATORIES.

4             AND IF YOU LOOK AT THE OTHER SIDE OF THE

5    COIN, FOR EXAMPLE, SITUATIONS IN THE PAST WHERE WE

6    HAD NOT LISTED A PARTICULAR PIECE OF EVIDENCE FOR

7    ARGUMENT IN OUR RESPONSES TO THEIR CONTENTION

8    INTERROGATORIES AND WE'D ARGUED TO THE COURT THAT

9    WE STILL SHOULD BE ABLE TO PRESENT THAT, EVEN

10   THOUGH IT WASN'T DISCLOSED IN THE INTERROGATORIES,

11   BECAUSE IT WAS DISCLOSED IN A REBUTTAL REPORT IN

12   RESPONSE TO AN ARGUMENT THAT WAS MADE IN AN OPENING

13   REPORT BY THE OTHER SIDE'S EXPERT, WHICH IS THE

14   SAME THING, OPENING THE DOOR.

15             THEY ADDRESSED IT.  WE RELIED ON IT.

16             THE COURT:  I HEAR YOU.  I HEAR YOU.

17             MR. VERHOEVEN:  AND YOUR HONOR

18   SUSTAINED --

19             THE COURT:  I'M GOING TO SHORT CIRCUIT.

20   I'M PERSUADED.  LET ME HEAR MR. JACOBS'S RESPONSE.

21             MR. JACOBS:  LET ME TRY TO UNPERSUADE

22   YOU, YOUR HONOR.  I WARNED MR. VERHOEVEN THIS WAS

23   GOING TO HAPPEN.  THAT WAS THE PURPOSE OF MY

24   STANDING UP.

25             HE ASKED DURING WINER ABOUT A PASSAGE AT

```
 1    PAGE 35 OF HIS DEPOSITION, AND IT'S AT PAGE 36 IN

 2    THE IMMEDIATELY FOLLOWING PASSAGE -- I CAN HAND IT

 3    TO YOUR HONOR, I THINK IT'LL BE --

 4              THE COURT:  OKAY.  GO AHEAD.  I'VE GOT IT

 5    AS WELL.

 6              MR. JACOBS:  AT PAGE 36 WHERE HE

 7    SPECIFICALLY TALKS ABOUT THE, THE BEST BUY ISSUE.

 8              THE COURT:  OKAY.

 9              MR. JACOBS:  SO YOU HEARD THE TESTIMONY

10    IN CROSS ABOUT DR. WINER SAYING I HAVE NO RESPONSE,

11    I HAVE NO IDEA.  THAT'S ON 35.

12              ON 36, "WHAT IS THE CLASS OF CONSUMERS

13    YOU HAVE -- YOU BELIEVE HAVE BOUGHT SOME DEVICES

14    THINKING THEY'RE APPLE DEVICES OR THEY WOULD-BE

15    APPLE PURCHASES?

16              "ANSWER:  I HAVE -- THE ONLY EVIDENCE I

17    HAVE FROM TESTIMONY THAT I REVIEWED IS THAT SOME

18    INDIVIDUALS BOUGHT A SAMSUNG GALAXY TAB MISTAKENLY

19    THINKING IT WAS AN IPAD, AND SUBSEQUENTLY RETURNED

20    TO THE STORE AND GOT AN IPAD.  THAT'S THE ONLY

21    DIRECT EVIDENCE I HAVE FOR ANY OF THESE QUESTIONS

22    THAT YOU ARE ASKING ON THIS PATH."

23              AND THEN THERE'S A QUESTION.  SO NUMBER

24    ONE, I THINK HE OPENED THE DOOR BY HIS QUESTION,

25    BUT AT THE VERY LEAST, BY TAKING THE PASSAGE OF THE
```

1    DEPOSITION OUT OF CONTEXT AND NOT ALLOWING, NOT

2    PROVIDING THE COMPLETE TESTIMONY FROM DR. WINER,

3    HE'S OPENED THE DOOR TO COMPLETENESS OF THAT

4    PASSAGE.  AND THAT PASSAGE DOES DISCUSS THE

5    TESTIMONY THAT YOUR HONOR HAD EXCLUDED THIS MORNING

6    ON THE GROUND THAT MR. VERHOEVEN CITED.

7            THE COURT:  SO WHAT ARE YOU SEEKING TO

8    GET IN?  JUST THIS LINES 8 THROUGH 9 UNDER THE RULE

9    OF COMPLETENESS?  OR YOU'RE TRYING TO GET IN THAT

10   POWERPOINT THAT I EXCLUDED THIS MORNING?  OR LAST

11   NIGHT?

12           MR. JACOBS:  THE POWER -- THE ANSWER IS

13   THE LATTER BECAUSE THE SLIDE IS THE TESTIMONY THAT

14   HE WAS REFERRING TO IN THIS PASSAGE.

15           THAT TESTIMONY IS REFERRED TO AT GREATER

16   LENGTH, I BELIEVE, IN THE REST OF -- ELSEWHERE IN

17   THE TRANSCRIPT, AND WE CAN CONFIRM THAT.

18           BUT IN ANY CASE, I DO HAVE A QUESTION OR

19   TWO ABOUT THE BASIS FOR THIS TESTIMONY IN THE

20   DEPOSITION.

21           THE COURT:  WELL, I EXCLUDED IT.  I KNOW

22   THAT YOUR POSITION IS THAT IT WAS IN HIS EXPERT

23   REPORT.

24           MR. JACOBS:  CORRECT, YOUR HONOR.

25           THE COURT:  BUT WHAT'S YOUR RESPONSE TO

```
 1    WHETHER IT'S IN THE CONTENTION INTERROGATORY

 2    RESPONSE?

 3                 MR. JACOBS:  WE'RE NOT REARGUING THAT

 4    POINT, YOUR HONOR.  WE'RE ONLY REARGUING THAT

 5    MR. VERHOEVEN SHOULD HAVE, ESPECIALLY WHEN WARNED,

 6    LET MATTERS LIE AND NOT ASK THIS WITNESS A QUESTION

 7    WHICH, TO ANSWER TRUTHFULLY UNDER OATH, HE MIGHT --

 8    AS YOUR HONOR SAID, IT'S MISLEADING TO THE JURY.

 9                 MR. VERHOEVEN:  YOUR HONOR, IF YOU LOOK

10    AT THE ACTUAL TESTIMONY, THIS IS NOT HIM CLARIFYING

11    HIS ANSWER.  THIS IS SEVERAL QUESTIONS LATER.

12                 THE COURT:  WELL, LET ME GO AHEAD AND SEE

13    THE QUESTIONS IN BETWEEN, PLEASE.  CAN YOU SCROLL

14    IT UP TO THE PREVIOUS PAGE.

15                 MR. VERHOEVEN:  I CAN HAND UP THE --

16                 THE COURT:  OKAY.  THAT WOULD BE EVEN

17    BETTER.

18                 MR. VERHOEVEN:  I JUST WON'T HAVE A COPY

19    MYSELF.

20                 THE COURT:  I'LL GIVE IT BACK TO YOU.  I

21    JUST WANT TO TAKE A QUICK LOOK.

22                 SO I'VE HIGHLIGHTED, FOR YOUR REFERENCE,

23    YOUR HONOR, I'VE HIGHLIGHTED THE QUESTION AND

24    ANSWER WE PLAYED.

25                 THE COURT:  ALL RIGHT.  THANK YOU.
```

1          AND IT GOES TO WHAT PAGE?  WHAT PAGE IS

2     THE ONE YOU JUST SHOWED, MR. JACOBS?  WHAT'S THE

3     PAGE YOU JUST SHOWED?

4          MR. JACOBS:  WHAT I SHOWED WAS 36, YOUR

5     HONOR.

6          THE COURT:  ALL RIGHT.  HANG ON.  I'M ON

7     35, PAGE 35, LINE 7 THROUGH 15.

8          (PAUSE IN PROCEEDINGS.)

9          MR. JACOBS:  SO ACTUALLY, NOW THAT I LOOK

10    AT IT, I SEE THE SOURCE EVEN OF WHY THIS WAS

11    COMPLETELY MISLEADING.

12         THE QUESTION WAS, ON 35, HAVE PEOPLE

13    BOUGHT APPLE DEVICES THINKING THEY'RE SAMSUNG

14    DEVICES, WHICH IS, OF COURSE, NOT A RELEVANT

15    QUESTION TO BEGIN WITH.

16         BUT IN THE NEXT PASSAGE HE IS ASKED,

17    SAMSUNG DEVICES THINKING THEY'RE APPLE DEVICES.

18         THE COURT:  ALL RIGHT.  WELL, I THINK THE

19    RULE OF COMPLETENESS, HAVING REVIEWED PAGES 34,

20    LINE 19, HE IS ASKED IN THAT, LINE 19 THROUGH LINE

21    25, ABOUT WHETHER CONSUMERS OUT IN THE REAL WORLD

22    HAVE BOUGHT SAMSUNG DEVICES THINKING THEY'RE APPLE

23    DEVICES.

24         BUT I THINK FOR THE RULE OF

25    COMPLETENESS --

1563

```
1            MR. VERHOEVEN:  CAN I LOOK AT YOUR

2    TRANSCRIPT WITH YOU?

3            THE COURT:  ALL RIGHT.  THIS IS WHAT I'M

4    GOING TO ALLOW I THINK FOR THE RULE OF

5    COMPLETENESS.

6            YOU HAVE PAGE 35, LINES 7 THROUGH 15 WAS

7    THE VIDEO DEPOSITION THAT WAS ALREADY SHOWN.

8            I THINK RULE OF COMPLETENESS GOES FROM

9    35, LINE 16 -- WHAT ABOUT THROUGH 37, LINE 9 AND

10   THAT'S IT?  YOU DON'T GET ANYTHING ELSE IN.

11           MR. JACOBS:  UNDERSTOOD, YOUR HONOR.

12           THE COURT:  LET ME GIVE THIS BACK TO --

13   DO YOU HAVE ONE, MR. VERHOEVEN?  I DON'T WANT TO

14   TAKE YOURS.

15           MR. VERHOEVEN:  I FOUND ANOTHER ONE.

16           THE COURT:  OKAY.

17           MR. VERHOEVEN:  THAT ONE HAS PROBABLY GOT

18   WORK PRODUCT ON IT, YOUR HONOR.

19           THE COURT:  OH, LET ME GIVE THIS BACK.

20           MR. VERHOEVEN:  JUST DISREGARD IT.

21           THE COURT:  THAT'S IT.  YOU DON'T GET

22   INTO MR. LEE.  YOU DON'T GET IN THAT POWERPOINT.

23   YOU DON'T GET IN HIS DEPOSITION -- WAS HE DEPOSED?

24           MR. JACOBS:  MR. LEE WAS DEPOSED, YES.

25           THE COURT:  OKAY.
```

```
1              MR. JACOBS:  THAT'S WHAT THE WITNESS WAS

2      RELYING ON.

3              THE COURT:  THAT'S RIGHT.  THAT'S THE

4      DEPOSITION.  OKAY.  SO THAT'S THE RULING.

5              NOW, WHAT I'M GOING TO DO, IT'S 3:26.

6      I'M GOING TO CHARGE THIS EQUALLY TO BOTH SIDES.

7              MR. JACOBS:  OH, YOUR HONOR, IF I HAD

8      KNOWN -- WE'RE BEING SO CAREFUL ABOUT TIME.

9              THE COURT:  WELL, LET ME -- I AM NOT --

10     SAMSUNG SEVEN MINUTES.  I'LL CHARGE YOU SIX

11     MINUTES, THREE MINUTES EACH.  IT'S NOT GOING TO --

12             MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

13             THE COURT:  IF IT DOESN'T KILL YOU, IT

14     WON'T HURT YOU, OKAY.  SO SIX MINUTES, IT'S THREE

15     MINUTES EACH.

16             MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

17             THE COURT:  ALL RIGHT.  ALL RIGHT.  SO

18     WHERE ARE WE?  WE'RE BACK IN THE CROSS.  WILL YOU

19     PLEASE BRING IN OUR JURY.  WE'LL GO UNTIL 4:30

20     TODAY.

21             MR. VERHOEVEN:  I HAVE NO FURTHER

22     QUESTIONS AT THIS TIME.  I'LL JUST LET THE JURORS

23     KNOW THAT.

24             THE COURT:  PLEASE, ALL RIGHT.

25             (WHEREUPON, THE FOLLOWING PROCEEDINGS
```

```
 1    WERE HELD IN THE PRESENCE OF THE JURY:)
 2              THE COURT:  ALL RIGHT.  WELCOME BACK.
 3              ALL RIGHT.  MR. VERHOEVEN.  IT'S 3:28.
 4              MR. VERHOEVEN:  YOUR HONOR, I PASS THE
 5    WITNESS AT THIS TIME.
 6              THE COURT:  ALL RIGHT.  MR. JACOBS, YOUR
 7    REDIRECT, 3:28.
 8              MR. JACOBS:  THANK YOU, YOUR HONOR.
 9              THE COURT:  GO AHEAD.
10                     REDIRECT EXAMINATION
11    BY MR. JACOBS:
12    Q   DR. WINER, DURING YOUR CROSS-EXAMINATION, YOU
13    WERE ASKED ABOUT A PORTION OF YOUR DEPOSITION, AND
14    I'D LIKE TO SHOW THE JURY SOME ADDITIONAL PORTIONS
15    OF THAT DEPOSITION.
16              MR. LEE, COULD YOU PUT UP PAGE 35, LINE 7
17    THROUGH 37, LINE 9.  WE'LL JUST GO THROUGH THAT
18    CAREFULLY.
19              SO YOU'LL RECALL, DR. WINER, YOU WERE
20    ASKED ABOUT THIS TESTIMONY WHERE YOU WERE ASKED,
21    "DO YOU BELIEVE THAT CONSUMERS OUT THERE IN THE
22    REAL WORLD HAVE ACTUALLY BOUGHT APPLE DEVICES
23    THINKING THEY ARE SAMSUNG DEVICES?"
24              AND YOU SAID IN YOUR DEPOSITION, "I HAVE
25    NO EVIDENCE OF THAT THAT."
```

```
 1              DO YOU RECALL GOING THROUGH THAT WITH
 2    MR. VERHOEVEN?
 3    A    YES, I DO.
 4    Q    AND THEN IF WE GO A LITTLE BIT AHEAD --
 5              MR. VERHOEVEN:  YOUR HONOR, I THOUGHT
 6    THIS WAS SUPPOSED TO BE READ IN ITS ENTIRETY FOR
 7    COMPLETENESS.
 8              THE COURT:  YES.  DO THE WHOLE THING
 9    THROUGH.  WHAT WAS THAT, PAGE 37?
10              MR. JACOBS:  OKAY.
11    Q    AND THEN YOU WERE ASKED, "DO YOU BELIEVE THAT
12    CONSUMERS OUT THERE IN THE REAL WORLD HAVE ACTUALLY
13    BOUGHT APPLE DEVICES THINKING THEY'RE SAMSUNG
14    DEVICES?"
15              YOU SAID, "I HAVE NO EVIDENCE OF THAT."
16              THEN YOU WERE ASKED, "I'M ASKING ABOUT
17    YOUR BELIEF.  DO YOU BELIEVE IT?"
18              YOU SAID, "I HAVE NO RESPONSE.  I HAVE NO
19    IDEA."
20              "QUESTION:  SO IT'S APPLE CONSUMERS WHO
21    WOULD BE CONFUSED, IS THAT RIGHT, IN YOUR VIEW?
22              "ANSWER:  I THINK THERE IS GENERAL
23    CONFUSION IN THE MARKETPLACE BETWEEN THE PRODUCTS.
24    I AM NOT READY TO STATE EXACTLY WHOSE CONSUMERS
25    HAVE BEEN CONFUSED.
```

1        "QUESTION:  RIGHT NOW I AM ASKING ABOUT

2   PURCHASING.  LET'S FOCUS ON ACTUAL PURCHASING.

3   IT'S YOUR BELIEF THAT APPLE CONSUMERS HAVE BOUGHT

4   SAMSUNG DEVICES THINKING THEY ARE APPLE DEVICES,

5   CORRECT?

6        "ANSWER:  I DON'T KNOW THE ANSWER TO

7   THAT.  I CAN'T RESPOND TO THAT.

8        "QUESTION:  WHO -- WHAT IS THE CLASS OF

9   CONSUMERS WHO YOU BELIEVE HAVE BOUGHT SAMSUNG

10  DEVICES THINKING THEY ARE APPLE DEVICES?  ARE THEY

11  WOULD-BE APPLE PURCHASERS?

12       "ANSWER:  I HAVE -- THE ONLY EVIDENCE I

13  HAVE FROM TESTIMONY THAT I REVIEWED IS THAT SOME

14  INDIVIDUALS BOUGHT A SAMSUNG GALAXY TAB MISTAKENLY

15  THINKING IT WAS AN IPAD AND SUBSEQUENTLY RETURNED

16  IT TO THE STORE AND GOT AN IPAD.  THAT'S THE ONLY

17  DIRECT EVIDENCE I HAVE FOR ANY OF THESE QUESTIONS

18  THAT YOU ARE ASKING ON THIS PATH.

19       "QUESTION:  SO WE HAVE A CLEAR RECORD,

20  THE ONLY EVIDENCE YOU HAVE THAT IN THE REAL WORLD,

21  ANY CONSUMERS HAVE PURCHASED A SAMSUNG PRODUCT

22  BELIEVING THAT IT WAS AN APPLE PRODUCT IS BASED

23  UPON DOCUMENTS RELATING TO BEST BUY RETURNS IN NEW

24  JERSEY; IS THAT TRUE?

25       "ANSWER:  CORRECT.

```
1              "QUESTION:  AND YOU HAVE NOTHING ELSE
2       BEYOND THAT; IS THAT TRUE?
3              "ANSWER:  I HAVE NOT SEEN ANY OTHER
4       REPORT THAT GIVES THAT SUCH EVIDENCE.
5              "QUESTION:  DO YOU HAVE ANY EVIDENCE THAT
6       ANY CONSUMER HAS BOUGHT A SAMSUNG PHONE BELIEVING
7       THAT IT IS AN APPLE PHONE?
8              "ANSWER:  NO, I DON'T."
9              MR. JACOBS:  AND, YOUR HONOR, THAT
10      CONCLUDES THE PORTION THAT, FOR THE RECORD, WE'D
11      READ.
12             THE COURT:  OKAY.
13      BY MR. JACOBS:
14      Q   NOW, I'D LIKE TO DECONFUSE POSSIBLE CONFUSION
15      ABOUT DILUTION AND LIKELY -- AND CONFUSION, AND
16      WHAT I'D LIKE TO DO IS ASK YOU A COUPLE QUESTIONS,
17      DR. WINER, ABOUT WHAT'S REALLY GOING ON HERE.
18             DR. WINER, WHAT'S THIS?
19      A   THAT'S ONE OF THE TWO TABLETS.  I CAN'T TELL
20      YOU.
21      Q   SO LET ME SHOW YOU THE TABLET (HANDING).
22             MAY I, YOUR HONOR?  I'M SORRY?
23             THE COURT:  YES.  MR. VERHOEVEN, DO YOU
24      WANT TO SEE IT?
25             MR. JACOBS:  HE DID.
```

```
1              MR. VERHOEVEN:  I DID, YOUR HONOR, AND

2      IT'S FINE.

3              THE COURT:  OKAY.

4      BY MR. JACOBS:

5      Q    WHAT IS IT?

6      A    IT'S AN IPAD.

7      Q    AND YOU BELIEVE THAT THE IPAD HAS ACQUIRED

8      DISTINCTIVENESS IN THE MARKETPLACE; CORRECT?

9              MR. VERHOEVEN:  OBJECTION, LEADING.

10             THE COURT:  SUSTAINED.

11             MR. JACOBS:  I'M SUMMARIZING HIS

12     TESTIMONY.

13     Q    DO YOU BELIEVE THE IPAD HAS ACQUIRED

14     DISTINCTIVENESS IN THE MARKETPLACE?

15     A    YES, I DO.

16     Q    WHAT DOES THAT MEAN?  WHEN SOMEONE SEES --

17     WHEN YOU SAY THAT A PRODUCT HAS ACQUIRED

18     DISTINCTIVENESS, WHAT DOES THAT MEAN IN TERMS OF

19     WHAT A CONSUMER WOULD THINK ABOUT THIS PRODUCT

20     BEFORE ANOTHER PRODUCT THAT THREATENED DILUTION BY

21     BLURRING ENTERED THE MARKETPLACE?

22     A    I THINK THAT WHAT THAT MEANS IS THAT THE

23     CONSUMERS ASSOCIATE A PARTICULAR TRADE DRESS OR

24     LOOK AND FEEL WITH A PARTICULAR COMPANY THAT MAKES

25     THAT PRODUCT, AND IN THIS CASE THAT WAS APPLE.
```

```
1    Q    NOW, MR. VERHOEVEN HAD ON THE PODIUM ALREADY

2    THIS PRODUCT, WHICH, AS YOU CAN SEE, I DON'T HAVE

3    TO PLAY THE GUESSING GAME, IS THE GALAXY TAB.

4             AND WHEN YOU TALK ABOUT DILUTION BY

5    BLURRING, WHAT ARE YOU SAYING ABOUT THE IMPACT OF

6    THIS PRODUCT BEING ON THE MARKET ON THE

7    DISTINCTIVENESS OF THE APPLE IPAD?

8    A    WHAT I'M SAYING IS THAT THE IMPACT OF THAT

9    COPYING OF THE TRADE DRESS HAS A SUBSTANTIAL IMPACT

10   ON THE INVESTMENT THAT APPLE HAS MADE IN DEVELOPING

11   THE PRODUCTS AND HAS A NEGATIVE IMPACT ON THEIR

12   MARKETING STRATEGY AS A RESULT.

13   Q    AND WHY IS THAT?  WHAT DOES THE EXISTENCE OF

14   THIS PRODUCT, THE SALES OF THIS PRODUCT IN THE

15   MARKET DO TO THE DISTINCTIVENESS -- I'M HOLDING UP

16   THE TAB -- TO THE DISTINCTIVENESS OF THE IPAD?

17   A    IT DIMINISHES IT.

18   Q    NOW, MR. VERHOEVEN ASKED YOU A LOT OF

19   QUESTIONS ABOUT ACTUAL CONFUSION.

20            IS IT YOUR UNDERSTANDING THAT THE TEST

21   FOR INFRINGEMENT REQUIRES THAT THERE BE ACTUAL

22   CONFUSION AT THE POINT OF SALE AT A STORE --

23            MR. VERHOEVEN:  OBJECTION.  LEADING AND

24   ALSO CALLS FOR A LEGAL CONCLUSION.

25            MR. JACOBS:  I DON'T THINK --
```

```
 1                    THE COURT:  SUSTAINED.

 2     BY MR. JACOBS:

 3     Q    WHAT IS YOUR UNDERSTANDING OF THE -- OF

 4     WHETHER ACTUAL CONFUSION AT THE POINT OF SALE IS

 5     REQUIRED IN ORDER FOR THERE TO BE A FINDING OF

 6     LIKELIHOOD OF CONFUSION?

 7     A    I'M AFRAID I DON'T KNOW THE ANSWER TO THAT.

 8     Q    WELL, YOU DISCUSSED THE SCENARIO IN WHICH

 9     SOMEONE IS WALKING DOWN THE STREET, LET'S SAY,

10     HOLDING THIS PRODUCT, MAYBE IT'S ON, MAYBE IT'S

11     OFF?

12     A    YES.

13     Q    AND WHAT DID YOU DESCRIBE THAT AS?

14     A    I CALLED IT THE IMITATOR, IMITATIVE SCENARIO.

15     Q    AND WHAT DID YOU MEAN BY THAT?

16     A    I MEAN THAT SOMEBODY COULD BE WALKING DOWN THE

17     STREET WITH A SAMSUNG GALAXY TAB LOOKING AT THE

18     TRADE DRESS, IF SOMEONE IS USING IT, HAS SEEN IPADS

19     BEFORE, SAY, I LIKE THAT, I LIKE THAT TRADE DRESS,

20     OR LOOK AND FEEL, APPEARANCE, AND THEN GO AND BUY A

21     SAMSUNG GALAXY TAB.

22     Q    AND IS THAT POINT-OF-SALE CONFUSION OR

23     POST-SALE CONFUSION?

24     A    THAT'S POST-SALE CONFUSION.

25                    MR. JACOBS:  THANK YOU VERY MUCH,
```

1        DR. WINER.  NO FURTHER QUESTIONS.

2             THE COURT:  ALL RIGHT.  THE TIME IS NOW

3        3:35.

4             ANY RECROSS?

5             MR. VERHOEVEN:  JUST ABOUT A MINUTE, YOUR

6        HONOR.

7             THE COURT:  OKAY.  GO AHEAD, PLEASE.

8             MR. VERHOEVEN:  CAN WE PUT UP DX

9        1317.109, PLEASE.

10                        **RECROSS-EXAMINATION**

11       BY MR. VERHOEVEN:

12       Q    WELL, LET'S JUST GO TO IT.  I'LL PUT IT UP IN

13       A SECOND.  BRING IT DOWN.  BRING IT DOWN.

14            YOU WERE JUST ASKED ABOUT DILUTION IN THE

15       MARKETPLACE BY COUNSEL FOR APPLE.  DO YOU REMEMBER

16       THAT?

17       A    YES.

18       Q    AND YOU TALKED ABOUT WHEN A PRODUCT HAS A

19       DISTINCTIVE LOOK AND FEEL, IF ANOTHER PRODUCT COMES

20       IN WITH THAT LOOK AND FEEL, IF THE FIRST PRODUCT

21       HAS GOT THAT DISTINCTIVE LOOK AND FEEL, ANOTHER

22       PRODUCT COMES IN, THAT MIGHT DILUTE IT.

23            DO YOU REMEMBER THAT GENERALLY?

24       A    I DO.

25       Q    ALL RIGHT.  LET'S GO TO DX 3917.109.

```
1              HAVE YOU EVER SEEN THE FUJITSU Q550?

2    A    AMONG OTHERS.

3    Q    H-P TOUCHPAD?

4    A    YES.

5    Q    H-P OPAL?

6    A    YES.

7    Q    HAVE YOU SEEN THOSE?

8    A    I SEE THEM ON THE SCREEN.

9    Q    ACER ICONIA.

10   A    I SEE THAT.

11   Q    LG?  G-SLATE?  DO YOU SEE THAT?

12   A    I SEE IT.

13   Q    TOSHIBA THRIVE?  DO YOU SEE THAT?

14   A    YES.

15   Q    THE VIEWPAD 7X?  DO YOU SEE THAT?

16   A    I DO.

17   Q    THE VIZIO TABLET?  DO YOU SEE THAT, SIR?

18   A    YES, I DO.

19   Q    SONY S1?

20   A    I SEE THAT.

21   Q    AND THEN THE ACCUSED PRODUCT, THE GALAXY TAB

22   10.1.  DO YOU SEE THAT?

23   A    YES, I DO.

24   Q    ALL OF THESE TABLETS ARE LARGE, RECTANGULAR

25   SHAPES WITH ROUNDED CORNERS; RIGHT, SIR.
```

1574

```
 1            MR. JACOBS:  OBJECTION, YOUR HONOR.

 2    COMPOUND.

 3            THE COURT:  OVERRULED.

 4            GO AHEAD.

 5            THE WITNESS:  I, I CAN'T SAY YES OR NO.

 6    THESE ARE PICTURES OF THEM.  I DON'T KNOW WHAT

 7    THEIR SIZE IS FROM THESE PHOTOGRAPHS TO GET THEM

 8    ALL ON ONE PAGE.  SO -- I WOULD HAVE TO SAY I DON'T

 9    AGREE WITH THAT.

10    BY MR. VERHOEVEN:

11    Q    SEVERAL OF THEM HAVE SHINY GLASS FLAT FRONT

12    THAT GOES FROM EDGE TO -- LOOK AT THIS TOSHIBA

13    THRIVE.  DO YOU SEE THAT?

14    A    YES.

15    Q    THEY ALL HAVE COLORFUL ROWS OF ICONS IN THERE;

16    RIGHT?

17    A    NOT NECESSARILY.  THE SONY S 1 PICTURE DOESN'T

18    HAVE ANY ICONS.

19    Q    DID YOU DO ANY ANALYSIS OF THE SONY S1 TO SEE

20    IF ITS GOT A COLORFUL ROLL OF ICONS IN ITS

21    APPLICATION SCREEN?

22    A    NO, I DID NOT.

23    Q    DO YOU THINK IT DOESN'T?

24    A    I HAVE NO IDEA.  I DON'T THINK I'VE EVER SEEN

25    ONE.
```

1    Q    HAVE YOU EVER SEEN AN APPLICATION MENU THAT

2    WASN'T A COLORFUL ROW OF ROWS AND COLUMNS OF ICONS,

3    SIR, AND IF SO, CAN YOU TELL ME WHAT IT WAS?

4    A    I, I CAN'T ANSWER THAT.  I HAVEN'T DONE AN

5    EXHAUSTIVE EXPLORATION OF ALL OF THESE TABLETS.

6    YOU MAY BE RIGHT.  YOU MAY BE WRONG.

7              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.  I

8    HAVE NO FURTHER QUESTIONS AT THIS TIME.

9              THE COURT:  ALL RIGHT.  TIME IS 3:38.

10   ANY REDIRECT?

11             MR. JACOBS:  JUST A QUICK MOMENT, YOUR

12   HONOR.

13             THE COURT:  ALL RIGHT.  3:38.  GO AHEAD,

14   PLEASE.

15             (PAUSE IN PROCEEDINGS.)

16             MR. JACOBS:  CAN WE HAVE THAT LAST

17   DEMONSTRATIVE UP AGAIN, PLEASE.

18             MR. LEE, CAN YOU DO A WEB SEARCH FOR THE

19   SONY S1?

20             MR. VERHOEVEN:  YOUR HONOR, IF WE'RE

21   GOING TO BE PULLING UP IMAGES FROM THE WEB THAT

22   HAVEN'T BEEN DISCLOSED, I'LL OBJECT.  WE HAD

23   DISCLOSURE REQUIREMENTS IN THIS CASE FOR BOTH CROSS

24   AND DIRECT.

25             THE COURT:  WHERE IS THIS GOING?

```
 1              MR. JACOBS:  I BELIEVE MR. VERHOEVEN PUT

 2   UP HIGHLY MISLEADING PICTURES OF THE SONY S1.  IN

 3   FACT, IT HAS A SURFACED AND ELABORATED DESIGN TO

 4   IT.  IN FACT, HERE IT IS.

 5              MR. VERHOEVEN:  YOUR HONOR, I PUT UP A

 6   PICTURE FROM AN INTERNAL APPLE DOCUMENT.

 7              FURTHER REDIRECT EXAMINATION

 8   BY MR. JACOBS:

 9   Q    DR. WINER, HAVE YOU SEEN THE SONY S1 BEFORE?

10   A    NO, I HAVE NOT.

11              MR. JACOBS:  THANK YOU.  I HAVE NO

12   FURTHER QUESTIONS, YOUR HONOR.

13              THE COURT:  IT'S 3:39.  ANY RECROSS?

14              MR. VERHOEVEN:  NO, YOUR HONOR.

15              THE COURT:  MAY THIS WITNESS BE EXCUSED,

16   AND IS IT SUBJECT TO HIS RECALL OR NOT?

17              MR. VERHOEVEN:  SUBJECT TO RECALL, YOUR

18   HONOR.

19              THE COURT:  ALL RIGHT.  YOU'RE SUBJECT TO

20   RECALL.

21              CALL YOUR NEXT WITNESS, PLEASE.

22              MR. JACOBS:  YOUR HONOR, WE CALL MR. HAL

23   PORET.

24              THE CLERK:  RAISE YOUR RIGHT HAND,

25   PLEASE.
```

1          **HAL PORET,**

2    BEING CALLED AS A WITNESS ON BEHALF OF THE

3    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

4    EXAMINED AND TESTIFIED AS FOLLOWS:

5              THE WITNESS:  YES, I DO.

6              THE COURT:  WOULD YOU HAVE A SEAT,

7    PLEASE.

8              AND STATE YOUR NAME AND SPELL IT.

9              THE WITNESS:  HAL, H-A-L, PORET,

10   P-O-R-E-T.

11             THE COURT:  IT'S 3:40.  GO AHEAD.

12             **DIRECT EXAMINATION**

13   BY MR. JACOBS:

14   Q    GOOD AFTERNOON, MR. PORET.  WE'RE GOING TO

15   TALK VERY CLEAR BECAUSE WE'RE ON THE CLOCK.

16   A    GOOD AFTERNOON.

17   Q    WHAT DID WE ASK YOU TO DO IN THIS CASE?

18   A    TO DESIGN AND CONDUCT CONSUMER SURVEYS TO

19   DETERMINE WHETHER OR NOT THE IPHONE AND THE IPAD

20   TRADE DRESS HAVE ACQUIRED SECONDARY MEANING.

21   Q    WHAT DO YOU MEAN BY THAT?

22   A    SECONDARY MEANING WOULD MEAN THAT THE OVERALL

23   LOOK OF THESE PRODUCTS HAS BECOME KNOWN TO

24   CONSUMERS SO THAT WHEN THEY SEE THE LOOK OF THE

25   PRODUCT, THEY CAN TELL IT'S AN APPLE PRODUCT.

1    Q    WHAT DID YOU CONCLUDE FROM YOUR SURVEYS?

2    A    I CONCLUDED THAT BOTH THE IPHONE AND THE IPAD

3    TRADE DRESS HAVE ACQUIRED SECONDARY MEANING AMONG

4    CONSUMERS.

5    Q    CAN YOU TELL THE JURY A LITTLE BIT ABOUT YOUR

6    BACKGROUND, PLEASE?

7    A    YES.  I HAVE A BACHELOR'S IN MATH FROM UNION

8    COLLEGE; A MASTER'S IN MATH FROM THE STATE

9    UNIVERSITY OF NEW YORK AT ALBANY; AND A J.D. FROM

10   HARVARD.

11             AND I AM CURRENTLY A SENIOR

12   VICE-PRESIDENT AT ORC INTERNATIONAL, WHICH IS A

13   MARKET RESEARCH FIRM.

14   Q    HAVE YOU CONDUCTED SURVEYS, SURVEYS OF THIS

15   GENERAL TYPE, BEFORE?

16   A    YES, I HAVE.

17   Q    HOW MANY DO YOU THINK YOU'VE DONE?

18   A    I'VE DONE BETWEEN 500 AND 500 CONSUMER SURVEYS

19   ACROSS A NUMBER OF AREAS, AND A LOT OF THOSE

20   SURVEYS RELATE TO TRADEMARKS OR TRADE DRESS OR

21   ADVERTISING.

22   Q    LET'S TALK ABOUT YOUR PHONE-RELATED SURVEY

23   FIRST.

24             WHAT WAS YOUR GOAL IN CONDUCTING THE

25   PHONE-RELATED SURVEY?

1     A     IT WAS TO DETERMINE WHETHER OR NOT THE, THE

2     TRADE DRESS OF THE IPHONE IN GENERAL, AND THE

3     SPECIFIC IPHONE 3G TRADE DRESS HAD A ACQUIRED

4     SECONDARY MEANING AMONG MOBILE PHONE PURCHASERS.

5     Q     AND REMIND THE JURY AGAIN WHAT SECONDARY

6     MEANING MEANS, PLEASE?

7     A     IT WOULD BASICALLY MEANS THAT PEOPLE HAVE COME

8     TO KNOW THE LOOK OF THE IPHONE AND SO THAT WHEN

9     THEY WOULD LOOK AT IT, THEY WOULD BE ABLE TO TELL

10    THAT IT'S AN APPLE PRODUCT OR AN IPHONE JUST FROM

11    THE OVERALL APPEARANCE OF IT.

12    Q     LET'S TURN TO PLAINTIFF'S EXHIBIT PX 23.  IT

13    SHOULD BE IN YOUR BINDER.

14    A     OKAY.

15    Q     AND WHAT IS PX 23?

16    A     THIS CONTAINS THE IMAGES OF BOTH SMARTPHONES

17    AND TABLETS THAT WERE SHOWN TO VARIOUS GROUPS OF

18    CONSUMERS IN THE VARIOUS SURVEYS.

19    Q     SO LET'S FOCUS ON THE PHONE FOR A MOMENT.

20              BUT, YOUR HONOR, WE MOVE PX 23 INTO

21    EVIDENCE.

22              THE COURT:  ANY OBJECTION?

23              MR. PRICE:  NO OBJECTION.

24              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

25              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

```
 1              23, HAVING BEEN PREVIOUSLY MARKED FOR

 2              IDENTIFICATION, WAS ADMITTED INTO

 3              EVIDENCE.)

 4      BY MR. JACOBS:

 5      Q    SO I THINK YOU USED THE WORD STIMULI.  IS THAT

 6      CORRECT, MR. PORET?

 7      A    YES, WE WOULD CALL WHAT WE SHOWED THE SURVEY

 8      RESPONSE STIMULI.

 9      Q    WHAT DO YOU MEAN BY THAT?

10      A    IT MEANS THIS IS WHAT THEY ACTUALLY SAW WHEN

11      THEY WERE TAKING THE SURVEY AND WHAT THEY WERE

12      QUESTIONED ABOUT.

13      Q    CAN YOU EXPLAIN THE STIMULUS HERE.  IT'S NOT

14      ACTUALLY A PICTURE OF AN IPHONE AS ONE WOULD

15      ORDINARILY ENCOUNTER IT.  WHY IS THAT?

16      A    IN THIS INSTANCE, THIS IS AN IPHONE 3G, WHICH

17      SHOWS THE OVERALL APPEARANCE OF IT, BUT WHAT YOU

18      CAN SEE IS THAT WE BLURRED THE SPECIFIC ICONS SO

19      THAT NOBODY WOULD BE ABLE TO TELL THAT THIS IS AN

20      IPHONE JUST BY LOOKING AT A SPECIFIC ICON LIKE, FOR

21      INSTANCE, AN ITUNES ICON, AND WE'VE ALSO COVERED UP

22      THE HOME BUTTON THAT APPEARS IN THE BOTTOM CENTER

23      SO THAT WE'RE TESTING THE OVERALL APPEARANCE OF THE

24      PHONE AND NOT LETTING A SPECIFIC ICON OR THE HOME

25      BUTTON INFLUENCE THE RESULTS.
```

1    Q    COULD WE SEE THE NEXT PAGE, PLEASE, 23.3,

2    MR. LEE.

3             AND WHAT'S THIS, WHAT'S THE DIFFERENCE

4    BETWEEN 2 AND 3, MR. PORET?

5    A    ONE GROUP SAW THE PREVIOUS ONE AND ONE GROUP

6    SAW THIS ONE.  THE ONLY DIFFERENCE IS THAT THE

7    ICONS HAVE BEEN RANDOMLY SCRAMBLED IN TERMS OF

8    THEIR ORDER, AND THAT WAS REALLY JUST TO CONTROL TO

9    MAKE SURE THAT THE ICONS WERE NOT IMPACTING THE

10   RESULTS.

11   Q    NOW, LET'S LOOK AT THE NEXT TWO PAGES OF THIS

12   EXHIBIT, 23.4 AND 23.5.

13             WHAT ARE THESE IMAGES?

14   A    THESE ARE IMAGES THAT WERE SHOWN TO TWO OTHER

15   GROUP NOTICE SURVEY, AND THE SILVER BEZEL THAT'S

16   PART OF THE IPHONE 3G TRADE DRESS HAS BEEN REMOVED.

17             SO THESE GROUPS WERE TESTING THE

18   PERCEPTION OF THE GENERAL IPHONE APPEARANCE WITHOUT

19   THE BEZEL THAT IS SPECIFICALLY PART OF THE 3G TRADE

20   DRESS.

21   Q    NOW, DID YOU GIVE -- DID YOU HAVE ANY OTHER

22   STIMULI?  DID YOU TEST ANY OTHER IMAGES?

23             LET'S TAKE A LOOK AT 6 AND 7?

24   A    YES.  THERE WERE TWO OTHER IMAGES, EACH OF

25   WHICH WAS SHOWN TO A CONTROL GROUP.

1    Q    SO CAN YOU EXPLAIN WHY YOU USE CONTROLS WHEN

2    YOU DO YOUR SURVEY?

3    A    YEAH.  A CONTROL IS LIKE A PLACEBO IN A

4    MEDICAL EXPERIMENT.  YOU'RE GOING TO HAVE ONE GROUP

5    THAT HAS SEEN AN IPHONE AND THEY'VE BEEN ASKED

6    QUESTIONS ABOUT THE IPHONE, AND IF THEY SAY THAT

7    THEY ASSOCIATE THE LOOK OF THAT WITH ONLY APPLE,

8    YOU WANT TO MAKE SURE THAT THEY'RE NOT SIMPLY

9    GUESSING APPLE BECAUSE IT'S A WELL-KNOWN BRAND OR

10   THAT THEY'RE JUST ASSUMING THAT ANY SMARTPHONE WITH

11   A BUNCH OF ICONS IS AN IPHONE.

12          AND THE WAY THAT YOU DO THAT IS THAT YOU

13   SHOW A DIFFERENT GROUP OF PEOPLE A SMARTPHONE WITH

14   A BUNCH OF ICONS LIKE THIS AND YOU ASK THEM THE

15   SAME QUESTIONS AND YOU SEE IF THEY STILL NAME

16   APPLE.

17          AND IF THEY DON'T, OR IF IT'S A MUCH

18   LOWER RATE, THEN YOU KNOW THAT YOUR RESULTS IN THE

19   OTHER GROUPS ARE RELIABLE.

20   Q    AND HOW DID YOU CONDUCT THIS SURVEY?

21   A    THIS WAS AN ON-LINE SURVEY, WHICH IS A VERY

22   COMMON STANDARD FORM OF SURVEY IN MARKET RESEARCH

23   TODAY.

24          SO THE RESPONSIBLE DEPARTMENTS WERE

25   SEEING AN IMAGE OF A PHONE ON A COMPUTER SCREEN AND

```
 1    THEY WERE ANSWERING THE QUESTIONS SCREEN BY SCREEN
 2    THROUGH A WEBSITE.
 3    Q    AND ARE THE VARIOUS WAYS TO CONTROL THE
 4    QUALITY, FOR THE QUALITY OF AN ON-LINE SURVEY LIKE
 5    THIS?
 6    A    YES, THERE ARE A NUMBER OF STANDARD PROCEDURES
 7    TO ENSURE THE QUALITY OF IT.
 8    Q    AND WERE THOSE USED HERE?
 9    A    YES.
10    Q    NOW, ONCE A RESPONDENT, A SURVEY RESPONDENT
11    SAW ONE OF THESE PICTURES, WHAT WERE THEY ASKED?
12    A    THEY WERE FIRST ASKED, HAVE YOU EVER SEEN A
13    MOBILE PHONE WITH AN APPEARANCE LIKE THIS ONE?
14         AND IF THEY SAID YES, THEY WERE THEN
15    ASKED WHETHER OR NOT THEY ASSOCIATE THE OVERALL
16    APPEARANCE OF THE PHONE WITH ANY PARTICULAR BRAND
17    OR COMPANIES.
18         AND IF THEY SAID, YES, I DO, THEN THEY
19    WERE ASKED, DO YOU ASSOCIATE THE OVERALL APPEARANCE
20    OF THE PHONE WITH ONLY ONE BRAND OR COMPANY OR WITH
21    MORE THAN ONE, OR IF THEY HAVE NO OPINION, AND IF
22    THEY SAID I ASSOCIATE THE APPEARANCE OF THE PHONE
23    WITH ONLY ONE COMPANY OR BRAND, THEY WERE THEN
24    ASKED WHAT BRAND OR COMPANY.
25    Q    BY THE WAY, WHEN WAS THIS SURVEY CONDUCTED?
```

1584

1    A    IN JUNE OF 2011.

2    Q    NOW, LET'S TAKE A LOOK AT, MR. LEE, PDX 30.2.

3    AND YOU REFERRED TO THIS QUESTION EARLIER.  CAN YOU

4    JUST AGAIN EXPLAIN TO THE JURY THE RESPONSE OF THIS

5    PARTICULAR QUESTION.

6    A    FOR THE PEOPLE WHO HAVE INDICATED THAT THEY DO

7    RECOGNIZE THE LOOK OF THE PHONE AND ASSOCIATE IT

8    WITH ONLY ONE COMPANY, THIS WAS THE QUESTION WHERE

9    WE ASKED THEM, WHAT IS THAT COMPANY OR BRAND THAT

10   THEY ASSOCIATE THE APPEARANCE OF THE PHONE WITH.

11   Q    NOW LET'S LOOK AT PDX 30.3.

12        AND DOES THIS SLIDE ACCOUNT FOR THE

13   RESULTS OF YOUR SURVEY?

14   A    YES.

15   Q    CAN YOU DESCRIBE THOSE RESULTS FOR THE JURY,

16   PLEASE?

17   A    YES.  AMONG THE GROUPS WHO SAW THE IPHONE 3G

18   TRADE DRESS WITH THE SILVER BEZEL, 68 PERCENT OF

19   THEM ANSWERED THAT THEY ASSOCIATE THE OVERALL

20   APPEARANCE OF THAT PHONE WITH ONLY ONE COMPANY, OR

21   BRAND, AND NAMED APPLE OR IPHONE.

22        AND IN THE CASE OF THOSE WHO SAW THE

23   IPHONE GENERAL TRADE DRESS WITHOUT THE BEZEL, IT

24   WAS 61 PERCENT.

25   Q    AND THEN YOU SUBTRACTED THE, THE PLACEBO

1    RESPONDENTS, RIGHT, THE CONTROL RESPONDENTS?

2    A    YES.  WHAT YOU CAN SEE IS BETWEEN THE TWO

3    CONTROL GROUPS, THE AVERAGE AS ONLY 3.7 PERCENT WHO

4    SAID THEY ASSOCIATED THE LOOK OF ANY OF THOSE WITH

5    APPLE, AND WHAT THAT SHOWS YOU IS THAT SINCE THAT'S

6    THE 68 PERCENT AND THE 61 PERCENT NUMBERS ARE SO

7    MUCH HIGHER, THAT THOSE RELIABLY MEASURED

8    RECOGNITION AND ASSOCIATION WITH APPLE AND CAN'T BE

9    DISMISSED AS, AS GUESSING.

10   Q    AND WHAT IS YOUR BOTTOM LINE ABOUT THE RESULTS

11   OF THIS SURVEY IN TERMS OF THE QUESTION WE ASKED

12   YOU TO LOOK AT?

13   A    THESE ARE HIGH PERCENTAGES THAT INDICATE THAT

14   THE IPHONE TRADE DRESS HAS A VERY HIGH LEVEL OF

15   RECOGNITION AND ASSOCIATION WITH ONLY APPLE,

16   MEANING IT HAS ACQUIRED SECONDARY MEANING.

17   Q    NOW LET'S TALK ABOUT YOUR TABLET SURVEY.

18        WHAT WAS THE GOAL OF YOUR TABLET SURVEY?

19   A    IT WAS TO DETERMINE WHETHER OR NOT THE IPAD

20   TRADE DRESS HAS ACQUIRED SECONDARY MEANING.

21   Q    LET'S GO BACK TO PX 23 IN YOUR BINDER.  AND

22   LET'S LOOK AT 23.8 AND 23.9.

23        WHAT DO THESE REPRESENT?

24   A    SO AS WITH THE PHONE SURVEY, THERE WERE

25   SEVERAL GROUPS IN THIS SURVEY, AND THESE WERE THE

1    IMAGES OF IPADS THAT WERE SHOWN TO TWO OF THE

2    SURVEY GROUPS.

3              AND, AGAIN, YOU WILL SEE THAT THE ICONS

4    HAVE BEEN BLURRED SO THAT YOU CAN'T SEE WHAT THE

5    SPECIFIC ICONS ARE, AND THAT THE HOME BUTTON THAT

6    WOULD BE IN THE BOTTOM CENTER HAS BEEN COVERED SO

7    THAT THE SURVEYS ARE TESTING THE PERCEPTION OF THE

8    OVERALL TRADE DRESS AND NOT INFLUENCED BY WHAT THE

9    SPECIFIC ICONS ARE OR THE HOME BUTTON.

10   Q    AND LET'S LOOK AT 23.10 AND.11.

11             WHAT ARE THESE IMAGES?

12   A    THESE ARE IMAGES THAT WERE SHOWN TO TWO OTHER

13   GROUPS.  AGAIN, EACH GROUP ONLY SAW ONE IMAGE, AND

14   THESE TESTED A DIFFERENT VIEW OF THE IPAD TRADE

15   DRESS WHICH YOU CAN SEE IS SHOWN FROM AN ANGLE AND

16   ALSO HAD TO BE -- THE HOME BUTTON VISIBLE, AND IN

17   THE CASE OF THE PREVIOUS SLIDE ALSO HAD THE ICONS

18   VISIBLE.

19   Q    NOW, WHAT DID YOU -- DID YOU -- I'M SORRY.

20   WHY DID YOU USE THIS SECOND SET OF IMAGES?

21   A    BECAUSE WE ALREADY HAD ONE GROUP THAT WAS

22   MEASURING WHETHER THERE WAS SECONDARY MEANING EVEN

23   WHEN THE ICONS AND THE BUTTON WERE COVERED, AND IT

24   WAS OF INTEREST TO SEE WHAT THE LEVELS WOULD BE

25   WHEN YOU SHOWED IT FROM A DIFFERENT VIEW LIKE THIS.

1   Q    NOW, DID YOU USE CONTROLS IN YOUR IPAD-RELATED

2   SURVEY?

3   A    YES.

4   Q    AND WHAT WAS YOUR CONTROL?

5   A    THE CONTROL WAS THE BODY OF A NOOK TABLET WITH

6   A FIELD OF ICONS IN THE MIDDLE.

7   Q    SO LET'S LOOK AT 23.12, 23.13, AND 23.14.

8        THIS WAS YOUR CONTROL, SIR?

9   A    YES.  THESE WERE THREE DIFFERENT GROUPS, EACH

10  OF WHICH SAW ONE OF THESE CONTROLS TO PARALLEL THE

11  TEST GROUPS THAT WE SAW WITH THE DIFFERENT VIEWS OF

12  THE IPAD.

13  Q    WHY DID YOU THINK THESE WERE GOOD CONTROLS?

14  A    THEY'RE GOOD CONTROLS BECAUSE THEY CLEARLY

15  LOOK LIKE A TABLET AND THEY HAVE A FIELD OF ICONS

16  VISIBLE ON THE SCREEN.  SO IF THERE IS ANY TENDENCY

17  OF RESPONDENTS TO SIMPLY GUESS THAT ANY TABLET WITH

18  A BUNCH OF ICONS IS AN IPAD, THEN THESE CONTROLS

19  WOULD REVEAL THAT KIND OF GUESSING.

20  Q    SINCE IT MAY NOT BE ENTIRELY VISIBLE, CAN YOU

21  DESCRIBE THE NOOK A LITTLE BIT -- MAYBE WE COULD

22  DIM THE LIGHTS FOR JUST A MOMENT.

23        CAN YOU DESCRIBE WHAT THE FRAME OF THE

24  NOOK IS LIKE AS COMPARED WITH AN IPAD?

25  A    IT -- YOU KNOW, IT'S RECTANGULAR.  IT'S

1    SOMEWHAT OF A DIFFERENT OVERALL SHAPE IN THAT IT'S,

2    IT'S THICKER ON THE BOTTOM THAN IT IS ON THE TOP,

3    AND THE GENERAL OVERALL LOOK OF IT IS DIFFERENT

4    FROM THE IPAD.

5    Q    NOW, ONCE THE RESPONDENTS SAW ONE OF THESE

6    IMAGES, WHAT WERE THEY ASKED?

7    A    THEY WERE ASKED THE SAME QUESTIONS THAT I

8    DESCRIBED ABOUT, IN THE PHONE SURVEY, ACCEPT THEY

9    WERE ASKED ABOUT TABLETS INSTEAD OF PHONES.

10   Q    SO LET'S LOOK AT PDX 30.4.  THAT'S THE SAME

11   QUESTION ABOUT ASSOCIATION THAT YOU ASKED IN

12   CONNECTION WITH THE PHONE SURVEY; CORRECT?

13   A    YES.  THIS WOULD BE THE FINAL QUESTION, OR ONE

14   OF THE FINAL QUESTIONS FOR THE PEOPLE WHO SAID THEY

15   DID ASSOCIATE THE LOOK OF THE TABLET WITH ONLY ONE

16   COMPANY OR BRAND, AND THEN WE ASKED THEM WHICH

17   COMPANY OR BRAND.

18   Q    AND NOW LET'S LOOK AT THE RESULTS OF THIS

19   SURVEY.

20          AND CAN YOU DESCRIBE THOSE RESULTS FOR

21   THE JURY, PLEASE?

22   A    YES.  IN THE GROUPS THAT SAW THE FIRST VIEW OF

23   THE IPAD HEAD ON WITH THE ICONS BLURRED AND THE

24   HOME BUTTON COVERED, 57.3 PERCENT ANSWERED THAT

25   THEY ASSOCIATED THE LOOK OF THE TABLET ONLY WITH

1    APPLE OR IPAD.

2           AND IN THE GROUPS THAT SAW THE OTHER VIEW

3    AT AN ANGLE AND WITH THE HOME BUTTON VISIBLE, IT

4    WAS 75.2 PERCENT THAT ANSWERED THEY ASSOCIATED THE

5    LOOK OF THAT ONLY WITH APPLE OR IPAD.

6    Q    AND THEN ON THE CONTROLS, CAN YOU JUST EXPLAIN

7    THE RESULTS YOU GOT THERE?

8    A    YES.  AGAIN, THE RESULTS WERE ONE OF THEM FOR

9    THE HEAD-ON VIEW WAS 17 PERCENT AND FOR THE OTHER

10   WAS 10.8 PERCENT.

11          SO DRAMATICALLY LOWER THAN THE GROUPS

12   THAT SAW THE IPADS.

13   Q    AND WHAT WAS THE NET ASSOCIATION THERE?

14   A    SO THE NET ASSOCIATION, IF YOU SUBTRACT THE 73

15   FROM THE 57.3 IS 40.3 PERCENT.  AND IF YOU SUBTRACT

16   10.8 FROM THE 75.2, YOU GET 64.4 PERCENT.

17          SO THE FACT THAT THE RESULTS FOR THE IPAD

18   EXCEED THE CONTROL RESULTS BY SUCH A LARGE MARGIN

19   SHOW YOU THAT THE 57.3 AND 75.2 RESULTS DO

20   REPRESENT GENUINE ASSOCIATION OF THE SPECIFIC -- OF

21   THE IPAD AND NOT JUST SIMPLY GUESSING THAT ANY

22   TABLET WITH SOME ICONS IN AN IPAD.

23   Q    AND BOTTOM LINE, AGAIN, WHAT DOES THIS SURVEY

24   CONVEY TO YOU BASED ON YOUR EXPERIENCE IN THE

25   FIELD?

```
 1    A    IT SHOWS THAT THE OVERALL APPEARANCE OF THE

 2    IPAD HAS -- IS HIGHLY KNOWN BY CONSUMERS AND THEY

 3    ASSOCIATE THE LOOK OF IT ONLY WITH APPLE, EVEN

 4    WITHOUT BEING ABLE TO SEE THE ICONS OR THE HOME

 5    BUTTON.

 6    Q    AND THEN DID YOU DO ANYTHING ELSE TO FIGURE

 7    OUT -- SORRY.  WHEN WAS THE TABLET SURVEY

 8    CONDUCTED?

 9    A    I BELIEVE IT WAS JUNE INTO JULY OF 2011.

10    Q    AND DID YOU DO ANYTHING ELSE TO ASSESS WHEN IN

11    THE TIMELINE OF THE RELEASE OF THESE PRODUCTS

12    CONSUMERS BEGAN TO ASSOCIATE THE TRADE DRESS OF THE

13    TABLET WITH APPLE?

14    A    YES.  YOU CAN'T EXPECT PEOPLE TO REMEMBER

15    EXACTLY THINGS LIKE THIS, BUT WE ASKED PEOPLE, TO

16    THE BEST OF THEIR, THE BEST OF THEIR RECOLLECTION,

17    OF THE PEOPLE WHO DID SAY THEY ASSOCIATED THE LOOK

18    OF ONE OF THE PRODUCTS WITH APPLE, WE ASKED THEM,

19    YOU KNOW, TO THE BEST OF THEIR MEMORY, WHEN DID

20    THEY FIRST COME TO ASSOCIATE THIS LOOK WITH APPLE,

21    AND IN BOTH THE PHONE AND THE TABLET SURVEYS, IT

22    WAS THE LARGE MAJORITY OF THOSE RESPONDENTS SAID

23    THAT THEY CAME TO ASSOCIATE THESE LOOKS WITH APPLE

24    PRIOR TO THE TIME THAT THE SAMSUNG PRODUCTS CAME ON

25    THE MARKET.
```

```
 1              MR. JACOBS:  THANK YOU VERY MUCH,
 2   MR. PORET.
 3              I HAVE NO FURTHER QUESTIONS, YOUR HONOR.
 4              THE COURT:  ALL RIGHT.  3:56, PLEASE GO
 5   AHEAD WITH THE CROSS.
 6              MR. PRICE:  YOUR HONOR, BEFORE MY TIME
 7   STARTS, COULD YOU READ THE LIMITING INSTRUCTION
 8   CONCERNING FAME?
 9              THE COURT:  AH.  ONE SECOND, PLEASE.
10              NOW, AS FOR PX 23, AND PX 30.2, AND 30.5,
11   THE 30.2 WAS THE QUESTION THAT WAS ASKED IN THE
12   SURVEY, 30.5 -- OH, THROUGH 30.5.
13              SO THOSE WERE ACTUALLY THE SURVEY RESULTS
14   AND THE QUESTIONS THAT WERE ASKED IN THE SURVEY, AS
15   WELL AS PX 23, WHICH IS ALL OF THOSE COPIES OF THE
16   PHONES AND THE TABLETS THAT WERE ACTUALLY USED IN
17   THE SURVEY, BOTH AS CONTROL AND OTHERWISE, YOU MAY
18   CONSIDER THIS SURVEY AS EVIDENCE THAT APPLE DESIGNS
19   HAVE ACQUIRED SECONDARY MEANING, BUT YOU MAY NOT
20   CONSIDER THE SURVEY AS EVIDENCE THAT THE APPLE
21   DESIGNS ARE FAMOUS.
22              ALL RIGHT.  GO AHEAD, PLEASE.
23              MR. PRICE:  THANK YOU, YOUR HONOR.
24                    **CROSS-EXAMINATION**
25   BY MR. PRICE:
```

1592

```
1    Q    LET ME MAKE SURE I GET THE -- BY THE WAY, I'M

2    BILL PRICE.  AND I WANT TO MAKE SURE I HAVE YOUR

3    PRONUNCIATION CORRECTLY.  IS IT PORET?

4    A    YES.

5    Q    THANK YOU.  FIRST OF ALL, LET ME CLARIFY WHAT

6    YOU ARE NOT DOING HERE.

7              THESE STUDIES ARE NOT TRYING TO STUDY

8    CONFUSION AMONG CONSUMERS; CORRECT?

9    A    CORRECT.

10   Q    AND BASED ON THE SURVEYS YOU DID, YOU CAN'T

11   MAKE A CONCLUSION ABOUT WHETHER OR NOT CONSUMERS

12   ARE CONFUSED; RIGHT?

13   A    RIGHT.

14   Q    INSTEAD, WHAT YOU'RE LOOKING AT IS SOMETHING

15   CALLED SECONDARY MEANING; RIGHT?

16   A    YES.

17   Q    AND THAT'S SORT OF A LEGAL TERM IN SOME WAYS

18   WHICH YOU TRIED TO EXPLAIN TO THE JURY; RIGHT?

19   A    YES.

20   Q    OKAY.  SO -- AND YOU'RE TALKING ABOUT

21   SECONDARY MEANING ASSOCIATED WITH APPLE'S CLAIMED

22   TRADE DRESS; RIGHT?

23   A    YES.

24   Q    SO LET ME ASK YOU ABOUT THAT.

25              NOW, APPLE'S CLAIMED TRADE DRESS, THE
```

1593

```
 1    ELEMENTS OF THAT WERE DESCRIBED TO YOU BY SOMEONE;
 2    CORRECT?
 3    A    YES.  OR READ IN THE COMPLAINT.
 4    Q    SO IT WASN'T A SITUATION WHERE YOU DID A STUDY
 5    TO FIND OUT WHAT IS APPLE'S TRADE DRESS; CORRECT?
 6    YOU JUST ACCEPTED WHAT WAS EITHER DESCRIBED TO YOU
 7    OR WHAT YOU READ IN A COMPLAINT; RIGHT?
 8    A    NO, THAT'S NOT REALLY RIGHT.
 9    Q    SO DID YOU ACTUALLY DO SOME SORT OF
10    INDEPENDENT STUDY TO SEE, YOU KNOW, WHAT ELEMENTS,
11    TOTAL ELEMENTS CONSTITUTE APPLE'S TRADE DRESS?
12    A    NO.  BUT THE SURVEY SHOWING THE DEVICES AS
13    THEY ARE, SO IT'S NOT AS IF I HAVE IN ANY WAY
14    DECIDED WHAT TRADE DRESS I'M SHOWING PEOPLE.
15    Q    WELL, FOR EXAMPLE, YOU DID SOME STATISTICAL
16    ANALYSIS ON THE EFFECT OF THE HOME BUTTON ON THE
17    APPLE PRODUCTS; CORRECT?
18    A    I WOULDN'T SAY I DID STATISTICAL ANALYSIS ON
19    THAT.  I WOULD SAY THAT WE DID HAVE TWO GROUPS, ONE
20    OF WHICH DID SEE A VERSION WITH THE IPAD BUTTON AND
21    ONE WITHOUT, SO THERE'S SOME DATA ON THAT.
22    Q    AND THE DATA THAT YOU FOUND SHOWED THAT THERE
23    WAS A HIGH ASSOCIATION OF PEOPLE BEING ABLE TO
24    IDENTIFY AN APPLE PRODUCT JUST BY THAT INDENTED
25    HOME BUTTON; CORRECT?
```

1    A     NO.

2    Q     YOU DIDN'T FIND A HIGH ASSOCIATION BETWEEN THE

3    HOME BUTTON AND BEING ABLE TO IDENTIFY AN APPLE

4    PRODUCT?

5    A     THAT'S NOT WHAT THE RESULTS SHOWED.

6    Q     DID YOU SHOW AN ASSOCIATION?

7    A     YOU MEAN REGARDING THE HOME BUTTON?

8    Q     YES.

9    A     NO.  WHAT, WHAT THE SURVEYS SHOW IS THAT IN

10   THE VERSION WHERE THE HOME BUTTON WAS VISIBLE,

11   THERE WAS A HIGHER RATE OF ASSOCIATION, BUT THAT IS

12   NOT THE ONLY THING THAT WAS DIFFERENT ABOUT THAT

13   IMAGE.  IT WAS ALSO SHOWN AT AN ANGLE THAT MAY HAVE

14   GIVEN PEOPLE A BETTER SENSE OF THE SHAPE AND

15   DIMENSIONS OF THE PRODUCTS.

16   Q     WELL, I'LL GO TO THE, THE DETAILS IN A SECOND,

17   BUT IF WE GO TO, I GUESS IT'S YOUR EXHIBIT, AND --

18   CAN YOU HELP ME OUT HERE.

19           I THINK IT'S 30.5.  DO YOU SEE THAT ON

20   THE RIGHT-HAND SIDE, YOU'VE GOT AN IPAD AND IT'S

21   NOT CLEAR HERE, BUT IN WHAT THE, THE SURVEY PEOPLE

22   COULD SEE, THERE'S A HOME BUTTON ON THAT IPAD;

23   CORRECT?

24   A     YES, THE ONE ON THE RIGHT, YES.

25   Q     AND THERE'S NOT A HOME BUTTON ON THIS TEST

1    WHERE YOU GOT THE 40.3 PERCENT NET ASSOCIATION

2    COMPARED TO THE 64.4; CORRECT?

3    A    YES.

4    Q    AND DO YOU HAVE -- WELL, YOU UNDERSTAND THAT

5    SAMSUNG'S PRODUCTS DON'T HAVE THAT KIND OF UNIQUE,

6    DISTINCTIVE HOME BUTTON LIKE APPLE HAS; CORRECT?

7    A    I BELIEVE THAT'S THE CASE.

8    Q    ALL RIGHT.  SO THAT'S A DISTINCTION BETWEEN

9    THE PRODUCTS; CORRECT?

10   A    I DON'T -- I DON'T KNOW IF YOU'D CHARACTERIZE

11   IT LIKE THAT.

12   Q    WELL, WERE YOU TOLD THAT THAT THE REASON APPLE

13   DID NOT INCLUDE THAT AS BEING AN ELEMENT OF ITS

14   TRADE DRESS IS BECAUSE SAMSUNG IS DIFFERENT FROM

15   APPLE ON THAT UNIQUE IDENTIFYING PART OF APPLE'S

16   PRODUCT?

17   A    NO, I WASN'T TOLD THAT ONE WAY OR THE OTHER.

18   Q    SO YOU WEREN'T GIVEN ANY REASON, IN DOING YOUR

19   SURVEYS, OF WHY APPLE WASN'T CLAIMING WHY THAT HOME

20   BUTTON WAS A DISTINCTIVE PART OF ITS TRADE DRESS

21   WHICH WOULD DISTINGUISH IT FROM OTHER COMPANIES?

22   A    I WAS NOT TOLD WHAT APPLE THINKS OF THE HOME

23   BUTTON.

24   Q    WELL, LET ME ASK YOU ABOUT THE NUMBERS YOU DID

25   PUT TOGETHER, AND THERE'S A -- AND WE CAN TAKE THAT

```
1    DOWN FOR NOW.

2              THERE'S A, A CORRECT PROCEDURE TO FOLLOW

3    TO FIND THE PERCENTAGE OF ASSOCIATION FOR SECONDARY

4    CONSIDERATION; CORRECT?

5    A    SECONDARY MEANING, YES.

6    Q    SECONDARY MEANING.

7              AND THE FIRST THING YOU HAVE TO DO IS

8    IDENTIFY THE RIGHT POPULATION; CORRECT?

9    A    YES.

10   Q    AND YOU AGREE THAT THE RIGHT POPULATION THAT

11   YOU SHOULD ASK QUESTIONS OF IS CONSUMERS WHO

12   PURCHASED IN THE LAST 12 MONTHS OR WERE LIKELY TO

13   PURCHASE IN THE NEXT 12 MONTHS THESE SORTS OF

14   PRODUCTS; CORRECT?

15   A    YEAH, GENERALLY.

16   Q    SO THAT'S LIKE THE TOTAL POPULATION.  AND HOW

17   MANY OF THOSE PEOPLE DID YOU HAVE IN THE SURVEY?

18   A    I NEED TO LOOK AT MY REPORT TO TELL YOU.

19   Q    CAN YOU GIVE ME AN ESTIMATE?

20   A    OFF THE TOP OF MY HEAD, I FEEL LIKE THERE WERE

21   800 PEOPLE IN ONE OF THE SURVEYS AND MAYBE 500 IN

22   ONE OF THE OTHERS.  BUT THERE WERE SOME OF THOSE

23   WHO MIGHT NOT HAVE BEEN IN THE CATEGORY YOU JUST

24   DESCRIBED.

25   Q    AND ALL OF THE PEOPLE IN THAT SURVEY, ALL
```

1    THOSE PEOPLE IN THAT POPULATION, WHAT YOU'RE TRYING

2    TO FIND OUT IS WHAT PERCENTAGE OF THE PEOPLE IN

3    THAT POPULATION ASSOCIATED THESE IMAGES WITH AN

4    APPLE PRODUCT IN A CERTAIN TIME FRAME; RIGHT?

5    A    I UNDERSTAND THE TIME FRAME TO BE RELEVANT.

6    IN THE TYPICAL SECONDARY MEANING SURVEY, THE ISSUE

7    OF TIMING IS NOT ADDRESSED.

8              I DID MAKE AN ATTEMPT TO ASK ABOUT TIMING

9    IN THIS ONE, SO IT'S A RELEVANT ISSUE.

10             BUT IT'S NOT THE HEART OF WHAT A

11   SECONDARY MEANING SURVEY IS ABOUT.

12   Q    NOW, WAIT A MINUTE.  ISN'T A SECONDARY MEANING

13   SURVEY SUPPOSED TO FIND OUT, IN THE APPROPRIATE

14   POPULATION, WHAT PERCENTAGE IN THAT POPULATION

15   ASSOCIATED THESE IMAGES WITH APPLE BETWEEN THE TIME

16   APPLE FIRST CAME OUT WITH ITS PRODUCT AND THE TIME

17   SAMSUNG FIRST CAME OUT WITH ITS PRODUCT?

18   A    I THINK THAT SOUNDS LIKE THE LEGAL DEFINITION,

19   BUT EVERY SECONDARY MEANING SURVEY IS DONE AFTER

20   THE FACT.  SO IT'S BEING USED TO DEAL WITH THE

21   PERIOD OF TIME THAT HAPPENED BEFORE THE SURVEY.

22   Q    OKAY.  SO LET'S TALK ABOUT, THEN, LEGALLY,

23   USING THE LEGAL DEFINITION WHAT YOU'RE SUPPOSED TO

24   BE TRYING TO FIND IN THIS SURVEY, OKAY?

25             AND IF YOU'D LOOK AT -- I'M GOING TO PUT

1    UP RIGHT NOW DEMONSTRATIVE 3705.101, THAT'S

2    3705.101.  DO WE HAVE THE BOOKS IN FRONT OF HIM.

3             SO LEGALLY, IF YOU'RE TRYING TO FIND

4    SECONDARY MEANING, YOU WANT TO SEE WHAT PERCENTAGE

5    OF PEOPLE IN THAT POPULATION, PEOPLE BUYING WITHIN

6    A YEAR OR AFTER A YEAR, ASSOCIATED THE ACCUSED

7    TRADE DRESS WITH APPLE BETWEEN, IN THIS CASE,

8    JANUARY 2007 WHEN THE PRODUCT CAME OUT, WAS

9    ANNOUNCED, AND JULY 2010 WHEN THE CASE OF THE

10   PHONE, THE FIRST ACCUSED SAMSUNG PHONE CAME OUT;

11   CORRECT?  THAT'S THE LEGAL DEFINITION?

12   A    YEAH.  MY UNDERSTANDING OF THE LEGAL

13   DEFINITION WOULD BE THAT THERE NEEDS TO BE

14   SECONDARY MEANING, IN OTHER WORDS, THAT CONSUMERS

15   WOULD HAVE TO HAVE ALREADY ASSOCIATED THIS LOOK

16   WITH APPLE AS OF JULY 2010.

17   Q    SO YOU ASKED THE CORRECT GROUP OF PEOPLE,

18   PEOPLE WHO HAD BOUGHT A PHONE 12 MONTHS BEFORE, OR

19   12 MONTHS AFTER, YOU ASKED THEM WHETHER OR NOT THEY

20   ASSOCIATED IMAGES YOU SHOWED THEM WITH APPLE;

21   CORRECT?

22   A    YES.  THAT'S A SUMMARY.

23   Q    OKAY.  AND YOU ALSO ASKED THEM -- AND IF WE

24   COULD LOOK AT YOUR REPORT, AND YOU'D LOOK AT PAGE,

25   I BELIEVE IT'S PARAGRAPH 91 OF YOUR REPORT.  LET ME

```
 1     SEE IF I CAN FIND THAT.  I'M SORRY, PARAGRAPH 91.

 2               YOU HAVE THIS THING CALLED TIMING OF

 3     SECONDARY MEANING.

 4               DO YOU SEE THAT?

 5     A    YES.

 6     Q    AND NOW I WANT TO SEE IF I CAN FIND THE EXACT

 7     QUESTION THAT YOU USED.

 8               IF WE CAN TAKE THAT DOWN.

 9               AND I BELIEVE IT IS ON, LET'S SEE, PAGE

10     14, LINES 9 THROUGH 17 RIGHT HERE.

11               SO YOU ASKED, THEN, "TO THE BEST OF YOUR

12     RECOLLECTION, DID YOU FIRST COME TO ASSOCIATE THE

13     OVERALL APPEARANCE OF THE MOBILE PHONE YOU WERE

14     SHOWN WITH," WHATEVER COMPANY, AND THEN YOU GAVE

15     THE OPTIONS BEFORE JULY 2010, DURING OR AFTER

16     JULY 2010, AND DON'T KNOW.

17               RIGHT?

18     A    THAT, THAT WAS ONLY A FOLLOW-UP QUESTION FOR

19     CERTAIN PEOPLE.  WHAT PEOPLE WERE REALLY ASKED --

20     FIRST THEY WERE ASKED IN WHAT YEAR DID THEY COME TO

21     ASSOCIATE THE APPEARANCE WITH APPLE.

22     Q    WELL, THAT -- THEY WERE ASKED, WHEN IS THE

23     FIRST YEAR YOU BECAME -- YOU ASSOCIATED THAT

24     APPEARANCE WITH APPLE; RIGHT?

25               IF THEY IDENTIFIED APPLE AS SOMETHING
```

```
1    THEY ASSOCIATED THE IMAGE WITH; RIGHT?

2    A    YES.  I'M JUST SAYING THIS IS NOT THE QUESTION

3    MOST PEOPLE WERE ASKED.

4    Q    OKAY.

5    A    THEY WERE ASKED JUST TO NAME THE YEAR.

6    Q    OKAY.  IN THAT CASE, LET'S GO UP ABOVE.

7              WHAT YOU'RE SAYING IS THAT, RIGHT ABOVE

8    HERE IT SAYS, YOU WERE ASKED, "IN WHAT YEAR, IF YOU

9    KNOW, DID YOU FIRST COME TO ASSOCIATE THIS OVERALL

10   APPEARANCE OF THE MOBILE PHONE YOU WERE SHOWN

11   WITH," FILL IN THE BLANK, APPLE; CORRECT?

12   A    CORRECT.

13   Q    OKAY.  AND IF WE LOOK AT EXHIBIT 3705.101 FOR

14   IDENTIFICATION, THIS IS THE -- OKAY, AND THAT WAS

15   -- SO OF THOSE -- YOU WANTED TO FIND OUT, OF THE

16   POPULATION, WHAT PERCENTAGE OF PEOPLE ASSOCIATED

17   THOSE IMAGES WITH APPLE AND ASSOCIATED THOSE IMAGES

18   WITH APPLE IN THIS TIME FRAME, PRIOR TO JULY 2010;

19   RIGHT?

20   A    I, I WOULDN'T -- I DON'T THINK THAT'S AN

21   ACCURATE DESCRIPTION OF WHAT THE QUESTION ABOUT THE

22   YEAR WAS, WAS TRYING TO DO.

23              IT WAS TRYING TO TAKE THE GROUP OF PEOPLE

24   WHO DID ASSOCIATE IT WITH APPLE AND BREAK IT UP

25   INTO THOSE THAT WERE BEFORE THAT POINT AND THOSE
```

1    THAT WERE AFTER TO SEE WHETHER THIS IS REALLY JUST

2    A NEW PHENOMENON THAT OCCURRED AFTER THE SAMSUNG

3    TABLETS CAME OUT OR WHETHER IT WAS ALREADY AN

4    EXISTING THING.

5    Q    THE LEGAL DEFINITION, YOU SAID, OF SECONDARY

6    MEANING WHICH YOU WERE TRYING TO MEASURE IS THE

7    PERCENTAGE IN THE APPROPRIATE POPULATION WHO

8    ASSOCIATED THE ALLEGED TRADE DRESS WITH APPLE AND

9    HAD THAT AN ASSOCIATION BETWEEN JANUARY 27TH, 2007

10   AND JULY 2010.

11         THAT'S THE LEGAL DEFINITION.  YOU CONCEDE

12   THAT; CORRECT?

13   A    THAT SOUNDS TO ME LIKE A FAIR DESCRIPTION OF

14   HOW I UNDERSTAND STAND THE LAW.

15   Q    OKAY.  AND YOU GOT THE INFORMATION FROM THESE

16   FOLKS AS TO WHEN THEY FIRST ASSOCIATED THE TRADE

17   DRESS WITH APPLE BECAUSE YOU ASKED THEM THE

18   QUESTION; CORRECT?

19   A    WE GOT THE INFORMATION FROM SOME PEOPLE WHO

20   COULD REMEMBER AND TO THE BEST OF THEIR, THEIR

21   RECOLLECTION.

22   Q    SO THEN YOU HAD THE ABILITY TO DO A

23   CALCULATION CONSISTENT WITH THE LEGAL MEANING OF

24   SECONDARY -- LEGAL DEFINITION OF SECONDARY MEANING,

25   YOU COULD HAVE DONE A CALCULATION TO SEE HOW MANY

```
 1    OF THAT POPULATION ASSOCIATED THE ALLEGED TRADE
 2    DRESS WITH APPLE IN THE LEGALLY RELEVANT TIME?
 3            YOU COULD HAVE DONE THAT CALCULATION?
 4    A    YOU'RE ASKING ME?
 5    Q    YEAH, YES.
 6    A    NO.  YOU CAN'T DO ANYTHING OTHER THAN EXACTLY
 7    WHAT I DID.  YOU CAN MEASURE THE LEVEL OF SECONDARY
 8    MEANING NOW AND YOU CAN ASK A QUESTION TO SEE
 9    WHETHER OR NOT IT LOOKS LIKE THAT'S SOMETHING THAT
10    JUST HAS HAPPENED OVER THE PAST FEW MONTHS OR
11    WHETHER IT HAPPENED A WHILE AGO, AND THAT'S WHAT I
12    DID.
13    Q    NO.  THE LEVEL OF ASSOCIATION NOW IS NOT
14    RELEVANT TO SECONDARY MEANING, IS IT?
15            MR. JACOBS:  YOUR HONOR, OBJECTION.  I
16    DON'T WANT TO HAVE THIS IN -- THIS IS A LEGAL
17    ISSUE.  I'D RATHER NOT HAVE IT IN FRONT OF THE
18    JURY.
19            I BET YOU WOULD RATHER NOT HAVE IT IN
20    FRONT OF THE JURY.
21            MR. PRICE:  LET ME REPHRASE IT.
22            THE COURT:  ALL RIGHT.
23    BY MR. PRICE:
24    Q    ACCORDING TO THE LEGAL DEFINITION YOU GAVE US
25    OF SECONDARY MEANING, THE QUESTION IS WHAT
```

1    PERCENTAGE OF THOSE, THAT GENERAL POPULATION, HAD

2    AN ASSOCIATION WITH APPLE OF THIS TRADE DRESS

3    BETWEEN JANUARY 2007 AND JULY 2010; RIGHT?

4    A    I AGREE WITH THAT.

5    Q    OKAY.  AND HAVING ASKED THESE, THIS GENERAL

6    POPULATION THE QUESTION YOU ASKED, IS THERE AN

7    ASSOCIATION, AND HAVING ASKED THEM, WHEN DID YOU

8    FIRST HAVE THAT ASSOCIATION, ALL RIGHT, YOU HAD A

9    NUMBER FOR THE GEM POPULATION; RIGHT?  HOW MANY --

10   YOU HAD A CERTAIN NUMBER OF THE GENERAL POPULATION;

11   RIGHT?  YOU ASKED A CERTAIN NUMBER OF PEOPLE?

12   A    YES.

13   Q    OKAY.  THAT WOULD BE THE, THE NOMINATOR, IS

14   THAT RIGHT?  THAT WOULD BE THE THING ON THE BOTTOM,

15   THAT WOULD BE THE NUMBER ON THE BOTTOM, RIGHT, FOR

16   TRYING TO FIND A PERCENTAGE, RIGHT?  YOU ASKED,

17   SAY, 800 PEOPLE, YOU WANT A PERCENTAGE, AND YOU PUT

18   800 DOWN THERE, RIGHT?  RIGHT?

19   A    YOU'RE --

20   Q    RIGHT?

21   A    WELL, I CAN'T SAY "RIGHT" BECAUSE I CAN TELL

22   YOU'RE CONFUSED ABOUT WHAT YOU'RE TALKING ABOUT, SO

23   I CAN'T REALLY SAY "RIGHT."

24            I CAN SEE WHAT YOU'RE CONFUSED ABOUT AND

25   SO --

1    Q    WELL, THAT'S VERY NICE OF YOU, BUT LET ME ASK

2    A QUESTION.

3    A    OKAY.

4    Q    AND THEN MAYBE SOMETIME OVER DRINKS YOU CAN

5    TELL ME HOW CONFUSED I AM.

6         IF YOU'RE TRYING TO FIND THE SECONDARY

7    MEANING OF A PRODUCT WITHIN A CERTAIN TIME PERIOD,

8    YOU NEED TO FIND OUT IF PEOPLE HAD THAT MEANING

9    DURING THAT TIME PERIOD; RIGHT?  IS THAT CORRECT?

10   A    NO.  I DON'T AGREE WITH THAT.

11   Q    WELL, YOU COULD LOOK AT YOUR DATA AND FIND THE

12   NUMBER OF PEOPLE WHO SAID THEY HAD AN ASSOCIATION

13   BETWEEN THESE IMAGES AND APPLE AND THEY HAD THAT

14   ASSOCIATION BETWEEN JANUARY OF 2007 AND JULY 2010?

15        YOU HAD THAT DATA; RIGHT?

16   A    I HAD THE DATA TO THE QUESTION THAT WE JUST

17   TALKED ABOUT, YES.

18   Q    AND THAT DATA WAS -- IF WE CAN GET BACK TO

19   PAGE 14 OF YOUR REPORT -- IN WHAT YEAR, IF YOU

20   KNOW, DID YOU FIRST COME TO ASSOCIATE THE OVERALL

21   APPEARANCE OF THE MOBILE PHONE YOU WERE SHOWN WITH,

22   AND THEY SAID APPLE.

23        THAT'S THE DATA YOU GOT; RIGHT?

24   A    YES.

25   Q    OKAY.  SO YOU HAD BOTH THE DATA FOR WHAT

1    PERCENTAGE OF THE LARGE POPULATION ASSOCIATED THESE

2    IMAGES WITH APPLE DURING THE 2007 TO 2010 TIME

3    FRAME, YOU HAD THAT DATA BECAUSE YOU ASKED THOSE

4    QUESTIONS; RIGHT?

5    A    NO.  YOU'RE -- YOU ARE MISINTERPRETING WHAT

6    THE ANSWERS TO THOSE QUESTIONS MEAN.

7    Q    WELL, PEOPLE EITHER FILLED IN A NUMBER, LIKE

8    2008, 2009, OR THEY SAID I DON'T KNOW TO THE

9    QUESTION; RIGHT?  YOU HAD THAT DATA?

10   A    YES.

11   Q    AND IF YOU TOOK THAT AS THE NUMERATOR, THE

12   NUMBER OF PEOPLE WHO SAID "I HAD AN ASSOCIATION OF

13   THESE IMAGES WITH APPLE'S TRADE DRESS BETWEEN 2000

14   SEARCH AND 2010," IF THAT'S THE NUMERATOR, AND THEN

15   THE DENOMINATOR, YOU HAVE YOUR POPULATION, WHICH

16   WE'VE AGREED UPON IS THE PEOPLE WHO BOUGHT PHONES

17   12 MONTHS BEFORE OR WERE LIKELY TO 12 MONTHS LATER,

18   RIGHT, YOU'RE WITH ME SO FAR, IF YOU HAD THAT, YOU

19   WOULD BE ABLE TO MAKE A CALCULATION AND GIVE US A

20   PERCENTAGE, RIGHT?

21   A    YES.  IT WOULD BE AN ARBITRARY PERCENTAGE, BUT

22   YOU COULD DO WHATEVER CALCULATION YOU'RE

23   DESCRIBING.

24   Q    WELL, YOU SAY "ARBITRARY ."  IF WE GO TO YOUR

25   NUMBERS, IF WE CAN GO BACK TO THE TABLE YOU HAD UP,

```
 1    WHICH IS, I GUESS, PDX 30.5 AND IF YOU LOOK AT YOUR
 2    NUMBERS AND DIVIDED THE NUMBER OF PEOPLE WHO SAID
 3    THEY ASSOCIATED TRADE DRESS WITH APPLE IN THE
 4    LEGALLY RELEVANT TIME FRAME BY THE NUMBER OF PEOPLE
 5    IN THE ENTIRE POPULATION THAT YOU SURVEYED, THIS
 6    WOULD GO DOWN BY ABOUT HALF; RIGHT?
 7    A    I DON'T KNOW BECAUSE THAT'S, THAT IS A RANDOM,
 8    ARBITRARY CALCULATION THAT YOU'RE DESCRIBING THAT'S
 9    NOT BASED ON ANY PROPER ANALYSIS, SO I DIDN'T DO
10    ANYTHING LIKE THAT, AND I DON'T KNOW WHAT THE
11    ANSWER WOULD BE.
12    Q    OKAY.  AND THIS NUMBER HERE, THAT 64.4, THAT
13    WOULD GO DOWN BY MORE THAN HALF AS WELL; CORRECT?
14    A    I DON'T KNOW.
15    Q    WELL, YOU DID ANOTHER CALCULATION WHICH LOOKED
16    AT A BROADER POPULATION AND ASKED THESE SAME
17    QUESTIONS; RIGHT?
18    A    I'M NOT SURE EXACTLY WHAT YOU'RE REFERRING TO.
19    Q    WELL, LET ME, IF I COULD, I'LL PUT UP AND SEE
20    IF THIS HELPS.
21         YOU DID A CONSUMER RECOGNITION SORT OF
22    SURVEY WHERE YOU USED A POPULATION THAT WAS BEYOND
23    THE BUYING 12 MONTHS BEFORE OR 12 MONTHS AFTER?
24    A    I WOULD SAY IT'S PART OF THE SAME SURVEY, BUT
25    IT WAS AN ADDITIONAL SET OF RESPONDENTS WHO DID NOT
```

1    MEET THOSE ORIGINAL QUALIFICATIONS WE TALKED ABOUT.

2    Q    AND YOU REPORTED DATA ON THAT AS WELL;

3    CORRECT?

4    A    YES.

5    Q    AND YOU THOUGHT THAT'S NOT DIRECTLY RELATED TO

6    SECONDARY MEANING?

7    A    RIGHT.  I -- SOME OF THOSE PEOPLE ARE NOT

8    WITHIN THE GROUP THAT I WOULD CONSIDER RELEVANT FOR

9    ASSESSING SECONDARY MEANING.

10   Q    AND, AGAIN, IN YOUR REPORT YOU DIDN'T FILTER

11   OUT THOSE WHO SAID, YOU KNOW, WE DIDN'T COME UP

12   WITH THAT ASSOCIATION UNTIL AFTER 2010?

13   A    I -- WHAT DO YOU MEAN THAT I DIDN'T FILTER

14   OUT?

15   Q    WELL, JUST AS BEFORE, WHEN I SAID THAT IF YOU

16   ONLY TOOK AS A POSITIVE HIT SOMEONE WHO SAID, I

17   ASSOCIATED WITH APPLE IN THE RELEVANT TIME FRAME,

18   IF YOU ONLY TOOK THOSE PEOPLE, THIS PERCENTAGE GOES

19   WAY DOWN; CORRECT?

20   A    YOU'RE DESCRIBING WHAT SEEMS TO BE AN

21   ARBITRARY, INCORRECT ANALYSIS TO ME, SO THE ANSWER

22   CAN ONLY BE I DIDN'T DO THAT CALCULATION BECAUSE IT

23   DOESN'T MAKE ANY SENSE.

24        I REPORTED THE NUMBERS TO THE QUESTION

25   ABOUT WHAT YEAR PEOPLE FORMED THEIR ASSOCIATION

1    EXACTLY AS THE NUMBERS ARE.

2    Q    OH, OKAY.  SO LET ME MAKE SURE.

3            SO YOU REPORTED THE ANSWERS TO THE

4    QUESTIONS TO WHEN PEOPLE REPORTED THEIR

5    ASSOCIATION, YOU HAD THAT NUMBER IN YOUR REPORT?

6    A    YES.

7    Q    OKAY.  OR YOU HAD THAT DATA ANYWAY?

8    A    YES.

9    Q    RIGHT?

10   A    YES.

11   Q    AND THAT WOULD BE, IF WE GO BACK TO 3705.105,

12   SO NOW WE'VE IDENTIFIED THE ENTIRE POPULATION OF

13   PEOPLE WHO SAY THEY HAD AN ASSOCIATION WITH THIS

14   STIMULI BETWEEN 2000 SEARCH AND 2010.  AND NOW WE

15   HAVE THAT NUMBER OF PEOPLE.  IT'S IN YOUR DATA

16   SOMEWHERE; RIGHT?

17   A    YES.

18   Q    AND THAT NUMBER OF PEOPLE WHO ACTUALLY

19   ASSOCIATED THESE STIMULI WITH APPLE IN THE RELEVANT

20   TIME FRAME, UNDER THE LEGAL DEFINITION OF SECONDARY

21   MEANING, THOSE PEOPLE WERE AN INCREDIBLY LOW

22   PERCENTAGE OF PEOPLE COMPARED TO WHAT YOU REPORTED

23   TO THE JURY?

24   A    NO.

25   Q    OKAY.  TELL US.  WHAT PERCENTAGE WERE THOSE?

1     LET'S GO BACK.  YOU CAN TELL US THE CORRECTION.

2     THAT'S EXHIBIT 3005, SO IT WASN'T A MUCH LOWER

3     PERCENTAGE.

4              HOW DOES THAT CHANGE THE NUMBER IF ALL

5     YOU'RE LOOKING AT IS YOU'RE IDENTIFYING THE PEOPLE

6     WHO, IN THE RELEVANT TIME FRAME, SAY THEY HAD THAT

7     ASSOCIATION?  IF YOU HAVE THAT AS YOUR NUMERATOR

8     AND THEN THE POPULATION WE AGREED ON AS YOUR

9     DENOMINATOR, IF YOU HAVE THAT, THEN TELL ME, WHAT

10    IS THIS FIGURE?

11    A    I GAVE YOU THE SAME ANSWER BEFORE.  YOU ARE

12    DESCRIBING A METHOD OF ANALYSIS THAT MAKES NO SENSE

13    AND IS ARBITRARY AND SO I DID NOT DO THAT AND I

14    DON'T KNOW THE ANSWER.

15             WHAT I CAN TELL YOU IS THE PROPER

16    ANALYSIS THAT OF THE PEOPLE WHO ASSOCIATED WITH THE

17    APPLE, THE LARGE MAJORITY OF THEM SAID THAT THEY

18    DID, PRIOR TO THE SAMSUNG TABLETS AND IT'S A

19    MINORITY THAT SAID THEIR ASSOCIATION CAME AFTER THE

20    SAMSUNG TABLETS CAME OUT.

21    Q    IN DOING -- FIRST LET ME GET BACK.

22             YOU SAID THAT IF WE DO THAT CALCULATION,

23    IT'S NOT MUCH LOWER THAN THIS AND THEN YOU JUST

24    SAID YOU DON'T KNOW IF IT IS.  DID YOU DO THE

25    CALCULATION?

1    A    I DIDN'T SAY IT'S NOT MUCH LOWER THAN THAT.  I

2    SAID I DIDN'T DO IT BECAUSE YOU'RE JUST INVENTING A

3    CALCULATION THAT MAKES NO SENSE.

4    Q    OKAY.  WELL, THEN, LET ME ASK YOU, THEN, A

5    SECOND QUESTION.

6              IN YOUR REPORT, IF WE GO TO -- IF I CAN

7    FIND YOUR CALCULATION HERE, IF WE GO TO I THINK

8    IT'S PAGE 57, PARAGRAPH 91.

9              AND DO YOU HAVE THAT IN FRONT OF YOU?

10   A    YES.

11   Q    AND HERE YOU HAVE SOMETHING CALLED "TIMING OF

12   SECONDARY MEANING."

13              DO YOU SEE THAT?

14   A    YES.

15   Q    AND THIS IS WHERE YOU ASKED -- YOU NO LONGER

16   WERE USING THE GENERAL, THE POPULATION OF PEOPLE,

17   FULL POPULATION OF PEOPLE WHO BOUGHT PHONES 12

18   MONTHS BEFORE OR 12 MONTHS AFTER, YOU'RE NARROWING

19   YOUR POPULATION DOWN; RIGHT?

20   A    I'M NOT DOING ANYTHING.  I'M JUST REPORTING

21   THE RESULTS AMONG THE PEOPLE WHO DID ASSOCIATE THE

22   LOOK WITH APPLE WHICH, YES, THAT IS A SUBSET OF THE

23   OVERALL SAMPLE.

24   Q    AND -- BUT -- YEAH, THIS IS A SUBSET.  NOW

25   YOU'RE NARROWING IT DOWN TO 270 PEOPLE WHEREAS

1611

```
1    BEFORE YOU SAID YOU HAD HOW MANY?

2    A    I DON'T -- I DON'T KNOW.  I DON'T KNOW EXACTLY

3    WHAT THE TOTAL WAS.  I AGREE WITH YOU THIS TABLE IS

4    SHOWING THE RESULTS AMONG 270 PEOPLE WHO DID

5    ASSOCIATE THE LOOK WITH APPLE AND WERE ABLE TO GIVE

6    SOME DATE.

7    Q    AND THIS IS THE BREAKDOWN YOU'RE REFERRING TO

8    IN YOUR DIRECT WHERE YOU SAID, WELL, I DID LOOK TO

9    SEE WHAT PERCENTAGE OF THOSE IN THE GENERAL

10   POPULATION WHO IDENTIFIED APPLE IDENTIFIED IT

11   BEFORE 2010 OR AFTER?  IS THAT WHAT YOU'RE

12   REFERRING -- IS THAT WHAT YOU WERE REFERRING TO?

13   A    YES.

14   Q    AND IT'S TRUE, SIR, THAT YOU CANNOT USE THIS

15   CHART TO COME TO ANY CONCLUSION AS TO WHAT THE

16   SECONDARY MEANING WAS AS OF JULY 2010; CORRECT?

17   A    NO.

18   Q    DO YOU RECALL YOUR DEPOSITION WAS TAKEN

19   CONCERNING YOUR REPORT IN THIS CASE SOMETIME AROUND

20   APRIL 19, 2012?

21   A    YES.

22   Q    AND HERE WE'RE REFERRING TO THE CHART IN

23   PARAGRAPH 91 OF YOUR REPORT?

24   A    YES.

25             MR. PRICE:  AND, YOUR HONOR, IF I MAY
```

1   READ INTO THE RECORD, THIS IS PAGE 165, LINES 9

2   THROUGH 16.

3           THE COURT:  GO AHEAD, PLEASE.

4           MR. PRICE:  PUT THAT UP.

5           (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

6   OPEN COURT OFF THE RECORD.)

7   BY MR. PRICE:

8   Q    ARE YOU A STATISTICIAN, BY THE WAY?

9   A    I HAVE MATH DEGREES, AND I'VE STUDIED

10  STATISTICS.  I WOULDN'T PARTICULARLY IDENTIFY

11  MYSELF AS A STATISTICIAN.  I WOULD SAY I'M A SURVEY

12  RESEARCHER, BUT STATISTICS ARE RELEVANT TO WHAT I

13  DO.

14  Q    YOU KNOW THE, ANYONE WHO STUDIED THIS, YOU

15  KNOW THE MARK TWAIN QUOTE, "LIES, DARN LIES AND

16  STATISTICS"?

17  A    YES.

18  Q    WELL, YOU STAND BY YOUR TESTIMONY THAT THAT

19  CHART, LET ME GET THE -- THAT YOU CANNOT USE THAT

20  CHART TO SAY WHAT THE SECONDARY MEANING LEVEL WAS

21  IN JULY OF 2010.

22           DO YOU STAND BY THAT TESTIMONY TODAY?

23  A    I STAND BY WHAT I WAS SAYING, WHICH WAS THAT

24  YOU CANNOT TAKE THOSE NUMBERS AND ADJUST THEM TO

25  COME UP WITH A DIFFERENT NUMBER AS OF 2010.

```
1            I WAS NOT SAYING THOSE NUMBERS ARE NOT

2     RELEVANT TO THE LEVEL IN 2010, WHICH IS WHAT YOU

3     WERE ASKING ME ABOUT TODAY.

4     Q    YOUR STATEMENT WAS THAT YOU CANNOT USE THAT

5     CHART -- THE QUESTION WAS, "SO CANNOT GET TO THE

6     CHART IN PHOTOGRAPH 91 TO SECONDARY MEANING; IS

7     THAT RIGHT?

8            "ANSWER:  YOU CANNOT GET, YOU CANNOT USE

9     THAT CHART TO SAY WHAT THE SECONDARY MEANING LEVEL

10    WAS IN JULY OF 2010."

11           THAT IS THE ABSOLUTE TRUTH; CORRECT?

12    A    THAT IS THE TRUTH TO WHAT THEY WERE ASKING ME

13    ABOUT IN THE DEPOSITION, WHICH IS THE SAME THING

14    YOU WERE ASKING ME ABOUT BEFORE, WHICH IS CAN YOU

15    TAKE THE NUMBERS THAT I GOT IN MY SURVEY AND

16    SOMEHOW DO SOMETHING LIKE YOU WERE DESCRIBING TODAY

17    AND COME OUT WITH A DIFFERENT NUMBER FOR JULY 2010.

18           AND I WAS SAYING, NO, YOU CANNOT DO THAT,

19    JUST LIKE TODAY I WAS TELLING YOU YOU CAN'T DO THE

20    CALCULATION YOU'RE TRYING TO DO.

21    Q    BUT --

22    A    BUT THE WHOLE PURPOSE OF THIS SURVEY IS TO

23    FIND OUT A NUMBER THAT IS RELEVANT.

24    Q    OKAY.  AND -- BUT YOU'D AGREE THAT THE

25    RELEVANCE, FOR AT LEAST THE IPHONES, WHETHER OR NOT
```

1614

1    PERCEPTION OF ASSOCIATION WAS TAKING PLACE AS OF

2    JULY 2010?

3    A    I AGREE THAT I BELIEVE THAT'S THE LEGAL

4    STANDARD THAT APPLE HAS TO PROVE.

5    Q    AND, THEREFORE, THAT'S HOW YOU WERE TRYING TO

6    FOCUS YOUR SURVEY, TO SEE WHAT THE SECONDARY

7    MEANING WAS, IF ANY, AS OF JULY 2010 WITH THE

8    IPHONE?

9    A    I DON'T THINK THAT'S AN ACCURATE DESCRIPTION

10    OF HOW THE SURVEY IS DESIGNED.

11    Q    OKAY.  SO LET'S JUST BE CLEAR THEN.

12          EVEN THOUGH YOU KNOW APPLE HAS TO PROVE

13    SECONDARY MEANING AS OF JULY 2010, YOU DID NOT

14    DESIGN YOUR SURVEY TO FIND OUT WHAT THE SECONDARY

15    MEANING WAS AS OF JULY 2010?  THAT'S WHAT YOU JUST

16    TOLD US?

17    A    NO.  WHAT I'M TELLING YOU IS WHEN YOU DO A

18    SURVEY IN JUNE OF 2011, WHAT YOU CAN FIND OUT IS

19    WHAT PEOPLE THINK AT THAT TIME AND YOU CAN DO YOUR

20    BEST TO SEE, YOU KNOW, IS THIS A NEW THING OR IS

21    THIS SOMETHING THAT, THAT WAS LIKELY TO HAVE

22    OCCURRED BEFORE THEN, AND I DID THAT AND WHAT THIS

23    SHOWS IS THAT -- IS THAT THESE ASSOCIATIONS LARGELY

24    DID OCCUR BEFORE JULY 2010.

25    Q    SO MY QUESTION IS DIFFERENT.  WE HAVE A

1    TRANSCRIPT, SO I JUST WANT TO ASK YOU, DIDN'T YOU

2    SAY, JUST A FEW MINUTES AGO, THAT THIS SURVEY

3    WASN'T DESIGNED TO SEE IF THERE WAS SECONDARY

4    LEVEL -- SECONDARY LEVEL MEANING WAS AS OF

5    JULY 2010.  DIDN'T YOU SAY THAT JUST THREE OR FOUR

6    MINUTES AGO?

7    A    NO, THAT'S NOT WHAT I INTENDED TO SAY.

8    Q    OKAY.  SO LET ME SHOW YOU EXHIBIT 3705.109.

9         IF YOU LOOK AT YOUR DATA AND YOU DO

10   FILTER FOR, FOR TIME, THAT IS, YOU COUNT JUST THOSE

11   WHO SAY, I ASSOCIATED THESE IMAGES WITH APPLE

12   EITHER BEFORE JULY 2010 FOR THE IPHONE OR BEFORE, I

13   THINK IT'S NOVEMBER 2011 FOR THE IPAD, IF YOU DO

14   THOSE CALCULATIONS, YOUR PERCENTAGE GOES DOWN TO

15   ABOUT 21.9 PERCENT FOR THE IPHONE AND 13.2 PERCENT

16   FOR THE IPAD WITH THE HOME BUTTON VISIBLE; RIGHT?

17   A    NO.

18   Q    DID YOU REVIEW -- I MEAN, YOU KNOW THERE'S A

19   DR. JACOBY WHO DID CALCULATIONS USING THE SUBSETS

20   THAT YOU IDENTIFIED IN YOUR DATA?

21   A    I KNOW THAT DR. JACOBY PREPARED A REPORT.

22   Q    AND ACTUALLY, I HAVE THE DATE WRONG.  IT'S

23   JUNE 2011 FOR THE IPAD.  SO YOU KNOW THAT HE DID

24   THESE CALCULATIONS OF WHAT PERCENTAGE OF THE

25   CORRECT POPULATION HAD AN ASSOCIATION WITH APPLE

1    FROM YOUR TEST AS OF EITHER JULY 2010 OR JUNE 2011?

2    YOU KNOW HE DID THAT?

3    A    I KNOW HE DID SOMETHING, BUT THE WORD

4    "CORRECT" DOES NOT BELONG IN THAT DESCRIPTION

5    BECAUSE IT IS, AS I'VE BEEN TELLING YOU, IT IS

6    ARBITRARY.

7    Q    OKAY.  SO LET'S SAY IT'S ARBITRARY.  BUT DID

8    HE DO THE MATH RIGHT?  THAT IS, IF HE TOOK THE

9    NUMBER OF PEOPLE IN YOUR SURVEY WHO SAID THEY HAD

10   THAT ASSOCIATION EITHER IN JUNE 2011 FOR THE IPAD

11   OR JULY 2010 FOR THE IPHONE, IF HE GOT THOSE

12   NUMBERS AND DIVIDED THEM BY THE POPULATION, DID HE

13   DO THE MATH RIGHT?

14   A    I DON'T KNOW.

15   Q    WELL, YOU LOOKED AT HIS REPORT; RIGHT?

16   A    YES.

17   Q    HIS CALCULATIONS WERE IN HIS REPORT?

18   A    THERE WERE SOME CALCULATIONS IN HIS REPORT.

19   Q    OKAY.  THE CALCULATION I JUST DESCRIBED TO YOU

20   WAS IN HIS REPORT, THE ONE THAT YOU SAY IS WRONG

21   AND WE SHOULDN'T LOOK AT; RIGHT?

22   A    THERE WASN'T A DESCRIPTION OF A CALCULATION.

23   THERE WAS A TABLE SHOWING A BUNCH OF NUMBERS THAT,

24   YOU KNOW, TO ME DON'T MEAN ANYTHING.

25            BUT, YES, THEY WERE IN THE REPORT.

```
1     Q     SO DID YOU CHECK TO SEE IF HIS MATH WAS
2     CORRECT?  I ASSUME, ASSUMING -- ASSUME SOMEONE WHO
3     MIGHT BE REALLY WRONG, BUT THEY DISAGREE WITH YOU,
4     ASSUMING THEY THINK THAT IS THE RIGHT THING TO LOOK
5     AT, YOU KNOW, THE PEOPLE WHO ASSOCIATED THESE
6     IMAGES WITH AN APPLE PRODUCT IN THE RIGHT TIME
7     FRAME, ASSUMING THAT'S WHAT THEY THOUGHT THEY
8     SHOULD DO AND THEY SHOULD DO THE MATH, DID YOU
9     CHECK TO SEE IF HE DID THE MATH RIGHT?
10    A     NO.
11    Q     OKAY.  NOW, LET'S TALK ABOUT HOW THE, HOW
12    THE -- THIS SURVEY WAS STRUCTURED.
13              AND I BELIEVE YOU SAID THAT THERE HAS TO
14    BE A CONTROL BECAUSE YOU WANT TO MAKE SURE THAT
15    WHAT YOU'RE GETTING ISN'T ACTUALLY IN ASSOCIATION
16    WITH, WITH APPLE THAT'S AS A RESULT OF THESE TRADE
17    DESIGN ELEMENTS; RIGHT?
18    A     YES, THAT SOUNDS BASICALLY RIGHT.
19    Q     AND WHAT YOU WANT TO DO IS YOU WANT TO GET A
20    CONTROL WHICH DOESN'T INFRINGE APPLE'S TRADE DRESS,
21    BUT OTHERWISE MIGHT LOOK SIMILAR SO THAT YOU CAN
22    GET OUT THAT NOISE THAT, YOU KNOW, THOSE PEOPLE WHO
23    MIGHT SAY, OH, IT'S APPLE, EVEN THOUGH IT DOESN'T
24    HAVE THE TRADE DRESS?
25    A     THAT SOUNDS LIKE A GENERALLY FAIR DESCRIPTION.
```

```
 1                THE COURT:  IT'S 4:32.  IF YOU WANT TO

 2      ASK ANOTHER QUESTION, THAT'S FINE, BUT LET'S TRY TO

 3      WRAP UP IN A COUPLE MINUTES.

 4                MR. PRICE:  OKAY.  I'LL NEVER FINISH IN A

 5      COUPLE MINUTES, SO LET ME JUST COMPLETE THIS REAL

 6      QUICK.

 7                THE COURT:  GO AHEAD, PLEASE.

 8                MR. PRICE:  JUST SO WE CAN SET UP THE

 9      CONCEPT AND REMEMBER IT ON FRIDAY MORNING, OKAY?

10      Q    SO WHAT WE'RE TRYING TO DO HERE, THEN, IS IF

11      YOU HAVE A CONTROL WHICH, LIKE, LOOKS NOTHING LIKE

12      APPLE AND IT'S AN OUTLIER, RIGHT, IT'S JUST WAY

13      OVER HERE, YOU'RE GOING TO GET A MUCH HIGHER NET

14      ASSOCIATION; RIGHT?

15      A    YEAH, I -- THAT'S A VERY GENERAL STATEMENT YOU

16      MADE.  I DON'T KNOW THAT I CAN SAY WHAT, HOW MUCH

17      HIGHER OR LOWER RESULTS ARE GOING TO BE BASED ON

18      SOME GENERAL DESCRIPTION.

19      Q    LET'S JUST MAKE SURE WE UNDERSTAND WHAT YOU'RE

20      DOING.  YOU'RE SHOWING THESE IMAGES TO PEOPLE OF

21      WHAT YOU SAY IS THE APPLE TRADE DRESS AND GETTING A

22      PERCENTAGE RESPONSE; RIGHT?

23      A    YES.

24      Q    AND YOU'RE SUBTRACTING FROM THAT, REDUCING

25      THAT BY THE NUMBER OF PEOPLE WHO SAY, ON THE SECOND
```

1    ITEM, THE CONTROL ITEM, THEY GIVE AN APPLE

2    RESPONSE; RIGHT?

3    A    THAT IS HOW YOU COME OUT WITH THE NET, YES.

4    Q    OKAY.  AND SO THE FEWER THE PEOPLE THAT SAY

5    THAT SECOND ITEM, OR ASSOCIATE WITH APPLE, THE

6    FEWER THAT NUMBER OF PEOPLE, THEN THE HIGHER NUMBER

7    YOU'RE GOING TO GET BECAUSE YOU'RE GOING TO BE

8    SUBTRACTING LESS?

9    A    THAT IS CORRECT.

10   Q    SIMPLE MATH, RIGHT?

11        AND THE PRODUCT YOU USED WAS, IN THAT

12   CONTROL, WAS A BLACKBERRY; RIGHT?

13   A    YOU'RE TALKING ABOUT FOR THE PHONES, THAT WAS

14   ONE OF TWO CONTROLS THAT WERE USED.

15   Q    A BLACKBERRY AND THE SANYO ZIO?

16   A    YES.

17   Q    SO LET ME JUST ASK YOU, BEFORE THE BREAK, HOW

18   MANY CONTROLS DID YOU ACTUALLY CONSIDER IN THE

19   MARKETPLACE?  THAT IS, HOW MANY OTHER PHONES DID

20   YOU CONSIDER IN THE MARKETPLACE BEFORE CHOOSING

21   THOSE TWO CONTROLS?

22   A    I, I COULDN'T TELL YOU HOW MANY.

23   Q    OKAY.  LET -- YOU WEREN'T TRYING TO RIG THE

24   RESULTS; RIGHT?

25   A    CORRECT.

1    Q    SO YOU OBVIOUSLY CONSIDERED A LOT OF OTHER

2    NON-SAMSUNG PHONES FOR CONTROLS AND IF YOU COULD

3    JUST GIVE US AN ESTIMATE OF HOW MANY.  I MEAN, WAS

4    IT ONE MORE THAN THE TWO?

5    A    NO, I DON'T THINK SO.

6    Q    I MEAN, YOU WEREN'T JUST TRYING TO CHOOSE THE

7    ONES THAT LOOKED THE LEAST LIKE APPLE BUT DIDN'T

8    INFRINGE?

9    A    NO, I WAS NOT.

10   Q    OKAY.  SO THEN TELL US HOW MANY YOU

11   CONSIDERED, AND WE'LL GET BACK TO IT ON FRIDAY,

12   TELL US HOW MANY YOU CONSIDERED TO USE AS THE

13   CONTROL, THE NUMBER YOU SUBTRACTED FROM THE APPLE

14   NUMBER?

15   A    I REALLY DON'T KNOW THAT I COULD TELL YOU, YOU

16   KNOW, THAT LONG AGO HOW MANY I LOOKED AT.

17   Q    DID YOU KEEP NOTES?

18   A    NO.

19   Q    IS IT IN YOUR REPORT?

20   A    HOW MANY CONTROLS THAT I CONSIDERED?

21   Q    YEAH.

22   A    I DON'T BELIEVE SO.

23   Q    WAS IT MORE THAN 200?

24   A    NO.

25   Q    ONE HUNDRED?

```
1    A    I DOUBT IT.

2    Q    FIFTY?

3    A    PROBABLY NOT.

4    Q    TEN?

5    A    THAT COULD BE.

6    Q    WELL, WE'LL LOOK AT WHAT MIGHT HAVE BEEN USED

7    WHEN WE GET BACK ON FRIDAY.  THANKS.

8              THE COURT:  ALL RIGHT.  IT'S 4:35.  SO WE

9    ARE OFF TOMORROW AND THURSDAY, BUT WE'LL SEE YOU

10   BACK FRIDAY MORNING AT 9:00 A.M.

11             IF YOU WOULD PLEASE LEAVE YOUR JURY

12   NOTEBOOKS IN THE JURY ROOM AND SAME, SAME

13   INSTRUCTION, PLEASE KEEP AN OPEN MIND.  PLEASE

14   DON'T DO ANY RESEARCH ON YOUR OWN, PLEASE DON'T

15   DISCUSS THIS CASE WITH ANYONE, PLEASE DON'T READ OR

16   HEAR ABOUT THE CASE.

17             ALL RIGHT.  THANK YOU.  THANK YOU FOR

18   YOUR PATIENCE AND YOUR SERVICE.  WE'LL SEE YOU ON

19   FRIDAY.

20             (WHEREUPON, THE FOLLOWING PROCEEDINGS

21   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

22             THE COURT:  ALL RIGHT.  THE RECORD SHOULD

23   REFLECT THAT THE JURORS HAVE LEFT THE COURTROOM.

24   PLEASE TAKE A SEAT.

25             YOU CAN STEP DOWN.
```

1622

```
 1                SO LET'S GO OVER, BETWEEN NOW AND FRIDAY

 2    MORNING, I BELIEVE THAT WE HAVE THE DIRECT AND

 3    CROSS-EXHIBITS FOR MR. VAN LIERE LATER AND

 4    BALAKRISHNAN.

 5                DOES THAT SOUND RIGHT?

 6                MR. JACOBS:  THAT SOUNDS RIGHT, YOUR

 7    HONOR.

 8                THE COURT:  OKAY.  SO UNLESS YOUR LIST

 9    CHANGES, THEN WHEN WILL WE GET SINGH AND TEKSLER?

10                MR. JACOBS:  I BELIEVE SINGH AND TEKSLER

11    ARE UNDERWAY IN TERMS OF THE OBJECTION PROCESS.

12                MS. MAROULIS:  YOUR HONOR, THE SAME

13    OBJECTIONS HAVE BEEN FILED.  YOU HAVE THE SAME

14    OBJECTIONS FOR BOTH PARTIES.

15                THE COURT:  THEY MUST HAVE BEEN FILED

16    TODAY US BECAUSE I LOOKED AT THE DAR AND I DIDN'T

17    SEE IT.

18                MR. JACOBS:  THAT'S CORRECT, YOUR HONOR.

19    WE'RE AHEAD OF SCHEDULE.

20                THE COURT:  OKAY, GOOD.  SO THAT'S SINGH

21    AND TEKSLER.  I WOULD BE SURPRISED IF YOU'RE

22    CALLING VAN LIERE LATER THAT WE WOULD EVEN GET

23    THROUGH -- I WOULD ASSUME BALAKRISHNAN IS GOING TO

24    BE QUITE SOME TIME.  IS THAT RIGHT?

25                MR. JACOBS:  MY DIRECT, YOUR HONOR, IS --
```

1623

```
 1    I'M PLANNING TO BE SHORT AND PRECISE.  I WOULD SAY

 2    40 MINUTES.

 3             THE COURT:  OKAY.  SO WE COULD

 4    POTENTIALLY GET TO MR. TEKSLER BY FRIDAY?

 5             MR. JACOBS:  YES.

 6             THE COURT:  OKAY.  ALL RIGHT.  AND YOU'VE

 7    ALREADY BRIEFED ALL THOSE OBJECTIONS AND RESPONSES?

 8             MS. MAROULIS:  NO, YOUR HONOR.  THE

 9    TEKSLER OBJECTIONS HAVE NOT BEEN BRIEFED YET

10    BECAUSE APPLE JUST GAVE US THE PROFFER THAT YOU

11    ASKED THEM FOR YESTERDAY.  SO WE EXPECT TO BRIEF

12    THE TEKSLER OBJECTIONS IN THE NEXT COUPLE OF DAYS,

13    BUT WELL BEFORE FRIDAY.

14             MR. MUELLER:  YOUR HONOR, WE SERVED THE

15    PROFFER THIS MORNING, ACTUALLY, AND OUR EXHIBITS

16    WERE SERVED ON SUNDAY.

17             SO WE ASK THAT SAMSUNG GIVE US THEIR

18    OBJECTIONS LATER THIS EVENING OR TOMORROW MORNING,

19    AND WE CAN COMPLETE THE BRIEFING RIGHT AWAY.

20             MS. MAROULIS:  THAT WOULD BE FINE, YOUR

21    HONOR.  WE CAN GIVE THEM OBJECTIONS TOMORROW.

22             THE COURT:  OKAY.  AND WHEN ARE YOU GOING

23    TO FILE YOUR -- WE'RE DOING THIS SORT OF JOINT

24    OBJECTION AND RESPONSE.  SO WHEN CAN WE GET A

25    FILING?  IS THAT THE ONLY ONE THAT'S OUTSTANDING IS
```

1    TEKSLER?

2            MR. MUELLER:  I BELIEVE SO.  I THINK

3    TOMORROW.

4            MS. MAROULIS:  TOMORROW, YES.

5            THE COURT:  THAT WOULD BE GREAT, BECAUSE

6    THEN WE HAVE THURSDAY TO TRY TO WORK ON THESE.

7            ALL RIGHT.  ANY OTHER EITHER NEW

8    DEMONSTRATIVES OR NEW EXHIBITS ON ANY OF THE

9    WITNESSES FOR WHOM YOU'VE GIVEN US THE EXHIBITS?

10   CAN WE GET A DATE BY WHICH WE'LL GET THAT?

11           MR. JACOBS:  FOR THE WITNESSES THAT WE'VE

12   ALREADY GIVEN YOU, I DON'T THINK THERE'S ANYTHING

13   NEW.

14           WE DID TAKE OUT COPYING ON

15   BALAKRISHNAN'S.  WE'LL MAKE SURE YOU HAVE -- THE

16   WORD "COPYING," CONSISTENT WITH YOUR ORDER, WE TOOK

17   THE WORD "COPY" OUT.

18           THE COURT:  OKAY.

19           MR. JACOBS:  AND WE'LL SUBSTITUTE THOSE.

20   I DON'T KNOW OF ANY OTHERS.

21           THE OTHER ONE THAT'S IN THE -- THE

22   OTHER --

23           IF YOUR HONOR WOULD LIKE A DEADLINE FOR

24   ANY NEW DEMONSTRATIVES, THAT MIGHT BE A GOOD IDEA.

25           THE COURT:  WELL, I GUESS MY CONCERN IS

```
1    IF THERE'S GOING TO BE ANY OBJECTIONS, I MEAN, THE

2    TWO OBJECTIONS WORK WELL JUST BECAUSE YOU -- BOTH

3    SIDES REALLY EXPLAINED WHAT WAS AT ISSUE, WHICH WAS

4    HELPFUL IN REACHING A RULING.

5              BUT I ALSO AM CONCERNED JUST BY THE

6    NUMBER OF OBJECTIONS THAT CAME OUT THAT REQUIRE

7    RESEARCH DURING THE TRIAL ITSELF.  IF WE CAN

8    MINIMIZE THAT, THAT WOULD BE HELPFUL.

9              MR. JACOBS:  IF I MAY, YOUR HONOR?

10             THE COURT:  YEAH.

11             MR. JACOBS:  I THINK ACTUALLY YOUR

12   CURRENT PROCESS IS WORKING PRETTY WELL AND YOUR

13   ALLOCATION OF TIME IS GOING TO BE A DETERRENT.  WE

14   MAY HAVE SOME DISCUSSIONS FOR YOU AS THINGS

15   DEVELOP.  BUT I KNOW YOU DON'T WANT ANY OF THESE

16   THINGS IN FRONT OF THE JURY.  I THINK THIS WAS

17   OKAY.

18             MR. VERHOEVEN:  FROM OUR STANDPOINT, YOUR

19   HONOR, THE OLD SYSTEM WHERE WE LIST EVERY SINGLE

20   OBJECTION IN A CHART WASN'T WORKING.  WE AGREE WITH

21   YOUR HONOR.

22             I AGREE WITH COUNSEL THAT THE NEW SYSTEM

23   IS MUCH BETTER.

24             WE CAN TRY AND MEET AND CONFER AMONGST

25   OURSELVES AND IF WE SEE SOMETHING THAT IS COMING UP
```

1    THAT WILL REQUIRE MORE THAN, YOU KNOW, LOOKING AT A

2    SLIDE TO SEE IF IT'S MISLEADING OR SOMETHING QUICK,

3    SOMETHING THAT MIGHT REQUIRE BRIEFING OR RESEARCH,

4    PERHAPS WE CAN HAVE SOME FLEXIBILITY TO RAISE THAT

5    AHEAD OF TIME AND LET YOU KNOW AND YOU CAN, AND

6    THEN MAKE YOU CAN DECIDE IF YOU WANT A BRIEF ON IT.

7            FOR EXAMPLE, WE HAVE TWO DAYS NOW AND WE

8    CAN TALK ABOUT SLIDES AND WHAT NOT.

9            THE COURT:  SO IF THERE IS ANYTHING THAT

10   COMES UP, I WOULD LIKE YOU TO RAISE IT -- I MEAN,

11   I'D LIKE TO TRY TO START AT 9:00 IF WE CAN.

12           MR. VERHOEVEN:  RIGHT.

13           THE COURT:  SO I'D RATHER NOT LEAVE TOO

14   MUCH FOR OUR 8:30 TO 9:00 WINDOW.

15           MR. VERHOEVEN:  IN MY OPINION, THE NEW

16   PROCEDURE IS WORKING A LOT BETTER, AND I THINK

17   MR. JACOBS AGREES.

18           THE COURT:  I AGREE WITH THAT.  I'M JUST

19   WONDERING IF THERE'S SOME WAY, IF SOMETHING COMES

20   UP DURING THE TRIAL, IF YOU CAN HAVE RIGHT

21   IMMEDIATELY AVAILABLE, WHATEVER THE DOCUMENT IS,

22   THAT SUPPORTS YOUR CONTENTION THAT EITHER SOMETHING

23   WAS OR WAS NOT DISCLOSED TIMELY, SOMETHING EITHER,

24   YOU KNOW, WAS OR WAS NOT PREVIOUSLY RULED ON, IT

25   WOULD BE HELPFUL BECAUSE THEN I COULD JUST TAKE A

1    LOOK AT THAT EXACT --

2            MR. VERHOEVEN:  I THINK WE'RE GETTING

3    BETTER AT IT, YOUR HONOR, NOW THAT WE KNOW HOW IT

4    WORKS.

5            THE COURT:  OKAY.

6            MR. VERHOEVEN:  SO WE'LL ENDEAVOR TO HAVE

7    THAT MATERIAL AVAILABLE.  I CAN'T TELL YOU 100

8    PERCENT WE'LL ALWAYS KNOW WHAT'S GOING TO TRY TO

9    COME UP.  BUT WE'LL HAVE THE SUPPORTING DOC BEFORE

10   INTRODUCING IT, AND I'M SURE THE OTHER SIDE WILL

11   HAVE THE SUPPORTING DOCS AVAILABLE IF THEY HAVE AN

12   OBJECTION.

13           THE COURT:  OKAY.  I DON'T WANT TO OPEN

14   UP THE FLOOD GATES, BUT IF THERE'S GOING TO BE ANY

15   NEW OBJECTION -- WELL, CAN WE HOLD THE LINE ON THE

16   TWO OR DO YOU REALLY NEED MORE FOR THE FRIDAY

17   WITNESSES.

18           MR. JACOBS:  I DON'T THINK WE NEED MORE

19   FOR THE FRIDAY WITNESSES, YOUR HONOR.  I DO THINK,

20   BELIEVE IT OR NOT, THERE'S A DISAGREEMENT ABOUT

21   WHAT THE TWO OBJECTIONS MEANS AND WE HAD A

22   DISCUSSION WITH THE COURT ABOUT WHAT YOU HAD IN

23   MIND WITH THE TWO OBJECTIONS, AND I'M AFRAID WE'RE

24   AT LOGGERHEADS ABOUT THIS AND WE CAN USE SOME

25   GUIDANCE FROM YOUR HONOR.

```
1                 THE COURT:  WHAT'S THE ISSUE?

2                 MR. VERHOEVEN:  MY UNDERSTANDING, YOUR

3       HONOR, I ASKED YOU THAT, YOU SAID NO CATEGORIES,

4       PICK AN EXHIBIT, WE HAVE ONE EXHIBIT, MAKE AN

5       OBJECTION, AND WE'LL GO TO SCHOOL OFF OF YOUR

6       RULING.

7                 FOR EXAMPLE, IN THE CASE OF DR. WINER, WE

8       PICKED ONE OF SEVERAL -- THERE WAS ACTUALLY MANY,

9       MANY OBJECTIONS THAT WERE OBJECTIONABLE ON THE SAME

10      PRINCIPLE.  WE JUST GAVE YOU ONE AND MADE OUR

11      ARGUMENTS.

12                YOUR HONOR MADE YOUR RULING, AND COUNSEL

13      FOR APPLE WAS ABLE TO UNDERSTAND THAT RULING THAT

14      WOULD BE APPLIED CONSISTENTLY TO THE OTHER SIDE.

15      SO I THINK IT WORKING QUITE WELL.

16                MR. JACOBS:  THAT'S NOT ACTUALLY THE

17      ISSUE IN DISAGREEMENT.  THE ISSUE IS HOW MANY

18      OBJECTIONS PER SLIDE IS ONE OBJECTION.  I'M SORRY,

19      YOUR HONOR, WE JUST WANT TO MAKE SURE WE FOLLOW THE

20      SAME RULES.

21                THE COURT:  I SEE.

22                MR. JACOBS:  AND SO YOU'RE GETTING A,

23      KIND OF A HIERARCHY OR MULTIPLE OBJECTIONS ON A

24      SINGLE EXHIBIT.  WE'LL DO IT WHICHEVER WAY YOU

25      WANT, YOUR HONOR.
```

```
 1              MR. VERHOEVEN:  YOUR HONOR, WE WOULD -- I

 2    WASN'T AWARE THAT WAS AN ISSUE.  WE THINK IT SHOULD

 3    BE TWO EXHIBITS, ACTUALLY, I WOULD PREFER THREE AS

 4    I SUGGESTED, BUT IT SHOULD BE LIMITED TO A SINGLE

 5    EXHIBIT, BUT IT SHOULDN'T BE LIMITED TO THE

 6    ARGUMENTS WE MAKE.  THERE MAY BE TWO OR THREE

 7    REASONS WHY THAT EXHIBIT IS OBJECTIONABLE AND IT

 8    WOULD DO THE COURT NO GOOD TO ONLY LEARN OF ONE OF

 9    THEM AND THEN HAVE TO HAVE COUNSEL APPRISED IN

10    COURT OF THE OTHER TWO.

11              SO I THINK THAT LIMITING US TO, AS YOU

12    HAVE, TO TWO EXHIBITS IS THE APPROPRIATE WAY TO GO.

13              THE ONLY THING I WOULD REQUEST IS PERHAPS

14    WE CAN GET THREE, BUT YOUR HONOR HAS ALREADY DENIED

15    THAT.

16              THE COURT:  WELL, IT'S JUST A MATTER OF

17    VOLUME.  IF WE'RE ONLY DOING A FEW WITNESSES A

18    NIGHT, THAT'S NOT A PROBLEM.

19              BUT NEXT WEEK WHEN WE'RE GOING EVERY

20    SINGLE NIGHT AND TRYING TO DO THIS MANY EXHIBITS

21    FOR SEVEN WITNESSES EVERY SINGLE NIGHT, IT'S GOING

22    TO BE HARD, I THINK, ON OUR END.  THAT'S MY ONLY

23    CONCERN.

24              WHY DON'T WE JUST SAY IT'S GOING TO KEEP

25    IT AT TWO OBJECTIONS PER EXHIBIT, BUT YOU CAN RAISE
```

```
 1    TWO DIFFERENT GROUNDS UPON WHICH TO OBJECT IN EACH
 2    EXHIBIT TO TAKE YOUR BEST TWO SHOTS.
 3              MR. JACOBS:  JUST TO RESTATE IT, YOUR
 4    HONOR, BECAUSE WE'LL ALL GO BACK AND LOOK AT THE
 5    RECORD, I THINK IT'S TWO EXHIBITS PER WITNESS.
 6              THE COURT:  YES.
 7              MR. JACOBS:  AND NOW THE COURT'S
 8    DIRECTION IS NO MORE THAN TWO GROUNDS IN EACH OF
 9    SAID OBJECTIONS.
10              THE COURT:  YES.  IS THAT NOT WHAT I
11    SAID?
12              MR. JACOBS:  I THINK -- IF THAT'S WHAT
13    YOU MEANT, THEN WE'RE ALL IN AGREEMENT, YOUR HONOR.
14              THE COURT:  ALL RIGHT.  THAT'S WHAT I
15    MEANT.
16              NOW, THE OTHER THING THAT I THINK WOULD
17    BE HELPFUL IS THAT WE GIVE THE JURY AN EXHIBIT LIST
18    OF ALL OF THE ADMITTED EXHIBITS SO THAT WHEN THEY
19    START DELIBERATING, THEY CAN EASILY FIND, BECAUSE
20    THERE'S SO MUCH HERE, THEY CAN EASILY FIND WHAT
21    THEY'RE LOOKING FOR.
22              SO I DON'T KNOW IF YOU ALL ARE PLANNING,
23    I DON'T KNOW IF YOU'RE DOING RED WELLS OR BOXES FOR
24    THE JURY, AND I THINK THEY NEED A NICE CLEAN
25    EXHIBIT LIST.  SO IF THEY ARE INTERESTED, THEY CAN
```

```
 1    FIND IT.  WHAT I WAS HOPING, SINCE YOU ALL HAVE
 2    MORE PEOPLE THAN WE DO, IS IF YOU CAN CREATE A
 3    JOINT LIST AND THEN I WILL COMPARE IT, I'VE BEEN
 4    KEEPING MY OWN LIST OF BOTH DEMONSTRATIVES AND
 5    ADMITTED EXHIBITS AND WE CAN COMPARE THEM AND THAT
 6    WAY WE'RE NOT STUCK TRYING TO DO THOUSANDS NEXT --
 7    AT THE END OF NEXT WEEK.  WE CAN KIND OF, YOU KNOW,
 8    DO IT AS WE PROGRESS.
 9              WHEN DO YOU THINK -- OR MAYBE YOU'VE
10    ALREADY BEEN DOING THAT.
11              MR. VERHOEVEN:  ON OUR SIDE, WE'VE BEEN
12    DOING THAT, YOUR HONOR.
13              THE COURT:  OKAY.  SO WHEN CAN YOU GIVE,
14    I WOULD LIKE A JOINT ONE, AND IF YOU DISPUTE
15    ANYTHING, I WOULD SAY CHECK THE TRANSCRIPT, BECAUSE
16    GENERALLY IT'S ALL IN THERE.
17              BUT IF YOU CHECK THE TRANSCRIPT AND
18    THERE'S STILL AN ISSUE BECAUSE I WAS UNCLEAR OR
19    WHATEVER, I GUESS RAISE IT IN THE JOINT LIST.
20              BUT WHEN DO YOU THINK YOU CAN PROVIDE
21    THAT.
22              MR. JACOBS:  HOW ABOUT THURSDAY MORNING,
23    YOUR HONOR, AT 11:00 A.M.
24              MR. VERHOEVEN:  I JUST HAVE A QUESTION.
25    I THOUGHT YOU WERE TALKING ABOUT AFTER THE JURY
```

1    RETIRED.

2                    ARE YOU TALKING ABOUT WHILE THEY'RE --

3    THEY'RE NOT GOING TO BE DELIBERATING UNTIL THE END?

4                    THE COURT:  I'D LIKE TO, BECAUSE MY LIST

5    IS ALREADY SEVEN PAGES LONG.  I DON'T KNOW HOW LONG

6    YOUR LIST IS.

7                    MR. VERHOEVEN:  YOU JUST WANT TO MAKE

8    SURE EVERYBODY IS ON THE SAME PAGE.

9                    THE COURT:  EXACTLY.  I WANT THERE NOT TO

10   BE DISAGREEMENT AS TO WHAT'S BEEN ADMITTED.

11                   MR. VERHOEVEN:  THAT SHOULD BE NO

12   PROBLEM, YOUR HONOR.

13                   THE COURT:  BECAUSE OF THE VOLUME, I

14   THOUGHT WE COULD AT LEAST GET THE FIRST TWO WEEKS,

15   EVERYONE IN AGREEMENT, AND NEXT WEEK WHEN WE HAVE A

16   SLEW OF MORE AGREEMENTS, WE CAN DO IT AGAIN.

17                   MR. VERHOEVEN:  I AGREE WITH MR. JACOBS.

18                   THE COURT:  THURSDAY MORNING IS GOOD.

19                   MR. JACOBS:  AND THEN WHY DON'T WE SET

20   THE SAME TARGET FOR, AND WE WILL TRY TO MEET AND

21   CONFER AND TAKE THIS UP, TOO, OF GETTING FOR THE

22   COURT A SET OF THE DISPLAYED DEMONSTRATIVES.

23                   THE COURT:  ALL RIGHT.  THAT WOULD BE --

24   I THINK THAT WOULD JUST BE HELPFUL FOR THE RECORD.

25                   MR. JACOBS:  EXACTLY.

1633

```
1              THE COURT:  OKAY.  SO THURSDAY MORNING?
2              MR. JACOBS:  AT 11:00 A.M.
3              THE COURT:  OKAY.  ALL RIGHT.  NOW, JUST
4    SO YOU KNOW, OUR OFFICIAL TIMERS, IT LOOKS LIKE
5    IT'S ABOUT TWO MINUTES AHEAD OF THAT CLOCK.  BUT
6    THIS TIMER IS TIED TO THE TRANSCRIPT, AND SO THAT'S
7    WHY I'M USING IT BECAUSE IT'S GOING TO BE CLEANER
8    FOR THE RECORD.
9              NOW, I DIDN'T GET -- WHAT WAS THE TIME
10   ON -- THE ONE TIME THAT I NEED TO CONFIRM IS, IS
11   10:30 THIS MORNING, THIS IS DURING THE KARE DIRECT,
12   IT WAS MS. KREVANS, EXACTLY WHAT TIME THAT ENDED.
13   CAN WE CHECK THAT?
14             I -- ACTUALLY, MY LIVE NOTE WASN'T
15   WORKING SO I TRIED TO REBOOT AND TURN OFF MY
16   COMPUTER.  I DIDN'T GET THAT PARTICULAR TIME.  IT
17   SHOULD BE IN THE TRANSCRIPT.
18             CAN WE CHECK THAT, IT SHOULD BE ABOUT
19   10:30, AND THEN I CAN CONFIRM IT.  THEN I CAN AT
20   LEAST GIVE YOU WHAT YOUR TIME TOTALS ARE SO FAR
21   GOING INTO FRIDAY.  IT'S ABOUT 10:32.
22             THE COURT:  I THINK IT WAS ABOUT 10:32
23   THIS MORNING.
24             MR. VERHOEVEN:  WE HAVE 10:30, AND YOU
25   SAID THAT ONE IS FAST.
```

1634

```
 1              MR. JACOBS:  I THINK IT'S ABOUT TWO

 2     MINUTES FAST.

 3              MR. JACOBS:  CAN WE CHECK THE TRANSCRIPT,

 4     YOUR HONOR?

 5              THE COURT:  I'M HAVING MS. RODRIGUEZ

 6     CHECK RIGHT NOW.

 7                  (PAUSE IN PROCEEDINGS.)

 8              THE COURT:  ALL RIGHT.  AND THE TIME SO

 9     FAR, APPLE HAS USED 9 HOURS AND 9 MINUTES, AND

10     SAMSUNG HAS USED 9 HOURS AND 1 MINUTE.

11              OKAY.  WHAT ELSE?  WHAT ELSE DO WE NEED

12     TO DO?  ANYTHING ELSE?

13              MR. MCELHINNY:  JUST ONE ISSUE THAT I'D

14     LIKE TO PUT ON YOUR RADAR.  AS YOUR HONOR KNOWS,

15     ONE OF THE MATTERS THAT IS PENDING IS YOUR HONOR'S

16     REVIEW OF JUDGE GREWAL'S SPOLIATION DECISION AND

17     THE ADVERSE INFERENCE.

18              THE COURT:  YES.

19              MR. MCELHINNY:  AND THE REASON I WANT TO

20     MENTION THAT TO YOU IS GIVEN THE REMEDY THAT

21     JUDGE GREWAL ORDERED, HE ORDERED WHAT IS, IN

22     EFFECT, A REBUTTABLE PRESUMPTION.

23              SO I JUST DON'T WANT TO END UP IN A

24     SITUATION WHERE SAMSUNG CLAIMS THAT IT WAS DEPRIVED

25     OF THE ABILITY TO REBUT THAT BECAUSE THEY DIDN'T
```

```
1    KNOW WHAT THE PRESUMPTION WAS GOING TO BE, OR THEY

2    DIDN'T KNOW WHAT THE ORDER WAS GOING TO BE, BECAUSE

3    OBVIOUSLY IF THEY'RE GOING TO TRY TO REBUT THAT,

4    THEY NEED TO DO THAT IN THEIR CASE-IN-CHIEF.

5              THE COURT:  IF IT'S POSSIBLE, I WILL

6    TRY -- I CAN'T GUARANTEE IT, BUT I'M GOING TO TRY

7    TO GET THE SEALING ORDERS, YOU KNOW, ALL THE ORDERS

8    ON THE MOTIONS TO SEAL, OR AS MANY AS POSSIBLE.

9    THERE'S SOME THAT SOME OF THE THIRD PARTIES HAVE

10   REQUESTED TO FILE REPLIES, WHICH I GRANTED LAST

11   NIGHT.  SO TO THE EXTENT ONES ARE FULLY BRIEFED,

12   I'LL TRY TO GET, IF IT'S POSSIBLE, THOSE TWO ORDERS

13   OUT THIS WEEK.

14             MR. MCELHINNY:  FOR THE RECORD, OUR

15   POSITION IS THAT SAMSUNG KNOWS THE ORDER'S OUT

16   THERE AND KNOWS WHAT THE REQUIREMENT IS, AND IF

17   THEY INTEND TO REBUT IT, THEY SHOULD TAKE THAT INTO

18   CONSIDERATION GOING FORWARD.

19             THE COURT:  I UNDERSTAND THAT.  I'M JUST

20   TRYING TO GIVE EVERYONE NOTICE.

21             MR. MCELHINNY:  THANK YOU, YOUR HONOR.

22             THE COURT:  TO THE EXTENT, I'LL TRY TO

23   USE -- I MEAN, I HAVE REGULAR AND CIVIL CALENDARS

24   TOMORROW AND THURSDAY, BUT I'LL TRY TO USE THIS

25   TIME TO GET SOME ORDERS OUT LIKE I DID LAST WEEK.
```

```
 1              MR. JACOBS:  AND JUST ON YOUR LAST POINT,

 2     YOUR HONOR, LET ME FLAG FOR YOU THAT WE'VE

 3     SUBMITTED A STIP AND PROPOSED ORDER, WHICH I THINK

 4     WILL MOOT MANY, IF NOT ALL, OF THE THIRD PARTY

 5     CONCERNS BECAUSE IT PROVIDES THAT WE WILL MANAGE

 6     THIS PROCESS GOING FORWARD IN A WAY THAT MINIMIZES

 7     THE REVELATION OF SUCH INFORMATION.

 8              THE COURT:  RIGHT.  BUT THAT DOESN'T TAKE

 9     CARE OF MY ISSUES WITH EVERYTHING THAT'S BEEN

10     ALREADY FILED IN THE CASE.

11              MR. JACOBS:  THAT'S TRUE, YOUR HONOR.

12              THE COURT:  WHICH IS WHAT I HAVE TO DEAL

13     WITH.

14              I SAW THAT THIS MORNING.  I APOLOGIZE.

15     I'M NOT READY TO DISCUSS THAT, BUT I DID SEE IT.

16     I'LL LOOK AT IT.  AND WE'LL JUST HAVE TO GET BACK

17     TO YOU ON THAT ONE.

18              MR. JACOBS:  THANK YOU, YOUR HONOR.

19              THE COURT:  OKAY.  WHAT ELSE?  ANYTHING

20     ELSE THAT WE NEED TO COVER TODAY?

21              MR. VERHOEVEN:  NOTHING FOR SAMSUNG, YOUR

22     HONOR.

23              THE COURT:  NOTHING ELSE?

24              MR. JACOBS:  NOTHING FURTHER FROM APPLE,

25     YOUR HONOR.
```

1637

1             THE COURT:  ALL RIGHT.  WELL, THANK YOU.

2     IF THERE'S ANYTHING ELSE YOU NEED TO GIVE US BY WAY

3     OF EXHIBITS, ANY TIME YOU CAN JUST RING THE BUZZER

4     FOR OUR CHAMBERS ON THE FOURTH FLOOR BETWEEN THE

5     TWO ELEVATOR BANKS, OKAY, AND WE CAN GET IT.

6             OKAY.  THANK YOU.  THANK YOU VERY MUCH.

7             MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

8             MR. MCELHINNY:  THANK YOU, YOUR HONOR.

9             (WHEREUPON, THE EVENING RECESS WAS

10    TAKEN.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                    CERTIFICATE OF REPORTERS

6

7

8            WE, THE UNDERSIGNED OFFICIAL COURT

9     REPORTERS OF THE UNITED STATES DISTRICT COURT FOR

10    THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11    FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12    CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14    CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15    CORRECT TRANSCRIPT OF OUR SHORTHAND NOTES TAKEN AS

16    SUCH OFFICIAL COURT REPORTERS OF THE PROCEEDINGS

17    HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18    TRANSCRIPTION TO THE BEST OF OUR ABILITY.

19

20                         /S/
                    _____
21                  LEE-ANNE SHORTRIDGE, CSR, CRR
                    CERTIFICATE NUMBER 9595
22

23                         /S/
                    _____
24                  IRENE RODRIGUEZ, CSR, CRR
                    CERTIFICATE NUMBER 8074
25

1        DATED:  AUGUST 7, 2012

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25