# EXHIBIT H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No.   11-cv-01846-LHK<br><br>**REBUTTAL EXPERT REPORT OF RAVIN BALAKRISHNAN, PH.D. REGARDING VALIDITY OF U.S. PATENT NO. 7,469,381** |

**\*\*CONFIDENTIAL – CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY PURSUANT TO A PROTECTIVE ORDER\*\***

page of the patent.  I understand that, to claim the benefit of the date of an earlier patent application, the earlier application must disclose and support the subject matter of the claims.

30. I understand that the "critical date" for a patent is one year before its priority date.

### E. Reexamined Patents

31. I have been informed by counsel that a patent may undergo a reexamination process in which the patentability of a patent's claims are reexamined on the basis of prior art patents and printed publications.  I understand that reexamination may result in the rejection or confirmation of patent claims.

## IV. DETAILED OPINION

### A. Background of the '381 Patent

32. U.S. Patent no. 7,469,381 (APLNDC00022467-527) is titled List Scrolling and Document Translation, Scaling and Rotation on a Touch-Screen Display.  The filing date of the patent application (Application No. 11/956,969) is December 14, 2007, and its date of issue is December 23, 2008.  There are a number of related patent applications to which the '381 application claims priority, the earliest of which is dated January 7, 2007.  I have reviewed portions of the deposition transcript of Bas Ording, the named inventor of the '381 patent, and understand that Mr. Ording conceived of his invention in early February 2005, and reduced it to practice in a prototype by February 11, 2005.  (B. Ording 8/9/11 Dep. Tr. at 126:3 – 130:7.)

33. The critical date for the claims of the '381 patent is January 7, 2006, one year before the filing date of the first provisional application.

34. I understand that on April 28, 2010, a Request for Reexamination was filed at the request of Nokia Corporation (*see* Dkt. No. 87-40), which was then involved in a patent infringement lawsuit with Apple regarding the '381 patent, with the Patent Office, asserting that a substantial new question of patentability existed in light of certain patents and printed publications.  (APLPROS0000019658-708.)  On July 14, 2010, the Patent Office granted this request for ex parte reexamination.  On January 13, 2011, the Patent office issued a Notice of Intent to Issue Ex Parte Reexamination Certificate, and confirmed that the identified patents and printed publications, "either singularly or in combination fail to teach or suggest, 'in response to

1  detecting that the object is no longer on or near the touch screen display, translating the electronic
2  document in a second direction until the area beyond the edge of the electronic document is no
3  longer displayed to display a fourth portion of the electronic document, wherein the fourth portion
4  is different from the first portion.'" (APLPROS0000019626-32.) On April 26, 2011, the Patent
5  Office issued an Ex Parte Reexamination Certificate in which the patentability of all of the claims
6  of the '381 patent was confirmed. (SAMNDCA00000030-31)

7     35.   As discussed in my opening expert report regarding Samsung's infringement of the
8  '381 patent, the '381 patent relates to translation of an electronic document on a touch screen
9  display in response to a user's movement of an object, such as the user's finger, on or near the
10 touch screen. (*See* '381 patent at Abstract.) The '381 patent generally claims an innovative
11 method of informing the user of a touch screen mobile device that the edge of an electronic
12 document has been reached by allowing the user to scroll beyond the edge of the document and to
13 view an area beyond the edge of the document for as long as the user keeps his finger in contact
14 with the screen. Once the user's finger is removed, the '381 patent describes having the
15 document or image scroll back into place so that the area beyond its edge is no longer shown, and
16 the document or image can be viewed.

17     36.   An overview of the invention is depicted in Figures 8A-8D of the patent, which
18 show the '381 patent's "rubber banding" feature in action:



26     37.   This invention provides an elegant and appealing form of visual feedback to a user
27 that there is no more of a document to be seen. For example, if a user is zoomed in on one part of
28 a large photo, he may continue to scroll the photo as he looks at other parts of the image. Not

knowing exactly where the photo ends, he may continue to scroll in a direction even when there is no more of the photo to display.  When this happens, an area beyond the edge of the photo will be displayed, and once the user lifts his finger, the photo will "bounce" or "rubber band" back to fill the screen.  This form of visual feedback is readily understood and makes clear to the user that he cannot continue to scroll in that direction.

38.     This visual feedback also provides an intuitive solution to a vexing user interface issue: what to do when a user scrolls to the edge of an electronic document.  In the prior art, when a user scrolled to the edge of a document, one of two scenarios would play out.  Either she would scroll continuously past the edge of the document into nothingness (*i.e.* beyond a place where there was any meaningful content), or she would hit a "hard stop" and not be allowed to scroll any further.

39.     Each of these scenarios has its own disadvantages.  Allowing a user to move through virtual space going absolutely anywhere, including beyond a place that has any meaningful content, can cause the user to become disoriented.  (*See* B. Bederson Dep. Ex. 222 at 4; B. Bederson Dep. Tr. at 204:6-24; 205:6-207:5; 213:2-214:1.)  In a paper he wrote in 2011, Benjamin Bederson referred to this as the "Desert Fog" phenomenon, citing an earlier article written by Jul and Furnas.  (*Id.*; *see also* A. Van Dam Dep. Tr. at 63:3-17 (referring to the empty area as "no man's land").)  Users who navigate into these empty spaces may get lost and not know how to find their way back.  (*Id.*; *see also* A. Van Dam Decl. (Dkt. No. 168) at ¶ 144.)

40.     Most user interfaces avoided the "Desert Fog" problem by inserting a hard stop at the edge of a document.  But that solution has its own disadvantages.  If the user does not realize he has hit the edge of a document, he may keep trying to move the document in vain.  No matter how hard he tries, however, the device will not allow the document to move.  As a result, the user may think his device has frozen or locked up, or that it is otherwise not registering his input.  In any case, the user could become frustrated when the scrolling or translating does not reflect his intent.  ('381 Patent at 2:26-28; *see also* A. Van Dam Decl. (Dkt. No. 168) at ¶ 144 (one way to prevent a user from moving an electronic document beyond the edge is "to prevent the document from moving beyond the edge by ignoring further requests for any such movement").)

### a. The Van Dam Report's Definition of an "Electronic Document" is Flawed

82. In the figures depicted in Lira, the electronic document is clearly the web page that a user seeks to navigate. For example, the Abstract of Lira states: "[v]iewing an electronic document in a display window of a display may include detecting a layout of the electronic document (505) and comparing the layout of the electronic document to a width of the display window (510)." Acknowledging this fact, the Van Dam Report simulated an image based on a figure in Lira which identifies the entire web page as an electronic document.



**Van Dam Report Ex. 5 at 11**

83. Another example in the Van Dam Report defines the electronic document as a single column in the center of the web page.



**Van Dam Report Ex. 5 at 8**

84. As support for his selection of this portion of the electronic document as an electronic document itself, Dr. Van Dam asserts that there is a "boundary of the logical column 1220" (Lira at 15:26-27) which identifies a "sub-document[] in a larger electronic document: the

1  web page." (Van Dam Report Ex. 5 at 7.)  This, however, contradicts the disclosure in the
2  publication itself.
3      85.   Lira makes clear that the only thing that it considers an electronic document is the
4  web page as a whole, and that while there may be formatting within that web page, that
5  formatting does not denote a different electronic document.  Lira discusses how "detecting the
6  layout of the electronic document may include detecting logical columns of the electronic
7  document, and reformatting the electronic document may include reformatting each logical
8  column to have a width that does not exceed the width of the display window." (Lira at 2:5-8
9  (emphases added).)  Just as reformatting a word processing document to have three paragraphs
10 does not create three separate electronic documents, so too does reformatting a web page into
11 three columns fail to generate three separate electronic documents.
12     86.   Accordingly, the reformatted columns in Lira are not electronic documents.  Even
13 if they could be considered as such, it is unclear where their "edges" would be.
14     87.   Because it is clear that Lira will execute its centering functionality to the center of
15 the logical column whether or not an edge of the electronic document is reached (*see* figure below
16 depicting centering with varying degrees of movement), Lira does not disclose the limitation of
17 "in response to an edge of the electronic document being reached while translating the electronic
18 document in the first direction while the object is still detected on or near the touch screen
19 display: displaying an area beyond the edge of the document, and displaying a third portion of the
20 electronic document, wherein the third portion is smaller than the first portion; and in response to
21 detecting that the object is no longer on or near the touch screen display, translating the electronic
22 document in a second direction ==until the area beyond the edge of the electronic document is no==
23 ==longer displayed== to display a fourth portion of the electronic document, wherein the fourth portion
24 is different from the first portion."  In sum, the centering functionality depicted below does not
25 satisfy this limitation of the asserted claims of the '381 patent.



**Lira Fig. 14B (partial view)**

88. Because this limitation appears in all of the asserted claims, Lira does not anticipate or render obvious those claims.

### b. Lira does not disclose how it would operate at the external edges of an electronic document

89. Lira does not discuss what will or should happen if the user attempts to move the display window beyond the external edge of the webpage. Nor does it disclose the specific solution in the '381 patent: displaying an area beyond the edge of the webpage in response to reaching the edge. On the contrary, the display windows in each figure never move beyond the edges of the webpage; they are always shown within the outer boundaries of the page. (*See, e.g. id.* at Fig. 14B.) In my opinion, the reference teaches away from the solution of the '381 patent.

90. As noted above, the Van Dam Report asserts that an entire web page can be an "electronic document."

150. In connection with my anticipated testimony in this action, I may use as exhibits various documents produced in this case that refer or relate to the matters discussed in this report. In addition, I may have demonstrative exhibits prepared to assist in the presentation of my testimony and opinions as set forth or cited in my report.

Dated: April 16, 2012            /s/
                                 RAVIN BALAKRISHNAN