# EXHIBIT N

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No.   11-cv-01846-LHK<br><br>**REBUTTAL EXPERT REPORT OF DR. KARAN SINGH, PH.D. REGARDING VALIDITY OF U.S. PATENTS NOS. 7,864,163, 7,844,915 AND 7,853,891** |

**\*\*CONFIDENTIAL – CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY PURSUANT TO A PROTECTIVE ORDER\*\***

## I. INTRODUCTION

1. I, Dr. Karan Singh, have been asked by counsel for Apple Inc. ("Apple") to provide additional opinions in the above-captioned case. I am the same Dr. Karan Singh who submitted an Expert Report regarding Samsung's infringement of U.S. Patent Nos. 7,864,163 (the "'163 patent"), 7,844,915 (the "'915 patent") and 7,853,891 (the "'891 patent"). I have been asked by counsel for Apple to review and respond to the opinions and assertions made in the Expert Report of Stephen Gray Regarding Invalidity of U.S. Patent Nos. 7,844,915 and 7,864,163 that generally concerns the validity of the '163 and '915 patents, and the Expert Report of Trevor Darrell, Ph.D. Regarding the Invalidity of U.S. Patent Nos. 6,493,002 and 7,853,891 generally concerning the validity of the '891 patent.

## II. QUALIFICATIONS

2. I incorporate here by reference the description of my qualifications contained in my Expert Report Regarding Infringement of U.S. Patents Nos. 7,864,163, 7,844,915, and 7,853,891. As in my earlier Expert Report, I am being compensated at my standard hourly consulting rate of $450 and my compensation is in no way dependent upon the opinions I offer or upon the outcome of the litigation between Apple and Samsung.

## III. MATERIALS REVIEWED

3. In forming the opinions provided in this Report, I considered the materials described in my Expert Report Regarding Infringement, the additional materials listed in Exhibit A to this Report, and any other materials referenced in this Report. In particular, I have reviewed the '163, '915 and '891 patents and their file histories, the Expert Reports of Dr. Gray and Dr. Darrell and the exhibits to those Reports, at least to the extent they concern the '163, '915 and '891 patents.

4. I have also reviewed the Court's claim construction Order dated April 4, 2012, and I will follow the Court's construction of claim terms for the '915 and '891 patents. I understand that the Court did not construe any claim terms for the '163 patent. I reserve the right to rely on any additional information or materials that may be provided to me or

that are relied on by any of Samsung's experts or witnesses, if called to testify or to give additional opinions regarding this matter.

5. I understand that discovery in this case is continuing, and I may consider additional facts and material produced through discovery to determine whether such additional material has an impact on my opinions. I may amend or supplement this Report as necessary based on such additional information. I reserve the right to supplement my Report if I receive additional information.

6. In addition to the materials specifically identified, I may provide further exhibits to be used at trial to support my opinions. For example, I may use as exhibits various documents produced in this Action that refer or relate to the matters discussed in this Report. I have not yet selected the particular exhibits that might be used. In addition, I may create or assist in the creation of certain demonstrative exhibits to assist in the presentation of my testimony and opinions as described herein or to summarize the same or information cited in this Report. Again, those exhibits have not yet been created.

7. Although I focus below on the particular alleged prior art references cited by Samsung's experts, I am also familiar more generally with the state of the art at the time that the inventions claimed in the '163, '915, and '891 patents were invented. I reserve the right to consider and testify about the general technological and marketplace background at the time of Apple's inventions to place my specific opinions below in context, and to respond to any arguments raised by Samsung's experts about the same.

**IV. UNDERSTANDING OF THE LAW**

8. I have not been asked to offer an opinion on the law; however, as an expert assisting the Court in determining patent validity, I understand that I am obliged to follow existing law. I have therefore been asked to apply the following legal principles to my analysis of patent validity:

9. My understanding of the law with respect to claim construction is set forth in my Expert Report Regarding Infringement. In addition, as noted above, I will apply any

25.     In my opinion, a person of ordinary skill in the relevant art of the '163 and '891 patents at the time of those inventions would have a Bachelor's degree in computer science or electrical engineering, or the equivalent, and one or more years of experience working on designing and/or implementing user interfaces.  A person of ordinary skill in the relevant art of the '915 patent at the time of the invention would have a Bachelor's degree in computer science or electrical engineering or an equivalent, and one or more years of experience working with electronic devices with touch screen displays.  I meet these requirements for all three patents discussed in this Report.  I have interpreted the '163, '915, and '891 patent claims according to how I believe a person of ordinary skill would have understood the claims at the time of the inventions in light of the patent specifications and file histories.

26.     My not analyzing or rebutting the asserted invalidity of any claim not asserted to be infringed in my Report Regarding Infringement should not be construed as an agreement or concession on invalidity.  If the Court should determine that there is a case or controversy with respect to such claims, I reserve the right to respond to any invalidity arguments raised with respect to these claims by Samsung's experts.

**V.     THE ASSERTED CLAIMS OF THE '163 PATENT ARE VALID**

27.     As stated in my Report Regarding Infringement, I understand that the claims of the '163 patent that I analyze below were conceived of by Andre Boule, Scott Forstall, Greg Christie, Stephen O. Lemay, Imran Chaudhri, Richard Williamson, Chris Blumenberg, and Marcel van Os in or before March 2006, and reduced to practice in March/April 2006.  I understand that the asserted claims were also constructively reduced to practice in a provisional patent application filed on September 6, 2006 and in U.S. Patent Application No. 11/850,013 filed September 4, 2007.

28.     I have reviewed the Expert Report of Stephen Gray Regarding Invalidity of U.S. Patent Nos. 7,844,915 and 7,864,163, including its appendices and exhibits. Mr. Gray cites the following references to support his opinions that the asserted claims of the '163 patent are invalid as anticipated: the LaunchTile Publication, the LaunchTile System, the

XNav System, U.S. Patent No. 7,327,349 to Robbins et al. ("Robbins"), U.S. Patent No. 7,933,632 to Flynt et al. ("Flynt"), and U.S. Patent No. 6,211,856 to Choi et al. ("Choi"). Mr. Gray also cites these references in combination with six other named references to support his opinions that the asserted claims of the '163 patent are invalid as obvious. For the reasons discussed below, it is my opinion that none of these prior art references anticipates any of the claims of the '163 patent that I asserted were infringed in my Expert Report Regarding Infringement. Moreover it is my opinion that none of these references, alone or in combination with one another, renders the asserted claims obvious. Finally, it is my opinion that the asserted claims of the '163 patent are not invalid for lack of written description or enablement, or for indefiniteness.

### A. The Asserted Claims of the '163 Patent Are Not Anticipated or Rendered Obvious by the LaunchTile or XNav Systems or the LaunchTile Publication

29. Three of the references that Mr. Gray asserts anticipate the '163 patent—the LaunchTile System, the XNav System, and a publication entitled AppLens and LaunchTile: Two Designs for One-Handed Thumb Use on Small Devices (the "LaunchTile Publication")—are closely related. I understand that the LaunchTile System is a prototype graphical user interface created by Benjamin Bederson and his colleagues for use on mobile devices such as Personal Digital Assistants and cell phones. (Bederson Decl. in Supp. of Samsung's Opp. to Apple's Mot. for Prelim. Inj. at 1.) The LaunchTile Publication describes how aspects of the LaunchTile System function. (*Id.*) The XNav System is a variant of the LaunchTile System that is adapted for use with different devices and operating systems. XNav is based on the same source code as LaunchTile, and it has many of the same features. (*Id.* at 7.)

30. Mr. Gray's own description of LaunchTile, which applies equally to XNav, shows that LaunchTile's functionality is fundamentally different from the functionality claimed in the '163 patent. Mr. Gray describes LaunchTile as follows:

> LaunchTile consisted of an "interactive zoomspace" consisting of 36 application tiles, divided into nine zones of four tiles each. The LaunchTile Publication referred to this "zoomspace" as the

> "World." When the entire zoomspace was in view, the LaunchTile Publication referred to the view as "World View."
>
> The zoomspace included a blue button ("Blue") in the center of each 4-tile "Zone" that could be selected by the user to enlarge and translate the four tiles that were adjacent to the selection button. When enlarged, the four tiles and the selection button [were] referred to as the "Zone View[.]"
>
> From the Zone View, LaunchTile permit[ted] the user to select any one of the 4 application tiles to launch the corresponding application.

(Gray Report at 89-90.)  LaunchTile / XNav and the '163 patent address fundamentally different problems: LaunchTile and XNav address the use of a fixed set of applications in a predefined layout, whereas the '163 patent deals with the readability and navigation of arbitrarily sized and structured documents on a small screen.

31. LaunchTile, as described above, discloses a method that purposely uses abstraction to provide <u>three different layers</u> of information.  At each layer (World, Zoom, and Application) the system displays <u>different content</u>, which is distinct from the content in other layers, notwithstanding the fact that symbolic links may exist between layers (such as text and graphics that comprise, for example, an email icon in the Zone View launching a corresponding, but separate, email Application).  By contrast, the '163 patent claims a method for viewing the content of <u>the same structured electronic document</u> effectively on a portable device's screen, even when the screen does not naturally accommodate the document's size.  The '163 patent describes scaling and translating a structured electronic document to better allow a user to focus on different portions of it, but it is, at all relevant times, <u>the same electronic document</u> that is displayed on the screen.  In contrast, moving to a different layer in LaunchTile and XNav does not merely enlarge or translate a structured electronic document, but instead displays different and additional content.  For at least these reasons, LaunchTile and XNav do not anticipate claims 2, 6-7, 10, 12-13, 17-18, 27, 29-30, 32-35, 37-41, or 49-52. Mr. Gray's obviousness arguments that urge combinations with LaunchTile and XNav are addressed below in connection with the claims to which they apply.

**1.     Claim 2: "detecting a first gesture at a location on the displayed portion of the structured electronic document; determining a first box in the plurality of boxes at the location of the first gesture; enlarging and translating the structured electronic document so that the first box is substantially centered on the touch screen display"**

32.     I disagree with Mr. Gray's determination that LaunchTile and XNav disclose claim 2's recitation of "detecting a first gesture at a location on the displayed portion of the structured electronic document; determining a first box in the plurality of boxes at the location of the first gesture; enlarging and translating the structured electronic document so that the first box is substantially centered on the touch screen display."

33.     The unambiguous language of claim 2 requires that the "structured electronic document" that is "enlarge[ed] and translate[ed]" (such that the enlarged portion of it is "substantially centered on the touch screen display") must be <u>the same structured electronic document</u> that includes a location where "a first gesture" is detected and "a first box" is determined.  LaunchTile and XNav fail to disclose this recitation of claim 2 because the different zoom levels in LaunchTile and XNav do not display the same structured electronic document.    In LaunchTile and XNav, the "substantially centered" Zone View is entirely distinct from the World View, or portion of it, that is initially displayed and tapped on by the user.[1]  Transitioning from the World View to the Zone View does not involve "enlarging and translating" a portion of the World View.  Rather, a Zone View entirely <u>replaces</u> the World View that was previously displayed.  This replacement functionality is apparent in all of the LaunchTile screenshots included in part [2b] of the claim chart attached as Appendix 7 to Mr. Gray's report, which clearly show that the Zone View is not merely a translated and enlarged version of the World View, but entirely different content with a different visual appearance:

---

[1] I express no opinion as to whether the portions of the World View, Zone View, and Application View displayed by LaunchTile and XNav individually constitute "structured electronic documents" within the meaning of the '163 patent.  Because it is clear that the different Views display distinct content, they cannot be the same structured electronic document.



Note, for example, that the single phone icon in the World View becomes a list of calls in the Zone View; the email and calendar cells similarly become detailed lists in the Zone View where they were merely iconic representations in the World View.  The difference is more than mere enlargement and translation; it is substitution of entirely different content.

34.     A review of the XNav source code confirms that the Zone View displays different content, not merely an enlarged and translated version of content displayed in the World View.  Specifically, the XNav code calls <u>entirely different</u> graphical assets when a transition is made from World View to Zone View, rather than enlarging the World View graphical assets.  (*See* Landscape.cs in Bederson Decl. in Supp. of Samsung's Opp. to Apple's Mot. for Prelim. Inj., Ex. G (hereinafter XNav Source Code Exhibit).)

   **2.   Claim 2: "while the first box is enlarged, a second gesture is detected on a second box other than the first box; and in response to detecting the second gesture, the structured electronic document is translated so that the second box is substantially centered on the touch screen display"**

35.     I disagree with Mr. Gray's determination that LaunchTile and XNav disclose claim 2's recitation of "while the first box is enlarged, a second gesture is detected on a

Apple v. Samsung
Confidential – Attorneys' Eyes Only

second box other than the first box; and in response to detecting the second gesture, the structured electronic document is translated so that the second box is substantially centered on the touch screen display."

36. Mr. Gray provides the following support seeking to establish that LaunchTile and XNav disclose this recitation of claim 2:

> In both the LaunchTile and XNav systems, the user "taps any of the 4 notification tiles within Zone view to launch a corresponding application." Therefore, in response to a second gesture (user tap) at the location of a second box (notification tile), "[a]n animated zoom draws the zoomspace toward the user until the target application fills the entire display . . . ." See LaunchTile Publication at 205.

(Gray Report Appendix 7 at 5.) Mr. Gray advances several alternative theories in part [2c] of the Appendix 7 claim chart that differ slightly in how the "first box" is defined or in the precise series of steps that precede tapping on a notification tile. But all of these alternatives define the "second box" as a notification tile in the Zone View, which is allegedly "substantially centered" when the user taps on it and launches the corresponding Application.

37. In my opinion, the transition from Zone View to Application View in LaunchTile and XNav fails to disclose this recitation of claim 2 for reasons analogous to those discussed in the previous section (there, in connection with the World View-to-Zone View transition): Zone View and Application View do not display the same structured electronic document. Rather, an Application, such as the email application that Mr. Gray uses as his example (Gray Report Appendix 7 at 5-8), displays content entirely distinct from anything displayed in the Zone View. As a result, any centering of content displayed in the Application View has no bearing on the "second box" defined in the Zone View, which is defined with respect to a different electronic document. The Application View displays separate content, which is not the result of merely "translat[ing]," as claim 2 requires, any electronic document visible in the Zone View. The unimplemented Applications in the LaunchTile and XNav prototypes—which include 33 of the 36 notification tiles (all except the email application that Mr. Gray uses as his example and two others)—provide the best

illustration of the fact that the Zone View and the Application View display entirely distinct content.  Selecting a notification tile in Zone View that corresponds to an unimplemented Application results in the display of a placeholder screen—shared by all of the unimplemented Applications—that says "Application Under Construction."  It is readily apparent that no notification tile in Zone View displays this text, so it cannot be the case that an Application View displaying this text is the result of merely "translat[ing]" any electronic document displayed in Zone View.



As shown above, selecting the unimplemented Calendar Application in XNav brings up a mostly blank screen with the text "Application Under Construction" on it.

38. My review of XNav source code confirms that each Application View displays content distinct from anything displayed in Zone View.  As with the transition from World View to Zone View, the transition from Zone View to display of an Application involves completely different graphical assets, rather than translation of the same graphical assets. (*See* Landscape.cs and EmailListNode.cs in XNav Source Code Exhibit.)

    **3.**    **Claim 4: "The method of claim 2, wherein the structured electronic document is a web page."**

39. In my opinion, LaunchTile and XNav do not expressly or inherently practice the method of claim 2 wherein the structured electronic document is a web page.

40. I disagree with Mr. Gray's assertion that it would have been obvious to one of ordinary skill in the art to combine LaunchTile with U.S. Patent Application 2002/0030699, filed by Van Ee ("Van Ee"), U.S. Patent Application 2004/0107403, filed by Tetzchner

("Tetzchner"), or U.S. Patent Application 2005/0195221, filed by Berger et al. ("Berger"). These references generally disclose zooming involving web pages. However, the iconic replacement nature of LaunchTile is substantially different than a true zoom function. LaunchTile provides no guidance as to how a web page would be rendered into representative tiles for iconic replacement. Rather, each of LaunchTile's tiles is in fact a predetermined program icon that is specific to the given application. Similar customization, which would not be obvious to one of ordinary skill in the art, would be required to provide every webpage—indeed, every part of it that one wanted to make zoomable in LaunchTile—with an iconic tile. In any event, a combination of LaunchTile/XNav with Van Ee, Tetzchner, or Berger would not disclose all of the elements of claim 4.

   **4. Claim 5: "The method of claim 2, wherein the structured electronic document is an HTML or XML document."**

41. In my opinion, LaunchTile and XNav do not expressly or inherently practice the method of claim 2 wherein the structured electronic document is an HTML or XML document.

42. I disagree with Mr. Gray's assertion that it would have been obvious to one of ordinary skill in the art to define an electronic document in LaunchTile as an HTML or XML document simply because such documents could be accessed, in other applications, on devices capable of running LaunchTile. As discussed above in connection with claim 4, LaunchTile would require HTML or XML documents to be rendered into representative tiles for iconic replacement, because this is how the LaunchTile system—unlike a typical web browser, for instance—functions. But LaunchTile itself provides no guidance on how an ordinary HTML or XML document would be converted into a LaunchTile-compatible form.

43. I further disagree with Mr. Gray's assertion that claim 5 is rendered obvious in light of Tetzchner. Tetzchner discloses zooming in a web browser, but this gets one of ordinary skill in the art no closer to knowing how to adapt documents viewable in a web browser—even one with zooming functionality—to the particular tile-based scheme of LaunchTile. Web browsers that were known in the prior art, as far as I am aware, did not