# EXHIBIT T

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

|  |  |
|---|---|
| APPLE INC., a California corporation,<br><br>       Plaintiff,<br><br>   vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>       Defendant. | CASE NO. 11-cv-01846-LHK<br><br>**EXPERT REPORT OF WOODWARD YANG REGARDING THE INFRINGEMENT OF U.S. PATENT NOS. US 7,577,460, US 7,456,893, US 7,698,711 AND US 7,079,871** |

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

## TABLE OF CONTENTS

<u>Page</u>

I.      INTRODUCTION ...................................................................................................1

II.     QUALIFICATIONS .............................................................................................1

III.    COMPENSATION ...............................................................................................3

IV.     OVERVIEW OF OPINIONS ...............................................................................3

V.      CLAIM CONSTRUCTION AND INFRINGEMENT ........................................5

VI.     BACKGROUND OF PATENTED TECHNOLOGY ..........................................7

VII.    U.S. PATENT NO. 7,577,460 ...........................................................................10

        A.      Infringement of U.S. Patent No. 7,577,460 ...........................................12

        B.      Response to Apple's Non-Infringement Contentions as to the '460 Patent...........13

VIII.   U.S. PATENT NO. 7,456,893 ...........................................................................15

        A.      Infringement of U.S. Patent No. 7,456,893 ...........................................17

        B.      Response to Apple's Non-Infringement Contentions as to the '893 Patent...........18

IX.     U.S. PATENT NO. 7,698,711 ...........................................................................20

        A.      Infringement of U.S. Patent No. 7,698,711 ...........................................22

        B.      Response to Apple's Non-Infringement Contentions as to the '711 Patent...........23

X.      U.S. PATENT NO. 7,079,871 ...........................................................................24

        A.      Infringement of U.S. Patent No. 7,079,871 ...........................................25

        B.      Response to Apple's Non-Infringement Contentions as to the '871 Patent...........26

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

**I.      INTRODUCTION**

1.      I, Woodward Yang, am the Gordon McKay Professor of Electrical Engineering and Computer Science in the School of Engineering and Applied Science at Harvard University.

2.      I have been retained by Samsung as an expert witness in this action.  If called upon to testify as to the truth of the matters stated herein, I could and would do so competently.

**II.     QUALIFICATIONS**

3.      I am presently the Gordon McKay Professor of Electrical Engineering and Computer Science in the School of Engineering and Applied Science at Harvard University, where I have taught and pursued research endeavors since 1990.  I have taught classes related generally to the design and analysis of microelectronic circuits and Very Large Scale Integration ("VLSI") systems: the process of creating integrated circuits by combining thousands of transistors into a single chip. VLSI began in the 1970s when complex semiconductor and communication technologies were being developed.  The microprocessors typically used in smartphones are an example of a VLSI device.  I have also taught graduate and undergraduate level courses in computer architecture, computing hardware, digital logic design, mixed signal circuit design, circuit theory, and engineering design.  My research pursuits have been directed to the development of advanced computing and memory systems for high performance image processing and computer vision applications, data encryption, error correcting codes, and integrated sensor and computing systems.

4.      Since 2008, I have also served as the Harvard Business School ("HBS") University Fellow and teach courses at HBS as a Visiting Professor.  In this capacity, I have conducted research and taught business school courses on the commercialization of new technologies, technological innovation, and industry architecture.

5.      I have over 25 years of experience in the field of electrical engineering and computer science, during which time I have published many peer-reviewed papers in the field and have been extensively involved in the development and commercialization of several important mobile phone technologies.  These technologies, which are now common in mobile

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

phones, include CMOS image sensors and pseudo-SRAM.  Over the course of my career, I have been a named inventor on at least 9 patents.

6.      I graduated with a Bachelor of Science degree in Electrical Engineering and Computer Science from the University of California, Berkeley in 1984.  During my undergraduate studies, I also pursued research in the university's Electronic Research Laboratory, where I researched the measurement and analysis of hot electron degradation in MOS ("metal oxide semiconductor") transistors.

7.      I received a Master's of Science degree in Electrical Engineering and Computer Science from the Massachusetts Institute of Technology in 1987.  While pursuing my Masters degree, I served as a research assistant in the Microsystems Technology Laboratory, where I assisted in developing and characterizing low pressure ammonia and oxygen annealing processes that improve the reliability of scaled MOS transistors.

8.      I received my Ph.D. in Electrical Engineering and Computer Science from the Massachusetts Institute of Technology in 1990.  My doctoral thesis concerned "The Architecture and Design of CCD Processors for Computer Vision."  While pursuing my doctorate, I served as research assistant in the university's Artificial Intelligence Laboratory, where I contributed to the development, design, and implementation of analog VLSI hardware in computer vision systems.

9.      From approximately 1990-2000, I taught and pursued advanced research at Harvard in the general areas of high performance VLSI computing systems and computer architecture, and also worked as a consultant in the area of advanced image sensors based on both CCD and CMOS technology.  The culmination of a large portion of this work was the successful commercialization of CMOS image sensors into miniature cameras that were integrated into computer and mobile phones.

10.     In 2000, I founded a company called Silicon7.  The company designed, developed, manufactured, and marketed advanced memory components and systems for mobile communication devices and platforms.  These advanced memory components and systems were optimized for the distinct requirements of mobile communication devices.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

11.      Over the course of my career, I have received various honors and fellowships.  In 1984, I received both the National Science Foundation Fellowship and Hertz Foundation Fellowship.  In 1992, I received both the Army Research Office Young Investigator Award and the National Science Foundation Young Investigator Award.  I have also served as an IEEE Distinguished Lecturer in the areas of CMOS Image Sensors and High Performance VLSI Systems.

12.      I have previously been qualified as an expert witness in the field of electrical engineering and computer science in the matter of Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers, ITC Investigation No. 337-TA-701.

13.      Attached as **Appendix A** to this report is my curriculum vitae, which contains a complete listing of my education, my professional experience, the publications that I have authored, and the cases in which I have testified as an expert at trial or in depositions during the previous four years.

## III.   COMPENSATION

14.      I am being compensated at the rate of $550 per hour for my work on this case.  I have received no other compensation for my work in this litigation.  My compensation is in no way contingent upon the opinions I arrive at or the result of the litigation.

## IV.   OVERVIEW OF OPINIONS

15.      In preparing this report, I have reviewed the documents listed in **Appendix B**.

16.      I have been asked to offer my opinion as an expert in the field of electrical engineering and computer science as to whether Apple Inc. infringes certain claims of U.S. Patent No. 7,577,460 ("'460 patent"); U.S. Patent No. 7,456,893 ("'893 patent"); U.S. Patent No. 7,698,711 ("'711 patent"); and U.S. Patent No. 7,079,871 ("'871 patent").

17.      I have investigated whether the following Apple products infringe the '460, '893, '711, and '871 patents:  iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S, iPad 2, iPod Touch (4th Generation).  As described more fully below, it is my opinion that:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

- The iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S, iPad 2, and iPod Touch (4th Generation) ("the '460 Accused Products") infringe claim 1 of the '460 patent, either literally or under the doctrine of equivalents;

- iPhone 3GS, iPhone 4, iPhone 4S, iPad 2, and iPod Touch (4th Generation) ("the '893 Accused Products") infringe claims 1-4, 6-8, and 10-16 of the '893 patent, either literally or under the doctrine of equivalents;

- The iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S, and iPod Touch (4th Generation) ("the '711 Accused Products") infringe claims 1, 2, 3, 7, 8, 9, 10, 15, 16, 17, and 18 of the '711 patent, either literally or under the doctrine of equivalents;

- The iPhone 3GS, iPhone 4, iPhone 4S, iPad 2, and iPod Touch (4th Generation) ("the '871 Accused Products") infringe claims 5, 9, 10, and 20 of the '871 patent, either literally or under the doctrine of equivalents.

18.     These opinions rely on my review of the devices themselves, the source code produced by Apple corresponding to the accused devices, the documents listed in this report and in **Appendix B**, and my academic and professional experience.

19.     With regard to each patent, I am prepared to testify to my understanding of the claims, the specification, the relevant aspects of the prosecution history, and the level of ordinary skill in the art applicable to each.

20.     I understand that claims of a patent are to be construed as they would have been understood by a person of ordinary skill in the art at the time of the invention of the claimed subject matter.  I am of the opinion that such a person of ordinary skill in the art for the '460, '893, '711, and '871 patents would have a Bachelor's Degree in computer science/engineering and several years of industry experience in multitasking systems and computer programming, or a Master's Degree with less relevant industry experience, or a person with equivalent industry experience in portable digital devices including cell phones, digital cameras, camera phones or smart phones.

21.     I understand that, to the extent Apple's accused products do not infringe the asserted claims literally, the accused products may still infringe under the doctrine of equivalents.  As discussed in detail below, I believe Apple's accused products literally infringe

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

each and every element of the asserted claims, or, alternatively, under the doctrine of equivalents because the manner in which the products perform the claimed methods and the products themselves are at most insubstantially different from each and every element of the asserted claims.

22.     I understand that Apple has provided certain non-infringement contentions for the '460, '893, '711, and '871 patents.  I address those below.  To the extent that Apple provides additional non-infringement contentions in its expert reports or elsewhere, I reserve the right to supplement the opinions expressed herein.

## V.     CLAIM CONSTRUCTION AND INFRINGEMENT

23.     I understand that claim construction is an issue of law decided by the Court.  I further understand that the purpose of claim construction is to determine the meaning and scope of the patent claims asserted by a party to be infringed.  I have reviewed and analyzed the proposed claim construction arguments advanced by both parties for "applet," the disputed claim term of the '711 patent, and I note that the Court was not asked to construe any claim terms in the '460, '893, and '871 patents.  I understand that the Court will construe "applet," but has not done so yet.  My analysis is consistent with Samsung's position on the proper construction of the term "applet."  However, my analysis is not inconsistent with Apple's proposed construction in light of Apple's arguments, including those advanced by Apple's expert witness.

24.     Counsel has instructed me that, in the absence of the Court's construction as to a particular term, claims should be given their ordinary and customary meaning within the context of the patent.  That is, claims are accorded the meaning that the term would have to a person of ordinary skill in the art at the time of the invention, in light of the teaching of the patent.  In setting forth my opinions below, I have explained the ordinary and customary meaning of claims asserted by Samsung in this litigation.

25.     I understand that determination of patent infringement requires two steps.  First, as discussed above, the proper meaning and scope of the asserted claims are construed.  Second,

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

the properly construed claims are compared to the accused devices or accused processes of the devices.

26.     I understand that direct infringement entails a person infringing a patent by making, using, selling, or offering for sale in the United States a product or method embodying the patented invention.  I understand that direct infringement requires that the person infringing the patent actually performs the act of making, using, selling, or offering for sale the patented embodiment in the United States.

27.     As touched on above, I understand that a person may infringe a patent literally or under the doctrine of equivalents.  To literally infringe a patent claim, a product or process must contain or embody each and every element of that claim.

28.     I understand that a product or process may also be found to infringe the claims of a patent under the doctrine of equivalents.  Specifically, if a product or process does not literally infringe, based upon the express terms of a patent claim, the product or process may nonetheless be found to infringe if the accused product or process is considered to be an equivalent product or process to the patented invention.  Such equivalency is typically found, I understand, if the accused product or process contains "insubstantial differences" from the claimed invention.  I understand that whether equivalency exists may be determined based on the "insubstantial differences" test or based on the "triple identity" test, namely, whether the element of the accused product or process performs substantially the same function in substantially the same way to obtain substantially the same result.

29.     I further understand that there can be no infringement under the doctrine of equivalents if even one claim element, or its equivalent, is missing from the accused product or process.

30.     I understand that liability for infringement also may arise from actively inducing infringement of a patent.  I understand that induced infringement requires proof of direct infringement of an asserted claim, and further requires that the infringer knew or should have known that his actions would induce infringement.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

## VI.    BACKGROUND OF PATENTED TECHNOLOGY

31.    The digital revolution—the ongoing paradigm shift from analog and other traditional technologies to digital technologies—has reshaped our world over the last fifty years. The building block of the digital revolution is the encoding of information into a single bit: a "1" or a "0."  The central insight of the digital revolution is that digitally encoding information as bits has yielded immense advantages over previous analog information-encoding techniques from the perspective of durability, performance, cost, speed, storage, power consumption, and size.  By offering these advantages, the development of digital technologies has vastly expanded our capacity to store, access, manipulate, acquire, and transmit information across several media, including audio and visual information.  At the same time, the increased complexity of the hardware and software has required significant, long term research and development.

32.    In the 1980's and early-1990's, portable digital devices in the fields of telephony (mobile phones), photography (digital cameras), internet email (laptops), and music playback (CDROM players and MP3 players) first entered the market.  Initially, these devices were expensive, unwieldy, and offered only dedicated and limited features.  For example, mobile phones were only able to make and receive phone calls and only had limited other functionality such as displaying caller ID type information or sending or receiving brief text messages through SMS (Short Message Service).  In contrast, modern mobile phones now contain all of these features, such as the ability to play digital music, take and send pictures and movies, receive and send email through the internet and text messages through SMS, navigate using GPS, and many other functions.

33.    Significant hurdles, including technological and economic hurdles, limited inclusion of multiple features into a single portable device.  Technologically, supporting these features in a single portable device presented both hardware and software challenges.  These challenges stemmed in part from the resource demands of these various features, including processing resources, wireless data transmission resources, memory resources, and power-supply resources.  Due in part to these demands, engineers faced daunting technical imperatives to

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

miniaturize and reduce power consumption such that the hardware components could fit into a convenient portable form factor.  On the software front, engineers faced a two-fold challenge in (1) designing software capable of utilizing the hardware efficiently while (2) providing an intuitive, user friendly interface which permitted seamless feature interoperability.

34.     From an economic perspective, engineers faced the additional hurdle that—even if engineers could overcome the aforementioned technological challenges—the resulting devices needed to remain affordable, easy to use, and portable.

35.     In 1991, more than 15 years before Apple announced its first mobile phone, Samsung began developing digital mobile phone technology.  Samsung has since invested billions of dollars researching and developing patented technologies necessary to practice modern wireless standards, as well as novel feature technologies for wireless products.  From 2005 through 2010 alone, Samsung invested more than $35 billion in research and development. More than a quarter of Samsung employees – 50,100 engineers overall, including more than 20,000 who work in telecommunications – engage daily in cutting-edge research and development projects.

36.     Samsung's milestones of innovation in wireless communications are legion. Samsung paved the way for today's 3G and 4G technology by introducing the first CDMA handset in Korea in 1996.  In 1999, Samsung introduced the first multi-function smartphone that combined a wireless Internet phone with a touch screen PDA— eight years before the iPhone. That same year, Samsung introduced the first cell phone with MP3 audio playback functionality and the first phone with TV functionality.  In 2000, Samsung released the first camera phone, and continued to improve on this technology by later introducing the first 5, 7, and 8 megapixel camera phones.  Samsung was also at the vanguard of reducing mobile phone size, unveiling an ultra-slim handset in 2001.

37.     Samsung's innovative contributions to the mobile device industry have been recognized through its receipt of numerous awards for excellence in mobile device and user interface design.  Samsung's mobile phones and devices were awarded close to 60 design awards

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

between 2007 and the beginning of 2011, while Apple's devices received only eight such awards. Samsung, for example, has received numerous "Red Dot Design Awards" in one of the largest international design competitions and a number of Samsung's mobile devices have been awarded the "iF Design Award" for features including the user interface.  The iF Design Awards are among the most important in the world, as evidenced by the more than 11,000 annual entries from almost 50 countries.

38.     The '460, '893, '711, and '871 patents' claimed technologies share a common thread, as all are solutions invented by Samsung engineers in the process of achieving the convergence of multiple digital technologies into a single device.  The claimed technologies are building blocks of the modern smart phone and are necessary to provide all-in-one portable digital devices that can perform voice, image capture, music, and email features.  Specifically:

- The '460 patent is directed to the convergence and integration of cell phone, digital camera, and email technologies in a single device.

- The '893 patent is directed to the convergence and integration of digital photography and image review/storage technologies in a single device.

- The '711 patent is directed to the convergence and integration of music playback and other multitasking functions in single mobile communication device.

- The '871 patent is directed to the convergence and integration of text entry and advanced display methods for multitasking functions in a single portable telephone.

39.     Since the 1990's, Samsung has also played a leading role in developing processors, memory chips, and other hardware components that have increased the computing power and storage capabilities of mobile devices.  Samsung developed hardware components that were not only increasingly powerful, but also increasingly energy efficient, affordable, and compact.

40.     To this day, Samsung is a leading supplier of hardware components for not only its own devices but for other leaders in the industry, such as Apple.  For example, Apple's Accused Devices all use "A4" or "A5" processors designed and manufactured by Samsung for

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

Apple.  In 2011, it was widely publicized that approximately 25% of the iPhone 4's hardware is purchased from Samsung.  In 2012, Apple began selling its newest iPad, the iPad HD, using Samsung's touchscreen technology.

## VII.   U.S. PATENT NO. 7,577,460

41.     The '460 patent application was filed on July 26, 2006 and issued on August 18, 2009, but claims priority to a Korean application filed on March 31, 1999.  The '460 patent is directed to the convergence of three digital technologies—e-mail, digital telephony, and digital photography—on a single device.  In particular, the patent is directed to the performance of three core functions on the device:  (i) transmitting an email displaying a message only (i.e., without any image); (ii) transmitting an email displaying an image and a message; and (iii) displaying images stored on the device in sequence.  As set forth in the background of the invention:  "A user can therefore photograph an object or images as needed in business and store the photographs on the device.  The MVP (mobile video phone) may also function as a radio transmitter and therefore the user can transmit/receive a desired image without logging into a personal computer (PC)."

42.     Claim 1 of the '460 patent claims the performance of these three core functions through performance of a five step method.  Using 1999 terminology, the preamble of claim 1 specifies that this claimed method is a "data transmitting method for a portable composite communication terminal which functions as both a portable phone and a camera."  However, today in 2012, this preamble can now be more easily described as a data transmitting method for a camera phone.  The preamble further specifies that this claimed method "comprises the following steps."  I am informed that "comprises" is open-ended transitional language, meaning that infringement requires proof of each of the claimed steps.

43.     Claim 1 next describes the performance of the three core functions of a camera phone in five steps (i.e. steps one through five can be found in the '460 patent in column 14; line 27, line 31, line 36, line 38, and line 41, respectively).  Although performance of these steps in the recited sequence would certainly infringe the patent, I do not understand claim 1 to require

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

that these five claimed steps be performed in sequence.  Rather, I understand the patent to permit the performance of the three claimed, core functions in any sequence.  Notably, unlike claim 1 of the '893 patent (which is discussed below), the preamble of claim 1 of the '460 patent does ***not*** specify that the claimed method "consist[s] of the ***sequential*** steps."

44.     Steps one (line 27) and four (line 38) of claim 1 describe transmitting an email with a message only.  I understand the patent to require logically the performance of step one before the performance of step four.  Specifically, step one of claim 1 requires the device to enter a specific user state (i.e. a "sub-mode") for sending text (i.e. non-image email).  In this specific user state, the device is able to receive incoming phone calls and otherwise performs like a regular portable phone.  Step four of claim 1 clearly implies that the device in this first sub-mode also has a user interface for inputting the address of the receiving party and the text message, such that the email can actually be transmitted.

45.     Steps two (line 31) and five (line 41) of claim 1 describe an alternative method for transmitting an email with a message and an image.  I understand the patent to require logically the performance of step two before the performance of step five.  Specifically, step two requires that the device enter a second, different specific user state (i.e. "second E-mail transmission sub-mode") for sending email with an image.  In this second, different state, or "second sub-mode," the device should allow the display of the most recently captured image from the camera mode.  Step two further requires that this second e-mail transmission state is entered through a display sub-mode, in which previously captured and/or stored images can be displayed.  Step five of claim 1 requires transmitting an email with an image in the second sub-mode.  Similar to step four, step five implies that the device in this second sub-mode also has a user interface for inputting the address of the receiving party and the text message.  However, step five also requires that the image displayed also be included in the email that is finally transmitted

46.     Step three of claim 1 (line 36) describes a third core function of a camera phone: sequentially displaying the images stored on the device.  This is an important core function for

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

the device since it enables a user to sequentially browse and select previously captured or other images stored in memory using scroll keys for convenient subsequent email transmission.

        **A.**      **Infringement of U.S. Patent No. 7,577,460**

      47.      I understand that Apple manufactures, sells, offers for sale and/or imports the iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S, iPad 2, and iPod Touch (4th Generation).  It is my opinion that these products infringe claim 1 of the '460 patent.  These '460 Accused Devices include each and every element recited in claim 1, either literally or equivalently.  My detailed analysis of how these products infringe claim 1 of the '460 patent is provided in **Exhibit 1** to this Report.

      48.      Notably, with respect to the infringing features of the '460 Accused Devices, I understand from Apple's interrogatory responses that iOS version 4 software produced by Apple in this case is representative of all commercially released versions of iOS 4 software, namely 4.0, 4.0.1, 4.0.2, 4.1, 4.2, 4.2.1, 4.2.5, 4.2.6, 4.2.7, 4.2.8, 4.2.9, 4.2.10, 4.3, 4.3.1, 4.3.2, 4.3.3, 4.3.4, and 4.3.5.  I further understand that, for these infringing features, iOS version 5 software produced by Apple in this case is representative of iOS 5.0 and 5.0.1 software.  I understand that, with respect to the infringing features of the '460 Accused Devices, there are no material differences between commercially released versions of iOS 4 software and that there are no material differences between commercially released versions of iOS 5.0 and 5.0.1 software. Finally, based on Apple's interrogatory responses, I understand that the relevant software and corresponding source code of all commercially released versions of iOS 4 software have been available and are the same on all '460 Accused Products, with the exception of the iPhone 4S, and that all commercially released versions of iOS 5 software have been available and are the same on all '460 Accused Products.

      49.      Therefore, it is my understanding that my infringement analysis applies with equal force and relevance for all '460 Accused Products.

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

B.    **Response to Apple's Non-Infringement Contentions as to the '460 Patent**

50.    I have reviewed Apple's contentions that its devices do not practice the '460 patent, as set forth in Apple's Supplemental Objections and Responses to Samsung's First Set of Interrogatories (No. 12), dated March 8, 2012.  In my opinion, Apple's contentions do not establish non-infringement of the '460 patent.

51.    Apple first contends that its accused devices do not infringe claim 1 of the '460 patent because they do not practice the "modes" and "sub-modes" recited by the claims.  In particular, Apple contends that the accused devices do not practice a "first E-mail transmission sub-mode," a "second E-mail transmission sub-mode," a "portable phone mode," a "camera mode," or a "display sub-mode."  Rather, according to Apple, the accused devices run "separate programs referred to as 'apps' that allow a user to capture, display and email images, and send email messages (Camera, Photos and Mail apps)."

52.    Although Apple does not attempt to explain how a person of ordinary skill in the art would understand the term "mode" or "sub-mode" in claim 1 of the '460 patent, it is clear to me that Apple is employing an unduly restrictive understanding of the terms.  Specifically, Apple suggests that the '460 Accused Devices use "apps," which is irreconcilable with a device that uses modes or sub-modes.  For a person of ordinary skill in the art, however, the terms "mode" and "sub-mode" are not so narrow.  Rather, a "mode" generally describes a specific user state in which certain functions are available to a user.  Furthermore, a "sub-mode" describes another set of functions which might be available upon subsequent selection to enter a "sub-mode" from the current "mode."  Thus, claim 1 of the '460 patent is directed to two distinct ways in which e-mail transmission is available, i.e., a "first E-mail transmission sub-mode" and a "second E-mail transmission sub-mode."  The claim further specifies that the "first E-mail transmission sub-mode" can be accessed within a "portable phone mode" (i.e., in which portable phone functions are available), while the "second E-mail transmission sub-mode" can be accessed within a "display sub-mode" (i.e., in which image display functions are available).  In turn, this "display

13

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

sub-mode" is also accessible from within the "portable phone mode." As set forth in Exhibit 1 to this report, the '460 Accused Devices practice the modes required by claim 1 of the '460 patent.

53.     Next, in order to avoid Samsung's allegations of indirect infringement, Apple contends that "Samsung's infringement contentions fail to allege any facts suggesting that Apple intended to induce others to infringe the '460 patent, that Apple intended for users to carry out the steps described in the infringement contentions, or that any users would actually carry out those steps (which, in any event, would not constitute direct infringement)."

54.     To support these contentions, Apple interprets Samsung's infringement contentions as asserting infringement ***only*** if the required steps of claim 1 are performed in the recited sequence. As an initial matter, it is my opinion that Apple's devices can perform the claimed steps in the recited sequence. In point of fact, however, I do not understand that the steps in Claim 1 of the '460 Patent must be performed in sequence in order to infringe.

55.     Indeed, an interpretation of Claim 1 that restricted it to requiring sequential performance of steps would be inconsistent with the invention disclosed by the '460 patent. I am further informed that, absent restrictive claim language or other restrictions in the specification or prosecution history of a patent, method claims generally do ***not*** require the performance of the claimed steps in the recited sequence. I have reviewed the claims, specification, and prosecution history of the '460 patent for an indication that claim 1 should be limited to sequential performance of steps. In my opinion, nothing in the intrinsic record of the '460 patent restricts performance of the three claimed functionalities of claim 1 to the recited sequence.

56.     In fact, this requirement would be inconsistent with a person of ordinary skill in the art's understanding of the '460 patent. Rather, the figures and specification of the patent disclose the option for a user to send an email through either of two sub-modes. In the first sub-mode, the device enters the first sub-mode and transmits an email message without an image. In the second sub-mode, the device transmits an email message displaying an image. Nowhere in the figures or elsewhere in the '460 patent does the patent suggest that these two modes of transmission must be performed at the same time. Thus, the specification of the '460 patent does

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

not, as Apple alleges, require a user "to run and switch between two or three different applications at once in order to send two email messages at the same time."

## VIII.   U.S. PATENT NO. 7,456,893

57.     The '893 patent application was filed on June 27, 2005 and issued on November 25, 2008, but claims priority to a Korean application filed on March 15, 2005.  The '893 patent is directed to a method and apparatus for "bookmarking" an image in a digital photo album.  The claimed invention for controlling a digital image processing system returns a user to the same bookmarked image in a digital image photo album even after capturing new images.  The invention marks a departure from the default mode on digital cameras practiced in the art, which always returned a user to the last image captured upon returning to a digital photo album.  This default mode resulted in users losing their place in a digital image photo album, forcing the user to tediously flip back to their place in a digital image photo album.  As explained in the Background of the Invention: "…when a user temporarily switches from the stored-image display mode to another operating mode (e.g., a photographing mode), the user has to again sequentially display files that were already displayed to find his or her most recently viewed stored image."  The invention of the '893 was to enable the user of a camera-phone to quickly and conveniently find "his or her most recently viewed stored image," even after switching between the viewing and photographing modes.

58.     Claim 1 of the '893 patent is a method claim directed to this digital bookmarking feature.  Using 1999 terminology, the preamble of claim 1 requires performance of a "method of controlling a digital image processing apparatus that, in a photographing mode, processes and stores an input image in a recording medium and, in a reproduction mode, displays at least one image file of a plurality of image files that are stored in the recording medium, the method consisting of the sequential steps."  Today in 2012, however, this preamble is best understood as requiring a single device that can photograph and display images and store a plurality of images.  I further understand that the single device performs the claimed method in a sequence of six steps, labeled (a) through (f).

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

DATED:  March 22, 2012                    Respectfully submitted,


Woodward Yang

# APPENDIX B

## Expert Report of Woodward Yang

## Appendix B

| Title |
| --- |
| U.S. Patent No. 7,698,711 ('711 Patent) |
| U.S. Patent No. 7,577,460 ('460 Patent) |
| U.S. Patent No. 7,456,893 ('893 Patent) |
| U.S. Patent No. 7,079,871 ('871 Patent) |
| U.S. Patent No. 7,139,014 ('014 Patent) |
| U.S. Patent No. 7,526,585 ('585 Patent) |
| Samsung's Patent L.R. 3-1 Infringement Contentions for the '871 Patent |
| Samsung's Patent L.R. 3-1 Infringement Contentions for the '893 Patent |
| Samsung's Patent L.R. 3-1 Infringement Contentions for the '711 Patent |
| Samsung's Patent L.R. 3-1 Infringement Contentions for the '460 Patent |
| Invention Disclosure (SMANDCA00019926-30) |
| Invention Disclosure (SMANDCA00019916-925) |
| Invention Disclosure (SMANDCA00019787-97) |
| Invention Disclosure (SMANDCA00019700-46) |
| Invention Disclosure (SMANDCA00019699) |
| File History of '711 Patent (U.S. App. No. 11/778,466) (SAMNDCA00007840-8459) |
| File History of '871 Patent (APLNDC-WH-A 0000018134-295) |

| |
|---|
| File History of '893 Patent (U.S. App. No. 11/167,851) (SAMNDCA00007240-68) |
| File History of '460 Patent (U.S. App. No. 11/493,754) (APLND-WH-A 14566) |
| File History of '460 Patent (U.S. App. No. 11/003,222) (APLND-WH-A 14434) |
| File History of '460 Patent (U.S. App. No. 09/540,830) (APLND-WH-A 14072) |
| Dep. Tr. of Sung-Ho Eun (Nov. 18, 2011) |
| Dep. Tr. of Sang-Ryul Park (Nov. 18, 2011) |
| Dep. Tr. of Moon-Sang Jeong (Nov. 17, 2011) |
| Dep. Tr. of Jeong-Seok Oh (Nov. 11, 2011) |
| Dep. Tr. of Curt Rothert (March 7, 2012) |
| Dep. Tr. of Emilie Kim (March 7, 2012) |
| Dep. Tr. of  Nitin Ganatra (February 10, 2012) |
| Apple's Translation of Invention Disclosure (SMANDCA00019856-66) |
| Apple's Translation of Invention Disclosure (SMANDCA00019140-186) |
| Apple's Translation of Invention Disclosure (APLNDC-WH-A 0000020001-03) |
| Apple's Translation of Invention Disclosure (APLNDC-WH-A 0000019995-99) |
| Samsung's Supplemental Infringement Contentions for iPhone 4S |
| Teardown of iPad 2 (SAMNDCA00019359, SAMNDCA00019365, SAMNDCA00019370) |
| Teardown of iPhone 3G ( SAMNDCA00019436-48) |

| |
|---|
| Teardown of iPhone 3GS ( S-ITC-010561539-93) |
| Teardown of iPhone 4 (SAMNDCA00019461-78) |
| Teardown of iPhone 4S (S-ITC-003058461 - S-ITC-003058653) |
| Teardown of iPod Touch (4th) (SAMNDCA00019515, SAMNDCA00019521, SAMNDCA00019526) |
| Excerpts of Apple Inc.'s Responses To Samsung's Fourth Set of Interrogatories |
| Apple's Supplemental Responses to Samsung's First Set of Interogatories (No. 12) |
| Materials Related to Markman Proceedings re '711 Patent |
| Source Code Produced by Apple for Accused Products |
| Other Documents and Materials Cited by this Report |