1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

5

APPLE INC., A CALIFORNIA     )  C-11-01846 LHK
6  CORPORATION,               )
                             )  SAN JOSE, CALIFORNIA
7            PLAINTIFF,        )
                             )  AUGUST 10, 2012
8        VS.                  )
                             )  VOLUME 6
9  SAMSUNG ELECTRONICS CO.,   )
   LTD., A KOREAN BUSINESS    )  PAGES 1638-1988
10  ENTITY; SAMSUNG           )
    ELECTRONICS AMERICA,      )
11  INC., A NEW YORK          )
    CORPORATION; SAMSUNG      )
12  TELECOMMUNICATIONS        )
    AMERICA, LLC, A DELAWARE  )
13  LIMITED LIABILITY         )
    COMPANY,                  )
14                            )
              DEFENDANTS.     )
15  _____

16            TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22

23  OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                     CERTIFICATE NUMBER 9595
24

25

```
1     A P P E A R A N C E S:

2     FOR PLAINTIFF          MORRISON & FOERSTER
      APPLE:                 BY:  HAROLD J. MCELHINNY
3                                 MICHAEL A. JACOBS
                                  RACHEL KREVANS
4                            425 MARKET STREET
                             SAN FRANCISCO, CALIFORNIA  94105
5

6     FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
      APPLE:                 HALE AND DORR
7                            BY:  WILLIAM F. LEE
                             60 STATE STREET
8                            BOSTON, MASSACHUSETTS  02109

9                            BY:  MARK D. SELWYN
                             950 PAGE MILL ROAD
10                           PALO ALTO, CALIFORNIA  94304

11    FOR THE DEFENDANT:     QUINN, EMANUEL, URQUHART,
                             OLIVER & HEDGES
12                           BY:  CHARLES K. VERHOEVEN
                             50 CALIFORNIA STREET, 22ND FLOOR
13                           SAN FRANCISCO, CALIFORNIA  94111

14                           BY:  VICTORIA F. MAROULIS
                                  KEVIN P.B. JOHNSON
15                           555 TWIN DOLPHIN DRIVE
                             SUITE 560
16                           REDWOOD SHORES, CALIFORNIA  94065

17                           BY:  MICHAEL T. ZELLER
                                  WILLIAM C. PRICE
18                           865 SOUTH FIGUEROA STREET
                             10TH FLOOR
19                           LOS ANGELES, CALIFORNIA  90017

20                           BY:  EDWARD J. DEFRANCO
                             51 MADISON AVENUE, 22ND FLOOR
21                           NEW YORK, NEW YORK  10010

22

23

24

25
```

1640

```
1                    INDEX OF WITNESSES

2      PLAINTIFF'S

3      HAL PORET
            CROSS-EXAM BY MR. PRICE (RES.)    P. 1665
4           REDIRECT EXAM BY MR. JACOBS       P. 1687

5      KENT VAN LIERE
            DIRECT EXAM BY MR. JACOBS         P. 1690
6           CROSS-EXAM BY MR. PRICE           P. 1702

7      RAVIN BALAKRISHNAN
            DIRECT EXAM BY MR. JACOBS         P. 1723
8           CROSS-EXAM BY MR. JOHNSON         P. 1769
            REDIRECT EXAM BY MR. JACOBS       P. 1806
9           RECROSS-EXAM BY MR. JOHNSON       P. 1813

10     KARAN SINGH
            DIRECT EXAM BY MR. JACOBS         P. 1815
11          CROSS-EXAM BY MR. DEFRANCO        P. 1848
            REDIRECT EXAM BY MR. JACOBS       P. 1909
12

13     JOHN HAUSER
            DIRECT EXAM BY MR. JACOBS         P. 1914
14          CROSS-EXAM BY MR. PRICE           P. 1917
            REDIRECT EXAM BY MR. JACOBS       P. 1945
15          RECROSS-EXAM BY MR. PRICE         P. 1948

16     BORIS TEKSLER
            DIRECT EXAM BY MR. MUELLER        P. 1951
17          CROSS-EXAM BY MS. MAROULIS        P. 1964

18

19

20

21

22

23

24

25
```

```
1                          INDEX OF EXHIBITS

2                                   MARKED          ADMITTED

3       PLAINTIFF'S

4       24                                          1692
        24.5                                        1697
5       24.6                                        1699
        24                                          1699
6       1045                                        1729
        64                                          1755
7       46                                          1758
        57                                          1763
8       1023, 1024, 1028, 1036                      1768
        27.9, 27.12, 27.14, 27.16, 27.18            1811
9            27.20, 27.22, 27.24, 27.33
             27.34 - 27.39
10      UNDER SEAL 31                               1811
        UNDER SEAL 27.31                            1812
11      1044                                        1817
        1014, 1009                                  1831
12      29.4, 29.5, 29.6, 29.10, 29.12              1844
        UNDER SEAL 29.13, 29.14, 29.36              1844
13      29.16, 29.18, 29.20 - 29.28,                1844
             29.32, 29.34 - 29.37,
14           29.39, 29.41 - 29.45
        38                                          1845
15      30                                          1915
        52                                          1959
16

17      DEFENDANT'S

18      2534                                        1669
        2528                                        1671
19      2529                                        1686
        2526                                        1722
20      3918.105                                    1795
        66-A, 66-B, 751-A                           1795
21      3918.104, 3918.105, 3918.106                1798
        29.29, 27.30                                1813
22      2557                                        1912
        586                                         1975
23

24

25
```

```
1     SAN JOSE, CALIFORNIA              AUGUST 10, 2012
2                   P R O C E E D I N G S
3              (WHEREUPON, THE FOLLOWING PROCEEDINGS
4     WERE HELD OUT OF THE PRESENCE OF THE JURY:)
5              THE COURT:  ALL RIGHT.  SO I JUST FILED
6     THE REVISED RULING ON THE TEKSLER AND CHANG
7     OBJECTIONS -- WERE YOU ABLE TO GET THAT? -- BASED
8     ON THE ADDITIONAL PROFFERS THAT APPLE FILED THIS
9     MORNING.
10             OKAY.  AND I ALSO ISSUED A RULING ON THE
11    REQUEST TO SEAL PORTIONS OF THE IBM/APPLE LICENSE.
12             DID YOU GET THAT AS WELL?
13             MR. JACOBS:  YES, YOUR HONOR.
14             THE COURT:  OKAY.
15             THE COURT:  AS YOU PROBABLY SAW FROM MY
16    RULING LAST NIGHT, THE ONLY THINGS THAT WILL BE
17    ACTUALLY SEALED ARE THE PAYMENT TERMES,
18    COMPENSATION TERMS.
19             WITH REGARD TO APPLE'S REQUEST FOR AN
20    INTERIM JURY INSTRUCTION ON CONFUSION, THAT REQUEST
21    IS DENIED.
22             I PREFER NOT TO DO ANY INTERIM
23    INSTRUCTIONS OTHER THAN LIMITING INSTRUCTIONS.  I
24    DON'T WANT TO OVEREMPHASIZE ANY ONE PARTICULAR
25    INSTRUCTION OVER THE OTHER, SO THE JURY WILL JUST
```

```
1    GET THE FINAL INSTRUCTIONS ON THE LAW AT THE END.

2    OKAY?  SO THAT'S DENIED.

3              LET'S TALK ABOUT THE STICKERS ON THE

4    PHONES.

5              WHAT I'D LIKE TO DO IS TO HAVE -- ONCE

6    THE EXHIBITS ARE ADMITTED IN EVIDENCE IS I'D LIKE

7    THE COURT TO TAKE CONTROL OF THEM AND HAVE US HAVE

8    THEM OVERNIGHT, AND IF EITHER SIDE NEEDS THEM,

9    YOU'RE GOING TO HAVE TO TALK TO -- CALL OUR

10   CHAMBERS TO GET THEM.

11             ANY OBJECTION TO THAT?  I THINK THAT JUST

12   MAY -- I DON'T WANT THIS TO BE A CONTINUING ISSUE.

13             MR. VERHOEVEN:  THAT'S GREAT, YOUR HONOR.

14   THE ONLY ONE THING I'D MENTION -- THIS IS

15   MR. VERHOEVEN -- IS THEY NEED TO BE CHARGED SO THAT

16   THEY CAN BE TURNED ON.

17             THE COURT:  OKAY.

18             MR. VERHOEVEN:  SO WE COULD PROBABLY WORK

19   SOMETHING OUT OFF THE RECORD TO MAKE SURE THAT

20   HAPPENS, BUT -- IF THEY JUST REMAIN -- WE JUST NEED

21   TO MAKE SURE THAT WHATEVER PARTICULAR PHONE WE MAY

22   NEED TO USE ON A GIVEN DAY, IF WE NEED TO TURN IT

23   ON, THAT IT'S CHARGED.

24             THE COURT:  OKAY.  THEN CAN YOU GIVE US

25   INSTRUCTIONS ABOUT WHICH ONES YOU NEED US TO
```

1644

1    CHARGE?

2             MR. VERHOEVEN:  WE'LL MEET AND CONFER AND

3    SEE IF WE CAN FIGURE OUT A PROCESS, YOUR HONOR, AND

4    PRESENT IT TO YOU.

5             THE COURT:  OKAY.

6             MR. VERHOEVEN:  I THINK THAT'S THE BEST

7    THING IS FOR THE COURT TO HOLD ON TO THEM.

8             THE COURT:  OKAY.  THE OTHER -- YES.

9             MR. JACOBS:  WE'RE FINE WITH THAT AS

10   WELL, YOUR HONOR.

11            THE COURT:  ALL RIGHT, GREAT.

12            NOW, I GUESS WHAT IS THE VOLUME?  IS IT

13   JUST THAT ONE CART WITH THE RED WELLS, OR IS IT

14   MORE THAN THAT?  I MEAN, I'M ASSUMING THIS DOESN'T

15   APPLY TO NON-PHYSICAL EXHIBITS, RIGHT, LIKE THE

16   DOCUMENTATION?

17            MS. MAROULIS:  YES, YOUR HONOR, THIS ONLY

18   APPLIES TO PHYSICAL EXHIBITS WHERE THE ACTUAL

19   LABELS ARE AFFIXED, AND IT'S ABOUT TWO DIFFERENT

20   CARTS BECAUSE SOME OF THEM ARE IN THE CUSTODY OF

21   SAMSUNG AND SOME ARE IN THE CUSTODY OF APPLE.  SO

22   WE'RE TALKING ABOUT 120 EXHIBITS.

23            THE COURT:  SO ABOUT THREE CARTS?  IS

24   THAT RIGHT?

25            MS. MAROULIS:  TWO AND A HALF CARTS.

```
 1              THE COURT:  TWO AND A HALF FULL CARTS,
 2    OKAY.
 3              SO HOW HAVE YOU ALL DIVIDED UP WHO HAS
 4    POSSESSION OF WHAT?
 5              MS. MAROULIS:  WE HAVE THE PRIOR ART,
 6    SAMSUNG HAS THE PRIOR ART, AND APPLE HAS THE
 7    ACCUSED DEVICES.
 8              THE COURT:  I SEE.  OKAY.  WELL, WHY
 9    DON'T -- AT THE BEGINNING AND AT THE END OF EACH
10    DAY -- MS. PARKER BROWN ACTUALLY IS GOING TO BE
11    GONE NEXT WEEK, SO MR. RIVERA WILL JUST TAKE
12    POSSESSION OF THE CARTS AND WE'LL BRING THEM IN
13    EACH MORNING AND THEN YOU GIVE US INSTRUCTIONS
14    ABOUT WHAT YOU WANT US TO DO WITH THEM.
15              I THINK DURING THE TRIAL, I'D LIKE TO
16    HAVE THE OFFICIAL STICKER THAT HAS THE NORTHERN
17    DISTRICT OF CALIFORNIA, THE OFFICIAL COURT ONE.
18              BUT WE'LL LET THE JURORS KNOW THAT WHEN
19    THEY'RE DELIBERATING, THEY CAN TAKE OFF WHATEVER
20    STICKERS THEY LIKE, BUT THAT WE WANT THEM TO
21    HOPEFULLY PUT IT BACK ON AT THE END OF THEIR
22    DELIBERATION.  BUT THEY CAN REMOVE THE STICKERS.
23              MR. JACOBS:  AND THAT TURNS OUT, I THINK,
24    TO BE A LITTLE DIFFICULT JUST BECAUSE OF THE
25    NATURE --
```

1646

```
 1              THE COURT:  THE GUMMY ISSUE.

 2              MR. JACOBS:  -- OF THE NATURE OF THE

 3     STICKER.

 4              OUR FEELING IS THAT BECAUSE THE PHONE MAY

 5     GET SEPARATED FROM THE BOX AND MAY GET SEPARATED

 6     SOME DAY FROM THE COURT FILE, IT'S IMPORTANT THAT

 7     THE STICKER HAVE THE FULL INFORMATION ABOUT THE

 8     CASE.

 9              THAT'S WHY WE -- THAT'S IN ADDITION TO

10     THINKING THAT THAT WAS YOUR HONOR'S PREDISPOSITION

11     AFTER OUR DISCUSSION THE OTHER DAY, THAT THE

12     OFFICIAL STICKER SHOULD BE ON THEM.

13              THE LOOKING AHEAD REASON TO HAVE THE

14     OFFICIAL STICKER IS THAT WE'D LIKE TO MAKE SURE THE

15     PHONE STAYS WITH THE CASE.

16              MS. MAROULIS:  YOUR HONOR, OUR PROPOSAL

17     IS TO PUT A STICKER ON A POST-IT AND TAPE IT ON AND

18     OFF SO IT CAN BE TAKEN OFF.

19              THE PROBLEM WITH THE STICKERS, AS IT

20     CURRENTLY STANDS, IS THAT THEY COVER LARGE PORTIONS

21     OF THE DEVICES FOR TRADE DRESS PURPOSES.

22              THE COURT:  WELL, I LOOKED AT THE PHOTOS

23     IN YOUR FILING AND I STILL THINK YOU CAN SEE THE

24     SHAPE AND YOU CAN SEE THE TEXTURE OF THE BACK.

25              I MEAN, I THINK YOU CAN CERTAINLY -- I
```

1647

```
 1    DIDN'T FEEL THAT IT WAS COVERING SO MUCH THAT YOU

 2    COULDN'T MAKE A PROPER EVALUATION OF TRADE DRESS.

 3              MY CONCERN ABOUT USING SOMETHING OTHER

 4    THAN THE OFFICIAL COURT STICKER IS THAT WE MAY HAVE

 5    A PROBLEM LIKE WE HAD WITH 1019, WHICH I DON'T WANT

 6    THAT EVER TO HAPPEN AGAIN, WHERE THERE WAS ANOTHER

 7    EXHIBIT THAT WAS NOT A JOINT EXHIBIT THAT ENDS UP

 8    GETTING SHOWN TO THE WITNESS, AND IF WE JUST HAVE

 9    ONE SMALL NUMBER STICKER, I'D LIKE TO HAVE THE

10    OFFICIAL STICKER KEEP THE OFFICIAL EXHIBIT JUST FOR

11    THE RECORD TO BE CLEARER.

12              WELL --

13              MS. MAROULIS:  YOUR HONOR, MAY WE CONFER

14    ADDITIONALLY TO DETERMINE THAT, BECAUSE IT'S VERY

15    IMPORTANT TO SAMSUNG THAT THE DEVICES BE SHOWN TO

16    THE JURORS AS THEY'RE SOLD IN THE STORES AND NOT IN

17    ANY WAY CHANGED BY STICKERS OR OTHERWISE.

18              THE COURT:  UM-HUM.

19              MS. MAROULIS:  SO WE UNDERSTAND THE

20    IMPORTANCE OF KEEPING TRACK OF THE DEVICES AND

21    MAKING SURE THEY HAVE APPROPRIATE IDENTIFICATION

22    INFORMATION.

23              WE SUGGESTED SMALLER STICKERS, BUT MAYBE

24    THERE'S ANOTHER WAY OF HAVING A FULL STICKER,

25    AFFIXED IN A REMOVABLE WAY.
```

1648

```
1            THE COURT:  WELL, I GUESS THE REMOVABLE

2   PROBLEM IS GOING TO CREATE AN ISSUE.  YOU KNOW, I

3   SUSPECT THAT REGARDLESS OF WHAT HAPPENS IN THIS

4   CASE, IT'S GOING TO BE REVIEWED ON APPEAL, AND MY

5   ONLY CONCERN IS IF WE'RE TAKING STICKERS ON AND

6   OFF, THERE COULD BE A CONFUSION AS TO WHAT WAS

7   ADMITTED OR WHAT WAS NOT, WHAT WAS THE CORRECT

8   NAME, IF THE CORRECT NUMBER WAS ON THAT PARTICULAR

9   DEVICE.

10           WHY DON'T YOU SEE IF PERHAPS THERE'S A

11  SMALLER OFFICIAL LABEL THAT SATISFIES BOTH PARTIES

12  THAT CAN BE PLACED ON THERE?

13           OTHERWISE FOR NOW I'D LIKE TO HAVE THE

14  OFFICIAL COURT STICKER THAT IDENTIFIES, YOU KNOW,

15  THAT IT'S THE NORTHERN DISTRICT OF CALIFORNIA AND

16  THAT IT'S OUR COURT.  I'D LIKE TO KEEP THOSE ON ALL

17  THE DEVICES AND HAVE US NOT TAKE THEM OFF.

18           MS. MAROULIS:  WE'RE GOING TO SEE IF WE

19  CAN REDUCE THE FONT SO THE SAME INFORMATION IS ON

20  THE LABEL THAT'S SMALLER.

21           THE COURT:  SURE.  I DON'T CARE ABOUT THE

22  ONES THAT HAVE NOT BEEN ADMITTED YET, BUT IF IT'S

23  ACTUALLY BEEN ADMITTED INTO EVIDENCE, WE'LL START

24  HOLDING THOSE ONLY FOR PHYSICAL EXHIBITS, NOT FULL

25  DOCUMENTS.
```

1649

```
 1              MR. JACOBS:  UNDERSTOOD.

 2              THE COURT:  SO THAT WAS ALL THAT WAS ON

 3    MY LIST.  WAS THERE ANYTHING ELSE?

 4              MS. MAROULIS:  YOUR HONOR, APPLE FILED

 5    TWO ADDITIONAL MOTIONS THAT SAMSUNG INTENDS TO

 6    OPPOSE.  WE'LL FILE THE OPPOSITIONS LATER TODAY.

 7              ONE OF THEM IS EXCLUSION OF A WITNESS,

 8    AND THE OTHER ONE IS PROFFER OF EVIDENCE.

 9              IT HAPPENED IN THE PAST DAY AND A HALF,

10    SO THE OPPOSITIONS YOU'LL BE GETTING ON FILE LATER

11    TODAY.

12              THE COURT:  OKAY.  WHAT'S THE EXCLUSION

13    OF WITNESSES ISSUE?

14              MR. MCELHINNY:  THE EXCLUSION OF

15    WITNESSES IS THAT THERE ARE TWO -- WE HAVE THEIR

16    WILL CALL LIST, THE LIST OF PEOPLE THAT THEY'RE

17    GOING TO CALL.

18              THE COURT:  YES.

19              MR. MCELHINNY:  AND THEY HAVE TWO

20    WITNESSES ON THERE THAT WE ARE ANTICIPATING -- AND

21    WE'RE GIVING THIS SO THAT YOUR HONOR HAS IT IN

22    ADVANCE AND YOU SEE IT COMING -- ONE OF WHOM IS A

23    GENTLEMAN, HIS NAME IS DALE SOHN, WHO'S THE

24    PRESIDENT OF STA.

25              THE COURT:  OKAY.
```

1              MR. MCELHINNY:  AND MR. SOHN WAS THE

2     SUBJECT OF AN APEX MOTION IN WHICH SAMSUNG TOOK THE

3     POSITION THAT HE HAS NO KNOWLEDGE OF THE CASE, HE'S

4     A HIGH LEVEL EXECUTIVE.

5              WE WERE GIVEN A VERY SHORT DEPOSITION OF

6     HIM, BUT WE WERE NOT GIVEN A FULL DEPOSITION, AND

7     NOW IT TURNS OUT THAT HE'S GOING TO COME AND

8     TESTIFY ABOUT THE SUBSTANCE OF THE CASE, THE MERITS

9     OF THE PHONES, AND ALL THE STUFF THAT SAMSUNG TOOK

10    THE POSITION HE HAD NO PERSONAL KNOWLEDGE ABOUT,

11    AND WE WANTED TO RAISE THAT IN ADVANCE.

12              THE OTHER ONE IS THEY ARE -- THEY WANT TO

13    CALL A WOMAN WHO APPARENTLY IS THE ORIGINAL

14    DESIGNER OF THE F700 PHONE, AND THE F700 PHONE, AS

15    YOUR HONOR KNOWS, HAS A LARGE HISTORY HERE, AND

16    YOUR HONOR HAS EXCLUDED ALL OF THE DESIGN EVIDENCE,

17    THE HISTORY OF THE DESIGN OF THE F700.

18              YOUR HONOR ALLOWED THE F700 TO BE SHOWN

19    TO OUR EXPERTS AS A POTENTIAL ALTERNATIVE DESIGN.

20              BUT WE CAN'T IMAGINE WHY THE DESIGNER OF

21    THE F700 -- WELL, WE KNOW BECAUSE THEY SAY IN THEIR

22    DISCLOSURE THAT THEY WANT TO BRING HER TO TALK

23    ABOUT THE HISTORY THAT LED UP TO THE DESIGN, THE

24    ALTERNATIVE DESIGNS THAT SHE CONSIDERED.

25              THIS IS THE WITNESS WHO WAS SUPPOSED TO

1651

```
 1   SPONSOR ALL OF THE INDEPENDENT DESIGN EVIDENCE THAT

 2   YOUR HONOR HAS EXCLUDED NOW.

 3             THE COURT:  WHAT IS HER NAME?

 4             MR. MCELHINNY:  PARKER, YOUR HONOR.

 5             THE COURT:  ALL RIGHT.  SO THAT'S BEEN

 6   BRIEFED ON APPLE'S SIDE.

 7             MS. MAROULIS:  AND YOUR HONOR, WE'LL FILE

 8   AN OPPOSITION.  I JUST WANTED TO RAISE IT THAT

 9   WE'RE FILING AN OPPOSITION SHORTLY ON THAT.

10             THE COURT:  OKAY, ALL RIGHT.  WHEN -- IN

11   TERMS OF TIMING, WHEN DO YOU NEED A RULING ON THESE

12   TWO?

13             MS. MAROULIS:  YOUR HONOR, WE'RE NOT

14   CALLING EITHER OF THESE WITNESSES ON MONDAY, SO WE

15   DON'T NEED A RULING UNTIL TUESDAY OR WEDNESDAY.

16             MR. MCELHINNY:  WE DON'T HAVE THEIR ORDER

17   OF WITNESSES, YOUR HONOR, SO WE DIDN'T KNOW WHEN IT

18   WAS COMING UP.

19             MS. MAROULIS:  IT'S PREMATURE RIGHT NOW,

20   BUT WE'LL BRIEF IT TODAY.

21             THE COURT:  IS YOUR AFFIRMATIVE CASE

22   CONCLUDING ON MONDAY?

23             MR. MCELHINNY:  EITHER TODAY OR MONDAY,

24   YOUR HONOR.

25             THE COURT:  I SEE.  SO WE PROBABLY NEED
```

1652

```
 1      TO RULE ON THIS PRETTY QUICKLY.

 2              CAN YOU FILE YOUR RESPONSES TODAY,

 3      PLEASE?

 4              MS. MAROULIS:  YES, YOUR HONOR.

 5              THE COURT:  OKAY.  WAS THERE ANYTHING

 6      ELSE OR WERE THOSE TWO OUTSTANDING --

 7              MR. MCELHINNY:  I'VE GOT ONE REALLY

 8      TECHNICAL ISSUE.

 9              THE COURT:  ALL RIGHT.

10              MR. MCELHINNY:  WHICH IS AS YOUR HONOR

11      KNOWS, IF WE GET TO THEM TODAY, WE'RE GOING TO BE

12      PLAYING SOME DEPOSITION DESIGNATIONS.  YOU HAVE NOW

13      RULED ON THE OBJECTIONS TO THOSE DESIGNATIONS.

14              IN THE DESIGNATION ITSELF, FOR SOME OF

15      THEM, THE WITNESS IDENTIFIES PARTICULAR DOCUMENTS

16      AND ACTUALLY TESTIFIES, IN ONE CASE, ABOUT A PAGE

17      OF A DOCUMENT, WHICH IS WHY WE HAVE DESIGNATED THE

18      DEPOSITION.

19              THE COURT:  UM-HUM.

20              MR. MCELHINNY:  IN THE NORMAL COURSE,

21      AFTER THE DEPOSITION CLIP IS SHOWED, WE WOULD MOVE

22      THE DOCUMENT INTO EVIDENCE.

23              WHAT WE WOULD LIKE TO DO, HOWEVER,

24      OBVIOUSLY SO THAT THE JURY UNDERSTANDS THE

25      DESIGNATION, WE WOULD LIKE TO PUBLISH THE DOCUMENT
```

1    WHEN THE JURY -- WHEN THE WITNESS -- IN THE

2    DEPOSITION CLIP WHEN THE DEPONENT SAYS THIS IS THE

3    DOCUMENT, WE WOULD LIKE TO HAVE IT UP NEXT TO THAT.

4              AND SO EITHER IF THERE'S GOING TO BE

5    OBJECTION -- I THINK YOUR HONOR HAS RULED ON THESE,

6    SO I THINK ALL THE -- I THINK ALL THE EXHIBITS DO

7    COME IN, BUT THE WAY WE'RE DOING THE CLIPS, THEY'LL

8    ACTUALLY BE PUBLISHED BEFORE YOUR HONOR ACTUALLY

9    MAKES THAT TECHNICAL RULING.

10             DO YOU SEE WHAT I'M TALKING ABOUT?

11             THE COURT:  AND WHAT ARE THE EXHIBITS?

12             MR. MCELHINNY:  ONE OF THEM IS THE APPLE

13   PRESENTATION THAT --

14             THE COURT:  THE PX 58?

15             MR. MCELHINNY:  I BELIEVE SO.

16             THE COURT:  OKAY.

17             MR. MCELHINNY:  52, YOUR HONOR.

18             AND THE OTHER TWO ARE PX 89 AND 69.

19             MS. MAROULIS:  YOUR HONOR HASN'T RULED ON

20   THOSE OBJECTIONS YET, SO IT'S PREMATURE AND SAMSUNG

21   OBJECTS TO THOSE TWO.

22             THE COURT:  WELL, 52 WAS MR. TEKSLER;

23   RIGHT.

24             MS. MAROULIS:  CORRECT.

25             MR. MCELHINNY:  IN THE CONTEXT OF

1654

```
 1    MR. TEKSLER, YOU RULED ON THAT AND THERE WAS NO

 2    OBJECTION TO IT BEING USED.

 3            THE COURT:  THAT'S FINE.  THAT'S GOING TO

 4    BE ADMITTED.

 5            SO I WAS NOT -- YOU KNOW, I THINK THAT WE

 6    NEED -- SOME OF THESE OBJECTIONS WERE FILED AROUND

 7    4:00 O'CLOCK YESTERDAY.  I THINK WE NEED MORE LEAD

 8    TIME IF YOU'RE SUDDENLY GOING TO FILE OBJECTIONS ON

 9    11 WITNESSES THE DAY BEFORE.

10            SO YOU ANTICIPATE ACTUALLY GETTING

11    THROUGH EVERYONE ON YOUR LIST TODAY?

12            MR. MCELHINNY:  IT'S ALL SUBJECT TO THE

13    CROSS, YOUR HONOR, AND WE DON'T KNOW HOW LONG THE

14    CROSS WILL BE.

15            THE COURT:  OKAY.

16            MR. MCELHINNY:  WE KEEP THINKING THAT

17    BECAUSE SAMSUNG IS USING ALL ITS TIME THAT THE

18    CROSSES ARE GOING TO GET SHORTER.  SO FAR THAT

19    HASN'T HAPPENED AND WE CAN'T ANTICIPATE WHETHER

20    THEY WILL.

21            THE COURT:  WHO DO YOU NEED A RULING ON

22    THIS MORNING?  LET'S ACTUALLY GO THROUGH THIS.

23            MR. MCELHINNY:  I THINK THE ONLY TWO THAT

24    YOUR HONOR HASN'T RULED ON SPECIFICALLY, YOUR

25    HONOR, ARE THE BENNER CLIPS AND THE PX 89 AND PX
```

```
 1    69.

 2              THE COURT:  WELL, I -- SO YOU HAVE

 3    RULINGS ON VAN LIERE, BALAKRISHNAN, SINGH, LEE,

 4    TEKSLER AND CHANG, SO 1 THROUGH 6.

 5              MR. MCELHINNY:  THAT WILL GET US THROUGH

 6    LUNCH, YOUR HONOR, WITHOUT ANY PROBLEM WHATSOEVER.

 7              THE COURT:  BUT YOU THINK THAT BENNER,

 8    SHEPPARD, SITTLER, HAUSER AND MUSIKA WILL BE GOING

 9    ON TODAY?

10              MR. MCELHINNY:  SAMSUNG HAS TOLD US THAT

11    THEY'RE GOING TO DO CROSSES AND THESE PEOPLE WON'T

12    GET ON TODAY, BUT OBVIOUSLY WE'RE NOT GOING TO REST

13    IF THEY STOP CROSSING.

14              THE COURT:  OKAY.  ALL RIGHT.  WELL, I

15    MEAN, YOU HAVE THE RULINGS ON THE FIRST SIX

16    EXHIBITS -- THE FIRST SIX WITNESSES TODAY, PLUS I

17    DON'T KNOW HOW LONG YOU HAVE ON MR. PORET, SO THE

18    FIRST SEVEN WITNESSES YOU HAVE RULINGS ON.

19              WE'LL PRIORITIZE -- ARE THEY GOING TO BE

20    CALLED IN THIS ORDER?  BECAUSE WE'LL PRIORITIZE

21    THEM IN THIS ORDER, BENNER FIRST, THEN SHEPPARD,

22    THEN SITTLER.

23              MR. MCELHINNY:  I WOULD PRIORITIZE

24    SITTLER OVER SHEPPARD, YOUR HONOR.

25              THE COURT:  OKAY.  SO BENNER, AND THEN
```

```
1     SITTLER?

2               MR. MCELHINNY:  YES, YOUR HONOR.

3               THE COURT:  WHO ELSE?  GIVE ME THE ORDER

4     SO WE CAN --

5               MR. MCELHINNY:  THEN HAUSER AND THEN

6     MUSIKA.  I WOULD PUT MR. SHEPPARD LAST AT THE

7     MOMENT.

8               THE COURT:  SO BENNER, SITTLER, HAUSER,

9     MUSIKA, AND THEN PUT SHEPPARD LAST?

10              MR. MCELHINNY:  YES, YOUR HONOR.

11              THE COURT:  OKAY.  ALL RIGHT.  WELL,

12    WE'LL GET THOSE OUT AS SOON AS WE CAN.  MAYBE WE'LL

13    DO IT PIECEMEAL.  BUT WE PROBABLY WON'T BE ABLE TO

14    GET MOST OF THESE TO YOU UNTIL, AT THE EARLIEST,

15    LUNCH TIME.

16              MR. MCELHINNY:  THAT WOULD BE PERFECTLY

17    FINE FOR US.

18              MS. MAROULIS:  YOUR HONOR, CAN WE DO ONE

19    MORE CLARIFICATION?

20              IN YESTERDAY'S ORDER, YOUR HONOR

21    SUSTAINED AN OBJECTION TO DX 2557, WHICH IS A VIDEO

22    OF A JOINT EXHIBIT.  WE HAVE SINCE, SEVERAL DAYS

23    AGO, REPLACED THAT DX EXHIBIT WITH ANOTHER ONE THAT

24    APPLE HAS NOT OBJECTED TO TO MY KNOWLEDGE.

25              SO WE RESPECTFULLY REQUEST THAT THAT
```

```
1    OBJECTION BE OVERRULED BECAUSE APPLE NOW HAS A

2    VIDEO THAT DOES NOT HAVE THE BLUE GLOW THAT YOUR

3    HONOR MENTIONS IN THE OBJECTION ITSELF.

4              THE COURT:  DO YOU HAVE ANY OBJECTION TO

5    THE NEW DX 2557?

6              MR. JACOBS:  I'LL HAVE TO CHECK, YOUR

7    HONOR.  IT'S NOT GOING TO COME UP FOR A BIT, SO

8    I'LL CHECK AT THE BREAK AND GET BACK TO YOU.

9              THE COURT:  ALL RIGHT.

10             MR. JACOBS:  I WANT TO MAKE SURE I'VE

11   SEEN THAT.

12             WE HAVE ONE QUICK ISSUE ON TEKSLER, YOUR

13   HONOR.

14             MR. MUELLER:  GOOD MORNING, YOUR HONOR.

15   JOE MUELLER.

16             FOR DEFENDANT'S CROSS EXHIBITS, ONE OF

17   THEM IS DX 51/DX 586.  IT'S THE SAME DOCUMENT.  WE

18   OBJECTED TO IT, YOUR HONOR, ON RULE 408 GROUNDS AND

19   IN LAST NIGHT'S ORDER, YOU OVERRULED THAT.

20             THE BASIS FOR THE ORDER, AS I UNDERSTAND

21   IT, IS THAT THE DOCUMENT, BECAUSE IT WAS STAMPED

22   RULE 408, DOES NOT PER SE BECOME RULE 408

23   PROTECTED, AND RESPECTIVELY, OUR POSITION IS NOT

24   THAT THE MERE STAMPING OF THE DOCUMENT MAKES IT

25   408.
```

1658

```
1          THE COURT:  ALL RIGHT.  I'M CHARGING YOUR

2    TIME, SO HANG ON.

3          MR. MUELLER:  I'LL MAKE IT VERY BRIEF,

4    YOUR HONOR.

5          THE COURT:  IT'S 9:04.  GO AHEAD.

6          MR. MUELLER:  SURE.  PAGES 12 THROUGH 18

7    SPECIFICALLY CONTAIN TERMS OFFERED IN AN ATTEMPT TO

8    COMPROMISE AND TO REACH A RESOLUTION.

9          SO WE WOULD RESPECTFULLY SUGGEST THAT

10   THOSE PAGES ARE PROTECTED BY 408, AND TO THE EXTENT

11   THAT SAMSUNG USES THE DOCUMENT, THOSE PARTICULAR

12   PAGES, PAGES 12 THROUGH 18, SHOULD BE REDACTED.

13         THERE'S NO CONNECTION BETWEEN THOSE PAGES

14   AND THE VALID PURPOSE THAT SAMSUNG HAS IN USING

15   THOSE, NAMELY, NOTICE OF APPLE'S PATENTS.

16         SO WE WOULD REQUEST THAT THOSE PAGES BE

17   REDACTED, YOUR HONOR.

18         MS. MAROULIS:  YOUR HONOR --

19         THE COURT:  SO THE ORDER WASN'T JUST

20   BASED ON HOW IT WAS STAMPED.  I MEAN, YOU'RE

21   SEEKING TO -- IT SEEMS LIKE YOUR POSITION IS

22   INCONSISTENT.  YOU'RE SEEKING TO INTRODUCE SOME OF

23   THE DOCUMENTS THAT WERE PART OF YOUR VARIOUS

24   MEETINGS AND SAYING, "OH, BUT THIS ONE IS, YOU

25   KNOW, PARTICULARLY JUST FOR THE PURPOSES OF
```

1659

```
 1    SETTLEMENT."
 2              MR. MUELLER:  RESPECTFULLY, WE'RE NOT,
 3    YOUR HONOR.
 4              THE FIRST PRESENTATION CONTAINS NO TERMS
 5    TO RESOLVE THE DISPUTE.
 6              THE SECOND PRESENTATION, WHICH IS
 7    PLAINTIFF'S EXHIBIT 51, DEFENDANT'S EXHIBIT 586,
 8    DOES CONTAIN TERMS, SO IT SQUARELY FALLS UNDER RULE
 9    408, AND IN PARTICULAR PAGES 12 THROUGH 18.
10              THE COURT:  UNFORTUNATELY, I DON'T
11    HAVE --
12              MR. MUELLER:  I HAVE A COPY FOR YOUR
13    HONOR.
14              YOUR HONOR, MAY I APPROACH?
15              THE COURT:  YES, PLEASE.  DO WE HAVE
16    THE -- DID I GET THE BINDERS FOR THE WITNESSES
17    TODAY?  I JUST HAVE MR. PORET'S.
18              MR. MUELLER:  AND, AGAIN, IT'S PAGES --
19              THE COURT:  WHAT ARE THE PAGES THAT YOU
20    ARE --
21              MR. MUELLER:  12 THROUGH 18, YOUR HONOR.
22    WE -- WE'D WITHDRAW OUR OBJECTION AS TO THE
23    REMAINDER.
24              THE COURT:  SO 12 THROUGH 18 IS WHAT
25    YOU'RE OBJECTING TO?
```

1          MR. MUELLER:  CORRECT, YOUR HONOR.  THOSE

2     CONTAIN TERMS FOR RESOLUTION OF A DISPUTE, PLAINLY

3     408 PROTECTED, AND IT HAS NOTHING TO DO WITH NOTICE

4     OF APPLE'S PATENT CLAIMS, WHICH IS THE PURPOSE THAT

5     SAMSUNG IDENTIFIED FOR USING THIS DOCUMENT.

6          THE COURT:  ALL RIGHT.  LET ME HEAR FROM

7     SAMSUNG.

8          MS. MAROULIS:  YES, YOUR HONOR.

9          THE PLAINTIFFS ARE TRYING TO REARGUE THE

10    OBJECTION THAT YOU ALREADY OVERRULED.  THIS

11    DOCUMENT IS RELEVANT TO NOTICE, AND ALSO RELEVANT

12    TO APPLE'S LICENSING PRACTICES WHICH WE UNDERSTAND

13    TO BE THE SUBJECT OF MR. TEKSLER'S TESTIMONY FROM

14    THE PROFFER.

15          IN PARTICULAR, PAGE 13 OF THIS EXHIBIT,

16    THEY REFER TO THE DISTINCTIVE INDUSTRIAL DESIGNS,

17    AND WE HAVE -- WE NEED TO HAVE AN OPPORTUNITY TO

18    QUESTION THE WITNESS ABOUT WHAT NOTICE, IF ANY, WAS

19    GIVEN AS TO DESIGN PATENTS, AND ALSO AS TO APPLE'S

20    LICENSING POLICIES.

21          YOUR HONOR ALREADY RULED THAT THERE'S

22    GOING TO BE A LIMITING INSTRUCTION THAT THIS CANNOT

23    BE CONSIDERED FOR ANY DAMAGES AMOUNT AND SUCH.

24          SO WE BELIEVE THAT LIMITING INSTRUCTION

25    IS SUFFICIENT AND IT WOULD BE INAPPROPRIATE TO

1    REDACT PORTIONS OF THE EXHIBIT SO THE JURY DOESN'T

2    HAVE THE ENTIRE PRESENTATION.

3              MR. MUELLER:  YOUR HONOR, LICENSING

4    PRACTICES IS A SUBSTANTIVE ISSUE.  THAT'S PRECISELY

5    THE SORT OF ISSUE THAT RULE 408 PROHIBITS.

6              THE COURT:  SHOW ME THE OTHER

7    PRESENTATION, THE ONE THAT YOU'RE TRYING TO GET IN,

8    BECAUSE IT LOOKS LIKE THE FIRST HALF OF THOSE TWO

9    SEEM VIRTUALLY IDENTICAL.

10             MS. MAROULIS:  YES, YOUR HONOR.

11             THEY'RE ACTUALLY PART OF THE SAME

12   LICENSING NEGOTIATIONS, AND AS WE EXPLAINED IN OUR

13   BRIEFS, THE LICENSING NEGOTIATIONS ARE OUTSIDE THE

14   CONTEXT OF RULE 408 BECAUSE NO LITIGATION WAS HAD

15   AT THE MOMENT.  IT WAS AN ATTEMPT TO RESOLVE THE

16   LITIGATION.

17             MR. MUELLER:  MAY I APPROACH, YOUR HONOR?

18             THE COURT:  GO AHEAD.

19             MR. MUELLER:  THIS IS PLAINTIFF'S EXHIBIT

20   52, AND I THINK YOU'LL SEE IN PLAINTIFF'S EXHIBIT

21   52, THERE'S NO IDENTIFICATION OF ANY TERMS AT ALL.

22             SO IN THAT SENSE, IT'S THE SAME AS PAGES

23   1 THROUGH 11 OF PLAINTIFF'S EXHIBIT 51.

24             AND THAT'S WHY OUR POSITION IS ENTIRELY

25   CONSISTENT.  THE FIRST IDENTIFICATION OF TERMS IS

1662

```
 1    ON PAGE 12 OF PLAINTIFF'S EXHIBIT 51.  THOSE TERMS

 2    ARE PLAINLY PROTECTED BY RULE 408, AND I THINK THAT

 3    SAMSUNG'S COUNSEL, BY MENTIONING LICENSING

 4    PRACTICES, HAS DEMONSTRATED THAT THEY'RE

 5    INTRODUCING IT FOR A SUBSTANTIVE PURPOSE AND THAT'S

 6    WHAT 408 PROHIBITS.

 7         THE COURT:  ALL RIGHT.  SO YOU HAVE NO

 8    OBJECTION TO PAGES 1 THROUGH 11.  YOUR OBJECTION IS

 9    JUST TO 12, 13, 14, 15, 16, AND 17?

10         MR. MUELLER:  AND 18, YOUR HONOR.  ALL

11    THOSE PAGES RELATE TO SPECIFIC TERMS FOR RESOLVING

12    A DISPUTE WHICH, AGAIN, IS WHAT 408 PROHIBITS THE

13    INTRODUCTION OF.

14         MS. MAROULIS:  AND AGAIN, YOUR HONOR, IN

15    OUR BRIEFS WE CITED THE CASE LAW THAT STATES THAT

16    LICENSING DISCUSSIONS OUTSIDE THE CONTEXT OF

17    LITIGATION ARE NOT COVERED BY RULE 408, AND THIS

18    PRESENTATION IS NOT WITHIN THE GAMBIT OF RULE 408

19    IN THE FIRST PLACE.

20         MR. MUELLER:  YOUR HONOR, IF THE

21    SUGGESTION IS THERE NEEDS TO BE AN ONGOING CASE FOR

22    RULE 408 TO APPLY, THAT'S WRONG AS A MATTER OF LAW.

23         THE COURT:  ALL RIGHT.  WELL, LET ME --

24    I'M INCLINED AT THIS POINT TO GRANT IT, BUT I WANT

25    TO TAKE A LOOK AT WHAT -- TELL ME WHAT YOUR BEST
```

1663

```
1    CASE IS ON EACH SIDE, ONE SAYING 408 DOES APPLY
2    EVEN THOUGH THERE'S NO ACTUAL DISPUTE IN TERMS OF
3    ONGOING LITIGATION, AND WHAT'S YOUR BEST CASE
4    SAYING THAT IT DOES OR DOESN'T APPLY WHEN THERE'S
5    NO LITIGATION PENDING.
6              MR. MUELLER:  YOUR HONOR, YOUR HONOR.  IF
7    WE COULD SUBMIT A CASE ON THE NEXT BREAK BEFORE --
8    MR. TEKSLER WON'T TESTIFY FOR SEVERAL HOURS AND WE
9    CAN RESOLVE THIS AT LUNCH.
10             I WOULD NOTE THAT MAGISTRATE JUDGE
11   GREWAL'S ORDER --
12             THE COURT:  YOU JUST SAID IT'S WRONG AS A
13   MATTER OF LAW AND YOU DON'T HAVE A CASE?
14             MR. MUELLER:  I DON'T HAVE A CASE AT MY
15   FINGERTIPS, BUT IT IS WRONG, YOUR HONOR.
16             THE COURT:  YOU MUST HAVE A CASE IN
17   YOUR BRIEF.
18             MR. MUELLER:  THIS WASN'T RAISED, YOUR
19   HONOR.  THIS IS A NEW ARGUMENT THAT WAS JUST
20   MENTIONED FOR THE FIRST TIMING.
21             BUT I WOULD NOTE THAT MAGISTRATE
22   JUDGE GREWAL'S DECISION ON THE SPOLIATION MOTION
23   EXPRESSLY FOUND THAT THERE WAS A DISPUTE AS OF
24   AUGUST OF 2010, WHICH WAS PRECISELY WHEN WE SAID
25   THERE WAS A DISPUTE.
```

```
 1                THE COURT:  I'M MORE INTERESTED IN

 2   WHETHER 408 APPLIES WHEN THERE'S NO LAWSUIT

 3   PENDING.  SO GIVE ME A CASE.

 4                MR. MUELLER:  WE WILL, YOUR HONOR.

 5                MS. MAROULIS:  OUR CASE IS THE SANDISK

 6   CASE CITED IN OUR BRIEFS.

 7                A COUPLE POINTS.  ONE IS APPLE IS TAKING

 8   A POSITION BEFORE JUDGE GREWAL THAT THEY DID NOT

 9   HAVE AN OBLIGATION TO PRESERVE.

10                THE COURT:  I UNDERSTAND.

11                MS. MAROULIS:  ONE MORE POINT, AS YOUR

12   HONOR POINTED OUT, IF WE INCLUDE PX 52, IN

13   FAIRNESS, WE HAVE TO INCLUDE PX 51 BECAUSE THEY'RE

14   VERY SIMILAR IN TERMS OF DISCUSSION.

15                THE COURT:  ALL RIGHT.  I'M GOING TO

16   RETURN THESE TO YOU.  I THINK, MR. MUELLER, THOSE

17   ARE BOTH YOURS?

18                MR. MUELLER:  YES, THANK YOU.

19                THE COURT:  OKAY.  IT'S NOW 9:11.  THAT

20   COST APPLE EIGHT MINUTES.

21                ALL RIGHT.

22                (WHEREUPON, THE FOLLOWING PROCEEDINGS

23   WERE HELD IN THE PRESENCE OF THE JURY:)

24                THE COURT:  ALL RIGHT.  WELCOME BACK.

25   PLEASE TAKE A SEAT.
```

1665

```
 1              IS MR. PORET HERE?

 2                    HAL PORET,

 3     BEING CALLED AS A WITNESS ON BEHALF OF THE

 4     PLAINTIFF, HAVING BEEN PREVIOUSLY DULY SWORN, WAS

 5     FURTHER EXAMINED AND TESTIFIED AS FOLLOWS:

 6              THE COURT:  ALL RIGHT.  THE TIME IS NOW

 7     9:13.

 8              AND MR. PORET, YOU ARE STILL UNDER OATH.

 9              THE WITNESS:  I UNDERSTAND.

10              THE COURT:  GO AHEAD, PLEASE.

11              CROSS-EXAMINATION (RESUMED)

12     BY MR. PRICE:

13     Q    GOOD MORNING, MR. PORET.

14     A    GOOD MORNING.

15     Q    WHEN WE LEFT, WE WERE TALKING ABOUT CONTROLS,

16     AND JUST SO WE CAN UNDERSTAND, IF WE PUT UP PDX

17     30.3, WHICH IS ONE OF YOUR DOCUMENTS HERE, YOU SEE

18     THAT THE CONTROL IS SOMETHING YOU SUBTRACT FROM THE

19     FIGURE YOU GET FOR ASSOCIATION.  RIGHT?

20     A    YES.

21     Q    AND THE IDEA IS TO GET A CONTROL WHICH IS --

22     WHICH DOESN'T HAVE THE SAME TRADE DRESS THAT'S

23     ALLEGED BY APPLE, BUT WHICH OTHERWISE MIGHT BE

24     SIMILAR; CORRECT?

25     A    I THINK THAT'S GENERALLY FAIR TO SAY.
```

1666

1    Q    AND SO YOU CHOSE -- IF WE LOOK AT 3705.107,

2    YOU CHOSE AS THE CONTROL, ONE OF THEM IS THE

3    BLACKBERRY STORM; IS THAT RIGHT?

4    A    YES.

5    Q    AND BLACKBERRY HAS BEEN IN THE MARKET FOR

6    QUITE A FEW YEARS?

7    A    I BELIEVE SO.

8    Q    IT'S -- DO YOU WATCH MANY MOVIES ON THE

9    BLACKBERRY?

10   A    DO I?

11   Q    YEAH.

12   A    NOT PERSONALLY.

13   Q    YOU KIND OF UNDERSTAND THE BLACKBERRY IS KIND

14   OF SEEN AS AN E-MAILING PHONE?

15   A    I DON'T -- THERE ARE A VARIETY OF

16   BLACKBERRIES.  I THINK THIS ONE IS OBVIOUSLY A

17   SMARTPHONE WITH A TOUCHSCREEN.

18   Q    HOW IS IT DOING IN THE MARKET?  BLACKBERRY,

19   RIM, IS KIND OF OFF THE MARKET RIGHT NOW, ISN'T IT?

20   A    I DON'T KNOW.

21   Q    THEN HOW DID YOU SELECT THIS -- FIRST, DID YOU

22   SELECT THIS PHONE OR DID SOMEONE GIVE IT TO YOU?

23   A    I LOOKED AT A LOT OF PHONES.  SOME OF THEM

24   WERE ONES THAT I CAME ACROSS ON MY OWN AND SOME

25   WERE ONES SHOWN TO ME BY APPLE, AND I'M NOT SURE

```
 1    WHICH -- I'M NOT SURE EXACTLY HOW I CAME TO SEE

 2    THIS ONE.

 3    Q    OKAY.  SO IT MAY HAVE BEEN SHOWN TO YOU BY

 4    APPLE, IT MAY NOT HAVE BEEN, YOU JUST DON'T

 5    REMEMBER; RIGHT?

 6    A    RIGHT.

 7    Q    IT'S NOT IN YOUR REPORT, IS IT, ONE WAY OR THE

 8    OTHER?

 9    A    NO.

10    Q    THAT'S CORRECT, WHAT I SAID?

11    A    YOU ARE CORRECT.

12    Q    IF YOU LOOK AT 3705.108, YOU USED THIS SANYO,

13    IS IT -- DO YOU REMEMBER THE NAME OF IT?

14    A    ZIO.

15    Q    ZIO, WHICH HAS THIS KIND OF A BART SIMPSON

16    HEAD HERE IF WE LOOK AT THE TOP WITH THE SILVER AND

17    IT'S GOT THIS THING ACROSS THE TOP.

18              DO YOU SEE THAT?

19    A    I SEE THE PICTURE.

20    Q    AND CERTAINLY YOU CAN TELL BY LOOKING AT THAT,

21    EVEN WITH THAT BLURRED OUT, THAT'S NOT AN APPLE?

22    A    THAT'S NOT FAIR TO SAY.

23    Q    WELL, IN THE PHONES THAT YOU LOOKED AT, I'M

24    GOING TO ASK YOU, DID YOU LOOK AT -- I'M GOING TO

25    SHOW YOU WHAT'S BEEN MARKED AS EXHIBIT 2534 FOR
```

```
 1     IDENTIFICATION.

 2              IF I MAY APPROACH, YOUR HONOR?

 3              THE COURT:  PLEASE, GO AHEAD.

 4     BY MR. PRICE:

 5     Q    AND THIS LOOKS LIKE A MOTOROLA PHONE.  DID

 6     APPLE GIVE YOU THAT PHONE OR A PHONE LIKE THAT TO

 7     PERHAPS USE AS A CONTROL?

 8              MR. JACOBS:  OBJECTION, YOUR HONOR.

 9     THAT'S QUITE A VAGUE QUESTION.

10              THE COURT:  SUSTAINED.

11     BY MR. PRICE:

12     Q    DID APPLE GIVE YOU THAT PHONE, THAT MOTOROLA,

13     TO USE AS A CONTROL?  IS THAT ONE OF THE

14     POSSIBILITIES?

15     A    I DON'T KNOW.  I DON'T REMEMBER.  I LOOKED AT

16     A LOT OF PHONES.  I DON'T REMEMBER IF THIS WAS ONE

17     OF THEM.

18     Q    DO YOU SEE EXHIBIT 2534 IS A MOTOROLA

19     SMARTPHONE?

20     A    YES.

21     Q    NOT A PHONE THAT'S ACCUSED OF INFRINGING

22     APPLE'S TRADE DRESS AS FAR AS YOU KNOW; CORRECT?

23     A    AS FAR AS I KNOW.

24              MR. PRICE:  YOUR HONOR, I MOVE EXHIBIT

25     2534 INTO EVIDENCE.
```

1669

```
 1              THE COURT:  ANY OBJECTION?

 2              MR. JACOBS:  NO OBJECTION, YOUR HONOR.

 3              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

 4              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 5              2534, HAVING BEEN PREVIOUSLY MARKED FOR

 6              IDENTIFICATION, WAS ADMITTED INTO

 7              EVIDENCE.)

 8    BY MR. PRICE:

 9    Q    AND I'M GOING TO SHOW YOU WHAT'S BEEN MARKED

10    AS EXHIBIT 2528 FOR IDENTIFICATION, WHICH IS AN LG

11    PHONE, MADE BY LG.

12              HERE WE HAVE THE LG PHONE.

13              LOOKING AT THAT, IS THAT A PHONE THAT

14    APPLE SHOWED YOU TO USE AS A POSSIBLE CONTROL?

15    A    AGAIN, I'M SORRY, I CAN'T REMEMBER.  I LOOKED

16    AT A LOT OF PHONES.  I CAN'T REMEMBER IF THIS IS

17    ONE OF THEM.

18    Q    AND YOU CAN'T TELL FROM ANYTHING THAT YOU PUT

19    IN WRITING WHAT PHONES YOU LOOKED AT; CORRECT?

20    A    CORRECT.

21    Q    AND WHAT YOU HAVE IN FRONT OF YOU APPEARS TO

22    BE AN LG SMARTPHONE, T-MOBILE?

23    A    YES, IT DOES.

24              MR. PRICE:  MOVE 2528 INTO EVIDENCE, YOUR

25    HONOR.
```

1670

```
 1            MR. JACOBS:  YOUR HONOR, I THINK A
 2    LIMITING INSTRUCTION WOULD BE APPROPRIATE HERE.
 3            THESE ARE BEING OFFERED TO CHALLENGE THE
 4    CONTROL THAT MR. PORET USED AND THEY SHOULD NOT BE
 5    USED FOR ANY OTHER PURPOSE.
 6            MR. PRICE:  WELL, I THINK THAT'S
 7    INAPPROPRIATE.  IT CAN BE USED FOR OTHER PURPOSES
 8    AS WELL IF IT'S IN EVIDENCE.
 9            I DON'T KNOW THE IMPROPER PURPOSE THAT
10    COUNSEL IS TALKING ABOUT, BUT PERHAPS WE COULD TALK
11    ABOUT THAT OFF --
12            THE COURT:  WHY IS IT BEING OFFERED?
13            MR. PRICE:  AT THIS POINT, IT'S BEING
14    OFFERED TO SHOW THAT THERE WERE OTHER PHONES OUT
15    THERE IN THE MARKET THAT WERE CLOSER LOOKING TO THE
16    APPLE, WHICH COULD HAVE AND SHOULD HAVE BEEN USED
17    FOR THIS STUDY IF IT WAS GOING TO BE A FAIR STUDY.
18            THE COURT:  ALL RIGHT.  ARE THESE PHONES
19    GOING TO BE ADMITTED FOR ANY OTHER PURPOSE LATER IN
20    THE CASE?
21            MR. PRICE:  TO SHOW WHAT WAS IN THE
22    MARKETPLACE.
23            THE COURT:  ALL RIGHT.
24            MR. JACOBS:  YOUR HONOR, THERE'S NO DATE,
25    THERE'S NO INDICATION OF WHAT THESE PHONES, WHAT
```

```
1    THE SCREEN IS LIKE ON THEM.  THERE'S NOTHING THAT

2    WOULD SET A FULL FOUNDATION FOR THEIR BEING USED

3    FOR OTHER PURPOSES.

4             THE COURT:  ALL RIGHT.  I'M GOING TO GIVE

5    A LIMITING INSTRUCTION THAT THESE ARE TO BE

6    CONSIDERED FOR THE PURPOSE OF EVALUATING HOW

7    MR. PORET CHOSE HIS CONTROL DEVICES FOR THIS.

8             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

9             2528, HAVING BEEN PREVIOUSLY MARKED FOR

10            IDENTIFICATION, WAS ADMITTED INTO

11            EVIDENCE.)

12            THE COURT:  GO AHEAD, PLEASE.

13            MR. PRICE:  THANK YOU, YOUR HONOR.  AND

14   MAY I HAND THOSE OUT TO THE JURY?

15            THE COURT:  YES.

16   BY MR. PRICE:

17   Q    NOW, LET ME SWITCH TOPICS AND LOOK AT YOUR

18   REPORT.  I'D LIKE TO TALK ABOUT SOME OF THE THINGS

19   YOU DID TO MAKE SURE THAT YOU WERE FOCUSSING JUST

20   ON THE TRADE DRESS ISSUES.

21            AND IF WE LOOK AT YOUR REPORT AT PAGE 5,

22   PARAGRAPH 11 -- IF WE CAN PUT THAT UP, PLEASE?

23            DO YOU SEE YOU SAY THAT "IN A SECONDARY

24   MEANING TRADE DRESS SURVEY, IT'S STANDARD PROCEDURE

25   TO OBSCURE OR REMOVE ANYTHING ON THE PRODUCT THAT
```

1    MIGHT SERVE AS AN INDICATOR OF SOURCE APART FROM

2    THE OVERALL TRADE DRESS."

3            THAT'S CORRECT?  THAT IS, IN FACT, THE

4    STANDARD PROCEDURE; CORRECT?

5    A    YES.

6    Q    AND "FOR EXAMPLE, BRAND NAMES, LOGOS OR OTHER

7    FEATURES THAT MIGHT INDICATE THE SOURCE OF A

8    PRODUCT ARE TYPICALLY OBSCURED OR REMOVED.  THIS

9    ALLOWS THE SURVEY TO MEASURE THE EXTENT TO WHICH

10   THE TRADE DRESS SPECIFICALLY SERVES AS A SOURCE

11   IDENTIFIER APART FROM OTHER MARKS THAT MIGHT, ON

12   THEIR OWN, SIGNAL THE SOURCE OF THE PRODUCT TO

13   RESPONDENTS."

14           THAT'S THE PURPOSE OF OBSCURING THESE

15   SORTS OF THINGS; CORRECT?

16   A    YES.

17   Q    AND IF WE LOOK AT PAGE 6 AT PARAGRAPH 13 --

18   PARAGRAPH 13 OF THE SAME EXHIBIT, PAGE 6 -- SAME

19   EXHIBIT, 2544, PAGE 6, PARAGRAPH 13.  THERE WE GO.

20           AND IF YOU CAN BLOW UP THE PHONE AND THE

21   PARAGRAPH THAT WOULD ACTUALLY BE GREAT.

22           SO IT SAYS, "AS CAN BE SEEN FROM THE

23   PRECEDING IMAGE, SEVERAL OTHER FEATURES OF THE

24   IPHONE WERE ALSO REMOVED OR OBSCURED TO SAFEGUARD

25   AGAINST THE POSSIBILITY THAT THOSE FEATURES COULD

1673

```
 1    THEMSELVES SERVE AS SOURCE INDICATORS."

 2           RIGHT?

 3    A    YES.

 4    Q    AND THAT'S, AGAIN, THE NATURE THAT YOU'RE

 5    FOCUSSING ON THE ISSUE THAT YOU'RE TESTIFYING

 6    ABOUT, WHICH IS SECONDARY MEANING; CORRECT?

 7    A    YES.

 8    Q    AND YOU'VE ALREADY DISCUSSED IN YOUR REPORT

 9    HOW THE ICONS WERE BLURRED BECAUSE, FOR EXAMPLE, IF

10    YOU SEE ITUNES ON SOMETHING, CLEARLY PEOPLE ARE

11    GOING TO THINK APPLE; RIGHT?

12    A    THAT WAS THE REASON FOR DOING THAT, YES.

13    Q    AND THEN YOU MENTION THAT THE INDENTED BUTTON

14    AT THE BOTTOM CENTER OF THE PHONE, WHICH

15    RESPONDENTS MIGHT ASSOCIATE WITH APPLE, WAS COVERED

16    WITH A LABEL.  RIGHT?

17    A    YES.

18    Q    AND THAT'S WHY YOU HAVE ITEM C HERE ON THE

19    BUTTON, BECAUSE THAT COVERS THE HOME BUTTON, AND

20    YOUR UNDERSTANDING IS APPLE'S NOT SAYING THE HOME

21    BUTTON IS PART OF THE TRADE DRESS; RIGHT?

22    A    RIGHT, THAT'S RIGHT.

23    Q    AND SO YOU DON'T WANT SOMETHING THAT'S NOT

24    PART OF THE TRADE DRESS INDICATING TO SOMEONE, OH,

25    THIS IS AN APPLE BECAUSE THAT WOULD DISTORT YOUR
```

1    RESULTS?

2    A    YES, I THINK THAT'S BASICALLY ACCURATE.

3    Q    AND FOR THE SAME REASON, YOU WOULD OBSCURE

4    SOMETHING THAT SAID AT&T BECAUSE THAT'S WHERE

5    ONLY -- THE ONLY CARRIER WHERE APPLE SOLD ITS

6    PHONES AT THE TIME; RIGHT?

7    A    YEAH.  I DON'T KNOW THAT THAT WAS NECESSARY

8    SINCE AT&T HAS OTHER PHONES, BUT IN THEORY, IT'S

9    POSSIBLE THAT SOMEBODY COULD SEE AT&T AND THINK

10   APPLE, SO I DID IT JUST TO BE SAFE.

11   Q    AND SO THE -- THE PHONES YOU USED IN THIS

12   SURVEY WERE BLURRED AND THE HOME BUTTON WAS

13   COVERED; RIGHT?

14   A    YES.

15   Q    AND BY THE WAY, IF THE HOME BUTTON'S -- NOT

16   JUST ON YOUR TEST, BUT ON YOUR CONTROL PHONES, YOU

17   ALSO PUT A STICKER THAT WOULD HIDE IF THERE HAD

18   BEEN A HOME BUTTON THERE; RIGHT?

19   A    YES.

20   Q    EVEN IF THERE WASN'T A HOME BUTTON THERE;

21   RIGHT?

22   A    YES.

23   Q    AND THAT'S BECAUSE THE ABSENCE OF THE HOME

24   BUTTON MIGHT SUGGEST IT'S NOT AN APPLE; RIGHT?

25   A    THAT MAY BE ONE WAY OF PUTTING IT.  IT WAS

1675

```
1     JUST TO KEEP CONSISTENCY BETWEEN THE TEST AND

2     CONTROL IMAGES.

3     Q    AND YOU DON'T WANT THE LACK OF A HOME BUTTON

4     INDICATING SOMETHING IS NOT AN APPLE FOR A CONTROL

5     BECAUSE THAT WILL REDUCE, MIGHT REDUCE THAT NUMBER

6     YOU'RE SUBTRACTING FROM THE ASSOCIATION NUMBER;

7     RIGHT?

8     A    I THINK THAT GENERALLY SOUNDS RIGHT.

9     Q    SO NOW LET'S SWITCH TO YOUR STUDY ABOUT THE

10    TABLET, THE IPAD.

11              AND YOU USED A COUPLE OF PICTURES FOR THE

12    APPLE IPAD.  IF WE CAN LOOK AT 2544 AT PAGE 22.

13              SO IN YOUR STUDY -- I MIGHT HAVE THE

14    WRONG ONE HERE.  IS THAT 22, PAGE 22?  2544, PAGE

15    22.  GOING ONCE -- THAT'S PAGE 19.  I CAN TELL

16    BECAUSE IT SAYS 19.

17              OKAY.  HERE WE GO.

18              SO WHAT YOU DID FOR THE APPLE PRODUCT IS

19    YOU, AGAIN, YOU BLURRED OUT THE ICONS AND YOU PUT

20    THAT STICKER OVER THE HOME BUTTON; RIGHT?

21    A    YES, FOR THIS GROUP.

22    Q    AND NEXT PAGE, IF WE CAN GET TO IT, IT SAYS

23    THE SAME THING.  IT DOES THE SAME THING.  YOU USED

24    TWO OF THESE; RIGHT?  AGAIN, IT'S COVERED; RIGHT?

25    A    SO YOU'RE ASKING IF THE HOME BUTTON IS
```

1676

1    COVERED?

2    Q    YES.

3    A    YES, FOR THIS GROUP IT WAS ALSO COVERED.

4    Q    AND THEN WE HAVE THE CONTROL, AND FOR THE

5    CONTROL, IF WE LOOK AT EXHIBIT -- LET'S GO TO --

6    AND TO REMIND THE JURORS, WE'LL GO TO 30.5, SDX

7    30.5 TO SHOW WHAT WE'RE DOING HERE.  IT SHOULD BE

8    SD -- THERE WE GO.

9             WE'RE NOW IN THIS STUDY AND WE'RE TALKING

10   ABOUT THE FIRST STUDY YOU DID OF THE IPAD, OKAY,

11   BECAUSE YOU DID TWO; RIGHT?

12   A    THERE WERE MULTIPLE PARTS OF IT.  I CONSIDERED

13   IT ALL PART OF THE SAME SURVEY, BUT YES, THERE WERE

14   MULTIPLE PARTS OF IT.

15   Q    I WANT TO REMEMBER THAT, THAT IT'S ALL PART OF

16   THE SAME SURVEY.  THAT'S WHAT YOU'RE SAYING TO THE

17   JURY.  RIGHT?

18   A    YES.

19   Q    SO YOU DO AN ASSOCIATION WITH THE IPAD, AND

20   YOU SUBTRACT THE CONTROL, SO AGAIN, YOU'VE GOT TO

21   SEE IF THE CONTROL HAS INDICATORS THAT MIGHT SCREAM

22   "NOT APPLE" THAT MIGHT DISTORT THE RESULTS,

23   CORRECT, BECAUSE YOU'RE SUBTRACTING THAT?

24   A    THAT'S NOT REALLY HOW I WOULD PUT IT, BUT I --

25   I MEAN, YOU GENERALLY HAVE THE GIST RIGHT, THAT,

1    YES, I WOULD NOT WANT THE CONTROL TO BE SCREAMING

2    "NOT APPLE."

3    Q    OKAY.  I'M GLAD I'M NOT TOTALLY WRONG THIS

4    TIME.

5         SO IF WE LOOK AT THAT CONTROL, YOU SEE

6    YOU USED THIS -- AND WE CAN GET IT BIGGER, I THINK,

7    AT 2544, PAGE 32.

8         THIS IS THE CONTROL FROM YOUR REPORT?

9    A    YES.  THIS WAS A CONTROL FOR THE HEAD-ON VIEWS

10   OF THE IPAD THAT WE SHOWED.

11   Q    SO LET ME ASK YOU, DO YOU KNOW OF ANY TABLETS

12   THAT ONLY HAVE THREE ICONS ACROSS?  I MEAN, THIS --

13   A    I DON'T -- I CAN'T SPEAK FOR HOW MANY ICONS

14   ALL THE TABLETS HAVE.  LIKE I WAS TALKING ABOUT

15   BEFORE, I THINK MOST OF THESE TABLETS CAN HAVE, YOU

16   KNOW, ANY NUMBER OF ICONS DEPENDING ON WHAT PEOPLE

17   PUT ON THEM.

18   Q    I MEAN, EVEN THE SMALL IPHONE HAS FOUR ACROSS;

19   RIGHT?

20   A    I DON'T KNOW HOW MANY ICONS.  IT VARIES

21   DEPENDING ON WHAT PEOPLE HAVE ON THEM.

22   Q    WELL, SO YOU'RE AWARE OF A TABLET THAT, THAT

23   HAS ONLY THREE ICONS INSTEAD OF FOUR?

24   A    I'M NOT SAYING THAT.  I'M JUST SAYING I THINK

25   THE NUMBER OF TABLETS VARIES -- THE NUMBER OF ICONS

1678

```
 1    CAN VARY FOR EACH INDIVIDUAL USER DEPENDING ON HOW
 2    MANY THEY HAVE ON A SCREEN OR WHAT SCREEN THEY'RE
 3    LOOKING AT.
 4    Q    WELL, HAVING THREE HERE SCREAMS "NOT APPLE"?
 5    A    NO.
 6    Q    BUT THIS ISN'T ACTUALLY ICONS ON A REAL
 7    SCREEN, THIS IS SOMETHING DONE WITH CGI OR -- I
 8    MEAN, YOU KIND OF CREATED THIS LOOKING SCREEN ON
 9    YOUR COMPUTER; RIGHT?
10    A    I DIDN'T PERSONALLY, BUT THE CONTROL WAS
11    CREATED TO APPEAR TO BE A TABLET WITH A FIELD OF
12    ICONS.
13    Q    NOW, WHEN YOU TALKED TO THE JURY AND SHOWED
14    THEM 30.5, EXHIBIT 30.5 -- IF WE CAN SHOW THAT
15    AGAIN -- DO YOU SEE THIS HERE, WHAT YOU SHOWED THE
16    JURY HAS THE STICKER WHERE A HOME BUTTON WOULD BE?
17    A    YES.
18    Q    BUT IN YOUR REPORT THAT YOU WERE JUST LOOKING
19    AT, WHICH IS 2544, PAGE 32, IN YOUR REPORT, THAT
20    STICKER IS UP ON THE SCREEN, AND SO THE PERSON
21    COULD SEE THAT THERE IS NO HOME BUTTON AND,
22    THEREFORE, KNOW IT'S NOT AN APPLE?
23    A    NO, THAT -- THAT'S NOT RIGHT.  MAYBE THIS
24    IMAGE GOT MESSED UP SOMEHOW.  BUT THE STICKER WAS
25    OVER THE BLACK PART.
```

1    Q    THIS IS THE IMAGE THAT IS IN YOUR REPORT;

2    CORRECT?

3    A    I -- I DON'T KNOW.  I MEAN, I'M -- I'M SEEING

4    THIS UP HERE NOW.  I'M PRETTY SURE THAT THE ACTUAL

5    DIGITAL IMAGES WERE, WERE PROVIDED AS THE EXHIBITS

6    TO THE REPORT.  THIS WAS SOMETHING THAT WAS SHOWN

7    IN THE BODY AND PERHAPS SOMETHING GOT MESSED UP IN

8    PASTING THAT EXHIBIT INTO THE BODY.

9         BUT I KNOW THAT'S NOT WHAT WAS SHOWN.

10   Q    WELL, ON PAGE -- I'M SORRY.  ON PAGE 31, JUST

11   THE PAGE BEFORE THIS, YOU'VE GOT PARAGRAPH 4.  YOU

12   SAY "THE CONTROL IMAGES ARE SHOWN ON THE FOLLOWING

13   PAGES," AND THAT'S ON THE VERY NEXT PAGE; RIGHT?

14   A    YES.

15   Q    AND YOUR RESULTS, WHICH WE'VE SEEN AT 30.5

16   AGAIN OF THE STUDY THAT YOU DID THAT IS -- YOU

17   ENDED UP WITH A 40.3 USING THIS CONTROL; CORRECT?

18   A    YES.

19   Q    AND YOU -- YOU'VE GRADUATED FROM LAW SCHOOL;

20   RIGHT?

21   A    YES.

22   Q    AND YOU HAVE AN UNDERSTANDING THAT FOR

23   SECONDARY MEANING, THERE'S KIND OF A, A THRESHOLD

24   THAT IS ABOUT 50 PERCENT?  THAT'S THE NUMBER YOU

25   WANT TO GET ABOVE?

```
 1    A     NO.

 2    Q     WELL, WHEN YOU DID THIS AND GOT THE 40.3

 3    PERCENT NUMBER, YOU THOUGHT THAT YOUR JOB WAS OVER

 4    AND YOU ACTUALLY STARTED WRITING THE REPORT?

 5    A     I -- I THINK THAT'S CORRECT, THAT AT THAT

 6    POINT I, I THOUGHT THAT THAT WAS GOING TO BE THE

 7    END OF THE RESEARCH.

 8    Q     AND THEN APPLE CAME TO YOU AND SAID, "WE NEED

 9    YOU TO DO ANOTHER STUDY."

10    A     NO, THAT'S NOT -- THAT'S NOT EXACTLY ACCURATE.

11    Q     YOU DID ANOTHER STUDY BECAUSE APPLE CAME TO

12    YOU AND ASKED YOU TO DO ANOTHER STUDY; CORRECT?

13    A     I CERTAINLY DID MORE ASPECTS OF THE SURVEY AT

14    APPLE'S REQUEST.

15    Q     OKAY.  SO THE ANSWER IS CORRECT, AT APPLE'S

16    REQUEST, YOU DID MORE WORK AFTER SHOWING THEM THE

17    RESULTS OF THIS STUDY; CORRECT?

18    A     YES.

19    Q     AND LET'S TALK ABOUT THAT STUDY THEN.

20          SO ON YOUR NEXT GO-ROUND -- LET'S LOOK AT

21    EXHIBIT 2544-24.  IF YOU CAN BLOW UP THE TOP HERE.

22          NOW, THIS ISN'T THE CLEAREST BLOW UP, BUT

23    ON YOUR NEXT STUDY, YOU DIDN'T PUT A STICKER OVER

24    THAT HOME BUTTON AS YOU PREVIOUSLY SAID WAS

25    NECESSARY TO GET A FAIR STUDY AND MAKE SURE THAT
```

1    YOU WERE LOOKING JUST AT THE TRADE DRESS?

2    A    I DON'T AGREE WITH HOW YOU JUST CHARACTERIZED

3    THAT, BUT YOU'RE CORRECT THAT THERE WAS NO LABEL

4    OVER THE BUTTON IN THIS PART OF IT.

5    Q    AND ALSO, IF WE LOOK AT THE NEXT PAGE, WHICH

6    IS 25, ANOTHER PART OF THE STUDY, AND AGAIN, THIS

7    ISN'T THE CLEAREST VIEW, BUT YOU SEE NOT -- THE

8    HOME BUTTON IS NOT COVERED; RIGHT?

9    A    RIGHT.

10   Q    AND THE ICONS ARE NOT BLURRED, EITHER, WHEREAS

11   PREVIOUSLY IN YOUR REPORT, YOU SAID THAT WAS

12   NECESSARY TO MAKE SURE YOU WERE GETTING A RESPONSE

13   THAT WAS MEANINGFUL TO TRADE DRESS.  RIGHT?

14   A    YOU'RE CORRECT THAT THAT'S WHAT'S SHOWN HERE.

15         I DON'T THINK YOU'RE CORRECT THAT AT THIS

16   POINT IT WAS NECESSARY TO DO THOSE THINGS GIVEN

17   THAT I HAD ALREADY DONE THEM AND HAD ALREADY SEEN

18   THAT THERE WAS SECONDARY MEANING EVEN WITH THOSE

19   THINGS COVERED.

20   Q    WITH THE 40 PERCENT FIGURE THAT YOU GOT?

21   A    IT'S NOT JUST THE 40 PERCENT FIGURE THAT'S

22   RELEVANT.  THE 57 PERCENT FIGURE IS THE PRIMARY

23   FIGURE AS WELL.

24   Q    SO BASICALLY FOR THIS SECOND STUDY THAT APPLE

25   ASKED YOU TO DO AFTER GETTING THE 40 PERCENT

1    RESULT, YOU STACKED THE DECK ACCORDING TO WHAT YOU

2    SAID, IN YOUR REPORT, WAS THE STANDARD PROCEDURE

3    FOR DOING SUCH STUDIES?

4    A    NO.

5    Q    WELL, IN FACT, YOU GOT COMMENTS FROM

6    PARTICIPANTS LIKE "THE BOTTOM BUTTON AT THE BOTTOM

7    IS A DEAD GIVE AWAY THAT THIS IS AN APPLE."

8    A    I DO RECALL THERE WERE SOME RESPONDENTS WHO

9    MENTIONED THE HOME BUTTON AS ONE OF THE THINGS THEY

10   RECOGNIZED.  I THINK IT WAS A PRETTY SMALL NUMBER,

11   BUT THERE WERE DEFINITELY SOME.

12   Q    AND THEN AS THE CONTROL -- IF WE CAN PUT UP

13   2544-33 -- YOU USED A NOOK, AN E-READER; RIGHT?

14   A    IT'S -- IT'S A TABLET.

15   Q    AND WITH THE NOOK, YOU SHOWED THE "N" HERE

16   THAT IDENTIFIES IT AS A NOOK TO PEOPLE WHO KNOW

17   NOOKS?

18   A    NO, THAT'S NOT TRUE.

19   Q    ISN'T THAT WHAT THAT IS RIGHT THERE?

20   A    WELL, I DON'T KNOW EXACTLY WHAT THAT IS, BUT I

21   KNOW THAT BARELY ANYBODY -- ONLY A VERY SMALL

22   NUMBER OF PEOPLE IN THE SURVEY SAID THAT THEY

23   THOUGHT THIS WAS A NOOK.  SO IT CLEARLY DID NOT

24   GIVE AWAY THAT IT WAS A NOOK TO MOST PEOPLE.

25   Q    IT DID GIVE AWAY THAT IT WASN'T AN APPLE?

1683

```
1    A    NO.  A LOT MORE PEOPLE SAID IT WAS AN APPLE.

2    Q    WELL, BUT NOT MANY.  YOU KIND OF MADE SURE OF

3    THAT.

4    A    NO.  YOU'RE JUST WRONG.  10 PERCENT, I

5    BELIEVE, I THINK THAT WAS THE NUMBER, I THINK 10

6    PERCENT SAID THAT THIS WAS AN APPLE, AND IT WAS A

7    LOT LESS THAN THAT THAT SAID ANYTHING ABOUT A NOOK,

8    SO THAT'S JUST NOT TRUE.

9    Q    SO ONLY 10 PERCENT SAID THAT IT WAS AN APPLE,

10   AND THAT COULDN'T BE, OF COURSE, BECAUSE APPLE

11   DOESN'T HAVE A HOME BUTTON LIKE THAT?

12   A    CERTAINLY IT'S POSSIBLE THAT ONE -- THAT

13   THAT'S ONE OF THE REASONS THAT PEOPLE DIDN'T THINK

14   THIS WAS AN APPLE.

15   Q    AND THEN IF WE CAN LOOK AT 34, 2544-34, WE'VE

16   GOT -- YOU SHOWED THEM ALSO A VERSION OF THIS THAT

17   HAS THAT NOOK BUTTON AND THEN HAS UNBLURRED ICONS;

18   RIGHT?

19   A    YES, JUST ONE GROUP.

20   Q    AND THESE DON'T LOOK ANYTHING LIKE APPLE'S?

21   AGAIN, IT SCREAMS "I'M NOT AN APPLE"?

22   A    AGAIN, THAT'S NOT WHAT THE SURVEY RESULTS

23   SHOW.

24   Q    BECAUSE YOU THINK 10 PERCENT IS A BIG NUMBER?

25   A    I'M NOT SAYING IT'S A BIG NUMBER, BUT 10
```

1    PERCENT OF PEOPLE SAYING THEY THINK SOMETHING IS AN

2    APPLE CERTAINLY SHOWS THAT IT WAS A POSSIBILITY

3    THAT PEOPLE WHO WERE GUESSING MIGHT GUESS THAT THIS

4    IS AN APPLE.

5    Q    AND IT'S A LOT CLEARER IN THE ACTUAL, WHAT YOU

6    SHOWED THEM, BUT UP HERE ALSO IT HAS THIS THING

7    THAT SAYS "APPS" AND IT SAYS "ARCHIVE."  IS THAT

8    CORRECT?

9    A    YES.

10   Q    AND TELL ME STEVE JOBS WOULDN'T HAVE FIRED

11   SOMEBODY THAT HAD PUT "ARCHIVE" UP THERE ON A HOME

12   SCREEN?

13   A    I COULDN'T SPEAK TO THAT.

14   Q    AND THEN THERE ARE OTHER ALTERNATIVES YOU

15   COULD HAVE USED.  FOR EXAMPLE, LET ME SHOW YOU

16   EXHIBIT 2529 FOR IDENTIFICATION.

17             THIS IS A MOTOROLA TABLET.

18             DO YOU RECOGNIZE THAT AS A MOTOROLA

19   TABLET?

20             I'M SORRY.  DO YOU WANT TO SEE IT?

21             THE WITNESS:  YES.

22             MR. PRICE:  AND I FORGOT TO SHOW IT TO

23   MR. JACOBS.  LET ME DO THAT.

24             (DISCUSSION OFF THE RECORD BETWEEN

25   COUNSEL.)

1685

```
 1              MR. PRICE:  SINCE THE WITNESS RECOGNIZES
 2    THIS AS A MOTOROLA, I'LL MOVE IT INTO EVIDENCE FOR
 3    THE PURPOSE OF CHALLENGING HIS METHODOLOGY.
 4              MR. JACOBS:  SO, YOUR HONOR, THIS WAS
 5    ACTUALLY DISCLOSED TO US AS A DEMONSTRATIVE, ALONG
 6    WITH 2528 AND 2534.  I WAS A LITTLE SLOW ON THE
 7    UPTAKE WHEN THEY WERE PRESENTED, BUT THEY ARE NOT
 8    ON THE EXHIBIT LIST FOR ADMISSION AS EXHIBITS.
 9              THE COURT:  ARE THEY ON YOUR --
10              MR. PRICE:  THEY ARE ON THE EXHIBIT LIST
11    FOR THE CASE.
12              WHAT WE GAVE THEM FOR THE WITNESS, I
13    THINK WE DID LIST THEM AS DEMONSTRATIVES BECAUSE I
14    DIDN'T KNOW IF HE WOULD BE ABLE TO SAY, "YES, I SEE
15    THIS IS A MOTOROLA TABLET," AND NOW THAT THEY'RE
16    GOING IN FOR THAT LIMITED PURPOSE, I'D ASK THAT
17    THAT BE ADMITTED.  THERE'S NO PREJUDICE TO
18    DEMONSTRATIVES GOING INTO EVIDENCE.
19              MR. JACOBS:  I THINK THERE IS, YOUR
20    HONOR.  IF IT HAD BEEN DISCLOSED TO US AS AN
21    EXHIBIT, IT MIGHT HAVE CHANGED THE WAY WE
22    APPROACHED OBJECTIONS.
23              MR. PRICE:  MR. JACOBS CAN'T SAY --
24              THE COURT:  WAS IT TIMELY ON THE EXHIBIT
25    LIST?
```

```
 1              MR. PRICE:  OH, YES.
 2              THE COURT:  ALL RIGHT.  THAT'S GOING TO
 3    BE ADMITTED WITH A LIMITING INSTRUCTION THAT THIS
 4    IS SOLELY FOR PURPOSES OF CHALLENGING MR. PORET'S
 5    STUDY.
 6              CORRECT?
 7              MR. PRICE:  YES.
 8              THE COURT:  OKAY.  IT'S ADMITTED.
 9              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
10              2529, HAVING BEEN PREVIOUSLY MARKED FOR
11              IDENTIFICATION, WAS ADMITTED INTO
12              EVIDENCE.)
13    BY MR. PRICE:
14    Q    AND LET ME SHOW YOU 2538 FOR IDENTIFICATION.
15              THIS IS AN LG TABLET.  DO YOU SEE THIS IS
16    AN LG TABLET AS WELL?
17    A    YES, IT IS.
18    Q    AND THEN IF WE CAN GO BACK TO 30.5.
19              AND SO GIVEN WHAT WE JUST WENT THROUGH AS
20    TO HOW YOU CHANGED YOUR PROCEDURES, CONTRARY TO THE
21    WAY YOU SAID A SURVEY SHOULD BE DONE IN THIS CASE,
22    YOU EXPECT THE JURY TO ACCEPT THESE NUMBERS IN
23    DECIDING A CASE WHERE APPLE IS ASKING FOR ABOUT
24    $2.7 BILLION?
25    A    WELL, YOU JUST SAID A LOT OF THINGS THERE.
```

1          IT'S NOT TRUE THAT I CHANGED MY

2     PROCEDURES.  I EXPLAINED WHAT HAPPENED, THAT I HAD

3     ALREADY DONE A SURVEY THAT HAD ESTABLISHED

4     SECONDARY MEANING WITHOUT THE HOME BUTTON VISIBLE

5     OR THE ICONS VISIBLE, AND SO IT WAS OF INTEREST TO

6     SURVEY IT FROM ANOTHER VIEW.

7          SO THAT'S NOT A FAIR WAY TO PUT IT.

8          AND, YOU KNOW, TO ANSWER YOUR SECOND

9     QUESTION, YES, THOSE WERE GOOD CONTROLS AND THEY

10    SHOWED THAT THOSE MUCH LARGER NUMBERS ARE NOT

11    GUESSING OR THE PRODUCT OF ANY PROBLEM WITH THE

12    SURVEY.

13          SO I THINK THEY CLEARLY WOULD BE ACCEPTED

14    AS SHOWING SECONDARY MEANING.

15          MR. PRICE:  YOUR HONOR, IF I MAY APPROACH

16    AND PASS TO THE JURY THE TABLETS?

17          THE COURT:  THAT'S FINE.  GO AHEAD,

18    PLEASE.

19          MR. PRICE:  NO FURTHER QUESTIONS.

20          THE COURT:  ALL RIGHT.  THE TIME IS NOW

21    9:38.

22          GO AHEAD, PLEASE, WITH ANY REDIRECT.

23                  **REDIRECT EXAMINATION**

24    BY MR. JACOBS:

25    Q    CAN I HAVE THE ELMO, PLEASE.

1688

```
 1              ACTUALLY, MR. PORET, CAN YOU TURN -- DO
 2     YOU HAVE YOUR FULL REPORT IN FRONT OF YOU?
 3     A    YES.
 4     Q    CAN YOU TURN TO PAGE 245 WHERE YOU HAVE THE,
 5     THE QUESTIONS THAT YOU'RE PRESENTING TO THE SURVEY
 6     TAKERS.
 7     A    YES.  282 -- OH, YES, OKAY.
 8     Q    NOPE, GO BACK.  I'M SORRY.  I'M WRONG.
 9              MAY I HAVE THE ELMO?
10              DOES THIS SHOW THE STICKER ON THE CONTROL
11     IN THE PLACE THAT YOU INDICATED IT WAS, MR. PORET?
12     A    YES.  THIS IS THE ACTUAL SCREEN SHOT FROM HOW
13     THE SURVEY SCREEN APPEARED TO PEOPLE ON THEIR
14     COMPUTERS.
15     Q    AND THE "ITEM H" IS LOCATED WHERE ON THIS
16     CONTROL?
17     A    IT'S OVER WHERE THE HOME BUTTON WOULD HAVE
18     BEEN.
19              MR. JACOBS:  THANK YOU.  NO FURTHER
20     QUESTIONS, YOUR HONOR.
21              THE COURT:  ALL RIGHT.  IT'S 9:41.
22              MAY THIS --
23              MR. PRICE:  NO FURTHER QUESTIONS.
24              THE COURT:  ALL RIGHT.  MAY THIS WITNESS
25     BE EXCUSED AND IS IT SUBJECT TO RECALL OR NOT?
```

```
1              MR. PRICE:  HE CAN BE EXCUSED.

2              THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

3              MR. JACOBS:  SUBJECT TO RECALL, YOUR

4    HONOR.

5              THE COURT:  OH, YOU ARE EXCUSED SUBJECT

6    TO RECALL.  YOU'RE FREE TO LEAVE, SIR.

7              THE WITNESS:  THANK YOU, YOUR HONOR.

8              THE COURT:  ALL RIGHT.  PLEASE CALL YOUR

9    NEXT WITNESS.

10             MR. JACOBS:  YOUR HONOR, APPLE CALLS

11   KENT VAN LIERE.

12             THE COURT:  OKAY.

13             THE CLERK:  WOULD YOU RAISE YOUR RIGHT

14   HAND, PLEASE.  REMAIN STANDING.

15                      KENT VAN LIERE,

16   BEING CALLED AS A WITNESS ON BEHALF OF THE

17   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

18   EXAMINED AND TESTIFIED AS FOLLOWS:

19             THE WITNESS:  I DO.

20             THE CLERK:  WOULD YOU HAVE A SEAT,

21   PLEASE.

22             THE COURT:  ALL RIGHT.  THE TIME IS 9:42.

23             GO AHEAD, PLEASE.

24             MR. JACOBS:  THANK YOU, YOUR HONOR.

25             THE CLERK:  EXCUSE ME.  WE NEED TO GET
```

1690

```
1    HIS NAME AND THE SPELLING.
2            IF YOU COULD STATE YOUR NAME, PLEASE, AND
3    SPELL IT.
4            THE WITNESS:  MY NAME IS KENT VAN LIERE,
5    THE LAST NAME IS V-A-N L-I-E-R-E.  IT'S TWO WORDS.
6            THE CLERK:  THANK YOU.
7                      DIRECT EXAMINATION
8    BY MR. JACOBS:
9    Q    SIR, CAN YOU TELL THE JURY WHAT YOU DO?
10   A    YES.  I'M A VICE-PRESIDENT WITH NERA ECONOMIC
11   CONSULTING.
12           I HAVE A PH.D. IN SOCIOLOGY FROM
13   WASHINGTON STATE UNIVERSITY.
14           I STARTED MY CAREER TEACHING AT THE
15   UNIVERSITY OF TENNESSEE.  I SPENT MANY YEARS AS A
16   PRESIDENT AND A PARTNER IN A MARKET RESEARCH FIRM,
17   AND NOW FOR THE LAST SIX YEARS, I'VE BEEN DOING
18   EXPERT WORK WITH NERA, PRIMARILY IN LITIGATION.
19   Q    IS ONE OF YOUR FIELDS OF EXPERTISE SURVEY
20   RESEARCH?
21   A    YES.
22   Q    CAN YOU DESCRIBE THAT BACKGROUND BRIEFLY FOR
23   THE JURY, PLEASE?
24   A    YES.  MY TRAINING WAS IN SURVEY RESEARCH AND
25   STATISTICS, ALONG WITH OTHER THINGS, AND I'VE SPENT
```

```
1    THE BETTER PART OF THE LAST 30 YEARS DOING SURVEY

2    RESEARCH IN A VARIETY OF CONTEXTS, BOTH AS A

3    PROFESSOR, AS THE HEAD OF A MARKET RESEARCH FIRM,

4    AND NOW MOST RECENTLY IN LITIGATION.

5              MR. JACOBS:  YOUR HONOR, WE OFFER

6    DR. VAN LIERE AS AN EXPERT QUALIFIED TO TESTIFY

7    ABOUT SURVEY RESEARCH AND CONSUMER --

8              THE COURT:  ANY OBJECTION?

9              MR. PRICE:  NO OBJECTION.

10             THE COURT:  ALL RIGHT.  SO CERTIFIED.

11             GO AHEAD, PLEASE.

12   BY MR. JACOBS:

13   Q    NOW, WHAT SURVEYS DID WE ASK YOU TO CONDUCT,

14   DR. VAN LIERE?

15   A    YES.  I WAS ASKED TO CONDUCT TWO SURVEYS FOR

16   THIS MATTER, ONE SURVEY TO MEASURE THE EXTENT TO

17   WHICH CONSUMERS ASSOCIATE THE LOOK AND THE DESIGN

18   OF SAMSUNG GALAXY PHONES WITH IPHONE; AND ONE

19   SURVEY TO MEASURE THE EXTENT TO WHICH CONSUMERS WHO

20   VIEW THE SAMSUNG GALAXY TABLETS IN A POST-SALE

21   ENVIRONMENT ARE CONFUSED AND BELIEVE THAT THEY ARE

22   SEEING AN IPAD OR APPLE PRODUCT.

23   Q    HOW DID YOU CONDUCT THE SURVEYS?

24   A    THE ASSOCIATION STUDY WAS CONDUCTED AS A

25   WEB-BASED SURVEY AND THE, THE CONFUSION STUDY WAS
```

```
 1    CONDUCTED AS A MALL INTERCEPT SURVEY.

 2    Q    ALL RIGHT.  WE'LL EXPLAIN THAT BRIEFLY IN A

 3    MINUTE.

 4            LET'S TAKE A LOOK AT EXHIBIT 24 IN YOUR

 5    BINDER.  WHAT IS EXHIBIT 24?

 6    A    EXHIBIT 24 IS PHOTOGRAPHS OF THE IMAGES THAT

 7    WERE USED IN THE ASSOCIATION SURVEY, AND THEN A

 8    PLACE HOLDER FOR THE VIDEOS THAT WERE USED AS THE

 9    TEST AND CONTROL STIMULI IN THE CONFUSION SURVEY.

10            MR. JACOBS:  YOUR HONOR, WE OFFER PX 24

11    INTO EVIDENCE.

12            THE COURT:  ANY OBJECTION?

13            MR. PRICE:  NO OBJECTION.

14            THE COURT:  ALL RIGHT.  IT'S ADMITTED.

15            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

16            24, HAVING BEEN PREVIOUSLY MARKED FOR

17            IDENTIFICATION, WAS ADMITTED INTO

18            EVIDENCE.)

19            THE COURT:  GO AHEAD, PLEASE.

20    BY MR. JACOBS:

21    Q    LET'S TAKE A LOOK AT PX 24.2 AND 24.3, PLEASE,

22    DR. VAN LIERE.

23            WHAT DO THESE SLIDES SHOW US?

24    A    SO IN THE ASSOCIATION SURVEY, WE WERE TESTING

25    THE DEGREE TO WHICH THE SAMSUNG GALAXY PHONES, THAT
```

1693

```
 1    CONSUMERS ASSOCIATED THEM WITH APPLE.

 2              SO THE FIRST ONE IS THE GALAXY FASCINATE

 3    AND THE SECOND IS THE GALAXY S II EPIC.  THESE WERE

 4    THE IMAGES THAT WERE USED AS MY TEST STIMULI IN THE

 5    ASSOCIATION SURVEY.

 6    Q    AND LET'S LOOK AT 24.2.  THAT'S -- 24.2 IS THE

 7    FASCINATE AND 24.3 IS THE GALAXY S II EPIC 4G

 8    TOUCH.  DO YOU SEE THAT, SIR?

 9    A    I DO.

10    Q    OKAY.  NOW LET'S GO TO 24.4, AND WHAT IS 24.4?

11    A    SO AS YOU'VE HEARD DISCUSSED THIS MORNING, I

12    ALSO USED A CONTROL DEVICE IN THE ASSOCIATION

13    SURVEY, AND THE BLACKBERRY STORM WAS MY CONTROL

14    DEVICE.

15    Q    AND WHAT'S THE PURPOSE OF A CONTROL IN THIS

16    KIND OF STUDY?

17    A    WELL, IN BOTH TRADEMARK INFRINGEMENT AND FALSE

18    ADVERTISING AND THE RANGE OF THESE KINDS OF

19    SURVEYS, WE TYPICALLY USE CONTROLS FOR THE SAME

20    PURPOSE THAT MR. PORET IDENTIFIED.

21              THE AMOUNT OF CONFUSION MEASURED OR

22    ASSOCIATION MEASURED IN THE TEST CONDITION MAY BE

23    PARTLY INFLUENCED BY THE WAY THE SURVEY WAS

24    CONDUCTED, BY WHETHER RESPONDENTS ARE GUESSING.

25              SO WE USE A CONTROL STIMULI TO MEASURE
```

1694

```
 1     THE EXTENT TO WHICH OUR SURVEY PROCESS OR CONSUMER
 2     GENERALLY KNOWING SOMETHING AND GUESSING AND KNOCK
 3     THAT OFF OF OUR TEST RESULTS.
 4     Q    ONCE A RESPONDENT SAW AN IMAGE OF A PHONE,
 5     WHAT DID THE SURVEY ASK?
 6     A    IN THE ASSOCIATION SURVEY, THE PRIMARY
 7     QUESTION WAS, DOES THE LOOK AND DESIGN OF THIS
 8     PHONE BRING TO MIND OR CREATE ANY ASSOCIATION FOR
 9     YOU WITH ANY OTHER PHONES?  BASICALLY THAT WAS THE
10     WORDING.
11     Q    SO THESE QUESTIONS WERE ASKED OF PEOPLE
12     LOOKING AT THE SAMSUNG PHONES AND THE CONTROLS?
13     A    YES.
14     Q    AND THEN IF SOMEONE ANSWERED YES, WHAT WERE
15     THEY ASKED?
16     A    SO IF THEY SAID IT BROUGHT TO MIND OR CREATED
17     AN ASSOCIATION YES TO THAT QUESTION, THEN THEY WERE
18     ASKED, WHAT PHONE OR PHONES DO YOU ASSOCIATE WITH
19     THIS LOOK?
20     Q    LET'S GO TO 31.4.  IS THAT THE -- ARE THOSE
21     THE QUESTIONS YOU WERE JUST REFERRING TO,
22     DR. VAN LIERE?
23     A    YES, FOR THE ASSOCIATION SURVEY.  SO THIS IS
24     THE BASIC FIRST QUESTION THEY WERE ASKED AFTER THEY
25     HAD LOOKED AT THE IMAGE OF THE PHONES THAT WE
```

```
 1    LOOKED AT A MINUTE AGO.
 2    Q    LET'S GO TO 31.5.   OKAY.   WHAT DOES THIS SLIDE
 3    SHOW?
 4    A    SO THIS IS BASICALLY A SUMMARY OF THE RESULTS
 5    FROM THE ASSOCIATION SURVEY.   SO THE FIRST TWO
 6    COLUMNS ARE THE RESULTS FOR MY TEST STIMULI, AND
 7    THEN THE THIRD COLUMN IS MY RESULTS FOR THE
 8    BLACKBERRY STORM, WHICH WAS MY CONTROL STIMULI.
 9              AND WHAT THIS IS BASICALLY SHOWING IN THE
10    FIRST ROW IS THAT FOR THE SAMSUNG GALAXY FASCINATE,
11    ABOUT 52 PERCENT OF THE RESPONDENTS SAID THAT THE
12    SAMSUNG GALAXY, THEY ASSOCIATED IT WITH APPLE OR
13    THE IPHONE; AND THE SECOND COMMENTS SHOWING THAT
14    FOR THE SAMSUNG GALAXY S II EPIC 4G, ABOUT 51
15    PERCENT ASSOCIATED IT WITH THE IPHONE OR AN APPLE
16    PRODUCT.
17    Q    DO YOU HAVE AN OPINION ABOUT THESE RESULTS?
18    A    YES.   BASICALLY WHAT THE RESULTS SUGGEST -- SO
19    WE NETTED OFF THE CONTROL, OR GUESSING, THE SAME
20    WAY WHAT YOU SAW THIS MORNING, AND SO THE NET
21    ASSOCIATIONS IN MY STUDY WERE 38 PERCENT AND 37
22    PERCENT FOR THE TWO SAMSUNG PRODUCTS.
23              SO THOSE PERCENTAGES WOULD SUGGEST THAT
24    IT IS LIKELY THAT CONSUMERS WILL ASSOCIATE THE LOOK
25    AND DESIGN OF THE SAMSUNG GALAXY PHONES WITH APPLE
```

1696

1    OR WITH THE IPHONE, AND THAT WOULD BE EVIDENCE

2    SUGGESTIVE OF DILUTION.

3    Q    LET'S TALK ABOUT YOUR TABLET SURVEY NOW.

4         WHAT WERE YOU DESIGNING -- WHAT DID YOU

5    DID -- HOW DID YOU -- WHAT WAS THE PURPOSE OF THAT

6    SURVEY?

7    A    SO THE TABLET SURVEY WAS A LIKELIHOOD OF

8    CONFUSION SURVEY, SO MY GOAL WAS TO MEASURE THE

9    EXTENT TO WHICH CONSUMERS, WHEN THEY VIEW THE

10   SAMSUNG GALAXY TABLET IN A WHOLESALE ENVIRONMENT,

11   DID THEY BELIEVE THEY'VE SEEN AN IPAD OR APPLE

12   PRODUCT.

13   Q    AND YOU SAID THIS IS A MALL INTERCEPT SURVEY.

14   CAN YOU EXPLAIN WHAT THAT WAS?

15   A    YES.  SO THERE'S A VARIETY OF WAYS TO COLLECT

16   DATA FOR THESE KINDS OF SURVEYS.  ONE WAY TO DO IT

17   IS IN MALLS.  THERE'S A NETWORK OF MALLS AROUND THE

18   U.S. THAT HAVE RESEARCH FACILITIES AT THEM.  THE

19   MARKET RESEARCH IS OFTEN DONE IN THESE KIND OF

20   FACILITIES.

21        THE IDEA IS TO GO OUT INTO THE MALL,

22   INTERCEPT CONSUMERS, ASK THEM A SERIES OF SCREENING

23   QUESTIONS TO MAKE SURE THEY QUALIFY FOR THE STUDY,

24   AND THEN BRING THEM BACK TO THE INTERVIEWING AREA

25   OR THE RESEARCH FACILITY AND CONDUCT THE ACTUAL

```
 1    SURVEY WITH THEM.

 2              SO THAT'S HOW WE DID THIS PARTICULAR

 3    STUDY.

 4    Q    AND WHAT DID YOU ACTUALLY --

 5              CAN WE GO DARK, MR. LEE?

 6              WHAT DID YOU ACTUALLY TEST IN THIS

 7    SURVEY?  WHAT TABLETS DID YOU TEST?

 8    A    SO THE, THE THREE -- THE TWO TESTS AND

 9    CONTROLS WERE A SAMSUNG GALAXY 10.1 WITH A BRAND ON

10    IT; A SAMSUNG GALAXY 10.1 TABLET WITHOUT A BRAND ON

11    IT; AND THEN A BARNES & NOBLE COLOR NOOK WAS THE

12    CONTROL DEVICE.

13    Q    AND YOU MENTIONED YOU USED VIDEOS FOR THE

14    SURVEY.  LET'S TAKE A LOOK AT ONE.  LET'S TAKE A

15    LOOK AT ACTUALLY -- LET'S TAKE A LOOK AT PX 24.5.

16              IS THIS ONE OF THE -- BEFORE YOU RUN IT,

17    MR. LEE -- IS PX 24.5 ONE OF THE VIDEOS YOU SHOWED

18    YOUR RESPONDENTS?

19    A    I BELIEVE SO.

20              MR. JACOBS:  YOUR HONOR, WE OFFER PX 24.5

21    INTO EVIDENCE.

22              THE COURT:  IT'S ADMITTED.

23              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

24              24.5, HAVING BEEN PREVIOUSLY MARKED FOR

25              IDENTIFICATION, WAS ADMITTED INTO
```

1698

```
1              EVIDENCE.)

2              THE COURT:  GO AHEAD, PLEASE.

3              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

4    OPEN COURT OFF THE RECORD.)

5    BY MR. JACOBS:

6    Q    SO WHICH GALAXY TAB ARE WE LOOKING AT IN 24.5?

7    A    I BELIEVE THIS IS THE UNBRANDED VERSION.

8              AND THEN WE TESTED -- THE SAME EXACT

9    VIDEO WAS DONE WITH A BRANDED VERSION.

10   Q    AND SO SOMEONE WOULD BE AT THE RESEARCH

11   FACILITY IN THE MALL AND THEY WOULD BE SHOWN THIS

12   VIDEO AND ASKED QUESTIONS?

13   A    YES, THAT'S CORRECT.  SO THE BASIC IDEA WAS TO

14   SIMULATE A POST-SALE CONFUSION ENVIRONMENT WHERE A

15   CONSUMER IN THE RELEVANT MARKET IS OBSERVING

16   SOMEBODY ELSE USING THE DEVICE, AS YOU WOULD IF YOU

17   WENT TO A COFFEE SHOP OR YOU WERE ON THE LIGHT RAIL

18   OR WALKED THROUGH THIS ROOM AND SEE THESE DEVICES

19   IN USE.  SO THAT WAS THE IDEA.

20             AND SO WE WERE GOING TO USE A VIDEO TO

21   SIMULATE THAT, SO THAT'S WHY WE DID THESE IN THE

22   MALL.

23   Q    AND LET'S TAKE A LOOK AT YOUR CONTROL VIDEO.

24             IS 24.6 YOUR CONTROL, SIR?

25   A    I BELIEVE SO.
```

```
 1              MR. JACOBS:  WE OFFER 24.6 INTO EVIDENCE,
 2      YOUR HONOR.
 3              MR. PRICE:  NO OBJECTION.
 4              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.
 5              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
 6              24.6, HAVING BEEN PREVIOUSLY MARKED FOR
 7              IDENTIFICATION, WAS ADMITTED INTO
 8              EVIDENCE.)
 9              MR. JACOBS:  I MOVE ALL OF 24 IN.
10              THE COURT:  ANY OBJECTION?  YOU WANT ALL
11      OF 24 IN?
12              MR. PRICE:  NO OBJECTION.
13              THE COURT:  ALL RIGHT.  IT'S IN.
14              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
15              24, HAVING BEEN PREVIOUSLY MARKED FOR
16              IDENTIFICATION, WAS ADMITTED INTO
17              EVIDENCE.)
18              THE COURT:  GO AHEAD, PLEASE.
19              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
20      OPEN COURT OFF THE RECORD.)
21              MR. JACOBS:  THANK YOU.  LET'S PUT UP PX
22      31.2, PLEASE.
23      Q    SO WHAT QUESTION DID YOU ASK IF YOUR SURVEY?
24      A    SO THE PRIMARY QUESTION WAS, WHAT'S SHOWN ON
25      THE SCREEN HERE, WHICH IS, IN YOUR OPINION, WHAT
```

1    TABLET WAS SHOWN IN THE VIDEO?

2    Q    AND LET'S GO TO 31.3.  WHAT IS THIS SLIDE

3    SHOWING, SIR?

4    A    SO THIS IS ALSO A SUMMARY OF THE RESULTS FROM

5    THE LIKELIHOOD OF CONFUSION SURVEY.  SIMILAR TO THE

6    OTHER ONE, THE FIRST TWO COLUMNS SHOW THE RESULTS

7    FOR THE TWO TEST VIDEOS, AND THEN THE FAR RIGHT

8    COLUMN SHOWS THE TEST FOR THE BARNES & NOBLE COLOR

9    NOOK CONTROL.

10            AND WHAT IT SHOWS IS FOR THE BRANDED

11   VERSION OF THE SAMSUNG GALAXY 10, THE FIRST COLUMN,

12   APPROXIMATELY 30 PERCENT OF THE RESPONDENTS

13   IDENTIFIED IT AS AN IPAD OR APPLE DEVICE.

14            IN THE SAMSUNG GALAXY 10.1 UNBRANDED

15   VERSION, APPROXIMATELY 43 PERCENT IDENTIFIED IT AS

16   AN IPAD OR APPLE DEVICE.

17            AND THEN IF YOU SIMPLY COMBINE THE

18   RESULTS FROM THOSE TWO, JUST TO BE -- JUST TO

19   EXPLAIN, SO EACH RESPONDENT ONLY SAW ONE VIDEO, AND

20   THEY WERE RANDOMLY ASSIGNED TO THE VIDEO THAT THEY

21   SAW.

22            AND THERE WERE APPROXIMATELY 200

23   RESPONDENTS WHO SAW THE FIRST VIDEO, 200 WHO SAW

24   THE SECOND, AND 200 WHO SAW THE CONTROL VIDEO.

25            SO IF YOU COMBINE THE 400 PEOPLE WHO SAW

1    THE BRANDED AND THE UNBRANDED, YOU GET ROUGHLY 36

2    PERCENT OF RESPONDENTS OVERALL THAT IDENTIFIED THE

3    GALAXY TABLET AS AN IPAD OR APPLE PRODUCT.

4    Q    AND WHAT ABOUT THE CONTROL RESULTS?

5    A    SO IN THIS PARTICULAR STUDY, WE FOUND THAT 24

6    PERCENT IDENTIFIED THE BARNES & NOBLE NOOK COLOR AS

7    AN APPLE OR AN IPAD, AND SO THAT'S OUR ESTIMATE OF

8    GUESSING AND THE EFFECTS OF OUR SURVEY PROCESS,

9    SIMILAR TO WHAT WE'VE DISCUSSED.

10           AND SO WHEN WE NET THAT OFF, WE GET A NET

11   RATE OF CONFUSION BETWEEN 6 AND 19 PERCENT.

12   Q    AND THE COMBINED RATE?

13   A    THE COMBINED RATE WOULD BE 12 PERCENT FOR THAT

14   STUDY.

15   Q    WHAT DO YOU BELIEVE THE RESULTS OF THIS SURVEY

16   SHOW, SIR?

17   A    WELL, THE RESULTS SUGGEST THAT THERE'S A, A

18   SUBSTANTIAL PORTION OF THE CONSUMERS WHO ARE LIKELY

19   TO BE CONFUSED WHEN THEY SEE A SAMSUNG GALAXY

20   TABLET IN A POST-SALE ENVIRONMENT, THAT THEY'RE

21   ACTUALLY VIEWING AN IPAD OR APPLE PRODUCT.

22           MR. JACOBS:  THANK YOU, DR. VAN LIERE.

23   NO FURTHER QUESTIONS.

24           THE COURT:  ALL RIGHT.  TIME IS NOW 9:55.

25           PLEASE GO AHEAD WITH YOUR CROSS.

1702

1              MR. PRICE:  THANK YOU, YOUR HONOR.

2                      **CROSS-EXAMINATION**

3    BY MR. PRICE:

4    Q    IS IT MR. VAN LIERE OR DOCTOR?

5    A    DR. VAN LIERE.  YOU CAN CALL ME EITHER.

6    Q    I'LL CALL YOU DOCTOR.  WE'RE IN COURT.

7              SO FIRST OF ALL, LET'S TALK ABOUT WHAT

8    YOU DID NOT DO WITH THAT CONFUSION STUDY.

9              YOU DID NOT DO A STUDY THAT MEASURED

10   CONFUSION OF CONSUMERS AT THE TIME THEY BUY AN IPAD

11   OR A TABLET; CORRECT?

12   A    YES.  I BELIEVE YOU'RE REFERRING TO A POINT OF

13   PURCHASE STUDY, AND I DID NOT DO A POINT OF

14   PURCHASE STUDY.

15   Q    NOW, HAVE YOU DONE POINT OF PURCHASE STUDIES

16   IN YOUR CAREER?

17   A    YES.

18   Q    ABOUT HOW MANY?

19   A    I DON'T KNOW EXACTLY.  PROBABLY SOMEWHERE

20   BETWEEN 5 AND 15.

21   Q    AND WHEN YOU WERE ASKED BY APPLE TO DO A

22   STUDY, DID THEY KIND OF EXPLAIN TO YOU WHAT THE

23   CASE WAS ABOUT?

24             MR. JACOBS:  YOUR HONOR, I THINK THIS

25   LINE OF QUESTIONING POTENTIALLY INVADES RULE 26.

```
 1              MR. PRICE:  LET ME WITHDRAW THAT.

 2    Q    WELL, LET ME ASK YOU THIS:  DID -- GIVEN YOUR

 3    EXPERIENCE IN DOING, YOU KNOW, POINT OF SALE

 4    STUDIES, DID APPLE ASK YOU TO DO ONE TO SEE WHETHER

 5    OR NOT THERE'S ANY EMPIRICAL EVIDENCE THAT A

 6    CONSUMER BUYING A SAMSUNG TABLET WOULD BE CONFUSED

 7    INTO THINKING IT'S AN IPAD OR VICE-VERSA?

 8    A    APPLE DID NOT ASK ME TO CONDUCT A POINT OF

 9    PURCHASE SURVEY.  THEY ASKED ME TO CONDUCT A

10    POST-SALE CONFUSION SURVEY.

11    Q    OKAY.  SO LET'S TALK ABOUT THE POST-SALE

12    CONFUSION SURVEY.

13              IT'S MY UNDERSTANDING, IS IT NOT, THAT

14    UNTIL THIS CASE, YOU HAD NEVER DONE A

15    POST-CONFUSION SURVEY.

16    A    I THINK THIS IS THE FIRST CASE THAT I'VE PUT

17    IN A SURVEY THAT IS PUBLICLY AVAILABLE IN WHICH WE

18    WERE TESTING A POST-SALE ENVIRONMENT.  I THINK THIS

19    IS THE FIRST TIME FOR THAT FOR SURE.

20    Q    SO LET'S SEE WHAT YOU DID ON YOUR FIRST TIME

21    OUT ON THIS THING.

22              BY THE WAY, DID YOU SAY TO APPLE, "THIS

23    IS THE FIRST TIME I'VE DONE ONE AFTER SALE"?

24    A    I DON'T RECALL IF APPLE ASKED ME THAT QUESTION

25    OR NOT.
```

1    Q    OKAY.  AND SO YOU CAN'T USE YOUR STUDY TO SHOW

2    EITHER -- WHETHER A CONSUMER WAS CONFUSED WHEN HE

3    BOUGHT A SAMSUNG TABLET OR TO SHOW ANY IMPACT ON

4    FUTURE PURCHASING DECISIONS; CORRECT?

5    A    THE SURVEY, AS IT'S DESIGNED, DOES NOT TEST

6    POINT OF PURCHASE, AND IT DOES NOT TEST THE EXTENT

7    TO WHICH THE CONFUSION AFFECTS FUTURE PURCHASE

8    BEHAVIOR, THAT'S CORRECT.

9    Q    NOW, SO IN THE SURVEY YOU DID, YOU DIDN'T SHOW

10   THESE PEOPLE IN THE MALL AN ACTUAL IPAD OR AN

11   ACTUAL SAMSUNG TABLET; CORRECT?

12   A    NO, I DON'T THINK YOU SAID THAT CORRECTLY.

13   Q    OKAY.  MAYBE I DIDN'T.  YOU DIDN'T -- THIS WAS

14   THE ONE IN THE MALL, RIGHT, THE ONE WITH THE IPAD

15   AND THE SAMSUNG?

16   A    THE TABLET CONFUSION STUDY WAS THE STUDY DONE

17   IN A MALL, YES.

18   Q    OKAY.  AND YOU DIDN'T SHOW THESE FOLKS -- YOU

19   DIDN'T ACTUALLY HAND THEM AN ACTUAL IPAD OR A

20   SAMSUNG TABLET; RIGHT?

21   A    THAT'S CORRECT.  WE SHOWED THE VIDEOS THAT

22   YOU'VE SEEN TWO EXAMPLES OF.

23   Q    AND WHY NOT SHOW THEM THE TABLET?

24   A    YOU SAY "SHOW THEM THE TABLET."  JUST TO BE

25   CLEAR, THEY DID SEE THE TABLETS.  THE TABLETS WERE

```
1    IN THE VIDEO.  WE JUST DID NOT HAND THEM PHYSICALLY

2    TO THEM.

3    Q    WELL, IF WE LOOK AT JOINT EXHIBIT 1004, THIS

4    IS AN ACTUAL IPAD, YOU KNOW, THREE-DIMENSIONAL

5    IPAD.

6             IS THIS ALREADY IN EVIDENCE?  IT IS,

7    OKAY.

8             SO I'M JUST ASKING YOU, DID YOU ACTUALLY

9    HAND ONE OF THESE OUT, AN ACTUAL ONE?

10   A    NO, WE DID NOT HAND THEM A PHYSICAL DEVICE.

11   Q    OR HAND THEM A, A -- THE SAMSUNG TABLET

12   EITHER; CORRECT?  YOU DIDN'T HAND THEM THAT?

13   A    THAT'S CORRECT.  WE DID NOT HAND THEM THE

14   SAMSUNG TABLETS, EITHER.

15   Q    NOW, IF WE COULD LOOK AT THE VIDEO YOU SHOWED

16   THEM, THE 24.5, COULD WE PLAY THAT?

17            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

18   OPEN COURT OFF THE RECORD.)

19   BY MR. PRICE:

20   Q    THAT WAS THE FULL VIDEO THAT YOU SHOWED THEM;

21   RIGHT?

22   A    THAT'S CORRECT.

23   Q    OKAY.  NOW, WAS THERE ANY BUDGET LIMITATION

24   THAT YOU HAD TO STOP THE VIDEO THERE?

25   A    WELL, TWO COMMENTS.  ONE, THE -- NO, I DIDN'T
```

```
 1    KNOW OF ANY SPECIFIC ONE.  THE IDEA WAS TO

 2    REPLICATE A REASONABLE POST-SALE ENVIRONMENT

 3    INTERACTING WITH THE DEVICE.

 4             BUT TWO, AS I WAS COMMENTING IN THESE

 5    KINDS OF STUDIES, WE ALSO LET THE RESPONDENTS VIEW

 6    THE VIDEO TWICE.

 7    Q    OKAY.

 8    A    SO THEY SAW IT ONCE, THEN THEY SAW IT AGAIN,

 9    AND THEN THEY ANSWERED THE QUESTIONS.

10    Q    I'M JUST WONDERING, YOU'VE BEEN IN CAFES OR

11    PLACES WHERE YOU'VE SEEN PEOPLE, FOR EXAMPLE, WITH

12    APPLE COMPUTERS; RIGHT?

13    A    YES.

14    Q    AND YOU'VE SEEN, FOR EXAMPLE, ON APPLE

15    COMPUTERS THAT THEY HAVE THAT BIG NEON APPLE AT THE

16    TOP OF THE COMPUTER?  YOU CAN SEE THAT PRETTY

17    EASILY WHEN YOU'RE LOOKING AT SOMEBODY WITH THEIR

18    APPLE COMPUTER; RIGHT?

19    A    MAYBE.  IT DEPENDS ON THE POINT OF VIEW THAT

20    YOU HAVE AS YOU OBSERVE THE PERSON USING THEIR

21    COMPUTER.

22    Q    IT'S ACTUALLY BACK LIT IN THE COMPUTERS;

23    RIGHT?

24    A    I'M NOT COMPLETELY CERTAIN, BUT PART OF AN

25    APPLE COMPUTER -- ARE YOU TALKING ABOUT THE ONE
```

```
1    THAT'S ON THE TOP OF IT WHEN IT'S CLOSED SO THAT

2    WHEN IT'S OPEN, YOU WOULD NOT SEE IT?

3    Q    WHEN IT'S -- WHEN AN APPLE COMPUTER IS OPEN,

4    YOU WOULDN'T SEE THE BIG NEON APPLE ON IT?

5    A    IF YOU'RE LOOKING -- I'M MAYBE

6    MISUNDERSTANDING WHAT YOU'RE ASKING ME.

7             BUT IF I HAVE THE COMPUTER, I OPEN IT,

8    AND I'M OBSERVING OVER THE SHOULDER, I DON'T SEE

9    THE NEON DEVICE THAT'S ON THE TOP.  I BELIEVE

10   THAT'S WHAT YOU'RE ASKING ME.

11   Q    AH, I SEE.  AND HERE, I GUESS, IS THE PROBLEM.

12            SO LET ME ASK YOU THIS:  SO WHY DIDN'T

13   YOU, YOU KNOW, IN YOUR VIDEO, JUST RUN IT A LITTLE

14   BIT LONGER AND HAVE THE PERSON WALK AROUND SO THAT

15   THE PERSON YOU'RE STUDYING COULD SEE THE BACK OF

16   THE DEVICE?

17   A    THE WAY WE CREATED THE STIMULI WAS TO TEST THE

18   ALLEGEDLY INFRINGING CONDITIONS THAT WERE OUTLINED

19   IN THE COMPLAINT.

20            AND IT WAS MY UNDERSTANDING, AT THE TIME

21   I DESIGNED THIS STUDY, THAT THE BACK OF THESE

22   DEVICES WAS NOT AT ISSUE, THAT IT WAS THE FRONT AND

23   THE SIDE VIEWS.

24            SO WHEN WE SET UP THE VIDEOS, WE SET THEM

25   UP TO SHOW A REAL PRODUCT THAT'S IN THE REAL
```

1    MARKETPLACE WHERE YOU WOULD SEE A SIDE VIEW AND A

2    FRONT VIEW OF THE PRODUCT.

3            SO THAT'S WHY WE DID NOT SHOW THE BACK.

4    Q    OKAY.  SO YOU WERE TOLD THAT IF THE PRODUCT

5    HAD SOMETHING ON THE BACK WHICH WOULD TELL ANY

6    CONSUMER THAT IT'S AN APPLE OR A SAMSUNG, THAT YOU

7    WERE TO IGNORE THAT AND NOT TEST IT?  THAT WAS YOUR

8    UNDERSTANDING AS GIVEN TO YOU BY APPLE'S COUNSEL?

9    A    IT WAS MY UNDERSTANDING THAT THE FRONT OF THE

10   DEVICE AND THE SIDE VIEW OF THE DEVICE WERE PART OF

11   THE ALLEGED INFRINGEMENT AND THE BACK WAS NOT.

12   Q    BUT DON'T YOU UNDERSTAND THAT TO SHOW

13   CONFUSION, YOU LOOK AT THE PRODUCT AND NOT JUST

14   WHAT THE ALLEGED TRADE DRESS IS?

15   A    NO, I DON'T AGREE WITH THE WAY YOU'VE STATED

16   THAT.

17   Q    OKAY.  SO IF THAT ACTUALLY IS THE TEST, THAT

18   IS, THAT YOU'RE SUPPOSED TO LOOK TO SEE WHETHER THE

19   PRODUCT AS SEEN BY A CONSUMER WOULD CONFUSE THEM,

20   IF THAT'S THE TEST, YOU DIDN'T TEST FOR THAT, DID

21   YOU?

22   A    NO.  IN FACT, I DID TEST FOR THAT.

23   Q    WELL, YOU SAID YOU DIDN'T TEST, FOR EXAMPLE,

24   IF THE CONSUMER JUST WALKS A LITTLE FURTHER AND SAW

25   THE PERSON LOOKING AT -- THIS IS EXHIBIT 1004 LIKE

```
1     THIS -- YOU DIDN'T TEST WHETHER SEEING THIS BIG

2     APPLE HERE WOULD LEAD THEM TO THINK IT WAS AN

3     APPLE?

4     A    NO, I DID NOT -- WELL, THERE'S TWO ISSUES.

5     ONE, I DID NOT TEST APPLE DEVICES.  I TESTED

6     SAMSUNG DEVICES.

7          BUT NO, WE DID NOT SHOW ALL VIEWS OF THE

8     PRODUCT.  WE SHOWED VIEWS THAT WOULD REPRESENT

9     TYPICAL POST-SALE OBSERVATIONS OF THESE PRODUCTS

10    BEING USED IN THE MARKETPLACE, AND THOSE POST-SALE

11    VIEWS WERE DESIGNED TO REPRESENT THE ALLEGEDLY

12    INFRINGING TRADE DRESS, NOT THE WHOLE DEVICE.

13    Q    LET ME SHOW YOU WHAT'S BEEN MARKED AS EXHIBIT

14    1038 FOR IDENTIFICATION.

15         APPARENTLY THIS IS IN EVIDENCE.

16         SO THIS IS A -- THE SAMSUNG TABLET -- AND

17    BY THE WAY, GIVEN WHAT YOU KNOW ABOUT THE MARKET,

18    IF SOMEONE SEES A TABLET THAT DOESN'T HAVE THAT BIG

19    APPLE ON IT, THEY KNOW IT'S NOT AN APPLE; RIGHT?

20    A    I DON'T KNOW THAT SPECIFICALLY.

21    Q    BUT IF THEY WERE LOOKING AT THE SAMSUNG TABLET

22    AND THEY WALK AROUND AND SAW IT, YOU KNOW, YOU CAN

23    SEE IT SAYS SAMSUNG.  IT DOESN'T SAY APPLE.  IT

24    SAYS SAMSUNG; RIGHT?

25    A    MY EYES AREN'T GOOD ENOUGH TO SEE THAT FROM
```

1     HERE.

2     Q    OKAY.  LET'S SAY IT'S AS CLOSE AS THE VIDEO

3     WOULD HAVE BEEN, SAY.

4            OKAY.  SO LOOKING AT IT HERE, YOU WALK

5     AROUND AND, INSTEAD OF STOPPING THE VIDEO HERE, YOU

6     ACTUALLY CONTINUE IT JUST A FEW SECONDS TO SEE

7     WHETHER OR NOT THE PRODUCT IS ACTUALLY CONFUSING.

8            DO YOU THINK YOU'D GET A DIFFERENT

9     RESULT?

10    A    I DON'T KNOW.  I DIDN'T TEST THAT.  BUT I

11    DIDN'T ALSO UNDERSTAND THAT TO BE THE ALLEGED

12    INFRINGEMENT HERE.

13    Q    OKAY.  SO IF -- SO YOU DESIGNED YOUR STUDY

14    BASED UPON WHAT YOU WERE TOLD BY APPLE'S COUNSEL?

15    A    AND WHAT I UNDERSTOOD FROM READING THE

16    COMPLAINT.

17    Q    OKAY.  AND SO YOUR STUDY WAS DESIGNED TO

18    IGNORE THE ENTIRE PRODUCT AND JUST SHOW THE BACK?

19    I MEAN THE FRONT AND SIDE?

20    A    YES.  MY STUDY WAS DESIGNED TO CREATE A

21    POST-SALE CONFUSION-LIKE INTERACTION FOR A CONSUMER

22    AND SHOW THAT IN A VERSION IN WHICH THEY WOULD SEE

23    THE FRONT AND THE SIDE OF THE DEVICE.  THAT'S WHAT

24    I DID, YES.

25    Q    OKAY.  AS A MATTER OF FACT, AT THE TIME YOU

```
1    DID THE STUDY, YOU DIDN'T EVEN KNOW THAT SAMSUNG'S

2    NAME WAS ON THE BACK BECAUSE YOU HAD NEVER SEEN ONE

3    OF THESE IN PERSON; RIGHT?

4    A    I KNEW THAT SAMSUNG WAS ON THE FRONT.  BUT I

5    DIDN'T KNOW FOR CERTAIN IF THE SAMSUNG WAS ON THE

6    BACK OF ALL THE DEVICES.

7    Q    AND NOW YOU KNOW -- YOU CALLED THESE BRANDED

8    VERSUS UNBRANDED PHONES, TABLETS.

9              YOU KNOW NOW THAT ALL THE SAMSUNG

10   TABLETS, IN FACT, ARE BRANDED BECAUSE THEY HAVE THE

11   SAMSUNG ON THE BACK; RIGHT?

12   A    I'LL UNDERSTAND THAT FROM WHAT YOU'VE JUST

13   TOLD ME.  I DIDN'T KNOW THAT FOR SURE.

14   Q    OKAY.  AND NOW LET'S TALK ABOUT THE CONTROL

15   YOU USED.

16             WHAT YOU USED WAS THE NOOK; RIGHT?

17   A    THE NOOK COLOR.

18   Q    OKAY.  THE NOOK COLOR.  AND IF WE CAN SHOW

19   3900.107.

20             SO THIS IS AN IPAD AND THIS IS A NOOK.

21             NOW, THIS IS THE NUMBER YOU SUBTRACT FROM

22   THE ASSOCIATION YOU GOT FROM SHOWING JUST THE FRONT

23   AND SIDE OF THE SAMSUNG TABLET.

24             AND YOU SUBTRACT THE NUMBER OF PEOPLE WHO

25   SAY THIS IS AN APPLE IPAD; RIGHT?
```

1712

```
 1    A    YES.  I THINK AS YOU'RE DESCRIBING IT, THAT'S

 2    CORRECT.

 3    Q    OKAY.  AND THIS HAS THIS LITTLE SCREEN THING

 4    HERE WHICH SCREAMS "I'M NOT AN IPAD," RIGHT?  WOULD

 5    YOU AGREE?

 6    A    NO.

 7    Q    OKAY.  AND IT HAS -- IT ACTUALLY HAS THE NOOK

 8    TRADEMARK ON IT AND THE NOOK BUTTON THERE; RIGHT?

 9    A    IT HAS THOSE THINGS ON THERE, YES, THAT'S

10    CORRECT.

11    Q    AND THE NOOK IS AN E-READER; RIGHT?  IT'S

12    BASICALLY KNOWN AS AN E-READER FOR READING BOOKS

13    ON?

14    A    THE NOOK COLOR, WHICH IS THE DEVICE WE USED IN

15    OUR STUDY, IS MARKETED AS A TABLET AND IT HAS THE

16    SAME BASIC FUNCTIONALITY AS THE IPAD AND THE

17    GALAXY.

18    Q    LET ME SHOW YOU EXHIBIT 2526 FOR

19    IDENTIFICATION.

20         THIS IS THE NOOK TABLET THAT WAS USED IN

21    YOUR STUDY, OR ONE JUST LIKE IT -- I MEAN NOOK

22    READER, COLOR; RIGHT?

23    A    I'LL UNDERSTAND THAT TO BE JUST LIKE IT.  I

24    DON'T THINK THAT'S THE ONE WE ACTUALLY USED.

25    Q    OKAY.  AND THERE WERE OTHER CONTROLS YOU COULD
```

```
 1    HAVE USED?  YOU COULD HAVE USED A MOTOROLA.  YOU

 2    COULD HAVE USED AN LG TABLET.  YOU COULD HAVE USED

 3    SOMETHING THAT LOOKED A LOT CLOSER TO THE IPAD THAN

 4    THAT?

 5    A    NO, I DON'T AGREE WITH THAT.

 6    Q    OKAY.  SO HAVE YOU SEEN OTHER TABLETS IN THE

 7    MARKET AND WHAT THEY LOOK LIKE?

 8    A    YES.

 9    Q    OKAY.  AND YOU DON'T AGREE THAT THE MOTOROLA

10    AND LG, WHICH WE'VE SEEN ALREADY HERE IN COURT AND

11    PASSED AROUND, YOU DON'T THINK THEY LOOK MORE LIKE

12    THE IPAD THAN THIS?

13    A    YES, I THINK, IN FACT, THEY DO LOOK MORE LIKE

14    THE IPAD IN THE SENSE THAT THEY HAVE MORE ELEMENTS

15    OF THE ALLEGEDLY INFRINGING TRADE DRESS.

16              SO IN CHOOSING THE CONTROL, THE IDEA IS

17    TO GET A PRODUCT THAT'S IN THE SAME MARKET THAT HAS

18    THE SAME BASIC FUNCTIONALITY, BUT DOES NOT INCLUDE

19    THE ALLEGEDLY INFRINGING TRADE DRESS.

20    Q    WELL, ACTUALLY -- SO ARE YOU SAYING THAT APPLE

21    IS CONTENDING THAT MOTOROLA AND LG, THAT THOSE

22    TABLETS INFRINGE APPLE'S TRADE DRESS AND THAT'S WHY

23    YOU DIDN'T USE THEM?

24              MR. JACOBS:  YOUR HONOR, THIS IS ASKING

25    FOR A LEGAL CONCLUSION FROM THIS WITNESS AND LACKS
```

```
 1    FOUNDATION.

 2                 THE COURT:  SUSTAINED.

 3    BY MR. PRICE:

 4    Q    I'M ASKING YOUR UNDERSTANDING AS TO WHY YOU

 5    DIDN'T USE THEM.  OKAY?

 6                 IS IT YOUR UNDERSTANDING, WHICH WOULD BE

 7    THE BASIS OF YOU NOT USING THE MOTOROLA AND THE LG,

 8    IS IT YOUR UNDERSTANDING THAT YOU COULDN'T USE THEM

 9    BECAUSE APPLE IS SAYING THAT THOSE INFRINGE ITS

10    TRADE DRESS?

11                 MR. JACOBS:  YOUR HONOR, YOU JUST

12    SUSTAINED AN OBJECTION TO THIS SAME QUESTION.

13                 THE COURT:  SUSTAINED.

14    BY MR. PRICE:

15    Q    IF WE CAN LOOK BACK AT THAT 30.5, I THINK IT

16    WAS 30.5, 24.5.  NO, I'M SORRY.  31.3.  THIS IS

17    YOUR STUDY.  I BELIEVE IT'S 31.3.

18                 SO IS THIS THE STUDY -- THIS IS YOUR

19    RESULTS SHOWING THAT VIDEO, SHOWING THE NOOK, AND

20    YOU GOT 6 PERCENT IS POST-CONFUSION WITH THE

21    BRANDED, 19, AND YOU AVERAGED THOSE TO GET 12.

22                 NOW, IF YOU REALLY WANTED TO COME UP WITH

23    AN AVERAGE THAT MEANT ANYTHING AS FAR AS THE REAL

24    WORLD, YOU'D HAVE TO WEIGHT THOSE NUMBERS; RIGHT?

25    A    WELL, I THINK I UNDERSTAND YOUR QUESTION, AND
```

```
 1    THE -- FIRST OF ALL, THE 12 WAS NOT -- IT ISN'T --

 2    I DIDN'T AVERAGE THE TWO.  I JUST SUMMED EVERYTHING

 3    ACROSS THE TWO CONDITIONS AND THEY COME TO 12

 4    PERCENT.

 5    Q    SO LET ME STOP YOU THERE.

 6         SO THIS IS NOT AN OPINION YOU HAVE AS TO

 7    NET CONFUSION RATE IN THE MARKET; RIGHT?

 8    A    NO.  I BELIEVE THE CONFUSION -- THE OPINION I

 9    OFFERED IN MY REPORT IS THAT IT'S SOMEWHERE BETWEEN

10    6 PERCENT AND 19 PERCENT WERE ACTUALLY CONFUSED BY

11    MY TEST.

12    Q    AND THE 19 HERE, YOU DON'T KNOW HOW MANY,

13    QUOTE, "UNBRANDED" TABLETS WERE IN THE MARKET

14    COMPARED TO THE BRANDED ONES; RIGHT?

15    A    WELL, TWO COMMENTS.  ONE --

16    Q    CAN YOU ANSWER YES OR NO?  BECAUSE I'M ON THE

17    CLOCK.

18    A    I'M SORRY.  I UNDERSTAND.

19    Q    DO YOU KNOW HOW MANY --

20    A    ASK ME THE QUESTION AGAIN.

21    Q    DO YOU KNOW IN THE MARKETPLACE HOW MANY

22    UNBRANDED VERSUS BRANDED THERE WERE?

23    A    NO, I DON'T KNOW HOW MANY UNBRANDED VERSUS

24    BRANDED THERE WERE.

25    Q    NOW LET'S TALK ABOUT YOUR PHONE ASSOCIATION
```

```
 1    SURVEY.
 2              AND, AGAIN, THIS IS NOT A SURVEY THAT
 3    SHOWS CONSUMER CONFUSION AT ALL; CORRECT?
 4    A    LET ME JUST MENTALLY SHIFT GEARS.
 5              SO YOU'RE TALKING ABOUT NOW MY PHONE
 6    ASSOCIATION STUDY?
 7    Q    YES.
 8    A    YES, THAT STUDY WAS NOT DESIGNED TO MEASURE
 9    LIKELIHOOD OF CONFUSION.  THAT STUDY WAS DESIGNED
10    TO MEASURE ASSOCIATION.
11    Q    OKAY.  SO IF WE CAN LOOK AT YOUR STUDY AND
12    LOOK AT 3900.153, THIS IS THE QUESTION YOU ASKED.
13    3900.153.  YOU SHOWED THE PICTURE OF ONE OF THE
14    SAMSUNG PHONES AND SAID, "DOES THE LOOK AND DESIGN
15    OF THIS PHONE BRING TO MIND OR CREATE ANY
16    ASSOCIATION FOR YOU WITH ANY OTHER PHONES?"
17              DO YOU SEE THAT?
18    A    YES.
19    Q    IN THE DEMONSTRATIVE YOU SHOWED THE JURY,
20    WHICH WAS THE QUESTION YOU ASKED, YOU DIDN'T
21    UNDERLINE "OTHER," BUT "OTHER" WAS UNDERLINED IN
22    THE ACTUAL SURVEY?
23    A    YES.
24    Q    THE PEOPLE WHO READ THIS KNEW THEY WERE
25    SUPPOSED TO THINK OF SOME OTHER PHONE FOR
```

```
 1    ASSOCIATION; RIGHT?

 2    A    IT SUGGESTS THAT -- WE'RE ASKING THEM, FIRST,

 3    YES, NO, OR DON'T KNOW, DOES IT BRING TO MIND ANY

 4    ASSOCIATION?  AT THIS STAGE WE'RE NOT TELLING THEM

 5    THERE IS AN ASSOCIATION.

 6    Q    NOW, I WANT TO ASK YOU, IF SOMEONE ASKED YOU,

 7    FOR EXAMPLE, SHOWED YOU A PICTURE OF A COKE AND

 8    SAID, "DOES THIS BRING TO MIND OR CREATE ANY

 9    ASSOCIATION WITH ANY OTHER SOFT DRINK," YOU'D THINK

10    A LOT OF PEOPLE MIGHT SAY PEPSI; RIGHT?  BECAUSE

11    THEY'RE THE TWO BIGGEST PLAYERS IN THE MARKET?

12    A    I HAVEN'T DONE THAT STUDY, SO I WOULDN'T HAVE

13    AN OPINION ON HOW THAT MIGHT TURN OUT.

14    Q    WELL, IF SOMEONE ASKED YOU, YOU KNOW, SHOWED A

15    PICTURE OF A BURGER KING, YOU KNOW, RESTAURANT AND

16    SAID, "DOES THE LOOK AND DESIGN OF THIS RESTAURANT

17    BRING TO MIND OR CREATE ANY ASSOCIATION WITH YOU OF

18    ANY OTHER RESTAURANT," THEY'RE QUITE LIKELY TO SAY

19    MCDONALD'S; RIGHT?

20    A    AGAIN, I HAVEN'T DONE THAT SURVEY.  I DON'T

21    KNOW THAT TO BE THE CASE.

22    Q    YOU DON'T KNOW THAT FROM COMMON SENSE?

23    A    I DON'T KNOW THAT FROM COMMON SENSE AS YOU'VE

24    DESCRIBED IT.

25    Q    WELL, IF YOU DID FIND THAT, HYPOTHETICALLY,
```

1    HYPOTHETICALLY YOU DID A SURVEY, "DOES THIS BURGER

2    KING RESTAURANT BRING TO MIND ANY OTHER FAST FOOD

3    RESTAURANT" AND THEY SAID MCDONALD'S, YOU CERTAINLY

4    COULDN'T CONCLUDE FROM THAT THAT THE ASSOCIATION

5    WAS BECAUSE THE DESIGNS ARE SIMILAR; RIGHT?

6    A    AGAIN, YOU'RE ASKING ME ABOUT A HYPOTHETICAL

7    STUDY THAT I HAVEN'T CONDUCTED, SO --

8    Q    WELL, IN THIS CASE, YOU UNDERSTAND THAT

9    SAMSUNG AND APPLE ARE THE TWO LARGEST COMPETITORS

10   IN THIS MARKET; RIGHT?

11   A    I UNDERSTAND THEY'RE TWO LARGE COMPETITORS IN

12   THIS MARKET.

13   Q    AND YOU UNDERSTAND FROM KNOWING THE MARKET

14   THAT IF SOMEONE SHOWED YOU A SAMSUNG PHONE AND SAID

15   "WHAT OTHER PHONE DOES THIS REMIND YOU OF," PEOPLE

16   ARE LIKELY TO SAY APPLE, AND VICE-VERSA, BECAUSE

17   THEY'RE THE TWO BIGGIES, JUST LIKE BURGER KING AND

18   MCDONALD'S AND COKE AND PEPSI?

19   A    PERHAPS.

20          BUT TO THE EXTENT THAT THAT'S TRUE,

21   THAT'S ALSO HAPPENING IN THE CONTROL.  SO IF THIS

22   WAS CREATING A DEMAND CHARACTERISTIC AS YOU

23   SUGGEST, THEN IT WOULD BE NETTED OUT IN THE CONTROL

24   CONDITION.

25   Q    SO NOW LET'S TALK ABOUT THE CONTROL.  THE

```
1     CONTROL -- I THINK IF WE CAN SHOW 3900.129.
2              IN SELECTING A CONTROL, YOU COULD HAVE
3     SELECTED FROM A NUMBER OF PHONES; RIGHT?
4     A    YES.
5     Q    AND YOU INSTEAD -- WELL, OF THE PHONES, YOU
6     SELECTED A BLACKBERRY?
7     A    YES, A BLACKBERRY STORM.
8     Q    AND IF WE COULD LOOK AT EXHIBIT 24, I GUESS
9     PAGE 4.  AND AGAIN, A BLACKBERRY, YOU SAID THIS
10    CONTROL, THE BLACKBERRY CONTROL FOR THE FACT THAT
11    SAMSUNG AND APPLE JUST MIGHT BE NAMES ON THE TIPS
12    OF YOUR TONGUE.
13             IF SOMEONE SHOWED YOU A PICTURE OF A CAN
14    OF MOXIE, DO YOU THINK PEOPLE WOULD ASSOCIATE THAT
15    WITH COKE OR PEPSI?
16    A    A CAN OF WHAT?
17    Q    MOXIE.  YOU DON'T KNOW MOXIE?
18    A    I DON'T KNOW MOXIE.
19    Q    OKAY.  WELL, JUST AS WITH THE BLACKBERRY --
20    AND BY THE WAY, IN THE REAL PICTURE, YOU CAN SEE
21    BLACKBERRY ACROSS THE TOP HERE; RIGHT?
22    A    YES.  IN ALL OF THE PHONES, THE PICTURES ARE
23    THE ACTUAL PRODUCTS THAT ARE IN THE MARKETPLACE AS
24    THEY WOULD LOOK.
25    Q    AND BLACKBERRY AND RIM ARE, ARE PRETTY MUCH --
```

1    AT THE TIME YOU TOOK THIS SURVEY, THEY'RE NOT ON

2    THE TONGUES OF MANY PEOPLE THINKING ABOUT

3    SMARTPHONES?  THEY ARE HAVING SERIOUS TROUBLE AND

4    ALMOST DROPPING OUT OF THE MARKET; RIGHT?

5    A    I DON'T HAVE THAT UNDERSTANDING DURING THE

6    PERIOD OF TIME OF THE SURVEY.

7    Q    YOU DON'T HAVE IT ONE WAY OR THE OTHER?

8    A    THAT'S CORRECT.

9    Q    AND IS IT JUST A COINCIDENCE THAT BOTH YOU AND

10   DR. PORET USED A NOOK AND THE BLACKBERRY STORM FOR

11   YOUR CONTROLS?  DID YOU GUYS GET TOGETHER AND TALK

12   ABOUT THIS?

13   A    NO.  I HAVE NO KNOWLEDGE OF MR. PORET'S WORK

14   BEFORE I CAME TO TRIAL AND HEARD ABOUT IT OTHER

15   THAN I KNEW HE HAD DONE SURVEYS.

16   Q    DID YOU -- WERE YOU GIVEN THESE PHONES AND THE

17   BLACKBERRY AND THE NOOK TO USE AS THE CONTROLS?

18   A    NO.  I SELECTED THESE PHONES AND TABLETS WITH

19   MY STAFF FROM OUR REVIEW OF THE PRODUCTS THAT WERE

20   AVAILABLE.

21   Q    SO YOU INTENTIONALLY SELECTED THE NOOK AS THE

22   TABLET TO USE AS A CONTROL; RIGHT?

23   A    YES.

24   Q    YOU'RE SAYING THAT?

25   A    YES.

```
1    Q    AND YOU INTENTIONALLY SELECTED THE BLACKBERRY

2    TO USE AS THE CONTROL; RIGHT?

3    A    THE BLACKBERRY STORM.

4    Q    AND YOU INTENTIONALLY DECIDED, IN THOSE

5    VIDEOS, NOT TO SHOW THE COMPLETE PRODUCT, THE

6    SAMSUNG TABLET?  THAT WAS YOUR DECISION?

7    A    WELL, IT WAS MY DECISION BASED ON MY

8    UNDERSTANDING FROM THE COMPLAINT, THAT -- AND

9    DISCUSSION WITH COUNSEL, THAT THE FRONT AND THE

10   SIDE VIEWS WAS WHAT MATTERED IN THE TABLET SETTING.

11   Q    AND WITH RESPECT TO THE SAMSUNG PHONES, YOU

12   TESTED JUST TWO OF THE PHONES?

13   A    YES, I TESTED TWO OF THE, WHATEVER THE NUMBER

14   OF PHONES IS.

15   Q    SO, FOR EXAMPLE, YOU DIDN'T TEST THE PHONE

16   THAT MS. KARE SAID HAD A CHIN, THE DROID CHARGE?

17   A    NO, I DIDN'T TEST THAT SPECIFIC DEVICE.

18              MR. PRICE:  THANK YOU, YOUR HONOR.

19              THE COURT:  ALL RIGHT.  THE TIME IS

20   10:19.

21              MR. PRICE:  I'M SORRY.  I MEANT TO MOVE

22   IN THE NOKIA -- I MEAN THE NOOK.

23              MR. JACOBS:  YOUR HONOR, AGAIN, THAT IS

24   LISTED ON THE LIST OF DEMONSTRATIVES.

25              THE COURT:  IS THAT 2526?
```

```
 1                    THE CLERK:  I BELIEVE SO.

 2                    MR. PRICE:  YES, 2526.  IT WOULD BE FOR

 3       THE SAME PURPOSE.

 4                    THE COURT:  ALL RIGHT.  IT'S ADMITTED

 5       WITH A LIMITING INSTRUCTION THAT IT'S ADMITTED

 6       SOLELY TO ASSESS MR. VAN LIERE'S SURVEY.  IT'S

 7       ADMITTED.

 8                    (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 9                    2526, HAVING BEEN PREVIOUSLY MARKED FOR

10                    IDENTIFICATION, WAS ADMITTED INTO

11                    EVIDENCE.)

12                    THE COURT:  ALL RIGHT.  THE TIME IS NOW

13       10:20.

14                    DO YOU HAVE ANY REDIRECT?

15                    MR. JACOBS:  NO, YOUR HONOR.

16                    THE COURT:  ALL RIGHT.  MAY THIS WITNESS

17       BE EXCUSED?

18                    MR. JACOBS:  SUBJECT TO RECALL.

19                    THE COURT:  ALL RIGHT.  YOU ARE EXCUSED

20       SUBJECT TO RECALL.  YOU MAY LEAVE.

21                    THE WITNESS:  THANK YOU, YOUR HONOR.

22                    THE COURT:  ALL RIGHT.  CALL YOUR NEXT

23       WITNESS, PLEASE.

24                    MR. JACOBS:  THE NEXT WITNESS IS

25       DR. RAVIN BALAKRISHNAN.
```

1723

```
 1              THE CLERK:  RAISE YOUR RIGHT HAND,
 2      PLEASE.
 3                   RAVIN BALAKRISHNAN,
 4      BEING CALLED AS A WITNESS ON BEHALF OF THE
 5      PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS
 6      EXAMINED AND TESTIFIED AS FOLLOWS:
 7              THE WITNESS:  I DO.
 8              THE CLERK:  WOULD YOU HAVE A SEAT,
 9      PLEASE.
10              THE WITNESS:  THANK YOU.
11              MR. JACOBS:  YOUR HONOR, LET'S JUST TAKE
12      A MOMENT TO GET SETTLED WITH THE BINDERS.
13              THE COURT:  THAT'S FINE.
14              (PAUSE IN PROCEEDINGS.)
15              THE CLERK:  COULD YOU STATE YOUR NAME,
16      PLEASE, AND SPELL IT.
17              THE WITNESS:  MY NAME IS RAVIN
18      BALAKRISHNAN.  THAT IS SPELLED R-A-V-I-N, LAST NAME
19      IS SPELLED B-A-L-A-K-R-I-S-H-N-A-N.
20              THE CLERK:  IT'S 10:22.  GO AHEAD.
21                   DIRECT EXAMINATION
22      BY MR. JACOBS:
23      Q    DR. BALAKRISHNAN, THE JURY HAS BEEN HEARING
24      ABOUT TRADEMARK SURVEYS.  ARE YOU HERE TO TALK
25      ABOUT TRADEMARK SURVEYS?
```

1    A    NO, I'M NOT.

2    Q    WHAT ARE YOU HERE TO TALK ABOUT?

3    A    I'M HERE TO TALK ABOUT THE UTILITY PATENT

4    KNOWN AS THE '381 PATENT.

5    Q    COULD YOU INTRODUCE YOURSELF TO THE JURY?

6    THEY'VE HEARD YOUR NAME, BUT CAN YOU DESCRIBE FOR

7    THEM WHAT YOU DO.

8    A    SURE.  I'M A PROFESSOR THE COMPUTER SCIENCE AT

9    THE DEPARTMENT OF COMPUTER SCIENCE AT THE

10   UNIVERSITY OF TORONTO, WHERE I ALSO HOLD A CANADA

11   RESEARCH CHAIR IN HUMAN CENTER INTERFACES, AND I

12   ALSO CODIRECT A USER INTERFACES AND GRAPHICS

13   LABORATORY AT THE UNIVERSITY OF TORONTO.

14   Q    TELL THE JURY A LITTLE BIT ABOUT YOUR

15   TRAINING.

16   A    I HOLD THREE DEGREES IN COMPUTER SCIENCE,

17   INCLUDING A PH.D. IN COMPUTER SCIENCE, GRADUATED IN

18   2001 FROM THE UNIVERSITY OF TORONTO.

19        AND I'VE SINCE THEN BEEN A PROFESSOR AT

20   THE UNIVERSITY SINCE 2001, SO THAT WOULD MAKE IT

21   ALMOST 11 YEARS AT THIS POINT.

22   Q    TELL THE JURY -- ACTUALLY, PULL THE MICROPHONE

23   A LITTLE BIT CLOSER TO YOU, AND THEN TELL THE JURY

24   JUST A LITTLE BIT ABOUT THE RESEARCH THAT YOU DO.

25   A    MY RESEARCH IS BROADLY IN THE FIELD OF

1   HUMAN/COMPUTER INTERACTION, WHICH INVOLVES THE

2   STUDY, DESIGN, AND IMPLEMENTATION OF DIFFERENT

3   FORMS OF USER INTERFACES FOR HOW PEOPLE INTERACT

4   WITH DIFFERENT KINDS OF TECHNOLOGY, WHETHER IT IS

5   MOBILE DEVICES OR DESKTOP COMPUTERS AND OTHER FORMS

6   OF COMPUTATIONAL --

7   Q    ON THIS SLIDE PDX 27.1 SHOWING SOME OF YOUR

8   QUALIFICATIONS, PATENTS ARE IDENTIFIED.  CAN YOU

9   DESCRIBE JUST A BIT ABOUT THE PATENTS THAT YOU'VE

10   BEEN AWARDED?

11   A    SURE.  THE 14 PATENTS THAT HAVE BEEN ISSUED

12   WITH ME AS A COINVENTOR, ARE ALL IN THE AREA OF

13   USER INTERFACES FOR DIFFERENT KINDS OF COMPUTING

14   TECHNOLOGIES.

15   Q    YOU MENTIONED THIS PHRASE "HUMAN/COMPUTER

16   INTERACTION."  CAN YOU BRIEFLY DESCRIBE WHAT THAT

17   MEANS?

18   A    SURE.  I POINTED AT IT A LITTLE BIT EARLIER.

19   IT'S A BROAD FIELD THAT STUDIES HUMAN INTERACTION

20   WITH TECHNOLOGY.

21        ONE OF THE THINGS THAT PEOPLE IN THE

22   FIELD CARE ABOUT IS CAN WE MAKE TECHNOLOGY MORE

23   ACCESSIBLE AND USABLE TO DIFFERENT USER POPULATIONS

24   DEPENDING WHAT THAT TECHNOLOGY IS.

25        SO IF IT'S A MOBILE DEVICE, FOR EXAMPLE,

```
 1    AND THE POPULATION IS A BROAD USER BASE, WE WOULD

 2    LOOK AT HOW YOU DESIGN THE INTERFACE FOR THAT

 3    TECHNOLOGY FOR THAT PARTICULAR POPULATION AND MAKE

 4    REFINEMENTS AND STUDY THE REFINEMENTS AND EVALUATE

 5    THEM AND SO FORTH.

 6    Q    YOU MENTIONED AT THE OUTSET THAT WE HAD ASKED

 7    YOU TO TAKE A LOOK AT THE '381 PATENT.  HAVE YOU

 8    SERVED AS AN EXPERT IN OTHER LITIGATION AND BEEN

 9    RETAINED BY APPLE?

10    A    YES, I HAVE SERVED AS AN EXPERT IN OTHER

11    LITIGATION RETAINED BY APPLE AND BY NINTENDO IN THE

12    PAST.

13    Q    AND WHAT'S THE AREA THAT YOU HAVE COVERED IN

14    THOSE CASES?

15    A    ALL OF THESE CASES HAVE TO DO WITH DIFFERENT

16    KINDS OF USER INTERFACE TECHNOLOGIES, BROADLY

17    SPEAKING.

18    Q    WHAT'S YOUR COMPENSATION LEVEL FOR YOUR WORK

19    ON THIS CASE?

20    A    I'M CURRENTLY BEING COMPENSATED AT MY STANDARD

21    RATE OF $430 AN HOUR.

22    Q    AND APPROXIMATELY HOW MUCH HAVE YOU BEEN

23    COMPENSATED FOR YOUR WORK ON THIS CASE?

24    A    ON THIS CASE, I'VE SPENT QUITE A BIT OF TIME.

25    IT STARTED ABOUT A YEAR AND A HALF AGO.  I'VE
```

```
 1    LOOKED AT DIFFERENT CODE, STUDIED THIS PATENT AND
 2    ANOTHER PATENT THAT IS NO LONGER AT ISSUE IN THIS
 3    CASE.
 4            SO IN ALL THAT WORK, I'VE BILLED
 5    APPROXIMATELY $150,000 OVER THE YEAR AND A HALF.
 6    Q    NOW, WE'VE BEEN REFERRING TO THE '381 PATENT.
 7    WHAT ARE THE, KIND OF THE ABBREVIATIONS WE HAVE
 8    BEEN USING TO DESCRIBE THAT PATENT?  WHAT DO WE
 9    CALL IT?
10    A    THE '381 PATENT GOES BY SEVERAL ABBREVIATIONS
11    OR NICKNAMES.  ONE OF THE TERMS IS CALLED A RUBBER
12    BANDING PATENT.  OTHER PEOPLE CALL IT A BOUNCE BACK
13    OR SNAP BACK PATENT.
14            OTHER TERMS I'VE HEARD IN THE COURSE OF
15    THIS CASE INCLUDE THE ELASTIC EFFECT OR THE LATEX
16    EFFECT.
17            SO THESE ARE ESSENTIALLY INTERCHANGEABLE
18    TERMINOLOGIES FOR THE SAME CONCEPT.
19            MR. JACOBS:  YOUR HONOR, WE OFFER
20    DR. BALAKRISHNAN AS AN EXPERT IN THE FIELD OF
21    COMPUTER SCIENCE AND HUMAN COMPUTER INTERACTION.
22            MR. JOHNSON:  NO OBJECTION.
23            THE COURT:  ALL RIGHT.  SO CERTIFIED.
24    BY MR. JACOBS:
25    Q    NOW, YOU LOOKED AT CLAIM 19 OF THIS RUBBER
```

1    BANDING OR BOUNCE BACK PATENT; CORRECT?

2    A    YES, I DID.

3    Q    AND WHAT OPINION DID YOU FORM ABOUT WHETHER

4    SAMSUNG MOBILE PHONES INFRINGE THIS CLAIM OF THIS

5    PATENT?

6    A    MY OPINION, FORMED AFTER STUDYING THE PATENT

7    AND THE PHONES, IS THAT 21 SAMSUNG MOBILE DEVICES

8    INFRINGE CLAIM 19 OF THE '381 PATENT.

9    Q    AND HOW DID YOU GO ABOUT DOING YOUR WORK TO

10   MAKE THAT, TO REACH THAT CONCLUSION?

11   A    FIRST OF ALL, I ANALYZED THE DEVICES

12   THEMSELVES, TRYING THEM OUT IN THE DIFFERENT

13   APPLICATIONS, SEEING WHICH APPLICATIONS MIGHT

14   INFRINGE.

15            AND THEN I -- IN SOME CASES, I ALSO

16   LOOKED AT THE SOURCE CODE TO CONFIRM THAT THE

17   BEHAVIOR WAS ACTUALLY AS WAS BEING SEEN ON THE

18   SCREEN FOR THE ACCUSED DEVICES.

19   Q    AND WHAT SOURCE CODE DID YOU LOOK AT, SIR?

20   A    I LOOKED AT FOUR REPRESENTATIVE VERSIONS OF

21   SOURCE CODE, REPRESENTATIVE OF THE DIFFERENT

22   PHONES, FOUR OF THE DIFFERENT PHONES; THAT IS, THE

23   SAMSUNG VERSION OF THE ANDROID 2.1, SAMSUNG VERSION

24   ANDROID 2.2, 2.3, AND 3.1 SOURCE CODE.

25   Q    AND WHAT WAS THE SOURCE OF THAT SOURCE CODE?

1    A    THAT SOURCE CODE WAS PROVIDED BY SAMSUNG'S

2    ATTORNEYS IN THEIR OFFICES AT REDWOOD SHORES.

3    Q    DID YOU ENCOUNTER ANY DIFFERENCES BETWEEN THE

4    VARIOUS VERSIONS OF THE SAMSUNG SOURCE CODE THAT

5    YOU LOOKED AT WITH REFERENCE TO THE '381 PATENT?

6    A    WITH REGARDS TO THE FUNCTIONALITY OF THE '381

7    PATENT, I DID NOT IDENTIFY ANY LOGICAL

8    INCONSISTENCIES AT ALL.  THEY WERE ESSENTIALLY THE

9    SAME AS IT PERTAINED TO THE FUNCTIONALITY OF THE

10   PATENT.

11   Q    WHAT ELSE DID YOU REVIEW IN THE COURSE OF

12   DOING YOUR WORK ON THIS PATENT?

13   A    IN ADDITION TO THE CODE AND THE DEVICES

14   THEMSELVES, I ALSO REVIEWED SEVERAL SAMSUNG

15   INTERNAL DOCUMENTS THAT PERTAINED TO THE

16   FUNCTIONALITY OF THE '381 PATENT.

17   Q    SO LET'S TAKE A LOOK AT THE '381 PATENT.  IT'S

18   JX 1045 IN YOUR BINDER, DR. BALAKRISHNAN.

19           YOUR HONOR, WE OFFER JX 1045 INTO

20   EVIDENCE.

21           THE COURT:  OKAY.  ANY OBJECTION?

22           MR. JOHNSON:  NO OBJECTION.

23           THE COURT:  IT'S ADMITTED.

24           (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

25           1045, HAVING BEEN PREVIOUSLY MARKED FOR

```
 1              IDENTIFICATION, WAS ADMITTED INTO

 2              EVIDENCE.)

 3    BY MR. JACOBS:

 4    Q    SO IS THIS THE '381 PATENT THAT YOU ANALYZED,

 5    SIR?

 6    A    YES, IT IS.  IT'S THE FRONT PAGE OF THE '381

 7    PATENT.

 8    Q    AND WHO IS THE INVENTOR ON THIS PATENT?

 9    A    THE INVENTOR ON THIS PATENT IS LISTED AS

10    MR. BAS ORDING.

11    Q    AND DO YOU LOOK AT THE QUESTION OF WHEN

12    MR. ORDING CONCEIVED THE INVENTION IN CLAIM 19 IN

13    THE COURSE OF HIS WORK?

14    A    YES, I DID.

15              MR. JOHNSON:  OBJECTION.  OUTSIDE THE

16    SCOPE OF HIS REPORT, YOUR HONOR.

17              MR. JACOBS:  PARAGRAPH 42, YOUR HONOR.

18              THE COURT:  OVERRULED.

19              GO AHEAD.

20              THE WITNESS:  YES, I DID.  I CONSIDERED

21    AND REVIEWED MR. ORDING'S -- PORTIONS OF

22    MR. ORDING'S DEPOSITION TESTIMONY WHERE HE

23    TESTIFIED THAT HE HAD BEEN WORKING WITH A PROTOTYPE

24    TOUCHSCREEN DEVICE IN AROUND ABOUT 2005, FEBRUARY

25    2005, WHICH IS ABOUT TWO YEARS BEFORE THE IPHONE
```

```
1    WAS RELEASED.

2              AND HE ALSO TESTIFIED THAT THE '381

3    PATENT AND THE BOUNCE BACK FUNCTIONALITY, HE WAS

4    DEVELOPING AT THAT TIME WAS PROTOTYPED.

5              AND HE ALSO PRODUCED A SOURCE CODE FILE

6    OF HIS EARLY PROTOTYPE USING A LANGUAGE CALLED

7    MACROMEDIA DIRECTOR THAT I BRIEFLY -- THAT I

8    REVIEWED AS WELL.

9    BY MR. JACOBS:

10   Q    NOW, LET'S GO BACK TO THIS, THIS PATENT,

11   DR. BALAKRISHNAN.

12             AND MAYBE WE CAN PUT UP 27. -- PDX 27.3,

13   MR. LEE.

14             SO WHAT IS THE PROBLEM THAT THE '381

15   PATENT IS DESIGNED TO SOLVE, SIR?

16   A    AT A VERY HIGH LEVEL, THE FOCUS OF THE '381

17   PATENT IS DEALING WITH USER INTERFACES FOR MOBILE

18   DEVICES, AND AS MANY OF US KNOW, MOBILE DEVICES

19   HAVE RELATIVELY SMALL SCREENS COMPARED TO, FOR

20   EXAMPLE, THE BIG MONITOR I'M LOOKING AT HERE.

21             BUT THE CONTENT WE WANT TO VIEW ON THOSE

22   MOBILE DEVICES CAN BE LARGER THAN WOULD FIT ON THE

23   SCREEN.

24             SO, FOR EXAMPLE, WHAT YOU SEE ON THE

25   SLIDE RIGHT NOW IS JUST A SIMPLE PHOTOGRAPH OF A
```

```
 1    STICK FIGURE AND IS LARGER THAN WHAT COULD FIT ON A

 2    HYPOTHETICAL MOBILE DEVICE.

 3            SO IF SOMEBODY WANTS TO VIEW THE ENTIRETY

 4    OF THIS PHOTOGRAPH, ONE NEEDS TO PROVIDE AN

 5    APPROPRIATE USER INTERFACE TO ALLOW THE USER TO

 6    MOVE AROUND THIS PHOTOGRAPH TO SEE THE REST OF IT.

 7            AND IN DOING THAT, PROVIDING THAT KIND OF

 8    NAVIGATION USER INTERFACE, THERE ARE TWO LONG-KNOWN

 9    PROBLEMS THAT ARE ENCOUNTERED, AND THE '381 PATENT

10    IS FOCUSSED AT SOLVING THOSE LONG-KNOWN PROBLEMS

11    WITH A VERY ELEGANT SOLUTION.

12            THE COURT:  I'M SORRY.  IT'S 10:31.

13    LET'S TAKE OUR BREAK NOW.

14            LET ME ASK, DOES THE JURY HAVE THE PHOTOS

15    OF MR. VAN LIERE YET?

16            THE CLERK:  I HAVE THEM.

17            THE COURT:  WHAT ABOUT MR. BALAKRISHNAN?

18            THE CLERK:  I HAVE NOT YET GOTTEN THEM.

19    BUT I'M ABOUT TO.

20            THE COURT:  OKAY.  SO MS. PARKER BROWN

21    WILL HAND OUT THE PHOTOS OF OUR LAST TWO WITNESSES.

22            THE CLERK:  I CAN JUST LEAVE THEM ON

23    THEIR CHAIRS.

24            THE COURT:  SHE'LL JUST LEAVE THEM ON

25    YOUR CHAIRS.
```

```
 1                  LET'S TAKE A BREAK.  IT'S 10:31.  BE BACK
 2       AT 10:45.  AGAIN, PLEASE KEEP AN OPEN MIND.  DON'T
 3       DO ANY RESEARCH OR DISCUSS THE CASE.
 4                  THANK YOU.
 5                  (WHEREUPON, A RECESS WAS TAKEN.)
 6                  (WHEREUPON, THE FOLLOWING PROCEEDINGS
 7       WERE HELD OUT OF THE PRESENCE OF THE JURY:)
 8                  THE COURT:  AS OF THIS MORNING, YOU
 9       DIDN'T HAVE ANY OBJECTIONS FILED AS TO
10       MR. SHEPPARD.
11                  MS. MAROULIS:  THAT'S CORRECT, YOUR
12       HONOR.
13                  THE COURT:  OKAY.  ARE THOSE GOING TO BE
14       FILED TODAY?
15                  MS. MAROULIS:  NO.  IT'S JUST A VERY
16       SHORT DEPOSITION CLIP AND WE DID NOT HAVE OBJECTION
17       TO THAT.
18                  THE COURT:  OH, OKAY.  AND YOU DIDN'T
19       HAVE ANY OBJECTIONS AS TO --
20                  MR. MCELHINNY:  NO, YOUR HONOR.  BUT THE
21       REASON WE'RE PUTTING HIM LAST IS BECAUSE WE THINK
22       WE DESIGNATED THE WRONG CLIP, SO IF WE GO OVER
23       UNTIL MONDAY, WE'LL PROBABLY DO A NEW DESIGNATION.
24                  THE COURT:  AT WHICH POINT YOU MIGHT HAVE
25       AN OBJECTION?
```

```
 1                   MS. MAROULIS:  THAT'S CORRECT.

 2                   YOUR HONOR, THIS RAISES ANOTHER ISSUE WE

 3     WANTED TO DISCUSS BRIEFLY.  APPLE SAID THEY'RE NOT

 4     GOING TO PLAY OUR COUNTER-DESIGNATIONS AS PART OF

 5     THEIR CLIPS AND WE WANTED TO MAKE SURE THAT WAS

 6     DONE, BECAUSE OTHERWISE OUR COUNTER-DESIGNATIONS

 7     WILL BE NOT UNDERSTANDABLE TO THE JURY IF THEY'RE

 8     PLAYED AT A LATER TIME.

 9                   THERE'S ONLY A FEW OF THEM SUBJECT --

10     WHERE THE COURT OVERRULED OBJECTIONS, BUT WE CAN'T

11     HAVE THEM PLAYED SEPARATELY BECAUSE THEY WILL NOT

12     MAKE ANY SENSE.

13                   THE COURT:  THAT'S WHAT WE'VE REQUIRED

14     THROUGHOUT THIS CASE.  THERE ARE A NUMBER OF TIMES

15     WHEN MR. VERHOEVEN PLAYED A VIDEO CLIP AND

16     MS. KREVANS JUMPED AND UP AND SAID "RULE OF

17     COMPLETENESS," AND I SAID NOPE, IT'S ON YOUR TIME

18     AND IN YOUR CASE.

19                   SO THAT'S OVERRULED.  OKAY?

20                   ALL RIGHT.  ANYTHING ELSE?

21                   LET'S BRING IN OUR JURY.

22                   MR. MUELLER:  YOU ASKED FOR A CASE CITE

23     ON THE 408 ISSUE.

24                   THE COURT:  OKAY.

25                   MR. MUELLER:  AFFILIATED MANUFACTURERS
```

1    VERSUS ALUMINUM COMPANY OF AMERICA, THIS IS 56 F.3D

2    521, PAGE 527, QUOTE, "LITIGATION NEED NOT HAVE

3    COMMENCED FOR RULE 408 TO APPLY," END QUOTE.

4            THAT WAS CITED WITH APPROVAL BY

5    JUDGE ILLSTON IN THE MOZAFFARIAN CASE, 1998 WEST

6    LAW 827596 AT PAGE 6 WHERE JUDGE ILLSTON STATED,

7    QUOTE, "IT IS NOT NECESSARY THAT THE NEGOTIATIONS

8    OCCUR AFTER A FORMAL COMPLAINT IS FILED."

9            THE COURT:  ALL RIGHT.  LET ME JUST MAKE

10   SURE I HAVE THE DATES -- THE CITES CORRECT.  56

11   F.3D 521, THE PIN CITE IS 527, AND 1998 WEST LAW

12   827.

13           MR. MUELLER:  827596 AT STAR 6 IS THE PIN

14   CITE, YOUR HONOR.

15           MS. MAROULIS:  AND YOUR HONOR, WE ALREADY

16   CITED THE SANDISK CASE EARLIER, SO I'M GOING TO, IF

17   I CAN, HAND UP IT THE COURT AND GIVE OPPOSING

18   COUNSEL A PAPER COPY WITH HIGHLIGHTED TEXT.

19           THE COURT:  I KNOW.  IT WAS IN YOUR

20   BRIEF.

21           MS. MAROULIS:  WOULD YOUR HONOR LIKE A

22   COPY, OR NOT?

23           THE COURT:  SURE, I'LL TAKE ONE.  BUT I

24   KNOW THAT WAS IN YOUR BRIEF.

25           MR. MUELLER:  AND IF YOUR HONOR WOULD

1736

```
 1    LIKE COPIES OF THOSE CASES I MENTIONED, WE WOULD BE
 2    HAPPY TO PROVIDE THEM.
 3              THE COURT:  OKAY.  THANK YOU.
 4              MR. MUELLER:  THANK YOU, YOUR HONOR.
 5              THE COURT:  ALL RIGHT.  IF THERE'S
 6    NOTHING ELSE, LET'S GO AHEAD WITH MR. BALAKRISHNAN.
 7    WE'LL GO UNTIL NOON.
 8              ALL RIGHT.  LET'S GO AHEAD AND BRING IN
 9    OUR JURY, PLEASE.
10              (WHEREUPON, THE FOLLOWING PROCEEDINGS
11    WERE HELD IN THE PRESENCE OF THE JURY:)
12              THE COURT:  ALL RIGHT.  PLEASE TAKE A
13    SEAT.  SORRY.  I KEEP FORGETTING.
14              ALL RIGHT.  IT'S 10:49.  PLEASE GO AHEAD.
15    BY MR. JACOBS:
16    Q    DR. BALAKRISHNAN, LET'S CONTINUE WHERE WE LEFT
17    OFF.
18              I THINK YOU WERE TALKING ABOUT THE
19    PROBLEMS THE '381 PATENT IS DESIGNED TO SOLVE.
20    A    RIGHT.  AND I THINK I LEFT OFF BY DESCRIBING
21    THE GENERAL PROBLEMS FACED, AND I THINK I SAID THE
22    '381 PATENT SOLVES TWO PARTICULAR PROBLEMS WHEN WE
23    BROKE.
24    Q    EXACTLY.  SO LET'S FOCUS ON THOSE TWO
25    PARTICULAR PROBLEMS NOW.
```

```
 1              WHAT'S THE FIRST OF THOSE PROBLEMS?

 2    A    THE FIRST OF THOSE PROBLEMS IS WHAT'S KNOWN IN

 3    THE FIELD AS THE FROZEN SCREEN PROBLEM, AND THIS

 4    OCCURS WHEN THE USER IS NAVIGATING ABOUT A

 5    DOCUMENT, OR A PHOTOGRAPH IN THIS EXAMPLE, AND WHEN

 6    THEY REACH THE EDGE OF THE PHOTOGRAPH, IT SIMPLY

 7    JUST STOPS.

 8              AND THE USER IS LEFT WONDERING, HAVE THEY

 9    REACHED THE EDGE OF THE PHOTOGRAPH OR HAS THE

10    SYSTEM JUST STOPPED REACTING TO THEM, IN OTHER

11    WORDS, FROZEN?

12              AND BECAUSE THEY ARE UNSURE, THEY OFTEN

13    TRY AGAIN JUST TO MAKE SURE THE SYSTEM IS NOT

14    FROZEN.

15              I'VE PREPARED A LITTLE VIDEO, ANIMATION

16    TO ILLUSTRATE THIS PROBLEM.

17              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

18    OPEN COURT OFF THE RECORD.)

19              THE WITNESS:  THE USER HITS THE EDGE,

20    TRIES AGAIN, AND YOU SEE IT'S FROZEN, BUT THE USER

21    IS TRYING AGAIN.

22              AND THAT'S ESSENTIALLY THE HEART OF THE

23    FROZEN SCREEN PROBLEM.  THERE ISN'T SUFFICIENT

24    FEEDBACK TO THE USER AS TO WHETHER THE SYSTEM IS

25    STILL ALIVE OR THEY'VE HIT THE EDGE OF THE
```

2738

```
 1    DOCUMENT.

 2    BY MR. JACOBS:

 3    Q     AND THAT WAS PDX 27.24.  WHAT'S THE NEXT

 4    PROBLEM THAT THE '381 PATENT WAS DESIGNED TO SOLVE?

 5    A     THE SECOND PROBLEM IS KNOWN IN THE FIELD AS A

 6    DESERT FOG PROBLEM.

 7             SO THIS IS A BIT OF THE CONVERSE OF THE

 8    FROZEN SCREEN PROBLEM IN THAT ONE COULD MANIPULATE

 9    THE IMAGE SUCH THAT IT GOES OFF, COMPLETELY OFF THE

10    SCREEN AND YOU'RE LEFT WITH A BLANK SCREEN, WHAT WE

11    WOULD CALL THE DESERT FOG, AND YOU HAVE NO IDEA

12    WHERE THE SCREEN IS RELATIVE TO WHERE THE

13    PHOTOGRAPH IS OUTSIDE THE SCREEN.

14             SO I PREPARED A LITTLE ANIMATION FOR THAT

15    AS WELL.

16             AS YOU CAN SEE, THE PHOTOGRAPH IS TAKEN

17    OFF THE SCREEN, AND NOW THE USER IS MANIPULATING

18    THE DESERT FOG AND IT'S UNCLEAR, ESSENTIALLY THEY

19    PAUSE FOR A MOMENT, HOW TO BRING THAT PHOTOGRAPH

20    BACK ON TO THE SCREEN.

21             SO THESE ARE OF THE TWO KEY PROBLEMS THAT

22    ARE FOUND IN THIS KIND OF NAVIGATION INTERFACE THAT

23    THE '381 PATENT IS FOCUSSED ON SOLVING.

24    Q     AND THAT WAS PDX 27.25.  HOW DOES THE '381

25    PATENT SOLVE THESE TWO PROBLEM PROBLEMS, FROZEN
```

```
 1    SCREEN AND DESERT FOG?

 2    A    THE '381 PATENT SOLVES BOTH THESE PROBLEMS IN

 3    ONE FELL SWOOP.  ESSENTIALLY, A, IT SOLVES THE

 4    DESERT FOG PROBLEM BY NOT ALLOWING THE PHOTOGRAPH

 5    TO GO OFF THE SCREEN COMPLETELY.

 6              AND THE FROZEN SCREEN PROBLEM IT SOLVES

 7    BY WHEN THE DOCUMENT REACHES THE EDGE, IT ALLOWS A

 8    CERTAIN AMOUNT OF MOVEMENT BEYOND THE EDGE, SHOWS

 9    AN AREA BEYOND THE EDGE, SO THE USER KNOWS, I'VE

10    REACHED THE EDGE OF THE DOCUMENT, AND THEN WHEN

11    THEY RELEASE THEIR FINGER, IT BOUNCES BACK.

12              IT GIVES NICE FEEDBACK SAYING "YOU'VE

13    REACHED THE EDGE.  THE SYSTEM IS STILL ALIVE.  IT'S

14    NOT FROZEN."

15              I PREPARED AN ANIMATION TO ILLUSTRATE

16    THAT AS WELL.

17              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

18    OPEN COURT OFF THE RECORD.)

19              THE WITNESS:  AS YOU CAN SEE, YOU'VE

20    REACHED THE EDGE OF THE DOCUMENT.  THE BLACK AREA

21    BELOW IS SHOWN.

22              CAN WE SHOW THAT AGAIN IF YOU DON'T MIND?

23              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

24    OPEN COURT OFF THE RECORD.)

25              THE WITNESS:  AND WHEN THE USER RELEASES
```

```
 1    THEIR FINGER, IT BOUNCES BACK.  SO IT GIVES THE

 2    ILLUSION OF A VERY LIVELY SYSTEM THAT'S NOT FROZEN

 3    BECAUSE THE USER KNOWS WHERE THE EDGES ARE AND IT

 4    DOESN'T DISAPPEAR IN THE DESERT FOG.

 5    BY MR. JACOBS:

 6    Q    WERE THESE PROBLEMS RECOGNIZED IN THE FIELD

 7    BEFORE THE '381 PATENT?

 8    A    THE TWO PROBLEMS WERE WELL RECOGNIZED IN THE

 9    FIELD.  IN FACT, PAPERS WERE PUBLISHED ABOUT IT

10    YEARS BACK.

11    Q    DID ANYONE SOLVE IT BEFORE APPLE?

12    A    NO, IT DID NOT.

13    Q    NOW, DOES THE IPHONE IMPLEMENT CLAIM 19 OF THE

14    '381 PATENT?

15    A    YES, IT DOES.

16    Q    AND HOW DO YOU KNOW THAT?

17    A    I INVESTIGATED THE DIFFERENT IPHONE DEVICES

18    AND TRIED THE FUNCTIONALITY ON THE DIFFERENT

19    DEVICES.

20         I ALSO LOOKED AT THE IPHONE SOURCE CODE

21    TO UNDERSTAND HOW IT'S IMPLEMENTED.

22    Q    SO LET'S LOOK AT 27.7, MR. LEE.

23    A    SO THIS IS A VIDEO OF THE FUNCTIONALITY BEING

24    SHOWED IN THE PHOTOS APPLICATION ON THE IPHONE 3GS.

25    THIS IS THE ACTUAL IPHONE, THE ACTUAL PERSON DOING
```

1    THE FUNCTIONALITY.

2              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

3    OPEN COURT OFF THE RECORD.)

4              THE WITNESS:  AS YOU CAN SEE, YOU MOVE TO

5    THE RIGHT, YOU GET TO THE EDGE, IT SHOWS BEYOND THE

6    EDGE, AND THEN IT BOUNCES BACK.

7    BY MR. JACOBS:

8    Q    LET'S SHOW THAT ONE MORE TIME, PLEASE.

9              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

10   OPEN COURT OFF THE RECORD.)

11             THE WITNESS:  THE USER IS DRAGGING, AN

12   AREA BEYOND THE EDGE IS SHOWN, AND THEN IT BOUNCES

13   BACK.

14   BY MR. JACOBS:

15   Q    LET'S TURN NOW TO SAMSUNG PRODUCTS AND YOUR

16   ANALYSIS OF HOW THEY -- WHETHER THEY INFRINGE CLAIM

17   19 OF THE '381 PATENT, AND LET'S START WITH THE

18   SAMSUNG GALAXY S II AT&T.

19             DOES IT INFRINGE CLAIM 19?

20   A    YES.  THE SAMSUNG GALAXY S II, AT&T VERSION,

21   INFRINGES CLAIM 19 OF THE '381 PATENT.

22   Q    NOW, YOU'VE LISTED HERE ON THE SLIDE THE

23   GALLERY APPLICATION.  WHAT'S THE GALLERY

24   APPLICATION?

25   A    THE GALLERY APPLICATION IN SAMSUNG'S PRODUCT

1    IS ESSENTIALLY THE PHOTO MIGRATION AND VIEWING

2    APPLICATION THAT ALLOWS YOU TO LOOK THROUGH A SET

3    OF PHOTOGRAPHS.

4    Q    SO LET'S LOOK AT THE GALLERY APPLICATION IN

5    THE GALAXY S II.

6              MR. LEE, COULD WE HAVE 27.9, PLEASE.

7              WHAT ARE WE SEEING HERE,

8    DR. BALAKRISHNAN?

9    A    HERE WE'RE SEEING ON THE GALAXY S II, AT&T

10   VERSION, THE GALLERY APPLICATION.  WE CONTINUE TO

11   USE THE SAME PHOTOGRAPH WE USED IN THE EARLIER

12   EXAMPLES.

13             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

14   OPEN COURT OFF THE RECORD.)

15             THE WITNESS:  AND AS YOU CAN SEE, THE

16   SAME BOUNCE BACK FUNCTIONALITY AS WE'VE SEEN.

17             AND IF YOU CAN SHOW THAT ONE MORE TIME,

18   YOU CAN SEE THE USER IS DRAGGING THE DOCUMENT, IT

19   REACHES THE EDGE, THE AREA BEYOND THE EDGE IS

20   SHOWN, AND IT BOUNCES BACK WHEN THEY RELEASE THE

21   FINGER.  ESSENTIALLY IT'S THE SAME AS THE WAY THE

22   IPHONE WORKS.

23   BY MR. JACOBS:

24   Q    LET'S BREAK THE REQUIREMENTS OF CLAIM 19 DOWN

25   INTO ITS VARIOUS PARTS.

2743

```
 1                    COULD WE HAVE 27.10, MR. LEE.

 2                    SO THE FIRST PART OF CLAIM 19 DISCUSSES A

 3       DEVICE WITH A TOUCHSCREEN DISPLAY, A PROCESSOR,

 4       MEMORY, AND A PROGRAM FOR PERFORMING RUBBER BANDING

 5       OF THE BOUNCE FUNCTION.

 6                    DO SAMSUNG'S PRODUCTS MEET THESE

 7       ELEMENTS, REQUIREMENTS, OR LIMITATIONS AS THE

 8       PATENT LAWYERS CALL THEM?

 9       A     YES, THEY DO.

10       Q     SO LET'S GO TO 27.12.  AND CAN YOU JUST REVIEW

11       THIS ELEMENT, THIS FIRST ELEMENT OF CLAIM 19

12       BRIEFLY WITH THE JURY AND WHY YOU FIND IT PRESENT

13       IN THE SAMSUNG DEVICE?

14       A     SURE.  THIS FIRST ELEMENT ESSENTIALLY SAYS IT

15       HAS TO BE A COMPETING DEVICE WHICH HAS A

16       TOUCHSCREEN DISPLAY.  AND WHAT A TOUCHSCREEN

17       DISPLAY IS IS A TOUCH SENSOR THAT SENSES THE USER'S

18       TOUCH INPUTS INTEGRATED WITH A DISPLAY.

19                    AND ALL THESE PHONES AND TABLETS CLEARLY

20       HAVE A TOUCH SENSOR INTEGRATED WITH THE DISPLAY.

21                    IT ALSO HAS ONE OR MORE COMPUTING

22       PROCESSORS, WHICH MAKES ALL THE PROGRAMS RUN;

23       MEMORY TO INSTALL THOSE PROGRAMS AND DATA; AND ONE

24       OR MORE PROGRAMS THAT ACTUALLY GIVE YOU THE

25       FUNCTIONALITY THAT WE USE ON THESE DIFFERENT
```

```
1    DEVICES.

2    Q    CAN WE HAVE 27.14, MR. LEE.

3              NOW, THIS IS ELEMENT 2 OF THE CLAIM -- OF

4    CLAIM 19 OF THE '381 PATENT.  WHAT IS IT CALLING

5    FOR?

6    A    ELEMENT 2 SIMPLY SAYS IT HAS TO BE

7    INSTRUCTIONS OR COMPUTER CODE FOR DISPLAYING A

8    FIRST PORTION OF AN ELECTRONIC DOCUMENT.

9              SO THE GALLERY APPLICATION, THE

10   ELECTRONIC DOCUMENT WILL BE THE PHOTOGRAPH, AND AS

11   YOU CAN SEE ON THIS PARTICULAR SLIDE, I'VE

12   ILLUSTRATED IT DISPLAYING A FIRST PORTION, JUST A

13   FIRST PART OF THAT DOCUMENT.

14   Q    LET'S GO TO THE NEXT SLIDE, MR. LEE, 27.16.

15             THIS IS THE THIRD ELEMENT OF CLAIM 19,

16   AND WHAT IS IT LOOKING FOR?

17   A    THIS ELEMENT IS LOOKING FOR THE DETECTION OF

18   AND MOVEMENT OF AN OBJECT ON A TOUCHSCREEN DISPLAY.

19             NOW, THE OBJECT COULD BE ANY OBJECT OR IT

20   COULD BE THE FINGER, THE USER'S FINGER AS WELL, AND

21   THE SAMSUNG DEVICES CLEARLY DETECT THE TOUCH.

22             AS YOU CAN SEE IN SUBSEQUENT VIDEOS, AND

23   EVEN THE ORIGINAL VIDEO WE SHOWED, IT CLEARLY

24   DETECTS THE MOVEMENT OF THAT OBJECT, A FINGER ON

25   THE SCREEN.
```

1    Q    LET'S GO TO 27.18.  THIS IS THE FOURTH ELEMENT

2    OF CLAIM 19.  AND WHAT IS IT REQUIRING?

3    A    THIS REQUIRES A TRANSLATION OR MOVEMENT OF THE

4    ELECTRONIC DOCUMENT, IN THIS EXAMPLE, THE

5    PHOTOGRAPH, IN A FIRST DIRECTION, AND THEN IT

6    SUBSEQUENTLY DISPLAYS A SECOND PORTION OF THAT SAME

7    DOCUMENT WHERE THAT SECOND PORTION HAS TO BE

8    DIFFERENT FROM THE FIRST PORTION.

9            AS YOU CAN SEE HERE -- IF YOU CAN SHOW

10   THE VIDEO AGAIN, PLEASE?

11           (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

12   OPEN COURT OFF THE RECORD.)

13   BY MR. JACOBS:

14   Q    THAT'S THE FIRST PORTION.

15   A    NOW, WHEN YOU DRAG IT IN THE FIRST DIRECTION,

16   A SECOND PORTION OF THE SAME ELECTRONIC DOCUMENT OR

17   PHOTOGRAPH IS SHOWN.

18           AS YOU CAN SEE, THE SECOND PORTION COULD

19   OVERLAP THE FIRST PORTION, BUT IT'S STILL DIFFERENT

20   FROM THE FIRST PORTION.

21   Q    AND JUST BECAUSE IT WENT A LITTLE FAST, SIR,

22   WHEN YOU WERE APPLYING THE PHRASE "TRANSLATING THE

23   ELECTRONIC DOCUMENT," YOU WERE LOOKING FOR WHAT?

24   A    I'M LOOKING FOR MOVEMENT.  "TRANSLATION"

25   SIMPLY MEANS MOVEMENT ON A PARTICULAR SET OF AXES,

2746

```
 1    IN THIS CASE IT'S MOVING ON THE X AND Y OR

 2    TWO-DIMENSIONAL PLANE OF THE SCREEN.

 3    Q    SO NOW LET'S LOOK AT THE FIFTH ELEMENT ON THE

 4    SCREEN, AND WE'RE LOOKING AT 27.20.  WHAT DOES THIS

 5    ELEMENT CALL FOR?

 6    A    THIS ELEMENT IS WHAT HAPPENS WHEN THE USER

 7    CONTINUES TO DRAG THE DOCUMENT, TRANSLATE THE

 8    DOCUMENT, AND IT REACHES THE EDGE OF THE DOCUMENT.

 9          WHEN THE SYSTEM RECOGNIZES THAT THE EDGE

10    OF A DOCUMENT HAS BEEN REACHED, IN RESPONSE TO THAT

11    EDGE BEING REACHED, AN AREA BEYOND THE EDGE IS

12    SHOWN, WHAT I'VE ILLUSTRATED IN THE YELLOW BOX TO

13    THE LEFT OF THE ACTUAL DOCUMENT'S EDGE THERE ON THE

14    SCREEN.

15          AND THE LAST PART OF THIS IS THAT A THIRD

16    PORTION OF THE DOCUMENT HAS TO REMAIN ON THE SCREEN

17    WHERE THAT THIRD PORTION HAS TO BE SMALLER THAN THE

18    ORIGINAL FIRST PORTION.

19          AND THAT'S PRETTY APPARENT FROM THIS

20    IMAGE HERE.  THE THIRD PORTION IS NOT -- DOESN'T

21    FILL THE FULL SCREEN, WHEREAS THE FIRST PORTION I

22    ORIGINALLY SHOWED FILLS THE FULL SCREEN.

23    Q    DOES THE SAMSUNG GALAXY S II, AT&T, MEET THIS

24    LIMITATION?

25    A    YES, IT DOES.
```

1    Q    LET'S GO TO THE SIXTH ELEMENT OF CLAIM 19.

2    WHAT DOES THIS ELEMENT REQUIRE?

3    A    THIS ELEMENT DEALS WITH WHAT HAPPENS WHEN THE

4    OBJECT OR FINGER IS RELEASED FROM THE SCREEN, IT'S

5    NO LONGER DETECTED BY THE TOUCHSCREEN, AND THIS

6    REQUIRES THAT WHEN THAT HAPPENS, THE DOCUMENT IS

7    TRANSLATED IN A SECOND DIRECTION, IT'S MOVED IN A

8    SECOND DIRECTION, SUCH THAT THE AREA BEYOND THE

9    EDGE OF THE SCREEN PREVIOUSLY DISPLAYED IS NO

10   LONGER DISPLAYED.

11             AND FINALLY, IT DISPLAYS A FOURTH PORTION

12   OF THE ELECTRONIC DOCUMENT, AND THAT FOURTH PORTION

13   HAS TO BE DIFFERENT FROM THE ORIGINAL FIRST PORTION

14   THAT WE SAW AT THE START OF THIS SEQUENCE OF

15   VIDEOS.

16             AND FOR SAKE OF ILLUSTRATION, JUST TO

17   REMIND US, I'VE ASKED TO PUT UP THE FOURTH -- THE

18   FIRST PORTION AS A CALL OUT.  IF WE CAN HAVE THAT

19   ON THE SLIDE?

20             THAT IS THE ORIGINAL FIRST PORTION.  AS

21   YOU CAN SEE, IT'S DIFFERENT FROM THE FOURTH PORTION

22   THAT'S ENDED UP ON THE SCREEN AND OF THIS

23   INTERACTION.

24   Q    SO WE'VE BEEN LOOKING AT THESE ELEMENTS IN THE

25   CONTEXT OF THE GALLERY APPLICATION ON THE

1    GALAXY S II, AT&T.  DOES THIS PHONE MEET THESE SAME

2    REQUIREMENTS IN OTHER APPLICATIONS?

3    A    YES, IT DOES.  THE GALAXY S II, AT&T, MEETS

4    THE ELEMENTS OF CLAIM 19 OF THE '381 PATENT IN TWO

5    OTHER APPLICATIONS, IN THE CONTACTS LIST AND THE

6    INTERNET BROWSER APPLICATIONS.

7    Q    LET'S TAKE A LOOK AT THOSE BRIEFLY.

8              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

9    OPEN COURT OFF THE RECORD.)

10             THE WITNESS:  SO ON THE LEFT YOU HAVE A

11   VIDEO OF THE CONTACTS LIST APPLICATION.  THIS IS

12   SIMPLY THE LIST OF PEOPLE YOU HAVE PHONE NUMBERS

13   AND SO FORTH FOR ON THE PHONE.

14             AND IF WE CAN PLAY THAT AGAIN, THE USER

15   IS DRAGGING THE LIST UPWARDS, AND WHEN THEY REACH

16   THE EDGE, IT'S HARD TO SEE, BUT YOU REACH THE EDGE,

17   IT'S BLACK ON THE BOTTOM, THE AREA BEYOND THE EDGE,

18   A BLACK AREA IS SHOWN.

19             WHEN THE USER LIFTS THEIR FINGER UP, IT

20   BOUNCES BACK.  IT'S THE EDGE OF THE PHOTOGRAPH,

21   JUST IN A DIFFERENT DIRECTION.

22   BY MR. JACOBS:

23   Q    AND HOW ABOUT IN THE BROWSER APPLICATION?

24   A    THE BROWSER APPLICATION SIMILARLY WORKS THE

25   SAME WAY.  YOU CAN DRAG IT BEYOND THE EDGE, IN THIS

1    CASE YOU'VE REACHED THE EDGE, AN AREA BEYOND THE

2    EDGE IS SHOWN, YOU RELEASE YOUR FINGER, IT BOUNCES

3    BACK, VERY MUCH LIKE THE GALLERY ACTUALLY.

4    Q    CLAIM 19 DISCUSSES INSTRUCTIONS THAT MAKE THIS

5    FEATURE WORK.  WHAT ARE INSTRUCTIONS IN THE CONTEXT

6    OF A SMARTPHONE OR A TABLET COMPUTER?

7    A    INSTRUCTIONS IN THE CONTEXT OF PHONES AND

8    TABLET COMPUTERS THAT WE'RE DISCUSSING HERE ARE

9    REALLY JUST COMPUTER CODE, COMPUTER PROGRAM

10   INSTRUCTIONS, AND THIS IS LINES OF CODE THAT'S IN

11   THE COMPUTER THAT EXECUTE ON THE PROCESSOR TO MAKE

12   THIS FUNCTIONALITY WORK.

13   Q    HOW DO YOU KNOW THAT THESE INSTRUCTIONS ARE

14   PRESENT ON THE GALAXY S II, AT&T?

15   A    AS I TESTIFIED EARLIER, I LOOKED AT THE

16   SAMSUNG PRODUCED CODE AND WHAT I'VE DONE IS I'VE

17   EXCERPTED JUST TWO SMALL PORTIONS TO ILLUSTRATE

18   SOME OF THE PERTINENT CODE FOR THE GALLERY AND FOR

19   THE BROWSER APPLICATIONS ON THE SCREEN.

20              IT'S NOT ON THE SCREEN YET.

21              MR. JACOBS:  SO, YOUR HONOR, WE'D LIKE TO

22   DISPLAY THIS FOR YOU, FOR OPPOSING COUNSEL, AND FOR

23   THE JURY AS IS REPRESENTATIVE OF THE CODE OF

24   SAMSUNG.

25              THE COURT:  OKAY.  GO AHEAD.

```
1      BY MR. JACOBS:

2      Q    SO WE'RE LOOKING AT 27.31, SIR, AND IS IT ON

3      THE JURY'S SCREEN.

4               NO, NOT ON THE PUBLIC SCREEN.

5               THE COURT:  TAKE THAT DOWN, PLEASE.

6               MR. JACOBS:  IS IT ON THE JURORS'

7      SCREENS?  NO.

8               THANK YOU MR. LEE.

9      Q    SO DR. BALAKRISHNAN, CAN YOU SHOW US WHAT WE

10     ARE SEEING ON THIS, IN THIS SOURCE CODE?

11     A    SURE.

12     Q    CAN YOU TELL US WHAT WE'RE SEEING ON THE

13     SOURCE CODE?

14     A    ON THE LEFT-HAND SIDE IS THE SOURCE CODE FOR

15     THE GALLERY APPLICATION THAT WE'VE BEEN TALKING

16     ABOUT.  SO THIS IS A VERY SMALL SNIPPET OF THE

17     OVERALL CODE THAT RUNS.  WHAT I'VE DONE IS

18     ILLUSTRATE JUST A PORTION THAT SETS UP THE

19     PARAMETERS FOR DETERMINING WHAT HAPPENS AT THE EDGE

20     OF THE DOCUMENT.

21               SO IT LOOKS AT THE LEFT EXTENT OR THE

22     RIGHT EXTENT OR THE TOP OR BOTTOM.  THOSE ARE FOUR

23     EDGES OF THE DOCUMENT.  IF IT EXCEEDS THE THRESHOLD

24     OF THAT EDGE, IT MOVES THE DOCUMENT BY THE

25     APPROPRIATE AMOUNT SO YOU CAN SEE IT.
```

```
 1              ON THE RIGHT-HAND SIDE IS THE SAME

 2    FUNCTIONALITY, BUT WRITTEN IN A SLIGHTLY DIFFERENT

 3    WAY FOR THE BROWSER APPLICATION, AND IN THIS CASE

 4    IT'S COMPUTING THE AMOUNT OF BOUNCE THAT NEEDS TO

 5    HAPPEN WHEN THE FINGER IS RELEASED AND IT DOES SOME

 6    CALCULATIONS WITH THAT.

 7              SO I WANT TO EMPHASIZE, THIS IS JUST THE

 8    RELEVANT SNIPPET OF THE OVERALL CODE.  THERE'S MUCH

 9    MORE CODE THAT MAKES THIS ALL REALLY WORK IN

10    TOTALITY.

11    Q    SO BASED ON YOUR REVIEW OF THE CODE AND OF THE

12    DEVICE, WHAT IS YOUR CONCLUSION AS TO WHETHER THE

13    SAMSUNG GALLERY S II, AT&T, INFRINGES CLAIM 19 OF

14    THE '381 PATENT?

15    A    BASED ON MY REVIEW OF THE DEVICES AND THE

16    CODE, IT IS MY OPINION THAT THE SAMSUNG

17    GALAXY S II, AT&T, INFRINGES CLAIM 19 OF THE '381

18    PATENT IN ALL THREE APPLICATIONS.

19    Q    YOU ANALYZED OTHER SAMSUNG PHONES?

20    A    YES, I DID.

21    Q    AND DOES YOUR OPINION EXTEND TO OTHERS OF THE

22    PHONES THAT YOU EXAMINED?

23    A    YES, 20 OTHER PHONES ALSO INFRINGE THE '381

24    PATENT.

25    Q    CAN WE SHOW THAT TO THE JURY ?
```

1    A    SURE.

2    Q    OKAY.  SO LET'S LOOK AT 27.32.  I'M SORRY,

3    .33?

4    A    WHAT I HAVE HERE IS THE FOUR OTHER PHONES,

5    GALAXY S I9000, GALAXY S II I9100, S 4G, AND THE

6    VIBRANT, ALL SHOWING THE SAME FUNCTIONALITY THAT I

7    WENT THROUGH IN DETAIL EARLIER WITH THE

8    GALAXY S II, AND YOU CAN SEE THAT ALL OF THEM DO

9    THE SAME KIND OF BOUNCING.

10   Q    AND NOW LET'S LOOK AT PDX 27.34?

11   A    THESE ARE FOUR MORE PHONES, THE ACE,

12   CAPTIVATE, CONTINUUM, AND THE DROID CHARGE.

13           AGAIN, EACH OF THEM DO THE SAME

14   FUNCTIONALITY AS I ILLUSTRATED BEFORE IN THE

15   GALLERY APPLICATION.

16   Q    LET'S JUST SEE THAT ONE MORE TIME SINCE WE

17   SHOWED ALL FOUR TOGETHER.

18   A    YOU DRAG TO THE RIGHT, REACH THE EDGE, YOU LET

19   GO, IT BOUNCES BACK.

20   Q    AND 27.35.

21   A    THESE ARE FOUR MORE DEVICES, EXHIBIT 4G, THE

22   EPIC 4G, THE FASCINATE, AND THE INDULGE,

23   ESSENTIALLY DOING WHAT YOU'VE ALREADY SEEN.

24   Q    AND LET'S PLAY THAT ONE MORE TIME.

25   A    AGAIN, DRAG TO THE RIGHT, YOU REACH THE EDGE,

```
1    AN AREA BEYOND THE EDGE IS SEEN, AND IT BOUNCES

2    BACK WHEN YOU LET GO.

3    Q     AND 27.36.

4    A     THIS IS ANOTHER FIVE PHONES, THE INFUSE, THE

5    MESMERIZE, THE NEXUS S 4G, THE PREVAIL, AND THE

6    REPLENISH.

7              AGAIN, SAME FUNCTIONALITY.  YOU DRAG TO

8    THE RIGHT, WHEN YOU LET GO, IT BOUNCES BACK.

9    Q     AND THEN 27.37.

10   A     AND THESE ARE THE TWO TABLET DEVICES RUNNING

11   THE GALLERY.  THEY DO THE EXACT SAME FUNCTIONALITY.

12   YOU REACH THE EDGE, YOU LET GO, IT BOUNCES BACK.

13   Q     NOW, DID YOU ALSO SHOW -- LOOK AT SOME OTHER

14   SAMSUNG PRODUCTS IN CONNECTION WITH THE CONTACTS

15   APPLICATION?

16   A     YES, I DID.  AND I THINK I'VE ILLUSTRATED FOUR

17   MORE OF THEM HERE.

18   Q     27.38?

19   A     RIGHT.  THIS IS THE FASCINATE, THE GALAXY S

20   4G, THE GEM, AND THE VIBRANT, AND THEY ALL DO THE

21   SAME BOUNCE BACK FUNCTIONALITY IN THE CONTACTS

22   LIST.

23             AND IN THIS CASE YOU DRAG UP AND DOWN,

24   YOU REACH THE EDGE, IT SHOWS AN AREA BEYOND THE

25   EDGE, AND IT BOUNCES BACK.
```

1    Q    DO OTHER SAMSUNG PRODUCTS ALSO INFRINGE IN THE

2    CONTACTS LIST APPLICATION?

3    A    YES, THEY DO.  I BELIEVE THERE'S A TOTAL OF 16

4    OF THE 21 ACCUSED PRODUCTS THAT INFRINGE IN THE

5    CONTACTS LIST APPLICATION.

6    Q    AND DO YOU HAPPEN TO REMEMBER WHAT THE OTHERS

7    ARE?

8    A    I DON'T REMEMBER, BUT I HAVE A LIST HERE AND I

9    CAN READ THEM OUT IF YOU WANT ME TO.

10   Q    THAT WOULD BE GREAT.

11   A    SO THE ONES THAT DO INFRINGE IN THE CONTACTS

12   LIST ARE THE CAPTIVATE, THE CONTINUUM, THE DROID

13   CHARGE, THE EPIC 4G, THE EXHIBIT 4G, THE FASCINATE,

14   THE GALAXY ACE, THE GALAXY S I9000, THE GALAXY S II

15   I9100, THE GALAXY S II, AT&T, WHICH WE'VE ALREADY

16   GONE THROUGH IN DETAIL, THE GALAXY S 4G, THE GEM,

17   THE INDULGE, THE INFUSE 4G, THE MESMERIZE, AND THE

18   VIBRANT.

19   Q    HAVE YOU PREPARED ADDITIONAL VIDEOS DEPICTING

20   INFRINGEMENT IN THE BROWSER APPLICATION?

21   A    YES, I HAVE.

22   Q    LET'S TAKE A LOOK AT THOSE, 27.39.

23   A    THESE ARE FOUR SAMSUNG DEVICES, THE ACE,

24   EXHIBIT 4G, GALAXY S II I9100, AND THE GALAXY

25   TAB 10.1, ALL OF WHICH ARE PERFORMING THE '391,

```
 1    CLAIM 19 FUNCTIONALITY IN THE BROWSER APPLICATION.

 2              AND IF WE PLAY THAT AGAIN JUST VERY

 3    QUICKLY, YOU CAN SEE YOU DRAG THE DOCUMENT, WHEN AN

 4    EDGE IS REACHED, AN AREA BEYOND THE EDGE, THE GRAY

 5    AREA IS SHOWN.  WHEN YOU LET GO, IT BOUNCES BACK.

 6    Q    HAVE YOU PREPARED A COMPILATION OF THESE

 7    VIDEOS FOR THE JURY?

 8    A    YES, I PREPARED A WHOLE SET OF VIDEOS OVER THE

 9    COURSE OF THIS THAT ILLUSTRATE THE DIFFERENT

10    INFRINGEMENT.

11    Q    AND ARE THOSE VIDEOS IN PX 64?

12    A    YES, THEY ARE.

13              MR. JACOBS:  YOUR HONOR, WE OFFER PX 64

14    IN EVIDENCE.

15              THE COURT:  ANY OBJECTION?

16              MR. JOHNSON:  NO OBJECTION, YOUR HONOR.

17              THE COURT:  ALL RIGHT.  THEY'RE ADMITTED.

18              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19              64, HAVING BEEN PREVIOUSLY MARKED FOR

20              IDENTIFICATION, WAS ADMITTED INTO

21              EVIDENCE.)

22    BY MR. JACOBS:

23    Q    GOING BACK TO THE GALLERY APPLICATION FOR A

24    MINUTE --

25              YOU CAN TAKE THAT DOWN, MR. LEE, THANK
```

1    YOU.

2              GOING BACK TO THE GALLERY APPLICATION FOR

3    A MINUTE, HAVE YOU HEARD OF SOMETHING CALLED THE

4    HOLD STILL BEHAVIOR IN SOME SAMSUNG PRODUCTS?

5    A    YES, I HAVE.

6    Q    AND WHAT IS YOUR UNDERSTANDING OF THAT

7    BEHAVIOR AND HOW DOES IT AFFECT YOUR INFRINGEMENT

8    ANALYSIS?

9    A    THIS IS BEHAVIOR THAT SEEMS TO MANIFEST ITSELF

10   IN SOME SAMSUNG PRODUCTS THAT ARE ACCUSED, BUT NOT

11   ALL, IN THE GALLERY APPLICATION.  AND I HAVE NOT

12   BEEN ABLE TO RELIABLY DUPLICATE IT, BUT IT DOES

13   OCCUR IN SOME OF THOSE PRODUCTS.

14             AND WHAT HAPPENS THERE IS WHEN YOU DRAG

15   THE IMAGE VERY, VERY SLOWLY, VERY GINGERLY, VERY

16   SLOWLY FROM THE EDGE INTO -- SO THE EDGE OF THE

17   DOCUMENT IS PASSED, AND YOU LET GO, IT SIMPLY

18   FREEZES.  IT DOESN'T ACTUALLY DO THE BOUNCE.

19             AND IN THOSE SITUATIONS, THOSE GALLERY

20   APPLICATIONS STILL DO THE BOUNCE FUNCTIONALITY MOST

21   OF THE TIME.

22             SO AS A RESULT, MY OPINION IS THAT THE

23   GALLERY APPLICATION, EVEN ON THOSE DEVICES THAT

24   HAVE THE HOLD STILL BEHAVIOR ONCE IN A WHILE, THEY

25   STILL INFRINGE THE '381 PATENT BECAUSE THE

```
1    INSTRUCTION FOR DOING THE BOUNCE FUNCTIONALITY
2    REMAINS ON THOSE DEVICES.
3    Q    AND SO JUST TO CLARIFY WHERE THIS EXISTS, WHAT
4    APPLICATION DID YOU LEARN OF THE HOLD STILL
5    BEHAVIOR IN?
6    A    THIS WAS IN THE GALLERY APPLICATION ON SOME OF
7    THE SAMSUNG PHONES, BUT NOT ALL OF THE ACCUSED
8    PHONES.
9    Q    AND DOES IT EXIST IN CONTACTS OR THE BROWSER
10   APPLICATION?
11   A    NO.
12   Q    DOES THE -- SO JUST TO SUM UP ON THE HOLD
13   STILL BEHAVIOR, DOES IT AFFECT YOUR INFRINGEMENT
14   ANALYSIS?
15   A    NO, IT DOESN'T.
16   Q    AND THE REASON FOR THAT IS?
17   A    BECAUSE THE INSTRUCTIONS FOR DOING THE BOUNCE
18   BACK FUNCTIONALITY I ALREADY DEMONSTRATED CONTINUE
19   TO EXIST ON THOSE PHONES AND, IN FACT, IS THE
20   DEFAULT BEHAVIOR THAT ONE ENCOUNTERS IN THE USE OF
21   THOSE DEVICES.
22   Q    YOU MENTIONED THAT YOU HAD STUDIED CERTAIN
23   SAMSUNG DOCUMENTS IN CONNECTION WITH YOUR WORK ON
24   THE '381 PATENT.
25        WAS EXHIBIT 46 ONE OF THOSE DOCUMENTS,
```

```
 1   THE BEHOLD 3 USABILITY EVALUATION RESULTS?

 2   A    YES, IT WAS.

 3             MR. JACOBS:  YOUR HONOR, WE OFFER PX 46

 4   INTO EVIDENCE.

 5             MR. JOHNSON:  YOUR HONOR, THERE HASN'T

 6   BEEN A FOUNDATION LAID WITH THIS WITNESS.

 7   OBJECTION.

 8             IT'S ALSO -- AT LEAST BY LOOKING AT THE

 9   DEMONSTRATIVES, HE ONLY REFERS TO THREE PAGES OUT

10   OF THE 94-PAGE DOCUMENT.

11             THERE'S NO FOUNDATION.

12             THE COURT:  ALL RIGHT.  OVERRULED.

13             MR. JACOBS:  THANK YOU.

14             THE COURT:  GO AHEAD.  WHAT WERE YOU

15   GOING TO SAY.

16             MR. JACOBS:  I WAS GOING TO SAY YOU

17   OVERRULED IT EARLIER.

18             THE COURT:  I'VE ALREADY RULED ON THIS

19   OBJECTION.  GO AHEAD.

20             MR. JACOBS:  THANK YOU VERY MUCH.

21             THE COURT:  IT'S ADMITTED.

22             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

23             46, HAVING BEEN PREVIOUSLY MARKED FOR

24             IDENTIFICATION, WAS ADMITTED INTO

25             EVIDENCE.)
```

```
 1    BY MR. JACOBS:

 2    Q    DR. BALAKRISHNAN, WHAT IS PX 46?

 3    A    PX 46 IS AN INTERNAL SAMSUNG DOCUMENT FAIRLY

 4    CREATED BY THE SOFTWARE VERIFICATION GROUP THAT IS

 5    A USABILITY EVALUATION ANALYSIS COMPARING THE

 6    BEHOLD 3 DEVICE, WHICH IS THE CODE NAME FOR THE

 7    VIBRANT PHONE, COMPARING IT TO THE IPHONE.

 8               SO THIS IS AN EVALUATION COMPARING

 9    DIFFERENT FEATURES OF THE BEHOLD 3, OR VIBRANT, TO

10    THE IPHONE.

11    Q    LET'S TAKE A LOOK AT THE SUMMARY PAGE IN THIS

12    DOCUMENT.  AND WHAT DID YOU UNDERSTAND THIS

13    DOCUMENT TO BE DESCRIBING BY WAY OF THE PURPOSE OF

14    THE STUDY THAT WAS DONE?

15    A    ON THIS PAGE, IF YOU LOOK AT THE BACKGROUND,

16    IF YOU CAN HIGHLIGHT THAT BACKGROUND AREA THERE, IT

17    BASICALLY SAYS THE -- THIS EVALUATION IS TO FIGURE

18    OUT THE PERCEIVED QUALITY OF DIFFERENT APPLICATIONS

19    IN THE ANDROID MODEL BEHOLD 3 IN COMPARISON TO THE

20    IPHONE BY EVALUATING IT IN THE AREAS OF EASE OF USE

21    FOR MULTIMEDIA FUNCTIONS, OVERALL AESTHETICS, P-I-M

22    IS PERSONAL INFORMATION MANAGEMENT, AND WEB

23    BROWSING.

24               SO I CONSIDER THIS TO BE COMPARING THESE

25    TWO DEVICES, THE IPHONE TO THE BEHOLD 3 IN THESE
```

1    DIFFERENT AREAS OF USABILITY.

2    Q    AND THIS IS PAGE 14 OF 94 OF THE DOCUMENT.

3    LET'S TAKE A LOOK AT THE EVALUATION OPINIONS PAGE,

4    PAGE 16 OF 94.

5            WHAT DID YOU UNDERSTAND THIS EVALUATION

6    OPINIONS PAGE TO BE CONVEYING?

7    A    SURE.  IF YOU LOOK AT THE FIRST BULLET, YOU

8    CAN HIGHLIGHT THAT, IT VERY CLEARLY SAYS THAT THE

9    RESULTS SHOW THAT THE BEHOLD 3 WAS SHOWN TO BE

10   INFERIOR TO APPLE'S IPHONE IN BOTH THE ACTIONS

11   SUCCESS RATE, SO THIS IS A QUANTITATIVE METHOD

12   WHERE PEOPLE DO THE TASKS THEY WERE ASKED TO DO,

13   AND THE SATISFACTION SCORE, WHICH APPEARS TO BE

14   MORE OF A QUALITATIVE METHOD.  IN OTHER WORDS, DO

15   PEOPLE FEEL COMFORTABLE?  DID THEY LIKE IT AND SO

16   FORTH?  SO THEY EVALUATED AT LEAST TWO METHODS.

17   Q    SO NOW LET'S LOOK AT AESTHETICS BROWSING IN

18   EXHIBIT 46, THIS INTERNAL SAMSUNG DOCUMENT.  WHAT

19   DID YOU SEE ON THIS, ON SLIDE 47 OF THIS ANALYSIS?

20   A    SURE.  THIS ANALYSIS HERE IS TALKING ABOUT

21   EVALUATION OF THE WEB BROWSER, AND IT SAYS WHEN THE

22   WEB PAGE IS DRAGGED TO ITS END POINT IN THE

23   BEHOLD 3, NO VISUAL EFFECT IS SHOWN, ONLY

24   INFORMATION IS PROVIDED WITHOUT ANY EFFECT.

25            IN OTHER WORDS, IT JUST STOPS WHEN YOU

1    REACH THE EDGE OF THE DOCUMENT.

2              IN CONTRAST, IT SPECIFICALLY NOTES THAT

3    THE IPHONE GENERATES FUN FOR THE USER WITH A VISUAL

4    ELEMENT THAT SEEMS TO BOUNCE.

5              SO THIS INDICATES TO ME THAT THE PEOPLE

6    WHO DID THIS STUDY AT SAMSUNG CLEARLY UNDERSTOOD

7    AND RECOGNIZED THE VALUE OF THE BOUNCE

8    FUNCTIONALITY THAT WAS SEEN IN THE IPHONE, WHICH

9    THE BEHOLD 3 DID NOT HAVE.

10   Q    SO WHAT WAS THE RECOMMENDATION IN VIEW OF THAT

11   FINDING?

12   A    THE RECOMMENDATION WAS THAT -- IN THE SECTION

13   AT THE BOTTOM OF THE SLIDE, YOU SEE THERE'S

14   DIRECTION OF IMPROVEMENT.  IT SAYS, "PROVIDE A FUN

15   VISUAL EFFECT WHEN DRAGGING A WEB PAGE."

16             AND IT GOES ON TO SAY THAT THE

17   "CORRESPONDING EFFECT IS NOT SUPPORTED CURRENTLY."

18             AND THIS IS AN ISSUE SHARED BY THE

19   BROWSER, AGAIN, AND IT DECLARES THAT -- AND I'LL

20   NOTE THAT SUBSEQUENT VERSIONS OF SAMSUNG PHONES

21   THAT FALL WITHIN THIS STUDY DOES IMPLEMENT A FUN,

22   VISUAL EFFECT WHICH IS, IN FACT, THE BOUNCE

23   FUNCTIONALITY THAT WE HAVE ALREADY SEEN ON

24   DIFFERENT VIDEOS AND WHICH IS WHAT THEY ANALYZED

25   AND FOUND IN THE IPHONE IN THIS STUDY.

2762

1    Q    AND JUST IN THE MIDDLE OF THAT PAGE, DO YOU

2    SEE WHERE IT SAYS, ON THE BEHOLD 3, IT DESCRIBES

3    ITS BEHAVIOR?

4    A    YES.  SURE.  WE CAN HIGHLIGHT THAT.

5         IT SAYS -- AND THIS IS ON BEHOLD 3 -- THE

6    WEB BROWSER IS DRAGGED BEYOND THE EDGE AND IT SAYS

7    "THE BEHAVIOR IS DULL BECAUSE NO SPECIAL EFFECTS

8    ARE PROVIDED WHEN DRAGGING WEB PAGE TO THE

9    BOTTOM-MOST OR SIDE EDGES."

10        AND YOU CAN SEE -- HOPEFULLY YOU CAN SEE

11   ON THIS IMAGE ON THE LEFT, THE PAGE DOESN'T GO

12   BEYOND THE EDGE.  IT VISUALLY SUFFERS FROM THE

13   FROZEN SCREEN PROBLEM I TALKED ABOUT EARLIER.

14   Q    AND THEN IF YOU LOOK ON THE RIGHT-HAND PORTION

15   OF THE PAGE AND THE DESCRIPTION OF THE IPHONE?

16   A    AND HERE YOU CAN SEE ON THE LEFT-HAND SIDE, AS

17   WELL AS THE IMAGE GOING BEYOND THE EDGE AND SHOWING

18   AN AREA BEYOND THE EDGE.

19        ON THE RIGHT HAND SIDE, THE COMMENTARY

20   SAYS "IF A WEB PAGE IS DRAGGED TO THE EDGE AND THE

21   HAND IS RELEASED, A BOUNCING VISUAL EFFECT IS

22   PROVIDED."  SO THAT'S EXACTLY THE '381 PATENT.

23   Q    THANK YOU, DR. BALAKRISHNAN.

24        LET'S TAKE A LOOK AT EXHIBIT PX 57.  NOW,

25   IS PX 57 ANOTHER DOCUMENT YOU STUDIED IN THE COURSE

```
 1    OF YOUR WORK ON THE '381 PATENT?

 2    A    YES, IT IS.

 3              MR. JACOBS:  YOUR HONOR, WE OFFER PX 57

 4    IN EVIDENCE.

 5              MR. JOHNSON:  OBJECTION, YOUR HONOR.  NO

 6    FOUNDATION.

 7              MR. JACOBS:  JUST PROVIDED THE

 8    FOUNDATION, YOUR HONOR.

 9              THE COURT:  ALL RIGHT.  OVERRULED.

10              GO AHEAD.  IT'S ADMITTED.

11              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

12              57, HAVING BEEN PREVIOUSLY MARKED FOR

13              IDENTIFICATION, WAS ADMITTED INTO

14              EVIDENCE.)

15    BY MR. JACOBS:

16    Q    WHAT IS PX 57, DR. BALAKRISHNAN?

17    A    PX 57 IS ANOTHER USABILITY EVALUATION DOCUMENT

18    CREATED BY SAMSUNG SOFTWARE VERIFICATION GROUP THAT

19    IN TURN -- SORRY -- INTERNAL SAMSUNG DOCUMENT, AND

20    THIS IS COMPARING A SAMSUNG TABLET TO THE IPAD 2,

21    AGAIN, FOR THE SAME BOUNCE FUNCTIONALITY, OR THE

22    LACK THEREOF IN THE ORIGINAL TABLET DESIGN IN

23    SAMSUNG'S CASE.

24    Q    SO LET'S TAKE A LOOK AT THE OVERVIEW.

25              AND WHAT DOES THE OVERVIEW DESCRIBE AS
```

1    KIND OF THE IMPORTANT POINTS OF THIS STUDY?

2    A    ONE OF THE IMPORTANT POINTS IS, IF YOU LOOK AT

3    THE SECOND MAJOR BULLET, IT SAYS "MAJOR USABILITY

4    PROBLEM AREAS," AND THE PART THAT'S RELEVANT TO THE

5    '381 PATENT IS THE LAST SUPPLEMENT OF THIS

6    PARAGRAPH.  IT STATES THAT "GUI," OR GRAPHICAL USER

7    INTERFACE, THAT'S WHAT THE G-U-I STANDS FOR, "AND

8    VISUAL EFFECT ARE LACKING IN COMPARISON TO THE

9    IPAD 2," AND THEN IT TALKS ABOUT FOUR APPLICATIONS

10   THAT'S LACKING FOR, AND ONE OF THEM IS THE GALLERY

11   APPLICATION.

12   Q    LET'S TAKE A LOOK AT ISSUE 51 IN THIS

13   DOCUMENT, THIS INTERNAL SAMSUNG DOCUMENT.

14        WHAT DOES THIS, THE PAGE OF THIS REPORT

15   DESCRIBE AS AN ISSUE?

16   A    THIS IS DESCRIBING AN ISSUE WITH THE BROWSER

17   ON THE PHONE, THE SAMSUNG TABLET, AND BASICALLY IF

18   YOU LOOK AT THE NEXT BULLET, THE FIRST BULLET POINT

19   UP THERE, IT SAYS "DURING THE TOP-MOST/BOTTOM-MOST

20   DIAGONAL MOVEMENTS, THERE IS NO SPRINGING BOUNCE

21   EFFECT."

22        AND YOU CAN SEE THAT ON THE LEFT-HAND

23   SIDE ARE THE IMAGE AND THE COMMENTARY TO THE RIGHT

24   OF THE LEFT IMAGE WHERE THEY'VE DRAGGED IT BEYOND

25   THE EDGE AND NOTHING IS HAPPENING.  IT DOESN'T

```
 1    BOUNCE.  IT SUFFERS FROM THE FROZEN SCREEN PROBLEM.

 2             AND THEN YOU LOOK AT THE COMPARISON,

 3    WHICH IS THE IPAD 2, AND IT CLEARLY GOES BEYOND THE

 4    EDGE AND IT SAYS IN THE COMMENTARY ON THE RIGHT, IT

 5    SAYS, "IN THE CASE OF IPAD 2, THERE IS A FUN

 6    ELEMENT FROM A NATURAL BOUNCE EFFECT THAT FOLLOWS

 7    THE HAND GESTURES."

 8             SO THIS THEN, THIS IS THE '381

 9    FUNCTIONALITY THAT SAMSUNG HAS CLEARLY SEEN IN THE

10    IPAD 2 AND FOUND THAT TO BE LACKING IN THEIR OWN

11    TABLET.

12    Q    AND WHAT WAS THIS -- CAN WE GO BACK TO THE

13    FULL PAGE VIEW?

14             AND HOW WAS THIS LABELED IN TERMS OF ITS

15    LEVEL OF IMPORTANCE BY SAMSUNG AS AN ISSUE?

16    A    IN A SUBSEQUENT PAGE I BELIEVE IT WAS LABELED

17    AS CRITICAL.  ON THIS PAGE IT WAS LABELED AS

18    SERIOUS.

19    Q    SO LET'S LOOK AT THAT SUBSEQUENT PAGE.

20    A    I DON'T --

21    Q    VISUAL EFFECT COMPARED TO IPAD 2.

22    A    SO THIS IS A CONTINUATION OF THAT SAME

23    DISCUSSION AND THEY'RE TALKING ABOUT IT LACKING --

24    IT LACKS THE FUN OR WOW EFFECT.  THAT'S THE FIRST

25    BULLET.
```

```
 1              AND IF YOU LOOK AT THE FIRST ROW THERE,
 2    IT TALKS ABOUT THE -- ACTUALLY, LET'S LOOK AT --
 3    YEAH, IF YOU LOOK AT THE MIDDLE IMAGE AND THE TEXT,
 4    RIGHT, THAT ONE, IT SAYS, "THE TOP-MOST/BOTTOM-MOST
 5    AND DIAGONAL MOVEMENT LACK THE BOUNCE EFFECT," SO
 6    THIS IS TALKING ABOUT WHAT I JUST TALKED ABOUT FROM
 7    THE PREVIOUS PAGE.
 8              AND IF YOU GO BACK TO THE PREVIOUS PAGE,
 9    YOU'LL SEE ON THE RIGHT-HAND SIDE, IT SAYS FOR
10    BROWSER, "THE BOUNCE EFFECT IS SCHEDULED TO BE
11    REVIEWED."  IN OTHER WORDS, THEY INTEND TO LOOK AT
12    THAT FUNCTIONALITY IN LIGHT OF WHAT THEY FOUND.
13    Q    AND HOW DID THIS GET LABELED IN TERMS OF ITS
14    LEVEL OF IMPORTANCE TO SAMSUNG AS AN ISSUE IN ITS
15    USER INTERFACE?
16    A    THIS WAS LABELED AS CRITICAL AS YOU CAN SEE ON
17    THE TOP RIGHT CORNER OF THE SLIDE.
18    Q    AND SO WHAT DO YOU OBSERVE AS A TECHNICAL
19    EXPERT WHEN YOU LOOK AT THESE DOCUMENTS AND YOU
20    LOOK AT THE SAMSUNG PRODUCTS?
21    A    AS A TECHNICAL EXPERT, WHEN I LOOK AT THESE
22    DOCUMENTS IT IS VERY CLEAR TO ME FROM THE DOCUMENTS
23    THAT THEY HAVE -- SAMSUNG HAS, A, STUDIED THIS
24    PROBLEM, RECOGNIZED THE LIMITATIONS OF THE CURRENT
25    DESIGN IN COMPARISON TO WHAT THE IPHONE AND THE
```

```
 1    IPAD WERE DOING, RECOGNIZED THE IPHONE AND IPAD HAD

 2    A BETTER, FUN, BOUNCING SOLUTION; AND IN SUBSEQUENT

 3    VERSIONS OF THE PHONES AND TABLETS THAT WE SEE IN

 4    THE MARKET, WHICH I'VE SHOWN SOME OF THE EXAMPLES

 5    OF, THAT EXACT SAME FUNCTIONALITY, THAT BOUNCING

 6    FUNCTIONALITY, HAS BEEN IMPLEMENTED.

 7    Q    DID YOU LOOK AT OTHER INTERNAL SAMSUNG

 8    DOCUMENTS IN ORDER TO ANALYZE THE LEVEL OF

 9    IMPORTANCE, THE LEVEL OF ANALYSIS SAMSUNG DID OF

10    THE BOUNCE BACK FEATURE?

11    A    YES.  I LOOKED AT SEVERAL OTHER SAMSUNG

12    INTERNAL DOCUMENTS, INCLUDING SOME E-MAILS THAT ALL

13    POINT TO THE -- THAT THEY HAVE ANALYZED THIS

14    FUNCTIONALITY AND DEEMED IT TO BE AN IMPORTANT

15    FUNCTION.

16          MR. JACOBS:  YOUR HONOR, AT THIS POINT I

17    WOULD LIKE TO MOVE INTO EVIDENCE -- I'VE SHOWN

18    THESE TO COUNSEL -- JX 1023, THE NEXUS S 4G; JX

19    1024, THE REPLENISH; JX 1028, THE EXHIBIT 4G; AND

20    JX 1036, THE GALAXY TAB.

21          MR. JOHNSON:  NO OBJECTION.

22          THE COURT:  OKAY.  1024 IS THE REPLENISH;

23    1028 IS THE EXHIBIT 4G; AND 1026 IS THE GALAXY TAB?

24          MR. JACOBS:  1036 IS THE GALAXY TAB; AND

25    1028 IS THE EXHIBIT 4G.
```

2768

```
1              THE COURT:  THE GALAXY TAB HAS ALREADY
2    BEEN ADMITTED.
3              MR. JACOBS:  THIS IS A -- IT'S POSSIBLE,
4    YOUR HONOR.  THIS IS THE 7 -- SOMETIMES CALLED THE
5    7.0.
6              THE COURT:  OKAY.  7.0.  ALL RIGHT.  SO
7    IT'S THE 1023, 1024, 1028, AND 1036.  IS THAT --
8              MR. JACOBS:  YES.
9              THE COURT:  THOSE FOUR.
10             MR. JACOBS:  THAT'S CORRECT, YOUR HONOR.
11             THE COURT:  AND THERE'S NO OBJECTION;
12   CORRECT?
13             MR. JOHNSON:  CORRECT.
14             THE COURT:  THOSE ARE ALL ADMITTED.
15             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBERS
16             1023, 1024, 1028, 1036, HAVING BEEN
17             PREVIOUSLY MARKED FOR IDENTIFICATION,
18             WERE ADMITTED INTO EVIDENCE.)
19   BY MR. JACOBS:
20   Q    SO DR. BALAKRISHNAN, YOU STUDIED THE '381
21   PATENT, YOU STUDIED THE SAMSUNG DEVICES, YOU
22   STUDIED THE SAMSUNG INTERNAL DOCUMENTS.  THE
23   SAMSUNG DEVICES YOU IDENTIFIED INFRINGE CLAIM 19 OF
24   THE '381 RUBBER BANDING PATENT?
25   A    YES, THE 21 DEVICES I IDENTIFIED INFRINGE
```

1    CLAIM 19 OF THE '381 PATENT.

2    Q    AND THE INTERNAL DOCUMENTS TELL YOU WHAT ABOUT

3    HOW SAMSUNG CAME TO INFRINGE THAT PATENT?

4    A    THE INTERNAL DOCUMENTS INDICATE TO ME THAT

5    THEY'D STUDIED THE PROBLEM, RECOGNIZED A SOLUTION

6    PROVIDED BY THE IPHONE AND THE IPAD 2 AS BEING A

7    GOOD SOLUTION TO THE PROBLEM AND THE RESULTING

8    DEVICES THEMSELVES MANIFEST -- THEY SHOW THAT THE

9    SOLUTION THAT THEY IMPLEMENTED WAS, INDEED, THE

10   BOUNCING FUNCTIONALITY OF THE '381 PATENT.

11              MR. JACOBS:  THANK YOU, DR. BALAKRISHNAN.

12              THE WITNESS:  THANK YOU.

13              THE COURT:  ALL RIGHT.  THE TIME IS

14   11:23.

15                    **CROSS-EXAMINATION**

16   BY MR. JOHNSON:

17   Q    HELLO, DR. BALAKRISHNAN.

18   A    GOOD MORNING.

19   Q    I AM KEVIN JOHNSON.

20              GOOD MORNING, LADIES AND GENTLEMEN OF THE

21   JURY.

22              I WANT TO START ACTUALLY,

23   DR. BALAKRISHNAN, WITH -- YOU BEGAN WORKING AS AN

24   EXPERT FOR APPLE BACK IN MAY AND JUNE OF 2011

25   TIMEFRAME; RIGHT?

1    A    NO, ACTUALLY.  I THINK I DID SOME WORK FOR

2    THEM ON ANOTHER CASE EARLIER THAN THAT IN 2010.

3    Q    OKAY.  YOUR WORK IN THIS CASE BEGAN BACK IN

4    MAY AND JUNE OF 2011; RIGHT?

5    A    ROUGHLY, THAT'S CORRECT.

6    Q    AND YOU WERE TOLD, BACK WHEN YOU WERE

7    RETAINED, THAT IN THIS CASE, APPLE HAD ALLEGED THAT

8    SAMSUNG PRODUCTS INFRINGED THE '381 PATENT BEFORE

9    YOU EVEN BEGAN YOUR OWN INFRINGEMENT ANALYSIS;

10   RIGHT?

11   A    I DON'T KNOW WHETHER EXACTLY I WAS TOLD THAT.

12   IN FACT, I BELIEVE I WAS TOLD THAT THEY WERE

13   ALLEGING INFRINGEMENT AND I WAS ASKED TO ANALYZE

14   THE DEVICES TO DETERMINE IF, INDEED, THAT WAS TRUE.

15   Q    YOU WERE TOLD BY APPLE'S COUNSEL THAT THEY

16   WERE ALLEGING SAMSUNG'S PRODUCTS INFRINGE THE '381

17   PATENT; RIGHT?

18   A    I WAS TOLD BY APPLE'S COUNSEL THAT THAT WAS

19   THE ALLEGATION, THAT'S RIGHT.

20   Q    AND YOU THEN AGREED WITH APPLE'S CONCLUSION

21   THAT THERE WAS INFRINGEMENT; RIGHT?

22   A    AFTER MY ANALYSIS, YES.

23   Q    AND, AGAIN, THAT WAS AFTER YOU WERE HIRED BY

24   APPLE AND AFTER APPLE'S COUNSEL TOLD YOU WHAT THE

25   ALLEGATIONS WERE IN THIS CASE; RIGHT?

```
 1    A     AFTER I WAS HIRED AND AFTER I WAS TOLD ABOUT

 2    THE ALLEGATIONS AND AFTER I DID MY OWN

 3    INVESTIGATION AS TO WHETHER THE FUNCTIONALITY WAS

 4    PRESENT --

 5    Q     AND --

 6    A     -- IN THE DEVICES.

 7    Q     AND AT THAT TIME, YOU CONCLUDED THAT THERE WAS

 8    INFRINGEMENT OF THE DEVICES BY LOOKING AT THE

 9    OPERATION OF THE DEVICES; RIGHT?

10    A     I CONCLUDED THERE WAS INFRINGEMENT BY LOOKING

11    AT THE OPERATION OF THE DEVICES, AND I ALSO

12    SUBSEQUENTLY LOOKED AT THE SOURCE CODE AS WELL.

13    Q     BUT AT THAT TIME, I'M GOING BACK TO LAST

14    SUMMER, YOU DIDN'T LOOK AT THE UNDERLYING SOURCE

15    CODE; RIGHT?

16    A     MY -- BEFORE MY CONCLUSIONS IN MY EXPERT

17    REPORT, I HAD ALREADY LOOKED AT THE UNDERLYING

18    SOURCE CODE.  SO IF YOU'RE ASKING FOR WHAT I LOOKED

19    AT WHEN I CONCLUDED INFRINGEMENT, YES, I HAD LOOKED

20    AT THE SOURCE CODE.

21    Q     I'M TALKING ALMOST A YEAR AGO, AUGUST 16TH TO

22    BE PRECISE, THAT'S WHEN I -- DO YOU REMEMBER I TOOK

23    YOUR DEPOSITION WAY BACK THEN?

24    A     YOU'VE TAKEN SEVERAL OF MY DEPOSITIONS.  THAT

25    WAS IN CLAIM CONSTRUCTION, PERHAPS, OR SOMETHING
```

1   ELSE.

2   Q    DO YOU -- DO YOU REMEMBER TESTIFYING THAT YOU

3   DID NOT NEED TO ANALYZE THE UNDERLYING SOURCE CODE

4   IN ORDER TO DETERMINE THAT THERE WAS INFRINGEMENT

5   OF THE '381 PATENT?

6   A    I MIGHT HAVE SAID THAT, YES.

7   Q    NOW, THERE'S ONE INVENTOR THAT'S NAMED ON THE

8   '381 BOUNCE BACK PATENT, RIGHT, MR. BAS ORDING?

9   A    THAT IS CORRECT, YES.

10  Q    AND YOU ARE AWARE THAT MR. ORDING IS STILL ON

11  EMPLOYEE OF APPLE TODAY; RIGHT?

12  A    AS FAR AS I KNOW, YES.

13  Q    AND YOU HAVE NOT SPOKEN TO MR. ORDING AS PART

14  OF YOUR WORK IN THIS CASE, HAVE YOU?

15  A    I HAVE NOT SPOKEN TO MR. ORDING.

16  Q    NOW, MR. ORDING IS A PERSON OF ORDINARY SKILL

17  IN THE ART; RIGHT?

18          MR. JACOBS:  OBJECTION, YOUR HONOR.

19  THAT'S A LEGAL TERM, LEGAL CONCEPT.  HE MAY BE

20  ORDINARY.  HE MAY BE EXTRAORDINARY.

21          THE COURT:  CAN YOU REPHRASE THE

22  QUESTION, PLEASE?

23  BY MR. JOHNSON:

24  Q    MR. ORDING UNDERSTANDS THE TECHNOLOGY THAT'S

25  DISCLOSED IN HIS PATENT?

```
 1            LET'S STRIKE THAT.  LET ME ASK YOU A
 2    DIFFERENT WAY.
 3            MR. ORDING UNDERSTANDS THE GENERAL IDEA
 4    OF BOUNCE BACK, OBVIOUSLY, SINCE HE'S THE INVENTOR;
 5    RIGHT?
 6    A    I WOULD ASSUME HE DOES.  I HAVE NOT SPOKEN TO
 7    HIM, SO I CAN'T SPEAK TO WHAT HE KNOWS IN HIS HEAD.
 8    Q    BUT YOU REMEMBER -- YOU REVIEWED HIS
 9    DEPOSITION TRANSCRIPT IN THIS CASE?
10    A    YES.
11    Q    AND DO YOU RECALL FROM READING HIS DEPOSITION
12    TRANSCRIPT THAT HE HAD A HARD TIME UNDERSTANDING
13    THE MEANING OF THE WORDS OF THE '381 PATENT CLAIMS?
14    A    NO, I DO NOT RECALL THAT PART OF THE
15    DEPOSITION TRANSCRIPT.
16    Q    LET ME SHOW YOU -- LET ME GO AHEAD AND PASS
17    OUT THE BINDERS.
18            SO THERE SHOULD BE A COUPLE OF BINDERS UP
19    THERE IN FRONT OF YOU?
20    A    I ONLY HAVE MY DIRECT BINDER HERE.
21    Q    OKAY.  CROSS, PLEASE.
22    A    OH, THERE'S SOME OTHERS LABELED FOR A
23    DIFFERENT WITNESS BEHIND ME.
24    Q    THOSE PROBABLY WON'T HELP.
25    A    PROBABLY NOT.
```

```
 1    Q    ALL RIGHT.  WE'RE GOING TO COME BACK TO

 2   MR. ORDING.

 3             YOUR HONOR, IF WE MAY APPROACH?

 4             THE COURT:  PLEASE, GO AHEAD.

 5   BY MR. JOHNSON:

 6    Q    AND IN THE DEPOSITION -- IN THE -- IN ONE OF

 7   THE BINDERS, THERE YOU SHOULD FIND THE ORDING

 8   DEPOSITION TRANSCRIPT FROM AUGUST 9TH, 2011.

 9    A    CAN YOU POINT ME TO A TAB?

10             MR. JOHNSON:  MAY I APPROACH, YOUR HONOR,

11   JUST TO HELP HIM FIND IT?

12             THE COURT:  PLEASE, GO AHEAD.  PLEASE.

13             THE WITNESS:  BECAUSE THEY ALL HAVE

14   NUMBERS ON THEM.

15             MR. JACOBS:  WHERE IS IT?

16             MR. JOHNSON:  IT'S THE AUGUST 9TH.

17             MR. JACOBS:  WHICH BINDER IS IT?

18             MR. JOHNSON:  IT SHOULD BE IN THE SECOND

19   BINDER.

20    Q    AND IF I CAN TURN YOUR ATTENTION TO PAGE 28,

21   LINE 23 THROUGH PAGE 29, LINE 15.

22    A    SO WHEN YOU SAY PAGE, DO YOU MEAN THE --

23    Q    THE SMALL PAGES.

24    A    THE SMALL PAGES.  OKAY.  I'M AT PAGE 28.

25    Q    AND IF YOU LOOK AT LINE 23.
```

```
 1    A    OKAY.

 2    Q    DO YOU SEE I WAS ASKING HIM QUESTIONS THERE

 3    ABOUT CLAIMS 19 AND 20?

 4             MR. JACOBS:  YOUR HONOR, WE OBJECT TO

 5    THIS LINE OF QUESTIONING.

 6             THE COURT:  WHAT'S THE OBJECTION?

 7             MR. JACOBS:  THE OBJECTION IS THIS IS

 8    HEARSAY BY MR. ORDING, WHO IS AN AVAILABLE WITNESS.

 9    THE COURT HAS ALREADY RULED ON SIMILAR SOURCE OF

10    USES.

11             MR. JOHNSON:  YOUR HONOR, HE SAID HE

12    REVIEWED THE TRANSCRIPT AS PART OF HIS WORK IN THIS

13    CASE.

14             THE COURT:  OVERRULED.

15             GO AHEAD.

16             MR. JACOBS:  IT CAN'T BE IMPEACHING

17    TESTIMONY, YOUR HONOR.  THERE'S NO TESTIMONY THAT

18    HE'S ELICITED FROM DR. BALAKRISHNAN.

19             THE COURT:  OVERRULED.

20             GO AHEAD, PLEASE.

21             MR. JOHNSON:  CAN WE PUT IT UP, YOUR

22    HONOR?

23             THE COURT:  GO AHEAD.

24             MR. JOHNSON:  RYAN, 28:23.

25    Q    DO YOU SEE I ASKED THE QUESTION, "IF YOU LOOK
```

1776

```
1   AT CLAIMS 19 AND 20, WHICH APPEAR IN COLUMN 36 --

2   THE BOTTOM OF 36 AND THEN 37" --

3            MR. JACOBS:  YOUR HONOR, WE NEED YOU TO

4   RULE ON THE OBJECTION BECAUSE THE WITNESS WAS ASKED

5   FOR A LEGAL CONCLUSION AND A RECORD WAS TIMELY

6   MADE.

7            THE COURT:  I OVERRULED THE OBJECTION.

8            WHICH OBJECTION ARE YOU TALKING ABOUT?

9            MR. JACOBS:  NOW I'M TALKING ABOUT THE

10  OBJECTION THAT CALLS FOR A LEGAL CONCLUSION AND

11  EXPERT TESTIMONY IN THE PASSAGE THAT IS BEING

12  DISPLAYED TO THE JURY WHICH SHOULD NOT BE.

13           THE COURT:  OVERRULED.

14           GO AHEAD, PLEASE.

15           MR. JOHNSON:  MAY WE PUT IT BACK UP?

16           THE COURT:  YES.

17           MR. JOHNSON:  "QUESTION:  AND YOU'LL SEE

18  THAT THEY USE A LOT OF THE SAME TERMS.  AND I CAN

19  GO THROUGH THESE ONE AT A TIME, BUT I WANTED TO ASK

20  YOU IF YOU HAVE A SIMILAR PROBLEM WITH READING --

21  OF UNDERSTANDING 'FIRST,' 'SECOND,' 'THIRD,'

22  'FOURTH PORTION' IN THOSE TERMS.  I JUST WANT TO

23  KNOW IF YOU HAVE THE SAME ANSWER."

24           ANSWER BY THE WITNESS, MR. ORDING:

25  "YEAH, I CAN -- LEGALLY, I'M NOT SURE WHAT THAT
```

1    MEANS.  I'M NOT SURE IF THEY MEAN THE SAME THING OR

2    NOT.  IN GENERAL, I JUST -- I'M NOT SURE WHAT IT

3    MEANS."

4    Q    DOES THIS REFRESH YOUR RECOLLECTION THAT

5    MR. ORDING HAD TROUBLE UNDERSTANDING WHAT THE

6    MEANING OF HIS CLAIMS WERE IN THE '381 PATENT?

7    A    NOT COMPLETELY, BECAUSE WHAT I'M SEEING HERE

8    IS JUST A PORTION OF THE TRANSCRIPT, AND I NOTE

9    THAT YOUR QUESTION SEEMS TO REFER TO AN EARLIER --

10   WHEN YOU SAY "SIMILAR PROBLEM," I NEED TO GO BACK

11   AND UNDERSTAND WHAT THAT SIMILAR PROBLEM HE HAD

12   EARLIER WAS, BECAUSE THIS SEEMS TO BE AFTER A LONG

13   LINE OF QUESTIONING.

14   Q    LET'S LOOK AT PLAINTIFF'S EXHIBIT 27.29.

15            BEFORE YOU PUT IT UP, RYAN -- YOU

16   OBVIOUSLY REVIEWED THE SLIDES, THE DEMONSTRATIVE

17   SLIDES IN CONNECTION WITH YOUR WORK IN THIS CASE

18   THAT WERE PROVIDED TO SAMSUNG'S COUNSEL; RIGHT?

19   A    MY DEMONSTRATIVE SLIDES --

20   Q    YES.

21   A    -- THAT I USED IN MY DIRECT?

22   Q    THE ONES THAT YOU USED IN YOUR DIRECT AND THAT

23   WERE PROVIDED TO US.

24   A    YES.

25   Q    OKAY.  AND YOU HELPED PREPARE THOSE SLIDES?

```
 1    A    OF COURSE.

 2    Q    SO LET'S GO AHEAD AND -- AND YOU APPROVED THEM

 3    ULTIMATELY?

 4    A    SURE.

 5    Q    OKAY.  LET'S PUT UP PDX 27.29.

 6              NOW, THIS IS THE SLIDE THAT YOU'RE

 7    RELYING ON TO SHOW THAT SAMSUNG'S GALAXY S II

 8    INFRINGES THE '381 PATENT; RIGHT?

 9    A    SO I'LL JUST NOTE, I THINK THIS SLIDE WASN'T

10    ACTUALLY USED IN MY DIRECT TODAY.  THIS IS AN

11    EARLIER VERSION.

12    Q    AND I'M ASKING YOU ABOUT THIS SLIDE THAT WAS

13    PROVIDED TO US, WHICH YOU SAID YOU HELPED PREPARE

14    AND APPROVED, AND I'M ASKING YOU ABOUT -- THIS IS A

15    SLIDE THAT YOU RELY ON TO SHOW THAT SAMSUNG'S

16    GALAXY S II INFRINGES THE '381 PATENT.  RIGHT?

17              MR. JACOBS:  YOUR HONOR, I THINK THE

18    WITNESS HAS ALREADY TESTIFIED THAT WE DIDN'T USE

19    THIS DEMONSTRATIVE IN HIS DIRECT, SO TO SAY THAT HE

20    RELIES ON IT --

21              MR. JOHNSON:  THEY ADDRESSED THIS VERY

22    SAME ELEMENT IN HIS DIRECT.

23              THE COURT:  OVERRULED.

24              GO AHEAD.  PLEASE ANSWER THE QUESTION.

25              THE WITNESS:  SO THE QUESTION IS DID I
```

2779

```
 1    RELY ON THIS SLIDE?  THE ANSWER IS NO, I DID NOT
 2    RELY ON THIS SLIDE TODAY.
 3    BY MR. JOHNSON:
 4    Q    BECAUSE THIS SLIDE IS INCORRECT; RIGHT?
 5    A    I DIDN'T SAY THAT.  I SAID I DID NOT RELY ON
 6    THIS SLIDE.
 7    Q    I'M ASKING YOU, THIS SLIDE IS INCORRECT, ISN'T
 8    IT?
 9    A    I'M NOT SURE WHY IT WOULD BE INCORRECT.
10    Q    WELL, LET'S LOOK AT BOTH THE CONTACT LIST AND
11    THE BROWSER THAT APPEARS ON THIS SLIDE.
12              WE'RE TALKING ABOUT ELEMENT NUMBER 5.
13              LET'S START ON THE LEFT, THE CONTACT
14    LIST.  THIS YELLOW BOX HERE SHOWS THE AREA BEYOND
15    THE EDGE AS THIS YELLOW BOX AT THE BOTTOM OF THE
16    CONTACT LIST.
17              NOW, THAT CANNOT BE THE AREA BEYOND THE
18    EDGE BECAUSE THE USER HASN'T REACHED THE EDGE HERE;
19    CORRECT?
20    A    I'D HAVE TO LOOK AT THAT IMAGE VERY CLOSELY.
21    THERE MAY BE A MISTAKE IN THE IMAGE.
22    Q    WELL, THIS IS A SLIDE, AGAIN, THAT YOU
23    APPROVED AND YOU REVIEWED; RIGHT?
24    A    I DID NOT RELY UPON IT TODAY.
25    Q    I DIDN'T ASK YOU THAT, SIR.  I ASKED YOU, THIS
```

```
 1    IS A SLIDE THAT YOU REVIEWED AND YOU APPROVED

 2    BEFORE IT WAS SENT OVER TO SAMSUNG AS PART OF YOUR

 3    DEMONSTRATIVE EXHIBITS?

 4    A    I REVIEWED MY SLIDES.  I'M NOT SURE AT WHAT

 5    POINT, WHAT VERSION WAS SENT OVER TO SAMSUNG, SO I

 6    JUST WANT TO MAKE THAT CLEAR, THAT THERE WERE MANY

 7    VERSIONS OF THESE SLIDES THAT I'VE WORKED ON IN THE

 8    LAST WEEK.

 9    Q    YOU WOULD AGREE WITH ME THAT THIS IS -- THIS

10    CANNOT BE THE AREA BEYOND THE EDGE FOR THE CONTACT

11    LIST OF THE SAMSUNG GALAXY S II; RIGHT?

12              MR. JACOBS:  YOUR HONOR, I'M SORRY.  I

13    HAVE TO INTERJECT.

14              WE'VE NOW HAD A CHANCE TO CHASE DOWN

15    WHAT'S GOING ON.  THIS IS A VIDEO, AND WHEN YOU

16    CONFLATE A VIDEO INTO A PDF, WHEN YOU PUT IT ALL

17    TOGETHER IN A SINGLE IMAGE, THIS IS HOW IT APPEARS.

18    BUT IT'S ACTUALLY A VIDEO.

19              MR. JOHNSON:  YOUR HONOR, THIS IS THE

20    SLIDE THAT WAS PROVIDED TO US BY APPLE AND I'M JUST

21    ASKING HIM QUESTIONS ABOUT IT, WHETHER HE AGREES IT

22    OR NOT.

23              THE COURT:  THE OBJECTION IS OVERRULED.

24              YOU'LL HAVE A CHANCE TO REDIRECT.

25              THE WITNESS:  SO IN THIS PARTICULAR IMAGE
```

```
 1    ON THE LEFT-HAND SIDE, IT APPEARS THAT IT'S NOT YET

 2    BEYOND THE EDGE.

 3              BUT I BELIEVE THE VIDEO WOULD HAVE SHOWN

 4    THAT IT WENT BEYOND THE EDGE.

 5    BY MR. JOHNSON:

 6    Q    WHAT ABOUT ON THE RIGHT-HAND SIDE FOR THE

 7    BROWSER?  THAT'S -- WHAT'S DELINEATED HERE IN

 8    YELLOW IS SHOWN AS THE AREA BEYOND THE EDGE BUT, IN

 9    FACT, THAT IS NOT THE AREA BEYOND THE EDGE, IS IT?

10    A    IN THAT PARTICULAR IMAGE, THAT IS NOT THE AREA

11    BEYOND THE EDGE.  I DID NOT RELY ON THIS SLIDE.

12    Q    OKAY.  LET'S LOOK AT PDX 27-30.

13              THIS IS THE NEXT ELEMENT, ELEMENT 6 OF

14    CLAIM 19; RIGHT?

15    A    YES.

16    Q    OKAY.  AND FOR THIS, AGAIN, THIS REFERS TO THE

17    GALAXY S II FOR THE CONTACT LIST AND THE BROWSER

18    APPLICATIONS; RIGHT?

19    A    YES.

20    Q    AND LOOK AT THE FIGURE ON THE LEFT FOR CONTACT

21    LIST, AND DO YOU SEE IT SAYS IT'S LABELED THE

22    FOURTH PORTION, NO AREA BEYOND THE EDGE?

23    A    OKAY.  I BELIEVE THIS WAS A STILL FROM A

24    VIDEO.  THE IMAGE DOESN'T SHOW THE RIGHT THING.

25              AGAIN, I DID NOT RELY ON THIS SLIDE TODAY
```

1782

1     THAT WAS SHOWN TO THE JURY.

2     Q     SORRY ABOUT THAT.   THIS IS INCORRECT; RIGHT?

3     A     THE IMAGE IS INCORRECT.

4     Q     AND THE IMAGE ON THE RIGHT-HAND SIDE UNDER THE

5     BROWSER APPLICATION IS ALSO INCORRECT, ISN'T IT?

6     A     IN THAT THAT IS NOT THE FULL PORTION.   THAT

7     STILL SHOWS AN AREA BEYOND THE EDGE.

8     Q     OKAY.   THANK YOU.

9           DO YOU KNOW, HOW MUCH IS APPLE CLAIMING

10    IN DAMAGES FOR INFRINGEMENT OF THIS PARTICULAR

11    PATENT?

12    A     I DON'T KNOW THE EXACT FIGURE.

13    Q     LET'S LOOK AT PDX 27.3, PLEASE.

14          NOW, FIRST, DR. BALAKRISHNAN, YOU WOULD

15    AGREE THAT NOT EVERY BOUNCE EFFECT ON A TOUCHSCREEN

16    IS COVERED BY THE '381 PATENT; RIGHT?

17    A     COULD YOU REPHRASE THE QUESTION?   I DON'T

18    UNDERSTAND.

19    Q     YEAH.   NOT EVERY BOUNCE EFFECT THAT YOU SEE ON

20    A TOUCHSCREEN IS COVERED BY THE '381 PATENT, IS IT?

21    A     IF THE BOUNCE EFFECT MEETS ALL OF THE

22    LIMITATIONS OF CLAIM 19, IT WOULD BE COVERED.

23    Q     BUT THERE ARE BOUNCE EFFECTS THAT DO NOT MEET

24    THE LIMITATIONS OF CLAIM 19; RIGHT?

25    A     CAN YOU GIVE ME AN EXAMPLE?

```
 1    Q    WELL, WHEN AN IMAGE BOUNCES BACK TO THE CENTER

 2    BEFORE YOUR FINGER REACHES THE EDGE OF THE DISPLAY,

 3    THAT'S NOT COVERED BY THE '381 PATENT; RIGHT?

 4    A    IF IT HASN'T REACHED THE EDGE, IT IS NOT IN

 5    RESPONSE TO THE EDGE AS THE CLAIMS REQUIRE, THEN

 6    CLAIM 19 WOULD NOT BE INFRINGED.

 7    Q    SO THERE ARE BOUNCE EFFECTS THAT DON'T

 8    INFRINGE CLAIM 19; RIGHT?

 9    A    I DON'T SEE AN EXAMPLE.  IF YOU PROVIDED A

10    HYPOTHETICAL -- ARE YOU SAYING IN THE SAMSUNG

11    DEVICES THERE'S A BOUNCE EFFECT THAT YOU WANT ME TO

12    LOOK AT THAT DOESN'T INFRINGE?

13    Q    I'M ASKING YOU MORE GENERALLY.  AREN'T THERE

14    BOUNCE EFFECTS THAT ARE NOT COVERED BY CLAIM 19?

15    A    JUST GENERALLY OUT THERE?

16    Q    YES.

17    A    SURE.  YOU CAN HAVE ALL KINDS OF THINGS THAT

18    BOUNCE THAT DON'T --

19    Q    ALL RIGHT.

20    A    THAT DON'T MEET THE ELEMENTS OF CLAIM 19.

21    Q    WELL, DURING YOUR DIRECT TESTIMONY, YOU SHOWED

22    27.3.  LET'S ACTUALLY GO TO 14, 27.14.  YOU SHOWED

23    27.14 AS A BASIS FOR INFRINGEMENT OF THE SAMSUNG

24    GALAXY S II; RIGHT?

25    A    I SHOWED A SLIDE SIMILAR TO THIS.  I'M NOT
```

1    SURE OF THE EXACT SLIDE NUMBER, SO I JUST WANT TO

2    MAKE SURE, BECAUSE YOU SEEM TO HAVE A DIFFERENT

3    SLIDE FROM WHAT I SHOWED TODAY.

4    Q    IS THIS ONE CORRECT?

5    A    IT APPEARS CORRECT, BUT I -- I CAN'T SAY FOR

6    SURE WHETHER IT'S THE EXACT SAME SLIDE NUMBER.

7    Q    WELL, THE PORTION THAT'S SHOWN ON THE DISPLAY

8    IS ONLY PART OF THE STICK FIGURE; RIGHT?

9    A    IT LOOKS TO BE, YES.

10   Q    AND IN ALL OF THE EXAMPLES THAT YOU SHOWED IN

11   YOUR VIDEOS, EVEN THE ONES THAT HAD THE, THE

12   FOUR-BY-FOUR, THE USER MUST FIRST ZOOM IN ON THE

13   STICK FIGURE IN ORDER TO MEET THE LIMITATIONS OF

14   CLAIM 19 OF THE '381; RIGHT?

15   A    IN ALL OF THOSE, THE IMAGE WOULD HAVE TO BE

16   BIGGER THAN WOULD FIT ON THE SCREEN, YES.

17   Q    AND YOUR VIDEOS, AND EVEN YOUR DEMONSTRATIVE

18   HERE, LEAVES OUT THAT STEP OF WHERE THE USER FIRST

19   ZOOMS IN ON THE IMAGE TO GET THE ENLARGED IMAGE;

20   RIGHT?

21   A    IT DOESN'T -- YOU DON'T NEED TO SHOW THAT

22   BECAUSE CLAIM 19 DOESN'T REQUIRE THAT.

23   Q    CLAIM 19 DOESN'T REQUIRE A SET UP MOVE LIKE

24   THAT?

25   A    NO.

1    Q    I'M SORRY?

2    A    NOT IN -- NOT EXACTLY, NO.  IT DIDN'T REQUIRE

3    THAT.  YOU COULD HAVE IT, BUT IT'S NOT REQUIRED.

4    Q    WELL, YOU HAVE ACCUSED THE GALAXY TAB 7.0 OF

5    INFRINGEMENT; RIGHT?

6    A    THAT IS CORRECT.

7    Q    OKAY.  NOW, I'D LIKE TO SHOW YOU A VIDEO OF

8    THE GALAXY TAB PRODUCT.

9            LET'S PUT UP SLIDE 3918.101 PLEASE,

10   MR. FISHER.

11           AND YOU'VE SEEN THIS VIDEO BEFORE.  IT'S

12   A -- I'M GOING TO SHOW IT TO YOU, BUT IT'S FROM THE

13   JOHNSON REPORT.

14   A    MAYBE I COULD LOOK AT THE VIDEO FIRST.

15   Q    LET'S TAKE A LOOK AT IT.

16           (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

17   OPEN COURT OFF THE RECORD.)

18   BY MR. JOHNSON:

19   Q    NOW, DR. BALAKRISHNAN, WHAT WE JUST SAW IN THE

20   SDX 3918.101, THAT DOESN'T INFRINGE THE '381

21   PATENT, DOES IT?

22   A    THAT FUNCTIONALITY -- IS MY MIKE ON?

23           THAT FUNCTIONALITY DOES NOT APPEAR TO

24   MEET THE CLAIMS, BUT --

25   Q    BECAUSE IT SHOWS --

2786

```
1    A    -- I DON'T KNOW WHETHER THAT TABLET HAS THE
2    BOUNCE BACK FEATURE IN OTHER APPLICATIONS THAT ARE
3    NOT SHOWN ON THE SCREEN.
4    Q    THAT APPLICATION THAT WE JUST LOOKED AT SHOWS
5    SOMETHING WE CALLED HARD STOP; RIGHT?  THERE'S NO
6    BOUNCE THERE?
7    A    THAT PARTICULAR FUNCTIONALITY YOU JUST SHOWED
8    IS THE HARD STOP, YES.
9    Q    OKAY.  AND YOU ORIGINALLY ACCUSED THE BROWSER
10   FUNCTION OF THE TAB 7.0, WHAT WE JUST LOOKED AT, OF
11   INFRINGING THE '381 PATENT; RIGHT?
12   A    THAT IS CORRECT.
13   Q    BUT IT'S YOUR UNDERSTANDING THAT THE BROWSER
14   APPLICATION OF THE GALAXY TAB 7.0 DOES NOT INFRINGE
15   THE '381 PATENT BECAUSE IT DOESN'T BOUNCE BACK;
16   RIGHT?
17   A    NO, THAT'S NOT CORRECT.  THE GALAXY TAB 7.0
18   THAT I ACCUSED, IN THE VERSION I LOOKED AT, THE
19   VERSION I ANALYZED DOES DO THE BOUNCE BACK.
20   Q    I JUST -- I JUST ASKED YOU ABOUT THE BROWSER.
21   A    OKAY.
22   Q    SO THE BROWSER APPLICATION OF THE GALAXY TAB
23   7.0 THAT WE JUST LOOKED AT DOESN'T INFRINGE THE
24   '381 PATENT; RIGHT?
25   A    IN THAT PARTICULAR VERSION --
```

1    Q    YES?

2    A    -- OF THE GALAXY TAB, I DON'T SEE AN

3    INFRINGEMENT.

4    Q    OKAY.

5    A    BUT THE VERSION I LOOKED AT DID HAVE THE

6    INFRINGEMENT.

7    Q    LET'S THEN LOOK -- LET'S LOOK AT THAT VERSION.

8    LET'S LOOK AT ANOTHER ONE.  CAN WE SHOW -- LET ME

9    ASK YOU, YOU'VE HEARD OF DR. SINGH?  HE'S ANOTHER

10   EXPERT IN THIS CASE; RIGHT?

11   A    YES.

12   Q    AND HE IS -- YOU'VE KNOWN HIM FOR MANY YEARS?

13   A    YES, I HAVE.

14   Q    HE WORKS DOWN THE HALL FROM YOU AT THE

15   UNIVERSITY OF TORONTO?

16   A    YES, HE'S A COLLEAGUE.

17   Q    OKAY.  SO HE'S IN THE SAME DEPARTMENT AS YOU?

18   A    YES, HE IS.

19   Q    ALL RIGHT.  NOW, I WANT TO SHOW YOU A VIDEO

20   THAT WAS PREPARED BY DR. SINGH.

21            CAN WE LOOK AT PX 66-A, PLEASE.  AND THIS

22   IS A VIDEO OF THE GALAXY TAB 10.1 THAT APPLE'S

23   EXPERT PREPARED.

24            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

25   OPEN COURT OFF THE RECORD.)

```
 1    BY MR. JOHNSON:

 2    Q    NOW, RIGHT THERE, STOP IT, RYAN, THANKS.

 3              WHAT THE USER JUST DID THERE DOESN'T

 4    INFRINGE THE '381 PATENT, DOES IT?

 5    A    WHAT THE USER DID THERE WAS A SCROLL.  I'M NOT

 6    SURE WHAT THIS VIDEO IS SUPPOSED TO BE SHOWING.  I

 7    DID NOT CREATE THIS VIDEO.

 8    Q    LET ME ASK IT AGAIN, DOCTOR.

 9              WHAT WE JUST SAW ON THAT VIDEO, THE

10    MOVEMENT DOWN AND THE LACK OF A BOUNCE, DOES NOT

11    INFRINGE THE '381 PATENT; RIGHT?

12    A    I DID NOT SEE IT REACHING THE EDGE, SO I HAVE

13    NO IDEA WHETHER IT IS MEETING THE '381 PATENT.

14    Q    MR. FISHER, CAN WE PLAY IT AGAIN?

15              AND I WANT TO ASK YOU, DR. BALAKRISHNAN,

16    DOES THIS INFRINGE THE '381 PATENT, BASED ON WHAT

17    YOU'RE SEEING HERE?

18              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

19    OPEN COURT OFF THE RECORD.)

20              THE WITNESS:  NOT WHAT I'M SEEING.  BUT I

21    CAN'T TELL, JUST FROM THE VIDEO, WHETHER IT'S

22    REACHED THE EDGE OR NOT.

23              IF YOU'D SHOW ME THE DEVICE, I'M HAPPY TO

24    CHECK IT OUT AND VERIFY THAT.

25    BY MR. JOHNSON:
```

2789

```
1    Q    LET'S LOOK AT PX 66-B.  THIS IS ANOTHER VIDEO

2    PREPARED BY APPLE'S EXPERT, DR. SINGH, WITH RESPECT

3    TO THE SAMSUNG VIBRANT PHONE.

4              I'M GOING TO ASK YOU THE SAME QUESTION.

5              IF WE CAN, PUT IT UP, MR. FISHER.

6              DOES THIS DEVICE THAT YOU SEE IN THIS

7    PARTICULAR VIDEO INFRINGE THE '381 PATENT?

8              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

9    OPEN COURT OFF THE RECORD.)

10             THE WITNESS:  I HAVE NOT ACCUSED THE

11   VIBRANT OF INFRINGING THE '381 PATENT IN THE

12   BROWSER APPLICATION.

13   BY MR. JOHNSON:

14   Q    SO THE ANSWER TO MY QUESTION IS YES, IT DOES

15   NOT INFRINGE THE '381 PATENT; RIGHT?

16   A    IN THE BROWSER APPLICATION, IT DOES NOT.

17             BUT THE VIBRANT INFRINGES THE '381 IN THE

18   GALLERY AND THE CONTACTS APPLICATION AS I'VE

19   ALREADY SHOWN.

20   Q    WELL, LET'S TALK ABOUT THAT.

21             SO YOU CLAIM, I BELIEVE -- YOU UNDERSTAND

22   THAT IN ORDER TO SHOW INFRINGEMENT OF A CLAIM, YOU

23   NEED TO SHOW THAT EACH AND EVERY CLAIM LIMITATION

24   HAS BEEN MET; RIGHT?

25   A    SURE.
```

1    Q    AND THAT EACH AND EVERY CLAIM LIMITATION IS

2    ACTUALLY CONTAINED IN THE ACCUSED DEVICES?

3    A    YES.

4    Q    AND IT'S NOT ENOUGH JUST TO SAY IT'S, IT'S

5    CONTAINED IN ONE DEVICE.  YOU HAVE TO SHOW THAT

6    EACH AND EVERY CLAIM LIMITATION IS SHOWN IN EACH

7    AND EVERY ONE OF THE 21 DEVICES THAT YOU'RE

8    ACCUSING OF INFRINGEMENT; RIGHT?

9    A    IN EACH OF THE DEVICES BEING ACCUSED, YES.

10    Q    OKAY.  AND YOU ALSO UNDERSTAND, GIVEN THAT

11    YOU'VE GOT SOME OF YOUR OWN PATENTS, THAT THE

12    CLAIMS MUST BE READ CONSISTENTLY FOR INFRINGEMENT

13    PURPOSES AND FOR INVALIDITY PURPOSES; RIGHT?

14    A    THAT'S CORRECT.

15    Q    AND SAID ANOTHER WAY, YOU CAN'T READ A CLAIM

16    BROADER TO ESTABLISH INFRINGEMENT, BUT THEN READ IT

17    NARROWLY IN ORDER TO AVOID THE PRIOR ART; RIGHT?

18    A    THAT'S TRUE.

19    Q    OKAY.  LET'S SHOW DX 751-A, MR. FISHER, AND

20    THIS IS THE VIBRANT.

21         OKAY.  AND ACTUALLY, BEFORE WE PLAY IT,

22    LET ME JUST ASK YOU, YOU'RE AWARE THAT SAMSUNG

23    BELIEVES IT DOESN'T INFRINGE THE '381 PATENT

24    BECAUSE SAMSUNG'S PHONES EXHIBIT SOMETHING CALLED

25    THE HOLD STILL BEHAVIOR; RIGHT?

```
 1    A    I'M AWARE THAT SAMSUNG'S MADE THE CLAIM THAT
 2    SOME OF THE SAMSUNG PHONES EXHIBIT THE HOLD STILL
 3    BEHAVIOR IN THE GALLERY APPLICATION --
 4    Q    OKAY.
 5    A    -- ONLY.  BUT NOT ALL THE SAMSUNG PHONES, AND
 6    EVEN ON THE PHONES THAT DO EXHIBIT THE HOLD STILL
 7    BEHAVIOR IN THE GALLERY APPLICATION, MANY OF THEM
 8    INFRINGE THE '381 IN OTHER APPLICATIONS.
 9    Q    IN YOUR VIEW, TO INFRINGE '381 PATENT, MUST
10    THE IMAGE ALWAYS BOUNCE BACK?
11    A    TO INFRINGE CLAIM 19 OF THE '381 PATENT?
12    Q    YES.
13    A    IT DOESN'T HAVE TO ALWAYS BOUNCE BACK.
14    Q    LET'S LOOK AT DX 751-A, PLEASE.
15              CAN WE GO AHEAD AND PLAY IT.
16              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
17    OPEN COURT OFF THE RECORD.)
18    BY MR. JOHNSON:
19    Q    THE VIDEO THAT WE JUST SHOWED THERE SHOWS THE
20    HOLD STILL BEHAVIOR; RIGHT?
21    A    CAN YOU PLAY THAT AGAIN, PLEASE?
22    Q    SURE.
23    A    I SAW SOMETHING GOING ON AT THE END WHERE THE
24    USER IS TAPPING THEIR FINGER ON SOME PART OF THE
25    SCREEN.
```

```
 1              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

 2      OPEN COURT OFF THE RECORD.)

 3              THE WITNESS:  SO I'M NOT SURE WHAT'S

 4      GOING ON WITH THE TAPPING OF THE FINGER.

 5      BY MR. JOHNSON:

 6      Q    I THINK THE TAPPING IS JUST TO SHOW THAT THE

 7      VIDEO IS STILL ROLLING.

 8      A    THE VIDEO IS STILL ROLLING, NOT THAT IT'S

 9      STILL IN CONTACT WITH THE SCREEN?

10      Q    RIGHT.

11      A    IF YOU REPRESENT THAT.

12      Q    I'LL REPRESENT THAT.

13      A    I'LL HAVE TO CHECK THAT OUT FOR MYSELF, BUT --

14      Q    I'LL REPRESENT THAT TO YOU.  YOU'VE -- LET ME

15      ASK IT TO YOU A DIFFERENT WAY.

16              WHAT WE JUST SAW HERE IN THE HOLD STILL

17      OF THE VIBRANT, JUST THE HOLD STILL, DOES NOT MEET

18      THE LIMITATIONS OF CLAIM 19 OF THE '381 PATENT;

19      RIGHT?

20      A    IF, INDEED, THAT IS THE HOLD STILL BEHAVIOR.

21              AND I STILL HAVE AN OPEN QUESTION AS TO

22      WHAT'S ACTUALLY HAPPENING AT THE END OF THAT VIDEO

23      WITH THE FINGER TAPPING.

24              BUT IF, INDEED, THE FINGER HAS LEFT THE

25      SCREEN AND IT'S HOLDING STILL, THAT HOLD STILL
```

1    BEHAVIOR DOES NOT MEET CLAIM 19.

2              BUT I'LL NOTE THAT THE VIBRANT, MOST OF

3    THE TIME, DOES MEET CLAIM 19 IN THE GALLERY

4    APPLICATION, BECAUSE IF YOU USE IT AS YOU NORMALLY

5    WOULD, IT WILL BOUNCE, AND I'M HAPPY TO SHOW THAT

6    TO YOU NOW AND SHOW IT TO THE JURY IF YOU SHOW ME

7    THE PHONE.

8    Q    HAVE YOU REVIEWED THE SOURCE CODE FOR THE HOLD

9    STILL ROUTINE FOR THE VIBRANT PHONE?

10   A    I HAVE NOT LOOKED AT SOURCE CODE FOR THE

11   NON -- FOR ANY FUNCTIONALITY THAT HAS NOTHING TO DO

12   WITH CLAIM 19.

13   Q    HAVE YOU LOOKED AT ANY OF THE HOLD STILL

14   SOURCE CODE FOR ANY OF THE PHONES THAT ARE ACCUSED

15   OF INFRINGEMENT?

16   A    I MAY HAVE ENCOUNTERED IT, BUT I DON'T RECALL

17   ANALYZING IT IN DETAIL.

18   Q    NOW, YOU UNDERSTAND THAT THERE'S HOLD STILL

19   BEHAVIOR FOR MANY SAMSUNG PHONES THAT ARE ACCUSED

20   OF INFRINGEMENT; RIGHT?

21   A    THERE APPEARS TO BE, AT LEAST ACCORDING TO

22   SAMSUNG, SIMILAR HOLD STILL BEHAVIOR ONLY IN THE

23   GALLERY APPLICATION FOR SOME, BUT NOT ALL, OF THE

24   21 ACCUSED DEVICES, AND ONLY IN THE GALLERY

25   APPLICATION.

```
 1              SO THERE ARE TWO OTHER APPLICATIONS, AND

 2    EVEN THE PHONES THAT HAVE THE HOLD STILL BEHAVIOR

 3    ONLY ONCE IN A WHILE, THEY'RE STILL INFRINGING THE

 4    OTHER APPLICATIONS.

 5    Q    I KNOW THERE ARE THINGS THAT YOU WANT TO ADD

 6    TO YOUR ANSWER, BUT I'M ON THE CLOCK HERE, AND IF

 7    YOU CAN TRY AND KEEP YOUR ANSWERS TO WHAT I ASK

 8    YOU, YOUR COUNSEL WILL HAVE AN OPPORTUNITY TO ASK

 9    YOU SOME MORE QUESTIONS.

10              SO LET ME JUST SHOW YOU SDX 3918.105.

11    I'M GOING TO SHOW YOU SOME ADDITIONAL VIDEOS THAT

12    EXHIBIT THE HOLD STILL BEHAVIOR.

13              MR. FISHER, CAN YOU PULL THAT UP?

14              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

15    OPEN COURT OFF THE RECORD.)

16    BY MR. JOHNSON:

17    Q    HAVE YOU SEEN THE HOLD STILL BEHAVIOR THAT'S

18    SHOWN FOR EACH OF THESE SAMSUNG PHONES, THE

19    CAPTIVATE, THE CONTINUUM, THE DROID CHARGE, AND THE

20    EPIC 4G LIKE WE JUST SAW IN DX 3918.105?

21    A    I BELIEVE I'VE SEEN SOME OF THEM.  I CAN'T

22    RECALL IF I'VE SEEN ALL OF THEM.

23              MR. JOHNSON:  YOUR HONOR, WE'D ASK

24    THAT -- WE MOVE THIS INTO EVIDENCE.

25              MR. JACOBS:  OBJECTION, YOUR HONOR.  THIS
```

```
 1          IS A DEMONSTRATIVE.

 2                    THE COURT:  OVERRULED.  IT'S ADMITTED.

 3                    (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 4                    3918.105, HAVING BEEN PREVIOUSLY MARKED

 5                    FOR IDENTIFICATION, WAS ADMITTED INTO

 6                    EVIDENCE.)

 7                    MR. JOHNSON:  AND WHILE WE'RE DOING THAT,

 8          I'D ASKS THAT 66-A AND B, AND 751-A, THE THREE

 9          OTHER VIDEOS THAT I REFERRED TO EARLIER, BE MOVED

10          INTO OBJECTION.

11                    MR. JACOBS:  OBJECTION, YOUR HONOR.

12          THERE'S BEEN NO FOUNDATION FOR HOW THEY WERE

13          PREPARED.

14                    MR. JOHNSON:  THEY WERE PREPARED -- TWO

15          OF THEM WERE PREPARED BY APPLE'S EXPERT.

16                    THE COURT:  66-A IS ADMITTED, AND 66-B IS

17          ADMITTED.

18                    AND MR. JOHNSON, I DIDN'T CATCH THE LAST

19          ONE.

20                    MR. JOHNSON:  751-A, WHICH IS THE VIDEO

21          WE JUST LOOKED AT FOR THE VIBRANT.

22                    THE COURT:  IT'S ADMITTED.

23                    (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS

24                    66-A, 66-B, AND 751-A, HAVING BEEN

25                    PREVIOUSLY MARKED FOR IDENTIFICATION,
```

```
1                WERE ADMITTED INTO EVIDENCE.)

2      BY MR. JOHNSON:

3      Q    LET ME SHOW YOU SDX 3918.104.

4               THESE ARE OTHER EXAMPLES OF THE HOLD

5      STILL BEHAVIOR IN THE EXHIBIT 4G, THE FASCINATE,

6      THE GALAXY PREVAIL, AND THE GALAXY S I9000.  HAVE

7      YOU SEEN THESE BEFORE -- ARE YOU AWARE THAT EACH OF

8      THESE ACCUSED PHONES DEMONSTRATES HOLD STILL

9      BEHAVIOR?

10     A    CAN YOU -- IF YOU DON'T MIND, CAN YOU PLAY

11     THAT AGAIN, PLEASE?

12     Q    SURE.

13              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

14     OPEN COURT OFF THE RECORD.)

15              THE WITNESS:  IT'S REALLY HARD TO TELL

16     FROM THESE VIDEOS EXACTLY WHAT IS HAPPENING, SO

17     IT'S VERY HARD TO COMMENT ON WHETHER IT'S DOING THE

18     HOLD STILL OR SOMETHING ELSE.

19              IT WOULD BE MUCH EASIER IF I SAW THE

20     DEVICES.

21     BY MR. JOHNSON:

22     Q    YOU WOULD AGREE WITH ME THAT THE HOLD STILL

23     BEHAVIOR THAT'S SHOWN IN EACH ONE OF THOSE PHONES

24     IN SDX 3918.104 DOES NOT INFRINGE THE '381 PATENT;

25     RIGHT?
```

```
 1     A    IF INDEED THOSE VIDEOS ARE DEMONSTRATING THE

 2     HOLD STILL BEHAVIOR, WHICH I CANNOT ASCERTAIN

 3     INDEPENDENTLY WITHOUT LOOKING AT THE PHONES, BUT IF

 4     YOU REPRESENT THAT, I WOULD SAY THAT THAT HOLD

 5     STILL BEHAVIOR ITSELF DOESN'T MEET THE CLAIMS.

 6              BUT THE GALLERY APPLICATION ON EACH OF

 7     THOSE PHONES DOES MEET THE CLAIM OF CLAIM 19.

 8     Q    LET'S LOOK AT 3918.105.  THIS IS ANOTHER VIDEO

 9     WITH MORE ACCUSED DEVICES THAT DEMONSTRATE THE HOLD

10     STILL BEHAVIOR, THE GALAXY S 4G, THE INDULGE, THE

11     INFUSE 4G, AND THE MESMERIZE.

12              YOU WOULD AGREE WITH ME THAT THE HOLD

13     STILL BEHAVIOR THAT'S DEMONSTRATED IN THIS EXHIBIT

14     DOES NOT INFRINGE THE '381 PATENT; RIGHT?

15     A    AGAIN, JUST GOING BY THE VIDEO HERE, I CAN'T

16     CONFIRM FOR CERTAIN WHETHER IT'S DOING THE HOLD

17     STILL BEHAVIOR.

18              BUT IF YOU REPRESENT THAT IT IS, I WOULD

19     SAY THAT THAT PARTICULAR BEHAVIOR DOESN'T MEET ALL

20     THE CLAIM ELEMENTS OF CLAIM 19.

21              BUT THE GALLERY APPLICATION, WHICH IS THE

22     SAME APPLICATION, DOES MEET CLAIM 19 AS I'VE

23     ALREADY DEMONSTRATED.

24              AND I'M HAPPY TO DEMONSTRATE IT AGAIN IF

25     I'M GIVEN THE OPPORTUNITY TO SHOW THE JURY LIVE.
```

1    Q    LET'S LOOK AT 3918.106.

2            THESE ARE THREE MORE DEVICES THAT EXHIBIT

3    THE HOLD STILL BEHAVIOR?

4            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

5    OPEN COURT OFF THE RECORD.)

6    BY MR. JOHNSON:

7    Q    THE NEXUS S 4G, THE REPLENISH, THE VIBRANT,

8    NONE OF THESE APPLICATIONS SHOWING -- RUNNING HOLD

9    STILL HERE OR DEMONSTRATING HOLD STILL INFRINGE THE

10   '381 PATENT; RIGHT?

11   A    AGAIN, I'M NOT VERIFYING THIS ON THE DEVICES

12   THEMSELVES.

13            BASED ON THE VIDEOS, IF INDEED THEY'RE

14   DOING THE HOLD STILL BEHAVIOR, I WOULD SAY THAT

15   BEHAVIOR, AS I'VE SAID BEFORE, DOESN'T MEET CLAIM

16   19.

17            BUT THE GALLERY APPLICATION RUNNING ON

18   EACH OF THOSE PHONES, AS I'VE ALREADY DEMONSTRATED,

19   DOES MEET CLAIM 19.

20            MR. JOHNSON:  YOUR HONOR, WE'D ASK THAT

21   DX 3918.104, .105 AND .106 BE ADMITTED.

22            THE COURT:  ANY OBJECTION?

23            MR. JACOBS:  SAME OBJECTION AS BEFORE,

24   YOUR HONOR.

25            THE COURT:  THEY'RE ALL THREE ADMITTED.

2799

```
 1                (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS
 2                3918.104, 3918.105, 3918.106, HAVING BEEN
 3                PREVIOUSLY MARKED FOR IDENTIFICATION,
 4                WERE ADMITTED INTO EVIDENCE.)
 5                THE COURT:  GO AHEAD, PLEASE.
 6    BY MR. JOHNSON:
 7    Q    NOW, DR. BALAKRISHNAN, I THINK YOU SAID
 8    EARLIER, THIS ISN'T THE FIRST TIME THAT YOU'VE
 9    SERVED AS AN EXPERT FOR APPLE; CORRECT?
10    A    THAT'S CORRECT.
11    Q    IT'S NOT THE SECOND TIME, EITHER?
12    A    NO.
13    Q    YOU'VE SERVED AS A TECHNICAL EXPERT FOR APPLE
14    IN AT LEAST NINE DIFFERENT CASES IN THE LAST COUPLE
15    YEARS; RIGHT?
16    A    I THINK I'VE TESTIFIED IN FOUR OTHER CASES
17    PRIOR TO THIS ONE.
18    Q    YOU'VE SERVED AS A TECHNICAL EXPERT FOR APPLE
19    IN AT LEAST NINE CASES IN THE LAST COUPLE OF YEARS;
20    RIGHT?
21    A    I PROBABLY HAVE BEEN RETAINED IN NINE, BUT I
22    HAVEN'T TESTIFIED IN ALL NINE.
23    Q    AND I HEARD YOU TALK ABOUT WHAT YOUR HOURLY
24    RATE WAS AND HOW MUCH YOU'VE BEEN PAID SO FAR FOR
25    YOUR WORK IN THIS CASE.  I THINK YOU SAID $150,000.
```

```
 1    A     APPROXIMATELY, YES.

 2    Q     RIGHT?

 3              NOW, IF APPLE PAYS YOU FOR ALL THE WORK

 4    YOU'VE DONE FOR THEM ACROSS ALL THESE DIFFERENT

 5    CASES, HOW MUCH WILL IT BE?

 6    A     THE LAST TIME I CHECKED, IT WAS -- I THINK I

 7    BILLED ON THE ORDER OF ABOUT $500,000.

 8    Q     I'M SORRY?

 9    A     IN THE ORDER OF ABOUT $500,000.

10    Q     $500,000.  AND THAT WAS AS OF APRIL OF THIS

11    YEAR; RIGHT?

12    A     ROUGHLY, THAT'S RIGHT.

13    Q     AND YOU'VE DONE HOW MUCH WORK SINCE APRIL OF

14    THIS YEAR FOR APPLE ACROSS ALL THESE DIFFERENT

15    CASES?

16    A     I'D HAVE TO LOOK AT MY INVOICES AND SO FORTH,

17    BUT I'D ESTIMATE A COUPLE OF HUNDRED HOURS.

18    Q     A COUPLE OF HUNDRED?

19    A     HOURS.

20    Q     SO, WHAT, THAT'S ANOTHER HUNDRED THOUSAND?

21    A     GIVE OR TAKE.

22    Q     SO IS IT FAIR TO SAY, ACROSS ALL THESE CASES,

23    YOU WILL HAVE MADE AT LEAST, TO TODAY, ABOUT

24    $600,000?

25    A     OVER THREE YEARS, YES.
```

```
 1    Q    NOW, YOU WERE ALSO CRITICIZED FOR YOUR

 2    OPINIONS BY AN ADMINISTRATIVE LAW JUDGE IN ANOTHER

 3    CASE --

 4              MR. JACOBS:  OBJECTION, YOUR HONOR.

 5    BY MR. JOHNSON:

 6    Q    -- IN ANOTHER CASE FOR TAKING INCONSISTENT

 7    POSITIONS, CORRECT?

 8              THE COURT:  OKAY.  THAT IS SUSTAINED.

 9              IF YOU WANT US TO START GETTING INTO

10    THINGS THAT I'VE ALREADY EXCLUDED, I'D BE HAPPY TO

11    DO IT.  DO YOU REALLY WANT ME TO DO THAT?

12              MR. JOHNSON:  YOUR HONOR, I DIDN'T

13    UNDERSTAND THIS TO BE ANYTHING AFAR FROM WHAT WE'VE

14    ALREADY DISCUSSED ACTUALLY.

15              BUT I'LL WITHDRAW THE QUESTION.

16              THE COURT:  BECAUSE I CAN CERTAINLY START

17    GETTING INTO PREVIOUS RULINGS IF YOU WANT ME TO.

18              MR. JOHNSON:  I WAS JUST --

19              THE COURT:  DO YOU WANT ME TO DO THAT?

20    IF I'VE RULED IT TO BE EXCLUDED, WHICH THERE WAS A

21    MOTION IN LIMINE TO EXCLUDE PREVIOUS THINGS FROM

22    OTHER CASES AND FROM THIS CASE, AND THEY'VE BEEN

23    SUSTAINED.  SO PLEASE DON'T --

24              MR. JOHNSON:  UNDERSTOOD.

25              THE COURT:  -- VIOLATE PREVIOUS RULINGS,
```

```
 1    UNLESS YOU WANT TO OPEN THE DOOR, IN WHICH CASE I
 2    WILL GET INTO IT.
 3              MR. JOHNSON:  NO, YOUR HONOR.  THAT'S
 4    FINE.
 5              THE COURT:  OKAY.
 6              MR. JOHNSON:  I'LL PASS THE WITNESS.
 7              OKAY.  IT'S 11:59.
 8              MR. JOHNSON:  THANK YOU,
 9    DR. BALAKRISHNAN.
10              THE WITNESS:  THANK YOU.
11              THE COURT:  OKAY.  LET'S GO AHEAD -- IT'S
12    11:59.  LET'S GO AHEAD AND TAKE OUR LUNCH BREAK.
13              AGAIN, PLEASE KEEP AN OPEN MIND.  PLEASE
14    DON'T DISCUSS THE CASE WITH ANYONE, AND PLEASE
15    DON'T DO ANY OF YOUR OWN RESEARCH.
16              AND IF YOU WOULD PLEASE GO AHEAD AND
17    LEAVE YOUR JURY NOTEBOOKS IN THE JURY ROOM.
18              ALL RIGHT.  THANK YOU.  WE'LL SEE YOU
19    BACK AT 1:00 O'CLOCK.
20              (WHEREUPON, THE FOLLOWING PROCEEDINGS
21    WERE HELD OUT OF THE PRESENCE OF THE JURY:)
22              THE COURT:  ALL RIGHT.  I WOULD LIKE
23    TO -- YOU CAN STEP DOWN.
24              I'D LIKE TO SEE DX 2557, BOTH THE ONE
25    THAT I SUSTAINED THE OBJECTION TO THAT HAD THE BLUE
```

2803

```
1    GLOW AND THE NEW ONE.  SO IF YOU COULD, PLEASE, IF

2    YOU DON'T HAVE IT NOW, IF YOU COULD PLEASE DELIVER

3    IT TO MY CHAMBERS DURING THE LUNCH HOUR.

4              AND I THINK THAT'S, THAT'S IT.  OKAY?

5              MS. MAROULIS:  DO YOU WANT IT ON A CD OR

6    IN WHAT FORMAT DO YOU WANT IT?

7              THE COURT:  VIDEO.  IT'S A VIDEO, I WANT

8    TO SEE BOTH THE ONE THAT I SUSTAINED THE OBJECTION

9    ON AND THE NEW REVISED ONE.

10             MR. MUELLER:  YOUR HONOR, I HAVE HARD

11   COPIES OF THOSE FOUR CASES IF YOU WOULD LIKE.

12             THE COURT:  OKAY.

13             MS. MAROULIS:  YOUR HONOR, I UNDERSTAND

14   THAT DURING THE BREAK COUNSEL FOR APPLE AND SAMSUNG

15   CONFERRED AND THEY DON'T HAVE OBJECTION TO THE NEW

16   EXHIBIT.

17             THE COURT:  IS THAT CORRECT?

18             MR. JACOBS:  WE'LL JUST TAKE A VERY QUICK

19   LOOK AND MAYBE SAVE YOUR HONOR THE TIME.  WE'LL

20   REPORT BACK.

21             THE COURT:  WELL, YOU KNOW, MR. SINGH IS

22   NEXT.  IS THAT RIGHT?

23             MR. JACOBS:  YES.

24             THE COURT:  SO I JUST WANT TO SEE THEM.

25   SO LET ME SEE BOTH THE SUSTAINED OBJECTION VERSION
```

2804

```
1     AND THE NEW ONE.  OKAY?

2               ALL RIGHT.  THANK YOU.

3               DO I HAVE -- I DON'T HAVE THE HAUSER

4     DIRECT -- WHO HAS THE HAUSER DIRECT EXHIBITS,

5     PLEASE?  I ONLY HAVE THE CROSS.

6               AND DO I HAVE BENNER, SITTLER, MUSIKA?

7     DO YOU HAVE THE DIRECT ON HAUSER, PLEASE?

8               MR. JACOBS:  WE'LL GET IT FOR YOU, YOUR

9     HONOR.

10              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

11              (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              **AFTERNOON SESSION**

2                  (WHEREUPON, THE FOLLOWING PROCEEDINGS

3      WERE HELD OUT OF THE PRESENCE OF THE JURY:)

4                  THE COURT:  OKAY.  WELCOME BACK.  PLEASE

5      TAKE A SEAT.

6                  SO I'VE ISSUED AN ORDER ON SITTLER AND

7      BENNER.  I DON'T KNOW IF YOU'VE HAD A CHANCE TO GET

8      THOSE.

9                  AND I WILL KEEP WORKING ON THE HAUSER AND

10     MUSIKA ONES.

11                 WITH REGARD TO DX 2557, APPLE HAS

12     WITHDRAWN ITS OBJECTION BASED ON THE AMENDMENT,

13     RIGHT?  SO THAT'S RESOLVED.

14                 MR. JACOBS:  CORRECT, YOUR HONOR.

15                 THE COURT:  WITH REGARD TO THE TEKSLER

16     EXHIBIT, I'M GOING TO ADMIT IT, BUT WITH THE

17     LIMITING INSTRUCTION THAT JUST SAYS YOU MAY NOT

18     CONSIDER THIS EVIDENCE TO PROVE OR DISPROVE THE

19     VALIDITY OR INVALIDITY OF A CLAIM OR THE AMOUNT OF

20     A DISPUTED CLAIM.  HOWEVER, YOU MAY CONSIDER THIS

21     EVIDENCE FOR SOME OTHER PURPOSE, FOR EXAMPLE, TO

22     ESTABLISH THAT SAMSUNG LACKED NOTICE.

23                 SO THERE'S GOING TO BE A LIMITING

24     INSTRUCTION.

25                 MR. MCELHINNY:  YOUR HONOR, I THINK WE

1    WOULD WANT IT "WHETHER OR NOT SAMSUNG HAD NOTICE."

2           THE COURT:  WHETHER OR NOT SAMSUNG HAD

3    NOTICE.  THAT'S FINE.

4           OKAY.  SO I THINK THAT WAS IT.  I'LL WAIT

5    TO SEE SAMSUNG'S OBJECTIONS ON DALE SOHN AND THE

6    F700 DESIGNER.

7           OKAY.  LET'S THEN PLEASE BRING IN OUR

8    JURY, MS. PARKER BROWN.

9           (WHEREUPON, THE FOLLOWING PROCEEDINGS

10   WERE HELD IN THE PRESENCE OF THE JURY:)

11          THE COURT:  ALL RIGHT.  WELCOME BACK.

12          THE TIME IS NOW 1:06.

13          GO AHEAD, PLEASE.

14              **REDIRECT EXAMINATION**

15   BY MR. JACOBS:

16   Q    DR. BALAKRISHNAN, SAMSUNG'S COUNSEL ASKED YOU

17   ABOUT SOME SLIDES AND YOU WEREN'T SURE WHETHER THEY

18   ACCURATELY REPRESENTED WHAT YOU HAD PREPARED.  DO

19   YOU RECALL THAT EXCHANGE?

20   A    YES, I DO.

21   Q    LET'S TAKE A LOOK, PLEASE, AT PDX 27.29.

22          AND CAN YOU RUN IT, PLEASE.

23          (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

24   OPEN COURT OFF THE RECORD.)

25   BY MR. JACOBS:

1   Q    SO, IN FACT, IS 27.29 A VIDEO,

2   DR. BALAKRISHNAN?

3   A    YES, IT IS, AS WE CAN SEE.

4   Q    AND IS THERE ANYTHING IN THIS VIDEO THAT'S

5   INCONSISTENT WITH THE TESTIMONY YOU GAVE EARLIER?

6   A    NO.  THE VIDEO EXPLAINS CLEAR THAT IT'S DOING

7   THE FUNCTIONALITY I DESCRIBED IN MY EARLIER

8   TESTIMONY.

9   Q    AND THEN ANOTHER SLIDE THAT YOU WERE SHOWN AS

10  KIND OF A STILL WAS 27.30.

11           MR. LEE, COULD WE SEE THAT?

12           (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

13  OPEN COURT OFF THE RECORD.)

14  BY MR. JACOBS:

15  Q    IS 27.30, IN FACT, A VIDEO, DR. BALAKRISHNAN?

16  A    YES, IT IS.

17  Q    AND DOES IT SHOW ANY -- DOES IT HAVE ANY

18  CONTENT INCONSISTENT WITH YOUR EARLIER TESTIMONY ON

19  INFRINGEMENT?

20  A    NO, IT DOESN'T.  IT'S COMPLETELY CONSISTENT

21  WITH MY EARLIER TESTIMONY.

22  Q    AND WHAT SAMSUNG'S COUNSEL SHOWED YOU WAS

23  WHAT, EXACTLY?

24  A    THEY WERE JUST PORTIONS OF THE VIDEO WHICH

25  APPEARED TO BE AN IN-BETWEEN STILL, HALFWAY THROUGH

```
1    THE VIDEO SOMEPLACE.  SO IT WAS A MISMATCH OF THE

2    STILL AND THE, THE CAPTIONING THAT'S ON THE SLIDE.

3    Q    NOW, LET'S LOOK AT ANOTHER VIDEO THAT SAMSUNG

4    PLAYED IN YOUR CROSS-EXAMINATION.

5              CAN WE SEE SDX 3918.101, PLEASE.

6              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

7    OPEN COURT OFF THE RECORD.)

8    BY MR. JACOBS:

9    Q    NOW, THIS WAS A VIDEO OF THE ANDROID TAB IN

10   THE BROWSER CONFIGURATION.  DO YOU RECALL THAT,

11   DR. BALAKRISHNAN?

12   A    THAT'S CORRECT.

13   Q    AND I HAVE EXHIBIT JX 1036, THE GALAXY TAB,

14   SOMETIMES KNOWN AS THE GALAXY TAB 7.0, ON THE ELMO.

15             CAN YOU TURN THAT OFF, MR. LEE, AND LET'S

16   LOOK AT THE ELMO.

17             AND DR. BALAKRISHNAN, IS THIS THE BOUNCE

18   FUNCTIONALITY THAT YOU OBSERVED WHEN YOU EXAMINED

19   THE TAB DEVICE?

20   A    IT IS.

21   Q    NOW, IF I COULD, I'M NOT -- I DON'T KNOW IF I

22   CAN GET THIS TO HOLD STILL, BUT IF I COULD, WOULD

23   THAT IN ANY WAY CALL INTO QUESTION THE PRESENCE OF

24   INSTRUCTIONS FOR -- ON THE DEVICE FOR EXECUTING THE

25   BOUNCE FEATURE?
```

1809

```
 1    A    ABSOLUTELY NOT.  EVEN IF YOU COULD GET IT TO

 2    HOLD STILL, WHICH YOU CANNOT ON THIS DEVICE, IT

 3    WOULD STILL HAVE THE INSTRUCTIONS FOR BOUNCING

 4    BECAUSE, AS YOU CAN SEE, IT'S BOUNCING AWAY.

 5    Q    AND WHAT DOES CLAIM 19 REQUIRE IN THIS

 6    CONNECTION?

 7    A    CLAIM 19 REQUIRES INSTRUCTIONS FOR THE BOUNCE

 8    BACK FEATURE.

 9    Q    NOW, ANOTHER VIDEO YOU WERE SHOWN WAS OF THE

10    VIBRANT.

11              CAN WE SEE DX 751-A, PLEASE.

12              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

13    OPEN COURT OFF THE RECORD.)

14    BY MR. JACOBS:

15    Q    AND IN THE VIBRANT, THE GALLERY APPLICATION

16    WAS SHOWN TO YOU AND THE HOLD STILL BEHAVIOR WAS

17    DEMONSTRATED IN THE VIDEO; CORRECT,

18    DR. BALAKRISHNAN?

19    A    YES.

20    Q    AND THERE WAS SOMETHING -- YOU HAD A QUESTION

21    ABOUT WHAT WAS GOING ON WITH THE FINGER.

22              I NOW HAVE ON THE ELMO JX 1010, THE

23    GALAXY VIBRANT.  AND WHAT ARE WE SEEING AS I MOVE

24    MY FINGER ON THE VIBRANT, JX 1010,

25    DR. BALAKRISHNAN?
```

1    A    WE ARE SEEING THE BOUNCE BACK FUNCTIONALITY OF

2    THE '381 PATENT AS I HAD CLEARLY DESCRIBED IN MY

3    DIRECT TESTIMONY.

4    Q    AND DID YOU PERSONALLY OBSERVE THE BOUNCE

5    FUNCTIONALITY ON ALL THE DEVICES THAT YOU

6    CATEGORIZED AS INFRINGING THE '381 PATENT, CLAIM

7    19?

8    A    YES, I DID EXAMINE EVERY SINGLE ONE OF THOSE

9    DEVICES FOR THE FUNCTIONALITY.

10             MR. JACOBS:  YOUR HONOR, WE WOULD LIKE TO

11   MOVE INTO EVIDENCE THE FOLLOWING VIDEOS THAT WERE

12   SHOWN IN DR. BALAKRISHNAN'S DIRECT TESTIMONY.  CAN

13   I JUST GIVE THEM TO YOU ALL AT ONCE?

14             THE COURT:  YES.

15             MR. JACOBS:  27.9, 27.12 --

16             THE COURT:  WAIT, WAIT.  I'M SORRY.

17             MR. JACOBS:  SORRY.

18             THE COURT:  ALL RIGHT.  GO AHEAD.  YOU

19   SAID 27.9.

20             MR. JACOBS:  27.12, 27.14, 27.16, 27.18,

21   27.20, 27.22, 27.24, AND THEN 27.33, .34, .35, .36,

22   .37, .38, AND .39.

23             ALL OF THESE WERE SHOWN DURING

24   BALAKRISHNAN'S DIRECT, DR. BALAKRISHNAN'S DIRECT.

25             THE COURT:  THESE ARE PDX NUMBERS; RIGHT?

```
 1              MR. JACOBS:  CORRECT.

 2              THE COURT:  OKAY.  ANY OBJECTION?

 3              MR. JOHNSON:  NO, YOUR HONOR.

 4              THE COURT:  ALL RIGHT.  THEY'RE ADMITTED.

 5              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBERS

 6              27.9, 27.12, 27.14, 27.16, 27.18, 27.20,

 7              27.22, 27.24, 27.33, 27.34, 27.35, 27.36,

 8              27.37, 27.38, 27.39, HAVING BEEN

 9              PREVIOUSLY MARKED FOR IDENTIFICATION,

10              WERE ADMITTED INTO EVIDENCE.)

11              MR. JACOBS:  AND THEN LASTLY WE'D LIKE TO

12    MOVE INTO EVIDENCE UNDER SEAL PX 31, WHICH IS THE

13    SAMSUNG SOURCE CODE PORTIONS THEREOF THAT

14    DR. BALAKRISHNAN EXAMINED.

15              THE COURT:  ALL RIGHT.  ANY OBJECTION?

16              MR. JOHNSON:  NO, YOUR HONOR.

17              THE COURT:  THAT'S ADMITTED.

18              (WHEREUPON, PLAINTIFF'S UNDER SEAL

19              EXHIBIT NUMBER 31, HAVING BEEN PREVIOUSLY

20              MARKED FOR IDENTIFICATION, WAS ADMITTED

21              INTO EVIDENCE.)

22              MR. JACOBS:  AND THEN, YOUR HONOR, ONE

23    MORE, PDX 27.31, THAT'S THE SLIDE THAT HAD THE CODE

24    SNIPPETS ON IT, AND WE'D OFFER THAT UNDER SEAL AS

25    WELL.
```

```
 1                THE COURT:  27.31.  ALL RIGHT.  ANY

 2    OBJECTION TO THAT?

 3                MR. JOHNSON:  I MISSED THE PART -- ARE

 4    YOU GOING TO -- IS THIS GOING TO BE UNDER SEAL?

 5                MR. JACOBS:  YES.

 6                MR. JOHNSON:  NO OBJECTION AS LONG AS

 7    IT'S UNDER SEAL, YOUR HONOR.

 8                THE COURT:  BOTH PX 31 AND PDX 27.31 WILL

 9    BE UNDER SEAL BECAUSE THEY ARE SOURCE CODE.

10                (WHEREUPON, PLAINTIFF'S UNDER SEAL

11                EXHIBIT NUMBER 27.31, HAVING BEEN

12                PREVIOUSLY MARKED FOR IDENTIFICATION, WAS

13                ADMITTED INTO EVIDENCE.)

14                MR. JACOBS:  NO FURTHER QUESTIONS, YOUR

15    HONOR.

16                THE COURT:  OKAY.  THE TIME IS NOW 1:12.

17                RECROSS, PLEASE.

18                MR. JOHNSON:  JUST A COUPLE QUESTIONS,

19    YOUR HONOR.

20                THE COURT:  GO AHEAD, PLEASE.

21                MR. JOHNSON:  FIRST, YOUR HONOR, I'D LIKE

22    TO MOVE IN THE EXHIBITS PDX 27.29 AND 27.30, WHICH

23    IS THE STILL IMAGES THAT I DISCUSSED WITH

24    DR. BALAKRISHNAN ON CROSS.

25                THE COURT:  ALL RIGHT.
```

1          MR. JACOBS:  YOUR HONOR, WE OBJECT.  NOW

2     WE'VE DEMONSTRATED THAT THOSE WERE VIDEOS.

3          MR. JOHNSON:  THAT WAS EXACTLY HOW IT WAS

4     PRODUCED TO US.  THAT IS EXACTLY WHAT WAS PRODUCED.

5          MR. JACOBS:  THEY'RE HIGHLY MISLEADING,

6     YOUR HONOR.

7          THE COURT:  THEY'RE ADMITTED.

8          (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS

9          27.29 AND 27.30, HAVING BEEN PREVIOUSLY

10         MARKED FOR IDENTIFICATION, WERE ADMITTED

11         INTO EVIDENCE.)

12         THE COURT:  GO AHEAD, PLEASE.

13         MR. JOHNSON:  JUST A COUPLE QUESTIONS.

14    IF I COULD ASK YOU TO PUT UP, PLEASE, MR. FISHER,

15    PDX 27.10, WHICH IS JUST THE CLAIM, CLAIM 19.

16                    **RECROSS-EXAMINATION**

17    BY MR. JOHNSON:

18    Q    DR. BALAKRISHNAN, THIS IS CLAIM 19, AND DURING

19    REDIRECT, YOU WERE ASKED QUESTIONS ABOUT HOLD

20    STILL; RIGHT?

21    A    SURE.

22    Q    THERE'S NO REQUIREMENT, NO LIMITATION IN CLAIM

23    19 THAT SAYS THAT THE FINGER HAS TO MOVE AT A

24    PARTICULAR SPEED; RIGHT?

25    A    SPEED OF THE FINGER MOVEMENT IS NOT DESCRIBED

```
 1    IN CLAIM 19.

 2    Q    IT'S IRRELEVANT TO CLAIM 19; RIGHT?

 3    A    IT'S NOT DISCUSSED IN CLAIM 19.

 4              MR. JOHNSON:  THANK YOU.  NO FURTHER

 5    QUESTIONS.

 6              THE COURT:  ALL RIGHT.  THE TIME IS NOW

 7    1:14.  ANY RE-REDIRECT?

 8              MR. JACOBS:  NO, YOUR HONOR.

 9              THE COURT:  ALL RIGHT.  MAY THIS WITNESS

10    BE EXCUSED, AND IS IT SUBJECT TO RECALL?

11              MR. JACOBS:  YES, AND YES.

12              THE COURT:  ALL RIGHT.  YOU ARE EXCUSED

13    SUBJECT TO RECALL.  YOU MAY STEP DOWN.

14              THE WITNESS:  THANK YOU.

15              MR. JACOBS:  YOUR HONOR, WE CALL --

16              (PAUSE IN PROCEEDINGS.)

17              THE CLERK:  WOULD YOU RAISE YOUR RIGHT

18    HAND, PLEASE.

19                        KARAN SINGH,

20    BEING CALLED AS A WITNESS ON BEHALF OF THE

21    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

22    EXAMINED AND TESTIFIED AS FOLLOWS:

23              THE WITNESS:  I DO.

24              THE CLERK:  HAVE A SEAT, PLEASE.

25              MR. JACOBS:  YOUR HONOR, I DIDN'T
```

```
 1    FORMALLY ANNOUNCE, WE CALL DR. KARAN SINGH AS OUR

 2    NEXT WITNESS.

 3               THE COURT:  ALL RIGHT.  THE TIME IS NOW

 4    1:15.  GO AHEAD.

 5               THE CLERK:  WOULD YOU STATE YOUR NAME,

 6    PLEASE, AND SPELL IT?

 7               THE WITNESS:  KARAN SHER SINGH,

 8    K-A-R-A-N, S-H-E-R, AND MY LAST NAME IS S-I-N-G-H.

 9               THE COURT:  THANK YOU.

10                      DIRECT EXAMINATION

11    BY MR. JACOBS:

12    Q    DR. SINGH, WHAT DO YOU DO FOR A LIVING?

13    A    I'M A PROFESSOR OF COMPUTER SCIENCE AT THE

14    UNIVERSITY OF TORONTO.  I CODIRECT THE GRAPHICS AND

15    HUMAN/COMPUTER INTERACTION LAB.  I TEACH.  I DO

16    RESEARCH AND SUPERVISE GRADUATE STUDENTS.

17               I'M ALSO INVOLVED WITH A NUMBER OF

18    PRIVATE COMPANIES IN THE AREA OF GRAPHICS

19    INTERFACE.

20    Q    HOW LONG HAVE YOU BEEN A PROFESSOR, SIR?

21    A    TEN YEARS.

22    Q    WHERE DID YOU GO TO SCHOOL?

23    A    I HAVE A NUMBER OF COMPUTER SCIENCE DEGREES.

24    I HAVE A BACHELOR'S FROM THE INDIAN INSTITUTE OF

25    TECHNOLOGY IN '91, AND A MASTER'S AND A PH.D., BOTH
```

2816

```
1    FROM THE OHIO STATE UNIVERSITY IN '92 AND '95.
2    Q    WHAT DID YOU DO BEFORE YOU BECAME A PROFESSOR?
3    A    WELL, AFTER MY PH.D. IN '95, I JOINED A
4    TORONTO COMPANY CALLED WAVEFRONT WHERE I HELPED
5    DESIGN AN ANIMATION SYSTEM CALLED MAYA.
6         LATER I WORKED IN CALIFORNIA AND I
7    CONSTRUCTED A SYSTEM CALLED PARAFORM THAT CONVERTED
8    PHYSICAL OBJECTS INTO DIGITAL MONITORS.
9    Q    WERE MAYA AND PARAFORM, WERE THEY A SUCCESS?
10   A    WELL, MAYA HAS BEEN THE INDUSTRY STANDARD FOR
11   COMMERCIAL ANIMATION AND MOVIE SPECIAL EFFECTS FOR
12   THE PAST DECADE.
13        IT WON A TECHNICAL OSCAR FOR THIS IN
14   2003, AND PARAFORM ALSO RECEIVED AN ACADEMY AWARD
15   FOR TECHNOLOGY.
16   Q    YOU SAID A TECHNICAL OSCAR.  IS THIS AN
17   ACADEMY AWARD WITH THE OSCAR AND ALL THAT?
18   A    THAT IS CORRECT.
19   Q    NOW, DR. SINGH, WOULD YOU SAY YOU'RE FAMILIAR
20   WITH COMPUTER PROGRAMMING, AND IN PARTICULAR, WITH
21   HUMAN/COMPUTER INTERFACES AND COMPUTER GRAPHICS?
22   A    SURE.  FOR OVER 20 YEARS IT'S BEEN THE FOCUS
23   OF MY EDUCATION, MY COMMERCIAL WORK, MY RESEARCH
24   AND MY TEACHING.
25        MR. JACOBS:  ALL RIGHT.  YOUR HONOR, WE
```

1    TENDER DR. SINGH AS AN EXPERT IN COMPUTER

2    PROGRAMMING, HUMAN/COMPUTER INTERFACES, AND

3    COMPUTER GRAPHICS.

4              THE COURT:  ANY OBJECTION?

5              MR. DEFRANCO:  NO OBJECTION, YOUR HONOR.

6              THE COURT:  THANK YOU.

7    BY MR. JACOBS:

8    Q    DR. SINGH, LET'S DIVE INTO SOME PATENTS.

9              I'D LIKE TO TALK FIRST ABOUT THE '915

10   PATENT.  COULD YOU TURN TO JX 1044 IN YOUR BINDER,

11   PLEASE.

12             YOUR HONOR, WE WOULD OFFER 1044 INTO

13   EVIDENCE.

14             THE COURT:  OKAY.  ANY OBJECTION.

15             MR. DEFRANCO:  NO, YOUR HONOR.

16             THE COURT:  OKAY.  THAT'S ADMITTED.

17             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

18             1044, HAVING BEEN PREVIOUSLY MARKED FOR

19             IDENTIFICATION, WAS ADMITTED INTO

20             EVIDENCE.)

21   BY MR. JACOBS:

22   Q    NOW, WHAT IS THE '915 PATENT, DR. SINGH?

23   A    THIS IS APPLE'S '915 PATENT WHICH YOU MIGHT

24   RECALL MR. FORSTALL IN HIS TESTIMONY DESCRIBED THE

25   CHALLENGE OF VIEWING AN IMAGE OF A BICYCLE THROUGH

```
 1      A WINDOW THE SIZE OF A POSTCARD AND HOW YOU MIGHT

 2      DIRECTLY REACH IN TO POSITION AND RESIZE THAT IMAGE

 3      WITH YOUR FINGERS.

 4              NOW, THE '915 PATENT DEALS EXACTLY WITH

 5      THAT PROBLEM AND GIVES YOU ACCESS TO THESE VARIOUS

 6      VIEW OPERATIONS IN A NATURAL AND FLUID MANNER.

 7      Q    LET'S TAKE A LOOK AT A DEMONSTRATION OF THIS

 8      ON THE IPHONE 4.  WE'RE LOOKING AT PDX 29.4, AND

 9      WHAT ARE WE SEEING HERE, DR. SINGH?

10      A    SO THE '915 PATENT SPECIFICALLY DRAWS A

11      DISTINCTION BETWEEN A VERY COMMONLY USED SCROLLING

12      OPERATION ON AN INTEGRATED TOUCHSCREEN DEVICE, LIKE

13      A SMARTPHONE OR A TABLET, AND ONCE IT MAKES THE

14      DISTINCTION BETWEEN THE COMMON SCROLLING OPERATION

15      AND A MORE GENERAL COMPLEX OPERATION, SUCH AS A

16      SCALE OR ROTATE, IT MAPS SINGLE FINGER INPUT TO, AS

17      WE'LL SEE OVER HERE, SINGLE FINGER INPUT TO

18      SCROLLING AND TWO OR MORE FINGERS TO THIS GENERAL

19      GESTURE TRANSFORMATION, SUCH AS SCALING, SO THAT

20      YOU CAN PERFORM BOTH OF THEM KIND OF

21      SATISFACTORILY, INTUITIVELY, AND AT THE SAME TIME

22      THEY ARE DISTINGUISHABLE FROM EACH OTHER.

23      Q    NOW, DID YOU STUDY WHETHER SAMSUNG HAS

24      INFRINGED CLAIM 8 OF APPLE'S '915 PATENT?

25      A    YES, I HAVE.
```

1    Q     AND WHAT DID YOU CONCLUDE?

2    A     I CONCLUDED THAT 24 SAMSUNG PRODUCTS INFRINGE

3    CLAIM 8 OF THE '915 PATENT.

4    Q     AND HOW DID YOU REACH THAT CONCLUSION?

5    A     WELL, FOR STARTERS, I STUDIED THE PATENTS, OR

6    THE PATENT, ITS PROSECUTION HISTORY TO FULLY

7    UNDERSTAND THE CLAIMED INVENTION.

8          AND THEN I PERSONALLY TESTED EACH OF

9    THESE 24 PRODUCTS TO OBSERVE THAT THEY, INDEED,

10   PERFORM THE FUNCTIONALITY THAT'S DESCRIBED BY CLAIM

11   8 OF THE '915.

12   Q     DID YOU DO ANYTHING ELSE?

13   A     SURE.  I ALSO REVIEWED ALL THE SOURCE CODE

14   THAT SAMSUNG MADE AVAILABLE IN THIS LITIGATION --

15   Q     SO LET'S LOOK --

16   A     SORRY.  -- THAT WAS RELEVANT TO THE '915

17   PATENT.

18   Q     SO LET'S LOOK AT THE SAMSUNG DEVICE.  AND YOU

19   HAVE UP HERE THE SAMSUNG GALAXY S II, T-MOBILE.

20   AND WHAT DOES THIS DEVICE -- WHAT BEHAVIOR DOES

21   THIS DEVICE DEMONSTRATE THAT IS RELEVANT TO THIS

22   CLAIM IN THE '915 PATENT, CLAIM 8?

23   A     WELL, AS YOU SEE IN THIS VIDEO, VERY MUCH

24   ALONG THE LINES OF WHAT YOU SAW WITH THE APPLE

25   IPHONE, A SINGLE FINGER IS USED IN THE WEB BROWSER

1    PROGRAM TO SCROLL THE CONTENT ON THE SCREEN.

2            AND SUBSEQUENTLY, YOU WILL NOW SEE TWO

3    FINGERS BEING USED TO SCALE THE, THE CONTENT, THE

4    VIEW, AND THE SCALE IS AN EXAMPLE OF A GESTURE

5    TRANSFORM.

6            AND WHAT YOU'VE JUST SEEN DESCRIBES, IN

7    EFFECT, THE CLAIM LANGUAGE OF THE CLAIM 8 OF THE

8    '915.

9    Q    WELL, LET'S GO TO THAT.  LET'S TURN TO THE

10   CLAIM LANGUAGE OF THE -- OF CLAIM 8 OF THE '915

11   PATENT.  AND CAN YOU WALK US THROUGH YOUR ANALYSIS

12   OF THAT CLAIM LANGUAGE AGAINST THE SAMSUNG DEVICE?

13   A    SURE.  SO THE FIRST PIECE OF LANGUAGE THAT IS

14   THE PREAMBLE OF THE CLAIM OVER HERE ESSENTIALLY IS

15   DESCRIBING A COMPUTING DEVICE, SUCH AS -- AN

16   EXAMPLE OF WHICH IS A SMARTPHONE OR A TABLET.  IT'S

17   A MACHINE READABLE STORAGE MEDIUM, IT HAS PROGRAMS,

18   AND THESE PROGRAMS DO THINGS.

19           SO THAT'S, THAT'S WHAT THE FIRST PART

20   DESCRIBES.

21   Q    LET'S GO TO THE NEXT SLIDE, SIR, AND LOOK AT

22   THE FIRST TWO ELEMENTS OF THE CLAIM.

23           WHAT DO THEY REQUIRE?

24   A    SO THE, THE FIRST ELEMENT, ELEMENT A, THE

25   OPERATIVE WORDS THERE ARE THAT THE DEVICE RECEIVES

1821

1    USER INPUT.

2              YOU'VE JUST SEEN AN EXAMPLE OF A VIDEO OF

3    THE DEVICE PERFORMING THIS FUNCTIONALITY.  SO IT'S

4    CLEARLY RECEIVING AND RESPONDING TO THAT INPUT.

5              THE USER INPUT IS IN THE FORM OF ONE OR

6    MORE INPUT POINTS, AND IT IS APPLIED TO A TOUCH

7    SENSITIVE DISPLAY.

8              AND WE'VE SEEN THAT WITH THE SAMSUNG

9    DEVICES.  TABLETS AND SMARTPHONES ARE, IN FACT,

10   TOUCH SENSITIVE DISPLAYS THAT ARE INTEGRATED.  THE

11   TOUCH SURFACE IS INTEGRATED TO THE SCREEN AND

12   FURTHER INTEGRATED WITH THE ACTUAL COMPUTING

13   DEVICE.

14             SO THAT, THAT MEETS THE CLAIM ELEMENT A.

15             CLAIM ELEMENT B ACTUALLY REQUIRES A PEEK

16   INTO THE SAMSUNG SOURCE CODE, AND I'LL WALK YOU

17   THROUGH THIS.

18             SO HERE WE SEE THE EXAMPLE RESULTING FROM

19   CLAIM ELEMENT A WHERE, AS I'VE ALREADY DESCRIBED,

20   USER INPUT IS, IS RECEIVED IN RESPONSE TO THIS USER

21   INPUT WITHIN SAMSUNG CODE, AND WHAT YOU SEE --

22   Q    OKAY.  CAN WE HAVE IT ON THE JURORS' SCREEN

23   AND THE COURT'S SCREEN AND OPPOSING COUNSEL?

24             GREAT.

25   A    SO WHAT YOU SEE ON THIS SLIDE IS ESSENTIALLY,

```
 1    IT'S AN EXCERPT FROM SAMSUNG'S SOURCE CODE THAT

 2    GETS CALLED WHEN THE USER PROVIDES INPUT ON THE

 3    SCREEN.

 4              AND WITHIN THIS FUNCTION, THAT

 5    INFORMATION IS ENCAPSULATED, IT, IT CREATES -- IT

 6    IS USED TO CREATE WHAT'S KNOWN AS A MOTION EVENT

 7    OBJECT, AND THIS MOTION EVENT OBJECT IS WHAT IS

 8    BEING REFERRED TO AS AN EVENT OBJECT IN CLAIM B.

 9              TO GIVE YOU SOME MORE SENSE OF WHAT THIS

10    MOTION EVENT OBJECT ACTUALLY IS, JUST BELOW THE

11    MOTION EVENT OBJECT, YOU SEE ANDROID DOCUMENTATION

12    DESCRIBING THE MOTION EVENT OBJECT, AND THE

13    DOCUMENTATION GOES ON TO SAY THAT THE MOTION EVENT

14    OBJECT REPORTS ON MOVEMENTS AND MOVEMENT EVENTS AND

15    IT HOLDS MOVEMENT DATA REGARDING FINGERS AND PENS

16    AND OTHER FORMS OF INPUT, THE LOCATIONS, THE TIMES

17    OF THE INPUT AND SO ON.

18    Q    AND SO DO YOU FIND ELEMENTS A AND B MET IN THE

19    SAMSUNG DEVICES AND CODE THAT YOU EXAMINED,

20    DR. SINGH?

21    A    YES, I DO.

22    Q    LET'S GO ON TO THE NEXT ELEMENTS OF THE CLAIM.

23    A    SO --

24    Q    SORRY.  LET ME JUST INTRODUCE -- WE'RE LOOKING

25    AT 29.12, AND BOTH 29.11 AND .12 ARE BEING SEEN
```

1   ONLY BY THE JURY AND THE COURT AND OPPOSING

2   COUNSEL.

3   A    OKAY.  SO THESE ELEMENTS, AGAIN, ARE -- SORT

4   OF DESCRIBE IN SOME SENSE WHAT'S HAPPENING BELOW IN

5   THE, IN THE SAMSUNG CODE.

6           AND THE OPERATIVE WORDS IN THE BIG ONE

7   ARE DETERMINING WHETHER THE EVENT OBJECT INVOKES A

8   SCROLLING OPERATION, WHICH I'VE DESCRIBED BEFORE,

9   WHICH IS MOVING CONTENT, OR THE SMALL COMPLEX

10  GESTURE OPERATION, SUCH AS SCALING, BY

11  DISTINGUISHING BETWEEN WHETHER A SINGLE INPUT POINT

12  IS APPLIED TO THE SCREEN OR TWO OR MORE INPUTS, IN

13  WHICH CASE A GESTURE OPERATION IS MADE.

14          SO TO UNDERSTAND THIS -- TO UNDERSTAND

15  THIS ELEMENT, WHAT YOU SEE BELOW IS A SCHEMATIC.

16  IT'S, IT'S JUST A SCHEMATIC SHOWING THE SAMSUNG

17  SMARTPHONE AND TAB PHONE.

18          AGAIN, WHAT YOU SEE OVER THERE ARE

19  EXCERPTS TAKEN FROM THE SAMSUNG SOURCE CODE AND

20  LAID OUT JUST TO MAKE THINGS VERY CLEAR.

21          AND UPON RECEIVING INPUT, THERE IS A --

22  THERE'S A FUNCTION IN THE WEB VIEW.  THE WEB VIEW

23  IS THE BROWSER PROGRAM, THE INTERNET BROWSER

24  PROGRAM ON THE SAMSUNG DEVICE.

25          WEB VIEW HAS A FUNCTION CALLED ON TOUCH

1    EVENT, SO WHENEVER THERE'S A TOUCH, YOU GO INTO

2    THAT CODE.

3           WHEN YOU GO INTO THAT CODE, THAT CODE IS

4    CALLED AND CAUSED BY THIS MOTION EVENT OBJECT THAT

5    IS BEING PASSED INTO THIS PIECE OF CODE AND IT'S --

6    IT'S SENT INTO THIS CODE AS A PARAMETER.

7           I'VE KIND OF ILLUSTRATED IT ON TOP JUST

8    SO YOU CAN CLEARLY SEE THE FLOW THAT IS TAKING

9    PLACE IN THE CODE.

10          AND THERE'S A VERY IMPORTANT LINE IN THIS

11   CODE WHERE A SIMPLE TEST IS MADE.  THE MOTION EVENT

12   OBJECT HAS A POINTER COUNT.  THE POINTER COUNT

13   TELLS YOU WHETHER ONE INPUT IS ONE INPUT TOUCH, TWO

14   INPUT TOUCHES, OR MORE.

15          SO ALL YOU'RE DOING OVER HERE IS MAKING

16   THIS QUINTESSENTIAL TEST, AND THEN BASED ON THE

17   TEST, WHEN A SINGLE INPUT TOUCH IS ON THE SCREEN,

18   YOU GO DOWN A ONE FINGER PART, THAT RESULTS IN A

19   SCROLL OPERATION.

20          SO THAT TAKES YOU TO THIS CLAIM ELEMENT C

21   WHERE YOU'RE DISTINGUISHING AND YOU'RE GOING DOWN

22   THIS SCROLL BAR, AND I'LL GO ONE STEP FURTHER INTO

23   CLAIM ELEMENT D, WHICH SAYS ISSUES AT LEAST A

24   SCROLL CALL OR A GESTURE CALL, DEPENDING ON WHICH

25   PART YOU GO DOWN, AND A SCROLL CALL, AN EXAMPLE OF

1    A SCROLL CALL IN THIS CASE IS A METHOD THAT SAYS DO

2    DRAG, WHICH SAYS I'M DRAGGING NOW, AND WHAT DO I

3    DO?  THAT'S IF YOU GO DOWN THE SCROLL CALL.

4              VERY SIMILARLY, IF YOU GO DOWN THE

5    GESTURE PART, WHICH IS TWO OR MORE FINGERS, YOU GO

6    DOWN IN THE CODE AND YOU PERFORM A GESTURE

7    OPERATION WHICH RESULTS IN A GESTURE CALL BEING

8    MADE.

9              IN THIS EXAMPLE, THE GESTURE CALL IS A

10   THE TOUCH EVENT OF A SCALE GESTURE, SOMETHING THAT

11   RESULTS IN THE SCALE OPERATION.

12             SO WHAT WE'VE JUST SEEN OVER HERE IS A

13   RUN THROUGH THROUGH THE SAMSUNG SOURCE CODE TO GIVE

14   YOU A SENSE OF TWO IMPORTANT THINGS.

15             ONE, THAT THE MOTION EVENT OBJECT CAUSES

16   A VERY IMPORTANT TEST TO BE MADE, ONE FINGER OR TWO

17   OR MORE FINGERS; AND THEN BASED ON THAT TEST,

18   THERE'S A FORK IN THE CODE AND YOU EITHER GO DOWN A

19   SCROLL BOX WHERE A SCROLL CALL IS MADE AND A SCROLL

20   OPERATION RESULTS, OR DOWN THE GESTURE PART AND A

21   GESTURE CALL IS MADE AND A GESTURE RESULTS.

22             SO THAT'S THESE TWO ELEMENTS.

23   Q    NOW, WHICH DEVICES DOES THIS ANALYSIS THAT YOU

24   JUST PROVIDED APPLY TO?

25   A    IT APPLIES -- THIS SPECIFIC SCHEMATIC APPLIES

1    TO 23 OF THE 24 ACCUSED DEVICES.

2            THE SAMSUNG GALAXY TAB 10.1 ALSO

3    INFRINGES THIS CLAIM, BUT FOR THE PURPOSES OF

4    CLAIM -- FOR ELEMENTS C AND D, IT'S STRUCTURED A

5    LITTLE BIT DIFFERENTLY.

6    Q    DO YOU WANT TO JUST SPEND A MINUTE EXPLAINING

7    THAT WITH 29.14?

8    A    SURE.  SO AS YOU CAN SEE ON THIS SLIDE, THE

9    SCHEMATIC OF THE SOURCE CODE, IT'S VIRTUALLY --

10   IT'S VERY SIMILAR.  AND FOR THE PURPOSES OF THESE

11   CLAIMS, IT'S ACTUALLY IDENTICAL.

12           YOU STILL HAVE THE MOTION EVENT OBJECT

13   CAUSING THIS ALL-IMPORTANT TEST OF ONE FINGER INPUT

14   OR TWO OR MORE FINGERS WITH INPUTS, SO YOU STILL

15   HAVE THE LOGICAL TEST.

16           YOU STILL HAVE THE BRANCHING TAKING PLACE

17   IN THE CODE, AND GOING DOWN THE SCROLL PART RESULTS

18   IN A SCROLL CALL.  EVENTUALLY IT RESULTS IN A

19   SCROLL OPERATION.

20           GOING DOWN THE GESTURE BOX ESSENTIALLY

21   RESULTS IN A GESTURE CALL AND THEN THE

22   CORRESPONDING GESTURE OPERATION.

23           THIS LOGIC THAT YOU SEE ACTUALLY ALLOWS

24   THE GALAXY TAB 10.1 TO PERFORM WHAT YOU CAN THINK

25   OF AS A MORE COMPLEX GESTURE TRANSFORM WHERE IT

```
 1    SIMULTANEOUSLY SCALES AND TRANSLATES THE VIEW.

 2              IF YOU GO BACK TO THAT PICTURE OF A

 3    BICYCLE AND IMAGINE YOUR FINGERS ARE DOWN ON THE

 4    WHEELS OF THE BICYCLE AND NOW YOU'RE GOING TO START

 5    TO MOVE YOUR FINGERS AROUND, MOVING -- SPREADING

 6    THEM APART WILL SCALE THE BICYCLE.

 7              BUT YOU ALSO WANT TO MOVE IT SO THAT YOUR

 8    FINGERS REMAIN ON TO THE BICYCLE.  IF YOU DON'T

 9    MOVE WITH IT, SIMULTANEOUSLY, ALL OF A SUDDEN YOUR

10    BICYCLE IS OFF IN SPACE AND IT'S BIGGER, BUT IT

11    DOESN'T HAVE THAT DIRECT FEEL.

12              AND THAT DIRECT FEEL IS WHAT THE APPLE

13    PRODUCTS PROVIDE.

14              OF THE 24 INFRINGING DEVICES, ONLY THE --

15    OVER HERE WITH THIS CODE, ONLY THE SAMSUNG GALAXY

16    TAB 10.1 KIND OF PROVIDES THIS, THIS -- IT MAKES IT

17    MORE LIKE THE APPLE PRODUCTS.

18    Q    OKAY.  LET'S MARCH THROUGH THE REST OF THE

19    CLAIM LIMITATIONS.

20    A    UM --

21    Q    WE'RE LOOKING AT 29.16.

22    A    SO CLAIM ELEMENT E, ONCE -- NOW THAT WE'VE

23    SPENT, WE'VE BEEN THROUGH THE SLIGHTLY MORE

24    DIFFICULT PART IN THE SAMSUNG CODE, THIS IS -- THIS

25    IS A LOT SIMPLER.
```

```
 1            YOU'VE ALREADY SEEN THIS VIDEO OF THE
 2    SAMSUNG GALAXY S II.  IF YOU CAN PLAY THIS VIDEO
 3    AGAIN, YOU WILL SEE THAT, IN FACT, IN RESPONSE TO
 4    THAT ONE FINGER INPUT, ONCE YOU'VE GONE DOWN THAT
 5    SCROLL PART, CLEARLY A SCROLL CALL HAS BEEN MADE
 6    AND THAT SCROLL CALL, EVENTUALLY IT RESULTS IN
 7    SCROLLING THE WINDOW, HAVING A VIEW ASSOCIATED WITH
 8    THE EVENT OBJECT.
 9            I'D JUST LIKE TO CLARIFY WHAT WE MEAN BY
10    A VIEW ASSOCIATED WITH THE EVENT OBJECT.
11            THE EVENT OBJECT WAS THE MOTION EVENT
12    OBJECT THAT WE SAW IN THE LAST COUPLE OF SLIDES,
13    AND THE VIEW WAS THE WEB VIEW, WEB VIEW FROM WHICH
14    THE PROGRAM THAT RUNS THE -- THAT IS THE BROWSER
15    THAT WE ARE SEEING THIS FUNCTIONALITY BEING
16    PERFORMED IN.
17            SO THAT ESSENTIALLY EXPLAINS ELEMENT E.
18    Q   GREAT.  LET'S GO TO ELEMENT F.
19            WHAT DOES IT REQUIRE?
20    A   ELEMENT F IS, IS ACTUALLY VERY ANALOGOUS TO
21    ELEMENT E.  ELEMENT E DESCRIBES WHAT HAPPENS WHEN
22    YOU GO DOWN THE SCROLL BAR.
23            ELEMENT F SIMPLY TELLS YOU WHAT HAPPENS
24    IF YOU GO DOWN THE GESTURE BAR.  SO IF YOU PLAY
25    THIS VIDEO, YOU NOTICE AGAIN OVER HERE, BASED ON
```

1    TWO FINGER INPUT, A GESTURE CALL IS MADE AND THAT

2    IS RESULTING IN SCALING THE VIEW ASSOCIATED WITH

3    THE OBJECT.

4    Q    DR. SINGH, CAN YOU SHOW THE JURY -- I'M SORRY.

5    LET'S GO TO THE NEXT SLIDE.

6              DR. SINGH, ARE EACH ELEMENTS -- ARE EACH

7    OF THE ELEMENTS OF CLAIM 8 MET BY THE SAMSUNG

8    DEVICES THAT YOU HAVE DETERMINED INFRINGE?

9    A    YES, THEY HAVE.  WE'VE JUST BEEN THROUGH ALL

10   THE ELEMENTS IN SEQUENCE, AND INDEED, ALL THE

11   DEVICES ACTUALLY MEET THESE CLAIM ELEMENTS.

12   Q    OKAY.  NOW LET'S SHOW THE JURY THE DEVICES,

13   AND CAN YOU SHOW ALL 24 OF THESE AS THEY

14   DEMONSTRATE THE INFRINGING BEHAVIOR?

15   A    SURE.  WE'LL START WITH THE GALAXY S II, AT&T,

16   THE GALAXY S II, T-MOBILE, THE GALAXY S II I9100,

17   AND THE GALAXY T 4G.

18             YOU JUST NOTICED THE ONE FINGER SCROLL

19   FOLLOWED BY A TWO FINGER SCALE GESTURE OPERATION.

20   Q    AND THAT WAS 29.20?

21   A    HERE WE SEE ANOTHER SET OF SIX DEVICES, THE

22   ACE, THE CAPTIVATE, THE CONTINUUM, THE DROID

23   CHARGE, THE EPIC 4G, AND THE EXHIBIT 4G.

24             ONCE AGAIN, ONE FINGER, SCROLL; TWO

25   FINGERS, STAY OR GESTURE.

1     Q     THAT WAS 29.21.

2     A     ANOTHER SET OF SIX, THE FASCINATE, THE

3     GALAXY S I9000, THE GEM, THE INDULGE, INFUSE 4G,

4     INTERCEPT.

5     Q     AND THAT'S 29.22.

6     A     ANOTHER SET OF SIX, MESMERIZE, NEXUS S 4G,

7     PREVAIL, REPLENISH, TRANSFORM, VIBRANT.

8             AND FINALLY, THE TABLETS, THE GALAXY TAB

9     7.0 AND THE GALAXY TAB 10.1.

10            AS YOU CAN SEE, ONE FINGER PERFORMS THE

11    PURE SCROLLING OPERATION, TWO OR MORE FINGERS

12    PERFORMS A GENERAL GESTURE OPERATION, SUCH AS THE

13    SCALE.

14    Q     SO BASED ON YOUR ANALYSIS OF THESE DEVICES

15    THAT YOU'VE ENUMERATED, DR. SINGH, AS WELL AS THE

16    SOURCE CODE THAT SAMSUNG PROVIDED YOU, WHAT IS YOUR

17    OPINION AS TO WHETHER THESE PRODUCTS INFRINGE CLAIM

18    8 OF THE '915 PATENT?

19    A     IT'S MY OPINION THAT THESE 24 PRODUCTS THAT

20    I'VE JUST RECITED INFRINGE CLAIM 8 OF THE '915

21    PATENT.

22            MR. JACOBS:  AND YOUR HONOR, I WOULD LIKE

23    TO OFFER INTO EVIDENCE JUST A COUPLE MORE PHONES.

24    1014 IS THE TRANSFORM; AND 1009 IS THE INTERCEPT,

25    BOTH JOINT EXHIBITS.

1           THE COURT:  ALL RIGHT.  ANY OBJECTION?

2           MR. DEFRANCO:  NO, YOUR HONOR.

3           THE COURT:  THEY'RE ADMITTED.

4           (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBERS

5           1014 AND 1009, HAVING BEEN PREVIOUSLY

6           MARKED FOR IDENTIFICATION, WERE ADMITTED

7           INTO EVIDENCE.)

8    BY MR. JACOBS:

9    Q    NOW LET'S TURN TO THE '163 PATENT, WHICH IS

10   1046 IN YOUR BINDER.

11           YOUR HONOR, WE OFFER -- IT'S ALREADY IN

12   EVIDENCE.

13           WHAT IS THE '163 PATENT ABOUT, DR. SINGH?

14   A    ONCE AGAIN, YOU MIGHT REMEMBER MR. FORSTALL

15   DESCRIBING THIS PROBLEM OF VIEWING A DOCUMENT, SUCH

16   AS A NEWSPAPER, ON A SMALL SMARTPHONE SCREEN.

17           NOW, WITH -- AS YOU CAN SEE, WITH THE --

18   WITH THE NEWSPAPER LARGELY OR ENTIRELY VISIBLE ON

19   THE SCREEN, YOU CAN, AT MOST, SORT OF SEE THE

20   LAYOUT OF STORIES AND PERHAPS READ SOME HEADLINES.

21           BUT THE '163 INVENTION, WHAT IT BRINGS TO

22   THE TABLE IS THAT IT ALLOWS A USER TO SIMPLY TAP ON

23   A STORY OR A REGION OR A BOX OF INTEREST AND THE,

24   THE PROGRAM, THE BROWSER ITSELF, USES THE STRUCTURE

25   TO DETERMINE WHAT THAT STORY IS AND THEN ENLARGES

1832

```
 1    AND POSITIONS THE DOCUMENT AS BEST IT CAN TO MAKE
 2    THAT INFORMATION READABLE.
 3              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
 4    OPEN COURT OFF THE RECORD.)
 5              THE WITNESS:  AND WE'LL SEE THIS IN AN
 6    EXAMPLE ON THE APPLE IPHONE 4.
 7              AND ONCE YOU'VE DONE THIS, OF COURSE THE
 8    '163 THEN ALLOWS YOU TO TAP ON A SECOND BOX OF
 9    CONTENT WHILE YOU ARE -- WHILE THE DOCUMENT IS
10    ENLARGED, AND IT MOVES THAT OVER SO THAT YOU CAN
11    READ THE SECOND STORY, AND SO ON.
12              AND YOU CAN CONTINUE IN THIS FASHION.
13    BY MR. JACOBS:
14    Q    SO WHY DON'T YOU JUST DEMONSTRATE THAT ONE
15    MORE TIME?
16    A    SO MAYBE WE CAN LOOK AT IT AGAIN.
17              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
18    OPEN COURT OFF THE RECORD.)
19              THE WITNESS:  THE FIRST TAP ENLARGES AND
20    POSITIONS THE DOCUMENT.  AGAIN, THE SECOND TAP
21    REPOSITIONS THE DOCUMENT ON THE SECOND BOX.
22    BY MR. JACOBS:
23    Q    DID YOU CONCLUDE ONE WAY OR THE OTHER WHETHER
24    THE APPLE PATENTS, THE APPLE PRODUCTS, IN FACT,
25    PRACTICE CLAIM 50 OF THE '163 PATENT?
```

1    A    YES, I DID.  ALL APPLE MOBILE TOUCH DEVICES,

2    THE IPHONE AS YOU JUST SAW AND THE IPODS AND IPADS,

3    IPOD TOUCHES PERFORM IT.

4    Q    WHY NOT JUST USE THE SCROLLING AND PINCHING OF

5    THE '915 PATENT TO ADDRESS THIS PROBLEM?

6    A    OF COURSE YOU CAN USE SCROLLING AND PINCHING.

7         BUT FOR THIS SPECIFIC PROBLEM, YOU WOULD

8    SPEND A LOT OF TIME ADJUSTING YOUR VIEW TO MAKE

9    SURE THE FONT WAS A READABLE SIZE AND SO ON.

10         THE '163 INSTEAD JUST MAKES A KEY

11   INSIGHT.  IT REALIZES THAT IN DOCUMENTS, SUCH AS

12   WEB PAGES, THERE'S ALREADY AN INHERENT STRUCTURE

13   THAT THE PROGRAM CAN EXPLOIT, SO THAT WHEN YOU

14   SIMPLY TAP ON A LOCATION OF THE SCREEN, THE PROGRAM

15   USES THAT INFORMATION OF THAT LOCATION AND FIGURES

16   OUT WHAT THAT PIECE OF CONTENT IS THAT YOU'RE

17   INTERESTED IN AND THEN IT RESIZES IT, ENLARGES THE

18   DOCUMENT AND POSITIONS IT AS BEST IT CAN TO MAKE

19   THAT PIECE OF INFORMATION READABLE.

20         SO IT'S MUCH MORE DIRECT IN THAT ASPECT.

21   Q    DO YOU HAVE AN EXAMPLE OF A SAMSUNG PRODUCT

22   PRACTICING CLAIM 50?

23   A    YES, I DO.

24         (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

25   OPEN COURT OFF THE RECORD.)

```
 1              THE WITNESS:  HERE IS AN EXAMPLE OF THE

 2    GALAXY S II, T-MOBILE, AND VERY SIMILAR TO THE

 3    APPLE DEVICE, YOU WILL SEE THE FIRST TOUCH ENLARGES

 4    THE DOCUMENT AND SUBSTANTIALLY CENTERS THE FIRST

 5    BOX, THE FIRST STORY.

 6              AND NOW THE SECOND BOX, ONCE IT'S TABBED

 7    ON, IS SUBSTANTIALLY CENTERED.

 8              LET'S LOOK AT THAT ONCE MORE JUST SO WE

 9    CAN SEE IT WITHOUT MY TALKING OVER IT.

10              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

11    OPEN COURT OFF THE RECORD.)

12    BY MR. JACOBS:

13    Q    AND THAT'S 29.26 FOR THE IPHONE, .27 FOR THE

14    FIRST TAP FOR THE SAMSUNG GALAXY S II, AND 29.28

15    FOR THE SECOND TAP; CORRECT?

16    A    THAT IS CORRECT.

17    Q    OKAY.  DID YOU STUDY THE CLAIM LANGUAGE OF

18    CLAIM 50 OF THE '163 PATENT?

19    A    YES, I DID.

20    Q    SO LET'S GO OVER THOSE ELEMENTS IN ORDER TO

21    ANALYZE HOW THE SAMSUNG PRODUCTS ALIGN WITH THAT

22    CLAIM.

23              AND FIRST WE HAVE, AGAIN, KIND OF A

24    PREAMBLE, RIGHT, DR. SINGH?

25    A    THAT'S RIGHT.  WELL, IN THIS CASE, IT -- IT IS
```

1    PART OF THE ACTUAL CLAIM ELEMENTS.

2              BUT IN FACT, ALL CLAIM ELEMENTS A TO D

3    ESSENTIALLY DISCLOSE OUR TOUCHSCREEN DISPLAY, ONE

4    OR MORE PROCESSORS, MEMORY, ONE OR MORE PROGRAMS,

5    WHICH WE'VE ALREADY SEEN SORT OF IN THE CONTEXT OF

6    THE '915, AS WELL AS HERE.

7              SAMSUNG SMARTPHONES AND TABLETS ARE

8    ESSENTIALLY -- THEY ARE TOUCHSCREEN DISPLAYS

9    INTEGRATED WITH A COMPUTER THAT HAS MEMORY AND

10   PROGRAMMING.

11   Q    SO LET'S GO TO THE FIRST OF THE MORE

12   SUBSTANTIVE LIMITATIONS.  LET'S GO TO ELEMENT E.

13   A    OKAY.

14   Q    WE'RE LOOKING AT 29.32.

15   A    RIGHT.  SO ELEMENT E ACTUALLY DESCRIBES

16   INSTRUCTIONS FOR DISPLAYING AT LEAST A PORTION OF A

17   STRUCTURED ELECTRONIC DOCUMENT ON THE TOUCHSCREEN

18   DISPLAY.

19             SO WHAT WE'RE TALKING ABOUT HERE IS A

20   STRUCTURE OF ELECTRONIC DOCUMENT, SUCH AS A WEB

21   PAGE.  IN THIS PARTICULAR SCENARIO, YOU SEE THE

22   NEW YORK TIMES WEB PAGE.  IT IS A WEB PAGE WRITTEN

23   IN A LANGUAGE CALLED HYPERTEXT MARKUP LANGUAGE,

24   HTML.  IT'S A VERY COMMON LANGUAGE USED FOR

25   ALTERING WEB PAGES.

1          AND YOU CAN SEE A PORTION OF THIS

2    DOCUMENT BEING CLEARLY DISPLAYED ON THE SAMSUNG

3    DEVICE.

4          THE LAST FEW OPERATIVE WORDS DESCRIBE

5    COMPRISING A PLURALITY OF BOXES OF CONTENT.

6          NOW, THESE WEB PAGES, IN FACT, DO HAVE A

7    NUMBER OF VISUALLY SALIENT REGIONS, VISUALLY

8    DISTINCT REGIONS THAT YOU SEE THAT ARE THESE BOXES

9    OF CONTENT, AND I HAVE ILLUSTRATED THESE BY DRAWING

10   SORT OF DOTTED LINES AROUND THEM AND LABELING THEM

11   FIRST BOX AND SECOND BOX, BUT THAT IS SIMPLY TO

12   ILLUSTRATE WHAT THE PROGRAM ACTUALLY SEES.

13   Q    AND HOW DOES THE UNDERLYING DOCUMENT GET

14   STRUCTURED?  WHAT'S THE SOURCE OF THE STRUCTURE IN

15   HTML?

16   A    WELL, HTML ACTUALLY HAS A NUMBER OF WHAT THEY

17   CALL TAGS.  THESE ARE JUST -- THESE ARE SPECIAL

18   CONSTRUCTS THAT HTML USES TO -- THAT YOU CAN USE TO

19   ANNOTATE YOUR CONTENT, ANNOTATE YOUR TEXT, YOUR

20   IMAGES AND SO ON.

21          AND THESE TAGS ARE DESIGNED SUCH THAT THE

22   VIEWER DOESN'T SEE THEM.  THEY'RE NOT DESIGNED FOR

23   VISUAL CONSUMPTION.

24          BUT WHAT THEY ARE DESIGNED FOR IS THAT

25   THE PROGRAM USES THESE TAGS TO FIGURE OUT HOW IT

1    SHOULD STRUCTURE AND DISPLAY THE CONTENT, THE

2    STORIES, THE HEADLINES, THE IMAGES ON THE SCREEN.

3    Q    LET'S LOOK AT THE NEXT ELEMENT, ELEMENT F ON

4    PDX 29.34.

5    A    OKAY.  SO THESE TWO CLAIM ELEMENTS ARE SORT

6    OF -- THEY SORT OF REQUIRE AN UNDERSTANDING OF WHAT

7    WE SEE ON THE SCREEN, AND PERHAPS WHAT THE PROGRAM

8    SEES.

9              SO I'LL TRY AND EXPLAIN THIS IN A WAY

10   THAT HOPEFULLY WILL BE UNDERSTANDABLE.

11             IN CLAIM ELEMENT F, WE SEE INSTRUCTIONS

12   FOR DETECTING A FIRST GESTURE AT A LOCATION OF THE

13   DISPLAYED PORTION OF THE ELECTRONIC DOCUMENT.

14             SO THAT ONE IS EASY.  DETECTING A FIRST

15   GESTURE, CLEARLY WE SAW IN THE VIDEO A GESTURE IS

16   MADE.  BASED ON THAT GESTURE, THE DEVICE RESPONDS,

17   SO THAT GESTURE IS, IS BEING DETECTED.

18             ON THE -- AND THEN BASED ON THAT,

19   INSTRUCTIONS FOR DETERMINING A FIRST BOX AMONG THE

20   PLURALITY OF BOXES.  THAT'S SORT OF ELEMENT G.

21             SO WHAT YOU SEE ON THE LEFT-HAND SIDE ARE

22   A NUMBER OF BOXES.  I'VE SORT OF LABELED THEM

23   SCHEMATICALLY 1 THROUGH 9.

24             BOX 6 IS PARTICULARLY INTERESTING, AND

25   WHAT YOU SEE ON THE RIGHT-HAND SIDE IS SORT OF A

2838

```
1     TREE STRUCTURE THAT THE SAMSUNG CODE PRODUCES THAT

2     IS REPRESENTATIVE OF WHAT YOU SEE ON THE SCREEN.

3              SO NOW WHEN --

4              THE COURT:  I'M SORRY.

5              DOES ANYONE NEED ANY CAFFEINE?  I'M MORE

6     THAN HAPPY IF YOU WANT TO TAKE A LITTLE MINUTE

7     BREAK OR TWO.  WOULD THAT BE GOOD NOW?  OR IF YOU

8     WOULD LIKE TO BRING A CAFFEINATED DRINK IN, THAT'S

9     FINE, TOO.  WOULD YOU LIKE TO DO THAT?  WE CAN TAKE

10    A COUPLE MINUTE BREAK TO DO THAT.

11             NO?  IS EVERYBODY OKAY?

12             ALL RIGHT.  GO AHEAD.

13             THE WITNESS:  WHEN A GESTURE IS MADE

14    WITHIN THE SAMSUNG CODE, A DOUBLE TAP FUNCTION IS

15    CALLED WHEN YOU TAP ON THERE.

16             AND THEN ONCE YOU DO THAT WITHIN THE

17    CODE, YOU WILL SEE THAT IT USES THE LOCATION OF

18    THAT TAP TO ESSENTIALLY TRAVERSE DOWN THIS TREE

19    STRUCTURE AND FIND WHICH BOX IN THAT TREE STRUCTURE

20    CORRESPONDED TO THE LOCATION.  IN THIS CASE, IT

21    HAPPENS TO BE BOX 6.

22             SO THAT TAKES CARE OF ELEMENTS F AND G.

23    BY MR. JACOBS:

24    Q    BECAUSE WHAT YOU HAVE JUST ILLUSTRATED IS

25    INSTRUCTIONS FOR DOING WHAT?
```

2839

1    A    IT'S INSTRUCTIONS FOR DETECTING THIS GESTURE

2    AND, BASED ON THE LOCATION OF THAT GESTURE,

3    ACTUALLY DETERMINING A BOX, A FIRST BOX THAT IS

4    PART OF THIS STRUCTURED ELECTRONIC DOCUMENT.

5    Q    OKAY.  LET'S GO TO THE NEXT ELEMENT OF CLAIM

6    50.

7              THE COURT:  OKAY.  WHAT WAS THE NUMBER OF

8    THAT ONE?

9              MR. JACOBS:  THAT ONE WAS 29.36.

10             THE COURT:  OKAY.  THANK YOU.

11   BY MR. JACOBS:

12   Q    AND NOW WE'RE ON 29.37.

13   A    SO ELEMENT H SORT OF BRINGS US BACK OUT OF

14   THE, OUT OF THE NITTY GRITTY OF THE SAMSUNG SOURCE

15   CODE AND HERE AGAIN WE'RE LOOKING AT THE DEVICE.

16             IF YOU PLAY THIS VIDEO, YOU'VE ALREADY

17   SEEN THIS VIDEO BEFORE WHERE, UPON RECEIVING THAT,

18   THAT FIRST GESTURE AND DETERMINING THE BOX, YOU CAN

19   SEE THAT THAT INFORMATION IS BEING USED TO ENLARGE

20   THE ENTIRE DOCUMENT AND THEN MOVE IT SUCH THAT THE

21   BOX IS ENLARGED AND SUBSTANTIALLY CENTERED ON THE

22   DISPLAY.

23   Q    AND JUST TO REMIND US, THIS IS A VIDEO OF

24   THE --

25   A    THIS IS A VIDEO OF THE SAMSUNG GALAXY S II,

```
 1   T-MOBILE, THAT WE'VE SEEN ONCE BEFORE.

 2   Q    NOW LET'S GO TO THE NEXT ELEMENT, THE NEXT TWO

 3   ELEMENTS, I AND J.

 4   A    SO ELEMENTS I AND J ESSENTIALLY RELATE TO THE

 5   SECOND GESTURE.  SO ONCE YOU HAVE PERFORMED WHAT

 6   YOU JUST SAW, YOU CAN SEE THAT THE FIRST BOX IS

 7   STILL ENLARGED, AND YOU WILL SEE IN THE VIDEO

 8   DETECTING A SECOND GESTURE ON A SECOND BOX, AND YOU

 9   CAN SEE THAT THE SECOND BOX IS DISTINCT FROM THE

10   FIRST BOX.

11         AND THEN THE INSTRUCTIONS IN RESPONSE TO

12   THAT GESTURE ESSENTIALLY TRANSLATE THE DOCUMENT SO

13   THAT NOW THE SECOND BOX IS SUBSTANTIALLY CENTERED

14   ON THE WEB SCREEN DISPLAY.

15   Q    AND THAT'S PDX 29.39.

16         SO HAVE YOU NOW GONE THROUGH ALL OF THE

17   ELEMENTS, ALL OF THE LIMITATIONS OF CLAIM 50 OF THE

18   '163 PATENT, SIR?

19   A    YES, I HAVE.

20   Q    AND YOU FIND THEM -- DO YOU FIND THEM PRESENT

21   IN THE SAMSUNG DEVICES YOU'RE ABOUT TO ENUMERATE?

22   A    YES, I DO, AND I HAVE.

23   Q    OKAY.  LET'S LOOK AT THE DEVICES.

24   A    OKAY.

25   Q    THIS IS 29.41.
```

```
1    A     WE SEE THE GALAXY S II, AT&T.  YOU JUST SAW

2    THE FIRST GESTURE AND NOW THE SECOND GESTURE.

3            THE GALAXY S II, T-MOBILE, WHICH IS A

4    VIDEO THAT WE'VE ALREADY SEEN.

5            THE GALAXY S II I9100, SECOND GESTURE.

6            GALAXY S II 4G, FIRST GESTURE, AND NOW

7    THE SECOND GESTURE.

8            OKAY.  HERE IS A SET OF SIX OTHER

9    DEVICES, THE ACE, THE CAPTIVATE, THE CONTINUUM, THE

10   DROID CHARGE, THE EPIC 4G, AND THE EXHIBIT 4G.

11           MAYBE THAT RAN BY A LITTLE QUICKLY.

12   PERHAPS WE CAN PLAY THAT ONE AGAIN.

13           (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

14   OPEN COURT OFF THE RECORD.)

15   BY MR. JACOBS:

16   Q    AND WE'RE UP TO 29.42.

17   A    ANOTHER SIX DEVICES, THE FASCINATE, THE

18   GALAXY S I9000, THE GEM, THE INDULGE, THE

19   INFUSE 4G, AND INTERCEPT.

20   Q    THAT'S 29.43.

21   A    THE MESMERIZE, NEXUS S 4G, PREVAIL, REPLENISH,

22   TRANSFORM, AND VIBRANT.

23   Q    THAT'S PDX 29.44.

24   A    AND THEN FINALLY THE TABLETS, THE GALAXY TAB

25   7.0, THERE YOU SEE THE FIRST GESTURE, AND THE
```

2842

```
1    SECOND GESTURE.
2              AND THE GALAXY TAB 10.1.
3              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
4    OPEN COURT OFF THE RECORD.)
5    BY MR. JACOBS:
6    Q    AND THAT'S 29.45.
7              YOUR HONOR, THE DEMONSTRATIVES -- SORRY.
8              THE VIDEOS THAT WE'VE SHOWN PREPARED
9    UNDER DR. SINGH'S DIRECTION WE WOULD OFFER INTO
10   EVIDENCE.
11             THE COURT:  AND WHICH ONES?  THERE HAVE
12   BEEN QUITE A FEW VIDEOS.
13             MR. JACOBS:  YES.
14             THE COURT:  WHY DON'T YOU GO THROUGH THE
15   NUMBERS, PLEASE?
16             MR. JACOBS:  29.4, 29.5, 29.6, 29.10;
17   THEN THREE THAT WOULD BE UNDER SEAL, 29.12, .13,
18   .14; 29.16, 29.18, 29.20, .21, .22, .23, .24, .25,
19   THEN 29.26, .27, .28, .32, .34, .35; THE NEXT ONE
20   WOULD BE SEALED, THAT WOULD BE 29.36, .37, .39,
21   29.41, .42, .43, .44, AND .45.
22             THE COURT:  I DIDN'T SEE ON THE SCREEN
23   29.23, 29.25, 29.35.  I WAS MOSTLY CATCHING EVEN
24   NUMBERS.
25             MR. JACOBS:  LET'S TAKE A QUICK LOOK.
```

2843

```
 1                    THE COURT:  ARE THOSE PART --
 2                    MR. JACOBS:  29.23, MR. LEE.
 3                    THE COURT:  IS THAT -- ALL RIGHT.
 4                    MR. JACOBS:  '915 INFRINGING SMARTPHONES.
 5                    WHAT WAS THE NEXT ONE, YOUR HONOR?
 6                    THE COURT:  FOR THE SEALED, I HAD 29.11,
 7       29.12, AND 29.13.  IT COULD BE THESE ARE
 8       INTERMEDIARY ONES THAT I DIDN'T CATCH.
 9                    MR. JACOBS:  SO .12 IS THE FIRST ONE, .13
10       IS THE NEXT ONE, AND .14, THOSE ARE ALL THE SOURCE
11       CODE.  OH, YES.
12                    THE COURT:  OKAY.  29.11, .12, .13, .14.
13                    MR. JACOBS:  11 DOESN'T NEED TO BE UNDER
14       SEAL.  ACTUALLY, I DIDN'T LIST -- LET'S GO BACK TO
15       11.  THAT'S JUST THE CLAIM LANGUAGE, YOUR HONOR.
16       WE DON'T NEED THAT IN.
17                    THE COURT:  OKAY.  SO THAT'S 29.11 IS NOT
18       COMING IN.
19                    MR. JACOBS:  CORRECT.
20                    THE COURT:  SO .12, .13, .14, .16, .18,
21       .20, .21, .22, .23, .24, .25, AND THEN 29.26, .27,
22       .28, .30, .32, .34, .35, .36.  IS THAT RIGHT?
23                    MR. JACOBS:  .32, .34, .35, .36 IS
24       SEALED.
25                    THE COURT:  YES.
```

2844

```
 1              MR. JACOBS:  THEN .37 IS THE VIDEO.
 2   .39 --
 3              THE COURT: .41, .42, .43, .44, .45.
 4              MR. JACOBS:  EXACTLY, YOUR HONOR.
 5              THE COURT:  ALL RIGHT.  THEY'RE ADMITTED.
 6              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBERS
 7              29.4 - 29.6, 29.10; UNDER SEAL 29.12,
 8              29.13, 29.14, 29.36; 29.16, 29.18, 29.20,
 9              29.21 - 29.28, 29.32, 29.34 - 29.37,
10              29.39, 29.41 - 29.45, HAVING BEEN
11              PREVIOUSLY MARKED FOR IDENTIFICATION,
12              WERE ADMITTED INTO EVIDENCE.)
13              MR. JACOBS:  THANK YOU VERY MUCH.
14              THE COURT:  GO AHEAD.
15   BY MR. JACOBS:
16   Q    NOW, DR. SINGH, DID YOU LOOK AT SAMSUNG
17   DOCUMENTS TO DETERMINE WHAT INTEREST SAMSUNG HAD IN
18   THIS FEATURE IN APPLE -- IN THE APPLE IPHONE?
19   A    YES, I DID.
20   Q    WAS PX 38 ONE OF THE DOCUMENTS YOU LOOKED AT?
21   A    YES, IT WAS.
22              MR. JACOBS:  YOUR HONOR, WE'D OFFER PX 38
23   INTO EVIDENCE.
24              MR. DEFRANCO:  OBJECTION, FOUNDATION,
25   YOUR HONOR.
```

2845

```
1     BY MR. JACOBS:

2     Q    DID YOU STUDY THIS DOCUMENT, SIR?

3     A    YES, I DID.

4              MR. JACOBS:  YOUR HONOR, WE'VE LAID A

5     FOUNDATION.

6              MR. DEFRANCO:  SAME OBJECTION, YOUR

7     HONOR.

8              THE COURT:  OKAY.  IT'S ADMITTED.

9              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

10             38, HAVING BEEN PREVIOUSLY MARKED FOR

11             IDENTIFICATION, WAS ADMITTED INTO

12             EVIDENCE.)

13             THE COURT:  I DON'T HAVE ANY BINDERS FOR

14    MR. SINGH.

15             (PAUSE IN PROCEEDINGS.)

16             MR. JACOBS:  YOUR HONOR, WE HAVE ONE HERE

17    IF YOU LIKE.

18             THE COURT:  OKAY, I HAVE IT.

19             (PAUSE IN PROCEEDINGS.)

20    BY MR. JACOBS:

21    Q    DR. SINGH, WHAT IS THE TITLE OF THIS DOCUMENT,

22    PX 38?

23    A    WELL, THE TITLE IS "BROWSER ZOOMING METHODS

24    UX," THAT'S USER EXPERIENCE, "EXPLORATION STUDY."

25             IT'S A DOCUMENT FROM SAMSUNG
```

TELECOMMUNICATIONS AMERICA.

Q    AND WHAT IS THE -- WHAT WAS THE PURPOSE OF
THIS DOCUMENT AS YOU UNDERSTOOD IT BASED ON YOUR
REVIEW?

A    SO THIS DOCUMENT WAS AN EXPLORATION STUDY
COMPARING A NUMBER OF DIFFERENT METHODS FOR ZOOMING
ON BROWSERS AND IT LOOKED AT A NUMBER OF DIFFERENT
ALTERNATIVE TECHNIQUES, INCLUDING SORT OF THE
DOUBLE TAP TO ZOOM FUNCTIONALITY.

Q    NOW, LET'S ADVANCE TO I BELIEVE IT'S SLIDE 47
IN THE DOCUMENT.

A    SO THIS, THIS PAGE OF THE DOCUMENT ESSENTIALLY
IS, IT'S SUMMARIZING THE RESULTS OF THE, OF THE
DOCUMENT, THAT THE EXPLORATION FOUND THAT, IN FACT,
THE DOUBLE TAP ZOOMING FUNCTIONALITY IN GENERAL WAS
SUPERIOR TO THEIR OTHER ALTERNATIVES THAT THEY
STUDIED, AND THAT THIS FUNCTIONALITY SHOULD BE
ADOPTED AS A SUPPLEMENTARY ZOOMING METHOD.

        AND, FURTHER, THAT THE USER EXPERIENCE OF
THE IPHONE COULD BE USED AS A DESIGN BENCHMARK IN
WHATEVER FUNCTIONALITY THAT THEY, THAT THEY USED.

Q    NOW LET'S TAKE A LOOK AT PLAINTIFF'S EXHIBIT
44, WHICH IS ALREADY IN EVIDENCE AND THAT'S IN YOUR
BINDER.

        THE JURY HAS SEEN THIS DOCUMENT.  IT'S

```
 1    THE "RELATIVE EVALUATION REPORT ON S1 IPHONE,

 2    MARCH 2, 2010."

 3              DOES THIS DOCUMENT HAVE ANY RELATIONSHIP

 4    TO THE PATENTS THAT YOU STUDIED?

 5    A    YES, IT DOES.

 6    Q    LET'S GO TO SLIDE 49, PLEASE.

 7              AND WHAT DOES THIS DOCUMENT SHOW?  OR

 8    WHAT DOES THIS PAGE SHOW?

 9    A    SO THIS, THIS DOCUMENT IS, AGAIN, A RELATIVE

10    EVALUATION REPORT, IN PARTICULAR, IT'S COMPARING

11    THE S1 PHONE, WHICH WAS A PHONE IN DEVELOPMENT, I

12    BELIEVE IT WAS -- IT REPRESENTED THE GALAXY S

13    FAMILY OF PHONES -- AND COMPARING THE S PHONE WITH

14    THE IPHONE FUNCTIONALITY.

15              NOW, IN THE IPHONE, AS YOU'VE SEEN, YOU

16    PERFORM A DOUBLE TAP TO, TO SORT OF ZOOM IN ON

17    CONTENT AND THEN YOU PERFORM A DOUBLE TAP AND IT

18    TAKES YOU TO A SECOND PIECE OF CONTENT AND SO ON.

19              IN THE OLDER SAMSUNG PHONES, THE SECOND

20    GESTURE WAS PERFORMED -- ACTUALLY IN ALL OF THE

21    SAMSUNG PHONES, BUT ALSO IN THE OLDER PHONES, THE

22    SECOND GESTURE WAS PERFORMED WITH A SHORT PRESS,

23    AND IF YOU DOUBLE TAPPED, IT WOULD SORT OF ZOOM IN

24    AND OUT.

25              SO THIS DOCUMENT FINDS THAT THAT ZOOMING
```

```
 1    IN AND OUT PERHAPS IS NOT AS GOOD AS WHAT WE SEE
 2    WITH THE IPHONE AND, THEREFORE, SUGGESTS AN
 3    IMPROVEMENT, WHICH IS THAT THE DOUBLE TAP ZOOM
 4    IN/OUT FUNCTION NEEDS TO BE SUPPLEMENTED IN THE
 5    NEWER DEVICES.
 6    Q    AND IN THE NEWER DEVICES DID YOU, IN FACT, SEE
 7    SUPPLEMENTATION THAT CORRESPONDED TO WHAT THIS
 8    DOCUMENT WAS SEEING IN THE IPHONE?
 9    A    YES, INDEED.  THE NEWER SAMSUNG DEVICES DID,
10    IN FACT, SUPPLEMENT THEIR DOUBLE TAP TO ZOOM
11    FUNCTIONALITY, AND THE WAY THEY SUPPLEMENTED IT WAS
12    TO WORK, ESSENTIALLY, THE WAY IT IS DESCRIBED AND
13    IT TAKES PLACE ON THE IPHONE.
14         MR. JACOBS:  THANK YOU VERY MUCH,
15    DR. SINGH.
16         THE COURT:  ALL RIGHT.  THE TIME IS NOW
17    2:00 O'CLOCK.
18                   CROSS-EXAMINATION
19    BY MR. DEFRANCO:
20    Q    GOOD AFTERNOON, DR. SINGH.
21    A    GOOD AFTERNOON.
22    Q    MY NAME IS ED DEFRANCO.  I'M ONE OF THE
23    LAWYERS REPRESENTING SAMSUNG.  WE HAVEN'T MET
24    BEFORE, OBVIOUSLY.
25    A    NO.
```

```
1    Q    YOU'RE TALKING ABOUT TWO PATENTS HERE TODAY;

2    RIGHT?  YOU'RE APPLE'S EXPERT ON INFRINGEMENT OF

3    THE '915 PATENT AND THE '163; IS THAT CORRECT?

4    A    YES.

5    Q    LET'S DO A LITTLE BACKGROUND FIRST.

6              THIS IS THE FIRST TIME YOU'RE TESTIFYING

7    IN COURT AS A TECHNICAL EXPERT; IS THAT TRUE, SIR?

8    A    THAT IS CORRECT.

9    Q    YOU'VE WORKED FOR APPLE -- YOU'RE WORKING FOR

10   APPLE ON OTHER CASES, THOUGH; IS THAT CORRECT?

11   A    I'M NOT SURE WHAT YOU MEAN.

12   Q    IS THIS THE ONLY LITIGATION IN WHICH YOU'RE

13   WORKING FOR APPLE AS AN EXPERT?

14   A    I HAVE DONE SOME WORK FOR APPLE IN AN ITC

15   CASE, AND SOME WORK ON ANOTHER -- A NORTHERN

16   DISTRICT OF CALIFORNIA CASE.

17             BUT AT THE MOMENT, THIS IS THE ONLY CASE

18   THAT I'M ACTIVELY WORKING ON.

19   Q    AND IS THIS THE FIRST TIME YOUR WORK FOR APPLE

20   GENERALLY, IS THIS THE FIRST -- IS THIS THE FIRST

21   TIME THAT YOU'VE ANALYZED INFRINGEMENT OF A PATENT

22   LIKE YOU SHOWED US EARLIER TODAY?

23   A    YES.

24   Q    FIRST TIME YOU'VE ANALYZED A SPECIFICATION OF

25   A PATENT, PROSECUTION HISTORY OF A PATENT AS YOU
```

2850

1    TOLD US EARLIER; IS THAT RIGHT?

2    A    WELL, I'VE READ PATENT SPECIFICATIONS BEFORE.

3    I'VE HAD PATENT APPLICATIONS OF MY OWN.

4    Q    RIGHT.  BUT IN TERMS OF ANALYZING THEM AND

5    PERFORMING A FULL-BLOWN INFRINGEMENT ANALYSIS OF A

6    SET OF ACCUSED PRODUCTS, THE FIRST TIME YOU'VE DONE

7    THAT IS YOUR WORK FOR APPLE; ISN'T THAT TRUE, SIR?

8    A    YES, THAT IS THE FIRST TIME.

9    Q    IT CAME OUT THIS MORNING -- WERE YOU IN THE

10   ROOM FOR DR. BALAKRISHNAN'S TESTIMONY?

11   A    YES, I WAS.

12   Q    YOU TWO ARE FRIENDS, OF COURSE.  YOU WORK

13   TOGETHER AT THE UNIVERSITY OF TORONTO; IS THAT

14   RIGHT?

15   A    YES, WE DO.

16   Q    YOU'VE KNOWN EACH OTHER FOR TEN YEARS AT THE

17   UNIVERSITY, AND YOU KNEW EACH OTHER EVEN BEFORE

18   THAT WHEN YOU BOTH WORKED FOR THE SAME COMPANY; IS

19   THAT CORRECT?

20   A    THAT IS CORRECT.

21   Q    AS A MATTER OF FACT, IT CAME ABOUT THROUGH

22   DR. BALAKRISHNAN'S CONSULTING WITH YOU THAT YOU

23   ACTUALLY BECAME AN EXPERT IN THIS CASE; IS THAT

24   TRUE?

25   A    YOU'D HAVE TO REPHRASE THAT QUESTION.  I'M NOT

1    SURE WHAT YOU'RE TRYING TO ASK ME.

2    Q    WELL, FOR EXAMPLE, YOU'RE GETTING PAID AN

3    HOURLY RATE TO TESTIFY HERE BY APPLE; ISN'T THAT

4    CORRECT?

5    A    I'M GETTING PAID FOR MY TIME AS AN EXPERT.

6    Q    BY APPLE?

7    A    BY APPLE.

8    Q    AND YOU CONSULTED WITH SOME PEOPLE ABOUT WHAT

9    RATE YOU SHOULD CHARGE, AND ONE OF THOSE PEOPLE WAS

10   DR. BALAKRISHNAN; ISN'T THAT TRUE, SIR?

11   A    YES.

12   Q    YOU TALKED ABOUT -- ON DIRECT EXAMINATION, YOU

13   TALKED ABOUT SOME OF YOUR ACHIEVEMENTS IN YOUR

14   PARTICULAR FIELD.  DO YOU REMEMBER THAT, SIR?

15   A    YES, I DO DID.

16   Q    JUST A FEW QUICK QUESTIONS ABOUT THAT.  YOU

17   WON AN OSCAR; RIGHT?

18   A    THE SOFTWARE THAT I WORKED ON WON AN OSCAR.

19   Q    OKAY.  A COUPLE QUESTIONS I NEED TO ASK YOU,

20   SIR.  IF YOU LOOK ON THE WEB, FOR EXAMPLE, AND SURF

21   FOR SOME INFORMATION RELATING TO THAT OSCAR,

22   THERE'S A LIST OF PEOPLE WHO WORKED FOR THE COMPANY

23   THAT YOU WORKED FOR AT THE TIME WHO ACTUALLY ARE

24   CREDITED WITH CONTRIBUTING TO THAT, ISN'T THERE?

25   A    PERHAPS.  I HAVEN'T -- I DON'T KNOW OF WHAT

1    YOU'RE TALKING ABOUT, BUT YES.

2    Q    WELL, I SAW ON THE WEB A LIST OF ABOUT 15

3    PEOPLE THAT WERE ASSOCIATED WITH THE WORK THAT WENT

4    INTO THE OSCAR THAT WAS OBTAINED.

5    A    PERHAPS.

6    Q    AND MY POINT IS, I JUST NEED TO MAKE CLEAR FOR

7    THE RECORD, THAT THAT WASN'T AN OSCAR THAT YOU AS

8    AN INDIVIDUAL OBTAINED; IS THAT TRUE, SIR?

9    A    I NEVER SAID IT WAS.  I SAID THE -- I SAID THE

10   SOFTWARE WON AN OSCAR.

11   Q    YOU TALKED ABOUT A COUPLE OF OTHER PROJECTS

12   THAT YOU WORKED ON AT ALIAS, WAVEFRONT, AND SOME

13   OTHER COMPANIES, PARAFORM.  DO YOU REMEMBER THAT,

14   SIR?

15   A    SURE.

16   Q    THAT WORK WASN'T SPECIFICALLY DIRECTED TO CELL

17   PHONES OR OTHER PORTABLE DEVICES LIKE TABS.  IS

18   THAT FAIR?

19   A    IT'S FAIR.

20   Q    AND IF YOU LOOK ON YOUR WEB PAGE ON THE

21   INTERNET, AN AWFUL LOT OF INFORMATION THERE,

22   CERTAINLY DISCUSSING SOME OF THE THINGS YOU TOLD US

23   ABOUT ON DIRECT BASED ON YOUR WORK EXPERIENCE.

24        BUT I DIDN'T SEE ANY PARTICULAR MENTION

25   OF YOUR WORK OR EXPERTISE RELATED TO CELL PHONES,

1    FOR EXAMPLE.  IS THAT FAIR?  ARE YOU AWARE OF ANY?

2    A    IT'S NOT FAIR.

3    Q    I DIDN'T SEE ANY SPECIFIC CALL OUT, MENTION OF

4    YOUR PARTICULAR EXPERTISE OR WORK EXPERIENCE IN THE

5    AREA OF TAB DEVICES.  IS THAT FAIR TO SAY, SIR?

6    A    IT'S NOT FAIR TO SAY.

7    Q    I DIDN'T -- WAS THERE SOMETHING MENTIONED ON

8    YOUR WEBSITE RELATING TO TABS LIKE WE'RE SEEING IN

9    THIS CASE?

10   A    ABSOLUTELY.  I -- ONE OF MY MAIN AREAS OF

11   RESEARCH IS AN AREA CALLED SKETCH-BASED INTERFACES,

12   WHICH IS VERY MUCH APPLICABLE TO TOUCHSCREEN

13   DEVICES WHERE YOU, YOU, YOU PROVIDE DIRECT INPUT

14   AND YOU SKETCH AND PERFORM OTHER KINDS OF DIRECT

15   MANIPULATION OPERATIONS.

16          SO I'VE JUST CHAIRED THE MAIN CONFERENCE

17   IN THAT AREA IN ANNECY ABOUT A MONTH BACK, ANNECY,

18   A-N-N-E-C-Y, FRANCE.

19   Q    AND YOU'RE TALKING ABOUT TOUCHSCREEN DEVICES

20   GENERALLY, NOT TAB DEVICES IN PARTICULAR?

21   A    I'M TALKING ABOUT GENERAL STROKE-BASED INPUT

22   THAT COULD COME FROM THE FINGERS, THAT COULD COME

23   FROM A PEN, BUT IS CLEARLY DISTINCT FROM

24   TRADITIONAL WINDOWS, MOUSE, KEYBOARD INTERFACES.

25   Q    LET'S TALK ABOUT THAT TECHNOLOGY.

```
1              YOU STARTED WITH THE '915 PATENT.  DO YOU
2    REMEMBER THAT?
3    A    YES.
4    Q    YOU TALKED ABOUT MR. FORSTALL AND SOME OF HIS
5    TESTIMONY THAT HE GAVE IN THIS CASE.
6              DO YOU REMEMBER THAT?
7    A    YES, I DO.
8    Q    WERE YOU HERE IN COURT FOR HIS TESTIMONY?
9    A    I WAS HERE FOR, I BELIEVE, FOR AT LEAST A PART
10   OF IT.
11   Q    LET'S PUT UP ONE OF YOUR SLIDES.  IT'S CLAIM 8
12   OF THE '915 PATENTS.  IT'S PDX 29.8.  THIS IS ONE
13   OF YOUR SLIDES, DR. SINGH; RIGHT?
14   A    YES.
15   Q    NOW, YOU SAID, IF I HAVE THIS RIGHT, ON DIRECT
16   EXAMINATION, THAT -- YOU MENTIONED MR. FORSTALL A
17   BIT, YOU TALKED GENERALLY ABOUT THE INVENTION IN
18   THE '915 PATENT, AND YOU SAID IT RELATES TO HOW TO
19   POSITION AND RESIZE, WITH YOUR FINGERS, ITEMS ON A
20   SMALL SCREEN, LIKE THE SIZE OF A POSTCARD.
21             DO YOU REMEMBER THAT?
22   A    I GAVE THAT EXAMPLE ACTUALLY BEFORE THIS SLIDE
23   SHOWED UP AS A GENERAL UNDERSTANDING TO PEOPLE AS
24   TO WHAT THE PATENT DEALT WITH.
25             WHEN WE CAME TO THIS SLIDE, WE WERE
```

1    TALKING MUCH MORE SPECIFICALLY ABOUT THE CLAIM

2    LANGUAGE.

3    Q    OKAY.  LET'S TALK ABOUT SOME OF THE CLAIM

4    LANGUAGE.  ONE OF THE THINGS THAT -- YOUR TITLE, BY

5    THE WAY, IS SCROLL VERSUS GESTURE; RIGHT?

6    A    SURE.

7    Q    DO YOU SEE THAT?

8    A    YES.

9    Q    AND THOSE ARE ACTUAL WORDS THAT ARE USED IN

10   CLAIM 8; ISN'T THAT RIGHT?

11   A    YES.

12   Q    NOW, A SCROLL GENERALLY, AS WE'VE SEEN IN THE

13   CASE, IS YOU CAN USE TWO FINGERS OR YOU CAN MOVE

14   TWO FINGERS TO MOVE CONTENT UP ON THE DEVICES THAT

15   WE'RE TALKING ABOUT.  IS THAT FAIR?

16   A    YOU'LL HAVE TO BE A LITTLE MORE PRECISE WITH A

17   QUESTION LIKE THAT IF YOU EXPECT AN ANSWER.

18   Q    WHAT'S A SCROLL, DOCTOR?

19   A    A SCROLL -- IN THE CONTEXT OF THE '915 PATENT,

20   A SCROLL IS MOVING OR SLIDING CONTENT ON THE

21   SCREEN.

22   Q    OKAY.  MOVING OR SLIDING CONTENT ON THE

23   SCREEN.  IS THAT RIGHT?

24   A    YEAH.

25   Q    THAT CONCEPT ALONE, SCROLL, THE '915 INVENTORS

```
1    DIDN'T INVENT SCROLLING.  THAT'S FAIR, ISN'T IT?

2    A    THAT'S FAIR.

3    Q    GESTURE, A GESTURE, WE'VE HEARD ALSO, IS A

4    SCALE.  THAT WORD IS USED IN THE CLAIM, RIGHT, A

5    SCALE?

6    A    YES.

7    Q    THEY'RE INTERCHANGEABLE IN YOUR VIEW; RIGHT?

8    A    NO, THEY'RE NOT INTERCHANGEABLE.  SCALE IS AN

9    EXAMPLE OF A MORE GENERAL GESTURE OPERATION.

10   Q    BETTER PUT.  THANK YOU.

11        BUT A SCALE IS A GESTURE; ISN'T THAT

12   TRUE?

13   A    A SCALE IS A GESTURE OPERATION IN THE CONTEXT

14   OF THE '915.

15   Q    AND A SCALE, IS THAT PRETTY MUCH THE SAME

16   THING AS A ZOOM?  YOU'RE TAKING TWO FINGERS AND

17   ZOOMING IN OR OUT?

18   A    YES.

19   Q    IS THAT FAIR?

20   A    THAT'S FAIR.

21   Q    THE INVENTORS OF THE '915 PATENT, THEY DIDN'T

22   INVENT A GESTURE, A SCALE, A ZOOM, OR DETECTING

23   THOSE ON THE DEVICES WE'RE TALKING ABOUT.  ISN'T

24   THAT FAIR, SIR?

25   A    ABSOLUTELY NOT.  THE CONCEPT OF SCALING GOES
```

2857

```
1    BACK TO THE ANCIENT GREEKS.

2    Q    I THINK AS YOU PUT IT -- LATER ON IN YOUR

3    TESTIMONY WHEN WE GOT TO THE DETERMINATION STEP, I

4    THINK YOU USED THE WORDS THE "ALL-IMPORTANT TEST."

5            DO YOU REMEMBER THAT?  DO YOU REMEMBER

6    USING THAT PHRASE?

7    A    I MAY HAVE SAID THAT, YEAH, SURE.

8    Q    AND BY THAT, DIDN'T YOU MEAN THAT THIS CLAIM

9    IS NOT TALKING ABOUT JUST USING A SCROLL AND THE

10   DEVICE FIGURING OUT IF A SCROLL IS THERE, BECAUSE

11   CERTAINLY THAT'S NOT WHAT THEY INVENTED.  FAIR?

12   A    FAIR.

13   Q    THE CLAIM IS NOT ABOUT SOME -- A USER USING A

14   GESTURE OPERATION LIKE A ZOOM AND THE DEVICE

15   FIGURING OUT IF THERE'S A GESTURE THAT HAS BEEN

16   PERFORMED; RIGHT?  BECAUSE THAT WAS THERE, AS YOU

17   SAID; CORRECT?

18   A    IT IS ABOUT THE DEVICE FIGURING OUT WHETHER

19   IT'S A GESTURE BASED ON TWO OR MORE FINGER INPUTS.

20   Q    BUT AS YOU SAID, IT'S THE ALL-IMPORTANT TEST

21   IN THE CLAIM AS TO WHETHER IT'S A ONE FINGER SCROLL

22   VERSUS A TWO FINGER GESTURE.  THAT'S WHAT THIS

23   INVENTION IS ABOUT.  FAIR?

24   A    SURE.

25   Q    OKAY.  NOW, YOU SAID YOU LOOKED AT THE
```

1    PROSECUTION HISTORY.

2              DO YOU REMEMBER THAT?

3    A    YES, I DID.

4    Q    LET'S PUT UP A SLIDE THAT'S BEEN PREPARED.

5    IT'S SLIDE SDX 3912.007.

6              NOW, DR. SINGH, HAVE YOU SEEN THIS SLIDE

7    BEFORE TODAY?

8    A    YES, I HAVE.

9    Q    YOU'VE SEEN -- THIS IS ONE OF OUR SLIDES WE

10   PREPARED FOR CROSS.  YOU SAW IT BEFORE YOU TOOK THE

11   STAND TODAY; RIGHT?

12   A    YES.

13   Q    YOU KNOW WHAT THIS SLIDE IS?  IT'S SHOWING ON

14   THE LEFT-HAND SIDE AN EARLY VERSION OF THE CLAIM

15   AND THE PROSECUTION HISTORY.  IS THAT RIGHT?

16   A    THAT IS CORRECT.

17   Q    AND PROSECUTION HISTORY, AGAIN, IS THE BACK

18   AND FORTH BETWEEN THE PATENT OFFICE.  IT'S THE

19   DIALOGUE THAT ULTIMATELY, IF SUCCESSFUL, RESULTS IN

20   A PATENT BEING ISSUED.  IS THAT FAIR?

21   A    ABSOLUTELY.

22   Q    AND ON THE RIGHT-HAND SIDE IS THE ACTUAL

23   CLAIM.  DO YOU SEE THAT?

24   A    YES.

25   Q    AND THERE'S -- YOU CAN TELL JUST BY LOOKING AT

```
 1    THE TWO THERE'S MORE WORDS, INFORMATION, THERE ARE
 2    MORE LIMITATIONS IN THE CLAIM AS ACTUALLY ISSUED
 3    THAN IN THE EARLY FILE CLAIM.  IS THAT FAIR?
 4    A    VERY FAIR.
 5    Q    AND IT'S TRUE, ISN'T IT, SIR, THAT FOR THERE
 6    TO BE INFRINGEMENT -- YOU'RE AN EXPERT ON
 7    INFRINGEMENT, RIGHT? -- FOR THERE TO BE
 8    INFRINGEMENT, EACH AND EVERY CLAIM ELEMENT MUST BE
 9    FOUND IN THE ACCUSED DEVICE; IS THAT RIGHT?
10    A    THAT IS RIGHT.
11    Q    IF ONE IS MISSING, ONE, ONLY ONE IS MISSING,
12    THERE'S NO INFRINGEMENT; RIGHT?
13    A    THAT IS RIGHT.
14    Q    NOW, THIS REFLECTS, DOESN'T IT, THAT AS
15    ORIGINALLY FILED, THAT ALL-IMPORTANT TEST THAT YOU
16    MENTIONED WAS NOT IN THE CLAIM; RIGHT?
17         DO YOU SEE THAT HIGHLIGHTED, "BY
18    DISTINGUISHING BETWEEN A SINGLE INPUT POINT," AND
19    THEN IT GOES ON TO TALK ABOUT TWO OR MORE INPUT
20    POINTS?  THAT NOTION WAS NOT IN THE CLAIM AS IT
21    ORIGINALLY FILED.  IS THAT FAIR?
22    A    ABSOLUTELY NOT.
23    Q    NOW, WHY -- THAT LANGUAGE IS -- DO YOU SEE
24    THAT LANGUAGE IN THE CLAIM AS ORIGINALLY FILED,
25    SIR?
```

```
1    A    I DO.

2    Q    OKAY.  NOW, IS IT YOUR UNDERSTANDING, SIR,

3    THAT ONE OF THE REASONS THAT PATENT EXAMINERS

4    INSIST ON ADDITIONS BEING MADE TO CLAIMS IS BECAUSE

5    THEY'VE SEEN SOMETHING THAT SAYS TO THEM, UNLESS

6    THAT'S ADDED, THIS CLAIM MAY NOT BE VALID, FOR

7    EXAMPLE?

8    A    PERHAPS.

9    Q    AND BY THE WAY, IF A CLAIM -- WE'RE GOING TO

10   TALK ABOUT INVALIDITY LATER IN THE CASE, BUT IF A

11   CLAIM IS INVALID, THEN YOU CAN'T INFRINGE THAT

12   CLAIM.  IS THAT FAIR?  YOU'RE HERE TO TALK ABOUT

13   INFRINGEMENT TODAY; RIGHT?

14   A    RIGHT.

15   Q    NOW, YOU SHOWED SOME DEMONSTRATIVES ON DIRECT

16   EXAMINATION.  YOU SHOWED SOME ACTUAL PRODUCTS.

17             DO YOU REMEMBER THAT?

18   A    THAT IS CORRECT.

19   Q    YOU SHOWED SOME INSTANCES WHERE THERE'S A, A

20   ONE FINGER SCROLL.  IS THAT FAIR?

21   A    YES.

22   Q    LET'S PUT BACK UP ON THE SCREEN, PLEASE, RYAN,

23   PDX 29.8.

24             NOW, WITH RESPECT TO THE SCROLL VERSUS A

25   GESTURE, THE CLAIM AS IT ULTIMATELY CAME OUT OF THE
```

1    PATENT OFFICES USES SOME PRETTY SPECIFIC LANGUAGE,

2    DOESN'T IT?

3    A    IT USES THE LANGUAGE OF THE CLAIM THAT YOU

4    SEE.

5    Q    BUT IT'S PRETTY SPECIFIC, ISN'T IT?  IT

6    DOESN'T JUST SAY "A SCROLL."  IT SAYS "A SINGLE

7    INPUT POINT."

8         DO YOU SEE THAT?

9    A    YES.  IT SAYS USING A, A SINGLE INPUT POINT AS

10   A WAY OF DISTINGUISHING BETWEEN A SCROLL AND A

11   GESTURE OPERATION.

12   Q    AND A SINGLE INPUT POINT, ACCORDING TO THE

13   CLAIM, IS INTERPRETED AS A SCROLL OPERATION; ISN'T

14   THAT CORRECT, SIR?

15   A    ABSOLUTELY CORRECT.

16   Q    TWO OR MORE INPUT POINTS ARE INTERPRETED

17   DIFFERENTLY; RIGHT?  THOSE ARE SPECIFICALLY

18   INTERPRETED, ACCORDING TO THIS CLAIM, AS A GESTURE

19   OPERATION; IS THAT RIGHT?

20   A    THAT IS RIGHT.

21   Q    AND THE CLAIM REQUIRES THAT DISTINCTION.  ONE

22   IS A SCROLL, TWO IS A GESTURE OR ZOOM OR SCALE;

23   CORRECT?

24   A    YES.

25   Q    AND IF YOU DON'T HAVE BOTH OF THOSE, IF YOU'RE

1862

```
 1    NOT APPLYING THAT TEST, THEN THAT CLAIM IS NOT
 2    PRACTICED; IS THAT CORRECT?
 3    A    IF YOU'RE NOT APPLYING THAT TEST AND, AND THE
 4    REST OF THE, OF THE CLAIM ELEMENTS, YES, IN THE
 5    APPROPRIATE CONTEXT, THEN, YES.
 6    Q    BUT THE TEST IS ONE, SCROLL; TWO, GESTURE.
 7    THAT'S THE TEST THAT THE CLAIM VERY CLEARLY LAYS
 8    OUT, ISN'T IT?  IT SAYS ONE, ONE IS A SCROLL; TWO
 9    IS A GESTURE; RIGHT?
10    A    ABSOLUTELY.
11    Q    OKAY.  BUT YOU'LL AGREE, THOUGH, THAT THERE
12    ARE AT LEAST SOME PRODUCTS, LIKE THE TAB 10.1 --
13    YOU KNOW THE TAB 10.1.  YOU CAN SCROLL WITH TWO
14    FINGERS; IS THAT CORRECT?
15    A    THAT IS NOT CORRECT.
16    Q    OH, YOU CANNOT SCROLL WITH TWO FINGERS IN THE
17    TAB 10.1?
18    A    ABSOLUTELY NOT.
19    Q    WHY IS THAT?
20    A    I'VE NEVER BEEN ABLE TO DO IT.  MAYBE YOU CAN
21    SHOW ME ON A DEVICE.
22    Q    WELL, LET'S TAKE A LOOK AT VIDEO DX 2557.
23              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
24    OPEN COURT OFF THE RECORD.)
25    BY MR. DEFRANCO:
```

1863

```
 1    Q     IS THAT TWO FINGERS, SIR, BEING USED TO DO A

 2    SCROLL OPERATION?

 3    A     THAT IS WHAT I DESCRIBED IN MY OWN DIRECT

 4    TESTIMONY AS A SIMULTANEOUS SCALE AND TRANSLATE.

 5           IF YOU LOOK AT THAT VIDEO CAREFULLY, YOU

 6    WILL, YOU WILL NOTICE THAT THE CONTENT IS, IS SORT

 7    OF JITTERING SPASMODICALLY BECAUSE IT'S SCALING

 8    WHILE IT'S, IT'S TRANSLATING.  AND PERHAPS IF YOU

 9    TRY REALLY HARD, YOU MIGHT BE ABLE TO GET IT TO GET

10    CLOSE TO STEADY.

11           BUT THE BOTTOM LINE IS THERE ARE

12    INSTRUCTIONS, AS I SHOWED YOU, AND THE CLAIM IS

13    ABOUT THE INSTRUCTIONS IN THE CLAIM LANGUAGE.

14    TECHNICALLY THE INSTRUCTIONS INFRINGE THE CLAIM.

15    Q     I'M SORRY.  ARE YOU DONE, SIR?

16    A     SORRY.

17    Q     OKAY.  LET ME -- LET ME -- LET'S PLAY IT ONE

18    MORE TIME, PLEASE.

19           (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

20    OPEN COURT OFF THE RECORD.)

21    BY MR. DEFRANCO:

22    Q     MAYBE, MAYBE WE JUST SEE THIS DIFFERENTLY.  I

23    SEE IT JITTERING BACK AND FORTH, BUT I DON'T SEE --

24    I SEE THAT AS -- WOULDN'T YOU SAY THAT'S MORE OF A

25    SCROLL THAN A ZOOM, SIR?
```

2864

```
1    A    WELL, YOU KNOW, IF YOU WERE TO GIVE ME A
2    DEVICE, I WILL HAPPILY SHOW IT TO YOU IN A WAY THAT
3    MAYBE YOU WON'T SEE IT SO DIFFERENTLY, BECAUSE I
4    CAN SHOW YOU THAT IT IS SCALING AND TRANSLATING
5    BOTH IN YOUR VIDEO AND IN THE SOURCE CODE THAT I
6    HAVE ANALYZED.
7    Q    WELL, LET ME ASK YOU THIS, AND I WANT TO TALK
8    TO YOU ABOUT YOUR SOURCE CODE ANALYSIS.
9         BUT IF IT WERE -- IF IT WAS TWO FINGERS,
10   IF TWO FINGERS WERE A SCROLL, THEN THAT WOULDN'T
11   NEATLY FIT THE TEST IN THE CLAIM, RIGHT?  BECAUSE
12   THE CLAIM, AS WE SAID, IS ONE FINGER IS A SCROLL,
13   TWO FINGERS IS A GESTURE; RIGHT?  IF IT WERE TWO
14   FINGERS AS A SCROLL, IT WOULDN'T FIT THAT TEST;
15   ISN'T THAT TRUE, SIR?
16   A    BUT THAT'S NOT WHAT YOU'RE SHOWING ME.
17   Q    THAT'S NOT MY QUESTION AT THIS POINT.  I'M
18   JUST ASKING YOU GENERALLY, SO WE CAN GET AWAY FROM
19   THE DEBATE YOU AND I ARE HAVING ABOUT WHAT'S
20   ACTUALLY SHOWN THERE, YOU'LL AGREE WITH ME, WON'T
21   YOU, THAT IF THERE'S A TWO FINGER SCROLL, ASSUMING
22   SOME PRODUCT DID THAT, THAT WOULDN'T FIT WITHIN THE
23   TEST THAT YOU POINTED OUT IN THE CLAIM 8 OF THE
24   '915 PATENT; IS THAT TRUE?
25   A    YOU WOULD HAVE TO QUALIFY WHAT YOU'RE SAYING,
```

```
 1     BECAUSE IF, FOR INSTANCE, THERE WAS SOME HYPER
 2     TECHNICAL PRODUCT WHERE THERE WAS ABSOLUTELY NO
 3     SCALING PERFORMED, ABSOLUTELY YOU COULD DO A, A TWO
 4     FINGER SCROLL OR WHATEVER YOU WANTED TO DO.
 5              IT'S -- THE KEY IS DISTINGUISHING BETWEEN
 6     A SCROLL AND A GESTURE OPERATION.
 7              AND, YES, IN THAT CONTEXT, A SINGLE INPUT
 8     IS USED FOR SCROLLING AND TWO OR MORE INPUTS IS
 9     USED FOR THE GENERAL GESTURE OPERATION.
10     Q    NOW, YOU SAID YOU ANALYZED SOFTWARE, IS THAT
11     CORRECT, THE SOFTWARE THAT IS USED IN SAMSUNG'S
12     PHONES?
13     A    YES.
14     Q    NOW, YOU DID AN EXPERT REPORT IN THIS CASE.
15              DO YOU REMEMBER THAT?
16     A    YES, I DID.
17     Q    YOU GAVE SOME DETAILED CLAIM CHARTS FOR
18     ANALYSIS OF A COUPLE OF PRODUCTS, TWO PRODUCTS, I
19     BELIEVE, RIGHT, WHERE YOU REFERENCE SOURCE CODE?
20              DO YOU REMEMBER THAT?
21     A    I BELIEVE I REFERENCED SOURCE CODE FOR FOUR
22     PRODUCTS.
23     Q    YOU -- IN DETAIL, YOU DID IT FOR TWO, AND THEN
24     YOU HAD SOME SHORTHAND REFERRING TO TWO OTHER
25     PRODUCTS IN THE CHART?
```

2866

1    A    IT WAS EQUALLY IN DETAIL FOR EVERY -- FOR EACH

2    CLAIM ELEMENT THAT HAD SOURCE CODE.  FOR ONE -- FOR

3    ONE OF THE CHARTS, IT HAD THE EQUIVALENT IN TWO

4    OTHER CHARTS.

5    Q    OKAY.  THAT'S FINE.  I'LL TAKE IT.

6         FOR FOUR PRODUCTS, THEN, YOU DID SOURCE

7    CODE ANALYSIS; IS THAT CORRECT?

8    A    THAT IS NOT CORRECT.

9    Q    WELL, AT LEAST IN YOUR EXPERT REPORT WHERE YOU

10   HAD DETAILED CHARTS, YOU DID THAT FOR FOUR

11   PRODUCTS; IS THAT CORRECT?

12        MR. JACOBS:  YOUR HONOR, OBJECTION.  I

13   FEAR WE'RE TREADING ON ONE OF THE COURT'S ORDERS

14   ABOUT CROSS-EXAMINATION RELATING TO THE SOURCE CODE

15   THAT SAMSUNG DID OR DID NOT PROVIDE.

16        MR. DEFRANCO:  YOUR HONOR, THIS IS ALL

17   WITHIN THE SOURCE CODE -- ALL I'M ASKING ABOUT IS

18   THE SOURCE CODE THAT DR. SINGH ACTUALLY ANALYZED.

19        I'M NOT ASKING HIM ABOUT SOURCE CODE THAT

20   WAS NOT PROVIDED.  HE SAID HE ANALYZED 24 PRODUCTS.

21        THE COURT:  ALL RIGHT.  GO AHEAD.  JUST

22   PLEASE BE AWARE OF MY ORDER.

23        MR. DEFRANCO:  YES, YOUR HONOR.

24        THE COURT:  AND JUDGE GREWAL'S ORDER.

25   THANK YOU.

```
 1              MR. DEFRANCO:  LET'S PUT UP PDX 29.12.
 2    Q    NOW, YOU SAID SOMETHING TO ME A MOMENT AGO,
 3    SIR --
 4              THE COURT:  I THINK THAT WAS SEALED.  CAN
 5    YOU TAKE THAT OFF?
 6              MR. DEFRANCO:  OKAY.
 7              THE COURT:  I MEAN, IF YOU WANT TO HAVE
 8    IT OPEN, THAT'S FINE.  THIS IS SAMSUNG SOURCE CODE,
 9    SO IT'S UP TO YOU.
10              MR. DEFRANCO:  JUST ON THESE SCREENS,
11    YOUR HONOR.
12              THE COURT:  THAT'S FINE.
13              MR. DEFRANCO:  SO I DON'T GET IN TROUBLE.
14              THE COURT:  THAT'S FINE.  WHATEVER YOU
15    WISH.
16    BY MR. DEFRANCO:
17    Q    NOW, WE'RE LOOKING -- YOU PRESENTED, DOCTOR, A
18    COUPLE OF DEMONSTRATIVES LIKE THIS WHERE YOU
19    DEPICTED WHAT'S HAPPENING IN THE SOURCE CODE; IS
20    THAT CORRECT?
21    A    THAT IS CORRECT.  THEY'RE EXCERPTS.
22    Q    WELL, IT'S NOT REALLY -- AN EXCERPT TO ME IS
23    SOMETHING WHERE YOU'VE TAKEN SOMETHING OUT AND
24    SHOWN IT.
25              THIS IS A DEPICTION OF YOUR ANALYSIS OF
```

1    THE SOURCE CODE.  ISN'T THAT TRUE, SIR?

2    A    YES.

3    Q    AND YOU DIDN'T ACTUALLY SHOW US -- WE'RE GOING

4    TO LOOK AT A LITTLE BIT, BUT YOU DIDN'T ACTUALLY

5    PRESENT ACTUAL SOURCE CODE AS IT EXISTS IN THE

6    PRODUCTS AND, LIKE SOMETIMES HAPPENS, SHOW US WHERE

7    CERTAIN THINGS ARE BEING DONE.

8         YOU SHOWED US A DEPICTION OF YOUR VIEW OF

9    WHAT'S HAPPENING IN THE SOURCE CODE; IS THAT FAIR?

10   A    I ANALYZED IT IN DETAIL IN MY, IN MY REPORT.

11   I -- I'VE SHOWN IT IN -- TO A LEVEL OF DETAIL THAT

12   I FELT WAS NECESSARY AND UNDERSTANDABLE TO, TO THE

13   JURY.

14        BUT IF YOU WOULD LIKE, I'LL BE HAPPY TO

15   DIG INTO IT WITH YOU.

16   Q    THAT'S THE LAST THING I WANT TO DO, SIR.

17   A    OKAY.

18   Q    I JUST DON'T HAVE TIME.

19   A    OKAY.

20   Q    MY POINT IS SIMPLE.  YOU ANALYZED FOUR

21   PRODUCTS IN YOUR EXPERT REPORTS, YOU HAD THIS

22   DEPICTION, BUT WHEN YOU TALKED ABOUT THE SOURCE

23   CODE YOU PRESENTED ON YOUR DIRECT EXAMINATION, IT'S

24   THIS DEPICTION THAT YOU WERE TALKING ABOUT.  YOU

25   DIDN'T ACTUALLY SHOW THE ACTUAL SOURCE CODE AND HOW

```
 1      IT'S STRUCTURED.  IS THAT FAIR?

 2      A    WELL, I'D LIKE TO CORRECT YOU FIRST.  I

 3      ANALYZED ALL 24 PRODUCTS, NOT FOUR PRODUCTS.

 4               AND WHAT YOU SEE, YES, IS A DEPICTION

 5      SHOWING THE IMPORTANT PORTIONS OF THE CODE AND

 6      SHOWING IT IN THE DEGREE OF DETAIL THAT IS

 7      NECESSARY FOR THE CLAIM LANGUAGE.

 8      Q    WELL, LET'S -- WELL, AS LONG AS WE'RE HERE,

 9      LET'S TAKE A LOOK AT A LITTLE BIT OF THE ANALYSIS

10      THAT YOU PREPARED, OKAY, IN YOUR EXPERT REPORT.  IS

11      THAT FAIR?

12      A    SURE.

13      Q    LET'S PUT UP DR. SINGH'S OPENING REPORT.  IT'S

14      EXHIBIT 17 AT PAGE 3, PLEASE.

15               NOW, DO YOU SEE THERE, IN THAT SECTION OF

16      YOUR REPORT, SIR, YOU'RE TALKING ABOUT -- AT THE

17      BOTTOM YOU TALK ABOUT THE GALAXY S II.

18               DO YOU SEE THAT?

19      A    YES.

20      Q    AND IF YOU SCROLL DOWN TO THE NEXT PAGE WHERE

21      IT CONTINUES, RYAN, PLEASE.  GO BACK TO THE TOP A

22      LITTLE BIT.

23               YOU'VE GOT -- AND CAN YOU JUXTAPOSE THE

24      TWO OF THEM?

25               YOU'VE GOT A REFERENCE IN THE MIDDLE
```

2870

```
1     THERE TO SOME CODE AT DOCUMENT NUMBER 5758.  DO YOU
2     SEE THAT, SIR, RIGHT IN THE MIDDLE OF THE
3     PARAGRAPH?
4     A    YEAH, OKAY.
5     Q    AND I'D LIKE TO PULL UP THAT CODE, 5758, THAT
6     YOU REFERENCED IN YOUR EXPERT REPORT.
7              IF WE TAKE A LOOK AT LINE 7479, DO YOU
8     SEE THERE IT'S GOT SOMETHING CALLED
9     MSCALEDETECTOR.TOUCHEVENT.
10             DO YOU SEE THAT, SIR?
11    A    YES, SURE.
12    Q    YOU HAD SOMETHING IN YOUR GRAPHIC CALLED M
13    SCALE GESTURE DETECTOR, BUT THAT'S NOT ACTUALLY
14    WHAT'S SHOWN IN THE CODE, IS IT, SIR?
15    A    THAT IS CORRECT.
16    Q    THAT'S AN ERROR IN YOUR CITATION?
17    A    NO, THAT'S NOT AN ERROR.
18    Q    BUT THAT'S NOT SHOWN IN THAT PARTICULAR
19    PORTION OF THE SOURCE CODE; IS THAT CORRECT, SIR?
20    A    THE VARIOUS PRODUCTS, THE CODE -- THE ACTUAL
21    NAMES OF VARIABLES AND ACTUAL, YOU KNOW, THE
22    PRECISE LINES OF CODE MAY HAVE SOME, SOME MINOR
23    DIFFERENCES.
24             BUT LOGICALLY, IT IS THE SAME CODE.  WHAT
25    I SHOWED YOU WAS REPRESENTATIVE OF THAT.
```

```
 1    Q    OKAY.  AND AGAIN, IN YOUR REPORT, SIR, YOU

 2    ANALYZED SHOWING THE CODE ANALYSIS FOR FOUR

 3    PRODUCTS, NOT ALL 24 SAMSUNG PRODUCTS; IS THAT

 4    CORRECT.

 5    A    IN MY REPORT.  BUT I DID ANALYZE ALL 24

 6    PRODUCTS.

 7              MR. JACOBS:  YOUR HONOR, I'M SORRY, HE'S

 8    IMPLYING THAT THERE WAS MORE TO ANALYZE.

 9              THE COURT:  OVERRULED.

10              GO AHEAD, PLEASE.

11    BY MR. DEFRANCO:

12    Q    NOW, LET'S GO BACK FOR A SECOND, DOCTOR.  I

13    THINK YOU MAY HAVE MISSPOKE.  LET'S GO BACK AND PUT

14    ON THE CONFIDENTIAL SCREEN EXHIBIT 29, PDX 29.12.

15              YOU KNOW WHAT, RYAN?  I'M SORRY.  LET'S

16    START WITH 29.8 JUST TO PUT THIS IN CONTEXT.

17              WE'RE GOING TO FINISH UP WITH THIS PATENT

18    AND TURN TO THE OTHER ONE IN A SECOND, DOCTOR.

19              BUT YOU TALKED ABOUT AN EVENT OBJECT,

20    RIGHT?  THAT'S ONE OF THE LIMITATIONS IN THE CLAIM.

21              DO YOU SEE THAT?

22    A    THAT'S CORRECT.

23    Q    AND AGAIN, IF THE EVENT OBJECT IS NOT PRESENT

24    IN AN ACCUSED DEVICE, THERE'S NO INFRINGEMENT;

25    RIGHT?
```

```
1     A    IF THE EVENT OBJECT IS NOT CREATED IN RESPONSE

2    TO USER INPUT, YES.

3     Q    OKAY.  AND AN EVENT OBJECT, IS IT FAIR TO SAY,

4    IS THAT A PIECE OF PROGRAMMING CODE THAT HOLDS

5    INFORMATION ABOUT THE TOUCHES THAT A USER MAKES ON

6    A TOUCHSCREEN?

7     A    IT DOES THAT AT LEAST, YES.

8     Q    OKAY.  AND YOU SHOWED A SLIDE ON DIRECT

9    EXAMINATION -- NOW WE'LL GO TO PDX 29.12 BY WAY OF

10    EXAMPLE ON THE CONFIDENTIAL RECORD -- AND YOU'VE

11    GOT WHAT YOU POINTED TO AS THE EVENT OBJECT IN

12    SAMSUNG'S CODE, YOU POINTED TO THE MOTION EVENT,

13    EV, THAT THING IN THE CIRCLE AT THE TOP; IS THAT

14    CORRECT?

15     A    THAT IS CORRECT.

16     Q    AND LIKE ANY EVENT OBJECT, AS YOU JUST SAID,

17    THAT COLLECTS OR HOLDS INFORMATION ABOUT TOUCHES

18    MADE ON A SCREEN; IS THAT CORRECT?

19     A    AND OTHER INFORMATION.

20     Q    AND, AGAIN, THAT SORT OF THING WAS OUT THERE

21    BEFORE THIS INVENTION.  THIS INVENTION ISN'T ABOUT

22    AN EVENT OBJECT THAT HOLDS INFORMATION BASED ON

23    TOUCHES ON A SCREEN; CORRECT?

24     A    WELL, IT'S ABOUT THE -- THE CLAIM ELEMENTS ARE

25    ABOUT THE ENTIRE INVENTION.  WE'VE SEEN THIS
```

1    BEFORE, THAT SIMPLY DECONSTRUCTING CLAIM ELEMENTS

2    INTO MICRO WORDS, YOU KNOW, DOESN'T NECESSARILY

3    SHOW THE PATENT FOR WHAT IT IS.

4           YOU REALLY HAVE TO LOOK AT ALL THE CLAIM

5    ELEMENTS TOGETHER.

6    Q    ABSOLUTELY.  ABSOLUTELY.  I DIDN'T MEAN TO CUT

7    YOU OFF.  ABSOLUTELY.  I DON'T DISAGREE WITH THAT.

8           ALL I'M SUGGESTING IS IF THIS WERE AN

9    INVENTION ABOUT AN EVENT OBJECT ITEM THAT HOLDS OR

10   STORES INFORMATIONS, THAT WOULDN'T BE AN INVENTION.

11   THERE'S MORE TO IT THAN THAT.  ISN'T THAT TRUE,

12   SIR?

13   A    THERE'S MUCH MORE TO IT, YES.

14   Q    AND BEING ABLE TO TAKE INFORMATION THAT

15   RESULTS FROM A USER TOUCHING A SCREEN AND STORING

16   IT SOMEPLACE, LIKE SOMETHING CALLED A MOTION EVENT

17   OBJECT, THAT WAS NOT NEW?

18   A    THE NOTION OF THE EVENT OBJECT, YES, WAS NOT

19   NEW.

20          BUT USING IT WITHIN THE CONTEXT OF THE

21   '915 PATENT, YOU KNOW, MAY AND COULD POSE CERTAIN

22   CHALLENGES THAT THE '915 PATENT HAS TO OVERCOME TO

23   PRODUCE THAT.

24   Q    AND THAT'S GETTING INTO VALIDITY AND WE'LL

25   TALK ABOUT THAT LATER ON IN THE CASE.

1    A    OKAY.

2    Q    BUT FOR NOW, THOUGH, I THINK -- I THOUGHT YOU

3    SAID THAT THE MOTION EVENT OBJECT CALLS OR CAUSES

4    CERTAIN THINGS TO BE HAPPENING.

5         THE MOTION EVENT OBJECT DOESN'T DO WHAT'S

6    KNOWN IN COMPUTER PARLANCE AS EFFECTUATING A CALL,

7    DOES IT?

8    A    IF WHAT YOU'RE REFERRING TO IS THE USE OF THE

9    WORD "INVOKE" IN CLAIM LANGUAGE, THE COURT HAS

10   ALREADY RULED THAT THE WORD "INVOKE" IN THIS

11   CONTEXT MEANS CAUSES OR CAUSES SOMETHING TO HAPPEN.

12        IT'S PLAINLY EVIDENT TO ANYBODY WHO'S A

13   PERSON OF ORDINARY SKILL IN THE ART THAT THE MOTION

14   EVENT OBJECT IS, INDEED, THE CONSTRUCT THAT IS

15   CAUSING THIS ENTIRE CHAIN OF EVENTS, INCLUDING THE

16   TEST THAT YOU SEE, BECAUSE THERE'S A GET POINTER

17   COUNT EVENT -- SORRY -- GET POINTER COUNT FUNCTION

18   THAT GETS CALLED, A LOGICAL BRANCH IS MADE AND THEN

19   YOU GO DOWN EITHER THE SCROLL OR GESTURE PATH.

20        SO ABSOLUTELY THE MOTION EVENT OBJECT

21   CAUSES EVERYTHING.

22   Q    OKAY.

23        AND I'M SORRY, YOUR HONOR, I HAVE TO MOVE

24   TO STRIKE.  THE QUESTION WAS, DOES IT -- WAS YOUR

25   TESTIMONY ON DIRECT THAT IT CALLS FOR CAUSES, AND

1    WE GOT A DIATRIBE ABOUT CAUSES.  THAT WAS NOT MY

2    QUESTION.

3              MR. JACOBS:  YOUR HONOR, I --

4              THE COURT:  OVERRULED.  GO TO THE NEXT

5    QUESTION.

6              THE WITNESS:  SORRY.

7    BY MR. DEFRANCO:

8    Q    LET ME ASK AGAIN.  MAYBE MY QUESTION WASN'T

9    CLEAR.  LET ME TRY AGAIN.

10             I THOUGHT ON DIRECT EXAMINATION YOU SAID

11   THE MOTION EVENT OBJECT CALLS FOR CAUSES.  YOU JUST

12   TOLD US ABOUT CAUSES.  I DON'T WANT TO TALK ABOUT

13   CAUSES FOR THE MOMENT.

14             I WANT TO FOCUS ON CALLS.  CALLS IS

15   SOMETHING SPECIFIC IN COMPUTER PARLANCE; RIGHT?

16   A    YES.

17   Q    IS IT YOUR TESTIMONY HERE THAT MOTION EVENT

18   OBJECT PERFORMS A CALL OPERATION?

19   A    NO.  THE MOTION EVENT OBJECT CAUSES --

20   Q    DOES IT PERFORM A CALL OPERATION?  YES OR NO,

21   SIR?  I NEED A YES OR NO TO THAT.

22             MR. JACOBS:  YOUR HONOR, THAT WAS AN

23   ANSWER.

24             THE COURT:  OVERRULED.

25             GO AHEAD, PLEASE.  YOU CAN ANSWER.

```
1    BY MR. DEFRANCO:

2    Q    PLEASE, SIR, JUST YES OR NO, DOES IT PERFORM A

3    CALL OPERATION?

4    A    WHEN YOU SAY "PERFORM A CALL OPERATION," A

5    CALL IS NOT AN OPERATION.  A CALL IS SOME -- IS A

6    FUNCTION.

7    Q    LET ME TRY IT THIS WAY, SIR.

8    A    YES.

9    Q    WOULD YOU AGREE WITH ME THAT MOTION EVENT

10   OBJECT DOESN'T MAKE A SCROLL CALL, FOR EXAMPLE?

11   A    THE MOTION EVENT OBJECT ITSELF DOES NOT.

12            BUT IT CAUSES THE CODE THAT RESULTS IN A

13   SCROLL CALL TO BE MADE, YES.

14   Q    IT DOESN'T DO IT ITSELF?

15   A    IT IS RESPONSIBLE FOR IT.

16   Q    IT DOESN'T DO IT ITSELF IS WHAT YOU JUST SAID,

17   SIR?

18   A    I SAID IT IS RESPONSIBLE FOR IT.

19   Q    DID YOU -- WERE NOT HERE WITH ME, SIR?  DID

20   YOU JUST SAY IT DOESN'T DO IT ITSELF?  YES OR NO?

21   A    I BELIEVE THE ANSWER TO THIS QUESTION NEEDS TO

22   BE COMPLETED, SO I SAID, YES, IT DOESN'T DO IT

23   ITSELF, BUT IT CAUSES IT.

24   Q    AND THERE'S NOTHING IN THE MOTION EVENT OBJECT

25   THAT CALLS A GESTURE OPERATION; ISN'T THAT TRUE,
```

1    SIR?

2    A    ONCE AGAIN, IT CAUSES IT.

3    Q    THERE'S NOTHING, THOUGH, THAT CALLS IT?  IS

4    THAT TRUE?

5    A    ONCE AGAIN, IT CAUSES IT.

6    Q    LET'S MOVE ON.  LET'S MOVE ON TO THE '163

7    PATENT.

8              THAT'S THE SECOND PATENT THAT YOU

9    TESTIFIED ON DIRECT EXAMINATION ABOUT INFRINGEMENT;

10   CORRECT?

11   A    YES.

12   Q    NOW, I THINK ON DIRECT EXAMINATION YOU SAID

13   SOMETHING TO THE EFFECT THAT IN THE '163 PATENT

14   THAT WAS A RESULT, IN YOUR VIEW, OF A KEY INSIGHT,

15   THOSE PARTICULAR WORDS I WROTE DOWN, KEY INSIGHT IN

16   REALIZING THAT THERE'S AN INHERENT STRUCTURE IN WEB

17   PAGES THAT CAN BE EXPLOITED FOR USE IN THE

18   INVENTION.

19              IS THAT FAIR?

20   A    THAT'S FAIR.

21   Q    OKAY.  THERE ARE NINE PATENTS -- NINE

22   INVENTORS ON THE, ON THE '163 PATENT; IS THAT

23   CORRECT?

24   A    I HAVEN'T COUNTED THEM, BUT THERE ARE MANY.

25   Q    YOU HAVEN'T SPOKEN TO THESE INVENTORS ABOUT,

```
 1    DIRECTLY ABOUT THE '163 PATENT OR THEIR INVENTION
 2    OR ANY INSIGHTS THEY MAY HAVE HAD.  ISN'T THAT
 3    TRUE, SIR?
 4    A    I READ THEIR DEPOSITION TESTIMONIES.
 5    Q    YOU HAVEN'T SPOKEN TO THEM ABOUT ANY INSIGHTS
 6    THEY MAY HAVE HAD.  IS THAT TRUE, SIR?
 7    A    I READ THEIR DEPOSITION TESTIMONIES WHERE THEY
 8    TALK ABOUT INSIGHTS THEY MAY HAVE HAD.
 9    Q    AND -- BY THE WAY, ARE YOU AWARE THAT MANY OF
10    THE INVENTORS ARE WORKING FOR APPLE AND THEY'RE
11    READILY ACCESSIBLE TO YOU IF YOU WANTED TO SPEAK TO
12    THEM AND ASK THEM ABOUT THE INVENTION AND WHAT LED
13    TO IT AND THEIR INSIGHTS AND THAT SORT OF THING?
14    WERE YOU AWARE OF THAT THAT, THAT'S AVAILABLE TO
15    YOU AS AN EXPERT FOR APPLE?
16    A    PERHAPS.
17    Q    NOW, LET'S PULL UP THE SLIDE THAT YOU PREPARED
18    FOR THE '163 PATENT.  THIS IS PDX 29.29.
19         NOW, YOU TOOK US THROUGH THIS ON DIRECT
20    EXAMINATION.  I JUST WANT TO POINT OUT A FEW
21    THINGS.
22         AGAIN, THIS CLAIM -- THIS IS THE -- YOU
23    CALLED IT TAP TO ZOOM AND SUBSTANTIALLY CENTER.
24         DO YOU SEE THAT?
25    A    YES.
```

1    Q    THAT'S SHORTHAND THAT YOU USED TO DESCRIBE

2    THIS INVENTION IN VERY GENERAL TERMS.  IS THAT

3    FAIR?

4    A    THAT'S FAIR.

5    Q    YOU WEREN'T TRYING TO SAY THAT'S WHAT THIS

6    INVENTION IS ALL ABOUT; RIGHT?

7    A    NO.  JUST, AS YOU SAID, A SHORTHAND

8    DESCRIBING.

9    Q    BECAUSE, OF COURSE, TAP TO ZOOM WAS, WAS OUT

10   THERE IN THIS FIELD BEFORE THIS PATENT; RIGHT?  YOU

11   WOULDN'T SAY THESE INVENTORS INVENTED TAP TO ZOOM;

12   RIGHT?

13   A    THAT IS CORRECT.

14   Q    AND SUBSTANTIALLY CENTERING CONTENT, WHATEVER

15   THAT MEANS -- WELL, LET'S TALK ABOUT CENTERING

16   CONTENT ON A MOBILE DEVICE, A PHONE OR AN IPAD.

17        THESE INVENTORS OF THE '163 PATENT, THEY

18   CERTAINLY DIDN'T INVENT SUBSTANTIALLY CENTERING; IS

19   THAT RIGHT?

20   A    IN A VERY GENERAL CONTEXT, MAYBE NOT.

21   Q    OKAY.  BUT AGAIN, YOU WOULD SAY -- I KNOW IT'S

22   COMING -- YOU WOULD SAY, WELL, YOU'VE GOT TO PUT

23   ALL THE ELEMENTS TOGETHER INTO THIS PARTICULAR

24   CLAIM, THAT'S WHAT DESCRIBES THE INVENTION.  THAT'S

25   FAIR; RIGHT?  NOT ANY ONE ELEMENT; RIGHT?

```
 1    A     RIGHT.

 2    Q     EVEN THOUGH, AS YOU TAKE APART THE ELEMENTS,

 3    THEY MAY HAVE BEEN OUT THERE INDIVIDUALLY,

 4    CERTAINLY LIKE TAP TO ZOOM AND CENTERING; IS THAT

 5    TRUE?

 6    A     WELL, WHEN YOU SAY TAP TO ZOOM, YOU HAVE TO,

 7    AGAIN, TALK ABOUT IT IN WHAT CONTEXT YOU'RE TALKING

 8    ABOUT IT.  SIMPLY ZOOMING, QUITE OFTEN ZOOMING OR

 9    TAPPING TO ZOOM WITHOUT -- WITH NO STRUCTURE FOR A

10    DOCUMENT WITHOUT STRUCTURE IS, IS A COMPLETELY

11    DIFFERENT PIECE OF FUNCTIONALITY.  IT'S

12    COMPLETELY -- IT'S SOMETHING THAT'S QUITE

13    DIFFERENT.

14          SO JUST BECAUSE YOU SHARE SOME TECHNICAL

15    WORDS DOESN'T MEAN THAT, YOU KNOW, SOMETHING IS

16    VERY COMMON.

17    Q     ABSOLUTELY.  BUT TAP TO ZOOM, AGAIN, ALONE,

18    THAT CONCEPT WAS NOT -- THESE INVENTORS DID NOT

19    COME UP WITH THAT CONCEPT?

20    A     IN A HYPER TECHNICAL GENERAL SENSE, YES.

21    Q     WHEN YOU SAY THE KEY INSIGHT IS THEY REALIZED

22    THERE'S AN INHERENT STRUCTURE IN WEB PAGES THAT CAN

23    BE EXPLOITED, THE PATENT, THE CLAIM, 50, USES THE

24    PHRASE "STRUCTURED ELECTRONIC DOCUMENT."

25          DO YOU SEE THAT?
```

1    A    YES, I DO.

2    Q    THAT'S ANOTHER LIMITATION ELEMENT THAT MUST BE

3    PRESENT IN THE ACCUSED DEVICE OR FEATURE IN ORDER

4    FOR THERE TO BE INFRINGEMENT; CORRECT?

5    A    WHAT, THAT A STRUCTURED ELECTRONIC DOCUMENT

6    MUST BE PRESENT?

7    Q    YES, YES.

8    A    NO, ABSOLUTELY NOT.

9    Q    OKAY.  IT'S GOT TO BE -- IT'S GOT TO BE DOING

10   SOMETHING TO A STRUCTURED ELECTRONIC DOCUMENT?

11   THERE'S GOT TO BE A DISPLAY, AND THEN THE CLAIM

12   CONTINUES ON; RIGHT?  SO THERE'S GOT TO BE A

13   STRUCTURED ELECTRONIC DOCUMENT PRESENT; IS THAT

14   TRUE?

15   A    NO, IT'S NOT TRUE.

16   Q    OKAY.  STRUCTURED ELECTRONIC DOCUMENT, SIR,

17   THEY WERE OUT THERE; RIGHT?  I MEAN, WEB PAGES USE

18   HTML.  THAT'S THE CODE THAT, AS YOU SAY, WITH TABS

19   WILL STRUCTURE AN ELECTRONIC DOCUMENT; IS THAT

20   RIGHT?

21   A    WITH TAGS.

22   Q    I'M SORRY.  I SAID TABS.  WITH TAGS, THOSE ARE

23   THE LITTLE CHARACTERS; RIGHT?  IS THAT RIGHT?

24   A    YEAH.

25   Q    SO ANY PROGRAMMER KNOWS THAT CERTAIN

2882

```
 1    INFORMATION YOU CAN GET ON THE INTERNET AND ACCESS
 2    THROUGH A MOBILE DEVICE, LIKE A WEB PAGE, THOSE ARE
 3    STRUCTURED DOCUMENTS USING, IN THAT INSTANCE, HTML
 4    CODE.  IS THAT FAIR?
 5    A    YEAH, THAT'S FAIR.
 6    Q    NOW, THIS CLAIM TALKS ABOUT INSTRUCTIONS.  DO
 7    YOU SEE THAT, SIR?
 8    A    YES.
 9    Q    ALL THE WAY DOWN?
10    A    YES.
11    Q    NOW, INSTRUCTIONS ARE ACTUAL LINES OF CODE; IS
12    THAT CORRECT?
13    A    YES.
14    Q    NOW, THAT MEANS THAT SOMEWHERE IN THE SOURCE
15    CODE, THERE ARE VERY SPECIFIC INSTRUCTIONS FOR
16    PERFORMING THOSE OPERATIONS; IS THAT CORRECT?  IS
17    THAT RIGHT?
18    A    YES.
19    Q    AND CAN YOU DETERMINE INFRINGEMENT JUST BY
20    OPERATING AN ACCUSED DEVICE, REGARDLESS OF WHAT MAY
21    OR MAY NOT ACTUALLY BE IN THE SOURCE CODE?
22    A    IT DEPENDS ON WHAT THE, WHAT THE CLAIM
23    LANGUAGE IS, IS STATING.
24         IF THE CLAIM LANGUAGE IS DESCRIBING A
25    VISUAL OPERATION AND YOU CLEARLY OBSERVE THAT
```

```
1    VISUAL OPERATION, THEN CERTAINLY INSTRUCTIONS MUST

2    EXIST.

3            IT'S A COMPUTATIONAL DEVICE.  IT'S NOT A

4    LITTLE MAN SITTING IN THE BOX PERFORMING THE, THE

5    ACTIONS.

6    Q    WELL, OKAY.  SO LET'S TALK ABOUT THIS CLAIM

7    THEN.

8            COULD YOU ANALYZE INFRINGEMENT OF THIS

9    CLAIM WITHOUT LOOKING AT THE PARTICULAR CODE TO SEE

10   WHAT SPECIFIC INSTRUCTIONS THERE WERE?

11   A    WELL, YOU WOULD WANT TO SEE THAT, IN FACT, A

12   FIRST BOX WAS BEING DETERMINED BASED ON THE

13   LOCATION.

14           THE REASON FOR THAT IS THAT THE BOX IS

15   ACTUALLY AN HTML BOX THAT EXISTS IN CODE AND NOT,

16   NOT NECESSARILY WHAT YOU ARE, ARE SEEING -- IT IS

17   NOT SOMETHING THAT YOU'RE NECESSARILY SEEING

18   VISUALLY.

19           SO THAT'S PROBABLY THE ONLY ELEMENT THAT

20   REALLY REQUIRES TO YOU DIG IN DEEP.

21   Q    OKAY.  AND AGAIN, YOU LOOKED -- AT IN YOUR

22   EXPERT REPORT, YOU ANALYZED IN DETAIL FOUR OF THE

23   24 PRODUCTS IN THE CODE; IS THAT CORRECT?

24   A    I ONCE AGAIN -- SORRY.

25           I ONCE AGAIN ANALYZED ALL RELEVANT
```

1    PORTIONS OF SOURCE CODE THAT SAMSUNG MADE AVAILABLE

2    IN THIS.

3              I PROVIDED INSTRUCTIONS FOR FOUR DEVICES.

4    THOSE FOUR DEVICES REPRESENTED MAJOR RELEASES OF

5    THE SAMSUNG SOURCE CODE 2.1, 2.2, 2.3, AND 3.1.

6    Q    AND THAT'S ALL I'M ASKING.  IN YOUR EXPERT

7    REPORTS PREPARED IN THE COURSE OF THE CASE, YOU

8    SPECIFICALLY MAPPED THE CODE FOR FOUR DEVICES;

9    FAIR?

10   A    THAT'S RIGHT.  BUT I ALSO --

11   Q    AND TODAY YOU SHOWED GRAPHICAL DEPICTIONS, BUT

12   NOT ACTUAL CODE IN YOUR DIRECT EXAMINATION; IS THAT

13   RIGHT?

14             MR. JACOBS:  YOUR HONOR, NOW I THINK WE

15   REALLY HAVE CROSSED THE LINE.

16             MR. DEFRANCO:  IT'S THE EXACT SAME

17   QUESTION.

18             MR. JACOBS:  HE'S IMPLYING THAT THERE WAS

19   MORE CODE TO ANALYZE WHEN WE KNOW WHY THERE WERE

20   ONLY FOUR RELEASES AND SETS OF CODE.

21             MR. DEFRANCO:  YOUR HONOR, IT'S THE SAME

22   CADENCE THAT I HAD FOR THE OTHER PATENT.  HE HAD IT

23   AVAILABLE, ONE VERSION FOR EACH PRODUCT.

24             THAT'S ALL I'M ASKING ABOUT, WHETHER HE

25   LOOKED AT EACH OF THE CODE PRODUCED, PRODUCED BY

```
 1    SAMSUNG FOR THE PRODUCTS.  HE DETERMINED --

 2              MR. JACOBS:  THE COURT'S ORDER

 3    SPECIFICALLY NOTES THAT THIS WOULD COME UP IN

 4    CROSS-EXAMINATION OF APPLE'S EXPERTS AND THAT IT IS

 5    UNFAIR TO IMPLY ANY KIND OF LIMITATION ON THE SCOPE

 6    OF THE INQUIRY WHEN THE SCOPE OF THE INQUIRY WAS

 7    LIMITED BY SAMSUNG'S CONDUCT.

 8              MR. DEFRANCO:  YOUR HONOR, I'M NOT GOING

 9    BEYOND THE SCOPE.

10              THE COURT:  I'M GOING TO SAY THIS HAS

11    BEEN ASKED AND ANSWERED ABOUT SIX OR SEVEN TIMES.

12    WE'RE GOING IN A CIRCLE HERE.  CAN YOU PLEASE MOVE

13    ON?  I DON'T KNOW HOW MANY TIMES YOU CAN ASK

14    WHETHER HE'S LOOKED AT ALL 24 CODE OR NOT.  SO

15    PLEASE MOVE ON.

16              ON 403, I'M GOING TO SUSTAIN THE

17    OBJECTION.

18    BY MR. DEFRANCO:

19    Q    YOU ANALYZED THE PROSECUTION HISTORY FOR THIS

20    PATENT, TOO; IS THAT CORRECT?

21    A    YES, I DID.

22    Q    AND WE'RE TALKING ABOUT CLAIM 50 IN THE '163

23    PATENT; IS THAT RIGHT?

24    A    THAT IS CORRECT.

25    Q    LET'S TAKE A LOOK AT A SLIDE, SDX 3912.1.
```

1          NOW, YOU SAW THIS SLIDE BEFORE.  THIS
2     SLIDE WAS PREPARED FOR CROSS-EXAMINATION BY
3     SAMSUNG?  YOU UNDERSTAND THAT, SIR?
4     A    YES, I DO.
5     Q    YOU SAW THE SLIDE BEFORE YOU TOOK THE STAND TO
6     TESTIFY ON DIRECT; IS THAT RIGHT?
7     A    THAT IS CORRECT.
8     Q    AND AGAIN, THIS SHOWS WHAT WE SAW FOR THE
9     OTHER PATENT, AN EARLY DRAFT CLAIM SUBMITTED BY
10    APPLE TO THE PATENT OFFICE ON THE LEFT SIDE; IS
11    THAT TRUE?
12    A    THAT'S CORRECT.
13    Q    AND THE CLAIM THAT WAS ACTUALLY ISSUED ON THE
14    RIGHT-HAND SIDE; IS THAT CORRECT?
15    A    YES, THAT IS CORRECT.
16    Q    AND THERE'S MORE INFORMATION THAT WAS REQUIRED
17    TO BE ADDED BY THE PATENT OFFICE SO THAT THE CLAIM
18    WOULD ULTIMATELY ISSUE; IS THAT RIGHT, SIR?
19    A    NO, I DON'T BELIEVE THAT THAT WAS EXACTLY WHAT
20    IT WAS.  IT WAS THE RESULT -- THE LANGUAGE THAT YOU
21    SEE IS THE RESULT OF A PHONE INTERVIEW BETWEEN THE
22    PROSECUTING LAWYERS, OR COUNSEL, AND THE PATENT
23    EXAMINER WHERE THEY AGREED ON ADDING THIS, THIS
24    CLAIM LANGUAGE.
25          IT'S UNCLEAR WHETHER THIS LANGUAGE WAS

2887

```
1    ADDED SORT OF IN ANY WAY THAT WAS NECESSARY, BUT
2    CLEARLY THE PROSECUTING LAWYERS JUST FIGURED THAT
3    THIS IS PART OF THE INVENTION AND SO IF ADDING IT
4    IS SOMETHING THAT MAKES THE CLAIM EASILY
5    ACCEPTABLE, WHY NOT ADD IT?
6    Q    WELL, LET'S LOOK THE -- THE LANGUAGE THAT WAS
7    ADDED RELATES TO DETECTING A SECOND GESTURE; IS
8    THAT RIGHT?
9    A    THAT'S RIGHT, AND THAT'S WHAT WE'VE BEEN
10   OBSERVING.
11   Q    AND THAT'S REQUIRED IN THIS CLAIM IN ORDER FOR
12   THERE TO BE INFRINGEMENT; IS THAT TRUE?
13   A    CERTAINLY.
14   Q    AND THAT WAS REQUIRED IN ORDER FOR THIS CLAIM
15   TO ISSUE FROM THE PATENT OFFICE.  YOU CAN SAY THAT
16   MUCH, CAN'T YOU, SIR?
17   A    THAT WAS SOMETHING THAT THE PATENT OFFICE AND
18   THE PROSECUTING COUNSEL AGREED ON ADDING.  IT'S
19   SPECULATIVE THAT HAD, HAD THEY -- HAD PROSECUTING
20   COUNSEL WANTED TO STICK WITH THEIR ORIGINAL CLAIMS,
21   THEY WOULD HAVE GONE BACK AND ARGUED THE VALIDITY
22   OF THOSE CLAIMS WITH THE PATENT EXAMINER.
23            BUT THERE'S -- JUST THE FACT THAT THEY
24   EXIST OVER THERE DOESN'T TELL YOU WHETHER THEY WERE
25   NECESSARY.
```

2888

1    Q    THE CLAIM AS ISSUED HAS THAT LANGUAGE?  IS

2    THAT CORRECT, SIR?

3    A    YES.

4    Q    THAT CAME ABOUT AFTER SOME ACTION WAS TAKEN,

5    SOME COMMUNICATION WAS RECEIVED FROM THE PATENT

6    OFFICE; IS THAT RIGHT?

7    A    THAT IS CORRECT.

8    Q    AND THAT SHOWS THE SECOND GESTURE; IS THAT

9    TRUE, SIR?

10   A    THAT IT DOES.

11   Q    NOW, YOU TALKED ABOUT A SAMSUNG DOCUMENT, IT

12   WAS EXHIBIT 44, BUT IN THE INTERESTS OF TIME, YOU,

13   YOU EXPLAINED HOW THAT DOCUMENT SHOWED THAT IN

14   SAMSUNG -- IN THE SAMSUNG PRODUCT AT ISSUE WHEN

15   THERE WAS A DOUBLE TAP, THERE WAS ZOOMING IN, AND

16   WHEN THERE WAS MORE TAPPING, IT WAS ZOOMING OUT.

17   IS THAT CORRECT?

18   A    IN OLDER SAMSUNG DEVICES, YES.

19   Q    RIGHT.  AND THAT, THAT DID NOT INFRINGE CLAIM

20   50 OF THE '163 PATENT; IS THAT CORRECT?

21   A    THAT IS NOT CORRECT.

22   Q    OH, YOU THOUGHT THAT OLD, THAT SAMSUNG

23   TECHNOLOGY, THE DOUBLE TAP AND JUST ZOOMING IN AND

24   DOUBLE TAP AND ZOOMING OUT, THAT -- IS THAT COVERED

25   BY CLAIM 50?

```
1    A    THOSE DEVICES ARE COVERED BY CLAIM 50.
2    Q    THAT SPECIFIC FEATURE THAT I DESCRIBED, DOUBLE
3    TAP TO ZOOM IN, DOUBLE TAP TO ZOOM BACK, IS THAT
4    COVERED BY CLAIM 50 OF THE '163 PATENT?
5    A    THAT IS NOT COVERED.  BUT THE EXISTING
6    FUNCTIONALITY --
7    Q    SO THEN -- I'M JUST ASKING ABOUT THAT
8    FUNCTIONALITY.  THAT FUNCTIONALITY IS NOT COVERED;
9    RIGHT?
10   A    BUT THOSE DEVICES STILL INFRINGE.
11   Q    AND IF -- IF A DEVICE ONLY HAD THAT
12   FUNCTIONALITY, THEN IT WOULDN'T PRACTICE CLAIM 50
13   OF THE '163 PATENT?
14   A    IF THE EARLIER FUNCTIONALITY THAT WAS ALREADY
15   INFRINGING, IN THE EVENT THAT THAT FUNCTIONALITY
16   WAS REMOVED, THEN, YES, IT WOULD NOT INFRINGE.
17   Q    LET'S GO TO SLIDE, BACK TO SLIDE 29.29.  PDX
18   29.29.
19        THE COURT:  IT'S 2:45, SO WHY DON'T YOU
20   GO AHEAD AND ASK THE NEXT QUESTION.
21        MR. DEFRANCO:  THIS IS A NEW TOPIC.
22        THE COURT:  SO WHAT WOULD YOU PREFER?
23   YOU WANT TO TALK GO A LITTLE BIT LONGER AND THEN
24   TAKE A BREAK?
25        MR. DEFRANCO:  COULD WE TAKE A BREAK NOW?
```

```
 1            THE COURT:  THAT'S FINE.  IT'S 2:45 NOW.
 2   WE'RE GOING TO TAKE A 20-MINUTE BREAK BECAUSE
 3   THERE'S SOMETHING THAT I WANT TO TALK TO THE
 4   LAWYERS ABOUT.
 5            SO IF YOU WOULD PLEASE KEEP AN OPEN MIND,
 6   DON'T TALK ABOUT THE CASE WITH ANYONE, AND PLEASE
 7   DON'T DO ANY OF YOUR OWN RESEARCH.
 8            IF YOU COULD GO AHEAD AND LEAVE YOUR
 9   BOOKS IN THE JURY ROOM.
10            THANK YOU.
11            THE WITNESS:  DO I HAVE TO STAY HERE?
12            THE COURT:  NO.  IF YOU COULD JUST STAY
13   SEATED UNTIL OUR JURORS GO INTO THE JURY ROOM, AND
14   THEN ONCE THEY'RE OUT OF THE COURTROOM, THEN YOU'RE
15   FREE TO STEP DOWN AND YOU CAN GO WHEREVER YOU'D
16   LIKE.
17            THE WITNESS:  SURE, OKAY.
18            (WHEREUPON, THE FOLLOWING PROCEEDINGS
19   WERE HELD OUT OF THE PRESENCE OF THE JURY:)
20            THE COURT:  ALL RIGHT.  THE RECORD SHOULD
21   REFLECT THE JURORS HAVE LEFT THE COURTROOM.
22            YOU'RE FREE TO STEP DOWN AND YOU DON'T
23   HAVE TO STAY.  YOU CAN GO WHEREVER YOU'D LIKE.
24            I JUST HAD A QUICK QUESTION ON THIS ISSUE
25   THAT YOU ALL ARE RAISING WITH REGARD TO THE SOURCE
```

```
 1    CODE.
 2              I WAS ONLY AWARE OF THE SOURCE CODE
 3    REGARDING DESIGN-AROUNDS FOR THE '163 AND THE '381,
 4    NOT HAVING -- I'M SORRY, PLEASE TAKE A SEAT -- NOT
 5    HAVING BEEN PRODUCED BY DECEMBER 31ST OF LAST YEAR.
 6              I WAS NOT AWARE OF THIS OTHER ISSUE THAT
 7    YOU SEEM TO BE RAISING.  SO IF YOU CAN POINT ME TO
 8    THE ECF NUMBERS, I'LL TAKE A LOOK AT THEM OVER THE
 9    BREAK BECAUSE I'M NOT AWARE OF WHAT THIS ISSUE IS.
10    IS IT THE SAME ISSUE AS THE DESIGN-AROUNDS, OR NO?
11              MR. JACOBS:  IT WAS IN THE ORDER THAT
12    AFFIRMED, THAT --
13              THE COURT:  MY ORDER IS ECF 1545 FILED ON
14    AUGUST 2ND.
15              MR. JACOBS:  RIGHT.
16              THE COURT:  THAT ONE?
17              MR. JACOBS:  I BELIEVE IT WAS EITHER IN
18    THAT ONE OR IN THE IMMEDIATELY PRECEDING ORDER BY
19    JUDGE GREWAL IN WHICH HE SAID THAT THE SCOPE OF THE
20    PROHIBITION ON SAMSUNG INTRODUCING DESIGN-AROUND
21    INFORMATION WAS BROADER THAN JUST THE QUESTION OF
22    WHAT SOURCE CODE, AND IN EITHER THAT ONE OR IN
23    YOURS, THERE'S A REFERENCE TO CROSS-EXAMINATION.
24    AND I'LL FIND IT.
25              THE COURT:  I GUESS WHAT I DON'T
```

2892

1    UNDERSTAND IS WAS SOURCE CODE ONLY PRODUCED FOR

2    FOUR PRODUCTS AND NOT FOR THE OTHER 24 -- THE OTHER

3    20?

4              MR. DEFRANCO:  YOUR HONOR, SOMEBODY WILL

5    JUMP UP AND CORRECT ME IF I'M WRONG.

6              THE COURT:  OKAY.

7              MR. DEFRANCO:  SINCE IT'S MY WITNESS, LET

8    ME STATE MY UNDERSTANDING FOR THE RECORD.

9              THERE WAS AT LEAST ONE VERSION, ONE

10   VERSION OF SOURCE CODE, LET'S SAY, FOR EACH ACCUSED

11   PRODUCT.

12             THE COURT:  OKAY.

13             MR. DEFRANCO:  SOME OF THAT -- IF YOU

14   LOOK AT A LIST, IT'S THE SAME VERSION FOR DIFFERENT

15   PRODUCTS IN A COUPLE INSTANCES.  BUT THERE WAS AT

16   LEAST ONE BODY OF SOURCE CODE FOR EACH ACCUSED

17   PRODUCT.

18             SO MY QUESTIONING WAS GOING TO -- HE SAID

19   HE ANALYZED ALL THE SOURCE CODE FOR 24 PRODUCTS.

20   WE DON'T HAVE THAT IN HIS EXPERT REPORT.

21             WE HAVE HIM DOING TWO IN DETAIL AND TWO

22   IN LESS DETAIL, BUT HE DIDN'T DO ALL 24.

23             THAT'S ALL I'M GETTING TO.  I'M NOT GOING

24   BEYOND TO SAY WHAT SOURCE CODE HE DIDN'T HAVE.

25             HE HAD AT LEAST ONE FOR EACH PRODUCT.  HE

```
 1    COULD HAVE DONE THAT IN DETAIL FOR EACH PRODUCT.

 2    HE COULD HAVE PRESENTED THE ACTUAL SOURCE CODE.

 3    THAT'S MY POINT FOR BOTH PATENTS.

 4            THE COURT:  THAT'S WHAT I UNDERSTOOD YOUR

 5    POINT TO BE, SO THAT'S WHY I DON'T UNDERSTAND HOW

 6    THE DESIGN-AROUND IS EVEN RELEVANT.

 7            HE'S NOT SAYING HE DIDN'T REVIEW ALL THE

 8    VERSIONS OF THE CODE FOR EACH PRODUCT.  HIS POINT

 9    IS YOUR REPORT ONLY ADDRESSED FOUR OUT OF THE 24.

10            SO THAT'S WHY I OVERRULED YOUR OBJECTION,

11    BECAUSE I LOOK AT MY ORDER THAT'S DOCUMENT NUMBER

12    1545 AND I JUST DON'T THINK IT'S RELEVANT TO THE

13    DISPUTE AT HAND.

14            BUT YOU CAN CORRECT ME IF I'M WRONG ON

15    THIS.

16            MR. JACOBS:  SO IT'S FACTUALLY INCORRECT.

17    THERE WAS NOT CODE PRODUCED FOR EACH PRODUCT.  THE

18    AT&T GALAXY S II, FOR EXAMPLE, THERE WAS NO CODE

19    PRODUCED FOR THAT.  AND WE CAN GET YOU A LIST OF

20    ALL THE CODE IN QUESTION.

21            THE POINT I WANT TO FLAG FOR YOU, IN YOUR

22    ORDER, WHICH I UNDERSTAND YOU MAY BE A LITTLE BIT

23    BEYOND NOW, YOUR HONOR, IS ON PAGE 5.

24            THE COURT:  AND THAT'S DOCUMENT NUMBER

25    1545?
```

```
 1            MR. JACOBS:  YES.  "INDEED, IT WAS A
 2   REASONABLE FINDING THAT SAMSUNG'S FAILURE TO FULLY
 3   COMPLY WITH THE ORDER TO COMPEL SOURCE CODE
 4   NECESSARILY PREJUDICED APPLE'S ABILITY TO BUILD ITS
 5   CASE AS TO EACH INFRINGING PRODUCT AND TO DEFEND
 6   ITSELF AGAINST CROSS-EXAMINATION OF ITS EXPERT
 7   WITNESSES.  SEE JUNE 19, 2012 HEARING TRANSCRIPT AT
 8   20 TO 21 (APPLE'S EXPERTS VULNERABLE ON
 9   CROSS-EXAMINATION TO ATTACKS THAT THEY HAD NOT
10   THOROUGHLY ANALYZED THE SOURCE CODE)."
11            THAT'S WHAT I WAS DRIVING AT.
12            MR. DEFRANCO:  MAY I RESPOND, YOUR HONOR?
13            THE COURT:  WELL, MY UNDERSTANDING ON
14   THAT IS MORE GEARED TOWARDS THE DESIGN-AROUND AND
15   WHETHER THERE WERE SUBSEQUENT VERSIONS OF THIS SAME
16   CODE THAT WERE NOT PRODUCED.
17            DOES THAT MAKE SENSE?  I NEVER
18   INTERPRETED THIS TO MEAN THAT THERE ARE ACTUALLY
19   PRODUCTS FOR WHICH NO VERSION OF CODE WAS EVER
20   PRODUCED.  I UNDERSTOOD THIS TO MEAN THERE ARE
21   LATER ITERATIONS OF THE CODE THAT WAS PRODUCED THAT
22   MAY SHOW A DESIGN-AROUND IN A DIFFERENT
23   FUNCTIONALITY.
24            MR. JACOBS:  I THINK MAYBE THE NUANCE
25   HERE IS THAT THE CODE THAT WAS PRODUCED, WE
```

1    BELIEVE, IS THE CODE FOR PRODUCTS FOR WHICH

2    SPECIFICALLY IDENTIFIED CODE WAS NOT PRODUCED

3    BECAUSE OF THE COMMONALITY OF THE CODE BASE.

4            BUT THERE ARE SPECIFIC PRODUCTS FOR WHICH

5    IDENTIFIED CODE WAS NOT PRODUCED.

6            THE COURT:  ALL RIGHT.  WELL, I THINK I'M

7    NOT GOING TO BE ABLE TO -- WHY DON'T -- WHATEVER

8    YOU HAVE, I NEED TO SEE IT BECAUSE I'M NOT

9    PERSUADED JUST, YOU KNOW, BASED ON MY OWN ORDER.

10   MY OWN ORDER WAS REALLY JUST DIRECTED AT SUBSEQUENT

11   ITERATIONS OF PRODUCED CODE AND WHETHER THEY SHOWED

12   ANY DESIGN AROUND OR DIFFERENT FUNCTIONALITY.

13           IT WAS NOT INTENDED, BECAUSE THAT ISSUE

14   WAS NOT BEFORE ME, OF WHETHER CODE HAD NOT BEEN

15   PRODUCED FOR SOME OF THESE PRODUCTS, PERIOD.

16           MR. JACOBS:  I UNDERSTAND YOUR CONCERN,

17   YOUR HONOR.

18           THE COURT:  OKAY.  ALL RIGHT.  WELL, IF

19   YOU HAVE ANYTHING ELSE ON THAT SCORE, YOU NEED TO,

20   I GUESS, FILE IT OR PROVIDE IT TO BOTH SIDES.

21   OTHERWISE I'M GOING TO CONTINUE TO OVERRULE THOSE

22   OBJECTIONS.  OKAY?

23           MR. JACOBS:  UNDERSTOOD, YOUR HONOR.

24   THANK YOU.

25           THE COURT:  ALL RIGHT.  LET'S GO AHEAD

1896

```
1    AND TAKE A BREAK TO 3:05.
2              MR. JACOBS:  ONE QUICK THING.  WE HAVE A
3    WITNESS SCHEDULING ISSUE, SO WE'RE GOING TO PUT
4    MR. HAUSER ON BRIEFLY NEXT.
5              THE COURT:  OH, OKAY.  THEN I NEED TO GET
6    THE RULINGS ON THOSE OBJECTIONS OUT AS SOON AS
7    POSSIBLE.
8              MR. VERHOEVEN:  YOUR HONOR, MR. PRICE IS
9    GOING TO BE HANDLING THAT WITNESS AND HE'S NOT EVEN
10   HERE BECAUSE WE HAVEN'T BEEN TOLD THAT MR. HAUSER
11   WOULD BE NEXT.  SO I'LL HAVE TO SEE IF HE'S IN THE
12   BUILDING.
13             THE COURT:  WHAT -- ARE YOU NOT CALLING
14   JUNWON LEE AT ALL?
15             MR. JACOBS:  IT'S BY DEPOSITION, YOUR
16   HONOR.
17             THE COURT:  OKAY.  SO THAT'S RELATIVELY
18   QUICK?
19             MR. JACOBS:  EXACTLY.
20             MS. MAROULIS:  THERE WAS ALSO MR. TEKSLER
21   WHO'S GOING TO GO BEFORE MR. HAUSER.
22             MR. VERHOEVEN:  AND HE'LL EASILY BE ON
23   AND OFF.  HE'LL BE ON AND OFF TODAY.
24             THE COURT:  MR. TEKSLER WILL BE ON AND
25   OFF QUICKLY?
```

2897

```
 1              MR. VERHOEVEN:  I CAN'T IMAGINE HE

 2   WOULDN'T BE.

 3              MR. JACOBS:  WE HAVE TO PUT THE LEE

 4   DEPOSITION ON FIRST AND THEN TEKSLER, AND THIS

 5   CROSS LOOKS LIKE IT'S CONTINUING TO GO AND IT'S TEN

 6   OF 3:00 AND MR. HAUSER HAS AN IRONCLAD SCHEDULING

 7   CONFLICT.  WE HAVE TO GET HIM ON AND OFF TODAY.

 8              I DON'T THINK WE HAD ANY IDEA THESE

 9   CROSSES OF OUR TECHNICAL EXPERTS WOULD GO THIS

10   LONG, YOUR HONOR.

11              THE COURT:  WELL, I'M NOT SURE THAT IN

12   THE NEXT 15 MINUTES I CAN GET YOU RULINGS ON

13   MR. HAUSER'S OBJECTIONS.  I'LL DO WHAT I CAN.

14              MR. VERHOEVEN:  AND WE WOULD ALSO OBJECT,

15   YOUR HONOR.  THE WHOLE POINT OF US HAVING THE

16   WITNESS ORDER WAS SO THAT WE COULD BE PREPARED AND

17   HAVE SOME ADVANCED NOTICE OF WHEN WITNESSES ARE

18   GOING TO BE CALLED.

19              SO WE'LL HAVE TO GO BACK AND SEE IF

20   MR. PRICE IS HERE.  HOPEFULLY HE IS.

21              BUT SWITCHING ORDER LIKE THIS AT THE LAST

22   SECOND --

23              THE COURT:  MR. HAUSER CAN'T COME BACK ON

24   MONDAY?

25              MR. MCELHINNY:  IN FAIRNESS, YOUR HONOR,
```

2898

1    MR. VERHOEVEN JUST SAID HE CAN GET ON AND OFF

2    TODAY.  SO THEY KNEW HE WAS COMING ON TODAY.

3            THE QUESTION IS WHETHER HE'S NEXT OR

4    SECOND TO NEXT.  THAT'S THE ISSUE.  SO THE SURPRISE

5    THAT MR. VERHOEVEN EXPRESSES IS A LITTLE GENERATED.

6            THE COURT:  WELL, LET'S -- IF MR. LEE AND

7    MR. TEKSLER ARE FAIRLY QUICK, THEN IT SOUNDS LIKE

8    WE SHOULD BE ABLE TO GET TO MR. HAUSER.  CORRECT?

9            MR. JACOBS:  IT'S JUST ONE OF THOSE

10   THINGS, YOUR HONOR.  HE HAS TO TESTIFY TODAY.

11           MR. VERHOEVEN:  YOUR HONOR, I DOUBT VERY

12   MUCH WE COULDN'T GET HIM AN AND OFF TODAY.

13           THE COURT:  YOU MEAN AFTER LEE AND

14   TEKSLER?

15           MR. VERHOEVEN:  I'M NOT SURE HOW LONG THE

16   DEPOSITION DESIGNATIONS ARE, BUT MR. TEKSLER IS --

17   THEY HAVEN'T TOLD US HOW LONG HIS DIRECT IS GOING

18   TO BE, BUT I DON'T THINK IT'LL BE VERY LONG.

19           MR. LEE:  VERY, VERY BRIEF, TEN MINUTES.

20           MR. VERHOEVEN:  AND THEN MR. HAUSER IS

21   NEXT.

22           MR. MCELHINNY:  SO IN TERMS OF YOUR

23   SCHEDULE, YOUR HONOR, IT'S -- I MEAN, THE

24   OBJECTIONS ARE COMING THIS AFTERNOON.

25           THE COURT:  ALL RIGHT.  WELL, LET ME SEE

1899

```
1    IF I CAN GET HAUSER DONE.  I WAS TOLD TO PRIORITIZE

2    BENNER AND SITTLER, WHICH I DID OVER THE LUNCH

3    HOUR.  BUT I'LL TRY TO SEE IF I CAN GET HAUSER.

4              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

5              THE COURT:  ALL RIGHT.  THANK YOU.

6              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

7              THE COURT:  THANK YOU.

8              (WHEREUPON, A RECESS WAS TAKEN.)

9              THE COURT:  OKAY.  WELCOME BACK.  PLEASE

10   TAKE A SEAT.

11             I FILED THE HAUSER OBJECTION RULINGS.

12             ALL RIGHT.  LET'S BRING THE JURY IN,

13   PLEASE.

14             (WHEREUPON, THE FOLLOWING PROCEEDINGS

15   WERE HELD IN THE PRESENCE OF THE JURY:)

16             THE COURT:  ALL RIGHT.  WELCOME BACK.

17             IT'S 3:12.  PLEASE GO AHEAD,

18   MR. DEFRANCO.

19   BY MR. DEFRANCO:

20   Q    WELCOME BACK, DR. SINGH.  A FEW FOLLOW-UP

21   QUESTIONS.

22             YOU STARTED YOUR WORK IN ABOUT DECEMBER

23   OF LAST YEAR?

24   A    MORE OR LESS ABOUT JANUARY OF THIS YEAR, MAYBE

25   LATE DECEMBER.
```

1900

```
 1    Q    AND IF I ASKED YOU, I APOLOGIZE, YOUR RATE,

 2    YOUR HOURLY RATE IS $450 AN HOUR?

 3    A    THAT'S CORRECT.

 4    Q    AND AT YOUR DEPOSITION IN APRIL, MY MEMORY IS

 5    YOU COULDN'T RECALL AT THAT TIME ABOUT HOW MANY

 6    HOURS YOU HAD SPENT ON THIS CASE.

 7          COULD YOU ESTIMATE FOR US NOW ABOUT HOW

 8    MANY HOURS YOU'VE SPENT WORKING ON THIS CASE?

 9    A    MAYBE SOMEWHERE BETWEEN 150 AND 200.

10    Q    LET'S GO BACK -- THANK YOU, SIR.  LET'S GO

11    BACK TO PDX 29.29, PLEASE.

12          I'D LIKE TO SHIFT GEARS -- WE'RE BACK --

13    WE'RE STILL IN THE '163 PATENT, ONE OF THE TWO

14    PATENTS YOU ANALYZED, CLAIM 50, ONE OF THE TWO

15    CLAIMS YOU ANALYZED, ONE FOR EACH PATENT; RIGHT?

16    A    YES.

17    Q    WE MENTIONED SUBSTANTIALLY CENTERED BRIEFLY.

18    I'D LIKE TO GO BACK TO THAT.

19          THAT TERM, THAT CONTENT, THAT LIMITATION

20    APPEARS TWICE IN CLAIM 50; IS THAT CORRECT?

21    A    YES.

22    Q    AND THERE -- THE CLAIM REQUIRES THERE TO BE

23    INSTRUCTIONS FOR SUBSTANTIALLY CENTERING SOME FIRST

24    BIT OF INFORMATION AND INSTRUCTIONS FOR

25    SUBSTANTIALLY CENTERING A SECOND BIT OF
```

1    INFORMATION; IS THAT RIGHT?

2    A    THAT IS CORRECT.

3    Q    NOW, YOU ANALYZED WHETHER OR NOT THE ACCUSED

4    PRODUCTS SUBSTANTIALLY CENTERED CONTENT IN YOUR

5    WORK ON INFRINGEMENT; IS THAT CORRECT?

6    A    YES.

7    Q    NOW, THERE'S NO -- OTHER THAN THAT PHRASE,

8    "SUBSTANTIALLY CENTERED," THERE'S NO -- THERE'S NO

9    DEFINITION OR EXPLANATION ABOUT WHAT THOSE TERMS

10   MEAN IN THE CLAIM; RIGHT?

11   A    NOT IN THE CLAIM, NO.

12   Q    AND THE SPECIFICATION TALKS ABOUT THOSE TERMS,

13   BUT THERE'S NO EXPLICIT DEFINITION IN THE

14   SPECIFICATION; ISN'T THAT RIGHT?

15   A    WELL, THERE'S TALK IN THE SPECIFICATION ABOUT

16   PADDING AND SO ON WITH REGARDS TO, TO THE DOCUMENT.

17           BUT BY AND LARGE, IT'S SOMETHING THAT A

18   PERSON OF ORDINARY SKILL IN THE ART WILL HAVE NO

19   PROBLEM UNDERSTANDING.

20   Q    SO IS IT YOUR TESTIMONY, SIR, THAT IF I HAD 50

21   PEOPLE LINED UP WHO WERE SKILLED IN THE ART, THEY

22   WOULD ALL GIVE ME THE EXACT SAME ANSWER IF I SHOWED

23   THEM SOMETHING AND ASKED THEM IF IT WAS

24   SUBSTANTIALLY CENTERED?

25   A    BY AND LARGE, GIVEN THE CONTEXT FOR THE '163

1902

```
 1    PATENT, THERE ARE OTHER DESIGN CRITERIA, DESIGN
 2    GOALS THAT UNDERLIE THE, THE PATENT, AND SO USUALLY
 3    IN THE RARE CIRCUMSTANCE WHERE YOU FIND -- YOU FEEL
 4    THAT REASONABLE MINDS MIGHT, MIGHT DEVIATE.
 5              THERE'S USUALLY A GOOD REASON IN THE, IN
 6    THE INTERFACE DESIGN FOR, FOR THINGS APPEARING THE
 7    WAY THEY DO.
 8    Q    SO TWO PEOPLE MIGHT DISAGREE ABOUT WHETHER
 9    SOMETHING IS SUBSTANTIALLY CENTERED, BUT THAT MAY
10    BE KEY TO THE DESIGN GOAL FOR THE SPECIFIC DEVICE?
11    IS THAT WHAT YOU'RE SAYING?
12    A    NO, THAT'S NOT WHAT I'M SAYING.
13    Q    OKAY.  LET ME ASK YOU THIS.  THERE'S NO -- IN
14    TERMS OF GIVING THOSE 50 HYPOTHETICAL PEOPLE SOME
15    TOOLS, THERE'S NO SPECIFIC PARAMETERS SET FORTH IN
16    THE CLAIM; IS THAT TRUE?
17    A    THERE DOESN'T NEED TO BE SPECIFIC PARAMETERS
18    SET FORTH IN THE CLAIM.
19    Q    THERE ARE NONE SET FORTH IN THE CLAIM, SIR;
20    ISN'T THAT TRUE?
21    A    WELL, THERE'S THE TERM "SUBSTANTIALLY
22    CENTERED."
23    Q    RIGHT.  IT DOESN'T SHOW ANY -- IT DOESN'T GIVE
24    ANY MORE INDICATION.  IT DOESN'T GIVE YOU
25    MEASUREMENTS OR DISTANCE OR ANY OTHER INDICATION
```

```
1    ABOUT WHAT THAT MEANS, ISN'T THAT TRUE, SIR, IN THE

2    CLAIM?

3    A    IN THE CLAIM TAKEN WITH THE PATENT, A PERSON

4    OF ORDINARY SKILL IN THE ART WILL UNDERSTAND WHAT

5    IT MEANS.

6    Q    THERE ARE NO -- THERE ARE NO SPECIFIC

7    PARAMETERS.  YOU'VE SEEN CLAIMS THAT HAVE

8    PARAMETERS, RIGHT, SPECIFIC MEASUREMENTS DETAILED

9    EXACTLY IN THE CLAIM?  YOU'VE SEEN THAT, RIGHT,

10   BEFORE SIR?  THAT'S NOT THE SITUATION, IS IT, HERE,

11   SIR?

12   A    NOT FOR THIS PARTICULAR --

13   Q    I'M SORRY.  EVERYBODY IS RUSHED.  I APOLOGIZE

14   FOR TALKING OVER YOU.

15        THAT'S ALSO NOT THE SITUATION WITH

16   RESPECT TO THE '163 SPECIFICATION.  THERE ARE NO

17   SPECIFIC PARAMETERS FOR EACH OF THOSE 50

18   INDIVIDUALS TO COME TO THE SAME CONCLUSION, TO SEE

19   WHETHER THOSE PARAMETERS ARE MET.  THAT'S FAIR,

20   ISN'T IT, SIR?

21   A    THAT'S WHY YOU NEED TO BE A PERSON OF ORDINARY

22   SKILL IN THE ART.

23   Q    NOW, YOU ANALYZED, FOR INFRINGEMENT OF THE

24   '163 PATENT, ONE WEB PAGE.  IS THAT TRUE, SIR?

25   A    THAT IS NOT TRUE.
```

1    Q    YOU ANALYZED A PARTICULAR APPLICATION, DIDN'T

2    YOU, THE BROWSER APPLICATION?

3    A    YES, THE BROWSER APPLICATION, YES.

4    Q    AND IN YOUR REPORT, YOU DIDN'T ANALYZE OTHER

5    APPLICATIONS, LIKE E-MAIL, THE MUSIC PLAYER, OR

6    GALLERY, OR ANY OTHER APPLICATION.  YOU FOCUSSED ON

7    THE GALLERY APPLICATION; IS THAT TRUE?

8    A    NO, I DID NOT.

9    Q    I'M SORRY?

10   A    I DID NOT FOCUS ON THE GALLERY APPLICATION AT

11   ALL.

12   Q    I APOLOGIZE.  I MISSPOKE.  I'M RUSHED.  LET ME

13   SLOW DOWN.

14        YOU FOCUSSED ON THE WEB BROWSER

15   APPLICATION IN YOUR ANALYSIS; IS THAT TRUE?

16   A    THAT IS TRUE.

17   Q    THERE ARE MANY OTHER APPLICATIONS OUT THERE,

18   HIGHER ORDER APPLICATIONS LIKE GALLERY AND E-MAIL

19   AND THINGS LIKE THAT, AND HUNDREDS OF OTHER MORE

20   DETAILED APPLICATIONS YOU CAN DOWNLOAD FROM THE

21   WEB, FOR EXAMPLE.  YOU DIDN'T ANALYZE OTHER

22   APPLICATIONS?

23   A    I DIDN'T NEED TO.

24   Q    NOW -- AND THE WEB PAGE, YOU ALSO -- WITHIN

25   ANALYZING THE WEB BROWSER, YOU PICKED OUT A

2905

1    PARTICULAR WEB PAGE, THE NEW YORK TIMES WEB PAGE;

2    IS THAT TRUE?

3    A    AS PART OF MY TESTING, I TESTED IT ON A NUMBER

4    OF WEB PAGES.  I JUST CHOSE THE NEW YORK TIMES AS A

5    GOOD REPRESENTATIVE WEB PAGE FOR MY ILLUSTRATIONS.

6            BUT THE DESIGN WORKS ON, ON AN

7    INNUMERABLE NUMBER OF WEB PAGES.

8    Q    IN THE INTERESTS OF TIME, SIR, DO YOU RECALL

9    TESTIFYING AT YOUR DEPOSITION THAT YOU COULD NOT

10   RECALL TESTING, PERFORMING ANY TESTS ON ANY OTHER

11   WEB PAGE OTHER THAN THE NEWYORKTIMES.COM WEB PAGE?

12   DO YOU RECALL THAT?

13   A    I RECALL SAYING AT MY DEPOSITION THAT I DID

14   NOT CONCLUSIVELY REMEMBER VERY PRECISE WEBSITES

15   THAT I TESTED ON.

16           AS PART OF MY TESTING, I SPENT A LOT OF

17   TIME JUST BROWSING AROUND GENERALLY ON THE WEB

18   PAGE.  WHEN ONE DOES THAT, YOU DON'T NECESSARILY

19   KEEP A CLEAR TRACK OF EVERY WEB PAGE THAT YOU MIGHT

20   HAPPEN TO VISIT.

21   Q    SO YOU DON'T DISAGREE, AT YOUR DEPOSITION, YOU

22   COULDN'T IDENTIFY ANY OTHER WEB PAGE OTHER THAN THE

23   NEW YORK TIMES?

24   A    NO.  I BELIEVE I DID GIVE AN EXAMPLE OR TWO.

25   Q    YOU DIDN'T REMEMBER EXACTLY WHAT YOU TESTED;

1    ISN'T THAT FAIR, SIR?

2    A    ARE YOU ASKING ME TO REMEMBER WHAT I SAID AT

3    THE DEPOSITION THREE MONTHS BACK?  OR I DON'T KNOW

4    HOWEVER LONG BACK?  YOU'D LIKE TO KNOW WHAT WEB

5    PAGES I TESTED ON, I'D BE HAPPY TO GIVE YOU A LIST.

6    Q    LET'S KEEP GOING.

7            THE -- THERE ARE OTHER -- THERE ARE

8    CERTAIN TYPES OF CONTENT WEB PAGES THAT ARE NOT OF

9    USE FOR THE '163 PATENT; IS THAT TRUE, SIR?

10   A    CAN YOU BE MORE PRECISE WITH THAT QUESTION?

11   Q    THERE ARE CERTAIN TYPES OF, LIKE, MOBILE

12   WEBSITES?  ISN'T IT TRUE, SIR, THAT MOBILE WEBSITES

13   ARE NOT USEFUL IN THE CONTEXT OF THE '163 PATENT?

14   A    MOBILE WEBSITES ARE SITES THAT ARE

15   SPECIFICALLY DESIGNED AS AN ALTERNATIVE, AS AN

16   ALTERNATIVE SOLUTION TO BROWSING ON A SMALL SCREEN

17   DEVICE.

18           THE '163 PATENT SORT OF OBVIATES THE NEED

19   FOR PEOPLE TO GO AND REWRITE THEIR ENTIRE WEB PAGE.

20           SO IT'S -- IT DOESN'T MATTER -- IT'S NOT

21   DESIGNED FOR IT, I WILL AGREE.

22           BUT IT DOESN'T MATTER FOR THE CASE -- FOR

23   THE SAKE OF INFRINGEMENT.

24   Q    WELL, WOULDN'T YOU AGREE THAT IT GOES AGAINST

25   THE TEACHING, MOBILE WEBSITES GO AGAINST THE

1     TEACHING OF THE '163 PATENT?

2     A    OF COURSE.

3     Q    NOW, GENERALLY, YOU DON'T HAVE ANY IDEA -- YOU

4     ANALYZED THE BROWSER -- YOU LOOKED AT THE

5     NEW YORK TIMES WEB PAGE.

6              DO YOU REMEMBER THAT?

7     A    AND OTHER WEB PAGES.

8     Q    AND YOU SPECIFICALLY AT YOUR DEPOSITION -- I

9     CAN PLAY IT FOR YOU, SIR -- YOU COULDN'T, AT YOUR

10    DEPOSITION, IDENTIFY OTHER SPECIFIC ONES YOU

11    REMEMBERED LOOKING AT.

12             DO YOU REMEMBER THAT?

13    A    YOU'RE WELCOME TO PLAY MY DEPOSITION

14    TESTIMONY, BUT I SAID I DID NOT CONCLUSIVELY GIVE

15    ANY NAMES, BUT I DID VERY CLEARLY SAY THAT I HAD

16    LOOKED AT OTHER WEB PAGES.

17    Q    OKAY.

18    A    I'M -- AT THIS POINT, I'M HAPPY TO GIVE YOU A

19    LIST IF YOU WANT.

20    Q    NOW, I JUST WANT TO COVER YOUR MEMORY AT YOUR

21    DEPOSITION.

22             YOU DON'T KNOW, SIR, DO YOU, SITTING

23    HERE, WHAT PERCENTAGE OF PEOPLE WHO OWN A SAMSUNG

24    PRODUCT HAVE ACTUALLY USED THE BROWSER APPLICATION?

25    THAT'S NOT PART OF YOUR TESTIMONY?  IS THAT TRUE?

1908

```
1    A    THAT IS TRUE, I DON'T KNOW.

2    Q    AND YOU -- YOU'RE NOT PROVIDING ANY SURVEY

3    ESTIMATE OF USAGE TO BACK UP YOUR TESTIMONY ON

4    INFRINGEMENT HERE.  IS THAT TRUE?

5    A    NO, IT'S NOT RELEVANT TO INFRINGEMENT AT ALL.

6    Q    AND, IN FACT, ISN'T IT TRUE, SIR, THAT YOU'VE

7    NEVER SEEN ANYONE USE A SAMSUNG SMARTPHONE OR

8    TABLET COMPUTER IN A WAY THAT WOULD DEMONSTRATE THE

9    RESULTS OF STEPS -- OF THE STEPS IN CLAIM 50 OF THE

10   '163 PATENT, OUTSIDE OF THE TESTING THAT YOU'VE

11   DONE?

12   A    IT'S NOT RELEVANT TO THIS CLAIM OF THE PATENT.

13   THIS IS A CLAIM THAT SPECIFICALLY TALKS ABOUT

14   HAVING INSTRUCTIONS ON A DEVICE.

15        IF THE INSTRUCTIONS FOR THIS CLAIM

16   LANGUAGE EXIST ON THE DEVICE, IT DOESN'T MATTER

17   WHETHER ANYONE EVER USES THAT DEVICE OR EVEN DOES

18   ANYTHING ABOUT IT.

19        THE FACT IS IT'S THE DEVICE THAT

20   INFRINGES BECAUSE IT POSSESSES THESE INSTRUCTIONS.

21   Q    YOU DIDN'T -- MY QUESTION WAS, YOU DIDN'T

22   SPEAK TO ANYBODY WHO ACTUALLY USES THIS

23   FUNCTIONALITY, SIR?

24   A    NO.

25   Q    AND THAT WOULD INCLUDE THE INVENTORS; IS THAT
```

1     TRUE, SIR?  YOU DIDN'T SPEAK TO THE INVENTORS ABOUT

2     THIS FUNCTIONALITY?

3     A     I DIDN'T SPEAK TO THE INVENTORS OF --

4     Q     THANK YOU.

5             THE COURT:  ALL RIGHT.

6             MR. DEFRANCO:  THANK YOU.

7             THE COURT:  ALL RIGHT.  THE TIME IS 3:22.

8             MR. JACOBS:  JUST A COUPLE OF QUESTIONS

9     FOR DR. SINGH.

10            COULD WE HAVE THE CLAIM LANGUAGE UP,

11    MR. LEE.

12                    **REDIRECT EXAMINATION**

13    BY MR. JACOBS:

14    Q     THERE WAS A MOMENT OF POSSIBLE CONFUSION.  YOU

15    WERE ASKED WHETHER A STRUCTURED ELECTRONIC DOCUMENT

16    HAS TO BE PRESENT IN THE ACCUSED DEVICE IN ORDER

17    FOR THERE TO BE INFRINGEMENT, AND I BELIEVE YOU

18    ANSWERED NO, AND I WONDERED IF YOU COULD EXPLAIN

19    YOUR ANSWER.

20    A     THAT'S RIGHT.  WHAT THE CLAIM LANGUAGE

21    REQUIRES IS THAT YOUR PROGRAM HAS INSTRUCTIONS THAT

22    ARE CAPABLE OF DEALING WITH A STRUCTURED ELECTRONIC

23    DOCUMENT, DISPLAYING IT AND THEN PERFORMING ALL

24    THESE ACTIONS.

25            THE ACTUAL SORT OF -- THE SPECIFIC

1    STRUCTURED ELECTRONIC DOCUMENT OR MULTIPLE OR WHICH

2    STRUCTURED ELECTRONIC DOCUMENT IS NOT OF

3    CONSEQUENCE.

4            WHAT IS OF CONSEQUENCE IS THAT THERE'S A

5    PROGRAM TO DEAL WITH SUCH DOCUMENTS.

6    Q    AND WHEN WE'RE OBSERVING THE DEVICES IN

7    ACTION, ARE WE OBSERVING THOSE ACTIONS OPERATING ON

8    A STRUCTURED ELECTRONIC DOCUMENT?

9    A    YES.

10           MR. DEFRANCO:  YOUR HONOR, WE'RE LEADING

11   THE WITNESS NOW THROUGH HIS TESTIMONY.

12           THE COURT:  YES.  SUSTAINED.

13   BY MR. JACOBS:

14   Q    CAN YOU EXPLAIN WHETHER OR NOT, WHEN WE'RE

15   OBSERVING THE DEVICE IN ACTION, WE ARE OBSERVING

16   THE INSTRUCTIONS OPERATING ON A STRUCTURED

17   ELECTRONIC DOCUMENT?

18   A    YES, EXACTLY.  WHEN WE OBSERVE THE DEVICE IN

19   ACTION, THESE INSTRUCTIONS ARE, IN FACT, OPERATING

20   ON A STRUCTURED ELECTRONIC DOCUMENT.  IN

21   PARTICULAR, WE SAW THEM OPERATING ON THE

22   NEW YORK TIMES WEB PAGE.

23   Q    YOU WERE ASKED ABOUT SOME SOURCE CODE EXTRACTS

24   AND THE WORD GESTURE IN YOUR SLIDE VERSUS THE

25   PRESENCE OF GESTURE IN THE ACTUAL CODE.

```
1              CAN YOU EXPLAIN WHAT WAS GOING ON THERE?
2    A    WELL, AS I SAID, I PROVIDED SORT OF A
3    SCHEMATIC, OR AN ILLUSTRATION OF WHAT WAS IN THE
4    SAMSUNG SOURCE CODE.
5              SAMSUNG, I BELIEVE, WAS ASKED TO PROVIDE
6    ALL -- ITS ENTIRE UNIVERSE OF ALL POSSIBLE SOURCE
7    CODE.  IN THIS LITIGATION WHAT WAS PROVIDED WAS
8    JUST A SUBSET.  I THINK AT MOST ONE FOR -- ONE
9    PIECE OF SOURCE CODE FOR EVERY DEVICE.
10             AND I FOUND THAT THESE INSTRUCTIONS WERE
11   LARGELY IDENTICAL ON ALL THESE PIECES OF SOURCE
12   CODE, NOT JUST THE FOUR THAT I'VE BEEN -- THAT I'VE
13   PRESENTED AS REPRESENTATIVE.
14             AND SO SIMILARLY ON THE SLIDE THAT YOU
15   SAW, WHAT YOU SAW WAS JUST A REPRESENTATIVE OF
16   THAT, THAT -- OF THAT FUNCTION.
17             PERHAPS IN THE OTHER PIECE OF CODE THAT I
18   WAS SHOWN, YOU KNOW, THE VARIABLE NAME MIGHT HAVE
19   BEEN CHANGED OR THERE COULD BE A MINOR
20   TYPOGRAPHICAL CHANGE.
21             BUT INSTRUCTIONALLY, LOGICALLY, THE CODE
22   WAS IDENTICAL.
23             MR. JACOBS:  THANK YOU VERY MUCH,
24   DR. SINGH.
25             THE COURT:  ALL RIGHT.  THE TIME IS 3:25.
```

2912

```
1    MAY THIS WITNESS BE EXCUSED AND IS IT SUBJECT TO
2    RECALL?
3              MR. DEFRANCO:  YOUR HONOR, WE JUST HAVE
4    ONE EXHIBIT.
5              THE COURT:  OKAY.  GO AHEAD, PLEASE.
6    IT'S 3:25.  GO AHEAD, PLEASE.
7              MR. DEFRANCO:  2257, 2557.  EXCUSE ME,
8    YOUR HONOR.
9              MR. JACOBS:  THAT'S FINE, YOUR HONOR.
10             THE COURT:  I'M SORRY?
11             MR. JACOBS:  THAT'S FINE.  I THINK YOU
12   WERE -- I DIDN'T OBJECT.
13             THE COURT:  I DIDN'T KNOW -- WHAT JUST
14   HAPPENED?
15             MR. DEFRANCO:  I'M SORRY.  THAT'S MY
16   FAULT.  WE'RE OFFERING EXHIBIT 25 -- DX 2557 INTO
17   EVIDENCE, AND THERE'S NO OBJECTION.
18             THE COURT:  OH, OKAY.  THAT'S ADMITTED.
19             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
20             2557, HAVING BEEN PREVIOUSLY MARKED FOR
21             IDENTIFICATION, WAS ADMITTED INTO
22             EVIDENCE.)
23             THE COURT:  OKAY.  ALL RIGHT.  IT'S 3:26.
24             ALL RIGHT.  NOW, DO YOU HAVE MORE?
25             MR. JACOBS:  NO.
```

1913

```
 1              THE COURT:  OKAY.  MAY THIS WITNESS BE

 2    EXCUSED?

 3              MR. JACOBS:  SUBJECT TO RECALL.

 4              THE COURT:  OKAY.  YOU'RE EXCUSED SUBJECT

 5    TO RECALL.  YOU CAN STEP DOWN.

 6              CALL YOUR NEXT WITNESS, PLEASE.

 7              MR. JACOBS:  WE WOULD LIKE TO CALL

 8    DR. HAUSER, YOUR HONOR.

 9              THE COURT:  OKAY.

10              (PAUSE IN PROCEEDINGS.)

11              THE COURT:  MAY I HAVE THE HAUSER DIRECT

12    EXHIBITS?

13              MR. JACOBS:  YES, YOUR HONOR.

14              THE CLERK:  RAISE YOUR RIGHT HAND,

15    PLEASE.

16                         JOHN HAUSER,

17    BEING CALLED AS A WITNESS ON BEHALF OF THE

18    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

19    EXAMINED AND TESTIFIED AS FOLLOWS:

20              THE WITNESS:  I DO.

21              THE CLERK:  WOULD YOU HAVE A SEAT,

22    PLEASE.

23              THE COURT:  IT'S 3:28.  GO AHEAD.

24              THE CLERK:  STATE YOUR NAME, PLEASE, AND

25    SPELL IT.
```

1                       **DIRECT EXAMINATION**

2      BY MR. JACOBS:

3      Q    STATE YOUR NAME AND SPELL IT, PLEASE, SIR.

4      A    MY NAME IS JOHN HAUSER, H-A-U-S-E-R.

5      Q    DR. HAUSER, ARE YOU A FACULTY MEMBER AT M.I.T.

6      SLOAN SCHOOL OF MANAGEMENT?

7      A    YES, I AM.  I'M THE KIRIN PROFESSOR,

8      K-I-R-I-N, PROFESSOR OF MARKETING AT THE M.I.T.

9      SLOAN SCHOOL OF MANAGEMENT.

10     Q    AND WHAT IS YOUR FIELD OF EXPERTISE?

11     A    MY FIELD OF EXPERTISE IS MARKETING RESEARCH

12     AND ANALYSIS.

13     Q    WHAT IS YOUR FORMAL TRAINING IN?

14     A    I HAVE A DOCTORATE OF SCIENCE FROM M.I.T. IN

15     OPERATIONS RESEARCH.  OPERATIONS RESEARCH IS

16     BASICALLY MATHEMATICS APPLIED TO BUSINESS PROBLEMS.

17     Q    WE'RE GOING TO BE TALKING IN A MINUTE ABOUT A

18     SURVEY CALLED A CONJOINT SURVEY.  HAVE YOU

19     PUBLISHED IN THAT FIELD?

20     A    YES, I HAVE.  I'VE PUBLISHED OVER 70

21     PROFESSIONAL ARTICLES IN MARKETING AND MARKETING

22     RESEARCH.

23              MR. JACOBS:  YOUR HONOR, WE OFFER

24     DR. HAUSER AS AN EXPERT IN THE FIELD OF MARKETING

25     SURVEYS AND ANALYSIS.

```
 1              MR. PRICE:  NO OBJECTION.

 2              THE COURT:  ALL RIGHT.  HE'S CERTIFIED.

 3    BY MR. JACOBS:

 4    Q    NOW, WE ASKED YOU IN THIS CASE TO CONDUCT A

 5    SURVEY; CORRECT, SIR?

 6    A    YES, THAT'S CORRECT.

 7    Q    WHAT DID WE ASK YOU TO DO?

 8    A    I WAS ASKED TO CONDUCT TWO SURVEYS TO

 9    DETERMINE HOW MUCH MONEY, IF ANY, SAMSUNG CONSUMERS

10    WOULD PAY FOR THE FEATURES ASSOCIATED WITH THE

11    PATENTS THAT ARE AT ISSUE IN THIS LITIGATION.

12    Q    I'D LIKE YOU TO TURN TO PX 30 IN YOUR BINDER,

13    PLEASE.

14    A    YES, I HAVE IT.

15    Q    WHAT IS PX 30?

16    A    PX 30 IS AN EXHIBIT THAT I PREPARED TO

17    SUMMARIZE MY FINDINGS.

18              MR. JACOBS:  YOUR HONOR, WE'D OFFER PX 30

19    INTO EVIDENCE.

20              MR. PRICE:  NO FURTHER OBJECTIONS.

21              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

22              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

23               30, HAVING BEEN PREVIOUSLY MARKED FOR

24               IDENTIFICATION, WAS ADMITTED INTO

25               EVIDENCE.)
```

2916

```
1    BY MR. JACOBS:

2    Q    WHAT CONCLUSIONS DID YOU DRAW FROM THE SURVEY

3    THAT YOU CONDUCTED?

4    A    I CONCLUDED THAT SAMSUNG CONSUMERS ARE WILLING

5    TO PAY A SUBSTANTIAL PRICE PREMIUM FOR THE FEATURES

6    THAT ARE ASSOCIATED WITH THE PATENTS THAT ARE AT

7    ISSUE IN THIS CASE.

8    Q    AND WHAT DO THE RESULTS OF YOUR SURVEY REFLECT

9    REGARDING CONSUMER DEMAND FOR THOSE PATENTED

10   FEATURES?

11   A    THE RESULTS REFLECT THAT THERE IS SUBSTANTIAL

12   DEMAND FOR THE FEATURES ASSOCIATED WITH THE PATENTS

13   AT ISSUE IN THIS CASE.

14            MR. JACOBS:  THANK YOU, DR. HAUSER.  I

15   HAVE NO FURTHER QUESTIONS.

16            THE COURT:  ALL RIGHT.  THE TIME IS NOW

17   3:30.

18            GO AHEAD, PLEASE.

19            MR. PRICE:  YOUR HONOR, I MOVE TO STRIKE

20   THE ENTIRE TESTIMONY.  THERE'S NO FOUNDATION FOR

21   THE JURY TO CONCLUDE HOW IT WAS DONE OR WHAT WAS

22   DONE.

23            THIS IS, IN THE INTERESTS OF TIME, GAME

24   PLAYING.  I WILL HAVE TO EXPLAIN THE ENTIRE SURVEY,

25   SO I MOVE TO STRIKE IT IN ITS ENTIRETY.
```

1          MR. JACOBS:  YOUR HONOR, DR. HAUSER, IN

2     PX 30, SHOWS HIS CONCLUSIONS AND GIVES A BRIEF

3     EXPLANATION OF THE SURVEY THAT HE CONDUCTED AND

4     COUNSEL HAS HAD AMPLE OPPORTUNITY TO STUDY THE WORK

5     THAT HE DID IN THE FORM OF HIS EXPERT REPORT.

6          MR. PRICE:  THE POINT, YOUR HONOR, IS IF

7     I ASK HIM QUESTIONS, THE JURY HAS NO IDEA

8     WHATSOEVER WHAT HE DID AND I WOULD HAVE TO EXPLAIN

9     IT AND THAT'S NOT MY BURDEN.

10          THIS IS INAPPROPRIATE, SO I MOVE TO

11     STRIKE THE ENTIRE TESTIMONY.

12          THE COURT:  IT'S OVERRULED.

13                    **CROSS-EXAMINATION**

14     BY MR. PRICE:

15     Q    GOOD AFTERNOON, DR. HAUSER.

16     A    GOOD AFTERNOON.

17     Q    I TAKE IT YOU COULD HAVE TOLD US A LOT MORE AS

18     TO WHAT YOU DID TO REACH YOUR CONCLUSIONS?

19     A    I ANSWERED THE QUESTIONS THAT I WAS ASKED.

20     Q    AND I APPRECIATE THAT AND I'M SURE COUNSEL

21     DOES, TOO.

22          MY QUESTION IS DIFFERENT.  YOU HAVE A LOT

23     MORE TO SAY AS TO EXACTLY WHAT IT IS YOU DID TO

24     REACH THIS CONCLUSION; RIGHT?

25     A    YES, I PREPARED AN EXPERT REPORT AND THERE'S

1    MORE DESCRIPTION IN THAT EXPERT REPORT.

2    Q    AND THAT EXPERT REPORT GOES ON FOR HOW MANY

3    PAGES, INCLUDING EXHIBIT, WOULD YOU ESTIMATE?

4    A    OH, I DON'T RECALL.  20, 30.

5    Q    20 OR 30 PAGES, INCLUDING EXHIBITS?

6    A    OH, NO.  THERE'S A LOT OF EXHIBITS.  I'VE GOT

7    A NUMBER -- A LIST IN THERE THAT'S QUITE LONG.  I'M

8    SURE YOU CAN PROVIDE THE NUMBER.

9    Q    YOU'VE GOT PROBABLY AT LEAST A COUPLE HUNDRED

10   PAGES IF YOU INCLUDE THE DATA AND THE DESCRIPTION

11   OF EXACTLY WHAT IT IS YOU DID; CORRECT?

12   A    WELL, YES.  IT'S -- I MEAN, IF YOU INCLUDE THE

13   DATA, SURE.

14   Q    AND I TAKE IT -- DO YOU THINK THAT, GIVEN WHAT

15   YOU'VE SAID IN YOUR DIRECT, WHICH IS THAT YOU DID A

16   CONJOINT SURVEY, AND YOU CAME TO A COUPLE OF

17   CONCLUSIONS, DO YOU THINK YOU'VE GIVEN THE JURY

18   ENOUGH INFORMATION TO UNDERSTAND WHAT A CONJOINT

19   SURVEY IS?

20           MR. JACOBS:  YOUR HONOR, THIS CALLS FOR

21   SPECULATION FROM THIS WITNESS.  YOUR HONOR

22   OVERRULED HIS OBJECTION.

23           THE COURT:  OVERRULED.

24   BY MR. PRICE:

25   Q    YOU CAN ANSWER, SIR.

1      A     OH, I CAN ANSWER?

2      Q     YEAH.

3      A     WELL, I'VE ANSWERED THE QUESTIONS.  I'M

4      CONFIDENT IN THE NUMBERS.  I HOPE THAT THEY'RE

5      SUFFICIENT, THAT IT'S A SUFFICIENT EXPLANATION.

6      Q     MY QUESTION -- ARE YOU A TEACHER, PROFESSOR?

7      A     OH, YES.  I TEACH A NUMBER OF COURSES AT

8      M.I.T.

9      Q     I'M JUST ASKING YOU, DO YOU THINK YOU'VE,

10     YOU'VE MADE ANY ATTEMPT TO TEACH THIS JURY HOW YOU

11     DID YOUR SURVEY SO THAT THEY COULD COME TO A

12     CONCLUSION WHETHER OR NOT IT WAS FAIR OR NOT?

13     A     WELL, INDEED, IT'S A SURVEY AND THERE'S SOME

14     COMPLICATED ANALYSIS IN THERE.  WE ASKED CONSUMERS

15     QUESTIONS AND THESE QUESTIONS RELATED TO THEIR

16     WILLINGNESS TO PAY AND THIS IS A SUMMARY OF THEIR

17     ANSWERS.

18     Q     NO.  MY QUESTION WAS -- I KNOW I CAN ASK YOU

19     QUESTIONS ABOUT THE DETAILS.  I'M WONDERING IF YOU

20     THINK, IN YOUR DIRECT EXAM, YOU GAVE THIS JURY

21     ENOUGH INFORMATION TO BE ABLE TO EVALUATE WHETHER

22     OR NOT WHAT YOU DID WAS REASONABLE?  OR DID YOU

23     JUST TELL THEM, "I'M A PROFESSOR, HERE'S MY

24     CONCLUSIONS, THANK YOU VERY MUCH."

25     A     I'M NOT SURE HOW TO ANSWER THAT.

1    Q    WELL, IT'S EASY.  DID YOU TEACH THEM HOW YOU

2    DID THIS IN ANY -- DID YOU EVEN ATTEMPT TO TEACH

3    THIS JURY HOW YOU CAME TO YOUR CONCLUSIONS?

4    A    WELL, I DON'T THINK I -- YOU KNOW, I LOOK AT

5    THE JURY AND I'M SURE THEY'RE QUITE, QUITE

6    INTELLIGENT AND, YOU KNOW, IF THEY CAME TO CLASS, I

7    COULD TEACH THIS METHOD.  IT'S THE TYPE OF THING I

8    WOULD TEACH TO M.B.A.'S.

9    Q    SO IT'S A -- YOU SAID IT'S AN INTELLIGENT

10   JURY, SO THEY WOULD ACTUALLY BE ABLE, YOU THINK, TO

11   UNDERSTAND, AT LEAST IN BROAD TERMS, WHAT YOU DID

12   SO THEY CAN EVALUATE WHETHER OR NOT THESE NUMBERS

13   MEAN ANYTHING; RIGHT?

14   A    WELL, I DID EXPLAIN.  I ANSWERED ALL THE

15   QUESTIONS I WAS ASKED AND, YOU KNOW, TO THE BEST OF

16   MY ABILITY.  I THINK IT'S A GOOD SURVEY.  I THINK

17   THE NUMBERS MAKE SENSE.

18   Q    WELL, LET ME ASK YOU A FEW, BECAUSE I GUESS

19   I'D LIKE TO -- I'D LIKE THE JURY TO KNOW A LITTLE

20   BIT ABOUT WHAT YOU DID.

21            AND SO THIS SURVEY THAT YOU WERE TALKING

22   ABOUT IS PEOPLE WOULD TAKE A SURVEY ON THE

23   INTERNET, RIGHT?  ON THE INTERNET?

24   A    YES, THIS IS AN INTERNET-BASED SURVEY.

25   Q    AND THEY -- YOU TELL THEM AT THE BEGINNING --

```
 1    AND WE CAN LOOK AT SDX 3902.042 -- YOU TELL THEM AT
 2    THE BEGINNING IT SHOULD TAKE ABOUT 25 MINUTES;
 3    RIGHT?
 4    A    WELL, I ACTUALLY CAN'T READ THAT.  MY EYES ARE
 5    GETTING OLD.
 6              BUT, YES, I THINK IT SAYS ABOUT 25
 7    MINUTES.
 8              IS THIS IN MY BINDER?
 9    Q    IT SHOULD BE IN YOUR BINDER.
10              AND YOU DON'T PAY THEM IF IT TAKES ANY
11    MORE, IF THEY TAKE LONGER TIME; RIGHT?
12    A    NO, NO.  WE -- WE DO -- THEY DO RECEIVE
13    BASICALLY AN HONORARIUM FOR COMPLETING THE SURVEY,
14    WHICH IS STANDARD IN THE FIELD, AND IT'S NOT AT ALL
15    TIED TO THEIR ANSWERS IN ANY WAY.
16    Q    MY QUESTION WAS, IF THEY -- IF THEY TAKE
17    LONGER, THEY DON'T GET PAID MORE?
18    A    NO, NO, THEY DON'T GET PAID MORE IF THEY TAKE
19    LONGER.
20    Q    SO YOU START THE 20, 25 MINUTES, AND YOU SHOW
21    THEM 12 VIDEOS; RIGHT?
22    A    YES, WE SHOWED THEM VIDEOS THAT THE -- WELL,
23    ACTUALLY, THEY'RE ANIMATIONS.  BUT WE DESCRIBE --
24    WE SHOWED THEM ANIMATIONS THAT DESCRIBE THE
25    FEATURES ASSOCIATED WITH THE PATENTS THAT ARE AT
```

1    ISSUE IN THIS CASE.

2    Q    AND YOU'RE NOT AN EXPERT IN THE FEATURES

3    ASSOCIATED WITH THE PATENTS IN THIS CASE, ARE YOU?

4    A    NO, I'M NOT.  I'M RELYING ON OTHER EXPERTS.

5    Q    SO YOU CAN'T TELL THIS JURY WHETHER OR NOT THE

6    VIDEOS YOU SHOWED THEM, THIS IS FROM YOUR OWN

7    PROFESSIONAL OPINION, ACTUALLY REFLECT THE PATENTS

8    IN THIS CASE?  YOU DON'T HAVE THAT EXPERTISE;

9    CORRECT?

10   A    THAT'S RIGHT.  I'M RELYING ON OTHER EXPERTS IN

11   THIS CASE THAT I BELIEVE JUST TESTIFIED.

12   Q    OKAY.  AND SO YOU'VE GIVEN THE JURY -- DID

13   THOSE EXPERTS SEE THE VIDEOS?

14   A    I THINK THEY HAVE, BUT I CAN'T ANSWER FOR

15   SURE.

16   Q    WELL, DID THOSE EXPERTS LOOK AT YOUR VIDEOS

17   THAT YOU SHOWED THESE FOLKS AND SAY, "YES, WHAT YOU

18   ARE SHOWING THESE FOLKS IS THE SAME THING AS WHAT

19   IS REQUIRED FOR OUR PATENT"?  DID THAT HAPPEN OR

20   NOT?

21   A    I BELIEVE THEY DID, BUT --

22   Q    OKAY.  THEN COULD YOU SHOW ME IN YOUR REPORT

23   WHERE IT SAYS THAT THE VIDEO YOU SHOWED THEM WAS

24   SOMETHING WHICH THEIR EXPERTS, APPLE'S, LOOKED AT

25   AND SAID "THIS ACCURATELY DESCRIBES WHAT OUR

```
 1    PATENTS DO"?

 2    A    THAT'S NOT IN MY REPORT.  I RELIED ON THEM TO,

 3    TO LOOK AT THE DESCRIPTIONS AND THAT IS IN MY

 4    REPORT.

 5    Q    I'M ASKING YOU ABOUT THE VIDEOS YOU SHOWED THE

 6    FOLKS.  WHERE IN YOUR REPORT DO YOU SAY ANYTHING

 7    THAT YOU VALIDATED WITH ANY EXPERT, CHECKED WITH

 8    ANY EXPERT TO SAY THESE VIDEOS ACTUALLY ACCURATELY

 9    SHOW WHAT THE PATENT REQUIRES?

10    A    I DON'T RECALL THE EXACT WORDS IN MY REPORT,

11    BUT IT DOES SAY THAT I DID RELY ON OTHER EXPERTS,

12    ACTUALLY DOCTORS SINGH AND BALAKRISHNAN, THAT THE

13    DESCRIPTIONS WERE ACCURATE.

14    Q    NO --

15    A    MY JOB IS A MARKETING RESEARCHER.

16    Q    I'M ON A CLOCK HERE.  MY QUESTION WAS

17    DIFFERENT.  I'M TALKING ABOUT THE VIDEOS, AND I'M

18    ASKING YOU, WERE THOSE VIDEOS -- DID YOU GO TO AN

19    EXPERT AND SAY, "DO THESE VIDEOS ACCURATELY

20    REPRESENT WHAT THE PATENTS DO?"  YES OR NO?

21    A    TO THE BEST OF MY RECOLLECTION, THEY DID LOOK

22    AT THOSE VIDEOS.

23    Q    THAT'S NOT MY QUESTION.

24    A    OH, DID I PERSONALLY SHOW THE VIDEOS?

25    Q    DID YOU TALK TO THEM AND HAVE THEM SAY --
```

```
 1    A    NO.

 2    Q    OKAY.  AND WHERE IN YOUR REPORT DOES IT SAY

 3    THAT ANY EXPERT LOOKED AT THOSE VIDEOS TO SEE THAT

 4    THEY WERE ACCURATE?

 5    A    I BELIEVE I'VE ANSWERED THAT TO THE BEST OF MY

 6    ABILITY.

 7    Q    WHICH MEANS YOU CAN'T POINT ME TO A PLACE,

 8    BECAUSE YOU SAID IT'S A SHORT REPORT.  YOU TOLD US

 9    THAT.

10    A    I DIDN'T SAY IT WAS A SHORT REPORT.

11    Q    I THINK YOU SAID 20 PAGES.  SO IF YOU COULD

12    TELL ME THEN, WHERE -- WHERE -- IT DIDN'T HAPPEN,

13    DID IT?  YOU DIDN'T CHECK THE VIDEOS WITH ANY

14    EXPERTS TO SEE IF THE VIDEOS ACCURATELY PORTRAYED

15    THE PATENTS?

16    A    IF YOU'RE ASKING DID I PERSONALLY SHOW THOSE

17    VIDEOS, NO, I DID NOT.

18    Q    NOW, AFTER SHOWING THEM ABOUT -- AND BY THE

19    WAY, FOUR VIDEOS HAD TO DO WITH TOUCHSCREENS;

20    RIGHT?

21    A    AGAIN, THEY'RE ANIMATIONS, BUT YES, FOUR

22    ANIMATIONS.

23    Q    AND THEN THERE WERE FOUR FOR TWO OTHER AREAS

24    THAT YOU LOOKED AT AT THE SAME TIME; RIGHT?

25    A    YES, THERE WERE FOUR FOR TWO OTHER AREAS, YES,
```

2925

```
1    THAT'S CORRECT.

2    Q    AND LET'S LOOK AT -- THIS IS, I THINK, 5680.

3    I THINK PDX 5680.

4          NO, THAT'S NOT IT.  IN THAT CASE, LET'S

5    TRY -- OH, LET'S TRY PDX 33.6.

6          SO IN THIS 20 TO 25 MINUTES AFTER LOOKING

7    AT FOUR ANIMATIONS, THERE THEN -- THERE'S A SCREEN

8    AT SOME POINT HERE WHICH HAS ONE, TWO, THREE, FOUR,

9    FIVE, SIX, SEVEN KIND OF FEATURES; RIGHT?

10   A    WELL, YES.  THERE'S SIX FEATURES PLUS PRICE,

11   THAT'S CORRECT.

12   Q    SO YOU'RE -- YOU'VE GOT PRICE AT THE TOP ROW;

13   RIGHT?  NUMBER OF APPS; SIZE AND WEIGHT;

14   CONNECTIVITY; TOUCHSCREEN; AND EACH OF THOSE BOXES

15   HAS DIFFERENT FEATURES ON THOSE TOUCHSCREENS,

16   RIGHT, LIKE RELIABLE TOUCH, AUTO SWITCH, THIS ONE

17   HAS SOMETHING DIFFERENT.  RIGHT?

18   A    WELL, YES.  I MEAN, THESE ARE DESCRIPTIONS OF

19   THE PRODUCT FEATURES.

20         NOW, OF COURSE THEY'VE ALREADY SEEN

21   VIDEOS AND THEY'VE SEEN PICTURES AND THEY'VE HAD A

22   DESCRIPTION OF THESE FEATURES BY THE TIME THEY GOT

23   HERE.  BUT THAT'S CORRECT, YES.

24   Q    AND 28 DIFFERENT THEN KIND OF CHOICES HERE,

25   BOXES WITH DIFFERENT TYPES OF, OF INFORMATION, LIKE
```

```
1    DO YOU WANT ONE WITH 3 MEGAPIXEL CAMERA OR AN 8, OR

2    WITH HD VIDEO OR ONE WITH AUTO FOCUS.  YOU'VE GOT

3    ALL THIS INFORMATION PACKED INTO THAT SCREEN;

4    RIGHT?

5    A    NO, THAT'S NOT CORRECT.

6    Q    WELL, IT LOOKS LIKE -- AM I WRONG, IT'S NOT ON

7    THE SCREEN?

8    A    THAT'S A CORRECT SCREEN.  BUT THAT'S NOT 28

9    CHOICES.  THAT'S FOUR CHOICES.

10   Q    OKAY.  IT'S -- I SEE.  SO YOU CHOOSE ONE

11   COLUMN HERE; RIGHT?

12   A    YES.  EACH CONSUMER SEES 16 CHOICE SETS LIKE

13   THAT, ABOUT 7,000 TOTAL ACROSS CONSUMERS.  ALL

14   THEY'RE ASKED TO DO, AFTER WE MAKE SURE THEY

15   UNDERSTAND THESE, IS TO CHOOSE ONE, AND THEN WE

16   INFER, BASICALLY, THE PRICE PREMIUM THEY'RE WILLING

17   TO PAY.

18   Q    AND IN CONNECTION WITH THAT -- SO THEY LOOK AT

19   SCREENS WHERE THESE CHOICES ARE JUMBLED UP

20   DIFFERENT WAYS AND THEN MAKE THEIR CHOICES?

21   A    AS IS STANDARD VALID PRACTICE, YES, WE DO

22   RANDOMIZE THE FEATURES SO THAT THERE'S NO BIAS DUE

23   TO ORDER.

24   Q    SO I'M JUST WONDERING, LIKE IF SOMEONE IS

25   LOOKING AT THIS ON A COMPUTER SCREEN AND THEY'RE
```

2927

1    ASKED HOW MUCH WOULD YOU PAY FOR THIS COMBINATION

2    VERSUS THIS COMBINATION, DO THEY -- DO YOU KNOW

3    WHETHER OR NOT -- THEY'RE NOT REALLY SPENDING

4    MONEY, ARE THEY?  THIS IS JUST VIRTUAL?

5    A    WELL, DO YOU WANT ME TO ANSWER -- ARE THEY

6    SPENDING MONEY HERE?  NO, THEY'RE NOT SPENDING

7    MONEY.

8    Q    AND YOU DON'T KNOW IF THEY HAVE ENOUGH TIME TO

9    THINK, DO I WANT TO PAY AN EXTRA 30 BUCKS FOR THAT

10   OR SHOULD I PAY MY GAS BILL?  YOU BELIEVE THEY HAVE

11   ENOUGH TIME TO MAKE ALL THOSE COMPARISONS WHEN

12   THEY'RE DOING THIS?

13   A    YES, THEY DO.

14   Q    HM.  AND DO THEY HAVE ENOUGH TIME TO SAY, YOU

15   KNOW, IF I'M GOING TO SPEND 50 BUCKS FOR THIS,

16   MAYBE I SHOULD ASK MY SPOUSE AND SEE IF SHE'D

17   RATHER INSTEAD BUY, YOU KNOW, SOMETHING FOR HER?

18   DOES THAT HAPPEN DURING THIS ON SCREEN ACTIVITY?

19   A    I'M NOT SURE WHAT YOU'RE ASKING, BUT NO, THEY

20   DO NOT HAVE TIME TO GO CALL THEIR SPOUSE.

21        BUT THEY CERTAINLY HAVE SUFFICIENT TIME

22   TO MAKE CHOICES AND, YOU KNOW, WE'VE BEEN ABLE TO

23   VALIDATE THAT THEIR CHOICES ARE ACCURATE.

24   Q    BY THE WAY, THERE'S DIFFERENT TYPES OF

25   VALIDATIONS, INTERNAL VALIDATIONS, EXTERNAL

1    VALIDATIONS, RIGHT?

2    A    YES, SURE.  I MEAN, I LOVE THIS.  THIS IS

3    GREAT.  INTERNAL VALIDATION, WE DID THAT HERE.

4    Q    NO, NO.  I WAS ASKING --

5    A    OH.

6    Q    I'M ON THE CLOCK.  I KNOW YOU LOVE TALKING

7    ABOUT THIS, AND I BET YOU WOULD HAVE LIKED TO HAVE

8    TALKED ABOUT IT WITH THE JURY WHILE YOUR ATTORNEY

9    WAS UP.

10   A    I HAD TO ANSWER THE QUESTIONS.

11   Q    WELL, YOU CAN TELL ME THAT YOU PUT IN ALL OF

12   THESE DIFFERENT TYPES OF PARAMETERS, DO YOU WANT A

13   SCREEN WITH 4.3 INCHES, 3.5, RIGHT?  THEY'RE MAKING

14   ALL THESE CHOICES.

15           AND LET ME JUST FIGURE OUT WHAT GOES ON

16   NOW.  SO THEN YOU PUT THAT INFORMATION INTO A

17   SOFTWARE PROGRAM.  WHAT'S THE NAME OF THE SOFTWARE?

18   A    THIS IS KNOWN AS HIERARCHICAL-BASED,

19   CHOICE-BASED CONJOINT ANALYSIS.

20           AND, YES, WE PUT IN THE ANSWERS.  I THINK

21   THERE WERE 455 CONSUMERS TIMES 16 TIMES FOUR

22   CHOICES.  YOU CAN MULTIPLY THAT OUT.  BUT IT'S

23   QUITE A LOT OF DATA.

24   Q    I CAN'T.  BUT WHAT'S THE NAME OF THE SOFTWARE

25   PROGRAM ?

2929

```
1    A    IT'S -- YOU MEAN WHO DOES -- WHO DO WE -- WHO

2    PROVIDES IT?

3    Q    YES.

4    A    OH.  THIS IS SAWTOOTH SOFTWARE, INCORPORATED.

5    Q    AND YOU SHOWED US SOME NUMBERS THAT YOU HAD

6    COME UP WITH BY DOING THIS, AND I'D LIKE YOU TO

7    LOOK, IF YOU COULD, AT -- LET'S GO TO 3920.015.

8              AND AT THE TOP HERE ARE, ARE SOME

9    CALCULATIONS YOU DID ABOUT WHAT SOMEONE WOULD BE

10   WILLING TO PAY IN ADDITION TO GET WHATEVER THE

11   VIDEOS SHOWED ABOUT THESE PATENTS; RIGHT?

12   A    YES.  FOR EXAMPLE, THE $39 SAYS THAT IF A

13   CONSUMER IS PAYING $199, PLUS THE 24 MONTHS FEES,

14   THEY WOULD BE WILLING TO PAY AN EXTRA $39 FOR THE

15   '915 PATENT AND AN EXTRA $100 FOR THE COMBINATIONS

16   OF THE '915, '163, AND '381 PATENT.

17             AND THEN WE HAVE SIMILAR NUMBERS FOR

18   TABLETS.

19             MR. PRICE:  JUST A SECOND.

20             (PAUSE IN PROCEEDINGS.)

21   BY MR. PRICE:

22   Q    SO LET ME UNDERSTAND THEN.  AFTER YOU GET

23   THESE SETS OF DATA, YOU THEN PUT THAT DATA INTO THE

24   SOFTWARE AND IT SIMULATES ABOUT TEN THOUSAND

25   CHOICES PER PERSON?  IS THAT RIGHT?
```

2930

```
 1      A      THAT'S NOT QUITE RIGHT.

 2      Q      CLOSE?  HOW MANY -- IT'S A SIMULATION THAT'S

 3   RUN OF THOUSANDS AND THOUSANDS AND THOUSANDS OF

 4   CHOICES?

 5      A      NO, THAT'S NOT QUITE RIGHT.

 6      Q      WHAT DOES THE SIMULATION DO?  AND CAN YOU SAY

 7   THIS IN LESS THAN 15 SECONDS?

 8      A      NOT IN LESS THAN 15 SECONDS.

 9      Q      OKAY.  SO THERE'S SOME PROGRAM THAT CRUNCHES A

10   LOT OF NUMBERS?

11      A      WELL, THERE'S A PROGRAM THAT ESTIMATES THE

12   PARAMETERS.  THERE'S A PROGRAM THAT USES THE

13   PARAMETERS.  THERE'S A PROGRAM THAT CHECKS THE

14   DATA.  THERE'S A LOTS OF PROGRAMS INVOLVED.  THIS

15   IS A CAREFULLY DONE STUDY.

16      Q      AND BY THE WAY, YOU SAID EACH PERSON TAKING

17   THIS HAS TO MAKE 16 CHOICES; RIGHT?

18      A      YES, CORRECT.  EACH PERSON, THEY SEE FOUR AND

19   THEY CHOOSE ONE SMARTPHONE -- THEY'RE SAMSUNG

20   CONSUMERS -- THEY CHOOSE ONE SMARTPHONE OUT OF FOUR

21   AND THEY DO THIS 16 TIMES.

22      Q      AND THE -- THERE'S SOMETHING CALLED AN

23   EXTERNAL TEST WHERE YOU CAN LOOK INTO THE MARKET

24   AND SEE WHETHER OR NOT THIS MAKES ANY SENSE; RIGHT?

25      A      I'M REALLY JUST DOING THE DEMAND SIDE.  I'M
```

1931

```
 1    DOING WHAT CONSUMERS WOULD BE WILLING TO PAY.  I AM

 2    NOT DOING A MARKET EQUILIBRIUM ANALYSIS HERE.

 3    Q    WHEN YOU SAY "WHAT CONSUMERS ARE WILLING TO

 4    PAY," IF I SAY THEY'RE WILLING TO PAY -- I MEAN,

 5    THIS IS AN ADDITIONAL $139 FOR A $199 PHONE.

 6              YOU'D LIKE TO LOOK TO SEE WHETHER OR NOT

 7    WHAT IS CRUNCHED HERE REALLY MAKES SENSE WHEN YOU

 8    LOOK INTO THE MARKETPLACE TO SEE WHETHER THAT'S

 9    REALLY TRUE; RIGHT?

10    A    WELL, YEAH.  I MEAN, IF YOU LOOK AT THE $39

11    OVER A 24 MONTH CONTRACT, THAT'S ABOUT A BUCK 60.

12              SO THE QUESTION IS, YEAH, DID I DO SOME

13    INTERNAL VALIDATION, ABSOLUTELY.

14    Q    I WAS ASKING EXTERNAL.  EXTERNAL.  WOULDN'T

15    YOU WANT TO LOOK IN THE MARKET AND SEE WHETHER OR

16    NOT THIS MAKES SENSE AS KIND OF A SANITY CHECK?

17    A    I'M NOT SURE WHAT YOU MEAN, BECAUSE I REALLY

18    WANT TO EXPLAIN WHAT I'M GETTING TO HERE.

19    Q    IF THE ANSWER IS NO, YOU CAN TELL ME NO,

20    BECAUSE I'M ON THE CLOCK.

21    A    THE ANSWER IS NOT NO.  YOU KNOW, YOU'VE ASKED

22    ME -- I'M TRYING TO HELP YOU.

23    Q    OH, I DON'T KNOW ABOUT THAT.

24              LET'S --

25              (LAUGHTER.)
```

1    BY MR. PRICE:

2    Q    NOW, THESE ARE -- CAMERA, WEIGHT AND SIZE,

3    STORAGE AND MEMORY, CONNECTIVITY, NUMBER OF APPS,

4    THESE ARE ALL CHOICES THAT WERE PART OF THAT

5    FOUR-BY-SEVEN GRAPHIC, THAT IS, THEY'RE MAKING ALL

6    THESE CHOICES AT THE SAME TIME; RIGHT?

7    A    YES.

8    Q    YES IS GOOD.  I LIKE YES.

9         OKAY.  NOW, SO YOU GOT DATA FROM THIS

10   THAT DIDN'T JUST GIVE YOU NUMBERS FOR THESE, WHAT

11   YOU HAVE IDENTIFIED AS PATENT NUMBERS, BUT YOU ALSO

12   GOT DATA AS TO WHAT THESE FOLKS WOULD PAY FOR AN

13   EXTRA BIT OF MEMORY, FOR BETTER CAMERAS, DIFFERENT

14   CAMERAS.

15        YOU GOT ALL OF THAT DATA SO THAT YOU

16   COULD HAVE FILLED IN NUMBERS FOR THOSE AS WELL,

17   CAMERA, WEIGHT AND SIZE, STORAGE, MEMORY, ET

18   CETERA.  RIGHT?

19   A    OH, ABSOLUTELY.  IT'S A COMPLICATED SET OF

20   COMPUTATIONS, BUT THE DATA I COLLECTED COULD HAVE

21   BEEN USED TO COMPUTE THE WILLINGNESS TO PAY IF IT'S

22   DONE CORRECTLY.

23   Q    OKAY.  SO, FOR EXAMPLE, YOU ACTUALLY GOT

24   RESULTS, OR -- AMONGST ALL THIS DATA, IF YOU WANTED

25   TO, YOU COULD HAVE, YOU COULD HAVE LOOKED AT, FOR

```
1    EXAMPLE, WHAT THIS PROGRAM SAID A CONSUMER WOULD

2    PAY FOR STORAGE, EXTRA MEMORY; RIGHT?

3    A    CERTAINLY THE DATA WOULD ALLOW ONE TO DO THAT,

4    THAT'S CORRECT.

5             (PAUSE IN PROCEEDINGS.)

6    BY MR. PRICE:

7    Q    SO, FOR EXAMPLE, IF YOU HAD SHOWN US THE

8    NUMBER FOR STORAGE AND MEMORY AND YOU WERE ASKING

9    THE CONSUMERS HERE HOW MUCH THEY WOULD PAY FOR,

10   LIKE, AN EXTRA 8 -- WHAT WAS IT, DO YOU RECALL WHAT

11   YOU WERE ASKING THEM FOR?  MAYBE WE CAN PUT BACK UP

12   3.6.

13            WHEN YOU LOOK, YOU'VE GOT 64 GIGABYTES, 8

14   GIGABYTES, 16, 32.  DO YOU SEE THAT?

15   A    DO I SEE THAT?

16   Q    YEAH.

17   A    YES, I DO.

18   Q    SO YOU COULD HAVE SHOWN THE JURY THE NUMBER

19   THAT YOU CAME UP WITH TO SEE WHAT THESE FOLKS, IN

20   DOING THIS STUDY, THIS TEST, WERE -- WHAT YOUR

21   NUMBERS TURNED OUT FOR WHAT THE CONSUMER WOULD BE

22   WILLING TO PAY FOR THE ONE WITH 8 GIGABYTES, THE

23   16, THE 16 TO 32; RIGHT?

24   A    WELL, THESE WERE DISTRACTION FEATURES MEANT

25   TO --
```

1    Q    NO, MY QUESTION IS DIFFERENT.  YOU CRUNCHED

2    ALL THESE NUMBERS?

3    A    OH.  OKAY, YEAH.

4    Q    YOU COULD HAVE -- YOU COULD HAVE -- LET'S GO

5    BACK TO WHAT I WAS SHOWING YOU, WHICH IS 3920.015.

6         YOU COULD HAVE PUT DOWN HERE WHAT A

7    CONSUMER ON THIS THING SAID THEY WERE WILLING TO

8    PAY FOR AN EXTRA 8 GIGABYTES OF MEMORY; RIGHT?

9    A    INDEED, ONE CAN DO THOSE COMPUTATIONS WITH THE

10   DATA.

11   Q    AND THAT WOULD BE NICE TO HAVE BECAUSE YOU CAN

12   GO ON APPLE'S WEB PAGE AND YOU CAN SEE THAT, FOR

13   EXAMPLE, TO GO FROM 16 TO 32 GIGABYTES, YOU HAVE TO

14   PAY $100 MORE, AND FROM 32 TO 64, YOU'VE GOT TO PAY

15   ANOTHER HUNDRED DOLLARS MORE?  RIGHT?  YOU CAN

16   ACTUALLY SEE WHAT PEOPLE ARE PAYING IN THE MARKET

17   FOR THAT; RIGHT?

18   A    WELL, LET'S A LITTLE COMPLICATED.  I MEAN,

19   SOME PEOPLE ARE WILLING TO PAY THIS.  BUT THE

20   AVERAGE CONSUMER MAY NOT.  SOME PURCHASE IT.  SOME

21   DON'T PURCHASE IT.

22   Q    SO MY QUESTION IS, YOU CAN DO A REALITY CHECK,

23   THOUGH, AND THAT IS IF YOU PUT THESE NUMBERS IN,

24   YOU CAN ACTUALLY GO AND SEE HOW MUCH THESE THINGS

25   ARE SELLING FOR IN THE REAL WORLD AND COMPARE THEM

2935

```
 1    TO WHAT YOU DID.
 2    A    THAT'S A LITTLE BIT MORE COMPLICATED THAN
 3    YOU'RE MAKING ON, BECAUSE, YOU KNOW, LET'S TAKE
 4    MEMORY.  IT'S AN INTERESTING COMMENT.
 5              BUT SOME PEOPLE WILL PAY MORE THAN
 6    OTHERS, AND SO THE QUESTION IS, WHAT WILL THE
 7    AVERAGE PERSON PAY?
 8              WELL, YOU'VE GOT TO AVERAGE THE PEOPLE
 9    WHO DO BUY THE MEMORY FOR THAT AND THE PEOPLE WHO
10    DON'T.
11              BUT IT'S AN INTERESTING QUESTION.
12    Q    IF IT'S COMPLICATED, I GUESS YOU -- YOU CHOSE
13    NOT, IN YOUR DIRECT, TO EXPLAIN IT TO THE JURY;
14    RIGHT?
15    A    I ANSWERED THE QUESTIONS I WAS ASKED.
16    Q    DO YOU BELIEVE THAT IF YOU'D PUT THESE NUMBERS
17    HERE THAT YOU, THAT YOU CRUNCHED, WOULD THAT HAVE
18    PUT THE JURY IN A BETTER POSITION TO LOOK AT THIS
19    AND USE THEIR COMMON SENSE TO DETERMINE WHETHER THE
20    NUMBERS MADE ANY SENSE IN THE REAL WORLD?
21    A    IF WE PUT THOSE NUMBERS UP, WE'D HAVE TO
22    UNDER -- I MEAN, WE'D HAVE TO EXPLAIN WHAT THEY
23    MEAN.  THEY'RE A DEMAND SLIDE.  IT'S WHAT PEOPLE
24    WOULD BE WILLING TO PAY.  IT'S NOT WHAT THEY
25    ACTUALLY PAY IN THE MARKETPLACE.
```

1    Q     SO THIS IS NOT -- STOP RIGHT THERE.  THIS DOES

2    NOT INDICATE WHAT PEOPLE WOULD ACTUALLY PAY IN THE

3    MARKETPLACE FOR ANY OF THESE ITEMS; CORRECT?

4    A     THAT --

5    Q     YES OR NO?

6    A     WHAT?

7    Q     IS THAT CORRECT?  YES OR NO?  ISN'T THAT WHAT

8    YOU JUST SAID?

9    A     THIS RELATES TO IT, BUT IT'S NOT IT, NO.

10   Q     AND SO LET ME GET BACK TO MY QUESTION.  DO YOU

11   THINK IT WOULD GIVE THE JURY A LITTLE BIT MORE OF

12   AN ABILITY TO JUDGE WHAT YOU'RE TELLING THEM IF

13   THEY, IF THEY WERE ABLE TO SEE THESE OTHER NUMBERS

14   SO THEY COULD JUST SEE, RELATIVELY SPEAKING, HOW

15   THESE THINGS RANK AND HOW MUCH YOU'RE SAYING PEOPLE

16   ARE WILLING TO PAY?  DO YOU THINK THAT WOULD HELP

17   THEM ANY?

18   A     YOU'RE ASKING ME, YOU KNOW, WHAT DO THEY

19   BELIEVE.

20              BUT THESE NUMBERS --

21   Q     YOU'RE A TEACHER.  THAT'S WHY I'M ASKING.

22   A     RIGHT.

23   Q     INSTEAD OF SAYING, "I'M A TEACHER, I'M SMART,

24   THESE ARE MY NUMBERS," DO YOU THINK IT WOULD HAVE

25   HELPED THEM ANY TO GIVE THEM THE DATA SO THAT THEY

2937

```
 1    CAN ACTUALLY COMPARE WHAT YOU'RE SAYING ABOUT THESE
 2    NUMBERS HERE, 9, 15, ET CETERA, TO THINGS THAT THEY
 3    MIGHT HAVE EXPERIENCE WITH, LIKE HOW MUCH FOR
 4    CAMERA, OR MEMORY, OR NUMBER OF APPS?  DO YOU THINK
 5    THAT WOULD HAVE HELPED THEM OR NOT?  YES OR NO?
 6              IF THE ANSWER IS NO, I'M GLAD TO HEAR IT
 7    AND I CAN GO ON.
 8    A    I CAN SAY THE QUESTION I CAN'T ANSWER YES OR
 9    NO BECAUSE IT'S GOT TO BE DONE CORRECTLY.  YOU
10    CAN'T JUST PUT THE NUMBERS UP.  THEY HAVE TO BE
11    EXPLAINED.
12    Q    WELL, AND YOU BELIEVE YOU DID A SUFFICIENT
13    EXPLANATION OF THOSE NUMBERS IN YOUR DIRECT
14    EXAMINATION?  BECAUSE YOU CAN'T JUST PUT THEM UP,
15    THEY HAVE TO BE EXPLAINED?  DID YOU DO A SUFFICIENT
16    EXPLANATION IN YOUR DIRECT EXAMINATION OF THE
17    NUMBERS YOU DID SHOW?
18    A    I PUT UP THE NUMBERS, YES, AND, IN FACT, I
19    JUST EXPLAINED THEM AND I'LL BE HAPPY TO EXPLAIN
20    THEM AGAIN.
21    Q    NO, NO.  MY QUESTION IS, IN YOUR DIRECT
22    EXAMINATION, DID YOU PUT UP THE NUMBERS AND GIVE A
23    SUFFICIENT EXPLANATION SO THAT THESE JURORS WOULD
24    KNOW WHAT IT MEANS?  YES OR NO?
25    A    I -- I BELIEVE -- YEAH, I'M CONFIDENT IN THOSE
```

2938

```
 1    NUMBERS AND I BELIEVE --
 2    Q    I'M NOT ASKING WHETHER YOU'RE CONFIDENT IN
 3    THEM.  YOU JUST SAID IT TAKES A LOT OF EXPLANATION.
 4         I'M ASKING WHETHER YOU EXPLAINED IT TO
 5    THESE FOLKS IN YOUR DIRECT EXAMINATION.
 6    A    I'M TRYING TO HELP YOU HERE.
 7    Q    WELL, THEN, ANSWER THE QUESTION.
 8    A    THE QUESTION IS, I BELIEVE, YES, THE DIRECT
 9    EXAMINATION GOT THE NUMBERS ACROSS.
10    Q    OKAY.  IF YOU LOOK AT 2578 IN YOUR BINDER, YOU
11    SEE IT'S A BOOK BY BRYAN ORME CALLED GETTING
12    STARTED WITH CONJOINT ANALYSIS.
13    A    I'M SORRY.  2 --
14    Q    IT'S 2578.
15    A    2578, OKAY.
16    Q    AND YOU KNOW MR. ORME?
17    A    YES, I KNOW -- I'VE KNOWN BRYAN FOR A NUMBER
18    OF YEARS.
19    Q    HE'S THE PRESIDENT OF THE SOFTWARE COMPANY,
20    THE -- WHAT WAS IT CALLED?
21    A    IT'S SAWTOOTH SOFTWARE.  YES, I KNOW BRYAN.
22    Q    AND HE'S THE PRESIDENT OF SAWTOOTH SOFTWARE;
23    CORRECT?
24    A    YES.  WELL, I THINK HE IS.  I -- HE MIGHT BE
25    PRESIDENT NOW.
```

2939

```
1    Q    YOU'VE READ THE BOOK?

2    A    I READ PARTS OF THE BOOK, YES.

3    Q    YOU RECOGNIZE IT AS BEING FAIRLY

4    AUTHORITATIVE?

5    A    IT'S -- IT'S, YOU KNOW, FAIRLY AUTHORITATIVE,

6    SURE.

7    Q    AND IS IT TRUE THAT -- IS THE FOLLOWING TRUE,

8    THAT "THE IDEA OF CONVERTING UTILITIES TO DOLLAR

9    VALUES" --

10   A    EXCUSE ME.  WHERE ARE YOU READING FROM?

11   Q    SURE.  THIS IS PAGE 85 WHERE IT SAYS "MONETARY

12   SCALING TRAP."  AND IT SAYS "THE IDEA OF CONVERTING

13   UTILITIES TO DOLLAR VALUES CAN BE APPEALING TO

14   MANAGERS.  BUT SOME APPROACHES TO CONVERTING

15   UTILITIES TO DOLLAR EQUIVALENTS ARE FLAWED.  EVEN

16   WHEN COMPUTED REASONABLY, THE RESULTS OFTEN SEEM TO

17   DEFY COMMONLY HELD BELIEFS ABOUT PRICES AND HAVE

18   LIMITED STRATEGIC VALUE FOR DECISION MAKING."

19          DO YOU AGREE WITH THAT, YES OR NO?

20   A    OF COURSE, BECAUSE WHAT HE SAYS IS THERE'S

21   SOME WAYS THAT ARE FLAWED, AND I WAS VERY CAREFUL

22   NOT TO USE THE FLAWED METHODS.

23   Q    AH.  AND YOU'VE EXPLAINED THOSE SUFFICIENTLY

24   SO THE JURY CAN TRUST YOU ON IT?

25   A    HAVE I GIVEN THEM A COMPLETE CLASS IN SOME
```

1    VERY ADVANCED STATISTICS?  NO, I HAVE NOT.

2    Q    HAVE YOU DONE ANYTHING TO EXPLAIN IT TO THEM?

3    A    I'M DOING THE BEST I CAN.

4    Q    OKAY.  ON PAGE 86, DO YOU SEE IT SAYS IN THE

5    THIRD PARAGRAPH, "EVEN WHEN ACCURATE PRICE

6    SENSITIVITY HAS BEEN ESTIMATED FOR EACH INDIVIDUAL,

7    AN EXAMINATION OF AVERAGE VALUES WILL OFTEN REVEAL

8    THAT RESPONDENTS ARE WILLING TO PAY MUCH MORE FOR

9    ONE FEATURE OVER ANOTHER THAN IS SUGGESTED BY

10   MARKET PRICES."

11              DO YOU AGREE WITH THAT?

12   A    YES, I DO.

13   Q    AND YOU AGREE THAT, THAT ONE OF THE

14   FUNDAMENTAL PROBLEMS WITH ANALYSIS BASED ON THESE

15   DOLLAR VALUES IS THAT THE APPROACH ASSUMES NO

16   COMPETITION BECAUSE THE PRODUCT PURCHASED USUALLY

17   CONSTITUTES A CHOICE AMONG SPECIFIC ALTERNATIVES,

18   BUT COMPETITIVE CONTEXT IS A CRITICAL PART OF THE

19   PURCHASE SITUATION.

20              DO YOU AGREE WITH THAT?

21   A    THAT'S CORRECT.

22   Q    ON PAGE 87, YOU SEE IT GIVES THE EXAMPLE OF

23   ASKING SOMEONE THEIR WILLINGNESS TO PAY FOR A COLOR

24   MONITOR FOR YOUR LAPTOP COMPUTER VERSUS A

25   MONOCHROME SCREEN, AND IT SAYS "ASSUMING WE CONDUCT

1   A CONJOINT ANALYSIS INCLUDING MONOCHROME VERSUS

2   COLOR MONITORS, IT WE COMPUTED YOUR WILLINGNESS TO

3   PAY FOR COLOR OVER MONOCHROME, WE WOULD LIKELY FIND

4   THAT THE INCREMENTAL VALUE OF COLOR OVER MONOCHROME

5   IS WORTH A THOUSAND DOLLARS OR MORE.  BUT HOW

6   MEANINGFUL IS THIS INFORMATION TO A LAPTOP

7   MANUFACTURER GIVEN THE FACT THAT LAPTOPS WITH COLOR

8   MONITORS ARE READILY AVAILABLE ON THE MARKET AT

9   QUITE INEXPENSIVE PRICES."

10          DO YOU AGREE WITH THAT?

11  A    ARE YOU ASKING ME DO I AGREE WITH WHAT BRYAN

12  IS TRYING TO MAKE THE DISTINCTION HERE BETWEEN THE

13  DEMAND SIDE OVER A DEMAND AND SUPPLY, YES, I AGREE

14  WITH BRYAN.

15  Q    THAT -- THESE NUMBERS MAY NOT HAVE ANY

16  RELATIONSHIP TO WHAT PEOPLE ACTUALLY PAY IN THE

17  MARKET; RIGHT?

18  A    NO, THAT'S -- I DON'T AGREE WITH THAT.

19  Q    WELL, LET ME ASK YOU THIS:  IF YOU HAD BEEN

20  ASKED TO DO A CONJOINT ANALYSIS ON -- LET ME GIVE

21  YOU AN EXAMPLE.  IF WE CAN GO TO 3920.016 -- HOLD

22  ON ONE SECOND.  YES, 016.

23          SO IF WE HAD -- IF YOU HAD BEEN ASKED TO

24  DO A CONJOINT ANALYSIS ON SLIDE TO UNLOCK, OR JUST

25  UP AND DOWN SCROLL, OR, YOU KNOW, SIDE SCROLL OR

```
 1    HAVING A VIRTUAL KEYBOARD OR JUST ZOOM OR SWIPE OR

 2    THE FLICK OR JUST DOUBLE TAP OR ROTATE OR MOVING

 3    ICONS OR CUT, COPY, PASTING, PRESS AND HOLD, YOU'RE

 4    GOING TO GET A VALUE FOR EVERY ONE OF THOSE; RIGHT?

 5    A    ONE COULD DO THAT STUDY, YES.

 6    Q    AND YOU'D GET A VALUE FOR EVERY ONE OF THOSE;

 7    RIGHT?

 8    A    RIGHT, SURE.  I MEAN, YOU WOULD -- YOU WOULD

 9    GET AN ACCURATE MEASURE OF HOW MUCH PEOPLE WOULD BE

10    WILLING TO PAY.

11    Q    GO TO THE NEXT PAGE.

12         AND THEN IF YOU DID THE SAME THING FOR

13    SCREEN QUALITY, LIKE HOW GOOD, HOW BRIGHT, HOW MANY

14    PIXELS IN THE GREEN, THE OPERATING SYSTEM, GPS

15    LOCATION SERVICES, BATTERY LIFE, HEADPHONES, BEING

16    ABLE TO MOVE THE TABLET SO IT ORIENTS TO YOU, I

17    MEAN, ALL OF THESE FEATURES, IF YOU DID THE

18    CONJOINT STUDY, YOU'RE GOING TO GET A NUMBER;

19    RIGHT?

20    A    YEAH, WE COULD DO THAT STUDY, ALTHOUGH I

21    WOULDN'T DO ALL OF THESE FEATURES AT THE SAME TIME,

22    BUT YOU COULD DO THAT STUDY.

23    Q    AND IF YOU DID THAT, YOU'D BE PAYING THOUSANDS

24    OF DOLLARS FOR A PHONE IF YOU JUST DID THAT

25    INDEPENDENTLY WITH EACH OF THOSE -- IF YOU DID
```

                                                                      1943

```
 1   THOSE FEATURES AND PLUGGED THEM INTO THE STUDY YOU

 2   JUST DID, THOSE NUMBERS WOULD ADD UP SO THAT PEOPLE

 3   WOULD BE PAYING THOUSANDS OF DOLLARS FOR A PHONE

 4   THAT THEY'RE REALLY ONLY WILLING TO PAY ABOUT $199

 5   FOR?

 6   A    WELL, IT'S GETTING A LITTLE BIT COMPLICATE

 7   HERE, BECAUSE PEOPLE DO, OVER THE LIFE OF THE

 8   CONTRACT, PAY MORE, ANYWHERE FROM 2,000 TO $5,000

 9   IF YOU INCLUDE HOW MUCH THEY'RE PAYING.

10        BUT, YES, SOME OF THESE FEATURES CAN BE

11   VALUABLE.

12   Q    AND JUST SO WE'RE CLEAR, IF YOU GO BACK TO

13   3920.015, YOU CHOSE NOT TO GIVE THE JURY ANY

14   NUMBERS HERE TO LET THEM INDEPENDENTLY USE THEIR

15   COMMON SENSE TO SEE WHETHER OR NOT YOUR NUMBERS

16   MADE ANY SENSE; RIGHT?

17   A    WELL, I WAS REALLY FOCUSSED ON THE QUESTION I

18   WAS ASKED, WHICH WAS THE VALUE OF THE PATENTS,

19   THAT'S CORRECT.

20   Q    BUT YOU HAVE TO USE COMMON SENSE WHEN YOU

21   LOOKED AT THESE THINGS TO SEE IF THEY REALLY MAKE

22   ANY SENSE IN THE REAL WORLD.  WOULD YOU AGREE WITH

23   THAT?

24   A    IN FACT, I -- YEAH, I THINK I LOOKED AT COMMON

25   SENSE.  BUT THESE NUMBERS MAKE SENSE TO ME BASED
```

2944

```
1    UPON 20 -- NO, HOW MANY, 1975, 35 YEARS OF
2    EXPERIENCE.  37.
3    Q    WELL, YOU MIGHT HAVE EVEN MORE THAN THAT MANY
4    YEARS OF EXPERIENCE AS A CONSUMER IN THIS BOX
5    HERE -- OOPS, I POINTED THIS AT THEM -- AND IT
6    WOULD HAVE BEEN NICE IF YOU WOULD HAVE PUT THEM IN
7    A POSITION WHERE THEY COULD HAVE USED THEIRS.
8              MR. JACOBS:  OBJECTION, YOUR HONOR.
9              MR. MCELHINNY:  THAT'S NOT A QUESTION.
10   BY MR. PRICE:
11   Q    IS THAT CORRECT?
12             THE COURT:  I'M SORRY.  LET ME LOOK AT
13   THE QUESTION.
14             LET'S JUST MOVE ON.  GO AHEAD, PLEASE.
15             MR. PRICE:  I'M SORRY, YOUR HONOR.  I
16   COULDN'T HEAR YOU.
17             THE COURT:  WHAT WAS THE QUESTION?  CAN
18   YOU READ IT PLEASE, MS. SHORTRIDGE?
19             MR. PRICE:  LET ME ASK IT AGAIN.  IT'LL
20   BE QUICKER.
21             THE COURT:  GO AHEAD.
22   BY MR. PRICE:
23   Q    YOU SAID YOU'D USE YOUR COMMON SENSE.  YOU'RE
24   NOT AN EXPERT IN COMMON SENSE; RIGHT?
25   A    NO, I'M NOT AN EXPERT IN COMMON SENSE.
```

1945

```
1    Q    SO IT WOULD HAVE BEEN NICE, YOU'D AGREE, IF

2    YOU WOULD HAVE PRESENTED FIGURES TO THE JURY SO

3    THEY COULD USE THEIR COMMON SENSE IN SEEING WHETHER

4    OR NOT THE NUMBERS YOU PRESENTED SO THEY COULD HAVE

5    USED THEIR COMMON SENSE.  THAT WOULD HAVE BEEN

6    FAIR?

7              MR. JACOBS:  THE FORM OF THE QUESTION IS

8    IMPROPER.

9              THE COURT:  OVERRULED.

10             GO AHEAD.

11             THE WITNESS:  LET ME SEE IF I UNDERSTAND

12   THE QUESTION.

13             MR. PRICE:  IF YOU DON'T UNDERSTAND THE

14   QUESTION, THAT'S FINE.

15             THE COURT:  OKAY.  IT'S 4:04.

16                  REDIRECT EXAMINATION

17   BY MR. JACOBS:

18   Q    DR. HAUSER, CAN YOU EXPLAIN TO THE JURY WHY

19   YOU BELIEVE YOUR RESULTS ARE VALID?

20   A    YES, I CAN.  THIS IS CONJOINT ANALYSIS.  WE'VE

21   BEEN -- THIS HAS BEEN USED IN MARKETING RESEARCH

22   SINCE 1971.  WE'VE DONE A LOT OF VALIDATION

23   STUDIES.  WE'VE ACTUALLY HAD PEOPLE MAKE CHOICES.

24   HAVING GIVEN THEM REAL MONEY, THEY MAKE CHOICES.

25             WE DESIGNED THE STUDY AS CAREFULLY AS
```

1    POSSIBLE TO DETERMINE HOW MUCH PEOPLE WOULD BE

2    WILLING TO PAY FOR THESE FEATURES, AND AS YOU CAN

3    SEE, WE GOT A SUBSTANTIAL AMOUNT.

4           CONJOINT ANALYSIS IS PROBABLY THE MOST

5    USED QUANTITATIVE TECHNIQUE IN MARKETING.  THE

6    LARGEST CORPORATIONS USE IT.  I'VE USED IT FOR AUTO

7    COMPANIES.  I'VE USED IT FOR CAMERAS.  I'VE USED IT

8    FOR SCREW TOP CAPS FOR WINE BOTTLES.  IT'S BEEN

9    VALIDATED MANY, MANY TIMES.

10   Q    AND WHAT ARE THE VALIDATION METHODS FOR THIS

11   PARTICULAR SURVEY THAT YOU CONDUCTED?

12   A    OKAY.  IN THIS PARTICULAR SURVEY, WE DID WHAT

13   ARE REFERRED TO AS HOLD OUT TASKS.

14          FOR EXAMPLE, WE ASKED THE CONSUMER TO

15   MAKE SOME CHOICES.  THEN WE CRUNCHED THE DATA, WE

16   ANALYZED THE DATA, AND THEN WE PREDICT WHAT THEY

17   WOULD ACTUALLY SAY IN THE NEXT QUESTIONS, AND THEN

18   WE COMPARED WHAT THEY WOULD SAY TO WHAT THEY WOULD

19   ACTUALLY DO.

20          AND THE STATISTICS WE GOT WERE DEFINITELY

21   WITHIN THE RANGE IN THE LITERATURE AND WHAT ONE

22   WOULD NORMALLY CONSIDER QUITE HIGH.

23   Q    AND WHAT KIND OF VALIDATION IS THAT?  IS THERE

24   A TERM FOR THAT?

25   A    THAT'S AN INTERNAL VALIDATION, YES.

2947

```
 1    Q    WHY DO YOU BELIEVE THAT'S A SUFFICIENT

 2    VALIDATION IN THIS CASE?

 3    A    I BELIEVE IT'S A SUFFICIENT VALIDATION BECAUSE

 4    IN MANY OTHER STUDIES, INCLUDING A NUMBER I'VE

 5    PUBLISHED, THERE'S INTERNAL VALIDATION AND AN

 6    EXTERNAL VALIDATION, WHAT PEOPLE ACTUALLY DO WITH

 7    REAL MONEY.

 8               AND IN ALL CASES, WHEN STUDIES ARE DONE

 9    CAREFULLY, THE INTERNAL VALIDATION LINES UP WITH

10    THE EXTERNAL VALIDATION.

11    Q    DID YOU HAVE AN UNDERSTANDING OF THE REASON WE

12    ASKED YOU TO DO THIS SURVEY?

13    A    YES.  I WAS ASKED TO OBTAIN A VALUATION OF

14    WHAT PEOPLE WOULD BE WILLING TO PAY, THE DEMAND

15    SIDE, FOR THE FEATURES AT ISSUE IN THE CASE.

16    Q    AND TO WHAT PURPOSE DID YOU UNDERSTAND YOUR

17    SURVEY WOULD BE USED?

18               MR. PRICE:  OBJECTION.  THIS IS BEYOND

19    THE SCOPE OF CROSS AT THIS POINT.

20               THE COURT:  SUSTAINED.

21               MR. JACOBS:  THANK YOU.

22               NO FURTHER QUESTIONS.

23               THE COURT:  ALL RIGHT.  IT'S 4:06.  ANY

24    RECROSS?

25               MR. PRICE:  JUST ONE SECOND.
```

2948

```
 1                    THE COURT:  PLEASE.

 2                    (PAUSE IN PROCEEDINGS.)

 3                    RECROSS-EXAMINATION

 4   BY MR. PRICE:

 5   Q    I FORGOT TO ASK YOU, YOU'RE BEING PAID ABOUT

 6   $800 AN HOUR?

 7   A    THAT'S MY STANDARD GOING RATE, YES.

 8   Q    AND HOW MUCH DO YOU THINK YOU'RE GOING TO END

 9   UP GETTING?

10   A    I DON'T KNOW.

11   Q    DO YOU HAVE ANY IDEA HOW MUCH YOU'VE BILLED?

12   A    PRIOR TO COMING HERE?  I'D HAVE TO ASK MY

13   WIFE.

14   Q    SOMETIMES YOU HAVE TO CHECK WITH YOUR SPOUSE

15   BEFORE MAKING THESE MARKETING DECISIONS; RIGHT?

16             YOU REALLY CAN'T TELL US?  I MEAN,

17   REALLY?

18   A    WELL, IT'S -- I'M TRYING TO VISUALIZE THE

19   SPREADSHEET.  I'D HAVE TO CALL MY WIFE.

20             OH, I DON'T KNOW.  TO ACTUALLY DO THE

21   STUDY, IT'S A COMPLICATED STUDY.  30,000, 40,000.

22   Q    THE TESTS YOU TALKED ABOUT, THOSE ARE INTERNAL

23   TESTS WITHIN THE -- WELL, THOSE WERE INTERNAL

24   TESTS; RIGHT?

25   A    WELL, ABSOLUTELY.  THESE WERE WHAT'S KNOWN AS
```

```
 1    INTERNAL VALIDITY, AND --

 2    Q    THAT WAS MY QUESTION.

 3    A    OKAY.

 4    Q    AND AS, AS MR. ORME SAID, THAT SOMETIMES

 5    DOESN'T REALLY LINE UP WITH REALITY IF YOU DID

 6    EXTERNAL TESTS; CORRECT?

 7    A    NO, NO.  IT ALMOST ALWAYS DOES.  WHEN YOU

 8    COMPARE --

 9    Q    OKAY.  YOU SAID IT ALMOST ALWAYS DONE.

10              WE COULD HAVE BEEN ABLE TO TELL THAT

11    INSTEAD OF JUST TRUSTING YOU IF YOU'D ACTUALLY

12    GIVEN US THOSE NUMBERS, RIGHT, ON HOW MUCH PEOPLE

13    ARE WILLING TO PAY FOR MEMORY?

14    A    I THINK YOU'RE GETTING A LITTLE CONFUSED.  AN

15    INTERNAL VALIDITY CHECK IS THE ABILITY TO PREDICT

16    WHAT PEOPLE ARE GOING TO DO, SO PEOPLE BEHAVE THE

17    WAY THEY SAY THEY'RE GOING TO BEHAVE.  THAT'S

18    DIFFERENT THAN LOOKING AT THESE NUMBERS.

19              MR. PRICE:  OKAY.  THANK YOU.

20              THE COURT:  ALL RIGHT.  IT'S 4:08.

21              ANY MORE QUESTIONS.

22              MR. JACOBS:  NO, YOUR HONOR.

23              THE COURT:  ALL RIGHT.  MAY THIS WITNESS

24    BE EXCUSED AND IS IT SUBJECT TO RECALL.

25              MR. JACOBS:  HE MAY, AND HE IS.
```

2950

```
1            THE COURT:  ALL RIGHT.  SO YOU'RE EXCUSED
2    SUBJECT TO RECALL.  YOU MAY STEP DOWN.
3            THE WITNESS:  THANK YOU.
4            THE COURT:  CALL YOUR NEXT WITNESS,
5    PLEASE.
6            DO WE HAVE A PHOTO FOR MR. HAUSER?
7            ALL RIGHT.  THANK YOU.
8            WHO'S YOUR NEXT WITNESS?
9            MR. LEE:  YOUR HONOR, WE'RE GOING TO CALL
10   MR. TEKSLER AT THIS TIME.  MR. MUELLER WILL PRESENT
11   HIM IF THAT'S ALL RIGHT.
12           THE COURT:  ALL RIGHT.  I DON'T HAVE ANY
13   DIRECT EXHIBITS FOR MR. TEKSLER.  I HAVE THE CROSS.
14           MR. LEE:  I THINK THEY'RE ON THE WAY,
15   YOUR HONOR.
16           THE COURT:  OKAY.
17           MR. MUELLER:  YOUR HONOR, MAY I APPROACH
18   WITH THE PHOTOS?
19           THE COURT:  YES.  THANK YOU.
20           MR. MUELLER:  YOUR HONOR, WE CALL
21   BORIS TEKSLER.
22           THE COURT:  ALL RIGHT.
23           THE CLERK:  WOULD YOU RAISE YOUR RIGHT
24   HAND, PLEASE, BEFORE YOU SIT DOWN.
25   ///
```

```
 1                    BORIS TEKSLER,

 2      BEING CALLED AS A WITNESS ON BEHALF OF THE

 3      PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

 4      EXAMINED AND TESTIFIED AS FOLLOWS:

 5               THE WITNESS:  YES, I DO.

 6               THE CLERK:  WOULD YOU HAVE A SEAT,

 7      PLEASE.

 8               THE WITNESS:  THANK YOU.

 9                   DIRECT EXAMINATION

10      BY MR. MUELLER:

11      Q    GOOD AFTERNOON.  WOULD YOU INTRODUCE YOURSELF

12      TO THE JURY?

13      A    CERTAINLY.  HELLO, MY NAME IS BORIS TEKSLER.

14               THE CLERK:  COULD YOU SPELL YOUR NAME,

15      PLEASE?

16               THE WITNESS:  CERTAINLY.  B-O-R-I-S,

17      T-E-K-S-L-E-R.

18      BY MR. MUELLER:

19      Q    MR. TEKSLER, WHERE DO YOU WORK?

20      A    I WORK AT APPLE.

21      Q    WHAT IS YOUR POSITION AT APPLE?

22      A    I'M THE DIRECTOR OF PATENTS AND LICENSING

23      STRATEGY.

24      Q    FOR HOW LONG HAVE YOU WORKED AT APPLE?

25      A    FOR A LITTLE OVER THREE YEARS NOW.
```

1952

```
 1    Q    WHAT ARE YOUR RESPONSIBILITIES IN YOUR

 2    POSITION?

 3    A    SO I HAVE TWO KEY AREAS.  THE FIRST ONE IS

 4    PATENT ACQUISITIONS WHERE WE ACQUIRE PATENTS IN THE

 5    COMPANY.

 6          THE SECOND ONE IS PATENT LICENSING WHERE

 7    WE DEAL WITH CROSS-LICENSING WITH THIRD PARTIES.

 8    Q    MR. TEKSLER, COULD YOU EXPLAIN TO THE JURY,

 9    PLEASE, WHAT IT MEANS TO LICENSE A PATENT?

10    A    CERTAINLY.  SO TO THE EXTENT THAT I HAVE A

11    PATENT THAT DESCRIBES, LET'S SAY, A TECHNOLOGY OR A

12    FEATURE, AND IF YOU WANT TO BUILD A PRODUCT THAT

13    USES THAT TECHNOLOGY OR FEATURE, THEN I CAN SELL

14    YOU A LICENSE TO PRACTICE THAT PATENT AND YOU CAN

15    GO AHEAD AND PRACTICE THAT WITHIN YOUR PRODUCT.

16    Q    COULD YOU PLEASE GIVE US AN OVERVIEW OF HOW

17    APPLE APPROACHES LICENSING?

18    A    SO I GUESS FROM A STRATEGIC PERSPECTIVE, WE

19    HAVE THREE DISTINCT AREAS WHEN WE THINK ABOUT

20    PATENT LICENSING AND WE TREAT THEM DIFFERENTLY.

21    Q    COULD YOU PLEASE LIST THOSE THREE.

22    A    CERTAINLY.  SO I'LL START WITH

23    STANDARDS-RELATED PATENTS.

24          MS. MAROULIS:  YOUR HONOR, OBJECTION PER

25    YOUR PRIOR RULING.
```

```
 1              THE COURT:  SUSTAINED.

 2              MR. MUELLER:  YOUR HONOR, I WAS ABOUT TO

 3     ASK MR. TEKSLER TO PAUSE ON STANDARDS QUESTIONS.

 4     Q    I'M NOT GOING TO ASK ANY QUESTIONS ABOUT

 5     THOSE.

 6              BUT IF YOU COULD JUST LIST FOR US THE

 7     NEXT TWO CATEGORIES, PLEASE.

 8     A    CERTAINLY.  THE NEXT ONE IS APPLE COMPUTING

 9     PATENTS, OR COMPUTING PATENTS, AND THE THIRD ONE IS

10     APPLE'S UNIQUE USER EXPERIENCE, I.P.

11     Q    SO LET'S TAKE, IF WE COULD, THOSE LAST TWO

12     CATEGORIES ONE BY ONE.

13              COMPUTING PATENTS, WHAT DOES THAT REFER

14     TO?

15     A    SO APPLE HAS HAD A LONG LEGACY OF COMPUTING

16     INNOVATION.  IT STARTED WITH PERSONAL COMPUTING,

17     AND SINCE THEN I WOULD DESCRIBE IT THIS WAY, WHICH

18     IS WE'VE BEEN ON OVER A TWO DECADE HISTORY OF

19     INNOVATION WITH BUILDING A VARIETY OF MOBILE

20     PRODUCTS, AND IT STARTED WITH NOTEBOOK COMPUTERS.

21              AS TECHNOLOGY WAS MATURING WITH THE

22     PROCESSOR TECHNOLOGY GETTING BETTER,

23     MINIATURIZATION TECHNOLOGY GETTING BETTER, AND

24     BATTERIES KEEP GETTING BETTER, WE WERE ABLE TO

25     BUILD A MULTITUDE OF DIFFERENT PRODUCTS AND WE
```

```
1    INNOVATE QUITE A BIT.  I'LL HIGHLIGHT A COUPLE.

2              SO IN 2001, WE BUILT THE IPOD AND, WITH

3    IT, WE REVOLUTIONIZED THE MUSIC INDUSTRY.

4              IN 2007, WE BUILT IPHONE AND, WITH IT, WE

5    RECAST WHAT ARE MEANT TO BE THE SMARTPHONES.

6              AND IN 2010, WE BUILT THE IPAD, AND WITH

7    IPAD WE CREATED A WHOLE NEW MARKET CATEGORY KNOWN

8    AS TABLETS.

9              MS. MAROULIS:  YOUR HONOR, OBJECTION.

10   MOVE TO STRIKE.  IT'S BEYOND THIS WITNESS'S

11   EXPERTISE.  HE STARTED OUT IN 2001.

12             THE COURT:  OVERRULED.

13   BY MR. MUELLER:

14   Q    CONTINUE, PLEASE.

15   A    AND WITH THAT SAID, WE BUILT A PORTFOLIO, A

16   PATENT PORTFOLIO ALONG THE WAY AND HAVE DONE A LOT

17   OF INNOVATION TO BUILD THOSE PRODUCTS OUT TO

18   MARKET.

19   Q    MR. TEKSLER, COULD YOU EXPLAIN TO THE JURY,

20   PLEASE, HOW THIS CATEGORY OF COMPUTING PATENTS

21   RELATE, IF AT ALL, TO WIRELESS DEVICES?

22   A    CERTAINLY.  SO ANY MODERN SMARTPHONE THAT HAS

23   A OPERATING SYSTEM BUILT INTO IT THAT YOU WANT TO

24   DOWNLOAD THIRD PARTY APPLICATIONS TO, THAT'S AN

25   EXAMPLE OF CORE COMPUTING I.P. THAT WE'VE REALLY
```

1    BUILT THE FOUNDATIONAL POSITIONING.

2    Q    WHAT IS APPLE'S POSITION ON LICENSING THIS

3    PORTION OF ITS PATENT PORTFOLIO?

4    A    SO UNLIKE STANDARDS WHERE WE HAVE TO LICENSE,

5    THIS IS AN AREA WHERE WE DON'T HAVE TO LICENSE.

6         MS. MAROULIS:  OBJECTION.  BEYOND THE

7    COURT'S ORDER ON STANDARDS.

8         MR. MUELLER:  YOUR HONOR, HE'S JUST

9    DESCRIBING THE SECOND CATEGORY, NON-STANDARDS

10   PATENTS.

11        THE COURT:  ALL RIGHT.  OVERRULED.

12        THE WITNESS:  SO WITH RESPECT TO THE

13   COMPUTING PORTFOLIO, IT'S NOT ONE THAT WE HAVE TO

14   LICENSE, BUT WE'RE CERTAINLY WILLING TO DISCUSS

15   LICENSING.

16        WE DO THAT WITH TWO PRIMARY GOALS.  THE

17   FIRST ONE IS THAT WE WANT TO GET FAIRLY COMPENSATED

18   FOR THE WORK THAT WE'VE DONE; AND THE SECOND -- AND

19   THE SECOND ONE IS WE WANT TO MAKE SURE THAT WE

20   SAFEGUARD APPLE'S DIFFERENTIATED USER EXPERIENCE.

21   BY MR. MUELLER:

22   Q    MR. TEKSLER, LET'S TURN, IF WE COULD, TO THE

23   THIRD CATEGORY IN THE APPLE PORTFOLIO.  WOULD YOU

24   REMIND US WHAT THAT IS?

25   A    CERTAINLY.  THAT'S APPLE'S UNIQUE USER

```
 1   EXPERIENCE I.P.

 2   Q    WHAT DOES THAT REFER TO?

 3   A    SO I WOULD DESCRIBE THAT IN A COUPLE DIFFERENT

 4   WAYS.  FROM A TOP LEVEL, IT'S THAT WHICH MAKES OUR

 5   BRAND IDENTITY AND KEEPS US UNIQUE IN THE

 6   MARKETPLACE, AND IT'S WHAT WE DON'T WISH TO SHARE

 7   AND OTHER PEOPLE TO MAKE.

 8             SO WITH THAT, I WOULD SAY FROM A

 9   TECHNICAL PERSPECTIVE, IT INCLUDES TRADEMARKS,

10   TRADE DRESS, ALL THE DESIGN PATENTS, AND A SMALL

11   SET OF UTILITY PATENTS THAT REALLY DEAL WITH USER

12   INTERFACE ELEMENTS, AND MAYBE A COUPLE OF

13   ASSOCIATED FEATURES.

14   Q    AND HOW DOES THIS CATEGORY RELATE TO WIRELESS

15   DEVICES?

16   A    WELL, I GUESS YOU DON'T REALLY NEED A LICENSE

17   TO THIS.  FROM OUR PERSPECTIVE, UNLESS YOU'RE

18   TRYING TO BUILD AN IPHONE KNOCK-OFF OR A CLONE OR

19   AN IPAD CLONE, YOU WOULDN'T NEED A LICENSE TO THIS

20   SET OF I.P.

21   Q    AND TO BE CLEAR, WHAT IS APPLE'S POSITION ON

22   LICENSING THIS PORTION OF ITS PORTFOLIO?

23   A    WE STRONGLY DESIRE NOT TO LICENSE IT.  IT'S

24   NOT AN AREA THAT WE LICENSE, AND OUR GOAL IN

25   LICENSING IS TO ENABLE PEOPLE TO DESIGN THEIR OWN
```

1    PRODUCTS, NOT THE ABILITY TO JUST COPY OUR

2    PRODUCTS.

3    Q    HAS APPLE EVER LICENSED ANY OF THE PATENTS

4    WITHIN THIS CATEGORY?

5    A    CERTAINLY OVER TIME WE HAVE, BUT I CAN COUNT

6    THOSE INSTANCES ON ONE HAND QUITE EASILY.  AND WE

7    DO SO WITH RARE EXCEPTION AND WE DO IT CONSCIOUSLY

8    KNOWING THAT WE'RE NOT ENABLING SOMEBODY TO BUILD A

9    CLONE PRODUCT.

10   Q    MR. TEKSLER, I WANT TO SHIFT GEARS, IF I

11   COULD, AND TURN BACK THE CLOCK TO THE BEGINNING OF

12   THE APPLE/SAMSUNG DISPUTE.

13          DO YOU KNOW WHEN THAT DISPUTE BEGAN?

14   A    YES.  IT BEGAN IN THE SUMMER OF 2010.

15   Q    AND WHAT HAPPENED IN THE SUMMER OF 2010?

16   A    SO SAMSUNG INTRODUCED THEIR GALAXY S PHONE,

17   AND WITH THIS, WE WERE QUITE SHOCKED FOR A COUPLE

18   OF REASONS.

19          FIRST, THEY WERE A TRUSTED PARTNER OF

20   OURS AND WE DIDN'T UNDERSTAND HOW A TRUSTED PARTNER

21   WOULD BUILD A COPYCAT PRODUCT LIKE THAT.

22          AND THE SECOND ONE WAS THAT THE PRODUCT

23   WAS JUST WAY TOO CLOSE TO OUR PRODUCT.

24          SO WE TOOK IT SO SERIOUS THAT STEVEN JOBS

25   AND TIM COOK CONTACTED SAMSUNG EXECUTIVES AND MET

1958

```
1    WITH THEM TO RELAY OUR CONCERN.

2              MS. MAROULIS:  YOUR HONOR, I MOVE TO

3    STRIKE FOR LACK OF FOUNDATION ON THAT RESPONSE.

4              THE COURT:  YOU'RE GOING TO HAVE TO LAY A

5    FOUNDATION HOW HE KNOWS THAT.

6    BY MR. MUELLER:

7    Q    SURE.  MR. TEKSLER, WERE YOU AT APPLE AT THAT

8    TIME?

9    A    I WAS.

10   Q    WHAT WAS YOUR POSITION AT THAT TIME?

11   A    I WAS THE DIRECTOR OF APPLE I.P. AND STRATEGY.

12   Q    YES OR NO, WERE YOU PRIVY TO CONVERSATIONS

13   INVOLVING SAMSUNG?

14   A    YES, I WAS.

15             MR. MUELLER:  YOUR HONOR, I'VE LAID A

16   FOUNDATION.

17   Q    COULD YOU PLEASE TURN TO TAB 1 IN YOUR BINDER,

18   THAT'S PLAINTIFF'S EXHIBIT 52.

19             THE COURT:  I DON'T HAVE THE DIRECT

20   EXHIBITS TO MR. TEKSLER.  I THOUGHT THEY WERE

21   COMING.

22             MR. MUELLER:  I'M SORRY.  I THOUGHT YOU

23   HAD A BINDER.  I APOLOGIZE, YOUR HONOR.  THIS IS

24   TAB 1, PLAINTIFF'S EXHIBIT 52.

25   Q    MR. TEKSLER, DO YOU KNOW WHAT THIS DOCUMENT
```

2959

```
1     IS?

2     A    I DO.

3     Q    WHAT IS IT?

4     A    IT'S A PRESENTATION THAT WAS GIVEN TO SAMSUNG

5     IN AUGUST OF 2010.  IT'S ONE THAT I HELPED AUTHOR

6     AND CREATE.

7              MR. MUELLER:  YOUR HONOR, I OFFER IT.

8              MS. MAROULIS:  YOUR HONOR, NO FURTHER

9     OBJECTION, BUT YOUR HONOR RULED THAT THE WITNESS

10    WOULD NOT BE ALLOWED TO TESTIFY ABOUT THE MEETING

11    ITSELF.

12             THE COURT:  AND I'LL CONTINUE THAT

13    RULING.  IT'S ADMITTED.

14             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

15             52, HAVING BEEN PREVIOUSLY MARKED FOR

16             IDENTIFICATION, WAS ADMITTED INTO

17             EVIDENCE.)

18             THE COURT:  GO AHEAD.

19    BY MR. MUELLER:

20    Q    MR. TEKSLER, WE'RE PUTTING PLAINTIFF'S EXHIBIT

21    52 ON THE SCREEN.  THIS IS TITLED "SAMSUNG'S USE OF

22    APPLE PATENT IN SMARTPHONES."

23             AND COULD YOU REMIND US WHAT THIS

24    DOCUMENT IS?  IT'S A PRESENTATION?

25    A    YES, IT'S A PRESENTATION GIVEN TO SAMSUNG IN
```

1960

```
1    AUGUST OF -- AUGUST 4TH OF 2010.

2    Q    WHO DELIVERED THE PRESENTATION?

3    A    CHIP LUTTON DID.

4    Q    WHO IS CHIP LUTTON?

5    A    CHIP LUTTON WAS THE CHIEF PATENT COUNSEL AND

6    MY MANAGER AT THAT TIME.

7    Q    MR. LUTTON IS STILL AT APPLE?

8    A    NO, HE'S NOT.

9    Q    NOW, WERE YOU AT THIS PRESENTATION?

10   A    I WAS NOT.

11   Q    BUT YOU NOW WHEN IT WAS GIVEN?

12   A    I DO.

13   Q    WHAT WAS THAT DATE?

14   A    AUGUST 4TH, 2010.

15   Q    LET'S TURN, IF WE COULD, TO PAGE 17 OF THE

16   PRESENTATION AND PUT IT ON THE SCREEN.

17             WHAT DO WE SEE HERE?

18   A    SO THIS WAS REALLY A CHAPTER THAT WAS ENTITLED

19   "SAMSUNG COPYING IPHONE," AND WHAT WE WERE -- WHAT

20   WE WERE RELAYING WITH THIS CONTENT WAS REALLY ABOUT

21   THE REMARKABLE SIMILARITY OF THE TWO PRODUCTS, ALL

22   THE WAY FROM THE OVERALL APPEARANCE OF THE PRODUCT

23   DOWN TO THE ARRANGEMENT, THE FOUR-BY-FOUR

24   ARRANGEMENT OF THE ICONS, THE SIMILARITY OF THE

25   ICONS, THE PERSISTENT DOCK THAT YOU HAVE AT THE
```

1    BOTTOM THAT DOESN'T CHANGE WITH THE SCREENS.

2              AND WE DETAILED IT, YOU KNOW, WITH

3    SUBSEQUENT PAGES THAT REALLY TALKED ABOUT THESE,

4    THE USER INTERFACE ELEMENTS THAT WERE SIMILAR ALL

5    THE WAY DOWN TO THE PACKAGING.

6    Q    LET'S TURN --

7              MS. MAROULIS:  YOUR HONOR, I MOVE TO

8    STRIKE.  THIS WAS A LAY OPINION ON INFRINGEMENT

9    ISSUES AND, AGAIN, THE WITNESS WAS NOT DISCLOSED.

10             MR. MUELLER:  YOUR HONOR, I'M SIMPLY

11   ASKING MR. TEKSLER ABOUT A DOCUMENT THAT HE HELPED

12   AUTHOR.

13             THE COURT:  OVERRULED.

14   BY MR. MUELLER:

15   Q    LET'S PUT PAGE 14 ON THE SCREEN IF WE COULD.

16             WHAT DO WE SEE HERE?

17   A    SO IN THIS PAGE WHAT WE WERE DESCRIBING --

18   THIS WAS PART OF THE CHAPTER WHERE WE TALK ABOUT

19   THE ARCHITECTURE OF SAMSUNG PHONES, AND

20   SPECIFICALLY HERE WE'RE REFERRING TO THE ANDROID

21   APPLICATION FRAMEWORK THAT'S HIGHLIGHTED IN THE

22   LEFT ARCHITECTURE DIAGRAM THERE.

23             AND WE WERE COMMUNICATING TO SAMSUNG BY

24   THIS SLIDE THAT THESE ARE SOME OF THE, SOME OF THE

25   PATENTS -- IT'S JUST REPRESENTATIVE OF A LIST OF

```
 1    PATENTS THAT SAMSUNG INFRINGES WITH THIS PORTION OF

 2    THE ARCHITECTURE.

 3    Q    I'D LIKE TO DIRECT YOUR ATTENTION, IF I COULD,

 4    MR. TEKSLER, TO U.S. PATENT NUMBER 7,469,381 ON

 5    THIS LIST.

 6              ARE YOU FAMILIAR WITH THAT PATENT?

 7    A    I AM.

 8    Q    WHAT IS IT?

 9    A    SO THIS PATENT RELATES TO SCROLL BOUNCING AND,

10    I GUESS PUT SIMPLY, IT'S A USER INTERFACE ELEMENT

11    WHEN YOU'RE PANNING THROUGH A LIST, WHEN YOU GET TO

12    THE BOTTOM OF THE LIST, HOW DO YOU KNOW THAT YOU

13    GOT TO THE BOTTOM?

14              WELL, WE HAVE A RUBBER BAND LIKE EFFECT

15    THAT HAPPENS WHEN YOU GET TO THE BOTTOM OF THE

16    LIST.  IF YOU DIDN'T HAVE SOMETHING LIKE THIS, YOU

17    WOULDN'T KNOW, IS THE COMPUTER HUNG UP?  SO YOU

18    NEED TO HAVE SOME KIND OF USER INTERFACE ELEMENT

19    AND THIS IS HOW WE DO IT.

20              MS. MAROULIS:  YOUR HONOR, MOVE TO

21    STRIKE.  LACK OF FOUNDATION AND OPINION TESTIMONY.

22              MR. MUELLER:  YOUR HONOR, AGAIN, THIS IS

23    A PORTION OF A PRESENTATION THAT MR. TEKSLER HELPED

24    TO AUTHOR.  I'M JUST ASKING ABOUT ONE ENTRY ON THIS

25    PAGE.
```

```
 1              THE COURT:  ALL RIGHT.  OVERRULED.
 2      BY MR. MUELLER:
 3      Q    MR. TEKSLER, IF YOU COULD, PLEASE TURN TO TAB
 4      2 IN YOUR BINDER, AND THIS IS PDX 32.  IF WE COULD
 5      ALSO PUT THAT ON THE SCREEN.
 6              MR. TEKSLER, THIS SHOWS SEVEN PATENT
 7      COVERS.  ARE YOU FAMILIAR WITH THESE PATENTS?
 8      A    I AM.
 9      Q    WHAT ARE THEY?
10      A    THESE ARE THE PATENTS --
11              MS. MAROULIS:  OBJECTION, CALLS FOR
12      OPINION TESTIMONY.  LACKS FOUNDATION.
13              THE COURT:  WHAT ARE YOU ASKING?
14              MR. MUELLER:  I MERELY WANTED TO GET
15      ACROSS THAT THESE ARE THE ASSERTED PATENTS IN THIS
16      CASE.
17              THE COURT:  IS THERE ANY QUESTION ABOUT
18      THAT SO FAR?
19              MR. MUELLER:  I CAN REPHRASE IF YOU -- IF
20      I MIGHT, YOUR HONOR.
21      Q    ARE THESE THE SEVEN ASSERTED PATENTS?
22      A    YES, THEY ARE.
23      Q    WHERE DO THESE FALL, THESE SEVEN PATENTS,
24      WITHIN THE CATEGORIES YOU DESCRIBED EARLIER IN THE
25      APPLE PORTFOLIO?
```

```
 1    A    CERTAINLY.  SO THERE'S FOUR DESIGN PATENTS,

 2    AND ALL FOUR DESIGN PATENTS FALL INTO APPLE'S

 3    UNIQUE USER EXPERIENCE.

 4            AND THEN THE THREE UTILITY PATENTS THAT

 5    ARE LISTED HERE GENERALLY RELATE TO USER INTERFACE

 6    AND FEATURES THAT WE WOULD ALSO PUT IN THAT SAME

 7    CATEGORY OF APPLE'S UNIQUE USER INTERFACE, OR USER

 8    EXPERIENCE.

 9            MR. MUELLER:  THANK YOU, SIR.

10            NO FURTHER QUESTIONS.

11            THE COURT:  ALL RIGHT.  THE TIME IS NOW

12    4:22.
```

**CROSS-EXAMINATION**

```
14    BY MS. MAROULIS:

15    Q    GOOD AFTERNOON, MR. TEKSLER.  HOW ARE YOU?

16    A    GOOD AFTERNOON.

17    Q    MY NAME IS VICTORIA MAROULIS.  I'M COUNSEL FOR

18    SAMSUNG.  AND SEEING HOW IT'S LATE FRIDAY

19    AFTERNOON, I'LL BE VERY BRIEF.

20            YOU TESTIFIED THAT YOU PREPARED A

21    POWERPOINT FOR A MEETING BETWEEN APPLE AND SAMSUNG

22    IN AUGUST 2010.  IS THAT CORRECT?

23    A    I BELIEVE THAT WAS KEY NOTE, BUT YES.

24    Q    AND YOU DIDN'T PERSONALLY ATTEND THE MEETING

25    IN QUESTION; RIGHT?
```

1965

```
 1    A    NO, I DID NOT.

 2    Q    YOU CANNOT TELL US FROM YOUR PERSONAL

 3    KNOWLEDGE ANYTHING ABOUT THAT MEETING AND WHAT WAS

 4    PRESENTED; CORRECT?

 5    A    I KNOW THAT THAT WAS PRESENTED.  WE LATER SENT

 6    SAMSUNG THE PRESENTATION AND, IN SUBSEQUENT

 7    MEETINGS WITH SAMSUNG, WE REFERRED BACK TO THAT

 8    PRESENTATION AND TO THE DIALOGUE THAT HAPPENED THAT

 9    DAY.  SO THAT'S --

10    Q    BUT FROM PERSONAL KNOWLEDGE, YOU DO NOT KNOW

11    WHAT OCCURRED AT THAT MEETING AND WHAT WAS SHOWN

12    AND WHAT WAS NOT SHOWN; CORRECT?

13    A    OKAY, CERTAINLY.

14    Q    AND THE POWERPOINT PRESENTATION THAT YOU

15    PREPARED IS EXHIBIT 52 IN EVIDENCE; CORRECT?  IF

16    YOU CAN LOOK IN YOUR CROSS-EXAMINATION BINDER AT

17    TAB 52, DO YOU SEE THAT?

18    A    I DO.

19    Q    IF YOU LOOK AT PAGES 12 THROUGH 14, DO YOU SEE

20    A VARIETY OF PATENTS LISTED THERE?

21    A    YES, I DO.

22    Q    OKAY.  AND DO YOU REMEMBER, ON DIRECT, JOE

23    ASKED YOU ABOUT THE SEVEN PATENTS ASSERTED IN THIS

24    CASE; CORRECT?

25    A    YES, THAT'S CORRECT.
```

2966

```
 1    Q    FOUR OF THEM WERE DESIGN PATENTS?

 2    A    YES, THAT'S CORRECT.

 3    Q    ONE OF THOSE DESIGN PATENT PATENTS WAS D'677;

 4    RIGHT?

 5    A    I BELIEVE THAT'S CORRECT, YES.

 6    Q    THAT PATENT IS NOWHERE IN THIS PRESENTATION;

 7    IS THAT CORRECT?

 8    A    IT'S NOT ENUMERATED.

 9    Q    IT'S NOT MENTIONED AT ALL AS A PATENT, THE

10    D'677; RIGHT?

11    A    SO I THINK WHAT I WOULD SAY IS I AGREE THAT

12    IT'S NOT ENUMERATED IN THE PRESENTATION.

13            WHEN WE WERE PREPARING THE, THE POINTS

14    THAT WE WANTED TO GET ACROSS -- AND I BELIEVE THAT

15    WAS BACK IN SLIDE 17 OF THIS PRESENTATION -- WE DID

16    SAY THAT THERE WAS A REMARKABLE SIMILARITY BETWEEN

17    THE PRODUCTS AND, IN DOING SO, WE DID TALK ABOUT

18    DESIGN PATENTS.

19    Q    SIR, THIS PRESENTATION DOES NOT MENTION THE

20    WORD "DESIGN PATENT" AT ALL; CORRECT?

21    A    I AGREE.

22    Q    AND DESIGN PATENT '087 THAT YOU REVIEWED WITH

23    COUNSEL IS ALSO NOT MENTIONED IN THIS PRESENTATION;

24    IS THAT RIGHT?

25    A    I AGREE.
```

1967

```
1    Q    AND DESIGN PATENT '889 IS SIMILARLY NOT

2    MENTIONED IN THIS PRESENTATION; CORRECT?

3    A    I AGREE.

4    Q    AND SO IS D'305, THAT IS ALSO NOT MENTIONED IN

5    THE PRESENTATION; RIGHT?

6    A    I AGREE.

7    Q    YOU ALSO LOOKED AT SEVERAL UTILITY PATENTS

8    WITH COUNSEL; IS THAT RIGHT?

9    A    I DID.

10   Q    ONE OF THEM WAS '163 PATENT; CORRECT?

11   A    I BELIEVE THAT'S CORRECT, YES.

12   Q    THAT PATENT IS NOT ENUMERATED ANYWHERE IN THIS

13   PRESENTATION WE JUST LOOK AT; RIGHT?

14   A    THAT'S CORRECT.

15   Q    AND THE '915 PATENT THAT YOU ALSO LOOKED AT IN

16   YOUR DIRECT TESTIMONY IS ALSO NOWHERE MENTIONED;

17   CORRECT?

18   A    THAT'S CORRECT.

19   Q    THIS PRESENTATION THAT YOU PREPARED FOR

20   SAMSUNG DOES NOT HAVE ANY MENTION OF TRADE DRESS;

21   RIGHT?

22   A    AGAIN, I THINK I WOULD PUT IT INTO THE SAME

23   CATEGORY OF BULLET POINTS THAT WE TALKED ABOUT.

24   Q    SIR, YOU'RE A LICENSING PROFESSIONAL.  YOU

25   KNOW WHAT A REGISTERED TRADE DRESS IS; CORRECT?
```

```
1    A    I AM, YES.

2    Q    SO NOWHERE IN THIS PRESENTATION IS THERE

3    MENTION OF A REGISTERED TRADE DRESS FOR AN IPHONE;

4    CORRECT?

5    A    I AGREE THAT THERE IS NOT.

6    Q    AND THERE'S NO MENTION OF UNREGISTERED TRADE

7    DRESS FOR IPHONE AS WELL; CORRECT?

8    A    I AGREE THAT IT'S NOT WRITTEN ON THE SLIDES.

9    Q    AND THERE'S NO UNREGISTERED TRADE DRESS FOR

10   IPAD; CORRECT?

11   A    I AGREE.

12   Q    EXHIBIT 52 DOESN'T SAY ANYWHERE THAT APPLE

13   WOULD NOT LICENSE ITS DESIGN PATENTS TO SAMSUNG; IS

14   THAT RIGHT?

15   A    I AGREE.

16   Q    AND THE PRESENTATION DOES NOT IDENTIFY ANY

17   UTILITY PATENTS THAT APPLE WOULD NOT LICENSE TO

18   SAMSUNG; IS THAT RIGHT?

19   A    I AGREE.

20   Q    PLEASE TAKE A LOOK AT EXHIBIT DX 586 IN YOUR

21   BINDER.  THIS IS A PRESENTATION THAT YOU MADE TO

22   SAMSUNG IN OCTOBER 2010; CORRECT?

23   A    YES, THAT'S CORRECT.

24   Q    YOU PREPARED IT YOURSELF?

25   A    I DID.
```

1969

```
1    Q    AS PART OF DOING BUSINESS AS A LICENSING

2    OFFICER AT APPLE; CORRECT?

3    A    YES, THAT'S CORRECT.

4            MS. MAROULIS:  YOUR HONOR, I MOVE EXHIBIT

5    586 INTO EVIDENCE.

6            MR. MUELLER:  NO FURTHER OBJECTIONS, YOUR

7    HONOR, SUBJECT TO THE LIMITING INSTRUCTION THAT

8    YOUR HONOR MENTIONED.

9            THE COURT:  RIGHT.  AND THERE IS A --

10   THIS IS ADMITTED.

11            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

12            586, HAVING BEEN PREVIOUSLY MARKED FOR

13            IDENTIFICATION, WAS ADMITTED INTO

14            EVIDENCE.)

15            THE COURT:  YOU MAY CONSIDER THIS -- YOU

16   MAY NOT CONSIDER THIS EVIDENCE TO PROVE OR DISPROVE

17   THE VALIDITY OR INVALIDITY OF THE CLAIM OR THE

18   AMOUNT OF THE DISPUTED CLAIM.

19            HOWEVER, YOU MAY CONSIDER THIS EVIDENCE

20   FOR SOME OTHER PURPOSE, FOR EXAMPLE, WHETHER OR NOT

21   SAMSUNG LACKED NOTICE OF APPLE'S INFRINGEMENT

22   CLAIMS.

23            OKAY.  GO AHEAD, PLEASE.

24   BY MS. MAROULIS:

25   Q    MR. TEKSLER, NOWHERE IN EXHIBIT 586 DOES APPLE
```

1    IDENTIFY ANY PATENTS; CORRECT?

2    A    THAT'S CORRECT.

3    Q    AND NOWHERE IN THIS WRITTEN PRESENTATION DOES

4    IT SAY THAT APPLE WOULD NOT LICENSE ITS DESIGN

5    PATENTS TO SAMSUNG; CORRECT?

6    A    I'M NOT SURE THAT I AGREE WITH THAT.  I KNOW

7    THAT WE TALKED ABOUT THAT AND THAT THERE WAS A

8    SPECIFIC BULLET, I BELIEVE, ON ONE OF THE PAGES

9    THAT ADDRESSED THAT.

10   Q    SIR, I'M NOT ASKING YOU ABOUT THE MEETING

11   ITSELF.  I'M ASKING YOU ABOUT THE PRESENTATION.

12   NOWHERE IN THIS DOCUMENT, 586, IS THERE A STATEMENT

13   THAT APPLE WOULD NOT LICENSE DESIGN PATENTS TO

14   SAMSUNG?

15   A    I THINK THERE IS A BULLET IN HERE THAT SAYS

16   SPECIFIC APPLE PROPRIETARY FEATURES TO BE

17   DISCUSSED.

18        AND IN THAT CONSTRUCT, WE TALKED ABOUT

19   NOT HAVING THE ABILITY TO CLONE OUR PRODUCTS.

20   Q    AGAIN, WITHIN THE CONTEXT OF THIS

21   PRESENTATION, THERE'S NO STATEMENT THAT APPLE WOULD

22   NOT LICENSE ITS DESIGN PATENTS TO SAMSUNG; CORRECT?

23   A    I AGREE.

24   Q    AND NOWHERE IN THIS DOCUMENT DOES APPLE SAY

25   THAT IT WOULD NOT LICENSE CERTAIN UTILITY PATENTS

1971

```
1    TO SAMSUNG; CORRECT?

2    A    SUBJECT TO THE SAME, YOU KNOW, POINT THAT I

3    MADE EARLIER, YES.

4    Q    LET'S PUT UP 586, PAGE 13, PLEASE.

5         AT THE TOP OF THE PAGE, IT SAYS "WE WILL

6    PROVIDE SAMSUNG WITH A NUMBER OF OPTIONS FOR

7    OBTAINING A COST-EFFECT LICENSE TO OUR PATENT

8    PORTFOLIO."

9         DID I READ THIS CORRECTLY?

10   A    YES, THAT'S CORRECT.

11   Q    AND THIS REFERS TO LICENSING PATENT PORTFOLIO;

12   RIGHT?

13   A    YES, THAT'S CORRECT.

14   Q    IT DOES NOT SAY "PATENT PORTFOLIO EXCEPT

15   DESIGN PATENTS."  CORRECT?

16   A    NO, I AGREE THE SLIDE DOESN'T SAY THAT.

17   Q    AND IT DOESN'T SAY "EXCEPT FOR CERTAIN UTILITY

18   PATENTS."  CORRECT?

19   A    THAT'S CORRECT.

20   Q    IN EXHIBIT 586, APPLE PROPOSED CERTAIN

21   DISCOUNTS ON THE LICENSE FEES BASED ON CERTAIN

22   ELEMENTS; CORRECT?

23   A    YES, THAT'S CORRECT.

24   Q    AND ONE OF THOSE ELEMENTS WERE PROPRIETARY,

25   SO-CALLED PROPRIETARY FEATURES?
```

1    A    YES.  I'M NOT SURE THAT WE'RE USING THE WORD

2    THE SAME WAY, BUT YES.

3    Q    OKAY.  AND APPLE DEFINED SOME OF ITS

4    PROPRIETARY FEATURES, WHAT IT'S CALLED DISTINCTIVE

5    INDUSTRIAL DESIGN; CORRECT?

6    A    APPLE DEFINED SOME OF IT AS -- OR WHAT I DID

7    SPECIFICALLY, I SHOULD SAY, IS I DEFINED THEM AS

8    DISTINCTIVE INDUSTRIAL DESIGNS, THAT'S CORRECT.

9    Q    AND APPLE NEVER GAVE SAMSUNG ANYTHING IN

10   WRITING THAT IDENTIFIED PATENTS OR FEATURES THAT

11   WERE NOT AVAILABLE FOR LICENSE; IS THAT RIGHT?

12   A    IN THIS PRESENTATION?  OR EVER?

13   Q    IN THIS PRESENTATION, SIR.

14   A    IN THIS PRESENTATION, NO, WE HAD NOT GOTTEN TO

15   THAT POINT OF THE DISCUSSION.  WE HAD JUST SIMPLY

16   MENTIONED THAT THERE WERE SOME THINGS THAT YET HAD

17   TO BE DISCUSSED.

18   Q    OKAY.  SIR, IT'S TRUE, IS IT NOT, THAT APPLE

19   LICENSED ITS DESIGN PATENTS TO ANOTHER PARTY?

20   A    YES.  I THINK I SAID EARLIER THAT THERE WERE

21   LESS THAN A HANDFUL OF SUCH EVENTS.

22   Q    BUT THOSE PATENTS HAVE BEEN LICENSED BEFORE;

23   CORRECT?

24   A    YES.

25   Q    ARE YOU AWARE OF WHETHER ANYONE HAS EVER PAID

1973

```
 1    APPLE A PER UNIT ROYALTY OF $2.02 FOR THE '381

 2    PATENT?

 3    A    NO, I'M NOT AWARE.

 4              (PAUSE IN PROCEEDINGS.)

 5    BY MS. MAROULIS:

 6    Q    I'M SORRY, SIR?

 7    A    NO, I'M NOT AWARE OF THAT.

 8              MS. MAROULIS:  OKAY.  YOUR HONOR, WE'RE

 9    ALMOST AT THE END.  SHOULD WE STOP OR CONTINUE?

10              THE COURT:  IT'S NOW 4:30, SO WE CAN END

11    FOR TODAY.

12              MS. MAROULIS:  OKAY.

13              THE COURT:  SO WE'LL CONTINUE WITH THE

14    CROSS ON MONDAY.

15              ALL RIGHT.  SO PLEASE DON'T DISCUSS THE

16    CASE WITH ANYONE, DON'T DO ANY RESEARCH, PLEASE

17    KEEP AN OPEN MIND, AND YOU'RE EXCUSED FOR TODAY AND

18    WE'LL SEE YOU BACK ON MONDAY AT 9:00 O'CLOCK.

19              AND NEXT WEEK WE ARE GOING FIVE DAYS

20    STRAIGHT, OKAY?

21              THANK YOU FOR YOUR PATIENCE AND YOUR

22    SERVICE.

23              AND IF YOU WOULD, PLEASE, LEAVE YOUR JURY

24    BOOKS IN THE JURY ROOM OVER THE WEEKEND.

25              OKAY.  THANK YOU.
```

1974

```
 1              (WHEREUPON, THE FOLLOWING PROCEEDINGS

 2     WERE HELD OUT OF THE PRESENCE OF THE JURY:)

 3              THE COURT:  THE RECORD SHOULD REFLECT THE

 4     JURY HAS LEFT THE COURTROOM.

 5              YOU MAY STEP DOWN.

 6              THE WITNESS:  THANK YOU.

 7              THE COURT:  AND PLEASE TAKE A SEAT.

 8              ARE YOU -- IS APPLE NOT CALLING ANY OF

 9     THE INDIVIDUALS, THE FOUR INDIVIDUALS WHO WERE

10     IDENTIFIED FOR DEPOSITION DESIGNATIONS?

11              MR. MCELHINNY:  I'M -- I'M SORRY, YOUR

12     HONOR.  I'M NOT SURE I UNDERSTAND YOUR QUESTION.

13              WE WILL BE PLAYING THE DEPOSITION

14     DESIGNATIONS.

15              THE COURT:  OF JUNWON LEE AND DONG HOON

16     CHANG AND TIMOTHY BENNER AND TIMOTHY SHEPPARD?

17              MR. MCELHINNY:  YES, YOUR HONOR.

18              THE COURT:  OKAY.  SO THAT'S WHAT YOU'LL

19     DO ON MONDAY.

20              MR. MCELHINNY:  YES, YOUR HONOR.

21              THE COURT:  AFTER MR. TEKSLER?

22              MR. MCELHINNY:  YES, YOUR HONOR.

23              THE COURT:  OKAY.

24              MR. MCELHINNY:  AND THEN MR. MUSIKA.

25              THE COURT:  AND THEN MR. MUSIKA.  AND
```

```
1    THEN WILL YOU HAVE ANY ADDITIONAL WITNESSES OR DO

2    YOU PLAN TO REST?

3                MR. MCELHINNY:  WE PLAN TO REST AFTER

4    MR. MUSIKA.

5                THE COURT:  I SEE.  OKAY.  SO THEN THE

6    ONLY OBJECTIONS THAT ARE LEFT, THEN, ARE

7    MR. MUSIKA.

8                AND THEN HAVE YOU REDESIGNATED THE

9    DEPOSITION EXCERPTS THAT YOU WANT FOR MR. SHEPPARD?

10               MR. MCELHINNY:  WE HAVEN'T YET.  WE'LL DO

11   THAT TOMORROW, YOUR HONOR.

12               THE COURT:  OKAY.  I NEED THE OBJECTIONS

13   TO ANY WITNESSES TO BE FILED AT 8:00 A.M. THE DAY

14   BEFORE THE WITNESS TESTIFIES.  DOING IT AT 4:00

15   O'CLOCK JUST DOESN'T GIVE ME ENOUGH TIME.  OKAY?

16               MR. JACOBS:  SO, YOUR HONOR, THE PROBLEM

17   I THINK WE'RE GOING TO RUN INTO IS WE WILL FINISH

18   WITH MR. MUSIKA, AND THEN THERE'S THE SAMSUNG CASE

19   ABOUT WHICH WE KNOW ABSOLUTELY NOTHING.

20               THE COURT:  WELL, I ASSUME THAT SAMSUNG

21   ALSO IS GOING TO DO ITS ROLLING LIST OF SEVEN

22   WITNESSES THAT APPLE HAS DONE.

23               SO WHEN ARE YOU INTENDING TO FILE THAT,

24   UNDERSTANDING, I THINK, THAT YOUR CASE,

25   MR. VERHOEVEN, WILL START ON MONDAY.
```

```
 1              MR. VERHOEVEN:  YES, YOUR HONOR.

 2              THE COURT:  SO WHEN ARE YOU GOING TO FILE

 3      YOUR ROLLING LIST OF SEVEN WITNESSES?

 4              MS. MAROULIS:  YOUR HONOR, THE

 5      DISCLOSURES ARE DUE SATURDAY FOR THE MONDAY

 6      WITNESSES, AND THEN SATURDAY NIGHT WE WILL FILE OUR

 7      ROLLING LIST OF SEVEN WITNESSES.

 8              MR. JACOBS:  IT WOULD BE VERY HELPFUL, TO

 9      MEET YOUR HONOR'S SCHEDULE, IF WE COULD GET ALL OF

10      THAT EARLY.  I THINK THE DISCLOSURE OF EXHIBITS

11      WOULD BE DUE AT, UNDER OUR NEW SCHEDULE --

12              MS. MAROULIS:  YOUR HONOR, UNDER OUR NEW

13      SCHEDULE, IT'S 10:00, 10:00 A.M. TOMORROW.

14              MR. JACOBS:  YEAH, 10:00 A.M. TOMORROW

15      FOR THE EXHIBITS.  IF WE COULD HAVE THE ROLLING

16      LIST OF SEVEN AT THAT TIME, THAT WOULD BE TERRIFIC.

17              THE COURT:  SO THE EXHIBITS AND THE LIST

18      OF WITNESSES FOR MONDAY ARE GOING TO BE FILED AND,

19      I GUESS, EXCHANGED SATURDAY AT 10:00 A.M., AND THEN

20      I WOULD LIKE THE OBJECTIONS AND RESPONSES TO BE

21      FILED ON SUNDAY.  CAN YOU DO THAT BY 8:00 A.M., OR

22      WHAT TIME?

23              MS. MAROULIS:  IN THAT CASE, WE WOULD

24      EXPEDITE THE CROSS DISCLOSURES BECAUSE WE WON'T BE

25      GETTING THE CROSS DISCLOSURES UNTIL 7:00.
```

```
 1              THE COURT:  7:00 ON WHICH DATE?

 2              MS. MAROULIS:  SATURDAY.

 3              THE COURT:  OKAY.  TELL ME WHAT TIME ON

 4    SUNDAY WERE YOU PLANNING TO -- I MEAN, YOU ALL

 5    PROPOSE A SCHEDULE FOR THIS WEEKEND, PLEASE.

 6              MS. MAROULIS:  WE WERE PLANNING TO DO IT

 7    BY 1:00 P.M. FOR MONDAY WITNESSES.  THAT'S THE

 8    SCHEDULE WE WORKED OUT, WHERE WE FILE OBJECTIONS

 9    THE DAY BEFORE AT 1:00 O'CLOCK IF THAT'S OKAY FOR

10    YOUR HONOR.

11              THE COURT:  THAT DOESN'T GIVE ME MUCH

12    TIME.  I MEAN, YOU HAD 11 WITNESSES THIS TIME AND

13    YOU MISSED THE 1:00 O'CLOCK DEADLINE.  I GOT THE

14    OBJECTIONS FOR MOST OF THE WITNESSES AT 4:00

15    O'CLOCK, AND I DIDN'T EVEN HAVE THE EXHIBITS.

16              MR. JACOBS:  WE APOLOGIZE FOR THAT.

17              THE COURT:  SO THAT HAS BECOME A

18    PERENNIAL PROBLEM THAT BOTH SIDES ARE FILING THESE

19    OBJECTIONS AND THEN NOT GIVING ME THE RELEVANT

20    EXHIBITS.  I DON'T KNOW HOW YOU EXPECT ME TO RULE

21    ON THINGS THAT I'VE NEVER SEEN BEFORE.

22              SO SOMEHOW THIS PROCESS NEEDS TO BE

23    IMPROVED BECAUSE I'M GETTING OBJECTIONS LATE AND

24    I'M NOT GETTING EXHIBITS.

25              SO I'M -- JUST DOING A LIST OF
```

2978

```
 1    RESERVATIONS DEPENDING ON WHAT THE EXHIBIT LOOKS
 2    LIKE IS NOT REALLY HELPFUL FOR ANYONE AND IT'S A
 3    WASTE OF TIME FOR ALL OF US.
 4              SO --
 5              MS. MAROULIS:  YOUR HONOR, MAY WE FILE
 6    EVERYTHING AT 1:00 P.M. SUNDAY, BUT SHARP THIS
 7    TIME?
 8              THE COURT:  WELL, THIS IS MY CONCERN.
 9    FOR EIGHT DIFFERENT WITNESSES, AT LEAST, AT A
10    MINIMUM BECAUSE WE, YOU KNOW, NO OBJECTIONS WERE
11    FILED AS TO MR. SHEPPARD.  I'VE EXCLUDED
12    MR. SITTLER, SO I'M ASSUMING HE'S OFF.  RIGHT?
13              MR. JACOBS:  YES, YOUR HONOR.
14              THE COURT:  NO.  I'M GOING TO SAY -- CAN
15    WE SAY AT LEAST BY 10:30 ON SUNDAY?
16              MR. JACOBS:  AS YOU WISH, YOUR HONOR.
17              MS. MAROULIS:  YES, YOUR HONOR.
18              THE COURT:  OKAY.
19              MR. JACOBS:  IS THERE ANY --
20              THE COURT:  OKAY.  SO WE HAVE ALSO THE
21    DALE SOHN ISSUE AND THE F7000 PHONE DESIGNER ISSUE,
22    AND I OWE YOU THE RULINGS ON THE MUSIKA OBJECTIONS
23    AND THEN WE'LL WAIT AND SEE ON SHEPPARD.
24              I GUESS IT'S POSSIBLE THAT DALE SOHN AND
25    THE PHONE DESIGNER WILL GO ON ON MONDAY?  IS THAT
```

```
 1    RIGHT?  IS THAT POSSIBLE?
 2              MS. MAROULIS:  NO, YOUR HONOR.  THEY'RE
 3    NOT SCHEDULED TO GO ON MONDAY.
 4              THE COURT:  OKAY.  ALL RIGHT.  I'LL TRY
 5    TO GET YOU A RULING ON THAT AS QUICKLY AS I CAN.
 6              YOU'RE GOING TO FILE THE OBJECTIONS
 7    TODAY?  RIGHT?
 8              MS. MAROULIS:  WE HAVE FILED IT, YOUR
 9    HONOR.  I UNDERSTAND IT'S BEEN FILED ABOUT AN HOUR
10    AGO.
11              THE COURT:  OKAY, PERFECT.  SO IF I CAN,
12    IF IT'S POSSIBLE, I'LL TRY TO GET YOU THE RULINGS
13    THIS WEEKEND.
14              OKAY.  WHAT ELSE?  ANYTHING ELSE THAT --
15              MR. MCELHINNY:  CAN I GET SOME GUIDANCE
16    FROM YOUR HONOR?
17              THE COURT:  YEAH.
18              MR. MCELHINNY:  THE ISSUE IS, IN MY MIND,
19    ADMITTING DEMONSTRATIVES AS EXHIBITS.  WE HAVE
20    BEEN -- AS YOU KNOW, WE HAVE A SPECIFIC EXHIBIT
21    LIST THAT WAS SUBJECT TO LIMITATIONS.  WE HAVE BEEN
22    FOCUSSING OUR OBJECTIONS ON THE EXHIBITS THAT ARE
23    ON THAT LIST.  TODAY YOUR HONOR BEGAN TO ADMIT
24    DEMONSTRATIVES.
25              THE COURT:  OH, NO, NO.  THAT'S NOT TRUE.
```

```
 1              MS. KREVANS IS THE ONE WHO STARTED THIS
 2     PROCESS OF ADMITTING DEMONSTRATIVES.  IT WAS APPLE
 3     THAT STARTED THIS PROCESS.
 4              MR. MCELHINNY:  LET ME JUST START BACK
 5     AGAIN.
 6              ALL I REALLY WANT -- WE DON'T WANT TO BE
 7     MAKING OBJECTIONS THAT ARE NOT GOING TO BE -- WHAT
 8     IS THE COURT'S --
 9              THE COURT:  ACTUALLY, BOTH SIDES HAVE
10     BEEN OBJECTING TO DEMONSTRATIVES, SO I'M NOT SURE
11     WHAT YOU'RE TALKING ABOUT THAT NO ONE HAS OBJECTED
12     TO DEMONSTRATIVES SO FAR.  THERE HAVE BEEN A LOT A
13     OBJECTIONS TO DEMONSTRATIVES.  THAT'S WHY YOU'VE
14     HAD TO CHANGE TITLES AND TAKE OUT PORTIONS.
15              MR. MCELHINNY:  WE'VE BEEN OBJECTING TO
16     THE DEMONSTRATIVES ON THE GROUNDS THAT THEY'RE
17     MISLEADING.  WE'VE NOT BEEN APPLYING EVIDENTIARY
18     OBJECTIONS TO THEM BECAUSE I DIDN'T THINK THEY WERE
19     COMING INTO EVIDENCE.
20              BUT I JUST WANT TO -- IF A DEMONSTRATIVE
21     IS SHOWN, IS IT MOVED INTO EVIDENCE?  IS THAT GOING
22     TO HAPPEN NOW?  THAT'S ALL I REALLY WANT TO KNOW.
23              THE COURT:  WELL, I'M TELLING YOU, ASK
24     MS. KREVANS.  SHE'S THE ONE THAT STARTED ADMITTING
25     DEMONSTRATIVES INTO EVIDENCE.
```

1              MR. VERHOEVEN:  YES.

2              THE COURT:  IT WAS NOT MY UNDERSTANDING

3     THAT WAS GOING TO HAPPEN.

4              LET ME HEAR FROM MS. KREVANS.

5              YOU SHOULD TALK TO YOUR OWN TEAM.  YOUR

6     OWN TEAM STARTED THIS PROCESS OF ADMITTING

7     DEMONSTRATIVES.

8              MR. VERHOEVEN:  AND IF I COULD JUST

9     SAY --

10             MS. KREVANS:  IF I MAY RESPOND TO YOUR

11    HONOR'S QUESTION?

12             THE COURT:  YEAH.

13             MS. KREVANS:  THE EXHIBITS THAT I PUT IN

14    WERE ON OUR EXHIBIT LIST FROM THE START.  THEY WERE

15    PHOTOGRAPHS THAT WERE PUT IN EXPLICITLY AS

16    SUMMARIES OF SETS OF DEVICES.  ALL THE UNDERLYING

17    DEVICES WERE MADE AVAILABLE TO COUNSEL.

18             THEY WERE OBJECTED TO NOT BECAUSE THEY

19    WERE DEMONSTRATIVES, THEY WERE OBJECTED TO ON THE

20    BASIS THEY WERE IMPROPER SUMMARIES.

21             YOUR HONOR SAID THAT OBJECTION WAS

22    OVERRULED, SO LONG AS THE UNDERLYING DEVICES WERE

23    MADE AVAILABLE, AND THEY WERE.  THEY WERE PLAIN AND

24    SIMPLE, STRAIGHT AHEAD PHOTOGRAPHS TO COLLECT FOR

25    THE JURY A SET OF UNDERLYING DEVICES.

```
1          THEY HAD NO GRAPHIC CONTENT WHATSOEVER.
2   AND THEY WERE PRESENTED ALL ALONG IN THE EXHIBIT
3   LIST.
4          MR. VERHOEVEN:  MAY I BE HEARD, YOUR
5   HONOR?
6          THE COURT:  PLEASE.
7          MR. VERHOEVEN:  NOT ONLY IS THAT NOT
8   CORRECT, AS YOUR HONOR WILL RECALL, I REPEATEDLY
9   OBJECTED THAT THEY WERE DEMONSTRATIVES AND I WAS
10  OVERRULED.
11         BUT JUST TODAY, MR. JACOBS PUT IN HIS
12  SLIDES, ONE AFTER ANOTHER AFTER ANOTHER AFTER
13  ANOTHER OF DEMONSTRATIVES, MOVED THEM INTO EVIDENCE
14  OVER OUR OBJECTION THAT THEY WERE DEMONSTRATIVES.
15         AND NOW THAT THEY'VE FINISHED PUTTING IN
16  ALL THEIR DEMONSTRATIVES IS WHEN WE HEAR COUNSEL
17  GET UP AND SAY, "WELL, WHAT'S SAUCE FOR THE GOOSE
18  SHOULDN'T BE SAUCE FOR THE GANDER."
19         THIS IS A CLEAR SITUATION WHERE THEY'RE
20  TRYING TO CHANGE THE RULES NOW THAT THEY'RE GETTING
21  CLOSE TO FINISHING THEIR CASE-IN-CHIEF.
22         IF WE CAN LOOK THROUGH MR. JACOBS'
23  SLIDES, HE MOVED THEM ALL IN, AND YOUR HONOR LET
24  THEM ALL IN, AND NOW THEY'RE TRYING TO CHANGE THE
25  RULES.
```

```
 1            MS. KREVANS:  YOUR HONOR, I OFFERED INTO

 2   EVIDENCE NO SLIDE THAT WAS PRESENTED AS A

 3   DEMONSTRATIVE WITH MR. BRESSLER OR DR. KARE'S

 4   TESTIMONY, ONLY THE PHOTOGRAPHS THAT HAD BEEN ON

 5   THE EXHIBIT LIST ALL ALONG.

 6            AND TODAY WHAT HAPPENED WAS THAT

 7   MR. JACOBS, WHEN HE DID HIS DIRECT OF HIS WITNESS,

 8   OFFERED NONE OF HIS DEMONSTRATIVES UNTIL AFTER, ON

 9   CROSS, SAMSUNG'S COUNSEL OFFERED SOME OF THEIR

10   DEMONSTRATIVES AND A PRECEDENT WAS SET THAT THEY

11   COULD COME IN.  HE THEN OFFERED HIS.  THAT'S THE

12   RECORD TO DATE.

13            MR. MCELHINNY:  AND IT'S LATE FRIDAY

14   AFTERNOON, YOUR HONOR, AND I'M REALLY SORRY FOR

15   OPENING THIS BECAUSE ALL I REALLY WANTED TO KNOW

16   WAS WHAT THE RULES ARE GOING FORWARD.

17            WE'LL LIVE WITH WHATEVER THE RULE IS.  I

18   JUST WANTED SOME SORT OF GUIDE.

19            THE COURT:  WELL, AS LONG AS THEY -- I

20   MEAN, THIS IS EXCEEDING ALL OF THE EXHIBIT LIMITS.

21            MR. VERHOEVEN:  YOUR HONOR --

22            THE COURT:  BUT I'M GOING TO THE ALLOW

23   THEM AS LONG AS THEY MEET 403 AND OUR, YOU KNOW,

24   OTHER PROPER EVIDENTIARY RULES.  I THINK THAT'S

25   ONLY FAIR SINCE THEY HAVE BEEN COMING IN.
```

1984

```
1              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

2              THE COURT:  SO -- AND THEY HAVE BEEN VERY

3      HEAVILY OBJECTED TO, SO I'M NOT SURE WHAT YOU'RE

4      REFERRING TO THAT NO ONE HAS BEEN OBJECTING TO

5      DEMONSTRATIVES, BECAUSE THAT AIN'T WHAT I'VE BEEN

6      DOING FOR THE LAST TWO WEEKS.

7              SO ANYWAY, WHAT ELSE DO WE HAVE?

8              MR. VERHOEVEN:  I JUST HAVE ONE SORT OF A

9      HOUSEKEEPING MATTER, YOUR HONOR.

10              ON THE DEPOS, I UNDERSTAND YOUR HONOR'S

11      RULING ON 106, BUT THE ISSUE WE'RE HAVING IS THE

12      WITNESS ISN'T HERE, RIGHT, AND SO TYPICALLY, MY

13      PRACTICE, THE WAY YOU DO DEPOS IS YOU HAVE

14      DESIGNATIONS AND COUNTER-DESIGNATIONS.

15              BUT THE COUNTERS DON'T MAKE ANY -- YOU

16      CAN'T -- BECAUSE IT'S A TRANSCRIPT, YOU CAN'T SAY,

17      "NOW, YOU REMEMBER WHEN SO AND SO ASKED YOU X, DID

18      YOU HAVE SOMETHING TO ADD TO THAT?"

19              SO IF YOU JUST PLAY THEM, THEY REALLY

20      DON'T MAKE SENSE AND THE JURY IS NOT GOING TO

21      UNDERSTAND, OUTSIDE OF THE CONTEXT.

22              SO MY -- I'M JUST TELLING MY HISTORICAL

23      PRACTICE HAS BEEN THAT YOU PUT THEM TOGETHER AND

24      YOU PLAY THEM AND THE TWO SIDES WORK OUT, YOU KNOW,

25      THEIR OBJECTIONS TO THE DESIGNATIONS AND COUNTERS,
```

```
 1    BUT THEY GO IN AS A UNIT.  THAT'S BEEN MY

 2    EXPERIENCE.

 3              YOUR HONOR, IF I CAN JUST FINISH?  IF

 4    YOUR HONOR IS NOT WILLING TO DO THAT, THEN AT LEAST

 5    I THINK IT MAKES SENSE TO HAVE THEM PLAYED SORT OF

 6    LIKE WHEN WE WERE TALKING ABOUT CROSS-EXAMINATION

 7    WHERE IF I PUT UP A SNIPPET ON REBUTTAL, OR REPLY,

 8    THE OTHER COUNSEL IS ABLE TO PUT UP THE OTHER

 9    CONTEXT, SO AT LEAST IT WOULD BE WHILE THE WITNESS

10    IS STILL ON THE STAND FOR CONTEXT.

11              SO IF WE'RE NOT ALLOWED TO PUT THEM

12    TOGETHER, WHICH I ACTUALLY THINK WOULD BE THE MOST

13    COHERENT FOR THE JURY, I THINK IT WOULD MAKE SENSE

14    FOR US TO PLAY OUR COUNTERS IMMEDIATELY AFTER

15    THEIRS, SORT OF LIKE A CROSS TO THEIR EXAMINATION.

16              THE COURT:  NO.  I'M JUST GOING TO HAVE

17    WHATEVER EXCERPTS ONE SIDE WANTS IN, THEY'LL JUST

18    FINISH IT AND IT'LL BE COUNTED TOWARDS THEIR TIME;

19    AND THEN WHATEVER EXCERPT THE OTHER SIDE WANTS,

20    THEN THEY'LL BE PLAYED AND THEY'LL BE COUNTED

21    TOWARDS THEIR TIME.

22              IT'S GOING TO BE LIKE THE WITNESS IS

23    HERE.  YOU DON'T GET TO DO THE IMMEDIATE CROSS WHEN

24    A LIVE WITNESS IS HERE, AND I'M NOT GOING TO TREAT

25    IT ANY DIFFERENTLY IF IT'S VIDEO.
```

2986

```
1              I'M ASSUMING THESE ARE VIDEO.

2              MR. MCELHINNY:  THEY ARE VIDEO.

3              MR. VERHOEVEN:  SO JUST FOR CLARITY, I

4    THINK I UNDERSTAND YOU TO SAY NO, WE CAN'T DO THAT,

5    WE HAVE TO WAIT UNTIL OUR CASE-IN-CHIEF TO PLAY IT?

6              THE COURT:  NO, NO.  IT'S GOING TO BE

7    LIKE THE WITNESS IS LIVE.  WHATEVER EXCERPT ONE

8    SIDE WANT, I WILL DOCK THEIR TIME, AND WHATEVER

9    OTHER EXCERPTS THE OTHER SIDE WANTS --

10             MR. VERHOEVEN:  SO WE SHOULD BE PREPARED

11   AND READY TO PLAY OUR COUNTERS IMMEDIATELY AFTER

12   THEY DO THEIR DESIGNATIONS?

13             THE COURT:  YES, AFTER THEY SHOW THEIR

14   VIDEO PORTIONS, YOU'LL SHOW YOUR VIDEO PORTIONS,

15   AND I ASSUME IT'S NOT GOING TO BE ANY FURTHER.

16   IT'S JUST ONE SET AND ONE SET.

17             AND THEN WE'LL GO TO THE NEXT WITNESS AND

18   ONE SET AND ONE SET, AND THAT WAY I'LL KEEP THE

19   TIME THAT WAY.

20             MR. VERHOEVEN:  THANK YOU, YOUR HONOR,

21   FOR THE CLARIFICATION.

22             THE COURT:  WHAT ELSE?  YOU'RE STILL

23   STANDING.

24             MR. MCELHINNY:  ARE YOU PREPARED TO SHARE

25   YOUR TIME?
```

```
 1                 THE COURT:  OH, YEAH, OKAY.
 2                 (PAUSE IN PROCEEDINGS.)
 3                 THE COURT:  ALL RIGHT.  APPLE HAS USED 11
 4      HOURS AND 35 MINUTES.
 5                 AND SAMSUNG HAS USED 12 HOURS AND 16
 6      MINUTES.
 7                 OKAY.  WHAT ELSE?  ANYTHING ELSE?
 8                 MR. VERHOEVEN:  NOTHING FROM SAMSUNG,
 9      YOUR HONOR.
10                 MR. MCELHINNY:  NOTHING FOR APPLE, YOUR
11      HONOR.
12                 THE COURT:  OKAY.  THEN I WILL -- ARE YOU
13      GOING TO -- FOR THE EXHIBITS, ARE YOU GOING TO THEN
14      PROVIDE THEM ON FTP OR E-MAIL, THE ONES THAT I NEED
15      TO RULE ON ON SUNDAY?
16                 MS. MAROULIS:  WHATEVER IS BEST FOR YOUR
17      HONOR.  WE CAN EITHER E-MAIL THEM OR FTP THEM.
18      THAT'S THE PREFERENCE?
19                 THE COURT:  I GUESS THAT DEPENDS ON SIZE.
20      IF THEY'RE RELATIVELY SMALL AND THEY CAN BE
21      E-MAILED, THAT'S FINE.  BUT IF IT'S A VERY BIG
22      VOLUME, THEN PROBABLY FTP IS PREFERABLE.
23                 MS. MAROULIS:  OKAY, YOUR HONOR.  WE'LL
24      PROBABLY DO FTP, BECAUSE IF THEY'RE POWERPOINTS FOR
25      DEMONSTRATIVES --
```

2988

```
 1              THE COURT:  THEY'LL TAKE A LONG TIME.

 2    OKAY.  SO WE'LL EXPECT THEM SUNDAY AT 10:30.

 3              WE'LL TRY TO GET THE MUSIKA OBJECTIONS,

 4    IF WE CAN, EVEN TODAY OUT, AND THEN THE OTHER TWO

 5    AS SOON AS WE CAN.  BUT HOPEFULLY THIS WEEKEND OR

 6    EARLY NEXT WEEK.

 7              OKAY.  ALL RIGHT.  THANK YOU ALL.

 8    APPRECIATE IT.

 9              MR. JACOBS:  THANK YOU VERY MUCH, YOUR

10    HONOR.

11              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

12              (WHEREUPON, THE EVENING RECESS WAS

13    TAKEN.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4                       CERTIFICATE OF REPORTER

5

6

7

8              I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13             THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21                   /S/

                     _____
22                   LEE-ANNE SHORTRIDGE, CSR, CRR
                     CERTIFICATE NUMBER 9595
23

24                   DATED:  AUGUST 11, 2012

25