# EXHIBIT A
# Part 2

# Exhibit H

Case5:11-cv-01846-LHK   Document166-8   Filed08/22/11   Page2 of 3



THE GOLD RUSH TO A $3.5 TRILLION MULTIMEDIA MARKET IS ON. FEW WOULD GUESS THAT THE RICHEST JACKPOT OF ALL MAY BE IN THE HANDS OF KNIGHT-RIDDER'S ROGER FIDLER, WHO IS CONCOCTING AN AUDACIOUS PLAN TO MAKE THE LOWLY NEWSPAPER THE SPEARHEAD OF THE INFORMATION ECONOMY

**Defendant's Exhibit No. 689.032**

# M

"edia mirror on the wall, who is the fairest of us all?" The perennial question of all suitors of fate and fortune now whispers and resounds through conference resorts, executive retreats and consulting sessions across the land as business leaders from Hollywood to Wall Street pose with pundits and

ponder the new world of converging technologies. Symbolized in a famous mandala by MIT's Media Lab, this grand fondue of information tools—to be served à la carte on a flat-panel screen— is foreseen to be a $3.5 trillion feast for American business sometime early next century. Few would guess that crucial to the emerging mediamorphosis—as king of the flat panel—will be a slight, graying, bearded man with some 30 teddy bears, Roger Fidler.

Fidler coined the term *mediamorphosis* as the title of his forthcoming book. His office in Boulder, Colo., looks out on the panorama of a picturesque downtown of red brick and neo-Gothic, surrounded by the Rocky Mountain foothills and sepia sandstone buildings of a mile-high Silicon Valley. Down the hall is an Apple Computer media center which is developing graphical forms of Apple-Link, the company's on-line network. Down the block is Cablelabs, John Malone's research arm, which is designing the future of the cable industry.

Roger Fidler, though, is a newspaperman, a veteran of some 32 years in a business little known for technology. Beginning as an 11-year-old



GEORGE GILDER'S

TELECOSM

"Digital Darkhorse-
Newspapers"

paperboy in Eugene, Oreg., Fidler went on to serve as a reporter, science columnist and art director before launching what is now Knight-Ridder Tribune Graphics. A multi-million-dollar business and reliable profit center, this venture provides digital graphics for newspapers and video animations for TV stations across the country over a dedicated network called PressLink, also launched by Fidler. Now Fidler and his allies working in Knight-Ridder's Information

Design Laboratory are concocting an audacious plan to make the lowly newspaper the spearhead of the information economy.

Most information companies and executives are betting on him to fail. Barry Diller, the former ruler of 20th Century Fox, recently circled the planet of technology on a celebrated pilgrimage from Hollywood to find where the money would be made in the new information economy. Shunning Fidler's little lab, he arrived at nearby Cablelabs and resolved on home shopping through cable TV. He bought into QVC for some $20 million and went into business with John Malone. After a more corporate investigation, featuring polls and customer surveys, Robert Allen of AT&T settled to a remarkable degree on the $14 billion market in electronic games. Since launching an alliance with Sega, AT&T has been collecting game companies as compulsively as your kid collects games. It has bought shares of Sierra Online, 3DO, Spectrum HoloByte and PF Magic.

Moving toward the news trade is IBM. But rather than collaborating with one of the thousands of newspapers that use its equipment, the computer giant is trysting with General Electric's NBC in a kind of elephants' waltz into the sunset of old broadcast media.

Most of these leaders in the new gold rush toward multimedia are getting it wrong. Fixated by market surveys that map demand for existing video, they are plunging down dead ends and cul-de-sacs with their eyes firmly focused on the luminous visions in their rearview mirrors.

Defendant's Exhibit No. 689.033

# Exhibit I

Defendant's Exhibit No. 689.035



Defendant's Exhibit No. 689.036

Defendant's Exhibit No. 689.037

# Exhibit J



# Exhibit K



Defendant's Exhibit No. 689.042

Case5:11-cv-01846-LHK   Document166-12   Filed08/22/11   Page1 of 2

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Charles K. Verhoeven (Bar No. 170151)
2  charlesverhoeven@quinnemanuel.com
   50 California Street, 22nd Floor
3  San Francisco, California 94111
   Telephone: (415) 875-6600
4  Facsimile: (415) 875-6700

5  Kevin P.B. Johnson (Bar No. 177129)
   kevinjohnson@quinnemanuel.com
6  Victoria F. Maroulis (Bar No. 202603)
   victoriamaroulis@quinnemanuel.com
7  555 Twin Dolphin Drive, 5th Floor
   Redwood Shores, California  94065-2139
8  Telephone: (650) 801-5000
   Facsimile: (650) 801-5100
9
   Michael T. Zeller (Bar No. 196417)
10 michaelzeller@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
11 Los Angeles, California 90017
   Telephone: (213) 443-3000
12 Facsimile: (213) 443-3100

13 Attorneys for SAMSUNG ELECTRONICS CO.,
   LTD., SAMSUNG ELECTRONICS AMERICA,
14 INC. and SAMSUNG
   TELECOMMUNICATIONS AMERICA, LLC
15

16                 UNITED STATES DISTRICT COURT

17       NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

18

19 APPLE INC., a California corporation,

20              Plaintiff,                    CASE NO. 11-cv-01846-LHK

21        vs.                                 **MANUAL FILING NOTIFICATION FOR**
                                              **EXHIBIT L TO DECLARATION OF**
22 SAMSUNG ELECTRONICS CO., LTD., a           **ROGER FIDLER IN SUPPORT OF**
   Korean business entity; SAMSUNG            **SAMSUNG'S OPPOSITION TO APPLE'S**
23 ELECTRONICS AMERICA, INC., a New           **MOTION FOR A PRELIMINARY**
   York corporation; SAMSUNG                  **INJUNCTION**
24 TELECOMMUNICATIONS AMERICA,
   LLC, a Delaware limited liability company,
25
                Defendant.
26

27

28
                                                        Case No. 11-cv-01846-LHK
                MANUAL FILING NOTIFICATION FOR EXHIBIT L TO DECLARATION OF ROGER FIDLER
             IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR A PRELIMINARY INJUNCTION

# Exhibit M

Defendant's Exhibit No. 689.045



# Exhibit N

**Defendant's Exhibit No. 689.048**



# Exhibit O



# Exhibit P



# Exhibit Q

# **MEDIA**MORPHOSIS

## Understanding New Media

## Roger Fidler

**Defendant's Exhibit No. 689.056**

Copyright © 1997 by Pine Forge Press

All rights reserved. No part of this book may be reproduced or utilized in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the publisher.

*For information, address:*

 **Pine Forge Press**
A Sage Publications Company
2455 Teller Road
Thousand Oaks, California 91320
(805) 499-4224
E-mail: sales@pfp.sagepub.com

**Sage Publications Ltd.**
6 Bonhill Street
London EC2A 4PU
United Kingdom

**Sage Publications India Pvt. Ltd.**
M-32 Market
Greater Kailash I
New Delhi 110 048 India

*Production:* Dusty Davidson, The Book Company
*Copy Editor:* Betty Berenson
*Interior Designer:* Lisa Mirski Devenish
*Compositor:* The Cowans
*Cover Designer:* Paula Shuhert and Graham Metcalfe
*Print Buyer:* Anna Chin

*Printed in the United States of America.*

97 98 99 00 01 10 9 8 7 6 5 4 3 2 1

Library of Congress Cataloging-in-Publication Data
Fidler, Roger F.

   Mediamorphosis : understanding new media / Roger Fidler.
      p.    cm. -- (Journalism and communication for a new century)
   Includes bibliographical references (p.   ) and index.
   ISBN 0-8039-9086-3 (alk. paper)
   1. Mass media--History.    2. Mass media--Technological innovations.
3. Mass media--Forecasting.    I. Title.   II. Title: Media morphosis.
III. Series.
P91.F467 1997
302.23'09--dc21
                                            96-52540
                                               CIP

**Defendant's Exhibit No. 689.057**

the function and importance of newspapers within societies extend well beyond the utilitarian role of information provider or database.

In this chapter, we explore an offline vision of digital publishing that builds upon and retains the familiar attributes of traditional print media, such as portability, portrait orientation, and branded packaging, while incorporating some of the more compelling traits of the interpersonal and broadcast forms.

I have focused this chapter on newspapers because in my view they represent the most complex as well as the most immediately challenged form within the document domain. It should be understood, however, that the concepts and technologies discussed are just as applicable to magazines, books, and nearly all other document forms.

A chronology of major technological developments that have influenced the transformation of newspapers in the past two centuries and that are likely to affect their ultimate transition to digital publishing systems early in the twenty-first century is found in Exhibit 9.1.

**Scenario for 2010.**   *The mobile digital document reader*

As Deborah awakens, her body tells her the time should be about 7 A.M., but the digital clock next to her bed argues that it's precisely 4:17 A.M., Tuesday, September 21, 2010. Memory returns slowly. Finally, she recalls that this is San Diego, California, and that she arrived late last night from New York to speak at a conference this morning. There's no chance of falling back to sleep now, so she goes to the microkitchen to start the coffeemaker. Then she picks up her **tablet** and prepares to gather her morning newspapers.

This hotel has equipped its rooms with the latest high-tech amenities. In addition to the microkitchen, Deborah's room has a wall-mounted flat-screen display, a color fax machine that also functions as a printer and copier, and a teledock. With the teledock, Deborah can choose the television programs she wants to watch and then set the time and sequence she prefers. She can also use the teledock to purchase current electronic editions of newspapers, magazines, and books.

About a year ago, she finally decided to buy a tablet to use in her work. The tablet is about the size and shape of a standard printed magazine and weighs about a pound. She can attach a keyboard, but mostly

**Defendant's Exhibit No. 689.058**

she interacts by touching or writing on the screen. With an electronic pen, she can highlight items, append notes, and work the crossword puzzle, as well as quickly locate items. If she chooses, she can also interact with the tablet by using a selection of voice commands.

Tablets have been on the market for about a decade, but she didn't see their value until there was an extensive selection of material available for reading on tablets. Now she can read the latest editions of her favorite publications almost anywhere and anytime that's convenient for her. Electronic newsstands and teledocks have already been installed in many airports, train stations, hotels, and book stores. Television controllers in homes and offices have also been adapted to provide easy access to digital print media.

Customers continue to have a choice of subscribing or purchasing single copies. Prices are about the same as they are for printed versions, although electronic editions contain more information and provide extra services. With a subscription to an electronic edition, delivery is no longer tied to a single home or office address. This gives subscribers the freedom to access their publications at the office or from any teledock or electronic newsstand. The system works in much the same way as the banks' automatic teller machines (ATMs).

To access the latest edition of the *New York Times,* Deborah inserts her *NYT* card into her room's teledock. These memory cards are supplied by newspapers and magazines when customers subscribe to their electronic editions. They are similar in size and shape to credit cards but are thicker and can be used anywhere for as long as the subscription remains active. Each card contains personal data, such as the subscriber's name and address, subscription codes, and preferences, as well as enough storage to hold a complete edition and a personal file of items that the subscriber has "clipped and saved."

On the teledock's touch screen, Deborah enters her personal identification number just as she would at an ATM. In less than a minute, the current edition of the *New York Times* is loaded onto her card. She removes the card and repeats the procedure for the *Financial Times.* To buy a single copy of the local newspaper, which in San Diego is the *Union-Tribune,* she inserts a card that allows her to purchase any electronic publication. This card contains her personal data and digital cash to pay for purchases. After entering her password, the teledock displays a menu of available newspapers. As soon as she touches the *Union-Tribune* option and confirms her selection, the edition is loaded and the fee is automatically debited.

**Defendant's Exhibit No. 689.059**

The coffee is ready, so she pours a cup and takes it to the bedside table along with her tablet and newspaper cards. She could use the wall-mounted, flat-screen television in her room to display the newspapers, but she prefers using the tablet to read in the comfort of her bed.

As soon as she inserts the *NYT* card into her tablet, she is told that 14 stories in this edition contain topics included in her personal profile. She is particularly interested in astronomy and space exploration and in news from several South American countries. She has the option of going directly to those stories or just browsing. Since she has plenty of time this morning, she chooses to browse first. She starts with the front page.

The page displayed on her tablet bears a strong resemblance to the front page of the printed edition of the *New York Times*. The only obvious difference is the page size. To preserve the information density of a full-sized printed paper, items that appear on the browsing pages of tablet editions are actually abstracts, or brief summaries. The combination of headlines, abstracts, and graphics organized on newspaperlike pages makes scanning and assessing content quick and easy.

For most stories, the abstracts provide enough information to satisfy Deborah's interests. But when she wants more, all she needs to do is touch the abstract. In an instant, the front page is replaced by the actual story, which can be as long as it needs to be. The story pages appear more like the pages of a book to facilitate reading. These pages can also include images and graphics as well as background and explanatory information.

With printed newspapers, readers often complain that the text is too small. With a tablet edition that is not a problem. If the standard text is difficult for Deborah to read, she can enlarge it to whatever size feels comfortable. If she is too tired to read or she needs to concentrate on some other activity, such as driving a car or preparing a meal, she can also have the tablet "speak" stories to her. She often uses this feature to create her own custom "radio" news reports that she listens to when she's driving to and from her office. With simple voice commands, she can skip to the next story, repeat a segment, or locate another story.

Each electronic edition contains sets of browsing pages organized in sections much as they are in the printed edition. After scanning the front page, Deborah can turn to the next page by touching the page-turning icon or go to another section by touching the appropriate section icon.

As she browses the *Times'* business section, she finds a story about the latest federal surtax. A graphic offers her the opportunity to see how she will be affected. By using the pen to enter her estimated salary and

Defendant's Exhibit No. 689.060

a few other details, the graphic immediately computes and displays the amount of her surtax and shows her how she compares with other tax-payers. She'd like to print the story and graphic later, so she touches the Clip option on the screen. This puts the page in her memory card's personal file. She can also transfer items she has "clipped" from the newspaper to her office computer or send annotated copies to other people by using the tablet's electronic mail feature.

Another story in the business section refers to a news event that occurred last week. She apparently missed the story when it was originally published, so she touches the Library icon. This retrieves the headlines and abstracts for all stories published on this subject by the *Times* in the past month. She discovers that the earlier story was published last Wednesday. The abstract is useful, but she would like to see the full story. By touching the abstract, she is told it will cost 50 cents to retrieve this item from the newspaper's electronic library. That's fine, so she touches the OK button. The tablet's wireless communicator autodials the newspaper and sends the necessary instructions to retrieve her selection from the library's central computer. Within a few seconds the complete story is added to her memory card's personal file.

The lead story in the science section is about the multinational exploration of Mars. By touching an image of the planet, Deborah can watch a 20-second video segment showing views sent only a few hours ago by the robot vehicle as it roved the surface of the planet. Video news clips are now becoming a common feature of tablet newspapers. When touched, some photographs become full-motion video clips with sound, so she can watch and listen to news events as well as read about them. If she missed something, she can replay the clip or freeze an image.

As she "turns" pages, she also encounters a variety of advertisements. Ads in tablet newspapers are juxtaposed with editorial content on most pages just as they are in printed editions. If she is not interested in an ad, she simply "turns" the page.

Advertisers are fully exploiting the opportunities afforded by these digital editions. If she requests it, some ads will speak to her; others display their merchandise with short video clips and animations. More importantly, advertisers are able to deliver a variety of targeted messages that can be matched to each personal profile. With the tablet's wireless communicator, customers can also conveniently order advertised products, request additional information, or take advantage of coupons.

For example, an airline offering discount fares and package deals to South America entices her to explore the possibilities alluded to in its ad.

**Exhibit 9.3** Tablet mockup.



**Source:** Courtesy of Kent State University News Service.

storage capacity than a typical PC had in the early 1980s. Nearly all include modems for both wired and wireless communications.

Although these devices are limited in their ability to display formatted pages, they are considered adequate for reading small amounts of text and possess two essential document traits—portability and simplicity. The importance of these traits was not over-

Defendant's Exhibit No. 689.062

looked by the *Mainichi Shimbun,* Japan's third largest national newspaper. Early in 1996, it became the world's first publisher to begin distributing daily editions specifically designed for reading on a portable electronic display. The digital editions are updated twice a day, five days a week, or more frequently when there are major breaking events. The handheld Zaurus, which is the recommended device, can store up to 18 stories for offline reading. It is also capable of receiving and displaying photos and graphics. The newspaper reportedly expects to reach its goal of 50,000 paying subscribers in 1997.

Other newspapers are also beginning to experiment with the delivery of content to larger portable digital devices. *El Periódico,* a newspaper published in Barcelona, Spain, launched the first market trial of a tablet edition in 1996 using devices called NewsPads developed by Acorn, a British electronics company. Even though the prototype tablets are bulkier and heavier than they would prefer for commercial versions, the newspaper and manufacturer still expect to learn a great deal about consumer acceptance of tablet publishing systems from this experiment.

## Flat-panel technology

The idea that people will be leisurely reading documents on portable tablets by the year 2010 may seem unrealistic given the present state of computer and display technologies, but it is no more fantastic than was the 1980 vision of people routinely using mobile cell phones, fax machines, and CD players. While the timing may be off by a few years either way, most executives of computer and consumer electronics companies are now reasonably confident that tablets suitable for displaying and interacting with digital print media will become ubiquitous in the next decade.

*The Dynabook.* The vision of thin, lightweight displays that can be used as portable information and communication media has been around for some time. However, the credit for conceiving the first portable information appliance is usually given to Alan Kay.

As a young computer scientist at the Xerox Palo Alto Research Center (PARC) in 1972, Kay created a cardboard model of a device that bore little resemblance to the huge mainframes and terminals most people then knew as computers. He called it a Dynabook and

**Defendant's Exhibit No.** 689.063

described it as a "dynamic media for creative thought."[7] According to Kay, it was to be a personal "self-contained knowledge manipulator in a portable package the size and shape of an ordinary notebook." It would have "enough power to outrace your senses of sight and hearing" as well as "enough capacity to store for later retrieval thousands of page-equivalents of reference materials, poems, letters, recipes, records, drawings, animations, musical scores, waveforms, dynamic simulations, and anything else you would like to remember and change."[8]

The Dynabook idea had been gestating in Kay's mind since the late 1960s when he was a graduate student at the University of Utah. So when he was invited to join the distinguished team of scientists who were forming Xerox PARC, he saw it as an opportunity to develop a working version of his dream. But despite his best efforts, Kay failed to win management support. Instead, the PARC team decided to pursue a project that would lead to the development of what became the world's first desktop personal computer—the Alto. More than two decades would pass before lightweight portable computers that could function as Kay originally envisioned became an "overnight success"—demonstrating once again the delayed adoption principle of mediamorphosis that transforming technologies always take longer than expected to become commercial successes.

*Liquid-crystal displays.* The development of the transforming technology considered most significant to the creation of portable computers and tablets—the liquid-crystal display (LCD)—also conformed to this principle. In 1964, George Heilmeier, a researcher at RCA's laboratories, accidentally discovered that images could be formed by applying an electric current to liquid crystals. Normally, this curious organic material is opaque and reflects light. But when a small electric current is applied, the crystals realign in such a way that they appear transparent.

Heilmeier immediately saw a number of practical applications for his invention and proceeded to build simple liquid-crystal devices

---

[7] Douglas K. Smith and Robert C. Alexander, *Fumbling the Future: How Xerox Invented, Then Ignored, the First Personal Computer.* New York: Morrow, 1988, pp. 84–85.

[8] Ibid.

**Defendant's Exhibit No.** 689.064

and more durable plastic instead of glass and lower-cost manufacturing processes. If this emerging form of digital ink on plastic "paper" lives up to its promise, it could make low-cost tablets possible by the end of this decade.

*Practical applications of tablets.* Tablets will have a vast number of practical applications early in the twenty-first century beyond displaying digital editions of newspapers, magazines, and books. They are likely to be used by students and teachers to read and interact with course materials; by factory-workers as electronic clipboards and manuals; by executives for viewing and distributing memos and reports; by salespersons for presentations and order entry; by attorneys to utilize depositions and documents in court; by repair persons and installers to access up-to-the-minute schematics and instructions; by public speakers as prompters and notepads; by stock brokers and commodities traders to process orders; and in nearly every other situation where paper is used today for storing, displaying, capturing, and distributing frequently changing, timely information.

Just as people don't think about the computer chips in their instant cameras when they take pictures, owners of tablets will not give much thought to the microprocessors behind their displays when they read and interact with digital documents. And instead of having to wrestle with the confusing proprietary technologies typical of computer systems, customers are likely to make their buying decisions for tablets based on the manufacturer's brand-name reputation, functionality, price, and other common variables. Tablets will probably be sold in consumer electronics stores along with digital TV sets, compact disc players, and minicams. While the initial price might be more than a thousand dollars at the end of this decade, by the year 2010 the range of prices will probably be comparable to other common consumer electronics, such as portable TV sets and mobile CD players.

# Memory cards and offline publishing

Unlike the current generation of Internet and consumer online services, customers will not have to remain connected to a communication network in order to read and interact with digital documents on their tablets. As soon as a publication has been captured and stored, customers would be free to move about. They will be able to