Exhibit 11

1             UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
2

3

4   APPLE, INC., a California        )
    corporation,                      )
5                                     )
            Plaintiff,                )
6                                     )
            vs.                       ) Case No.
7                                     ) 11-CV-01846-LHK
    SAMSUNG ELECTRONICS CO., LTD.,    )
8   a Korean business entity;         )
    SAMSUNG ELECTRONICS AMERICA,      )
9   INC., a New York corporation;    )
    SAMSUNG TELECOMMUNICATIONS        )
10  AMERICA, LLC, a Delaware          )
    limited liability company,        )
11                                    )
            Defendants.               )
12

13

14

15       VIDEOTAPED DEPOSITION OF ROGER F. FIDLER

16          TAKEN ON BEHALF OF THE PLAINTIFF

17               SEPTEMBER 23, 2011

18

19

20
        (Starting time of the deposition:  9:32 a.m.)
21

22

23

24

25   Job Number: 41966

Page 6

1    IT IS HEREBY STIPULATED AND AGREED by and
2  between counsel for the Plaintiff and counsel for the
3  Defendants that this deposition may be taken in
4  shorthand by William L. DeVries, RDR/CRR, a Certified
5  Court Reporter, Certified Shorthand Reporter, and
6  Notary Public, and afterwards transcribed into
7  typewriting; and the signature of the witness is
8  expressly reserved.
9           *   *   *   *   *
10     (Starting time of the deposition: 9:32 a.m.)
11
12      VIDEOGRAPHER: This is the start of tape
13  labeled number one of the videotaped deposition of
14  Roger Fidler, in the matter of Apple, Inc. versus
15  Samsung Electronics Corporation, Limited, et al., in
16  the U.S. District Court, Northern District of
17  California, Case Number 11-CV-01846-LHK.
18      This deposition is being held at Midwest
19  Litigation Services in Columbia, Missouri on
20  September 23rd, 2011 at approximately 9:32 a.m. My
21  name is John Niehaus. I am the legal video specialist
22  from TSG Reporting, headquartered at 747 Third Avenue,
23  New York, New York. The court reporter is Bill
24  DeVries, in association with TSG Reporting.
25      Will counsel please introduce yourself?

TSG Reporting - Worldwide      877-702-9580

Page 7

1      MS. TAYLOR: Jennifer Taylor for Apple.
2      MR. ZELLER: Mike Zeller for the witness
3  and Samsung.
4      MR. SADOWITZ: Michael Sadowitz for
5  Samsung.
6      VIDEOGRAPHER: If you could please swear in
7  the witness?
8           *   *   *   *   *
9         ROGER F. FIDLER,
10  of lawful age, produced, sworn and examined on behalf
11  of the Plaintiff, deposes and says:
12           *   *   *   *   *
13         EXAMINATION
14  QUESTIONS BY MS. TAYLOR:
15    Q.  Good morning.
16    A.  Good morning.
17    Q.  Could you state your name for the record,
18  please?
19    A.  Roger Frank Fidler.
20    Q.  Could you spell your last name, please?
21    A.  F as in Frank, I-D-L-E-R.
22    Q.  Have you ever had your deposition taken
23  before?
24    A.  No.
25    Q.  So what's going to -- I'm sure counsel has

TSG Reporting - Worldwide      877-702-9580

Page 8

1  told you this, but what's going to happen is I'll be
2  asking you questions, and I'll need you to answer
3  audibly. So shaking the head, nodding the head won't
4  work --
5    A.  I understand.
6    Q.  -- because it needs to be recorded. I also
7  need you to wait for me to finish my question
8  completely before you answer so that he can take down
9  what I say and then what you say.
10      If you need to take a break at any point in
11  time, let me know. We will definitely be taking
12  breaks probably every hour or so in any event, but if
13  you need a break earlier than that, let me know.
14    A.  Okay.
15    Q.  If there's a question pending, if you could
16  wait and answer the question before you ask for a
17  break, that will be helpful because it helps with the
18  transcript.
19    A.  I understand.
20    Q.  Are you on medication or anything that
21  could prevent you from answering questions today?
22    A.  No.
23    Q.  Okay. I notice that you brought with you
24  the three tablets I asked you to bring. Could you
25  pick up the one on top?

TSG Reporting - Worldwide      877-702-9580

Page 9

1    A.  Okay.
2    Q.  Can you tell me -- my first question is
3  what -- what is it?
4    A.  Well, this is the first mock-up I made of a
5  tablet in the early eighties. Began from a article
6  that I wrote for the Associated Press Managing Editors
7  Association about the future of newspapers and
8  described the idea of a tablet that newspapers could
9  be displayed upon.
10    Q.  How -- how did you create that tablet?
11    A.  It's just created from plastic, pieces that
12  I found to be able to represent what a tablet might be
13  like.
14    Q.  Did you have a specific idea in mind of
15  what you wanted it to look like?
16    A.  I did. My -- my feeling was that it should
17  be something that's lightweight, portable, a flat
18  screen that had a ability to use touch to navigate and
19  that the newspapers displayed on it would involve
20  hyperlinks and hypermedia.
21    Q.  You said it's made out of plastic; is that
22  correct?
23    A.  Yes.
24    Q.  Is it one layer of plastic or multiple
25  layers of plastic?

TSG Reporting - Worldwide      877-702-9580

Page 74

1        MR. SADOWITZ: Sadowitz.
2        Q. (By Ms. Taylor) Sadowitz.
3        A. Uh-huh.
4        Q. Did you meet with Mike Sadowitz in person?
5        A. Other than e-mail there was one visit to
6   our lab by Mike and another colleague to take pictures
7   of the tablets that I had in my laboratory.
8        Q. Do you know who that colleague was?
9        A. I don't recall her name.
10       Q. When you say your laboratory?
11       A. My office in the Reynolds Journalism
12  Institute.
13       Q. Is that the office I visited last night?
14       A. Yes.
15       Q. Is that where the photographs were taken?
16       A. Yes.
17       Q. And do you recall who took those
18  photographs?
19       A. Mike.
20       Q. And were those photographs taken prior to
21  August 16th?
22       A. Yes.
23       Q. Was that -- do you remember how far in
24  advance of August 16th that visit was?
25       A. It was probably less than a month.

TSG Reporting - Worldwide    877-702-9580

Page 75

1        Q. Was Mike the first person with whom you
2   spoke about this case?
3        A. Yes.
4        Q. And did Mike initiate that contact or did
5   you?
6        A. Mike initiated the contact.
7        Q. Was that by telephone or e-mail?
8        A. I don't recall.
9        Q. Was it following that initial contact that
10  he visited your office --
11       A. Yes.
12       Q. -- here in Columbia? Now you can answer
13  the question.
14       A. I'm sorry?
15       Q. You answered halfway through the question.
16  So was it --
17       A. I apologize.
18       Q. -- following that initial contact that he
19  visited your office here in Columbia?
20       A. Yes. Sorry.
21       Q. That's okay. You're getting better.
22  You'll be an ace at the end of the day.
23       Did you draft this declaration that's
24  Exhibit 245?
25       A. No.

TSG Reporting - Worldwide    877-702-9580

Page 76

1        Q. Did you make any revisions to the
2   declaration that -- is this declaration identical to
3   what you first saw?
4        MR. ZELLER: You know, I'm going to
5   instruct on that question as phrased.
6        MS. TAYLOR: Go ahead.
7        MR. ZELLER: No, I'm instructing him not to
8   answer on that.
9        THE WITNESS: I won't answer.
10       MS. TAYLOR: Why not?
11       MR. ZELLER: Because it will disclose the
12  content potentially of privileged communications.
13       MS. TAYLOR: Victoria Maroulis asked
14  exactly the same questions of Sissie Twigts.
15       MR. ZELLER: Well, I'll -- I'll check on
16  that and I'll -- I'll find out, but I'm concerned as
17  to what the sequence of this question is and how this
18  one is phrased. I mean, you can back out what the
19  privileged communications are. So you can try and
20  rephrase it.
21       I can check on a break as to, you know, how
22  that question was asked if -- if you're correct, but
23  at this point I'm going to stand on my instruction.
24       Q. (By Ms. Taylor) Are you represented by
25  counsel here today?

TSG Reporting - Worldwide    877-702-9580

Page 77

1        A. Technically, I guess, yes.
2        Q. And when did you hire counsel?
3        A. I did not hire any counsel.
4        Q. Are you paying counsel?
5        A. No.
6        Q. When did they -- when -- which counsel is
7   representing you here today?
8        A. At this point the two lawyers you see here.
9        Q. Mr. Zeller and Mr. Sadowitz?
10       A. Yes, uh-huh.
11       Q. Were they your attorneys when you first
12  spoke with them?
13       A. No.
14       MR. ZELLER: Hold on. That's -- that's an
15  improper question and it's improper because it calls
16  for a legal conclusion. There is an agreement in
17  process, there is -- a written agreement, and that --
18  that attorney-client relationship goes back to the
19  beginning of the communication, so that is an improper
20  question and --
21       MS. TAYLOR: So you were representing him
22  as of your very first communication with him? That's
23  your position? I just want to make sure.
24       MR. ZELLER: It is -- it is retroactive,
25  yes. It is because there has been -- by the

TSG Reporting - Worldwide    877-702-9580

Page 78

```
 1  agreement, the written agreement that is in process,
 2  it goes back to the beginning.
 3       MS. TAYLOR:  What written agreement?
 4       MR. ZELLER:  It's -- like I say, it's one
 5  in process.  We're working on it.
 6       MS. TAYLOR:  What -- what does in process
 7  mean?
 8       MR. ZELLER:  It means in process.
 9       MS. TAYLOR:  You say a written agreement in
10  process.  Is this an agreement with us?  Is this an
11  agreement with Mr. Fidler?  I'm confused.
12       MR. ZELLER:  Between -- between Quinn
13  Emanuel and the witness.
14       MS. TAYLOR:  So you're working on an
15  agreement with Mr. Fidler?
16       MR. ZELLER:  We're working on a written
17  agreement --
18       THE WITNESS:  We've had oral.
19       MR. ZELLER:  -- as I've said many times
20  now.
21       MS. TAYLOR:  But there's no written
22  agreement in place yet.  Got it.
23       MR. ZELLER:  Correct.  We're working on it.
24       MS. TAYLOR:  But you won't let him comment
25  on any -- the substance of any communications with you
TSG Reporting - Worldwide       877-702-9580
```

Page 79

```
 1  ever, is that -- I want to make sure because I'm not
 2  going to spend thirty minutes asking him questions and
 3  having you instruct not to answer.  There was no point
 4  when you were communicating with him when you were not
 5  his attorney.  Is that your position?
 6       MR. ZELLER:  You've now asked two different
 7  questions.  You've said the substance of any
 8  communications.  There are communications that
 9  potentially are -- and you'd have to ask.
10       I'm not saying that there are, but there
11  are obviously conceivable communications in this world
12  between an attorney and a client that is not
13  privileged.  So you're confusing two different
14  concepts.
15       You asked a question that began all this as
16  to when the attorney-client relationship began.  That
17  is a legal question.  I am telling you our legal
18  position is that it began with this witness because
19  it's going to be pursuant to this written agreement
20  that it goes back to the beginning of the
21  communications.
22       Now, you are entitled or not entitled to
23  ask further questions beyond that, but you are not
24  entitled to ask questions that mischaracterize legally
25  what the relationship is.
TSG Reporting - Worldwide       877-702-9580
```

Page 80

```
 1       Q.  (By Ms. Taylor) Mr. Fidler, did you make
 2  any changes to the declaration before you signed it?
 3       MR. ZELLER:  You can answer that yes or no.
 4       A.  Minor corrections.
 5       Q.  (By Ms. Taylor) Please tell me what they
 6  were.
 7       A.  Don't recall at this point.
 8       MR. ZELLER:  Hold -- hold on.  Okay.
 9  Counsel, you know that this witness answers quickly.
10  You just deliberately, deliberately violated what you
11  knew was an instruction that I gave counsel that is
12  improper.
13       I move to strike it.  I ask that you not do
14  it again.  Was there a reason why you just did that
15  other than just the obvious blatant attempt to
16  circumvent improperly the instruction that I gave?
17       MS. TAYLOR:  Mr. Zeller, shall we take a
18  break?  It sounds like you might need one.  Do you
19  need a break?
20       MR. ZELLER:  No, you're the one who needs a
21  break, Counsel.
22       MS. TAYLOR:  No.
23       MR. ZELLER:  I encourage you -- in fact, I
24  do more than encourage you.  I insist that you respect
25  the attorney-client privilege.  If you're not going
TSG Reporting - Worldwide       877-702-9580
```

Page 81

```
 1  to, then you can in fact expect to be in front of the
 2  judge on this.
 3       MS. TAYLOR:  I am asking questions.  That's
 4  all I've come to do.
 5       MR. ZELLER:  You snuck in as quickly as you
 6  could exactly the same question that I instructed on.
 7  You asked him what those changes were.  Was there
 8  something different about what you think the word
 9  change is and revision?
10       Is that -- is that what you're going to
11  stand on as the difference between the question that
12  you just asked and the question that I instructed on?
13  You do know it's improper, it's unethical for a lawyer
14  to deliberately attempt to elicit privileged
15  information, right?  You do know that.
16       MS. TAYLOR:  Mr. Zeller, you are the one
17  who is mischaracterizing what's going on.  I am not
18  going to spend even one minute of this deposition
19  addressing your groundless arguments.  I listened to
20  them last week.
21       MR. ZELLER:  This is not a waiver in any
22  way and you are -- are you going to argue it's a
23  waiver?
24       MS. TAYLOR:  I listened to them last week.
25  I am not going to spend --
TSG Reporting - Worldwide       877-702-9580
```

Page 158

1    A.  It was journalism.
2    Q.  In journalism.
3    A.  It was the -- the school of journalism
4  that -- that waived it basically and said, okay, we'll
5  accept Mr. Fidler's -- as a graduate even though I
6  didn't have a degree from them, so ...
7    Q.  So along -- along --
8    A.  I was a college dropout in the sixties
9  basically like a lot of other people.
10   Q.  I was going to say, I think you had a lot
11 of company.
12   A.  Bill Gates, Steve Jobs.  Same thing.
13   Q.  Yeah.  Yeah.  There's a lot of company out
14 there.  Did you take any design classes?
15   A.  No, although I taught information design at
16 Kent State University.
17   Q.  What is information design?
18   A.  Long story.  Think of information
19 architecture as building the building.  Information
20 design is more like the interior designer working
21 within the structures that have been established.  And
22 so it's designing the organization of elements.  It's
23 understanding typography, presentation, all that.
24   Q.  So is this like designing the organization,
25 the elements within -- within --
TSG Reporting - Worldwide          877-702-9580

Page 159

1    A.  Within an information space.
2    Q.  And is that like newspapers or websites or
3  whatever?
4    A.  Could be any of those things, uh-huh.
5    Q.  And are you being paid in connection with
6  your testimony today?
7        MR. ZELLER:  I'll object to the form.  You
8  can ask him about -- he's being paid for his time.
9  The way you phrased it about his testimony is kind of
10 odd and objectionable.
11       THE WITNESS:  That's not objection --
12 objection?
13       MR. ZELLER:  I'm sorry?
14       THE WITNESS:  I can say yes or no?
15       MR. ZELLER:  No.  I'm saying something
16 different.  I'm just objecting to the notion you're
17 being paid for your testimony as opposed to your time.
18       THE WITNESS:  Uh-huh.  Oh, okay.
19       MR. ZELLER:  I'm just objecting to the form
20 of the question.
21       THE WITNESS:  Oh, okay.
22   Q.  (By Ms. Taylor)  Are you being compensated
23 in connection with your deposition?
24   A.  For my time.
25   Q.  And how much are you being paid per hour?
TSG Reporting - Worldwide          877-702-9580

Page 160

1        THE WITNESS:  What should I say?
2        MR. ZELLER:  Oh, you can go ahead and
3  disclose that.  Sure.
4        THE WITNESS:  Okay.
5    Q.  (By Ms. Taylor)  Yeah, that's not
6  privileged.
7    A.  I'm being paid per hour.
8    Q.  Yes.  How much?
9    A.  Last time we agreed I think $220 an hour.
10   Q.  Did you get any payment in connection with
11 the -- any work you've done on this case before your
12 deposition today?
13   A.  It's retroactive to the beginning of our
14 relationship for gathering material and being able to
15 this --
16   Q.  Have you been paid already?
17   A.  No.  I have not received any compensation.
18   Q.  But -- but you expect to be paid
19 retroactively?
20   A.  Uh-huh.  Yes.
21   Q.  Okay.  The Information Design Lab closed in
22 1995.  Did I hear that?
23   A.  Yes, July 31st, 1995.
24   Q.  Why did it close, do you know?
25   A.  Why did it close?
TSG Reporting - Worldwide          877-702-9580

Page 161

1    Q.  Yeah.  Do you know why it closed?
2    A.  Well, because I reported directly to the
3  chairman of Knight-Ridder who died of brain cancer in
4  the end of June 1995.  The new president decided there
5  wasn't any need for a -- a futures lab within
6  Knight-Ridder and so decided to move everything to San
7  Jose.  Offered me the opportunity to go to San Jose.
8  I decided not to go to San Jose, and so I took an
9  early retirement.
10   Q.  And it was after that that you went to
11 Columbia University's -- is that correct?
12   A.  No.  Columbia University was -- was
13 1991, '92.  Kent State -- I took a year to get -- to
14 finish my book and do consulting for a year, and got
15 two hip replacements done.
16       And then Kent State offered me an
17 opportunity to come speak there at -- on campus about
18 the future of journalism and newspapers.  And after I
19 spoke there, they offered me an opportunity to come
20 there as a professional in residence.
21   Q.  And the book that you just referenced is
22 the one that we have --
23   A.  Yes.
24   Q.  -- an excerpt of?
25   A.  That was published in 1997.  So it was
TSG Reporting - Worldwide          877-702-9580

41 (Pages 158 to 161)

Page 206

1    African-American woman who was using the tablet
2    sitting in the park. Was she an actress?
3         A. Oh, the woman who was in the video. I
4    don't even know who she was. She was hired -- Theresa
5    is the one who recruited the people for the video, and
6    so I never met her personally.
7         Q. She's not part of your team?
8         A. No, she was not part of my team.
9         Q. What about the couple sitting at the table?
10        A. Have no idea who they were.
11        Q. What about the -- the -- there was another
12   woman who was alone sitting near a window. She seemed
13   a little older.
14        A. Yeah, don't know who she was either. I --
15   I -- she -- I left the handling of recruiting of the
16   people for the video and the actual supervision of the
17   video to Theresa.
18        Q. So none of those people are members of your
19   team?
20        A. No, they were not members of the team.
21        Q. Okay. On paragraph eleven --
22        A. Uh-huh.
23        Q. -- that first sentence, the last half says
24   Apple personnel were exposed to my tablet ideas and
25   prototypes.
TSG Reporting - Worldwide          877-702-9580

Page 207

1         A. Uh-huh.
2         Q. Were they exposed to any of the particular
3    prototypes that we have now stacked up on your right
4    side?
5         A. Are you talking about --
6            MR. ZELLER: Objection, asked and answered.
7         A. -- these?
8         Q. (By Ms. Taylor) Yes.
9         A. This all came after I left the
10   Knight-Ridder lab, so these -- you're talking about
11   the Plexiglas?
12        Q. Oh, no, I mean all of them. So let's set
13   those over here.
14        A. Okay. So the Plexiglas --
15        Q. This is later.
16        A. -- ones they did not see because this was
17   done when I was at Kent State University after I left
18   Knight-Ridder --
19        Q. Okay.
20        A. -- and -- and down here as well.
21        Q. Okay. So no Plexiglas. What about the
22   rest of what's in your stack?
23        A. Everyone in our lab and everyone at the
24   Apple Lab at that time would have seen this tablet.
25        Q. Which is the black --
TSG Reporting - Worldwide          877-702-9580

Page 208

1         A. The black --
2         Q. -- 1994 prototype?
3         A. Oh, I'm sorry. The black 1994 tablet. And
4    they would have seen the -- the white 1980s tablet.
5         Q. Okay.
6         A. As I said, none of the things that we were
7    discussing we were keeping secret.
8         Q. So in paragraph thirteen of your
9    declaration --
10        A. Uh-huh.
11        Q. -- it looks to me like you're talking about
12   the black 1994 prototypes that you brought with you
13   today; is that correct?
14        A. Uh-huh. Uh-huh. Uh-huh.
15        Q. Okay. So the last sentence in paragraph
16   thirteen says members of the Apple Lab viewed this
17   tablet shortly after its creation.
18        A. Uh-huh.
19        Q. Do you see that sentence?
20        A. Uh-huh. That's correct.
21        Q. So they viewed the black 1994 prototype
22   that you brought with you today?
23        A. Uh-huh. That's correct.
24        Q. Who are those members of the Apple Lab who
25   viewed it?
TSG Reporting - Worldwide          877-702-9580

Page 209

1         A. Well, as I said, I'm sure that Dennis
2    and -- and Joe were two of the people from the Apple
3    Media Lab who saw it. We often went over to the wall
4    street -- or the Walnut Brewery across the street to
5    have a beer and we often took the tablets with us to
6    just get a feel for what it would be like to carry a
7    tablet and use a tablet.
8         Q. When you say we often went across the
9    street to have a beer, who is we?
10        A. Other members of the IDL and Apple and
11   members of the -- the Apple Media Lab and Apple's --
12   and people from Paramount as well.
13        Q. Okay. Do you specifically remember anyone
14   from Apple who saw the 1994 prototype?
15           MR. ZELLER: This was just asked and
16   answered.
17        A. Well, I -- I -- that's what I just said.
18   That's what I -- I'm sure that -- I know that Dennis
19   and Joe both saw the prototype.
20        Q. (By Ms. Taylor) You know they both saw it?
21        A. Right. And my assumption is everyone else
22   at the lab also saw it, but I don't remember their
23   names and I don't remember the specific occurrences
24   where they met.
25        Q. Who -- has anyone come by your office this
TSG Reporting - Worldwide          877-702-9580

Page 342

1  Q. So whatever was confidential was no longer
2  confidential?
3  A. Right. What was confidential at the time
4  of that NDA was their drawings of what they
5  anticipated their tablet would look like and what it
6  would do.
7  Q. Okay. I -- is there any other aspect of
8  the work that you were doing that we've talked about
9  today that was confidential?
10  A. That was covered under an NDA?
11  Q. That was -- that you understood in any way
12  was covered under an NDA?
13  A. Nothing I've shown you today was covered
14  under an NDA or was considered confidential.
15  Q. Is there anything that we talked about
16  today that you consider confidential?
17  MR. ZELLER: Well, that's -- that's
18  compound. I mean, we'll discuss that. I mean, but --
19  I mean, if you want to ask what his -- his memory is,
20  but I mean, we obviously have to go through the
21  transcript to make sure.
22  Q. (By Ms. Taylor) Do you remember discussing
23  anything today that's --
24  A. I'm sorry?
25  Q. Do you remember discussing anything today
TSG Reporting - Worldwide    877-702-9580

Page 343

1  that's confidential?
2  A. To my knowledge, nothing I discussed today
3  was confidential.
4  MS. TAYLOR: Okay. I think I'm done. So
5  we'll go off the record.
6  MR. ZELLER: I may have one question. Let
7  me see one second. No, I was incorrect. I have no
8  further questions for you.
9  VIDEOGRAPHER: Signature?
10  MR. ZELLER: We have -- we have a
11  stipulation.
12  VIDEOGRAPHER: We're going off the record
13  at approximately 7:52 p.m.
14  (WHEREIN, the deposition was concluded at
15  7:52 p.m.)
TSG Reporting - Worldwide    877-702-9580

Page 344

1        CERTIFICATE OF REPORTER
2  STATE OF MISSOURI  )
                      ) ss.
3  CITY OF ST. LOUIS  )
4      I, William L. DeVries, a Certified Court
5  Reporter (MO), Certified Shorthand Reporter (IL),
6  Registered Diplomate Reporter, Certified Realtime
7  Reporter, and a Notary Public within and for the State
8  of Missouri, do hereby certify that the witness whose
9  testimony appears in the foregoing deposition was duly
10  sworn by me; that the testimony of said witness was
11  taken by me to the best of my ability and thereafter
12  reduced to typewriting under my direction; that I am
13  neither counsel for, related to, nor employed by any
14  of the parties to the action in which this deposition
15  was taken, and further that I am not a relative or
16  employee of any attorney or counsel employed by the
17  parties thereto, nor financially or otherwise
18  interested in the outcome of the action.
19
20  _____
21      Notary Public within and for
22      The State of Missouri
23  Dated September 24th, 2011
24
25  My commission expires August 14, 2015.
TSG Reporting - Worldwide    877-702-9580

Page 345

1  STATE OF        )
2                  )
3  COUNTY OF       )
4
   I, ROGER F. FIDLER, do hereby certify:
5     That I have read the foregoing deposition;
      That I have made such changes in form and/or
6  substance to the within deposition as might be
   necessary to render the same true and correct;
7     That having made such changes thereon, I hereby
   subscribe my name to the deposition.
8     I declare under penalty of perjury that the
   foregoing is true and correct.
9
10
           ROGER F. FIDLER
11
12    Executed this 24th day of September,
13  2011.
14
15
16  Notary Public:
17  My Commission Expires:
18
19
20
21
22
23
24
25
TSG Reporting - Worldwide    877-702-9580