# EXHIBIT 1

**ORIGINAL**

## In The Matter Of:

*APPLE, INC*
*VS.*
*SAMSUNG ELECTRONICS CO., Ltd*

*VINCENT O'BRIEN, DBA - Vol. 1*
*April 20, 2012*

## *HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY*

**MERRILL CORPORATION**
LegaLink, Inc.
179 Lincoln Street
Suite 401
Boston, MA 02110
Phone: 617.542.0039
Fax: 617.542.2119

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

---oOo---

**ORIGINAL**

APPLE, INC.,

    Plaintiff,

vs.                                  Case No.
                                     11-cv-01846-LHK
SAMSUNG ELECTRONICS CO., Ltd.,
SAMSUNG ELECTRONICS AMERICA,
Inc., SAMSUNG TELECOMMUNICATIONS
AMERICA, LLC.,

    Defendants.
_____ /

VIDEOTAPED DEPOSITION OF

VINCENT O'BRIEN, DBA

_____

Friday, April 20, 2012

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REPORTED BY:  RACHEL FERRIER, CSR 6948

(3-442940)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 2

| | | |
|---|---|---|
| 1 | INDEX OF EXAMINATIONS | |
| 2 | | |
| 3 | EXAMINATION BY | PAGE |
| 4 | Mr. Heyison | 6, 113 |
| 5 | Mr. Price | 227 |
| 6 | EXHIBITS MARKED FOR IDENTIFICATION | |
| 7 | NO.    DESCRIPTION | PAGE |
| 8 | Exhibit 1   Expert Report of Vincent E. | |
|   |             O'Brien, March 22, 2012 | 15 |
| 9 | | |
|    | Exhibit 2   Exhibits to the Expert Report of | |
| 10 |             Vincent E. O'Brien | 15 |
| 11 | Exhibit 3   Exhibit 5 (Revised) | 18 |
| 12 | Exhibit 4   Report, Results from A Survey | |
|    |             Measuring Use and Valuation of | |
| 13 |             Four Patented Features and | |
|    |             A Survey of World Clock | |
| 14 |             Patented Feature Usage | |
|    |             (Patented feature 055) | 121 |
| 15 | | |
|    | Exhibit 5   Excerpt from the deposition | |
| 16 |             transcript of Jun Won Lee taken | |
|    |             3/26/12 | 150 |
| 17 | | |
|    | Exhibit 6   Samsung-Apple Licensing | |
| 18 |             Discussion, October 5, 2010 | |
|    |             (Bates No. APLNDC00010886 - | |
| 19 |             APLNDC00010917) | 166 |
| 20 | Exhibit 7   Dunn on Damages, The Economic | |
|    |             Damages Report for Litigators | |
| 21 |             and Experts | 202 |
| 22 | ---oOo--- | |
| 23 | | |
| 24 | | |
| 25 | | |

| | | |
|---|---|---|
| 1 | A | Page 22? |
| 2 | Q | Page 22. |
| 3 | A | Oh, correct. |
| 4 | Q | Okay?  Now -- so at trial, what are you going to say the royalty is for the '055 patent? |
| 6 | A | 375-. |
| 7 | Q | Okay.  Okay.  Now, with respect to the other four patents, you calculate reasonable royalty damages on a running royalty basis; correct? |
| 10 | A | Correct. |
| 11 | Q | And the formula for your calculation is 99 cents times .3 times Dr. Sukumar's usage percent; correct? |
| 14 | A | Correct. |
| 15 | Q | Okay.  The 99 cents is -- I think you say that apps often cost 99 cents; correct? |
| 17 | A | Well, I -- yes. |
| 18 | Q | Okay.  And the .3 is what you describe as the split between developers and Apple for apps revenue; correct? |
| 21 | A | Correct. |
| 22 | Q | Okay.  The usage percentage is from Dr. Sur- -- Sukumar's survey; correct? |
| 24 | A | That's correct. |
| 25 | Q | Okay.  And when you do that multiplication, you |

Timestamps: 10:38:24, 10:39:01, 10:39:19, 10:40:02, 10:40:15

1   would like to have the -- the value numbers that you
2   have got for the other patents.
3          Now, those -- the value -- the market value
4   numbers that Dr. Sukumar provides and you state in
5   Table 5 of your report, those numbers are not part of
6   the equation that you use to calculate damages for the
7   patents; correct?
8      A   They are not physically part of that
9   computation, yes.
10     Q   Well, I don't know what you mean by
11  "physically," but the computation does not include a
12  variable for Dr. Sukumar's average consumer value of the
13  feature patent technologies; correct?
14     A   That's correct.
15     Q   So we can calculate your patent damages --
16  reasonable royalty patent damages numbers without
17  reference to Dr. Sukumar's value of feature patent
18  technology numbers; correct?
19     A   I'm not comfortable doing that, but, I mean,
20  you appear to be.
21     Q   Well, no --
22     A   I mean, are you saying you are going to
23  stipulate to 7.7 million?
24     Q   Well, one, I don't answer questions; you do.
25  Second is this:  Tell me where in the equation is there

10:49:59
10:50:20
10:50:37
10:51:00
10:51:10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 74

```
 1    a place for Dr. Sukumar's value of feature patent
 2    technology numbers?
 3        A    These numbers show me that there's sufficient
 4    consumer surplus to be confident that the numbers I
 5    calculate are -- are correct.                              10:51:27
 6        Q    So, for example, let's look at music in
 7    background, which Dr. Sukumar's survey produces an
 8    average consumer value of $20 for.
 9             What royalty rate did you calculate for music
10    in background?                                             10:51:59
11        A    19 cents per unit.
12        Q    Okay.  So the values calculated by Dr. Sukumar
13    are about a hundred times more than your reasonable
14    royalty rate; correct?
15             MR. PRICE:  Objection; vague.                     10:52:14
16             THE WITNESS:  I mean, that's the math.
17             MR. HEYISON:  Okay.
18             THE WITNESS:  I don't think it's an appropriate
19    comparison, but that's the math.
20    BY MR. HEYISON:                                            10:52:22
21        Q    Okay.  Well, how do you explain the fact that
22    Dr. Sukumar's survey says that the average consumer
23    value for music in background is $20.52 per unit, but
24    your opinion is a reasonable royalty for that particular
25    patent is only 19 cents?                                   10:52:48
```

| | |
|---|---|
| 1   it be then incorrect to use -- or consider his value | |
| 2   numbers in connection with the termination of a | |
| 3   reasonable royalty? | |
| 4           MR. PRICE:  Objection; vague. | |
| 5           THE WITNESS:  I would have to see, you know, | 11:20:49 |
| 6   what you meant by in his data, what -- what he included | |
| 7   and what he didn't, but I'd have to revisit the -- | |
| 8   the -- the methodology. | |
| 9   BY MR. HEYISON: | |
| 10      Q   Okay.  And then, similarly, let's -- or strike | 11:20:50 |
| 11  that out.  Withdraw that. | |
| 12          If the Court would determine that -- to exclude | |
| 13  Dr. Sukumar's usage figures for the four features, would | |
| 14  you be able to calculate a reasonable royalty damages? | |
| 15          MR. PRICE:  Objection; incomplete hypothetical. | 11:20:50 |
| 16          THE WITNESS:  Well, with no other source? | |
| 17          MR. HEYISON:  For usage, correct. | |
| 18          THE WITNESS:  So, basically, I mean, that's | |
| 19  really kind of a tautology.  You take away one of the | |
| 20  numbers in the equation and, yeah, I can't calculate it. | 11:20:50 |
| 21          MR. HEYISON:  Okay. | |
| 22          MR. PRICE:  I've lost my realtime. | |
| 23          (Discussion off the stenographic record.) | |
| 24  BY MR. HEYISON: | |
| 25      Q   Okay.  Doctor, did you calculate a per-unit | 11:20:50 |

```
 1      A    I'm not sure what you mean by the word
 2   "broader."
 3      Q    Provided more functionality or additional
 4   functionality to that provided in the accused features?
 5      A    No, I did not.                                     13:07:03
 6      Q    And you don't know whether anybody in your
 7   staff did so; correct?
 8      A    No, I don't.
 9      Q    Dr. O'Brien, did you independently verify
10   Dr. Sukumar's usage and value results?                      13:07:45
11      A    No.
12      Q    And why not?
13      A    I'm relying upon him.
14      Q    Okay.  And so for both the usage and -- and
15   market value, you are relying exclusively on                13:08:10
16   Dr. Sukumar's report and trusting that his methodology
17   is valid and that his results are reliable and accurate;
18   correct?
19           MR. PRICE:  Objection; vague, compound.
20           THE WITNESS:  Well, I'm relying upon them to be     13:08:24
21   of sufficient accuracy that I can use them.
22   BY MR. HEYISON:
23      Q    Okay.  But you've made no attempt to determine
24   whether they are of sufficient accuracy; correct?
25           MR. PRICE:  Objection --                            13:08:37
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 117

```
 1            THE WITNESS:  No.
 2            MR. PRICE -- vague.
 3            MR. HEYISON:  I have to ask that again because
 4   I think you --
 5            THE WITNESS:  Talked over each other.          13:08:46
 6            MR. HEYISON:  Whatever.
 7       Q    So am I correct that you've made no attempt to
 8   determine whether Dr. Sukumar's results are of
 9   sufficient accuracy?
10            MR. PRICE:  Objection; vague.                  13:09:03
11            THE WITNESS:  I've made no independent test or
12   analysis of that question.
13   BY MR. HEYISON:
14       Q    Okay.  Why did you turn to Dr. Sukumar instead
15   of doing your own survey?                               13:09:25
16       A    The requirements for getting a survey admitted
17   into evidence are very specific and -- and vigorous, and
18   our shop doesn't have the staff to -- to, one, perform
19   these and -- and, two, to perform them to the level that
20   they need to be.                                        13:09:42
21       Q    Okay.  Do you understand how Dr. Sukumar
22   determined usage for each of the feature patents?
23       A    Only what's described in the -- you know, only
24   from his report and our general descriptions.
25       Q    And with respect to his market value analysis, 13:10:16
```

```
 1    do you know how Dr. Sukumar arrived at his conclusions?
 2        A    He used what's called a conjoint analysis.
 3        Q    Now, other than knowing that it's a conjoint
 4    analysis, do you understand how that methodology works?
 5        A    Yes.                                                    13:10:39
 6        Q    Okay.  And so to the best of your ability,
 7    could you describe it for me.
 8        A    Well, you're -- basically for a product with
 9    multiple features, you are asked a series of questions
10    that compare a base case with those different            13:10:57
11    combinations of features, and from that you can extract
12    the incremental value of any one feature.
13        Q    Did you read Dr. Sukumar's report?
14        A    I haven't read it, no.  I've looked it over,
15    but I didn't read it.                                    13:11:13
16        Q    And so before submitting your report, you had
17    not read Dr. Sukumar's report?
18        A    No.  My staff has, but I have not.
19        Q    And did you ask your staff to review
20    Dr. Sukumar's report and determine whether it was        13:11:26
21    reliable?
22        A    No.
23        Q    If -- if -- if the Court were to determine that
24    Dr. Sukumar's market value analysis and conclusions was
25    not admissible, could you provide your conclusions       13:11:49
```

| | | |
|---|---|---|
| 1 | regarding reasonable royalty damages in this case? | |
| 2 |     MR. PRICE:  Objection; incomplete hypothetical. | |
| 3 |     THE WITNESS:  I -- I think you said -- | |
| 4 |     MR. PRICE:  Compound. | |
| 5 |     THE WITNESS:  -- market analysis.  Are you | 13:12:08 |
| 6 | saying his survey basically in its -- in its entirety is | |
| 7 | ruled -- | |
| 8 |     MR. HEYISON:  Oh, no. | |
| 9 |     THE WITNESS:  -- inadmissible? | |
| 10 |     MR. HEYISON:  That's a good -- good point. | 13:12:14 |
| 11 |   Q  My question is specifically -- excluded the | |
| 12 | portion of his report and opinions concerning the market | |
| 13 | value of the feature patents. | |
| 14 |   A  And it's just totally excluded? | |
| 15 |   Q  Yes. | 13:12:34 |
| 16 |   A  I think I could continue to use this analysis, | |
| 17 | but I would have to qualify some of my opinions. | |
| 18 |   Q  Okay.  And in what way would you have to | |
| 19 | qualify some of your opinions, Doctor? | |
| 20 |   A  Well, I would -- I wouldn't be able to talk | 13:12:47 |
| 21 | about consumer surplus, so I wouldn't be able to do | |
| 22 | that.  I mean, that's basically the part I couldn't do. | |
| 23 |   Q  Okay.  And if you couldn't talk about that, | |
| 24 | Dr. O'Brien, would you still feel comfortable, | |
| 25 | nevertheless, in providing your opinion regarding the | 13:13:11 |

1   A   But, you know, while we are on this thing, I --
2   I need to clarify an earlier answer.  These -- on
3   Table 5 are the numbers that Dr. Sukumar told us, "You
4   should use these numbers for the value."  I know when I
5   go to his Exhibit C, they don't line up with users who
6   answered -- or nonusers who answered, and I know they
7   are not a weighted average, so I'm trying to investigate
8   exactly what they are.  They -- they are close to those
9   numbers, but -- but not identical.
10   Q   I just need to look at Sukumar to figure out
11   what you're telling me.
12   A   Page 15 of his report.
13   Q   Okay.  Now, Dr. O'Brien, your Table 5, is -- is
14   that reproduced from any table in Doctor -- in Mr. -- I
15   don't know if -- it is -- Dr. Sukumar's report?
16   A   I couldn't find that.
17   Q   Okay.
18   A   That's why I'm trying to verify.  But I do know
19   that these are what he -- of course, he -- you know, I
20   didn't see his report before it was filed.  I, instead,
21   was working off of information he sent, and these are
22   the numbers he told us to use.
23   Like I said, they are close, so they wouldn't
24   change my opinion, but I would like to know exactly what
25   these are.

15:34:14
15:34:49
15:35:47
15:35:57
15:36:17