# EXHIBIT S

## In The Matter Of:

*APPLE, INC*
*VS.*
*SAMSUNG ELECTRONICS CO., Ltd*

―――――――――――――――――――――

*VINCENT O'BRIEN, DBA - Vol. 1*
*April 20, 2012*

―――――――――――――――――――――

## *HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY*

**MERRILL CORPORATION**
LegaLink, Inc.

179 Lincoln Street
Suite 401
Boston, MA 02110
Phone: 617.542.0039
Fax: 617.542.2119

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 29

```
          1    in place before the ITC, is -- is -- was there any part
          2    of the opinions and conclusions that you gave which is
          3    public information that you could tell me about?
          4         A    I don't know what's public.  I'm sorry.
09:37:10  5         Q    Okay.
          6         A    Yeah.
          7         Q    Okay.  So let's leave --
          8         A    I mean, my report was filed under seal, and I
          9    just don't know if anything of it is in the public
09:37:20 10    domain.
         11         Q    Okay.  So other than that HTC case that you
         12    just mentioned, are there any other cases in which you
         13    have testified for a party that was adverse to Apple?
         14         A    You know, I would have to look through the list
09:37:44 15    of cases attached to my resume, but I would -- I
         16    would -- I would be surprised if I haven't been adverse
         17    to Apple on something at some other point in time.
         18         Q    Okay.  Nothing comes to mind now, but it's
         19    possible if -- when looking through your CV, it might
09:37:58 20    refresh your recollection?
         21         A    Yeah.
         22         Q    Okay.
         23         A    I would have to do that, but, yeah.
         24         Q    Okay.  So are you an expert in marketing?
09:38:12 25              MR. PRICE:  Objection; vague.
```

Page 30

1      THE WITNESS:  Yeah, I know an awful lot about
2  marketing.  Would I hold myself out as a expert on the
3  level of a marketing professor?  No
4  BY MR. HEYISON:
09:38:26    5      Q    Okay.  And are you an expert in surveys,
6  consumer surveys?
7      A    I have done surveys, consumer surveys, in the
8  past, yes.
9      Q    Okay.  And so do you consider yourself to be an
09:38:36   10  expert in surveys?
11      MR. PRICE:  Objection; vague.
12  BY MR. HEYISON:
13      Q    Consumer surveys?
14      MR. PRICE:  Same objection.
09:38:46   15      THE WITNESS:  It would just depend upon what
16  the topic was that I was analyzing and preparing to
17  testify to.
18  BY MR. HEYISON:
19      Q    What type of consumer surveys have you done in
09:38:53   20  the past?
21      A    Well, the doctoral thesis had a consumer survey
22  in it about branch banking behavior.
23      Q    Okay.
24      A    I've done several of them that were on
09:39:06   25  industrial products where the consumers were purchasing

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 31

|        |    |                                                                     |
|--------|----|---------------------------------------------------------------------|
|           | 1  | agents.  I think I did -- I'm trying to recall.  I think |
|           | 2  | we did a very big one on the demand for |
|           | 3  | telecommunication services.  You know, I would have -- |
|           | 4  | well, I have a long career.  I would have to go back and |
| 09:39:34  | 5  | think hard to get them all. |
|           | 6  | Q   Okay.  And the -- the surveys that you did, did |
|           | 7  | you prepare the survey questions, compile the data, |
|           | 8  | analyze the data, draw conclusions from the surveys, or |
|           | 9  | did somebody else do that? |
| 09:39:53  | 10 | MR. PRICE:  Objection; compound. |
|           | 11 | THE WITNESS:  It -- it depended.  Sometimes I |
|           | 12 | did -- well, on the doctoral thesis, I did everything. |
|           | 13 | MR. HEYISON:  Yeah. |
|           | 14 | THE WITNESS:  On -- I think it was the |
| 09:40:04  | 15 | telecommunication survey I did everything but actually |
|           | 16 | do the survey.  We hired a firm that did the phone calls |
|           | 17 | and compiled the data, but then, you know, my team |
|           | 18 | analyzed the data.  And then I'd say the more recent |
|           | 19 | ones, I've taken to using somebody who that's all they |
| 09:40:26  | 20 | do, are surveys. |
|           | 21 | BY MR. HEYISON: |
|           | 22 | Q   Okay.  Like Dr. Sukumar -- |
|           | 23 | A   Yeah. |
|           | 24 | Q   -- somebody like that? |
| 09:40:31  | 25 | A   Somebody like that. |

|  |  |
|---|---|
| 1 | Q   Okay.  Are you an expert in statistics? |
| 2 | A   Yes.  In the application of statistics to |
| 3 | business problems, yes. |
| 4 | Q   Okay.  And are you an expert in patent |
| 09:40:45  5 | licensing? |
| 6 | MR. PRICE:  Objection; vague. |
| 7 | THE WITNESS:  What -- yeah, what do you mean by |
| 8 | that? |
| 9 | BY MR. HEYISON: |
| 09:40:52 10 | Q   Are you an expert in the field of parties' |
| 11 | agreements to license patents? |
| 12 | MR. PRICE:  Same objection. |
| 13 | THE WITNESS:  Yeah, I'm -- I don't quite |
| 14 | understand the question. |
| 09:41:08 15 | BY MR. HEYISON: |
| 16 | Q   Okay.  Well, let me ask you this:  Have you |
| 17 | ever negotiated a patent license? |
| 18 | A   Directly, no.  I have been involved in |
| 19 | negotiations but as a -- providing the data and the |
| 09:41:22 20 | analysis. |
| 21 | Q   And how many patent licensing negotiations have |
| 22 | you been involved in? |
| 23 | A   Oh, I'd say three or four. |
| 24 | Q   And when were those? |
| 09:41:32 25 | A   Oh, I don't know, ten years ago. |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 57

|  |  |  |
|---|---|---|
|  | 1 | feature is, and I wasn't satisfied that I was getting a |
|  | 2 | consistent answer at the time, and there was some |
|  | 3 | uncertainty about it, and so we just said, let's go get |
|  | 4 | the survey on what we know, and we do have this |
| 10:23:40 | 5 | alternative and we can use it. |
|  | 6 | Q   Okay.  So you were getting -- there were |
|  | 7 | questions asked to respondents designed to get at the -- |
|  | 8 | the issue of the value of the '055 feature; is that |
|  | 9 | correct? |
| 10:23:59 | 10 | A   No.  I don't -- those didn't get into the |
|  | 11 | survey. |
|  | 12 | Q   Okay.  But you told me that you didn't -- you |
|  | 13 | were not getting answers that you -- and I'm |
|  | 14 | paraphrasing -- you were comfortable with.  I'm |
| 10:24:14 | 15 | trying -- |
|  | 16 | A   Oh -- |
|  | 17 | Q   -- what answers -- |
|  | 18 | A   From -- |
|  | 19 | Q   -- was it that you were getting? |
| 10:24:16 | 20 | A   -- from counsel.  When we were discussing |
|  | 21 | what's the base case, with counsel and the technical |
|  | 22 | experts, we weren't getting -- it wasn't settling into |
|  | 23 | consistent base case and -- and people -- I mean, it |
|  | 24 | was -- well, anyway. |
| 10:24:35 | 25 | Q   Okay. |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 58

1   A   And -- and we just had to go with the survey,
2   so we went with it.  We had -- we had a license and so
3   we -- we went that route.
4   Q   Okay.  So if I understand it correctly, you --
10:24:48  5   you were trying to do the survey under some time
6   pressure; correct?
7   A   Correct.
8   Q   Okay.  You were working with Dr. Sukumar in
9   connection with the survey.
10:24:56  10   A   Correct.
11   Q   You were also working with counsel for Samsung
12   in connection with that; correct?
13   A   Correct.
14   Q   Okay.  And you were involved with trying to
10:25:13  15   formulate a -- formulate descriptions to use in
16   connection with the '055 patent for the survey; is that
17   correct?
18   A   Correct.
19   Q   Okay.  And if I understand you correctly, there
10:25:34  20   was difficulty in doing that because you were not
21   comfortable with the way that the -- that feature was
22   described in connection with a -- with what the base
23   case would be; is that correct?
24       MR. PRICE:  Objection; vague, misstates the
10:25:59  25   testimony.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 59

 1           THE WITNESS:  I think it is, yes.
 2      BY MR. HEYISON:
 3           Q   Okay.  And tell me what you mean by the "base
 4      case"?
10:26:08  5  A   Well, we would be -- what's often called the
 6      next-best alternative or a non-infringing alternative.
 7      That's the -- the base case you want to have.  What --
 8      what can you provide that goes toward that function of
 9      the phone but doesn't infringe the patent at issue.
10:26:30 10  Q   Okay.  And -- and why was it difficult to come
11      up with a non-infringing alternative base case for the
12      '055 world clock feature?
13           A   Well, you will have to ask counsel that.
14      What -- what all I was seeing was that was changing and
10:26:50 15 it wasn't settling down.
16           Q   Okay.  And do you remember what the various
17      iterations were?
18           A   I'm trying to think here.  No.  I mean, a lot
19      of it in the beginning went with the people -- boy, I'm
10:27:13 20 really nervous about getting into attorney-client stuff
21      here, but it went to people trying to understand the
22      patent and -- and then interpreting what that meant in
23      terms of what the phone could and could not do.  I mean,
24      that -- I mean, from my -- from my standpoint, I just
10:27:36 25 wasn't getting a clear answer, so I just went on with

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 117

```
                1        THE WITNESS:  No.
                2        MR. PRICE -- vague.
                3        MR. HEYISON:  I have to ask that again because
                4   I think you --
13:08:46        5        THE WITNESS:  Talked over each other.
                6        MR. HEYISON:  Whatever.
                7    Q   So am I correct that you've made no attempt to
                8   determine whether Dr. Sukumar's results are of
                9   sufficient accuracy?
13:09:03       10        MR. PRICE:  Objection; vague.
               11        THE WITNESS:  I've made no independent test or
               12   analysis of that question.
               13   BY MR. HEYISON:
               14    Q   Okay.  Why did you turn to Dr. Sukumar instead
13:09:25       15   of doing your own survey?
               16    A   The requirements for getting a survey admitted
               17   into evidence are very specific and -- and vigorous, and
               18   our shop doesn't have the staff to -- to, one, perform
               19   these and -- and, two, to perform them to the level that
13:09:42       20   they need to be.
               21    Q   Okay.  Do you understand how Dr. Sukumar
               22   determined usage for each of the feature patents?
               23    A   Only what's described in the -- you know, only
               24   from his report and our general descriptions.
13:10:16       25    Q   And with respect to his market value analysis,
```

Merrill Corporation - Boston

617-542-0039                                    www.merrillcorp.com/law

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 118

```
              1   do you know how Dr. Sukumar arrived at his conclusions?
              2       A   He used what's called a conjoint analysis.
              3       Q   Now, other than knowing that it's a conjoint
              4   analysis, do you understand how that methodology works?
13:10:39      5       A   Yes.
              6       Q   Okay.  And so to the best of your ability,
              7   could you describe it for me.
              8       A   Well, you're -- basically for a product with
              9   multiple features, you are asked a series of questions
13:10:57     10   that compare a base case with those different
             11   combinations of features, and from that you can extract
             12   the incremental value of any one feature.
             13       Q   Did you read Dr. Sukumar's report?
             14       A   I haven't read it, no.  I've looked it over,
13:11:13     15   but I didn't read it.
             16       Q   And so before submitting your report, you had
             17   not read Dr. Sukumar's report?
             18       A   No.  My staff has, but I have not.
             19       Q   And did you ask your staff to review
13:11:26     20   Dr. Sukumar's report and determine whether it was
             21   reliable?
             22       A   No.
             23       Q   If -- if -- if the Court were to determine that
             24   Dr. Sukumar's market value analysis and conclusions was
13:11:49     25   not admissible, could you provide your conclusions
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 119

| | | |
|---|---|---|
| | 1 | regarding reasonable royalty damages in this case? |
| | 2 | MR. PRICE: Objection; incomplete hypothetical. |
| | 3 | THE WITNESS: I -- I think you said -- |
| | 4 | MR. PRICE: Compound. |
| 13:12:08 | 5 | THE WITNESS: -- market analysis. Are you |
| | 6 | saying his survey basically in its -- in its entirety is |
| | 7 | ruled -- |
| | 8 | MR. HEYISON: Oh, no. |
| | 9 | THE WITNESS: -- inadmissible? |
| 13:12:14 | 10 | MR. HEYISON: That's a good -- good point. |
| | 11 | Q   My question is specifically -- excluded the |
| | 12 | portion of his report and opinions concerning the market |
| | 13 | value of the feature patents. |
| | 14 | A   And it's just totally excluded? |
| 13:12:34 | 15 | Q   Yes. |
| | 16 | A   I think I could continue to use this analysis, |
| | 17 | but I would have to qualify some of my opinions. |
| | 18 | Q   Okay. And in what way would you have to |
| | 19 | qualify some of your opinions, Doctor? |
| 13:12:47 | 20 | A   Well, I would -- I wouldn't be able to talk |
| | 21 | about consumer surplus, so I wouldn't be able to do |
| | 22 | that. I mean, that's basically the part I couldn't do. |
| | 23 | Q   Okay. And if you couldn't talk about that, |
| | 24 | Dr. O'Brien, would you still feel comfortable, |
| 13:13:11 | 25 | nevertheless, in providing your opinion regarding the |

Page 124

```
                1    would come through on a value survey.
                2         MR. PRICE:  Objection; vague as to time and the
                3    wording in the question.
                4    BY MR. HEYISON:
13:20:40        5    Q    Why do you assume that it would come into play
                6    on the value part of the --
                7    A    Well --
                8    Q    -- survey?
                9    A    The survey goes on to ask them that question,
13:20:51       10    so if -- if, indeed, a user that used it once didn't
               11    place a big value on it, then that would be part of the
               12    number that went in.  You know, he would say, "I don't
               13    value it very much," and the other user would say, "I
               14    value it a lot."  You put a number on it and it would go
13:21:09       15    into the average.
               16    Q    And the -- the value -- Dr. Sukumar's value
               17    calculations, however, are not a factor in your
               18    reasonable royalty damages calculation; correct?
               19    A    Well, they are in terms of telling me that
13:21:21       20    there is consumer surplus.
               21    Q    But in calculating your damages, you do not
               22    use, in your formula, Dr. Sukumar's market value
               23    calculation?
               24    A    That's correct.
13:21:34       25    Q    So when you use your percentages in calculating
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 125

|  |  |  |
|---|---|---|
|  | 1 | reasonable royalty damages, you don't know whether the |
|  | 2 | people who responded to the -- the question that they |
|  | 3 | have used the feature used it one time or a thousand |
|  | 4 | times; correct? |
| 13:21:56 | 5 | A   That's correct. |
|  | 6 | Q   Did you ask Dr. Sukumar to test frequency of |
|  | 7 | use in his survey? |
|  | 8 | A   Yes. |
|  | 9 | Q   And did he? |
| 13:22:20 | 10 | A   I believe he did. |
|  | 11 | Q   How? |
|  | 12 | A   Oh, I'm sorry.  Frequency of use? |
|  | 13 | Q   Yes.  Yes. |
|  | 14 | A   Within a user, I asked him -- I wanted to know |
| 13:22:30 | 15 | what fraction of the users -- |
|  | 16 | Q   Yes. |
|  | 17 | A   -- of the owners used the feature.  I didn't |
|  | 18 | ask him if they use the feature, how much -- how often |
|  | 19 | they use it. |
| 13:22:40 | 20 | Q   Okay.  And did you and he discuss whether that |
|  | 21 | should be included in the survey? |
|  | 22 | A   No. |
|  | 23 | Q   Okay.  Now, would you agree that Dr. Sukumar's |
|  | 24 | survey question on usage does not tell us anything about |
| 13:23:05 | 25 | the recency of the use by the respondent? |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VINCENT O'BRIEN, DBA - 4/20/2012

Page 126

```
          1        A    By "recency," you mean how recently did they
          2   use it?
          3        Q    Yes.
          4        A    No, it does not.
13:23:17  5        Q    So given the phrasing of Dr. Sukumar's
          6   question, somebody might answer "yes" who used the
          7   feature in the last hour, and another person might
          8   answer "yes" and they haven't used the feature in a
          9   year; correct?
13:23:35 10             MR. PRICE:  Objection; speculation, foundation.
         11             THE WITNESS:  I mean, yeah, it -- conceivable.
         12   I don't know whether that, indeed, is the case.
         13   BY MR. HEYISON:
         14        Q    Did -- did you ask Dr. Sukumar to include
13:23:51 15   anything in the survey concerning recency of use?
         16        A    Oh, I thought you were still formulating your
         17   question.
         18        Q    No.  I -- use?
         19        A    I thought we -- I thought we just covered that.
13:24:13 20   Did I -- I must be misunderstanding your question.
         21        Q    No.  I asked you the question based on
         22   frequency, and now I'm asking:  Did you ask him to
         23   include anything in the survey --
         24        A    Oh --
13:24:23 25        Q    -- on recency of use?
```