# EXHIBIT 3

SUBJECT TO PROTECTIVE ORDER -- HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>      Plaintiff,<br><br>  vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>      Defendants.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>      Counterclaim-Plaintiffs,<br><br>  v.<br><br>APPLE INC., a California corporation,<br><br>      Counterclaim-Defendant. | Civil Action No. 11-CV-01846-LHK |

# Expert Report of Dr. Janusz A. Ordover

**March 22, 2012**

market need not be perfect substitutes for each other. However, they need to be good enough substitutes so that they would be considered as reasonably interchangeable by the members of the SSO for inclusion in the standard.

82.     As a final point, I want to emphasize that the market definition step is not an end in itself. Rather, it provides a useful starting point for the assessment of the competitive constraints operating on a firm (or a group of firms). In the instant case, the relevance of this step to the competitive assessment of Samsung's conduct is further reduced by virtue of the fact that once Samsung's (or any firm's) IP has turned into a declared SEP, the set of *ex post* constraints generally shrinks to zero.

83.     In defining the technology markets implicated in this litigation, I fully rely on Apple's technical experts for my description of the technology and the alternatives available before the standard was set. I profess no technical or other expertise that would enable me to independently assess the experts' findings. I summarize them here for the sake of completeness.

### 1.     *Scrambling Code Technology*

84.     A handset or other wireless device that communicates using cellular technology may simultaneously receive signals from multiple base stations as well as multiple signals from a single base station, and must have a way of distinguishing these signals from one another. Cellular systems use scrambling code technology to achieve that objective.[70]

85.     Samsung's declared standard-essential '867 patent proposes a particular technique for generating and utilizing scrambling codes. One alternative for generating the set of primary and secondary codes would have been a proposal submitted by Ericsson to TSG-

---

[70]    Expert Report of Dr. Wayne Stark Regarding Invalidity of U.S. Patent No. 7,362,867, *Apple Inc. v. Samsung Electronics Co., Ltd., et al.*, Civil Action No. 11-CV-01846-LHK, March 22, 2012 (hereinafter, *Stark '867 Expert Report*),§ IX.A.

**SUBJECT TO PROTECTIVE ORDER -- HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY**

92.     The UMTS standard for transport channel multiplexing was adopted by 3GPP in October 1999.  Prior to the setting of the standard, the market for transport channel multiplexing technologies comprised Samsung's technology embodied in the '001 patent, the various alternatives described above, and any other reasonable alternatives that could have been implemented at a similar cost.

> 4.     *Rate Matching Technology*

93.     Wireless communications networks use turbo-encoding to produce redundant data streams and therefore minimize transmission errors (because the redundant data can be substituted for data that is lost).  Due to restrictions in the amount of bandwidth available for transmission, some of the redundant data sometimes needs to be identified and removed from the transmission.  This can be achieved using rate matching technology.[78]

94.     Samsung's declared standard-essential patent '410 proposes a particular technique for rate matching.  Dr. Hamkins has identified an alternative to Samsung's proposal that could have been implemented "without loss of performance or increased cost."[79]

95.     The UMTS standard for rate matching was adopted by 3GPP in October 1999.  Prior to the setting of the standard, the market for rate matching technologies comprised Samsung's technology embodied in the '410 patent, the alternative described by Dr. Hamkins, and any other reasonable alternatives that could have been implemented at a similar cost.

> 5.     *Interleaving Technology*

96.     Interleaving is a means of minimizing transmission errors by shuffling and reassembling bits of data.[80]

---

[78]     Expert Report of Dr. Jon Hamkins Regarding Invalidity of U.S. Patent No. 7,050,410, *Apple Inc. v. Samsung Electronics Co., Ltd., et al.*, Civil Action No. 11-CV-01846-LHK, March 22, 2012 (hereinafter, *Hamkins '410 Expert Report*), § VIII.4.

[79]     *Hamkins '410 Expert Report*, §XVI.

97. Samsung's declared standard-essential patent '792 proposes a particular technique for interleaving that uses two interleavers. Professor Gitlin describes several alternatives that the Working Group could have implemented instead of the Samsung method; these alternatives would have been equivalent in terms of ease of implement and performance.[81]

98. The UMTS standard for interleaving was adopted by 3GPP in June 2002. Prior to the setting of the standard, the market for interleaving technologies comprised Samsung's technology embodied in the '792 patent, the alternatives described by Professor Gitlin, and any other reasonable alternatives that could have been implemented at a similar cost.

### 6.    *Power Control Scaling Technology*

99. To avoid causing interference with other networks or devices, wireless communications devices have maximum power thresholds that they cannot exceed. Power control technology allows a network to control the power level of devices so that they stay below a maximum power threshold across all the voice and data channels over which a device transmits information. Power control scaling refers to further reductions by a device to stay below a threshold.[82]

100. Samsung's declared standard-essential patent '516 proposes a particular technique for power control scaling that reduces power on just one type of channel to stay under the threshold, rather than reducing power across all channels equally. Dr. Kim has identified at least two alternative techniques that could have been implemented by the Working Group, neither of which would have added any complexity to the standard.[83]

---

[80]   *Gitlin '604 and '792 Expert Report*, §§ VIII.B and IX.H.2.

[81]   *Gitlin '604 and '792 Expert Report*, § XXI.

[82]   Expert Report of Dr. Hyong S. Kim Regarding Invalidity of U.S. Patent No. 7,447,516, *Apple Inc. v. Samsung Electronics Co., Ltd., et al.*, Civil Action No. 11-CV-01846-LHK, March 22, 2012 (hereinafter, *Kim '516 Expert Report*), § VI.B.

[83]   *Kim '516 Expert Report*, §XI.

101. The UMTS standard for power control scaling was adopted by 3GPP in June 2005. Prior to the setting of the standard, the market for power control technologies comprised Samsung's technology embodied in the '516 patent, the alternative technologies described by Dr. Kim, and any other reasonable alternatives that could have been implemented at a similar cost.

### 7. Voice-over-Internet-Protocol (VOIP) Header Technology

102. Blocks or frames of data may be broken into smaller pieces for transmission and then must be reassembled. The header portion of the transmission contains certain information used in understanding the content of the transmission and in reassembling the pieces. VoIP Header Technology allows a network to treat the header information for VoIP transmissions differently from the header information of other types of transmissions in order to improve the handling of VoIP transmissions.[84]

103. Samsung's declared standard-essential patent '941 proposes a particular technique for handling VoIP headers. Dr. Knightly concludes that there would have been alternatives to using the Samsung technology, including the option of leaving the feature out altogether, which would have reduced the complexity of the standard.[85]

104. The VoIP Header standard was adopted by 3GPP in June 2005. Prior to the setting of the standard, the market for header technologies comprised Samsung's technology embodied in the '941 patent, the alternatives described by Dr. Knightly (including omitting the feature), and any other reasonable alternatives that could have been implemented at a similar cost.

---

[84] Expert Report of Dr. Edward W. Knightly Regarding U.S. Patent No. 7,675,941, *Apple Inc. v. Samsung Electronics Co., Ltd., et al.*, Civil Action No. 11-CV-01846-LHK, March 22, 2012 (hereinafter, *Knightly '941 Expert Report*), § V.

[85] *Knightly '941 Opening Report*, § VIII.

*8.     Summary*

105. As the preceding paragraphs indicate, I have assumed, based on the expert reports that I reference, that, before 3GPP standardized the technologies that Samsung claims are covered by its patents, there were close substitutes for each. As a result, there are seven separate relevant technology markets consisting of each of the seven technologies that Samsung claims are covered by its patents and the technologies that were close substitutes for them. In addition, had 3GPP understood that Samsung had IP that it considered essential to the proposed standard and would refuse to license on FRAND terms its declared SEPs, 3GPP could have sought other alternatives to the Samsung technologies. Thus, but for Samsung's conduct, there may have been additional alternative technologies available for each of the Samsung claimed SEPs, and thus each of the relevant technology markets might have included even more competing technologies.[86] Finally, because technologies that were or could have been alternatives for the technologies that Samsung claims are covered by its patents could be sourced from various locations around the world, the relevant technology markets are global in geographic scope.

B.     **MONOPOLY POWER**

106. The approach to determining whether a firm has monopoly power[87] has to be adapted to the particular circumstances of the case. In this matter, there are two relevant

---

[86] I understand that if the owner of a preferred technology will not commit to license its patents on FRAND terms, ETSI's policy requires it to seek to identify an alternative technology that complies with ETSI's requirements or to eliminate the feature. (*ETSI IPR Policy*, Section 8.1.1.)

[87] Many firms in many markets have what economists call "market power," meaning simply that a firm can charge a price above a benchmark competitive level without losing all of its sales: basically, this means that the firm is not facing a perfectly elastic demand for its product or service. "Monopoly power" typically connotes a substantial amount of market power and is defined as a firm's ability to raise the price of a good or service significantly above the competitive level for a sustained period of time.

**SUBJECT TO PROTECTIVE ORDER -- HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY**

injunctive relief, also has the potential to impose anticompetitive harm on downstream consumers through the elevation of prices, the dampening of incentives to innovate, and the deterrence of entry. Samsung's behavior also has harmed Apple already through the imposition of litigation costs, and has the potential to harm Apple and other UMTS implementers in the future.

*[signature]*                                                                 March 22, 2012

_____                    _____

Janusz A. Ordover                                                                  Date