# EXHIBIT 10

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

```
 1   UNITED STATES INTERNATIONAL TRADE COMMISSION
 2                  WASHINGTON, D.C.
 3            Investigation No. 337-TA-794
 4         DEPOSITION OF DR. MICHAEL WALKER
 5    In the Matter of:                            )
 6    CERTAIN ELECTRONIC DEVICES, INCLUDING        )
 7    WIRELESS COMMUNICATION DEVICES,              )
 8    PORTABLE MUSIC AND DATA PROCESSING           )
 9    DEVICES, AND TABLET COMPUTERS                )
10                      and
11       IN THE UNITED STATES DISTRICT COURT
12           NORTHERN DISTRICT OF CALIFORNIA
13    SAN JOSE DIVISION - Case No. 11-CV-01846-LHK
14     CONTAINS CONFIDENTIAL BUSINESS INFORMATION
15    APPLE, INC., a California Corporation, )
16               Plaintiff                   )
17    vs.                                    )
18    SAMSUNG ELECTRONICS CO., LTD., a       )
19    Korean business entity; SAMSUNG        )
20    ELECTRONICS AMERICA, INC., a New York  )
21    corporation; SAMSUNG TELECOMMUNICATIONS)
22    AMERICA, LLC, a Delaware limited       )
23    liability company,                     )
24               Defendants.                 )
25    Job Number: 48553
```

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

1   UNITED STATES INTERNATIONAL TRADE COMMISSION
2                  WASHINGTON, D.C.
3              Investigation No. 337-TA-794
4                         ***
5       In the Matter of:                         )
6       CERTAIN ELECTRONIC DEVICES, INCLUDING     )
7       WIRELESS COMMUNICATION DEVICES,           )
8       PORTABLE MUSIC AND DATA PROCESSING        )
9       DEVICES, AND TABLET COMPUTERS             )
10
11
12      CONTAINS CONFIDENTIAL BUSINESS INFORMATION
13    HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
14                  ATTORNEYS' EYES ONLY
15
16           DEPOSITION OF DR. MICHAEL WALKER
17                   Washington, D.C.
18                     May 2, 2012
19
20
21
22
23
24     Reported by:  Mary Ann Payonk, RDR-CRR
25     Job No. 48553

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

```
 1
 2
 3
 4              May 2, 2012
 5              9:12 a.m.
 6
 7      Deposition of DR. MICHAEL WALKER, held
 8  at the offices of Quinn Emanuel, 1299
 9  Pennsylvania Avenue, N.W., Washington, D.C.,
10  pursuant to Notice before Mary Ann Payonk,
11  Certified Realtime Reporter and notary public
12  of the District of Columbia.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 4

```
 1    APPEARANCES:
 2    ON BEHALF OF SAMSUNG:
 3         ROBERT S. ROGOYSKI, ESQUIRE
 4         THOMAS D. PEASE, ESQUIRE
 5         QUINN EMANUEL URQUHART & SULLIVAN
 6         51 Madison Avenue
 7         New York, NY 10010
 8
 9    ON BEHALF OF APPLE and THE WITNESS:
10         TIMOTHY D. SYRETT, ESQUIRE
11         WILMERHALE
12         60 State Street
13         Boston, MA 02109
14
15    ALSO PRESENT:
16         Jasmine Rice, Legal Video Specialist
17
18
19
20
21
22
23
24
25
```

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 14

1  Doctor, but Mr. Ordover (ph)?
2       A.   No, I haven't spoken to him.
3       Q.   I take it none of the Apple experts
4  who have been retained to comment on the
5  technical aspects of the patent issues in these
6  suits; is that right?
7       A.   I have not spoken to anyone from
8  Apple, yeah, or retained by Apple.
9       Q.   Okay.
10      A.   No one has contacted me.
11      Q.   Now, did you review -- in preparing
12 these reports, did you review any expert
13 reports submitted on behalf of Samsung?
14      A.   Yes, I have received recently the
15 report from Rosenbrock, and I read that -- I
16 wouldn't say I reviewed it thoroughly, but I
17 did read it -- some depositions that have been
18 made, one sometime ago by Mr. Lee, I believe,
19 from Samsung.
20      Q.   Young-Hwan Lee?
21      A.   Yes, and also the deposition made by
22 Rosenbrock.  But I received that very recently,
23 so I'm afraid I think I got to page
24 290-something and stopped.
25      Q.   And when you say you reviewed the

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 15

1  reports by Mr. Rosenbrock, you're referring to
2  the expert reports you submitted in the U.S.
3  actions?
4     A.  The expert report -- I have -- the
5  expert report that -- whether it's called an
6  expert -- yeah, which was challenging some of
7  the statements I had made in my report.  And
8  also I had a look at the report that he wrote
9  in the case of Samsung versus Ericsson.
10         But, as I say, I looked at them.  I
11 wouldn't say that I studied them in huge
12 detail.
13    Q.  And have you formed any new opinions
14 based on what you read in the reports of
15 Mr. Rosenbrock in this case as well as the
16 Samsung/Ericsson case?
17    A.  Not in terms of what I stated here.
18 I wouldn't change my view substantially.
19    Q.  Now, are your opinions in any way
20 contingent upon the opinions of other witnesses
21 or information provided by other witnesses?
22    A.  No, they're not.
23    Q.  Now, what do you consider yourself an
24 expert in generally, for the purposes of this
25 case, obviously?

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 313

1   favor of a cap.
2        Q.   So ETSI explicitly rejected that
3   proposal?
4        A.   Yes.  It didn't embody that proposal
5   in any of its -- its policies.  That doesn't
6   mean it's wrong, I just think it's very
7   difficult for a standard organization to get
8   down to that level of detail when it comes to
9   licensing.
10       (M. Walker Exhibit No. 25 was marked for
11       identification.)
12  BY MR. PEASE:
13       Q.   I'll hand you what's been marked as
14  Walker Exhibit 25, a document bearing
15  production numbers S-ITC-003360813 through
16  60839.
17            Have you seen this before, sir?
18       A.   Thank you very much.  No, I have not.
19       Q.   Is this an article entitled "Is the
20  Patent Ambush Prerequisite Met?  Assessing of
21  the Extent of Ex Ante IPR Disclosure within
22  Standard Setting"?
23       A.   That's correct, yes.
24       Q.   It's authored by Anne Layne-Farrar?
25       A.   Correct.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 314

1      Q.   Do you know her?
2      A.   No, I do not.
3      Q.   And this article was published
4   August 18, 2011; is that right?
5      A.   That's correct.  That's the date on
6   the front, so I think it's the publication
7   date.
8      Q.   And at that point, you were still
9   chairman of the board of ETSI?
10     A.   18th of August 2011, I was, yes.
11     Q.   In fact, that's about three months
12  before ETSI released the latest version of the
13  ETSI IPR Policy and Guide to IPRs?
14     A.   Yes.  That does appear to be the
15  case, yes.
16     Q.   So you've not seen this article or
17  heard about it?
18     A.   No, I haven't.
19     Q.   Well, you understand -- and I'll
20  refer you to maybe the third line of the
21  abstract -- that this article grew out of
22  certain testimony that Ms. Layne-Farrar gave to
23  the U.S. Federal Trade Commission on June 21,
24  2011?
25     A.   Yes, I can -- I've read that, yes.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 315

1      Q.   So in this article, the author
2  reports that she went through ETSI's publicly
3  available database and comprehensively analyzed
4  the IPR disclosures that had been made by ETSI
5  members.
6      A.   I haven't got to that bit in the --
7  where does that say that?
8      Q.   Let's see.  If you look to page 5, in
9  the middle, there's a paragraph that says "The
10 remainder of this paper."
11          But maybe I'll give you some
12 background information first, since you haven't
13 seen this before.
14     A.   Yeah, that would be -- that would
15 be --
16     Q.   It appears to me -- and I think you
17 can confirm this on paragraph -- on page 5 as
18 well -- that Ms. Layne-Farrar was examining the
19 question of whether what she calls ex ante IPR
20 disclosure within standard-setting context is
21 actually the general rule or not.  Do you know
22 what I mean by -- or what she means by "ex
23 ante" in that context?
24     A.   No.  Could you explain?
25     Q.   Yeah.  She explains it down below.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 316

1   And she says, "While it is impossible to
2   precisely define the demarcation line between
3   ex ante and ex post," essentially before and
4   after, with respect to a standard, she said,
5   "analysis using a reasonable definition for
6   that dividing line indicates that the majority
7   of the official IPR disclosures at ETSI have
8   been made ex post."
9          And I think she bases that on -- see
10  if we can find it.
11     A.   So after the event.
12     Q.   The public -- yeah, but the -- the
13  demarcation line -- this is on page 8 -- is the
14  publication date for a standard component
15  specification.  So it's not necessarily the
16  freeze date but, rather, the later publication
17  date for standard.
18          Do you understand that?
19     A.   Uh-huh, yes.
20          MR. SYRETT:  I'll just note my
21     objection that you're -- you're
22     purporting to summarize a document that
23     he has testified he hasn't seen.  It's a
24     27-page article.
25     Q.   You can look it over as much as you

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 317

1  like as we go through this.
2       A.   It would take me more than a few
3  minutes, though, to read it properly.
4       Q.   I'll tell you, this is all, in my
5  view, just foundation.  Let me ask you about
6  certain things she reports and get your
7  reaction to it.
8            I'm not expecting you to master this
9  or say you agree or disagree with the general
10 applicability of the article if you haven't
11 read it.
12           So if you turn to page 17, and
13 there's a table at the top there, declarations
14 and entries made by ex ante and ex post by
15 standard.  And so you see she divides it
16 between projects, 2G, 2 1/2G, 3G and 4G.
17           Do you see that?
18      A.   Yes, I do.
19      Q.   And so the UMTS standard is a 3G
20 standard?
21      A.   Yes, that's correct.
22      Q.   And do you see that she concludes
23 that 17 percent of the IPR disclosures to ETSI
24 were made ex ante, before the standard was
25 published, and 83 percent were made ex post, or

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 318

1   after the standard was published?
2           MR. SYRETT:  Objection.
3       A.   Could I get some clarity, though?
4   What does that mean?  Is that the -- the final
5   published standard -- patent?  Which, of course
6   will take some time.  Or was that the time at
7   which the owner of the IPR declared that it
8   believed that IPR would become essential and it
9   had made an application?  What's it referring
10  to?
11      Q.   It's my understanding that it's the
12  IPR declaration compared to the date when the
13  proposal correlating to that declaration was
14  published.
15      A.   So if I read that correctly, what
16  you're saying, that she is claiming that
17  83 percent of all the IPR that reads onto 3G
18  was declared after the standard was complete.
19      Q.   Correct, my understanding.
20      A.   That's your understanding of this.
21      Q.   Is that your -- based on your
22  familiarity with ETSI and -- and the
23  disclosures made at ETSI, does that comport
24  with your understanding of the timeliness of
25  the disclosures at ETSI?

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 319

1        MR. SYRETT:  Objection.
2    A.   I'm rather surprised by that figure.
3 I would want to look into that figure.
4    Q.   But as of today, you haven't looked
5 into that?
6    A.   No, no.  As I said, I have not seen
7 this figure, and I have not explicitly looked
8 into the disclosures at all, as we discussed
9 when we looked at the Ansgar Bergman paper.  I
10 suppose the good point is that the disclosure
11 delays have been falling over time.
12    Q.   Are you looking at table 9?
13    A.   I'm looking at the statement in
14 table 5, underneath table 5.
15    Q.   Along the same lines, I'll direct you
16 to table 9.
17    A.   That's all right.  It was just a
18 remark on what I happened to have seen.
19    Q.   It's interesting.  The mean, delay in
20 years hits 5.13 years in 2001, goes down to
21 4.52 years in 2002, 4.59 years in 2003, before
22 dropping down to about a year after 2004, and
23 it continues to decline going forward.
24        I mean, do you have a sense, based on
25 your involvement at ETSI, that people have

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 320

1  become much better about disclosing IPR early
2  within the last few years than they were, for
3  example, in the 1997 to 2003 time frame?
4          MR. SYRETT:  Objection.
5      A.  I have not had a sense of that
6  happening.  I have not had a sense that it was
7  ever a problem in the sense that people were
8  deliberately, or otherwise, not disclosing,
9  when they could disclose.
10     Q.  Assuming she's right -- and I realize
11 you haven't verified it.  If she were right
12 that the delays in the time frame for 1997
13 through 2003 range from 2.43 in 1997 to an
14 average delay of 4.59 in 2003, that wouldn't
15 change your view that it was not perceived that
16 timely disclosure was a problem at ETSI during
17 that time frame; right?
18     A.  It wouldn't change my view that it
19 had never been raised that timely disclosure
20 was a problem.  I have no evidence that it was
21 raised.
22     Q.  In other words, even if people on
23 average were delaying between 2, 3, 4, even 5
24 years before disclosing IPR, that was not
25 recognized as a problem at ETSI at any time

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 321

1   between 1997 and 2003; is that right?
2        A.   If it was recognized as a problem,
3   then I was not aware that it was being
4   recognized as a problem.  But we're talking
5   about between 2000 and 2003?
6        Q.   1997 and 2003 was the last question.
7        A.   Yeah, yeah.  During that period, I
8   was not very engaged with ETSI.  I took over
9   looking after Vodafone's application for
10  Spectrum licenses in the -- late '99 and -- and
11  minimized the amount of work I did for ETSI
12  from that moment on until I became chairman of
13  the board because I had too much -- a larger
14  responsibility within Vodafone.
15       Q.   Now --
16       A.   But I had no reports from people that
17  worked -- worked for me in their capacity as
18  their looking after our interest in standards,
19  so there was a problem.
20       Q.   Let me just direct you quickly to
21  paragraph 29 of Exhibit 1.  We're running out
22  of time on the tape, so I want to finish up
23  very quickly.
24       A.   I'm sorry, paragraph 29 of --
25       Q.   Your first report, the California

CONTAINS CONFIDENTIAL BUSINESS INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 329

1        EXAMINATION
2   BY MR. PEASE:
3        Q.   Just one follow-up question.
4             If you were to seek out the prices of
5   the iPod Touch and the iPhone, you could easily
6   find that information online; isn't that
7   correct?
8        A.   I believe that is the case, yes.
9             MR. PEASE:  No further questions.
10            THE VIDEOGRAPHER:  Off the record
11  at 6:07 p.m.
12
13       (Deposition adjourned at 6:07 p.m.)
14
15            _____M Walker_____
16                DR. MICHAEL WALKER
17  SUBSCRIBED AND SWORN TO BEFORE ME
18  THIS  30th  DAY OF  May       , 2012.
19  _____
20  (Notary Public)
21  My Commission expires: _____
22
23
24
25