# EXHIBIT 4

# In The Matter Of:

*APPLE INC., et al.*

*v.*

*SAMSUNG ELECTRONICS CO., LTD., et al.*

---

*KARAN SINGH- Vol. 2*

*April 27, 2012*

---

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

**MERRILL CORPORATION**

LegaLink, Inc.

179 Lincoln Street
Suite 401
Boston, MA 02110
Phone: 617.542.0039
Fax: 617.542.2119

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
KARAN SINGH - 4/27/2012

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

--oOo--

```
APPLE INC. a California      )
corporation,                 )
                             )
            Plaintiff,       )
                             )
     vs.                     ) 11-cv-01846-LHK
                             )
SAMSUNG ELECTRONICS CO.,     )
LTD., a Korean corporation;  )
SAMSUNG ELECTRONICS AMERICA, )
INC., a New York corporation;)
and SAMSUNG TELECOMMUNICATIONS)
AMERICA, LLC, a Delaware     )
limited liability company,   )
                             )
            Defendants.      )
_____)
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEPOSITION OF

KARAN SINGH

_____

APRIL 27, 2012

VOLUME II

(Pages 286 - 367)

REPORTED BY:  SARAH LUCIA BRANN, CSR 3887

Page 287

I N D E X
INDEX OF EXAMINATIONS
                                              Page
EXAMINATION BY MR. BRIGGS ................... 290


        EXHIBITS MARKED FOR IDENTIFICATION
No.         Description              Page
Exhibit 8  United States Patent .............   291
           Number 7,844,915













                --oOo--

Page 288

```
                    --oOo--
        Deposition of KARAN SINGH, taken by the
Defendant, at 555 Twin Dolphin Drive, Suite 500,
Redwood Shores, California, commencing at 9:39 a.m.,
on April 27, 2012, before SARAH LUCIA BRANN, CSR,
pursuant to Notice.
                    --oOo--
            A P P E A R A N C E S
FOR PLAINTIFF AND COUNTERCLAIM DEFENDANT APPLE INC.
    MORRISON & FOERSTER LLP
    425 Market Street
    San Francisco, California 94105-2482
    415.268.7000
    By:  ANDREW E. MONACH, Attorney at Law
         amonach@mofo.com
    By:  MARK MELAHN, Attorney at Law
         mmelahn@mofo.com

FOR DEFENDANT AND COUNTERCLAIM PLAINTIFF SAMSUNG:

    QUINN EMANUEL URQUHART & SULLIVAN LLP
    555 Twin Dolphin Drive
    Redwood Shores, California 94065
    650.801.5000
    By:  TODD M. BRIGGS, Attorney at Law
         toddbriggs@quinnemanuel.com
    QUINN EMANUEL URQUHART & SULLIVAN LLP
    51 Madison Avenue, #22
    New York, New York 10010
    212.849.700
    By:  GUY EDDON, Attorney at Law
         guyeddon@quinnemanuel.com

ALSO PRESENT:
    JEFREE ANDERSON, Videographer, Merrill
                    --oOo--
```

Page 289

            REDWOOD SHORES, CALIFORNIA; FRIDAY, APRIL 27, 2012
                        9:39 A.M.
                        --oOo--
08:09:09        P R O C E E D I N G S
09:39:03        THE VIDEOGRAPHER:  Here begins Volume II,
09:39:05  Videotape Number 1, in the deposition of Karan
09:39:07  Singh.  Today's date is April 27, 2012.  The time on
09:39:11  the video monitor is 9:39 a.m.  The court reporter
09:39:16  today is Sarah Brann of -- employed by Merrill Court
09:39:22  Reporting, San Francisco, California.
09:39:24        Counsel, please voice identify yourselves
09:39:26  and state whom you represent.
09:39:28        MR. BRIGGS:  Todd Briggs from Quinn
09:39:30  Emanuel, representing Samsung.
09:39:34        MR. EDDON:  Guy Eddon from Quinn Emanuel,
09:39:36  representing Samsung.
09:39:37        MR. MONACH:  Andrew Monach from Morrison &
09:39:38  Foerster, representing Apple and the witness.
09:39:42        MR. MELAHN:  Mark Melahn from Morrison &
09:39:44  Foerster representing Apple.
09:39:46        THE VIDEOGRAPHER:  Please begin.
09:39:47            KARAN SINGH
09:39:47        _____
09:39:47  called as a witness, who, having been previously
09:39:47  duly sworn, was examined and testified as follows:

Page 290

09:39:47   1         EXAMINATION BY MR. BRIGGS
09:39:47   2         MR. BRIGGS:  Q.  Dr. Singh, did you
09:39:48   3  discuss your testimony from yesterday with counsel
09:39:50   4  after the deposition?
09:39:52   5         MR. MONACH:  I'll instruct the witness not
09:39:53   6  to answer.
09:40:02   7         I'm instructing you not to answer.
09:40:03   8         MR. BRIGGS:  Q.  I am not asking for any
09:40:06   9  substance or communications.  I just want to know if
09:40:08  10  you discussed your testimony from yesterday with
09:40:11  11  counsel after the deposition.
09:40:12  12         MR. MONACH:  And I am instructing him not
09:40:14  13  to answer, because the question contains subject
09:40:17  14  matter.
09:40:18  15         MR. BRIGGS:  I am not asking for -- I am
09:40:20  16  just -- it's a yes-or-no question.  Did you discuss?
09:40:24  17         MR. MONACH:  And I'm instructing the
09:40:25  18  witness not to answer, based on Rule 26, work
09:40:28  19  product, et cetera.
09:40:31  20         MR. BRIGGS:  Q.  Are you going to follow
09:40:32  21  that instruction?
09:40:34  22         A.  I'm -- I'm not -- I'm not -- I don't know
09:40:39  23  the exact procedure in this -- in this scenario, but
09:40:45  24  I'm -- I -- under clear sort of indication like that
09:40:52  25  from counsel, without any further understanding of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
KARAN SINGH - 4/27/2012

Page 307

```
10:09:08  1   operation on a touch screen?
10:09:21  2       A.  I think that you would probably need to --
10:09:23  3   you would need to provide more context on -- on
10:09:33  4   what -- what constituted distinguishing.
10:09:35  5       Q.  Did Apple invent distinguishing between a
10:09:39  6   single input point and multiple input points on a
10:09:43  7   touch screen?
10:09:48  8       A.  Simply distinguishing them?  I couldn't
10:09:51  9   say.
10:09:53 10       Q.  Let's turn to claim 1 of the '915 patent.
10:10:18 11       A.  Yes.
10:10:20 12       Q.  The first limitation, or the first element
10:10:22 13   of claim 1 requires a touch-sensitive display that
10:10:31 14   is integrated with the device.  What does that mean
10:10:33 15   to a person of ordinary skill in the art?
10:10:53 16       A.  I believe that a person of ordinary skill
10:10:55 17   in the art would understand that the entity that was
10:11:04 18   receiving and -- receiving touch input and the
10:11:09 19   entity that was -- that was responsible for the --
10:11:13 20   that was responsible for the display were an
10:11:19 21   integrated unit.
10:11:26 22       Q.  What do you mean by an integrated unit?
10:11:42 23       A.  Well, one -- one way of talking about it
10:11:44 24   would be to say that they were part of the same
10:11:46 25   physical housing.
```

Page 308

```
10:11:48  1       Q.  Are there other ways to talk about it?
10:11:54  2       A.  Well, at least that.
10:12:04  3       Q.  So, it's at least the same physical
10:12:07  4   housing.
10:12:08  5       A.  Mm-hmm.
10:12:10  6       Q.  What more could it be than that?
10:12:31  7       A.  Well, let's just say that, for starters.
10:12:34  8       Q.  Okay.  So your definition of integrated is
10:12:38  9   same physical housing in the context of the claims
10:12:41 10   of the '915 patent; is that correct?
10:12:56 11       A.  Well, essentially -- I mean, there are
10:13:04 12   sort of examples -- essentially that the components
10:13:10 13   were -- yes, were together.  The various components
10:13:14 14   were together in a single -- yeah, in a single
10:13:18 15   integrated device, in a single integrated housing.
10:13:32 16       Q.  What in the claims or the specification or
10:13:36 17   the prosecution history for the '915 patent supports
10:13:42 18   that definition of integrated?
10:13:53 19       A.  I just believe that that's how a person of
10:13:55 20   ordinary skill in the art would understand it.
10:13:57 21   There may be -- there may be certain other --
10:14:01 22   other -- you know, I mean, there are examples of --
10:14:05 23   of such devices shown in the specification.  And
10:14:15 24   there -- there could be additional support for the
10:14:19 25   second.  I can go through the patent, if you like,
```

Page 309

```
10:14:22  1   to find...
10:14:24  2       Q.  Just sitting here today, are you aware of
10:14:26  3   any definitions of integrated within the
10:14:28  4   specification or the prosecution history for the
10:14:30  5   '915 patent?
10:14:36  6       A.  Well, there -- you know, as I pointed
10:14:39  7   to -- I can point to -- there are examples in the
10:14:41  8   figures.  But I believe -- yeah, I believe there are
10:14:47  9   potentially other examples in the specification as
10:14:49 10   well.  I seem to vaguely recall that.  I could go
10:15:00 11   through it, if you like.
10:15:12 12       Q.  Could integrated mean connected to?
10:15:17 13       MR. MONACH:  Object to the form of the
10:15:18 14   question.
10:15:20 15       THE WITNESS:  Connected to?  Well, usually
10:15:30 16   if you want something to mean connected to, you
10:15:35 17   would just say connected to, is what -- in my
10:15:38 18   understanding a person of ordinary skill in the art
10:15:42 19   would use the term connected to usually to refer
10:15:45 20   to -- yeah.  But again, you know, in -- it could,
10:15:53 21   or -- it depends on the context.  It depends on
10:15:56 22   how -- what examples are suggested or provided.
10:16:07 23       MR. BRIGGS:  Q.  The next limitation in
10:16:09 24   claim 1 has a term "event object."  Do you see that?
10:16:20 25       A.  Yes.
```

Page 310

```
10:16:21  1       Q.  What is an object in the context of claim
10:16:27  2   1?
10:16:30  3       A.  What an object, as -- in the context of
10:16:35  4   this patent and as a person of ordinary skill in the
10:16:43  5   art would understand is it's a programming construct
10:16:46  6   that -- that encapsulates some information and
10:16:54  7   functionality in a general setting.
10:16:57  8       Q.  So it has two components, information and
10:17:03  9   functionality?
10:17:05 10       A.  Not -- not necessarily.  I mean, it could
10:17:09 11   have.  It -- it could have one.  It could have the
10:17:15 12   other.  It could possibly have both.
10:17:28 13       Q.  Now, in your opinion, does object refer or
10:17:33 14   is it connected in some way to the idea of
10:17:35 15   object-oriented programming?
10:17:37 16       A.  Yes, I believe so.
10:17:40 17       Q.  So would you say that the claims of the
10:17:43 18   '915 patent are limited to, or they would only read
10:17:48 19   on systems that use object-oriented programming?
10:18:05 20       A.  Yes, I -- you could say that.
10:18:10 21       Q.  What other type of programming is there
10:18:12 22   other than object-oriented programming?  What would
10:18:16 23   you call that?
10:18:19 24       A.  Procedural programming, logical
10:18:22 25   programming.  There's -- there are a number of
```

7 (Pages 307 to 310)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
KARAN SINGH - 4/27/2012

Page 343

```
11:20:05  1       Q.  So let's assume that there are no such
11:20:07  2   methods in the motion event object.  If that is
11:20:10  3   true, and if Mr. Gray's construction for invoke were
11:20:18  4   accepted by the court, would you agree that claim 1
11:20:24  5   of the '915 patent is not literally infringed by
11:20:28  6   Samsung's products?
11:20:30  7       MR. MONACH:  Objection.  Vague.
11:20:32  8       THE WITNESS:  I would need to look at the
11:20:33  9   trace again carefully to answer this question
11:20:36 10   conclusively.
11:20:39 11       MR. BRIGGS:  Q.  But based on my
11:20:40 12   hypothetical, how would you answer the question?
11:20:43 13       MR. MONACH:  Same objection.
11:20:43 14       THE WITNESS:  Well, on the hypothetical, I
11:20:50 15   would answer the question hypothetically.
11:20:53 16       MR. BRIGGS:  Q.  What's your hypothetical
11:20:54 17   answer?
11:20:55 18       A.  Maybe.
11:20:57 19       Q.  Maybe no literal infringement?
11:20:59 20       A.  Maybe no, maybe yes, depending on how
11:21:05 21   exactly the code and its flow was laid out, based on
11:21:15 22   the new construction that you would give me.
11:21:17 23       Q.  You also mentioned that there may be --
11:21:22 24   there may still be infringement in your opinion
11:21:25 25   under the doctrine of equivalence.
```

Page 344

```
11:21:27  1       A.  Yes.
11:21:27  2       Q.  Can you explain that for me?
11:21:30  3       A.  Sure.  I believe the -- the claim as -- as
11:21:46  4   described by -- the claim language as I pointed out
11:21:52  5   describes the window or view receiving event
11:22:03  6   information that it then processes to process
11:22:08  7   that -- the event of information that the --
11:22:18  8       Excuse me.  I will start over.
11:22:20  9       Q.  Okay.
11:22:35 10       A.  I believe that the -- the claim
11:22:41 11   describes -- describes an -- the use of an
11:22:51 12   event-driven, object-driven infrastructure.  And the
11:22:56 13   use of it is essentially the medium by which -- by
11:23:02 14   which scroll or gesture operations were performed.
11:23:08 15       Were this medium in this situation to be
11:23:16 16   produced using a different sort of, in some sense,
11:23:23 17   flow of logic, in the end the -- the actual
11:23:30 18   operations that would be performed, the
11:23:33 19   determination, would be all substantially
11:23:37 20   equivalent.  They would be substantially the same.
11:23:42 21       Q.  Now, did you provide that description in
11:23:46 22   your report, the one you just testified as to?
11:23:49 23       A.  I believe in my report I -- well, let me
11:23:52 24   see exactly what I said in my report.
11:25:27 25       Right.  So as I say in paragraph 333, "To
```

Page 345

```
11:25:33  1   the extent that this limitation is not met
11:25:36  2   literally, in my opinion it is met under the
11:25:37  3   doctrine of equivalents because each of the Accused
11:25:40  4   Products perform steps insubstantially different
11:25:42  5   from determining whether the event object invokes a
11:25:47  6   scroll or gesture operation by distinguishing
11:25:50  7   between a single input point applied to the
11:25:51  8   touch-sensitive display that is interpreted as the
11:25:54  9   scroll operation and two or more input points
11:25:56 10   applied to the touch-sensitive display that are
11:26:00 11   interpreted as the gesture operation, and
11:26:03 12   accomplishes the same function in the same way to
11:26:06 13   achieve the same result."
11:26:08 14       MR. BRIGGS:  Let's take a break.
11:26:09 15       THE VIDEOGRAPHER:  This marks the end of
11:26:10 16   Tape Number 1 in the deposition of Karan Singh,
11:26:15 17   Volume II.  Going off the record, the time is 11:26.
11:33:07 18       (Recess taken from 11:26 to 11:42.)
11:41:37 19       THE VIDEOGRAPHER:  This marks the
11:41:38 20   beginning of Tape Number 2 in the deposition of
11:41:42 21   Karan Singh, Volume II.  Going back on the record,
11:41:45 22   the time is 11:42.
11:41:51 23       MR. BRIGGS:  Q.  Dr. Singh, let's turn to
11:41:53 24   your rebuttal report.
11:41:55 25       A.  Yes.
```

Page 346

```
11:42:06  1       Q.  And if you turn to page 56, that's where
11:42:08  2   you begin your discussion of the '915 patent.
11:42:11  3       A.  Yes.
11:42:14  4       Q.  And you understand that Dr. Gray -- I am
11:42:18  5   sorry -- Mr. Gray has provided the opinion that the
11:42:25  6   asserted claims of the '915 patent are anticipated
11:42:32  7   by the DiamondTouch system?
11:42:35  8       A.  Mm-hmm.
11:42:37  9       Q.  And you disagree with that opinion;
11:42:38 10   correct?
11:42:39 11       A.  Yes.
11:42:40 12       Q.  So what are the reasons you disagree with
11:42:42 13   his opinion?
11:42:55 14       A.  I provided a detailed description based on
11:42:58 15   the claims.  But generally speaking the DiamondTouch
11:43:09 16   describes navigation and interaction on -- on a
11:43:16 17   touch screen display that is not integrated as the
11:43:21 18   claims of the '915 patent require, at least.
11:43:29 19       Q.  Can you describe why DiamondTouch is not
11:43:32 20   integrated?
11:43:40 21       A.  Well, it would be speculative as to why
11:43:47 22   the inventors chose that design.  But in general
11:43:52 23   it's a design that involves sort of a touch surface
11:44:09 24   that typically sort of rests on a table and that has
11:44:13 25   a display that projects information on top of it
```

16 (Pages 343 to 346)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
KARAN SINGH - 4/27/2012

Page 347

```
11:44:18  1   from above, and then people sort of interact with
11:44:23  2   that display.  So there are a number of different
11:44:31  3   components that are situated in a very different
11:44:37  4   schematic from -- from that suggested by the '915.
11:44:41  5       Q.  What components in DiamondTouch are not,
11:44:46  6   in your opinion, integrated with the main touch
11:44:50  7   display?
11:44:51  8           MR. MONACH:  Objection.  Assumes facts not
11:44:53  9   in evidence regarding the nature of the DiamondTouch
11:44:59 10   display.
11:45:06 11           THE WITNESS:  Well, the DiamondTouch has a
11:45:08 12   number of, firstly, hardware configurations.  So it
11:45:13 13   would be difficult to say exactly for which one
11:45:18 14   without knowing the specific hardware
11:45:21 15   specifications.  But in general -- generally they
11:45:25 16   all have at least a table that has an overlaid touch
11:45:40 17   sensor, and then a projector which is a separate
11:45:47 18   component that I believe by design is set up to
11:45:58 19   project onto the surface from above, and sort of, by
11:46:02 20   virtue of that, needs to be physically separate,
11:46:05 21   because you need a throw to be able to project
11:46:11 22   light, at least probably has a computer that drives
11:46:14 23   it, and maybe a mouse or a keyboard additionally.
11:46:24 24           MR. BRIGGS:  Q.  So your position is that
11:46:26 25   the DiamondTouch system is not integrated because,
```

Page 348

```
11:46:29  1   first of all, there's a separate projector, and then
11:46:37  2   possibly a separate computer?
11:46:43  3       A.  Well, particularly the touch input and
11:46:53  4   the -- and the entity responsible for the display
11:46:58  5   are disparate, at least, by design.
11:47:07  6       Q.  So in other words, the projector is not
11:47:11  7   integrated with the touch table; is that correct?
11:47:16  8       A.  That is correct.
11:47:17  9       Q.  They are two separate components?
11:47:19 10       A.  That's right.
11:47:19 11       Q.  How is the projector connected to the
11:47:25 12   table?
11:47:29 13       A.  Light.
11:47:30 14       Q.  Is there a physical connection between the
11:47:32 15   two?
11:47:33 16       A.  Between the table and the projector?
11:47:41 17   Probably not directly.  That is, it projects light.
11:47:44 18   The projector projects light onto the table.
11:47:49 19       Q.  What else does the projector do?
11:47:54 20       A.  Well, the projector is probably connected
11:47:56 21   to a computer.  And the -- and the table is also
11:48:02 22   connected to a computer.
11:48:03 23       Q.  Have you ever inspected a DiamondTouch
11:48:07 24   system in person?
11:48:15 25       A.  A specific hardware configuration of the
```

Page 349

```
11:48:17  1   DiamondTouch?
11:48:18  2       Q.  Correct.
11:48:19  3       A.  I may have seen such a system.  I have
11:48:21  4   inspected specifications of them in cited documents.
11:48:37  5       Q.  So have you ever physically been in the
11:48:38  6   same room as a DiamondTouch system, any DiamondTouch
11:48:43  7   system?
11:48:44  8       A.  I may have.
11:48:50  9       Q.  When you were preparing your report, did
11:48:52 10   you make any efforts to personally inspect a
11:48:55 11   DiamondTouch system?
11:49:01 12       A.  No, I relied on the hardware descriptions
11:49:04 13   and specifications that were provided to me in the
11:49:06 14   cited documents.  And I assumed that they were
11:49:12 15   accurate and that they were describing what the
11:49:15 16   components that the system -- how it was set up,
11:49:20 17   just like everything else that they were citing.
11:49:25 18       Q.  Did those documents that you reviewed, did
11:49:28 19   they describe how the projector -- or what the
11:49:32 20   projector was connected to?
11:49:38 21       A.  I would have to look at the papers in
11:49:41 22   detail.  But generally speaking the projector would
11:49:49 23   have been connected to some kind of computational
11:49:52 24   device that was -- that was displaying -- that was
11:49:55 25   causing the images that the projector projected to
```

Page 350

```
11:50:01  1   be displayed.
11:50:02  2       Q.  Do you know if the projector was connected
11:50:10  3   to the table?
11:50:11  4       A.  As to precisely whether the physical table
11:50:16  5   or whether the table through the computational
11:50:28  6   device, I would have to look at the specification
11:50:32  7   precisely, but I do not believe that that would
11:50:36  8   be -- that is relevant.
11:50:50  9       Q.  Why wouldn't it be obvious to one of
11:50:53 10   ordinary skill in the art to take the DiamondTouch
11:50:57 11   system and the concepts disclosed by the
11:50:59 12   DiamondTouch system and integrate it into a single
11:51:03 13   device?
11:51:10 14       A.  Well, as I can understand, given some of
11:51:12 15   the DiamondTouch techniques and the interaction
11:51:17 16   techniques, it's sort of aiming at a vision where --
11:51:25 17   where your table is really the notion of -- of --  of
11:51:33 18   tables.  As we know there are images where -- where
11:51:39 19   in -- in the various documents and systems, where
11:51:43 20   people are talking about placing coffee mugs and
11:51:49 21   cups, and so on, on the table with the additional --
11:51:56 22   with the additional use of being able to have light
11:52:02 23   from the projector projected onto them.
11:52:06 24           So in some sense the design is exploiting
11:52:09 25   and utilizing the fact that this is a projection
```

17 (Pages 347 to 350)

Page 351

```
11:52:14  1  system where the projection is coming from above and
11:52:18  2  this is the surface that you interact with.
11:52:23  3       I don't -- so for that reason I don't see
11:52:26  4  any reason for being able, or wanting, to combine
11:52:33  5  them or integrate them, because there is value in
11:52:37  6  them being -- in them being separate.
11:52:43  7       In addition, just the physicality of a
11:52:46  8  projection system requires a certain throw.  So you
11:52:49  9  would need to have somewhat of a large, yeah, large
11:52:59 10  installation.
11:53:03 11     Q.  Would it be -- would it be predictable if
11:53:06 12  you were running the application -- if you take
11:53:08 13  the -- strike that.
11:53:10 14       If you take the applications that were
11:53:11 15  running on the DiamondTouch system, such as the
11:53:14 16  Mandelbrot, DTMouse, and tablecloth applications,
11:53:21 17  and you modified them so they could run on a single
11:53:25 18  integrated touch screen device, would that be a
11:53:28 19  predictable thing to do?
11:53:31 20       MR. MONACH:  Object to the form of the
11:53:32 21  question as possibly including document error,
11:53:36 22  applications that are not in fact in the prior art
11:53:38 23  disclosures.
11:53:39 24       Further object that the question is
11:53:41 25  compound and vague and an incomplete hypothetical.
```

Page 352

```
11:53:44  1       THE WITNESS:  It might be -- it would be
11:53:52  2  easier to answer this question if you could sort of
11:53:53  3  maybe simplify the question or maybe break it down
11:53:58  4  into a few questions.
11:54:02  5       MR. BRIGGS:  Q.  Are you familiar with the
11:54:03  6  Mandelbrot application?
11:54:05  7     A.  Yes.
11:54:06  8     Q.  Is it necessary to use an overhead
11:54:09  9  projection touch screen system with the Mandelbrot
11:54:13 10  application?
11:54:14 11     A.  Well, as I recall, the Mandelbrot
11:54:18 12  application involved a very large screen display,
11:54:21 13  and it involved a table and overhead projector.  So,
11:54:26 14  I mean, it was a fairly composite application.
11:54:31 15     Q.  Why couldn't one of skill in the art use
11:54:34 16  the Mandelbrot application on an integrated touch
11:54:40 17  screen?
11:54:40 18       MR. MONACH:  Objection.  Vague and
11:54:41 19  ambiguous.  Incomplete hypothetical.
11:54:59 20       THE WITNESS:  I don't see any clear reason
11:55:02 21  for wanting to use -- use the Mandelbrot application
11:55:06 22  on an integrated touch screen display.  The program
11:55:16 23  was -- it's designed to be shown as an application
11:55:23 24  of an overhead projection device.
11:55:29 25       MR. BRIGGS:  Q.  What about the Mandelbrot
```

Page 353

```
11:55:32  1  application would limit its use to an overhead
11:55:36  2  projection device?
11:55:38  3       MR. MONACH:  Object to the form of the
11:55:39  4  question.
11:56:01  5       THE WITNESS:  Hypothetically, inasmuch as
11:56:03  6  it's a hypothetical question, you could attempt to
11:56:11  7  create such a program on an integrated touch device.
11:56:22  8  However, I -- yeah, I don't see any clear reason to
11:56:25  9  do so.
11:56:26 10       MR. BRIGGS:  Q.  So there's nothing that
11:56:27 11  would prevent one with skill in the art from
11:56:35 12  incorporating the Mandelbrot application into an
11:56:39 13  integrated touch screen device; correct?
11:56:42 14       MR. MONACH:  Objection.  Incomplete
11:56:43 15  hypothetical.
11:56:44 16       THE WITNESS:  Well, you would have to look
11:56:45 17  into the parameters of the particular Mandelbrot
11:56:48 18  application, sort of the resources that they -- that
11:56:51 19  they -- that they use, the form of display that they
11:56:55 20  apply, and see whether it would make sense to
11:57:02 21  consider such a -- consider such a transfer.
11:57:13 22       MR. BRIGGS:  Q.  Are you familiar with the
11:57:14 23  DTMouse application that ran on the DiamondTouch
11:57:17 24  system?
11:57:19 25     A.  Yes.
```

Page 354

```
11:57:19  1     Q.  Is there anything about the DTMouse
11:57:21  2  application that would limit its use to an overhead
11:57:26  3  projection device?
11:57:32  4     A.  I would have to look at the DTMouse in a
11:57:35  5  little more detail to refresh my mind as to how
11:57:44  6  exactly it operated.
11:57:45  7     Q.  How do you recall the DTMouse program
11:57:48  8  operating?
11:57:48  9     A.  Well, it provided some kind of mouse-like
11:57:52 10  functionality, but I would really need to...
11:57:58 11     Q.  What kind of mouse-like functionality did
11:58:01 12  it provide?
11:58:03 13     A.  I would need to look into my report to
11:58:06 14  provide -- to give you a good answer on that.
11:58:08 15     Q.  So sitting here right now, without looking
11:58:10 16  at your report, you can't tell me what type of
11:58:13 17  functionality DTMouse provided?
11:58:21 18     A.  Well, I have definitely reviewed it.  I
11:58:26 19  would just like to refresh -- I would need to
11:58:29 20  refresh my mind on it.  I have been through, and I
11:58:32 21  have looked at a fairly large volume of material
11:58:42 22  over the course of this.
11:58:43 23     Q.  Are you familiar with the tablecloth
11:58:45 24  application that ran on the DiamondTouch systems?
11:58:47 25     A.  Yes.
```