# EXHIBIT 7

**SUBJECT TO PROTECTIVE ORDER -- HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC., a California corporation, | |
| Plaintiff, | |
| vs. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | Civil Action No. 11-CV-01846-LHK |
| Counterclaim-Plaintiffs, | |
| v. | |
| APPLE INC., a California corporation, | |
| Counterclaim-Defendant. | |

# Expert Report of Dr. Janusz A. Ordover

## March 22, 2012

SUBJECT TO PROTECTIVE ORDER --  HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY

environment that promotes investment and innovation in products that comply with the standard.

57.     SSO rules that guard against opportunistic behavior usually address the timely disclosure of intellectual property rights that are relevant to a standard and the licensing terms for patented technologies that are declared essential to a standard.  I discuss here the particular policies of ETSI, since I understand those govern Samsung's conduct in this matter.

### 1.     *ETSI's IPR Policy Regarding Timely Disclosure*

58.     ETSI's IPR policy requires that members disclose in a "timely fashion" any intellectual property rights they hold that might be essential for the practice of a standard:

> Each MEMBER shall use its reasonable endeavours to timely inform ETSI of ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a technical proposal for a STANDARD shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.[51]

As the policy makes clear, when an ETSI member proposes or sponsors a technical solution (as I understand Samsung did here), it has an especially exacting duty to disclose any of its intellectual property rights that might be essential before the proposal is adopted.[52]

59.     When fully adhered to, timely disclosure ameliorates the risks of standards implementers being surprised by patent claims, and conveys valuable information to SSO members regarding which firms may be seeking patent licenses and for what technologies.  Importantly, timely disclosure also allows SSO members to make informed

---

[51]     *ETSI IPR Policy*, § 4.1.

[52]     I understand that ETSI's policy does not require a company to conduct an IPR search, but rather to employ "reasonable endeavours" to inform ETSI of relevant IPR.  (*ETSI IPR Policy*, § 4.2.)

**SUBJECT TO PROTECTIVE ORDER -- HIGHLY CONFIDENTIAL**
**ATTORNEY'S EYES ONLY**

decisions in choosing among alternative technologies to perform a function that has been proposed for inclusion in a standard, or in determining whether to include that function in the standard at all.  For example, members of the standard-setting committee may have assessed the suitability of a particular technology for inclusion in the standard differently had they known that the sponsor of the technology proposal had a direct interest in the proposal in the form of the patent (actual or pending), as opposed to having only an interest in sponsoring "the best" possible technology.  Put another way, if the committee is made aware that the sponsoring member claims to have a patent or patent application covering the technology proposal, it may consider more intensively the known alternatives, search for and develop new alternatives, or consider more fully the importance to the standard of the functionality that the technology would perform.

### 2.     *ETSI's IPR Policy Regarding FRAND Licensing*

60.     In addition to requiring that SSO participants disclose their relevant IPR "during the development of a standard," ETSI's IPR Policy also requires that the SSO request that members that have patents that are potentially essential for the practice of a standard promise to license those patents on FRAND terms and conditions to anyone practicing the standard:

> When an ESSENTIAL IPR relating to a particular STANDARD is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory [FRAND] terms and conditions under such IPR…The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.[53]

---

[53]     *ETSI IPR Policy*, § 6.1.

**SUBJECT TO PROTECTIVE ORDER -- HIGHLY CONFIDENTIAL**
**ATTORNEY'S EYES ONLY**

market need not be perfect substitutes for each other.  However, they need to be good enough substitutes so that they would be considered as reasonably interchangeable by the members of the SSO for inclusion in the standard.

82.     As a final point, I want to emphasize that the market definition step is not an end in itself.  Rather, it provides a useful starting point for the assessment of the competitive constraints operating on a firm (or a group of firms).  In the instant case, the relevance of this step to the competitive assessment of Samsung's conduct is further reduced by virtue of the fact that once Samsung's (or any firm's) IP has turned into a declared SEP, the set of *ex post* constraints generally shrinks to zero.

83.     In defining the technology markets implicated in this litigation, I fully rely on Apple's technical experts for my description of the technology and the alternatives available before the standard was set. I profess no technical or other expertise that would enable me to independently assess the experts' findings.  I summarize them here for the sake of completeness.

### 1.     Scrambling Code Technology

84.     A handset or other wireless device that communicates using cellular technology may simultaneously receive signals from multiple base stations as well as multiple signals from a single base station, and must have a way of distinguishing these signals from one another.  Cellular systems use scrambling code technology to achieve that objective.[70]

85.     Samsung's declared standard-essential '867 patent proposes a particular technique for generating and utilizing scrambling codes.  One alternative for generating the set of primary and secondary codes would have been a proposal submitted by Ericsson to TSG-

---

[70]     Expert Report of Dr. Wayne Stark Regarding Invalidity of U.S. Patent No. 7,362,867, *Apple Inc. v. Samsung Electronics Co., Ltd., et al.*, Civil Action No. 11-CV-01846-LHK, March 22, 2012 (hereinafter, *Stark '867 Expert Report*),§ IX.A.

**SUBJECT TO PROTECTIVE ORDER -- HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY**

97.     Samsung's declared standard-essential patent '792 proposes a particular technique for interleaving that uses two interleavers.  Professor Gitlin describes several alternatives that the Working Group could have implemented instead of the Samsung method; these alternatives would have been equivalent in terms of ease of implement and performance.[81]

98.     The UMTS standard for interleaving was adopted by 3GPP in June 2002.  Prior to the setting of the standard, the market for interleaving technologies comprised Samsung's technology embodied in the '792 patent, the alternatives described by Professor Gitlin, and any other reasonable alternatives that could have been implemented at a similar cost.

                    6.     *Power Control Scaling Technology*

99.     To avoid causing interference with other networks or devices, wireless communications devices have maximum power thresholds that they cannot exceed. Power control technology allows a network to control the power level of devices so that they stay below a maximum power threshold across all the voice and data channels over which a device transmits information.  Power control scaling refers to further reductions by a device to stay below a threshold.[82]

100.    Samsung's declared standard-essential patent '516 proposes a particular technique for power control scaling that reduces power on just one type of channel to stay under the threshold, rather than reducing power across all channels equally.  Dr. Kim has identified at least two alternative techniques that could have been implemented by the Working Group, neither of which would have added any complexity to the standard.[83]

---

[80]    *Gitlin '604 and '792 Expert Report*, §§ VIII.B and IX.H.2.

[81]    *Gitlin '604 and '792 Expert Report*, § XXI.

[82]    Expert Report of Dr. Hyong S. Kim Regarding Invalidity of U.S. Patent No. 7,447,516, *Apple Inc. v. Samsung Electronics Co., Ltd., et al.*, Civil Action No. 11-CV-01846-LHK, March 22, 2012 (hereinafter, *Kim '516 Expert Report*), § VI.B.

[83]    *Kim '516 Expert Report*, §XI.

SUBJECT TO PROTECTIVE ORDER --  HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY

101.    The UMTS standard for power control scaling was adopted by 3GPP in June 2005.  Prior to the setting of the standard, the market for power control technologies comprised Samsung's technology embodied in the '516 patent, the alternative technologies described by Dr. Kim, and any other reasonable alternatives that could have been implemented at a similar cost.

### 7.    Voice-over-Internet-Protocol (VOIP) Header Technology

102.    Blocks or frames of data may be broken into smaller pieces for transmission and then must be reassembled.  The header portion of the transmission contains certain information used in understanding the content of the transmission and in reassembling the pieces.  VoIP Header Technology allows a network to treat the header information for VoIP transmissions differently from the header information of other types of transmissions in order to improve the handling of VoIP transmissions.[84]

103.    Samsung's declared standard-essential patent '941 proposes a particular technique for handling VoIP headers.  Dr. Knightly concludes that there would have been alternatives to using the Samsung technology, including the option of leaving the feature out altogether, which would have reduced the complexity of the standard.[85]

104.    The VoIP Header standard was adopted by 3GPP in June 2005.  Prior to the setting of the standard, the market for header technologies comprised Samsung's technology embodied in the '941 patent, the alternatives described by Dr. Knightly (including omitting the feature), and any other reasonable alternatives that could have been implemented at a similar cost.

---

[84]    Expert Report of Dr. Edward W.  Knightly Regarding U.S. Patent No. 7,675,941, *Apple Inc. v. Samsung Electronics Co., Ltd., et al.*, Civil Action No. 11-CV-01846-LHK, March 22, 2012 (hereinafter, *Knightly '941 Expert Report*), § V.

[85]    *Knightly '941 Opening Report*, § VIII.

**SUBJECT TO PROTECTIVE ORDER --  HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY**

injunctive relief, also has the potential to impose anticompetitive harm on downstream consumers through the elevation of prices, the dampening of incentives to innovate, and the deterrence of entry.  Samsung's behavior also has harmed Apple already through the imposition of litigation costs, and has the potential to harm Apple and other UMTS implementers in the future.

March 22, 2012

_____                        _____

Janusz A. Ordover                                                                Date