# EXHIBIT 11

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>      Plaintiff,<br><br>  v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>      Defendants.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>      Counterclaim-Plaintiffs,<br><br>  v.<br><br>APPLE INC., a California corporation,<br><br>Counterclaim-Defendant. | Civil Action No. 11-CV-01846-LHK<br><br>**EXPERT REPORT OF PETER ROSSI** |

**SUBJECT TO PROTECTIVE ORDER**

**CONFIDENTIAL**

4's.  Any respondent who used the definition of the features as indicated by Dr. Sukumar's abbreviations in the actual survey has misunderstood the questions in the survey.  The only way to gauge whether respondents understand the survey is to take them through the survey and ask them to explain, in their own words, how they interpret the questions.  Survey respondents are likely to have misunderstood the survey and not be aware of their misunderstandings.

According to Dr. Sukumar, none of the 75 pre-test respondents found any aspect of the feature descriptions confusing.  Dr. Sukumar supplied audio files with responses to the one pre-testing inquiry. At least one of the files (iPad pretest file prA0088.wma) indicates that one of the respondents did find the survey confusing (the respondent says that he got "jumbled up" by the questionnaire) even though Dr. Sukumar states that all pre-test respondents were not confused.  In my experience with pre-testing, it is unheard of that all pre-test respondents were completely comfortable with the questionnaire.  All surveys that I have been involved with or I have learned the details regarding pre-testing were altered and improved in response to the pre-testing exercise.

Dr. Sukumar did not perform a rigorous pre-test procedure so it is impossible to determine if respondents were indeed confused or if they misunderstood the feature descriptions used in the questionnaire.  In point of fact, Dr. Sukumar's procedure cannot determine if his respondents "understood" feature descriptions as he claims in his report.

*Usage Measurement*

Dr. Sukumar measures usage by asking respondents "[h]ave you used" the feature.  (*See, e.g.,* Exhibit G to Sukumar report, p. 31.)  There is no measurement of frequency or recency.  For example, consider an iPhone user who has used the "photo gallery bookmark" feature only once during the first week of phone ownership while he/she was exploring the phone's functionality.  Another user might use this feature on a much more regular and continuing basis.  Responses to the usage question are relied upon directly in Mr. O'Brien's damage analysis.  (*See* Expert Report of Vincent E. O'Brien (the "O'Brien report"), p. 20.)  In order to provide a basis or input into an economic analysis of the profits achieved by patent infringement, the feature must be valued.  That is, Dr. Sukumar's survey must be designed to measure how the allegedly infringing feature enhances the market value of the device.  Usage as measured by Dr. Sukumar is simply not relevant to the market value of the patented feature.  Even if everyone used the feature, its market value might be very low.  Only if no one ever used the feature would the Sukumar-style usage question be of value for a damages analysis.

**Time for Completion of the Survey**

It is important that survey respondents devote enough effort to produce meaningful responses.  This is particularly important in situations where a financial incentive is offered to induce respondents to participate in the survey and complete the questionnaire.  Typically, the financial incentive is not paid until the survey is completed.  This means that, unless the survey was pretested carefully, there can be the danger that respondents

rush through the survey simply to collect the incentive in the minimal length of time. This is why it is important to measure the time to completion of the survey and ensure that this is adequate for a thoughtful response.

The Sukumar survey involves complicated and lengthy instructions as well as complex descriptions of features alleged to be enabled by patents. These features, at least in some cases, require lengthy sentences to describe and involve uses of devices features only under certain conditions. For example, it is important that respondents understand what the "window dividing" feature is and that it involves a specific use of texting in conjunction with other phone functions. For this reason, it is important that respondents devote time to a careful reading of the survey instructions and the feature descriptions. By Dr. Sukumar's own estimation, his survey should have taken more than 20 minutes to complete (at question 12 in the questionnaire, his survey instructions explain that the remainder of the survey should take about 20 minutes to complete). (Exhibit G to Sukumar report, p. 30.)

Many respondents devoted minimal time to completing the survey. The median time to completion for the iPhone, iPad, and iPod surveys are all 6 minutes or less. (*See* 5004_Raw_Data.xls.) More than 25 percent of the respondents took four minutes or less to complete the survey. (*Id.*) In my own estimation, it is impossible to even read the screens for the survey in less than 5-10 minutes, much less spend time to comprehend each screen and respond thoughtfully. The survey consists of 36 screens that means that respondents, on average, are spending 10 seconds or less per screen.

The conjoint screens (Exhibit G to Sukumar report, pp. 34-45) are dense with text and long sentences. It is critical that respondents take the time to read the entire array of text and process the information as well as to make a choice between the three options presented. A respondent who spends less than 3 or 4 minutes on the survey simply does not have time to even read these screens.

**5. Conjoint Analysis**

Although Mr. O'Brien does not rely on anything else but the usage questions in his damages analysis, Dr. Sukumar uses a conjoint study to value some of the patent features. (*See* Sukumar report, p. 4.)

Just as the measure of feature usage is only useful if the feature is understood and usage is properly defined, the conjoint analysis requires that features be precisely defined and understood.

In the case of Dr. Sukumar's conjoint survey, the feature descriptions are not precise and, in the case of the '460 and '893 patents, do not correspond to what Samsung has identified to be the patented features. It would have been a simple matter to illustrate what the feature allegedly enables by providing a video demonstration instead of the long and confusing descriptions provided in the survey. In the case of the conjoint exercise,

this results in a very confusing conjoint choice task screen. (*See, e.g.,* Exhibit G to Sukumar report, p. 34.) At the left margin of the screen, confusing and misleading abbreviations are used for the features. (*Id.*) In the body of the choice task table, the levels of each feature are described with long and confusing sentences. (*Id.*)

For example, the "photo gallery" feature is associated with two levels: "[a]bility to return to the photo gallery at the same place that you left off only within a certain period of time"; and "[a]bility to return to the photo gallery at the same place that you left off any time (sic)." (*Id.*) These are long and confusing sentences but they do not precisely specify the possible values of the "photo gallery bookmark" attribute. A "certain period of time" is not specified. If it were a day or a week, most iPhone users would regard this as functionally equivalent to "anytime." However, if a "certain period of time" is to be interpreted as 10 seconds, then there might be some difference. In conjoint analysis, it is imperative that the levels and attributes be precisely and meaningfully specified. Moreover, this conjoint analysis does not test the value of the "photo gallery bookmark" feature but only compares the feature to a diminished feature. The same is true for the "music in the background" feature which now has a strange new addition as a "slightly larger or thicker phone or consumes battery power faster." (*See, e.g., id.*) Again, what "faster" or "larger" means is left unspecified. In my opinion, respondents could not meaningfully evaluate these two alternative values, and the results of the survey can not be utilized to provide any meaningful information about the value of the patented feature. For a conjoint analysis to be valid, at least one of the choices must exclude the claimed feature. In Dr. Sukumar's conjoint design for the "photo gallery bookmark" and "music in the background" feature, he introduces "diminished" values for the feature that do not tie to something disclosed in the patent or discussed with an expert. These descriptions lack a sufficient basis in Samsung's claimed invention and the alternatives to the patented invention to permit a meaningful measure of the value of the claimed technology.

The conjoint analysis conducted by Dr. Sukumar only considers attributes or features that he has been instructed by counsel are related to the patents-in-suit. This means that many of the important attributes of a smartphone or smart device are left out of the survey. The fact that only features related to the patents are used calls out these features to survey respondents and can result in respondents attaching more importance to the features than in a more realistic conjoint study in which other features are present. Thus, conjoint studies must include features beyond those allegedly claimed in the patents. Dr. Sukumar's efforts to address this problem by telling the respondents that they are "going to **purchase** an iPhone 4 [or iPad 2 or iPod touch]" and to "assume that all other features of the iPhone 4 [or iPad 2 or iPod touch] not shown to you are the same" are inadequate to permit a valid analysis. (See, e.g., Exhibit G to Sukumar report, pp. 34, 55, 76.) In my view, Dr. Sukumar's construct likely resulted in confusion. It is difficult to predict how the respondents interpreted the exercise where different versions of the same product (iPhone 4) are presented. This is contrary to the fact in the marketplace that (other than color and memory) all iPhone 4 (UMTS version) products are identical in all functionality. What Dr. Sukumar should have done is to explain to the respondents that the products presented are hypothetical variations on an existing product. This was not done. What the study signals very clearly to respondents is that, for some reason, the

iPad, or iPod touch) and does not consider competition or cost factors. That is, Dr. Sukumar assumes that Apple is a monopolist instead of one firm in a highly competitive market with other products such as products made by RIM, Motorola, Samsung and HTC.

Dr. Sukumar's MVAI calculations are simply not relevant to the market value of any of the features considered. The "MVAI" calculations sponsored by Dr. Sukumar must be higher than the true market value as they are based on the willingness to pay of the average consumer and do not take into consideration costs and competition.

**6. Trial Exhibits**

I may rely on audio or visual aids and demonstrative exhibits that demonstrate the bases of my opinions. These materials may include, for example, recordings of pre-test calls with the Sukumar survey respondents, slides comparing the feature descriptions utilized by Dr. Sukumar with the description of the patented invention as alleged by Samsungs or showing the Sukumar survey screen shots, as well as charts, diagrams, videos and animated or computer-generated video.

Other than as referred to in this report, I have not yet prepared any exhibits for use at trial as a summary or support for the opinions expressed in this report, but I expect to do so in accordance with the Court's scheduling order.

**7. Supplementation of Opinion**

I reserve the right to supplement my opinions after I have and the opportunity to review expert reports or other materials from Samsung or other additional documents or materials that are brought to my attention.

_____
Peter E. Rossi

Date: April 16, 2012

- 11 -